# EXHIBIT 1

In early 2001, the US Environmental Protection Agency is expected to adopt a secondary maximum contaminant level (SMCL) for methyl tertiary butyl ether (MTBE) in drinking water. This article presents the first and only consumer study to determine the odor threshold of MTBE in drinking water. A protocol, based on the American Society for Testing and Materials method E679-91, was augmented to address concerns raised by interested stakeholders. The study, which was conducted according to the final odor threshold protocol, used a panel of 57 consumers and yielded an odor threshold for MTBE in drinking water of 15 µg/L. The 15 µg/L threshold is the geometric mean of the individual thresholds for each of the 57 consumers. This consumer panel threshold is consistent with the trained panel thresholds reported from five other taste and/or odor studies, which ranged from 13.5 to 45.5 µg/L. Consequently, the authors recommend using the methodology presented in this article as the scientific basis for establishing the federal SMCL for MTBE and other organic chemicals in drinking water.

BY ANDREW J. STOCKING
IRWIN H. SUFFET
MICHAEL J. MCGUIRE
MICHAEL C. KAVANAUGH

# Implications of an MTBE odor study for setting drinking water standards

Methyl tertiary butyl ether (MTBE) has been used as a gasoline additive in increasing volume percentages since its introduction in 1979, when it was < 3% by volume. By 1998, MTBE was added to approximately 30% of the gasoline sold in the United States at approximately 11 to 15% by volume (USEPA, 1998). As a result of this widespread usage of MTBE and because of its unique physiochemical properties, it has been detected in some drinking water wells in areas with leaking underground storage tanks (Gullick & LeChevallier, 2000; Moran et al, 1999). Consequently, setting protective drinking water standards for MTBE has become an issue for regulatory agencies in federal and state governments.

As of January 2001, the US Environmental Protection Agency (USEPA) had not yet set any drinking water standards for MTBE. However, USEPA did issue an

©2001 American Water Works Association

AMWA-MDL-002498

NYC-LAWLESS-000146

advisory in December 1997 to provide guidance to communities whose water supplies had been affected by MTBE. The advisory recommended that "keeping the concentrations [of MTBE] in the range of 20 to 40 µg/L or below will likely avert unpleasant taste and odor effects" (USEPA, 1997), which suggests that MTBE is considered more of a taste and odor concern than a health concern. Currently, USEPA is considering the development of a formal secondary maximum contaminant level (SMCL) for MTBE; it is expected to be adopted in early 2001. The establishment of an SMCL for MTBE would represent the first time that USEPA has developed an SMCL based on taste and odor for a specific synthetic organic chemical.

METHYL TERTIARY BUTYL ETHER CONCENTRATIONS IN SAMPLES USED FOR THE ODOR TEST

2 µg/L
3.5 µg/L
6 µg/L
10 µg/L
18 µg/L
30 µg/L
60 µg/L
100 µg/L

The concentrations were calculated using a 1.75 step factor: Concentration = 100 µg/L ÷ $1.75^{(8-n)}$, in which $n$ is the dilution number.

At the state government level, several states, including Maine, California, New Hampshire, and New Jersey, have set primary MCLs for MTBE. Maine and New Jersey have set MTBE MCLs of 35 and 70 µg/L, respectively, whereas in May 2000, California and New Hampshire adopted MCLs of 13 µg/L. All of these standards are based on protection of human health and not on aesthetic concerns. California is unique in setting an SMCL for MTBE based on the organoleptic characteristics of MTBE in water; it was adopted Jan. 7, 1999, at 5 µg/L. In contrast to the SMCLs of all other states, SMCLs in California are enforceable standards. The technical foundation for the California SMCL for MTBE was derived from (1) an estimation of the first concentration that could not be detected by any members of a testing panel (Young et al, 1996) and (2) the lowest concentration detected by any panelist in a study (Shen et al, 1998) that would not be subject to background laboratory MTBE interference during analytical measurement. This SMCL represented California's second attempt to establish an SMCL for a single organic compound. However, as the final statement of reasons for the MTBE SMCL illustrates, there is disagreement regarding the interpretation and application of these previous studies as they relate to drinking water standard-setting (Title 22 CCR, 1999).

## SCOPE AND OBJECTIVE

Since 1996, five independent studies have been completed to determine the taste and odor thresholds for MTBE in drinking water (Shen et al, 1998; Dale et al, 1997; Young et al, 1996; API, 1994; ARCO, 1993). Each of these studies used trained, expert panelists to elicit the threshold value for MTBE in drinking water. In light of the regulatory developments in California and elsewhere early in 1998, representatives of the regulatory and industrial communities believed that additional taste and/or odor data for MTBE should be developed using an untrained consumer panel—a group that was believed to reflect public sensitivities more accurately. To augment the five existing taste and odor studies, the Oxygenated Fuels Association commissioned a private consulting firm* to organize a consumer taste and/or odor study with a large sample population. Of critical importance in this process was the development of a methodology that would serve as a solid foundation for collecting threshold data that could be used to support an SMCL and also serve as a precedent for establishing future SMCLs for other organic chemicals.

The study's methodology, its results, and a discussion of the implications of these results for setting an SMCL for MTBE are presented here. The results and conclusions of this article are intended to be generally applicable; however, much of the discussion addresses the California experience in establishing SMCLs.

## SMCL REGULATORY AUTHORITY AND GUIDANCE

In accordance with the Safe Drinking Water Act (SDWA) of 1974, as amended in 1986 and 1996, the US Congress directed USEPA to develop and enforce primary, health-risk based standards, or MCLs (USEPA, 1996). Under the SDWA, each state is given the option to (1) adopt the federal standards or (2) develop more stringent standards. Each state may also either (1) allow the federal government to retain enforcement responsibility or (2) take on the responsibility of enforcement from the federal government. Most states have chosen to locally enforce the federal standards.

In addition to primary MCLs, the SDWA required the federal government to establish aesthetic-based SMCLs for organic and inorganic chemicals in water. Again, most states have chosen to adopt the federal secondary standards; however, because of the aesthetic-based nature of these standards, they generally are not enforced by the federal or state governments. Thus, states neither require frequent monitoring for these chemicals nor do they levy

*Malcolm Pirnie Inc., Oakland, Calif.

