# EXHIBIT 7

**David Norman Deposition Excerpts**

- Norman Dep. 29–30, 33–34, 61–64, 100–101, and 283, Apr. 14, 2012 & Ex. 33

David W. Norman, P.E.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL
ETHER ("MTBE")                    MDL 1358
PRODUCTS LIABILITY LITIGATION   (SAS)


This Document Relates to:

        CITY OF FRESNO v. CHEVRON U.S.A.
        INC., et al.
        Case No. 04 Civ. 04973 (SAS)



                    --  --  --

            WEDNESDAY, APRIL 18, 2012

                --  --  --


            Videotaped Deposition of DAVID W. NORMAN,
P.E., VOLUME I, held at the Law Offices of Sheppard
Mullin Richter & Hampton, 333 South Hope Street, 43rd
Floor, Los Angeles, California, beginning at 9:05 a.m.,
before Sandra Bunch VanderPol, FAPR, RMR, CRR, CSR
#3032


                --  --  --

                    GOLKOW TECHNOLOGIES, INC.
            877.370.3377 ph|917.591.5672 fax
                    Deps@golkow.com

## David W. Norman, P.E.

**Page 26**

1  for cleaning up in order to get your expertise into
2  what they should do additionally?
3      A.   That would be --
4      MR. MILLER: Compound. Vague and ambiguous.
5  Overbroad.
6      Wait just a second so I can object when I
7  need to.
8      You can answer.
9      MR. CORRELL: Or when he wants to. I'm not
10 sure he needs to.
11     THE WITNESS: No.
12 BY MR. CORRELL:
13     Q.   If the City did ask for that type of
14 analysis, would you be capable of providing it?
15     MR. MILLER: Calls for speculation. Vague
16 and ambiguous on what kind of analysis.
17     Go ahead.
18 BY MR. CORRELL:
19     Q.   If the City of Fresno came to you and
20 said that it had three UST release sites in which it
21 was or is currently the responsible party in charge
22 for cleaning up, would it be within your expertise to
23 provide the City advice on how to conduct the
24 assessment and remediation to ensure that MTBE did
25 not escape its facilities?

**Page 27**

1      MR. MILLER: Compound. Calls for
2  speculation. Insufficient facts on which to base a
3  hypothetical.
4      THE WITNESS: If the City of Fresno retained
5  us to provide similar services or services that we
6  typically provide, we could provide them.
7  BY MR. CORRELL:
8      Q.   When you said "similar services," you
9  were pointing down to your report. You meant similar
10 services to the opinions that you provided about the
11 31 release sites at issue here?
12     A.   Correct.
13     Q.   Now, for most of the sites, after you
14 conducted your review, you did recommend additional
15 assessment activities, correct?
16     A.   On a number of them, yes.
17     Q.   And for those sites, you reached
18 the -- what would be a good way -- well, let me back
19 up.
20     In general -- we're going to go into site
21 specific. But, in general, for the sites in which
22 you recommended additional assessment activities,
23 they were either CPT testing or monitoring wells or a
24 combination of both?
25     MR. MILLER: Compound. Overbroad.

**Page 28**

1      THE WITNESS: That's correct.
2  BY MR. CORRELL:
3      Q.   And then you concluded that you could
4  not recommend steps beyond those in your report until
5  the results from those initial steps were determined,
6  right?
7      MR. MILLER: Same objections.
8      THE WITNESS: And from clarity, I don't
9  think we concluded we couldn't. It -- we didn't make
10 additional recommendations indicating that until that
11 initial work was done, that there wouldn't be
12 sufficient data to make those recommendations.
13 BY MR. AXLINE:
14     Q.   Right. Well, I guess we can look at
15 this when we get to a specific site. But, in
16 general, is it your opinion that you cannot with
17 reasonable certainty predict what further assessment
18 and/or remediation activities would be needed until
19 after you conducted the steps that you recommended in
20 your report?
21     MR. MILLER: Same objections.
22     THE WITNESS: It is my experience and my
23 practice that in -- that without sufficient
24 information, it's premature to make recommendations.
25 ///

**Page 29**

1  BY MR. CORRELL:
2      Q.   And so until you got the information
3  from the first round of assessment activities you
4  proposed at these sites, you could not with
5  reasonable certainty tell the jury what additional
6  assessment and remediation actions will be needed,
7  correct?
8      MR. MILLER: Vague and ambiguous. Compound.
9  Calls for speculation as asked.
10     THE WITNESS: Yeah, as -- as I indicated
11 before, without additional information that, in my
12 experience in my practice, is that we wouldn't make
13 recommendations for cleanup unless we knew what
14 needed to be cleaned up, for instance.
15 BY MR. CORRELL:
16     Q.   The reason that you recommended these
17 initial steps at these sites was to obtain additional
18 information, right?
19     A.   That's correct.
20     Q.   Additional information you would need
21 before you could opine on what additional activities
22 would be needed, if any, at these sites, right?
23     A.   The additional information would add
24 to the existing data that would allow us to make
25 additional recommendations, whether further work was

8 (Pages 26 to 29)

cc957abb-a8da-4d18-84f2-8982d3b3b096

David W. Norman, P.E.

