# EXHIBIT 11

### Brock Buche and John Whiting Deposition Excerpts

- Buche Dep. 343–44, 480–82, Apr. 1, 2011; and
- Whiting Dep. 30–31 and 42–43, Apr. 25, 2011

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl   :  Master File No. 1:00-1898
Ether ("MTBE")         :  MDL 1358 (SAS)
Products Liability    :
Litigation             :

_____

This Document Relates to:

City of Fresno v. Chevron U.S.A.
Inc., et al., et al.,
Case no. 04 Civ. 04973 (SAS)
_____/

------
APRIL 1, 2011
------

     Videotaped Deposition of BROCK BÜCHE and
ROBERT C. LITTLE, Volume II, City of Fresno's 30(b)(6)
Designee re Damages and Remedies, held in the Law Offices
of McCormick Barstow LLP, 5 River Park Place East,
Fresno, beginning at 9:04 a.m., before Sandra Bunch
VanderPol, FAPR, RPR, RMR, CRR, CSR #3032

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

City of Fresno 30(b)(6) - Brock Buche & Robert Little

Page 341

1  beyond this for anything related to MTBE construction
2  costs?
3       A.   Not that I'm aware of.
4       Q.   Okay. Has the City investigated
5  whether or not it needs to float bonds to fund
6  construction of the MTBE treatment facilities?
7       A.   I'm not aware of that.
8       Q.   Has the City investigated any funding
9  source, other than this litigation, for treatment of
10 contamination from MTBE and/or TBA?
11      A.   I'm only aware of the litigation.
12      Q.   Have there ever been any discussions
13 about any alternate funding sources?
14      A.   Not that I'm aware of.
15      Q.   Does the City have an insurance
16 policy that it might be able to -- that it might be
17 able to reimburse it for monies it may spend relating
18 to MTBE contamination?
19      MR. MILLER: Objection. Calls for expert
20 opinion.
21      Go ahead.
22      THE WITNESS: The City is self-insured, and
23 I don't believe it would cover this type of thing.
24 BY MR. FINSTEN:
25      Q.   The City doesn't expect to receive

Page 342

1  any reimbursement from anybody outside the litigation
2  for construction costs for treatment of MTBE?
3       A.   Not that I'm aware of.
4       Q.   No grant funding from the state or
5  the federal government has been investigated and
6  applied for?
7       A.   Not that I'm aware of.
8       MR. MILLER: Objection. Assumes facts in
9  evidence that it's available.
10      Don't you read the newspaper?
11      MR. FINSTEN: My wife works for the City of
12 L.A. I'm very familiar with it.
13      MR. MILLER: Well, then I'm sure you know
14 what's been happening to our wonderful budget.
15      No wonder I can't get the City of L.A. to
16 hire me.
17      MR. FINSTEN: I'm not saying anything.
18      Q.   Has the City told the Regional Board
19 about its expected need for construction of MTBE
20 removal as evident in Exhibit 1 to Exhibit 4?
21      A.   Exhibit 1 to Exhibit?
22      Q.   The estimate of probable construction
23 costs.
24      A.   I don't know if that's been relayed
25 to the Regional Board.

Page 343

1       Q.   How about the state Department of
2  Health Services or Department of Public Health,
3  whatever it's commonly known as?
4       A.   I don't know.
5       Q.   How about anybody in Fresno County
6  Environmental Health?
7       A.   I don't know.
8       Q.   Typically when you construct
9  treatment facilities, you notify the Regional Board?
10      MR. MILLER: Excuse me? What kind of
11 treatment facility?
12 BY MR. FINSTEN:
13      Q.   For any groundwater contaminant --
14 TCE, DIPE, DBCP, EDB -- whatever you have in your
15 water that you're treating for, you notify the
16 Regional Board when you have to construct treatment?
17      A.   Typically we just work with the CDPH.
18 I'm not aware of notifying the Regional Board.
19      Q.   You notify the State Health
20 Department?
21      A.   Yes, absolutely.
22      Q.   Do you notify the County Health
23 Department?
24      A.   Not typically.
25      Q.   Let's look at the estimate that

