# EXHIBIT 12

### Steven Rhodes and Martin McIntyre Deposition Excerpts

- Rhodes Dep. 24-25, Mar. 29, 2011 & Ex. 3; and

- McIntrye Dep. 38–39, 78, 95–96, Mar. 16, 2011 & Ex. 2

Steven T. Rhodes, R.E.H.S.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl      :   Master File No. 1:00-1898
Ether ("MTBE")             :   MDL 1358 (SAS)
Products Liability         :
Litigation                 :

This Document Relates to:

City of Fresno v. Chevron U.S.A.
Inc., et al., et al.,
Case no. 04 Civ. 04973 (SAS)
_____/

------
MARCH 29, 2011
------

    Videotaped Deposition of STEVEN T. RHODES,
R.E.H.S., Volume I, Fresno County Department of Public
Health's 30(b)(6) Designee, held in the Law Offices of
McCormick Barstow LLP, 5 River Park Place East,
Fresno, beginning at 9:10 a.m., before Sandra Bunch
VanderPol, FAPR, RPR, RMR, CRR, CSR #3032

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Steven T. Rhodes, R.E.H.S.

### Page 22

1  volume of cases that she had requested. I believe it
2  was starting in November, and I think we just
3  finished, you know, part of -- midway into last
4  month.
5      Q.  If you look at the list of sites on
6  page 4 of the subpoena, did Ms. Hydrick request
7  documents for all of those sites?
8      A.  All but one.
9      Q.  Which one is that?
10     A.  3996 North Parkway Drive. X.
11     Q.  And subsequently you produced those
12 documents to the law firm of King & Spalding on
13 Monday; is that right?
14     A.  That is correct.
15     Q.  Do you have copies of those here?
16     A.  No, I do not.
17     Q.  Well, we will make sure -- were any
18 provided to Miller, Axline & Sawyer or Ms. Hydrick?
19     A.  No.
20     Q.  We will make sure that they get that
21 immediately.
22     Other than those documents that were
23 produced beginning in the time frame of November to
24 recently, and the 3996 North Parkway documents, and
25 these documents that you've brought today, are there

### Page 23

1  any other documents that you're aware of that are
2  responsive to the document request in the subpoena?
3      A.  Not in our possession.
4      Q.  You had mentioned that the main part
5  of the documents for the Fresno County are
6  electronic. And then later you said that not
7  everything is electronic.
8      Can you explain what Fresno County has
9  that's not electronically stored that is responsive?
10     A.  Our office began in mid-2003 of
11 having the documents that we have on file scanned and
12 stored electronically in a system called FileNet.
13 It's a proprietary system.
14     And because of time constraints on clerical
15 staff and budget we lost in the last few years --
16 we've gone from six staff in clerical positions down
17 to two -- and so we have not completed scanning all
18 of our documents. So we had, I think it's like "A"
19 to "E" completely in electronic format, and from "E"
20 to "Z" we have files that still have some hard
21 copies.
22     Anything from 2003 forward we scanned
23 electronically, you know, as they came in, as opposed
24 to going in and getting into those other files. So
25 anything new had been scanned. Anything behind that

### Page 24

1  in age may still be in paper copy.
2      Q.  What is the Fresno County's retention
3  policy regarding documents?
4      A.  It depends on the program in our
5  department. And for the records that we -- were
6  requested in the subpoena, it's a permanent record.
7  It should not be destroyed.
8      And I have a copy of our policy, if that
9  would be helpful.
10     MR. GRENARDO: It would. Let's mark that,
11 for the record, as Exhibit 3.
12     THE WITNESS: And I brought six copies of
13 that.
14     MR. GRENARDO: Perfect.
15     (Exhibit No. 3 was marked.)
16     MR. GRENARDO: And we had premarked as
17 Exhibit 2 the C.V. of Mr. Rhodes, which we will
18 discuss later.
19     Exhibit No. 2 was marked.)
20 BY MR. GRENARDO:
21     Q.  Can you quickly point us to where in
22 this retention policy documents relating to -- or
23 that may be responsive to the subpoena would fall
24 under?
25     A.  If you will look on page 3 of 4 --

