UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK
------------------------------------------------- X
                                              :
IN RE: METHYL TERTIARY BUTYL      :
ETHER ("MTBE") PRODUCTS           :
LIABILITY LITIGATION                       :          **OPINION AND ORDER**
------------------------------------------------- :    ___
                                              :     **Master File No. 1:00–1898**
**This document relates to:**              :     **MDL 1358 (SAS)**
                                              :     **M 21-88**
**Hope Koch, et al. v. John R. Hicks, et**   :
**al., 05 Civ. 5745 (SAS)**                :
                                              :
------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.    INTRODUCTION

In this consolidated multi-district litigation, plaintiffs seek relief from

defendants' alleged contamination, or threatened contamination, of groundwater

with the gasoline additive methyl tertiary butyl ether ("MTBE").  The parties have

already engaged in extensive motion practice, and familiarity with the Court's

previous opinions is assumed.[1]  This opinion relates only to *Hope Koch, et al. v.*

---

[1]    *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
No. M21-88, MDL 1358, 2005 WL 3005794 (S.D.N.Y. Nov. 9, 2005); *In re
MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d 340 (S.D.N.Y. 2005); *In re MTBE
Prods. Liab. Litig.*, 399 F. Supp. 2d 325 (S.D.N.Y. 2005); *In re MTBE Prods.
Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 1529594 (S.D.N.Y. Jun. 28,
2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL
1500893 (S.D.N.Y. Jun. 24, 2005); *In re MTBE Prods. Liab. Litig.*, 402 F. Supp.

1

*John R. Hicks, et al.*, 05 Civ. 5745.

Hope and Frank Koch, Robert and Gail Kurtz, Alora and Drake M. Roche, Jennifer and Timothy Stevens, residents of Fallston Maryland, bring this putative class action in Maryland against John R. Hicks[2] and Exxon Mobil Corporation[3] ("Exxon") alleging state law claims of (1) public nuisance, (2) private nuisance, (3) trespass to property, (4) negligence, (5) strict liability for an abnormally dangerous activity, and (6) medical monitoring that would require defendants to conduct monitoring and testing of plaintiffs for early detection and

---

2d 434 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d 242 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 233 F.R.D. 133 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan. 18, 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan. 6, 2005); *In re MTBE Prods. Liab. Litig.*, 364 F. Supp. 2d 329 (S.D.N.Y. 2004); *In re MTBE Prods. Liab. Litig.*, 361 F. Supp. 2d 137 (S.D.N.Y. 2004) ("*MTBE VI*"); *In re MTBE Prods. Liab. Litig.*, 341 F. Supp. 2d 386 (S.D.N.Y. 2004) ("*MTBE V*"); *In re MTBE Prods. Liab. Litig.*, 341 F. Supp. 2d 351 (S.D.N.Y. 2004) ("*MTBE IV*"); *In re MTBE Prods. Liab. Litig.*, 342 F. Supp. 2d 147 (S.D.N.Y. 2004) ("*MTBE III*"); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) ("*MTBE II*"); *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001) ("*MTBE I*").

[2] Hicks operates the Crossroads Exxon located at 2800 Fallston Road in Fallston, Maryland "through a licensing, franchise and/or other agreement" with Exxon. First Amended Class Action Complaint ("Complaint") ¶¶ 4-5.

[3] Exxon Mobil Corporation was formerly known as Exxon Corporation.

treatment of potential diseases caused by exposure to MTBE.[4]  The claims arise

from the alleged contamination of plaintiffs' water supply due to unsafe storage

and leakage from defendants' underground storage tanks at the Crossroads Exxon

gasoline station ("Crossroads Exxon").[5]  Exxon and Hicks have moved to dismiss

this action.  For the following reasons, those motions are denied.

## II.  LEGAL STANDARD

### A.  Prediction of State Law

Plaintiffs bring state law claims under the law of Maryland.  "Except

in matters governed by the Federal Constitution or by acts of Congress, the law to

be applied in any case is the law of the state. . . .  There is no federal general

common law."[6]

In the absence of a definitive ruling on a particular issue by the

highest court of a state, however, this Court must predict what that court would

decide.  States have the primary responsibility to construe their own laws.[7]  In

---

[4]       *See* Complaint ¶¶ 44-95.

[5]       *See id.* ¶ 1.

[6]       *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[7]       *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)
("[T]he State's highest court is the best authority on its own law."); *Erie*, 304 U.S.
at 79 ("The authority and only authority is the State, and if that be so, the voice
adopted by the State as its own (whether it be of its Legislature or of its Supreme

making a prediction of state law a court must determine what the state's highest court would find if presented with the same issue.[8]  This Court previously explained that a plaintiff is entitled to the same treatment it would receive in state court – no more, and no less.[9]

**B.     Rule 12(b)(6)**

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'"[10]  At the motion to dismiss stage, the issue "'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.

The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence

_____

Court) should utter the last word.").

[8]     *See Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005)*.  See also In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 776 (2d Cir. 1996); *Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103, 105 (2d Cir. 1991); *Plummer v. Lederle Labs, Div. of Am. Cyanamid Co.*, 819 F.2d 349, 355 (2d Cir. 1987).

[9]     For a full discussion of the law applicable to the prediction of state law see *In re MTBE Prods. Liab. Litig.*, 2005 WL 3005794, at *2 and *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d at 369-70.

[10]     *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

which might be offered in support thereof."[11]  When deciding a motion to dismiss,

courts must accept all factual allegations in the complaint as true, and draw all

reasonable inferences in plaintiff's favor.[12]  Although the plaintiff's allegations are

taken as true, the claim may still fail as a matter of law if it appears beyond doubt

that the plaintiff can prove no set of facts in support of its claim which would

entitle it to relief, or if the claim is not legally feasible.[13]  Accordingly, a claim can

only be dismissed if "'no relief could be granted under any set of facts that could

be proved consistent with the allegations.'"[14]

### C.    Rules 8 and 12(e)

Rule 8(a) of the Federal Rules of Civil Procedure requires that the

plaintiff must provide "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Rule 8(a) does not require "a plaintiff to plead the

---

[11]    *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (quotation marks and citation omitted).

[12]    *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 30 (2d Cir. 2004) (citation omitted).

[13]    *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, L.L.P.*, 322 F.3d 147, 158 (2d Cir. 2003); *Stamelman v. Fleishman-Hillard, Inc.*, No. 02 Civ. 8318, 2003 WL 21782645, at *2 (S.D.N.Y. Jul. 31, 2003).

[14]    *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (quoting *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984)).

legal theory, facts, or elements underlying his claim."[15] "To comply with Rule 8, plaintiffs need not provide anything more than sufficient notice to permit defendant to file an answer."[16] The only requirement is that a complaint allege the "bare minimum facts necessary to put the defendant on notice of the claim so that [it] can file an answer."[17] Fair notice is "'that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial.'"[18] This notice pleading standard "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."[19] If a party contends that a pleading nonetheless "is so vague or ambiguous that [it] cannot reasonably be required to frame a responsive pleading"

---

[15]     *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir. 2005) (citations omitted).

[16]     *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 323 (S.D.N.Y. 2003) (citations omitted).

[17]     *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002).

[18]     *Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004) (quoting *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995)).

[19]     *Swierkiewicz*, 534 U.S. at 514.  *Accord Conley*, 355 U.S. at 48 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").

the party is not left without a remedy, as the party "may move for a more definite statement" before responding to the pleading.[20]

**D.      Standing**

Constitutional standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."[21]  There are three constitutional requirements that plaintiffs must satisfy in order to establish standing: (1) injury-in-fact – an injury that is "concrete and particularized" and is "actual or imminent, not conjectural or hypothetical," (2) an injury that is fairly traceable to the challenged action, and (3) an injury that will likely be redressed by a favorable ruling of the court.[22]

---

[20]      Fed. R. Civ. P. 12(e).  *Accord Swierkiewicz*, 534 U.S. at 514 ("If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding."); *Phillips*, 408 F.3d at 128.

[21]      *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[22]      *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  *Accord Denney v. Deutsche Bank AG*, __F.3d __, 2006 WL 845727 at *4 (2d Cir. Mar. 31, 2006); *New York Pub. Interest Research Group v. Whitman*, 321 F.3d 316, 325 (2d Cir. 2003) (finding that the allegations of plaintiffs who lived near facilities subject to the Clean Air Act, "about the health effects of air pollution and [] uncertainty as to whether the EPA's" failure to enforce the Clean Air Act exposed them to "excess air pollution," sufficiently established an "injury-in-fact").  *See also Allen v. Wright*, 468 U.S. 737, 751-52 (1984) (noting that the three standing requirements share a common goal – to ensure that the judiciary, and not another branch of government, is the appropriate forum in which to address a plaintiff's

Mere "[a]llegations of possible future injury do not satisfy the requirements of Art[icle] III."[23]  However, an allegation of a threatened injury in the form of an increased risk of future injury that is "certainly impending" is sufficient to establish an injury-in-fact.[24]  The Second Circuit has further explained that in enhanced risk cases, a plaintiff must allege a "credible threat of harm."[25]  The "probability of harm which a plaintiff must demonstrate in order to allege a

complaint).

