**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- X
                              :

**IN RE: METHYL TERTIARY BUTYL**  :
**ETHER ("MTBE") PRODUCTS**     :
**LIABILITY LITIGATION**         :
------------------------------------------------------- :
                              :

**This document relates to:**     :
                              :

**All cases**                        :
------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/23/06

**OPINION AND ORDER**

**Master File No. 1:00–1898**
**MDL 1358 (SAS)**
**M 21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

In this consolidated multi-district litigation ("MDL"), plaintiffs seek

relief from contamination, or threatened contamination, of groundwater from

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation. Doc. 1107

various defendants' use of the gasoline additive methyl tertiary butyl ether

("MTBE") and/or tertiary butyl alcohol ("TBA"), a degradation product of

MTBE.[1] The parties have already engaged in extensive motion practice, and

---

[1]    Although the complaints are not identical they allege essentially the same facts. For a thorough recitation of plaintiffs' fact allegations see *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 364 (S.D.N.Y. 2005). Plaintiffs also allege similar causes of action. For example, Escambia County Utilities Authority, in Florida, asserts claims sounding in (1) strict liability for design defect and/or defective product; (2) strict liability for failure to warn; (3) negligence; (4) public nuisance; (5) private nuisance; (6) trespass; and (7) civil conspiracy. *See* Fifth Amended Complaint, *Escambia County Utilities Authority v. Amerada Hess Corp., et al.*, No. 04 Civ. 1722. Long Island Water Corporation, in New York,

1

familiarity with the Court's previous opinions is assumed.[2]  Defendants now move

for dismissal of plaintiffs' product liability, public nuisance, deceptive business

practices, negligence and related claims, insofar as they relate to defendants'

manufacturing or selling gasoline containing MTBE and/or TBA ("product

_____

alleges (1) public nuisance, (2) strict liability for design defect and/or defective
product, (3) failure to warn, (4) negligence, (5) private nuisance, (6) deceptive
business practices in violation of General Business Law § 349, (7) violation of
New York's Oil Spill Prevention, Control, and Compensation Act, Navigation
Law § 170, and (8) trespass. *See* Fifth Amended Complaint, *Long Island Water
Corp. v. Amerada Hess Corp.*, No. 04 Civ. 2068 ("*Long Island* Complaint").  I
will cite to the *Long Island* Complaint as a typical complaint for purposes of this
motion.

[2]      *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
415 F. Supp. 2d 261 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F.
Supp. 2d 340 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d
325 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358,
2005 WL 1529594 (S.D.N.Y. Jun. 28, 2005); *In re MTBE Prods. Liab. Litig.*, No.
M21-88, MDL 1358, 2005 WL 1500893 (S.D.N.Y. Jun. 24, 2005); *In re MTBE
Prods. Liab. Litig.*, 402 F. Supp. 2d 434 (S.D.N.Y. 2005); *In re MTBE Prods.
Liab. Litig.*, 399 F. Supp. 2d 242 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*,
233 F.R.D. 133 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d
348; *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 106936
(S.D.N.Y. Jan. 18, 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL
1358, 2005 WL 39918 (S.D.N.Y. Jan. 6, 2005); *In re MTBE Prods. Liab. Litig.*,
364 F. Supp. 2d 329 (S.D.N.Y. 2004); *In re MTBE Prods. Liab. Litig.*, 361 F.
Supp. 2d 137 (S.D.N.Y. 2004) ("*MTBE VI*"); *In re MTBE Prods. Liab. Litig.*, 341
F. Supp. 2d 386 (S.D.N.Y. 2004) ("*MTBE V*"); *In re MTBE Prods. Liab. Litig.*,
341 F. Supp. 2d 351 (S.D.N.Y. 2004) ("*MTBE IV*"); *In re MTBE Prods. Liab.
Litig.*, 342 F. Supp. 2d 147 (S.D.N.Y. 2004) ("*MTBE III*"); *In re MTBE Prods.
Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) ("*MTBE II*"); *In re MTBE Prods.
Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001) ("*MTBE I*").

liability claims").[3] Defendants argue that plaintiffs' product liability claims

present nonjusticiable political questions under two prongs of the Supreme Court's

decision in *Baker v. Carr*.[4] Specifically, defendants argue that (1) resolution of

this case requires an initial policy determination regarding MTBE and (2) judicial

