USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/23/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X
                                              :
IN RE: METHYL TERTIARY BUTYL    :
ETHER ("MTBE") PRODUCTS          :
LIABILITY LITIGATION                  :          **OPINION AND ORDER**
------------------------------------------------ :
                                              :          **Master File No. 1:00–1898**
**This document relates to:**            :          **MDL 1358 (SAS)**
                                              :          **M 21-88**
**All cases**                               :
------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

In this consolidated multi-district litigation ("MDL"), plaintiffs seek

relief from contamination, or threatened contamination, of groundwater from

various defendants' use of the gasoline additive methyl tertiary butyl ether

("MTBE") and/or tertiary butyl alcohol ("TBA"), a product that is formed by the

natural degradation of MTBE in water.  Defendants now move for summary

judgment on the ground that plaintiffs' claims are conflict preempted by the Clean

Air Act ("CAA") because *first*, "compliance with both federal and state

regulations is a physical impossibility;"[1] or *second*, plaintiffs' state tort claims

---

[1]    *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132,
142-43 (1963).

"stand[] as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress."[2] After hearing oral argument on May 9, 2006 and

conducting a thorough review of the facts presented, defendants' motion is denied.

## II. BACKGROUND

The parties have already engaged in extensive motion practice, and

familiarity with the Court's previous opinions is assumed.[3] The facts underlying

---

[2] *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Defendants have preserved their arguments that plaintiffs' claims are expressly preempted or that Congress has occupied the relevant field of reformulated gasoline as affirmative defenses and grounds for removal. *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment on Conflict Preemption ("Def. Mem.") at 2 n.4.

[3] *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2006 WL 928997 (S.D.N.Y. Apr. 7, 2006); *In re MTBE Prods. Liab. Litig.*, 415 F. Supp. 2d 261 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d 340 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d 325 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 1529594 (S.D.N.Y. Jun. 28, 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 1500893 (S.D.N.Y. Jun. 24, 2005); *In re MTBE Prods. Liab. Litig.*, 402 F. Supp. 2d 434 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d 242 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 233 F.R.D. 133 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 364 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan. 18, 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan. 6, 2005); *In re MTBE Prods. Liab. Litig.*, 364 F. Supp. 2d 329 (S.D.N.Y. 2004); *In re MTBE Prods. Liab. Litig.*, 361 F. Supp. 2d 137 (S.D.N.Y. 2004) (*"MTBE VI"*); *In re MTBE Prods. Liab. Litig.*, 341 F. Supp. 2d 386 (S.D.N.Y. 2004) (*"MTBE V"*); *In re MTBE Prods. Liab. Litig.*, 341 F. Supp. 2d 351 (S.D.N.Y. 2004) (*"MTBE IV"*); *In re MTBE Prods. Liab. Litig.*, 342 F. Supp. 2d 147 (S.D.N.Y. 2004)

this case are comprehensively set out in those opinions.[4]

## A.    The 1990 CAA Amendments

The purpose of the CAA is "to protect and enhance the quality of the

Nation's air resources so as to promote the public health and welfare and the

productive capacity of its population."[5]  The CAA gives the United States

Environmental Protection Agency ("EPA") the authority to set national ambient

air quality standards for various air pollutants.[6]  Individual states must devise

plans to meet the standards.[7]

In 1990, amendments to the CAA created the Reformulated Gasoline

Program ("RFG Program")[8] to help reduce ozone-causing car emissions, such as

volatile organic compounds ("VOCs") and toxic air pollutants.[9]  In order to

---

("*MTBE III*"); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002)
("*MTBE II*"); *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y.
2001) ("*MTBE I*").

[4]      For a thorough recitation of plaintiffs' fact allegations see, for
example, *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d at 364-67.

[5]      42 U.S.C. § 7401(b) (2006).

[6]      *See id.* § 7409.

[7]      *See id.* § 7410.

[8]      *See id.* § 7545.

[9]      *See id.* § 7545(k)(1).

3

accomplish this, section 211(k)(2)(B) of the amendments required that reformulated gasoline have a minimum oxygen content of two percent.[10] To achieve this minimum oxygen content, gasoline manufacturers add oxygenated fuel to the gasoline. The RFG Program required the use of reformulated gasoline in the nine largest metropolitan areas with the most severe summertime ozone levels.[11] Other areas that did not attain the national ambient air quality standards could opt into the program.[12] In addition, the amendments enacted an Oxygenated Fuels ("Oxyfuel") Program, which required that gasoline contain 2.7 percent oxygen by weight during the wintertime in areas that did not attain the national ambient air quality standard for carbon monoxide.[13] The EPA certified various blends of gasoline for use in the RFG Program, including gasoline with MTBE, however, it did not mandate the use of any one oxygenate.[14] Two of the most

---

[10]  *See id.* § 7545(k)(2)(B) ("The oxygen content of the gasoline shall equal or exceed 2.0 percent by weight (subject to a testing tolerance established by the Administrator) except as otherwise required by this Act.") (repealed 2005).

[11]  *See id.* § 7545(10)(D).

[12]  *See id.* § 7545(k)(6).

[13]  *See id.* § 7545(m)(2).

[14]  Under the RFG Program, certification has a narrow meaning. Section 7545(k)(4)(B) states that the EPA "shall certify a fuel formulation . . . as complying with this subsection" if it satisfies the conditions set forth in section 7545(k)(2) and (3), both of which concern only the effectiveness of the

4

widely used oxygenates are MTBE and ethanol.

Section 211(k)(1) of the amendments authorizes the EPA to issue regulations for reformulated gasoline to require "the greatest reduction" in emissions of ozone-forming VOCs during the summer and toxic air pollutants throughout the year "achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emission reductions, any nonair-quality and other air-quality related health and environmental impacts and energy requirements."[15] In 2005, Congress removed the oxygen requirement for reformulated gasoline contained in the CAA.[16] The Energy Policy Act of 2005 now requires the EPA to promulgate regulations to require gasoline "sold or introduced into commerce in the United States" to contain an annual average

---

formulation in reducing air pollution and do not consider non air-quality concerns. In addition, while MTBE has been registered for use by the EPA pursuant to section 7545(a) and (b), such registration does not constitute an "endorsement, certification or approval by any agency of the United States." 40 C.F.R. § 79.11(h).

[15]     42 U.S.C. § 7545(k)(1).

[16]     *See* Energy Policy Act of 2005, Pub. L. No. 109-58 ("Energy Policy Act of 2005"), § 1504(a), 119 Stat. 594 (codified in scattered sections of 16 U.S.C. and 42 U.S.C.) (2005). *See also* Regulation of Fuels and Fuel Additives: Removal of Reformulated Gasoline Oxygen Content Requirement and Revision of Commingling Prohibition to Address Non-Oxygenated Reformulated Gasoline, 71 Fed. Reg. 9070 (Feb. 22, 2006) (amending 40 C.F.R. § 80 to remove the oxygen content requirement for reformulated gasoline).

volume of four billion gallons of renewable fuel starting in 2006 and increasing to seven and a half billion gallons of renewable fuel in 2012.[17]

## B. Brief Summary of Plaintiffs' Allegations

MTBE is highly soluble in water and does not readily biodegrade. Because of its high solubility, MTBE races through the underground water supply, eventually contaminating wells and underground aquifers. MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline. Even in very small quantities, MTBE imparts a foul taste and odor to water and renders it unusable and unfit for human consumption. MTBE is carcinogenic in animals and may be carcinogenic in humans.[18]

Sometime after 1979, defendants started manufacturing, distributing, and/or selling MTBE-containing gasoline.[19] By the 1990s, defendants added MTBE to gasoline in concentrations varying between eleven and fifteen percent.[20] Plaintiffs allege that defendants chose to add MTBE to gasoline despite their

---

[17]    Energy Policy Act of 2005 § 1501.

[18]    *See* Fifth Amended Complaint, *Long Island Water Corp. v. Amerada Hess Corp.*, No. 04 Civ. 2068 ("*Long Island* Complaint") ¶¶ 114-119.

[19]    *See id.* ¶ 107. Although the complaints in this MDL are not identical they allege essentially the same facts and claims. I will continue to cite to the *Long Island* Complaint as a typical complaint for purposes of this motion.

[20]    *See id.* ¶¶ 108-109.

awareness of specific incidents of MTBE contamination and the dangers posed by MTBE.[21] Defendants misled the EPA and the public about the dangers of MTBE during the process leading up to the 1990 CAA amendments and conspired to convince the EPA and the public that MTBE was harmless and that increased concentrations of MTBE were desirable.[22] According to plaintiffs, had the public been warned of the hazards of MTBE, plaintiffs and the public would have sought and demanded alternative oxygenates.[23]

Plaintiffs assert that defendants have a duty "not to market any product which is unreasonably dangerous for its intended and foreseeable uses."[24] And plaintiffs claim MTBE is "defective and unreasonably dangerous for its intended and foreseeable transportation, storage, handling and uses."[25]

## III. LEGAL STANDARD

Summary judgment is appropriate if the record "show[s] that there is

---

[21] *See id.* ¶¶ 132-155.

[22] *See id.* ¶ 157. According to plaintiffs' allegations, the idea for the RFG Program was developed and promoted by the petroleum industry – not by the EPA or federal government. *See id.* ¶ 176.

[23] *See id.* ¶ 187.

[24] *Id.* ¶ 239.

[25] *Id.* ¶ 240.

