# **EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL ETHER
("MTBE") PRODUCTS LIABILITY LITIGATION

| | |
|---|---|
| HOPE KOCH, et al. | ) |
| Plaintiffs, | ) |
| | ) Civil Action |
| v. | ) No. 05-cv-05745 |
| | ) |
| JOHN R. HICKS, et al., | ) Master File |
| | ) No: 1:00-1898 |
| Defendants. | ) MDL 1358 (SAS) |

     Videotape deposition of JENNIFER L. STEVENS
taken pursuant to notice at the law offices of
Venable, LLP, Two Hopkins Plaza, Suite 1800,
Baltimore, Maryland, beginning at 2:09 p.m. on Monday,
June 12, 2006, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.

APPEARANCES:

SCOTT D. SHELLENBERGER, ESQUIRE
MARY V. KOCH, ESQUIRE
LAW OFFICES OF PETER G. ANGELOS, P.C.
  100 North Charles Street
  One Charles Center
  Baltimore, Maryland  21201
          -and-
MARSHALL PERKINS, ESQUIRE
LAW OFFICES OF CHARLES J. PIVEN, P.A.
  401 East Pratt Street - Suite 2525
  The World Trade Center - Baltimore
  Baltimore, Maryland  21202
  for the Plaintiffs

MR. GENDRON: It will be number 10.

Q. It's interrogatory number 8 and we asked --

MR. SHELLENBERGER: Well, you are going to have to wait a minute so the court reporter can mark it and then pass it over to us.

MR. ISHAK: I'm sorry. Let me know when she's ready.

MR. SHELLENBERGER: Sure.

(J. Stevens Exhibit 10 was marked for identification.)

MR. SHELLENBERGER: We've marked it and it's in front of her. And what number do you want us to look at?

MR. ISHAK: Number 8, page 4.

BY MR. ISHAK:

Q. And the question was: "State the date on which you contend Hicks or Exxon should have ceased operations at the Crossroads Exxon as a gasoline station," and your answer was that "Crossroads Exxon should never have been built at the location based on topography, geology, and surrounding land use." I

wanted to ask you about that.

The "surrounding land use," what do you mean by that?

MR. SHELLENBERGER: Objection.

Go ahead and --

Q. If you know. I realize -- and again, I'll state this, Counsel. I realize that your attorneys helped you draft the answer.

But factually, what do you know or what did you mean by that?

A. I'm not really sure.

Q. Okay. Geology, I assume you're not sure, also?

A. Correct.

Q. And topography, I assume you're not sure on that, as well?

A. Correct.

Q. And when you say "should never have been built at this location," in terms of timing, the Exxon station was there when you bought your home. True?

A. It was.

Q. But there have been homes newly built in this

three-mile radius that you're creating a class of plaintiffs for. Isn't that true?

Let me ask it this way: Since you've lived there, you've seen new homes built within that radius --

A. Yes.

Q. -- of the Exxon. Is that true?

A. Yes.

Q. Now, your neighbor -- let me make sure I get the neighbor correct. The folks next to you, bought the house next to you?

A. Yes.

Q. Let me make sure. It's the Patricks?

A. Mm-hmm.

Q. They bought at a time when you've talked about the controversy -- or it was apparent at the time that there was something going on with MTBE at the time of their purchase; is that right?

A. I don't know when they bought the house, to be honest with you. I don't know the exact date of their purchase, but I do know that it was after June of '04.

Q. Okay. And the house already had this system, this water purifying system put on by the folks from Exxon?

A. I don't -- I don't know that for sure.

Q. You don't know that for sure?

A. You would have to contact the Patricks.

Q. I misunderstood. Your husband seemed to know that. That's why I asked you. So maybe your husband knows a bit more about that than you. Is that a fair statement?

A. Yes.

Q. Okay. Despite the fact or assuming the fact that their purchase came after what I'll say the controversy, assume that fact for the moment, are they still a potential plaintiff that you seek to be representative of in this case?

MR. SHELLENBERGER: Objection.

