# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

| | |
|---|---|
| HOPE KOCH, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action |
| v. | ) No. 05-cv-05745 |
| | ) (SAS) |
| JOHN R. HICKS, et al., | ) Master File |
| | ) No: 1:00-1898 |
| Defendants. | ) MDL 1358 (SAS) |

Videotape deposition of TIMOTHY C. STEVENS taken pursuant to notice at the law offices of Venable, LLP, Two Hopkins Plaza, Suite 1800, Baltimore, Maryland, beginning at 9:17 a.m. on Monday, June 12, 2006, before Kathleen White Palmer, Registered Merit Reporter and Notary Public.

APPEARANCES:

SCOTT D. SHELLENBERGER, ESQUIRE
MARY V. KOCH, ESQUIRE
LAW OFFICES OF PETER G. ANGELOS, P.C.
100 North Charles Street
One Charles Center
Baltimore, Maryland 21201
-and-
MARSHALL PERKINS, ESQUIRE
LAW OFFICES OF CHARLES J. PIVEN, P.A.
401 East Pratt Street - Suite 2525
The World Trade Center - Baltimore
Baltimore, Maryland 21202
for the Plaintiffs

anything about him? I know there was -- there was gas in a repair station there. What were the discussions about?

A. I don't remember. I think just the fact that he owned it is all.

Q. I see. So he was just -- he was the person that was Exxon? Is that a fair statement?

A. Yes.

Q. You indicated you put DryLock in your basement?

A. Yes.

Q. Did your basement leak?

A. It did, yes.

Q. It was damp then, so you put the DryLock in it?

A. Yes.

Q. Have you had your house tested for any kind of mold?

A. I don't know. I think my wife would know. I think we may have because I know it was a concern of hers, but I don't -- I don't really recollect.

Q. She would know that information?

A. She would know, yeah. I personally don't think

we did. When I moved in, the basement wasn't finished, so when I redid it, I did the DryLock because the wall, one wall was a little bit damp.

Q. Understood.

Now, you've talked to us a little bit about your neighbor, the Patricks. Did they tell you how much they bought their house for?

A. Yeah. I believe it was 425. And that's -- and I'm going off my memory.

Q. Okay. I think the public report reflects it was like 449.

A. Okay.

Q. Does that --

A. It could be. Like I said, I don't -- he -- he may have told me less to -- for whatever reason.

Q. But you would consider him to be one of the potential members of the class that you're going to represent?

A. I don't know. I don't know. I don't know if he would be involved in that or not since he bought the house after all this started. I don't know how

that would work. To my knowledge, he bought the house with a filtering system in it and knew all this, you know.

Q. So he had knowledge of what was going on?

A. Yeah. I'm -- I'm almost positive he had knowledge of what was going on when he bought the house.

Q. Do you know anyone who owns or works at Walker's Garage?

A. No.

Q. What about Scarff's Market when it was in operation?

A. No.

Q. Do you know anybody up here at that time?

A. No.

Q. Your neighbors, you indicated you didn't know whether any of them had oil tanks or used oil to heat their homes. What about their lawn --

A. I can't hear.

MR. SHELLENBERGER: Mr. Ishak, you're fading on us here. You got to speak a little louder,

please.

MR. ISHAK: I'm sorry.

MR. SHELLENBERGER: That's okay.

BY MR. ISHAK:

Q. What about the lawn care of your neighbors, do you know if your neighbors like own their own tractors, have their own fuel for that? Do you see that?

A. No. I -- I do know that one of my neighbors two doors -- three doors up, he cuts my grass. I don't know where he operates his business out of, though.

Q. So he has a lawn business, then?

A. Yes, he has a lawn business.

Q. Does he keep all his equipment there?

A. I have no idea.

MR. ISHAK: I don't want to repeat anything. I think Andrew covered the lion's share of it. So I have no further questions at this time, Counsel.

