**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X
                  :

**IN RE: METHYL TERTIARY BUTYL**  :
**ETHER ("MTBE") PRODUCTS**     :
**LIABILITY LITIGATION**          :
-------------------------------------------------- :
                  :
**This document relates to:**     :
                  :
*County of Suffolk, et al. v. Amerada Hess*  :
*Corp. et al.*, 04 Civ. 5424        :
                  :
-------------------------------------------------- X



USDC
DF
ELECTRONICALLY
DOC #:
DATE FILED: 5/7/08

**OPINION AND ORDER**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

        In 2002, two plaintiffs – the Suffolk County Water Authority and the

County of Suffolk – sued various oil companies for their use and handling of the

gasoline additive methyl tertiary butyl ether ("MTBE"). According to plaintiffs,

MTBE has contaminated over one hundred and fifty groundwater wells that are

used to supply water to residents and businesses in Suffolk County. In October

2006, plaintiffs added a federal claim under the Toxic Substances Control Act

("TSCA")[1] against some of the defendants including Exxon Mobil Corporation

("ExxonMobil") and Lyondell Chemical Company ("Lyondell"). Plaintiffs allege

In Re: Methyl Tertiary Butyl Ether MTBE Products Liability Litigation          Doc. 1814

---

[1]     *See* 15 U.S.C. §§ 2601-2692.

-1-

that these defendants are in violation of section 8(e) of TSCA because they have failed to inform the Environmental Protection Agency ("EPA") of "information which reasonably supports the conclusion" that MTBE or releases of gasoline with MTBE into the environment present "a substantial risk of injury to health or the environment."[2]

In particular, plaintiffs have sued defendants to compel them to provide the EPA with four types of information: (1) notification whenever defendants know that a substantial amount of gasoline with MTBE has been spilled, leaked or otherwise released into the environment (*e.g.*, discovery of a leaking underground storage tank), (2) information generated once the release of gasoline is discovered (*e.g.*, the method and cost of remediation), (3) studies about MTBE's effect on the taste and odor of water, and (4) information that plaintiffs believe a reasonable manufacturer in the defendants' position would have generated to determine the potential liability for MTBE contamination of groundwater.

Defendants now move for summary judgment on the TSCA claim.[3]

---

[2]     *Id.* § 2607(e).

[3]     *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment on Plaintiffs' Claims Under The Toxic Substances Control Act ("Def. Mem.") at 1-25; Declaration of Lisa Gerson in Support of Defendants'

-2-

Defendants' motion is denied with one exception. Because plaintiffs have failed to submit any evidence that defendants have information about their potential liability from MTBE contamination of groundwater, summary judgment is granted against this part of plaintiffs' claim.

## II. LEGAL STANDARD ON SUMMARY JUDGMENT

Under Rule 56(b) of the Federal Rules of Civil Procedure, "[a] party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim."[4] Rule 56(c) states: "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[5]

The key issue on a summary judgment motion is whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6] In deciding the motion, the court must construe all evidence in the light

---

Motion for Summary Judgment of Plaintiffs' Claim Under The Toxic Substances Control Act ("Gerson Decl."); Defendants' Reply in Support of Their Motion for Summary Judgment on Plaintiffs' Claims Under The Toxic Substances Control ("Def. Reply") at 1-11.

[4]     Fed. R. Civ. P. 56(b).

[5]     Fed. R. Civ. P. 56(c).

[6]     *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

-3-

most favorable to the party opposing summary judgment.[7] However, if the evidence will not support a reasonable jury's verdict in favor of the nonmoving party, summary judgment must be entered. As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[8]

## III. BACKGROUND

### A. TSCA

Congress enacted Title I of TSCA in 1976[9] in the aftermath of several well-publicized events of environmental pollution including the contamination of the Hudson River and other waterways by polychlorinated biphenyls (commonly known as PCBs), the threat of ozone depletion by chlorofluorocarbons, and the

---

[7] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

[8] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[9] The original statute, Pub. L. No. 94-469, 90 Stat. 2003 (1976), is now referred to as Title I of TSCA because Congress has added three titles since 1976 to address asbestos, radon, and lead.

contamination of agricultural produce with polybrominated biphenyls.[10] These events, "together with more exact estimates of the costs of imposing toxic substances controls, opened the way for final passage of the legislation."[11]

In passing TSCA, Congress found that "human beings and the environment are being exposed each year to a large number of chemical substances."[12] Indeed, the Chemical Abstract Service has "indexed more than 30 million organic and inorganic chemicals, 12 million of which are in commerce worldwide, according to the Service."[13] Not surprisingly, Congress declared that some of these chemicals "present an unreasonable risk of injury to health or the environment" in the manner in which they are manufactured, processed,

---

[10]     *See* Linda-Jo Schlerow, *The Toxic Substances Control Act (TSCA): Implementation and New Challenges* at 1-2 (Congressional Research Serv. Aug. 3, 2007) ("Schlerow, TSCA Report").

[11]     *Id.* at 2. Of course, TSCA was also enacted as a result of heightened public concern about the effects of other industrial chemicals and pollution on the environment and human health. *See, e.g.*, Rachel Carson, *Silent Spring* (1962) (detailing the harmful properties of the pesticide DDT including its effects on wildlife bird reproduction and its role as a carcinogen in a book that is widely credited with launching the environmental movement in the United States).

[12]     15 U.S.C. § 2601(a)(1).

