UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X
: 

IN RE: METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

------------------------------------------------- :

This document relates to:

*County of Suffolk, et al. v. Amerada Hess
Corp. et al.*, 04 Civ. 5424

*United Water New York Inc. v. Amerada
Hess Corp., et al.*, 04 Civ. 2389

------------------------------------------------- X



**OPINION AND ORDER**

**Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation Plaintiffs County of Suffolk, Suffolk County Water Authority, and Doc. 1815

United Water New York allege that defendants' use and handling of the gasoline

additive methyl tertiary butyl ether ("MTBE") has resulted in contamination and

threatened future contamination of groundwater from which they supply water for

drinking and other uses to customers in Suffolk and Rockland Counties, New

York.  The cases are part of a consolidated multi-district litigation regarding water

contaminated with MTBE, which oil companies added to gasoline as an oxygenate

to meet emissions requirements under the Clean Air Act ("CAA") of 1990.

In their complaints, plaintiffs assert claims for (1) public nuisance; (2) strict liability for design defect and/or defective product; (3) failure to warn; (4) negligence; (5) private nuisance; (6) trespass; (7) deceptive business acts and practices in violation of New York General Business Law § 349; and (8) violation of New York Navigation Law § 170.[1]

To prove their product liability claims, plaintiffs rely heavily on expert testimony, including two witnesses who are experts on the ethanol industry. The first is Robert Reynolds, a consultant to the government and the petroleum industry specializing in the use of fuel oxygenates, particularly ethanol. Reynolds analyzes the logistics of producing, transporting, and blending ethanol into gasoline and concludes that ethanol was a viable alternative to MTBE at all relevant times, because ethanol production capacity could have expanded to meet national demand under CAA requirements.

The second is T. Jack Huggins, a former CEO of Pekin Energy Company ("Pekin"), former chair of the Renewable Fuels Association, and now a consultant on ethanol plant development. His testimony is also offered to show

---

[1]    *See* Fourth Amended Complaint, *County of Suffolk, et al. v. Amerada Hess Corp. et al.*, 04 Civ. 5424 ("Suffolk Compl.") ¶¶ 205-260; Second Amended Complaint, *United Water New York Inc. v. Amerada Hess Corp., et al.*, 04 Civ. 2389 ("United Water Compl.") ¶¶ 202-257.

2

that ethanol production could have expanded. He reaches his conclusion based on an analysis of the financing of new plant development and the contracts that ethanol producers would have needed to expand production capacity.

Defendants now bring two motions *in limine* seeking to exclude that portion of Reynolds' testimony that requires economic analysis or forecasting, and all of Huggins' testimony.[2] For the reasons set forth below, defendants' motions are denied.

## II.  BACKGROUND

### A.  The Clean Air Act of 1990 and Reformulated Gasoline

Some background on the Reformulated Gasoline ("RFG") Program and the beginning of widespread MTBE use in gasoline is needed to understand the purpose of Reynolds' and Huggins' testimony. Congress passed amendments

---

[2]  The following defendants join in this motion: Atlantic Richfield Company, BP Products North America, Inc., Chevron Corporation, Chevron U.S.A., Inc., CITGO Petroleum Corporation, CITGO Refining and Chemical Company L.P., Coastal Eagle Point Oil Company, ConocoPhillips Company, El Paso Merchant Energy-Petroleum Company, Equilon Enterprises LLC, Flint Hills Resources LP, Giant Yorktown Inc., Hess Corporation, Motiva Enterprises LLC, PDV Midwest Refining, LLC, Shell Oil Company, Shell Oil Products Company LLC, Shell Petroleum, Inc., Shell Trading (US) Company, Sunoco, Inc., Sunoco, Inc. (R&M), Texaco Inc., Texaco Refining and Marketing (East) Inc., The Premcor Refining Group, Inc., Total Petrochemicals USA, Inc., TMR Company, TRMI Holdings, Inc., Valero Energy Corporation, Valero Marketing & Supply Company, Valero Refining and Marketing Company, Valero Refining Company.

to the CAA in 1990 that created the RFG Program.[3] That program aimed to reduce ozone-causing vehicle emissions by requiring that gasoline contain a minimum of two percent oxygen in certain areas of the country where ozone levels were particularly high or where national ambient air quality standards were not met.[4] In addition, the amendments created an Oxygenated Fuels Program requiring that gasoline contain 2.7 percent oxygen by weight during the winter in areas that failed to meet national ambient air quality standards for carbon monoxide.[5]

Congress authorized the Environmental Protection Agency ("EPA") to issue regulations for RFG that certified various additives for use as oxygenates.[6] Oil companies could choose which additives to use in order to meet program requirements. The most commonly used oxygenate by far was MTBE, which was used in about eighty-seven percent of all RFG.[7] For the duration of the program,

---

[3]     *See* 42 U.S.C. § 7545.

[4]     *See id.* §§ 7545(k)(2)(B); 7545(10)(D); 7545(k)(6).

[5]     *See id.* § 7545(m)(2).

[6]     *See id.* §§ 211(k)(1); 7545(k)(B)(4).

[7]     *See* EPA, Methyl Tertiary Butyl Ether: Gasoline, http://www.epa.gov/mtbe/gas.htm; EPA, Oxygenate Type Analysis RFG Survey Data 1995-2000.

4

about thirty percent of gasoline sold in the U.S. was reformulated.[8]

In an earlier motion, defendants argued that plaintiffs' claims were conflict preempted by the CAA. They claimed it would have been impossible for them to comply with the RFG program without using MTBE because the amount of ethanol produced each year between 1995 and 2003 was "lower than the amount needed to meet the demand for oxygenated fuel."[9] In a 2005 decision, I held plaintiffs' claims were not preempted by RFG requirements in the CAA because the EPA did not mandate the use of MTBE.[10] Although the question of whether defendants could have used a different oxygenate was beyond the scope of that motion, I stated that "plaintiffs may eventually need to prove that a viable alternative to MTBE existed to succeed in their design defect claims."[11]

## B. Design Defect Claims

Plaintiffs assert a claim in products liability, alleging that MTBE

---

[8]    *See* EPA, Reformulated Gas Basic Information, http://www.epa.gov/otaq/rfg/information.htm. Congress removed the oxygen requirement for RFG in the Energy Policy Act of 2005. Pub. L. No. 109-58 § 1504(a), 119 Stat. 594 (2005) (codified in scattered sections of Titles 16 and 42 of the United States Code).

[9]    *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 457 F. Supp. 2d 324, 334 (S.D.N.Y. 2006).

[10]    *See id.*

[11]    *Id.* at 334-35.

