UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

In Re: Methyl Tertiary Butyl Ether ("MTBE")          Master File C.A. No.
Productions Liability Litigation                      1:00-1898 (SAS)
                                                     MDL 1358
**This document refers to:**

All cases


_____




**GETTY PETROLEUM MARKETING INC.'S
MEMORANDUM OF LAW IN OPPOSITION
TO GETTY PROPERTIES CORP.'S
MOTION FOR SUMMARY JUDGMENT**




BLEAKLEY PLATT & SCHMIDT, LLP
*ATTORNEYS FOR GETTY PETROLEUM MARKETING INC.*
ONE NORTH LEXINGTON AVENUE
P.O. BOX 5056
WHITE PLAINS, NY 10602-5056
(914) 949-2700

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
TABLE OF AUTHORITIES ........................................................................................iii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS

I.     THE CREATION OF GETTY PETROLEUM CORPORATION IN 1985 ................................................................................2

II.    THE MARCH 1997 GPMI TRANSACTION ..............................................2

    (a)    THE REORGANIZATION AGREEMENT.....................................3
    (b)    THE MASTER LEASE .................................................................5

        (i)    EXHIBIT "D" SITES – UST UPGRADES AND ATTENDANT ENVIRONMENTAL LIABILITIES............5
        (ii)    EXHIBIT "E" SITES – ACTIVE CONTAMINATION SITES ...............................................................................5

    (c)    THE RECORD RETENTION POLICY ..........................................6

III.    PROPERTIES' 1997 SEC FILINGS ............................................................6

    (a)    PROPERTIES' 1997 INFORMATION STATEMENT ...................6
    (b)    PROPERTIES' 1997 ANNUAL REPORT TO SHAREHOLDERS ...................................................................7

IV.    THE 2000 CONSOLIDATED, AMENDED AND RESTATED MASTER LEASE AND INDEMNITY AGREEMENTS............................8

    (a)    THE AMENDED MASTER LEASE ...............................................8

        (i)    PROPERTIES' LIABILITIES FOR THE UST UPGRADES SITES ...................................................8

    (b)    THE INDEMNITY AGREEMENT ................................................10
    (c)    THE AMENDED AND RESTATED TRADEMARK LICENSE AGREEMENT ..........................................................12
    (d)    PROPERTIES' 2007 ANNUAL REPORT TO SHAREHOLDERS .................................................................12

V.    THE PARTIES' COURSE OF CONDUCT CONFIRMS PROPERTIES' ONGOING ENVIRONMENTAL LIABILITY.................13

ARGUMENT ...............................................................................................................13

POINT I

      PROPERTIES' MOTION IS PROCEDURALLY DEFECTIVE ............................13

POINT II

      PROPERTIES RETAINED ONGOING ENVIRONMENTAL
      LIABILITY FOR APPROXIMATELY 1,300 "GETTY" SITES
      UNDER THE PARTIES' ENVIRONMENTAL ALLOCATION
      AGREEMENTS ......................................................................................................15

POINT III

      GPMI DOES NOT HAVE SUCCESSOR LIABILITY FOR
      GETTY PETROLEUM CORP. ...............................................................................20

POINT IV

      GPMI HAS NO LIABILITY FOR PLAINTIFFS' CLAIMS
      AT OAK STREET WELL NO. 1 AND PLAINTIFFS HAVE
      AGREED TO DISMISS CLAIMS AGAINST PROPERTIES
      RELATING TO BROADWAY WELL NO. 2..........................................................24

      A.      OAK STREET WELL NO. 1 ........................................................24
      B.      BROADWAY WELL NO. 2 ........................................................25

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Atlantic Richfield Co. v. Interstate Oil Transp. Co.,* 784 F.2d 106
 (2d Cir. 1981)..................................................................................................................15

*Coliseum Towers Assocs. v. County of Nassau,* 2 A.D.3d 562,
 769 N.Y.S.2d 293 (2d Dept. 2003) ................................................................................19

*Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599 (1961) .............................................18

*Federal Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39,
 691 N.Y.S.2d 508 (1st Dept. 1999) ...............................................................................19

*Fitzgerald v. Fahnestock & Co.,* 286 A.D.2d 573,
 730 N.Y.S.2d 70 (1st Dept. 2001) ..................................................................................23

*Grant-Howard Associates v. General Housewares Corp.,* 63 N.Y.2d 291,
 482 N.Y.S.2d 225 (1984)...........................................................................................20, 21

*Harris v. Rivera,* 921 F.Supp. 1058 (S.D.N.Y. 1995) .........................................................15

*Heimback v. Metropolitan Transp. Authority,* 75 N.Y.2d 387,
 553 N.Y.S.2d 653 (1990)................................................................................................18

*In Re MTBE Litigation,* 2008 U.S. Dist. LEXIS 38792 (S.D.N.Y. May 13, 2008)...............19

*Kids Cloz Inc. v. Officially for Kids, Inc.,* 00 Civ. 6270,
 2002 WL 1586877 (S.D.N.Y., 2002)..............................................................................22

*Manley v. Ambase Corp.,* 337 F.3d 237, 245 (2d Cir. 2003)................................................18

*Mid Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corporation,*
 418 F.3d 168 (2d Cir. 2005).............................................................................................15

*Multi Juice S.A. v. Snapple Beverage Corp.,* 2006 U.S. Dist. LEXIS 35928
 at 11-12, 2006 WL 1519981 (S.D.N.Y., June 1, 2006) .......................................................14

*Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42 (1956).........................................................18

*Ottley v. Palm Tree Nursing Home,* 493 F. Supp. 910 (S.D.N.Y. 1980)..............................19

*Park v. Automotive Realty Corp.,* 94 Civ. 4451 (S.D.N.Y. May 30, 1996)...........................14

*Placente v. JK Funding, Inc.,* 271 A.D.2d 666, 706 N.Y.S.2d 198 (2d Dept. 2000) ............20

*Royal Ins. Co. of Am. v. DHL Worldwide Express,* 1999 U.S. Dist. LEXIS 10530,
1999 WL 494118, at 4 (S.D.N.Y. July 12, 1999) ...................................................14

*Schumacher v. Richards Shear Company, Inc.,* 59 N.Y.2d 239,
464 N.Y.S.2d 437 (1983).........................................................................20, 21, 22

*Semenetz v. Sherling & Walden, Inc.,* 7 N.Y.3d 194, 818 N.Y.S.2d 819 (2006) .................22

*Societe Anonyme Dauphitex v. Schoenfelder Corp.,* 2007 WL 3253592
(S.D.N.Y. 2007) ................................................................................…..22, 23

*State v. Green,* 96 N.Y.2d 403, 729 N.Y.S.2d 420 (2001) .....................................24

*Zubulake v. UBS Warburg,* 231 FRD 159, 2005 U.S. Dist. LEXIS 1525
(S.D.N.Y. 2005) .........................................................................................15

Other

1 RESTATEMENT, Contracts, § 235(c) ..................................................................18

<u>**PRELIMINARY STATEMENT**</u>

"Desperate times call for desperate measures." (Guy Fawkes, November 6, 1605).

