# Exhibit 3

Case 1:00-cv-01898-VSB-VF   Document 1925-3   Filed 07/21/08   Page 2 of 19



# GETTY REALTY

CELEBRATION
2005
ANNUAL REPORT



> "In addition to celebrating record level pre-tax income, adjusted funds from operations and regular dividend payments, in 2005 the Company celebrated its 50th anniversary in business, its 20th anniversary on the New York Stock Exchange and its 5th year as a real estate investment trust."

## Consolidated Financial Highlights
in thousands (except per share amounts)

|  | For the years ended December 31, | | |
|---|---:|---:|---:|
|  | **2005** | 2004 | 2003 |
| Revenues from rental properties | **$71,377** | $66,331 | $66,601 |
| Earnings before income taxes | **43,954** | 39,352 | 36,887 |
| Net earnings | **45,448** | 39,352 | 36,887 |
| Preferred stock dividends | **—** | — | 2,538 |
| Net earnings applicable to common shareholders | **45,448** | 39,352 | 34,349 |
| Diluted earnings per common share | **1.84** | 1.59 | 1.49 |
| Funds from Operations*(a)* | **52,252** | 46,224 | 42,382 |
| Diluted FFO per common share*(a)* | **2.11** | 1.87 | 1.82 |
| Adjusted Funds from Operations*(a)* | **46,588** | 41,760 | 36,845 |
| Diluted AFFO per common share*(a)* | **1.88** | 1.69 | 1.59 |
| Cash dividends declared per share: | | | |
|    Common | **1.76** | 1.70 | 1.68 |
|    Preferred | **—** | — | 1.159 |

*(a)* In addition to measurements defined by generally accepted accounting principles ("GAAP"), our management also focuses on funds from operations available to common shareholders ("FFO") and adjusted funds from operations available to common shareholders ("AFFO") to measure our performance. FFO is generally considered to be an appropriate supplemental non-GAAP measure of the performance of real estate investment trusts ("REITs"). FFO is defined by the National Association of Real Estate Investment Trusts as net earnings before depreciation and amortization of real estate assets, gains or losses on sales of real estate, non-FFO items reported in discontinued operations, extraordinary items, and cumulative effect of accounting change. Other REITs may use definitions of FFO and AFFO that are different than ours and, accordingly, may not be comparable.

    We believe that FFO is helpful to investors in measuring our performance because FFO excludes various items included in GAAP net earnings that do not relate to, or are not indicative of, our fundamental operating performance such as gains or losses from property sales and depreciation and amortization of real estate assets. In our case, however, GAAP net earnings and FFO include the significant impact of deferred rental revenue (straight-line rental revenue) on our recognition of revenue from rental properties, which results primarily from fixed rental increases scheduled under certain leases with our tenants. In accordance with GAAP, the aggregate minimum rent due over the initial term of these leases is recognized on a straight-line basis rather than when due. GAAP net earnings and FFO also include income tax benefits recognized due to a net reduction in amounts accrued for uncertain tax positions related to the Company being taxed as a C-corp. prior to 2001. As a result, management pays particular attention to AFFO, a supplemental non-GAAP performance measure that we define as FFO less straight-line rental revenue and income tax benefit. Income taxes have not had a significant impact on our earnings since 2001 when we first elected to be taxed as a REIT, and accordingly, have not recently appeared as a separate item in our statements of operations or reconciliation of AFFO from net earnings. In management's view, AFFO provides a more accurate depiction than FFO of the impact of the scheduled rent increases under these leases and our election to be taxed as a REIT beginning in 2001. Neither FFO nor AFFO represent cash generated from operating activities calculated in accordance with generally accepted accounting principles and therefore should not be considered an alternative for GAAP net earnings or as a measure of liquidity. FFO and AFFO are reconciled to net earnings in Selected Financial Data on page 7.

