# Exhibit 6

REORGANIZATION AND
DISTRIBUTION AGREEMENT

between

GETTY PETROLEUM CORP.

and

GETTY PETROLEUM MARKETING INC.

dated as of

January 31, 1997

## REORGANIZATION AND DISTRIBUTION AGREEMENT

This REORGANIZATION AND DISTRIBUTION AGREEMENT (this "Agreement") is made this 31st day of January, 1997 between Getty Petroleum Corp., a Delaware corporation ("Getty"), and Getty Petroleum Marketing Inc. a Maryland corporation and a wholly-owned subsidiary of Getty ("Marketing").

### RECITALS

WHEREAS, Getty, directly and through subsidiaries, (i) acquires, develops, leases and disposes of real estate (the "Real Estate Business"), purchases, stores, transports and sells home heating oil to residential and commercial customers in Pennsylvania and Maryland (the "Aero Home Heating Oil Business"), and (ii) purchases, stores, markets and distributes gasoline and diesel fuel in 12 Northeastern and Middle Atlantic States and purchases, stores, transports and sells home heating oil to residential and commercial customers in the New York Mid-Hudson Valley (which businesses described in this clause (ii) are more specifically defined herein as the "Marketing Business");

WHEREAS, the Board of Directors of Getty has determined that it is in the best interests of Getty to separate the Aero Home Heating Oil Business and the Real Estate Business on the one hand, and the Marketing Business on the other hand, and, in order to effect such separation, to transfer to Marketing the stock of certain Getty subsidiaries principally engaged in the Marketing Business and certain other assets relating principally to the Marketing Business (collectively, the "Asset Transfers"), and thereafter to distribute all of the outstanding shares of common stock, par value $.01 per share, of Marketing to the holders of Getty common stock (the "Distribution");

WHEREAS, Getty has effected (i) certain preliminary transfers and corporate restructurings and (ii) the elimination of all intercompany and intracompany receivables, payables and loans between entities that will be part of Getty and its subsidiaries after the Distribution and entities that will be part of Marketing and its subsidiaries after the Distribution, which transactions are not contingent upon consummation of the Distribution and will not be undone if the Distribution does not occur; and

WHEREAS, in connection with the Distribution, Getty and Marketing have determined that it is necessary and desirable to set forth the principal corporate transactions required to effect the Asset Transfers and the Distribution, and to set forth the agreements that will govern certain matters following the Distribution.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained in this Agreement, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01 General. As used in this Agreement, the following terms shall have the following meanings:

Action: Any action, claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, any governmental or other regulatory or administrative agency or commission or any arbitration tribunal.

Aero: Aero Oil Company, a Pennsylvania corporation.

Affiliate: With respect to any specified Person, means any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such specified Person. For purposes of this definition, "control," when used with

files relating to any Action pertaining to the Retained Liabilities, original corporate minute books, stock ledgers and certificates and corporate seals, and all licenses, leases, agreements and filings, relating to Getty, the Retained Subsidiaries or the Retained Business (but not including the Marketing Books and Records, provided that Getty shall have access to, and shall have the right to obtain duplicate copies of, the Marketing Books and Records in accordance with the provisions of Article VII).

Getty Common Stock:  The common stock, par value $0.10 per share, of Getty.

Getty Group:  Getty and the Retained Subsidiaries, collectively.

Getty Pro Forma Balance Sheet:  The Pro Forma Consolidated Balance Sheet for Getty, after giving effect to the Distribution, as of October 31, 1996 attached hereto as Exhibit A.

Highspire Assets:  All tangible and intangible personal property and equipment that Aero owns or to which it has rights and that is located at or used in connection with the operation of the property is known as the Highspire Terminal.

Holders:  The holders of record of Getty Common Stock as of the Distribution Record Date.

HSR Act:  The Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

Indemnified Environmental Liabilities:  All Liabilities relating to (i) the pre-closing environmental liabilities and obligations set forth on Schedule 1.01(a) hereto, (ii) all future upgrades set forth on Schedule 1.01(b) hereto necessary to cause USTs to conform to the 1998 federal standards for USTs, and (iii) all environmental liabilities and obligations

arising out of discharges with respect to the properties containing USTs that have not been upgraded to conform to the 1998 federal standards for USTs, that are discovered prior to the date such USTs are upgraded to meet the 1998 federal standards.

Insurance Administration:  With respect to each Policy, the accounting for premiums, retrospectively rated premiums, defense costs, adjuster's fees, indemnity payments, deductibles and retentions as appropriate under the terms and conditions of such Policy; and the reporting to excess insurance carriers of any losses or claims in accordance with Policy provisions, and the distribution of Insurance Proceeds as contemplated by this Agreement.

Insurance Proceeds:  Those moneys (i) received by an insured from an insurance carrier or (ii) paid by an insurance carrier on behalf of an insured, in either case net of any applicable premium adjustment, retrospectively-rated premium, deductible, retention, cost or reserve paid or held by or for the benefit of such insured.

Insured Claims:  Those Liabilities that, individually or in the aggregate, are covered within the terms and conditions of any of the Policies, whether or not subject to deductibles, co-insurance, uncollectability or retrospectively rated premium adjustments, but only to the extent that such Liabilities are within applicable Policy limits, including aggregates.

IRS:  The Internal Revenue Service.

KOSCO:  Kingston Oil Supply Corp., a New York corporation.

Liabilities:  Any and all debts, liabilities and obligations, absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, including all costs and expenses relating thereto, and

including, without limitation, those debts, liabilities and obligations arising under any law, rule, regulation, Action, threatened Action, order or consent decree of any governmental entity or any award of any arbitrator of any kind, and those arising under any contract, commitment or undertaking.

Marketing Adjustment Amount:  The difference between the Marketing Initial Target Net Working Capital and the Marketing Initial Net Working Capital.

Marketing Balance Sheet:  The Consolidated Balance Sheet for Marketing as of October 31, 1996 attached hereto as Exhibit D.

Marketing Board:  The Board of Directors of Marketing.

Marketing Books and Records:  The books and records (including computerized records, ledgers, files and software) of Marketing and the Marketing Subsidiaries and all books and records owned by Getty and its Subsidiaries that relate to the Marketing Business or are necessary to operate the Marketing Business including, without limitation, all such books and records relating to Marketing Employees, all files relating to any Action being assumed by Marketing as part of the Marketing Liabilities, original corporate minute books, stock ledgers and certificates and corporate seals, and all licenses, leases, agreements and filings relating to Marketing, the Marketing Subsidiaries or the Marketing Business (but not including the Getty Books and Records, provided that Marketing shall have access to, and have the right to obtain duplicate copies of, the Getty Books and Records in accordance with the provisions of Article VII).

Marketing Business:  The businesses conducted by Marketing and the Marketing Subsidiaries and the businesses conducted pursuant to or utilizing the Marketing Assets, including without limitation (i) the purchase, storage, distribution, marketing and sale

Marketing Group as of the Distribution Date, as determined in accordance with Section 2.06(b) hereof.

Marketing Initial Target Net Working Capital:  $1,100,000.

Marketing Liabilities:  (i) All of the Liabilities of the Marketing Group under, or to be retained or assumed by Marketing or any of the Marketing Subsidiaries pursuant to, this Agreement or any of the Related Agreements, (ii) all Liabilities for payment of outstanding drafts of Getty attributable to the Marketing Business existing as of the Distribution Date, and (iii) all other Liabilities arising out of or in connection with any of the Marketing Assets or the Marketing Business, determined on a basis consistent with the determination of the Liabilities of Marketing included on the Marketing Balance Sheet (but excluding (i) all Indemnified Environmental Liabilities and (ii) any Financing Obligations of Getty or any of the Retained Subsidiaries, except to the extent otherwise set forth above or reflected in the Marketing Balance Sheet).

