# Exhibit 10

## ENVIRONMENTAL INDEMNITY AGREEMENT

This **ENVIRONMENTAL INDEMNITY AGREEMENT** (together with all Exhibits and Schedules attached hereto, this "Indemnity Agreement"), effective as of the Restatement Effective Date, is made and entered into as of November 2, 2000 between Getty Properties Corp., a Delaware corporation, whose address is 125 Jericho Turnpike, Jericho, New York 11753 (formerly known as Getty Realty Corp.,) (as further defined hereinafter, "Landlord"), and Getty Petroleum Marketing Inc., a Maryland corporation whose address is 125 Jericho Turnpike, Jericho, New York 11753 (as further defined hereinafter, "Tenant")(together referred to as the "Parties").

### RECITALS

A.  Contemporaneously with this Indemnity Agreement, the Parties are executing that certain Consolidated, Amended and Restated Master Lease (the "Restated Master Lease") and related documents, pursuant to which Landlord leased to Tenant certain lands and subleased or sub-subleased to Tenant certain other lands, together with all right, title and interest of Landlord, if any, in and to certain improvements and appurtenances (together, the "Premises").

B.  Landlord and Tenant desire to allocate risks associated with certain liabilities, potential liabilities and responsibilities regarding the environmental condition of certain of the Properties.

NOW, THEREFORE, in exchange for good and valuable consideration and of the mutual covenants and agreements contained herein, and as a further inducement to enter the Restated Master Lease, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**SECTION I.    DEFINITIONS.**

1.  Any term not otherwise defined herein shall have the meaning assigned to such term in the Restated Master Lease. For purposes of this Indemnity Agreement, the following term shall have the following meaning.

    a.  "Highspire Petroleum Terminal Property" shall mean, for purposes of this Indemnity Agreement, any and all land and Improvements at the Highspire Petroleum Terminal, 911 South Eisenhower, Middletown, Pennsylvania, except for the land and Improvements that constitute the terminal loading rack at which Tenant has rights to obtain fuel through operation of a cardlock or similar access system.

**SECTION II.    LANDLORD'S REPRESENTATIONS AND WARRANTIES.**

1.  Landlord represents and warrants to Tenant that, to the knowledge of Landlord, as of the date hereof, except for (i) those Service Station Properties listed on Exhibits D and E to the 1997 Master Lease, Schedules 2 and 3 and Exhibit C to the Restated Master Lease, and Schedule 12 and Schedule Z hereto,(ii) those Service Station Properties and Petroleum Terminal Properties listed on Schedule 7A and Schedule 7B to that certain Informational Side Letter of even date herewith between the parties hereto and on Schedule 3.1(r)(ii) to the Merger Agreement, and

(iii) those Service Station Properties and Petroleum Terminal Properties set forth in the July 31, 2000 Project Summary Binders:

a. There are no material permits, licenses or other authorizations for which Landlord is responsible that are required with respect to the business, operations, assets or current uses of the Service Station Properties or Petroleum Terminal Properties under applicable Environmental Laws that have not been obtained and complied with and are not otherwise in full force and effect.

b. Except as authorized by the permits, licenses or Environmental Law: (i) no Hazardous Substances are located on the Service Station Properties or Petroleum Terminal Properties, nor have Hazardous Substances been generated, treated, contained, handled, located, used, manufactured, processed, buried, incinerated, deposited, stored, discharged, refined, dumped, disposed, or released on, under or about any part of the Service Station Properties or Petroleum Terminal Properties by Landlord or any previous owner, tenant, occupant, or user of the Premises except as set forth on Schedule 3 to the Restated Master Lease; and (ii) no Hazardous Substances have migrated from or to the Service Station Properties or Petroleum Terminal Properties upon, under or about other properties in violation of any Environmental Laws.

