# Exhibit 13

```
  7/14/08  16:32:27        Property Master Inquiry                    REG020I
Selection:   58240
Property # - 58240 Status Code - D Include(Y/N) - N A/R CO# - 150 Sub.Type -
Address Line 1 - UPPER SHEEP PASTURE RD.            Reg # - 102 Zone -  97 Type -
Address Line 2 -                                   State - NY   Zip - 11733
Date Sold - 12/31/92 Brand - G Tax Juris -  4760 City - S. SETAUKET
Date Acquired -            Acquis.Code -    Date Closed -           Closed CD -
                                    Facility Types F                          A
Property Size(Sq Ft) -          No.of Product Systems -     Prime Corners -
     Property Frontage -           No.of Product Types -         Area Code -
Building Size(Sq Ft) -                  No. of Hoses -          Owning CO # -
  No.of Pump Islands -          Condition of Premises -         Sales Terr# - 2
  Quality of Location -                     Area Type -           Mort Type  -
Quality of Operation -                                     Real Estate
Competitor #1  -            Competitor #2  -                       Code
Competitor #3  -            Competitor #4  -                       Date
Competitor #5  -            Competitor #6  -
Competitor #7  -            Competitor #8  -
Competitor #9  -            Competitor #10 -
Competitor #11 -            Competitor #12 -
                                                  Status of Bays

  Remarks - OFFICE/WAREHOUSE
            MASTER LEASE TERMINATES 12/31/92.              CMD 9 Address Search
CMD 1 Exit
```

# Exhibit 14



GETTY REALTY

COAST TO COAST

2007

ANNUAL REPORT

## Company Profile

Getty Realty Corp. (NYSE: GTY) was founded in 1955 and had its initial public offering of common stock in 1971. We historically operated as an integrated wholesale and retail marketer of motor fuels with a network of owned and leased gasoline stations and petroleum distribution assets. In 1997, we spun-off our petroleum marketing business to our shareholders as a separate NYSE listed company, Getty Petroleum Marketing, Inc. ("Marketing"). In 2000, Marketing was acquired by a subsidiary of OAO LUKoil, one of the largest integrated Russian oil companies. Currently, our assets, revenues and income relate exclusively to properties that we lease to others.

We are the largest publicly-traded real estate investment trust in the United States specializing in ownership and leasing of motor fuel and convenience store properties and petroleum distribution terminals. Our properties are located primarily in the Northeast and the Mid-Atlantic regions in the United States. We also own or lease properties in Texas, North Carolina, Hawaii, California, Florida, Arkansas, Illinois and North Dakota. As of December 31, 2007, we owned 880 of our 1,083 properties, including nine petroleum distribution terminals, and leased the remaining 203 properties from third-party landlords, generally under long-term leases. As of December 31, 2007, approximately 81% of our properties were leased on a long-term basis to Marketing. Additionally, we own the Getty trademark and trade name in connection with our real estate and the petroleum marketing business in the United States which we have licensed to Marketing on an exclusive basis in its marketing territory.

## Financial Highlights

| (in thousands, except per share amounts) | Year ended December 31, | | |
|---|---|---|---|
| | 2007 (a) | 2006 | 2005 |
| Revenues from rental properties | $78,462 | $71,904 | $70,881 |
| Earnings before income taxes and discontinued operations | 28,103 (b) | 41,620 | 43,573 |
| Earnings from continuing operations | 28,103 | 42,320 | 45,067 |
| Discontinued Operations | 5,791 | 405 | 381 |
| Net earnings | 33,894 | 42,725 | 45,448 |
| Diluted earnings per common share | 1.37 | 1.73 | 1.84 |
| Funds from Operations (c) | 37,509 | 49,027 | 52,252 |
| Diluted FFO per common share (c) | 1.51 | 1.98 | 2.11 |
| Adjusted Funds from Operations (c) | 43,844 | 45,317 | 46,588 |
| Diluted AFFO per common share (c) | 1.77 | 1.83 | 1.88 |
| Dividends declared per common share | 1.85 | 1.82 | 1.76 |

(a) The financial highlights for the year ended December 31, 2007 include (from the date of the acquisition) the effect of the $84.6 million acquisition of convenience stores and gas station properties from FF-TSY Holding Company II LLC (successor to Trustreet Properties, Inc.) which was substantially completed by the end of the first quarter of 2007.

