**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X
:
**IN RE: METHYL TERTIARY BUTYL** :
**ETHER ("MTBE") PRODUCTS** :
**LIABILITY LITIGATION** :
------------------------------------------------- :
:
**This document relates to:** :
:
*City of Riverside v. Atlantic Richfield Co., et* :
*al.*, 04 Civ. 4969 :
:
*Quincy Community Services District v.* :
*Atlantic Richfield Co., et al.*, 04 Civ. 4970 :
:
*People of the State of California, et al. v.* :
*Atlantic Richfield Co., et al.*, 04 Civ. 4972 :
:
*California-American Water Co. v. Atlantic* :
*Richfield Co., et al.*, 04 Civ. 4974 :
:
*Martin Silver, et al. v. Alon USA Energy,* :
*Inc., et al.*, 04 Civ. 4975 :
:
*Village of Island Lake v. Ashland Inc., et al.,* :
04 Civ. 2053 :
------------------------------------------------- X



**OPINION AND ORDER**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Twelve large gasoline refiners and their related corporate entities,

who together account for approximately seventy percent of the named defendants

in these cases, have agreed to pay plaintiffs in fifty-nine actions approximately $422 million to settle claims arising from contamination of public and private well water with the gasoline additive methyl tertiary butyl ether ("MTBE").[1]  In addition, they have agreed to pay seventy percent of the cost of treating any of plaintiffs' non-contaminated wells ("threatened wells") that become contaminated above a certain level in the future.  Six of these cases are pending in California and Illinois.  The settling defendants now bring this motion for a determination that the portions of the global settlement allocated to these six cases are made in good faith under California and Illinois law, so that they will be protected from contribution claims by non-settling defendants.

ExxonMobil, the sole large refiner defendant that has not joined the settlement, opposes the motion, arguing that the settling parties have not correctly estimated the settling defendants' share of liability in each case, and that it will not receive a sufficient setoff from any damages plaintiffs recover at trial for claims pertaining to threatened wells. In addition, Toms Sierra Company and Sierra Energy (together, "TSC"), a gasoline distributor, opposes settling defendants'

---

[1]     The cases are before me as part of a multi-district litigation ("MDL") that has transferred to this Court over one hundred actions involving claims against numerous gasoline and chemical companies for MTBE contamination in public and private water supplies.

2

motion in the *Quincy Community Services District* case on the grounds that it has no liability and will therefore have to pay a disproportionate amount of plaintiffs' recovery at trial.

A hearing was held on July 9, 2008. After considering the arguments, the declarations and other evidence submitted in support and in opposition, including the settlement agreement and its exhibits, I find that the settlement is in good faith with respect to each case, and grant the motion of the settling defendants.

## II.  BACKGROUND

### A.  The Nature of the Cases

Plaintiffs in these actions include public and private water suppliers as well as individual well owners. After MTBE was detected in their wells, or when they believed their wells were threatened with MTBE contamination, plaintiffs sued gasoline refiners, distributors, marketers and retailers, as well as manufacturers of MTBE. Plaintiffs asserted numerous claims, including product liability – design defect, failure to warn, negligence, public and private nuisance, trespass, and various state law claims. Some plaintiffs also asserted a federal claim under the Toxic Substances Control Act.

The lawsuits alleged similar facts about MTBE, its inclusion in

3

gasoline, and its release into the environment, which I summarize here.[2]  MTBE

was added to gasoline to increase its oxygen content beginning in 1979.[3]  After the

Clean Air Act amendments of 1990 required the use of oxygenated gasoline in

high-smog areas of the country, the use of MTBE in gasoline increased

exponentially.[4]  Regulations authorized the use of several other additives to meet

the oxygenate requirements, but these were not as widely used as MTBE.[5]

      Plaintiffs allege that groundwater across the country has become

contaminated with MTBE due to releases of gasoline into the environment, often

from underground storage tanks at gas stations.  Further, MTBE is highly soluble

in water and does not biodegrade easily.[6]  It moves more quickly in groundwater

than other gasoline components, and can persist in aquifers for decades.[7]  MTBE

can impart a foul taste and odor to water even at very low concentrations, and

---

[2]     These factual allegations are set forth in greater detail in an omnibus
opinion denying defendants' motions to dismiss.  *See In re Methyl Tertiary Butyl
Ether ("MTBE") Prods. Liab. Litig.*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005).

[3]     *See id.* at 365.

[4]     *See id.*

[5]     *See id.*

[6]     *See id.*

[7]     *See id.*

4

some studies suggest that it is a human carcinogen.[8] The complaints allege that despite their knowledge of the risks MTBE posed to groundwater, refiner defendants chose to use it in gasoline and misled the public and government agencies about the nature and extent of the risk of doing so.[9]

Although these cases were filed in 2004, very little discovery has taken place due to the management of the cases in the MDL. Early in the litigation, four actions were designated "focus cases" and prioritized for discovery and motion practice. Meanwhile, discovery was stayed in the non-focus cases until fall 2007. The intention, of course, was that discovery and motion practice in the focus cases would narrow the issues for trial and facilitate discovery in the non-focus cases.

## B.    The Settlement

Beginning in August of 2006, plaintiffs and defendants began exploring a settlement of the MDL cases, and the Court appointed a Special Settlement Master in early 2007.[10] The parties met with the Special Settlement

---

[8]    *See id.*

[9]    *See id.*

[10]    *See* Declaration of Sheila Birnbaum (Defendants' counsel) in Support of Motion for a Determination of Good Faith ¶ 3.

5

Master throughout 2007, and in December 2007 drafted an outline of proposed settlement terms.[11] The final agreement was executed in March 2008.[12] The settlement includes fifty-nine cases filed in seventeen states on behalf of over 550 plaintiffs.

Settling defendants submitted the eight hundred-page settlement agreement along with their motion, as well as numerous declarations from counsel setting forth the key terms. In exchange for a cash payment and a future treatment obligation, the settling plaintiffs fully release settling defendants from past, present or future claims arising from the use of MTBE or other authorized oxygenates in gasoline, the actual or threatened presence of MTBE in water or other property of the plaintiff, or the actual presence of gasoline or any of its components that was detected in any of plaintiff's wells prior to March 12, 2008.

The cash payment is allocated among the cases at issue here as follows:

- The City of Riverside, which has four contaminated wells and one hundred wells that have never been contaminated with MTBE, will receive $1,014,097.

---

[11]    *See id.* ¶ 10.

[12]    *See id.* ¶ 14.

6

- Quincy Community Services District, which has one contaminated well and five wells that have never been contaminated with MTBE, will receive $2,663,840.

- California-American Water Company, which has three contaminated wells and 184 wells that have never been contaminated with MTBE, will receive $8,029,550.

- M & P Silver Family Partners II, which has two contaminated wells and no other wells, will receive $3,937,202.

- A number of plaintiffs in *People of California v. Atlantic Richfield, et al.* have no contaminated wells and will each receive a base payment of $264,853. The amount comprises a base allocation of $141,321 for all plaintiffs and an additional $124,695 for all California plaintiffs to reflect the low maximum contaminant level ("MCL") for MTBE in that state. These plaintiffs include: Citrus Heights Water District, which has five such wells; Del Paso Manor Water District, which has eight such wells; Fair Oaks Water District, which has nine such wells; Florin Resource Conservation District, which has fifteen such wells; and Rio Linda Elverta Community Water District, which has twelve such wells.

•    The Village of Island Lake, which has three contaminated wells and

     five wells that have never been contaminated with MTBE, will

     receive $3,834,158.

     As a comparison of these figures reveals, the settlement payment was

not simply allocated based on the number of a plaintiff's contaminated wells. The

plaintiffs assessed the characteristics of each well, and assigned each a "grade"

based on a number of factors affecting the cost of treatment as well as the

likelihood of significant recovery at trial. These factors include: the operating

capacity or flow rate of the well, the level of detections in each well, the length of

time over which the detections occurred, how recently detections have occurred,

and the relationship of the detections to applicable regulatory standards.[13]  The

amount of money assigned to each grade ranges from $5,299 for wells that have

never had a detection of MTBE above 0.5 parts per billion ("ppb") or that have not

had a detection of MTBE since January of 2000, to $6.5 million for wells with a

flow rate of at least one thousand gallons per minute ("gpm") and contamination

levels of at least seventy ppb.[14]  A ten percent increase in allocation value was

---

[13]    *See* Declaration of Victor M. Sher (Plaintiffs' counsel in the
California cases) in Support of Motion for a Determination of Good Faith ("Sher
Decl.") ¶ 10.

