**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------- X
          :

**IN RE: METHYL TERTIARY BUTYL**  :
**ETHER ("MTBE") PRODUCTS**     :
**LIABILITY LITIGATION**         :
-------------------------------------------------- :
          :

**This document relates to:**      :
          :
*County of Suffolk v. Amerada Hess Corp., et* :
*al.,* 04 Civ. 5424          :
-------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/6/08

**OPINION AND ORDER**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

After discovering that many of their wells were contaminated with the

gasoline additive methyl tertiary butyl ether ("MTBE"), plaintiffs in each of the

cases in this multi-district litigation ("MDL"), including the County of Suffolk and

the Suffolk County Water Authority, sued numerous oil companies for their use

and handling of MTBE. One of the defendants is Getty Properties Corporation

("Getty Properties"), which is named "individually and formerly known as Getty

Petroleum Corp."[1]

Getty Properties brings this motion for summary judgment, arguing

---

[1]    *See, e.g.,* Sixth Amended Complaint, *County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al.,* No. 04 Civ. 5424.

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation    Doc. 1953

1

that all claims against it must be dismissed. It submits that Getty Petroleum

Marketing, Inc. ("GPMI"), a spin-off corporation of its predecessor Getty

Petroleum Corp., is the successor in interest to Getty Petroleum's marketing

business, and therefore only GPMI can be liable for claims arising out of Getty

Petroleum's gasoline releases prior to the spin-off. Both plaintiffs and GPMI

oppose the motion. For the reasons stated below, Getty Properties' motion is

denied.

## II.    BACKGROUND

### A.    History of the Corporate Entities

Getty Petroleum Corp. was formed in 1985 when its predecessor,

Power Test Inc., purchased the northeastern United States petroleum distribution

and marketing assets of the former Getty Oil Company, as well as the "Getty"

trademark, from Texaco and changed its name to Getty Petroleum Corp.[2] The

company's business included the distribution and marketing of petroleum products

as well as the acquisition and leasing of properties involved in the distribution and

marketing business such as gasoline terminals and gas stations.[3]

---

[2]     *See* Defendant Getty Properties Corp.'s Local Rule 56.1 Statement of
Undisputed Material Facts ("Getty Rule 56.1 Statement") ¶ 2.

[3]     *See id.* ¶ 3.

2

In March 1997, Getty Petroleum spun off most of its marketing business into a new corporate entity, GPMI. According to Getty Petroleum's Board of Directors, the separation was warranted due to the "distinctly different investment, operating and financial characteristics" of the marketing and real estate businesses – while the real estate business was relatively stable, the marketing business was highly volatile.[4] New shares of GPMI common stock were issued to holders of Getty common stock.[5] GPMI's initial Board of Directors included directors of Getty Petroleum, and all of GPMI's initial executive officers were former executive officers of Getty Petroleum.[6] Additionally, substantially all of the employees of Getty Petroleum who had been involved in the marketing business became employees of GPMI after the spin-off.[7]

Getty Petroleum and GPMI entered into a Reorganization and Distribution Agreement governing the terms of the spin-off on January 31, 1997. Under that Agreement Getty Petroleum transferred assets principally involved in

---

[4]     Information Statement, Getty Petroleum Marketing, Inc. Common Stock, Ex. C to Declaration of John McGahren in Support of Getty Properties Corp.'s Motion for Partial Summary Judgment ("McGahren Decl."), at 9.

[5]     *See id.* at 5.

[6]     *See* Getty Rule 56.1 Statement ¶ 16.

[7]     *See id.* ¶ 17.

