UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

**This document pertains to:**

*Basso, et al. v. Sunoco, Inc., et al.*, No. 03-Civ-9050
*Tonneson, et al. v. Sunoco, Inc., et al.*, No. 03-Civ-8248

# DEFENDANT EXXON MOBIL CORPORATION'S
# PRETRIAL MEMORANDUM OF LAW

December 10, 2008

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF FACTS ......................................................................................... 2
    A. Historic Water Problems ................................................................................ 2
    B. The Former Sunoco Station ........................................................................... 3
    C. The Mobil Branded Station ............................................................................ 3
    D. Hydrogeology ................................................................................................ 5
    E. Decreasing MTBE Levels .............................................................................. 6

III. ARGUMENT ............................................................................................................. 7
    A. Plaintiffs Cannot Establish That the Mobil Branded Station is the Source of the MTBE Detected at Their Properties ............................................................. 7
    B. Plaintiffs' Defective Product Claims .............................................................. 8
    C. Plaintiffs Cannot Establish Their Claims for Damages ................................ 11
        1. Plaintiffs' Alleged Property Damages .............................................. 11
        2. Plaintiffs' Fear of Future Injury Damages ....................................... 13
        3. Plaintiffs are not Entitled to Punitive Damages ............................... 15
    D. Plaintiffs Cannot Prove the Requisite Facts to Support a Navigation Law Claim .............................................................................................................. 15

IV. CONCLUSION ........................................................................................................ 16

# TABLE OF AUTHORITIES

## CASES

*Denny v. Ford Motor Co.*, 87 N.Y.2d 248 (1995) ................................................................. 9

*Doralee Estates, Inc. v. Cities Service Oil Co.*, 569 F.2d 716 (2d.Cir. 1977) ..................... 15

*Fisher v. Qualico Contracting Corp.*, 779 N.E.2d 178; 98 N.Y.2d 534 (N.Y.2002) .......... 11

*Hartshorn v. Chaddock*, 31 N.E. 997; 135 N.Y. 116 (N.Y. 1892) ...................................... 11

*Healey v. Firestone Tire & Rubber Co.*, 87 N.Y.2d 596 (1996) ........................................... 7

*Homes v. Epperson*, 344 F.Supp.2d 875 (E.D.N.Y. 2004) ................................................. 16

*In re MTBE Prod. Liability Litigation*, 379 F.Supp.2d 348 (S.D.N.Y. 2005) ............... 15, 16

*In re MTBE Products Liability Litigation*, 528 F.Supp.2d 303 (S.D.N.Y. 2007) ............... 13

*In re MTBE Products Liability Litigation*, 2008 U.S.Dist. LEXIS 50255 (S.D.N.Y 2008) ......... 14

*Mink Mart Inc., v. Reliance Insurance Co.*, 65 F.Supp.2d 176 (S.D.N.Y. 1999) ............. 7, 9

*Petitt v. Celebrity Cruises, Inc.*, 153 F.Supp.2d 240 (S.D.N.Y. 2001) ................................. 7

*State v. Avery-Hall Corp.*, 719 N.Y.S.2d 735 (3d Dep't 2001) ........................................... 15

*Voss v. Black & Decker Manufacturing Co.*, 59 N.Y.2d 102 (1983) ................................... 9

*Young v. Elmira Transit Mix, Inc.*, 52, A.D.2d 202, (4th Dep't 1976) ................................. 9

## STATE STATUTES AND REGULATIONS

10 N.Y.C.R.R. § 5-1.10, et seq ....................................................................................... 11, 12

10 N.Y.C.R.R. § 170.1 ........................................................................................................ 11

N.Y. Pub. Health Law § 210 ............................................................................................... 11

Proposed Rule, 2003-36 N.Y. St. Reg. 12 .......................................................................... 12

