Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN  DISTRICT OF NEW YORK**
---------------------------------------------------------- X
                     :

**IN RE: METHYL TERTIARY BUTYL**    :
**ETHER ("MTBE") PRODUCTS**       :     **OPINION AND ORDER**
**LIABILITY LITIGATION**           :
---------------------------------------------------------- :     **Master File No. 1:00-1898**
                     :     **MDL 1358 (SAS)**
**This document relates to:**      :     **M21-88**
                     :
*County of Suffolk and Suffolk County Water* :
*Authority v. Amerada Hess Corp. et al.,*   :
04 Civ. 5424                  :
---------------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

In 2002, two plaintiffs, the County of Suffolk and the Suffolk County

Water Authority, sued various corporations for their use and handling of the

gasoline additive methyl tertiary butyl ether ("MTBE").[1]  After defendants

removed the action from state to federal court, the Judicial Panel on Multidistrict

Litigation transferred it to this Court pursuant to section 1407 of title 28 of the

United States Code as part of a large multi-district litigation ("MDL") involving

MTBE.

---

[1]     The parties have engaged in extensive motion practice.  This Opinion
assumes the reader's familiarity with this Court's previous opinions, in which the
facts underlying this and other related actions are more comprehensively
discussed.  For a thorough recitation of plaintiffs' fact allegations see, for
example, *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.* (*"In re MTBE"*),
379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005).

On March 12, 2007, plaintiffs moved to "Set Bellwether Trial of Ten Wells" in this action, which had been previously selected as one of several focus actions for early discovery and trial. After full briefing on the Motion, an oral argument was held on April 27, 2007.[2] Following oral argument, and at the Court's request, both plaintiffs and defendants submitted supplemental briefs on three issues. Finally, by stipulation dated June 13, 2007, the parties have resolved one of the issues raised by this Motion – namely, the order in which the proof will be presented to a jury.[3] With respect to the remaining issues, plaintiffs' Motion to Set Bellwether Trial of Ten Wells is granted in part and denied in part.

---

[2]     *See* April 27, 2007 Hearing Transcript ("4/27/07 Tr.") at 32-86. At oral argument, Samuel Issacharoff argued for plaintiffs and Sheila L. Birnbaum argued for defendants.

[3]     In the parties' Joint Proposal, defendants specifically preserved their objection to a trial of less than all of plaintiffs' claims and to a trial pertaining only to a subset of wells. *See* June 13, 2007 Joint Proposal Regarding Trial Plan at 1. Nonetheless, anticipating that the Court might overrule defendants' objection, the parties reached an agreement with respect to the phasing issue. The essence of their agreement is that "[t]he parties shall be allowed to present all admissible evidence on all issues regarding the claims for liability and compensatory damages . . . before the jury renders any findings, decision or verdict. The parties shall be allowed to present evidence on these issues in the order they deem appropriate." *Id.* at 2.

## I.    Brief Background on Bellwether Trials

Rule 42(b) provides, in pertinent part, that a court "may order a

separate trial of any claim . . . or any separate issue . . . always preserving inviolate

the right of trial by jury as declared by the Seventh Amendment to the

Constitution . . . ."[4]  Pursuant to this rule, federal courts have the authority to

conduct a "bellwether trial."  In *In re Chevron* ("*Chevron*"),[5] the Fifth Circuit

explained the function of such a trial in the context of a mass tort action:

> The term bellwether is derived from the ancient practice of
> belling a wether (a male sheep) selected to lead his flock. The
> ultimate success of the wether selected to wear the bell was
> determined by whether the flock had confidence that the wether
> would not lead them astray, and so it is in the mass tort context.
>
> The notion that the trial of some members of a large group of
> claimants may provide a basis for enhancing prospects of
> settlement or for resolving common issues or claims is a sound
> one . . . .  The reason for acceptance [of bellwether trials] by the
> bench and bar are apparent. If a representative group of claimants
> are tried to verdict, the results of such trials can be beneficial for
> litigants who desire to settle such claims by providing information
> on the value of the cases as reflected by the jury verdicts.
> Common issues or even general liability may also be resolved in
> a bellwether context in appropriate cases.[6]

---

[4]     Fed. R. Civ. P. 42(b)

[5]     109 F.3d 1016 (5th Cir. 1997).

[6]     *Id.* at 1019.

