Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re:  Methyl Tertiary Butyl Ether
("MTBE") Products Liability Litigation

Master File No. 1:00-1898
MDL No. 1358 (SAS)
M21-88

-------------------------------------------------------------------X

**This Document Relates To:**

-------------------------------------------------------------------X

*County of Suffolk and Suffolk County Water
Authority v. Amerada Hess Corp. et al.*, 04 Civ. 5424

-------------------------------------------------------------------X

## PLAINTIFFS' SUPPLEMENTAL SUBMISSION REGARDING TRIAL PLAN

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**..................................................................................1

**ARGUMENT**...........................................................................................................1

I.   **Punitive Damages Should Follow Findings on Liability In each Trial**.......................................................................................................1

    A.   Allowing a punitive damages multiplier ensures constitutionality..........2

    B.   Defendants will suffer no prejudice by trying punitive damages as part of each trial.......................................................................................5

    C.   Putting off punitive damages needlessly raises constitutional and appealability issues.................................................................................7

II.   **The Jury's Findings on General Liability May Be Applied to the Same Parties in Subsequent Trials of the SCWA Case**................................11

III.   **Reverse Bifurcation Makes No Sense for MTBE Litigation**...........................................................................................12

**CONCLUSION**......................................................................................................15

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Sam Airlines*,
    1997 WL 1179955, *5-6 (E.D.N.Y. 1997)……………………………………………15

*Angelo v. Armstrong World Indus., Inc.*,
    11 F.3d 957, 963 (10th Cir.1993)……………………………………………………..14

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559, 575 (1996))………………………………………………………...4, 7

*Campolongo v. Celotex Corp.*,
    681 F.Supp. 261, 262 (D.N.J. 1988)…………………………………………………15

*Capital Distribution Services, Limited v. Ducor Exp. Airlines, Inc.*,
    462 F.Supp.2d 354, 357-358 (E.D.N.Y. 2006)………………………………………11

*Cimino v. Raymark Industries, Inc.*,
    151 F.3d 297 (5th Cir. 1998)…………………………………………………………...2

*Citizens Accord, Inc. v. Town of Rochester, N.Y.*,
    235 F.3d 126, 128 (2d Cir. 2000)………………………………………….…11

*Coopers & Lybrand v. Livesay*,
    437 U.S. 463, 467 (1978)……………………………………………………...11

*Exxon Corp. v. Jarvis Christian College*,
    1991 WL 771247, *1 (E.D.Tex. 1991)………………………………………………15

*Hilao v. Estate of Marcos*,
    103 F.3d 767, 781 (9th Cir. 1996)……………………………………………...4

*In re Chevron U.S.A., Inc.*,
    109 F.3d 1016, 1020 (5th Cir. 1997) ………………………………………….1

*In re New Orleans Train Car Leakage Fire Litig.*,
    795 So.2d 364, 380 (La.App. 4th Cir. 2001)……………………………….....4

*In re New York County DES Litigation*,
    211 A.D.2d 500, 500, 621 N.Y.S.2d 332, 333 (N.Y.A.D. 1 Dept. 1995)……………15

*In re Shell Oil Refinery*,
    136 F.R.D. 588, 594 (E.D.La. 1991)…………………………………………………5

*In re Simon II Litigation,*
    407 F.3d 125, 139 (2d Cir. 2005)………………………………………………………4, 7, 14

*International Controls Corp. v. Vesco,*
    535 F.2d 742, 748 (2d Cir. 1976)……………………………………………………...12

*Jenkins v. Raymark Industries, Inc.,*
    782 F.2d 468, 474 (5th Cir. 1986)…………………………………………………...2, 4, 5

*Kasali v. Tereshko,*
    2002 WL 32348342, *1 (E.D.Pa. 2002)……………………………………………15

*Lee v. Edwards,*
    101 F.3d 805, 809 (2d Cir.1996) ……………………………………………………4, 7

*Liona Corporation, Inc. v. PCH Associates* (In re PCH Associates),
    949 F.2d 585, 593 (2d Cir.1991)……………………………………………………12

