Exhibit 8

# McDermott
# Will&Emery



24608866
Apr 9 2009
7:19PM

Boston  Brussels  Chicago  Düsseldorf  Houston  London  Los Angeles  Miami  Munich
New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

James A. Pardo
Attorney at Law
jpardo@mwe.com
+1 212 547 5353

April 9, 2009

**BY ELECTRONIC MAIL AND LNFS**

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York  10007-1312

      Re:    City of New York v. Amerada Hess, et al.
            *New Assumptions, Methodologies and Conclusions in the "Rebuttal Expert*
            *Report of David Terry"*

Dear Judge Scheindlin:

      As requested by the Court at the April 2 status conference, Defendants submit this letter
to identify those portions of the *Rebuttal Expert Report of David Terry* ("Rebuttal Report") that
introduce new and different assumptions, analyses and conclusions under the guise of "rebuttal"
and, therefore, that are improper under Federal Rule of Civil Procedure 26(a)(2)(C)(ii) and
should be stricken.

      Generally speaking, Terry has been proffered as a putative expert to opine about *future*
MTBE concentrations in seven of the ten focus wells, all of which are presently idle.  To do this,
Terry speculates about how these (and other) wells may be pumped in the future, applies one of
three hypothetical gasoline release scenarios, and from these assumptions predicts whether (and,
if so, at what concentration) MTBE might be detected in a well sometime between 2016-2040.[1]

      In a nutshell, the most significant changes in Terry's Rebuttal Report are:

- Introduction of 37 brand new sites that Terry explicitly rejected from consideration in
  his *Corrected Expert Report of David Terry* ("Initial Report");

---

[1] Per the Court's request, this letter focuses on the material *changes* Terry made between his Initial Report and
Rebuttal Report, and not on the myriad *problems* with Terry's analyses and conclusions.  Defendants believe that
Terry's analyses or conclusions fall far short of the requirements under *Daubert*, and reserve their right to make a
*Daubert* motion after the proper scope of Terry's initial and rebuttal opinions have been determined by the Court
and, relatedly, after the deposition of Terry has been completed.

U.S. practice conducted through McDermott Will & Emery LLP.

**340 Madison Avenue New York New York 10173-1922  Telephone: +1 212 547 5400  Facsimile: +1 212 547 5444  www.mwe.com**

The Honorable Shira A. Scheindlin
April 9, 2009
Page 2

- Introduction of three completely new analyses for Station 6, drastically changing Terry's initial predictions about MTBE concentrations and contamination boundaries;

- Abandonment of his prior ATRANS model, and substitution of a completely new methodology ("Analysis 2"), for Wells 5 and 22;

- Assignment of new values to several of the most important data inputs in Terry's computer simulations, again significantly changing his modeling output and conclusions; and

- Introduction of two completely new "drought simulations" not undertaken or disclosed in his Initial Report.

Terry's changes are detailed below and, for the Court's convenience, also are summarized in the Table attached hereto as Exhibit ("*Exh.*") A.

**<u>Terry's Initial Report</u>**

Terry's initial approach to predicting future MTBE detections in the focus wells varied between the Station 6 wells chosen by the City, and the focus wells chosen by Defendants.

<u>Terry's Initial Station 6 Analysis</u>

Terry initially ran two modeling scenarios for the Station 6 wells, which he refers to as "Analysis 1" and "Analysis 2." Analysis 1 seeks to predict future MTBE detections based on what Terry called the "ambient" levels of MTBE in groundwater. For his "ambient" computer simulation, Terry selected the maximum amount of MTBE detected in certain wells in Queens (also selected by him) in 2004. Terry then used these single data points to estimate the extent of "ambient" MTBE in Queens, based solely on hand drawn maps prepared not from water quality or other objective data, but from his putative "experience." Terry then simulated the movement of this "ambient" MTBE into the Station 6 wells and predicted what concentration might appear in those wells sometime during the years 2016-2040.

