# Exhibit 13

```
0001
  1                UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
  2
         MDL No. 1358 Master File C.A. No. 1:00-1898 (SAS)
  3      In Re:  Methyl Tertiary Butyl Ether ("MTBE")
         Products Liability Litigation,
  4
         COUNTY OF SUFFOLK
  5            -and-
         SUFFOLK COUNTY WATER AUTHORITY
  6
                          v.
  7
         AMERADA HESS CORP., et al.
  8      ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
  9                VIDEOTAPED DEPOSITION OF
 10                    RONALD R. SABIA
 11                    November 6, 2007
                         10:00 a.m.
 12
                       Goodwin Procter LLP
 13                      Exchange Place
                         53 State Street
 14                   Boston, Massachusetts
 15
 16
 17
 18    Ayako Odanaka, Notary Public, Certified Shorthand
 19    Reporter and Registered Professional Reporter within
 20    and for the Commonwealth of Massachusetts.
 21
 22
 23
 24
0002
  1              APPEARANCES:
  2              ON BEHALF OF PLAINTIFFS:
  3              JOHN LESLIE YATES, ESQUIRE
  4                Baron & Budd, P.C.
  5                3102 Oak Lawn Avenue, Suite 1100
  6                Dallas, Texas 75219-4281
  7                214.521.3605
  8                jyates@baronbudd.com
  9              ON BEHALF OF VALERO:
 10              ANDREW M. TAYLOR, ESQUIRE
 11              (Via Telephone)
 12                Bracewell & Giuliani, LLP
 13                111 Congress Avenue, Suite 2300
 14                Austin, Texas 78701-4061
 15                512.472.7800
 16                andy.taylor@bgllp.com
 17              ON BEHALF OF SUNOCO:
 18              BETHANY S. FRENCH, ESQUIRE
 19              (Via Telephone)
 20                Beveridge & Diamond PC
 21                1350 I Street, NW, Suite 700
 22                Washington, D.C. 20005-3311
 23                202.789.6000
 24                bfrench@bdlaw.com
0003
  1              APPEARANCES (Continued):
  2                 .
```

```
0020
 1     brand.
 2         Q.  Well, in what way does Cumberland
 3     today distribute GOLP -- gasoline which
 4     has been stored in any GOLP facility?
 5         A.  They purchase product from Gulf Oil
 6     Limited Partnership and deliver it to
 7     company op and dealer locations.
 8         Q.  And does Cumberland physically pick
 9     up gasoline and deliver it in trucks?
10         A.  Yes, they do.
11         Q.  So, for example, if there is a GOLP
12     terminal with a truck rack, Cumberland
13     trucks could come and pick up gasoline and
14     distribute it to service stations?
15         A.  Yes, they can -- as well as common
16     carriers.
17         Q.  So it's not an exclusive
18     relationship.  Cumberland's not the only
19     company that does that for GOLP at the
20     present time.
21         A.  Correct.
22         Q.  All right.  I believe that you
23     either said a minute ago or we saw it in
24     one of these documents, that from '88
0021
 1     until '93, Cumberland was engaged in the
 2     business of wholesale marketing and trading
 3     of unbranded gasoline.
 4             MR. TULLY:  I think you
 5     meant to say Catamount.
 6         A.  Catamount.
 7         Q.  I'm sorry, Catamount.  You're
 8     right, Catamount.
 9             What is wholesale marketing and
10     trading?
11         A.  It's selling unbranded product to
12     jobbers and end-users.
13         Q.  Okay.  And what do you mean by
14     "unbranded product"?
15         A.  It is not associated with any brand
16     trademark.  It is a discretionary
17     relationship between buyer and seller.
18     There is no contract -- that is, as is
19     typical between branded entities -- to buy
20     all of their gallons from -- from a brand.
21         Q.  From '93 until 2005, what -- in
22     general, what was GOLP's primary business?
23         A.  Well, they really had two
24     businesses.  They had the branded
0022
 1     distribution business, the Gulf Oil brand,
 2     distributing branded Gulf product through
 3     jobbers and dealers.  In 2003, they
 4     acquired the Exxon brand in addition -- so
 5     that was, I believe, September 2003 -- and
 6     own the Exxon brand until 2010.
 7         Q.  Is that for about the same
```

```
 8     geographical area?
 9     A.  Seven states, New York and New
10     England, for the Exxon brand.
11     Q.  Okay.
12     A.  They also maintain their unbranded
13     supply business.
14     Q.  Okay. Let's take those one at a
15     time. You say, first of all, they had
16     the branded distribution business for Gulf,
17     and, then, beginning 2003, Exxon in seven
18     states. Describe, if you could, what you
19     mean by that.
20     A.  Okay. Gulf will -- would either
21     supply directly individual sites, dealer
22     locations with fuel, and there is a
23     contractual obligation.
24     Q.  Okay. Would these be under the
0023
 1     scenario you're talking about, either
 2     Gulf-branded or Exxon-branded stations?
 3     A.  Depending on the time frame; if it
 4     was pre-2003, it would have been Gulf.
 5     After 2003, it could be Gulf or Exxon.
 6     Q.  Yeah, right. Either one.
 7         (Deponent nodding)
 8         Would it necessarily be the case
 9     that the gasoline which was delivered to
10     those branded stations would have been
11     refined and manufactured by either Gulf or
12     Exxon?
13     A.  Not Gulf Oil LP. We are not a
14     refiner -- never have been a refiner.
15     Q.  No, I didn't mean -- I may have
16     misspoke.
17         What about the Exxon gasoline?
18     Would it necessarily have been refined by
19     Exxon?
20     A.  No.
21     Q.  Was it kept segregated when it came
22     into the GOLP terminals?
23     A.  No.
24     Q.  Did any of the GOLP terminals have
```