# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl:MDL NO. 1358 (SAS)
Ether ("MTBE")         :
Products Liability     :
Litigation             :

          In Re:

               City of New York
               ------

     CONFIDENTIAL (Per 2004 MDL 1358 Order)

               ------
               November 19, 2008
               ------

               Videotaped Deposition of

VIRGINIA MURRAY, 30(b)(6) witness re

taste and odor, held at McDermott, Will

& Emery, 340 Madison, New York, New

York 10173, beginning at approximately

9:38 a.m., before Ann V. Kaufmann, a

Federally approved Registered

Professional Reporter, Certified

Realtime Reporter, and a Notary Public.

               ------

          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph|917.591.5672 fax
               deps@golkow.com

Page 46

1    issue given that the City, at least in
2    the normal course of those documents
3    being produced, it was made clear to
4    defendants that we -- excuse me, we, the
5    City of New York does not necessarily
6    provide that information.
7         MR. CONDRON: I didn't
8    follow that.
9         MR. STACK: Are you
10   directing the witness not to answer?
11        MR. PASTERNACK: No, I'm
12   not. I just want to make clear on the
13   record that the question being posed may
14   be exploring an area of expert testimony
15   regarding correlation that the City
16   doesn't normally undertake.
17        MR. STACK: Can you read
18   that back, Ann?
19        I'll have the court reporter
20   read it back.
21        THE WITNESS: Thank you.
22        (The court reporter read the
23   record as follows:
24        "QUESTION: In reviewing the

Page 47

1    two boxes of scanned complaint forms,
2    did you undertake any analysis at any
3    time to identify the complaints in those
4    boxes which you believe were caused by
5    the presence of MTBE in the City's water
6    supply?")
7         THE WITNESS: So are you
8    saying did I look at these complaints
9    and try to determine that these
10   complaints were the result of MTBE?
11   BY MR. STACK:
12        Q.   Correct.
13        A.   Well, before I answer that,
14   I would like to say that taste and odor
15   complaints routinely are not -- a VOC
16   sampling is not conducted for all taste
17   and odor complaints. So by looking at
18   various taste and odor complaints, for
19   most of them I would not be able to say
20   that MTBE -- that the complaint was
21   caused by MTBE simply because for the
22   majority or for 99% of our sampling, we
23   do not test for VOCs in consumer
24   complaint sampling.

Page 48

1         Q.   And with regard to the
2    complaints that you reviewed in these
3    boxes, did you at any time attempt to
4    determine which of the complaints were
5    among those instances where you actually
6    conducted VOC sampling?
7         MR. PASTERNACK: Same
8    objection.
9         A.   There was one particular
10   consumer who we had VOC data for where
11   MTBE did show up. However, the
12   complaint was not specifically for taste
13   and odor. It was an oil and grease
14   complaint. It was a sheen on the
15   water. And typically when these type of
16   complaints come in, they are -- even
17   though there might be taste and odor
18   associated with this oily sheen, it's
19   given a grease and oil, sorry, code so
20   this way that would direct us to then
21   sample for volatile organics.
22        Q.   And with respect to this
23   particular complaint, was it one of the
24   oil and grease complaints in which the

Page 49

1    complainant noted that there was
2    construction ongoing in the neighborhood
3    and they attributed the oil and grease
4    in the water to construction activities?
5         A.   I did not see the actual
6    complaint card. I just saw a
7    spreadsheet with the data on it, so --
8    and I looked it up in the logbook and
9    there was no record of the complainant
10   specifying construction. But just
11   because it wasn't in the logbook doesn't
12   mean it wasn't on the sample card.
13        Q.   Apart from this one
14   complaint in which you were able to
15   identify testing at the tap for the
16   customer's complaint, were there any
17   others, among those in the two boxes of
18   scanned complaints that you looked at
19   for Queens, in which you were able to
20   identify an instance that MTBE was
21   detected in the customer's tap?
22        A.   Yes. There were a couple
23   of other complainants, maybe three or
24   four, that had trace amounts of MTBE

13  (Pages 46 to 49)

Confidential - Per 2004 MDL 1358 Order

Page 50

1    showing up.
2        Q.   And as part of your
3    preparation for this deposition, did you
4    list out those instances, the one
5    consumer with the oil and grease
6    complaint and the other three to four in
7    Queens, in which there was a detection
8    of MTBE for the complaints that you
9    reviewed in the two boxes?
10        MR. PASTERNACK:  Objection,
11   vague, "list out."
12   BY MR. STACK:
13        Q.   Did you identify, list,
14   compile, otherwise --
15        A.   It was --
16        Q.   -- in some written form
17   provide a compilation of the specific
18   complaints in which this witness in
19   reviewing the box in preparing for this
20   deposition actually identified the
21   complaints in which there was
22   corresponding test results?  That's the
23   question.
24        A.   The data was in one of the

