# EXHIBIT B

Page 1

1      IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2

3    IN RE:

4    Methyl Tertiary Butyl : MDL NO. 1358(SAS)
     Ether ("MTBE")        :
5    Products Liability    :
     Litigation            :
6

7    CONFIDENTIAL (Per 2004 MDL 1358 Order)

8           In Re:  City of New York

9                    ------
              April 22, 2009
10
                     ------
11
                  CONFIDENTIAL Videotaped
12   Deposition of WILLIAM A.T. MEAKIN,
     P.E., held in the law offices of
13   McDermott, Will & Emery, 340 Madison
     Avenue, New York, New York, beginning at
14   approximately 10:13 a.m., before Ann V.
     Kaufmann, a Registered Professional
15   Reporter, Certified Realtime Reporter,
     Approved Reporter of the U.S. District
16   Court, and a Notary Public.

17                   ------

18

19

20

21

22
            GOLKOW TECHNOLOGIES, INC.
23       877.370.3377 ph|917.591.5672 fax
                deps@golkow.com
24

Page 106

1  Q. Are those being accorded
2  any rank in terms of capital
3  expenditures that may have to be spent
4  down the line, or are they in their
5  infancy and you really can't predict the
6  capital spending needs?
7       MR. REO: Objection.
8  A. They -- all the projects
9  are going to be taken forward to some
10 point of facility planning to allow DEP
11 to make an informed decision of what the
12 Dependability Program should be to take
13 us -- to allow us to take the Rondout-
14 West Branch Tunnel offline for
15 inspection, repair.
16      Q. And when do you believe the
17 DEP will make the decision concerning
18 what aspects of the Dependability
19 Project will be developed beyond the
20 facility phase and in what order?
21      MR. REO: You mean
22 Dependability Project or Program?
23      Q. Program.
24      A. The Dependability Program

Page 107

1  is one of the reasons why we're doing
2  the investigation for the parallel
3  tunnel. At that point, when we have
4  more information, the information of the
5  present jobs that are facility-planned
6  and the rest of the projects that will
7  need to be further investigated, at that
8  point we're anticipating two to three
9  years from now that DEP will have enough
10 information on all the projects to allow
11 it to make an informed decision on
12 which -- the program, the Dependability
13 Program, to get us to allow us to take
14 Rondout-West Branch offline.
15      Q. With respect to the
16 development of a parallel tunnel, in two
17 to three years will there be information
18 to permit DEP to assess whether or not
19 construction of the tunnel may obviate
20 the need to take the Rondout-West Branch
21 Tunnel out of service?
22      MR. REO: Objection.
23      Q. Put it to you this way: Is
24 there a scenario in the planning that

Page 108

1  you are conducting in which the
2  construction of the parallel tunnel may
3  be funded and proceed forward and
4  obviate the need for other projects
5  being undertaken because you're going to
6  actually build the tunnel before you
7  have to take the Rondout-West Branch
8  Tunnel out of service?
9       A. My job is to supply the
10 information for DEP and the City of New
11 York, the Mayor, to make an informed
12 decision on what projects we can
13 afford. I cannot tell anybody, sitting
14 right now, the present tunnel, how long
15 it will last and when it needs to be
16 repaired. I can only state right now we
17 monitor it. It is at steady state; the
18 leakage has not gotten any greater.
19 There are no alarms at the moment, but
20 we constantly monitor this tunnel.
21      So for them to make an
22 informed decision, all that information
23 is going to be brought to them and they
24 will be probably asking for more

Page 109

1  information, putting an informed
2  decision on the projects needed to allow
3  us to take that tunnel. So I can't
4  predict what's going to happen in three
5  years from now, but I can see a whole
6  host of projects going forward. In
7  fact, there will be a whole host of
8  projects going forward.
9       Q. With respect to the
10 ultimate decision as to which projects
11 within the Dependability Program will
12 proceed forward and on what schedule,
13 who ultimately makes that decision?
14      A. The ultimate person in
15 charge of the City is the Mayor.
16 Obviously, my old job -- it's not my job
17 anymore -- was to present all the
18 information needed for them to make that
19 informed decision. It will be brought
20 to all the DCs, the deputy commissioners
21 of all the bureaus involved. There will
22 be other Deputy Commissioners involved.
23 BEPA, Kathryn Garcia will be involved.
24 They will be bringing it to the

