# EXHIBIT 4

# DEPARTMENT OF ENVIRONMENTAL CONSERVATION

## EMERGENCY RULE MAKING

**Oxygenated Gasoline Use in Carbon Monoxide Nonattainment Areas**

I.D. No. ENV-33-92-00010-E
Filing No. 1541
Filing date: Aug. 10, 1993
Effective date: Aug. 10, 1993

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following action:
*Action taken:* Amendment of Subpart 225-3 and Part 200 of Title 6 NYCRR.
*Statutory authority:* Environmental Conservation Law, sections 19-0301(1)(a) and (b), 19-0301(2)(a) and (e) and 3-0301.2(a)
*Finding of necessity for emergency rule:* Preservation of public health; and preservation of the general welfare.
*Specific reasons underlying the finding of necessity:* New York State's proposed oxygenated fuels program is aimed at reducing carbon monoxide (CO) emissions from gasoline-fueled motor vehicles in the Syracuse and New York City metropolitan areas so that these areas may attain the National Ambient Air Quality Standard (NAAQS) for CO. The federally mandated implementation date for the oxygenated fuels program is November 1, 1992. A late program, even if late by a few months, would have adverse impacts on health for citizens of these two metropolitan areas. It would also significantly affect the welfare of New York State by disrupting the petroleum distribution network, and the petroleum industry doing business in the State. Therefore, to minimize these adverse effects, the New York State Department of Environmental Conservation (the Department) is proceeding with emergency rule making to enable the State to realize the full benefits of an oxygenated fuels program as intended by the 1990 amendments to the Clean Air Act (the Act).

WELFARE EFFECTS ON FUEL DISTRIBUTION:
If New York State's oxygenated fuels rule is not adopted in time for implementation by November 1, 1992, fuel distribution within the New York, New Jersey and Connecticut tri-state region would be adversely impacted. The Department estimates that about 75-85%, and possibly more, of the oxygenated fuel to be dispensed within this region will be distributed through pipelines. Therefore, a late rule would undoubtedly cause uncertainty in the marketplace and would increase the potential for supply problems and the incentive for bootlegging nonoxygenated fuel into New Jersey and Connecticut, which appear to be on schedule for having their respective state rules in place by the November 1, 1992 deadline.

WELFARE EFFECTS ON NEW YORK STATE:
The Act includes a sanctions process if a state fails to submit a required State Implementation Plan, has a State Implementation Plan (SIP) disapproved in whole or part, or fails to implement a measure contained in the plan. In a July 22, 1992 memorandum, the U.S. Environmental Protection Agency (EPA) indicated that it expects states to make full submittals of their oxygenated fuels program as part of the CO SIP by the November, 1992 deadline. Thus, EPA, operating under its authority pursuant to the Act, has effectively declared that it will initiate a SIP sanctions process against New York State if the State fails to implement an oxygenated fuels program on time. Sanctions would include the prohibition of approvals by the Secretary of Transportation of any projects or the awarding of any highway funding, and an air contaminant emission offset requirement of 2 to 1 for any new or modified sources.

In addition, EPA may use portions of the State's air program federal funding to prepare a Federal Implementation Plan (FIP) which would impose the measures for which the State was sanctioned. A FIP would effectively remove authority from the State to incorporate certain environmentally beneficial provisions of its proposed rule. The FIP would be effective two years from the date the State failed to submit a plan or had a plan disapproved.

WELFARE EFFECTS ON THE PETROLEUM INDUSTRY:
Indications are that the major petroleum companies have already begun to invest resources into gearing up for an oxygenated fuels program with an implementation date of November 1, 1992. It can be assumed that these major petroleum companies have signed contracts with oxygenate suppliers based on a November 1 start-up date for the oxygenated fuels program.

Uncertainty in the marketplace is a primary concern of the petroleum industry. A late rule raises the concern that companies, which have not yet committed to the November 1, 1992 implementation date, will not voluntarily comply with the oxygenated fuel requirements and, therefore, will place the major petroleum companies (the majors) at a competitive disadvantage before actual implementation of the program occurs. For example, to remain competitively priced with noncommitted companies, the majors would have to sell higher cost oxygenated fuel at the lower conventional gasoline prices. An option for the majors to remain competitive would be to store the contracted oxygenated fuel until actual implementation. However, ample storage cannot be expected to be available and would surely be expensive (possibly as high as $0.05-0.10 per gallon or up to an additional $2-4 million overall).

It is estimated that between 30 and 40 million gallons per month of oxygenate will be added to fuel to run New York's oxygenated fuels program, and for a three month period, over 100 million gallons will be needed. Assuming an average increased wholesale cost for oxygenate (above nonoxygenated fuel) of $0.60 per gallon, a rule making delay of three months could yield losses to the majors of about $54 to $72 million.

HEALTH EFFECTS:
Carbon monoxide is a colorless, odorless, tasteless gas which has adverse impacts on human health at high concentrations, usually at 10 parts per million (ppm) or above for a period of more than a few hours. At these concentrations, CO, which deprives the body of oxygen, can cause reduced awareness, headaches and fatigue. People who are at risk of developing cardiovascular problems or who perform vigorous exercise when ambient CO concentrations are high are especially susceptible. Depending on the ambient CO concentration and on a person's risk factors, the effects of CO exposure may begin within a few hours.

