# EXHIBIT 5

The proposed amendment is necessary to implement Education Law section 409-h, as added by section 6 of Chapter 285 of the Laws of 2000, and generally does not impose any costs on school districts, boards of cooperative educational services, or nonpublic schools beyond those imposed by the statute. Potential costs associated with this requirement include printing and distribution costs for: (1) the initial written notification, pursuant to section 155.24(b)(1), provided at the beginning of the school year or summer school session to all staff and persons in parental relation to students; (2) the 48-hour written advance notification, pursuant to 155.24(b)(4), provide to those staff and persons in parental relation who are included on a list maintained for that purpose; and (3) the follow-up summary reports, pursuant to section 155.24(b)(2), provided to all staff and persons in parental relation. The costs will vary depending upon the number of staff and students to be provided the required information and the method of distribution. The proposed amendment affords flexibility to schools in that it permits written notification to be provided either directly to students and staff members, mailed to their home address, or by other reasonable methods authorized by the Commissioner, such as through a school newsletter. If schools provide written notification directly to students and staff, the minimum estimated cost per school district or nonpublic school is $172.00 per year for the printing costs associated with such notice. This estimate is based on a total statewide public and nonpublic school population of students and staff of 4.2 million in 2,928 public and nonpublic schools with four required notices per year at a cost of three cents per page per notice. If a school applies pesticides that require forty-eight hour advance notification six times during the school year, this would add an estimated $65.00 per year to the estimated cost for complying with this section. Based on this information, the total potential annual cost for compliance with this section is $237.00 per school district or nonpublic school.

MINIMIZING ADVERSE IMPACT:

The proposed amendment is necessary to implement Education Law section 409-h, as added by section 6 of Chapter 285 of the Laws of 2000.

The statute requires public school districts, private or parochial schools and boards of cooperative educational services to establish a pesticide notification procedure to provide information to staff who regularly work at and persons in parental relation of children regularly receiving instruction at school facilities. The statute also requires schools to provide written notification of certain pesticide applications forty-eight hours in advance to staff and persons in parental relation who request to be included on a list to be maintained for such purpose. In addition, the statute requires the Commissioner to establish a procedure to notify the State of any school's failure to comply with the requirements of the statute and authorizes the Commissioner to withhold State aid where it is demonstrated to the Commissioner's satisfaction that a school has failed to comply with the statute.

The legislation upon which the proposed amendment is based applies to all school districts, BOCES, and private and parochial schools in the State. Therefore, it was not possible to establish different compliance and reporting requirements for schools located in rural areas, or exempt them from the provisions of the proposed amendment.

RURAL AREA PARTICIPATION:

Copies of the proposed regulation have been distributed to members of the Department's Rural Advisory Committee and Nonpublic Schools Advisory Council, whose memberships include representatives of schools in rural areas.

*Job Impact Statement*

The proposed amendment relates to procedures for school districts, boards of cooperative educational services, and nonpublic schools to provide notification to staff and persons in parental relation of certain pesticide applications on school properties, pursuant to Education Law section 409-h, as added by section 6 of Chapter 285 of the Laws of 2000, and will not have an adverse impact on jobs or employment opportunities. Because it is evident from the nature of the proposed amendment that it will have a positive impact, or no impact, on jobs or employment opportunities, no further steps were needed to ascertain those facts and none were taken. Accordingly, a job impact statement is not required and one has not been prepared.

# Department of Environmental Conservation

## PROPOSED RULE MAKING
## HEARING(S) SCHEDULED

**Oxygenated Fuels Program**

**I.D. No.** ENV-26-01-00006-P

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:

*Proposed action:* Amendment of section 200.9 and Subpart 225-3 of Title 6 NYCRR.

*Statutory authority:* Environmental Conservation Law, sections 1-0101, 3-0301, 19-0103, 19-0105, 19-0301, 19-0303 and 19-0305

*Subject:* Oxygenated Fuels Program in the New York City Consolidated Metropolitan Statistical Area (CMSA) and the Syracuse Metropolitan Statistical Area (MSA).

*Purpose:* To remove the requirement for the program on the basis that both areas are in attainment with the carbon monoxide (CO) National Ambient Air Quality Standard (NAAQS).

*Public hearing(s) will be held at:* 1 p.m. on July 30, 2001 at Clean Communities of Central New York, Applied Technology Center, Suite W206, Onondaga Community College, 4915 Onondaga Rd., Syracuse, NY; and 1 p.m. on July 31, 2001 at USEPA, 290 Broadway, 27th Fl., Conference Rm. D, New York, NY.

*Accessibility:* All public hearings have been scheduled at places reasonably accessible to persons with a mobility impairment.

*Interpreter Service:* Interpreter services will be made available to deaf persons, at no charge, upon written request submitted within reasonable time prior to the scheduled public hearing. The written request must be addressed to the agency representative designated in the paragraph below.

*Text of proposed rule:* (Section 200.1 through and 200.8 remains unchanged) Section 200.9, Table 1 is amended to read as follows (beginning after 225-2.4(a)(3) on Table 1)

| | | |
|---|---|---|
| 225-3.2(b)[(14)]*12* | Clean Air Act 42 U.S.C. Section 7512(a)(2)(A) 1988 as amended by Public Law 101-549 (1990) | ** |
| [225-3.2(b)(16) | Clean Air Act 42 U.S.C. Section 745 (1988) as amended by Public Law 101-549 (1990)] | ** |
| 225-3.2(b)[(26)]*16* | Clean Air Act 42 U.S.C. Section 7512a(a)(2)(A) 1988 as amended by Public Law 101-549 (1990) | ** |
| 225-3.3(c)(1) | Clean Air Act 42 U.S.C. Section 7502(c)(9) 1988 as amended by Public Law 101-549 (1990) | ** |
| 225-3.3(c)(1) | Clean Air Act 42 U.S.C. Section 7512(c)(9) 1988 as amended by Public Law 101-549 (1990) | ** |
| 225-3(c)(1)[(ii)]*(i)* | Clean Air Act 42 U.S.C. Section 7512(a)(3) 1988 as amended by Public Law 101-549 (1990) | ** |
| 225-3(c)(1)[(iii)]*(ii)* | Clean Air Act 42 U.S.C. Section 7512(a)(2)(A) 1988 as amended by Public Law 101-549 (1990) | ** |
| [225-3.5(b)(1) | 40 CFR Part 80, Appendix D (July 1991) pages 380-393 | * |
| 225-3.5(c)(1)(i) | ASTM, D4815-89 (October 1989) | **** |
| 225-3.5(c)(1)(ii) | ASTM, D4815-89 (October 1989) | ****] |

(The remainder of 220.9 remains unchanged.)

