**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------- x

In Re: Methyl Tertiary Butyl Ether ("MTBE")          Master File No. 1:00-1898
Products Liability Litigation                                      MDL 1358 (SAS)
                                                                              M21-88
----------------------------------------------------------------- x    ECF Case

**This document relates to the following case:**

*City of New York v. Amerada Hess Corp., et al.*
Case No. 04 Civ. 3417

----------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF CITY OF NEW YORK'S MOTION *IN LIMINE* NO. 3**
**TO EXCLUDE EXPERT TESTIMONY CONSISTING OF LEGAL CONCLUSIONS,**
**INTERPRETING THE LAW, OR REGARDING LEGISLATIVE OR AGENCY**
**MOTIVE OR INTENT**

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ........................................................................................................................ 2

    **A.**   **Expert Testimony Consisting of Legal Conclusions and Interpreting or Applying Laws or Regulations Should Be Excluded** ..................................................... 2

    **B.**   **Expert Testimony Regarding the Motives or Intentions of Lawmakers or Agencies Should Be Excluded** ............................................................................................ 10

**CONCLUSION** ................................................................................................................ 17

# TABLE OF AUTHORITIES

## Federal Cases

*Adalman v. Baker, Watts & Co.,*
807 F.2d 359 (4th Cir.1986) ................................................. 5

*AstraZeneca LP v. TAP Pharm. Prods., Inc.,*
444 F.Supp.2d 278 (D.Del.2006) ......................................... 9

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971) ...................................................... 1, 10

*FAA v. Landy,*
705 F.2d 624 (2d Cir.), *cert. den.,* 464 U.S. 895 (1983) ........... 2

*Highland Capital Management, L.P. v. Schneider,*
379 F.Supp.2d 461 (S.D.N.Y. 2005) ............................ *passim*

*Hygh v. Jacobs,*
981 F.2d 359 (2d Cir. 1992) ............................................ 1, 2

*In re MTBE,*
591 F.Supp.2d 259 (S.D.N.Y. 2008) .................................. 6

*In re Rezulin Products Liability Litigation,*
309 F.Supp.2d 531 (S.D.N.Y. 2004) ............................ *passim*

*Lippe v. Bairnco,*
288 B.R. 678 (S.D.N.Y. 2003) .......................................... 9

*Malletier v. Dooney & Bourke, Inc.,*
525 F.Supp.2d 558 (S.D.N.Y. 2007) (Scheindlin, J.) ............ 2

*Marx & Co. v. Diner's Club, Inc.,*
550 F.2d 505 (2d Cir.), *cert. den.,* 434 U.S. 861 (1977) ...... *passim*

*Pinter v. Dahl,*
486 U.S. 622 (1988) ....................................................... 5

*Roundout Valley Cent. Sch. Dist. v. Coneco Corp.,*
321 F.Supp.2d 469 (N.D.N.Y.2004) .................................. 5

*Soon Hing v. Crowley,*
113 U.S. 703 (1885) ..................................................... 10

*Stissi v. Interstate and Ocean Transport Co. of Philadelphia,*
   765 F.2d 370 (2d Cir. 1985) ........................................................ 6

*U.S. v. American Tel. and Tel. Co.,*
   524 F.Supp. 1381 (D.C.D.C. 1981) ........................................... 10

*United States v. Awadallah,*
   436 F.3d 125 (2d Cir. 2006) ...................................................... 2

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir.1991) ............................................. *passim*

### State Cases

*Elder v. Pacific Telephone and Telegraph Co.,*
   66 Cal.App.3d 650 (1977) ....................................................... 5, 6

*Los Angeles v. Superior Court (Burroughs),*
   13 Cal.3d 721 (1975) ................................................................ 10

*Matter of Daniel C.,*
   472 N.Y.S.2d 666 (App.Div. 2d Dep't 1984) .......................... 10

*San Mateo City Sch. Dist. v. Public Employment Relations Board,*
   33 Cal.3d 850 (1983) ............................................................... 10

