# EXHIBIT 1



23432756
Jan 23 2009
4:55PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

This document relates to:

*City of New York v. Amerada Hess Corp., et al.*, 04 Civ. 3417 (SDNY)

# EXPERT REPORT OF ANTHONY TAVERNI

Operation of the New York Oil Spill Fund

**January 23, 2009**

Respectfully submitted by:

_____
Anthony Taverni
Chestertown, New York

I.      Preliminaries

**Introduction and Qualifications**

1.      I am a retired State employee with over 30 years of government service with New York State and Oneida County.  From February 1987 until April 1999 I served as Deputy Comptroller within the State Comptroller's Office and as part of my responsibilities served as the Administrator of the New York Environmental Protection and Spill Compensation Fund.  I have a Bachelors Degree from the State University of New York and did my graduate work at Cornell University.

2.      During my employment with New York State I served in several diverse capacities in which I authored, in whole or part, significant legislation; administered several Funds including the Oil Spill Fund; and managed large organizations.

3.      I have testified once as an expert witness as Administrator of the State's Office of Unclaimed Funds, in approximately 1985, in an action initiated by the US Postal Inspector against a firm that was engaging in fraudulent practices.

4.      I am being compensated for my time in this matter at the hourly rate of $150.

II.     Assignment

   A.   **Description of Assignment and Summary of Opinion**

5.      I was engaged by counsel for certain defendants in In re: MTBE Products Liability Litigation (MDL-1358) to address the general, practical operation of the New York Oil Spill Fund.  On the basis of my experience as the Administrator of the Fund, it is my opinion that a public or private water supplier, whose wells were contaminated by a spill of gasoline, or its constituents including MTBE, would be entitled to compensation from the Oil Spill Fund.  This

compensation would include the direct costs incurred in the cleanup of the subject contamination and such other direct or indirect damages as provided for by Article 12 of the Navigation Law, provided the water supplier submitted a timely claim to the Fund and was not the source of the spill.

    **B.**    **Steps Undertaken to Date**

6.    In the course of my preparation I have supplemented my knowledge and background by reviewing relevant Portions of Article 12 – Oil Spill Prevention, Control, and Compensation Act of the New York State Navigation Law; relevant court cases; and information generally available on the web sites of the New York State Department of Environmental Conservation, the Office of the State Comptroller, the Office of the Attorney General and the Governor of the State of New York.

**III. Background on the Operation of the Oil Spill Fund**

7.    The Department of Environmental Conservation and the Office of the State Comptroller operate the Fund in a manner to ensure the cleanup of petroleum spills that threaten the environment and to provide for liability for damages sustained within the State as a result of such discharges.

8.    The Office of the State Comptroller administers the Oil Spill Fund to ensure that there are financial resources available for cleaning up oil spills and that there is a mechanism available to recover the costs of cleanup and associated damages from unknown spillers or spillers unable or unwilling to pay them.

9.    Article 12 of the Navigation Law established the Environmental and Spill Compensation Fund as a revolving Fund in the Department of Audit Control, also known as the

Office of the State Comptroller.  The Fund pays for the cleanup and removal of petroleum spills, conducted under the supervision of the Department of Environmental Conservation.

10. The Administrator of the Fund has significant duties that are enumerated in the Navigation Law.  The Administrator of the Fund is appointed and supervised by the State Comptroller.  Historically, this role has been fulfilled by the Deputy Comptroller for Administration who reports directly to the Comptroller.  The Administrator serves as the chief executive of the Fund with the following responsibilities: representing the State in meetings with the alleged discharger and claimants concerning liability for the discharge and the amount of claims; determining if hearings are needed to settle particular claims filed by injured persons and convening hearings (during my tenure I do not recall that we convened formal hearings to settle claims); certifying the amount of claims and the names of claimants to the Comptroller; and disbursing monies from the Fund for cleanup and removal costs pursuant to a certification of claims by the commissioner of Environmental Conservation.

11. The Administrator seeks to promote settlements between the claimants and the person responsible for the discharge.  If the source of the discharge is unknown or cannot be determined, then the Administrator is required to attempt to arrange a settlement of any claim against the Fund by parties damaged by the spill.

12. The Fund's major source of revenue is a license fee charged on each barrel of petroleum sold in New York State. The Fund is accountable for all monies received and expended by the Fund.  The Fund reviews and processes all clean up vouchers submitted for payment and maintains a file for each cleanup project.  Statements of cleanup costs are prepared from an account analysis conducted for each project.

