# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:
Methyl Tertiary Butyl :MDL NO. 1358 (SAS)
Ether ("MTBE") :
Products Liability :
Litigation :

    In Re:
        City of New York

------

March 18, 2009

------

    Videotaped Deposition of
ANTHONY F. TAVERNI, held in the law
offices of Hunton & Williams, 1751
Pinnacle Drive, Suite 1700, McLean,
Virginia 22102, beginning at
approximately 10:02 a.m., before Ann V.
Kaufmann, a Registered Professional
Reporter, Certified Realtime Reporter,
Approved Reporter of the U.S. District
Court, and a Notary Public.

------

**ORIGINAL**

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

1    A.    Just the way the Oil Spill
2  Fund -- the way we handled the
3  administration of the Oil Spill Fund on
4  a day-to-day basis.
5    Q.    Is it your understanding or
6  belief that the City of New York, as
7  plaintiff in this lawsuit, has
8  misperceptions or misunderstandings
9  about how the New York State Spill Fund
10 operates?
11   A.    I have no opinion on that.
12   Q.    Do you believe that the
13 public at large has any misperceptions
14 or misunderstandings about how the Spill
15 Fund operates?
16   A.    Not to my knowledge, but I
17 have no firm opinion.
18   Q.    I would like to read the
19 next sentence here on page 2: "On the
20 basis of my experience as...
21 Administrator of" this "Fund, it is my
22 opinion that a public or private water
23 supplier, whose wells were contaminated
24 by a spill of gasoline, or its

1    constituents including MTBE, would be
2    entitled to compensation from the Oil
3    Spill Fund." Is that your opinion in
4    this litigation?
5        A.    Yes.
6        Q.    Other than the statute,
7    what specific events in your past
8    experience as administrator of the Fund
9    has led you to this opinion?
10       A.    I cannot answer your
11   question.
12       Q.    And why not?
13       A.    New York State Public
14   Officers Law has a section referring to
15   what they refer to as revolving door. I
16   cannot offer an opinion or be
17   compensated in any way on any specific
18   activity in which I was engaged under
19   penalty of law, so that's why this is
20   a -- that's why this statement is
21   general and practical.
22             And, for the record, I went
23   to the -- had a conversation with folks
24   at the ethics office, and they endorsed

1  that position, so I cannot address any
2  specific case.  I can give you a general
3  answer to any question.
4       Q.    Was this given to you in
5  any written opinion by the agency --
6       A.    No, no.
7       Q.    -- ethics officers?
8       A.    No.  There are written
9  opinions on point, though.
10      Q.    Did you ever discuss this
11 issue with Mr. Raphael?
12      A.    Yes.
13      Q.    Okay.  So it is your
14 position that you will not testify
15 regarding any specific matter that you
16 were involved in while you were employed
17 as the State -- in the State
18 Comptroller's Office?
19      A.    I will not place myself in
20 that criminal position, potentially
21 criminal position.
22      Q.    And your understanding is
23 that it's a criminal position?
24      A.    It's my understanding.  I'm

1  not a lawyer.
2      Q.   How did you develop this
3  position?  Who first told you about
4  this?
5      A.   I was the ethics officer.
6  I'm very aware of it.  In fact, I had
7  reason, as part of my employment in the
8  comptroller's office, to issue opinions
9  on this very matter to ex-employees and
10 had worked closely with the Ethics
11 Commission on this issue.  So when first
12 approached by Mr. Raphael, I indicated
13 to him that I had to check into this
14 thoroughly before we could have any
15 subsequent conversations.
16     MR. GREENE:  For the record,
17 I'm just going to object to the legal
18 characterization of this restriction and
19 I'm going to designate this, his
20 response, as nonresponsive.  His
21 opinions are based upon his experience
22 as a Spill Fund administrator.  The City
23 should be entitled to ask about specific
24 instances during his time as the Spill

1  Fund administrator if he is basing it on
2  those opinions. And we're going to have
3  to mark this for a ruling.
4           MR. RAPHAEL: Yeah, I think
5  you need to understand what he is
6  saying. He is not saying he can't talk
7  about what he did generally. He is
8  saying he can't talk about a specific
9  case because he is prohibited by the New
10 York Public Officers Law from doing
11 that. But you are perfectly free to
12 ask him about general experience, not,
13 just not -- he can't get into a specific
14 case that he worked on or that was under
15 his supervision while he was there.
16          MR. GREENE: Well, see,
17 that's a problem, because we can talk
18 about generalities all we want, but we
19 need to ask questions about specific
20 instances that the City has performed
21 research on regarding his opinion
22 regarding -- in addition --
23          MR. RAPHAEL: I mean, you
24 are free to -- I assume you have looked

