# EXHIBIT 6

Robert N. Stavins, M.D.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MDL No. 1358
Master File C.A. No. 1:00-1898 (SAS)

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation
County of Suffolk and Suffolk County Water Authority

vs.

Amerada Hess, et al.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
ROBERT N. STAVINS, M.D.
November 27, 2007
9:13 a.m.

McDermott Will and Emery, LLP
28 State Street
Boston, Massachusetts

Susan A. Romano,
Notary Public,
Registered Merit Reporter and
Certified Realtime Reporter
within and for the
Commonwealth of Massachusetts

Golkow Technologies, Inc. - 1.877.370.DEPS

```
 1                    APPEARANCES:

 2         ON BEHALF OF THE PLAINTIFFS:

 3         THOMAS SIMS, ESQUIRE

 4          Baron & Budd, P.C.

 5          701 Brazos Street, Suite 650

 6          Austin, Texas 78701

 7          512.852.5919

 8          tsims@baronbudd.com

 9          .

10         ON BEHALF OF SHELL AND CHEVRON:

11         PETER C. CONDRON, ESQUIRE

12          Wallace King Domike & Reiskin, PLLC

13          1050 Thomas Jefferson Street, N.W., Suite 500

14          Washington, District of Columbia 20007

15          202.204.3707

16          pcondron@wallaceking.com

17          .

18         ON BEHALF OF SUNOCO, INC. and SUNOCO, INC. R&M:

19         THOMAS DAVID SINGER, ESQUIRE (via telephone)

20          Beveridge & Diamond, P.C.

21          1350 I Street, N.W., Suite 700

22          Washington, District of Columbia 20005-3311

23          202.789.6033

24          tsinger@bdlaw.com
```

```
 1                    APPEARANCES (Continued):
 2       .
 3       ON BEHALF OF GETTY PETROLEUM MARKETING:
 4       VINCENT W. CROWE, ESQUIRE (via telephone)
 5        Bleakley Platt & Schmidt, LLP
 6        One North Lexington Avenue
 7        White Plains, New York 10601
 8        914.287.6142
 9       .
10       ON BEHALF OF EXXON MOBIL CORPORATION:
11       JENNIFER KALNINS TEMPLE, ESQUIRE (via telephone)
12        McDermott Will & Emery LLP
13        340 Madison Avenue
14        New York, New York 10173-1922
15        212.547.5392
16        jkalnins@mwe.com
17       .
18       ALSO PRESENT:
19       Fred Monthei, Videographer
20       .
21       .
22       .
23       .
24       .
```

1       just point that out.
2            Were the Clear Air Act amendments
3       of 1990 intended to be oxygenate neutral?
4                MR. CONDRON:  Object to
5       form.
6            You can answer.
7       A.   Yes.  My understanding of the -- of
8       the amendments themselves were that there
9       was not an intention to favor one
10      oxygenate or another.
11      Q.   So did the EPA then view its
12      directive from Congress under the Clean
13      Air Act Amendments to be oxygenate
14      neutral?
15               MR. CONDRON:  Object to
16      form.
17      A.   EPA, I think, correctly viewed its
18      objective under the Clean Air Act to be
19      oxygenate neutral and to promulgate a
20      standard that would achieve a maximum
21      reduction in VOCs, emissions during the
22      summer and toxics throughout the year --
23      taking into account costs, energy and
24      other factors.  And, in doing that, then,

```
 1          EPA began to, as revealed in the
 2     regulatory record, move in a particular
 3     direction, which was to assume widespread
 4     use of MTBE and then to come up with
 5     regulations which had the effect of
 6     requiring the use of MTBE, as I've said.
 7          Q.   Are you going to offer an opinion
 8     that, at any time, EPA expressly required
 9     the use of MTBE?
10          A.   Can you define for me what you --
11     again, I just want to understand what do
12     you mean by "expressly required"?
13          Q.   Well, I'm trying to contrast it
14     with the phrase you've used which is "in
15     effect, required."
16          A.   I see.
17          Q.   I mean, when you say "in effect,
18     required" --
19          A.   Yeah.
20          Q.   -- why do you make that notation of
21     "in effect"?
22          A.   I do it because they did not say
23     in so many words you must use MTBE;
24     rather, they designed regulations which, by
```

```
 1         the nature of the regulations and given
 2         their own statements about the
 3         achievability of those, EPA must have
 4         thought could only be achieved with
 5         widespread use of MTBE.
 6              Does that fairly answer your
 7         question?
 8         Q.   Well, do you agree, then, that the
 9         EPA regulations never expressly required
10         MTBE use?
11              MR. CONDRON:  Object to
12         form.
13              You can answer.
14         A.   I agree that the regulations do not
15         make, you know, the simple categorical
16         statement that MTBE is required or that,
17         you know, at this point in time ethanol is
18         required.
19         Q.   What is the significance of your
20         opinion that the final RFG standards were
21         not published until February of 1994?
22              MR. CONDRON:  Object to
23         form.
24              You can answer.
```

Robert N. Stavins, M.D.

