UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
PRODUCTS LIABILITY LITIGATION

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This document relates to:

*City of New York v. Amerada Hess Corporation, et al.*,
No. 04-CV-3417 (SAS)

Dockets.Justia.com

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO EXCLUDE TESTIMONY AND OPINION OF MARTIN TALLETT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................... 1
LEGAL STANDARD...................................................................................................................... 1
ARGUMENT ................................................................................................................................... 2
I.   TALLETT IS NOT QUALIFIED TO TESTIFY ABOUT A "MARKET SHARE" METHODOLOGY THAT HE ADMITS IS ERRONEOUS AND, TELLINGLY, THAT EVEN HE HAS NOT ACTUALLY EMPLOYED ............................................... 2
   A.   Tallett's "Market Share" Opinion...................................................................... 2
   B.   Tallett Is Not Qualified To Opine About "Market Share" Methodology In This Case (Or Anywhere Else) ......................................................................... 3
   C.   Tallett's Opinion About An Alternative Methodology for Determining "Market Share" is Not Reliable ......................................................................... 5
   D.   Tallet's Opinion Does Not "Fit" This Case ....................................................... 7
II.  TALLETT'S ETHANOL OPINION IS NOT ABOUT "FEASIBILITY" AT ALL BUT, EVEN AS MISCHARACTERIZED, FAILS TO SATISFY THE BASIC PREREQUISITES FOR ADMISSIBILITY AS EXPERT TESTIMONY AND SHOULD BE STRICKEN........................................................................................... 8
   A.   Tallett's Opinion is About "Technical Possibility," Not Feasibility .................. 8
   B.   Tallett Admits He is Not Qualified to Opine About Ethanol "Feasibility." ...... 8
   C.   Tallett's "Ethanol" Opinion is Not Reliable ..................................................... 10
   D.   Tallett's Opinion About The Feasibility of Ethanol Does Not "Fit." ............... 13
CONCLUSION.............................................................................................................................. 13

# TABLE OF AUTHORITIES

## CASES

*Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329 (S.D.N.Y. 2006) ............................................. 1

*Arista Records*, 2009 U.S. Dist. LEXIS 5185 ............................................................................. 2, 3

*Arista Records LLC v. Usenet.com, Inc.*, No. 07-cv-8822 (HB) ................................................ 2

*City of New York v. Amerada Hess Corporation, et al.*, No. 04-CV-3417 (SAS) ................. 1, 3

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ......................................................... 1, 3, 5, 6

*GE v. Joiner*, 522 U.S. 136 (1997) ............................................................................................. 3

*Guarascio v. Drake Associate, Inc.*, 582 F. Supp. 2d 459 (S.D.N.Y. 2008) .......................... 2, 4

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2008) ........... 1

*In Re MTBE*, 593 F. Supp. 2d 549 (S.D.N.Y. 2008) .............................................................. 3, 5

*Santoro v. Donnelly*, 340 F. Supp. 2d 464 (S.D.N.Y. 2004) .................................................... 1

*Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70 (N.D.N.Y. 2000) ................... 2, 4, 5

*Zaremba v. GMC*, 360 F.3d 355 (2d Cir. 2004) ....................................................................... 2

## FEDERAL STATUTES

Fed. R. Evid. 403 ...................................................................................................................... 2, 14

Fed. R. Evid. 702 ...................................................................................................................... 1

## PRELIMINARY STATEMENT

Exxon Mobil Corporation ("ExxonMobil") hereby moves pursuant to Federal Rule of Evidence ("FRE") 702 to exclude the testimony of Plaintiff City of New York's ("Plaintiff") putative expert, Martin Tallett, as to his opinions regarding (a) "market share" and (b) ethanol blended gasoline as a feasible alternative design to gasoline with MTBE. With respect to "market share," Mr. Tallett disclaims any expertise or specialized knowledge of petroleum distributions or marketing. Moreover, he does not offer any opinions relative to any Defendant's market share (%). He merely argues—erroneously—that an EIA database could be used to quantify a defendant's "market share." Likewise, with regard to the feasibility of ethanol blended gasoline as an alternative to gasoline with MTBE, Mr. Tallett expressly disclaims any relevant expertise and merely opines using ethanol was "possible." As detailed below, Tallett's opinions fall far short of the requirements set forth in FRE 702, and articulated in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and its progeny.

