# EXHIBIT "B"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") | MDL: No. 1358 |
| Products Liability Litigation | Master File C.A. No. |
| | 1:00-1898 (SAS) |

This document relates to the following case:

*City of New York  v. Amerada Hess Corp., et al.,*

04 Civ. 3417

### EXPERT MARKET SHARE REPORT OF MARTIN R. TALLETT

EnSys Energy & Systems, Inc.

1775 Massachusetts Avenue

Lexington, MA 02420

_____          _____
Signature                                         March 16th, 2009

                                                          Date

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

# Table of Contents

1   **Qualifications** .................................................................................. 1

2   **Summary of Opinions** ...................................................................... 3

3   **Computation of Market Share** ........................................................ 4

Market share calculations must be consistent, clear, avoid estimation and be verifiable at the individual and aggregate level............................................................... 4

Defendants' market share calculations fail to meet the criteria for a market share that can be finalized and verified ......................................................................... 5

Defendants' market share methods centered on New York Harbor suffer from a fatal flaw ............................................................................................................ 10

EIA Prime Supplier information provides a workable means for calculating market share ........................................................................................................... 11

Data submissions to the EPA provide secondary means of supporting market share claims, also ignored by Defendants' experts ................................................. 17

Defendants' expert reports do not enable verification of their calculations................... 19

Defendants' experts' methods do not account for the full extent of involvement in the supply system and their impacts on market share ........................................... 19

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

# 1  Qualifications

My name is Martin R. Tallett.  I am the President of EnSys Energy & Systems, Inc., an independent consultancy specializing in quantitative evaluation of refining, regulatory, technology and market issues in the petroleum industry.

In November 2008, I was retained by the City of New York and Sher Leff LLP in *City of New York v. Amerada Hess Corp.*, 04 Civ. 3417, which is part of a multidistrict proceeding in the United States District Court for the Southern District of New York, entitled In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, MDL No. 1358 (SAS), Master File No. 1:00-1898, M21-88.  This document relates to the case: City of New York v. Amerada Hess Corp.

I was previously retained by Weitz & Luxenberg, PC and Baron & Budd, PC in the *County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp.*, 04 Civ. 5424 and *United Water New York, Inc. v. Amerada Hess Corp.*, 04 Civ 2389, actions, which were also part of the *In re MTBE* proceeding.

The principal purpose of that work, in which I was assisted by my long-time associate, Mr. Daniel N. Dunbar, was to assess the various defendants' decisions to use MTBE from among other oxygenate options (primarily ethanol) in complying with the requirements of the Clean Air Act Amendments of 1990.

On June 8, 2007, I filed an Expert Report (hereinafter the *Suffolk* Expert Report) in that matter.  On October 8, 2007, I filed a Rebuttal Report under the same action (hereinafter the *Suffolk* Rebuttal Report).

On December 19th 2008, I filed an Expert Report in this *City of New York* case (04 Civ. 3417), hereinafter the *City of New York Expert Report*.  I detailed my qualifications and compensation in that report.   The primary purpose of that new Expert Report was to

1

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

supplement my opinions in the *Suffolk* case by presenting my review and assessment of internal oil company documents concerned with the costs of using ethanol versus MTBE in gasoline. My earlier *Suffolk* Expert Report, Rebuttal Report and Deposition Testimony were essentially unchanged and I had incorporated and adopted that work for the purposes of this *City of New York* case.

I then, on February 6th, 2009, filed an Expert Rebuttal Report.

I have since been asked by the legal representatives of plaintiffs to comment on the latest expert reports of Dr. Bailey, Dr. Burtis, Dr. Kalt, Dr. Keeley, Mr. Killen, Dr. Montgomery, Professor Murphy and Mr. O'Brien. This Expert Market Share Report sets out my reactions and opinions in response to portions of these reports. My work on this case remains ongoing and, as such, I reserve the right to revise and update my analysis and conclusions should new information in this matter become available.

