# EXHIBIT 1

I.H. Mel Suffet, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:
Methyl Tertiary Butyl  :   MDL NO. 1358 (SAS)
Ether ("MTBE")         :
Products Liability     :
Litigation             :

This Document Relates to:

City of New York vs.
Amerada Hess Corp., et al
Case No. 04 Civ. 3417 (SDNY)
_____/

------
APRIL 30, 2009
------

Videotaped Deposition of I.H. MEL SUFFET, Ph.D., Volume 1, held in the law offices of Latham & Watkins LLP, 505 Montgomery Street, Suite 20, San Francisco, California beginning at 9:33 a.m., before Sandra Bunch VanderPol, RPR, RMR, CRR, CSR #3032.

------

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

```
                                                            Page 2
 1    APPEARANCES:
 2
      SHER LEFF, LLP
 3    TODD E. ROBINS, ESQUIRE
      trobins@sherleff.com
 4    450 Mission Street, Suite 400
      San Francisco, California 94105
 5    (415) 348-8300
      Counsel for plaintiffs
 6
 7    BLANK ROME LLP
      JEFFREY S. MOLLER, ESQUIRE
 8    moller@BlankRome.com
      One Logan Square
 9    130 North 18th Street
      Philadelphia, Pennsylvania 19130-6998
10    (215) 569-5792
      Counsel for Lyondell Chemical Company
11
12    PRESENT:
13
      Jay Finneburg, CLVS, Videographer
14
      Loren Seaby, Environmental Resource Analyst,
15    Sher Leff
16
17
18
19
20
21
22
23
24
```

 1   the '97, '98 time frame until the publication of this
 2   article?
 3          A.    Could you repeat that?  I want to
 4   make sure I understood what you said.  Was I -- I
 5   don't -- I'm not clear what you mean by "involved."
 6          Q.    I'll just withdraw the question.
 7          Let me look at -- let me ask you to take a
 8   look at your -- keep the Stocking study, Exhibit 8,
 9   the 2001 published study in front of you, because
10   we're going to look at it in some detail.  But I also
11   want you to have your expert report nearby.
12          In -- on the first page of the introduction
13   of your expert report, that's Exhibit No. 2 -- I'm
14   sorry, 1 -- Exhibit No. 1, you characterize
15   Dr. Lawless as saying that the MTBE odor study that
16   you worked on, the Stocking study, is the single-most
17   valuable and reliable study of MTBE odor in drinking
18   water.
19          Do you see that?
20          A.    Yes, I see it.
21          Q.    Okay.  And do you agree that this is
22   the most valuable and reliable study of MTBE odor in
23   drinking water?
24          A.    I think -- I think this -- this is.

1  Shen data from 1998 there.  Do you see that?
2      A.   Yes.
3      Q.   Okay.  And it looks to me, from your
4  presentation or understanding of it, that -- well,
5  and let me -- let me back up again.
6           You cite Shen in your expert report as a --
7  as a valid -- valid scientific study with respect to
8  MTBE odor thresholds, correct?
9      A.   It's a valid study at the time it
10 was -- in terms of the data that it has, yes.
11     Q.   And it shows here that some panelists
12 were able to detect MTBE as low as 2.5 parts per
13 billion in at least six of the tests Shen and her
14 colleagues ran; is that right?
15          MR. MOLLER:  Objection.  Form.
16          THE WITNESS:  Once again, this is an
17 individual range of panelists' identification.  All
18 geometric means are much above that.  And we pick the
19 value at 2 that is below the lowest value on the
20 table at 2.5.
21 BY MR. ROBINS:
22     Q.   Well, wait a minute. Geometric mean,
23 that's not relevant to 6.1 in ASTM's E-679, which
24 says -- is it?  I mean, 6.1 says the concentration of

