# EXHIBIT 2



SHER·LEFF LLP
LAWYERS PROTECTING WATER

Victor M. Sher
vsher@sherleff.com
415.348.8300 x100

May 14, 2009

*Via Email and Hand-Delivery*

The Honorable Shira A. Scheindlin
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1316

      Re:   *City of New York v. Amerada Hess et al.*, Case No. 04 CV 3417 (SAS)
             *In re MTBE Products Liability Litigation*, MDL 1358
             ExxonMobil's Proposal for Trial Structure

Dear Judge Scheindlin:

ExxonMobil's May 7 proposal to "reverse bifurcate" trial by limiting a first phase to presentation of "damages" will lengthen not shorten this case. Presenting damages first would only lead to an inefficient and highly confusing presentation of proof. Unlike the rare "mature tort" cases in which courts have used reverse bifurcation appropriately, to artificially place "damages" before causation and liability here would result in significant confusion of the complex issues of MTBE litigation, and would not permit the parties to present evidence in an organized and coherent order.

First, Mr. Sacripanti's proposal rests on his forceful but entirely unsupported assertion that the City's case is "only about threatened MTBE contamination" (May 7 letter at 1). To the contrary, the jury will hear that:

- "Station 6" is a long-planned facility to bring six City wells back into producing drinking water for the residents of New York. Station 6 will treat the combined flow of Wells 6, 6A, 6B, 6C, 6D and 33 – up to 10 million gallons per day – as part of delivering water from these wells to the public.[1]

- Station 6 represents a central and crucial step in revitalizing the City's groundwater wells in Queens. This water supply constitutes an important piece of

---

[1] Station 6 includes the five bellwether wells designated by the City. The jury will hear similar evidence concerning the five bellwether wells (City Wells 5, 22, 26, 39, and 45) designated by defendants.

- the City's plans to ensure its continued ability to provide its residents with a City-owned, reliable and predictable water supply.

- MTBE unquestionably has already reached the Station 6 wells. Indeed, each of the Station 6 individual wells (except Well 6C, which draws from the deeper Lloyd Aquifer and is not part of this litigation) has tested positive for MTBE. Pilot testing in 2002 (i.e., pumping the wells to assess the effectiveness of proposed treatment) showed concentrations of MTBE as high as 350 ppb in Well 6D.

- Plaintiff's expert David Terry will testify that "the MTBE concentrations at Station 6 will more likely than not reach a *combined* peak concentration of about 35 ppb" shortly after the wells are turned on, and that the concentration of MTBE will remain significantly elevated "until at least 2040." (Terry Rebuttal Report at 26 (emphasis added).)

- The presence of MTBE at Station 6 substantially increases the costs of the treatment facility. Indeed, compared to perchloroethylene (PCE, a contaminant associated with dry cleaning and a favorite red-herring of defendants), removing MTBE from drinking water requires a larger, more robust (and more expensive) treatment facility, with substantially higher operation and maintenance costs. *See, e.g.,* Rebuttal Report of Marnie A. Bell (City's expert) at p. 3-16 ("facility sizing and operating parameters are controlled by MTBE, which is by far, the more difficult of the two VOC's to remove"); Revised Expert Report of David W. Hand (defendants' expert) at Table 5 (attributing $910,000 for 3 years of treatment in Well 6D for MTBE, but only $147,000 for PCE for same period).

- Based on the projected continued impacts of MTBE on the Station 6 wells, plaintiff's experts estimate the net present value of the MTBE-related costs of treatment for 40 years will range from approximately $158 million (using air stripping for a combined flow of 7.5 million gallons per day) to more than $258 million (using granular activated carbon at a combined flow of 10 million gallons per day). (Bell Rebuttal Report at 4-3.)[2]

Far from a "mountain of hypothetical assumptions about future damages" (May 7 letter at 2), the City's damages claim flows ineluctably from the facts that its residents need this water, that the contamination in its wells is real and will last for decades, that it will be expensive to remove the MTBE so the water can be used, that treatment costs are reasonably ascertainable, and that defendants – not the ratepayers – should pay the costs of removing MTBE from the City's water.

---

[2] Defendants' assertion that past damages for Station 6 are limited to $900,000 is also incorrect. In New York, the statutory rate of prejudgment interest for actions that interfere with property rights is 9 percent per annum. *See* NY CPLR §5001, 5004.

Second, it is hard to make sense of defendants' proposal to present the jury with a truncated initial presentation that addresses only the harm to specific wells. Defendants may want to keep evidence of their own wrongdoing from the jury while focusing on the City's operation of its water system, but this proposal is not a practical (much less efficient, much less fair) way to do so. The jury will still need to understand what MTBE is, how it was used in gasoline, how it got to Queens, how it was released into the environment and how much, how the MTBE problem in the City's water supply (according even to defendants' experts) has become "ubiquitous," how environmental cleanup at underground storage tank sites has been inadequate, how long and at what levels it will persist in the City's wells, and what it will cost to remove it before delivering the water from the well to the public.

