# EXHIBIT D



Jan 23 2009
4:25PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation | MDL No. 1358 Master File C.A. No. 1:00-1898 (SAS) |

This document relates to the following case :

City of New York v. Amerada Hess Corp. et al,
Civil Action No. 04 – cv – 3417

Expert Report of _____
Richard D. Wilson

Date: January 16, 2009

1

## Report of Richard D. Wilson

### Introduction

This report contains my opinions regarding the circumstances under which the refining industry was required to use MTBE in gasoline in the United States. These opinions are based on my 31 years of experience with the Environmental Protection Agency and over 8 years of experience as an environmental consultant. I believe that this experience has equipped me with specialized knowledge as to the inner-workings of the federal EPA and the interaction between the EPA, the White House, and the Congress. More specifically, my opinions are based on my active participation in the process within the Executive Branch and the Legislative Branch of the Federal Government that led to these requirements. I was a senior member of the White House-led Executive Branch team that developed President Bush's Clean Air Proposal announced in June 1989. I was also a senior member of the Administration's team that negotiated with the Congress regarding the legislation that became the Clean Air Act of 1990. In addition, I directed the negotiated rulemaking process that EPA initiated and that was successful in developing implementing regulations for the new clean fuels programs. Finally, I was deeply involved in the implementation of these programs until my retirement from EPA in 1998.

In addition to my personal experience and specialized knowledge of these issues, the foundation for and further explanation of my opinions is set forth below and in the resource documents referred to in attachment 1, a table of notes I prepared regarding the critical dates and events related to the use of oxygenates in gasoline. My work experience and education are summarized in attachment 2. Attachment 3 contains a list of my trial testimony and publications during the last 10 years. I have been engaged to testify in these cases by a group of the defendants, who have agreed to compensate me for my time at the rate of $350 per hour, to be paid to my firm, National Environmental Strategies, on a monthly retainer basis ($7,000 per month) through the date of completion of my trial testimony or the settlement of each case, whichever occurs first.

2

### My opinions are:

1. the requirement to use oxygenates in reformulated gasoline was imposed on the refining industry over their strenuous objection:
    a. as a prelude to the 1990 Clean Air Amendments, President Bush proposed a cleaner motor vehicle fuels program calling for the introduction and use of cleaner burning fuels such as methanol and ethanol
    b. the refining industry responded by arguing that the government shouldn't choose the fuels but should set environmental performance standards and allow the market place to choose between those fuels that were able to meet the environmental standards
    c. Congress reached a political compromise between the various proposals and established a reformulated gasoline program and defined the environmental performance standards that this fuel needed to meet, as supported by the refining industry. But, in response to pressure from the ethanol industry, they also imposed a requirement for the use of oxygenate (at a 2% oxygen content level) in reformulated gasoline whether needed or not to meet the environmental standards.
    d. The refining industry had strenuously opposed such an oxygenate requirement even mounting an advertising campaign against the so called "government gas"

2. the refining industry was, in effect, mandated to use MTBE in reformulated gasoline:
    a. MTBE and ethanol were considered by Congress and the EPA to be the only then viable oxygenate options
    b. while on its face the Clean Air Act of 1990 did not mandate a particular oxygenate, there was not enough supply of ethanol (the only real alternative to MTBE) available for the January 1995 start of the program
    c. the ethanol that was available tended to be produced in the Midwest (near the source of raw materials) and difficulties of transport and handling (it couldn't be shipped in pipelines due to its affinity for water) added to the limitations on its use
    d. the reformulated gasoline program began in January 1995, only 4 years after the Clean Air Act of 1990 was adopted and only one year after EPA signed final implementing rules in 12/1993, leaving

3

      insufficient time to increase the supply of ethanol. The clean air benefits of the program were considered so important that prompt implementation was required

    e. during the Congressional debate and also during the EPA rulemaking process the terms of the oxygenate requirements were written to assure they could be met using MTBE since it was clear that MTBE would have to be used

    f. providing for the use of multiple oxygenates was also a key component that allowed for the expansion of the reformulated gasoline program to additional urban areas with air pollution problems while avoiding constraints on the fuel supply

3. the issues of MTBE's potential risk to groundwater and drinking water supplies were known at the time that Congress adopted the reformulated gasoline program:
    a. in 1986 an Interagency Testing Committee established under the Toxic Substances Control Act (TSCA) submitted a public report to EPA on MTBE and described its potential to contaminate groundwater. In 1987 EPA used its authority under TSCA to require industry to conduct more testing on MTBE.
    b. the problems of leaking underground storage tanks were also well known at this time and in September of 1988 EPA had issued regulations to deal with this problem

4. MTBE's potential impact on ground water or drinking water supplies did not affect the actions taken by Congress in adopting the Clean Air Act of 1990, the Administration, or of any of the parties to the negotiated rulemaking (States, industry, environmental groups, etc):
    a. while MTBE's characteristics were known, leakage of gasoline or any of its components from underground storage tanks had already been determined to be unacceptable and EPA's 1988 rules had set a deadline of December 1998 to stop such leaks
    b. none of the parties involved raised an objection to the use of MTBE based on groundwater or drinking water issues during the Congressional debate or during the negotiated rulemaking process that followed and, in my opinion, this was due to the fact that EPA was in the process of implementing a program to stop any leaks from underground gasoline storage tanks
    c. in fact, most of the participants in the process (with the obvious exception of the ethanol industry) viewed MTBE to be the oxygenate of choice due to its many favorable properties and promoted provisions in the Act and in the implementing regulations that would provide for its use

4

# RICHARD D. WILSON

## WORK EXPERIENCE

1998 - current    National Environmental Strategies        Washington, DC
*Senior Vice President*
- Environmental consulting firm providing advice, guidance, and advocacy to clients on a wide variety of federal, state, and local environmental, energy, and health and safety issues

1997 – 1998   Environmental Protection Agency        Washington, DC
*Acting Assistant Administrator for Air and Radiation*
- Directed office responsible for EPA's airborne pollutant, global climate, and radiation programs

1994 – 1997   Environmental Protection Agency        Washington, DC
*Deputy Assistant Administrator for Air and Radiation*
- Senior career employee and responsible for day to day operations of the office responsible for EPA's airborne pollutant, global climate, and radiation programs

1982 – 1994   Environmental Protection Agency        Washington, DC
*Director, Office of Mobile Sources*
- Directed office responsible for EPA's programs related to motor vehicle emissions and fuels as well as other transportation sources such as airplanes, trains, and ships

1976 – 1982   Environmental Protection Agency        Washington, DC
*Director, Office of Air Noise and Radiation Enforcement and Office of General Enforcement*
- Directed offices responsible for EPA's enforcement of air, noise, radiation, pesticides, and toxic substances programs

1967 – 1976   Environmental Protection Agency        Washington, DC
*Various positions*
- Started with the National Air Pollution Control Administration of the Department of Health, Education and Welfare in 1967 and joined EPA in 1970 at its inception and helped organize the new agency.

2600 VIRGINIA AVENUE • SUITE 505 • WASHINGTON, D.C. 20037
PHONE 202-333-2524 • FAX 202-333-0178 • E-MAIL RWILSONNES@AOL.COM

## EDUCATION

University of Pennsylvania, Wharton School - MBA 1967

Lafayette College - BS in Electrical Engineering 1965

New Brighton High School, New Brighton, PA – 1961 graduate

## AWARDS RECEIVED

Received highest Federal Government Executive award from 3 different Presidents of the United States

Received numerous gold and silver medals and other awards from the Environmental Protection Agency including the Distinguished Career Award

Member of the Environmental Protection Agency's Clean Air Act Advisory Committee