**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- x

In Re: Methyl Tertiary Butyl Ether ("MTBE")   Master File No. 1:00-1898
Products Liability Litigation                MDL 1358 (SAS)
                                             M21-88
--------------------------------------------------------------------- x   ECF Case

**This document relates to the following case:**

*City of New York v. Amerada Hess Corp., et al.*
Case No. 04 Civ. 3417

--------------------------------------------------------------------- x

**PLAINTIFF CITY OF NEW YORK'S OPPOSITION TO DEFENDANTS' JOINT MOTION *IN LIMINE* TO EXCLUDE EVIDENCE REGARDING TRADE-ASSOCIATION ACTIVITIES UNTIL AND UNLESS PLAINTIFFS ESTABLISH PREDICATE FACTS**

## I.  INTRODUCTION

Defendants have moved *in limine* to prevent the introduction of evidence related to various trade associations on the grounds that no such evidence should be introduced until the City first shows that defendants are substantively liable for the civil conspiracy cause of action. Defendants conflate the admissibility of evidence of statements – both by them and by the trade associations – with liability for civil conspiracy.

## II.  ARGUMENT

*Claiborne Hardware* and *Pfizer*, the central cases relied upon by defendants, hold that mere membership in an otherwise legal association without more does not equate with membership in a conspiracy undertaken by some subset of the membership. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982); *Pfizer Inc. v. Giles* (*In re Asbestos Sch. Litig.*), 46 F.3d 1284, 1290 (3rd Cir. 1994). Defendants then make the leap of logic that any

evidence vaguely related to trade associations cannot be relevant unless and until the City can meet the elements of a civil conspiracy cause of action. However, none of the cases cited by defendants stand for the proposition that evidence otherwise admissible cannot be introduced because it happens to relate to the activities of a trade association. The cases cited by defendants deal solely with the requirements for liability under a concert of action theory. Thus evidence of statements made in the context of "trade-association conduct" must be analyzed for admissibility just as any other evidence.

Defendants do not specify what evidence is at issue, other than all evidence vaguely related to "trade-association conduct". The City sees four broad categories of statements it will seek to introduce, categorized by who made the statement and who received the statement:

> A. Statements by defendants to other oil companies or a trade association in relation to the activities of a trade association.
>
> B. Statements by other oil companies or the trade association itself in the context of the trade association where defendants received the statement.
>
> C. Statements by other oil companies or the trade association itself in the context of the trade association where the document does not facially show that defendants received it.
>
> D. Statements by a trade association to regulators and the public, such as lobbying efforts and submissions of technical data.

### A. Statements by Defendants

Statements by a defendant are admissible as a party admission pursuant to Fed. R. Evid. 801(D)(2)(A). Statements by defendants as to such facts in issue as the role of MTBE as a groundwater contaminant are directly relevant to this case. Defendants have presented no reason or law that such party admissions are inadmissible because they were made in the context of trade association activity.

**B. Statements by Others Received by Defendants**

In many of the statements at issue, other petroleum companies and the trade associations made statements regarding key facts to be proved at trial, such as the threat to groundwater posed by MTBE, where a document facially shows that Exxon received it. Mostly these statements are contained in documents which are not hearsay, either because they are business records, ancient documents, or both. Fed. R. Ev. 803(6), 803(16). As non-hearsay, such documents provide probative evidence of the facts that they address, such as the pernicious nature of MTBE as a groundwater contaminant. More importantly, regardless of their hearsay status, such documents go directly to notice to defendants of dangers associated with their products.

For example, on December 23, 1986, a staffer at API faxed several articles to Exxon and other oil companies. *See* Ex. 1 (API Fax). As evidenced by the comments on the faxed cover sheet, API was seeking input from Exxon and other oil companies to rebut two articles which raised concerns as to MTBE as a groundwater contaminant. One was a paper by Garrett, Moreau[1], and Lowry to be presented to a joint meeting of the National Well Water Association and API. *See* Ex. 2 (Maine Paper). This paper characterizes MTBE as a pernicious groundwater contaminant that should be banned, or at a minimum stored in extra-secured double-walled containers. Another was an Alcohol Weekly article addressing the same general concerns with MTBE as a groundwater contaminant. *See* Ex. 3 (Alcohol Weekly article). The API staffer considered this article to be "of grave concern". The articles, and the worried comments by the API staffer, provided notice to Exxon in 1986 of "grave concern[s]" regarding MTBE as a

---

[1] The City has retained Marcel Moreau, one of the authors of this seminal study often called "The Maine Paper", as an expert on topics that include underground storage tank systems in general and their relationship with MTBE.

groundwater contaminant and the need for extra secure storage facilities, and the articles and fax sheet are admissible for that purpose.

