# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

IN RE: METHYL TERTIARY BUTYL ETHER
("MTBE") PRODUCTS LIABILITY LITIGATION

This documents relates to:

*City of New York v. Amerada Hess Corp., et al.*, 04 Civ. 3417

**DECLARATION OF STEVEN C. SCHINDLER IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF HARRY T. LAWLESS**

Master File No. 1:00-1898
MDL 1358 (SAS)

----------------------------------------------------------------------- x

I, STEVEN C. SCHINDLER, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, that the following is true and correct::

**Qualifications and Background**

1. I am the Director of Water Quality for the New York City Department of Environmental Protection ("NYCDEP") Bureau of Water Supply. I have been employed by NYCDEP since 1987, and have served in the capacity of Director of Water Quality since 2003.

2. As Director of Water Quality, I am ultimately responsible for overseeing water quality monitoring and testing within the City of New York's water supply and distribution systems, and ensuring that water delivered to the eight million residents of the City of New York, and the one million residents of upstate communities who receive City water, is safe and of high quality. My responsibilities include oversight of water quality related to both the surface water supply and the groundwater system that the City owns and operates in and around Jamaica, Queens ("groundwater system"), when it is in operation.

3. The Directorate of Water Quality monitors several water quality characteristics, including chemical contaminants, bacteria, and constituents affecting taste and odor. The Directorate also receives public inquiries and complaints related to water quality, including complaints involving taste and odor.

4. From 2003 until 2007, when the organization was restructured, I served as the Chief of the Division of Drinking Water Quality Control ("DWQC"). My primary responsibilities in that position, which was eliminated when the organization was restructured, were the same as my current responsibilities as Director of Water Quality. The former Division of Drinking Water Quality Control also received customer complaints related to water quality.

5. Prior to 2003, I held several positions in NYCDEP laboratories, including Section Chief of DWQC Watershed Laboratory & Treatment Operations from 1999-2003, where I managed five laboratories that monitored the City's upstate water supply, and, among other duties, provided water quality input to water supply operations and treatment. I also served as Laboratory Director/Associate Chemist II and III, for NYCDEP's Grahamsville Laboratory from 1990 to 1999.

6. I received a Bachelor of Arts in Biology from Lafayette University in 1981, and a Master of Science in Environmental Forest Biology, from the State University of New York's College of Environmental Science & Forestry in Syracuse, N.Y. in 1984.

**Summary of Statement**

7. I submit this declaration in opposition to Defendants' Joint Motion In Limine to Exclude the Opinion of Plaintiff's Expert Harry T. Lawless. In that report, Dr. Lawless states that 10% of the population can detect taste or odor of MTBE in drinking water at levels as low as 1-2 ppb.

2

8.  The Defendants' attempt to distinguish between detection of MTBE and objection or rejection of water containing MTBE misses the mark, and demonstrates a lack of understanding of the duties of a reasonable and responsible water supplier. Based on the Department's past experience, it is more likely than not that the public will object to any taste or odor attributable to the presence of a toxic chemical constituent, such as MTBE, even if it is assured that the concentrations of that chemical constituent are below harmful levels.

9.  Based on my experience, once it is reported that certain members of the public are able to taste or smell MTBE in their drinking water, the NYCDEP will likely be faced with vocal opposition from the community, particularly in light of the fact that the majority of the water users served by NYCDEP do not receive water with MTBE contamination. Accordingly, NYCDEP does not consider the attempted distinction between detection and objection or rejection to have any practical import.

**NYCDEP Objectives and Operation of the City's Water Supply**

10. The City of New York ("City") is renowned for its high quality drinking water. Water provided to the City comes predominantly from three surface water supply systems in Upstate New York: the Catskill, Delaware and Croton systems. Historically, certain portions of the Borough of Queens received water from the groundwater system, but the last well was removed from service in 2007. Since that time, the entire City has received its water from the upstate reservoirs.

