**EXHIBIT E**

Fletcher G. Driscoll, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE:

Methyl Tertiary Butyl    :   MDL NO. 1358 (SAS)
Ether ("MTBE")           :
Products Liability       :
Litigation               :

- - -

IN RE:                   :
                         :
City of New York         :

- - -

New York, New York
Thursday, April 30, 2009

- - -

Videotaped Deposition of FLETCHER G. DRISCOLL, Ph.D., held at New York Law Department, Office of the Corporation Counsel, 100 Church Street, on the above date, beginning at 10:36 a.m., before Kimberly A. Overwise, a Certified Realtime Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 102

1  mean now you're saying there was only seven
2  faxes between you?
3      A   I can only remember --
4          MR. RICCARDULLI: Objection.
5          THE WITNESS: Excuse me.
6      Excuse me. I can only remember just, you
7  know, a limited number of faxes because
8  the information that he sent me were
9  generally portions of reports or
10 something that related to what somebody
11 else had actually put together, whether
12 related to chemistry, related to geology
13 at the sites, related to the well logs or
14 pump tests, anything like that. And when
15 I mean correspondence, just as I said,
16 I'm talking about telephone calls, faxes,
17 any other means of communication except
18 that we don't use e-mail.
19 BY MR. GREENE:
20     Q   Was Mr. Kero's files produced, files
21 related to this litigation produced to defense
22 counsel for production to the City?
23         MR. RICCARDULLI: Objection.
24     A   I presume he did. Rhea Lowell's --
25 that's Rhea Lowell's job. And everything that

Page 103

1  relates to the case we release.
2      Q   Did Ms. Lowell also assemble
3  Ms. Susan Mullin's electronics files related
4  to this litigation and produce them to defense
5  counsel for production to the City?
6      A   I'm sure she did.
7      Q   And did Ms. Lowell also collect
8  Mr. Mitchell's files in electronic and paper
9  and produce them to defendants for production
10 to the City in this litigation?
11     A   Yes, sir.
12     Q   And when would that have occurred?
13         MR. RICCARDULLI: Objection.
14     A   That would have occurred at just the
15 time that we had to do that, and I frankly
16 don't know what that date was. I do know that
17 we met the requirement. We got all the
18 discovery documents into the proper place at
19 the proper time.
20     Q   Were any documents -- and I
21 apologize, sir, because I have the benefit of
22 knowing what has been produced.
23     A   Sure.
24     Q   Were any original work product that
25 were generated, spreadsheets, correspondence

Page 104

1  from Mr. Kero to you, any of that material
2  included in the materials produced to the
3  defendants?
4          MR. RICCARDULLI: Objection.
5      A   Her job is to collate and then
6  forward every single thing that we have that's
7  enabled us to make these -- to create these
8  opinions, but we don't save drafts, we don't
9  save worksheets, we don't save documents that
10 are just in progress.
11     Q   Fair enough, drafts, but how about
12 Mr. Kero sending you pieces of information,
13 correct, for you to review? And you are the
14 named person on here and that is the
15 information on which you base your opinion;
16 that's correct?
17     A   What he sends me are pieces of a
18 document that we've received that I haven't
19 had a chance to review because Ms. Lowell
20 sends that document to Mr. Kero because that's
21 his area in which he's helping me. So Mr.
22 Kero then looks at it and says -- or makes a
23 decision on what's really important as it
24 relates to a potential opinion that we will
25 have and that's what we correspond about.

Page 105

1      Q   Do you know if prior to the issuance
2  of your expert report did Mr. Davis, to your
3  knowledge, ever run a model produced by
4  Malcolm Pirnie which was an MT3D model of two
5  sites adjacent to Station 6?
6          MR. RICCARDULLI: Objection.
7      A   I don't know.
8      Q   Do you know which model I'm
9  referring to?
10     A   No, I don't.
11     Q   Do you know that Malcolm Pirnie
12 conducted modeling of -- do you know if
13 Malcolm Pirnie conducted any modeling of two
14 sources next to Station 6?
15         MR. RICCARDULLI: Objection.
16     A   I do know that Malcolm Pirnie has
17 identified two stations close to Station 6 as
18 potential sources.
19     Q   Have you reviewed any of the
20 modeling associated with that?
21     A   No, I haven't.
22     Q   Have you reviewed a report entitled
23 "2007 VOC Removal Alternatives Analysis"?
24         MR. RICCARDULLI: Objection.
25     A   I don't recall that I have, no.

