UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
PRODUCTS LIABILITY LITIGATION

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This document relates to:

*City of New York v. Amerada Hess Corporation, et al.,*
No. 04-CV-3417 (SAS)

Dockets.Justia.com

**EXXONMOBIL'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY AND OPINION OF MARTIN TALLETT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT .................................................................................................... 1

I.   TALLETT IMPERMISSIBLY OFFERS "NEW" EXPERT ANALYSIS WHICH
     MUST BE STRICKEN PURSUANT TO FED. R. CIV. P. 37(C)(1) ............................ 1

II.  TALLETT FAILS TO "REHABILITATE" HIS MARKET SHARE OPINION
     AND FURTHER UNDERSCORES WHY THIS OPINION FAILS TO SATISFY
     THE DAUBERT/KUMHO CRITERIA ........................................................... 3

III. LIKEWISE, TALLETT FAILS TO ESTABLISH THAT HIS OPINION AS TO
     THE FEASIBILITY OF ETHANOL AS AN ALTERNATIVE TO MTBE IS A
     VAILD "EXPERT OPINION." ................................................................. 6

CONCLUSION ................................................................................................ 10

# INTRODUCTION

Defendant Exxon Mobil Corporation ("ExxonMobil") has moved pursuant to Federal Rule of Evidence ("FRE") 702 to exclude the testimony of Plaintiff City of New York's ("Plaintiff") putative expert, Martin Tallett, as to his opinions regarding (a) "market share" and (b) ethanol blended gasoline as a feasible alternative design to gasoline with MTBE. Plaintiff attempts to stave off such a determination by offering new opinion and analysis from Tallett. This Plaintiff cannot do. Such new analysis must be stricken pursuant to Fed. R. Civ. P. 37(c)(1). Notwithstanding this fact, however, Plaintiff's Opposition ("Opp.") does nothing to rehabilitate Tallett's opinions; nor does it rebut ExxonMobil's arguments for exclusion. Because of this, Tallett's opinions fall far short of the requirements of FRE 702 and articulated in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and must be excluded.

# ARGUMENT

## I. TALLETT IMPERMISSIBLY OFFERS "NEW" EXPERT ANALYSIS WHICH MUST BE STRICKEN PURSUANT TO FED. R. CIV. P. 37(C)(1).

At deposition, Tallett admitted that he had not actually tried to determine ExxonMobil's "market share" in Queens or in New York Harbor. *See* Motion at 2. To remedy this failure, Plaintiff now tries to shoehorn Tallett's untimely calculations into this case under the guise of a "supporting declaration" to its Opposition. *See* Tallett Decl. at ¶¶ 20-23; Pltf's Ex. I. Moreover, while Tallett admitted to his fundamental misunderstanding of the dataset (and, thus, the method) he championed as appropriate for calculating market shares, and confessed he did not know what "role" his suggested method could still serve in this case (Def. Motion at 5-6), he now has undergone another change of heart – one prompted by his consideration of (and calculations with) an entirely new dataset – namely Form-EIA 782A "Refiner Sales" data, never before discussed in any Tallett report. *See* Tallett Decl. at ¶¶ 21-23. In fact, Tallett goes so far as to

introduce a host of new comparative calculations using this new data to bolster his newfound confidence in his proposed method. *Id.*; Pltf's Ex. I.

However, under the law this untimely "expert" submission must be stricken. Fed. R. Civ. P. 26(a)(2)(B) requires that the report pertaining to the proposed opinions of an expert and their factual basis must be 'detailed and **complete**.'" *Lava Trading Inc. v. Hartford Fire Ins. Co.*, No. 03-Civ-7037, 2005 U.S. Dist. LEXIS 4566 at **14-15 (S.D.N.Y. Feb. 14, 2005) (citing 1993 Advisory Committee Notes at 160) (emphasis added). Notably, expert depositions are to take place only after the expert provides the complete report. *Id.* citing Fed. R. Civ. P. 26(b)(4)(A). Where a party fails to comport with these rules, and attempts to use its response to a *Daubert* motion to introduce "new explanations, new analyses and a set of demonstrative exhibits never before produced," it only "underscores the failure of the original...to describe the essential details of his analysis." *Id.* at *18. Moreover, it forecloses defendants from meaningful examination of those opinions or calculations through deposition. *Avance v. Kerr-McGee Chem. LLC*, No. 5:04CV209, 2006 U.S. Dist. LEXIS 87224 at *22 (E.D.Tex. Nov. 30, 2006)(consideration of such new information in a *Daubert* response would be unfair and prejudicial without opportunity for deposition). Accordingly, such a submission must be stricken pursuant to Fed. R. Civ. P. 37(c)(1).[1] *Lava*, 2005 U.S. Dist. LEXIS 4566 at *19 (noting that such untimely submissions are subject to "near automatic exclusion" under Rule 37(c)(1)); accord

