**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898<br>MDL 1358 (SAS)<br>M21-88 |
| ------------------------------------------------------------------- x | ECF Case |
| **This document relates to the following case:** | |
| *City of New York v. Amerada Hess Corp., et al.*<br>Case No. 04 Civ. 3417 | |

------------------------------------------------------------------- x

**PLAINTIFF CITY OF NEW YORK'S TRIAL MEMORANDUM FOR PHASE ONE (EXHIBIT 7 OF THE PROPOSED PRETRIAL ORDER)**


# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................................... ii

I.  **FACTS** ............................................................................................................................. 1

    The NYC Groundwater System ..................................................................................... 2

    The Station 6 Wells ........................................................................................................ 3

    Station 6 Planning and Pilot Testing .............................................................................. 4

    Station 6 Design Work ................................................................................................... 6

    The City's Dependability Study ..................................................................................... 7

II.  **ARGUMENT** .................................................................................................................. 7

    A.  The Appropriate Burden of Proof for the City in Phase One is Preponderance of the Evidence ................................................................................................................... 7

    B.  Reasonable Certainty is Not Appropriate for this Case ........................................... 9

III. **CONCLUSION** ............................................................................................................. 11

# TABLE OF AUTHORITIES

**Federal Cases**

*Edmonds v. Purdy,*
   Slip Copy, 2009 WL 483189 (S.D.N.Y. Feb. 26, 2009) ............................................................. 9

*Ellis v. Brotherhood of Railway Clerks,*
   685 F.2d 1065 (9th Cir. 1982) ................................................................................................... 8

*Fifth Ave. of Long Island Realty Associates v. Caruso Management Co., Ltd.,*
   Slip Copy, 2009 WL 412126 (E.D.N.Y. 2009) ......................................................................... 9

*Glew v. Cigna Group Ins.,*
   590 F.Supp.2d 395 (E.D.N.Y. 2008) ......................................................................................... 7

*Henry v. Dept. Corrections,*
   131 Fed.Appx. 847 (3d Cir. 2005) ............................................................................................. 8

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation,*
   Slip Copy, 2008 WL 5188193 (S.D.N.Y., Dec. 09, 2008) .................................................... 9, 10

*In re MTBE,*
   591 F.Supp.2d 259 (S.D.N.Y. 2008) ..................................................................................... 9, 10

*Kyles v. Whitley,*
   514 U.S. 419 (1995) ................................................................................................................... 9

*Mask v. McGinnis,*
   233 F.3d 132 (2d Cir. 2000) ..................................................................................................... 10

*Nissho-Iwai Co. v. M/T Stolt Lion,*
   719 F.2d 34 (2d Cir.1983) ......................................................................................................... 8

*Porter v. American Export Lines, Inc.,*
   387 F.2d 409 (3d Cir.1968) ....................................................................................................... 8

*Ramsey v. United Mine Workers of America,*
   401 U.S. 302 (1971) ................................................................................................................... 8

*South-East Coal Co. v. Consolidation Coal Co.,*
   434 F.2d 767 (6th Cir.1970), cert. denied, 402 U.S. 983 (1971) .............................................. 8

*Strickler v. Greene,*
   527 U.S. 263 (1999) ................................................................................................................... 9

*The Millgard Corp. V E.E. Cruz/Nab/Frontier-Kemper*,
  2007 WL 2388902 *4 (S.D.N.Y. Aug. 21, 2007) ................................................................ 10

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
  487 F.3d 89 (2d Cir. 2007) ................................................................................................ 10

*U.S. v. District Council of New York City*,
  2007 WL 2697135 at *13 (S.D.N.Y. Sept. 17, 2007) ........................................................ 10

*Ventimiglia v. Tishman Speyer Archstone-Smith Westbury, L.P.*
  588 F.Supp.2d 329 (E.D.N.Y. 2008) .................................................................................. 9

*Weitzman v. Stein,*
  897 F.2d 653 (2d Cir.1990) ................................................................................................ 9

*Williams v. Taylor*,
  529 U.S. 362 (2000) .......................................................................................................... 11

*Yi v. Sterling Collision Centers, Inc.*,
  480 F.3d 505, 507 (7th Cir. 2007) ...................................................................................... 8

