UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------- X
                        :

**IN RE: METHYL TERTIARY BUTYL**   :    <u>**OPINION AND ORDER**</u>
**ETHER ("MTBE") PRODUCTS**      :
**LIABILITY LITIGATION**          :
--------------------------------------------------- :    **Master File No. 1:00-1898**
                        :    **MDL 1358 (SAS)**
**This document relates to:**      :    **M21-88**
                        :
*City of New York v. Amerada Hess*  :
*Corp., et al.*, 04-CV-3417        :
--------------------------------------------------- :
                        X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       In 2003, the City of New York (the "City") filed a Complaint against

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation various corporations for their use and handling of the gasoline additive methyl Doc. 2543

tertiary butyl ether ("MTBE"), alleging that the MTBE contaminated, or

threatened to contaminate, the City's water supply.[1]  The action was transferred to

this district pursuant to section 1404 of Title 28 of the United States Code.[2]

---

    [1]    This Opinion assumes familiarity with this Court's previous opinions, in which the facts underlying these actions are comprehensively discussed.  For a thorough recitation of essentially similar fact allegations, see, for example, *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.* ("*In re MTBE*"), 379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005).

    [2]    The action was initially transferred to this Court pursuant to section 1407 of Title 28 of the United States Code as part of a large multi-district

Over the last five years, the City and defendants have engaged in extensive discovery and motion practice. The trial in this case is now imminent. Defendants move *in limine* to bar the City from seeking punitive damages on any claim for which liability is established under either the market share or the commingled product theory.[3] For the following reasons, defendants' motion is granted in part and denied in part.

## II. BACKGROUND

### A. Allegations in Complaint

The City of New York, as owner of a groundwater well system and surrounding City property, brings various claims alleging that defendants, as MTBE manufacturers, producers, distributors and sellers, caused MTBE to contaminate, or threaten to contaminate, the City's well system, soil and aquifers.[4]

litigation ("MDL") involving MTBE.

[3]     *See* Defendants' Memorandum in Support of Their Motion to Bar Punitive Damages Based on Market Share or Commingled Product Theories ("Def. Mem."). Defendants move in the alternative for summary judgment on the City's "claims" for punitive damages. Because defendants' motion is properly considered as a motion *in limine*, their motion for summary judgment is denied. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.* ("*In re MTBE*"), 517 F. Supp. 2d 662, 666-67 (S.D.N.Y. 2007).

[4]     The City's claims include common law property tort claims for trespass and nuisance; strict liability tort claims for defective product design and failure to warn; deceptive business practices claims for violations of section 349 of

Because causation is an element of most of the claims, the City may recover only against those defendants who are responsible for the MTBE that contaminated, or threatens to contaminate, the City's wells.[5]

In addition to claims against the owners of gasoline stations that allegedly leaked MTBE into groundwater, the City brings strict liability claims against the refiners and distributors of MTBE-infused gasoline. The City alleges that refiners mix their products together for transportation and distribution in such a manner that the gasoline sold at any given retail station contains the product of multiple refiners.[6] According to the City, the mixed gasoline forms a commingled, joint product and the individual molecules of MTBE are not distinguishable by

---

the New York General Business Law ("section 349"); strict liability claims for violations of Article 12 of the New York Navigation Law ("Article 12"); and a civil conspiracy claim. These actions are somewhat unusual among toxic tort/groundwater contamination actions in that plaintiff does not allege personal injuries.

[5]     Although the City originally sued approximately fifty defendants, at this time the only remaining defendant is ExxonMobil, a manufacturer, refiner, distributor and retailer of gasoline.

[6]     For a detailed discussion of the gasoline distribution network that supplies gas to much of New York, see *In re Methyl Tertiary Butyl Ether Prods. Liab. Lit.* ("*In re MTBE*"), 591 F. Supp. 2d 259, 269-73 (S.D.N.Y. 2008) (noting that gasoline supplied to Suffolk County "becomes commingled in the process, making it the joint product of all who have contributed to it along the way from refineries through pipelines and tankers to primary terminals and out again via pipelines and barges to secondary terminals." (quotation marks omitted)).

refiner or distributor. As a result, even in those instances where the City is able to

trace a contamination to a particular gasoline station, the City has no direct method

of proving which refiner(s) produced the MTBE-infused gasoline that leaked from

the station. Similarly, if the City is able to show, through circumstantial evidence,

that a refiner's product was more likely than not a part of the MTBE that

contaminated the City's property, there is a good chance that each refiner was

responsible for only a fraction of the MTBE that caused the contamination.[7]

## B. Alternative Theories of Liability

To address similar difficulties in other cases within this MDL, this

Court has permitted plaintiffs to proceed with various alternative theories of

liability that are designed to ensure plaintiffs' right to redress and to apportion

liability fairly among defendants. Each theory addresses a separate set of

difficulties.

