**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ X

**IN RE METHYL TERTIARY BUTYL**          **OPINION AND ORDER**
**ETHER ("MTBE") PRODUCTS**
**LIABILITY LITIGATION**                      **00 MDL 1898 (SAS)**

------------------------------------------------------ X

**This Document Relates to:**

------------------------------------------------------ X

**CITY OF NEW YORK,** *et al.,*

      **Plaintiffs,**

   **- against -**                              **04 Civ. 3417 (SAS)**

**EXXON MOBIL CORPORATION,**

      **Defendant.**

------------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.     INTRODUCTION**

      In 2003, the City of New York (the "City") filed a Complaint against

various corporations for their use and handling of the gasoline additive methyl

tertiary butyl ether ("MTBE"), alleging that the MTBE contaminated – or

threatened to contaminate – the City's groundwater supply.[1]  Defendant Exxon

Mobil Corporation ("Exxon") – the only remaining non-settling defendant –

moves *in limine* to preclude the City from introducing evidence of past or future

investigation and treatment costs until the City proves actual injury to its wells.[2]

For the reasons that follow, Exxon's motion is granted in part and denied in part.

## II.     BACKGROUND

### A.     Facts

The New York City water supply system provides drinking water to

over eight million customers in the City of New York and one million customers

in upstate communities.[3]  The water supply system largely relies on the collection

and storage of surface water in upland reservoirs in upstate New York and

Delaware.[4]  The water supply system also includes a groundwater system, which is

---

[1]     This Opinion assumes familiarity with facts discussed in this Court's previous opinions in this case.  For a general discussion of the MTBE litigation, see *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005).

[2]     *See* Memorandum of Law in Support of Defendants' Joint Motion *In Limine* to Exclude Evidence and Argument Regarding Plaintiff's Past and Future Investigation and Treatment Costs Until It Proves Actual Injury ("Def. Mem.").

[3]     *See* Joint Pretrial Order for Phase II ("JPTO II") at 5.

[4]     *See id.*

not presently in use.[5]

The New York City groundwater system consists of sixty-eight wells located in Queens, New York, which draw water from the Brooklyn-Queens Aquifer.[6] The system was previously owned by the Jamaica Water Supply Company ("JWSC"). A statute enacted by the New York Legislature in August 1986 required "the City of New York to acquire . . . and to maintain and operate" all or part of the assets of the JWSC.[7] In May 1996, the City purchased sixty-nine wells in Queens from JWSC, at an approximate cost of $148 million.[8] On July 24, 1996, The New York State Department of Environmental Conservation ("DEC") issued a water permit that authorized the City to operate the New York City groundwater system.[9]

---

[5] *See* JPTO II at 5. Exxon recently contested whether the City owns the groundwater system and is the proper plaintiff in this case. On July 6, 2009, this Court resolved any potential dispute by joining the New York City Water Board Authority and the New York City Municipal Water Finance Authority as necessary plaintiffs. *See* Order, No. 337, *City of New York v. Amerada Hess Corp.*, No. 00 MDL 1898, 04 Civ. 3417 (S.D.N.Y. July 6, 2009). For ease of understanding, I will continue to use "the City" to refer to all three plaintiffs.

[6] *See* JPTO II at 5.

[7] N.Y. Gen. City Law § 20(2).

[8] *See* JPTO II at 5.

[9] *See id.* On May 13, 2008, the DEC renewed this permit for an additional eleven years. The current permit authorizes the City to operate sixty-

At a public information session on November 21, 2001, the

Commissioner of the New York City Department of Environmental Protection

noted that the JWSC had produced some of the poorest quality water in the area.[10]

Some JWSC customers lacked confidence in the quality of the water. After 1996,

production from the JWSC wells continued to decrease. By 2005, only five

former JWSC wells were producing water continuously for delivery to

customers.[11] As of May 2007, no consumers are receiving drinking water from the

City's groundwater system.[12] The City has not pumped water from any of the

wells at issue in this trial – the area known as "Station 6" – to its distribution

center since the City acquired them in 1996.[13]

In 1994, the City – partnered with the United States Geological

Survey ("USGS") – commenced the Brooklyn-Queens Aquifer Study, a multi-year

planning study of the New York City groundwater system.[14] In 1999, the findings

---

eight wells in the system, including the five at issue in this trial. *See id.*

[10]    *See id.* at 8.

[11]    *See id.*

[12]    *See id.*

[13]    *See id.* at 10.

[14]    *See id.* at 6.

4

of the study were published in a report entitled "The Feasibility Study for Use of the Brooklyn-Queens Aquifer as an Additional Potable Water Supply Source" ("BQA Report").[15] The BQA Report recommended using the Brooklyn-Queens Aquifer groundwater for potable water supply and treating the groundwater at several regional facilities, or well clusters.[16] The BQA Report specifically recommended siting the first well treatment cluster at Station 6 and using that cluster to demonstrate that high quality drinking water on par with the quality of the City's upstate water could be produced from the New York City groundwater system.[17] If Station 6 is completed, the City expects that it will provide up to ten million gallons per day ("mgd") of potable water to the public.

