UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- X

IN RE METHYL TERTIARY BUTYL         OPINION AND ORDER
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION                  00 MDL 1898 (SAS)

----------------------------------------------------- X

This Document Relates to:

----------------------------------------------------- X

CITY OF NEW YORK, *et al.*,

         Plaintiffs,

  - against -                   04 Civ. 3417 (SAS)

EXXON MOBIL CORPORATION,

         Defendant.

----------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/21/09

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.     INTRODUCTION

       In 2003, the City of New York (the "City") filed a Complaint against

various corporations for their use and handling of the gasoline additive methyl

tertiary butyl ether ("MTBE"), alleging that MTBE contaminated – or threatened

1

to contaminate – the City's groundwater supply.[1]  The case is about to proceed to trial.  Defendant Exxon Mobil Corporation ("Exxon") – the only remaining non-settling defendant – moves *in limine* to exclude the testimony of three of the City's expert witnesses: Harry Lawless, Kathleen Burns, and Marcel Moreau.[2]  The City moves to exclude the testimony of several of Exxon's expert witnesses: Fletcher Discoll, Anthony Taverni, Robert N. Stavins, Richard D. Wilson, Thomas C. Austin, and Marcia E. Williams.  For the reasons that follow, Exxon's motions are granted in part and denied in part, and the City's motions are granted in part and denied in part.

## II.    BACKGROUND

### A.    Harry Lawless

---

[1]      This Opinion assumes familiarity with facts discussed in this Court's previous opinions in this case.  For a general discussion of the MTBE litigation, see *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.* ("*In re MTBE*"), 379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005).  Exxon recently contested whether the City owns the groundwater system and is the proper plaintiff in this case.  On July 6, 2009, this Court resolved any potential dispute by joining the New York City Water Board Authority and the New York City Municipal Water Finance Authority as necessary plaintiffs.  *See* Order, *City of New York v. Amerada Hess Corp.*, No. 04 Civ. 3417, Docket No. 337 (S.D.N.Y. July 6, 2009).  For ease of understanding, I will continue to use "the City" to refer to all three plaintiffs.

[2]      Exxon has additionally moved to exclude the testimony of Martin Tallett, another of the City's experts.  That motion will be addressed in a separate opinion.

The City proposes to call Professor Harry T. Lawless to testify concerning the odor detection threshold of MTBE. Lawless is an expert in sensory evaluation methods, specifically focused on taste and smell.[3] Relying on data gathered in a study published in 2001, Lawless's report concludes that the "human threshold" for the detection of MTBE – a standard value based on the geometric mean of the data – is 14 parts per billion ("ppb").[4] Lawless additionally states that ten percent of the population will detect MTBE at 1-2 ppb and twenty-five percent of the population will detect MTBE at approximately 3 ppb.[5] Lawless concludes by asserting that further testing at lower potential detection thresholds and the integration of real-world factors such as temperature and water dispersion patterns would likely indicate an even lower detection threshold.[6]

Exxon challenges the admissibility of Lawless's testimony on two grounds. *First*, Exxon asserts under Federal Rule of Evidence ("FRE") 702 that

---

[3]   *See* 2/5/09 Expert Report of Harry T. Lawless ("Lawless Rep.") ¶ 1, Ex. B to Memorandum of Law in Support of Defendants' Joint Motion *in Limine* to Exclude the Opinion of Plaintiff's Expert Harry T. Lawless ("Def. Lawless Mem.").

[4]   *See id.* ¶¶ 1, 15.

[5]   *See id.* ¶¶ 1, 16.

[6]   *See id.* ¶¶ 7, 16, 31-32. Notably, Lawless states that some real-world factors such as background odors could mitigate *against* the detection of MTBE. *See id.* ¶ 33.

3

Lawless's testimony concerning detectability will not aid the jury to determine the true fact at issue, which Exxon frames as consumer rejection.[7] *Second*, Exxon claims that even if Lawless's testimony is relevant, its probative value is outweighed by prejudice to Exxon and the testimony's likelihood to confuse the jury, requiring exclusion under FRE 403.[8]

## B.   Kathleen Burns

The City next proposes to call Dr. Kathleen Burns to testify concerning the potential health effects of MTBE, as well as industry knowledge of the harms posed by MTBE and industry reaction to that knowledge. Burns is an expert in toxicology, public health, and regulatory development.[9] Burns's report first addresses toxicology, specifically stating that MTBE exposure may cause nervous, reproductive, and developmental damage and may increase cancer risk.[10] Moreover, the report concludes that "there is no completely safe exposure level"

---

[7]     *See* Def. Lawless Mem. at 9-14.

[8]     *See id.* at 14.  Exxon initially argued that Lawless's methodology is not reliable or proven. *See id.* at 15-19.  However, Exxon later withdrew that argument. *See* Reply Memorandum of Law in Support of Defendants' Joint Motion in Limine to Exclude the Opinions of Harry Lawless at 2.

[9]     *See* 2/6/09 Expert Report of Kathleen M. Burns at 3-4, Ex. A to 5/26/09 Declaration of Amanda C. Goad, plaintiff's attorney ("Goad Decl.").

[10]     *See id.* at 7-45.

to MTBE.[11]

The Burns report then addresses the concept of product stewardship, "'an integrated business process for identifying, managing and minimizing the health, safety and environmental risks throughout all stages of a product's life.'"[12] Burns specifically opines that the petroleum industry as a whole – including Exxon – failed in its duty of product stewardship, as it knew of the health risks posed by MTBE, resisted regulation, delayed additional toxicology studies, and promulgated misleading communications concerning MTBE.[13] Burns bases this opinion on public pronouncements of petroleum industry officials and government regulators, as well as independent and industry-sponsored studies.[14]

The report concludes with two discussions of the public health implications of MTBE contamination. *First*, Burns discusses public health standards concerning drinking water and applies those standards to MTBE, particularly noting incompatibility between public health principles and state

---

[11]     *Id.* at 44.

[12]     *Id.* at 46 (quoting Kodak, *Product Stewardship*, http://www.kodak.com/US/en/corp/HSE/stewardship.jhtml).

[13]     *See id.* at 46-58.

[14]     *See id.*

contamination standards.[15] *Second*, Burns discusses what steps a "reasonable" water provider would take in light of the public health concerns created by MTBE contamination.[16]

Exxon does not challenge Burns's testimony concerning "the health effects of MTBE."[17] However, Exxon argues that all other proposed testimony provided in Burns's report is inappropriate. Specifically, Exxon contends that Burns seeks to testify concerning facts that do not require expert explanation.[18] Moreover, Exxon argues that much of Burns's testimony asserts legal conclusions including intent, state of mind, and reasonableness.[19] Finally, Exxon argues that testimony concerning the broader petroleum products industry is irrelevant to a trial where Exxon Mobil is the sole defendant.[20]

---

[15]     *See id.* at 59-68.

[16]     *See id.* at 69-71.

[17]     Reply Memorandum of Law in Support of Defendants' Motion *in Limine* to Exclude Non-Expert Testimony of Kathleen Burns and Marcel Moreau ("Def. Burns/Moreau Reply") at 2.

[18]     *See* Memorandum of Law in Support of Defendants' Motion *in Limine* to Exclude Non-Expert Testimony of Kathleen Burns and Marcel Moreau ("Def. Burns/Moreau Mem.") at 7-9.

[19]     *See id.* at 5-7.

[20]     *See id.* at 10.

6

## C. Marcel Moreau

The City also intends to call Marcel Moreau, "a nationally recognized expert in underground petroleum storage systems."[21] Moreau's report first explains the nature of underground petroleum storage systems, also known as underground storage tanks ("USTs").[22] He then explains three categories of "commonly used leak detection methods."[23]

In a manner similar to Burns, the latter half of Moreau's report opines on the petroleum industry's knowledge concerning the integrity of USTs during the period when MTBE was in use. Specifically, Moreau bases his opinion on the history of leakage studies and government regulation of contaminants frequently leaked from USTs, with a particular focus on MTBE.[24] Finally the report discusses "the M[T]BE problem," which Moreau defines as the confluence of MTBE's high water solubility, resistance to biodegradation, and low odor and taste threshold.[25] Moreau presents a summary of publicly available information

---

[21] 12/19/08 Expert Report of Marcel Moreau at 1, Ex. C to Goad Decl.

