UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X

IN RE METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

------------------------------------------------------ X

This Document Relates to:
------------------------------------------------------ X

CITY OF NEW YORK, *et al.*,

        Plaintiffs,

    - against -

EXXON MOBIL CORPORATION,

        Defendant.

------------------------------------------------------ X

**OPINION AND ORDER**

**00 MDL 1898 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/21/09

**04 Civ. 3417 (SAS)**

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation        Doc. 2632

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      The City of New York ("the City") alleges that a number of gasoline

makers are strictly liable for their use and handling of the gasoline additive methyl

tertiary butyl ether ("MTBE").[1] Oil companies added MTBE to gasoline as an

---

[1]    This Opinion assumes familiarity with facts discussed in this Court's
previous opinions in this case. For a general discussion of the MTBE litigation,
see *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.* ("*In re MTBE*"), 379 F.

oxygenate in order to meet emissions requirements under the Clean Air Act

("CAA") of 1990. MTBE gasoline has since contaminated groundwater

throughout the United States. This case, related to groundwater contamination in

Queens County, New York, is part of a consolidated multi-district litigation

addressing this issue of national concern.

Exxon Mobil Corporation ("Exxon"), the sole non-settling defendant

in this case, moves *in limine* to exclude the testimony of the City's expert witness

Martin Tallett. Exxon argues that Tallett is unqualified, that his testimony is

unreliable, and that he improperly supplemented his expert report. For the reasons

that follow, Exxon's motion is denied.

## II. BACKGROUND

### A. Scope of Testimony

The City offers Martin Tallett as an expert on two separate issues.

*First*, the City has alleged several theories of tort liability, including defective

Supp. 2d 348, 364-67 (S.D.N.Y. 2005). Exxon recently contested whether the
City owns the groundwater system and is the proper plaintiff in this case. On July
6, 2009, this Court resolved any potential dispute by joining the New York City
Water Board Authority and the New York City Municipal Water Finance
Authority as necessary plaintiffs. *See* Order, No. 337, *City of New York v.
Amerada Hess Corp.*, No. 00 MDL 1898, 04 Civ. 3417 (S.D.N.Y. July 6, 2009).
For ease of understanding, I will continue to use "the City" to refer to all three
plaintiffs.

product design. To prove its case, the City must show that "the product, as

designed, was not reasonably safe because there was a substantial likelihood of

harm and it was feasible to design the product in a safer manner."[2] Tallett will

testify that Exxon could have used another oxygenate – ethanol – in place of

MTBE at a roughly comparable cost.[3] *Second*, this Court has adopted a

commingled product theory of liability for harms caused by fungible products

made up of material from various manufacturers, such as gasoline.[4] The City also

offers Tallett as an expert witness on Exxon's share of the market for MTBE

gasoline in Queens.

## B.    Martin R. Tallett

A chemical engineer by training, Tallett has spent most of his forty-

year career advising clients on technical and economic matters in the oil refining

industry.[5] Tallett's experience includes work on "market analysis and projection,"

---

[2]       *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108 (1983).

[3]       *See* 12/9/08 Expert Report of Martin R. Tallett ("Ethanol Report") at
4, Ex. A to 5/28/09 Declaration of Martin R. Tallett, plaintiff's expert ("Tallett
Decl."). For background information on oxygenated gasoline requirements see *In
re MTBE*, No. 04 Civ. 5424, 2008 WL 1971538, at \*1-\*2 (S.D.N.Y. May 7, 2008).

[4]       *See In re MTBE*, 379 F. Supp. 2d 348, 377-78, 425 (S.D.N.Y. 2005).

[5]       *See* Ethanol Report at 1.

