# Exhibit 4

Oct 22 Rudo

1

```
 1              IN THE CIRCUIT COURT
 2          FOR BALTIMORE COUNTY, MARYLAND
 3   JEFF ALBAN, et al,
 4          Plaintiffs
 5   VERSUS                CASE No.  03-C-06-010932
 6
 7   EXXONMOBIL CORPORATION, et al,
 8          Defendant
 9                * * * * * * *
10                      October 22, 2008
11   REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
12                     (Trial)
13   BEFORE:
14     HONORABLE MAURICE W. BALDWIN, JR., ASSOCIATE JUDGE
15
16
17
18   REPORTED BY:
19
20   RANDY MACKUBIN (AM Session)
21   BARBARA ZENTZ (PM Session)
22   Official Court Reporters
23   401 Bosley Ave., M-08
24   Towson, Maryland 21204
25   (410) 887-2635
```

BALTIMORE COUNTY CIRCUIT COURT

2

```
                              Oct 22 Rudo
    1         APPEARANCES:
    2
    3         ON BEHALF OF THE PLAINTIFFS:
    4
    5              STEPHEN SNYDER, ESQUIRE
    6              ROBERT J. WELTCHEK, ESQUIRE
    7              SCOTT SNYDER, ESQUIRE
    8                 MICHAEL SNYDER, ESQUIRE
    9                 TOMEKA CHURCH, ESQUIRE
   10                 JASON A. L. TIMOLL, ESQUIRE
   11
   12         ON BEHALF OF THE DEFENDANTS:
   13
   14              JAMES F. SANDERS, ESQUIRE
   15              WILLIAM STACK, ESQUIRE
   16                 ANDREW GENDRON, ESQUIRE
   17                 C. CAREY DEELEY, ESQUIRE
   18                 CARLOS BOLLAR, ESQUIRE
   19
   20
   21
   22
   23
   24
   25


                       BALTIMORE COUNTY CIRCUIT COURT
                                                                  3



    1                    (WHEREUPON, the jury entered the
    2         courtroom.)
                                  Page 2
```

Oct 22 Rudo

18  I'm sure.  That is all I have, Your Honor.  It may take
19  me a minute, Mr. Stack, to move my stuff.
20          MR. STACK:  Okay.
21          THE COURT:  Mr. Stack.
22          MR. STACK:  Give me one moment.  I'm going to
23  do a little housekeeping if I may.
24          THE COURT:  Sure.
25          MR. WELTCHEK:  All yours.

BALTIMORE COUNTY CIRCUIT COURT

59

1           MR. STACK:  Thanks.
2                   CROSS EXAMINATION
3           BY MR. STACK:
4     Q.    Good morning, Dr. Rudo.  How are you today?
5     A.    Good morning.  It is good to see you again.  I
6  hope I can say that several hours from now.
7     Q.    It is always a pleasure to see you, doctor.
8     A.    Same here.
9     Q.    There are several subjects that I want to
10  discuss with you today.  I will ask the gentleman in
11  charge of video, Mr. Ramsmeyer, to bring up HR 1.
12  Pardon me.  KR 1.  They are quite a few topics which I
13  anticipated your discussing.  You did in fact discuss
14  virtually all of them.  And those topics would include
15  generally science of toxicology and some of the
16  specific toxicology of MTBE and you're prepared to talk
17  about that one, correct?
18    A.    Yes, sir.
19    Q.    Exposure assessments in dose analysis.  Two


Oct 22 Rudo

20  other concepts, general causation and specific
21  causation, which were not necessarily called out but
22  certainly alluded to in your testimony, would you
23  agree?
24      A.  Yes, sir.
25      Q.  And talking about background contamination,

