Exhibit 5

Oct 23 Rudo.txt

1

1                          IN THE CIRCUIT COURT
                    FOR BALTIMORE COUNTY, MARYLAND
2

3   JEFF ALBAN, et al

4                                    CASE NO.
          VERSUS                     03-C-06-10932
5
    EXXONMOBIL CORPORATION, et al
6

7
                          /        OCTOBER 23, 2008
8

9

10
          REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
11

12

13
      BEFORE THE HONORABLE MAURICE W. BALDWIN, JR., JUDGE
14

15

16

17

18

19

20

21
    Reported by:
22
    RITA TAGGART, CSR
23  Official Court Reporter
    401 Bosley Ave., M-08
24  Towson, Maryland 21204
    410 887-2635
25

2

1   APPEARANCES:

2
    ON BEHALF OF THE PLAINTIFFS:

Oct 23 Rudo.txt

3
        STEPHEN SNYDER, Esquire
4
        ROBERT J. WELTCHEK, Esquire
5
        SCOTT SNYDER, Esquire
6
        MICHAEL SNYDER, Esquire
7
        TOMEKA CHURCH, Esquire
8

9

10   ON BEHALF OF THE DEFENDANT, EXXONMOBIL Corp.:

11        JAMES SANDERS, Esquire

12        ANDREW GENDRON, Esquire

13        MICHAEL DEVINNE, Esquire

14        THOMAS DUNDON, Esquire

15        CARLOS BOLLAR, Esquire

16        C. CAREY DEELEY, Esquire

17

18

19

20

21

22

23

24

25

                                              3


1                    P R O C E E D I N G S

2                    October 23rd, 2008

3                         AM SESSION

4              (Whereupon, the jury returned to the

5               courtroom and the following ensued:)

6         THE COURT:   Be seated.

7         MR. STACK:   May I proceed, Your Honor?

                      Page 2

Oct 23 Rudo.txt

8              THE COURT:  Almost.  For the record, this is

9     Alban v. Exxon, a continuation of 03-C-006-10932.

10    Counsel are present, all fourteen of the jurors are

11    present and accounted for.

12              You may proceed, Mr. Stack.

13              MR. STACK:  Thank you, Your Honor.

14                         DR. RUDO

15    a witness produced on call of the Plaintiffs, having

16    first been previously sworn, was examined and testified

17    as follows:

18              CONTINUED CROSS EXAMINATION

19    BY MR. STACK:

20    Q.   Good morning, Doctor Rudo.

21    A.   Good morning, Mr. Stack.  Good morning,

22    everybody.

23              THE JURY:  Good morning.

24    Q.   Doctor Rudo, you and I have been cautioned off

25    the record that we both tend to speak very fast so I

                                                          4


1     will try to slow down just a little bit today to

2     accommodate everybody.

3     A.   And I will try to match your pace if I can.

4     Q.   As part of your work in this case, you went ahead

5     and reviewed the potable test results for the testing

6     and sampling of potable wells of the Plaintiffs, am I

7     correct?

8     A.   Yes, you are.

9     Q.   You also reviewed test data for monitoring wells,

10    am I correct?

11    A.   Yes, sir.

                    Page 3

Oct 23 Rudo.txt
12    Q.  Can you tell the jury how many Plaintiffs
13  actually have a monitoring well on their property?
14    A.  None off the top of my head.
15    Q.  With respect to monitoring wells, can you tell
16  the jury which of the Plaintiffs have monitoring wells
17  on their property?
18    A.  Once again not off the top of my head, no, sir.
19    Q.  As part of your work in this case did you conduct
20  any investigation to determine if the Plaintiffs in this
21  case were exposed to contamination in ground water
22  beneath their homes other than through their drinking
23  water well?
24    A.  No, sir.
25    Q.  As part of your work in this case did you conduct
                                                              5


1   any investigation to determine if the Plaintiffs were
2   exposed to soil contamination that might be on their
3   property?
4     A.  No, sir.
5     Q.  With respect to the work that you did in this
6   case, did you do any work to conduct an investigation to
7   determine if the Plaintiffs were exposed to vapors from
8   the contamination of ground water beneath their home
9   entering their home?
10    A.  No, sir.
11    Q.  At any point in time did you conduct an
12  investigation to determine if the Plaintiffs were
13  exposed to contamination present in any monitoring wells
14  that might be on their property?
15    A.  Can you please repeat that?
16    Q.  Yes, sir.  At any point in time did you conduct
                              Page 4

Oct 23 Rudo.txt

17    an investigation to determine if any of the Plaintiffs

18    were at any time actually exposed to contamination in

19    monitoring wells which might be on their property?

