# EXHIBIT A

In The Matter Of:

*THE CITY OF NEW YORK, ET AL*
*EXXON MOBIL CORPORATION, ET AL*

*VOLUME 22*
*September 2, 2009*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 992dcitf.txt, Pages 3174-3367 (194)

**Word Index included with this Min-U-Script®**

Page 3234

Judge.

THE COURT: However, he did point out that that was five hours after discovering the issues in conference. They quoted three sentences from Mr. Sher's opening which arguably could have been done in five minutes rather than five hours. So while the G-mail servers around the country were slow and he did get it at midnight, it was too late to forward it to me because I was sleeping. But in any event, that is the story.

It was e-mailed at 9:13. He received it at midnight, and it was five hours after you raised it at the conference.

MR. SACRIPANTI: Yes. Thank you, your Honor.

THE COURT: You are welcome.

(Recess)

(Continued on next page)

Page 3235

(Jury present)

THE COURT: Please be seated. My clerk said during the recess that I should tell you the checks are coming before lunch. I thought that would make you cheerful.

A JUROR: Yes. Thank you.

THE COURT: That's what I was told to say. The checks are coming before lunch. OK.

MR. CHAPMAN: Thank you.

BY MR. CHAPMAN:

Q. Dr. Scala, I would like to refer you to PL3652.
Sir, on June 13, 1984, you were at Exxon, correct?
A. Yes, sir.
Q. And you'll notice that this refers to a revised overview statement for the Gasoline Groundwater Tox Group. Do you see that?
A. Yes.
Q. It says that, "Please return your comments to Ben as soon as you can. Once this is done, he and Bob Scala will redraft the statement, according to the wishes of the work group as well as API management."
Do you see that?
A. Yes, I do.
Q. And that is a reference to you, Bob Scala?
A. Yes, it is.
Q. If we go further down on that page, you'll see where it

Page 3236

says, on the "ic" there is a reference to R. A. Scala. Do you see that down on the lower left?
A. I do.
Q. That's you?
A. Yes, it is.
Q. And if you turn to the next page, sir, there is the enclosure draft. Do you see that?
A. Just a moment, please.
(Pause)
Yes, I see it.
Q. And the document is entitled "Hydrocarbon Contamination of Groundwater," correct?
A. Yes, it is.
Q. The Toxicology Overview?
A. Yes.
Q. And this was a draft that you were going to work on, correct?
A. Yes.
Q. And it says, under "Background," that "Groundwater is recognized as an invaluable natural resource, used by society for human consumption, crop irrigation, for watering livestock, as a source for industrial water, and geothermal energy."
It goes on to say: "Contamination of groundwater by hydrocarbons due to the accidental spillage/leakage of gasoline into the environment is therefore of high concern to the

Page 3237

petroleum industry."
Do you see that?
A. I do.
Q. And this is a document that you were revising on behalf of the API, correct?
A. Yes, it is.
Q. So you knew at the time that groundwater contamination by the accidental spillage or leakage of gasoline into the environment was a matter of high concern?
A. Yes, it is.
Q. So --
A. And was.
Q. So the leak that we talked about, the 50,000-gallon leak, was a matter of environmental concern, wasn't it?
A. Yes, indeed it was.
Q. And you knew that at the time?
A. I did.
Q. And if you would go to the next page, page 2. If you look, you'll see there is another specific reference to MTBE after the middle. Do you see that?
A. I do.
Q. And then it says, "The contamination of groundwater by gasoline-associated compounds raises numerous questions of relevance."
Do you see that?

Page 3238

[1] A. I do.
[2] Q. One of those gasoline-associated compounds is MTBE,
[3] correct?
[4] A. Yes.
[5] Q. So in 1984, you were working on a paper for Exxon and the
[6] API which says the following questions concerning groundwater
[7] and gasoline-associated compounds: "Is the water safe to
[8] drink? To bathe in? To wash fruit and vegetables? To cook
[9] with? To water pets and livestock? To irrigate crops? To
[10] water the lawn?"
[11]   Do you see that?
[12] A. I do.
[13] Q. Those were all matters of concern in connection with
[14] groundwater and gasoline-associated compounds, correct?
[15]   MR. BONGIORNO: Your Honor, could I just ask that you
[16] read the sentences like the one he just read, "Oxygenates such
[17] as methyl tertiary butyl ether," and continue the full
[18] sentence, "and various alcohols."
[19]   THE COURT: Sure. "And various alcohols often migrate
[20] together as a relatively early plume."
[21]   Do you want the whole sentence, "soluble arithmetic
[22] compounds such as" --
[23]   MR. BONGIORNO: Up to the semi-colon.
[24]   Thank you, your Honor.
[25]   THE COURT: OK.

Page 3239

[1] BY MR. CHAPMAN:
[2] Q. So that's the reference to gasoline-associated compounds,
[3] with an "s", sir, correct?
[4] A. Yes.
[5] Q. Including MTBE?
[6] A. Yes.
[7] Q. And there are also taste and odor concerns about those
[8] contaminants and whether they were provided adequate warning if
[9] a contamination of groundwater had occurred, correct?
[10] A. Yes.
[11] Q. And there was also a concern that due to the taste and odor
[12] properties -- "organoleptic" means taste and odor, right?
[13] A. Yes, it does.
[14] Q. There was a concern whether those properties of the water
[15] contaminated by gasoline, including MTBE and other compounds,
[16] was such that people would refuse to drink it, right?
[17] A. Yes.
[18] Q. So as of 1984, these were all concerns of yours, Exxon and
[19] the API, correct?
[20] A. Yes.
[21] Q. And you knew at that time that gasoline storage tanks
[22] leaked, correct?
[23] A. Could leak, yes.
[24] Q. And did leak, right?
[25] A. Yes.

