# EXHIBIT   C

# In The Matter Of:

*THE CITY OF NEW YORK, et al, v.*
*EXXON MOBIL CORPORATION, et al,*

---

*September 4, 2009*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 994DCTTF.txt, Pages 3540-3705 (166)

Word Index included with this Min-U-Script®

September 4, 2009
THE CITY OF NEW YORK, et al, v.
EXXON MOBIL CORPORATION, et al,

Page 3544

been consolidated to a group in Houston.

Q. As part of your work for Exxon in 1984, did you get an assignment to review information concerning MTBE?

A. Yes, I did.

Q. At that time you were an environmental engineer in the marketing department?

A. Yes, I was.

Q. To your knowledge at that time, Exxon was not yet adding MTBE to gasoline in its refineries, was that your understanding?

A. That was my understanding at the time, yes.

Q. You were asked to evaluate what would be the environmental concerns if there were a release of gasoline containing MTBE into the environment, correct?

A. That was the question that we were asked to address.

Q. Specifically, you were asked to focus on underground storage tank systems at retail stations, do I have that right?

A. I was in the marketing group, and the question was directed at the activities -- that question that I was asked to answer was directed towards the marketing activities which would focus on retail storage.

Q. You worked with your boss at the time Art Decker in reviewing this issue, is that right?

A. Initially I was working for Sully Curran. Then, within a few months, maybe eight months, I was working for Art Decker.

Page 3545

Q. Was Mr. Decker the supervisor of the staff in Houston that worked on engineering issues within marketing?

A. Art Decker was a supervisor of the environmental group of engineers.

Q. What were the responsibilities of the environmental group?

A. We coordinated the investigation and remediation of environmental incidents throughout the United States, coordinating the activities of consultants and subcontractors.

Q. You also worked with Mr. Ron Eaton, is that right?

A. That's correct.

Q. Who was Mr. Eaton?

A. Mr. Eaton was the manager of real estate and engineering services. He was Mr. Decker's supervisor.

Q. I think you already mentioned Mr. Sully Curran. Did you work with him as well?

A. Yes, I did.

Q. This is tab 1 in your binder, Ms. Mickelson. You can take a look at it. It will also be up on the little screen where you are sitting and it will also be up on the big screen.

MR. SHER: Your Honor, this is PL-247 in evidence. The jury has seen it before.

Q. This is a memo from Jack Spell to J.S. Dick and R.C. Peters dated April 1984. I just want to bring your attention, Ms. Mickelson, to the portion of the second full paragraph, where Mr. Spell states, "In addition to the historic technical

Page 3546

concerns of being able to deliver clean on-spec mogas to our service station customers, we have ethical and environmental concerns that are not too well defined at this point, e.g. (1) possible leakage of S/S tanks into underground water systems of a gasoline component that is soluble in water to a much greater extent."

In 1984 was it your understanding, Ms. Mickelson, that MTBE had a greater solubility than the other traditional constituents of gasoline?

A. Yes, that was my understanding.

Q. Was that of concern because it could cause MTBE to have groundwater impacts?

A. It was a concern because the process when a gasoline spill occurred was that the constituents that comprise gasoline that will dissolve in water would move into the water. The solubility determines how much or how fast it moves into the water. The higher the solubility, the more of that constituent would move into water.

Q. Could you go to tab 2, please. This is PL-268. It's in evidence. This is a memo dated August 8, 1984, from V.M. Dugan to Mr. S.D. Curran. Ms. Mickelson, do you know who V.M. Dugan is?

A. Yes, I do.

Q. Who is that?

A. He's an Exxon employee that was in a planning capacity, as

Page 3547

I understood it, for marketing.

Q. Mr. S.D. Curran, is that Sully Curran, whom you mentioned?

A. Yes, that's Sully Curran.

Q. The first paragraph of the letter states, "We request your input concerning the use of methyl tertiary butyl ether (MTBE) as a motor gasoline blending component. Recent assessments of Exxon's G/EC octane strategy and potential responses to EPA led phasedown have assumed the use of MTBE as a motor gasoline blending component. We understand that you have information concerning potential groundwater contamination problems associated with the use of MTBE for motor gasoline and Shell's experience in this area."

Ms. Mickelson, did you understand that your assignment to look at MTBE came as a result of a request from Mr. Dugan to Mr. Curran to look into the issue?

A. Yes, I did.

Q. After that, you undertook that investigation, correct?

A. Correct.

Q. The second paragraph continues, "Also, Exxon supplies the Corpus Christi and Brownsville, Texas, markets with motor gasoline received on exchange from Triangle containing MTBE. We request your input concerning the retail maintenance experience factor with this mogas, e.g., leaking tanks, etc."

Did you also undertake to look at the experience of the company with the Corpus Christi and Brownsville markets?

Page 3548

[1] A. I don't remember whether I did or not.
[2] Q. Was it your understanding at the time that although Exxon
[3] had not been blending MTBE into gasoline at its refineries,
[4] that it had experience with gasoline at Exxon's own gasoline
[5] stations with MTBE as a result of receiving gasoline that
[6] contained MTBE on exchange.
[7] A. I knew that Exxon service stations in some locales would
[8] receive gasoline from other refiners and that gasoline could
[9] contain MTBE.
[10] Q. You also have familiarity during this period with Exxon's
[11] tank maintenance program, is that right?
[12]    MR. STACK: Objection, your Honor. Could we get a
[13] time period?
[14] Q. During the period that you worked for Exxon.
[15] A. After 1986 until I left the company, I did have experience
[16] with the tank maintenance program.
[17] Q. As of 1986 Exxon was well into upgrading its tanks, is that
[18] right?
[19] A. Yes, that is correct.
[20] Q. About half of Exxon's tanks had been upgraded by that time?
[21] A. I believe, based on my memory, that it was a greater number
[22] than that.
[23] Q. Had all of them been upgraded?
[24] A. Not all of them had been upgraded, but it was definitely
[25] more than half had been treated through the underground storage

Page 3549

[1] tank program.
[2] Q. Some of them were not?
[3] A. Some of them were not yet treated at that time.
[4] Q. The ones that weren't yet treated, were those the old steel
[5] tanks?
[6] A. There were single-wall steel tanks. There were different
[7] degrees of protection that you could add to that. So some of
[8] them might have been simply single-wall steel tanks.
[9] Q. During the period that you were working with Exxon's tank
[10] maintenance and upgrade program, you were aware that in general
[11] the tank population of the United States contained UST's that
[12] were steel and single-walled and not upgraded?
[13] A. I don't know what my knowledge was of the entire universe
[14] of underground storage tanks in the United States. My
[15] experience and exposure was to the tank system that Exxon had
[16] at the time, so I could talk about what I knew about the Exxon
[17] tanks at the time.
[18] Q. Let's move on. Tab 3. This is PL-270. This is a memo
[19] dated August 23, 1984, from you to Mr. Dugan. Is this one of
[20] the memos that you prepared as part of your assignment to
[21] investigate MTBE in Exxon gasoline?
[22] A. Yes, it is.
[23] Q. Let's turn to the second paragraph. You state, "First
[24] MTBE, when dissolved in groundwater, will migrate further than
[25] BTX before soil attenuation processes stop the MTBE migration."

