# MEMORANDUM PART 2

Dockets.Justia.com

rejected these arguments in its June 23, 2006 *Order* (*In Re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 324, 343 (S.D.N.Y. 2006)) and respectfully notes its objection to that ruling.

But that prior ruling did not foreclose a finding of preemption. Instead, the Court left open the possibility of a preemption finding if "eliminating MTBE would have prevented the growth of the RFG Program" because of insufficient supplies of an MTBE substitute. *Id.* at 340. The evidence overwhelmingly proves that while ExxonMobil could (and did) use ethanol in certain parts of the country to comply with the Clean Air Act Amendments of 1990 ("CAAA"), ethanol simply was not a feasible substitute for MTBE for purposes of complying with Congress' oxygenated fuel and reformulated gasoline mandates:

- Exxon's analysis of available oxygenates concluded that there would be significant shortfalls of MTBE and ethanol combined to meet the industry-wide demand under the Clean Air Act requirements. (9/21/09 Tr. 5314:12-22, 5327:25-5330:3 (Eizember));

- Because ethanol plants were located mainly in the Midwest, transporting ethanol to the coasts posed increased complications and costs. (9/15/09 Tr. 4457:13-4459:2 (O'Brien));

- Compared to MTBE, using ethanol increases the cost of shipping gasoline from "several cents per gallon" to "10 cents a gallon." (9/14/09 Tr. 4291:9-17 (Tallett));

- Because ethanol separates from gasoline in the presence of water, and all pipelines contain some water, gasoline blended with ethanol could not be transported by pipeline – the principal mode for distributing gasoline from refineries in the United States (9/11/09 Tr. 4188:4-7 (Burke));

- Because EPA rules prohibited mixing gasoline containing MTBE with gasoline containing ethanol during summer months, refiners who shared common distribution systems all had to use either MTBE or ethanol in that area. (9/21/09 Tr. 5318:16-23 (Eizember); 9/23/09 Tr. 5614:9-5615:7 (Eizember));

- The commercial viability of ethanol depended, in part, on refiners being able to obtain a waiver from the U.S. EPA from rules regarding RVP, and that waiver was denied by the federal government. (9/15/09 Tr. 4454:14-25, 4455:1-5, 21-24. (O'Brien)) The waiver was denied because EPA was concerned about increased air emissions from ethanol use. (9/16/09 Tr. 4712:25-4718:2 (Reynolds));

- The commercial viability of ethanol also depended, in part, on federal subsidies, which were scheduled to expire and created further uncertainty about the viability of the ethanol industry. (9/15/09 Tr. 4470:4-16 (O'Brien); 9/23/09 Tr. 5612:9-5613:7).

In short: the evidence at trial proved that "it would be impossible for the defendants to comply with both the state law sought to be imposed and the federal requirements" because alternatives (*e.g.* ethanol) have not "been available to the defendants for their use in the RFG Program." *In Re MTBE*, 175 F. Supp. 2d 593, 614, 616 (S.D.N.Y. 2001). ExxonMobil simply had no alternative but to use MTBE to comply with Congress and EPA's fuel mandates. Because no reasonable jury could conclude otherwise from the evidence, and because allowing the jury to second-guess the balancing that Congress and EPA did when they allowed both MTBE and ethanol to be used in gasoline for purposes of complying with the CAAA (*see* 42 U.S.C. § 7545(k)(1)), all of the City's claims are preempted by federal law.

## IV. THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW IN FAVOR OF EXXONMOBIL ON THE CITY'S DESIGN DEFECT CLAIM.

### A. No Reasonable Jury Could Find That Ethanol Was a Feasible, Safer Alternative to MTBE.

To prevail on its product liability (design defect) claim, the City was required to prove the existence of a safer, feasible alternative to MTBE. *See Voss v. Black & Decker*, 450 N.E.2d 204, 208 (N.Y. 1983) ("The plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner."). The City's position is that ethanol was this safer, feasible alternative, and that it should be have used **instead** of MTBE for purposes of boosting octane and complying with the federal government's oxygen content mandates.

