# EXHIBIT A – Part 2

Dockets.Justia.com

As for the remaining six (6) wells that have had an MTBE detection above the applicable MCL, five (5) had such detections before October 9, 1999 – the accrual date for statute of limitations purposes.[14] (LR 56.1 ¶14; *Appendix C*). Plaintiff's claims for MTBE impacts to these wells are time-barred.[15]

Which leaves SCWA with exactly one (1) well: Wheeler Rd. #1. The key fact about this well is that SCWA's reported MTBE exceedances are based on the "raw" water that SCWA removes from the ground, before treatment to produced finished drinking water. These elevated MTBE levels subsequently are reduced below the applicable MCL by an existing granular activated carbon ("GAC") system, allowing SCWA to serve that water to its customers. *1991 and 1993 Annual Water Quality Statement.* (LR 56.1 ¶15; Exh. K, L). It is undisputed that this GAC system was installed to treat tetrachlorethylene in 1992 – <u>long before MTBE was detected in the well</u>. Id. Although this existing treatment system has the "ancillary benefit" of reducing MTBE levels to below the MCL, its presence on Wheeler Rd. #2 obviously cannot be attributed to defendants' use of MTBE. See Iberville Parish, 45 F. Supp. 2d at 938, n. 2 (discussed supra, n. 7). Because the presence of MTBE in this "raw" water has not interfered with plaintiff's

---

[14]SCWA's initial complaint was voluntarily (and unconditionally) dismissed shortly after this Court's denial of class certification in MDL 1358 I. On August 19, 2002, it was re-filed in state court but named only one defendant. That complaint was amended to add other refiner defendants on October 9, 2002. For the majority of defendants, therefore, the accrual date for statute of limitations purposes is October 9, 1999. *CPLR 205(a)*; Bunger v. U.S. Blind Stitch Mach. Co., 8 F.R.D. 362, 362 (S.D.N.Y. 1948). Obviously, the relevant accrual date is even later for those defendants subsequently added to this matter by SCWA.

[15]The MTBE exceedances reported by SCWA for two of these wells (Banana St. #5 and Wheeler St. #3) cannot be attributed to defendants for another reason: <u>they are not based on the water that is actually in the well</u>. In fact, the exceedances are based on water that SCWA removed from the well <u>and then intentionally spiked with MTBE</u> to test its HiPOx treatment systems. *"HiPOx Technology Field Evaluation, Wheeler Road and Banana St. Well Fields."* (Exh. P, Q). While SCWA is free to spike its water with MTBE to test a treatment system, it cannot then take the manufactured MTBE exceedance and use it as a basis for demanding tort damages from defendants.

legally protected right to serve potable drinking water from this well, it provides no legal or factual basis for SCWA to assert standing here.

4. Suffolk County

County of Suffolk ("the County") has identified four (4) non-community wells it contends have been impacted by MTBE. *November 4, 2005 Letter from Le Verrier to Riccardulli* (LR 56.1 ¶16; Exh. R).[16] None of these wells ever has had MTBE above the applicable MCL. (LR 56.1 ¶17; *Appendix B*). Because the County's interest in serving potable water from these wells has not been impaired by MTBE, it lacks standing to seek relief for the MTBE that has been detected in these wells.

The County also seeks to recover costs it allegedly has incurred "investigating and monitoring MTBE contamination of all private, community and non-community wells in the County of Suffolk." (Exh. R). Undisputed evidence proves that the County began testing wells for MTBE no later than 1991. *Deposition of K. Hill*, p. 33-34 (Exh. S). Even if these costs might support a legally cognizable cause of action against defendants (and they do not),[17] the

---

[16] Plaintiff's counsel also identified one private well (Prosser Pines County Park) allegedly owned by the County and impacted with MTBE. (Exh. R). Despite defendants' discovery requests, the County has failed to produce any testing data for this well which would support its claim – and also did not list the well on its *June 16, 2005 Chart of MTBE Impacted Wells*. (LR 56.1 ¶18). There is no record evidence that this well ever had MTBE at any level.

