# EXHIBIT A –
# Part 7

Dockets.Justia.com

# APPENDIX C

# APPENDIX C

# FIRST MTBE DETECTION ABOVE MCL BEFORE RELEVANT ACCRUAL DATE
# FOR STATUTE OF LIMITATIONS

## CITY OF NEW YORK

Plaintiff filed lawsuit on October 31, 2003. Relevant accrual date for Statute of Limitations purposes is October 31, 2000.

| Well | Statute of Limitations Accrual Date | Date of First Detection Above MCL | Amount Detected (ppb) | Reference in Evidentiary Record |
|---|---|---|---|---|
| 6D | 10/31/00 | | 1500 | MP-00024875-880 |
| 10 | 10/31/00 | | 58.5 | NYC-0015355 |
| 38 | 10/31/00 | | 130 | NYC-0000561 |
| 38A | 10/31/00 | | 52.8 | NYC 0000001-7 |
| 39A | 10/31/00 | | 53.8 | NYC-0015096 |
| 53 | 10/31/00 | | 76.3 | NYC-0015114 |

## SUFFOLK COUNTY WATER AUTHORITY

Plaintiff filed lawsuit against majority of defendants on October 9, 2002. Relevant accrual date for Statute of Limitations purposes is October 9, 1999.

| Well | Statute of Limitations Accrual Date | Date of First Detection Above MCL | Amount Detected (ppb) | Reference in Evidentiary Record |
|---|---|---|---|---|
| BANANA ST #1 | 10/09/99 | | 75 | MTBEpre2000_1.xls |
| BANANA ST #3 | 10/09/99 | | 896 | MTBEpre2000_1.xls |
| BANANA ST #4 | 10/09/99 | | 59 | MTBEpre2000_1.xls |
| EDGEMERE ST #1A | 10/09/99 | | 64 | MTBEpre2000_1.xls |
| SAMUEL ST #4 | 10/09/99 | | 88 | MTBEpre2000_1.xls |
| WHEELER RD #1 | 10/09/99 | | 16 | mtbeFeb04_Mar05.xls |

[PAGE INTENTIONALLY LEFT BLANK]



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether ("MTBE")     Master File No. 1:00 – 1898
Products Liability Litigation     MDL 1358 (SAS): M21-88

---

**This document refers to the following New York cases:**

*City of New York v. Amerada Hess Corp., et al., 04 Civ. 3417*
*United Water of New York v. Amerada Hess Corp., et al., 04 Civ. 2389*
*Suffolk County Water Authority v. Amerada Hess Corp., et al., 04 Civ. 3417*

# DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS FOR LACK OF JUSTICIABILITY

Defendants' opening papers ("*Motion*") proved that plaintiffs' legally protected interest in "potable" drinking water has not been impaired for 95% (250 of 263) of the wells at issue here that <u>never</u> had MTBE detections above New York's safe drinking water standards.[1] That proof comes from plaintiffs' own documents, deposition testimony and admissions – all of which establish that plaintiffs' drinking water is potable as a matter of black letter law, and that they have incurred no legally cognizable injury because of MTBE as a matter of undisputed fact.

Plaintiffs' *Response* ("*Pl. Opp.*") literally asks this Court to ignore both New York law and the undisputed factual record.[2] Indeed, plaintiffs devote the bulk of their *Response* to generic abstractions about MTBE's alleged "taste and odor" – the same type of "general allegations" and "random statistical studies" this Court rejected as a basis for Article III standing in <u>MDL I</u> – without once mentioning the <u>undisputed fact</u> that no plaintiff ever has received a "taste and odor" complaint attributable to MTBE. Such conjecture and speculation, the hallmark of plaintiffs' entire *Response*, creates no genuine issue of material fact to preclude summary judgment. <u>Argus, Inc. v. Eastman Kodak Co.</u>, 801 F.2d 38, 42 (2d Cir. 1986); see also <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) (summary judgment movant meets its burden by showing that there is no evidence to support plaintiffs' claim).

---

[1] Claims based on the remaining thirteen (13) wells also fail for the reasons stated at defendants' opening *Memorandum of Law*, pp. 10-14 (hereinafter "*Motion*").

