# EXHIBIT C – Part 2

Dockets.Justia.com

### 2. *Agent Orange* Is Persuasive Conflicting Authority on the Availability of a Commingled-Product Theory of Causation.

In addition to the absence of New York law to support the commingled-product theory and its recently articulated applications, the theory contravenes Judge Weinstein's persuasive analysis in *Agent Orange*. Although Judge Weinstein approved a class-action settlement when the plaintiffs could not identify the specific manufacturers who caused class-wide injury, he noted that his holding was limited to class actions and that there are no "inhibitions against dismissal of individual actions" on that basis, even for a commingled product like Agent Orange. *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 843 (E.D.N.Y. 1984). When individual plaintiffs who had opted out of the class sought to pursue their claims on a commingled-product theory, Judge Weinstein dismissed the claims, identifying "no possible theory of law on which ... individual opt-out plaintiffs can recover." *Agent Orange*, 611 F. Supp. at 1263. *Agent Orange* thus establishes, contrary to this Court's commingled-products theory, that "particularistic proof of causation is still a necessity in a toxic tort case." Edward J. Schwartzbauer and Sidney Shindell, *Cancer and the Adjudicative Process: The Interface of Environmental Protection and Toxic Tort Law*, 14 Am. J. L. & Med. 1, 38 (1988).

The Court has recognized Judge Weinstein's holding: "I think Judge Weinstein said what he meant and meant what he said. He said there is no case that has gone so far and these plaintiffs could never prove product ID and they can't recover. I think that is what he meant." (11/28/07 Tr. at 104:5-9.) And even in the face of Plaintiffs' effort to distinguish *Agent Orange*, the Court expressed its understanding that the case was factually on point and indistinguishable:

> MR. SUMMY: . . . I think that it's too broad for them to come in and say, you know what, we sit back and we put this joint product and it was in our best interest to basically distribute it this

way,[9] now you've got it in a well where you can't actually identify a station, too bad, no recovery. That just simply can't be the way that products liability law works.

THE COURT: You say that but products liability law has been around a long time, show me your case. When Judge Weinstein wrote [in *Agent Orange* that] there is no case that has gone so far, he might be right. Where is that case?

MR. SUMMY: There is no case like that, but this is a case of first impression where you have a joint product and it is a liquid product, and that liquid product, that becomes very important because you can't separate the molecules. And so this Court now is in a position where it clearly has the first case of a liquid like this where you have a joint product. . . .

THE COURT: But Agent Orange, too, is a commingled product. It had a smaller number of manufacturers—

MR. SUMMY: Yes.

THE COURT: —than you have here but it was a commingled product.

MR. SUMMY: That's correct.

THE COURT: Right. And the judge said in the end that the plaintiffs can't do product ID. They are never going to be able to figure it out and they can't recover. No court has gone so far.

So when you say this is the first time, I don't know that that is right.

MR. SUMMY: That was a spray-on, Agent Orange. This is a liquid—

THE COURT: I don't think that is a distinction.

(*Id.* at 118:3-119:11.) Although the Court did not discuss *Agent Orange* in the 5/13/08 Order, the case is strong, contrary authority from within the Second Circuit further establishing that

---

[9] Despite Plaintiffs' suggestion that gasoline refiners acted in their own interests in determining how to distribute gasoline across the country, the Court recognized that "the gasoline distribution system in the United States *requires* manufacturers to mix their products together for transportation in a common pipeline system." *County of Suffolk*, 2008 U.S. Dist. LEXIS 38792, at *6 (5/13/08 Order at 4) (emphasis added).

- 14 -

there is room for substantial difference of opinion on this important and novel question of law—and that § 1292(b) certification is therefore warranted so that the Court and the parties can have the much-needed clarity before this case proceeds to lengthy trial.

