# EXHIBIT E – Part 2

Dockets.Justia.com

in the first instance). Regardless of the number or identity of defendants left at trial, it remains "fundamentally unfair" to presume joint and several liability when Plaintiff has "dispens[ed] with product identification." *See In re MTBE*, 447 F. Supp. 2d at 302-03.

Plaintiff's legal arguments are also misguided. It resorts primarily to cases arising under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.S. §§ 9601, *et seq.* ("CERCLA"). But the Court has already held that CERCLA authorities are inapposite in this context:

> Plaintiffs rely on cases arising under the [CERCLA] to support the application of joint and several liability when there are numerous tortfeasors. . . . ***This reliance is misplaced***. In the CERCLA context, courts have relied on the rule of joint and several liability from the Second Restatement of Torts to hold that "damages should be apportioned only if defendant can demonstrate that the harm is divisible" even when there are many defendants. But, the analysis does not stop there. Under CERCLA, courts have explained that it is fair to apply joint and several liability because ***Congress intended those proven to be "partially culpable to bear the cost of the uncertainty"*** and it established provisions for mitigating the possible unfairness of the rule in cases where there are many tortfeasors ***who may have only contributed a small amount to the whole injury***.

*In re MTBE*, 447 F. Supp. 2d at 303 n.61 (emphasis added) (citations omitted). Plaintiff fails to disclose the Court's prior disposition of this argument.

CERCLA cases are inapposite for the additional reason that CERCLA imposes no causation requirement:

> The Second Circuit has made clear that when the Government seeks to recover response costs for removal or remedial action under this section, it is "not required under CERCLA [to] show that a specific defendant's waste caused incurrence of clean-up [and other response] costs," and therefore an owner of a facility can be held liable even ***"without a finding of causation of the release . . . ."***

*In re Dana Corp.*, 379 B.R. 449, 455 (S.D.N.Y. 2007) (quoting *United States v. Alcan Alum. Corp.*, 990 F.2d 711, 721 (2d Cir. 1993)) (emphasis added); *see also Prisco v. A&D Carting Corp.*, 168 F.3d 593, 606 (2d Cir. 1999) ("No causation is needed, however, to establish liability under CERCLA . . . ."). While "CERCLA does away with a causation requirement," *United States v. Cornell Univ.*, 990 F.2d 711, 721 (2d Cir. 1993), New York common law does not. *E.g.*, *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, 1073 (N.Y. 1989) ("identification of the exact defendant whose product injured the plaintiff is, of course, generally required"). Whatever burdens CERCLA cases place on defendants to avoid or lessen liability simply have no application here, Plaintiff's "reliance" on CERCLA cases here "is misplaced." *In re MTBE*, 447 F. Supp. 2d at 303 n.61.

At bottom, requiring ExxonMobil to prove that its contribution to Plaintiff's alleged damages is *de minimis* is the functional equivalent of holding it concurrently liable. ExxonMobil would be jointly and severally liable even though Plaintiff has been permitted to "dispens[e] with product identification." *See id.* at 302-03. Such a holding would undermine the very premise of the Court's commingled product theory, which was "to strike a balance between the concurrent wrongdoing and market-share theories." 6/9/09 Opinion at 8. The Court should impose no burden on ExxonMobil as a predicate to several liability.

### III. PLAINTIFF BEARS THE BURDEN OF APPORTIONING DAMAGES UNDER A COMMINGLED PRODUCT THEORY.

Although Plaintiff reargues joint and several liability, ExxonMobil understood that the parties were to confine their letter-briefing to the issue "[t]his Court has not yet decided" – which party "'bears the burden of proof'" on the question of ExxonMobil's "'share of the market at the time of the injury.'" 6/9/09 Opinion at 22 (quoting *In re MTBE*, 591 F. Supp. 2d at 274 n.72). Plaintiff, of course, wants to thrust that burden on ExxonMobil as well, and it attempts to do so through the same resort to inapposite CERCLA cases. But the law places that burden on Plaintiff.

