# EXHIBIT F

Dockets.Justia.com



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                       :

In Re: Methyl Tertiary Butyl Ether ("MTBE")    :   MDL No. 1358
Products Liability Litigation                         :   Docket No. M21-88
                                       :
                                       :   Master File C.A. No. 1:00-1898 (SAS)
                                       :
------------------------------------------------------------X

**This Document Relates To: All Cases**

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON CONFLICT PREEMPTION

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

SUMMARY OF ARGUMENT.....................................................................................................2

ARGUMENT .................................................................................................................................5

    I. Standard of Review ......................................................................................................5

    II. Due to Insufficient Ethanol Capacity, Compliance with the Plaintiffs' Proposed
        Duty Would Have Been Physically Impossible ...........................................................6

    III. Congress Specifically Intended For Refiners to Be Able to Choose Among
         Oxygenates, Including MTBE ...................................................................................11

    IV. Eliminating MTBE Would Interfere with the Goals Set By Congress in the
         1990 Clean Air Amendments.....................................................................................18

        A. Eliminating MTBE Would Undermine Congress's Goals of Minimizing
            Gasoline Price Spikes and Supply Disruptions.............................................20

        B. Congress Intended the Use of Oxygenated Fuel to Expand as More
            Oxygenate Became Available ........................................................................22

        C. Congress Provided a Limited Role for Other Environmental
            Considerations ................................................................................................25

        D. Plaintiffs' Claims Would Frustrate Each of Congress's Goals in
            Amending the CAAA to Require Oxygenates...............................................26

    V. Plaintiffs' Theories Would Impose Damages for Any Compliance With Federal
        Law..............................................................................................................................28

CONCLUSION ............................................................................................................................33

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566 (2d Cir. 2005) .......................... 5-6

*American Petroleum Inst. v. EPA*, 52 F.3d 1113 (D.C. Cir. 1995) ..........................10, 25

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ..........................5, 6

*Bates v. Dow Agrosciences LLC*, 125 S.Ct. 1788 (2005) ..........................27

*Bieneman v. City of Chicago*, 864 F.2d 463 (1988) ..........................27, 28

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) ..........................6

*City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973) ..........................19

*Clean Air Markets Grp. v. Pataki*, 338 F.3d 82 (2d Cir. 2003) ..........................11, 13, 18

*Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272 (6th Cir. 1991) ..........................32

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ..........................18

*English v. General Elec. Co.*, 496 U.S. 72 (1990) ..........................6

*Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491 (10th Cir. 1994) ..........................24

*Fidelity Fed. Sav. & Loans Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) ..........................3, 11, 12, 15, 18

*Florida Lime and Avocado Growers v. Paul*, 373 U.S. 132 (1963) ..........................6

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ..........................26

*Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002) ..........................5

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) ..........................passim

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ..........................4, 11, 19, 28

*In re: MTBE Products Liab. Litig.*, 175 F. Supp.2d 593 (S.D.N.Y. 2001) ..........................passim

*In re: MTBE Products Liab. Litig.*, 342 F. Supp.2d 147 (S.D.N.Y. 2004) ..........................2

*International Paper Co. v. Ouellette*, 479 U.S. 481 (1987) ............................................. 11, 18

*Moser v. Ford Motor Co.*, 28 Fed. Appx. 168 (4th Cir. 2001) ............................................ 31-32

*Nash v. Florida Indus. Comm'n*, 389 U.S. 235 (1967) .................................................. 19, 20, 26

*Oxygenated Fuels Ass'n v. Pataki*, 158 F. Supp.2d 248 (N.D.N.Y. 2001) ................. 8, 17, 21

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) ........................................................ 27

*U.S. v. General Motors Corp.*, 876 F.2d 1060 (1st Cir. 1989) ............................................ 24

*United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605 (7th Cir. 2000) .......................... 31

*Xerox v. County of Harris*, 459 U.S. 145 (1982) ............................................... 19, 20, 26

## Statutes

42 U.S.C. § 7401(b)(1) ............................................................................................. 20

42 U.S.C. § 7410 ..................................................................................................... 24

42 U.S.C. § 7545(c)(4) ............................................................................................... 2

42 U.S.C. § 7545(k) ................................................................................................... 1

