# EXHIBIT F – Part 2

Dockets.Justia.com

\* \* \*

In addition, for the reasons that follow, even if there had been enough ethanol, plaintiffs' claims would *still* be conflict preempted.

### III. Congress Specifically Intended for Refiners to Be Able to Choose Among Oxygenates, Including MTBE.

State law is preempted whenever it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fidelity*, 458 U.S. at 153 (quoting *Hines*, 312 U.S. at 67); *see also Geier*, 529 U.S. 861. One well-recognized type of obstacle is where state law "interferes with the methods by which the federal statute was designed to reach [its] goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). More specifically, as set forth in the discussion below, where federal law provides a range of choices for complying with a federal requirement, a state law restricting that range, as plaintiffs propose here with respect to MTBE and the RFG program, is necessarily an obstacle to the federal purpose and preempted. *Fidelity, supra; Geier, supra; Clean Air Markets Grp. v. Pataki*, 338 F.3d 82 (2d Cir. 2003).

---

More recently, in the context of California postponing the effective date of its MTBE ban from December 31, 2002, to December 31, 2003, the Governor issued an executive order stating that "the current production, transportation and distribution of ethanol is insufficient to allow California to meet federal requirements and also eliminate use of MTBE on January 1, 2003." Executive Order D-52-02 (Mar. 14, 2002) (excerpts at Ex. P). The California Environmental Protection Agency's Air Resources Board ("CARB") also recognized the lack of ethanol to replace MTBE *in just that one state* (albeit a large one), noting "[t]he Governor found that it was not possible to eliminate use of MTBE on January 1, 2003 without significantly risking disruption of the availability of gasoline in California." *CARB Initial Statement of Reasons, Proposed Amendments to the California Phase 3 Reformulated Gasoline Regulations* at 22 (Jun. 7, 2002) (excerpts at Ex. Q); *see also CARB Proposed Determination Pursuant to Health and Safety Code Section 43830(g) of the Ozone Forming Potential of Elevated RVP Gasoline Containing 10 Percent Ethanol* at 36 (Nov. 1998) ("[T]he replacement of MTBE by the use of ethanol is likely to be limited because of ethanol's limited supply and state and federal limits on volatility.") (excerpts at Ex. R). This history from California's attempts to ban MTBE also provides support for Mr. Urbanchuk's conclusions.

In *Fidelity*, the Supreme Court held that federal regulations allowing federally chartered savings and loans to use "due on sale" clauses in their mortgage instruments preempted a conflicting California law that limited the enforcement of such clauses to cases in which the sale of the property would have actually impaired the lender's security interest. 458 U.S. at 170. The Supreme Court specifically rejected the argument that, since the federal regulations only *permitted* (but did not require) due-on-sale clauses, there was no actual conflict with the California law. *Id.* at 155. The Court held that the "conflict" was California law's denial to federally chartered S&Ls of the "flexibility" to use a clause that was permitted by federal law, explaining:

> The *conflict* does not evaporate because the [Federal Home Loan Bank] Board's regulation *simply permits, but does not compel*, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred. The Board consciously has chosen not to mandate use of due-on-sale clauses "because [it] desires to afford associations the flexibility to accommodate special situations and circumstances." Although compliance with both [the federal standard] and the [California] rule may not be "a physical impossibility," the California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely "at its option" and *have deprived the lender of the "flexibility" given it by the Board*.

458 U.S. at 155 (citations omitted, emphasis added).

*Geier* is to the same effect. There, federal regulations "deliberately provided the manufacturer with a range of choices among different passive restraint devices," in order to "bring about a mix of different devices" and "thereby lower costs, overcome technical safety problems," and achieve other benefits – "all of which would promote [the regulation's] safety objectives." 529 U.S. at 875. The Court held that a state tort duty not to use a passive seatbelt (one of the choices permitted by the regulation) "would have presented an obstacle to the variety and mix of devices that the federal regulation sought." 529 U.S. at 881.

