# EXHIBIT F –
# Part 3

Dockets.Justia.com

## V. Plaintiffs' Theories Would Impose Damages for Any Compliance With Federal Law

Plaintiffs' challenges to MTBE cannot be viewed in isolation. These cases also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, because they present the very real possibility that defendants could be subject to tort liability for the use of *any* oxygenate. As just noted, however, "a state may not use common law procedures to . . . extract money from those who abide" by federal law. *Bieneman*, 864 F. 2d at 473.

Every oxygenate approved by EPA has characteristics similar to those that plaintiffs' lawyers argue make MTBE a "defective product." Although defendants dispute such claims about MTBE and other oxygenates, it would not take an overly creative plaintiffs' lawyer to allege, for example, that *all* EPA-approved oxygenates are defective because they are more soluble in water than other gasoline constituents, as enhanced solubility in water is one of the principal reasons that these plaintiffs allege MTBE is defective.[19] *Compare* EPA, Office of Superfund Remediation and Technology Innovation, *Technologies for Treating MTBE and Other Fuel Oxygenates* at p. 2-6 to 2-7 (May 2004) (discussing affinity for water of all oxygenates) (excerpts at Ex. T); EPA, *Oxygenates in Water: Critical Information and Research Needs* at 9 (Dec. 1998) ("Oxygenates generally are more soluble in water and less sorbed to soils than the other major organic compounds in gasoline, namely benzene, toluene, ethylbenzene, and xylenes (BTEX).") (excerpts at Ex. U, full text available at http://www.epa.gov/ncea/pdfs/oxy_h2o.pdf). Indeed, as noted above, plaintiffs in at least five cases (four of which are now before this Court)

---

[19] *See, e.g., Hicksville Water Dist. v. Amerada Hess Corp., et al.*, Compl. at ¶¶ 111, 123, 207 (excerpts at Ex. V); *Franklin Sq. Water Dist. v. Amerada Hess Corp., et al.*, Compl. at ¶¶ 108, 116, 199 (excerpts at Ex. W); *County of Nassau v. Amerada Hess Corp., et al.*, Compl. at ¶¶ 79, 90, 175 (excerpts at Ex. X); *Long Island Water Corp. v. Amerada Hess Corp., et al.*, Compl. at ¶¶ 109, 121, 205 (excerpts at Ex. Y).

have made exactly this allegation. *See supra*, p. 7. Moreover, some studies have concluded that other oxygenates are more toxic, *i.e.*, they become lethal in certain test-species at lower concentrations, than MTBE and TBA.[20]

Nor is ethanol – the oxygenate that plaintiffs allege should have been used – immune from attacks by plaintiffs' lawyers. According to the EPA Blue Ribbon Panel, leaks or spills of gasoline containing ethanol produce larger BTEX (benzene, toluene, ethylbenzene, and xylene) plumes. *See* Blue Ribbon Panel at 17-18 (noting that "ethanol may inhibit the biodegradation of BTEX because the microbes preferentially metabolize ethanol before BTEX, ... enhance[] the solubilization and migration of BTEX" and "extend BTEX plumes by 25 percent to 40 percent").[21] Indeed, in response to a notice of proposed rulemaking from EPA regarding MTBE, plaintiff State of New Hampshire submitted comments noting that "ethanol ... is not without negative consequences, *i.e.* somewhat larger BTEX plumes and co-solvency of BTEX compounds with ethanol." Letter from Robert W. Varney, Commissioner, State of New Hampshire Dep't of Envtl. Services, to EPA, at 2-3 (Jun. 27, 2000) (Ex. Z). By contrast,

---

[20] For example, increasing ethanol use may cause increases of peroxy acyl nitrates (PAN) and acetaldehyde – PAN is mutagenic to cells, "a known toxin to plant life and a respiratory irritant to humans"; acetaldehyde is a respiratory irritant and classified as a "probable human carcinogen." *See* Blue Ribbon Panel at 79 (Ex. L).

