# EXHIBIT F – Part 4

Dockets.Justia.com

MTBE to ethanol because consumers would buy less expensive MTBE gasoline from competitors, eventually putting ethanol-using firms out of business. (Hausman Dec. ¶ 7)[7]

    iv. Recent expansion in ethanol capacity is irrelevant.

Plaintiffs assume that ethanol producers could have expanded ethanol production in time for the beginning of the RFG Program in 1995, based on ethanol capacity expansion between 2001 and 2005 in reaction to MTBE bans in California, Connecticut and New York. (Whitelaw Aff. ¶ 15; Whitelaw Dep. 211-12, 320-23, 328-29, 334-35) This *non sequitur* fails.

*First*, structural and technological changes within the ethanol industry invalidate any comparison between the two periods. In the early 1990s, the ethanol industry was dominated by a few diversified corn processors that manufactured ethanol ancillary to other corn-based products and utilized an expensive and capital intensive "wet mill" process designed to accommodate feedstock from other business lines. (Urbanchuk Supp. ¶¶ 26-29) In recent years, new "dry mill" technology developed, substantially reducing capital and operating costs (*id.*; Whitelaw Dep. 148-49) and allowing farm cooperatives to compete with large corn processors. (Urbanchuk Supp. ¶ 26)

*Second*, an increase in ethanol production following a legislative ban on its only real competitor (MTBE) is fundamentally different from defendants making independent decisions about which oxygenate to use when both were available. In 1994, when EPA promulgated the final RFG rules, ethanol producers had to compete against other oxygenate manufacturers in the marketplace and thus could not be assured of a reliable, consistent demand for their product. In 2001, legislative mandates – *i.e.*, state MTBE bans – created a level of certainty for ethanol

---

[7] As Whitelaw has failed to consider these (or any) economic factors, his assertions should be stricken, and plaintiffs are left with no admissible evidence to support their speculative position. *See* Motion to Strike at 5-7.

8

producers that did not exist in the competitive early 1990s oxygenate market. (Urbanchuk Supp. ¶¶ 23-25; Hausman Dec. ¶ 9; Whitelaw Dep. 295-96 (conceding significance of MTBE bans to ethanol producers)). This key market difference means that growth in the 2001-2005 time period cannot be used to hypothesize potential growth in the early 1990s.

Plaintiffs are conspicuously silent on all these issues. Whitelaw admitted that market conditions between 2001 and 2005 differed significantly from the early 1990s. (Whitelaw Dep. 287, 321-22) Yet he made no efforts to identify, let alone consider, the effects of those differences.[8] (*Id.* 287) Plaintiffs' bald assertion that ethanol capacity could have expanded more than a decade ago as quickly as it did following the California and New York MTBE bans is rank speculation, insufficient to defeat summary judgment. *See Kulak, supra.*

## II. Plaintiffs' Claims Are Conflict Preempted Because Congress and EPA Intended That Refiners Have The Ability To Choose MTBE

Plaintiffs' claims are preempted under *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), and *de la Cuesta*, 458 U.S. 141, because they seek to impose a retroactive state law duty on refiners to use only ethanol. The Court's distinction of *Geier* in *MTBE I* was predicated upon plaintiffs' assertion *then* that "plaintiffs do not seek to require the use of a specific oxygenate." *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 615 (S.D.N.Y. 2001). It is now unquestionable that plaintiffs do indeed seek, retroactively, to require the use of a specific oxygenate: ethanol.

