# EXHIBIT I

Dockets.Justia.com


Mar 6 2006
12:02PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
PRODUCTS LIABILITY LITIGATION

This document pertains to:

*City of New York v. Amerada Hess Corp., et al.,*
Case No. 04-CIV-3417

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS

Revised per Judge Scheindlin's March 1, 2006, Order

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ......................................................................... 2

    A. The City's Claims Relating to the Queens System ..................................... 2

    B. The City's Acquisition of JWSC's System ................................................ 3

    C. The City Knew The Queens System Was Impacted Prior to October 2000 ............. 4

    D. The City Took Wells Out of Service Due to MTBE and Weighed Taking Legal Action in 1998 ............................................................ 7

    E. The City Was Aware Prior to October 2000 of the Source of the MTBE Contamination ...................................................................... 9

    F. The City Tracked National MTBE Issues from 1997 Forward .............................. 11

ARGUMENT ........................................................................................................................ 13

    I. CPLR 214-c BARS PLAINTIFFS' TORT CLAIMS ........................................... 14

        A. The City Was Required to File Suit Within Three Years of Discovering Its Alleged Injuries ............................................................ 15

        B. The City Has Known of Its Alleged Injury for More Than a Decade ................ 16

        C. New York No Longer Recognizes The "Continuing Tort" Exception ............. 20

    II. PLAINTIFFS' GBL § 349 CLAIM IS UNTIMELY ............................................ 22

    III. PLAINTIFF'S NAVIGATION LAW CLAIMS ARE TIME-BARRED ................ 23

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................. 13

*In re Application of City of New York*,
    158 Misc. 2d 378, 600 N.Y.S.2d 914 (Sup. Ct. Queens Cty. 1993) .............................. 3

*Beller v. William Penn Life Insurance Co.*,
    8 A.D.3d 310, 778 N.Y.S.2d 82 (2d Dep't 2003) ................................................. 22, 23

*Bello v. New England Financial*,
    3 Misc. 3d 1109A, 787 N.Y.S.2d 676 (Sup. Ct. Nassau Cty. 2004) ..................... 22, 23

*Blue Cross & Blue Shield v. Philip Morris, Inc.*,
    178 F. Supp. 2d 198 (E.D.N.Y. 2001) ..................................................................... 22

*Boswell v. Leemilt's Petroleum, Inc.*,
    252 A.D.2d 889, 676 N.Y.S.2d 313 (3d Dep't 1998) ......................................... 15, 17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................. 13

*Chase Securities Corp. v. Donaldson*,
    325 U.S. 304 (1945) ............................................................................................. 14

*Chira v. Columbia University*,
    289 F. Supp. 2d 477 (S.D.N.Y. 2003) ..................................................................... 18

*City of Buffalo v. Watkins*,
    422 N.Y.S.2d 563 (Sup. Ct. Erie Cty. 1979) ........................................................... 14

*Connell v. Hayden*,
    83 A.D.2d 30, 443 N.Y.S.2d 383 (2d Dep't 1981) ................................................. 14

*Di Stefano v. Nabisco, Inc.*,
    282 A.D.2d 704, 724 N.Y.S.2d 444 (2d Dep't 2001) ............................................. 17

*Duffy v. Horton Memorial Hospital*,
    66 N.Y.2d 473, 497 N.Y.S.2d 890 (1985) .............................................................. 14

*Gaidon v. Guardian Life Insurance Co.*,
    96 N.Y.2d 201, 727 N.Y.S.2d 30 (2001) ........................................................... 22, 23

*Jensen v. General Electric Co.*,
    82 N.Y.2d 77, 603 N.Y.S.2d 420 (1993) ............................................................. 16, 20, 21

*Kozemko v. Griffith Oil Co.*,
    256 A.D.2d 1199, 682 N.Y.S.2d 503 (4th Dep't 1998) ............................................. 15, 24

*MRI Broadway Rental, Inc. v. United States Mineral Products Co.*,
    92 N.Y.2d 421, 681 N.Y.S.2d 783 (1998) ..................................................................... 16

*In re MTBE*,
    379 F. Supp. 2d 348 (S.D.N.Y. 2005) ............................................................................ 24

*In re N.Y. County DES Litigation (Wetherill v. Eli Lilly & Co.)*,
    89 N.Y.2d 506, 655 N.Y.S.2d 862 (1997) ................................................................. 16, 17

