# EXHIBIT J

Dockets.Justia.com

Jul 8 2009 7:07PM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation<br><br>**This document pertains to:**<br><br>*City of New York v. Amerada Hess Corp., et al.*, No. 04 Civ. 3417 | Master File No. 1:00-1898<br>MDL 1358 (SAS)<br>M21-88 |

**DEFENDANT EXXON MOBIL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF CITY OF NEW YORK'S CLAIMS RELATED TO STATION 6 BASED ON THE STATUTE OF LIMITATIONS**

# TABLE OF CONTENTS

|  | Page |
|---|---|
| TABLE OF CONTENTS | i |
| TABLE OF AUTHORITIES | ii |
| PRELIMINARY STATEMENT | 1 |
| SUMMARY OF ARGUMENT | 1 |
| FACTS | 3 |
| LAW | 6 |
| ARGUMENT | 7 |
|     THE CITY'S DOCUMENTS AND CONDUCT PROVE THAT IT HAD ACTUAL KNOWLEDGE OF ITS STATION 6 "INJURY" LONG BEFORE THE BAR DATE | 7 |
| CONCLUSION | 12 |

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Chira v. Columbia Univ.*, 289 F. Supp. 2d 477 (S.D.N.Y. 2003)..................................................6

*In re MTBE Prods. Liab. Litig.*, 2007 U.S. Dist. LEXIS 40484
    (S.D.N.Y. June 4, 2007)..................................................................................1, 6, 7, 10

## STATE CASES

*In re N.Y. County DES Litig.*, 89 N.Y.2d 506 (1997) ..................................................................6

*Whitney v. Quaker Chem. Corp.*, 90 N.Y.2d 845 (1997)..............................................................6

## STATE STATUTES

N.Y. C.P.L.R. 214(4)......................................................................................................................6

N.Y. C.P.L.R. 214-c(2)...................................................................................................................6

## PRELIMINARY STATEMENT

The Court has written before on the statute of limitations in this case. However, whereas Defendants' earlier motion focused on the City's knowledge about MTBE's characteristics and presence in Queens groundwater generally, this motion is different. This motion focuses solely on the City's actual knowledge – acquired years ago, and long before the bar date – of the very "injury" that the City now contends it has incurred (or will incur) here: namely, the need to construct Station 6 differently because of future MTBE.

## SUMMARY OF ARGUMENT

In a little over three weeks, we will begin trial on Station 6. The City will say that it intends to construct Station 6. The City will say that if it uses this facility in the future, the wells will contain MTBE. The City will say that, in anticipation of that future MTBE, it must design and construct its Station 6 facility **differently**. It is that difference – which the City attributes to future MTBE detections – that is the City's alleged "injury" here.

The City's trial expert, Malcolm Pirnie, has submitted a report that tells us what this putative "injury" will look like. Not surprisingly, the report describes a Station 6 remedial system that includes components specifically designed to treat MTBE: specialized air strippers capable of achieving a minimum air-to-water ratio (100:1) to vaporize MTBE out of the water, followed by a Granular Activated Carbon ("GAC") system to remove that MTBE from the vapor before it is discharged to the atmosphere. *Expert Report of Donald Cohen and Marnie Bell (Malcolm Pirnie)* (Feb. 10, 2009) (LR 56.1 ¶¶ 2-5).

But the City has had actual knowledge of the alleged need to construct this very system – its "injury" in this case – for almost a decade. In fact, the City had actual knowledge of this precise "injury" a full 13 months **before** the statute of limitations bar date here. *In re MTBE,*

2007 U.S. Dist. LEXIS 40484 at *37 (S.D.N.Y. June 4, 2007) (bar date is October 31, 2000). In September 1999, Malcolm Pirnie told the City that it should plan for MTBE at Station 6 ("the need to treat for MTBE should be anticipated"), and that the presence of MTBE would require a different type of treatment system ("[t]he presence of highly soluble VOCs such as MTBE will greatly impact the design"). More importantly, Malcolm Pirnie told the City to construct the very same treatment components – *i.e.*, specialized air strippers capable of achieving a minimum air-to-water ratio (100:1), followed by a GAC system – that the City now claims as its "injury" here. *Technical Memorandum: Brooklyn-Queens Aquifer Project – Station 6 Modifications*, pp. 7, 10, 14 (Sept. 24, 1999) (LR 56.1 ¶¶ 8-11).

