**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

In Re: Methyl Tertiary Butyl Ether ("MTBE")       Master File No. 1:00-1898
Products Liability Litigation      MDL 1358 (SAS)
     M21-88
-------------------------------------------------------------------- x      ECF Case

**This document relates to the following case:**

*City of New York, et al. v. Amerada Hess Corp., et al.*
Case No. 04 Civ. 3417

-------------------------------------------------------------------- x

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO EXXON MOBIL DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Dockets.Justia.com

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..........................................................................................ii

**I.      INTRODUCTION** .............................................................................................1

**II.     LEGAL STANDARD** ........................................................................................2

**III.    ARGUMENT** ....................................................................................................2

    A.      The City Presented Ample Evidence of Injury ........................................2

    B.      The City Has Demonstrated Causation .....................................................5

        1.      The City Has Proven "Direct Spiller" Causation .............................5

        2.      The City Has Proven Traditional Causation .....................................6

        3.      The City Has Established Causation Under the Commingled Product Theory ...............................................................................................7

        4.      The Burden of Proving Apportionment Under the Commingled Product Theory Properly Rests on ExxonMobil .............................8

    C.      The City's Claims Are Not Preempted ......................................................8

    D.      ExxonMobil's Product Was Defectively Designed .................................10

        1.      Ethanol Was a Feasible, Safer Alternative to MTBE .....................10

        2.      The City's Injury Was Caused By a Foreseeable Use of the Product .............13

    E.      The City Has Proven Its Failure-To-Warn Claim ...................................13

    F.      The City's Claims Are Not Time-Barred ................................................16

    G.      The City Has Proven All of Its Remaining Claims .................................16

        1.      The City Has Proven the Required Elements of Its Negligence Claim ...........16

        2.      The City Has Proven the Elements of Its Trespass Claim ...............18

        3.      The City Has Proven Its Private Nuisance Claim ...........................19

        4.      The City Has Proven Its Public Nuisance Claim ............................20

**IV.    CONCLUSION** ...............................................................................................21

# TABLE OF AUTHORITIES

**New York State Cases**

*Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*,
  41 N.Y.2d 564, 394 N.Y.S.2d 169 (1977) ........................................................................ 19, 20


**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................................. 2

*Hall v. Consolidated Freightways Corp. of Delaware*,
  337 F.3d 669 (6th Cir. 2003) ................................................................................................ 2

*In re MTBE*,
  2009 WL 2058525, *3 (July 14, 2009) ................................................................................ 8

*In re MTBE*,
  2009 WL 2176635, *4 (S.D.N.Y., July 21, 2009) .............................................................. 10

*In re MTBE*,
  2009 WL 2634749 n. 21 (S.D.N.Y. August 25, 2009) ........................................................ 16

*In re MTBE*,
  379 F.Supp.2d 348 (S.D.N.Y. 2005)..................................................................................... 18

*In re MTBE*,
  457 F.Supp.2d 324 (S.D.N.Y. 2006) ..................................................................................... 9

*In re MTBE*,
  488 F.3d 112 (2d Cir. 2007) .............................................................................................. 8, 9

*Mickle v. Morin*,
  297 F.3d 114 (2d Cir. 2002).................................................................................................. 2

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000).............................................................................................................. 2


**Other Authorities**

F.R.C.P. 50(a)(1)........................................................................................................................ 2

# I.    <u>INTRODUCTION</u>

Plaintiff City of New York ("the City") has presented percipient and expert testimony and documentary evidence to support every element of its claims.  The City is *injured* by the presence of MTBE in its groundwater, whether or not that MTBE has exceeded or will exceed the MCL, because a reasonable water provider in the City's position would treat that groundwater.  The evidence is that the City wishes to serve high-quality water to all of its customers, there are potential health hazards of MTBE, and there are taste and odor issues associated with MTBE in drinking water.  The evidence was undisputed that the City was not on notice of its injury outside the statutory limitations period.  The City has established that its injury was substantially *caused* by ExxonMobil's actions as: (1) a direct spiller at six gas stations in the capture zone of Station 6, (2) a significant supplier of MTBE-containing gasoline to the relevant local market, and (3) as a contributor of MTBE-containing gasoline to the commingled product that reached gas stations in Queens.

ExxonMobil's reargument of positions that have already been lost over the course of this trial does not support judgment as a matter of law.  The City's claims are not preempted by the Clean Air Act because MTBE was not required under federal law and ethanol was a feasible alternative that was present in sufficient supply.  The City established that ethanol could meet the oxygenate demand and all air quality standards.  Moreover, the issues of consumer acceptability and materials compatibility were either non-existent or insubstantial.

The City showed that MTBE-containing gasoline was a defective product, not only because ethanol was a feasible, safer alternative, but because the City's injury was entirely foreseeable given what ExxonMobil knew about MTBE and underground storage tanks.  Despite this knowledge and the foreseeability of the harm, ExxonMobil never provided adequate

1

warnings of MTBE's hazards to groundwater.  Had it done so, the City's injury could have been averted.

The evidence demonstrated ExxonMobil's negligence in spilling gasoline at gas stations it owned and controlled.   ExxonMobil also intentionally allowed MTBE to leak into the groundwater in the capture zone of Station 6, intentionally interfered with the City's right to use and enjoy its property, and interfered with the public welfare while knowing of MTBE's hazardous properties.  ExxonMobil's motion must be denied given the substantial evidence in the record of each of the City's claims.

