# Attachment A – Part 4

Confidential - Per 2004 MDL 1358 Order

Page 154

1  States?
2       MS. AMRON: Objection as to
3  relevance and to -- my standing
4  objection to the use of that document,
5  questions of the document.
6       A.   Probably a day and a half
7  to two days.
8       Q.   Somewhere on the order of,
9  say, 8 to 16 hours?
10      MS. AMRON: Objection. Same
11 objections.
12      A.   Yes.
13      Q.   And with respect to
14 Ms. Guterrez, approximately how much
15 time did she take to assemble the
16 information and assist you in providing
17 counsel with information requested for
18 inclusion in Exhibit 8?
19      MS. AMRON: Objection as to
20 relevance, to the questions about that
21 document, and mischaracterizes the
22 witness' testimony.
23      A.   It's a bit of a guess, but
24 I would say about the same amount of

Page 155

1  time.
2       Q.   Ms. Guterrez spent
3  approximately 8 to 16 hours apart from
4  the work that you spent to assemble this
5  information?
6       MS. AMRON: Objection as to
7  relevance and to the questions about the
8  document.
9       A.   That's correct.
10      Q.   And with regard to the
11 meetings that you attended today, what
12 did you discuss with counsel relative to
13 the testimony that you would offer
14 relative to Exxon Mobil's refining
15 capacity in the period 1985 to 2003?
16      MS. AMRON: Objection on the
17 grounds of privilege. I'm not directing
18 the witness not to answer.
19      A.   Basically with regard to
20 Exxon Mobil capacity market share to
21 give my review based on my experience in
22 working with the industry.
23      Q.   And were you instructed in
24 the course of the meetings that you had

Page 156

1  today that you could not in any way rely
2  upon any of the work that you and
3  Ms. Guterrez had previously done?
4       A.   Yes, I was.
5       Q.   And with respect to the
6  work that you did with Ms. Guterrez, did
7  you have materials with you when you
8  traveled from London to New York
9  relative to the ranking of Exxon and
10 Mobil that you reviewed in transit?
11      MS. AMRON: Objection as to
12 relevance.
13      A.   I had them -- that material
14 on my computer. I did not review it,
15 actually.
16      Q.   You had it on your computer
17 and assembled it and forwarded it to
18 counsel previously; is that a fair
19 statement?
20      MS. AMRON: Objection as to
21 relevance.
22      A.   That is correct.
23      Q.   And the information on your
24 computer included the table that you

Page 157

1  prepared ranking Exxon Mobil in terms of
2  its refining capacity; am I correct?
3       MS. AMRON: Objection as to
4  relevance and to the use of questions
5  about the document.
6       A.   That's correct.
7       Q.   You also had on your
8  computer information that you had
9  assembled about ranking Exxon Mobil in
10 terms of its refining capacity; am I
11 correct?
12      MS. AMRON: Objection as to
13 relevance and to questions about the
14 document.
15      A.   That's correct.
16      Q.   You also had information
17 relative to ranking Exxon Mobil in terms
18 of its retail market share nationwide
19 for gasoline sales?
20      MS. AMRON: Objection as to
21 relevance and to questions about
22 Exhibit 8.
23      A.   That's correct.
24      Q.   Did you also have

40 (Pages 154 to 157)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Per 2004 MDL 1358 Order

Page 158

1  information on your computer relative to
2  the distribution of gasoline from the
3  Torrance refinery to terminals in
4  southern California?
5       MS. AMRON: Objection as to
6  relevance and also vagueness as to
7  information.
8       A. No, I don't believe I do
9  have information on that. I don't
10 really have direct -- as I mentioned
11 earlier, I really don't have direct
12 information of where gasoline goes
13 directly from the Torrance refinery.
14      Q. And with regard to Exxon's
15 Benicia refinery, do you have any
16 information based on your experience in
17 the industry that would link refining of
18 product at Exxon's Benicia refinery to
19 releases of gasoline in California that
20 have contaminated public water supply
21 wells?
22      MS. AMRON: Objection as
23 going beyond the scope of direct.
24      A. Based on my experience?

Page 159

1       Q. Yes.
2       A. Only to the extent that
3  Benicia supplied MTBE gasoline into the
4  common carrier pipeline system, northern
5  California, on a commingled basis. And
6  similar to how I had testified on the
7  East Coast with the commingling, that
8  supplies in this case from Benicia would
9  be spread throughout that system. To
10 the extent there were leaks that were
11 supplied by that system, I would say
12 that it is my opinion that it's
13 reasonable to assume that some gasoline
14 produced by Benicia got into those
15 service stations and into those leaks.
16      Q. And can you identify for us
17 any specific release from a service
18 station in northern California supplied
19 by that system which you believe had an
20 impact on a public water supply well
21 resulting in a well being closed or
22 having to be treated?
23      MS. AMRON: Objection as
24 beyond the scope of direct.

