**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ X

IN RE METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

------------------------------------------------------ X

**This Document Relates to:**

------------------------------------------------------ X

CITY OF NEW YORK, *et al.*,

Plaintiffs,

- against -

EXXON MOBIL CORPORATION,

Defendant.

------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/19/09

**OPINION AND ORDER**

**00 MDL 1898 (SAS)**

**04 Civ. 3417 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Almost five years after it was filed, a portion of the instant case (a "bellwether" trial) has now been on trial for close to three months. The case has been tried before one jury in several phases. The jury has reached a verdict on the first two phases. At the close of Phase III, the liability phase, ExxonMobil has

1

moved to preclude this jury from considering an award of punitive damages.[1]  Both

parties filed memoranda of law and supplemental letters addressing this issue, and

the Court heard several oral arguments.[2]  ExxonMobil argues that the City's

evidence of ExxonMobil's conduct, both presented and proffered, is insufficient, as

a matter of law, to establish the degree of malicious, reckless or wanton conduct

necessary to support an award of punitive damages.  For the following reasons,

ExxonMobil's motion is granted.

## II.    PROCEDURAL BACKGROUND

In Phase I of the trial, the jury held that the City intends, in good faith,

(a) to begin construction of the Station Six facility within the next fifteen years and

(b) to use the water from the Station Six wells, within the next fifteen to twenty

years, as a back-up source of drinking water.  In Phase II, the jury held that (a)

MTBE will be in the groundwater of the capture zone of the Station Six wells

when they begin operation and (b) MTBE will peak at 10 parts per billion ("ppb")

---

[1]    *See* ExxonMobil's Memorandum of Law in Support of Its Motion in Limine to Exclude Evidence and Argument on Joint and Several Liability and Punitive Damages and Proposed Testimony of Dr. Fogg and Mr. Burke.  This motion was granted in an oral decision. *See* Transcript ("Tr.") 10/14/09, 6927:19 - 6945:8.  This written decision supercedes and expands on that oral decision.

[2]    *See* 10/8/09 and 10/9/09 Letters from Victor M. Sher, counsel for the City, to the Court; 10/9/09 Letter from Peter J. Sacripanti, counsel for ExxonMobil, to the Court.

2

in the combined outflow of the Station Six wells in 2033. The state's current

maximum contaminant level ("MCL") is 10ppb.

## III.    FACTUAL BACKGROUND

The following summary is based on the evidence of malice the City

presented in Phase III of this trial, as well as that which it intends to offer in a

Phase IV (or punitive phase).    In summarizing these facts, I draw all reasonable

inferences in the City's favor.

The majority of the evidence presented in Phase III relates to the state

of ExxonMobil's general knowledge about MTBE at a national level. Specifically,

the City has shown ExxonMobil's awareness of (a) MTBE's effect on the taste and

odor of water, (b) MTBE's potential impact on human health, and (c) the existence

of spilling and leakage problems involving tanks storing gasoline containing

MTBE. While there is some evidence that there may have been some spills from

ExxonMobil owned or controlled stations in the area of Station Six, there is no

evidence of any major spill from an ExxonMobil station in that area. The case

against ExxonMobil is primarily based on its role as one of the many suppliers of

MTBE containing gasoline to New York harbor over a lengthy period of time.

### A.    MTBE's Effect on the Taste and Odor of Water

There is no dispute that at some level of concentration MTBE

3

contaminated water has a taste and odor that renders it unpleasant for use as drinking water. The City has introduced evidence in support of the inference that ExxonMobil was aware of this property of MTBE. *First*, Robert Scala, a former director of the Research and Environmental Health Division at Exxon, admitted on cross examination that in 1984 Exxon was concerned that certain gasoline additives, including MTBE, might render water undrinkable by humans.[3] *Second*, internal memoranda drafted in 1984 and 1985 by Barbara Mickelson, an Exxon employee, indicated to Exxon managers that MTBE has low taste and odor thresholds.[4] *Third*, Jack Spell, an employee of Exxon's Marketing Technical Services division, stated that he had received and shared a report from Shell Oil in 1984 indicating that the taste and odor of MTBE was detectable at five parts per billion.[5]

## B.    MTBE's Impact on Health

The parties vehemently disagree about the impact of MTBE on human health. The City has introduced evidence of animal studies suggesting that MTBE

---

[3]    *See* Tr. 9/2/09, 3239:7-20.

