UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X
                 :

IN RE: METHYL TERTIARY BUTYL   :
ETHER ("MTBE") PRODUCTS       :
LIABILITY LITIGATION           :

-------------------------------------------------- :
                 :

This document relates to:        :
                 :

*City of Merced Redevelopment Agency v.*  :
*ExxonMobil Corp. et al.*, 08 Civ. 6306   :
                 :

-------------------------------------------------- X

**OPINION AND ORDER**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

In this consolidated multi-district litigation ("MDL"), plaintiffs seek relief for contamination, or threatened contamination, of groundwater from various defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol ("TBA"), which is a product formed by the natural degradation of MTBE in water. The parties have already engaged in extensive motion practice, and familiarity with the Court's previous opinions is assumed.[1] In this case, plaintiff City of Merced Redevelopment Agency

-------------------------

[1]    For a thorough recitation of plaintiffs' factual allegations, see, for example, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005).

1

("Merced") filed an action in state court based on state statutory law and state common law. Defendants removed to federal court on the basis of section 1503 of the Energy Policy Act of 2005 ("Energy Policy Act"). I raised the issue, *sua sponte*, of whether that removal was constitutionally permissible under Article III.

The Government, which intervened in this action pursuant to 28 U.S.C. § 2403(a), argues that section 1503 should be read to require the assertion of a federal defense or the presence of minimal diversity. Because this interpretation would contradict the plain meaning of clear statutory language, I decline to follow the Government's recommendation. However, in this case, defendants have asserted a federal defense and the parties are minimally diverse. The presence of either a federal defense or minimal diversity is sufficient to satisfy the requirements of Article III, and therefore, the statute is constitutional as applied to this specific case. Accordingly, following principles of judicial restraint, I decline to determine whether this statute would be unconstitutional in the absence of a federal defense or minimal diversity.

## II.    BACKGROUND

### A.    Procedural History

On April 3, 2008, Merced filed an action against defendants in the Superior Court of California for the County of Merced. The complaint sought

remedies solely under state statutory law and state common law.[2] Nevertheless,

defendants removed the case to the United States District Court for the Eastern

District of California on the basis of section 1503 of the Energy Policy Act.[3] That

statutory provision states in its entirety: "Claims and legal actions filed after the

date of enactment of this Act related to allegations involving actual or threatened

contamination of methyl tertiary butyl ether (MTBE) may be removed to the

appropriate United States district court."[4] While the Notice of Removal did not

assert any federal defenses, or cite any other basis for removal, defendants'

subsequently filed answer did assert several affirmative defenses based on federal

law.[5] In addition, according to the Complaint, which was attached to the Notice of

Removal, while Merced is a California agency, and defendant Chevron has its

---

[2]     *See* Merced Complaint filed in rhe Superior Court of the State of
California for the County of Merced ("Compl.") ¶¶ 32-57.

[3]     *See* 4/7/08 Defendants' Notice of Removal ("Notice of Removal"),
Ex. B to Declaration of Sarah S. Normand, Assistant United States Attorney for
the Southern District of New York ("Normand Decl.").

[4]     Energy Policy Act of 2005 ("Energy Policy Act"), Pub. L. No. 109-
58, § 1503, 119 Stat. 594, 1076.

[5]     *See* Notice of Removal. *See also* Defendant Exxon Mobil
Corporation's Answer to Compl. ¶¶ 73, 86, 93, 103-113 (asserting the following
federal defenses: compliance with federal laws, orders, duties and standards;
federal preemption; MTBE contamination amounts within federal water quality
standards; claim for punitive damages barred by Due Process and Excessive Fines
Clauses of the United States Constitution).

principal place of business in California, no other defendant is either incorporated in California or has its principal place of business in California.[6]

The United States Judicial Panel on Multidistrict Litigation transferred the case to the Southern District of New York on July 9, 2008.[7] Shortly after transfer, I ordered the parties to show cause "why this action should not be remanded to state court because it does not 'aris[e] under' federal law within the meaning of Article III of the Constitution, given that no federal issue appears to be stated in the complaint or the removal petition."[8] Merced argued that section 1503 was unconstitutional on the ground that it "grant[s] jurisdiction over a particular class of cases that do not [arise under] the Constitution, law, or treaties of the United States"[9] and requested that the action be remanded to state court.[10] Defendants disagreed, arguing that this Court has jurisdiction on three independent grounds: (1) because section 1503 "is part of a comprehensive

---

[6]    *See* Compl. ¶¶ 1, 5-14.

[7]    *See* 7/9/08 Conditional Transfer Order Issued by the United States Judicial Panel on Multidistrict Litigation, Ex. D to Normand Decl.

