# W E I T Z

## &

# L U X E N B E R G

### A   P R O F E S S I O N A L   C O R P O R A T I O N

• L A W   O F F I C E S •

**180 MAIDEN LANE** • **NEW YORK, NY 10038-4925**
**TEL. 212-558-5500** **FAX 212-344-5461**
**WWW.WEITZLUX.COM**

December 8, 2008

**<u>VIA HAND DELIVERY &
ELECTRONIC MAIL</u>**

The Honorable Shira A. Scheindlin
United States District Court
Southern District of New York
500 Pearl Street — Room 1620
New York, New York 10007

Re:   *Plaintiffs' Reply to Defendants' Pre-Conference Letter*

Dear Judge Scheindlin:

Plaintiffs respectfully submit this reply letter in advance of the December 11, 2008, status conference.[1]

**Joint Agenda Items:**

**1.      <u>CMOs for New Jersey and Puerto Rico Cases</u>**

Both New Jersey and Puerto Rico have thousands of unique leaking underground storage tank sites. Some of the information on these sites is maintained in electronic format, but much more information is in extensive hard copy files, in the case of New Jersey covering several decades and including tens of thousands of boxes of material. Throwing the discovery floodgates open for this massive volume of information at the inception of this case would significantly delay resolution of the case and impose enormous burdens on the parties and the Court. Plaintiffs believe that a staged approach to discovery would allow full development of issues important to the ultimate resolution of the case, without the burden and delay that would accompany the defendants' approach.

---

[1]      We apologize for the length of the reply letter. As the issues are not related to cases on which plaintiffs' liaison counsel works, we were not able to edit the letter to comply with the reply page limit.

210 LAKE DRIVE EAST, SUITE 101 • CHERRY HILL, NJ 08002 • TEL 856-755-1115 • FAX 856-755-1995
76 SOUTH ORANGE AVENUE, SUITE 201 • SOUTH ORANGE NJ 07079 • TEL 973-761-8995 • FAX 973-763-4020
215 MONARCH STREET, SUITE 202 • ASPEN, CO 81611 • TEL 970-925-6101 • FAX 970-925-6035
100 E. 15TH STREET, SUITE 400 • FORT WORTH, TX 76102 • TEL 817-885-7815 • FAX 817-882-8585

Plaintiffs propose producing statewide electronic information in New Jersey to provide defendants with the specific locations of all MTBE releases known to the State. In the Puerto Rico case, plaintiffs already have produced electronic files for over five-hundred leaking gasoline underground storage tank cases with the most significant gasoline contamination and/or MTBE contamination. This electronic data allows defendants to identify the specific location of MTBE releases, and to then determine from their own extensive site specific files which locations warrant more in-depth discovery. At many (and perhaps most) of these locations, the bulk of the information held by the State came from defendants in the first instance. Requiring the State to engage in a massive, burdensome, and time consuming process to provide defendants with information they already have at the very inception of the discovery process makes little sense.

While Defendants acknowledge that "[a]t some point, detailed discovery including depositions and expert reports might be focused on particular sites," they continue to resist structuring a CMO premised on such an approach. Instead, they argue that "[f]or now , . . .defendants are entitled to documents related to all release sites at issue." This reasoning, however, is circular. The idea of developing focus sites is to allow the parties to drill down on issues useful to resolving the case without the burden, expense, and delay of simply opening the state-wide discovery floodgates. Defendants propose no real alternatives to using focus sites to accomplish this purpose.

## A. Defendants' Overbroad Damages Discovery in New Jersey Case

Defendants attempt to justify serving exceptionally broad discovery on the New Jersey plaintiffs while ostensibly meeting and conferring on a CMO that would govern discovery by pointing out that when they began the meet and confer process they had not yet filed answers to the complaint. This is a non-sequitur. The point is that unilaterally serving broad discovery while ostensibly engaged in good faith in a meet and confer process to address what discovery should be served fundamentally undermines the meet and confer process.

Apart from the method in which defendants' discovery was served, the discovery is overbroad and unduly burdensome. The discovery would require review and production of all DEP leaking underground storage tank files involving gasoline discharges since the late 1970's, as well as all files concerning discharges at refineries, terminals, pipelines, transport accident sites, and common carrier sites since the late 1970's. For example, Request For Production No. 4 requests "[a]ll documents concerning any remedial or investigative action planned or performed in the State concerning the presence or threatened presence of MTBE at issue in this lawsuit." In addition, many of the discovery requests concerning damages seek information that will require expert opinions.

Even if the New Jersey case involved a smaller universe of sites, most of the requests would be objectionable as overbroad and unduly burdensome. The actual case involves thousands of release sites. While plaintiffs acknowledge that information regarding Statewide damages will have to be produced eventually, production at this stage, before the exchange of preliminary discovery, the narrowing of issues, or the designation of experts, makes no sense.

Plaintiffs have, however, agreed to produce extensive, statewide non-site specific information pursuant to the agreed exchange contemplated in the draft CMOs.

### B.  Discovery on "Contaminants" and "Waters"

Defendants' insistence that they need statewide "other contaminants" information and information on the "waters" at issue is a red herring. Defendants already possess site-specific cleanup documents, including information on other contaminants and affected groundwater, which will inform them about the specifics of sites once they receive electronic information identifying release sites. This information is more than sufficient to identify an initial suite of focus sites, which can then be the subject of more comprehensive discovery regarding waters affected and other contaminants.

### C.  Further Clarification of Discovery

If a focus site approach is adopted by the Court, plaintiffs will discuss with defendants whether the provisions in section III of CMO 4 can be applied to streamline discovery in the New Jersey case. With respect to defendants' written discovery topics, plaintiffs welcome a more detailed and agreed-upon list that better defines what defendants seek. Plaintiffs are willing to produce responsive documents without the need for the exchange of written requests and objections. To the extent the parties disagree over what written discovery must ultimately be produced, they should meet and confer.

Plaintiffs believe that they could agree with defendants on a CMO in the New Jersey case if the Court rules that a focus site approach is appropriate. If the Court decides otherwise, plaintiffs request the opportunity to add additional written discovery topics to the CMOs. With respect to the Puerto Rico case, plaintiffs respectfully request additional time so that counsel and the new Administration can confer regarding time lines and substantive provisions of a CMO.

### Plaintiffs' Agenda Item:

### 1.  Trial in *Tonneson & Basso*

Exxon argues that plaintiffs' request for a brief continuance of the *Tonneson* and *Basso* trial should be denied simply because the potential conflict anticipated by plaintiffs' counsel several months ago has actually occurred. Based on the Court's direction, plaintiffs' counsel made every effort to avoid the conflict. As explained in plaintiffs' Pre-Conference Letter, however, due to circumstances beyond Mr. Miller's control, the *City of Modesto* trial commenced more than three months late.[2]

Plaintiffs' specifically hired Miller, Axline & Sawyer because of Mr. Miller's prior experience in successfully prosecuting the *South Tahoe Public Utility District v. Atlantic Richfield Co., et al.* ("*South Tahoe*") matter.[2] *South Tahoe* is one of the very few MTBE

---

[2]  Mr. Axline was not a member of the firm at the time of the *South Tahoe* trial.

groundwater contamination cases which was fully presented to a jury, and where a jury rendered a verdict based on the evidence. Mr. Miller is therefore uniquely experienced to conduct the trial in *Tonneson* and *Basso*. It is important that plaintiffs be permitted to have the counsel of their choice conduct the trial in this matter. Plaintiffs anticipate that only a short continuance will be needed.