©2001 American Water Works Association

TABLE 1 Federal secondary maximum contaminant levels

| Regulated Constituent | Concentration/Level |
|---|---|
| Aluminum | 0.05–0.2 mg/L |
| Chloride | 250 mg/L |
| Color | 15 color units |
| Copper | 1 mg/L |
| Corrosivity | Noncorrosive |
| Fluoride | 2 mg/L |
| Foaming agents | 0.5 mg/L |
| Iron | 0.3 mg/L |
| Manganese | 0.05 mg/L |
| Odor | 3 TON* units |
| pH | 6.5–8.5 |
| Silver | 0.1 mg/L |
| Sulfate | 250 mg/L |
| Total dissolved solids | 500 mg/L |
| Zinc | 5 mg/L |

*TON—Threshold odor number

fines or take legal action when secondary standards are exceeded. In contrast, the California statute that addresses drinking water declares: "It is the intent of the Legislature to improve laws governing drinking water quality, to improve upon the minimum requirements of the federal Safe Drinking Water Act Amendments of 1996,..." (CHSC, 2000). Thus, California is one of the few states to establish several primary standards that are more stringent than corresponding federal standards, and it is the only state to enforce all secondary standards.

The SDWA provides several rules that must be followed when primary and secondary drinking water MCLs are established. Primary MCLs are based on protecting the population from exposure to individual chemicals and on chemical-specific health risk levels. These standards must conform to several sections of the SDWA, namely those titled Use of Science in Decision Making, Health Risk Reduction and Cost Analysis, Feasibility, and Subpopulations at Greater Risk (USEPA, 1996). The collective intent of these sections is to ensure that primary standards are scientifically supported, protective of the population, and technically and financially feasible.

However, the development and implementation of SMCLs is only vaguely described in federal regulatory language. Under the SDWA, a secondary drinking water standard is applied to any contaminant in drinking water that

> may adversely affect the odor or appearance of such water and consequently may cause a substantial number of the persons served by the public water system providing such water to discontinue its use or may otherwise adversely affect the public welfare (USEPA, 1996).

The SDWA follows these criteria by noting "Such regulations may vary according to geographic and other circumstances" (USEPA, 1996). Thus, because of a lack of specific regulatory guidance for setting SMCLs (aside from the previous excerpts), states have significant latitude when establishing SMCLs.

On the basis of this guidance, USEPA has set many SMCLs for a variety of taste-, odor-, and color-causing constituents in drinking water since 1974 (Table 1). These regulated constituents are primarily inorganic chemicals (such as aluminum, iron, manganese) and general characteristics of water (such as color, corrosivity, and odor), but the list does not currently include any individual organic chemicals. Currently, taste and odor in water from organic and inorganic sources are regulated federally and at the state level through use of the threshold odor number (TON), which is designed to represent the minimum number of sample dilutions required to achieve a detectable taste or odor in water. By definition, a TON of 1 indicates that if a sample is diluted at all, the sample has no detectable odor to a trained assessor (*Standard Methods*, 1995). If a sample is assigned a TON of 3, for example, it indicates that the sample must be diluted to three times its initial volume to reach the lowest detectable concentration by a trained assessor. However, the TON method cannot guarantee an aesthetically acceptable water quality in many situations, especially those in which earthy, musty odors are present (McGuire et al, 1984). Thus, other methods such as the flavor profile analysis (FPA) were developed to protect consumers from taste and odor problems (Krasner et al, 1983).

## BACKGROUND OF TASTE AND ODOR TESTING PROCEDURES

Taste and odor evaluation and quantification are continuing to evolve as an applied science (Suffet et al, 1999). The American Society for Testing and Materials (ASTM) and the American Public Health Association have developed procedures and practices that specify standardized applications of sensory methods. The methods use panelists as measuring devices, which is analogous to the use of analytical instruments to quantify the concentration of specific chemicals. Taste and odor threshold concentrations for specific compounds in water are set using a threshold test as outlined in method 2150 for odor and method 2160 for taste (*Standard Methods*, 1995), as well as method E679-91 for odor (ASTM, E679-91).

The development of a taste and odor testing panel is fundamental to each of these methods because of the differences in individual sensitivity to compounds causing taste and odor problems. There are two types of panels for determining taste and odor thresholds—expert (or trained) panels and consumer panels. Expert panelists are people who have an increased sensitivity to odor. Although this may be desirable for regular monitoring for odorous substances in drinking water before the water is treated or distributed, it may skew the results of an odor threshold determination

©2001 American Water Works Association

**TABLE 2** Summary of taste and odor results*

| Study | Type of Test | Temperature | Type of Water | Number of Panelists | Geometric Mean µg/L | Range µg/L |
|---|---|---|---|---|---|---|
| Shen et al, 1998 (paired comparison with known blank) | Odor | 20°C | Odor-free | 5† | 13.5 | 2.5–100 |
| | Odor | 20°C | Odor-free | 5 | 15.6 | 2.5–100 |
| | Odor | 20°C | Odor-free | 5 | 40.3 | 15–100 |
| | Odor | 20°C | Odor-free | 5 | 22.6 | 5–100 |
| | Odor | 20°C | Tap water | 9 | 33.9 | 2.5–150 |
| | Odor | 20°C | Tap water | 8 | 13.5 | 2.5–100 |
| | Odor | 20°C | Water with free Cl | 7 | 43.5 | 15–150 |
| | Odor | 20°C | Water with free Cl | 6 | 31.3 | 5–100 |
| | Odor | 40°C | Odor-free | 5 | 35.3 | 15–150 |
| | Odor | 40°C | Odor-free | 5 | 28.5 | 5–100 |
| | Odor | 40°C | Tap water | 8 | 17.4 | 15–50 |
| | Odor | 40°C | Water with free Cl | 7 | 20.9 | 2.5–50 |
| | Odor | 60°C | Odor-free | 5 | 15.8 | 5.0–50 |
| | Odor | 60°C | Odor-free | 5 | 45.4 | 2.5–100 |
| Young et al, 1996 (paired comparison test) | Odor | 40°C | Tap water | 7 | 34 | Min = 15 |
| | Taste | 25°C | Tap water | 5 | 48 | Min = 40 |