Page 30

1  necessary or not.
2      Q.    And until you -- until you obtained
3  that data from this -- from the recommendations that
4  you make from these sites, you could not with
5  reasonable certainty recommend any additional steps,
6  correct?
7      MR. MILLER: That's been asked and answered.
8  And it's also compound. Insufficient facts on which
9  to base a hypothetical. And calls for speculation.
10     This is the third time you've asked the same
11 question repackaged.
12     THE WITNESS: Our recommendations and my
13 recommendations and experience indicate that the
14 approach we took here, looking for additional
15 information within a reasonable distance from the
16 site, provides the next information so that we
17 don't -- we aren't spending effort and/or dollars
18 that aren't necessary to define something.
19     And so the next set of information is the
20 step with which we would take to define the next
21 piece of work. So...
22 BY MR. CORRELL:
23     Q.    And I appreciate that, but I'm
24 looking for something very specific here.
25     And that -- you've laid out a plan at these

Page 31

1  sites to collect additional information, correct?
2      A.    Correct.
3      Q.    And that information would be needed
4  before you could, with reasonable certainty, predict
5  what future steps would need to be taken, correct?
6      MR. MILLER: That's the fourth time you've
7  answered (sic) the question. He has answered it
8  several times. You're harassing the witness.
9      If you have a new question, please ask it.
10 But forcing the witness to repeat his answer over and
11 over again is inappropriate.
12     THE WITNESS: Could you repeat his last
13 portion of the question.
14     (Record read as follows: QUESTION: And
15 that information would be needed before you could,
16 with reasonable certainty, predict what future steps
17 would need to be taken, correct?)
18     THE WITNESS: I could respond this way. I
19 think it might help.
20     Without using some level of certainty and
21 prediction, we would take data, and in my
22 recommendations, could -- we could add additional
23 wells, and it might reduce the number of iteration or
24 potential future steps.
25     But my recommendations are based on a

Page 32

1  reasonable approach to assessment. And with that
2  approach, then we would have additional information
3  to make additional opinions.
4      It is possible for somebody to make
5  different opinions based on different levels of
6  information at different levels of certainty. But I
7  would probably agree that you would be predicting and
8  not using scientific data to make those opinions.
9      Is that --
10 BY MR. CORRELL:
11     Q.    If you went beyond your first step?
12     A.    That's correct.
13     Q.    Now, putting aside assessment
14 activities and talking about remediation activities,
15 that is actual cleanup activities, based on your
16 experience and review of the data, you cannot predict
17 any remediation that is needed at any one of these
18 sites at this time with reasonable certainty,
19 correct?
20     MR. MILLER: The question is vague and
21 ambiguous.
22     Are you claiming that the work he's
23 recommending is not remediation related?
24     MR. CORRELL: Let me --
25     MR. MILLER: It's argumentative and assumes

Page 33

1  facts not in evidence.
2      MR. CORRELL: Let me clarify it because I'm
3  not trying to trick you, sir.
4      Q.    You have at all these sites
5  recommended additional assessment activities,
6  correct?
7      A.    At many of the sites, yes.
8      Q.    At many of the sites.
9      At no site have you recommended additional
10 remediation action, right?
11     A.    At this time that would be correct.
12     Q.    And that is because at this time,
13 focusing exclusively on remediation activities, you
14 do not have enough data to predict what would be
15 needed with reasonable certainty, correct?
16     MR. MILLER: What are you talking about when
17 you say "remediation activities"? It's the same
18 problem I raised earlier. You're assuming facts not
19 in evidence that this work is unrelated to
20 remediation. It's argumentative.
21     THE WITNESS: And I believe we could answer
22 those questions -- in a general form it's a little
23 difficult. Site by site is a little simpler. But I
24 think I can answer the question this way.
25     That, generally speaking, if remediation was

9 (Pages 30 to 33)

cc957abb-a8da-4d18-84f2-8982d3b3b098

David W. Norman, P.E.