Page 344

1  begins, "This memorandum provides planning level
2  capital cost estimates, Table 1, for nonspecific
3  wellhead treatment of methyl tertiary butyl ether,
4  MTBE, using granular activated carbon, GAC
5  adsorption."
6       Did I read that correctly?
7       A.   Yes.
8       Q.   Has the City investigated any
9  site-specific wellhead treatment costs for MTBE?
10      MR. MILLER: Don't go into attorney-client
11 communications when you answer.
12      THE WITNESS: The only thing I'm aware of is
13 this.
14 BY MR. FINSTEN:
15      Q.   "The cost estimates are prepared for
16 generic groundwater wellhead treatment and not for
17 specific wells or specific geographic location."
18      Has the City done any investigation for
19 specific wells and the need for -- or not the need,
20 but the costs of treatment at any specific wells in
21 the City of Fresno for MTBE?
22      MR. MILLER: Same objection and instruction.
23      Go ahead.
24      THE WITNESS: I'm just aware of what's here.
25 BY MR. FINSTEN:

22 (Pages 341 to 344)

City of Fresno 30(b)(6) - Brock Buche & Robert Little

Page 477

1  you were expecting to incur in the future: The
2  review of agency files; analysis of data related to
3  MTBE sampling; and additional hydrogeologic
4  investigation. Am I -- am I right that those are
5  three categories of investigation for the future?
6      A.   Sure.
7      Q.   Are there any other types of
8  investigation in the future that you expect the City
9  of Fresno to engage in?
10     A.   What was the second one?
11     Q.   Analysis -- you said analysis of data
12 related to MTBE sampling.
13     A.   Yeah, I don't know that we have a
14 firm grasp on the treatment cost still, so there
15 would be additional investigations there.
16     Q.   Okay. So a fourth category
17 might be some sort of investigation relating --
18 investigation relating to figuring out what kind of
19 treatment the City wants to do; is that accurate?
20     A.   The -- the most cost-effective
21 treatment. And then, too, another category would be
22 dealing with the taste and odor issues. We
23 definitely would have further investigations on that.
24     Q.   Do you view that as something that is
25 separate and apart from the hiring of a consultant

Page 478

1  regarding taste and odor that we talked about
2  earlier, or is that the same thing?
3      A.   The same thing.
4      Q.   All right. So, now, other than what
5  we have discussed so far, are there any other
6  investigative costs that you expect the City of
7  Fresno to incur in the future?
8      A.   I can't recall anything right
9  offhand, but it doesn't mean that something else
10 won't come up.
11     Q.   But, as you sit here today, you can't
12 think of anything else?
13     A.   Right.
14     Q.   All right. Now, based on my notes,
15 the third category of future costs that you mentioned
16 earlier today was production well sampling. And I'm
17 curious, do you have an estimate as to how much money
18 the City of Fresno expects to spend in the future
19 related to production well sampling for MTBE?
20     A.   It would be consistent with what
21 we've been spending in the past. But I don't know
22 that value specifically.
23     Q.   Other than looking at what has been
24 spent in the past, are you aware of any other
25 information that would help us to estimate how much

Page 479

1  the City of Fresno is going to spend in the future
2  for well sampling related to MTBE?
3      A.   Offhand, I don't know of any other
4  information.
5      Q.   And has there been any sort of
6  budgeting or forecasting by the City of Fresno
7  related to how much it's going to spend in the future
8  for well sampling related to MTBE?
9      A.   I don't know specifically. I don't
10 know.
11     Q.   All right. Fourth topic. The fourth
12 one you listed was City staff costs. Do you have any
13 estimate, as you sit here today, as to how much money
14 the City of Fresno expects to incur -- or incur in
15 terms of staff costs related to dealing with MTBE?
16     A.   I don't have a feel for that, no.
17     Q.   Are you aware of any facts or
18 information that we could look at to try to estimate
19 what they would be in the future?
20     MR. MILLER: Apart from expert testimony
21 later?
22     MS. ROY: Yes. Apart from expert testimony.
23     THE WITNESS: I don't have any additional
24 information on that.
25 ///