### Page 25

1  and this is our policy and procedure No. 701 for
2  Environmental Health System. And on page 3 of 4,
3  under the No. 14 "Underground Tanks," if you will
4  notice it's marked "Permanent."
5      Also, in regards to the other programs that
6  are hazardous materials programs, Item No. 6,
7  "Hazardous Materials Disclosure," it's marked
8  "Permanent." No. 7 on the -- is hazardous waste
9  sites; it's marked "Permanent."
10     And at the time this policy was written,
11 those were the three programs we had in our system.
12 And it appears we need to update our policy.
13     But, however, the programs that we now
14 administer under the CUPA program, which is the
15 Certified Unified Program Agency, all of those we've
16 continued to maintain as permanent records.
17     Q.  If you go to No. 18 on page 4 of 4,
18 can you describe that, under "Water"?
19     A.  That particular group of records was
20 designed for our administration of water systems and
21 for individual residences that have drilled water
22 wills. And that's -- that was the intent there.
23     It was not an oversight program with regards
24 to groundwater contamination, other than to notify
25 the agency that they had to do some corrective

```
 1                  REPORTER'S CERTIFICATE
 2           I, SANDRA BUNCH VANDER POL, Certified
 3     Shorthand No. 3032 for the State of California do
 4     hereby certify:
 5           That prior to being examined, the witness
 6     named in the foregoing deposition was duly sworn to
 7     testify to the truth, the whole truth, and nothing
 8     but the truth.
 9           That said deposition was taken down by me
10     stenographically at the time and place therein named,
11     and thereafter reduced by me into typewritten form,
12     and that the same is a true, correct and complete
13     transcript of said proceedings.
14           Before completion of the deposition, review of
15     the transcript was requested.  Any changes made by
16     the deponent (and if provided to the reporter) during
17     the period allowed are appended hereto.
18           I further certify that I am not interested in
19     the outcome of the litigation.
20           Witness my hand this 6th day of April, 2011.
21                  Sandra Bunch VanderPol
22           _____
23           SANDRA BUNCH VANDER POL
24           Certified Shorthand Reporter
25           Certificate No. 3032
```



**County of FRESNO**

DEPARTMENT OF HEALTH
POLICIES AND PROCEDURES

| Manual: Environmental Health System Policy and Procedure | No: 701 |
|---|---|
| Subject: Requirements for Documents and Files | Effective Date: 1-1-92 |

**POLICY:** The Environmental Health System is required by law to maintain records regarding its regulatory actions.

**PURPOSE:** To ensure that files are maintained properly and that essential information will be available when needed.

**REFERENCES:**
1. Department of Health Policy and Procedure Number ADM 05.12 Records Retention.
2. Environmental Health System Policy and Procedure Number 401 Inspection of Public Records.
3. Environmental Health System Policy and Procedure Number 809 Complaint/Service Request Procedure.

**PROCEDURE:**

I. **CONTENT OF FILES**

  A. Records which shall be kept in files include, but are not limited to:

  1. Original inspection reports.
  2. Copies of correspondence.
  3. Laboratory test results.
  4. Photographs and negatives, dated, and properly identified.
  5. Any other pertinent documents or information.

Exhibit 3
Date 3-29-11

| APPROVED BY: [signature] | Reviewed: 1-92 |
|---|---|
| | Revised: 3-25-93 |

Page 1 of 4

H-473 (9/84)

| Subject: Requirements for Documents and Files | No. 701 |
|---|---|

6. Significant contacts shall be recorded indicating name of contacted person, date, and summary of contact, method of contact (telephone, in person), name of involved Environmental Health staff, and date of recording the information.

7. Copies of complaints.

B. All records shall contain a complete date (day, month, and year), and if appropriate for the type of record, name of the Environmental Health staff involved.