[23]    *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

[24]    *Id.  See, e.g., Denney*, 2006 WL 845727 at *5-6 (holding that plaintiffs who received fraudulent tax advice and acted in reliance on the advice, though only alleging a "future risk" of being assessed penalties for acting on the advice, had alleged an injury-in-fact); *Covington v. Jefferson County*, 358 F.3d 626, 638-39 (9th Cir. 2004) (holding that, under the Resource Conservation and Recovery Act ("RCRA"), plaintiffs had standing to sue a landfill that was across the street from their home because "[i]f the landfill is not run as required by RCRA, [plaintiffs] are *directly confronted* with the risks that RCRA sought to minimize: Fires, explosions, vectors, scavengers, and groundwater contamination") (emphasis added); *Baur v. Veneman*, 352 F.3d 625, 632-37 (2d Cir. 2003) (holding that in the context of food and drug safety suits, enhanced risk qualifies as sufficient injury to confer standing).

[25]    *Baur*, 352 F.3d at 632, 637 (finding a credible threat from a government regulation because government studies and statements confirmed plaintiffs' key allegations and the alleged risk of harm arose from an established government policy).  *Accord Comstat Corp. v. Federal Commc'ns Comm'n*, 250 F.3d 931, 936 (5th Cir. 2001) ("A threatened injury satisfies the injury in fact requirement so long as that threat is real, rather than speculative.").

cognizable injury-in-fact logically varies with the severity of the probable harm."[26] Distinguishing between a threatened injury satisfying the injury-in-fact requirement and a speculative or hypothetical injury is a matter of degree and each case must be considered on an individual basis.[27]

Although the plaintiffs bear the burden of establishing these elements, the determination of whether Article III standing exists must comport with the "manner and degree of evidence required at the successive stages of the litigation."[28] Thus, when standing is challenged on the basis of the pleadings, a court is required to "'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'"[29] At the pleading stage, an "[a]llegation of a credible risk may be sufficient" without "further factual confirmation or quantification of the precise risk" to establish standing.[30]

---

[26] *Baur*, 352 F.3d at 637 (finding that even a moderate increase in the risk of Creutzfeldt-Jacob disease, a deadly disease with no known treatment, "may be sufficient to confer standing").

[27] *See Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 595-96 (2d Cir. 1988).

[28] *Lujan*, 504 U.S. at 560-61.

[29] *United States v. Vazquez*, 145 F.3d 74, 81 (2d Cir. 1998) (quoting *Warth*, 422 U.S. at 501).

[30] *Baur*, 352 F.3d at 642 (noting that a more stringent view of the injury-in-fact requirement in environmental cases and food and drug safety suits

## III.   DISCUSSION

### A.    Exxon's Motion to Dismiss[31]

#### 1.    Standing for Alora and Drake Roche

Alora and Drake Roche alleged that although the water on their property "has not tested positive for MTBE, the adjacent properties to the east and west have detections of MTBE."[32]  Exxon argues that the Roches lack standing because they do not have any MTBE in their wells.  Exxon claims that plaintiffs have not alleged that MTBE "would be detected at actionable levels sufficient to impair their interests, as opposed to non-actionable levels below federal and state law."[33]  Exxon claims plaintiffs cannot allege that the harm they face is "death, deadly disease, or any disease at all."[34]  Exxon argues that there is only a "mere possibility that MTBE may be carcinogenic" and that this "risk of harm fails to

---

"would essentially collapse the standing inquiry into the merits").

[31]    In his separately filed motion to dismiss, Hicks "adopts in its entirety the Motion to Dismiss filed by ExxonMobil."  Hicks' Motion to Dismiss ("Hicks' MTD") ¶ 18.  Because the motions were filed separately, each defendant's arguments will be treated in turn.  Nonetheless, the discussion regarding Exxon's arguments is equally applicable to Hicks.

[32]    Complaint ¶ 3c.

[33]    Exxon Mobil Corporation's Memorandum in Support of Its Motion to Dismiss the Amended Complaint ("Exxon Mem.") at 19.

[34]    *Id.*

'rise above mere conjecture.'"[35]  Plaintiffs counter that they have alleged

threatened harm in the form of an increased risk of future injury.

This Court characterized the standing issue in a similar MTBE case as

a question of whether plaintiffs' allegations are sufficient to show that plaintiffs

are faced with a present threat of imminent harm.[36]  In that case, some plaintiffs

had tested their wells but had not found any MTBE, and other plaintiffs had not

tested their wells for the presence of MTBE.  There, the "general allegations

concerning the chemical characteristics of MTBE and the widespread MTBE

contamination of groundwater throughout the country" were found insufficient to

establish a "present threat of imminent harm" as to both groups of plaintiffs.[37]

This Court noted that the first group of plaintiffs, from Madison County, Illinois,

had not presented statistics of MTBE detection rates for private wells in the county

or even state; that Madison County was not a participant in the reformulated gas

program (a congressional program whereby gasoline companies were required to

sell oxygenated gasoline); and that ethanol was the "primary oxygenate used in the

---

[35]     Exxon Mobil Corporation's Reply in Further Support of Its Motion to Dismiss the Amended Complaint ("Exxon Reply Mem.") at 10 (quoting *Baur*, 352 F.3d at 636).

[36]     *See MTBE I*, 175 F. Supp. 2d at 607.

[37]     *Id.* at 608-10.

Midwest."[38]  The other group of plaintiffs, from Dutchess County, New York, did not allege that they were "proximately located to, or had a direct connection to, an alleged area of contamination on or near and identified release site."[39]

Unlike plaintiffs in *MTBE I*, the allegations of the Roches are sufficient to present a threat of imminent harm.  The Roches lodged specific allegations demonstrating that they face an increased risk of future injury.  For example, the Roches, whose property is located at 2307 Franklins Chance Drive in Fallston, Maryland, alleged that the neighboring properties have tested positive for MTBE.[40]  Moreover, the Kochs live near the Roches at 2310 Franklins Chance Court and have alleged actual contamination.[41]

The allegations from all plaintiffs also demonstrate that the Roches face an impending threat.  Plaintiffs alleged that "residents surrounding the Crossroads Exxon relied on groundwater wells drawing from the same aquifer as the Crossroads Exxon's supply well for all their water needs" and that this aquifer

---

[38]     *Id.* at 608-09.

[39]     *Id.*

[40]     Complaint ¶ 3c.

[41]     *See id.* ¶ 3a (alleging that the property is contaminated with MTBE "above the laboratory detection limit").

12

is contaminated.[42]  "As of October 28, 2005, at least 360 private wells within a two-mile radius of the Crossroads Exxon have been tested monthly and/or quarterly" and these tests have revealed the presence of MTBE.[43]  Plaintiffs alleged that MTBE is "highly soluble and travels faster and farther in water than other gasoline components."[44]  Plaintiffs also alleged that MTBE's "chemical makeup . . . allows it to persist in underground aquifers for decades at a time."[45] Given the Roches' proximity to property known to be contaminated, these allegations present a threat of contamination that is certainly impending.[46]

In addition, despite Exxon's attempt to deprecate the risk that MTBE poses to plaintiffs, plaintiffs' allegations are sufficient to establish a credible threat of harm.  Plaintiffs alleged that (1) "[a]t a certain point in contamination, MTBE's foul taste and odor render water unusable and unfit for human consumption" and (2) "MTBE is a known animal carcinogen that has been linked to many potential

---

[42]     *Id.* ¶ 20.

[43]     *Id.* ¶ 22.

[44]     *Id.* ¶ 12.

[45]     *Id.*

[46]     *See Covington*, 358 F.3d at 639 (noting that "risks from improper operation of a landfill are in no way speculative when the landfill is your next-door neighbor").

human health problems."[47] Plaintiffs noted that the U.S. Environmental Protection Agency classified MTBE as a possible human carcinogen and is reevaluating "whether to upgrade its carcinogenic classification to a probable human carcinogen."[48] Thus, plaintiffs alleged that MTBE poses a risk to their health. The Roches have made an allegation of a credible risk and that is all that is required at the pleading stage to establish Article III standing.

## 2. Public Nuisance

Maryland courts rely on the definition of a public nuisance set forth in the Second Restatement of Torts, which states that "[a] public nuisance is an unreasonable interference with a right common to the general public."[49] An individual plaintiff can file a claim for a public nuisance if she alleges a special damage, such as physical harm to her land.[50] Plaintiffs' public nuisance claim states that the contamination of the bedrock aquifer by defendant has made the

---

[47]     Complaint ¶ 12.

[48]     *Id.*

[49]     *Tadjer v. Montgomery County*, 479 A.2d 1321, 1327-28 (Md. 1984) (citing Restatement (Second) of Torts § 821B (1979)).