involvement would express a lack of the respect due coordinate branches of

---

[3] *See* Defendants' Memorandum of Law in Support of Their Motion to
Dismiss on Political Question Grounds ("Def. Mem.") at 1. "Defendants" refers to
the following moving parties: Amerada Hess Corporation,; Ashland, Inc.; Atlantic
Richfield Company; BP Products North America, Inc.; Chevron Texaco
Corporation; Buckley Gasoline Marketers, Inc.; Buckley Energy Group, Ltd,
Chevron Texaco Corp.; Chevron USA, Inc.; CITGO Petroleum Corporation;
CITGO Refining and Chemicals Company, L.P.; Coastal Eagle Point Oil
Company; Coastal Oil New England, Inc; Crown Central Petroleum Corporation
(n/k/a Crown Central LLC); El Paso Merchant Energy-Petroleum Company;
Equilon Enterprises, LLC (d/b/a Shell Oil Products US); Equistar Chemicals L.P.;
Exxon Corporation; Exxon Mobil Corporation; ExxonMobil Chemical Company;
ExxonMobil Oil Corporation; ExxonMobil Refining and Supply Company; Flint
Hills Resources, LP; Getty Petroleum Marketing, Inc.; Giant Yorktown, Inc.;
Irving Oil Corporation; Irving Oil Limited; Irving Oil Terminals, Inc.; La Gloria
Oil and Gas Company (n/k/a Tyler Holding Company, LLC); Lyondell Chemical
Company; Marathon Oil Company; Marathon Petroleum Company LLC; Mercury
Fuel Services, Inc.; Mobil Corporation; Motiva Enterprises, LLC; PDV Midwest
Refining, L.L.C.; Phibro, Inc,; Santa Holding Company; Santa Fuel, Inc.; Shell
Oil Company; Shell Oil Products Company; Shell Oil Products Company, LLC;
Shell Petroleum, Inc.; Shell Trading (US) Company Sunoco, Inc.; Sunoco, Inc.
(R&M); Tesoro Petroleum Corporation (n/k/a Tesoro Corporation); Tesoro
Refining and Marketing Company (erroneously named as Tesoro Refining and
Marketing Company, Inc.); Texaco, Inc.; Texaco Refining and Marketing, Inc.;
Texaco Refining and Marketing (East), Inc.; TMR Company Union Oil Company
of California; and Unocal Corporation.

[4]     369 U.S. 186, 217 (1962).

3

government, because Congress has expressed an intent to resolve the "highly politicized issues surrounding MTBE, . . . by means other than litigation."[5] For the following reasons, defendants' motion is denied.

## II.    LEGAL STANDARD

The parties dispute which of the Federal Rules of Civil Procedure covers a motion to dismiss under the political question doctrine. Defendants moved pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for dismissal of plaintiffs' product liability claims. Plaintiffs claim that the political question doctrine is not jurisdictional and that defendants' motion should be treated as a motion for judgment on the pleadings under Rule 12(c).[6] Defendants respond that regardless of how the motion is construed the legal standard is the same.[7]

"In determining whether a case presents a non-justiciable political question, the court must first make a 'discriminating inquiry into the precise facts

---

[5]    *Id.* at 5.

[6]    *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss on Political Question Grounds ("Pl. Mem.") at 2.

[7]    *See* Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss on Political Question Grounds ("Reply Mem.") at 2 n.3.

4

and posture of the particular case.'"[8] As the Second Circuit has explained, the question of justiciability should not be conflated with that of jurisdiction.[9] A motion to dismiss pursuant to the political question doctrine is a "motion to dismiss for failure to state a justiciable cause of action."[10] Here, because the motion has been made on the pleadings, it is appropriate to analyze it pursuant to Rule 12(b)(6).[11]

The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[12] When deciding a motion to dismiss, a court must accept all factual allegations in the complaint as true, and draw all

---

[8]     *Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, 838 F.2d 649, 655 (2d Cir. 1988) (quoting *Baker*, 369 U.S. at 217).

[9]     *See 767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*, 218 F.3d 152, 163 (2d Cir. 2000).

[10]     *Baker*, 369 U.S. at 196.

[11]     *See Planned Parenthood*, 838 F.2d at 655 (analyzing a motion to dismiss pursuant to the political question doctrine under Rule 12(b)(6)). *See also 767 Third Ave. Assocs.*, 218 F.3d at 164 (noting that "where adjudication would force the court to resolve 'political questions,' the proper course for the courts is to dismiss").

[12]     *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (quotation marks and citation omitted).

5

reasonable inferences in plaintiff's favor.[13]  Thus, for a motion to dismiss on

nonjusticiability to succeed, it must be clear from the Complaint that the case

involves or requires determination of an inextricably linked political question.[14]

## III.  APPLICABLE LAW

The political question doctrine calls for a careful and delicate analysis

into whether a "matter has been committed by the Constitution to another branch

of government or whether the action of that branch exceeds whatever authority has

been committed."[15]  This doctrine is distinguished from lack of jurisdiction, as

"consideration of the cause is not . . . foreclosed; rather, the [] inquiry necessarily

proceeds to the point of deciding whether the duty asserted can be judicially

identified and its breach judicially determined, and whether protection for the right

asserted can be judicially molded."[16]  This "nonjurisdictional, prudential" doctrine

---

[13]  *See Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005); *Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 30 (2d Cir. 2004) (citation omitted).

[14]  *See Baker*, 369 U.S. at 217 (noting that in cases that involve a political question one of six factors will be found "[p]rominent *on the surface*" of the case) (emphasis added).

[15]  *Id.* at 211.

[16]  *Id.* at 198.