7

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[26] An issue of fact is genuine if "the evidence is such that a jury could return a verdict for the nonmoving party."[27] A fact is material when it "might affect the outcome of the suit under the governing law."[28] The movant has the burden of demonstrating that no genuine issue of material fact exists.[29]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does "'not rely on conclusory allegations or unsubstantiated speculation.'"[30] To do so, it must do more than show that there is a "'metaphysical doubt as to the material facts.'"[31] In determining whether a genuine issue of material fact exists, the court must

---

[26]    Fed. R. Civ. P. 56(c).

[27]    *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). *Accord Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

[28]    *Jeffreys*, 426 F.3d at 553 (quoting *Anderson*, 477 U.S. at 248).

[29]    *See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[30]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[31]    *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

construe the evidence in the light most favorable to the non-moving party and

draw all justifiable inferences in that party's favor.[32]

## IV. APPLICABLE LAW

Regulation and control of matters related to public health and safety,

such as abatement of water pollution, are within the police powers of the states.[33]

However, Congress may preempt state law under the Supremacy Clause of Article

VI of the Constitution.[34]   In the absence of explicit statutory language signaling an

intent to preempt state law in traditional state areas of regulation, there is a strong

---

[32]     *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004).

[33]     *See Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 715 (1985); *Oxygenated Fuels Ass'n v. Pataki*, 158 F. Supp. 2d 248, 253 (N.D.N.Y. 2001), *adhering to opinion as modified on reconsideration*, No. 00-1073, 2002 WL 32329221 (N.D.N.Y. May 16, 2002) (quoting *City of Utica v. Water Pollution Control Bd.*, 156 N.E.2d 301 (N.Y. 1959) ("'The abatement and prevention of water pollution is a matter of state concern, and legislation designed to regulate and control such pollution is within the scope of the state's police power.'").

[34]     *See Northwest Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 509 (1989) (in order to determine whether Congress has exercised its power to preempt state law, a court must "examine congressional intent. In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, : . . or where the state law at issue conflicts with federal law, either because it is impossible to comply with both, or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives.") (quotations omitted).

9

"basic assumption" that Congress did not intend to displace state law.[35]

"Ordinarily, the mere existence of a federal regulatory or enforcement scheme . . . does not by itself imply pre-emption of state remedies."[36] "Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law. . . . Instead, we must look for 'special features warranting pre-emption.'"[37] Thus, "where Congress has not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal law."[38] The Supreme Court has warned against "seeking out conflicts between state and federal regulations where none clearly exists."[39] "While Congress may preempt or regulate particular branches of tort law,

---

[35]   *See Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

[36]   *English v. General Elec. Co.*, 496 U.S. 72, 87 (1990).

[37]   *Id.* (quoting *Hillsborough County*, 471 U.S. at 719 (concluding that local ordinances regarding plasma donation were not preempted by the Food and Drug Administration's ("FDA") blood plasma regulations because the FDA had stated that its regulations were not intended to be exclusive and because of the deference with which the Court must review the state ordinances in the areas of health and safety)).

[38]   *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987).

[39]   *Id.* at 90.

particularly as part of a larger regulatory scheme that seeks to redress the injuries

previously covered by state law, the Court has made clear the importance of

respecting the role of the states as independent sovereigns."[40]

## A. Impossibility

"Conflict preemption" occurs "where it is impossible for a private

party to comply with both state and federal requirements."[41] Though defendants

have failed to identify a single case where this doctrine was applied,[42] it is a

potentially powerful doctrine that has been consistently referred to in the Supreme

Court's preemption cases.[43] The doctrine focuses on whether the federal

---

[40]     *City of New York v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244, 288
(E.D.N.Y. 2005) (quotations omitted).

[41]     *English*, 496 U.S. at 79 (citing *Florida Lime*, 373 U.S. at 142-43).

[42]     Each case cited by defendants relies instead on a finding that the state
law presented an *obstacle to* or *interfered with* a federal purpose. *See Geier v.
American Honda Motor Co.*, 529 U.S. 861, 881-83 (2000) (holding that a tort
action asserting a "duty to install an airbag" would have presented an obstacle to
certain federal standards); *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458
U.S. 141, 155 (1982) (noting that compliance with both a *California* common law
rule and a federal regulation was not a physical impossibility, however the
common law rule created an obstacle to the accomplishment of federal purpose);
*Free v. Bland*, 369 U.S. 663, 669 (1962) (finding that a state community property
law "interfered directly" with a federal regulation).

[43]     · *See, e.g.*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363,
372 (2000) (noting that the Court "will find preemption where it is impossible for
a private party to comply with both state and federal law" but holding that the
"Burma law of the Commonwealth of Massachusetts," which restricted the

11

requirement, on its face, precludes the possibility of the state requirement and is derived from the Court's Commerce Clause cases.[44] Thus, where one standard precludes the other there is no need to question whether Congress intended to preempt state law. As the court in *Florida Lime* explained, a situation of impossible dual compliance would be presented if, for example, a federal law "forbade the picking and marketing of any avocado testing more than 7% oil" while a state law "excluded from the State any avocado measuring less than 8% oil

___

authority of state agencies to purchase goods or services from companies doing business with Burma, created an obstacle to a federal statute that imposed mandatory and conditional sanctions on Burma).

[44] *Florida Lime*, 373 U.S. at 142-43 ("A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce") (citing *Union Bridge Co. v. United States*, 204 U.S. 364, 400 (1907) (the federal government retained the power under the Commerce Clause to order improvements on a bridge, even though it was lawfully erected under the authority of a Pennsylvania charter); *Morgan v. Virginia*, 328 U.S. 373, 377 (1946) (there is "a recognized abstract principle . . . that may be taken as a postulate for testing whether particular state legislation in the absence of action by Congress is beyond state power. This is that the state legislation is invalid if it unduly burdens that commerce in matters where uniformity is necessary. . . . Where uniformity is essential for the functioning of commerce, a state may not interpose its local regulation."); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529 (1959) (though the Court found no discrimination against interstate commerce, a mudguard regulation on trucks passing through Illinois, which differed from requirements in almost all other states, placed an unconstitutional burden on interstate commerce)).

content."[45]

Though the "categories of preemption are not 'rigidly distinct'"[46] the question of whether it is impossible to comply with two conflicting provisions is conceptually different from the question of whether state law stands as an obstacle to the accomplishment of Congressional purpose. For conflict preemption based on impossibility, the question is whether plaintiffs' tort duty is explicitly inconsistent with the federal law, not whether state law interferes with some purpose of the federal law.[47]

## B. Obstacle Preemption

In the absence of impossibility, a finding of conflict preemption may nonetheless be appropriate when state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[48] The state law must interfere *directly* with the federal purpose. For example, in *Free v. Bland*, the Supreme Court held that Texas's community property law

---

[45]    *Florida Lime*, 373 U.S. at 142.

[46]    *Crosby*, 530 U.S. at 373 n.6 (quoting *English*, 496 U.S. at 79 n.5).

[47]    *See Barnett Bank, N.A. v. Nelson,* 517 U.S. 25, 31 (1996) (noting that an impossible conflict would arise where two statutes imposed directly conflicting duties on national banks: "as they would, for example, if the federal law said, 'you must sell insurance,' while the state law said, 'you may not.'").

[48]    *Fidelity Fed. Sav.*, 458 U.S. at 153 (quoting *Hines*, 312 U.S. at 67).

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X
                                                :
IN RE: METHYL TERTIARY BUTYL   :
ETHER ("MTBE") PRODUCTS        :
LIABILITY LITIGATION            :          **OPINION AND ORDER**
------------------------------------------------ :
                                                :          **Master File No. 1:00–1898**
**This document relates to:**            :          **MDL 1358 (SAS)**
                                                :          **M 21-88**
**All cases**                                 :
------------------------------------------------ X

┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:                          │
│ DATE FILED: 6/23/06             │
└─────────────────────────────────┘

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

In this consolidated multi-district litigation ("MDL"), plaintiffs seek

relief from contamination, or threatened contamination, of groundwater from

various defendants' use of the gasoline additive methyl tertiary butyl ether

("MTBE") and/or tertiary butyl alcohol ("TBA"), a product that is formed by the

natural degradation of MTBE in water. Defendants now move for summary

judgment on the ground that plaintiffs' claims are conflict preempted by the Clean

Air Act ("CAA") because *first*, "compliance with both federal and state

regulations is a physical impossibility;"[1] or *second*, plaintiffs' state tort claims

---
[1]      *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132,
142-43 (1963).

"stand[] as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress."[2] After hearing oral argument on May 9, 2006 and

conducting a thorough review of the facts presented, defendants' motion is denied.

## II. BACKGROUND

The parties have already engaged in extensive motion practice, and

familiarity with the Court's previous opinions is assumed.[3] The facts underlying

---

[2] *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Defendants have preserved their arguments that plaintiffs' claims are expressly preempted or that Congress has occupied the relevant field of reformulated gasoline as affirmative defenses and grounds for removal. *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment on Conflict Preemption ("Def. Mem.") at 2 n.4.