Q. Did you understand my question, ma'am?

A. Are you asking -- you're asking me if I think that they're a potential part of this class action suit?

41 (Pages 158 to 161)

# EXHIBIT B

www.theaegis.com

# MDE continues cleanup of MTBE

BY MATT WARD

mward@theaegis.com

Two years after Fallston residents learned of ground-water contamination around the former Upper Cross Roads Exxon, representatives from the oil giant said Tuesday they are well into the process of cleaning up the site.

The gas station, where a leaking underground tank was responsible for the spread of methyl tertiary butyl ether, or MTBE, to hundreds of drinking water wells in the Fallston area, closed for good last year.

Exxon officials told about 50 people who attended an informational update at Fallston High School Tuesday night that a groundwater treatment system that has been operating on the site since early April is taking billion of MTBE and cleaning it until it has at least less than

10 ppb.

The state's actionable level is 20 ppb. The actionable level for the administrator for the Maryland Department of the Environment's Oil Control Program, said most of the treated water at the site is at a level where MTBE is not detected.

In another phase of Exxon's mitigation plan, the company is planning to install 28 monitoring wells in the roughly half-mile surrounding the former gas station. That network of wells is set for completion by October.

In summer of 2004, Upper Cross Roads residents learned that water at the nearby Exxon had been in violation of allowable MTBE levels for a year, that nearby businesses had been using carbon filtration systems on their drinking wells since 1998 and that there had been some form of MTBE contamination in the area for a

decade.

Tuesday's meeting was a far cry from the initial public forums on the matter two years ago, when tempers flared between the public and MDE officials. Still, on a night when meetings and public events around the county were canceled because of heavy rains and flooding, the Greater Fallston Association powwow went on.

## Action in Forest Hill

In other MTBE issues, gas tanks have been removed at the Sunoco station at Meller's Food Mart in Forest Hill, which will no longer be a gas station.

"He made a business decision to remove his tanks and get out of the service station business," Meade, of MDE, said of the station's owner.

MDE is monitoring ground-water at nearby Forest Hill Elementary School, where students and staff switched to

bottled water in April.

MDE has installed three monitoring wells at the school, and officials there will decide within the next 90 days whether to install carbon filtration systems, Meade said.

Contaminated soil was found around one of the removed diesel tanks at the Sunoco station, and a leak was discovered around one of the school's heating oil tanks, Meade added, noting he's waiting for lab tests to conclude on samples from both locations.

**EXHIBIT C**



FOR IMMEDIATE RELEASE                                              ENR
TUESDAY, OCTOBER 21, 1997                              (202) 514-2008
                                                  TDD (202) 514-1888

COLONIAL PIPELINE COMPANY AGREES TO UP TO $4 MILLION SETTLEMENT
       FOR 1993 OIL SPILL THAT DESPOILED SUGARLAND RUN
                  AND THE POTOMAC RIVER

Washington, D.C. - Colonial Pipeline Company today agreed to
pay a $1.5 million fine and spend up to 2.5$ million to restore
natural resources in and around Sugarland Run and the Potomac
River, which were damaged by a massive 1993 oil spill from the
company's pipeline in Reston, Virginia.

The proposed settlement was lodged today by the Justice
Department in U.S. District Court in Alexandria, on behalf of the
U.S. Department of the Interior, the Environmental Protection
Agency, Virginia, and the District of Columbia.

The spill, which occurred in March 1993, released about
407,000 gallons of diesel fuel into Sugarland Run.  Despite
emergency efforts to contain the spill, about 48 square miles of
surface water, shorelines, islands and wetlands were contaminated.
The entire length of Sugarland Run was severely contaminated,
threatening water supplies in Virginia, Maryland and the District
of Columbia.  The oil flowed down Sugarland Run and into the
Potomac River, creating oil slicks on the river.

"The Colonial pipeline spill was a tragedy, but today's
settlement will heal the environmental damage that was inflicted
upon the waters of the Potomac," said Lois Schiffer, Assistant
Attorney General in charge of the Justice Department's Environment
and Natural Resources Division.  "The environmental restoration and
enhancement projects that Colonial will perform will help protect
the natural integrity of the waters in and around our nation's
capital."