MR. SHELLENBERGER: I was going to ask a

WORD INDEX EXHIBITS

**EXHIBIT F**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------X

IN RE: METHYL TERTIARY BUTYL ETHER :

("MTBE") PRODUCTS LIABILITY LITIGATION :

---------------------------------------------:

This document relates to: :

Hope Koch, et al. V. John R. Hicks, et al., :

No. 05-cv-05745-SAS :

:

---------------------------------------------X

Master File No. 1:00-1898

- MDL 1358 (SAS)

M21-88

The deposition via videotape of DRAKE ROCHE was taken on Tuesday, June 20, 2006, commencing at 9:19 a.m., at the offices of Venable, LLP, Two Hopkins Plaza, Suite 1500, Baltimore, Maryland 21201, before Alfred A. Betz, Notary Public.

Reported By: Alfred A. Betz, Court Reporter

believe I spoke with the gentleman.

Q. How about any of his employees or any of the employees there?

A. Beyond exchange of money, getting gas, I mean that type of conversation.

Q. Okay. Can you, based on your personal knowledge, then, describe to me in any way how he operated the station?

A. Are you getting at, I mean, was it a -- can you elaborate on that a little bit, sir? I mean, I can answer that if you want to. Could you sort of express to me what you mean by that a little more?

Q. Well, I mean did you see him mishandling fuel? Did he run a clean place? You can answer that in two, you can answer those two questions.

A. I'd say this: I didn't, in my times, the times I would go in there to get gas I didn't encounter what I would call any problems, you know, things being out of place, you know, anything to make it I guess difficult for me to get in there

and obtain gas for the vehicle, no, I wouldn't say that I saw that.

Q. Generally were the conditions from what you could see clean and well kept?

A. I would classify them as not unkempt from my perspective. I did not notice anything that would put him in that category.

Q. You have used the word, and if I'm misstating the word help me out, you seemed to use the word in your testimony that Mr. Hicks is attached to Exxon. Can you describe for me what you mean by that a little bit more?

A. I guess maybe another way to, or an additional way to say it would be that because -- we've got a couple elements here. One is that Exxon is the installation. It's Exxon's overall location, their gas, et cetera. And then the other component of that would be the actual person that runs that facility. And I think those two things inevitably are attached in any type of store like a gas station.

Q. Okay. But you don't know the level of the attachment or the nature of the attachment or any contractual relationship between them?

A. No, sir. It would just be my general understanding of an owner/manager with the gas station, with any gas station.

Q. Do you have any, are you just saying that generally or do you have some specific past knowledge about folks you knew who operated gas stations?

A. No. The way you put that, sir, I'd have to say general. No, I don't believe I know anybody specifically that runs a gas station.

Q. Okay. Going back again, you used the word that MTBE was allowed to emanate from the station. Do you have personal knowledge of that or are you relying on potential expert testimony about that?

A. I'm aware that, I've been made aware that that has happened and by the means that we've already discussed in here and I guess beyond that,

you know, the specifics that, the technical aspects of how that occurred I guess I wouldn't be the best person to speak to that.

Q. You'll be relying then on expert testimony to describe that?

A. For the technical aspects of that I would say yes, sir.

Q. And do you know in what form or how you are claiming the MTBE is being allowed to emanate from the station? Are we talking liquid, vapor? What are we talking here?

A. I guess my knowledge is that it has emanated in a form that can cause harm to the wells surrounding the Exxon. I mean, I guess I'm hesitating a little bit because I'm not a chemist so I wouldn't want to land on, you know, what mechanism or what form can cause the contamination. But what I would say is that I've been made aware that emanation from the gas station has caused the issue that brings us here today.

Q. And for the moment you've got two

defendants in this case. If you come to learn that there are other sources or alternate sources altogether do you know whether you as class representative do you have plans to expand the claim to include other defendants?

MR. SHELLENBERGER: Objection. You can answer if you know.

A. Yeah, I would say, sir, I for right now I mean my understanding is the source is as we've discussed and I think that, you know, should other things come up that are attached in that way I mean I wouldn't say that I wouldn't recognize that. I mean, I guess to say that I wouldn't take into consideration other information, I wouldn't want to sit here and say that. But I'm comfortable as we've discussed it today that the source is as we've discussed it.

Q. Is your answer done?

A. Yes, sir.

Q. Okay. I didn't want to cut you off.

MR. ISHAK: No further questions.

MR. BOLLAR: Any other questions from other counsel? Mr. Shellenberger, do you have any questions?

MR. SHELLENBERGER: No. Are we done?

MR. BOLLAR: We're done.