[13]     Schlerow, TSCA Report at 3 n.5 (citing data provided by Chemical Abstract Service as of February 16, 2007).

distributed, used, or disposed.[14]

TSCA established three policy goals for the United States in regulating chemical substances and mixtures:

(1)    adequate data should be developed with respect to the effect of chemical substances and mixtures on health and the environment and that the development of such data should be the responsibility of those who manufacture and those who process such chemical substances and mixtures;

(2)    adequate authority should exist to regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment, and to take action with respect to chemical substances and mixtures which are imminent hazards; and

(3)    authority over chemical substances and mixtures should be exercised in such a manner as not to impede unduly or create unnecessary economic barriers to technological innovation while fulfilling the primary purpose of this chapter to assure that such innovation and commerce in such chemical substances and mixtures do not present an unreasonable risk of injury to health or the environment.[15]

With these findings and policy goals in mind, Congress gave authority to the EPA

---

[14]    15 U.S.C. § 2601(a)(2). In addition, Congress found that the effective regulation of interstate commerce in toxic chemicals required federal regulation of intrastate commerce in these substances. *See id.* § 2601(a)(3).

[15]    *Id.* § 2601(b).

to regulate chemical substances and mixtures in the United States.[16]

In addition, TSCA allows citizens to bring "environmental citizen

suits" – that is, the statute allows private citizens to sue individuals and companies

for violating the statute. In particular, section 20 states:

> . . . any person may commence a civil action –
>
> (1) against any person . . . who is alleged to be in violation of this chapter . . . or
>
> (2) against the [EPA] Administrator to compel the Administrator to perform any act or duty under this chapter which is not discretionary.[17]

## B.    Section 8(e)

A key provision of TSCA is section 8(e). It states:

---

[16]    *See id.* § 2601(c) ("It is the intent of Congress that the Administrator [of the EPA] shall carry out this chapter in a reasonable and prudent manner, and that the Administrator [of the EPA] shall consider the environmental, economic, and social impact of any action the Administrator takes or proposes to take under this chapter.").

[17]    15 U.S.C. § 2619(a). In *Gwaltney v. Chesapeake Bay Found., Inc.,* 484 U.S. 49 (1987), the Supreme Court held that private plaintiffs may not sue on the basis of wholly past violations by defendants when Congress uses the phrase "to be in violation." *See id.* at 57. Rather, "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* While *Gwaltney* applied only to the Clean Water Act, the Supreme Court noted that "Congress used identical language in the citizen suit provisions of several other environmental statutes that authorize only prospective relief" including TSCA. *Id.* (citing, *inter alia*, 15 U.S.C. § 2619).

> Any person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the Administrator [of the EPA] of such information unless such person has actual knowledge that the Administrator has been adequately informed of such information.[18]

Section 8(e) helps fulfill Congress's goal that "those who manufacture and those who process such chemical substances and mixtures" should be responsible for the development of data about the risks that the chemicals pose to human beings and the environment.[19]

Section 8(e) is "self-implementing" – that is, the statute's requirements became effective without the EPA passing any regulations. Morever, the EPA has not engaged in any "formal adjudication or notice-and-comment rulemaking" involving section 8(e) that have "the force of

---

[18]    15 U.S.C. § 2607(e).

[19]    *Id.* § 2601(b). Section 15 of TSCA makes it unlawful for any person to "fail or refuse to . . . submit reports, notices, or other information" including any information that must be produced under section 8(e). *Id.* § 2614(3). In turn, "[a]ny person who violates a provision of section 2614 [*i.e.*, section 15] or 2689 of this title shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day such a violation continues shall, for purposes of this subsection, constitute a separate violation of section 2614 or 2689 of this title." *Id.* § 2615(a)(1).

-8-

law."[20]  However, the EPA has issued a non-binding "guidance document."[21]  "The

term 'guidance document' means an agency statement of general applicability and

future effect, other than a regulatory action . . . that sets forth a policy on a

statutory, regulatory or technical issue or an interpretation of a statutory or

regulatory issue."[22]

The EPA's current guidance document has undergone several

revisions.  The EPA first published "a proposed policy statement in the Federal

Register of September 9, 1977 (42 FR 45362), and sought public comment with

regard to the Agency's interpretation and implementation of section 8(e)."[23]  After

considering public comments, the "EPA issued a final TSCA section 8(e) policy

---

[20]     *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).  *See generally* 5 U.S.C. § 553 (setting forth rulemaking requirements under the Administrative Procedure Act).

[21]     *See* U.S. Envtl. Protection Agency, Notice:  TSCA Section 8(e); Notification of Substantial Risk; Policy Clarification and Reporting Guidance, 68 Fed. Reg. 33129, 33131 (June 2, 2003) ("EPA Section 8(e) Guidance").

[22]     Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432, 3,439 (Jan. 25, 2007).  *See also* Proposed Bulletin for Good Guidance Practices, 70 Fed. Reg. 71,866 (Nov. 30, 2005).

[23]     EPA Section 8(e) Guidance, 68 Fed. Reg. at 33131.  *See also* 5 U.S.C. § 552(a)(1) (requiring that administrative agencies "separately state and currently publish in the Federal Register . . . statements of general policy or interpretations of general applicability formulated and adopted by the agency").

statement" on March 16, 1978.[24] The EPA made further revisions to this guidance

document after considering public comments that were solicited in 1993 and

1995.[25] The EPA issued its final revisions to this guidance document on June 3,

2003, and republished "the policy statement in its entirety . . . including both those

portions of the policy statement that are revised and those portions that are not

affected by any revisions."[26]

In this guidance document, the EPA explains that it:

hopes and expects that this guidance will be useful to
manufacturers, including importers, processors, and distributers
[sic] of chemical substances in fulfilling their responsibilities
under section 8(e). *This guidance is not, however, a substitute for
rulemaking and it does not impose any binding requirements
upon either the regulated community or the Agency.* In any
particular set of circumstances, any person who has a question
about the applicability of section 8(e) to certain information is
welcome to contact EPA. In responding to such person, the
Agency will consider the guidance contained in this document,
but the guidance will not be determinative. It is also important to
point out that the guidance provided will not be unalterable, and
that the Agency may revise this guidance without notice or an
opportunity to comment. EPA has sought public comment on this
guidance so that it can ensure the utility of the guidance for the
intended audience. If it becomes necessary, the Agency will

---

[24]  EPA Section 8(e) Guidance, 68 Fed. Reg. at 33131.