5

gasoline is a defective product.[12] To prove this claim, they must show that "the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner."[13]

## C.  Robert Reynolds

Robert Reynolds is president of Downstream Alternatives, a fuels consulting firm specializing in "fuel quality and specification issues as well as logistics, especially as these items relate to the use of fuel oxygenates, such as ethanol."[14] Reynolds has worked in the transportation fuels industry for over twenty-five years, first as a manager of special fuels, marketing, and strategic planning for ethanol fuel companies, and now as a consultant to government agencies, ethanol and MTBE manufacturers, and trade associations.[15] He has written articles for trade publications and sits on committees of several industry and standard-setting associations including the National Conference of Weights and Measures, the Coordinating Research Council, and ASTM International

---

[12]  *See* Suffolk Compl. ¶¶ 217-228; United Water Compl. ¶¶ 214-225.

[13]  *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108 (1983).

[14]  3/22/07 Expert Report of Robert Reynolds ("Reynolds Rpt.") at 1.

[15]  *See* Summary of Qualifications & Professional Experience, Appendix A to Reynolds Rpt.

6

(formerly the American Society for Testing and Materials).[16]

### D.    T. Jack Huggins

Huggins holds degrees in chemical engineering and business administration, and has been an ethanol industry executive and consultant since the 1980's. For fourteen years, he was an executive at Pekin, the second-largest ethanol producer in the United States during the 1990's.[17] Huggins was at the helm of Pekin both prior to and during the implementation of the RFG program, and oversaw market forecasts and ethanol production development as well as a major expansion of Pekin's facilities and production levels.[18] He currently runs a consulting company, TJ3 Inc., advising companies entering the ethanol market and

---

[16]    *See* Reynolds Rpt. at 2. The National Conference of Weights and Measures is a standard-setting organization. *See* http://www.ncwm.net. The Coordinating Research Council directs studies on the interaction between automotive equipment and petroleum products. *See* http://www.crcao.com. ASTM International develops industry standards in a variety of fields. *See* http://www.astm.org.

[17]    *See* Attachment to 3/20/07 Expert Report of T. Jack Huggins ("Huggins Rpt."). Huggins was Senior Vice President for Finance and CFO from 1986 to 1989, then President and CEO from 1989 to 1995. After Pekin was purchased by the Williams Company in 1995, Huggins remained for five years as the head of the ethanol group. *See id*.

[18]    *See* Plaintiffs' Opposition to Defendants' *In Limine* Motion to Exclude the Opinion of T. Jack Huggins ("Pl. Opp. Huggins") at 4-5.

7

focusing on ethanol plant development and financing.[19]  Huggins also serves on

the Board of Directors of VeraSun Energy Corp., where he has worked on the

development and financing of six new ethanol plants.[20]

## III.  APPLICABLE LAW

Rule 702 of the Federal Rules of Evidence governs the admissibility

of expert opinions.  The Rule states:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.[21]

The three enumerated admissibility criteria were added in 2000, in

response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[22] and subsequent cases

applying its principles.  *Daubert* charged district courts with a "gatekeeping"

function to "ensure that any and all scientific testimony or evidence admitted is

---

[19]     *See id*. at 5.

[20]     *See id*.

[21]     Fed. R. Evid. 702.

[22]     509 U.S. 579 (1993).

8

not only relevant, but reliable."[23]

The test of reliability applies equally when an expert's testimony is not scientific in nature.[24] Often "expert testimony will not rely on anything like a scientific method . . . ."[25] The four factors set out in *Daubert* as a means of determining reliability may therefore not be applicable when assessing the testimony of non-scientific experts.[26] The reliability determination in such a case should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[27] The Supreme Court has made clear that "the law grants a district court . . . broad

---

[23]   *Id*. at 589.

[24]   *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

[25]   Fed. R. Evid. 702 Advisory Committee Note.

[26]   When determining whether scientific evidence is reliable, trial courts may consider: (1) whether the expert's theory or technique can be tested; (2) whether the theory or technique has been published in a peer-reviewed journal; (3) the theory or technique's known or potential rate of error; and (4) acceptance of the theory or technique in the scientific community. These factors are not "a definitive checklist," however, and the inquiry is "flexible." *Daubert*, 509 U.S. at 593-94.

[27]   *Kumho Tire*, 526 U.S. at 152.

latitude when it decides how to determine reliability."[28]

Whether the expert's testimony is relevant remains the first inquiry under Rule 402 of the Federal Rules of Evidence, which admits only testimony that "has any tendency to make a fact that is of consequence . . . more probable or less probable,"[29] and under Rule 702, which requires that the testimony assist the trier of fact. "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'"[30] To be deemed an expert for the purposes of Rule 702 a witness must also be qualified "by knowledge, skill, experience, training, or education."[31]

In addition, evidence that is otherwise admissible under Rule 702 may still be excluded under Rule 403 if the trial court believes that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[32] Exclusion under Rule

---

[28]   *Id*. at 142.

[29]   Fed. R. Evid. 402.

[30]   *Daubert*, 509 U.S. at 591 (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02], p. 702-18 (1988)).

[31]   Fed. R. Evid. 702.

[32]   Fed. R. Evid. 403.

403 is within the discretion of the trial court.

The Supreme Court has emphasized that the Federal Rules of Evidence favor admissibility of expert testimony.[33] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence."[34]

## III. TESTIMONY OF ROBERT REYNOLDS

In his expert report, Reynolds concludes that ethanol production could have grown to meet demand within the necessary time frame to meet RFG program requirements, and sufficient infrastructure existed or could have been added to permit the transportation of ethanol to various markets around the country.[35] To reach this conclusion, Reynolds compares the technical properties of MTBE and ethanol and discusses the modifications to blending, transportation, terminal and retail technology that would have been necessary to use ethanol more widely in RFG. He also looks at the supply of ethanol, relative prices of raw

---

[33]     *Daubert*, 509 U.S. at 588. *Accord Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (noting that Daubert "reinforces the idea that there should be a presumption of admissibility of evidence" and that it "advanced a bias in favor of admitting evidence short of that solidly . . . proven to be unreliable.").

[34]     *Id*. at 596.

[35]     *See* Reynolds Rpt. at 5-6.

11

ethanol and MTBE in the early 1990's, and other costs involved in expanding ethanol production and distribution. He concludes as well that the one-time costs involved in such preparatory steps would not have been prohibitive.[36]

Defendants seek to exclude portions of Reynolds' testimony that they claim require economic analysis or forecasting for four reasons. *First*, defendants argue that Reynolds' testimony is not relevant under Rule 402 because it fails to address ethanol availability for each individual defendant and for the Suffolk and Rockland County markets in particular. *Second*, they contend that Reynolds does not qualify as an expert on economic issues under Rule 702. *Third*, they argue that his testimony does not rely on sufficient data as required by Rule 702. *Finally*, defendants argue that Reynolds does not meet the standard of Rule 702 because he does not use reliable principles or methodologies in his analysis.

## A. Reynolds' Opinion Is Relevant to the Issues in These Cases

Both parties raise the issue of whether a viable alternative to MTBE existed during the mid-1990's. Defendants claim, as an affirmative defense, that they were required by federal law to add an oxygenate to gasoline. Because insufficient amounts of ethanol were produced in the United States between 1995

---

[36] *See id.*

and 2003, they argue, the only oxygenate they could have used was MTBE.[37]

Plaintiffs' product liability claim requires them to show that "it was feasible to design the product in a safer manner."[38] Therefore, whether an alternative, safer oxygenate than MTBE could have been added to gasoline is a key issue that Reynolds' testimony directly addresses.