Therein lies the motivation behind defendant Getty Properties Corporation's ("Properties") belated motion which, in effect, seeks summary judgment against Getty Petroleum Marketing Inc. ("GPMI") in **all** pending MTBE lawsuits on a cross-claim for indemnity which has never been pled.[1]  Properties now argues that GPMI is the successor in interest of Getty Petroleum Corporation ("Getty Petroleum") and therefore affirmatively assumed all environmental liability for all "Getty" sites, including sites which were never leased to GPMI and/or which predated GPMI's 1997 formation.  In truth, Properties has retained liability for approximately 1,300 former Getty Petroleum sites from Maine to Virginia.

The pleading flaw aside (discussed *infra,* Point I), the motion fails for three fundamental reasons.  First, Properties' arguments contradict the parties' controlling environmental allocation agreements (relevant provisions of which Properties simply ignores), as well as Properties' own SEC filings describing its ongoing significant environmental liabilities.  Second, Properties' arguments are contrary to its own course of conduct in remediating hundreds of pre-1997 spill sites and in defending and indemnifying GPMI in both environmental and tort lawsuits arising therefrom.  Third, aside from the 18 trial wells in the first phase of the *Suffolk* case, there has been no well specific causation discovery or environmental analysis in any of the remaining 41 cases.  As a result, multiple issues of disputed material fact preclude summary judgment in all these cases.

---

[1]     Like Properties, GPMI is a defendant in 42 of the pending MDL lawsuits.  GPMI, along with the vast majority of defendants have reached settlement agreements with plaintiffs' counsel (Weitz & Luxenberg and Baron & Budd) in the *Suffolk* case and 26 other cases (the "Settled Cases"), leaving Properties as one of the few non-settling defendants facing a September 15, 2008 trial date.

**STATEMENT OF FACTS**

## I.   The Creation of Getty Petroleum Corporation in 1985

In 1985, PowerTest Corp., a Long Island-based gasoline distributor and retailer, acquired the "Getty" brand, certain Getty marketing assets (terminals and gasoline stations) located in the Northeast and Mid-Atlantic, changed its name to Getty Petroleum Corporation ("Getty Petroleum"), and operated the expanded business until 1997.  In March 1997, Getty Petroleum created and transferred to GPMI certain non-real estate petroleum distribution and marketing assets.  (McGahren Dec., Ex. "J," ¶ 3).  In 1997 Getty Petroleum transformed itself into a publicly traded REIT, changing its name to Getty Realty Corp. and ultimately Getty Properties Corp.  (McGahren Dec., Ex. "J," ¶ 3).

Properties is not merely a "real estate company."  Properties is "**the largest publicly traded real estate investment trust specializing in the ownership and leasing of service stations, convenience stores and petroleum distribution terminals in the United States**." (GPMI Ex. "2," p. 1; www.gettyrealty.com, (emphasis added)).  In 2005 it "celebrated its 50th anniversary in the [gasoline] business, the 20th anniversary on the New York Stock Exchange and its 5th year as a real estate investment trust."  (*Id.*; Ex. "3," p. 2).

Properties continues to own the "Getty" trademark and licenses same to GPMI pursuant to a license agreement, under which Properties retains control over the nature and quality of the petroleum products and services distributed by GPMI.  (GPMI Ex. "4," pp. 6-7).

## II.   The March 1997 GPMI Transaction

In March 1997, Getty Petroleum transferred to GPMI certain gasoline marketing and distribution assets, principally via a Master Lease (discussed *infra*)  (McGahren Dec., Ex. "J," ¶ 3).  The terms of the transaction were set forth in (a) the January 31, 1997 Reorganization

Agreement (McGahren Dec., Ex. "D") and (b) the February 1, 1997 Master Lease between

Properties (f/k/a Getty Realty), as landlord, and GPMI, as tenant. (McGahren Dec., Ex. "G").

Properties did not transfer all of Getty Petroleum's marketing and distribution assets to

GPMI in 1997. Getty Petroleum retained title to the gasoline-related real estate assets (terminals,

service stations, etc.), a Maryland and Pennsylvania-based home heating oil business (GPMI Ex.

"6," p. 1),[2] as well as the rights to the "Getty" trademark (GPMI Ex. "4"). In addition, prior to

the GPMI transaction, Properties engaged in the "divestment of non strategic and uneconomic

retail outlets," leaving it with a "strategic core of more than 1,100 properties." (GPMI Ex. "1,"

p. 6). Properties divested itself of approximately 1,000 terminals and/or gasoline station

locations. These divested sites were never leased to GPMI. (Stendardi Dec., p. 2; GPMI Ex.

"12").

    **(a)**       **The Reorganization Agreement**

The Reorganization Agreement contained specific provisions governing allocation of the

Getty Petroleum liabilities. Pursuant to Article 3.01, GPMI agreed to assume the "Marketing

Liabilities" and Properties (described as "Getty") agreed to retain the "Retained Liabilities."

(GPMI Ex. "6," p. 21).

"Marketing Liabilities", to be assumed by GPMI, was defined in pertinent part to

specifically exclude "all Indemnified Environmental Liabilities." (*Id.*)[3]

"Retained Liabilities", to be retained by Properties, was defined in pertinent

part as follows:

---

[2]     To avoid confusion, all GPMI exhibits are annexed to the Harrington Declaration and shall be referred to as "GPMI Ex. '__'."

[3]     Properties conveniently ignores the exclusion of "all Indemnified Environmental Liabilities" from the definition of "Marketing Liabilities."

Retained Liabilities:  (i) All of the Liabilities arising out of or in connection with the Retained Assets or the Retained Business determined on a basis consistent with the determination of the Liabilities of Getty included on the Getty Pro Forma Consolidated Balance Sheet, (ii) **all of the Liabilities of Getty under, or to be retained or assumed by Getty or any of the Retained Subsidiaries pursuant to this Agreement or any of the Related Agreements, . . . (vi) all Indemnified Environmental Liabilities,[4] and (vii) all other Liabilities of Getty not constituting Marketing Liabilities**.