# Exhibit 4

## AMENDED AND RESTATED
## TRADEMARK LICENSE AGREEMENT

THIS AMENDED AND RESTATED TRADEMARK LICENSE AGREEMENT (together with all Schedules attached hereto and made a part hereof, this "License Agreement"), effective as of the Restatement Effective Date (as defined in the Master Lease (as hereinafter defined)), is entered into by and between: Getty Properties Corp. (f/k/a Getty Realty Corp.) (hereinafter called "REALTY"), a corporation organized and existing under the laws of the State of Delaware, located at 125 Jericho Turnpike, Jericho, New York 11753; and Getty Petroleum Marketing Inc. (together with any successors and permitted assignees, hereinafter called "MARKETING"), a corporation organized and existing under the laws of the State of Maryland, located at 125 Jericho Turnpike, Jericho, New York 11753.

WHEREAS, REALTY is the owner of certain trademarks, service marks and trade names that have been utilized in, among other businesses, the motor fuels marketing business, as conducted in certain areas of the United States (defined below as the Licensed Territory);

WHEREAS, REALTY has leased and subleased various motor fuels outlet properties to MARKETING under certain net lease agreements, all of which net lease agreements have been incorporated, consolidated, amended and restated as of the date hereof pursuant to that certain Consolidated, Amended and Restated Master Lease between REALTY, as landlord, and MARKETING, as tenant (as so incorporated, consolidated, amended and restated, the "Master Lease");

WHEREAS, REALTY licensed certain trademarks, service marks and trade names to MARKETING for use in its marketing business pursuant to the Trademark License

3. <u>OWNERSHIP OF MARKS</u>

MARKETING acknowledges REALTY's ownership of the Licensed Marks in the Licensed Territory. MARKETING agrees that it will do nothing inconsistent with such ownership and that all use of the Licensed Marks by MARKETING shall inure to the benefit of, and be on behalf of, REALTY. MARKETING agrees that nothing in this License Agreement shall give MARKETING any right, title or interest in the Licensed Marks other than the right to use the Licensed Marks in accordance with this License Agreement. MARKETING agrees that it will not attack the title of REALTY to the Licensed Marks or attack the validity of the rights granted under this License Agreement.

4. <u>QUALITY STANDARDS</u>

MARKETING agrees that the nature and quality of all services rendered by MARKETING in connection with the Licensed Marks; all goods sold by MARKETING under the Licensed Marks; and all related advertising, promotional and other related uses of the Licensed Marks by MARKETING shall conform to reasonable standards set by and be under the control of REALTY. MARKETING agrees that the quality of all such services, goods, and advertising and promotional materials associated with the Licensed Marks shall be of the same high-level quality as previously associated with the Licensed Marks. MARKETING further agrees that the quality of all such services, goods, and advertising, promotional and other related uses of the Licensed Marks shall conform with the standards, specifications, and instructions as established by REALTY or such subsequent standards, specifications, or instructions reasonably comparable thereto promulgated by MARKETING subject to the approval of REALTY, such approval not to be unreasonably withheld or delayed. MARKETING shall be deemed to have complied with the quality standards in existence from time to time under this License Agreement so long as MARKETING maintains the physical condition of, and the services provided through,

Branded Outlets not materially worse than the physical condition and level of service generally characteristic on the date hereof of retail service stations of MARKETING and its sublicensees that use the Licensed Marks. Except as may be required by law or as reasonably necessary to protect the Licensed Marks, REALTY shall not set quality standards higher than those generally characteristic on the date hereof of services rendered and goods sold through retail service stations of MARKETING and its sublicensees that use the Licensed Marks. REALTY shall not set quality standards for other licensees of the Licensed Marks that are lower than those set for MARKETING from time to time during the term of this License Agreement. Without limiting the generality of the foregoing, MARKETING agrees to comply with the standards, specifications, and instructions set out in Schedule B hereto, as may be modified from time to time in accordance with this Paragraph 4. If MARKETING intends to use the Licensed Marks on a new product within the ambit of a particular registration it shall request approval for such new product from REALTY at least thirty (30) days prior to initiating such new product use, and such approval shall not be unreasonably withheld by REALTY. REALTY shall provide MARKETING with notice of approval or non-approval, as the case may be, within thirty (30) days of the receipt of the notice with respect to MARKETING's intended new product; provided that REALTY shall be deemed to have given such approval if REALTY fails to deliver to MARKETING any notice within such 30-day period. If REALTY rejects any proposal to use any of the Licensed Marks with a new product, then REALTY shall provide a reasonably detailed explanation to MARKETING as to why REALTY found the proposed use of the Licensed Marks unacceptable. MARKETING may resubmit to REALTY, and REALTY shall give reasonable consideration to, an amended proposal for such new product.