Marketing Policies:  All Policies, current or past, which are owned or maintained by or on behalf of Getty or any of its Affiliates or predecessors, that relate to the Marketing Business but do not relate to the Retained Business, and which Policies are either maintained by the Marketing Group or assignable to the Marketing Group.

Marketing Security Deposits:  Any claim to or right in (i) monies deposited with third parties to secure the performance of any obligation of Getty, Marketing or any of their subsidiaries incurred in connection with the Marketing Business or any Marketing Asset and (ii) monies deposited with Getty by motor fuel station operators or dealers.

Marketing Subsidiaries:  The Transferred Subsidiaries and all Subsidiaries of Marketing or the Transferred Subsidiaries at the time of the Distribution.

contemplated hereby and which are set forth in a writing, including, without limitation, the Conveyancing and Assumption Instruments, the Master Lease, the Tax Sharing Agreement, the Trademark License Agreement, the Services Agreement and the Office Space License.

Retained Assets:  The assets of Getty other than the Marketing Assets, including without limitation (i) the capital stock of the Retained Subsidiaries, (ii) assets relating to the Retained Business, determined on a basis consistent with the determination of assets included on the Getty Pro Forma Balance Sheet, (iii) all of the assets expressly allocated to Getty or any of the Retained Subsidiaries under this Agreement or the Related Agreements, and (iv) any other assets of Getty and its Affiliates relating to the Retained Business.

Retained Business:  The businesses conducted by Getty and its Affiliates other than the Marketing Business, including without limitation the Aero Home Heating Oil Business and the Real Estate Business.

Retained Employees:  The persons employed by the Getty Group on the Distribution Date, all of whom (except those employed pursuant to union contracts or to agreements providing for continued employment upon a change in control of Getty) are at will employees.

Retained Liabilities:  (i) All of the Liabilities arising out of or in connection with the Retained Assets or the Retained Business determined on a basis consistent with the determination of the Liabilities of Getty included on the Getty Pro Forma Consolidated Balance Sheet, (ii) all of the Liabilities of Getty under, or to be retained or assumed by Getty or any of the Retained Subsidiaries pursuant to, this Agreement or any of the Related Agreements, (iii) any Financing Obligations not constituting Marketing Liabilities, (iv) any

Liabilities arising out of the settlement of lawsuits relating to the Distribution (other than those Liabilities that constitute Marketing Liabilities), (v) all Liabilities for the payment of outstanding drafts of Getty attributable to the Retained Business existing as of the Distribution Date, (vi) all Indemnified Environmental Liabilities, and (vii) all other Liabilities of Getty not constituting Marketing Liabilities.

Retained Policies:  All Policies, current or past, that are owned or maintained by or on behalf of any member of the Getty Group (or any of its predecessors) which relate to the Retained Business but do not relate to the Marketing Business.

Retained Subsidiaries:  All Subsidiaries of Getty, except Marketing and the Marketing Subsidiaries.

Retained USTs:  The USTs that, pursuant to Section 7.6 of the Master Lease, are retained by Getty after the Distribution Date.

Securities Act:  The Securities Act of 1933, as amended.

Services Agreement:  The Services Agreement, which shall be entered into between Getty and Marketing on or prior to the Distribution Date in substantially the form attached hereto as Exhibit G.

Shared Policies:  All Policies, current or past, that are owned or maintained by or on behalf of Getty or any of its Subsidiaries or their respective predecessors that relate to both the Retained Business and the Marketing Business, and all other Policies not constituting Marketing Policies or Retained Policies, as specified on Schedule 1.01(d) hereto.

Subsidiary:  With respect to any Person, (a) any corporation of which at least a majority in interest of the outstanding voting stock (having by the terms thereof voting power under ordinary circumstances to elect a majority of the directors of such corporation,

parties contemplate that the Retained Business and the Marketing Business, including but not limited to the administration of accounts payable and accounts receivable, will be conducted in the normal course.

(d)    Audit and Disputes.  All transactions contemplated in this Section 2.06 shall be subject to audit by the parties, and any dispute thereunder shall be resolved by an independent firm of certified public accounts mutually acceptable to Getty and Marketing, whose decision shall be final and unappealable.

ARTICLE III

ASSUMPTION AND SATISFACTION OF LIABILITIES

Section 3.01   Assumption and Satisfaction of Liabilities.  Except as set forth in the Tax Sharing Agreement, the Master Lease or other Related Agreements, effective as of and after the Distribution Date, (a) Marketing shall, and/or shall cause the Marketing Subsidiaries to, assume, pay, perform, and discharge in due course all of the Marketing Liabilities and (b) Getty shall, and/or shall cause the Retained Subsidiaries to, pay, perform and discharge in due course all of the Retained Liabilities.

ARTICLE IV

THE DISTRIBUTION

Section 4.01   Cooperation Prior to the Distribution.

(a)    Getty and Marketing have prepared, and Marketing has filed with the Commission, a Form 10 registration statement with respect to the registration under the Exchange Act of the Marketing Common Stock (the "Form 10 Registration Statement").

(b)    Getty and Marketing shall cooperate in preparing, filing with the Commission and causing to become effective any registration statements or amendments

(b)      Except as otherwise provided in a Related Agreement, Marketing shall

arrange as soon as practicable following the Distribution Date, to the extent not previously

delivered in connection with the transactions contemplated in Article II, for the transportation

(at Getty's cost) to Getty of the Getty Books and Records in its possession, except to the

extent such items are already in the possession of Getty.  The Getty Books and Records shall

be the property of Getty, but shall be available to Marketing for review and duplication until

Marketing shall notify Getty in writing that such records are no longer of use to Marketing.

Section 7.02   Access to Information.  Except as otherwise provided in a

Related Agreement, from and after the Distribution Date, Getty shall afford to Marketing and

its authorized accountants, counsel and other designated representatives reasonable access

(including using reasonable efforts to give access to persons or firms possessing information)

and duplicating rights during normal business hours to all records, books, contracts,

instruments, computer data, software and systems and other data and information relating to

pre-Distribution operations (collectively, "Information") within Getty's possession insofar as

such access is reasonably required by Marketing for the conduct of its business, subject to

appropriate restrictions for classified or Privileged Information.  Similarly, except as

otherwise provided in a Related Agreement, Marketing shall afford to Getty and its

authorized accountants, counsel and other designated representatives reasonable access

(including using reasonable efforts to give access to persons or firms possessing information)

and duplicating rights during normal business hours to Information within Marketing's

possession, insofar as such access is reasonably required by Getty for the conduct of its

business, subject to appropriate restrictions for classified or Privileged Information.  ·

Information may be requested under this Article VII for the legitimate business purposes of

either party, including without limitation, audit, accounting, claims (including claims for indemnification hereunder), litigation and tax purposes, as well as for purposes of fulfilling disclosure and reporting obligations and for performing this Agreement and the transactions contemplated hereby.

Section 7.03   Production of Witnesses.  At all times from and after the Distribution Date, each of Marketing and Getty shall use reasonable efforts to make available to the other, upon written request, its and its subsidiaries' officers, directors, employees and agents as witnesses to the extent that such persons may reasonably be required in connection with any Action.

Section 7.04   Reimbursement.  Except to the extent otherwise contemplated in any Related Agreement, a party providing Information or witness services to the other party under this Article VII shall be entitled to receive from the recipient, upon the presentation of invoices therefor, payments of such amounts, relating to supplies, disbursements and other out-of-pocket expenses (at cost) and direct and indirect expenses of employees who are witnesses or otherwise furnish assistance (at cost), as may be reasonably incurred in providing such Information or witness services.