c. Landlord has not received, and is not aware that there is proposed or threatened, with respect to the Service Station Properties or Petroleum Terminal Properties any written notice, demand, request for information, Claim (as hereinafter defined), proceeding, citation, complaint, summons, investigation, order, agreement or litigation alleging violation of Environmental Laws on the Service Station Properties or Petroleum Terminal Properties, or alleging the suspected presence or release of Hazardous Substances thereon, for which Landlord (or Tenant after the Restatement Effective Date) may be liable.

d. None of the Service Station Properties or Petroleum Terminal Properties are or have been listed on the National Priorities List, or any other list, schedule, law, inventory or record of hazardous or solid waste sites maintained by any federal, state or local agency, and Landlord has not been designated as a "potentially responsible party" with respect to any such sites.

e. Landlord has reported to the applicable Government, to the extent required by the Environmental Laws, any matter required to be reported by Landlord under such Environmental Laws.

## SECTION III. PETROLEUM TERMINAL PROPERTIES.

1. In the event that one or more of the owned Petroleum Terminal Properties set forth on Schedule Y hereto is not in compliance in any respect with any Environmental Law(s) as in effect as of the Restatement Effective Date or if there are conditions existing at any Petroleum Terminal Property as of the Restatement Effective Date that Tenant addresses to ensure continuing compliance, or to mitigate the cost of continuing compliance, with such Environmental Laws or

NY_DOCS\495701.1 [W97]

2

to mitigate the potential for future non-compliance with such Environmental Laws, Tenant and Landlord shall share the actual, out-of-pocket costs and expenses related to the Remediation and other compliance-related activities (any such Remediation and other compliance-related activities being referred to herein as the "Preexisting Condition Terminal Compliance")(Liabilities associated with any Remediation activities at the Newark Petroleum Terminal Property related to or arising from the Industrial Sites Recovery Act ("ISRA") shall not be considered Preexisting Condition Terminal Compliance, but shall be addressed by Subsection 4 below) as follows:

a. First, Tenant shall pay all costs and expenses incurred in connection with such Preexisting Condition Terminal Compliance until the amount so incurred with respect thereto equals $1,500,000 in aggregate.

b. Second, Landlord and Tenant shall share equally the next $8,500,000 of such costs and expenses incurred in connection with such Preexisting Condition Terminal Compliance until the amount so incurred with respect thereto equals $10,000,000 in aggregate.

c. Third, to the extent that such costs and expenses incurred in connection with such Preexisting Condition Terminal Compliance exceeds $10,000,000, all such costs and expenses shall be borne by Tenant.

d. Notwithstanding the above, Landlord shall be solely responsible for the actual, out-of-pocket costs and expenses related to the Preexisting Condition Terminal Compliance for the Highspire Petroleum Terminal Property.

The net effect of the foregoing provisions is that, for Petroleum Terminal Properties other than the Highspire Petroleum Terminal Property, Landlord shall not pay more than $4,250,000 in connection with all Preexisting Condition Terminal Compliance. Until the amount expended with respect to Preexisting Condition Terminal Compliance exceeds $10,000,000, Tenant shall forward to Landlord copies of all invoices and bills received by Tenant in connection with such Preexisting Condition Terminal Compliance and evidence of Tenant's payment therefor. Within forty-five (45) days after receipt of such evidence, Landlord shall, if so required pursuant to this Section III, reimburse Tenant for Landlord's share of the amount paid by Tenant with respect to such invoices and bills.

2. In connection with any proposed Preexisting Condition Terminal Compliance contemplated at a time when the costs and expenses incurred by Tenant for all prior Preexisting Condition Terminal Compliance expenditures exceed $1,500,000 in aggregate (and Landlord shall not have paid its maximum amount), Tenant shall furnish to Landlord plans setting forth the scope of such project and an estimate of the cost thereof, certified by a reputable environmental engineering firm (a "Terminal Expenditure Plan").

a. Landlord shall have thirty (30) days from the receipt of any such Terminal Expenditure Plan either to approve such Terminal Expenditure Plan or provide Tenant with an alternate Terminal Expenditure Plan, certified by a reputable environmental engineering firm, which alternate Terminal Expenditure Plan shall have the same scope as Tenant's Terminal Expenditure Plan but may have a lower cost estimate than that set forth in Tenant's Terminal Expenditure Plan.