(b) Includes the effect of a $10.5 million non-cash reserve for the full amount of the deferred rent receivable recorded as of December 31, 2007 related to approximately 40% of the properties under leases with our primary tenant, Getty Petroleum Marketing, Inc. ("Marketing"). (See recent developments related to Marketing and our leases with Marketing in "Recent Developments" on page 7 for additional information.)

(c) In addition to measurements defined by generally accepted accounting principles ("GAAP"), our management also focuses on funds from operations available to common shareholders ("FFO") and adjusted funds from operations available to common shareholders ("AFFO") to measure our performance. FFO is generally considered to be an appropriate supplemental non-GAAP measure of the performance of real estate investment trusts ("REITs"). FFO is defined by the National Association of Real Estate Investment Trusts as net earnings before depreciation and amortization of real estate assets, gains or losses on dispositions of real estate, (including such non-FFO items reported in discontinued operations), extraordinary items, and cumulative effect of accounting change. Other REITs may use definitions of FFO and/or AFFO that are different than ours and, accordingly, may not be comparable.

We believe that FFO is helpful to investors in measuring our performance because FFO excludes various items included in GAAP net earnings that do not relate to, or are not indicative of, our fundamental operating performance such as gains or losses from property dispositions and depreciation and amortization of real estate assets. In our case, however, GAAP net earnings and FFO include the significant impact of deferred rental revenue (straight-line rental revenue) and the net amortization of above-market and below-market leases on our recognition of revenue from rental properties, as offset by the impact of related collection reserves. Deferred rental revenue results primarily from fixed rental increases scheduled under certain leases with our tenants. In accordance with GAAP, the aggregate minimum rent due over the initial term of these leases is recognized on a straight-line basis rather than when payment is due. The present value of the difference between the fair market rent and the contractual rent for in-place leases at the time properties are acquired is amortized into revenue from rental properties over the remaining lives of the in-place leases. GAAP net earnings and FFO also include income tax benefits recognized due to the elimination of, or reduction in, amounts accrued for uncertain tax positions related to being taxed as a C-corp. rather than as a REIT prior to 2001. As a result, management pays particular attention to AFFO, a supplemental non-GAAP performance measure that we define as FFO less straight-line rental revenue, net amortization of above-market and below-market leases and income tax benefit. In management's view, AFFO provides a more accurate depiction than FFO of the impact of the scheduled rent increases under these leases, rental revenue from acquired in-place leases and our election to be treated as a REIT under the federal income tax laws beginning in 2001. Neither FFO nor AFFO represent cash generated from operating activities calculated in accordance with generally accepted accounting principles and therefore should not be considered an alternative for GAAP net earnings or as a measure of liquidity. FFO and AFFO are reconciled to net earnings in "Selected Financial Data" on page 5.

Management's Discussion and Analysis
of Financial Condition and Results of Operations