[14]    *See id.* ¶¶ 11-12.

8

given to wells with a grade of C and below if the well had received treatment for volatile organic compounds including MTBE, if the maximum detection exceeded the relevant state MCL, or if the well was abandoned due to MTBE contamination.[15]

In addition to the monetary payment, the settling defendants agreed to a Treatment Protocol under which they will pay seventy percent of the cost of treating wells that are not currently contaminated, if they become contaminated in the future. To qualify for reimbursement of the costs of treatment under the settlement agreement, the following conditions must exist:

- the well was owned and/or operated by the plaintiff at the time of the execution of the agreement,

- no MTBE was ever detected in the well prior to the execution of the agreement,

- detections of MTBE have occurred in the well at rates of five ppb (four ppb in California) or higher for four consecutive quarters of a calendar year during the twenty year period following execution of the agreement,

- the MTBE/TBA must be attributable to gasoline and not another use

---

[15]     *See id.* ¶ 11.

9

of MTBE/TBA.

Some exceptions to these conditions exist. For example, a well is eligible for treatment if it exceeds an applicable MCL that is below five ppb for four consecutive quarters. Also, if the well owner elects to install treatment on a contaminated well before four quarters of a year have passed, there is a tolling of the consecutive quarters requirement. And, new wells drilled after the agreement's execution date for the purpose of increasing operational capacity are eligible for treatment, provided they are not drilled into a known plume of MTBE/TBA.

## C. Estimated Damages in These Cases

Although very little discovery has taken place in these six cases, the settling plaintiffs have estimated the damages they could reasonably recover at trial based on general information about the cost of treating wells for MTBE contamination. To calculate probable damages for each plaintiff's contaminated wells, the settling plaintiffs employed four steps. *First*, they began with a study by the American Petroleum Institute ("API") that calculated high, low, and mean costs of treating wells contaminated with MTBE for a ten-year period.[16] *Second*,

---

[16]     *See* Supplemental Declaration of Victor M. Sher in Support of Motion for a Determination of Good Faith ("Sher Suppl. Decl.") ¶ 6. The calculations were based on treatment using three different technologies – air

to tailor the API estimates more closely to the thirteen contaminated wells in these cases, the settling plaintiffs used a standard linear regression analysis to derive the estimated API cost for treatment at each well's flow rate.[17]

*Third*, the settling plaintiffs considered other characteristics of the wells' contamination, most significantly the MTBE detection levels. Because contamination levels in several wells were far below the lowest level used in the API calculations, settling plaintiffs explained that their estimated recovery for those wells is significantly less than the API figures, even when adjusted for flow rate.[18] The lower estimated recovery is due to both a lower estimated cost of treatment for such low contamination levels and to the litigation assessment that

---

stripping, which is the cheapest; GAC, which is middle-range and is the most commonly used in California; and AOP, the most expensive – at contamination levels of 20 ppb, 200 ppb, and 2,000 ppb. *See* Mike Martinson, Delta Environmental Consultants, Analysis of MTBE Groundwater Cleanup Costs, A Report to the American Petroleum Institute, July 2005, Ex. A to Sher Suppl. Decl. Plaintiffs acknowledge the imperfect nature of the study's cost estimates as a basis for estimating their reasonable recovery at trial. *See* Sher Suppl. Decl. ¶ 10.

[17]     *See* Sher Suppl. Decl. ¶ 7.

[18]     *See id.* ¶ 9.

11

there is a lower likelihood of recovery for such wells.[19] *Fourth*, and finally, any

past costs incurred by plaintiffs due to MTBE contamination were added.[20]

## III. LEGAL STANDARD

### A. The Law of the Transferor States Applies

The district court to which an action is transferred pursuant to section

1407 of title 28 of the United States Code ("section 1407") must apply the

substantive law of the jurisdictions from which the action originated.[21] Federal

courts apply state law regarding the preclusive impact of a settlement on state law

contribution and indemnity claims applies when adjudicating state law claims.[22]

### B. California Code of Civil Procedure 877.6

Section 877 of the California Code of Civil Procedure protects

---

[19]     *See id.* ¶¶ 11-12 ("In general, we reduced the settlement value with respect to wells with low detections of MTBE in light of defendants' asserted defenses that, for example, public water suppliers suffer no injury for contamination below the applicable MCL.").

[20]     *See* Third Supplemental Declaration of Victor M. Sher in Support of Motion for a Determination of Good Faith ("Third Supp. Sher Decl."); Second Supplemental Declaration of Scott Summy (Plaintiff's counsel in the Illinois case) in Support of Motion for a Determination of Good Faith ("Second Supp. Summy Decl.").

[21]     *See In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007).

[22]     *See, e.g., Sabater v. Lead Indus. Ass'n*, No. 00 Civ. 8026, 2001 WL 111505, at *5 (S.D.N.Y. Sept. 21, 2001).

settling tortfeasors from contribution claims by other, non-settling tortfeasors

where a release, dismissal, or covenant not to sue is made "in good faith."[23]

Section 877.6 provides:

> (a) Any party to an action wherein it is alleged that two or more parties
> are joint tortfeasors shall be entitled to a hearing on the issue of the good
> faith of a settlement entered into by the plaintiff or other claimant and
> one or more alleged tortfeasors . . . (c) A determination by the court that
> the settlement was made in good faith shall bar any joint tortfeasor from
> any further claims against the settling tortfeasor for equitable
> comparative contribution, or partial or comparative indemnity, based on
> comparative negligence or comparative fault.[24]

In addition, "the party asserting the lack of good faith shall have the burden of

proof on that issue."[25] The trial court has broad discretion when making a

determination of good faith.[26]

The purpose of these two statutory provisions is "to promote two

major goals – the equitable sharing of costs among the parties at fault and the

encouragement of settlements."[27] When construing the meaning of "good faith"

[23]    Cal. C.C.P. § 877.

[24]    *Id.* § 877.6.

[25]    *Id.*

[26]    *See North County Contractor's Ass'n v. Touchstone Ins. Servs.*, 33
Cal. Rptr. 2d 166, 172 (Cal. Ct. App. 1994).

[27]    *Bay Development, Ltd. v. Superior Court*, 791 P.2d 290, 298 (Cal.
1990).

13

under the statute, the California Supreme Court sought to balance these two sometimes competing goals. It held that an "appropriate definition of 'good faith' . . . would enable the trial court to inquire, among other things, whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries."[28] The court stressed, however, that "a showing that a settling defendant paid less than his theoretical proportionate or fair share" does not, in and of itself, establish bad faith, since "[s]uch a rule would unduly discourage settlements."[29]

A number of factors should be considered when determining whether a settlement is made in good faith, including (1) "a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability," (2) the amount of the settlement payment, (3) the allocation of the settlement among plaintiffs, and (4) "a recognition that the settlor should pay less in settlement than [it] would if [it] were found liable after a trial."[30] In addition, considerations such as financial circumstances of settling defendants, insurance policy limits, and

---

[28]    *Tech-Bilt, Inc. v. Woodward-Clyde*, 698 P.2d 159, 166 (Cal. 1985).

[29]    *Id.*

[30]    *Id.*

evidence of fraud or collusion may also be relevant.[31]

The key consideration is whether the settlement is "grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be."[32] In other words, the settlement amount cannot be "so far 'out of the ballpark'" that it would unfairly saddle the non-settling defendants with a grossly disproportionate share of liability.[33]

### C. Illinois Joint Tortfeasor Contribution Act

Under Illinois' Joint Tortfeasor Contribution Act, a tortfeasor who settles with a claimant in good faith is "discharged from all liability for any contribution to any other tortfeasor."[34] Illinois courts have articulated four factors relevant to the determination of good faith:

> (1) whether the amount paid was within a reasonable range of the settlor's fair share; (2) whether there was a close personal relationship between the settling parties; (3) whether the plaintiff sued the settlor; and (4) whether a calculated effort was made to conceal information about the circumstances surrounding the settlement agreement.[35]

---

[31]    *See id.*

[32]    *Id.*

[33]    *Id.*

[34]    740 ILCS 100/2(d).