3

the marketing business to GPMI, and GPMI expressly assumed the Getty

Petroleum's marketing liabilities.[8]  Getty Petroleum retained certain environmental

liabilities relating to sites that were currently contaminated and undergoing

remediation, and sites where it had not yet upgraded underground storage tanks

("USTs") to comply with 1998 federal standards.[9]

        At the time of the spin-off, Getty Petroleum Corp. changed its name

to Getty Realty Corp. and leased 1,037 gas station and gasoline terminal properties

to GPMI for its gasoline distribution and retail sales business.[10]  The parties

entered into a Master Lease setting forth, *inter alia*, each party's respective

obligations regarding environmental remediation at the leased sites.  The Lease

specified 694 sites leased to GPMI for which Getty Realty remained obligated to

remediate known contamination and/or perform upgrades to USTs.[11]  In 2000,

after Getty Realty changed its name to Getty Properties Corp. and GPMI was

acquired by Lukoil Oil Company, the parties entered into a new master lease,

---

[8]     *See* Reorganization and Distribution Agreement ("Reorganization Agreement"), Ex. D to McGahren Decl.

[9]     *See id.*

[10]    *See* Master Lease Dated February 1, 1997 Between Getty Realty Corp., as Landlord, and Getty Petroleum Marketing, Inc., as Tenant ("Master Lease"), Ex. G to McGahren Decl.

[11]    *See id.*

4

which similarly set forth the parties' respective obligations regarding environmental remediation at the leased properties.[12] The parties also entered into an Environmental Indemnity Agreement at that time, which further specified the parties' obligations with respect to environmental remediation and other environmental liabilities.[13]

In addition to leasing gas station and terminal properties to GPMI, Getty Properties owns the "Getty" trademark and licenses it to GPMI under a License Agreement entered into at the time of the spin-off.[14] The Agreement requires GPMI to comply with Getty Properties' quality standards for petroleum products and station operations.[15]

## B. Procedural History

Getty Properties is named as a defendant in forty-three cases in this MDL. In this action, a focus case in the MDL, eighteen of plaintiffs' numerous

---

[12] *See* Consolidated, Amended and Restated Master Lease Dated as of November 2, 2000 Between Getty Properties Corp., as Landlord, and Getty Petroleum Marketing Inc., as Tenant ("Amended Lease"), Ex. H to McGahren Decl.

[13] *See* Environmental Indemnity Agreement, Ex. I to McGahren Decl.

[14] *See* Amended and Restated Trademark License Agreement, Ex. 4 to the Declaration of William Harrington in Opposition to Getty Properties' Motion for Summary Judgment ("Harrington Decl.").

[15] *See id.* at 6-8.

contaminated wells were selected for a "bellwether trial" that is scheduled to be the first trial held in the MDL. Plaintiffs' expert identified Getty gas stations in the vicinity of six of these eighteen wells where releases of gasoline into the ground may have caused or contributed to MTBE contamination.[16]

In March 2008, plaintiffs dismissed claims against Getty Properties relating to contamination in two wells, because the Getty station to which the contamination was traced was never owned, operated, leased, or otherwise controlled by Getty Properties or Getty Petroleum. In May 2008, the Court granted summary judgment in favor of Getty on claims arising from three other wells, because plaintiffs did not present sufficient evidence for a jury to conclude that spills at the Getty stations near these wells had caused the contamination.[17]

In the bellwether trial, Getty Properties now faces liability for claims related to two wells.[18] All other defendants implicated in the bellwether trial, including GPMI, have settled with the plaintiffs either as part of a global

---

[16]    *See* Phase I Expert Report of Charles B. Sosik, June 22, 2007 ("Sosik Report"), Ex. A to McGahren Decl.

[17]    *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. 00 Civ. 1898, 2008 WL 2047611 (S.D.N.Y. May 13, 2008).

[18]    Evidence linking a release of gasoline at a Getty station to one of these wells was not included in plaintiffs' expert report.

6

settlement of cases in the MDL or individually. Therefore Getty Properties is the only defendant facing trial in this action. The other forty-two cases in which Getty Properties is a defendant are still in the process of discovery.

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[19] An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[20] A fact is material when it "'might affect the outcome of the suit under the governing law.'"[21] "It is the movant's burden to show that no genuine factual dispute exists."[22]

In turn, to defeat a motion for summary judgment, the non-moving

---

[19]    Fed. R. Civ. P. 56(c).