I.  **INTRODUCTION**

There are five families of plaintiffs (Bogardus, Boyce, Buccholz, Burley and Camacho) who live in the vicinity of the "Mobil" branded in Fort Montgomery, New York (the "Mobil Five"). These Plaintiffs have not only suffered no personal injury or property damage, but now also have MTBE levels of "non-detect" in each of the potable wells on their property. Moreover, all of the Mobil Five now have access to municipal water. Thus, not only is the drinking water in each of the Mobil Five's potable wells clean, they could each also have municipal water for the cost of hook-up (a few thousand dollars). As more fully set forth below, the installation of this municipal water system had nothing to do with MTBE. In fact, the Fort Montgomery area has long suffered a significant iron and sulfur-related problem due to the fractured bedrock nature of the area.

Finally, Plaintiffs' theory of the case is novel at best, and not supported by the evidence. Specifically, the Plaintiffs do not allege that there was ever a spill of liquid product at the subject Mobil branded station. Instead, they allege that "vapors" escaped from a loose cap on the vapor recovery system at the station, and that the MTBE in such vapors made its way into the soil and then the groundwater. Moreover, defendant Exxon Mobil Corporation ("ExxonMobil") never owned, operated or controlled the subject service station. In fact, the New York State Department of Environmental Conservation ("NYSDEC") twice declined to name ExxonMobil a Potentially Responsible Party ("PRP"), once when asked to do so by Plaintiffs' counsel.

Therefore, as more fully set forth below, this is a case where the Plaintiffs have little to no evidence of causation, have suffered no damages, and now have clean water in their potable wells. In all events, they also have easy access to the new municipal water system, which was installed for reasons wholly unrelated to MTBE.

## II. STATEMENT OF FACTS

### A. Historic Water Problems

The Town of Highlands (which borders "West Point") is made up of two hamlets, Fort Montgomery and Highland Falls. The Plaintiffs reside in Fort Montgomery. Fort Montgomery is located in a area comprised of fractured bedrock. Accordingly, Fort Montgomery residents, including Plaintiffs, have historically received water from potable wells installed on individual properties. Residents have experienced issues with the quantity and quality issues of their water for more than 20 years. For example, many of the plaintiffs testified that they did not drink and/or cook with their well water – long before MTBE was detected – due to concerns over iron and sulfur levels. See e.g., *Deposition of Plaintiff Charles Hannigan* (Aug. 21, 2006) at p. 76:10-24. Moreover, a development project by plaintiff David Tonneson was stalled (also years before MTBE was detected) because of elevated radon levels in the two potable wells drilled on the development property. *Deposition of Plaintiff Dave Tonneson* (Aug. 24, 2006) at pp. 94:20-96:17. Because of the poor quality of the well water, the Town of Highlands has been trying to acquire a public water source for its residents since at least the 1980s. *Letter from R. Rothenberg to New York State Dept. of Health* (May 13, 1997).

The municipal water system from the nearby Village of Highlands was extended to a limited portion of Fort Montgomery. However, because of a limit on available water, the Village of Highlands maintains the position it cannot sell enough water to all Fort Montgomery residents. Accordingly, only certain residents have been approved to connect to the municipal system.

Recently, however, those water quantity concerns have abated. Now, all of the Mobil Five plaintiffs can connect to the public water system. Indeed, two of the properties have already connected, and one recently received a permit to connect. The plaintiff Thomas Burley testified

-2-

that the cost to connect to the municipal system is approximately $1,400. Exhibits 5, 6 and 7 from *Deposition of Plaintiff Thomas Burley* (Dec. 6, 2006), Exhibits 5, 6, 7.

### B. The Former Sunoco Station

Sunoco operated a gas station in Fort Montgomery from 1955 through November 2002. During that time at least three significant gasoline spills occurred and eight separate "spill incident" numbers were opened by NYSDEC. NYSDEC named Sunoco as a PRP for groundwater contamination (including MTBE) in Fort Montgomery. The agency ordered Sunoco to conduct remediation and to provide filtration systems for certain impacted homes.