3

Over the last decade, bellwether trials have become more common in large actions, and, in particular, mass tort actions. For example, courts have held bellwether trials in actions involving the outbreak of Legionnaires' Disease on board a cruise ship, uranium contamination of a community, and the adverse effects of a prescription drug.[7]

The obvious justification for a bellwether trial is that "a consolidation or a multi-district transfer has the potential of overwhelming the resources of a particular court."[8] "It is a fundamental principle of American law that every person is entitled to his or her day in court."[9] However, if plaintiffs file hundreds or thousands of individual actions, the sheer volume of the proceeding may overwhelm a court's ability to provide *any* plaintiff with relief in a timely and efficient manner.

A bellwether trial also allows a court and jury to give the major arguments of both parties due consideration without facing the daunting prospect

---

[7]    *See Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 359 (2d Cir. 2003); *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1194 (10th Cir. 2000); *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 906 (E.D. La. 2007).

[8]    R. Joseph Barton, *Utilizing Statistics and Bellwether Trials in Mass Torts: What do the Constitution and Federal Rules of Civil Procedure Permit?*, 8 Wm. & Mary Bill Rts. J. 199, 202 (1999).

[9]    *Tice v. American Airlines, Inc.*, 162 F.3d 966, 968 (7th Cir. 1998).

4

of resolving every issue in every action. It must be remembered that a defendant is

not liable merely because it has been sued by a large group of plaintiffs. And

every experienced litigator understands that there are often a handful of crucial

issues on which the litigation primarily turns. A bellwether trial allows each party

to present its best arguments on these issues for resolution by a trier of fact.

Moreover, resolution of these issues often facilitates settlement of the remaining

claims.[10]

Of course, bellwether trials cannot exceed the limits imposed by the

Constitution, but they do not necessarily pose an uncommonly high risk of doing

so. Judges are often called upon to protect litigants' rights in unusual

circumstances. Indeed, at least two Courts of Appeal have found that a bellwether

trial may be superior to other forms of adjudication without violating any party's

substantive or procedural due process rights.[11]

---

[10]     As the *Manual for Complex Litigation* explains: "Prior to
recommending remand, the transferee court could conduct a bellwether trial of a
centralized action or actions originally filed in the transferee district, the results of
which (1) may, upon the consent of parties to constituent actions not filed in the
transferee district, be binding on those parties and actions, or (2) *may otherwise
promote settlement in the remaining actions.*" *Manual for Complex Litigation
(Fourth)* § 20.132 (2004) (emphasis added).

[11]     *See Hilao v. Estate of Marcos*, 103 F.3d 767, 771 (9th Cir. 1996);
*In re Chevron*, 109 F.3d at 1017.

## II.    A Trial on All Issues with Respect to a Limited Group of Representative Wells Shall Be Held, Commencing on March 3, 2008

### A.    The Court's Order

The action before this Court, which is part of a larger MDL, involves

182 wells located in Suffolk County, New York.  Plaintiffs have proposed a trial

of a subset (approximately five percent) of their wells that have been allegedly

impacted by MTBE.[12]  The parties estimate that it will take at least three months to

try ten to twelve wells.  In contrast, if all 182 wells were tried before a single jury,

this estimate might grow to two years or more.  Such a trial would be untenable

because, at the very least, it would be unreasonable to expect a jury to sit for this

length of time, as well as strain limited judicial resources.

Thus, pursuant to Rule 42(b), this Court finds that a trial on all issues

with respect to a limited group of representative wells shall be held, commencing

on March 3, 2008.  Such a trial is warranted by the sheer size of this action, the

need for expeditious resolution, judicial economy, and the convenience of the

Court, the jury, and the parties.  Trying a subset of the wells in this two-plaintiff

action renders a massive, complex trial manageable.

---

[12]      Because of this, much of the precedent cited by the parties in their submissions is irrelevant.  There is no effort here to extrapolate the judgments with respect to these representative wells to the remaining wells in this action.  *See* Plaintiffs' Motion to Set Bellwether Trial of Ten Wells ("Pl. Mem.") at 8.

**B.     Defendants' Objections to the Bellwether Trial Are Meritless**

Defendants oppose plaintiffs' Motion to try a group of representative

wells by asserting that such trials are a disfavored procedure rife with dangers and

pitfalls.  While defendants may be correct that a bellwether trial raises certain

problems, these problems are not so serious as to overcome the obvious

advantages.