*Parklane Hosiery Co., Inc. v. Shore,*
    439 U.S. 322, 326 (1979)………………………………………………………...12

*Pioli v. Morgan Guar. Trust Co. of New York,*
    199 A.D.2d 144, 144-145, 605 N.Y.S.2d 254, 255 (N.Y.A.D. 1 Dept. 1993)………….15

*Ryan v. N.Y. Telephone Co.,*
    62 N.Y.2d 494, 500 (N.Y. 1984)……………………………………………………...12

*Silivanch v. Celebrity Cruises, Inc.,*
    2000 WL 1211578, *4 (S.D.N.Y. 2000)……………………………………………11

*Simon v. Philip Morris Incorporated,*
    200 F.R.D. 21, 32 (E.D.N.Y. 2001)……………………………………………………..14

*Smith v. C.I.R.,*
    2001 WL 1505917, *3 (U.S.Tax Ct. 2001)……………………………………………15

*State ex rel. Atkins v. Burnside,*
    212 W.Va. 74, 85, 569 S.E.2d 150, 161 (W.Va. 2002)…………………………………14

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003)……………………………………………………………...*passim*

*Stevens v. Owens-Corning Fiberglas Corp.,*
    49 Cal.App.4th 1645, 1663 (Cal.App. 1 Dist. 1996)…………… …………………..3

*TVT Records v. Island Def Jam Music Group*,
    279 F.Supp.2d 413, 440 (S.D.N.Y. 2003)……………………………………………...6

*Walker Drug Co., Inc. v. La Sal Oil Co.*,
    972 P.2d 1238, 1245 (Utah 1998)………………………………………………………..14

## **PRELIMINARY STATEMENT**

Pursuant to the Court's instructions at the April 27, 2007 hearing in this matter, Plaintiffs submit this post-hearing memorandum on three questions.  First, Defendants claim that punitive damages should be determined at the end of the last trial of Suffolk County wells, rather than at the conclusion of each trial.  Plaintiffs contend that there is no legal authority for this claim, that it would unnecessarily raise Seventh Amendment issues, and that it would not advance the interests of efficient resolution of this case.  Second, Defendants argue that there is no preclusive effect of any jury findings in the first trial of the Suffolk County wells on any parties in the subsequent trials of the Suffolk County Water Authority (SCWA) case. Plaintiffs contend that the jury's findings on general liability may be applied to the same parties in subsequent trials of the SCWA case. Third, Defendants argue that this case should be subject to a form of reverse bifurcation, with well-specific harms tried before a comprehensive presentation on the nature of MTBE and the history and culpability surrounding its introduction into the nation's water system.  This proposal is not only unprecedented, but under the facts of this case it makes no sense at all.

## **ARGUMENT**

**I.    Punitive Damages Should Follow Findings on Liability In Each Trial**

Although there is little authority discussing the proper timing for assessment of punitive damages in a phased case, there is no authority compelling the delay of the determination or holding that it would be improper to decide punitives at the end of the trial of the first group of SCWA wells. So long as punitive damages are within a tolerable multiplier of actual damages, the determination of such damages at the end of each trial will be constitutionally proper, will cause no prejudice to defendants, and will avoid Seventh Amendment and trial management problems.

### A.    *Allowing a Punitive Damages Multiplier Ensures Constitutionality*

According to defendants, it would be unconstitutional to assess punitive damages for any proven harms until the total extent of damages for all harms in Suffolk County has been determined. The crux of this argument is that the total amount of compensatory damages *for all wells* must be known before punitive damages *for all wells* can be assessed because the ratio between the two *total* amounts must be proper. This argument overlooks a simple solution: applying the ratio at the conclusion of the trial of each discrete set of wells provides constitutional protection to the Defendants from excessive punitive damages.