Analysis 2 purported to model projected future MTBE impacts based on certain gasoline release sites within an undisclosed capture zone for Station 6. Specifically, Terry relied on 22 sites that he determined were "potentially significant" – all but two are service stations. *See Initial Report* at p. 9. Notably, Terry chose not to include certain "additional sites" (including several City-owned gasoline spill sites) in Analysis 2 because, in his opinion, "insufficient information was available about these sites to conclude that potentially significant discharges occurred." *Initial Report* at p. 9. For the 22 sites that Terry did consider "significant," he then declined to use the actual spill data from these sites to estimate the volume of gasoline released and, instead, assumed hypothetical release volumes of 50, 500, and 2000 gallons, although no specific references are provided for these particular assumptions. *Id.* at Table 4. Mr. Terry also

The Honorable Shira A. Scheindlin
April 9, 2009
Page 3

made assumptions concerning groundwater velocity, the percentage of MTBE in gasoline in each release, the mass of MTBE in the purported plumes, and the thickness of the aquifer through which the plumes would hypothetically travel.  *Id.*  From these hypotheses and assumptions (and others), Terry apparently estimated a single, collective "capture zone" for the Station 6 wells that, while not disclosed to Defendants, apparently includes most the 22 sites chosen by Terry for his initial analysis.

Terry's Initial Analyses for Defendants' Focus Wells

Terry's Initial Report targets four (of the five) focus wells chosen by Defendants (wells 5, 22, 39 and 45).[2]  Unlike his Station 6 analyses – which hypothesized a single, collective capture zone for that group of five wells – for these two wells Terry employed a wholly different methodology:  hypothesizing a unique "composite" capture zone for each well.  To simulate these zones he assumed that the wells (now idle) would pump continuously and at their maximum rated capacity from 2009-2040.[3]  Terry then identified "significant sites" within each zone and, again declining to use actual site data, relied instead on assumed hypothetical release volumes of 50, 500 and 2000 gallons (again, without any reference to supporting evidence).  In addition, Terry took those assumptions and input them into one of two different models, depending on whether his predicted MTBE plume for each station was all or partially within a particular well's capture zone.  Both of those models employed a different methodology than was applied for the Station 6 estimations.

**Defense Experts' Critique of Mr. Terry's Analyses**

Defense experts criticized Terry's Initial Report on several bases, including: (1) failing to simulate confirmed MTBE gasoline releases from at least 18 City-owned sites, and from an "Atlas" branded service station located immediately across the street from Station 6; (2) running his computer simulations with an unrealistically high value for "dispersivity," which measures the tendency for a contamination plume to spread over time as it moves downgradient; (3) speculating about future pumping rates that are inconsistent with how the wells are proposed to be used (if they are used) in the future; (4) misrepresenting MTBE releases as creating instantaneous and fully formed contaminant plumes; and (5) relying on hypothetical (and highly exaggerated) release volumes that are not supported by actual site files or other empirical data.

---

[2]   Terry did not perform an analysis for Defendants' focus well 26 because "no significant sources of MTBE contamination were identified within the capture zone for this well."  *Initial Report* at 17.

[3]   Just like his hypothetical release volumes, Terry's assumptions about well pumping are not supported by any evidence.  In fact, Terry acknowledges that the two wells are not even identified as operating wells under the City's projected Groundwater Management Plan, and he admits that "in the event another operating scenario is utilized, the results of the analysis would differ from that presented in this assessment."  *Initial Report* at 13.  Terry neglects, however, to model any of those other scenarios in his Initial Report.

The Honorable Shira A. Scheindlin
April 9, 2009
Page 4


## What Terry Has Changed in His Rebuttal Report

Contrary to the City's representations at the April 3 conference, Terry's Rebuttal Report significantly changes many of his prior assumptions, methodologies, conclusions and opinions – far exceeding the proper scope of "rebuttal" permitted under the FRCP.  Most telling, although by no means exclusive, Terry now "extends" his previous assumptions and methodologies (and opinions) to "capture" 37 new sites as potential future sources – each of which he explicitly considered and *rejected* in his Initial Report.

### New Station 6 Analyses

Terry's Rebuttal seeks to introduce three so-called "Revised Analyses" for Station 6.  For each new analysis, Terry has changed key assumptions and/or methodologies from those relied on in his Initial Report.  For his "Revised Analysis 1," Terry has changed his prior assumption about the maximum MTBE concentrations at certain stations, and has altered his analysis to re-draw a completely new contaminant boundary to capture new potential future sources.  Indeed, Terry's new conclusions are so distinct that he actually compares them against his original "Analysis 1" results at Figure 5 of his Rebuttal Report.