Page 51

1    spreadsheets that was provided and I
2    think that you reference in your
3    deposition.
4        Q.   And the data you are
5    referring to is data in a spreadsheet
6    from the City's lab?
7        A.   Yes.
8        Q.   You indicated that you
9    looked at spreadsheets.  Specifically
10   which spreadsheets did you review for
11   purposes of preparing for this
12   deposition?  And if you want to look at
13   Paragraph 8, 9, 10 in there, please, by
14   all means, do so.
15        A.   Yes, I looked at the 9 and
16   10 and I think 8 has an incorrect name.
17   I looked at a spreadsheet called
18   groundwater service area.  It was not
19   Excel1.  But it did have a complaint
20   something tab on it.
21        Q.   Okay.  With respect to --
22   let's go backwards.  And number 8 seems
23   to be somewhat problematical,
24   Ms. Murray.

Page 52

1        A.   Okay.
2        Q.   With regard to the
3    spreadsheet described in Paragraph 10,
4    qns_Complaints_080612VX.xls, did you
5    prepare that spreadsheet?
6        A.   No, I did not.
7        Q.   Did anyone in your unit
8    prepare that spreadsheet?
9        A.   Yes.
10        Q.   Who prepared it?
11        A.   I believe it was prepared
12   by Lin Lu, and then and the VX would
13   indicate that it was either appended
14   to -- the data itself was prepared by
15   Lin Lu.  VX is Vicky Xu, X-U, and she
16   just added a -- she added a sheet that
17   had the -- like a legend to what the
18   spreadsheet -- some of the
19   abbreviations.  So she saved it with her
20   initials.
21        Q.   And Ms. Xu, X-U?
22        A.   Xu.
23        Q.   Xu, she is a City employee?
24        A.   Yes.

Page 53

1        Q.   Does she work directly
2    under your supervision?
3        A.   No.
4        Q.   For whom does she work?
5        A.   She works for Lin Lu.
6        Q.   And with regard to the
7    Queens complaint spreadsheet, when did
8    you first review that document?
9        A.   Recently.
10        Q.   And by "recently" what do
11   you mean, approximately?
12        A.   Probably since I got the
13   deposition.
14        Q.   Deposition notice?
15        A.   Notice.
16        Q.   Fair enough.
17        A.   Correct.
18        Q.   And with respect to that
19   spreadsheet, did you for that
20   spreadsheet attempt to identify the lab
21   data that corresponded to any of the
22   test results reported on this
23   spreadsheet?
24        A.   I'm sorry.

Confidential - Per 2004 MDL 1358 Order

Page 54

1    Q.   The spreadsheet included
2  reported test results; am I correct?
3    A.   That's the spreadsheet that
4  had the whatever, organic data, volatile
5  organic data from any consumer taps over
6  whatever time period was requested,
7  so....
8    Q.   And as part of your
9  preparation for this deposition, did you
10 request the laboratory provide you with
11 the laboratory test reports for those
12 specific complaints?
13   A.   No.
14   Q.   Did you, as part of your
15 work in this case, review any of the
16 laboratory QA/QC data accompanying the
17 analysis of these samples?
18   A.   No, I did not.
19   Q.   Did you look at any of the
20 complaint cards?
21   A.   No, I did not.
22   Q.   Did you look at any of the
23 complaint logs?
24   A.   Yes.

Page 55

1    Q.   And for each of the
2  complaints identified on the spreadsheet
3  Qns_Complaints_080612VX, did you have a
4  complaint log for each of those?
5    A.   It would be -- all
6  complaints are logged into a logbook,
7  so, yes. Did I look specifically at
8  each one in the logbook? No, but
9  they're there.
10   Q.   Did you review any letters
11 written by the City to the complaining
12 customer reporting on the results of
13 sampling of their water supply?
14   A.   For a customer relating to
15 this database?
16   Q.   Correct. And I will
17 rephrase it.
18       With regard to the database
19 Qns_Complaints_080612VX, did you
20 specifically look for and review any
21 letters that were sent to these
22 complaining customers?
23   A.   No.
24   Q.   With regard to that

Page 56

1  database, did you speak to any of the
2  City employees relative to the detection
3  of contaminants in the tap water of
4  those complaining customers?
5       MR. PASTERNACK:  Objection,
6  vague.
7    A.   Yeah, I'm not really sure
8  what you are getting at.
9    Q.   You looked at this
10 complaint form -- pardon me, the
11 spreadsheet Qns_Complaints_080612VX;
12 correct?
13   A.   Yes.
14   Q.   After you looked at it, did
15 you speak to any of your fellow
16 employees in the City to obtain
17 information about what was in that
18 spreadsheet?
19   A.   No.
20       Well, I -- the only one is
21 we tried to find out who had generated
22 the spreadsheet. And as far as the data
23 within, no.
24   Q.   And with respect to this