Page 114

1  this tunnel to find out if the historic
2  reports were accurate and there was 660
3  and there's been changes over the years
4  since the operation that affected the
5  carrying capacity.
6      It is also looking at can we
7  increase it -- if that turns out to be
8  no, that was a mistake in the documents,
9  is there other methods of bringing the
10 water from the reservoirs to the City, a
11 higher carrying capacity.
12     Q.  And that will be one of the
13 three projects that will be through the
14 facility planning stage for decision-
15 making on the Dependability Program
16 sometime down the line?
17     A.  For the decision, for the
18 ultimate Dependability Program, those
19 are one of the three that would have
20 reached 10% design.
21     Q.  With respect to Ms. Garcia,
22 has Ms. Garcia ever had any contact with
23 you in which she has expressed any
24 preference as to which of the proposed

Page 115

1  major facility plans should be pursued
2  by the department?
3      MR. REO:  Objection.
4      A.  She's one of many people
5  that give her my opinion -- give me her
6  opinion what goes forward.  I am the
7  project manager.  I am the program
8  manager involved with this.  I'm doing a
9  facility plan for Dependability.  I look
10 at all aspects of the projects.  She has
11 her favorites; other people have their
12 favorites.  I'm independent.  I'm
13 gathering the work to allow them to have
14 an informed decision.  I try not to have
15 favorites.
16     Q.  And has she ever expressed
17 to you any interest in pursuing one of
18 the facility plans over the other, as
19 best you recall?
20     MR. REO:  One of all the
21 facility plans within the Dependability
22 Program or just the three we've talked
23 about?
24     MR. STACK:  No, the three

Page 116

1  we've mentioned, 55 --
2      THE WITNESS:  I think she
3  understands we have to pursue all the
4  projects to get to 400-plus mgd.
5  BY MR. STACK:
6      Q.  With regard to the 55-mgd
7  project, does that contemplate the
8  development of Station 6 as part of the
9  55-mgd production?
10     A.  Station 6 is not part of
11 the 55 potable water.  It is 55 --
12 Station 6 is 10 mgd above the 55 mgd or
13 vice versa, 55 is above 10.
14     Q.  Okay.  With respect to the
15 15-mgd project, is that part of the
16 overall Dependability Plan?
17     MR. REO:  15, you mean the
18 existing capacity?
19     MR. STACK:  The emergency
20 capacity, correct.
21     THE WITNESS:  It goes by
22 many names.  The 15 emergency capacity
23 is part of the Dependability Program.  I
24 wouldn't call it a separate project.  It

Page 117

1  is facilities we have right now that
2  have stated that can be in operational
3  condition within a couple months.
4  BY MR. STACK:
5      Q.  With regard to the 15-mgd
6  emergency wells, are you preparing any
7  capital budgets to secure new treatment
8  equipment at any of those wells for
9  installation in the future?
10     A.  In the immediate future,
11 no.  When we plan to take the tunnel
12 offline, we will be looking at the
13 complete infrastructure of the City to
14 make sure that we can guarantee we can
15 get 400-plus mgd.  If at that time
16 capital money has to be spent on
17 facilities like this, there's always a
18 possibility.
19     Q.  With regard to the current
20 Dependability Program, does it include
21 the expenditure of capital monies to
22 remove the existing treatment equipment
23 on the emergency wells with a capacity
24 of 15 mgd and replace it with new

Page 118

1  treatment equipment?
2  A. No. The emergency wells
3  have to be up and ready for an
4  emergency. We do not want to take
5  anything offline or anything. They have
6  to be available to us at any time.
7  Q. With respect to the design
8  phase of Station 6, who is the
9  contractor who is going to take the
10 Station 6 design to the 10% facility
11 plan level?
12 A. Station 6 has already gone
13 to 10% design level under Malcolm
14 Pirnie.
15 Q. With regard to the
16 contracting work to complete the design
17 and construct the project, has that
18 contract been awarded to anyone?
19 A. That contract has not been
20 awarded. We have started preliminary
21 work of trying to have a negotiated
22 acquisition with the present -- Malcolm
23 Pirnie, the present planners.
24 Q. What does it mean to have a

Page 119

1  negotiated acquisition?
2  A. Under the City guidelines,
3  rules, PPB rules, you -- there's many
4  ways to hire someone, open bidding, such
5  things. If they have an existing
6  contract on a planning stage, a facility
7  plan, and if you stated it was always
8  your intent that this designer may take
9  other stages of the design, if the DEP
10 project management decides that it's
11 beneficial to the City to have them
12 carry on the design, it's called -- you
13 enter into negotiations with them. But
14 it has to also make certain rules of,
15 you have to prove that it's not
16 beneficial to the City to put it on the
17 street. You have to prove that it's
18 time sensitive, that we really need to
19 get this work done as soon as possible,
20 such things like that. Guidelines like
21 that are involved in any -- in the
22 negotiation.
23 Q. With regard to the
24 negotiation process, is there a deadline