Recognizing that CO causes such health effects, and based upon scientific determinations of the threshold levels of air pollution below which no adverse effects will be experienced by humans or the environment, the EPA has promulgated NAAQS for CO and other air pollutants. Two types of standards have been set: primary standards which define the air quality required to prevent any adverse impact on human health; and secondary standards which in some instances establish lower numerical limits to prevent adverse effects on vegetation, property and other elements of the environment.

The New York City consolidated metropolitan statistical area (NYC-CMSA), comprised of an eleven county area, exceeds the primary 8-hour standard of 9 ppm for CO. As NYC-CMSA data indicates, the primary standard has been and continues to be exceeded, thus causing an adverse impact on human health and justifying emergency regulations. The Syracuse metropolitan statistical area (MSA) remains in nonattainment status for CO and also warrants immediate action.

To bring areas with high levels of CO into compliance with the NAAQS, the CAA has outlined several programs for the control of CO emissions, with the primary one being the oxygenated fuels program. Motor vehicles are responsible for the overwhelming majority of the State's CO nonattainment problems, and it has been determined that an oxygenated fuels program, by decreasing the tailpipe CO emissions of most gasoline-fueled motor vehicles, will significantly reduce ambient levels of CO. In fact, the intent of the Act is for the oxygenated fuels program to be the first new CO control strategy to be implemented under the 1990 amendments since this program may well result in the greatest amount of CO reductions.

The combined population of the Syracuse and New York City metropolitan areas, which are the two areas where an oxygenated fuels program is to be implemented, is roughly 11,775,000 people. If New York State's oxygenated fuels program is delayed by 2-3 months past November 1, 1992, residents of these two areas, equaling approximately two-thirds of the State's total population, will not begin to benefit from

**NYS Register/August 25, 1993**                                     **Rule Making Activities**

the expected 15-20 percent reduction in wintertime CO emissions. In addition, since oxygenated fuels are to be used in the Syracuse area from November 1 through February 29 of each year, a delay in the rule making will severely jeopardize the program for the entire winter, and residents of the Syracuse area would derive no health benefits from the program until November 1993.

*Subject:* Oxygenated gasoline use in portions of New York State containing carbon monoxide nonattainment areas.

*Purpose:* To require the use of oxygenated gasoline in the New York City and Syracuse metropolitan statistical areas during specific months and to meet the requirements of the Federal Clean Air Act.

*Substance of emergency rule:* The Department of Environmental Conservation (the Department) has amended 6 NYCRR Subpart 225-3, Fuel Composition and Use -Volatile Motor Fuel, through provisions which further regulate the characteristics of gasoline used in New York State. Under amended Subpart 225-3, an oxygenated fuels program is established in designated portions of the State. Amended Subpart 225-3 continues to regulate the volatility, or Reid vapor pressure (RVP), of gasoline during New York's ozone season with some nonsubstantial changes for purposes of rule consistency and clarity. Furthermore, the amendments to this Subpart introduce a carbon monoxide (CO) contingency measure which, if activated, will place limits on the RVP of gasoline used in the New York City metropolitan area during the State's nonozone season.

Under the federal Clean Air Act (CAA), each state which contains areas designated as nonattainment for CO must revise its State Implementation Plan (SIP) to require the use of oxygenated fuels (gasoline which contains at least 2.7 percent oxygen by weight) in such areas during the portion of the year in which the areas are prone to high ambient concentrations of CO. These federally mandated oxygenated fuel programs, which were to have been implemented by November 1, 1992, are designed to reduce ambient levels of CO to comply with the National Ambient Air Quality Standards (NAAQS). Since motor vehicles are responsible for the majority of New York State's CO nonattainment problems, it is expected that an oxygenated fuels program, by decreasing the tailpipe CO emissions of most gasoline-fueled motor vehicles, will significantly reduce ambient levels of CO.

In New York State, the areas which are required to implement an oxygenated fuels program are the New York City Consolidated Metropolitan Statistical Area (NYC-CMSA) and the Syracuse Metropolitan Statistical Area (Syracuse MSA). The NYC CMSA consists of the counties of Bronx, Kings, Queens, New York, Richmond, Orange, Rockland, Putnam, Westchester, Nassau and Suffolk. The Syracuse MSA consists of the counties of Onondaga, Oswego and Madison.

Amended Subpart 225-3 requires statewide continued compliance with existing RVP provisions. It also establishes a nonozone season (September 16 through April 30) CO contingency measure to become effective in the NYC-CMSA if: 1) any nonattainment area within the NYC-CMSA fails to attain the NAAQS for CO by December 31, 1995; 2) the annual estimate of actual vehicle miles traveled (VMT) in the VMT tracking area within the NYC-CMSA during the previous calendar year exceeds the numeric allowance incorporated in the most recent forecast of VMT made prior to that calendar year; or 3) an annual updated forecast of VMT in the VMT tracking area within the NYC-CMSA for subsequent calendar years exceeds the numeric allowance incorporated in the most recent prior forecast of VMT. If implemented, this contingency provision would further limit RVP levels to 11.5 pounds per square inch (psi) from September 16 through October 31, 13.5 psi from November 1 through March 31, and 11.5 psi from April 1 through April 30. The CO contingency measure shall take effect within twelve months from the date of a finding by the Administrator of the U.S. Environmental Protection Agency (EPA) that one of the above three conditions has occurred.

With respect to oxygenated fuels, amendments to Subpart 225-3 require that any gasoline sold or dispensed in the NYC-CMSA during the control period of October 1 through April 30 must contain 2.7 to 2.9 percent oxygen by weight. In addition, any gasoline sold or dispensed in the Syracuse MSA during the control period of November 1 through February 29 must contain at least 2.7 percent oxygen by weight.