(Statutory authority: Environmental Conservation Law, §§ 1-0101; 3-0301; 19-0301; 19-0103; 19-0105; 19-0301; 19-0303; and; 19-0305)

Section

225-3.1 Applicability

225-3.2 Definitions

225-3.3 Prohibitions and requirements—volatility

[225-3.4 Prohibitions and requirements—oxygen]

[225-3.5 Methods for determining oxygen content]

225-3.[6] 4 Records and reports

[225-3.7 Labeling requirements]

225-3.[8] 5 Exceptions and variances—volatility

[225-3.9 Exceptions and variances—oxygen content content]

225-3.[10] 6 Severability

225-3.1 Applicability.

This Subpart applies throughout the State of New York except that the provisions in [sections 225-3.4, 225-3.5, 225-3.7, and 225-3.9 of this Subpart apply only throughout the carbon monoxide control areas in the State of New York as defined by section 225-3.2(b)(3) of this Subpart, and that] section 225-3.3(c) of this Subpart applies only throughout the New York City CMSA as defined by section 225-3.2(b)(3)(i) of this Subpart.

225-3.2 Definitions.

(a) For the purpose of this Subpart, the general definitions of Part 200 of this Title apply.

(b) For the purpose of this Subpart, the following definitions also apply:

(1) ASTM. American Society for Testing and Materials.

(2) Carbon monoxide (CO). A colorless, odorless, tasteless gas at standard conditions having a molecular composition of one carbon atom and one oxygen atom.

(3) Carbon monoxide control area (control area).

(i) The Consolidated Metropolitan Statistical Area (CMSA) in which a carbon monoxide nonattainment area is located; or

(ii) if the area is not located in a CMSA, the Metropolitan Statistical Area (MSA) in which the area is located; or

(iii) if an area which was designated as nonattainment is redesignated as attainment for carbon monoxide, that CMSA or MSA as long as is necessary to maintain such standard in that area. The following shall be considered to be carbon monoxide control areas:

(a) New York City Consolidated Metropolitan Statistical Area (New York City CMSA). This area consists of the counties of Bronx, Kings, Queens, New York, Richmond, Orange, Rockland, Putnam, Westchester, Nassau and Suffolk.

(b) Syracuse Metropolitan Statistical Area (Syracuse MSA). This area consists of the counties of Onondaga, Oswego and Madison.

[(4) Carbon monoxide control period (control period). The dates between which a requirement or prohibition of section 225-3.4 of this Subpart applies.]

[(5) Chemical name. The specific or unique chemical(s) from which oxygen is derived. As applied to oxygenates, the name of the oxygenate as given in Table 2 of section 225-3.5(d) of this Subpart; or, if not included in Table 2, the technical or common name of the oxygenate.]

[(6)] 4 Conforming gasoline. Any gasoline which conforms with the requirements of [sections] section 225-3.3 [and 225-3.4] of this Subpart.

[(7)] 5 Distributor. Any person who transports or stores or causes the transportation or storage of gasoline at any point between a refinery or importer's facility and a retail outlet or wholesale purchaser-consumer's facility.

[(8)] 6 Ethanol blending plant. Any refinery at which gasoline is produced solely through the addition of ethanol to gasoline, and at which the quality or quantity of gasoline is not altered in any other manner.

[(9)] 7 Final distribution facility. The stationary facility of a distributor from which gasoline is supplied to a retail outlet or wholesale purchaser-consumer's facility. [; or the portable container used to transport gasoline if an oxygenate has or will be added to such portable container prior to delivery to a retail outlet or wholesale purchaser-consumer's facility.]

[(10)] 8 Gasoline. A volatile liquid mixture containing hydrocarbons or a blend of this mixture with one or more oxygen containing ashless organic compounds, such as alcohols or ethers, which is suitable for use in motor vehicles with spark-ignition, internal combustion engines and which is commonly or commercially known or sold as gasoline.

[(11)] 9 Gasoline bulk plant (bulk plant). A gasoline storage and distribution facility with an average daily throughput of 40,000 gallons of gasoline or less.

[(12)] 10 Gasoline loading terminal (terminal). A gasoline storage and distribution facility with an average daily throughput greater than 40,000 gallons of gasoline or with an emission rate potential of volatile organic compounds of 100 tons per year or greater.

[(13)] 11 Nonconforming gasoline. Any gasoline which does not conform with the requirements of section 225-3.3 [or 225-3.4 of this Subpart].

[(14)] 12 Numeric allowance. The maximum margin of error in vehicle miles traveled allowed by the United States Environmental Protection Agency pursuant to 42 U.S.C. section 7512a(a)(2)(A) (See Table 1, section 200.9 of this Title). (Note: As of November 15, 1992, the numeric allowance is five percent for calendar year 1993, four percent for 1994, and three percent for 1995 and subsequent years.)

[(15) Oxygen content. The ratio of the weight of oxygen in a unit of gasoline to the total weight of the gasoline multiplied by 100, determined through the method specified in section 225-3.5 of this Subpart.

(16) Oxygenate. Any substance which, when blended into gasoline, increases the amount of oxygen in that gasoline blend and which is allowed to be used as a gasoline additive pursuant to 42 U.S.C. 7545 (see Table 1, section 200.9 of this Title).

(17) Oxygenated gasoline. Gasoline to which at least one oxygenate has been added and which complies with the requirements of section 225-3.4 of this Subpart.]

[(18)] 13 Refiner. Any person who owns, leases, operates, controls, or supervises a refinery.

[(19)] 14 Refinery. Any facility, including an ethanol blending plant, which produces gasoline.

[(20)] 15 Reid vapor pressure (RVP). A measure of the vapor pressure of a gasoline in pounds per square inch absolute at 100°F.

[(21)] 16 Reseller. Any person who purchases gasoline and resells or transfers it to a retailer or a wholesale purchaser-consumer.

[(22)] 17 Retail outlet. Any establishment at which gasoline is sold or offered for sale to the general public for use in motor vehicles.

[(23)] 18 Retailer. Any person who owns, leases, operates, controls or supervises a retail outlet.

[(24) Specific gravity of oxygenated gasoline. The ratio of the weight of a given volume of oxygenated gasoline at 60°F to the weight of an equal volume of pure water at the same temperature as determined by a hydrometer method and reported to 0.0001 specific gravity.]

[(25)] 19 Ultimate consumer. The first person who purchases or obtains gasoline for use in motor vehicles.