*Water Quality Association v. City of Escondido,*
   53 Cal.App.4th 755 (1997) ...................................................... 11

### Other Authorities

New York State Navigation Law, Article 12 § 190-a .................. 6

### Federal Rules

5 U.S.C. 610 .................................................................................. 7

Fed. R. Evid. 401 ......................................................................... 6

Fed. R. Evid. 402 ......................................................................... 6

Fed. R. Evid. 403 ......................................................................... 2

Fed. R. Evid. 704(a) .................................................................... 2

# INTRODUCTION

Plaintiff the City of New York ("the City") hereby moves the Court *in limine* for an order barring expert testimony or opinions that offer legal conclusions, as well as expert testimony regarding (1) the interpretation, application or meaning of laws and regulations, and (2) the intention or purpose of governmental agencies or legislative bodies in adopting or enforcing such laws or regulations.

Expert witnesses may not testify as to conclusions of law or as to the motives or intentions of governmental authorities in passing or implementing laws and regulations. *Hygh v. Jacobs*, 981 F.2d 359, 363 (2d Cir. 1992) (requiring "exclusion of expert testimony that expresses a legal conclusion"); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) ("inquiry into mental processes of administrative decisionmakers is usually to be avoided"); *In re Rezulin Products Liability Litigation*, 309 F.Supp.2d 531, 547 (S.D.N.Y. 2004) ("[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony"). Based upon Defendants' identification of defense expert topics, the expert reports of Anthony Taverni ("Taverni"), Robert N. Stavins ("Stavins"), Richard D. Wilson ("Wilson"), Thomas C. Austin ("Austin") and Marcia E. Williams ("Williams"), and the testimony submitted at the depositions of these experts, the City anticipates that all of these witnesses will continue to impermissibly proffer legal conclusions and to testify regarding (1) the interpretation and application of governmental statutes and regulations, and (2) the legislative or administrative intent of various governmental agencies in enacting and enforcing regulations relating to MTBE, reformulated gasoline ("RFG") and underground storage tanks ("USTs"). Specifically, these experts opine regarding the meaning of the New York State Navigation Law and the laws implementing the New York Environmental Protection and Spill Compensation Fund, the Regulatory Flexibility Act, the 1990 Clean Air Act

Amendments, and the intent of Congress, the EPA, and state agencies in promulgating and implementing these laws and regulations.

Such testimony is speculative, intrudes on the Court's role of interpreting the law and amounts to an impermissible jury instruction. Accordingly, Defendants should be prohibited from presenting this prejudicial and misleading evidence and argument to the jury.

## ARGUMENT

"[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *see also United States v. Awadallah*, 436 F.3d 125, 134 (2d Cir. 2006) (court has "broad discretion under Rule 403 to balance the probative value of evidence against the risk of prejudice"). Expert testimony that consists of legal conclusions, or of speculation as to lawmakers' motives, is especially prone to create unfair prejudice, confuse the issues, or mislead the jury, and is therefore inadmissible for the following reasons.

### A.     Expert Testimony Consisting of Legal Conclusions and Interpreting or Applying Laws or Regulations Should Be Excluded

Expert testimony that offers legal conclusions is inadmissible under Fed. R. Evid. 704(a). *Highland Capital Management*, *L.P. v. Schneider*, 379 F.Supp.2d 461, 471 (S.D.N.Y. 2005) ("while an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts"); *accord*, *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 566 (S.D.N.Y. 2007) (Scheindlin, J.) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991) (expert testimony not permitted if it will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it")); *see also Hygh v. Jacobs*, 981 F.2d at 363 ("This

circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion [citing cases]"); *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir.), *cert. den.,* 464 U.S. 895 (1983) (holding that an expert may not testify as to what the law is, because such testimony would impinge on the trial court's function); *In re Rezulin Products Liability Litigation*, 309 F.Supp.2d at 547 (rejecting portions of plaintiffs' expert's testimony that was "a narrative reciting selected regulatory events" because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence"). Thus, expert testimony expressing a legal conclusion, or analyzing applicable law, should be excluded, because such testimony is not the way a legal standard should be communicated to the jury. "The special legal knowledge of the judge makes the witness' testimony superfluous. . . . The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case." *Marx & Co. v. Diner's Club, Inc.,* 550 F.2d 505, 510 (2d Cir.), *cert. den.,* 434 U.S. 861 (1977).