13. In addition to the license fee levied on each barrel of oil, the Fund also has other revenue sources available through cost recovery actions. The Fund seeks to recover all costs incurred by the Fund in the cleanup of a spill or discharge when the person responsible for causing a discharge has failed to promptly clean it up to the satisfaction of the Department of Environmental Conservation. Costs incurred by the Fund in the payment of claims for direct and indirect damages and all penalties assessed are also included in the cost recovery effort.

14. Three executive level agencies are generally involved in the operation of the Oil Spill Fund: the Department of Environmental Conservation, which reports to the Governor; the Department of Audit and Control, which is also known as the Office of State Comptroller, reports to the independently elected State Comptroller; and the Department of Law, also known as the Attorney General's Office, which reports to the independently elected Attorney General. The Department of Health, which reports to the Governor, also plays a smaller role pursuant to the Navigation Law in establishing an Oil Spill Relocation Network which is used to relocate persons whose health is threatened by a spill. There is an appropriation made by the State Legislature from the Oil Spill Fund to pay for costs incurred in the operation of the Oil Spill Program.

15. The Department of Environmental Conservation (hereafter referred to as DEC) generally provides the "retail service" and has responsibility for: issuing licenses, collecting fees, establishing cleanup standards, responding to spills, determining responsibility, establishing an emergency oil spill control network, entering into stand-by contracts with organizations with immediate response capabilities, engaging the services of such contractors and such other activities commensurate with its mission as the State's environmental protection agency. The State Comptroller, acting as the State's chief financial officer, assumes the responsibilities

entailed above in addition to those provided for in Sections 98-a and 112 of the State Finance Law concerning the investment of monies and approval of all contracts and payments. The Attorney General serves as the State's lawyer and, among other duties, has a role in approving all contracts and representing the State in matters before the courts.

16.     The statute requires that all oil spills must be reported to DEC within two hours of the discharge. The DEC maintains an "800" number for this purpose. There are more than 10,000 oil spills in any year and the vast majority — in excess of 95% — are cleaned up by either the DEC or the spiller and, as a general rule, tend to be small. The provisions of Article 12 are also applied to public and private ground water supply systems contaminated by a spill. DEC is authorized to respond quickly to protect the environment and is required to give first priority to minimizing environmental damage by initiating the prompt cleanup of the discharge.

17.     If the discharger is not immediately known or the spiller does not have readily available resources, authority or is otherwise unable or unwilling to respond in a timely manner, the Oil Spill Fund is used to pay for cleanup costs. The costs are incurred by DEC and, frequently, by immediate response firms under contract to DEC. As discussed above, DEC is required by statute to respond quickly to any notification of a spill and to direct the cleanup activities by its own staff, the discharger or immediate response contractors.

18.     In those instances where the Oil Spill Fund is engaged and immediate response contractors are employed, the contractor issues invoices that are reviewed by DEC staff, who, in turn, prepare payment vouchers that are forwarded to the Oil Spill Fund. The Fund reviews and processes all cleanup vouchers submitted for payment and maintains a file for each spill. Statements of cleanup costs are prepared upon review and analysis of the file and serve as the basis for the reimbursement. There are time limits on the filing of claims against the Fund: a

claim must be filed within three years of discovery of damage; and within ten years of the discharge. Also, the discharger is not permitted to recover compensation from the Fund for the subject spill. Once an entity has been deemed responsible for the spill, the Fund seeks to obtain reimbursement. If necessary, DEC may employ consultants to assist it in determining culpability for the subject oil spill.

19. The Fund also reviews and pays all eligible damage claims. These claims include such things as: restoration of property; providing alternative sources of potable water; repairing landscapes; and repairing or replacing property damaged by a spill. Loss of income, impairment of earning capacity, and interest on loans obtained to reduce the adverse effects of the spill are examples of the indirect damages which are covered by the Fund. Penalties and interest may be imposed by the Fund on the spiller.

20. In those instances where the spiller does not voluntarily reimburse the Fund, the Administrator is required to seek a remedy through the State's Supreme Court. The Fund has only to prove, with the assistance of the Attorney General, that the discharge occurred and that the party to the action was responsible for it. The Administrator can compromise and settle the case and may do so with the general agreement of the Attorney General and DEC.

21. The decision on whether the Fund was liable would not rest on whether the oil spill caused contamination of the ground water that exceeded the requisite MCL, but whether there is contamination that is causing or could cause damages or a concomitant loss of income. In this instance, the Fund would be liable for all such direct or indirect damages. The State's Navigation Law makes it very clear that the Oil Spill Fund is liable for two separate and distinct types of spill related costs: cleanup and damage claims. I am not aware of any "per se" standard

that would be applied by the Oil Spill Fund to deny compensation for property damage caused by groundwater contamination less than the applicable MCL.