1  at the law, as we have, and it says what
2  it says.  And there are various ethics
3  opinions on point that Mr. Taverni is
4  familiar with, and he is going to abide
5  by his obligations as a former employee
6  under the ethics law.
7              MR. GREENE:  Well, we will
8  mark the ruling.  I'm not -- you know,
9  we will mark it for a ruling and we will
10 have to decide whether we need to get
11 the judge or the special master on the
12 phone today so that we don't have to
13 reconvene, given our limited amount of
14 time.
15             I also note that this was
16 not disclosed in Mr. Taverni's report
17 nor in the letter scheduling --
18 submitting documents for this
19 deposition.
20             MR. RAPHAEL:  I don't know
21 why it would have needed to be, Dan.
22 You didn't ask about a specific case and
23 he didn't testify or offer an opinion
24 about a specific case.

Anthony F. Taverni

Page 63

1  MR. GREENE:  We will mark it
2  for a ruling and continue.
3  BY MR. GREENE:
4  Q.  Mr. Taverni, are you aware
5  of any instance in your experience where
6  the Spill Fund provided money to a
7  municipality to allow for the
8  construction of a treatment system to
9  remove gasoline from drinking water?
10  A.  It is my general
11  recollection that we did that.
12  Q.  If so, when?
13  A.  Mid-'90s.
14  Q.  Can you identify the
15  municipality involved in that?
16  A.  I'm barred from doing that.
17  Q.  Can you identify the facts
18  and circumstances that were --
19  A.  No.
20  Q.  And your position is you
21  cannot answer that because --
22  A.  My position is because of
23  my previous statement, I cannot answer
24  that question.

Anthony F. Taverni

Page 64

1  Q. Were you ever involved in
2  any applications to the Spill Fund made
3  by a public or private water supplier?
4  A. Please explain
5  "application."
6  Q. Did you ever review any
7  applications to the Spill Fund for
8  compensation made by a public or private
9  water supplier?
10 A. Yes.
11 Q. If so, when?
12 A. During the course of my
13 tenure and position.
14 Q. And who were those
15 entities?
16 A. I can't respond.
17 Q. Can you discuss the facts
18 and circumstances of those instances?
19     MR. RAPHAEL: Are you asking
20 him generally or specifically?
21 A. Generally --
22 Q. I'm asking specifically.
23 A. No.
24 Q. Do you recall what the

1   amount of damages were paid to
2   compensate those?
3       A.   No, I don't recall.
4       Q.   Is it your position that
5   you'd be able to tell me the amount of
6   damages that you -- that paid out to
7   individual claimants?
8           MR. RAPHAEL:  Do you mean
9   generally or specifically?
10          MR. GREENE:  Specifically.
11      A.   No.
12      Q.   In your experience has the
13  Spill Fund ever expended money for the
14  construction of sentinel wells or
15  monitoring wells for a drinking water
16  well or reservoir?
17      A.   Yes.
18      Q.   Can you identify those
19  instances?
20      A.   No.
21      Q.   Because?
22      A.   Because of the statute and,
23  frankly, I don't recall.
24      Q.   You are familiar with the

Anthony F. Taverni

Page 75

1  anything regarding the City's lawsuit?
2           MR. RAPHAEL:  Objection,
3  asked and answered.
4       Q.   You can answer the
5  question.
6       A.   You can rephrase the
7  question, because I lost it within your
8  colloquy.
9           MR. GREENE:  And please wait
10 for your objections until I'm done
11 asking the question.
12 BY MR. GREENE:
13      Q.   Have you -- can you offer
14 any opinion as to whether the City would
15 be entitled to compensation under the
16 Spill Fund given the damages and facts
17 and circumstances of its claims?
18      A.   Since I have not reviewed
19 the facts and circumstances of the
20 claim, I can render no opinion.
21      Q.   Mr. Taverni, you used the
22 word would be entitled to compensation
23 from the Spill Fund.  Are you aware of
24 any law that requires a public entity