Page 132

1    A.   When you say "what is the
2         significance," you mean why do I even
3         bring that up?
4    Q.   Correct.
5    A.   I bring that up here because it
6         demonstrates to me that there was
7         continuing uncertainty throughout this
8         period up until the regulations were
9         finalized regarding what the nature of the
10        standards would be for Phase 1 and for
11        Phase 2, and with regards what EPA's
12        judgment would be regarding the
13        relationship between the standards and a
14        given fuel; that is, the relationship
15        between a fuel and emissions.
16   Q.   And so does that then really tie in
17        -- can we more or less merge Opinion 1
18        with Opinion 6, which is uncertainty
19        regarding ethanol use and RFG existed
20        until at least 1994?
21             MR. CONDRON:  Object to
22        form.
23   A.   Let me just reread these --
24   Q.   Sure.

1    recollection is that I actually quoted it.
2    In fact, I quoted, I think, maybe a
3    paragraph of it.  So bear with me for a
4    moment while I find this passage for you.
5         (Deponent viewing document)
6         Well, we can find the full context,
7    but I have the sentence quoted here.  It's
8    Page .11 of Exhibit 3, and it's Paragraph
9    32, second sentence.  "EPA stated that it
10   believed that the 1995," which is the
11   Phase 1 implementation date, "provided
12   insufficient lead time for refiners to
13   comply with a more stringent RVP standard
14   than they were proposing at the time."
15    Q.   And what is it about that sentence
16   that leads you to believe that the
17   insufficiency relates to physical
18   impossibility as opposed to capital cost?
19    A.   Well, physical impossibility was
20   your phrase, not mine.  I said it was
21   closer to that than cost because when it's
22   a matter of differential cost, EPA, in
23   these materials, tends to talk -- these
24   materials, meaning the regulatory impact

Page 162

1  analyses, tends to talk about cost.  When
2  it's a matter of engineering feasibility,
3  this is the language that they tend to
4  use, so I take this as meaning engineering
5  feasibility, but, you know, I -- at some
6  cost.  Again, the entire gross domestic
7  product of the United States, you know, we
8  could go to the moon in two weeks.
9     Q.   Have you done any independent
10 analysis, independent of your review of
11 the regulatory record, of what the cost
12 would have been for refiners to supply or
13 to satisfy the Phase 1 VOC standards for
14 an RFG program using just ethanol?  Have
15 you done any assessment of that?
16    A.   Including what the investment would
17 have been to have been able to remove the
18 pentanes, et cetera?
19    Q.   Correct.
20    A.   No.  In general, my -- the focus
21 of my work in this case has been on, you
22 know, EPA's analysis, what they thought,
23 what signals they were sending throughout
24 the matter as opposed to my carrying out

```
 1            an economic analysis of the refining
 2            industry.
 3              Q.   Okay.  And can you point me to
 4            anything beyond the sentence that you
 5            quoted from Paragraph 32 of Exhibit 3 that
 6            more -- contains more detail regarding
 7            EPA's analysis of this insufficient lead
 8            time issue?
 9                      MR. CONDRON:  Object to
10            form.
11              A.   You're asking me that documents
12            their analysis of the insufficient --
13            where EPA documents its analysis of
14            insufficiency of lead time.
15              Q.   Correct.
16              A.   The best that I could do, as I sit
17            here now, would be to take you to the
18            underlyings -- underlying supplemental
19            notice of proposed rule making that's
20            cited, but -- wait, let me finish --
21              Q.   I'm listening.
22              A.   -- my sentence, that they do not
23            provide an analysis there of that issue.
24              Q.   And, therefore, you are attributing
```

1   some logic to the EPA based on your
2   experience with regulatory impact analysis.
3   And by that, I mean you believe that the
4   EPA was more likely addressing physical
5   impossibility, understanding that's my term
6   and not yours, as opposed to the economics
7   and capital costs of it?
8              MR. CONDRON:  Object to
9   form.
10   A.   Again, this is a little difficult
11   for an economist because we don't have
12   these sharp definitions that I understand
13   you may have in the law between the
14   economics and the physical impossibility so
15   it's difficult to respond to that
16   question.  But now that I've said, that
17   I've forgotten what your question was.
18   Q.   That's okay.
19              It sounds to me that you were
20   drawing on your experience in reviewing
21   regulatory records --
22   A.   Um-hum.
23   Q.   -- for the determination that EPA's
24   conclusion of insufficient lead time is