## LEGAL STANDARD

Federal Rule of Evidence 702 imposes three basic criteria for the admissibility of expert testimony: "qualifications, reliability, and fit." *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 341 (S.D.N.Y. 2006). The witness must be **qualified** as an expert on the subject matter; the expert's methodology must be **reliable**; and the expert's proposed testimony must **"fit"** -- *i.e.*, it "must assist the trier of fact" – because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (1993).

The Court is tasked with determining, in the first instance, whether a witness' proposed "expert testimony" meets these three criteria. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2008) (Scheindlin, J.). Even testimony meeting these

criteria, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

## ARGUMENT

### I. TALLETT IS NOT QUALIFIED TO TESTIFY ABOUT A "MARKET SHARE" METHODOLOGY THAT HE ADMITS IS ERRONEOUS AND, TELLINGLY, THAT EVEN HE HAS NOT ACTUALLY EMPLOYED.

#### A. Tallett's "Market Share" Opinion.

The header to this section is a bit of a misnomer. Tallett admits that he has no "market share" opinion – *i.e.*, that he has no opinion about any defendant's "market share" in this case. In fact, Tallett admits that he has not tried to determine "market share," and has not even looked at Queens, New York Harbor, or any other conceivable "market" that might be relevant here:

> Q: And you yourself did not attempt to estimate individual market shares in New York Harbor, correct?
>
> A: Correct.
>
> Q: And you have not been asked to do so in this case?
>
> A: No.
>
> * * *
>
> Q: And you have not been asked to do an analysis of market share in Queens?
>
> A: Specificall y in Queens, no.
>
> Q: Oka y. Or New York Harbor?
>
> A: I was not asked to stick to any specific definition of geographical area.

See *Transcript of Deposition of Martin Tallett,* ("Tallett Dep."), dated April 29, 2009, attached as **Exhibit A** at 132, 140.

Rather, the sum-and-substance of Tallett's opinion is that there is an alternative *methodology* that could be (but has not) been employed to determine a defendant's "market

share" in the event that Plaintiff establishes it is entitled to rely on an alternative theory of liability. Specifically, Tallett opines that certain data provided to the Energy Information Administration ("EIA") – *i.e.*, Form EIA-782C "Prime Supplier" data – could be used to calculate market share in this case as it "appropriately captures the key major players encompassing refiners, importers and major blenders..." See *Expert Market Share Report of Martin R. Tallett*, ("Exp. Rpt."), dated March 16, 2009, attached as **Exhibit B**, at pp. 11-13; see also *Tallett Dep.* at 142. Simply put: Tallett is not opining about "market share" as a conclusion; he is opining about "market share" as a methodology.

Notably, Tallet's report is silent about whether his proposed alternative methodology for determining market share (a) is capable of being tested; (b) has been subjected to peer review and publication; or (c) is generally accepted by the scientific community. What speaks volumes, however, is this conceded fact: Tallett has not employed his own proffered methodology to calculate any defendant's "market share" in this case – an omission that probably is best explained by Tallett's own admission that his understanding about this EIA data was mistaken.

### B. Tallett Is Not Qualified To Opine About "Market Share" Methodology In This Case (Or Anywhere Else).

Tallett freely admits that he has no special knowledge of the distribution system for gasoline into Queens or any other geographic area that might conceivably be relevant in this case. Indeed, Tallett's description of his experience is revealing: "...in the work we do we sort of maintain a *general knowledge* of the major distribution supply routes and *I don't regard myself as an expert* in that I've never worked in the distribution end of the business itself." *Tallett Dep.* at 123, 138 (emphasis added). Having admitted to no expertise on petroleum distribution, it is hardly surprising that Tallett goes on to admit to being ignorant about how the primary supply hub for supply to Queens and the surrounding area – New York Harbor – is even

defined within the petroleum industry. *Id.* at 125. Nor is it surprising that Tallett concedes he has no special insight into "the retail level of the business" that might allow him to opine about market share – "once one gets down into the retail end of the business, that is not an area where I have direct expertise, nor have I been retained to testify in that area." *Tallett Dep.* at 54.

Despite all these admissions about *lacking* knowledge or expertise, Tallett professes to have experience that allows him to offer expert testimony about "market share" in this case – specifically, his purported "extensive experience with the US and international refining and petroleum products supply system." *Exp. Rpt.* at 2. However, Tallett fails to explain how this "experience" qualifies him to opine as an expert about "market share" in this particular case, particularly when he admits to having only "general knowledge" and disclaims being an expert ("I don't regard myself as an expert") on the topic of gasoline distribution – either to Queens, New York Harbor, or anywhere else.