The basis of my work in this Report is my extensive experience with the US and international refining and petroleum products supply system, including but not limited to the many studies I have undertaken on refining, supply and regulatory questions and refining and market outlooks for such entities as the U.S. Department of Energy, the Energy Information Administration, the Environmental Protection Agency, major oil companies and others. It is further based on extensive work with EIA published data on US refining and supply, again in conjunction with refining and market studies but also in conjunction with prior expert witness work for ExxonMobil in the TAPS (Trans-Alaskan Pipeline System) case before the Federal Energy Regulatory Commission and in *Oxygenated Fuels Association* vs. State of New York on the issue of gasoline supply and MTBE versus ethanol use in New York State.

Based on my review of the above-referenced expert reports, I find nothing that compels me to alter my opinions as stated in my *City of New York* Expert or Rebuttal Reports. I now offer comments and opinions on certain aspects of those defendants' expert reports which are, I believe, significant issues relating to questions concerning market share. No

2

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

one should construe the fact that I have not commented on a specific topic or opinion in the Bailey, Burtis, Kalt, Keeley, Killen, Montgomery, Murphy or O'Brien Reports as my agreement with those reports' statements and/or opinions.

## 2   Summary of Opinions

Based on the Defendants' reports, and my education, professional training, independent research and prior experience, I have concluded the following:

1. Market share calculations must be consistent, clear, avoid estimation and be verifiable at the individual and aggregate level

2. Defendants' market share calculations fail to meet the criteria for a market share that can be finalized and verified

3. Defendants' market share methods centered on New York Harbor suffer from a fatal flaw

4. EIA Prime Supplier information provides a workable means for calculating market share

5. Data submissions to the EPA provide secondary means of supporting market share claims, also ignored by Defendants' experts

6. Current Defendants' expert reports do not enable verification of their calculations

7. Defendants' experts' methods do not account for the full extent of involvement in the supply system and their impacts on market share.

3

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

# 3   Computation of Market Share

I understand that each Defendant bears a burden to establish its market share.  To date,
certain but not all Defendants have prepared – and I have received for review – reports
which cover their market share. Thus, the present situation is incomplete.  Having
reviewed the reports supplied, I find the present situation is even more incomplete in that
not all of the Defendants' Experts' reports go as far as making quantitative assessments
of market share.  The reports of Dr. Bailey, Dr. Burtis, Dr. Keeley, Dr. Montgomery and
Professor Murphy do so, the other reports do not.

I am also aware that different experts have taken different positions in terms of defining
the "Relevant Geographic Area".  Mr. Burke for Plaintiff has prepared an analysis that
demonstrates Defendants' various levels of participation in gasoline that reached the
market at the "ground" level, i.e. specific to Queens County, the direct subject of this
case. Defendants' experts Messrs. O'Brien, Killen and Montgomery have attempted to
define the "New York Harbor" market, arguably the next "level" up.  Several experts
have referred to New York state level data and, moving beyond, to the sub-PADD or
PADD levels in market share calculations. I would also add that there are other generally
"higher" levels for which potentially relevant data exist.  These include the national level
and, regarding RFG, areas that EPA defines such as that for all Northern Region RFG.

## *Market share calculations must be consistent, clear, avoid estimation and be verifiable at the individual and aggregate level*

To be capable of being verified, the methodology for market share computation should be
(a) the same across all Defendants, (b) be void of estimation, (c) give a clear and readily
understandable measure of market share and (d) be capable of verification at the
individual Defendant levels and at the aggregate total Defendants level.  Further, and in
the interests of being verifiable and authoritative, the methodology should rely on official

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

statistics, preferably those maintained by the Federal government. Defendants'
submissions fail these tests.

## Defendants' market share calculations fail to meet the criteria for a market share that can be finalized and verified

I have reviewed, *inter alia*, the report of Dr. Burtis on behalf of Coastal Defendants. I
focus on this report because it most clearly illustrates the issues at hand in computing
market share.

Her report arguably goes furthest in presenting quantitative estimates of market share. Dr.
Burtis presents an array of methodologies relying on a range of data sources. In doing so
though she (a) uses estimations in several of the methodologies and (b) arrives at a range
of results.