1   the levels of the test substance in a medium should
2   begin well below the level at which the most
3   sensitive panelist is able to detect, right?
4            A.    That's correct.  We're looking -- if
5   you look at the data, the range is shown as 2.5 being
6   the lowest value for an expert panel.
7            Q.    Is it your position, Doctor --
8            A.    Excuse me.  Could I please continue
9   with my statement?
10           Q.    Absolutely.  I -- I believed you were
11  done.
12           A.    I apologize if I interrupted your
13  statement, but you -- you, in turn, interrupted mine.
14           So it has 2.5 for an expert panel.  I think
15  we have agreed, and it's my understanding and my
16  scientific opinion, that expert panelists would be
17  better than the general public in terms of
18  identifying an odorant, and 2.5 was a panelist in an
19  expert panel.
20           So we thought that by looking at that and
21  looking at trying to cover the range to 100, because
22  there were some values that were up in that -- up in
23  that range, that we felt 2 was a valid point to pick.
24           If I had the study to do over again, I might

1  have picked a lower number.  But this is the way we
2  at the time felt was the correct scientific
3  evaluation.
4         Q.    Is it your position that 2 parts per
5  billion is well below 2.5 parts per billion?
6             MR. MOLLER:  Objection.  Argumentative.
7             THE WITNESS:  2.5 --
8             MR. MOLLER:  It calls for -- calls for -- it
9  calls for a -- forget it.
10            MR. ROBINS:  Calls for something.
11            MR. MOLLER:  I don't know what it calls for.
12            MR. ROBINS:  It calls for an answer.
13            MR. MOLLER:  Well below?  Okay.  I'll call
14 it vague.  What do you mean by "well below"?
15 BY MR. ROBINS:
16         Q.   What does the ASTM mean by it?  You
17 can answer the question as it is pending -- as it is
18 posed.
19            MR. MOLLER:  If you understand it.
20            THE WITNESS:  I'm using 2.5 from an expert
21 group.  And if 2.5 is what the experts do, I don't
22 expect a -- a consumer panelist to be measured -- to
23 be able to evaluate -- to be able to observe below
24 2. -- 2.5.

1          So we picked 2, thinking that a -- a
2    consumer panelist might pick it out as 5 or 10 -- not
3    5, but maybe 10.
4    BY MR. ROBINS:
5          Q.     You said if you had --
6          A.     And that's been our judgment by
7    looking -- by looking at data for consumers.  It's
8    not just picked out of the air in a sense.
9          Let me clarify.  If you look at consumers
10   who have complaints, et cetera, about MIB and geosmin
11   in the water, we find that the testing labs that do
12   tests for analysis of this are much better than the
13   consumers in terms of evaluating what they can read
14   than what the consumers can read.
15         Q.     You said a few moments ago, if you
16   had to do it over again, you might have picked a
17   lower value for the bottom of the concentration
18   scale.  Why did you say that?
19         A.     If I knew that these consumers would
20   pick -- would be able to possibly guess at 2, I might
21   have picked a lower -- I would have picked a lower
22   number.  We had no understanding that that -- that
23   would happen.  We did the best scientific credible
24   study at the time with the information that we had at

1  points.