When, moreover, the jury is asked to determine damages associated with a particular *level* of MTBE in a specific well (as the jury must be), the questions become even more inextricably intertwined with the rest of the City's case in chief (assuming, of course, defendants do not want to concede liability). Imagine that the jury hears evidence that a specific well contained or will contain MTBE at 30 ppb, 10 ppb, 5 ppb, 1 ppb or 0.5 ppb. What could such facts – alone – possibly mean to a lay jury trying to assess the City's "damages" for that well? As the Court has recognized, "[i]n the end, the issue of when the water suppliers are harmed by MTBE contamination is fact specific in a variety of ways...." *In re MTBE*, 593 F.Supp.2d 549, 552 (S.D.N.Y. 2008). To allow the jury to make sense of this issue, the City would have to present evidence of the nature of MTBE and its various adverse impacts on drinking water from both a health and aesthetic perspective, *e.g., id.* (taste and odor) & n. 14 (health effects), as well as how much it will cost to treat. The Defendants in turn would want to present evidence of the Maximum Contaminant Level. The City would counter with (among other things) regulatory requirements that treatment be implemented so that public exposure is "minimized" and MTBE removed "to the lowest practical levels" (*see, e.g., Recommended Standards for Water Works, 2003 Edition, Great Lakes - Upper Mississippi River Board of State and Provincial Public Health and Environmental Managers, incorporated by reference into* New York State Sanitary Code, 10 N.C.Y.R.R.), evidence of the adverse impacts of MTBE on water at levels below the health-based MCL, and the City's strong interest in delivering water to its citizens as free as practical of MTBE. And none of this can be separated from defendants' tortious conduct that led to MTBE reaching the City's water, including what *they* knew of MTBE's pernicious environmental proclivities and when, *their* estimates of MTBE-related impacts to drinking water and the costs of dealing with them (which will bear directly on the jury's view of the City's damages here), and *their* failures to take any steps to prevent the MTBE problem from reaching Queens and the Nation.

The bottom line is that a jury simply could not make an informed judgment about "damage" to any particular well in this case absent an understanding of the world of MTBE. Unlike other torts where such strategies might be employed, here there is one inescapable fact: Any assessment of what harm is compensable or not can only emerge from an understanding of the entire case. Of course the parties will have to address the

Hon. Shira A. Scheindlin
May 14, 2009
Page 4 of 5

world of MTBE eventually anyway. Artificially limiting an initial phase to "damages" would only lead to confusion. And – once defendants fail to defense the case – it would require repetitive and lengthy presentation of evidence in later phase(s).

Third, nothing about the amount of damages is even dispositive. For example, it is simply not true that proof of actual damages is even a required element of each of the City's claims. *See, e.g., Mondello v. Newsday, Inc.*, 774 N.Y.S.2d 794, 794-95 (App. Div. 2004) ("Even without pleading actual damages for trespass, a plaintiff is entitled to nominal damages"); 87 C.J.S. Trespass § 132 (same); *Shearing v. City of Rochester*, 273 N.Y.S.2d 464, 469 (Sup. Ct. 1966) (same re nuisance). Regardless of proof of actual damage, the City could still sustain its nuisance and trespass actions and obtain injunctive and equitable relief forcing ExxonMobil to abate the nuisance and trespass its tortious and intentional actions created. *Cf. In re MTBE*, 2007 WL 1601491 *3-4 (S.D.N.Y. Jun. 4, 2007) (discussing statute of limitations for damages and equitable relief claims for trespass and nuisance). Accordingly, even assuming *arguendo* that a jury found no actual damages (a possibility the City views as extremely remote), the case would not "end" after an initial damages phase, as ExxonMobil evidently assumes.

Finally, this case presents none of the characteristics of those rare circumstances in which reverse bifurcation is appropriate. This is not by any stretch a case in which "the parties have excellent information about the likelihood of success on the issue of liability and the real sticking points are the individual issues of causation and damages." *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 32 (E.D.N.Y. 2001); *see also In re Simon II Litigation*, 211 F.R.D. 86, 187 (E.D.N.Y. 2002) (citing *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 963 (10thCir. 1993).[3] Rather, as defendants have often reminded the Court, MTBE cases represent an "immature" tort.[4] A preliminary determination of "damages" would

---

[3] Because it is useful only in limited circumstances, reverse bifurcation is considered inappropriate in most cases. "In light of the issues to be analyzed and the complexity of the litigation … reverse bifurcation would result in significant confusion of the complex issues" and would not "permit the parties to present evidence in an organized and effective order." *State ex rel. Atkins v. Burnside*, 569 S.E.2d 150, 161 (W.Va. 2002) (reverse bifurcation improper in personal injury and wrongful death actions arising out of exposure to toxic chemicals). *See, e.g., Walker Drug Co., Inc. v. L Sal Oil Co.*, 972 P.2d 1238, 1245 (Utah 1998) (declining to reverse bifurcate case involving gasoline contamination of private landholdings by gas stations, because reverse bifurcation "has been used only rarely in complex asbestos-related litigation" and "so drastic a technique has never been employed in Utah"); *Campolongo v. Celotex Corp.*, 681 F.Supp. 261, 262 (D.N.J. 1988) (reverse bifurcation is an "extraordinary" case management technique necessitated by the magnitude of the asbestos caseload). Indeed, outside of the asbestos context, reverse bifurcation has been used by courts in only a handful of cases, each based on highly idiosyncratic, case-specific facts.

[4] *See, e.g.*, remarks of Rick Wallace, Status Conference 61-62 (Nov. 10, 2006) ("This is the quintessential immature tort. From our perspective, as you know, we regard the claims as naught. This much has to be acknowledged. Not one of these cases has been

Hon. Shira A. Scheindlin
May 14, 2009
Page 5 of 5

only leave the parties trying to pick up the rest of their presentation of evidence concerning liability and causation, with the jury struggling to follow along.

The Court should reject Exxon's proposal.

Respectfully submitted,

*[signature]*

Victor M. Sher

Cc: Liaison Counsel
    Alan Hoffman
    M. Coy Connelly
    Ben Krowicki (All *Via Email*)

---

tried to a full conclusion, not one"); remarks of Sheila Birnbaum, Status Conf. 52 (Apr. 27, 2007).