### C. Statements by Others Not Necessarily Received by Defendants

But what of those statements made by non-defendant oil companies to each other and the trade associations where the document does not facially show that it was received by one of the defendants? Defendants are charged with knowledge of such information even if they did not receive it.

A manufacturer is held to the expert standard of knowledge in the relevant manufacturing community at the time the manufacturer puts its product into the marketplace. *Restatement (Third) of Torts* § 2, cmt. a. This principle makes the knowledge of other oil companies and petroleum trade associations admissible and relevant to what defendants should have known about MTBE. The Second Circuit addressed this principal in the similar context of asbestos, a widely-used and widely-litigated chemical. In *George v. Celotex*, 914 F.2d 26 (2nd Cir. 1990), the defendant challenged the admissibility of an unpublished decades-old internal report of a different asbestos manufacturer that it had never received. The Second Circuit upheld the admissibility of the report because the defendant manufacturer "should have known of the information comprising the contents of the report." *Id*. at 28-31. This was because a manufacturer "has a duty to keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby." *Id*. at 28.

In other similar cases, reports and documents of other manufacturers not seen by defendants have been held relevant to show that possible dangers of a product were discoverable by the defendant manufacturer. *See*, *e.g.*, *Gonzalez v. Digital Equipment Corp*., 8 F.Supp.2d

194, (E.D.N.Y. 1998) (J. Weinstein) (admitting internal documents of nonparty manufacturer, relying on *Celotex*); *Dunn v. HOVIC*, 1 F.3d 1362, 1369-70 (3d Cir.1993) (relying on *Celotex* in asbestos case to admit very same report which was at issue in *Celotex*); *King v. Armstrong World Industries, Inc.*, 906 F.2d 1022, 1025 (5th Cir.1990) (admitting internal memoranda of nonparty asbestos manufacturer on same reasoning as *Celotex*); *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 465 (5th Cir.1985) (minutes of committee meetings of Asbestos Textile Institute admissible to show "state of the art," even without a showing that defendant was a member of the institute or had knowledge of its meetings).

### D. Statements by the Trade Associations to the Government and the Public

The final category of statements implicated by defendants' instant Motion seems to be the gravamen of their concern: introduction of evidence of statements by trade associations to government regulators and the public. Such statements are admissible as non-hearsay against defendants as "statement[s] by a person authorized by the party to make a statement concerning the subject" under Rule 801(d)(2)(C) because the defendants, along with other oil companies, authorized the trade associations to speak on their behalf.

The Oxygenated Fuels Association (OFA) was formed by oxygenate producers in early 1983 to "advance the use of oxygenates". *See* Ex. 4 at *2 (March 10, 1993 OFA Press Release). In the 1984-85 timeframe, OFA began to focus on MTBE. *See* Ex. 5 at 34:12-21 (Dominguez Depo on Sep. 12, 2000). In 1986, the OFA started to form an MTBE Committee to serve as an interlocutor with EPA. *Id.* at 40:16 – 42:11, 45:20 – 46:22. EPA later held a public focus meeting on MTBE, raising concerns about the toxicology of MTBE and its role as a contaminant of groundwater. *See* Ex. 6 at *1 (Minutes for the Public Focus Meeting dated Dec. 17, 1986).

As reflected in an Exxon internal memo dated a few days later, on January 6, 1987, Exxon, ARCO Chemical and others in the MTBE industry met with Mr. Dominguez regarding EPA's concerns with MTBE and agreed to meet again to nominate someone to speak on their behalf with EPA. *See* Ex. 7 (Lington Memo dated Jan. 9, 1987). On January 8, 1987 a staff member of OFA called Beth Anderson, a staffer at EPA, stating that "OFA will be representing producers of MTBE . . . George Dominguez will be the coordinator." *See* Ex. 8 (EPA Contact Report dated Jan. 8, 1987).