11. It is my understanding that NYCDEP, as part of its overall dependability program, intends to construct treatment facilities that will allow it once again to provide water from its groundwater system, in particular from Station 6 wells, for extended periods of time.

3

12. NYCDEP operates its water supply system with the goal of providing the highest quality water possible. To that end, decisions as to where and when releases from reservoirs are made are based, in part, on the quality of water within any particular reservoir at any given time. It is the policy of NYCDEP that, to the extent feasible, water provided in the future from any wells within the groundwater system for extended periods of time, be as pure and clean, in terms of toxic chemical contaminants, as the water from the surface supply system.

13. NYCDEP follows a specific procedure with respect to water quality complaints, including those related to taste and odor. As noted above, water quality complaints related to taste and odor are referred to the Directorate of Water Quality. Most of these inquiries come through the City's "311" telephone information system. Upon receipt of a water quality complaint, a member of my staff will attempt to reach the person who lodged the complaint. Based upon the conservation with the person making the complaint, or if there is a cluster of complaints in one particular geographic area, staff may be dispatched to take water quality samples from hydrants in the immediate area and from inside the residences or businesses of those who reported the problem.

14. The information obtained through the routine investigation of a taste and odor complaint may indicate the presence or absence of a contaminant, and its general nature. That information would not indicate whether reported problems are related specifically to MTBE or another contaminant. It therefore cannot be determined whether past taste and odor complaints are attributable to the presence of MTBE.

**Defendants' Statements Regarding the Lawless Report**

15. In his report, Dr. Lawless concludes that 10% of the population can detect MTBE in drinking water at levels as low as 1-2 ppb. The Department would have serious concerns if 10% of the population receiving groundwater could detect MTBE through either taste or odor. My understanding is that Station 6 alone will be capable of providing water to 70,000 residents when it is placed into operation. Based on Dr. Lawless' report, 10%, or 7,000 of those residents, would be able to detect a taste or odor attributable to MTBE at levels of 1-2 ppb. If even a fraction of those 7,000 residents were to lodge a complaint or inquiry, it would likely cause a strong public reaction and NYCDEP would likely be faced with vocal opposition from the community, particularly in light of the fact that the majority of the water users served by NYCDEP do not receive water with MTBE contamination. Such a public reaction could be problematic to NYCDEP's long term reliance on the groundwater system as a drinking water source.

16. Moreover, I see no validity to Defendants' attempt to distinguish between detection and objection or rejection of drinking water with taste or odor attributable to MTBE. Because residents in the relevant geographic area of Queens are accustomed to receiving high quality water, it is unlikely that residents who receive groundwater in the future will simply accept a new taste or odor in their water supply, regardless of whether that taste or odor is, in itself, objectionable.

17. Instead, in my opinion, based on my experience, it can be expected that those residents would object to the presence of a chemical constituent, regardless of whether the taste or odor is described as "sweet," and regardless of any assurance that the contaminant is present at safe concentrations. This is because, in my experience, residents typically find any

5

indication that a contaminant is present in drinking water objectionable. This is particularly true given that they will view themselves against the backdrop of the majority of the populous, which will continue to receive the high quality water from the surface water supply, and whose water is free of MTBE contamination.

18. Accordingly, NYCDEP should not allow for the possibility that a significant portion of the population that will receive water from the groundwater system will be able to detect a taste or odor attributable to MTBE.

19. Based on the conclusions of Dr. Lawless, NYCDEP must treat for MTBE to achieve concentrations below 1-2 ppb in order to ensure public acceptance of the long-term use of the groundwater supply.

**Conclusion**

20. I believe that Defendants' attempt to distinguish between detection of MTBE in drinking water and objection or rejection of MTBE has no practical utility. Defendants are unrealistic to assume that the public will accept detectible levels of MTBE contamination, merely because the taste or odor it experiences may not be objectionable. Defendants' arguments do not reflect the real world concerns of a water provider, and the political realities that affect public acceptance of a water supply system.

Dated: May 13, 2009
Kingston, NY

_____
Steven C. Schindler