Fletcher G. Driscoll, Ph.D.

Page 186

1  MR. RICCARDULLI: Objection.
2  THE WITNESS: Active
3  remediation let's say in terms of soil
4  removal would be much, much greater, of
5  course, than any sort of sense of
6  bioremediation over a very short period
7  of time.
8  BY MR. GREENE:
9  Q  So if a site is not going under
10  active remediation, would it likely be present
11  in the aquifer for a longer period of time?
12  MR. RICCARDULLI: Objection.
13  A  I think I'd like to just add to my
14  last answer.
15  Q  Sure.
16  A  The likelihood of a large spill to
17  be undetected or unreported I think would be
18  small, that a large spill would be obviously
19  noted by somebody and an action would be
20  taken. So in your hypothetical, I would
21  presume that most of those undiscovered spills
22  would be fairly small in size and so their
23  ultimate effect on a groundwater system would
24  be less than probably the typical spill that
25  you might have in a system.

Page 187

1  Q  Have you -- go ahead, sir. Are you
2  finished?
3  A  Typical spill that you would have in
4  a system.
5  Q  In the course of your work on this
6  project, have you reviewed a report issued by
7  the New York State Department of Environmental
8  Conservation called the USEPA 2007 Pilot
9  Study?
10  A  I can't recall.
11  Q  Sir, I'm going to refer you to your
12  fourth opinion. Excuse me. I'm going to
13  refer you to your --
14  A  Are we through with Maguire's?
15  Q  We are through for now with that
16  one.
17  Page 12. Your second opinion. I
18  misspoke. Did you have assistance in drafting
19  this portion of the report?
20  A  In writing the report?
21  Q  Did you have assistance in gathering
22  the information in writing this section of the
23  report?
24  A  Yes, sir. We've already identified
25  those individuals.

Page 188

1  Q  Correct, we have generally. And I
2  just want to know: Which individuals assisted
3  you with this specific section of the report?
4  A  I'm not sure. It was probably David
5  Mitchell that would have come up with some of
6  the data here.
7  Q  Have you ever -- can you tell me
8  what a consent order is?
9  A  Yes, an agreement with the
10  government or with a regulatory body that
11  certain actions will be taken. And the reason
12  the consent order has been enacted is that up
13  until that time, there hasn't been compliance
14  with the particular regulation.
15  Q  Have you ever prior to today been
16  asked to give testimony regarding legal
17  documents such as legal complaints or consent
18  orders?
19  A  We may have operated under consent
20  orders in the past at various sites, but
21  clearly I'm not a lawyer and so, therefore, I
22  couldn't -- I can't give legal advice.
23  Q  Correct, but did you personally
24  review the documents that are cited within the
25  first portion of Section 2 that outline

Page 189

1  certain consent orders and complaints filed by
2  EPA and DEC against the City?
3  A  I didn't review those documents, the
4  consent orders.
5  Q  You didn't review the documents?
6  A  I didn't review the consent orders,
7  no. If Mr. Mitchell actually helped me on
8  this thing, I'm sure he looked at those.
9  Q  Do you know why you were asked to
10  review the consent orders as part of your work
11  on this case?
12  MR. RICCARDULLI: Objection.
13  A  One of the things that we noticed
14  early on in the work that Mr. Terry did is
15  that he seemed to be ignoring the public
16  release sites in this urban environment. And
17  so we wanted to determine how many there were
18  and whether they had been in compliance in the
19  same fashion that industry had been urged to
20  update their tank systems and do their
21  remediation and everything else. And so we
22  just wanted to see what role those facilities
23  played in the overall contamination by MTBE of
24  the Queens aquifer.
25  Q  Did Mr. Mitchell in working on this