---

[1] Notably, Plaintiff has not demonstrated that its delay in providing Tallett's new analyses was "substantially justified." Just like the plaintiff in *Lava*, the City had ample time to provide the required expert submissions to ExxonMobil, but only disclosed the "new" analyses when faced with a *Daubert* challenge. *Id.* at **19-20. Nor was Plaintiff's argue failure to timely produce Tallett's new analyses "harmless" – ExxonMobil was unable to examine Tallett on his calculations and "new" dataset at deposition; and ExxonMobil's expert rebuttal reports are long since final. *Id.* at *20.

*Major v. Astrazeneca, Inc.*, No. 5:01-CV-618, 2006 U.S. Dist. LEXIS 65225 at **26-27 (N.D.N.Y. Sept. 13, 2006); *Lippe v. Bairnco, Corp.*, 99 Fed. Appx. 274, 280 (2d Cir. 2004) ("[F]airness does not require that a plaintiff...be afforded a second chance to marshal other expert opinions and shore up his case" when expert submission was untimely).

Because the very purpose of Rule 26(a)(2)(B) is to "lock in" expert opinion, and eliminate unfair surprise to the opposing party, "the appropriate sanction in this case [is] preclusion." *Lava*, 2005 U.S. Dist. LEXIS 4566 at *63 (citing *Salgado v. G.M. Corp.*, 150 F.3d 735, 740-43 & n. 6 (7th Cir. 1998)).

## II.   TALLETT FAILS TO "REHABILITATE" HIS MARKET SHARE OPINION AND FURTHER UNDERSCORES WHY THIS OPINION FAILS TO SATISFY THE *DAUBERT/KUMHO* CRITERIA.

Even if the Court chooses to consider Tallett's "new" and untimely analyses, his opinion fails to satisfy the *Daubert/Kumho* standards. At bottom, Tallett is still unqualified. His admitted ignorance of the distribution system that supplies Queens and New York Harbor (see Def. Motion at 4) leaves him incapable of actually analyzing that market, or critiquing the market share analyses proffered by experts who **do** understand this system and have issued their analyses accordingly. Nor does Tallett squarely answer how, without understanding the distribution of product in the relevant market, he can so confidently conclude that his approach is the best possible means to calculating a defendant's (or non-defendant's) share of that market. Tallett also does not explain what has changed since admitting that he did not know if his method was more accurate than that of ExxonMobil's experts, as he had not examined the "workings" of any of these methods. Tallett Dep. at 171, attached here as Ex. A. Instead Plaintiff and Tallett simply argue that such knowledge is "not relevant" or "necessary" (Tallett Decl. at ¶¶25-26) in light of Tallett's purported expertise – which purportedly "includes a

thorough familiarity with EIA and other data on crude and product flows into the US northeast" – "expertise" that informs his selection of a "superior" methodology. *Id.* at ¶¶ 11, 26.

But it is not "expertise" that led Tallett to originally proffer EIA 782C data as invariably capturing each manufacturer's share in this case, only to backpedal when he realized that this data does *not* reliably capture all manufacturers' supply of product to New York State, but rather the supplies brought into the state by parties "further down the supply chain" who merely held title at some later point in distribution. Ex. A at 167. And it is the same lack of "expertise" that leads him to his latest methodological gaffe, and underscores that Tallett's method is wholly unreliable.