**State Cases**

*Lillian F. v. Superior Court*,
  206 Cal.Rptr. 603, 160 Cal.App.3d 314 (CA 1984) ......................................................... 11

*Mathis v. Hargrove*,
  888 A.2d 377, 166 Md.App. 286 (Md. 2005) .................................................................... 8

*Mutual of Enumclaw Ins. Co. v. McBride*,
  667 P.2d 494, 295 Or. 398 (Or. 1982) ................................................................................ 8

*Rixmann v. City of Prior Lake*,
  723 N.W.2d 493 (Minn.App. 2006) .................................................................................... 8

*Ralston Oil & Gas Co. v. July Corp.*,
  719 P.2d 334 (Colo.App.1985) ........................................................................................... 9

**Statutes, Regulations, and Treatises**

28 U.S.C. § 2254(d)(1) ............................................................................................................ 10

Gen. City L. § 20(2), ¶ 4 ..................................................................................................... 2, 3

Restatement (Second) of Torts § 433 (1977) ............................................................................ 9

Plaintiff the City of New York (the "City") hereby submits its Trial Memorandum for Phase One of this trial. The question presented in Phase One of this trial is whether the City will build Station 6 sometime within the next 15 years, assuming it has the money necessary to do so immediately available. The evidence will show that the answer is an unqualified yes.

## I.  FACTS

At a recent hearing in this matter, Defendant's counsel told the Court - repeatedly - that the law authorizing the acquisition of Station 6 and the other wells from the Jamaica Water Supply Company required the City to shut down those wells.

> MR. SACRIPANTI:  And what makes this case particularly interesting is that the reason the City bought the water system is that the legislature made them buy it because it was bad and they wanted it shut down.

Transcript of Hearing in this Action (June 2, 2009) 26:21-24.

> THE COURT:  The legislature made them buy it because it was so bad?
> MR. SACRIPANTI:  Right.  And they actually had to replace the water.  There was a statute passed.  This Jamaica water system, before the City had it, was of such poor quality that the legislature got together and they passed a law requiring, forcing the City of New York to buy the water system and take it out of service.
> THE COURT:  And take it out of service?
> MR. SACRIPANTI:  Absolutely.

*Id.* at 27:12-19.

> MS. TEMPLE:  . . . a law was passed and the City had to buy the Jamaica water supply system.  And since 1996 they systematically shut it down and replaced it with surface water.
> THE COURT:  They were forced to buy it to shut it down?
> MR. SACRIPANTI:  That's in the law.

*Id.* at 28:9-20.  However, Defendant's counsel mischaracterized the plain words of the statute, which required the City as part of the acquisition "to maintain and operate" those wells:

> "Notwithstanding any general, special or local law to the contrary, the city of New York is hereby required to acquire by condemnation, ***and to maintain and operate***, all or part of the plants, properties, mains, pipes, facilities, easements,

1

> franchises and other real or personal property of the Jamaica Water Supply Company constituting or related to the water distribution system located in the city of New York. . . ."

NY General City Law Section 20 (2) [fourth paragraph] (emphasis added).

At trial the City will present the following evidence showing that this is precisely what the City has done and intends to do with these wells.

**The NYC Groundwater System**

The City, through its agency the City Department of Environmental Protection ("DEP"), supplies clean and safe drinking water to more than 8 million residents of the City, almost 1 million residents of counties north of the City, and millions of daily commuters and visitors to the City. DEP manages the City's water supply resources to provide the highest quality water to consumers, to maintain consumer confidence in the City's drinking water, and to anticipate and plan for short- and long-term future water quality and quantity issues so as to ensure the continued availability of exceptional water sufficient to meet demand.

The City owns and operates a network of reservoirs north of the City that supply an average of 1.2 billion gallons/day of surface water to consumers. The City also owns and operates 68 groundwater wells ("the Groundwater System") in southeast Queens, capable of supplying approximately 80 million gallons/day on a sustained basis to consumers in Queens.