The *first* is concurrent wrongdoing: "When two or more tortfeasors

act concurrently or in concert to produce a single [indivisible] injury, they may be

---

[7]     This Court has discussed the difficulties of establishing causation in
the MTBE context on many occasions. Although the fungibility and blended
nature of MTBE creates common issues across cases, each case raises a unique set
of facts that requires individual attention.

held jointly and severally liable."[8] The New York Court of Appeals applied this theory in a case where water flowing from two sources due to two separate defendants' negligence caused an "indivisible" injury by becoming "*commingled* . . . [and] concentrating at the same locality, soaking through the wall into the plaintiffs' premises and injuring the plaintiffs' property."[9] Significantly, in concurrent wrongdoing cases, plaintiffs must prove in the usual manner that each defendant *caused* a *contribution* to the injury. However, unlike the traditional theory of causation, plaintiffs need not show that each defendant's actions, taken alone, would have caused the injury. The concurrent wrongdoing theory addresses the difficulty of determining *how much* each defendant's commingled product contributed to a single, indivisible injury. The theory resolves that difficulty by providing that "each tortfeasor is responsible for the entire result, even though his act alone might not have caused it."[10] The theory is similar to joint tortfeasor

---

[8]      *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.* ("*In re MTBE*"), 447 F. Supp. 2d 289, 297 (S.D.N.Y. 2006) (quoting *Ravo v. Rogatnick*, 70 N.Y.2d 305, 311-12 (1987)).

[9]      *Slater v. Mersereau*, 64 N.Y. 138, 146 (1876) (emphasis added).

[10]      *Hill v. Edmonds*, 270 N.Y.S.2d 1020, 1021 (2d Dep't 1966). *Accord Slater*, 64 N.Y. at 146 ("[A]lthough the act of each, alone and of itself, might not have caused the entire injury, under the circumstances presented, there is no good reason why each should not be liable for the damages caused by the different acts of all.").

-5-

liability in that it imposes joint and several liability, but it differs from traditional joint tortfeasor liability in that it does not require that the tortfeasors acted in concert. And yet, a defendant cannot be held liable under the concurrent wrongdoing theory unless it is determined that the defendant's conduct contributed to the injury.

The *second* theory is market share liability. "Market share liability is an evidentiary tool that allows a plaintiff to prove causation."[11] The New York Court of Appeals applied this theory in a case where plaintiff was injured by a defective pharmaceutical pill but it was impossible to determine which of many manufactures produced the pill.[12] The Court adopted a market-share theory, which created a presumption that each manufacturer selling pills into the national market caused plaintiff's injury.[13] Unlike the concurrent wrongdoing theory, the market-share theory "provides an exception to the general rule that a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury."[14] As such, a defendant may be held partially liable under the market-share theory without any

---

[11]     *In re MTBE*, 517 F. Supp. 2d at 668. *Accord Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222 (2001).

[12]     *See Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 502 (1989).

[13]     *See id.* at 512.

[14]     *In re MTBE*, 447 F. Supp. 2d at 299.

showing that the defendant caused, or contributed, to the injury. Indeed, the New York Court of Appeals held that "there should be no exculpation of a defendant who, although a member of the market . . . , appears not to have caused a particular plaintiff's injury."[15] Also unlike the concurrent wrongdoing theory, liability is not joint and several but is apportioned by market share.[16]

The *third* theory is the commingled theory of liability. Because this theory "incorporat[es] elements of concurrent wrongdoing" and market share liability,[17] it has been difficult to describe.