Currently, approximately half of the City's water supply is distributed through the Rondout-West Branch Tunnel, which links to a remote surface water reservoir.[18] The tunnel has been leaking for at least ten years, and necessary repairs require taking the tunnel out of service. In order to take the tunnel out of

---

[15]   *See id.*

[16]   *See id.*

[17]   *See id.*

[18]   *See id.* at 8.

service, the City must find an alternative source of 400 mgd of potable water.[19]  In

addition, the lack of pumping from the Brooklyn-Queens Aquifer contributes to

flooding in Queens.[20]  Finally, an additional water management plan suggests that

the normal output from the New York City groundwater system should be

increased to supplement the upstate drinking water supply in case of droughts,

which have occurred at emergency levels four times since 1982.[21]

Exxon contends that the City has no firm plans to build a treatment

cluster at Station 6 and that City planners currently favor building a third tunnel to

surface water reservoirs to satisfy any projected water shortages.  City deposition

witnesses testified that the City has completed early stages of the design process

for the Station 6 treatment cluster[22] and has earmarked funds for final design and

engineering work.[23]  The City alleges that it has already spent just under one

million dollars in designing the Station 6 treatment cluster and seeks damages for

---

[19]     *See id.*

[20]     *See id.*

[21]     *See id.* at 7-8.

[22]     *See* 4/22/09 Deposition of William A.T. Meakin, expert for the City, at 222:22-23, Ex. 4 to 5/26/09 Declaration of Nicholas G. Campins, counsel for the City ("Campins Decl.").

[23]     *See* 4/17/08 Deposition of James J. Roberts, expert for the City, at 72:15-21, Ex. 3 to Campins Decl.

that expenditure.

None of the Station 6 wells were turned off in response to MTBE

contamination and Exxon contends that these wells are unusable for reasons

unrelated to MTBE contamination.[24]  The City contends that the value of pumping

water from these wells far exceeds the cost of treating the other contaminants and

that other contaminants are more easily removed – at a much lower cost – than

MTBE.[25]  The City further asserts that if the Station 6 wells are turned back on,

there will be an immediate influx of MTBE.

## B.    Trial Structure

This Court adopted a bellwether approach to this trial: Among the

dozens of wells that the City alleges have been injured by Exxon's MTBE, Exxon

---

[24]    For example, Exxon emphasizes that the City received a
recommendation in 1987 to abandon all of the Station 6 wells, long before MTBE
was detected. *See* JPTO II at 10.

[25]    The City emphasizes that a 2003 USGS analysis of 275 organic and
inorganic constituents in fifty Brooklyn and Queens wells reported MTBE to be
the most frequently detected contaminant. *See* JPTO II at 4.  The City also notes
that a defense expert of a settling party stated in his report that "MTBE is
ubiquitous in the Region's shallow aquifers." *See* 3/9/09 Expert Report of James
A. Schaeffer, expert for defendant Getty Properties Corporation, Ex. L to 5/26/09
Declaration of Daniel Greene, counsel for the City ("Greene Decl.").  Another
defense expert testified that the City's groundwater system has "by far" more
MTBE contamination than in typical communities using public supply wells. *See*
1/30/09 Deposition of Dr. Fletcher G. Driscoll, at 174:20-177:8, Ex. K to Greene
Decl.

and City each chose five to litigate.  The parties recently agreed to litigate only the

City's five focus wells during the initial bellwether trial.  The City's focus wells

are 6, 6A, 6B, 6C, and 6D, which are all in Station 6.   MTBE has been detected in

each of these wells.  All of these wells are available for use by the City, but none

are currently in use.

        This case will be tried in four phases, with special jury interrogatories

posed at the end of each phase.[26]  Phase I will focus on the City's groundwater

supply plans, asking the jury whether the City intends to begin construction of

Station 6 in the next fifteen years and to use water from the wells in the next

fifteen to twenty-five years.  Phase II will ask the jury whether MTBE will be

present in the wells when the Station 6 treatment facility is completed or

immediately after the wells are turned on.[27]  Phase III will focus on the remaining

liability issues, such as causation and damages.[28]  Phase IV will focus on punitive

damages.[29]

---

[26]    The parties dispute the questions that should be put to the jury at the
end of each phase.  Nothing in the following description is intended to resolve any
of these disputes.

[27]    *See* JPTO II at 10-11.

[28]    *See id.*

[29]    *See id.*

### C.   Motion in Limine

Exxon moves to prevent the City from presenting evidence of past or future costs relating to MTBE treatment and design until it proves actual injury. Exxon argues that this case concerns *threatened* wells because the City's property interest is – at most – in the use of the water and the City – for reasons unrelated to MTBE contamination – has never used these wells. Under this theory, the only possible injury to the City is the future injury that might occur if the City puts these wells back in service. In turn, actual injury will occur only if MTBE is still in the water at a level that requires remediation when the wells are brought on line.

Exxon also makes several related arguments. *First*, Exxon claims that the City does not have standing to sue because it suffers no current or imminent injury. *Second*, Exxon asserts that this suit is not ripe for adjudication. *Third*, Exxon argues that the City's claim of future damages is too speculative to merit recovery under New York law. *Fourth*, Exxon states that the cost of treating MTBE – including the design of necessary facilities – is a pure economic loss, which does not constitute a cognizable injury. Exxon maintains that if the City is permitted to present evidence of future or past costs, the jury will likely become confused when assessing whether there is an injury. For all of these reasons, Exxon argues that the City should be precluded from presenting evidence

9

of past or future treatment costs to these wells until the City establishes an actual injury.