[22] *See id.* at 4-18.

[23] *Id.* at 18-25.

[24] *See id.* at 25-51.

[25] *Id.* at 52.

7

concerning the MTBE problem, as well as internal discussions within the oil industry of the hazards caused by this additive.[26] Moreau concludes by stating a number of preventative measures that the petroleum industry did *not* take, which he believes would have significantly reduced environmental harm resulting from MTBE leaks.[27]

Exxon concedes that the first two portions of Moreau's report – concerning storage tank leakage and leak detection methods – "are likely appropriate areas of testimony."[28] However, Exxon objects to the remainder of Moreau's proposed testimony in a similar manner to its objections to Burns's proposed testimony. Again, Exxon contends that Moreau seeks to testify concerning facts that do not require expert explanation.[29] Again, Exxon argues that much of Moreau's testimony asserts legal conclusions including intent, state of mind, and reasonableness.[30] And again, Exxon argues that testimony concerning the broader petroleum products industry is irrelevant to a trial where

---

26      *See id.* at 52-70.

27      *See id.* at 71-72.

28      Def. Burns/Moreau Reply at 2.

29      *See* Def. Burns/Moreau Mem. at 7-9.

30      *See id.* at 5-7.

8

Exxon Mobil is the sole defendant.[31]

### D. Fletcher Driscoll

Exxon intends to call Dr. Fletcher G. Driscoll – an expert in "hydrogeology[ and] particularly in contaminant hydrogeology and water well and monitoring well design and construction"[32] – to testify concerning the effects of MTBE in the City's wells. Driscoll has submitted two reports in this matter, the first concerning "the hydrogeology of the Queens area, as well as the general fate and transport characteristics of MTBE,"[33] the second concerning the City's management of its wells, the persistence of MTBE in groundwater, the need for wells in the area known as "Station 6," the presence of MTBE in Station 6, and problems in several of the City's expert reports.[34]

The portion of Driscoll's report dedicated to the City's maintenance of its own wells relies on the history of legal proceedings against the City concerning problems with city-maintained storage tanks. Driscoll cites to requirements implemented at the state and local level, as well as the history of

---

[31] *See id.* at 10.

[32] 3/9/09 Report of Fletcher G. Driscoll at 1, Ex. A1 to 5/15/09 Declaration of Daniel Greene, plaintiff's attorney ("Greene Decl. I").

[33] *Id.*

[34] *See id.* at 2-3.

enforcement actions by both the New York Department of Environmental Conservation ("DEC") and the U.S. Environmental Protection Agency ("EPA") against the City.[35] This portion of the report relies solely on legal materials, rather than technical or scientific studies or data.

The portion of Discoll's report concerning the presence of MTBE at the Station 6 wells relies on a limited amount of generalized data. Rather than analyzing individual site files, Driscoll looked to the general characteristics of the Brooklyn Queens Aquifer, the termination dispersion patterns of MTBE, and remedial measures taken at spill sites.[36] Thus rather than testifying concerning specific dates on which he anticipated MTBE would no longer be present, Driscoll opined more broadly that MTBE will be non-detectable when the Station 6 wells are brought on line a decade from now.[37] Moreover, Driscoll did not analyze potential sources of MTBE that could be drawn into the Station 6 wells when they are activated; he solely looked at potential sources of MTBE found within the

---

[35]     *See id.* at 12-14.

[36]     *See id.* at 32-36.

[37]     *See id.* at 36.

10

immediate capture zone of the focus wells.[38]

During the development of his expert testimony, Driscoll
communicated with a team of associates via fax. These faxes ranged from
mundane matters such as telephone numbers to relevant materials such as ideas
concerning proposed testimony, diagrams, and sample statistical plots.[39] Driscoll
admitted that the information relayed via fax aided his thought processes.[40] It is
unclear precisely how much correspondence occurred via fax, but it is not an
insignificant amount.[41] "[T]he City does not allege that Driscoll or the defendants
destroyed these documents in bad faith . . . ."[42]

---

[38] *See* 5/1/09 Deposition of Fletcher G. Driscoll ("Driscoll Dep. II"), at
244:22-245:13, Ex. B to 6/11/09 Declaration of Daniel Greene, plaintiff's counsel
("Green Decl. II"). *See also* 4/30/09 Deposition of Fletcher G. Driscoll ("Driscoll
Dep. I"), at 216:11-217:23, Ex. A to Greene Decl. II (noting the potential for
additional contamination resulting from an influx of MTBE after the Station 6
wells are activated).

[39] *See* Driscoll Dep. I at 60:1-60:9, Ex. B to Greene Decl. I; Driscoll
Dep. II at 171:16-172:3, Ex. C to Greene Decl. I.

[40] *See* Driscoll Dep. I at 99:19-100:8, Ex. B to Greene Decl. I.

[41] *Compare id.* at 98:24-99:1 ("[T]here's been so much correspondence
back and forth by telephone calls and faxes."), *with id.* at 100:10-100:19, 101:25-
102:18 (recalling only "six or seven faxes" from a key staff member).

[42] Plaintiff City of New York's Memorandum of Law in Support of Its
Motion to Exclude Testimony and Opinion of Defendants' Expert Fletcher G.
Driscoll at 10.

The City asserts a three-part challenge to Driscoll's proposed

testimony. *First*, the City claims that Driscoll is not qualified to testify concerning

the history of legal proceedings brought by environmental regulators against the

City.[43] *Second*, the City argues that Driscoll cannot testify concerning the duration

of MTBE contamination because of his failure to investigate the circumstances at

particular wells.[44] *Third*, the City complains that it will be unable to assess

Driscoll's testimony appropriately because it did not receive copies of faxes

between Driscoll and his staff; the City asserts that the appropriate remedy for this

alleged spoliation is the complete preclusion of Driscoll's proposed testimony.[45]

## E.   **Richard Wilson**

Exxon also intends to call Richard Wilson, Senior Vice President of

National Environmental Strategies, an environmental consulting firm.[46]  Prior to

being an environmental consultant, Wilson was employed by the EPA for over

thirty years.[47]  As part of his role as Director of the Office of Mobile Sources, he

---

[43]    *See id.* at 2-4.

[44]    *See id.* at 4-6.

[45]    *See id.* at 7-10.

[46]    *See* Resume of Richard Wilson, attached to 1/16/09 Expert Report of
Richard Wilson ("Wilson Rep."), at 1.

[47]    *See id.*

12

was a senior member of the team that developed President George H.W. Bush's June 1989 Clean Air Proposal and was also involved in negotiations with Congress regarding the Clean Air Act of 1990.[48]  Thereafter, he participated in the implementation of EPA regulations for the "new clean fuels programs."[49]

Wilson seeks to provide four opinions. *First*, he will testify that the use of oxygenates in reformulated gasoline was required by federal law.[50]  *Second*, he will opine that the refining industry was effectively mandated to use MTBE in reformulated gasoline.[51]  *Third*, he will testify that Congress knew of the risks of MTBE in groundwater and drinking water supplies when it adopted the reformulated gasoline program.[52]  *Fourth*, he will testify that although Congress, the Administration, and other parties involved in the rulemaking process knew about the potential harmful effects of MTBE in groundwater and drinking water

---

[48]     *See* Wilson Rep.; Memorandum of Law in Support of Defendants' Opposition to Plaintiff's Motion in Limine No. 3 to Exclude Expert Testimony Consisting of Legal Conclusions, Interpreting the Law, or Regarding Legislative or Agency Motive or Intent ("Def. Law/Intent Mem.") at 6.

[49]     Wilson Rep. at 1.

[50]     *See id.* at 3.

[51]     *See id.* at 3-4.

[52]     *See id.* at 4.

13

supplies, such knowledge did not affect their actions.[53]

The City objects to any testimony that Wilson will provide

"'regarding the circumstances under which the refining industry was required to

use MTBE in gasoline in the United States.'"[54] For instance, it moves to preclude

Wilson's explanation about the registration process for gasoline additives and the

regulations passed by the EPA to clean up leaking USTs.[55] The City also contends

that Wilson should be precluded from opining regarding Congress' intent when it

enacted the Clean Air Act or the EPA's intent when it promulgated the

accompanying regulations.[56]

## F. Thomas Austin

Thomas Austin is a founding Senior Partner at Sierra Research and a

former executive officer of the California Air Resources Board.[57] He is an expert

---

[53]  *See id.*

[54]  Memorandum of Law in Support of Plaintiff City of New York's
Motion in Limine No. 3 to Exclude Expert Testimony Consisting of Legal
Conclusions, Interpreting the Law, or Regarding Legislative or Agency Motive or
Intent ("Pl. Law/Intent Mem.") at 8 (quoting Wilson Rep. at 2).