3

"fuels regulation, supply and economics," and "refinery process investment economic analysis."[6] Although it now seeks to exclude his testimony, Exxon has in the past hired Tallett as a consultant on "the economics of gasoline and naptha in US Gulf and West Coast markets."[7] Tallett asserts that he is thoroughly familiar with statistical data "on crude and product flows into the US Northeast," and is also familiar with the distribution or "downstream" end of the oil industry, having worked "extensively with petroleum industry data . . . covering all aspects of supply, demand, regulation, refining and transportation."[8]

## C. Tallett's Proposed Ethanol Testimony

Tallett has prepared two expert reports on the use of ethanol. Tallett had already prepared a report for the plaintiffs in *County of Suffolk v. Amerada Hess Corp.*, another case consolidated in this multi-district litigation.[9] Tallett has also submitted a new report on ethanol use that incorporates and builds upon that earlier report.[10] In these reports, Tallett concluded that oil companies have used

---

   [6]    Tallett Decl. ¶ 7.

   [7]    *Id.* ¶ 9.

   [8]    *Id.* ¶ 11.

   [9]    *See* 6/8/07 Expert Report of Martin R. Tallett, on file with chambers ("Suffolk Report").

   [10]   *See* Ethanol Report at 2.

4

ethanol to increase oxygen levels in gasoline since 1979 and faced no technological limit on substituting ethanol for MTBE.[11] He also found that the oil industry "projected close supply costs" between gasolines made with ethanol and those made with MTBE.[12]

## D. Tallett's Proposed Market Share Testimony

Tallett has submitted a separate report on the issue of Exxon's market share.[13] In that report, he reviewed market share calculations performed by defense experts and concluded that those calculations are neither transparent nor verifiable.[14] He also concluded that one of Exxon's experts understated his client's market share by focusing solely on the gasoline refined by the company and ignoring "exchange, purchase, and sale agreements, management and/or use of or agreements with major terminals and blending facilities" through which Exxon owned and controlled MTBE gasoline in New York that had been refined by others.[15]

---

[11]    *See id*. at 4; Suffolk Report at 54.

[12]    Ethanol Report at 4.

[13]    *See* 12/9/08 Expert Market Share Report of Martin R. Tallett, Ex. B to Tallett Decl. ("Market Share Report").

[14]    *See id*. at 3.

[15]    *Id*. at 19-20.

5

Tallett opined that he saw "a workable means for calculating market share" using gasoline sales reported by refiners and other "prime suppliers" on the U.S. Energy Information Administration's Form 782C.[16] Form 782C records state level data; thus, Tallett's calculation generates a company's share of all gasoline sold for local use across the State of New York.[17] Tallett found the state level data were clear, reliable, and consistently reported by all major gasoline manufacturers, importers, and sellers.[18] He concluded that it was better to calculate market share at the state level than to accept the assumptions and methods used by defense experts seeking a more localized result.[19] The calculation of market shares from Form 782C data was first proposed and applied not by Tallett, but by Dr. Michelle Burtis, an expert hired by several of the defendants who have now settled this lawsuit.[20]

In his expert report, Tallett explained how to use Form 782C data but did not actually perform the calculation. As Tallett's later declaration makes clear,

---

[16]   *Id.* at 3, 11-13.

[17]   *See id.* at 13.

[18]   *See id.* at 11-12.

[19]   *See id.* at 3.

[20]   *See* 2/13/09 Expert Report of Michelle M. Burtis, ¶¶ 28-29, Ex. E to Tallett Decl. ("Burtis Report").

6

however, this method generates a market share for Exxon approximately five times higher than the share calculated by Exxon's expert.[21]

## III. APPLICABLE LAW

### A. Motions in Limine

The Federal Rules of Evidence favor the admission of all relevant evidence.[22] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[23] A district court will "exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."[24] "Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context."[25] Moreover, a court's ruling regarding a motion in limine "'is subject to change when the case unfolds . . . . Indeed even if nothing unexpected happens at trial, the district judge is free – in the exercise of sound

---

[21]  *See* Tallett Decl. ¶ 23.

[22]  *See* Fed. R. Evid. 402.

[23]  Fed. R. Evid. 401.

[24]  *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006).

[25]  *United States v. Chan*, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).