BALTIMORE COUNTY CIRCUIT COURT

60

1   which is something that wasn't mentioned, specifically
2   the process of risk assessments, then what you did in
3   this case.  And then I want to talk about something
4   that we didn't talk about in the context of your direct
5   testimony but nonetheless you alluded to and that is
6   plaintiffs' exposure and exposure is through three
7   different routes:  You mentioned them but in the field
8   of toxicology, I think you agree with me, we look at
9   ingestion, which in this case would be drinking the
10  water, am I correct?
11      A.  Yes, sir.
12      Q.  We look at inhalation, which would be
13  breathing volatile vapors of any of the contaminants in
14  the water which might be encountered when water
15  volatilizes the chemical through either dermal or
16  physical processes, am I correct?
17      A.  Yes, sir.
18      Q.  And then the last one would be dermal contact,
19  am I correct?
20      A.  Yes.
21      Q.  And certainly all of these have been studied

Oct 22 Rudo

9   A.  To a certain degree. And when you are talking
10  about fatal, you are talking about, you know, a dose
11  that is a lethal dose and it also has to take into
12  account the fact that people are going to react to a
13  drug like Tomoxafin or the chemicals that we are
14  talking about in different ways.
15  Q.  And with respect to the variability of
16  reactions, you just have a generalized qualitative
17  opinion in this case that any exposure to any amount,
18  irrespective of how the plaintiffs may vary, that that
19  is creating a risk for each of the plaintiffs, right?
20  A.  Yes.
21  Q.  And without regard to how long the exposure
22  may have been or how much the exposure may have been,
23  any exposure is enough, am I correct?
24  A.  That is actually a position that the EPA
25  takes, too.

BALTIMORE COUNTY CIRCUIT COURT

[]

70

1   Q.  And but it is your position in this case that
2   every one of the plaintiffs are at risk, irrespective
3   of how long or how much of a particular chemical that
4   they may have been exposed to in their water?
5   A.  Yes, it does increase their risk, yes, sir.
6   Q.  Now, you base your opinion on this fact that
7   you believe MTBE is a probable human carcinogen,
8   correct?
9   A.  Yes, sir.
10  Q.  And you also base it on the animal studies and

Oct 22 Rudo

11  the three studies which you didn't mention, there is
12  one by Dr. Burleigh-Flayer?
13      A.  Yes.
14      Q.  And Burleigh-Flayer did one of the inhalation
15  studies, am I correct?
16      A.  Yes.
17      Q.  And she is a reputable scientist, of some
18  renown, right?
19      A.  I'm not familiar with her reputation but
20  familiar with the studies.
21      Q.  And the other study was done by Dr. Chun, that
22  is the other one of the three studies?
23      A.  Yes.  In fact, they worked together on both of
24  those studies.
25      Q.  And with respect to the last study, that is

BALTIMORE COUNTY CIRCUIT COURT

71

1   the one that was done by Dr. Belpoggi, am I correct?
2       A.  Yes.
3       Q.  And so we are clear and the jury is clear, the
4   two studies by Chun and Burleigh Flayer, those were
5   inhalation studies, am I correct?
6       A.  Yes, sir.
7       Q.  And the study by Dr. Belpoggi was a gavage
8   study, correct?
9       A.  Correct.
10      Q.  And gavage study means they put a feeding tube
11  down some poor little rat's throat and force feeding
12  them with a mineral oil based substance that has MTBE

Page 66

Oct 22 Rudo

13   in it, correct?

14   A.   Yes, sir.

15   Q.   And with regard to the dosages that were
16   administered to those rats in this gavage study, they
17   did a dosage based on how many kilogram of body weight,
18   am I correct?

19   A.   Yes.

20   Q.   Can you extrapolate from that and tell the
21   jury in this case how much MTBE a human being would
22   have to ingest to have the same effects that the rats
23   had in the Belpoggi study?

24   A.   I think you are talking about two completely
25   different things here.  You might want to rephrase the

BALTIMORE COUNTY CIRCUIT COURT

72

1   question in terms of the animal studies.  When we do
2   animal studies for cancer, they are generally
3   considered to be high dose studies.