20        A.   No, sir.

21        Q.   As part of your work in this case, did you

22    quantify each Plaintiff's exposure to ground water

23    contamination beneath their homes that wasn't being

24    drawn into any of their potable wells?

25        A.   No, sir.

                                                          6


 1        Q.   As part of your work in this case, did you

 2    attempt to quantify each Plaintiff's exposure to any

 3    soil contamination that might be present on their

 4    property?

 5        A.   No, sir.

 6        Q.   As part of your work in this case, did you ever

 7    form any opinion to a reasonable degree of scientific

 8    probability regarding how much each Plaintiff was

 9    exposed to in the form of ground water contamination

10    beneath their homes that wasn't in their well?

11        A.   No, sir.

12        Q.   As part of your work in this case, did you ever

13    form an opinion to any reasonable degree of scientific

14    probability regarding how much each Plaintiff may have

15    been exposed to any soil contamination on their

16    property?

17        A.   No, sir.

18        Q.   As part of your work in this case, did you ever

19    form an opinion to a reasonable degree of scientific

20    certainty regarding how much MTBE or benzene Plaintiffs

Oct 23 Rudo.txt
21   may have been exposed to in vapors that may have entered

22   their home from contamination beneath the sub-surface?

23        A.   No, sir.

24        Q.   Fair to say in the context of your work in this

25   case, you only looked at the presence of contamination

                                                            7


 1   in Plaintiffs' drinking water wells?

 2        A.   Yes, sir.

 3        Q.   At any point in time did you attempt to quantify

 4   and form an opinion regarding the amount of exposure the

 5   Plaintiffs may have had to MTBE or benzene from any

 6   source other than your drinking water well?

 7        A.   No, sir.

 8        Q.   At any point in time did you ever attempt to

 9   quantify what the dose was for each Plaintiff for

10   benzene or MTBE from any source other than their

11   drinking water?

12        A.   No, sir.

13        Q.   As part of your work in this case you and I

14   reviewed your deposition.  The Kleinfelder test results

15   confirm that?

16        A.   I have to refresh my memory on that.

17        Q.   That would be deposition -- Exhibit 16, the long

18   table with the redactions in it?

19        A.   We would have to go look at it.

20        Q.   In preparation for trial did you look at the

21   Joint Exhibit J, the one which has all of the test

22   results for the Plaintiffs in it?

23        A.   You would have to show it to me.  I have looked

24   at a lot of testing data.  So whether it is a total

25   summary data or it's, you know, partial data, I'd have
                           Page 6

Oct 23 Rudo.txt

8

1    to look at it.

2        Q.   With respect to this case, before you got on the

3    stand did you look at the chart that showed the maximum

4    concentrations of contamination in the Plaintiffs'

5    wells?

6        A.   Chart in that was maybe presented here.

7        Q.   Yes, sir.

8        A.   No, sir, I haven't seen that.

9        Q.   Did counsel provide you with any of the Joint

10   Exhibits that were provided to the jurors showing for

11   each one of the Plaintiffs what their contamination was

12   in their well?

13       A.   I'm not aware of what they would have shown to

14   the jurors in terms of what would have been shown to me.

15            MR. WELTCHEK:   On direct examination,

16   Plaintiffs' Exhibits.

17   BY MR. STACK:

18       Q.   Mr. Weltchek has clarified one point.  You have

19   seen the chart from the 66 people, am I correct?

20       A.   Yes.  I have seen the chart for the sampling

21   results for residents.

22            In terms of what you have used for exhibits here,

23   if they're in another, may have, I may not have seen

24   those.

25       Q.   Fair enough.  Would you agree with me that there

9

1    are 24 plaintiffs' wells in this case that the highest

2    detection ever in their well was non detect?

Page 7

Oct 23 Rudo.txt

3    A.  I have to go look at the chart for that.

4           MR. WELTCHEK:  I would agree that, yes,

5    that's correct.

6    A.  Okay.

7    Q.  Would you also agree that there are an additional

8    30 wells that the maximum value in the well was a J

9    value at 0.5 parts per billion?

10   A.  Once again I'd have to look at the -- count it

11   up.  I'd have to look at.

12          MR. WELTCHEK:  Sounds right.

13   A.  That sounded about right.

14   Q.  Is it your understanding, sir, that in this case

15   there are a total of 54 wells for which the maximum

16   value of MTBE ever detected in the well was 0.5 or

17   below?

18   A.  Once again I'd have to look at the table and

19   count it up.

20          MR. STACK:  Your Honor, if I could take one

21   minute to see if I can grab the tables and provide them

22   to the witness?