Page 3240

[1]   MR. CHAPMAN: I have no more questions, your Honor.
[2]   THE COURT: All right.
[3]   MR. BONGIORNO: Could we keep this up on the screen,
[4] please?
[5]   THE COURT: Sure.
[6] REDIRECT EXAMINATION
[7] BY MR. BONGIORNO:
[8] Q. Dr. Scala, Mr. Chapman just identified three questions that
[9] are raised in this document that you worked on. And if Liz
[10] could keep going with her box down to the next sentence, thank
[11] you, and pull it up, the very next sentence says, "As noted
[12] above, many of these questions are being addressed by various
[13] API technical committees."
[14]   That's what it says, right?
[15] A. Yes.
[16] Q. Now, Dr. Scala, Mr. Chapman made reference to the 35,000 to
[17] 50,000-gallon spill in East Meadow, Long Island. Do you recall
[18] that testimony?
[19] A. I sure do.
[20] Q. And you recall the incident, correct?
[21] A. Very clearly.
[22] Q. Now, you personally worked with personnel from the Nassau
[23] County Department of Health with regard to that issue, did you?
[24] A. I did.
[25] Q. And you recall that work?

Page 3241

[1] A. I recall the people, too.
[2] Q. What people did you work with from the Nassau County
[3] Department of Health?
[4] A. Well, the key person was their chief epidemiologist, and
[5] there were other technical people. But the man I remember best
[6] was the epidemiologist.
[7] Q. So they were right on top of that situation with you,
[8] correct?
[9] A. Yes.
[10] Q. And you also worked with the County Health Department,
[11] correct?
[12] A. Yes.
[13] Q. And they were notified immediately about this spill,
[14] correct?
[15] A. Yes.
[16] Q. And you further worked with the New York State Department
[17] of Health on that East Meadow, Long Island spill, correct?
[18] A. Yes.
[19] Q. And EPA was even notified, weren't they?
[20] A. As far as I know, yes.
[21] Q. And you, in fact, to take it one step further, or Exxon
[22] retained was it a Dr. Goldstein from Robert Wood Johnson
[23] school?
[24] A. Yes, he was still at NYU at the time, yes.
[25] Q. He was at NYU at the time?

Page 3242

A. Bernie Goldstein.

Q. For what reason, Dr. Scala, did you bring in Bernie Goldstein for the East Meadow, Long Island spill?

A. Because he was a recognized, independent health effects authority who could give opinion about the potential health risk of residual hydrocarbons in the groundwater after the cleanup was completed.

Q. And, Dr. Scala, just to confirm one more point.

You can't say or you don't recall whether that incident actually took place before or after the implementation of TSCA Section 8(e), right?

A. To the best of my recollection, I cannot.

MR. BONGIORNO: No further questions, your Honor.

THE COURT: All right. Anything further, then, for this witness?

(Continued on next page)

Page 3243

RECROSS-EXAMINATION
BY MR. CHAPMAN:

Q. So in 1984, you were familiar with the fact that MTBE traveled further and faster in groundwater than other -- than the other properties of gasoline, correct?

A. MTBE and other oxygenated compounds, yes.

MR. CHAPMAN: I have no further questions, your Honor.

MR. BONGIORNO: Nor do I. Thank you, your Honor.

THE COURT: Thank you, Doctor.

THE WITNESS: Thank you, your Honor.

(Witness excused)

(Continued on next page)

Page 3244

THE COURT: Who might be the next witness?

MR. BONGIORNO: Your Honor, we have no further witnesses in this case.

MR. CHAPMAN: We would like to call Dr. Kenneth Rudo as a rebuttal witness, your Honor.

MR. BONGIORNO: Your Honor, I meant Phase III (a).

THE COURT: I knew that. All right, it's time to let the jury in on this. In Phase III, just to be organized, the lawyers and I talked about subphasing, not to send you out to deliberate, but just to keep their presentations organized issue by issue. This was the first issue, the toxicology of MTBE. Both sides presented their evidence on toxicology. Then we are going to move on to a subphase with very short 15-minute openings. No more closings. You will not be sent out to deliberate. So A new 15-minute introduction from each side on the new issue and both sides will present evidence on the new issue, then another little opening, another issue.

At the end of the phase, it goes to the jury. You don't have deliberations in between every subphase. It's just an organizational tool.

THE JURY: How many?

THE COURT: It went through (g), if I remember. At least seven. But look how fast this one was or is.

MR. BONGIORNO: Judge, I'm being informed that I wasn't as eloquent as I should have been with regard to the

Page 3245

phasing issues. All counsel have agreed as to people who are coming in because of their schedule later, it's not to say their testimony isn't pertinent to (a).

THE COURT: Right. We can't also be absolutely sure that some phase of III(a) is actually closed. Some people, especially in the sciences, are in academia, they are teaching, their schedule didn't permit them to come this week, they are coming next week. So we can't be perfect with this, but we were just trying to be organized.

MR. PARDO: Your Honor, two points.

THE COURT: Yes, Mr. Pardo?

MR. PARDO: First, the subject of the email we sent last night. There is actually one other III(a) witness.

THE COURT: That's what I just told the jury. We can't be perfect about it. We will have one witness out of order.

MR. PARDO: Second, before this witness is seated and sworn, we have an objection. I'm happy to do this at side bar, happy to do this now.

(Continued on next page)