Page 3550

[1] Is that what you wrote in this memo?
[2] A. That's what I wrote in that memo.
[3] Q. BTX refers to what?
[4] A. Benzene, toluene, xylene. But it encompasses usually ethyl
[5] benzene.
[6] Q. What did you mean by "soil attenuation processes"?
[7] A. It had been my experience that when a release of gasoline
[8] occurred, you would see the more soluble constituent, like
[9] benzene, move out further away from the release site, and then
[10] you would see a follow-on, you would have ethyl benzene or
[11] xylene. So you could actually kind of see an effect of
[12] attenuation.
[13]    Whether it was entirely soil-related, it was a
[14] compound of a number of attenuation factors. Some of the
[15] materials would bind to the soil and stop moving. Some of the
[16] materials would volatilize into the pore space, and that means
[17] they just turn into vapor. Some of the constituents, as they
[18] moved forward, would move from the high concentration area to
[19] the lower concentration area, so eventually the plume would be
[20] defined to a certain distance. It would depend on a lot of
[21] factors: Whether there was the volume of the original release,
[22] was it a single spill or a slow release over time. That would
[23] determine how far it would move.
[24]    But my statement that MTBE appeared to move further
[25] than those compounds was based on my experience at a particular

Page 3551

[1] clean-up site where MTBE was included in some of the gasoline.
[2] Q. Which site was that?
[3] A. That was a site in Jacksonville, Maryland.
[4] Q. What had been your experience with that site?
[5] A. There were two service stations involved in a release.
[6] There was a Gulf service station that contained a percentage, I
[7] think up to 7 percent, of MTBE in their gasoline, and there was
[8] an Exxon station. Both had plumes emanating from the stations
[9] that we could monitor with groundwater monitoring wells, and we
[10] could measure the constituents, the concentrations of the
[11] different chemicals.
[12]    We observed that the MTBE in the plume that appeared
[13] to be coming from the Gulf station was further away from the
[14] source area than the plume of predominantly benzene, toluene,
[15] and xylene that appeared to be emanating from the Exxon
[16] station. So that was where I drew that it would migrate
[17] farther, because of what I observed in the groundwater at this
[18] site.
[19] Q. You state in the fourth paragraph, "We are now facing
[20] onerous federal EPA compliance actions which will add costs to
[21] this multimillion dollar incident." What was your purpose in
[22] making that statement? I'm sorry. Were you talking about
[23] Jacksonville?
[24] A. Yes, I was. I was just trying to to find the paragraph in
[25] this. That's the fourth paragraph?

Q. Yes.

A. Because there were a number of parties involved -- there was an Amoco station in addition to the Gulf and the Exxon -- and there had been this identification of multiple plumes of contamination. the EPA, region 3 EPA, issued a kind of a consent order requiring the three companies to cooperatively examine and investigate what was happening.

So now we answered to the Maryland environmental authorities, but also overlying that was communication and response to the EPA. It increased the cost because we had to coordinate the investigation and the response between the three major parties that were involved: Gulf. Amoco. and Exxon.

Q. In the paragraph before this one, you talk about something that happened in Thurmont, Maryland. What was your experience with that site?

A. The initial investigation was completed before I got involved. But there had been releases from apparently gasoline released into the groundwater, and there was a plume that included the benzene constituents and then there was another ether called isopropyl ether.

We noted the similar configuration. that the ether portion of the plume was further away from the source area than the benzene portion of the plume. In fact, the ether was drawn into a well that supplied water for the city of Thurmont. The ether created an odor in the groundwater, so the city shut down

the well.

I was involved in efforts to find and install an alternate well in a location where the groundwater would not be impacted and then provide that well water to the city of Thurmont to replace the one that had been impacted by the isopropyl ether.

Q. That's your reference in the last sentence to "well replacement costs are expected to exceed $500,000 in this case"?

A. That's what I was referring to, yes.

Q. That was in 1984 dollars?

A. It would have been. There was a complication that created that increased cost. In this area the groundwater occurs in fractured bedrock. To produce a large amount of water that a city would need. you have to drill into a fracture that would feed that water to the well.

We drilled 13 bore holes looking for a suitable fracture and didn't find enough water. On the 14th hole we found water that was of a volume that was sufficient to provide it to the city. but that water was contaminated with a chlorinated solvent TCE. So we not only drilled a new well but treated the TCE.

Q. You continue in your memo. "Second, MTBE has lower odor and taste thresholds than BTX. Therefore, low nonhazardous analytically nondetectable levels of MTBE continue to be a

source of odor and taste complaints in affected drinking water. This low threshold will extend the clean-up and testing time to close out a well contamination incident."

Let me ask you first about how you had learned about the lower odor and taste thresholds.

A. That was anecdotal really information from both Sully Curran and Shell Oil Company engineers that I communicated with at a conference in Houston.

Q. The Shell experience, was that Rockaway, New Jersey?

A. Yes, it was.

Q. Was that the only Shell site at which you heard about from Shell?

A. That was the major site, and that was the one that we were talking about at that conference.

Q. What did you mean by "extend the clean-up and testing time to close out a well contamination incident"?

A. I meant that because the water would have to be cleaned up to a level that would be a taste and odor threshold, which was very low, it might take, and I thought it would take, longer to do that and to continue the analytical monitoring of that well to be sure that you no longer had a problem.

Q. That would be more expensive, correct. because it would take longer?

A. That would be more expensive, because even if you weren't actively remediating anymore. you would be collecting samples

and evaluating the samples of water.

Q. You continue, "Third, MTBE cannot be removed by carbon adsorbtion." Can you tell the jury what adsorption is.

A. Adsorption is a process where chemicals like benzene or MTBE would bind to spaces in activated carbon. They would actually bind into the exterior of the carbon so that carbon would basically collect the contaminants and then allow the water to pass on by. The contaminant would bind to the surface of the carbon.