But the facts and evidence clearly establish that ethanol was not feasible at any relevant time or safer, and could not have been used in place of MTBE. Many of the facts bearing on the availability/feasibility of ethanol already have been identified in ExxonMobil's argument on preemption, and are reincorporated here by reference. In addition, the evidence proved that ethanol was not a "safer," better alternative:

- Compared to MTBE, ethanol *increases* discharges of the very air pollutants that Congress sought to *reduce* by passing the CAAA. (9/14/09 Tr. 4298:1-12 (Tallett); 9/17/09 Tr. 4890:7-13, 4892:15-25, 4901:17-4902:14 (Austin));

- New York applied to the federal government to take ethanol out of gasoline because of its adverse impacts on air quality. (9/14/09 Tr. 4299:6-10, 19-24 (Tallett));

- New Jersey and New York rejected a petition by Getty which would have permitted it to use ethanol in gasoline in the summertime, and told Getty that they wanted it to use MTBE in the summer months (9/11/09 Tr. 4231:14-19 (Stendardi));

- Defendant's air quality benefits expert (Austin) testified that "[m]y opinion was that MTBE provided significantly greater benefits in terms of emissions and air quality than a blend containing ethanol." (9/17/09 Tr. 4913:10-13);

- The City's expert (Whitelaw) admitted that he did not factor in this increased air pollution when assessing the social costs of using ethanol. (9/14/09 Tr. 4367:20-24);

- The City's expert (Tallett) admitted that he did not factor increased social costs or health costs when assessing the feasibility of using ethanol instead of MTBE. (9/14/09 Tr. 4302:19-22);

- Mr. Tallett acknowledged that ethanol use has increased consumer food prices. (9/14/09 Tr. 4292:19-2);

- The City's expert (Reynolds) acknowledged that there were consumer perception/ acceptance issues with gasoline containing ethanol, and that some stations actually "quit using ethanol and put signs up that said no alcohol in our gas." (9/16/09 Tr. 4660:15-23);

- Mr. Reynolds admitted that ethanol increased emissions from permeation in certain vehicles. (9/16/09 Tr. 4661:25-4662:6). Mr. Austin testified to the same point. (9/19/09 Tr. 4884:9-17);

- The City's toxicology expert (Dr. Burns) testified that ethanol is a human carcinogen that can cause cancer. (8/27/2009 Tr. 2834:22-2835:12);

- Ethanol reduced the amount of gasoline that one could make out of crude oil. (9/15/09 Tr. 4476:3-14 (Burke));

- Ethanol lowered average mileage per gallon. (9/15/09 Tr. 4475:11-4478:2 (O'Brien)) For this reason, MTBE made more economic sense than ethanol. (9/15/09 Tr. 4479:18-4480:1 (O'Brien)); and

- Ethanol posed compatibility problems with certain automobiles and engines. (9/8/09 Tr. 3712:17-3713:5; 9/11/09 Tr. 4188:4-13). There were many complaints about ethanol causing "vapor lock" and engine stalling. (9/11/09 Tr. 4188:8-13 (Burke)).

In other words, ethanol was **not** a safer or better alternative to MTBE. Indeed, from the standpoint of air pollution and other social costs, it was no safer than MTBE and may actually pose more risk in terms of human health.

That ethanol was **not** a commercially feasible or practical alternative was made clear to the jury by the City's ethanol expert (Mr. Reynolds), who testified about a speech he gave in 1985 which detailed all of the "obstacles to using ethanol" (9/16/09 Tr. 4656:1-6) that the refining industry faced in the mid-1980s. Among the obstacles identified by Mr. Reynolds:

- Unlike MTBE, ethanol was not "pipeline and terminal fungible" and was "distorted by a hit [or] miss network of tax subsidies which could change overnight." (9/16/09 Tr. 4658:5-14);

- "Depending on a given company's market area and method of distribution, they may not be able to use alcohol blends in all or part of their system." (9/16/09 Tr. 4668:1-11);

- Water tolerance issues that made it difficult to ship gasoline containing ethanol in pipelines (9/16/09 Tr. 4699:4-24);

- State tax exemptions for ethanol were uncertain (9/16/09 Tr. 4702:5-20); and

- Increased air emissions and denial of a waiver from EPA that would permit ethanol use in reformulated gasoline (9/16/09 Tr. 4714:4-25, 4715:9-13).