Likewise, although the County told defendants that it would identify other "private" wells by November 15, 2005, it has not done so despite repeated requests for that information. (LR 56.1 ¶19). In fact, the County informed defendants on January 20, 2006 that it is unable to identify additional private wells owned by the County. *January 20 Email from D. Le Verrier* (Exh. R). Because there is no evidence of any County-owned "private" well being impacted by MTBE, plaintiff's claims for MTBE contamination in "private wells" must be dismissed.

[17] Most of the County's alleged "damages" appear to be costs for testing private wells. Because costs incurred by the County to test private wells for MTBE are wholly derivative of the alleged harm incurred by well owners as a result of MTBE, those costs fail the "direct injury test" and cannot be recovered from defendants. Laborers Local 17 v. Philip Morris, 191 F.3d 229 (2d Cir. 1999) (rejecting labor union claims to recover increased health insurance costs
(continued...)

County's demand that it be permitted to recover these costs from defendants is time-barred by the statute of limitations and must be dismissed.

5. Summary

Like the law and facts, the "bottom line" here is straightforward:

| Impacted wells identified by plaintiffs | 263 |
|---|---|
| *Less: Wells never impacted above MCL* | (250) |
| | 13 |
| *Less: Wells impacted above MCL before accrual date* | (11) |
| | 2 |
| *Less: Wells out of service for other contaminants* | (1) |
| | 1 |
| *Less: Wells with treatment system for other contaminants that reduces MTBE below MCL* | (1) |
| **Bottom Line:** | 0 |

Plaintiffs' claims come down to this: 95% of their wells never have been impacted above the applicable MCL; 4% were impacted long before the applicable statute of limitations accrual date; and the remaining two (1%) either have been out-of-service, or already have a treatment system, because of other contaminants. This is the "MTBE crisis" that plaintiffs have been telling this Court about for years and for which they now demand – under the guise of "product defect" and other tort claims – hundreds of millions of dollars in damages and equitable relief from defendants. Plaintiffs' "legally protected interest" in potable drinking water has not been impaired (or even impacted) by MTBE. Their claims must be dismissed.

---

allegedly incurred because of members' cigarette smoking). "[T]he critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party." Id. at 238-39. "[W]here a plaintiff complains of injuries that are wholly derivative of harm to a third party, plaintiff's injuries generally are deemed too remote, as a matter of law, to support recovery." Id. at 236 (citing Holmes v. Securities Investor Prot. Corp., 503 U.S. 258, 269-270 (1992)).

## III. PLAINTIFFS CANNOT CREATE A LEGALLY PROTECTED INTEREST IN DRINKING WATER THAT CONTAINS LESS THAN 10 PPB OF MTBE.

Plaintiffs' retort is that they have "standing" to seek relief for MTBE detections below the applicable MCL. See, e.g., *Pasternack Letter to Pardo*, p. 3 (October 28, 2005) (Exh. T). Because plaintiffs are seeking to recover for any MTBE detection, in effect what they propose is a "legally protected interest" in drinking water that contains zero MTBE.

From plaintiffs' perspective, their "0.0 ppb" proposal has the wonderful appeal of putting defendants in a position where liability for MTBE is based on a standard (zero contamination) that plaintiffs admit is unattainable. Better yet for plaintiffs, this standard presumably would be unique to MTBE – meaning that plaintiffs could continue serving potable drinking water with dozens of carcinogenic, radioactive and other contaminants provided they met federal and state MCLs. Best of all for plaintiffs, their "zero contamination" standard would allow them to manufacture their own damages – recovering billions of dollars for drinking water that federal and state regulations say is legally potable, and for which plaintiffs (of course) are more than happy to charge their customers.