[2] Plaintiffs' willingness to ignore the evidence is illustrated by their *Rule 56.1 Statement in Opposition*, which admits virtually all the facts presented on this Motion but impermissibly interposes "denials" by, <u>inter alia</u>, quarreling with the relevance of those facts and making arguments neither set forth in plaintiffs' *Response* nor supported by (or even citing to) evidence. Plaintiffs' *Rule 56.1 Opposition* violates this Court's Individual Rules and Procedures § III(I), Local Rule 56.1, Fed. R. Civ. P. 56(e) and numerous Southern District decisions, including this Court's ruling in <u>Union Carbide Corp. v. Montell N.V.</u>, 179 F.R.D. 425 (S.D.N.Y. 1998). Plaintiffs' *Rule 56.1 Opposition* should be stricken and the material facts deemed admitted.

## ARGUMENT

### I. PLAINTIFFS ADMIT THAT THEIR "LEGALLY PROTECTED INTEREST" IN POTABLE WATER HAS NOT BEEN IMPAIRED.

To establish Article III standing, plaintiffs must show that a "legally protected interest" has been impaired by defendants. Plaintiffs admit that their legally protected interest is the right to serve water that is "potable." *Pl. Opp.* at 3. Defendants agree. *Motion* at 6.

"Potable" water is defined by New York law: "Potable water means a water which meets the requirements established by this Subpart." N.Y. COMP. CODES R. & REGS. Tit. 10 §5-1.1(at) (2003). "This Subpart" refers to Subpart 5-1, which governs water served by "Public Water Systems" like plaintiffs here. Id. at §5-1.50. "[T]he requirements" of Subpart 5-1 state that water is potable if MTBE does not exceed a Maximum Contaminant Level ("MCL") of 10 parts per billion ("ppb") (50 ppb before December 24, 2003). Id. at §5-1.52 (Table 3). Plaintiffs do not dispute that 95% of their wells never exceeded these applicable MCLs. *Motion* at 9-14, Appendix B. Because their well water is "potable" as a matter of law, plaintiffs admit that their "legally protected interest" never has been impaired as a matter of fact. Id.

Plaintiffs do not challenge the law or the facts – rather, they ask this Court to ignore both. According to plaintiffs, "potable" should mean "water that does not have an offensive taste and odor and is safe to drink." *Pl. Opp.* at 3. Their ad hoc "definition" appears nowhere in the relevant law.[3] But even if it did, plaintiffs never have had a "taste and odor" complaint

---

[3] Plaintiffs principally rely on Subpart 170 of the New York regulations for their *Response* and Rule 56.1 denials. *Pl. Opp.* at 3, 6; *Plaintiffs' Rule 56.1 Statement in Opposition*, ¶¶ 2-4. Subpart 170 relates to "Sources of Water Supply" – i.e., source water before it is appropriated by public providers. Id. at §§170.2, 170.3. Subpart 170 is irrelevant here. Plaintiffs admit that these cases only are about water they appropriate and serve to customers, not water resources generally. *See Plaintiffs' Opp. to Defendants' Primary Jurisdiction Motion*, p. 8 ("[Plaintiffs] do *not* seek remediation of releases that affect generally the natural resources properly confided to the stewardship of the State." (emphasis in original)). Plaintiffs' appropriated
(continued...)

attributable to MTBE. Plaintiffs' conjecture about "taste and odor" does not create a genuine issue of material fact. See infra, pp. 6-8.

As for whether water containing MTBE below the applicable MCLs is "safe to drink," plaintiffs could not be more clear:

> In order to ensure that the water is safe to drink, the State and the EPA prescribe regulations that limit the amount of certain contaminants in water provided by public water systems [i.e., Subpart 5-1]. . . . So what's the bottom line? If bottled water and tap water meet the standards, they are both safe to drink.

Exh. A (*UWNY "Annual Water Quality Report 2004,"* p. 6) (emphasis added)[4]; *Motion*, p. 5.

"So what's the bottom line?" Plaintiffs' water is "potable" under New York law. It even is "potable" under their self-created definition. Indeed, it is precisely because plaintiffs' water is "potable" that they have served it – with low levels of MTBE and dozens of other regulated substances – to their paying customers in the past, and continue to do so today.[5] Because there is no genuine issue of material fact that plaintiffs' "legally protected interest" in potable water has not been impaired by MTBE, plaintiffs lack standing and their claims must be dismissed.[6]

---

water is regulated by Subpart 5, a fact plaintiffs admit elsewhere in their opposition papers. See *Declaration of Michael A. Principe*, ¶ 5; see also Exhs. A, B, C (Water Quality Reports).