### C. An Immediate Appeal "Would Materially Advance The Ultimate Termination Of The Litigation."

An appeal now would also "materially advance the ultimate termination" of the action, because it "'promises to . . . shorten the time required for trial.'" *See Transp. Workers*, 358 F. Supp. 2d at 350 (quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51, 53 (S.D.N.Y. 1998)); *see also In re Citigroup Pension Plan*, 2007 U.S. Dist. LEXIS 27004, at *11. Indeed, the current bellwether trial involves nine focus wells for which Plaintiffs concede they have no proof of traditional causation. These "non-source" wells are in the case at this point only by virtue of the Court's commingled-product theory. If that theory is reversed on appeal, then the scope of the bellwether trial will be considerably reduced – eliminating approximately half of the wells at issue - with a commensurate savings in both time and resources for the Court and all parties.

The reduction in trial time would impact not only the length of the bellwether trial; it would also facilitate faster resolution of the rest of this action and other actions in this MDL. This action alone "involves 182 wells located in Suffolk County," *County of Suffolk v. Amerada Hess Corp. (In re MTBE Prods. Liab. Litig.)*, No. 1:00-1898, 2007 U.S. LEXIS 45543, at *7 (S.D.N.Y. June 15, 2007), and all of the other non-source wells are likewise in the case only by virtue of the Court's commingled-product theory. Indeed, the Court scheduled a bellwether trial of a portion of the 182 wells precisely because a trial of all of the alleged impacted wells "would be untenable." *See id.* at *8. If it makes sense to try only a portion of this case at a time, then by definition it makes sense to *avoid* trials on wells for which there may turn out to be *nothing* to

try. The Court's and the parties' resources are far better expended on trials of only those wells for which Plaintiffs have a legally cognizable causation theory.

Moving Defendants also note that they sought § 1292(b) certification of the Court's original order denying their motion to dismiss based on issues of causation. At that time, the Court held that an interlocutory appeal would not have materially advanced the termination of the litigation:

> These cases are in the midst of intensive discovery, and plaintiffs continue to seek individualized proof of product identification through product tracing. If plaintiffs discover such evidence, they will, where feasible, pursue the actual tortfeasors, rather than rely on theories of collective liability. Thus, even if the Court's Order were reversed, the litigation would not terminate because plaintiffs would proceed on traditional causation theories.

*In re MTBE*, 399 F. Supp. 2d at 324 (footnote omitted). These considerations no longer counsel against certification. First, discovery in this matter has already closed. Second, the Court has now held that Plaintiffs may pursue all manufacturers *even if* they are able to identify a particular party responsible under traditional causation principles. If anything, this change in the law of the case establishes that certification would have been helpful three years ago. Indeed, since 2005, Plaintiffs have wavered back and forth between relying on theories of traditional and alternative causation, including market-share liability. (*See, e.g.*, 8/15/07 Letter from N. Eimer to the Court.) Over these years, as Plaintiffs' theories shifted, so too did Defendants' discovery obligations.[10] Defendants have also expended considerable resources in developing and

---

[10] Defendants were required to respond to the following requests regarding product tracing (traditional causation): Plaintiffs' Amended First Set of Interrogatories, Requests for Admissions and Requests for Proudction of Documents Relating to Gasoline Product and Title Tracing (4/3/07); Plaintiffs County of Suffolk and Suffolk County Water Authority's First Set of Requests for Admission Upon All Defendants Regarding Pipelines (10/1/07); First and Second Sets of RFPs to All Defendants re: Title to Gasoline Sold to Certain Service Stations (9/19/07; 10/1/07); Plaintiffs County of Suffolk's and Suffolk County Water Authority's Corrected Requests for Admission Served on Defendant (10/2/2007); and Notices of Deposition re:

executing their own discovery plan, selecting experts, and pursuing a litigation strategy in reliance upon the Court's prior decisions and directives. Defendants respectfully submit that guidance from the Second Circuit on the issue of causation in 2005 would have helped streamline this case and perhaps rendered unnecessary many of these discovery efforts. It certainly would be helpful now.

If, in fact, Plaintiffs must "proceed on traditional causation theories," *see In re MTBE*, 399 F. Supp. 2d at 324, we should know as much before the Court and the parties expend tremendous resources trying a case involving a non-traditional causation theory, particularly considering the extensive additional evidence that would be required for the latter.