Because the commingled product theory is a theory of several liability, it "impose[s] a burden of proof on plaintiff to demonstrate the portion of the injury caused by each defendant." *See In re MTBE*, 447 F. Supp. 2d at 298 n.34 (quoting Restatement (Third) of Torts – Apportionment of Liability § 11 cmt. b (2000)); *see also In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 372 (S.D.N.Y. 2005) (also citing § 11 cmt. b and noting that the burden of apportionment shifts to the defendants only when joint and several liability applies). Of course, it is axiomatic that "the plaintiff bears the burden of proving the elements of the cause of action." *See, e.g., Crick v. HSBC Bank USA*, 775 N.Y.S.2d 497, 503 (Civil Ct. 1997). And here, allocation is a two-part burden.

First, Plaintiff must prove "the time that the risk of harm – the contamination of groundwater – occurred." *In re MTBE*, 591 F. Supp. 2d at 275. The Court has never relaxed Plaintiff's obligation to establish this predicate fact, and denied summary judgment in *County of Suffolk* precisely because "plaintiffs have presented sufficient evidence about the spills alleged to have caused contamination in each well and/or the dates MTBE was first detected in each well to allow a jury to estimate a range of time during which the contamination occurred." *Id.*

Second, Plaintiff bears the burden of establishing ExxonMobil's market share at the time the risk of harm occurred. *Hymowitz*, 539 N.E.2d at 1077-78; *see also City of Phila. v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112 (3d Cir. 1993) ("In some states, a plaintiff must prove the actual market share of each defendant." (citing *Hymowitz*)). In New York, Plaintiff's burden is to prove ExxonMobil's *actual* market share. *Id.*

Apart from the ordinary requirement that a plaintiff carry the burden on every element of a its claims, there are two fundamental reasons why Plaintiff must carry this burden of apportionment.

First, placing the burden on ExxonMobil would be tantamount to presuming that ExxonMobil is jointly and severally liable for all of Plaintiff's alleged harm. Because Plaintiff would be allowed to put on its case-in-chief without offering any proof of ExxonMobil's actual market share at the time the risk of harm was created, ExxonMobil would begin its rebuttal case facing a presumption that it is responsible for *all* of Plaintiff's alleged damages – precisely the joint and several liability burden that this Court repeatedly has rejected.[6] Accordingly, Plaintiff *must* bear the burden of proving ExxonMobil's allocation in the first instance.

Second, placing the burden on ExxonMobil would deprive ExxonMobil of due process in connection with any award of punitive damages. Due process requires that punitive damages be "reasonable and proportionate to the amount of harm." *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003). In holding that punitive damages are available under the commingled product theory even without evidence of the harm actually caused, the Court held that "the defendant's market share clearly reflects the *potential* harm that the defendant imposed on the [Plaintiff], which is permissible Constitutional ground for punitive damages." 6/9/09 Opinion at 25. If ExxonMobil's market share serves as the proxy for potential harm – so that potential harm can, in turn, serve as the basis for measuring the proportionality of punitive damages – then due process requires that ***Plaintiff prove that potential harm*** rather than imposing that burden on ExxonMobil. There may be "no requirement that the measure of potential harm be exact," *id.*, but it certainly is the Plaintiff's obligation to prove it. *See, e.g., Philip Morris U.S.A. v. Williams*, 549 U.S. 346, 353 (2007) ("the Constitution imposes certain limits, in respect both to ***procedures for awarding punitive damages*** and to amounts forbidden as "grossly excessive.") (emphasis added) (citation omitted). Indeed, the Court implicitly recognized as much in suggesting that proof of ExxonMobil's "share of the relevant market may establish, by a preponderance of the evidence, the extent of [its] share of the comingled product that in fact caused the injury." 6/9/09 Opinion at 24 n.65.