42 U.S.C. § 7545(k)(1) ........................................................................................ 21, 25

42 U.S.C. § 7545(k)(3)(v) ........................................................................................ 15

42 U.S.C. § 7545(k)(5) .............................................................................................. 9

42 U.S.C. § 7545(k)(6) ............................................................................................ 24

42 U.S.C. § 7545(m) .................................................................................................. 1

42 U.S.C. § 7545(m)(2) ........................................................................................... 15

42 U.S.C. § 7545(m)(3)(C)(ii) ................................................................................. 22

42 U.S.C. § 7561(b) ................................................................................................. 13

## Legislative Materials

136 Cong. Rec. S2280 (Mar. 7, 1990) ................................................................. 14, 15

136 Cong. Rec. S2732 (Mar. 20, 1990) ............................................................................... 23

136 Cong. Rec. S3500 (Mar. 29, 1990) ............................................................................... 23

136 Cong. Rec. S3504 (Mar. 29, 1990) ......................................................................... 17, 23

136 Cong. Rec. S6383 (May 16, 1990) ............................................................................... 14

136 Cong. Rec. S17232 (Oct. 26, 1999) ........................................................ 16, 21, 22, 24, 31

136 Cong. Rec. S16895 (Oct. 27, 1990) ............................................................................. 14

136 Cong. Rec. S17512 (Oct. 27, 1990) ............................................................................. 14

139 Cong. Rec. S16633 (Nov. 20, 1993) ............................................................................ 17

136 Cong. Rec. H2756-02 (May 23, 1990) ................................................................... 16, 23

136 Cong. Rec. H2915 (May 23, 1990) .............................................................................. 23

136 Cong. Reg. H12848 (Oct. 26, 1990) ....................................................................... 16, 21

S. Rep. 101-228 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385 .......................................... 13

IV Comm. on Env't & Pub. Works, *A Legislative History of the Clean Air Act Amendments of 1990*, S. Prt. 103-38 (1993) ...................................................................... 16

## Rules

Fed. R. Civ. P. 56(c) ............................................................................................................. 5

## Regulations

40 C.F.R. § 80.42 ............................................................................................................... 14

40 C.F.R. § 80.45 ............................................................................................................... 14

40 C.F.R. § 80.78(a) ............................................................................................................ 9

40 C.F.R. § 80.78(d) ............................................................................................................ 9

*Regulation of Fuels and Fuel Additives: Definition of Substantially Similar,*
56 Fed. Reg. 5352 (Feb. 11, 1991) ...................................................................................... 6

*Supplemental Notice of Proposed Rulemaking, Regulation of Fuels and Fuel Additives; Standards for Reformulated and Conventional Gasoline,*
57 Fed. Reg. 13416 (Apr. 16, 1992) ...................................................................................14

*Regulation of Fuel and Fuel Additives; Administrator's Finding That No Control or Prohibition on Maximum Oxygen Content of a Winter Oxygenated Gasoline Program Is Necessary Under Section 211 (c)(4) of the Clean Air Act as Amended by the Clean Air Act Amendments of 1990,* 57 Fed. Reg. 47849 (Oct. 20, 1992) ....................16

*Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline,* 59 Fed. Reg. 7716 (Feb. 16, 1994) ...........................................................................9

*Regulation of Fuels and Fuel Additives: Renewable Oxygenate Requirement for Reformulated Gasoline,* 59 Fed. Reg. 39258 (Aug. 2, 1994) .....................................................10

*Regulation of Fuels and Fuel Additives: Extension of the Reformulated Gasoline Program to the Phoenix, Arizona Moderate Ozone Nonattainment Area,*
62 Fed. Reg. 30260 (Jan. 3, 1997)......................................................................................25

*MTBE Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substance Control Act to Eliminate or Limit the use of MTBE as a Fuel Additive in Gasoline,*
65 Fed. Reg. 16094 (Mar. 24, 2000) ........................................................................ 7, 10-11

## Administrative Agency Materials

*Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline* (Sept. 15, 1999) ...............................................................................8, 29

EPA, Office of Superfund Remediation and Technology Innovation, *Technologies for Treating MTBE and Other Fuel Oxygenates* (May 2004).............................................28

EPA, *Oxygenates in Water: Critical Information and Research Needs* (Dec. 1998) ...................28