A last, but important, example of this principle is a Second Circuit case that was decided after this Court's decision in *MTBE I*. In *Clean Air Markets*, the Second Circuit considered whether a New York statute interfered with the methods by which Congress sought to achieve the purposes of another portion of the CAAA. The general purpose of Title IV was to "reduce the adverse effects of acid deposition through reductions in annual emissions of sulphur dioxide." 42 U.S.C. § 7651(b). Congress also specified a method to achieve this goal, choosing "to effectuate such reductions ... through ... an emission allocation and transfer system," which permitted utilities to transfer their emissions allowances to "any other person who holds such allowances." *Id.* The court relied on legislative history explaining that Congress intended to grant utilities "the opportunity to reallocate among themselves their total emissions reduction obligations in the most efficient and cost-effective way possible." 338 F.3d at 87 (quoting S. Rep. No. 101-228, at 303 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3686).

New York law, however, required a utility to forfeit its proceeds if it transferred allowances to a party in certain upwind states. The court found that this effectively banned sales to those states, and "indisputably decrease[d] the value of the allowances." Noting that earlier versions of the bill had included geographic limits on transfers, but that the final statute contained no such restrictions, the court found that Congress intended a nationwide market for trading emissions allowances. *See* 338 F.3d at 89. Accordingly, the New York law "interfere[d] with the methods by which [Title IV] was designed to reach [its] goal ... and therefore it [stood] as an obstacle to the execution of Title IV's objectives." *Id.* (internal quotations omitted).

Just as federal law intended an option to be available in each of these cases, Congress and EPA likewise intended that MTBE would be available to meet the oxygenate demands of the RFG program. This Court has acknowledged that Congress "anticipated that MTBE would be

used to meet the oxygenate requirements." *MTBE I*, 175 F. Supp.2d at 612; *see* 136 Cong. Rec. S6383, S6384 (May 16, 1990) (Sen. Daschle) ("EPA predicts that the amendment will be met almost exclusively by MTBE, a methanol derivative."). In addition to mere "anticipation," however, Congress intended that MTBE be used, knowing that its use was necessary for the program it created. *See, e.g.*, 136 Cong. Rec. S16895, S16954 (Oct. 27, 1990) (Sen. Chafee) (RFG Program "will encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S2280, S2289 (Mar. 7, 1990) (Sen. Daschle) ("We want MTBE . . . . I want ETBE and ethanol and MTBE and other fuels to play a role in achieving a variety of national objectives."); 136 Cong. Rec. S17512, S17514 (Oct. 27, 1990) (Sen. Heinz) ("reformulated gasoline will also encourage the use of oxygen-containing additives like ethanol and MTBE"); 136 Cong. Rec. S16895, S16922 (Sen. Durenberger) (RFG "is to have not less than 2 percent oxygen by weight. This requirement can be met by blending gasoline with a variety of additives like ethanol or MTBE.").

Indeed, EPA expected that "MTBE will be the most *heavily used* oxygenate" and that "MTBE will be *widely available for use*" in reformulated gasoline. *Supplemental Notice of Proposed Rulemaking, Regulation of Fuels and Fuel Additives; Standards for Reformulated and Conventional Gasoline*, 57 Fed. Reg. 13416, 13424 (Apr. 16, 1992) (emphasis added). The RFG rules promulgated by EPA specifically allowed MTBE, by name, to be used in RFG. *See* 40 C.F.R. § 80.42 (setting forth the "simple model" and including 21 references to MTBE in the regulatory text and compliance calculations); *id.* § 80.45 (setting forth the "complex model" and including 13 references to MTBE). Consequently, a state law rule that penalizes the use of MTBE is preempted because it denies refiners the "flexibility" to use a fuel additive that federal

14

law permitted them to use, and which Congress and EPA expected them to use. *See Fidelity*, 458 U.S. at 155.

The Court's view in *MTBE I* that Congress did not intend flexibility, *i.e.*, a mix of oxygenates, 175 F. Supp.2d at 615, is contradicted by the legislative history. The RFG and Oxyfuel programs do seek to maintain a mix of oxygenates, primarily MTBE and ethanol, the two largest in supply. As described above, Congress knew and expected that MTBE would play an integral role in the RFG program (*supra* at p. 14). Congress also knew that it was necessary to utilize both ethanol and MTBE, and that competition between ethanol and MTBE would give refiners the flexibility to achieve emissions reductions most efficiently.[12] Giving refiners a choice of oxygenates was essential to furthering Congress's goals that the RFG program be cost efficient and maintain a stable supply of reasonably priced gasoline. *See, e.g.*, 136 Cong. Rec. S2280, S2289 (Sen. Daschle) ("That is the whole essence behind this compromise, this agreement. We want MTBE. I have come to the floor on numerous occasions in the past advocating a balanced approach in our policy toward MTBE, toward ETBE, toward ethanol and methanol, in order to give us an opportunity to use these fuels in those areas where they can do the most good. This balance is essential.").