[21] *See also* Blue Ribbon Panel at 79 ("Laboratory data and hypothetical modeling indicate that based on physical, chemical, and biological properties, ethanol will likely preferentially biodegrade in ground water compared with other gasoline components with the potential to extend BTEX plumes further than they would be without ethanol present.") (Ex. K); *id.* ("ethanol has been shown to retard BTEX biodegradation"); *Report to the California Environmental Policy Council in Response to Executive Order D-5-99*, Vol. 1, p. 1-12 (Dec. 1999) ("The presence of ethanol in groundwater may alter the processes of sorption and retardation and could contribute to increased benzene plume lengths.") (excerpts at Ex. AA); *Fate and Transport of Ethanol in the Environment, Hearing Before the Blue Ribbon Panel on Oxygenates in Gasoline* (May 24, 1999) (presentation by Michael C. Kavanaugh and Andrew Stocking, Malcolm Pirnie) (reporting that studies had found both ethanol and methanol to inhibit degradation of BTEX) (excerpts at Ex. BB, available in full at http://www.epa.gov/oar/caaac/mtbeethan.pdf).

"MTBE had no measurable effect on the degradation of BTEX in an aquifer." *Interagency Assessment* at p. 2-62 (Ex. M).

If the use of ethanol causes benzene to spread farther than it would have if an alternative oxygenate (say, MTBE) had been used in gasoline, what is to prevent a plaintiff from bringing suit, claiming that her injury was caused by a defective product (*i.e.*, ethanol) and that but for the use of ethanol the benzene plume would have been smaller and she would not have been exposed?[22] Surely such a result would be inconsistent with federal law.

Plaintiffs may assert that their claims are not preempted because they argue that ethanol was a "safer" or "better" oxygenate. But this response (aside from the fact that there has never been enough ethanol available) is meritless. Even if it were possible, in any single case, to ensure that defendants would not be impeded in their ability to comply with federal law (by, for example, requiring in a particular case proof of an available, environmentally preferable oxygenate), that would not prevent plaintiffs in different or later cases from suing on the basis of those alternative oxygenates. Such suits clearly would threaten the entire federal oxygenated fuels program. Even if judgments could be coordinated state by state, this would contradict explicit congressional intent that the federal oxygenate program *not* fragment the gasoline supply. More generally, avoidance of cumulative and possibly inconsistent tort verdicts is itself a basis for preemption. *See infra* at p. 31.

As discussed in more detail above (*supra* p. 22), the legislative history is absolutely clear that Congress intended that the federal oxygenate program not result in further fragmentation of the national gasoline supply. As Senator Simpson said, "[N]ew [RFG and Oxyfuel

---

[22] Benzene has been recognized as a "human carcinogen," associated with one form of leukemia (AML). National Institutes of Health, *Report on Carcinogens*, Benzene, p. 1 (11th ed) (excerpts at Ex. CC).

requirements] already create several new kinds of gasoline. . . . Further balkanizing of the gasoline industry – with different oxygenate concentrations in different east coast cities, for example – potentially risks further disruptions and precision from refiners that may not be possible." 136 Cong. Rec. S17232, S17254.

Moreover, the possibility of cumulative judgments that steadily eliminate each of the options available to refiners to comply with the federal oxygenate mandates and, in particular, the possibility of conflicting judgments, independently supports the need for preemption. In *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 611 (7th Cir. 2000), for example, the Seventh Circuit held that tort claims asserted by a feeder airline against two other carriers were preempted by the Airline Deregulation Act. The court said: "Basic rules for inter-carrier transactions may come from voluntary agreements or from the Department of Transportation; applying the conflicting tort principles of 50 different states to these interstate and international transactions would make a mess of things."

Similarly, the Fourth Circuit has held (albeit in an unpublished disposition) that even tort suits which might partially limit a manufacturer's options under federal law are preempted under the *Geier* decision, even if the suit does not seek to establish an affirmative mandate that would be contrary to the federal scheme: "While [this] suit seeks only to exclude one type of passive restraint system, the two-point passive system, similar state tort actions could likewise seek to exclude another specific type of passive system, then another, then another. While no one claim would result in a complete frustration of the goal of permitting a mix of passive systems, the net effect of state tort law could be to exclude most or all of the passive systems that were available to manufacturers in 1989. This would frustrate the goals of FMVSS 208 just as completely as Geier's suit to impose a uniform airbag requirement." *Moser v. Ford Motor Co.*, 28 Fed. Appx.

168, 171 (4th Cir. 2001); *see also Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1279 (6th Cir. 1991) (Surheinrich, J., concurring) ("[T]he plan [would] also be subject to the laws of the individuals states concerning the types of damages recoverable in tort, including consequential and punitive damages. The danger of inconsistent state laws, with its attendant effect of increasing the administration costs of a plan, is the key concern behind ERISA preemption.").