---

[8] Whitelaw conceded he did not consider the differences between dry mill and wet mill technology (Whitelaw Dep. 36); the shares of wet mill and dry mill capacity (*id.* 48-49); the flexibility to switch between ethanol and other corn products (*id.* 74-76); the dominant firm's market share (*id.* 47-48, 264-65); or the availability of MTBE as a competitive oxygenate (*id.* 258-60, 312-13, 321). Whitelaw also admitted he does not know how long it takes to build an ethanol plant. (*Id.* 281-82)

9

Plaintiffs respond by suggesting that conflict preemption is no different from express preemption, and that preemption requires evidence that "Congress intended to put its thumb on the MTBE side of the scale by immunizing MTBE from liability in the marketplace for contamination of groundwater." Pl. Opp. at 14.[9] This represents a fundamental misapplication of conflict preemption principles: "conflict pre-emption is different in that it turns on the identification of 'actual conflict,' and not on an express statement of pre-emptive intent." *Geier*, 529 U.S. at 884; *see English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990).[10]

Here the conflict is obvious: Congress wanted more than one oxygenate available to refiners to maximize the size of the RFG program, and it wanted one of them to be MTBE. (Defs. Mem. at 11-18) The administrative record also demonstrates that EPA viewed MTBE as an essential element of the RFG program. (Stavins Dec. ¶¶ 11-22) Indeed, the Phase I volatility standards simply could not have been met using only ethanol. (*Id.* ¶¶ 19-22) And although plaintiffs pay lip service to the position that they would not mandate a single oxygenate (Pl. Opp. at 18), plaintiffs elsewhere admit that their complaints challenge all other ethers and assert that only "ethanol is a safer alternative to MTBE." Pl. Opp. at 22 n.9; *id.* at 3 n.2, 23 n.10; Defs. Mem. at 7-8 & n.7.

Although plaintiffs assert that Congress wanted a "market" that includes "the liabilities created by an oxygenate that contaminates groundwater" (Pl. Opp. at 14), no legislative history or other support says so. More importantly, the Supreme Court's "pre-emption cases do not

---

[9] This is a consistent erroneous theme in Plaintiffs' Opposition. *See also, e.g.*, Pl. Opp. at 18 ("Defendants in this case, unlike defendants in *Clean Air Markets*, do not cite any statutory language establishing Congressional goals of: (1) mandatory MTBE use in gasoline, or (2) protection of MTBE from state tort laws.").

[10] For this reason, plaintiffs' extensive reliance (Pl. Opp. at 4, 15, 18) on *Bates v. Dow AgroSciences LLC*, 125 S. Ct. 1788 (2005), an express-preemption case, is inapposite (if not misleading). Plaintiffs' reliance on the "savings clause" in the citizen suit provision of the Clean Air Act (Pl. Opp. at 18) is misplaced for the same reason.

ordinarily turn on such compliance-related considerations as whether a private party in practice would ignore state legal obligations – paying, say, a fine instead . . . Rather, this Court's preemption cases ordinarily assume compliance with the state-law duty in question." *Geier*, 529 U.S. at 882. Here, the state-law duty in question is a duty not to use MTBE. That alleged duty inescapably conflicts with Congress' and EPA's intent to allow MTBE use.

Plaintiffs do not deny that Congress rejected a nationwide ethanol-only program by setting the required oxygen level at 2.7% instead of 3.1%. *See* Defs. Mem. at 15-17. And even if federal law preserved some "state flexibility" to set higher oxygen levels, levels that effectively required the use of ethanol, that state flexibility was entirely subject to federal supervision. In *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246 (9th Cir. 2000), the court allowed such a requirement as to *one county* in a state implementation plan (which had to be approved by EPA), *id.* at 1248, and it distinguished *Exxon Corp. v. City of New York*, 548 F.2d 1088 (2d Cir. 1977), in which preemption was found, on the ground that the local standards there "were neither authorized by provisions of the Clean Air Act nor approved by the EPA Administrator." 217 F.3d at 1256. Plaintiffs now seek to create a nationwide no-MTBE rule – unreviewed by EPA and expressly rejected by Congress.[11]

Plaintiffs' last gambit is to argue that a state rule is not preempted if it is on a different "subject matter." Pl. Opp. at 16. But surely states could not ban the use of *all* oxygenates in RFG areas simply because they claimed to be protecting groundwater. "The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both