*Neri v. R.J. Reynolds Tobacco Co.*,
    185 F. Supp. 2d 176 (N.D.N.Y. 2001) ........................................................................... 17

*Oliver Chevrolet, Inc. v. Mobil Oil Corp.*,
    249 A.D.2d 793, 671 N.Y.S.2d 850 (3d Dep't 1998) ................................................. 16, 17

*Pfohl v. Amax, Inc.*,
    222 A.D.2d 1068, 635 N.Y.S.2d 880 (4th Dep't 1995) .................................................. 21

*Rose v. Grumman Aerospace Corp.*,
    196 A.D.2d 861, 602 N.Y.S.2d 34 (2d Dep't 1993) ....................................................... 22

*Snyder v. Town Insulation, Inc.*,
    81 N.Y.2d 429, 599 N.Y.S.2d 515 (1993) ..................................................................... 16

*Syms v. Olin Corp.*,
    408 F.3d 95 (2d Cir. 2005) ....................................................................................... 17, 22

*Tarazi v. Exxon Corp.*,
    269 A.D.2d 385, 703 N.Y.S.2d 205 (2d Dep't 2000) .................................................... 18

*Town of Guilderland v. Texaco Refining & Marketing Inc.*,
    159 A.D.2d 829, 552 N.Y.S.2d 704 (3d Dep't 1990) .................................................... 24

*Town of Windsor v. Tesa Tuck, Inc.*,
    919 F. Supp. 662 (S.D.N.Y. 1996) ................................................................................ 22

*Water Authority v. Lockheed Martin Corp.*,
    276 A.D.2d 624, 714 N.Y.S.2d 726 (2d Dep't 2000) ................................................ 21, 22

*Wender v. Gilberg Agency,*
 276 A.D.2d 311, 716 N.Y.S.2d 40 (1st Dep't 2000)..................................................23

*Whitney v. Quaker Chemical Corp.,*
 90 N.Y.2d 845, 660 N.Y.S.2d 862 (1997)..................................................16

*Williams v. Dow Chemical Co.,*
 2004 U.S. Dist. LEXIS 10940 (S.D.N.Y. 2004)..................................................16, 22

## STATUTES

CPLR 201..................................................14

CPLR 214..................................................2

CPLR 214-c ..................................................*Passim*

CPLR 214-c(2)..................................................15, 21

CPLR 214(2)..................................................15

CPLR214 (4)..................................................15

Fed. R. Civ. P. 56(c) ..................................................13

Fed. R. Civ. P. 56(e) ..................................................13

GBL § 349..................................................2, 14, 22, 23

Navigation Law § 181..................................................2

# PRELIMINARY STATEMENT

On October 31, 2003, the City brought this action seeking more than $300 million in damages that it allegedly suffered because the Queens groundwater system it acquired from the former Jamaica Water Supply Company ("JWSC") has been impacted with MTBE. The City bought JWSC's Queens distribution assets in 1996 for $152 million knowing that the aquifer had been contaminated with numerous chemicals, wastes and contaminants for decades. JWSC detected MTBE in the Queens system no later than June 1995. The City itself detected MTBE in the Queens system in June 1996, only a month after assuming ownership.

There is no genuine factual dispute that, since at least 1998 and certainly well before October 2000 – the relevant date under the Statute of Limitations – the City knew all the facts it needed to know to file this lawsuit. In summary, the City knew that: (1) MTBE was in the Queens aquifer from which its wells drew; (2) MTBE came chiefly, if not exclusively, from gasoline releases; (3) JWSC wells had been impacted by MTBE; and (4) the presence of MTBE in four wells caused the City to shut those wells down.

Under New York law, the City's knowledge was more than sufficient to trigger the three-year statute of limitations by no later than 1998. First, as a matter of New York law, a plaintiff need only have knowledge of the "primary condition" – in this case, the presence of MTBE in the Queens system and wells – to commence the limitations period. In other words, the City cannot save its claims by positing that its knowledge of the scope of its injury was in some way "incomplete." Second, as a matter of fact, the evidence here forecloses any such argument – the record amply demonstrates the City's full appreciation of the alleged impact of MTBE to its groundwater system. Thus, the City cannot meet its burden of demonstrating a *genuine* issue of *material* fact concerning its knowledge of the primary condition giving rise to its alleged injury.