Eight months later, after MTBE had appeared in two of the Station 6 wells (6D and 33), Malcolm Pirnie confirmed that it had already "planned for treatment of VOCs and MTBE at Station 6." *Brooklyn Queens Aquifer Study, Station 6 Restoration Project, Impact of Two Contamination Sites Issue Paper*, p. 2 (May 2000) (LR 56.1 ¶ 14). That plan is the conceptual design for Station 6 that we still see today. And, yes, it includes the specialized air strippers and GAC system that Malcolm Pirnie first recommended almost 10 years ago.

The dispositive point is that by September 1999, the City of New York had actual knowledge that it must anticipate treating MTBE at Station 6; had actual knowledge that treating MTBE would impact its design for Station 6; had actual knowledge that MTBE already was in at least two of its Station 6 wells; and, in fact, had definitively started planning and designing Station 6 to treat future MTBE. In short: long before the bar date in this case, the City had actual knowledge of the very "injury" at Station 6 for which it now, almost a decade later, seeks to recover at trial.

## FACTS

Three City documents set forth the key facts on this Motion.

### February 2009: Malcolm Pirnie Proposes Air Stripping + GAC For Station 6.

Earlier this year (2009), the City's trial expert (Malcolm Pirnie) identified the treatment system that, the City contends, will be needed at Station 6 because of MTBE. That system consists of three principal components: (1) two smaller 12' diameter air strippers to remove PCE and other more "scrubbable" contaminants; (2) two larger 12' diameter air strippers specially designed to vaporize MTBE out of the water; and (3) a Granular Activated Carbon ("GAC") system to remove MTBE from the vapor before it is released to the atmosphere. (LR 56.1 ¶¶ 4-5). Malcolm Pirnie explained that the second pair of air strippers must be specially constructed to generate the higher air-to-water ratio required to remove MTBE from groundwater:

> MTBE has a low Henry's Law constant . . . which is indicative of MTBE's properties that once it is dissolved in water, it is difficult to volatize back into the gaseous phase. **Therefore, air stripping requires a larger air-to-water ratio (often greater than 100:1) for MTBE applications in comparison to other VOCs, such as tetrachloroethylene (PCE), which typically only requires an air-to-water ratio of 40:1 in packed bed applications.**

(LR 56.1 ¶ 4).

Translation: if the water being treated will contain MTBE (which the City alleges here), more air must come into contact with the water to remove that MTBE. This additional air-to-water contact is achieved by making the MTBE strippers longer/higher. In the treatment system proposed by Malcolm Pirnie the first, shorter air strippers achieve an approximate 40:1 air-to-water ratio (to remove PCE and other more "scrubbable" VOCs) while the second, longer set achieve an air-to-water ratio of between 110:1 to 220:1, sufficient to remove MTBE. The MTBE and other VOCs which are volatized out of the water (*i.e.*, converted to gas form) by the air

- 3 -

strippers are then filtered through a Granular Activated Carbon ("GAC") system to remove them from the gas before it is discharged to the atmosphere.

Because these latter two components – longer air strippers and GAC – are alleged to comprise the City's MTBE-specific "injury" at Station 6, for purposes of the statute of limitations the question is: *When did the City actually know that these two components would be required to treat future MTBE at Station 6?*

The answer is: on September 24, 1999.

### September 1999: Malcolm Pirnie Proposes Air Stripping + GAC For Station 6.

In September 1999, Malcolm Pirnie – then just the City's consultant – prepared a Technical Memorandum to the City that detailed a series of recommended modifications to the proposed Station 6 demonstration plant. (LR 56.1 ¶ 6). Although MTBE had not yet been detected in the Station 6 wells, Malcolm Pirnie warned that "[t]he presence of methyl-tertbutyl-ether (MTBE) is a widespread concern" and that "[t]hese other contaminants may be present in the raw water when the [Station 6] wells are pumped over the long term." (LR 56.1 ¶¶ 7-8). Indeed, speaking to the City's future pumping of Station 6, Malcolm Pirnie recommended that "[c]onsidering that numerous potential sources of MTBE exist within 1 mile of Station 6, **the need to treat for MTBE should be anticipated**, particularly in conjunction with the high concentrations of PCE reported nearby." (LR 56.1 ¶ 8 (emphasis added)).

But Malcolm Pirnie not only "anticipated" the need to treat MTBE, it recommended a system uniquely intended to perform that treatment:

> *Packed Air Stripping Towers:*
> **Four 12-foot diameter** packed air column strippers will be used to treat the groundwater for VOC removal. . . . [T]he first stage (two towers) is expected to have an air-water ratio of 40:1 to remove the more 'strippable' VOCs, while a second phase of air strippers (two additional towers) will

> have a much higher air-water ratio (150:1) to remove the much less strippable VOCs, **such as MTBE,** that are not removed by the first stage.
>
> *Vapor-Phase Carbon Adsorbers:*
>
> Dual-bed activated carbon systems could provide 99 percent removal of VOCs in the off-gas stream from the air strippers. . . . .