## II.    LEGAL STANDARD

The Court may only grant a motion for judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  F.R.C.P. 50(a)(1).  A Rule 50 motion may only be granted where, viewing all evidence in the light most favorable to the nonmoving party and drawing all factual inferences in the nonmovant's favor, the evidence allows only one reasonable conclusion.  *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251 (1986).  If reasonable minds could differ, the motion should be denied.  *Hall v. Consolidated Freightways Corp. of Delaware*, 337 F.3d 669, 672 (6th Cir. 2003).  Moreover, in ruling on a Rule 50 motion, the court may not make credibility determinations or weigh the evidence.  *Reeves*, 530 U.S. at 150-151; *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002).

## III.    ARGUMENT

### A.    THE CITY PRESENTED AMPLE EVIDENCE OF INJURY.

To prove that it has been injured, the City need only prove that a reasonable water supplier in its position would treat the water.  The City produced undisputed evidence that it

intends to treat the water at the current levels of MTBE contamination. ExxonMobil's motion should be denied on this basis alone, but there is more. There is direct evidence that at levels far below the MCL, MTBE is harmful to health and has a noxious taste and odor. Any reasonable water supplier would treat water with MTBE at these levels. In addition, the testimony establishes that if one or more of the Station 6 wells are taken offline or out of service for any reason, the concentration of MTBE in the combined outflow of the remaining wells will be 15 ppb or higher – a violation of the MCL. (9/25/09 Tr. at 5860:10-5861:20 (Bell); 9/30/09 Tr. at 1677:23-6178:4 (Hand).) The record also includes testimony concerning the health risks of MTBE, taste and odor concerns associated with MTBE, and the City's goal of providing water of equal quality to all of its customers.

The MCL is not a license for ExxonMobil to pollute the water up to the MCL. The City's witness Mr. Schindler testified that the City's goals

> are not the MCLs. As I said, the MCL is really the worst-case scenario. It's the highest level of a contaminant that you are allowed to deliver to the public. Our goal is to deliver the highest quality possible and to minimize the level of contaminants as best we can.

(8/31/09 Tr. at 2948:18-23.) State regulations also require the City to monitor and treat contamination even if it is below the MCL, if there are any "deleterious changes in water quality." N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.12. The City must also provide "a *safe*, adequate and aesthetically pleasing supply of water for drinking and other domestic uses." N.Y. Comp. Codes R. & Regs. tit. 10, § 40-2.160, emphasis added. And once treatment has been placed on a well, NYSDOH regulations specify that "[i]n all cases, public exposure to organic contamination must be *minimized*," and "[w]here treatment is proposed, best available technology shall be provided to reduce organic contaminants to the *lowest practical levels*." N.Y. Comp. Codes R. & Regs. tit. 10, §§ 5-1.22, 5-6.5 (incorporating by reference

"Recommended Standards for Water Works, 2003 Edition" (Ten States 2003) (emphasis added)).

The City has presented ample evidence that these concerns drive its decisions as a reasonable water provider in New York:

- The City Department of Environmental Protection's goal is to promote public health by providing clean water (8/4/09 Tr. at 362:20; D-2919);

- Acting DEP Commissioner Steven Lawitts' testimony that his job "is to ensure the continued delivery of *safe* drinking water to 9 million people," in part by constructing Station 6 (8/6/09 Tr. at 681:13-24);

- the expert opinion of Dr. Lawless that 25 percent of the population would detect MTBE in water at 3 to 4 parts per billion, and that 10 percent of the population would detect at 1 or 2 parts per billion (8/31/2009 TR at 2889:14-2889:25, 2896:3-2897:1;

- testimony by Mr. Schindler that such a rate of impact on taste and odor would raise concerns by the public about the quality of the water supply (8/31/2009 TR at 2943:4-2943:14);

- evidence concerning the substantial public interest and concern about the quality of the water (D-547) and testimony that a reasonable water provider in the City's position has to treat the water so that its quality is equal to or better than the water in the rest of its system (8/5/2009 TR at 541:9-19 (Yulinsky testimony that "we had to show them that the groundwater *is safe to drink*"); 8/31/2009 at 2937:8-2937:21 (Schindler testimony regarding "commitment" "DEP made the residents of Queens that groundwater from Station 6 would be comparable in quality to the Cat\Del water");

- the expert opinion of Ms. Bell that once treatment is installed, applicable regulations and guidance require treatment to the lowest practical level (10/1/2009 TR at 6250:6-6251:8);

- the expert opinion of Ms. Bell that a prudent water provider would apply a safety factor to its treatment protocols when a contaminant of concern is present (9/30/2009 TR. at p. 6049:15-6051:10);

- Dr. Rudo's testimony that MTBE is a probable human carcinogen, is mutagenic, and that even at the lowest levels of exposure in drinking water it can cause a mutation which can possibly lead to cancer (9/2/2009 TR. at 3267:18-3267:24);

- Dr. Burns' testimony that MTBE in water is "a particular concern from a public health and toxicological standpoint" and that it is a "probable human carcinogen" (8/27/09 Tr. at 2803:24-2804:2; 2809:16-17).

This evidence supports a finding that "a reasonable water provider in the City's position would treat the water to reduce the levels, or minimize the effects, of the MTBE in the combined outflow of the Station 6 wells." *See* Exhibit 1 at 2. ExxonMobil's argument that there is no imminent threat of injury to the City's usufructuary rights ignores the jury's finding that "(a) the City intends, in good faith, to use the water from the Station 6 wells within the next fifteen to twenty years to serve as a back-up source of drinking water and (b) MTBE will peak at a level of 10 parts per billion in the combined outflow of the Station 6 wells in 2033." *Id.* at 1. It is up to the jury "to determine whether the level of MTBE that you have found will be in the Station 6 wells in the future will constitute an injury to the City," regardless of whether the MCL has been or will be exceeded. *Id.* at 2.