Page 160

1       A. No. As I said, that
2  gasoline commingled in that system. To
3  the extent it was supplied to locations
4  that had leaks, then Benicia-produced
5  MTBE gasoline over time would have
6  gotten into those leaks.
7       I have not reviewed or
8  assessed specific locations for where
9  leaks have occurred.
10      Q. In the course of doing work
11 for counsel, were you ever asked to
12 trace the movement of product on the
13 northern California Kinder Morgan
14 system?
15      A. I was asked on -- I was
16 asked to understand how gasoline is
17 distributed in the California market.
18 So to the extent that that includes that
19 system, yes.
20      Q. Were you asked, though, to
21 specifically trace batches of gasoline
22 moving on the northern California Kinder
23 Morgan system?
24      MS. AMRON: Objection on the

Page 161

1  grounds of privilege.
2       A. No, I was not.
3       Q. With regard to the southern
4  California Kinder Morgan system, were
5  you ever asked to trace batches of
6  gasoline moving on that system?
7       MS. AMRON: Objection on the
8  ground of privilege.
9       A. No, I was not.
10      Q. With regard to the meeting
11 that you had with counsel, what were you
12 told relative to the ranking of Exxon
13 for the retail sales of gasoline
14 nationwide?
15      MS. AMRON: Objection on the
16 ground of privilege.
17      A. I was told to present my
18 view on what that ranking was, again,
19 based on my experience in the industry.
20      Q. With regard to national
21 rank for petroleum sales including
22 gasoline, can you tell us based on your
23 general knowledge what the rank of Shell
24 is?

41 (Pages 158 to 161)

Confidential - Per 2004 MDL 1358 Order

Page 162

1  MS. AMRON: Objection. I
2  think vague and ambiguous,
3  mischaracterizes his previous testimony.
4      Q. I will rephrase the
5  question. Based on your general
6  experience and knowledge of the
7  industry, can you tell us on a national
8  basis what the market share is for Shell
9  and its sales of gasoline?
10     A. Over what period of time?
11     Q. 1985 to 2003?
12     A. I would rank them in --
13 typically in probably the top five. You
14 know, they were a major marketer.
15     Q. And with regard to BP Amoco
16 and its market share percentage for
17 sales of gasoline in the United States,
18 how would you rank them, 1985 to 2003?
19     A. Top 10.
20     Q. With respect to Conoco
21 Phillips, during the period from 1985 to
22 2003, what rank would you give them in
23 terms of percentage of market share for
24 retail sales of gasoline?

Page 163

1      A. Well, if we're talking
2  about presumably Conoco Phillips and all
3  of the companies that they have acquired
4  over that time so that the same way we
5  looked at Exxon Mobil, right; is that
6  correct?
7      Q. Yes, sir.
8      A. It is a little more
9  difficult because they acquired a lot of
10 firms.
11         But I would rank them,
12 again, in the top ten.
13     Q. With regard to Sunoco, how
14 would you rank Sunoco's share of the
15 retail market on a nationwide basis for
16 the years 1985 to 2003?
17     A. I would put them probably
18 the lower end of the top ten, maybe a
19 little below the top ten on occasion.
20     Q. With regard to the top five
21 based on your experience in the
22 industry, what companies would you
23 identify as being in the top five for
24 percentage of retail market share for

Page 164

1  gasoline sales in the United States,
2  1985 to 2003?
3      A. Well, Exxon and Mobil. I
4  would say Chevron, Shell, maybe BP
5  Amoco.
6      Q. Any others that you would
7  include as possible candidates for being
8  in the top five for percentage of retail
9  sales of gasoline, 1985 to 2003?
10     A. I'd say that's -- what I've
11 given you is a reasonable estimate. All
12 of those were major retailers during
13 that time period.
14     Q. In the course of your
15 meeting with counsel today, what else
16 were you told about your testimony on
17 direct relative to the subjects that you
18 would be testifying to today?
19         MS. AMRON: Objection on the
20 ground of privilege.
21     A. Not really much more. I
22 was told to, again, rely on my
23 experience and that I was not able to
24 use the analysis that's shown in

Page 165

1  Exhibit 8. So I think, as I recall,
2  that's basically it.
3      Q. And what efforts did you
4  undertake before appearing to testify
5  here today to in any way expunge your
6  knowledge of the work that was done in
7  preparing Exhibit No. 8 from your
8  general experience and background so you
9  could testify otherwise on the topics
10 you were going to be asked about in your
11 direct?
12         MS. AMRON: Objection on the
13 grounds that it mischaracterizes the
14 witness' testimony and is argumentative.
15         MR. STACK: I certainly
16 would dispute it is argumentative.
17 BY MR. STACK:
18     Q. Let me rephrase the
19 question. Mr. Burke, what did you do in
20 appearing to testify here today to
21 expunge, remove everything you learned
22 from your experience in assembling the
23 information with your colleague to
24 assist counsel in putting together