[4]    *See* PL 272, 8/23/84 Letter from Barbara Mickelson to V.M. Dugan Re: MTBE Contamination of Groundwater ("Mickelson Letter 8/23").

[5]    *See* PL 5506, 4/13/00 Clip Report from Videotaped Deposition of Jack Spell.

4

has carcinogenic properties. A City expert, for example, referenced three studies of experiments on two different species (rats and mice).[6] On the basis of these studies, the expert concluded that MTBE "is clearly an animal carcinogen, and . . . probably a human carcinogen."[7] In addition, she described the National Science and Technology Council's findings that "MTBE was a known animal carcinogen and . . . had the potential . . . to be a human carcinogen."[8]

Other studies have produced more mixed results. According to the City's toxicology expert, Dr. Kenneth M. Rudo, most studies investigating the mutagenic effect of MTBE on DNA were negative as of the 1980s.[9] However, in the late-1990s and 2000s several mutation studies showed damage to DNA.[10] According to Dr. Rudo, in total there have been eight or nine positive studies and probably ten to fifteen negative studies.[11]

By the mid-1980s, ExxonMobil was aware that MTBE posed certain health risks. In 1986, Spell and his supervisor G.N. Shah reviewed a letter stating

---

[6]    *See* Tr. 8/27/09, 2817:14-24.

[7]    *Id.* at 2817:23-24.

[8]    *See id.* at 2825:2-10.

[9]    *See id.* at 3262:2-3263:5.

[10]    *See id.*

[11]    *See id.*

that "MTBE has been identified as a health concern at the state and federal level when it is a contaminate in either ground water or air."[12]  Nearly ten years later, aware that regulators and members of the public were still asking questions about the safety of MTBE, Exxon staff prepared a slideshow in 1995 indicating that their strategy was to "continue to monitor data on MTBE in groundwater" and to participate in ongoing health studies in conjunction with others in the petroleum industry.[13]

## C.    Spilling and Tank Leakage Problems

Gasoline escapes into water by two means: large one-time spills and leakage over time.  Letters and memoranda drafted by Mickelson in 1984 and 1985 note that the company had experienced spills at over sixty sites.[14]  Tank leakage was also common due to the fact that many older tanks lacked sufficient corrosion protection.[15]  Exxon documents relating to tank failures and the company's

---

[12]    PL 5506, 1/1987 Jack Spell's Handwritten Note and Accompanying Memorandum from R.T. Harvin Dated 12/30/86.

[13]    PL 477, 5/19/95 Exxon Powerpoint Presentation: Oxygenate Strategy Review.

[14]    *See* Mickelson Letter 8/23.

[15]    *See* Tr. 9/2/09 at 3513:3-11.

6

Underground Tank Program date back to the late 1970s.[16]

Due to MTBE's physical properties, these problems were of particular concern when the gasoline being stored and transported contained MTBE. By the mid 1980's, Exxon executives were aware that (1) MTBE migrates farther than other contaminants and thus may affect greater areas than other gasoline components; (2) MTBE has low taste and odor thresholds; and (3) MTBE is difficult to remove.[17] Further, a handwritten memo prepared by Spell in 1984 stated that there were "ethical and environmental concerns" to using oxygenated gasoline because MTBE's increased solubility has implications for leaks from underground tanks into groundwater.[18]

These tank problems extended well into the 1990s. A 1995 slide show prepared by Exxon staff indicates that the "US Geological Service [had] recently released [a] report identifying MTBE as the second most common groundwater contaminant."[19] At some point after 1997, Mobil prepared a slide

---

[16]    *See, e.g.*, PL 473B, 11/2/78  Exxon Memorandum to Randall Meyer from C.R. Sitter Re: Underground Leak Detection, Prevention Program.

[17]    *See* Mickelson Letter 8/23.

[18]    PL 247, 4/3/84 Handwritten Memorandum from Jack Spell, Re: Use of MTBE in Exxon Mogas.

[19]    PL 477, 5/19/95 Exxon Powerpoint Presentation: Oxygenate Strategy Review.

7

show – presumably for internal purposes – explaining the company's MTBE risk reduction strategy.[20] While the slides show that it expected that more releases were inevitable, they also demonstrate that the company had plans and training in place to minimize the risk of releases.