[8]    11/12/08 Order to Show Cause at 1.

[9]    Plaintiff City of Merced Redevelopment Agency's Response to Defendants' Response to Order to Show Cause Why This Action Should Not Be Remanded ("Merced Resp.") at 3.

[10]    *See id.* at 15.

4

congressional scheme";[11] (2) because defendants have asserted federal defenses;[12] and (3) because "this Court has protective jurisdiction, premised upon congressional authority to protect national interests by creating a federal forum for certain disputes."[13]

Following party briefing, I certified to the Attorney General of the United States, pursuant to 28 U.S.C. § 2403(a), that the constitutionality of the Energy Policy Act had been called into question, and afforded the Attorney General an opportunity to intervene within sixty (60) days.[14] The Government elected to intervene and has submitted memoranda of law in support of section 1503's constitutionality.[15] The Government argues that section 1503 is constitutional because defendants have asserted federal defenses and because

---

[11] Defendants' Response to Order to Show Cause Why This Action Should Not Be Remanded at 1.

[12] *See id.* at 2.

[13] *Id.*

[14] *See* 2/27/09 Letter from the Court to the Attorney General of the United States, Ex. F to Normand Decl. *See also* Fed. R. of Civ. P. 5.1.

[15] *See* United States of America's Memorandum of Law in Support of the Constitutionality of Section 1503 of the Energy Policy Act of 2005 ("U.S. Mem."); United States of America's Reply Memorandum of Law in Further Support of the Constitutionality of Section 1503 of the Energy Policy Act ("U.S. Reply Mem.").

5

Merced is diverse from at least one defendant.[16]  Accordingly, it suggests, I do not need to reach defendants' other grounds for jurisdiction.[17]

**B.     Energy Policy Act of 2005**

The Energy Policy Act is an omnibus act dealing with nationwide energy issues.  It contains two provisions relating to MTBE.  *First*, the statute memorializes Congressional findings that the "Clean Air Act Amendments of 1990 . . . established a fuel oxygenate standard under which reformulated gasoline must contain at least 2 percent oxygen by weight" and that the "fuel industry responded to [this standard] by making substantial investments in . . . (A) MTBE production capacity . . . and (B) systems to deliver MTBE-containing gasoline to the marketplace."[18]  *Second*, the statute enacts section 1503 – which allows for the removal of legal actions related to allegations of MTBE contamination.[19]

Originally, the Energy Policy Act also included a safe harbor provision retroactively limiting or even eliminating liability for MTBE producers

---

[16]     *See* U.S. Mem. at 1-2.

[17]     *See id.* at 2.

[18]     Energy Policy Act § 1502.

[19]     *See id.* § 1503.

and distributors.[20]  However, due to widespread objections by members of

Congress, the provision was removed.[21]  As a compromise, section 1503 was

added in its place.[22]

The legislative history relating to section 1503 is sparse.  Senator

Charles Schumer provided a summary of congressional intent in the conference

report.  In relevant part, he stated that "nothing in the [provision] will alter the

substantive law that courts. . . apply in these cases" and that the provision "is not

intended to provide Federal courts with exclusive or subject matter jurisdiction or

grant Federal courts jurisdiction over nonproduct liability cases, such as

---

[20]     *See* 149 Cong. Rec. S15212 (daily ed. Nov. 20, 2003) (statement of
Sen. Dianne Feinstein) ("Let me take up MTBE. In this bill, there is a liability
waiver so nobody can sue for the fact that MTBE has been found to be defective
by a court of law.  Not only that, it is a retroactive liability protection for MTBE
producers.  This provision offers them immunity from claims that the additive is
defective in design or manufacture.  It makes this liability protection retroactive to
September 5 of this year thereby wiping out hundreds of lawsuits brought by local
jurisdictions all across America.  This retroactive immunity is a perverse incentive
to those who pollute because it says to them, OK, you have done all of this
damage; nonetheless, it does not really matter.  You do not really have any
liability. All these suits will be wiped out.").

[21]     *See, e.g.*, 151 Cong. Rec. H6949 (daily ed. July 28, 2005) (statement
of Rep. Bart Stupak) ("I am happy that the 'safe harbor' provisions for
manufacturers of MTBE that were in the House bill were dropped.  Instead, there
is a provision allowing lawsuits to be sent to Federal court if a defendant wants to
make a request to do so.").