All of the parties have been working very hard to prepare for trial. As the Court is aware, virtually all pretrial preparations have been completed, including briefing on all pretrial motions. Exxon complains that certain final pretrial papers have not been served by plaintiffs. Exxon fails to mention, however, that Exxon also failed to serve several of the pretrial papers required by Case Management Order No. 35. As of this letter, plaintiffs have served a draft Pretrial Order and Memorandum of Law. Plaintiffs believe that the Court's and the parties time preparing jury instructions and verdict forms will be more efficient once significant outstanding motions in limine have been resolved, including motions concerning emotional distress, punitive damages, and causation.

## Defendants Agenda Items:

1. ## OCWD's Recent Dropping of Three of Defendants' Focus Plumes

Defendants materially misrepresent the "purposes" of Bellwether Plume discovery in the Orange County Water District (the "District") matter. This Court asked the District and defendants to each select 10 Bellwether Plumes in January 2007 for purposes of focusing discovery and preparing this case for trial on these plumes. (Ex. 1, R.T. (Jan. 30, 2007) at 109:18-112:17.) Despite the Court's direction, defendants continue to assert that any trial in this matter must include all stations and all releases within the District's service area (even though defendants have provided little or no discovery on many of these releases). This is the real reason why defendants want the Court to dismiss plumes from the case, and force the District to review all 127 plumes.

The District initially identified several hundred gasoline stations within the District's service area where "releases" of gasoline occurred. (Ex. 2, Complaint at 3, 6-7.) As the District explained during briefing on the statute of limitations, "[s]ignificant investigation and monitoring may be necessary before the District can form a "reasonable belief"as to whether releases at particular locations do or do not pose a threat of . . . contamination" that is a concern to the District. (Ex. 3, Plaintiff's Supplemental Brief Re Statute of Limitations (Jan. 16, 2007 at 4.) Mr. Herndon explained that this is lengthy, complex process which ultimately involves the installation of monitoring wells. (Ex. 4, Herdon Decl. (Jan. 16, 2007) at ¶ 7.) When the Court asked the District to select 10 Bellwether Plumes for trial, the District's assembled 10 plumes based on some preliminary investigation and advice from the District's experts. (Ex. 5, R.T. (March 1, 2007) at 39:14-40:5.) The District had not, however, fully completed the lengthy process of investigating and analyzing all releases from all stations within the District's service area. (Ex. 5, R.T. (March 1, 2007) at 43:23-44:20.)

Even though the District complied with the Court's request and designated 10 Bellwether Plumes, defendants' complained that the District's Bellwether Plumes contained more than one

station per plume. (Ex. 5, R.T. (March 1, 2007) at 15:7-15.) The District's counsel explained that where there are several releases in the vicinity of a well which have escaped the station property, the District identified each release the District believes may have co-mingled. (Ex. 5, R.T. (March 1, 2007) at 13:19-15:3.) Even though the Court confirmed that the District's Bellwether Plumes were appropriate, the Court asked the District to revise all releases within the District's service area into plumes. (Ex. 5, R.T. (March 1, 2007) at 35:10-25, 42:14-44:18) At the time the District provided an updated list of 127 Bellwether Plumes, the District explained that the list "represented the District's best efforts" based on minimal or no discovery from defendants. (Ex. 6, April 23, 2007, Letter from T. O'Reilly to J.Anderson.)

Since the District and defendants finalized the 20 Bellwether Plumes in March 2007, the District has focused the majority of its efforts on investigating and assessing the District's 10 Bellwether Plumes. For example, the District hydrogeologists, David Bolin and Roy Herdon, prepared detailed summaries of investigation and contamination activities at each station within the Bellwether Plumes. (Ex.7, Arco #6131 Bates #OCWD-MTBE-001-192493 - OCWD-MTBE-001-192495.) The District also recently hired additional consultants to conduct the next phase of investigation and assessment. (Ex. 8, Agreement No. 0518 with Hargis & Associates, Inc. For MTBE Threat Assessment Support Services.) Defendants have also focused discovery almost exclusively on the District's 10 Bellwether Plumes. (Ex. 9, Defendant ConocoPhillips Company's Second Set of Interrogatories to Plaintiff Orange County Water District at 2.)

By contrast, little or no discovery on defendants' 10 Bellwether Plume has occurred to date. For example, at the beginning of October the defendants finally produced tank information concerning these stations. Additionally, defendants only recently sought discovery from the District as to defendants' 10 Bellwether Plumes, and only recently produced. (Ex.10, Defendant ConocoPhillips Company's Notice of Deposition re Defendants' Bellwether Plumes.)

Defendants' request would effectively force the District (and its experts) to cease all work on the designated Bellwether Trial Plumes to conduct a detailed investigation and analysis of the remaining 103 plumes preliminarily identified by the District in March 2007. Moreover, in order for the District to complete this analysis, defendants would also need to produce all tank files and records for each station on the list. In other words, defendants' request would significantly derail the Bellwether Plume process. This is not consistent with the Court's direction that the parties prepare a subset of plumes for trial.

The District has eliminated only 3 of the original 127 plumes.[3] Since almost no discovery has been conducted on defendants' 10 Bellwether Plumes, defendants selection of three replacement plumes should not create significant delays.

---

[3] Due to a miscommunication within Miller, Axline & Sawyer, the District's identification of plumes to be eliminated was not communicated to defendants until November 17, 2008.

## 2.    City of New York's Failure to Produce Distribution System Maps in Electronic Form

As Defendants indicated, the parties are currently discussing an arrangement to resolve this issue that provides the proper safeguards that the City needs to protect its water supply.

## 3.    City of New York's Use of Employees as Expert Witnesses

Defendants' request is premature and unfair. As the Court is aware, the City is not required to provide a report for witnesses who are not "retained or specially employed to provide expert testimony in the case" or whose duties do not "regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(A)-(B). *See Bank of China v. NBM LLC*, 359 F.3d 171, n. 13 (2d Cir. 2004). Here, the City noted in its November 7 letter disclosing the topics on which it was providing expert reports that it might also call current and former City employees to testify at trial who might offer opinion testimony on relevant topics, but that it was not providing reports from any such employees. *See* Defs. Exh. H. The City subsequently explained that it would appropriately identify such employees when it serves its witness list in April 2009, almost 2 1/2 months before trial, and that reports are not required under the Federal Rules of Civil Procedure. *See* Defs. Exh. J.

Defendants continue to insist that the City identify now any employees who may testify at trial and offer expert testimony, although Defendants appear to have withdrawn their demand that those employees submit expert reports. *See Letter from J. Pardo to S. Amron*, dated December 5, 2008 (Exh. 11). The City has not yet decided which of its employees will testify and on precisely topic, and is not required to until April 2009. Any requirement that the City provide this information now would prejudice the City by forcing it to make binding decisions on trial strategy months in advance of when they would normally be required. *Day v. CONRAIL*, 1996 U.S. Dist. LEXIS 6596 (S.D.N.Y. May 15, 1996), on which Defendants rely, has been criticized by several other courts which have noted that *Day* misread the plain language of Rule 26. *See, e.g., GSI Group, Inc. v. Sukup Mfg. Co.*, 2007 U.S. Dist. LEXIS 18764 (C.D. Ill. Mar. 16, 2007); *Adams v. Gateway, Inc.*, 2006 U.S. Dist. LEXIS 14413 (D. Utah Mar. 10, 2006); *Navajo Nation v. Norris*, 189 F.R.D. 610, 1999 U.S. Dist. LEXIS 20761, 45 Fed. Serv. 3d (Callaghan) 1283 (E.D. Wash. 1999).

Respectfully submitted,

WEITZ & LUXENBERG, P.C.