| Study | Type of Test | Temperature | Type of Water | Number of Panelists | 60% Probability of Correct Detection‡ | Range µg/L |
|---|---|---|---|---|---|---|
| Dale et al, 1997 (triangle test) | Taste | 25°C | Odor-free | 9 | 24–37 | NA§ |
| | Taste | 25°C | Colorado River water | 9 | 24–58 | NA |
| | Odor | 26°C | Odor-free | 9 | 43–71 | NA |

| Study | Type of Test | Temperature | Type of Water | Number of Panelists | Arithmetic Average of Linear Regression µg/L | Recognition Range µg/L |
|---|---|---|---|---|---|---|
| ARCO, 1993 (triangle test) | Odor | 25°C | Odor-free | 6 | Detection = 95<br>Recognition = 174 | 106–774 |
| | Odor | 25°C | Odor-free | 6 | Detection = 95<br>Recognition = 212 | 106–774 |
| | Taste | 25°C | Odor-free | 6 | Detection = 149 | 106–774 |
| | Taste | 25°C | Odor-free | 6 | Detection = 118 | 106–774 |
| API, 1994 (triangle test) | Odor | 25°C | Odor-free | 7 | Detection = 48<br>Recognition = 65 | 46–740 |
| | Odor | 25°C | Odor-free | 7 | Detection = 41<br>Recognition = 44 | 46–370 |
| | Taste | 25°C | Odor-free | 7 | Detection = 39 | 46–370 |
| | Taste | 25°C | Odor-free | 7 | Detection = 39 | 23–370 |

*This table includes results from each of the tests in which there were four or more panelists. The number of panelists in the Shen et al study has been estimated based on available information. This table does not contain results from the flavor profile analysis conducted by Dale et al (1997) because these results are not directly comparable to threshold results.
†Initially, 8 to 10 panelists were used during each session, but many of these panelists were not used to determine the geometric mean because of detection anomalies.
‡One standard deviation range
§NA—not applicable

study toward overrepresenting the more sensitive portion of the population. However, expert panelists are capable of characterizing and describing odors and thus should not be expected to guess whether a taste or an odor is present.

Alternatively, a consumer (untrained) panelist is only capable of determining whether multiple samples are different and is often required to guess which one of the samples is different. For example, in a forced-choice triangle test, such as that described by ASTM E679-91, a consumer panelist is forced to identify the different sample, even if he or she cannot detect a taste or an odor. The risk of false-positives is thus higher for a consumer

©2001 American Water Works Association

AMWA-MDL-002501

NYC-LAWLESS-000149



Sample solutions of 4 oz each were presented to the panelists in disposable 7-oz plastic cups that were determined by a consumer testing laboratory to be odor-free. Plastic cups were used instead of glass containers because glass containers often retain residual odors.

panel than it would be for a trained panel. The consumer panel test is designed to determine the detection threshold—the threshold at which a consumer can detect a difference but cannot identify or characterize that difference. Regardless of the type of panel, it is important that the selected panelists be diverse in terms of age, gender, and ethnicity, as each of these factors can affect sensory perceptions.

Most odor studies use expert, trained panelists because of their familiarity with taste and odor testing protocol and the benefit that fewer panelists are necessary to determine a threshold. *Standard Methods* states that "when the results must represent the population as a whole or when great precision is desired [it is recommended that expert panels contain] not less than five persons, and preferably ten or more" (*Standard Methods*, 1995). As this statement implies, statistical analysis of the results from taste and odor studies is a complex issue, and it is particularly dependent on panel size and composition. Typically, threshold standards for various chemicals are determined using the geometric mean of the taste and odor thresholds from panelists' results—in which case, a panel of 8 to 10 trained panelists is usually sufficient (Mallevialle & Suffet, 1987; *Standard Methods*, 1995).

However, if an untrained consumer panel is used, additional panelists are needed to achieve scientifically valid results because of the likelihood of a much larger variability in each consumer's sensitivity (Mallevialle & Suffet, 1987). As more panelists are added, an individual panelist's results become less important, and there is a larger numeric confidence that the panelists' combined results are representative of some larger population under similar testing conditions. To statistically represent an even larger population, such as that of California, with any significant level of confidence is even more difficult because a panel must be formed that is statistically representative of the entire state. Studies often attempt to circumvent this problem (and protect a larger percentage of the population) by choosing a panel that is more sensitive to the chemical of concern, which in turn elicits a lower taste or odor threshold value. If a panel consists of the most sensitive individuals within a population, then the taste or odor threshold value gives an estimate of the absolute minimum concentration detectable to the population.

The remainder of this article will focus specifically on the odor threshold study completed for MTBE and policy implications of that study.

**In light of the regulatory developments in California and elsewhere early in 1998, representatives of the regulatory and industrial communities believed that additional taste and/or odor data for MTBE should be developed using an untrained consumer panel—a group that was believed to reflect public sensitivities more accurately.**

## PREVIOUS TASTE AND/OR ODOR STUDIES FOR MTBE

At least five taste and/or odor studies for MTBE in water have been completed (Shen et al, 1998; Dale et al, 1997; Young et al, 1996; API, 1994; ARCO, 1993). Each of these studies relied on published taste and odor standard methods as a basis for determining threshold detection values for MTBE (Table 2). Each of these studies used expert panelists to describe the odor associated with MTBE in water. The most frequently used descriptors to characterize the odor of MTBE were "sweet solvent" (Dale et al, 1997) and "estery, vanilla, and sweet" (Young et al, 1996). However, at concentrations > 20 µg/L, the descriptor "solvent" was used more frequently, and it was characterized at an increasingly greater intensity (Dale et al, 1997). The API (1994) and ARCO (1993) studies determined both detection thresholds (39–48 and 95–149 µg/L, respectively) and recognition thresholds (44–65 and 174–212 µg/L, respectively) for MTBE. The difference between a detection threshold and a recognition