| Page 34 | Page 36 |
|---|---|
| 1 performed on a site that included vapor extraction,<br>2 it, in most of the cases -- and, again, I have to go<br>3 look site by site as we are going through it -- the<br>4 vapor extraction likely removed the source at the<br>5 site.<br>6     So in most of the cases that we're talking<br>7 about, we're looking at groundwater impact. And<br>8 off-site groundwater impact, to be more specific.<br>9     Currently, at -- I don't remember a site.<br>10 So it may be a site or two only. Is there sufficient<br>11 data to develop a Remedial Action Plan or some even<br>12 conceptual idea of what that remediation might look<br>13 like if, it were necessary, without any additional<br>14 work.<br>15 BY MR. CORRELL:<br>16     Q.   And so sitting here today, you would<br>17 need more data at these sites before you could, with<br>18 reasonable certainty, propose a Site Remediation Plan<br>19 or even a Conceptual Site Remediation Model?<br>20     MR. MILLER: Objection. Compound. And the<br>21 witness just explained in his last answer that you<br>22 have to go site by site to answer your question. And<br>23 you're refusing to do that.<br>24     THE WITNESS: In general, I think that's<br>25 true. | 1 Fresno.<br>2     Q.   Okay. And what do you mean by "data<br>3 produced by the City of Fresno"?<br>4     A.   Data that shows MTBE detections in<br>5 particular wells.<br>6     Q.   Okay. Do you know if that data was<br>7 generated by the firm Friedman & Bruya?<br>8     A.   We were provided a table. I don't<br>9 have the actual data. I believe that two of the<br>10 samplings were provided by Friedman & Bruya.<br>11     Q.   And do you know who provided the<br>12 other samples?<br>13     A.   I'd have -- I'd like to refresh my<br>14 memory. There were other consultants doing other<br>15 work for them at different times.<br>16     Q.   Was BSK one of those, do you know?<br>17     A.   I believe BSK was the laboratory that<br>18 was used. I don't know who collected the sample. So<br>19 BSK, for clarification, has both an engineering firm,<br>20 consulting firm, and a laboratory.<br>21     Q.   Have you reviewed the deposition of<br>22 the BSK corporate representative about those samples?<br>23     A.   No.<br>24     Q.   Have you reviewed any depositions in<br>25 this matter to prepare your opinions? |

| Page 35 | Page 37 |
|---|---|
| 1 BY MR. CORRELL:<br>2     Q.   Okay. Now, the opinions that you<br>3 rendered for additional assessment at these sites,<br>4 have you told anybody at the City of Fresno about<br>5 your opinions?<br>6     A.   No.<br>7     Q.   Have you discussed your work at all<br>8 with anybody at the City of Fresno?<br>9     A.   No.<br>10     Let me clarify. With the exception of<br>11 requesting information from them, no.<br>12     Q.   Okay. From whom did you request<br>13 information at the City of Fresno?<br>14     A.   Most of those requests went from my<br>15 staff to their staff. So I couldn't give you exact<br>16 names. But it would be somebody in the water<br>17 department.<br>18     Q.   Okay. What type of information did<br>19 your staff request from the City?<br>20     A.   We were provided with copies of some<br>21 of the well logs and a table with their laboratory<br>22 data that was -- has been produced.<br>23     Q.   Okay. When you say "their laboratory<br>24 data," what are you referring to?<br>25     A.   Data that was produced by the City of | 1     A.   I did look at the expert report --<br>2 no, no depositions.<br>3     Q.   And when you say the City produced<br>4 this table, do you mean they provided it to you?<br>5     A.   Yes.<br>6     Q.   Do you know if the City has provided<br>7 this table to anyone else?<br>8     A.   I don't know for a fact, no.<br>9     Q.   And did you produce this table as<br>10 part of your work papers?<br>11     A.   Yeah, I -- I believe so. Or at least<br>12 we referred to that information as we talked about<br>13 the local -- the wells proximal to sites.<br>14     Q.   Do you have that table with you<br>15 today, sir, in your materials?<br>16     A.   Unless it's produced in one of the<br>17 reports, I do not have it.<br>18     Q.   Okay. Is that something you could<br>19 bring with you tomorrow?<br>20     A.   I could get e-mailed. And I will<br>21 take a quick look through the reports and see if it's<br>22 in there, too.<br>23     Q.   Okay. Now, speaking with City of<br>24 Fresno, do you know whether or not the City of Fresno<br>25 has taken any action to implement your |

10 (Pages 34 to 37)

cc957abb-a8da-4d18-84f2-8982d3b3b096

David W. Norman, P.E.

Page 58

1  which is overlaid by individual depressions from
2  individual wells which cause -- which appear to cause
3  sort of like these seasonal changes. And oftentimes
4  if you sample less often, you may only get the high
5  points, you may only get the low points, but you
6  don't know.
7        And so a year to a year and a half would be
8  a reasonable time frame.
9        Q.    Of quarterly monitoring?
10       A.    Of quarterly monitoring.
11       Q.    And for the sites you recommended not
12  monitoring wells but CPTs, how long would you need to
13  monitor the CPT?
14       A.    They are one time. You get the data,
15  and then you make the recommendations. So it would
16  take three to four months to get all the data.
17       Q.    And after you either drill the
18  monitoring wells and do the CPT, one thing that you
19  could learn is that additional assessment activities
20  aren't needed, correct?
21       A.    It is possible, yes.
22       Q.    Now, you said, when talking about the
23  monitoring -- installing the monitoring wells, you
24  talked about regulatory approval. What regulatory
25  approval would you need to obtain to install the