Page 480

1  BY MS. ROY:
2      Q.   Do you know if the City of Fresno has
3  estimated future staff time dealing with MTBE in any
4  budget or any forecast?
5      A.   I'm not aware of that.
6      Q.   All right. So the fifth category --
7  we're almost done -- you identified were treatment
8  costs. And we have already talked somewhat about
9  that. But I want to just get into a little more
10 detail with you -- or, actually, I want to
11 talk now not about the treatment at a station but,
12 rather, treatment potentially at a well in the
13 future.
14     A.   A municipal well?
15     Q.   A municipal well, that's right.
16     And if you could pull back out Exhibit 4,
17 our favorite exhibit. That was the one -- the thick
18 one. You got it.
19     And if you turn to page 24, please.
20 Exhibit 24 has a table that estimates capital costs
21 associated with the installation of GAC treatment
22 facilities on various wells; am I right?
23     A.   Yes.
24     Q.   And I think you testified earlier
25 that as of right now, none of the City's wells need a

City of Fresno 30(b)(6) - Brock Buche & Robert Little

Page 481

1  GAC treatment system installed right now to deal with
2  MTBE; is that right?
3      A.  That's correct.
4      Q.  And, as we sit here today, there are
5  no specific plans to install a GAC treatment facility
6  on any of the wells in the City; is that right?
7      A.  For?
8      Q.  For MTBE. Thank you for the
9  clarification.
10     A.  Not that I'm aware of.
11     Q.  Now, if you will look at the table on
12 page 24, you will see that for each well there's a
13 dollar estimate for the amount of money that it's
14 essentially going to cost to build a GAC treatment
15 facility. Do you see that?
16     A.  Yes.
17     MR. MILLER: The capital cost.
18     MS. ROY: The capital cost. Thank you.
19     Q.  And I believe you testified that it
20 was Boyle Engineering that prepared these numbers?
21     A.  Yes.
22     Q.  Are you aware of any information or
23 facts that would help us to verify the accuracy of
24 these numbers?
25     A.  I'm not. You would need an

Page 482

1  consultant expert on that.
2      Q.  Now, if you could also -- keeping
3  that one out, if you could also pull out Exhibit 27,
4  which I think is the one sitting right on the top.
5          And I apologize, I don't have a copy of
6  Exhibit 27. Can you just remind us for the record
7  what it is, please.
8      A.  It's a list of wells that Bob Little
9  provided to the Water Board that had detections of
10 MTBE.
11     Q.  Aside from the wells that are listed
12 in Exhibit 4 on page 24 that the City of Fresno
13 believes may have to have GAC installed in the
14 future, do any other wells listed on Exhibit 27 also
15 need to have GAC installed in the future?
16     MR. MILLER: Counsel, some of that is
17 covered in the supplemental answers to
18 interrogatories. And some of them on this list are
19 brand-new detections that occurred in the most recent
20 round of testing.
21     MS. ROY: First, Duane, can you point me to
22 where in the supplemental answer you're referring to.
23     MR. MILLER: Sorry.
24     MS. ROY: It's Exhibit 5.
25     MR. MILLER: There's a list of wells, for

Page 483

1  example, on page 7. And I haven't had a chance to
2  compare, but I'm seeing no obvious overlap, with the
3  exception of Well 205, which is on both lists. But
4  I'm just doing a quick comparison.
5  BY MS. ROY:
6      Q.  Mr. Büche, what I'm trying to do is
7  get a definitive list from you with respect to which
8  wells the City believes that in the future it may
9  need to install GAC treatment for MTBE.
10         Is that something that you can do, as you
11 sit here today?
12     A.  I don't think anybody can do that
13 here today. I mean, as the contamination spreads, it
14 can be detected at more wells, and, you know, that
15 would certainly potentially go beyond this list here.
16 So I don't think there's a definitive answer to that
17 question.
18     Q.  What we have in front of us, we have
19 Exhibit 4, which was prepared in 2008, which lists,
20 it look likes a half -- a dozen wells or so that the
21 City thinks might need GAC treatment.
22         And I want to know which other wells you
23 think need GAC treatment that aren't included in this
24 list. Is that something that you can do, or you're
25 just saying that there's potential, but you don't