C. Unless preprinted as confidential, confidential information should be stamped "confidential" in red before it is filed or given to the clerical staff for filing. Confidential information in a file shall be segregated from nonconfidential information. (Refer to Environmental Health System Policy and Procedure 401 "Inspection of Public Records" for detailed description of confidential information.)

D. Further information regarding documents and files is provided in Attachment 1.

II. **RETENTION OF FILES**

A. Environmental Health file records shall be retained as follows:

| | | |
|---|---|---|
| 1. | All complaints (not part of a file) | Four years |
| 2. | Dairy Inspections | Lesser of 10 or life of dairy + five years |
| 3. | Disaster Worker Registration | Up to five years after end of employment/registration. |
| 4. | Division of Real Estate Notice | Five years |
| 5. | Food | Lesser of 10 years or life of business + five years |
| 6. | Hazardous Materials Disclosure | Permanent |

| APPROVED BY: [signature] | Revised: 11-17-92 |
|---|---|

| Subject: Requirements for Documents and Files | No: 701 |
|---|---|

| | | |
|---|---|---|
| 7. | Hazardous Waste Sites | Permanent |
| 8. | Housing | |
| | a. Demo/Rehab | Lesser of 10 years or life of building + five years |
| | b. Owner/Occupied | Five years |
| | c. Employee Housing | Seven years |
| | d. Employee Housing Exemptions | Five years after exemption has expired |
| 9. | Land Use | Final Act + 10 Years |
| 10. | Milk | |
| | a. Inspections | Two years |
| | b. Lab Test Results | Five years |
| 11. | Pools (Municipal) | Life of structure + five years |
| 12. | Pools (non government) | Lesser of 10 years or life of pool + 5 years |
| 13. | Rabies (bites) | Four years |
| 14. | Underground Tanks | Permanent |
| 15. | Vector Control | Lesser of 10 years or life of building + five years |
| 16. | Waste, Liquid | Monthly pumping records: 3 years. Inspection: Lesser of 10 years or life of business + 5 years |
| 17. | Waste, Solid | Permanent |

| APPROVED BY: [signature] | Revised: 3-25-93 |
|---|---|

Page 3 of 4

Martin R. McIntyre

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl      :   Master File No. 1:00-1898
Ether ("MTBE")             :   MDL 1358 (SAS)
Products Liability         :
Litigation                 :

This Document Relates to:

City of Fresno v. Chevron U.S.A.
Inc., et al., et al.,
Case no. 04 Civ. 04973 (SAS)
_____/

------
Wednesday, March 16, 2011
------

    Videotaped Deposition of MARTIN R. McINTYRE,
held in the Law Offices of McCormick Barstow LLP,
5 River Park Place East, Fresno, beginning at 9:06 a.m.,
before Sandra Bunch VanderPol, FAPR, RPR, RMR, CRR,
CSR #3032

GOLKOW TECHNOLOGIES, INC.
877.370.3377  ph|917.591.5672 fax
deps@golkow.com

**Page 38**

1  A. My recollection was that at some time
2  it was 13 and 3, but my memory could be --
3  Q. We are going to look at some --
4  A. -- may not serve me well.
5  Q. I am sorry to cut you off.
6  We are going to look at some documents.
7  Would it refresh your recollection that the detection
8  reporting limit to the state was 3 parts per billion
9  while you were at the City of Fresno?
10  A. Are you asking if I recall that? I
11  do not, as I sit here today.
12  Q. Does that sound familiar?
13  A. The 3 parts sounds familiar. I
14  just...
15  Q. And the City of Fresno had no policy
16  regarding a certain level relating to MTBE that
17  determined what type of action the City would take at
18  any point?
19  MR. MILLER: You're asking about
20  MTBE-specific policies?
21  MR. GRENARDO: That's right.
22  THE WITNESS: I don't recall any -- any
23  specific policy, just a growing concern about the
24  constituent.
25  ///