[50]     *See Five Oaks Corp. v. Gathmann*, 58 A.2d 656, 658 (Md. 1948) ("The law has been long settled that an individual may file a bill to restrain the continuance of a public nuisance if it injures or impairs the value of his property."). *Accord* Restatement (Second) of Torts § 821C cmt. d (special injury includes physical harm to a plaintiff's land).

aquifer "unfit for use by all members of the community" for years.[51]  Plaintiffs

alleged that defendants' conduct "unreasonably interferes with the rights of the

community at large to use the bedrock aquifer as a drinking water supply."[52]  Each

plaintiff also alleged that he or she "suffered specific harm different from the

public at large."[53]

Exxon attempts to defeat this claim by arguing that a public nuisance

in Maryland is a criminal offense, and noting that plaintiffs reference no law that

criminalizes Exxon's alleged conduct.[54]  Plaintiffs respond that under Maryland

law criminal conduct is not a required element of a public nuisance; but even

assuming it is, plaintiffs have alleged that MTBE contamination is "proscribed by

state and federal law."[55]

At common law, every public nuisance was a crime.[56]  Many states

---

[51]     Complaint ¶ 45.

[52]     *Id*.

[53]     *Id.* ¶ 48.

[54]     *See* Exxon Reply Mem. at 1; Exxon Mem. at 4.

[55]     Plaintiffs' Memorandum of Law in Support of Their Opposition to Defendant Exxon Mobil Corporation's Motion to Dismiss ("Opp. Mem.") at 3 (citing Complaint ¶ 47).

[56]     *See Potomac River Ass'n, Inc. v. Lundeberg Md. Seamanship Sch., Inc.*, 402 F. Supp. 344, 358 (D. Md. 1975) ("a public nuisance is an interference

15

enacted statutes criminalizing conduct creating public nuisances.[57]  But, the terms

public nuisance and crime have never been interchangeable.[58]  As the Restatement

notes, "interference with a public right is unreasonable" when

> (a) the conduct involves a *significant interference with the public health*, the public safety, the public  peace, the public comfort or the public convenience, *or* (b) . . . the conduct is proscribed by a statute, ordinance or administrative regulation, *or* (c) . . . the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.[59]

Comment d to this section explicitly states that "there is clear recognition that a

defendant need not be subject to criminal responsibility" to be liable in tort for

creation of a public nuisance.[60]

---

with the rights of the community at large and is punishable as a crime by the state").

[57]    *See, e.g., People v. Rubenfeld*, 172 N.E. 485, 486 (N.Y. 1930) ("an act which 'annoys, injures or endangers the comfort, repose, health or safety of any considerable number of persons' is declared to be 'a public nuisance,' and punishable as a crime") (quoting New York Penal Law § 1530).

[58]    *See Wynkoop v. Mayor and City Council of Hagerstown*, 150 A. 447, 450 (Md. 1930) (noting that the term nuisance is not "convertible" with the term crime).

[59]    Restatement (Second) of Torts § 821B (emphasis added).

[60]    *Id.* cmt d.  *See, e.g.*, *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 712 P.2d 914, 922 (Ariz. 1985) (noting that a criminal violation is only one factor among others to be used in determining reasonableness and holding that "conduct which unreasonably and significantly interferes with the

Maryland has long recognized that conduct may constitute a per se public nuisance where the conduct is proscribed by statute, or it may be a public nuisance "in fact" where the conduct is unreasonable in the specific locality and under the circumstances of the situation.[61]  Maryland courts classify public nuisances in three categories: "first, those which are nuisances per se or by statute; second, those which prejudice public health or comfort . . .; third, those which are not nuisances, but may become so by reason of their locality, surroundings, or the manner in which they may be maintained."[62]  Where the circumstances of a particular locality or the manner in which the activities are carried out creates a public nuisance, no statute criminalizing the activity is necessary for plaintiffs to

_____

public health, safety, peace, comfort or convenience is a public nuisance within the concept of tort law, even if that conduct is not specifically prohibited by the criminal law").

[61]  *See Adams v. Commissioners of Trappe*, 102 A.2d 830, 835 (Md. 1954) (noting that there is a distinction between per se public nuisances and public nuisances "in fact").  *See also Yommer v. McKenzie*, 257 A.2d 138, 139 (Md. 1969) (noting that "establishment of a gasoline filling station does not constitute a nuisance per se, but [] it may become a nuisance because of its location or manner in which it is operated.").

[62]  *Adams v. NVR Homes, Inc.*, 135 F. Supp. 2d 675, 689 (D. Md. 2001) (citing *Burley v. City of Annapolis*, 34 A.2d 603 (Md. 1946) and *Tadjer*, 479 A.2d at 1321).

proceed with their claim.[63]

Plaintiffs' allegations here are sufficient to allege public nuisance under any one of the three prongs in the Restatement.[64] Plaintiffs alleged that MTBE contamination in the aquifer "significantly and unreasonably interferes with [plaintiffs'] public health, safety, comfort, and convenience."[65] Plaintiffs also alleged that the contamination is "proscribed by state and federal law."[66] And, finally, plaintiffs alleged that MTBE contamination produced a long-lasting effect,[67] and that defendants knew (or had reason to know) that MTBE would have

---

[63] Though Exxon cites two cases which state that a "public nuisance is a criminal offense" neither case holds that a statute criminalizing the activity is a *prerequisite* to public nuisance. *See* Exxon Mem. at 4 (citing *Hoffman v. United Iron & Metal Co.*, 671 A.2d 55, 64 (Md. Ct. Spec. App. 1996) (declining to decide whether a scrap metal yard and automobile shredding facility was a public nuisance because the issue was not raised below) and *Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 190 (Md. 1994) (holding that the current property owner may not assert a public nuisance claim against the former owner)). Instead, as noted, Maryland relies on the common law definition of public nuisance and the definition found in the Second Restatement of Torts. *See Tadjer*, 479 A.2d at 1327 (relying on the definition of a public nuisance from section 821B of the Restatement). *See also Rosenblatt*, 642 A.2d at 190 (citing to *Tadjer*, 479 A.2d at 1327 for the definition of a public nuisance).

[64] Restatement (Second) of Torts § 821B.

[65] Complaint ¶ 46.

[66] *Id.* ¶ 47.

[67] *See id.* ¶ 12 ("The chemical make-up of MTBE [] allows it to persist in underground aquifers for decades at a time.").

a significant effect upon the public right to a groundwater resource.[68]

Exxon also claims that plaintiffs fail to identify a "public right affected by the conduct."[69]  Exxon argues that the right to use the aquifer is an individual landowner's right and that the community at large has no right to use the bedrock aquifer as a drinking water supply.[70]  Plaintiffs counter that the presence of MTBE in the aquifer "affects the basic right of the community at large to appropriate groundwater for use by the public in the future."[71]  Plaintiffs argue that this right "affects the interest of the community at large."[72]  In addition, plaintiffs assert that because adjacent landowners may only use the groundwater as long as the use does not interfere unreasonably with the rights of neighboring landowners, this right is shared by the public.[73]

A public nuisance must involve "some interference with a public

---

[68]     *See* Complaint ¶¶ 15-18 (noting that Exxon was aware of "specific incidents of MTBE groundwater contamination as early as 1980" and that it was aware of the "properties of MTBE that rendered it a significant threat to groundwater resources").

[69]     Exxon Mem. at 4-5.

[70]     *See* Exxon Reply Mem. at 2.

[71]     Opp. Mem. at 5.

[72]     *Id.* at 4 (citing Restatement (Second) of Torts § 821B cmt. g).

[73]     *See* Opp. Mem. at 5.

right."[74]  However, a public nuisance need not affect the entire community "so

long as the nuisance will interfere with those who come in contact with it in the

exercise of a public right or it otherwise affects the interests of the community at

large."[75]

> In any case in which a private nuisance affects a large number of
> persons in their use and enjoyment of land it will normally be
> accompanied by some interference with the rights of the public as
> well. Thus the spread of smoke, dust or fumes over a considerable
> area filled with private residences may interfere also with the use
> of the public streets or affect the health of so many persons as to
> involve the interests of the public at large.[76]

One public interest that is central to this case is the use of the state's

groundwater.[77]  Maryland courts have favored the "American Rule" governing an

individual's right to use the water in an aquifer beneath their land.[78]  "The

---

[74]     Restatement (Second) of Torts § 821B cmt. g.

[75]     *Id.*

[76]     *Id.*

[77]     *See MTBE I*, 175 F. Supp. 2d at 607 ("It is beyond cavil that the
public has a right to soil and water that is free from environmental
contamination.") (citing *State v. Schenectady Chems., Inc.*, 459 N.Y.S.2d 971, 978
(N.Y. 1983)).