6

distinguishes between political cases and political questions.[17] "A well-recognized, if not altogether clear" doctrine, it "instructs federal courts to avoid deciding 'political questions.'"[18] The doctrine requires dismissal, where a political *question* is inextricably linked to the case.[19]

Cases pose non-justiciable political questions only to the extent that those questions are "beyond the competence and proper institutional role of the federal courts."[20] The Supreme Court established six factors for determining whether an action is nonjusticiable under the political question doctrine.[21] A case fails to state a justiciable cause of action if it "prominently" involves:

> (1)  'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
>
> (2)  a lack of judicially discoverable and manageable standards for resolving it; or

---

[17]  *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995).

[18]  *Vietnam Ass'n for Victims of Agent Orange/Dioxin v. Dow Chemical Co. (In re Agent Orange Prod. Liab. Litig.)*, 373 F. Supp. 2d 7, 64-69 (E.D.N.Y. 2005).

[19]  *See Baker*, 369 U.S. at 217.

[20]  *767 Third Ave. Assocs. v. Consulate Gen. of the Socialist Fed. Republic of Yugo.*, 60 F. Supp. 2d 267, 272 (S.D.N.Y. 1999), *aff'd in part, stay vacated and remanded by*, 218 F.3d 152 (2d Cir. 2000) (affirming the justiciability decision).

[21]  *See Baker*, 369 U.S. at 200.

7

(3)     the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

(4)     the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

(5)     an unusual need for unquestioning adherence to a political decision already made; or

(6)     the potentiality of embarrassment from multifarious pronouncements by various departments on one question.'[22]

In *Baker*, plaintiffs challenged the Tennessee Apportionment Act claiming that

the apportionment scheme placed them in a position of "constitutionally

unjustifiable inequality."[23] The Court found that it was not barred from deciding

the case because the plaintiffs' equal protection challenge posed an ordinary

question of constitutional interpretation.[24]

---

[22]     *Whiteman v. Dorotheum GmbH & Co KG*, 431 F.3d 57, 70 (2d Cir. 2005) (quoting *Baker*, 369 U.S. at 217).

[23]     *Baker*, 369 U.S. at 207-08.

[24]     *See id.* at 228. *See also Powell v. McCormack*, 395 U.S. 486, 548 (1969) (finding that a determination that Adam Clayton Powell should be allowed to take his seat in the House of Representatives "would require no more than an interpretation of the Constitution" and that the determination fell "within the traditional role accorded courts to interpret the law, and [did] not involve a lack of the respect due a coordinate branch of government, nor [did] it involve an initial

8

Over the years, the Supreme Court has applied the political question

doctrine to questions under the Guarantee Clause of the Constitution,[25] as well as

ratification of constitutional amendments, impeachment of officials from office,

foreign policy decisions, training of state national guards, and political party

disputes.[26] In 1973, for example, the Court found a claim regarding the use of the

National Guard three years earlier to quell student unrest nonjusticiable.[27] The

Court found it would be inappropriate for a district court to evaluate the "wide

range of possibly dissimilar procedures and policies approved by different law

enforcement agencies or other authorities" for training, equipping, and general

---

policy determination of a kind clearly for nonjudicial discretion") (citations and
quotations omitted).

[25]     Const. art. IV, § 4.

[26]     *See* Erwin Chemerinsky, *Cases Under the Guarantee Clause Should
be Justiciable*, 65 U. COLO. L. REV. 849, 853-54 (1994) (citing *Nixon v. United
States*, 506 U.S. 224, 235 (1993) (impeachment process is textually committed to
the Senate); *Gilligan v. Morgan*, 413 U.S. 1, 8 (1973); *O'Brien v. Brown*, 409 U.S.
1 (1972) (question of which group of delegates from Illinois should be seated at
the 1972 Democratic convention was nonjusticiable); *Baker*, 369 U.S. at 211
(though many questions of foreign relations "uniquely demand single-voiced
statement of the Government's views . . . it is error to suppose that every case or
controversy which touches foreign relations lies beyond judicial cognizance");
*Coleman v. Miller*, 307 U.S. 433, 459 (1939) (Congress has "sole and complete
control" over the process of amending the Constitution)).

[27]     *See Gilligan*, 413 U.S. at 8.

management of the military forces.[28]

In recent years, the Supreme Court has only applied the political

question doctrine to cases implicating the first two *Baker* criteria.[29] As the Court

has explained, the criteria are "probably listed in descending order of both

importance and certainty."[30] Thus, in a case that involved the Senate's

impeachment duties under the Constitution, the Court applied the first factor and

found that the case was nonjusticiable based on a textually demonstrable

constitutional commitment of the issue to a coordinate political department.[31]

And, in a case regarding political gerrymandering, Justice Scalia's plurality

opinion applied the second factor to bar a claim noting that the Court lacked

---

[28]     *Id.* at 11 (the Court also noted that its conclusion should not imply
that there may not be accountability in a judicial forum for violations of the law by
way of damages or injunctive relief).