[3] *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2006 WL 928997 (S.D.N.Y. Apr. 7, 2006); *In re MTBE Prods. Liab. Litig.*, 415 F. Supp. 2d 261 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d 340 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d 325 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 1529594 (S.D.N.Y. Jun. 28, 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 1500893 (S.D.N.Y. Jun. 24, 2005); *In re MTBE Prods. Liab. Litig.*, 402 F. Supp. 2d 434 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 399 F. Supp. 2d 242 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 233 F.R.D. 133 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 364 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan. 18, 2005); *In re MTBE Prods. Liab. Litig.*, No. M21-88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan. 6, 2005); *In re MTBE Prods. Liab. Litig.*, 364 F. Supp. 2d 329 (S.D.N.Y. 2004); *In re MTBE Prods. Liab. Litig.*, 361 F. Supp. 2d 137 (S.D.N.Y. 2004) ("*MTBE VI*"); *In re MTBE Prods. Liab. Litig.*, 341 F. Supp. 2d 386 (S.D.N.Y. 2004) ("*MTBE V*"); *In re MTBE Prods. Liab. Litig.*, 341 F. Supp. 2d 351 (S.D.N.Y. 2004) ("*MTBE IV*"); *In re MTBE Prods. Liab. Litig.*, 342 F. Supp. 2d 147 (S.D.N.Y. 2004)

2

this case are comprehensively set out in those opinions.[4]

## A. The 1990 CAA Amendments

The purpose of the CAA is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."[5] The CAA gives the United States Environmental Protection Agency ("EPA") the authority to set national ambient air quality standards for various air pollutants.[6] Individual states must devise plans to meet the standards.[7]

In 1990, amendments to the CAA created the Reformulated Gasoline Program ("RFG Program")[8] to help reduce ozone-causing car emissions, such as volatile organic compounds ("VOCs") and toxic air pollutants.[9] In order to

---

("*MTBE III*"); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) ("*MTBE II*"); *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001) ("*MTBE I*").

[4]     For a thorough recitation of plaintiffs' fact allegations see, for example, *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d at 364-67.

[5]     42 U.S.C. § 7401(b) (2006).

[6]     *See id.* § 7409.

[7]     *See id.* § 7410.

[8]     *See id.* § 7545.

[9]     *See id.* § 7545(k)(1).

accomplish this, section 211(k)(2)(B) of the amendments required that reformulated gasoline have a minimum oxygen content of two percent.[10] To achieve this minimum oxygen content, gasoline manufacturers add oxygenated fuel to the gasoline. The RFG Program required the use of reformulated gasoline in the nine largest metropolitan areas with the most severe summertime ozone levels.[11] Other areas that did not attain the national ambient air quality standards could opt into the program.[12] In addition, the amendments enacted an Oxygenated Fuels ("Oxyfuel") Program, which required that gasoline contain 2.7 percent oxygen by weight during the wintertime in areas that did not attain the national ambient air quality standard for carbon monoxide.[13] The EPA certified various blends of gasoline for use in the RFG Program, including gasoline with MTBE, however, it did not mandate the use of any one oxygenate.[14] Two of the most

---

[10]     *See id.* § 7545(k)(2)(B) ("The oxygen content of the gasoline shall equal or exceed 2.0 percent by weight (subject to a testing tolerance established by the Administrator) except as otherwise required by this Act.") (repealed 2005).

[11]     *See id.* § 7545(10)(D).

[12]     *See id.* § 7545(k)(6).

[13]     *See id.* § 7545(m)(2).

[14]     Under the RFG Program, certification has a narrow meaning. Section 7545(k)(4)(B) states that the EPA "shall certify a fuel formulation . . . as complying with this subsection" if it satisfies the conditions set forth in section 7545(k)(2) and (3), both of which concern only the effectiveness of the

4

widely used oxygenates are MTBE and ethanol.

Section 211(k)(1) of the amendments authorizes the EPA to issue regulations for reformulated gasoline to require "the greatest reduction" in emissions of ozone-forming VOCs during the summer and toxic air pollutants throughout the year "achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emission reductions, any nonair-quality and other air-quality related health and environmental impacts and energy requirements."[15]  In 2005, Congress removed the oxygen requirement for reformulated gasoline contained in the CAA.[16]  The Energy Policy Act of 2005 now requires the EPA to promulgate regulations to require gasoline "sold or introduced into commerce in the United States" to contain an annual average

formulation in reducing air pollution and do not consider non air-quality concerns. In addition, while MTBE has been registered for use by the EPA pursuant to section 7545(a) and (b), such registration does not constitute an "endorsement, certification or approval by any agency of the United States." 40 C.F.R. § 79.11(h).

[15]      42 U.S.C. § 7545(k)(1).

[16]      *See* Energy Policy Act of 2005, Pub. L. No. 109-58 ("Energy Policy Act of 2005"), § 1504(a), 119 Stat. 594 (codified in scattered sections of 16 U.S.C. and 42 U.S.C.) (2005). *See also* Regulation of Fuels and Fuel Additives: Removal of Reformulated Gasoline Oxygen Content Requirement and Revision of Commingling Prohibition to Address Non-Oxygenated Reformulated Gasoline, 71 Fed. Reg. 9070 (Feb. 22, 2006) (amending 40 C.F.R. § 80 to remove the oxygen content requirement for reformulated gasoline).

volume of four billion gallons of renewable fuel starting in 2006 and increasing to seven and a half billion gallons of renewable fuel in 2012.[17]

## B.    Brief Summary of Plaintiffs' Allegations

MTBE is highly soluble in water and does not readily biodegrade. Because of its high solubility, MTBE races through the underground water supply, eventually contaminating wells and underground aquifers. MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline. Even in very small quantities, MTBE imparts a foul taste and odor to water and renders it unusable and unfit for human consumption. MTBE is carcinogenic in animals and may be carcinogenic in humans.[18]

Sometime after 1979, defendants started manufacturing, distributing, and/or selling MTBE-containing gasoline.[19] By the 1990s, defendants added MTBE to gasoline in concentrations varying between eleven and fifteen percent.[20] Plaintiffs allege that defendants chose to add MTBE to gasoline despite their

---

[17]    Energy Policy Act of 2005 § 1501.

[18]    *See* Fifth Amended Complaint, *Long Island Water Corp. v. Amerada Hess Corp.*, No. 04 Civ. 2068 ("*Long Island* Complaint") ¶¶ 114-119.

[19]    *See id.* ¶ 107. Although the complaints in this MDL are not identical they allege essentially the same facts and claims. I will continue to cite to the *Long Island* Complaint as a typical complaint for purposes of this motion.

[20]    *See id.* ¶¶ 108-109.

6

awareness of specific incidents of MTBE contamination and the dangers posed by MTBE.[21] Defendants misled the EPA and the public about the dangers of MTBE during the process leading up to the 1990 CAA amendments and conspired to convince the EPA and the public that MTBE was harmless and that increased concentrations of MTBE were desirable.[22] According to plaintiffs, had the public been warned of the hazards of MTBE, plaintiffs and the public would have sought and demanded alternative oxygenates.[23]

Plaintiffs assert that defendants have a duty "not to market any product which is unreasonably dangerous for its intended and foreseeable uses."[24] And plaintiffs claim MTBE is "defective and unreasonably dangerous for its intended and foreseeable transportation, storage, handling and uses."[25]

## III. LEGAL STANDARD

Summary judgment is appropriate if the record "show[s] that there is

---

[21]    *See id.* ¶¶ 132-155.

[22]    *See id.* ¶ 157. According to plaintiffs' allegations, the idea for the RFG Program was developed and promoted by the petroleum industry – not by the EPA or federal government. *See id.* ¶ 176.

[23]    *See id.* ¶ 187.

[24]    *Id.* ¶ 239.

[25]    *Id.* ¶ 240.

7

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[26] An issue of fact is genuine if "the evidence is such that a jury could return a verdict for the nonmoving party."[27] A fact is material when it "might affect the outcome of the suit under the governing law."[28] The movant has the burden of demonstrating that no genuine issue of material fact exists.[29]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does "'not rely on conclusory allegations or unsubstantiated speculation.'"[30] To do so, it must do more than show that there is a "'metaphysical doubt as to the material facts.'"[31] In determining whether a genuine issue of material fact exists, the court must

---

[26]   Fed. R. Civ. P. 56(c).

[27]   *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). *Accord Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

[28]   *Jeffreys*, 426 F.3d at 553 (quoting *Anderson*, 477 U.S. at 248).

[29]   *See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[30]   *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[31]   *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

8

construe the evidence in the light most favorable to the non-moving party and

draw all justifiable inferences in that party's favor.[32]

## IV.  APPLICABLE LAW

Regulation and control of matters related to public health and safety,

such as abatement of water pollution, are within the police powers of the states.[33]

However, Congress may preempt state law under the Supremacy Clause of Article

VI of the Constitution.[34]   In the absence of explicit statutory language signaling an

intent to preempt state law in traditional state areas of regulation, there is a strong

---

[32]     *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir.
2004).

[33]     *See Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S.
707, 715 (1985); *Oxygenated Fuels Ass'n v. Pataki*, 158 F. Supp. 2d 248, 253
(N.D.N.Y. 2001), *adhering to opinion as modified on reconsideration*, No. 00-
1073, 2002 WL 32329221 (N.D.N.Y. May 16, 2002) (quoting *City of Utica v.
Water Pollution Control Bd.*, 156 N.E.2d 301 (N.Y. 1959) ("'The abatement and
prevention of water pollution is a matter of state concern, and legislation designed
to regulate and control such pollution is within the scope of the state's police
power.'").

[34]     *See Northwest Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S.
493, 509 (1989) (in order to determine whether Congress has exercised its power
to preempt state law, a court must "examine congressional intent. In the absence of
explicit statutory language signaling an intent to pre-empt, we infer such intent
where Congress has legislated comprehensively to occupy an entire field of
regulation, . . . or where the state law at issue conflicts with federal law, either
because it is impossible to comply with both, or because the state law stands as an
obstacle to the accomplishment and execution of congressional objectives.")
(quotations omitted).