"The fine is a reminder to Colonial and others that polluters
will pay a price over and above just restoring what they have
damaged," said Steve Herman, EPA's Assistant Administrator for
Enforcement and Compliance Assurance.  "The environmental
improvement projects that Colonial must perform will be good news
to the citizens of Washington, D.C., Maryland and Virginia who use
the Potomac River and its adjacent lands for boating, hiking and
other forms of recreation."

"Pollution freely crosses state boundaries, and has no regard
for bureaucratic structures," said EPA Regional Administrator W.
Michael McCabe.  "Today's settlement shows the benefits of federal
and state cooperation in enforcing our nation's environmental
laws."

The spill, which occurred during the height of the white perch

spawning run in these waters, killed or injured fish, birds, reptiles, and mammals.  Wildlife also were injured by the damage the spill inflicted upon their environment and food sources.  Some federal park areas had to be closed to the public because of the spill.

Under the proposed settlement, Colonial will pay a $1.5 million civil penalty, to be split evenly between the federal government and Virginia, and reimburse the federal government, Virginia and the District of Columbia for the costs of assessing damages to natural resources.  Also, Colonial will pay $253,314 to help fund the construction of a fish passage over Little Falls Dam on the Potomac River that will be built by the District of Columbia, Maryland, and the Army Corps of Engineers.

The proposed settlement also requires Colonial to restore or rehabilitate natural resources in and around Sugarland Run and the Potomac River that were damaged by the spill, and pay the monitoring and oversight costs of these projects.  These projects include restoring wetlands, aquatic habitats and enhancing forests. They are designed to compensate the public for depriving it of the use and enjoyment of parklands affected by the spill.  Other projects the company will perform include constructing a bike path near Herndon linking the Washington and Old Dominion Trail to the Fairfax County Sugarland Run trail, a wildlife observation area at Dyke Marsh Wildlife Preserve near Belle Haven Marina in the George Washington Memorial Parkway, and storm water management controls in the Sugarland Run area.

The settlement is the result of more than four years of studies and negotiations among representatives of Colonial, the Interior Department, the Environmental Protection Agency, Virginia, and the District of Columbia.

The settlement will be published in the Federal Register and is subject to a thirty day public comment period.

                              ###

97-437

About Us  Press Releases  Services  Safety & The Environment  Career Opportunities  Customer Support

◀ BACK
▶ SEARCH  ▶ SITE MAP

# SystemMap

System Map

President's Message

Mizsion

Operations Philosophy

Community Service

Owners and Customers

Frequently Asked
Questions



For more information contact us
© Copyright Colonial Pipeline 2006



**Colonial Pipeline Company**

| About Us | Press Releases | Services | Safety & The Environment | Career Opportunities | Customer Support |

▶ SEARCH   ▶ SITE MAP

Thursday, September 14  8:34 A.M.



# Welcome To

# Colonial Pipeline Company

Based in Alpharetta, Ga., Colonial Pipeline delivers a daily average of 100 million gallons of gasoline, home heating oil, aviation fuel and other refined petroleum products to communities and businesses throughout the South and Eastern United States.

Colonial's first priority is to operate its pipeline safely in a way that protects the public, our employees and the environment.

## U.S. to Colonial: Thank You!

The U.S. Department of Transportation presented Colonial Pipeline a plaque honoring the company's efforts to resume



normal operations after Hurricanes Katrina and Rita. The plaque, presented by Brigham McCown, Acting Administrator of the DOT's Pipeline Hazardous Materials Safety Administration, hangs at Colonial's offices in Alpharetta, Ga. It reads:

"In appreciation of the exceptional efforts made by the Colonial Pipeline Company and its Valued Employees in the face of overwhelming natural disaster by Hurricanes Katrina and Rita, to safely recover from the emergency, cooperate with Federal, State and local agencies, and restore pipeline operations for the well being of your fellow American citizens and the prosperity of our great nation."

McCown's office includes the Office of Pipeline Safety and is the principal safety regulator of Colonial and other U.S. pipelines. Colonial employees and its contractors worked with Colonial customers and with electric utilities to restore power and resume operations of Colonial's lines. This was achieved safely - without a single injury or without a single drop of fuel being spilled.