MR. SHELLENBERGER: You have a right to read and sign the deposition or you can waive that. I recommend that we read and sign.

A. Okay.

THE VIDEOGRAPHER: This ends videotape number 2. We're going off the record at 11:43.

(Proceedings concluded -- 11:43 a.m.)

---------------------

State of Maryland,
City of Baltimore, to wit:

I, Alfred A. Betz, a Notary Public of the State of Maryland, City of Baltimore do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by Counsel. I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of Counsel to any of the parties, nor an employee of Counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and Notarial Seal this 21st day of June, 2006.

Alfred A. Betz, Notary Public

My commission expires: 11/1/07

INDEX

DRAKE ROCHE,
a witness.................................... 6
EXAMINATION BY MR. BOLLAR...................... 6
Exhibit Number 1, Plaintiff Drake Roche's Response to Defendant Exxon's Fact Interrogatories, Preliminary Statement/General Objections,...... 15
Exhibit Number 2, Plaintiff Drake Roche's Response to Defendant Exxon's Class Interrogatories, Preliminary Statement/General Objections,...... 15
Exhibit Number 3, letter from Mary V. Koch to Andrew Gendron, dated June 7, 2006, with attachments,................................ 16
Exhibit Number 4, document Bates stamped FAL-GES-03158-161, ........................... 30
Exhibit Number 5, document Bates stamped GES-07/04-00308-311,.......................... 30
Exhibit Number 6, document Bates stamped R000097-98,.................................. 30
Exhibit Number 7, document Bates stamped GES-11/04-01548-551,.......................... 30

**EXHIBIT G**

VOLUME II

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:
Methyl Tertiary Butyl : MDL NO. 1358(SAS)
Ether ("MTBE") :
Products Liability :
Litigation :

------

Hope Koch, et al., :
:
vs. : No. 05-CV-05745
: (SAS)
John R. Hicks, et al.:

------

MAY CONTAIN CONFIDENTIAL TESTIMONY

------

November 14, 2006

------

Continued Videotaped Deposition of RICHARD K. SPRUILL, Ph.D., at the Hilton Greenville, 207 Greenville Boulevard, Southwest, Greenville, North Carolina, beginning at approximately 8:30 a.m., before Ann V. Kaufmann, a Registered Professional Reporter, Certified Realtime Reporter, Approved Reporter of the U.S. District Court, and a Notary Public of the Commonwealth of Pennsylvania.

------

GOLKOW LITIGATION TECHNOLOGIES
1600 John F. Kennedy Boulevard
Four Penn Center, Suite 1210
Philadelphia, Pennsylvania 19103
(877) DEPS.USA

**aquifer -- again, I have not been allowed to see the cores yet -- that aquifer exists at variable depths: on top of the hills at depths of 40 to 50 feet and it gets closer to the land surface as you approach the drainages to the north, south, east, and west. And at half a mile or so from the top of this hill, the water table or the top of this aquifer, the saturated parts of this aquifer may be 20 feet below the land surface.**

**And this aquifer extends potentially to great depth. This is a very thick geological formation called the Wissahickon. This is a late pre-Cambrian geological formation that has significant vertical thickness.**

**And I don't agree with an earlier -- the earlier concept that was put forward -- we certainly discussed this -- that there are no fractures below a certain depth. So this aquifer has the potential to extend to**

**significant depths below the land surface, so it underlies the entire area. And the saturated part of it is variable in depth, deeper beneath the land surface on the tops of hills and closer to the land surface near discharge areas.**

Q. Understood. What is your opinion, sir, in terms of the radius of effect of the claim or what the plaintiffs' claim was a leak at the Exxon station?

How far out radius-wise are you going to give an opinion should the -- as part of this class?

**A. Well --**

MR. SHELLENBERGER: I object as he has not completed that work at this time and I don't believe that he is in a position to give a complete and final radius.

But go ahead and ask to the extent that -- answer to the extent that you can.

THE WITNESS: Well, the plume is at least as large as shown on Exxon's consultant maps showing the 50 -- I think 50 and 100 microgram per liter dissolved plume south of the facility. I see no reason to assume that it's any smaller than that north of the facility.

But that's exactly what we're trying to determine at this time.