[25]  *Id.* at 33130.

[26]  *Id.* at 33129.

-10-

revise this guidance.[27]

The guidance document also explains that the agency planned to take the following action in response to the comments given in 1995:

> ... the Agency stated that it would develop, in cooperation with interested parties, a "question and answer" (Q. and A.) document that would provide further detail and "real world" examples to further assist persons in fulfilling their section 8(e) reporting responsibilities as regards the revised guidance. The Agency stated that it intends to work with interested parties to prepare such a Q. and A. document, which EPA expects to have available several months from the issuance of the final reporting guidance. At that time, the Agency intends to post the Q. and A. document on the TSCA section 8(e) homepage (http://www.epa.gov/oppt/tsca8e). A copy may also be obtained from the contacts listed under FOR FURTHER INFORMATION CONTACT. As additional examples, or questions and answers are identified as being of potential value to share broadly, the Agency will refine this Q. and A. document.[28]

The EPA's website has twice updated its Q. and A. document – once in January 2005 and again in September 2006.[29]

## IV. PLAINTIFFS' TSCA CLAIM

Because TSCA requires plaintiffs to give sixty-days notice to the

---

[27]    *Id.* at 33130-31 (emphasis added).

[28]    *Id.* at 33133.

[29]    *See* http://www.epa.gov/oppt/tsca8e/pubs/frequentlyasked questionsfaqs.htm.

alleged violator and the EPA before a claim may be brought,[30] plaintiffs sent letters to ExxonMobil and Lyondell notifying them of their intent to bring a section 8(e) claim against them. These letters outline the basis for plaintiffs' section 8(e) claim.

## A.    Letter to ExxonMobil

On July 28, 2006, plaintiffs notified ExxonMobil of their intent to bring a claim against it for violations of section 8(e). The letter alleges that ExxonMobil is in violation of TSCA in three ways. *First*, "ExxonMobil owns gasoline service stations that utilize underground storage tanks, as well as tanks at refineries and terminals that store gasoline containing MTBE, in many States throughout the United States (the 'ExxonMobil Storage Facilities')."[31]  Plaintiffs contend that, on an annual basis, there have been a large number of releases of gasoline containing MTBE from these facilities into the environment and these releases have caused significant contamination of groundwater across the country. "Those contamination incidents themselves collectively pose a substantial risk of

---

[30]     *See* 15 U.S.C. § 2619(b)(2)(B); 40 C.F.R. §§ 702.60-702.62 (describing the procedures for giving notice of intent to file suit).

[31]     7/26/06 Letter from Counsel for Plaintiffs to ExxonMobil Corporation at 1, Ex. 1 to Gerson Decl.

injury to human health and the environment,"[32] and thus should have been reported to the EPA under section 8(e).

In support of this allegation, plaintiffs state that around August 4, 2000, ExxonMobil produced a document in a separate civil action "in which ExxonMobil identified MTBE remediation at 408 ExxonMobil service stations and petroleum marketing terminals in California, Maine, North Carolina, and New Jersey."[33] More recently, plaintiffs allege that ExxonMobil has knowledge about releases of gasoline containing MTBE at facilities in the following locations:

- Gary, Indiana (around 2002);

- Long Beach, New York (around February 2, 2002);

- Long Island, New York (around March 4, 2002);

- Jamaica, New York (around January 8, 2003);

- Floral Park, New York (around March 19, 2003);

- Manhasset, New York (around March 31, 2003);

- Chilton, Wisconsin (around November 18, 2003);

- San Diego, California (around April 12, 2004); and

---

[32]    *Id*.

[33]    *Id.*

-13-

- Marietta, Ohio (around April 19, 2004).[34]

According to plaintiffs, section 8(e) required ExxonMobil to notify the EPA immediately when it discovered that gasoline containing MTBE had been released at these sites.

*Second*, "ExxonMobil has obtained extensive information concerning the releases at or from the Release Notices sites, including efforts to remediate those releases (the 'Release Information')."[35] For example, "ExxonMobil conducted a study in 1999 to determine the extent and sources of MTBE contamination in soils and groundwater at selected ExxonMobil service stations in California and New Jersey."[36] This study "reviewed quarterly ground water sampling data from 71 ExxonMobil service stations in Northern California and 215 stations in New Jersey" and "revealed extensive MTBE contamination in ground water at those sites."[37] More recently, plaintiffs point to information that ExxonMobil generated about "the extent of MTBE contamination in soil and ground water" around a facility in Fallston, Maryland from 1991 to June 2004.

---

[34]   *See id.* at 1-2.

[35]   *Id.* at 2.

[36]   *Id.*

[37]   *Id.*

-14-

*Third*, plaintiffs contend that "a reasonable manufacturer and distributor of gasoline containing MTBE in ExxonMobil's position would on one or more occasions assess its potential liability for MTBE contamination of ground water utilized by the public within the United States . . . ."[38] Plaintiffs allege that "[i]n performing such an assessment, a reasonable manufacturer and distributor would analyze" information such as "its supply into the market of gasoline containing MTBE" as well as "information concerning the prevalence of MTBE contamination in relation to (1) the ground water resources utilized by the public for drinking water supply, (2) its storage facilities such as the ExxonMobil Storage Facilities, or (3) both . . . ."[39]

## B.    Letter to Lyondell

On August 4, 2006, plaintiffs notified Lyondell of their intent to bring a claim against it for violations of section 8(e). According to plaintiffs, the company is violating TSCA in three ways.[40] *First*, "Lyondell has obtained numerous studies and other information concerning the taste and odor effects of

---

[38]    *Id.*

[39]    *Id.*

[40]    *See* 8/4/06 Letter from Counsel for Plaintiffs to Lyondell Chemical Company, Ex. 1 to Gerson Decl.