Defendants do not dispute that an expert opinion on these issues could be relevant under Rule 402. They argue, however, that because Reynolds addresses ethanol production and distribution capacity industry-wide and on a national level, his testimony is not relevant to show that ethanol was a feasible alternative for each individual defendant, or that producers could have supplied enough ethanol to meet demand in Suffolk or Rockland County specifically.[39]

Testimony is relevant if it "has any tendency to make a fact that is of consequence to the determination of the action more probable or less probable."[40] Reynolds' testimony is relevant under this liberal standard. Evidence that ethanol

---

[37]    *See In re MTBE*, 457 F. Supp. 2d at 334.

[38]    *Voss*, 59 N.Y.2d at 108.

[39]    *See* Memorandum in Support of Defendants' Motion *In Limine* to Partially Exclude the Opinions of Plaintiffs' Proposed Expert Robert Reynolds ("Reynolds Def. Mem.") at 5.

[40]    Fed. R. Evid. 401.

production capacity could have expanded to meet demand nationwide makes it more probable that a sufficient amount of ethanol could have been produced to supply Suffolk and Rockland Counties. Similarly, if ethanol production capacity could have expanded to meet demand industry-wide, it is more probable that sufficient ethanol could have been available to each individual defendant.

Reynolds' expert report does not address factors that may have been important to individual oil companies or refiners had each one been deciding independently whether to use ethanol rather than MTBE. However, Reynolds explains that it would have been "operationally impractical" for some oil companies to use ethanol while other companies used MTBE "because of exchange agreements" and a pipeline transport system that requires gasoline to be mixed with other companies' product.[41] That system of agreement among companies makes an industry-wide assessment of ethanol production capacity more, not less, relevant to evaluating each individual defendant's actions. Whether companies entering the market after others began using MTBE had less of a choice among oxygenates is an issue defendants can raise on cross-examination.

---

[41] Reynolds Def. Mem. at 5. *See also* 8/2/07 Deposition Testimony of Plaintiffs' Expert Robert Reynolds ("Reynolds Dep.") at 307:3-6.

## B. Reynolds May Testify About Economic Factors as Part of His Analysis of Ethanol Production Capacity

Defendants' objections to Reynolds' expert qualifications and methodology both relate to his analysis of the costs he projects would have been involved in the growth of ethanol production and its use in RFG. Defendants argue that Reynolds is not qualified to testify about the economic factors that he has considered because he is not trained as an economist. Defendants also argue that Reynolds' methodology is unreliable because (1) he did not consider *all* costs to refiners of using ethanol, and (2) for those costs he did consider, he did not use a scientific methodology to make economic forecasting projections.

In making these arguments, however, defendants mischaracterize the purpose and nature of Reynolds' expert testimony. The main issue Reynolds addresses in his opinion is not economic, but logistical. Indeed, Plaintiffs offer a different expert on refinery economics.[42] Reynolds' consideration of the cost of ethanol, production facilities and retail technology is "an essential *part* of his

---

[42] Plaintiffs offer Martin Tallett as a refinery economics expert. Tallett runs an international oil consulting company that "specializes in: petroleum refining, economics, technology, investment, regulatory, fuels and market analyses . . . ." EnSys Energy, http://www.ensysenergy.com. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion *In Limine* to Partially Exclude the Opinions of Plaintiffs' Proposed Expert Robert Reynolds ("Reynolds Pl. Mem.") at 6 n.5.

feasibility analysis,"[43] but is only one of the many factors Reynolds considers.[44] Reynolds does not offer a separate opinion on economic matters, nor does his analysis require a complex economic statistical analysis. Rather, like the other factors in his analysis – how the technical properties of MTBE and ethanol affect blending and transportation, ethanol distribution infrastructure, or retail modifications necessary to sell ethanol gasoline – the economic factors Reynolds considers are business judgments, and fall within his business experience.

### 1. Reynolds Is Qualified by Experience to Testify About Cost Considerations

An expert can be qualified by "knowledge, skill, experience, training, or education" to offer opinions that will assist the trier of fact.[45] Courts within the Second Circuit have "liberally construed expert qualification requirements."[46]

---

[43] Defendants' Reply in Support of Their Motion *In Limine* to Partially Exclude the Opinions of Plaintiffs' Proposed Expert Robert Reynolds ("Reynolds Def. Reply Mem.") at 4 (emphasis added).

[44] *See* Reynolds Rpt. at 23 ("because of certain differences in blending properties the comparison of ethanol to MTBE is more than just a price comparison").

[45] Fed. R. Evid. 702.

[46] *TC Sys., Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002). *Accord United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985).

Further, Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience" rather than formal education.[47]

Defendants do not dispute that Reynolds' experience qualifies him as an expert in matters relating to ethanol production, specifications, and distribution. They argue, however, that these qualifications do not encompass economics, and therefore any of his opinions that consider cost factors should be excluded.

Courts allow experts to testify to matters within their general expertise when they lack qualifications as to certain technical matters within that field.[48] For example, the Second Circuit found that an industrial engineer's testimony that the plaintiff was within the "breathing zone" of hot-glue fumes "easily qualifie[d] for admission under *Daubert*," despite his lack of education on fume dispersal patterns, knowledge regarding the fumes' chemical constituents or

---

[47] *Walker v. Soon Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).

[48] Of course, an expert who is qualified in one field cannot offer an opinion about aspects of the case in another field for which she is not qualified. *See Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) (allowing expert forensic pathologist to testify as to police officer's "perception" was abuse of discretion for reasons including expert's lack of qualifications as an expert on human perception or cognitive function); *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657-58 (2d Cir. 1995) (expert qualified to testify as an industrial engineer was not qualified to testify whether warning labels on defendant's product were adequate).

the glue vapor's concentration level, or experience performing or interpreting air quality studies.[49]  Such "quibble[s]" with the expert's training were properly explored on cross-examination and went to the weight, not the admissibility, of his testimony.[50]

Defendants' challenges to Reynolds' qualifications as an economist similarly may be a basis for cross-examination, but do not prevent him from testifying about ethanol production capacity.  Reynolds' considerations of cost, supply and demand are part of his overall analysis of ethanol production capacity rather than separate conclusions about facts of the case outside his area of expertise.  These cost factors would normally be considered by a non-economist like Reynolds with extensive experience in marketing fuels and advising the industry on fuel production logistics.[51]  He need not hold an advanced economics

---

[49]     *McCullock v. H.B. Fuller Co.("McCullock II")*, 61 F.3d 1038, 1042-43 (2d Cir. 1995).