(*Id.,* pp. 11-12) (emphasis added).

The term "Indemnified Environmental Liabilities", also to be retained by Properties, was defined as follows:

Indemnified Environmental Liabilities: All Liabilities relating to (i) the pre-closing environmental liabilities and obligations set forth on Schedule 1.01(a) hereto, (ii) all future upgrades set forth on Schedule 1.01(b) hereto necessary to cause USTs to conform to the 1998 federal standards for USTs, and (iii) all environmental liabilities and obligations arising out of discharges with respect to the properties containing USTs that have not been upgraded to conform to the 1998 federal standards for USTs, that are discovered prior to the date such USTs are upgraded to meet the 1998 federal standards.

(*Id.,* pp. 5-6).

---

[4]     The term "Liabilities" was defined as:

Any and all debts, liabilities and obligations, absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, including all costs and expenses relating thereto, and including, without limitation, those debts, liabilities and obligations arising under any law, rule, regulation, Action, threatened Action, . . . and those arising under any contract, commitment or undertaking.

(*Id.,* pp. 6-7).

The term "Action" is defined, in pertinent part, as:  "any action, claim, suit, arbitration, inquiry, proceeding or investigation by or before any court . . ." (*Id.,* p. 2).

**(b)** **The Master Lease**

One of the "Related Agreements" referred to in the definitions of "Retained Liabilities" and "Marketing Liabilities" was the 1997 Master Lease which further identified and amplified the allocation of environmental liabilities between Properties and GPMI.[5]

Under the Master Lease, Properties leased to GPMI only those specific gasoline properties identified in Exhibits A and B thereto as of the Commencement Date (February 1, 1997). (GPMI Ex. "7," p. 1, ¶¶ A, B). Properties' 1997 SEC Information Statement confirms 1,037 terminals and/or stations were leased to GPMI under the Master Lease. (GPMI Ex. "5," p. 15).

**(i)** **Exhibit "D" Sites – UST Upgrades and Attendant Environmental Liabilities**

Paragraph 7.6 of the Master Lease obligated Properties to retain liability for 473 leased stations (Exhibit "D" Sites) until Properties upgraded the UST systems to comply with the enhanced 1998 EPA UST regulations, at which time responsibility for these UST systems would be transferred to GPMI, "except for Landlord's obligation under Paragraph 9.3 to remediate." (GPMI Ex. "7," p. 13).

**(ii)** **Exhibit "E" Sites – Active Contamination Sites**

Paragraph 9.3 obligated Properties' to also retain ongoing and future obligations with respect to "Exhibit E" sites: 694 leased sites which contained existing environmental contamination requiring remediation, providing in pertinent part:

> **Landlord shall retain responsibility for the ongoing remediations at the Premises, set forth on Exhibit E . . .**

[5] The Master Lease was subsequently superceded by a 2000 Amended Master Lease (*infra*, Section IV(a)). However, we discuss same to provide the Court with an accurate factual evolution of Properties' ongoing environmental liabilities.

> **Landlord shall, at Landlord's expense, comply with all
> applicable Environmental Laws (a) to the extent such
> compliance is necessitated by events that occurred before the
> Commencement Date, and (b) affecting the Premises (i) set
> forth on Exhibit D until such time as the UST's have either
> been replaced or upgraded to comply with the Law requiring
> compliance by December 22, 1998 and all remediation has
> been completed until such time as Government closure has
> been received for such Premises whether or not the Hazardous
> Substances Discharge being remediated was discovered during
> the upgrade or replacement of the USTs, and (ii) set forth on
> Exhibit E until all remediation has been completed to
> Government closure.**

(*Id.,* p. 15) (emphasis added).

Accordingly, of the original 1,037 sites leased to GPMI (GPMI Ex. "5," p. 15),

Properties expressly retained liability, and agreed to indemnify GPMI, for at least 694 sites

(Exhibits "D" and "E" Sites) – or 67% of the total leased sites. (*Id.*).

**(c)    The Record Retention Policy**

The Reorganization Agreement required GPMI to maintain the Getty Petroleum books

and records in the event Properties required access to same to defend claims or lawsuits arising

from these "Retained Liabilities." (GPMI Ex. "6," p. 33, § 7.02).[6]

**III.    Properties' 1997 SEC Filings**

**(a)    Properties' 1997 Information Statement**

In explaining why GPMI's consolidated balance sheet did not reflect any existing

environmental liabilities, Properties again acknowledged its significant ongoing and future

obligations for pre-1997 environmental contamination:

> Marketing has not reflected a liability for the Getty

---

[6]    Properties retained "in perpetuity, [the right] to control the assertion or waiver of all
Privileges in connection with Privileged Information which relates solely to the Retained
Business . . ." (*Id.* p. 36, ¶ 7.07(a)).

Environmental Liabilities in its consolidated balance sheet **since Getty remains the primary obligor for such liabilities**.  The liabilities, which were initially recorded in Marketing's balance sheet, were subsequently capitalized into stockholders' equity as a contribution to capital by Getty to Marketing.  **In the unlikely event that Getty fails to remediate a contaminated property and Marketing is held jointly and severally responsible for the Remediation Costs, Getty is obligated to indemnify Marketing, and any Remediation Costs paid by Marketing will be offset against Marketing's rental obligations under the Master Lease.  Because of such rental offset, it is remote that Marketing would incur any incremental costs in connection with any such remediation**.

(Ex. "5," p. 24) (emphasis added).

In an unrelated lawsuit between the parties now pending in New Jersey state court, Leo Liebowitz, Properties' Chairman and CEO and former President and CEO of Getty Petroleum, testified that "GPMI had no liabilities at the time of the transfer of assets" and that "it was the [Properties'] board of directors and management's intention to form **this new corporate entity. That was Lily White, no liabilities**."  (GPMI Ex. "8," p. 20, l. 5-11) (emphasis added).

### (b)    Properties' 1997 Annual Report to Shareholders

The Properties' 1997 Annual Report acknowledged its ongoing future environmental obligations, advising shareholders that it had "accrued $46,134,000 and $19,974,000 [for fiscal years 1997 and 1996], respectively, as management's best estimate for environmental remediation costs."  (GPMI Ex. "1," p. 20).