5. QUALITY MAINTENANCE

MARKETING agrees to cooperate with REALTY in facilitating REALTY's control of the nature and quality of goods, services and related uses associated with the Licensed Marks, to permit reasonable inspection of MARKETING's operations once in any four-month period during normal business hours and upon ten day's prior written notice, and to supply REALTY with specimens of all uses of the Licensed Marks upon request. REALTY shall have no right to inspect the books and records of MARKETING other than those books and records reasonably related to the use of the Licensed Marks by MARKETING in accordance with the terms of this License Agreement, and REALTY shall maintain all such information in the strictest of confidence. MARKETING shall comply with all applicable laws and regulations, including, but not limited to laws and regulations applicable to the storage and sale of gasoline at Branded Outlets and will obtain all appropriate government approvals pertaining to the sale, distribution and advertising of goods and services covered by this License Agreement. REALTY shall have the right to enter and inspect up to fifteen Branded Outlets in any three-month period, which number, for purposes of clarification, includes Branded Outlets operated by sublicensees of the Licensed Marks. REALTY shall have the right to receive from MARKETING, upon request and without charge, a reasonable number of samples of products sold by MARKETING as well as labels, promotional materials, advertising materials, sales materials and related materials using any of the Licensed Marks.

6. FORM OF USE

A. MARKETING agrees to use the Licensed Marks only in the form, manner and trade dress and with appropriate legends as reasonably prescribed from time to time by REALTY, and not to use any other trademark, trade name, trade dress, or service mark in combination with any of the Licensed Marks without prior written approval of REALTY.

settle the action or proceeding shall be made by the party bringing the action or proceeding, subject to the approval of REALTY (if not a party), such approval not to be unreasonably withheld. If within ten (10) business days or such shorter time period as shall be reasonably practicable under the circumstances REALTY does not approve a proposed settlement recommended by MARKETING in good faith, REALTY shall be deemed to have taken over responsibility for the action or proceeding, including subsequent legal fees, awards against REALTY or MARKETING and expenses relating thereto. No settlement by either party shall bind the other to make any payment or suffer any loss of existing or future rights without such other party's consent, which shall not be unreasonably withheld. Any recovery in such action or proceeding shall be applied first to reimburse the party or parties for its or their legal expenses in maintaining such action or proceeding. The excess shall belong to the party maintaining the action or proceeding at the time such recovery is awarded. If the action is brought jointly and the recovery is not sufficient to reimburse REALTY and MARKETING for their legal expenses in such action, the unreimbursed portion of such legal expenses shall be borne equally by each party.

12. TERM

This License Agreement shall continue in force and effect until fifteen years from the effective date of this License Agreement unless sooner terminated as provided for herein. This License Agreement shall be automatically renewed when and to the extent that the Master Lease is extended. All extended terms of this License Agreement shall be coterminous with the Master Lease.

13. TERMINATION AND BREACH

This License Agreement shall be terminated upon (a) the voluntary filing by MARKETING of a bankruptcy petition or an involuntary bankruptcy proceeding having been

IN WITNESS WHEREOF, the parties hereto have caused this License Agreement to be executed as of the day and year first above written.

GETTY PROPERTIES CORP. (f/k/a Getty Realty Corp.)

By: _____
Name:
Title:

GETTY PETROLEUM MARKETING INC.