Section 7.05   Retention of Records.  Except as otherwise required by law or agreed to in a Related Agreement or otherwise in writing, each of Getty and Marketing may destroy or otherwise dispose of any of the Information (including information that is material Information and is not contained in other Information retained by Getty or Marketing, as the case may be) at any time after the tenth anniversary of this Agreement, provided that, prior to such destruction or disposal, (a) it shall provide no less than 90 or more than 120 days prior written notice to the other, specifying in reasonable detail the Information proposed to

be destroyed or disposed of and (b) if a recipient of such notice shall request in writing prior to the scheduled date for such destruction or disposal that any of the Information proposed to be destroyed or disposed of be delivered to such requesting party, the party proposing the destruction or disposal shall promptly arrange for the delivery of such of the Information as was requested at the expense of the party requesting such Information.

Section 7.06  <u>Confidentiality</u>.  Each of Getty and its Subsidiaries on the one hand, and Marketing and its Subsidiaries on the other hand, shall hold, and shall cause its consultants and advisors to hold, in strict confidence, all Information concerning the other in its possession or furnished by the other or the other's representatives pursuant to this Agreement (except to the extent that such Information has been (i) in the public domain through no fault of such party or (ii) later lawfully acquired from other sources by such party), and each party shall not release or disclose such Information to any other person, except its auditors, attorneys, financial advisors, rating agencies, bankers and other consultants and advisors, unless compelled to disclose by judicial or administrative process or, as reasonably advised by its counsel, by other requirements of law, or unless such Information is reasonably required to be disclosed in connection with (x) any litigation with any third-parties or litigation between the Getty Group and the Marketing Group, (y) any contractual agreement to which the Getty Group or the Marketing Group are currently parties, or (z) in exercise of either parties' rights hereunder.

Section 7.07  <u>Privileged Matters</u>.  Getty and Marketing recognize that legal and other professional services that have been and will be provided prior to the Distribution Date have been and will be rendered for the benefit of both the Getty Group and the Marketing Group and that both the Getty Group and the Marketing Group should be deemed

to be the client for the purposes of asserting all Privileges.  To allocate the interests of each party in the Privileged Information, the parties agree as follows:

(a)      Getty shall be entitled, in perpetuity, to control the assertion or waiver of all Privileges in connection with Privileged Information which relates solely to the Retained Business, whether or not the Privileged Information is in the possession of or under the control of Getty or Marketing.  Getty shall also be entitled, in perpetuity, to control the assertion or waiver of all Privileges in connection with Privileged Information that relates solely to the subject matter of any claims constituting Retained Liabilities, now pending or which may be asserted in the future, in any lawsuits or other proceedings initiated against or by Getty, whether or not the Privileged Information is in the possession of or under the control of Getty or Marketing.

(b)      Marketing shall be entitled, in perpetuity, to control the assertion or waiver of all Privileges in connection with  Privileged Information which relates solely to the Marketing Business, whether or not the Privileged Information is in the possession of or under the control of Getty or Marketing.  Marketing shall also be entitled, in perpetuity, to control the assertion or waiver of all Privileges in connection with Privileged Information which relates solely to the subject matter of any claims constituting Marketing Liabilities, now pending or which may be asserted in the future, in any lawsuits or other proceedings initiated against or by Marketing, whether or not the Privileged Information is in the possession of Marketing or under the control of Getty or Marketing.

(c)      Getty and Marketing agree that they shall have a shared Privilege, with equal right to assert or waive, subject to the restrictions in this Section 7.07, with respect to all Privileges not allocated pursuant to the terms of Sections 7.07(a) and (b).  (All Privileges

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

GETTY PETROLEUM CORP.

By: _____
Name: _Leo Liebowitz_
Title: _President_


GETTY PETROLEUM MARKETING INC.

By: _____
Name: _Alvin A. Smith_
Title: _Sr. Vice President_

# Exhibit 7

MASTER LEASE
DATED
FEBRUARY 1, 1997
between

GETTY REALTY CORP., as LANDLORD,

and

GETTY PETROLEUM MARKETING INC., as TENANT

This **MASTER LEASE** (the "Lease") is made and entered into on February 1, 1997 (the "Commencement Date"), between Getty Realty Corp., a Delaware corporation  whose address is 125 Jericho Turnpike, Jericho, New York 11753 ("Landlord"), and Getty Petroleum Marketing Inc.,  a Maryland corporation  whose address is 125 Jericho Turnpike, Jericho, New York 11753 ("Tenant").

## R E C I T A L S

A.      Landlord holds good and marketable fee simple absolute title to the lands described in **Exhibit A**, (the "Land"), together with: (a) all buildings, structures and other improvements and appurtenances presently located on the Land; (b) all right, title and interest of Landlord, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line of such street or highway; (c) the appurtenances and all the estate and rights of Landlord in and to the Land; (d) any strips or gores adjoining the Land; and (e) all right, title and interest of Landlord, if any, in and to any furnishings, fixtures, equipment or other personal property attached or appurtenant to any improvements located on the Land which are not being transferred to Tenant on the date hereof (all, collectively, together with the properties set forth in Exhibit B, the "Premises") subject only to the estates, interests, liens, charges and encumbrances set forth in **Exhibit C** (the "Permitted Exceptions").

B.      Landlord (including certain of its subsidiaries) is the lessee of certain Premises described in **Exhibit B** (the "Third Party Leases").

C.      The Premises consist of Petroleum Terminals and Service Stations.

D.      Landlord and Tenant have entered into that certain Reorganization and Distribution  Agreement dated as of _____, 1997 (the "Distribution Agreement") transferring to Tenant the Marketing Assets and Marketing Business (as such terms are defined in the Distribution Agreement) in anticipation of  a distribution by Landlord of the common stock of Tenant to the stockholders of Landlord.

E.      In accordance with the Distribution Agreement, Landlord desires to lease or sublease the Premises to Tenant, and Tenant desires to lease or sublease the Premises from Landlord, most of which Service Station Premises are subject to the tenancies of lessee-dealers ("Dealers").

F.      The parties desire to enter into this Lease to set forth their rights and obligations relating to the Premises.

**NOW, THEREFORE**, in exchange for good and valuable consideration, Landlord hereby leases and subleases the Premises to Tenant and Tenant hereby takes and hires the Premises from Landlord, subject only to the Permitted Exceptions, and the Dealers' tenancies, for the Term (as hereinafter defined), upon the terms and conditions of this Lease.

1

Construction Work, Tenant shall promptly upon Landlord's request provide Landlord, for Landlord's information only, with a true and complete copy of such plans and specification(s) or survey(s), subject to the terms of any agreement between Tenant and the applicable outside architect, engineer or surveyor.  (Tenant shall exercise reasonable efforts to cause its agreements with such outside professionals to permit the deliveries described in this paragraph.)

7.4  *Excavations.*  If an excavation shall be made (or authorized) upon land adjacent to the Land, then at Tenant's election Tenant shall either: (a) afford to the person causing or authorized to cause such excavation, license to enter the Premises, in accordance with Tenant's reasonable instructions, to perform such work as such person shall reasonably deem necessary or desirable, and as Tenant shall reasonably approve, to preserve and protect the Premises from injury or damage and to support the same by proper foundations, or (b) perform or cause to be performed, without cost or expense to Landlord in its capacity as Landlord under this Lease, work of the nature described in clause (a) to the extent reasonably necessary under the circumstances.  Tenant shall not, by reason of any excavations or work described in this paragraph, have any claim against Landlord in its capacity as Landlord under this Lease for damages or for Indemnity or for suspension, diminution, abatement or reduction of any Rent.