3

    b.    If Landlord fails to approve Tenant's Terminal Expenditure Plan or to provide Tenant with such alternate Terminal Expenditure Plan within such thirty (30) day period, Landlord's approval of such Terminal Expenditure Plan shall be deemed granted.

    c.    In the event that Landlord provides Tenant with an alternate Terminal Expenditure Plan, such Preexisting Condition Terminal Compliance shall be conducted in accordance with such alternate Terminal Expenditure Plan, unless Tenant reasonably disapproves of such Terminal Expenditure Plan within seven (7) days of receipt of the same.

    d.    If Tenant fails to respond to such alternate Terminal Expenditure Plan within such seven (7) day period, then Tenant's approval of such alternate Terminal Expenditure Plan shall be deemed granted.

    e.    If Tenant reasonably disapproves of such alternate Terminal Expenditure Plan and if Landlord and Tenant cannot thereafter promptly agree on a Terminal Expenditure Plan, such dispute shall be resolved by an arbitration conducted in accordance with the applicable provisions set forth in Exhibit F of the Restated Master Lease.

    f.    Except as provided in Subsection g. below, all Preexisting Condition Terminal Compliance shall be conducted in accordance with the Terminal Expenditure Plan.

    g.    In the event of an imminent and substantial endangerment or when, in the reasonable judgment of Tenant, immediate action is necessary to avoid enforcement activities, or a fine and/or penalty in excess of $1500 per day or $100,000 in the aggregate, by an applicable Government, Tenant may take such action as necessary to respond to the imminent and substantial endangerment or to avoid enforcement by the applicable Government, prior to agreement on a Terminal Expenditure Plan and such action shall not affect in any way Landlord's obligations under this Section.

All costs and expenses incurred by Landlord related in any way to the development of an alternate Terminal Expenditure Plan (as contemplated by subsection a. above) or by Tenant and Landlord related in any way to arbitration of a dispute concerning a Terminal Expenditure Plan (as contemplated by subsection e., above) shall not be chargeable as costs and expenditures hereunder.

3.    With respect to any Preexisting Condition Terminal Compliance for which Notice has been given in good faith prior to the tenth (10th) anniversary of the Restatement Effective Date, Landlord's obligations hereunder shall survive and continue in full force and effect until completion of the Terminal Expenditure Plan or Landlord's fulfillment of its obligations hereunder, whichever is sooner. Landlord shall have no liability or obligation whatsoever hereunder with respect to any Preexisting Condition Terminal Compliance for which Notice has been received after the tenth (10th) anniversary of the Restatement Effective Date.

4.    Landlord shall be solely responsible for any and all liability or obligation at the Newark Petroleum Terminal Property related to or arising from ISRA, except for that liability or obligation under ISRA created or caused by Tenant after the Restatement Effective Date, including but not limited to all liability or obligation related in any way to the Contamination for which Texaco is responsible, or to Contamination discovered as a result of the sampling for

4

which the New Jersey Department of Transportation has given notice and shall hold Tenant harmless for any such liability or obligation. Landlord shall retain and continue to exercise whatever rights it may have to compel a third party to fully discharge any Remediation or other related obligations the third party may have under ISRA, and shall remain solely responsible for any associated actual, out-of-pocket costs and expenses. If Landlord fails to compel such third party to fully discharge any Remediation or other similar obligations under ISRA, Landlord shall be fully responsible for the discharge of such responsibilities.