Environmental Matters

We are subject to numerous existing federal, state and local laws and regulations, including matters relating to the protection of the environment such as the remediation of known contamination and the retirement and decommissioning or removal of long-lived assets including buildings containing hazardous materials, USTs and other equipment. We enter into leases and various other agreements which allocate responsibility for known and unknown environmental liabilities by establishing the percentage and method of allocating responsibility between the parties. In accordance with the leases with certain of our tenants, we have agreed to bring the leased properties with known environmental contamination to within applicable standards and to regulatory or contractual closure ("Closure") in an efficient and economical manner. Generally, upon achieving Closure at an individual property, our environmental liability under the lease for that property will be satisfied and future remediation obligations will be the responsibility of our tenant. We will continue to seek reimbursement from state UST remediation funds related to these environmental liabilities where available. Generally, the liability for the retirement and decommissioning or removal of USTs and other equipment is the responsibility of our tenants. We are contingently liable for these obligations in the event that our tenants do not satisfy their responsibilities. A liability has not been accrued for obligations that are the responsibility of our tenants based on our tenant's past history of paying such obligations and/or their financial ability to pay their share of such costs. It is possible that our assumptions regarding the ultimate allocation methods and share of responsibility that we used to allocate environmental liabilities may change, which may result in adjustments to the amounts recorded for environmental litigation accruals, environmental remediation liabilities and related assets. (See recent developments related to Marketing and the Marketing Leases in "Recent Developments" above for additional information.) We may ultimately be responsible to directly pay for environmental liabilities as the property owner if Marketing fails to pay them. The ultimate resolution of these matters could have a material adverse effect on our business, financial condition, results of operations, liquidity, ability to pay dividends and stock price.

We have not accrued for approximately $1.0 million in costs allegedly incurred by the current property owner in connection with removal of USTs and soil remediation at a property that was leased to and operated by Marketing. Marketing is responsible for such costs under the terms of the Master Lease but Marketing has denied its liability for the claim and its responsibility to defend against, and indemnify us for, the claim. In addition, Marketing has denied liability and refused our tender for defense and indemnification for another legal proceeding. We have filed third party claims against Marketing in both proceedings. It is reasonably possible that our assumption that Marketing will be ultimately responsible for the claim may change, which may result in our providing an accrual for this matter.

We have also agreed to provide limited environmental indemnification to Marketing, capped at $4.25 million and expiring in 2010, for certain pre-existing conditions at six of the terminals we own and lease to Marketing. Under the indemnification agreement, Marketing is obligated to pay the first $1.5 million of costs and expenses incurred in connection with remediating any such pre-existing conditions, Marketing will share equally with us the next $8.5 million of those costs and expenses and Marketing is obligated to pay all additional costs and expenses over $10.0 million. We have accrued $0.3 million as of December 31, 2007 and 2006 in connection with this indemnification agreement. Under the Master Lease, we continue to have additional ongoing environmental remediation obligations for two hundred nineteen scheduled sites.

As the operator of our properties under the Marketing Leases, Marketing is directly responsible to pay for the remediation of environmental contamination it causes and to comply with various environmental laws and regulations. In addition, the Marketing Leases and various other agreements between Marketing and us allocate responsibility for known and unknown environmental liabilities between Marketing and us relating to the properties subject to the Marketing Leases. Based on various factors, including our assessments and assumptions at this time that Lukoil would not allow Marketing to fail to perform its obligations under the Marketing Leases, we believe that Marketing will continue to pay for substantially all environmental contamination and remediation costs allocated to it under the Marketing Leases. It is possible that our assumptions regarding the ultimate allocation methods and share of responsibility that we used to allocate environmental liabilities may change as a result of the factors discussed above, or otherwise, which may result in adjustments to the amounts recorded for environmental litigation accruals, environmental remediation liabilities and related assets. We may ultimately be responsible to directly pay for environmental liabilities as the property owner if Marketing fails to pay them. We are required to accrue for environmental liabilities that we believe are allocable to Marketing under the Marketing Leases and various other agreements if we determine that it is probable that Marketing will not pay its environmental obligations.

continued

Based upon our assessment of Marketing's financial condition and certain other factors, including but not limited to those described above, we believe at this time that it is not probable that Marketing will not pay the environmental liabilities allocable to it under the Marketing Leases and various other agreements and, therefore, have not accrued for such environmental liabilities. Our assessments and assumptions that affect the recording of environmental liabilities related to the properties subject to the Marketing Leases are reviewed on a quarterly basis and such assessments and assumptions are subject to change.