[35]    *Wreglesworth v. Arctco, Inc.*, 317 Ill. App. 3d 628, 634 (1st Dist. 2000).

A settlement will not be found to be in good faith if there is evidence of collusion or fraud, or if it conflicts with the policies of the statute to encourage settlement and to ensure the equitable apportionment of damages among tortfeasors.[36] The good faith determination is within the discretion of the trial court.

## IV. SUFFICIENT INFORMATION TO DETERMINE GOOD FAITH IS BEFORE THE COURT

ExxonMobil's objections to a determination of a good faith settlement are relatively limited. It concedes that the settling parties have defined a "ballpark" for claims pertaining to contaminated wells – in other words, that the settling parties have adequately supported their estimated recovery in each case.[37] It does not claim that there was any collusion or bad faith in settlement negotiations. However, it contends that the Court does not have sufficient information to make a determination of good faith. It argues first that the settling parties' estimated share of settling defendants' liability is not viable because it is based on a theory that might not be applied at trial, and it does not set forth each

---

[36] *See Johnson v. United Airlines*, 203 Ill.2d 121, 134 (2003).

[37] *See* 7/9/08 Transcript of Good Faith Hearing ("Hearing Tr.") at 10:13-16 (Mr. Sacripanti, Counsel for ExxonMobil).

16

settling defendant's individual share of liability. In addition, ExxonMobil argues that the settlements cannot be approved unless a monetary value is assigned to the Treatment Protocol, in order to ensure an appropriate setoff from any recovery for threatened wells.

The objections are specific to the unique aspects of this aggregate settlement. Neither of these issues have been directly addressed by California or Illinois courts – indeed, the determination of good faith in an aggregate settlement such as this is an issue of first impression in California and Illinois. Yet courts have stressed that in determining the good faith of a settlement, "all that can be expected is an estimate, not a definitive conclusion," and the best a trial court can do is "make an educated guess."[38] In light of the aggregate nature of the settlement, the substantial information submitted by the settling parties, and the instruction that "[a] judge charting the boundaries of good faith of necessity must avoid a rigid application of the factors set forth in *Tech-Bilt*," I find that the information before the Court is sufficient to make a good faith determination.[39]

## A. The Settling Defendants' Proportional Liability

Because it is the measure of the consideration paid in settlement, "one

---

[38]     *North County Contractor's Ass'n*, 33 Cal. Rptr. 2d at 169.

[39]     *Id.*

of the most important [factors] is the settling party's proportionate liability."[40] The settling parties have estimated the proportionate liability of all settling defendants in each case to be roughly sixty-eight percent based on the settling defendants' combined average share of national refining capacity in the years 1996, 1999, and 2003.[41] ExxonMobil contends as a preliminary matter that national refining capacity is not an appropriate measure of liability, since according to the settling parties' own admissions it may not be the applicable means of allocating liability at trial.[42]

The settling parties justify their use of national refining capacity as a

---

[40] *Toyota Motor Sales U.S.A., Inc. v. Super. Ct.*, 269 Cal. Rptr. 647, 650 (Cal. Ct. App. 1990).

[41] 1996 marked the beginning of the widespread use of MTBE in gasoline under the federal Reformulated Gasoline program. 2003 was the last year before California banned the use of MTBE and was selected because several mergers and acquisitions of oil companies had occurred since the 1990s. 1999 was selected simply as a midpoint. *See* Third Supp. Sher Decl. ¶ 12.

[42] The settling plaintiffs note that the use of refining capacity share to measure the settling defendants' proportional liability "implies neither that plaintiffs believe that defendants' liability will be several rather than joint, nor that the appropriate measure of liability or proof of causation rests on any market share analysis." Third Supp. Sher Decl. ¶ 11(f). Settling defendants similarly disavow the applicability of the allocation of liability by share of refining capacity at trial. *See* Reply Memorandum of Law in Further Support of Settling Defendants' Motion for Determination of Good Faith Settlement at 2 n.3. *See also* Hearing Tr. at 11:11-12:11 (exchange between the Court, Mr. Sacripanti, counsel for ExxonMobil, and Mr. Wallace, counsel for settling defendants).

rough estimate of liability in several ways. *First*, the plaintiffs stress that nearly all

the claims in each case are premised on defendants' decision to use MTBE in their

gasoline rather than on spilling gasoline or failing to prevent leaks at their gas

stations.[43] *Second*, they note that discovery in other cases in the MDL has shown

that gasoline from various refiners is generally commingled for transportation,

storage, and distribution, with the result that any gasoline released into the

environment is generally the product of numerous defendants.[44] In addition, they

state that the national refining share is a better measure than the California or

Illinois refining share because certain defendants that do not own refineries in a

state may still participate in the gasoline market through exchange agreements or

otherwise.[45]

I find that the parties' estimate that the settling defendants collectively

bear sixty-eight percent of liability based on their share of refining capacity is

adequate for the purposes of the good faith determination, for several reasons.

*First*, "[a] 'good faith' settlement does not call for perfect or even nearly perfect

---

[43]    *See* Third Supp. Sher Decl. ¶ 11(a).

[44]    *See id.* ¶ 11(b).

[45]    *See id.* ¶ 11(c).

19

apportionment of liability."[46]  The law requires only a *rough* approximation of the

settling defendants' proportional liability based on "the state of the evidence as it

exists at the time the motion for a good faith determination is heard."[47]  Because

these cases are in the very early stages of discovery, detailed information relevant

to a more individual, case-specific allocation of liability, such as ownership or

supply of gas stations near contaminated wells and releases of gasoline from those

stations, is not available.

    *Second*, the means of allocating liability in these cases remains highly

contested.  Because MTBE gasoline is a fungible product that is commingled for

distribution in many areas of the country, it is often all but impossible to identify

the refiner of the MTBE gasoline that caused contamination in a given well.  Some

theory of collective liability will likely be applied in these cases, in which case

many refiners would be liable for contamination of each well regardless of the

entity that spilled the gasoline.[48]  It is not yet clear how liability will be allocated

---

[46]  *Abbott Ford v. Superior Court*, 741 P.2d 124, 134 (Cal. 1987).

[47]  *Toyota Motor Sales*, 269 Cal. Rptr. at 650.

[48]  In an omnibus ruling denying defendants' motions to dismiss
numerous actions, I held that plaintiffs could rely on theories of collective liability
to prove causation against refiners in states that had adopted such theories.  *See In
re MTBE*, 379 F. Supp. 2d at 377-78, 391.  Illinois has rejected market share
liability, but I held that plaintiffs could use concert of action liability or a

20

under certain collective liability theories.[49]  Calculating each defendant's share of

the gasoline market is a logical preliminary means of estimating the share of

liability on these claims.

Liability can be estimated in this manner even though it is not clear

whether the theory of market share liability will be employed to prove causation at

trial. In the context of determining the good faith of a settlement, "any factual

findings or determinations made on contested issues of liability are tentative and

solely for the purposes of evaluating the good faith of a proposed settlement *as of*

*the date of such evaluation*."[50]

---

conspiracy theory to prove causation. None of the motions to dismiss applied to
the California actions, but since California was the first state to adopt market share
liability, in *Sindell v. Abbott Laboratories*, 607 P.2d 924 (Cal. 1980), the ruling
would have allowed collective liability in California cases.

[49]     The means of allocating liability under the commingled product
theory, a modification of market share liability developed in this MDL, was left
open in a recent ruling in a focus case allowing plaintiffs to prove their claims
under the theory. *See In re MTBE Prods. Liab. Litig.*, No. 00 Civ. 1898, MDL No.
1358, 2008 WL 2047611, at *9 n.72 (S.D.N.Y. May 13, 2008).