[20]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[21]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

[22]    *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

party must raise a genuine issue of material fact. To do so, it must do more than show that there is "'some metaphysical doubt as to the material facts,'"[23] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[24] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[25]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[26] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court

---

[23] *Higazy*, 505 F.3d at 169 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[24] *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[25] *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[26] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

8

on a motion for summary judgment.'"[27] Summary judgment is therefore

inappropriate "'if there is any evidence in the record that could reasonably support

a jury's verdict for the non-moving party.'"[28]

## B. Successor Liability

The general rule in New York is that "a corporation which acquires

the assets of another is not liable for the torts of its predecessor."[29] There are four

well-recognized exceptions to this rule. A corporation may be held liable for the

debts of its predecessor if: "(1) it expressly or impliedly assumed the predecessor's

[] liability, (2) there was a consolidation or merger of seller and purchaser, (3) the

purchasing corporation was a mere continuation of the selling corporation, or (4)

the transaction is entered into fraudulently to escape such obligations."[30] The

exceptions are based on "the desire to ensure that a source remains to pay for [a

---

[27] *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[28] *American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).

[29] *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244 (1983). The rule extends to all debts and obligations, not just tort liability. *See, e.g.*, *Cargo Partner AG v. Albatrans, Inc.*, 207 F. Supp. 2d 86 (S.D.N.Y. 2002).

[30] *Schumacher*, 59 N.Y.2d at 245.

9

plaintiff's] injuries."[31]

## IV. DISCUSSION

Getty Properties must overcome two major hurdles to succeed in its argument that it cannot be liable for contamination resulting from gasoline releases that occurred at Getty stations or other Getty properties prior to the spin-off in 1997. *First*, Getty Properties is the direct continuation of the corporate entity formerly called Getty Petroleum Corp. that is alleged to have caused plaintiffs' injuries. *Second*, Getty Properties expressly assumed, and agreed to indemnify GPMI against, certain of Getty Petroleum's environmental liabilities.

Getty Properties is unable to overcome these hurdles. Its argument that plaintiffs can sue *only* GPMI for the debts of Getty Petroleum Corp. under the common law of successor liability is legally incorrect. The argument that its retained environmental liability does not extend to third-party tort claims is inconsistent with the language of the Reorganization Agreement, the subsequent Environmental Indemnity Agreement, and with the parties' past actions under these agreements. Therefore, plaintiffs' claims against Getty Properties cannot be dismissed as a matter of law. As between Getty Properties and GPMI, liability

---

[31]     *Grant-Howard Assoc. v. Gen. Housewares Corp.*, 63 N.Y.2d 291, 297 (1984).

10

must be determined on a site-by-site basis, and fact issues preclude summary judgment at this time.

## A.    Propriety of the Instant Motion

As an initial matter, GPMI argues that the motion is procedurally defective because Getty Properties is in effect moving for summary judgment on a cross-claim for indemnity that it has never asserted. However, Getty Properties brought this motion at the suggestion of the Court, in order to resolve a dispute among plaintiffs, Getty Properties, and GPMI arising in the course of settlement negotiations.[32] Further, Getty Properties has moved against plaintiffs on its affirmative defenses rather than against GPMI on a claim for indemnity. Therefore the Court treats this motion as one for summary judgment on plaintiffs' claims against Getty Properties.

## B.    Common Law Successor Liability Is Not Relevant to the Assertion of Claims Against Getty Properties

Although Getty Properties is the same corporate entity as Getty Petroleum Corp., having merely changed its name after the spin-off, it argues that it is not the proper defendant in this action. Rather, it claims that GPMI is the

---

[32]     As stated previously, neither Getty Properties nor Gulf Oil Limited Partnership ("GOLP") have settled with plaintiffs in the *County of Suffolk v. Amerada Hess Corp., et al.* case. GOLP is not implicated in the contamination of the wells selected for the bellwether trial, however.

11

successor-in-interest to Getty Petroleum's "Marketing Business" and therefore, under common law rules of successor liability, plaintiffs' claims are properly brought against GPMI. It claims that GPMI is a "mere continuation" of Getty Petroleum's marketing business, bringing it under an exception to the general rule in New York that a corporation that acquires the assets of another is not liable for the debts of its predecessor.