Sunoco assumed responsibility for providing filtration systems (or bottled water) to approximately 80% of the affected well owners in Fort Montgomery. However, Sunoco refused to address the remaining properties located nearest to the Favre station. Both sides' hydrogeologists have confirmed this "territorial divide" between the Sunoco and Mobil branded stations. However, as set forth below, while naming Sunoco, NYSDEC has not named ExxonMobil a PRP for this contamination.

### C. The Mobil Branded Station

Neither ExxonMobil nor its predecessors ever owned, operated or controlled the "Mobil" branded station at issue in these matters. It was owned and operated by third party defendant, Favre Brothers, from June 1995 through May 2001 pursuant to a dealer franchise agreement with Mobil Oil Corporation. Favre Brothers accepted their last delivery in January 2001, and went out of the retail fuel sales business shortly thereafter. However, Favre Brothers continue to own the property and operate an automotive repair shop on-site. The "Mobil" branded station is now operated by Chestnut Mart of Newburgh, Inc. (also a defendant), pursuant to a Distributor Franchise Agreement between Mobil Oil Corporation and Alta East, Inc.

Significantly, there has never been a documented spill at the Favre station. Rather, there was a detection of 91 ppb of MTBE in an on-site water well during a routine inspection by the Orange County Department of Health ("OCDOH") in August 2001. This was immediately reported to NYSDEC and, on August 8, 2001, a spill number was opened for the station. NYSDEC subsequently investigated and identified both Favre and Chestnut as PRPs for this "spill" number. Importantly, NYSDEC did not name ExxonMobil as a PRP. In fact, when Plaintiffs' counsel wrote to NYSDEC on December 8, 2003 (after this litigation had commenced) and asked the agency to name ExxonMobil as a PRP, the agency declined to do so. See *Letter from NYSDEC to John A. Sarcone* (Dec. 9, 2003).

NYSDEC ordered Favre to conduct a subsurface investigation and sampling of potable wells within a 500 foot radius of the property. Favre failed to conduct that investigation, citing lack of funds. However, in response to Favre's coverage claim, its insurance company engaged a contractor to test the UST system in 2001. That testing concluded that the UST system was "tight." NYSDEC also stepped in to conduct the investigation it had ordered Favre to undertake, including sampling of private wells in the immediate vicinity of the Favre station. The agency's investigation found low level MTBE in the soil beneath the station, and higher levels (approximately 400 ppb) in groundwater at one on-site monitoring well located adjacent to the automotive repair shop operated by David Favre. In 2003, NYSDEC tested the UST system again, including a "Tracer" test to test vapor releases, and confirmed what the insurer's contractor had found before: the system was tight.

Depositions and document discovery taken of NYSDEC and its contractor, EnviroTrac, reveal that the agency never confirmed any release at the Favre station. EnviroTrac's theory is that a "remnant source" located in soil beneath the station may explain the MTBE detections in

certain local wells, but it could not determine who caused this "remnant source." See *Deposition of Ted Masters*, at 177:10-13 (Jan. 11, 2007) ("We never determined what that source was from. We just basically concluded that there was something in the soil. There was MTBE in the soil."). Notably, discovery also revealed that an old, out-of-service UST system was excavated from the site in 1994. *Id.* at 178. By that time the UST system had been out of service for 10-15 years and, in fact, pre-dated Favre's involvement at the property. *Id.* Significantly, Plaintiffs do not rely on NYSDEC's "remnant source" theory to explain the presence of MTBE in soil beneath the Favre property – because such a "remnant source" would long pre-date the supply of "ExxonMobil" MTBE gasoline to the Favre station. Instead, Plaintiffs' theory (discussed below) is that the low-level MTBE detected in their private wells resulted from undocumented "vapor releases" at the Favre station.

Again, NYSDEC has refused to name ExxonMobil as a PRP for the contamination at this station property, even when Plaintiffs' counsel wrote to NYSDEC, requesting the same.