In arguing against plaintiffs' proposal, defendants rely heavily on the

Fifth Circuit's decision in *Chevron*.  In doing so, however, defendants fail to give

sufficient weight to the fact that the *Chevron* court explicitly approved of

bellwether trials.  As the *Chevron* court explained, "[t]he notion that the trial of

some members of a large group of claimants may provide a basis for enhancing

prospects of settlement or for resolving common issues or claims is a sound one

that has achieved general acceptance by both bench and bar."[13]

The question in *Chevron* was not whether a court could use a

bellwether trial, but rather what preclusive effects would attach to findings

resulting from that trial.  The *Chevron* court concluded that unless the

representative plaintiffs are selected by a statistically-valid, random method, the

results of a trial of representative plaintiffs could not form the basis for a judgment

---

[13]     109 F.3d at 1019.

7

affecting any action other than those brought by the representative plaintiffs.[14]
Applying that conclusion, the Fifth Circuit found that the district court's selection
method was not statistically valid and thus the first trial verdict would have no
binding effect with respect to any other plaintiff.[15]

The *Suffolk County* action does not raise the same concerns as those
discussed in *Chevron*. *Chevron* involved approximately three thousand plaintiffs
suing a single defendant for harm arising from its acts and omissions. Here, by
contrast, only two plaintiffs – Suffolk County and the Suffolk County Water
Authority – are suing more than fifty defendants for harm to approximately 182
wells owned or managed by these two plaintiffs. The extrapolation question in
this action is thus quite different than the one addressed in *Chevron* – in this
action, there is no other plaintiff who will benefit from the trial, to the detriment of
the defendants, from any verdict reached in the proposed trial of representative
wells.[16]

---

[14]   *See id.* at 1020.

[15]   *See id.* at 1021.

[16]   As plaintiffs have argued, "[t]here is no suggestion that the Trial
Wells be the basis for any extrapolated judgments to any parties or even to any
wells that have not been submitted for trial." Pl. Mem. at 4. *See also* 4/27/07 Tr.
at 35 (Mr. Issacharoff stating: "I think we should be absolutely clear, we do not
intend to extrapolate . . . .").

8

Moreover, even if a jury finds one or more of the defendants liable with respect to any of the representative wells, that finding would not establish that the particular defendant is responsible for the alleged harm to other wells. As explained below, the only preclusive effect would be with respect to common issues of tort liability. And such preclusion would attach only *if and when it is proven to a different jury that other wells in fact sustained any harm*, and even then, would only bind those defendants who were found to have caused harm to the two plaintiffs by virtue of their tortious conduct.

In short, because the results of the proposed trial of representative wells will *not* be extrapolated into a finding of liability with respect to any other well involved in this action, the proposed trial does not raise the same problems that the *Chevron* court faced.[17]

---

[17]     The proposal also avoids Seventh Amendment problems because all issues regarding the limited group of wells will be tried before a single jury. Finally, the Court should be able to direct the entry of a final judgment with respect to the jury's verdicts on claims relating to these wells, pursuant to Rule 54(b), that can be reviewed by an appellate court. *See* Fed. R. Civ. P. 54(b) ("[T]he court may direct the entry of a final judgment as to one or more but fewer than all of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.").

9

## C.    Selection of Representative Wells

Plaintiffs propose a trial that includes a mix of wells from three categories, with each category defined by the causation evidence that is available for the wells in that category: (1) a "known-source" category of wells for which the evidence can likely identify a single defendant whose conduct allegedly caused the MTBE contamination of a particular well; (2) a "multiple-source" category of wells for which the evidence will likely show that more than one defendant contributed to the MTBE contamination of a well; and (3) an "unknown-source" category of wells for which no expert can identify the source of the MTBE contamination of a well.[18] Plaintiffs' plan for selecting representative wells from the three causation categories is tentatively approved because it is likely to provide useful guidance to the parties with respect to subsequent trials or the settlement of claims regarding the remaining wells.[19] As to the particular wells that will represent each category at trial, the final selection must be approved by the Court after hearing from all counsel.[20]

---

[18]     *See* Pl. Mem. at 8-9 and Appendix.

[19]     *See Manual for Complex Litigation (Fourth)* § 22.315 (2004).