The parties can protect against excessive awards by the use of a multiplier - as Plaintiffs proposed - which would ensure that no award of punitive damages, either in the first case or any subsequent one, would result in any awards not being proportional to the actual injury suffered. The use of a multiplier has been approved by *State Farm Mut. Auto. Ins. Co. v. Campbell*, which instructs that "[s]ingle-digit multipliers are more likely to comport with due process." 538 U.S. 408, 422-423 (2003); *see also Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 474 (5th Cir. 1986) ("[T]he jury could be allowed to award an amount of money that each class member should receive for each dollar of actual damages awarded."); *Cimino v. Raymark Industries, Inc.*, 151 F.3d 297 (5th Cir. 1998). Additionally, a court may instruct the jury regarding the existence of additional trials, previous and subsequent, in which punitive damages had been or might be awarded based on the specific injuries at issue in those trials. *See, e.g., Stevens v. Owens-Corning Fiberglas Corp.*, 49 Cal.App.4th 1645, 1663 (Cal.App. 1 Dist. 1996) ("[J]uries are capable of properly evaluating the impact of other awards against the defendant when weighing the deterrent effect of a punitive damage award. An appropriate instruction can be given to ensure that the evidence of other awards

is not used to increase punitive damages, but only to decrease them if the jury concludes the level

of deterrence and punishment already imposed justifies a lesser award, or no award at all.").

Defendants believe that *State Farm*'s requirement that conduct relevant to the punitive

damages analysis have a nexus to the specific harm suffered by the plaintiff compels this Court to

delay the assessment of punitive damages *for all wells* until the jury has determined compensatory

damages *for all wells*. But *State Farm* guarantees only the nexus; it does not at all mandate that this

analysis may only be performed on an aggregate basis. Nor does it instruct that due process is

violated if successive determinations are made, as proposed here. As a practical matter, Plaintiffs'

plan may provide for a stronger nexus between actual harm and punitive damages because the

punitive damages for each set of wells will be found by the same jury that decided compensatory

damages for those wells.

Plaintiffs are aware of no cases that have overturned an award of punitive damages that did

not exceed a single-digit multiplier of actual damages as being constitutionally excessive. Awards

of punitive damages are frequently not sustained on their facts but not at the level of constitutional

abstraction posited by defendants when confined to a proper multiple of actual damages. The law

in the Second Circuit in light of the most recent Supreme Court punitive damages cases defines the

relevant legal inquiry as: "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of

punitive damages to compensatory damages; and (3) the difference between this remedy and the civil

penalties authorized or imposed in comparable cases." *Lee v. Edwards,* 101 F.3d 805, 809 (2d

Cir.1996) (*quoting BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Further, the Second

Circuit in *In re Simon II* read the subsequent decision in *State Farm* as follows: "*State Farm* made

clear that conduct relevant to the reprehensibility analysis must have a nexus to the specific harm

3

suffered by the plaintiff, and that it could not be independent of or dissimilar to the conduct that harms the plaintiff." *In re Simon II Litigation,* 407 F.3d 125, 139 (2d Cir. 2005).

Recent Supreme Court rulings in this area of law do not change this analysis. Courts analyzing these recent decisions indicate that the reasonableness of the relationship between punitive damages and compensatory damages need not be considered prior to the determination of both damage awards. *See In re New Orleans Train Car Leakage Fire Litig.*, 795 So.2d 364, 380 (La.App. 4th Cir. 2001) ("[T]he lack of a determination of compensatory damages as to all class members as of the time of trial of the amount of punitive damages is irrelevant, as least in terms of constitutional Due Process, because there are no Due Process requirements that the jury consider the amount of compensatory damages when determining the amount of punitive damages."); *see also Jenkins*, 782 F.2d at 474 ("While no plaintiff may receive an award of punitive damages without proving that he suffered actual damages, the allocation need not be made concurrently with an evaluation of the defendant's conduct. The relative timing of these assessments is not critical") (internal citations omitted); *Hilao v. Estate of Marcos*, 103 F.3d 767, 781 (9th Cir. 1996) (rejecting the idea "that a punitive damage award *must* in all cases be determined after an award of compensatory damages, since compensatory damages will not include recovery for harm that was likely to have occurred but did not actually occur.")(emphasis in original).