Terry's "Additional Revised Analysis 1" is, as its title suggests, "additional" (or, put another way, "new").  For this new analysis Terry has altered his prior assumption about the appropriate "dispersivity" value from 350 feet in his Initial Report, to 70 feet in his Rebuttal Report.  Again, the new results are summarized graphically at Figure 6 of Terry's Rebuttal.  The net effect is to significantly change Terry's prior conclusions about future MTBE detections at Station 6 – by about 5 ppb for a period of almost 24 years (2016-2040).

But it is Terry's "Revised Analysis 2" where his new assumptions, methodologies and conclusions are most striking.  For this revision, Terry has actually added to his analysis 19 sites that he explicitly rejected as lacking "sufficient evidence" for consideration in his Initial Report. For each of these new sites, Terry models new hypothetical releases and introduces new assumptions concerning groundwater velocity, the character of the aquifer, and various other parameters.  Terry also provides – for the first time – a graphical depiction of his hypothetical Station 6 capture zone, which now covers nearly seven square miles and, notably, is significantly larger than the "capture zones" hypothesized by the City's other hydrogeology expert, Donald Cohen.  *See Exh. B, Station 6 Rebuttal Report Additional Disclosures* (showing newly modeled spill locations and capture zone depiction introduced in Rebuttal Report).  Moreover, for the 22 original sites that Terry considered in his Initial Report, he has now changed his earlier assumptions about the character of each hypothetical MTBE plume and also changed his prior inputs for critical modeling variables including the "head" and "saturated thickness" data inputs. The results of these data input changes is predictable:  a completely new model result that encompasses 19 new potential sources and significantly changes Terry's conclusions about predicted future concentrations in the Station 6 wells.  Indeed, even Terry admits that his

The Honorable Shira A. Scheindlin
April 9, 2009
Page 5

"revised Analysis 2c simulation show[s] generally higher influent concentrations at Station 6 than the original Analysis 2c simulation summarized in my report."  *Rebuttal Report* at 22.

<u>New Analyses for the Other Focus Wells (#5 and #22)</u>

Just as with Station 6, a significant modification of Terry's "rebuttal" analysis on Defendants' Focus Wells is the addition of new sites (18 total) that Terry specifically excluded from consideration in his Initial Report.  In fact, Terry's Initial Report only considered six potential sites – four as to Well 5, and two as to Well 22.  *Compare Initial Report*  Table 5 with *Rebuttal Report* Table 3; *see also Exh. C*, Well 5 Rebuttal Report Additional Disclosures (showing newly modeled spill locations).

Whereas Terry's initial conclusions were based on an ATRANS computer modeling simulation that estimated future MTBE detections, Terry's Rebuttal resorts to his new version of "Analysis 2" – an analysis he previously had applied only to Station 6.  Simply put:  Terry's rebuttal analysis for Wells 5 and 22 is based on a *new* version of a *new* methodology that was developed and disclosed for the first time in his Rebuttal Report.  This was not done in response to any criticism from Defendants' experts and, notably, Terry makes no attempt to justify (or even explain) his wholesale methodological switch.  It is, in fact, an entirely new model.

Terry also has changed several of the most important data inputs for his new modeling simulations.  For example, he no longer models a certain release from one site, and no longer models two spills from a second site.  No explanation is provided for why these data points have been dropped.  Terry apparently has eliminated the data inputs for "MTBE contaminant distance" and "unsaturated thickness;" has changed the data values for "velocity," "head" and "saturated thickness" for three of the four original release sites (excluding the site he no longer models on rebuttal); and has changed the "MTBE percentage" value for one station.  *See Exh. D,* Comparison of Well 5 and Well 22 Data Inputs (highlighting new data inputs in yellow) .

Terry also now models estimated releases from stations *outside* of his theoretical "capture zones" for the wells, on the theory that such releases "could enter" a well's capture zone in the future.  *Rebuttal Report* at 25.  Finally, he has now first the first time introduced two entirely new "Drought Simulations" (labeled "Drought Simulation 1" and "Drought Simulation 2"), both of which assume periodic pumping of 11 City wells between 2009 and 2040.  *See Rebuttal Report*, § 8.4, at pp. 24-26.  Neither of these scenarios was modeled in Terry's initial report, even though he acknowledged that under such different scenarios "the results of the analysis would differ from that presented in this [initial] assessment."  *Initial Report* at 13.  Predictably, the addition of 18 new sites, new assumptions about future pumping rates, new data inputs, and a new methodology result in significantly changed conclusions about future MTBE concentrations at Wells 5 and 22.  Indeed, Terry not only admits to these changes, he describes his new results as being "substantially" different from the conclusions set forth in his Initial Report.