Page 57

1  particular spreadsheet,
2  Qns_Complaints_080612VX, you determined
3  it was assembled by Lin Lu?
4    A.   Yes.
5    Q.   And did you speak to
6  Mr. Lin Lu relative -- is it Mr. or Ms?
7    A.   Mr.
8    Q.   Mr. Lin Lu relative to
9  assembling this particular spreadsheet?
10   A.   No, I did not.
11   Q.   Did you make any inquiry of
12 any other employees of the City of New
13 York relative to the information
14 contained on the spreadsheet identified
15 Qns_Complaints_080612VX?
16   A.   Just Lin Lu and Vicky Xu.
17   Q.   And did you actually speak
18 to Vicky Xu?
19   A.   Yes, because I was trying
20 to determine who generated the
21 spreadsheet.
22   Q.   And apart from determining
23 who generated the spreadsheet, did you
24 discuss with her other aspects of the

15 (Pages 54 to 57)

Page 58

1    information contained in it?
2        A.   No.
3        Q.   With respect to the
4    spreadsheet identified in Paragraph 9,
5    which is (Redacted) TASTE ODOR
6    COMPLAINTS 1994 to 2008.xls, did you
7    specifically review that spreadsheet?
8        A.   Yes.
9        Q.   And did you determine who
10   created it?
11       A.   That was initially created
12   by Aspa Capetanakis and then when she
13   left and Arthur Tringali took her job,
14   then he perpetuated the spreadsheet.
15       Q.   And the spreadsheet that is
16   identified as (Redacted) TASTE ODOR
17   COMPLAINTS 1994 to 2008.xls, is that
18   something that's maintained in the
19   ordinary course of business in your
20   office?
21       A.   Yes.
22       Q.   And the current individual
23   who is the person responsible for
24   updating, is that Mr. Tringali or is

Page 59

1    it --
2        A.   No.  There's a third person
3    who's newly -- the new complaint or
4    special investigation coordinator.
5        Q.   And who is that individual
6    today?
7        A.   That is Ralph Riccardi.
8        Q.   And when did Mr. Riccardi
9    assume that position?
10       A.   Recently.  Within the last
11   year.
12       Q.   And with regard to the
13   taste and odor complaints database, did
14   you for each of those taste and odor
15   complaints review a complaint card?
16       A.   I did not review any
17   complaint cards.
18       Q.   Why did you not review
19   complaint cards?  It could be too
20   voluminous to maybe they don't exist?
21       A.   Because they are too
22   voluminous.  There's boxes and boxes.  A
23   complaint card is generated for every
24   sample, complaint sample that comes into

Page 60

1    the lab.  If we get over 10,000 to
2    15,000 complaints every year, that boils
3    down to a lot of complaint cards.  So,
4    no.
5        Q.   And with regard to the
6    complaint cards, are they known within
7    the department by any other name?
8    Mr. Hurley referred to blue cards and
9    white cards.
10       A.   Well -- okay.  For
11   complaints we used to have yellow cards
12   that we used for complaints and special
13   investigations.  We wanted to separate
14   the complaints from the special
15   investigation.  So several years ago, I
16   don't know what year, we just -- we went
17   to green cards.  But that's also in the
18   sampling site plan.  If you look at the
19   different sampling site plans, it will
20   tell you green card, yellow card, what
21   the card looks like, what each field,
22   what kind of data is generated or input
23   into each field.  So originally they
24   could have been yellow cards; then it

Page 61

1    was switched to green cards.
2            Blue cards have nothing to
3    do with complaints.
4        Q.   Blue cards pertain to what,
5    as best you understand it?
6        A.   The blue cards are for
7    compliance sampling, which is the main
8    focus of our laboratory.  When we -- we,
9    as a big water supplier, we will respond
10   to consumer complaints, but this is a
11   complimentary type of sampling
12   analysis.  We're not required to sample
13   for consumer complaints.  Our main focus
14   is on compliance sampling, which is
15   deemed -- regulated by state and federal
16   regulations.  So as a courtesy we will
17   respond to consumer complaints, but it
18   is not the main focus of our
19   laboratory.
20       Q.   With respect to the
21   preparation that you undertook for this
22   deposition, did you relate it to the
23   TASTE ODOR COMPLAINTS 1994 to 2008.xls
24   database, look at any letters responding

16  (Pages 58 to 61)