Page 120

1  by which that is anticipated to be
2  completed?
3  A. We have started the
4  paperwork because the goal was that I
5  wanted to be able to be able to jump on
6  any opportunity in any of the fiscal
7  years coming up if other funds came
8  available, that we could instantly push
9  the paperwork done and get it signed off
10 in that fiscal year.
11        There will be a time when
12 the guidelines will probably not allow
13 me to go to negotiated acquisition. I
14 would not say we've reached that point
15 at the moment.
16 Q. With respect to the point
17 at which you will either have a
18 negotiated acquisition or no, that would
19 be what date that you are going to know
20 whether you actually will have
21 successfully come up with a negotiated
22 acquisition or whether you have to take
23 it to bid?
24 A. There will be a timeline,

Page 121

1  and it's probably within a year or so,
2  that we will not be able to go the
3  negotiation route, and at that point I
4  will -- in my former job the person in
5  charge would instructed his people to
6  start developing an RFP and get ready to
7  put it onto the street.
8  Q. If there is an RFP that has
9  to be issued for Station 6, what impact
10 would that have on the schedule to
11 design and build the project?
12 A. Right now it shouldn't.
13 We're anticipating that that RFP will be
14 set in place when the funding is there.
15 Q. The funding will be there
16 in what fiscal year?
17 A. I -- sorry, I have to look
18 at the budget, the ten-year budget. I
19 would like to say -- can I look at the
20 budget, please?
21 Q. I think I have the ten-year
22 capital plan. Is that what you're
23 talking about?
24 A. Yes.

Page 364

1  THE WITNESS: And here it
2  says implemented schedule, "9 to 10
3  years."
4  BY MR. STACK:
5      Q.  With regard to the
6  implementation schedule of nine to ten
7  years, does that include the facility
8  planning phase, if you know?
9      A.  The facility planning
10 stages now, no, it's after this work.
11     Q.  Okay. So with regard then
12 to the "Brooklyn-Queens Groundwater
13 Project" being referred to on Bates page
14 7017 in Exhibit 17, after the facility
15 planning is completed -- and that is
16 about 2012, I believe you said?
17     MR. REO: I believe he
18 testified earlier it was 2011.
19     MR. STACK: Whichever.
20 BY MR. STACK:
21     Q.  You can tell me.
22     A.  I'd have to review my
23 notes. I wrote it on my notes,
24 actually, of what we've submitted when I

Page 365

1  was reviewing it.
2      I would say '11. '09 is,
3  yes, '11.
4      Q.  Fair enough. Okay. With
5  regard to the 55 mgd project, we will
6  have the facility plan in place, 10%
7  design completed sometime in 2011;
8  correct?
9      A.  That's what I recall.
10     Q.  With regard to the schedule
11 thereafter, it will take approximately
12 nine to ten years to bring the 55
13 million gallons on line, complete
14 construction and deliver water to
15 customers?
16     A.  On this baseball card, yes.
17     Q.  And with respect to your
18 testimony as the representative of the
19 City, is it your testimony that the
20 delivery of water from the 55 mgd
21 project will occur sometime between 2020
22 and 2021?
23     MR. REO: Objection. You
24 mean the full 55?

Page 366

1      MR. STACK: The full 55.
2  And I'll clarify.
3  BY MR. STACK:
4      Q.  With regard to completion
5  of the project and delivery of all 55
6  million gallons of water to be produced,
7  that will be achieved sometime in the
8  year 2020 or 2021 based on the current
9  schedule?
10     A.  My goal in my past job was
11 to ensure that we adhered to the
12 schedule and get it done then or before
13 that, to beat that schedule. So if the
14 question is the schedule time, yes, my
15 job was to make sure that would happen
16 in that scheduled time or better.
17     Q.  With regard to the schedule
18 that's set forth here in Exhibit No. 21,
19 and I'm really trying to figure out --
20     This is a very simple
21 question. You are testifying as a
22 representative of the City. I simply am
23 trying to establish in your capacity as
24 the person most knowledgeable for the