·Gasoline refiners and owners or operators of terminals and bulk plants may apply for an exception to provide, offer for sale, or sell gasoline above the maximum 2.9 percent oxygen content requirement in the NYC-CMSA. To obtain such an exception, applicants must demonstrate that the use of gasoline containing higher oxygen contents will not significantly exacerbate ambient levels of air pollutants within the NYC-CMSA. Furthermore, upon application, the Commissioner of the Department, after consultation with the Commissioner of the State Energy Office, may issue an order granting a temporary variance from the oxygen content requirements to allow gasoline to be provided, offered for sale, or sold at an oxygen content below 2.7 percent by weight if a shortage of oxygenated gasoline in any control area is determined to exist.

Amended Subpart 225-3 includes testing and labeling requirements for oxygenated fuels. Sampling and testing shall be performed prior to releasing gasoline from a final distribution facility, which supplies gasoline to a retail outlet or to a wholesale purchaser-consumer, and shall be repeated if the oxygen content of the gasoline could have been altered prior to being supplied to retail outlets or wholesale purchaser-consumers. During the applicable control period, all gasoline pumps and other gasoline dispensing devices at retail outlets within a designated control area shall be labeled to indicate that the gasoline dispensed from the pump is oxygenated and will reduce CO pollution from motor vehicles. The label shall also specify the oxygenate class (e.g. alcohol or ether), or methanol, present in the gasoline. If the gasoline pump label, stating that the gasoline is oxygenated and will reduce CO emissions, is displayed on the pump at times outside the applicable control period, and if the gasoline actually being dispensed from that pump has an oxygen content below 2.0 percent by weight, then a label specifying the dates when oxygenated gasoline is to be dispensed shall also be posted.

Amendments to Subpart 225-3 also revise the reporting requirements of the existing rule. The owner or operator of any refinery, terminal, or bulk plant must maintain records on the gasoline, subject to this Subpart, that is delivered to or distributed from such facilities. These records shall document the RVP and the oxygen content of the gasoline, specify the appropriate time periods in which the gasoline is intended to be dispensed, certify that the gasoline is in compliance with this Subpart, and specify the volume and chemical name of each oxygenate added, the shipment quantity, and the shipment date of all gasoline leaving the refinery, terminal, and bulk plant. Furthermore, each retailer or wholesale purchaser-consumer shall maintain records on each delivery of gasoline. These records shall include the RVP and oxygen content of the gasoline, documentation of the oxygenate composition of the gasoline and associated volume percent(s), the delivery quantity and delivery date, the time period in which the gasoline is intended to be dispensed to motor vehicles, and a copy of the certification that the gasoline complies with this Subpart.

Part 200 is amended to list references incorporated in amended Subpart 225-3.

*This notice is intended* to serve only as a notice of emergency adoption. This agency intends to adopt the provisions of this emergency rule as a permanent rule, having previously published a notice of proposed rule making, I.D. No. ENV-33-92-00010-P, Issue of August 19, 1992. The emergency rule will expire September 3, 1993.

*Text of emergency rule, the regulatory impact statement, if any, the regulatory flexibility analysis, if any, and the assessment of public comment, if any, may be obtained from:* Michael Cronin, Department of Environmental Conservation, 50 Wolf Rd., Rm. 130, Albany, NY 12233-3251, (518) 457-2823

*Additional matter required by statute:* A negative declaration has been prepared pursuant to Environmental Conservation Law, Art. 8 (State Environmental Quality Review).

**Revised Regulatory Impact Statement**

The Department of Environmental Conservation (Department) has proposed to adopt amendments to the New York State air pollution control regulations to establish an oxygenated fuels program in the New York City Consolidated Metropolitan Statistical Area (NYC-CMSA) and the Syracuse Metropolitan Statistical Area (Syracuse MSA) which contain carbon monoxide (CO) nonattainment areas. Specifically, amendments to 6 NYCRR Subpart 225-3, "Fuel Composition and Use - Volatile Motor Fuel", and 6 NYCRR Part 200, "General Provisions", were proposed. The notice of proposed rule making was published in the *State Register* on August 19, 1992.

The Department made several nonsubstantial revisions to the proposal in response to public comments received through the public hearing

process and to clarify rule language and maintain general consistency between rule making documents and federal guidelines. As a result, the regulatory impact statement (RIS) sections entitled "Needs and Benefits", "Records and Paperwork", and "Relationship to Other Air Regulations" must also be revised. In general, the RIS, which was initially published with the proposed rule in the *State Register* on August 19, 1992 (Identification No. ENV-33-92-00010-P), is revised by changing the term "motor fuel" to "gasoline", wherever it appears.

In the "Needs and Benefits" section, the RIS stated that a 0.75 percent increase in emissions of nitrogen oxides ($NO_x$) is expected to increase the annual nitrogen dioxide ($NO_2$) concentration in the NYC-CMSA by less than 0.2 parts per million. The phrase "parts per million" was a typographical error and is revised to read "parts per billion". Furthermore, this section indicated that the proposed CO contingency measure, which would set limits on gasoline volatility during the nonozone season, would be implemented if the NYC-CMSA fails to attain the CO National Ambient Air Quality Standard (NAAQS) on schedule or if total vehicle miles traveled (VMT) exceed current projections following the 1993-1994 control period. The RIS is changed to more accurately indicate that the CO contingency measure would be invoked if: 1) any nonattainment area within the NYC-CMSA fails to attain the NAAQS for CO by December 31, 1995; 2) the annual estimate of actual VMT in the VMT tracking area within the NYC-CMSA during the previous calendar year exceeds the numeric allowance incorporated in the most recent forecast of VMT made prior to that calendar year; or 3) an annual updated forecast of VMT in the VMT tracking area within the NYC-CMSA for subsequent calendar years exceeds the numeric allowance incorporated in the most recent prior forecast of VMT. The RIS is further changed to clearly indicate that a finding by the U.S. Environmental Protection Agency (EPA), that one of the above three conditions has occurred, will precede an invocation of the CO contingency measure. Therefore, the CO contingency measure shall take effect within twelve months from the date of such a finding by the EPA.