[(26)] 20 VMT tracking area. The area in which the vehicle miles traveled (VMT) must be monitored or tracked in accordance with 42 U.S.C. section 7512a(a)(2)(A) (see Table 1, section 200.9 of this Title).

[(27)] 21 Wholesale purchaser-consumer. Any ultimate consumer of gasoline who purchases or obtains gasoline from a supplier for use in motor vehicles and receives delivery of that product into a storage tank, substantially under the control of that person, of at least 550 gallon capacity.

225-3.3 Prohibitions and requirements-volatility.

(a) No person shall sell or supply a gasoline to a retailer or wholesale purchaser-consumer, having a Reid vapor pressure greater than 9.0 pounds per square inch (psi) as sampled and tested by methods acceptable to the commissioner, during the period May 1st through September 15th of each year beginning 1989.

(b) Any person who sells or supplies gasoline, subject to subdivision (a) of this section, to retailers or wholesale purchaser-consumers must comply with the requirements of section 225-3.[6]4 of this Subpart which pertain to gasoline RVP.

(c) Carbon monoxide contingency measure.

(1) A contingency measure, pursuant to 42 U.S.C. section 7502 (c)(9) (see Table 1, section 200.9 of this Title) and 42 U.S.C. section 7512a(a)(3) (see Table 1, section 200.9 of this Title), shall be invoked to limit the maximum allowable wintertime RVP of gasoline sold, supplied, or dispensed in the New York City CMSA *after the first quality assured violation of the National Ambient Air Quality Standard (NAAQS) for carbon monoxide at any New York State operated monitor within the New York City CMSA* or if [any] *either* of the following occur:

[(i) if any nonattainment area within the New York City CMSA fails to attain the National Ambient Air Quality Standard (NAAQS) for carbon monoxide by December 31, 1995;]

[(ii)] *(i)* if the annual estimate of actual vehicle miles traveled (VMT), pursuant to 42 U.S.C. section 7512a(a)(2)(A) (see Table 1, section 200.9 of this Title), in the VMT tracking area within the New York City CMSA during the previous calendar year exceeds the numeric allowance

incorporated in the most recent forecast of VMT made prior to that calendar year; or

[(iii)] *(ii)* if an annual updated forecast of VMT, pursuant to 42 U.S.C. section 7512a(a)(2)(A) (see Table 1, section 200.9 of this Title), in the VMT tracking area within the New York City CMSA for subsequent calendar years exceeds the numeric allowance incorporated in the most recent prior forecast of VMT.

(2) Under such a carbon monoxide contingency measure, the following maximum RVP limits of gasoline sold, supplied, or dispensed in the New York City CMSA shall apply:

[(i)] 11.5 psi during the period September 16th through October 31st of each year;]

[(ii)] *(i)* 13.5 psi during the period November 1st through [March 31st] *the last day of February* of each year;

[(iii) 11.5 psi during the period April 1st through April 30th of each year; and]

[(iv)] *(ii)* 9.0 psi during the period May 1st through September 15th of each year (the summertime gasoline volatility provisions of subdivisions [a] and [b] of this section are unaffected by the carbon monoxide contingency measure established in this subdivision).

(3) Prior to its implementation, the carbon monoxide contingency measure, as established in this subdivision, shall be preceded by the following administrative actions:

(i) the administrator of the United States Environmental Protection Agency, or his or her designee, must find that at least one of the conditions in paragraph (1) of this subdivision has occurred; and

(ii) the commissioner must provide notice in the New York State Register, within 60 days of a finding as referred to in subparagraph (i) of this paragraph that the contingency measure will be invoked.

(4) The carbon monoxide contingency measure, as established in this subdivision, shall take effect within 12 months from the date of a finding, as referred to in subparagraph (i) of this paragraph.

[§ 225-3.4 Prohibitions and requirements—oxygen content.

(a) Except as provided in section 225-3.9 of this Subpart, beginning November 1, 1992, any gasoline which is sold or dispensed to the ultimate consumer in a carbon monoxide control area during the associated carbon monoxide control period or sold or dispensed, directly or indirectly, to persons who sell, resell, dispense or intend to sell, resell or dispense that gasoline to the ultimate consumer in such a carbon monoxide control area during such a carbon monoxide control period shall meet all of the following requirements:

(1) conform with the oxygen content requirements of Table 1 of this subdivision;

TABLE 1
OXYGENATED GASOLINE REQUIREMENTS

| Control area | Control period | Oxygen content |
|---|---|---|
| New York City CMSA | October 1-April 30 | 2.7-2.9 |
| Syracuse MSA | November 1-February 29 | minimum 2.7 |

(2) contain only oxygenates which comply with the definition of oxygenate in section 225-3.2(b)(16) of this Subpart;

(3) have the oxygen content determined pursuant to section 225-3.5 of this Subpart;

(4) be accompanied by the records and reports required by section 225-3.6 of this Subpart; and

(5) be labeled pursuant to section 225-3.7 of this Subpart.

(b) No retailer nor wholesale purchaser-consumer shall knowingly accept gasoline, intended for use by the ultimate consumer, unless accompanied by the information required to conform with section 225-3.6(b) of this Subpart.

225-3.5 Methods for determining oxygen content.

(a) Any gasoline subject to section 225-3.4 of this Subpart shall be sampled and tested prior to sale or dispensing. Such sampling and testing shall:

(1) be performed prior to releasing gasoline from a final distribution facility; and

(2) be repeated if the oxygen content of the gasoline could have been altered by addition, subtraction or alteration of fuel components such as by commingling with other fuels, chemical or physical processing, or storage prior to the release of the gasoline to retail outlets or wholesale purchaser-consumers.

(b) Any sampling of gasoline required by this section to determine the oxygen content shall be conducted in accordance with the following:

(1) the methods set forth in 40 CFR 80, Appendix D (see Table 1, section 200.9 of this Title); or

(2) any other method approved in advance in writing by the commissioner and the Administrator of the United States Environmental Protection Agency, or his or her designee, on the basis that such method yields substantially similar results as the method listed in paragraph (1) of this subdivision.

(c) The following method shall be used to determine the oxygen content of any gasoline:

(1) Test a sample of the gasoline using one of the following test methods to determine the percent by volume of each oxygenate in the gasoline (all volume measurements shall be adjusted to 60°F):

(i) ASTM Test Method D 4815-89 (see Table 1, section 200.9 of this Title); or

(ii) any other test method approved in advance in writing by the commissioner and the Administrator of the United States Environmental Protection Agency, or his or her designee, on the basis that such test method yields substantially similar results as ASTM Test Method D 4815-89 (see Table 1, section 200.9 of this Title).