The City expects that Defendants will attempt to present expert testimony at trial purporting to explain the meaning of particular regulations or indicating how those regulations are applied in practice. Defendants have submitted several expert reports in this case in which Defendants' experts purport to explain statutory and regulatory schemes. Defendants' expert Anthony Taverni, for instance, is a former administrator of the New York Environmental Protection and Spill Compensation Fund ("Oil Spill Fund"), which is a fund created by statute under Article 12 of the New York State Navigation Law. (Expert Report of Anthony Taverni, dated January 23, 2009 (attached to the Declaration of Marnie E. Riddle in Support of Motion in Limine No. 3 as Exhibit 1) ("Taverni Report") at 2). In his Expert Report, Mr. Taverni purports to "address the general, practical operation of the New York Oil Fund" and opines about the compensation a

water supplier would be entitled to receive, under the Oil Spill Fund's regulatory scheme, following "a spill of gasoline, or its constituents including MTBE." (Taverni Report at 2.) Mr. Taverni's opinions, even when couched in practical terms, are based on an impermissible analysis of the laws controlling the Oil Spill Fund and its Administrator. The following quotations from Mr. Taverni's expert report (emphasis added in each instance) demonstrate the essentially *legal* nature of his conclusions:

- "In the course of my preparation I have supplemented my knowledge and background by reviewing relevant Portions of Article 12 – *Oil Spill Prevention, Control, and Compensation Act of the New York State Navigation Law; relevant court cases* . . ." (Taverni Report at 3);

- "*Article 12 of the Navigation Law* established the Environmental and Spill Compensation Fund as a revolving Fund in the Department of Audit Control . . ." (*Id.* at 3);

- "The Administrator of the Fund has significant duties that are *enumerated in the Navigation Law*" (*Id.* at 4);

- "The Department of Health . . . plays a smaller role *pursuant to the Navigation Law* . . ." (*Id.* at 5)

- "The *statute requires* that all oil spills must be reported to DEC within two hours of the discharge" (*Id.* at 6)

- "The *provisions of Article 12 are also applied* to public and private ground water supply systems contaminated by a spill" (*Id.* at 6)

- "DEC is *required by statute* to respond quickly to any notification of a spill . . ." (*Id.* at 6)

- "the Administrator is *required to seek a remedy* through the State's Supreme Court . . ." (*Id.* at 7)

- "The State's *Navigation Law makes it very clear* that the Oil Spill Fund is liable for two separate and distinct types of spill related costs" (*Id.* at 7).

Mr. Taverni's analysis of the Oil Spill Fund's legal framework is inadmissible, whether or not Mr. Taverni has any experience or expertise that gives him particular insight into those laws. The above-cited cases make this very clear; *see also Highland Capital Management, L.P. v. Schneider*, 379 F.Supp.2d at 471 ("discussion of federal securities laws, including statutes and cases" inadmissible, because "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge") (*citing Marx & Co., Inc. v. Diners' Club Inc.,* 550 F.2d at 509-10) ("it is ... erroneous for a witness to state his opinion on the law of the forum."); *cf. Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 368 (4th Cir.1986) (trial court did not err in refusing to allow plaintiffs' expert, an attorney, to testify at trial where "[f]rom beginning to end, it is obvious that [plaintiffs] proffered [the expert] as an expert witness to testify in substantial part to the meaning and applicability of the securities laws to the transactions [at issue], giving his expert opinion on the governing law"), *disapproved on other grounds, Pinter v. Dahl*, 486 U.S. 622 (1988); *see also Roundout Valley Cent. Sch. Dist. v. Coneco Corp.,* 321 F.Supp.2d 469, 480 (N.D.N.Y. 2004) ("[T]o make it abundantly clear for the parties, it is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within the province of the court") (citing cases); *accord, Elder v. Pacific Telephone and Telegraph Co.*, 66 Cal.App.3d 650, 664 (1977) (an expert "may not state interpretations of the law, whether it be of a statute, ordinance or safety regulation promulgated pursuant to a statute").