22.     Recognizing the wisdom of the aphorism that "a stitch in time saves nine" the Fund would not require a water supply company to sustain losses before it commenced remedial action in response to such contamination, including the purchase of filtration equipment or the provision of alternative sources of water.  Also, for the purposes of this opinion, I am presuming that the public water supply company could provide sufficient documentation for its actions, and that it was not the source of the spill.  I would hasten to add that in approving such payments, the Fund would seek assurances from the New York State Department of Health as to the propriety of such actions by the public water supply company.  Upon receipt of such confirmation from the Department of Health, the Fund would approve the claim.

23.     If the Fund and claimant were to disagree as to whether the claimant sustained damage, the claimant could request an administrative hearing and final decision from the Administrator.  If dissatisfied with the Administrator's decision, the claimant could seek judicial review.

## IV. The Fund's Finances

24.     In a recent ruling,[1] the Court suggested that the Oil Spill Fund was not equal to the task of addressing oil spills of significant complexity or cost.  It came to these conclusions by citing a New York State Comptroller's Report about the Fund,[2] subtitled "More Than Two

---

[1] County of Suffolk v. Amerada Hess, Corp., No. 04 Civ. 5424, at 34-35 (S.D.N.Y. May 13, 2008)

[2] *See* H. Carl McCall New York State Comptroller, New York State's Oil Spill Fund: More than Two Decades of Success, March 2001 (Comptroller's 2001 Report) at 1.

8

Decades of Success." The report described several challenges faced by the Fund going forward and recommended against making changes to the law that would weaken it. It concluded at page 11:

> This program has accomplished great good for the environment, has kept economic costs in check, has aided victims of oil spills, and has demonstrated consistent administrative efficiency. The program faces challenges, as every program does. These challenges can be overcome with balanced thinking. The Comptroller's Oil Spill Fund should continue to be supported as an independent program; it demonstrates how a quietly and consistently reliable program can protect the environment, the petroleum industry and the citizens of our State.

To my knowledge, the Fund has not been weakened since this 2001 Report was issued. The purpose of the Oil Spill Fund, remains to exercise the powers of the state to provide liability for damage sustained as a result of the discharge of petroleum and to provide for the swift and adequate compensation of parties injured by such a discharge.

25. In its ruling, the court also suggested that the Fund might be insufficient because it pays an average claim of $15,000 to $20,000 which would be "miniscule to the damage plaintiffs seek here." The fact that many of the claims paid are small certainly leads to a lower dollar per claim when averaging all of the many claims paid. But there is nothing in the Fund that restricts it from paying very large claims, and it has, in fact, done so. Moreover, an Oil Spill Fund recovery action for total damages associated with a single oil spill could include a number of claims based on when a service was provided and/or the type of service: consultant, relocation, equipment purchase, utility cost, *etc.* Therefore, a spill requiring several years for remediation could contain a dozen or more such claims. (As of March 31, 2008 the Oil Spill Fund had 185

9

cases in litigation for a total of $43,997,815 or an average of approximately $240,000.)[3]

Furthermore, since its inception, the Fund has disbursed approximately $644 million through March 31, 2008.[4]

26. During my tenure as Administrator of the Fund, every valid claim presented for payment was paid. The Fund finished each State fiscal year since its inception through March 31, 2008 with a positive cash balance[5]. I would further suggest that an assertion that current funding may be insufficient is a very common device used by both the executive and judicial branches of state government to alert the Legislature that additional resources may be needed. It is not a necessary conclusion, however, that the Executive, Legislative or Judicial branches of state government would not respond appropriately if confronted by a situation requiring their attention, and if necessary, additional funding.

**V. Conclusion**

27. The Fund has proven to be an effective mechanism, since its inception in 1977, to protect the general health, safety and welfare of the people of New York State. It has been available and used by thousands of parties to remedy damage caused by oil spills over this thirty year history. Public or private water suppliers whose wells are contaminated by oil or petroleum of any kind are entitled to compensation and, provided that the water supplier is not the spiller

---

[3] *See* Thomas P. Di Napoli, New York State Comptroller, New York Environmental Protection and Spill Compensation Fund Annual Financial Report and Other Supplemental Information, for fiscal year ended March 31, 2008 at 8.

[4] *See* Thomas P. Di Napoli, New York State Comptroller, New York Environmental Protection and Spill Compensation Fund –Receipts and Disbursement History, April 1, 1978 - March 31, 2008.

[5] *See* 4 above.

and its claim is filed in a timely manner, I cannot foresee any reason why a public or private water supplier would not be reimbursed in accordance with the Navigation Law.