"An expert must be qualified by knowledge, skill, experience, training, or education. A court must consider the totality of a witness' background when evaluating the witness' qualifications to testify as an expert. Additionally, a court must ensure that an expert will be proffering opinions on issues or subject matter that are within his area of expertise." *Arista Records LLC v. Usenet.com, Inc.*, No. 07-cv-8822 (HB) (THK), 2009 U.S. Dist. LEXIS 5185 at ** 28-29 (S.D.N.Y. Jan. 26, 2007). It is well-settled that having *some* experience in a relevant industry does not qualify one as an "expert" on any topic that might relate to said industry. *Zaremba v. GMC*, 360 F.3d 355, 359-60 (2d Cir. 2004) (noting that where proffered expert possessed "meager qualifications," additional *Daubert* analysis was "almost superfluous"). Tallett may have "extensive experience" and "general knowledge" about U.S. and International petroleum supply systems, but what he does not have – what he *admits*, in detail, he does not

have – is experience or expertise in how gasoline is supplied to New York Harbor or Queens. Mr. Tallett's candid cataloguing of his own shortcomings is the best evidence that he is not qualified to opine about any Defendant's unique "market share" in this particular case.

### C. Tallett's Opinion About An Alternative Methodology for Determining "Market Share" is Not Reliable.

*Daubert* requires that the trial judge determine if an expert's proffered opinions are "supported by appropriate validation – *i.e.* 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Basically, "reliability" asks two questions. **First**, are the expert's conclusions based on reliable data, principles and methodologies? Because an "insightful, even an inspired, hunch must be excluded if it lacks scientific rigor." *In Re MTBE*, 593 F. Supp. 2d 549, 562 (S.D.N.Y. 2008) (Scheindlin, J.) ("Cain Opinion"). **Second,** do the expert's opinions follow from the underlying data, principles and methodologies? As the Supreme Court has explained:

> [N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*GE v. Joiner*, 522 U.S. 136, 146 (1997). In the case of Tallett's proposed testimony, the answer to both these inquiries is a definitive "No."

Tallett's opinion about an alternative methodology for calculating "market share" is based on a single, fundamental premise: *i.e.*, that 782C "prime supplier" data is an acceptable approach for calculating volume. Tallett's premise, in turn, is based on his understanding that this "prime supplier" volumetric data was provided to EIA by the gasoline "refiners, importers and major blenders" in the first instance, and not by secondary handlers of the product in any particular relevant geographic area. Put another way: Tallett believed that 782C volume data not only was acceptable, but that it was the most "workable" data set for determining market

share because he believed that the data was coming from the "major players" – *i.e.*, the "refiners, importers and major blenders" who are in the best position to accurately determine and report volume data to EIA.

But Tallett's premise was wrong – a fact he candidly (albeit grudgingly) admits:

> A: It is now my understanding, but I say now because when I prepared my market share report I had actually interpreted the 782C as requiring the first party, not the second, to report, and it wasn't until I saw Mr. O'Brien's [John O'Brien, defendants' supply/distribution expert] comment that I went and we checked into it. *[O'Brien] is in fact correct that it is the second party, not the first party that would report.*
>
> Q: And does that change any of your opinions?
>
> A: *It could do, yes.* It's something that we only really homed in on yesterday so I haven't had a chance to reflect on it, and I think this approach is still, has merit, I think it still has value, *but I may want to reconsider the best context in which it could be used.*

*Tallett Dep.* at 162-163 (emphasis added).

Tallett trumpeted 782C data as the *only* "workable" data set for determining market share – and he embraced this data set based on his (mistaken) interpretation that it was coming directly from the "major players." *Id.* at 164. That Tallett was wrong about the most fundamental premise for his opinion is enough to call into question the reliability of that opinion.

But the unreliability of Tallett's testimony is even more obvious when one considers that he is not opining about any defendant's actual "market share" *number* – an opinion that might be tested by comparing it against the results generated by other data sets – but, rather, about a *methodology* for calculating "market share." Tallett's methodology is a "formula" that consists of a single data point. Tallett's understanding of where the data for that single data point came from was *wrong*. Defendants respectfully submit that there is nothing "insightful," "inspired" (or reliable) about a methodology that consists of a single data point about which the expert was

so fundamentally mistaken. *In Re: MTBE*, 593 F. Supp. 2d at 562. Indeed, how "reliable" can an expert's opinion be when the expert himself *admits* that the opinion "could" change? *Tallett Dep.* at 163-164, 169.