Exhibit 1 summarizes the approaches used by Dr. Burtis. For her early period,
predominately defined as 1986-1994, she assesses a range of <u>average</u> market share per
method from 2.03% to 3.79%, a factor of 1.86 between the lowest and the highest. For
her later period, 1995 – 2003, the market share averages range from 2.03% to 4.47%, a
factor of 2.2. These ranges illustrate the potential – and potentially unacceptable -
variability that would come from having each Defendant follow its own methodology, i.e.
such that a variety of methodologies was employed among the Defendants[1]. Thus,
whether intended or not, Dr. Burtis' report makes clear how essential it is to have only
one single methodology for market share. Dr. Burtis' estimates also spell out the need to
have a methodology where the individual market shares can be clearly understood, then
summed and compared and validated against a clearly defined total; also a methodology
which includes being able to validate the non-defendants' market share.

---

[1] Further, Dr. Burtis' estimates are frequently inconsistent in the time periods they cover.

5

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

| Summary of Dr. Burtis' Estimates of Coastal Defendants' Market Share | | | | |
|---|---|---|---|---|
| Burtis Exhibit | Method Description, Basis of Data | Used estimates | Time frame & Computed Market Share | |
| | | | 1979/86-1994(1) | 1995-2003 |
| **Manufacturers for the Period 1995 - 2003** | | | | |
| 3 | RFG Supplied from Coastal Eagle Point refinery to New York Harbor (as estimated by Mr. O'Brien) | Yes | | 2.9% |
| 4 | RFG supplied to PADD1, basis Eagle Point Refinery gross production | Yes | | 3.05% |
| 5 | RFG supplied to PADD1, basis Eagle Point Refinery gross production adjusted | Yes | | 3.04% |
| 6 | All Gasoline from Eagle Point and Corpus Christi refineries into PADD1 | Yes | 2.03% | |
| 7 | All Gasoline from Eagle Point and Corpus Christi refineries into PADD1 - variant | Yes | 2.48% | |
| **Title for the Period 1995 - 2003** | | | | |
| 8 | EIA 782C RFG Prime Supplier into New York State | No | | 4.37% |
| 9 | EIA 782A RFG Refiner's Sales Report into New York State | No but mixes use of 782C with 782A data | | 4.47% |

6

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

| | | | | |
|---|---|---|---|---|
| 10 | New York State Station Counts | No but does not yield volume information | | 3.23% |
| **Title for the Period 1979 – 1994 (1)** | | | | |
| 11 | EIA 782C All Gasoline Prime Supplier into New York State | No | 3.59% | |
| 12 | EIA 782A All Gasoline Refiner's Sales Report into New York State | No but mixes use of 782C with 782A data | 3.79% | |
| 10 | New York State Station Counts(2) | No but does not yield volume information | 2.28% | |
| 13 | National MTBE Inputs (3) | No | 2.03% | 2.03% |
| | PADD1 MTBE Inputs | Yes | | 3.78% |
| | Ranges in estimates | | 2.03% – 3.79% | 2.03% - 4.47% |

Notes:

1. Period stated as 1979-1994 but data in Exhibits 6 and 7 are for period 1986-1994.

2. NY station count data per Exhibit 10 were for 1991 through 2004.

3. Date range in Exhibit 13 is 1993 – 2003.

Exhibit 1

In her report, Dr. Burtis states: "In using this measure, I assumed that all RFG placed on the Colonial and Harbor pipelines from the Eagle Point Refinery reached New York Harbor. However, I expect that some RFG that was placed on the Colonial and Harbor pipelines from the Eagle Point Refinery was distributed to locations in southern New Jersey prior to entering New York Harbor. To the extent some or all of the RFG was removed at points prior, this measure overstates the RFG manufactured by Coastal Defendants that was supplied to New York Harbor. Further, I also assumed in using this measure that no other RFG produced at Eagle Point Refinery reached New York Harbor.

7

*Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

To the extent that any additional volumes may have reached New York Harbor, this measure would be understated." *See* Burtis Report ¶ 15.

At other points in describing several of her methodologies, Dr. Burtis also invokes estimation:

"I assumed in using this measure that all the production of RFG at the Eagle Point Refinery was supplied into PADD1", (*id* at ¶ 18),

"I assumed that for the period prior to 1995, formulations of gasoline that could have been supplied into the County of Queens were not restricted to RFG", (*id* at ¶ 20),

"I assumed to the extent Coastal Defendants imported nominal volumes of RFG, the Coastal Defendants did not manufacture these nominal imports and so I did not include them in the measure", (*id* at footnote 20),

and so on.