2          Q.     With a ruler and a pencil, or did
3  they do a linear best fit or least squares apply?
4          A.     I would have to look back at the
5  original data.  I assume they had -- they did have a
6  statistician working on it, so I would assume it
7  would be a best fit.
8          Q.     And that best fit analysis allows you
9  to look at any point on that line and look down and
10 see the corresponding concentration, and look across
11 and see the corresponding percent of the consumer
12 panel correctly detecting, correct?
13         MR. MOLLER:  Objection.  Lacks foundation.
14         THE WITNESS:  If -- if -- yes, that's --
15 that's what it's showing.
16 BY MR. ROBINS:
17         Q.     And do you view that to be a
18 scientifically unreliable or inappropriate
19 statistical analysis with odor threshold data?
20         MR. MOLLER:  Objection.  Vague.
21         THE WITNESS:  They're just doing the same
22 thing that I -- that was done in Figure 1.  They are
23 just plotting the data.  And they -- they drew a
24 line.  That's fine.

```
 1                    REPORTER'S CERTIFICATE
 2
 3        I certify that the witness in the foregoing
 4   deposition.
 5                    I.H. SUFFET, Ph.D.
 6   was by me duly sworn to testify in the within-entitled
 7   cause; that said deposition was taken at the time and
 8   place therein named; pages 1 through 318 of the
 9   testimony of said witness were reported by me, a duly
10   Certified Shorthand Reporter of the State of
11   California authorized to administer oaths and
12   affirmations, and said testimony was thereafter
13   transcribed into typewriting.
14        I further certify that I am not of counsel or
15   attorney for either or any of the parties to said
16   deposition, nor in any way interested in the outcome
17   of the cause named in said deposition.
18        IN WITNESS WHEREOF, I have hereunto set my hand
19   this 6th day of May, 2009.
20   _____
21
22        SANDRA BUNCH VANDER POL, RMR, CRR
23        Certified Shorthand Reporter
24        Certificate No. 3032
```

I.H. Mel Suffet, Ph.D.

Page 320

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:
Methyl Tertiary Butyl  :   MDL NO. 1358 (SAS)
Ether ("MTBE")         :
Products Liability     :
Litigation             :


This Document Relates to:

City of New York vs.
Amerada Hess Corp., et al
Case No. 04 Civ. 3417 (SDNY)
_____/


------
MAY 1, 2009
------

           Videotaped Deposition of I.H. MEL SUFFET,
Ph.D., Volume 2, held in the law offices of Latham &
Watkins LLP, 505 Montgomery Street, Suite 20,
San Francisco, California beginning at 9:29 a.m.,
before Sandra Bunch VanderPol, RPR, RMR, CRR, CSR
#3032.


------


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

I.H. Mel Suffet, Ph.D.

Page 321

```
 1   APPEARANCES:
 2
     SHER LEFF, LLP
 3   TODD E. ROBINS, ESQUIRE
     trobins@sherleff.com
 4   450 Mission Street, Suite 400
     San Francisco, California 94105
 5   (415) 348-8300
     Counsel for plaintiffs
 6
 7   BLANK ROME LLP
     JEFFREY S. MOLLER, ESQUIRE
 8   moller@BlankRome.com
     One Logan Square
 9   130 North 18th Street
     Philadelphia, Pennsylvania 19130-6998
10   (215) 569-5792
     Counsel for Lyondell Chemical Company
11
12   PRESENT:
13
     Jay Finneburg, CLVS, Videographer
14
     Loren Seaby, Environmental Resource Analyst,
15   Sher Leff
16
17
18
19
20
21
22
23
24
```

 1   nothing to do with anything that I know as factual
 2   information.
 3           And I -- I still agree with that statement,
 4   because Dr. Lawless knows full and well, as being a
 5   previous member of the ASTM committee that developed
 6   the -- the method that was used in the Stocking
 7   study, that you should not -- that you should use the
 8   data for geometric mean only, and you should use 1432
 9   for specific -- for specific things.
10           In fact, we talked about that yesterday, and
11   he did that exact thing when he did his cottage
12   cheese study.
13           Q.   What evidence do you have that Harry
14   Lawless entered into his work on this case with a
15   pre-formed conclusion?
16           A.   I don't have any -- any evidence that
17   he did.  I just have evidence -- I just have
18   information by looking at how he evaluated the
19   situation that I have -- that it appears that he has
20   this pre-formed notion, because he knows -- he knows
21   what the method is.
22           I don't even know if -- he could have voted
23   on it, for all I know, to accept the method, if he
24   was a member of the committee at that time.  I know

I.H. Mel Suffet, Ph.D.