In a meeting on January 16, 1987, Exxon, Arco Chemical, and other oil companies met and formed an MTBE Committee, affiliated with but not part of OFA, with the mission to "1. Represent MTBE interest to EPA re: ITC action; 2. Provide a forum in which MTBE producers, importers and users could provide a basis for responding to environmental concerns that have been raised in a number of states regarding groundwater contamination . . ..". *See* Ex. 9 at *2 (MTBE Technical Committee Meeting Minutes dated Jan. 23, 1987). Following this meeting, Mr. Dominguez contacted EPA again to inform them of the formation of the MTBE Committee and its role on February 2, 1987. *See* Ex. 10 at *2 (EPA Contact Form dated Feb. 2, 1987). Mr. Dominguez followed up in writing to explain to EPA that he was "preparing an integrated response on behalf of the MTBE Committee . . . to the questions raised at your December 17th Focus Meeting on MTBE" and he enclosed the charter of the Committee. *See* Ex. 11 (Dominguez Feb. 12, 1987 Letter to EPA). In a further conversation on February 18, Mr. Dominguez stated that he was representing multiple producers of MTBE, including Exxon and Arco. *See* Ex. 12 (EPA Contact Form dated Feb. 18, 1987). Finally, Exxon in writing informed EPA that it was a member of the MTBE Committee and communications regarding MTBE testing should be directed to Mr. Dominguez:

> Exxon Chemical Americas is a member of the MTBE Committee which is affiliated with the Oxygenated Fuels Association. We are interested in developments related to the process, but in the spirit of simplicity, we will look to the MTBE Committee for keeping us informed. We therefore wish to ensure that Mr. George Dominquez of the MTBE Committee be kept apprised of all proceedings and developments concerning MTBE testing.

*See* Ex. 13 (Hunter Letter dated Feb. 20, 1987).

Defendants joined the MTBE Committee in order for the MTBE Committee to serve as an interlocutor with EPA for them. Thus statements later made by the MTBE Committee and Mr. Dominguez to EPA are properly attributed to Exxon and Arco under Rule 801(d)(2)(C). Based on the foregoing exhibits, the Court may and should rule that the necessary foundation has been laid pursuant to Rule 104(a).

Prior to the introduction of statements by API, the City will make a similar foundational showing pursuant to Rule 104(a).

### III. CONCLUSION

Defendants conflate substantive liability for the actions of a trade association with threshold determinations of admissibility in regards to statements somehow related to trade associations. The admissibility of statements by the defendants themselves, other oil companies, and the trade associations should be analyzed on their own merits. The Court should accordingly deny Defendants' instant Motion in Limine.

Dated: San Francisco, California
      May 26, 2009

    MICHAEL A. CARDOZO
    Corporation Counsel of the City of New York
    Attorney for Plaintiff City of New York
    100 Church Street
    New York, New York 10007

(212) 788-1568


/s/ *JOSHUA STEIN*
VICTOR M. SHER *(pro hac vice)*
TODD E. ROBINS *(pro hac vice)*
JOSHUA STEIN *(pro hac vice)*
LESLEY E. WILLIAMS (LW8392)
NICHOLAS G. CAMPINS *(pro hac vice)*
MARNIE E. RIDDLE *(pro hac vice)*

SHER LEFF LLP
450 Mission Street, Suite 400
San Francisco, CA 94105
(415) 348-8300

*Attorneys for Plaintiff City of New York*

**CERTIFICATE OF SERVICE**

I hereby certify that true and correct copies of the following documents were served on Liaison Counsel via Electronic Mail, and on all counsel of record by posting them directly to CM/ECF and LexisNexis File & Serve on the 26th day of May, 2009:

1. **PLAINTIFF CITY OF NEW YORK'S OPPOSITION TO DEFENDANTS' JOINT MOTION *IN LIMINE* TO EXCLUDE EVIDENCE REGARDING TRADE-ASSOCIATION ACTIVITIES UNTIL AND UNLESS PLAINTIFFS ESTABLISH PREDICATE FACTS**

2. **DECLARATION OF JOSHUA STEIN IN SUPPORT OF PLAINTIFF CITY OF NEW YORK'S OPPOSITION TO DEFENDANTS' JOINT MOTION *IN LIMINE* TO EXCLUDE EVIDENCE REGARDING TRADE-ASSOCIATION ACTIVITIES UNTIL AND UNLESS PLAINTIFFS ESTABLISH PREDICATE FACTS**

KRISTIN MEYERS