48 (Pages 186 to 189)

**Page 190**

1  report receive any assistance from counsel in
2  reviewing the consent orders and complaints
3  that are referenced in the first part of this
4  section?
5     A  I'm sure he did not.
6     Q  And is he a lawyer?
7     A  No.
8     Q  Does he have any familiarity with
9  the RCRA regulations?
10    A  Well, I do because obviously we
11 worked on them for many, many years, and
12 several of the people I have in the company
13 have worked under RCRA orders before at other
14 sites.
15    Q  Do you know if Mr. Mitchell has?
16    A  I don't recall.
17    Q  Do you know what aspect of the RCRA
18 regulations you -- well, what aspect of the
19 RCRA regulations have you worked on?
20    A  Well, I think it would be fair to
21 say my experience is mostly under CERCLA, but
22 occasionally we've gotten involved in a RCRA
23 project, especially when I was working with
24 Geraghty and Miller. We do not do -- our
25 company does not do RCRA type work on sites.

**Page 191**

1  We don't haul hazardous waste or do the normal
2  things that a consultant would do on the site,
3  but during the time I was with Geraghty and
4  Miller, I had to become pretty familiar with
5  RCRA regs and RCRA rules.
6     Q  Did you ever work on a project
7  regarding the RCRA's underground storage tank
8  regulations?
9     A  I can't recall whether I did or not.
10    Q  Do you know if Mr. Mitchell, do you
11 know if he has ever worked on a matter
12 regarding the UST regulations in RCRA?
13    A  I don't know. He worked for another
14 consultant before we hired him and he may well
15 have done that there. While he's been with
16 us, he has not.
17    Q  And when you describe -- and I've
18 seen this on your resume. You describe that
19 you've worked on RCRA in the past; correct?
20    A  Well, in conjunction with Geraghty
21 and Miller and their activities, yes.
22    Q  And when you were working on it, you
23 were working primarily on transport storage
24 and disposal facility work?
25    A  Mostly just in the identification of

**Page 192**

1  how the waste got into the environment. In
2  other words, try to look at the facility, look
3  at the operations, try to judge the volume of
4  the particular chemical that was used there,
5  how it got out of the building and into the
6  environment and then how it spread on the
7  site.
8     Q  Is Mr. Mitchell qualified to
9  interpret legal documents like consent orders
10 and legal Complaints?
11       MR. RICCARDULLI: Objection.
12    A  He's not a lawyer so I have to say
13 no.
14    Q  Are you qualified to interpret legal
15 documents such as consent orders and legal
16 Complaints?
17    A  No, I'm not.
18       MR. RICCARDULLI: Objection.
19    Q  You can answer it. I'm sorry.
20    A  No, I'm not.
21    Q  Okay. I want to refer you to Page
22 14. And you have a subopinion that begins:
23 "At least 19 confirmed or highly likely
24 releases of MTBE to groundwater have occurred
25 at publicly-owned sites in and near the JWS

**Page 193**

1  service area."
2        Do you see where I'm reading?
3     A  No.
4     Q  Page 14.
5     A  Is it a footnote?
6     Q  It is the heading of that section.
7     A  Oh, yes, I see.
8     Q  Who's responsible for reviewing
9  information regarding the City's underground
10 storage tanks?
11    A  I believe Mr. Mitchell came up with
12 this estimate, but Rhea Lowell may have
13 assisted him.
14    Q  And what data sources did he use to
15 come up with this estimate?
16    A  I can't tell you that.
17    Q  Did you review any of the City
18 sites?
19    A  No, I have not.
20    Q  In Paragraph 11, there's certain
21 criteria that are used to classify City sites
22 and there's four categories. There's
23 confirmed, likely, possible, and unlikely.
24 Who developed the criteria, those four
25 criteria?