Tallett remains unburdened by any explanation of how the 782C state-wide (not Queens) sales (not supply) data of parties who may or may not be refiners adequately measures the shares of manufacturers who supply the Queens market. Nor does Tallett advance any reason that New York State sales data is somehow a valid proxy for RFG supply to Queens. Tallett nonetheless re-embraces his method and his opinion.[2] Opp. at 9. In doing so, Tallett fails to recognize that his 782C calculations still do not provide the Court with complete market share information for

---

[2] All Tallett offers as justification for his proposed method is a re-hash of criticisms already levied (and rebutted) at Defendants' experts in his report. Opp. at 5, 7-10. Tallett ignores the New York Harbor because he claims that there is no "standard definition" of the same within the industry, and argues that ExxonMobil's expert analyses are invalid for focusing on this market. He cares little that both the City, his client, and this Court have affirmed that this *is* the relevant market to examine. See *12/13/06 Letter from S. German to S. Raphael*, defining New York Harbor as the relevant market for all focus cases; see also *In re MTBE Prod. Liab. Litig.*, 591 F.Supp.2d 249, 271 (S.D.N.Y. 2008). Instead, Tallett argues that because ExxonMobil's experts do not agree on the definition of New York Harbor, their methods are unreliable. But that is a red herring. The sole difference between these experts' definitions is O'Brien's inclusion of the Northville distribution system, which Montgomery excludes so as to provide a conservative estimate of ExxonMobil's share – one which may *inflate*, not decrease, the share – which exclusion Montgomery explains in his report. *See* Expert Report of W. David Montgomery at 7.
(continued...)

those companies that actually manufactured the gasoline containing MTBE. Yet Plaintiff now promotes Tallett's theory as a method that can be used to provide "an incontrovertible allocation of market shares for RFG in New York State among all defendants and non-defendants" (*id.* at 6-7), in spite of the fact that only "prime suppliers" report such sales information to the EIA. This new "gold standard" has apparently been revealed to Tallett by cross-checking the 782C data against the separate (and previously unmentioned) 782A data, which, Tallett alleges, validates his conclusions. Tallett Decl at ¶21.

Of course, Tallett does not explain how this comparison of apples to oranges is apt, though these are two different reporting protocols, conducted for different purposes, capturing numerous different "players." *Id.* at ¶¶21-23. Nor does Tallett explain how his new calculations using 782A data lead inexorably to his conclusion that "ExxonMobil does not transfer petroleum to other prime suppliers" (*id.* at ¶32) – a rather noteworthy leap for someone so averse to the use of assumptions in a market share analysis. *Id.* at ¶13. Rather, Tallett again asks the Court to accept his *ipse dixit* that his entire comparison is valid. The EIA disagrees, however. Indeed, in published reports, the EIA catalogues the many substantive differences between the 782A and 782C datasets and warns that "caution should be exercised when comparing sales volumes between refiners and prime suppliers...."[3] By the agency's own estimation, one dataset does not confirm or necessarily correlate with the other. And, notably for this case, neither of these datasets focus on the relevant market (Queens), nor a manufacturer's supply of product to that

---

Indeed, this difference is simply an allowance by Montgomery to avoid double-counting volumes he has already accounted for.
[3]http://www.eia.doe.gov/pub/oil_gas/petroleum/data_publications/petroleum_marketing_annual/current/pdf/enote.pdf
http://www.eia.doe.gov/pub/oil_gas/petroleum/feature_articles/2004/comparison782/comparison782.pdf

market. Such an apples to oranges comparison must be excluded. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *Barrett v. Black & Decker Inc.*, No. 06-Civ-1970, 2008 u.S. Dist. LEXIS 108787 at *17 (S.D.N.Y. Aug. 5, 2008).

Tallett has not even properly "done the math" with these misapplied datasets. In his Exhibit "I," Tallett uses ExxonMobil 782A RFG volumes as a numerator and New York State total RFG 782C volumes as a denominator, and calculates a percentage share for ExxonMobil. Tallett is utilizing two separate measurements of volume to derive ExxonMobil's share. Should he want to compare ExxonMobil's 782A data to that for New York State, he should have calculated using the respective 782A volumes – not a mix of the two. Put simply, Tallett's self-proclaimed expertise and "thorough understanding" of EIA data seem to have deserted him, rendering his "validation" suspect, his expert qualifications compromised, and his methodology (still) unreliable.