The City's groundwater wells draw water from the Brooklyn-Queens Aquifer system, three hydrogeologically distinct aquifers that underlay Long Island. The shallowest aquifer is the Upper Glacial Aquifer. Next is the Jameco-Magothy combined aquifer formation, which is separated in places from the Upper Glacial Aquifer by a clay layer known as Gardiners Clay. The deepest aquifer is the Lloyd Aquifer, which is separated by the Raritan Clay layer from the Jameco-Magothy Aquifer. In 1983, the United States Environmental Protection Agency

designated the entire Brooklyn-Queens Aquifer system as a sole source aquifer under the federal Safe Drinking Water Act.  New York State statute prohibits drilling any new water supply wells into the Lloyd Aquifer.

In 1986, the New York State Legislature enacted a statute requiring the City to acquire and "maintain and operate" the groundwater wells in Queens, which were then owned and operated by the Jamaica Water Supply Company ("JWSC"), the last private water supply company in the City.  *See* Gen. City L. § 20(2), ¶ 4.  The City purchased the Groundwater System in May 1996 for approximately $148 million.  Before the City's acquisition, JWSC customers in southeast Queens paid higher rates for lower quality water than all other City consumers, and repeatedly complained about their inequitable treatment.  Shortly after the City's acquisition, the New York State Department of Environmental Conservation issued the City a permit to operate the wells, as required under State law.  This permit, both originally and as recently renewed, authorizes the City to withdraw 67.964 million gallons/day from the Groundwater System.

**The Station 6 Wells**

Station 6 consists of six wells – 6, 6A, 6B, 6C, 6D, and 33 – which the City intends to return to regular active use, and for which the City has committed to building a state-of-the-art treatment facility.  Wells 6, 6A, 6B, 6D, and 33 draw from the Upper Glacial Aquifer; well 6C draws from the currently pristine Lloyd Aquifer and is not part of this litigation.  Drawing from all six wells, Station 6 will treat up to 10 million gallons/day.  JWSC originally treated water at an earlier station 6 facility located on the same site.  The original Station 6 facility ceased operating in 1985.  Well 33 was not treated at that facility, but is located less than a quarter-mile away.

Station 6 will help fulfill several critical City needs.  It will provide southeast Queens with water in times of drought and during planned or unplanned outages, both City-wide and localized in Queens.  It will pave the way for returning the Groundwater System to more widespread use by convincing the same community that complained about JWSC water that the well system can provide water comparable to the City's upstate reservoirs.  And it will enable the City to again rely on a valuable asset owned and controlled by the City.  For these reasons, the City has continued to move Station 6 forward and include funding for the facility in its capital budget despite significant budget cuts.

**Station 6 Planning and Pilot Testing**

The City has been working since the mid-1980s to identify, assess and strategically manage its groundwater resources.  In response to a severe drought in 1985, the Mayor's Intergovernmental Task Force on New York City Water Supply Needs ("Task Force") conducted a series of studies to assess the City's long-range water supply needs and ways to meet them.  As part of its evaluation, the Task Force recommended in-depth hydrological investigation of the Brooklyn-Queens Aquifer system, as well as study of the engineering, water quality, managerial, and cost implications of using the Aquifer system to supplement the existing surface water system.

In 1994, the City partnered with the United States Geological Survey to begin a comprehensive multi-year planning study of potentially available groundwater resources, entitled the Brooklyn-Queens Aquifer Study.  A report of their findings entitled "The Feasibility Study for Use of the Brooklyn-Queens Aquifer as an Additional Potable Water Supply Source" ("BQA Study") was published in 1999.  The BQA Study considered several alternative management approaches for the Groundwater System.  Among others, the BQA Study recommended

continued use of groundwater for potable drinking water, and construction of several well clusters treatment systems to treat well water before distribution to consumers.

The BQA Study further recommended building the first well cluster treatment system on the site of the former Station 6, and using it to demonstrate to the public that high-quality drinking water, on par with the celebrated quality of the City's upstate surface water, could be provided by the Groundwater System. The BQA Study specified that Station 6 was the best site for a "demonstration plant" due to the need for water in its immediate vicinity, the availability of City-owned land for construction of a treatment plant, the presence nearby of supporting infrastructure, and the potential added benefit of reducing groundwater flooding problems in the area. It noted the efficiency of installing a clustered treatment plant on property that already contained three water supply wells, and suggested building connections to nearby Well 33 to enable treatment at Station 6.