> [U]nder the "commingled product theory" of market share liability, when a plaintiff can prove that certain gaseous or liquid products ( e.g., gasoline, liquid propane, alcohol) of many refiners and manufacturers were present in a completely commingled or blended state at the time and place that the harm or risk of harm occurred, and the commingled product caused plaintiff's injury, each refiner or manufacturer is deemed to have caused the harm. A defendant must be able to exculpate itself by proving that its product was not present at the relevant time or in the relevant place, and therefore could not be part of the commingled or blended product.[18]

---

[15] *Hymowitz*, 73 N.Y.2d at 512 (apportioning liability based upon "the amount of risk of injury each defendant created to the public-at-large").

[16] *See In re MTBE*, 447 F. Supp. 2d at 300 (quotation marks omitted).

[17] *Id.* at 301.

[18] *Id.*

-7-

This hybrid theory was introduced to strike a balance between the concurrent

wrongdoing and the market-share theories. Although the concurrent wrongdoing

theory is well-suited to torts caused by a commingled product, this Court

explained that the theory did not apply to many of these cases because "it would

be fundamentally unfair to hold these defendants jointly and severally liable"

given the likelihood that "each defendant's contribution to the total volume of

MTBE-containing gasoline in any particular well was very small."[19] Similarly,

although the market-share theory does not fit the facts of cases where the plaintiff

can prove that the defendants' products were part of the commingled product

causing the injury, that theory offers an equitable solution to the apportionment of

damages. Hence, the commingled product theory adopts, with slight adjustments,

the concurrent wrongdoing theory of liability and the market-share theory of

apportioning damages.[20]

   Even though this Court has previously addressed the question, the

---

[19]  *In re MTBE*, 379 F. Supp. 2d at 378.

[20]  For further discussion and clarification, see *In re MTBE*, 591 F. Supp. 2d at 244-45 ("The commingled product theory lies somewhere between market share and concurrent wrongdoing. It is similar to concurrent wrongdoing . . . because it addresses a situation in which multiple defendants have contributed to an indivisible injury. It is similar to market share in that it shifts the burden to defendants to exculpate themselves from liability."). *See also In re MTBE*, 379 F. Supp. 2d at 377-79.

parties again raise the issue of whether the commingled theory permits a finding of liability against a defendant without proof that the defendant's conduct contributed to the injury. When the theory was introduced, this Court stated that, unlike the market-share theory, the "conceptual basis" for the commingled theory is that "defendants' products were *actually present* and *contributed to the injury.*"[21] This Court further explained that, under the commingled theory,

> [T]he product of each supplier is *known* to be present. It is also known that the commingled product caused the harm. What is *not known* is what percentage of each supplier's goods is present in the blended product that caused the harm.[22]

### C.   Punitive Damages Based on Market Share

In the *Suffolk County* action, this Court held that when the "plaintiffs rely on market share liability to prove causation for a particular well, they are

---

[21]     *In re MTBE*, 379 F. Supp. 2d at 378 (emphasis added).

[22]     *Id.* at 379. In a more recent opinion, this Court stated that "because the gasoline that has contaminated plaintiffs' wells was undeniably the commingled product of numerous manufacturers, there is a good chance that many of the defendants held liable, if not the majority, actually did cause plaintiffs' injury." *In re MTBE*, 591 F. Supp. 2d at 275. This phrase, however, has been misunderstood. It simply means that while the commingled product caused the injury, it is unlikely that the product of a defendant, in isolation, caused the injury. *See infra* note 55.

precluded from arguing that punitive damages are available for that well."[23]  In reaching that holding, this Court emphasized two points in predicting how the New York Court of Appeals would decide the issue.[24]

*First*, the Court in *Hymowitz* acknowledged – and sought to minimize – the inequities imposed on defendants when plaintiffs utilize market share liability.  One inequity resulted from the inexactness of apportioning liability based on the *national market*: the *Hymowitz* Court adopted "a market share theory using a national market" for "essentially practical reasons."[25]  In so doing, the *Hymowitz* Court was "aware that the adoption of a national market will likely result in a *disproportion* between the liability of individual manufacturers and the actual injuries each manufacturer caused in this State,"[26] which that Court sought to minimize.  Based on that analysis, this Court noted that "allowing punitive damages [in the *Suffolk* MTBE action] would magnify any inaccuracies between

---

[23]     *In re MTBE*, 517 F. Supp. 2d at 672.