The City responds that it suffered injury when its wells were contaminated by MTBE. Although Station 6 wells have not been in use for reasons unrelated to MTBE, the City argues that its current ability to use the wells is significantly hampered by the presence of MTBE. In particular, the City maintains that were it not for MTBE contamination, it would treat the other contaminants in order to use these wells. As a result, the City argues that the contamination constitutes a current injury.

The City also counters each of Exxon's secondary arguments. *First*, the City states that the suit is ripe for adjudication because it is presently injured by hardships including the inability to plan and to implement a treatment project for these wells absent recovery. *Second*, the City asserts its claim for damages is not speculative because it firmly intends to use these wells once it can treat them; thus damages can be calculated based on definite treatment costs. *Third*, it further argues that its damages claim is not speculative because it has already spent money to design treatment facilities for these wells and will incur further costs for design and implementation of a treatment facility as a result of a statutory obligation to investigate and remediate MTBE. *Fourth*, the City claims that

10

evidence of past costs for designing treatment facilities is relevant to rebut

Exxont's argument that the City has no intention to use Station 6 wells in the

future.

## III.   APPLICABLE LAW

### A.   Motion in Limine

The Federal Rules of Evidence favor the admission of all relevant

evidence.[30]  Evidence is relevant if it has "any tendency to make the existence of

any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence."[31]  A district court will

"exclude evidence on a motion in limine only when the evidence is clearly

inadmissible on all potential grounds."[32]  "Indeed, courts considering a motion in

limine may reserve judgment until trial, so that the motion is placed in the

appropriate factual context."[33]  Moreover, a court's ruling regarding a motion in

limine "'is subject to change when the case unfolds . . . .  Indeed even if nothing

unexpected happens at trial, the district judge is free – in the exercise of sound

---

[30]     *See* Fed. R. Evid. 402.

[31]     Fed. R. Evid. 401.

[32]     *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006).

[33]     *United States v. Chan*, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).

judicial discretion – to alter a previous in limine ruling.'"[34]

## B.    Standing

The Constitution of the United States expressly limits the federal

judicial power to certain enumerated "cases" or "controversies."[35]  The purpose of

this limitation is – among other things – to ensure that matters brought before the

federal courts are appropriate for adjudication.[36]

The Supreme Court has identified an "irreducible constitutional

minimum" that must be shown by a party seeking redress.[37]  Although this baseline

is comprised of three distinct elements, only one is at issue here: A plaintiff must

have suffered an injury-in-fact, the invasion of a "legally protected interest" in a

manner that is "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical."[38]  "Injury in fact is a low threshold."[39]  "An

---

[34]    *Palmeri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996) (quoting *Luce v. United States*, 469 U.S. 38, 41-42 (1984)).

[35]    U.S. Const. art. III, § 1.

[36]    *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

[37]    *Id.* at 561.

[38]    *Id.* (quotation marks and citations omitted).  *Accord Heckler v. Mathews*, 465 U.S. 728, 736 (1984) (requiring "actual or threatened injury" (quotation marks omitted)).  The other two requirements are that the plaintiff's injury must be "fairly traceable" to the defendant's alleged conduct, and it must be

12

injury-in-fact differs from a 'legal interest' [in that] an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law."[40] "An injury-in-fact may simply be the fear or anxiety of future harm."[41] "The risk of future harm [sufficient to support standing] may include economic costs, such as medical monitoring and preventative steps."[42] "[E]xposure to toxic or harmful substances has been held sufficient to satisfy the Article III injury-in-fact requirement even without physical symptoms of injury caused by the exposure, and even though exposure alone may not provide sufficient ground for a claim under state tort law."[43] Finally, "lack of compensatory damages does not negate

---

likely that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561.

[39] *Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008).

[40] *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). *Accord Whitmore*, 495 U.S. at 155 ("Our threshold inquiry into standing in no way depends on the merits of the [plaintiff's claim]." (quotation marks omitted)).

[41] *Denney*, 443 F.3d at 265.

[42] *Id.*

[43] *Id. Accord In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425, 1434 (2d Cir. 1993) (rejecting the argument that "injury in fact means injury that is manifest, diagnosable or compensable") (internal quotation marks omitted), *overruled in part on other grounds by Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002); 7A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Fed. Prac. & Proc. Civ. 3d § 1785.1 (2005) ("If plaintiff can show that there is a

13

standing"[44] and "the fact that an injury may be outweighed by other benefits, while

often sufficient to defeat a claim for damages, does not negate standing."[45]

Because the requirements of standing are "not mere pleading requirements" – but

rather an "indispensable part" of a claim – each element must be supported "with

the manner and degree of evidence required" at each successive stage of

litigation.[46]

### C. Ripeness

The "ripeness doctrine is drawn both from Article III limitations on

judicial power and from prudential reasons for refusing to exercise jurisdiction."[47]

In its constitutional dimension, the ripeness doctrine "'prevents a federal court

from entangling itself in abstract disagreements over matters that are premature for

---

possibility that defendant's conduct may have a future effect, even if injury has not
yet occurred, the court may hold that standing has been satisfied.").