[55]  *See id.* at 8-9.

[56]  *See id.* at 8.

[57]  *See* Resume of Thomas Austin, Ex. A to 1/23/09 Expert Report of
Thomas Austin ("Austin Rep."), at A1.

14

on the control of motor vehicle emissions.[58] He will testify, inter alia, about the

1990 Clean Air Act Amendments, which established federal oxygen content

requirements for gasoline; the available oxygenates that could have been or were

used to comply with the federal Oxygenated Fuels and Reformulated Gasoline

programs; and the benefits and disadvantages of using certain of these

oxygenates.[59]

The City contends that Austin's opinions would interfere with the

duties of the Court to interpret the law and the jury to apply the law to the facts.[60]

Specifically, the City objects to Austin's opinion that MTBE "'became the

oxygenate of choice for compliance' with these programs."[61]

## G.    Marcia G. Williams

Exxon next intends to call Marcia E. Williams, a former EPA

employee who held various managerial and technical positions while employed at

---

[58]    *See* Austin Rep. at 1.

[59]    *See id.* at 2-3.

[60]    *See* Pl. Law/Intent Mem. at 9.

[61]    *Id.* (quoting 1/23/09 Expert Report of Thomas C. Austin ("Austin Rep."), Ex. 5 to Pl. Law/Intent Mem., at 12).

15

the agency from 1970 to 1988.[62] Williams was a Deputy Director and then an
Acting Director in the Office of Toxic Substances and thus was involved in the
rule-making process and implementation of the Toxic Substances and Control Act
("TSCA").[63] After her employment at the EPA, Williams was an environmental
executive at Browning-Ferris Industries.[64] She is currently a Director at LECG
LLC, an environmental consulting firm.[65]

        Williams will testify in large part to rebut Marcel Moreau's proposed
testimony that Exxon and other defendants concealed information about leaking
USTs and the harmful effects of MTBE from the federal government.[66]
Specifically, Exxon seeks to have Williams offer six distinct opinions. *First*,
Williams will opine that Congress directed the EPA to promulgate regulations that
were "protective of human health and the environment" and that the EPA did so
when it established baseline standards for USTs in the 1980s.[67] *Second*, Williams

---

[62]    *See* 1/22/09 Expert Report of Marcia E. Williams ("Williams Rep.")
at 2-5.

[63]    *See id.* at 3. *See also* 15 U.S.C. §§ 2601-2695d.

[64]    *See id.* at 5-6.

[65]    *See id.* at 6.

[66]    *See* Def. Law/Intent Mem. at 6.

[67]    *See* Williams Rep. at 11-22.

16

will testify that – contrary to Moreau's allegations that petroleum companies withheld or "whitewashed" information regarding the presence of MTBE in gasoline – the EPA knew of the use of MTBE but nevertheless believed that existing UST regulations would protect human health and the environment.[68] *Third*, Williams seeks to testify that although the EPA knew that the use of MTBE would increase with the passage of the 1990 Clean Air Act, it nevertheless believed that the storage tank regulations in place were sufficient to combat contamination.[69] *Fourth*, Williams will testify that state and local governments played a key role in UST regulations and could have adopted or passed additional regulation if they believed that federal regulations were insufficiently protective.[70] *Fifth*, Williams challenges Moreau's conclusion that petroleum companies knew about the dangers of MTBE and nevertheless "cross[ed] their fingers" and hoped that they would not be subject to liability as nonsensical and illogical because these companies would not wish to expose themselves to future significant liability.[71] *Sixth*, Williams will refute Moreau's statement that the federal

---

[68] *See id.* at 22-30.

[69] *See id.* at 30-33.

[70] *See id.* at 33-35.

[71] *See id.* at 35-38.

government was unconcerned with small gasoline leaks, noting that the EPA and Congress were aware and had voiced concerns about the impact of small releases and spills.[72]

The City appears to object principally to Williams' opinions regarding the EPA's belief that its regulations were sufficiently protective of human health and the environment.[73] It moves to preclude Williams' testimony on the basis that she should not be permitted to attest to "the mindset or motives" of the EPA.[74]

### H. Robert N. Stavins

Robert N. Stavins is the Albert Pratt Professor of Business and Government and chairman of the Environment and Natural Resources Faculty Group at the John F. Kennedy School of Government, Harvard University, as well as Director of the Harvard Environmental Economics Program.[75] He is also the former Chairman of the EPA's Environmental Economic Advisory Committee, and in that capacity he provided expert advice to the EPA on the economics

---

[72] *See id.* at 38-39.

[73] *See* Pl. Law/Intent Mem. at 12.

[74] *See id.*

[75] *See* 1/23/09 Expert Report of Robert N. Stavins ("Stavins Rep.") ¶ 1.

associated with environmental decision making.[76]

Stavins' testimony principally concerns the EPA's assessments of the qualities of ethanol and MTBE and how these analyses contributed to its development of standards for reformulated gasoline. Specifically, he observes that because ethanol increases gasoline volatility and toxic emissions, the EPA set standards that anticipated that MTBE would be widely used instead of ethanol.

The City contends that Stavins should be precluded from testifying about the EPA's "mindset and intentions in adopting particular regulations" because such testimony is unduly speculative.[77] The City notes – in particular – that when Stavins was asked at his deposition whether he had conducted an independent analysis of the cost to refiners for using ethanol, Stavins responded "no" and explained that "the focus of his work 'in this case has been on [] EPA's analysis, what they thought, what signals they were sending throughout the matter as opposed to my carrying out an economic analysis of the refining industry.'"[78]

## I.     Anthony Taverni

---

[76]     *See id.*

[77]     Pl. Law/Intent Mem. at 14.

[78]     *Id.* at 14 (quoting Transcript of Robert Stavins Deposition at 162:21-163:2).

19

Finally, Exxon intends to call Anthony Taverni, who will testify about "the operation of the Spill Fund and the availability of financial resources for the cleanup of spills and compensation to persons injured by petroleum resources."[79] Taverni spent twelve years as the Deputy Comptroller within the New York State Comptroller's Office.[80] As part of his responsibilities, he was the administrator of the New York Environmental Protection and Spill Compensation Fund.[81] Taverni will opine that "a public or private water supplier, whose wells were contaminated by a spill of gasoline, or its constituents including MTBE, would be entitled to compensation from the Oil Spill Fund."[82]

The City mainly objects to Taverni's testimony on two grounds. *First*, the City contends that Taverni's testimony consists of nothing more than a legal analysis of the requirements of the Oil Spill Fund, which is already "explicitly stated in the statutory provisions of the Navigation Law."[83] *Second*, the City argues that whether the City can obtain compensation from the Oil Spill Fund

---

[79]     Def. Law/Intent Mem. at 5.

[80]     *See* 1/23/09 Expert Report of Anthony Taverni ("Taverni Rep.") ¶ 1.

[81]     *See id.*

[82]     *Id.* ¶ 2.

[83]     Pl. Law/Intent Mem. at 6 (noting that Section 190-a of the Navigation Law provides for compensation for public and private water suppliers).

is entirely irrelevant to whether Exxon should be held liable or pay damages for possible contamination.[84] It also notes that Taverni admitted that he was unfamiliar with the nature of the City's claims and therefore could not opine with respect to this particular case.[85]

## III. APPLICABLE LAW

### A. Motions in Limine

The Federal Rules of Evidence favor the admission of all relevant evidence.[86] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[87] A district court will "exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."[88] "Indeed, courts considering a motion in

---

[84]    *See id.*

[85]    *See id.* at 7 (noting that at his deposition, Taverni had stated, "Since I have not reviewed the facts and circumstances of the [City's] claim, I can render no opinion [regarding whether the City would be entitled to compensation under the Spill Fund].").

[86]    *See* Fed. R. Evid. 402.

[87]    Fed. R. Evid. 401.

[88]    *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006).