7

judicial discretion – to alter a previous in limine ruling.'"[26]

## B.    Expert Witnesses

Federal Rule of Evidence 702 governs the admissibility of expert

testimony. It states,

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.[27]

The preliminary requirement of Rule 702 is that expert testimony be

relevant, meaning that "scientific, technical, or other specialized knowledge will

assist the trier of fact to understand the evidence or to determine a fact in issue."[28]

Any person qualified by "knowledge, skill, experience, training, or education" to

---

[26]    *Palmeri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996) (quoting *Luce v. United States*, 469 U.S. 38, 41-42 (1984)).

[27]    Rule 702 – as amended – reflects the factors used by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals* to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). *See generally In re MTBE*, 593 F. Supp. 2d 549, 553-56 (S.D.N.Y. 2008) (laying out the history of Rule 702 and *Daubert*).

[28]    Fed. R. Evid. 702. *Accord Daubert*, 509 U.S. at 597 (requiring district courts to determine whether the evidence "is relevant to the task at hand").

assist the trier of fact may testify as a relevant expert.[29]  Courts within the Second Circuit have "liberally construed expert qualification requirements."[30]

The Supreme Court's 1993 decision in *Daubert* charged courts with ensuring that expert testimony "is not only relevant, but reliable."[31]  The Supreme Court also has made it clear that "the law grants a district court . . . broad latitude when it decides how to determine reliability."[32]  As reflected in the post-*Daubert* modifications to Rule 702, reliable expert testimony is based upon "sufficient facts or data" and "reliable methods."  Sufficiency of the evidence is judged "in light of the custom and practice" of those who share the expert's specialized knowledge.[33]  While *Daubert* lists factors for assessing the reliability of scientific methods, they "may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject matter of his testimony."[34]

---

[29]   Fed. R. Evid. 702.

[30]   *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002).  *Accord United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985).

[31]   *Daubert*, 509 U.S. at 589 (reliability of scientific expert testimony). *Accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (applying *Daubert* standards to non-scientific expert testimony).

[32]   *Kumho Tire*, 526 U.S. at 142.

[33]   *Crowe v. Marchand*, 506 F.3d 13, 17-18 (1st Cir. 2007).

[34]   *Kumho Tire*, 526 U.S. at 150.

9

Fundamentally, a district court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[35]

In assessing reliability, this Court is mindful that the Federal Rules of Evidence favor admissibility of expert testimony.[36] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence."[37]

## C. Expert Reports

Rule 26 of the Federal Rules of Civil Procedure requires that opposing parties receive notice of expert testimony in a report containing – among other things – "a complete statement of all opinions to be expressed and the basis and reasons for them."[38] Should an expert learn of an error in her work, she must

---

[35]    *Id.* at 152.

[36]    *See Daubert*, 509 U.S. at 588. *See also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (noting that *Daubert* "advanced a bias in favor of admitting evidence short of that solidly . . . proven to be unreliable").

[37]    *Daubert*, 509 U.S. at 596.

[38]    Fed. R. Civ. P. 26(a)(2)(B).

10

disclose and correct it no later than thirty days before trial.[39]

Under Rule 37, a court may refuse to allow testimony on a matter that

a party failed to include in an expert report "unless the failure was substantially

justified or is harmless."[40] Although complete disclosure is strongly encouraged,

the court retains broad discretion to determine whether a report is substantially

complete, whether the opposing party was harmed by an omission, and whether

any sanction is warranted.[41]

## IV. DISCUSSION

There is no dispute that expert testimony will assist the jury in

grasping the complex facts related to the use of ethanol in place of MTBE and the

determination of Exxon's market share. Exxon's challenge goes to Tallett's

expertise and the relevance and reliability of his testimony.

### A. Expertise

[39] *See* Fed. R. Civ. P. 26(e). Thirty days before trial is a default rule.
*See* Fed. R. Civ. P. 26(a)(3)(B).

[40] Fed. R. Civ. P. 37(c)(1).