4   Q.   Mega dose is what they are called, am I
5   correct?

6   A.   No.  Never seen that term used.

7   Q.   Never seen that term?

8   A.   They are high.

9   Q.   Can you answer the question?  Can you --

10      MR. WELTCHEK:  He was answering.  He cut
11   him off.

12      MR. STACK:  Nonresponsive.

13      MR. WELTCHEK:  I object.

14      THE COURT:  Have you finished your answer yet?

Page 67

Oct 22 Rudo

15          THE WITNESS:  No, sir.
16          THE COURT:  Go ahead.
17          THE WITNESS:  The animal studies are
18  considered high dose studies.  And the reason that they
19  use high dose studies in animals is because they really
20  want to try to make sure that they can determine and
21  see clearly any effects that they have.
22          Part of the process is that the levels in
23  animals are extrapolated in terms of risk, not in terms
24  of dose to the animal and dose to the human in terms of
25  what you would see in comparison to the animal.  We

BALTIMORE COUNTY CIRCUIT COURT

73

1   don't do that.  That is not done in toxicology.  You
2   can have an expert that can sit down and say this is
3   what it is --
4       Q.  We will do --
5       A.  Excuse me.  I would like to finish the answer.
6   It is a question you asked.  It is not something we do
7   in toxicology.  We don't sit here and say, well, an
8   animal had a high dose study and what level that high
9   dose will cause that high dose effect in humans.  In
10  toxicology, that is not the kind of study that is done.
11  It is not the kind of approach that is done.  The
12  approach is to take the animal level that causes the
13  tumor and extrapolate it to humans, try to make sure we
14  understand what level it could be caused, the mechanism
15  by which it could cause that tumor, how does it do it,
16  which is very, very important.  And the idea is to

Page 68

Oct 22 Rudo

17  extrapolate it to humans because humans have so much
18  variability in how they are going to respond from
19  person to person.
20          Meanwhile, in the animal studies, we are using
21  strains of animals that we would hope to have a
22  consistent finding and consistent reaction in those
23  animals.
24          MR. STACK:  I move to strike as
25  nonresponsive.

BALTIMORE COUNTY CIRCUIT COURT

74

1   Q.  The basic principle question I asked is could
2   you tell the jury in terms of exposure how much a human
3   would have to be exposed to in terms of MTBE in order
4   to have the same effects as the animals in the test
5   that was performed with rats?
6           THE COURT:  I will deny the motion but the
7   witness may answer this question.
8   A.  I'm going to pretty much stay with my last
9   answer.  I mean, if you want to sit down and calculate,
10  we can calculate, you know, the levels that were used
11  in the animals and, you know, body weight basis on
12  humans but it is not applicable.  It is not done.  It
13  is not considered in toxicology in terms of discussing
14  human risk.  It is more of an approach that would be
15  used by say an industry representative who wants to
16  say, well, this is a high dose in animals, it will be a
17  high dose in humans.  And we have so many chemicals and
18  MTBE is looking more and more like one of those

Oct 22 Rudo

19  chemicals that is a low dose chemical.  So it doesn't
20  apply.
21      Q.   You have done testing on animals yourself?
22      A.   Long ago, yes, sir.
23      Q.   You tested rats and also tested dogs, didn't
24  you?
25      A.   Actually, I went back and looked at that and I

BALTIMORE COUNTY CIRCUIT COURT

75

1   remember I had tremendous guilt about it, but I
2   actually did not do the testing myself on the dogs.  It
3   was done as, there was a physician, Dr. Myers, over at
4   Duke University who was at the time one of the first
5   people to do liver transplants in humans, and as part
6   of his training he was practicing on dogs to learn the
7   process to do it so that it could be safe when he did
8   it in people.
9       Q.   And you were concerned because some of the
10  dogs in those experiments were sacrificed, am I
11  correct?
12      A.   State that again.
13      Q.   I thought you expressed some concern yourself?
14      A.   I did.  Working with animals is something that
15  you know, long after the fact I could never conceive of
16  doing it again.  It was just -- it was just something
17  that never sat well with me, which is part of the
18  reason that I do what I do today.
19      Q.   Now, with regard to all the testing that you
20  did and your experience, you have never tested MTBE in

Oct 22 Rudo

21  a lab; is that correct?
22      A.   No, sir.
23      Q.   You only tested the polycyclic aromatic
24  hydrocarbons, am I correct?
25      A.   Yes.