23          THE COURT:  Very well, sir.

24          MR. STACK:  I apologize.

25          THE WITNESS:  They're in the box.

                                                  10


1           MR. STACK:  They're right here.

2           MR. WELTCHEK:  There's a blow-up right here

3    if you need it.

4           MR. STACK:  I'd apologize, Your Honor, but

5    -- I can't find the chart.  Sorry, no problem.  Give

6    this to the witness.

7           MR. STACK:  What I am looking for is JT2 and
                        Page 8

Oct 23 Rudo.txt

8   JT3.   Here we go.  I got one.

9   BY MR. STACK:

10      Q.   I'll provide these to you.

11      A.   Thank you.

12      Q.   The record should reflect I've provided a copy of

13   what was marked as Joint Exhibit Number 2 to the

14   witness.

15          Have you prior to appearing here in Court to

16   testify reviewed what has been marked at this trial as

17   Joint Exhibit Number 2?

18      A.   Yes, sir.

19      Q.   And in looking at that, does it refresh your

20   recollection that there were a total of 54 wells for

21   which the maximum value ever detected was 0.5 parts per

22   billion or below?

23      A.   Okay, yes.

24      Q.   And can we have 52 please, Mr. Ramsmeyer?  At any

25   point in time did you actually as part of your work in

                                                              11


1   this case undertake to map out which ones of the

2   Plaintiffs had nondetect or a maximum detection of less

3   than 0.5 parts per billion?

4      A.   I have seen it mapped out.  I haven't done it

5   myself but it's been done already.

6      Q.   So we are clear in this case, it is your opinion

7   that with respect to these residents of these 54 homes

8   served by these 54 wells that these individuals should

9   have medical monitoring, am I correct?

10      A.   When you are talking about the people that are

11   .5, now please explain that again, what you were saying

Oct 23 Rudo.txt

12    there --

13        Q.   Yes, sir.

14        A.   -- in terms of that.

15        Q.   In this exhibit, which is KR52 for the record, is

16    a map depicting the 54 homes for which the highest MTBE

17    detection ever was either nondetect or detect for less

18    than 0.5 parts per billion.

19        A.   So are you saying that this includes values,

20    homes that were -- actually had less detected or

21    estimated, right?

22        Q.   That's correct.

23        A.   Okay.

24        Q.   And estimate is the key thing, too, Doctor.  It's

25    a J value for all these homes?

                                                          12


 1        A.   Right.  And I think it needs to be understood

 2    that the detection limit is a value that -- it's a

 3    target that they use in terms of, you know, what they

 4    want to try to detect it at, and it still is valid in

 5    terms of if you detect it under that detection limit,

 6    it's still considered in our world in terms of an

 7    evaluating sample results if there is value that, an

 8    estimated value, it's considered a detect and it is

 9    considered contamination.  So I just want to --

10        Q.   I'm not going to quibble with you about that at

11    all.  These were all detections with J value

12    estimations.

13             But I want to make clear for the jury that it is

14    your opinion that individuals residing in homes with

15    wells, and there are 54 of them, that those individuals

16    who had nondetect or a detection under 0.5 parts per

Page 10

Oct 23 Rudo.txt

17  billion, every one of those people should get medical

18  monitoring?

19      A.  Now, and there is a reason for it if you -- I

20  will explain that if --

21      Q.  If -- you can explain it.  If you just answer the

22  question.

23      A.  Yes.

24      Q.  It is yes, it is your opinion?

25      A.  Yes.

                                                            13


 1      Q.  Why do you think every resident living in a home

 2  where there is nondetect or at level of 0.5 or below

 3  needs medical monitoring?

 4      A.  All right, the reason is that, number one, there

 5  is no certainty that the nondetects that the people had

 6  didn't mean that they had exposure either before that or

 7  either they may have had it after that, number one.

 8          Number two, there was a window of, I don't know

 9  about a month, a month and a half where contamination in

10  this residence and in this residential area was not

11  detected.  It was not known.

12          You have a plume that was moving very quickly

13  contaminating homes and it is indeed possible that,

14  number one, people were exposed during that time that

15  later on may not have had it in their well.

16          The nondetects may have been levels that were

17  detected in the past and that since then they may have

18  had contamination in their well, and there may have been

19  exposure, in other words, either before or after the

20  nondetect period, including the period I believe from

                            Page 11

Oct 23 Rudo.txt

21    January into February of 2006 where the contamination

22    occurred without anyone being aware that it had

23    occurred.

24         And the reason that you recommend medical

25    monitoring is that we have been talking about risks in

                                                          14


1    this room.  We have been talking about it in terms of,

2    and Mr. Stacks has been trying to present it as a

3    theoretical risk or as a valued risk, when in terms of

4    the reality of the situation, in terms of public health

5    and what it can do to people because of the nature of

6    the chemical, it is a mutagenic carcinogen and there is

7    no safe level.  The safe level is zero.  That's been

8    established by the EPA in terms of their maximum

9    contaminant limit goes.