Q. You continue, "Small household carbon filtration units are used by Exxon to treat private drinking supplies contaminated by BTX. This option would not provide adequate treatment for water supplies additionally contaminated by MTBE." What did you mean by that?

A. The option of putting carbon on. If we had a contamination incident that impacted a person's private well, I had experience in Pennsylvania and other states where we would, either through a consultant or through a company like Calgon, bring in carbon vessels, then pipe the water through the carbon vessels, usual have a couple of carbon vessels in series. The first one would take out the contaminant and the second one would be a safeguard to make sure that nothing passed through. We would analyze it. We were able then to treat the water.

With MTBE. at the time I wrote this memo, the carbon that was available in the marketplace didn't have the capacity

THE CITY OF NEW YORK, et al, v.
EXXON MOBIL CORPORATION, et al.

September 4, 2009

Page 3556

[1] to absorb very much MTBE, so it wouldn't have been something
[2] that would be feasible. The MTBE would initially adsorb, it
[3] would fill up the capacity of the carbon, and then it would
[4] just continue to pass through. You'd have to replace the
[5] carbon too frequently to make it a really viable option, in my
[6] opinion at that time.
[7] Q. So even for small household treatment facilities, you were
[8] telling the recipients of this memo that it would require a
[9] more expensive option to treat the water, is that right?
[10] A. That was my understanding at this time. I've learned a lot
[11] more about how to treat MTBE since that time, and carbon
[12] manufacturers have developed additional types of carbon. So
[13] today and in the last five years --
[14]       MR. SHER: Your Honor. I'm sorry. I think this
[15] witness is limited to her experience while she was at Exxon.
[16] That's the way she was designated.
[17]       THE COURT: Yes. You said, I've learned a lot more
[18] about that. You are limited to the time period you were at
[19] Exxon. You are here as a former Exxon employee.
[20]       THE WITNESS: OK.
[21]       THE COURT: Thank you.
[22] Q. Then you conclude on this page, "In summary, there appear
[23] to be three reasons MTBE could add to groundwater incident
[24] costs and adverse public exposure." Are you referring to the
[25] three points that you had made above on the first page or to

[1] cost Exxon more money, is that right?
[2] A. That's what I'm trying to put a dollar amount on, what the
[3] increase would cost.
[4]       MR. SHER: Liz, can you highlight and enlarge the
[5] handwritten portion at the top.
[6]       MR. STACK: Your Honor, if that's the witness's
[7] handwriting, we don't object.
[8]       THE COURT: Let's find out. Is that your handwriting,
[9] do you know?
[10]       THE WITNESS: That is not my handwriting.
[11] Q. Do you know whose initials RTP are?
[12] A. I would be guessing.
[13] Q. So this wasn't your copy of the memo, was it?
[14] A. I don't believe so.
[15] Q. Let's continue to the next paragraph. "Finally, the
[16] closing out of these incidents would take longer and treatment
[17] costs would be higher by a factor of 5." What did you mean by
[18] that?
[19] A. I think the taking longer I talked about earlier, that you
[20] may have to treat longer. There was an attachment to this memo
[21] that isn't in my binder.
[22] Q. Not in mine either. It must not have been attached to this
[23] copy of the memo.
[24] A. I did look at these memos yesterday before I came here, and
[25] there was an attachment. What I had done to get that number

[1] points that you make then on the next page?
[2] A. The next page, I believe.
[3] Q. Let's continue on to there, then.
[4]       MR. SHER: Blow up the first paragraph, please.
[5] Q. You wrote, "Based on higher mobility and taste/odor
[6] characteristics of MTBE, Exxon's experiences with
[7] contaminations in Maryland and our knowledge of Shell's
[8] experience with MTBE contamination incidents, the number of
[9] well contamination incidents is estimated to increase three
[10] times following the widespread introduction of MTBE into Exxon
[11] gasoline." You wrote that in 1984?
[12] A. I did.
[13] Q. That was your estimate that there would be more well
[14] contamination incidents as a result of introducing MTBE into
[15] gasoline?
[16] A. That was my estimate based on Shell's experience, trying to
[17] compare how many incidents Shell had as to how many incidents
[18] Exxon had and attributing that difference to MTBE. That's how
[19] I came up with the number.
[20] Q. You continue. "With 62 groundwater clean-up activities
[21] under way at an average annual cost of" -- is that $3 million?
[22] A. Yes, it is.
[23] Q. -- "this represents an increase of some 120 or $6 million
[24] to a total of 180 and $9 million annual cost." What you were
[25] saying was that having more well contamination incidents would

[1] was I had looked at a typical 40 gallon per minute domestic
[2] well and what it would cost in terms of putting a carbon unit
[3] on that well compared to what it would cost to put an air
[4] stripper on that well.
[5]       The initial cost to build that system, whether it was
[6] carbon or air stripping, the air stripping in my estimate for
[7] that 40 gallon per minute well was five times greater. That
[8] five times was the initial construction. The operating and
[9] maintenance costs of the two options, treatment options,
[10] varied. So the five times didn't take into consideration how
[11] long you would operate it, and that could affect the economics.
[12] Q. You said, "Therefore, we estimate that by extending
[13] closeout times the 180 incidents would double to over 300."
[14] What did you mean by that?
[15] A. What I meant by that was if annually we had 180 cases with
[16] the new MTBE added to it but we couldn't close them out at the
[17] rate we had previously because of the longer time to monitor,
[18] we would have had a rolling average of more cases. We carry
[19] forward more each year. That 180 cases you would carry
[20] forward, so the annual cost would approach that of like the 300
[21] cases.
[22] Q. Then you wrote, "Shell Oil currently has over 300 ongoing
[23] contamination incidents which resulted at some 4,000 retail
[24] facilities, versus 62 incidents at Exxon's 7,000 retail
[25] facilities. The estimated additional costs involved would

September 4, 2009

THE CITY OF NEW YORK, et al. v.
EXXON MOBIL CORPORATION, et al.