Mr. Reynolds ultimately told his audience, and the jury in this case, that all of these points were "legitimate challenges in 1985" – notably, the very time period when Exxon and Mobil were making their respective decisions about whether to use MTBE, ethanol, or both –

and that "the attitude was will the [ethanol] industry grow and be there on a long term basis. That was at least on the mind I think of some in the petroleum industry." (9/16/09 Tr. 4669:1-2, 4670:25-4671:1-5).[6]

### B. The City Failed to Prove That Its Harm Was Caused By a Foreseeable "Use" of the Product.

The City failed to prove that its alleged injury was caused by any foreseeable consumer "use" of gasoline containing MTBE, as required under New York law. "[A] manufacturer who sells a product in a defective condition is liable for injury which results to another when the product is used for its intended purpose or for an unintended but reasonably foreseeable purpose." *Lugo v. LJN Toys, Ltd.*, 552 N.E.2d 162, 163 (N.Y. 1990). At trial, the City presented evidence and argument that its alleged injuries were caused by inadvertent releases of gasoline containing MTBE from underground storage tank systems. But as both the Court and the City have recently acknowledged, releases of gasoline from underground storage tanks are not plausible "uses" of the product for any intended, or even unintended, purpose. *See* Tr. 9/21/09 Charging Conference at 5405 (Court: "Is it use, unintended but foreseeable use? Funny word to attribute to a spill. That's not exactly a use. It's an unintended but foreseeable consequence."); *Id.* at 5407 ("It's not a foreseeable misuse. It's not a misuse."); *R. Chapman letter to Court dated 9/23/09* (arguing that City, as a spiller, was not a "user" of the product for purposes of applying contributory fault). No New York court has found that the storage or release of gasoline (or any

---

[6] Indeed, Mr. Reynolds' 1985 speech makes the very point about ethanol's questionable viability that ultimately led refiners like Exxon and Mobil, in the 1980s, to select MTBE as their principal oxygenate for purposes of lead replacement and, later, for compliance with the CAAA: "When one considers all the negatives and complex details, one might ask if there would be anyone left with a strong enough incentive to use alcohol who has the capability to use it." (9/16/09 Tr. 4668:12-16 [question from Mr. Stack, but reading from speech]). "As we enter 1986 and 1987, some companies using alcohols will turn to other options if we cannot convince them of our long term viability." (9/16/09 Tr. 4670:18-21 [question from Mr. Stack, reading from speech]).

other product) is a "use" for purposes of strict product liability. To the contrary, in *Pfohl v. Amax*, the New York Appellate Division dismissed the plaintiffs' strict products liability claim because chemicals from a landfill that contaminated their property "were not being used for the purpose and in the manner normally intended." 222 A.D.2d 1068, 1068 (N.Y. App. Div. 4th Dep't 1995). Thus, as a matter of law, the City has not proven any "use" of the product that caused its alleged injuries and judgment should be granted in favor ExxonMobil.

## V. THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW IN FAVOR OF EXXONMOBIL ON THE CITY'S FAILURE-TO-WARN CLAIM.

A failure to warn claimant must prove that (1) a manufacturer had a duty to warn, (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that the failure to do so was the proximate cause of the harm. *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 84 (S.D.N.Y. 2001) (applying New York law).[7] "To constitute proximate cause, an inadequate warning must be a *substantial cause* of the events leading to the injury." *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 370 (S.D.N.Y. 2003) (emphasis in original). "An act cannot be the 'substantial cause' if the injury would have occurred regardless of the content of defendant's warning." *Id.* (citing *Erony v. Alza Corp.*, 913 F. Supp. 199, 200 (S.D.N.Y. 1995)).[8]

---

[7] The Court has ruled that ExxonMobil had a duty to warn the general public. (09/08/09 Tr. 3787:14 – 3788:22). ExxonMobil respectfully reiterates its prior objection to that ruling.