What plaintiffs' "zero contamination" standard ignores, however, is the law. Plaintiffs' only legally protected interest is the right to serve "potable" water to their customers – and what is potable is defined by federal and state regulations. New York's "strictest" regulations say that drinking water is potable if MTBE detections are below 10 ppb, and those regulations have the force of law. While plaintiffs are free to adopt their own internal policies or standards that are stricter than this regulation, such policies do not displace New York law and have no legal consequence as to defendants. Likewise, plaintiffs cannot demand a "legally protected interest" that conflicts with the undisputed facts and that, frankly, would substitute chaos for common sense (and predictability) in the comprehensive regulatory system for drinking water.

### A. SCWA Cannot Rely On Its Own Internal Business Policies To Create a "Legally Protected Interest" That Conflicts With Existing Law.

The SCWA has an "internal standard" that it will treat drinking water (by installing GAC or other remedial systems) when any volatile organic compound ("VOC"), including MTBE, is detected at one-half its applicable MCL. *Deposition of Herman Miller*, pp. 26-28 (Exh. U). Similarly, if a treatment system already exists on a well SCWA will replace the filter when a VOC is detected at one-half its MCL in the post-treatment drinking water that is sold to customers. (LR 56.1 ¶20 ; Exh. U).

SCWA's "internal standards" are not required by New York law and, in fact, deviate from that law because they mandate treatment for MTBE (and other VOCs) at levels below what New York regulations deem acceptable for drinking water. SCWA is free to adopt these standards as internal business practices, but it cannot impose them on defendants by demanding – under the guise of common law tort and statutory claims – that defendants be held liable for the costs SCWA incurs to comply with such practices. Creadore v. Shades of Light and Mario Indus., 2002 U.S. Dist. LEXIS 25351, *7-8 (S.D.N.Y. 2002) (because guidelines promulgated by private organization were not mandated by law, compliance was voluntary and failure to comply would not support common law tort claims) (citing Pfeiffer v. Eagle Mfg. Co., 771 F. Supp. 1133, 1136 (D. Kan. 1991) (private safety standards "do not have a force of law, and are not entitled to the presumption of validity which would be accorded administrative regulations.")); Paredes v. County of Fresno, 203 Cal. App. 3d 1, 12-14 (5th Dist. 1988) (because "action level" not an enforceable maximum safe drinking water standard, County had no duty to ensure compliance with action level); see also Niagara Mohawk Power Corp. v. Ferranti-Packard Transformers, Inc., 607 N.Y.S.2d 808, 810 (4th Dept. 1994) (costs voluntarily incurred to avoid risk of injury that has not occurred are not recoverable under New York law).

But the "story" of SCWA's internal standards gets more interesting. Herman Miller, SCWA's Deputy CEO for Operations, testified at his deposition that SCWA recently modified its practices to require that treatment filters be replaced when MTBE – but not any other VOC contaminant – is detected at 1.0 ppb in post-treatment drinking water. *Deposition of Herman Miller*, pp. 28-30 (LR 56.1 ¶¶21, 22; Exh. U). Although Miller stated that SCWA made this change because it perceived a potential for "taste and odor" concerns at MTBE levels below the MCL, he also testified that SCWA has never received a "taste and odor" complaint that was attributed to MTBE. (LR 56.1 ¶¶23, 24; Exh. U).[18] Miller went on to admit that this new policy was adopted on the advice of SCWA's counsel (not federal or state regulatory authorities) after this litigation had been initiated. (LR 56.1 ¶25; Exh. U).

The bottom line is that shortly after filing this lawsuit SCWA made its internal "filter replacement" policy even stricter – but only for MTBE. The net result is that SCWA now replaces treatment filters far more frequently than required by law, and far more frequently than it required before this litigation was commenced. Defendants can think of no clearer case of attempting to "manufacture damages" than SCWA's post-filing, lawyer-initiated, MTBE-only, filter replacement policy.