[4] "Exh." refers to the exhibits annexed to the *Declaration of James A. Pardo*, sworn to January 23, 2006 and filed with defendants' original papers (A-AA). Two additional exhibits (BB and CC) are submitted with this Reply. See *Declaration of Stephen J. Riccardulli* sworn to March 15, 2006 and filed concurrently herewith.

[5] See, e.g., Exh. A (UWNY: water provided in 2004 contained 23 regulated compounds, including up to 0.8 ppb of MTBE), Exh. B (SCWA: water provided in 2004 contained 73 regulated compounds, including up to 5.2 ppb of MTBE), Exh. C (NYC: water provided in 2004 contained 41 regulated compounds, including an average of less than 0.5 ppb of MTBE).

[6] Plaintiffs' reference to TBA only underscores their lack of justiciable impairment. (*Pl. Opp.* at 2, n. 2). The City of New York and SCWA have produced no evidence of TBA contamination near or above its applicable MCL of 50 ppb. The County of Suffolk and UWNY do not even test for TBA. Exh. BB (*Deposition of K. Hill* [County of Suffolk], pp. 33-35); Exh. CC (*Deposition of S. Lu Soong* [UWNY], pp. 89-90).

## II. THE MCLs DEFINE "POTABILITY" AND PLAINTIFFS' LACK OF INJURY

Recognizing that their "legally protected interest" in potable water has not been impaired by MTBE below applicable MCLs, plaintiffs retreat to a litany of assaults on these legal standards for safe drinking water – arguing that they should be ignored by the Court (and, eventually, by juries) when determining if plaintiffs' right to serve potable water has been impaired. Plaintiffs are wrong as a matter of law and are betrayed by their own admissions, conduct and reliance on the very standards they now impugn. Plaintiffs' "double-speak" about the MCLs creates no genuine issue of material fact to preclude summary judgment here.

### A. Plaintiffs Trumpet MCLs as the Standard for "Safe to Drink" Water.

Plaintiffs ask this Court to ignore the MCLs because "[w]ater standards do not provide a guarantee of safety." *Pl. Opp.* at 8. One can only imagine how plaintiffs square this statement with what they repeatedly tell their customers about water being "safe to drink" if it "meet[s] the standards." (Exhs. A, B, C). Or with what the New York State Department of Health says about MCLs: "Maximum Contaminant Levels are established <u>to ensure that the water is safe for people to drink</u>." (www.health.state.ny.us/nysdoh/water/faq_def.htm (emphasis added)).

Plaintiffs praise New York's MCLs as "the strictest requirements in the nation" (Exh. B); rely on them as the criteria for serving potable drinking water (Exh. E ["And it is our job to make sure that the drinking water meets that standard."]); and boast of their own compliance with these safety standards. Exh. A ("United Water New York performed more than 100,000 tests on water samples <u>to be sure that your water met the safety standards. We're proud to let you know it did</u>.") (emphasis added). Plaintiffs' new-found position that those MCLs provide no guarantee of safety and "are motivated by concerns other than the (*sic*) health, safety and potability" (*Pl. Opp.* at 11) is betrayed by their own undisputed evidentiary record. Plaintiffs cannot manufacture an issue of fact by ignoring that record.

- 4 -

### B. Plaintiffs Support MCLs as the Standard for Determining "Injury."

Plaintiffs contend that this Court should ignore MCLs because they "are set via a political process" – "the result of negotiation rather than regulation." *Pl. Opp.* at 10. This is a *non sequitur*. All laws and regulations in a democracy are the product of a "political process." The U.S. Constitution was drafted "via a political process" – the Constitutional Convention – yet presumably plaintiffs agree the Court may not ignore that "result of negotiation." Regulatory standards have the force of law and must be respected. *Motion* at 6 n. 5 (citing cases). Plaintiffs' suggestion that enforcing these standards will "further . . . erode the power of the judiciary in this country" (*Pl. Opp.* at 11) is nonsense. The power of the judiciary is compromised by ignoring laws, not by enforcing them.