## II. NONE OF THE OTHER DISCRETIONARY CONSIDERATIONS COUNSELS AGAINST CERTIFICATION.

The Court has noted that it has the discretion to deny certification, even if the statutory criteria are satisfied, if other considerations counsel the other way. These prudential considerations include:

> (1) the time an appeal would likely take; (2) the need for a stay pending appeal and the effect on the litigation, including discovery, that would result from a stay; (3) the probability of reversal on appeal; (4) the effect of a reversal on the remaining claims; (5) the benefit of further factual development and a complete record on appeal, particularly in rapidly developing or unsettled areas of law; and (6) the probability that other issues may moot the need for the interlocutory appeal.

*Id.* at 322 n.5. These considerations do not override the compelling case for certification here.

---

Terminal and Pipelines. Similarly, Defendants were required to provide the following discovery related to market share: Plaintiffs' Second Set of Requests for Production of Documents (11/1/06); Barrels In/Barrels Out Chart (03/07); Market Participation Chart (04/07); Responses and Objections to Plaintiffs' First Set of Interrogatories as Revised by PTO No. 30 (04/07).

*First*, an appeal would obviously have to run its normal course in the Second Circuit. But that is true of any § 1292(b) appeal; the question is whether the value of an appellate decision overcomes any negative consequences of delay. Here, because of the resources the Court and the parties would otherwise have to expend to try wells for which there may be no liability as a matter of law, as well as the long-term benefits of clarification that would clarify issues for the remaining wells in this action and all of the other actions in this MDL, the time is well spent obtaining the much-needed appellate guidance. Plaintiffs have recovered significant compensation in settlements with other parties, so there is no concern that an appeal would cause financial hardship to them. To the contrary, an appeal would expedite finality because it would remove uncertainty as to a major issue for trial, and for that reason—as with a bellwether trial—"resolution of these issues [could] facilitate[] settlement of the remaining claims." *See County of Suffolk*, 2007 U.S. LEXIS 45543, at *6.

*Second*, a stay of the September trial would enable the Court to apply the benefits of the Second Circuit's decision, rather than trying the case under a cloud of uncertainty. In the interim, the parties could undertake discovery of the remaining wells in this action so that the eventual trial could resolve more than the initial bellwether trial contemplated—especially if the non-source wells are no longer an issue for trial.

*Third*, for all the reasons set forth above, Moving Defendants believe there is a substantial likelihood of reversal on appeal. Obviously the Court believes its decision was correct, but at the very least there is significant doubt about New York law in this area, and *Agent Orange* establishes that another respected federal judge has viewed this issue quite differently.

*Fourth*, a reversal would have a dramatic impact on the remaining claims, because it would establish that Plaintiffs have no ability to establish causation as to *any* of the non-source wells and that their right of recovery with respect to the known-source wells is limited to those parties who are identifiable.

*Fifth*, the issues are pure questions of law, so there is no further factual development that could materially affect the appellate disposition.

*Sixth*, a trial would moot the need for interlocutory appeal only if the jury were to find against Plaintiffs on some other basis (*e.g.*, statute of limitations, absence of compensable damages). Even so, the Court's development of a commingled-products theory would continue to direct the parties in this and other actions in this MDL. An immediate appeal would benefit the Court and all litigants in the MDL because it would resolve these important legal issues *even if* the trial in this action would potentially render them moot.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants' motion and certify its 5/13/08 Order for interlocutory appeal.

Dated: New York, New York  
May 29, 2008

Respectfully submitted,

Peter John Sacripanti (PS 8968)  
James A. Pardo (JP 9018)  
Stephen J. Riccardulli (SR 7784)  
McDERMOTT WILL & EMERY LLP  
340 Madison Avenue  
New York, New York 10173  
Tel: 212-547-5400  
Fax: 212-547-5444

*Counsel for Defendant Exxon Mobil Corporation*

*and*

*On behalf of each Defendant identified in footnote 2*

[PAGE INTENTIONALLY LEFT BLANK]