\* \* \*

---

[6] Other courts have circumvented this problem by creating a presumption that, absent proof of allocation from a defendant, that defendant's share is considered to be pro rata with all other defendants who did not prove their respective shares. In *City of Phila. v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112 (3d Cir. 1993), the Third Circuit explained the two principal methods by which different courts have allocated the burden of carving up the relevant market:

> Although all states use only several and not joint and several liability, their approaches vary greatly. In some states, a plaintiff must prove the actual market share of each defendant. . . . *Hymowitz*, 539 N.E.2d at 1077-78. Other states impose a rebuttable presumption that all defendants have an equal market share, totaling one hundred percent. Each defendant may rebut this presumption by showing that its actual market share was less. The liability of defendants that cannot prove their actual market share then inflates so plaintiff receives a total recovery.

994 F.2d at 127 (citations omitted) (emphasis added).

For the reasons set forth above, the Court should: (1) decline Plaintiff's request to impose joint and several liability under the commingled product theory; (2) decline Plaintiff's request to impose on ExxonMobil a burden of proving *de minimis* contribution to Plaintiff's alleged injury; and (3) clarify that Plaintiff bears the burden of proving ExxonMobil's market-share allocation.

Respectfully submitted,

*Peter John Sacripanti*

Peter John Sacripanti

cc:  All Counsel By LNFS

[PAGE INTENTIONALLY LEFT BLANK]

# McDermott
# Will & Emery


Boston Brussels Chicago Düsseldorf Houston London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

James A. Pardo
Attorney at Law
jpardo@mwe.com
+1 212 547 5353

September 20, 2009

**BY ELECTRONIC MAIL AND HAND DELIVERY**

Honorable Shira A. Scheindlin
United States District Judge
U.S. District Court, Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    City of New York v. Amerada Hess, et al., 04 CV 3417 (SDNY)
*Objection to Court Changing Commingled Product Theory to Include Non-Refiners/Manufacturers*

*Objection to Court Permitting Plaintiff to Rely on Prime Supplier Data as Proof that ExxonMobil was a "Substantial Factor" in Causing Plaintiff's Injury for Purposes of "Traditional" Product Liability*

Dear Judge Scheindlin:

    As directed by the Court, Exxon Mobil Corporation ("ExxonMobil") writes to memorialize its objection to the Court changing its commingled product theory to include "suppliers" or anyone other than the refiners/manufacturers to whom the Court repeatedly has held the theory applies. Contrary to the City of New York's ("City") arguments last Friday, the Court has never been unclear or inconsistent about the scope of its commingled product theory, which was created precisely so that plaintiffs might reach gasoline refiners on a product liability claim. Indeed, the City's representation that it understood the commingled product theory to apply to "suppliers" was demonstrably wrong; a desperate attempt to circumvent the fact that its own expert never analyzed or calculated ExxonMobil's refining market share, as the commingled product theory has long required. Changing the commingled product theory seven weeks into trial, and mere days before the close of evidence in Phase 3, would profoundly prejudice ExxonMobil.

    Likewise, ExxonMobil objects to the Court permitting the City to rely on EIA 782C "prime supplier" data to try and meet the "substantial factor" proximate cause requirement for traditional product liability under New York law. If the City wishes to rely on "traditional" product liability that is its choice, but it should not be permitted to substitute "market share" data for traditional proximate causation – essentially mixing aspects of both traditional and alternative

Honorable Shira A. Scheindlin
September 20, 2009
Page 2

liability theories to cobble together a claim against ExxonMobil. But if permitted to do so over our objection, the Court should then acknowledge the City's claim for what it is – *i.e.*, Market Share liability for which, as the Court already has held, several liability (not joint and several liability) applies.

Because the Court directed us to make these objections in writing, and not on the record taken at last week's conference, we ask that the Court direct the Clerk's Office to accept this letter for filing so that it is part of the trial record for this case.

1. **ExxonMobil's Objections**

As detailed below, the Court consistently has held that its commingled product theory applies only to gasoline refiners/manufacturers, and has never extended the theory to mere suppliers or other re-sellers in the distribution system. For the past five years, ExxonMobil has taken discovery and formulated its strategy for this case – including its trial strategy – based on the Court's prior rulings and enunciations about the commingled product theory. We object to the theory being changed seven weeks into trial, and a mere three days before the most significant phase closes. Moreover, the extreme prejudice that ExxonMobil would face if the Court were to adopt this unanticipated change toward the very end of trial manifests itself in the following ways:

1. As a result of the Court's prior rulings and articulations/commentary about its commingled product theory, ExxonMobil did not (i) sue "suppliers" or others in the gasoline distribution system, and (ii) has never retained an expert to implicate the myriad non-party suppliers and others in the gasoline distribution system.