Michael C. Kavanaugh and Andrew Stocking, *Fate and Transport of Ethanol in the Environment, Hearing Before The Blue Ribbon Panel on Oxygenates in Gasoline* (May 24, 1999).................................................................................................29

MTBE Blue Ribbon Panel, Mar. 1-2, 1999, meeting minutes ............................................7

National Institutes of Health, *Report on Carcinogens,* Benzene (11th ed) ..........................30

National Sci. And Tech. Council Comm. on Env't and Natural Res., *Interagency Assessment of Oxygenated Fuels* (June 1997)..............................................................8, 30

# State Materials

*CARB Initial Statement of Reasons, Proposed Amendments to the California Phase 3 Reformulated Gasoline Regulations* (Jun. 7, 2002) ..................................................11

*CARB Proposed Determination Pursuant to Health and Safety Code Section 43830(g) of the Ozone Forming Potential of Elevated RVP Gasoline Containing 10 Percent Ethanol* (Nov. 1998) ..................................................11

Executive Order No. D-52-02 (Cal.) (Mar. 14, 2002) ..................................................11

Letter from Robert W. Varney, Commissioner, State of New Hampshire Dep't of Envt'l Services, to EPA (Jun. 27, 2000) ..................................................29

*Report to the California Environmental Policy Council in Response to Executive Order D-5-99*, Vol. 1 (Dec. 1999) ..................................................29

# Other Materials

Hon. Henry A. Waxman, et al., *An Overview of the Clean Air Act Amendments of 1990*, 21 Envtl. L. 1721 (1991) ..................................................1

Hon. Henry A. Waxman, et al., *Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990*, 21 Envtl. L. 1947 (1991) ..................................................1

Lawrence H. Tribe, *American Constitutional Law* (3d ed. 2000) ..................................................19, 20

Defendants[1] respectfully move this Court for summary judgment on the ground of federal preemption with respect to all of plaintiffs' claims based on the use of MTBE in gasoline.

## INTRODUCTION

The 1990 federal Clean Air Act Amendments ("CAAA"), which in relevant part regulate the content of gasoline, "are unusually prescriptive and far reaching." They affect "every gallon of gas that is pumped, and ultimately the very success or failure of the nation's efforts to control urban smog, stop toxic emissions, and reduce acid rain." Hon. Henry A. Waxman, et al., *Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990*, 21 Envtl. L.1947, 1949 (1991).[2] One of the CAAA's most important provisions was Congress's requirement that oxygenated gasolines be used in those parts of the country with the worst air quality. 42 U.S.C. § 7545(k), (m).

Given this Court's familiarity and experience with MTBE cases, defendants will not repeat the history of the Clean Air Act Amendments of 1990 at length, but will identify the history as relevant to defendants' arguments. The bottom line is that federal law required an oxygenate in much of the gasoline sold in the U.S., and plaintiffs' proposed duty not to use the oxygenate MTBE impermissibly conflicts with that federal law. This motion responds to the Court's invitation to demonstrate the "impossibility" of complying with federal law if plaintiffs' claims are given effect; it does so by demonstrating that sufficient ethanol to meet the federal oxygenate mandates simply did not exist. This motion also respectfully suggests that this Court erred in holding in its August 20, 2001, Opinion and Order that Congress did not affirmatively

---

[1] The term "defendants" as used herein refers to the group of defendants identified on Attachment A to the Notice of Motion.

[2] *See also* Hon. Henry A. Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 Envtl. L. 1721, 1768 (1991) ("Title II of the 1990 Amendments contains provisions that reduce pollution from cars, trucks, and other mobile sources. These provisions are essential to an effective clean air bill because motor vehicles play a dominant role in air pollution.").

intend refiners to have a choice of oxygenates, such that state rules limiting refiner choice conflicted with Congressional intent. Finally, broader principles of conflict preemption – broader than this Court has previously considered – demonstrate that plaintiffs' claims impermissibly interfere with Congress's goals and must be preempted. Thus, much of this motion presents new argument, but, even when it does not, "[t]he allegations now before [the Court] are somewhat different than the allegations that were [here] in *MTBE I*. Accordingly, defendants have the right to assert these defenses in the context of the current complaints." *In re: MTBE Products Liab. Litig.*, 342 F. Supp.2d 147, 158 (S.D.N.Y. 2004).[3] Indeed, plaintiffs' allegations in many of the cases now before the Court challenge other federally approved oxygenates along with MTBE, further escalating the conflict with federal law.