One of the most telling aspects of the CAAA debate was over a proposal that the Oxyfuel standard be set at 3.1% oxygen by weight. This proposal drew strong objections on the grounds that the 3.1% standard was effectively an ethanol mandate because of ethanol's higher oxygen content. As finally enacted, the RFG program requires a minimum of 2.0% oxygen by weight (42 U.S.C. § 7545(k)(3)(v)), and the Oxyfuel program requires a minimum of 2.7% (42 U.S.C. § 7545(m)(2)). Congressional debate over the particulars of the oxygen content standards

---

[12] This is the kind of competition Congress envisioned when "Congress expected that oxygenates would compete in the marketplace." 175 F. Supp.2d at 613.

demonstrates that Congress selected those levels – and rejected 3.1% – to permit flexibility generally and MTBE specifically. Indeed, in discussing this very episode, EPA has stated as follows: "The legislative history reflects Congress' intent to preserve a role for the two major oxygenates – MTBE and ethanol – in the oxygenated gasoline program."[13] As Senator Lautenberg explained, "Gasohol [gasoline made with ethanol] is the only viable fuel that exceeds the 3.1 percent oxygen content, so by requiring an average fuel oxygen content of 3.1, the bill now perforce mandates a greatly increased use of gasohol." IV Comm. on Env't & Pub. Works, *A Legislative History of the Clean Air Act Amendments of 1990*, S. Prt. 103-38, at 5430 (1993) (Sen. Debate on Mar. 7, 1990) (Sen. Lautenberg) (Ex. S).

Although the 3.1% proposal was debated by a number of other Senators, Congress eventually amended the bill to lower the minimum oxygen level to 2.7% to ensure that MTBE could be used. *See, e.g.,* 136 Cong. Rec. H12848, H12860 (Oct. 26, 1990) (Rep. Sharp) (Congress reduced a proposed OxyFuel 3.1% oxygenate level to 2.7% to "provide more even opportunities for competition between the two major oxygenates, methyl tertiary butyl ether (or MTBE), and ethyul [sic] alcohol (or ethanol). The Administrator may not discriminate among these different oxygenates, and should encourage fair competition among them."); 136 Cong. Rec. S17232, S17252 (Oct. 26, 1990) (Sen. Simpson) ("The level of 2.7 percent was chosen in part to provide more even opportunities for competition between the two major oxygenates, methyl tertiary butyl ether, or MTBE, and ethyl alcohol, or ethanol."); 136 Cong. Rec. H2756-02, H2764 (May 23, 1990) (Rep. Alexander) ("you don't have to use ethanol to meet the

---

[13] *Regulation of Fuel and Fuel Additives; Administrator's Finding That No Control or Prohibition on Maximum Oxygen Content of a Winter Oxygenated Gasoline Program Is Necessary Under Section 211 (c)(4) of the Clean Air Act as Amended by the Clean Air Act Amendments of 1990*, 57 Fed. Reg. 47849, 47852 (Oct. 20, 1992).

requirements. You can use other additives like MTBE.").[14] As Senator Grassley noted in 1993, "we agreed to reduce the oxygen content required for these fuels to allow for MTBE's use, and to avoid mandating the use of only ethanol." 139 Cong. Rec. S16633 (Nov. 20, 1993). Indeed, each of the statements in the legislative history that the "market" should decide which oxygenate would be used was a response to critics who asserted that the legislation would permit only the use of ethanol.