Indeed, this rule – that tort claims which would in combination threaten the federal scheme are preempted – flows both from the general proposition that state law cannot impede the full effectiveness of federal law and from the Court's statement in *Geier* that a court should not attempt to "calculate the precise size of the 'obstacle'" before finding preemption. *Geier*, 529 U.S. at 882.

This Court previously found that Congress did not adopt a "means-related" program when it passed the CAAA. That finding is addressed more fully above. But this Court also stated that "unlike the rule sought to be imposed in *Geier* – establishing a duty to install airbags – plaintiffs do not seek to require the use of a specific oxygenate." *MTBE I*, 175 F. Supp.2d at 615. The foregoing demonstrates that conflict preemption cannot be so limited. Indeed, the plaintiffs are in something of a dilemma: either they are seeking an ethanol mandate, in which case they offend the congressional purpose to maintain multiple oxygenates and are in conflict with *Geier*; or they believe that each of the 50 states has the right to eliminate as an option any or all of the federal government's approved oxygenates, in which case their claims give rise to multiple and inconsistent judgments because, under plaintiffs' theories, refiners will be potentially liable no matter what oxygenate they use. In the latter case, the plaintiffs will have

been allowed to use state law to punish compliance with a federal program – precisely what is prevented by the doctrine of federal preemption.

## CONCLUSION

For all of the reasons set forth above, defendants respectfully request that this Court enter judgment as a matter of law in favor of defendants on all claims based on defendants' use of MTBE in gasoline.

July 29, 2005

Nathan P. Eimer (NE 2996)
Pamela R. Hanebutt (PH 4515)
Lisa S. Meyer (LM 2003)
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Phone: (312) 660-7600
Fax: (312) 692-1718

*Counsel for CITGO Petroleum Corporation,
CITGO Refining and Chemicals Company L.P.,
and PDV Midwest Refining, L.L.C.*

[PAGE INTENTIONALLY LEFT BLANK]


Feb 21 2006
5:44PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
:
In re: Methyl Tertiary Butyl Ether ("MTBE") : MDL No. 1358 (SAS)
Products Liability Litigation : Docket No. M21-88
:
: Master File C.A. No. 1:00-1898 (SAS)
:
: DEFENDANTS'[1] REPLY IN
: SUPPORT OF THEIR MOTION
: FOR SUMMARY JUDGMENT
: REGARDING FEDERAL
: PREEMPTION
:
: ORAL ARGUMENT REQUESTED
:
:
-----------------------------------------------------------X
This Document Relates To: All Cases

---

[1] This Memorandum of Law and accompanying Appendix of Exhibits are respectfully submitted on behalf of the defendants identified in Attachment A, hereto.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES.........................................................................................ii

I. There is No Genuine Issue of Material Fact As to Whether Sufficient Ethanol Capacity Existed to Meet the CAAA Oxygenate Requirements ........... 1

   A. Plaintiffs Concede that Domestic Capacity Was Insufficient .......................2

   B. Plaintiffs' Foreign Capacity Arguments Are Speculative and Not Supported By Facts........................................................................................ 2

   C. Plaintiffs' Assertion that the Proper Question is Whether the Ethanol Industry Could Have Expanded is Erroneous as a Matter Of Law................................................................................................................ 3

   D. Plaintiffs' Claims that the Ethanol Industry Could Have Met the Demands of the Oxygenated Fuels Program Fail to Raise a Genuine Issue of Material Fact................................................................... 5

      i. Plaintiffs' "could have" argument ignores the RFG Program's volatility standards, which were not achievable using only ethanol................................................................ 5

      ii. Plaintiffs' contention that defendants were in a position to guarantee ethanol demand as of November 1990 is unfounded................................................................ 5

      iii. Plaintiffs' contention about the "proper economic question" is supported by no economic analysis and is fundamentally flawed................................................................ 6

      iv. Recent expansion in ethanol capacity is irrelevant............................... 8

II. Plaintiffs' Claims Are Conflict Preempted Because Congress and EPA Intended that Refiners Have The Ability To Choose MTBE..................... 9

III. Eliminating MTBE Would Be an Obstacle To Congress' Goals ....................... 12

IV. Plaintiffs' Theory Results in Damages for Complying With Federal Law ....................................................................................................... 14