---

[11] *OFA v. Davis*, 331 F.3d 665 (9th Cir. 2003), which plaintiffs say confirms *Exxon Mobil* (Pl. Opp. at 16-17), actually emphasizes the existence of a conflict. Because of inadequate ethanol supply, California sought a waiver of the federal oxygenate mandate, which EPA denied, and California was forced to delay its legislative ban. This clearly shows that the federal scheme and the state-law duty plaintiffs propose are in conflict. *See* Letter from Gov. Gray Davis to EPA (Apr. 12, 1999) (available at http://www.arb.ca.gov/fuels/gasoline/Oxy/wav/041299.pdf).

regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992) ("Whatever the purpose or purposes of the state law, pre-emption analysis cannot ignore the effect of the challenged state action on the pre-empted field.").[12] Regardless of how plaintiffs describe their tort claims here ("water contamination"), the effect of those claims is to eliminate the flexibility that Congress granted refiners in the area of fuel oxygenates.

### III. Eliminating MTBE Would Be an Obstacle To Congress' Goals

Plaintiffs do not dispute that Congress intended the use of multiple oxygenates, including both MTBE and ethanol, to serve Congress' own goals of maximizing the number of non-attainment areas that would use oxygenated gasoline and minimizing the price effects of the oxygenation requirement. Plaintiffs only say that there is no evidence to support this conclusion. But this asks the wrong legal question. Congress had a plan, *i.e.*, that multiple oxygenates would keep prices down and allow the RFG program to expand. Because plaintiffs work at cross-purposes to this plan, their claims are preempted. "[A] state may not use common law procedures to question federal decisions." *Bieneman v. City of Chicago*, 864 F.2d 463, 473 (7th Cir. 1988). And courts do not take evidence "to calculate the precise size of the obstacle." *Geier*, 529 U.S. at 882; *see* Defs. Mem. at 26-27.

---

[12] *Clean Air Markets Group v. Pataki*, 338 F.3d 82 (2d Cir. 2003), also cannot be distinguished as plaintiffs suggest (Pl. Opp. at 18). The state tax interfered with what EPA considered to be an "essential element" of the federal regulatory framework. 338 F.3d at 88. Compliance with the statutory command – transfers are permitted to "any other person" (*id.*) but are subject to state taxes – would be possible. But the Court found the state tax preempted because it interfered with the means and efficiency that the agency thought necessary to the scheme, precisely the same problem that exists with plaintiffs' claims here.

It is indisputable that eliminating the principal oxygenate (MTBE) would be inconsistent with Congress' desire to grow the program's scope. Plaintiffs' do not deny that Congress wanted the use of oxygenated gasoline to expand as oxygenate supplies became available (Defs. Mem. at 22-25). The program was cut back in drafting from 101 areas to nine (*id.*), but a specific provision (the opt-in provision) was added because Congress wanted to "extend the reformulated gas program to additional areas beyond the nine originally covered" as soon as "domestic supplies are adequate" and there would not be "*even slight* physical shortages and commensurate price hikes." 136 Cong. Rec. S17232, 17251 (Sen. Simpson). Plaintiffs assert *only* that it was "defendants, by refusing to use ethanol, [that] themselves created the conditions that prevented the RFG program from expanding." Pl. Opp. at 21. This is nonsense; refiners have used ethanol in RFG where it was economical and practical to do so. *See* EPA, 1995-1997 RFG surveys (showing 50-95% use of ethanol in Chicago/Lake County, Milwaukee, and Phoenix regions and 25-36% in Louisville) (excerpts at Ex. J). Eliminating one of the *two* oxygenates being used, as plaintiffs demand, would decrease the possibility of expansion, contrary to Congress' intent.[13]

Congress also provided a limited ambit for non-air environmental considerations. Defs. Mem. at 25. And although plaintiffs are in high dudgeon over the alleged "ruin of the nation's drinking water" (Pl. Opp. at 21), they do not, and cannot, deny that Congress sought to remedy