Nor can the City revive its stale claims by asserting a "continuing tort." The New York Legislature eliminated that concept when it amended CPLR 214 to provide for a "discovery rule." The fact that MTBE may still be present in the Queens system is of no moment. The City discovered the alleged injury to its integrated groundwater system more than three years before this action was initiated. Therefore, the City's claims are time-barred.

Finally, the City's General Business Law § 349 and Navigation Law § 181 claims are also time-barred because the limitations period for those claims expired long before October 2003. Summary judgment is proper.

## STATEMENT OF UNDISPUTED FACTS

### A. The City's Claims Relating to the Queens System

The City initiated this suit on October 31, 2003 by filing a summons with notice in the Supreme Court for Queens County. (LR 56.1 ¶ 1.) In its complaint, the City seeks "to recover all costs and damages ... it has incurred, is incurring, and will incur from investigating, cleaning, detecting, monitoring, preventing, abating, containing, removing, and remediating, among other things, the harm that methyl tertiary butyl ether ('MTBE') and other Products ... has [sic] caused to the City's groundwater well system...." (LR 56.1 ¶ 1.) The complaint alleges that "[t]ests performed by the New York City Department of Environmental Protection ('DEP') reveal significant concentrations of MTBE in groundwater drawn from a number of the City's wells in the Affected Area" (defined by the City as the area in and around Jamaica, Queens), and that "other wells in the City's groundwater well system in the Affected Area are imminently at risk of drawing at any moment groundwater contaminated by MTBE and other products...." (LR 56.1 ¶ 2.) The City claims that "[MTBE] Products move freely throughout the groundwater in these aquifers and such water can be drawn up by the City's wells at any time...." (LR 56.1 ¶ 2.)

2

Even crediting these allegations, it is undisputed that the City knew the "Affected Area" was affected by MTBE at least a decade ago. MTBE was first detected in the Queens system by JWSC, the prior operator, no later than 1995, and has been detected by the City since 1996. In fact, the City itself effectively concedes its claims are untimely by alleging that it learned of the basis for its claims – "widespread MTBE contamination"– during a "feasibility study" performed on the former JWSC system. (2d Am. Compl. ¶¶ 119-20.) That study was completed and reported to high-level City officials in April 1999. (LR 56.1 ¶ 5.) Therefore, the City, by its own admission, knew of the "primary condition" giving rise to its claims at least 18 months before October 31, 2000, the relevant date for the Statute of Limitations for most Defendants.[1]

### B. The City's Acquisition of JWSC's System

A statute enacted by the New York Legislature in August 1986 required the City to acquire all JWSC assets located in Queens. (LR 56.1 ¶ 3.) In May 1996, the City Department of Environmental Protection ("DEP") finally acquired the heavily-contaminated JWSC system for $152 million[2] and began to operate it. (LR 56.1 ¶ 3.) DEP Commissioner Miele stated that JWSC had been "producing some of the poorest quality water and charging customers approximately 40% more than residents elsewhere in the City." (LR 56.1 ¶ 4.)[3]

The Queens groundwater well system is an "integrated unit." (LR 56.1 ¶ 8.) The City's own complaint emphasizes its unified nature; it describes the entirety of the groundwater aquifers and interconnected well system of Jamaica, Queens as "the Affected Area" (2d Am.

---

[1] Some Defendants were not joined until the City amended its Complaint on December 10, 2004, making the relevant date December 10, 2001 for those Defendants.

[2] Although the City seeks $300,000,000 in damages, it contended in a 1993 condemnation proceeding that the Queens groundwater system's value was $62,500,000. *In re Application of City of New York*, 158 Misc. 2d 378, 600 N.Y.S.2d 914, 918 (Sup. Ct. Queens Cty. 1993).

[3] A variety of volatile organic compounds and other contaminants were present throughout the Queens groundwater system when the City acquired it. (LR 56.1 ¶ 4.)