(LR 56.1 ¶ 11). In fact, Malcolm Pirnie made clear to the City why MTBE required the treatment system to be unique: "[t]he presence of highly soluble VOCs such as MTBE will **greatly impact the design** of the air strippers, as they require much higher air to water ratios for removal (150:1 vs. 40:1)." (LR 56.1 ¶ 10).

If this proposed system (and explanation) sounds familiar, that is because it is the same system – literally, **the same design, components, methodology and explanation** – that Malcolm Pirnie would set forth almost a decade later in its February 2009 expert report for this trial. The exact same MTBE treatment system that, the City now contends, constitutes its Station 6 "injury" here.[1]

### May 2000: Malcolm Pirnie Confirms it is Designing Station 6 to Treat MTBE, and that the City May Recover Its Costs From "the Responsible Parties."

As if Malcolm Pirnie's September 1999 Technical Memorandum was not clear enough about the City's actual knowledge with respect to MTBE treatment at Station 6, eight months later (May 2000) Malcolm Pirnie generated an Issues Paper entitled "Brooklyn Queens Aquifer Study Station 6 Restoration Project, Impact of Two Contamination Sites." (LR 56.1 ¶ 12). This document reiterates that "[t]he need to treat the groundwater for VOCs (including MTBE) **was anticipated in the [Station 6] conceptual design.**" (LR 56.1 ¶ 14 (emphasis added)) ("We have

---

[1] To be clear, the City's February 2009 expert report also considers the possibility of treating MTBE with just a GAC system. But that fact does not change the dispositive point: the City was told, in September 1999, that the presence of MTBE would require significant modifications to any treatment system that might be installed at Station 6.

planned for treatment of VOCs and MTBE at Station 6."). It goes on to discuss the need to treat MTBE (which had been detected in Wells 6D and 33 the prior month) and, in a section titled "Opportunities," states that the City could seek to recover its Station 6 modification costs from "the Responsible Parties":

> In return for assisting the NYSDEC with their cleanup activities, the DEP could receive financial assistance directly from the NYCDEC, from the State Spill Fund, **or from the Responsible Parties**.

(LR 56.1 ¶ 15 (emphasis added)).

## LAW

We know that that Court is familiar with the applicable statute of limitations and case law. Accordingly, we will be brief.

An action for injury to property must be commenced within three years. CPLR 214(4). In a toxic tort case, this three-year period commences when a plaintiff "actually or constructively discovers its injury[.]" *In re MTBE*, 2007 U.S. Dist. LEXIS 40484 at *23, *25 (S.D.N.Y. June 4, 2007); *see also Whitney v. Quaker Chem. Corp.*, 90 N.Y.2d 845, 847 (1997) ("[a]ll that is necessary to start the limitations period is that plaintiff be aware of the primary condition for which damages are sought."); *In re N.Y. County DES Litig.*, 89 N.Y.2d 506 (1997) (same); CPLR 214-c(2). Plaintiff need not know the full extent of its injury for the limitations period to accrue. *Chira v. Columbia Univ.*, 289 F. Supp. 2d 477, 484 (S.D.N.Y. 2003). Plaintiff also need not know the actual cause of its injury – *e.g.*, the identities of defendants – for the limitations period to accrue. *In re MTBE*, 2007 U.S. Dist. LEXIS 40484 at *30.

For statute of limitations purposes in MTBE cases like this one, it is not enough to show that a plaintiff was aware of the mere presence of MTBE in water. Rather, it must be established that plaintiff had actual (or constructive) knowledge of the harm or injury that MTBE allegedly

caused. *Id.* at *25. As a matter of law, such knowledge is proven where an MTBE concentration exceeded the applicable Maximum Contaminant Level ("MCL") – for example, the Court's prior ruling dismissing claims for Well 10 here. *Id.* at *31, *44. But regardless of concentration, actual knowledge also may be established by a plaintiff's conduct upon learning of MTBE in its water. *Id.* at *33. For example, the Court's prior dismissal of the City's claims for Wells 38 and 38A because it took them offline upon learning of MTBE, even though the concentration detected was below the then-applicable MCL. *Id.* at *45-46.