B. **THE CITY HAS DEMONSTRATED CAUSATION.**

1. **The City Has Proven "Direct Spiller" Causation**

The City has proven that "(a) at the time that ExxonMobil owned or controlled some or all of these underground storage systems, they leaked gasoline containing MTBE and that (b) these leaks caused, or will cause, an injury to the City's Station 6 wells." Exhibit 1 at 3. At each site owned or controlled by ExxonMobil – 165-01 Hillside, 113-21 Merrick, 138-50 Hillside, 162-35 N Conduit, 177-90 S Conduit, and 84-04 Parsons – substantial evidence demonstrates that spills of MTBE-containing gasoline occurred at these sites while they were under the control of ExxonMobil.

The fact that these leaks caused or will cause an injury to the City's Station 6 wells is established by David Terry's testimony and documentary evidence indicating that the plumes of MTBE emanating from these stations will be drawn into the capture zone and from there into the wells. For example, Mr. Terry testified that given the high concentrations of MTBE found in the

soil and groundwater at these sites, a substantial amount of MTBE must have been released at the site and traveled into the capture zone of Station 6. (8/19/09 Tr. 1977:7-1990:3.) The fact that Mr. Terry's analysis determined this without assigning percentages of that substantial contribution to each of the six separate stations does not render the *combined* contribution insubstantial.

### 2. The City Has Proven Traditional Causation

ExxonMobil did not track or maintain records regarding deliveries of product that it manufactured to specific service stations in Queens (PL-5567, PL-5568, PL-5569, PL-5570). Accordingly, the City relied on circumstantial evidence of ExxonMobil's share of the New York market – evidence demonstrating that ExxonMobil supplied approximately a quarter of the gasoline sold in Queens. (9/14/09 Tr. 4281:8-11 (Tallett)). ExxonMobil's expert Dr. Montgomery testified that ExxonMobil's market share in the State of New York was 27.7 percent. (10/1/09 Tr. at 6334:12-16) The evidence introduced at trial shows that the Queens market substantially reflects the New York market and that ExxonMobil was responsible for about a quarter of the MTBE-containing gasoline that leaked into the City's groundwater. (9/14/09 Tr. 4281:8-11 (Tallett)).

Bruce Burke testified that, due to commingling, ExxonMobil-produced gasoline was, over time, present in *every* underground storage tank that leaked. (9/10/09 Tr. 4103:6-4105:20 (Burke).) ExxonMobil's witness Mr. O'Brien also testified to the fact that over time, ExxonMobil-produced gasoline makes it to virtually every gas station, due to trades and exchanges along the chain of distribution. (9/15/09 Tr. 4508:1-17 (O'Brien)) Given this testimony, ExxonMobil's statement that "there is a 75% chance that ExxonMobil-supplied product is not present at any particular location at any point in time" conflicts with the facts.

(*See* ExxonMobil Mem. at 6.) The issue is not whether *any* molecule of gasoline spilled was more likely than not to have been supplied by ExxonMobil, but whether ExxonMobil-supplied gasoline was more likely than not a substantial factor contributing to the City's injury. It is more likely than not – if not a virtual certainty – that at any particular location, at any point in time, over a quarter of the MTBE in the mix was supplied by ExxonMobil. On the basis of the City's evidence, the jury could reasonably conclude that, over time, as much as 27.7% of the MTBE in every underground plume came from ExxonMobil, and that this was a substantial factor causing the City's injury.

### 3. The City Has Established Causation Under the Commingled Product Theory

There was a great deal of evidence at trial that gasoline made by ExxonMobil was present in the capture zone supplying the Station 6 wells. The following testimony shows that gasoline refined by ExxonMobil was present in the commingled product that caused the City's injury at Station 6:

- Over time, ExxonMobil gasoline made it to virtually every station in the area (9/15/09 Tr. 4508:1-17 (O'Brien))

- Releases from gas stations can be substantial, can occur on a daily basis, and can continue for long periods of time (8/12/09 Tr. 1117:4-23; 8/13/09 Tr. 1335:1-21; 8/14/09 Tr. 1389:4-11, 1451:8-1452:2 (Moreau))

- Each of the retail gas stations in Queens and their underground storage tanks contained ExxonMobil product, because the distribution system supplying Queens distributed a commingled product (9/10/09 Tr. 4103:6-4105:20 (Burke))

The combination of the foregoing testimony establishes that gasoline made by ExxonMobil was, more likely than not, present as part of a commingled gasoline product within the capture zone of the Station 6 wells. None of the contrary testimony cited by ExxonMobil proves that gasoline made by ExxonMobil was *not* present as part of the commingled product at issue in this

case.  The City has met its burden to prove that it is more likely than not that ExxonMobil-made

product was present in the gasoline released from underground storage tanks in the Station 6

capture zone, and therefore ExxonMobil's motion must be denied.