Confidential - Per 2004 MDL 1358 Order

Page 166

1  Exhibit No. 8?
2      MS. AMRON: And I will
3  object that it mischaracterizes the
4  witness' testimony.
5      A.  Well, I guess it is a
6  little hard to expunge things. But I
7  reviewed in my mind the -- my experience
8  in these areas in terms of, you know,
9  over the course of this time period,
10 what I have done in terms of working
11 with the industry, you know. Over this
12 time period Exxon Mobil repeatedly, as
13 I've checked it through the years, has
14 always ranked at the top in both
15 refining capacity and retail market
16 share. So, I mean, it wasn't too hard.
17 The tables in Exhibit 8 largely
18 confirmed what I had already known. It
19 just put some numbers behind it.
20     Q.  And with regard to the
21 information that's in Exhibit No. 8 in
22 the tables, those materials were
23 assembled within the last two to three
24 weeks?

Page 167

1      MS. AMRON: Objection on the
2  grounds of relevance and repeat my
3  standing objection to questions about
4  Exhibit 8?
5      A.  Yes, they were.
6      Q.  With respect to your
7  appearance here today, are you being
8  compensated for your time?
9      A.  Yes, I am.
10     Q.  Were you compensated for
11 your travel expenses to appear in New
12 York while en route to China?
13     MS. AMRON: Objection,
14 mischaracterizes his testimony.
15     A.  I have not been en route to
16 China. Sorry.
17     Q.  Are you going to China next
18 week?
19     A.  I am.
20     Q.  And did you fly in from
21 London to appear here today?
22     A.  Yes. Well, no, no, no.
23 Well, I was coming back anyway so I was
24 not compensated by counsel for flying

Page 168

1  back.
2      Q.  Did you stay in New York
3  last night?
4      A.  No.
5      Q.  Pardon me?
6      A.  No, I did not.
7      Q.  Okay. And with regard to
8  your transit from -- you did travel from
9  London-New York; am I correct?
10     A.  That's correct.
11     Q.  With regard to the transit,
12 were you paid for travel time to appear
13 here today?
14     A.  No.
15     Q.  But you are being
16 compensated for the time that you spent
17 to prepare for and appear at your
18 deposition here today?
19     A.  Yes, I am.
20     Q.  And at what rate are you
21 being compensated?
22     A.  I believe it is $460 an
23 hour.
24     MR. STACK: I have no

Page 169

1  further questions.
2      MS. AMRON: I do. Just a
3  few questions.
4      REDIRECT EXAMINATION
5  BY MS. AMRON:
6      Q.  Referring to Exhibit 8
7  which you have in front or you,
8  Mr. Burke, have you ever seen that
9  document before counsel handed it to you
10 today?
11     A.  No, I have not.
12     Q.  I don't have a copy of it.
13 It is a document called a stipulation.
14 Do you have an understanding -- before
15 counsel explained it to you today, did
16 you have an understanding of what a
17 stipulation is?
18     A.  Unfortunately, no. I'm not
19 a lawyer. So I did not.
20     Q.  Was your direct testimony
21 today based on the information that you
22 gained and knowledge that you have
23 gained during your 30 years of
24 experience in your current position?

43 (Pages 166 to 169)

Confidential - Per 2004 MDL 1358 Order

Page 170

```
 1       A.   Yes.
 2            MR. STACK: Objection.
 3            THE WITNESS: Yes, it was
 4   based on that.
 5   BY MS. AMRON:
 6       Q.   Did you review documents in
 7   preparation for preparing -- in
 8   preparation for testimony today?
 9            MR. STACK: Objection.
10       A.   Well, I -- as I've stated,
11   I reviewed these documents which we've
12   talked about, the National Petroleum
13   News, the Oil and Gas Journal, and a
14   list of terminals from the OPIS terminal
15   directory listing. So I have reviewed
16   some documents, yes.
17       Q.   Did you review those
18   documents that you've just mentioned to
19   prepare for your testimony today or
20   for -- to put together the charts in
21   Exhibit 8?
22            MR. STACK: Objection.
23       A.   It was put together, the
24   charts.
```