### D.    New York Conduct

ExxonMobil knew that MTBE had contaminated water in New York. A survey completed by Mike Meola, an Exxon engineer, shows that in 1998 he tested for MTBE at 98 sites in New York, and found average MTBE concentrations of 50,000-100,000ppb.[2] However, there is no indication that ExxonMobil knew about MTBE contamination in New York before that point, or that ExxonMobil was aware of precisely how the MTBE concentrations that it had detected would affect groundwater at a distance from the spill site after the MTBE had dissolved and dissipated into a very large volume of groundwater. Indeed, a 1987 memorandum introduced by the City suggests that Mobil originally thought that MTBE's tendency to dissolve would lead it to dissipate to extremely low

---

[20]    *See* PL 1026, Mobil Presentation Slides: "Management Strategies for MTBE Remediation Liabilities."

[21]    *See* PL 3074, 4/24/98 Memorandum from Carol Fairbrother to Vic Dugan Re: EUSA Marketing Environmental Engineering MTBE Survey – Retail Stations, at 12.

levels in groundwater.[22]

The City has also established that an Exxon underground storage tank

spilled somewhere between 35,000 and 50,000 gallons of gasoline in Long

Island.[23]  However, that spill was in 1978 – before Exxon began adding MTBE to

gasoline.  The City has not introduced evidence of any major ExxonMobil gasoline

spills in New York after that point.

## IV.    LEGAL STANDARDS

### A.    Judgment as a Matter of Law

There is only one test for determining whether a party has produced

sufficient evidence on a disputed issue of fact.  The standard is always the same,

whether the motion is for summary judgment, judgment as a matter of law, a

renewed motion for judgment as a matter of law (judgment *non obstante*

*veredicto*), or a *motion in limine* to exclude all evidence in support of punitive

damages.[24]  To prevail, ExxonMobil must show that "a reasonable jury would not

---

[22]  *See* PL 2636, 5/6/87 Mobil Technical Service Laboratories
Correspondence to C.L. Hagan Re: MTBE in Water.

[23]    *See* Tr. 9/02/09, 3227:17-3228:4.

[24]    *See Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir.
2001) ("[I]n determining whether the evidence suffices to allow a reasonable jury
to find in plaintiff's favor, we apply the same standard to a pretrial motion for
summary judgment as to a motion for judgment as a matter of law during or after
trial.").

9

have a legally sufficient evidentiary basis to find" for the City.[25]  "[T]he burden of

demonstrating that no material fact exists lies with the moving party. . . ."[26]

       In turn, to defeat a motion for judgment as a matter of law, the

non-moving party must raise a genuine issue of material fact.  "When the burden of

proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the

movant to point to a lack of evidence on an essential element of the nonmovant's

claim."[27]  To do so, the non-moving party must do more than show that there is

"'some metaphysical doubt as to the material facts,'"[28] and it "'may not rely on

conclusory allegations or unsubstantiated speculation.'"[29]  However, "'all that is

required [from a non-moving party] is that sufficient evidence supporting the

---

[25]    Fed. R. Civ. P. 50(a)(1).

[26]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)
(citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).
*Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d
Cir. 2004).

[27]    *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).
*Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4
(S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof
at trial, the burden on the moving party may be discharged by showing – that is,
pointing out to the district court – that there is an absence of evidence to support
the nonmoving party's case.") (quotation marks omitted).

[28]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting
*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[29]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)
(quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

10

claimed factual dispute be shown to require a jury or judge to resolve the parties'

differing versions of the truth at trial.'"[30]

      In determining whether a genuine issue of material fact exists, the

court must "constru[e] the evidence in the light most favorable to the non-moving

party and draw all reasonable inferences" in that party's favor.[31]  However, "[i]t is

a settled rule that '[c]redibility assessments, choices between conflicting versions

of the events, and the weighing of evidence are matters for the jury, not for the

court on a motion . . . .'"[32] Judgment as a matter of law is therefore "appropriate

only if there is no genuine issue of material fact and the moving party is entitled to

judgment as a matter of law."[33]

### B.    Punitive Damages

      "A defendant's dissimilar acts, independent from the acts upon which

---

[30]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[31]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[32]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[33]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

liability was premised, may not serve as the basis for punitive damages."[34]  "A

defendant should be punished for the conduct that harmed the plaintiff, not for

being an unsavory individual or business."[35]  Further, "as a general rule . . . a State