[22]     *See id.*

7

environmental cleanup and cost recovery cases involving general petroleum spills

initiated by State government and private citizens."[23]

Section 1503's effect on subject matter jurisdiction was also

addressed in a somewhat confused colloquy between Representatives Bart Stupak

and Joe Barton:

> Chairman Barton. The Section 1504 [Sic] is a negotiated section between the House and the Senate, that in lieu of the base text language in the House bill on MTBE, we put in a section that is permissive, that for prospective claims, defendants may request that they be consolidated in a Federal court as opposed to a State court. It is a permissive, not mandatory, thing.
>
> Mr. Stupak. So in that case, then it can remain in the State courts. So this provision does not in any way give the Federal courts a new subject jurisdiction over MTBE cases?
>
> Chairman Barton. The base text that's before the conferees, on existing MTBE lawsuits, changes nothing on prospective MTBE lawsuits, that is, lawsuits that have not yet been filed.
>
> Mr. Stupak. Correct.
>
> Chairman Barton. It gives the defendant in the lawsuit, the prospective lawsuit, if it were to be filed, the right to request that the lawsuit be sent to a Federal court.
>
> Mr. Stupak. Or it could remain in the State court if –
>
> Chairman Barton. Well, it just gives them right to request

---

[23]    151 Cong. Rec. S9255 (daily ed. July 28, 2005).

it. Now I am not an attorney, so I am not-but that's what the
section does.

. . . .

Mr. Stupak. Discretionary. They don't have to. It is within
their discretion to go to Federal court, if the defendants so choose.

Chairman Barton. That's correct.

Mr. Stupak. And then it is up to the judge whether or not
the case is properly there or remanded back to State court?

Chairman Barton. That's my understanding.

Mr. Stupak. So we are not conferring a new substantive or
subject matter jurisdiction over these cases?

Chairman Barton. Not to my knowledge.[24]

It is difficult to comprehend the exact meaning of this colloquy. However, the

following day Senator Patrick Leahy confirmed its conclusion that section 1503

was not intended "to alter the subject matter jurisdiction of [MTBE] cases."[25]

## III. APPLICABLE LAW

### A. Federal Court Jurisdiction

"The district courts of the United States . . . are courts of limited

---

[24]   *Id.*

[25]   *See* 151 Cong. Rec. S9335 (daily ed. July 28, 2005).

9

jurisdiction."[26] They only possess jurisdiction over a matter if they have both

constitutional authorization under Article III and federal statutory authorization.[27]

Moreover, it is "firmly establish[ed] that Congress may not expand the jurisdiction

of the federal courts beyond the bounds established by the Constitution."[28] The

two most important basis for federal court jurisdiction are federal question

jurisdiction and diversity jurisdiction.

### 1. Federal Question

Under Article III, the federal judicial power "extend[s] to all Cases . .

. arising under this Constitution, the Laws of the United States, and treaties made,

or which shall be made, under their Authority."[29] The Supreme Court has

interpreted this provision as authorizing federal courts to entertain jurisdiction

over "all cases in which a federal question is 'an ingredient' of the action."[30] This

---

[26]     *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552
(2005) (quotation marks and citation omitted).

[27]     *See id.* The burden of establishing federal court jurisdiction falls on
the party asserting jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of
America*, 551 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside
this limited jurisdiction, and the burden of establishing the contrary rests upon the
party asserting jurisdiction.") (citation omitted)).

[28]     *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 491 (1983).

[29]     U.S. Const. Art. III, § 2, cl. 1.

[30]     *Merrell Dow Pharms. Inc. v. Thomson*, 478 U.S. 804, 807 (quoting
*Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 823 (1824)).

constitutional grant is much broader than the grant established by the federal statute, 28 U.S.C. § 1331, that authorizes federal question jurisdiction.[31]  For example, while section 1331 only permits federal court jurisdiction when an issue of federal law appears on the face of a "well-pleaded" complaint,[32] it is well established that Congress could constitutionally extend federal court jurisdiction to any matter where there is a colorable federal defense.[33]

Not every federal statute, however, is constitutionally sufficient to create federal question jurisdiction.  There is a "distinction between jurisdictional statutes and the federal law under which [an] action arises."[34]  "Pure jurisdictional statutes which seek to do nothing more than grant jurisdiction over a particular class of cases cannot support Article III arising under jurisdiction."[35]  For a pure jurisdictional statute to survive constitutional review, the relevant jurisdictional provision must either be limited to circumstances where the requisite federal law

---

[31]     *See id.*

[32]     *Id.* at 808 (quotation marks and citation omitted).

[33]     *See id.*

[34]     *Mesa v. California*, 489 U.S. 121, 136 (1989) (quotation marks and citation omitted).

[35]     *Id.* (quotation marks and citation omitted).