By:    *Robin J. Greenwald*

Robin Greenwald (RG-9205)
*Plaintiffs' Liaison Counsel*
180 Maiden Lane, 17th Floor
New York, New York 10038
(212) 558-5500

cc:    All Counsel of Record

Exhibit 1

1

71USMTBE

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  IN RE: METHYL TERTIARY BUTYL          00 MDL 1358
3  ETHER ("MTBE") PRODUCTS          Master File C.A.
4  LIABILITY LITIGATION          No. 1:00-1898(SAS)
4
5  ------------------------------x
5
6                    January 30, 2007
6                    10 a.m.
7
7  Before:
8
8            HON. SHIRA A. SCHEINDLIN,
9
9                    District Judge
10
10                 APPEARANCES
11
11
12  WEITZ & LUXENBERG, P.C.
12       Plaintiffs' Liaison Counsel
13  ROBIN L. GREENWALD
13  ROBERT J. GORDON
14  STEVEN J. GERMAN
14
15  BARON & BUDD
15       Attorneys for Plaintiffs
16       Suffolk County water Authority
16       United Water of New York
17  CARY McDOUGAL
17
18  SHER LEFF LLP
18       Co-lead attorneys for Plaintiffs
19  VICTOR M. SHER
19
20  MICHAEL A. CARDOZO
20       Corporation Counsel of the
21       City of New York
21       Attorney for City plaintiffs
22  SUSAN E. AMRON

23
24
25

1    MR. AXLINE: That is true. That is coming.

2    THE COURT: It is.

3    MR. AXLINE: It's teed up so we know a lot more now

4 than when we initially set this up.

5    THE COURT: We are getting to a do-over on the statute

6 of limitations, is that right, with OCWD?

7    MR. AXLINE: There has been additional briefing on

8 that.

9    THE COURT: Is it fully submitted?

10    MR. AXLINE: I think yes.

11    THE COURT: Fully? Or is it in process?

12    MR. LYONS: As far as we know.

13    THE COURT: The supplemental motions are done?

14    MR. HEARTNEY: I am Matt Heartney and I took the

15 statute of limitations briefing for the OCWD. We received the

16 supplemental brief you requested from the district and our

17 brief is due on February 15. There is a reply due.

18    THE COURT: So it's not submitted.

19    In any event, let's get back to your point about

20 opening up discovery. Is there any reason that the OCWD case

21 shouldn't go into full-throttle discovery? We have tried the

22 approach and we have gotten issues briefed and why aren't they

23 entitled to open up discovery? They are the focus case.

24    MR. LYONS: They are, but it's a different type of

25 focus case.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1    THE COURT:  That is a good thing too, to get different
2    types of focus cases on the road.
3        MR. LYONS:  It's good and bad.  Their well sites that
4    they have is 532 well sites, perhaps 5,000 gas station sites.
5    It is a monster if you say open it up no controls.
6        THE COURT:  Maybe there is a middle position.
7        MR. LYONS:  What we haven't allowed at this point is
8    the first process that we adopted which was select some well
9    sites, put them in certain categories, try to focus on those,
10   take those down the road.  We haven't even completed that road
11   yet.
12       THE COURT:  Did I hear you say the word 50 a little
13   while ago about something, Mr. Axline?  What was 50?
14       MR. AXLINE:  50 sites that the defendants identified
15   that we would tee up issues with respect to threatened wells
16   which was associated with some standing motion that they were
17   bringing at the time.  It seems to me like it has morphed into
18   a damages issues.
19       THE COURT:  500 plus well sites, is that right?  To
20   open up full discovery on 500, plus we haven't done that in the
21   New York cases.
22       MR. AXLINE:  It's 400 stations where releases have
23   occurred.
24       THE COURT:  He wasn't talking about stations and
25   release.  He said well sites.

1    MR. LYONS: We reached that in the primary
2  jurisdiction issue which was how many sites are they alleging
3   have some potential for contribution to their wells and I --
4       THE COURT: What does that mean, have some potential?
5       MR. LYONS: That they have a spill site.
6       THE COURT: That is stations. That is not wells.
7       MR. LYONS: Your Honor, no, that would depend on where
8  those plumes come from. They could come from multiple sources.
9  So you would have to say if you have 400 some plumes how many
10  stations could have contributed to those plumes, is it one
11  station per plume, 2, 3? I don't know.
12       THE COURT: In New York I know better now, we are
13  talking about 20 wells. It could be hundreds of stations. It
14  probably is with some of the things Mr. Sacripanti was saying
15  earlier about 400. We are arguing about hundreds of stations.
16  That is not onerous. I know you don't have wells like New York
17  does but I am not sensing a magnitude difference from, say,
18  Suffolk.
19       MR. LYONS: It's a different type of plaintiff. They
20  don't own wells.
21       THE COURT: By now if there is anything I know I know
22  that.
23       MR. LYONS: What they have alleged is MTBE plumes. In
24  other words, in the acquifer there is some kind of plume going
25  on, 400 some plumes. How many stations, I don't know.

1          THE COURT: Right. But I am still not quite
2     understanding why the scope of the full discovery, so to speak,
3     in one county, in Orange County, which implies a county, Orange
4     County water district is any more complex than what we are
5     doing in Suffolk County that we are not doing the actual wells.
6          MR. LYONS: The equivalent in Suffolk County would be
7     all the wells, all the gasoline stations in Suffolk County
8     producing all their records.
9          THE COURT: This is all the plumes.
10         MR. LYONS: That would be the equivalence.
11         THE COURT: Why aren't we taking a similar approach,
12    Mr. Axline, of samples, like 20 sample plumes? Why can't each
13    side pick ten plumes? You can pick the biggest of all and he
14    can pick the littlest and that is 20 and you are in a similar
15    track of Suffolk. I understand the difference not owning wells
16    and all that but plumes is just a different concept but it
17    would be a representative group.
18         MR. AXLINE: We did propose exactly that in the letter
19    that was submitted separately from the reply letter and there
20    was some kerfuffel about that we essentially are tracking like
21    the approach in Suffolk County.
22         THE COURT: How many plumes, 20?
23         MR. AXLINE: 20 would be a good number.
24         THE COURT: You will pick, then, ten?
25         MR. AXLINE: Yes.

Exhibit 2

1 | Victor M. Sher, #96197
SHER & LEFF
2 | 450 Mission Street, 5th Floor
San Francisco, CA 94105
3 | Telephone: (415) 982-0468
Facsimile: (415) 348-8333
4 |
5 | Duane C. Miller, #57812
A. Curtis Sawyer, Jr., #101324
6 | MILLER & SAWYER
1651 Response Road, Second Floor
7 | Sacramento, CA 95815
Telephone: (916) 927-8600
8 | Facsimile: (916) 927-9267
9 | Attorneys for Plaintiff
Orange County Water District
10

Exempt from Filing and Motion Fees
[Govt. Code, Section 6103]

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 0 6 2003

ALAN SLATER, Clerk of the Court

BY _____PA HOUA VANG LY_____

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF ORANGE

**03CC00176**

| | |
|---|---|
| ORANGE COUNTY WATER DISTRICT, | CASE NO: |
| Plaintiff, | COMPLAINT FOR DAMAGES AND OTHER RELIEF (MTBE AND TBA CONTAMINATION): (1) STRICT LIABILITY; (2) NEGLIGENCE; (3) TRESPASS; (4) NUISANCE; (5) ORANGE COUNTY WATER DISTRICT ACT; and (6) DECLARATORY RELIEF |
| vs. | |
| UNOCAL CORPORATION, INDIVIDUALLY AND FORMERLY KNOWN AS UNION OIL COMPANY OF CALIFORNIA; TOSCO CORPORATION; CONOCOPHILLIPS COMPANY; CHEVRON USA, INC.; CHEVRONTEXACO CORPORATION; TEXACO REFINING & MARKETING, INC.; EQUILON ENTERPRISES, LLC; SHELL OIL COMPANY; EXXON MOBIL CORPORATION; MOBIL CORPORATION; ULTRAMAR, INC; VALERO REFINING COMPANY; ATLANTIC RICHFIELD COMPANY; BP PRODUCTS NORTH AMERICA, INC.; LYONDELL CHEMICAL COMPANY, INDIVIDUALLY AND FORMERLY KNOWN AS ARCO CHEMICAL COMPANY; G&M OIL COMPANY, INC.; 7-ELEVEN, INC.; USA GASOLINE CORPORATION; AND DOES 1-600 INCLUSIVE, | |
| Defendants. | |

**JUDGE DAVID C. VELASQUEZ
DEPT. CX104**

Page 1

---

Complaint for Damages and Other Relief

## II. PLAINTIFF

4.     The District is a special water agency created by the Legislature in 1933 to maintain and manage the Basin.  The Legislature expressly granted the District the right and duty, among other things, "to commence, maintain, intervene in, defend, and compromise ... any and all actions and proceedings ... to prevent interference with water or water rights used or useful to lands within the district, or diminution of the quantity or pollution or contamination of the water supply of the district, ... or to prevent any interference with the water or water rights used or useful in the district which may endanger or damage the inhabitants, lands, or use of water in the district...." (Water Code App. Sec. 40-2.)