©2001 American Water Works Association

**TABLE 3** Consumer panel breakdown

| Gender (57 total) | | Age (57 total) | | |
|---|---|---|---|---|
| Male *number (%)* | Female *number (%)* | 18–29 *number (%)* | 30–49 *number (%)* | 50–65 *number (%)* |
| 28 (49) | 29 (51) | 17 (30) | 18 (32) | 22 (38) |

**TABLE 4** Consumer testing laboratory* quality control results

| Target Concentration *μg/L* | Measured Concentration *μg/L* | | | | |
|---|---|---|---|---|---|
| | Session 1† | Session 2 | Session 3 | Session 4 | Session 5 |
| Blank | ND‡ | ND | ND | ND | ND |
| 2.0 | 1.7 | 2.6 | 1.1 (1.0, 1.2)§ | 1.5 | 2.2 |
| 3.5 | 4.4 (6.1, 2.7)§ | 4.5 | 3.6 | 3.7 | 3.5 |
| 6 | 8.3 | 8.3 (10.2, 6.5)§ | 6.1 | 6.7 | 4.2 |
| 10 | 13.3 | 16.7 (17.4, 15.9)§ | 12.4 | 11.4 | 8.2 |
| 18 | 20.3 | 18.9 | 18 | 22.0 | 15.3 |
| 30 | 33.0 | 29.7 | 27.1 | 25.4 | 32.0 |
| 60 | 57.1 | 54.2 | 63.6 | 69.5 (44.5, 94.5)§ | 60.0 |
| 100 | 92.7 | 107.7 | 94 | 86.9 (64.5, 109.4)§ | 100.8 (77.4, 124.2)§ |

*National Food Laboratory, Dublin, Calif.
†The water pH numbers for sessions 1, 2, 3, 4, and 5 were 7.43, 7.41, 7.20, 7.00, and 7.20, respectively.
‡ND—nondetect
§Average of replicate samples in parentheses

threshold is significant because, on the basis of regulatory experience, consumers will not complain about the quality of their drinking water until the recognition threshold is exceeded—that is, the point when they can describe the offending taste and/or odor. These two studies indicate that MTBE has a significantly higher recognition threshold than detection threshold.

In cases in which the respective published method failed to provide specific guidance on a procedure, each of the five studies made procedural assumptions, such as the type of water to use and the method of comparison. Moreover, several of the studies deviated from published procedures for analyzing data. ASTM method E679-91 states that the "best-estimate" threshold for any individual consumer is the geometric mean between the last miss and the first detection. First detection is defined as the concentration at which the consumer successfully detects all higher concentrations. Although data analysis techniques other than that described by method E679-91 may be more robust when taste and odor threshold data are analyzed, these analytical methods should be justified and peer-reviewed for application to taste and odor analysis prior to use.

However, both the ARCO and API studies presented results based on an alternative numerical analysis—an extrapolation of the data based on a linear regression of the data, assuming a lognormal distribution of the results. Using this alternative analytical technique, the thresholds from both of these studies resulted in detection thresholds higher than those of Shen et al (1998), Young et al (1996), and Dale et al (1997). As a result of these deviations from published methods or the methods of similar tests, the applicability of the ARCO and API results for setting SMCLs is questionable. To overcome this deficiency and confirm their results, the ARCO and API studies should have conducted retests at concentrations surrounding the reported odor threshold concentrations; however, this was not done.

## SCOPE OF CONSUMER PANEL STUDY

To augment the results and avoid the noted deficiencies from the previous studies, the current study was undertaken (Malcolm Pirnie], 1998). The private comsulting firm retained a consumer testing laboratory* to organize the consumer panel and execute the sensory evaluation test. This consumer study was designed to be complementary to previous studies and to correct the main limitations of those studies, namely the size and makeup of their panels. Considerable effort was made to incorporate the experiences of the previous studies through discussions with some of the principal investigators of those studies. Following compilation of a draft protocol, the private consulting firm worked closely with members of the Association of California Water Agencies (ACWA) regarding recommendations for improvement.

To resolve inconsistencies among commentators, the stakeholders agreed to the formation of an expert advisory panel that consisted of Irwin H. Suffet and Michael J. McGuire—both past-chairmen of AWWA's Taste and Odor Committee—and Richard Berk of the University of California, Los Angeles—a statistician familiar with taste and odor study statistical analyses. Together, this panel incorporated all comments from ACWA, as well as verbal comments received from Steve Book of the California Department of Health Services (CDHS), in final-

*National Food Laboratory, Dublin, Calif.

©2001 American Water Works Association

AMWA-MDL-002503

NYC-LAWLESS-000151

izing the protocol. Ultimately, the study protocol, including the procedure for statistical data analysis, followed ASTM method E679-91 primarily because E679-91 is a standard and well-accepted methodology that could be rigorously duplicated by other researchers.

TABLE 5 ASTM* threshold analysis

| Dilution Number | Lowest Detected Concentration μg/L | Calculated Individual Threshold† μg/L |
|---|---|---|
| 1 | 2 | 1.4 |
| 2 | 3.5 | 2.6 |
| 3 | 6 | 4.6 |
| 4 | 10 | 7.7 |
| 5 | 18 | 13 |
| 6 | 30 | 23 |
| 7 | 60 | 42 |
| 8 | 100 | 77 |
| † | Missed 100 | 132 |

*ASTM—American Society for Testing and Materials
†A calculated individual threshold is the geometric mean between the lowest detected concentration and the next lowest concentration. In the case of 2 μg/L, the next lowest concentration is 1 μg/L. If a consumer panelist missed the highest concentration (100 μg/L), it was assumed that such a panelist would identify the next highest concentration (175 μg/L).