Page 59

1  monitoring wells that you have recommended?
2        A.    There's a couple. One, the City of
3  Fresno issues a permit, and then the Water Board
4  needs to approve a work plan.
5        Q.    Okay.
6        A.    And in some cases there may be some
7  permits from other agencies that are necessary.
8        Q.    Okay. For the CPT testing, would
9  that require Water Board approval, too?
10       A.    Yes.
11       Q.    So one possibility is that you could
12  take these opinions to the Water Board, and they
13  could reject your plan, right?
14       MR. MILLER: Calls for speculation, as
15  asked.
16       THE WITNESS: I'm not sure how to answer the
17  question. Could you reframe the question.
18       MR. CORRELL: Sure.
19       Q.    You talked about before drilling the
20  monitoring wells with CPT, one step you need to take
21  was to obtain regulatory approval, right?
22       A.    Correct.
23       Q.    And one of those regulatory bodies
24  was the Water Board, right?
25       A.    Correct.

Page 60

1        Q.    So you could take your plan to the
2  Water Board, and the Water Board could disagree that
3  the assessment was needed and deny approval, right?
4        MR. MILLER: Compound. Assumes facts not in
5  evidence. Calls for speculation as asked.
6        THE WITNESS: I couldn't speak for the Water
7  Board. I believe there would be two scenarios.
8  One -- well, maybe -- at least two scenarios. Let me
9  rephrase that.
10       One, that on face value they looked at it
11  and agreed and would reopen the case; or, secondly,
12  that the City they said they were concerned whether
13  the Water Board reopened the case or not.
14       And if they didn't require -- in the case of
15  CPT analysis, which possibly with a rare exception or
16  two, I think all the CPT recommendations were
17  off-site, that the City could perform those without
18  property permission.
19       The Water Board would still have to approve
20  the work plan. And I don't know that I could answer
21  the question what I thought the Water Board may or
22  may not do at that point.
23  BY MR. CORRELL:
24       Q.    So, sitting here today, you cannot
25  render an opinion whether or not the Water Board

Page 61

1  would actually approve a work plan, based upon your
2  expert opinions in this case, right?
3        MR. MILLER: Objection. That's vague and
4  ambiguous and overbroad.
5        THE WITNESS: I think I could say that I'm
6  not -- I couldn't tell you, sitting here today,
7  whether the Water Board would reopen the case.
8        I don't know specifically how they would
9  handle reviewing a work plan for a case that they had
10  not yet reopened. I just couldn't even give you an
11  answer one way or the other.
12  BY MR. CORRELL:
13       Q.    Okay. So two possibilities in your
14  scenario. One is they could take your suggestions,
15  reopen the case, and make the responsible party do
16  the work?
17       A.    Correct.
18       Q.    And the other one is if they decide
19  not to reopen the case, you don't know how they would
20  proceed?
21       A.    That's correct.
22       MR. CORRELL: Why don't we take a five-,
23  ten-minute break to go to the bathroom.
24       THE WITNESS: Sure.
25       THE VIDEOGRAPHER: With the approval of

16 (Pages 58 to 61)

cc957abb-a8da-4d18-84f2-8982d3b3b096

David W. Norman, P.E.

**Page 62**

1  counsel, we are going off the record. The time is
2  approximately 10:09 a.m.
3      (Recess taken.)
4      THE VIDEOGRAPHER: With the approval of
5  counsel, we are back on the record. The time is
6  approximately 10:18 a.m.
7  BY MR. CORRELL:
8      Q.   Sir, as part of your review in this
9  matter, you were not able to determine that -- even
10 assuming that trace MTBE detections in the City of
11 Fresno's wells are accurate, you weren't able to
12 trace those detections to any specific UST station,
13 correct?
14     MR. MILLER: Objection. Vague as to
15 "trace." Assumes facts not in evidence.
16     Go ahead and answer, if you can. It's also
17 compound.
18     THE WITNESS: We weren't asked to attempt to
19 evaluate that, but I can generally say -- and I'm
20 sure that fate and transport is being discussed by
21 other experts.
22     But, generally speaking, at the sites that
23 we looked at, without the additional work that we
24 recommended, I'm not sure there's sufficient data, at
25 least for us, to make that opinion.