Page 484

1  know which ones?
2      A.  I mean, it would be a matter of
3  having to sit down and work with the appropriate
4  experts to evaluate the information available. And
5  certainly there's no way to determine, you know,
6  additional sites beyond what are here in front of us
7  that could be impacted.
8      Q.  So, make sure I understand. What
9  you're telling me is that right now you can't tell us
10 what other wells might need it; you would need an
11 expert to do that work. Is that correct?
12     A.  It would even go beyond having an
13 expert help us, because we can only make projections
14 that not even an expert could identify other wells
15 being impacted.
16     Q.  I understand. Thank you.
17         If you flip to page 25 of Exhibit 4. At the
18 top of the page it's talking about Well 219. And it
19 states that, "The City does not have a treatment
20 estimate for Well 219 at this time."
21     A.  Yes.
22     Q.  And that's as of 2008, when this was
23 drafted.
24         Does the City now have a treatment estimate
25 for Well 219?

```
 1                    REPORTER'S CERTIFICATE
 2          I, SANDRA BUNCH VANDER POL, Certified
 3    Shorthand No. 3032 for the State of California do
 4    hereby certify:
 5          That prior to being examined, the witness
 6    named in the foregoing deposition was duly sworn to
 7    testify to the truth, the whole truth, and nothing
 8    but the truth.
 9          That said deposition was taken down by me
10    stenographically at the time and place therein named,
11    and thereafter reduced by me into typewritten form,
12    and that the same is a true, correct and complete
13    transcript of said proceedings.
14          Before completion of the deposition, review of
15    the transcript was requested.  Any changes made by
16    the deponent (and if provided to the reporter) during
17    the period allowed are appended hereto.
18          I further certify that I am not interested in
19    the outcome of the litigation.
20          Witness my hand this 14th day of April,
21    2011.
22                    _____
23                    SANDRA BUNCH VANDER POL
24                    Certified Shorthand Reporter
25                    Certificate No. 3032
```

John D. Whiting, RG

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl       :  Master File No. 1:00-1898
Ether ("MTBE")              :  MDL 1358 (SAS)
Products Liability          :
Litigation                  :
_____

This Document Relates to:

City of Fresno v. Chevron U.S.A.
Inc., et al.
Case No. 04 Civ. 04973 (SAS)
_____/

------
APRIL 25, 2011
------

    Videotaped Deposition of JOHN D. WHITING, RG,
Volume I, California Regional Water Quality Board,
Central Valley Region, Fresno Branch 30(b)(6) Designee,
held in the Law Offices of McCormick Barstow LLP, 5 River
Park Place East, Fresno beginning at 9:09 a.m., before
Sandra Bunch VanderPol, FAPR, RMR, CRR, CSR #3032

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

John D. Whiting, RG

Page 30

1  Q.  Does that mean that there may be some
2  instances where you think that there's someone who
3  knows more about a topic that you do?
4  A.  I'm certain there is.
5  Q.  If we get into a situation where I'm
6  asking you questions and you don't feel that you have
7  the information to answer them, let me know. We can
8  talk about how to handle that.
9  A.  Okay.
10 Q.  But, as you sit here today, you were
11 the one designated as the one to talk for the
12 Regional Board?
13 A.  Yes, I was.
14 Q.  Can you briefly describe what your
15 job duties are?
16 A.  I provide regulatory oversight for
17 leaking underground storage tank release cases in
18 several counties, as I mentioned. That would be
19 Kings County, Kern County, Tulare County, and some
20 sites within the City of Fresno. And I interface
21 with the dischargers -- the responsible parties for
22 the releases.
23 I prepare correspondence requesting or
24 formally requiring corrective action, which is
25 investigation or cleanup, of those sites.