**Page 39**

1  BY MR. GRENARDO:
2  Q. What was that growing concern?
3  A. In our -- in the City's service area,
4  there were some 350 to 400 identified leaky
5  underground tanks, mostly fuel tanks. And we knew
6  that MTBE was showing up in certain monitoring wells
7  and were concerned about its ultimate migration into
8  the 300-plus high production wells that the City
9  operated.
10  Q. What time frame are we talking about
11  here, Mr. McIntyre?
12  A. To the best of my recollection, that
13  would have been late '90s to -- even though I wasn't
14  directly involved, I presume that concern continued
15  up until my departure during the period of time when
16  I was the Public Works Director -- I'm sorry -- the
17  Public Utilities Director.
18  Q. And that was up until 2005?
19  A. Correct.
20  Q. And you said that you knew MTBE was
21  showing up in certain monitoring wells. Which
22  monitoring wells?
23  A. I don't recall any in specific. But
24  my recollection was that it had been identified in
25  certain private remedial investigation wells. And I

**Page 40**

1  believe that it occurred in a couple City of Fresno
2  monitoring wells.
3  Q. Do you remember which City of Fresno
4  monitoring wells those were?
5  A. I do not.
6  Q. And this is all in the late '90s time
7  frame when this began?
8  A. That's the best of my recollection,
9  as I sit here today.
10  Q. Let me try and summarize.
11  So as -- in the late '90s, 1990s, the City
12  of Fresno was aware of MTBE in its water system; is
13  that right?
14  A. That there was MTBE in the aquifer as
15  a consequence of those many leaky underground tanks.
16  Q. And that's in the late 1990s,
17  correct?
18  A. That's the best of my recollection,
19  but I'm certain that water quality data would -- from
20  the City of Fresno would identify exactly when that
21  was.
22  Q. Do you have any recollection
23  regarding the underground storage tanks that you have
24  mentioned? You said 350 or 400.
25  MR. MILLER: You want him to name them?

**Page 41**

1  BY MR. GRENARDO:
2  Q. In general, do you recall where they
3  were? Were they in specific spots?
4  A. Wow.
5  MR. MILLER: Gee, where streets were?
6  THE WITNESS: Actually they were --
7  MR. GRENARDO: Pull out the map, Duane.
8  THE WITNESS: I at one time had a map
9  prepared that plotted the database maintained by the
10  Regional Water Quality Control Board.
11  We plotted the location of leaky underground
12  tanks, and they were pretty well dispersed over most
13  of the urban area, except for the newest areas where
14  tanks were new or less likely to leak. And many of
15  the later ones had special containment and monitoring
16  devices to identify leaks before they entered the
17  subsurface.
18  But, no, I don't -- I don't have any
19  particular recollection about any specific leaky
20  underground tanks.
21  BY MR. GRENARDO:
22  Q. And you don't recall any specific --
23  A. I do -- excuse me. I do -- I do
24  remember -- I do remember a couple tanks, just
25  because they were located in sensitive areas. One at

Martin R. McIntyre

Page 78

1  that position, but he held it until 1994.
2       Q.   Did he leave the City after 1994?
3       A.   Yes, I believe he did.
4       Q.   Do you know where he currently is?
5       A.   I -- I don't. He's -- I do know that
6  he's retired. If he's -- I'm not even certain he's
7  still alive. He has a neuromuscular degenerative
8  disease.
9       Q.   If you go to the first page of your
10 C.V. under "Water System Manager," from 1994 to 2000,
11 who reported to you during that time? I mean, who
12 was directly below you?
13      A.   Doug Kirk; Garth Gaddy; I believe a
14 gentleman named Stan Mayer, although I'm not certain
15 of his last name.
16      Q.   Who did you report to during that
17 time, 1994 to 2000, as the Water System Manager?
18      A.   I reported, I believe, for an initial
19 period of time to the Public Works Director and then
20 to the Public Utilities Director.
21      Q.   Who were they?
22      A.   Dan Traffikan and Bill Hetland.
23      Q.   Was Dan Traffikan the Public Works
24 Director?
25      A.   He was actually the Assistant Public