[78]     *See Finley v. Teeter Stone, Inc.*, 248 A.2d 106, 109 (Md. 1968).  The
American Rule is sometimes known as the reasonable use rule.  In Maryland,
subterranean water in an aquifer is known as "percolating water."  *Id.*
("Percolating waters . . . are those which ooze, seep or filter through soil beneath
the surface, without a defined channel, or in a course that is unknown and not

American Rule is based upon the concept that the surface owner's right to obstruct, divert or remove the percolating waters under the surface of his land shall be exercised in such a way that will not unreasonably injure the exercise of a similar right by the owner of neighboring land."[79]  The water rights of an individual under the American Rule are sometimes termed usufructory rights to the groundwater.[80]

Exxon argues that under the American Rule, use of the aquifer is a shared individual right rather than a public right.  Exxon is mistaken.  Though a plaintiff may have usufructory rights to the groundwater, this does not eliminate the public quality of the state's water resources.  In California, for example, where ownership of water is similarly usufructory, the "pollution of the ground and river waters is damage to public property, as well as a direct injury to public welfare."[81]

---

discoverable from surface indications without excavation for that purpose.  The fact that they may, in their underground course, at places come together so as to form veins or rivulets does not destroy their character as percolating waters.") (citations and quotations omitted).

[79]     *Id.* at 112.

[80]     A usufructory right is "[a] right to use . . . another's property for a time without damaging or diminishing it, although the property might naturally deteriorate over time."  Black's Law Dictionary 1542, 1543 (8th ed. 2004).

[81]     *Aerojet-General Corp. v. Superior Crt.*, 257 Cal. Rptr. 621, 629 (1989).

In addition, courts in several states have found that the release of contaminants harmful to human health into the environment unreasonably infringes upon a public right regardless of whether the release occurs in the groundwater or surface water.[82] Thus, plaintiffs have sufficiently alleged a public nuisance.

### 3. Private Nuisance

A private nuisance is "'a nontrespassory invasion of another's interest in the private use and enjoyment of land.'"[83] Nuisance "must materially diminish the property's value, [and] seriously interfere with ordinary comfort and enjoyment."[84] The interference must also be substantial and unreasonable.[85] Plaintiffs alleged that Exxon has engaged in conduct that caused "substantial and unreasonable injury or interference with [their] use and enjoyment of property."[86]

---

[82] *See, e.g.*, *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050 (2d Cir. 1985); *Rockaway v. Klockner & Klockner*, 811 F. Supp. 1039, 1057 (D. N.J. 1993) (finding that one defendant, in cross-claim, "sufficiently alleged a claim for public nuisance" where he "alleged interference with a public right, that is, the right of all members of the community to uncontaminated water from the Rockaway aquifer").

[83] *Exxon Corp. v. Yarema*, 516 A.2d 990, 1002 (Md. Ct. Spec. App. 1986) (quoting Restatement (Second) of Torts § 821D).

[84] *Fantasy Valley Resort, Inc. v. Gaylord Fuel Corp.*, 607 A.2d 584, 587 (Md. Ct. Spec. App. 1992).

[85] *See Yarema*, 516 A.2d at 1002.

[86] Complaint ¶ 54.

Plaintiffs also alleged that defendants' activities have "materially increased health risks to homeowners and/or residents of properties in the vicinity of the Crossroads Exxon."[87]

Exxon argues that plaintiffs' claim fails because it is not "substantial and unreasonable."[88] Exxon notes that it "has installed granular activated carbon filtration systems on . . . 193 private wells," and that plaintiffs have not alleged that they cannot sell their property, build on their property, or that a government agency has forbidden them from using their groundwater.[89] Exxon argues that plaintiffs' claim amounts to "at most . . . minor inconveniences"[90] and that "as a matter of law" plaintiffs allegation about the testing and treating of their water and apprehension about the presence of MTBE in the water do not amount to substantial and unreasonable interference.[91]

Plaintiffs counter that it is not necessary for them to *prove* a "substantial and unreasonable interference with the use and enjoyment of

---

[87]     *Id.* ¶ 1.

[88]     Exxon Mem. at 5 (citing *Yarema*, 516 A.2d at 1002).

[89]     *Id.* at 7.

[90]     *Id*.

[91]     Exxon Reply Mem. at 2.

property" in order to survive a motion to dismiss.[92] Nonetheless, plaintiffs claim that the allegations of leaking tanks that contaminated the public aquifer, "making the water unfit for use" are sufficient to *allege* a substantial interference with their use and enjoyment of their property.[93]

The Maryland Court of Special Appeals has held that "harm to property should be construed broadly to include intangible tortious interferences of plaintiffs' use and enjoyment of their properties."[94] Thus, in Maryland, private nuisance includes all tangible intrusions on another's property, including noise, odor and light, and is "not contingent upon whether the defendant physically impinged on plaintiff's property, but whether the defendant substantially and unreasonably interfered with the plaintiff's use and enjoyment of [the] property . . . [T]he mere diminution of property value, absent such tortious interference" is not a sufficient basis for recovery.[95]

Exxon relies on two cases where, after trial, plaintiffs were denied

---

[92]    Opp. Mem. at 8.

[93]    *Id.* at 10.

[94]    *Yarema*, 516 A.2d at 1004.

[95]    *Id*.

24

recovery for diminution of property value.[96]  Both cases are readily

distinguishable.  *First*, in *McCaw*, plaintiffs sought to stop the construction of a

new cemetery and, after trial, the lower court found in favor of defendant.[97]  In

affirming the lower court, the Maryland Court of Appeals noted that "[a] cemetery

does not constitute a nuisance merely because it is a constant reminder of death

and has a depressing influence on the minds of  persons who observe it, or because

it tends to depreciate the value of property in the neighborhood, or is offensive to

the aesthetic sense of the adjoining proprietor" and disallowed recovery.[98]  The

court noted, however, that "if the location or maintenance of a cemetery endangers

the public health, either by corrupting the surrounding atmosphere, or water of

wells or springs, it constitutes a nuisance."[99]

 *Second*, in *Gray*, plaintiffs sued for damages after gasoline was

pumped into a river and caught fire.[100]  The trial court granted an involuntary

---

[96]  *See McCaw v. Harrison*, 259 S.W.2d 457, 458 (Ky. 1953); *Gray v. Southern Facilities, Inc.*, 183 S.E.2d 438, 443 (S.C. 1971).

[97]  *See McCaw*, 259 S.W.2d at 458.

[98]  *Id.*

[99]  *Id.*

[100]  *See Gray*, 183 S.E.2d at 439.

nonsuit.[101]  The appellate court affirmed because the plaintiff could not show any damages beyond those "predicated upon an asserted diminution in market value resulting, not from any physical injury, but from a psychological factor, in that prospective buyers allegedly would be reluctant to purchase the property due to fear of a similar occurrence in the future."[102]

These cases are inapposite because plaintiffs here have alleged far more than diminution in property value.  Moreover, whether plaintiffs have suffered a substantial and unreasonable interference with their property is a question of fact, and at this stage plaintiffs have made a sufficient showing to proceed with their private nuisance claim.[103]  This case is at the pleading stage unlike those cited by Exxon.  In fact, this case more closely resembles the hypothetical case of a cemetery that polluted the well water in *McCaw*, where a claim of private nuisance would have been appropriate.  Plaintiffs have satisfied

---

[101]  A court may grant an involuntary nonsuit when the plaintiff has not, as a matter of law, presented evidence upon which a jury could find a verdict.  *See* 75A Am. Jur. 2d Trial § 853 (2005).

[102]  *Gray*, 183 S.E.2d at 443.

[103]  *See Hart v. Wagner*, 40 A.2d 47, 50 (Md. 1944) (noting that in cases of nuisance where plaintiffs claimed that either "smoke, smell, noise, vapors or water, or any gas or fluid" caused the nuisance, "[t]he real question . . . [was] the question of fact, vis: whether the annoyance is such as materially to interfere with the ordinary comfort of human existence") (quotations and citations omitted).

the Rule 12(b)(6) standard for pleading a private nuisance.

### 4. Trespass to Property

A trespass is an invasion of one's interest in the exclusive possession of land.[104] Plaintiffs claim that "defendants entered (or infringed) upon and/or caused gasoline and its constituent parts to enter and/or continue to enter (or infringe) upon property (including real property) owned (or controlled) by [p]laintiffs . . . in an unlawful manner."[105]

Exxon argues that plaintiffs' trespass claim fails because plaintiffs have not alleged an interference with the "exclusive possession" of their land.[106] Exxon claims that under the "American Rule" of water rights a landowner does not have an exclusive possessory interest in the groundwater underneath her lands.[107] Exxon also argues that the claim of trespass requires a tangible invasion

---

[104]    *See Patapsco Loan Co. v. Hobbs*, 98 A. 239, 241 (Md. 1916) ("Every unauthorized entry upon the property of another is a trespass."). *See also* Restatement (Second) of Torts § 158 ("One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove.").

[105]    Complaint ¶ 59.

[106]    Exxon Mem. at 8.

[107]    *See id.* at 8-9.