[29]     *See* Mark Tushnet, *Law and Prudence in the Law of Justiciability: the
Transformation and Disappearance of the Political Question Doctrine*, 80 N.C. L.
REV. 1203, 1213 and n.51 (2002) (explaining evolution of the doctrine and
collecting cases and noting that "[a]fter *Bush v. Gore*, [531 U.S. 98 (2000)] neither
the Court nor its defenders thought it disrespectful to assume that leaving
resolution of the election dispute to Congress would either provoke or itself be a
constitutional crisis. In contemporary circumstances, a constitutional
jurisprudence of boldness predicated on refusing to temper legal with political
judgment is a politically sound jurisprudence.").

[30]     *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004).

[31]     *See Nixon*, 506 U.S. at 235 (finding that Judge Nixon's claims
regarding the Senate procedures used in his impeachment trial was nonjusticiable).

10

judicially manageable standards for deciding the case.[32] In contrast, where the government argued that judicial review of a statute's constitutionality would show a lack of respect to Congress because Congress had explicitly considered a statute's constitutionality, the Court refused to apply the fourth factor to bar a claim, noting that "a judicial finding that Congress has passed an unconstitutional law might in some sense be said to entail a 'lack of respect' for Congress' judgment. But disrespect, in [this sense], cannot be sufficient to create a political question."[33]

The third and fourth factors have, however, recently been applied by courts in the Second Circuit. These cases, when read in conjunction with the Supreme Court's earlier cases, demonstrate that the third factor – "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion" – requires a court to avoid removing an important policy determination from the Legislature. For example, in *767 Third Avenue*, plaintiffs sought to recover unpaid rent for offices leased to the former Socialist

---

[32] *See Vieth*, 541 U.S. at 292-93 (no judicially manageable standards could be applied to decide when "political gerrymandering has gone too far," as opposed to "racial gerrymandering" which would be justiciable under the Equal Protection Clause).

[33] *United States v. Munoz-Flores*, 495 U.S. 385, 390 (1990).

11

Federal Republic of Yugoslavia (SFRY), and the court found the claim

nonjusticiable based on the third *Baker* factor.[34] The SFRY had been replaced by

the countries of Macedonia, Slovenia, Croatia, Bosnia-Herzegovina, and the

Federal Republic of Yugoslavia and defendants argued that liability for the rent

could not be determined until the questions of which individual states succeeded

to the liabilities of the SFRY, and in what proportion liabilities would be

allocated, were resolved. The United States submitted a statement in the case

arguing that its policy was to allocate interests and liabilities among states through

international negotiations, and that liability could not attach "in the absence of a

political determination" regarding succession.[35] The Second Circuit found that

there were no standards for a court to use to make the initial policy decision of

"the equitable distribution of the public debt of a foreign state between several

successor states."[36]

In another example, a district court recently found a claim to abate

"the public nuisance of global warming" nonjusticiable as it required "an initial

---

[34]    *See 767 Third Ave. Assocs.*, 218 F.3d at 155.

[35]    *Id.* at 157-60.

[36]    *Id.* at 161.

12

policy determination of a kind clearly for non-judicial discretion."[37]  That court

found that the claims regarding global warming were unique in the context of

"pollution-as-public-nuisance cases" as they "touched on so many areas of

national and international policy."[38]

In contrast, one district court has refused to apply the third factor in a

case involving allegations by Vietnamese nationals that United States herbicide

manufacturers were responsible under international law and tort law for harming

them and their land during the Vietnam War.[39]  Defendants argued that the

question would require an initial policy determination to assess "the President's

conduct during a time of war."[40]  However, the court found that this "kind of

determination is one of substantive international law, not policy."[41]

---

[37]     *Connecticut v. American Elec. Power Co. ("AEP Co.")*, 406 F. Supp.
2d 265, 272 (S.D.N.Y. 2005). *But see Ohio v. Wyandotte Chemicals Corp.*, 401
U.S. 493, 496 (1971) ("While we have refused to entertain, for example, original
actions . . . that seek to embroil this tribunal in political questions, . . . this Court
has often adjudicated controversies between States and between a State and
citizens of another State seeking to abate a nuisance that exists in one State yet
produces noxious consequences in another") (quotations and citations omitted).

[38]     *AEP Co.*, 406 F. Supp. at 272.

[39]     *See In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d at 71.

[40]     *Id.*

[41]     *Id.* at 69-70.

The fourth criteria – "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government" – is generally only implicated where judicial resolution of a question "would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests."[42] For example, the Second Circuit found that "judicial deference" was due to the Executive Branch where it had filed a "statement of interest" urging dismissal of plaintiffs' claims against the Republic of Austria for "looting, expropriation, Aryanization, and/or liquidation" of their property between 1938 and 1945.[43] The United States had entered into an executive agreement with Austria under which Austria was to set up a fund to compensate Austrian Jews, but disbursement of the funds was contingent on dismissal of plaintiffs' putative class action against Austria. The Second Circuit found in a

---

[42] *Kadic*, 70 F.3d at 249. *See also Can v. United States*, 14 F.3d 160, 164 (2d Cir. 1994) (a judicial decision as to who has title to blocked Vietnamese assets, where that decision implicated a question of sovereign succession to the Republic of South Vietnam would "involve 'an initial policy determination of a kind clearly for nonjudicial discretion', (2) 'express lack of the respect due coordinate branches of government', and (3) lead to the 'potentiality of embarrassment from multifarious pronouncements by various departments on one question'") (quoting *Baker*, 369 U.S. at 217).