9

"basic assumption" that Congress did not intend to displace state law.[35]

"Ordinarily, the mere existence of a federal regulatory or enforcement scheme . . . does not by itself imply pre-emption of state remedies."[36] "Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law. . . . Instead, we must look for 'special features warranting pre-emption.'"[37] Thus, "where Congress has not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal law."[38] The Supreme Court has warned against "seeking out conflicts between state and federal regulations where none clearly exists."[39] "While Congress may preempt or regulate particular branches of tort law,

---

[35] *See Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

[36] *English v. General Elec. Co.*, 496 U.S. 72, 87 (1990).

[37] *Id.* (quoting *Hillsborough County*, 471 U.S. at 719 (concluding that local ordinances regarding plasma donation were not preempted by the Food and Drug Administration's ("FDA") blood plasma regulations because the FDA had stated that its regulations were not intended to be exclusive and because of the deference with which the Court must review the state ordinances in the areas of health and safety)).

[38] *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987).

[39] *Id.* at 90.

10

particularly as part of a larger regulatory scheme that seeks to redress the injuries

previously covered by state law, the Court has made clear the importance of

respecting the role of the states as independent sovereigns."[40]

## A. Impossibility

"Conflict preemption" occurs "where it is impossible for a private

party to comply with both state and federal requirements."[41] Though defendants

have failed to identify a single case where this doctrine was applied,[42] it is a

potentially powerful doctrine that has been consistently referred to in the Supreme

Court's preemption cases.[43] The doctrine focuses on whether the federal

---

[40]     *City of New York v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244, 288 (E.D.N.Y. 2005) (quotations omitted).

[41]     *English*, 496 U.S. at 79 (citing *Florida Lime*, 373 U.S. at 142-43).

[42]     Each case cited by defendants relies instead on a finding that the state law presented an *obstacle to* or *interfered with* a federal purpose. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 881-83 (2000) (holding that a tort action asserting a "duty to install an airbag" would have presented an obstacle to certain federal standards); *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 155 (1982) (noting that compliance with both a *California* common law rule and a federal regulation was not a physical impossibility, however the common law rule created an obstacle to the accomplishment of federal purpose); *Free v. Bland*, 369 U.S. 663, 669 (1962) (finding that a state community property law "interfered directly" with a federal regulation).

[43]     *See, e.g.*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) (noting that the Court "will find preemption where it is impossible for a private party to comply with both state and federal law" but holding that the "Burma law of the Commonwealth of Massachusetts," which restricted the

requirement, on its face, precludes the possibility of the state requirement and is derived from the Court's Commerce Clause cases.[44] Thus, where one standard precludes the other there is no need to question whether Congress intended to preempt state law. As the court in *Florida Lime* explained, a situation of impossible dual compliance would be presented if, for example, a federal law "forbade the picking and marketing of any avocado testing more than 7% oil" while a state law "excluded from the State any avocado measuring less than 8% oil

---

authority of state agencies to purchase goods or services from companies doing business with Burma, created an obstacle to a federal statute that imposed mandatory and conditional sanctions on Burma).

[44]     *Florida Lime*, 373 U.S. at 142-43 ("A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce") (citing *Union Bridge Co. v. United States*, 204 U.S. 364, 400 (1907) (the federal government retained the power under the Commerce Clause to order improvements on a bridge, even though it was lawfully erected under the authority of a Pennsylvania charter); *Morgan v. Virginia*, 328 U.S. 373, 377 (1946) (there is "a recognized abstract principle . . . that may be taken as a postulate for testing whether particular state legislation in the absence of action by Congress is beyond state power. This is that the state legislation is invalid if it unduly burdens that commerce in matters where uniformity is necessary. . . . Where uniformity is essential for the functioning of commerce, a state may not interpose its local regulation."); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529 (1959) (though the Court found no discrimination against interstate commerce, a mudguard regulation on trucks passing through Illinois, which differed from requirements in almost all other states, placed an unconstitutional burden on interstate commerce)).

content."[45]

Though the "categories of preemption are not 'rigidly distinct'"[46] the question of whether it is impossible to comply with two conflicting provisions is conceptually different from the question of whether state law stands as an obstacle to the accomplishment of Congressional purpose. For conflict preemption based on impossibility, the question is whether plaintiffs' tort duty is explicitly inconsistent with the federal law, not whether state law interferes with some purpose of the federal law.[47]

## B. Obstacle Preemption

In the absence of impossibility, a finding of conflict preemption may nonetheless be appropriate when state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[48] The state law must interfere *directly* with the federal purpose. For example, in *Free v. Bland*, the Supreme Court held that Texas's community property law

---

[45]     *Florida Lime*, 373 U.S. at 142.

[46]     *Crosby*, 530 U.S. at 373 n.6 (quoting *English*, 496 U.S. at 79 n.5).

[47]     *See Barnett Bank, N.A. v. Nelson,* 517 U.S. 25, 31 (1996) (noting that an impossible conflict would arise where two statutes imposed directly conflicting duties on national banks: "as they would, for example, if the federal law said, 'you must sell insurance,' while the state law said, 'you may not.'").

[48]     *Fidelity Fed. Sav.*, 458 U.S. at 153 (quoting *Hines*, 312 U.S. at 67).

13

conflicted with federal Treasury Regulations. The federal regulation decreed that when a co-owner of a United States Savings Bond dies, "the survivor will be recognized as the sole and absolute owner."[49]   By contrast, the state's community property law gave the decedent co-owner's heirs fifty percent of the bond, "interfer[ing] directly" with the right of survivorship determined by the federal regulations.[50]

The Second Circuit has noted the importance of clear evidence of interference.[51]  *Clean Air Markets Group v. Pataki* addressed a "cap-and-trade" system set up by the CAA that allots each electricity-generating utility a certain number of sulfur dioxide emission allowances per year.[52]  If the utility emits less sulfur dioxide than allowed by the program, it can transfer its surplus allowance to another utility with higher emissions.  A New York State statute restricted the

---

[49]     *Free*, 369 U.S. at 664.

[50]     *Id.* at 669. *Accord Fidelity Fed. Sav.*, 458 U.S. at 154-55 (finding that state common law rule which limited the use of a "due on sale" clause in a mortgage contract to cases where a lender could demonstrate that the transfer impaired its security and a federal regulation that specifically allowed a savings and loan association the flexibility to enforce due on sale clauses "at its option" "created an obstacle" to the federal regulation).

[51]     *See Clean Air Mkts. Group v. Pataki*, 338 F.3d 82, 87-88 (2d Cir. .2003).

[52]     *See* 42 U.S.C. § 7651 et seq.

14

transfer of sulfur dioxide emission credits to states upwind of New York State in order to cut back on the sulfur dioxide emissions that reached New York. The court found that the CAA provisions evidenced a clear goal to set up a nationwide allocation and transfer system for reducing emissions of sulfur dioxide.[53] The New York statute was preempted because it restricted the nationwide quality of the system and "clearly interfere[d]" with the federal program.[54]

Evidence that may tend to show preemption may also include proof that the agency authorized to implement the federal statute has found that the state law would interfere with federal purpose. In *Geier v. American Honda Motor Company*,[55] as this Court earlier explained,[56] a tort action that asserted a "duty to install an airbag" was preempted because it would have presented an obstacle to

---

[53]     *See Clean Air Mkts. Group*, 338 F.3d at 88-89 (The New York state provision "did not technically limit the authority of New York utilities to transfer their allowances," however, "it clearly interfere[d] with their ability to effectuate such transfers" by "requiring utilities to forfeit one hundred percent of their proceeds from any allowance sale to a utility in an upwind state" and requiring the utilities to ensure that every allowance they sold included a restrictive covenant that prohibited the subsequent transfer of the allowance to an upwind state, a provision which would lower the value of the allowance.).

[54]     *Id.* In finding preemption, the court emphasized that "EPA regulations expressly mandate[d] that state programs . . . shall not restrict or interfere with allowance trading." *Id.*

[55]     529 U.S. at 882.

[56]     *See MTBE I*, 175 F. Supp. 2d at 615.

15

the "means-related objectives" found in the Federal Motor Vehicle Safety

Standard 208.[57] In reaching this conclusion, the *Geier* Court relied on the fact that

the Department of Transportation believed the plaintiffs' tort suit would frustrate

its regulatory objectives.[58]

In the absence of evidence that the administrative agency tasked with

implementing the federal law believes state law to be preempted, a finding of

preemption is less likely. In *Hillsborough County v. Automated Medical*

*Laboratories*, the Supreme Court addressed a claim that local ordinances that

imposed a more stringent restriction on plasma donations than the federal

regulations were a "serious obstacle to the federal goal of ensuring an 'adequate

---

[57]     *Geier*, 529 U.S. at 881 (quotations omitted) (noting that the federal
standard required only ten percent of a manufacturer's fleet to include passive
restraint devices and that the devices be integrated gradually into the cars).

[58]     *See id.* (noting that the Solicitor General had argued that
promulgation of Federal Motor Vehicle Safety Standard 208 embodied an
affirmative "policy judgment that safety would best be promoted if manufacturers
installed *alternative* protection systems in their fleets rather than one particular
system in every car."). *See also Sprietsma v. Mercury Marine*, 537 U.S. 51, 67-68
(2002) (explaining that in *Geier*, the Court "expressly placed weight upon the
[Department of Transportation's] interpretation of the [safety standard's]
objectives and its conclusion, as set forth in the Government's brief, that a tort suit
such as this one would stand as an obstacle to the accomplishment and execution
of those objectives") (quotations omitted).