**Site Highlights**
- ▶ Pipeline System Map
- ▶ President's Message
- ▶ Operations Philosophy
- ▶ Mizsion
- ▶ Community Service
- ▶ FAQ
- ▶ Transport 4
- ▶ Shipper Manual & Tariffs
- ▶ Product Specifications
- ▶ Colonial University
- ▶ Resident Watchers

**Archives**
- ▶ Press Releases

**Feedback**
- ▶ Send us your comments
- ▶ Contact Us

About Us | Press Releases | Services | Safety & The Environment |
Career Opportunities | Customer Support | Colonial University |

http://www.colpipe.com/home.asp

9/14/2006



## U.S. Environmental Protection Agency
# Civil Enforcement

Recent Additions | Contact Us | Print Version    Search: [＿＿＿＿] **GO** Advanced Search

EPA Home > Compliance and Enforcement > Enforcement > Civil Enforcement > Information Resources > Cases and Settlements > Colonial Pipeline Company Clean Water Act Settlement

**Compliance and Enforcement Home**

Enforcement Home

Civil Enforcement Home

Basic Information

Newsroom

Clean Air Act

Clean Water Act

Safe Drinking Water Act

Resource Conservation and Recovery Act

Toxics Substances Control Act

Federal Insecticide Fungicide Rodenticide Act

Emergency Planning and Community Right to Know Act

Multimedia Enforcement

Small Business Regulatory Fairness Act

# Colonial Pipeline Company Clean Water Act Settlement

U.S. REACHES LANDMARK SETTLEMENT WITH COLONIAL PIPELINE FOR OIL SPILLS IN FIVE STATES

$34 Million Civil Penalty is the Largest Paid by a Company in EPA History

The Department of Justice and the Environmental Protection Agency announced on April 1, 2003, a settlement with Colonial Pipeline, resolving charges that the company violated the Clean Water Act on seven occasions by spilling 1.45 million gallons of oil from its 5,500 mile pipeline in five states. Colonial will upgrade environmental protection on the pipeline at an estimated cost of at least $30 million, and pay $34 million under the consent decree. This is the largest civil penalty a company has paid in EPA history.

Colonial is the largest-volume pipeline transporter of refined petroleum products in the world, based in Atlanta, Georgia. The pipeline moves an average of 83 million gallons of petroleum products per day through an underground pipeline that stretches from Port Arthur, Texas, to Linden, New Jersey, passing through Louisiana, Mississippi, Alabama, Georgia, Tennessee, South Carolina, North Carolina, Virginia, District of Columbia, Maryland, and Pennsylvania.

The government maintained that pipeline corrosion, mechanical damage, and operator error in seven recent spills resulted in the release of approximately 1.45 million gallons of oil and other petroleum products in the environment, including numerous rivers, streams, and wetlands. Oil spills from the pipeline damaged a variety of aquatic systems. In one spill, more that 950,000 gallons of diesel fuel spilled into the Reedy River in South Carolina in 1996, killing 35,000 fish and other species of wildlife, and dispersing more than 34 miles downstream. It can take years for an ecosystem to recover from damage caused by an oil spill.

Attorney General John Ashcroft said, "maintaining the integrity of our nation's industrial infrastructure, such as oil pipelines, is a critical priority for the Justice Department." "Today's settlement sends the message that we will vigorously pursue violations of environmental laws that subject our citizens and our environment to potentially catastrophic consequences."

Colonial is required to pay for an independent monitoring contractor, approved by EPA, to ensure that the company incorporates these requirements into its existing programs and then implements the requirements.

The settlement agreement was lodged at the U.S. District Court for the Northern District of Georgia in Atlanta on April 1, 2003, and is subject to a 30-day public comment period and final court approval.



FOR IMMEDIATE RELEASE

ENRD

TUESDAY, NOVEMBER 28, 2000

(202) 514-2008

WWW.USDOJ.GOV

TDD (202) 514-1888

## U.S. SUES COLONIAL PIPELINE FOR OIL SPILLS IN NINE STATES

WASHINGTON - The Justice Department on behalf of the EPA today filed suit against Colonial Pipeline Company, alleging the company violated the Clean Water Act by spilling about 3 million gallons of oil and petroleum products from its 5,300-mile pipeline.