BY MR. ISHAK:

Q. What was that distance that you have preliminarily?

**A. I'd have to refer to the CSA, and I don't mind doing that.**

MR. STACK: The witness, so you know, Paul, is pulling the binder out. He is complying by trying to find the map.

If I could give you a helpful hint, Richard, I would, but I'm not sure I know exactly where that bad boy is.

THE WITNESS: Me, neither.

Yes, okay. I'm going to just refer you, because I talked about these minimal distances and these initial contouring efforts, and so what I'm referring to is Figure 22.

BY MR. ISHAK:

Q. Okay.

**A. Prepared on 3/21/05. This figure is called MTBE Distribution in the Upper Unit and Middle Lower Unit using Monitoring Wells, Domestic and POET Influent Results, January 2005.**

Q. Can you tell the distance?

**A. Yeah, I'm getting to it.**

**This map shows, with two different lines, a really pretty blue line, dashed line, indicated as estimated maximum extent of greater than 100 ppb in the upper unit.**

**And then in the almost mauve color, an estimated maximum greater of -- the estimated maximum extent of greater than 100 ppb in the middle lower unit, and so we show --**

**this map shows a greater extent in the lower unit than the upper unit and that extent is using the scale on the map. And I'm going estimate for you.**

Q. Sure.

A. **Now I want you to have this visual picture of me using my fingers as a scale.**

MR. STACK: Do you want to use a piece of paper?

THE WITNESS: No, I want to continue to use my fingers, because this distance is about a perfect map distance of 4 to 5 hundred feet out to the 100 ppb line.

And I just want to keep emphasizing that I think that that is beyond the minimum limit. That's an ultra-minimum extent of the nature and extent of contamination at this site, and that isoconcentration lines of 1, 5, 10, 20 would be a welcome addition to these kinds of studies, both south and north of the highway.

BY MR. ISHAK:

Q. So what was the distance, actually? Did you say 4 to 5 hundred feet?

A. **I said 4 to 5 hundred feet away from the approximate location, and it's very approximate, the approximate location of the tank pit to the south only. No such lines have ever been drawn to the north or I've not seen any such lines drawn to the north on maps.**

Q. In your --

MR. STACK: You broke up, Paul.

MR. ISHAK: Oh, I'm sorry.

BY MR. ISHAK:

Q. In your work with the State of North Carolina, have you ever dealt with Colonial Pipeline?

A. **No.**

Q. Not at all?

A. **No, not that I recall. Now, there might be an intermediate holding facility in the Greensboro area**

**for Colonial Pipeline where there are some above-ground tanks. It seems that I do recall that, now that you mention it.**

Q. Okay. The exhibit marked No. 2 that shows the houses with the various results on that, but when I look at that, I can't see anywhere on that exhibit the existence of the Colonial Pipeline as it travels through Harford County for the transmission of parcel property contaminated by Colonial Pipeline.

Is that of any significance to you, Doctor, that there's a transmission line and actually a transmission facility that actually appear on what is Exhibit 2?

A. **I think that the pipeline actually shows up on Figure 2. Did I hear you say you thought it didn't?**

Q. Where do you believe it is shown?

A. **It is shown as two parallel**

**lines on the western side of the figure, but I'm not sure that's it.**

**Obviously you can't see where I'm pointing, but this is a photocopy, obviously.**

Q. Right.

A. **Or maybe it's not on this figure. Maybe I'm wrong about that.**

**I have not emphasized the Colonial Pipeline because I find no evidence for leaks in this pressurized pipeline. You know, the petroleum in this thing is pressurized, that's how you transport it from one location to another. If a leak develops in it, I think people are going to know about it pretty soon.**

**And I find no evidence of any specific spots on the pipeline in this area in the literature that I have looked at that would indicate that that pipeline is leaking.**

**In addition, it is pretty far to the west of the -- of what I**

**EXHIBIT H**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:
Methyl Tertiary Butyl : MDL NO. 1358(SAS)
Ether ("MTBE") :
Products Liability :
Litigation :

------

Hope Koch, et al., :
:
vs. : No. 05-CV-05745 (SAS)
:
John R. Hicks, et al. :

------

MAY CONTAIN CONFIDENTIAL TESTIMONY

------

November 13, 2006

------

Videotaped Deposition of RICHARD SPRUILL, Ph.D., at the Hilton Greenville, 207 Greenville Boulevard, Southwest, Greenville, North Carolina, beginning at approximately 8:30 a.m., before Ann V. Kaufmann, a Registered Professional Reporter, Certified Realtime Reporter, Approved Reporter of the U.S. District Court, and a Notary Public of the Commonwealth of Pennsylvania.