-15-

MTBE in water and air (the 'Taste & Odor Information').["41] "In particular, the plaintiffs identified a taste and odor study commissioned by, among other companies, Lyondell Chemical's predecessor, Arco Chemical . . . .["42] This study was completed in 1993 by an organization now known as Campden & Chorleywood Research Association Group ("1993 Campden Study"). It reported that "the taste and odor of MTBE in drinking water could be detected even when the concentration of MTBE in water is less than 1 part per billion.["43]

In addition, plaintiffs point out that Lyondell has other "reports" or "accounts" on which it has relied but failed to produce to the EPA. For example:

> in its Material Safety Data Sheets ('MSDSs') for MTBE with validation dates of September 16, 2005, and January 17, 2003, Lyondell stated that the odor/taste threshold in water has been *reported to be* less than 5 ppb . . . .[44]

Likewise, in a "Product Safety Bulletin" for MTBE, which was published around January 17, 2003, Lyondell stated that

> small amounts (*by some accounts*) in the below one part per billion range of MTBE or gasoline blended with MTBE may

---

[41]    *Id.* at 2.

[42]    Pl. Mem. at 5.

[43]    *Id.*

[44]    8/4/06 Letter from Counsel for Plaintiffs to Lyondell Chemical Company at 2 (emphasis in original).

-16-

> impart an unpleasant and distasteful odor and taste to
> groundwater which can render such groundwater unsuitable for
> consumption . . . .[45]

Plaintiffs contend that section 8(e) requires Lyondell to produce any such reports
to the EPA.

*Second*, "Lyondell has been informed by manufacturers, processors or
distributors" about incidents where gasoline containing MTBE has been released
into the environment at facilities owned or operated by those entities that required
remediation.[46] In support of this allegation, plaintiffs rely on a memo written in
1987 by George Yogis, the former Manager of Business Development for Arco
Chemical. In the memo, Yogis documented a telephone conversation with an
individual from Chevron who told him that Chevron "was at that time cleaning up
ground water contaminated with MTBE in 3 states, Florida, Maryland, and
Texas."[47] The memo also "described various technical impediments to cleaning up
MTBE in ground water versus conventional gasoline."[48]

*Third*, plaintiffs contend that "a reasonable manufacturer and

---

[45]    *Id.* (quotation marks omitted) (emphasis in original).

[46]    *Id.*

[47]    *Id.*

[48]    *Id.*

-17-

distributor of MTBE in Lyondell's position" would have assessed its potential

liability for MTBE contamination of groundwater. Plaintiffs allege:

> In performing such an assessment, a reasonable manufacturer and distributor would analyze, among other types of information such as its supply into the market of MTBE, information concerning the prevalence of MTBE contamination in relation to the ground water resources utilized by the public for drinking water supply . . . .[49]

## V.    THE BURDEN OF PROOF UNDER SECTION 8(e)

Before addressing defendants' summary judgment motion, a threshold

issue regarding the burden of proof must be addressed.[50]   Plaintiffs argue that,

once they have demonstrated that the information should be reported to the EPA

under section 8(e), "a defendant, not the plaintiff, should bear the burden of proof

regarding whether the EPA is adequately informed of the information at issue."[51]

---

[49]    *Id.*

[50]    When I refer to "burden of proof," I am only referring to the "burden of persuasion." *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("We note at the outset that this case concerns only the burden of persuasion, as the parties agree, and when we speak of burden of proof in this opinion, it is this to which we refer.") (citations removed); *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 272 (1994) (discussing the fact that "burden of proof" may be  ambiguous because it has historically referred to two distinct burdens – the "burden of persuasion," and the "burden of production").

[51]    Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Claims Under the Toxic Substances Control

-18-

While defendants do not squarely address this argument, they have stated that plaintiffs "needed to show that Lyondell currently possesses more or different information concerning MTBE than does [the] EPA."[52]

Like many statutes, section 8(e) is silent about the allocation of the burden of proof.[53] While I "begin with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims,"[54] there are three reasons that, once plaintiffs prove that defendants have withheld information from the EPA, defendants bear the burden of persuasion in showing that they had "actual knowledge" that the EPA was already "adequately informed."

---

Act ("Pl. Mem.") at 13. *See also id.* at 13-15.

[52]    Def. Reply at 5 (citing 15 U.S.C. § 2619(a)(1)). In their initial memorandum, defendants take the position that plaintiffs bear the burden of persuasion for all the elements of the TSCA claim. *See* Def. Mem. at 11 ("Both the law and . . . record evidence in this case establish that Plaintiffs cannot meet their burden of proof on their TSCA 8(e) claim.").

[53]    Congress occasionally states which party bears the burden of persuasion. *See, e.g.*, 15 U.S.C. § 78u-4(b)(4) (stating that in an action arising under the Securities Exchange Act, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). Congress also occasionally specifies the burden that must be satisfied. *See, e.g.*, 42 U.S.C. § 247d-6d (stating that under the Public Readiness and Emergency Preparedness Act "the plaintiff shall have the burden of proving by clear and convincing evidence willful misconduct by each covered person sued . . . .").

[54]    *Schaffer*, 546 U.S. at 56 (citing 2 John W. Strong, *McCormick on Evidence* § 337, at 412 (5th ed. 1999).

*First*, when courts are "determining the burden of proof under a statutory cause of action, the touchstone of our inquiry is, of course, the statute."[55] The most natural reading of section 8(e) is that it establishes a requirement for "[a]ny person who manufactures, processes, or distributes [various chemicals]"[56] and proof that a defendant violated this requirement may be rebutted with a defense. The requirement is straightforward: If a regulated company has "information which reasonably supports the conclusion" that a chemical or a chemical mixture "presents a substantial risk of injury to health or the environment," then the company must "immediately inform" the EPA about such information.[57] The defense is equally clear: the regulated company will not be liable if it had "actual knowledge" that the EPA has "been adequately informed of such information."[58]

*Second*, the "default rule is, however, just that, and [courts] may depart from it when considerations of fairness, convenience, or probability so

---

[55] *Id.*

[56] 15 U.S.C. § 2607(e).