[50]     *Id.*

[51]     *See, e.g.*, Reynolds Dep. at 400:14-401:10 (Q: "Have you assessed the economics or viability of refiners using an all-hydrocarbon RFG versus RFG with ethanol? A: I have done work in that area . . . there are other considerations certainly other than price because you have to look at your octane balances and things like that.  But . . . based solely on price, my assessment is that ethanol is – is the most competitive of those options.").  Reynolds' list of publications also includes several articles in trade publications relating to ethanol pricing and market factors, such as "Ethanol Prices Increase: Supply/Demand Stabilizing,"

18

degree to testify as to these matters as part of his overall opinion. Indeed, Reynolds also considers other technical factors such as the chemical properties of ethanol and MTBE, but defendants do not object that he does not hold a degree in chemistry.

### 2. Reynolds' Analysis of the Facts Is Reliable

The heart of the court's analysis under *Daubert*'s interpretation of Rule 702 is whether the methodology used by the expert in formulating her opinion is reliable.[52] The test for reliability is flexible, especially in this case where Reynolds' expertise is non-scientific and is based on his experience.

"Some types of expert testimony will not rely on anything like a scientific method."[53] Discussing the reliability factors set out in *Daubert* as applied to non-scientist experts, the Supreme Court stated that "no one denies that an expert might draw a conclusion from a set of observations based on extensive

---

Alcohol Outlook, May 1988, and client studies such as The Supply, Demand, & Logistic of Fuel Oxygenates, An Assessment of the Marketplace Implications of Oxygenated Fuel Mandates in CO Non-Attainment Areas, Feb. 8, 1991. *See* Reynolds Rpt., Appendix A.

[52]     *See Daubert*, 509 U.S. at 590.

[53]     Fed. R. Evid. 702 Advisory Committee Note.

and specialized experience."[54] In that case, the "method" is the application of experience to facts. For example, the Advisory Committee Note to Rule 702 explains that when a law enforcement agent testifies regarding the use of code words in a drug transaction, the "method used by the agent is the application of extensive experience to analyze the meaning of the conversations."[55] In those cases, the court must determine that an expert's testimony is "properly grounded, well-reasoned, and not speculative;"[56] and the expert must "show how his or her experience . . . led to his conclusion."[57]

Reynolds does not use social science methodologies such as regression analysis or econometrics. Instead, he applies his extensive experience in ethanol production and distribution logistics to analyze an array of facts. The manner in which he does so is reliable under Rule 702 for several reasons.

*First,* Reynolds properly grounds his conclusions in substantive facts that easily meet the sufficiency requirement of Rule 702. Reynolds' expert report

---

[54]    *Kumho Tire*, 526 U.S. at 156.

[55]    Fed. R. Evid. 702 Advisory Committee Note.

[56]    *Id.*

[57]    *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132 (2d Cir. 2006).

demonstrates that his analysis relies on facts and data on ethanol and MTBE technical properties, pricing, export and import levels, and processing methods.[58] Reynolds' opinion is therefore sufficiently well-grounded in fact.[59]

Second, Reynolds applies his experience to these facts in a reasoned manner. Courts have found the testimony of non-scientific experts to be unreliable when such experts apply their experience to the facts in a poorly reasoned manner, or when their testimony is not grounded in facts and is speculative.[60] In contrast, Reynolds uses his business experience to assess the

---

[58] See Reynolds Rpt. Reynolds cites to government-compiled statistics on ethanol properties and pricing from EPA, the U.S. Department of Energy's Energy Information Agency, and the U.S. International Trade Commission, as well as to reports by his own consulting firm, Downstream Alternatives.

[59] In this respect, Reynolds' testimony is distinguishable from that of the proffered expert in Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416 (7th Cir. 2005), on which defendants rely. In Zenith, the defendant's expert estimated its future losses based on projected growth in subscriptions to digital television service in San Juan, Puerto Rico, and the defendant's projected share of that market. The projections he made, however, were not grounded in actual sales figures from San Juan or comparable markets. The lack of data rendered the expert's opinion unreliable. See id. at 418-19.

[60] See, e.g., Nimely, 414 F.3d at 399 (forensic pathologist's opinion on a police officer's state of mind and perception when shooting a fleeing suspect was total speculation and thus inadmissible); Kumho Tire, 526 U.S. at 156-57 (tire expert's theory that at least two of four signs of tire abuse must be present to find that the cause of a blown tire was abuse rather than a manufacturing defect was poorly reasoned because (1) the two-factor requirement was a randomly chosen standard, and (2) the theory was not accepted in the expert's field).

facts and form conclusions throughout his expert report, including his economic considerations.

Reynolds demonstrates the grounding of his economic-related analysis in fact, and explains how he drew on his experience to evaluate certain of those facts. For example, when defendants asked the basis for his opinion that ethanol would have cost refiners less than MTBE, or at least be competitively priced, he explained that he began with data showing that factoring in tax credits, raw ethanol was often cheaper than MTBE.[61] Reynolds explained that he then considered costs related to the chemicals' technical properties such as octane balances and butane back out as well as additional investment for ethanol at the terminal level or for installation of equipment.[62]

Reynolds also considered the environmental costs of using MTBE, as well as oil industry estimates of the costs refiners would expend at the terminal level when implementing ethanol use.[63] Finally, based on his experience he

---

[61]     The source of the pricing data is ICIS, an industry news sources specializing in chemical and oil price information. The company's website describes ICIS pricing services as "unbiased and independent oil and chemical price reporting from . . . the world leader in commodity market intelligence for over 25 years." http://www.icis.com/News/AboutNews.htm.

[62]     *See* Reynolds Dep. at 408:14-411:7.

[63]     *See id.*

opined that a one to two cent increase per gallon in the price of gasoline would have been significant when gas cost thirty cents a gallon, but when the price was over one dollar the market was less sensitive to such small price increases.[64]

Defendants also contend that Reynolds' failure to consider all relevant factors is evidence of poor reasoning. For example, they state that "Reynolds should have analyzed the costs and all aspects of the decision-making process of refiners switching from MTBE to ethanol."[65] However, defendants' claim that Reynolds admitted he had not actually calculated "all costs that a refiner would face" in switching from MTBE to ethanol mischaracterizes his deposition testimony.[66] Although Reynolds did not perform any calculations specifically for this assignment, he testified that he relied on calculations he had done for previous studies on the same topic.[67]

More importantly, as Reynolds states in his deposition, analyzing all costs to refiners was not within the scope of his testimony, as a separate refinery

---

[64]     *See id*. at 406:16-407:21.

[65]     Reynolds Def. Mem. at 4.

[66]     Reynolds Def. Reply Mem. at 5.

[67]     *See* Reynolds Dep. at 416:23-417:19.

economics expert will address that issue.[68]  Instead, Reynolds focused on the

*logistics within the ethanol industry* of increasing ethanol production to meet

demand under the RFG requirements.  That focus was proper, as that is his area of

expertise and the subject of his expert opinion.  Defendants may cross-examine

Reynolds at trial about any costs they contend he should have considered.