Properties also acknowledged the difficulty in estimating the fiscal magnitude of these future environmental liabilities and warned shareholders that actual remediation costs could exceed the accrued estimates due to "compliance with more stringent laws or regulations as well as more vigorous enforcement policies of the regulatory agencies or stricter interpretation of existing laws which may develop in the future."  (*Id.*).  Properties further warned that these

future developments might have an "adverse effect on the financial position or operations of the Company and **could require substantial additional expenditures for future remediation or the installation and operation of required environmental or pollution control systems and equipment**." (*Id.,* p. 20) (emphasis added).

**IV.**     **The 2000 Consolidated, Amended and Restated Master Lease and Indemnity Agreements**

In November 2000, the parties entered into a (i) Consolidated, Amended and Restated Master Lease which, by its terms, superceded the Master Lease (GPMI Ex. "9," p. 1) (the "Amended Master Lease"), (ii) an Environmental Indemnity Agreement (The "Indemnity Agreement") (GPMI Ex. "10"), and (iii) an Amended and Restated Trademark License Agreement. (GPMI Ex. "4"). The agreements were executed in conjunction with Lukoil Americas' contemplated acquisition of GPMI; the Lukoil transaction being specifically dependent upon the execution of the agreements. (GPMI Ex. "9," p. 1, Recitals, ¶ D).

    **(a)**     **The Amended Master Lease**

        **(i)**     **Properties' Liabilities for the UST Upgrades Sites And Pre-GPMI Contamination Sites**

Section 7.6 of the Amended Master Lease continued to require Properties to complete the upgrades for the UST systems for sites contained on Schedule 2 and Exhibit C to the Amended Master Lease (GPMI Ex. "9," p. 30).

Section 9.1 of the Amended Master Lease also reiterated Properties' obligation to remediate "Contamination" on the pre-1997 contaminated sites set forth on Schedule 2, 3, and Exhibit C. (*Id.*, pp. 31-32).[7] In other words, as of November 2000, Properties retained liability

---

[7]     The term "Contamination" was defined as follows: ". . . recoverable free liquid hydrocarbons, dissolved hydrocarbon components, absorbed and vapor phase hydrocarbon, or (footnote continued on next page)

to remediate at least the 408 sites reflected on Schedule 3 (12 of which are located in Suffolk County),[8] as well as the remaining properties listed on Schedule 2 and Exhibit C.[9]

Section 10.2 of the Amended Master Lease also confirmed that Properties retained liability to **third parties** for environmental claims. Entitled "Liability of Landlord", this section provided in pertinent part that:

> **. . . nothing in this Restated Lease shall be construed to exculpate, relieve or Indemnify Landlord [Properties] from or against any obligation, liability or duty of Landlord to third parties existing at or before the applicable Commencement Date [February 1, 1997]** *or* **its obligations arising under Sections 7.6 or 9.1 hereof or the Environmental Agreement.**

(*Id.,* p. 35) (emphasis added).

Mr. Liebowitz conceded that under this provision Properties retained liability to third parties for pre-February 1, 1997 environmental contamination and related claims. (GPMI Ex. "8," p 65, l. 10 to p. 66, l. 15).

---

other environmental contamination that is required to be Remediated under applicable Environmental Laws." (*Id.* p. 4, ¶ 1.14).

[8] "Getty" stations (by station numbers) are located in the following municipalities: Brentwood (53), Bayshore (54), Middle Island (61), Medford (110), N. Babylon (357), Smithtown (360), Lake Ronkonkoma (366), West Islip (425), Amityville (454), N. Babylon (535), Bayshore (58087), and Smithtown (58574).

[9] According to Properties' 2002 Annual Report, as of December 2002 it retained environmental liability for 411 active contamination sites:

. . . As of December 31, 2002, we have remediation action plans in place for 348 (85%) of the 411 properties for which we retained environmental responsibility. Sixty-three properties (15%) remain in the assessment phase, which when completed will likely result in a change in estimate for those properties.

(GPMI Ex. "11," p. 12).

**(b)** **The Indemnity Agreement**

The express purpose of the November 2, 2000 Indemnity Agreement was ". . . to allocate risks associated with certain liabilities, potential liabilities and responsibilities regarding the environmental condition of certain of the Properties." (GPMI Ex. "10," p. 1).[10] In the Indemnity Agreement, Properties also made various affirmative representations regarding the conforming environmental condition of the remaining leased properties (*Id.*, Section II, pp. 1-2), including that "no Hazardous Substances" were contained on or under the leased properties and that "no Hazardous Substances have migrated from or to the Service Station Properties or Petroleum Terminal Properties upon, under or about other properties in violation of any Environmental Laws." (*Id.*, Section II (b)(ii)).

Section IV(1)(d) and (e) reiterated Properties' obligations to indemnify and hold GPMI harmless concerning "all" claims arising from the "scheduled sites", and specified **new** categories of "closed, sold or otherwise disposed of" sites for which Properties now expressly retained liability:

> 1.  Notwithstanding anything to the contrary herein, in the Restated Master Lease, or any other agreement, **Tenant [GPMI] shall have no liability or obligation whatsoever, and Landlord [Properties] shall indemnify and hold Tenant harmless with respect to any and all allegations, actions, orders, decrees, suits, demands, demand letters, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in**

---

[10]   To evade application of the Indemnity Agreement, Properties argues that "the [Indemnity Agreement] agreement does not purport to govern liabilities unrelated to the environmental condition of the owned or leased properties, such as liabilities arising at the premises relating to the sale, distribution or marketing of gasoline." (Properties Br. p. 10). Yet, the clear language of the Indemnity Agreement confirms it was designed to address those precise liabilities – remediation and related claims arising from gasoline discharges and resultant contamination. Indeed, all gasoline discharges from retail stations or terminals must, by their nature, "relate to the sale, distribution or marketing of gasoline" from such sites.

**settlement, liabilities, obligations, taxes, liens, losses, expenses, and fees (hereinafter "Claims") with respect to a breach of Landlord's representations in Section II, above,** *as well as*:

\* \* \*

b.     **Any Petroleum Terminal Property and Service Station Property closed, sold or otherwise disposed of prior to February 1, 1997** (the "Spinoff Transaction");

c.     **Service Stations Properties closed, sold or otherwise disposed of after the Spinoff Transaction and before the Restatement Effective Date, except for the Service Station Properties identified on Schedule Z hereto**;

(*Id.,* p. 5) (emphasis added).

Therefore, in addition to the hundreds of "scheduled sites" described above, in the Indemnity Agreement Properties also expressly retained **all** liability relating to (a) any breach of its representations concerning the purported conforming environmental status of all "non scheduled" leased sites and (b) terminals and service stations "closed, sold or otherwise disposed of" (i) before the February 1, 1997 to GPMI Spinoff and (ii) between February 1, 1997 and November 2, 2000 Lukoil transaction. There are over 1,000 such "closed sites" for which Properties retains liability (Stendardi Dec., ¶ 5; GPMI Ex. "12"); 44 of which are located in Suffolk County. (GPMI Ex. "12," pp. 13, 18).