By: _____
Name:
Title:

## SCHEDULE B

## STANDARDS AND SPECIFICATIONS

1. **Commingling**

   MARKETING shall not mix, and shall not permit any of its sublicensees of the Licensed Marks to mix, any other product with Branded Gasoline or mix one grade of Branded Gasoline with another grade of Branded Gasoline or adulterate it in any way, except that, with REALTY's written consent, MARKETING and its sublicensees may blend Unleaded Regular Branded Gasoline and Premium Branded Gasoline so as to achieve a mid-grade of gasoline. MARKETING shall not use, and shall not permit any of its sublicensees of the Licensed Marks to use, the Licensed Marks in connection with the storage, handling, dispensing or sale of any adulterated, mixed or substituted products.

2. **Trademark Protection**

   (a)  MARKETING shall not sell gasoline or other petroleum products under the Licensed Marks that does not meet the quality standards established and in effect from time to time pursuant to this License Agreement.

   (b)  MARKETING will not allow or permit any sublicensees of the Licensed Marks to sell gasoline or other petroleum products under the Licensed Marks that do not meet the quality standards established and in effect from time to time pursuant this License Agreement.

3. **Exclusivity**

   (a)  MARKETING shall not sell gasoline other than Branded Gasoline at Branded Outlets.

   (b)  MARKETING will not allow or permit any sublicensees of the Licensed Marks to sell gasoline other than Branded Gasoline at Branded Outlets.

4. **Unleaded Gasoline**

   (a)  MARKETING acknowledges that it shall be its responsibility that unleaded Branded Gasoline is not contaminated and meets the specifications of all governmental authorities. It shall not mix or allow unleaded Branded Gasoline to be mixed with any gasoline containing lead.

   (b)  MARKETING agrees that it will defend, indemnify and hold REALTY harmless from and against all present and future claims, demands, suits, proceedings, and litigation arising out of any alleged liability for MARKETING's or its sublicensees' storage of unleaded Branded Gasoline in or through any container, tank, pump, pipe or other element of its gasoline storage or distribution system or

052191.0001 NEW YORK 219504 v1

the introduction of leaded gasoline into any motor vehicle tank or compartment which is labeled "UNLEADED GASOLINE ONLY." MARKETING further agrees that it will, on REALTY's demand, promptly pay all losses, costs, damages, obligations, judgments, fines, penalties, expenses and fees suffered or incurred by REALTY by reason of any such claims, demands, suits, actions, proceedings, or litigation, except those which are caused by the sole negligence of REALTY or its employees.

(c) To the extent reasonably necessary to assure compliance with relevant Federal Environmental Protection Agency Regulations pertaining to unleaded gasoline, MARKETING will seek representations and warranties from suppliers of gasoline to be sold by MARKETING or any sublicensee as unleaded Branded Gasoline that such gasoline is in compliance with relevant Federal Environmental Protection Agency Regulations pertaining to unleaded gasoline.

(d) MARKETING shall sample and test, or cause to be sampled and tested, the lead content of gasoline to be sold as unleaded Branded Gasoline with commercially reasonable frequency. In the event that MARKETING discovers any contamination, MARKETING shall take commercially reasonable efforts to inspect and correct any deficiency in its gasoline storage and handling facilities.

5. **Minimum Standards**

MARKETING recognizes that it is in the interest of the parties to this License Agreement for MARKETING to affirmatively conduct its business to reflect favorably on the parties and to further promote public acceptance of the Licensed Marks. In recognition of such objectives, MARKETING agrees to and cause its Branded Outlets to be operated during the term of the License Agreement in accordance with the minimum standards set forth in this Paragraph 5.

(a) **Branded Outlets**

(i) If (x) a Branded Outlet is abandoned or unoccupied for a period of 30 days other than as a result of on-going construction at such Branded Outlet or (y) a Branded Outlet is in material breach of the minimum quality standards established from time to time in accordance with this License Agreement and such Branded Outlet has not been brought into substantial compliance with such minimum quality standards within 30 days of written notice thereof (or MARKETING has taken, and is then continuing to take, reasonable and meaningful steps to correct any such deficiency), then in each such case MARKETING will cause, upon written demand by REALTY, signage bearing any of the Licensed Marks to be covered or removed, at MARKETING's option, at such location(s) promptly, but no later than within 15 days following the date of the demand. Such covering or removal will be the expense of MARKETING. If Getty identification is not covered or removed within such time, REALTY may, in addition to any other

right it has, cause the covering or removal and charge MARKETING's account, which shall reimburse REALTY.