7.5  *Cooperation by Landlord.*  Upon Tenant's request, subject to the provisions of any Fee Mortgage, Landlord shall, without cost to Landlord, promptly join in and execute (or assist Tenant in obtaining the requisite consent of a Third Party Lessor) any instruments including, but not limited to, applications for building permits, demolition permits, alteration permits, consents, zoning, rezoning or use approvals, amendments and variances, easements, encumbrances, and/or liens (excluding Mortgages) against the Premises (Fee Estate and Leasehold Estate), and such other instruments as Tenant may from time to time request in connection with Construction Work or to enable Tenant from time to time to use and operate the Premises in accordance with this Lease, provided each of the foregoing is in reasonable and customary form and does not cause the Fee Estate to be encumbered as security for any obligation and does not otherwise expose the Fee Estate to any material risk of forfeiture during the Term.  Tenant shall reimburse Landlord's Legal Costs and all other out-of-pocket costs incurred in performing under this paragraph.

7.6  *UST'S.*  Landlord shall retain responsibility for the maintenance and repair of UST's at the Premises set forth in **Exhibit D** hereto, which UST's are leased to Tenant hereunder. Tenant shall be responsible for the repair and maintenance and replacement of all other UST's which were transferred to Tenant on the date hereof.   At the time the replacement or upgrading of the UST's is completed at the Premises set forth in Exhibit D so that the UST's meet the requirements of Law effective December 22, 1998, Landlord shall no longer be responsible for the maintenance,  repair or replacement of such UST's and, except for Landlord's obligation under Paragraph 9.3 to remediate, Tenant shall be solely responsible therefor.  In the event that Tenant exercises the Renewal Option for the First Renewal Term for certain Premises, under Paragraph 2.1, at that time Landlord shall by a quitclaim Bill of Sale (disclaiming all warranties, express and implied, including merchantability and fitness) transfer the UST's under such

13

Premises to Tenant for nominal consideration, except that the foregoing shall not apply to any USTs owned by Third Party Lessors.

8       *Prohibited Liens.*

8.1 *Tenant's Covenant.* Tenant shall not suffer or permit any Prohibited Lien to be filed. If a Prohibited Lien is filed then Tenant shall, within 30 days after receiving Notice from Landlord of such filing (but in any case within 15 days after receipt of Notice from Landlord of commencement of foreclosure proceedings), commence and then prosecute appropriate action to cause such Prohibited Lien to be paid, discharged or bonded. Nothing in this Lease shall be construed to restrict Tenant's right to contest the validity of any Prohibited Lien and to pursue Tenant's position to a final judicial determination. The mere existence of a Prohibited Lien shall not be construed as a default under this Lease unless Tenant fails to take action as aforesaid.

8.2 *Protection of Landlord.* Notice is hereby given that Landlord shall not be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and that no mechanic's or other lien for any such labor or materials shall attach to or affect the Fee Estate. Nothing in this Lease shall be deemed or construed in any way to constitute Landlord's consent or request, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer, equipment or material supplier for the performance of any labor or the furnishing of any materials or equipment for any improvement, alteration or repair of, or to, the Premises, or any part of the Premises, nor as giving Tenant any right, power or authority to contract for, or permit the rendering of, any services, or the furnishing of any materials that would give rise to the filing of any liens against the Fee Estate. Tenant shall Indemnify Landlord against any Construction Work performed on the Premises for or by Tenant, including any Prohibited Lien arising from such Construction Work.

9       *Hazardous Substances; Environmental Indemnification.*

9.1 *Restrictions.* Tenant shall not cause or permit to occur after the Commencement Date: (a) any material violation of any Environmental Law; or (b) the use, generation, release, manufacture, refining, production, processing, storage or disposal of any Hazardous Substance on, under, or about the Premises, or the transportation to or from the Premises of any Hazardous Substance, except to the extent that such use (i) is reasonably necessary for the conduct of Tenant's business in accordance with acceptable industry standards for the petroleum industry in which Tenant operates and (ii) complies in all material respects with all applicable Environmental Laws.

9.2 *Landlord's Representation.* Except for the Premises set forth on Exhibit D and Exhibit E, Landlord represents and warrants to Tenant that as of the Commencement Date to the knowledge of Landlord the Premises comply in all material respects with all Environmental Laws.

14

9.3 *Compliance; Clean-Up; Environmental Indemnification.* Landlord shall retain responsibility for the ongoing remediations at the Premises, set forth on **Exhibit E.** Except as provided in the following sentence, Tenant shall, at Tenant's expense, comply with all applicable Environmental Laws to the extent such compliance is necessitated by events occurring after the Commencement Date. Landlord shall, at Landlord's expense, comply with all applicable Environmental Laws (a) to the extent such compliance is necessitated by events that occurred before the Commencement Date, and (b) affecting the Premises (i) set forth on Exhibit D until such time as the UST's have either been replaced or upgraded to comply with the Law requiring compliance by December 22, 1998 and all remediation has been completed until such time as Government closure has been received for such Premises whether or not the Hazardous Substances Discharge being remediated was discovered during the upgrade or replacement of the USTs, and (ii) set forth on Exhibit E until all remediation has been completed to Government closure. Except as expressly set forth hereinabove, any Hazardous Substances Discharge discovered after the Commencement Date shall be deemed to be an event that occurred after, and not before, the Commencement Date notwithstanding the fact that the discharge causing the contamination may have occurred in whole or in part before the Commencement Date. Any party required by this paragraph to comply with Environmental Laws (the "Clean-Up Obligor") shall, at the Clean-Up Obligor's own expense, make all submissions to, provide all information required by, and otherwise fully comply with all requirements of any Government arising under Environmental Laws with which such Clean-Up Obligor is required to comply. If any Government requires any clean-up plan or clean-up measures on account of Hazardous Substances Discharges for which a Clean-Up Obligor is responsible, such Clean-Up Obligor shall, at its own expense, prepare and submit the required plans and all related bonds and other financial assurances and shall promptly and diligently carry out all such clean-up plans. Any Clean-Up Obligor shall promptly provide the other party with all information reasonably requested by such other party regarding the Clean-Up Obligor's use, generation, storage, transportation or disposal of Hazardous Substances in, at, or about the Premises and the remediation efforts undertaken.

9.4 *Indemnity.* Tenant shall Indemnify Landlord against any Hazardous Substances Discharge for which Tenant is responsible under Paragraph 9.3. Landlord shall Indemnify Tenant against any Hazardous Substances Discharge for which Landlord is responsible under Paragraph 9.3.

10    *Indemnification; Liability of Landlord.*

10.1 *Mutual Indemnity Obligations.* Landlord and Tenant shall each Indemnify the other against: (a) any wrongful act, wrongful omission or negligence of the Indemnitor (and, in the case of (i) Tenant, that of any of Tenant's Subtenants, and (ii) Landlord, that of any Third Party Lessor ) or its or their partners, directors, officers, or employees; and (b) any breach or default by the Indemnitor under this Lease. In addition to and without limiting the generality of the foregoing indemnity, Tenant shall Indemnify Landlord and Third Party Lessors against all the following matters (except to the extent any claim arises from any wrongful act, wrongful