### SECTION IV.    TENANT'S OBLIGATIONS.

1. Notwithstanding anything to the contrary herein, in the Restated Master Lease, or any other agreement, Tenant shall have no liability or obligation whatsoever, and Landlord shall indemnify and hold Tenant harmless with respect to any and all allegations, actions, orders, decrees, suits, demands, demand letters, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses, and fees (hereinafter "Claims") with respect to a breach of Landlord's representations in Section II, above, as well as:

   a. The Highspire Petroleum Terminal Property;

   b. Any Petroleum Terminal Property and Service Station Property closed, sold or otherwise disposed of prior to February 1, 1997 (the "Spinoff Transaction");

   c. Service Stations Properties closed, sold or otherwise disposed of after the Spinoff Transaction and before the Restatement Effective Date, except for the Service Station Properties identified on Schedule Z hereto;

   d. UST Upgrades at the Service Station Properties for which Landlord is responsible pursuant to Section 7.6 of the Restated Master Lease; and

   e. Remediation activities at the Service Station Properties for which Landlord is responsible pursuant to Section 9 of the Restated Master Lease.

2. Notwithstanding anything to the contrary herein, in the Restated Master Lease, or any other agreement, any condition not in full compliance with any Environmental Law as of the Restatement Effective Date at any Service Station Property or Petroleum Terminal Property shall not operate as a lease default and Tenant shall have no liability or obligation whatsoever to engage in any Remediation or other compliance-related activity with respect to any such non-compliance condition as of the Restatement Effective Date at any such Service Station Property or Petroleum Terminal Property, except when required by a *bona fide* Claim asserted by an applicable Government or a party other than Landlord or any Landlord affiliate (excluding any Claim relating to any breach of Landlord's representations in Section II, above), provided, however, that at any time, in Tenant's sole discretion, Tenant may engage in any Remediation or other compliance-related activity with respect to any Service Station Property or Petroleum Terminal Property. Landlord shall not take any action (i) reasonably likely to cause an applicable Government or a party other than Landlord to assert a Claim that seeks such Remediation or other compliance-related activity or (ii) to compromise, admit any fact, concede liability or otherwise materially prejudice Tenant's ability to defend any actual or potential Claim. Tenant shall not be deemed to be required by a *bona fide* Claim to take action if Tenant

5

has a reasonable, good faith basis for asserting a challenge or defense and Tenant is, in fact, diligently challenging or defending against such Claim. So long as Tenant has a reasonable, good faith basis for asserting a challenge or defense and Tenant is, in fact, diligently challenging or defending against such Claim, any condition that is the subject of Tenant's challenge or defense shall not operate as a lease default.

3. Except as set forth in this Indemnity Agreement and in the Restated Master Lease, Landlord shall have no liability to Tenant for any environmental matter related to the Service Station Properties or Petroleum Terminal Properties.

## SECTION V.    LANDLORD'S ADDITIONAL OBLIGATIONS.

1. **Landlord's Cooperation..** Landlord hereby grants Tenant the right to exercise Landlord's rights to compel each third party listed on Schedule 12 hereto to discharge fully any Remediation or other similar obligations that such third party may owe to Landlord pursuant to any purchase and sale or similar agreement for any of those Properties (a "Sale Agreement"). Tenant shall comply with all applicable obligations of Landlord under any Sale Agreement, including, without limitation, Landlord's obligation to provide for and permit access to the Property that is the subject matter of such Sale Agreement by such third party and/or its employees, agents and contractors in the manner set forth in such Sale Agreement. Such third parties shall be solely responsible for fulfilling all Remediation and similar obligations, and Landlord shall under no circumstance have any obligation or liability with respect thereto, except as may be specifically required by Article 9 of the Restated Master Lease. If such rights of Landlord under any such Sale Agreement are not assignable, then Landlord shall cooperate with Tenant (which cooperation may include, without limitation, litigation) as Tenant shall reasonably request, and at Tenant's expense (including, without limitation, Indemnifying Landlord), so as to enforce the performance of such third party obligations under such Sale Agreement.