The estimated future costs for known environmental remediation requirements are accrued when it is probable that a liability has been incurred and a reasonable estimate of fair value can be made. Environmental liabilities and related recoveries are measured based on their expected future cash flows which have been adjusted for inflation and discounted to present value. The environmental remediation liability is estimated based on the level and impact of contamination at each property and other factors described herein. The accrued liability is the aggregate of the best estimate for the fair value of cost for each component of the liability. Recoveries of environmental costs from state UST remediation funds, with respect to both past and future environmental spending, are accrued at fair value as income, net of allowance for collection risk, based on estimated recovery rates developed from our experience with the funds when such recoveries are considered probable.

Environmental exposures are difficult to assess and estimate for numerous reasons, including the extent of contamination, alternative treatment methods that may be applied, location of the property which subjects it to differing local laws and regulations and their interpretations, as well as the time it takes to remediate contamination. In developing our liability for probable and reasonably estimable environmental remediation costs, on a property by property basis, we consider among other things, enacted laws and regulations, assessments of contamination and surrounding geology, quality of information available, currently available technologies for treatment, alternative methods of remediation and prior experience. These accrual estimates are subject to significant change, and are adjusted as the remediation treatment progresses, as circumstances change and as these contingencies become more clearly defined and reasonably estimable. As of December 31, 2007, we have regulatory approval for remediation action plans in place for two hundred sixty-three (93%) of the two hundred eighty-two properties for which we continue to retain remediation responsibility and the remaining nineteen properties (7%) were in the assessment phase. In addition, we have nominal post-closure compliance obligations at 28 properties where we have received "no further action" letters.

As of December 31, 2007 we had accrued $13.8 million as management's best estimate of the net fair value of reasonably estimable environmental remediation costs which is comprised of $18.5 million of estimated environmental obligations and liabilities offset by $4.7 million of estimated recoveries from state UST remediation funds, net of allowance. Environmental expenditures, net of recoveries from UST funds, were $4.7 million, $3.0 million and $3.5 million, respectively, for 2007, 2006 and 2005. For 2007, 2006 and 2005, the net change in estimated remediation cost and accretion expense included in our consolidated statements of operations amounted to $5.2 million, $3.3 million and $1.4 million, respectively, which amounts were net of probable recoveries from state UST remediation funds.

Environmental liabilities and related assets are currently measured at fair value based on their expected future cash flows which have been adjusted for inflation and discounted to present value. We also use probability weighted alternative cash flow forecasts to determine fair value. We assumed a 50% probability factor that the actual environmental expenses will exceed engineering estimates for an amount assumed to equal one year of net expenses aggregating $6.3 million. Accordingly, the environmental accrual as of December 31, 2007 was increased by $2.4 million, net of assumed recoveries and before inflation and present value discount adjustments. The resulting net environmental accrual as of December 31, 2007 was then further increased by $0.9 million for the assumed impact of inflation using an inflation rate of 2.75%. Assuming a credit-adjusted risk-free discount rate of 7.0%, we then reduced the net environmental accrual, as previously adjusted, by a $2.0 million discount to present value. Had we assumed an inflation rate that was 0.5% higher and a discount rate that was 0.5% lower, net environmental liabilities as of December 31, 2007 would have increased by $0.2 million and $0.1 million, respectively, for an aggregate increase in the net environmental accrual of $0.3 million. However, the aggregate net change in environmental estimates expense recorded during the year ended December 31, 2007 would not have changed significantly if these changes in the assumptions were made effective December 31, 2006.

# **Exhibit 15**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: Methyl Tertiary Butyl Ether<br>("MTBE") Productions Liability Litigation | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

)  **ORDER**

)  **Master File No. 1:00-1898**
)  **MDL 1358 (SAS)**
)  **M21-88**

This document relates to:

*County of Suffolk and Suffolk County Water Authority*
*v. Amerada Hess Corp., et al.*
No. 04-CV-5424

**SHIRA A. SCHEINDLIN, U.S.D.J.:**


## AMENDMENT TO CASE MANAGEMENT ORDERS #38 and #39

Getty Petroleum Marketing Inc. is included in the list of Settling Defendants

under Case Management Orders No. 38 and No. 39.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated: New York, New York
June 24, 2008