[50]     *Toyota Motor Sales*, 269 Cal. Rptr. at 655 n.9. ExxonMobil cites
*Toyota Motor Sales*, in which the appellate court vacated a finding of good faith
that was based on the trial court's conclusion that a co-defendant was an
independent contractor and not an employee of the settling defendant, to support
its argument. In that case, however, the evidence available *at the time of the
settlement* clearly required a finding under the only applicable legal standard that
the non-settling defendant was an employee of the settling defendant. *See id.* at
655. Here, by contrast, the legal theory by which liability will be allocated

21

Further, ExxonMobil has not identified another viable means of estimating the settling defendants' share of liability – nor has it estimated its own share. It suggests that liability should be premised on actual spills of gasoline, and therefore those settling defendants that own or operate gas stations near the contaminated wells will have a higher share of liability. Yet there is *no evidence* in these cases regarding the location of gas stations in proximity to each well, much less the ownership or supply of those gas stations or whether gasoline releases have occurred there. As I have repeatedly noted, the good faith determination must be made based on the evidence as it exists at the time of settlement.

ExxonMobil also argues that each settling defendant's share of liability must be separately estimated. It contends that the evidence may show, for example, that a station owned by a very small refiner is the only gas station in proximity to the one contaminated well owned by the Quincy Community Services District, and that a plume of MTBE has migrated from a gasoline leak at that station to the water from which the well draws. In that case, ExxonMobil argues, the gas station owner may be ninety-five percent liable, but the settlement payment

---

remains uncertain, and there is little evidence to determine the appropriate allocation.

22

will only be measured against an estimated sixty-eight percent share of liability.[51]

However, the estimate of each defendant's share of liability is not relevant where allocation of liability under the settlement was done on an aggregate and not on a case-by-case basis, and where any non-settling defendant that sustains an adverse judgment at trial will receive the benefit of the *entire aggregate amount* paid in settlement as a setoff. In addition, there is no evidentiary basis for estimating the individual liability of each defendant in these cases, making ExxonMobil's example purely hypothetical.[52] Any variation in a defendant's share of liability in one case over another has been accounted for in the aggregate allocation of payment among the settling defendants.[53] Therefore, it is reasonable to measure the amount paid in settlement against the combined share of liability of sixty-eight percent in each of these six cases.

---

[51] *See* Hearing Tr. at 15:14-21.

[52] It is also unlikely that any single defendant will be ninety-five percent liable, because evidence is likely to show that the gasoline released from a given gas station was the product of many refiners, all of whom may be held liable under products liability law.

[53] The allocation of payment among settling defendants is confidential, and is not known to the settling plaintiffs or the Court. ExxonMobil conceded at the hearing that knowing the allocation of payment would not help determine individual shares of liability in these cases, because the allocation was based on a defendant's estimated aggregate liability. *See* Hearing Tr. at 23:21-24:3 (exchange between Mr. Sacripanti and the Court).

23

## B. Threatened Wells and the Treatment Protocol

ExxonMobil's most strenuous objection to the determination of a good faith settlement pertains to the value of the Treatment Protocol. It argues that under California law, the Protocol must be assigned a value in order to make a good faith determination. Without an assigned value, ExxonMobil contends that it is not guaranteed a sufficient setoff against plaintiffs' potential recovery on claims arising from wells that are not currently contaminated.[54] While the Treatment Protocol is a reasonable way to settle highly uncertain future claims, it does present a problem of valuation. However, even without valuing or considering the Protocol, the monetary payment is within a reasonable range of estimated recovery on all claims – for contaminated and threatened wells alike – because of the slim likelihood of any recovery on claims where the Treatment Protocol is not triggered. In addition, the Treatment Protocol provides an adequate setoff where it is triggered.

---

[54] This objection does not apply to the following cases: the M&P Silver Family Partners case, in which all of plaintiff's wells are currently contaminated; the Village of Island Lake case, in which threatened well claims are to be dismissed without prejudice, to be reinstated against non-settling defendants only if the Treatment Protocol's triggering conditions are met (*see infra* fn. 78); or to the plaintiffs in the *People of California* case (Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, and Rio Linda Elverta Community Water District) who are dismissing their claims as none of their wells were ever contaminated.

24

### 1. Estimated Recovery for Threatened Well Claims

As a preliminary matter, it is necessary to address the prospect of

recovery on the claims the Treatment Protocol is intended to address. Three

possibilities exist with respect to wells that are not currently contaminated: the

wells are not threatened with imminent contamination, the wells are threatened

with imminent contamination, or the wells have become contaminated by the time

of trial.

Plaintiffs will not recover any damages for wells that are not

threatened with imminent contamination at the time of trial. I have already held

that plaintiffs lack standing to bring a claim if tests of their wells "have shown *no*

MTBE contamination, and there are no allegations of any known releases of

gasoline containing MTBE" near their wells.[55]

To recover damages for an imminent threat of contamination,

plaintiffs concede they must show that "the water purveyor is responding to the

threat and incurring costs."[56] The plaintiffs represented that no such response costs

---

[55]     *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175
F. Supp. 2d 593, 608 (S.D.N.Y. 2001).

[56]     Hearing Tr. at 31:1-2. This Court has never definitively ruled that the
threat of contamination is a compensable injury. *See id*. at 50:4-23 (exchange
between Richard Wallace, counsel for Shell and on behalf of settling defendants,
and the Court).

have been incurred to date, but the costs eventually incurred would constitute the amount of recovery.[57]

To show that response costs are justified, however, plaintiffs must first prove that there is an imminent threat of contamination. This would require extensive expert analysis to locate releases of MTBE gasoline near the wells, delineate MTBE plumes, calculate rates of MTBE transport in groundwater, and estimate the direction of transport based on the area's geography. None of this work has been done in these cases. In a recent case regarding threatened wells, a New York state court held that plaintiff had not met its burden of proving an imminent threat to the wells, despite extensive expert testimony.[58] Therefore the likelihood of recovery for threatened wells is quite low.

There is of course a possibility that some of plaintiffs' wells will become contaminated after the settlement is finalized. This is the very contingency that the Treatment Protocol is designed to address. The Protocol gives settling

---

[57] *See* Third Supp. Sher Decl. ¶¶ 2-10 (discussing past costs incurred in California cases); Second Supp. Summy Decl. ¶¶ 3-4 (discussing past costs in Illinois case).

[58] *See Plainview Water District v. Exxon Mobil Corp., et al.*, 856 N.Y.S.2d 502, 2008 WL 220192 (Sup. Ct. Nassau Co. Jan. 9, 2008) (holding that, despite extensive expert testimony, plaintiff failed to prove its wells were imminently threatened with MTBE contamination).

defendants the assurance that plaintiffs will not bring any MTBE-related claims against them in the future, and gives plaintiffs the assurance that they will receive compensation for any contamination that arises in the future at the levels specified by the Treatment Protocol.

Because the Treatment Protocol will provide a setoff only when the contamination level reaches four ppb in California, however, ExxonMobil's main concern is the possibility that some wells will become contaminated at levels above zero but less than four ppb. Counsel for the California plaintiffs stated at the hearing that he would pursue claims for such wells.[59] Nonetheless, ExxonMobil will undoubtedly argue vigorously that contamination below the MCL is not a compensable injury.[60]

The settling plaintiffs made an assessment in accepting the terms of the Treatment Protocol that "our litigation prospects of prevailing at lower levels at wells that aren't [currently] hit" were low enough to forgo assured payment if the

[59]   *See* Hearing Tr. at 35:17-19 (Mr. Sher). The Village of Island Lake will not pursue recovery for wells that are not contaminated now but become contaminated in the future below the level required for payment under the Treatment Protocol. *See infra* n. 78.

[60]   *But see In re MTBE Prods. Liab. Litig.*, 458 F. Supp. 2d 159 (S.D.N.Y. 2006) (holding that contamination below the MCL was an injury in fact for the purposes of standing, and that summary judgment on claims for wells contaminated below the MCL was premature).

27

contamination was below four ppb.[61]  I concur in that assessment.  The prospect

that these wells will become contaminated at all is unclear.  If they do, to recover

damages for contamination below four ppb California plaintiffs will likely have to

show that the low levels of contamination adversely impacted the taste and odor of

the water and that this caused discrete problems such as customer complaints or

increased monitoring.[62]  Thus, it is highly unlikely that any damages will be

recovered for claims that fall outside the scope of both the Treatment Protocol and

the cash portion of the settlement.