The major flaw in Getty Properties' argument is that while the common law of successor liability governs when a plaintiff can bring a claim against a *successor* corporation, it does not prevent a plaintiff from also suing the *predecessor* corporation. "A sale of assets does not vitiate the original company's liability," and if one of the successor liability exceptions applies, "the injured party can elect to proceed against the defunct corporation, the successor corporation, or both."[33] Here, plaintiffs have chosen to proceed against the predecessor corporation.[34] A finding that GPMI is a mere continuation of Getty Petroleum's

---

[33] *Grant-Howard Assoc.*, 63 N.Y.2d at 297.

[34] Getty Properties also casts the marketing and real estate activities of Getty Petroleum as entirely separate businesses, in an apparent effort to distance itself from liabilities incurred by Getty Petroleum in the course of its marketing activities. It cannot change the fact, however, that it is the corporate continuation of Getty Petroleum. Barring the contractual allocation of liability between itself and GPMI, discussed *infra* at Part IV.C, it remains liable for Getty Petroleum's debts.

12

marketing business thus would not require dismissal of plaintiffs' claims against Getty Properties.

Yet Getty Properties' argument assumes that if GPMI can be held liable on claims arising from Getty Petroleum's marketing business under the law of successor liability, Getty Properties cannot be held liable on those claims. This assumption fundamentally misapprehends the exceptions allowing plaintiffs to pursue a successor corporation, which are designed to protect injured plaintiffs by ensuring them a source of recovery – not to protect corporations that have transferred their assets from liability for their own torts.[35]

Moreover it is not clear that the mere continuation exception would apply to GPMI. Generally, the mere continuation exception applies when "only one corporation survives . . . the predecessor corporation must be extinguished."[36] Courts have made exceptions to this rule only when it appeared that the successor corporation was created to avoid liability to the plaintiff, or where the predecessor corporation continued only as a shell and conducted no business.[37] Neither of

---

[35]   *See Grant-Howard Assoc.*, 63 N.Y.2d at 297.

[36]   *Schumacher*, 59 N.Y.2d at 245.

[37]   *See Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07 Civ. 489, 2007 WL 3253592 (S.D.N.Y. Nov. 2, 2007); *Kidz Cloz, Inc. v. Officially for Kids, Inc.* No. 00 Civ. 6270, 2002 WL 1586877 (S.D.N.Y. July 17, 2002).

13

those situations are present here; Getty Petroleum has continued to exist as a fully operational corporation. There is no support for Getty Properties' argument that the transfer of Getty Petroleum's "marketing business" to GPMI is analogous to a transfer of all assets, as the marketing and real estate businesses were part of a fully integrated company. Indeed, the New York Court of Appeals has rejected the "product line" exception to the successor liability rule, in which liability could be imposed based on the transfer of only a portion of a company's assets – a situation somewhat analogous to the spin-off of GPMI from Getty Petroleum.[38]

I need not resolve the issue of successor liability here, however, because plaintiffs have settled their claims against GPMI. Additionally, GPMI has expressly assumed and agreed to indemnify Getty Petroleum from nearly all liabilities arising from Getty Petroleum's marketing business, with the exception of certain environmental liabilities. Ultimately, whether Getty Properties or GPMI is liable for plaintiffs' alleged injuries is a question of indemnity that is governed by the Reorganization Agreement and other contracts allocating liability between the two entities. Successor liability "is irrelevant to the question of indemnification or liability as between the seller and purchaser" of a company's

---

[38] *See Semenetz v. Sherling & Walden, Inc.*, 7 N.Y.3d 194 (2006).