### D. Hydrogeology

Plaintiffs, Sunoco and ExxonMobil each retained a hydrogeology expert to opine about (1) sources of the MTBE detected in Fort Montgomery, and (2) the extent of the alleged contamination. Plaintiffs' expert is Dr. Stephen Wheatcraft, who opines that there are "two major MTBE plumes" which have contaminated private wells. According to Dr. Wheatcraft "[t]he largest plume is associated with the Sunoco station. In the Fort Montgomery area, the Sunoco station is the only source area which has caused contamination of private drinking water wells with several hundred ppb of MTBE...." See *Expert Report of Stephen W. Wheatcraft*, at 7 (Mar. 2, 2007).

As for the Favre station, Dr. Wheatcraft opines that "MTBE is also found in groundwater in the Fort Montgomery area in the immediate vicinity of the Mobil station and in approximately

a dozen private drinking water wells directly downgradient from the Mobil station." *Id.* In his opinion, "the Sunoco and Mobil stations represent two physically separate and distinct MTBE plumes." *Id.* At his deposition, Dr. Wheatcraft admitted that the Favre station could not be a source for the contamination found in the Plaintiffs' homes in the vicinity of the Sunoco station. See *Deposition of Stephen Wheatcraft*, at 264:18-23 (Feb. 26, 2008) ("Q: Other than Burley, Bogardus, Buccholz, Camacho, and Boyce, do you suggest that the Mobil service station in Fort Montgomery is the source of contamination in the wells of any other Plaintiffs in the Tonneson and Basso case? A: No."). Thus, Dr. Wheatcraft links the Favre station to only five Plaintiff families in these cases.

ExxonMobil and Sunoco's experts – Thomas Maguire and Steven Hart, respectively – agree with the territorial divide posited by Plaintiffs and Dr. Wheatcraft. Mr. Maguire also opined that the transient detections made in the private wells attributed to ExxonMobil were caused by a discrete and limited mass of fuel (either gasoline, diesel fuel or heating oil) released in the general area of the Favre station. In light of this record, and the testimony of plaintiffs' own expert, on October 17, 2008, ExxonMobil filed a motion for summary judgment on the claims of the Plaintiffs on the Sunoco side of Fort Montgomery. That motion was fully submitted on November 21, 2008.

E.  **Decreasing MTBE Levels**

The most recent sampling results prove that Plaintiffs' wells contain little to no MTBE. Apparently dissatisfied with the prior testing showing miniscule (or non-existent) MTBE in the wells, Plaintiffs' counsel retained its own consultant to conduct sampling – and that testing confirmed the absence of MTBE in most of the wells. Indeed, for those wells which Plaintiff now alleges contain any level of MTBE, the putative "detections" are down to parts per trillion. The ability of laboratories to detect MTBE (or anything else) down to the level of parts

- 6 -

per trillion is extremely controversial and the laboratory chosen by Plaintiffs to conduct this testing is not certified in any state, much less New York, to even analyze drinking water. On October 31, 2008, ExxonMobil filed a motion *in limine* to exclude this data from trial.

## III. ARGUMENT

### A. Plaintiffs Cannot Establish That the Mobil Branded Station is the Source of the MTBE Detected at Their Properties

Plaintiffs have the burden of proving that their properties were impacted from a release of MTBE gasoline at the Mobil branded station in Fort Montgomery, New York. *Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240, 252 (S.D.N.Y. 2001); *Healey v. Firestone Tire & Rubber Co.*, 87 N.Y.2d 596, 601 (1996). See also *Mink Mart Inc., v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 181 (S.D.N.Y. 1999) (opinion excluded where expert speculates that air conditioning system leaked causing water damage). Plaintiffs will not invoke alternative theories of causation such as collective liability based on market share, commingled product or joint tortfeasor liability.

In proving their case, Plaintiffs must do more than simply show that there is a metaphysical possibility that the Mobil station is the source of the MTBE detected at their homes. It is well settled that mere conclusory allegations, conjecture and unsupported speculation are insufficient to succeed.