[20]     Plaintiffs have already selected eleven wells for trial. *See* June 1, 2007 Letter from Robin L. Greenwald, plaintiffs' liaison counsel and counsel for plaintiffs, to the Court, at 2. These wells are mostly from the group of wells that

**D.     Preclusion and Subsequent Trials for Remaining Wells**

The verdict reached in this trial will only bind the parties who

participate in the trial and then only if a verdict is reached as to that party.

Because all issues will be tried as to the representative wells, issue preclusion will

attach only as to those defendants against whom there is an adverse verdict and

who will then have the opportunity for appellate review.[21]  The Court envisions

that the representative-well trial jury will be asked, for each well, to answer certain

interrogatories on a special verdict form with respect to general liability, damages,

and causation.  For example, with respect to general liability, the jury might decide

the following:

> whether defendants could have provided feasible alternatives to
> MTBE;
>
> whether defendants knew of the dangers of MTBE at various
> points in time;

---

were designated as "focus wells" for discovery purposes, because the focus wells
are the only wells for which the parties have had full discovery. *See id.* at 2-3.

[21]     Collateral estoppel as to those defendants is appropriate.  Subsequent
trials regarding the remaining wells will involve issues identical to those actually
litigated and decided in the first trial, those defendants will have had a full and fair
opportunity to litigate those issues, and the jury's findings on those issues will
have been necessary to support a valid and final judgment on the merits. *See
Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979); *Liona Corp., Inc.
v. PCH Assoc. (In re PCH Assoc.)*, 949 F.2d 585, 593 (2d Cir. 1991).

11

whether defendants provided adequate warnings regarding the
dangers of MTBE; and

whether water contamination was a foreseeable result of the
use of MTBE-containing gasoline.

If general liability is established, the jury will likely be asked to decide, with

respect to damages, whether a particular well suffered a compensable injury, and,

if so, which defendants, if any, were specifically responsible for that injury.

The jury's findings on general liability will only have preclusive

effect in subsequent trials as to those defendants who are found liable to plaintiffs.

If a jury finds that certain defendants were not liable, there is no adverse verdict as

to that defendant, who therefore has no right to appeal. In the absence of a right to

appeal, there can be no preclusive effect.[22] In short, there can be no liability

without proof of injury.[23]

---

[22]     *See Concerned Citizens of Cohocton valley, Inc., v. New York State
Dep't of Envtl. Conservation*, 127 F.3d 201, 205 (2d Cir. 1997); *Ashley v.
Boehringer Ingelheim Pharms. (In re DES Litig.)*, 7 F.3d 20, 23 (2d Cir. 1993).
*See also Warner/Elektra/Atl. Corp. v. County of Dupage*, 991 F.2d 1280, 1282-83
(7th Cir. 1993) ("an unappealable finding does not collaterally estop . . . . If an
appellant is complaining not about a judgment but about a finding (here that the
[appellant] was negligent and also an inverse condemnor) – on the bottom line it
prevailed – the appeal does not present a real case or controversy. So it must be
dismissed for want of jurisdiction, and the finding will thus have no collateral
estoppel effect.").

[23]     *See* Defendants' Memorandum of Law Concerning the Three Issues
Raised by the Court at the April 27, 2007 Oral Argument ("Def. Supp. Mem.")

If there are subsequent trials regarding the remaining wells in the *Suffolk County* action, there will be issue preclusion with respect to those defendants who suffered an adverse verdict in the first trial. Thus, a subsequent jury will not reexamine the findings of the first jury. However, with respect to a defendant as to whom there was no prior adverse verdict, the subsequent jury will be asked to make findings similar to those asked of a prior jury with respect to the liability of those defendants.

This procedure does not violate the Seventh Amendment's reexamination clause which forbids a subsequent jury from re-examining a matter already decided by a prior jury.[24] As defendants argued, if a defendant is not found liable for damages to a particular well, there can no "finding" of general liability as to that defendant. Thus, *a fortiori*, a subsequent jury would not be re-examining any matter that has already been decided as to that defendant since *no matter* has been decided as to that defendant.

**E.    Punitive Damages**

The final question is whether the Court will permit plaintiffs to seek an award of punitive damages during the trial of the representative wells.

_____

at 7-12.

[24]    *See Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999).