There is even authority that punitive damages can be fixed at the end of the first trial for the entirety of the conduct. For example, a district court in Louisiana rejected the exact type of delay proposed here. In a class action arising out of an explosion at a Shell refinery, Shell argued that each of the 20,000 claimants would have to prove actual damages before an amount of punitive damages could be calculated. *In re Shell Oil Refinery*, 136 F.R.D. 588, 594 (E.D.La. 1991). As Defendants

4

argue here, Shell contended that the jury had to know the total amount of compensatory damages awarded before it could determine an amount of punitive damages that bears a rational relation and is proportionate to actual damages. *Id.* Noting that this same argument was rejected in *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 474 (5th Cir.1986), the *In re Shell* court reasoned that "unlike compensatory damages which vary from plaintiff to plaintiff, punitive damages focus on the defendant's conduct which, in this case, is identical for all claimants." *Id.* at 595. The court explained that the trial of twenty representative claimants' actual damages would give the jury "a fair context in which to assess the defendant's conduct and fix a single punitive award for the class." *Id.* And the court observed that two steps would ensure a reasonable relationship between compensatory and punitive damages: first, punitives would be stated as a multiplier of actual damages; second, the court would be able to review the reasonableness of the relationship between the punitive damages and the actual injury. *Id.* at 595-596. The same analysis is relevant here.

B. ***Defendants Will Suffer No Prejudice by Trying Punitive Damages As Part of Each Trial***

Plaintiffs anticipate that Defendants will unduly emphasize the following quotation from *State Farm:*

> When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

*State Farm,* 538 U.S. at 425. The crux of the Defendants' argument will probably be that one cannot ensure the right level of punitives until all the compensatories are known. Consequently, they will likely argue, Suffolk County cannot claim punitives without an overall compensatory amount being known. They would be wrong. In one opinion, Judge Marerro explicated on the implications of this

5

passage:

> The magnitude of compensatory damages awarded for a particular offense is pertinent to the analysis of excessiveness on two grounds. First, the extent of actual or potential injuries inflicted by extreme wrongdoing may shed light on the degree of culpability reflected in defendant's state of mind and thus serve as an index of the severity of the underlying misconduct. Second, the size of the compensatory award may reflect the extent to which components of the same harm may also have been incorporated in punitive damages, and thus represent duplicative penalty and multiple recovery for the same injury.

*TVT Records v. Island Def Jam Music Group*, 279 F.Supp.2d 413, 440 (S.D.N.Y. 2003).

Neither of these opinions, however, addresses the limited facts of this case in which a series of claims between the same parties necessitates the division of trials on discrete but related claims. Under these circumstances, each jury will be aware of the overarching fact of Defendants' contamination of the Long Island aquifer and will hear proof of how that has caused the well-by-well contamination presented for the divided subjects of trial. Thus, as Judge Marerro observed, each jury will be able to make the critical determination "of the extent of actual or potential injuries" in determining the ratio of punitive damages to assign.

Moreover, even assuming that Defendants are right in their central claim on the potential need to revisit punitive damages once the total amount of compensatories is known, this can easily be handled by a motion for a set off in the last award of damages to offset any excesses in punitive damages awarded earlier on. It must be remembered that what is being proposed is two or more trials between the same parties, such that any diminution in earlier awards can be handled as an offset against later awards. This is a practical solution, even assuming that Defendants are correct in reading *State Farm* to impose a lower constitutional limit on punitive damages in cases of great harm – itself a bizarre and rather arresting proposition.

6

It should also be noted that there may be an important value in *raising* the amount of punitives allowed in later trials if the earlier compensatory awards were *too low*. Much as the Defendants are all in thrall over recent Supreme Court punitive damages cases, the Court in *BMW v. Gore* actually cautioned that punitives might be *too low* in cases in which there is egregious conduct that resulted in low levels of damages or even in damages that are hard to specify:

> Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

517 U.S. at 582. Ironically, the only Second Circuit cases to reverse the use of a multiplier have done so in the context of actual damage awards that are too low to deter the underlying conduct. As stated in the leading case on point: "In *Gore*, a 500 to 1 ratio was 'breathtaking.' However, in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration. Since the use of a multiplier to assess punitive damages is not the best tool here, we must look to the punitive damage awards in other civil rights cases to find limits and proportions." *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996).