The Honorable Shira A. Scheindlin
April 9, 2009
Page 6


**<u>Conclusion</u>**

The City represented at the Status Conference that Terry's rebuttal opinions did not rely on "new factors" or "new criteria," and that his opinions "have not changed." *Transcript at pp. 41-42.* Nothing could be further from the truth.

Federal Rule of Civil Procedure 26(a)(2)(C)(ii) permits an expert to disclose opinions "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)." However, a rebuttal report may not be used to present new arguments that should have been expressed in the original report, unless presenting those arguments in the rebuttal is substantially justified and causes no prejudice. *See Ebbert v. Nassau County*, 2008 WL 4443238 (E.D.N.Y. 2008); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.,* No. 03 C 7713, 2005 WL 1300763, at *2 (N.D. Ill. 2005). Indeed, expert disclosures are designed to prevent unfair surprise at trial, not to create it. *See Foraker v. Schauer*, 2005 WL 6000493, Case Nos. 04-cv-00363-EWN-OES, 04-cv-00840-EWN-OES, *4 (D. Colo. Sept. 8, 2005).

But surprise and prejudice are exactly what Terry's untimely new opinions, analysis and conclusions have belatedly introduced into this case under the guise of rebuttal. Terry's rebuttal report adds 37 new sites to his analysis – having "extended" (his word) his review, an extension that is certainly surprising given that Terry considered *and rejected* these very same sites for inclusion in his Initial Report. A rebuttal report is not the proper place for Terry to "extend" a prior analysis based on an identical set of facts. *See Crowley v. Chait*, 322 F. Supp. 2d, 530, 551 (D.N.J. 2004) ("Rebuttal evidence is . . . not an opportunity for the correction of any oversights in the plaintiff's case in chief."). Moreover, Terry has introduced three revised or entirely new methodologies for Station 6, and even extends one of those methodologies (for the first time on Rebuttal) to the other focus wells. He also has altered the values for several of the most important data inputs in this models, and has even eliminated entire data points without explanation. He also has added two entirely new "drought" modeling analyses.

Defendants respectfully submit that the prejudice here is obvious. Our experts have rightfully devoted enormous time and attention to the analysis and opinions expressed by Terry in his Initial Report. They have already submitted their own response reports. If permitted to stand, Terry's "rebuttal" opinions will necessitate an entire new round of analyses, and further expenditure of time and resources. Even now, as to Station 6, Defendants cannot determine which sites Terry contends will theoretically contribute to *future* contamination. We do not know if Terry will rely at trial on his "Analysis 1" and "Analysis 2" from the Initial Report; the "Revised Analysis 1," "Additional Revised Analysis 1," and/or "Revised Analysis 2" from his Rebuttal Report; or some combination thereof. As to the Defendant Focus Wells, we cannot determine if Terry will opine at trial based on his analysis in the Initial Report; the entirely different methodology and/or Drought Simulations he proposes in the Rebuttal Report; or some combination thereof.

The Honorable Shira A. Scheindlin
April 9, 2009
Page 7


      Defendants do not contend that Terry's entire Rebuttal Report should be stricken, only those sections that introduce new methodologies, evidence and opinions.  Specifically, Defendants ask the Court to strike: §§ 2.0 (pp. 3-5), 3.1 (first full paragraph and last full paragraph), 6.4 (last three paragraphs), 7.1, and 8.0, as well as Tables 2 and 3, and Figures 4 through 11.

      Defendants appreciate the Court's time and attention to this matter, and look forward to further discussing these issues with the Court on April 24.