Confidential - Per 2004 MDL 1358 Order

Page 70

1    going off the record. The time is
2    10:41 a.m. This is the end of Tape 1 of
3    the deposition of Virginia Murray.
4        (Recess.)
5        THE VIDEOGRAPHER: We are
6    back on the record. The time is
7    10:52 a.m. This is the start of Tape 2
8    of the deposition of Virginia Murray.
9    BY MR. STACK:
10       Q.    When we broke you were
11   talking about your discussions with
12   Ms. Capetanakis, and I think it's
13   appropriate now to focus on the claims
14   process which you have touched upon for
15   at least the special investigations
16   coordinator.
17       For purposes of this
18   deposition, did you undertake to inform
19   yourself about the claims -- pardon me,
20   complaint intake and processing employed
21   by the City of New York since 1996?
22       A.    Did I --
23       Q.    Did you attempt to inform
24   yourself about what the process was

Page 71

1    for --
2        A.    I know the process. I was
3    here for the duration, so I remember.
4    Certain things I remember.
5        Q.    Certain things. With
6    regard to the claims intake process, if
7    a customer wants to register a complaint
8    with the City back in 1996, what was the
9    organization that that individual was
10   directed to?
11       A.    There was a phone number
12   718-DEP-HELP, which were for water and
13   sewer complaints. It was a specific DEP
14   hotline, so to speak. I was -- the
15   operators would then process the call,
16   and depending on the nature of the
17   complaint, they would funnel the
18   complaints to the various -- I think it
19   might have been the borough yards.
20       Q.    And the complaint line --
21   my words, not yours, but the complaint
22   line 718-DEP-HELP, is that still in
23   existence today?
24       A.    No. Right now it's 311.

Page 72

1        Q.    And can you recall
2    approximately when it was that the 311
3    service replaced 718-DEP-HELP?
4        A.    It was when Mayor Bloomburg
5    came to town, I believe, so maybe it was
6    seven or eight years ago or six or seven
7    years ago.
8        Q.    With respect to the
9    718-DEP-HELP line, that was manned 24
10   hours a day?
11       A.    Yes.
12       Q.    And the people who manned
13   the complaint line 718-DEP-HELP, were
14   they all City employees?
15       A.    I believe so.
16       Q.    The complaint line you say
17   then would take the complaints, and my
18   words, not yours, distribute them to
19   certain people, be it sewer or water or
20   by borough; am I correct?
21       A.    Correct.
22       Q.    Now, what criteria, if you
23   know, did the complaint line personnel
24   employ to classify the type of

Page 73

1    complaint?
2        A.    It was textual, so they
3    would just type whatever the complainant
4    told them over the phone and then I
5    believe they would fax -- I don't know
6    how, if it was a fax or it was, you
7    know, a teleprompt -- tele -- whatever
8    they used to use back then, it wasn't
9    computerized, to each borough yard;
10   okay? And then the borough yard would
11   then take a look at the complaint and if
12   it had something to do with water
13   quality, they would fax it to then to
14   our office.
15       Q.    And in those instances
16   where there were water quality problems
17   faxed to your office, were they routed
18   to a special investigations coordinator?
19       A.    Yes, she would pick up the
20   faxes every morning and log them into
21   the logbook.
22       Q.    And once the special
23   investigations coordinator logged them
24   into the logbook, thereafter the

19 (Pages 70 to 73)

Page 82

1    MR. PASTERNACK: Objection,
2 vague, "doing something."
3    A.   I can answer that.
4       First of all, we never
5 found orthophosphate -- in my
6 recollection, orthophosphate levels were
7 generally pretty stable.  So if an
8 occurrence came where the person in the
9 field analyzed for an orthophosphate
10 sample and came up with an unusual
11 result, I'm sure that that person would
12 have contacted the base and asked for
13 further instruction.  But I do not
14 recall any time that orthophosphate came
15 anywhere near over the limit of our
16 field meters.
17    Q.   With respect to residual
18 chlorine, what is the protocol that the
19 personnel attending a customer's home to
20 conduct sampling are to follow if they
21 find residual chlorine at excessive
22 levels?
23    A.   Once again, the residual
24 chlorine we tended to go in the opposite

Page 83

1 direction, so we were looking more for
2 the lower chlorine values.  So we tended
3 not to see residual chlorine at such
4 high values.  If they were what we
5 considered high, we would then
6 contact -- you know, they would radio
7 the results to the base and then someone
8 at the base would then contact
9 groundwater headquarters and, you know,
10 let them know that their residual
11 chlorine would exceed -- is exceeding
12 what we're -- what they're targeting.
13 But, once again, that was never really a
14 problem.  The problem sometime was lack
15 of chlorine, so that was more of an
16 indicator.
17    Q.   And when you say they
18 called the base for the Borough of
19 Queens, what does that mean?
20    A.   The base is the
21 laboratory.  It's the field operations.
22 We have a two-way radio in each vehicle.
23    Q.   When you conducted analyses
24 on samples collected at a customer's tap