Page 367

1  Dependability Program, is it your
2  testimony that this project is going to
3  be completed and on line by 2020 or
4  2021?
5      MR. REO: Objection, asked
6  and answered.
7      A.  The job of the chief of
8  that division's job is to adhere to the
9  schedule and do better than the
10 schedule.
11     Q.  And with regard to the
12 schedule -- I'm sorry, because I really
13 don't think that was responsive to my
14 question. I apologize.
15     A.  I then misunderstood your
16 question, sorry.
17     Q.  With respect to the
18 testimony that you are giving here as
19 the representative of the City of New
20 York, what is the date certain by which
21 all 55 million gallons that will be
22 produced in the first phase of the
23 Groundwater Dependability
24 Program/Project in Queens, what is the

Page 368

1  date that that will be in service and
2  available to customers?
3      MR. REO: Objection. Asked
4  and answered.
5      A. The precise date. I can
6  give you a general date of -- the
7  schedule shows, after facility plan,
8  implementation is ten years. If the
9  facility plan is going to be finished by
10 11, so if I add ten years onto that, the
11 outside schedule says 1021 --
12     Q. With respect to --
13     A. -- 2021.
14     Q. With respect to the funding
15 decision to proceed and complete final
16 design and construct these facilities,
17 that decision will be made sometime
18 after 2011?
19     MR. REO: Objection.
20     A. Sorry. You'll have to --
21     MR. REO: Asked and
22 answered.
23     A. -- repeat that.
24     Q. Yes, sir. With respect to

Page 369

1  a final decision by the Commissioner and
2  the Mayor to proceed with the 55 mgd
3  project, that will be made sometime
4  after the facility planning phase is
5  completed in 2011?
6      MR. REO: Objection, asked
7  and answered. I mean, I don't know that
8  he said it was the Mayor was going to
9  make the decision, but that it goes up a
10 chain that may include the Mayor.
11     THE WITNESS: Well, I'm
12 getting confused what you mean by
13 finalized as well. The program -- if
14 we're talking about the program, this 55
15 mgd is in the program already. It's
16 what else is needed to get up to 400
17 mgd, what other projects.
18 BY MR. STACK:
19     Q. Understood.
20     And perhaps I misunderstood
21 your testimony. As I understood your
22 testimony yesterday, you indicated that
23 after the facility planning phase is
24 completed for the Catskill project, the

Page 370

1  55 mgd project, and the Rondout-West
2  Branch parallel tunnel project, that at
3  some point in 2011 that information
4  would be provided to the ultimate
5  decision-makers in the City and they
6  would decide which, if any, of those
7  projects would go forward to final
8  design and construction.
9      MR. REO: Objection.
10     Q. Was I misunderstanding what
11 you said?
12     A. I don't know if you
13 misunderstood it, but I'll clarify that
14 when NCA has -- NCA, sorry -- 3 CDA has
15 had enough information, which is two to
16 three years, probably three years, with
17 the other projects that we want to
18 further develop to have -- to be able to
19 provide upper management the resources
20 they could make a decision on the
21 program, the other information that
22 we've already gathered on the Brooklyn-
23 Queens and the Catskill capacity will
24 also be part of all that information,

Page 371

1  they will be making a decision on the
2  program.
3      But I think I've stated
4  that the 55 and the Catskill is part of
5  the program as I've stated the 15
6  emergency is already part of the
7  program. The Croton filtration plant is
8  part of the program. Cross River -- I
9  don't want to name them all. I don't
10 want to delay the point.
11     Q. Understood.
12     With respect to the
13 decision point in 2011, at that point in
14 time will the decision-makers, based on
15 what you understand the process to be,
16 have the authority to pick and choose
17 which of these projects may go forward,
18 given whatever the budget constraints
19 are at the time?
20     MR. REO: Objection, asked
21 and answered.
22     A. I'm caught on the word
23 "authority."
24     What do you mean by that?

Page 404

1  memory I would have read something like
2  this. I want to make sure. There are
3  several documents on Jamaica Phase I
4  Groundwater.
5      Q.  Do you want to refer to
6  your notes to do that?
7      A.  If I could, yes, please.
8      Q.  Please. By all means. At
9  some point it may be appropriate, too,
10 to just go ahead and mark a copy of your
11 notes unless counsel wants to review
12 them first to see if there's any work
13 product.
14      MR. REO: It's already been
15 redacted in anticipation of your
16 request.
17     A.  I want to make sure the
18 dates are right because there were
19 several -- it doesn't matter about
20 dates?
21     MR. REO: No, I'm not saying
22 that.
23     MR. STACK: I think counsel
24 is cautioning you that everything you