In the "Records and Paperwork" section, the RIS listed records which must be maintained by regulated refineries, terminals, bulk plants, and other distribution facilities. Specifically, the RIS stated that certification that the gasoline has been tested in accordance with Subpart 225-3 and is in compliance with this and all other applicable regulations is to be made on the test report or on the invoice, bill of lading, or other transfer document. The RIS is revised by noting that this certification shall be in writing and can be made on one of the above mentioned documents or in another form, as indicated in proposed Subpart 225-3. Furthermore, the RIS is revised to state that a copy of this certification is also to be maintained by retailers and wholesale purchaser-consumers as was required in proposed Subpart 225-3 that went to public hearing.

Proposed Subpart 225-3 would require owners or operators of regulated refineries, terminals, and bulk plants to maintain records, including the time periods of intended gasoline use and the shipment quantity and shipment date, of gasoline distributed from or delivered to such facilities. It also would require such parties to provide, or transfer, certain records with gasoline which is distributed from these facilities. Although proposed Subpart 225-3 implicitly included the time periods of intended gasoline use and the shipment quantity and shipment date as records to be provided with gasoline being distributed from refineries, terminals, and bulk plants, it was not specifically stated. Throughout the rule making process, it was the Department's clear intent to include these with the records to be provided with gasoline distributed from the above facilities. Therefore, the Department revised proposed Subpart 225-3 to specifically include the time periods of intended gasoline use and the shipment quantity and shipment date as records to be provided with gasoline distribution from refineries, terminals, and bulk plants. Regulated retail outlets and wholesale purchaser-consumer facilities would also be required to maintain such records, as was previously indicated in the RIS. This should not be an additional burden on regulated parties since the proposed regulation already required refineries, terminals, and bulk plants to maintain these exact records, which could easily be transferred with the distribution of gasoline. Furthermore, current Agriculture and Market's regulations require shipping information to be provided with gasoline distribution.

In the "Relationship to Other Air Regulations" section, which deals with duplication with other state and federal rules and requirements, the RIS made a comparison between the proposed Subpart 225-3 labeling provisions and those in Article 16, subsection 192-c(5) of the Agriculture and Markets Law (AML). The RIS mentioned that regulated retailers are required to affix labels on fuel pumps indicating the type and percent by volume of each oxygenate present in the gasoline. Furthermore, if the oxygenate is methanol, the RIS mentioned that the percent of co-solvent must be noted. In response to public comments, the RIS is revised to reflect that, pursuant to amended Subpart 225-3, only the oxygenate class (*e.g.* alcohol or ether), as opposed to the exact oxygenate type, needs to be identified on the pump label if alcohol comprises at least one percent by volume or if ether comprises at least two percent by volume of the gasoline. Methanol shall be identified on the pump label if it comprises at least 0.3 percent by volume of the gasoline. Any mention of Subpart 225-3 requiring the percent of co-solvent to be noted on the label if the oxygenate is methanol is deleted since this is no longer a requirement of the rule. Additionally, the RIS is revised by deleting any indication that amended Subpart 225-3 requires the percent by volume of the oxygenate to be labeled since the regulation no longer mandates that this be done.

In the RIS, the Department mentioned that formal notice of the EPA's approval of a seven-month control period for the NYC-CMSA was forthcoming. EPA finalized its approval of such a control period in the "Federal Register" on October 20, 1992.

None of the revisions to Subpart 225-3 made subsequent to the proposed rule making materially alter the purpose, meaning, or effect of this regulation. Changes to the other sections of the RIS are not necessary as these sections are not affected by the revisions to amended Subpart 225-3.

*Revised Regulatory Flexibility Analysis*

The Department of Environmental Conservation (Department) has proposed to adopt amendments to 6 NYCRR Subpart 225-3, "Fuel Composition and Use - Volatile Motor Fuel", and 6 NYCRR Part 200, "General Provisions", of the New York State air pollution control regulations to permanently establish an oxygenated fuels program in designated areas of the State. The notice of proposed rule making was published in the *State Register* on August 19, 1992.

In response to public comments received during the public hearing process and to clarify rule language and maintain general consistency between rule making documents and federal guidelines, the Department made several nonsubstantial revisions to the proposal. As a result, the regulatory flexibility analysis (RFA) sections entitled "Effects on Small Businesses", "Compliance Requirements", and "Minimizing Adverse Impacts" must also be revised. In general, the RFA, which was initially published with the proposed rule in the *State Register* on August 19, 1992 (Identification No. ENV-33-92-00010-P), is revised by using the term "gasoline" in place of "motor fuel", wherever it appears.