(2) Multiply the percent by volume of each oxygenate determined in paragraph (1) of this subdivision by the ratio of the specific gravity of the oxygenate to the specific gravity of the oxygenated gasoline. Specific gravities of oxygenates are set forth in Table 2 of subdivision (d) of this section.

(3) Calculate the oxygen content by weight contribution of each oxygenate by multiplying the product determined in paragraph (2) of this subdivision by the weight fraction oxygen of each oxygenate set forth in Table 2 of subdivision (d) of this section.

(4) Sum the oxygen content by weight contribution of each oxygenate obtained pursuant to paragraph (3) of this subdivision to obtain the total oxygen content of the gasoline.

(5) The above steps for determining the oxygen content of a gasoline are summarized by the following equation:

where:

$W_{oxygen}$ = weight percent of oxygen (oxygen content)

$V_{oxygenate}$ = volume percent of oxygenate in blend as determined pursuant to paragraph (1) of this subdivision

$d_{oxygenate}$ = specific gravity of oxygenate from Table 2 of subdivision (d)

$W_{oxygenoxygenate}$ = weight fraction oxygen contribution of oxygenate from Table 2 of subdivision (d)

$d_{bl}$ = specific gravity of oxygenated gasoline

(d) The weight fraction oxygen and specific gravity values of the common oxygenates listed in Table 2 of this subdivision shall be used in the above equation to calculate the oxygen content of a gasoline. If an oxygenate is not listed in Table 2 of this subdivision, the owner or operator of a refinery, terminal, or bulk plant shall advise the commissioner in writing of its intended use so that the commissioner can decide on the proper specific gravity and weight fraction oxygen values to assign to the unlisted oxygenate.

TABLE 2
SPECIFY GRAVITY AND WEIGHT FRACTION OXYGEN
OF COMMON OXYGENATES

| Oxygenate | Weight fraction ($W_{oxygen/oxygenate}$) | Specific gravity at 60°F ($d_{oxygenate}$) |
|---|---|---|
| methyl alcohol (methanol) | 0.4993 | 0.7963 |
| ethyl alcohol (ethanol) | 0.3473 | 0.7939 |
| normal propyl alcohol | 0.2662 | 0.8080 |
| isopropyl alcohol | 0.2662 | 0.7899 |
| normal butyl alcohol | 0.2158 | 0.8137 |
| isobutyl alcohol | 0.2158 | 0.8058 |
| secondary butyl alcohol | 0.2158 | 0.8114 |
| tertiary butyl alcohol | 0.2158 | 0.7922 |
| methyl tertiary butyl ether (MTBE) | 0.1815 | 0.7460 |
| tertiary amyl methyl ether (TAME) | 0.1566 | 0.7752 |
| ethyl tertiary butyl ether (ETBE) | 0.1566 | 0.7452 |
| diisopropyl ether (DIPE) | 0.1566 | 0.7300 |

(e) Notwithstanding the requirements in this section for testing to determine the oxygen content of gasoline, the owner or operator of any refinery, terminal, or bulk plant subject to this Subpart may apply to the

commissioner for approval to use an alternative method of determining the oxygen content of gasoline. The commissioner shall not approve such an application unless the alternative method proposed has been deemed generally acceptable by the Administrator of the United States Environmental Protection Agency, or his or her designee, and would ensure that the oxygen content of the gasoline would be determined with no less accuracy and reliability than would be achieved through testing in accordance with this section.]

225-3.[6] *4* Records and reports.

(a) The owner or operator of any refinery, terminal, or bulk plant from which gasoline, subject to this Subpart, is distributed must maintain records on the gasoline that is delivered to or distributed from such facilities. These records shall include:

(1) The RVP of the gasoline if subject to section 225-3.3 of this Subpart.

[(2) A test report, or other acceptable information, which documents the oxygen content of the gasoline as determined by section 225-3.5 of this Subpart and which contains all measured values used to determine the oxygen content if subject to section 225-3.4 of this Subpart.]

[(3)] *2* A designation of the appropriate time period(s) in which the gasoline is intended to be dispensed to motor vehicles

[(4) Documentation of the volume percent and chemical name of each oxygenate added, the shipment quantity, and the shipment date of all gasoline leaving the refinery, terminal, or bulk plant (documentation may include, but is not limited to, bills of lading, invoice delivery tickets, and loading tickets).]

[(5)] *3* Written certification that the gasoline:

[(i) has been tested in accordance with section 225-3.5 of this Subpart;]

[(ii)] *(i)* conforms with all RVP [and oxygen content] requirements of this Subpart; and

[(iii)] *(ii)* is in compliance with all applicable State and Federal regulations which apply during the time period(s) specified pursuant to paragraph (3) of this subdivision.

(b) Persons subject to subdivision (a) of this section shall provide the following records with gasoline which is distributed from facilities:

(1) A copy of the certification produced for paragraph (a)(5) of this section.

(2) Documentation of the maximum RVP of the gasoline if the gasoline was subject to section 225-3.3 of this Subpart.

[(3) Documentation of the oxygenate composition of the gasoline as determined by section 225-3.5 of this Subpart including the following information: oxygen content, volume percent of alcohols, volume percent of methanol, volume percent of ethanol, volume percent of ethers, and name and address of person performing the determination.]

[(4)] *(3)* Designation of the appropriate time period(s) in which the gasoline is intended to be dispensed to motor vehicles.

[(5)] *(4)* Documentation of the shipment quantity and the shipment date of the gasoline being distributed.

(c) Each retailer or wholesale purchaser-consumer shall maintain records on each delivery of gasoline. These records shall include all those required to be delivered pursuant to subdivision (b) of this section.

(d) Persons required to maintain records pursuant to subdivisions (a), (b) and (c) of this section must make the records available for inspection during normal business hours, at the location from which the gasoline was delivered, sold, or dispensed, to the commissioner or his or her representative and must furnish copies of these records to the commissioner or his or her representative upon request. Such persons shall maintain all records and documentation required to be made or maintained in accordance with this section, including any calculations performed, for at least two years from date of delivery.

[225-3.7 Labeling requirements.

(a) During the applicable carbon monoxide control period, all gasoline pumps and other gasoline dispensing devices at retail outlets within a designated carbon monoxide control area shall be labeled as specified in this section. Any person who owns, leases, operates, controls or supervises a retail outlet shall be responsible for compliance with these labeling requirements.