His impermissible analysis of the Oil Spill Fund's legal context and requirements leads Mr. Taverni to the conclusion that, under the Oil Spill Fund's regulatory framework, "a public or

private water supplier, whose wells were contaminated by a spill of gasoline, or its constituents including MTBE, would be entitled to compensation from the Oil Spill Fund." (Taverni Report at 2); *see also* Taverni Report at 10-11 (Oil Spill Fund would reimburse "[p]ublic or private water suppliers whose wells are contaminated by oil or petroleum of any kind"). Mr. Taverni's so-called opinion, however, simply applies what is already explicitly contained in the statutory provisions of the Navigation Law. Section 190-a of the Navigation Law states, "For purposes of cleanup and removal of any public or private ground water supply system contaminated by a discharge occurring either before or after the effective date of article twelve of this chapter, *all relevant provisions of article twelve of this chapter shall apply*." *See* New York State Navigation Law, Article 12 § 190-a (emphasis added). As his conclusion is a legal opinion that usurps the role of the Court by interpreting the law for the jury, it should be excluded. *United States v. Bilzerian*, 926 F.2d at 1294; *Stissi v. Interstate and Ocean Transport Co. of Philadelphia*, 765 F.2d 370 (2d Cir. 1985) (deeming testimony as to what nautical rules required or prohibited inadmissible); *accord, Elder v. Pacific Telephone and Telegraph Co.*, 66 Cal.App.3d at 664 (an expert "may not state interpretations of the law, whether it be of a statute, ordinance or safety regulation promulgated pursuant to a statute").

In addition to simply re-stating the statute, because the City has not submitted a claim to the Oil Spill Fund and its eligibility for compensation from the Fund is not at issue, Mr. Taverni's testimony is also irrelevant. Fed. R. Evid. 401, 402. First, the City has not submitted a claim to the Oil Spill Fund and its eligibility for compensation from the Fund is not at issue. This Court has already indicated that the Fund is not a substitute for, and does not preclude a plaintiff from pursuing, traditional tort remedies. *In re Methyl Tertiary Butyl Ether Products Liability Litigation* (*In re MTBE*), 591 F.Supp.2d 259, 276-277 (S.D.N.Y. 2008).

Second, at his deposition, Mr. Taverni professed that he was completely unfamiliar with the very nature of the City's claim in this proceeding. See Transcript of the Deposition of Anthony Taverni ("Taverni Tr."), dated March 18, 2009 (attached as Exhibit 2 to the Declaration of Marnie E. Riddle in Support of Motion in Limine No. 3). For instance, when asked whether he could "offer any opinion as to whether the City would be entitled to compensation under the Spill Fund given the damages and facts and circumstances of its claims," Mr. Taverni responded, "Since I have not reviewed the facts and circumstances of the claim, I can render no opinion." *See* Taverni Tr. at 75:13-20. Mr. Taverni's admission that he cannot offer an opinion regarding the facts and circumstances of the City's case indicates that his opinion is completely irrelevant to this action and not at all helpful to the finder of fact.

Finally, even though Mr. Taverni's report specifically states that his opinion is based on his "experience" as Deputy Comptroller for the State of New York, Mr. Taverni absolutely refused to testify regarding any of those specific experiences because he believes that the New York State Public Officers Law forbids him from doing so. *See* Taverni Tr. at 57-65. Mr. Taverni's refusal to testify about his specific experiences as spill fund administrator make it impossible for the City to cross-examine Mr. Taverni regarding the factual and experiential underpinnings of his opinion. This not only greatly prejudices the City, but it also demonstrates that Mr. Taverni will only be able to provide testimony at trial that interprets what the law says, not about his specific experiences when administering the fund.