### D. Tallet's Opinion Does Not "Fit" This Case.

For expert testimony to "fit," it must have a valid "connection to the pertinent inquiry" and be "sufficiently tied to the facts of the case so that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591-592. "This condition goes primarily to relevance." *Id.* at 591. "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

Whether Plaintiff can rely on alternative liability theories (including "market share") is a legal issue for the Court to decide. The relevant factual issue, if there is one at trial, will be what any defendant's "market share" was at a particular point in time. On that point, Tallett is completely silent – he offers no opinion or conclusion about any Defendant's "market share." Rather, all he opines about is that there is an alternative methodology for calculating "market share," albeit one about which Tallett admits he was mistaken and which "could" change after he has "had a chance to reflect on it."

In short: because Tallett has not actually "done the math" under his proposed alternative methodology (or under any other methodology), his "opinion" – assuming it does not change – simply is not relevant to any disputed issue of fact in this case. It does not "fit."

## II. TALLETT'S ETHANOL OPINION IS NOT ABOUT "FEASIBILITY" AT ALL BUT, EVEN AS MISCHARACTERIZED, FAILS TO SATISFY THE BASIC PREREQUISITES FOR ADMISSIBILITY AS EXPERT TESTIMONY AND SHOULD BE STRICKEN.

### A. Tallett's Opinion is About "Technical Possibility," Not Feasibility.

Tallett proposes to testify at trial that ethanol was a "feasible" alternative to MTBE for purposes of complying with the Federal Clean Air Act Amendments ("CAAA"). See *Expert Report of Martin R. Tallett*, ("CNY Exp. Rpt."), dated December 19, 2008, attached as **Exhibit C**, at p. 4. In fact, Tallett's proposed testimony is not about "feasibility" at all. Rather, it is about whether it was "technically" possible (however commercially impractical) for gasoline refiners to have used ethanol to comply with the CAAA. That point, of course, hardly requires "expert" testimony as it is undisputed that U.S. EPA specifically determined that it was possible to use ethanol to comply with the CAAA.

However it is (mis)characterized, Tallett's opinion about ethanol "feasibility" – like his opinion about an alternative methodology for calculating "market share" – fails to satisfy the "qualifications, reliability, and fit" prerequisites for admitting expert testimony. *Adesina*, 438 F. Supp. 2d at 341; *Daubert*, 509 U.S. at 589, 591 (1993). Accordingly, Tallett's opinion about ethanol "feasibility" should be stricken.

### B. Tallett Admits He is Not Qualified to Opine About Ethanol "Feasibility."

To prove a product liability (design defect) claim under New York law, Plaintiff must establish that a **feasible** alternative design existed. *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 484 (S.D.N.Y. 2004) (denying summary judgment where there was a material issue of fact as to the feasibility of providing a safer, alternative design) (J. Scheindlin). "Feasibility" is more than just technological possibility – it includes the concept of commercial practicability. "The plaintiff, in order to make out a prima facie case [of design defect], must present some

admissible evidence that there exists a technologically feasible **and commercially practicable** alternative design[.]" *Guarascio v. Drake Assoc., Inc.*, 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008) (emphasis added). "Commercial practicability," in turn, encompasses factors such as "cost of manufacturing or marketing an alternative design, or whether an alternative product would be profitable[.]" *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 85 (N.D.N.Y. 2000). In short: plaintiff must prove that an alternative design is commercially practicable, not just that it is technologically possible. Product liability requires proof of a commercially practicable alternative design -- and what is "technologically possible" may not be "commercially practicable."

The sum-and-substance of Tallett's testimony is that it was technologically *possible* for refiners to have used ethanol instead of MTBE. But as noted above, one need not be an "expert" to know that it is technologically *possible* to use ethanol to create reformulated gasoline. The more important issue is "commercial practicability," and on this key point Tallett candidly admits that he is *unqualified* to give any opinion:

> "...this is more the bailiwick of an economist, for example, and I am not an economist, and I'm not testifying as an economist."