Equally, Dr. Montgomery's report is rife with assumptions. For instance, and selecting only a sub-set:

"For some counties, I reasonably assumed that a fraction of their RFG demand was met by NY Harbor and the rest was met by another logical source."

"I then identified three counties that likely received a significant amount of their RFG supply through NY Harbor, but the remainder from other supply sources. I reasonably assumed that each of these counties received one-half of their RFG supply through NY Harbor and the other half from terminals along pipelines and waterways that receive product from somewhere other than NY Harbor."

"I concluded that it was a very consistent percentage across the period, and applied the average from 1999 through 2003 to the period from 1995 through

*Methyl Teritary Butyl Ether (MTBE) Products Liability Litigation*
*Expert Market Share Report of Martin R Tallett, EnSys Energy & Systems, Inc.*

1998 – the year for which no New Jersey county-by-county VMT data were available."

"I first assumed that all RFG coastwise shipments by water out of NY Harbor were shipped to New England to meet its demand."

"The USACE data does not explicitly state RFG volumes or the destination of shipments. Therefore, I assumed that all motor gasoline shipped was RFG and that all shipments went to New England."

"I assumed that all RFG injected by ExxonMobil into the Colonial Pipeline from the Plantation Pipeline at Collins, Mississippi, was produced at an ExxonMobil facility."

(*See* Montgomery Report at ¶ ¶ 43, 47, 48, 51, 56, 66.)

These statements illustrate the need Dr. Burtis and Dr. Montgomery found to make estimations, in doing so rendering the particular methodology being described both unverifiable and open to potential dispute, an untenable prospect especially when multiplied up across the full range of Defendants.   Similarly, Messrs. O'Brien, Killen and Montgomery all used estimations in arriving at their definitions of New York Harbor gasoline consumption.  Dr. Montgomery arrived at a slightly different definition of New York Harbor than did Mr. O'Brien.

It is conceivable in my view that all Defendants could arrive at an agreed definition of "New York Harbor" with quantitative estimates by year of gasoline consumption. However, using methodologies along the lines for instance of that used by Dr. Montgomery, the chances are minimal of arriving at a computation of individual and total Defendants' supply into New York Harbor, and thus market share, that is clear, authoritative and not open to dispute. The number of inherent uncertainties would be too great.

9

Thus, while I can understand the logic from a supply system perspective of a market defined as "New York Harbor", I do not see how such a definition will lead to verifiable market shares. In addition to the concerns I have expressed above, that definition is not consistent with market definitions in official statistical sources. It crosses state boundaries (e.g. includes northern New Jersey). It does not, I believe, fully match the EPA northern New Jersey, New York, western Connecticut RFG supply area. It is also not an attempt to establish market share at the "ground level". Such a "ground level" approach could have its own benefits of focusing directly on the specific geographical area at issue in the case. (I have not been asked by Plaintiff to address such an option but have focused on methods that apply at broader geographic levels and thus the encompass methods put forward to date by Defendants' experts.)

### Defendants' market share methods centered on New York Harbor suffer from a fatal flaw

Defendants' methodologies centered around estimation of gasoline supplies into New York Harbor also suffer from another flaw that is in my view fatal. It is, namely, that, under this methodology, there is no way to verify the market share of the <u>non-defendants</u>. Given there is no official definition of "New York Harbor" and no corresponding official statistics, Defendants could sum and present their total market share but there would be no means available to verify this against non-defendants' market share. The only means that could, in principle, be employed would entail obtaining from every non-defendant their respective market shares so that, when added to the Defendants' figure, the total agreed with the level for total New York Harbor (which of itself would have to have been agreed to (a) among the Defendants and (b) by Plaintiff and the Court and (c) possibly by non-defendants). I do not see this as a practical option.

What this means, in my view, is that the only workable means for establishing market share are those which (a) do not use any form of estimation and (b) where total market size is clearly identifiable <u>and</u> wherein the market share/volume of non-defendants can be verified. Defendant's methods do not work.

10