Page 431

1  "This gradation between detection, recognition and
2  objection is conceded by Dr. Lawless and universally
3  recognized in the field of drinking water science."
4  That's the last part of that statement?
5       Q.   Well, that's not the sentence I read,
6  but yes.
7       A.   But that's the last part of the
8  statement.  I want that on the record, because when I
9  write a paragraph, and I write a statement, I like
10 the whole statement to be presented.  This is -- I'm
11 not --
12      MR. MOLLER:  The question is, is that your
13 opinion in this case?
14      THE WITNESS:  That's my opinion in this
15 case.  And those -- the whole paragraph is my
16 statement.  Yes.
17 BY MR. ROBINS:
18      Q.   And is it your belief that the -- the
19 gradation that you have described in this paragraph
20 is applicable to MTBE?
21      A.   Yes.
22      Q.   What studies, if any, are you aware
23 of that actually attempt to determine a rejection
24 threshold for MTBE?

I.H. Mel Suffet, Ph.D.

Page 432

1   A.   No studies have been designed to
2   determine rejection threshold.  But if you look at
3   Dale's studies, you could see a change from
4   sweet to sweet solvent as you go up in higher
5   concentrations, which indicates the -- which
6   indicates the type of thing of detection -- detection
7   and then recognition of one kind of odor slightly
8   changing to a slightly different odor as you go up in
9   higher concentration.  And that -- that is an
10  indication that there's detection, recognition and
11  eventually there will be objection.  And this is the
12  kind of thing --
13  Q.   The Dale study --
14  A.   -- this is the kind of thing that
15  Dr. Lawless presented in his wine study.
16  Q.   The Dale report doesn't contain any
17  data or conclusions regarding the level at which
18  consumers will reject or object to MTBE; is that
19  right?
20  MR. MOLLER:  Objection.  Mischaracterizes
21  the study.
22  THE WITNESS:  I'd have to look at the Dale
23  study to see if they said what you said or didn't say
24  what you said.

I.H. Mel Suffet, Ph.D.

Page 436

```
 1         A.    Absolutely.
 2         Q.    Did you suggest to defense counsel at
 3   any point during your consultancy on this case that a
 4   MTBE rejection threshold study be done?
 5         A.    No.
 6         Q.    Why not?
 7         A.    I don't think it's necessary.  I
 8   think the odor threshold concentration gives you the
 9   protection.  And the Stocking data is more protective
10   at 15, is as protective as you can be for New York.
11   And New York is a 10, and I think it's going to
12   protect the New York population at 10.  And being a
13   New Yorker, I want to protect the New York
14   population.
15               I still root for the Yankees.
16         Q.    What a shock.  I'm a National
17   leaguer, myself.
18         A.    Well, I root for the Phillies because
19   I live there.
20         Q.    You grew up in Brooklyn and you root
21   for the Yankees?  That's awful.
22         A.    Well, my father rooted for the
23   Dodgers.  How could I root for the Dodgers?  When the
24   Dodgers left town, I reject them.  And I go to L.A.
```

```
 1                    REPORTER'S CERTIFICATE
 2
 3        I certify that the witness in the foregoing
 4   deposition.
 5                   I.H. SUFFET, Ph.D.
 6   was by me duly sworn to testify in the within-entitled
 7   cause; that said deposition was taken at the time and
 8   place therein named; pages 320 through 459 of the
 9   testimony of said witness were reported by me, a duly
10   Certified Shorthand Reporter of the State of
11   California authorized to administer oaths and
12   affirmations, and said testimony was thereafter
13   transcribed into typewriting.
14        I further certify that I am not of counsel or
15   attorney for either or any of the parties to said
16   deposition, nor in any way interested in the outcome
17   of the cause named in said deposition.
18        IN WITNESS WHEREOF, I have hereunto set my hand
19   this 7th day of May, 2009.
20
21              _Sandra Bunch VanderPol_____
22              SANDRA BUNCH VANDER POL, RMR, CRR
23              Certified Shorthand Reporter
24              Certificate No. 3032
```