Because Tallett's conclusions are not based on reliable data, principles and methodologies, and because Tallett's opinions do not follow from the underlying data, principles and methodologies, his "market share" opinion must be excluded. *Daubert*, 509 U.S. at 590; Def. Motion at 5.

## III.  LIKEWISE, TALLETT FAILS TO ESTABLISH THAT HIS OPINION AS TO THE FEASIBILITY OF ETHANOL AS AN ALTERNATIVE TO MTBE IS A VAILD "EXPERT OPINION."

Plaintiff attempts to establish Tallett's expert qualifications and reliability to defeat ExxonMobil's instant argument through misdirection, basically weaving Tallett's resume´ and proclaimed "expertise" together with a number of his disjointed opinions and "hypotheticals" in the hope that this patchwork analysis might suffice to lead the Court from the proper determination here. What Plaintiff cannot avoid, however, is Mr. Tallett's admissions, and the requirements of Rule 702.

Plaintiff does not deny that under New York law it carries the burden of establishing a "feasible alternative" to MTBE to make out its product liability claim, and therefore must show that any putative "feasible alternative" was necessarily "commercially practicable" – not just technologically possible. Def. Motion at 8-9. It follows that such proof must be grounded in reality, not speculation, and account for *all* relevant variables that can impact such a determination. *Guarascio v. Drake Assoc. Inc.*, 582 F.Supp.2d 459, 464 (S.D.N.Y. 2008). In this case, because any evaluation of ethanol as a "feasible alternative" must include the consideration of whether it was commercially practicable, Plaintiff has to at least establish the sufficient supply and the sound economics of that potential option. At bottom, if there was not enough ethanol to ensure a continued supply, or the cost (in light of all factors) was prohibitive, it cannot have been a feasible alternative.

Tallett's proffered opinion does not and cannot illuminate this point. Accordingly, it cannot assist the trier of fact, but rather would confuse and misinform a jury. Tallett admits that he is no economist. *Id.* at 9. Tallett also confesses that he has no understanding of the retail-level costs and/or impact of using ethanol as an alternative to MTBE; and given that he does not "regard [him]self as an expert in that [he's] never worked in the distribution end of the business itself," he is admittedly unqualified to opine about the distribution costs and other distribution-related issues that would be implicated if a refiner used ethanol instead of MTBE. *Id.* at 10. Indeed, Plaintiff claims such expertise is "not necessary for, or even related to," his opinions. Opp. at 13. Most importantly, Tallett disclaims any expertise whatsoever "in the economics of corn or ethanol production." Tallett Decl. at ¶45. In fact, Tallett admitted he was not even retained to offer such an analysis. Def. Motion at 9-10.

Yet Tallett now claims that it is not "necessary for me to have such an expertise to proffer the opinion that it would have been feasible for the petroleum industry to have used ethanol instead of MTBE." Tallett Decl. at ¶45. In other words, Tallett has unilaterally authorized his own ability to opine as to commercial practicability – though his opinion must be (and is) completely divorced from any expertise as to ethanol production or related costs that will undeniably impact this determination. But where an expert "attempts to serve as his own authority," his opinion "lacks a reliable foundation." *Landau v. Spenuzza, Inc.*, No. 04-Civ-5504, 2009 U.S. Dist. LEXIS 27379 at *17 (E.D.N.Y. March 31, 2009) Indeed, Tallett's conclusory opinion just states what Plaintiff seeks to prove. However, "[r]eliance on – and indeed the rubber-stamping of – the client's vague, self-interested and untested beliefs does not constitute a reliable method of estimation, does not reflect any meaningful expertise on the part of the estimator, and most assuredly doers not assist the trier of fact." *Lava*, 2005 U.S. Dist. LEXIS 4566 at **54-55. Plaintiff's mere recitation of Tallett's sundry experience in the industry (Opp. at 3-5, 14), which is unrelated to expertise that might inform "commercial practicability," does not overcome this principle, or establish his qualifications.