After reviewing the BQA Study, the City concluded that construction of groundwater well cluster treatment facilities would be beneficial in meeting the City's water needs, both on an ongoing basis and as an emergency backup in case of a drought or unplanned outage impacting the upstate surface water supply. As recommended in the BQA Study, the City began with Station 6, and has since steadily advanced the Station 6 project.

As a first step, in 2001-2, the City re-drilled and re-screened the five Station 6 wells at issue in this trial. The City also retained the environmental consulting and engineering firm Malcolm Pirnie, Inc. to begin design work for a Station 6 treatment facility to remove iron and manganese, calcium carbonate ("hardness"), and possibly volatile organic compounds ("VOCs"), and to adjust pH. At the same time, the City embarked on a public outreach campaign to educate the southeast Queens community about, and gain their support for, reactivation of Station 6. At a

public meeting in 2001, DEP officials explained that the City's goal was to "provide drinking water from the Jamaica aquifers that equals, if not exceeds in excellence, that of the reservoir supply." DEP, working with consultants, convened a Citizens Advisory Committee ("CAC") in 2002 to provide the City with formal community input on Station 6 and other related projects. The CAC met publicly more than 30 times between 2002 and 2005, generating feedback on numerous aspects of the City's plans for Station 6. The City also funded the CAC to retain an expert Scientific Review Panel, whose members provided additional technical comments on the Station 6 plans. The minutes of the CAC meetings reflect community members' confidence in the proposed treatment techniques and their desire to see the project completed.

DEP constructed a demonstration plant and conducted a pilot study in 2002-3 to test and demonstrate treatment technologies for Station 6. During the pilot study, MTBE was detected for the first time in Wells 6, 6A, and 6B and at significantly higher levels (up to 350 parts per billion) than previously detected at Well 6D.[1] The City's design consultant, Malcolm Pirnie, issued its report on the results of the pilot testing in October 2003. The MTBE detections during the pilot study required revision to the design planning and budget for Station 6 to account for removal of MTBE.

**Station 6 Design Work**

Malcolm Pirnie completed the conceptual, or approximately 15%, design of the Station 6 facility, the first step in designing a City capital construction project, and issued its Conceptual Design Report in December 2004. The design then underwent review under the City's Value Engineering process, in which technical experts specifically convened for the purpose, evaluated

---

[1] Well 33 was not connected to the Station 6 demonstration plant.

6

and commented on the proposed design. These activities completed the work funded under DEP's preliminary design contract with Malcolm Pirnie.

Funding for final design has been deferred several times, most recently until fiscal year 2013 (July 2012 through June 2013), due to DEP capital budget demands and City budget cuts. Despite budget shortfalls, in 2007 DEP came up with limited funds to progress the design work for Station 6. That work consisted of preliminary analyses and additional conceptual design work for VOC treatment at the Station 6 plant, to be further expanded on in the final design.

**The City's Dependability Study**

Separate from Station 6, the City is also in the preliminary stages of a study to improve the long-term dependability of its water supply and identify approximately 400 million gallons/day in alternative water sources so that it can repair leaks in one of its largest upstate water transmission tunnels. As part of that dependability study, the City is proceeding with preliminary design of treatment facilities for an additional 55 million gallons/day from the Groundwater System and of a parallel tunnel to bypass the leaking section of the upstate tunnel. The Station 6 plant is not part of the dependability study, and its construction does not depend on decisions to be made under the dependability study.

II.     ARGUMENT

A. <u>**The Appropriate Burden of Proof for the City in Phase One is Preponderance of the Evidence**</u>

The appropriate burden of proof for Plaintiff, the City of New York ("the City") in Phase One is preponderance of the evidence, which is the standard burden of proof in a civil case such as this. *Glew v. Cigna Group Ins.*, 590 F.Supp.2d 395 (E.D.N.Y. 2008) ("While there has been some dispute as to the burden of proof, in this Court's view, the proper standard is the same as