[24]     *See Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 80 (2d Cir. 2007) ("In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the [fact-finder] may consider in determining their amount, are questions of state law." (quotation marks omitted)).

[25]     73 N.Y.2d at 511.

[26]     *Id.* at 511-12 (emphasis added).

the harm done and the relief provided by particular defendants" particularly because "each jury will only be permitted to award a ratio or multiplier [of compensatory damages], rather than any dollar figure."[27] Thus, following the lead of the *Hymowitz* Court, this Court found that one reason not to permit punitive damages is that such damages would increase the inherent uncertainties of the market-share approach. Similarly, equity counseled against permitting punitive damages against a defendant that plaintiffs could not prove had caused their injuries.

Further, practical considerations supported not permitting punitive damages. In particular, this Court noted that the market-share "theory relies on the assumption that plaintiffs cannot prove which defendant injured them."[28] Because plaintiffs should be encouraged "to make every effort to identify the particular defendants who caused the harm . . . rather than lumping all defendants together to find the deepest pockets among them," practical considerations weighed in favor of withholding punitive damages from cases where plaintiffs rely on market share.[29]

---

[27]     *In re MTBE*, 517 F. Supp. 2d at 670.

[28]     *Id.*

[29]     *Id.* at 671.

**D.     Due Process and Excessive Awards**

In a series of cases, the Supreme Court has recognized that the Due Process Clause of "the Constitution imposes certain limits, in respect both to procedures for awarding punitive damages and to amounts forbidden as 'grossly excessive.'"[30]  In determining whether an award is grossly excessive, a punitive award that is more than ten times the compensatory award is more likely to be excessive, but this ratio is not dispositive.[31]  Rather, a balancing test is used and the "excessiveness decision depends upon the reprehensibility of the defendant's conduct, whether the award bears a reasonable relationship to the actual and potential harm caused by the defendant to the plaintiff, and the difference between the award and sanctions authorized or imposed in comparable cases."[32]  The amount of the punitive award may be based only on the harm, or potential harm, suffered by plaintiffs, not by non-parties.[33]

In evaluating "the potential harm the defendant's conduct could have

---

[30]     *Philip Morris U.S.A. v. Williams*, 549 U.S. 346, 352 (2007).

[31]     *See State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award.").

[32]     *Philip Morris*, 549 U.S. at 353.

[33]     *See id*.

caused . . . the plaintiff,"[34] courts look to "whether there is a reasonable

relationship between the punitive damages award and *the harm likely to result*

from the defendant's conduct [to the plaintiff] as well as the harm that actually has

occurred."[35] In one case, the Court noted that although the disparity between the

punitive award and the *compensatory* award may have appeared "shocking," the

punitive award was not grossly excessive because the disparity between the

punitive award and the "potential loss" to plaintiffs was not shocking.[36]

### E. Parties' Arguments

Defendants argue that, for purposes of punitive damages, the

commingled theory raises the same concerns as the market-share theory. In

particular, defendants argue that "under both theories defendants face liability for

compensatory damages without proof that they caused or contributed to the

harm."[37] "That lack of actual proof of causation, and the absence of a nexus

between the injury and the conduct of any particular defendant, should bar

---

[34]     *Id.* at 354.

[35]     *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993)
(plurality opinion) (emphasis in original).

[36`]     *Id.* at 462 (plurality opinion).

[37]     Def. Mem. at 4.

-13-

punitive damages against defendants."[38] Defendants further argue that "it would be unconstitutional to permit a plaintiff to recover *punitive damages* without direct proof that the defendant in question actually caused the harm."[39] Indeed, defendants argue that "[e]ven if the commingled theory establishes that *every* Defendant contributed to *every* alleged harm," it would still be unconstitutional to apply punitive damages based on a commingled theory because "the Constitution prohibits punitive damages that are disproportionate to *actual harm* caused by a particular defendant."[40] According to defendants, under the commingled theory the *amount* of compensatory damages is based on market share, which cannot "serve as a meaningful measure of actual harm for purposes of the all-important ratio."[41] Finally, defendants argue that market share liability reflects potential harm to *non-parties*, whereas the Constitution prohibits punitive awards that are based on potential or actual harm to non-parties.

The City does not contest, for purposes of this decision, that punitive

---

[38] *Id.* at 3.