[44]     *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port
Auth.*, 567 F.3d 79, 86 (2d Cir. 2009) (quotation marks omitted).

[45]     *Denney*, 443 F.3d at 265. *Accord Sutton v. St. Jude Med. S.C., Inc.*,
419 F.3d 568, 574-75 (6th Cir. 2005) (holding that the increased risk that a faulty
medical device may malfunction constituted a sufficient injury-in-fact even though
the class members' own devices had not malfunctioned and may have actually
been beneficial).

[46]     *Lujan*, 504 U.S. at 561.

[47]     *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57, n.18 (1993).

review because the injury is merely speculative and may never occur.'"[48]  In this

respect, ripeness overlaps with standing, and a showing that a claim is sufficiently

"actual and imminent" to constitute an Article III injury in fact is normally

sufficient to establish that the claim is constitutionally ripe for review.[49]

Under the prudential doctrine of ripeness, "when a court declares that

a case is not prudentially ripe, it means that the case will be better decided later

and that the parties will not have constitutional rights undermined by the delay."[50]

"[T]he fitness of the issues for judicial decision and the hardship to the parties of

withholding court consideration must inform any analysis of ripeness."[51]  "If a

ripe claim is presented as to one aspect of a common aggregation of facts, it may

be appropriate to adjudicate other claims that would not independently satisfy the

more elastic and discretionary aspects of the ripeness calculus."[52]

---

[48]     *Ross*, 524 F.3d at 226 (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002)).

[49]     *Id.*

[50]     *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003).

[51]     *Thomas v. Union Carbide Agricultural Prods. Co.*, 473 U.S. 568, 581 (1985).

[52]     13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532.1 (2009). *Accord Uhl v. Thoroughbred Tech. and Telecoms., Inc.*, 309 F.3d 978, 984–85 (7th Cir. 2002) (holding that when one claim is justisticiable, "[t]his is enough to permit the court to address the entire suit").

## D.    Injury

Under New York law, the injury in a toxic tort case is sustained at the

time the noxious substance *entered* the body, not the time when the harm

manifests.[53]  "The exposure rule is premised upon the proposition that . . . injury in

a toxic tort case accrues upon exposure to the toxic substance, because it is at that

point that there has been 'a wrongful invasion of personal or property rights.'"[54]

This is based "upon the assumption that a toxic substance acts immediately upon

the body to produce injury."[55]

In another case concerning MTBE contamination – which also

applied New York law – this Court found a cognizable injury sufficient to support

_____

[53]    *See Snyder v. Town Insulation, Inc.*, 81 N.Y.2d 429 (1993). *See also Schmidt v. Merchants Despatch Transp. Co.*, 270 N.Y. 287, 300 (1936) ("The injury occurs when there is a wrongful invasion of personal or property rights . . . . When substantial damage may result from any wrong affecting the person or property of another, a cause of action for such wrong immediately accrues."); *Snyder*, 81 N.Y.2d at 433 ("Disease was a consequence of the injury . . . not the injury itself . . . .") (citing *Schmidt*, 270 N.Y. at 301).

[54]    *Blanco v. American Tel. & Tel. Co.*, 90 N.Y.2d 757, 772 (1997) (quoting *Schmidt*, 270 N.Y. at 300).

[55]    *Id.* In contrast, an injury resulting from contact with a substance that is not "inherently toxic or dangerous" – such as a repetitive stress injury resulting from contact with a computer keyboard – occurs at the time the harm manifests. *Id.* at 772-73. *Accord id.* at 768 (noting that injury resulting from malfunction of a medical implant occurs at the time of the malfunction because the action is "based upon objects being implanted, but not assimilated, into the body"); .

16

standing because "[a] reasonable jury could find that property with drinking wells

that have been contaminated with MTBE is *worth less* than property with drinking

wells that have not been contaminated."[56] The owner of a well has a property

interest in the use of the water therein and may recover damages for an injury to

this usufructuary property interest.[57]

This Court also held in a third MTBE case – applying analogous

principles of California law – that whether a water district "has suffered an injury

turns on whether such contamination caused or should have caused [the District]

to act in furtherance of its charge[ of] protecting all groundwater within the

District's territory."[58] Accordingly, an injury occurred if "the MTBE detected in

the groundwater was such that [the Water District] took, or should have taken,

---

[56]  *In re MTBE Prods. Liab. Litig.*, 568 F. Supp. 2d 376, 379 (S.D.N.Y.
2008) (emphasis added).

[57]  *See, e.g.*, *Westphal v. City of New York*, 78 N.Y.S. 56, 59 (2d Dep't
1902) ("The plaintiff has no property right in the water, as such; he does not own
the particles of which it is formed. His property in the water is in its use while it
remains upon or under his lands; it is the usufructuary right, the same as in flowing
water. He has the right to the use of the water, but he has no property in the water
as such; and the measure of his damages . . . is the decreased fee or rental value of
the property with the water withdrawn.").