21

limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context."[89]  Moreover, a court's ruling regarding a motion in limine "'is subject to change when the case unfolds . . . . Indeed even if nothing unexpected happens at trial, the district judge is free – in the exercise of sound judicial discretion – to alter a previous in limine ruling.'"[90]

## B.    Expert Witnesses - FRE 702

Federal Rule of Evidence 702 broadly governs the admissibility of expert testimony.  It states,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[91]

---

[89]     *United States v. Chan*, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).

[90]     *Palmeri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996) (quoting *Luce v. United States*, 469 U.S. 38, 41-42 (1984)).

[91]     Rule 702 – as amended – reflects the factors used by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals* to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. 579, 589 (1993).  *Accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (applying *Daubert* standards to non-scientific expert testimony).  *See generally In re MTBE*, 593 F. Supp. 2d 549, 553-56 (S.D.N.Y. 2008) (laying out

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions."[92] Nevertheless, "while the district court's discretion is considerable, it is not unfettered."[93] Although expert testimony should be excluded if it is speculative or conjectural – or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison[94] – other contentions that are unfounded go to the weight – not the admissibility – of the testimony.[95] The proponent of expert evidence must establish admissibility by a preponderance of the proof.[96]

---

the history of Rule 702, *Daubert*, and *Kumho Tire*).

[92]   *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (citing, *inter alia*, *Daubert*, 509 U.S. at 588).

[93]   *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). *Accord Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998) (reviewing the decision of a district court concerning expert testimony under the "highly deferential abuse of discretion standard").

[94]   *See United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded.").

[95]   *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006).

[96]   *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); Fed. R. Evid. 702, 2000 Advisory Committee Note.

23

The preliminary requirement of Rule 702 is that "scientific, technical,

or other specialized knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue."[97]

> "There is no more certain test for determining when experts
> may be used than the common sense inquiry whether the
> untrained layman would be qualified to determine
> intelligently and to the best possible degree the particular
> issue without enlightenment from those having a
> specialized understanding of the subject involved in the
> dispute."[98]

"When opinions are excluded, it is because they are unhelpful and therefore

superfluous and a waste of time."[99] "'[T]he jury is intelligent enough, aided by

counsel, to ignore what is unhelpful in its deliberations.'"[100]

Once the need for an expert witness has been established, expert

testimony must also be "based upon sufficient facts or data." Sufficiency is based

on both the type of evidence used and its relevance to the opinions offered.

---

[97]   *Accord Daubert*, 509 U.S. at 597 (requiring district courts to
determine whether the evidence "is relevant to the task at hand").

[98]   Fed. R. Evid. 702, 1972 Advisory Committee Note (quoting Mason
Ladd, *Expert Testimony*, 5 Vand. L. Rev. 414, 418 (1952)).

[99]   *Id.* (citing 7 *Wigmore on Evidence* § 1918).

[100]   *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992) (quoting
3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 702[03], at
702-30 (1989)).

24

Sufficient evidence will be of the type typically relied upon "in light of the custom and practice" of those who share the expert's specialized knowledge.[101] An insufficiently specific factual basis "may diminish the probative value" but does not mandate exclusion of the expert's resulting testimony.[102]

The second requirement for proper expert testimony is that it "is the product of reliable principles and methods." The Supreme Court's seminal opinion in *Daubert v. Merrell Dow Pharmaceuticals* established four non-exclusive criteria to apply to the expert's methodology: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) "general acceptance" within the relevant scientific community.[103] However, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject matter of his [or her] testimony."[104]

---

[101]   *Crowe v. Marchand*, 506 F.3d 13, 17-18 (1st Cir. 2007).

[102]   *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, ___ F.3d ___, No. 08-0639, 2009 WL 1910963, at *7 (2d Cir. July 6, 2009).

[103]   *See Crowe*, 506 F.3d at 593-94.

[104]   *Kumho Tire*, 526 U.S. at 150.

25

"[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[105]

## C. Experts and Hearsay – FRE 703

Under FRE 703, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data" upon which an expert bases an opinion or inference "need not be admissible in evidence in order for the opinion or inference to be admitted."[106] "[T]he rule is designed to broaden the basis for expert opinions . . . and to bring the judicial practice into line with the practice of the experts themselves when not in court."[107] "The expert may not, however, simply transmit that hearsay to the jury. Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever,' a practice that allows [a party offering an expert] 'to circumvent the rules prohibiting hearsay.'"[108]

---

[105]    *Id.* at 153.

[106]    Fed. R. Evid. 703. *Accord United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quoting *United States v. Dukagjini*, 326 F.3d 45, 58-59 (2d Cir. 2003)).

[107]    Fed. R. Evid. 703, 1972 Advisory Committee Note.

[108]    *Mejia*, 545 F.3d at 197 (quoting

26

## D. Opinions Concerning Ultimate Issues – FRE 704

Subject to a specific exception in criminal cases, under FRE 704 "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[109] However, the Federal Rules of Evidence still permit a court "to exclude opinions phrased in terms of inadequately explored legal criteria."[110] Thus a court should exclude the conclusion that an individual had the capacity to make a will but should permit conclusions concerning constituent elements of capacity.[111] In other words, "although an expert may opine on an issue of fact within the jury's province, [s]he may not give testimony stating ultimate legal conclusions based on those facts."[112]

---

[109] Fed. R. Evid. 704(a).

[110] Fed. R. Evid. 704 1972 Advisory Committee Note. *Accord Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) ("'It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions.'" (quoting *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994)); *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988), *rev'd in part on other grounds*, 856 F.2d 5 (2d Cir. 1988) ("[R]epeated statements embodying legal conclusions exceed[] the permissible scope of opinion testimony under the Federal Rules of Evidence.").

[111] *See id.* (citing Charles Tilford McCormick, *McCormick on Evidence*, § 12 ).

[112] *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

27

## E. Balancing Probative Value and Prejudice – FRE 403

Federal Rule of Evidence 403 states,

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"'[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational.'"[113]

## F. Spoliation

"[W]here . . . the nature of [an] alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction, including the discretion . . . to proceed with a trial with an adverse inference instruction."[114]

> [A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3)

---

[113] *United States v. Al-Moayad*, 545 F.3d 139, 159-60 (2d Cir. 2008) (quoting *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006)).

[114] *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 101 (2d Cir. 2002).

> that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.[115]

The culpable state of mind requirement may be met "through ordinary negligence."[116] "In the context of a request for an adverse inference instruction, the concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant."[117] In cases of negligence, gross negligence, or recklessness, "'it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him.'"[118] "Only in the case of *willful* spoliation is the spoliator's mental culpability itself evidence of the relevance of the documents destroyed."[119] A party may seek production of documents not directly relevant to a claim or defense insofar as they contain "the data or other information considered by [an expert]

---

[115] *Id.* at 107 (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001)).

[116] *Id.* at 101.

[117] *Zubulake v. UBS Warburg LLC* ("*Zubulake V*"), 229 F.R.D. 422, 431 (S.D.N.Y. 2004) (citing *Residential Funding Corp.*, 306 F.3d at 108-09).

[118] *Zubulake v. UBS Warburg LLC* ("*Zubulake IV*"), 220 F.R.D. 212, 221 (S.D.N.Y. 2003) (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 77 (S.D.N.Y. 1991)).

[119] *Id.* (citing *Residential Funding*, 306 F.3d at 109).

29

witness in forming" his or her opinion.[120]

## IV. DISCUSSION

### A. Harry Lawless

A party need not prove its entire case through the testimony of a single witness. With regard to the City's taste and odor claims, the jury's final determination is not whether consumers will detect MTBE once the Sector 6 wells are activated. Nor will the jury be asked whether individual consumers will reject water at particular concentration levels. Rather, harm occurs when concentrations reach the point where "a reasonable company would . . . take steps to remove MTBE."[121] Lawless's testimony need only be a premise to a plausible argument that will reach the conclusion that harm has occurred.

Assume for the sake of argument that the City will convince a jury – through Lawless's testimony – that a small but significant portion of consumers can detect MTBE at between one and two ppb. The City may then introduce *other* evidence to demonstrate that when consumers detect MTBE in water, enough consumers will reject the water that a reasonable water provider could not provide such water. In other words, consumers are unlikely to reject what they cannot

---

[120] Fed R. Civ. P. 26(a)(2)(B)(ii).

[121] *In re MTBE*, 593 F. Supp. 2d 549, 552 (S.D.N.Y. 2008).