[41] *See Hein v. Cuprum, S.A. de C.V.*, 53 Fed. App'x 134, 136 (2d Cir.
2002). *See also Lorme v. Delta Airlines*, 251 Fed. App'x 691, 692 (2d Cir. 2007)
("the premise . . . that the preclusion sanction under Rule 37 is nearly automatic, is
not correct"); *Orjias v. Stevenson*, 31 F.3d 995, 1005 (10th Cir. 1994) ("The
imposition of sanctions for abuse of discovery under Fed. R. Civ. Pro. 37 is a
matter within the discretion of the trial court.").

11

Conceding that ethanol "was a technologically possible alternative" to MTBE, Exxon seeks to narrow the dispute over a feasible alternative design to whether it was "commercially practicable" to use ethanol.[42]  Exxon argues that Tallett cannot opine on this narrower issue because his lack of training in economics – combined with statements he made during his deposition – disqualify him as an expert on the commercial feasibility of ethanol.[43]

Tallet's experience and knowledge qualify him as an expert on engineering and cost considerations in the refining industry.  Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience" rather than formal education.[44]  Moreover, courts allow experts to testify to matters within their general expertise when such experts lack qualifications as to specific technical matters within their field.[45]

---

[42]    5/13/09 Memorandum of Law in Support of Defendant Exxon Mobil Corporation's Motion to Exclude Testimony and Opinion of Martin Tallett at 9-10 ("Exxon Mem.").

[43]    *See id*. at 9-12.

[44]    *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).

[45]    *See McCullock v. KB. Fuller Co.,* 61 F.3d 1038, 1042-43(2d Cir. 1995) (industrial engineer's testimony that the plaintiff was within the "breathing zone" of hot-glue fumes "easily qualifie[d] for admission under Daubert," despite his lack of education on fume dispersal patterns, knowledge regarding the fumes' chemical constituents or the glue vapor's concentration level, or experience performing or interpreting air quality studies). *See also First Tennessee Bank*

12

Tallett proposes to testify that the industry perceived the supply costs of MTBE gasoline and ethanol-oxygenated gasoline to be fairly close.[46] His professional experience includes evaluating the supply costs of many refined products, while his knowledge extends to pricing and profitability of refined products.[47] Testifying on economic considerations that affected Exxon's production decisions is therefore well within Tallett's general area of expertise.

Exxon also argues that Tallett is not qualified to help the jury understand its share of the gasoline market in Queens because he has admitted that he is unfamiliar with local gasoline distribution.[48] However, Tallett's proposed testimony does not rely on an intimate knowledge of retail distribution. *First*, Tallett plans to critique the market share analyses of other experts. This role draws on Tallett's experience as an analyst and his knowledge of industry practices and reliable data sources to query the assumptions of defense experts and to verify their data sources. *Second*, Tallett plans to testify about his method for

*Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (to the extent that an expert on international lending "may have lacked familiarity with some aspects of banking relationships . . . such unfamiliarity merely affected the weight and credibility of his testimony, not its admissibility").

[46]    *See* Ethanol Report at 4.

[47]    *See* Tallett Decl. ¶¶ 9-10.

[48]    *See* Exxon Mem. at 3-4.

13

using state-level data to calculate Exxon's market share. Here Tallett claims only "a general knowledge of the major distribution supply routes,"[49] and assumes the state-level market share data are a reasonable proxy for market share in New York City: "Since [MTBE gasoline] into New York State is supplied predominantly into the greater New York City area, [MTBE gasoline] supplies from 782C data should be the criteria for market determination from 1995 on."[50]

Exxon is free to use Tallett's assumptions and admitted unfamiliarity with local distribution to impeach his credibility on cross-examination. But by virtue of his experience with petroleum and refined product markets, his familiarity with contractual arrangements between large players in this field, and his knowledge of oil sector data sources, Tallett is qualified to testify on the issues of Exxon's market share and the commercial feasibility of using ethanol.

**B.    Relevance**

Although Exxon suggests otherwise,[51] Tallet's proposed testimony regarding ethanol and market share is unquestionably relevant to core disputes in this case. The proposed ethanol testimony makes it more probable that Exxon

---

[49]    Tallett Decl. ¶ 25.