BALTIMORE COUNTY CIRCUIT COURT

76


1       Q.   And you told the jury that the results of
2  animal testing are relevant to toxicological analysis,
3  am I correct?
4       A.   Could you restate that?
5       Q.   That in the context of your opinions, you
6  consider animal testing results as relevant and that
7  generally, in a practice of toxicology, people look at
8  and accept the results of animal testing, am I correct?
9       A.   Yes.  Thank you for rephrasing that.
10      Q.   And with respect to the testing process, one
11  of the things you look at is the mechanism that causes
12  a problem, am I correct?
13      A.   If you can, yes.
14      Q.   And with respect to toxicological testing,
15  there are some tests which have been qualified, maybe
16  even rejected because the mechanism of carcinogenicity
17  has no relevance to mankind, right?
18      A.   Yes, sir.
19      Q.   And with respect to the testing that has been
20  done so far, we certainly know and everyone knows that
21  testing in animals and humans sometimes have different
22  results; things that are toxic to animals are not

```
                         Oct 22 Rudo
23   necessarily toxic to humans and vice versa, correct?
24        A.    Yes, sir.
25        Q.    The people who own dogs and I believe, as I


                  BALTIMORE COUNTY CIRCUIT COURT
                                                              77


1    recall, you own a g too?
2         A.    Cat.
3         Q.    Did?
4         A.    Cat.
5         Q.    And you know that Theobromine is toxic to dogs
6    and Theobromine is something that everybody who loves
7    their -- there are probably a lot of people in the jury
8    that love chocolate and one of the primary ingredients
9    of chocolate is Theobromine, which is fatal to dogs,
10   correct?
11        A.    Correct.
12        Q.    So it is toxic to dogs but not to humans,
13   right?
14        A.    I haven't studied that that much.  So I will
15   grant you that.
16        Q.    And with respect to the tests of animals, you
17   also know that there are needs to check the findings?
18   You talk about how the group, which we refer to as
19   OEHHA in California, reviewed the findings and
20   conclusions of the Tox studies that you are relying on,
21   am I correct?
22        A.    Yes.
23        Q.    And they looked at a variety of factors and I
24   want to mention a couple of them because we are going
```

Oct 22 Rudo

25   to talk about them in light of some of the studies you

BALTIMORE COUNTY CIRCUIT COURT

78

1    are relying upon.  They talk about the incidences of
2    cancer in a control group.  A control group is a group
3    of animals that aren't exposed, correct?
4         A.   Yes, sir.
5         Q.   And what you try to do is try to look at
6    animals in a controlled group and compare them to the
7    exposed group and see whether or not there are any
8    incidences of cancer, or whatever the outcome is you
9    are looking for in a controlled group and compare it to
10   what happens to the test group, am I right?
11        A.   Yes.
12        Q.   Test group is the group that you actually have
13   exposed to the chemical, correct?
14        A.   Yes, sir.
15        Q.   And with regard to the incidence of cancers in
16   the control group, some of these strains of rats that
17   you talked about, the Sprague Dawley rat, the T 344
18   and --
19        A.   Fisher 344.
20        Q.   Fisher 344, those animals can spontaneously
21   develop cancer, am I correct?
22        A.   Yes, sir.
23        Q.   And they spontaneously developed cancer, am I
24   right?
25        A.   To a certain degree, yes.