10         It's, it's a public health approach that is used

11    and because of that, and because we do not know if the

12    people that have contamination, how long they have had

13    it, we do not know the people that have no detects now

14    may have had it in the past or in the future.

15         We also do not know the people that have the

16    values that are being -- the J values which are existing

17    levels of the chemical in the well, these all pose a

18    risk, and part of the, part of the reason for the

19    medical monitoring and the importance of the medical

20    monitoring is that this is a neighborhood that has

21    been -- has had their water put at risk for them by

22    Exxon.

23         They have contaminated their wells.  From what I

24    understand, they have actually admitted to doing that,

25    and having admitted to doing that, and having put these

                         Page 12

Oct 23 Rudo.txt

15

1   people at risk in terms of carcinogenic chemicals in the
2   water that have been found to cause cancer in animals
3   and in the field, indeed, these chemicals have been
4   found to cause cancer in people in cases that have been
5   found.
6          So when you look at that and you look at the
7   risk, the idea from a public health standpoint, for me
8   as a toxicologist whose job it is to try to protect
9   public health, is that you want to make sure that these
10  people are not put at any further risk or if they are,
11  down the road, God forbid, something should happen to
12  them, you would want them to be in a situation where
13  they are having their physicians look at them, they are
14  having medical monitoring, they're being looked after
15  medically down the road in the future because a lot of
16  times we talk about something that may take five to 30,
17  35 years to occur.
18         So you want to make sure that you are looking
19  after their health, that you are taking responsibility
20  in this case, which Exxon has taken responsibility for
21  contaminating their water.  They need to take
22  responsibility at this point in time for making sure
23  that these people are not going to get any kind of
24  adverse health affect down the road from this
25  contamination which has put them at an increased risk.

16

1          So medical monitoring in our world is an
2   appropriate approach to make sure that you're protecting

Page 13

Oct 23 Rudo.txt

3  people that have had this kind of contamination without

4  their knowledge and put at risk without their knowledge.

5      So that's my answer, sir.

6  Q.   Do you have any test results that you can show

7  the jury as a result of testing performed to indicate

8  that there was ever any detection of MTBE or benzene in

9  any of the homes that are listed as nondetects?

10  A.   I'd have to go back and look at the full data for

11  all -- from all times.

12  Q.   As part of your work in this case, did you ever

13  request that sampling be conducted at these 54 homes to

14  confirm that during times that Exxon was not sampling at

15  the direction of the MDE, there actually was

16  contamination there?

17  A.   I have recommended a general sampling protocol

18  for the whole neighborhood, yes.

19  Q.   And during the period of time that you have been

20  involved in this case, has any one on behalf of the

21  Plaintiffs followed your protocol for these 54 homes?

22  A.   I'm not sure --

23  Q.    Anyone show you bi-monthly, any one show you

24  bi-monthly testing results for these 54 homes showing

25  detects?

17

1  A.   I have seen breakdowns of all the detailed

2  monthly testing that has been done for all the

3  residences.

4      I have seen the actual chart in terms of -- I'd

5  have to go back and look at that to see if some of the

6  nondetects now are the ones you have here have been

7  consistently that or not.

Page 14

Oct 23 Rudo.txt

8        But I was aware when I looked at the data

9    originally that a lot of -- there was fluctuations in

10   levels, and that's what you expect, that some people who

11   had nondetects at one point in time had detects at other

12   points in time and --

13      Q.  But as to these 54 people, has anyone ever shown

14   you testing performed by anyone other than Kleinfelder

15   or the State of Maryland that actually shows that these

16   54 wells had a detection of MTBE greater than 0.5 or

17   greater than that nondetect?

18      A.  Once again, I'd have to look at the monthly

19   chart.

20      Q.  You haven't done that as part of your work in

21   this case?

22      A.  I have, I have looked at it for all the, the

23   Plaintiffs in the case.  I'd have to go back and see if

24   it answers your question as you're stating it.

25      Q.  With respect to these individuals, did you ever

                                                           18


1    calculate periods of time during which there were

2    intervals in the testing in which there could have been

3    contamination in their well and then quantify the risk

4    for that exposure?

5       A.  I haven't in terms of doing quantitative reports

6    for the Plaintiffs, and looking at exposure intervals,

7    I'm aware of, you know, the fact that there were gaps in

8    testing in terms of calculations.

9       Q.  Did you actually look at those intervals and for

10   each of these 54 homes determine what the period of time

11   was and quantify the risk assuming there was some

                        Page 15