Page 3560

Page 3562

[1] result in annual leaker incident costs exceeding $20 million."
[2] What were you saying there?
[3] A. I was just trying to take Shell's experience. I didn't
[4] know at the time what Shell defined a contamination incident as
[5] or what their incidents were. I just assumed that the two
[6] companies would have similar definitions for leaker or
[7] incident. So I scaled up the Shell experience to the Exxon
[8] tank systems. It was based on assuming that they were the
[9] same.
[10] Q. Then you write, "There is a fourth and probably the most
[11] significant consideration. Any increase in potential
[12] groundwater contamination will also increase risk exposure to
[13] major incidents."
[14] THE COURT: Hold on one second. Would you like that
[15] up?
[16] MR. SHER: Yes. Thank you.
[17] THE COURT: Go ahead.
[18] Q. What did you mean by "major incidents"?
[19] A. These were incidents that impacted a larger number of
[20] wells. They were incidents that generated a higher degree of
[21] regulatory involvement. There was more publicity. They were
[22] incidents that were larger and required more attention.
[23] Q. You wrote, "Since 1978 Exxon has been exposed to three
[24] major groundwater incidents (East Meadow, Long Island, Canob
[25] Park, Rhode Island, Jacksonville, Maryland.) While the most

Page 3561

[1] recent cases are unsettled, the cost of these incidents can be
[2] as high as $7 million each based on East Meadow. Therefore, if
[3] the trend of one $7 million suit every two years is increased
[4] commensurate with the number of ongoing outstanding incidents,
[5] i.e., current 62 to over 300, then annual major incident cost
[6] would increase from $3.5 million to $18 million."
[7] Were you expressing your opinion that if MTBE was
[8] added to Exxon gasoline, there would be a larger number of
[9] major incidents?
[10] A. That was my idea at the time, that if you had more area,
[11] plume area, you would have a greater opportunity to impact a
[12] receptor, so that would increase the chance for a major
[13] incident.
[14] Q. Then you conclude, "Taking the above four factors into
[15] consideration" -- pull this up, please -- "it would appear that
[16] widespread use of MTBE has the potential of increasing our
[17] ongoing contamination incidents from a current of 62 to over
[18] 300 and costs from $6½ million ($3 million and $3.5 million) to
[19] over $40 million, that is, plus $20 million and plus $8
[20] million."
[21] So you were informing again the reader of the memo
[22] that you expected the addition of MTBE to Exxon gasoline to
[23] increase the costs of ongoing contamination incidents, correct?
[24] A. To increase the costs associated with the program, not a
[25] single incident but the program.

[1] Q. This memo was copied to Mr. Curran --
[2] MR. SHER: Liz, if you could highlight that.
[3] Q. -- to Mr. Curran, whom we have discussed, Mr. Dick and Mr.
[4] Eaton. So this memo went to individuals in three different
[5] departments at Exxon, am I right: Marketing, Mr. Dugan; real
[6] estate, you, Curran, and Eaton; and marketing technical
[7] services, Mr. Dick, is that right?
[8] A. I'm not sure about where Mr. Dick was working at that time,
[9] but I don't have a reason to disagree. I know it went to at
[10] least two different divisions or departments.
[11] Q. I think we have a copy of the memo that had your
[12] attachment. I want to mark it and pass it out.
[13] MR. SHER: Go ahead and highlight the chart.
[14] Your Honor, this is Exhibit PL-271. It is the same
[15] memo that we have just been discuss.
[16] THE COURT: I understand. That's the attachment A
[17] referred to in the memo?
[18] MR. SHER: It is.
[19] THE COURT: Any objection to using attachment A?
[20] MR. STACK: No objection, your Honor.
[21] MR. SHER: Let me get a copy for the witness.
[22] THE COURT: OK.
[23] MR. SHER: It's 272, not 271.
[24] Q. Is that the attachment that you were referring to?
[25] A. Yes, it is.

Page 3563

[1] Q. These were your estimates of the additional costs
[2] associated with treating water for a 40 gallon per minute well?
[3] A. That's correct.
[4] Q. 40 gallons per minute would be typical for a private well,
[5] is that right?
[6] A. Yes.
[7] Q. Let's go to tab 4, please. This is PL-283, a memo dated
[8] February 22, 1985, from you to Mr. J.M.E. Mixter, subject
[9] methyl tertiary butyl ether, MTBE. Who was Mr. Mixter?
[10] A. My recollection is that Mr. Dugan worked for Mr. Mixter.
[11] Q. So he was another pay grade up?
[12] A. As far as I knew.
[13] Q. The first paragraph says, "Your memo of February 7, 1985,
[14] indicated that the addition of 7 to 11 percent MTBE to Exxon
[15] mogas in the Texas pipeline system is being considered
[16] beginning in the second quarter of 1985. As you requested, we
[17] have reviewed the environmental risks from retail service
[18] station underground storage systems associated with the
[19] addition of MTBE."
[20] You were now asked specifically to focus on one
[21] portion of the Exxon distribution system, do I have that right?
[22] A. Yes.
[23] Q. That was the Texas pipeline system?
[24] A. Yes.
[25] Q. You continue in the next paragraph -- I'm sorry. I lost my

Page 3564

[1] place. Now I have found it again. You wrote, "The addition of
[2] MTBE to EUSA motor gasolines" -- EUSA refers to Exxon USA?
[3] A. Yes.
[4] Q. -- "is of concern primarily because MTBE has a much higher
[5] aqueous solubility, 25,000 milligrams per liter, than other
[6] soluble gasoline compounds such as benzene, 1,780 milligrams
[7] per liter. This can be a factor in instances where underground
[8] storage tanks develop a leak which ultimately may find its way
[9] to the underground aquifer."
[10]        This is basically the same point about solubility that
[11] you made in your first memo, am I right?
[12] A. Yes, it is.
[13] Q. You're just making sure that the reader of the memo has the
[14] same background, correct?
[15] A. I believe so.
[16] Q. You continue in the rest of the highlighted area, "Exxon
[17] has been involved in several groundwater contamination and
[18] clean-up incidents in the eastern U.S. where the more rapid
[19] differential transport of MTBE and IPE, isopropyl ether, has
[20] been clearly observed." Those are the incidents that you
[21] previously described in Thurmont, Maryland, and Jacksonville,
[22] Maryland?
[23] A. That was what I was referring to to make that statement.
[24] Q. "However, in the Texas pipeline system we have experienced
[25] no known drinking water contamination incidents. This

Page 3565

[1] favorable incident record is a result of geohydrologic factors
[2] such as depth to potable aquifers, overlining confining layers
[3] and cultural factors such as public utility districts supplying
[4] drinking water limiting the wells which could be impacted by a
[5] spill."
[6]        You found that MTBE was slightly less hazardous in
[7] Texas, in this portion of Texas anyway, because the groundwater
[8] was deeper and was protected by clay deposited actually where
[9] the Gulf of Mexico used to be, correct?
[10] A. That was the statement there, the factor that you
[11] mentioned, the geology. But also that it wasn't as common to
[12] have individual wells because of the depth to water."
[13]        (Continued on next page)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3566