[8] To the extent that the City was permitted to offer evidence at trial about statements allegedly made to the federal government by ExxonMobil, or by trade associations such as the American Petroleum Institute, ExxonMobil reiterates its prior arguments that such statements were inadmissible because they (1) are protected lobbying activity under *Eastern R.R. Presidents Conference v. Noerr Freight Co.*, 365 U.S. 127 (1967) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) [*i.e.*, the *Noerr-Pennington* doctrine], and (2) are preempted by the U.S. Supreme Court's ruling in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). ExxonMobil incorporates by reference the arguments and analysis that were made in *Defendants' Joint Motion in Limine to Exclude Evidence of Protected Lobbying Conduct* and

The City introduced no evidence indicating (let alone proving) that an omitted (or better) warning from ExxonMobil about MTBE would have prevented the City's alleged injury at Station 6. Not one piece of evidence was introduced to establish that anyone who might have received a warning about MTBE would have done something differently such that the releases of gasoline that allegedly caused the City's harm might have been prevented or cleaned up more rapidly. No one who might have come in contact with the gasoline that allegedly caused the City's injury – no gasoline distributor, service station operator, or City employee – testified that they would have taken extra precautions, or done anything differently, in handling gasoline with MTBE if only they had received an additional or different warning from ExxonMobil.

To the contrary, the evidence proves that the City's alleged harm would have occurred regardless of the content or existence of ExxonMobil's warning. **First**, the release of any gasoline to the environment, with or without MTBE, is illegal in New York State so distributors and retailers already understood that gasoline should not be released. (09/03/09 Tr. 3426:1-5 (Moreau); 09/03/09 Tr. 3495:19 – 3496:6 (Roman)). **Second**, ExxonMobil did provide warnings to gasoline distributors and retailers that no gasoline, with or without MTBE, should be released into the environment. (09/03/09 Tr. 3498:15-22, 3515:1-11 (Roman)). **Third**, it is common knowledge that all gasoline must be handled carefully, and that no gasoline should be allowed to leak into the environment so no extra warning was necessary due to the addition of MTBE to gasoline. (09/08/09 Tr. 3742:14 – 3743:1 (Dugan); 09/02/09 Tr. 3318:22–25 (Moreau)). Indeed, the City's own "warnings" expert (Mr. Moreau) admitted that (i) despite co-authoring the seminal report warning about the dangers of MTBE [*i.e.*, "MTBE as a Groundwater

---

*Defendants' Joint Motion in Limine to Exclude Evidence Regarding Trade-Association Activities*, filed May 11, 2009, as well as all associated memoranda, reply papers, letter-briefing and/or oral argument on these motions. (*Pardo Decl.*, Exs. G-H). ExxonMobil acknowledges that the Court denied these arguments in an oral ruling prior to trial. (07/29/09 Tr. 72:21-80:01).

Contaminant"] in 1986, he never gave that report to EPA (9/3/09 Tr. 3436:17-3437:1); (ii) despite giving petroleum handling training sessions to EPA and other regulators for years, he had never warned those regulators about the alleged incremental risks posed by gasoline containing MTBE, or that it required more careful handling practices or training (9/3/09 Tr. 3456:6-19); and (iii) he had never formulated his own version of the warning that he alleges should have been given about MTBE. (9/3/09 Tr. 3424:9-13). Mr. Moreau admitted that the state law prohibition against spilling prohibition was "very direct" (9/3/09 Tr. 3426:1-5), and he could not testify to what additional or different warning refiners like ExxonMobil should have given.

## VI. THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW IN FAVOR OF EXXONMOBIL BASED ON THE STATUTE OF LIMITATIONS.

ExxonMobil has previously argued that the City's claims are time-barred by the applicable statute of limitations, and hereby incorporates by reference the argument and analysis set forth in *Defendants' Motion For Summary Judgment Based On the Statute of Limitations*, filed on April 14, 2006; *Defendant's Motion for Summary Judgment of Plaintiff City of New York's Claims related to Station 6 Based on the Statute of Limitations*, filed August 12, 2009; and all associated memoranda, reply papers, letter briefing and oral argument on each of these motions. (*Pardo Decl.*, Exs. I-J). ExxonMobil reiterates these arguments while acknowledging that the Court has previously rejected them. *See In Re MTBE Prods. Liab. Litig.*, No. 1:00-1898, 2007 U.S. Dist. LEXIS 40484 (S.D.N.Y. June 4, 2007), and *City of N.Y. v. Amerada Hess Corp., (In Re MTBE Prods. Liab. Litig.)*, 2009 U.S. Dist. LEXIS 78081 (S.D.N.Y. Aug. 25, 2009)).