New York law says that drinking water is potable if it contains less than 10 ppb (or, for water served before December 24, 2003, less than 50 ppb) of MTBE. Potable water meeting these applicable MCLs has been sold by SCWA for years, and continues to be sold to this day. If SCWA wants to impose on itself a different standard – one that says it will install treatment

---

[18] Nor has SCWA produced any evidence of a "taste and odor" complaint that identified MTBE as the basis for the complaint. In short, SCWA's "policy" is based on an alleged factual predicate (potential customer dissatisfaction with "taste and odor" because of MTBE) that is unsupported by the evidentiary record.

systems at 5.0 ppb, and cycle out system filters at 1 ppb – it is free to do so as a business practice. But unlike New York's MCLs, such business practices do not have the force of law; do not create any "legally protected interest" for SCWA; and cannot be imposed on defendants under the guise of common law tort claims. Defendants cannot be held liable to reimburse SCWA for complying with its own business practices that deviate from the drinking water standards adopted by New York and the federal government.

### B. Plaintiffs Cannot Demand A "Legally Protected Interest" That Would Allow Juries to Override (and Undermine) Existing Drinking Water Regulations.

In Hartwell, the California Supreme Court correctly recognized that permitting common law tort claims against a water provider for serving water with detectible levels of contamination "without regard to whether the water met drinking water standards" would undermine the regulatory system by allowing litigants to "hold[] the utility liable for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do." – *i.e.*, comply with requirements more stringent than the applicable MCLs. Hartwell, 27 Cal. 4th at 275-276. Because such claims effectively would permit courts (or juries) to challenge the adequacy of water quality standards set by expert regulatory authorities, the claims were barred as a matter of law. Id.

The possibility that public water providers – like the defendants in Hartwell and Gleason (who won summary judgment on the same arguments presented by this motion), and like the plaintiffs here – might be found liable by courts or juries for contamination below federal and state MCLs, has led to proposed legislation on Capitol Hill. The *"Drinking Water Standards Preservation Act of 2005"* (HR 1540 IH) would amend the Safe Drinking Water Act to make clear that civil damage suits cannot be filed against public water providers that serve drinking water with contaminants at levels below Federal or State regulations. HR 1540, Sec. 3 (Exh. V).

The *Act* has been endorsed by the American Water Works Association ("AWWA") on behalf of its members, including each of the plaintiffs in these focus cases.[19] Several of Congress' proposed "Findings" are particularly relevant here:

> (3) <u>It is technologically infeasible for a drinking water system to provide water with a zero level of contaminants</u>, and a determination that drinking water must contain no contaminants would threaten the adequacy of water supplies.
>
> (4) <u>The setting of drinking water standards is a complex public policy determination</u> requiring a careful analysis and balancing of a number of factors . . .
>
> (5) <u>The setting of these standards is not appropriate for individual juries deciding individual cases in the separate States</u>, but rather is fundamentally a scientific issue to be resolved by the appropriate Federal and State agencies . . .
>
> (6) Claims for monetary damages brought against public water providers under the common law of various States based on alleged contamination of drinking water <u>threaten to undermine the science-based uniform national system of water quality regulation.</u>

Id., Sec. 2 ("Findings") (emphasis added).

Because courts across the country have found that contamination below applicable federal and state MCLs does not constitute an actionable injury (*supra* at 7-9), the additional legal protection sought by AWWA appears to be unnecessary. It is noteworthy, however, that plaintiffs are attempting to impose on defendants the very same liability that they wish to bar by federal legislation. Permitting claims for MTBE contamination below New York's 10 ppb MCL would invite individual juries to ignore the "complex public policy determination" that the

---

[19] Each plaintiff is a member of the AWWA. Exh. W (*Suffolk County's Response to Defendants' First Set of Interrogatories*, p. 41); Exh. X (*SCWA's Response to Defendants' First Set of Interrogatories*, pp. 73-74); Exh. Y (*City of New York's Responses and Objections to Defendants' First Amended Set of Interrogatories*, p. 48); Exh. Z (*UWNY's Responses to Defendants' First Set of Interrogatories.*, p. 79).