Indeed, this is precisely plaintiffs' point in lobbying Congress for federal legislation that – far from ignoring MCLs – extols these regulatory standards and would mandate that compliance with them is an absolute bar to the very sort of claims plaintiffs now allege here:

> Congress has put in place a public and scientifically based regulatory system that ensures the public receives safe drinking water. However, <u>this carefully crafted system is in danger of being seriously undermined by dangerous and groundless lawsuits</u> . . .
>
> As incredible as it may sound, a new type of lawsuit has emerged around the country wherein utilities are being sued for providing unsafe water <u>even though they are in compliance with relevant State and Federal drinking water regulations</u>. This means that the current scientifically based standard setting process established by Congress could be replaced by individual juries, who – with no scientific expertise – would effectively be setting national drinking water standards. The juries could well decide that more stringent standards than those mandated by EPA were needed. The result will inevitably be higher water rates for customers <u>without any commensurate increase in health protection, environmental protection, or system security</u>.

Exh. AA (emphasis added); *Motion* at 20-21. Plaintiffs are right. Claims that ignore "compliance with relevant State and Federal drinking water regulations" are "dangerous and groundless" because such claims invite courts (and juries) to ignore existing law and to substitute

their judgment for that of the agencies charged with the responsibility and possessing the requisite expertise to determine what constitutes "safe" drinking water. Id. "As incredible as it may sound," that is precisely what plaintiffs seek standing to do here.

### C. "Taste and Odor" Is Irrelevant Here.

Plaintiffs' principal line of attack on New York's MCLs is that they fail to account for "taste and odor" issues. Indeed, plaintiffs devote the majority of their brief to this argument – citing various government reports, industry documents, consumer studies, and even the declaration of their own alleged "taste and odor" specialist, for the proposition that certain people may detect MTBE at low levels. *Pl. Opp.* at 12-17. It is all irrelevant. For purposes of Article III standing, the only issue is whether plaintiffs' legally protected interest has been impaired by MTBE. That is: *Has plaintiffs' interest in serving potable drinking water been impaired by the alleged "taste and odor" of low-level MTBE?* The answer is "*No.*"

Plaintiffs do not cite – because it <u>does not exist</u> – an actual "taste and odor" complaint attributable to MTBE. Defendants began taking discovery, including "taste and odor" discovery, more than a year ago. *CMO-4 § III(C)(1)(a)(v); Defendants' First Request for Production of Documents*, ¶¶ 8, 11 (Dec. 17, 2004); *Defendants' First Set of Interrogatories*, ¶¶ 6, 7 (Dec. 17, 2004). Plaintiffs have produced more than 600,000 pages of documents, not one of which memorializes a "taste and odor" complaint attributable to MTBE. Plaintiffs have produced 24 witnesses for deposition (including 30(b)(6) witnesses on "taste and odor" issues), and not one of them has identified a single "taste and odor" complaint related to MTBE. The evidence does not exist because the "taste and odor" complaints do not exist.

Lacking any record evidence to support their "taste and odor" argument, plaintiffs resort to a laundry list of reports, studies, documents and one declaration about "taste and odor" in the abstract that are no different than the "general allegations," "random statistical studies,"

government reports (including the *EPA Blue Ribbon Panel Report* plaintiffs again rely on here), and other generic documents about MTBE detections that this Court rejected as a basis for Article III standing in MDL I.[7] Rejecting the claims of "non-test" and "non-detect" plaintiffs in that case, this Court held that "federal jurisdiction cannot lie if the alleged injury is merely 'an ingenious academic exercise in the conceivable.'" MDL I, 175 F. Supp. 2d 593, 608-10 (S.D.N.Y. 2001) (quoting Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 156 (4th Cir. 2000) (other citations omitted)).

To the extent "taste and odor" issues – rather than the MCLs – even are material, defendants have met their summary judgment burden by showing that plaintiffs never have had a "taste and odor" complaint attributable to MTBE. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (defendant satisfies its summary judgment burden by showing that there is no evidence to support plaintiffs' claims). Plaintiffs' only response is to cite the same generic abstractions that this Court rejected in MDL I, and to speculate about "how some literature shows it is possible for persons to taste MTBE at levels as low as 1 to 2 ppb" (*Declaration of Donald Distante*, ¶ 15) or about how they "believe[] that [their] customers are able to detect MTBE at low levels in drinking water." (*Pl. Opp.* at 22). Plaintiffs' "academic exercise in the conceivable" does not change the undisputed evidentiary record, and such "conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion." Argus v. Eastman Kodak, 801 F.2d 38, 42 (2d Cir. 1986).