2. As a result of the Court's prior rulings and articulations/commentary about its commingled product theory, ExxonMobil selected certain experts to present evidence about ExxonMobil's refining/manufacturing "market share," not any other formulation of market share. For example, John O'Brien has already testified about how ExxonMobil-refined gasoline (*i.e.*, gasoline that we made) gets distributed into the transportation system. Dr. Montgomery will testify this week about how much ExxonMobil-refined product actually gets to New York Harbor. We never retained an expert in this case to calculate ExxonMobil's putative market share on a "supply," "distribution," "wholesale," "retail" or any basis other than refining/manufacturing.

3. As a result of the Court's prior rulings and articulations/commentary about its commingled product theory, ExxonMobil has conducted its trial defense in a certain way. For example, our cross-examinations of both Mr. Tallett and Dr. Burke (City experts) assumed that the Court's commingled product theory required proof of ExxonMobil's refining/ manufacturing market share, not "market share" for some other level of the gasoline market.

2.  **The Court Has Been Clear and Consistent About the Scope of Its Commingled Product Theory, and has Never Held (or Even Suggested) that the Theory Applies to "Suppliers" or Anyone Other Than Refiners/Manufacturers.**

The Court's long history with different "alternative liability" theories is well-documented in the record and was recently summarized in *Defendants' Memorandum of Law in Support of Motion In Limine Regarding Application of the Commingled Product Theory, Consideration of Fault of Nonparties by Jury, and Proof of Date of Harm* (Apr. 27, 2009) (copy on file with Court); *see also In Re MTBE*, 591 F.Supp.2d 249, 267-68 (S.D.N.Y. May 13, 2008). We will not burden the Court by restating that entire history here.

That the commingled product theory applies only to refiners/manufacturers of gasoline has been manifestly clear to everyone, including the City, since the theory was first articulated by the Court in April 2005: "When the commingled product theory was first introduced, this Court discussed – by way of example – a situation in which *ten* **manufacturers** each supplied ten percent of the gas to an underground storage tank that leaked and contaminated plaintiff's property." *In Re MTBE*, 2009 U.S. Dist. LEXIS 61382, at *6 (July 14, 2009) (referring to *In Re MTBE*, 379 F. Supp. 2d 348, 377-78 (S.D.N.Y. 2005) (italics in original; boldface added)). Since then, the scope of the commingled product theory has been consistently restated by the Court any number of times. *See In Re MTBE*, 591 F. Supp. 2d at 267-68 ("[P]laintiffs may rely on the commingled product theory, which this Court developed to address the particular facts of this case, to prove their claims against gasoline and MTBE **manufacturers**."), p. 269 ("Instead, as explained below, the commingled product theory provides plaintiffs with a means to prove their claims against the **manufacturers**."), p. 275 ("and therefore the **manufacturer defendants** could be held liable under the commingled product theory.") (emphasis added to all); *see also In Re MTBE*, 447 F.Supp.2d 289, 301 (S.D.N.Y. 2006) ("when a plaintiff can prove that certain gaseous or liquid products . . . of many **refiners and manufacturers** were present in a completely commingled or blended state at the time and place that the harm or risk of harm occurred, and the commingled product caused plaintiff's injury, **each refiner or manufacturer** is deemed to have caused the harm." (emphasis added)). Indeed, we have not been able to find a single instance where the Court has described the theory as applying to anyone other than refiners/manufacturers.

Which is not to say that the Court has not used the words "supply" or "suppliers" in its discussions about the commingled product theory. But those references have always been to describe the act of refiners/manufacturers supplying gasoline into the distribution system, and could not conceivably (or legitimately) be confused as suggesting that the commingled product theory applies to "suppliers" or others in the distribution system who do not refine gasoline. In fact, the Court has made clear that its commingled product theory does not reach mere suppliers or others in the distribution system who do not refine/manufacture gasoline:

> MR. RAPHAEL: What about Giant Industries, Your Honor? They were in the market between 2002 and 2003.