## SUMMARY OF ARGUMENT

Each of the following arguments – alone or in combination – demonstrates that no genuine issue of material fact exists regarding defendants' conflict preemption defense.[4]

*First*, plaintiffs challenge defendants' use of MTBE, but the alternative plaintiffs offer to MTBE was simply not available in adequate supply to meet federal oxygenated fuel requirements. Thus, "it would be impossible for the defendants to comply with both the state law sought to be imposed and the federal requirements" because alternatives have not "been available to the defendants for their use in the RFG Program." *In re: MTBE Products Liab. Litig.*, 175 F. Supp.2d 593, 614, 616 (S.D.N.Y. 2001) ("*MTBE I*"). In *MTBE I*, this Court held

---

[3] Moreover, not only are the current complaints' allegations different, but only about 20 of the current 264 defendants were before the Court in *MTBE I*.

[4] Defendants also continue to believe, as argued in defending the removal of these cases to federal court, (1) that plaintiffs' claims are expressly preempted by the CAAA itself, 42 U.S.C. § 7545(c)(4), and EPA's actions in approving the formulas for oxygenated gasolines, and (2) that Congress has occupied the relevant field of reformulated gasoline formulations. Defendants expressly preserve the arguments – as affirmative defenses as well as grounds for removal.

that the issue of whether adequate supply of alternatives to MTBE existed was a question of fact. *Id.* at 616. The indisputable facts now show that ethanol, the only alternative oxygenate that plaintiffs contend defendants should have used instead of MTBE, was not available in adequate quantities during any relevant period.

*Second*, Congress specifically intended for refiners to have an affirmative choice among oxygenates, including MTBE, and plaintiffs' proposed duty not to use MTBE would interfere with the federal government's chosen method of achieving a federal goal. Although the Court rejected this argument in *MTBE I*, *id.* at 614-16, defendants respectfully submit that decision was incorrect. The statutory design and the legislative history, read together, lead to only one conclusion: that Congress wanted refiners to be able to choose, and to choose MTBE, to comply with the CAAA. Congress acknowledged that oxygenates were in short supply, and deliberately gave refiners a choice among oxygenates as a means of cleaning up the air while promoting price and supply stability. And Congress specifically set the oxygen content level to ensure that refiners could choose MTBE. Contrary to this Court's earlier view, the fact that the federal law is permissive does not negate its preemptive effect if flexibility is part of Congress's intent. *See Fidelity Fed. Sav. & Loans Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982) ("The conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred."). Moreover, defendants respectfully submit that this Court misread legislative statements "that oxygenates would compete in the marketplace." *MTBE I*, 175 F. Supp.2d at 613, 615. Read in context, those statements do not mean that Congress took no position on what oxygenates should be used. Rather, Congress expressly designed the program to provide refiners with a choice of oxygenates, and specifically

3

MTBE, to ensure that its goals of clean air and minimizing costs and supply disruptions were met.

*Third*, a state law duty not to use MTBE would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). In *MTBE I*, defendants presented (and the Court addressed) only the just-described conflict preemption argument grounded in Congress's having specifically intended refiners to have a choice among oxygenates, based on the application of *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000). But conflict preemption is broader, as are the purposes of the relevant federal programs. In designing the oxygenated fuels programs, Congress simultaneously pursued several goals: cleaning up the air, minimizing costs and supply disruptions, and providing a limited ambit for other environmental concerns. Not only did Congress require the immediate use of oxygenated gasoline in nine cities, but it also provided that the use of oxygenated gasoline should *increase* as other areas of the country elected to opt in to the program. Congress also adopted provisions to keep the cost of the programs low, in part by specifically considering and rejecting alternatives that would have precluded the use of MTBE. The elimination of MTBE as an available oxygenate would necessarily decrease the scope of the oxygenated fuels programs (which Congress wanted to *increase*) and would increase the costs and supply disruptions associated with oxygenated fuels (which Congress wanted to *decrease*). In short, eliminating MTBE from the oxygenated fuels programs would impermissibly conflict with all of Congress's goals.