Thus, the statutory design as well as the legislative history of the CAAA reflects a Congressional intent that a range of oxygenates be available and that their use expand as quickly as capacity allowed. This Court's conclusion to the contrary should be reconsidered. *See MTBE I*, 175 F. Supp.2d at 615.[15]

This Court also distinguished *Geier* on the ground that the plaintiffs there sought to establish a legal duty compelling the use of air bags, whereas the MTBE plaintiffs did not seek to compel the use of a particular oxygenate. *Id.* This distinction is likewise erroneous for two

---

[14] This emphasis on "competition," therefore, was a response to critics who charged that the oxygen requirement was really a back-door ethanol mandate. *See, e.g.*, 136 Cong. Rec. S3504, S3513 (Mar. 29, 1990) (Sen. Daschle) ("But to claim that this is an ethanol amendment is wrong. The 2.7 percent oxygen standard is fuel neutral."); *id.* at S3515 (Sen. Daschle) ("[I]t does not benefit one industry. There are a number of options that the oil companies have with regard to additives they can use to reformulate gasoline. They can use ethanol. They can use methanol. They can use a whole range of aromatic substitutes that provide them options in improving gasoline quality.").

[15] Relying on *OFA v. Pataki*, 158 F. Supp.2d 248, this Court said that, "unlike the federal regulation at issue in *Geier*, the RFG Program does not *deliberately* seek to employ various 'means-related' objectives, such as maintaining a mix of oxygenates or creating a gradual phase-in plan for the use of oxygenates in order to further its goal of reducing air pollution." *Id.* But Congress in fact did both of these things in three ways: (1) by reducing the oxygenate requirement in the Oxyfuel program to ensure that it was not an ethanol-only program (*supra* at pp. 15-17); (2) by reducing the number of non-attainment areas to which the RFG program initially applied (*infra* at pp. 22-23 & n. 17); and (3) by providing for opt-ins as capacity grew (*infra* at pp. 23-25 & n. 18).

The Court did not itself cite legislative history to support its conclusion, but cited to the District Court's decision in *Pataki*. With respect, defendants suggest that the *Pataki* court misread the balance that Congress struck in the statute.

reasons. First, as discussed above, plaintiffs do seek to compel the use of ethanol – they offer no other alternative. Second, whether plaintiffs seek to narrow the field to six or three or only one oxygenate is irrelevant; conflict preemption principles work to maintain the choice that Congress and the EPA made to allow MTBE. In other words, plaintiffs seek to *disallow* a particular oxygenate that Congress and EPA fully expected could be used at defendants' option. Conflict preemption attaches here for the same reasons as in *Fidelity*, *Geier*, and *Clean Air Markets*: plaintiffs' claims would deny the defendants the flexibility to use an option that Congress and EPA specifically intended to be available.

In sum, state law damages imposed merely for adding MTBE to gasoline would interfere with federal purposes of the CAAA by decreasing the amount of available oxygenates and by reducing refiner flexibility in supply decisions (thus increasing the risk of supply interruptions and price effects). The inconsistency of the plaintiffs' position (that MTBE is a defective product that should not have been used) and the federal position (that MTBE was an available oxygenate that would be used to meet the oxygenate requirements) clearly "undermines the congressional calibration," *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 380 (2000), that Congress and EPA used to establish the RFG program. Put another way, the common law duty plaintiffs seek to impose – to refrain from using MTBE – "interferes with the methods by which the [Clean Air Act] was designed to reach its goal." *International Paper Co.*, 479 U.S. at 494.

### IV. Eliminating MTBE Would Interfere with the Goals Set By Congress in the 1990 Clean Air Amendments.

Federal preemption is broader than a simple rule that States may not forbid actions that federal law expressly permits, such as refiners' choice of MTBE. It is therefore broader than the type of preemption recognized in *Geier*, which formed the basis of defendants' motion to dismiss

in *MTBE I*. State law is also preempted whenever it "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. Thus, even if this Court were again to conclude that a *choice* of MTBE was not an integral part of the CAAA's design (as it surely was, *see supra* Part II), plaintiffs' claims are nevertheless preempted.