Conclusion ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Argus, Inc. v. Eastman Kodak, Co.*, 801 F.2d 38 (2d Cir. 1986)...................... 1

*Bates v. Dow AgroSciences LLC*, 125 S. Ct. 1788 (2005) .......................... 10

*Beech ex rel. Beech v. Outboard Marine Corp.*, 584 So.2d 447 (Ala. 1991)................ 4

*Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988)........................ 12

*Bolm v. Triumph Corp.*, 71 A.D.2d 429, 437, 422 N.Y.S.2d 969 (4th Dep't 1979) ............ 4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................................. 1

*Clean Air Markets Group v. Pataki*, 338 F.3d 82 (2d Cir. 2003).................... 12

*Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53 (S.D.N.Y. 2001) ............ 4

*Daley v. McNeil Consumer Prod. Co.*, 164 F. Supp. 2d 367 (S.D.N.Y. 2001)................ 1

*Elyria-Lorain Broad. Co. v. Lorain Journal Co.*, 298 F.2d 356 (6th Cir. 1961) ............ 4

*English v. General Elec. Co.*, 496 U.S. 72 (1990)................................ 10

*Exxon Corp. v. City of New York*, 548 F.2d 1088 (2d Cir. 1977)...................... 11

*Exxon Mobil Corp. v. EPA*, 217 F.3d 1246 (9th Cir. 2000) ........................ 11

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982)................ 5, 9

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)................ 12

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314 (S.D.N.Y. 1982)........ 3

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992)...................... 12

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) ..................... passim

*In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001)................ 9

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996) .......................... 3, 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................ 1

*OFA v. Davis*, 331 F.3d 665 (9th Cir. 2003) ..................................................................11

*Roberts v. Sears, Roebuck & Co.*, 531 F. Supp. 784 (N.D. Ill. 1982) ...........................4

*Santoro* ex rel. *Santoro v. Majestic Fireplace Corp.*, 2004 WL 2569493
   (S.D.N.Y. Nov. 12, 2004)..............................................................................................4

*United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605 (7th Cir. 2000) ..................15

*United States v. Price*, 361 U.S. 304 (1960)..................................................................15

*United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968) ..................................14

*Winkler v. Metropolitan Life Ins. Co.*, 2005 WL 911862 (S.D.N.Y. Apr. 18, 2005).....1

**Rules**

Fed. R. Civ. P. 56..............................................................................................................1

**Regulations**

58 Fed. Reg. 46551 (Sept. 2, 1993)................................................................................14

**Other Authorities**

136 Cong. Rec. S17232 ..................................................................................................13

*ADM Scraps Ethanol Expansion Plans, Cites Concern Over Fuels' Future Market*,
   Alcohol Week's New Fuels Report, Mar. 30, 1992 ....................................................6

EIA, *Renewable Motor Fuel Production Capacity Under H.R. 4* ..................................3

EPA, 1995-1997 RFG surveys ......................................................................................13

Letter from Gov. Gray Davis to EPA (Apr. 12, 1999) (available at
   http://www.arb.ca.gov/fuels/gasoline/Oxy/wav/041299.pdf) ..................................11

*The Ethanol Challenge: An Interview with T. Jack Huggins*,
   Intra-Business Issues, April 1993 ................................................................................6

Plaintiffs concede that not enough ethanol existed to meet federal oxygenate requirements. Plaintiffs' retort that defendants could have created an ethanol industry is, in their expert's own words, completely "mythical." (Deposition of Ed Whitelaw ("Whitelaw Dep.," excerpts at Ex. A) 266.) Resisting summary judgment requires material *fact*, not "myth."

## ARGUMENT

### I. There is No Genuine Issue of Material Fact As to Whether Sufficient Ethanol Capacity Existed to Meet the CAAA Oxygenate Requirements

"[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion." *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986). Defendants have met their initial burden by demonstrating the impossibility of meeting the RFG regulations without MTBE. Plaintiffs' response – that defendants should have (or could have) created a "mythical" ethanol market that never existed – is precisely the sort of "conjecture or speculation" that does not satisfy Rule 56(e)'s obligation to present admissible evidence raising a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Winkler v. Metropolitan Life Ins. Co.*, 2005 WL 911862, *5 (S.D.N.Y. Apr. 18, 2005) (non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and it 'may not rely on conclusory allegations or unsubstantiated speculation'").[2]

---

[2] It is worth noting that *plaintiffs* have the burden to prove a feasible alternative design – *i.e.*, ethanol – to maintain their design defect claims, and that they therefore have the ultimate burden of proof on this issue, a burden they cannot sustain, for all of the reasons set forth in this brief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Daley v. McNeil Consumer Prod. Co.*, 164 F. Supp. 2d 367, 374 (S.D.N.Y. 2001) ("it is well established that a plaintiff must plead and prove that there was a feasible design alternative").