---

[13] Plaintiffs fail to rebut the contention that prices would be higher. Plaintiffs are careful in their brief not to use the word "price," but it is clear that their "if they build it, they will come" theory is that refiners merely needed to throw enough money at ethanol, by increasing the price they would pay for it, to get the necessary capacity. *Compare* Pl. Opp. at 6 (defendants ignore "supply elasticity" – which is the supply response to increased price); *id.* at 11 ("like U.S. ethanol producers, foreign producers in Brazil and elsewhere would have responded to signals of increased U.S. demand" – which can only be *price* signals); Whitelaw Aff. ¶ 4 n.1 ("the ethanol market, *responding to market signals*, would have responded to increases in demand by increasing productive capacity") (emphasis added). Congress intended gasoline oxygenation to be accomplished with a minimal increase to gasoline prices and without supply disruptions. Defs. Mem. at 21-22. Eliminating the largest oxygenate, as plaintiffs' theory implicitly concedes, would require increased gasoline prices and would decrease total supply.

13

state inaction on clean air by requiring oxygenated gasoline, by permitting refiner choice of oxygenates, and by generally elevating air quality issues over other non-air-quality (including water quality) considerations.

Perhaps Congress did not foresee the unprecedented expansion of tort law that plaintiffs propose; in any event, what Congress expressly intended – an expanding program, minimal price and supply effects, and a limited role for non-air concerns – points in the opposite direction of plaintiffs claims, which would impose state law duties that conflict with federal law.

## IV. Plaintiffs' Theory Results in Damages for Complying With Federal Law

Plaintiffs' oft-repeated claim that the prospective elimination of the oxygenate requirement allows them to seek damages that penalize past compliance with federal law has no merit. Pl. Opp. at 22-23. Because preemption analysis focuses on the duty underlying the tort claim, (*Geier*, 529 U.S. at 883),[14] plaintiffs cannot seek such damages.

Plaintiffs' claim that Congress' unwillingness to pass an explicit liability shield should be evidence against defendants in this case is unfounded. Not only is plaintiffs' suggested inference not supported by Congressional activity, the Supreme Court has made clear in a number of contexts that a statute should not be construed against a party that seeks (but fails to receive) a clarifying amendment from Congress. *See, e.g., United States v. Southwestern Cable Co.*, 392 U.S. 157, 170 (1968) (no negative inference can be drawn from party's "requests for legislation" that would eliminate "uncertainty" and provide "more detailed ... guidance" than current statutes); *United States v. Price*, 361 U.S. 304, 312 (1960) ("Whether Congress thought the

---

[14] Indeed, the Supreme Court found conflict preemption in *Geier* in 2001, four years after the mandatory airbag rule went into effect. *See* 58 Fed. Reg. 46551-02 (Sept. 2, 1993) (mandating installation of airbags by September 1, 1997). Thus, even though there was no need for "prospective" relief, conflict preemption existed where plaintiffs sought tort damages for past conduct in conflict with existing federal law.

14

proposal unwise, as respondent argues, or unnecessary, we cannot tell; accordingly, no inference can properly be drawn from the failure of the Congress to act.").

With remarkable irony, plaintiffs (who vigorously argued against removal) now contend that "defendants have already safeguarded themselves against inconsistent adjudications by removing and consolidating MTBE cases in this MDL 1358." Pl. Opp. at 23 n.10. While defendants believe the MDL to be the most efficient method for handling pretrial proceedings, MDL cases must be returned to their home districts for trial, creating the very real risk of inconsistent judgments. As the Seventh Circuit said in *United Airlines, Inc. v. Mesa Airlines, Inc.*, where it found preemption, "applying the conflicting tort principles of 50 different states to these interstate and international transactions would make a mess of things." 219 F.3d 605, 611 (7th Cir. 2000); *see* Defs. Mem. at 30-32.