Compl. ¶ 2) and claims that "[MTBE] Products move freely throughout the groundwater in these aquifers and such water can be drawn up by the City's wells at any time." (LR 56.1 ¶ 8.)[4]

### C. The City Knew The Queens System Was Impacted Prior to October 2000.

The City suggests that it detected MTBE in the former JWSC system only recently, when it undertook a "feasibility study" to determine how best to use that system and "uncovered widespread MTBE contamination ... in over one-quarter of its approximately 70 drinking water wells." However, that "feasibility study" was completed, and the results were reported to high-level City officials, in April 1999. (LR 56.1 ¶ 5.)[5]

Former JWSC and current DEP employees John Dydland and William Yulinsky participated in the study and provided comments on the draft report. (LR 56.1 ¶ 6.) The final report noted that "MTBE, the gasoline additive, has recently become a contaminant of concern due to its widespread occurrence in the Upper Glacial Aquifer...." (LR 56.1 ¶ 6.) The report confirmed that MTBE had been detected in at least five JWSC wells in 1995-96, and that City well No. 10 was "currently operable...but restricted due to MTBE contamination." (LR 56.1 ¶ 6) On April 30, 1999 – four and a half years before the City filed suit – Mr. Yulinsky forwarded the "feasibility study" to numerous City officials, including the acting Commissioner of DEP. (LR 56.1 ¶ 6.)

The City's "Statute of Limitations Chart" further confirms the City's longstanding knowledge of the presence of MTBE in the Queens system and wells. In fact, that chart establishes that the City's knowledge of MTBE impacts to its Queens wells long predates the

---

[4] Defendants do not concede that contamination in any part of the Queens aquifer, which this Plaintiff does not own, is actionable, or that contamination in one part of that aquifer harms or poses a risk to every well or the rest of the aquifer. None of the plaintiffs in these New York focus cases has any ownership right in the respective aquifers from which they appropriate water. *See* Defendants' Motion for Summary Judgment on Justiciability at 4 n.3.

[5] Currently, the City only operates five wells it acquired from JWSC. (LR 56.1 ¶ 4.)

4

1999 completion of the feasibility study. Specifically, the City admits to knowing that MTBE was in 21 wells more than three years prior to filing suit, in some cases dating back to June 1996. (LR 56.1 ¶ 9.) But even that chart does not tell the full story. The fact that MTBE was present in the system was known to JWSC and its employees, many of whom became City employees in May 1996, even earlier. (LR 56.1 ¶ 7.) That information was shared with the City either before, or soon after, it acquired the JWSC system.

In 1995, Edward Kunsch, JWSC laboratory director (and currently a City employee), requested an outside laboratory to test JWSC groundwater samples for MTBE after he read two trade publications – an article on MTBE in the April 10, 1995 newsletter of the American Water Works Association ("AWWA"), and a March 24, 1995 memorandum on MTBE from the National Association of Water Companies. (LR 56.1 ¶ 10.) These materials led Mr. Kunsch to believe that MTBE might be a threat to JWSC's wells, and caused him to investigate whether MTBE was in the water being pumped from JWSC wells. (LR 56.1 ¶ 10.)

On June 5, 1995, JWSC received the test results and learned that MTBE was present in ten JWSC wells at levels ranging from 0.6-130 ppb. (LR 56.1 ¶ 11.) Mr. Kunsch thereafter requested permission to include MTBE results on all "volatile organic reports." (LR 56.1 ¶ 11.) On June 30, 1995, Mr. Kunsch drafted a letter to the City's Director of Public Health Engineering, explaining what JWSC had done and why:

> Prompted by a report in the April 10, 1995 issue of Waterweek and the March 24, 1995 NAWC Memorandum of growing concern for the gasoline additive MTBE (Methyl Tertiary Butyl Ether), I asked H2M Labs Inc. to research volatile organic scans for MTBE for samples from Jamaica Water Supply Company has [sic] submitted since January 1, 1995.
>
> Although scans revealed that all finished water results fell within the unspecified organic contaminant level of 50 ug/l, I have asked H2M Labs, Inc. to include MTBE results and the accompanying qualifier of 50 ug/l Limit on all future reports.

(LR 56.1 ¶ 11.) These JWSC documents were provided by Mr. Kunsch to Virginia Murray of DEP after the City acquired JWSC, "somewhere from '97 through '98." They were contained in DEP files, and were produced by the City in this lawsuit. (LR 56.1 ¶ 11.) Information regarding the 1995 JWSC MTBE detections, and other MTBE detections in Queens, was also included in the 1999 "feasibility study" prepared for the City by its consultant, Malcolm Pirnie, and sent to high-ranking City officials. (LR 56.1 ¶ 11.)