Of course, the City's actual knowledge of its alleged "injury" at Station 6 cannot be established by showing that it removed the wells from service – because the wells were never "in service" by the City. But, as discussed below, the City's actual knowledge of its putative Station 6 "injury" is manifest from its own documents and conduct before the bar date here.

## ARGUMENT

### THE CITY'S DOCUMENTS AND CONDUCT PROVE THAT IT HAD ACTUAL KNOWLEDGE OF ITS STATION 6 "INJURY" LONG BEFORE THE BAR DATE.

The City's documents prove that it had actual knowledge of the precise "injury" for which it seeks damages at this trial – *i.e.*, it knew the "primary condition" for its Station 6 claims – long before the October 30, 2000 bar date.

The City today claims that MTBE will continue to exist in the shallow aquifer beneath Queens for years to come, and may impact the Station 6 wells when (and if) they are used as a potable water source in the future. But the City was told in September 1999 that "[t]he presence of methyl-tertbutyl-ether (MTBE) is a widespread concern" and a contaminant that "may be present in the raw water when the [Station 6] wells are pumped over the long term." (LR 56.1 ¶¶ 7-8).

The City today claims that it must anticipate and plan for future MTBE detections at Station 6. But the City was told in September 1999 that "[c]onsidering that numerous potential sources of MTBE exist within 1 mile of Station 6, **the need to treat for MTBE should be anticipated[.]**" (LR 56.1 ¶8 (emphasis added)). Indeed, eight months later – after MTBE had been detected in the Station 6 wells, and again well before the operative bar date – the City confirmed that "[w]e have planned for treatment of VOCs **and MTBE** at Station 6." (LR 56.1 ¶ 14 (emphasis added)).

The City today claims that it will be "injured" because future MTBE will increase its costs to design, construct and operate a treatment system at Station 6, particularly because it must build special air strippers capable of achieving at least a 100:1 air-to-water ratio.[2] But the City was told in September 1999 that "[t]he presence of highly soluble VOCs such as MTBE will **greatly impact the design** of the air strippers, as they require much higher air to water ratios for removal (150:1 vs. 40:1)." (LR 56.1 ¶¶ 10 (emphasis added)).

The City claims today that it must construct a special system consisting of four air strippers (two specially designed for MTBE), plus a vapor-phase carbon adsorber system (GAC), to treat future MTBE. (LR 56.1 ¶5). But this is literally the **very same system** that the City's trial expert (then functioning just as a consultant) told the City to build in September 1999, almost a decade ago. (LR 56.1 ¶¶ 9-11).

The City claims today that it must be permitted to pursue its claims for "injury" against ExxonMobil and other defendants, but the City contemplated seeking "financial assistance" for

---

[2] Indeed, the City's Complaint specifically alleges that MTBE's "chemical properties make it extremely difficult to treat and/or remove" (4th Am. Compl. ¶ 2), and that "removing MTBE from groundwater is far more difficult and expensive than removing gasoline or other contaminants associated with gasoline." (4th Am. Compl. ¶ 72).

Station 6 from "the Responsible Parties" in May 2000, months before the operative bar date. (LR 56.1 ¶ 15).

These facts – taken from the City's own documents – prove that the City had **actual knowledge** of its alleged "injury" at Station 6 almost a decade ago and long before the bar date here. The City first detected MTBE in certain of its Station 6 wells by May 2000. (LR 56.1 ¶¶ 16-17). By that time the City was aware at MTBE was a "widespread concern," "that numerous potential sources of MTBE exist within 1 mile of Station 6," that MTBE "may be present in the raw water when the [Station 6] wells are pumped over the long term," and that "the need to treat for MTBE should be anticipated." Indeed, by May 2000 the City not only knew it had MTBE in certain of its Station 6 wells, its consultant already had "planned for treatment of VOCs and MTBE at Station 6." (LR 56.1 ¶ 14).

Most significantly, though, the City knew by May 2000 that the presence of MTBE "would greatly impact the design" of future treatment systems – *i.e.*, what the City now claims as its "injury" in this case. In fact, the City had been told by its consultant eight months **earlier** (September 1999) to build the **very same** system – the exact same components, for the exact same reasons – that this same consultant would detail almost 10 years later in its expert report for this case, and that the City will claim as its Station 6 "injury" at this upcoming trial.

The City had more than actual knowledge – it had, literally, **exact** knowledge of the precise "injury" it now claims for Station 6 here. Even if the City were to go ahead eventually with a different treatment system (*e.g.*, GAC only) than the one actually suggested by its consultant/expert, this would not change the point: the City had actual knowledge in September 1999 that the presence of MTBE would effect any future treatment systems at Station 6 and, thus, its alleged future "injury" here.