      **4.     The Burden of Proving Apportionment Under the Commingled
Product Theory Properly Rests on ExxonMobil**.

This Court has already ruled that "[a] party alleging that damages are divisible has the

burden to prove that they are divisible.  The burden to prove the magnitude of each part is on the

party who seeks division."  *In re MTBE*, 2009 WL 2058525, *3 (July 14, 2009).  Where liability

is several, the divisibility of damages must be proved by the party seeking division, for two

principal reasons:  first, the burden of proof "should be placed on culpable rather than innocent

parties," and second, that "defendants are often in a better position to know their relative

contribution to the harm than are plaintiffs."  *Id.* at *3.  ExxonMobil is the culpable party in this

case, the party seeking division of damages, and the party in the best position to know its own

relative contribution to the harm.  Therefore, the burden of demonstrating how damages should

be apportioned among severally-liable defendants rests on ExxonMobil.

      **C.     <u>THE CITY'S CLAIMS ARE NOT PREEMPTED.</u>**

The Second Circuit has previously considered and rejected ExxonMobil's argument that

the CAA and supporting regulations preempt state tort law claims.  *See In re MTBE*, 488 F.3d

112, 126-135 (2d Cir. 2007).  The legislation "does not establish … that the defendants were

required to use MTBE or that, if MTBE were not used, ethanol producers would have been unable

to meet the expected demand in the few years before the fuel-oxygenation requirements took

effect."  *Id.* at 129.  The Second Circuit has held as a matter of law that Congress did not intend to

require the use of MTBE in gasoline.  The same is true of ExxonMobil's argument regarding the

feasibility of ethanol:  the Second Circuit noted that "plaintiffs argue persuasively, and without

contradiction, that the defendants' argument that ethanol capacity was insufficient is a classic

example of confusing the cart with the horse: ethanol supplies were low because the oil industry

chose not to use it, not the other way around." *Id*.

ExxonMobil's remaining argument, that MTBE was the only approved oxygenate available in

quantities sufficient to comply with the Clean Air Act and related regulations, fails because

ExxonMobil has not established that "it is impossible … to comply with both state and federal

requirements." *In re MTBE*, 457

F.Supp.2d 324, 330 (S.D.N.Y. 2006).[1]  "Impossibility does not depend on whether events in

the physical world would have made it difficult to comply with both standards, but on whether

the two standards are expressly incompatible." *Id.* at 335.  This Court has already decided that

"[i]t was not physically impossible for defendant to comply with both standards because, even if

state tort law demands that defendants not use MTBE, the federal law did not require the use of

MTBE." *Id.*

The City has presented evidence that ethanol supplies were fully adequate to meet the

demand as states banned MTBE, even while the federal oxygenate requirement remained in

place, and that if the oil companies had chosen to use ethanol, supplies would have been

available:

- Bruce Burke's expert opinion that ethanol supplies rose to meet demand during each
  relevant period and that ethanol is now used nationwide (9/10/2009 TR. at 4090:17 –
  4093:24);

---

[1] *See also In re MTBE*, 488 F.3d at 135  ("Judge Scheindlin held that there was no conflict
preemption, as it was not physically impossible for defendants to comply with both standards
because, even if state tort law demands that defendants not use MTBE, the federal law did not
require the use of MTBE");  *id.* at 129-30 ("That it may have been more convenient or less
expensive for the defendants to use MTBE does not mean it would have been impossible for them
to use other, less-polluting additives.")

- Bruce Burke's expert opinion that enough ethanol could have been made available to the oil industry if the oil industry had decided to use ethanol instead of MTBE (4097:4-4098:10);

- testimony by Exxon's witness John O'Brien that when the demand for ethanol in fact increased, supply increased to meet it (9/15/09 Tr. 4484:3-10);

- Bruce Burke's expert opinion that the ramp-up time for increased ethanol production was the same as it was for MTBE (9/10/2009 TR. at 4102:16-4012:19);

- Paul Stendardi of Getty Oil testified that Getty used ethanol in the Northeastern United States during the relevant time period (9/11/2009 TR. at 4223:16-4224:21);

- Robert Reynolds' expert opinion that ethanol supply could have risen to meet demand (9/16/2009 TR. at 4627:19-4628:6);

- ExxonMobil's corporate representative, Robert McGraw, testified that the supply of both ethanol and MTBE rose to meet industry demand in response to the Clean Air Act Amendments and that when MTBE was banned and ethanol supply rose to meet demand (9/17/2009 TR. at 4814:1-4814:18; 4815:2-4815:9; 4830:12-4830:17);

- ExxonMobil corporate representative, Thomas Eizember, testified that sufficient supply of ethanol was created in response to the increase in demand that resulted from the ban on MTBE (9/23/2009 TR. at 5623:23-5624:3);

- documentary evidence establishing that by May 1995, Exxon was using at least 75 thousand barrels per day of ethanol (PL 477).

The feasibility of ethanol as a gasoline additive for reasons other than supply is discussed in Section D, *infra*, and that evidence indicates that ethanol was an entirely feasible choice of oxygenate. This evidence would support a jury finding that ethanol was a feasible alternative to MTBE and destroys ExxonMobil's conflict preemption argument.

### D. <u>EXXONMOBIL'S PRODUCT WAS DEFECTIVELY DESIGNED</u>

#### 1. Ethanol Was a Feasible, Safer Alternative to MTBE.

Ethanol was a feasible and safer alternative to MTBE. ExxonMobil has already conceded "that ethanol 'was a technologically possible alternative' to MTBE." *In re MTBE*, 2009 WL 2176635 at *4 (S.D.N.Y., July 21, 2009). ExxonMobil used ethanol in the Midwest even while

it used MTBE elsewhere.  (9/03/09 Tr. 3534:5-12 (Roman); 9/08/09 Tr. 3769:23-25 (Dugan).)