Page 171

```
 1       Q.   Did you review any
 2   documents specifically in preparation
 3   just for your testimony today?
 4            MR. STACK: Objection.
 5       A.   No. I've relied on my
 6   experience over time.
 7       Q.   Did you do any research
 8   specifically for your -- in preparing
 9   for your testimony today?
10            MR. STACK: Objection.
11       A.   I really did not. I was
12   told to rely on my knowledge that I've
13   gained over 30 years. I have mentioned
14   a number of specific engagements that
15   were relevant to how gasoline is
16   distributed, transported in California,
17   so I reviewed those really for memory.
18   I did not dig up the original reports or
19   analyses.
20       Q.   Now, you were asked by
21   Mr. Stack fairly early in his
22   questioning of you a series of questions
23   about working for individual pipelines.
24   Do you recall that series of questions?
```

Page 172

```
 1       A.   Yes.
 2       Q.   And you answered that you
 3   had not worked for the various pipeline
 4   systems that he mentioned to you?
 5       A.   That's correct.
 6       Q.   If you didn't work for
 7   those systems, how is it that you are
 8   familiar with common carrier pipelines
 9   in the United States?
10            MR. STACK: Objection.
11       A.   Well, I'm familiar from the
12   point of view of their relationship to
13   refining and moving product to market.
14   So typically my engagements have been
15   with refiners themselves or preparing
16   analyses for the, in this case, the
17   overall U.S. market or regional parts of
18   the U.S. market. And to do that, you
19   need to have a knowledge of how
20   pipelines work, common carrier pipelines
21   work and the big systems. But in
22   general, you know, I have not worked
23   directly for pipeline systems.
24       Q.   You were also asked a
```

Page 173

```
 1   series of questions about refining
 2   capacity, and you referred in your
 3   answer to the Oil and Gas Journal; is
 4   that correct?
 5       A.   That's correct.
 6       Q.   Is the Oil and Gas Journal
 7   a document that you -- or journal that
 8   you receive and rely on in the ordinary
 9   course of your work?
10            MR. STACK: Objection.
11       A.   Yeah, it's --
12            MR. STACK: A legal
13   conclusion.
14       Q.   You may answer the
15   question.
16       A.   The Oil and Gas Journal is
17   a weekly journal which is an industry
18   standard. You know, I have been
19   reviewing that, I think, for the past 30
20   years. It is basically -- provides news
21   and in some cases data for the industry.
22       Q.   And is that the type of
23   information that you rely on in
24   providing services to your clients?
```

44 (Pages 170 to 173)

Confidential - Per 2004 MDL 1358 Order

Page 174

1  MR. STACK: Objection.
2      A.  Well, it is one source,
3  yeah.
4      Q.  And you also have referred
5  to the National Petroleum News. Is that
6  also a source of information that you
7  generally rely on in the course of your
8  work?
9      A.  Yes. Yes.
10     Q.  And is it information that
11 you receive and gather in the normal
12 course of your work?
13     A.  We subscribe to the --
14     MR. STACK: Objection.
15     THE WITNESS: We subscribe
16 to the publication. We maintain it
17 going back a fair number of years.
18     As I mentioned, it doesn't
19 go all the way back to '85,
20 unfortunately, due to shelf space.
21     Q.  And I think when you said
22 it didn't go back all the way to '85,
23 you referred to a summary of the
24 information from API; correct?

Page 175

1      A.  This API Basic Data Book
2  covers data going back in series in some
3  cases back to 1960.
4      Q.  And can you just remind the
5  jury what API stands for?
6      A.  Yeah. It is the American
7  Petroleum Institute. It is an industry
8  association which essentially all of the
9  industry, you know, major refiners,
10 belong to.
11     Q.  And is the information that
12 you receive from API, is that the kind
13 of information that you typically rely
14 on in the course of your work?
15     MR. STACK: Objection.
16     A.  Yes.
17     Q.  And is it information that
18 you gather in the normal course of
19 business?
20     MR. STACK: Objection.
21     A.  It is one source,
22 absolutely.
23     MS. AMRON: I have no
24 further questions.

Page 176

1      MR. STACK: Nothing
2  further. Thank you, Mr. Burke. Travel
3  safely.
4      THE WITNESS: Thank you.
5      THE VIDEOGRAPHER: We're
6  going off the record. The time is
7  5:29 p.m. This is the end of tape 3 of
8  the deposition of Bruce F. Burke.
9      (Witness excused.)
10     (Whereupon the examination
11 adjourned at 5:29 p.m.)
12     ------

20          C E R T I F I C A T E
21     I hereby certify that the
22 proceedings and evidence noted are
23 contained fully and accurately in the
24 notes taken by me in the deposition of

Page 177

1  the above matter, and that this is a
2  correct transcript of the same.

7          Ann Kaufmann, RPR, CRR

11     (The foregoing certification
12 of this transcript does not apply to any
13 reproduction of the same by any means,
14 unless under the direct control and/or
15 supervision of the certifying reporter.)

45 (Pages 174 to 177)

Golkow Technologies, Inc. - 1.877.370.DEPS