[does not] have a legitimate concern in imposing punitive damages to punish a

defendant for unlawful acts committed outside of the State's jurisdiction."[36]

Accordingly, the New York Pattern Jury Instructions ("NY PJI") provide that a

jury may only punish "the act(s) of the defendant . . .that *caused* the injury

complained of."[37]

        The controlling standard for punitive damages in New York "has been

variously described but, essentially, it is conduct having a high degree of moral

culpability which manifests a conscious disregard of the rights of others or conduct

so reckless as to amount to such disregard."[38]  In order to recover punitive

damages, it must be shown that the defendant "acted with actual malice involving

an intentional wrongdoing, or that such conduct amounted to a wanton, willful or

---

[34]     *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23
(2003).

[35]     *Id.*

[36]     *Id.* at 423.

[37]     NY PJI 2:278 (emphasis added).

[38]     *Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 203
(1990) (citations and quotation marks omitted).

12

reckless disregard of plaintiffs' rights."[39]

To support a finding of actual malice, there must be an "evil motive on the part of the defendant," such that the defendant's actions were done out of "hatred, ill will, [or] spite" for the plaintiff.[40]  The NY PJI provides that malice requires "the *intent* to interfere with the rights of others."[41]  There is no malice under New York law unless, at a minimum, the defendant intended to harm the plaintiff.[42]

To justify punitive damages based on wanton and reckless conduct, the defendant must have acted with a "conscious indifference and utter disregard of its effect upon the health, safety [or] rights of others."[43]  As explained by the Second Circuit, "the recklessness that will give rise to punitive damages [in New

---

[39]    *Ligo v. Gerould*, 665 N.Y.S.2d 223, 224 (4th Dep't 1997).  *Accord Home Ins. Co.*, 75 N.Y.2d at 203 ("Such conduct need not be intentionally harmful but may consist of actions which constitute willful or wanton negligence or recklessness.").

[40]    *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479 (1993) (quotation marks omitted).

[41]    NY PJI 2:278 Damages—Punitive (emphasis added).

[42]    *Cf. Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 838 (2d Cir. 1967) (noting that plaintiff "does not claim that defendant intended to harm him" and then considering whether defendant's conduct was reckless and morally culpable under New York law).

[43]    NY PJI 2:278 Damages—Punitive.

York law] must be close to criminality."[44]  Under this standard, "[a] person acts

recklessly with respect to a result . . . when [s]he is aware of and consciously

disregards a substantial and unjustifiable risk that such result will occur or that

such circumstance exists."[45]  "The risk must be of such nature and degree that

disregard thereof constitutes a gross deviation from the standard of conduct that a

reasonable person would observe in the situation."[46]

Punitive damages are never warranted unless "the very high threshold

of moral culpability is met."[47]  This is because punitive damages are "a socially

exemplary remedy, not a private compensatory remedy."[48]  Accordingly, to warrant

the imposition of punitive damages, the reckless conduct at issue must be

"sufficiently blameworthy" such that punishing it "advance[s] a strong public

---

[44]     *Roginsky*, 378 F.2d at 843. *Accord Home Ins. Co.*, 75 N.Y.2d at 203
(referring to punitive damages as "a sort of hybrid between a display of ethical
indignation and the imposition of a criminal fine.").

[45]     *Roginsky*, 378 F.2d at 843 (quotation marks omitted).

[46]     *Id.* (quotation marks omitted).

[47]     *Giblin v. Murphy*, 73 N.Y.2d 769, 772 (1988).

[48]     *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358 (1976). *Accord Ross
v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007) ( "Punitive damages are not
to compensate the injured party but rather to punish the tortfeasor and to deter this
wrongdoer and others similarly situated from indulging in the same conduct in the
future.").

14

policy of the State."[49]  Because "punitive damages . . . are aimed at deterrence and
retribution,"[50] one factor to consider in determining whether punitive damages are
warranted is whether there is a need to deter that conduct in the future.  In *Ross v.
Louise Wise Services, Inc.*, the New York Court of Appeals concluded that one
factor weighing against the imposition of punitive damages was that the conduct
complained of in that case had been banned by an intervening statute, with the
consequence that punitive "damages would [not] deter future reprehensible
conduct."[51]

　　　　　Two factors are particularly important in assessing the availability of
punitive damages.  *First*, as the Second Department explained in 2007, to analyze
"the egregiousness of a tortfeasor's conduct, and the corresponding need for
deterrence," courts  must "take into account the importance of the underlying right
or public policy jeopardized by the tortfeasor's conduct. . . . [T]he more important
the right at issue, the greater the need to deter its violation."[52]  *Second*, the plaintiff
must introduce evidence showing that the defendant's conduct in the case on trial,

---

[49]    *Randi A.J. v. Long Island Surgi-Center*, 46 A.D.3d 74, 81 (2d Dep't
2007) (emphasis added).