11

comes from another source[36] or be part of "a 'comprehensive scheme' comprising both pure jurisdictional provisions and federal law capable of supporting Article III 'arising under' jurisdiction."[37]

### 2. Diversity Jurisdiction

Article III also grants federal courts jurisdiction over "Controversies . . . between Citizens of different states."[38] As with federal question jurisdiction, the Supreme Court has interpreted 28 U.S.C. § 1332 – the federal statute enabling diversity jurisdiction – as establishing a narrower jurisdictional grant than that allowed by the Constitution. While section 1332 requires complete diversity (*i.e.*, every plaintiff must be diverse from every defendant), minimal diversity (*i.e.*, at least one plaintiff must be diverse from at least one defendant) is sufficient to satisfy the requirements of Article III.[39]

---

[36] *See, e.g.*, 28 U.S.C. § 1331 (creating federal jurisdiction when a civil action "aris[es] under the Constitution, laws, or treaties of the United States"); *Mesa*, 489 U.S. at 139 (holding the federal officer removal statute constitutional because, according to the Supreme Court's long-standing interpretation of the statute, removal based on the statute "must be predicated upon averment of a federal defense").

[37] *Mesa*, 489 U.S. at 136 (quoting *Verlinden*, 461 U.S. at 496).

[38] U.S. Const. Art. III, § 2, cl. 1.

[39] *See State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530-31 (1967) ("In *Strawbridge v. Curtiss*, [7 U.S. (3 Cranch) 267 (1806),] this Court held that the diversity of citizenship statute required 'complete diversity': where co-

Diversity is determined on the basis of each party's citizenship.

There are specific rules for determining the citizenship of individuals,

corporations, state governments, and various other entities. A corporation is

deemed to be a citizen both of any state where it is incorporated and the state

where it has its principal place of business.[40] Although "a State is not a 'citizen'

for purposes of . . . diversity jurisdiction[,] . . . a political subdivision of a State,

unless it is simply the arm or alter ego of the State, is a citizen of the State for

diversity purposes."[41]

## B.    Statutory Interpretation

Established rules of statutory interpretation require courts to "look

first to the statutory language and then to the legislative history if the statutory

language is unclear."[42] This means that the plain-meaning of unambiguous

---

citizens appeared on both sides of a dispute jurisdiction was lost. But Chief
Justice Marshall there purported to construe only 'The words of the act of
congress,' not the Constitution itself. And in a variety of contexts this Court and
the lower courts have concluded that Article III poses no obstacle to the legislative
extension of federal jurisdiction founded on diversity, so long as any two adverse
parties are not co-citizens." (citations omitted)).

[40]      *See* 28 U.S.C. § 1332(c)(1).

[41]      *Moor v. Alameda County*, 411 U.S. 693, 717 (1973) (quotation marks
and citations omitted).

[42]      *Blum v. Stenson*, 465 U.S. 886, 896 (1984).

13

statutory text is controlling, and courts should "'not resort to legislative history to cloud a statutory text that is clear' even if there are 'contrary indications in the statute's legislative history.'"[43]

While it is true that "[w]hen the validity of an act of the Congress is drawn in question" a court should "ascertain whether a construction of the statute is fairly possible by which the question may be avoided,"[44] "it is equally true . . . that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication."[45] Moreover, "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."[46] "The canon of constitutional avoidance does not supplant

---

[43]   *Arciniaga v. General Motors Corp.* 460 F.3d 231, 236 (2d Cir. 2006) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994)). *Accord Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.").

[44]   *Crowell v. Benson*, 285 U.S. 22, 62 (1932).

[45]   *Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833, 841 (1986).

[46]   *Clark v. Martinez*, 543 U.S. 371, 385 (2005).

traditional modes of statutory interpretation."[47] Thus, even where there are grave

constitutional concerns, unambiguous statutory language remains definitive.

## III. DISCUSSION

### A. Meaning of Section 1503

The Government urges this Court to construe section 1503 to require

the assertion of a federal defense or the presence of minimal diversity.[48] Either

limitation would preserve the constitutionality of section 1503,[49] and the Supreme

Court has accepted similar interpretations of jurisdictional provisions in other

cases.[50] However, unlike in those cases, such a statutory interpretation of section

1503 is not "fairly possible."[51]

---

[47]     *Boumediene v. Bush*, 128 S.Ct. 2229, 2271 (2008).

[48]     *See* U.S. Mem. at 5-6, 8,  9.

[49]     *See, e.g.*, *Mesa*, 489 U.S. at 139 (holding the federal officer removal
statute constitutional because removal "must be predicated upon averment of a
federal defense").