## III. DEFENDANTS

5.     The defendants in this action are all corporate members of the petroleum industry. As described below, defendants include refiners of gasoline containing MTBE and/or TBA that contaminates and pollutes the Basin; manufacturers and promoters of MTBE and/or TBA; suppliers of gasoline containing MTBE and/or TBA that contaminate and pollutes the Basin; and owners and operators of gasoline facilities that have released MTBE and/or TBA that contaminates and pollutes the Basin.

6.     Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein under the fictitious names DOES 1 through 600, inclusive.

### A.     Refiner Defendants

7.     The following defendants owned and operated gasoline refineries in Southern California that have provided, at all times relevant to this complaint, gasoline containing MTBE and/or TBA to areas affecting the Basin:

8.     Unocal Corporation, individually and formerly known as Union Oil Company of California, is a Delaware corporation with its principal place of business in El Segundo, California, doing business in California.  Plaintiff is informed and believes that Unocal holds a patent for reformulated gasoline containing MTBE used in California.

### B. MTBE/TBA Manufacturer Defendants.

23.     Lyondell Chemical Company, individually and formerly known as ARCO Chemical Company, ("Lyondell") is a corporation with its headquarters in Houston, Texas, and doing business in California. Plaintiff is informed and believes that Lyondell is a successor in interest to ARCO Chemical. During much of the time relevant to this complaint, ARCO Chemical was a division of ARCO.

24.     The defendant identified in paragraph 23 and DOES 201 through 250 will be collectively referred to as the "Manufacturer Defendants." The Manufacturer Defendants, and each of them: (1) designed, manufactured, formulated, refined, promoted, distributed, transported, packaged, exchanged and/or sold MTBE and/or TBA in the State of California that is contaminating and polluting the Basin; (2) were legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this Complaint; (3) participated in one or more enterprises to promote MTBE and/or TBA and/or gasoline containing MTBE and/or TBA; and (4) in doing the tortious and wrongful acts alleged in this Complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named defendants.

### C. Owner/Operator Defendants.

25.     The following defendants own and operate gasoline delivery facilities, including, but not limited to, gasoline stations, gasoline storage, transfer, delivery, and dispensing systems ("gasoline delivery systems") in areas affecting the Basin:

26.     G&M Oil Company, Inc. is a California Corporation, with its principal place of business in Huntington Beach, California, doing business in California.

27.     7-Eleven, Inc. is a Texas corporation with its principal place of business in Dallas, Texas, doing business in California.

28. USA Gasoline Corporation is a California corporation with its principal place of business in Agoura, California, doing business in California.

29. The Refiner defendants, and each of them, owned and operated gasoline stations.

30. The defendants identified in paragraphs 26 through 28 and DOES 401 through 600 will be collectively referred to as the "Owner/Operator Defendants." The Owner/Operator Defendants, and each of them, (1) negligently operated, designed, constructed, owned, repaired, controlled, installed, inspected, and/or fabricated gasoline delivery systems from which MTBE and/or TBA is contaminating or polluting the Basin; (2) were legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this Complaint; (3) participated in one or more enterprises to promote, market, distribute, and sell MTBE and/or TBA and/or gasoline containing MTBE and/or TBA; and (4) in doing the tortious and wrongful acts alleged in this Complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of ache of the remaining DOE and named defendants.

## IV. ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION.

### A. The Contaminants: MTBE and TBA.

31. MTBE is an additive to gasoline. As used herein, MTBE consists not only of methyl tertiary butyl ether, but also the contaminants in commercial grade MTBE as well as the following oxygenates and ethers, including, but not limited to, TAME, DIPE, and ETBE.

32. TBA is present in some gasoline. TBA is variously a gasoline constituent, an impurity in commercial grade MBE, and a degradation or breakdown product of MTBE.

33. MTBE and TBA contaminate the environment through leaks and spills from gasoline delivery systems. Once released to the environment from gasoline delivery systems, MTBE and TBA have unique characteristics that cause extensive environmental contamination and a corresponding threat to the public health and welfare. In particular, the fate and transport

8. For such and other further relief as the court may deem just and proper.

Dated this 5 day of May, 2003

By: _Victor M. Sher_
SHER & LEFF
Victor M. Sher, #96197
450 Mission Street, 5th Floor
San Francisco, CA 94105
Telephone: (415) 982-0468
Facsimile: (415) 348-8333


By: _____
MILLER & SAWYER
Duane C. Miller #57812
A. Curtis Sawyer, Jr.#101324
1651 Response Road
Second Floor
Sacramento, CA 95815
Telephone: (916) 927-8600
Facsimile: (916) 927-9267

M:/orange/pleadings/Complaint (5-5-03)

Complaint for Damages and Other Relief

Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

This document relates to:

*Orange County Water District v. Unocal
Corp., et al.*, 04 Civ. 4968

:
:
:
:
:
:
:
:
:
:
:
:
:

Master File No. 1:00–1898
MDL 1358 (SAS)
M 21-88


PLAINTIFF'S SUPPLEMENTAL
BRIEF RE STATUTE OF
LIMITATIONS

omitted.]")

A release that will never cause detectable levels of MTBE in the potable water of the District's deep aquifers is not a concern to the District. Herndon Decl., at ¶ 18. Significant investigation and monitoring may be necessary, however, before the District can form a "reasonable belief" (Slip Op. at 24) as to whether releases at particular locations do or do not pose a threat of such contamination.

If defendants were able to meet their burden to show that MTBE escaped remedial efforts at a particular location and either caused or threatened to cause appreciable harm to drinking water outside the statute of limitation, the District would then be entitled to present site specific evidence regarding the discovery rule. *See California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1407-08 (9th Cir. 1995) ("the burden is on [plaintiff] to plead and prove the facts necessary to toll the limitations period *once it is established that it would have otherwise commenced . . . .*" (emphasis added). When determining if a cause of action has accrued or the statute of limitations has been tolled, "the ultimate issue as to whether the cause of action for negligence was barred by the statute of limitations [is] a mixed question of law and fact [for a] . . . jury [to consider] under proper instructions of law." *Oakes v. McCarthy Co.*, 267 Cal.App.2d 231, 255 (1968) (citations omitted) (underground trespass).

Finally, the District requests clarification with respect to footnote 81 of the Court's opinion. The District argued in opposing defendants' motion: "For locations where both post-May 6, 2000, and pre-May 6, 2000, releases occurred, the continuing tort doctrine allows the District to recover for damages caused by post-May 6, 2000, releases. [Citations omitted.]" Opp. Brief at 7. Footnote 81 correctly notes that the mere fact that contamination is present both

4

Santa Ana River water and at the Edinger Avenue Chevron Station.