## PROTOCOL DEVELOPMENT

The final protocol was based on a consensus of the authors and Berk, and it was also deemed responsive to the ACWA comments. It was decided to conduct an odor study in lieu of a taste (flavor) study for two reasons: (1) it was thought an odor study would result in a lower threshold (Young et al, 1996), and (2) there were no laboratories available that would accept the liability of performing a taste (flavor) study without a primary MCL established by CDHS.

The ASTM method describes a forced-choice triangle test in which the consumer must choose one of three samples as being different from the rest. Although this inherently requires a panelist to guess, this triangle method was determined to be the best available published method. Although the ASTM method does describe many of the required details for performing an odor threshold study, there are a few aspects that it does not describe. These include

- the maximum number of trials that should be presented to a consumer,
- the type of water to use for the blanks,
- the sample presentation container, and
- the water temperature.

These details were addressed by the authors in cooperation with Berk, and a consensus was reached on each issue. The odor protocol used for this study involved presenting eight samples to the panelists in increasing MTBE concentrations (see sidebar, page 96), calculated according to a lognormal distribution. The MTBE and blank comparison solutions were prepared in odor-free bottled water at room temperature. The authors agreed that eight trials were the maximum number of trials to which a consumer could be exposed before olfactory fatigue began to affect the results (Mallevialle & Suffet, 1987). On the basis of FPA analysis, the authors also agreed that bottled water with < 500 mg/L total dissolved solids (TDS), as opposed to deionized or distilled water, was a neutral water that would neither mask nor enhance any MTBE odor in the samples. Room temperature (19.8–23.1°C [67.7–73.4°F]) was chosen by the authors as the operating temperature because it allowed this study to be comparable to other studies and it represented a temperature at which the public most often consumes drinking water.

**Although setting the SMCL below 15 μg/L would be even more restrictive because even fewer consumers could detect MTBE, an SMCL set at such a level would have to be a public policy decision rather than a scientifically based decision.**

Sample solutions of 4 oz each were presented to the panelists in disposable 7-oz plastic cups that were determined by the consumer testing laboratory to be odor-free. Plastic cups were used instead of glass containers because glass containers often retain residual odors. Each spiked and blank sample was covered with a clean watch glass. The panelists were instructed to lift each sample, swirl it several times, lift the watch glass, and smell the sample—as suggested in the FPA protocol (Krasner et al, 1983). The panelists were allowed to repeat a trial if they were uncertain after the first time. Once a trial was completed, the panelist replaced the watch glasses and signaled to the consumer testing laboratory staff that he or she was finished. The panelist then indicated on his or her individual scorecard the number of the sample that smelled different from the other two. If the panelist was not able to determine a difference, he or she was directed to guess which sample smelled different.

©2001 American Water Works Association

AMWA-MDL-002504

NYC-LAWLESS-000152

**FIGURE 1** Individual consumer results from the threshold odor study

X Correct identification
O Incorrect identification
Geometric mean of concentrations in shaded areas represents individual consumer threshold

| Consumer | 2 | 3.5 | 6 | 10 | 18 | 30 | 60 | 100 | Consumer | 2 | 3.5 | 6 | 10 | 18 | 30 | 60 | 100 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Concentration—µg/L | | | | | | | | | Concentration—µg/L | | | | | | | |
| 1 | X | O | X | X | X | X | X | X | 30 | O | X | X | O | X | X | X | X |
| 2 | O | O | O | X | X | X | X | X | 31 | X | O | O | X | O | O | X | O |
| 3 | O | X | O | O | O | O | X | X | 32 | X | X | X | X | O | O | O | X |
| 4 | O | O | O | O | O | O | X | X | 33 | X | X | X | O | X | O | X | X |
| 5 | X | O | X | O | X | X | O | X | 34 | O | O | O | O | O | O | X | O |
| 6 | O | O | X | X | X | X | X | X | 35 | O | O | O | X | O | X | X | O |
| 7 | O | X | X | O | X | X | X | X | 36 | O | O | O | X | O | X | X | X |
| 8 | X | X | O | X | X | X | X | X | 37 | X | X | X | X | X | X | X | X |
| 9 | O | O | X | O | X | X | X | X | 38 | X | O | X | X | X | X | X | X |
| 10 | O | O | O | O | O | O | O | X | 39 | X | X | O | O | X | X | X | X |
| 11 | X | O | X | X | X | X | X | X | 40 | O | O | X | O | X | X | X | X |
| 12 | O | O | O | O | X | O | X | O | 41 | X | X | X | X | X | X | X | X |
| 13 | X | X | X | X | X | X | X | X | 42 | O | X | O | X | X | X | X | X |
| 14 | X | X | X | X | X | X | X | X | 43 | O | O | O | O | O | O | X | X |
| 15 | O | X | X | O | X | X | X | X | 44 | O | X | X | O | X | O | X | X |
| 16 | O | O | X | O | O | O | X | O | 45 | O | X | X | O | X | X | X | X |
| 17 | X | O | X | X | X | X | X | X | 46 | X | X | X | X | X | O | X | X |
| 18 | O | O | X | X | X | X | X | X | 47 | O | X | O | O | O | X | X | O |
| 19 | X | X | X | X | X | X | X | X | 48 | O | X | O | X | O | X | X | X |
| 20 | X | O | X | X | O | X | O | O | 49 | O | O | O | X | O | X | X | X |
| 21 | X | X | X | X | X | X | X | X | 50 | O | O | X | X | X | X | X | X |
| 22 | X | X | X | X | X | X | X | X | 51 | O | O | O | X | X | X | X | X |
| 23 | X | X | O | O | X | X | X | X | 52 | X | X | X | X | X | X | X | X |
| 24 | X | X | X | X | X | X | X | X | 53 | X | X | X | X | X | X | X | X |
| 25 | O | X | X | X | O | X | X | X | 54 | X | O | O | O | O | X | X | X |
| 26 | O | X | X | X | O | X | X | X | 55 | O | O | X | X | X | X | X | X |
| 27 | X | O | O | O | X | O | O | X | 56 | O | O | O | O | O | X | X | X |
| 28 | O | O | X | X | X | X | X | O | 57 | O | O | X | X | O | X | O | X |
| 29 | O | X | O | O | X | X | X | X | | | | | | | | | |

A key aspect of the protocol development was the composition of the panel. The original intention of this study was to use a large (50+) consumer panel. Although a consumer panel recruited from throughout California (through random-digit dialing techniques) may have been a stronger statistical representation of the California population, the authors and Berk acknowledged that this was not possible given the available budget, time frame, and logistical constraints of the study. Therefore, the test panel was recruited from a database of more than 10,000 consumers available from the consumer testing laboratory conducting the testing. Given the constraining circumstances, the authors and Berk decided that this database of consumers was sufficient to develop a consumer panel odor threshold.