**Page 63**

1  BY MR. CORRELL:
2      Q.   Okay. And at no -- and at no -- at
3  none of the sites were you able to predict that a
4  release from a site would impact a specific City of
5  Fresno drinking water well, correct?
6      MR. MILLER: Objection. As asked calls for
7  speculation and exceeds the scope of his assignment
8  in the case.
9      THE WITNESS: Again, we didn't do fate and
10 transport modeling, so it was beyond the scope of
11 what we were asked to do.
12 BY MR. CORRELL:
13     Q.   And so you don't have any opinions on
14 that subject either?
15     A.   It's beyond the scope of my
16 expertise.
17     Q.   And you did not do any fate and
18 transport modeling?
19     A.   That's correct.
20     Q.   In general, your approach to these
21 sites was to review the available data given and then
22 recommend additional assessment activities?
23     A.   If it were necessary.
24     Q.   And I apologize if I asked you this
25 before. You didn't do any groundwater modeling,

**Page 64**

1  correct?
2      A.   That's correct.
3      Q.   When you said you assumed fate and
4  transport was being handled by different experts, do
5  you know which expert is handling fate and transport
6  issues form City of Fresno?
7      A.   I don't specifically.
8      Q.   Okay. Have you met with any of the
9  other experts who are testifying on behalf of the
10 City of Fresno?
11     A.   No.
12     Q.   You cannot say, based upon the data
13 that you reviewed, that a release from any one of the
14 UST stations at issue here poses an imminent threat
15 to a drinking water well in the City of Fresno,
16 correct?
17     MR. MILLER: Exceeds the scope of his
18 assignment.
19     Go ahead.
20     THE WITNESS: Again, same answer from a fate
21 and transport -- that's a fate and transport
22 question, beyond our scope.
23 BY MR. CORRELL:
24     Q.   And so you can't opine that?
25     A.   I would not opine on that.

**Page 65**

1      Q.   And you not opined on that?
2      A.   That's correct.
3      Q.   Do you agree that the EPA testing
4  Method 8080 is unreliable for determining if MTBE is
5  present?
6      MR. MILLER: Exceeds the scope and calls for
7  an opinion on the subject of chemistry. Calls for
8  speculation.
9      THE WITNESS: I am not an expert in chemical
10 analysis. I do know that we oftentimes, currently,
11 using Method 8260. But 82 -- 8020 was a method
12 that -- that does see MTBE, and it is -- depending on
13 many circumstances, may have some accuracy and
14 precision issues that are less problematic in 8260.
15 BY MR. CORRELL:
16     Q.   Has it been your experience that 8220
17 resulted in false positives for MTBE?
18     MR. MILLER: Vague and ambiguous on scope.
19 Overbroad. Calls for speculation. Exceeds scope.
20     THE WITNESS: Not being an expert in
21 chemical analysis, I think that it's safe to say that
22 there are ranges of detection limits for any
23 analysis, and false positives and false negatives are
24 possible with any analysis.
25     8020, if used, should be confirmed with 8260

17 (Pages 62 to 65)

cc957abb-a8da-4d18-84f2-8982d3b3b096

# David W. Norman, P.E.

## Page 98

1  tell you exactly. Miller Axline might have provided
2  some information on that early on. I might have
3  asked somebody about other long plumes.
4         I did ask some Water Board folks for some
5  information, if they knew any other fairly long
6  plumes. And it may have been one of those, but I
7  don't specifically remember.
8         Q.   So you were not the consultant on the
9  former Easy Service Station in Bishop?
10       A.   No, no, no.
11       Q.   Okay. And you -- what did you --
12  what records did you have about plume length on the
13  former Easy Service Station?
14       A.   I pulled off reports from GeoTracker.
15       Q.   Okay. Who at the Water Board did you
16  ask for examples of long plumes?
17       A.    You know, I don't remember
18  specifically. It was probably eight or nine months
19  ago. I might have asked Warren Gross for some
20  general information.
21       Q.   Okay. Did you ask Mr. Gross, or
22  anybody else, at the Water Board, for example, for
23  shorter MTBE plumes?
24       A.   No.
25       Q.   Under "Remediation Alternatives for

## Page 99

1  MTBE," you say towards the end of the first
2  paragraph, "Advancement in oxygenation technique
3  since 2005 have made ozone and oxygenation a primary
4  alternative."
5         What did you mean by that?
6         A.   Was I specifically -- I believe I'm
7  talking about groundwater specific here. Most of the
8  conversation here is about groundwater.
9         That both those two techniques are ones that
10  I have found to be extremely useful for ozone -- for
11  MTBE, especially if you can -- if the MTBE is -- if
12  there are higher concentrations of MTBE and lower
13  concentrations of other compounds. Because those two
14  techniques tend to react with organic molecules of
15  any type.
16        But many -- a lot of other techniques have a
17  hard time of getting at MTBE and ozone or other
18  oxygenation techniques. And there are -- there are
19  others, including injection of hydrogen peroxide or
20  other patented and trademark kinds of chemicals.
21        And so if you can -- if you can get to it,
22  then these techniques destroy it pretty much in
23  place. And so it's very effective.
24        Q.   Then you say, "Remedial costs vary
25  widely."