Page 31

1  And I populate the GeoTracker online
2  database that our agency -- well, the State Water
3  Resources Control Board, our parent organization,
4  maintains.
5  And I am a -- I supervise a student intern
6  and am currently co-lead of our Underground Storage
7  Tank Unit.
8  Q.  Referring back to the second to last
9  page of Exhibit 1. Are you personally responsible
10 for oversight of any of the stations listed?
11 A.  I am personally responsible for
12 oversight of letter A, 2394 South Elm; letter C,
13 2139 South Elm; formerly responsible for letter M,
14 1703 West Olive Avenue. That is now a closed case.
15 And one more -- well, maybe not one more.
16 I am currently learning some of these other
17 cases as the lead interacting with our personnel.
18 MS. ROY: Another exhibit for you. We will
19 mark this one as Exhibit 3.
20     (Exhibit No. 3 was marked.)
21 BY MS. ROY:
22 Q.  Mr. Whiting, have you seen Exhibit 3
23 before?
24 A.  Yes, I have.
25 Q.  Can you tell us what it is, please.

Page 32

1  A.  It is an organization chart for the
2  Fresno office of the Central Valley Regional Water
3  Quality Control Board.
4  Q.  And --
5  MS. ROY: Let's go off the record real
6  quick.
7  THE VIDEOGRAPHER: Going off the record.
8  The time is 9:33.
9     (Off the record.)
10 THE VIDEOGRAPHER: We are back on the
11 record. The time is 9:33.
12 BY MS. ROY:
13 Q.  So you said this is an org chart for
14 your office, basically?
15 A.  Yes, it is.
16 Q.  Is it accurate or has anything
17 changed? I pulled this off of your Website the other
18 day.
19 A.  You're interested in the -- just the
20 tanks and cleanup unit or all? I don't know how
21 accurate it is for all the organization.
22 Q.  But within your organization, the
23 tanks?
24 A.  Within the tanks and cleanup unit, it
25 appears to be accurate. The personnel listed are the

Page 33

1  personnel that are in the underground tanks unit
2  currently.
3  Q.  And do you have an understanding as
4  to when Mr. Noonan is planning to retire?
5  A.  My understanding is he will probably
6  be retiring at the end of this month. He's currently
7  using vacation time and not at the office.
8  Q.  So we should sort of put with an
9  asterisk both your name and Mr. Hannel's name in the
10 top portion of that box?
11 A.  Yes. My understanding, for an
12 undetermined amount of time, due to a state hiring
13 freeze, Mr. Hannel and myself are both acting as
14 co-leads and interacting with our supervisor, who is
15 Lonnie Wass.
16 Q.  And has anyone advised you as to when
17 a formal replacement will take place for Mr. Noonan?
18 A.  No.
19 Q.  And who is Ken Jones?
20 A.  Ken Jones is a recent addition to our
21 unit. He has been working in our unit since, I
22 believe, about December of 2010. He transferred over
23 from our dairy unit because Warren Gross, who is a
24 long-time member of our unit, has been promoted to
25 another unit as the unit chief. So Mr. Jones is

John D. Whiting, RG

### Page 42

1  Jeff Hannel uses caching. And he had records back
2  to, I believe, 2008, 2009. Warren Gross uses caching
3  and has complete records for at least several years
4  back, is my understanding, on his computer.
5  　　　Ken Jones just started working with our unit
6  in December, and I -- I'm not certain if that one
7  month in between the 90 days and when he started
8  working, if that was cached or not. But -- I believe
9  that covers it.
10 　Q.　Is there any sort of standard rule or
11 expectation that certain e-mail might be printed out
12 and put into a paper file?
13 　A.　Yes.
14 　Q.　And what is the policy with respect
15 to that?
16 　A.　For, I believe, at least the last
17 couple of years or year and a half or two, all
18 e-mails that are going to be included of substance
19 that are going to be included in the file are printed
20 out and given to Mr. Wass to review, and then he
21 signs a signature block on a stamp on them, and they
22 are included in the file, the paper file.
23 　Q.　And is there -- has there been any
24 sort of clear statement as to what type of e-mail it
25 is that needs to be printed out?