Page 79

1  Works Director.
2       Q.   How long was he with the City of
3  Fresno?
4       A.   Over 25 years.
5       Q.   Do you know when he left?
6       A.   I believe sometime between 1998 and
7  2000.
8       Q.   And you had mentioned another
9  individual -- before we get there, do you know where
10 he is currently, Dan Traffikan?
11      A.   I know he lives in Fresno.
12      Q.   You mentioned another individual,
13 Bill Hetland?
14      A.   Hetland.
15      Q.   Hetland.
16 What was his title?
17      A.   He was the Public Utilities Director.
18      Q.   How long was he with the City?
19      A.   The best of my recollection, three
20 years, maybe four.
21      Q.   Do you know when he left?
22      A.   I believe it would have been
23 somewhere around 1998.
24      Q.   And then at the City of Fresno,
25 finally, you were the Director of the Department of

Page 80

1  Public Utilities from 2000, 2005, correct?
2       A.   Correct.
3       Q.   And did you deal with treatment of
4  constituents basically the whole time you were at the
5  City of Fresno?
6       A.   Rather indirectly. As the director
7  of the department, I largely managed the personnel
8  management with a staff of 650 that involved five
9  different operational divisions, one of which was the
10 water system.
11      Q.   Who made decisions at the City of
12 Fresno while you were there regarding when to treat a
13 production well for a constituent?
14      MR. MILLER: You want the names or you want
15 an understanding of the positions, or what? And you
16 haven't specified the capital amount, which could
17 affect the answer.
18      THE WITNESS: I would say generally it would
19 be most often or most centrally the Water System
20 Manager, but City Council would make the ultimate
21 decision based on any contracts issued. Utilities
22 Director and City Manager had -- and Budget Directors
23 all had tangential involvement in that process.
24 BY MR. GRENARDO:
25      Q.   And you were the water system manager

Page 81

1  from 1994 to 2000, correct?
2       A.   Correct.
3       Q.   So you said generally it would be
4  most often or most centrally the water system
5  manager. So that was you for a period of time?
6       A.   Yes. Would make that -- would make
7  the recommendation or advance the proposal for
8  appropriations and approval by the City Council.
9       Q.   When you were the water system
10 manager, what was part of your decision-making
11 process in terms of deciding whether or not to
12 recommend treatment for a constituent?
13      A.   Well, there were --
14      MR. MILLER: It's overbroad. Calls for a
15 narrative. Insufficient facts on which to base a
16 hypothetical.
17      Go ahead.
18      THE WITNESS: Off the -- off-the-cuff, I
19 would say there were several criteria. One would be
20 the immediate need for water supply, the other would
21 be -- and over time became an increasingly important
22 criteria, that is, managing the migration of
23 contaminants in the aquifer.
24      Early on we had a simple solution, which
25 would be to shut off a well when it became

21 (Pages 78 to 81)

Martin R. McIntyre

Page 94

1  A. That's the case with this one, yes.
2  Q. Does it have any other names that it
3  goes by?
4  A. Not to my immediate recollection.
5  Q. If you go to the second page of this
6  exhibit, Bates stamped ending -6098. Are you there?
7  A. I am.
8  Q. At the bottom -- towards the bottom
9  of the page, the last paragraph before the bullet, it
10 says, "Long-range planning efforts and successful
11 settlements of the City's DBCP lawsuit have been key
12 to the successful pace of repairs that are currently
13 underway."
14     Did I read that correctly?
15 A. Yes.
16 Q. And I'm asking you that for the sake
17 of the record, not to comment on my aptitude for
18 reading.
19     MR. MILLER: Well, I will feel free to do
20 all that for you.
21     MR. GRENARDO: Thank you, Duane.
22 Q. That statement that I just read about
23 the DBCP lawsuit is something that I alluded to -- we
24 alluded to earlier talking about the City of Fresno
25 could put in the CCRs issues relating to the water