27

and that Maryland has not recognized "penetration by smoke, dust, soot, or other micro-particles" as a tangible invasion of property.[108]

Plaintiffs counter that they have exclusive possession of the wells on their properties, which are fed by the aquifer, and that the presence of MTBE in their well water constitutes a trespass.[109]  In addition, plaintiffs claim that Maryland recognizes a cause of action for trespass for material that leaked underground into the plaintiffs' property, including invisible MTBE particles.[110]

As noted, the American Rule of water rights limits a landowner "to the reasonable exercise of the owner's proprietary right in the water, i.e., such an exercise as may be reasonably necessary for some useful or beneficial purpose, before obstructing, diverting, or removing percolating water to the injury of a neighbor."[111]  Thus, under the American Rule, use of the water is limited to reasonable beneficial use.  But, this does not mean that plaintiffs do not have a

---

[108]     *Id.* at 9.

[109]     *See* Opp. Mem. at 12.

[110]     *See id.* at 11 (citing *JBG/Twinbrook Metro, Ltd. P'ship v. Wheeler*, 697 A.2d 898 (Md. 1997)).

[111]     *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1034 (Md. 1993).

property right to the water.[112]  The right is merely *limited* by the reasonable use doctrine.[113]  In Maryland, a plaintiff has ownership rights to the groundwater beneath her land.[114]  Thus, a plaintiff has a right to sue a neighboring landowner for breach of her duty "not to impair [plaintiff's] ownership rights through water contamination" in the groundwater.[115]

The next question is whether invasion by invisible particles of MTBE beneath the earth may constitute a trespass.  Maryland courts have not definitively settled this question.  Plaintiffs argue that the Maryland Court of Appeals has already recognized a claim for trespass where gasoline seeped through the earth and contaminated plaintiff's water.[116]  In *JBG/Twinbrook Metro*, the Maryland Court of Appeals reviewed a finding that assumption of the risk was an absolute defense to trespass by gasoline that seeped from defendant's underground gasoline

---

[112]    *See Walker v. United States*, 69 Fed. Cl. 222, 230 (2005) (citing 2 Kinney on Irrigation and Water Rights (2d ed.) at 1328) (noting that "it is generally conceded by all of the authorities that a water right, or an interest in water, is real property, and it is so treated under all the rules of law appertaining to such property").

[113]    *See* A. Dan Tarlock, Law of Water Rights and Resources ¶¶ 4.7, 4.8 (17 rel. 2005).

[114]    *See Yarema*, 516 A.2d at 1005.

[115]    *Id.*

[116]    *See* Opp. Mem. at 11 (citing *JBG/Twinbrook Metro*, 697 A.2d 898).

29

tanks.[117]  At trial, the jury was instructed that: "[a] trespass occurs when a person without authority, privilege or permission enters into the land of another or permits a *substance under the person's control to enter the land* of another without authority, privilege, or permission."[118]  In addition, the trial court instructed the jury that there was no difference between an invasion that occurred above or beneath the surface of the land.[119]  After the jury found that the plaintiff assumed the risk, the Court of Appeals reversed on that issue.  At the same time, the court noted that the trespass instruction was given without objection from the defendants.[120]  The court specifically mentioned that it would not reach the issue of whether the instruction that an invasion by a substance in a defendant's groundwater could constitute a trespass was a "correct instruction" under Maryland law.[121]  Thus, it is still unclear whether an invasion by a substance through groundwater constitutes a trespass.

Historically, an invasion by smoke, dust or invisible particles was not

---

[117]     *See JBG/Twinbrook Metro*, 697 A.2d at 900.

[118]     *Id.* at 907 (emphasis added).

[119]     *See id.*

[120]     *See id.* at 907 n.12, 912.

[121]     *Id.*  The court did not state or cite the "correct" definition under Maryland law.  *See id.*

considered trespass because this type of invasion was not considered a "physical" invasion "in the primitive society where trespass had its roots."[122]  Invasions of particulates or smoke were typically seen to infringe on a plaintiff's use and enjoyment of the land and thus were heard as nuisances, rather than trespasses. Modern scientific advances have caused many courts to abandon the notion that an invasion by smoke, dust, or particles is not "physical."[123]  Courts have instead allowed plaintiffs to claim trespass by invisible contaminants; while at the same time limiting such claims, for example, by requiring proof of substantial

---

[122]    Fowler V. Harper, Fleming James, Jr. Oscar S. Gray, The Law of Torts ("Harper, The Law of Torts") ¶ 1.1 (3d ed. 1996).

[123]    *See, e.g.*, *Borland v. Sanders Lead Co.*, 369 So. 2d 523, 529 (Ala. 1979) (allowing liability for invasion by invisible particulates); *Maryland Heights Leasing v. Mallinckrodt, Inc.*, 706 S.W.2d 218, 225-26 (Mo. 1985) (intrusion by "radioactive emissions" may constitute trespass if it interferes with plaintiffs' exclusive possessory interest in the land); *Martin v. Reynolds Metals Co.*, 342 P.2d 790, 793 (Or. 1959) ("It is quite possible that in an earlier day when science had not yet peered into the molecular and atomic world of small particles, the courts could not fit an invasion through unseen physical instrumentalities into the requirement that a trespass can result only from a direct invasion.  But in this atomic age even the uneducated know the great and awful force contained in the atom and what it can do to a man's property if it is released.").  *See also Baltimore Belt R.R. Co. v. Sattler*, 59 A. 654 (Md. 1905) (allowing recovery for damage by noise, smoke, and vapors without specifying whether plaintiffs could proceed under theory of trespass or nuisance); *North Central R.R. Co. v. Oldenburg & Kelley, Inc.*, 89 A. 601 (Md. 1914) (same).

damage.[124]  Thus, nuisance and trespass law have slowly begun to "coalesce."[125]  A

modern explanation of the difference between nuisance law and trespass is

instructive:

> [I]f the smoke or polluting substance emitting from a defendant's operation causes discomfort and annoyance to the plaintiff in his use and enjoyment of the property, then the plaintiff's remedy is for nuisance; but if, as a result of the defendant's operation, the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the res, then the plaintiff may seek his remedy in trespass, though his alternative remedy in nuisance may

---

[124]    *See* Harper, The Law of Torts ¶ 1.23.  *See, e.g.*, *Schwartzman, Inc. v. Atchison, T. & S.F. Ry.*, 857 F. Supp. 838, 844 (D. N.M. 1994) (to be actionable under trespass, groundwater contamination "must have reached [p]laintiff's property and damaged it"); *Maddy v. Vulcan Materials Co.*, 737 F. Supp. 1528, 1539 (D. Kan. 1990) ("The modern trend departs from the traditional rule by finding that intangible invasions of the plaintiff's property may constitute a trespass.  However, the modern trend also departs from traditional trespass rules by refusing to infer damage as a matter of law, thereby eliminating the right to nominal damages. The plaintiff claiming trespass must prove that the intangible invasion resulted in substantial damages to the plaintiff's land."); *Wilson v. Interlake Steel Co.*, 649 P.2d 922, 924 (Cal. 1982) (noting that recovery for trespass based on an invasion of noise, gas emissions, or vibration was predicated on "the deposit of particulate matter upon the plaintiffs' property or on actual physical damage thereto").

[125]    *Martin*, 342 P.2d at 795 ("when inquiry is made as to whether the plaintiff's interest falls within the ambit of trespass law the courts look at the interference with the plaintiff's use and enjoyment of his land to determine whether his interest in exclusive possession should be protected and thus the two torts [of nuisance and trespass] coalesce").

co-exist.[126]

According to the Restatement, "[a] trespass may be committed on or beneath the surface of the earth."[127]  Maryland courts have noted that tunneling under another's property is a trespass,[128] and that particles may constitute a trespass when they travel to plaintiff's land in water on the surface of the land.[129]

It makes no sense to say that particles beneath the surface that are transported through the groundwater to plaintiffs' well cannot constitute a trespass.  Imagine a situation where a defendant walked onto a plaintiff's property and poured a bucket of poisonous chemicals into her well.  Now imagine that the defendant deposited the poisonous chemicals onto the ground next to the well.  These two cases would both constitute trespass.  The only difference in this case is that Exxon allegedly deposited the contaminants in the well without walking onto

---

[126]    *Maryland Heights Leasing, Inc.*, 706 S.W.2d at 225 (citations and quotations omitted).

[127]    Restatement (Second) of Torts § 159.  *See also In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d at 438.

[128]    *See Blaen Avon Coal Co. v. McCulloh*, 59 Md. 403, 419 (1883).

[129]    *See Rockland Bleach & Dye Works Co. v. H. J. Williams Corp.*,  219 A.2d 48, 55 (Md. 1966) (noting that where surface water that invades plaintiff's property is "accompanied by large quantities of mud and other debris" an action in trespass would lie) (citing *Cahill v. Baltimore City*, 48 A. 70 (Md. 1901); *Guest v. Commissioners of Church Hill*, 45 A. 882 (Md. 1900)).

the property. Maryland allows claims for trespass where a defendant caused an invading substance to enter plaintiff's property without actually entering himself.[130] As alleged, this is a case where a polluting substance was allegedly deposited in plaintiffs' wells, thus interfering with the plaintiffs' exclusive possessory interests by causing substantial damage to plaintiffs' drinking water.[131] For these reasons, I predict that Maryland courts confronted with Exxon's argument would reject it as "hyper-technical"[132] and rely on the Restatement and modern tort law to allow plaintiffs' trespass claim to proceed.