[43] *Whiteman*, 431 F.3d at 60.

14

two-to-one decision that "a court's undertaking independent resolution" of the claim would be impossible "without expressing lack of respect due the Executive Branch."[44] In another case, where neither the Executive nor the Legislature had "made significant political decisions" in the areas raised by the plaintiffs' claims, the claims were found to be justiciable.[45]

The political question analysis must be performed carefully and on a case-by-case basis.[46] Considering the Supreme Court's reticence in applying the later *Baker* criteria to find a case nonjusticiable, utmost caution is warranted in considering a request based on those criteria. The political-question doctrine continues to rest, at least in part, "on prudential concerns calling for mutual respect among the three branches of Government."[47]

---

[44]  *Id.*

[45]  *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d at 72 (noting that "[t]he determination that a branch of government has exceeded its constitutional authority does not express lack of respect for it" and that international agreements regarding "property that was expropriated or nationalized by Vietnam" were not related to the herbicide claims).

[46]  *See Whiteman*, 431 F. 3d at 70 (political question claims are analyzed on a "case-by-case" basis); *Can*, 14 F.3d at 163 ("The political question doctrine must be cautiously invoked."). *See also In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d at 65 (noting that experts have observed that the "political question doctrine is in a state of some confusion") (citations and quotations omitted).

[47]  *Goldwater v. Carter*, 444 U.S. 996, 1000 (1979) (holding that Senator Goldwater's claim that the Constitution required Senate agreement to abrogate a

## IV. DISCUSSION

This motion requires me to weigh "[t]he respect due to coequal and independent departments,"[48] against "[t]he very essence of civil liberty . . . the right of every individual to claim the protection of the laws, whenever he receives an injury."[49]  Defendants argue that plaintiffs' claims "run afoul" of the third and fourth *Baker* criteria because (1) the Court cannot balance the interests implicated by plaintiffs' "effort to ban MTBE absent 'an initial policy determination' by Congress and the President"[50] and (2) the Court cannot grant plaintiffs' requested relief without "'expressing lack of the respect due coordinate branches of government.'"[51]

Plaintiffs respond that *Baker* factor three does not apply as there are clear and well-settled rules for determining plaintiffs' product liability, public nuisance, and other claims.  In addition, plaintiffs argue that *Baker* factor four is not applicable as Congress has not made a decision or set a policy regarding

treaty raised a political question).

[48]     *Baker*, 369 U.S. at 217.

[49]     *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

[50]     Def. Mem. at 6.

[51]     *Id.* at 6-7 (quoting *Baker*, 369 U.S. at 217).

16

MTBE.[52] Plaintiffs note that merely because MTBE legislation has been proposed and debated in Congress is no guide to congressional intent. Allowing congressional debates to create a political question, as defendants claim, would permit a defendant to "lobby its way into a dismissal even when it comes up short in Congress."[53]

## A. *Baker* Factor Three

The third *Baker* factor requires courts to evaluate whether it would be impossible to decide the case without making an initial policy determination of a kind clearly involving nonjudicial discretion. Defendants characterize plaintiffs' requests for relief as broad policy goals which can only be achieved by replacing MTBE with ethanol throughout the national fuel supply.[54] Defendants claim that this Court cannot balance the "relevant economic, environmental, energy and

---

[52]     *See* Pl. Mem. at 11.

[53]     *Id.* at 12. Plaintiffs also argue that the doctrine does not apply to tort cases that do not allege constitutional claims or affect foreign affairs. Because I find that neither of the *Baker* factors defendants invoked applies to this case, I need not reach the issue of whether, in general, the Supreme Court's application of *Baker* establishes that the political question doctrine only applies to constitutional claims or claims that affect foreign affairs.

[54]     *See* Def. Mem. at 7 (citing Fourth Amended Complaint, *County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al.*, No. 04 Civ. 5424 ¶ 3).

security interests implicated by plaintiffs' effort to ban MTBE" before Congress and the President make an initial policy determination regarding whether to ban the product.[55]

Defendants have blurred the line between a determination of whether defendants are liable for water pollution caused by MTBE and a policy determination regarding the composition of the country's fuel supply. Here, the only relevant policy determination would be if Congress had decided to ban the use of MTBE or grant manufacturers immunity from lawsuits asserting damages attributable to the use of MTBE. But Congress has not made any such determination. If and when it makes such a decision, the Court can then assess the impact of that decision on these cases.[56]

---

[55]    Def. Mem. at 6.