16

supply of plasma.'"[59]  The Court upheld the district court's ruling that the local

ordinances' threat to the national plasma supply was speculative, noting that there

were no facts to support the conclusion that the number of plasma vendors would

decrease as a result of the local ordinance.  Noting the lack of any indication from

the FDA that the local ordinances conflicted with the federal regulations, the Court

concluded that in the absence of "strong evidence" it could not find "a threat to the   ·

federal goal of ensuring sufficient plasma."[60]

     A court must also look at whether Congress has struck a balance

between safety (the state's domain) and the federal purpose.  For example, in

*Hillsborough*, the Court denied preemption, finding that even if the local

regulations restricted the national plasma supply, neither Congress nor the FDA

had "struck a particular balance between safety and quantity."[61]

     Finally, where a state regulation is challenged as presenting an

---

[59]    *Hillsborough County*, 471 U.S. at 720.

[60]    *Id.* at 721 ("even if the Hillsborough County ordinances had, in fact,
reduced the supply of plasma in that county, it would not necessarily follow that
they interfere with the federal goal of maintaining an adequate supply of plasma.
Undoubtedly, overly restrictive local legislation could threaten the national plasma
supply. Neither Congress nor the FDA, however, has struck a particular balance
between safety and quantity; as we have noted, the regulations, which
contemplated additional state and local requirements, merely establish minimum
safety standards.").

[61]    *Id.*

17

obstacle to a federal purpose, defendants' compliance with the regulation is presumed.[62] Thus, there is no need to predict whether or not a defendant will comply with a regulation – either the regulation conflicts with the federal purpose or it does not. On the other hand, when a tort law claim is the basis for a preemption argument, the question of whether a successful claim would necessarily cause defendants to change their behavior may be relevant. If, for example, defendants would rather pay damages than modify their behavior, then the tort claim presents no obstacle to the federal purpose.[63] As a result, tort claims are treated differently from state regulations. As Justice Blackmun explained in *Cipollone v. Liggett Group, Inc.*, "[t]he effect of tort law on a manufacturer's behavior is necessarily indirect."[64] Although an award of damages attaches consequences to continued unlawful conduct, the award does not mandate a particular change in behavior. A manufacturer has a number of options for responding to a finding of liability and one option for a manufacturer is to "accept

---

[62]     *See Geier*, 529 U.S. at 882 (noting that a party is assumed to comply with state regulations, and considerations such as whether the party could, in practice, "ignore state legal obligations – paying, say, a fine instead – or how likely it is that state law actually would be enforced" are irrelevant to the preemption analysis).

[63]     *See id.* at 881-82.

[64]     505 U.S. 504, 536 (1992) (Blackmun, J., concurring).

18

damages awards as a cost of doing business and not alter its behavior in any way."[65]   In addition, "tort law has an entirely separate function – compensating victims – that sets it apart from direct forms of regulation."[66]

In *Bates v. Dow*, the Supreme Court recently cautioned against finding that a tort duty is tantamount to a state regulation.[67]   In *Bates*, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") expressly preempted "any [state] requirements for labeling or packaging in addition to or different from those required" by the Act.[68]   The Court noted, however, that a tort claim which "motivates an optional decision does not qualify as a requirement" for express preemption purposes under FIFRA.[69]   The possibility that a jury verdict could induce a pesticide manufacturer to change its label did not amount to a state requirement.[70]

Even where plaintiffs assert a tort duty that creates a substantial

---

[65]   *Id.*

[66]   *Id.* at 537.

[67]   544 U.S. 431, 443 (2005).

[68]   *Id.*

[69]   *Id.*

[70]   *See id.*

obstacle, preemption should not "ordinarily [] be implied absent an 'actual conflict.'"[71] Thus, while the Court in *Geier* ultimately declined to decide whether compliance with an alleged tort duty could be assumed for purposes of preemption, it found that the alleged tort duty conflicted with federal law as there was strong evidence of clear interference with a Congressional purpose, as well as evidence that the Department of Transportation believed the claims to be preempted.[72]

## V.    DISCUSSION

### A.    Impossibility

Defendants argue that in each year from 1995 to 2003, the amount of ethanol produced in the United States was lower than the amount needed to meet the demand for oxygenated fuel.[73] Defendants argue that this shortfall in "actual installed ethanol capacity"[74] would have made it impossible for them to comply

---

[71]    *English*, 496 U.S. at 90 (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

[72]    *See Geier*, 529 U.S. 861.

[73]    *See* Def. Mem. at 9; Declaration of John M. Urbanchuk, agricultural economist and Director of LECG, LLC, in Support of Defendants' Motion for Summary Judgment on Conflict Preemption *passim*.

[74]    Defendants and plaintiffs agree, for the purposes of this motion, that defendants' calculations regarding the ethanol production capacity reflect only the "actual installed ethanol capacity" between 1995 and 2003 and do not, for

20

with the RFG Program requirements without using MTBE. Thus complying with

the plaintiffs' demand would be physically impossible. Plaintiffs agree, for the

purposes of this motion, that there was not enough ethanol produced in the United

States to satisfy the demand for oxygenated fuel between 1995 and 2003.[75] They

also note, however, that domestic production of MTBE was insufficient during

that time to meet the demand causing defendants to import a third of the MTBE

used.[76] Plaintiffs believe that the dispositive question is how much ethanol *could*

*have* been made available to meet the RFG requirements in light of the

"production capacities of overseas ethanol manufacturers" and the "ability of the

_____

example, reflect how much ethanol could have been produced had different
economic decisions been made. *See* 9/16/05 Transcript of Court Conference at
42-46, *In re MTBE Prods. Liab. Litig.*, No. 00-1898; Plaintiffs' Second Revised
Memorandum of Law in Opposition to Defendants' Motion for Summary
Judgment on Conflict Preemption ("Pl. Mem.") at 5; Defendants' Revised Reply in
Support of Their Motions for Summary Judgment Regarding Federal Preemption
("Reply Mem.") at 4.

[75]     *See* Def. Mem. at 9 (comparing oxygenated fuel sales data with
ethanol capacity reports to note that the total ethanol necessary to oxygenate
reformulated gasoline and oxyfuel fell below the total actual installed ethanol
capacity); Pl. Mem. at 5 (noting that plaintiffs accept the data set forth to show
that the actual installed production capacity for ethanol fell short of the ethanol
needed to meet the RFG mandates for the years between 1995 to 2003, "as true for
purposes of defendants' motion").

[76]     *See* Pl. Mem. at 7 (citing Energy Administration Information, Status
and Impact of State MTBE Bans, *available at*
http://www.eia.doe.gov/oiaf/servicerpt/mtbeban/table2.html).

21

United States and foreign ethanol producers alike to increase their production capacities" during a four-year period before the RFG requirements went into effect.[77]

       The question of whether defendants could have used an oxygenate other than MTBE is beyond the scope of this motion.[78] Nonetheless, for the impossibility analysis, whether ethanol could have been imported or whether domestic production of ethanol could have increased is irrelevant. Impossibility does not depend on whether events in the physical world would have made it difficult to comply with both standards, but on whether the two standards are expressly incompatible.[79] It was not physically impossible for defendant to comply with both standards because, even if state tort law demands that defendants not use MTBE, the federal law did not *require* the use of MTBE.[80] As defendants admit, the CAA amendments only set minimum oxygenate

---

[77]    *Id.* at 8. The CAA amendments directed the EPA to issue regulations establishing requirements for reformulated gasoline by November 15, 1991. The requirements did not take effect until January 1, 1995. *See* 42 U.S.C. § 7545(k)(1),(5).

[78]    *See* 1/14/05 Case Management Order #6.

[79]    *See Florida Lime*, 373 U.S. at 142-43.

[80]    *See infra* Part V.B.

22

requirements.[81]

Depending on the law of each state, plaintiffs may eventually need to prove that a viable alternative to MTBE existed to succeed in their design defect claims.[82] Evidence presented by defendants shows only that the actual domestic installed capacity was not sufficient to satisfy market demand. This does not amount to undisputed evidence that ethanol was not a reasonable alternative.

## B.    Obstacle Preemption

Defendants' argument that plaintiffs' claims are conflict preempted rests on the assumption that plaintiffs' defective design claims are the equivalent of a duty not to use MTBE.[83] Defendants argue that plaintiffs effectively seek a ban on MTBE and that a ban would present an impermissible obstacle to

---

[81]     *See* Declaration of Robert N. Stavins, Albert Pratt Professor of Business and Government at the John F. Kennedy School of Government, in Support of Defendants' Motion for Summary Judgment ("Stavins Decl.") ¶ 3.

[82]     *See McCarthy v. Olin Corp.*, 119 F.3d 148, 155 (2d Cir. 1997) ("The purpose of risk/utility analysis is to determine whether the risk of injury might have been reduced or avoided if the manufacturer had used a feasible alternative design."). *See also Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 83 (S.D.N.Y. 2001) (citing *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 207 (N.Y. 1983)) ("The plaintiff bears the burden of presenting evidence that (1) the product as designed posed a substantial likelihood of harm, (2) no feasible alternative existed, and (3) the defective design caused plaintiff's injury.").

[83]     *See* Def. Mem. 3-4, 6 (characterizing plaintiffs' tort claims as asserting a "duty not to use MTBE"); 5/9/06 Transcript of Oral Argument at 64-65, *In re MTBE Prods. Liab. Litig.*, No. 00-1898 ("Transcript of Oral Argument").

accomplishing the goals of the CAA.[84]  Plaintiffs assert that they do not seek an injunction banning MTBE, and that civil liability for the use (and misuse) of MTBE is not the equivalent of a ban.[85]

Plaintiffs alleged that defendants have a duty "not to market" MTBE because it is "defective and unreasonably dangerous for its intended and foreseeable transportation, storage, handling and uses."[86]  Even if this alleged duty would induce a change in defendants' behavior, that is not tantamount to a state regulation *requiring* certain behavior.[87]  Finally, even if the tort duty is characterized as a duty not to use MTBE and defendants comply with that duty, for the reasons set forth below, that would not present an obstacle to a federal purpose.