The complaint filed today in U.S. District Court in Atlanta charges that Colonial illegally discharged petroleum products into waterways in nine states. Pipeline corrosion, mechanical damage, and operator error have resulted in numerous spills over the past 20 years, in Louisiana, Alabama, Georgia, Tennessee, South Carolina, North Carolina, Maryland, Virginia, and New Jersey.

Atlanta-based Colonial Pipeline Company is the largest-volume pipeline transporter of refined petroleum products in the world, moving an average of 80 million gallons of petroleum products each day through an underground pipeline that stretches from Port Arthur, Texas, to Linden, N.J., where it terminates in the New York Harbor area.

The pipeline crosses numerous rivers, streams, and wetlands, and oil spills from the pipeline have put at risk a variety of aquatic systems. In one case, more than 950,000 gallons of diesel fuel spilled into the Reedy River in South Carolina, killing 35,000 fish and dispersing oil 34 miles downstream.

The lawsuit asks the court to order Colonial Pipeline to take several steps to prevent future oil spills:

- investigate the depth and condition of the dirt or other material that covers the buried pipeline and take action to address exposed and shallow pipe;

- inspect the pipeline for defects such as corrosion and cracks, and repair these defects in accordance with industry standards on a prompt schedule;

- inspect, upgrade and maintain the cathodic protection system, which controls corrosion, so that it complies with industry performance standards; and

- upgrade the pipeline's leak detection strategy and system.

The United States also is seeking significant civil penalties from Colonial Pipeline under the Clean Water Act, to serve as a monetary deterrent both to Colonial and others who might otherwise violate the statute. The Act authorizes a court to impose civil penalties of up to $25,000 for each day of violation prior to January 1997, and $27,500 per day for each day thereafter, or, alternatively, $1,000 per barrel of oil spilled or $3,000 per barrel in the case of gross negligence.

### 

00-673



# Department of Justice

**FOR IMMEDIATE RELEASE**
**TUESDAY, APRIL 1, 2003**
**WWW.USDOJ.GOV**

ENRD (202) 514-2007
EPA (202) 564-7842

### U.S. REACHES LANDMARK SETTLEMENT WITH COLONIAL PIPELINE FOR OIL SPILLS IN FIVE STATES

#### *$34 Million Civil Penalty Is The Largest Paid By A Company In Epa History*

**WASHINGTON, D.C.** - The Department of Justice and the Environmental Protection Agency today announced a settlement with Colonial Pipeline Company, resolving charges that the company violated the Clean Water Act on seven recent occasions by spilling 1.45 million gallons of oil from its 5,500 mile pipeline in five states. Under the consent decree, Colonial will upgrade environmental protection on the pipeline at an estimated cost of at least $30 million, and pay $34 million, the largest civil penalty a company has paid in EPA history.

Atlanta-based Colonial is the largest-volume pipeline transporter of refined petroleum products in the world, moving an average of 83 million gallons of petroleum products each day through an underground pipeline that stretches from Port Arthur, Texas, to Linden, N.J., passing through Louisiana, Mississippi, Alabama, Georgia, Tennessee, South Carolina, North Carolina, Virginia, District of Columbia, Maryland, and Pennsylvania.

The government maintained that pipeline corrosion, mechanical damage, and operator error in seven recent spills resulted in the release of approximately 1.45 million gallons of oil and other petroleum products into the environment, including numerous rivers, streams, and wetlands. Oil spills from the pipeline damaged a variety of aquatic systems. In one spill, more than 950,000 gallons of diesel fuel spilled into the Reedy River in South Carolina in 1996, killing 35,000 fish and other species of wildlife, and dispersing more than 34 miles downstream. It can take years for an ecosystem to recover from damage caused by an oil spill. Other spills forming the basis of the penalty occurred in Georgia, Tennessee, Louisiana, and North Carolina.

"Maintaining the integrity of our nation's industrial infrastructure, such as oil pipelines, is a critical priority for the Justice Department," said Attorney General John Ashcroft. "Today's settlement sends the message that we will vigorously pursue violations of environmental laws that subject our citizens and our environment to potentially catastrophic consequences."