------

GOLKOW LITIGATION TECHNOLOGIES
1600 John F. Kennedy Boulevard
Four Penn Center, Suite 1210
Philadelphia, Pennsylvania 19103
(877) DEPS.USA

complained prior to 2004 of the taste or odor of the water in their well?

A. **No.**

Q. As part of your work in this case did you perform any analysis to develop data to indicate how many residents living in the greater Fallston area around the Exxon station registered any subjective complaints about the quality of their well water before 2004?

A. **I didn't do any analysis.**

Q. Based upon the work that you did in preparing your affidavit, can you state an opinion to a reasonable degree of scientific certainty that greater than 40 of the residents living in the vicinity of the Fallston Crossroads Exxon had MTBE in their private wells greater than 10 parts per billion?

A. **You are going to have to repeat that question. I'm really sorry.**

Q. That's quite all right.

A. **I got off on a tangent.**

Q. That's quite all right.

A. **I've got to go back to the charts.**

Q. Sure.

A. **Go ahead.**

Q. Based on the work that you performed in this case, can you state an opinion to a reasonable degree of scientific certainty that greater than 40 residents in Fallston living in the vicinity of the Crossroads Exxon have MTBE in their private wells at concentrations greater than 10 parts per billion?

A. **Again, I've not done a synopsis like that in which I break out the number of people who were exposed to 1, 10, 20, 40 because that's not the way I think when I do groundwater hydrology.**

**My task has really not been -- I have not been directed to do that. I have not thought about doing that specifically, because I think that any concentration of this material is**

**onerous and should be dealt with. And so I simply have not compiled the kinds of subdivision of levels of contaminants that could have impacted or that have impacted individual homes, nor do I believe that every home in the area has been properly sampled.**

**There are places within the area that could be impacted by this contamination that have not been sampled. So I think we have an incomplete data set. And I'm certainly interested in looking at the completed data set in terms of impact, but I haven't spent any time at all, Mr. Stack, trying to subdivide the levels of contaminants that show up in these wells on the basis of ranges of concentrations.**

Q. With respect to the sampling that took place and is depicted on the map we marked as Exhibit No. 2, do you know how many homes depicted on that map had no sampling results

reported?

A. **Is this No. 2?**

Q. Yes, sir. I believe it is. I'm just making sure it doesn't slide and it started to. I apologize.

A. **How many homes in this area have no sampling results?**

Q. Correct.

A. **Large numbers.**

Q. And with respect to your comment that there are homes for which there's been insufficient sampling or no sampling, are there particular areas where you believe that sampling has not occurred and should occur in order to ascertain the extent of contamination in the area?

A. **Yeah, there are.**

Q. Can you identify them by street name in looking at that map?

A. **Well, I'd kind of do it as a broad brush here because something we're working on now is defining this, what I'd call this groundwater region.**

**I would look at homes in the vicinity of Choate, C-H-O-A-T-E, Road. I think that would be a very interesting area to see if there's contamination.**
**Further north on Baldwin Road I think there are some residences. I'd be concerned about them and maybe the lack of sampling there.**
**There are further homes west on Fallston Road and not far from Fallston Road in the vicinity of Rutledge Road that I think should be sampled.**
**It seems to me there are a fairly large number of homes in the Tally Ho Drive area, the Kelso Court area, and the Preakness Drive area that probably haven't been sampled. So I would say there's a pretty large number of homes in different quadrants that have not been sampled.**
Q. Have you ever attempted to estimate the number of homes in the

areas you have identified -- the Choate Road, Baldwin Road area north, west on Fallston Road near Rutledge Road, Tally Ho Drive, Kelso Court, and Preakness Drive -- the total number of homes which are within a mile and a half of the Exxon station but for which we have no sampling results?
**A. Did you ask me if I ever attempted to compile that number?**
Q. Just estimate it, yes, sir.
**A. I think that something we're working on is more defining the area where there could be further contamination; and sampling hasn't been performed, but that's an ongoing thing at GMA.**
Q. With respect to the work that you did prior to your affidavit, had you completed work at that time to ascertain how many homes within a mile and a half had not been sampled but should be sampled?