[57] *Id.*

[58] *Id.*

-20-

require."[59]  The fact is that companies have much better, if not exclusive, access to

evidence showing how they had "actual knowledge" that the EPA was already

"adequately informed."[60]  Indeed, because a corporation's knowledge may only be

proved by showing the state of mind of one or more of its employees, it would be

unfair and inefficient to require plaintiffs to show that none of the employees had

actual knowledge about whether the EPA was adequately informed.  For example,

a company such as ExxonMobil may have over a hundred thousand employees.  It

is far simpler, and more efficient, to put the burden on the defendant to show

which employees had actual knowledge that the EPA was already adequately

informed about the withheld information.[61]

---

[59]     *Thompson v. Drug Enforcement Admin.*, 492 F.3d 428, 434 (D.C. Cir.
2007).  *Accord Keyes v. School Dist. No. 1*, 413 U.S. 189, 209 (1973) ("There are
no hard-and-fast standards governing the allocation of the burden of proof in every
situation. The issue, rather, 'is merely a question of policy and fairness based on
experience in the different situations.'") (quoting 9 John H. Wigmore, *Evidence* §
2486, at 275 (3d ed. 1940)); Fleming James, Jr., "Burdens of Proof," 47 *Va. L.
Rev.* 51, 66 (1961) (explaining that in civil cases "[a]ccess to evidence is often the
basis for creating a [burden-shifting] presumption" on the grounds of convenience,
fairness, and public policy).

[60]     *See* 10 Charles Alan Wright & Arthur R. Miller, *Federal Practice &
Procedure* § 2730 (3d ed. 2004) ("information relating to state of mind generally
is within the exclusive knowledge of one of the litigants . . . .").

[61]     *See Metzl v. Leininger*, 57 F.3d 618 (7th Cir. 1995) ("Economy in
litigation also requires that burdens of presenting evidence be assigned to the
parties that can produce the necessary evidence at least cost.") (Posner, J.).

-21-

*Third*, placing the burden of persuasion on the defendant for this aspect of the claim nonetheless requires the plaintiffs to "bear the burden of persuasion regarding the *essential aspects* of their claims."[62] The essential aspect of plaintiffs' section 8(e) claim involves proving that defendants have information that should be provided to the EPA. Requiring defendants to prove an element that is properly characterized as an affirmative defense or exemption does not depart significantly from the ordinary rule that requires plaintiffs to prove their claim.[63]

## VI.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Under section 8(e), two questions must be resolved by the jury in this case. *First*, have the plaintiffs proven by a preponderance of the evidence that defendants "obtain[ed] information which reasonably supports the conclusion that such substance or mixture [i.e., MTBE or gasoline with MTBE] presents a

---

[62]     *Schaffer,* 546 U.S. at 57 (emphasis added).

[63]     *Id.* ("the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or exemptions") (citing *FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948)). For example, in *Keyes*, the Supreme Court held that where "school authorities have been found to have practiced purposeful segregation in part of a school system," the burden of proof shifts to the school district to demonstrate that it did not engage in such discrimination in other schools in the same system. 413 U.S. at 209.

substantial risk of injury to health or the environment?"[64] *Second*, if so, have the

defendants proven by a preponderance of the evidence that they had "actual

knowledge that the [EPA] Administrator has been adequately informed of such

information?"[65] Because a reasonable jury could answer these questions in favor

of the plaintiffs, summary judgment is denied.

## A. Section 8(e) Requires Defendants to Inform the EPA of the Requested Information

Defendants make four arguments as to why section 8(e) does not

apply to the information requested by plaintiffs. Defendants' first argument only

applies to the "release information" (*i.e.*, notification about the releases of gasoline

with MTBE and information about the clean-ups). Defendants argue that "the

release information for which Plaintiffs seek to compel disclosure to [the] EPA is

excepted from such disclosure by federal law, including the very statute (TSCA)

that Plaintiffs seek to enforce here."[66] In support of this argument, defendants cite

– but do not quote or discuss – the 2003 guidance document on section 8(e)

---

[64]    15 U.S.C. § 2607(e).

[65]    *Id.*

[66]    Def. Mem. at 12. *See also id.* (the "gasoline release information that
Plaintiffs contend ExxonMobil should have disclosed to [the] EPA is not
reportable under federal law, including TSCA § 8(e)"); Reply Mem. at 2 n.3.

published by the EPA.[67] "Likewise," defendants argue, the "EPA's regulations implementing the UST [*i.e.*, Underground Storage Tank] provisions of the Resource Conservation and Recovery Act direct companies that own or operate service stations to report releases to state agencies, not to [the] EPA."[68]

These arguments, however, ignore the plain language of TSCA. Whether information should be reported under section 8(e) depends on whether the information "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment . . . ."[69] TSCA broadly defines "environment" to include "water, air, and land and the interrelationship which exists among and between water, air, and land and all living things."[70] A reasonable jury could easily find that spills, leaks or releases of gasoline containing MTBE present a "substantial risk of injury" to "water" as well as "all living things" and must be reported to the EPA.

The 2003 guidance document cited by defendants discusses in vague

---

[67] *See* Def. Mem. at 12 (citing EPA Section 8(e) Guidance, 68 Fed. Reg. at 33138).

[68] *Id.* (citing 40 C.F.R. § 280.50).

[69] *Id.* § 2607(e).