*Third*, and finally, defendants' argument that Reynolds' failure to use

a social science methodology renders his opinion unreliable is misplaced.

Reynolds may properly rely on his experience to testify about all matters within

his experience, including basic economic considerations.  The only requirement is

that he do so with the same degree of intellectual rigor as a professional in his

field.

Defendants rely on *Zenith Electronics Corp. v. WH-TV Broadcasting*

*Corp.* for the proposition that experts must rely on a scientific methodology.[69]  In

*Zenith*, an economist testified as to lost profits damages, but did not use a method

such as multivariate regression to compare markets.  As a result, the factual basis

---

[68]      *See id*. at 412:10-21 ("Q. . . . you didn't calculate . . . all of the costs
that would be necessary to actually produce the RFG . . . ?  A.  Well, for the . . .
supply . . . I didn't need to . . . a refinery expert . . . would handle that.  I was more
focused on supply, demand, logistics.").

[69]      395 F.3d 416 (7th Cir. 2005).

for his opinion was merely his own prediction of future sales.[70]  In addition, when asked what methodology he used to calculate the rate of growth, the expert replied "my expertise."[71]  The Seventh Circuit rejected such an opinion as unreliable, and stated, "[a] witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines the term."[72]

Defendants take that statement out of context in applying it to Reynolds.[73]  A non-scientific expert may rely on *experience* to assess facts. Unlike the expert in *Zenith*, Reynolds never randomly assigned values to ethanol prices or projected market growth without reference to actual figures.  Nor has he opined that sales would have increased by specific percentages without relying on a methodology to calculate those percentages.  The *Zenith* expert's testimony was

---

[70]     *See id*. at 419-20.

[71]     *Id*. at 419.

[72]     *Id*. at 419-20.

[73]     Defendants conflate "expertise" with "experience," implying that under *Zenith* Reynolds cannot rely on his experience to testify as an expert witness. *See* Def. Mem. at 3 ("the Seventh Circuit rejected an expert who, like Reynolds here, relied on '*my experience*' as the relevant criteria); *id.* at 6 ("'A witness who invokes "*my expertise*" rather than analytic strategies widely used by specialists is not an expert . . . .' *Zenith Electronics*, 395 F.3d at 418-20.  But even when such witnesses are permitted to give opinion testimony . . . .") (emphasis added).

solely an economic forecasting exercise, and was relevant to prove damages on the defendant's counterclaim. In contrast, Reynolds' testimony is not solely, or even primarily, about economic matters, and he does not engage in economic forecasting in the same manner as the *Zenith* expert. He need not employ social science methodologies simply because he estimates costs and considers prices to form conclusions about the possibility of increasing ethanol production. If defendants believe his estimates are inaccurate, they may raise these issues on cross-examination.

      The Supreme Court has reminded trial courts that the reliability analysis should focus not on "the reasonableness *in general*" of an expert's methods, but on "the reasonableness of using such an approach . . . to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*."[74] Because the particular matter to which his testimony is relevant concerns logistics of ethanol production rather than refinery economics, Reynolds' consideration of certain economic factors, including projected costs, is reliable even without the use of economics methodologies. I am satisfied that he applied the intellectual rigor of a professional in his field, making his testimony

---

[74]    *Kumho Tire*, 526 U.S. at 153-54 (emphasis in original).

26

admissible.

## IV.  TESTIMONY OF T. JACK HUGGINS

Like Reynolds, Huggins concludes in his expert report that ethanol
production capacity could have grown to meet demand under the RFG program.
As a former ethanol company executive, however, Huggins focuses more on
questions of business development than logistics.  He analyzes how the ethanol
industry would have responded had oil companies chosen to use ethanol rather
than MTBE.  Specifically, he proposes to testify that commitments from oil
companies to purchase ethanol, similar to long-term contracts refiners entered into
with MTBE producers, could have guaranteed a sufficient return on ethanol
producers' investment in new production facilities.  According to Huggins,
ethanol producers could have financed additional production capacity, built new
plants within the necessary time frame, and met projected demand under the
oxygenate requirements of the CAA if refiners had entered into long-term
contracts with them, as they did with MTBE producers.[75]

Defendants seek exclusion of Huggins' testimony for a number of
reasons.  They contend that, like Reynolds' opinion, Huggins' opinion is not

---

[75]    *See* Huggins Rpt. at 1-2.

relevant under Rule 402 because it does not address individual defendants and the Suffolk and Rockland County markets specifically. Defendants also argue that Huggins' opinion does not meet the standards of Rule 702 because he does not present specialized knowledge to assist the jury; he does not rely on sufficient facts or data; and he does not use reliable methods or principles. Defendants argue that Huggins' testimony should be excluded based on bias. Finally, they argue that his testimony should be excluded as cumulative under Rule 403, and because it embraces an ultimate issue for the jury.

## A. Huggins' Testimony Is Relevant and Will Assist the Jury

Huggins' testimony about the oil and ethanol industries as a whole is relevant to the issue of ethanol production because it makes the feasibility of ethanol use for individual defendants and in the Suffolk and Rockland County markets more probable. It is also relevant because of the tendency of the industry to make coordinated or similar decisions about the type of gasoline that will be supplied to certain markets. As Huggins testified, "[oil companies] make similar decisions at similar times so that they can share their infrastructure with each other."[76] Defendants' objection that Huggins' testimony is not relevant under Rule

---

[76] 10/26/07 Deposition of Thomas Jackson Huggins III ("Huggins Dep.") at 153:15-17.

402 because it does not relate to any individual defendant or location, like their similar objection to Reynolds' testimony, is without merit.

Huggins' opinion also imparts specialized knowledge about the ethanol industry and oxygenate supply contracts that is helpful to "assist the trier of fact to understand the evidence [and] to demonstrate a fact in issue."[77] Huggins analyzes the capacity and growth of the ethanol industry, trends such as RFG requirements, and MTBE supply contracts that refiners executed in the 1990's. Because such information is not within the experience of an average juror, Huggins' testimony will help the jury understand evidence relating to the ethanol supply in the 1990's and the industry's ability to grow to meet demand under the RFG program requirements.

## B.     Huggins' Analysis Is Based on Sufficient Facts and Data

Under Rule 702 an expert must base her analysis on sufficient facts and data.[78] Although Huggins was unable to provide specifics on some factual matters at his deposition, those facts were not essential to his analysis.[79] On the

---

[77]      Fed. R. Evid. 702.

[78]      *See id.*

[79]      For example, Huggins could not recall specific companies that rejected proposed ethanol supply contracts. *See* Huggins Dep. at 275:5-24 ("Q. But you don't know which refiners [Pekin Vice President of Sales Ron Miller]

whole, he has relied on sufficient facts and data to form his conclusions.