Similarly, Section IV(2) reaffirmed that GPMI had **no** obligation to remediate "any condition not in full compliance with any Environmental Law as of the Restatement Effective Date [November 2, 2000] at any Service Station Property or Petroleum Terminal Property"; that such contamination did **not** constitute a lease default, that Properties would **not** "take any action (i) reasonably likely to cause an applicable Government or a party . . . to assert a Claim that

seeks such Remediation or other compliance-related activity" and that, while free to do so, GPMI was not obligated to engage in any remediation if GPMI had "a reasonable, good faith basis for asserting a challenge or defense and . . . is, in fact, diligently challenging or defending against such Claim." (GPMI Ex. "10," pp. 5-6).

      **(c)**      <u>**The Amended and Restated Trademark License Agreement**</u>

Under the License Agreement, Properties expressly retained "control of the nature and quality of goods, services and related uses associated with the Licensed Marks." (GPMI Ex. "4," p. 8). The License Agreement requires GPMI to comply with Properties' written "Quality Standards" for petroleum products and station operations. (*Id.,* pp. 6-8 and Schedule B thereto). Properties expressly reserved the right to conduct periodic inspections of GPMI stations and to receive specimen samples of gasoline for testing. (*Id.,* p. 8). Finally, the License Agreement is coterminous with the Amended Master Lease. Upon expiration of same, the "Getty" trademark and all the real estate marketing assets revert back to Properties. (*Id.,* p. 14).

      **(d)**      <u>**Properties' 2007 Annual Report to Shareholders**</u>

In 2007 Annual Report, Properties again acknowledged ongoing environmental liability for 294 active contamination sites under its various agreements with GPMI:

> . . . **As of December 31, 2007, we have regulatory approval for remediation action plans in place for two hundred sixty-three (93%) of the two hundred eighty-two properties for which we continue to retain remediation responsibility and the remaining nineteen properties (7%) were in the assessment phase. In addition, we have nominal post-closure compliance obligations at 28 properties where we have received "no further action" letters**.

(GPMI Ex. "14," p. 19) (emphasis added).

Accordingly, as of 2007, Properties retained liability to remediate pre-1997 environmental contamination for at least 294 active contamination sites and approximately

1,000 "closed" gasoline station and/or terminal sites.

**V.     The Parties' Course of Conduct Confirms Properties' Ongoing Environmental Liability**

Consistent with the aforesaid express contract provisions, since 1997 Properties has defended and indemnified GPMI for pre-1997 environmental liabilities, including lawsuits asserting environmental remediation claims, as well as wrongful death and personal injury actions for exposure to environmental contamination.  The Court need look no further than Schedule 14 of the Amended Master Lease for a list of then pending lawsuits in which each party was indemnifying the other as required by the Amended Master Lease.  (GPMI Ex. "9," Schedule 14).  Categories B and D describe the lawsuits for which Properties was indemnifying and holding GPMI harmless.  They included environmental contamination claims, a wrongful death lawsuit arising from alleged exposure to benzene filed in 2000 in the United States District Court in Vermont (Category B(5) – *Shangraw v. ExxonMobil Corp., et al.*), and a 1999 state court personal injury lawsuit also based on alleged benzene exposure in Nassau County (Category D(1) – *Eric Parker v. Getty Petroleum Marketing Inc.*).

**ARGUMENT**

**POINT I**

**PROPERTIES' MOTION IS PROCEDURALLY DEFECTIVE**

As recognized in the Court's May 13, 2008 Opinion (p. 2, fn. 4) and Amendment to Case Management Order # 38 and # 39 (GPMI Ex. "15"), plaintiffs and GPMI have settled the *Suffolk* case and the 26 other cases wherein plaintiffs are represented by the law firms of Weitz & Luxenberg and Baron & Budd (the "Settled Cases").  Properties elected not to settle and now moves for summary judgment to shift all "Getty" liability to GPMI in both the Settled cases, as well as the 15 remaining active MTBE cases in which Properties and GPMI are defendants.

Despite four years of litigation and multiple amended answers, Properties has **never** asserted a cross-claim for such relief. Therefore, on this basis alone Properties' motion should be denied. *Park v. Automotive Realty Corp.,* 94 Civ. 4451, pp. 5-6 (S.D.N.Y. May 30, 1996) (A. Schwartz) (copy is annexed hereto).

We recognize that, under circumstances not present here, a court may entertain a summary judgment motion based upon an unpled affirmative defense and treat such motion as one for leave to amend under Rule 15(a) F.R.Civ.P. *See generally Multi Juice S.A. v. Snapple Beverage Corp.,* 2006 U.S. Dist. LEXIS 35928 at 11-12, 2006 WL 1519981 (S.D.N.Y., June 1, 2006) citing *Royal Ins. Co. of Am. v. DHL Worldwide Express,* 1999 U.S. Dist. LEXIS 10530, 1999 WL 494118, at 4 (S.D.N.Y. July 12, 1999). In considering such a motion, a court must consider the criteria typically governing a Rule 15 motion. *Id.*

Application of that standard warrants denial of any belated request by Properties to amend its answer on the eve of trial to assert the indemnity claim against GPMI which is the lynchpin of this motion. Assertion of such a cross-claim would be extraordinarily prejudicial to GPMI. GPMI has resolved the "Settled Cases" and, as such, has not complied with any of the CMO # 37 pretrial submission deadlines. GPMI withdrew its motion for summary judgment in light of the settlement. Finally, no discovery has been taken on Properties' belated "indemnity" theory, or the critical well and station specific causation discovery required to adjudicate the *Suffolk* case (other than the 18 trial wells), let alone the 41 other cases where Properties now seeks summary judgment.

Properties cannot offer any legitimate excuse for its delay in asserting this cross-claim. If Properties' motion for dismissal was as simple and dispositive as Properties argues (and it is not), an appropriate cross-claim and this motion should have been made years ago, not **after** the

expiration of the Court deadline for dispositive motions, and **after** the vast majority of defendants, including GPMI, resolved the "Settled Cases."  This Court properly denied leave to amend an answer on the eve of trial under far less egregious circumstances.  *Zubulake v. UBS Warburg,* 231 FRD 159, 2005 U.S. Dist. LEXIS 1525 (S.D.N.Y., 2005) (motion to amend answer on eve of trial denied after 22-month delay).  That rationale applies with equal force here.