(ii) MARKETING shall, and shall use its reasonable best efforts to cause each sublicensees of the Licensed Marks, at such operator's expense paint all station and marketing equipment for the dispensing of products, covered by this Agreement, in colors and designs approved by REALTY. Should the exterior appearance of any of the Branded Outlets require painting and the same is reasonably determined by REALTY to be detrimental to the Licensed Marks and if MARKETING has not painted after 20 days prior written notice, REALTY, at its option, shall have the right to paint such Branded Outlet and charge MARKETING, which shall reimburse REALTY.

(iii) Upon termination of this License Agreement, MARKETING shall forthwith obliterate and discontinue the use of Getty's color schemes.

(b) **MARKETING'S Operations**

(i) MARKETING will maintain its place of business inside and out, including storage tanks, warehouse buildings, loading racks, improvements and facilities thereon, in a good, clean, neat, safe, painted, operative and condition generally characteristic of facilities of a similar type, age and style and in accordance with all applicable laws, rules and regulations.

(ii) MARKETING will maintain all automotive equipment used in its business in good, clean, safe, painted, operative and condition generally characteristic of facilities of a similar type, age and style and in compliance with all applicable laws, rules, and regulations. Said equipment will be identified in accordance with REALTY's identification specifications as may be issued from time to time.

(iii) In the conduct of its operations, MARKETING will take reasonable action to promote the Licensed Marks and the branded products they represent and not operate its business in a manner detrimental to the Licensed Marks.

(iv) In the conduct of its operations, MARKETING will provide prompt, efficient, courteous and diligent service to Branded Outlets and other customers.

(c) **Branded Outlets Operated or Served By MARKETING**

(i) Premises including buildings, rest rooms, driveways, sidewalks, grass or planting areas, and storage areas will be maintained inside and out in good, clean, neat, safe and healthful condition with all necessary painting and repairs being made thereto.

(ii) Branded Outlets will be equipped to provide services comparable with retail outlets of similar type, age and style. All equipment will be kept neat, clean and in good repair. Pumps and dispensers which dispense Branded Gasoline or

other products bearing the Licensed Marks shall be properly identified with the appropriate Licensed Mark decals and other decals which may be required by applicable laws, rules and regulations. The Licensed Marks will be kept clean, in good repair and painted when required according to REALTY's specifications.

(iii) MARKETING's operators or retailers, including employees at retail outlets served by MARKETING, will at all times present a good personal appearance, observe clean, neat and safe working habits, render prompt, courteous and honest treatment to customers and take reasonable action to promote the Licensed Marks and the branded products they represent.

The standards set forth above are subject to the provisions contained set forth in Paragraph 4 of the License Agreement.

# Exhibit 5

INFORMATION STATEMENT

# GETTY PETROLEUM MARKETING INC.

Common Stock
($.01 par value)

This Information Statement is being furnished in connection with a special distribution (the "Distribution") by Getty Petroleum Corp. ("Getty") of one (1) share of common stock, $.01 par value ("Marketing Common Stock"), of Getty Petroleum Marketing Inc. ("Marketing") for each share of Getty common stock, $.10 par value (the "Getty Common Stock"), held of record as of the close of business on March 21, 1997 (the "Record Date"). The Distribution will result in 100% of the outstanding shares of Marketing Common Stock being distributed to the holders of Getty Common Stock. On March 21, 1997 (the "Distribution Date"), Getty will deliver all of the issued and outstanding shares of Marketing Common Stock to American Stock Transfer and Trust Company, as distribution agent (the "Distribution Agent"), which in turn will distribute such shares to the holders of Getty Common Stock as of the Record Date. It is expected that certificates representing shares of Marketing Common Stock will be mailed by the Distribution Agent on March 31, 1997. See "INTRODUCTION" and "THE DISTRIBUTION — Manner of Effecting the Distribution." Holders of Getty Common Stock on the Record Date will not be required to make any payment or take any other action to receive Marketing Common Stock in the Distribution. On the Distribution Date, Getty will change its name to Getty Realty Corp.