15

53

EXHIBIT D

PREMISES WITH NON-COMPLYING UST'S

INVESTMENT-CAPITAL

LOCATION

| # | CITY | STATE |
|---|------|-------|
| 6 | BROOKLYN | NY |
| 7 | JAMAICA | NY |
| 8 | REGO PARK | NY |
| 20 | BRONX | NY |
| 22 | CORONA | NY |
| 24 | BRONX | NY |
| 61 | MIDDLE ISLAND | NY |
| 74 | WHITE PLAINS | NY |
| 79 | HARTSDALE | NY |
| 82 | OSSINING | NY |
| 91 | ELMSFORD | NY |
| 102 | PEEKSKILL | NY |
| 104 | LARCHMONT | NY |
| 111 | BRONX | NY |
| 115 | BRONX | NY |
| 117 | MAMARONECK | NY |
| 121 | YONKERS | NY |
| 126 | BROOKLYN | NY |
| 128 | BROOKLYN | NY |
| 138 | YONKERS | NY |
| 146 | MAHOPAC | NY |
| 157 | POUGHKEEPSIE | NY |
| 160 | MARLBORO | NY |
| 163 | LAKE KATRINE | NY |
| 174 | STONY POINT | NY |
| 177 | HIGHLAND | NY |
| 178 | KINGSTON | NY |
| 181 | HOWARD BEACH | NY |
| 186 | BRONX | NY |
| 195 | S. ISLAND | NY |
| 200 | S. ISLAND | NY |
| 223 | BROOKLYN | NY |
| 229 | BROOKLYN | NY |
| 234 | S. ISLAND | NY |
| 235 | S. ISLAND | NY |
| 240 | SPRINGFIELD GDNS. | NY |
| 252 | MT. VERNON | NY |
| 264 | BRONX | NY |
| 266 | BRONX | NY |
| 270 | BRONX | NY |
| 272 | BRONX | NY |
| 275 | BRONX | NY |
| 276 | BRONX | NY |
| 277 | BRONX | NY |
| 278 | YONKERS | NY |
| 301 | N. TARRYTOWN | NY |
| 307 | BREWSTER | NY |
| 312 | FLUSHING | NY |
| 323 | BRONX | NY |
| 324 | S. ISLAND | NY |

1

62

INVESTMENT-CAPITAL

LOCATION
```
------------------------------------
   #        CITY          STATE
------------------------------------
 71113 MARTINSVILLE         VA
 71120 ROANOKE              VA
 71173 RICHMOND             VA
 71177 DALEVILLE            VA
 71178 BRISTOL              VA
 71213 MARTINSVILLE         VA
 71215 CHESAPEAKE           VA
 71216 VIRGINIA BCH         VA
 71218 VIRGINIA BCH         VA
 71220 HAMPTON              VA
 71222 PORTSMOUTH           VA
 71250 NEWPORT NEWS         VA
 71251 VIRGINIA BCH         VA
 71252 VIRGINIA BCH         VA
 71255 VIRGINIA BCH         VA
 71257 VIRGINIA BCH         VA
 71262 HAMPTON              VA
 71264 STERLING PARK        VA
 71270 PORTSMOUTH           VA
 71288 CHRISTIANASBR        VA
 71293 VIRGINIA BCH         VA
 71294 MAHASSAS PK          VA
 76112 BENNINGTON           VT
   473 SITES
```

10

63

EXHIBIT E

PREMISES WITH ONGOING REMEDIATIONS

INVESTMENT-ENVIRONMENTAL

LOCATION

| # | CITY | STATE |
|---|------|-------|
| 7 | JAMAICA | NY |
| 8 | REGO PARK | NY |
| 16 | OZONE PARK | NY |
| 17 | BROOKLYN | NY |
| 20 | BRONX | NY |
| 22 | CORONA | NY |
| 24 | BRONX | NY |
| 38 | OCEANSIDE | NY |
| 54 | BRIGHTWATERS | NY |
| 61 | MIDDLE ISLAND | NY |
| 74 | WHITE PLAINS | NY |
| 75 | WHITE PLAINS | NY |
| 77 | NEW ROCHELLE | NY |
| 78 | YONKERS | NY |
| 79 | HARTSDALE | NY |
| 82 | OSSINING | NY |
| 91 | ELMSFORD | NY |
| 93 | PELHAM MANOR | NY |
| 100 | MAHWAH | NJ |
| 101 | VALLEY COTTAGE | NY |
| 102 | PEEKSKILL | NY |
| 103 | PORT CHESTER | NY |
| 104 | LARCHMONT | NY |
| 110 | MEDFORD | NY |
| 111 | BRONX | NY |
| 114 | BRONX | NY |
| 115 | BRONX | NY |
| 116 | ELMSFORD | NY |
| 117 | MAMARONECK | NY |
| 121 | YONKERS | NY |
| 126 | BROOKLYN | NY |
| 128 | BROOKLYN | NY |
| 138 | YONKERS | NY |
| 146 | MAHOPAC | NY |
| 157 | POUGHKEEPSIE | NY |
| 159 | CARMEL | NY |
| 160 | MARLBORO | NY |
| 163 | LAKE KATRINE | NY |
| 169 | WAPPINGERS FALLS | NY |
| 174 | STONY POINT | NY |
| 177 | HIGHLAND | NY |
| 178 | KINGSTON | NY |
| 179 | POUGHKEEPSIE | NY |
| 181 | HOWARD BEACH | NY |
| 182 | LAGRANGEVILLE | NY |
| 186 | BRONX | NY |
| 195 | STATEN ISLAND | NY |
| 200 | S. ISLAND | NY |
| 210 | BRONX | NY |
| 214 | JAMAICA | NY |

1

76

INVESTMENT-ENVIRONMENTAL

LOCATION
--------------------------------------------
     #         CITY              STATE
--------------------------------------------
  69415 BETHLEHEM              PA
  69416 LANCASTER              PA
  69417 SCHAEFFERSTOWN         PA
  69419 HAMBURG                PA
  69420 READING                PA
  69421 MILLERSVILLE           PA
  69422 MANHEIM                PA
  69424 MOUNTVILLE             PA
  69425 EBENEZER               PA
  69426 BETHLEHEM              PA
  69428 INTERCOURSE            PA
  69430 REINHOLDS              PA
  69431 BOYERTOWN              PA
  69436 WEST GROVE             PA
  69439 OXFORD                 PA
  69440 POTTSTOWN              PA
  69443 EPHRATA                PA
  69444 READING                PA
  69445 ROBESONIA              PA
  69449 YORK                   PA
  69466 KENHORST               PA
  69472 LEOLA                  PA
  69476 SHREWSBURY             PA
  69483 RED LION               PA
  69484 READING                PA
  69485 ROTHSVILLE             PA
  69495 HARRISBURG             PA
  69497 ADAMSTOWN              PA
  69503 LANCASTER              PA
  69504 NEW HOLLAND            PA
  69505 CHRISTIANA             PA
  69507 LANCASTER              PA
  69672 READING                PA
  69673 WYOMISSING HILLS       PA
  69676 ST.CLAIR               PA
  69680 REIFFTON               PA
  69681 W. READING             PA
  69682 ARENDTSVILLE           PA
  69683 MOHNTON                PA
  69684 ST.THOMAS              PA
  69685 CARLISLE               PA
  69688 BONNEAUVILLE           PA
  69690 MCCONNELLBURG          PA
  76112 BENNINGTON             VT
    694 SITES