2. **Restatement Effective Date.** Upon the occurrence of the Restatement Effective Date, Landlord shall deliver to Tenant a certificate containing representations as of the Restatement Effective Date substantially identical to those contained in Section II, except that the Exhibits and Schedules referred to in that Section shall, for the purposes of such certificate, contain such modifications or amendments as may be necessary to cause the representations contained in such certificate to be true and correct as of the Restatement Effective Date. In no event, shall the modifications or amendments to the Exhibits and Schedules serve to cure any breach of the representations made on the date hereof.

## SECTION VI.    MISCELLANEOUS PROVISIONS.

1. **Amendment and Modification.** Any amendment or modification to this Indemnity Agreement must be in writing signed by both of the Parties hereto.

2. **Assignment.** This Indemnity Agreement and all of the provisions hereof shall bind and benefit the Parties hereto and their respective successors and permitted assigns. Nothing in this Indemnity Agreement, expressed or implied, is intended or shall be construed to confer upon any person other than the Parties hereto, and their respective successors and assigns, any right,

6

remedy, or Claim under or by reason of this Indemnity Agreement or any provision herein contained. Both Parties have the right to assign (and each successive assignee may further assign) their rights under this Indemnity Agreement to any person or entity, which such person or entity by acceptance of such assignment shall be deemed to assume all liabilities, indebtedness and obligations included in the rights assigned.

3. **Governing Law**. This Indemnity Agreement and its interpretation and performance shall be governed by and construed and regulated in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

4. **Counterparts**. This Indemnity Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and shall become a binding agreement when one or more of the counterparts have been signed by each of the Parties and delivered to the other party.

5. **Agent for Service of Process**. Tenant hereby irrevocably names and designates Lukoil Americas Corporation, a Delaware corporation whose address is 540 Madison Avenue, New York, NY, as Tenant's agent (Tenant's "Agent") for service of process, including all notices required to institute any proceeding in any court or in any other way required to confer personal jurisdiction over Tenant in any court, and for the receipt of any Notices or other communications required under this Indemnity Agreement, including any and all Notices under this Indemnity Agreement issued for the purpose of demanding compliance with this Indemnity Agreement. Service or demand upon Agent shall be good and sufficient service and demand upon Tenant for all purposes, including, without limitation, the purpose of obtaining personal jurisdiction over Tenant for any legal action or proceeding or for the purpose of commencing any proceeding. Tenant agrees to take any and all action necessary to continue Agent's designation in full force and effect. If Agent becomes unable to act as Agent for any reason then Tenant shall forthwith irrevocably designate a replacement Agent satisfying the requirements of this Section that would apply to any replacement Agent, as set forth in the next sentence. By Notice to Landlord (but no more frequently than once every six months), Tenant may substitute in place of Agent any other Person having full-time business offices and a street address in Manhattan. Tenant agrees that delivery of any Notice to Agent, or any service of process upon Agent, in accordance with the notice requirements of this Indemnity Agreement, shall constitute valid and effective personal service upon Tenant. Any such Notice or service of process shall be effective in accordance with the provisions of this Indemnity Agreement relating to Notices. Any failure of Agent to give any notice of such service of process or Notice to Tenant shall not impair or affect the validity of such Notice, service of process, or any judgment rendered in any proceeding based thereon.

6. **Entire Agreement**. This Indemnity Agreement embodies the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein. There are no separate understandings or agreements, oral or written, between the Parties with respect to the subject matter contained herein. This Indemnity Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter. The Restated Master Lease contains certain parallel provisions, but in the event of any conflict between this Indemnity Agreement and the Restated Master Lease, this Indemnity Agreement governs and controls.

NY_DOCS\495701.1 [W97]

7

7. **Headings**. The article and section headings contained in this Indemnity Agreement are for convenience and reference purposes only and shall not affect in any way the meaning or interpretation of this Indemnity Agreement.