## 2.     Necessity of Assigning a Value to the Treatment Protocol

Courts in California have generally required that the parties assign a

---

[61]     Hearing Tr. at 65:20-21 (Mr. Sher).  The settling plaintiffs have
assessed wells contaminated at such levels to have relatively low litigation value
based on the allocations made to those wells under the settlement.  Wells
contaminated at levels below three ppb receive between $8,834 and $300,305
under the settlement, with the higher value representing a very large well that
pumps over 1000 gpm.  Wells contaminated at levels between three and five ppb
receive between $38,863 and $388,630, again with the highest value representing
a very large well.  *See* Sher Decl. ¶¶ 11-12.

[62]     *See In re MTBE*, 458 F. Supp. 2d at 159 ("Unless plaintiffs can
produce evidence that [customer] complaints are due to MTBE contamination,
such speculation will be insufficient to defeat summary judgment.").

28

value to non-cash consideration to support a good faith determination.[63] Until now, the non-cash consideration at issue has been either an assignment of indemnity rights[64] or a sliding-scale agreement.[65]

ExxonMobil and the settling parties dispute whether the Treatment Protocol is a sliding-scale agreement, also known as a "Mary Carter" agreement. A sliding-scale agreement is defined as one in which the financial responsibility of the settling defendants "is variable and usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the non[settling] defendant or defendants."[66] In *Abbott Ford v. Superior Court*, for example, defendant Abbott

---

[63] *See, e.g.*, *Alcal Roofing & Insulation v. Superior Court*, 10 Cal. Rptr. 2d 844, 846 (Cal. Ct. App. 1992) ("In a situation where the cash amount of the settlement does not dictate the amount of the offset, the settling parties must include an allocation or a valuation in their agreement.").

[64] *See, e.g.*, *Regan Roofing Co. v. Superior Court*, 27 Cal. Rptr. 2d 62, 79 (Ct. App. 1994); *Erreca's v. Superior Court*, 24 Cal. Rptr. 2d 156 (Cal. Ct. App. 1993).

[65] *See, e.g.*, *Abbott Ford*, 741 P.2d 124; *Franklin Mint Co. v. Superior Court*, 31 Cal. Rptr. 3d 319 (Cal. Ct. App. 2005).

[66] *Abbott Ford*, 741 P.2d at 131 n.9 (quoting *Maule Industries, Inc. v. Rountree*, 264 So.2d 445, 446 n.1 (Fla. App. 1972)). In Illinois, such agreements (known as "loan-receipt agreements") have been deemed to be not in good faith as a matter of law. *See In re Babb*, 642 N.E.2d 1195 (Ill. 1994). To avoid any question that the settlement of the Village of Island Lake's claims involves such an agreement, the Village has agreed to dismiss claims for as-yet uncontaminated wells without prejudice, to be reinstated only when the Treatment Protocol is triggered. *See infra* n. 78.

29

Ford entered into an agreement guaranteeing the plaintiffs three million dollars, with the understanding that if the jury awarded anything less than that amount Abbott Ford would pay the balance, but if the jury awarded over three million dollars Abbott Ford would pay nothing.[67] The Treatment Protocol is distinguishable because although the amount settling defendants will pay is variable, it is not inversely proportionate to the amount of recovery the plaintiffs secure against non-settling defendants.[68] Instead it is contingent upon the level of contamination that may arise in plaintiffs' wells in the future.[69] Once the triggering conditions are met, the payment amount is no longer contingent, as settling defendants are obligated to pay a *set percentage* of the costs plaintiffs incur to treat their wells.

Although the Treatment Protocol is not a sliding-scale agreement, valuation is still important to guarantee an appropriate setoff to the non-settling defendants. Courts in most cases require the settling parties to jointly determine the value of non-cash consideration for the purpose of setoff, reasoning that the

---

[67]     *See Abbott Ford*, 741 P.2d at 128.

[68]     *See* Hearing Tr. at 68:19-23 (Mr. Wallace).

[69]     *See id* at 69:7-11 (Mr. Wallace) ("that will depend on physical characteristics of the water . . . and not on the outcome of the claim against Exxon").

parties' adverse interests regarding the value "should generally produce a reasonable valuation."[70]

Yet the settling parties agree that in these cases there is no way to assign a reasonable value to the Treatment Protocol. The Protocol's value depends on the circumstances at the time of the judgment: if the conditions triggering the Protocol do not exist, it has no value and therefore there is no setoff; if it is triggered, it has a value of seventy percent of the cost of treatment, which would be set off against any jury award. Neither the Court nor the parties can estimate the likelihood that plaintiffs' non-contaminated wells will become contaminated in the future, however, or the level of such contamination.[71] Such an estimate would require extensive expert analysis to determine the number and location of gasoline releases and whether MTBE plumes are moving toward any of plaintiffs' wells.

In this unique circumstance, in which the non-cash portion of the settlement will provide a set percentage of plaintiffs' recovery in the event future

---

[70]    *Id.* at 137.

[71]    *See* Hearing Tr. at 73:14-17 (Mr. Wallace) ("we could not go out in the market and find a company that would insure us against the risk [of future contamination] because they'd say, we don't know enough, we're not going to take that risk").

claims arise, the non-cash portion of the settlement need not be valued now.[72] In light of the low estimated recovery for threatened well claims and for future contamination at low levels, the cash payment made in settlement, standing alone, is within a reasonable range of defendants' estimated liability for claims arising from both currently contaminated and threatened wells. If wells become contaminated below four ppb, the cash payment will provide a setoff against plaintiffs' recovery on claims for existing contamination as well as future low-level contamination. Should any wells become contaminated at levels above four ppb, the Treatment Protocol will have a determinable value of seventy percent of the cost of the wells' treatment.[73] As the non-settling defendants already know, if the Treatment Protocol is triggered they will be entitled to a setoff in that amount, in addition to the setoff in the amount of the cash payment.

## V. TSC'S OBJECTION IS MERITLESS

---

[72]     *See Aero-Crete, Inc. v. Superior Court*, 25 Cal. Rptr. 2d 804 (Cal. Ct. App. 1993) ("where valuation is unnecessary to assess good faith, we see no reason why the value of the assigned rights cannot be adequately determined once a finding of liability makes such a determination necessary").

[73]     In some cases, courts have allowed for determination of a more precise setoff amount and allocation after trial. *See Regan Roofing*, 27 Cal. Rptr. 2d 62 (trial court did not abuse its discretion when it concluded that a pro rata formula could be used to allocate the settlement among certain claims, with the exact amount of setoff for each claim to be determined after a jury verdict).

TSC has objected to the settlement in the *Quincy Community Services District* case, the only case in which it is a named defendant. TSC argues that because it only delivered gasoline containing MTBE, its liability is vicarious to that of refiners, and therefore the possibility that it will have to pay any portion of a judgment with no means of seeking indemnity is unjust.[74] TSC repeatedly notes that it could be liable at trial for $1,000,000 – the difference between the amount paid in settlement and the highest API estimated treatment cost. That figure fails to account for the fact that other defendants have not settled, however, and therefore TSC's share would likely be substantially less.

TSC acknowledges that strict products liability in California extends to "every supplier in the stream of commerce or chain of distribution, from manufacturer to retailer."[75] Its assertion that its liability is vicarious is based on the right of entities farther down in the stream of distribution to seek indemnity against the manufacturer of a defective product. Although it is true that TSC's right to seek indemnity against the settling defendants will be cut off by a finding of a good

---

[74] TSC also argues that it was excluded from this settlement. However, other defendants have settled with these plaintiffs outside of this aggregate settlement.

[75] *Edwards v. A.L. Lease & Co.*, 54 Cal. Rptr. 2d 259, 261 (Cal. Ct. App. 1996).

33

faith settlement, TSC's objection has no merit. California courts have held that a settlement can be found to be in good faith even though it would terminate another defendant's indemnity rights.[76] Further, this settlement will not completely cut off TSC's indemnity rights because it can still seek indemnity from ExxonMobil. TSC has not met its burden to prove that the settlement in *Quincy* is not in good faith.