14

assets.[39]

## C. Getty Properties Retained Environmental Liability for Numerous Sites

The Reorganization Agreement of January 1997 allocated Getty

Petroleum Corp.'s liabilities between Getty Petroleum – soon to become Getty

Properties – and GPMI. Under that Agreement, GPMI assumed Getty Petroleum

Corp.'s "Marketing Liabilities" with the exception of certain "Indemnified

Environmental Liabilities" defined as:

> All Liabilities relating to (i) the pre-closing environmental liabilities and obligations set forth on Schedule 1.01(a) hereto, (ii) all future upgrades set forth on Schedule 1.01(b) hereto necessary to cause USTs to conform to the 1998 federal standards for USTs, and (iii) all environmental liabilities and obligations arising out of discharges with respect to the properties containing USTs that have not been upgraded to conform to the 1998 federal standards for USTs, that are discovered prior to the date such USTs are upgraded to meet the 1998 federal standards.[40]

In other words, Getty Petroleum retained liability and agreed to indemnify GPMI

for claims arising from sites that were known to be contaminated and were

currently being remediated (Schedule 1.01(a) sites), as well as from sites where

Getty Petroleum had not yet upgraded USTs to 1998 federal standards (Schedule

---

[39]     *Grant-Howard Assoc.*, 63 N.Y.2d at 297.

[40]     *See* Reorganization Agreement.

15

1.01 (b) sites).  In 1997, this amounted to 694 sites.[41]

Two Master Leases and a related Environmental Liability Agreement between Getty Properties and GPMI also allocate environmental liabilities between the two corporations.  The leases generally govern the parties' respective liability in the event of future releases of hazardous substances or other violation of environmental laws, and responsibility for any government-ordered remediation.  The Environmental Liability Agreement, executed contemporaneously with the Amended Lease, was intended "to allocate risks associated with certain liabilities, potential liabilities and responsibilities regarding the environmental condition of certain of the Properties."[42]  It contains detailed cost-sharing provisions regarding liability for contamination at certain gasoline terminals, and provides that Getty Properties retains environmental liability for some properties not listed in the master leases, such as terminal or gas station properties that were closed, sold, or otherwise disposed of prior to February 1, 1997.[43]  In addition, Getty Properties warranted in the Agreement that, other than the properties for which it retained liability and remediation

---

[41]     *See id.*, Schedule 1.01(a) and Schedule 1.01(b).

[42]     Environmental Indemnity Agreement at 1.

[43]     *See id.* Section III; Section IV(1).

16

responsibility, it was not aware of any potential environmental liabilities arising from sites leased to GPMI.[44]

Getty Properties first argues that the environmental indemnification provisions in these agreements do not apply because plaintiffs' claims are marketing liabilities and not environmental liabilities. This argument makes no sense for two reasons. *First*, it ignores the fact that "marketing liabilities," as defined in the Reorganization Agreement, is a broad category that *includes* environmental liabilities.[45] *Second*, and most importantly, plaintiffs allege contamination of groundwater arising out of the release of gasoline into the environment. While the gasoline was undeniably released in the course of marketing activities such as distribution and sale, plaintiffs ultimately allege injury to the environment. Such claims must be categorized as environmental liabilities.

Next, Getty Properties argues that the environmental indemnity provisions in these agreements do not apply to plaintiffs' claims because its retained environmental liability is limited to "remediation for known spills; it did

---

[44]     *See id.* Section II.

[45]     *See* Reorganization Agreement at 9. Getty Properties argues that environmental liabilities were traditionally considered a liability of the marketing business of Getty Petroleum Corp. Indemnified Environmental Liabilities are specifically excluded from the definition of Marketing Liabilities.

17

not agree to assume all environmental liabilities associated with these sites."[46] It claims that "remediation" means obtaining closure on government-ordered cleanups. Yet it offers no support for this assertion. In fact, the Reorganization Agreement states that Getty Petroleum shall indemnify GPMI for "*[a]ll* Liabilities relating to . . . the pre-closing environmental liabilities and obligations" arising from the sites then undergoing remediation, and "*all* environmental liabilities and obligations arising out of discharges" at sites where Getty Petroleum remained obligated to upgrade USTs.[47]

This language does not limit the *type* of liability assumed by Getty Petroleum, but rather its *duration*. A reasonable interpretation of this provision is that Getty Petroleum retains all environmental liability on each listed site until "closing" – which presumably refers to agency closure of ongoing government-ordered remediation activities – and/or the completion of UST upgrades.