Plaintiffs will rely on the opinion of Marcel Moreau. Moreau will testify at trial, if the Court permits him to, that the "most likely scenario" is that the MTBE was released from a intermittent vapor release that occurred over an unknown period of time (*i.e.*, an undocumented and unreported release). Further, if the Court permits it, he will testify that "there may also have been releases associated with the premium submersible pump, and there may also -- well, there

were customer releases that may have impacted groundwater quality as well." See *Deposition of Marcel Moreau*, 260:12-260:19 (Jan. 22, 2008).

Mr. Moreau's opinion is rank speculation based, he says, largely on prior experiences at other service station sites. Indeed, the "vapor release" scenario is based in large part of his review of other persons' data collected in New Hampshire. Additionally, his opinion regarding customer spills is based, not on evidence specific to the Mobil branded station in Fort Montgomery, but instead his belief that "generic low level spills" occur at all service stations. See *Id* at 261:6 – 261:20.

ExxonMobil will prove that there was not a release from the UST system at the Mobil station. Indeed all of the evidence proves that the system was "tight" at all relevant times. Further, the evidence will show that the likely cause of the MTBE detected at the Mobil station and Plaintiffs' properties was a release from the on-site auto body shop. For example, the highest detections of MTBE were recorded by the State's own contractor in a monitoring well ("MW-4") immediately down gradient from the auto body shop. Moreover, the evidence will show that compounds –associated with auto body shop activities, not gasoline station operations – were also detected in the on-site potable well. See *Expert of Thomas F. Maguire*, (May 24, 2007) at 9.

### B.  Plaintiffs' Defective Product Claims

Plaintiffs allege that gasoline containing MTBE is a defective product. Specifically, Plaintiffs contend that gasoline with MTBE was designed defectively and that ExxonMobil failed to adequate warn of MTBE's characteristics, including its propensity to impact groundwater. To prevail at trial, Plaintiffs must convince a jury that the risk of harm from MTBE outweighs its risks. In making such a risk/utility determination, the jury will consider the following factors:  (1) the product's utility to the public as a whole and to the individual user;  (2)

the likelihood that the product will cause injury; (3) the available of a safer alternative; (4) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user; and (6) the manufacturer's ability to spread the cost of any safety-related design changes. *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257 (1995). In light of these factors, a jury must find that MTBE was not reasonably safe for its intended, or unintended but reasonably foreseeable, purpose.

Plaintiffs must also prove at trial that ExxonMobil had reason to know that gasoline with MTBE was likely to be dangerous for the use for which it was supplied, had no reason to believe that the user would realize the dangerous condition and that it failed to exercise reasonable care in providing adequate warnings. *Young v. Elmira Transit Mix, Inc.*, 52, A.D.2d 202, 204-05 (4th Dep't 1976) (citing Restatement (Second) of Torts § 388). To prevail against ExxonMobil on a design defect or failure to warn claim, Plaintiffs must also convince a jury that the alleged defect was a substantial cause of their harm. *See Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106 (1983); *Mink Mart Inc., v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 181 (S.D.N.Y. 1999).

The evidence will show that gasoline with MTBE is not a defective product as a matter of law. Plaintiffs cannot prove that there was an alternative to fulfill the oxygenate mandates of 1992 (winter Oxyfuel) and 1995 (reformulated gasoline). ExxonMobil will demonstrate that ethanol could not have been used in the supply system in the east coast to meet the oxygenate

mandates throughout the 1990s and early 2000s. Indeed, ExxonMobil will prove that ethanol supplies were insufficient because of logistical problems that could not be corrected.[1] In light of these factors, ExxonMobil could not have complied with the oxygenate mandates without using MTBE in gasoline.

ExxonMobil will also establish that gasoline with MTBE served its intended purpose – *i.e.*, it reduced air pollution (including lead emissions) and helped address a national health crisis while performing well in motor vehicles. See *Expert Report of Janet Kester, Ph.D.* (May 28, 2007) at p. 8. Plaintiffs' claims are based on spills or leaks of gasoline with MTBE – not issues related to the intended use of the product.