13

Plaintiffs argue, *inter alia*, that the same jury that considers defendants' alleged

misconduct for the purpose of assessing liability and damages *must* consider the

question of whether that conduct warrants an award of punitive damages. If a

different jury was asked to make that assessment, then a subsequent jury might, in

effect, be re-examining the conclusions of a prior jury, which is forbidden by the

Seventh Amendment.[25]  Plaintiffs also argue that the failure to present the request

for punitive damages to the first jury would jeopardize the parties' ability to seek

appellate review[26] because certification under Rule 54(b) requires that a judgment

be final – *i.e.*, that it "ends the litigation on the merits and leaves nothing for the

court to do but execute the judgment."[27]

       Defendants, in turn, argue that if each successive jury is permitted to

award punitive damages, there is a real risk that these successive awards would

unduly increase the amount of the total award of punitive damages.[28]  Defendants

---

[25]     *See* Plaintiffs' Supplemental Submission Regarding Trial Plan at 8.

[26]     *See id.* at 10.

[27]     *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978). *Accord International Controls Corp v. Vesco*, 535 F.2d 742, 748 (2d Cir. 1976) (holding that a judgment "cannot be considered final as long as it leaves open the question of additional damages").

[28]     *See* Def. Supp. Mem. at 3 (citing *King v. Macri*, 993 F.2d 294 (2d Cir. 1993)).

make the related argument that a jury must know the total amount of compensatory

damages before making a punitive damages award because such an award must

bear a reasonable relationship to the total harm suffered by the plaintiff.[29]

Finally, in yet another related argument, defendants contend that a

punitive damages award must be "proportionate to the amount of harm to the

plaintiff and to the general damages recovered."[30]  Because the economic harm for

a five-percent subset of wells (the number of wells proposed for the first trial), is

far less than the possible total damages based on all of the wells, defendants fear

that the jury will award a higher multiple of the compensatory damages than they

might otherwise award if the total damages figure was significantly higher.[31]

Thus, for example, if a jury believed that the total harm to plaintiffs was

$200 million, it might award a punitive damages multiplier of 2:1. But if the same

jury had realized that the total harm was twenty times that figure ($4 billion), it

might only have awarded a punitive damages multiplier of 1:1.

---

[29]     *See id.* (citing *Philip Morris U.S.A. v. Williams*, 127 S. Ct. 1057
(2007); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *BMW of
N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)).

[30]     *Campbell*, 538 U.S. at 426.

[31]     *See* Def. Supp. Mem. at 4-5.

15

Both sides make compelling arguments: there is no final judgment

unless a punitive damages verdict is taken; yet if punitive damages are awarded,

there is a risk that the award will not be proportionate to the total harm caused by

defendants' alleged egregious conduct. After weighing all of the arguments, I

conclude, for the following reasons, that plaintiffs must be allowed to seek, and

possibly obtain, a punitive damages award at the close of the first trial.

*First*, it is axiomatic that punitive damages are based on a defendant's

overall conduct as well as the harm to plaintiff.[32] Plaintiffs intend to present *all* of

the evidence regarding defendants' alleged egregious conduct in the liability phase

of the first trial. Such evidence is *not* well specific. Thus, the first jury will have a

complete presentation as to the conduct allegedly engaged in by those defendants

it finds liable for compensatory damages.

*Second*, each jury will be instructed that it is only hearing evidence as

to a subset of the wells that plaintiffs allege have suffered damage as a result of

MTBE contamination. Each jury will be further instructed that it cannot consider

---

[32]     *See Campbell*, 538 U.S. at 425. *See also Philip Morris*, 127 S. Ct. at
1062-63 (explaining that whether a punitive damages decision is excessive
depends upon (1) the reprehensibility of the defendant's conduct, (2) whether the
award bears a reasonable relationship to the actual and potential harm caused by
the defendant to plaintiff or plaintiffs, and (3) the difference between the award
and sanctions imposed in comparable cases) (citing *BMW*, 517 U.S. at 575-85).

16

*damage* to wells other than those currently on trial because there will be no proof
at that trial as to whether those other wells sustained any damage, nor proof of
who is responsible for damage, if any, to the other wells. Nonetheless, the jury
will know that it is trying only a subset of the potential claims.