## C.    *Putting Off Punitive Damages Needlessly Raises Constitutional and Appealability Issues*

In light of *In re Simon II*, it appears risky to allow any case to proceed in which the jury that determines punitive damages is distinct from the jury that determines actual damages.

Consider what would happen if there were evidence in the first trial of particularly egregious conduct concerning the conduct of one or several defendants in a particular spill that contaminated a specific well. Clearly, the particulars of the underlying conduct would be a relevant fact in finding

7

liability and assessing damages.   Under all relevant legal standards, however, the particulars of the underlying conduct – its egregiousness, wantonness, disregard for harm to others – would also be relevant to a jury's award of punitive damages for this conduct.

Under the Defendants' proposal, the jury that would assess the underlying conduct for purposes of liability and damages would be different from the one that would assess the exact same conduct for punitive damages purposes.  The second jury could have the same exact assessment of the underlying conduct, *or* it might not.  The second jury could as easily assess the conduct giving rise to the contamination of a particular well as being more or less egregious.  This is, of course, a classic (and entirely avoidable) invitation to one jury reviewing the determination of another, precisely what is forbidden by the Reexamination Clause of the Seventh Amendment.

To determine general liability, the jury would hear evidence that Defendants fully understood — as early as 1979 — the dangers of MTBE and the potential costs to clean up water supplies but chose to add MTBE to gasoline anyway.  The documents and testimony that show the refiners' decision to use MTBE despite actual knowledge would also support the jury's finding that such a decision was egregious, wanton, and made with conscious disregard for others.

For example, Plaintiffs will present testimony and documents demonstrating Shell's awareness of MTBE's risks and its decision to use MTBE.[1]  In a 1981 memorandum, a Shell employee explains that Shell has been involved in the contamination of a town's drinking water with MTBE.  The author cautioned that because approximately 20% of all underground storage tanks leak, the possibility of groundwater contamination should be considered.  In a prior deposition, T.J.

---

[1] Plaintiffs refer to evidence here simply to provide factual context for their proposal. Plaintiffs have not attached the actual documents and testimony discussed but will provide them to the Court if requested.

Kirkpatrick, who was a staff engineer at Shell, admitted that by 1983, he was aware that MTBE was

showing up in water systems.  Therefore, in the early 1980's, Shell not only knew that MTBE had

characteristics such that if it were released into the environment it would contaminate drinking water

supplies and would be more difficult to remediate, Shell was also fully aware that very low levels

of MTBE in a drinking water supply would still cause taste and odor problems rendering the water

undrinkable.  An internal study conducted in 1998 showed that Shell's earlier fears had been well

founded:  the study found MTBE at 98.6% of tested sites owned by Equilon, (formed by the merger

of Shell and Texaco), and that MTBE concentrations exceeded 100 ppb at 80% of those sites and

exceeded 200 ppb at 75% of those sites.  In a 1998 internal email, Curt Stanley of Shell, who

previously circulated his opinion that "MTBE and similar oxygenates should not be used at all in

areas where groundwater is a potential drinking water supply," warned that MTBE contamination

would be a problem for Shell:

> I know that you are beginning to feel the heat (it will get much hotter).  As you are
> aware, MTBE is one of the biggest environmental issues that U. S. oil companies are
> facing due to 1) MTBE's wide occurrence in groundwater, 2) MTBE's high
> migration potential, 3) MTBE's impact on several high visibility municipality well
> systems, 4) MTBE's very low odor and taste thresholds, and 5) the difficulty and
> high cost associated with treating MTBE in water.  My first association with MTBE
> was in 1980 at Rockaway, New Jersey, where 400 people were tasting ether (MTBE
> and DIPE) in their water supplied from a municipal well.  The problem in the U.S.
> is now much worse.