                  Very truly yours,

                  *James A. Pardo*

                  James A. Pardo

cc:    Christopher J. Garvey
       All Counsel via Lexis Nexis File and Serve


Attachments

Exhibit A

## CHART OF KEY CHANGES IN REBUTTAL REPORT

| Issue | Initial Report | Rebuttal Report |
|---|---|---|
| **Contamination Sources to Station 6** | Identifies 22 sites of "potential significance." Models hypothetical releases from these sites as contributing to Station 6 contamination. Excludes remainder of sites based on lack of sufficient evidence. | Based on same information previously available, "extends" review in Initial Report to include 19 "additional spill sites" previously excluded from consideration. Models hypothetical releases from these additional sites, which include retail service stations. |
| **Contamination Sources to Well 5** | Identifies four sites of "potential significance." Models hypothetical releases from these sites as contributing to Station 6 contamination. Excludes remainder of sites based on lack of sufficient evidence. | Based on same information previously available, "extends" review in Initial Report to include 18 "additional spill sites" previously excluded from consideration. Models hypothetical releases from these additional sites, which include retail service stations. |
| **Station 6 Capture Zone** | No capture zone depicted, even though Terry purports to rely on capture zone to select contamination sites. | Depicts Station 6 Capture Zone for the first time.  Capture zone covers roughly seven square miles and encompasses Dependability Wells |
| **Well 5 and Well 22 Capture Zones** | Depicts "composite capture zone" for each well | Does not depict a capture zone for either well under new assumed pumping conditions |
| **Station 6 Modeling Methodology: "Analysis 1"** | Models future MTBE concentrations based on assumed presence of "ambient" MTBE in groundwater system. | Introduces two new models.  "Revised Analysis 1" changes prior assumption about the maximum MTBE concentrations at certain stations, and re-draws a new contaminant boundary.  "Additional Revised Analysis 1" changes dispersivity value (which measures travel of plume through aquifer) from 350 feet to 70 feet.  Results in projected future MTBE concentrations at Station 6 that differ from Initial Report analysis by roughly 5ppb for 24-year span. |
| **Station 6 Modeling Methodology: "Analysis 2"** | Models future MTBE concentrations based on specific gasoline releases within undisclosed capture zone.  Models releases from 22 locations. | Discloses capture zone.  Adds 19 new modeled release locations. Changes assumptions concerning size and character of MTBE plumes and aquifer. |
| **Defendant Focus Well Analysis** | Models future MTBE concentrations based on specific gasoline releases within capture zone.  Utilizes ATRANS program to simulate future concentrations. Models eight releases from four locations with respect to Well 5.  Assumes continuous future pumping rates at maximum capacity for all Defendant Focus Wells. | For Well 5, models releases from 18 "additional spill sites" previously excluded from consideration.  Models spills from station located outside capture zone.  Eliminates certain stations and spills from prior analysis without explanation.

For Wells 5 and 22, utilizes "Analysis 2" modeling--previously applied only to Station 6--instead of ATRANS.  Introduces two "Drought Simulations" that assume intermittent future pumping at City Wells. Changes various data inputs concerning character of aquifer and hypothetical MTBE plumes.  Results in "substantially different" projected future concentrations at Well 5 and 22. |

Exhibit B



Station 6
Rebuttal Report
Additional Disclosures

Exhibit C



NYC Supply Wells
Initial Report Modeled Release Sites
Rebuttal Report Modeled Release Sites
Terry TMR Model Boundary
Terry Initial Report Capture Zone

Well 5
Rebuttal Report
Additional Disclosures

Exhibit D

# Comparison of Initial and Rebuttal Data Inputs for Well 5 and Well 22 Analyses

## Data Inputs from Initial Report (per Table 5 to Initial Report)

| Well # | spill ID | Address | Dist(m) | v(m/yr) | head(m) | satThick(m) | unsatThick(m) | Gasoline (ga) run1 | run2 | run3 | MTBE % | MTBE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 9713740 | 202-06 Hillside Ave. | 649 | 129.60 | 5.16941 | 25.77 | 23.82 | 50 | 500 | 2000 | 10.72 | 14.15 |
| 5 | 8701739 | 211-60 Hillside Ave. | 1473 | 86.72 | 6.11429 | 13.52 | 25.58 | 50 | 500 | 2000 | 2.00 | 2.00 |
| | 9111141 | | 1342 | 111.92 | 6.11429 | 13.52 | 25.58 | 50 | 500 | 2000 | 11.90 | 16.39 |
| | 9203537 | | 1342 | 111.92 | 6.11429 | 13.52 | 25.58 | 50 | 500 | 2000 | 11.90 | 16.39 |
| | 0212002 | | 107 | 106.89 | 6.11429 | 13.52 | 25.58 | 50 | 500 | 2000 | 7.37 | 10.73 |
| 5 | 9000972 | 211-02 Jamaica Ave. | 1130 | 80.75 | 5.76072 | 14.78 | 15.45 | 50 | 500 | 2000 | 2.00 | 2.00 |
| | 9208777 | | 1124 | 93.73 | 5.76072 | 14.78 | 15.45 | 50 | 500 | 2000 | 11.90 | 16.39 |
| 5 | 0512745 | 212-01 Hillside Ave. | N/A | N/A | 5.76072 | 14.78 | N/A | 50 | 500 | 2000 | 0.08 | 0.08 |
| 22 | 9308567 | 118-02 Queens Blvd. | 46 | 4.16 | 5.42544 | 118.51 | 29.32 | 50 | 500 | 2000 | 11.90 | 16.39 |