Page 84

1 for VOCs for the period 1996 up through
2 the present, what analytical method was
3 used?
4    A.   524.2.
5    Q.   And with respect to the
6 results that were obtained, did the City
7 send the complaining customer a copy of
8 a lab sheet showing the results of the
9 524.2 analysis?
10    A.   I'm not certain about
11 that.  I'm sure if there were any --
12 anything above the MCL, the maximum
13 contaminant level, I'm sure that would
14 have been highlighted in the letter of
15 the report.  However, I don't know if we
16 would actually present pages upon pages
17 of multisyllable compounds which would
18 just totally confuse the consumer, which
19 would then lead to more telephone calls
20 and questions.
21       So if there was something
22 that was above the MCL or approaching
23 the MCL or even present, we would then
24 probably mention that in the letter

Page 85

1 itself.  I'm not really sure about
2 including all those non-detect results.
3 I'd have to check on that, though.
4    Q.   With respect to notifying
5 the customer of the results of testing,
6 was there a protocol that the department
7 employed regarding what information
8 would be reported back to the customer
9 after a complaining customer's tap
10 sample was analyzed?
11    A.   Yes.  Yeah, yeah, we had
12 specific templates that were reported
13 back.  However, VOC was not a routine
14 analysis and we did not test for VOCs on
15 -- for routine consumer complaint.
16    Q.   As part of your preparation
17 for this deposition, did you ever
18 determine what percentage of consumer
19 complaints from Queens were actually
20 submitted to the lab for VOC analysis?
21    A.   I did not.
22    Q.   With respect to the
23 occurrence of VOC testing, did you, in
24 preparation for this deposition,

22  (Pages 82 to 85)

Confidential - Per 2004 MDL 1358 Order

Page 94

1  believe the way -- it wasn't even a
2  compound that was measured for under the
3  524 analysis. So I don't think you had
4  to -- and I'm not an expert on this. I
5  want to clarify I'm not an expert, but
6  this is my understanding, is that when
7  we started analyzing volatile organics
8  from these wells, which previously we
9  had just been analyzing volatile
10 organics from surface water, they
11 noticed, I believe, in the data coming
12 from the mass spec that there was an
13 additional peak and that's when they
14 started calibrating the instrument for
15 MTBE. So that's when it was -- when we
16 acquired the groundwater wells is when
17 we started -- shortly thereafter when we
18 started monitoring for MTBE.
19    Q.  With respect to customer
20 taste and odor complaints, are there any
21 instances you can recall where there
22 have been specific complaints in which a
23 customer has identified MTBE as the
24 possible cause?

Page 95

1    A.  Not that I can recall.
2    Q.  In the context of your
3  experience with the City, are there any
4  instances where you, as a City employee,
5  or your fellow employees have
6  specifically identified MTBE as the
7  cause of a specific customer complaint
8  in Queens?
9       MR. PASTERNACK: Again, I
10 just renew the objection that Ms. Murray
11 is not here as an expert with respect to
12 any kind of correlation that should be
13 done on top of what the City routinely
14 does in its ordinary course of business.
15      MR. STACK: And I appreciate
16 that and I will clarify this question is
17 not eliciting expert opinion and I will
18 repeat it.
19 BY MR. STACK:
20    Q.  In your experience with the
21 City of New York, can you recall any
22 instances where you or your fellow
23 employees associated specific customer
24 taste and odor complaints in Queens with

Page 96

1  the presence of MTBE in the source water
2  or distribution system?
3    A.  I cannot recall. However,
4  just because we didn't test for the MTBE
5  does not mean it wasn't there. So
6  people may have complained taste and
7  odor complaints, they may have been
8  smelling MTBE, but it was not a course
9  of our routine response to consumer
10 complaints, so we did not collect VOC
11 samples.
12      So specifically, did people
13 complain specifically about MTBE? No.
14 I don't think most people knew what MTBE
15 was.
16      MR. CONDRON: Move to
17 strike as nonresponsive.
18 BY MR. STACK:
19    Q.  And the focus of my
20 question -- and if I have been inartful,
21 I apologize. I'm asking if you, as an
22 employee of the City, can recall
23 instances where you or your fellow
24 employees associated customer taste and

Page 97

1  odor complaints in Queens with the
2  presence of MTBE in any well?
3    A.  No.
4    Q.  Did you at any point in
5  time in your career associate customer
6  taste and odor complaints in Queens with
7  the presence of MTBE somewhere in the
8  water distribution system in Queens
9  Borough?
10      MR. PASTERNACK: Again, same
11 objection with respect to Ms. Murray not
12 being here as an expert on the
13 correlation; only with respect to what
14 was done by the City in its ordinary
15 course of business.
16    A.  No, we did not correlate
17 between MTBE and consumer complaints.
18    Q.  With respect to your career
19 with the City of New York, I take it
20 from your commentary that it wasn't
21 until sometime in the late 1990s that
22 the compound MTBE was routinely analyzed
23 for in the VOC analysis in the labs; am
24 I correct?