Page 405

1  say is being written down.
2      MR. REO: And you can think
3  to yourself.
4      THE WITNESS: I reviewed my
5  notes twice and I don't see this, the
6  document you just referred to listed on
7  my notes.
8  BY MR. STACK:
9      Q.  Did you review any of the
10 technical memos prepared by CDM/Hazen
11 and Sawyer concerning Jamaica Phase I
12 groundwater?
13     A.  And I'd have to go back to
14 my....
15     I have a Jamaica Phase I
16 groundwater, November 14.
17     Q.  Of which year?
18     A.  And there's an addenda to
19 that, Technical Memo T06-02-TM02.
20     Q.  That is November of which
21 year?
22     A.  2007. And there's an
23 addenda to that.
24     Q.  Okay.

Page 406

1      A.  Same T number, January 7,
2  2008.
3      Q.  Okay. I take it then you
4  did not see the memoranda that was
5  identified as Exhibit 26 for purposes of
6  this deposition?
7      A.  That would be a fair
8  statement. It's not listed. I would
9  have listed it.
10     Q.  With respect to the
11 technical report identified as
12 Exhibit 27, the Jamaica Phase I
13 groundwater, did you review that
14 document prior to your deposition?
15 April 2008, yes.
16     A.  Yes, I did.
17     Q.  With respect to this
18 document, have final decisions been made
19 as to where the treatment facilities
20 should be located in Queens?
21     A.  As stated before, until the
22 modeling is finished, no, that decision
23 has not been made.
24     Q.  With respect to -- and this

Page 407

1  is a chicken and egg question. I
2  apologize. With respect to the siting
3  of wells and treatment facilities in the
4  selection process, which location is
5  going to be identified and selected
6  first for purposes of the Dependability
7  Program? Are you going to identify
8  available sites with sufficient acreage
9  to put a treatment facility or are you
10 going to identify locations where wells
11 will be most productive and water will
12 be cleanest?
13     MR. REO: Objection.
14     A.  My goal when I had -- when
15 I was chief was to fast track this
16 project. I have requested that as soon
17 as possible after the modeling has been
18 done is to identify the well sites first
19 so we can progress with them. So the
20 well sites will take -- they will go
21 concurrently, but the well sites will
22 come quicker.
23     Q.  Now, in the course of your
24 work on the Dependability Program and

Confidential - Per 2004 MDL 1358 Order

Page 408

1  the 55 mgd project, did you learn about
2  which of the existing wells were
3  considered for inclusion in the project
4  and which were not?
5      A.   No wells have been excluded
6  or included into the final decision.
7  That's a correct statement.
8      Q.   At any point in time were
9  you told that --
10     A.   You know, I just -- there's
11 saltwater intrusion wells. Those are
12 definitely not part of the 55 mgd
13 potable water.
14     Q.   Fair enough.
15          What I was going to do is,
16 were you told that Station 45 should not
17 be considered for inclusion in the
18 Dependability Project because of the
19 potential for saltwater intrusion
20 affecting that well?
21     A.   If it's a saltwater
22 intrusion well, yes.
23     Q.   Now --
24     A.   And I --

Page 409

1      Q.   Yes, sir. Go ahead.
2      A.   Because once I remembered
3  the saltwater, the emergency 15-mgd
4  wells, as well, is not considered part
5  of the 55. They are already in the
6  program.
7      Q.   At 15 mgd?
8      A.   At 15 -- well, potential
9  15, yes.
10          MR. STACK: And I'll ask the
11 court reporter to mark a document as
12 Exhibit No. 28. And Exhibit No. 28 is a
13 document which appears to have been
14 forwarded to Ms. Barnes and not to you,
15 unfortunately, but I want to see if it
16 refreshes your recollection and we can
17 clarify these locations.
18          NYC-DS-027246 through 248.
19 It's a series of e-mails, June 19, 2008,
20 and June 23, 2008.
21          I provide a copy to you,
22 I'll provide a copy of what has been
23 marked as Exhibit 28 to your counsel and
24 to co-counsel.