In the "Effects on Small Businesses" section, the RFA indicated that the proposed carbon monoxide (CO) contingency measure, which would limit the volatility of gasoline year-round after the 1993-1994 "winter" CO control period, would be implemented if the New York City Consolidated Metropolitan Statistical Area (NYC-CMSA) fails to attain the CO National Ambient Air Quality Standard (NAAQS) or if total vehicle miles traveled (VMT) exceed projections. The RFA is revised to more accurately indicate that the CO contingency measure would be invoked if: 1) any nonattainment area within the NYC-CMSA fails to attain the NAAQS for CO by December 31, 1995; 2) the annual estimate of actual VMT in the VMT tracking area within the NYC-CMSA during the previous calendar year exceeds the numeric allowance incorporated in the most recent forecast of VMT made prior to that calendar year; or 3) an annual updated forecast of VMT in the VMT tracking area within the NYC-CMSA for subsequent calendar years exceeds the numeric allowance incorporated in the most recent prior forecast of VMT. The RFA is further changed to clearly indicate that a finding by the U.S. Environmental Protection Agency (EPA), that one of the above three conditions has occurred, will precede an invocation of the CO contingency measure. Therefore, the CO contingency measure shall take effect within twelve months from the date of such a finding by the EPA.

In the "Compliance Requirements" section, the RFA listed records which must be maintained by regulated refineries, terminals, bulk plants, and other distribution facilities. Specifically, the RFA stated that certification that the gasoline has been tested in accordance with Subpart 225-3, and is in compliance with this and all other applicable regulations, is to be made on the test report or on the invoice, bill of lading, or other transfer document. The RFA is revised by noting that this certification

shall be in writing and can be made on one of the above mentioned documents or in another form. Furthermore, the RFA is revised to mention that a copy of this certification is also to be maintained by retailers and wholesale purchaser-consumers as was required in proposed Subpart 225-3 that went to public hearing.

Proposed Subpart 225-3 would require owners or operators of regulated refineries, terminals, and bulk plants to maintain records, including the time periods of intended gasoline use and of the quantity and date of shipments, of gasoline distributed from or delivered to such facilities. It also would require such regulated parties to provide, or transfer, certain records with gasoline which is distributed from their respective facilities. Although, proposed Subpart 225-3 implicitly included the time periods of intended gasoline use and the shipment quantity and shipment date as records to be provided with gasoline being distributed from refineries, terminals, and bulk plants, it was not specifically stated. Throughout the rule making process, it was the Department's clear intent to include these items with the records to be provided with gasoline distributed from the above facilities. Therefore, the Department revised proposed Subpart 225-3 to specifically include the time periods of intended gasoline use and the shipment quantity and shipment date as records to be provided with gasoline distribution from refineries, terminals, and bulk plants. Regulated retail outlets and wholesale purchaser-consumer facilities would also be required to maintain such records, as was previously indicated in the RFA. This additional language in the regulation will not pose additional burdens on regulated parties since the proposed regulation already required refineries, terminals, and bulk plants to maintain these exact records; records which can easily be transferred with distributed gasoline. Furthermore, current regulations of the Department of Agriculture and Markets already require shipping information to be provided when gasoline is distributed.

In the "Compliance Requirements" section, the RFA also mentioned that regulated retailers are required to affix labels on fuel pumps indicating the oxygen content of the gasoline to be distributed, the type of oxygenate it contains, and the time period that the gasoline may be dispensed to motor vehicles. In response to public comments, the RFA is revised by deleting any indication that Subpart 225-3 requires the oxygen content of the gasoline to be labeled since the regulation no longer mandates that this be done. In addition, the RFA is revised to reflect that, pursuant to amended Subpart 225-3, only the oxygenate class (*e.g.* alcohol or ether), as opposed to the exact oxygenate type, would need to be identified on the pump label if alcohol comprises at least one percent by volume or if ether, or another oxygenate class, comprises at least two percent by volume of the gasoline. Methanol shall be identified on the pump label if it comprises at least 0.3 percent by volume of the gasoline. The RFA is further revised to indicate that the time period that the gasoline is to be dispensed to motor vehicles must be posted on the gasoline pump only if the statement that the gasoline is oxygenated and will reduce CO emissions is displayed on the pump at times outside the applicable CO control period and if the gasoline actually being dispensed from that pump has an oxygen content below 2.0 percent.

The "Minimizing Adverse Impacts" section of the RFA is revised to include alternative methods for determining oxygen content, providing additional flexibility to regulated parties. The owner or operator of a refinery, terminal, or bulk plant subject to this Subpart may apply to the Department for approval of such an alternative method. The Department shall not approve an application unless the proposed alternative method has received backing from the EPA and would ensure that the oxygen content of the gasoline would be determined with no less accuracy and reliability.

None of the revisions to Subpart 225-3 made subsequent to the proposed rule making materially alter the purpose, meaning, or effect of this regulation. Changes to the other sections of the RFA are not necessary as these sections are not affected by these revisions.

*Summary of Assessment of Public Comment*

The assessment of public comments is DEC's responsive summary of significant and pertinent issues. Written and/or oral comments were received from 49 parties.

The following is a summary of the issues and DEC responses as found in the "Assessment of Public Comments" document.

GENERAL

Issue. Several parties indicated their general support of the proposed amendments.

Response. DEC expressed appreciation.

Issue. Oxygenated fuel program will yield an extremely cost efficient air quality control strategy.

Response. DEC agrees.

Issue. The public should be notified of monitored violations.

Response. DEC conveys health warnings to the public through use of the Pollutant Standards Index, an ozone hot line, and annual air quality reports.