(b) The label shall, except as provided in subdivision (c) of this section, contain the following statement: "The gasoline dispensed from this pump is oxygenated and will reduce carbon monoxide pollution from motor vehicles." This statement shall not be altered, and no additional language shall be inserted within the text.

(c) The label shall also, except as provided in subdivision (e) of this section, contain language, added before or after the statement required in subdivision (b) of this section, which identifies:

(1) the oxygenate class (e.g., alcohol or ether) present in the gasoline, if alcohol comprises at least one percent by volume or if ether, or another oxygenate class, comprises at least two percent by volume; or

(2) "methanol" if methanol comprises at least 0.3 percent by volume of the gasoline.

(d) If the label as required by subdivision (b) of this section is displayed on a gasoline pump or other gasoline dispensing device at times outside the applicable carbon monoxide control period:

(1) the gasoline being dispensed from such pump or dispensing device must have a minimum oxygen content of 2.0 percent; or

(2) the statement required by subdivision (b) of this section must be preceded or followed by the phrase "from (date 1) to (date 2)," where (date 1) and (date 2) are filled in with the beginning and ending dates, respectively, of the applicable carbon monoxide control period.

(e) If the gasoline pump or other gasoline dispensing device is dispensing noncomforming gasoline with an oxygen content below the required minimum 2.7 percent oxygen by weight in accordance with a variance issued by the commissioner pursuant to section 225-3.9(a) of this Subpart, the label shall contain the following statement: "The gasoline dispensed from this pump does not meet standards established to reduce carbon monoxide pollution from motor vehicles but is temporarily authorized to be distributed due to a shortage of supply of gasoline that meets the standard."

(f) Any label required pursuant to this section shall be:

(1) posted on the vertical surface of the gasoline pump or other gasoline dispensing device on each side with gallonage and price meters, on the upper two-thirds of the surface, in a position clearly recognizable, conspicuous and easily readable for the public; and

(2) clearly legible and in block letters that are:

(i) no less than 20-point bold type; and

(ii) in a color that contrasts with the background upon which they are placed.]

225-3.[8] *(5)* Exceptions and variances-volatility.

(a) Upon application, the commissioner may grant an exception from the requirements of section 225-3.3(a) of this Subpart to a supplier of a gasoline which contains simple alcohols upon a showing that gasoline and gasoline blending components are not reasonably available that, when blended, would enable the resulting fuel to meet the requirements of section 225-3.3(a) of this Subpart, and that granting the exception will not significantly exacerbate ambient ozone levels. Such an exception may be issued for all or a part of the State for up to one year, and may be renewed upon application. The commissioner shall place conditions on exceptions granted pursuant to this subdivision including a maximum RVP allowed and the quantity of gasoline permitted to be supplied under the exception.

(b) Effective September 16, 1989, upon application, the commissioner, after consultation with the [Commissioner of the State Energy Office] *President of the New York State Energy Research and Development Authority*, may grant a temporary variance from the requirements of section 225-3.3 of this Subpart if the applicant for such an exception can demonstrate to the commissioner that quantities of gasoline sufficient to meet the demand in New York State cannot be manufactured in time to meet all the requirements of section 225-3.3 of this Subpart.

(1) The [Commissioner of the State Energy Office] *President of the New York State Energy Research and Development Authority* must certify that there exists an insufficient supply of fuel which conforms to the standards in section 225-3.3 of this Subpart before a temporary variance may be granted under this subdivision.

(2) The commissioner shall impose an interim volatility standard and/or restrictions on the quantity of gasoline permitted to be supplied as conditions of a variance granted pursuant to this subdivision.

(3) The commissioner shall require that an economic adjustment fee must be deposited with the commissioner before a temporary variance will be granted. The economic adjustment fee shall equal the economic benefit that may accrue because of the lower cost of gasoline that does not comply with section 225-3.3 of this Subpart, in comparison with gasoline that does.

[225-3.9 Exceptions and variances-oxygen content

(a) Upon application, the commissioner, after consultation with the Commissioner of the State Energy Office, may issue an order granting a temporary variance from the requirements of section 225-3.4 of this Subpart to allow gasoline to be provided, offered for sale, or sold at an oxygen

**Rule Making Activities**                          **NYS Register/June 27, 2001**

content below 2.7 percent by weight due to a shortage of gasoline conforming to the requirements of section 225-3.4 of this Subpart.

(1) To be eligible for a variance pursuant to this subdivision, the applicant shall:

(i) demonstrate to the commissioner that quantities of oxygenated gasoline are not reasonably available and cannot be produced in time to meet the requirements of section 225-3.4 of this Subpart due to extreme and unusual circumstances which are clearly outside the control of the applicant;

(ii) demonstrate to the commissioner that it exercised prudent planning, diligence, and due care and was not able to avoid the nonconformity and has taken all reasonable steps to minimize the extent of the nonconformity;

(iii) show how the requirements of section 225-3.4 of this Subpart will be expeditiously achieved; and

(iv) deposit an economic adjustment fee with the commissioner before the granting of a temporary variance pursuant to this subdivision. The economic adjustment fee shall equal the economic benefit that may accrue because of the lower cost of gasoline that does not comply with section 225-3.4 of this Subpart, in comparison with gasoline that does.

(2) The Commissioner of the State Energy Office must certify that there exists an insufficient supply of gasoline which conforms to the requirements in section 225-3.4 of this Subpart before a temporary variance may be granted under this subdivision.

(3) The commissioner reserves the right to impose an interim oxygen content standard and/or restrictions on the quantity of nonconforming gasoline permitted to be supplied and used under conditions of a variance granted pursuant to this subdivision.

(4) A temporary variance pursuant to this subdivision may be issued for all or part of a carbon monoxide control area for which the shortage of conforming gasoline exists for a period of time up to the duration of the area's designated carbon monoxide control period, and may be renewed upon application.

(b) Upon application, the commissioner may grant an exception from the requirements of section 225-3.4 of this Subpart to allow individual refiners and individual owners or operators of terminals and bulk plants to provide, offer for sale, or sell gasoline at an oxygen content above 2.9 percent by weight within the New York City CMSA.

(1) To be eligible for an exception pursuant to this subdivision, the applicant shall make a demonstration acceptable to the commissioner that the granting of such an exception will not significantly exacerbate ambient levels of air pollutants.

(2) An exception pursuant to this subdivision may be issued for all or part of the New York City CMSA for a period of time up to the duration of the area's designated carbon monoxide control period, and may be renewed upon application.

(3) The commissioner reserves the right to restrict the quantity of gasoline not conforming to the requirements of section 225-3.4 of this Subpart but permitted to be supplied and used under conditions of an exception granted pursuant to this subdivision.]