Like Mr. Taverni, Defendants' expert Marcia Williams includes in her report inadmissible testimony about the legal requirements of the Regulatory Flexibility Act (5 U.S.C. 610). (Expert Report of Marcia E. Williams ("Williams Report"), dated January 22, 2009 (attached as Exhibit 3 to the Declaration of Marnie E. Riddle in Support of Motion in Limine No.

3) at 31-32.) Ms. Williams' expert report outlines the obligations created by the statute, and states the legal conclusion that "[c]ertainly, new information related to MtBE" would trigger a legal obligation for the EPA to conduct a review of its cleanup policies. (*Id.*) Ms. Williams also discusses the laws comprising the "liability framework" governing releases from underground storage tanks, and concludes that they create substantial liability, of which petroleum companies are "well aware." (*Id.* at 36-37.) This testimony, like Taverni's, is inadmissible for the same reasons and under the same law discussed above: because an expert may neither testify about the meaning of the law nor provide legal conclusions. *Highland Capital Management*, 379 F.Supp.2d at 471.

Defendants have also designated as an expert Richard Wilson, a former EPA employee. Mr. Wilson will testify "regarding the circumstances under which the refining industry was required to use MTBE in gasoline in the United States." (Expert Report of Richard D. Wilson ("Wilson Report"), dated January 16, 2009 (attached as Exhibit 4 to the Declaration of Marnie E. Riddle in Support of Motion in Limine No. 3) at 2.) In so doing, Mr. Wilson will purport to testify regarding: (1) the EPA's views on whether oxygenates, including MTBE, were needed for Clean Air Act attainment, (2) the EPA's intent with respect to the use of certain oxygenates, including MTBE, and (3) what Congress intended by the enactment of Clean Air Act provisions in terms of the use of MTBE. This testimony amounts to an expert purporting to interpret the Clean Air Act statutes, which on their face are expressly "fuel neutral." Testimony regarding what Congress or the EPA really intended by these statutes invades the province of this court. *United States v. Bilzerian*, 926 F.2d at 1294 (barring expert testimony that will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it"). Nevertheless, in his expert report, Mr. Wilson purports to explain the registration

process for gasoline additives pursuant to the Clean Air Act (Wilson Report at 9) and regulations to clean up leaking USTs (*id.* at 11).  These interpretations of the law are not proper subjects of expert testimony and should be excluded for the same reasons and under the same law cited above.

Finally, Defendants have proffered Thomas Austin to opine regarding the use of MTBE "as a means of compliance with federal Oxygenated Fuels and RFG requirements …" (Expert Report of Thomas C. Austin ("Austin Report"), dated January 23, 2009 (attached as Exhibit 5 to the Declaration of Marnie E. Riddle in Support of Motion in Limine No. 3) at 3).  In doing so, Mr. Austin has impermissibly opined as to the interpretation and application of those federal requirements.  His report purports to explain what the Oxygenated Fuels and RFG programs set forth in the 1990 Clean Air Act Amendments required or mandated, where they are applied, how they are applied, when they are applied and how they are "phased," and the "anti-dumping" restrictions contained in the RFG regulations."  (*Id.* at 9-12.)  Mr. Austin goes on to opine regarding which oxygenate compounds might be permitted under these laws and then explains why MTBE "became the oxygenate of choice for compliance" with these two programs.  (*Id.* at 12.)  Because it is the role of the court, not of experts, to explain the law to the jury, Mr. Austin's opinions on the interpretation and application of these laws is inadmissible for the same reasons and under the same law cited above.

For the foregoing reasons, Defendants' proffered expert testimony purporting to interpret the law, and any testimony like it that may be offered at trial, should therefore be excluded.