*Tallett Dep. at* 114. Indeed, Tallett admits that he did not undertake any analysis of the commercial feasibility of ethanol versus MTBE:

> Q: So are you saying that it was simply possible to use ethanol to satisfy Phase I standards?
>
> A: Yes.
>
> Q: Okay. In this part of your report, you're offering no opinion relative to the economics of doing so?
>
> A: Correct.

*Tallett Dep.* at 68; *see also id.* at 58-59 (no analysis of specific costs associated with manufacturing ethanol versus manufacturing MTBE), 94-95 (no consideration of how ethanol tax credits might effect commercial feasibility).

But Tallett goes even further to underscore his lack of qualifications to opine about "commercial practicability." Tallett admits that he is not qualified to speak to the retail-level costs and/or impact of using ethanol as an alternative to MTBE, as he has no "direct expertise" in this area. *Id.* at 54. Tallett admits that he is not qualified to opine about the distribution costs and other distribution-related issues that would be implicated if a refiner used ethanol instead of MTBE. *Id.* at 138 (admits that he does not "regard [him]self as an expert in that [he's] never worked in the distribution end of the business itself."). Tallett admits that he has no expertise or understanding about the relative costs to produce ethanol, or the production capabilities of those ethanol facilities that existed during the relevant time frame for the reformulated gasoline program. *Id.* at 113-114.

"An expert must be qualified by knowledge, skill, experience, training, or education. A court must consider the totality of a witness' background when evaluating the witness' qualifications to testify as an expert. Additionally, a court must ensure that an expert will be proffering opinions on issues or subject matter that are within his area of expertise." *Arista Records,* 2009 U.S. Dist. LEXIS 5185 at ** 28-29. Here, Mr. Tallett's own admissions explain why he is uniquely *not* qualified to opine about the "feasibility" of ethanol as compared to MTBE.

### C.   Tallett's "Ethanol" Opinion is Not Reliable.

Tallett's opinion that ethanol was a technologically possible alternative is *non sub lite* – such feasibility being an undisputed fact. The problem arises when Tallett tries to confuse

"technological possibility" with "commercial practicability." To the extent Tallett wants to opine about the latter, such testimony is unreliable and should be precluded.

The unreliability of any opinion Tallett might offer about commercial feasibility is established, in the first instance, by Tallett's several admissions that he is not qualified to offer such an opinion. Beyond that, the *methodology* Tallett employed further proves the unreliability of any opinion he might offer about ethanol feasibility. In a nutshell, Tallett's "methodology" was to review certain Defendant's documents – selected by Plaintiff's trial counsel – that purportedly "pertain[] to refinery economics and the decision to use MTBE." *CNY Exp. Rpt.* at 4. Tallett does not fully describe what these documents were (or were not); does not discuss the import of the materials he reviewed; and does not describe how complete (or incomplete) a picture they might present on the issue of "feasibility." Rather, he simply asserts that he reviewed these industry documents through the lens of his "experience in and consulting to the oil industry over the past 37 years." *CNY Exp. Rpt.* at 2. Put another way: we are asked to accept Tallett's conclusory testimony on faith, as *ipse dixit* – *i.e.*, the testimony is "reliable" because Tallett says so.

Faith, however, is not the standard for determining admissibility of expert testimony in New York. "New York courts uniformly rule that competent, non-conclusory expert testimony is needed in cases involving more complex design issues." *Guarascio*, 582 F. Supp.2d at 463 (citations omitted). A failure to support proffered expert testimony with sufficient "empirical data, technological evidence, foundational facts or reference to industry standards" establishing that "there was a technologically feasible and commercially practicable alternative design" renders such opinion inadequate and unreliable. *Id.* at 464-65; *see also Tompkins*, 92 F. Supp.2d at 85.

And therein lies the problem with Tallet's so-called "methodology" of reviewing amorphous and ill-defined materials hand-selected for him by Plaintiff's trial counsel. There simply is no way to determine if Tallett's testimony is based on "empirical data, technological evidence, foundational facts or reference to industry standards." *Id.* There simply is no way to determine if Tallett's methodology (a) has been tested, or even is capable of being tested; (b) has been subjected to peer review and publication; or (c) is generally accepted by the scientific community.