Nor does Plaintiff establish that Tallett's method is reliable. ExxonMobil explains that Tallett offers nothing other than his resume´ to support the idea that a selective review of some defendants' internal documents (discussing ethanol and MTBE) amounts to an expert methodology that is a platform for Tallett's "feasibility" opinion. Def. Motion at 11. Plaintiff answers that "[i]t is incomprehensible how ExxonMobil can claim that it cannot identify the documents under consideration" in Tallett's supposedly "expert methodology." Opp. at 15. ExxonMobil does not contend that it cannot identify those documents; just that their significance has not been adequately established. ExxonMobil understands what Tallett did here, but it is

entirely unclear from the record that this approach amounts to an analysis of sufficient "empirical data, technological evidence, foundational facts or reference to industry standards" to qualify as "reliable." Def. Motion at 11. Indeed, "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Rypkema v. Time Mfg. Co.*, 263 F.Supp.2d 687, 693 (S.D.N.Y. 2003).

Plaintiff also fails to explain how Tallett's description of an imaginary world where MTBE was not an option to refiners under the Clean Air Act can assist the trier of fact determine whether ethanol was a feasible alternative. Notably, Plaintiff's Opposition skips over Tallett's flight of fancy entirely, leaving it to Tallett alone to explain the viability of his "method." And he does try. Indeed, Tallett's explanation even accounts for his admitted lack of expertise in areas that should inform this opinion. Put simply, Tallett argues that no such expertise is required to imagine "that if MTBE had been taken off the table, which should have been the case because of the groundwater contamination issues related to MTBE that were known throughout the industry, ethanol could have been used to meet EPA RFG requirements, in terms of both technical possibility *and* economic feasibility." Tallett Decl. at ¶¶45-46. However this venture into the realm of "what if" is not germane to the question this Court has to answer. *That* question is whether ethanol was a feasible alternative in the "real world." And because Tallett fails to explain how his fanciful "method" is or could be verifiable, subjected to peer review or publication, or generally accepted by the scientific community, it cannot be "reliable." "That the required exercise is unavoidably hypothetical does not permit a purported expert witness to use his credentials to legitimize what amounts to a client's wishes." *Lava*, 2005 U.S. Dist. LEXIS 4566 at *47; see also *Kass v. The West Bend Co.*, No. 02-cv-3719, 2004 U.S. Dist. LEXIS 22217 at *16 (E.D.N.Y. Nov. 4, 2004) (proper question is "whether manufacturer could have designed a safer product, not on whether expert's proposed but untested hypothesis might bear fruit").

Moreover, in light of Tallett's admission that he does not even "assert that it would have been 'competitive' for any one petroleum company to have used ethanol in place of MTBE in a market context where both were allowed" (*id.* at ¶47), it is clear that such opinion does not truly advance the point at issue, and can only be confusing to the jury and, therefore, prejudicial to ExxonMobil. On this basis alone it should be excluded. See Fed. R. Evid. 403.

In sum, Tallett's opinion as to ethanol as a feasible alternative to MTBE is, at best, specious and incomplete. Because it fails all of the *Daubert* criteria, and because it can only be confusing and misleading, it must be excluded here.

## CONCLUSION

For each of the foregoing reasons, Defendants respectfully request that this Court exclude the opinion evidence of Plaintiff's expert Martin Tallett as to (a) "market share" and (b) ethanol-blended gasoline as a feasible alternative design to gasoline blended with MTBE.

Dated: New York, New York
      June 4, 2009

Respectfully submitted,

Peter J. Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Stephen J. Riccardulli (SR 7784)
Michael J. Dillon (MD 4553)
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173-1922
Tel: (212) 547-5400
Fax: (212) 547-5444

*Attorneys for Exxon Mobil Corporation*

## CERTIFICATE OF SERVICE

Michael J. Dillon, pursuant to 28 U.S.C. 1746, hereby declares under penalty of perjury, that on the 4th day of June, 2009, I caused to be served by electronic means upon counsel for plaintiff, a true and correct copy of EXXONMOBIL'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY AND OPINION OF MARTIN TALLETT.

Michael J. Dillon