7

other civil cases in the federal court, namely, by a preponderance of the evidence."); *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 507 (7th Cir. 2007) (presumption that preponderance standard applies in federal civil cases); *Mathis v. Hargrove*, 888 A.2d 377, 391 n. 5, 166 Md.App. 286 (Md. 2005) (preponderance of the evidence is the proper standard for civil action); *Rixmann v. City of Prior Lake*, 723 N.W.2d 493, 495 (Minn.App. 2006); *Mutual of Enumclaw Ins. Co. v. McBride*, 667 P.2d 494, 295 Or. 398 (Or. 1982) (burden of proof on issue of fraud to void a fire insurance policy is by a preponderance of the evidence; it does not require clear and convincing proof). *See also Ramsey v. United Mine Workers of America*, 401 U.S. 302 (1971) (plaintiff in an antitrust action against a labor union need only prove his case by a preponderance of the evidence; pro-vision of 29 U.S.C.A. § 106 requiring "clear proof" only applies to question of authorization, participation or ratification of acts); *Ellis v. Brotherhood of Railway Clerks*, 685 F.2d 1065, 1071 (9th Cir. 1982) (in a civil case, the party with the burden of proof must persuade the trier of fact by a preponderance of the evidence; no higher standard is required simply because a constitutional issue is involved).

To "establish by a preponderance of the evidence" means to prove that something is more likely than not. *See, e.g., Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir.1983) ("preponderance" means that "upon all the evidence … the facts asserted by the plaintiff are more probably true than false"), *quoting Porter v. American Export Lines, Inc.*, 387 F.2d 409, 410–411 (3d Cir.1968). *See also South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 777–78 (6th Cir.1970), cert. denied, 402 U.S. 983 (1971); *Henry v. Dept. Corrections*, 131 Fed.Appx. 847, 850 (3d Cir. 2005) ("more likely than not"; quoting Black's Law Dictionary); *Mathis v. Hargrove*, 2005, 888 A.2d 377, 391 n. 5, 166 Md.App. 286 ("evidence which, when considered and compared with the evidence opposed to it, has more convincing force and

produces in the mind of the trier of fact a belief that it is more likely true than not); *Ralston Oil & Gas Co. v. July Corp.*, 719 P.2d 334 (Colo.App.1985) (proof by a preponderance of the evidence means evidence that leads the trier of fact to find that the existence of the fact is more probable than not).

Thus, in Phase One, the City's proper requirement of proof is to show that it is more likely than not that it will build Station 6 sometime within the next 15 years, assuming it has the money necessary to do so immediately available. *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation* Slip Copy, 2008 WL 5188193 (S.D.N.Y., Dec. 09, 2008) (Plaintiffs bear the burden of proving elements of a prima facie case, by a preponderance of the evidence.); *In re MTBE*, 591 F.Supp.2d 259, 266 (S.D.N.Y. 2008) (same); Restatement (Second) of Torts § 433 (1977).[2]

### B. Reasonable Certainty is Not Appropriate for this Case

Defendant's argument that "reasonable certainty' is the appropriate burden of proof for Phase One lacks merit. In the Second Circuit, courts have used the reasonable certainty standard in the context of general and consequential damages in contract cases and as part of the clear and convincing evidence required for proof of civil contempt. *See, e.g., Tractebel Energy Marketing,*

---

[2] Preponderance of the evidence is not the same as reasonable probability. *See Edmonds v. Purdy,* Slip Copy, 2009 WL 483189 (S.D.N.Y. Feb. 26, 2009). "The phrase, "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not." *Strickler v. Greene*, 527 U.S. 263, 289-91 (1999); *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1565-66 (1995). Cf. *Fifth Ave. of Long Island Realty Associates v. Caruso Management Co., Ltd.,* Slip Copy, 2009 WL 412126
(E.D.N.Y. 2009). February 17, 2009 (Reasonable probability of success on the merits is one of the prongs for preliminary injunctive relief) *citing Weitzman v. Stein,* 897 F.2d 653, 658-59 (2d Cir.1990); *Ventimiglia v. Tishman Speyer Archstone-Smith Westbury, L.P.* 588 F.Supp.2d 329 (E.D.N.Y. 2008). (In opposition to motion to remand, a removing defendant must show that it appears to a "reasonable probability" that the aggregate claims of the plaintiff class are in excess of $5 million.)

*Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 108-11 (2d Cir. 2007) (in breach of contract actions reasonable certainty is a requirement of fact of damage for general damages and for amount and fact of damages for consequential damages); *The Millgard Corp. V E.E. Cruz/Nab/Frontier-Kemper*, 2007 WL 2388902 *4 (S.D.N.Y. Aug. 21, 2007) ("While plaintiff, in a breach of contract suit, has the burden of proof, he need only demonstrate the amount of damages with reasonable certainty and a wrongdoer has no right to insert upon a mathematically precise evaluation of damages suffered."); *U.S. v. District Council of New York City*, 2007 WL 2697135 at *13 (S.D.N.Y. Sept. 17, 2007) (in context of civil contempt , the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred).

Reasonable certainty is not an appropriate standard of proof, here, where the City is addressing elements of its prima facie case that sound in tort and violation of Federal and State statute. *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation* Slip Copy, 2008 WL 5188193 (S.D.N.Y. Dec. 09, 2008)   (Plaintiffs bear the burden of proving elements of a prima facie case, by a preponderance of the evidence.); *In re MTBE*, 591 F.Supp.2d 259, 266 (S.D.N.Y. 2008) (same).  Furthermore, because certainty is a higher standard of proof than preponderance of the evidence, the City would be prejudiced by the requirement of any such a heightened burden in this case. *See Mask v. McGinnis,* 233 F.3d 132 (2d Cir. 2000). (the state court's insistence on certainty (an even higher standard than preponderance of the evidence) represents an "unreasonable application of[ ] clearly established Federal law," 28 U.S.C. § 2254(d)(1), in light of the requirement that a petitioner need only show that but for counsel's errors there was a "reasonable probability" that the result of the plea bargaining process would have been different.) (*citing Williams v. Taylor*, 529 U.S. 362 (2000) (citation omitted));

*Lillian F. v. Superior Court*, 206 Cal.Rptr. 603, 606, 160 Cal.App.3d 314 (CA 1984) (clear and convincing evidence requires a finding of high probability and evidence so clear as to leave no substantial doubt, while preponderance merely requires that existence of fact be more probable than its nonexistence);.

### III. CONCLUSION

For the foregoing reasons this Court should rule that the burden of proof for the City in Phase One of this case is preponderance of the evidence.

Dated:  San Francisco, California

June 8, 2009

    MICHAEL A. CARDOZO
    Corporation Counsel of the City of New York
    Attorney for Plaintiff City of New York
    100 Church Street
    New York, New York 10007
    (212) 788-1568

    /s/ *LESLEY E. WILLIAMS*
    VICTOR M. SHER *(pro hac vice)*
    TODD E. ROBINS *(pro hac vice)*
    JOSHUA STEIN *(pro hac vice)*
    LESLEY E. WILLIAMS (LW8392)
    NICHOLAS G. CAMPINS *(pro hac vice)*
    MARNIE E. RIDDLE *(pro hac vice)*

    SHER LEFF LLP
    450 Mission Street, Suite 400
    San Francisco, CA 94105
    (415) 348-8300

    *Attorneys for Plaintiff City of New York*

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the following documents:

1) **PLAINTIFF CITY OF NEW YORK'S PHASE ONE TRIAL WITNESS LIST (EXHIBIT 1 OF THE PROPOSED PRETRIAL ORDER)**

2) **PLAINTIFF CITY OF NEW YORK'S PHASE ONE TRIAL EXHIBIT LIST (EXHIBIT 3 OF THE PROPOSED PRETRIAL ORDER)**

3) **PLAINTIFF CITY OF NEW YORK'S TRIAL MEMORANDUM FOR PHASE ONE (EXHIBIT 7 OF THE PROPOSED PRETRIAL ORDER)**

4) **PLAINTIFF CITY OF NEW YORK'S PROPOSED JURY INSTRUCTIONS FOR PHASE ONE (EXHIBIT 5 OF THE PROPOSED PRETRIAL ORDER)**

5) **PLAINTIFF CITY OF NEW YORK'S PROPOSED JURY QUESTION FORM FOR PHASE ONE (EXHIBIT 9 OF THE PROPOSED PRETRIAL ORDER)**

were served on Liaison Counsel via Electronic Mail, and on all counsel of record by posting them directly to CM/ECF and LexisNexis File & Serve on the 8th day of June, 2009.

KRISTIN MEYERS