[39] *Id.* at 18.

[40] Defendants' Reply to Plaintiff City of New York's Opposition to Defendants' Motion to Bar Punitive Damages Based on the Market Share and Commingled Product Theories ("Def. Rep.") at 4 (emphasis added).

[41] *Id.* at 5.

-14-

damages would be inappropriate under the market-share theory because "the City is no longer seeking damages based on the theory of market share liability."[42] The City argues that punitive damages should be available under the commingled theory, however, because, "of the defendants held liable under the commingled product theory *all defendants*, not just a single defendant, blended their products into the product that caused the harm, and therefore *all defendants*, not just a single defendant, proximately caused the harm."[43] Thus, the City intends to prove that "'*all* defendants contributed to the commingled gasoline that caused contamination in plaintiffs' wells.'"[44] In order to make this showing, the City intends to rely on an expert who recently testified that "for the Defendants that supplied MTBE gasoline into the gasoline distribution system that supplied the [relevant geographical area of New York], over time it is a *virtual certainty* that their MTBE-gasoline is present in any release that occurred while they were doing

---

[42] Plaintiff City of New York's Opposition to Defendants' Motion to Bar Punitive Damages Based on the Market Share and Commingled Theories of Liability at 4 (quotation marks omitted).

[43] *Id.* at 5.

[44] *Id.* at 7 (quoting *In re MTBE*, 591 F. Supp. 2d at 268 (emphasis added)).

that supplying."[45]

## III. APPLICABLE LAW

The Federal Rules of Evidence favor the admission of all relevant evidence.[46] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[47] A district court will "exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."[48] "Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context."[49] Moreover, a court's ruling regarding a motion in limine "'is subject to change when the case unfolds . . . . Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound

---

[45]     *Id.* (quoting Expert Rebuttal Report of Bruce F. Burke, Feb. 6, 2009) (emphasis added).

[46]     *See* Fed. R. Evid. 402.

[47]     Fed. R. Evid. 401.

[48]     *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006).

[49]     *United States v. Chan*, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).

-16-

judicial discretion, to alter a previous in limine ruling.'"[50]

## IV. DISCUSSION

### A. Proof of Causation

On the most crucial issue, there is no disagreement: for purposes of this trial, punitive damages will not be available against a defendant if the City is unable to prove that the defendant caused or contributed to the injury. The principal disagreement therefore relates not to the operation of punitive damages but to the operation of the commingled product theory; specifically, the issue is whether a showing that a defendant is liable under the commingled theory necessarily means that the plaintiff has shown that the defendant caused or contributed to the injury.

In many respects, the disagreement, stated in these broad terms, requires no resolution. The Court has described the commingled theory in different ways over the years. But nomenclature is not important. What is important is that, for punitive damages to be available for a claim based on the commingled theory, the jury must be carefully instructed that it cannot find a defendant liable unless it finds that *that* defendant's MTBE was actually "present

---

[50]    *Palmeri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996) (quoting *Luce v. United States*, 469 U.S. 38, 41-42 (1984)).

in a completely commingled or blended state at the time and place that the harm or risk of harm occurred."[51] Of course, the City may attempt to make this showing through circumstantial evidence, including competent expert evidence, credited by a jury, that MTBE from a refiner defendant is, more likely than not, present in every release that contaminated the City's wells.[52] However, in order to prove that a particular defendant is liable under the commingled theory, it is *not* enough for the City to prove that "gasoline from *many* refiners and manufacturers" was present in the commingled product.[53] That is, unlike the market-share theory, no *presumption* of causation applies. Rather, the City must prove, by a

---

[51]    *In re MTBE*, 447 F. Supp. 2d at 300.

[52]    *Cf. In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831, 837 (2d Cir. 1992) (discussing cases that found "proof of causation sufficient in the absence of identification of the precise product that injured a given plaintiff" and holding, under New York law, that causation was adequately proved against a particular defendant based on evidence that "asbestos-containing products made by the defendants were used interchangeably throughout the shipyard, and . . . the environment was extremely dusty with asbestos fibers"). *See also O'Brien v. National Gypsum Co.*, 944 F.2d 69, 73 (2d Cir. 1991) (upholding jury's finding of causation based on "testimony that asbestos products were used interchangeably on virtually all of the warships under construction in the Navy Yard"); *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1286 (2d Cir. 1990) (upholding jury's finding of causation based on the circumstantial evidence that defendants' asbestos-containing products were present on particular ships and that asbestos fibers were "[a]ll over the deck").