[58]  *In re MTBE Prods. Liab. Litig.*, 475 F. Supp. 2d 286, 295 (S.D.N.Y.
2006) (quotation marks omitted).

steps to investigate, clean up, abate, and/or remediate the alleged contamination."[59]

## E.     Damages

"'Establishing the appropriate measure of damages for injuries

suffered from environmental conditions on neighboring land is separate and

distinct from offering the requisite proof of the underlying claim.'"[60]  The goal of

compensatory damages "is to restore the injured party, to the extent possible, to

the position that would have been occupied had the wrong not occurred."[61]  "A

court may award property damages to address necessary restoration and repairs,

lost rental value or property devaluation, depending on the type of action brought

and the specific facts and circumstances of the case."[62]  "There are many ways,

however, to determine the proper measure of damages for wrongful occupation of

property, and courts are very flexible in choosing a measure of recovery [that] is

---

[59]     *Id.* On the other hand, "where MTBE was present at low levels or located in areas that did not, at that time, threaten the groundwater, [the District] suffered no appreciable harm." *Id.*

[60]     *In re MTBE Prods. Liab. Litig.*, 568 F. Supp. 2d at 381 (quoting Mark S. Dennison, *Recovery of Damages For Injury to Landowner's Property from Environmental Condition on Neighboring Land*, 37 Am. Jur. Proof of Facts 3d 439, § 10 (2008)).

[61]     *McDougald v. Garber*, 73 N.Y.2d 246, 254 (1989).

[62]     *In re MTBE Prods Liab. Litig.*, 568 F. Supp. 2d at 379 (quotation marks omitted).

most appropriate to the particular facts of the case."[63] "The plaintiff bears the burden of proving economic loss, and future loss may be established using expert testimony that assesses future probabilities."[64]

### F.    Burden of Proof

Under New York Law,  recovery of damages based on future consequences of a present injury may be had only if such consequences are "reasonably certain."[65] Recovery of damages for speculative or conjectural future consequences is not permitted.    However, it is "well established" that "'[t]he rule of certainty as applied to the recovery of damages does not require mathematical accuracy or absolute certainty or exactness, but only that the loss or damage be capable of ascertainment with reasonable certainty.'"[66] "If such proof is made, the alleged future effect may be treated as certain to happen and the injured party may

---

[63]     *Id.* (quotation marks omitted).

[64]     *Okraynets v. Metropolitan Transp. Auth.*, 555 F. Supp. 2d 420, 444 (S.D.N.Y. 2008).

[65]     *E.g., Schultz v. Harrison Radiator Div. General Motors Corp.*, 90 N.Y.2d 311, 320-21 (1997); *Cumming v. Brooklyn City R.R. Co.*, 109 N.Y. 95, 98 (1888). *See generally* Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353, 1371-72 (1981).

[66]     *Reichman v. Warehouse One, Inc.*, 569 N.Y.S.2d 452, 453 (1st Dep't 1991) (quoting 36 N.Y. Jur. 2d Damages, § 15).

19

be awarded full compensation for it[. I]f the proof does not establish a greater

than 50% chance, the injured party's award must be limited to damages for harm

already manifest."[67]

In New York, the meaning of the term "reasonably certain" varies

depending on the context. The rule of reasonable certainty has been applied to the

proof of *every* type of damage – both past and future.[68] Fixed rules are not

appropriate; rather, particular circumstances of cases govern the type of damages

recoverable and the applicable burden of proof.[69] In most contexts, it is akin to the

ordinary preponderance of the evidence standard,[70] which requires only that

---

[67]    *Id.*

[68]    *See Steitz v. Gifford*, 280 N.Y. 15, 20 (1939) ("In actions in tort, there
are certain well-settled and universally recognized rules relating to damages
recoverable . . . [including that] [r]easonable certainty as to the amount . . . is
required."). *See also Behrens v. Metropolitan Opera Ass'n, Inc.*, 794 N.Y.S.2d
301, 303 (1st Dep't 2005) ("In tort actions, an injured plaintiff may recover from
the defendant all damages directly flowing from and as a natural consequence of
the wrongful act, so long as the damages may be ascertained with reasonable
certainty.").

[69]    *See Steitz*, 280 N.Y. at 20. *See also Caudle v. Towers, Perrin,
Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 275 (S.D.N.Y. 2008) (declining to
apply the reasonable certainty requirement when a plaintiff sought damages for
insurance against future harm and for monitoring to detect future harm, rather than
the "present value of a future loss").

[70]    *See, e.g., Jarrett v. Madifari*, 415 N.Y.S.2d 644, 649 (1st Dep't 1979)
(stating that plaintiff "must establish the propositions essential to his cause by a
preponderance of the evidence" and explaining that "plaintiff is required to show

20

damages are "capable of measurement based upon known reliable factors without undue speculation."[71] Only in three limited contexts have New York courts equated "reasonable certainty" with the clear and convincing evidence standard. *First*, New York courts have expressly required a defendant to prove the existence of an offset to a damages award based on a collateral source by clear and convincing evidence because the collateral source offset is available pursuant to a statute in derrogation of the common law.[72] *Second*, New York courts have

---

with *reasonable certainty* that the injury resulted from the act of the defendant" (emphasis added)). *See also Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 119 (D.C. Cir. 1982) ("To meet the 'reasonably certain' standard, courts have generally required plaintiffs to prove that it is more likely than not (a greater than 50% chance) that the projected consequence will occur." (applying District of Columbia law)). *See generally Seybolt v. New York, Lake Erie & W. R.R. Co.*, 95 N.Y. 562, 570 (1884) ("[U]pon the trial of a civil action the party sustaining the burden of proof performs his obligation by presenting a preponderance of evidence."); *Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions [arising under federal law] between private litigants unless particularly important individual interests or rights are at stake." (quotation marks omitted)).