30

detect. The Court need not speculate at this time on the form of evidence the City

intends to introduce to prove that consumers will reject water in which they detect

MTBE.[122] As part of a larger argument, the proposed testimony of Harry Lawless

will assist the trier of fact to determine a fact in issue. Therefore, Exxon's

challenge under FRE 702 is denied.

Exxon's assertion that the prejudicial effect of Lawless's testimony

outweighs its probative value fares no better. Lawless's testimony serves as the

essential foundation to the City's taste and odor claim concerning consumer

rejection. Its probative value is extremely high. This testimony alone is not

enough to prove the City's case, and the City will not be permitted to argue to the

jury that it is sufficient. To the extent that this testimony might confuse a jury or

promote speculation concerning the connection between detection and rejection,

---

[122] Notably, "the City has no intention of pursuing any claims based on past customer complaints, as it cannot be determined from the City's complaints data whether past taste and odor complaints are attributable to the presence of MTBE." City of New York's Conditional Non-Opposition to Defendants' Joint Motion *in Limine* to Exclude Evidence of Customer Taste and Odor Complaints at 4. However, the City may call fact witnesses to offer direct evidence of the effect of contaminant detection on the City's ability to deliver water to consumers. *See* 5/13/09 Declaration of Steven C. Schindler. As fact witnesses, Schindler and others will only be able to testify concerning matters within their personal knowledge. *See* Fed R. Evid. 701. Exxon may of course call witnesses to rebut the City's evidence connecting detection to rejection. *See* Melissa S. Dale, et al., *MTBE: Taste-and-Odor Threshold Determinations Using the Flavor Profile Method*, Ex C. to Def. Lawless Mem.

Exxon's skilled advocates should have no problem correcting jury confusion through cross-examination and summation. Therefore, Exxon's challenge under FRE 403 is denied as well. Exxon's motion to exclude the opinion of Harry T. Lawless is denied in full.

## B.    Kathleen Burns

Exxon has wisely chosen not to challenge the admissibility of the vast majority of Burns's testimony, which concerns the toxicology of MTBE. The narrow motion is granted with regard to Burns's background discussion of product stewardship.[123] This portion of Burns's report merely defines the concept and explains its rationale. The corporate declarations outlined in Burns's report have been gathered from web sites designed for consumption by the lay public, and Burns has applied neither scientific technique nor technical expertise in presenting them.

Nevertheless, Burns may testify concerning the availability of information concerning the risk of public exposure to MTBE and the specific range of information available within the petroleum industry concerning the safety of MTBE. Although this testimony may not be couched in terms of industry knowledge or Exxon-specific knowledge – as such opinions would constitute

---

[123]    *See* Burns Rep. at 46-48.

impermissible legal conclusions – the general availability of information is relevant to the City's argument concerning Exxon's knowledge. Moreover, experts in the field of public health frequently draw conclusions concerning the state of current knowledge; the application of Burns's expertise to publicly available information does not place the proposed testimony outside of her area of expertise.

Nor do hearsay concerns require exclusion of the proposed testimony. When establishing the scope of public health information available to the public at a particular point in time, an expert may refer to any and all public statements concerning the purported threat. Moreover, in assessing the scope of information specifically available to Exxon, a public health expert could be expected to rely on industry documents produced by trade groups of which Exxon was a member or communications sent directly to Exxon. Thus under FRE 703, three sets of documents may be used as the basis of Burns's opinion concerning the general scope of available information: public statements, internal and external statements of trade groups of which Exxon was a member, and communications produced or received by Exxon. Opinions based on internal documents from other defendants to which Exxon had no access are not probative of the scope of information to which Exxon had access, and Burns may not invite undue speculation that other

companies must have had access to similar knowledge. On the other hand, Burns may opine concerning the feasibility of discovering the harmful effects of MTBE exposure based on the internal documents of other defendants, as such an opinion is probative of what dangers were "scientifically discoverable" and thus relevant to a product liability claim.[124]

Additionally, Burns may testify concerning the feasibility of testing the health effects of MTBE and the accuracy of Exxon's communications concerning those effects. As an expert in toxicology, Burns's explanation is essential to the jury's understanding of the scientific methods by which long-term health effects are tested over a short period of time. As the City wishes to prove that Exxon's communications were misleading, the assistance of an expert is essential precisely because the communications were allegedly calibrated to confuse a lay audience. Notably, although an expert may offer an opinion

---

[124] *George v. Celotex Corp.*, 914 F.2d 26, 27 (2d Cir. 1990) (applying New York law). *Accord id.* ("The actual knowledge of the individual manufacturer is not the issue."). *See generally Dartez v. Fibreboard Corp.*, 765 F.2d 456, 461 (5th Cir. 1985) ("[A]ll manufacturers [are deemed to have] the knowledge and skill of an expert. They are obliged to keep abreast of any scientific discoveries and are presumed to know the results of all such advances. Moreover, they each bear the duty to fully test their products to uncover all scientifically discoverable dangers before the products are sold."). This issue is discussed at length in a separate opinion concerning Exxon's fourth motion *in limine*.

concerning the misleading nature of testimony, Burns may not opine that Exxon *intended* to mislead, as that would again constitute an impermissible legal conclusion. Moreover, Burns may not testify concerning "industry" communications; her testimony must be limited to Exxon or industry groups of which Exxon was a member, including collective defense efforts in MTBE litigation.

Finally, Exxon offers little explanation for its request to preclude Burns's proposed testimony concerning the development of drinking water standards. This testimony is essential to the jury's task and relies heavily on Burns's expertise. Exxon's sole clear objection – however – is a valid one. Burns may not opine that water providers acted "reasonably" in seeking to minimize MTBE exposure. Rather, Burns may testify concerning the health risks of MTBE and the actions taken by water providers and allow the jury to reach its own conclusion concerning reasonableness.

### C. Marcel Moreau

Exxon's objections to Moreau's proposed testimony are similar to those raised against Burns. Again the centerpiece of Moreau's report – concerning storage tank leakage and leak detection methods – is appropriate and admissible. The third section of Moreau's testimony is directed to the petroleum marketing

industry's knowledge of tank leakage. This testimony must be reframed in order to avoid offering an expert opinion concerning a legal conclusion that Exxon *knew* of the problem. Rather, Moreau may offer opinions concerning the existing evidence in the field and Exxon's exposure to that evidence. The state of knowledge concerning a particular problem with USTs lies squarely within Moreau's expertise and is best explained to a lay jury by an expert. Although Moreau must limit his testimony to the opinion that Exxon's statements are probative of Exxon's access to evidence of storage tank failures, Moreau may testify that – based on his understanding of the science of USTs – it would not have been difficult to reach particular conclusions based on the scope of available evidence.[125]

Along similar lines, Moreau's testimony concerning the so-called MTBE Problem is permissible, so long as it is reframed to avoid opining on legal conclusions. Moreau may not testify that Exxon *knew* of the MTBE Problem in the 1980s and 1990s. However, he may opine on what was known concerning the

---

[125]    *See* Def. Burns/Moreau Mem. at 8 (quoting Burns Rep. at 67). Other complaints raised in Exxon's brief to specific portions of Moreau's report fail to bar their admissibility. Although Moreau may not opine on Exxon's specific intent or knowledge – as those would be impermissible legal conclusions – he may undoubtedly express opinions concerning the purpose and activities of the MTBE Committee or the information available to Exxon concerning the likelihood of MTBE spills. *See id.* at 8-9 (quoting Burns Rep. at 64, 71).

problem at the time – based on public information and internal documents drafted by Exxon or to which Exxon had acccess – and is free to emphasize that Exxon's statements and publications are particularly probative of whether particular information was available. He may also express opinions concerning the feasibility of discovering the MTBE problem based on internal documents produced by other defendants. Notably, as Moreau worked on this problem at the time, the state of scientific understanding concerning this problem lies directly within his expertise.

### D. Fletcher Driscoll

Fletcher Driscoll is a well-qualified expert in hydrogeology, but he is not an attorney. Nor is he an expert in regulatory enforcement. Thus he has no specialized understanding relevant to the steps the City failed to take to prevent MTBE contamination.[126] The opinions expressed in Driscoll's report concerning the City's purported failings to comply with regulatory requirements and the history of enforcement actions against the City do not reflect any expert analysis based on Driscoll's experience.[127] Nor is the untrained layman incapable of

---

[126] *See* Driscoll Rep. at 12-14.