[50]    Suffolk Report at 15.

[51]    *See* Exxon Mem. at 14.

14

faced a choice between two technically and commercially practical oxygenates –

i.e. that Exxon had a feasible alternative to MTBE gasoline. Further, whether

Exxon's market share is in the range suggested by its experts or five times higher

– as suggested by Tallett – is a significant factual dispute. Any testimony going to

the validity of the methods used to reach these results is relevant.

Exxon additionally argues that because it has conceded that ethanol

use is technically possible, Tallett's testimony concerning ethanol is now

irrelevant because he addresses only the technical feasibility of ethanol.[52] The

argument is patently false; Tallett proposes to testify that the supply costs of

ethanol and MTBE were comparable, a relevant issue that remains in significant

dispute.[53]

## C.   Reliability of Ethanol Testimony

Exxon next argues that Tallett's method for comparing the cost of

ethanol and MTBE is unreliable.[54] To reach his conclusions, Tallett surveyed the

---

[52]     *See id*. at 13-14.

[53]     *See* Ethanol Report at 4. The majority of the Ethanol Report and an
entire section of the Suffolk Report are concerned with the costs to refiners of
substituting ethanol for MTBE, the sourcing of ethanol, and even touch briefly on
consumer perceptions of, and willingness to pay for, gasoline containing ethanol.
*See id*. at 4-14; Suffolk Report at 57-75.

[54]     *See* Exxon Mem. at 11.

15

results of over a dozen government and industry cost studies comparing MTBE with other oxygenates,[55] then supplemented this assessment with a review of internal technical and economic analyses conducted by refiners.[56]

These public and private data sources provide a sufficient factual basis for Tallett's conclusion. Moreover, it is reasonable that an expert wishing to assess an industry's cost projections would review multiple cost studies developed both by the industry and its regulators. Exxon implies that the City's attorneys may have skewed Tallett's report by selectively providing him internal corporate studies obtained through discovery.[57] But Exxon does not point to a single concrete example of a public study or internal document that Tallett overlooked. Tallett claims he did not omit from his report "*any* documents containing a cost differential analysis" of which he was aware.[58] As Tallett's conclusion is based on sufficient facts analyzed in a reliable manner, his testimony is admissible.

## D. Reliability of Market Share Testimony

Tallett's method of calculating market share from Form 782C

---

[55] *See* Suffolk Report at 57-71.

[56] *See* Ethanol Report at 5-14.

[57] *See* Exxon Mem. at 11 ("Tallett's 'methodology' was to review certain Defendant's documents – selected by Plaintiff's trial counsel . . .").

[58] Tallett Decl. ¶ 51.

16

gasoline sales data is sufficiently reliable. In his opinion, Form 782C provides a

sufficient basis to calculate market share because the data accurately capture

gasoline supply to New York state by the "major players encompassing refiners,

importers and major blenders," who number no more than around 185 entities

nationwide, while excluding smaller secondary actors in the wholesale gasoline

market.[59] As one of the experts for a now-settled defendant, Dr. Michelle Burtis,

also used form 782C data to calculate market share, Tallett's method evidently

displays "the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field."[60]

Nevertheless, Exxon claims that Tallett's testimony is unreliable

because he fundamentally misunderstood the nature of the Form 782C data.[61] In

fact, Tallett's description of his data source shows that he understood the

fundamentals of this data set: the definition of a "prime supplier" who must submit

Form 782C, the difference between the universe of entities submitting Form 782C

and a different form in the same series – Form 782A – which reports only the sales

of refiners, his preference for 782C data over 782A data because a broader set of

---

[59]    Market Share Report at 11-12.

[60]    *Kumho Tire*, 526 U.S. at 152.

[61]    *See* Exxon Mem. at 5.

17

actors file these reports, and the temporal limits of this data set.[62] Tallett's fundamental understanding of the data was sufficiently sound.