[1] Q. Thank you. In the next paragraph: "Offsetting the
[2] negative factors above, MTBE could be considered both an early
[3] indicator of contamination and as a method to predict the fate
[4] of the slower moving, toxic constituents offsetting some of the
[5] adverse effects of its inclusion in our gasoline."
[6]        What did you mean by that?
[7] A. What we were very concerned about was that a known
[8] carcinogen like benzene would impact a water well, a supply
[9] well, and since MTBE was not a known carcinogen and it did have
[10] this really low level of taste and odor, the thought in this
[11] paragraph is that if it hit a well, if the leading edge of the
[12] plume had MTBE in it and it hit a well, the owner of the well
[13] would recognize there was something wrong, make complaints. It
[14] would allow us to investigate and close down the well before
[15] the toxic carcinogen benzene actually reached the well. So it
[16] would be an opportunity to get ahead of that benzene plume, and
[17] the MTBE would be the warning that would alert the user of the
[18] well.
[19] Q. Had it been your experience with MTBE and BTEX that the
[20] BTEX plumes ultimately spread as far as the MTBE plumes?
[21] A. In my experience with the plume in Jacksonville, Maryland,
[22] and Thurmont, the benzene lagged behind the MTBE and generally
[23] I didn't see it catch up.
[24] Q. So the MTBE ultimately was the only contaminant that
[25] reached the well, correct?

Page 3567

[1] A. I mean, not in Jacksonville. The benzene at that time -- I
[2] mean, the benzene plume moved also. So I can't say that MTBE
[3] was the only contaminant that ever reached the wells.
[4] Q. Let's go to the next paragraph.
[5]        "We see no overriding reason to recommend against the
[6] use of MTBE in the Texas Pipeline System. However, the
[7] decision to utilize MTBE in this system should also consider in
[8] the base case economics the capital and expense associated with
[9] a program to increase monitoring at affected retail service
[10] stations."
[11]        What did you mean by that? What did you mean by "base
[12] case economics?"
[13] A. What I meant by that was if you were going to consider what
[14] it cost to put MTBE in the gasoline or what benefit there would
[15] be to put MTBE in the gasoline, you should build into that
[16] money for additional monitoring at those service stations,
[17] select service stations, that would have MTBE in the gasoline.
[18] Q. Were you recommending that all gas stations that receive
[19] MTBE have such monitoring systems?
[20] A. No.
[21] Q. And how would you select which ones would?
[22] A. What I was recommending, that we look at a kind of a risk
[23] assessment, which stores were in sensitive areas, so it would
[24] be more problematic and then we would then focus monitoring on
[25] those stores.

THE CITY OF NEW YORK, et al., v.
EXXON MOBIL CORPORATION, et al.

September 4, 2009

Page 3660

[1] A. Correct.

[2] Q. And at that time did Exxon undertake any additional

[3] environmental review of the implications of adding MTBE to its

[4] gasoline?

[5] A. When we introduced MTBE -- before we introduced MTBE, we

[6] went to our Exxon Research and Engineering scientists and asked

[7] for an evaluation of the health and environmental impacts.

[8] Q. That was before you introduced it at all?

[9] A. Before we introduced it at all.

[10]     After we introduced it, we initiated a study with

[11] Exxon Research and Engineering Products Research Division,

[12] directed and funded a study to look at the remediation of MTBE

[13] in gasoline, because that's one of the concerns that had been

[14] raised by Real Estate and Engineering.

[15]     We also advocated with --

[16] Q. When was that study?

[17] A. That study was -- I'll have to look at the date but I have

[18] that information. I can find that.

[19] Q. It was after the approval that we have been discussing?

[20] A. It was even before the approval. It is when it was raised.

[21] It was the fourth quarter of 1984. I don't have the exact date

[22] but I can get you the memo.

[23]     It was the fourth quarter of 1984, and we asked Exxon

[24] Research and Engineering Products Research Division to initiate

[25] a study -- Marketing funded the study -- to come up with an

Page 3661

[1] effective and efficient way to remediate MTBE from gasoline,

[2] because this is one of the concerns that Barbara Mickelson had

[3] raised.

[4] Q. So you were looking to see how it could be removed from

[5] groundwater once it got there?

[6] A. We knew how it did. We wanted a more efficient and a more

[7] effective way.

[8] Q. I see.

[9] A. Secondly --

[10] Q. That was because you knew that gasoline tanks leaked,

[11] right, and that MTBE would escape into the environment?

[12] A. That's correct.

[13]     I would like to add, if I might, that our records at

[14] the time -- and this was part of our decision making -- at the

[15] time we had 7,000 retail stores. We only had had 62 leaking

[16] incidents. And, really, that 62 is out of a total of 21,000

[17] tanks.

[18]     In addition to that, we had spent $178 million in the

[19] period we're talking about here, 1985, to upgrade our

[20] underground tank system. So those were the parts of the

[21] information, the studies I think you are referring to, that you

[22] are looking for information on.

[23]     In addition to that, another study that we undertook

[24] was a study with the API. We advocated for and helped fund a

[25] study at the API to look at effective and efficient ways to

Page 3662

[1] remediate MTBE-blended gasoline.

[2] Q. Once it got out into the environment, correct?

[3] A. This was before. This was before --

[4] Q. I know. But the remediation assumes that it escapes into

[5] the environment, correct?

[6] A. That's correct.

[7] Q. And so you knew at the time that MTBE would escape to the

[8] environment and you were looking at ways to try to reduce the

[9] costs of removing it from water once it had already done so?

[10] A. What we were trying to do was to prevent it. Our mantra,

[11] our corporate philosophy was to prevent gasoline, whether it

[12] contained MTBE or didn't contain MTBE, from --

[13] Q. Sir, I'm asking about the study that you mentioned, which

[14] was to remediate -- which was techniques of remediation.

[15]     And that was based on the assumption that releases

[16] would occur, was it not?

[17]     MR. BONGIORNO: Objection, your Honor. Could the

[18] question wait for the answer to be finished?

[19]     THE COURT: No.

[20]     Did you hear the last question?

[21]     THE WITNESS: Could it be repeated, please?

[22] (Pause)

[23]     THE COURT: I'll read it back.