An action for injury to property must be commenced within three years after a plaintiff "actually or constructively discovers its injury[.]" *In Re MTBE*, 2007 U.S. Dist. LEXIS 40484 at *23, *25; CPLR 214(4); CPLR 214-c(2). Because the City filed this suit on October 31, 2003, the relevant bar date for statute of limitations purposes is October 31, 2000.

The evidence proves that the City was aware of its alleged injury vis-à-vis Station 6 and MTBE long before the bar date. Mr. Kunsch (the City's former water quality manager) testified that he told the City's Department of Health – by memo dated June 14, 1995 – that MTBE was a growing concern as a potential groundwater contaminant and, on that basis, he requested that wells be tested for MTBE going forward. (9/23/09 Tr. 5752:18-5753:2, 5754:7-15, 5756:3-20). Mr. Kunsch also testified that MTBE's resistance to biodegradation, high mobility in soils, and propensity to disperse rapidly in water, all were detailed in an April 7, 1997 memorandum to the City. (9/23/09 Tr. 5761:1-9). As to Station 6 specifically, Mr. Yulinksy (another City employee) testified that (i) by September 1999 the City was discussing with its consultant, Malcolm Pirnie, the anticipated need to treat MTBE at Station 6 (9/23/09 Tr. 5781:24-5782:15); (ii) by May 2000 the City had "planned for treat of VOCs and MTBE at Station 6" (9/23/09 Tr. 5776:25-5777:4); and (iii) by August 2000 the City knew that "the presence of highly [soluble] VOCs such as MTBE will greatly impact the design" of the treatment system at Station 6." (9/23/09 Tr. 5772:25-5773:15).

In short: to the extent that the City has been "injured" as a result of MTBE at Station 6, and has been "damaged" by having to build a system to treat that MTBE, the evidence adduced at trial – from the City's own employees – conclusively establishes that the City was aware of both its "injury" and its "damage" before the October 30, 2000 statute of limitations bar date.

## VII. THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW IN FAVOR OF EXXONMOBIL ON THE OTHER COMMON-LAW CLAIMS.

### A. The City Failed to Prove Its Negligence Claim

The City alleges that ExxonMobil negligently operated certain service stations in Queens, causing gasoline releases and injury to the Station 6 facility. To succeed on this claim the City must prove, *inter alia*, that ExxonMobil's alleged negligence in the operation of certain service

stations was a substantial factor in causing the injury it alleges has occurred at Station 6. *In Re MTBE*, 591 F. Supp. 2d at 266; *see also N.Y. Pattern Jury Instructions* 2:70 (an act or omission is regarded as a cause of an injury if it was a substantial factor in bringing about the injury).[9]

The City has not satisfied its burden. The evidence at trial was that five of the six "ExxonMobil" service stations at issue here were operated by independent dealers – not ExxonMobil or its employees. The City has failed to put on any evidence about ExxonMobil's conduct (or even any dealer's conduct) at any of these stations, and certainly no evidence of how such conduct either breached any "duty" to the City or was a substantial factor in causing the City's alleged injury at Station 6. In short: the City put on no evidence of any "negligence" on the part of ExxonMobil.

The City's only "proof" of negligence is circumstantial evidence that releases of gasoline occurred, or may have occurred, at ExxonMobil stations in the vicinity of Station 6. The City's argument is, essentially, a *res ipsa loquitor* argument. However, for *res ipsa loquitor* to apply "(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; [and] (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant ...." *Morejon v. Rais Construction Co.*, 851 N.E.2d 1143, 1147 (N.Y. 2006) (quoting *Corcoran v. Banner Super Market*, 227 N.E.2d 304, 305 (N.Y. 1967)). Here, the record is replete with testimony – from the City's own expert, Marcel Moreau – that spills happen at every service station **without any negligence ever occurring**. (08/12/09) Tr. 1114:25 – 1115:16 (Moreau)). Furthermore, there has been no proof that ExxonMobil had exclusive