NYSDOH undertook when it set the MCL at 10 ppb, and to substitute their own "standard" in its place. Id. What "standard" any particular jury might invent is anybody's guess. With license to ignore NYSDOH's existing regulations, a jury conceivably could say that "0.0 ppb" is the new *ad hoc* rule for MTBE (or for any other regulated contaminant) – putting defendants, plaintiffs, and all bottled water purveyors doing business in New York in a position where they must comply with a "zero contamination" standard that everyone agrees is "technologically infeasible." Id. Another jury, accepting plaintiffs' position that all "[d]rinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants" (Exh. B, C, D), might set its own MTBE standard of 0.1 ppb, 0.5 ppb, 5.0 ppb or any other number in between.

Defendants are not the only ones expressing these concerns. Consider the "Issue Paper" recently released by the National Association of Water Companies ("NAWC") – which represents UWNY and other water providers just like the plaintiffs here – in support of HR 1540:

> Congress has put in place a public and scientifically based regulatory system <u>that ensures the public receives safe drinking water</u>. However, this carefully crafted system is in danger of being seriously undermined by <u>dangerous and groundless lawsuits</u> aimed squarely at the drinking water industry and its customers.
>
> As incredible as it may sound, a new type of lawsuit has emerged around the country wherein utilities are being sued for providing unsafe water even though they are in compliance with relevant State and Federal drinking water regulations. <u>This means that the current scientifically based standard setting process established by Congress could be replaced by juries, who – with no scientific expertise – would effectively be setting national drinking water standards. The juries could well decide that more stringent standards than those mandated by EPA were needed</u>. The result will inevitably be higher water rates for customers without any commensurate increase in health protection, environmental protection, or system security.

NAWC, "Issue Paper, *The Drinking Water Standards Preservation Act, H.R. 1540, Support Protecting Our Nation's Drinking Water Standards*" (emphasis added) (Exh. AA).

NAWC is correct. It is "incredible" that a water provider would be sued – or, like plaintiffs here, would itself sue – on the basis that it provided drinking water that is "in compliance with relevant State and Federal drinking water regulations." Id. Claims like the ones asserted by plaintiffs here are "dangerous and groundless" and will, if permitted to proceed, allow juries to "seriously undermine" the "scientifically based standard setting process" that "ensures the public receives safe drinking water." Id. In New York, that process has culminated in a 10 ppb standard for MTBE. That standard applies to defendants and plaintiffs. It has the force of law. Neither courts nor juries (nor litigants) can just ignore it. Because the "legally protected interest" demanded by plaintiffs – *i.e.*, a "zero contamination" standard for MTBE in drinking water – would allow juries to override New York law (and undermine the NYSDOH) by creating their own *ad hoc* regulatory "standard" for MTBE, plaintiffs' claims invite chaos into the very drinking water regulatory system that governs them as water providers.

C. **Plaintiffs Cannot Demand a "Legally Protected Interest" For MTBE That Contradicts Their Own Practices For MTBE and Other Contaminants.**

Liability for any level of MTBE below the regulatory threshold not only flies in face of existing law and common sense, it is contradicted by plaintiffs' policies and practices concerning other contaminants with known adverse health effects. Plaintiffs routinely serve drinking water that contains dozens of regulated chemicals (*e.g.*, arsenic) and contaminants (*e.g.*, carbon tetrachloride), that are classified carcinogens, radioactive substances or otherwise confirmed to cause adverse health effects, at levels below the applicable MCLs. See, e.g., Exh. A (UWNY, *Annual Water Quality Report 2004* [water provided to customers in 2004 contained 23 regulated compounds]); Exh. B (SCWA, *2005 Annual Drinking Water Quality Report* [73 regulated compounds]); Exh. C (NYC, *2004 Drinking Water Supply and Quality Report* [41 regulated

compounds]). With respect to each of these contaminants, plaintiffs simply comply with the Federal and State drinking water standards.