---

[7] The declaration of plaintiffs' alleged expert (William S. Cain) perfectly illustrates the absolute absence of any record support for plaintiffs' "taste and odor" claims here. Dr. Cain's declaration mentions "projects" he worked on as a professor; discusses data he reviewed from other cases (South Tahoe); and summarizes four reports and "studies" performed by others. *Declaration of William S. Cain, Ph.D.*, ¶¶ 4-13. The key fact missing in Dr. Cain's declaration is an actual "taste and odor" complaint from these cases – because none exists.

Likewise, plaintiffs' contentions about alleged "health risks" from low-level MTBE detections are textbook "conjecture or speculation" insufficient to defeat summary judgment. Id. They also are betrayed by the facts. If plaintiffs really were "reluctant to serve any water containing any level of MTBE to the public" (*Pl. Opp.* at 17), they would not do so.[8] But they do serve it (and charge for it) from virtually all the wells at issue here. See, e.g., supra at n. 5.

### III. THE DECISIONS CITED BY PLAINTIFFS *CONFIRM* THEIR LACK OF LEGALLY COGNIZABLE INJURY.

Courts across the country have held that a plaintiff's legally protected interest in potable drinking water is <u>not</u> impaired where contaminant levels are below federal and state regulatory standards. *Motion* at 7-9. Plaintiffs' only retort is to dismiss those decisions as not involving "taste and odor" issues. *Pl. Opp.* at 6. Their response simply confirms the applicability of these decisions because "taste and odor" issues do not exist here either. See *supra*, pp. 6-8.

Moreover, plaintiffs' reliance on Friends of the Earth v. Laidlaw Envt'l Serv., 528 U.S. 167 (2000), merely underscores their lack of standing. Plaintiffs in Laidlaw filed a "citizen suit" for civil penalties based on defendant's mercury discharges <u>in excess of the regulatory standard</u>. The Court held that Article III standing depended on "injury to the plaintiff" (id. at 181), and concluded that the environmental-group litigants sufficiently alleged how defendant's "illegal" discharges had injured their "recreational, aesthetic, and economic interests." Id. at 184-85.

The instant cases are not citizens' suits; plaintiffs are not environmental litigants; plaintiffs seek damages, not to enforce statutory civil penalties; and, despite their rhetoric to the

---

[8] If MTBE's status as a "possible carcinogen" is as problematic as plaintiffs suggest, how do they explain the dozens of contaminants with greater carcinogenicity – such as Carbon Tetrachloride ("probable carcinogen" in NYC water); Chloroform and Dichloroacetic Acid ("probable" and "likely" carcinogens in UWNY water); and Haloacetic acids ("associated with an increased risk for certain types of cancer" in NYC and SCWA water) – that <u>plaintiffs deliberately</u> put in their water through the disinfection process? Plaintiffs have no explanation. They serve water with these contaminants because it is "safe" and "potable" as a matter of law.

contrary, plaintiffs' claims are not based on "illegal" discharges of MTBE. See *Plaintiffs' Opposition to Defendants' Primary Jurisdiction Motion*, p. 2 ("This case is not about spills."). Plaintiffs are public water providers alleging common law tort and statutory claims for alleged MTBE impacts to their wells. Laidlaw confirms that the standard for Article III standing is "injury to the plaintiff."[9] Plaintiffs cannot meet that standard. There is no dispute that 95% of plaintiffs' wells (and all of UWNY and Suffolk County's wells) never have been "injured" because the water in those wells is potable as a matter of law.[10]

### IV. PLAINTIFFS' ALLEGED "DAMAGES" ONLY UNDERSCORE THEIR LACK OF LEGALLY COGNIZABLE INJURY (AND STANDING).

Plaintiffs contend they "must take action and expend resources *before* contaminants reach MCLs." *Pl. Opp.* at 18. Putting aside that such prophylactic measures are unrecoverable under New York law (Niagara Mohawk v. Ferranti-Packard Transformers, 201 A.D.2d 902, 903-04 (4th Dept. 1994)), the one thing missing from this argument is any reference to the facts. That is because there are no such facts: plaintiffs have not incurred any of their speculative damages.