>THE COURT: What market? They were not a manufacturer until 2002.
>
>MR. RAPHAEL: They supplied no product to New York Harbor until 2002.
>
>THE COURT: **I'm not interested in supplying product to New York Harbor. Were they in the business of manufacturing gasoline containing MTBE** such that their product might have mixed into some batch in Texas a year before the spill? I don't know that.

*Status Conf. Tr. at p. 68 (July 25, 2006 (emphasis added))* (Ex. A). Likewise, the Court several times has noted the distinction between refiners/manufacturers (commingled product theory applies) and others in the distribution system (traditional product liability applies) (*see, e.g., In Re MTBE*, 591 F. Supp. 2d 249, 276), and also has explained its creation of the commingled product theory as being consistent with New York's preference for imposing product liability on those higher in the chain of distribution – *i.e.*, the refiner/manufacturer of the product.[1] *Id.*.

### 3. The City Has Never Understood the Commingled Product Theory to Apply to "Suppliers" or Non-Refiners.

Seizing on the Court's comments last Friday, the City's trial counsel (Mr. Chapman) suggested that the City had understood the commingled product theory to apply to "suppliers" and other non-refiners, and that the City had relied on that understanding. But that suggestion was flat-out wrong. The record is replete with proof that the City has long understood the Court's commingled product theory to apply only to refiners/manufacturers of gasoline. But we need not restate all of that proof here because there can be no clearer statement of the City's

---

[1] Indeed, applying "commingled product" to anyone other than refiners/manufacturers defies common sense. New York decisional law is replete with cases where plaintiffs have sued gasoline manufacturers, distributors, suppliers, retailers, etc. – under common law theories like negligence, nuisance, trespass, etc. – for harm caused by the alleged mishandling of gasoline. The City does not need a "commingled product theory" to assert such claims here and, in fact, the Court has indicated that its commingled product theory cannot be used to establish causation on such common law claims. What makes this case different is that the City wants to recover on a **product liability** claim against a **gasoline refiner**, but cannot make out proximate causation because of what it contends is a commingled distribution system. Thus, the commingled product theory was created to relieve some of the burden of traditional causation – specifically, the requirement that plaintiff identify the specific defendant whose product caused the alleged injury. The commingled product theory was created, literally, because the City could not trace MTBE molecules from its Station 6 wells back to **refiners**. The point is that the theory only makes sense when one is talking about **refiners** and **product liability** claims.

understanding than what its other trial counsel (Vic Sher) wrote just a few weeks ago before trial began:

> Because **only refiner/manufacturer defendants** contributed MTBE-containing gasoline to the commingled product that caused the City's injury, refiner/manufacturer defendants -- *i.e.*, "defendants shown under the commingled product theory to have manufactured the gasoline that spilled" (*In re MTBE*, 591 F.Supp.2d 259, 268 (S.D.N.Y. 2008) -- are the **only** ones to whom this discussion [availability of punitive damages under the commingled product theory] applies. . . .

*Letter from V. Sher to Court*, p. 3 n.2 (June 17, 2009) (emphasis added) (Ex. B). And if that was not clear enough, here is what Mr. Sher had to say just a few days earlier:

> **The only defendants to whom the commingled product theory applies are the "upstream" refiners; . . . .**

*Letter from V. Sher to Court*, p. 6 (June 8, 2009) (emphasis added) (Ex. C).