*Fourth*, plaintiffs' attack on MTBE cannot be viewed in isolation: plaintiffs' legal theories would make all federally allowable oxygenates defective under state law. EPA has approved only certain specific ethers and alcohols to meet oxygenate requirements. In addition

4

to MTBE (an ether), most of plaintiffs' complaints specifically attack a second of these, TBA (an alcohol), and at least five complaints attack *every* federally approved oxygenate. Moreover, plaintiffs' strict liability theories would apply whenever oxygenated gasoline affects water quality. Given that there is *no* environmentally neutral formulation of gasoline if spilled into drinking water supplies, and that each of the oxygenates (*including* ethanol) arguably presents a potential threat to water quality, plaintiffs' theories would effectively impose strict tort liability for compliance with federal law. Such an outcome, of course, is preempted by federal law.

For these reasons, defendants move for summary judgment on all claims in which plaintiffs allege that defendants' liability arises from the use of MTBE in gasoline. This motion does *not* seek summary judgment as to plaintiffs' claims that any particular defendant actually spilled or leaked the gasoline that caused any alleged contamination.

## ARGUMENT

### I. Standard of Review.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. 'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Aetna Cas. &*

*Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 574 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

## II. Due to Insufficient Ethanol Capacity, Compliance with the Plaintiffs' Proposed Duty Would Have Been Physically Impossible.

Plaintiffs have alleged that defendants committed a tort by using MTBE to meet the CAAA's oxygenated gasoline requirements. Plaintiffs therefore seek to establish a legal duty *not* to use MTBE. "[C]ommon-law damages actions . . . are premised on the existence of a legal duty . . . ." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 522 (1992).

It was, however, impossible for defendants to comply with the state law duty that plaintiffs seek to impose (no MTBE) and at the same time comply with federal oxygen requirements. Simply stated, there was not enough alternative oxygenate to meet the CAAA requirements. "[T]he Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements." *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990); *see Florida Lime and Avocado Growers v. Paul*, 373 U.S. 132, 143 (1963) ("A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility"). Preemption analysis of a common law claim asks "whether the legal duty that is the predicate of the common-law damages action" is foreclosed by or conflicts with federal law. *Cipollone*, 505 U.S. at 523-24; *see also MTBE I*, 175 F. Supp.2d at 613, 615 (setting forth this standard).

The only oxygenates EPA has approved for use in RFG and OxyFuel are aliphatic ethers and aliphatic alcohols (excluding methanol).[5] More specifically, EPA has identified the alternative oxygenates to MTBE as TBA, ethanol, TAME, DIPE, and ETBE. *See MTBE*

---

[5] Methanol may be used at the oxygen levels necessary for RFG only if it is combined with another co-solvent alcohol. *See Regulation of Fuels and Fuel Additives; Definition of Substantially Similar*, 56 Fed. Reg. 5352 (Feb. 11, 1991).

*Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substance Control Act to Eliminate or Limit the use of MTBE as a Fuel Additive in Gasoline*, 65 Fed. Reg. 16094, 16097, 16104-06 (Mar. 24, 2000); MTBE Blue Ribbon Panel, Mar. 1-2, 1999, meeting minutes at 15 ("the oxygen mandate allows six commercial oxygenates to be used by refiners including MTBE, ETBE, ethanol, TBA, DIPE, and TAME") (excerpts at Ex. A).

Plaintiffs do not, however, seriously suggest that defendants should have used any oxygenate other than ethanol. Indeed, many of plaintiffs' complaints challenge defendants' use of TBA as well as MTBE. *See, e.g., City of Lowell v. Amerada Hess Corp., et al.*, Compl. at ¶ 1; *City of New York v. Amerada Hess Corp., et al.*, Compl. at ¶ 62c; *County of Suffolk, et al. v. Amerada Hess Corp., et al.*, Compl. at ¶ 1; *United Water New York, Inc. v. Amerada Hess Corp., et al.*, Compl. at ¶ 1 (excerpts at Exs. B through E). And five recently filed complaints – brought by one of plaintiffs' co-lead counsel – challenge defendants' use of *any* approved oxygenate: "Whenever referred to in this complaint, MTBE means not only methyl tertiary butyl ether, but also the contaminants in commercial grade MTBE, as well as other oxygenates and ethers, including, but not limited to, TAME, DIPE, and ETBE." *See City of Merced v. Chevron U.S.A., et al.*, Compl. at ¶ 13, Ex. F; *see also Tonneson v. Sunoco, Inc., et al.*, Compl. at ¶ 20, Ex. G; *City of Fresno v. Chevron U.S.A. Inc., et al.*, Compl. at ¶ 51, Ex. H; *Orange County Water District v. Unocal Corp., et al.*, Compl. at ¶ 46, Ex. I; *Quick v. Shell Oil Co., et al.*, Compl. at ¶ 51, Ex. J.[6]