As a leading commentator has observed, the Supreme Court consistently has adhered to the principle that "state action must ordinarily be invalidated if its manifest effect is to penalize or discourage conduct that federal law specifically seeks to encourage." Lawrence H. Tribe, *American Constitutional Law* § 6-29, 1181-82 (3d ed. 2000). *See, e.g., Nash v. Florida Indus. Comm'n*, 389 U.S. 235, 239 (1967) (striking down state law that denied unemployment compensation to otherwise eligible persons if those persons had filed unfair labor practices charges with NLRB); *Xerox v. County of Harris*, 459 U.S. 145 (1982) (striking down state taxes on customs warehouses for goods not destined for the U.S. because federal law's purpose was to promote such trade); *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 627 (1973) (local ordinance setting flight time limits conflicted with federal law because it constrained federal regulators' ability to maximize safety in air travel).

In *Nash*, the Supreme Court struck down a state law forbidding unemployment compensation to those employees who filed federal unfair labor practice charges, saying that it would "impede resort to the [labor] Act" and that the state may not "handicap a valid national objective by threatening to withdraw [its] benefits." 389 U.S. at 239. Similarly, in *Xerox*, the Court struck down state taxation of goods lodged temporarily in government regulated bonded storage – which Congress had exempted from federal duties – in part because the state tax would "offset substantially the very benefits Congress intended to confer by remitting the duty."

19

Allowing state taxation would deter conduct federal law sought to encourage, *i.e.*, use of American ports as transshipment centers. 459 U.S. at 151-52.

As in *Nash* and *Xerox*, the state law duty that plaintiffs seek to impose (*i.e.*, to refrain from using MTBE in gasoline) clearly "would discourage conduct that federal law seeks to encourage." *See* Tribe, *supra*. The statutory structure that Congress designed reflects several goals, each of which Congress accommodated. Congress wanted to maximize clean air benefits, and it pursued clean air by *mandating* oxygenates. But Congress was also sensitive to cost and supply concerns, including limited initial supplies of oxygenates, and so it did three things. First, it limited the initial scope of the program, but provided means through which the program could and should grow when additional oxygenate capacity became available. Second, Congress also lowered the initially proposed oxygenate levels to ensure that MTBE as well as ethanol could be used by refiners. Third, Congress limited EPA's ability to take concerns other than clean air into account in approving oxygenates for the programs.

As detailed below, plaintiffs' claims interfere with these additional elements of Congress's design and are contrary to Congress's goals. Product liability for using MTBE would *reduce* the total amount of oxygenate available, frustrating Congress's intent that the use of oxygenates expand and that the cost of oxygenates be minimized.

### A. Eliminating MTBE Would Undermine Congress's Goals of Minimizing Gasoline Price Spikes and Supply Disruptions.

The oxygenate requirements of the CAAA were enacted to clean up the nation's air. "The purpose of the CAAA is to 'protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population.'" *MTBE(I)*, 175 F. Supp.2d at 612 (quoting 42 U.S.C. § 7401(b)(1)). But the statutory scheme that Congress adopted, and the accompanying legislative history, show that Congress also intended to

minimize adverse impacts to the cost and supply of gasoline. The plain language of the statute directs EPA to "tak[e] into consideration the cost of achieving such emission reductions" in implementing the program. 42 U.S.C. § 7545(k)(1). The legislative history also emphasizes the importance Congress ascribed to price and supply stability:

- "[O]ne of the Nation's major energy requirements is an adequate supply of transportation fuels at a reasonable cost. Reformulated gasoline thus is not an 'at any cost' program, and is not to be administered in a way that results in pump price increases that are significantly in excess of this estimate." 136 Cong. Rec. S17232, S17249 (Sen. Simpson).

- "Others will argue that cleaning our Nation's air is so urgent that we should ignore cost and technical feasibility.... They, too, are wrong.... [T]he key to this conference report is balance.... [W]here economics could be balanced against control requirements, it was." *Id.* at S17233 (Sen. Baucus).

- "[T]his program shall not be carried out in a manner that permits even modest physical shortages of refining and oxygenate capacity...." *Id.* at S17249 (Sen. Simpson).[16]

Even *OFA v. Pataki*, 158 F. Supp.2d 248, on which this Court relied in 2001, 175 F. Supp.2d at 614-16, recognized that these goals were necessarily intertwined: "the congressional goal in enacting the RFG program was to reduce emissions pollution while ensuring an adequate gasoline supply at a reasonable cost, taking into account other health and environmental concerns so far as reasonable." 158 F. Supp.2d at 259.