1

A.  Plaintiffs Concede that Domestic Capacity Was Insufficient.

Plaintiffs have conceded that U.S. ethanol capacity could not have met RFG and OxyFuel oxygenate demand from 1995 to 2003. *See* Nov. 4, 2005 teleconference with J. Scheindlin, Tr. at 26-27 (excerpt at Ex. B) (Mr. Gordon admitting that there was not enough actual installed capacity in the U.S.); Pl. Opp. at 7 ("accept[ing] . . . Mr. Urbanchuk's declaration as true for the purposes of defendants' motion"). Indeed, plaintiffs' own expert Ed Whitelaw admitted that Mr. Urbanchuk used the best available ethanol capacity data. (Whitelaw Dep. 92)[3]

B.  Plaintiffs' Foreign Capacity Arguments Are Speculative and Not Supported By Facts

Conceding insufficient *U.S.* ethanol capacity, plaintiffs assert that *foreign* suppliers could have made up the ethanol shortfall. Plaintiffs' argument and their "expert" affidavits are textbook examples of the "metaphysical doubt" that will not defeat summary judgment.

Plaintiffs' blithe assumption that foreign ethanol would have been available had defendants simply "demanded it" (*see* Whitelaw Aff. ¶¶ 4, 18-20; Pl. Opp. at 8-10) is naïve and, frankly, absurd. Plaintiffs, without foundation, simply assume that there was excess global capacity to which defendants had unfettered access. Whitelaw admits he had no reliable data on non-U.S. ethanol capacity. (Whitelaw Dep. 81) He ignores, however, the critical fact that Brazil, plaintiffs' proposed solution to ethanol capacity shortfall, was actually a net ethanol *importer* until 1999. (*Id.* ¶¶ 10-18). In addition, as Whitelaw conceded at his deposition, Brazilian ethanol is predominantly "hydrous" ethanol that contains too much water to be added to gasoline. (Whitelaw Dep. 83) Plaintiffs also fail to account for the ethanol import tariff

---

[3] Plaintiffs nonetheless criticize Mr. Urbanchuk's U.S. capacity analysis and the data he relies on (*see* Pl. Opp. at 6 n.5). But plaintiffs fail to offer more accurate data on U.S. ethanol capacity. What is more, their unfounded criticisms are not material because they do not affect Mr. Urbanchuk's ultimate conclusions. *See* Supplemental Declaration of John Urbanchuk ¶¶ 30-37, Ex. C; Motion to Strike at 15.

2

imposed at the urging of U.S. producers, which has made substantial imports cost-prohibitive. *See, e.g.*, EIA, *Renewable Motor Fuel Production Capacity Under H.R. 4*, at 4 (Sept. 2002) (excerpt at Ex. D) ("One reason for the low level of imports is the tariff of $0.54 per gallon that applies to most imported fuel ethanol to offset the gasoline excise tax exemption for ethanol blended gasoline").[4] In short, plaintiffs' claims about the availability of foreign ethanol to fill the gap in domestic capacity are nothing more than rank speculation, contradicted by the facts and common sense. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

### C. Plaintiffs' Assertion that the Proper Question is Whether the Ethanol Industry Could Have Expanded is Erroneous as a Matter of Law.

Because plaintiffs cannot (and do not) dispute the lack of sufficient domestic capacity, they seek to redefine the standard for determining "impossibility" by speculating about "what could have been" if only the oil industry had acted monolithically and irrationally in favor of ethanol. But "impossibility" is not assessed by looking backward in time and speculating about what "mythical" scenario might have existed under a different set of facts. Courts consistently reject using hindsight in other contexts because it is too speculative. For example, a fundamental rule of evidence is that "[v]ague, self-serving speculative testimony concerning what a party would have done under different circumstances is generally not admissible." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1373 (S.D.N.Y. 1982).