## CONCLUSION

In sum, plaintiffs fail to avoid conflict preemption for several, independent reasons. Plaintiffs' criticisms of Mr. Urbanchuk's ethanol capacity analysis, and the derivative conclusion that compliance with both federal and state law is "impossible," are both unsupported by admissible evidence and legally misplaced. To find otherwise would require conjecture and speculation about what "might have been" in plaintiffs' "mythical" world, which the Supreme Court has said will not defeat summary judgment. The fact that EPA's RVP standards governing RFG made from 1995 to 1999 were not achievable using only ethanol provides a separate basis for finding "impossibility" conflict preemption. In addition, Congress' and EPA's clear intent that refiners have, for several reasons, the ability to choose MTBE would be abrogated if plaintiffs are allowed to pursue their claims, in contravention of the law set forth in *Geier, de la Cuesta*, and other Supreme Court precedents.

February 21, 2006

Respectfully Submitted,

*[signature]*

Nathan P. Eimer (NE 2996)
Pamela R. Hanebutt (PH 4515)
Lisa S. Meyer (LM 2003)
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Phone: (312) 660-7600
Fax: (312) 692-1718

*Counsel for CITGO Petroleum Corporation,
CITGO Refining and Chemicals Company L.P.,
and PDV Midwest Refining, L.L.C.*

# ATTACHMENT A

Amerada Hess Corporation
Ashland Inc.
Atlantic Richfield Company
BP Products North America Inc.
BP West Coast Products LLC
Buckley Energy Group, Ltd.
Buckley Gasoline Marketers, Inc.
Chevron Corporation
Chevron Environmental Services Company
Chevron U.S.A. Inc.
CITGO Petroleum Corporation
CITGO Refining and Chemicals Company L.P.
Colorado Refining Company
Crown Central Petroleum Corporation, n/k/a/ Crown Central LLC
Diamond Shamrock Refining and Marketing Company
Duke Energy Merchants, LLC
Equilon Enterprises LLC d/b/a Shell Oil Products US
Equistar Chemicals L.P.
Equiva Services LLC
Exxon Mobil Corporation
ExxonMobil Chemical Company
ExxonMobil Oil Corporation
ExxonMobil Pipeline Company
Fauser Oil Co., Inc.
Flint Hills Resources LP
Giant Yorktown, Inc.
Keck, Inc.
LaGloria Oil and Gas Company, n/k/a Tyler Holding Company, Inc.
Marathon Ashland Petroleum LLC
Marathon Oil Company
Mercury Fuel Service, Incorporated
Mobil Corporation
Motiva Enterprises LLC
Mulgrew Oil Co.
PDV Midwest Refining, L.L.C.
Santa Fuel, Incorporated
Santa Holding Company
Shell Oil Company
Shell Oil Products Company LLC
Shell Petroleum, Inc.
Shell Trading (US) Company
Star Enterprise
Sunoco, Inc.
Sunoco, Inc. (R&M)

Tesoro Petroleum Corporation k/n/a Tesoro Corporation
Tesoro Refining and Marketing Company
Tesoro Refining and Marketing Company, Inc.
Texaco Inc.
Texaco Refining and Marketing (East) Inc.
Texaco Refining and Marketing Inc.
Total Petrochemicals USA, Inc.
TPI Petroleum, Inc.
Ultramar Energy Inc.
Ultramar Inc.
Ultramar Ltd.
Union Oil Company of California
Unocal Corporation
Valero Energy Corporation
Valero Marketing and Supply Company
Valero Refining and Marketing Company
Valero Refining Company-California
Valero Refining Company-Louisiana
Valero Refining Company-New Jersey
Valero Refining-Texas, L.P.
Westport Petroleum, Inc.

## CERTIFICATE OF SERVICE

I, Greg J. Weintraub, an attorney, hereby certify that on this 21st day of February, 2006, a copy of the **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT REGARDING FEDERAL PREEMPTION, DECLARATION OF ROBERT N. STAVINS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PREEMPTION, REPLY DECLARATION OF JOHN M. URBANCHUK IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON CONFLICT PREEMPTION AND DECLARATION OF PROFESSOR JERRY A. HAUSMAN IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON FEDERAL PREEMPTION** were served upon all parties of record via LexisNexis File and Serve.

_____
Greg J. Weintraub