The City continued to test for and detect MTBE after taking over JWSC's system in May 1996. (LR 56.1 ¶ 12.) Arthur Ashendorff, DEP's Director of Drinking Water Quality, recalled that in 1996, after it was detected in laboratory samples, the City added MTBE to its "routine [VOC] analytical schedule." (LR 56.1 ¶ 12.) Mr. Ashendorff learned that MTBE could readily dissolve in water, and he "could very well have been" aware of MTBE's effect on the taste and odor of drinking water by 1997. (LR 56.1 ¶ 12.)

On April 7, 1997, the City DEP distributed a "briefing document" detailing its experience with MTBE. (LR 56.1 ¶ 13.) That document indicated that MTBE "first came to our attention in July 1996," and reported that "MTBE disperses rapidly in water and is less biodegradable than common gasoline hydrocarbons.... MTBE is highly mobile in soils and therefore will find its way into ground water." Further, "DEP analyses show that MTBE has been identified in both our ground water and surface water samples." (LR 56.1 ¶ 13.) By 1997, 67 percent of the wells in Queens had been impacted by MTBE. (LR 56.1 ¶ 13.)

Detections of MTBE in the Queens system were known at the highest levels of the City's Bureau of Water Supply. On May 14, 1997, Mr. Ashendorff sent a memorandum to Michael Principe, Deputy Director of the Bureau of Water Supply, which laid out the multiple detections

of MTBE in the City's drinking water in 1997. (LR 56.1 ¶ 14.) Mr. Ashendorff conceded that by 1997, "MTBE was being looked at as a drinking water quality issue." (LR 56.1 ¶ 14.)

The City's 1997 Water Quality Report, an annual statement required under the Safe Drinking Water Act, indicated that 117 Queens groundwater samples were analyzed for MTBE in 1997 and that MTBE was detected in the system at levels up to 14.9 ppb – six years before the City filed suit. A graph and charts prepared by the City reveal MTBE detections throughout the City's water distribution system in 1996-97. (LR 56.1 ¶ 15.) The 1998 Water Quality Report tells a similar story. The City sampled the Queens system 102 times, and found MTBE at levels up to 62 ppb – five years before the City decided to file suit. The report identifies MTBE as an "additive to gasoline." Likewise, the 1999 Water Quality Report indicated that 189 groundwater samples from Queens had been analyzed for MTBE, and that a maximum detection of 10.1 ppb was discovered – four years before the City decided to file suit. (LR 56.1 ¶ 16.)

### D. The City Took Wells Out of Service Due to MTBE and Weighed Taking Legal Action in 1998

John Dydland, the City's chief of groundwater operations, acknowledged that MTBE was detected in the Queens well system during 1998. (LR 56.1 ¶ 17.) Indeed, the City voluntarily took Wells 10 and 10A out of service due to MTBE in 1998:

> On April 21, 1998, Well 10 was voluntarily removed from service as a result of MTBE contamination. In addition, the deeper well at the same location, Well 10A was removed from service on May 21, 1998, as a precaution against drawing the MTBE into that well. Through the efforts of the New York State Department of Environmental Conservation, the source of the MTBE contamination (a gas station) was located, and remediation was successfully concluded.... Since remediation began, MTBE levels have steadily declined....

(LR 56.1 ¶ 17.) Representatives of the City, the state Department of Health, and the state Department of Environmental Conservation met to discuss MTBE detections at Well Station 10 on May 19, 1998. (LR 56.1 ¶ 18.) By that date, the City unquestionably was aware that "MTBE

7

is a fast moving contaminant," and that "[a]ir stripping or G[ranular] A[ctivated] C[arbon] treatment is not very effective at removing MTBE." (*Id.*)

Wells 10 and 10A were removed from service due to MTBE in 1998. (LR 56.1 ¶ 19.) Well 10 was "pumped to waste" (*i.e.*, the water was routed to a sewer system) "to eliminate the underground plume, if it existed, and get it out of the aquifer." (LR 56.1 ¶ 19.) The City formed a task force to investigate the source of MTBE contamination in Well 10, and Messrs. Kunsch and Yulinsky worked with NYSDEC to identify the source of the MTBE. (LR 56.1 ¶ 19.) Monitoring wells were installed near the suspected source, a gasoline station at 223rd Street and Linden Boulevard. (LR 56.1 ¶ 19.) By June 17, 1998, the City had "identified the MTBE contamination as coming from [a] gas station...." (LR 56.1 ¶ 19.)[6]