But the facts prove more. The City's **conduct** also establishes that it had constructive knowledge of its "injury" as well. Obviously, the City could not respond to its actual knowledge by acting to take the Station 6 wells out of service – conduct that the Court previously found time-barred the City's claims for Wells 10, 38 and 38A. That is only because the Station 6 wells were not "in service," and never have been, by the City. But the City did respond with another important act. Following up on its representation that it had "planned for treatment of VOCs and MTBE at Station 6," sometime on or before May 2000 it requested that Malcolm Pirnie take Station 6 through the conceptual design phase. (LR 56.1 ¶ 12 ["The need to treat the groundwater for VOCs (including MTBE) was anticipated in the conceptual design."]). That conceptual design **included the special treatment systems for MTBE** that Malcolm Pirnie had previously recommended, and that the City claims as its "injury" here.

ExxonMobil respectfully submits that the City's affirmative act of retaining (and paying) Malcolm Pirnie to begin design of an MTBE-specific treatment system at Station 6 is analogous to – and arguably is even more pro-active than – the City's act of removing Wells 10, 38 and 38A from service (which the Court previously found commenced the statute of limitations in this case). Certainly the City's act of proceeding with the conceptual design of an MTBE treatment system at Station 6 – coupled with Malcolm Pirnie's several prior warnings about "the need to treat for MTBE" (LR 56.1 ¶¶ 8, 14) – speaks volumes about the City's constructive (and actual) knowledge of its alleged "injury" here, and proves that the City "perceived an MTBE hazard" by no later than May 2000, months before the bar date here. *In re MTBE*, 2007 U.S. Dist. LEXIS at *45-46.

\* \* \*

In sum: the City stands today, on the eve of trial, exactly where it stood almost a decade ago. Same consultant (Malcolm Pirnie); recommending construction of the same Station 6 modifications (four air strippers plus GAC); to treat the same "anticipated" future MTBE. Only two things have really changed. The City long ago had Malcolm Pirnie take Station 6 through a conceptual design that anticipated "[t]he need to treat the groundwater for VOCs (including MTBE)" – a pre-bar date act that confirms the City's actual knowledge of the future harms it believes it will face because of MTBE. And the City subsequently followed through on its plan to seek reimbursement from allegedly "Responsible Parties" – by commencing this litigation, of course.

But the City's second act came 13 months too late, at least with respect to Station 6. The City already had acquired actual (and constructive) knowledge of its "injury" years earlier, and long before the operative bar date, by the time the City filed this lawsuit.

## CONCLUSION

The City's own documents and conduct prove that it had actual knowledge of its alleged "injury" for Station 6 long before the October 30, 2000 bar date here. Because the City's claims for Station 6 are time-barred as a matter of law, they should be dismissed. This will permit the parties to move on to the other wells (including the five focus wells chosen by defendants) for which the City also has asserted "injury," and which remain in the queue for trial.

July 8, 2009
New York, New York

Respectfully submitted,

_____
Peter John Sacripanti
James A. Pardo
Stephen J. Riccardulli
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10017-4613
(212) 547-5400

Jennifer Kalnins Temple
McDermott Will & Emery LLP
18191 Von Karman Avenue
Suite 500
Irvine, CA 92612-7108

*Counsel for Exxon Mobil Corporation*

## CERTIFICATE OF SERVICE

Jennifer Kalnins Temple, pursuant to 28 U.S.C. 1746, hereby declares under penalty of perjury, that on the 8th day of July, 2009, I caused to be served by electronic means upon counsel for Plaintiff, a true and correct copy of each of the following documents:

1. DEFENDANT EXXON MOBIL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF CITY OF NEW YORK'S CLAIMS RELATED TO STATION 6 BASED ON THE STATUTE OF LIMITATIONS.

2. DEFENDANT EXXON MOBIL CORPORATION'S RULE 56.1 STATEMENT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF CITY OF NEW YORK'S CLAIMS RELATED TO STATION 6 BASED ON THE STATUTE OF LIMITATIONS.

3. DECLARATION OF JAMES A. PARDO IN SUPPORT OF DEFENDANT EXXON MOBIL CORPORATION'S MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF CITY OF NEW YORK'S CLAIMS RELATED TO STATION 6 BASED ON THE STATUTE OF LIMITATIONS.

_____
Jennifer Kalnins Temple

[PAGE INTENTIONALLY LEFT BLANK]