ExxonMobil's senior executive Robert Larkins agreed that Exxon "could have used ethanol[,]

MTBE or they could have changed the base gasoline" to address the octane requirement after

lead was phased out.  (Larkins Depo at 477:5-15)  As soon as MTBE was banned in New York

and California, ethanol supply increased to meet the new oxygenate demand.  (9/10/09 Tr.

4092:17-4093:24 (Burke))

All of the distribution, air quality emissions, consumer acceptability, materials

compatibility and regulatory concerns raised by ExxonMobil in its motion were addressed by the

City over the course of this trial:

- Ethanol can be shipped by pipeline, rail or barge, and transportation is not a barrier to the use of ethanol.  (9/10/09 Tr. 4095:9-4096:18 (Burke); 9/16/09 Tr. 4628:7-18 (Reynolds))

- The oil industry had the technological capability in the 1980s and 1990s to manufacture reformulated gasoline blend stocks that could be used with ethanol. (9/11/09 Tr. 4195:12-16 (Burke));

- Companies using ethanol did not experience customer complaints as a result. (9/11/09 Tr. 4225:8-15; 4232:17-19 (Stendardi))

- Companies using ethanol did not have to make major changes to their infrastructure in order to do so.  (9/11/09 Tr. 4225:16-4226:6; 4229:13-20 (Stendardi))

- The only reason Getty was not permitted to use ethanol during the summer months was because refiners like ExxonMobil would not sell them the appropriate reformulated gasoline blend stock – not because it was technically infeasible to do so. (9/11/09 Tr. 4230:12-4231:13 (Stendardi))

- No relaxation of any of air quality standards or the Reid vapor pressure (RVP) requirement was needed to use ethanol in gasoline (9/23/2009 TR. at 5625:22-5626:2 (Eizember);

- Increases in consumer food prices were not due to the use of ethanol in gasoline. (9/14/09 Tr. 4293:3-11 (Tallett))

- Vapor lock due to the use of ethanol was not a common problem and was resolved by regulatory action.  (9/16/09 Tr. 4626:4-22 (Reynolds))

- Underground storage tanks were compatible with ethanol-containing gasoline. (9/16/09 Tr. 4631:15-4632:11 (Reynolds))

- Concerns that ethanol subsidies might eventually diminish or disappear were unwarranted. (9/16/09 Tr. 4633:13-24 (Reynolds))

- Ethanol as a gasoline additive met the emissions reduction requirements of the Clean Air Act. (9/16/09 Tr. 4634:9-21 (Reynolds))

- As of 1985, Mobil's view was that "in well-managed distribution systems, [ethanol] does not present the problems inherent with methanol." (PL 2488, 9/17/2009 TR. at 4824:8-4824:19).

Evidence in the record establishes that any marginal costs associated with the use of ethanol would have been minimal:

- Martin Tallett testified that ExxonMobil could indeed have used ethanol in gasoline for approximately the same cost as using MTBE with a small increase (9/14/2009 TR at 4272:15-4272:20);

- a statement in the Federal Register in 1999 that MTBE could be eliminated for costs ranging from 1.9 cents to 2.5 cents per gallon (PL 614 and 9/17/2009 TR at 4835:19-4836:9);

- The oil industry could have recouped any additional cost associated with using ethanol instead of MTBE by raising the consumer price of gasoline (9/14/09 Tr. 4317:20-4318:8 (Whitelaw));

ExxonMobil also points to evidence suggesting that ethanol can be carcinogenic. That evidence is irrelevant. The City's expert Dr. Burns testified that "even the smallest amounts of MTBE … can lead to cancer" (8/27/09 Tr. 2829:10-15), whereas ethanol is only carcinogenic "in people that have high exposures over a long period of time." (8/27/09 Tr. 2835:11-12) Given the much greater biodegradability of ethanol (9/02/09 Tr. 3344:1-6 (Moreau)), ethanol is *far* safer than MTBE because there is no evidence that ethanol is carcinogenic in the amounts that might eventually be found in groundwater as a result of gasoline leakage from underground storage tanks. It is both a safer and a more feasible choice than MTBE.

### 2. The City's Injury Was Caused By a Foreseeable Use of the Product

The City has presented direct evidence through ExxonMobil witnesses that ExxonMobil was aware that underground storage tanks leaked when MTBE gasoline was used in a foreseeable manner, and that those leaks could be substantial – on the order of 50,000 gallons. (9/02/09 Tr. at 3227:5-3229:4 (Scala))  To prove defective design, the City must prove that gasoline containing MTBE was not reasonably safe for its intended or reasonably foreseeable purpose or in light of the reasonably foreseeable harms caused by its use.  See *In re MTBE*, 2008 WL 1971538, *2 (May 7, 2008).  At trial, it was undisputed that ExxonMobil sold gasoline to third-parties and lessees for sale to other companies and the public.  See, e.g., 9/4/2009 TR. at 3664:5-3667:14 (describing relationship to various station types).  The "use" of gasoline in the context of a gas station is as a commingled fungible commodity for resale.  The public at large were also foreseeable users, so their use of gasoline for consumption was also a foreseeable use. *See* 9/8/2009 TR. 3787:8- 3788:19 (Ruling from Bench).Part of that use is the storage of gasoline in underground storage tank systems and its retrieval by the public from such systems for consumption.  ExxonMobil knew that underground storage tanks leaked and that other types of spills were common.  See 9/2/2009 TR at p. 3235:10-3239:25, 3243:3-3243:6 (Scala); 9/9/2009 TR at 3902:25-3939:22 (Curran); 9/4/09 TR at 3545:20-3546:10, 3549:18-3561:25, 3563:7-3567:13 (Mickelson); PL 394;  PL 323.  Therefore, the resultant harm from the use of gasoline - spills that contaminated groundwater, including the groundwater in the Station 6 capture zone -- was not only "foreseeable," it was regularly witnessed by ExxonMobil.