[50]    *State Farm*, 538 U.S. at 416.

[51]    *Ross*, 8 N.Y.3d at 489.

[52]    *Randi A.J.*, 46 A.D.3d at 81.

15

viewed at the time that conduct occurred, manifested a conscious disregard of an unacceptably high risk of harm.[53]

Although determination of a defendant's state of mind is generally a question for the jury, this does not relieve the court of its obligation to determine whether there is sufficient evidence for a reasonable jury to find that the requisite state of mind existed.[54] Once "all the evidence is . . . considered" the court must decide if "there is enough to warrant the finding that the law requires."[55]

## V.    DISCUSSION

The City does not claim that ExxonMobil had a malicious intent to harm the City or anyone else. Rather, the City contends that ExxonMobil acted with a high degree of moral culpability, such that its conduct manifested a wanton

---

[53]    *See In Re Matter of New York City Asbestos Litig.*, 89 N.Y.2d 955, 956 (1997) (holding that punitive damages were not appropriate where there was evidence that defendant had general knowledge of the dangers of asbestos, but where defendant did not have knowledge that the workers alleged to be injured in the case "were at risk at any time it could have warned them."). *Accord Ross*, 8 N.Y.3d at 488-89 (holding that it would not be appropriate to punish an adoption agency for its 1960's era policy of not disclosing adopted children's mental health records in part because mental health professionals of that era "thought that mental illness could be avoided if a child were placed in a loving environment and that disclosure of birth parents' emotional disturbances would negatively affect the child's bonding with the adoptive parents").

[54]    *See Roginsky*, 378 F.2d at 850.

[55]    *Id.*

16

and reckless disregard for the City's rights.

      The punitive damages evidence that the City has produced, and proffered, primarily relates to ExxonMobil's general awareness of the dangers of MTBE and its decision to continue producing, distributing and storing MTBE without providing sufficient warnings about its dangers or taking steps to ensure that those dangers were averted. The City has also proffered evidence of major spills of gasoline that caused severe MTBE contamination of groundwater sources across the country. While this type of evidence might form part of the predicate for the imposition of punitive damages in an appropriate case, the narrow question presented by this motion is whether the City has produced or proffered sufficient evidence to allow a reasonable jury to conclude that ExxonMobil's conduct *with respect to Station Six* manifested a wanton, reckless and highly immoral disregard for the rights of others.

      The decision of whether to *permit* an award of punitive damages turns on the recklessness and moral turpitude of ExxonMobil's conduct. The appropriate *amount* of punitive damages to be awarded, by contrast, turns largely on the harm or potential harm to the City caused or risked by ExxonMobil's conduct. Although recklessness and degree of harm are, for this reason, distinct issues, they are interrelated. As the Second Circuit explained more than forty years

ago, conduct is reckless if it creates a "substantial and *unjustifiable* risk" of harm.[56] To be unjustifiable, the risk must be of "such nature and degree" that disregard thereof constitutes a "*gross deviation* from the standard of conduct that a reasonable person would observe in the situation."[57]

To make this determination, it is necessary to balance the *severity* of the harm and the probability of its occurrence, because conduct posing a high risk of *slight* harm would not constitute a *gross deviation* from the reasonable standard of care. The NY PJI captures this point by explaining that to be sufficiently reckless to warrant punitive damages, a defendant's conduct must "represent[] a high degree of immorality."[58] In some cases – such as civil rights cases and defamation cases – conduct may be immoral for reasons that have little or nothing to do with that conduct's propensity to inflict compensable harm. In a toxic tort case, however, a defendant's conduct relating to the manufacture, use or distribution of a toxic substance represents a high degree of immorality only if that conduct causes or creates a substantial risk of severe harm to the population or the environment. Thus, in evaluating whether ExxonMobil's conduct was sufficiently

---

[56]    *Id.*

[57]    *Id.*

[58]    NY PJI 2:278 Damages—Punitive.