[50]     *See id.*

[51]     *Crowell*, 285 U.S. at 62. *Accord Commodity Futures Trading Com'n*,
478 U.S. at 841 ("Where [serious constitutional doubts] arise, a court should
determine whether a construction of the statute is 'fairly possible' by which the
constitutional question can be avoided.  It is equally true, however, that this canon
of construction does not give a court the prerogative to ignore the legislative will
in order to avoid constitutional adjudication . . . .") (quoting *Crowell*, 285 U.S. at
62) (other citations omitted)); *Heckler v. Mathews*, 465 U.S. 728, 741 (1984)
("The canon favoring constructions of statutes to avoid constitutional questions

The Government primarily relies on the Supreme Court's decision in *Mesa v. California* to support its assertion that section 1503 requires either the averment of a federal defense or the presence of minimal diversity. *Mesa* reviewed the constitutionality of section 1442(a) of the federal officer removal statute – which allows a federal officer to remove civil and criminal cases for acts executed "under the color of office."[52] Unlike in this case, the Government argued for a broad interpretation of the statute that would "permit removal of any civil actions or criminal prosecutions brought against a federal officer for acts done during the performance of his duties regardless of whether that officer raises a federal defense."[53] The Supreme Court rejected this argument on the ground that it had always interpreted the jurisdictional provision at issue to require the averment of a federal defense, and that none of the alterations Congress had made to the statute over time suggested that the Court should "depart from this long-standing interpretation of Congress' intent."[54]

*Mesa*, however, is properly distinguished from this case. In *Mesa*,

---

does not . . . license a court to usurp the policy making and legislative functions of duly-elected representatives.") (citations omitted)).

[52]    28 U.S.C § 1442(a).

[53]    *Mesa*, 489 U.S. at 135.

[54]    *Id.*

16

the Supreme Court rooted its understanding of Congressional intent in "an unbroken line of [Supreme Court] decisions extending back nearly a century and a quarter [which] understood all the various incarnations of the federal officer removal statute to require the averment of a federal defense."[55] Section 1503, in contrast, has never been interpreted to require a federal defense. The absence of prior court decisions giving a limited interpretation to section 1503 is not by itself definitive. Section 1503 was only enacted in 2005, and at some point every statute is subjected to its first judicial interpretation. Nevertheless, the absence of long-standing precedent does meaningfully distinguish this case to the extent that the *Mesa* Court relied on that precedent in determining that Congress intended to require the assertion of a federal defense.

In the absence of similar precedent, section 1503 should only be given a limited interpretation if the statutory language and legislative history demonstrate that it is "fairly possible" that Congress intended such an interpretation.[56] It is difficult to imagine statutory text that is clearer than that of section 1503. It permits the removal of all "[c]laims and legal actions filed after the date of enactment of this Act related to allegations involving actual or

---

[55]     *Id.* at 134.

[56]     *Crowell*, 285 U.S. at 62.

17

threatened contamination of methyl tertiary butyl ether (MTBE)."[57]  Given this

unambiguous statutory language, it is inappropriate to look to the legislative

history to divine a contrary statutory interpretation.[58]

However, even if I did consider the legislative history, its import is

far from clear.  According to the conference report, section 1503 was "not

intended to provide Federal courts with exclusive or *subject matter jurisdiction*."[59]

In a colloquy, two senators explained this to mean that section 1503 was not

"conferring a new substantive or subject matter jurisdiction" over MTBE cases,

and that it simply gave defendants the "right to request [removal]."[60]  A literal

interpretation of this legislative history would render section 1503 entirely

meaningless as the general federal removal statute already gives defendants the

right to remove "any civil action brought in a State court of which the district

courts of the United States have original jurisdiction."[61]  Defendants do not need

section 1503 as a basis to request the removal of cases that could have originally

been brought in federal court, and thus, it would be inappropriate to give section

---

[57]      Energy Policy Act § 1503.

[58]      *See Connecticut Nat'l Bank*, 503 U.S. at 253-54.

[59]      151 Cong. Rec. S9255 (daily ed. July 28, 2005) (emphasis added).

[60]      *Id.*

[61]      28 U.S.C. § 1441(a).

1503 the ineffectual meaning suggested by a literal interpretation of the legislative history.[62]

Admittedly, a more creative interpretation of this legislative history is minimally plausible. It could be argued that the import of the assertion that section 1503 does not confer "a new substantive or subject matter jurisdiction" is that section 1503 does not create any new federal law that can provide a *constitutional basis* for arising-under jurisdiction. Theoretically, this would leave section 1503 available to overcome *pre-existing statutory limitations* such as the well-pleaded complaint rule or the requirement of complete diversity,[63] and a court could conceivably give the Government the statutory interpretation it requests.