The District does not read the cases cited at page 27, footnote 81, of the Court's opinion as rejecting the proposition that tortious conduct occurring inside the statute of limitations is not immunized by the fact that tortious conduct may also have occurred outside the statute of limitations at the same location. Defendants, however, are certain to interpret the Court's opinion in this manner, as demonstrated by Matthew Heartney's letter to the Court of January 2, 2007. Accordingly, the District respectfully seeks clarification on this important point.

## Conclusion

For the foregoing reasons, the District asks that the Court deny defendants' motion with respect to sites not specifically addressed in the Court's opinion of December 14, 2006. The District also respectfully requests that the Court clarify that its opinion of December 14, 2006, does not bar claims under California Water Code, West's Annotated Appendix section 40-8, and does not bar claims based upon MTBE releases that occurred subsequent to May 6, 2000, even if those releases occurred at sites where other releases occurred prior to May 6, 2000.

Dated this 16th day of January, 2007.

Respectfully submitted,

Michael Axline
Counsel for Plaintiff
Orange County Water District

Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File C.A.
No. 1:00-Civ. 1898
MDL No 1358 (SAS)

This Document Relates To:

*Orange County Water District v. Unocal Corp., et al.,*
04 Civ. 4968

### SUPPLEMENTAL DECLARATION OF ROY HERNDON IN SUPPORT OF PLAINTIFF'S SUPPLEMENTAL BRIEF RE STATUE OF LIMITATIONS

I, Roy Herndon, hereby declare:

1. I am the Chief Hydrogeologist at the Orange County Water District (District). Several prior declarations I have submitted in this case set forth my qualifications. I have been employed by the District since 1988.

2. I have reviewed the Court's opinion on the statute of limitations in the District's case. This declaration addresses issues that the Court asked the District to address.

3. The Court asked whether MTBE in groundwater caused the District to act prior to May 6, 2000. The answer to that question is no. The District took no specific action with respect to MTBE in groundwater at any specific location prior to May 6, 2000, for reasons explained below.

4. The District shares authority to address groundwater contamination with the Regional Water Quality Control Board and with local oversight authorities. When a release of gasoline containing MTBE is detected by a station operator, that release is required to be reported to either the Regional Board or to local oversight authorities, or both. I am not aware of any authority that

1

requires that such releases be reported to the District, and such releases are not as a general matter reported to the District by station operators.

5. The District relies upon the Regional Board and local oversight authorities to initiate "first responses" to reported releases. The Regional Board and local authorities have the power to order responsible parties to engage in initial investigations and remediation efforts at release sites. The Memorandum of Understanding between the District and the Regional Board, provided to the Court in response to the defendants' primary jurisdiction motion, establishes that the Regional Board will provide initial responses to releases that threaten to contaminate groundwater.

6. The District has no reason to take action in response to a release of gasoline containing MTBE at a station where the Regional Board or local authority has received notice of a release, even when the release impacts groundwater at the site of the release, if the Regional Board or local oversight agency has ordered or undertaken remedial efforts at the site. In many cases, remedial efforts are successful and no further action is required by the District. If the Regional Board or local oversight agency elects not to order or undertake remediation, or if MTBE has escaped remediation in significant amounts, however, the MTBE may then pose a threat of appreciable harm if hydrogeologic conditions are such that the MTBE is likely to contaminate groundwater used as a drinking water source. As explained in the Memorandum of Understanding, the District may also provide technical advice, conduct investigations and remediate contamination when requested to do so by Regional Board or a discharger. The District received no such request with respect to any MTBE release site prior to May 6, 2000.

7. Determining whether MTBE has escaped remediation efforts and poses a

2

threat of appreciably harming groundwater used as drinking water is a lengthy, complex, and expensive process. Because of the complex, multiple-layer hydrogeology and dynamic hydrologic conditions of the Orange County groundwater basin, such determinations require detailed analyses and the installation of multiple-depth monitoring wells outside the area of initial remediation.

8. The Orange County groundwater basin covers over 300 square miles. After more than 15 years of detailed groundwater monitoring and analysis, District hydrogeologists and engineers have found that the groundwater basin is composed of three major aquifer systems, all hydraulically connected. The District refers to these as the Shallow, Principal, and Deep aquifer systems.

9. The Shallow aquifer system reaches a depth of approximately 200 feet, while the underlying Principal aquifer system reaches depths of approximately 1,500 feet. The Deep aquifer system underlies the Principal aquifer system and reaches depths of 2,000 feet or greater. Each aquifer system is composed of multiple interconnected layers of sands and gravels with intervening less-permeable (but "leaky") clays and silts.

10. Most of the approximately 200 drinking water production wells in the District currently draw groundwater from the Principal aquifer system at typical depths of 300 to 1,000 feet. The Principal aquifer system is replenished by recharge water that travels from ground surface through the Shallow aquifer system, including through intervening "leaky" clay and silt layers, into the Principal aquifer system. Only a few production wells are currently deep enough to draw water from the Deep aquifer system.

11. The Shallow aquifer system once supplied large numbers of drinking water wells. In

3

Care Agency (OCHCA). With respect to this earlier release, the OCHCA approved a remedial action completion certification on September 21, 2001. A true and correct copy of OCHCA's approval is attached to this declaration as Exh. 2.

23. Another release at the Edinger Avenue Chevron station was reported to OCHCA in 2003 and appears to have occurred during the process of removing an underground storage tank. A true and correct copy of the unauthorized release report to OCHCA for this site is attached to this declaration as Exh. 3. OCHCA is currently overseeing attempts to remediate this second release. A true and correct copy of a well installation report (w/o attachments) submitted to OCHCA by the station's consultant is attached to this declaration as Exh. 4. This report identifies MTBE in groundwater at the site in 2005, some four years after the 1997 release had been remediated and a closure certificate approved, at levels of 4,800 ppb (report, page 4). The District has not, at this time, received any information suggesting that the MTBE released in 2003 at the site has escaped the remediation currently being overseen by OCHCA at this site.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 16th day of January, 2007, at Fountain Valley, California.

Roy Herndon

Exhibit 5

7315MTBC                    conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
    ETHER ("MTBE") PRODUCTS                Master File C.A.
4   LIABILITY LITIGATION                   No. 1:00-1898(SAS)

5   ------------------------------x

6                                          March 1, 2007
                                           10:14 a.m.
7
    Before:
8
                    HON. SHIRA A. SCHEINDLIN,
9
                                           District Judge
10
                            APPEARANCES
11

12  WEITZ & LUXENBERG, P.C.
            Plaintiffs' Liaison Counsel
13  ROBIN L. GREENWALD
    ROBERT J. GORDON
14
    MICHAEL A. CARDOZO
15          Corporation Counsel for the City of New York
    BY:  SCOTT PASTERNACK
16          Assistant Corporation Counsel

17  SHER LEFF LLP
            Co-lead attorneys for Plaintiffs
18  VICTOR M. SHER

19  MILLER, AXLINE & SAWYER
            Attorneys for OCWD
20  DUANE C. MILLER

21  McDERMOTT, WILL & EMERY
            Attorneys for Defendants Exxon Mobil Corp.
22          and defendants' liaison counsel
    PETER JOHN SACRIPANTI
23

24  SAMUEL ISSACHAROFF, ESQ.

25

1            THE COURT:  For a well?

2            MR. MILLER:  For a well.

3            THE COURT:  Hmm.  Let's take the first one, N-B?

4            MR. MILLER:  That's Newport Beach.

5            THE COURT:  Oh.

6            MR. MILLER:  So we have a well in Newport Beach,

7    California, and that well is in the immediate vicinity of a

8    number of service stations --

9            THE COURT:  What does the T-A-M-D mean?

10           MR. MILLER:  That's the designation for an individual

11   well.  The D stands for deep.  But, let's just call it, for

12   this purpose, a Newport Beach well.  In the immediate vicinity

13   are several gasoline stations all with known MTBE releases.