Many of the consumers from the consumer testing laboratory's database had participated in previous sensory testing conducted by the laboratory that ranged from beer tasting to ice cream evaluations. The consumer testing laboratory stated that only a few consumers in the database had done any type of drinking water evaluation in the past. The authors and Berk agreed that consumers recruited from this database should represent a cross-section of ages and genders from within a group of people who have not participated in sensory testing for at least one year prior to this study. The laboratory recruited the panelists according to these guidelines (Table 3). Consumers who smoked, were pregnant, or had been diagnosed as asthmatic were not used because the consumer testing laboratory wanted to limit potential auxiliary odors and liability concerns.

Once at the consumer testing laboratory's testing area, the consumers read and signed a disclosure statement and received a brief orientation that described the testing process. Before testing began, the laboratory conducted an example triangle test involving touching different grades of sandpaper to familiarize the panelists with the triangle test methodology. However, the consumers were not familiarized with the odor of MTBE because the authors felt that this would "train" the consumer panel, which is not desirable for consumer testing.

Because of size limitations of the consumer testing laboratory's testing facility, 5 sessions were conducted over two days, with 9 to 14 consumers present at each session. Between sessions, large fans were used to dissipate any fugitive MTBE odors present in the testing areas. The laboratory prepared fresh MTBE-spiked samples for each test session and prepared two split solutions for the subsequent quality assurance/quality control validation of the test concentrations. Gas chromatography/mass spectroscopy (GC/MS), USEPA drinking water method 524.2, was performed on all of the samples for each consumer panel. The results of the GC/MS analysis fell within the required range: ±40% for values < 10 µg/L and ±20% for values > 10 µg/L (Table 4), except for the few deviations noted.

## RESULTS

Once collected, data were analyzed according to ASTM method E679-91, which states that individual threshold concentrations are calculated by taking the geometric mean of the last concentration missed and the first concentration detected, given that all higher concentrations

©2001 American Water Works Association

AMWA-MDL-002505

NYC-LAWLESS-000153

were successfully detected (Table 5). If a panelist could detect all the concentrations presented, the threshold concentration for that panelist was the geometric mean of 2 µg/L and the next lowest theoretical concentration (1 µg/L). If a panelist did not detect the highest concentration (100 µg/L), it was assumed that the panelist would have detected the next highest theoretical concentration and the threshold was calculated to be 132 µg/L (the geometric mean of 100 and 175 µg/L).

Results from each of the panelists are summarized in Figure 1. Individual calculated thresholds ranged from 1.4 to 132 µg/L. The test panel geometric mean threshold was calculated to be 15 µg/L, and it represents the threshold of approximately 50% of the consumers (assuming a lognormal distribution as shown in Figure 2).

FIGURE 2 Distribution of odor threshold results

*MTBE—methyl tertiary butyl ether*

## PREVIOUS ORGANIC CHEMICAL SMCLS

There is no precedent for applying these results to establish an SMCL. USEPA has not promulgated any SMCLs for organic chemicals. However, in Phase II of the National Secondary Drinking Water Regulations Proposed Rule (USEPA, 1989), USEPA considered setting SMCLs for several organic chemicals. In the Final Rule (USEPA, 1991), USEPA decided not to set these SMCLs because there was an inadequate experimental basis for setting SMCLs specific to organic chemicals. USEPA concluded with the statement: "Utilities are urged to find imaginative ways to meet the objective of having more pleasing odor characteristics for their finished water using the current 3-TON standard" (USEPA, 1991).

California established an SMCL for one organic chemical prior to MTBE, which serves as a case study in evaluating SMCL standard-setting protocols. The first organic chemical for which California established an SMCL was thiobencarb.* Thiobencarb is a rice herbicide that is used primarily in the Sacramento River Valley. It breaks down during drinking water treatment to create a by-product with a bitter, pungent taste. The primary and secondary standards were set in 1987 for thiobencarb because the by-product was unidentified. The SMCL for thiobencarb was based on a consumer taste discrimination test (Stone & Sidel, 1983), in which 30 of the 51 panelists (59%) detected thiobencarb in water at 3 µg/L. In addition, the results of a large consumer complaint database identified that complaints increased significantly when thiobencarb levels in untreated water exceeded 1 µg/L. CDHS concluded that "organoleptic studies indicated that thiobencarb [sic] at a concentration of 3 µg/L and above generates an off-taste in drinking water. These observations [sic], however, do not provide a maximum level at which the off-taste cannot be detected. In real-life situations, based on the number of complaints and the thiobencarb concentrations in the Sacramento River water, a statistically significant increase of complaints . . . [occurred] when thiobencarb was detected at 1 µg/L near the intake to the Sacramento River Water Treatment Plant." (California Proposed MCL for Thiobencarb, 1987).

Using both the consumer taste discrimination test and the consumer database, the SMCL for thiobencarb was set at 1 µg/L. The second organic chemical for which California established an SCML was MTBE. This SMCL was established at 5 µg/L, based on an interpretation of the available taste and odor data for MTBE, as noted earlier (Title 22 CCR, 1999).

## POLICY IMPLICATIONS

Without specifically discussing whether the California SMCL was established at a justifiable level, past policy directions and the technical procedures used to arrive at the other SMCLs can be reviewed to determine a scientifically supportable SMCL for MTBE. As discussed in criterion A of the SDWA SMCL guidance, the purpose of SMCLs is to prevent a "substantial number of the persons . . . to discontinue [public water system] use" (USEPA, 1996). Pivotal to this statement is the reference to protecting a substantial number of people when SMCLs are set. There is no indication of whether the term "substantial" should represent 50, 75, or even 95% of the population.