## Page 100

1         Do you see that in the next paragraph?
2         A.   Yes.
3         Q.   Is that widely among sites? What did
4  you mean by --
5         A.   Yes. Widely among sites.
6         Q.   You say, "Without a complete
7  assessment, it is not possible to estimate the cost
8  to remediate a site."
9         That's a true statement, right?
10       A.   Yes.
11       Q.   And -- and that's why you weren't
12  able to offer opinions as to what it would cost, if
13  anything, to remediate the sites in this case?
14        MR. MILLER: Objection. Vague and ambiguous
15  about "remediate."
16        Are you talking about ozone, or what?
17        THE WITNESS: I think the difficulty in
18  giving a cost for remediation without knowing the
19  extent of the problem, and that other variables that
20  go along with designing a remediation system make it
21  very difficult to just give a number before that
22  information is available.
23  BY MR. CORRELL:
24       Q.   And so for no site you -- you say,
25  "Estimate the cost to remediate a site." Do you see

## Page 101

1  that?
2         A.   Yes.
3         Q.   For none of the 31 sites at issue did
4  you provide an estimate -- an estimate of the cost to
5  remediate the site, correct?
6         A.   That's correct.
7         MR. MILLER: Are we talking about a site
8  specific? The question is vague and ambiguous.
9         THE WITNESS: That's correct.
10  BY MR. CORRELL:
11       Q.   You stay -- then you talk about the
12  State Cleanup Fund. You say, "This upper limit for
13  state reimbursement is not intended to make the
14  responsible party whole."
15        What did you mean by "responsible party"?
16        A.   In this case it would be the person
17  that was eligible to receive reimbursement from the
18  fund.
19        Q.   And it's been your experience at a
20  UST cleanup site that the regulatory agency
21  identifies a responsible party or parties, correct?
22        A.   Yes.
23        Q.   Okay. You then say, "The Fund has
24  not kept records that allow breakdown for evaluating
25  or comparing select remedial techniques versus cost.

26 (Pages 98 to 101)

1       CERTIFICATE OF REPORTER

2           I, SANDRA BUNCH VANDER POL, a Certified

3   Shorthand Reporter, hereby certify that the witness in

4   the foregoing deposition was by me duly sworn to tell

5   the truth, the whole truth and nothing but the truth

6   in the within-entitled cause;

7           That said deposition was taken down in shorthand

8   by me, a disinterested person, at the time and place

9   therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12          That before completion of the deposition, review

13  of the transcript was requested.  If requested, any

14  changes made by the deponent (and provided to the

15  reporter) during the period allowed are appended

16  hereto.

17          I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22  DATED:   APRIL 30, 2012

23          _____

            SANDRA BUNCH VANDER POL, CSR #3032
24

25

David W. Norman, P.E.

Page 273

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:   METHYL TERTIARY BUTYL
ETHER ("MTBE")              MDL 1358
PRODUCTS LIABILITY LITIGATION   (SAS)

This Document Relates to:

        CITY OF FRESNO v. CHEVRON U.S.A.
        INC., et al.
        Case No. 04 Civ. 04973 (SAS)

                 --  --  --

            THURSDAY, APRIL 19, 2012

                 --  --  --

        Videotaped Deposition of DAVID W. NORMAN,
P.E., VOLUME II, held at the Law Offices of Sheppard
Mullin Richter & Hampton, 333 South Hope Street, 43rd
Floor, Los Angeles, California, beginning at 9:02 a.m.,
before Sandra Bunch VanderPol, FAPR, RMR, CRR, CSR
#3032

                 --  --  --

            GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph|917.591.5672 fax
               Deps@golkow.com

7b500dc6-618b-4f6e-b3cc-7439a4dacc77

# David W. Norman, P.E.

Page 282

1    A.   Most likely tomorrow midday.
2    Q.   I would like you to turn to your
3  attention to three documents that were produced to us
4  this morning.
5    Exhibit 31 is, "MTBE Test Results Summary
6  Sheet, City of Fresno Municipal Wells Compiled
7  11-18-2011."
8    A.   That's correct.
9    Q.   And this is the MTBE table we
10 discussed yesterday?
11   A.   It is.
12   Q.   Exhibit No. 32 is -- are invoices for
13 professional services your firm rendered on this case
14 through February 29, 2012.
15   A.   That's correct.
16   Q.   Have you not yet invoiced for the
17 March time?
18   A.   No, we have not.
19   Q.   Do you know approximately how much
20 the invoice will be for March time?
21   A.   You know, I did not look. I would
22 estimate approximately $30,000.
23   Q.   So what -- through March, what is the
24 total amount of fees you've been paid for, that your
25 firm has charged in this matter?