### Page 43

1  　A.　Well, any -- any substantive e-mail
2  that would have information that would be of use in
3  the file, excluding -- I believe it's attorney-client
4  confidentiality would be placed in the file as a
5  public record to -- of the site investigation, clean
6  up, and our regulatory directives.
7  　　　I don't know if that --
8  　Q.　It sounds to me like it's somewhat a
9  judgment call?
10 　A.　Yes. It is a judgment call. Yes.
11 　Q.　All right. Now, focusing on
12 Topic 8 -- we have gotten into it a little bit
13 here -- which is the Regional Board's policy and
14 procedures regarding document retention and storage.
15 　　　Have you now told me everything there is
16 related to retention and e-mail?
17 　A.　As far as I know, yes.
18 　Q.　What about other documents?
19 　A.　Paper files, documents that are
20 included in a -- in a paper case file are retained,
21 and I'm not certain how many years. That's something
22 that I'm not aware of.
23 　　　Our administrative unit and our I.T. people
24 possibly -- our administrative unit is the unit that
25 deals with that.

### Page 44

1  　　　And when a case is closed -- in other words,
2  there is no further corrective action that our agency
3  requires -- the files are sent to the State Records
4  Center in Sacramento for retention. How long they
5  are there, I'm not certain.
6  　　　But I think at certain times after the case
7  is closed, we have the opportunity to review the
8  status of those files and what should be done with
9  them. "Should they be maintained or should they be
10 destroyed?" I'm not involved in that. So I don't
11 know the particulars of that.
12 　Q.　Are there any other policies or
13 procedures related to document retention?
14 　A.　I suppose there are working --
15 working files that include nonformal documents or
16 just handwritten notes and things. And those are --
17 I'm not certain what those are.
18 　　　Do you know what those are, Patrick?
19 　　　I think we -- I don't personally have any
20 real working files on my cases that I'm aware of.
21 But I believe those are -- should be with the file.
22 Actually, they wouldn't be with a file. I'm not
23 certain.
24 　　　They are not with the file, in the files,
25 the paper filing. They may be somewhere else in our

### Page 45

1  office.
2  　Q.　So if I understand what you're
3  saying --
4  　A.　It might be notes or calculations
5  that the caseworker uses to prepare his response in a
6  formal letter. Everybody, I think, has a little
7  different way of doing that. Some people probably
8  just throw them away. Some people might retain them
9  in an informal paper file, in an manila envelope in
10 their cubicle or something.
11 　Q.　In collecting documents to produce in
12 this litigation, do you know whether anyone searched
13 the working files that you just referenced to see if
14 there was anything responsive to produce?
15 　A.　I don't believe they were. But I --
16 I didn't search them.
17 　Q.　All right. Let's shift gears now.
18 　　　I want to talk about what the Regional
19 Board's role is with respect to remediation at a
20 site. Can you just explain generally what the role
21 is?
22 　A.　Yes. We are -- our organization is
23 charged with preserving and promoting water quality
24 in general, for beneficial uses of water, which
25 includes municipal -- municipal use, which is

```
1              REPORTER'S CERTIFICATE
2         I, SANDRA BUNCH VANDER POL, Certified
3    Shorthand No. 3032 for the State of California do
4    hereby certify:
5         That prior to being examined, the witness
6    named in the foregoing deposition was duly sworn to
7    testify to the truth, the whole truth, and nothing
8    but the truth.
9         That said deposition was taken down by me
10   stenographically at the time and place therein named,
11   and thereafter reduced by me into typewritten form,
12   and that the same is a true, correct and complete
13   transcript of said proceedings.
14        Before completion of the deposition, review of
15   the transcript was requested.  Any changes made by
16   the deponent (and if provided to the reporter) during
17   the period allowed are appended hereto.
18        I further certify that I am not interested in
19   the outcome of the litigation.
20        Witness my hand this 1st day of May, 2011.
21
22              Sandra Bunch VanderPol
                ------------------------------
23              SANDRA BUNCH VANDER POL
24              Certified Shorthand Reporter
25              Certificate No. 3032
```