Page 95

1  system that it believes the consumer should know
2  about, correct?
3  A. Correct.
4  Q. That aren't mandated to be in there
5  because of the state, correct?
6  A. Yes.
7  Q. Do you recall when the City of Fresno
8  started sampling for MTBE?
9  A. I do not.
10 Q. Does 1997 sound about right? I have
11 a document here, if you don't recall.
12 A. I don't recall.
13     THE REPORTER: Exhibit 4.
14     (Exhibit No. 4 was marked.)
15 BY MR. GRENARDO:
16 Q. I hand to the court reporter a
17 document we marked as Exhibit 4, dated April 15th,
18 1997, Bates stamped FRESNO-MTBE-006075 through
19 -006076.
20     Have you seen this document before?
21 A. I would presume I have, since it has
22 my notations on it.
23 Q. Any reason to believe that you
24 haven't seen it?
25 A. No.

Page 96

1  Q. Any reason to believe you didn't --
2  you didn't receive it?
3  A. No.
4  Q. What is this document?
5  A. It's a document from the Department
6  of Health Services alerting community water systems
7  to a requirement to start monitoring or sampling for,
8  analyzing for MTBE in areas considered vulnerable,
9  such as leaking underground storage tanks and
10 associated piping and, it appears, notifying the City
11 to commence that monitoring.
12     And it also notices an action -- an Interim
13 Action Level of an unregulated compound of
14 35 micrograms per liter.
15 Q. So this was before there was a
16 primary and secondary MCL, correct?
17 A. Yes.
18 Q. Do you know if the City of Fresno
19 started sampling at that point, as directed?
20 A. I don't know, as I sit here, but I
21 would presume so.
22 Q. Other than this document, do you have
23 any idea of when the City of Fresno may have started
24 sampling for MTBE?
25 A. I do not.

Page 97

1     THE REPORTER: Exhibit 5.
2     (Exhibit No. 5 was marked.)
3  BY MR. GRENARDO:
4  Q. We have marked as Exhibit 5 a "Water
5  Quality Annual Report 1999," Bates stamped
6  FRESNO-MTBE-006121 through -006128.
7     Have you seen this document before?
8  A. I don't recall it, but I'm sure I
9  have.
10 Q. What is it?
11 A. It is the Consumer Confidence Report
12 for 1999 for the City of Fresno.
13 Q. When you look at the constituents
14 that are listed at page Bates stamped 006123 and
15 -6124, are there any that stand out to you?
16 A. I am sorry. Could you be a little
17 more specific in your question?
18 Q. Sure.
19     When you look at the constituents on those
20 two pages, other than the constituents that we have
21 already talked about, are there any others that were
22 contaminants of concern to the City of Fresno at that
23 time?
24 A. That's a long list of constituents,
25 but I don't see any that jump out as constituents of

25 (Pages 94 to 97)

```
 1                REPORTER'S CERTIFICATE
 2         I, SANDRA BUNCH VANDER POL, Certified
 3   Shorthand No. 3032 for the State of California do
 4   hereby certify:
 5         That prior to being examined, the witness
 6   named in the foregoing deposition was duly sworn to
 7   testify to the truth, the whole truth, and nothing
 8   but the truth.
 9         That said deposition was taken down by me
10   stenographically at the time and place therein named,
11   and thereafter reduced by me into typewritten form,
12   and that the same is a true, correct and complete
13   transcript of said proceedings.
14         Before completion of the deposition, review of
15   the transcript was requested.  Any changes made by
16   the deponent (and if provided to the reporter) during
17   the period allowed are appended hereto.
18         I further certify that I am not interested in
19   the outcome of the litigation.
20         Witness my hand this 20th day of March,
21   2011.
22              Sandra Bunch VanderPol
                ------------------------------
23              SANDRA BUNCH VANDER POL
24              Certified Shorthand Reporter
25              Certificate No. 3032
```