## 5. Negligence and Strict Liability

To state a cause of action for negligence, a plaintiff must allege: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."[133] The "occupier of land owes a duty to occupants of neighboring land to use care when conducting activities on the land so as to avoid causing harm to

---

[130] *See id.*

[131] *See Maryland Heights Leasing, Inc.*, 706 S.W.2d at 225.

[132] *Yarema*, 516 A.2d at 1004.

[133] *Rosenblatt*, 642 A.2d at 188.

the neighboring land."[134]

Maryland has adopted the standard for strict liability for abnormally dangerous activity set forth in section 519 of the Second Restatement of Torts: "'[O]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.'"[135] The cause of action is available for "claims by an occupier of land harmed by an activity abnormally dangerous in relation to the area, which is carried on by a contemporaneous occupier of neighboring land."[136] Maryland courts allow strict liability claims for abnormally dangerous activities such as the pollution of percolating groundwater by gasoline and similar substance. These "activities are not entered into by the great mass of mankind, and they do result in extensive injury to percolating groundwater supplies if their waste products are uncontrollable."[137]

---

[134]    *Id.* at 189.

[135]    *Id.* at 185 (quoting  Restatement (Second) of Torts § 519).  *Accord Yommer*, 257 A.2d at 141(holding that the doctrine of strict liability applies where an owner of residential property brought a claim against the owners of a gasoline station "immediately adjacent to a private residence" after gasoline leaked into the property owner's well).

[136]    *Rosenblatt*, 642 A.2d at 186.

[137]    Peter N. Davis, *Groundwater Pollution: Case Law Theories for Relief*, 39 MO. L. REV. 117, 137 (1974) (citing *Yommer*, 257 A.2d 140-41).

Plaintiffs alleged that defendants breached their duty to plaintiffs "by failing: to properly design, install, maintain, and/or monitor the buildings, facilities, underground storage tanks, and associated systems at the Crossroads Exxon; to notify [p]laintiffs . . . of the contamination; and to adequately mitigate the harm to [p]laintiffs' water supply."[138]  Plaintiffs alleged strict liability claiming that defendants' sale and storage of MTBE-containing gasoline caused contaminants to be released into the environment, injuring plaintiffs.[139]  Plaintiffs alleged injuries that include "actual present harm to [p]laintiffs' persons, property, and economic interests, and potential future harm . . .  due to the threat of future contamination."[140]  Plaintiffs alleged that these "injuries constitute the type that make the activities abnormally dangerous."[141]

Exxon argues that under Maryland's "economic loss rule" there is no cause of action for negligence or strict liability if a plaintiff only alleges economic harm.  "Economic losses include such things as the loss of value or use of the product itself, the cost to repair or replace the product, or the lost profits resulting

---

[138]    Complaint ¶ 69.

[139]    *See id.* ¶ 78.

[140]    *Id.*

[141]    *Id.*

from the loss of use of the product."[142]   Under the economic loss rule, where "the

failure to exercise due care creates a risk of economic loss only, courts have

generally required an intimate nexus between the parties as a condition to the

imposition of tort liability."[143]   Exxon argues that plaintiffs' negligence and strict

liability claims fail because they allege only economic damages.[144]

The economic loss rule typically bars recovery in tort for intangible

economic losses between parties to a contract or where the plaintiff is asserting a

products liability claim.[145]   The economic loss rule, however, does not always bar

---

[142]    *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 634 A.2d 1330, 1332
(Md. 1994) (allowing plaintiff who was not a party to the building contract to sue
the builder to recover the resasonable cost of correcting a dangerous condition).
*Cf. Jacques v. First Nat'l Bank*, 515 A.2d 756, 760 n.4 (Md. 1986) (noting that
"[a]n increasing number of courts have declined to consider the nature of the risk
of harm as a factor in determining the existence of a tort duty, finding no rational
basis to distinguish between a risk of personal injury and a risk of economic
loss").

[143]    *Jacques*, 515 A.2d at 759 (finding that plaintiffs could recover for
economic loss, where a bank promised to process an application for a loan and
owed a "duty of reasonable care in the processing and determination" of the
application). *Accord PPM Am., Inc. v. Marriott Corp.*, 820 F. Supp. 970, 979 (D.
Md. 1993) ("Where . . . the alleged negligent misrepresentation creates a risk of
economic loss only, Maryland law requires plaintiffs to show an 'intimate nexus'
giving rise to a duty on the part of defendants to disclose information with care.")
(quoting *Jacques*, 515 A.2d at 759).

[144]    *See* Exxon Mem. at 13-14.

[145]    *See* Prosser and Keaton on Torts ¶¶ 92-93, 101 (5th ed. 1984);
*Superior Bank v. Tandem Nat'l Mortg.*, 197 F. Supp. 2d 298, 311 (D. Md. 2000),

the recovery of economic losses in a negligence case. For example, where the

plaintiff suffers both physical injury and economic loss, economic losses resulting

from personal injury are recoverable.[146] In Maryland, "the determination of

whether a duty in tort will be imposed in an economic loss case should depend

upon the risk generated by the negligent conduct, rather than upon the fortuitous

circumstance of the nature of the resultant damage . . . where the risk is of death or

personal injury the tort action will lie for recovery of the reasonable cost of

---

*reconsideration denied*, 197 F. Supp. 2d 298 (D. Md. 2000) (finding that, where there was an ambiguity as to whether the plaintiffs' claims were fully encompassed by a purchase agreement between the parties, defendants were not entitled to dismissal of the tort claims based on the economic loss rule); *Brock Bridge Ltd. P'ship v. Development Facilitators, Inc.*, 689 A.2d 622, 631 n.10 (Md. Ct. Spec. App. 1997) ("The existence of a tort duty for purely economic damages does not extend to products liability cases. Economic damages are generally not recoverable under a negligence theory in these cases."). *See also Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 16 (2d Cir. 2000) (explaining that to "prevent [] open-ended liability, courts have applied the economic loss rule to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort" and noting that where circumstances indicate that a claim has been made in tort and is not a contractual dispute disguised as a tort, the economic loss rule does not apply).

[146]     *See, e.g.*, *Lumber Terminals, Inc. v. Nowakowski*, 373 A.2d 282, 287 (Md. Ct. Spec. App. 1977) ("In personal injury cases courts generally, and Maryland particularly, consider among other losses, lost wages and earnings suffered by the injured person not only from the time of injury to the trial, but those reasonably certain to occur in the future.").

correcting the dangerous condition."[147]  Similarly, damage to property is distinct

from economic loss and is recoverable.[148]

The economic loss rule does not bar plaintiffs' negligence or strict

liability claims because plaintiffs have also alleged personal injury and property

damage.[149]  Plaintiffs alleged that defendants' "reckless, negligent, and illegal

conduct resulted in the actual dangerous releases of hazardous and toxic

---

[147]    *Morris v. Osmose Wood Preserving*, 667 A.2d 624, 631 (Md. 1995) (quotations omitted).

[148]    *See Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 517 A.2d 336, 344 (Md. 1986) ("[T]he seller's liability for negligence covers . . . property damage to the defective chattel itself.") (quotations and citations omitted).  *See also A.J. Decoster Co.*, 634 A.2d at 1333 (product defect "tort liability is limited to situations in which the negligence causes physical harm to person or property").

[149]    *See* Complaint ¶ 72 (alleging "unreasonable risk of harm, threat of future harm" and "actual injuries to their property, economic interests and person").  The cases relied on by Exxon are inapposite because in those cases plaintiffs alleged no more than economic damages.  *See, e.g.*, *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 587 (Md. 2000) (in a breach of contract and negligent misrepresentation case plaintiffs sought to recover their losses resulting from an accounting error that caused their company to collapse); *Flaherty v. Weinberg*, 492 A.2d 618 (Md. 1985) (requiring strict privity in an attorney malpractice suit where plaintiff sought damages for negligent misrepresentation regarding a real estate sale); *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534 (Md. 1982) (buyer of automobile dealership sought to recover losses against seller who misrepresented the dealership's profitability); *Brack v. Evans*, 187 A.2d 880 (Md. 1963) (negligent misrepresentation alleged by plaintiff, a stock-purchaser, after defendant, a stock brokerage firm failed to deliver the correct stock to plaintiff).

substances into the Plaintiffs' water supply."[150]  Plaintiffs also explained that the value of their property has diminished and that they will continue to "incur actual damages as a result of the contamination including the costs of obtaining alternate water, maintenance of water systems, and remediation."[151]

Similarly, plaintiffs' strict liability claim is not barred by the economic loss rule because plaintiffs alleged far more than economic losses. Plaintiffs alleged injuries which included "actual present harm to [p]laintiffs' persons, property, and economic interests, and potential future harm to [p]laintiffs due to the threat of future contamination."[152]

### 6.     Medical Monitoring

Medical monitoring is "'one of a growing number of non-traditional torts that have developed in the common law to compensate plaintiffs who have been exposed to various toxic substances.'"[153]  This cause of action has been recognized in federal and state courts around the country as a mechanism for

---

[150]    Complaint ¶ 72.