[56]    When Congress has passed a law or an agency has regulated a product, tort law and product liability claims are not generally displaced, unless (1) the claims are expressly preempted by the statute, (2) Congress has established a comprehensive regulatory scheme in the area effectively removing the entire field from the state realm; or (3) it is impossible for a private party to comply with both state and federal requirements or the state law is an obstacle to the achievement of federal objectives. *See MTBE I*, 175 F. Supp. 2d at 611 (citing *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990); *Leipart v. Guardian Indus., Inc.*, 234 F.3d 1063, 1066 (9th Cir. 2000); *Lady v. Neal Glaser Marine, Inc.*, 228 F.3d 598, 601 (5th Cir. 2000); *Bedford Affiliates v. Sills*, 156 F.3d 416, 426 (2d Cir. 1998)); *City of New York v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244, 288 (E.D.N.Y. 2005) (finding that preemption law does not apply to New York City's public nuisance and negligent and reckless merchandising claims

Tort litigation concerning a gasoline additive may proceed despite the possibility that Congress may ban any further use of the product. Even when products are heavily regulated under federal law, tort suits involving those products may be brought absent a congressional injunction prohibiting such suits.[57] For example, prescription drugs are heavily regulated by the federal government,[58] but the Products Liability Restatement nonetheless includes a provision for product liability for prescription drugs and medical devices.[59] Thus,

---

against handgun manufacturers as Congress did not preclude all state gun legislation by means of the Protection of Lawful Commerce in Arms Act (Pub. L. No. 109-92, 119 Stat. 2095) and Congress did not provide new federal tort protections that might preempt plaintiffs' claims). Defendants have not satisfied their burden of showing that plaintiffs' claims are conflict preempted. *See* 6/23/06 Opinion and Order, No. M21-88, MDL 1358.

[57]     *Cf.*, *Moss v. Merck & Co.*, 381 F.3d 501, 503 (5th Cir. 2004) (explaining that "[t]he Vaccine Act is a remedial program designed to provide swift compensation for persons injured by vaccines, while ensuring that the nation's supply of vaccines isn't unduly threatened by the costs and risks of tort litigation. To that end, victims of a 'vaccine-related injury or death,' as that term is defined in 42 U.S.C. § 300aa-33(5), are barred from seeking redress in the courts unless they have first filed a claim for recovery in a specialized Vaccine Court.").

[58]     *See, e.g.*, *Abbot v. American Cyanamid Co.*, 844 F.2d 1108, 1112 (4th Cir. 1988) (noting that the Food and Drug Administration's "regulation of prescription drugs and biological products is comprehensive").

[59]     *See* Restatement (Third) of Torts: Products Liability § 6(c). *See also id.* § 4 cmt. e. ("most product safety statutes or regulations establish a floor of safety below which product sellers fall only at their peril, but they leave open the question of whether a higher standard of product safety should be applied").

where the foreseeable risk of a drug or medical device is so great in comparison to its benefits that a reasonable medical provider, knowing the risks, would not prescribe the drug for "any class of patients," the drug is defective.[60] In general, while Congressional regulation is relevant to tort liability, it is not dispositive.[61]

This case is distinguishable from *Connecticut v. American Electric Power Company*.[62] In that case, the court found that plaintiffs sought to enact broad limits on carbon dioxide emissions and that Congress and the Executive had issued explicit statements "on the issue of global climate change in general," specifically refused to "impose limits on carbon dioxide emissions," taken several steps to study and research the issues involved in global warming, and directed the Secretary of State to "coordinate U.S. negotiations concerning global climate change."[63] Though Congress has studied MTBE, defendants cannot point to any similar statements or actions regarding MTBE. Indeed, Congress has not banned the use of MTBE and has passed no law governing liability for the decision to use

---

[60]     *Id.*

[61]     *See id.* § 4 (stating in relevant part: "a product's noncompliance with an applicable product safety statute or administrative regulation renders the product defective with respect to the risks sought to be reduced by the statute or regulation").

[62]     406 F. Supp. 2d at 272.

[63]     *Id.* at 274.

20

MTBE and any contamination its use may have caused. Failure to act on an issue is a notoriously poor guide to congressional purpose.[64]

In addition, while plaintiffs in the global warming case sought quasi legislative remedies such as an injunction "enjoining each of the defendants to abate its contribution to the nuisance by capping its emissions of carbon dioxide and then reducing those emissions by a specified percentage each year for at least a decade,"[65] plaintiffs here do not seek such relief. Plaintiffs simply request that defendants be prevented from "engaging in further *releases* of MTBE."[66]

It is also inaccurate for defendants to assert that plaintiffs are seeking an "ethanol mandate." To the extent plaintiffs referred to "safer alternatives,"[67] such as ethanol, this tracks the typical product liability claim. New York law, for example, requires that a plaintiff show a "reasonable alternative design before she

---

[64]    *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988) (noting that the "Court generally is reluctant to draw inferences from Congress' failure to act").

[65]    *American Electric Power Co.*, 406 F. Supp. 2d at 270 (citing Complaint, *State of Connecticut, et al. v. American Electric Power Company, Inc., et al.*, No. 04 Civ. 05669, ¶ 6).

[66]    *Long Island* Complaint, Prayer for Relief ¶ 1 (emphasis added).

[67]    *Id.* ¶ 244 ("Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline.").