---

[84]     *See* Def. Mem. at 6 (citing *Cipollone*, 505 U.S. at 522).

[85]     *See* 5/9/06 Letter from Robin Greenwald, Plaintiffs' Liaison Counsel, to the Court;  Transcript of Oral Argument at 81 (arguing that while some plaintiffs have asserted that there was no safe use of MTBE these claims request damages not a regulatory ban). *But see* Transcript of Oral Argument at 82 (conceding for the purposes of argument that the tort law duty asserted by the claim that there was no safe use of MTBE is the equivalent of a ban but arguing that this hypothetical ban would not defeat the Congressional purpose of bringing more areas into the RFG Program because there was never a Congressional purpose to allow expansion at any cost).

[86]     *Long Island* Complaint ¶¶ 239-240.

[87]     *See supra* notes 63-71 and accompanying text.

24

Defendants point to four alleged features of the Clean Air Act and its legislative history in support of their argument that plaintiffs' tort claims present an obstacle to a federal purpose: (1) Congress intended that defendants could choose which oxygenate to use to meet the requirements of the CAA; (2) Congress wanted to increase the amount of oxygenates available and thus maximize the improvement in air quality achievable under the RFG Program; (3) the EPA expected MTBE to be the most heavily used oxygenate; and (4) plaintiffs' theories would impose strict tort liability for compliance with federal law.[88] As discussed below, none of these alleged features prove that a duty not to use MTBE would present an obstacle to compliance with the CAA.

### 1. Choice and Flexibility

---

[88] Defendants also argue that eliminating MTBE would undermine Congress' goal of minimizing gasoline price spikes and supply disruptions. *See* Def. Mem. at 20-22 (citing legislative history to show that Congress considered the economic effect of the reformulated gasoline program). Even assuming that one of the goals of the legislation was to minimize price spikes and supply disruptions, defendants have presented no evidence that eliminating MTBE *would* have caused price spikes. *See Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665, 673 (9th Cir. 2003) ("It is questionable whether a smoothly functioning gasoline market should be considered a 'goal' of the Clean Air Act; the statutory text describing the purposes of the Act mentions no such goal. We take it as true that Congress wanted to reduce pollution caused by motor vehicles, but at the same time did not want to harm the nation's economy by causing gasoline prices to rise too much. But saying that Congress might not have wanted to cause a substantial increase in gasoline prices is not the same as saying that assuring inexpensive gasoline was a goal of the Act.") (citations omitted).

Defendants argue that Congress intended refiners to have a choice among oxygenates and that the "market should decide which oxygenate would be used."[89] In support of their argument, defendants place heavy reliance on the legislative history of the CAA amendments. Plaintiffs respond that even if Congress intended that market forces would decide which oxygenates would be used, the definition of market necessarily includes the liabilities created by an oxygenate that contaminates groundwater.

As an initial matter, because the text of the CAA is clear and unambiguous, the legislative history is irrelevant.[90] The CAA itself contains no language mandating that defendants have a choice among oxygenates. Congress intended the states to have flexibility in setting emissions standards as long as the

---

[89]     Def. Mem. at 3, 17 (quotations and citations omitted).

[90]     *See Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) ("We do not resort to legislative history to cloud a statutory text that is clear."); *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute."); *In re Sinclair*, 870 F.2d 1340, 1343 (7th Cir. 1989) ("[l]egislative history is a poor guide to legislators intent" because "it is often losers' history" and can be manipulated by a court or the parties who emphasize some portions of the history over others). *See also Davis*, 331 F.3d at 671 (finding the text of the Clean Air Act regarding fuel additives to be clear); *American Petroleum Inst. v. United States Env't Prot. Agency* ("*API II*"), 198 F.3d 275, 280 (D.C. Cir. 2000) (finding that the opt-in provisions of the RFG Program are clear).

state met the minimum threshold set by the RFG Program.[91] The most that can be shown from the text of the Act is that Congress intended to create a fuel neutral program.[92]

Nonetheless, defendants have combed the legislative history in an attempt to prove that "giving refiners a choice of oxygenates was essential to furthering Congress's goals that the RFG Program be cost efficient and maintain a stable supply of reasonably priced gasoline."[93] Defendants place the greatest weight on a debate over a proposed 3.1 percent oxygen standard, which would have effectively mandated the use of ethanol.[94] Defendants claim that the failure

---

[91]    *See* 42 U.S.C. § 7416 (preserving the states' right to "adopt or enforce [] any standard or limitation respecting emissions of air pollutants"); *id.* § 7545(m) (directing each state with an area that had not attained the national ambient air quality standards for carbon monoxide and fulfilled certain other criteria to "submit to the Administrator a State implementation plan revision [under the Clean Air Act guidelines]. . . for such area which shall contain the provisions specified under this subsection regarding oxygenated gasoline."). *See also Exxon Mobil Corp. v. United States Env't Prot. Agency*, 217 F.3d 1246, 1253 (9th Cir. 2000) (All "references to state authority" in the CAA demonstrate that "state authority to regulate oxygenate levels was not thereby limited.").

[92]    *See Davis*, 331 F.3d at 671; *Exxon Mobil Corp*, 217 F.3d at 1253.

[93]    Def. Mem. at 15.

[94]    "Gasohol" (gasoline containing ethanol) was the only gasoline capable of reaching the 3.1 percentage for oxygen. *See* Def. Mem. at 16 (quoting Staff of the S. Comm. on Env't & Pub. Works, a Legislative History of the CAA Amendments of 1990 at 5430 (Comm. Print 1993)) ("'Gasohol [gasoline made with ethanol] is the only viable fuel that exceeds the 3.1 percent oxygen content,

of the 3.1 percent oxygen standard evinces a Congressional intent to create a cost-efficient program. This argument is premised on the idea that a program limited to ethanol would have been more expensive and would have caused supply problems in the gasoline industry. But, the debate over the 3.1 percent requirement shows only that Congress did not mandate the use of any one oxygenate. Thus, in arguing against the 3.1 percent oxygen requirement as an effective ethanol mandate, Senator Lautenberg stated:

> But the question is, should we, as a Federal initiative, provide an advantage to one of these fuels over another? I do not think so. So my amendment would set an oxygen content level of 2.7 percent for fuels within carbon monoxide nonattainment areas. This would allow for open and free competition among the various fuels and provide State and local officials with the *flexibility to decide what fuels they need in their areas. It also would help to keep us from going too far in addressing one problem so as to create another.*[95]

so by requiring an average fuel oxygen content of 3.1 percent, the bill mandates a greatly increased use of gasohol.'").

[95]    136 Cong. Rec. S2280, S2289 (Mar. 7, 1990) (emphasis added). Defendants also cite Senator Daschle, a proponent of the 3.1 standard, during the debate as stating that "we want MTBE . . . I want ETBE and ethanol and MTBE and other fuels to play a role in achieving a variety of national objectives." 136 Cong. Rec. S2280, S2289 (Mar. 7, 1990) (Sen. Daschle)). While defendants believe this proves that Congressional purpose would be frustrated if MTBE were not used, Senator Daschle's quote is taken out of context. Senator Daschle was arguing *in favor* of the 3.1 percent standard because he believed it would have "maximize[d] the carbon monoxide reduction" in the CAA and that the requirement would have encouraged growth in *both* the MTBE and ethanol industries. *Id.* But defendants rely on the *failure* of the proposal to show that

Defendants also rely on statements by individual Senators during the

debate over the CAA amendments.[96] For example, defendants cite a 1993

statement from Senator Grassley of Iowa to prove that Congress intended the

market to decide which oxygenate would be used so that the use of oxygenates

could expand quickly.[97] In his statement, Senator Grassley warned that certain

regulations under the Act would create an "effective mandate for the use of

MTBE."[98] Seeking support for ethanol, he explained that the original intent was to

Congress intended MTBE to be used. Senator Daschle's comment, made in favor of a failed amendment, cannot support the proposition that all Senators would have mandated the use of MTBE.

[96]   *See* Def. Mem. at 14-15 (quoting 136 Cong. Rec. S6383, S6384 (May 16, 1990) (Sen. Daschle) (in a statement inserted into the record, noting that "EPA predicts that the amendment will be met almost exclusively by MTBE, a methanol derivative"); 136 Cong. Rec. S17512, S17514 (Oct. 27, 1990) (Sen. Heinz) (during Senate floor debate on a precursor to the CAA amendments stating that "reformulated gasoline will also encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S16895, S16954 (Oct. 27, 1990) (Sen. Chafee) (Conference Report - CAA Amendments of 1990 Chafee-Baucus Statement of Senate Managers: the RFG Program "will encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S16895, S16922 (Sen. Durenberger) (during Senate consideration of the CAA amendments, noting that RFG "is to have not less than 2 percent oxygen by weight. This requirement can be met by blending gasoline with a variety of additives like ethanol or MTBE.")).

[97]   *See* Def. Mem. at 17 (quoting Senator Grassley as explaining "we agreed to reduce the oxygen content required for these fuels to allow for MTBE's use, and to avoid mandating the use of only ethanol.").