"This settlement is another example of EPA's 'smart enforcement' approach, illustrating how an enforcement decision translates into the very real results of cleaner air, purer water and better protected land. The combined efforts of EPA and DOJ successfully address environmental

damage and prevent future harm to public health and the environment," said EPA Administrator Christie Whitman.

Today's settlement requires Colonial to designate its entire pipeline as potentially affecting "high consequence areas." This will subject the entire 5,500 mile pipeline to the pipeline integrity regulations of the U.S. Department of Transportation's Office of Pipeline Safety (OPS). Under the terms of the settlement, Colonial is also required to:

•Inspect its corrosion prevention system along the entire pipeline system every five years;

•Repair problems detected in the corrosion prevention system to meet the standards developed by the National Association of Corrosion Engineers (NACE);

•Maintain its right-of-ways, including mowing and removing debris;

•Have personnel on site when utility or other excavation is occurring within five feet of the pipeline; and

•Survey and inspect the pipeline where it crosses water, and address areas of the pipeline that are exposed or insufficiently buried.

Finally, the settlement requires Colonial to pay for an independent monitoring contractor, approved by EPA, to ensure that the company incorporates these requirements into its existing programs and then implements the requirements.

Colonial's $34 million civil penalty will go to the United States' Oil Spill Liability Trust Fund. The Fund underwrites oil spill cleanup activities nationwide.

On Feb. 25, 1999, Colonial Pipeline Company pled guilty to criminal charges in connection with the Reedy River, S.C., spill. The company was ordered to pay a $7 million fine and serve a five-year term of probation.

In addition to this settlement, the United States has taken action recently against several other pipeline companies for oil spill violations. For example, in January of this year, the United States and the State of Washington reached civil settlements with Olympic Pipe Line Company and Shell Pipeline Company that included penalties totaling $15 million plus injunctive and other relief for violations leading to a fatal pipeline rupture in Bellingham, Wash., in 1999. In December 2002, Olympic and Shell entered pleas and agreed to pay $21 million in criminal fines for criminal violations arising from the same incident.

Today's settlement agreement has been lodged at the U.S. District Court for the Northern District of Georgia in Atlanta and is subject to a 30-day public comment period and final court approval.

### 

03-201





# Fact Sheet Summary of Pipeline Protection

**(Please visit colpipe.com for additional information)**

- Colonial Pipeline Company is an interstate common carrier of petroleum products headquartered in Alpharetta, Georgia, just north of Atlanta. Colonial operates more than 5,500 miles of pipelines stretching from Texas to the New York harbor. Each day, we deliver an average of 96 million gallons of gasoline, kerosene, home-heating oil, diesel fuel and jet fuel to over 120 million customers throughout the Eastern United States.

- Colonial Pipeline's Mission, Vision and Values represent the fundamental belief of our employees that "We value safety and protecting the environment as we do our family and home."

- The pipeline system is constructed of steel pipe with protective coating and cathodic protection to control corrosion

- Pipe diameters range from 6 to 40 inches system wide

- The lines are buried a minimum of 3 feet underground

- Above-ground warning markers identify locations of the pipe

- The entire system is monitored at all times by employees called Controllers who use state-of-the-art computerized systems that monitor flow rates, pressures and other critical operating variables

- Aerial patrols of the pipeline right of way are performed on a weekly basis by aircraft flying at altitudes of 300-500 feet above the ground. These patrols look for any evidence of leaks or threatening activity, such as unplanned excavation.

- Remote video surveillance is provided at key locations throughout the system

- Colonial has an aggressive inspection and maintenance program to maintain pipeline integrity. In-line inspection devices called "smart pigs" are periodically run through the pipelines to detect any corrosion or pipe wall anomalies. Engineers evaluate information collected by these devices so that appropriate maintenance can be conducted.

- Colonial actively participates in underground utility protection programs commonly known as "One Call" in all of the states of our operations. These programs are critical in preventing damage from unauthorized digging.

- Right of way inspectors coordinate any construction or excavation activity along the pipeline. They also manage the clearing of overgrowth on the right of way that could obscure aerial observation or could damage the underground pipes.