**A. No. But I had just a general opinion that not enough homes had been sampled in order to define the plume and write a comprehensive site assessment.**
Q. With respect to the work that you have undertaken after your affidavit was authored, can you estimate for us the number of homes which you believe lie within a mile and a half of the Exxon station but for which there's no sampling of the well to indicate whether MTBE is present?
**A. The number is tens of homes, but I do not know the exact number.**
Q. And with regard to the data that you had in front of you, I believe there are reported 134 homes which are nondetect; is that correct?
**A. It depends on which data set you look at. But the comprehensive May '04 to January '05 data set 134 out of 360 have nondetect.**

Q. Are there as many as 134 homes within a mile and a half of the Exxon station for which we have no test results?
**A. There very well may be.**
MR. STACK: I have been advised that we have about two minutes remaining on the tape, so we're going to take a break --
THE WITNESS: Good.
MR. STACK: -- to let the videographer change the tape and --
THE WITNESS: Can I run to the restroom?
MR. STACK: -- otherwise take care of Mother Nature.
THE WITNESS: Okay. I'm ready. Thank you.
THE VIDEOGRAPHER: That marks the end of Tape No. 2 of Richard Spruill, Ph.D. Going off the record. The time is 13:46.
(Recess.)
THE VIDEOGRAPHER: Back on

**EXHIBIT I**

VOLUME II

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:
Methyl Tertiary Butyl :MDL NO. 1358(SAS)
Ether ("MTBE") :
Products Liability :
Litigation :

------

Hope Koch, et al., :
:
vs. : No. 05-CV-05745
: (SAS)
John R. Hicks, et al.:

------

MAY CONTAIN CONFIDENTIAL TESTIMONY

------

November 14, 2006

------

Continued Videotaped Deposition of RICHARD K. SPRUILL, Ph.D., at the Hilton Greenville, 207 Greenville Boulevard, Southwest, Greenville, North Carolina, beginning at approximately 8:30 a.m., before Ann V. Kaufmann, a Registered Professional Reporter, Certified Realtime Reporter, Approved Reporter of the U.S. District Court, and a Notary Public of the Commonwealth of Pennsylvania.

------

GOLKOW LITIGATION TECHNOLOGIES
1600 John F. Kennedy Boulevard
Four Penn Center, Suite 1210
Philadelphia, Pennsylvania 19103
(877) DEPS.USA

**perceive to be some of the hot spots in the subsurface with respect to MTBE. And based on my knowledge of groundwater flow patterns at this time south of the highway and my evolving knowledge north of the highway, I don't see how contamination could emanate from this pipeline and affect the properties that we've been discussing for the last two days.**

Q. Okay. If I told you that the two parallel lines that you are looking at on Exhibit 2 isn't the actual --

**A. Yeah, I hedged on that because I didn't see it labeled as a pipeline, so I couldn't tell whether it is or not.**

Q. I would tell you, just for the sake of our questioning and answering, that that is not the Colonial Pipeline, that it actually goes in a different location.

**A. Okay.**

Q. But your answers remain the same? You just don't have any evidence of a Colonial Pipeline --

THE COURT REPORTER: Of a what -- I'm sorry. You are breaking up.

MR. STACK: The noise in the room is cutting out the mic, that's what it is.

BY MR. ISHAK:

Q. I will ask it again.

Doctor, I think that the parallel lines that appear on Exhibit 2, if I told you that is not where the Colonial Pipeline is, that doesn't necessarily matter to you because you don't have any evidence that there are any kind of leaks in the Colonial Pipeline; is that a fair assessment of where your opinion is?

**A. That's a fair assessment of my opinion.**

Q. And the presence of a gas transmission facility in Harford County that could appear on Exhibit 2, that

doesn't affect your opinion, either?

**A. If that particular gas line were parallel with Baldwin Mill Road and it has a history of documented release or something, I certainly would be interested in knowing.**

Q. Okay.

**A. But since it is west of this location and I can find no history that documents a release of product from this line, I won't say I'm not worried about it, but -- I will have concern about it, but until I can find data that suggests there is a release, I can't do much with it.**

Q. All right. If I told you that that facility is located along Rutledge Road, which I believe you indicated that you would like to see some further testing in that area, that you're indicating that might that change your opinions?