[70] *Id.* § 2602(5).

terms what constitutes a "substantial risk of injury to health or the environment."[71]

For example, it states:

> A "substantial risk of injury to health or the environment" is a risk of considerable concern because of (a) the seriousness of the effect (see subparts (a), (b), and (c) of this part for an illustrative list of effects of concern), and (b) the fact or probability of its occurrence. (Economic or social benefits of use, or costs of restricting use, are not to be considered in determining whether a risk is "substantial.")  These two criteria are differentially weighted for different types of effects.  The human health effects listed in subpart (a) of this part, for example, are so serious that relatively little weight is given to exposure . . . .[72]

Nothing in EPA's guidance document supports defendants' argument that TSCA *exempts* companies from reporting releases of gasoline containing MTBE to the EPA.

Likewise, it is misleading to rely on regulations passed under the Resource Conservation and Recovery Act ("RCRA") for the argument that releases of gasoline are exempted from being reported to the EPA under TSCA's reporting requirements.[73]  Congress often passes multiple statutes that regulate the

---

[71]    *Id.* § 2607(e).

[72]    EPA Section 8(e) Guidance, 68 Fed. Reg. at 33138 (quoting 15 U.S.C. § 2607(e)).

[73]    Of course, regulations passed by the EPA under RCRA may help companies and others satisfy the requirements of TSCA because, by complying with such regulations, the EPA becomes "adequately informed."  I discuss this

same companies or information in different ways. For example, financial institutions may need to comply with, *inter alia*, the Securities Exchange Act[74] and the Commodity Exchange Act.[75] But courts do not look to regulations passed under the former to interpret statutory requirements imposed by the latter.

A court is not permitted to eliminate the requirements of various statutes in order to impose a grand design on the regulatory structure. Rather, a court is required to apply the various statutes as they are written. A release of chemicals into the environment may trigger not only the reporting requirements of TSCA and RCRA but also (depending on the type of chemical, location of the release, and other factors) the following statutes:

- Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA);

- Emergency Planning and Community Right-to-Know Act (EPCRA);

---

issue below in section VI.B.

[74]   15 U.S.C. §§ 78a *et seq.*

[75]   7 U.S.C. § 1 *et seq. See generally* Jerry W. Markham, "Banking Regulation: Its History and Future," 4 *N.C. Banking Inst.* 221, 221 (2000) ("The current regulatory structure for banking services in the United States is not the result of any grand design or reasoned blueprint. Instead, it represents a set of accumulated responses to a long history of financial crises, scandals, happenstance, personalities and compromises among a broad and competing array of industry and governmental units.").

- Natural Gas Pipeline Safety Act (NGPSA);

- Outer Continental Shelf Lands Act (OCSLA);

- Hazardous Materials Transportation Act (HMTA);

- Clean Air Act (CAA); and

- Clean Water Act (CWA).[76]

Regulations enacted under RCRA, or any other statute, are irrelevant to a determination of whether defendants have "obtain[ed] information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment."[77]

Defendants' second argument only applies to the various studies that have been conducted about the effects of MTBE on the taste and odor of water that defendants have obtained. Defendants argue that "MTBE taste and odor studies fall well outside the purview of section 8(e) because the ability to taste and smell MTBE in water is not health-related, or an indicia of serious toxicity or

---

[76] *See* James A. Bruen, *Summary of Major Release Reporting Requirements*, SM092 ALI-ABA 1053 (ALI-ABA Course of Study, June 27-30, 2007).

[77] 15 U.S.C. § 2607(e).

ecological harm."[78]  TSCA does not define what constitutes an "injury" to the water but common sense dictates that otherwise potable water is injured when it is given a turpentine-like taste and odor and rendered unfit for human consumption.

Defendants' third argument only applies to one of the MTBE studies – the "Taste and Odor Threshold Report" by Campden Food & Drink Research Association for Arco.  Defendants argue that "Lyondell was not required to report Campden (1993) because it is an invalid and scientifically unreliable study.  A manufacturer's belief that a study is 'low quality' is a 'valid basis for withholding reports' under Section 8(e)."[79]  The only support cited by defendants is a footnote from an article published in the *American Journal of Law and Medicine*, which states the "EPA also warns that the manufacturer need not wait for corroborating evidence, but implies [in the 2003 EPA guidance document] that not reporting if a manufacturer believes the information is low quality is a valid basis for withholding reports."[80]

---

[78]     Def. Mem. at 21 n.6.

[79]     *Id.* at 23 (quoting Wendy Wagner & David Michaels, "Equal Treatment for Regulatory Science:  Extending the Controls Governing the Quality of Public Research to Private Research," 30 *Am. J.L. & Med.* 119, 144 n.149 (2004)) ("Wagner & Michaels, Equal Treatment for Regulatory Science").

[80]     Wagner & Michaels, Equal Treatment for Regulatory Science, 30 *Am. J.L. & Med.* at 144 n.149 (citing EPA Section 8(e) Guidance, 68 Fed. Reg. at

-28-

Once again, this argument ignores section 8(e). Information must be reported to the EPA if it "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment."[81] Under the plain language of the statute, a manufacturer's "belief" about the quality of a study plays no role in determining whether it should have been reported. The only question is whether the study "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment."[82]

Defendants may argue to the jury that a particular study does not "reasonably support" the conclusion that MTBE harms groundwater because it was a poorly designed or executed study. And, in making this argument, defendants may well explain to the jury why they did not believe that the study "reasonably supported" this conclusion when they obtained it. But these arguments are a far cry from contending that defendant's subjective state of mind should determine whether it violated the statute.

An analogy illustrates this point. Negligence may be defined as the

33,138-39).

[81]     15 U.S.C. § 2607(e).

[82]     15 U.S.C. § 2607(e).

-29-

failure to use that degree of care which a "reasonably prudent" person would use under similar circumstances. Thus, defendants in negligence actions may explain to the jury the facts underlying their subjective belief that they acted in a "reasonably prudent" fashion. But the defendant's state of mind plays no role in determining whether they violated the law – *i.e.*, whether they, in fact, acted as a reasonably prudent person. Likewise, in this case, defendants may explain to the jury why they did believed that particular information should not be reported to the EPA and the jury may well agree – but defendants may not contend that their subjective belief absolves them of liability for failing to reporting.