Huggins relies on certain facts drawn from his business experience, such as the length of time it has taken for dry milling ethanol facilities to be permitted and constructed.[80] Defendants argue that Huggins' experience is an improper basis for his opinion because he worked at only one ethanol company and is unfamiliar with the industry as a whole. Specifically, defendants point out that Pekin's ability to finance the construction of additional plant capacity may not be representative of smaller companies. While this is a valid point, Huggins addressed it to some extent in his deposition, stating that the majority of new plants, not just Pekin's, were built within twenty-four months.[81] Defendants may cross-examine Huggins at trial as to whether Pekin was representative of the entire ethanol industry.

Defendants also contend that "the core" of Huggins' opinion is

---

approached with that proposal who turned it down? . . . A. Specifically, no. He approached many of the major refiners . . . .").

[80] *See* Huggins Dep. at 158:4-16 ("Q. In the last paragraph you refer to [the idea that] a dry milling ethanol facility could be permitted and constructed within 24 months. What is the basis for that conclusion? A. The fact that that's how long it took plants to be permitted and constructed. An example would have been the Aurora ethanol plant. An example would have been other plants built in Minnesota.").

[81] *See id.*

improperly based on a 2005 email from Ron Miller, Pekin's vice president of sales during the 1990's.[82] The Miller email sets out the pricing formula commonly used in MTBE supply contracts, and a different formula for ethanol supply contracts given to refiners by ethanol producers.[83] Huggins includes these formulas in his report, with an explanation of their terms and estimated prices.[84] He also quotes Miller's statement that Pekin and others in the ethanol industry were not able to persuade refiners to enter into supply contracts on these or other terms.[85]

However, this information is not derived solely from Miller's email. The MTBE contract formula is independently verifiable information that was published in the trade press.[86] And the information about ethanol contracts falls

---

[82]    Memorandum in Support of Defendants' Motion *In Limine* to Exclude the Opinions of Plaintiffs' Proposed Expert T. Jack Huggins ("Huggins Def. Mem.") at 6.

[83]    *See* 10/18/05 Email from Ron Miller to Jack Huggins re: MTBE Contracts, Ex. D to Huggins Def. Mem.

[84]    *See* Huggins Rpt. at 5.

[85]    *See id*.

[86]    *See* Huggins Dep. at 206:1-6 ("So the implication, I think, with our earlier discussion was that I had just two sources, and that is not at all true. I ran a business that was intimately involved in that market . . . ."); *id*. at 210:1-6 ("all of [the refiners] told us they were committed to MTBE with long-term A+B+C contracts, and the A+B+C contracts were widely reported in the press at that time.").

within the scope of Huggins' professional experience, since as CEO he oversaw

Miller's sales activities.[87] Therefore, reference to the email does not render his

opinion unreliable.

Finally, Huggins relies on other data drawn from outside sources,

such as Energy Information Agency reports or OxyFuels News, a trade

publication. Although defendants question the accuracy of these sources, they

advance no valid reason as to why Huggins should not have relied on information

from government and industry publications.

## C.    Huggins' Analysis Is Sufficiently Reliable

Defendants raise two principal objections to the reliability of

Huggins' opinion:  he does not use a proper methodology, and his conclusions are

speculative.  On the whole, Huggins' analysis is sufficiently reliable to be

admitted under Rule 702.  The concerns defendants raise go to the weight to be

accorded his testimony rather than its admissibility.

First, defendants' insistence that Huggins employ a "methodology"

---

[87]    *See id.* at 272:1-275:4 (discussing types of ethanol contracts that Pekin considered and proposed to refiners); *id.* at 277:5-23 ("Q.  Are you asserting that he approached ARCO and Chevron based on personal knowledge . . . . A. Other than I happened to be [Miller's] boss, I happened to know the business that we were in . . . .").

again ignores the fact that an expert testifying on the basis of experience may form his conclusions by applying his extensive experience to the facts of the case. Because Huggins' expert qualifications and testimony rest on his business experience and not on scientific, mathematical or social science studies or calculations, he need not employ a methodology used in those fields. He must only apply his experience to the facts using the same intellectual rigor a professional ethanol executive would use in practice. An ethanol executive would make business decisions about expected profit, investment and risk by applying his experience and judgment to existing data about the market – exactly what Huggins has done in his report.

To further support their argument that Huggins does not employ the requisite level of intellectual rigor, defendants also contend that Huggins' opinion rests on unsupported premises. They take issue with two premises: *first*, that ethanol contracts could have been modeled after MTBE contracts, and *second*, that such contracts would have created sufficient demand for ethanol to justify investment in the expansion of production capacity. "It is not enough . . . for experts to venture hunches that they would never express or act upon in their

everyday working lives."[88]  However Huggins' expert report and deposition

testimony show that these premises are not simply "hunches," but are grounded in

Huggins' application of his business experience to the facts and circumstances of

ethanol production and the market for oxygenates under the RFG program.

The first premise – that ethanol producers could have entered into

long-term supply contracts with oil refiners as MTBE producers did in the early

1990's – is supported by Huggins' understanding of the market for RFG and the

ethanol industry, and his analysis of various economic factors.[89]  According to

Huggins, some level of commitment from refiners would have been necessary to

allow ethanol producers to invest funds in expanding production capacity.[90]

---

[88]     Margaret A. Berger, "The Supreme Court's Trilogy on the
Admissibility of Expert Testimony," Federal Judicial Center, *Reference Manual
on Scientific Evidence* 25 (2d ed. 2000).

[89]     At the time the CAA was passed, MTBE production was also below
projected demand under the RFG program.  According to plaintiffs and Huggins,
the fact that producers were able to secure five-year contracts on favorable terms
for a good portion of their output allowed MTBE producers to expand production
to meet RFG demand.  *See* Plaintiffs' Opposition to Defendants' *In Limine* Motion
to Exclude the Opinion of T. Jack Huggins ("Huggins Pl. Opp.") at 8.  *See also*
Huggins Dep. at 272:1-22 ("Q. . . . you stated that you were proposing that
[ethanol contracts] be on similar terms to those entered with MTBE producers.
What do you mean by similar terms? A.  Well, let me back up.  I didn't propose.  I
said had they been willing to enter into contracts on similar terms, and what I
meant by similar terms was time and dollars, time and price.").

[90]     *See* Huggins Dep. at 191:16-193:7.

34

Because expert testimony is not admissible if it is "based on assumptions that are . . . unrealistic,"[91] Huggins also explains why entering into ethanol contracts similar in duration and pricing to MTBE contracts would have been economically rational for both the ethanol producers and the oil companies.

Huggins evaluated the viability and economic implications of potential contracts for both the producers and the oil companies. To begin with, he did not simply copy the terms of MTBE contracts and pronounce them workable for the sale of ethanol.[92] Instead, he based his conclusions on the use of an alternate octane-based pricing formula, which was one of "several contracting possibilities" proposed to RFG blenders.[93] Huggins explained in his deposition

---

[91] *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal citations omitted).