Finally, assuming the Court were inclined to grant a Rule 15 amendment (and we submit it should not), assertion of an indemnity claim at this juncture in this complex litigation is premature.  *Mid Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corporation,* 418 F.3d 168 (2d Cir. 2005) (a claim for indemnity under New York law is not ripe until the indemnitee sustains  liability); *see also Atlantic Richfield Co. v. Interstate Oil Transp. Co.,* 784 F.2d 106, 112 (2d Cir. 1981); *cf Harris v. Rivera,* 921 F.Supp. 1058, 1062 (S.D.N.Y. 1995) (exception to general rule permitting amendment under circumstances, not applicable here, where assertion of contingent third party claim for indemnity serves interests of judicial economy and fairness).

## POINT II

### PROPERTIES RETAINED ONGOING ENVIRONMENTAL LIABILITY FOR APPROXIMATELY 1,300 "GETTY" SITES UNDER THE PARTIES' ENVIRONMENTAL ALLOCATION AGREEMENTS

Properties argues that GPMI simply assumed "all environmental liabilities" as the "successor in interest" to Getty Petroleum Corp.'s "Marketing Assets."  The express language of the Reorganization Agreement, Master Lease, Restated Master Lease and Indemnity Agreement expose the folly of this argument.

The aforesaid agreements, which govern the allocation of liabilities (see *infra,,* POINT

III), could not be any clearer – Properties expressly retained all liability for approximately 1,300 "Getty" stations and terminals which required either (i) UST upgrades, and any related remediation (GPMI Ex. "7," p. 13 and GPMI Ex. "9," p. 30), (ii) remediation of existing environmental contamination (GPMI Ex. "7," p. 15 and GPMI Ex. "9," pp. 31-33), as well as (iii) former terminal or station sites "closed, sold or otherwise disposed of" before the 1997 GPMI or the 2000 Lukoil transaction.  (*Id.,* GPMI Ex. "10," p. 5).

Second, the Indemnity Agreement reaffirmed that GPMI had no obligation to remediate "any condition not in full compliance with the Environmental Law as of the Restatement Effective Date [November 2, 2000] at any Service Station Property or Petroleum Terminal Property."  (GPMI Ex. "10," p. 5).

And there is no question that the parties reference to "all" liability relating to those sites meant just that.

Section IV(1) of the Indemnity Agreement (which Properties also ignores) expressly provides that GPMI has "no liability or obligation whatsoever" and is entitled to be indemnified and held harmless by Properties for "any and all" claims relating to (i) Properties' breach of warranty concerning the environmental compliance of non scheduled sites, (ii) sites "sold or disposed of" either before the 1997 Spinoff transaction or the 2000 Lukoil transaction, and (iii) "scheduled sites" for which Properties is obligated to upgrade USTs or remediate active contamination.  (GPMI Ex. "10," p. 5).

Furthermore, Properties' argument that it did not assume liabilities to "third parties" also flies in the face of the aforesaid agreements.  (Properties Br., p. 13).  Section 10.2 of the Restated Master Lease confirms that nothing in the "**Restated Lease shall be construed to exculpate, relieve or Indemnify [Properties] from or against any obligation, liability or duty of**

**Landlord [Properties] to third parties existing at or before the applicable Commencement Date** [February 1, 1997]."  (GPMI Ex. "9," Section 10.2, p. 35) (emphasis added).  Mr. Liebowitz, Properties' Chairman, conceded this during his recent deposition.  (GPMI Ex. "8," p. 65, l. 10 to p. 66, l. 15).  Consistent with this express third party obligation, Properties has defended GPMI in products liability and tort actions relating to alleged exposure to pre-1997 petroleum contamination.  (GPMI Ex. "9," Schedule 14).

Finally, the aforesaid agreements and Properties' SEC filings defeat Properties' argument that it has no liability for "unknown contamination."  Properties expressly warranted in the Indemnity Agreement that no such contamination existed on "non scheduled" sites, and agreed to indemnify Properties for "all liability" arising from breaches of those warranties in the Indemnity Agreement.  (GPMI Ex. "10," Section II (1)(b), p. 2).  Properties' 1997 Annual Report, wherein it accrued $46 million for "Retained Liabilities," specifically warned the investing public that the magnitude of these future liabilities was difficult to predict given the vagaries of environmental contamination and ever evolving regulatory and legislative enforcement mechanisms, and "could require substantial additional expenditures for future remediation . . ."  (Ex. "1," p. 2).[11]

Finally, Properties' reliance upon the definition of "Marketing Liabilities" is, at best, disingenuous.  (Properties Br., p. 7).  Properties disregards the reality that the term "Marketing Liabilities" expressly excludes "Indemnified Environmental Liabilities."  (GPMI Ex. "6," p. 9).  Moreover, the broad definition of the term "Liabilities" applies with equal force to Properties' "Retained Liabilities" which specifically includes "(ii) all of the Liabilities of Getty under . . .

---

[11]     Properties' 2007 Annual Report reiterated this precise warning regarding the potential escalating of future remediation costs.  (GPMI Ex. "14," pp. 18-19).

this Agreement, . . . (vi) all Indemnified Environmental Liabilities and (viii) all other Liabilities of Getty not constituting Marketing Liabilities." (GPMI Ex. "6," p. 12). Since the term "Liabilities" is defined to include "any and all debts, liabilities and obligations absolute or contingent, mature or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising . . ." (*Id.,* p. 6), Properties' retention of the "Retailed Liabilities," as well as the additional environmental liabilities provided in the Indemnity Agreement, obligate Properties to indemnify and defend GPMI for all environmental claims, "known or unknown, whenever arising," including the claims asserted by plaintiffs for pre-February 1, 1997 petroleum discharges.

"It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract * * * without force and effect.'" *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599 (1961) *quoting Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46 (1956); 1 RESTATEMENT, Contracts, § 235(c). Yet, that is precisely what Properties asks this Court to do in the instant motion. In order to grant Properties summary judgment the Court would have to disregard the indemnity provisions of the Amended Master Lease and Indemnity Agreement. We submit the Court should not do so.

Furthermore, "New York law requires indemnification agreements to be strictly construed; a court cannot find a duty to indemnify absent manifestation of an "unmistakable intention to indemnify." *Manley v. Ambase Corp.,* 337 F.3d 237, 245 (2d Cir. 2003) citing *Heimback v. Metropolitan Transp. Authority,* 75 N.Y.2d 387, 392, 553 N.Y.S.2d 653, 657 (1990). Here, the operative agreements reflect an "unmistakable intention" by Properties to indemnify GPMI for environmental and related claims arising from approximately 1,300 sites.