Marketing is a newly formed company that, as of the close of business on January 31, 1997, owns and operates the businesses and assets of, and is responsible for the obligations and liabilities associated with, the petroleum marketing business and the New York Mid-Hudson Valley home heating oil business, both of which were previously conducted by Getty and its subsidiaries. There is no established public trading market for Marketing Common Stock, although it is expected that a "when-issued" trading market will develop on or about the Record Date. Shares of Marketing Common Stock have been approved for listing on The New York Stock Exchange, subject to official notice of issuance, under the symbol "GPM." See "THE DISTRIBUTION — Listing and Trading of Marketing Common Stock."

NO VOTE OF STOCKHOLDERS IS REQUIRED IN CONNECTION WITH THE
DISTRIBUTION.
NO PROXIES ARE BEING SOLICITED, AND YOU ARE REQUESTED
NOT TO SEND US A PROXY.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES
AND EXCHANGE COMMISSION OR ANY OTHER FEDERAL OR STATE AUTHORITY,
NOR HAS SUCH COMMISSION OR OTHER AUTHORITY PASSED UPON THE
ACCURACY OR ADEQUACY OF THIS INFORMATION STATEMENT. ANY
REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS INFORMATION STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR
THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES.

The date of this Information Statement is March 13, 1997

### Effects on Getty Common Stock

After the Distribution, Getty Common Stock will continue to be listed on the NYSE, and traded on certain other exchanges. As a result of the Distribution, the trading prices of Getty Common Stock are likely to be lower than the trading prices of Getty Common Stock immediately prior to the Distribution. The aggregate trading prices of Getty Common Stock and Marketing Common Stock after the Distribution may be less than, equal to or greater than the trading prices of Getty Common Stock prior to the Distribution. In addition, until the market has fully analyzed the operations of Getty without the petroleum marketing business, the prices at which the Getty Common Stock trades may fluctuate significantly.

### Certain Federal Income Tax Considerations

Getty has received a Tax Ruling from the IRS to the effect that, among other things, for United States federal income tax purposes the Distribution will be tax-free under Section 355 of the Code. See "THE DISTRIBUTION — Federal Income Tax Aspects of the Distribution." The continuing validity of the Tax Ruling is subject to certain factual representations and assumptions. Marketing is not aware of any facts or circumstances which should cause such representations and assumptions to be untrue. The Tax Sharing Agreement (as defined below) provides that neither Getty nor Marketing is to take any action inconsistent with, nor fail to take any action required by, the request for the Tax Ruling or the Tax Ruling unless required to do so by law or permitted to do so by the prior written consent of the other party or, in certain circumstances, a supplemental ruling. Getty and Marketing have agreed to indemnify each other with respect to any tax liability resulting from their respective failures to comply with such provisions. See "RELATIONSHIP BETWEEN GETTY AND MARKETING AFTER THE DISTRIBUTION — Tax Sharing Agreement."

### Certain Anti-Takeover Features

Certain provisions of Maryland statutory law could discourage potential acquisition proposals and could delay or prevent a change in control of Marketing. Such provisions could diminish the opportunities for a stockholder to participate in tender offers, including tender offers at a price above the then current market value of the Marketing Common Stock. See "DESCRIPTION OF CAPITAL STOCK — Common Stock."

## THE DISTRIBUTION

### General

On the Distribution Date, Getty intends to distribute all of the outstanding shares of Marketing Common Stock to holders of record on the Record Date of Getty Common Stock. Each holder of Getty Common Stock will receive one share of Marketing Common Stock for each share of Getty Common Stock held on the Record Date. Holders of Getty Common Stock on the Record Date will not be required to make any payment or to take any other action to receive their portion of the Distribution.