14

# Exhibit 8

```
0001
 1  SUPERIOR COURT OF NEW JERSEY
 2  LAW DIVISION: UNION COUNTY
 3  -------------------------------------x
 4  NEW JERSEY SCHOOLS CONSTRUCTION
    CORPORATION, a Subsidiary of the
 5  NEW JERSEY ECONOMIC DEVELOPMENT
    AUTHORITY, a public body,
 6
              Plaintiff,
 7
    vs.
 8
    POWER TEST REALTY COMPANY, L.P.; GETTY
 9  PETROLEUM MARKETING, INC.; GETTY
    PROPERTIES CORP.; "JOHN DOES" 1 through
10  10 (Names Fictitious); and "ABC
    CORPORATIONS" 1 through 10
11  (Names Fictitious),
              Defendants.
12  -------------------------------------X
13
14
15          DEPOSITION OF LEO LIEBOWITZ
16          TUESDAY, JUNE 24, 2008
17               9:19 A.M.
18
19
20
21      D'AMICO CERTIFIED REPORTING, LLC
22          225 LENOX AVENUE
23         WESTFIELD, NEW JERSEY 07090
24      908.233.6577 * 908.233.6578 (FAX)
25      DAMICO.REPORTING@VERIZON.NET
0002
 1
 2
 3
 4       Deposition of LEO LIEBOWITZ, held at the
 5  offices Of Getty Realty Group, 125 Jericho
 6  Turnpike, Jericho, New York, pursuant to notice,
 7  before Renate Reid, Registered Professional
 8  Reporter and Notary Public of the State of New
 9  York.
10
11
12
13
```

```
14
15
16
17
18
19
20
21
22
23
24
25
0003
 1   A P P E A R A N C E S:
 2
 3      LOWENSTEIN SANDLER
 4      Attorneys for Defendants
 5      Getty Realty Corp. And Power Test Realty Co.
 6          65 Livingston Avenue, P.C.
 7          Roseland, New Jersey 07068
 8   BY:   RICHARD F. RICCI, Esq.
 9
10
11      THOMPSON HINE, LLP
12      Attorneys for Defendant
13      Getty Petroleum Marketing, Inc.
14          335 Madison Avenue, 12th Fl.
15          New York, New York 10017
16   BY:   BY BARRY M. KAZAN  Esq.
17
18   ALSO PRESENT:
19      Scott Hanley
20      Joshua Dicker
21
22
23
24
25
0004
 1            INDEX
 2   WITNESS       EXAMINATION BY      PAGE:LINE
 3   LEO LIEBOWITZ   MR. KAZAN              7:10
 4            MR. KAZAN          81:24
 5
 6
 7
 8
 9   ----------------INFORMATION REQUESTS--------------
10   DIRECTIONS NOT TO ANSWER            84:09
```

13     Q.     And what was that?
14     A.     Chairman, president, CEO.
15     Q.     Do you have the same title in both
16  companies?
17     A.     Yes.
18     Q.     Do you have the same responsibilities
19  in both companies?
20     A.     Yes.
21     Q.     Who negotiated the transaction or the
22  terms of the spinoff?
23     A.     I did it, along with our outside
24  counsel, which was Latham & Watkins at that time.
25     Q.     And did Getty Petroleum Marketing,
0020
1   Inc. End up with any environmental liabilities as a
2   result of that transaction?
3          MR. RICCI:  Object to the form of the
4   question.
5     A.     Getty Petroleum Marketing, Inc. Had no
6   liabilities at the time of the transfer of the
7   assets.
8     Q.     Do you know why that was?
9     A.     It was the board of directors and
10  management's intention to form this new corporate
11  entity.  That was Lily White, no  liabilities.
12     Q.     And was there any -- was there a
13  business purpose behind the transaction?
14     A.     Yes, there was.
15     Q.     What was it?
16     A.     The board of directors and I,
17  including myself, felt that the underlying value of
18  the real estate held by Getty Petroleum Corp.  Was
19  not recognized and/or appreciated by the public
20  markets, and a spinoff should, in fact, result
21  in an enhanced value for the combined entities.
22     Q.     Was any real estate transferred to
23  Getty Petroleum Marketing, Inc. As part of that
24  transaction?
25          MR. RICCI:  You mean, in fee?
0021
1          MR. KAZAN:  Yes.
2     A.     I don't recall any, but there may have
3   been.  In any event, it could not have been
4   significant.
5     Q.     And did you continue, after 1997, as
6   the chairman and CEO and president of Getty
7   Petroleum Marketing, Inc.?
8     A.     I did.
9     Q.     Until what time?

7   Smith.
8      Q.      Okay.  That was the former president
9   at Getty Refining & Marketing who then came to
10  Getty Petroleum Corp.
11     A.      Correct.
12     Q.      During the course of the Lukoil tender
13  offer, did you have any discussions with Mr.
14  Gluzman regarding allocation of environmental
15  liabilities?
16     A.      Yes, we did.
17     Q.      What was the nature of those
18  discussions?
19     A.      That we were -- we, Getty Petroleum
20  Corp., were going to assume all known liability at
21  that time as well as those necessary requirements
22  mandated by the government to complete
23  environmental upgrades that Getty Petroleum Corp.
24  Had started or was obligated to do to meet the
25  deadline for the environmental upgrade regulations
0024
1   in 1998.
2      Q.      You had this discussion with Mr.
3   Gluzman?
4      A.      I did.
5      Q.      On how many occasions?
6      A.      I don't know.
7      Q.      Do you recall when this was?
8      A.      During the negotiation.
9      Q.      Did you have any discussions with
10  anybody else regarding the allocation of
11  environmental liabilities?
12            MR. RICCI:  I'll object.  You can
13  answer but not with respect to conversations with
14  your counsel, which I'm sure Mr. Kazan knew.
15     A.      I don't recall.
16     Q.      Did you have any discussion with
17  anybody from Getty Petroleum Marketing regarding
18  the allocation of environmental liabilities?
19     A.      I personally don't recall any.
20     Q.      Now, you're saying that Getty
21  Petroleum Corp.  Was going to assume
22  liabilities.
23            How was that going to be documented?
24     A.      In the form of a schedule which was
25  attached to the master lease, I believe.
0025
1      Q.      But as far as you recall, you didn't
2   have these  discussions with anyone other than Mr.
3   Gluzman;  correct?

20  liabilities.
21        What about unknown liabilities?
22    A.    The lease specifically employed that
23  if there were any environmental liabilities that
24  came up, that would be the responsibility of
25  Getty Petroleum Marketing.  That was unknown to
0031
1  Getty Realty at the time of this transaction.
2    Q.    Turn to page 14.
3    A.    Yes.
4    Q.    This section 9, "Hazardous Substances
5  Environmental Indemnification," is that the
6  section that you believe allocated environmental
7  liabilities?
8    A.    Yes.
9    Q.    Let me ask you to look at section 9.2.
10        MR. KAZAN:  For the record, it states,
11  "Landlord's representation -- except for the
12  premises set forth on Exhibit D and Exhibit E,
13  Landlord represents and warrants to Tenant that as
14  of the commencement date, to the knowledge of
15  Landlord, the premises comply in all material
16  respects with all environmental laws."
17    A.    Yes.
18    Q.    Did I read that correctly?
19    A.    Yes.
20    Q.    What was the basis of that
21  representation?
22        MR. RICCI:  I'm going to object to
23  the  form of the question.
24        THE WITNESS:  Should I answer?
25        MR. RICCI:  If you understand it, you
0032
1  can answer.
2    A.    The basis is what I've said before,
3  that except for what's been scheduled, the Landlord
4  has no other environmental liability.
5    Q.    What due diligence was undertaken by
6  the Landlord to make this representation?
7    A.    I don't recall.
8    Q.    Do you recall if any phase 2
9  environmental assessments were done?
10    A.    I don't recall.
11    Q.    Do you know who would know that?
12    A.    That would not be my responsibility.
13    Q.    Do you know if any due diligence was
14  done in advance of making this representation in
15  9.2?
16    A.    I recall that our attorneys did insist