8. **Severability**. If any one or more terms or provisions contained in this Indemnity Agreement or the application of such terms or provisions shall, for any reason and to any extent, be held to be invalid, illegal or unenforceable in any respect, then the remainder of this Indemnity Agreement, or the application of terms or provisions to persons or circumstances other than those as to which it is invalid, illegal or unenforceable, shall not be affected by such invalidity. All remaining provisions of this Indemnity Agreement shall be valid and enforced to the fullest extent permitted by law.

9. **Further Assurances**. Each party to this Indemnity Agreement agrees to execute such documents or instruments, and to take such action, as the other party may reasonably request after the date hereof in order to effectuate and perfect the indemnification contemplated hereby.

10. **Third Party Beneficiary**. The Landlord and Tenant are the intended beneficiaries of this Indemnity Agreement.

11. **Submission to Jurisdiction**. Each of the Parties to this Indemnity Agreement hereby submits to the exclusive jurisdiction of the United Stated District Court for the Southern District of New York for purposes of all legal proceedings arising out of or relating to this Indemnity Agreement and the estates and relationships created hereby. If the Parties hereto are unable to submit to the jurisdiction of the United States District Court for the Southern District of New York notwithstanding reasonably diligent efforts to do so, then the Parties shall submit to the exclusive jurisdiction of any New York State court sitting in New York County, New York. Each of the Parties to this Indemnity Agreement hereby irrevocably waives, to the fullest extent it may effectively do so, any objection which it may now or hereafter have to the laying of venue of any such proceedings brought in any such court and any Claim that any such proceeding brought in any such court has been brought in an inconvenient forum.

12. **Interpretation**. No inference in favor of or against any party shall be drawn from the fact that such party has drafted any portion of this Indemnity Agreement. The Parties have both participated substantially in the negotiation, drafting and revision of this Indemnity Agreement with representation by counsel and such other advisers as they have deemed appropriate. The words "include" and "including" shall be construed to be followed by the words: "without limitation."

13. **Remedies**. Any breach by Tenant of any obligation or undertaking herein shall not, under any circumstances, absolve Landlord of its obligations and undertakings herein. The sole remedies available to Landlord upon breach by Tenant shall be the ability to seek injunctive relief to ensure compliance and to seek actual damages accrued as a result of the breach.

IN WITNESS WHEREOF, the Parties have caused this Indemnity Agreement to be signed by their respective officers thereunto duly authorized as of the date above.

Getty Properties Corp.

By: _____
    Name: _____
    Title: _____

Getty Petroleum Marketing Inc.

By: _____
    Name: _____
    Title: _____

# Exhibit 11

# GettyRealty

Getty Realty Corp Year End December 31, 2002 Annual Report

## 2002

## OnTarget

COMPANY PROFILE Getty Realty Corp. (NYSE: GTY) was founded and historically operated as an integrated wholesale and retail marketer and owner of gasoline stations. We lease approximately 93 percent of our properties on a long-term net basis to Getty Petroleum Marketing Inc. ("Marketing"), which was spun-off to our shareholders as a separate NYSE listed company in March 1997 and was subsequently acquired, in December 2000, by a subsidiary of OAO Lukoil, one of Russia's largest integrated oil companies. As a result, our assets, revenues and income relate exclusively to properties leased to others, including 972 properties leased to Marketing. We have retained ownership of the Getty trademark and trade name in the United States and have granted licenses to Marketing to use the Getty trademark, while retaining the right to grant licenses to others.

We own or lease 1,040 gasoline station/convenience stores and nine petroleum distribution terminals in thirteen states in the eastern half of the United States. As of December 31, 2002, we owned fee title to 739 of these properties, including six petroleum distribution terminals, and leased the remaining 310 properties. The leased properties have a remaining lease term averaging 17 years, including renewal options. The Company is the largest real estate investment trust specializing in gasoline/convenience store properties in the United States.