## VI. THE SETTLEMENT AMOUNT IN EACH CASE IS WITHIN A REASONABLE RANGE OF SETTLING DEFENDANTS' SHARE

ExxonMobil bears the burden of proof that the settlement is not in good faith, yet it has not argued that the amount paid in settlement in any case is grossly disproportionate to the settling defendants' estimated share of damages. Keeping in mind the dual goals of the statutes to encourage settlement and to ensure an equitable apportionment of damages, I conclude that the cash payment made in settlement in each case is well within the reasonable range of settling defendants' estimated combined share of liability, and therefore the settlement of these cases is in good faith. Non-settling defendants will be entitled to a setoff against recovery on all claims in the amounts listed below. In addition, non-settling defendants will be entitled to a setoff against recovery for claims arising from wells that are eligible for the Treatment Protocol in an amount equal to

---

[76]    *See Far West Fin. Corp. v. D & S Co.*, 760 P.2d 399 (Cal. 1988).

34

seventy percent of projected treatment costs, to be ascertained at the time of judgment.

## A. Village of Island Lake[77]

The Village of Island Lake has three contaminated wells and is receiving a total of $3,834,158.[78] The largest of the three wells had a very high maximum detection of MTBE and is allocated $3,249,900, the bulk of the settlement payment, and almost the full amount of the mean estimated API cost of treatment.[79] The two other wells are relatively small, and MTBE detections have fallen to very low levels.[80] Therefore, each of these two smaller wells is allocated

---

[77] ExxonMobil questioned the Court's jurisdiction over the *Village of Island Lake* action during the July 9 hearing. Although the original basis under which defendants removed the action has been held by the Second Circuit to be inapplicable, plaintiff amended its complaint to add a federal claim under the Toxic Substances Control Act, thereby conferring federal jurisdiction. Both ExxonMobil and the settling defendants have argued that this amendment cannot cure the jurisdictional defect. The settling defendants argue, however, that the Court may now have jurisdiction under the Bankruptcy Act, specifically under 28 U.S.C. § 1452, which authorizes removal of bankruptcy-related cases. *See* Hearing Tr. at 82:12-21 (Mr. Wallace).

[78] The Village of Island Lake has stipulated that it will not bring suit against any non-settling defendants for any wells with no past or current detection of MTBE and/or TBA that may become contaminated in the future unless and until those wells have detections that trigger the application of the Future Treatment Protocol.

[79] *See* Supplemental Declaration of Scott Summy ¶ 11(a).

[80] *See id.* ¶ 11(b).

35

$229,612.50. Although this figure is far lower than the mean API estimates for treating these wells, which are $3,326,475 and $1,496,868 respectively, the discrepancy is justified by the low concentration levels that appear to be decreasing.

Overall, the total payment of $3,834,158 is forty-six percent of the mean API estimated cost of treatment for all three wells. Because two of the three wells are contaminated at levels far lower than the API estimates contemplated, I find that this amount is well within the reasonable range of settling defendants' estimated sixty-eight percent of liability.

## B. Quincy Community Services District

Quincy Community Services District has one currently contaminated well and five non-contaminated wells, and is receiving a total of $2,663,840. This amount is 132 percent of the mean API estimated cost of treatment, which is $2,011,445. Taking into account an estimated $520,000 in past costs associated with closing down the contaminated well, the settlement payment is easily within the reasonable range of settling defendants' share of liability. The settlement payment will also provide a sufficient setoff against any damages for threatened wells or for future contamination that is not eligible for payments under the Treatment Protocol.

## C. California-American Water Company

The California-American Water Company has three contaminated wells and one hundred ninety seven non-contaminated wells, and is receiving $8,029,550. This amount is fifty-four percent of the mean API estimated cost of treatment, which is within the reasonable range of settling defendants' estimated sixty-eight percent share of liability. The lower amount is further justified by the fact that the largest well, which had the highest API estimated treatment cost with a mean of $6,101,143, was allocated only $88,325 due to its very low levels of contamination that never exceeded one ppb.[81] Taking into account the lower prospect of recovery for that well, the settlement amount is well within the reasonable range of settling defendants' share of liability. It will also provide a sufficient setoff against any damages for threatened wells or for future contamination that is not eligible for payments under the Treatment Protocol.

## D. City of Riverside

The City of Riverside has four wells with current or historic MTBE contamination, as well as one hundred non-contaminated wells, and is receiving $1,014,097. This relatively low amount is justified by the very low levels of MTBE detected in three of the four contaminated wells. Three of the City of

---

[81]    *See* Third Supp. Sher Decl. ¶ 16 n.8.

37

Riverside's wells – the Hunt 6 well, the Thorne 12 well, and the Raub 5 well – have never had detections of MTBE over one ppb and therefore have far lower costs of treatment than the API estimates project, and the City is less likely to recover damages at trial for claims arising out of contamination in these wells.

The API mean estimated cost for the Hunt 6 well is $4,330,956, but because the maximum MTBE detection is 0.8 ppb it was allocated only $70,660. Similarly, the API mean estimate for the Thorne 12 well is $7,514,745, but its maximum detection was 0.7 ppb and it was allocated only $88,325. The Raub 5 well, at 3,000 gpm, is a very large well with an API mean estimated treatment cost of $11,653,670, but due to its maximum MTBE detection of 0.9 ppb it was allocated only $88,325.

Because of the low levels of contamination in each of these wells, the API estimated costs are not indicative of what plaintiffs could reasonably recover at trial in this particular case. Indeed, recovery for any of these wells is uncertain, and therefore the $1,014,097 that the City of Riverside will receive in settlement is not disproportionate to the settling defendants' estimated share of liability. The amount can also provide a setoff against any damages for threatened wells or for future contamination that is not eligible for payments under the Treatment Protocol.

### E. M & P Silver Family Partners II

38

M & P Silver Family Partners is a private property owner that supplies well water to residents of mobile homes on its property. Both of its wells are contaminated with MTBE, and it is receiving $3,937,202. This amount exceeds the mean API estimated cost of treatment for both wells, which is $2,936,561, and the additional past costs incurred by M & P, which are estimated at $550,000. Therefore the settlement is well within the reasonable range of settling defendants' estimated sixty-eight percent share of liability.

### F. Plaintiffs With No Contaminated Wells

The remaining plaintiffs' wells have never been contaminated with MTBE. Each of these plaintiffs (Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, and Rio Linda Elverta Community Water District) is receiving a base amount of $264,853. They each intend to dismiss their claims against all non-settling defendants without prejudice, with the right to reinstate their claims in the event that MTBE is detected in their wells in the future.

Because none of these plaintiffs has more than fifteen wells, it is uncertain whether future claims will arise at all, and the damages recoverable for claims in which MTBE contamination is low are not likely to be high, I find that the settlement as to each of these plaintiffs is in good faith. The amount allocated

39

to each plaintiff is sufficient to provide a setoff against any potential recovery in the event any of the reinstated claims involves a well that does not meet the triggering conditions of the Treatment Protocol, and the Protocol will provide an adequate setoff against recovery on all other claims.

## VII. CONCLUSION

For the reasons discussed above, the motion of the settling defendants is granted. The Clerk of the Court is directed to enter a final judgment dismissing the claims against the settling defendants (as listed in Exhibits A and B attached to this Opinion and Order) in each of these actions.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           July 22, 2008

## -Appearances-

**Liaison Counsel for Plaintiffs and Counsel for Plaintiff Village of Island Lake:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Counsel for Plaintiff Village of Island Lake:**

Scott Summy, Esq.
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Tel: (214) 521-3605
Fax: (214) 520-1181

**Counsel for Plaintiffs City of Riverside, Quincy Community Services District, California-American Water Company, Citrus Heights Water District, Del Paso Manor Water District, Fair Oaks Water District, Florin Resource Conservation District, Rio Linda Elverta Community Water District, and M&P Silver Family Partners II:**

Victor Sher, Esq.
Sher Leff LLP
450 Mission Street, Suite 400
San Francisco, California 94105
Tel: (415) 348-8300
Fax: (415) 348-8333

**Liaison Counsel for Defendants and Counsel for ExxonMobil:**

Peter John Sacripanti, Esq.