Getty Properties apparently draws its more limited definition of its environmental responsibilities from the Master Leases, which govern GPMI's rental of gas station sites from Getty Properties. Certain provisions of the leases allocate responsibility for environmental remediation at sites leased by Getty

---

[46]     Defendant Getty Properties Corp.'s Reply Memorandum of Law in Further Support of its Motion for Summary Judgment ("Reply Mem.") at 5.

[47]     Reorganization Agreement at 5-6 (emphasis added).

Properties to GPMI, in the event remediation is ordered by a government agency.[48] The leases also include representations that neither party will violate environmental law or release hazardous substances in the future; in the event of a hazardous substance release, the responsible party will indemnify the non-responsible party.[49] The Amended Lease also confirms, however, that Getty Properties retained liability to third parties for claims existing at or before the spin-off transaction. It states that the Lease provisions shall not be construed to "exculpate, relieve, or Indemnify" Getty Properties from those third-party liabilities "or its obligations arising under [the Amended Lease] or the Environmental Agreement."[50]

Further, the Environmental Indemnity Agreement of 2000 clearly contemplates that environmental liabilities extend beyond government-ordered remediation or violations of environmental law. For example, Getty Properties warranted in the Agreement that, *inter alia*, it was not aware of "any written notice, demand, request for information, Claim . . . proceeding, citation, complaint,

---

[48]     *See* Amended Lease, Section 9.1 ("Landlord Remediation"), Section 9.2 ("Tenant Obligations"). *See also* Master Lease, Section 9.3 ("Compliance; Clean-Up, Environmental Indemnification").

[49]     *See* Master Lease, Section 9.1; 9.4.

[50]     Amended Lease, Section 10.2.

19

summons, investigation, order, agreement or litigation alleging the violation of

Environmental Laws . . . *or alleging the suspected presence or release of*

*Hazardous Substances*" on any service station or terminal property.[51] Getty

Properties agreed to indemnify GPMI for any breach of that warranty.[52] It also

agreed to indemnify GPMI with respect to *any claims* arising from the scheduled

sites, certain other specified properties, and any Getty Petroleum station that was

closed or disposed of prior to the 1997 spin-off.[53] "Claims" are defined as

"allegations, actions, orders, decrees, suits, demands, demand letters, injunctions,

judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts

paid in settlement, liabilities, obligations, taxes, liens, losses, expenses, and

fees."[54]

      Reading these agreements together, it is reasonable to conclude that

Getty Properties retained liability for *all* claims arising out of existing

environmental contamination at a set of defined sites until remediation and

upgrades required by law are completed, and for *all* claims arising out of sites that

---

[51]     Environmental Indemnity Agreement, Section II(1)(c) (emphasis added).

[52]     *See id.* Section IV(1).

[53]     *See id.*

[54]     *Id.*

Getty Petroleum Corp. closed, sold, or otherwise disposed of prior to the spin-off and creation of GPMI. Nowhere do the agreements expressly limit Getty Properties' liability to the completion of government-ordered remediation projects.

This interpretation of the agreements is further supported by the fact that Getty Properties has consistently defended and indemnified GPMI for pre-1997 environmental liabilities. Schedule 14 to the Amended Lease lists matters in which GPMI was at the time defending itself and/or indemnifying Getty Properties, as well as matters in which Getty Properties was defending itself and/or indemnifying GPMI.[55] Tellingly, all non-insurance matters in which GPMI was indemnifying Getty Properties were contract or business-related, while all but one non-insurance matter in which Getty Properties was indemnifying GPMI were environmental in nature.[56] The environmental matters included actions by the State of New York for violation of environmental law, as well as actions brought by private parties. One matter, filed in 2000, was a personal injury action alleging wrongful death due to benzene exposure.[57]

---

[55]    *See* Amended Lease, Ex. 9 to Harrington Decl., Schedule 14.

[56]    *See id.*

[57]    *See id.* (the action is *George B. Shangraw and Carol A. Shangraw v. Exxon Mobil Corp., Getty Petroleum Marketing Inc., Agway Petroleum Corporation, Shell Oil Corporation, Texaco, Inc., Chevron USA, Inc., and Atlantic Richfield Co.*, filed in the U.S. District Court, District of Vermont, Index No. 00-

21

The claims in this action cannot be distinguished as non-environmental marketing liabilities, nor are they outside the scope of Getty Properties' retained environmental liability. Which of the two corporations is responsible thus depends on whether the contaminated sites from which plaintiffs' claims arise are listed on the various "Schedules" to the agreements as sites for which Getty Properties retained environmental liability.