The evidence will demonstrate that additional warning would not have made any difference in the way gasoline with MTBE was handled. Service station operators and transporters knew at all relevant times that gasoline (with or without MTBE) should not be spilled on the ground or released from storage systems. Further, ExxonMobil will show that these individuals knew it was against the law not to report such releases if and when they occurred. See Navigation Law § 175. Indeed, even Plaintiffs testified that they knew gasoline was a dangerous product that should be handled carefully. See, e.g., *Deposition of Sandra Bogardus* (Aug. 16, 2006); pp. 93:4 – 93:16.

---

[1] Logistical problems associated with ethanol use include: the inability to ship it in pipelines; the requirement for separate additional tanks at terminals for blending; the inability to mix ethanol gasoline with non-ethanol gasoline; and the inability to exchange ethanol gasoline with other blends.

### C. Plaintiffs Cannot Establish Their Claims for Damages

#### 1. Plaintiffs' Alleged Property Damages

The New York Pattern Jury Instruction (P.J.I.) for damage to real property states, in pertinent part:

> If Plaintiff's property was damaged by the defendant's negligence, you will award to the Plaintiff as damages the difference between its market value immediately before and immediately after it was damaged, or the reasonable cost of repairs necessary to restore it to its former condition, *whichever is less*.

P.J.I. 2:311 (emphasis added); *see also Fisher v. Qualico Contracting Corp.*, 779 N.E.2d 178, 182; 98 N.Y.2d 534, 540 (N.Y. 2002) ("[R]eplacement cost and diminution in market value are simply two sides of the same coin. Each is a proper way to measure lost property value, the lower of the two figures affording full compensation to the owner."); *Hartshorn v. Chaddock*, 31 N.E. 997, 998; 135 N.Y. 116, 121 (N.Y. 1892) ("[D]iminution in the value of the land is the general rule for measuring the damages in an action for an injury to real property of a permanent character.").

Despite all its other problems (which far exceed the low-level MTBE that no longer exists in the wells), Plaintiffs' well water meets all New York standards for "potability" as a matter of law.

The New York legislature authorized the Department of Health ("DOH") to supervise and regulate the sanitary aspects of water supplies. *See* N.Y. Pub. Health Law § 210(l). Pursuant to its authority, the DOH promulgated regulations to protect present or future sources of water supply and to ensure that the public water supply is and continues to be potable. *See* 10 N.Y.C.R.R. § 5-1.10; 10 N.Y.C.R.R. § 170.1.

Under these regulations, potable water is defined as "water which meets the requirements established by [the State Sanitary Code]." 10 NYCRR § 5-1.1(at). The requirements established by the DOH include "Maximum Containment Levels" ("MCLs") for certain chemicals, such as MTBE. Drinking water containing concentrations of a substance at levels below the MCL is safe for human consumption. *See* 10 N.Y.C.R.R. § 5-1.1(ak).

In response to an increase in MTBE detections in groundwater, the DOH established a more restrictive MCL standard for MTBE to address concerns over the potential health risks of MTBE in drinking water.[2] Although the federal government advises that regulatory standards set between 20-40 ppb will protect consumers from potential health effects, New York's standard for MTBE is even lower. Proposed Rule, 2003-36 N.Y. St. Reg. 12, at 14. The DOH determined that drinking water containing MTBE at or below 10 ppb is safe for human consumption. 10 N.Y.C.R.R. 5-1.52 Table 3.

In addition to the DOH's determinations in the context of the State Sanitary Code, the NYSDEC uses the MCL of 10 ppb as a threshold or action level for the "remediation of private wells contaminated by [MTBE], thereby providing protection for private wells." Proposed Rule, 2003-36 N.Y. St. Reg. 12, at 14.