Such a jury instruction is not unusual. For instance, it is no different
from an action in which a plaintiff sues the manufacturer of Vioxx: the jury
knows that there are other, similar actions pending. Indeed, the Supreme Court
has made it clear "a plaintiff may show harm to others in order to demonstrate
reprehensibility[,]" a "part of the punitive damages constitutional equation."[33] At
the same time "a jury may not go further than this and use a punitive damages
verdict to punish a defendant directly on account of harms it is alleged to have
visited on nonparties."[34]

Thus, a court must properly instruct a jury because "it is
constitutionally important for a court to provide assurance that the jury will ask the
right question,.not the wrong one."[35] Yet, once the jury is properly instructed,
plaintiffs are allowed to show alleged harm to others in order to demonstrate

---

[33]    *Philip Morris*, 127 S. Ct. at 1063-64.

[34]    *Id.* at 1064.

[35]    *Id.*

17

reprehensibility of defendants' conduct (which conduct plaintiffs will have already

proved directly harmed them). As the Supreme Court recently stated:

> Evidence of actual harm to nonparties can help to show that the
> conduct that harmed the plaintiff also posed a substantial risk of
> harm to the general public, and so was particularly
> reprehensible – although counsel may argue in a particular case
> that conduct resulting in no harm to others nonetheless posed a
> grave risk to the public, or the converse.[36]

While there are no nonparties here, there are other wells that will not be

considered at the first trial. By analogy, each jury may consider the alleged harms

to other wells as evidence of reprehensibility, but may not directly punish

defendants for such alleged harms.

Moreover, plaintiffs could have brought 182 separate lawsuits, each

alleging damage to a single well.[37] While this would have created an

administrative nightmare for the courts, it is unlikely that defendants would have

(or could have) argued that each of these 182 actions would need to be tried before

a jury could consider punitive damages. In the end, it makes little sense to reach a

different result based on plaintiffs' pleading choices at the outset of this complex

litigation – choices that benefitted both the parties and the courts.

_____

[36]     *Id.*

[37]     *See* 4/27/07 Tr. at 38.

18

*Finally*, each jury will only be permitted to award a ratio or multiplier, rather than any dollar figure.[38]  If, at the end of the trials of all of the wells in the *Suffolk County* action, the Court concludes that the later punitive damages awards, if any, are disproportionate to the total harm, it can strike any later punitive damages award, leaving only the first, or the earliest, award(s).[39]  For these reasons, plaintiffs may seek a punitive damages award at the trial of the representative wells against any defendant that is determined to be liable for compensatory damages.

For the foregoing reasons, plaintiffs' Motion to Set Bellwether Trial of Ten Wells is granted in part and denied in part.  The Clerk of the Court is directed to close this Motion (document # 1359).

SO ORDERED:

Dated:         New York, New York
               June 15, 2007

Shira A. Scheindlin
U.S.D.J.

---

[38]  *See id.* at 69-74.

[39]  *See Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 434-35 (1994) (holding that the Constitution requires meaningful post-verdict judicial review in which the court has the power to reduce an excessive punitive damages award); *see also id.* at 421  ("Judicial review of the size of punitive damages awards has been a safeguard against excessive verdicts for as long as punitive damages have been awarded.").

19

## -Appearances-

### Liaison Counsel for Plaintiffs and Counsel for *Suffolk County* Plaintiffs:

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York  10038
Tel: (212) 558-5500

### Counsel for *Suffolk County* Plaintiffs:

Carla M. Burke, Esq.
Scott Summy, Esq.
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas  75219
Tel: (212) 523-6267

Samuel Issacharoff, Esq.
40 Washington Square South
New York, New York  10012
Tel: (212) 998-6580

### Liaison Counsel for Defendants:

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York  10020
Tel: (212) 547-5583

20

**Counsel for Defendants ChevronTexaco Corporation (n/k/a Chevron Corporation), Chevron U.S.A. Inc., TRMI Holdings Inc., Texaco Inc., and Chevron Environmental Services Company:**

Robert E. Meadows, Esq.
Charles C. Correll, Jr., Esq.
King & Spalding LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Tel: (713) 751-3200

Richard E. Wallace, Jr., Esq.
William F. Hughes, Esq.
Wallace King Domike & Branson PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Tel: (202) 204-1000

Sheila L. Birnbaum, Esq.
Barbara Wrubel, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-2450

21