Similarly, Plaintiffs will show that Exxon chose to add MTBE to its gasoline despite repeated

warnings from its own environmental engineer, Barbara Mickelson.  In a 1984 memorandum, she

estimated that the number of the well contamination incidents would increase three times following

the widespread introduction of MTBE into Exxon's gasoline.  She also warned that remediation

would take longer and that treatment costs would be higher by a factor of five.  She calculated that

the use of MTBE would increase Exxon's contamination incidents from 62 to over 300 and related costs from $6.5 M [million] to over $40M million. Ms. Mickelson specifically acknowledged that Exxon could be required to remediate it from water supplies based on its taste and odor characteristics. In 1986, she advised management at Exxon not to add MTBE to gasoline on a blanket basis in the United States – including the east coast. Management failed to take her advice and made the conscious decision to add MTBE nationwide despite specific knowledge of the damages that would occur.

These are just a few examples of the type of evidence that will be central to the jury's determination of general liability questions and critical for the jury's finding of culpability sufficient to support punitive damages as well. Defendants' plan would have two juries looking at the same documents and making culpability determination concerning the same wells. That is needless and entirely avoidable reexamination.

Moreover, Defendants' proposal would needlessly compromise the ability of the parties to get an appealable judgment at the end of the first trial.

An important consequence of delaying the determination of punitive damages is that the judgment for the first group of wells would not be final and appealable until that determination. Federal Rule of Civil Procedure 54(b) provides that a court may enter a judgment as to fewer than all of the claims as long as that judgment is "final" — i.e., that it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978); *Citizens Accord, Inc. v. Town of Rochester, N.Y.*, 235 F.3d 126, 128 (2d Cir. 2000); *Capital Distribution Services, Limited v. Ducor Exp. Airlines, Inc.*, 462 F.Supp.2d 354, 357-358 (E.D.N.Y. 2006); *Silivanch v. Celebrity Cruises, Inc.*, 2000 WL 1211578, *4 (S.D.N.Y.

2000) (not reported). The Second Circuit has explained that a judgment "cannot be considered final as long as it leaves open the question of additional damages." *International Controls Corp. v. Vesco*, 535 F.2d 742, 748 (2d Cir. 1976).

Accordingly, the proposal to delay punitives not only needlessly raises constitutional difficulties, it also compromises the ability of the parties to seek appellate review of the myriad difficult legal issues in this case.

II.    **The Jury's Findings on General Liability May Be Applied to the Same Parties in Subsequent Trials of the SCWA Case**

As discussed in Plaintiffs' Motion to Set Bellwether Trial of Ten Wells, the jury's findings on general liability issues could be applied to the remaining SCWA wells. Defendants could be collaterally estopped from relitigating common threshold issues determined by the first jury. Those issues include whether Defendants were negligenct in adding MTBE to gasoline, whether MTBE is a defective product, whether Defendants failed to warn, etc. Trial courts have broad discretion in applying collateral estoppel, whose purpose is to promote judicial economy by preventing needless litigation. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979); see *Ryan v. N.Y. Telephone Co.*, 62 N.Y.2d 494, 500 (N.Y. 1984).    There is no question that it could be applied in this case because any subsequent trial of additional SCWA wells would involve (1) findings on identical issues; (2) those issues were actually litigated in the first trial and actually decided; (3) there was full and fair opportunity to litigate those issues the first trial; and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. See *Liona Corporation, Inc. v. PCH Associates* (In re PCH Associates), 949 F.2d 585, 593 (2d Cir.1991) (citations omitted).

**III.    Reverse Bifurcation Makes No Sense for MTBE Litigation**

In our initial submission to this Court, plaintiffs proposed that the jury be asked to make findings at the conclusion of a first phase of trial on the overall liability of the defendants. We cited *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997) and a handful of other cases, mostly from the Fifth Circuit, on the use of binding phased trials. These cases, together with Rule 42(b) of the Fed. R. Civ. P,. give the Court the authority to do so.