## Data Inputs to Rebuttal Report (per Table 3 to Rebuttal Report)*: New Values Highlighted in Yellow

| Well # | spill ID | Address | Dist(m) | v(m/yr) | head(m) | satThick(m) | unsatThick(m) | Gasoline (ga) run1 | run2 | run3 | MTBE % | MTBE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 202-06 Hillside Ave. (206-06) | | 114.50 | 5.04 | 18.77 | | 50 | 500 | 2000 | 11.63 | 16.41 |
| | | 211-60 Hillside Ave. | | 98.55 | 6.13 | 13.53 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | | | 98.55 | 6.13 | 13.53 | | 50 | 500 | 2000 | 7.37 | 10.73 |
| | | 211-02 Jamaica Ave. | | 152.30 | 5.69 | 14.73 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | | | 152.30 | 5.69 | 14.73 | | 50 | 500 | 2000 | 11.90 | 16.39 |
| | | 118-02 Queens Blvd. (118-10) | | 5.38 | 5.43 | 127.54 | | 50 | 500 | 2000 | 11.90 | 16.39 |
| | | 118-29 Queens Blvd. | | 6.20 | 5.42 | 116.51 | | 50 | 500 | 2000 | 11.52 | 15.87 |
| | | 219-28 Hillside Ave. | | 115.82 | 6.90 | 14.44 | | 50 | 500 | 2000 | 2.00 | 2.70 |
| | | 103-15 219th St. | | 132.99 | 6.79 | 23.30 | | 50 | 500 | 2000 | 11.63 | 16.06 |
| | | 103-33 Springfield Blvd. | | 139.29 | 6.65 | 29.20 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | 212-02 Jamaica Ave. | | 153.62 | 6.07 | 15.10 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | 213-10 Jamaica Ave. | | 150.37 | 6.25 | 16.59 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | 218-02 Hillside Ave. | | 99.57 | 6.68 | 22.46 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | 219-06 Hempstead Ave. | | 131.57 | 6.86 | 23.38 | | 50 | 500 | 2000 | 11.90 | 16.39 |
| | | 220-20 Jamaica Ave. | | 134.01 | 7.48 | 15.86 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | 235-15 Braddock Ave. | | 180.75 | 8.37 | 24.39 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | 239-09 Jamaica Ave. | | 152.10 | 7.15 | 11.34 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | 240-40 Jericho Tpke | | 150.06 | 8.34 | 12.54 | | 50 | 500 | 2000 | 10.04 | 13.9 |
| | | 248-12 88th Ave. | | 135.13 | 9.29 | 10.47 | | 50 | 500 | 2000 | 11.90 | 16.39 |
| | | 196-00 Union Tpke | | 71.32 | 7.66 | 23.60 | | 50 | 500 | 2000 | 11.90 | 16.39 |
| | | 198-15 Grand Central Pkwy | | 102.21 | 6.68 | 26.09 | | 50 | 500 | 2000 | 2.00 | 2.7 |
| | | 206-01 Hollis Ave. | | 36.07 | 5.01 | 23.95 | | 50 | 500 | 2000 | 11.90 | 16.39 |
| | | 206-06 Jamaica Ave. | | 137.06 | 5.26 | 18.00 | | 50 | 500 | 2000 | 10.72 | 14.77 |
| | | 241-15 Hillside Ave. | | 160.63 | 7.15 | 6.86 | | 50 | 500 | 2000 | 11.90 | 16.39 |
| | | 252-02 Union Tpke | | 40.64 | 10.36 | 9.89 | | 50 | 500 | 2000 | 10.72 | 14.77 |

*Note that Rebuttal Did Not List Well ID, Spill ID, Dist(m), or unsatThick(m)