25  (Pages 94 to 97)

Confidential - Per 2004 MDL 1358 Order

Page 118

1 in the late 1990s?
2     A.   I think it was '99 into
3 2000, somewhere around there.
4     Q.   Prior to that point in
5 time, was there any classification
6 system to codify taste and odor
7 complaints by a descriptor?
8     A.   Well, that's where we got
9 the codes from, is we took a look at how
10 we were describing these taste and odor
11 codes, and that's where we got the five
12 subcategories from.  So we found most of
13 the taste and odor complaints fell into
14 one of five categories.
15     Q.   And with respect to the
16 work that you do for the City, do you
17 provide reports to your superiors
18 indicating what number of taste and odor
19 complaints fall into each of these
20 categories?
21     A.   No.
22     Q.   With regard to the
23 categorization of taste and odor
24 complaints, is there any routine

Page 119

1 reporting within the department to
2 indicate which types of taste and odor
3 complaints are being reported more
4 prevalently than others?
5     A.   No.  We just tabulate total
6 number of complaints received over a
7 certain time, how many resolved.
8     Q.   And with respect to the
9 instances out of the 12,000 that you
10 receive, I believe you said it could be
11 90 or 99 percent of them you don't do
12 VOC testing; am I correct?
13     A.   I would say correct.
14     Q.   So is it 99% or 90?  I'm
15 sorry, that was a lousy question.
16     A.   I would say the vast
17 majority we do not collect VOCs.
18     Q.   And why is it that you
19 don't collect VOC samples for the vast
20 majority?
21     A.   Because we monitor the
22 source water.  We monitor the source
23 water.  We -- the consumer complaint --
24 response to consumer complaints is not

Page 120

1 required by law.  It is something that
2 we're doing to try to alleviate problems
3 that our consumers are having.  However,
4 we're responsible only for the water in
5 the water mains.  Once it leaves the
6 water mains, it is out of our domain.
7 If a consumer is having a particular
8 problem, we will attempt to rectify the
9 situation.  However, most of our
10 resources up at the lab are devoted to
11 compliance issues, and we feel that by
12 monitoring the source water and certain
13 specific sites in our distribution
14 system and the three tunnels, whatever,
15 we are monitoring all that entry points
16 on a routine basis, there should be
17 no -- there should be no need to --
18 there should be no way that VOCs should
19 be able to get into the water unless it
20 is coming from the source water.
21     Q.   Now, with respect to taste
22 and odor complaints, in the process of
23 responding to those, are there instances
24 where there are specific reports that

Page 121

1 are generated identifying the cause of
2 any customer's complaint?
3     A.   If we do a special
4 investigation and we find that something
5 was, you know, awry in the system, yes,
6 we can then rectify the situation, get
7 other bureaus involved to help us
8 alleviate whatever is going on in the
9 consumer's home, and the letter will
10 state such.
11     Q.   Are there any instances
12 that you can recall in your career with
13 the City of New York where a taste and
14 odor complaint registered by a resident
15 in Queens was identified as having been
16 caused by gasoline constituents,
17 including MTBE, in the distribution
18 system?
19     A.   I don't think so.
20     Q.   Are there any instances
21 where you can recall that your
22 department worked with the other
23 departments in the City of New York to
24 identify a leak or spill of gasoline

31  (Pages 118 to 121)

Confidential - Per 2004 MDL 1358 Order

Page 138

1  odor problems for public water
2  purveyors?
3      A.  No, I did not.
4      Q.   With regard to your work in
5  preparing for this deposition, did you
6  look at any taste and odor studies
7  relative to the taste or odor threshold
8  of MTBE in drinking water?
9      A.  Honestly, I couldn't
10 find -- I would have liked to, but....
11     Q.   In the course of your
12 preparation for this deposition, did you
13 look at any reports submitted in any of
14 the other multidistrict cases before
15 Judge Scheindlin relative to taste and
16 odor issues in other cases?
17     A.  No, I did not.
18     Q.   Did you undertake to do a
19 search on the Internet to identify any
20 peer-reviewed articles relative to the
21 taste and odor threshold for MTBE in
22 drinking water?
23     A.  No.
24     Q.   Did you, in the course of