Page 410

1          (Above-described document
2  marked Meakin Exhibit 28.)
3          THE WITNESS: I'm ready for
4  your questions.
5  BY MR. STACK:
6      Q.   Yes, sir. First, with
7  reference to Exhibit 28, is it your
8  understanding as a representative of the
9  City of New York in this case who is
10 most knowledgeable as to the
11 Dependability Project -- Program -- I'll
12 rephrase that.
13         As the person most
14 knowledgeable for the City of New York
15 concerning the Dependability Program, is
16 it your understanding that in developing
17 wells in Queens for the 55 mgd project
18 that wells where there is a potential
19 for saltwater intrusion will not be
20 included in the project?
21     A.   It will not be included as
22 part of that project, the 55 mgd.
23     Q.   And with regard to the
24 stations that were identified, was

Page 411

1  Station 45 one of the stations that have
2  been identified as having potential
3  saltwater intrusion if pumping were to
4  occur at that location?
5      A.   According to this exhibit,
6  yes, that is one of the stations.
7      Q.   Is Station 45, to the best
8  of your knowledge, being considered for
9  any other project under the
10 Dependability Program?
11     A.   It will be, yes.
12     Q.   When will it be?
13     A.   It is one of the listed
14 projects, the desalination of brackish
15 water. It would come under that
16 program.
17     Q.   So if we were to look at
18 the baseball cards in Exhibit 21, the
19 location for Exhibit -- pardon me, the
20 location for Well 45 is one of those
21 that is potentially identified or may be
22 identified for desalinization?
23     A.   It has potential of being
24 part of that project. I do not know

27 (Pages 408 to 411)

Confidential - Per 2004 MDL 1358 Order

Page 436

1 to produce 55 mgd?
2           MR. REO: Objection.
3      A.  And the answer would be the
4 same as for the other well we just
5 discussed.
6      Q.  Which is that they are not
7 considering it until such time as the
8 modeling is completed?
9           MR. REO: Objection,
10 mischaracterization of his answer.
11     A.  It is stated that well 39
12 is not recommended for Dependability at
13 this time.
14          When the model is -- when
15 they are stating this, it's for the
16 further development of the budget and
17 the site. When the model is finished
18 and when DEP agrees that the best well
19 locations for the City of New York are
20 these well locations and this happens to
21 be in that area, it will be
22 re-evaluated.
23     Q.  Now, with respect to
24 well 35 -- 45, is it your understanding

Page 437

1 that the location of well 45 is not
2 proposed for the Dependability Project
3 because there is concern that if a deep
4 well was installed there, it would
5 possibly promote saltwater intrusion?
6           MR. REO: Objection.
7      A.  It was my understanding in
8 the previous document you presented to
9 me that well 45 has possible saltwater
10 intrusion.
11     Q.  And as a saltwater
12 intrusion well, well 45 would be
13 excluded because the production of
14 water, including water which would
15 induce saltwater intrusion, is not going
16 to be something you will pursue in this
17 phase of the project?
18          MR. REO: Objection. You
19 mean the 55 mgd project?
20 BY MR. STACK:
21     Q.  With respect to the 55 mgd
22 project, is it correct that any well
23 which is identified as causing or
24 contributing to saltwater intrusion

Page 438

1 would be excluded from further
2 consideration for inclusion in that
3 project?
4      A.  For the 55 mgd, yes, it
5 will be evaluated in the desal, the
6 desalination project.
7      Q.  With respect to the joint
8 venture project, has a decision been
9 made that the joint venture project will
10 not develop or use water from the Upper
11 Glacial Aquifer because of its
12 susceptibility to contamination as part
13 of the 55 million gallon per day
14 project?
15          MR. REO: Objection.
16     A.  The joint venture has
17 stated that deeper wells may produce
18 better quality water than the upper
19 aquifer. Until the model is completed
20 and that is proved out to be correct to
21 gain us 55 potable water, the decision
22 hasn't been made which wells are to be
23 selected.
24     Q.  Fair enough.

Page 439

1           MR. STACK: I will ask the
2 court reporter to mark another document
3 as Exhibit 31. Exhibit 31 is an e-mail
4 with attachments. It is -- the latest
5 of which is July 13, 2007. It indicates
6 that you were copied with this memo
7 concerning water quality standards for
8 dependability.
9           I will provide you with a
10 copy of Exhibit 31, I will provide a
11 copy to your counsel and I will provide
12 a copy of a portion of that to
13 co-counsel because the attachment was
14 not included.
15          This document for the record
16 is Bates labeled NYC-DS-053868 and it
17 includes pages in the e-mail up to
18 3870. Pages 3871 through 3875 are part
19 and parcel of a memorandum to William
20 Meakin from Gary Kroll, dated July 13,
21 2007, and it is relating to flooding and
22 water quality considerations.
23          (Above-described document
24 marked as Meakin Exhibit 31.)