Issue. Commentors challenged DEC's assertion that the projected 3 percent increase in $NO_x$ emissions does not constitute a significant environmental impact and also claimed that an increase in $NO_x$ emission conflicts with DEC's "no net nitrogen increase" policy.

Response. Oxygenated fuel is a federally mandated program; there are no legal alternatives. The oxygenated fuel program could potentially increase total ambient $NO_x$ emissions by approximately 0.75 percent. DEC's reported 3 percent potential increase represents automotive exhaust $NO_x$ only, and not total $NO_x$ emissions.

New York's ozone SIP outlines programs, such as vehicle turnover and $NO_x$ RACT rules, to offset $NO_x$ emission increases. Overall, DEC predicts that New York's ozone SIP will produce significant net reductions in $NO_x$ emissions.

DEC agrees that further extensive studies, on a federal level, are necessary to determine the effects of oxygenated fuel on $NO_x$ emissions.

Issue. DEC's adoption was not timely.

Response. Sufficient lead time and notice were given. In February 1992, DEC participated at a meeting in Danbury, Connecticut to inform affected parties. The proposed rule was filed in the "*State Register*" on August 19, 1992.

Issue. The emergency regulations were promulgated without a public hearing.

Response. A public hearing was not required by State rules.

ONONDAGA COUNTY/SYRACUSE MSA ISSUES

Issue. Support was exposed for oxygenated fuel in Onondaga County and the Syracuse MSA.

Response. DEC appreciates this support.

Issue. Commentors recommended mass transportation and cleaner forms of transportation as strategies for reducing CO.

Response. DEC is implementing and developing transportation control measures to reduce vehicle miles traveled (VMT) and enhanced vehicle inspection and maintenance.

Issue. Commentors opposed implementation in the Syracuse MSA as there have been no violations in over two years.

Response. Although CO exceedances have declined in Onondaga County, the potential for exceedances still exists. Data for 1990 and 1991 show one exceedance each year in Onondaga County. The CAA requires this program in the Syracuse MSA because Onondaga county is designated as nonattainment for CO based on 1988 and 1989.

Issue. The program imposes financial burdens on consumers and businesses; and increases the cost of moving product from the Syracuse area, nullifying the advantage of the Syracuse MSA being "a crossroads for Central New York."

Response. Noncompliance is usually more costly than compliance. This program will be extremely cost effective at approximately $600 to $900 per ton of CO removed.

Issue. Oxygenated fuel is not effective at reducing CO emissions from "cold starts".

Response. Federal test procedures, demonstrate oxygenated fuel as quite effective at reducing CO emissions from "cold starts".

Issue. DEC should use alternative control measures instead of oxygenated fuel.

Response. The CAA requires this program.

Issue. The negative impact of oxygenated fuel in the Syracuse MSA can contribute to ground-level ozone pollution.

Response. The program is not in place during the ozone season.

Issue. Extending the program outside the Onondaga County nonattainment area is unwarranted.

Response. Section 211(m) of the CAA requires implementation in the larger of the MSA or consolidated metropolitan statistical area containing the nonattainment area.

Issue. A small retail outlet, just inside Madison County border with Oneida county, feared inadequate supply of oxygenated fuel since he currently buys outside the MSA. DEC's notice of public hearing failed to identify Madison County, and thus, his business, as included in the Syracuse MSA.

Response. Ample supplies of oxygenated fuel are available in the Syracuse MSA. Terminals outside of the control area may supply oxygenated fuel to the Syracuse MSA. Proper, adequate, and timely notice was provided.

Issue. Ethanol could remove dirt and debris from gasoline tanks and foul fuel filters and fuel injectors.

Response. Retailers should follow the recommendations of their suppliers regarding the need to filter gasoline before dispensing.

Issue. CO violations in the Syracuse area are questionable due to inappropriate equipment and monitor locations.

Response. The validity of monitor location and its data has been judged appropriate by the USEPA and DEC.

Issue. DEC should petition USEPA for redesignation of Onondaga County as attainment for CO.

Response. DEC submitted a proposed redesignation request on November 14, 1992.

Issue. DEC should maintain the nonattainment classification of Onondaga County.

Response. DEC has petitioned the USEPA for redesignation as there are no grounds for continued nonattainment status.

Issue. The oxygenated gasoline control period for the Syracuse MSA is a month too long.

Response. DEC petitioned USEPA to reduce the control period to three months but was rejected.

Issue. DEC did not involve local environmental groups in an October 7, 1992 meeting at the Syracuse Chamber of Commerce with Onondaga County and the USEPA.

Response. DEC, and the USEPA, did not attend this meeting.

6 NYCRR 225-3.2 DEFINITIONS

Issue. DEC should define the word "dispensed".

Response. The term "dispensed" is understandable and consistent with the CAA.

Issue. A minimum oxygen content of 2.0 percent by weight should be included in the definition of oxygenated motor fuel.

Response. DEC is not implementing an oxygen averaging approach for which this implies.

Issue. Change "motor fuel" to "gasoline" to properly characterize the definitions.

Response. So changed.

6 NYCRR 225-3.3(c) WINTERTIME RVP CONTINGENCY MEASURE

Issue. Regulated parties need notification when the wintertime RVP contingency takes effect.

Response. DEC changed the regulation to affect this.

Issue. Wintertime RVP control CO benefits are uncertain. Without multi-state coordination the New York Harbor gasoline market would be disrupted.

Response. The CAA requires contingency measures for CO. Control of wintertime RVP is the most viable contingency measure. DEC foresees no major hardships to the multi-state distribution system.

Issue. Commentors supported the proposed wintertime RVP contingency measure for reducing CO levels.