225-3.[10] *(6)* Severability.

Each provision of this Subpart shall be deemed severable, and in the event that any section of this Subpart is held to be invalid, the remainder of this Subpart shall continue in full force and effect.

*Text of proposed rule and any required statements and analyses may be obtained from:* Steven Botsford, Department of Environmental Conservation, Division of Air Resources, 625 Broadway, 2nd Fl., Albany, NY 12233-3251, (518) 402-8396, e-mail: srbotsfo@gw.dec.state.ny.us

*Data, views or arguments may be submitted to:* Arlene F. Schmidt, Department of Environmental Conservation, Division of Air Resources, 625 Broadway, 2nd Fl., Albany, NY 12233-3250, (518) 402-8465, e-mail: afschmid@gw.dec.state.ny.us

*Public comment will be received until:* five days after the last scheduled public hearing.

*Additional matter required by statute:* Pursuant to art. 8 of the State Environmental Quality Review Act, a short environmental assessment form, a negative declaration and a coastal assessment form has been prepared and are on file. This rule must be approved by the Environmental Board.

*Regulatory Impact Statement*
STATUTORY AUTHORITY:
GENERAL: The statutory authority for this proposal is found in the Environmental Conservation Law (ECL), Sections 1-0101; 3-0301; 19-0103; 19-0105; 19-0301; 19-0303; and 19-0305.

Pursuant to Section 3-0301(b)(i) of the Environmental Conservation Law (ECL), (L. 1972, c. 664), the Commissioner is charged with promoting and protecting the air resources of New York including providing for the prevention and abatement of air pollution. Section 3-0301(2)(a) permits the Commissioner to adopt rules and regulations to carry out the purposes and provisions of the ECL.

19-0103 is a declaration of the State's policy with specific reference to air pollution. "It is declared to be the policy of the State of New York to maintain a reasonable degree of purity of the air resources of the State . . . and to that end to require the use of all available practical and reasonable methods to prevent and control air pollution." (L. 1953, c 897) Section 19-0105 sets out the purpose of Article 19, "to safeguard the air resources of the State from pollution . . ." (L. 1972, c. 664)

Sections 19-0301(1)(a) and (b) state that:
1. Consistent with the policy of the state as it is declared in section 19-0103, the department shall have power to:

a. Formulate, adopt and promulgate, amend and repeal codes and rules and regulations for preventing, controlling or prohibiting air pollution in such areas of the state as shall or may be affected by air pollution . . .

b. Include in any such codes and rules and regulations provisions establishing areas of the state and prescribing for such areas (1) the degree of air pollution or air contamination that may be permitted therein, (2) the extent to which air contaminants may be emitted to the air by any air contamination source . . . (a was enacted in the L. 1957 c. 931, b was enacted in the L. 1986 c. 902).

Section 19-0301(2)(a) further provides:
1. It shall be the duty and responsibility of the department to: prepare and develop a general comprehensive plan for the control or abatement of existing air pollution, and for the control or prevention of any new air pollution recognizing varying requirements for different areas of the state. (L. 1957, c. 931)

In addition, Section 19-0301(2)(e) provides authority for the Commissioner to: "[p]romulgate standards for the use of fuels for use in motor vehicles or motor vehicle engines, taking due recognition of federal standards and requirements." (L. 1972, c. 664) Section 19-0305 provides the Commissioner with general enforcement power. (L. 1972, c. 664)

Based on the above-referenced sections, the Commissioner has very broad authority to regulate air pollution, including pollution caused from motor vehicle fuels.

LEGISLATIVE OBJECTIVES:
GENERAL: Article 19 of the ECL was adopted for the purpose of safeguarding the air resources of New York State from pollution. To facilitate this purpose, the Legislature bestowed general and specific powers and duties on the Department of Environmental Conservation (DEC) including the power to formulate, adopt, promulgate, amend, and repeal regulations for preventing, controlling or prohibiting air pollution.

Section 211(m) of the Clean Air Act (the Act) required all areas of the country that were designated as nonattainment for the carbon monoxide (CO) National Ambient Air Quality Standard (NAAQS) to implement an oxygenated fuels program during certain months of the year. At the time of the amendments, New York had two such areas: the New York City Consolidated Metropolitan Statistical Area (New York City CMSA) and the Syracuse Metropolitan Statistical Area (Syracuse MSA). Both areas have since come into attainment with the CO NAAQS.

The Environmental Protection Agency (EPA) has promulgated rule makings removing the requirement for the oxygenated fuels program in both the New York City CMSA and the Syracuse MSA, on the basis of both areas being in attainment with the CO NAAQS. Currently Subpart 225-3 requires that the oxygenated fuels program be implemented in the New York City CMSA and the Syracuse MSA during certain months of the year. This revision to Subpart 225-3 will remove the requirement for the program, making the state's regulations consistent with EPA's rule makings. Part 200 will also be revised to reflect the changes to Subpart 225-3.

NEEDS AND BENEFITS:
PURPOSE: This amendment to Subpart 225-3 will impact the New York City CMSA and the Syracuse MSA by removing the requirement that the oxygenated fuels program by implemented during winter months. Specifically, Section 225-3.4, "Prohibition and requirements - oxygen content," and Section 225-3.9, "Exceptions and variances - oxygen content," along with specific definitions in Section 225-3.2 relating to the oxygenated fuels program, will be removed from the regulation.

In addition, in accordance with C. 83 of the Laws of 1995, all references to the "State Energy Office" will be removed from Subpart 225-3 and language referencing the successor of this office, the New York State

Energy Research and Development Authority, will be substituted in its place.

WHY AMENDMENT IS NEEDED AND BENEFITS:

GENERAL: Section 211(m) of the Act requires States with certain CO nonattainment areas to include in their State Implementation Plans (SIPs) a requirement that gasoline must contain not less than 2.7 weight percent oxygen during certain cold months (the oxygenated fuels program).

New York City CMSA: The New York City CMSA consists of Bronx, Kings, Queens, New York, Richmond, Orange, Rockland, Putnam, Westchester, Nassau and Suffolk Counties. The five counties in New York City (Bronx, Kings, Queens, New York and Richmond) along with Westchester and Nassau, were designated and classified as a moderate CO nonattainment area in November 1991. New York State was then required to submit a SIP that included the oxygenated fuels program, among other measures, to demonstrate that the New York City CMSA would attain and maintain the CO NAAQS. The New York City CMSA has attained the CO NAAQS; and in August of 1999, the Department submitted a redesignation request and maintenance plan (plan) for the area to EPA. This plan included a proposal to remove the oxygenated fuels program as a CO control measure. EPA approved the removal of the program from the SIP in April of 2000. Although the program has been removed from the SIP and is no longer federally enforceable, it remains a requirement established in Part 225-3.