**B.      Expert Testimony Regarding the Motives or Intentions of Lawmakers
or Agencies Should Be Excluded**

Expert testimony purporting to illuminate the motives or intentions of others is inadmissible.  *In re Rezulin Products Liability Litigation*, 309 F.Supp.2d at 547 (concluding that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony"); *accord id.* at 546 ("[P]laintiffs' experts propose improperly to assume the role of advocates for the plaintiffs' case by arguing as to the intent or motives underlying the conduct of [the defendant] or others, a transgression that has resulted in the exclusion of 'expert' testimony as to the 'real motive' behind certain business transactions."); *Lippe v. Bairnco*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (testimony about intent or motive "is not the function of an expert witness… [views as to] 'real' motivations are simply not relevant"); *AstraZeneca LP v. TAP Pharm. Prods., Inc.,* 444 F.Supp.2d 278, 293 (D.Del.2006) (precluding expert opinion regarding what a party "recognized," "felt," or "concluded," and recognizing that expert witnesses are not permitted to testify regarding "intent, motive, or state of mind, or evidence by which such state of mind may be inferred.")

In particular, testimony that purports to explain the reasoning or motive behind administrative agency or lawmaking processes is disfavored.  *Citizens to Preserve Overton Park v. Volp*e, 401 U.S. at 420 ("inquiry into mental processes of administrative decisionmakers is usually to be avoided"); *see also U.S. v. American Tel. and Tel. Co.*, 524 F.Supp. 1381, 1388 (D.C.D.C. 1981) ("it would be difficult (if not impossible) to question [the agency representatives] without at the same time opening up the deliberative process of the [agency] as a whole to judicial scrutiny"); *accord, Matter of Daniel C.*, 472 N.Y.S.2d 666, 672 (App.Div. 2d Dep't 1984) ("Regardless of the contents of any memorandum written by a drafter of legislation,

the legislation stands for what its words manifest and not the inner thoughts of a draftsman.");

*San Mateo City Sch. Dist. v. Public Employment Relations Board*, 33 Cal.3d 850, 863 (1983)

("in construing a statute, we do not consider the motives or understandings of individual

Legislators who cast their votes in favor of it").  The Supreme Court's reasoning in *Soon Hing v.*

*Crowley* (1885) 113 U.S. 703, still applies today:

> [T]he rule is general with reference to the enactments of all legislative bodies that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferrible from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducement for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile.

*Id.* at 710-711 (quoted in *Los Angeles v. Superior Court (Burroughs),* 13 Cal.3d 721, 726-727

(1975).  Because the motives or intentions of lawmakers are not to be considered by the courts,

expert testimony as to those motives or intentions is superfluous and unhelpful to the trier of fact,

and should therefore be excluded.

The foregoing rule holds true even if an expert previously worked for or with the

government office in question.  *Highland Capital Management*, 379 F.Supp.2d at 469

(speculation about what former colleagues of an expert "knew" inadmissible because "[t]hese

sorts of comments consist simply of inferences that [the expert] draws from other evidence in the

case"); *accord Water Quality Association v. City of Escondido*, 53 Cal.App.4th 755, 764, fn. 8

(1997) (declaration of former employee of Water Control Board regarding legislative intent to

preempt local regulations of certain water softeners not persuasive evidence).

The City expects Defendants to present evidence, consistent with the testimony in their

experts' reports, purporting to explain the reasoning and purpose behind UST regulatory programs developed by federal and state regulatory agencies (Williams Report), the 1990 Clean Air Act and its implementing regulations (Williams Report, Wilson Report), and the EPA's Reformulated Gasoline Program (Stavins Report, Wilson Report, Austin Report).  This testimony, which delves impermissibly into the motives and reasoning of lawmakers in crafting such regulatory programs, is both irrelevant and falls outside the bounds of expert testimony.  *In re Rezulin Products Liability Litigation*, 309 F.Supp.2d at 547.   Defendants' use of this testimony to imply that the 1990 CAA and associated regulations *required*, *mandated,* or even *effectively required* the use of MTBE is erroneous as a matter of law, and will only serve to mislead and confuse the jury.