Lack of reliability is further established by the fact that Tallett contradicts his own qualifications to employ this methodology. Specifically, Tallett admits that his opinion about "feasibility" is based, in part, on his alleged expertise in "refining economics." Yet, Tallett also concedes that he is no "economist, and [he is] not testifying as an economist." *Tallett Dep.* at 26, 114-115. Likewise, lack of reliability also is established by the fanciful assumptions on which Tallett bases his opinion about ethanol feasibility. Tallett states that the fundamental premise for his opinion about ethanol feasibility is that you first have to imagine that MTBE was never an option to refiners. *Id.* at 97. However, Mr. Tallett himself decries the use of such theoretical assumptions (contradicted by reality) as the basis for expert opinion, and describes them as unreliable and/or unverifiable. See, e.g. *Exp. Rpt.* at 9; *Tallett Dep.* at 132. Such a "what if" proposition is not indicative of "reliability," and is certainly not a sound methodological basis for expert testimony.

Interestingly, to the extent Mr. Tallett offers any opinion about the comparative economics of ethanol versus MTBE, he admits that ethanol was *not* competitive with MTBE:

> Q: Okay. Based on the cost ranges developed for Phase II RFG, do you believe ethanol-containing RFG was competitive relative to MTBE-containing RFG in the Northeast?
>
> A: **The short answer is no, I never said it was.**

*Tallett Dep.* at 58. This candid admission from Tallett – that even he does not believe that ethanol-containing RFG was "competitive" relative to MTBE-containing RFG – further confuses his opinions about feasibility, and only underscores the lack of reliability in his methodology and conclusions.

### D. Tallett's Opinion About The Feasibility of Ethanol Does Not "Fit."

Plaintiff bears the burden of proving a feasible alternative design – one that is, at a minimum, commercially practicable. By his own admission, Tallett cannot carry this burden – he is unqualified to opine as to the sufficiency of the supply of ethanol and the relative costs and/or practicability of the alternative. Instead, Tallett offers only that ethanol was a technical possibility – a fact that does not require expert opinion, as the federal government provided for that "possibility" in its amendments to the Clean Air Act. Ethanol was a *possible* choice for all refiners – this "technical" fact sheds no light on whether it was *feasible*. Put more plainly, the technical possibility of ethanol as an alternative to MTBE is a poor "fit" in this case as it does nothing to assist the trier of fact in determining whether ethanol was, in fact, a more feasible alternative than MTBE, and therefore is ultimately irrelevant. *Daubert,* 509 U.S. at 591. Indeed, Mr. Tallett's opinion(s) on this issue are the embodiment of the Court's admonition that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

### CONCLUSION

Tallett proposes to offer "expert" testimony on two discrete subjects: (1) market share, and (2) ethanol feasibility.

Tallett's testimony about "market share" is merely a proposal for an alternative methodology to *calculate* market share. At his deposition, Tallett conceded that the basis for his proposed methodology was mistaken; that his opinion about that methodology may change

because of his mistake; and, in any event, that he did not actually employ his proposed methodology (or any other methodology) to calculate any defendant's putative "market share" in this case. Putting aside that the myriad reasons why Tallett's proposed "market share" testimony does not come close to satisfying the requisites for reliability articulated in *Daubert*, it is not probative to any disputed issue of fact and, therefore, should be precluded under FRE 403.

Tallett's proposed testimony about "ethanol feasibility" is arguably even more irrelevant (and unreliable) than his self-discredited proposal for calculating "market share." Tallett confuses "technical possibility" with "commercial practicability." His only opinion is that it was "technically possible" for refiners to use ethanol -- an undisputed fact of no relevance here. As to the more probative issue of whether ethanol was a "commercially practicable" alternative to MTBE, Tallett concedes that he is not qualified to (and does not) offer any opinion. Again, Tallett's proposed testimony does not come close to satisfying *Daubert* and, in any event, is not relevant to any disputed issue of fact in this case.

For each of the foregoing reasons, Defendants respectfully request that this Court exclude the opinion evidence of Plaintiff's expert Martin Tallett as to (a) "market share" and (b) ethanol-blended gasoline as a feasible alternative design to gasoline blended with MTBE.

Dated: New York, New York
May 13, 2009

Respectfully submitted,

_____
Peter J. Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Stephen J. Riccardulli (SR 7784)
Michael J. Dillon (MD 4553)
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173-1922
Tel: (212) 547-5400
Fax: (212) 547-5444

Anthony A. Bongiorno (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775

Jennifer Kalnins Temple (JK 3274)
MCDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue, Suite 500
Irvine, CA 92612-7108

*Attorneys for Exxon Mobil Corporation*