[53]    *In re MTBE*, 591 F. Supp. 2d at 275 (emphasis added) (quotation marks omitted).

preponderance of the evidence, that MTBE of the particular defendant was actually in the commingled product that caused the contamination.

So understood, the commingled theory is very different from the market-share theory, where causation is presumed rather than established. Under the commingled theory, the City must prove that MTBE supplied by a defendant was part of the commingled product that caused the contamination (or threatened contamination) of a given well. The City must show, in other words, that each defendant *contributed-in-fact* to the injury. What sets the commingled theory apart from the traditional theory of causation is that the City need not show that each individual defendant's contribution, *taken alone*, would have caused an injury. Rather, to establish liability against a particular defendant with respect to an individual well, the City must show that (a) the defendant's MTBE was present in a commingled product and (b) "the *commingled product* [rather than defendant's product *alone*] caused plaintiff's injury."[54] This rule is important in the context of this litigation because defendants strongly urge that *minimal* concentrations of MTBE cause no injury. The commingled theory, much like the concurrent wrongdoing theory, provides that it is no defense for a defendant to argue that its contribution, taken alone, caused no injury. The real issue is whether

---

[54]    *In re MTBE*, 447 F. Supp. 2d at 301 (emphasis added).

-19-

the *commingled product* caused an injury and, if so, whether a defendant's MTBE *contributed* to that commingled product.[55]

For these reasons, the decision to bar punitive damages when liability is based on the market-share theory is easily distinguished. That decision rested largely on the fact that, in the market-share context, plaintiffs are unable to identify which defendants contributed to the injury. Permitting punitive damages without proof of causation was deemed improper because (a) it is inequitable to impose punitive damages on a defendant for whom no causal nexus to the injury was established and (b) it would create perverse incentives because there would be no impetus for plaintiffs to identify the actual defendants that contributed to the injury.

Here, by contrast, the City will prevail against a defendant on the commingled theory only if the City can prove that the defendant actually contributed to the injury. This extinguishes the inequity of exposing a defendant to punitive damages that is not shown to have contributed to the injury. Further,

_____

[55]     Accordingly, the language quoted above suggesting that the commingled product theory need not involve proof that each defendant caused plaintiff's injury should be taken to mean that, under the commingled theory, a defendant can be held liable for contributing to the *commingled product that caused an indivisible injury* even though defendant's contribution, taken alone, did not individually "cause plaintiff's injury." *In re MTBE*, 591 F. Supp. 2d at 275.

-20-

there is no need to incentivize the City to identify the wrongdoers under the commingled theory because, for liability to attach in this action, it will have already done so. It is true that the City may not have identified the precise extent of each defendant's contribution, but this is because a commingled and fungible product, by definition, resists such proof. However, for apportionment purposes, one or both parties will be required to identify,[56] as near as possible, the extent of a defendant's contribution. For both reasons, punitive damages would not create any perverse incentives.

## B.    Apportionment

The remaining issue is whether the difficulty in determining the portion of the harm (or potential harm) that each defendant caused is consistent with the imposition of punitive damages. This issue raises both equitable and Constitutional concerns, which are discussed in turn.

*First*, in denying punitive damages based on market share, this Court quoted the *Hymowitz* Court's observation that the decision to adopt a *national market* for determining market share liability would result in a "disproportion" between, on the one hand, each defendant's apportioned liability and, on the other,

---

[56]    The issue of which party bears the burden of proof for apportionment is raised in another motion in limine and will not be decided here.

-21-

the likely harm, or potential harm, each defendant imposed on plaintiffs, who haled from *this State*.[57] This Court noted that punitive damages, based on a multiplier, would amplify this inaccuracy.

In the commingled setting, this Court has stated that "liability is several only and is apportioned by proof of a defendant's share of the market at the time of the injury."[58] This Court has not yet decided "who bears the burden of proof on this issue."[59] Further, the Court has not yet decided whether the relevant market is the national market, the market that supplies gasoline to the city or state,

---

[57]     *In re MTBE*, 517 F. Supp. 2d at 670. *Accord Hymowitz*, 73 N.Y.2d at 512 (noting that "[the Court's] [national] market share theory cannot be founded upon the belief that, over the run of cases, liability will approximate causation in this State. Nor does the use of a national market provide a reasonable link between liability and the risk created by a defendant to a particular plaintiff.").