[71]    *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993). *Accord id.* ("Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision." (citing, *inter alia*, Restatement (Second) of Contracts § 352 (1981))).

[72]    *See Sternfeld v. Forcier*, 679 N.Y.S.2d 219, 219 & n.2 (2d Dep't 1998) (citing *Ashland*, 82 N.Y.2d at 403). *See also Firmes v. Chase Manhattan Automotive Finan. Corp.*, 852 N.Y.S.2d 148, 160 (2d Dep't 2008) (noting that the

implied a hightened evidentiary burden in cases concerning medical treatment and

future risk, as the injury itself – and not merely the resultant damages – has yet to

occur.[73] *Third*, New York courts have implied a heightened burden of proof in

cases requesting damages for "future damages for loss of household services" or

similar future income, as they are special damages, "separate and apart from pain

and suffering," unrelated to the injury alleged in the case, and inherently

speculative and difficult to prove.[74]

---

appellate divisions have uniformly required proof of an offset by "clear and
convincing evidence that the result is highly probable" (citing N.Y. C.P.L.R.
4545(c)).

[73]     *See, e.g., Ellis v. Emerson*, 870 N.Y.S.2d 190, 191-92 (4th Dep't
2008) (overturning a jury verdict concerning future medical expenses); *Bossio v.
Fiorillo*, 620 N.Y.S.2d 596, 598 (3rd Dep't 1994) (upholding summary judgment
against a plaintiff concerning increased risk of cancer).

[74]     *Presler v. Compson Tennis Club Associates*, 815 N.Y.S.2d 367, 369
(4th Dep't 2006) (quotation marks omitted). *Accord Schultz v. Harrison Radiator*,
90 N.Y.2d 311, 320-21 (1997) (overturning a jury verdict based on insufficient
certainty of the value of lost services); *Jeffries v. 3520 Broadway Mgmt. Co.*, 827
N.Y.S.2d 136, 138 (1st Dep't 2007) (overturning a jury verdict based on
insufficient certainty of the value of future earnings). Even in this limited
circumstance, New York courts have not consistently applied a heightened burden
of proving reasonable certainty. *See Kavanaugh v. Nussbaum*, 514 N.Y.S.2d 55,
59 (2d Dep't 1987) (allowing damages for lost future earnings even though "the
computation of damages in a case such as this 'is necessarily speculative and
fraught with difficulties'" (quoting *Snow v. State of New York*, 469 N.Y.S.2d 959,
964 (2d Dep't 1983), *aff'd*, 64 N.Y.2d 745 (1984)).

## IV.   DISCUSSION

### A.   Standing

The City alleges two types of injury, one present and one future.  The present injury claim is that Section 6 wells have already been contaminated by MTBE at a level that requires remediation.  The City has three different bases for standing to bring this claim.  *First*, because the injury caused by a toxic substance occurs at the time of impact (under New York law) – even if the effects of this injury will not materialize until the wells are turned on – the City already has a claim related to Exxon's introduction of MTBE into its groundwater.  *Second*, the City alleges that the introduction of MTBE into the Brooklyn-Queens Aquifer required it to expend funds designing a treatment facility.  These expenditures are sufficient to give the City a cognizable interest in this suit sufficient to support standing.  *Third*, the City has been injured if a reasonable well owner would take substantial steps to remediate the contamination.[75]  Even if the groundwater is so contaminated by other pollutants that the wells have no value to the City regardless of the MTBE contaminations, this consideration cannot defeat standing.

---

[75]   There is significant room for debate concerning the types of steps that a reasonable well owner would need to take before an injury is established, but – at a minimum – if the level of contamination is such that a reasonable well-owner would take substantial measures to remove the MTBE from the water, then an injury has occurred.

23

Standing exists when a party has been harmed by another party's conduct, even if that harm is outweighed by other considerations and no damages ultimately result.[76] In sum, the threshold for establishing standing is low, and the City has plainly crossed it.

The City's future injury claim is that even if some of these wells are not currently contaminated by MTBE at a level that establishes injury, once the wells are turned on the MTBE contamination will substantially and immediately increase to a level that constitutes a cognizable injury to the City. The City's water is threatened; thus the City has standing to make these claims, with the usual caveat that it must show that the injury will be "imminent" once the wells are turned on.[77]

---

[76]     *See Denney*, 443 F.3d at 265.