[127] Exxon asserts in its memorandum in opposition to the City's motion that Driscoll relies on extensive experience concerning compliance with consent decrees. *See* Memorandum of Law in Opposition to City of New York's Motion

understanding the basic chronology and substance of the DEC and EPA

enforcement actions as summarized in Driscoll's report. The principles under

which portions of the City's proposed expert testimony are excluded apply to

Exxon's proposed expert as well. Although a party might prefer to introduce a

substantial body of documentary evidence through the direct testimony of a

friendly expert, when those documents can be understood by a layman, they may

be organized and summarized only during summation. Driscoll is precluded from

testifying as to the history of regulatory enforcement against the City.

On the other hand, Driscoll is well qualified to testify concerning the

duration of MTBE contamination at the Station 6 wells. The City's challenge

concerns the adequacy of the underlying facts on which his opinion is based. As

the Second Circuit has repeatedly counseled, concerns about the adequacy of data

underpinning an expert opinion are best addressed via cross-examination. Driscoll

has prepared a generalized analysis of the area within which the Station 6 wells are

located. Relying upon his expert analysis of MTBE and water flows within the

---

to Exclude Testimony and Opinion of Defendants' Expert Fletcher G. Driscoll
("Def. Driscoll Mem."), at 5-7. Had Driscoll opined on engineering work that
would have been necessary to comply with the consent decrees, such an opinion
would have been permissible. That is not the testimony found in Driscoll's report.
Driscoll merely summarizes the monitoring requirements and penalties established
in the consent decrees. Such summaries do not reflect Driscoll's expertise and are
impermissible.

Brooklyn Queens Aquifer, his analysis has led him to the conclusion that MTBE will not be detectable within ten years. Analysis that leads an expert to conclude that the entire aquifer will effectively be flushed of MTBE is not wholly invalid absent further analysis of every well and spill. Methodology that fails to forecast a specific non-detect date and fails to take into account site specific data, additional sources of MTBE within the capture zone, and rates of biodegradation may be far less probative than a more specific analysis, but a lack of specificity does not render the testimony unhelpful or misleading.

Finally, Exxon's failure to preserve and disclose communications between Driscoll and his associates certainly merits this Court's disapproval, but it does not mandate exclusion of Driscoll's testimony.[128] Driscoll is an experienced expert, and he was well aware of the document retention requirements imposed in a litigation. Moreover, counsel for Exxon had an obligation to remind Driscoll to preserve and produce documents subject to the expert protocol. Driscoll made a judgement call that the faxes were not sufficiently important to merit retention, but as he admits to having relied on them, it was the wrong call. Thus Driscoll had

---

[128] Exxon argues that the lost faxes were merely "documents produced by the City during discovery." Def. Driscoll Mem. at 11. However, Driscoll specifically stated at his deposition that the faxes contained notes and impressions submitted by his staff. Thus these materials were undoubtedly subject to production pursuant to the expert protocol.

control over these faxes, relied on them, and destroyed them in a grossly negligent manner.[129] However, given the narrow scope of spoliation and the absence of bad faith, general exclusion would be inappropriate. Nor would the lesser – but still extremely potent – sanction of an adverse inference instruction be proper.[130] To the extent that Driscoll relied on the faxes in forming his opinion, they are reflected in his report. Moreover, as the spoliation was not willful, the burden remains on the City to demonstrate that the content of the faxes would have undermined the credibility of Driscoll's report. The City has not provided proof to that effect. Nevertheless, the City will be permitted to cross-examine Driscoll concerning his retention of records and the content of records that were not produced to the City. The jury will be permitted to draw its own conclusion without specific instructions from the Court.

---

[129]    Although the Second Circuit's test concerning spoliation addresses documents relevant to the ultimate issues of a case, in the context of expert discovery, destroyed evidence need only have been considered by the witness in forming his or her opinions. *Compare* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ."), *with* Fed R. Civ. P. 26(a)(2)(B)(ii) (requiring disclosure of "the data or other information considered by the witness in forming" his or her opinions).

[130]    *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219-20 (S.D.N.Y. 2003) ("The *in terrorem* effect of an adverse inference is obvious. . . . Accordingly, the adverse inference instruction is an extreme sanction and should not be given lightly.").

## E.    Richard Wilson

As I held in my July 15 bench ruling, Exxon is permitted to present
evidence that use of MTBE was the only feasible means by which it could have
met the oxygenation requirements of the Clean Air Act. Certainly, the testimony
that sets forth the federal requirements to use certain oxygenates in reformulated
gasoline is relevant, as is *evidence* that tends to show that the refining industry –
although not *legally* required to – was *effectively* mandated to use MTBE in
reformulated gasoline. However, Wilson intends to go a step further and opine
that MTBE was the only feasible alternative. The feasibility of an alternative
design is an ultimate issue with specific legal meaning in a product liability case
such as this one; thus an expert opinion that states that there was no feasible
alternative would constitute impermissible testimony on an ultimate legal issue.
Wilson may testify concerning the oxygenation requirements of the Clean Air Act
and the difficulties of proposed alternatives to MTBE, but he may not opine to the
jury that there was no feasible alternative design to MTBE reformulated gasoline.

The City also objects to Wilson's proposed testimony regarding the
knowledge of Congress and the EPA at the time relevant legislation and

regulations were developed.[131] Exxon explains that such testimony is relevant both to the alleged deception of the federal government about the harmful effects of MTBE and to the critical issue of whether use of MTBE was wrongful.[132]

To the extent that Exxon seeks to defend against the City's TSCA claim by arguing that the EPA knew about the potential harmful effects of MTBE – and therefore that Exxon was not obliged to submit such information to the agency – such testimony will be admissible subject to connection. Pursuant to section 2607 of Title 15 of the United States Code, a defendant is relieved of the reporting requirement under the TSCA only if it has "actual knowledge that the Administrator has been adequately informed of such information." Thus Exxon's proposed testimony is permissible but must be limited in two ways. *First*, Wilson may offer evidence of the information available to the Administrator, but he may not opine on the legal conclusion that the Administrator had been adequately informed of the harmful effects of MTBE. *Second*, evidence of information available to the Administrator may only be offered if Wilson also is able to testify that the fact of the Administrator's access was also publicly available. Through

---

[131]   For instance, Wilson seeks to testify that the EPA knew of MTBE's potential risk to groundwater and drinking water supplies. *See* Wilson Rep. at 4. He also wishes to testify that the EPA was aware of leaking USTs. *See id.*

[132]   *See* Def. Law/Intent Mem. at 10-11.

42

these two limitations Wilson may testify without offering legal conclusions concerning Exxon's actual knowledge or irrelevant testimony concerning information to which the Administrator had access but of which Exxon was unaware.

However, Wilson's proposed testimony concerning Congress and the EPA's intent or motives is inadmissible. Evidence expressing the view of only one actor in the legislative or regulatory process – offered after the bill has passed or the agency has promulgated the regulation – expresses the witness's "interpretive preference, but that preference cannot overcome the language of the statute and the related considerations."[133] Although evidence of the scope of information and opinions presented to legislators or regulators at the time of their actions – as well as contemporaneous statements of the actors themselves – constitute permissible evidence of statutory or regulatory intent,[134] conclusory and

---

[133] *Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001). *Accord Heintz v. Jenkins*, 514 U.S. 291, 298 (1995) (A "statement [made] not during the legislative process, but *after* the statute became law . . . is not a statement upon which other legislators might have relied in voting for or against the Act, but it simply represents the views of one informed person on an issue about which others may (or may not) have thought differently.").

[134] *Cf. Garcia v. United States*, 469 U.S. 70, 76 (1984) (noting that committee reports – a summary of the bill's provisions available prior to a floor vote and on which legislators routinely base their votes – are "the authoritative source for finding the Legislature's intent"); *United States v. Indelicato*, 865 F.2d

43

retrospective testimony – even when offered by a first-hand witness to the

regulatory or legislative process – is unduly speculative.[135]

Nor may Wilson ascribe legislative or regulatory intent to the mere

fact of inaction. A regulatory body acts or fails to act for any number of reasons.