Exxon focuses upon Tallett's admission that he was initially mistaken about one aspect of the 782C reporting protocol: the rule governing two prime suppliers who sell gasoline to each other. Tallett believed that the first party to import gasoline into the state reported that gasoline on its Form 782C even if it sold the gasoline to another prime supplier, and thus that Form 782C data reflect the role of manufacturers and refiners to the greatest extent possible.[63] In fact, shortly before his deposition Tallett learned that the last prime supplier to own gasoline before selling to a secondary party reports the sale.[64] Thus, as Tallett admitted at his deposition, Form 782C data will in these instances assign that gasoline to the last primary supplier and therefore will lead to some undercounting of the market share of a refiner or manufacturer, an effect that could potentially be significant.[65]

In a May 28, 2009 declaration attached to the City's opposition to the

---

[62]   *See* Market Share Report at 11-12.

[63]   *See* Tallett Decl. ¶¶ 30-32.

[64]   *See* Exxon Mem. at 6 (quoting Tallet's statement at his deposition that "its something we really only homed in on yesterday").

[65]   *See* Tallett Decl. ¶ 31.

18

instant motion, Tallett stated that he had compared the results of his original

market share method against a similar method that had also been used by Dr.

Burtis.[66] Using this second method to verify his results, Tallett found that

"ExxonMobil's market share is essentially the same under either calculation"; thus

his initial concern that reliance on 782C data could lead to a significant

understatement of Exxon's market share was unfounded.[67] Having tested the

---

[66]    *See id.* ¶ 32.

[67]    *Id.* Tallett checked the impact of these transactions by dividing
refiners sales, as reported on Form 782A, into the total primary supply of gasoline
from Form 782C reports. Exxon's contention that by combining data from Forms
782A and 782C "Tallett has not even properly 'done the math'" is meritless. *See*
6/4/09 ExxonMobil's Reply Memorandum of Law in Further Support of its
Motion to Exclude Testimony and Opinion of Martin Tallett at 6 ("Exxon Reply
Mem."). Both Tallett and Dr. Burtis used 782A data as the numerator and 782C
data in the denominator for the same reason. Primary suppliers other than refiners
– such as importers – also sell gasoline. But only refiners report sales on 782A,
and they include both gasoline sold for local use and for interstate resale. *See*
EIA, *Petroleum Marketing Annual 2007* 393 (2007), *available at*
http://www.eia.doe.gov/pub/oil_gas/petroleum/data_publications
/petroleum_marketing_annual/current/pdf/enote.pdf. Thus a "782A/782A"
calculation reflects a refiner's sales as a proportion of all refiner sales, not as a
proportion of all gasoline sales for local use by all parties. In contrast, the
782A/782C ratio represents a refiner's total instate sales as a proportion of all
primary gasoline supply for local use. Although this approach has limitations,
both Burtis and Tallett understood them, and Tallett used this method solely to
check the validity of his original method, to which he adheres. *See* Tallett Decl. ¶¶
32-33; Market Share Report at 12 (noting that 782A data set is limited to refiners);
Burtis Report ¶¶ 29-30. Exxon is free to challenge Tallett's work on cross-
examination, but it is sufficiently reliable to reach the jury.

significance of the discrepancy that Exxon's expert uncovered, Tallett states that his opinions are unchanged.[68]

In its reply memorandum, Exxon argues that Tallet's reconfirmation of his results introduced "a host of new comparative calculations" which are untimely and must be struck.[69] Under Rule 26, however, an expert may supplement disclosures in a timely manner in order to correct errors.[70] Tallett's declaration was submitted approximately thirty days after he discovered the problem, and more than thirty days before trial. There has been no egregious delay, prejudice, or bad faith involved.[71]

Tallett's initial testimony was reliable. When Tallett discovered an error in his work he double-checked it in a timely fashion and supplemented the

___

[68]  *See* Tallett Decl. ¶ 33.

[69]  Exxon Reply Mem. at 1-2.

[70]  *See* Fed. R. Civ. P. 26(e)(2).