[24]     THE WITNESS: Thank you.

[25] (Question read)

Page 3663

[1] A. Yes.

[2] Q. In fact, going forward from the initial --

[3] A. Could I complete my answer to the question? Because you

[4] asked me about the studies and what we had done when we

[5] introduced it, and one of the things that we did was we formed

[6] a team as part of the introduction, which we referred to in our

[7] final review, to follow MTBE from cradle to grave, from the

[8] refining through the pipeline to the terminals into the

[9] underground storage tanks and retail dispensers at the service

[10] station and to the ultimate consumer's car, to see if MTBE did

[11] anything unusual. Did it cause leaks is really what we were

[12] looking for with respect to underground storage tanks. Did it

[13] cause a materials compatibility problem with respect to

[14] underground storage tanks?

[15] Q. And you discovered that Ms. Mickelson was correct when she

[16] said that it was an incremental risk because once it escaped it

[17] traveled farther and faster and it reached more receptors, it

[18] took longer and was more expensive to remediate than gasoline

[19] that did not contain MTBE, didn't you?

[20] A. What we -- yes.

[21]     THE COURT: Is that true, what he said?

[22]     THE WITNESS: Yes.

[23]     THE COURT: Yes. OK.

[24] BY MR. SHER:

[25] Q. Now, you also in this litigation previously were designated

[1] as ExxonMobil's corporate representative regarding warnings
provided by the premerger of Exxon concerning MTBE; do you
recall that?

[4] A. Yes.

[5] Q. And the jury spent some time with your counterpart for
Heritage Mobil yesterday discussing the different relationships
that the company had with actual gas stations, and I would like
to take just a moment to walk through how Exxon categorized
those.

[10]     As a general matter, am I correct that Exxon generally
classified its gas station -- its station customers -- as
falling in one of four types? I will take them one at a time.
There were corporate-owned retail stations or CORSs?

[14] A. Correct. We call them company operated retail stores,
stores we own and operate.

[16] Q. Thank you. And those are stations that Exxon owned and
operated using Exxon employees, correct?

[18] A. Correct.

[19] Q. And Exxon owned and operated the underground storage system
at those kinds of stores, correct?

[21] A. That's correct.

[22] Q. OK. And then a second category is branded dealers?

[23] A. That's correct.

[24] Q. And at those --

[25] A. We refer to them as company-owned leased to dealer

[1] locations. The company owned the land, the building, the
underground storage tanks, the dispensers, and we had a
franchise agreement with the dealer. So we call them
company-owned leased to dealers in Exxon.

[5] Q. COLD?

[6] A. COLD.

[7] Q. At those locations, then, you own the tank, you own the
land and the independent dealers leased them from you, correct?

[9] A. Correct.

[10] Q. And if there is a spill at this kind of a store, or at one
of the company-owned retail stations, Exxon assumed that it was
responsible for cleaning it up, correct?

[13] A. Correct.

[14] Q. And by "spill," I mean a spill or a leak from an
underground storage tank system.

[16] A. Correct.

[17] Q. The third category is branded distributors, right?

[18] A. I would say there is another class of trade in Exxon. We
had what we called DOSS, D-O-S-S. It was for dealer-owned
service station. This is a service station in which the dealer
owned the underground storage tanks, owned the land, and we
supplied gasoline. But the dealer owned the underground
storage tank in this case, whereas with the company-owned
leased to dealer, we owned it.

[25] Q. And with respect to these DOSSs --

[1] A. Yes.

[2] Q. -- Exxon did not claim responsibility for the tanks,
correct?

[4] A. That is correct. He owned -- the DOSS dealer owned and
operated those tanks.

[6] Q. And if there is a leak or a spill, even though they are
called Exxon stations, from Exxon's perspective, the station
owners are on their own to address any contamination?

[9] A. Well, he was responsible for operating the stations and
ensuring that they didn't leak, and if there was a leak he was
responsible.

[12] Q. And the fourth category is the so-called unbranded
distributors, correct?

[14] A. No, branded distributors within ExxonMobil -- well, within
Exxon at that time.

[16] Q. Well, isn't there a category, sir, where the distributors
had bought gasoline from Exxon directly but they either owned
or sold to gas stations that were not branded as Exxon
stations?

[20] A. Correct.

[21]     And could I explain "branded" and then I will get to
"unbranded" to give you a clear picture of all the classes of
trade that we dealt with?

[24] Q. Sure.

[25] A. The branded distributors, they flew the Exxon flag. They

[1] owned either a store or they supplied gasoline to a store, but
they picked up the gasoline at the terminal. We supplied the
gasoline to all the other classes of trade that I just
described.

[5]     But for branded distributors, they came to the
terminal and picked up the product in their own trucks or in
leased trucks and delivered it to their stations.

[8]     And then you have the unbranded distributors who did
not fly the Exxon flag. The unbranded distributor would pick
up product at the terminal and deliver it to a store or stores,
but it didn't have -- it could be XYZ, it could be 7-Eleven, it
could be any store but it wasn't flying the Exxon flag.

[13] Q. So it could be Joe's gas?

[14] A. Correct.

[15] Q. And in your experience and familiarity with the gasoline
distribution, is it right that these unbranded distributors are
motivated primarily by price as to who they buy their gasolene
from?

[19]     MR. BONGIORNO: Objection, your Honor. He is asking
state of mind of unbranded dealers.

[21]     THE COURT: Yes. Objection sustained.

[22] Q. In any event, those unbranded dealers, in your experience,
might have Exxon gas in the tank one day, the next day it could
be Shell, the next day it could be Citgo, correct?

[25] A. Correct.

THE CITY OF NEW YORK, et al. v.
EXXON MOBIL CORPORATION, et al.

September 4, 2009

[1] Q. And depending on their own factors.
[2]     Now, there are fewer company-owned retail stores today
[3] than there were in the past, isn't that right?
[4] A. Correct.
[5] Q. And that is in part because during the late 1970s and
[6] through the 1980s, Exxon sold off a number of sites, correct?
[7] A. I wouldn't describe them as selling them off. A lot of
[8] them were converted to dealer operated or were purchased by
[9] branded distributors.
[10] Q. Sir, would you agree that if a company knows the dangers of
[11] its products, it has a duty to warn about those dangers?
[12] A. Yes.
[13] Q. Would you agree that a company has the duty to warn those
[14] that handle the products and those that may be injured by it?
[15] A. Yes.
[16] Q. And Exxon would distribute with its gasoline a material
[17] safety data sheet, correct?
[18] A. That's correct.
[19] Q. That's required by the federal government to describe
[20] certain health hazards associated with the handling of
[21] gasoline?
[22] A. Correct.
[23] Q. Did Exxon ever take any steps to ensure that its MSDS
[24] sheets made its way to mom-and-pop station owners?
[25] A. Those weren't our customers. So, no, we did not.