---

[9] Although the City never pled this claim in any of its five complaints, the Court granted the City's motion to add this claim – over ExxonMobil's objection – on September 18, 2009, in the middle of trial. (09/18/09 Tr. 5099:19 – 5100:02). ExxonMobil respectfully submits that the Court erred when it permitted this untimely and improper amendment, resulting in prejudice to ExxonMobil, and respectfully reiterates it objection to that amendment.

control over the gasoline alleged to have caused the City's harm. In fact, all but one of the ExxonMobil stations at issue were, at all relevant times, operated by dealers independent of ExxonMobil. In light of Mr. Moreau's testimony – and absent proof of any failure of care by ExxonMobil – it would not be reasonable for the jury to infer that a release at any particular station was a result of any "negligence" on the part of ExxonMobil. Accordingly, the City's negligence claim fails as a matter of law and judgment should be granted to ExxonMobil.

### B. The City Failed to Prove Its Private Nuisance Claim.

To recover for private nuisance, the City must prove that (1) ExxonMobil's conduct caused an invasion of the City's interest in the private use and enjoyment of its land; (2) the interference was substantial; (3) ExxonMobil's conduct was intentional and unreasonable, negligent or reckless, or abnormally dangerous; and (4) ExxonMobil's conduct was unreasonable under all of the circumstances. *See, e.g., Copart.*, 362 N.E.2d at 971; *N.Y. Pattern Jury Instruction* 3:16. The City also must prove that ExxonMobil **intended** to cause a substantial interference – *i.e.*, that ExxonMobil actually knew, or reasonably should have known, that its conduct was substantially certain to impact the Station 6 wells. *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000).

While ExxonMobil disputes that the City has proven any of the elements for this claim, it clearly has failed to prove substantial interference with Station 6. For the reasons, stated above, that the City failed to prove an actual or imminent injury to its usufructuary right to use groundwater via Station 6 (*see supra* at 3-4), the City also has failed to prove a substantial interference with its only property interest in this case.

The City also has failed to prove the intent required for this claim. The City has presented no proof that would permit a jury to infer that ExxonMobil's actions were

"substantially certain" to result in MTBE in the Station 6 wells, or even in the future capture zone of those wells.[10] Instead, the City has offered only generalized "proof" that, at the time ExxonMobil was adding MTBE to gasoline (to comply with federal law), it knew that USTs could leak and, therefore, ExxonMobil knew, or reasonably should have known, that groundwater somewhere may become impacted by MTBE. But even if such generalized proof were true, it does not prove the intent required under New York law for a private nuisance claim. New York law requires proof that ExxonMobil intentionally committed acts that it knew or should have known were substantially certain to cause an impact to *the City's* property interest – *i.e.*, the Station 6 wells themselves or, at most, the City's usufructuary right to appropriate water from the Station 6 "capture zone" some day in the future, assuming the Station 6 facility is ever built and the wells ever used as a backup. *See, e.g., Gussack*, 224 F.3d at 94 (nuisance claim properly dismissed where plaintiff failed to prove defendants' actions were substantially certain to result in contamination to plaintiff's property). There is absolutely no evidence in the record that ExxonMobil – at the time it was using MTBE in gasoline (*i.e.*, 1985-2003) – knew or should have known that its MTBE use was "substantially certain" to impact a Station 6 facility (or capture zone) that was not being used at the time, is not being used almost twenty years later, and may never be used in the future.

## C. The City Failed to Prove Its Public Nuisance Claim.

To recover for public nuisance, the City must meet the high burden of establishing by clear and convincing evidence that future MTBE contamination at its Station 6 wells will "offend, interfere with or cause damage to the public in the exercise of rights common to all ...

---

[10] This is particularly true where Plaintiffs seek to rely on "Supplier" or "Refiner" causation. *See, e.g., Gussack*, 224 F.3d at 94 (nuisance claim properly dismissed where plaintiff relied on evidence of accidental releases and "non-obvious theory of causation.")

in a manner such as to offend public morals, ... or endanger or injure the property, health, safety or comfort of a considerable number of persons." *See Copart*, 362 N.E.2d at 970-71. Moreover, "the annoyance, discomfort or interference experienced by a considerable number of persons must be substantial." *New York v. Fermenta ASC Corp.*, 630 N.Y.S.2d 884, 890 (Sup. Ct. 1995), *aff'd*, 656 N.Y.S.2d 342, 346 (App. Div. 2d Dep't 1997). The presence of regulated chemicals in groundwater, even at concentrations above applicable MCLs, does not constitute a public nuisance unless the contamination has caused actual harm to humans or is reasonably certain to cause such harm imminently. *Id.* at 890-91.