Only in the case of MTBE, **which is neither radioactive nor recognized as a human carcinogen**, do plaintiffs now demand an unprecedented "zero contamination" standard. This standard is contradicted by plaintiffs' own admission that all "[d]rinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants." (Exh. A, B, C). This standard ignores the fact that pure drinking water is "technologically infeasible" (Exh. V) and is not required by New York or Federal law. This standard is betrayed by plaintiffs' unfettered ability to legally serve, and charge customers for, drinking water that contains MTBE and dozens of other regulated contaminants.

Basically, plaintiffs want absolute liability for MTBE. Plaintiffs want to capitalize on any MTBE – even if detected only once in a well years ago, and even if present at levels the State says are acceptable – and use it as the legal "hook" to demand that a single "deep pocket" industry fund compensation and treatment packages that can then be used to upgrade and treat plaintiffs' wells and water systems. Plaintiffs' ulterior motive is exemplified by wells like UWNY's "Piermont 25," which has been shut down for three decades not because of MTBE, but because of other contaminants that have nothing to do with gasoline or the petroleum industry. Plaintiffs' "zero contamination" standard for MTBE defies the law, the facts and common sense. It should be rejected by this Court.

## CONCLUSION

Defendants return to the opening question presented: *Have defendants created a tortious condition that has interfered with plaintiffs' ability to serve potable water to their customers?* As a matter of law and undisputed fact, the answer is no.

Defendants' use of MTBE has not impaired plaintiffs' "legally protected interest" in serving potable drinking water that complies with federal and state law. Because plaintiffs have not suffered a legally cognizable "injury in fact," they lack Article III standing to bring any of the common law tort and statutory claims alleged here. Those claims must be dismissed.

January 23, 2006
New York, New York

Respectfully submitted,

Peter John Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Stephen J. Riccardulli (SR 7784)
Jennifer N. Kalnins (JK 3274)
McDermott Will & Emery LLP
50 Rockefeller Plaza
New York, NY 10020
(212) 547-5400

*Counsel for Defendant Exxon Mobil Corporation and on behalf of the defendants listed on Appendix A*

# APPENDIX A

# APPENDIX A

| | |
|---|---|
| Amerada Hess Corporation | Gulf Oil Limited Partnership |
| Atlantic Richfield Company | Irving Oil Corporation |
| BP Products North America, Inc. | Irving Oil Limited |
| Chevron Texaco Corporation | La Gloria Oil and Gas Company (n/k/a Tyler Holding Company, Inc.) |
| Chevron USA Inc. | Lyondell Chemical Company |
| CITGO Petroleum Corporation | Motiva Enterprises LLC |
| CITGO Refining and Chemicals Company L.P. | PDV Midwest Refining, L.L.C. |
| Coastal Eagle Point Oil Company | Shell Oil Company |
| Coastal Oil New England, Inc. | Shell Oil Products Company |
| Colorado Refining Company | Shell Oil Products Company, LLC |
| ConocoPhillips Company | Shell Petroleum, Inc. |
| Crown Central Petroleum Corporation (n/k/a Crown Central LLC) | Shell Trading (US) Company |
| El Paso Merchant Energy-Petroleum Company | Sunoco, Inc. |
| Equilon Enterprises, LLC | Sunoco, Inc. (R&M) |
| Equistar Chemicals LP | Texaco Inc. |
| Exxon Chemical U.S.A. | Texaco Refining and Marketing Inc. |
| Exxon Corporation | Texaco Refining and Marketing (East) Inc. |
| Exxon Mobil Corporation | TMR Company |
| Exxon Mobil Chemical Company, Inc. | TPI Petroleum, Inc. |
| Exxon Mobil Chemical Corporation | Ultramar Energy, Inc. |
| Exxon Mobil Chemical U.S.A. | Ultramar Ltd. |
| Exxon Mobil Oil Corporation | Valero Energy Corporation |
| Exxon Mobil Pipe Line Company | Valero Marketing and Supply Company |
| Exxon Mobil Refining and Supply Company | Valero Refining and Marketing Company |
| Flint Hills Resources, LP | |
| Getty Petroleum Marketing, Inc. | |