**City of New York** offers two instances of alleged MTBE injury. Wells 10/10A were taken out of service in 1998 because of an MTBE exceedance, and pumping was reduced in Well 53 around February 2000 as MTBE detections trended upward. *Pl. Opp.* at 21. The City's

---

[9] Indeed, Congress' very purpose in enacting citizen suit provisions in environmental statutes like RCRA, the Clean Water Act and the Endangered Species Act was to expand standing beyond traditional common law concepts. See Hawaii County Green Party v. Clinton, 14 F. Supp. 2d 1198, 1201 (D. Hawaii 1998). No comparable statutory grant of standing exists here.

[10] The remaining cases cited by plaintiffs are a hodge-podge of decisions about private property diminution of value (Bentley v. Honeywell, 223 F.R.D. 471 (S.D. Ohio 2004)); asbestos exposure (Independence v. U.S. Gypsum, 750 S.W.2d 442 (Mo. App. 1988)); and disputed contaminant levels (German v. Federal Home, 885 F. Supp. 537 (S.D.N.Y. 1995)). All of the cases involved actual, cognizable injury. In contrast, plaintiffs here have no injury here because their legally protected interest in "potable" water never has been impaired by MTBE.

problem is that it knew about these alleged injuries long before the relevant limitations date here. Its claims for these wells, even if legally cognizable, are time-barred.[11]

**United Water New York**'s "injuries" confirm the irrationality of its claims. UWNY says it wanted to reactivate "Piermont 25" – idle for 31 years because of *manganese* – but was "thwarted" by the only two MTBE detections (each 1.8 ppb in mid-2002) ever found in that well. *Distante Decl.*, ¶¶ 11-12. UWNY offers no explanation for why this well has remained idle despite the absence of MTBE (0.0 ppb) ever since. UWNY also contends that because 2.9 ppb of MTBE appeared in "Tallman 26" six years ago (none since) it is entitled to several million dollars today to upgrade a treatment system that has been on the well since 2002 for *freon* contamination. Finally, UWNY wants millions of dollars for "Sparkill 8" – a well that has not had MTBE in it for 15 years (1990) and for which UWNY already knows the responsible party. See *Defendants' Motion for Summary Judgment on Statute of Limitation Grounds (UWNY)*.

**Suffolk County Water Authority**'s only explanation for its alleged injuries is that "it has been forced to replace carbon filters more frequently" because of MTBE. What SCWA does not mention, of course, is that it was "forced" to do this by its own internal policy – not New York law or customer complaints. *Motion* at pp. 16-18. As for **Suffolk County**, it admits that its "extensive damages" are solely the costs of testing drinking water wells: indirect injuries for which it cannot recover as a matter of law. *Motion* at 13-14, n. 7.[12]

---

[11] The City argues about two other wells in plaintiffs' *Rule 56.1 Opposition*, apparently because those arguments did not fit into plaintiffs' *Response* brief. Those arguments, and plaintiffs' entire *Rule 56.1 Opposition*, are improper and should be stricken. A detailed response is not possible within the page limit here. Suffice it to say that the City's arguments distort the undisputed facts and ignore their own admissions.

[12] Suffolk County tries to dismiss the indirect injury point by asserting that "[t]he scope of [its] damages is not at issue at this time." To the contrary, the County's damages – or lack thereof – are squarely at issue. The whole point of an Article III standing inquiry is to determine whether the County has been damaged at all. It has not.

## CONCLUSION

For the reasons set forth above and in the opening papers on this Motion, plaintiffs' claims should be dismissed.

March 15, 2006
New York, New York

Respectfully submitted,

*[signature]*

Peter John Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Stephen J. Riccardulli (SR 7784)
Jennifer N. Kalnins (JK 3274)
McDermott, Will & Emery LLP
340 Madison Avenue
New York, NY 10017
(212) 547-5400

*Counsel for defendant Exxon Mobil Corporation and on behalf of the defendants listed on Appendix A of the opening Motion.*