There was no misunderstanding or confusion on the City's part. So let's cut to the chase about what is *really* going on here. The City has long understood (correctly) that ExxonMobil's "refiner" share of the gasoline that actually makes its way to New York Harbor is far lower than many of the other major refiners that supply gasoline to New York, and far lower than what the City desires in this case. Accordingly, the City did not have its "market share" expert (Mr. Tallett) calculate ExxonMobil's "refiner" share. Rather, the City had Mr. Tallett use EIA 782C "primary supplier" data to come up with an alternative ExxonMobil "share" that is far higher than its actual "refiner" percentage. But as Mr. Tallett candidly admits, his number has nothing to do with whether ExxonMobil actually refined the gasoline product reported on the 782C form -- it only reflects how much gasoline ExxonMobil "supplied" and, even then, only on a statewide (*i.e.*, all of New York state) basis. How much gasoline ExxonMobil "supplied" to New York state has no relevance to a commingled product theory that was created only because plaintiffs could not trace back to refiners for purposes of establishing traditional product liability causation. And, so, the City obviously wants that theory to be changed to include "suppliers."

While Courts may permit amendments of pleadings to conform with the evidence actually adduced at trial (*e.g.*, what the Court did with respect to plaintiff's never-pled "negligence" claim), it is fundamentally unfair – indeed, it is profoundly prejudicial – to change the longstanding law of this case to obviate a failure of proof by one party. The proper response to the City's failure of proof here is for the Court to hold that the City cannot make out a claim under the Court's commingled product theory – not to change the scope of that theory to accommodate the inadequate proofs that the City has actually made. Alternatively, the proper response is for the Court to declare a mistrial given the extraordinary prejudice that ExxonMobil

faces with such a fundamental change in the Court's commingled product theory this close to the end of trial.

4.  **"Prime Supplier" Market Share Cannot be a Surrogate for "Substantial Factor" Proximate Causation Under Traditional Product Liability.**

The Court indicated at last Friday's conference that the City could rely on EIA 782C data – and specifically, Mr. Tallett's opinions about ExxonMobil's market share based on "prime supplier" data – to establish that ExxonMobil's gasoline was a "substantial factor" in causing the City's alleged injury for purposes of traditional product liability. This is erroneous as a matter of law and fact.

The Court repeatedly has held that, to recover on a product liability claim, the City must establish that MTBE-gasoline refined by ExxonMobil is present (or will be present in the future) in the Station 6 wells. This is true under commingled product, and it is true under traditional product liability. All that 782C "primary supplier" data indicates is that a certain percentage of gasoline is believed by ExxonMobil to have been **supplied** (not manufactured; not sold) by ExxonMobil in New York **state** (not New York Harbor; not New York City; not Queens), and consumed therein, during a particular time period. This data does not prove how much gasoline was supplied by ExxonMobil to Queens, or even through New York Harbor, and certainly does not prove that that any gasoline refined by ExxonMobil is, or will ever be, detected in the Station 6 wells. Prime supplier data does not put "ExxonMobil" product into the BP, Citgo or Atlas stations that the City contends have caused its past damages; or into any other station that the City alleges will cause its putative damages in the future. Prime supplier data does not establish that ExxonMobil was a "substantial factor" – or any factor – in the MTBE that has been, or will be, detected in the Station 6 wells.

EIA 782C data is, in a word, **irrelevant** – at least for purposes of establishing proximate causation under New York product liability law. In fact, 782C data has no probative value for purposes of establishing proximate causation under *either* "commingled product" or traditional product liability. Permitting the City to present such data to the jury as a surrogate for product liability causation would be extraordinarily prejudicial, as it basically would allow the jury to determine whether ExxonMobil is liable on a **product liability** theory based on wholesale market share data that has nothing to do with how much of that product, if any, ExxonMobil actually refined or manufactured.

Because EIA 782C data reflects how much gasoline a company may have wholesaled within the entire State of New York, it is barely akin to traditional "market share." Allowing the City to establish "substantial factor" causation by reliance on such data is, at best, to permit the City to prove its product liability claim by resort to traditional Market Share causation. Accordingly, if the City is permitted to rely on EIA 782C data for purposes of this case the Court should rule that any liability established against ExxonMobil is "several" only, not joint and several.

We appreciate the Court's time and attention to this matter, and respectfully ask that this letter be filed with the Clerk's Offices so that it is part of the Trial Record for this case.

Respectfully submitted,

*James A. Pardo*

James A. Pardo


Attachments
Cc:  All Counsel of Record