Tellingly, during the January 13, 2005 status conference, plaintiffs' counsel framed the factual issue on preemption as involving only the availability of ethanol:

---

[6] It is surprising that plaintiffs challenge "all other oxygenates and ethers," as this clearly brings ethanol within the bounds of the complaints and the CAAA clearly preempts these cases regardless of how much ethanol was available, even according to plaintiffs' view of the issue. However, a plain reading of the complaints indicates this is exactly what plaintiffs have done.

7

> [F]rom a frustration of purpose or obstacles to federal objectives perspective, the only factual question that remains is, was there enough ethanol to use?

January 13, 2005, Status Conference before Judge Scheindlin, Tr. 30. And plaintiffs' preemption interrogatories ask *only* about the possibility of defendants' using ethanol, not any other oxygenate. *See* Plaintiffs' April 4, 2005, Conflict Preemption Interrogatories, Ex. K.[7]

In sum, plaintiffs' position, in effect, is that defendants should have used *ethanol* to meet the CAAA oxygenate requirements. But there was never even close to enough ethanol to meet federal requirements. *See* Declaration of John M. Urbanchuk, Ex. N (hereinafter "Urbanchuk Decl.").

Mr. John Urbanchuk is an agricultural economist and expert in ethanol production and supply. He has served as a consultant to various ethanol producers and associations (including the Renewable Fuels Association and the National Corn Growers Association) for over 20 years. Urbanchuk Decl. ¶¶ 1-7.[8] Mr. Urbanchuk has reviewed ethanol capacity reports and oxygenated fuel sales data from the inception of the RFG program in 1995[9] through the time that plaintiffs

---

[7] In any event, plaintiffs could not seriously suggest that ETBE, DIPE, and TAME were "adequate alternatives," because, like MTBE, these are ethers, and therefore share many of the same characteristics of MTBE about which plaintiffs complain. Indeed, EPA's Blue Ribbon Panel concluded that these other oxygenates "appear to have similar, but not identical, chemical and hydrogeologic characteristics" with MTBE. *Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline* at 8 (Sept. 15, 1999) (hereinafter "Blue Ribbon Panel") (excerpts at Ex. L, available in full text at http://www.epa.gov/otaq/consumer/fuels/oxypanel/r99021.pdf); *see generally* National Sci. and Tech. Council, Comm. on Env't and Natural Res., *Interagency Assessment of Oxygenated Fuels* at 2-50 to 2-64 (June 1997) (hereinafter "*Interagency Assessment*") (noting that all alkyl ether oxygenates have higher mobility in soil than BTEX compounds, "are difficult to biodegrade," are difficult to remove from water, and "can be expected to behave very much like MTBE" with respect to their half life in water) (excerpts at Ex. M, available in full text at http://www.epa.gov/otaq/regs/fuels/ostpfin.pdf).

[8] Indeed, in *Oxygenated Fuels Ass'n v. Pataki*, 158 F. Supp.2d 248 (N.D.N.Y. 2001), Mr. Urbanchuk was qualified as an expert witness for the State of New York.