Congress's concern about supply disruptions is borne out not only by the legislative history but also by the statute's prohibition on partial waivers of the oxygenate requirement (*i.e.*

---

[16] *See also* 136 Cong. Rec. S17232, S17253 (Sen. Simpson) ("EPA must consider the different handling and transportation needs of different oxygenates, and the problems that can result if they are commingled, because these factors will bear on the adequacy of distribution capacity to, and supply in end user markets. ... [T]he Administrator must consider costs, fuel availability, and infrastructure capacity in promulgating regulations."); 136 Cong. Reg. H12848, H12860 (Oct. 26, 1990) (Rep. Sharp) (same).

21

lower oxygen concentrations in certain geographic areas). *See* 42 U.S.C. § 7545(m)(3)(C)(ii).

As expressed by Senator Simpson:

> [N]ew [RFG and Oxyfuel requirements] already create several new kinds of gasoline .... Further balkanizing of the gasoline industry – with different oxygenate concentrations in different east coast cities, for example – potentially risks further disruptions and precision from refiners that may not be possible. Segregating a great many individually-tailored blends will also create substantial difficulties for the pipeline and terminal segments of the industry. For example, the Colonial Pipeline, which serves six of the 40 areas, would be more prone to bottlenecks, for any given shipment might be legal in only some or one of those cities.

136 Cong. Rec. S17232, S17254 (Sen. Simpson). If partial waivers were permitted, gasoline blends that would qualify as neither conventional nor certified RFG would develop. These blends could not be sold in other RFG areas. Accordingly, "Title II [of the CAAA] does not allow a proliferation of new or different reformulated gasolines in the same State or the same ozone nonattainment area." *Id.* at S17252 (Sen. Simpson). EPA's "regulations must ensure that no more than one prohibition or requirement respecting reformulated gasoline will apply in any [ozone non-attainment] area, and shall provide maximum air quality benefit consistent with technical feasibility, cost, flexibility, and domestic supply and distribution capacity." *Id.* at S17253 (Sen. Simpson).

    **B.    Congress Intended the Use of Oxygenated Fuel to Expand as More Oxygenate Became Available.**

The size of the oxygenated fuels programs, in terms of the number of covered areas, also reflects Congress's balancing of clean air versus cost and supply issues. The original draft legislation required oxygenated fuels to be used in all 101 areas of the country that had failed to meet federal ozone requirements ("nonattainment areas"), but during the legislative process, Congress specifically scaled back the program because of concerns about the limited oxygenate supply, at a time when MTBE *and* ethanol were contemplated as the primary available

22

oxygenates. As Senator Daschle, a sponsor of both the original proposal and the ensuing compromise, explained:

> The original draft of this amendment covered all 101 ozone nonattainment areas, and we have also discussed the option of covering the 41 serious to extreme ozone nonattainment areas. We could easily justify coverage of all 101 areas, but in acknowledgement of the concerns of others and in the spirit of cooperation, we have deferred to EPA's request that the clean octane standard be applied only to the nine most severe ozone nonattainment areas, with the proviso that other communities could opt into the program.
>
> ...
>
> *Because there currently is a limited capacity in this country to supply oxygenates and limited refinery flexibility without further capital investment, the amendment limits the program to the nine critical ozone non-attainment areas.* A phase in of oxygenate requirements over 3 years from 1992 through 1994 is provided. ... In the event that there are insufficient supplies of reformulated gasoline to meet market demands, the Administrator may delay the effective date of specific State implementation programs until the necessary quantities of reformulated fuels can be made available.