Similarly, in product liability cases, the feasibility of an alternative design is always determined as of the time of manufacture or sale, not the time of injury or the lawsuit. "[P]laintiffs must show that a safer, feasible design alternative existed at the time of manufacture." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 83 (S.D.N.Y.

---

[4] Moreover, even *tripling* ethanol imports – a completely unrealistic assumption – still would leave a significant ethanol shortfall until 2002. (Urbanchuk Supp. ¶ 9)

2001); *see also id.* at 84 ("alternative designs must be 'economically and technically feasible' when manufactured"); *Santoro ex rel. Santoro v. Majestic Fireplace Corp.*, 2004 WL 2569493, *4 (S.D.N.Y. Nov. 12, 2004) (plaintiff "must demonstrate... there was a safer, feasible alternative design at the time of manufacture"); *Bolm v. Triumph Corp.*, 71 A.D.2d 429, 437, 422 N.Y.S.2d 969, 975 (4th Dep't 1979) (rejecting evidence of testing methodology that had not yet been developed at the time of manufacture, despite contention that "such tests were technically or ultimately possible at that time"). Thus, the feasible alternative test precludes speculation about what "could have been" designed. *See, e.g., Beech ex rel. Beech v. Outboard Marine Corp.*, 584 So.2d 447, 448, 450 (Ala. 1991) ("We decline to hold, as a matter of law, that simply because 'a feasible propeller guard *could have been* designed by a proper use of the manufacturer's resources' that an 'alternative design' existed"). Product liability law does not allow plaintiffs to rewrite history by asserting that defendants could have created a safety device that was not, in fact, available at the time.[5]

The same logic applies here. It is undisputed that when refiners manufactured RFG, there was not enough ethanol to supply the entire program, and plaintiffs cannot create a genuine issue of material fact through mere speculation and conjecture about what "could have been."

---

[5] Plaintiffs also may not rewrite history to establish antitrust standing. For example, in *Roberts v. Sears, Roebuck & Co.*, 531 F. Supp. 784 (N.D. Ill. 1982), an inventor alleged that the defendant had fraudulently induced him to assign the rights to his patent, and thereby prevented him from selling his product directly or licensing it to others. The court found the plaintiff's statement that he "would have considered selling wrenches had he retained the patent" was too speculative. "Current conjecture as to what he might have thought about doing at an early time is simply too speculative to be characterized as admissible." *Id.* at 788 n.5. *See also Elyria-Lorain Broad. Co. v. Lorain Journal Co.*, 298 F.2d 356, 360 (6th Cir. 1961) ("a witness may not testify to what he would have done had the situation been different from what it actually was. Such an answer is too speculative to be admissible.").

4

D.  Plaintiffs' Claims that the Ethanol Industry Could Have Met the Demands of the Oxygenated Fuels Program Fail to Raise a Genuine Issue of Material Fact.

   i. Plaintiffs' "could have" argument ignores the RFG Program's volatility standards, which were not achievable using only ethanol.

Fundamental to plaintiffs' argument is the assumption that there were no regulatory bars to the refining industry using only ethanol in RFG. Because of ethanol's negative effect on gasoline volatility (*see* Declaration of Robert Stavins ¶ 5, Ex. E), EPA's volatility standard directly affected whether and to what extent ethanol could be used to meet the RFG program. In fact, it was EPA's own assessment that because of ethanol's effect on volatility, the Phase I RFG standards for VOC emissions – which governed RFG made from 1995 to 1999 – were not achievable using only ethanol. (Stavins Dec. ¶¶ 19-22) "EPA ... set Phase I VOC standards that required the maximum achievable reduction in gasoline volatility, based on assessments that assumed refiners would use MTBE, and not ethanol, to meet those standards." (Stavins Dec. ¶ 7)

In addition to disproving plaintiffs' "could have" argument, the inability to meet EPA's volatility standards using only ethanol is an independent basis for conflict preemption. The impossibility of complying with federal regulations is as much a basis for preemption as the impossibility of complying with a federal statute. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes").

   ii. Plaintiffs' contention that defendants were in a position to guarantee ethanol demand as of November 1990 is unfounded.