That same day, a City employee asked Messrs. Kunsch, Principe, Ashendorff, Dydland and Lu, "Should Legal be involved and work with DEC to recover our costs?" (LR 56.1 ¶ 20.) Mr. Ashendorff testified that "clearly, when we began to find [MTBE] popping up in significant numbers in Well 10, we realized that this was an issue that had to be dealt with." (LR 56.1 ¶ 20.) Mr. Dydland was asked to calculate the damages the City had incurred by having to pump Well No. 10 to waste. (LR 56.1 ¶ 20.) But no legal action was taken.

On April 7, 1998, Mr. Kunsch wrote a memorandum indicating that the City Department of Health had detected MTBE in surveillance samples in the former JWSC service area. (LR 56.1 ¶ 21.) The City informed the Department that it had "also detected MTBE in routine sampling...." (*Id.*) The City received MTBE testing results from Distribution Site 778 in December 1998 and, as a result, had "no choice but to remove the entire Plant [38] from service." (LR 56.1 ¶ 21.) Mr. Kunsch instructed Mr. Dydland to "contact the NYSDEC for any assistance they can provide in locating the source." (*Id.*) Other documents emphasize the City's

---

[6] The station was excavated in 1998, and Well 10 returned to service in 2001. (LR 56.1 ¶ 19.)

concern over MTBE detections in Well No. 10 and that the City conducted regular meetings with state personnel regarding those detections that the City conducted throughout 1998. (LR 56.1 ¶ 21.) One such e-mail, copied to senior DEP directors Principe and Ashendorff, reported that MTBE "[r]esults are not good!" (LR 56.1 ¶ 21.)

### E. The City Was Aware Prior to October 2000 of the Source of the MTBE Contamination.

As is set forth in more detail below, the foregoing facts demonstrate that the City knew or should have known of the primary condition on which its claims are based – MTBE impacts to its interconnected Queens well system – during the 1990s, and that this triggered the limitations period. But the City also knew far more, which, although not necessary to trigger the statute of limitations, demonstrates that the City appreciated not just the existence of the contamination, but virtually everything about their potential claims. For example, a 1999 City Drinking Water Quality "Planning Document" recognized that MTBE detections in the Queens system were the result of leaking gasoline storage tanks and spills:

> MTBE IMPACT:
> In 1999, attention remained focused on MTBE since four well, in two well fields, were removed from service in 1998: one for MTBE levels above standard, two because levels were observed to be quickly rising, and one as a precaution against drawing MTBE to the well.... Since MTBE is discharged into groundwater from leaking underground storage tanks or from spills, and this has the potential to be drawn into operating wells, frequent monitoring remains a priority.

(LR 56.1 ¶ 22.)

By February 2000, the issue of MTBE in the Queens system made its way up to the City Council level: "There will be a City Council hearing on Feb. 15.... [W]e're likely to ... address the use of MTBE as an oxygenate fuel additive, its impact on drinking water/ground water and possible substitutes. Dust off your thinking caps." (LR 56.1 ¶ 23.)

In March 2000 – more than three years prior to filing this suit – DEP prepared a comprehensive document entitled "MTBE – An Overview" in preparation for the City Council hearing. (LR 56.1 ¶ 24.) That document acknowledged that "while MTBE has served to reduce air pollution, it has also been sited [sic] as a water pollutant. MTBE has found its way into ground water supplies via leaking below and above ground gasoline storage tanks." The document further stated that "[b]ecause of its solubility in water, MTBE travels through the aquifer faster than the other, less soluble, components of gasoline and is always the first component of gasoline to be detected." (*Id.*) DEP reported that "[i]n April 1998, attention became focused on MTBE when elevated levels (62.4 ug/l) were detected during routine DEP distribution system sampling," and that "[i]n November, 1998, rising MTBE levels (19.9 ug/l) were detected during routine DEP distribution system sampling...." (*Id.*)

Mr. Ashendorff testified that the "overview" was prepared because "we had just gone through a couple of episodes where we closed wells, and we recognized the possibility of it happening again, and it was a question of, what's this going to mean to the DEP and the [C]ity." Thus, the document "basically let our superiors and other people in the office know about the entire situation. Most of them, obviously, were in on what was being said and being done previously, but here was a chance to put together in one package so they don't have to take bits and pieces. It's all right here." (LR 56.1 ¶ 25.)