### E. THE CITY HAS PROVEN ITS FAILURE-TO-WARN CLAIM

The City has presented evidence demonstrating that adequate warnings would have alerted users to the need for adequate precautions, and the City would therefore not have been

harmed.  Indeed, the evidence shows that MTBE has been banned in many states because it contaminates groundwater.  (9/23/09 Tr. at 5624:22-23 (Eizember) (MTBE banned in NY and CA); 9/16/09 Tr. at 4729:9-13 (Reynolds) (MTBE banned in at least 18 states); 9/17/09 Tr. at 4963:16-18 (Austin) (responding to jury question by stating that MTBE was banned in NY and CA because of groundwater contamination).) These state bans demonstrate that information about MTBE's pernicious threats to water was highly material, and that parties with knowledge of those threats acted to avoid or mitigate them.

Marcel Moreau testified that "ExxonMobil could have done a lot more in the realm of publicity in terms of ***letting people know*** that this was a different kind of gasoline that people hadn't had before, that you needed to handle it very carefully and make sure that there were no releases of gasoline into the ground."  (9/03/09 Tr. 3377:10-14, emphasis added)  Had Exxon done so, the small releases of gasoline that Mr. Moreau identified – the ones that "would probably not become very big issues" if the gasoline did not contain MTBE – would not have occurred, and the City's injury could have been prevented.   (*See* 9/03/09 Tr. 3376:6-11) "[U]ltimately," Mr. Moreau testified, "I think we needed just a gigantic public awareness program.  We needed to really change the behavior of pretty much everybody in the industry." (9/03/09 Tr. 3379:11-13)  These steps were necessary to "deal with the MTBE issues" and were *not* necessary if MTBE weren't present in the gas.  (9/03/09 Tr. 3380:9-14)

Mr. Dugan testified that at the time Exxon made the decision to use MTBE, inventory control was the leak detection technology in use.  (09/08/09 Tr. 3750:15-22 (Dugan))  But had users been warned of the dangers of MTBE, Mr. Moreau testified that *all* of the following options could have been pursued, all of which would have prevented the City's injury:

- "The first thing to do would be not to use MTBE."  (9/02/09 Tr. 3352:19)

- "secondary containment, have double-walled tanks, double-walled pipe" (9/02/09 Tr. 3352:22-23)

- "very reliable and very secure leak detection" (9/02/09 Tr. 3353:1-2)

- "pay attention when you were doing maintenance" (9/02/09 Tr. 3353:3-4)

- "measures to prevent customer spills from entering the ground," including pavement sealing (9/02/09 Tr. 3353:7-12)

- "improve your delivery practices to make sure there were no delivery spills" (9/02/09 Tr. 3353:13-14)

- "educate consumers not to top off their cars" (9/02/09 Tr. 3353:14-15)

- "make sure…that your spill containment manholes are liquid tight and not leaking stuff into the ground" (9/02/09 Tr. 3354:6-8)

- "restricted where MTBE was going to be used" to "parts of the country where the groundwater was not as vulnerable to contamination" (9/03/09 Tr. 3375:9-14)

- vapor monitoring to find releases from all parts of the storage system "very soon after they occurred" (9/03/09 Tr. 3378:25-3379:2)

If MTBE were not present in gasoline, these steps would not have been necessary. (9/02/09 Tr. 3353:18-24 (Moreau)) All of these steps were identified by Mr. Moreau as steps that could have been taken "to prevent MTBE contamination of groundwater." (9/03/09 Tr. 3375:24-3377:14) Mr. Moreau testified that gas station vapor releases, in particular, "never got to be a big issue until MTBE was involved, in which case the vapor releases were significant enough to cause groundwater contamination." (9/02/09 Tr. 3354:15-19) Without the presence of MTBE, the gas station leaks Mr. Moreau referred to "would probably not become very big issues." (9/03/09 Tr. 3376:6-11) But the incremental environmental risk created by MTBE in gasoline also created a need for additional warnings so that the foregoing precautions could have been taken. Had they been taken, the City's injury would not have occurred.

F.     **THE CITY'S CLAIMS ARE NOT TIME-BARRED**

The City has brought a recurring injury claim, not a future injury claim.

"[A] recurring injury claim is a very different type of claim from a future injury claim and the claims have different elements and standards of proof. Because a recurring injury claim, by definition and unlike a future injury claim, cannot be brought until the recurring injury has begun, the statute of limitations for a recurring injury claim cannot begin to run until the recurring injury first began – regardless of when future damages could have first been proven. Thus, in determining the timeliness of the City's recurring injury claim, the question is not, as Exxon suggests, when the City first knew of its *future* damages, but rather when the City was first injured by MTBE contamination in its water and first knew that it was so injured."

*In re MTBE*, 2009 WL 2634749 at *4. Therefore, in order to prevail on its motion for judgment as a matter of law, ExxonMobil would have had to show both (1) that the City was injured by the presence of MTBE contamination and (2) knew that it was so injured.