18

reckless to warrant punitive damages, this Court must consider the extent to which

ExxonMobil's conduct, with respect to present or future harm to the Station Six

wells, risked severe harm to the population or the environment, such that punishing

it would advance "a *strong* public policy of the State" of New York in light of "the

importance of the underlying right."[59]

---

[59]     *Randi A.J.*, 46 A.D.3d at 81 (emphasis added). *See also Hooker
Chemicals*, 850 F. Supp. 993 at 998 (in toxic tort case concluding that "actual
awards of punitive damages are rare in the absence of conclusive evidence of
serious injury or deliberately flaunting regulatory standards"). In a letter written
by the City after the oral decision was read into the record, the City argued that
"[u]nder New York law the availability of punitive damages turns on the nature of
ExxonMobil's conduct, not on the degree of harm suffered by the City." 10/15/09
Letter from Victor M. Sher, counsel for the City, to the Court ("Pl. Ltr."). But as
this passage makes clear, the *nature* of ExxonMobil's allegedly reckless conduct
cannot be analyzed separately from the degree of *harm* caused or *risked* by that
conduct. In support of its position, the City cites decisions indicating that, under
New York law, "[p]unitive damages are available even when the actual harm
suffered is only nominal, specifically in trespass cases." *id.* (citing *Ligo*, 665
N.Y.S.2d at 224 (awarding $1 in nominal damages and $1500 in punitive damages
in trespass case where defendant acted with "actual malice" in entering upon "the
property of plaintiffs without their consent and dumping compost on their porch
and boathouse roof"). The City's argument is not persuasive for several reasons.
*First*, the issue of whether punitive damages are available when a plaintiff only
recovers nominal damages is sufficiently unsettled that the Second Circuit recently
certified that very question to the New York Court of Appeals, asking whether "the
plaintiff [may] recover nominal or punitive damages without demonstrating
pecuniary loss or other actual injury." *Colavito v. New York Organ Donor
Network, Inc.*, 438 F.3d 214, 233 (2d Cir. 2006). *See also Colavito v. New York
Organ Donor Network, Inc.*, 8 N.Y.3d 43, 58 (2006) (accepting the certified
questions but not reaching the punitive damages question). *Second*, the rare New
York decisions allowing punitive damages absent a finding of actual damages have
done so only in cases where there is *actual malice*, as opposed to recklessness.
*See, e.g., Ligo*, 665 N.Y.S.2d at 224 (finding "actual malice"); *Bryce v. Wilde*, 333

The City's and the public's right to *potable* drinking water is

undoubtedly of paramount importance. If it were shown that a defendant's conduct

led to a high concentration of MTBE in an active water supply that exceeded the

MCL, that conduct would interfere with the plaintiff's important right to have

*potable* and *legally dispensable* drinking water. The jury has already found,

however, that MTBE concentrations at Station Six – which is not yet active – will

reach a peak of 10ppb in 2033. Moreover, the City never provided any water to its

residents from Station Six, and had it sought to do so, it would have been required

to treat the other contaminants in those wells before it could use the water. While I

have held that MTBE concentrations that do not exceed the MCL may injure the

City because a reasonable water provider may deem it best to clean up even low

concentrations of MTBE, it is uncontested that New York's current public policy

---

N.Y.S.2d 614, 616 (3d Dep't), *aff'd on other grounds*, 31 N.Y.2d 882 (1972)
("Punitive damages [in a tortious interference with contract case] are not
recoverable alone although they may be based upon an award of nominal
compensatory damages and there must be *actual malice* shown on the part of a
defendant." (emphasis added)). As discussed below, the City has never alleged
that ExxonMobil acted toward it with actual malice. *Third*, the City has not cited
any toxic tort case – or any case at all – in which punitive damages were awarded,
absent actual malice, when both the actual and potential harm were not substantial.
In light of these considerations, I predict that the New York Court of Appeals
would not permit an award of punitive damages on the facts developed by the
parties in this bellwether trial. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d
114, 119 (2d Cir. 1994) ("Where the substantive law of the forum state is uncertain
or ambiguous, the job of the federal courts is carefully to predict how the highest
court of the forum state would resolve the uncertainty or ambiguity.").