However, I am unwilling to depart from clear statutory language on the basis of unclear legislative history in order to avoid potential constitutional concerns.[64] Section 1503, by its own terms, creates federal jurisdiction over all

---

[62]    *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))).

[63]    *See Mesa*, 489 U.S. at 136 (holding that "[t]he [federal officer] removal statute itself merely serves to overcome the well-pleaded complaint rule").

[64]    *See Ratzlaf*, 510 U.S. at 147-48 ("We do not resort to legislative history to cloud a statutory text that is clear."). There have been cases where the

MTBE-related cases.

## B. Permissibility of a Facial Challenge

Even though the statute, as interpreted, does not require the presence

of minimal diversity or the averment of federal defenses, in this case defendants

have asserted federal defenses and the parties are minimally diverse.[65] Because

Supreme Court famously ignored clear statutory language in interpreting jurisdictional statutes. In *Lousville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149 (1908), the Supreme Court interpreted section 1331 to have a narrower meaning than the Constitution even though the statute contains almost identical language to the Constitution and the only relevant legislative history suggested that the statute was meant to confer the whole power available under the Constitution. *See* Richard H. Fallon, Jr. et al., Hart and Wechsler's The Federal Courts and the Federal System 857-58. However, more recently the Supreme Court has been careful to ensure that its statutory interpretations accurately reflect Congressional intent even when interpreting jurisdictional statutes. *See Verlinden*, 461 U.S. at 490 (holding – on the basis of unambiguous statutory language and supportive, if inconsistent, legislative history – that Congress did not intend for the Foreign Sovereign Immunities Act "to limit jurisdiction under the Act to actions brought by American citizens"); Debra Lyn Bassett, *Statutory Interpretation in the Context of Federal Jurisdiction*, 76 Geo. Wash. L. Rev. 52, 91 (2007) ("A 'saving' construction to preserve . . . the viability [of the permanent-resident-alien provision of section 1332], despite its plain language, is inappropriate in the federal jurisdiction context.").

[65]     Merced argues that defendants' assertion of a federal defense in its answer, which was served after removal, cannot provide a basis for removal because the "grounds for removal must be in the record when the notice of removal is filed." Merced Resp. at 8. The Government disputes that this failure is determinative – arguing, among other things, that "[d]efendants' failure to assert federal defenses in their removal notice was, at most, a 'statutory defect,'" U.S. Reply Mem. at 4 n.1., and that "Article III contains no requirement that the federal defense that provides the basis for 'arising under' jurisdiction be raised in the removal petition and not in a subsequently-filed answer." *Id.* at 3-4. This is a

either condition is sufficient to satisfy Article III, the Government suggests that I

"need not (and should not) consider whether [I could constitutionally exercise

jurisdiction] in a case in which neither minimal diversity nor a federal defense was

present."[66] Relatedly, the Government argues I should not entertain a facial

challenge to section 1503 because "the statute is constitutional under the facts of

this case, and has a plainly legitimate sweep."[67]

There are few areas of the law that are as confused and conflicted as

the law governing facial challenges. In *United States v. Salerno*, Justice Scalia

stated that facial challenges can succeed outside the First Amendment context only

by "establish[ing] that no set of circumstances exists under which the Act" could

---

difficult issue about which there is little relevant case law.

      However, because it is apparent from Merced's complaint, which was
attached to defendants' notice of removal, that the parties are minimally diverse I
need not decide whether it was necessary for the federal defense to be asserted at
or before the time of removal. For diversity purposes, Merced is a citizen of
California because it is a California agency with the independent power "to alter
improve, reconstruct, rehabilitate, modernize, and clean up property . . . in the
interests of the health, safety, and general welfare of the people." Compl. ¶ 1.
Defendant corporations are all incorporated outside of California, and only
Chevron has its principal place of business in California. *See id.* ¶¶ 5-14. Merced,
therefore, is diverse from every defendant except Chevron.

[66]     U.S. Reply Mem. at 6.

[67]     *Id.* at 3 (quotation marks omitted).

be validly applied.[68]  Justice Stevens has labeled this statement dictum and

rejected Justice Scalia's formulation as contrary to Supreme Court practice and

established legal principles.[69]  Recently, Justice Thomas tried to find middle

ground – stating that "[w]hile some Members of the Court have criticized the

*Salerno* formulation all agree that a facial challenge must fail where the statute has

a plainly legitimate sweep."[70]  Because even this more restrained formulation fails

to capture the nuanced approaches that courts actually take in passing on the

constitutional validity of statutes, it seems unlikely that the debate about the

permissibility of facial challenges will be settled anytime soon.[71]

---

[68]    481 U.S. 739, 745 (1987).