14   All of the releases there is evidence hydrogeologically that

15   the plume has left the station and moved toward the well.

16           THE COURT:  Wait.  The plume has left what station,

17   all nine?

18           MR. MILLER:  Each, yes.

19           THE COURT:  Why is it one plume?

20           MR. MILLER:  It co-mingles at the well.  And under the

21   defendants' approach, one station would be designated.  That's

22   their approach, only one.  And then they would point the finger

23   at other wells which inevitably would be litigated but they

24   wouldn't be in front of the Court as parties under the

25   defendants' approach.  So, it is an empty chair approach to

1    designation.

2         Our approach is if we have releases that we have

3    reason to believe escaped and headed toward the well and are

4    likely to be a source of contamination in the well, we should

5    have each of them in front of the Court as parties so that they

6    can't point the finger at an empty chair, they can point the

7    finger at each other.  They'll still be litigated.  Even if

8    they're not in the courtroom they'll still be talking about the

9    other stations as a practical matter.

10        That's why we did it the way we did it.

11   Unfortunately, this is a very heavily populated area with a lot

12   of gasoline stations and a lot of releases so you don't

13   typically get, in this area, one well and one station.  It is

14   just --

15        THE COURT:  I wasn't expecting one well.  I thought we

16   were identifying something called plumes, not wells.  And I

17   suppose I didn't realize that your definition of a plume is the

18   co-mingled release from 10 different stations.  But, just

19   focusing on No. 1 -- it actually is 10, there is 10 stations

20   listed there?

21        MR. MILLER:  Right.

22        THE COURT:  And, your view is they're so close to each

23   other and they all had known releases, that all of those

24   releases co-mingled to create something called a plume which is

25   threatening that well.

1          MR. MILLER:  Yes.  In Southern California it is not

2    uncommon to have a service station on each of four corners at

3    an intersection.

4          THE COURT:  Sure.  That's true in New York too.  But,

5    anyway.

6          MR. MILLER:  Of course.

7          And so, the defendants would have us pick one of their

8    selection and point the finger at the other three.

9          THE COURT:  No, you weren't asked to identify a

10   station so I'm not worried about that --

11         MR. MILLER:  Right.

12         THE COURT:  -- you were not asked that.  You were

13   asked to identify a plume.  It is just that I don't think they

14   expected you to say the plume is the co-mingled result of the

15   releases from 10 stations.

16         MR. MILLER:  Some of the others are as few as two, as

17   you can see on the next page.

18         THE COURT:  Right.  Sure.  Sure, the seventh one.

19   A-29, for example, has only two.

20         MR. MILLER:  Yes.

21         THE COURT:  What is A-29, by the way?

22         MR. MILLER:  Anaheim.  The City of Anaheim, it is

23   their 29th well in series.  They numbered them as they drilled

24   them, consecutively.

25         THE COURT:  Let's take No. 9 for a minute because

1  the oral argument.  More than 13 months?  Was it January or

2  February?  January.  So, we have to be closing in.

3       So, I think while I appreciate your concerns, any day

4  now this may become a state case, so I think we should just

5  wait a little longer.  If by March 22nd I still haven't heard,

6  I promise to take it up at the next conference.  On that issue.

7  Okay.

8       So, we probably have discussed everything but these

9  plumes.

10       Now, you heard -- Mr. Meadows, do you want to address

11  this one?  You heard Mr. Miller's explanation of how he

12  identified his 10 plumes.  You heard it and it was pretty clear

13  and pretty simple, at least to me.

14       He said the releases come from different stations but

15  come together to form a plume.  That makes sense to me.  And

16  that single plume could threaten one well, or three, or five,

17  that are very close to each other.  And maybe now not

18  threatened, some of these may be already impacted.

19       These 10 choices you made, Mr. Miller, are not all

20  threatened, are they?

21       MR. MILLER:  They are not all threatened.

22       THE COURT:  Right.  Some are also already been

23  impacted?

24       MR. MILLER:  That's correct.

25       THE COURT:  Okay, so what is so bad?  While the charts

1      So, I would like to know, did you say that then?  Did

2   you call them separate plumes then?  Do you know what he is

3   talking about?  Do you want to see the letter in his hand from

4   Mr. Axline?

5          MR. MILLER:  I know generally what he is talking

6   about, your Honor.

7          THE COURT:  All right.

8          MR. MILLER:  And it was regional board plumes.  I'm

9   not saying that we -- the regional board list is what it is.

10  It is the way they look at the world.

11         THE COURT:  No.  You gave that in response to the

12  Court's order.

13         MR. MILLER:  That's correct.

14         THE COURT:  The Court ordered you to identify, by a

15  map, I guess that was how, the 550 plumes.  You did.

16         And I understand you may have used the regional

17  board's material to do it but you said these are our

18  designations, here is a list of our 550 plumes.  And,

19  apparently, 10 of those plumes are right here in the right-hand

20  column of designation 1.

21         So, if you are saying, well, that's right, we did that

22  in October 2005 but it is a year and a half later and we are

23  much more sophisticated, we met with our experts and scientists

24  we now believe a plume is a co-mingled continuous mass of

25  substance and that's a plume, say so.  And then we will deal

1  with it.

2        MR. MILLER:  It is true, your Honor, we have met with

3  our experts and they've told us they are co-mingled.  And we

4  don't believe we can separate them and that is the reason we

5  did it the way we did it.

6        THE COURT:  So, in October 2005 you weren't that

7  sophisticated.  You thought each of these releases were a

8  separate plume because the regional board thought so and that's

9  what you did.

10        MR. MILLER:  It wasn't so much that we were

11  representing that they were separate but we were telling the

12  defendants, as best we could, which stations we believe caused

13  MTBE contamination.

14        THE COURT:  You identified them as plumes, apparently.

15  He can show you the question and answer.  You called them

16  plumes so you have to grow up on this.  If you did, you did.

17        MR. MEADOWS:  Would you like the letter, your Honor?

18        THE COURT:  No.  I believe that it says what it says.

19  You wouldn't be handing it to me so confidently if it didn't

20  say that these are the 550 plumes.

21        MR. MILLER:  It does say it is a plume map, your

22  Honor.  And this is our letter.

23        THE COURT:  I wouldn't doubt it.

24        MR. MILLER:  I am not in any way trying to depart from

25  that.

1  That's a release or a spill site.

2         But a plume, like we said, as he said, it is a one

3  contiguous substance caused by releases from several sites that

4  comes together and it is a mass.  It is a mass that moves

5  through the groundwater and it is moving as we speak.  It is

6  probably a whole inch closer than it was at the beginning of

7  this conference.  It is moving then, right?

8         MR. MILLER:  Yes.

9         THE COURT:  It travels.  It is moving.

10        So, all of which means in the Orange County case we

11 have to do some regrouping.  We have to do regrouping because

12 you are right that if there is any focused approach it has to

13 be apples and apples and not apples an oranges.

14        And you correctly, Mr. Meadows, you did sort of win

15 the point but not the war, I think.  You were right that you

16 gave 10 of the 550 he identified in October '05.  The problem

17 is he has changed the definitions in the middle of the game,

18 but maybe correctly.  It may actually advance the case.  It may

19 be the more appropriate definition of plume but you didn't know

20 that you were misled and you picked differently.

21        So, now if we work with apples and apples, if his

22 definition is the way the plaintiff wants to frame its case and

23 they have the right to do that and there is less of them so it

24 is actually a smaller mass for a court some day to gets its

25 arms around, it may be for the best.  But, you can consider

1  redesignating if he gives you a list of all 300 now and defines

2  what a plume is.

3          I don't even want to tell you this but some people on

4  your side are agreeing with me shaking their head like that.   I

5  don't want to upset you, Mr. Meadows, but some people are going

6  like that.