To shed some light on the qualitative meaning of the word "substantial," one can examine the current TON standard. By definition, a trained assessor can detect a perceptible odor from water with a TON of 3 units. This suggests that the TON SMCL is not meant to protect the most sensitive individuals from objectionable tastes or odors in drinking water—rather, it is meant to protect a greater portion of the general population. If USEPA had defined "substantial" as protective of the most sensitive individuals, it would have selected a TON standard much lower than 3 to minimize taste and odor detection among consumers. The TON SMCL implies that there is an acceptable odor for drinking water.

*Bolero®, Valent USA, Walnut Creek, Calif.

©2001 American Water Works Association

AMWA-MDL-002506

NYC-LAWLESS-000154

In fact, none of the SMCLs currently approved were established to protect all consumers. Instead, a level was set that could generally be met by most water utilities but that would also ensure a high quality of water for the general population. For example, the federal SMCL for TDS is 500 mg/L; California has set an SMCL for TDS with an upper limit of 1,000 mg/L. Using a consumer panel, it was determined that water with a TDS level of 320–658 mg/L was identified as aesthetically "good," water with a TDS level of 659–996 mg/L was identified as "fair," and water with a TDS level of 997–1,332 mg/L was identified as "poor" (Bruvold et al, 1969). The fact that the federal and California SMCLs were established at a TDS concentration that was above the concentration detectable to consumers is illustrative of the compromises that are often made when SMCLs are set—an acceptable quality of water must be ensured for a substantial portion of the general population. Similarly, when trained panelists were used to evaluate the odor threshold for MTBE, the descriptor words suggested that at low concentrations (<15 µg/L) MTBE exhibits an odor that may not motivate a substantial number of consumers to discontinue use of their water supply.

Furthermore, all of the taste and/or odor studies for MTBE discussed in this article were completed in odor-free water. In practice, consumers would be exposed to MTBE in a natural water matrix that may enhance or mask the odor of MTBE. Experience from LaCrosse, Kan., where consumers were repeatedly exposed to MTBE concentrations > 100 µg/L without voicing complaints and elsewhere suggest that a natural water matrix with a high level of hardness or TDS can mask the odor of MTBE (California MTBE Research Partnership, 2000; MDHS, 1998). Thus, field data suggest that a consumer threshold concentration for MTBE in a natural water matrix will be greater than such a threshold in odor-free water.

Finally, in order to create a precedent for establishing future taste and odor standards for individual organic compounds, it is necessary to develop a reproducible approach for evaluating the quantitative results from threshold studies. The most conservative approach for evaluating threshold panel data would be to base the SMCL on the minimum value detected by any one panelist; however, there is no scientific precedent or technical foundation for this because it would only incorporate one individual's sensitivity to that specific compound. An alternative statistical analysis could also be performed; however, no methodologies for completing such an analysis of threshold data have been approved by ASTM or *Standard Methods*. The analytical option that has been approved and recommended by ASTM for evaluating threshold data is using the geometric mean of all panelists, which incorporates each panelist's sensory variability. In addition, the geometric mean is a reproducible and technically supportable statistic that serves as a foundation for an SMCL in the absence of other data, such as the consumer database that was available in California for establishing the SMCL for thiobencarb.

The geometric means from the literature for MTBE in drinking water are as follows:

- from 13.5 to 45.4 µg/L (Shen et al, 1998) for odor,
- 34 µg/L (Young et al, 1996) for odor, and
- 48 µg/L (Young et al, 1996) for taste.

This study concluded that the geometric mean is 15 µg/L when a consumer panel is used. Thus, 15 µg/L represents a conservative approximation of the odor threshold for MTBE; this threshold is from a highly reproducible study that could be used as a scientifically justifiable basis for setting an SMCL. Furthermore, the use of 15 µg/L as the SMCL is consistent with past SMCL standard-setting approaches that are protective of many—but not all—consumers.

## SUMMARY AND CONCLUSIONS

Following the development and application of a methodology to determine the odor threshold of MTBE in water, the authors determined that this threshold is 15 µg/L. This concentration represents the lower range of the taste and odor threshold values obtained from the other five MTBE threshold studies. Thus, the methodology used in this study produces conservative results when compared with other analyses, and this study is reproducible. Consequently, the authors suggest that the methodology used in this analysis supports a reasonable scientific basis for establishing SMCLs for organic chemicals. In the absence of an alternative, formalized, peer-reviewed methodology for determining the threshold for a taste or odor test, the use of any other value for an SMCL would be unreliable and difficult to reproduce.

Following this argument, the authors believe that 15 µg/L is the only scientifically defensible value when the establishment of an SMCL for MTBE is under consideration. Although setting the SMCL below 15 µg/L would be even more restrictive because even fewer consumers could detect MTBE, an SMCL set at such a level would have to be a public policy decision rather than a scientifically based decision. Currently, there is no precedent for setting SMCLs that are protective of all consumers—an approach that would likely apply an increased burden on the regulated water utilities. Such an increased burden may not be commensurate with the benefits derived from attempting to avoid all negative consumer responses. In contrast to the thiobencarb case, there is no consumer complaint database to support any specific SMCL for MTBE below the geometric mean. Thus, the authors suggest that the logical and the only scientifically practical conclusion is to set an SMCL for MTBE at the geometric mean value.

## ACKNOWLEDGMENT

This research was funded by the Oxygenated Fuels Association through a contract with Malcolm Pirnie Inc.

©2001 American Water Works Association

AMWA-MDL-002507

NYC-LAWLESS-000155

The authors also thank the Association of California Water Agencies; Steve Book of the California Department of Health Services; Richard Berk of the Department of Statistics at the University of California, Los Angeles; and Mark Waer and Nat Federici of Malcolm Pirnie for their help in developing the odor threshold protocol. Finally, the authors express sincere thanks to the National Food Laboratory in Dublin, Calif., for its continued aid and support in completing this project.