Page 283

1    A.   Oh, you know, I did not prepare for
2  that. I do not -- I do not know.
3    Q.   And then Exhibit 33 is a spreadsheet,
4  correct?
5    A.   Correct.
6    Q.   Briefly --
7    A.   It's a series of spreadsheets.
8    Q.   Briefly describe what Exhibit 33 is,
9  sir.
10   A.   This -- this is a series of
11 spreadsheets which we built up the costs for the
12 individual recommendations made for work at the
13 individual sites.
14   Q.   Okay. And so for each site you --
15 did you use the same unit costs?
16   A.   We used the same unit costs, that's
17 correct, unless otherwise noted.
18   Q.   Let's start with Exhibit 33, then,
19 and let's find one of the sites that we discussed
20 yesterday. It has both monitoring -- let's go to --
21 the pages aren't numbered, but let's go to Unocal
22 6583 at 1418 East Shaw.
23   A.   Yes. Oh, wait. Unocal?
24   Q.   6553, 1418 East Shaw.
25   A.   Yes.

Page 284

1    Q.   So we have CPTs, six CPTs to 125
2  feet, correct?
3    A.   That's correct.
4    Q.   And so you come up with a total of
5  $31,000 for all six?
6    A.   That's correct.
7    Q.   And the work plan preparation,
8  including monitoring wells, that's going to cost
9  $4,000?
10   A.   Yes.
11   Q.   And what did you base that on?
12   A.   That's just our experience in
13 preparing work plans.
14   Q.   Is there any -- are there any cost
15 buildups behind these spreadsheets?
16   A.   In some cases there would be. In
17 some cases there would be just unit costs that we
18 developed over time.
19   Q.   Have you produced the spreadsheets
20 that build up the costs?
21   A.   These were probably PDFs. They may
22 be notes in the individual cells that -- for the
23 behind-the-unit cost, there may be a note in the cell
24 in the Excel spreadsheet.
25   Q.   Let me see real quick how they were

Page 285

1  produced.
2    MS. O'REILLY:  They were produced PDF.
3    THE WITNESS:  As a PDF.
4    MS. O'REILLY:  By his office. So he would
5  have to have Stephanie see if she can send the native
6  file.
7    MR. CORRELL:  And will you do that, sir?
8    THE WITNESS:  I will do that.
9    MS. O'REILLY:  I can do that right now,
10 Dave. I will send her an e-mail.
11   THE WITNESS:  Beautiful.
12   MR. CORRELL:  She's more helpful than Duane.
13 Okay.
14   Q.   So work plan -- the work plan. And
15 that would be a work plan that you would submit to
16 the regulatory agencies?
17   A.   That's correct.
18   Q.   And an underground service alert,
19 what is that?
20   A.   That is a utility check that's
21 required before you penetrate the ground surface.
22 And there is a service that is offered through a
23 conglomerate of the utility companies.
24   Q.   Okay. And you base the 650 on what?
25   A.   That is approximately a few hours,

4 (Pages 282 to 285)

Golkow Technologies, Inc. - 1.877.370.DEPS

7b500dc6-618b-4f6e-b3cc-7439a4dacc77

David W. Norman, P.E.

Page 563

1                  CERTIFICATE OF REPORTER

2           I, SANDRA BUNCH VANDER POL, a Certified

3      Shorthand Reporter, hereby certify that the witness

4      in the foregoing deposition was by me duly sworn to

5      tell the truth, the whole truth and nothing but the

6      truth in the within-entitled cause;

7           That said deposition was taken down in

8      shorthand by me, a disinterested person, at the time

9      and place therein stated, and that the testimony of

10     the said witness was thereafter reduced to

11     typewriting, by computer, under my direction and

12     supervision;

13          That before completion of the deposition,

14     review of the transcript was requested.  If

15     requested, any changes made by the deponent (and

16     provided to the reporter) during the period allowed

17     are appended hereto.

18          I further certify that I am not of counsel or

19     attorney for either or any of the parties to the said

20     deposition, nor in any way interested in the event of

21     this cause, and that I am not related to any of the

22     parties thereto.

23     DATED:  MAY 2, 2012

24          _Sandra Bunch Vander Pol_
                SANDRA BUNCH VANDER POL, CSR #3032

25

## 7-Eleven #13917
## FRESNO, CALIFORNIA
## Workload Staffing Plan and Cost Breakdown

| CPT 1 (CPT to 125 ft) | | Units | Unit Cost | Total Fees |
|---|---|---|---|---|
| TASK | | | dollars | |
| 1 | Work Plan Preparation (including Monitoring Wells) | 1 | $4,000 | $4,000 |
| 2 | Underground Service Alert | 1 | $650 | $650 |
| 3 | Field Labor | 16 | $110 | $1,760 |
| 4 | Permits | 1 | $1,000 | $1,000 |
| 5 | Report | 1 | $4,450 | $4,450 |
| 6 | Gregg Drilling | 1.5 | $5,500 | $8,250 |
| 7 | Laboratory Costs (TPHg and MTBE soil) 3 per CPT @ $200 each | 9 | $200 | $1,800 |
| 8 | Laboratory Costs (TPHg and MTBE groundwater) 1 per CPT @ $200 | 3 | $200 | $600 |
| 9 | | | | |
| | | | | $22,510 |