**MARTIN R. McINTYRE- CV**
1761 E Ticonderoga
Fresno California
559-593-3448
e mail: martin.m3653@sbcglobabl.net

### GENERAL MANAGER, San Luis Water District (4/2006-Present)
Chief Executive for 66,000 acre California Water District
- Water service to urban and agricultural customers
- Oversight of planning, engineering and water development
- Administration of 125,000 acre-foot Central Valley Project water contract
- Supplemental water acquisition
- Bay Delta activity oversight
- Represent District with US Bureau of Reclamation and Department of Water Resources in water transfers, project development and interagency activities

### MARTIN MCINTYRE, Consulting (4/2005-Present)
Consulting support to Water Districts, Industry, Land Development
- Water supply planning and resource management
- Regulatory interface
- Project management

### CITY OF FRESNO, Director, Department of Public Utilities (6/2000-2/2005)
Executive management of municipal utilities, including: Water, Wastewater, Solid Waste, Community Sanitation. $126 million annual O&M budget, $100 million Capital Improvement program, 560 employees, service population 500,000.

- Developed comprehensive strategic utility service delivery plan
- Oversight of groundwater contaminant sites/remediation throughout City. Interface with Department of Health Services and Department of Toxics Substance Control
- Executive oversight of legal, environmental and legislative programs
- Oversight of large CIP program, including $40 million Drinking Water Treatment Facility and $60 million Wastewater Reclamation Facility expansion.

### CITY OF FRESNO, Water System Manager (1994-2000)
Management of full service municipal water utility: service population 500,000, $30 million annual O&M budget, $10-20 million annual capital budget, 160 employees, 250 wells, 132 million gallon per day potable water production and treatment.

- Planned, financed and implemented a $40 million water quality remediation program to address extensive groundwater contamination.
- Developed positive relations with regulatory agencies, business, academic, political, environmental and agricultural interests.
- Developed and implemented plume management plans in collaboration with DTSC and DHS



Exhibit  2
Date  3-16-11
Deponent McIntyre

**CITY OF FRESNO, Water Quality and Production Manager** (1988-1994)
Management of Water Resources, Wellhead Treatment, Recharge, Conservation and Information Systems, 55 employees

- Project Manager for a five agency, 50 year, Metropolitan Water Resource Management Plan
- Developed comprehensive remedial programs and well head treatment designs to address groundwater contamination.
- Developed comprehensive public information program, including risk communication and media management

**FRESNO COUNTY WATER WORKS DISTRICTS** (1979-1988)
Operations Manager for six Special Service Districts including four potable water systems and three wastewater treatment systems. Responsibilities included water supply planning, operations, construction management, and CIP.

- Promoted and implemented first water conservation and metering programs
- Developed new water supply sources
- Developed and implemented corrosion control program
- Successful capital improvement grant and low interest loan programs
- Oversight of $5 million Clean Water Grant master sewerage project.

## EDUCATION

AA, Fresno City College- 1972
U. C. Berkeley- areas of study: psychology, anthropology, 1973
Continuing Education:
U. C. Davis Extension- areas of study: hydrology, chemistry, groundwater remediation. Numerous focused course work from various extension and vocational programs , areas of study: water treatment, business management practices, communications, public relations.

## BOARD MEMBERSHIPS

- San Joaquin Valley Drainage Authority
- Central Valley Project Water Association
- State and Federal Contractor Water Agency
- San Luis Delta Mendota Water Authority

## AFFILIATIONS

- Delta Habitat Conservation and Conveyance Program
- Association of California Water Agencies
- Water Education Foundation
- American Water Works Association
- City/ County Chamber Of Commerce

## AWARDS

- Fresno Bee/Fresno Business Council, "Excellence in Public Service"
- Central California Building Industry Association, "Public Employee of the Year"
- American Public Works Association, "Leadership in Public Works"