[151]    Opp. Mem. at 15 (citing Complaint, Prayer for Relief ¶¶ F-H).

[152]    Complaint ¶ 78.

[153]    *Phillip Morris v. Angeletti*, 752 A.2d 200, 250 (Md. 2000) (quoting *In re Paoli R.R. Yard Polychlorinated Biphenyls (PCB) Litig.*, 916 F.2d 829, 849 (3rd Cir. 1990)).

allowing the plaintiff to recover "quantifiable costs of periodic medical examinations necessary to monitor plaintiffs' health and to facilitate early diagnosis and treatment of disease(s) caused by exposure to chemicals."[154]  The theory behind the claim is that the risk of disease and injuries from many toxic substances is often latent and current injury cannot be demonstrated under traditional tort theories.[155]  Under this theory, plaintiffs are entitled to recover the "costs of periodic medical examinations necessary to detect the onset of physical harm."[156]  Some courts have allowed medical monitoring to be pled as a separate cause of action, while some see it as merely a separate remedy.[157]

In their medical monitoring claim, plaintiffs requested a "monitoring

---

[154]    *Id.* at 250 (citing *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984); *Burns v. Jaquays Mining Corp.*, 752 P.2d 28 (Ariz. Ct. App. 1987); *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795 (Cal. 1993); *Ayers v. Township of Jackson*, 525 A.2d 287 (N.J. 1987); *Askey v. Occidental Chemical Corp.*, 477 N.Y.S.2d 242 (N.Y. App. Div. 4th Dep't 1984); *Laxton v. Orkin Exterminating Co.*, 639 S.W.2d 431 (Tenn. 1982); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah 1993)).

[155]    *See id.*

[156]    *Id.*

[157]    *See id.* at 253 ("'Several states have permitted recovery of damages for medical monitoring as part of the relief.  In Pennsylvania, however, medical monitoring is an independent cause of action, not a compensable item of damages.'") (quoting *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 484 (E.D. Pa. 1997)).

program" that would allow early detection of any illnesses caused by exposure to MTBE.[158] Plaintiffs noted that defendants have installed equipment to monitor and treat the groundwater beneath the Crossroads Exxon and that "no lesser degree of care should be given to humans contaminated by prolonged, repeated exposure to MTBE."[159] Plaintiffs also alleged that the "Monitoring Sub-Class" has no adequate remedy at law.[160]

Exxon contends that Maryland does not recognize a medical monitoring claim and that even if such a claim were recognized under Maryland law, plaintiffs must be exposed to a known cause of cancer or disease before monitoring would be appropriate.[161] Plaintiffs counter that Maryland courts had the opportunity to reject the medical monitoring cause of action and declined to do so.[162]

Maryland courts have not definitively ruled on whether medical monitoring is a valid cause of action in Maryland, or on whether plaintiffs must

---

[158]   Complaint ¶ 92.

[159]   *Id.* ¶ 94.

[160]   *Id.* ¶ 92.

[161]   *See* Exxon Mem. at 17-18.

[162]   *See* Opp. Mem. at 17 (citing *Angeletti*, 752 A.2d at 251).

42

show that they were exposed to a known cause of cancer or disease before making a claim of medical monitoring. In a recent case involving the tobacco industry, the Maryland Court of Appeals addressed the question of whether a medical monitoring class, certified at the trial level under section 2-231(b)(2) of Maryland's class action rule,[163] was a cognizable claim.[164] The court, however, refused to decide that question, because the "equitable relief class action should never have been certified on the basis of such a claim under the circumstances of this case."[165] The court found that section 2-231(b)(2) is only appropriate for injunctive relief claims where the class exhibited "cohesiveness."[166] Because the purported class in that case alleged claims for money damages and lacked

---

[163]     Maryland Rule 2-231(b)(2) states in relevant part: "Unless justice requires otherwise, an action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition: . . . (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

[164]     *See Angeletti*, 752 A.2d at 249.

[165]     *Id.* (noting that "whether medical monitoring is allowable as a form of relief or distinct cause of action is a difficult question which is not easily answered").

[166]     *Id.* at 253-54.

cohesiveness, the court vacated the class certification.[167]  In conclusion, the court

noted that it was "clear that notwithstanding the possibility that a medical

monitoring claim might legitimately be framed as one seeking equitable relief . . .

that possibility [could not] be realized through the instant lawsuit."[168]

In any case, Maryland's highest court had the opportunity to bar a

medical monitoring claim, but refrained from doing so.  Thus, I find that Maryland

is likely to permit claims for medical monitoring, either as a distinct cause of

action or as a remedy depending on the circumstances of a particular case.  For

example, where the latent nature of a particular risk would bar plaintiffs from

recovering "quantifiable costs for medical examinations" Maryland courts are

likely to allow a medical monitoring claim in order to facilitate early detection of

disease due to exposure to chemicals.  Here, plaintiffs have alleged sufficient facts

to support a medical monitoring claim.

## B.    Hicks' Motion to Dismiss

Hicks moved to dismiss this action without filing a supporting

memorandum of law, in violation of Local Rule 7.1.  Nonetheless, a reading of

---

[167]    *See id.* at 252-53 (noting that a monitoring fund has a "fundamentally
monetary nature").

[168]    *Id.* at 252.

Hicks' Motion to Dismiss together with Hicks' Reply to Plaintiffs' Opposition to

Hicks' Motion to Dismiss[169] reveals that Hicks is arguing that he is immune from

any claims of property damage and personal injury caused by a defective product

design, pursuant to Section 5-405 of the Courts & Judicial Proceedings Article of

the Annotated Code of Maryland. This provision gives sellers of a product from a

receptacle[170] a "defense to an action . . . for property damage or personal injury

allegedly caused by the defective design or manufacture of a product" (the "sealed

container defense").[171] Hicks claims that he is a seller of gasoline and that

---

[169]     Hicks filed his Reply to Plaintiffs' Opposition to Hicks' Motion to Dismiss with a memorandum of law and bizarrely claimed that he filed a "combined Motion and Memorandum" and that he "split the filing with this Reply." Reply of Defendant Hicks ("Hicks' Reply Mem.") ¶ 16. Plaintiffs were given leave to file a surreply to the new points addressed in Hicks' Reply Memorandum. *See* Koch Plaintiffs' Memorandum in Support of Their Motion to Strike or in the Alternative for Leave to File a Surreply to Defendant Hicks' Motion to Dismiss the First Amended Complaint ("Surreply Mem.").

[170]     A seller is any "wholesaler, distributor, retailer, or other individual or entity other than a manufacturer that is regularly engaged in the selling of a product whether the sale is for resale by the purchaser or is for use or consumption by the ultimate consumer." Md. Courts and Judicial Proceedings Code Ann. § 5-405(a)(5).

[171]     To avail himself of this defense a seller must show that:
(1) The product was acquired and then sold or leased by the seller in a sealed container or in an unaltered form;
(2) The seller had no knowledge of the defect;
(3) The seller in the performance of the duties he performed or while the product was in his possession could not have discovered

45

plaintiffs' case is a product defect case.[172]  Hicks argues that the case against him

should be dismissed because the sealed container defense protects a salesperson

"who had no duty or opportunity to alter the design or manufacture of the

product."[173]

   Hicks also invites this court to treat his motion to dismiss as one for

summary judgment.[174]  Summary judgment is appropriate if the record "show[s]

that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."[175]  An issue of fact is genuine if "the

evidence is such that a jury could return a verdict for the nonmoving party."[176]  A

---

the defect while exercising reasonable care;
(4) The seller did not manufacture, produce, design, or designate the specifications for the product which conduct was the proximate and substantial cause of the claimant's injury; and
(5) The seller did not alter, modify, assemble, or mishandle the product while in the seller's possession in a manner which was the proximate and substantial cause of the claimant's injury.

Md. Courts and Judicial Proceedings Code Ann. § 5-405.

[172]   *See* Hicks Reply Mem. ¶¶ 15-16.

[173]   *Id.* ¶ 15.

[174]   *See* Hicks MTD ¶ 17.

[175]   Fed. R. Civ. P. 56(c).

[176]   *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  *Accord Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

fact is material when it "might affect the outcome of the suit under the governing law."[177] The movant has the burden of demonstrating that no genuine issue of material fact exists.[178]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does "'not rely on conclusory allegations or unsubstantiated speculation.'"[179] To do so, it must do more than show that there is a "'metaphysical doubt as to the material facts.'"[180] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[181]

Hicks did not file a supporting Rule 56.1 statement presenting the "material facts as to which the moving party contends there is no genuine issue to

---

[177] *Jeffreys*, 426 F.3d at 553 (quoting *Anderson*, 477 U.S. at 248).