21

will be permitted to recover in strict liability for a defectively designed product."[68]

The weighing of alternative designs is typical of the balancing undertaken in

courts around the country in product liability cases and it is wholly independent of

a policy determination mandating the use of ethanol.[69]

Defendants finally argue that plaintiffs' actions do not comprise

"ordinary tort actions" because they named defendants who did not actually

"release" gasoline containing MTBE.[70] It is well accepted, however, that product

defect claims may be brought against manufacturers.[71] Merely because plaintiffs

---

[68] *McCarthy v. Olin Corp.*, 119 F.3d 148, 173 (2d Cir. 1997) (citing
*Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 208 (N.Y. 1983)) (also noting
that some disagreement exists as to whether this requirement still exists). *See also*
Restatement (Third) on Torts § 2(b) ("A product is defective in design when the
foreseeable risks of harm posed by the product could have been reduced or
avoided by the adoption of a *reasonable alternative design* by the seller or other
distributor [] and the omission of the alternative design renders the product not
reasonably safe.") (emphasis added).

[69] *See, e.g.*, *Liriano v. Hobart Corp.*, 132 F.3d 124, 131 (2d Cir. 1998)
(noting that the risk-utility test, which applies in New York to design defects,
involves making a cost-benefit analysis to "gauge the benefits of a product in
relation to its dangers").

[70] Reply Mem. at 1. To the extent defendants are attempting to reargue
their claim that plaintiffs' complaints must be dismissed because plaintiffs have
failed to identify which defendant's MTBE-containing gasoline proximately
caused their harm, they are referred to *In re MTBE Prods. Liab. Litig.*, 379 F.
Supp. 2d at 348.

[71] *See Escola v. Coca Cola Bottling Co.*, 150 P.2d 436, 440-41 (Cal.
1944) (Traynor, J., concurring) (explaining reasons why a manufacturer should be

22

have asserted a claim of market share liability based primarily on the difficulty of product identification does not transform a complex product liability case into a political question.[72]

## B. *Baker* Factor Four

The fourth *Baker* factor requires a court to determine whether judicial resolution of a question "would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests."[73] Defendants argue that plaintiffs raise nonjusticiable political questions in light of "Congress's active and ongoing debate regarding the use of MTBE and ethanol in gasoline sold in the US."[74] Defendants then argue that plaintiffs seek a regulatory scheme regarding the fuel supply that would implicate the standards set by Congress's reformulated gasoline program under the Clean Air Act and the ability of refiners and

---

held responsible for an injury caused by a defective product to any person who comes in lawful contact with it).

[72] *See, e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d at 64-69.

[73] *Kadic*, 70 F.3d at 249.

[74] Def. Mem. at 10.

23

manufacturers to meet emissions standards.[75]

Allowing these claims to proceed does not contradict any prior decisions made by a coordinate branch of government because Congress has never spoken on the issues raised in these lawsuits. Defendants point to legislative findings to a proposed bill that was introduced in the House of Representatives on April 8, 2005, which state that setting "drinking water standards is a complex public policy determination requiring careful analysis and balancing of a number of factors."[76] The bill was sent to the House Committee on Energy and Commerce and the House Committee on the Judiciary on the day it was proposed.[77] It remains in those Committees to this day. As such, the proposed findings cannot be considered evidence of legislative intent nor are they a prior legislative decision which would be contradicted by allowing these cases to proceed.

Defendants also point to the fact that MTBE "was hotly debated in

---

[75]    *See id.* at 9-10.

[76]    *Id.* at 7 (citing Drinking Water Standards Preservation Act of 2005, H.R. 1540, 109th Cong. § 2 (2005)).

[77]    2005 Bill Tracking H.R. 1540.

24

the 109th Congress in the context of H.R. 6," the Energy Policy Act of 2005.[78] But, as defendants concede, the signed Act does not shield MTBE producers from product liability claims, impose a nationwide ban on MTBE, or mandate ethanol's use in its place.[79] These provisions were debated and proposed but no legislative decision was made on the issue of liability for water pollution caused by MTBE.

Defendants note that the EPA has been actively involved in regulating and investigating use of MTBE and ethanol in gasoline. Defendants refer to recommendations by an EPA Blue Ribbon Panel on Oxygenates regarding use of MTBE and ethanol, which recommend reducing MTBE use over time.[80] Defendants also claim that the Energy Policy Act of 2005 replaced the oxygenate requirements under the Clean Air Act with economic incentives to use ethanol and a timeline for meeting the new standards, and thus, a "de facto ban [on MTBE] and ethanol mandate would usurp Congress's power" to set such a timeline.[81]

---

[78]     *See* Def. Mem. at 11 (citing Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (codified in various sections of Titles 16 and 42 of the United States Code) (2005) ("Energy Policy Act")).

[79]     *See id.*

[80]     *See* 9/15/99 Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline at 3, Ex. B to Def. Mem.

[81]     *See* Def. Mem. at 11-12 (citing Energy Policy Act of 2005 §§ 1501, 1504, 1510).