[98]   139 Cong. Rec. S16633 (Nov. 20, 1993).

create a program that was "fuel neutral."[99]  Senator Grassley then criticized the

President for not doing enough to encourage the use of ethanol in the order to aid

Midwestern state economies and reduce this nation's dependance on foreign

petroleum.[100]  At most, these statements demonstrate that Congress intended to

allow a role for ethanol.  They do nothing to support defendants' conclusion that

Congress intended the use of oxygenates to "expand as quickly as capacity

allowed."[101]

Defendants also cite a 1992 statement of the EPA in which it noted

that "the legislative history reflects Congress' intent to preserve a role for the two

major oxygenates – MTBE and ethanol – in the oxygenated gasoline program."[102]

Read in context, however, the EPA statement merely explained why a certain

proposed regulation, which would have discouraged ethanol use, was

inappropriate.  The statement does not prove that Congress intended anything

[99]     *Id.*

[100]     *Id.* at S16633-34.

[101]     Def. Mem. at 17.  In addition, statements from individual legislators
as part of the legislative history, carry little weight.  *See Davis*, 331 F.3d at 672
(noting that committee reports, as opposed to statements by individual senators,
are the "authoritative source for finding the Legislature's intent."); *API II*, 198
F.3d at 280 ("The colloquial language of debate is at best a rough guide to the
intricacies of technical statutory wording.").

[102]     57 Fed. Reg. 47849, 47852 (Oct. 20, 1992).

more than a fuel neutral program. While it may show that Congress understood that both MTBE and ethanol would be used to fulfill the RFG Program requirements, the legislative history cited by defendants does not address whether Congress intended that the RFG Program would be cost efficient and would maintain a stable supply of reasonably priced gasoline.

The 1990 amendments to the CAA gave the states the flexibility to set emissions standards.[103] They were not intended to give unfettered discretion to defendants to use any oxygenate, regardless of its safety. Every other court to grapple with state regulations banning MTBE or tort claims based on defendants' use of MTBE has found that the RFG program does not result in federal preemption.[104] As the Ninth Circuit has noted, the legislative history of the CAA

---

[103]    *See* EPA, Approval and Promulgation of Implementation Plans; Nevada State Implementation Plan Revision, Clark County, 64 Fed. Reg. 29573, 29578 (June 2, 1999) ("The legislative history indicates that Congress intended to provide flexibility to states regarding oxygen content, and did not want to restrain that flexibility by setting a federal mandate for a specific oxygen level that states must require. While Congress deliberately rejected a federal mandate that would reduce the market opportunities for various oxygenates, it did this with the goal of preserving state flexibility, not limiting it. . . .") (citing *Cipollone*, 505 U.S. at 518).

[104]    *See, e.g.*, *Pataki*, 158 F. Supp. 2d 248 (upholding New York state ban on MTBE); *Oxygenated Fuels Ass'n. v. Pataki*, 293 F. Supp. 2d 170 (N.D.N.Y. 2003) (concluding after bench trial that New York MTBE ban does not conflict with any aspect of CAA); *Exxon Mobil Corp*, 217 F.3d 1246 (upholding Nevada County regulation that effectively banned MTBE); *Abundiz v. Explorer Pipeline Co.*, No. 00-2029, 2002 WL 1592604, at *3-4 (N.D. Tex. July 17, 2002) (*Geier*

"does not support a conclusion that Congress meant to give gasoline producers an unconstrained choice of oxygenates."[105] In short, defendants have presented no evidence to show that Congress or the EPA intended to protect the "market share of MTBE even if it proves to be inferior to other oxygenates due to environmental considerations other than motor vehicle emissions."[106]

## 2. Maximizing the RFG Program

Defendants also contend that Congress intended to maximize the improvement in the air quality achievable under the RFG Program, and that a duty

_____

does not compel a finding that state MTBE regulations are preempted); *Valley Stream Sch. Dist. v. Exxon Mobil Corp.*, No. 5093/02, slip op. at 7-8 (N.Y. Sup. Ct. Nassau County Jan. 23, 2003) (noting that plaintiffs' tort claims did not present an impediment to the "goals behind the CAA, which were to protect and enhance the quality of air resources); *Plainview Water District v. Exxon Mobil Corp.*, No. 9975/01, slip op. at 6 (N.Y. Sup. Ct. Nassau County May 22, 2003) (noting that ExxonMobil could comply with the state and federal requirements by using an additive other than MTBE); *City of Dinuba v. Unocal*, No. 305450, slip op. at 5 (Cal. Sup. Ct. Apr. 1, 2003) ("absent any grant of immunity to marketers of oxygenates, and absent any EPA intervention based on what it finds to be unreasonable price hikes, . . . this Court [] finds that the CAA provides that open market competition, including the costs of state law liability actions, determine which oxygenate is used."); *South Tahoe Public Utility District v. Atlantic Richfield Co.*, No. 999128, slip op. at 2 (Cal. Sup. Ct. Jan. 15, 2002) ("The claims asserted do not conflict with any federal statute or regulation.").

[105]    *Davis*, 331 F.3d at 672.

[106]    *Pataki*, 158 F. Supp. 2d 248 (upholding New York state ban on MTBE).

32

not to use MTBE would be an obstacle to this goal.[107]  Defendants rely primarily

on section 211(k)(1), which states that regulations should be established for

reformulated gasoline that "require the greatest reduction in emissions of

ozone."[108]  Plaintiffs respond that defendants have failed to demonstrate that the

use of ethanol in lieu of MTBE would have reduced the number of localities in the

RFG Program.[109]  In addition, plaintiffs argue that Congress never intended to

allow expansion of the RFG Program regardless of the impact on the

environment.[110]

      Defendants have presented no facts demonstrating that eliminating

MTBE would have prevented the program from growing.  The facts presented

merely show that the actual installed capacity of ethanol in 1995 would not have

been sufficient to satisfy market demand.[111]  Viewed in the light most favorable to

the non-moving party, genuine issues of material fact remain as to whether

---

[107]    *See* Transcript of Oral Argument at 63.

[108]    42 U.S.C. § 7545(k)(1).

[109]    Indeed, plaintiffs argue that had defendants used ethanol instead of MTBE, more communities rather than fewer may have been able to opt into the RFG Program.  *See* Pl. Mem. at 17.

[110]    *See* Transcript of Oral Argument at 82.

[111]    *See* Def. Mem. at 9-10.

eliminating MTBE would have prevented the growth of the RFG Program.[112]

Nor is there any indication that Congress or the EPA "struck a particular balance" between water pollution and the ability of the program to expand.[113] Defendants argue that Congress made the choice to prioritize clean air over clean water. Section 211(k)(1)(A) provides that the EPA may not promulgate standards that advance "the use of renewable oxygenates" where that use may be detrimental to a reduction in emissions.[114] However, the consideration of "any

---

[112] Defendants submitted an affidavit arguing, inter alia, that had refiners been forced to use ethanol only they would have been required to modify their gasoline and make capital investments, thus raising the cost of production for reformulated gasoline. *See* Stavins Decl. ¶ 5. Because this evidence was submitted in reply and plaintiffs did not have a chance to respond to it, the Court need not consider those arguments. *See Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 711 n.3 (2d Cir. 2002). In addition, plaintiffs were specifically *barred* from presenting evidence regarding a hypothetical world where only ethanol was used to meet demand because that discussion is beyond the scope of this motion. *See* 11/4/05 Transcript of Telephone Conference with the Court, *In re MTBE Prods. Liab. Litig.*, No. 00-1898; 4/3/06 Transcript of Telephone Conference with the Court, *In re MTBE Prods. Liab. Litig.*, No. 00-1898. If defendants wish to move for summary judgment on the grounds that an ethanol-only mandate would have undermined the goals of the CAA because of the hypothetical costs of using ethanol and modifying gasoline refining facilities, that is a separate motion. However, it is highly unlikely that defendants will be able to present undisputed facts about a hypothetical ethanol world, as the nature of a hypothetical world is that its facts are easily disputed.

[113] *See Hillsborough County*, 471 U.S. at 716.

[114] *American Petroleum Inst. v. United States Env't Prot. Agency* ("*API I*"), 52 F.3d 1113, 1120 (D.C. Cir. 1995) (holding that the CAA amendments did not give the EPA the authority to require the use of oxygenates made from

34

nonair-quality and other air-quality related health and environmental impacts and energy requirements"[115] in that section ensured that any emission control measures did not have "inordinate economic, environmental, or energy effects."[116] The CAA amendments thus provided for the possibility that emissions reductions would cause unexpected or inordinate environmental effects. Plaintiffs have alleged that the use of MTBE caused inordinate environmental effects[117] and thus their tort claims do not conflict with this provision of the CAA.

By the same token, the Second Circuit's decision in *Clean Air Markets Group v. Pataki* does not mandate a finding of preemption, as there is no evidence here that these tort claims would have prevented the EPA from implementing the RFG requirements or enforcing them.[118] Unlike the state regulation in *Clean Air Markets* that would have restricted the transfer of pollution credits to states upwind of New York, plaintiffs' tort claims present no such clear

---

renewable fuels because the RFG Program was enacted to reduce VOCs and toxic emissions and such a requirement may have increased rather than reduced those emissions).

[115]    42 U.S.C. § 7545(k)(1).

[116]    *API I*, 52 F.3d at 1120.

[117]    *See supra* notes 18-25 and accompanying text.