- Colonial's Resident Watcher's program rewards landowners and other members of the public for identifying threatening activities or hazardous conditions along the pipeline system. Residents become our "eyes and ears" and are paid a cash reward for reporting such activities or conditions.

- While prevention and detection are the primary methods for managing pipeline integrity, Colonial is also prepared in the unlikely event that a spill occurs. Our Emergency Response Plan is an integrated and detailed process ensuring that the necessary assessment, containment and recovery resources are deployed to handle any pipeline emergency.

MDEF008978

**Petroleum Releases in Harford County, Maryland**

There have been two reportable releases at Colonial facilities and no release from Colonial's pipelines in Harford County within the past ten years. The most recent incident occurred at our Bel Air Station facility in 1998. It was a 0.12 barrels (about 5 gallons) gasoline release in which all of the gasoline was recovered. The Colonial Bel Air Station facility is located approximately 1.5 miles from the center of the area of interest.

Another incident occurred at our Aberdeen Junction facility in 1994. It was a 140 barrels (about 5,800 gallons) gasoline release. The amount of gasoline recovered from the facility retention pond was 121 barrels (about 86%) with the remainder being lost to evaporation or entrapment in the soil. The contaminated soil was excavated and disposed of properly. At the request of the Maryland Oil Control Program, a groundwater assessment has been done. The assessment indicated only minor dissolved contamination contained entirely within our facility. The Colonial Aberdeen Junction facility is located approximately 4.5 miles from the center of the area of interest.

MDEF008979

**EXHIBIT D**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

IN RE: METHYL TERTIARY BUTYL ETHER          :

("MTBE") PRODUCTS LIABILITY LITIGATION      :

------------------------------------------:

This document relates to:                   :

Hope Koch, et al. V. John R. Hicks, et al., :

No. 05-cv-05745-SAS                          :

                                             :

------------------------------------------X

Master File No. 1:00-1898

MDL 1358 (SAS)

M21-88

The deposition via videotape of HOPE KOCH was

taken on Monday, June 19, 2006, commencing at 8:59

a.m., at the offices of Venable, LLP, Two Hopkins

Plaza, Suite 1500, Baltimore, Maryland 21201,

before Alfred A. Betz, Notary Public.


Reported By:  Alfred A. Betz, Court Reporter

1 getting information from him?

2  A.  No.

3  Q.  Since you moved into your home there in

4 Fallston did you frequently use the Exxon station?

5  A.  No.

6  Q.  Not at all or very infrequently?  How

7 would you describe your use of it?

8  A.  Very infrequently.

9  Q.  Okay.  Other than the person you believe

10 you spoke to did you have any other direct contact

11 with Mr. Hicks?

12  A.  No.

13  Q.  How about any of his employees?

14  A.  No.

15  Q.  Obviously the station was there when you

16 moved into your home on Franklin's Chance in '91,

17 right?

18  A.  I believe so.  I think so.

19  Q.  Now, when you purchased your home on

20 Franklin's Chance you did that without the benefit

21 of having a real estate agent; is that true?

1  A.  Yes.

2  Q.  How did you come to learn the property

3 was available?

4  A.  It was an auction.  A bank auction.

5  Q.  Did you learn about that through your

6 work?

7  A.  No.

8  Q.  You learned about it from an

9 advertisement in the paper?

10  A.  Yes.

11  Q.  Where had you been living prior to coming

12 to Franklin's Chance?

13  A.  Fallston.

14  Q.  Just another spot in Fallston?

15  A.  Yes.

16  Q.  So this wasn't the first house you

17 purchased with a well; is that true?

18  A.  That's right.

19  Q.  You indicated that you did some

20 improvements to the home.  Did you finish off the

21 basement?

1  A.  Yes.

2  Q.  The basement was it a poured concrete or

3 is it block?

4  A.  It's block.

5  Q.  Do you recall whether there was any water

6 seepage or leakage in the basement prior to it

7 being finished off?

8  A.  There was none.

9  Q.  You indicated also that you did roof

10 repairs?

11  A.  Replaced the roof.

12  Q.  Okay.  What precipitated having the roof

13 replaced?

14  A.  The shingles I guess wore out or

15 whatever, why you replace a roof.