MR. SHELLENBERGER: Can you tell us where Rutledge Road is a

little --

MR. ISHAK: It's north of Fallston Road.

THE WITNESS: Rutledge Road is here. Here is Rutledge Road.

I'm still not convinced -- I'm not certain of whether or not that is the location of the pipeline. I suspect it is. There are two parallel lines right here, and so they are roughly in the position of Rutledge Road about 300 feet north of the intersection of Rutledge Road with Fallston Road.

And so I will stand by my statement that we need analyses of groundwater in these areas to the west, we need head measurements in these areas, we need to figure out which way groundwater is flowing and we need to see if any contamination that shows up in these locations is consistent with any known sources of contamination.

BY MR. ISHAK:

Q. Do you have an opinion at

**EXHIBIT J**

Click here for a plain text ADA compliant screen.

**Maryland Department of Assessments and Taxation**
**HARFORD COUNTY**
**Real Property Data Search**

Go Back
View Map
New Search
Ground Rent

**Account Identifier:** **District -** 04 **Account Number -** 076060

## Owner Information

**Owner Name:** COLUMBIA GAS TRANS CORP

**Mailing Address:** PO BOX 10146
FAIRFAX VA 22030-8046

**Use:** COMMERCIAL
**Principal Residence:** NO
**Deed Reference:** 1) / 1161/ 100
2) / 1161/ 103

## Location & Structure Information

**Premises Address**
2220 RUTLEDGE ROAD
FALLSTON 21047

**Legal Description**
LOT 1 29.468 AC
2220 RUTLEDGE ROAD
COLUMBIA GAS PT 77/5

| Map | Grid | Parcel | Sub District | Subdivision | Section | Block | Lot | Assessment Area | Plat No: 77005 |
|---|---|---|---|---|---|---|---|---|---|
| 39 | 3A | 28 | | | | | 1 | 1 | Plat Ref: |

**Special Tax Areas** **Town**
**Ad Valorem**
**Tax Class**

| Primary Structure Built | Enclosed Area | Property Land Area | County Use |
|---|---|---|---|
| 0000 | | 29.46 AC | |

| Stories | Basement | Type | Exterior |
|---|---|---|---|

## Value Information

| | Base Value | Value As Of 01/01/2004 | Phase-in Assessments As Of 07/01/2006 | As Of 07/01/2007 |
|---|---|---|---|---|
| **Land:** | 0 | 0 | | |
| **Improvements:** | 0 | 0 | | |
| **Total:** | 0 | 0 | 0 | NOT AVAIL |
| **Preferential Land:** | 0 | 0 | 0 | NOT AVAIL |

## Transfer Information

| | | | | | |
|---|---|---|---|---|---|
| **Seller:** RUTLEDGE CHARLES C ET AL | | **Date:** | 04/20/1982 | **Price:** | $115,000 |
| **Type:** IMPROVED ARMS-LENGTH | | **Deed1:** | / 1161/ 100 | **Deed2:** | / 1161/ 103 |
| **Seller:** | | **Date:** | | **Price:** | |
| **Type:** | | **Deed1:** | | **Deed2:** | |
| **Seller:** | | **Date:** | | **Price:** | |
| **Type:** | | **Deed1:** | | **Deed2:** | |

## Exemption Information

| Partial Exempt Assessments | Class | 07/01/2006 | 07/01/2007 |
|---|---|---|---|
| County | 000 | 0 | 0 |
| State | 000 | 0 | 0 |
| Municipal | 000 | 0 | 0 |

**Tax Exempt:** NO
**Exempt Class:**

**Special Tax Recapture:**

* NONE *

**Maryland Department of Assessments and Taxation**
**HARFORD COUNTY**
**Real Property Data Search**

**Go Back**
**View Map**
**New Search**

**District** - 04 **Account Number** - 076060

Property maps provided courtesy of the Maryland Department of Planning ©2004.
For more information on electronic mapping applications, visit the Maryland Department of Planning web site at www.mdp.state.md.us/webcom/index.html