Defendants' fourth argument only applies to information that they may have generated as a result of determining potential liability for MTBE contamination of groundwater. Defendants contend that plaintiffs have not offered any evidence that defendants have such information.[83] Defendants are correct. While the allegations that a reasonable manufacturer in the defendants' position would have determined the potential liability for MTBE contamination of groundwater may have been sufficient to survive a motion to dismiss under Rule

---

[83]    *See* Def. Mem. at 5 ("Plaintiffs' allegation about litigation-related 'assessments' or 'Proximity Information,' as referenced in the Notice Letter to ExxonMobil, are merely hypothetical. Plaintiffs identified no evidence to support their claim.").

12(b)(6),[84] and thus entitled plaintiffs to discovery, the allegations are not sufficient to survive a summary judgment motion under Rule 56.

At this stage, plaintiffs must present evidence that would allow a reasonable jury to return a verdict in their favor.[85] Plaintiffs have presented no evidence that defendants determined their potential liability for MTBE groundwater contamination. Summary judgment as to this aspect of plaintiffs' TSCA claim is therefore granted.

## B.    The EPA Has Not Been "Adequately Informed"

Defendants make two arguments in contending that the EPA has already "been adequately informed" of the requested information. Their first argument is that "*as a matter of law* this [release information] is considered 'known to the [EPA] Administrator' – and thus excepted from disclosure under Section 8(e) – because it is reported to *state environmental agencies*."[86] The problem with this argument is obvious: section 8(e) does not mention state agencies but instead requires the defendants to produce such information to the

---

[84]    *See Bell Atl. Corp. v. Twombly*, – U.S. – , 127 S. Ct. 1955, 1975 (2007) (holding that to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility").

[85]    *See Anderson*, 477 U.S. at 248.

[86]    Def. Mem. at 12 (emphasis added).

-31-

Administrator of the EPA unless they have "actual knowledge that the

Administrator has been adequately informed of such information."[87]

Nonetheless, defendants argue that providing information to a state

agency satisfies section 8(e) – as a matter of law – because the Q. and A.

document posted on the EPA's website states:

> Q.10. EPA manages the Underground Storage Tank (UST) program (40 CFR Part 280) by approving state programs to operate in lieu of the Federal program. Some state programs are approved by the Agency and some are operating under a "Memorandum of Agreement" with EPA. Is reporting to a state UST program operating under either of these conditions considered "known to the Administrator"?
>
> A.10. Yes. All information submitted to states under an UST program approved by or operating under a "Memorandum of Agreement" with EPA is considered "known to the (EPA) Administrator". Such information does not need to be reported under TSCA §8(e), as long as it is reported within the timeframes stated in Part VII.(d) of the June 3, 2003, Reporting Guidance (i.e., within 90 days for non-emergency contamination situations; immediately for emergency incidents of environmental contamination; and within 30 days for other substantial risk information).[88]

According to defendants, this statement should receive deference under *Chevron*

---

[87]     15 U.S.C. § 2607(e).

[88]     http://www.epa.gov/oppt/tsca8e/pubs/frequentlyasked questionsfaqs.htm.

*U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*[89] a case in which the

Supreme Court held that courts should defer to a reasonable interpretation of a

statute offered by an agency if the statute is ambiguous or silent about that issue.[90]

    *Chevron* deference does not apply here for two reasons. The first

reason is that the website's Q. and A. does not have any "force of law." As the

Supreme Court explained in *United States v. Mead Corp.*:

> administrative implementation of a particular statutory provision
> qualifies for *Chevron* deference when it appears that Congress
> delegated authority to the agency generally to make rules carrying
> the force of law, and that the agency interpretation claiming
> deference was promulgated in the exercise of that authority.
> Delegation of such authority may be shown in a variety of ways,
> as by an agency's power to engage in adjudication or
> notice-and-comment rulemaking, or by some other indication of
> a comparable congressional intent. [91]

The Q. and A. document does not have any such authority.[92] In fact, the 2003

---

[89]    467 U.S. 837 (1984).

[90]    *See* Def. Mem. at 13 n.5 (citing *Chevron*).

[91]    533 U.S. 218, 226-27 (2001).

[92]    *See Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (explaining that "[t]o begin with, the rule must be promulgated pursuant to authority Congress has delegated to the official" and holding that an interpretive ruling by the Attorney General is not entitled to *Chevron* deference because there was no general grant of rulemaking authority to the Attorney General). *See generally* Cass R. Sunstein, "Chevron Step Zero," 92 *Va. L. Rev.* 187, 191 (2006) (discussing "Chevron Step Zero–the initial inquiry into whether the Chevron framework applies at all").

guidance document does not even have the force of law. As that document

explains: "This guidance is not, however, a substitute for rulemaking and it does

not impose any binding requirements upon either the regulated community or the

Agency."[93]

The EPA's Q. and A. simply falls within a wide range of documents

that are published by agencies that may be considered for their "power to

persuade" when a court interprets a statute.[94] Such documents fall into the

category of "nonlegislative rules" and may include, for example, staff manuals,

inspection manuals, opinion letters, unpublished non-binding opinions, press

releases, amicus briefs, advisories and bulletins.[95] As the Supreme Court

explained in *Skidmore*:

> The weight of such a judgment in a particular case will depend
> upon the thoroughness evident in its consideration, the validity of
> its reasoning, its consistency with earlier and later
> pronouncements, and all those factors which give it power to

[93]    EPA Section 8(e) Guidance, 68 Fed. Reg. at 33130-31.