[92] About fifty percent of MTBE was supplied under five-year contracts setting the price of MTBE as A+B+C, where A was the butane spot price, B was 0.34 x the methanol contract price, and C was MTBE producers' operating cost, capital recovery, and return on investment. *See* Huggins Rpt. at 4. Butane and methanol are two key components used in MTBE production. *See* Tancred C.M. Lidderdale, MTBE Production Economics, Energy Information Administration (2001), http://www.eia.doe.gov/emeu/steo/pub/special/mtbecost.html. Using average prices, Huggins calculates that the cost of MTBE under such a contract ranged between $0.99 to $1.52 a gallon. *See* Huggins Rpt. at 4.

[93] Huggins Rpt. at 4. The formula Huggins used in his report is similar to the "default formula used with the MTBE contracts in the event oxygenates would no longer be required by the Clean Air Act." *Id.* at 5.

testimony that he used the octane-based formula in part because a component cost-based contract such as the A+B+C contract used for MTBE would not have been acceptable to oil companies due to frequent corn price fluctuation.[94] Instead of basing the price on the cost to ethanol producers, the formula that Huggins used is based on the price of gasoline and the octane level of ethanol.[95]

Huggins acknowledged that the octane-based contract formula on which he based his conclusions would have placed the risk of corn price fluctuations directly on ethanol producers.[96] Contrary to defendants' assertions, however, he accounted for this risk in his report, where he noted that ethanol

---

[94]    Ethanol is made from corn, which constitutes about eighty percent of production costs. *See* Huggins Rpt. at 7. *See also* Huggins Dep. at 273:3-24 ("clearly the ethanol industry would have loved a corn tolling agreement, much as the MTBE industry had, but we had no second thoughts that would be acceptable to the oil industry. Q. Okay. And is that because you believe it would not be economically in the refiners' interest to enter such a contract? A. No . . . . It's because of their uncertainty with the economics of corn . . . it's not part of their base business . . .whereas, octane clearly is.").

[95]    The ethanol pricing formula is ULR (unleaded regular gasoline price) + 5.2 (ULP (unleaded premium gasoline) - ULR) + Federal Incentive (a tax exemption). *See* Huggins Rpt. at 5. The figure of 5.2 is based on ethanol's octane level. Under this octane-based formula, according to Huggins, an average price for ethanol would be $1.508 a gallon. *See id.* Adding in transportation costs, the ethanol manufacturers would have earned $1.40 a gallon, while tax exemptions would have brought the net cost to RFG marketers down to $0.968 a gallon. *See id.*

[96]    *See* Huggins Dep. at 329:20-23.

36

producers such as Pekin have hedge programs for corn purchases to alleviate losses due to sharply rising corn prices.[97]  In addition, ethanol companies market byproducts of the ethanol production process, whose prices tend to move with corn, thereby recovering some of the excess corn costs.[98]  Huggins' report shows that ethanol producers decided that an octane-based formula would be acceptable, even when accounting for corn price fluctuations.

Huggins also evaluated the profitability of an ethanol plant under this contract pricing formula and the other proposed contracts.  He concludes that although a range of factors influence a company's ability to finance new plant development,[99] a five-year contract using the octane-based formula would provide a sufficient return on investment to ensure capital recovery.[100]  Huggins' profitability estimate is based on the price of corn from 1991 to 1994.[101]  If the price of corn were to rise as it did in 1995 and 1996,[102] profits would be likely to

---

[97]     *See* Huggins Rpt. at 8.

[98]     *See id.*

[99]     *See* Huggins Dep. at 197:15-198:9.

[100]    *See id.* at 226:24-227:17.

[101]    *See id.* at 229:12-19.

[102]    *See id.* at 332:11-16.

fall. Huggins admitted that the only way to *guarantee* profitability would be to utilize a contract incorporating the cost of production.[103] Ethanol producers could have feasibly entered into contracts without such a guarantee of profitability, however. As Huggins testified, "[T]his is a commodity risk that an investor and a business person take on every time they do an investment in the commodity arena."[104]

In sum, Huggins' assertion that ethanol contracts could have been modeled on MTBE contracts is based on an evaluation of economic feasibility and is grounded in fact, and is therefore not speculative. "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith . . . other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."[105] Defendants may question Huggins at trial about the impact of corn price fluctuation, Wall Street interest rates during the 1990's, or other factors related to the economic feasibility of ethanol contracts that they believe he has failed to consider.

---

[103]     *See id.* at 330:16-331:12.

[104]     *Id.* at 205:9-11.

[105]     *Boucher*, 73 F.3d at 21 (internal citations omitted).

The second challenged premise underlying Huggins' opinion is "the existence of demand [for ethanol] in the first place."[106] Defendants argue that there is no basis for the assumption that contracts would provide the necessary demand for ethanol.[107] This argument is a red herring. Clearly the RFG program created new demand for oxygenates, a demand that both defendants and the ethanol industry forecast carefully.[108] What defendants imply is that even under the RFG program, Huggins cannot show that there would have been demand for *ethanol* because MTBE was less expensive – and that therefore Huggins' opinion that oil companies would have purchased ethanol in the first place is unrealistic and speculative.[109]

---

[106] Reply in Support of Defendants' Motion *In Limine* to Exclude the Opinions of Plaintiffs' Proposed Expert T. Jack Huggins ("Huggins Def. Reply Mem.") at 3.

[107] *See id.* at 4 ("The key assumption for Huggins is . . . the existence of demand in the first place. The contract formulas proposed by Huggins are just a jargon-filled was of stipulating demand.") (internal citations omitted).

[108] In fact, as discussed above, Huggins' testimony is offered in part to respond to defendants' claim that ethanol production could not have met oxygenate demand under the CAA. *See In re MTBE*, 457 F. Supp. 2d at 334 ("Defendants argue that in each year from 1995 to 2003, the amount of ethanol produced in the United States was lower than the amount needed to meet the demand for oxygenated fuel.").

[109] *See* Huggins Def. Reply Mem. at 3 ("[A]s Huggins admitted during his deposition, 'the ability to build capacity is a function of government programs and economics'").

However, this attack misses the point of Huggins' testimony, as well as the argument his testimony is intended to support. Plaintiffs need not prove that defendants *would* have chosen to use ethanol rather than MTBE to oxygenate their fuel. Product liability law only requires an expert to opine on whether a product *could* have been made using a *safer* alternate design.[110] To that end, Huggins' testimony is offered in support of plaintiffs' argument that because ethanol could have been produced in sufficient amount and supplied to the industry at a reasonable price, defendants had a safer alternative to an oxygenate that threatened to pollute water. Under both plaintiffs' product liability claims and defendants' impossibility defense, the demand for ethanol would be based, at least in part, on a desire to avoid using MTBE because of its harmful properties.[111]

Huggins does not assume, therefore, that the contracts themselves would have created demand for ethanol. Rather, he bases the existence of demand on the oxygenate requirements under the CAA and his evaluation of the relative merits of ethanol and MTBE, including costs associated with MTBE's propensity to mix with groundwater. That premise is reasonable and is not speculative.

---

[110]     *See Voss*, 59 N.Y.2d at 108.