Since 1997 the parties' course of conduct has been consistent with that "unmistakable

intention." Properties has and continues to remediate hundreds of active contamination sites. Properties has also indemnified and held GPMI harmless for environmental claims as well as wrongful death and personal injury claims based upon contaminant exposure. (GPMI Ex. "9," Schedule 14). Such conduct is compelling, dispositive evidence of Properties' ongoing pre-1997 environmental liabilities. *Coliseum Towers Assocs. v. County of Nassau,* 2 A.D.3d 562, 564, 769 N.Y.S.2d 293, 296 (2d Dept. 2003) ("The practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling influence."); *Federal Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 691 N.Y.S.2d 508 (1st Dept. 1999); *Ottley v. Palm Tree Nursing Home,* 493 F. Supp. 910, 914 (S.D.N.Y. 1980) ("Few things can better evidence the meaning of a contract than the actions of the parties themselves").

Properties has retained environmental liability for approximately 1,300 sites. Plaintiffs have filed a total of 42 cases against Properties and GPMI in eight (8) different states.[12] This Court has held that potential liability for MTBE contamination requires a fact intensive, well by well, station by station causation analysis, particularly regarding non-refiner defendants such as Properties and GPMI. (2008 U.S. Dist. LEXIS 38792, pp. 15 and 47-50 (S.D.N.Y. May 13, 2008)). We respectfully submit the Court cannot possibly grant summary judgment to Properties regarding the site specific liabilities for these "Getty" sites since the vast majority of the allegedly impacted wells in the 42 cases have yet to be identified, let alone discovery completed on contamination causation with respect thereto. Accordingly, at this preliminary

---

[12]    Plaintiffs have filed pending MTBE lawsuits in the following states: New York (27), New Jersey (3), Connecticut (4), Maine (1), Pennsylvania (1), Virginia (3), Vermont (2), and West Virginia (1).

stage, obvious material issues of disputed fact exist as to the issue of causation in each of the 42 cases which preclude the grant of summary judgment to Properties.

## POINT III

### GPMI DID NOT RETAIN SUCCESSOR LIABILITY FOR GETTY PETROLEUM CORP.

Properties argues in the alternative that GPMI is a "mere continuation" of Getty Petroleum Corp. and therefore, retains "successor liability" for Getty Petroleum's liabilities. This argument is both irrelevant and incorrect.

Properties concedes, as it must, that "a corporation which acquires the assets of another is not liable for the torts of its predecessor." *Schumacher v. Richards Shear Company, Inc.,* 59 N.Y.2d 239, 240, 464 N.Y.S.2d 437 (1983). Where, as here, sophisticated parties to an asset sale enter into liability allocation agreements, those agreements govern the parties' liabilities, rendering "successor liability" analysis "irrelevant." *Grant-Howard Associates v. General Housewares Corp.,* 63 N.Y.2d 291, 482 N.Y.S.2d 225 (1984), *see also Placente v. JK Funding, Inc.,* 271 A.D.2d 666, 706 N.Y.S.2d 198 (2d Dept. 2000).

In *Grant-Howard,* as here, the defendant corporations entered into a reorganization agreement wherein, *inter alia,* they allocated liabilities and indemnity obligations for third party claims in conjunction with Grant Howard's sale of assets to General Housewares. In reversing the trial court and Appellate Division, the Court of Appeals held that the terms of the reorganization agreement, not the doctrine of successor corporate liability, governed who was responsible for a product liabilities claim filed five years after the transaction:

> All of this [successor liability doctrine], however, is irrelevant to the question of indemnification or liability as between the seller and purchaser. The precise issue here is the ordering of relations between the two contracting parties, not guaranteeing that some third party has recovery against a tortfeasor. A sale of assets

does not vitiate the original company's liability (citation omitted); it may allow an injured plaintiff to proceed against a successor corporation (citation omitted). In short, the injured party can elect to proceed against the defunct corporation, the successor corporation, or both. This right of election cannot be altered per se by the corporations. The companies can regulate how such liability will be allocated among themselves, but they cannot affect the rights of a stranger to their contract (citations omitted).

**By this analysis, it is unnecessary to decide defendant's status as a successor corporation. Who must bear the ultimate burden of defending the Pohl suit and, if unsuccessful, paying the damages, is wholly dependent on the terms of the Reorganization Agreement.**

(*Id.*, p. 297) (emphasis added).

And so it is here. However, to the extent the Court considers Properties' "successor liability" argument, it is nonetheless unavailing since none of the four exceptions to the general rule necessary for imposition of successor liability are present. *Schumacher, supra* at p. 239.

First, GPMI did not "expressly or impliedly" assume all of Getty Petroleum's tort liabilities. (*supra* POINT II). To the contrary, as reflected in the parties' multiple agreements, the parties expressly allocated those liabilities in the 1997 Reorganization and Master Lease Agreements, reaffirmed and expanded same in the 2000 Amended Master Lease and Indemnity Agreements and since then have defended and indemnified each other in accord therewith.

Similarly, there was no consolidation or merger of Properties and GPMI. Each was and is a separate and distinct corporate entity. Properties does not seriously argue to the contrary, nor could it since its SEC filings say just that. (GPMI Ex. "1," p. 2; GPMI Ex. "11," p. 2; GPMI Ex. "14," p. 2).

Instead, Properties is forced to rely exclusively on the third exception, arguing that GPMI

was a "mere continuation" of Getty Properties. (Properties Br., p. 14). [13] However, at best, GPMI was a spinoff of only a portion of Getty Petroleum's business – the gasoline distribution and marketing business. Getty Petroleum (later known as Properties) continued to own the far more lucrative, less market sensitive real estate business (with GPMI as its primary tenant), as well as a Pennsylvania and Maryland-based home heating oil business. Therefore, GPMI did **not** receive all of Properties' marketing assets. As such, GPMI is not a "mere continuation" of Properties. Properties' argument is more akin to a "product line" theory of successor liability; a theory which the New York Court of Appeals has resoundingly rejected. *Semenetz v. Sherling & Walden, Inc.,* 7 N.Y.3d 194, 818 N.Y.S.2d 819 (2006).

Properties' "mere continuation" argument has additional problems. This exception applies ". . . only where one corporation survives the transaction; the predecessor corporation must be extinguished." *Schumacher* at 245. Here, Properties is not only in existence, by its own admission it is "the largest publicly traded [REIT] . . . specializing in the ownership and leasing of service stations, convenience stores and petroleum distribution terminals in the United States." (GPMI Ex. "2," p. 1).