### Background and Reasons for the Distribution

The Board of Directors of Getty has determined, for the reasons set forth below, to separate Getty into two publicly held companies: Marketing, a newly formed corporation which will own and operate the petroleum marketing business and the New York Mid-Hudson Valley home heating oil business, and Getty, which will continue to own and operate the real estate business and the home heating oil business in Pennsylvania and Maryland.

The Board of Directors of Getty believes that over the long term the Distribution will benefit Getty's stockholders and each of Getty's current businesses.

The petroleum marketing business of Marketing and the real estate business of Getty have distinctly different investment, operating and financial characteristics. Marketing's earnings largely depend on its ability to sell petroleum products on a wholesale and retail level in a volatile industry at product margins and in quantities sufficient to cover its fixed and variable expenses. Marketing's variable costs, operating margins and earnings have varied significantly over time and will likely continue to do so. In contrast, Getty's earnings will depend on its receipt of rent from Marketing, its receipt of rent for properties leased to other third parties, and

9

The Properties leased or subleased by Getty to Marketing pursuant to the Master Lease are as follows:

|  | Number of Service Stations | Number of Distribution Terminals and Bulk Plants | Termination Date Under the Master Lease (not including renewals) |
|---|---|---|---|
| Owned by Getty and Leased to Marketing | 358 | 2 | January 31, 2012 |
| Leased by Getty from Power Test Realty Company Limited Partnership* and Subleased to Marketing | 265 | 5 | January 31, 2012 |
| Leased by Getty from Third Parties and Subleased to Marketing | 414 | 3 | Various dates coincident with the termination dates of the applicable underlying leases, but not later than January 31, 2012 |
|  | 1,037 | 10 |  |

*See "CERTAIN TRANSACTIONS."

Rent for each of the Properties has been set using the fair market value of each such Property, assuming the USTs have been upgraded to meet the 1998 Standards and such Properties are free of known environmental contamination, since Getty is to be responsible for all such costs. Rent for each Property will increase at the end of each five-year period by the net increase in the Consumer Price Index for all items in the Northeast Region for such five-year period, such increase not to exceed fifteen percent (15%). Rents for all Properties are payable in advance on the first day of the month. The initial term of the Master Lease is (i) fifteen years with respect to Properties owned in fee by Getty and leased to Marketing and Properties leased by Getty from Power Test Realty Company Limited Partnership and subleased to Marketing and (ii) the length of time remaining under underlying lease terms (which ranges from one to fifteen years under the Master Lease) with respect to other Properties leased by Getty from other third parties and subleased to Marketing. See "CERTAIN TRANSACTIONS." The Master Lease terms for each category of Properties described above also include four ten-year renewal options (or, with respect to category (ii), such shorter period as the underlying lease may provide), which may be exercised by Marketing with two years advance notice on an individual property basis for all Properties then subject to the Master Lease. For the subleased Properties, Getty has agreed to use reasonable efforts to extend the underlying lease terms upon conditions acceptable to Marketing. In the event that Marketing desires not to renew the sublease upon terms (including any underlying lease term extensions negotiated by Getty) available to it, Getty may extend or renew the lease and sublease the property to a third party after the end of Marketing's term. The Bylaws of Marketing contain a provision requiring that the renewal of leases under the Master Lease, including the exercise of any renewal options, must be approved by a majority of Directors, including, for so long as Outside Directors (as defined below) are required to constitute a majority of the Board of Directors, a majority of such Outside Directors. See "— Board of Directors and Management."

The Master Lease provides that if during the lease term, Marketing determines that any of the leased premises have become uneconomic or unsuitable for their use as a service station or convenience store and has discontinued use of the Property or intends to discontinue use of the Property as a service station or convenience store within one year of the date of said determination, Marketing shall have the right to sublet the Property for any lawful use without Getty's consent and, prior to the commencement of any such sublease term, Marketing shall remove any USTs on the Property and thereafter perform all requisite environmental investigations and/or remediations. Marketing shall have the right of economic abandonment with respect to no more than ten Properties during any fiscal year of the lease term. Marketing shall have no right of economic abandonment for the terminal premises and the premises subject to third party leases.