14  deemed to be an event that occurred after, and not
15  before, the commencement date notwithstanding the
16  fact that the discharge causing the contamination
17  may have occurred in whole or in part before the
18  commencement date."
19          Did I read that correctly, Mr.
20  Liebowitz?
21      A.   Yes.
22      Q.   Do you know what the purpose of that
23  language was?
24      A.   To ensure that Getty Petroleum Corp.
25  Would only be responsible for a known environmental
0035
1  that was on the schedules provided in this
2  agreement.
3      Q.   And this allocation, environmental
4  responsibility, was something you arrived at based
5  on your wearing the two hats, as you said; correct?
6      A.   It was, yes.
7      Q.   And this language contemplates that
8  there could be contamination that was preexisting
9  but was not yet discovered at the properties that
10  were being leased to Marketing; correct?
11      A.   Yes.
12      Q.   Do you know if, in fact, after
13  entering into this lease, Getty Realty Corp. Sought
14  indemnification on all contamination that was
15  discovered after the commencement date, even if it
16  was unknown at the time?
17      A.   Please repeat the question.
18      Q.   The agreement provides that
19  contamination that had not been identified but
20  which occurred after -- let me start over.
21          You could have contamination at a site
22  that pre-existed the commencement date but wasn't
23  discovered until after the commencement date;
24  correct?
25      A.   That's correct.
0036
1      Q.   And it's contemplated in 9.3?
2      A.   Yes.
3      Q.   And you stated that the purpose of
4  this language was to place that responsibility on
5  Getty Petroleum Marketing; correct?
6      A.   That's correct.
7      Q.   Do you know if, in fact, that's what
8  Getty Realty Corp. Always did?  Do you have any
9  instances where contamination, that it was clear,
10  occurred prior to the commencement date, was

11  discovered after the commencement date, and yet
12  Getty Realty Corp. assumed that liability?
13      A.     It was Getty Realty Corp.'s intention
14  to only be responsible for those identified
15  environmental liability issues that were on the
16  schedules either D or E.
17      Q.     But did Getty Realty ever assume the
18  liability, even though the agreement provided that
19  the liability was Getty Petroleum Marketing?
20      A.     I don't know.
21      Q.     Do you know who would?
22      A.     No.
23      Q.     Are you familiar with an entity known
24  as Donna Oil?
25      A.     Yes.
0037
1       Q.     What was Donna Oil?
2       A.     It was a wholly-owned subsidiary of
3   Getty Petroleum Corp.
4       Q.     And do you know when it was formed?
5       A.     It was purchased along with a group of
6   other corporate entities in the 1970's.
7       Q.     Was it purchased by Power Test, or was
8   it purchased by Getty Refining Marketing?
9       A.     It was purchased by Power Test.
10      Q.     And what were the operations of that
11  entity?
12      A.     They owned at least a certain number
13  of gas stations and had all the responsibility that
14  went with it.
15      Q.     Was there anything unique about those
16  particular stations that Donna Oil owned?
17      A.     Not that I recall.
18      Q.     Will you look at GPM 770, or page 34
19  of the master lease?
20      A.     Yes.
21      Q.     Is that your signature?
22      A.     Yes, it is.
23      Q.     It says, "Getty Realty Corp., now
24  known as Getty Petroleum Corp."
25          See that?
0038
1       A.     Correct.
2       Q.     Was there a Getty Realty Corp. That
3   became known as Getty Petroleum Corp., and then
4   became known as Getty Realty Corp. Again?  Do you
5   know how this name change occurred?
6       A.     We changed the name to Getty Realty
7   Corp. after the spinoff to identify and separate

7     A.    Yes.
8     Q.    9.2 refers to Tenant obligation.
9     A.    Yes.
10    Q.    "Except for those particular
11   obligations of Landlord set forth in sections 7.6,
12   9.1 and 25.3 herein, and set forth in the
13   Environmental Agreement, Tenant shall, except as
14   provided in section 25.3, be solely responsible, at
15   its own cost and expense, for compliance with all
16   environmental laws applicable to the premises after
17   the commencement date of the 1997 Master Lease."
18          Did I read that correctly?
19    A.    Yes.
20    Q.    What is your understanding of what
21   "compliance with all environment laws" means?
22    A.    That there are environmental laws that
23   are applicable to service stations and other
24   businesses, and Getty Petroleum Marketing, the
25   Tenant is responsible for compliance with all of
0056
1    those laws.
2     Q.    And would they be responsible for
3    compliance with all environmental laws prior to the
4    commencement date of the 1997 Master Lease?
5           MR. RICCI:  Object to the form of the
6    question.
7    BY MR. KAZAN:
8     A.    They had to be responsible since 1997.
9     Q.    But for environmental compliance that
10   predated 1997, was Getty Petroleum Marketing, Inc.
11   responsible for that?
12    A.    There was no Getty Petroleum
13   Marketing, Inc. Prior to 1997.
14    Q.    So they couldn't have been responsible
15   for environmental compliance prior to 1997;
16   correct?
17    A.    That's correct.
18    Q.    The next sentence says, "Tenant shall
19   be solely responsible at its own cost and expense
20   for any remediation required by the applicable
21   government resulting from remediation limits
22   changed after closure has been completed at any of
23   the properties on schedule 2, schedule 3 and
24   Exhibit C."
25          Did I read that correctly?
0057
1     A.    You read it correctly.
2     Q.    What is your understanding of that
3    obligation?

4      A.     I believe it says that the Tenant is
5  responsible for any remediation limit changes after
6  the closure on any of its schedules 2, 3 and C.
7      Q.     And closure, on schedules 2, 3 and C,
8  was the obligation of Getty Properties Corp.;
9  correct?
10     A.     Closure, I believe, is responsible for
11  any of the properties listed on schedules 2, 3, and
12  C.
13     Q.     You said closure -- I asked you if
14  Getty Properties Corp. Was responsible for
15  obtaining closure on the properties for schedule 2,
16  schedule 3 and Exhibit C.
17     A.     Yes.
18     Q.     The last sentence says, "The
19  obligations of Tenant set forth in this section,
20  9.2, shall survive the expiration or earlier
21  termination of this Restated Lease."
22            Did I read that correctly?
23     A.     Yes.
24     Q.     What do you understand that obligation
25  to be?
0058
1      A.     That the Tenant's obligations shall
2  continue even after the expiration or termination
3  of this Restated Lease.
4      Q.     Now, if Getty Petroleum Marketing,
5  Inc. were to give back a property to Getty
6  Properties, is it your understanding they would
7  still be obligated to ensure compliance with all
8  environmental laws going forward?
9      A.     Unless we relieved them of that
10  responsibility.
11     Q.     So even if a new operator or a new
12  Tenant came on to the property, Getty Petroleum
13  Marketing would still be responsible to ensure that
14  all environmental laws were complied with at the
15  premises?
16     A.     Unless we relieved them of that
17  responsibility.  "We," being Getty Realty.
18     Q.     So say somebody came and installed a
19  nuclear reactor on the property after Getty
20  Marketing left, Getty Marketing would still be
21  liable to make sure that that nuclear facility
22  complied with  environmental laws?
23            MR. RICCI:  Object to the form of the
24  question.  You can answer.
25  BY MR. KAZAN:
0059

1   A.   I think that's an absurd question.
2   Q.   But what's the answer?  Why is it an
3  absurd question?
4   A.   Repeat the question, please.
5   Q.   Say, for example, that on a property
6  that Getty Petroleum Marketing returned back to
7  Getty Properties, a subsequent Tenant came and
8  installed a nuclear facility, is it your position
9  that Getty Petroleum Marketing, Inc. Would still be
10  responsible to ensure compliance with environmental
11  laws on a going-forward basis?
12        MR. RICCI:  I continue to object to
13  the form of the question.
14  BY MR. KAZAN:
15   A.   I think, under those circumstances, we
16  would have negotiated something with Getty
17  Petroleum Marketing where they would not have
18  continuing responsibility.
19   Q.   But do you believe, absent such a
20  negotiation, Getty Petroleum Marketing, Inc. Would
21  still be responsible?
22   A.   As per this language, yes.
23   Q.   Let me have you look at section 10.
24  It's on the same page.  "Indemnification, Liability
25  of Landlord."  And it states, "Mutual Indemnity
0060
1  Obligations," section 10.1, "Landlord and Tenant
2  shall each indemnify the other against section A,
3  any wrongful act, wrongful admission or negligence
4  of the indemnitor, and in the case of one tenant,
5  that of any tenants, subtenants and tenants, and
6  any of their respective partners, directors,
7  officers, members, contractors, employees, agents,
8  licensees, and invitees; and section 2, Landlord,
9  that of the Leemilt's Lessor, the Power Test
10  Lessor, the Gettymart Lessor, and their respective
11  partners, directors, officers, members,
12  contractors, employees, agents, licensees, and
13  invitees; and section B, any breach or default by
14  the indemnitor under this Restated Lease or the
15  Environmental Agreement."
16        Did I read that correctly?
17   A.   I believe so.
18   Q.   There is certain indemnifications that
19  flow back and forth between properties on one hand
20  and realty on the other; correct, under this
21  agreement?
22   A.   I believe so.
23   Q.   And there are certain things for which