GETTY REALTY CORP. AND SUBSIDIARIES

## MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

is that the state underground storage tank fund programs will be administered and funded in the future in a manner that is consistent with past practices and that future environmental spending will be eligible for reimbursement under these programs.

### Environmental Matters

We are subject to numerous existing federal, state and local laws and regulations, including matters relating to the protection of the environment. Currently, environmental expenses are principally attributable to remediation, monitoring and governmental agency reporting incurred in connection with contaminated properties. In prior periods, a larger portion of the expenses also included soil disposal and the replacement or upgrading of underground storage tanks ("USTs") to meet federal, state and local environmental standards, as well as routine monitoring and tank testing.

Under the Master Lease with Marketing, and in accordance with leases with other tenants, we agreed to bring the leased properties with known environmental contamination to regulatory or contractual closure ("Closure") in an economical manner and, thereafter, transfer all future environmental risks to our tenants. Generally, upon achieving Closure at an individual property, our environmental liability under the lease for that property will be satisfied and future remediation obligations will be the responsibility of our tenant. We have agreed to pay all costs relating to, and to indemnify Marketing for, environmental liabilities and obligations scheduled in the Master Lease. We will continue to collect recoveries from certain state UST remediation funds related to these environmental liabilities.

We have also agreed to provide limited environmental indemnification to Marketing for pre-existing environmental conditions at six terminals owned by us. Under the indemnification agreement, Marketing will pay the first $1.5 million of costs and expenses incurred in connection with remediating any such pre-existing conditions, Marketing will share equally with us the next $8.5 million of those costs and expenses and Marketing will pay all additional costs and expenses over $10.0 million. Our indemnification responsibility under this agreement is capped at $4.25 million and expires in December 2010. We have not accrued a liability for this indemnification agreement since it is uncertain that any significant amounts will be required to be paid under the agreement.

The estimated future costs for known environmental remediation requirements are accrued when it is probable that a liability has been incurred and the amount of remediation costs can be reasonably estimated in accordance with GAAP. The environmental remediation liability is estimated based on the level and impact of contamination for each property. The accrued liability is the aggregate of the best estimate of cost for each component of the liability. If the best estimate of cost for a component of the liability can only be identified as a range, and no amount within the range is a better estimate than any other amount, the minimum of the range is accrued for that cost component. Recoveries of environmental costs from state underground storage tank remediation funds, with respect to both past and future environmental spending, are accrued as income based on estimated recovery rates when such recoveries are considered probable.

Environmental exposures are difficult to assess and estimate for numerous reasons, including the extent of contamination, alternative treatment methods that may be applied, location of the property which subjects it to differing local laws and regulations and their interpretations, as well as the time it takes to remediate contamination. In developing our liability for probable and reasonably estimable environmental remediation costs, on a property by property basis, we consider among other things, enacted laws and regulations, assessments of contamination and the quality of information available, currently available technologies for treatment, alternative methods of remediation and prior experience. These accrual estimates are subject to significant change, and are adjusted as the remediation treatment progresses, as circumstances change and as these contingencies become more clearly defined and reasonably estimable. As of December 31, 2002, we have remediation action plans in place for 348 (85%) of the 411 properties for which we retained environmental responsibility. Sixty-three properties (15%) remain in the assessment phase, which when completed will likely result in a change in estimate for those properties.

As of December 31, 2002 and 2001, we had accrued $27.9 million and $27.3 million, respectively, as management's best estimate for probable and reasonably estimable environmental remediation costs. As of December 31, 2002 and 2001, we had also recorded $13.4 million and $14.3 million, respectively, as management's best estimate for recoveries from state UST remediation funds related to environmental obligations and liabilities. It is possible that estimated aggregate future cash expenditures for environmental remediation from 2003 through 2012 could approximate $29.6 million, or approximately $14.2 million on a net basis after estimated recoveries