James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

**Counsel for Defendants Toms Sierra Company, Inc. and Sierra Energy:**

M. Taylor Florence, Esq.
John E. Spomer, III, Esq.
Bullivant Houser Bailey P.C.
1415 L Street, Suite 1000
Sacramento, California 95814
Tel: (916) 930-2500
Fax: (916) 930-2501

**Liaison Counsel for Settling Defendants and Counsel for Defendants Chevron U.S.A. Inc., Motiva Enterprises LLC, Shell Oil Company, and TMR Company:**

Richard E. Wallace, Esq.
Wallace King Domike & Reiskin, PLLC
2900 K Street, N.W., Harbourside
Washington, D.C. 20007
Tel: (202) 204-1000
Fax: (202) 204-1001

**Counsel for Defendant ConocoPhillips and on Behalf of Settling Defendants:**

John J. Lyons, Esq.
Latham & Watkins LLP
633 West Fifth Street, Suite 4000
Los Angeles, California 90071
Tel: (213) 485-1234
Fax: (213) 891-8763

**Counsel for Defendants BP Products North America Inc., Atlantic Richfield Company, BP West Coast Products LLC and BP Amoco Chemical Company**

**and on Behalf of Settling Defendants:**

J. Andrew Langan, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601
Tel: (312) 861-2000
Fax: (312) 861-2200

**Counsel for Defendants BP America Inc., Chevron Corporation, ConocoPhillips Company, and Shell Oil Company:**

Sheila L. Birnbaum, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-3000
Fax: (212) 735-2000

**Counsel for Marathon Petroleum Company, Marathon Oil Company, and Ashland Inc.:**

Steven L. Leifer, Esq.
Baker Botts LLP
1299 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Tel: (202) 639-7700
Fax: (202) 639-7890

## EXHIBIT A

The following are the Settling Defendants as identified in the Settlement Agreement dated as of March 12, 2008, which is the subject of this motion: (1) BP America Inc., BP Corporation North America Inc., BP Company North America Inc., BP Amoco Chemical Company, BP Products North America Inc. (f/k/a Amoco Oil Company and including by merger BP Exploration & Oil Inc.), BP West Coast Products LLC, and Atlantic Richfield Company, (2) Chevron Corporation (f/k/a ChevronTexaco Corporation), Chevron U.S.A. Inc. (f/k/a Gulf Oil Corporation), in its own name and on behalf of its operating divisions, Chevron Products Company and Chevron Chemical Company, Texaco Inc., TRMI-H LLC (f/k/a TRMI Holdings Inc.), Unocal Corporation, Union Oil Company of California, Four Star Oil & Gas Company (f/k/a Getty Oil Company), Chevron Phillips Chemical Company LLC, Chevron Phillips Chemical Company LP, (3) ConocoPhillips Company, Conoco Oil Company, Phillips Petroleum Company, Tosco Corporation, Chevron Phillips Chemical Company, L.L.C, and Chevron Phillips Chemical Company, L.P., (4) Equilon Enterprises LLC (d/b/a Shell Oil Products US, and as successor-by-merger to Equiva Services LLC), Motiva Enterprises LLC (individually and also incorrectly named as f/k/a Star Enterprises), Shell Oil Company, Shell Oil Products Company LLC (individually and d/b/a Shell Oil Products Company), Shell Petroleum Inc., Shell Trading (US) Company (individually and also incorrectly named as f/k/a Equiva Trading Company), and TMR Company (f/k/a Texaco Refining and Marketing, Inc. individually and as successor-by-merger to TRME Company f/k/a Texaco Refining and Marketing (East) Inc.); (5) Marathon Petroleum Company LLC, Marathon Oil Company, Marathon Oil Corporation, and Ashland Inc., (6) Big Diamond, Inc., Diamond Shamrock Refining Company, L.P., Diamond Shamrock Stations, Inc., Emerald Marketing, Inc., Huntway Refining Company,

Premcor USA Inc., Sigmor Beverage, Inc., Sigmor Corporation, The Premcor Refining Group Inc., Ultramar Energy Inc., Ultramar Inc., Ultramar Ltd., Valero California Retail Company, Valero Diamond Metro, Inc., Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing Company, Valero Refining Company-California, Valero Refining Company-Louisiana, Valero Refining Company-New Jersey, Valero Refining Company-Oklahoma, Valero Refining Company-Tennessee, L.L.C., Valero Refining-New Orleans, L.L.C., Valero Refining-Texas, L.P., Valero Retail Holdings, Inc., Valero Services, Inc., Valero Terminaling and Distribution Company, and VRG Properties Company, (7) CITGO Petroleum Corporation, CITGO Refining and Chemicals Company L.P., PDV Midwest Refining, L.L.C., Cities Service Company, The UNO-VEN Company, and LYONDELL CITGO Refining L.P., (8) Sunoco, Inc. (individually and f/k/a Sun Oil Company and f/k/a Sun Company, Inc., and as successor-in-interest to Coastal Eagle Point Oil Company), Sunoco, Inc. (R&M) (individually and f/k/a Sun Refining and Marketing Company and f/k/a Sun Company, Inc. (R&M)), Suntide Refining Company; Belvieu Environmental Fuels L.P., Belvieu Environmental Fuels GP, LLC, Sun BEF, Inc., Sunoco Partners LLC, Sunoco Logistics Partners Operations GP LLC, Sunoco Logistics Partners L.P., Sunoco Pipeline L.P., Sun Pipe Line Company, Atlantic Refining & Marketing Corp., Atlantic Petroleum Corporation, Sun Atlantic Refining and Marketing B.V., and Sun Atlantic Refining and Marketing Company, (9) Hess Corporation (f/k/a Amerada Hess Corporation), Hess Oil Virgin Islands Corporation (a/k/a HOVIC), Hess Energy, Inc., Hess Energy Trading Company (a/k/a HETCO), and HOVENSA, Inc., (10) Flint Hills Resources, LP (f/k/a Koch Refining Company and Koch Petroleum Group), (11) El Paso Merchant Energy-Petroleum Company, El Paso Corporation, El Paso Energy Corporation, El Paso CGP Company, El Paso CGP Company, L.L.P., The Coastal Corporation, Coastal Eagle Point Oil Company,

Coastal Refining and Marketing Inc., Coastal Mobile Refining Company, Coastal Oil New England, Coastal Oil New York, Coastal States Trading Company, Coastal Chem, Inc., and Coastal Mart, Inc., and (12) Tesoro Corporation (f/k/a Tesoro Petroleum Corporation) and Tesoro Refining and Marketing Company (erroneously named in some cases as Tesoro Refining and Marketing Company, Inc.).

## EXHIBIT "B"

The following lists for each case those Settling Defendants and Released Entities that are actually named as defendants in the complaints (as they appear in the operative complaints) in the various cases subject to this Order and Judgment of Dismissal.

### *Village of Island Lake, a Municipal corporation, v. Ashland Inc., et al.,* Case No. 04-CV-02053:

| Named Settling Defendants and Named Released Entities: |
| --- |
| Ashland, Inc. |
| Atlantic Richfield Company, individually and doing business as ARCO Products Company (f/k/a Arco Petroleum Company), and also known as ARCO |
| BP Amoco Chemical Company, individually and formerly known as Amoco Chemical Company |
| BP Products North America, Inc., individually and as successor-by-merger to Amoco Oil Company and BP Exploration and Oil Inc. (successor-by-merger to BP North America Inc.) |
| ChevronTexaco Corporation (n/k/a Chevron Corporation), individually and as successor-in-interest to Chevron Corporation and as successor-in-interest to Texaco Inc. |
| Chevron U.S.A. Inc., individually and formerly known as Gulf Oil Corporation (d/b/a Chevron Product Company, d/b/a Chevron Chemical Company) |
| CITGO Petroleum Corporation |
| CITGO Refining and Chemicals Company L.P. |
| Coastal Eagle Point Oil Company |
| Coastal Oil New England |
| Colorado Refining Company |
| ConocoPhillips Company, f/k/a Phillips Petroleum Company, individually and as successor-in-interest to Tosco Corporation and d/b/a Phillips 66 Company |
| El Paso Merchant Energy-Petroleum Company, individually and formerly known as Coastal Refining an Marketing, Inc. and formerly known as Coastal States Trading, Inc. |
| Equilon Enterprises, LLC, d/b/a Shell Oil Products US, individually and as successor-by-merger to Equiva Services LLC |
| Flint Hills Resources, LP (f/k/a Koch Petroleum Group, LP) |
| LYONDELL CITGO Refining L.P. |
| Marathon Ashland Petroleum, LLC |