## D. Getty Properties' Liability Must Be Determined on a Site-by-Site Basis

With respect to most claims against Getty Properties in the *Suffolk County* action, as well as numerous other cases in the MDL, site-specific discovery has either not taken place or has not been presented to the Court on this motion. Because the parties have not yet identified the sites where Getty Petroleum released gasoline into the environment, allegedly causing plaintiffs' injuries, summary judgment on those claims is premature.

Plaintiffs have identified the one Getty release at issue in the *Suffolk County* bellwether trial.[58] Sometime prior to 1990, gasoline leaked into the soil at

CV-229).

[58] Contamination in another well, Broadway Well No. 2, was also linked to a pre-1997 release of gasoline at a Getty station, but plaintiffs have withdrawn claims with respect to that well against Getty Properties and represented that they have settled those claims with GPMI. According to Getty Properties' moving papers, the release site was not listed in any Schedules to the various agreements,

a former Getty site at 19 Terminal Road in East Setauket, New York. Plaintiffs'
expert stated that this release could have contributed to MTBE contamination in
the Oak Street Well, and this Court held that a reasonable jury could find that the
gasoline release at that site caused or contributed to the contamination.[59] The
parties agree that this site is not listed on any of the relevant Schedules to the
agreements allocating liability between Getty Properties and GPMI. However, its
absence is due to the fact that Getty Petroleum vacated the property in 1992 and its
lease of the property terminated at the end of that year.[60]

Under the Environmental Indemnity Agreement, Getty Properties
agreed to indemnify GPMI on all claims arising from, *inter alia*, "[a]ny Petroleum
Terminal Property and Service Station Property closed, sold, or otherwise
disposed of prior to February 1, 1997."[61] The undisputed evidence submitted in

---

nor was it disposed of prior to 1997.

[59]     *See In re MTBE*, 2008 WL 2047611, at *31.

[60]     *See* Declaration of Joseph Guarino, Manager of Product Supply,
Operations and Scheduling for GPMI, in Opposition to Getty Properties' Corp.'s
Motion for Summary Judgment, ¶ 11.

[61]     Environmental Indemnity Agreement, Section IV(1)(b). It should be
noted that this provision of the Environmental Indemnity Agreement does not
extinguish plaintiffs' claim against GPMI; it merely obligates Getty Properties to
indemnify GPMI against any claim plaintiffs elect to bring against GPMI.
However, because of their settlement with GPMI plaintiffs have chosen not to
pursue GPMI for these claims and instead seek recovery from Getty Properties.

opposition to this motion supports a finding that the 19 Terminal Road facility falls under this category. Therefore, Getty Properties will ultimately be responsible for any recovery plaintiffs obtain at trial on claims arising from the spill at this site.

## V.    CONCLUSION

For the reasons stated above, Getty Properties' motion for summary judgment is denied. The Clerk of the Court is directed to close this motion (docket # 1904 in the Master File, # 224 in the Individual Case file).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          August 5, 2008

-Appearances-

**Liaison Counsel for Plaintiffs and Counsel for Plaintiffs Suffolk County Water Authority and County of Suffolk:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
William Walsh, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

**Counsel for Defendant Getty Properties Corporation:**

John McGahren, Esq.
Daniel F. Mulvihill, Esq.
Patton Boggs LLP
One Riverfront Plaza, 6th Floor
Newark, New Jersey 07102
Tel: (973) 848-5600
Fax: (973) 848-5601

**Counsel for Defendant Getty Petroleum Marketing Inc.:**

William P. Harrington, Esq.
Matthew G. Parisi, Esq.

Bleakley Platt & Schmidt, LLP
One North Lexington Avenue
P.O. Box 5056
White Plains, New York 10602
Tel: (914) 949-2700
Fax: (914) 683-6956