Plaintiffs well water has not contained MTBE at levels greater than 10 ppb in over four years, if it ever did. Moreover, there is no evidence their well water currently contains any MTBE. Accordingly, ExxonMobil disputes that any Plaintiff has suffered any "property damage." Nevertheless, Plaintiffs allege that the market value of their properties has been

---

[2] Prior to December 2003, New York State had not set a specific MCL for MTBE, the State's general MCL for volatile organic compounds of 50 ppb applied.

diminished because of the MTBE that once was (but no longer is) detected in their wells, and seek to recover the difference in that value as "stigma" damages here.

The deposition testimony of those Plaintiffs who already have connected to the municipal water system establishes that the cost to connect is approximately $1,400. *Deposition of Thomas Burley* (Cost to Cap Water Well ($200.00); Cost of Excavation and Backfill ($420.00); and Cost to Connect to Water Main ($786.00)). New York law says that, if Plaintiffs are to recover property damages at all, it must be the <u>lesser</u> of the diminution in value or the cost to repair the property. Thus, putting aside any dispute as to whether there has been a diminution in value to plaintiffs' property, under the "lesser of" standard, plaintiffs' damages cannot exceed the cost to repair, *i.e.*, the cost to connect to city water.

### 2. Plaintiffs' Fear of Future Injury Damages

To maintain a cause of action for negligent infliction of emotional distress caused by fear of injury due to exposure to MTBE, this Court determined that Plaintiffs must prove that: (1) they were in fact exposed to MTBE, and (2) there is "a physical manifestation of that exposure to guarantee that their fears have a rational basis." *In re MTBE Prods. Liab. Litig.*, 528 F. Supp.2d at 313. Under New York law, "rational basis" means "the clinically-demonstrable presence of a toxin in the Plaintiff's body, or some other indication of a toxin-induced disease." *Id.* (citing *DiStefano v. Nabisco, Inc.*, 2 A.D.3d 484, 485, 767 N.Y.S.2d 891 (2d Dep't 2003)).

Plaintiffs intend to meet this standard through the opinion of Dr. Mehlman that Plaintiffs "more probably than not experienced genetic or subcellular damage" in the form of DNA adducts, and that any Plaintiff who is concerned about past exposure to MTBE has a reasonable basis for concern. *See id.* at 314-317; (citing February 2, 2007 Expert Report of Myron A. Mehlman, Ph.D. at 38). However, the Court granted ExxonMobil's *Daubert* motion in part, holding that "[w]hile exposure levels are often difficult to 'precisely quantify,' this does not

excuse Dr. Mehlman from attempting to analyze plaintiffs' exposure levels if he intends to testify that they have a basis for their fear of cancer." *Id.* at *18; *see also Id.* at *18 n.49 ("[T]he fact that this Court has found that the evidence demonstrates that plaintiffs were generally exposed to MTBE does not excuse Dr. Mehlman from analyzing plaintiffs' exposure levels when offering the expert testimony that they 'more probably than not experienced genetic or subcellular damage as a result of that exposure.'" (quoting Mehlman Report at 38)). The Court concluded that "it would be absurd to allow Dr. Mehlman to testify that 'any plaintiff who is concerned that [his or her] past exposure to MTBE . . . may cause cancer has a reasonable basis for their concerns' if that plaintiff only had consumed one glass of filtered water on one occasion." *Id.* at *20. The Court further concluded that "[w]ithout attempting to analyze plaintiffs' exposure to MTBE and considering all of the available evidence, Dr. Mehlman cannot reliably testify that the plaintiffs have a reasonable fear of cancer due to their exposure to MTBE." *Id.*

Plaintiffs have no evidence – clinical or otherwise – that any of them experienced specific subcellular damage due to MTBE exposure. Plaintiff's sole proof of "physical manifestation" is the expert opinion of Dr. Mehlman that MTBE exposure can cause DNA adducts. Dr. Mehlman never examined a single Plaintiff in this case to confirm either actual MTBE exposure or actual DNA adducts, nor did he perform any exposure calculations or analysis. The Court already (and properly) ruled that Dr. Mehlman will be precluded from testifying at trial that any Plaintiff has DNA adducts based on alleged exposure to MTBE, or that any Plaintiff has a rational basis for fearing future injury. *In re MTBE Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 50255, at *17-21 (S.D.N.Y. July 1, 2008). Accordingly, they cannot prove at trial that the alleged resulting fear of future evidence is "reasonable" under New York law.