In response, Defendants propose to present the jury with a truncated initial presentation that addresses only the harm to specific wells. It is hard to make sense of this proposal. Imagine that a jury were presented evidence that a specific well had an MTBE level of 30 ppb, 10 ppb, 5 ppb, or 0.5 ppb. What would that possibly mean to a lay jury? In order to make sense of this, the Plaintiffs would have to present evidence of the nature of MTBE and its potential harms. Plaintiffs would have to explain how MTBE got there and who made the decision to add it to gasoline. The Defendants in turn would want to present evidence of the relevant MCLs and of the actions taken or not taken by the Plaintiffs to remediate on their own. The Plaintiffs would counter with the pervasiveness of the harm, the difficulty and cost of treatment, the knowing irresponsibility of the Defendants in allowing this state of affairs to develop, what could have been done to avoid it, and so forth. And then the Defendants would no doubt claim that alternatives were not available and that this was the best oxygenate available, and so on. In other words, a jury simply could not  make an informed judgment about any well absent an understanding of the world of MTBE. Unlike other torts where such strategies might be employed, here there is one inescapable fact. There is MTBE in the water and it did not get there from any source other than gasoline. Any assessment of what harm is compensable or not can only emerge from an understanding of the entire case.

12

Reverse bifurcation would have the jury stumbling in the dark. The jury would have to decide whether a particular well was "injured" and assess damages for that well before it heard evidence of what Defendants knew about groundwater contamination from MTBE *before* deciding to add it to gasoline, details about MTBE's characteristics, of the levels of contamination associated with taste and odor and health problems, the extent of the problem, and - more fundamentally - what MTBE is, why it was used, and how it gets into the environment. The jury should not be asked to quantify the harm to a well without understanding first what that harm is. Plaintiffs most strenuously oppose any trial plan that would preclude a sensible ordering of proofs and that would risk turning trial into some sort of roulette wheel of impressionistic jury assessments whether 5 or 7 or 11 ppb is a winning number.

Moreover, under this scenario, it is hard to see how trial could be managed. In order to avoid the overall liability phase of the trial, the Defendants would have to prevail on all trial wells (whether 8, 10, or all 20). But for each of those wells, both parties would then have to present detailed and scientific evidence regarding, at least, (1) the hydrogeology of the well and how the contamination plume has moved over time; (2) the costs of treatment based on the particular characteristics of that well; (3) identification of source of the MTBE and possible title tracing to a make-whole Defendant(s); and (4) injury to the well including taste and odor complaints and costs for monitoring, testing, and treatment.

Those issues are not well-established with respect to the types of claims that Plaintiffs assert against Defendants. As Defendants have often reminded the Court, this is an "immature" tort.[2] As

---

[2] *See*, *e.g.*, remarks of Rick Wallace, Transcript of Status Conference, November 10, 2006, pp. 61-62 ("This is the quintessential immature tort. From our perspective, as you know, we regard the claims as naught. This much has to be acknowledged. Not one of these cases has

such, it is simply not ready for reverse bifurcation, which has been considered useful "where the parties have excellent information about the likelihood of success on the issue of liability and the real sticking points are the individual issues of causation and damages." *Simon v. Philip Morris Incorporated*, 200 F.R.D. 21, 32 (E.D.N.Y. 2001). *See also In re Simon II Litigation*, 211 F.R.D. 86, 187 (E.D.N.Y. 2002) (citing *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 963 (10th Cir.1993), which approved reverse bifurcation in asbestos case where the procedure would save time and money and would not prevent plaintiffs from developing a history of their exposure to defendant's product). This does not describe the state of MTBE litigation: the parties have scant information about the likelihood of success, the liability issues are hotly debated, and the points of contention far outnumber individual causation and damages. In such a case, reverse bifurcation is inappropriate: "In light of the issues to be analyzed and the complexity of the litigation . . . reverse bifurcation would result in significant confusion of the complex issues" and would not "permit the parties to present evidence in an organized and effective order." *State ex rel. Atkins v. Burnside*, 212 W.Va. 74, 85, 569 S.E.2d 150, 161 (W.Va. 2002) (reverse bifurcation was improper in personal injury and wrongful death actions arising out of exposure to toxic chemical substances).