Page 139

1  your work on this matter, review any
2  material data safety sheets that were
3  issued by any of the defendants
4  concerning taste and odor of MTBE in
5  drinking water?
6      A.  No.
7      Q.   Did you review any product
8  safety bulletins concerning the taste
9  and odor threshold for MTBE in drinking
10 water?
11     A.  No.  I want to backtrack
12 and say you keep asking me did I review
13 this, did I review that, did I review
14 this.  And I keep saying no, which may
15 seem to you like I'm ill prepared for
16 this.  But previously you asked me if I
17 had looked at cards and I said no
18 because I have not looked at cards, I
19 have not looked at sample cards.  I have
20 seen so many sample cards and so many
21 complaint cards in my 13 years, there
22 was no need for me to look at complaint
23 cards.  You see one complaint card, you
24 know what's on there.  I had a part in

Page 140

1  designing the complaint cards.  I know
2  the kind of information that's there.
3  So, no, I did not for this specific case
4  look at any of -- some of these
5  documents.
6      Q.   Did you for purposes of
7  this deposition review complaint cards
8  which were related to customer
9  complaints where testing had occurred
10 for volatiles specifically to prepare to
11 testify here today?
12     A.  I didn't look at complaint
13 cards because I know what information is
14 going to be on the complaint cards.
15 There's not going to be any information
16 on that card that's going to be useful
17 for this type of deposition.
18     Q.   And you say that because of
19 your experience or because you have
20 looked at the cards or both?
21     A.  Because of both.  I know
22 what the cards -- I know the information
23 on the cards.  What's on the green cards
24 is just the complainant's name, address,

Page 141

1  the location that the sample was taken,
2  either the kitchen tap, bathroom tap,
3  whether it was a hydrant sample, some of
4  the field readings.  And then if there
5  was any -- I don't know.  At the time
6  the lab was actually putting data on the
7  card as well, but after a while they
8  stopped using those cards and they just
9  started inputting data into computers.
10 So the green cards were just sort of
11 like a sample of custody transfer.  It
12 was like a chain of custody.
13     We provided -- we filled
14 out a green card or a yellow card prior
15 to the green cards, one per sample;
16 okay?  Kitchen sink, immediate sample,
17 here is your field readings.  Kitchen
18 sink, five-minute sample, the address,
19 the consumer's name, whatever, here are
20 your five-minute readings.  All this
21 information got put into a laboratory
22 information system, the LIMS system,
23 which was computerized.  So if you
24 wanted to see the data, you didn't have

36  (Pages 138 to 141)

Page 142

1   to look at the green card, you could
2   just look at the database.
3       So for me looking at green
4   cards, it was an exercise in futility.
5       Q.   And with regard to the
6   complaint cards, are there areas where
7   the sampler can make remarks relative to
8   the conditions that they observed?
9       A.   Yes.
10      Q.   And did you think, in terms
11  of preparing for the deposition, that
12  there were any comments that might be
13  particularly remarkable for purposes of
14  talking about taste and odor complaints
15  relative to the --
16      A.   That information would have
17  also have been put into the LIMS system.
18      Q.   And did you look at all of
19  the LIMS system entries for VOC samples
20  in the Borough of Queens?
21      A.   The LIMS system, no, but I
22  think there was another table; I'm not
23  sure which one that was.
24      Q.   And we will look at those.

Page 143

1       A.   Okay.
2       Q.   We're not going to -- it is
3   not a memory test.
4       A.   I mean, looking at the
5   cards does nothing for me because all
6   that information is somewhere else,
7   that's my point.
8       Q.   So if the -- and I'm just
9   trying to be clear. So I understand
10  you, if the person going to the field
11  and taking the samples observes certain
12  conditions, they record that on the
13  green card and that is then transferred
14  to the Laboratory Information Management
15  System?
16      A.   Correct.
17      Q.   And is that then put onto
18  any other database that you could review
19  or anyone else in the City could review,
20  like a log or some kind of --
21      A.   Well, you can export that
22  data into one of these spreadsheets.
23      Q.   And with regard to the
24  spreadsheets that have been prepared,

Page 144

1   the spreadsheet, for example, which is
2   the TASTEODOrCOMPLAINTS1994TO2008, the
3   version of that that you looked at and
4   which I looked at, is that the way its
5   kept by Ms. Capetanakis or Mr. Tringali?
6       MR. PASTERNACK: Objection,
7   vague.
8   BY MR. STACK:
9       Q.   I'm asking this for a very
10  simple reason.
11      A.   Okay.
12      Q.   You told me you could
13  import data from different databases.
14      A.   Right.
15      Q.   So what I'm trying to
16  figure out is --
17      A.   No, export data from LIMS.
18      Q.   Correct. And then likely
19  put it somewhere else?
20      A.   Well, you make -- right.
21      Q.   Okay.
22      A.   You don't merge files. You
23  put it in its own.
24      Q.   But the taste and odor