Response. DEC expressed its appreciation.

Issue. The proposed wintertime RVP contingency control measure may cause market disruptions and unnecessary costs for the New York Harbor cash market and for gasoline futures contracts traded on the New York Mercantile Exchange due to short lead times.

Response. Changes to the regulation increase lead time prior to implementation, if triggered.

6 NYCRR 225-3.4 PROHIBITIONS AND REQUIREMENTS - OXYGEN CONTENT

Issue. The oxygen content requirement of gasoline for the Syracuse MSA should include an upper limit of 3.5 percent by weight.

Response. Federal regulations set the upper limit for oxygen content.

Issue. DEC should not regulate wholesale transactions of conventional gasoline. The regulations should be modified to indicate they apply only when gasoline is intended for retail sale in New York State's control areas during the designated control periods.

Response. The regulatory language was revised slightly to further clarify where and when the oxygenation requirements apply.

Issue. The maximum oxygen content requirement for the NYC-CMSA reduces $NO_x$ emissions.

Response. DEC agrees.

Issue. The maximum oxygen content requirement does not produce air quality benefits.

Response. This requirement reduces $NO_2$, nitrate and PM-10 pollution and, thereby, produces air quality benefits.

Issue. The 2.9 percent oxygen cap downstate bans ethanol and severely impacts the ethanol industry.

Response. Ethanol may be blended into gasoline up to 2.9 percent by weight. The regulation creates new markets for ethanol.

Issue. The oxygen limit downstate reduces CO benefits.

Response. The CO reduction effect of oxygenates is not linear with oxygen content and is a function of oxygenate type. The oxygen limit will not substantially reduce CO benefits.

Issue. The oxygen cap will negatively affect the fuel market and national environmental and energy security interests.

Response. The regulation requires oxygenates and reduces air pollution. Not all parties will benefit.

Issue. $NO_x$ increases will be offset by stringent $NO_x$ tailpipe emission standards and vehicle turnover.

Response. DEC desires to lower ambient $NO_x$ not keep it constant.

Issue. One company intends to supply gasoline containing up to 10 percent by volume ethanol downstate.

Response. This would be a violation subject to enforcement.

Issue. Averaging without a cap would yield lower or equivalent $NO_x$ emissions than with a cap.

Response. DEC has not adopted averaging due to environmental and administrative concerns.

Issue. Average annual $NO_2$ contractions are decreasing by about 5 percent per year and this would overwhelm any increase from ethanol.

Response. $NO_2$ ambient levels have not declined significantly in recent years.

Issue. Increases in $NO_2$ during winter will not significantly increase annual averages.

Response. An increase in any month has the same effect on the annual average.

6 NYCRR 225-3.5 TEST METHODS FOR DETERMINING OXYGEN CONTENT

Issue. Test methods must be approved by the USEPA and should be automatic by the Commissioner if when approved.

Response. When USEPA approves a method DEC will consider it.

Issue. The regulation should have a test tolerance.

Response. Under the CAA only EPA may do this.

Issue. USEPA guidance allows certification to be transferred downstream.

Response. So does this rule.

Issue. Certification by volumetric metering should be allowed.

Response. Alternative methods may be used upon approval.

6 NYCRR 225-3.6 RECORDS AND REPORTS

Issue. The phrase "chemical source of each oxygenate" is confusing.

Response. Has been changed to "chemical name".

Issue. Change "reports" in 225-3.6(b).

Response. "Reports" was changed to "records".

Issue. The rule requires extraordinary documentation, of no practical use.

Response. All required information should be available and has practical value.

Issue. Subdivision 225-3.6(b) does not specify report routing.

Response. Reports go where and to whom the fuel goes.

Issue. Test reports for paragraphs 225-3.6(b)(3) and (b)(4) need not accompany gasoline.

Response. Paragraph 225-3.6(b)(3) was removed from the regulation. 225-3.6(b)(4) is necessary for labeling requirements.

Issue. Blending records should also be allowed for oxygen certification.

Response. Alternative test methods require application and approval.

6 NYCRR 225-3.7 LABELING REQUIREMENTS

Case 1:00-cv-01898-VSB-VF   Document 2403-5   Filed 05/11/09   Page 7 of 7

Issue. Identification of individual oxygenates on the pump label will be a burden.
Response. The regulation no longer require this.
Issue. Posting the minimum and maximum oxygen contents should not be required.
Response. This requirement was eliminated.
Issue. Labeling of all oxygenates would provide information to consumers and treat oxygenates equally. Only alcohols should be labeled.
Response. Labeling of the oxygenate class (*i.e.* ethers or alcohols) only is appropriate and provides beneficial information.
Issue. Post control period dates only if a label remains on the pump outside the control period.
Response. DEC has changed the regulation to agree.
Issue. Labeling language must contain the exact USEPA phrasing.
Response. Appropriate changes were made.

6 NYCRR 225-3.8 EXCEPTIONS AND VARIANCES - VOLATILITY
Issue. DEC may not waive federal volatility requirements.
Response. This comment is not relevant to this rule making. Accordingly, DEC will pursue this issue with the USEPA through appropriate means.

6 NYCRR 225-3.9 EXCEPTIONS AND VARIANCES - OXYGEN CONTENT
Issue. Calculations for economic benefit should be published.
Response. See DEC's Civil Penalty Policy and language in sections 225-3.8 and 225-3.9.
Issue. Oxygen content variances by "part" of a control area could place some retail service stations at a competitive disadvantage.
Response. The economic adjustment fee will offset any competitive advantage.
Issue. Oxygen content variances should not be granted by State initiative.
Response. The rule was changed appropriately.