There remains a need for a contingency measure (i.e., a control program to be implemented in the case of violations of the CO NAAQS for the New York City CMSA. The current contingency measure - gasoline volatility limits based on Reid vapor pressure as established in 225-3.3(c) - will remain in place.

Syracuse MSA: In the late 1970's, a study was conducted to locate a CO monitor in Onondaga County which was likely to measure high traffic related CO concentrations. As a result, a CO monitor was located in downtown Syracuse at the intersection of East Adams and Almond Streets. This area is considered a "hot spot" area, and not representative of all areas in the Syracuse MSA. Data generated in 1988 and 1989 from this monitor indicated that a violation of the CO NAAQS existed and in January of 1992, EPA designated Onondaga County as a CO nonattainment area and required the state to submit a State Implementation Plan for the area. To comply with the CO nonattainment provisions of the Act, the Department revised Subpart 225-3 to require the oxygenated fuels program be implemented in the Syracuse MSA. In 1993, EPA approved the CO Redesignation Request and Maintenance Plan for Onondaga County. As the nonattainment designation was based upon data from before the oxygenated fuels program was implemented, and the fact that there had been no violations since that time, the Department requested, and got EPA approval for, changing the oxygenated fuels program from a required measure to a contingency measure. Although Part 225-3 requires the use of the program in the Syracuse MSA during winter months, this provision of the regulation has not been enforced since 1994. The language requiring the program will be removed, and language will be added to the CO Redesignation Request and Maintenance Plan for Onondaga County to substitute the basic Inspection and Maintenance Program as a contingency measure in lieu of the oxygenated fuels program.

BENEFITS: Regulated parties will benefit from this amended regulation by having an inconsistency between a regulation and current control programs eliminated.

COSTS: There will be no costs, either capital or non-capital investments, annual compliance, or administrative, to regulated parties, to the Department, to state government as a whole, or to local governments.

PAPERWORK: There will be no change to the paperwork requirements of regulated parties, state government as a whole, or to local governments. The Department will see a decrease in paperwork, as it will no longer send out an annual letter to regulated entities, advising them of the non-enforcement of the oxygenated fuels program.

LOCAL GOVERNMENT MANDATES: This amendment to Part 225-3 does not impose any additional record keeping, reporting or other requirements on local governments. The revision imposes no new programs, services, duties, or responsibilities on any counties, cities, towns, villages, school or fire districts.

DUPLICATION: This proposal does not duplicate any other federal or state regulations or statutes. It brings consistency to federal and state regulations by complying with EPA's rule making removing New York's requirement to have an oxygenated fuels program.

ALTERNATIVES:

There are two possible alternatives:

1.) The Department takes no action. Currently, the Department sends out an annual letter to regulated parties informing them that the Department will not be enforcing the oxygenated fuels program. This practice would have to be continued in order to reduce confusion among the regulated community as to the status of the program, and would be contrary to EPA's April 2000 final rule removing New York's oxygenated fuels program as a control measure from its CO SIP.

2.) The Department enforces 225-3 as written. This is not a preferred alternative as it is contrary to EPA's April 2000 final rule, as discussed above. Also, the primary oxygenate in northeastern gasoline is methyl tertiary butyl ether (MTBE). MTBE has drawn much attention due to the concern of the oxygenate being a groundwater and surface water contaminant. MTBE is a proven carcinogen in laboratory animals and a suspected carcinogen in humans. Enforcement of 225-3 as written would increase the amount of MTBE present in gasoline during the winter months. This will increase the groundwater MTBE contamination caused by leaking underground storage tanks and surface spills.

FEDERAL STANDARDS: The federal standards for the oxygenated fuels program are established in section 211(m) of the Act, which requires certain CO nonattainment areas to implement such a program. EPA has found both the New York City CMSA and the Syracuse MSA to be in attainment with the CO NAAQS, and has established final rules in the Federal Register to remove the requirement for an oxygenated fuels program for both areas (NY CMSA: 65 FR 20909, April 19, 2000, Syracuse MSA: 58 FR 50851, September 29, 1993).

COMPLIANCE SCHEDULE: The Department would like to have the amended regulation in place for the 2000/2001 oxygenated fuels season which would begin November 1, 2000. Compliance with the regulation would begin 30 days after adoption, requiring promulgation by October 1, 2001.

*Regulatory Flexibility Analysis*

1. Effects on Small Businesses:

Subpart 225-3 of Title 6 of the New York Code of Rules and Regulations (NYCRR) contains specific requirements for the allowable vapor pressure and oxygen content of gasoline. The New York State Department of Environmental Conservation (DEC) proposes to amend Subpart 225-3 to remove the oxyfuel program from the New York Consolidated Statistical Metropolitan Area (New York CMSA) and the Syracuse Metropolitan Statistical Area (Syracuse MSA), and revise the trigger mechanisms for carbon monoxide contingency plans for both areas, in order to be consistent with the State Implementation Plan for carbon monoxide and the Environmental Protection Agency's (EPA) rule making removing the requirement for the oxyfuel program in the New York CMSA and Syracuse MSA (65 FR 20209, April 19, 2000, and 58 FR 50851, September 29, 1993, respectively).

The proposed amendment is not expected to have any effect on small businesses. The Department of Environmental Conservation (DEC) has been using its enforcement discretion to not enforce the oxyfuel program in either the New York CMSA and the Syracuse MSA for several years. The proposed amendment will formalize DEC's past actions.

2. Compliance Requirements:

There are no compliance requirements for small businesses. In the event that a contingency plan is required, it is the responsibility of refineries to provide gasoline distributors with gasoline at the required Reid vapor pressure.

3. Professional Services:

There will be no requirement for professional services.

4. Compliance Costs:

There are no compliance costs.

5. Minimizing Adverse Impact:

The revisions to Subpart 225-3 will mitigate an adverse impact on small businesses such as gasoline service stations by reducing the amount of record keeping required by such businesses, and removing an inconsistency from the Department's regulations, thereby eliminating confusion.

6. Opportunities for Participation:

EPA's rule makings were the subject of public hearings. The SIP revisions were the subject of public hearings. Public hearings will be held to obtain comments on the Department's proposed regulation. Participation by every affected party will be actively sought through these hearings. In addition, all regulated entities have been receiving an annual letter informing them of the non-enforcement of the oxyfuels program. Should this amendment not be promulgated before October 1, 2001, these entities will continue to receive the letter, with additional language informing them of the status of the regulation. These entities will receive notification of the public hearing on the regulation.