For example, Defendants' expert Marcia Williams, a former EPA employee, repeatedly claims that "EPA clearly did" believe that the federal UST regulations "were protective of human health and the environment."  (*See, e.g.,* Williams Report at 11, 13.)  Ms. Williams also makes a number of statements that purport to describe the mindset or motives of the EPA at the time it promulgated the UST regulations (emphasis added to each quote):

"[The EPA] *knew* that the use of MtBE would increase under the 1990 Clean Air Act, and still believed the UST regulations were protective." (*id.* at 11)

- "the EPA will not issue regulations *unless it is satisfied* this objective has been met" (*id.* at 14)

- "the EPA *had a comprehensive, thorough, and in-depth understanding* of relevant technical and programmatic issues at the time it promulgated its federal regulations:  (*id.* at 21)

- "the EPA *clearly understood* that gasoline could contain a wide array of constituents including numerous and constantly-changing additives" (*id.* at 23)

- "the EPA *clearly understood* that the traditional constituents of gasoline posed real health risks when released from USTs to groundwater" (*id.* at 24)

- "Not only did the EPA *understand* that its regulations must protect against a variety of additives, it also *clearly understood* that MtBE was one of the additives in gasoline" (*id.* at 25)

- "the EPA was also *concerned* about MtBE contamination of groundwater" (*id.* at 28)

- "*if the EPA had believed* that the increase in the use of MtBE under the oxygenate program would present significant risks to human health or the environment, *the Agency would have* either restricted the use of MtBE as an oxygenate or made modifications to the existing UST regulations." (*id.* at 31)

- "small leaks and spills *were a great concern* to government officials" (*id.* at 38)

- "the EPA was *clearly concerned* about such small spills" (*id.* at 39)

- "The EPA was also *acutely aware* of the potential impact of small releases and spills in adopting the federal UST regulations" (*id.* at 39)

- "*For this reason*, the EPA designed its regulations to address all petroleum releases" (*id.* at 39).

Whether or not "protection of human health and the environment" was a requirement imposed by Congress on the EPA (a fact to be demonstrated by reference to the law itself, not through expert testimony), Ms. Williams may not speculate that EPA "believed" it was meeting that requirement, or that EPA "understood" or was "concerned" about gasoline or spills.  Nor may she speculate as to what EPA would have done if the facts were different.  To the extent Ms. Williams purports to base her testimony on statements in the legislative record, her personal interpretation of those statements is superfluous and unhelpful to the trier of fact, because

speculation as to the motives of the EPA in making those statements is not permitted under the cases discussed above. *See, e.g., Highland Capital Management*, 379 F.Supp.2d at 469.

Like Ms. Williams, Defendants' expert Robert Stavins speculates explicitly about the EPA's mindset and intentions in adopting particular regulations, suggesting that the EPA "did not say in so many words you must use MTBE; rather, they designed regulations which, by the nature of the regulations and given their own statements about the achievability of those, EPA *must have thought* could only be achieved with widespread use of MTBE." (Transcript of Deposition of Robert N. Stavins, November 27, 2007 (attached as Exhibit 6 to the Declaration of Marnie E. Riddle in Support of Motion in Limine No. 3), p. 130, line 22 – p. 131, line 5, emphasis added.) Indeed, the focus of his work "in this case has been on, you know, EPA's analysis, what they thought, what signals they were sending throughout the matter as opposed to my carrying out an economic analysis of the refining industry." (*Id.* at p. 162, line 21 – p. 163, line 2.) The following statements in his expert report (Expert Report of Robert N. Stavins ("Stavins Report"), dated January 23, 2009 (attached as Exhibit 7 to the Declaration of Marnie E. Riddle in Support of Motion in Limine No. 3)) demonstrate the speculative nature of Professor Stavins' analysis of EPA's motives and thoughts:

- "EPA set those [RFG] standards so as to strike a balance among their environmental benefits, economic costs, and energy impacts." (Stavins Report at 3)