[58]     *In re MTBE*, 591 F. Supp. 2d at 274 n.72. The City argues in another motion in limine that joint and several liability should apply to some of its claims against defendant. For now, it is enough to note that even if joint and several liability were to apply to any of the City's claims, the defendant would retain its rights to contribution and the award would be reduced by the settling parties' equitable share. *See* N.Y. C.P.L.R. § 1401 (providing that "two or more persons who are subject to liability for damages for the same . . . injury to property . . . may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought."). *See also* N.Y. G.O.L. § 15-108 (providing that plaintiff's award against a non-settling party shall be "reduced in the amount of the [settling] tortfeasor's equitable share of the damages").

[59]     *Id.*

-22-

the market that supplies gasoline to the stations from which the gasoline leaked, when that station can be identified, or some other market.[60] However, this Court has stated that a "defendant must be able to exculpate itself by proving that its product was not present *at the relevant time or in the relevant place*, and therefore could not be part of the commingled or blended product."[61] Because the markets that are used to apportion liability and to establish exculpation must be the same markets on pain of potential inconsistencies,[62] and because the commingled theory is designed to apportion liability fairly in the face of uncertainty, it follows that apportionment should be based, as near as possible, on each defendant's share of the actual market that supplied gasoline to the commingled product that contaminated the City's wells – *i.e.*, on each defendant's share of the gasoline in the relevant place and at the relevant times.[63] In this way, a defendant's share of

---

[60]    *Cf. In re MTBE*, 379 F. Supp. 2d at 375-76 (listing various markets courts have used to determine market share); *Hymowitz*, 73 N.Y.2d at 709-12 (discussing same at more length).

[61]    *In re MTBE*, 447 F. Supp. 2d at 300 (emphasis added).

[62]    For example, if the national market were chosen for apportionment and the station-supplying market were chosen for exculpation, a defendant might exculpate itself by showing that its gasoline was not supplied to the station responsible for the spill and yet be liable on the ground that it had a share in the national market.

[63]    In this context, this Court expects to adhere to the decision in *Suffolk County* that "the time that the risk of harm – the contamination of groundwater –

-23-

the relevant market should coincide as nearly as possible with its share of the MTBE in the contaminating product.[64]

Accordingly, the gap between the apportioned liability and a defendant's share of the harm is significantly less than in the market-share context. Indeed, there may be no gap at all.[65] For this reason, the concern for magnifying inaccuracies is not great. Further, although *potential harm* to plaintiffs is a permissible ground for punitive damages in New York, the *Hymowitz* Court emphasized that a defendant's share of the *national* market does not reflect potential harm to plaintiffs. As discussed below, this concern is not present here. Therefore, practical and equitable considerations do not support precluding the City from seeking punitive damages in this case.

*Second*, in reference to defendants' Constitutional arguments, to the extent (if any) that proof of a defendant's share of the relevant market does not

---

occurred is an issue of fact for the jury" and "the place the harm or risk of harm occurred is the capture zone of each well." *In re MTBE*, 591 F. Supp. 2d at 275.

[64]    Of course, this too may be shown through circumstantial evidence, including evidence of defendant's market share of the gasoline sent to the City, or the region, during the years of the alleged leaks.

[65]    Proof of a defendant's share of the relevant market may establish, by a preponderance of the evidence, the extent of that defendant's share of the commingled product that in fact caused the injury. If so, there is no gap at all between the apportionment and the defendant's share of the liability.

constitute proof of that defendant's share of the responsibility for the City's injury, the defendant's market share clearly reflects the *potential* harm that the defendant imposed on the City, which is a permissible Constitutional ground for punitive damages. That is, if a defendant delivered a certain percentage of MTBE-infused gasoline to the City's stations, then that percentage represents the best measure of the potential harm that the defendant imposed on the City.[66] Even if this measure is not exact, there is no requirement that the measure of potential harm be exact.[67]

More broadly, defendants incorrectly suggest that in order to allow

---

[66] Defendants argue that apportioning liability based on market share necessarily reflects potential harm to everyone in the market, including non-parties, but that when assessing punitive damages the jury may not consider the potential harm to non-parties. Although correct, this argument misses the point. In a market that is narrowed to one in which plaintiff is a potential victim of every market transaction, a defendant's market share reflects the potential harm that defendant imposed on plaintiff. Although market share also represents potential harm to non-parties, the jury will be carefully instructed only to consider the potential harm to the City in assessing the amount of punitive damages. Further, because the calculation of compensatory damages is based on the value of the City's injury, the compensatory damages awarded will reflect potential harm to the City alone.