[77]     *Lujan*, 504 U.S. at 561. The City need not show, however, that it is about to turn on its wells. If the City can show that its wells will become injured immediately upon turning them on, it need not go through the curious exercise of turning the wells on to injure itself. In alleging that the wells will become contaminated once they are turned on, the City alleges a *current* threatened harm, which is sufficient to support standing. *See Dimarzo v. Cahill*, 575 F.2d 15, 18 (1st Cir. 1978) (holding that plaintiffs had standing for claims related to fire hazards – despite inability to show that a fire was likely – because they "need not wait for the conflagration before concluding that a real and present threat exists"). *See also Loa-Herrera v. Trominski*, 231 F.3d 984, 987–88 (5th Cir. 2000) ("[A]ctual injury is not constitutionally required. Mere threatened injury is sufficient, and the threat in this case is real.").

24

### B.    Ripeness

The City has standing based on a number of present or threatened injuries to its groundwater.  For the same reasons, the suit is ripe for review.  Furthermore, the suit is prudentially ripe because it is fit for judicial resolution and denying plaintiff permission to sue now would create a significant hardship.  Claims involving future damages are commonplace in New York courts.[78]  Plaintiff would suffer significant hardship if it were not able to sue now because – as both parties agree – it takes many years to design and implement a treatment facility of the scale allegedly contemplated for Station 6.  Moreover, the City plausibly argues that it will not be in a position to decide how to proceed with budgeting the treatment facility until it learns what future costs – if any – it may recover from Exxon.[79]  Further, and more important, if the City were to delay suit until the completion of the Station 6 facility, the suit would likely be time-barred

---

[78]    The questions of ripeness and the certainty of future harm are analytically distinct.  By bringing a claim before threatened injury has become a present or past harm, a plaintiff runs the risk that it will not be able to prove damages with sufficient certainty.  However, that does not render the suit unfit for adjudication.

[79]    *Cf. New York v. United States*, 505 U.S. 144, 175 (1992) (finding challenge to a regulation ripe several years before the regulation's effective date because the plaintiff "must take action now in order to avoid the . . . provision's consequences.").

25

under the New York statute of limitations, a hardship of the highest order.[80]

Finally – given that damage is not part of a trespass claim – the City's claim for

trespass is unquestionably ripe.  At a minimum, because each of the City's claims

arise out of a common set of facts, prudential considerations favor hearing all of

the City's claims at once.

## C.     The City Must Prove Its Claim By a Preponderance of the Evidence

A significant portion of the City's claim relates to future damages,

albeit arising from a present injury.  Under New York law, future damages must be

proven to a reasonable degree of certainty.  The ordinary interpretation of this term

is the equivalent of a preponderance of the evidence standard.  Moreover,

plaintiffs' claims are distinguishable from those claims where courts have imposed

a heightened burden of proof.  *First*, future damages from a present injury have

long been available under the common law.  Therefore there is no need for courts

to narrowly construe future damages as a departure from common law principles.

*Second*, the City's claims relate primarily to future damages for a present injury,

---

[80]     *See In re MTBE Prods. Liab. Litig.*, No. 00 MDL 1898, 2007 WL
1601491, at *6 (S.D.N.Y. June 4, 2007) (holding – under New York law – that "a
plaintiff's claims accrue when it first knows of both (1) the presence of MTBE at a
level sufficient to constitute an injury and (2) the harmful impact of MTBE on
drinking water.").  Notably, ExxonMobil intends to argue at trial that the claims
for Station Six are *already* time-barred.

rather than future damages arising from a future injury. Thus *future damages claims* are inherently less speculative and uncertain than *future injury claims*, such as claims relating to uncertain medical risks and complications. *Third*, damages sought by the City are directly compensatory for the injury alleged, rather than special damages that are by their very nature speculative. Although there is some future element to these claims, the nature of the injury is known, distinguishing this case from one concerning future earnings or lost services.

Here – as in most cases – the reasonable certainty requirement does not require a plaintiff to meet a heightened burden of proof – *i.e.* the clear and convincing evidence standard. Although the jury may not base a damages finding on speculative or conjectural evidence, the City need only prove that it is more likely than not that it will suffer the particular damages alleged. In other words, the City must meet only the traditional preponderance of the evidence standard for a civil claim.

The situation differs with regard to wells in which present levels of MTBE are insufficient to constitute an injury. In such event, the case is properly analogized to the medical treatment and device cases described above, as they relate to a future injury – not merely future damages. Therefore, with reard to those wells, the City must prove by clear and convincing evidence that MTBE will

27

remain in the capture zone by the date of the City's intended use of the

groundwater and that when the wells are turned on the influx of water will raise

MTBE concentrations to an injurious level.

### D.     The Ciy's Damages Claims Are Not Speculative

Exxon incorrectly asserts that the City must prove that it *will* use the

well in Section 6 in the future, either by actively supplying drinking water or

bringing the wells on line as a back-up source.  The general rule in New York is

that a plaintiff may recover for interference with use of property provided that the

plaintiff "actually intends, in good faith, to make such use" of the property.[81]

Exxon has not shown why this Court should deviate from that rule.

Although this case presents an atypical fact pattern, it is not *sui*

*generis*.  In *Squaw Island Freight Terminal Co. v. City of Buffalo*, the plaintiff had

ceased dredging sand from his property after sewage released by the defendant had

rendered the sand "useless for commercial purposes."[82]  The plaintiff had allowed

his federal license to dredge to elapse; thus plaintiff had not proven that he *could*

begin again to dredge, even if he intended to do so.[83]  Nevertheless, the New York

---

[81]     36 N.Y. Jur. 2d Damages, § 113.