Attributing action or inaction to only one reason absent substantial further factual

evidence would be mere speculation.[136]

Such testimony is also inappropriate because it is entirely irrelevant

and will only serve to confuse the jury. Exxon seeks to show that the federal

government knew about the danger of MTBE in groundwater and nevertheless

failed to prohibit its use. But what the federal government knew and what it did or

1370, 1382 (2d Cir. 1989) (deferring to the floor statement of a legislative sponsor).

[135]     Such evidence could be presented as facts, rather than expert opinion. Furthermore, any testimony Wilson might give about his own views or motives is irrelevant. *Cf. International Paper Co. v. Federal Power Comm'n*, 438 F.2d 1349, 1358 (2d Cir. 1971) (affirming a district court's decision not to compel the disclosure of an agency's staff memoranda, noting that "the views of individual members of the [agency's] staff are not legally germane, either individually or collectively to the actual making of final orders. They could be grossly misleading . . . .").

[136]     Administrative agency inaction is frequently amenable to a variety of explanations and therefore is often subject to deference and beyond judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (recognizing that an agency's failure to enforce "involves a complicated balancing of a number of factors which are peculiarly within its expertise").

44

failed to do has no relevance with respect to whether Exxon acted reasonably. To the extent that Exxon seeks to argue to the jury that it should infer from the federal government's inaction that the government somehow approved or condoned the use of MTBE, such argument is precluded by my July 15 bench ruling. The City's motion to exclude the testimony of Wilson is therefore granted in part and denied in part.

## F.    Thomas Austin

Consistent with my July 15 ruling, Exxon is permitted to advance the argument and present evidence regarding the feasibility of using additives other than MTBE. Austin's testimony regarding air pollutant emissions may be helpful as background evidence for the jury in understanding the passage of the 1990 Clean Air Act Amendments. An explanation of the oxygen content requirements may aid the jury in determining whether other oxygenates that satisfy these requirements could have been used instead. Opinions about the attributes of the other oxygenates when compared to MTBE are also relevant to whether there was a feasible alternative to MTBE. Unlike Wilson, Austin was never a senior executive at the EPA, and therefore any concern that the jury would misinterpret his opinions as those of the EPA – resulting in substantial prejudice – is diminished. The City's motion to preclude the testimony of Austin is therefore

45

denied.

## G.    Marcia E. Williams

The portion of Williams' testimony that is objectionable relates almost exclusively to the EPA's knowledge and intent with respect to the development or failure to develop certain regulations. For instance, Williams seeks to testify that "[The EPA] knew that the use of MTBE would increase under the 1990 Clean Air Act and still believed the UST regulations were protective."[137] She states that "if the EPA had believed that the increase in the use of MTBE under the oxygenate program would present significant risks to human health or the environment, the Agency would have either restricted the use of MTBE as an oxygenate or made modifications to existing UST regulations."[138]

The same reasons for precluding Wilson's testimony of knowledge and intent are applicable here. Because the principal purpose of Williams' testimony is to defend against the City's TSCA claim, her testimony is similarly limited. She may only offer opinions concerning the scope of information available to the EPA, and then only if she can offer opinions concerning Exxon's access to information tending to show that Exxon knew that the EPA possessed

---

[137]    Williams Rep. at 11.

[138]    *Id.* at 31.

46

such information.[139] To the extent that Exxon intends to offer Williams' testimony to show that the federal government failed to prohibit MTBE notwithstanding its knowledge of its dangers – and that therefore Exxon acted reasonably in its use of MTBE – such testimony is precluded as irrelevant and speculative.[140]

In addition, Williams may not opine that knowledge about the harmful effects of MTBE would have incentivized the refining industry to minimize contamination. Not only is Williams unqualified to testify about the thinking processes of the refining industry, but such testimony is argumentative and is therefore best left to Exxon's counsel at summations.[141]

Finally, Williams seeks to testify that EPA regulations were promulgated and standards were developed for the purpose of protecting human health and the environment, pointing to Congress' mandate with respect to the EPA's authority for regulating USTs.[142] However, Exxon has demonstrated no

---

[139]  This limitation applies primarily to Williams' Opinions #2 and #3.

[140]  Thus, Williams may not opine that although the EPA was concerned about UST leaks (Opinion #6), it believed that UST regulations were sufficiently protective (Opinion #3). Nor may she testify that state and local governments could also have passed additional legislation, but failed to do so (Opinion #4).

[141]  Thus, Williams may not testify as to Opinion #5.

[142]  *See* Williams Rep. at 13 ("In passing legislation establishing regulatory programs, Congress not only provides the EPA the authority to address specific environmental issues through regulation but also provides EPA with a

47

reason why it needs to call an expert to make this point. Exxon can simply request the admission of that statutory provision into evidence.[143] The City's motion to preclude the testimony of Williams is therefore granted in part and denied in part.

## H.    Robert N. Stavins

The testimony that Stavins proposes to offer is inadmissible. *First*, as a mere economic advisor to the EPA, it is unclear whether Stavins is even qualified to testify about the intent of the EPA. *Second*, even if he was privy to the EPA's thought processes, his retrospective and conclusory testimony is impermissibly speculative. Thus, any opinions with respect to the EPA's motives or intent are precluded.

Although Stavins makes a number of observations about the attributes of ethanol and MTBE and the costs associated with using each additive – evidence I would allow – these observations are so thoroughly intertwined with his statements about the EPA's motives that it is nearly impossible to separate what

---

general standard or goal to be met by the regulations. The general standard for the EPA's UST regulations was that these regulations be protective of '*human health and the environment*.'") (emphasis in original).

143      Williams is therefore precluded from testifying as to Opinion #1.

48

would be appropriate testimony from what would be wholly inappropriate.[144] I am

additionally hard-pressed to allow Stavins to testify about these matters because he

has conceded that he has not conducted any economic analyses with respect to the

issues in this case. Stavins' testimony is therefore excluded in its entirety.[145]

## I.    Anthony Taverni

Exxon's purpose for calling Taverni as an expert witness is unclear.

It appears that Exxon intends to argue that the City can seek payment from the Oil

Spill Fund, and therefore that Exxon is somehow relieved of its obligation to pay

damages irrespective of liability for contaminating groundwater and drinking

water. However, while the Oil Spill Fund may be used to compensate or

reimburse an injured party, Article 12 of New York's Navigation Law specifically

---

[144]    *See, e.g.*, Stavins Rep. ¶ 11 ("EPA recognized ethanol's effect on gasoline volatility and set Phase I VOC standards that required refiners to meet the lowest achievable gasoline volatility level, based on assessments that assumed refiners would use MTBE, and not ethanol, to meet those standards."); *id.* ¶ 22 ("EPA explicitly recognized MTBE's superior [] performance [in reducing the emissions of toxic substances] relative to that of other oxygenates, and it believed its proposed standards were appropriate because it expected MTBE to be widely available."). I note that Exxon is not without alternative means to present the evidence contained within the admissible portion of Stavins's proposed testimony.

[145]    It is surprising that Exxon failed to capitalize on expertise that Stavins clearly does possess – the economics of using MTBE compared to other alternatives. Such testimony would have been both highly relevant and entirely appropriate. However, with trial less than two weeks away, it is too late for Stavins to conduct analyses and produce a new report.

49

places liability and responsibility for clean-up costs on the party that has discharged petroleum.[146] The statute also explicitly allows the pursuit of other civil remedies and provides – importantly – that an injured party cannot receive compensation from the Fund for the same damages he is able to obtain through litigation under federal or state law.[147] Thus, whether the City would be entitled to compensation from the Oil Spill Fund has no relevance to the question of Exxon's liability and responsibility for damages.[148]

Even if the Oil Spill Fund were relevant, Taverni's testimony would be precluded because it provides nothing more than an explication of the Navigation Laws. The same information could be presented to the jury through submission of Article 12 as a trial exhibit. There is no reason a lay person would be unable to comprehend the statute. Any other background information that Taverni seeks to give that is not expressly provided in the Navigation Laws is

---

[146] For instance, section 176 of the Navigation Law provides that "[a]ny person discharging petroleum [] shall immediately undertake to contain such discharge." It also provides that any party who incurs clean-up costs is entitled to contribution from the responsible party.

[147] *See id.* § 193.

[148] This conclusion is consistent with my previous ruling that the existence of the Oil Spill Fund does not preclude a plaintiff from pursuing tort remedies. *See In re MTBE*, 591 F. Supp. 2d 259, 276-77 (S.D.N.Y. 2008).

superfluous and unnecessary. Taverni's testimony is therefore precluded in its entirety.