[71]  *Cf. Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03-Civ-7037, 2005 WL 4684238, at \*4 - \*8 (S.D.N.Y. Apr. 11, 2005) (finding the opposing party "unquestionably prejudiced" where initial report revealed no methodology or underlying data, first supplemental report was identically vague, several more months passed before expert submitted substantially new supplemental materials); *Major v. Astrazeneca, Inc.*, No. 5:01-CV-618, 2006 WL 2640622 at \*6 - \*7 (N.D.N.Y. Sept. 13, 2006) (finding inordinate delay when experts failed to supplement reports for nearly two and a half years, until six months after the close of discovery).

20

basis for his conclusions without altering the results. His actions were appropriate under the Federal Rules, his supplemented disclosure is proper, and Exxon has suffered no harm as Tallett's conclusions and proposed testimony are unchanged. Accordingly, Tallett's market share testimony is admissible, and Exxon's motion to strike his supplementary disclosure is denied.

## E. Completeness of the Expert Report

Finally, Exxon points to Tallett's failure to present an actual percentage figure for Exxon's market share in his report. The report provided a critique of defense expert methodologies, the basis for concluding that market share should be calculated from Form 782C data, and instructions on how to perform the calculation. But only in his declaration does Tallett put Exxon's market share in a range of seventeen to twenty percent, five times higher than Exxon's own estimate.[72] Arguing that Tallett's original report was incomplete, Exxon seeks to preclude Tallett from testifying about the results of his method.[73]

The purpose of an expert report is to eliminate "unfair surprise to the opposing party."[74] "[T]he test of a report is whether it was sufficiently complete,

[72]   *See* Tallett Decl. ¶¶ 22-23.

[73]   *See* Exxon Rep. Mem. at 1-2.

[74]   *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995). *Accord Hyun v. South Kent School*, No. Civ. 3:95CV2235, 1997 WL

21

detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced."[75] There is no doubt that Tallett's report is imperfect. Ideally, an expert report would contain every fact, conclusion, and detail of the planned testimony. However, "[s]ection 26(a)(2)(B) does not limit an expert's testimony simply to reading his report . . . . The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."[76] Thus, the issue is whether Tallett's report is substantially complete and any omissions are either justified or harmless.

The absence of a calculated percentage share worked no unfair surprise on Exxon. Tallett opined that 782C data was a workable means to calculate market share, provided the basis for that conclusion, and spelled out precisely how to perform the exceedingly simple calculation. Exxon has copies of its own 782C forms and could easily obtain the aggregate 782C data. Upon receiving Tallett's report, Exxon had all the information it needed to take one

597122, at *1 (D. Conn. Sept. 17, 1997).

[75] *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996). *Accord Lorme v. Delta Air Lines, Inc.*, No. 03 Civ. 5239, 2005 WL 1653871, at *3 (S.D.N.Y. July 13, 2005).

[76] *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006).

22

number and divide it by the other. Rule 26 prevents one party from "sandbagging"

an opposing party with new evidence.[77] Tallett's omission of an obvious and

readily calculated result which has now been revealed more than thirty days before

trial followed a complete disclosure of his methodology and factual basis. This

hardly rises to the level of unacceptable sandbagging.

## V. CONCLUSION

For the reasons set forth above, Exxon's motion is denied. The Clerk

of the Court is directed to close this motion (No. 00 MDL 1898, Docket # 2424,

No. 04 Civ. 3417, Docket # 200).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           July 20, 2009

---

[77]     *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).

## -Appearances-

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
(212) 558-5500

**Counsel for Plaintiff City of New York:**

Victor M. Sher, Esq.
Todd E. Robins, Esq.
Joshua G. Stein, Esq.
Nicholas G. Campins, Esq.
Marnie E. Riddle, Esq.
Sher Leff LLP
450 Mission Street, Suite 400
San Francisco, California 94105
(415) 348-1568

Susan Amron
Daniel Greene
Assistant Corporation Counsel
100 Church Street
New York, New York 10007
(212) 788-1568

**Liaison Counsel for Defendants and Counsel for Exxon Mobil Corporation:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173
(212) 547-5583