[1]     We made sure that we supplied them to our customer,
[2] and our customer was the unbranded distributor. We did not
[3] know where the unbranded distributor was delivering the
[4] gasoline.
[5] Q. So the MSDSs, which described the health effect of Exxon's
[6] gasoline, would not reach unbranded stations, correct?
[7] A. I don't know if they would or they wouldn't. We would be
[8] providing them to the unbranded distributor. If the unbranded
[9] distributor turned and gave them to the account that they were
[10] delivering to, yes, they would receive them.
[11] Q. Now, the MSDSs did not contain any of the incremental
[12] environmental risk information that Barbara Mickelson has
[13] identified, about MTBE traveling farther and faster, a lower
[14] taste and odor threshold, impacting more wells and things like
[15] that, did they?
[16] A. No, they didn't. And can I explain why?
[17] Q. No. You can -- can you explain -- I'm sorry, was your
[18] question could you explain why?
[19] A. Yes. Could I explain why?
[20] Q. Yes, of course. I was saying no, they did not, to follow
[21] up on your no.
[22]     You can answer. Go ahead.
[23] A. Thank you. Our concern and our thrust was gasoline.
[24] Whether it contained MTBE, ethanol, TBA, whatever it
[25] contained -- whatever oxygenate it contained, whatever

[1] component it contained, our thrust was gasoline and the
[2] handling of gasoline. That was the key concern. And that's
[3] what was reflected in the MSDS.
[4] Q. And Exxon didn't believe that the incremental environmental
[5] risk posed by MTBE was appropriate for an MSDS, am I right?
[6] A. Well, MSDS -- the purpose of an MSDS was to provide
[7] primarily health-related information to a customer. And MTBE
[8] was, from our perspective, virtually innocuous from a health
[9] perspective. So there was no health information to provide to
[10] them.
[11] Q. Is there any reason that you can think of that an MSDS
[12] could not contain environmental safety information?
[13] A. No.
[14] Q. But Exxon chose not to put it on its MSDS, correct?
[15] A. Correct.
[16] Q. You mentioned that unbranded stations, or independent
[17] stations receive their gasoline from unbranded distributors
[18] from -- who had gotten their gasoline from Exxon; do you recall
[19] that?
[20] A. Yes.
[21] Q. Yes. Did Exxon direct unbranded distributors to give
[22] warnings to their customers?
[23] A. I don't know.
[24] Q. Did Exxon direct those unbranded distributors to pass on
[25] the MSDSs that they received from Exxon?

[1] A. We could not direct them to do that.
[2] Q. So --
[3] A. And could I explain why on that issue?
[4] Q. I think counsel will have a chance to bring this out on
[5] redirect, if he wants to -- or cross.
[6] A. I'm sorry.
[7] Q. So Exxon never warned the owners of its branded dealers in
[8] the MSDS concerning MTBE's incremental environmental risk,
[9] right?
[10] A. The purpose of an MSDS is to provide health information,
[11] hazard information, so when you're handling the product at a
[12] retail store, if something happens to you from an inhalation
[13] perspective or you get it on your hands, that is the kind of
[14] information, the actionable information, that an MSDS is to
[15] provide.
[16] Q. I see. So the answer is no, correct?
[17] A. No.
[18] Q. Well, it is correct that the --
[19] A. I apologize. I was trying to tell you yes, what it was.
[20] Q. Is there any other written warnings that Exxon provided to
[21] company-owned retail stations concerning the incremental risk
[22] posed to the environment by MTBE other than the MSDSs?
[23] A. There was no need to, no.
[24] Q. So no information to the company-owned stores about
[25] environmental incremental risk, is that right?

September 4, 2009

THE CITY OF NEW YORK, et al, v.
EXXON MOBIL CORPORATION, et al.

Page 3672

Page 3674

**Page 3672**

A. No.

Can I answer why?

Q. Yes.

A. The reason is our concern was gasoline. We wanted to keep gasoline out of the environment. So if you are talking about the environmental concern about it leaking, our concern was gasoline. And we trained our company-operated retail store managers, our dealer-operated retail store managers and our branded distributors, before they could even become those, of the hazards of gasoline and keeping gasoline out of the environment. Whether it contained MTBE or not was not the issue.

Q. Did you succeed in eliminating releases of gasoline to the environment?

A. No, but we did an outstanding job. As you will recall, we had 62 incidents of leaking underground storage tanks at 7,000 stores. This was in 1985 when we made the decision. At 7,000 retail stores, there were three tanks at each store; that was 21,000 tanks. We had 62. But even for those 62, we had initiated a study of each one of those to determine the cause, to preclude that from occurring in the future.

Q. Sir, those were -- isn't it true, sir, that you did not test all of the tanks at all of those facilities for the statistic that you just gave? Those were 60-plus-odd known incidents of leaks, isn't that right?

**Page 3673**

A. Correct. That's correct. But I don't know if we did or we didn't test. That was Real Estate and Engineering.

What I asked for, when we gathered information to make the decision whether to use MTBE, was what is going on with our leaking Underground Storage Tank Program, what is our experience factor, what do we know, how are we doing. And I knew we were spending a lot of money and I didn't know how much when I asked for that before we made the decision. That's when I found out we spent $178 million in that five-year period on underground storage tank upgrading alone, and found out that we had 62 of 7,000. Now, whether they went out at every store or not, I don't know. That's the data they provided to me in the decision making process that we were under.

Q. Once Exxon made the decision to add MTBE to gasoline, did releases of gasoline containing MTBE from Exxon-owned stores stop?

A. No.

Q. They continued throughout the 1980s, correct?

A. Correct.

Q. And throughout the 1990s, correct?

A. Correct.

Q. Throughout the 2000s, until MTBE was banned from gasoline, correct?

A. They continued after 2000.

Again, you're making some relationship to MTBE causing

**Page 3674**

a release in the underground storage tanks from my perspective, and that's not true.

Q. No. I don't intend to argue with you. I'm asking you about warnings to the company-owned retail stores of the incremental risk posed by MTBE when it was released, and were any such warnings provided to your company-owned stores of that incremental risk?