Again, the City has failed to prove a substantial interference. For the reasons previously noted, the City has failed to prove that the presence of MTBE will interfere with its usufructuary right to appropriate groundwater via the Station 6 wells. Moreover, the jury has found that any future MTBE at Station 6 will not exceed the New York State MCL of 10 ppb. Even if the jury were to determine that these low levels of MTBE constitute an "injury" to the City's usufructuary rights, it would not be reasonable for the jury to find that such injury substantially endangers the property, health, safety or comfort of a considerable number of persons.

### D. The City Failed to Prove its Trespass Claim.

Trespass is an intentional tort. The City must prove that ExxonMobil (1) "intended the act which amounts to or produces the unlawful invasion," and (2) "the intrusion must at least be the immediate or inevitable consequence of what he willfully does." *Phillips v. Sun Oil Co.*, 121 N.E.2d 249, 251 (N.Y. 1954).[11] Similar to the proof of intent required support a nuisance claim,

---

[11] The Court previously rejected ExxonMobil's argument that, given the intent required under New York law of trespass, the City's trespass claim cannot be based on ExxonMobil's conduct of manufacturing or supplying gasoline with MTBE, as opposed to its conduct as an alleged spiller at specific service stations in the vicinity of Station 6. (9/22/09 Tr. 5552:8-5566:15) ExxonMobil respectfully reiterates its prior objection to that ruling.

to establish a trespass claim the City must prove that ExxonMobil's actions were "substantially certain" to result in MTBE contamination at Station 6. *Id.* ("To constitute such a trespass, the act done must be such as 'will to a substantial certainty result in the entry of the foreign matter.'") (citing Restatement of Torts § 158, comment h); see also *N.Y. Pattern Jury Instruction 3:8*. In a case of trespass by groundwater contamination, "even when the polluting material has been deliberately put onto, or into, defendant's land, he is not liable for his neighbor's damage therefrom, unless he (defendant) had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land ...." *Phillips*, 121 N.E.2d at 251; see also *Scribner v. Summers*, 84 F.3d 554, 558 (2d Cir. 1996) ("under *Phillips*, the appropriate standard is whether [the defendant]: (i) 'intended the act which amounts to or produces the unlawful invasion,' and (ii) 'had good reason to know or expect that subterranean and other conditions were such that there would be passage [of the contaminated water] from defendant's to plaintiff's land.'"); *Snyder v. Jessie*, 565 N.Y.S.2d 924, 929 (App. Div. 4th Dep't 1990) (trespass claim based on migration of gasoline contamination properly dismissed where "Plaintiffs' complaint does not allege facts tending to show that defendant had the requisite willful intent to intrude upon plaintiffs' property.").

Again, the City has offered only generalized proof that, at the time it was manufacturing and selling gasoline containing MTBE, ExxonMobil knew that underground storage tanks could leak and, therefore, ExxonMobil knew, or reasonably should have known, that groundwater somewhere may become impacted by MTBE. But even if such generalized proof were true, it does not prove the intent required under New York law to support a trespass claim. Such proof is insufficient to establish that ExxonMobil knew or should have known that gasoline it supplied to stations in the vicinity of Station 6 would leak and that "subterranean and other conditions

were such" that the MTBE would reach the Station 6 property. The City's failure to introduce such evidence requires judgment for ExxonMobil on this trespass claim.

## CONCLUSION

For all of the foregoing reasons, including the analysis and argument incorporated herein by reference, ExxonMobil respectfully moves this Court to enter judgment as a matter of law in ExxonMobil's favor.

DATED: October 1, 2009

Respectfully submitted,

Peter John Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Stephen J. Riccardulli (SR 7784)
Lauren E. Handel (LH 0755)
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10017-4613
Tel. (212) 547-5400
Fax (212) 547-5444

*Counsel for Defendant Exxon Mobil Corporation*