[9] Congress required that the RFG rules take effect on January 1, 1995. 42 U.S.C. §§ 7545(k)(1),

filed the instant lawsuits in 2003. *Id.* ¶ 8-11.[10] He has determined the total amount of ethanol that would have been necessary to oxygenate all RFG and OxyFuel sold during the relevant time period. *Id.* ¶ 20-40. The following chart demonstrates that during no year was there enough ethanol to meet the oxygenate demand. Indeed, in every year, the shortfall was hundreds of millions of gallons of ethanol. Therefore, it was impossible to meet the Clean Air Act Amendment mandates without MTBE. *See* Urbanchuk Decl. at ¶ 12-19, 41-45.

| Year | Total Ethanol Necessary to Oxygenate RFG and Oxyfuel (gallons per year) | Total Ethanol Production Capacity (gallons per year) | Shortfall (gallons per year) |
|---|---|---|---|
| 1995 | 2,189,000,000 | 1,588,000,000 | [601,000,000] |
| 1996 | 2,432,000,000 | 1,541,000,000 | [891,000,000] |
| 1997 | 2,497,000,000 | 1,600,000,000 | [897,000,000] |
| 1998 | 2,640,000,000 | 1,698,000,000 | [942,000,000] |
| 1999 | 2,753,000,000 | 1,717,000,000 | [1,036,000,000] |
| 2000 | 2,778,000,000 | 1,897,000,000 | [881,000,000] |
| 2001 | 2,802,000,000 | 1,997,000,000 | [805,000,000] |
| 2002 | 2,828,000,000 | 2,347,000,000 | [480,000,000] |
| 2003 | 2,841,000,000 | 2,707,000,000 | [134,000,000] |

For the sake of simplicity, Mr. Urbanchuk's analysis is based on extremely conservative assumptions about ethanol capacity and usage (*i.e.*, that all available ethanol would have been

---

(k)(5). Indeed, after a lengthy rulemaking period, the final rules were promulgated by EPA on February 16, 1994, with the required effective date of January 1, 1995. *Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716 (Feb. 16, 1994); 40 C.F.R. § 80.78(d). As of January 1, 1995, therefore, federal law required that RFG be sold in all covered areas. 42 U.S.C. § 7545(k)(5); 40 C.F.R. § 80.78(a).

[10] Plaintiffs have recognized the accuracy of this data. *See* Jul. 22, 2005, letter from D. Leverrier to L. Meyer ("[W]e have no reason at this time to believe that the data are inaccurate inasmuch as they reflect how much fuel ethanol was actually produced or available to meet the limited demand in those years…"); *see id.* at 2 (admitting accuracy of RFG and Oxyfuel sales volumes) attached as Ex. O.

diverted exclusively to the RFG and Oxyfuel programs) and logistics (*i.e.*, that all transportation and other logistical hurdles to using ethanol could be overcome). More specifically, this analysis assumes the following:

* That every drop of ethanol capacity could have been diverted from other mandated fuel uses, such as for states with State Implementation Plans requiring higher oxygen content than under the RFG or Oxyfuel programs;

* That every drop of available industrial grade ethanol would have been diverted from the dozens of other industries that rely on ethanol to manufacture products like paint solvents, cosmetics, adhesives, and pharmaceuticals; and

* That it would have been possible to move ethanol from wherever it was produced (mainly in the Midwest) to every RFG and Oxyfuel region in the country (primarily the East and West coasts).

Even making these unrealistic assumptions (which give the plaintiffs the full benefit of the doubt), there still simply was not enough ethanol to fulfill the oxygenated fuel requirements.[11] Therefore, compliance with both federal law (requiring oxygenates) and plaintiffs' state-law claims (effectively disallowing MTBE) would be impossible.

---

[11] Federal and State regulators have also said that there was not enough ethanol to meet federal requirements. EPA, in the context of promulgating rules to require that at least 30% of the oxygenate content for the RFG program be met with renewable fuels like ethanol, 59 Fed. Reg. 39258 (Aug. 2, 1994), recognized that *the ethanol supply in 1994 was inadequate to meet merely 30% of the oxygenate demand. Id.* at 39271. (EPA's attempted 30% set-aside for ethanol was subsequently struck down by the D.C. Circuit as exceeding EPA's authority under § 211(k). *American Petroleum Inst. v. EPA*, 52 F.3d 1113 (D.C. Cir. 1995).) In March 2000, EPA likewise noted that "[d]espite its current use in RFG, *ethanol is not yet manufactured in sufficient volume to meet total current national oxygenate demands.*" *MTBE Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substance Control Act to Eliminate or Limit the use of MTBE as a Fuel Additive in Gasoline*, 65 Fed. Reg. 16094, 16104 (Mar. 24, 2000) (emphasis added). EPA's statements in 1994 and 2000 corroborate the facts established by Mr. Urbanchuk.