136 Cong. Rec. S3504, S3510, S3515 (Sen. Daschle) (emphasis added).[17]

More importantly for present purposes, Congress provided that the scaled-back program would expand as additional states opted in to the program, and such opt-ins would be allowed as

---

[17] *See also* 136 Cong. Rec. H2756-02, S2769 (May 23, 1990) (Rep. Fields) ("requiring 44 mainly large cities to sell only fuel containing 2.7 percent oxygen by 1992 is most likely impossible. There is not enough ethanol and ether [including MTBE] capacity in this country to supply that much oxygen in such a short timeframe."); 136 Cong. Rec. H2915, H2936 (May 23, 1990) (Rep. Oakar) ("it is clear that not enough supply of oxygenates exists to meet the requirements of the bill, and the legislation needs modification to recognize these problems in conference"). *See also* 136 Cong. Rec. S2732, S2758 (Mar. 20, 1990) (Letter from Dep't of Energy Deputy Sec'y Moore to Sen. Dole); 136 Cong. Rec. S3500, S3502-03 (Mar. 29, 1990) (Sen. Harkin). Congress, therefore, had to scale back the RFG program, at least in the short term, and amended the bill to mandate RFG initially in only the most severe non-attainment areas. *See* 136 Cong. Rec. S3504, S3515 (Sen. McClure) ("Because there currently is a *limited capacity in this country to supply oxygenates* and limited refinery flexibility without further capital investment, the [Daschle] amendment limits the program to the nine critical ozone non-attainment areas.") (emphasis added).

more oxygenate became available. *See* 42 U.S.C. § 7545(k)(6).[18] Thus, the opt-in program is yet another example of how carefully Congress balanced gasoline and oxygenate supply and distribution factors. To prevent opt-ins from re-creating the oxygenate supply shortage that had made the previously proposed 101-area program impossible, Congress included a safety valve. Before the RFG regulations would become effective in an opt-in area, EPA had to make specific findings about the adequacy of the RFG supply, including the availability of oxygenates. *Id.* If there was a supply shortfall, EPA was empowered to delay implementation in opt-in areas for up to three years. *Id.* As Senator Simpson described the opt-in program:

> The basic purpose of new 211(k)(6) is to extend the reformulated gas program to additional areas beyond the nine original covered areas, so long as the Administrator — prior to the *effective* date of the program in the opt-in cities — is fully assured on three points: That new demand from the new areas will not stretch limited domestic capacity already dedicated to the 211(k) and (m) areas, so that those areas experience even slight physical shortages and commensurate price hikes; That domestic supplies will also be adequate to fully handle the new demand in the opt-in areas; and That refiners have adequate advance notice of increased demand created by opt-in areas, to efficiently plan, finance, gain offsets for, gain permits for, and construct the required new capacity.

136 Cong. Rec. S17232, S17251 (Sen. Simpson).

In fact, in implementing the opt-in program, EPA specifically "determine[s] whether industry's capacity to supply RFG for an opt-in area meets or exceeds the demand," taking into account "supply logistics, cost, potential price spikes, the number of current and potential suppliers for that market, whether such suppliers have experience producing RFG or the

---

[18] States are required to develop plans to implement the Clean Air Act generally (called State Implementation Plans), *see* 42 U.S.C. § 7410, and states may choose to opt-in to the RFG program as part of their SIPs. "Once an original or revised SIP is approved by the EPA, it becomes federal law . . . ." *U.S. v. General Motors Corp.*, 876 F.2d 1060, 1063 (1st Cir. 1989); *see Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994).

Of course, there is nothing optional about an opt-in from the refiners' perspective; if accepted by EPA, an opt-in makes it illegal to sell non-RFG gasoline in that area. *See* § 7545(k)(6)(A), (B).

24

capability to produce RFG, intent of suppliers to withdraw from the market, availability of adequate gasoline volumes, and the amount of lead time needed by suppliers and the distribution industry to set up storage and sales agreements to ensure supply." *Regulation of Fuels and Fuel Additives: Extension of the Reformulated Gasoline Program to the Phoenix, Arizona Moderate Ozone Nonattainment Area*, 62 Fed. Reg. 30260, 30264 (Jan. 3, 1997).

### C. Congress Provided a Limited Role for Other Environmental Considerations

Congress required the use of oxygenated gasolines, and it delegated to the EPA authority to create rules for the oxygenated fuels programs. In its delegation, Congress noted that the oxygenated fuels program might raise issues other than clean air – and it specifically included non-air environmental considerations. Nevertheless, the rulemaking authority required EPA to prefer clean air. It said that the agency's regulations "shall require the greatest reduction in emissions of ozone forming volatile organic compounds (during the high ozone season) and emissions of toxic air pollutants (during the entire year) achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emission reductions, any non air-quality and other air quality related health and environmental impacts and energy requirements." 42 U.S.C. § 7545(k)(1).