Plaintiffs' position is also premised on the bare assertion that refiners could have demanded ethanol immediately upon enactment of the CAAA in 1990 so that there was a four-year lead time for building new ethanol capacity. However, plaintiffs ignore that the proposed RFG regulations were being continually reassessed and revised until EPA published the final

5

rule in February 1994, only months before the RFG compliance deadline. (Stavins Dec. ¶¶ 9-10) As long as the regulations were still in flux, neither refiners nor ethanol producers knew to what extent ethanol could be used to meet them. (Stavins Dec. ¶¶ 23-27). In particular, the volatility standards for RFG were among the last that EPA resolved. (*Id.*; Whitelaw Dep. 290-95) (acknowledging that ethanol producers were concerned about ethanol's ability to meet EPA's proposed volatility standard). Given this regulatory environment, refiners could not have committed to using ethanol years before the regulations were implemented.[6]

      iii. Plaintiffs' contention about the "proper economic question" is supported by no economic analysis and is fundamentally flawed.

Plaintiffs contend through Whitelaw's affidavit that "the relevant economic question . . . is whether ethanol suppliers would have increased capacity to produce sufficient quantities of ethanol to meet the RFG mandates if refiners had chosen to use ethanol instead of MTBE." (Whitelaw Aff. ¶ 4; *see also* Pl. Opp. at 8) As detailed in defendants' Motion to Strike, the Court should not consider this affidavit. But even if it does, what becomes clear is the highly speculative nature of trying to revise history. Whether or not it was possible to comply with federal law using only ethanol must be judged against what was, not what could have been, based on plaintiffs' simplified, unrealistic view of the world.

---

[6] Ethanol manufacturers themselves were reluctant to expand due to regulatory uncertainty as to whether ethanol would meet EPA's RFG standards. In 1992, ADM, the nation's largest ethanol producer, cancelled plans to add 170 million gallons of capacity due to concerns that EPA's regulations would preclude ethanol from being used in RFG. *See ADM Scraps Ethanol Expansion Plans, Cites Concern Over Fuels' Future Market*, Alcohol Week's New Fuels Report, Mar. 30, 1992, at 1, 8 (Ex. F). According to the Illinois Corn Growers Association, "Nobody will make that kind of an investment if someone can pull the floor out from under them." *Id.* at 9. And according to the CEO of Pekin Energy, then the second largest ethanol producer, "the [EPA's proposed] simple model has the potential to almost knock out the ethanol industry." *The Ethanol Challenge: An Interview with T. Jack Huggins*, Intra-Business Issues, April 1993, at 34, 39 (Ex. G); *see also id.* at 42 (explaining that construction in ethanol industry was on hold until ethanol's position in RFG was resolved).

During Whitelaw's deposition, it became clear that he conducted no economic or other analysis to support his conclusion. (Whitelaw Dep. 176-77, 233-34 ("Q: Have you identified all the conditions that would be assumed to exist in the but-for world? A: No.")). In fact, Whitelaw admitted that his opinion was based only on his personal belief that the ethanol industry could have increased capacity in the early 1990s because it increased capacity between 2001 and 2005 in response to the MTBE bans in California and New York. (Whitelaw Aff. ¶ 15; Whitelaw Dep. 211-12, 320-23, 328-29, 334-35) As explained in Section I.D.iv., *infra*, this apples-to-oranges comparison provides no basis for denying summary judgment.

As Professor Jerry Hausman sets forth in his declaration, Whitelaw's question assumes his answer by failing to properly account for restraints on ethanol supply and demand. (Hausman Dec. ¶ 3, Ex. H) Had Whitelaw properly analyzed what he claims is "the relevant economic question," he would have had to consider a series of economic issues that he admittedly ignored. (Hausman Dec. ¶ 5) For example, Whitelaw did not consider uncertainties affecting returns on ethanol plant investment that indisputably existed during the 1990s. Under the well-accepted economic theory of "sunk and irreversible investment," such uncertainties would have prevented ethanol producers from ramping up ethanol capacity. (Hausman Dec. ¶¶ 10-18) In addition, competition in the indisputably sensitive gasoline refining and retail markets would have prevented refiners from switching from MTBE to ethanol. (Hausman Dec. ¶¶ 19-31) Plaintiffs concede that defendants used MTBE in gasoline because it was the "most inexpensive oxygenate" (*see, e.g., Suffolk County*, Fourth Am. Cmplt. ¶ 151, excerpt at Ex. I). Given the cost disadvantage of using ethanol, economically rational firms would not have switched from MTBE