The City Council hearing culminated in a March 20, 2000 resolution urging the New York Senate to adopt a statewide ban on the use of MTBE in gasoline. That resolution stated:

> **Whereas,** Controversy has surrounded the use of MTBE, particularly as a result of the contamination of drinking water supplies by leaks from gasoline storage tanks and pipelines...; and
>
> **Whereas,** Unlike other components of gasoline, which evaporate and do not mix with water, MTBE readily dissolves in water, quickly spreading underground and

> resisting the effect of filters that remove other pollutants as well as soil bacteria that readily digest other ingredients of gasoline; and ...
>
> **Whereas** In New York City, there are 101 [reported MTBE spills], including one that has contaminated two wells in Queens that are part of the New York City water supply ...
>
> **Resolved**, The Council of the City of New York calls upon the New York State Senate to... ban the sale of gasoline containing ...MTBE....

(LR 56.1 ¶ 25.) The City did not produce this resolution in discovery.

Other March 2000 City e-mails, sent to Messrs. Principe and Ashendorff, discussed the levels of MTBE in the Queens system and the "rising levels of MTBE in Well 53." (LR 56.1 ¶ 26.) All told, the City has taken five wells – 10, 10A, 38, 38A, and 53 – offline at various times due to MTBE detections. MTBE had been initially detected in all five wells in 1995-97. (LR 56.1 ¶ 26.)

### F. The City Tracked National MTBE Issues from 1997 Forward

But the City's knowledge did not stop there. In addition to its own extensive experience with MTBE, the City tracked national MTBE issues. JWSC and the City both belonged to AWWA and other water associations. (LR 56.1 ¶ 27.) A wide array of City employees regularly received AWWA publications that specifically discussed MTBE issues, including frequency of detection, taste and odor, and impacts on drinking water sources. (LR 56.1 ¶ 27.) The City also was aware of a 1998 lawsuit filed by South Tahoe Public Utility District, asserting the same product liability theories and allegations that the City makes here. (LR 56.1 ¶ 29.)

The City participated in the AWWA Research Foundation's "National Assessment of MTBE Occurrence in Drinking Water." (LR 56.1 ¶ 28.) Documents produced by the City regarding this study described detections of MTBE and MTBE by-products, including tertiary-

butyl alcohol (TBA), in drinking water systems in the United States. A March 1998 request for proposals issued by AWWA for work on the project, contained in the City's files, noted:

> The widespread occurrence of MTBE in drinking water could be a greater concern because of low-level, taste-and-odor thresholds rather than its associated health effects.... Very low levels of MTBE could cause severe taste-and-odor problems for utilities, requiring treatment to almost nondetectable levels....

(LR 56.1 ¶ 28.) DEP's David Lipsky served on the Project Advisory Committee for that work in 1998. (LR 56.1 ¶ 28.) In January 2000, an announcement regarding the project, and other MTBE research conducted by AWWA, was widely distributed among the leadership of the City's Drinking Water Quality organization. (LR 56.1 ¶ 28.)

Other documents in the City's files demonstrate the attention paid to MTBE issues. A consultant sent the City a January 10, 2000 *New York Times* article that reports on the *Berisha* MTBE product liability class action that was previously before this Court. The article noted that "[t]he suit, which names companies that sell or distribute gasoline in New York state..., accuses the industry of misrepresenting the potential dangers of the additive and seeks to force industry to pay for annual well inspections or clean contaminated wells and to pay damages for losses in property values." (LR 56.1 ¶ 29.)

The City closely followed MTBE developments at EPA. On March 28, 2000, numerous City employees received an AWWA e-mail regarding EPA's Advance Notice of Proposed Rulemaking to "eliminate or limit the use of the use of MTBE as a fuel additive in gasoline." The notice recited all the characteristics of MTBE that the City claims render it "defective": "MTBE dissolves and spreads readily in the groundwater underlying a spill site, resists biodegradation, and is difficult and costly to remediate. Low levels of MTBE can render drinking water supplies unpotable due to its offensive taste and odor." (LR 56.1 ¶ 30.)

12