ExxonMobil has only noted evidence suggesting that testing and treatment might be required for MTBE in the future. (ExxonMobil Mem. at 18.) However, "where there were MTBE detections below the MCL prior to October 31, 2000, the City's damages claims are time-barred only if Exxon proves that, prior to October 31, 2000, the City was injured by the detected level of MTBE contamination and the City knew, or should have known, that an MTBE detection at that level was injurious." *In re MTBE*, 2009 WL 2634749 at *4. ExxonMobil has not established either that the City was injured by MTBE contamination in its water or knew of its injury prior to October 31, 2000, and therefore a jury could easily find that there was no injury outside the statutory limitations period.

G.     **THE CITY HAS PROVEN ITS REMAINING CLAIMS**

1.     **The City Has Proven the Required Elements of its Negligence Claim.**

The City has presented substantial evidence of ExxonMobil's negligence at each of the six stations it owned and operated. Taking 165-01 Hillside Avenue, 113-21 Merrick Boulevard

and 84-04 Parsons Boulevard as examples, the City introduced extensive evidence upon which

the jury can predicate a finding of negligence both in terms of the operation of the underground

storage system, the inventory control procedures and the subsequent inadequate remediation:

- At 165-01 Hillside Avenue, there was an MTBE spill reported for the first time in 2007, three years after MTBE was banned. The date the spill actually occurred is uncertain, but about 285 tons of contaminated soil were removed from the site after the spill was discovered. Monitoring did not start until 2008. To date, no real off-site monitoring has been done and the New York DEC told ExxonMobil that it needed to delineate the plume in 2008. (PL 15564; PL 12199; PL 12195);

- At 113-21 Merrick Boulevard, the spill was reported more than ten years ago, in 1999, but it is still not cleaned up. In fact, MTBE-contaminated soil was removed in early 2001, but MTBE was still found in the groundwater later that year at 1500 parts per billion and then nothing more was done at the site for two years. So active cleanup of the site did not even begin until 2008, nine years after the spill was reported. (8/13/2009 TR at 1267:1–1277:16; 9/21/2009 TR at 5253:19-5254:1; PL-13369; PL-13290; PL-13391A; PL 13342; PL 13422);

- At 84-04 Parsons Boulevard, the spill was originally reported to DEC as 1 gallon, even though internal Mobil records indicated that about 4,300 gallons were missing from that spill in the late 1980s. Floating gasoline was found across the site. In fact, Mobil marketing employee Mark Fuessinger received and reviewed the inventory control records. As of 1996, there was still around 1100 gallons of free product that remained unaccounted for and the remediation site is still open. (8/13/2009 TR at 1230:7-1267:1; 9/21/2009 TR at 5244:19-5244:20; PL 11689; PL 11700; PL11707; PL11708; PL 11823; PL 12007);

- There was substantial testimony and documentary evidence ExxonMobil checked inventory reconciliation records and took responsibility for their accuracy (9/4/09 Tr. 3629:24-3630:18 (Mickelson); 9/9/09 Tr. at 3854:3-3856:17 (Curran); 9/3/09 Tr. at 3490:3-3490:4 (Roman); PL-11700; D-9948.)

In addition, the City produced the following testimony and exhibits concerning the

following stations, which demonstrate ExxonMobil's negligent operation of underground storage

systems and negligent remediation efforts: 138-50 Hillside Avenue (8/13/2009 TR at 1289:9–

1301:1; PL-11429; PL-11337; PL-11339; PL-11361; PL-11338; PL-11415; and PL-11255); 162-

35 North Conduit (8/13/2009 TR at 1308:2-1308:25; PL 14732); and 177-90 South Conduit

(8/13/2009 TR at 1277:17 – 1288:24; PL 13503; PL-13305; PL-10479; PL-10700; PL-1466; PL-10405).

## 2. The City Has Proven the Elements of Its Trespass Claim.

The Court addressed the City's proof of the intent element of its trespass claim in context of its April 2005 opinion concerning ExxonMobil's motion to dismiss:

> [B]ased on the allegations, it could be reasonably inferred that defendants willfully intruded upon plaintiffs' land. First, defendants' intentional creation and distribution of MTBE-containing gasoline could be construed as the act which amounted to or produced the unlawful invasion of plaintiffs' property. Second, given defendants' alleged awareness of the vulnerabilities in the gasoline distribution and storage system, a reasonable inference is that it was substantially certain that MTBE would enter plaintiffs' property.

*In re MTBE*, 379 F.Supp.2d 348, 426 -427 (S.D.N.Y. 2005).

ExxonMobil acted with the required intent. The evidence presented at trial demonstrates that by the mid-1980s, ExxonMobil *knew* that: (1) MTBE is highly soluble; (2) MTBE travels much farther and faster than BTEX in groundwater; (3) MTBE imparts an offensive taste and odor to water at extremely low concentrations; (4) MTBE is far more expensive and difficult to remediate than BTEX and other gasoline constituents; (5) MTBE does not readily biodegrade; (6) underground storage tank systems leaked frequently and such leaks often went undetected for long periods of time; and (7) safer, feasible alternatives were readily available (including but not limited to meaningful warnings, better product management, safer underground storage tank systems and/or the use of ethanol as an oxygenate).[2] In face of these known risks, ExxonMobil