20

allows water providers to serve water with MTBE contamination at or below the

MCL of 10ppb.  Thus, although a reasonable jury may conclude that the City is or

will be injured by the 10ppb contamination, punishing ExxonMobil for its

contribution to this injury would not "advance a *strong* public policy of the State"

or protect against a *severe* risk to the public.[60]

A further consideration strengthens this conclusion.  Prior to a

revision of the MCL effective December 24, 2003, water providers in New York

were permitted to serve water containing 50ppb of MTBE.[61]  In December 1999,

then-Governor George Pataki reduced the permissible limits of MTBE in

underground aquifers, lakes and rivers, from 50ppb to 10ppb.[62]  The recklessness

and moral iniquity of conduct must be evaluated by the standards that prevailed at

the time of the conduct.[63]  There is no genuine dispute that the vast majority of the

---

[60]     *Randi A.J.*, 46 A.D.3d at 81.

[61]     *See* NYS Register, December 24, 2003, at 3.

[62]     *See* 11/10/99 N.Y. Times B6.

[63]     *See Ross*, 8 N.Y.3d at 490-91 (finding no recklessness for failing to
disclose adopted children's medical history in the 1960's because, *at that time*,
"[m]any thought that mental illness could be avoided if a child were placed in a
loving environment" and noting that the fact that a statute was enacted only in
1993 to require such disclosures "is a factor in determining that punitive damages
are inappropriate").

conduct that produced the City's injury occurred *prior* to December 1999.[64] As a result, there is also no genuine dispute that the vast majority of the conduct that produced the City's injury led to persistent levels of MTBE in the capture zone of Station Six that are well below the MCL in place at the time the conduct occurred.

The City correctly emphasizes that the availability of punitive damages turns not just on the actual harm caused by the defendant's conduct, but also on the degree of potential harm to the plaintiff that was risked by the defendant's conduct.[65] In light of the jury's finding that the City will have 10ppb of MTBE in its Station Six wells, the jury might reasonably conclude that the combined conduct of every company created a *risk* that the Station Six wells would contain more than 10ppb of MTBE. Of course, as the City has argued, this finding

___

[64]    According to his corrected analysis, plaintiff's expert David Terry examined thirty-six spill reports that occurred at twenty-three sites. *See* David B. Terry, Memorandum Documenting Corrections to Original Analysis 2, at 5 (5/14/09), Ex. C to 7/28/09 Declaration of Daniel Greene, counsel for the City, in Opposition to ExxonMobil Corp.'s Motion to Exclude Opinions of Plaintiff's Expert David Terry. Of these spill reports, only thirteen were entered in 1999 or thereafter. *See id.* Of the thirty-six spills in Terry's report, the City produced evidence of only a few spills that may have occurred after December 1999. *See, e.g.*, PL 14840, 2/9/05 Delta Environmental Consultants Site Investigation Summary Report for BP Service Station at 113-40 Merrick Boulevard (reporting tank test failure in 2003); PL 11255, 7/24/08 Kleinfelder's Supplemental Subsurface Investigation Report for Mobil Gas Station at 138-50 Hillside Ave. (2001 tank overfill).

[65]    *See Roginsky*, 378 F.2d at 843.

was made by a preponderance of the evidence, which means that there is also some

chance that there will be even less MTBE contamination by the time the wells are

available for use as a back-up source of drinking water, which this jury found will

occur within the next fifteen to twenty years. Moreover, ExxonMobil can be

punished only for its own conduct[66] and no reasonable jury could find that

ExxonMobil's conduct, taken alone, created a substantial risk that the persistent

levels of MTBE in Station Six would exceed the MCL. Further, and most

important, based on the evidence proffered and produced, no reasonable jury could

conclude that ExxonMobil's conduct after December 1999 created a substantial

risk of contamination greater than 10ppb in the Station Six wells or that its conduct

prior to December 1999 created a substantial risk of contamination greater than

50ppb in the Station Six wells.

Finally, there is no credible evidence from which a jury could

conclude that the risk of harm to the City, resulting from ExxonMobil's conduct,

significantly outstripped the actual harm caused by that conduct. This is so for

several reasons. *First*, the Station Six wells have not been used as a source of

water supply to City residents at any time relevant to this litigation and, due to

---

[66]    *See Felice v. Delporte*, 524 N.Y.S.2d 919, 920 (4th Dep't 1988)
(noting that because punitive damages "are in the nature of a penalty . . .
contribution among tortfeasors is not permissible"). *See also Rodick v. City of
Schenectady*, 1 F.3d 1341, 1349 (2d Cir. 1993) (same).