[69]    *See, e.g.*, *Janklow v. Planned Parenthood*, 517 U.S. 1174, 1175
(1996) (denying certiorari) ("While a facial challenge may be more difficult to
mount than an as-applied challenge, the dicta in *Salerno* 'does not accurately
characterize the standard for deciding facial challenges,' and 'neither accurately
reflects the Court's practice with respect to facial challenges, nor is consistent with
a wide array of legal principles.'" (quoting Michael C. Dorf, *Facial Challenges to
State and Federal Statutes*, 46 Stan. L. Rev. 235, 236, 238 (1994))).

[70]    *Washington State Grange v. Washington State Republican Party*, 552
U.S. 442, 128 S. Ct. 1184, 1190 (2008) (quotation marks and citation omitted).

[71]    *See* Richard H. Fallon, Jr., *As-Applied and Facial Challenges and
Third-Party Standing*, 113 Harv. L. Rev. 1321, 1321-25 (2000) (describing the
numerous approaches to standing taken by the various Justices of the Supreme
Court and academics).  Indeed, in many cases federal courts seem to engage in
facial challenges without ever considering whether a facial challenge is
appropriate.  For example, in *United States v. Lopez*, 514 U.S. 549 (1995), the
Supreme Court entertained a facial challenge to a statutory provision that forbid

Despite this disagreement regarding what portion of a statute's applications must produce unconstitutional results before a court entertains a facial challenge, however, the related doctrine that a court should refrain from analyzing the constitutionality of a specific statute until that statute produces an unconstitutional result in a specific case before it remains a bedrock principle of judicial review.[72] Accordingly, because section 1503 has not created an unconstitutional result *in this case*, it would be inappropriate for me to review section 1503's constitutionality.

---

"any individual knowingly to possess a firearm at a place that [he] knows . . . is a school zone." 18 U.S.C. § 922(q)(1)(A). It determined that the statutory provision was an unconstitutional exercise of Congress' Commerce Clause power without considering whether in a legitimate sweep of cases the firearms in question would have traveled through interstate commerce. Instead, the Supreme Court emphasized that one of the reasons the statute was unconstitutional was because it did not contain an "express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. Thus, the Supreme Court held the statute unconstitutional because it did not expressly limit itself to constitutional applications, even though it is quite possible that a great number of applications would have been constitutional. Because section 1503 similarly lacks a limitation ensuring that all the cases it delivers to federal courts will satisfy Article III requirements, section 1503 could be analogized to the statute held facially unconstitutional in *Lopez*. However, for the reasons stated below, I decline to do so in this case.

[72] *See, e.g.*, *United States v. Rutherford*, 332 F.2d 444 (2d Cir. 1964) ("As applied to the act of which appellant was found guilty, the act is clearly constitutional. The decision of the question whether the act is unconstitutional as applied to some other set of circumstances must be left for a case which raises that question." (citing *United States v. Raines*, 362 U.S. 17 (1960)).

In addition, there are two specific considerations that weigh against evaluating the constitutionality of section 1503 in this particular case. *First*, language used by the Second Circuit suggests that courts should not entertain constitutional challenges to jurisdictional statutes if the statute is constitutional as applied to a particular case. In *Mizuna, Ltd. v. Crossland Federal Savings Bank*, the Second Circuit upheld the constitutionality of section 1819(b)(2) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") – which allows for removal of any action where the Federal Deposit Insurance Corporation ("FDIC") is a party.[73] Before analyzing whether the statute was part of a comprehensive federal scheme sufficient to support federal question jurisdiction, the Second Circuit stated:

> [Plaintiff's] complaint (well-pleaded or not) invoked no federal law, and no federal defense was interposed by [defendant], the FDIC or anyone else. Federal jurisdiction, if any, therefore depends on whether [the jurisdictional statute] independently supports 'arising under' jurisdiction.[74]

This statement suggests that federal courts in the Second Circuit should ask whether a federal defense has been asserted – or, by extension, whether the parties are minimally diverse – before passing on the facial constitutionality of the

---

[73] *See* 90 F.3d 650, 655 (2d Cir. 1996).

[74] *Id.*

jurisdiction provision at issue.