7          So, I think you need to redefine your plumes and

8  update, by letter, saying now we are revising our October 2005

9  submission.  Here is the list of our 300 plumes.  It is

10 different than what it was, we admit that.  It is not the 550

11 station releases.  These are things we are calling plumes.  We

12 stick with our 10 designations but you now have more time,

13 obviously, to designate your 10 because I'm giving you a

14 different list.

15         MR. MILLER:  I don't have an objection to that, your

16 Honor.

17         THE COURT:  So, we have to redo this.

18         MR. MEADOWS:  Just for an understanding of where we

19 are.

20         THE COURT:  Okay.

21         MR. MEADOWS:  Are we starting from ground zero meaning

22 we get a new plume list or some set of examples.

23         THE COURT:  No.  His pick is done.  He has picked

24 from -- he already knew how he was going to define plume so he

25 stuck with his 10, he can't change those.  But he is going to

1   give you a new list promptly, right?

2           MR. MILLER:  Yes, your Honor.

3           THE COURT:  Right.  How promptly?

4           MR. MILLER:  Your Honor, if you are talking about all

5   300 it would --

6           THE COURT:  Just to list them.  He wants them for 550.

7   It is less.

8           MR. MILLER:  He wants to do it accurately and once.

9           THE COURT:  So I don't know if you change it a third

10  time.  This is it.

11          MR. MILLER:  You are talking about work by

12  hydrogeologists, not my office.

13          THE COURT:  In order to pick these 10 somebody had

14  done work to define a plume otherwise you wouldn't have known

15  that plume No. 1 in Newport Beach was made up of these 10

16  former plumes, there was 10 releases.  So, somebody had done

17  it.  So, you couldn't have picked your 10.  I think you are

18  further along than you are saying you are.

19          MR. MILLER:  Your Honor, I am being very candid about

20  where we are.

21          THE COURT:  But you picked these 10.

22          MR. MILLER:  I am saying three to four weeks.  I have

23  to talk to the hydrogeologist.

24          THE COURT:  Somebody had done it or you couldn't have

25  come up with this.

# EXHIBIT 6

Law Offices of

# MILLER, AXLINE & SAWYER

A Professional Corporation

DUANE C. MILLER                                    TRACEY L. O'REILLY
MICHAEL AXLINE                                     TAMARIN E. AUSTIN
A. CURTIS SAWYER, JR.                              EVAN EICKMEYER
                                                   DANIEL BOONE

April 23, 2007


<u>VIA FACSIMILE AND U.S. MAIL</u>

Jon D. Anderson, Esq.
Latham & Watkins
650 Town Center Drive, Suite 2000
Costa Mesa, California 92626-1918


Re:    *In Re MTBE: Orange County Water District v. Unocal Corp., et al.*
       **Bellwether Plumes**


Dear Mr. Anderson,

Per our conversation with Matthew Heartney and Jeffrey Parker last week, enclosed is
Orange County Water District's (the "District") revised Plume List in compliance with Judge
Scheindlin's order at the March 1, 2007, Status Conference, and pursuant to the agreement
between the parties.

The revised Plume List incorporates comments from Mssrs. Heartney and Parker during
our conversation last week as well as correcting typographical errors. For example, defendants
were apparently concerned that Plume No. 8, the Dryer Road Well Field, was too large. The
District therefore broke Plume No. 8 in four separate plumes which identify specific wells.

As stated in my April 6, 2007, email, the enclosed revised Plume List represents the
District's best efforts given the following limitations:

The District has only been permitted to conduct limited discovery of the defendants' files
and records pertaining to MTBE releases within the District's service area. For example,
despite repeated requests, defendants have declined to update the productions of their Site
Remediation Files, in particular consultant reports, for the past two years. After the
District receives the updated SRF productions and documents, through discovery or
otherwise, the District my utilize the new information to adjust the Plume List. The
Plume List will also be adjusted to reflect new MTBE and/or TBA water quality data
which is being gathered and analyzed by the District on an ongoing basis.

This letter and the enclosure will also be served via LexisNexis File & Serve today and represents the District's formal service of the revised Plume List.

Please feel free to give me a call if you have any questions.

Sincerely,

Tracey L. O'Reilly

Encl.

cc: All Counsel (via LNFS w/h encl.)

# EXHIBIT 7

**ORANGE COUNTY WATER DISTRICT V. UNOCAL CORP., et. al.**
**PLUME LIST**

| Plume | Well | Stations | Address | City |
|-------|------|----------|---------|------|
| 1 | NB-TAMD | Exxon #4283, Chevron #208552 | 8980 Warner Ave. | Fountain Valley |
| | | Arco #1887 | 16742 Beach Blvd. | Huntington Beach |
| | | G&M #4 | 16990 Beach Blvd. | Huntington Beach |
| | | Texaco #8520, Texaco 121608 | 8520 Warner Ave. | Fountain Valley |
| | | Mobil #18-G6B | 9024 Warner Ave. | Fountain Valley |
| | | Unocal #5376 | 8971 Warner Ave. | Huntington Beach |
| | | Shell #204359403 | 8471 Warner Ave. | Huntington Beach |
| | | Texaco #121681 | 9475 Warner Ave. | Fountain Valley |
| | | Unocal #5399 | 9525 Warner Ave. | Fountain Valley |
| 2 | MCWD-3B | Mobil #18-HDR | 3195 Harbor Blvd. | Costa Mesa |
| | MCWD-5 | Arco #6131 | 3201 Harbor Blvd. | Costa Mesa |
| | MCWD-7 | Mobil #18-JMY | 3470 Fairview Rd. | Costa Mesa |
| | IRWD-7 | Arco #3083 | 3470 Fairview Rd. | Costa Mesa |
| | | Costco FV | 17900 Newhope St. | Fountain Valley |
| 3 | OCWD-M10 | Arco #1912 | 18480 Brookhurst St. | Fountain Valley |
| | OCWD-M11 | Thrifty #383 | 18520 Brookhurst St. | Fountain Valley |
| | OCWD-M45 | Arco #1905 | 18025 Magnolia St. | Fountain Valley |
| | | Beacon Bay Car Wash FV | 10036 Ellis Ave. | Fountain Valley |
| 4 | SA-16 | Thrifty #376 | 801 N. Bristol St. | Santa Ana |
| | | Unocal #7470 | 114 S. Bristol St. | Santa Ana |
| | | Thrifty #008 | 704 N. Bristol St. | Santa Ana |
| 5 | | Unocal #5356 | 1913 W. Edinger | Santa Ana |
| 6 | NB-DOLD | Thrifty #085 | 17475 Brookhurst St. | Fountain Valley |
| | NB-DOLS | Arco #6116 | 17520 Brookhurst St. | Fountain Valley |
| | | Exxon #3738 | 17474 Brookhurst St. | Fountain Valley |
| 7 | A-29 | Arco #1994 | 100 N. Beach Blvd. | Anaheim |
| | | Unocal #5869 | 676 S. State College Blvd. | Anaheim |
| 8 | IRWD-1 | G&M #24 | 3301 Bristol St. | Santa Ana |
| | IRWD-4 | Beacon Bay Car Wash SA | 1501 W. MacArthur Blvd. | Santa Ana |
| | IRWD-C8 | Mobil #18-HEP | 2921 S. Bristol St. | Santa Ana |
| | IRWD-C9 | Chevron #1921 | 3801 S. Bristol St. | Santa Ana |
| | SA-34 | Arco #3085 | 3361 S. Bristol St. | Santa Ana |
| 9 | HB-1 | Chevron #9-5401 | 5992 Westminster Blvd. | Westminster |
| | HB-13 | Unocal #5123 | 14972 Springdale St. | Huntington Beach |
| | HB-4 | Shell #6502 | 6502 Bolsa Avenue | Huntington Beach |
| | HB-7 | Thrifty #368 | 6311 Westminster Blvd. | Westminster |
| | | Unocal #5226 | 6322 Westminster Ave. | Westminster |
| | | Westminster Shell | 5981 Westminster Ave. | Westminster |
| | | Huntington Beach Arco | 6002 Bolsa Ave. | Huntington Beach |
| | | USA Gasoline #141 | 14600 Edwards St. | Westminster |
| 10 | WM-22 | Shell #08990 (aka Shell #8990) | 8990 Westminster Blvd. | Westminster |
| | | Four Star Ventures | 9356 Westminster Blvd. | Westminster |
| 11 | TAOR-A | Arco Master Auto Repair | 2604 W. La Palma Ave. | Anaheim |