**ABOUT THE AUTHORS:**

*Andrew J. Stocking was a project engineer at Malcolm Pirnie Inc. in Oakland, Calif., when this work was completed. He received his MS and BS degrees from Stanford University in Stanford, Calif., and was a recipient of the Paul L. Busch Prize, a national engineering award. He is a member of AWWA, the American Chemical Society, and the National Ground Water Association. Irwin H. Suffet is a professor in the School of Public Health at the University of California, Los Angeles. Michael J. McGuire is president of McGuire Environmental Consultants Inc. in Santa Monica, Calif. Michael C. Kavanaugh* is vice-president of Malcolm Pirnie Inc., 180 Grand Ave., Suite 1000, Oakland, Calif. 94612-3754; <mkavanaugh@pirnie.com>.*

* To whom correspondence should be addressed

If you have a comment about this article, please contact us at <journal@awwa.org>.

## REFERENCES

API (American Petroleum Institute), 1994. Odor Threshold Studies Performed With Gasoline and Gasoline Combined With MTBE, ETBE, and TAME. *API Pub. 4592.* Washington.

ARCO (ARCO Chemical Co.), 1993. The Odor and Taste Threshold Studies Performed with Methyl Tertiary Butyl Ether and Ethyl Tertiary Butyl Ether. Windsor, Conn.

ASTM (American Society for Testing and Materials), 1991. Standard Practice for Determination of Odor and Taste Thresholds by a Forced-choice Ascending Concentration Series Method of Limits (E679-91). Philadelphia.

Bruvold, W.H.; Ongerth, H.J.; & Dillehay, R.C., 1969. Consumer Assessment of Mineral Taste in Domestic Water. *Jour. AWWA,* 61:11:575.

California MTBE Research Partnership, 2000. Treatment Technologies for Removal of Methyl Tertiary Butyl Ether From Drinking Water: Air-stripping, Advanced Oxidation Processes, Granular Activated Carbon, Synthetic Resin Sorbents (G. Melin, editor). Natl. Water Res. Institute, <www.ocwd.com/nwri>.

California Proposed MCL for Thiobencarb, 1987. Health Assessment Document. CDHS Files, Berkeley, Calif. (Dec.).

CHSC (California Health and Safety Code, 2000). Div. 104, Part 12, Chapter 4, Article 1, Sec. 116270.

Dale, M.S. et al, 1997. MTBE Taste-and-Odor Threshold Determinations Using the Flavor Profile Method. Proc. 1997 AWWA WQTC, Denver.

Gullick, R.W. & LeChevallier, M.W., 2000. Occurrence of MTBE in Drinking Water Sources. *Jour. AWWA,* 92:1:100.

Krasner, S.W.; McGuire, M.J.; & Ferguson, V.B., 1983. Application of the Flavor Profile Method for Taste and Odor Problems. Proc. 1983 AWWA WQTC, Norfolk, Va.

Malcolm Pirnie Inc., 1998. Internal Technical Memorandum: Taste and Odor Properties of Methyl Tertiary Butyl Ether and Implications for Setting a Secondary Maximum Contaminant Level (June 26). <mkavanaugh@pirnie.com>.

Mallevialle, J. & Suffet, I.H., 1987. Sensory and Chemical Analysis of Taste and Odor. *Identification and Treatment of Tastes and Odors in Drinking Water* (90518). AWWA Res. Fdn. and Lyonnaise des Eaux, Denver.

McGuire, M.J. et al, 1984. Controlling Attached Blue-Green Algae With Copper Sulfate. *Jour AWWA,* 76:5:60.

MDHS (Maine Department of Human Services, Maine Department of Environmental Protection, and Maine Department of Conservation), 1998. The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water, a Preliminary Report, <www.state.me.us/dhs/boh>, accessed Oct. 13.

Moran, M.J.; Zogorski, J.S.; & Squillace, P.J., 1999. MTBE in Groundwater of the United States—Occurrence, Potential Sources, and Long-range Transport. Proc. 1999 AWWA Water Resources Conf., Norfolk, Va.

Shen Y.F. et al, 1998. Threshold Odor Concentrations of MTBE and Other Fuel Oxygenates. Res. Rept. Orange County Water District, Fountain Valley, Calif.

*Standard Methods for the Examination of Water and Wastewater,* 1995 (19th ed.). APHA, AWWA, and WEF, Washington.

Stone, H. & Sidel, J.L., 1983. Sensory Tests of Bolero® and Bolero® With Permanganate (unpubl.).

Suffet, I.H.; Khiari, D.; & Bruchet, A., 1999. The Drinking Water Taste and Odor Wheel for the Millennium: Beyond Geosmin and Methyl Isoborneol. *Water Sci. & Technol.,* 40:6:1.

Title 22 CCR (California Code of Regulations) 64449, 1999. Final Statement of Reasons, Secondary Maximum Contaminant Level for Methyl Tert-Butyl Ether and Revisions to the Unregulated Chemical Monitoring List. R-44-97 (Jan.).

USEPA, 1998. MTBE Fact Sheet 3: Use and Distribution of MTBE and Ethanol. EPA 510-F-97-016. Ofce. of Solid Waste and Emergency Response, Washington (Jan.).

USEPA, 1997. Drinking Water Advisory: Consumer Acceptability Advice and Health Effects Analysis on Methyl Tertiary Butyl Ether (MTBE). EPA-822-F-97-008. Ofce. of Water. (Dec.).

USEPA, 1996. Safe Drinking Water Act. As Amended by Congress (Aug. 6, 1998).

USEPA, 1991. National Drinking Water Regulations. Final Rule. *Fed. Reg.,* 56:20:3526 (Jan. 30).

USEPA, 1989. National Primary and Secondary Drinking Water Regulations. Proposed Rule. *Fed. Reg.,* 54:97:22062 (May 22).

Young, W.F. et al, 1996. Taste and Odor Threshold Concentrations of Potential Potable Water Contaminants. *Water Res.,* 30:2:331.

©2001 American Water Works Association

NYC-LAWLESS-000157