| MONITORING WELLS (3 Monitoring Wells to 135 ft) | | Units | Unit Cost | Total Fees |
|---|---|---|---|---|
| TASK | | | dollars | |
| 1 | Work Plan | 0 | $4,000 | $0 |
| 2 | Underground Service Alert | 0 | $650 | $0 |
| 3 | Field Labor | 0 | $110 | $0 |
| 4 | Permits | 0 | $1,000 | $0 |
| 5 | Report | 0 | $2,500 | $0 |
| 6 | Driller ($40/foot x 135 ft x3 ) | 0 | $16,200 | $0 |
| 7 | Survey | 0 | $3,000 | $0 |
| 8 | Develop Monitoring Wells | 0 | $1,500 | $0 |
| 9 | Disposal of Water | 0 | $300 | $0 |
| 10 | Post Construction Report | 0 | $4,000 | $0 |
| | | | | $0 |

| MONITORING (4 sampling events) | | Units | Unit Cost | Total Fees |
|---|---|---|---|---|
| TASK | | | dollars | |
| 1 | Sampling Labor (10 hrs x 4 times a year) | 0 | $110 | $0 |
| 2 | Laboratory ($200 per sample, 3 samples, 4 times a year) | 0 | $800 | $0 |
| 3 | Supplies ($200 per event 4 times a year) | 0 | $200 | $0 |
| 4 | Disposal ($500 per event to dispose of water) | 0 | $500 | $0 |
| 5 | Report (1 per sampling event) | 0 | $4,000 | $0 |
| 6 | | | | $0 |
| 7 | | | | $0 |
| 8 | | | | $0 |
| 9 | | | | $0 |
| 10 | | | | $0 |
| | | | | $0 |

| Total | CPT | Monitoring Wells | Monitoring |
|---|---|---|---|
| Phase | | | |
| Cost per Phase | $22,510 | $0 | $0 |
| Cumulative Cost | | | $22,510 |



**Tosco 39118**
**FRESNO, CALIFORNIA**
**Workload Staffing Plan and Cost Breakdown**

| CPT (7 CPTs to 150 ft) | Units | Unit Cost | Total Fee |
|---|---|---|---|
| TASK | | dollars | |
| 1  Work Plan Preparation (including Monitoring Wells) | 1 | $4,000 | $4,000 |
| 2  Underground Service Alert | 1 | $650 | $650 |
| 3  Field Labor | 80 | $110 | $8,800 |
| 4  Permits and Traffic Control | 1 | $6,500 | $6,500 |
| 5  Report | 1 | $4,000 | $4,000 |
| 6  Gregg Drilling | 6 | $5,500 | $33,000 |
| 7  Laboratory Costs (TPHg and MTBE soil) 3 per CPT @ $200 each | 21 | $200 | $4,200 |
| 8  Laboratory Costs (TPHg and MTBE groundwater) 1 per CPT @ $200 | 7 | $200 | $1,400 |
| 9 | | | |
| | | | $ 60,350 |

| MONITORING WELLS (3 Monitoring Wells to 150 ft) | Units | Unit Cost | Total Fee |
|---|---|---|---|
| TASK | | dollars | |
| 1  Work Plan | 1 | $0 | $0 |
| 2  Underground Service Alert | 1 | $250 | $250 |
| 3  Field Labor | 50 | $110 | $5,500 |
| 4  Permits and Traffic Control | 1 | $5,000 | $5,000 |
| 5  Report | 1 | $4,000 | $4,000 |
| 6  Driller ($45/foot x 150 ft x 3) | 1 | $20,250 | $20,250 |
| 7  Survey | 1 | $3,000 | $3,000 |
| 8  Develop Monitoring Wells | 1 | $2,500 | $2,500 |
| 9  Dispose of Water | 3 | $500 | $1,500 |
| 10  Post Construction Report | 1 | $6,000 | $6,000 |
| | | | $48,000 |

| MONITORING (1 year) | Units | Unit Cost | Total Fee |
|---|---|---|---|
| TASK | | dollars | |
| 1  Sampling Labor (10 hrs x 4 times a year) | 40 | $110 | $4,400 |
| 2  Laboratory ($200 per sample, 3 samples, 4 times a year) | 4 | $600 | $2,400 |
| 3  Supplies ($200 per event 4 times a year) | 4 | $200 | $800 |
| 4  Disposal ($500 per event to dispose of water) | 4 | $500 | $2,000 |
| 5  Report | 4 | $4,000 | $16,000 |
| 6 | | | $0 |
| 7 | | | $0 |
| 8 | | | $0 |
| 9 | | | $0 |
| 10 | | | $0 |
| | | | $25,600 |

| Total | CPT | Monitoring Wells | Monitoring |
|---|---|---|---|
| Phase | | | |
| Cost per Phase | $60,350 | $48,000 | $25,600 |
| Cumulative Cost | | | $133,950 |