[178] *See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[179] *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[180] *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[181] *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004).

be tried" pursuant to Local Rule 56.1. Instead, in support of his request for

summary judgment, Hicks stated that he "adopted in its entirety" a "Verification"

that "appeared in the earlier filed Motion to Dismiss/Motion for Summary

Judgment."[182] Other than this cryptic statement, Hicks' Motion to Dismiss does

not specify what the "Verification" is, or where to find it. In Hicks' Reply

Memorandum he argues that summary judgment is appropriate because plaintiffs

did not oppose Hicks' "affidavit" in the case of *Wagner, et al. v. Hicks, et al.*

("*Wagner v. Hicks*") where Hicks claimed that he did not alter or mishandle the

gasoline and that he had no knowledge of "defects in the gasoline product."[183]

Hicks' citation to his Motion to Dismiss/Motion for Summary Judgment, filed in

the case of *Wagner v. Hicks* led plaintiffs to believe that Hicks' "Verification" was

the motion to dismiss that he filed in *Wagner v. Hicks*.[184]

Hicks' "Verification" is insufficient to support a claim for summary

judgment. Because there is no evidence to the contrary, I shall assume that Hicks

---

[182]     Hicks MTD ¶ 18.

[183]     Hicks Reply Mem. ¶¶ 8-9 (citing Hicks' Motion to Dismiss/Motion
for Summary Judgment, *Wagner v. Hicks*, 12-C-04-2448 (Md. Cir. Harford Co.) ¶¶
21, 24).

[184]     *See* Koch Plaintiffs' Motion to Strike or in the Alternative for Leave
to File a Surreply to Defendant Hicks' Motion to Dismiss the First Amendment
Complaint ¶ 4.

meant to incorporate as his "Verification" his motion to dismiss in *Wagner v. Hicks.* That case was voluntarily dismissed on October 23, 2004 by plaintiffs pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure. The fact that plaintiffs did not oppose a statement made in Hicks' motion to dismiss is irrelevant to the pending case. In addition, statements in a memorandum of law are insufficient to defeat a summary judgment motion.[185]

Nonetheless, I need not decide whether to treat Hicks' pending motion to dismiss as a motion for summary judgment, because either motion must be denied. Hicks' motion for summary judgment fails because Hicks has not established all five elements of the sealed container defense.[186] *First*, Hicks has not shown that he lacked knowledge of the alleged defect. State and federal regulations regarding the use of underground storage tanks have been in place since the Crossroads Exxon was opened. These regulations required Hicks to

---

[185]     *See Dusanenko v. Maloney*, 726 F.2d 82, 84 (2d Cir. 1984) (citing Rule 56(e)). *See also* Rule 56.1 ("Failure to submit [a Rule 56.1] statement may constitute grounds for denial of the motion.").

[186]     *See* Memorandum of Law in Opposition to Defendant Hicks' Motion to Dismiss the Koch First Amended Complaint ("Opp. Mem. Hicks") at 3 (citing Md. Courts and Judicial Proceedings Code Ann. §§ 5-405(2)(3),(5)).

meet stringent requirements regarding the storage of gasoline.[187]  As plaintiffs argue, Hicks "had the opportunity and competence as a dealer in petroleum products not only to discover the peculiar dangers of gasoline containing MTBE but also the duty to prevent and mitigate any harm from the handling, storing, dispensing and/or use of petroleum products."[188]

 *Second*, Hicks has not shown that he could not have discovered the defect.  Plaintiffs alleged that Hicks had a duty as a gasoline station owner to monitor the underground storage tanks for leaks and "perform regular integrity testing" of the tanks.[189]  In addition, according to the Complaint, Hicks knew as early as 1990 that leaks from the Crossroads Exxon had contaminated the well water supply with MTBE.[190]  Thus, Hicks cannot show that he lacked knowledge of the dangers posed by MTBE-containing gasoline.

 *Third*, Hicks cannot show that he did not "alter, modify, assemble or

---

[187] *See id.* at 4 (citing Md. Code Regs., tit. 26, § 10.02.01 (2006)).  *See also* Hicks MTD ¶ 5 ("The distribution, transportation, and sale of gasoline must meet the stringent requirements of Federal and State law.").

[188] Opp. Mem. Hicks at 5 (citing *Eagle-Picher Indus., Inc. v. Balbos*, 604 A.2d 445, 455-57 (Md. 1992) (affirming the finding that installer of asbestos, as a "dealer in asbestos-containing products," could have discovered information about the dangers of asbestos)).

[189] *Id.* (citing Complaint ¶¶ 69, 71, 72).

[190] *See* Complaint ¶ 30.

mishandle the product" while it was in his possession "in a manner which was the proximate and substantial cause of the claimant's injury."[191]  Plaintiffs have alleged that Hicks mishandled the gasoline stored at the Crossroads Exxon.[192]  For example, plaintiffs alleged that between October 1991 and May of 2004, water samples taken at the Crossroads Exxon showed levels of MTBE that grew from 9.5 parts per billion ("ppb") to 26,000 ppb.[193]  Nothing submitted by Hicks refutes these allegations.

Similarly, Hicks' motion to dismiss fails because the defense he raises is only available to sellers in product defect claims, and plaintiffs did not bring such a claim.  Hicks argues that plaintiffs' "entire theory is that somehow the operator of the gasoline station knew or should have known that the gasoline he sold was not designed or manufactured properly for sale from the station he operated" and that it "sounds like a product defect claim."[194]  Though Hicks attempts to re-cast plaintiffs' complaint as a claim of product defect, there is nothing in the Complaint to this effect.  Plaintiffs alleged that "reckless, negligent,

---

[191]    Md. Courts and Judicial Proceedings Code Ann. § 5-405(5).

[192]    *See* Opp. Mem. Hicks at 6 (citing Complaint ¶¶ 30-34).

[193]    *See* Complaint ¶¶ 30-34.

[194]    Hicks Reply Mem. ¶ 5.

51

and illegal conduct resulted in the actual dangerous releases of hazardous and toxic substances into the Plaintiffs' water supply."[195]  Plaintiffs alleged that "use and storage of gasoline containing MTBE is abnormally dangerous."[196]  Plaintiffs also alleged that defendants "knew of the environmental and health hazards associated with the release of gasoline constituents."[197]  Plaintiffs did not claim that defendants are liable for placing a defective product in the stream of commerce, nor did plaintiffs rely on the fact that defendants placed MTBE in the gasoline.  Plaintiffs rely on *Rosenblatt* for the proposition that "if a gasoline station owner has faulty tanks which leak gasoline into the underground water supply, that might be abnormally dangerous if the land in which the tanks are buried is located in a well populated area."[198]  Plaintiffs explain that "[a]ny allegations regarding the knowledge of MTBE's particular properties [were] included in the Amended Complaint to establish a basis for punitive damages, as well as for a claim for strict liability for an abnormally dangerous activity."[199]  For

---

[195]   Complaint ¶ 72.

[196]   *Id.* ¶ 76.

[197]   *Id.* ¶ 77.

[198]   Opp Mem. at 16 (citing *Rosenblatt*, 642 A.2d at 185).

[199]   Opp. Mem. Hicks at 7.

these additional reasons, the sealed container defense cannot defeat plaintiffs' claims against Hicks.

## IV.  CONCLUSION

For the foregoing reasons, Exxon's and Hicks' motions are denied. The Clerk of the Court is directed to close these motions (docket #863 and docket #1037).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           April 7, 2006

**- Appearances -**

**For Plaintiffs:**

Mary V. McNamara-Koch, Esq.
Scott D. Shellenberger, Esq.
Karyn S. Bergmann, Esq.
Law Offices of Peter G. Angelos, P.C.
100 North Charles Street
Baltimore, MD 21201
Tel: (410) 649-2000
Fax: (410) 649-2101

Charles J. Piven, Esq.
Marshall N. Perkins, Esq.
Law Offices of Charles J. Piven, P.A.
The World Trade Center, Suite 2525
401 East Pratt Street
Baltimore, MD 21202
Tel: (410) 332-0030
Fax: (410) 685-1300

Lon Engel, Esq.
Engel & Engel, P.A.
11 East Lexington Street, Suite 200
Baltimore, MD 21202
Tel: (410) 727-5095

**For Defendant Exxon Mobil Corporation:**

Andrew Gendron, Esq.
VENABLE LLP
Two Hopkins Plaza, Suite 1800
Baltimore, MD 21201
Tel: (410) 244-7439
Fax: (410) 244-7742

**For Defendant John R. Hicks:**

Paul W. Ishak, Esq.
Stark and Keenan, P.A.
30 Office Street
Bel Air, MD 21014
Tel: (410) 879-2222
Fax: (410) 879-0688

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
C. Sanders McNew, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel:  (212) 558-5500
Fax:  (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery LLP
340 Madison Ave.
New York, NY 10017
Tel: (212) 547-5353
Fax: (212) 547-5444