25

Regulatory recommendations from the Blue Ribbon Panel do not

prove that Congress intends to resolve the issues raised in this litigation. And,

though Congress has considered phasing out MTBE, there is no sign that Congress

or the President has set up an alternative forum or entered into an agreement to

resolve plaintiffs' product liability claims outside the judicial process, as in

*Whiteman*.[82] Indeed, plaintiffs' requested relief, including investigation,

monitoring, and an early warning system, does not conflict with EPA

recommendations as those recommendations track some of the equitable relief

sought by plaintiffs.[83] Thus, while "[i]t is true that requests for injunctive relief

can be particularly susceptible to justiciability problems" a ruling by any court that

defendants must clean up MTBE contamination and take precautions to avoid

causing further MTBE contamination would not clearly interfere or *conflict* with

---

[82]     *Whiteman*, 431 F.3d at 74 (noting that the court "could not 'undertake
independent resolution without expressing lack of the respect due' the Executive
Branch, because (1) the Executive Branch [had] exercised its authority to enter
into executive agreements respecting the resolution of the claims in question; (2)
the United States Government (a) [had] established through an executive
agreement an alternative international forum for considering the claims in
question, and (b) [had] indicated to [the] Court that, as a matter of foreign policy,
the alternative forum is superior to litigation; and (3) the United States foreign
policy advanced by the executive agreement [would be] substantially undermined
by the continuing pendency of [the] case.") (quoting Baker, 369 U.S. at 217).

[83]     *See Long Island* Complaint Prayer for Relief ¶ 1.

26

federal policy goals regarding the country's fuel supply.[84]

Defendants' arguments boil down to the claim that holding

manufacturers, refiners, and sellers responsible for MTBE contamination is highly

controversial and thus should be left to the Congress, the EPA, and the President.[85]

But, the fact that the issues arise in a "politically charged context" does not

convert this tort suit into a non-justiciable political question, given that there is no

evidence that Congress has decided that it would resolve the issues.[86] While

regulation of the national fuel supply is surely not an issue for the judicial branch,

---

[84] *Gordon v. Texas*, 153 F.3d 190, 195 (5th Cir. 1998) (finding that where, among other reasons, it was not clear that the requested injunctive relief would conflict with a current policy of the federal government, an action was not barred by the political question doctrine). *See also Sprietsma v. Mercury Marine*, 537 U.S. 51, 67 (2002) (The Coast Guard's decision not to require propeller guards, though intentionally and carefully considered, did not convey an authoritative message of a federal policy against propeller guard and thus a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular kind of boat equipped with respondent's particular type of motor would not be inconsistent.) (quotations and citations omitted).

[85] *See* Def. Mem. at 13-16.

[86] *See Immigration and Naturalization Serv. v. Chadha*, 462 U.S. 919, 942-43 (1983) ("The presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine."); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione, etc.*, 937 F.2d 44, 49 (2d Cir. 1991) (upholding the district court's finding that a tort suit against the Palestine Liberation Organization for its actions in connection with the October 1985 seizure of the Italian passenger liner Achille Lauro and the killing of one of the passengers did not present a political question).

27

these suits seek abatement and damages in addition to a ban on further *contamination*. Weighing the issues in a products liability claim is a quintessential judicial function. Plaintiffs claim that "when [d]efendants placed gasoline containing MTBE into the stream of commerce, it was defective and unreasonably dangerous for its intended and foreseeable uses,"[87] and defendants had a duty to warn plaintiffs, the public, and public officials about the dangers posed by MTBE.[88] Though the political question doctrine has given rise to many difficult cases, this is not one of them. Plaintiffs' claims fall into the realm of justiciable questions and do not implicate a political question as defined by *Baker*.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion is denied. The Clerk of the Court is directed to close this motion (docket #871).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          June 23, 2006

---

[87]    *Long Island* Complaint ¶ 240.

[88]    *See id.* ¶ 250.

28

## -Appearances-

**Counsel for Plaintiffs:**

Matthew F. Pawa, Esq.
Benjamin A. Krass, Esq.
Law Offices of Matthew F. Pawa, P.C.
1280 Centre Street, Suite 230
Newton Centre, MA 02459
Tel: (617) 641-9550
Fax: (617) 641-9551

Scott Summy, Esq.
Carla Burke, Esq.
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Tel: (214) 521-3605

Michael Axline, Esq.
Duane Miller, Esq.
Miller, Axline & Sawyer
1050 Fulton Street
Sacramento, CA 95825
Tel: (916) 488-6688

Scott Pasternak, Esq.
Daniel Greene, Esq.
Ramin Pejan, Esq.
Environmental Division
New York City Law Department
100 Church Street, Room 6-145
New York, NY 10007
Tel: (212) 676-8517

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
C. Sanders McNew, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Counsel for Sunoco, Inc. and
Sunoco, Inc (R&M):**

John S. Guttman, Esq.
Daniel M. Krainin, Esq.
Beveridge & Diamond, P.C.
477 Madison Ave., 15th floor
New York, NY 10022
Tel: (212) 702-5400
Fax: (212) 702-5450

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery LLP
340 Madison Ave.
New York, NY 10017
Tel: (212) 547-5353
Fax: (212) 547-5444