[118]    *See Clean Air Mkts. Group*, 338 F.3d 82.

restriction on the implementation of the CAA amendments. The Supreme Court

has continually cautioned against inferring that Congress intended to preempt tort

remedies, and defendants have offered no evidence to permit this Court to draw

such an inference.[119]

In support of their argument, defendants point to a Senate Conference

Report on the CAA amendments for the proposition that the EPA, "may not

discriminate among [] different oxygenates, and should encourage fair competition

among them."[120] Once again, I note that a Conference Report, though more

reliable than individual statements by Senators, is legislative history and therefore

---

[119] *Bates*, 544 U.S. at 432-33 ("The long history of tort litigation against
manufacturers of poisonous substances adds force to the basic presumption against
preemption. If Congress had intended to deprive injured parties of a long
available form of compensation, it surely would have expressed that intent more
clearly. Moreover, this history emphasizes the importance of providing an
incentive to manufacturers to use the utmost care in the business of distributing
inherently dangerous items.") (quotations and citations omitted). Defendants are
wrong to cite *Bates* for the proposition that state tort remedies may only
supplement federal ones if the state liability rules track the federal rules precisely.
*See* Def. Mem. at 27. In *Bates*, unlike this case, the Court dealt with an express
preemption argument where the statute expressly prohibited "state-law labeling
and packaging requirements" that were "'in addition to or different from' the
labeling and packaging requirements under FIFRA." *Bates*, 544 U.S. at 447
(citations and quotations omitted). *Because* of this provision, the Court explained,
the common law failure to warn and fraud standards invoked by plaintiffs would
not be preempted if they were "equivalent to, and fully consistent with, FIFRA's
misbranding provisions." *Id.*

[120] 136 Cong. Rec. S17232.

36

irrelevant in the absence of an ambiguity in the plain language of the statute. But,

it is also worth noting that the Report itself goes on to caution the EPA to

"consider the different handling and transportation needs of different oxygenates,

and the problems that can result if they are commingled."[121] Thus, at best, the

Report demonstrates that Congress encouraged the EPA to take into account

known problems when writing its regulations.

### 3. EPA Expectations

Defendants also argue that the EPA expected MTBE to be the most

heavily used oxygenate and thus any restriction on MTBE use would frustrate

EPA's expectations.[122] To support this argument, defendants claim that the EPA

specifically allowed MTBE to be used and it included it, for example, in its

"simple emissions model" for reformulated gasoline.[123] Defendants also point to

the fact that the EPA used MTBE as part of the calculations for a reformulated

gasoline formula because of "the likelihood that MTBE will be the most heavily

---

[121]     *Id.*

[122]     *See* Def. Mem. at 14 (citing Regulation of Fuels and Fuel Additives;
Standards for Reformulated and Conventional Gasoline, 57 Fed. Reg. 13416,
13424 (Apr. 16, 1992) ("MTBE will be the most heavily used oxygenate" and
"MTBE will be widely available for use" in reformulated gasoline).

[123]     *See* 40 C.F.R. § 80.42 (presenting the simple emissions model for
VOC emissions).

used oxygenate."[124]

Defendants' evidence does not support the conclusion that the EPA intended to preempt plaintiffs' tort claims. This Court has previously held that the "EPA did not intend to preempt the field of fuel content regulation for all purposes."[125] Nor does the EPA "have authority to preempt the field of fuel content for all purposes."[126] *Geier* teaches that in order to support a claim of conflict preemption, defendants must make a showing that some special provision of the EPA regulations would be frustrated by these tort claims.[127] The EPA's use of MTBE as an example oxygenate in its formula does not establish that Congress or the EPA intended to mandate any specific percentages of MTBE for the gasoline or a phase in program for ethanol or MTBE.[128] As this Court has already

---

[124] EPA, Supplemental notice of proposed rulemaking: Regulation of Fuels and Fuel Additives; Standards for Reformulated and Conventional Gasoline, 57 Fed. Reg. 13416, 13424 (Apr. 16, 1992).

[125] *In re MTBE Prods. Liab. Litig.*, 341 F. Supp. 2d at 406 (citing EPA, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline, 59 Fed. Reg. 7716, 7809 (Feb. 16, 1994) (to be codified at 40 C.F.R. pt. 80)).

[126] *Id.* at 407.

[127] *See Geier*, 529 U.S. at 881-83.

[128] Indeed, plaintiffs have alleged that defendants misled the EPA and the public about the dangers of MTBE during the process leading up to the 1990 CAA amendments, and had Congress been aware of the hazards of MTBE, it would have required the use of alternative oxygenates. *See Long Island*

38

held, the fact that the EPA expected MTBE to be used does not amount to a means-related objective or a mandate that defendants use MTBE.[129]

Defendants have also failed to present any evidence that the EPA considers plaintiffs' tort claims to be an obstacle to federal objectives. In contrast to the explicit agency statement of federal preemption in the regulations at issue in *Fidelity Federal Savings*, the EPA here has never expressed its intent to preempt state tort claims.[130] In addition, unlike in *Geier*, the EPA has not argued that plaintiffs' tort claims would frustrate its regulatory objectives. In fact, the EPA expressed an opinion that a state ban on MTBE is not preempted by the CAA. In approving a plan submitted by Clark County, Nevada to require a minimum oxygen content of wintertime gasoline of 3.5 percent oxygen by weight (a requirement which would essentially eliminate the use of MTBE), the EPA found that Clark County's provisions were not conflict preempted by the CAA.[131]

Complaint ¶ 187.

[129]     *See MTBE I*, 175 F. Supp. 2d at 615.

[130]     *See Fidelity Fed. Sav.*, 458 U.S. at 158 (noting that the Federal Home Loan Bank Board had published a preamble to its regulations stating that "it was and is the Board's intent to have . . . due-on-sale practices of Federal associations governed exclusively by Federal law. Therefore, . . . exercise of due-on-sale clauses by Federal associations shall be governed and controlled solely by [the federal regulations] and the Board's new Statement of Policy.").

[131]     *See* EPA, Approval and Promulgation of Implementation Plans; Nevada State Implementation Plan Revision, Clark County, 64 Fed. Reg. 29573,

Nothing in the legislative history or EPA's regulations rebuts the assumption that Congress did not intend to displace state law.[132]

### 4. Punishment for Compliance with Federal Law

Defendants finally argue that plaintiffs' claims should be dismissed because a finding of liability would be tantamount to punishing compliance with a federal program. Defendants claim that a "creative plaintiffs' lawyer" could argue that all EPA-approved oxygenates are defective; thus denying defendants any chance to follow the law and simultaneously avoid tort liability.[133] Defendants also argue that certain of plaintiffs' complaints allege that any approved oxygenate was defective.[134]

Speculation about future tort suits is no basis for finding the current claims preempted by federal law. In addition, defendants have misinterpreted plaintiffs' complaints. Defendants cite the following paragraph in five complaints:

---

29578 (June 2, 1999).

[132] *See Maryland*, 451 U.S. at 726. *See also Hillsborough County*, 471 U.S. at 721. In addition, defendants' argument fails because plaintiffs claim that defendants began adding MTBE to gasoline as early as 1979, while the RFG Program requirements only took effect on January 1, 1995. *See* Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline, 59 Fed. Reg. 7716 (Feb. 16, 1994).

[133] *See* Def. Mem. at 28.

[134] *See id.* at 7.

"'[w]henever referred to in this Complaint, MTBE means not only MTBE, but also the contaminants in commercial grade MTBE, as well as other oxygenates and ethers, including but not limited to TAME, DIPE, and ETBE.'"[135]   Plaintiffs do not allege that all oxygenates are defective.  The paragraph must be read in conjunction with plaintiffs' other allegations.  It clearly refers only to the oxygenates and ethers found in commercial grade MTBE.

## VI.   CONCLUSION

Just as the many other courts that have addressed the issue of preemption and MTBE, this Court finds that plaintiffs' tort law claims are not preempted.  For the foregoing reasons, defendants' motion is denied.  The Clerk of the Court is directed to close this motion (docket #923).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:   New York, New York
         June 23, 2006

---

[135]   *Id.* (quoting Complaint, *City of Merced v. Chevron, U.S.A., et al.*, No. 05 Civ. 9071 ¶ 13; Complaint, *Tonneson v. Sunoco, Inc., et al.*, No. 03 Civ. 8248 ¶ 20; First Amended Complaint, *City of Fresno v. Chevron U.S.A. et al.*, No. 04 Civ. 4973 ¶ 46; Second Amended Complaint, *Orange County Water District v. Unocal Corp., et al.*, No. 04 Civ. 4968 ¶ 46, Third Amended Complaint, *Quick v. Shell Oil Co.*, No. 05 Civ. 7269 ¶ 51, Exs. F-J to Def. Mem.).

## -Appearances-

**Counsel for Plaintiffs:**

Scott Summy, Esq.
Carla Burke, Esq.
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Tel: (214) 521-3605

Michael Axline, Esq.
Duane Miller, Esq.
Miller, Axline & Sawyer
1050 Fulton Street
Sacramento, CA 95825
Tel: (916) 488-6688

Victor M. Sher, Esq.
Todd Robins, Esq.
Sher Leff LLP
450 Mission Street, Suite 400
San Francisco, CA 94105
Tel: (415) 348-8300
Fax: (415) 348-8333

Scott Pasternak, Esq.
Environmental Division
New York City Law Department
100 Church Street, Room 6-145
New York, NY 10007
Tel: (212) 676-8517

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
C. Sanders McNew, Esq.

Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Counsel for CITGO Petroleum Corporation, CITGO Refining and Chemicals Company, L.P., and PDV Midwest Refining, L.L.C.:**

Nathan P. Eimer, Esq.
Pamela R. Hanebutt, Esq.
Lisa S. Meyer, Esq.
Eimer Stahl Klevorn & Solberg, LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Tel: (312) 660-7600
Fax: (312) 692-1718

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
McDermott, Will & Emery LLP
340 Madison Ave.
New York, NY 10017
Tel: (212) 547-5353
Fax: (212) 547-5444