16  Q.  Was there any leaking inside your home,

17 ma'am?

18  A.  There might have been trace leaking on

19 the corner or something like that where the sun

20 room and the house in that area on a specific

21 blowing downpour, something like that.

1  Q.  The sun room you say was an addition?

2  A.  Yes.

3  Q.  Do you know who did that work, who did

4 the addition?

5  A.  Yes.

6  Q.  Who was that?

7  A.  Frank Koch.  I'm sorry, to backtrack, the

8 sky lights in the garage were leaking.  That was

9 what was the main thing that made us watch the

10 roof.

11  Q.  Were the skylights with the house when

12 you bought it or did you add them?

13  A.  Yes.  They were there.

14  Q.  I think counsel asked you this:  Have you

15 ever had the home tested for mold?

16  A.  For mold?  Is that what you said?

17  Q.  Yes, ma'am.

18  A.  I don't believe so.  No.

19  Q.  Okay.  You indicated that you wouldn't

20 have bought the house if you knew about the MTBE

21 issue; is that true?

Al Betz & Associates, Inc.
www.albetzreporting.com

1 A. That's true.

2 Q. When you bought the house at auction was
3 there anyone there available for you to ask
4 questions about the house?

5 A. I think you need to clarify what you mean
6 about anyone available and then also what kind of
7 questions. Please.

8 Q. Well, I mean did you have any questions
9 about the house when you were at the auction?

10 A. The bank, the auctioneer made whatever
11 statements are made at the auction and the
12 questions that the bank could answer were the only
13 questions. Did I have any personally? I don't
14 remember.

15 Q. Okay. Do you remember the auctioneer?

16 A. I don't remember.

17 Q. Did you have any independent testing done
18 to the home or the well prior to going to the
19 auction?

20 A. No.

21 Q. And I'm operating under the assumption

1 that you were the high bidder at the auction and
2 that's how you got the house?

3 A. That's correct.

4 Q. Now, after you bought the house at
5 auction how soon did you move in?

6 A. Time had to pass for the Court to approve
7 the sale. After the approval was done several
8 months after the auction when it was deeded to us
9 we didn't move in immediately. We started doing
10 work in the house because we still had our other
11 house.

12 Q. What address was that, ma'am?

13 A. 2126 Buell Drive.

14 Q. I know you've done your best to answer my
15 question but how long after that auction do you
16 think you moved in?

17 A. Do you mean in its entirety or --

18 Q. Was it a year later or --

19 A. Oh, no. Within six months I would say is
20 a good estimate.

21 Q. Okay. Thank you. Now, from the time you

1 moved in was there ever a time when the water in
2 your home was foul to drink?

3 A. I'm not -- I don't understand what foul
4 to you means. I don't understand what you're
5 saying to me.

6 Q. Was there ever a time after you moved in
7 your home that you could not drink the well water
8 because of either a taste or a smell?

9 A. Either what or smell?

10 Q. A taste?

11 A. Okay. A taste or smell. That would be
12 after installation of the systems.

13 Q. Sure.

14 A. Not prior to the systems that were
15 installed for the MTBE remittance.

16 Q. Okay. So not prior to the installation
17 of the system were you unable to drink the water
18 because of taste or smell?

19 A. That's what I recall.

20 Q. Okay. When I look at the tax assessment
21 for your home at Franklin's Chance Court -- I think

1 that's exhibit 1, counsel.

2 MR. ENGEL: Correct.

3 Q. It indicates that this is not your
4 principal residence. When I look at the tax
5 assessment for your Park Beach Drive property which
6 I don't think is an exhibit that actually indicates
7 that that is your principal residence at Park Beach
8 Drive. Can you tell us when the shift was made?

9 A. I'm not the tax assessment office. I
10 can't really tell you when it was made.

11 Q. Don't you supply the information to the
12 tax assessors as to which house is your principal
13 residence?

14 A. Yes.

15 Q. And that's my question. Do you recall
16 when you let the taxing authorities know that the
17 Park Beach Drive address was your principal
18 residence?

19 A. I don't remember exactly when.

20 Q. Okay. Now, again that assessment for the
21 Park Beach Drive property indicates that you

76 (Pages 298 to 301)