[94]    *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

[95]    *See generally* William Funk, "A Primer on Nonlegislative Rules," 53
*Admin. L. Rev.* 1321 (2001); Peter L. Strauss, "Publication Rules in the
Rulemaking Spectrum: Assuring Proper Respect for an Essential Element," 53
*Admin. L. Rev.* 803, 803-05 (2001); Robert A. Anthony, "Interpretive Rules,
Policy Statements, Guidances, Manuals, and the Like–Should Federal Agencies
Use Them to Bind the Public?," 41 *Duke L.J.* 1311, 1327-55 (1992).

persuade, if lacking power to control.[96]

In this case, the Q. and A. is not entitled to any weight under *Skidmore* as it pays no attention to the language of section 8(e) and there is no "thoroughness evident in its consideration."[97] Moreover, its reasoning is clearly flawed as it relies on a regulation passed under another statute, RCRA, that has no bearing on determining TSCA's requirements.[98]

The second reason that *Chevron* deference does not apply to the Q. and A. document is that a court may only defer to the agency's interpretation when the statute is ambiguous or silent about that particular issue.[99] But section 8(e) is clear that the company "shall immediately inform *the Administrator* of such information unless such person has actual knowledge that *the Administrator* has

---

[96]   *Skidmore*, 323 U.S. at 140.

[97]   *Id.* In contrast, the 2003 guidance document properly pays attention to the language of the statute when responding to the fact that "commenters would have EPA expand the reporting exemption by including any Federal, State, or local reporting requirements." EPA Section 8(e) Guidance, 68 Fed. Reg. at 33134. In response, the document recognizes that "[t]he issue of expanding the reporting authorities is problematic because of the statutory language in section 8(e)." *Id.*

[98]   *See* Section VI.A. *supra*.

[99]   *See Chevron*, 467 U.S. at 842-43 ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

-35-

been adequately informed of such information."[100] According to the statute, the "term 'Administrator' means the Administrator of the Environmental Protection Agency."[101] Congress has spoken directly on this issue: it is the Administrator – not state agencies – that must be informed under TSCA.[102]

Of course, the EPA may coordinate with the state agencies and share information so as to lighten the burden on regulated companies. For example, once a company informs a state agency of certain information, that state agency may then inform the EPA or *vice versa*. Such coordination would satisfy the statute because the Administrator would – in fact – be informed. Yet, on their summary judgment motion defendants have not argued that such coordination takes place or presented any evidence that the EPA is informed once defendants sent particular information to a state agency (*e.g.*, the New York State Department

---

[100]    15 U.S.C. § 2607(e) (emphasis added).

[101]    *Id.* § 2602(1). *See also id.* § 2601(c) ("It is the intent of Congress that *the Administrator* shall carry out this chapter in a reasonable and prudent manner, and that *the Administrator* shall consider the environmental, economic, and social impact of any action the Administrator takes or proposes to take under this chapter.") (emphasis added).

[102]    Defendants also briefly contend that "[w]hatever harm Plaintiffs may have suffered has ended" because they are now aware of the information (*e.g.*, it has been produced during discovery). Def. Mem. at 25. This argument fails for the simple reason that the issue under section 8(e) is whether *the EPA* has been informed.

of Environmental Conservation).[103]  Rather, they have argued that informing the state agency satisfies TSCA "as a matter of law."  Given the plain language of the TSCA, this argument must fail.

Defendants' second argument that the EPA has already "been adequately informed" of the requested information only applies to studies about the effect of MTBE on the taste and odor of water.  Defendants contend that the EPA already has access to studies on MTBE's effect on the taste and odor of water and thus the agency has been adequately informed.[104]  According to defendants, the "EPA's very own documents confirm that it has been fully aware of MTBE's taste and odor characteristics for years."[105]

However, documents such as the 1993 Campden Study are substantially different from the studies that the EPA has previously relied upon. The 1993 Campden Study concluded that MTBE may affect the taste and odor of

___

[103]     If evidence of coordination between state agencies and the EPA exists, defendants may present it at trial.  It is worth emphasizing that plaintiffs have sued defendants to produce information related to gasoline releases not just in New York but across the country.  Plaintiffs have included examples of such releases that occurred in California, Indiana, Maine, New Jersey, North Carolina, Ohio, and Wisconsin.

[104]     *See* Def. Mem. at 8-9.

[105]     *Id.* at 22.

-37-

drinking water at concentrations below one part per billion. As plaintiffs argue:

> By way of contrast, the EPA's 1997 drinking water advisory
> regarding MTBE cited by defendants states the lower ends of the
> range for both taste and odor are the lowest concentrations elicit
> a response in a 1996 study . . . where the mean [threshold for]
> taste was 48 parts per billion, and 34 parts per billion.[106]

In 1997, the EPA also stated "that the taste and odor responses reported in

observed individuals for MTBE are in the 15-180 parts per billion range for odor,

and in the 24 to 135 parts per billion range for taste."[107] There is nothing in the

record to indicate that the EPA had received any information about studies or

reports that concluded that MTBE concentrations as low as one part per billion

could affect the taste and odor of water.[108]

## VII. CONCLUSION

For the reasons discussed above, defendants' motion for summary

judgment on Plaintiffs' TSCA claim is denied to the extent that the claim is based

on (1) notice about releases of gasoline with MTBE into the environment, (2)

information generated once the gasoline release has been discovered, and (3)

---

[106]   Pl. Mem. at 6.

[107]   *Id.* at 15.

[108]   *See* 8/4/06 Letter from Counsel for Plaintiffs to Lyondell Chemical
Company at 2.

studies about MTBE's effect on the taste and odor of water. However, summary judgment is granted with respect to any information that plaintiffs believe a reasonable manufacturer would have generated to determine the potential liability for MTBE contamination of groundwater.

The Clerk of the Court is directed to close this motion (docket # 1660).

SO ORDERED:

Dated:    New York, New York
           May 7, 2008

Shira A. Scheindlin
U.S.D.J.

## -Appearances-

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York  10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York  10020
Tel: (212) 547-5583
Fax: (212) 547-5444