[111]     Huggins factored in the cost of MTBE remediation when asked his opinion about the cost of MTBE as compared with ethanol. *See* Huggins Dep. at 295:14-18.

## D. There Is No Other Basis for Excluding Huggins' Testimony

Many witnesses are biased to some degree, and "lack of bias is not required for expert testimony" to be admissible.[112] As an ethanol plant manager, Huggins was a direct competitor of MTBE manufacturers during the 1990's, and he may harbor negative feelings toward refiners, who declined to purchase his company's product to make RFG. Ethanol companies are not parties to this litigation, however, and due to current or pending MTBE bans Huggins does not stand to gain should defendants lose in this litigation. Therefore, he is not the "naked partisan" defendants make him out to be; he is an advocate for the ethanol industry, not for county water suppliers, the plaintiffs in these cases.[113]

Defendants also contend that Huggins' testimony should be excluded because it is cumulative of Reynolds' testimony. Under Rule 403, a trial court may, in its discretion, exclude needlessly cumulative evidence. I have instructed the parties in these cases that, due to the large number of expert witnesses, it is important that each expert address a distinct issue and cumulative expert testimony

---

[112] *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (citing 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence §§ 702-60 and n.38 (2002)).

[113] In *Lippe*, the plaintiffs' expert was excluded for bias because he was also plaintiffs' legal counsel. *Id*. at 687-88.

will not be allowed. Although the two experts both address ethanol production capacity, Huggins' testimony is distinct from Reynolds'. Huggins discusses the importance of long-term contracts to help finance plant expansion and new plant construction, whereas Reynolds discusses the logistics of ethanol production, transportation, and blending. While their reports overlap somewhat on the subject of new plant development, this single area of overlap is not sufficient to preclude all of Huggins' testimony. If plaintiffs attempt to introduce cumulative testimony by Huggins, however, that testimony will be excluded at trial.

Defendants' final argument is that Huggins impermissibly offers an opinion on an ultimate issue for the jury when he states that ethanol was a "feasible alternative" to MTBE.[114] Under Rule 704, an opinion should not be excluded simply because it "embraces an ultimate issue to be decided by the trier of fact."[115] Nevertheless, expert testimony must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."[116] In keeping with this premise, "an expert may opine on an issue of fact within the jury's province, [but] he may not

---

[114]    Huggins Rpt. at 2.

[115]    Fed. R. Evid. 704.

[116]    *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1988).

give testimony stating ultimate legal conclusions based on those facts."[117] Opinion

testimony should "be phrased in terms of []adequately explored legal criteria."[118]

Product liability law requires a plaintiff asserting a defective design

claim to prove that "it was feasible to design the product in a safer manner."[119]

Huggins' testimony that ethanol was a feasible alternative to MTBE as a gasoline

oxygenate embraces this issue, but that alone does not warrant exclusion under

Rule 704. In product liability cases, courts have generally admitted expert

opinions embracing ultimate issues such as causation, product defect, or whether

warnings were required if the expert opinions satisfied Rules 402 and 702.[120]

---

[117]     *Id. Accord AUSA Life Ins. Co. v. Dwyer*, 899 F. Supp. 1200, 1202 n.2
(S.D.N.Y. 1995) (the Second Circuit is "especially concerned with testimony that
tracks the language of particular statutes or legal standards") (citing *United States
v. Scop*, 846 F.2d 135 (2d Cir. 1988), *modified on other grounds*, 856 F.2d 5 (2d
Cir. 1988), which excluded expert's repeated statements that defendants' conduct
constituted fraudulent scheme within the meaning of securities laws, and *Hygh v.
Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992), which held expert's statements in civil
rights action that police force was "not justified" and "totally improper"
impermissibly told the jury what result to reach).

[118]     Fed. R. Evid. 704 Advisory Committee Note (giving the example that
"the question 'Did T have capacity to make a will?' would be excluded, while the
question 'Did T have sufficient mental capacity to know the nature and extent of
his property and to know the natural objects of his bounty and to formulate a
rational scheme of distribution?' would be allowed.").

[119]     *Voss*, 59 N.Y.2d at 108.

[120]     *See, e.g.*, *Garrett v. Desa Industries, Inc.*, 705 F.2d 721, 725 (4th Cir.
1983) (reversing trial court's decision to exclude expert testimony as to

Huggins does not testify as to the legal meaning of a feasible alternative or otherwise attempt to instruct the jury on the law.[121] Nor is his testimony similar to that of a witness who "repeatedly tracked the exact language of the statutes and regulations which the defendant had allegedly violated and used judicially defined terms."[122] Whether it was feasible for a manufacturer to design a product in a safer manner is a question of fact,[123] and Huggins permissibly states a factual conclusion supporting a legal argument.[124] For this reason, Huggins'

_____

defectiveness of stud driver's design because it embraced ultimate issue); *see also Jiminez v. Dreis & Kump Mfg. Co.*, 736 F.2d 51, 54 (2d Cir. 1984) (expert testimony that manufacturer could have installed safety devices making a safer product created a genuine issue of material fact as to whether product could have feasibly been designed in safer manner).

[121]     Should Huggins attempt to do so at trial, the Court will exclude such testimony at that time.

[122]     *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (allowing testimony of expert who used language from the indictment but "did not couch his opinions in terms that derived their definitions from judicial interpretations," and distinguishing his testimony from that of an excluded expert in *Scop*, 846 F.2d at 140).

[123]     *See Sciurca v. Chrysler Motor Corp.*, 712 F. Supp. 303, 305-06 (E.D.N.Y. 1983).

[124]     *See Bilzerian*, 926 F.2d at 1295 (holding that trial court did not abuse discretion by allowing expert in securities case to testify about the reason for certain requirements in securities law, but excluding testimony that the term "personal funds" in securities law includes the type of loan received by defendant, because it constituted an "opinion on the legality of defendant's conduct"); *Allen v. City of New York*, 466 F. Supp. 2d 545, 549 (S.D.N.Y. 2006) (allowing expert to

testimony will not usurp the role of the judge in instructing the jury on the law, or the role of the jury in applying the law to the facts to independently determine whether ethanol was in fact a safer, feasible alternative oxygenate.

## V. CONCLUSION

For the above reasons, defendants' motions *in limine* are denied and are hereby closed.

SO ORDERED:

Dated: New York, New York
May 7, 2008

Shira A. Scheindlin
U.S.D.J.

---

testify that defendants acted "deliberately" as a factual conclusion embracing the ultimate issue of intent).

## -Appearances-

### Liaison Counsel for Plaintiffs:

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

### Liaison Counsel for Defendants:

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

### Counsel for Defendant CITGO Petroleum Corporation:

Nathan P. Eimer, Esq.
Pamela R. Hanebutt, Esq.
Lisa S. Meyer, Esq.
Greg J. Weintraub, Esq.
Eimer Stahl Klevorn & Solberg LLP
224 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel: (312) 660-7600
Fax: (312) 692-1718