Properties next argues that recent court decisions have eliminated the requirement for extinguishments of the predecessor corporation. (Properties Br. at p. 15). However, the cited authorities do not support such a proposition, particularly in the context of a summary judgment motion. *See, Societe Anonyme Dauphitex v. Schoenfelder Corp.,* 2007 WL 3253592 (S.D.N.Y. 2007) (Court denied Rule 12(b)(6) motion at pleading stage); accord *Kids Cloz Inc. v. Officially*

---

[13] As the creator of GPMI, Properties could not possibly argue that the fourth exception – the fraudulent attempt to avoid corporate liabilities – applies.

*for Kids, Inc.,* 00 Civ. 6270, 2002 WL 1586877 (S.D.N.Y. 2002).[14]

Moreover, the fundamental justification underlying the "mere continuation" exception – to disregard corporate shenanigans to provide an injured plaintiff facing the prospect of no relief with a remedy against a viable corporate defendant – is not present. Two viable Getty entities exist.

Finally, Properties argues that it is not liable for either "products liability" or "traditional tort" and statutory claims. (Properties Br., pp. 17-22). This argument similarly fails. First, this Court has held that a "retailer" is potentially liable under each theory. (May 13 Opinion at pp. 47-50). Properties ignores this holding. Properties also disregards the clear liability allocation language of the parties' various agreements wherein Properties has expressly retained liability for more than 1,300 sites. Instead, Properties argues that since all the claims allegedly relate to the "Marketing Business" acquired by GPMI, liability for the plaintiffs' various claims must naturally follow. However, Properties cites no authority for this *ipse dixit* argument for good reason – none exists. Finally, Properties disregards the reality that it was Properties (then known as Getty Petroleum), not GPMI (which did not exist), that engaged in the alleged "Marketing Business" that generated petroleum discharges prior to February 1, 1997. Properties' retained liabilities, as reflected in the Amended Master Lease and Indemnity Agreement, all refer to Getty Petroleum's past conduct as a gasoline "retailer." Under Section 10.2 of the Amended Master Lease, Properties expressly retained liabilities to third parties for such pre-1997 claims.

---

[14]     *Societe Anonyme* relied heavily on the Second Department decision in *Fitzgerald v. Fahnestock & Co.,* 286 A.D.2d 573, 730 N.Y.S.2d 70 (1st Dept. 2001) which, while never embraced by the New York Court of Appeals, dealt with (i) the "de facto merger" doctrine, which Properties does not (and cannot) assert and (ii) a brazen corporate attempt to evade third party liabilities by leaving the acquired corporation an assetless shell. Under those circumstances, which are not present here, the *Fitzgerald* court held that, in essence, the remaining shell corporation did not exist.

(GPMI Ex. "9," Section 10.2).  As such, Properties has specifically retained "retailer liability" for potential MTBE or any other gasoline contamination for pre-1997 gasoline discharges at approximately 1,300 sites – regardless of the theory or nature of plaintiffs' claims (product liability, negligence, Navigation Law or common law claims).[15]

**POINT IV**

**GPMI HAS NO LIABILITY FOR PLAINTIFFS CLAIMS AT OAK STREET WELL NO. 1 AND PLAINTIFFS HAVE AGREED TO DISMISS CLAIMS AGAINST PROPERTIES RELATING TO BROADWAY WELL NO. 2**

**A.     Oak Street Well No. 1**

Properties asserts that the Getty station at "19 Terminal Road" "is not listed on any of the schedules" to the parties' various agreements.  (Properties Br., pp. 22-25).  However, as explained in the Declaration of Joseph Guarino, this is because this site was closed in 1992, five years **before** GPMI was created.  Properties expressly retained all liability for this site under the "closed, sold or otherwise disposed of" provisions of Section IV(1)(b) and (c) of the Indemnity Agreement.  (GPMI Ex. "10," Section IV, p. 5).  The balance of Properties' arguments, which predictably ignore the Indemnity Agreement, are irrelevant.  Therefore, Properties' motion as to this site should be denied.

---

[15]     Properties argues that "but for the 'Marketing Business' . . . there would be no environmental liability."  (Properties Br. , p. 13).  However, taken to its logical conclusion, "but for" Properties' lucrative petroleum-based real estate business, which provided the precise venues for the "Getty" terminals and stations, there would be no "Marketing Business" or related service or liabilities.  As such, this circular argument has no merit.  Further, since Properties retained control over the quality of petroleum products and services provided by GPMI under the License Agreement, and owned or controlled the underlying real estate, it has potential liability as a landowner under the Navigation Law.  *See State v. Green,* 96 N.Y.2d 403, 729 N.Y.S.2d 420 (2001).

**B.**    **Broadway Well No. 2**

Multiple issues of material disputed fact preclude an award of summary judgment to Properties with respect to the 734 Park Avenue station including, without limitation, that (i) GPMI had no obligation under the Indemnity Agreement to remediate "any condition not in full compliance with any Environmental Law" as of November 2, 2000 (GPMI Ex. "10," pp. 5-6); (ii) Properties misrepresented the environmental compliance of said site, entitling GPMI to indemnification for same (*Id.*, Section IV(1), p. 5); and (iii) under the Amended Master Lease Properties expressly assumed third party liabilities for this type of claim.  (GPMI Ex. "9," Section 10.2, p. 35).

However, to preserve judicial resources and expedite the first phase of the *Suffolk* trial, plaintiffs have agreed to dismiss their claims against Properties arising from the 734 Park Avenue site, under the parties' standing stipulation of dismissal (Properties Br., p. 2) and plaintiffs include these site specific claims against GPMI as settled and dismissed as against GPMI under the GPMI settlement agreement.  As such, plaintiffs' claims relating to this site are dismissed against both Getty defendants, rendering Properties' motion moot as to this site.

**CONCLUSION**

For the foregoing reasons, Properties' motion should be denied in its entirety.

Dated:  White Plains, New York
        July 17, 2008

RESPECTFULLY SUBMITTED,
BLEAKLEY PLATT & SCHMIDT, LLP

BY:_____s/ William P. Harrington____
        WILLIAM P. HARRINGTON (WH-5262)
        MATTHEW G. PARISI (MP-2188)
*Attorneys for GPMI*
ONE NORTH LEXINGTON AVE., P.O. BOX 5056
WHITE PLAINS, NY 10602-5056
(914) 949-2700