GPC0002680

Marketing has not reflected a liability for the Getty Environmental Liabilities in its consolidated balance sheet since Getty remains the primary obligor for such liabilities. The liabilities, which were initially recorded in Marketing's balance sheet, were subsequently capitalized into stockholders' equity as a contribution to capital by Getty to Marketing. In the unlikely event that Getty fails to remediate a contaminated property and Marketing is held jointly and severally responsible for the Remediation Costs, Getty is obligated to indemnify Marketing, and any Remediation Costs paid by Marketing will be offset against Marketing's rental obligations under the Master Lease. Because of such rental offset, it is remote that Marketing would incur any incremental costs in connection with any such remediation.

Marketing will be responsible for and will indemnify Getty with respect to all environmental obligations and liabilities other than the Getty Environmental Liabilities. No amounts have been included for Marketing environmental obligations and liabilities as such amounts are not currently probable and estimable. However, future environmental expenditures may have a significant impact on results of operations for any single fiscal year or interim period, though Marketing believes that such costs will not have a material adverse effect on Marketing's financial position.

Marketing cannot predict what environmental legislation or regulation may be enacted in the future or how existing laws or regulations will be administered or interpreted with respect to products or activities to which they have not previously been applied. Compliance with more stringent laws or regulations as well as more vigorous enforcement policies of the regulatory agencies or stricter interpretation of existing laws which may develop in the future, could have an adverse effect on the financial position or operations of Marketing and could require substantial additional expenditures for future remediation or the installation and operation of required environmental or pollution control systems and equipment.

## Termination of Uni-Marts Agreements

On December 27, 1996, Uni-Marts, Inc. ("Uni-Marts") notified Getty that, effective December 31, 1997, it would not renew its various leases and subleases of approximately 100 service station properties from Getty or the existing petroleum supply agreement between Getty and Uni-Marts with respect to such service stations and certain additional service stations owned or operated by Uni-Marts. Uni-Marts subsequently advised Getty by letter that it may be interested in negotiating and entering into revised arrangements. While Getty has preliminarily discussed such matters with Uni-Marts, there can be no assurance that any revised terms will be agreed upon. In connection with the Distribution, Marketing will become a party to the existing supply agreement and the sublessor or sub-sublessor under the leases and subleases with Uni-Marts. In the event the parties do not agree upon any revised arrangements prior to December 31, 1997, Marketing believes that it will be able to re-lease the approximately 100 affected service station properties. The loss of motor fuel product sales to Uni-Marts pursuant to the existing supply agreement, if not replaced, could have a material adverse effect on Marketing's revenues. Marketing believes such loss of product sales would not impact its operating income because the affected leased service station properties should be re-leased to retail dealers at higher retail product margins to be realized by Marketing than the current lower wholesale product margins under the supply agreement with Uni-Marts. Net sales and rental income attributable to the Uni-Marts agreement amounted to $76.8 million (or 10.1% of net sales) and $4.6 million (or 14.3% of rental income), respectively, for the year ended January 31, 1996 and $66.5 million (or 10.8% of net sales) and $3.4 million (or 13.8% of rental income), respectively, for the nine months ended October 31, 1996.

## DIVIDEND POLICY

The payment and amount of cash dividends on Marketing Common Stock after the Distribution will be subject to the discretion of the Marketing Board. Marketing's dividend policy will be reviewed by Marketing's Board of Directors from time to time as may be appropriate and payment of dividends on Marketing Common Stock will depend upon Marketing's financial position, capital requirements and other factors as the Marketing Board deems relevant. Subject to the foregoing, Marketing may declare and pay dividends after the Distribution, although there can be no assurance that any dividends will be paid in the future or at what level.

GPC0002689