24  marketing is obligated to indemnify realty for;
25  correct?
0061
1      A.     Correct.
2      Q.     And there's certain things that
3  Properties is obligated to indemnify Marketing for;
4  correct?
5      A.     I believe so.
6      Q.     And there are also exceptions to those
7  indemnities; correct?
8      A.     I don't really remember.
9      Q.     Well, looking at subsection, B, for
10  example, there is an indemnification if there's a
11  breach or default by the indemnitor under this
12  lease; correct?
13      A.     Yes.
14      Q.     So, Properties, if they breached the
15  lease in some fashion, might have to indemnify
16  Marketing; correct?
17      A.     Yes.
18      Q.     And if they breach the Environmental
19  Agreement, they might have to indemnify marketing
20  for that breach; correct?
21      A.     Probably.
22      Q.     Please look at section 10.2, which is
23  on the next page.  And in the middle of the
24  paragraph, or I guess the second sentence, it says,
25  "Landlord shall not be liable for any injury or
0062
1  damage to any property or to any person occurring
2  on or about any property for any injury or damage
3  to any property of Tenant or of any other person
4  during the term unless caused by Landlord's, the
5  Leemilt's Lessor's, the Power Test Lessor's or the
6  Gettymart Lessor's wrongful acts and/or omissions
7  or acts of negligence or a breach of Landlord's
8  obligations under this Restated Lease either by
9  Landlord, the Leemilt's Lessor, the Power Test
10  Lessor, the Gettymart Lessor, or any of their
11  respective agents, employees, contractors,
12  licensees or invitees."
13          Did I read that correctly?
14      A.     Yes, you did.
15      Q.     Do you agree that this section imposes
16  certain liabilities on Getty Properties Corp.?
17      A.     I believe it says so, only if it's
18  caused by the Landlord.
19      Q.     Caused by the Landlord's wrongful
20  acts, omission or negligence; correct?

21     A.    Correct.
22     Q.    Does Realty's -- excuse me.  Does
23  Properties' failure to discover ghost tanks
24  constitute a wrongful act?
25          MR. RICCI:  Object to the form of the
0063
1  question.
2  BY MR. KAZAN:
3     A.    It does not.
4     Q.    Why not?
5     A.    Because no one knows of ghost tanks.
6     Q.    Does Properties' failure to identify
7  ghost tanks constitute an omission of Properties?
8          MR. RICCI:  Object to the form of the
9  question.
10     A.    Getty Properties and Getty Realty have
11  agreed to be responsible only for what's known.
12  Ghost tanks are not known.
13     Q.    Was it an act of negligence on Getty
14  Property's part not to do environmental assessments
15  to discover ghost tanks?
16          MR. RICCI:  Object to the form of the
17  question.
18  BY MR. KAZAN:
19     A.    Absolutely not.
20     Q.    Why not?
21     A.    Because that was not a requirement of
22  the transaction.
23     Q.    Are ghost tanks discussed in the
24  amended lease at all?
25     A.    I don't believe so.
0064
1     Q.    Did you have a discussion with Mr.
2  Gluzman about the possibility of ghost tanks being
3  in existence?
4     A.    I don't recall that.
5     Q.    Prior to entering into the Master
6  Lease, had you had any experience with discovering
7  ghost tanks on  properties?
8          MR. RICCI:  You're talking about the
9  '97 or the 2000?
10          MR. KAZAN:  2000.
11  BY MR. KAZAN:
12     A.    I don't recall.
13     Q.    You didn't recall one way or the other
14  whether ghost tanks were ever discovered on
15  properties owned by Getty Properties Corp. Prior to
16  2000?
17     A.    You're saying prior to 2000.

18          Do you mean after '97 and prior to
19    2000, or at any time prior to 2000?
20    Q.    At any time prior to 2000.
21    A.    Yes.
22    Q.    Are there specific ones you have in
23    mind?
24    A.    No, I don't.
25    Q.    How about prior to '97?
0065
1    A.    Same answer, there may have been some,
2    but I can't tell you specifically which.
3    Q.    Do you know how the remediation was
4    addressed for those ghost tanks?
5    A.    We did what was ever required by the
6    authorities.
7    Q.    Meaning Getty Properties?
8    A.    Yes.  Or Getty Realty or Power Test,
9    whatever.
10    Q.    Please look at the last sentence in
11    section 10.2.
12          The last sentence there says, "Such
13    provisions shall not be construed to impose upon
14    Landlord any obligation, liability or duty to third
15    parties.  But nothing in this Restated Lease shall
16    be construed to exculpate, relieve or indemnify
17    Landlord from or against any obligation, liability
18    or duty of Landlord to third parties existing at
19    or before the applicable commencement date or its
20    obligations arising under 7.6 or 9.1 hereof or the
21    Environmental Agreement."
22          Did I read that correctly?
23    A.    You did.
24    Q.    That paragraph or that sentence I just
25    read  illustrates certain liabilities that were
0066
1    retained  by Properties; correct?
2    A.    Yes.
3    Q.    Specifically liabilities that may have
4    existed as between the Landlord and third parties
5    that existed at or before the applicable
6    commencement date; correct?
7    A.    Let me read this again.
8          Could you repeat the question?
9          (Whereupon, the record was read back.)
10    BY MR. KAZAN:
11    A.    Yes.
12    Q.    So if Properties had a preexisting
13    liability, that liability was not transferred to
14    Marketing; correct?

15    A.    That's correct.
16          MR. KAZAN:  Let's go off the record.
17          (Whereupon, a discussion was held off the
18    record.)
19          MR. KAZAN:  Please mark this document
20    as LL-6.
21          (Exhibit LL-6, document entitled,
22    "Environmental Indemnity Agreement,"
23    was marked for identification, as of this date.)
24    BY MR. KAZAN:
25    Q.    Let me hand you what's been marked as
0067
1    LL-6.
2          MR. KAZAN:  LL-6 is a document
3    entitled, "Environmental Indemnity
4    Agreement," Bates number GPM 0722 through
5    0730.
6          MR. RICCI:  For the record, the
7    facsimile heading at the top is not part of the
8    original document.  I don't think there's any
9    disagreement on that.
10          MR. KAZAN:  No.
11    BY MR. KAZAN:
12    Q.    Do you recognize this document?
13    A.    Yes.
14    Q.    What is it?
15    A.    It's an environmental indemnity
16    agreement between Getty Properties and Getty
17    Petroleum Marketing, Inc.
18    Q.    Who signed on behalf of Getty
19    Petroleum Marketing?
20    A.    I did.
21    Q.    Who signed on behalf of Getty
22    Properties?
23    A.    John Fitteron.
24    Q.    Do you know what the genesis of this
25    agreement was?
0068
1    A.    I believe this came about as a result
2    of an environmental study authorized by Lukoil of
3    the terminals and agreement where it would be a
4    sharing of certain costs and the formula spelled
5    out in the agreement.
6    Q.    And you signed on behalf of marketing
7    here; is that correct?
8    A.    Yes.
9    Q.    Do you know why that was?
10    A.    No, I don't.
11    Q.    Did you negotiate this on behalf of