| Named Settling Defendants and Named Released Entities: |
|---|
| Marathon Oil Company |
| Motiva Enterprises, LLC, individually and formerly known as Star Enterprises LLC |
| PDV Midwest Refining, L.L.C. |
| The Premcor Refining Group, Inc., individually and formerly known as Clark Refining |
| Shell Oil Company |
| Shell Oil Products Company |
| Shell Oil Products Company, LLC |
| Shell Petroleum, Inc. |
| Shell Trading (US) Company, individually and formerly known as Equiva Trading Company, and also known as Stusco |
| Sunoco, Inc., individually and formerly known as Sun Oil Company, and formerly known as Sun Company, Inc., and as successor-in-interest to Coastal Eagle Point Oil Company |
| Sunoco, Inc (R&M), individually and formerly known as Sun Refining and Marketing Company and formerly known as Sun Company, Inc. (R&M) |
| Texaco Inc. |
| Texaco Refining and Marketing Inc. (a/k/a TRMI Holdings) |
| TMR Company (f/k/a Texaco Refining and Marketing Inc., individually and as successor-by-merger to TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.)) |
| Tosco Corporation, individually and as predecessor-in-interest to Conoco Phillips and also known as Tosco Refining Company, and also known as Tosco Marketing Company |
| TPI Petroleum, Inc. |
| Union Oil Company of California d/b/a UNOCAL |
| Unocal Corporation, individually and formerly known as Union Oil Company of California |
| Valero Energy Corporation |
| Valero Marketing and Supply Company |
| Valero Refining Company |
| Valero Refining and Marketing Company |

2

*City of Riverside v. Atlantic Richfield Co., et al.*, **Case No. 04-CV-4969**:

| Named Settling Defendants and Named Released Entities: |
|---|
| Atlantic Richfield Company |
| BP Products North America, Inc. |
| BP West Coast Products, LLC |
| ChevronTexaco Corporation |
| Chevron U.S.A., Inc. |
| ConocoPhillips Company |
| El Paso Merchant Energy-Petroleum Company |
| Equilon Enterprises LLC |
| Shell Oil Company |
| Shell Oil Products Company |
| Shell Oil Products Company, LLC |
| Shell Oil Products U.S. |
| Tesoro Petroleum Corporation (n/k/a Tesoro Corporation) |
| Tesoro Refining and Marketing Company |
| Texaco Refining and Marketing Inc. |
| Ultramar, Inc. |
| Union Oil Company of California |
| Unocal Corporation |
| Valero Energy Corporation |
| Valero Marketing and Supply Company |
| Valero Refining Company -- California |

*Quincy Community Services District v. Atlantic Richfield Co., et al.*,
**Case No. 04-CV-4970**:

| Named Settling Defendants and Named Released Entities: |
| --- |
| Atlantic Richfield Company |
| BP Products North America, Inc. |
| BP West Coast Products, LLC |
| ChevronTexaco Corporation |
| Chevron U.S.A., Inc. |
| ConocoPhillips Company |
| El Paso Merchant Energy-Petroleum Company |
| Equilon Enterprises LLC |
| Shell Oil Company |
| Shell Oil Products Company |
| Shell Oil Products Company, LLC |
| Shell Oil Products U.S. |
| Tesoro Petroleum Corporation (n/k/a Tesoro Corporation) |
| Tesoro Refining and Marketing Company |
| Texaco Refining and Marketing Inc. |
| Ultramar, Inc. |
| Unocal Corporation |
| Union Oil Company of California |
| Valero Energy Corporation |
| Valero Marketing and Supply Company |
| Valero Refining Company – California |

*People of the State of California, et al. v. Atlantic Richfield Co., et al.*,
**Case No. 04-CV-4972:**

| Named Settling Defendants and Named Released Entities: |
| --- |
| Atlantic Richfield Company |
| BP Products North America, Inc. |
| BP West Coast Products, LLC |
| ChevronTexaco Corporation |
| Chevron U.S.A. Inc. |
| CITGO Petroleum Corporation |
| CITGO Refining and Chemicals Company L.P. |
| ConocoPhillips Company |
| El Paso Merchant Energy-Petroleum Company |
| Equilon Enterprises LLC |
| Equilon Enterprises, LLC dba Shell Oil Products U.S. |
| Shell Oil Company |
| Shell Oil Products Company |
| Shell Oil Products Company, LLC |
| Tesoro Petroleum Corporation (n/k/a Tesoro Corporation) |
| Tesoro Refining and Marketing Company |
| Texaco Refining and Marketing Inc. |
| Ultramar, Inc. |
| Unocal Corporation, Individually and Formerly Known as Union Oil Company of California |
| Valero Energy Corporation |
| Valero Marketing and Supply Company |
| Valero Refining Company - California |

*California-American Water Co. v. Atlantic Richfield Co., et al.*,
**Case No. 04-CV-4974**:

| Named Settling Defendants and Named Released Entities: |
| --- |
| Atlantic Richfield Company |
| BP Products North America, Inc. |
| BP West Coast Products, LLC |
| Chevron U.S.A. Inc. |
| ChevronTexaco Corporation |
| ConocoPhillips Company |
| El Paso Merchant Energy-Petroleum Company |
| Equilon Enterprises LLC |
| Shell Oil Company |
| Shell Oil Products Company |
| Shell Oil Products Company, LLC |
| Shell Oil Products U.S. |
| Tesoro Petroleum Corporation (n/k/a Tesoro Corporation) |
| Tesoro Refining and Marketing Company |
| Texaco Refining & Marketing Inc. |
| Ultramar, Inc. |
| Unocal Corporation |
| Union Oil Company of California |
| Valero Energy Corporation |
| Valero Marketing and Supply Company |
| Valero Refining Company -- California |

| Named Settling Defendants and Named Released Entities: |
| --- |
| Amerada Hess Corporation ("Hess") |
| Atlantic Richfield Company ("Arco") |
| BP Products North America, Inc. ("BP Products") |
| BP West Coast Products, LLC ("BP West Coast") |
| Chevron U.S.A. Inc. ("Chevron U.S.A.") |
| CITGO Petroleum Corporation ("CITGO Petroleum") |
| CITGO Refining and Chemicals Company L.P. ("CITGO Refining") |
| Coastal Eagle Point Oil Company |
| Conocophillips Company |
| Diamond Shamrock Refining and Marketing Company |
| El Paso CGP Company ("El Paso CGP") |
| El Paso Corporation ("El Paso Corp.") |
| El Paso Merchant Energy-Petroleum Company ("El Paso Merchant") |
| Equilon Enterprises LLC ("Equilon") |
| Marathon Ashland Petroleum, LLC |
| Motiva Enterprises LLC |
| Shell Oil Company ("Shell Oil") |
| Shell Oil Products Company ("Shell Oil Products Co.") |
| Shell Oil Products Company, LLC ("Shell Oil Products LLC") |
| Shell Petroleum, Inc. ("Shell Petroleum") |
| Shell Trading (US) Company ("Shell Trading") |
| Sunoco, Inc. ("Sunoco Inc.") |
| Sunoco, Inc. (R&M) ("Sunoco R&M") |
| Tesoro Petroleum Corporation ("Tesoro Petroleum") (n/k/a Tesoro Corporation) |
| Tesoro Refining and Marketing Company ("Tesoro Refining") |
| Texaco, Inc. ("Texaco Inc.") |
| Texaco Refining and Marketing ("Texaco Refining") |
| Tosco Corporation |
| Ultramar Inc. ("Ultramar") |
| Unocal Corporation ("Unocal") |
| Valero Energy Corporation ("Valero Energy") |
| Valero Refining Company - California ("Valero Refining") |
| Valero Marketing and Supply Company ("Valero Marketing") |
| Valero Refining and Marketing Company ("VRMC") |