- 14 -

### 3. Plaintiffs are Not Entitled to Punitive Damages

Plaintiffs are not entitled to punitive damages. Punitive damages may be awarded against a corporation only if its officers or directors authorized, participated in, consented to, or after discovery, ratified the conduct giving rise to such damages. *Doralee Estates, Inc. v. Cities Service Oil Co.*, 569 F.2d 716, 721-22 (2d Cir. 1977). For punitive damages to be assessed against the corporation based upon the conduct of one of its officers, the officer must be a "superior officer," *i.e.*, a person possessing "a high level of general managerial authority in relation to the nature and operation of the employer's business." *Id.*

The evidence at trial will demonstrate that Plaintiffs cannot establish that ExxonMobil's management "authorized," "participated in" and/or "consented to" any outrageous conduct. Indeed, as the Court already found here, Plaintiffs offered only "scant evidence to support their claim that defendants market gasoline containing MTBE despite their knowledge that MTBE posed serious risk to the public. *See In re: MTBE Prods. Liaib. Litig.*, 2007 U.S.Dist. LEXIS 88516 at *37 (dismissing Plaintiffs' claims for intentional infliction of emotional distress). ExxonMobil will prove at trial that its conduct was at all times reasonable and appropriate.

### D. Plaintiffs Cannot Prove the Requisite Facts to Support a Navigation Law Claim

The Navigation Law "was not meant to impose liability merely for supplying the market with gasoline." *In re MTBE Prod. Liab. Litig.*, 379 F. Supp. 2d 348, 427 (S.D.N.Y. 2005); *see also State v. Avery-Hall Corp.*, 719 N.Y.S.2d 735, 736 (3d Dep't 2001) (mere delivery of gasoline to station does not give rise to "discharger" status under Navigation Law). Instead, the

Navigation Law imposes liability on "any person who has discharged petroleum"[3] that can be causally linked to a plaintiff's alleged injury. Nav. Law § 181(1).

At minimum, therefore, the Navigation Law requires proof that defendant (1) <u>discharged</u> the petroleum product that (2) <u>caused</u> plaintiff to be damaged. As discussed above, the evidence will demonstrate that there was not a release from the UST system at the Mobil-branded station. Accordingly, Plaintiffs' cannot prevail on their Navigation Law claims against ExxonMobil.

## IV. CONCLUSION

For the foregoing reasons, ExxonMobil cannot be found liable to Plaintiffs.

December 10, 2008  
New York, New York

Respectfully submitted,

Peter John Sacripanti (PS 8968)  
Stephen J. Riccardulli (SR 7784)  
McDermott Will & Emery LLP  
340 Madison Avenue  
New York, NY 10017-4613  
Tel. (212) 547-5400  
Fax 212) 547-5444

Anthony A. Bongiorno  
McDermott Will & Emery LLP  
28 State Street  
Boston, MA 02109  
(617) 535-4000

*Counsel for Defendant Exxon Mobil Corporation*

---

[3] A "discharge" may be an affirmative act resulting in a release, or a failure to act to prevent or halt a release. Nav. Law § 172(8) (defining "discharge" to include omissions). The key point is that there must be a "nexus between the defendant and the discharge" (*In re MTBE Prod. Liab. Litig.*, 379 F. Supp. 2d at 427 (S.D.N.Y. 2005)) – *i.e.*, a causal "link between a party's actions and the petroleum discharge." *Homes v. Epperson*, 344 F. Supp. 2d 875, 895 (E.D.N.Y. 2004).