Because it is useful in only limited circumstances, reverse bifurcation is considered inappropriate in most cases. In declining to reverse bifurcate a case involving gasoline contamination of private landholdings by neighboring gas stations, the Utah Supreme Court observed that reverse bifurcation "has been used only rarely in complex asbestos-related litigation" and "so drastic a technique has never been employed in Utah." *Walker Drug Co., Inc. v. La Sal Oil Co.*, 972

_____

been tried to a full conclusion, not one."); remarks of Sheila Birnbaum, Transcript of Status Conference, April 27, 2007, p. 52.

P.2d 1238, 1245 (Utah 1998); *see also Campolongo v. Celotex Corp.*, 681 F.Supp. 261, 262 (D.N.J. 1988) (suggesting that reverse bifurcation is an "extraordinary" case management technique necessitated by the magnitude of the asbestos caseload).

Indeed, outside the asbestos context, reverse bifurcation has been employed in only a handful of cases, each based on highly idiosyncratic, case-specific facts. *See, e.g., Kasali v. Tereshko*, 2002 WL 32348342, *1 (E.D.Pa. 2002) (not reported) (ordering that attorneys' affirmative defense to legal malpractice be determined before their liability to former clients); *Smith v. C.I.R.*, 2001 WL 1505917, *3 (U.S.Tax Ct. 2001) (ordering that the question of damages be decided before liability in tax proceeding); *Anderson v. Sam Airlines*, 1997 WL 1179955, *5-6 (E.D.N.Y. 1997) (not reported) (ordering determination of damages first because defendant airline would not settle wrongful death case without an agreement as to how proceeds would be divided among family members); *Exxon Corp. v. Jarvis Christian College*, 1991 WL 771247, *1 (E.D.Tex. 1991) (requiring that Exxon first prove it had suffered loss in action for reimbursement from royalty interest owners and working interest owners of an oil field); *In re New York County DES Litigation*, 211 A.D.2d 500, 500, 621 N.Y.S.2d 332, 333 (N.Y.A.D. 1 Dept. 1995) ("The direction of a damages trial as the first part of a reverse-bifurcated proceeding was, under the unique circumstances of this case, not an improvident exercise of discretion."); *Pioli v. Morgan Guar. Trust Co. of New York*, 199 A.D.2d 144, 144-145, 605 N.Y.S.2d 254, 255 (N.Y.A.D. 1 Dept. 1993) (reverse bifurcation in action alleging violation of Labor Law § 200 resulting in injury to worker).

## CONCLUSION

Any argument for reverse bifurcation in this case cannot overcome the numerous practical objections to using such a procedure here. Considerations of juror comprehension, judicial economy,

15

and fundamental trial fairness are best served by denying this unusual request.

Dated: May 14, 2007
New York, New York

Respectfully submitted,

_____
Robert J. Gordon (RG-3408)
Robin Greenwald (RG-9205)
*Plaintiff's Liaison Counsel*
180 Maiden Lane, 17th Floor
New York, New York 10038
(212) 558-5500

Scott Summy
Carla Burke
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
(214) 521-3605

Samuel Issacharoff
Reiss Professor of Constitutional Law
NYU School of Law
40 Washington Square South
New York, New York 10012

**ATTORNEYS FOR PLAINTIFFS**

cc: All Counsel (*via liaison counsel*)

## DECLARATION OF SERVICE

I, April J. Warner, hereby declare under perjury of law that a true copy of

**PLAINTIFFS' SUPPLEMENTAL SUBMISSION REGARDING TRIAL PLAN**

was served via e-mail, pursuant to Judge Shira A. Schiendlin's Case Management Order dated

April 1, 2004 [Section IV], upon Ryan Micallef, Court Clerk, and Peter Sacripanti, Esq., to serve

upon the defense attorneys in his capacity as liaison counsel, and via LNFS on the 14th day of

May, 2007.

APRIL J. WARNER