Page 145

1   complaints file listed under paragraph
2   9 --
3       A.   Right, that's a separate.
4       Q.   The version that I'm
5   looking at, that version is in a form
6   that's maintained by one of your
7   subordinates in the ordinary course of
8   doing their job?
9       A.   Right.
10      Q.   And as far as you know, no
11  information was exported from LIMS and
12  added to that just for purposes of the
13  litigation?
14      A.   No.
15      Q.   With regard to the Queens
16  complaints database that was put
17  together by Mr. Lu and Ms. Xu, that is
18  maintained in the form that we see it in
19  the ordinary course of business?
20      A.   I don't think so. I think
21  that that was -- that data was extracted
22  from other places specifically to
23  address at the tap VOC sampling in
24  Queens, I believe.

37 (Pages 142 to 145)

Confidential - Per 2004 MDL 1358 Order

Page 287

VOLUME II·

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl:MDL NO. 1358 (SAS)
Ether ("MTBE")       :
Products Liability    :
Litigation            :

In Re:

City of New York
------

CONFIDENTIAL (Per 2004 MDL 1358 Order)

------
November 20, 2008
------

Continued Videotaped
Deposition of VIRGINIA MURRAY, 30(b)(6)
witness re taste and odor, held in the
law offices of McDermott, Will & Emery,
340 Madison, New York, New York 10173,
beginning at approximately 9:39 a.m.,
before Ann V. Kaufmann, a Registered
Professional Reporter, Certified
Realtime Reporter, Approved Reporter of
the U.S. District Court, and a Notary
Public.

------

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Confidential - Per 2004 MDL 1358 Order

Page 424

1     A.   Each borough has a borough
2  engineer, so we deal with the borough
3  engineer.
4     Q.   And with respect to
5  investigation in instances where, as we
6  saw, there was a QD code where there was
7  actually oil and grease being reported
8  in the water, is there an onsite
9  investigation conducted in the field by
10  someone from your office or under
11  Mr. Tringali's direction who actually
12  goes out to find out what the problem
13  is?
14     A.   Are you talking about
15  construction in the area?
16     Q.   As one example, yes,
17  ma'am.
18     A.   That was a bigger
19  investigation than just water quality.
20  That was a broken water main that
21  involved the Bureau of Water and Sewer,
22  their deputy commissioner, and all their
23  construction engineers.  That was a big
24  event; and, yes, they did contact Water

Page 425

1  Quality to come out and take samples,
2  but it was their investigation that we
3  responded to.
4     Q.   As I understand it, you
5  actually did participate in that
6  particular incident?
7     A.   Yes.
8     Q.   Are there any instances
9  that you can recall where there were
10  contaminants present in the water supply
11  system and you were called upon to
12  actually go to the field and conduct
13  sampling and the contaminant of concern
14  was MTBE?
15     A.   We did not test for MTBE
16  for consumer complaints, so we would not
17  have made that correlation.
18     Q.   And my question, though, is
19  recognizing you didn't test for MTBE
20  from consumer complaints, there
21  obviously were some circumstances that
22  you have identified to us that fell into
23  a different category and necessitated a
24  response, which depending upon the

Page 426

1  decision made in the field, may have
2  entailed volatile organic compound
3  testing.
4     So my question to you is,
5  was there ever an instance, apart from a
6  taste and odor complaint, where a
7  complaint was registered of a
8  contaminant visible or contaminant
9  present, in some other manner of
10  perceptive -- perceived by the customer,
11  that you were called into the field to
12  do sampling and the sampling was
13  sampling that showed presence of MTBE in
14  the water system?
15     A.   It's possible that we were
16  investigating something and MTBE showed
17  up, but I can't recall any particular
18  instances.
19     Q.   You indicated yesterday --
20  two more subjects to go -- that you were
21  involved in meetings with community
22  groups at times in the course of your
23  job; am I correct?
24     A.   Our division was involved.

Page 427

1     Q.   Had your division ever
2  attended meetings of community groups in
3  Queens to respond to taste and odor or
4  water quality complaints?
5     A.   I believe so.
6     Q.   Have you personally ever
7  attended any of those?
8     A.   No, I have not.
9     Q.   And with respect to the
10  community groups in Queens, are there
11  any instances which you can identify for
12  us in which the City responded to
13  complaints from a community group
14  related to concerns about MTBE in the
15  water system creating taste and odor
16  problems?
17     A.   Specifically MTBE?
18     Q.   Yes, ma'am.
19     A.   No.
20     Q.   Any instances you can
21  recall where community groups complained
22  about gasoline being present in the
23  groundwater area and possibly affecting
24  taste and odor, be it through MTBE or

36 (Pages 424 to 427)