## NOTICE OF ADOPTION
**Solid Waste Management Facilities**
I.D. No. ENV-44-92-00001-A
Filing No. 1519
Filing date: Aug. 5, 1993
Effective date: Oct. 9, 1993

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following action:
*Action taken:* Amendment of Part 360 of Title 6 NYCRR.
*Statutory authority:* Environmental Conservation Law, sections 1-0101, 3-0301, 8-0113, 19-0310, 19-0306, 23-2305, 23-2307, 27-0101, 27-0106, 27-0107, 27-0109, 27-0305, 27-0703, 27-0704, 27-0911, 27-1217, 27-1515, 52-0107, 52-0505 and 70-0107
*Subject:* Solid waste management facilities in New York State.
*Purpose:* To incorporate Federal final rule on solid waste disposal facility criteria (40 CFR Parts 257 and 258) and Federal final rule on standards for the management of used oil (40 CFR Part 279).
*Substance of final rule:* Subpart 1 GENERAL PROVISIONS
A new section has been added to address the requirements for obtaining a beneficial use determination (BUD) for the reuse of a solid waste. Also included are beneficial uses for specified solid wastes based upon the Department experience with BUDs issued since December 31, 1988.
Most of the proposed changes to the Comprehensive Recycling Analyses (CRA) have been rescinded due to concerns raised in public comment. The CRA regulations will remain basically unchanged from the existing regulations.
The existing two-phase permit system, permit to construct, and permit to operate, has been consolidated into a single combination permit to construct and operate for all solid waste management facilities subject to permitting.
Subpart 2 LANDFILLS
This Subpart incorporates the technical requirements of EPA Final Rule, 40 CFR Parts 257 and 258, Solid Waste Disposal Facility Criteria.
The Construction Quality Assurance/Construction Quality Control section was revised to more specifically address the regulatory requirements for proper landfill construction oversight and documentation of final construction certification to ensure construction quality on the project.
The Landfill Siting section has been revised to allow more availability of suitable sites for landfill developers. The primary siting restrictions will be maintained and enhanced by adding site restriction areas to maintain compliance with the 40 CFR Part 258 Criteria (fault areas and seismic impact zones). The increased availability of landfill sites is opened up to landfill developers by allowing an applicant to propose a suitable site from a technical perspective without the need for a formal site selection report.
A new Landfill Reclamation section has been added in response to the heightened interest in the concept of landfill reclamation projects at active and inactive landfills based upon the recent research sponsored by New York State Energy Research and Development Authority. This section includes planning and reporting requirements for feasibility studies, demonstration projects and reclamation project activities. Feasibility studies must be conducted pursuant to department-approved feasibility study work plans. Demonstration projects and reclamation activities may be conducted under an existing permit, consent order or new permit.
A new Financial Assurance section has been added to specify requirements for closure, post-closure care and corrective action activities at municipal solid waste and other landfills. Written cost estimates must be submitted and updated annually for a third party to conduct these activities and the amount of financial assurance must be adjusted to reflect increases in inflation or changes in facility conditions. EPA approved mechanisms for municipal solid waste landfills include a trust fund, surety bonds, letters of credit, insurance policies, and other State-approved mechanisms. EPA has yet to develop and publish financial assurance mechanisms commonly used by municipalities such as a local government financial test and local government guarantee.
A new Corrective Measures section for landfills is being added to require that specific procedures be followed for corrective action for known releases to groundwater.
Groundwater monitoring requirements contained in 40 CFR Part 258 are being incorporated with an attempt to assimilate these requirements in the least disruptive way to the existing groundwater monitoring requirements.
Subpart 3 SOLID WASTE INCINERATORS OR REFUSE-DERIVED FUEL PROCESSING FACILITIES OR SOLID WASTE PYROLYSIS UNITS
The requirement for a landfill contract for municipal solid waste ash residue has been modified in the action to require that a contract for ash residue and bypass disposal be submitted to the department 90 days prior to facility start-up.
The action retains the current ash residue disposal requirements, which establishes a matrix of disposal options, authorizing either ash residue monofilling or co-disposal of incinerator ash with municipal solid waste to afford maximum flexibility and relief to local government while being protective of human health and the environment.
Subparts 4 and 5 LAND APPLICATION FACILITIES and COMPOSTING FACILITIES
The requirements in these two Subparts remain essentially unchanged from the Part 360 regulations effective December 31, 1988. Federal regulations governing sewage sludge management were promulgated February 19, 1993 and are found in 40 CFR Part 503, Standards for the Use or Disposal of Sewage Sludge. It is expected that draft regulations for these Subparts will be available for public comment in the fall of 1993.
Subpart 6 LIQUID STORAGE
No significant changes have been made.
Subpart 7 CONSTRUCTION AND DEMOLITION DEBRIS LANDFILLS
This Subpart contains new provisions which will allow land clearing debris landfills that are three acres or less in size, to be registered with the department and not have to comply with permit requirements provided they comply with specified site, design and operating conditions.
This Subpart separates construction and demolition (C&D) debris landfills into two categories: three acres or less and greater than three acres, or any C&D debris landfill which accepts pulverized C&D material. Landfills three acres or less will be required to have liners consisting of two feet of low permeability soil but no leachate collection will be required. However, these landfills will not be allowed to accept pulverized C&D materials. Landfills over three acres, and landfills which accept