**Rule Making Activities**                                    **NYS Register/June 27, 2001**

7. Economic and Technological Feasibility:

There are no economic impacts of compliance with the proposed amendment. There is no issue of technological feasibility as this is not a technology-forcing measure, but an administrative one.

*Rural Area Flexibility Analysis*

1. Types and estimated number of rural areas affected.

The New York City CMSA includes the following rural towns and villages in Orange County: Towns of Deerpark, Greenville, Hamptonburgh, Minisink, Tuxedo, and the villages of Unionville and Tuxedo Park. The Syracuse MSA includes the following rural areas in Madison and Oswego Counties, and the following towns and villages in Onondaga County: Fabius (town and village), Lafayette, Otisco, Pompey, Spafford and, Tully (town and village).

2. Reporting, recordkeeping, and other compliance requirements, and professional services:

There are no reporting, record keeping, or other compliance requirements associated with this amendment beyond those already imposed by the current version of the rule. In fact, paperwork will be reduced as businesses affected by the amended rule will no longer be required to maintain records regarding the shipping, analysis, purchase, and sale of oxygenated fuels. No professional services are required for compliance with this rule.

3. Costs:

There are no cost implications attributable to the amendments to part 225-3 to consumers, state and local governments, or the regulating agency.

4. Minimizing adverse impact:

There will be no adverse environmental impact.

5. Rural area participation:

Regulated entities in the rural areas discussed above have been receiving an annual letter for the past several years informing them of the non-enforcement of the oxyfuels program. Those entities will continue to receive this letter until the proposed revision is promulgated. In addition, those entities will receive notification of the public hearings and comment period for this amendment.

*Job Impact Statement*

1. Nature of impact:

The Department of Environmental Conservation (the Department) proposes to amend 6 NYCRR Part 225-3, Fuel Composition and Use - Gasoline. The purpose of the amendment is to remove the requirement that the oxygenated fuels program (oxyfuels) be implemented in certain portions of the state during winter months. The United States Environmental Protection Agency (EPA) no longer requires New York State to have the program, and the Department has been using its enforcement discretion to not enforce oxyfuels for several years. As this amendment to the regulation serves to formalize the Department's past actions, it is essentially an administrative action and will not have an adverse impact on job and employment opportunities.

2. Categories and numbers affected:

Not Applicable.

3. Regions of adverse impact:

This rule making will only affect the New York City Consolidated Statistical Metropolitan Area, which consists of the Counties of Bronx, Kings, Queens, New York, Richmond, Orange, Rockland, Putnam, Westchester, Nassau and Suffolk, and the Syracuse Metropolitan Statistical Area, which consists of the Counties of Onondaga, Oswego and Madison. There will be no adverse impacts attributable to this rule making to any of the areas described above.

4. Minimizing adverse impact:

There will be no adverse impacts attributable to the revisions to the regulation which is the subject of this rule making.

5. Self-employment opportunities:

There will be no self-employment opportunities as the result of the revisions to the regulation which is the subject of this rule making.

# Housing Finance Agency

## PROPOSED RULE MAKING
## NO HEARING(S) SCHEDULED

**Federal Low Income Housing Tax Credits**

I.D. No. HFA-26-01-00009-P

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:

*Proposed action:* Addition of Part 2188 to Title 21 NYCRR.

*Statutory authority:* Internal Revenue Code of 1986, section 42, as amended (code), and the regulations and other publications of the Internal Revenue Service with binding authority issued under the code; and Executive Order No. 135, issued on Feb. 27, 1990

*Subject:* Federal low income housing tax credits (LIHTC).

*Purpose:* To govern the allocation of the compliance monitoring guidelines.

*Substance of proposed rule:* The New York State Housing Finance Agency ("Agency"), a public benefit corporation established pursuant to Article III of the New York State Private Housing Finance Law, has served as a sub-allocating agency for the Federal Low Income Housing Tax Credit program since Executive Order No. 135 was issued by the Governor on February 27, 1990. Under Part 2040 of Title 9 of the New York Official Compilation of Codes, Rules and Regulations, the Agency has served as a Housing Credit Agency ("HCA"), and has allocated Low Income Housing Tax Credit ("LIHTC") to projects for which it has provided financing. Pursuant to Section 42 of the Internal Revenue Code and the regulations and other authoritative publications of the Internal Revenue Service, ("Code"), the Agency, as an HCA, is required to adopt a Qualified Allocation Plan ("QAP") governing the allocation of LIHTC.

In January of 2000, the Internal Revenue Service promulgated final revisions of certain regulations requiring, *inter alia*, HCAs to include additional allocation and compliance requirements in their QAPs. The following reflects the required changes as well as incorporating a number of structural and procedural changes intended to more accurately express the Agency's current LIHTC procedures and priorities.

1. The Agency's QAP includes a consolidation of definitions of certain terms used in the QAP.

2. The goals and needs assessment which produced the housing priorities contained in this Agency's QAP is based on the State of New York's Consolidated Plan ("Consolidated Plan"). The QAPs general priorities for assisting low income residents and includes three objectives, which, to the extent consistent with the Code, are intended to be implemented by the QAP:

a- Preserve and increase the supply of decent, safe and affordable housing available to all low and moderate income households, and help identify and develop available resources to assist in the development of housing;

b- Improve the ability of low and moderate income New Yorkers to access rental housing and homeownership opportunities and;

c- Address the shelter, housing, and service needs of the homeless poor and others with special needs. While the demographic analysis and state-wide market analysis contained in the Consolidated Plan demonstrates a need for more affordable rental housing for all types of low and extremely low income households, the Consolidated Plan also indicates that there are substantially more low and extremely low income elderly rental households with housing problems as opposed to low and extremely low income large family rental households with housing problems. For the purpose of this Agency's QAP, low and extremely low income elderly rental households will therefore be considered as a population with special needs.

3. The Agency's QAP clearly expresses the Agency's LIHTC application process. To further delineate the application guidelines, the QAP outlines threshold requirements, which must be met before a project will be further considered by the Agency. Such requirements contain guidelines that limit the amount of eligible basis per unit which may be included in the qualified basis of a building for LIHTC purposes.

4. The Agency's QAP distinguishes the evaluation process employed by the Agency for LIHTC allocated from the State's per capita ceiling from the allocation process used with respect to "as of right" LIHTC, which does not count against the State's per capita ceiling because the