- "Through its RFG standards, EPA sought to reduce toxics emissions year-round and to reduce gasoline volatility during the summertime." (*id.* at 4)

- "the balance among the RFG standards' environmental, economic and energy implications that EPA struck depended on EPA's presumption of widespread MTBE use." (*id.* at 4)

- "EPA proposed Phase I RFG standards for VOC, toxics, and NOx emissions that again depended fundamentally on its presumption of widespread MTBE use." (*id.* at 8)

-"EPA's assessment of the standards anticipated no ethanol use in RFG during the summer" (*id*. at 8)

- "[EPA] believed its proposed standards were appropriate because it expected MTBE to be widely available" (*id.* at 9)

- "EPA would have had to choose between accepting a smaller reduction in toxics emissions than could be achieved through the use of MTBE or adopting more stringent toxics standards that EPA believed would impose significantly greater economic costs." (*id.* at 12)

- "EPA estimated this cost for Phase II RFG under the presumption that MTBE would be used in this RFG" (*id.* at 14)

- "EPA set those standards because it was seeking to achieve the greatest reduction in emissions" (*id.* at 17).

Defendants' expert Mr. Wilson's report, much like those of Ms. Williams and Mr. Stavins, includes the following statements purporting to explain the state of mind and motivations of lawmakers in formulating the Clean Air Act and its implementing regulations:

- "during the Congressional debate and also during the EPA rulemaking process the terms of the oxygenate requirements were written to assure they could be met using MTBE since it was clear that MTBE would have to be used" (Wilson Report at 4)

- "MTBE's potential impact on ground water or drinking water supplies did not affect the actions taken by Congress in adopting the Clean Air Act of 1990, the Administration, or of any of the parties to the negotiated rulemaking" (*id.* at 4)

- "most of the participants in the process . . . viewed MTBE to be the oxygenate of

choice" (*id.* at 4)

- "MTBE and ethanol were considered by Congress and the EPA to be the only viable oxygenate options" (*id.* at 7)

- "we at EPA believed that leaks of gasoline from underground storage tanks were unacceptable and that the agency's response should be to concentrate its efforts on improving UST compliance programs and helping states and cities with remediation efforts" (*id.* at 13)

- "This testimony was cleared not only within the EPA but also within all involved parts of the Federal Government and therefore represented the collective judgment of the Federal Government." (*id.* at 14)

- "EPA [assumed] that tank clean up programs would substantially reduce the risk that gasoline or any of its components like MTBE would get out of tanks and harm the environment or public water supplies" (*id.* at 14).

These statements by each expert impermissibly purport to explain the state of mind, intentions or motives of an agency, and are not proper subjects of expert testimony. Such speculation about the EPA's intent or motive should be excluded for the reasons and under the law cited above. *In re Rezulin Products Liability Litigation*, 309 F.Supp.2d at 547 ("[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony").

//

//

**CONCLUSION**

For the reasons stated above, the City respectfully requests that the Court issue an order excluding any expert testimony consisting of a legal conclusion or interpreting any statute or regulation, or regarding the intent of any legislative, administrative or other governmental agency including but not limited to the above-described examples found in the testimony of expert witnesses Taverni, Stavins, Wilson, Williams and Austin.

Dated: San Francisco, California
      May 11, 2009

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Plaintiff City of New York
100 Church Street
New York, New York 10007
(212) 788-1568

/s/ *MARNIE E. RIDDLE*
VICTOR M. SHER *(pro hac vice)*
TODD E. ROBINS *(pro hac vice)*
JOSHUA G. STEIN *(pro hac vice)*
LESLEY E. WILLIAMS (LW8392)
NICHOLAS G. CAMPINS *(pro hac vice)*
MARNIE E. RIDDLE *(pro hac vice)*

SHER LEFF LLP
450 Mission Street, Suite 400
San Francisco, CA 94105
(415) 348-8300

*Attorneys for Plaintiff City of New York*