[67] *Cf. TXO*, 509 U.S. at 462 (plurality opinion) ("While petitioner stresses the shocking disparity between the punitive award and the compensatory award, that shock dissipates when one considers the potential loss to respondents, in terms of reduced or eliminated royalties payments, had petitioner succeeded in its illicit scheme. Thus, even if the actual value of the 'potential harm' to respondents is not between $5 million and $8.3 million, but is closer to $4 million, or $2 million, or even $1 million, the disparity between the punitive award and the potential harm does not, in our view, jar one's constitutional sensibilities.").

the jury to consider punitive damages, the jury must be able to calulate each defendant's exact contribution to the injury because without that calculation the "all-important ratio" test cannot be performed.[68] Defendants seem to overlook that the ratio-test is an inexact benchmark, which is never dispositive,[69] and that the imposition of punitive damages always requires juries, and reviewing courts, to balance non-quantifiable values, such as the reprehensibility of each defendant's conduct.[70] Further, punitive damages are frequently imposed in cases of serious injury, which defy precise compensatory calculation. Finally, the common practice of imposing punitive damages in joint and several liability cases shows that punitive damages are available when the compensatory damages do not reflect defendant's actual (or potential) share of the harm to plaintiffs.[71]

---

[68]    Def. Rep. at 5.

[69]    *See State Farm*, 538 U.S. at 425 ("[T]hese ratios are not binding, they are instructive"). *See also DiSorbo v. Hoy*, 343 F.3d 172, 187 (2d Cir. 2003) (noting that reasonableness review "does not entail a 'simple mathematical formula'" and concluding that "'the use of a multiplier to assess punitive damages is not the best tool'" in the circumstances of that case (quoting *Lee v. Edwards*, 101 F.3d 805, 810-11 (2d Cir. 1996))).

[70]    *Cf. BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996) ("[T]he most important indicium of the [award's] reasonableness . . . is the degree of reprehensibility of the defendant's conduct.").

[71]    It might be argued that in joint and several liability cases, the compensatory damages do represent a defendant's share of the harm because, *by operation of law*, each defendant is liable for the full amount of the damages. But

-26-

## V.  CONCLUSION

For the foregoing reasons, defendants' motion *in limine* is granted in part and denied in part. If the City relies on market share liability to prove causation for a particular well, it is precluded from arguing that punitive damages are available for that well, and is further precluded from presenting evidence that is relevant solely to punitive damages as to that well. If the City relies on the commingled product theory to establish liability, it is not precluded from arguing that punitive damages are available, or from presenting evidence of punitive damages, for that well. The Clerk of the Court is directed to close this motion (document #95 in 04-CV-3417; document #2306 in 00-CV-1898).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          June 9, 2009

---

the same could be said in the context of commingled liability: to the extent that apportioned damages do not reflect a defendant's actual share of contaminants in the commingled product, each defendant, *by operation of law*, is liable for that share of the commingled product that corresponds to its share of the relevant market.

## -Appearances-

### Liaison Counsel for Plaintiffs:

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
Tel: (212) 558-5500

### Counsel for Plaintiff City of New York:

Victor M. Sher, Esq.
Todd E. Robbins, Esq.
Joshua G. Stein, Esq.
Nicholas G. Campins, Esq.
Marnie E. Riddle, Esq.
Sher Leff LLP
450 Mission Street, Suite 400
San Francisco, California 94105
Tel: (415) 348-1568

Susan Amron
Assistant Corporation Counsel
100 Church Street
New York, New York 10007
Tel: (212) 788-1568

### Liaison Counsel for Defendants and Counsel for ExxonMobil:

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173
Tel: (212) 547-5583