[82]     273 N.Y. 119, 125 (1937).

[83]     *See id.* at 130.

Court of Appeals held that "the lack of licenses . . . cannot bar the plaintiff from

recovering damages" because a new license "*might* be granted in the future."[84]

Thus, New York law permits a degree of conjecture concerning the future use of

property rendered temporarily unusable. The City need not prove that it *will* use

its water; it must only show that it *might*.[85]

Accordingly, the City must show that it intends, in good faith, to use

the property. To ensure that this proof is not speculative, the City will be required

to show that it intends – in good faith – to commence building the treatment

facility within fifteen years. The City must also show the requisite level of MTBE

contamination in one of two ways. *First*, it may prove by a preponderance of the

evidence that MTBE will be in the water – at a level sufficient to cause injury – at

[84]     *Id.* (emphasis added).

[85]     Notably the Court of Appeals noted that the lack of licences "may be
considered in mitigation of damages and even perhaps to the entire elimination
thereof." *Id.* On remand, the Fourth Department of the Appellate Division held
that the plaintiff was not entitled to any damages because plaintiff had not "shown
that it *can* obtain a permit from the United States Government to dredge sand."
*Squaw Island Freight Terminal Co., Inc. v. City of Buffalo*, 11 N.Y.S.2d 459, 461
(4th Dep't 1939) (emphasis added). *See id.* (stating that the Court of Appeals
"h[eld] in effect that the plaintiff has not suffered any loss by the destruction of its
sand and gravel under water unless it has *or can* obtain the right to take the same
from the bed of the river" (emphasis added)). Thus the requirement that a plaintiff
"might" use the harmed property creates an evidentiary burden concerning
feasibility, if not likelihood.

29

the time the plant is likely to be built.[86]   *Second*, it may prove by clear and

convincing evidence that MTBE will remain in the capture zone by the date of the

City's *intended use* of the groundwater and that when the wells are turned on the

influx of water will raise MTBE concentrations to an injurious level.

### E.     Evidence of Past or Future Costs Prior to Establishing Injury

The City intends to introduce evidence that it has recently spent

significant sums to design a treatment facility for these wells in order to rebut

Exxon's contention that the City has abandoned the wells. The evidence is

relevant for that purpose and is therefore admissible in Phase I. Further, contrary

to Exxon's argument, the amount of money spent to upgrade the wells is also

relevant and admissible because it may help the jury understand *how* committed

---

[86]     To be sure, the City will not be able to use these wells until a facility
is built to treat the contaminated water, but the same is true in *every* case where
injury to property requires extensive remediation. The inevitable delay between
contamination and sufficient treatment to allow renewed use of property does not
render speculative a claim for funds needed to render property usable again.
Exxon argues that this case is special because other contamination has prevented –
and continues to prevent – the City from using these wells. However it would be
unreasonable to require the City to first remedy one set of contaminants before it is
able to seek damages resulting from a second form of contamination. The
presence of multiple pollutants does not negate the injury and "is but a factor to be
weighed by a jury in their determination of damages" and does not negate a later
injury. *Cornell v. Exxon Corp.*, 558 N.Y.S.2d 647, 651 (3rd Dept. 1990).

the City is to using these wells in the future.[87]  However, during Phase I, when

MTBE contamination will not be an issue, the City may not attribute those costs to

MTBE contamination.  Finally, the City may not present evidence of future design

costs in Phase I.  During Phase III, the jurors will be carefully instructed that the

future treatment costs are relevant only to damages and not to the question of

whether the City has been injured.[88]

---

[87]      That is, if the City had spent only a few hundred dollars to design
treatment facilities for these wells, this may persuade the jury that the City is not
committed to using these wells in the future.  If the City spent tens of thousands of
dollars on this, however, a different picture might emerge.

[88]      Exxon recently requested that Phase III be divided into several
discrete phases.  This late-breaking request is not addressed in this opinion.

31

## V.   CONCLUSION

For the foregoing reasons, Exxon's motion *in limine* is granted in part

– to the extent that the City may not attribute the past design costs to MTBE

contamination and may not present evidence of future design costs in Phase I –

and denied in all other respects.  The Clerk of the Court is directed to close this

motion (No. 04 Civ. 3417, document 95; No. 00 MDL 1898, document 2306).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 6, 2009

## -Appearances-

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York  10038
(212) 558-5500

**Counsel for Plaintiff City of New York:**

Victor M. Sher, Esq.
Todd E. Robins, Esq.
Joshua G. Stein, Esq.
Nicholas G. Campins, Esq.
Marnie E. Riddle, Esq.
Sher Leff LLP
450 Mission Street, Suite 400
San Francisco, California  94105
(415) 348-1568

Susan Amron
Daniel Greene
Assistant Corporation Counsel
100 Church Street
New York, New York  10007
(212) 788-1568

**Liaison Counsel for Defendants and Counsel for Exxon Mobil Corporation:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173
(212) 547-5583