## V. CONCLUSION

Expert witnesses provide laymen with crucial knowledge where the common experience of such jurors is insufficient to comprehend particular facts of a case. Along with their knowledge, experts bring biases and strong opinions concerning the legal inferences that should be drawn from their testimony.[149] While this Court welcomes experts' knowledge, it must vigilantly guard against any attempt by an expert to opine on the ultimate *legal* issues in this case.[150] At its essence, Rule 704 restricts how an expert may frame her opinions.[151] She may opine that a defendant had access to information, but she may not opine that the defendant *knew* that information or that the information was *sufficient for* or

---

[149] *See United States v. Moran*, 493 F.3d 1002, 1008-09 (9th Cir. 2007) (finding expert testimony acceptable when "the jury would still have to draw its own inference from that predicate testimony to answer the ultimate factual question").

[150] *Cf.* Fed. R. Evid. 704 ("[Expert testimony] is not objectionable because it embraces an ultimate issue to be decided by the trier of *fact*.") (emphasis added).

[151] *See* Ric Simmons, *Conquering the Province of the Jury: Expert Testimony and the Professionalization of Fact-Finding*, 74 U. Cin. L. Rev. 1013, 1022 (2006) ("This limitation merely affects the form of the question, not the substance.").

51

*material to* a legal purpose.[152] She may opine that a defendant acted outside of established guidelines, but she may not opine that the defendant acted *negligently* or *recklessly*.[153] The crucial distinction is that an expert may not draw the final inference between relevant evidence and the ultimate conclusion the jury will be asked to make. Such impermissible testimony is most easily banished from the courtroom by cautioning experts not to use words with "a specialized legal meaning that is more precise than the lay understanding of the term."[154] Within the courts of the Second Circuit, an expert may lead a jury to the precipice of a verdict, but she may not instruct them to leap.[155]

---

[152]  *See, e.g.*, *Highland Capital Management, L.P. v. Schneider*, 551 F. Supp. 2d 173, 182-83 (S.D.N.Y. 2008) (knowledge or belief); *Feinberg v. Katz*, No. 01 Civ. 2739, 2007 WL 4562930, at *11 (S.D.N.Y. Dec. 21, 2007) (material). *See also United States v. Feliciano*, 223 F.3d 102, 120-21 (2d Cir. 2000) (noting that it is impermissible to offer testimony couched in statutory terms such as "enterprise" or "racketeering activity").

[153]  *See, e.g.*, *Andrews v. Metro North Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989) (negligent). *See also In re WorldCom, Inc. Secs. Litig.*, 352 F. Supp. 2d 472, 500 n.34 (S.D.N.Y. 2005) (noting that an expert's failure to opine that a defendant's actions were "reckless" accords with the prohibition on testimony concerning legal conclusions).

[154]  *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997).

[155]  This issue has caused confusion and contention both in the academy and the courts. In some circuits, if the testimony is found to be helpful to the jury, courts have not been troubled by an expert opining on the legal issues to be determined by the jury. *See* 4 Jack B. Weinstein, *et al.*, *Weinstein's Federal*

Both parties' experts will provide opinions crucial to this highly

technical case, but decisions concerning whether the facts presented fulfill the

legal requirements of knowledge, reasonableness, irresponsibility, sufficiency, and

intent remain the exclusive province of the jury. Both parties must instruct their

witnesses to limit their testimony to their scientific or technical opinions, and the

parties' attorneys may not ask questions designed to elicit impermissible testimony

concerning legal conclusions. In sum, this Court makes the following specific

rulings:

- Exxon's motion to exclude the testimony of Harry Lawless is denied in full.

- Exxon's motion to exclude the testimony of Kathleen Burns and Marcel

*Evidence*, § 704.04[1], at 704-13 n.9 (2d ed. 2008) (collecting cases from the First, Fourth, Seventh, Eighth, Ninth, and Tenth Circuits). However, in the Second, Sixth, and D.C. Circuits, courts have made a careful distinction between the ultimate facts on which a legal conclusion is based and the legal conclusion itself. *See, e.g.*, *Bilzerian*, 926 F.2d at 1294; *Burkhart*, 112 F.3d at 1212-13 (barring testimony concluding that communication had not been "effective," when the term had a precise legal meaning in the case (citing 28 C.F.R. § 35.160(a)); *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (holding that expert testimony couched in terms of a "legal conclusion" is "not helpful to the jury"). *See generally* Charles W. Ehrhardt, *The Conflict Concerning Expert Witnesses and Legal Conclusions*, 92 W. Va. L. Rev. 645, 653 (1990) (noting that appellate courts "sometimes ignore the above limitation"); Daniel J. Capra, *A Recipe for Confusion: Congress and the Federal Rules of Evidence*, 55 U. Miami L. Rev. 691, 697 (2001) (criticizing rules prohibiting experts from providing "a capstone to her testimony by expressing a conclusion"); Note, *Expert Legal Testimony*, 97 Harv. L. Rev. 797, 799 (1984) ("The difficulty of distinguishing issues of law and fact calls into question the viability of a system predicated on such a distinction.").

53

Moreau is granted in part and denied in part.

- Burns may not testify concerning the concept of product stewardship.

- Burns and Moreau may not offer ultimate legal conclusions concerning knowledge, intent, or reasonableness.

- Burns and Moreau may not invite the jury to speculate that Exxon must have had access to information available to other petroleum industry participants when such information is internal to another defendant. Nonetheless, they may provide opinions based on internal information concerning the scientific feasibility of reaching such conclusions.

- Burns and Moreau will be permitted to offer all other testimony found in their expert reports.

- The City's motion to exclude the testimony of Fletcher Driscoll is granted in part and denied in part.

  - Driscoll may not testify concerning regulatory enforcement actions against the City and the resulting consent decrees.

  - Driscoll will be permitted to offer all other testimony found in his expert report.

  - No sanction will result from the spoliation of expert documents.

- The City's motion to exclude the testimony of Richard Wilson is granted in part and denied in part.

  - Wilson may not opine on the ultimate legal conclusion concerning the feasibility of alternatives to MTBE-formulated gasoline.

  - Wilson may not directly opine on the sufficiency of the EPA's information concerning the health effects of MTBE or Exxon's knowledge thereof, but he may testify concerning the scope of information available to the EPA so long as he is also capable of testifying concerning Exxon's knowledge of the scope of information available to the EPA.

  - Wilson may not offer opinions on Congressional or agency intent concerning the Clean Air Act and accompanying regulations.

- The City's motion to preclude the testimony of Thomas Austin is denied in full.

- The City's motion to preclude the testimony of Marcia Williams is granted in part and denied in part.

  - Williams may not offer opinions on Congressional or agency intent concerning the TSCA and accompany regulations.

  - Williams may not directly opine on the sufficiency of the EPA's

information concerning the health effects of MTBE, failings of USTs, or Exxon's knowledge of the scope of information available to the EPA, but she may testify concerning the scope of information available to the EPA so long as she is also capable of testifying concerning Exxon's knowledge of the scope of information available to the EPA.

- Williams may not opine that knowledge about the harmful effects of MTBE would have incentivized the refining industry to minimize contamination.

- Williams may not offer testimony to the effect that EPA regulations were promulgated and standards were developed for the purpose of protecting human health and the environment.

- The City's motion to preclude the testimony of Robert Stavins is granted in full.

- The City's motion to preclude the testimony of Anthony Taverni is granted in full.

The Clerk of the Court is directed to close these motions (No. 04 Civ. 3417,

documents 104, 166, and 179; No. 00 MDL 1898, documents 2392 and 2405).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           July 21, 2009

## -Appearances-

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York  10038
(212) 558-5500

**Counsel for Plaintiff City of New York:**

Victor M. Sher, Esq.
Todd E. Robins, Esq.
Joshua G. Stein, Esq.
Nicholas G. Campins, Esq.
Marnie E. Riddle, Esq.
Sher Leff LLP
450 Mission Street, Suite 400
San Francisco, California  94105
(415) 348-1568

Susan Amron
Daniel Greene
Assistant Corporation Counsel
100 Church Street
New York, New York  10007
(212) 788-1568

**Liaison Counsel for Defendants and Counsel for Exxon Mobil Corporation:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173
(212) 547-5583