A. No, and nor should they have been.

Q. Sir, with respect to owner-leased stores, dealer-leased stores --

A. Yes.

Q. -- did you provide any warnings of the incremental risk posed by MTBE once it was released from underground storage systems?

A. No, and nor should we have.

Q. And did you provide any warnings to any of the distributors who flew Exxon branded flags at their stations of the incremental environmental risk posed by MTBE in gasoline?

A. No, and nor should we have.

Q. And did you provide any warnings to any nonbranded stations with respect to the incremental risk posed by MTBE in gasoline?

A. No, and nor should we have.

May I answer why?

Q. With respect to --

THE COURT: You know, it is really not appropriate.

**Page 3675**

Why don't you wait for your counsel on cross, and I'm sure they will ask you whatever they want.

THE WITNESS: I'm sorry.

THE COURT: That is OK.

MR. SHER: Thank you, your Honor.

BY MR. SHER:

Q. With respect to this incremental risk, you understood it to include the fact that MTBE could travel farther and faster in the subsurface than gasolines that did not contain MTBE, correct?

A. Yes.

Q. You understood it to include the likelihood that a plume of MTBE in the subsurface would be more likely to reach a private or public well than gasoline that did not contain MTBE, didn't you?

A. Yes.

Q. And you understood that incremental risk to include the fact that cleanup could take longer than for gasoline that did not contain MTBE, correct?

A. Yes.

Q. And you understood that incremental risk to include that the cleanup of the sites where MTBE was released from the underground storage system could be more expensive than where MTBE was not present, correct?

A. Correct.

Page 3676

[1] Q. You understood it to include that the costs of treating a
[2] well contaminated with MTBE would occur more frequently and
[3] would be more expensive than if the gasoline did not contain
[4] MTBE at the site, correct?
[5] A. It could.
[6] Q. And your company provided no warnings to anybody about
[7] those prospects in connection with MTBE in gasoline, correct?
[8] A. Correct.
[9]     MR. SHER: I have no further questions, your Honor.
[10]    THE COURT: All right. Mr. Bongiorno.
[11]    MR. BONGIORNO: Thank you, your Honor. If I could, I
[12] will just swap out the notebooks.
[13]    THE COURT: That is OK.
[14] CROSS-EXAMINATION
[15] BY MR. BONGIORNO:
[16] Q. Good afternoon, Mr. Dugan.
[17] A. Good afternoon.
[18] Q. Do you recall moments ago Mr. Sher was asking you whether
[19] you could direct unbranded distributors what to tell the
[20] stations to which they delivered?
[21] A. That's correct, I do.
[22] Q. And you said no and you wanted to tell him why not and he
[23] asked you to wait. Do you remember that?
[24] A. Yes.
[25] Q. Would you now tell us why not?

Page 3677

[1] A. Yes. The Petroleum Marketing Practices Act, the federal
[2] act that directs how we -- in our relationship with our
[3] unbranded customers as well as our branded distributors as well
[4] as our dealer-operated stores, precludes that.
[5] Q. That's federal law which precludes it?
[6] A. It is.
[7] Q. Do you also recall that Mr. Sher was asking you a series of
[8] questions about whether you provided warnings of the
[9] incremental environmental risk, and you were saying "No, nor
[10] should we have?"
[11] A. That is correct.
[12] Q. You also wanted to say why you should not have. Do you
[13] remember that?
[14] A. Yes, I do.
[15] Q. Mr. Sher asked you to wait.
[16] A. Yes.
[17] Q. So could you now tell us why you should not have?
[18] A. Our mantra, our doctrine, our philosophy, our objective at
[19] Exxon was to keep gasoline out of the environment. Whether
[20] that gasoline contained MTBE or not was not important to us.
[21] The important thing was to keep the gasoline out of the
[22] environment.
[23]     And we had spent -- we put our money where our mouth
[24] was. We spent $178 million in 1980 to '85 to upgrade all of
[25] the tanks we owned. We had an incident -- 62 leaking incidents

Page 3678

[1] out of a total of 7,000 stores; that's 21,000 tanks. Even with
[2] those 62 we were not satisfied. We were looking at each one of
[3] those individually to determine why they leaked, what was it
[4] that caused it, so we could take action to preclude that from
[5] occurring in the future.
[6]     The key was MTBE was not causing underground storage
[7] tanks to leak; it was somebody not taking care of their
[8] underground storage tanks.
[9] Q. Mr. Dugan, I would like to direct your attention to a
[10] document -- it is in the defense notebook I just handed to you
[11] at Tab 5. For the record, and so there is no misunderstanding,
[12] the D number is 12489.
[13]     Now, Mr. Sher just showed you this document when he
[14] was looking at his book at PI 302. But just to keep you in one
[15] book, stay with mine, the black notebook.
[16] A. Got it.
[17] Q. Tab 5.
[18] A. Mm-hmm.
[19]    MR. BONGIORNO: Dave, if you can pull up the very
[20] first page, please.
[21] Q. He was showing you this June 10, 1985 memo from Mr. Raglin
[22] to Mr. Pearman and Mr. Larkins. Do you remember he was asking
[23] you about that?
[24] A. Correct.
[25] Q. He was then asking you about the series of memoranda

Page 3679

[1] attached to it.
[2]     And I would like to direct your attention --
[3] Mr. Dugan, maybe the easiest way to do it would be to go to
[4] your monitor because there are not page numbers at the bottom.
[5] But he was directing your attention to an attachment dated
[6] January 2, 1985, from Mr.Olsen to Mr. Mixter, and he was
[7] highlighting for you certain sections. And I want Dave to pull
[8] up the first one, "Water solubility of MTBE."
[9]     In that first bullet point, Mr. Sher only read the
[10] first clause. I want to read the rest of it.
[11]     Does it not say: "MTBE is substantially more water
[12] soluble than gasoline" -- and now the part that was left out --
[13] "but much less soluble than ethyl or methyl alcohols."
[14]     That's what it says, correct?
[15] A. Correct.
[16] Q. And would you agree that ethanol is an ethyl alcohol?
[17] A. Yes.
[18] Q. Now, on the next page Mr. Sher also showed you some
[19] language but he left some out. So I would like to highlight
[20] what he left out.
[21]     When he was asking you about distinctive taste and
[22] odor, I don't think we got down to the third bullet point. So
[23] why don't we read that one now, and you can tell me if I read
[24] this correctly.
[25]     "However, since we are already committed to keeping