As the D.C. Circuit has held, this wording reflects Congress's intent that, while cost and other environmental concerns were relevant, clean air was to be given priority.

> Section 7545(k)(1) authorizes the adoption of regulations to achieve the greatest reduction in emissions of VOCs and toxics and the consideration of nonair-quality factors listed in the section is only to ensure that any emission reduction steps do not have inordinate economic, environmental, or energy effects. The overriding goal is air quality, and the other listed considerations are subordinate to that goal.

*American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1120 (D.C. Cir. 1995). In that case, the court rejected EPA's attempt to require the use of renewable oxygenates (i.e., *ethanol*) as part of the

25

reformulated fuels program, holding that Congress did not want other goals (energy security, in that case) pursued on the same level as encouraging the use of oxygenates to clean the air.

### D. Plaintiffs' Claims Would Frustrate Each of Congress's Goals in Amending the CAAA to Require Oxygenates

Plaintiffs' claims are conflict preempted because they stand as an obstacle to the achievement of the goals of the Act. If successful, plaintiffs' claims would decrease the amount of oxygenates available, whereas Congress wanted to encourage the use of oxygenates and to expand the program. Like *Nash*, in which a state law unemployment compensation rule was preempted because it could have decreased the number of people pursuing remedies that federal labor law made available, plaintiffs' claims would decrease the number of states using oxygenated gasoline to meet federal clean air requirements. And plaintiffs' theories necessarily would increase the supply difficulties and costs facing refiners, contrary to Congress's intent to limit those effects. Like *Xerox*, in which a state tax on commerce in customs compounds was preempted because it could have increased the costs of using those compounds, plaintiffs' claims are preempted because they would increase the costs of the federal clean air program.

Nor can plaintiffs, by means of a state tort suit, further their own goals at the expense of the air quality goals to which Congress gave preference. In fact, making clean air a priority over other environmental issues was a particular choice that Congress made, a "method" that is used to accomplish the goals of the 1990 CAAA. To that end, any different balance (as required by plaintiffs' theories) is preempted, for state law may not interfere with the "methods by which the federal statute was designed to reach [its] goal.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992).

For these reasons, plaintiffs' claims point in the opposite direction and effect from Congress's intent, and that is enough for preemption. If the state law creates *potentially*

26

conflicting duties, it is preempted. As the Seventh Circuit has summarized, "a state may not use common law procedures to question federal decisions or extract money from those who abide by them." *Bieneman v. City of Chicago*, 864 F.2d 463, 473 (7th Cir. 1988). Rather, "the state may employ damages remedies only to enforce federal requirements (as in *Silkwood [v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)]) or to regulate aspects of [the defendant's] operation over which the state has discretionary authority." *Id.* In its most recent conflict preemption decision, the Supreme Court followed the same line, allowing state tort remedies to supplement federal ones, but only if the state liability rules tracked the federal rules precisely. *Bates v. Dow Agrosciences LLC*, 125 S.Ct. 1788, 1803-04 (2005).

Nor can plaintiffs assert that the frustration of Congress's intent would be "small." In *Geier*, the Court rejected, in the strongest terms, an analysis that depended upon the size of the obstacle a tort claim presented to federal law; the mere potential for conflict was enough:

> Petitioners ask this Court to calculate the precise size of the "obstacle," with the aim of minimizing it, by considering the risk of tort liability and a successful tort action's incentive-related or timing-related compliance effects. ... But this Court's pre-emption cases do not ordinarily turn on such compliance-related considerations as whether a private party in practice would ignore state legal obligations – paying, say, a fine instead – or how likely it is that state law would actually be enforced. Rather, this Court's preemption cases ordinarily *assume* compliance with the state law duty in question.

529 U.S. at 882.

The duty that plaintiffs propose, and the effect of that duty, point in a vector at odds with Congress's purposes and methods, and plaintiffs' proposed duty, therefore, as a matter of law impermissibly presents an obstacle to the achievement of Congress's goals. For that reason, plaintiffs' claims are preempted.