---

[2] *See, e.g.,* PL 2636 (May 6, 1987 internal ExxonMobil memorandum written by Samuel Hetrick); PL 247 (internal ExxonMobil memorandum dated April 6, 1984 from Jack Spell to J.S. Dick); PL 270-PL 271 (internal ExxonMobil memorandum to V. Dugan from B.J. Mickelson dated August 23, 1984); PL 283 (internal ExxonMobil memorandum to JME Mixter from B.J. Mickelson dated February 22, 1985); PL-292 (internal ExxonMobil memorandum to JME Mixter from B.J. Mickelson dated April 19, 1985); Scala, Curran, and Mickelson (testimony re East Meadow, Jacksonville, Rockaway) 9/2/2009 TR at p. 3235:10-3239:25, p 3243:3-6;(N.

approved the use of MTBE.[3]  Similarly, in face of these known risks, ExxonMobil operated

stations in the capture zone of station 6, which it knew had experienced repeated leaks

throughout the relevant time period and which it knew would leak into the groundwater.  *See*

Section (G)(1), supra.  In sum, ExxonMobil knew or should have known that MTBE from leaks

at its stations and others in the capture zone that it supplied was "substantially certain to impact

groundwater, including the groundwater in the capture zone of the Station 6 wells." *See* Exhibit

1.

### 3.    The City Has Proven Its Private Nuisance Claim.

A private nuisance is (1) an interference, substantial in nature, (2) intentional in origin,

(3) unreasonable in character, (4) with plaintiff's right to use and enjoy property, (5) caused by

defendant's conduct.  *Copart Industries, Inc. v Consolidated Edison Co.*, 41 NY2d 564 (1977);

The City has proven each of these elements.  *First*, ExxonMobil's argument that it has not

substantially interfered with the City's property interests is contrary to the jury's finding that the

City intends to use the water from the Station 6 wells and that MTBE concentrations will peak in

the water in 2033.  *See* Exhibit 1.  The presence of MTBE in the water for decades to come will

require extensive and expensive treatment to remove so the water can be served to the public – a

substantial interference with the City's interests.

*Second*, ExxonMobil acted with the required intent.  ExxonMobil knew that MTBE was

far more hazardous and was far more expensive and difficult to remediate than BTEX and other

---

Campins Decl. Ex A)  9/9/2009 TR at p. 3902:25-3939:22; (N. Campins Decl Ex. B)  9/4/09 TR
at p. 3545:20-3546:10, p. 3549:18-3561:25, p. 3563:7-3567:13; (N. Campins Decl. Ex. C) PL
394;  PL 2436 (toxicology document); PL 323 (document dated May 29, 1986 to R .J . Landry
from S .D . Curran re: Exxon Underground Tank Leak Experience); PL 2488 (March 1, 1985
Memorandum from R. G. Weeks to several individuals regarding Ethanol/Gasoline Marketing –
Illinois/Minnesota).
[3] PL 302 (June 10, 1985 Memorandum requesting approval for use of MTBE)

gasoline constituents and that underground storage tank systems leaked frequently. Nonetheless, Exxon chose to approve the use of MTBE in gasoline and deliver that gasoline into underground storage systems it owned and that others owned in the Station 6 capture zone. ExxonMobil therefore knew or should have known that MTBE was substantially certain to impact groundwater, including the groundwater in the capture zone of the Station 6 wells.

*Third*, the interference was unreasonable. Among other things, the City has proven that safer alternatives existed to the use of MTBE in gasoline, that even using MTBE ExxonMobil could have taken added precautionary steps (such as the installation of monitoring wells and quick remediation of any releases), that ExxonMobil kept is underground storage systems in a state of disrepair and that ExxonMobil failed to timely remediate releases. ExxonMobil's actions were therefore patently unreasonable.

### 4. The City Has Proven its Public Nuisance Claim.

In New York, a public nuisance is "conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all in a manner such as to offend public morals or interfere with the use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 567 (1977).

The jury has found that the City intends to use Station 6 as a back-up supply, and that MTBE will be present in the water in the future. ExxonMobil's introduction of MTBE into the groundwater in the capture zone of the Station 6 wells, has interfered and will interfere with the City's ability to provide clean and potable water to the public in the case of need for a back-up supply such as emergency or infrastructure difficulties. The presence of MTBE at injurious levels in this back-up water supply clearly endangers and injures the health, safety and comfort

of a considerable number of persons and substantially interferes with the public right to safe, clean water – as discussed in Section A, *supra*.

Similarly, there is ample evidence that ExxonMobil acted with the required intent. As discussed above, ExxonMobil manufactured, refined, and supplied gasoline containing MTBE in a commingled product system that it knew would be stored in underground storage systems (including stations it owned) and then enter the groundwater in the capture zone of the Station 6 wells. ExxonMobil therefore knew or should have known that MTBE was substantially certain to impact groundwater, including the groundwater in the capture zone of the Station 6 wells.

## IV.   CONCLUSION

For each of the foregoing reasons, the City respectfully requests that ExxonMobil's Motion for Judgment as a Matter of Law be denied in its entirety.

Dated:  October 6, 2009

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Plaintiff City of New York
100 Church Street
New York, New York 10007
(212) 788-1568

 /s/ *VICTOR M. SHER*
VICTOR M. SHER *(pro hac vice)*
TODD E. ROBINS *(pro hac vice)*
NICHOLAS G. CAMPINS *(pro hac vice)*
MARNIE E. RIDDLE *(pro hac vice)*

SHER LEFF LLP
450 Mission Street, Suite 400
San Francisco, CA 94105
(415) 348-8300

ROBERT S. CHAPMAN *(pro hac vice)*
 GREENBERG, GLUSKER, FIELDS,
CLAMAN & MACHTINGER LLP
1900 Ave. of Stars, 21st Floor
Los Angeles, CA 92886
(310) 553-3610