23

preexisting contaminants, significant time is required before the wells can be

returned to service. In addition, there is no evidence that it would take a longer

period of time to treat higher concentrations of MTBE. Thus, even if there was a

risk that the contamination of the groundwater might have been at a higher level

than that found by the jury, there was no substantial risk that this would cut off an

active water supply or delay its use. *Second*, the City argued at length that all

underground storage tanks experience some small level of regular leakage that is

unreported.[67] The City argued that its contamination was caused by small reported

leaks and many unreported spills from underground storage tanks, both of which

were foreseeable. The City did not produce any evidence to show that these

foreseeable spills and leaks created a substantial risk of *greater* contamination than

that which occurred, or will occur, in the Station Six wells. Rather, the only risk of

greater contamination in Queens would come from a major spill, such as that

experienced in other jurisdictions. But if a major spill had contaminated the

Station Six wells, the recklessness of the direct spiller would have been the primary

cause of the injury. For purposes of punitive damages, where each party is

responsible only for its own conduct, a direct spiller's recklessness cannot be

---

[67]    *See* Summation of Victor Sher, for the City, Tr. 6559:15-17 (arguing
that the "key point is that [ExxonMobil] knew that [its] gasoline would go to a
universe of un-upgraded stations that leaked like sieves").

24

attributed to ExxonMobil in its role as a manufacturer or distributor of gasoline

containing MTBE. Thus, ExxonMobil, in its role as a manufacturer and

distributor, did not create a substantial risk of severely injuring the City at its

Station Six wells. Further, ExxonMobil's conduct in its role as a controller of

gasoline stations – from which no major spills occurred – did not create a

substantial risk of severely injuring the City at its Station Six wells. In sum, I

predict that the New York Court of Appeals would not permit an award of punitive

damages against a manufacturer and distributor of gasoline containing MTBE

based on the risk that another company might have caused a major spill

contaminating the Station Six wells, which do not actively supply any water to

New York City residents.

As for deterrence, which is but one factor to consider, New York

banned the use of MTBE in 2004. Therefore, as in *Ross*, there is no need to deter

further reprehensible conduct specifically relating to the use of MTBE in New

York.[68] However, New York has an interest in deterring *similar*, in addition to

---

[68]    *See Ross*, 8 N.Y.3d at 491 (holding that because a state statute, enacted after the conduct occurred, precluded that type of conduct from occurring in the future, punitive "damages would [not] deter future reprehensible conduct"). *Cf. Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 543 (S.D.N.Y. 2007) (declining, at the pleading stage, to dismiss punitive damage claim relating to PCB – a substance that had previously been banned).

*identical*, conduct.[69]  This might include an interest in deterring gasoline companies from placing *other* substances in gasoline that create a substantial risk of severe injury to groundwater.  However, with respect to Station Six, because the City has not presented evidence that ExxonMobil's conduct presented a substantial risk of severe injury to the City's groundwater, punishing that conduct does not serve any valid deterrence goal in New York.

## VI.    CONCLUSION

For the foregoing reasons, ExxonMobil's motion is granted.  I stress, however, that this holding is necessarily limited to the facts presented at this bellwether trial, where the City has not shown that ExxonMobil's conduct created either significant actual harm or a substantial risk of severe harm to the Station Six wells.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

---

[69]     *See, e.g.*, *Walker v. Sheldon*, 10 N.Y.2d 401, 404 (1961) ("Punitive . . . damages have been allowed . . . not only to punish the defendant but to deter him, as well as others . . . from indulging in *similar* conduct in the future." (emphasis added)).

Dated:     New York, New York
           October 19, 2009

## -Appearances-

**Counsel for Plaintiff City of New York:**

Victor M. Sher, Esq.                    Susan Amron
Todd E. Robins, Esq.                    Daniel Greene
Joshua G. Stein, Esq.                   Assistant Corporation Counsel
Nicholas G. Campins, Esq.               100 Church Street
Marnie E. Riddle, Esq.                  New York, New York  10007
Sher Leff LLP                           (212) 788-1568
450 Mission Street, Suite 400
San Francisco, California  94105
(415) 348-1568

**Counsel for Exxon Mobil Corporation:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173
(212) 547-5583

28