      *Second*, additional experience will aid courts in determining whether section 1503 is constitutional. Whether a jurisdictional statute is part of a comprehensive federal scheme – and hence, whether it is constitutional – depends in part on how often federal law must be applied to the cases it delivers to federal court. In *Verlinden*, the Supreme Court upheld the constitutionality of the Foreign Sovereign Immunities Act in large part because "every action against a foreign sovereign necessarily involves application of a body of substantive federal law, and accordingly 'arises under' federal law, within the meaning of Article III."[75] The Second Circuit has gone further than the Supreme Court in defining the outer boundaries of Article III jurisdiction. In *Mizuna*, it held that the jurisdictional provision at issue was constitutional even though some of the cases over which the provision granted jurisdiction would not require the "application of a body of substantive federal law."[76] However, in making this determination, the Second Circuit still placed great weight on the degree to which federal law was likely to play a role in cases removed pursuant to the provision.[77] Experience will help

---

    [75]    *Verlinden*, 461 U.S. at 496.

    [76]    *Mizuna*, 90 F.3d at 656 (quotation marks and citation omitted).

    [77]    *See id.* at 657 (stating that one of the primary reasons that the Second Circuit upheld the provision was because FIRREA conferred "procedural and

federal courts determine how integral federal law is to claims of alleged MTBE contamination, and hence whether or not section 1503 is properly considered part of a comprehensive federal scheme.

Merced objects to this decision to exercise judicial restraint – arguing that neither minimal diversity nor a federal defense can provide the basis for removal because Congress did not grant defendants the power to remove on either of those bases.[78] Merced's point is well-taken. Because Congress derives its power to control federal jurisdiction, as it does all its powers, from the Constitution, there is something peculiar about separating the questions of whether there is constitutional authority for a case to be in federal court and whether there is statutory authority for that case to be in federal court. However, Merced has not cited any cases disfavoring this analysis, and other courts have taken similar approaches.[79]

---

substantive rights and powers on the FDIC" and "deliberately sought to channel the cases in which the FDIC would have or may wield those powers away from the state courts and into federal courts, thereby reducing the potential for a multiplicity of conflicting results among the courts of the 50 States").

[78] *See* Plaintiff City of Merced Redevelopment Agency's Brief In Response to U.S. Mem. at 5.

[79] *See, e.g., Singh v. Daimler-Benz AG*, 9 F.3d 303 (3d Cir. 1993) (refusing to determine whether an amendment to the diversity jurisdiction statute defining a permanent resident alien as a citizen for diversity purposes would be unconstitutional if it authorized one alien to sue another because in the case before

Section 1503 authorizes *this case* to be in federal court, and that authorization has not produced an unconstitutional result. Whether the application of section 1503 will lead to unconstitutional results in other instances must wait for another day when that issue is squarely presented.[80]

## IV. CONCLUSION

---

the court there was "a citizen party, thereby satisfying minimal diversity.").

[80] I am also concerned that section 1503 allows defendants to remove MTBE-related cases to federal court without providing plaintiffs with an analogous right to file in federal court. Section 1503 is not unique among jurisdictional statutes in giving only one party the right to access federal court. *See, e.g.*, 28 U.S.C. 1442(a) (permitting federal officer defendants asserting a colorable federal defense to remove to federal court even though a federal defense is not a sufficient basis for plaintiffs to file in federal court under section 1331); 28 U.S.C. 1441(b) (prohibiting defendants that are citizens of the state where the action is filed from removing to federal court on the basis of complete diversity even though plaintiffs can file in federal court on the basis of that diversity under section 1332). However, these statutes are arguably justified by the greater need of one party to obtain the protection of federal court. It is possible that section 1503 lacks a similar rationale.

Because Merced does not want to be in federal court, the issue of whether section 1503 unfairly denies plaintiffs access to federal court has not been raised in this case. However, I do not rule out the possibility that section 1503, by providing only defendants with the ability to access federal court, might unconstitutionally deny plaintiffs due process and/or equal protection. The Constitution envisions access to federal courts, in part, as a cure to potential discrimination in state court. Under Article III, it gives Congress the power to determine when access to federal courts is necessary to protect parties from the possibility of such discrimination. However, in exercising that power Congress must still act in accordance with other constitutional provisions (*e.g.*, the Due Process Clause).

27

For the reasons set forth above, this action shall not be remanded to

state court.

SO ORDERED

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
             December 8, 2009

## - Appearances -

### For Plaintiff:

Michael Axline, Esq.
Evan Eickmeyer, Esq.
Miller, Axline & Sawyer LLP
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825
Telephone: (916) 488-6688
Facsimile: (916) 488-4288

### For Defendants:

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
Lauren H. Handel, Esq.
McDermott, Will & Emery LLP
340 Madison Avenue
New York, NY 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

### For the Government:

Sarah S. Normand
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, NY 10007
Telephone: (212) 637-2709
Facsimile: (212) 637-2702