April 23, 2007

| Plume | Well | Stations | Address | City |
|---|---|---|---|---|
| 12 | DISN-AE1<br>AM-20<br>AM-20A | 7-Eleven #26216<br>Texaco #100 | 107 Ball Rd.<br>100 W. Katella Ave. | Anaheim<br>Anaheim |
| 13 | SA-26 | Thrifty #150<br>Shell #1202<br>Unocal #5422 | 1539 Standard Avenue<br>1202 E. Edinger Avenue<br>1502 E. Edinger Ave. | Santa Ana<br>Santa Ana<br>Santa Ana |
| 14 | MAGM-GG | Exxon #1354<br>Mobil #18-GWN<br>Arco #1055<br>Mobil #11-GTB | 12493 Beach Blvd.<br>11962 Brookhurst St.<br>9001 Garden Grove Blvd.<br>13031 Magnolia St. | Stanton<br>Garden Grove<br>Garden Grove<br>Garden Grove |
| 15 | OCWD-M36<br>OCWD-M37 | Chevron #8474<br>Metro Car Wash HB | 18501 Beach Blvd.<br>18400 Beach Blvd. | Huntington Beach<br>Huntington Beach |
| 16 | SA-18<br>SA-24 | Chevron #1825<br>Unocal #5618 | 2261 N. Fairview St.<br>591 The City Dr. | Santa Ana<br>Orange |
| 17 | IRWD-3<br>SCC-D1 | Ultramar #750<br>Mobil #18-HCN | 1501 S. Broadway<br>1351 E. Dyer St. | Santa Ana<br>Santa Ana |
| 18 | SCWC-SSHR | Unocal #4778 | 10460 Magnolia Ave. | Stanton |
| 19 | | 7-Eleven #18167 | 1020 South Bristol St. | Santa Ana |
| 20 | AM-2<br>AM-3<br>AET-RMW2<br>AET-RMW3/2<br>CHDZ-A | Texaco #5650<br>Tosco / 76 #5372 | 5650 E. La Palma Ave.<br>18951 Esperanza Rd. | Anaheim<br>Yorba Linda |
| 21 | EOCW-E<br>EOCW-W<br>SCS-6<br>SCS-8<br>SCS-9 | Unocal #5106 | 5344 E. Chapman Ave. | Orange |
| 22 | ET-2 | Unocal #6839 | 15275 Culver Dr. | Irvine |
| 23 | IRWD-2<br>IRWD-5 | Arco #6071<br>Mobil #18-HGC | 3414 S. Main St.<br>100 W. MacArthur Blvd. | Santa Ana<br>Santa Ana |
| 24 | SA-31 | Thrifty #075<br>Mobil #18-H7Q<br>Unocal #5678<br>Arco #1077<br>Arco #3045<br>Tustin Auto Wash<br>Cardlock Fuels<br>Tosco #4911 | 14121 Newport Blvd.<br>13872 Redhill Ave.<br>14081 Redhill Ave.<br>13742 Red Hill Ave.<br>14231 Red Hill Ave.<br>535 E. Main St.<br>13922 Newport Ave.<br>17280 E. 17th St. | Tustin<br>Tustin<br>Tustin<br>Tustin<br>Tustin<br>Tustin<br>Tustin<br>Tustin |
| 25 | HMEM-COS | Arco #5185<br>Mobil #18-HD4 | 1450 Baker St.<br>2799 Harbor Blvd. | Costa Mesa<br>Costa Mesa |
| 26 | OCWD-M41 | Exxon #3915<br>Thrifty #385 | 20001 Beach Blvd.<br>19971 Beach Blvd. | Huntington Beach<br>Huntington Beach |

April 23, 2007

| Plume | Well | Stations | Address | City |
|---|---|---|---|---|
| 27 | A-43<br>KBS-4<br>KBS-4A | Mobil Atwood Terminal | 1477 Jefferson St. N. | Anaheim |
| 28 | YLWD-7<br>YLWD-12 | Setco - Anaheim | 4875 E. Hunter Ave. | Anaheim |
| 29 | | Arco #1998<br>Mobil #18-F1M<br>Unocal #5398 | 5472 Orangethorpe Ave.<br>5502 Orangethorpe Ave.<br>5014 Orangethorpe Ave. | La Palma<br>Buena Park<br>La Palma |
| 30 | | Shell #4001, Shell 135218<br>Texaco #3311<br>Tosco / 76 #5792, ConocoPhilips #5792<br>Unocal #4727 | 4001 Ball Rd.<br>3311 Katella Ave.<br>4002 Ball RD<br>3501 Cerritos Ave. | Cypress<br>Los Alamitos<br>Cypress<br>Los Alamitos |
| 31 | | Unocal #5599<br>Texaco #6011 | 7250 Artesia Blvd.<br>6011 Manchester Blvd. | Buena Park<br>Buena Park |
| 32 | | Shell #5231<br>Unocal #4914 | 5231 Beach Blvd.<br>5262 S. Beach Blvd. | Buena Park<br>Buena Park |
| 33 | | Thrifty #014<br>Thrifty #302 | 120 E. Imperial Hwy.<br>718 S. Brea Blvd. | Brea<br>Brea |
| 34 | | Arco #3080<br>Mobil #18-793 | 2840 E. Imperial Hwy.<br>2800 E. Imperial Hwy. | Fullerton<br>Fullerton |
| 35 | | Exxon #3650<br>Unocal #4629 | 901 N. Placentia Ave.<br>820 W. Chapman Ave. | Fullerton<br>Placentia |
| 36 | | Mobil #18-JQY<br>Unocal #5156 | 17591 Yorba Linda Blvd.<br>17499 Yorba Linda Blvd. | Yorba Linda<br>Yorba Linda |
| 37 | | Jet Gas, Former<br>Arco #0629 | 13202 Brookhurst St.<br>13482 Brookhurst St. | Garden Grove<br>Garden Grove |
| 38 | | Arco #3042<br>Costco GG<br>Thrifty #371 | 13331 Euclid St.<br>11000 Garden Grove Blvd.<br>13511 Euclid Street | Garden Grove<br>Garden Grove<br>Garden Grove |
| 39 | | Arco #0192<br>World Oil #31 | 2100 SE. Bristol St.<br>2040 S. Bristol St. | Santa Ana<br>Santa Ana |
| 40 | | Chevron #1202<br>Unocal #5915 | 9491 Edinger Ave.<br>9020 Edinger Ave. | Westminster<br>Fountain Valley |
| 41 | | Mobil #11-G6R<br>Texaco #6962<br>Unocal #5280<br>Unocal #5336 | 6012 Edinger Ave.<br>6962 Edinger Ave.<br>6502 Edinger Ave.<br>6012 Warner Ave. | Huntington Beach<br>Huntington Beach<br>Huntington Beach<br>Huntington Beach |
| 42 | | Arco #3053<br>Mobil #11-G31 | 5981 Warner Ave.<br>5972 Warner Ave. | Huntington Beach<br>Huntington Beach |