



23207195

Jan 7 2009
6:25PM

**THE CITY OF NEW YORK**
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**MICHAEL A. CARDOZO**
*Corporation Counsel*

**AMANDA C. GOAD**
Phone: (212) 788-1145
Fax: (212) 788-1619
E-mail:agoad@law.nyc.gov

January 7, 2009

*Via E-mail and Hand Delivery*

The Honorable Shira A. Scheindlin
U.S. District Court Judge
D.P. Moynihan United States Courthouse
500 Pearl Street, Room 1620
New York, NY 10007

Re: *City of New York v. Amerada Hess, et al.*, 2:04-CV-3417 (SAS)
MTBE MDL 1358, Master File No. 1:00-CV-1898 (SAS)

Dear Judge Scheindlin:

Plaintiff City of New York ("City") respectfully submits this letter in order to seek Your Honor's assistance in resolving ongoing problems with the Shell Defendants' abuse of the privilege doctrine. Despite nearly two years of motion practice on the subject of Shell's privilege logs, Shell continues to assert improper privilege claims.

Pre-Trial Order #42 ("PTO 42"), dated December 9, 2008, held that the validity of the Shell Defendants' assertions of privilege should be assessed based on Shell's May 19, 2008 privilege logs for its Phase I and Phase II document repositories (the "new logs"). Rather than appeal PTO 42, the City has elected to comply with it by evaluating the validity of privilege claims in the new logs. *See* Transcript of December 11, 2008 Court Conference, 14:5-7 ("there would be a privilege log challenge that still needs to be conducted if you contest the log claim privilege"); *see also* PTO 42 at n.1 (noting that the City of New York rationally awaited a decision from the Special Master on its motion to compel, filed in May 2008 and resolved by PTO 42 in December, before reviewing the new logs). Based on a preliminary evaluation, the City believes that Shell's new logs, while facially complete, contain significant misrepresentations of underlying documents that are not, in fact, privileged and that should be produced to the City immediately. The City respectfully seeks prompt *in camera* review of a subset of the entries on Shell's new logs so that the Court may ascertain the validity of Shell's current privilege assertions and order the production of documents as warranted.

Dockets.Justia.com

Shell's new logs contain a total of over 43,000 entries. Counsel for the City obviously has not been able to analyze every entry on the new logs in detail. Nonetheless, through an initial review, the City has identified at least two troubling examples of documents Shell previously produced in other MTBE litigations but which Shell is now improperly attempting to withhold on grounds of privilege. This is significant not merely because Shell improperly claimed privilege for two documents,[1] but because the manifest impropriety of Shell's privilege claims as to these two documents calls into question the propriety and credibility of Shell's logs as a whole, or at least several broad categories of entries therein.

Attached as Exhibit A are copies[2] of a document Shell previously produced in the *South Tahoe Public Utility District v. ARCO et al.* MTBE litigation (and which was in that matter the subject of a Motion in Limine, resulting in a determination that Shell could not withhold the document as privileged). Nonetheless, in its new logs for MDL 1358, Shell asserted privilege for this document based on (1) "client's request for legal advice" and (2) "work product written at attorney's request." (*See* excerpt from Shell's new log for the Phase I repository, attached as Exhibit B, at entry 762). Judge Bea previously found in the *South Tahoe* litigation that these assertions lack merit. As the author states in the cover email, this document was written at the request of a non-lawyer "to develop a strategy for TECHNICAL support that will help reduce potential costs related to MTBE issues in California." *See* Exhibit A; *cf. In Re IPO Securities Litigation*, 249 F.R.D. 457, 459 (S.D.N.Y. 2008)(establishing applicability of work product privilege is a "'heavy burden' and cannot be 'discharged by mere conclusory or *ipse dixit* assertions.'") The presence of an attorney as one of several individuals copied on the email does not transform this document, which was written primarily as a set of business recommendations, into an attorney-client communication. *See* Transcript of MDL 1358 Status Conference, June 19, 2007, at 92:9-10 ("THE COURT: …the mere fact that a lawyer is there with 21 other people doesn't make a document privileged…Most of us have known that since we graduated law school.") In short, while the entry for this document on Shell's new logs facially asserts appropriate grounds for privilege, the entry fundamentally misrepresents the substance of the document itself. In addition, even if privilege had ever attached to this document, that privilege would have been waived for this document through its production in prior litigation.

Also attached, as Exhibit C, is a copy of another document that Shell previously produced *within MDL 1358*, but for which Shell is again purporting to assert privilege claims in MDL 1358. *See* Exhibit B at log entry 19245. The stated basis of Shell's privilege claim is "Attorney-Client Communication: client requesting legal advice from attorney." However, this

---

[1] *See L.H. v. Schwarzenegger*, 2008 U.S. Dist. LEXIS 86829, *24 (E.D. Cal. 2008) (finding the listing on a defendant's privilege log of documents previously produced to plaintiffs' counsel in related litigation to be "a blatant abuse of the purpose of the privilege log.")

[2] Exhibit A contains two versions of this document; one was partially electronically corrupted, while the other lacks the covering email, but both were introduced as exhibits at trial in the *South Lake Tahoe* matter.

is clearly erroneous; the document is not a communication between a client and an attorney. In fact, no attorney appears as either sender or recipient of the email (including in the cc's). Nor is the document, upon review of its substance, a request for legal advice from an attorney (or anyone else). *See* Exhibit C. Sent and received by engineers, it discusses Shell's possible participation in a remediation study. The purported basis for claiming a privilege in connection with this document is erroneous; Shell has no valid basis to claim that this document is privileged, putting aside the fact that privilege was waived for this document when it was produced in a prior case.

The privilege log entries for the two documents described *supra* appear facially complete and fully compliant with the requirements of Local Rule 26, Pre-Trial Order #38, and Pre-Trial Order #42; the log entries themselves would not have naturally given rise to a privilege log challenge. However, because the documents themselves are in plaintiffs' possession, the City is able to observe that the privilege log entries distort the content of the documents and the privilege claims are in fact invalid. In other words, Shell's privilege log is pernicious precisely because it facially complies with the requirements for asserting privilege – with regard to documents that provide no factual basis for such assertions. In addition, the errors in Shell's new logs must be viewed in light of Shell's numerous representations, in the motion practice leading up to PTO 42, that it had extensively revised its privilege logs and cured all defects therein.

The City respectfully seeks:

- An *in camera* review of a representative sampling of documents listed on the new logs. In particular, we suggest that this review should focus on 1) documents listed on Shell's logs as attorney work product, but not as principally prepared by an attorney, and 2) documents purporting to contain client requests for legal advice, but not citing an attorney as primary recipient.

- An order compelling Shell to produce all documents for which it has asserted the attorney-client and attorney work product privileges, based on the widespread abuse of the attorney-client and attorney work product privileges we expect *in camera* review to reveal.

- In the alternative, and at a bare minimum, an order compelling Shell to produce the specific documents for which *in camera* review reveals distortions or misrepresentations on its privilege logs such that privilege never actually attached.

Thank you for your attention to this matter.

Respectfully submitted,

Amanda C. Goad
Assistant Corporation Counsel
Environmental Law Division

cc:    Richard Wallace, Esq., counsel for Shell Defendants
All counsel via LexisNexis File & Serve



# EXHIBIT A

| From: | White Christine B [Newcos] |
|---|---|
| Sent: | Sunday, January 24, 1999 10:47 PM |
| To: | Meyers Otto O [Newcos]; Boschetto Brad H [Newcos]; Kornylo Barbara A [Newcos]; Tovar Dora O [Newcos]; Gallagher Michael P [Newcos]; Dedoes Robert E [Newcos]; Michalak James L [Newcos]; Stanley CC (Curtis) at MSXWHWTC |
| Subject: | FW: MTBE Cost-Reduction Considerations |

Attorney-Client Work Product

Jim and Otto, Curt Stanley at WTC developed a White Paper (file attached below) outlining 18 areas where the Alliance has the opportunity to reduce future MTBE costs. This, plus the work products developed in the January 18 Santa Monica meeting can be used to form a specific plan to mitigate the costs of MTBE impacts in California and in other parts of the country. My recommendation is that another meeting to develop a California specific action plan is needed in short order. The plan needs to be specific on what resources are needed to acheive the goals and then the resources need to be obtained. This will be discussed in more detail at a conference call Monday morning with WTC and Legal. Government Affairs as well as Communication and Public Affairs input will also be sought.

—Original Message—
| From: | Stanley CC (Curtis) at MSXWHWTC [SMTP:CS193653@MSXWHWTC.SHELL.COM] |
|---|---|
| Sent: | Friday, January 22, 1999 10:42 AM |
| To: | White Christine B [Newcos]; Gallagher Michael P [Newcos]; Hsu EH (Ed) at MSXWHWTC; Michalak James L [Newcos] |
| Cc: | Benton F R [Newcos]; Hansen EE (Erik) at MSXWHWTC |
| Subject: | MTBE Cost-Reduction Considerations |

Chris,

I appreciate your phone call the other day in which you asked me to develop a strategy for technical support that will help reduce potential costs related to MTBE issues in California. I have put considerable thought into this and am enclosing a draft paper which describes 18 issues that will help the Alliance reduce potential costs. In this paper, it is not my intent to step on anyone's feet, but to describe the issues that I think will help us reduce potential costs. These issues are based on my technical experience, my field experience, my business experience, and on my relationship with environmental agencies in California. Please consider this document as a brainstorm draft. I am open to any thoughts you or anyone else has on this issue.

Hopefully, these issues will provide a basis for discussion on our Monday conference call/meeting. As these issues are resolved, we can more clearly develop an understanding of the resources required to meet our goals.

Best Regards,

MTBE Cost Saving
Strotegies.do...

## *Curtis C. Stanley*

Environmental Technology Directorate - Soil and Groundwater
Westhollow Technology Center
(phone-J2) 281-544-7675 (fax-L) ) 281-544-8727
e-mail: ccstanley@equilon.com
(This communication per applicable agreements between our respective companies.)

SH 033365

ý          Ī + ĺ + + + + + + + + + + + + + + +                    δ + + + + + + + + + +
÷δó
δ + + + + + + + + + +
δ + + + + + + + + + +
δ + + + + + + + + + +    *

## Cost Savings Considerations for MTBE and Other Oxygenates in California

Releases of oxygenates to the subsurface will result in increased environmental monitoring/remediation costs in California and elsewhere. While these increases may be significant in states like California, there are still opportunities to reduce potential long-term environmental costs. These opportunities may result in increased short-term costs, but the long-term benefits are considerable. Finally, these efforts will require coordination of all the groups working this issue including: Senior Management, Governmental/Public Affairs, SH&E (S&E, Environmental Affairs, Toxicology), WTC, Refining/Pipeline/Distribution/Retail Businesses, Legal, Procurement, and key consultants. For best results, coordination of these efforts should be focussed through a single management function.

Below, I have outlined 18 issues that provide an opportunity to significantly reduce potential MTBE-related expenditures. Each issue has a brief background discussion followed by tactical considerations. Reasonable groundwater classification and new remediation technology development alone have a potential to save the Alliance on the order of $100 MM just for Retail.

### Groundwater Classification

Background: Currently, California has a very stringent groundwater classification system. In this system, 80-90% of groundwater is classified as a potential drinking water supply. This classification also extends to shallow groundwater which in many cases has very low deliverability and which may also have relatively high TDS. The end result is that many shallow aquifers are classified as a potential drinking water supply when there is a very low probability of use within a reasonable time frame. Groundwater with a potable use classification is subject to considerable environmental scrutiny. Agencies will focus their efforts in these areas and establish relatively low action levels. The end result is that remediation may be required at many sites where groundwater has no reasonable probability of use. This will result in unnecessary expenditures by companies and will also place a severe stress on agencies with the potential to bankrupt the Trust Fund. In addition, groundwater classification is also a significant issue under Prop. 65.
Tactics: The best alternative would be development of a new groundwater classification system which considers reasonable deliverability and water quality factors. In my opinion, the odds of achieving this are very low due to 1) an entrenched classification system and 2) a liberal state administration. It may be possible to partially work this issue through Government Affairs to clarify Porter-Cologne as to beneficial use/receptor. Finally, a higher probability exists for developing a "Probability of Use Template" which can be overlain on the existing groundwater classification system. This would not require a change in the existing system and would help agencies and industry focus their efforts

SH 033366

on high risk-sites while minimizing expenditures on low-risk sites. I would strongly recommend that we discuss this issue with Craig Johns (ex Director of the SFRWQCB) and get his advice on the best way to proceed. Several key agency personnel have also expressed an interest in working with us on this issue. This issue is the keystone for potential cost savings.

Vulnerability Studies
Background: There are approximately 10,000 public water supply wells, significantly more residential (single use) wells, 1000's of agricultural wells, and an unknown number of abandoned wells. Based on a recent study, approximately 50% of the public wells are screened above 200ft. Well seals (used to prevent shallow contamination from entering deeper zones) may have a low integrity or even be absent on older wells. Locations of many wells are poorly documented. Finally, in some areas, groundwater recharge is occurring from shallow to deeper zones through natural or induced (pumping) gradients. All of these factors may contribute to shallow contamination impacting shallow screened wells or migrating to deeper zones and impacting potable aquifers and wells.

The other key factor in a vulnerability study is a general understanding of the types and concentrations of contaminants relative to their sources. A recent internal study showed that 98.6 percent of the sites tested had MTBE in groundwater and that 75% of these sites exceeded 200ppb. This information is tied in with well/recharge zone information to determine potential vulnerability.

Tactics: Several agencies are currently conducting vulnerability studies to better understand this issue so they can develop Basin Vulnerability Maps. These maps will then be tied in with groundwater classification to develop a site classification system. It is essential that we continue to work with the agencies on these studies to help ensure technically sound development. It is also important to develop a GIS system for identifying these areas in relation to our sites. This can be done in conjunction with the agencies or as an internal effort. There are several internal programs which will help the Alliance in this regard. One internal program that is under continued development is the RPI program which helps us understand the potential for a release at our sites. However, use of this program for determining the potential for a release may not be as important as using it for site maintenance/upgrades. Another program is the GIS program at WTC which can be expanded for California. Finally, ground-truthing of well locations is an important aspect of this, since documented locations may be off by several thousand feet.

Site Classification
Background: Site classification provides industry and agencies a means to prioritize activities and help ensure proper resource allocation. This process relies on integrating groundwater classification and vulnerability as described above.
Tactics: Many agencies will likely develop a classification system. We should work with them to help ensure these systems are reasonable and properly utilized. It is also important to continue our efforts in development of GSRE (focussed on oxygenates). Use of both the modified RPI and GSRE will be important factors in developing a useful

SH 033367

classification system.

## High Priority Sites – Monitoring Program

Background: Once a classification system is developed, we will be able to determine which sites are in very sensitive areas. In many cases, this can actually be done now if we know the location of nearby wells. In my opinion, sites located within 3000 feet of a water well or located in aquifer recharge zones should be classified as a high priority. Since current leak detection methods are unable to identify very small releases which can impact groundwater, another monitoring method is needed.

Tactics: Develop a groundwater monitoring protocol and implement it immediately at high priority sites. These systems should be monitored on a timely basis (as a function of groundwater velocity) to help ensure new releases are not occurring. Where existing contamination is discovered, appropriate remediation should be implemented. These efforts may help prevent additional near-term well impacts.

## Establishing Action Levels

Background: Currently, agencies are developing basin-wide action levels for MTBE. In many cases, these levels will be overly conservative and in some cases, they may not be conservative enough. Exceedence of these action levels in any well will likely result in a mandate to implement an extensive monitoring program with source removal and plume containment.

Tactics: A RBCA-based protocol can be developed for establishing site-specific action levels. These levels will be a function of 1) groundwater classification, 2) distance to existing or potential points of exposure (wells, etc.), and groundwater velocity. The basis for this is established in a paper which we presented last summer. This protocol would then have to be accepted by the RWQCB's.

## Technology Evaluation/Development

Background: Existing technologies for the assessment and remediation of oxygenates such as MTBE are relatively inefficient and costly. Expensive pump & treat systems will generally be required to contain soluble MTBE plumes. Where relatively large releases have occurred and residual hydrocarbon is present, these systems may be required to run 10 years or longer. O&M costs over this time period will be very large. In other cases where relatively small releases have occurred, these systems may only need to run a relatively short time. Remediation lifetimes can be significantly reduced if the residual source can be effectively remediated. Finally, current water treatment technologies for MTBE and other oxygenates (i.e. TBA) are very costly and need to be improved.

Tactics: WTC should continue efforts in developing MTBE-degrading microbes and effective field applications such as passive reaction zones. In addition, microbe growth rates need to be increased, if possible. If growth rates can not be significantly increased, then the Alliance should evaluate other methods of large scale production. Ongoing efforts in source elimination such as insitu oxidation and other techniques should be continued. New water treatment technologies should continue to be evaluated for potential application on MTBE/TBA. Finally, research on the fate and transport of ethanol/methanol should be conducted so that potential environmental problems can be identified and properly dealt with before significant use occurs.

SH 033368

Site Assessment Protocols

Background: In the past, site assessments related to BTEX were relatively simple. Due to the characteristics of MTBE, much more sophisticated site assessments will be required. Agencies are currently mandating complete horizontal and vertical plume delineation with depth discrete sampling. In addition, significant hydrostratigraphy and aquifer hydraulics (permeability, horizontal/vertical gradients, etc.) information will be required. With this many sampling points being installed in deeper zones, there is a significant potential for improperly sealed holes and resultant cross contamination. Finally, significantly increased monitoring costs will be realized. On-site costs alone will be on the order of $40M. Off-site investigations will raise this cost significantly.

Tactics: Guidance on MTBE monitoring considerations should be developed. In this guidance there should be a focus on the use of cost-effective screening technologies, proper sampling and analytical protocols, and hole completion to prevent potential cross contamination into deeper zones.

Engineering/Construction/Operations Upgrades

Background: Current in-house research and API/USGS research is indicating that extremely small amounts of MTBE released to the environment may pose an unacceptable risk to groundwater. In some cases, preliminary results indicate that only mg's – grams of MTBE may cause an exceedence. This factor should be carefully considered by Engineering in the design and construction of sites. Even factors such as vent line integrity and storm water handling should be carefully considered. Operational factors such as filter spills and overfills may also contribute to unacceptable releases and should be dealt with.

Tactics: Set up a one day engineering conference to discuss this issue and develop solutions. These solutions should be rapidly implemented at high-risk sites. In addition, there may be simple operational/remediation systems which could be installed at sites that would remediate small releases before they impact groundwater. An example of such a system might be a small SVE line beneath dispensers, tanks, and fills.

Trust Fund Upgrades

Background: Most states have established Trust Funds (TF's) to manage environmental costs associated with leaking underground storage tanks (LUST). Funding is accomplished through a tax on gasoline. Reimbursement of approved activities is paid to qualified companies. Several years ago, most TF's were bankrupt ($1.5B in the red nationally). The Fund managers put considerable pressure on the EPA to help ASTM implement RBCA. In general, these TF managers are very practical and reasonable. Their job is to develop reasonable guidance for dealing with LUST sites. The California TF only has enough money to deal with BTEX issues and is not prepared to handle MTBE cases. Without an upgrade of the CA TF, it is likely to go bankrupt as MTBE cases increase.

Tactics: We need to establish a stakeholder group to work with the TF management in developing a modified program that can handle MTBE and other oxygenates. In

SH 033369

developing this program, there may be a potential to establish reasonable monitoring/remediation requirements that the Regional Boards would have to consider. Finally, a solvent TF would allow us to recover some portion of our environmental costs in the future.

Development of Institutional Controls
Background: In some cases, it may be appropriate to leave small concentrations of chemicals in the subsurface as long as the risk is acceptable. This is an especially important concept for monitored natural attenuation (MNA). In some areas where groundwater does not have a potable use or where distance to a receptor is large compared to the site concentration, natural attenuation/monitoring is a remediation tool which some agencies may accept. In California, natural attenuation may be utilized with agency approval as part of a non-attainment zone. Where natural attenuation might be used for MTBE arguments, new types of institutional controls will have to be established. Tactics: Establish a stakeholder group to work with the state in developing an IC program that will facilitate the use of MNA for MTBE at appropriate sites. ASTM is currently developing an IC standard which may be very helpful in this regard.

Focussed Litigation Support
Background: The MTBE issue has almost become hysterical in California. Significant legal issues have arisen around class action lawsuits, individual lawsuits, product liability issues, and the Prop 65 lawsuit. Potential litigation costs are enormous and the effort is taking considerable time from regional management and environmental staff. Tactics: Establish a technical focal point to assist legal in developing a defense for various litigation activities. This focal point will assist in developing technical strategies, expert witness testimony/selection, cost allocation strategies, and other relevant courses of action. In addition, this person will keep the attorneys abreast of key technical considerations. Our past experience has shown that a strong technical case has a good chance to win the day.

Real Estate Transactions
Background: Real estate transactions consisting of property acquisitions and relinquishments occur quite often ranging from individual site deals to many site deals. In some cases, it is difficult to develop an adequate understanding of site conditions prior to the transaction. Without an understanding of MTBE issues prior to the transaction, several potential problems may arise. These may include the following: the Alliance gets stuck for someone else's environmental costs, may incur litigation expenses, or may end up taking a property back if the Buyer is unable to handle the environmental costs. Tactics: Due to the potential high cost of MTBE remediation, an adequate understanding of site conditions is necessary prior to closing the deal. A policy and guidance document should be developed to address this issue in a way which minimizes future potential costs.

Health Issues Focus
Background: California health officials are well known for taking very conservative

SH 033370

approaches in developing MCL's, carcinogenicity values, and Prop 65 chemicals. A recent determination that MTBE is not a carcinogen and is also not a Prop 65 compound id under fire by the governor. The new governor (Davis) is establishing a group to review the votes against MTBE. I have been told by agency staff that it is his intent to reclassify MTBE as a carcinogen and as Prop 65 compound in order to facilitate a ban on MTBE. Current data does not indicate that MTBE is a carcinogen, however, if it is found to be a carcinogen in the future, our potential costs could increase dramatically. Tactics: Our health and tox people need to follow this issue closely and help ensure that the best science is used in making any decision. They should work closely with state officials and challenge results that are not based on good science.

NERDA

Public Affairs Outreach

Governmental Affairs Lobbying

Consultant/Contractor Procurement

Business Strategy Coordination

th a focus on doing what
th a focus on doing what's best for the Alliance as a whole.
 (including Engineering, and Environmental Groups)  Through effective consideration of these issues, the Alliance would be strongly positioned to realize a significant cost advantage over our competition.the Acta Plans.  These plans willentify very small releases thatwith a frequencythatsand long-term monitoring - Finally, a significantly increased number of tional/remediation systems that developing an IC standard thatoduct liability issues, and litigation provides a very good defenseom individual site de (including Engineering, and Environmental Groups)  Through effective consideration of these issues, the Alliance would be strongly positioned to realize a significant cost advantage over our competition.the  Acta Plans.  These plans willentify very small

SH 033371

releases thatwith a frequencythatsand long-term monitoring - Finally, a significantly increased number of tional/remediation systems that developing an IC standard thatoduct liability issues, and litigation provides a very good defenseom individual site dep

Ethan Frome
EW/LN/CB
Normal
Shell Oil Company
Microsoft Word 8.0
Shell Oil Company
Ethan Frome
_PID_GUID
{CB8CDDC5-B112-11D2-883C-0060970D5F31}
{CB8CDDC5-B112-11D2-883C-0060970D5F31}

ell understood by all the businesses. One individual should chair this group with a focus on doing what's best for the Alliance as a whole.

Attorney Client Privileged
Private and Confidential


DRAFT



Attorney Client Privileged
Private and Confidential


DRAFT



Ethan Frome
Ethan Frome
EW/LN/CB
EW/LN/CB
Shell Oil Company
Shell Oil Company
Normal
Normal
Heading 1
Heading 1
Heading 2
Heading 2
Default Paragraph Font
Default Paragraph Font
als to multipleor lyddress this issue in a way thats also not a Prop 65 compound

SH 033372

isicologystaffscision. Technical staffGovernment Affairs and . Future agency developments that artificially push MTBE as a health concern should be strongly d where the resultsNBackground: When chemical releases occur to the ecosystem, there is an increasing trend to conduct Natural Resource Damage Assessments. These assessments provide a means for governmental agencies to assess financial damage to the ecosystem and fine responsible companies. MTBE releases to soil and groundwater are a likely target for increased NRDA assessments and fines.

Tactics: Alliance experts like Michael Macrander should understand the ecological aspects of MTBE releases to the environment and develop a protocol for effectively addressing NRDA issues.Background: Environmentalists are causing a state of hysteria in California around MTBE. While some of their facts may be accurate, many of their issues are completely over-exaggerated. This is causing considerable concern with the public and regulatory agencies which in many cases is resulting in very severe repercussions for MTBE issues.

Tactics: A balanced and factual outreach effort is needed by industry for the public and regulatory sectors to put MTBE issues in perspective. With this effort, we need to be very careful not to overstate our case (as some industry organizations have done) where technical credibility is lost. Once our credibility is lost, it will be very difficult for anyone to listen to the issues seriously.Background: Over the last 10-15 years, industry has established a very strong lobby with the state administration. Whenever industry felt that they were being unfairly treated by local agencies, they were able to take the issue to a higher level for a generally favorable resolution. Many agency staff and NPO als to multipleor lyddress this issue in a way thats also not a Prop 65 compound isicologystaffscision. Technical staffGovernment Affairs and . Future agency developments that artificially push MTBE as a health concern should be strongly d where the resultsNBackground: When chemical releases occur to the ecosystem, there is an increasing trend to conduct Natural Resource Damage Assessments. These assessments provide a means for governmental agencies to assess financial damage to the ecosystem and fine responsible companies. MTBE releases to soil and groundwater are a likely target for increased NRDA assessments and fines.

Tactics: Alliance experts like Michael Macrander should understand the ecological aspects of MTBE releases to the environment and develop a protocol for effectively addressing NRDA issues.Background: Environmentalists are causing a state of hysteria in California around MTBE. While some of their facts may be accurate, many of their issues are completely over-exaggerated. This is causing considerable concern with the public and regulatory agencies which in many cases is resulting in very severe repercussions for MTBE issues.

Tactics: A balanced and factual outreach effort is needed by industry for the public and regulatory sectors to put MTBE issues in perspective. With this effort, we need to be very careful not to overstate our case (as some industry organizations have done) where technical credibility is lost. Once our credibility is lost, it will be very difficult for anyone to listen to the issues seriously.Background: Over the last 10-15 years, industry has established a very strong lobby with the state administration. Whenever industry felt that they were being unfairly treated by local agencies, they were able to take the issue to a higher level for a generally favorable resolution. Many agency staff and NPO's became very upset with this practice. Now that a new democratic governor (Davis) is in place,

SH 033373

who has appointed liberals to key environmental positions and who are supported by a liberal Attorney General, a new working environment is developing. In this new environment, many of our lobbyists will have a more difficult time-getting our position across. In addition, many agencies/NPO's are looking at payback for perceived past environmental transgressions. Two recent examples of things to come are clear. In one case, Assistant AG's elected not to head-off the Prop. 65 lawsuit. It was very clear that they were not inclined to rock the boat with the new AG. In another case, the governor has established a group to review the basis for negative votes relating to MTBE carcinogenicity and reproductive toxicity. My contacts have told me that the governor wants to demonstrate that MTBE is a carcinogen or at least a reproductive toxicant (for Prop 65 listing) in order to establish a strong basis for a ban. If MTBE is listed as either a carcinogen or a reproductive toxicant, the perceived health issues will greatly increase our potential environmental/litigation costs.

Tactics: Governmental Affairs staff needs to establish a working relationship with key players in the new administration. In addition, they need to work closely with technical experts so that technically defensible arguments can be presented. Key areas to focus on are health aspects of MTBE and groundwater classification. In addition, other efforts should take place at a national level to help put pressure on California in developing rational approaches to MTBE and other oxygenates.Background: Due to use of natural attenuation and RBCA over the past 5 years, many environmental consultants and contractors have seen a severe decline in business. Many of these groups are becoming aware that MTBE is going to greatly increase business opportunities. In order to deal effectively with MTBE in soil and groundwater, we will need considerable field support from consultants and contractors. Reliance on natural attenuation for MTBE will not be adequate in many cases and we will be forced into very complex investigations and installation of pump & treat systems.

Tactics: Since it is clear that assessment and remediation efforts are going to significantly increase while becoming more complex and costly, it is appropriate to develop new contractual relationships between the Alliance and key consultants and contractors which will stay in effect for the next five years. These contracts need to be developed relatively soon, before service costs are driven higher by increasing demand. In developing these relationships, it is extremely important that consultants and contractors be technically screened prior to developing a contract. There are many companies that purport to offer excellent services/materials when in fact they are relatively incompetent. Without adequate

Attribut
(1Normal.ThisDocument-
"*\Rffff*536a8652d
*\R1*#17b
*\R1*#17b
*\R1*#c1
*\R1*#c1
*\R1*#17e
*\R1*#17e
*\R1*#c6
*\R1*#c6

SH 033374

```
*\R1*#17c
*\R1*#17c
*\R1*#c0
*\R1*#c0
*\R1*#166
*\R1*#166
*\R0*#12
*\R0*#12
*\R0*#e
*\R0*#e
*\R1*#c7
*\R1*#c7
*\G{0002E157-0000-0000-C000-000000000046}#5.0#0#..\..\..\PROGRAM
FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBEEXT1.OLB#Microsoft
Visual Basic for Applications Extensibility*#1a
*\G{0002E157-0000-0000-C000-000000000046}#5.0#0#..\..\..\PROGRAM
FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBEEXT1.OLB#Microsoft
Visual Basic for Applications Extensibility*#19
*\G{0002E157-0000-0000-C000-000000000046}#5.0#0#..\..\..\PROGRAM
FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBEEXT1.OLB#Microsoft
Visual Basic for Applications Extensibility*#22
*\G{0002E157-0000-0000-C000-000000000046}#5.0#0#..\..\..\PROGRAM
FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBEEXT1.OLB#Microsoft
Visual Basic for Applications Extensibility*#21
*\G{0002E157-0000-0000-C000-000000000046}#5.0#0#..\..\..\PROGRAM
FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBEEXT1.OLB#Microsoft
Visual Basic for Applications Extensibility*#26
*\G{0002E157-0000-0000-C000-000000000046}#5.0#0#..\..\..\PROGRAM
FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBEEXT1.OLB#Microsoft
Visual Basic for Applications Extensibility*#25
*\G{0002E157-0000-0000-C000-000000000046}#5.0#0#..\..\..\PROGRAM
FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBEEXT1.OLB#Microsoft
Visual Basic for Applications Extensibility*#2c
*\G{0002E157-0000-0000-C000-000000000046}#5.0#0#..\..\..\PROGRAM
FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBEEXT1.OLB#Microsoft
Visual Basic for Applications Extensibility*#2b
*\R1*#60
*\R1*#60
*\R1*#123
*\R1*#123
*\R1*#124
*\R1*#124
*\R0*#cß
e = "Thi
sDocumen
1Normal
```

SH 033375

VCreata

`False

Predecl

xTru

"Expose

Template Deriv

$CuAstomiz

__SRP_2

__SRP_2

__SRP_3

__SRP_3

_VBA_PROJECT

_VBA_PROJECT

*\G{000204EF-0000-0000-C000-000000000046}#3.0#9#C:\PROGRAM FILES\COMMON FILES\MICROSOFT SHARED\VBA\VBA332.DLL#Visual Basic For Applications

*\G{00020905-0000-0000-C000-000000000046}#8.0#409#C:\Program Files\Microsoft Office\Office\MSWORD8.OLB#Microsoft Word 8.0 Object Library

.*\G{00020430-0000-0000-C000-000000000046}#2.0#0#C:\WINDOWS\SYSTEM\stdole2.tlb#OLE Automation

.*\G{00020430-0000-0000-C000-000000000046}#2.0#0#C:\WINDOWS\SYSTEM\stdole2.tlb#OLE Automation

à*\G{07BAC886-AFB4-11D0-883A-3C8B00C10000}#2.0#0#C:\WINDOWS\SYSTEM\MSForms.TWD#Microsoft Forms 2.0 Object Library

à*\G{07BAC886-AFB4-11D0-883A-3C8B00C10000}#2.0#0#C:\WINDOWS\SYSTEM\MSForms.TWD#Microsoft Forms 2.0 Object Library

ã*\G{57186685-CD36-11D1-883B-3C8B00C10000}#2.0#0#C:\WINDOWS\TEMP\VBE\MSForms.EXD#Mictechnical screening, use of these companies would very likely drive our end costs considerably higher than if a competent business professional was used to start with. In addition, key technical focal points for various environmental companies need to be rosoft Forms 2.0 Object Library

ã*\G{57186685-CD36-11D1-883B-3C8B00C10000}#2.0#0#C:\WINDOWS\TEMP\VBE\MSForms.EXD#Mictechnical screening, use of these companies would very likely drive our end costs considerably higher than if a competent business professional was used to start with. In addition, key technical focal points for various environmental companies need to be rosoft Forms 2.0 Object Library

*\CNormal

*\CNormal

*\CNormal,

*\G{2DF8D04C-5BFA-101B-BDE5-00AA0044DE52}#2.0#0#C:\PROGRAM FILES\MICROSOFT OFFICE\OFFICE\MSO97.DLL#Microsoft Office 8.0 Object Library

SH 033376

ThisDocument
5
ThisDocument
        d
MTBE Cost Saving StrategiesŸ
stdole

MSFormsC
ThisDocument<
_Evaluate
Normal
Office
Project-®
DocumentjÓ
Document_Close7\
ActiveDocumentÓ\
Savedd
Application¥*
EnableCancelKeyêó
Options§
ConfirmConversions
VirusProtectionoD
SaveNormalPromptÊ¼
MacroContainer  >
VBProjectOh
VBComponents

CodeModuleá
CountOfLines!\
SetAttrC‡
NormalTemplateq¬
InsertLinesŠ«
DialogsŠ
wdDialogFileSummaryInfo¦º
Author
Keywords
ExecuteYÍ
SaveAsf;
FileNamejÃ
FullNameÐ
_B_var_s
_B_var_i        ¢
_B_var_a
_B_var_t
_B_var_LeftQá
Project

SH 033377

\G{00020°430-
0046}#
2.0#0#C:
\WINDOWS
\SYSTEM\
c2.tlb#O
LE Autom`ation
mMSForms
BAC886-A
FB4-11D0
-883A-3CÀ8B00C1
3.TWD#Mi
crosoft E
  Library
P5718668@5-CD36
P  JP\VB$E\...(EX§(á.
CxRN@UaICxN,,TaQÀx
OPfficD‰O@†f°
G{2DF8D0
4C-5BFA-
101B-BDER5@‰AA@ˆ4À
fPROGRAM
 FILES\M
ICROSOFT
 OFFICE\
MSO97.D
LLHk∫f# 8.0E'k
ocument
__SRP_0
__SRP_0
__SRP_1
__SRP_1
PROJECTwm
PROJECTwm
PROJECT
PROJECT
identified to help ensure quality work on Alliance projects. After all, it
identified to help ensure quality work on Alliance projects. After all, it's not the
company, but the individuals that are important. Once companies are screened and
approved, Procurement staff can establish favorable contractual relationships. Business
ThisDocument
tThisDocument
ID="{CB8CDDC6-B112-11D2-883C-0060970D5F31}"

Document=ThisDocument/&H00000000

SH 033378

Name="Project"

HelpContextID="0"

CMG="5E5C9478AC880E8C0E8C0E8C0E8C"

DPB="BCBE76D68A358B358B35"

GC="1A18D0BC2FBD2FBDD0"


[Host Extender Info]

&H00000001={3832D640-CF90-11CF-8E43-00A0C911005A};VBE;&H00000000


[Workspace]

ThisDocument=0, 0, 0, 0, C

Microsoft Word Document
es to consider in this regard are hydrogeological consulting firms, remediation
companies, drillers, field screening companies (CPT's, geoprobes, etc.), labs, and
equipment suppliers (pumps, well casing, treatment system vendors, etc.).Background:
Many of
the issues that the Alliance will face cut across all of our major downstream businesses.
There are many issues, some of which are not intuitively obvious, which can affect
Alliance businesses. These issues need to be considered so that decisions can be
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving
Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving
Strategies.asd
Shell Oil
, Engineering, and Environmental Groups Through effective consideration of these
issues, the Alliance would be strongly positioned to realize a significant cost advantage
over our competition.the Acta Plans. These plans willand long-term monitoring Finally,
a significantly increased number of developing an IC standard thatoduct liability issues,
and litigation provides a very good defenseom individual site deals to multipleor lyddress
this issue in a way thats also not a Prop 65 compound isicologystaffcision. Technical
staffGovernment Affairs and . Future agency developments which artificially push
MTBE as a health concern should be strongly d where the resultsNBackground: When
chemical releases occur to the ecosystem, there is an increasing trend to conduct Natural
Resource Damage Assessments. These assessments provide a means for governmental

SH 033379

agencies to assess financial damage to the ecosystem and fine responsible companies. MTBE releases to soil and groundwater are a likely target for increased NRDA assessments and fines.

Tactics: Alliance experts like Michael Macrander should understand the ecological aspects of MTBE releases to the environment and develop a protocol for effectively addressing NRDA issues.Background: Environmentalists are causing a state of hysteria in California around MTBE. While some of their facts may be accurate, many of their issues are completely over-exaggerated. This is causing considerable concern with the public and regulatory agencies which in many cases is resulting in very severe repercussions for MTBE issues.

Tactics: A balanced and factual outreach effort is needed by industry for the public and regulatory sectors to put MTBE issues in perspective. With this effort, we need to be very careful not to overstate our case (as some industry organizations have done) where technical credibility is lost. Once our credibility is lost, it will be very difficult for anyone to listen to the issues seriously.Background: Over the last 10-15 years, industry has established a very strong lobby with the state administration. Whenever industry felt that they were being unfairly treated by local agencies, they were able to take the issue to a higher level for a generally favorable resolution. Many agency staff and NPO , Engineering, and Environmental Groups Through effective consideration of these issues, the Alliance would be strongly positioned to realize a significant cost advantage over our competition.the Acta Plans. These plans willand long-term monitoring Finally, a significantly increased number of developing an IC standard thatoduct liability issues, and litigation provides a very good defenseom individual site deals to multipleot lyddress this issue in a way that also not a Prop 65 compound isicologystaffcision. Technical staffGovernment Affairs and . Future agency developments which artificially push MTBE as a health concern should be strongly d where the resultsNBackground: When chemical releases occur to the ecosystem, there is an increasing trend to conduct Natural Resource Damage Assessments. These assessments provide a means for governmental agencies to assess financial damage to the ecosystem and fine responsible companies. MTBE releases to soil and groundwater are a likely target for increased NRDA assessments and fines.

Tactics: Alliance experts like Michael Macrander should understand the ecological aspects of MTBE releases to the environment and develop a protocol for effectively addressing NRDA issues.Background: Environmentalists are causing a state of hysteria in California around MTBE. While some of their facts may be accurate, many of their issues are completely over-exaggerated. This is causing considerable concern with the public and regulatory agencies which in many cases is resulting in very severe repercussions for MTBE issues.

Tactics: A balanced and factual outreach effort is needed by industry for the public and regulatory sectors to put MTBE issues in perspective. With this effort, we need to be very careful not to overstate our case (as some industry organizations have done) where technical credibility is lost. Once our credibility is lost, it will be very difficult for anyone to listen to the issues seriously.Background: Over the last 10-15 years, industry has established a very strong lobby with the state administration. Whenever industry felt that they were being unfairly treated by local agencies, they were able to take the issue to a higher level for a generally favorable resolution. Many agency staff and NPO's became



SH 033380

very upset with this practice. Now that a new democratic governor (Davis) is in place, who has appointed liberals to key environmental positions and who are supported by a liberal Attorney General, a new working environment is developing. In this new environment, many of our lobbyists will have a more difficult time getting our position across. In addition, many agencies/NPO's are looking at payback for perceived past environmental transgressions. Two recent examples of things to come are clear. In one case, Assistant AG's elected not to head-off the Prop. 65 lawsuit. It was very clear that they were not inclined to rock the boat with the new AG. In another case, the governor has established a group to review the basis for negative votes relating to MTBE carcinogenicity and reproductive toxicity. My contacts have told me that the governor wants to demonstrate that MTBE is a carcinogen or at least a reproductive toxicant (for Prop 65 listing) in order to establish a strong basis for a ban. If MTBE is listed as either a carcinogen or a reproductive toxicant, the perceived health issues will greatly increase our potential environmental/litigation costs.

Tactics: Governmental Affairs staff needs to establish a working relationship with key players in the new administration. In addition, they need to work closely with technical experts so that technically defensible arguments can be presented. Key areas to focus on are health aspects of MTBE and groundwater classification. In addition, other efforts should take place at a national level to help put pressure on California in developing rational approaches to MTBE and other oxygenates.Background: Due to use of natural attenuation and RBCA over the past 5 years, many environmental consultants and contractors have seen a severe decline in business. Many of these groups are becoming aware that MTBE is going to greatly increase business opportunities. In order to deal effectively with MTBE in soil and groundwater, we will need considerable field support from consultants and contractors. Reliance on natural attenuation for MTBE will not be adequate in many cases and we will be forced into very complex investigations and installation of pump & treat systems.

Tactics: Since it is clear that assessment and remediation efforts are going to significantly increase while becoming more complex and costly, it is appropriate to develop new contractual relationships between the Alliance and key consultants and contractors which will stay in effect for the next five years. These contracts need to be developed relatively soon, before service costs are driven higher by increasing demand. In developing these relationships, it is extremely important that consultants and contractors be technically screened prior to developing a contract. There are many companies that purport to offer excellent services/materials when in fact they are relatively incompetent. Without adequate technical screening, use of these companies would very likely drive our end costs considerably higher than if a competent business professional was used to start with. In addition, key technical focal points for various environmental companies need to be identified to help ensure quality work on Alliance projects. After all, it's not the company, but the individuals that are important. Once companies are screened and approved, Procurement staff can establish favorable contractual relationships. Businesses to consider in this regard are hydrogeological consulting firms, remediation companies, drillers, field screening companies (CPT's, geoprobes, etc.), labs, and equipment suppliers (pumps, well casing, treatment system vendors, etc.).Background: Many of the issues that the Alliance will face cut across all of our major downstream businesses. There are many issues, some of which are not



SH 033381

intuitively obvious, which can affect Alliance businesses. These issues need to be considered so that decisions can be made that are best for the Alliance as a whole. Without adequate coordination, a well intended action may inadvertently have a negative affect on another business.

Tactics: An MTBE business strategy council should be established so that key issues are well understood by all the businesses. One individual should chair this group wi
CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Doc
Normal
Normal
Heading 1
Heading 1
Default Paragraph Font
Default Paragraph Font
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving

SH 033382

Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving
Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving
Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving
Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving
Strategies.asd
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving
Strategies.docÿ    ù    ù    H
Times New Roman
Times New Roman
Symbol
Symbol
Ethan Frome
Ethan Frome
EW/LN/CB
EW/LN/CB
Shell Oil Company
Shell Oil Company
uments\WORD\Retail\MTBE Cost Saving Strategies.doc
uments\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving
Strategies.docÿ
Times New Roman
Times New Roman
Symbol
Symbol
Ethan Frome
Ethan Frome
EW/LN/CB
EW/LN/CB
made that are best for the Alliance as a whole. Without adequate coordination, a well-
intended action may inadvertently have a negative affect on another business.
Tactics: An MTBE business strategy council should be established so that key issues are
well understood by all the businesses. One individual should chair this group with a
focus on doing what

SH 033383



made that are best for the Alliance as a whole. Without adequate coordination, a well-intended action may inadvertently have a negative affect on another business.

Tactics: An MTBE business strategy council should be established so that key issues are well understood by all the businesses. One individual should chair this group with a focus on doing what's best for the Alliance as a whole.

Normal
Normal
Heading 1
Heading 1
Default Paragraph Font
Default Paragraph Font
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil CompanyDC:\WINDOWS\TEMP\AutoRecovery save of MTBE Cost Saving Strategies.asd
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc
Shell Oil Company;C:\My Documents\WORD\Retail\MTBE Cost Saving Strategies.doc9    Ð   Ð   H
Times New Roman
Times New Roman
Symbol
Symbol
Ethan Frome



SH 033384

Ethan Frome
EW/LN/CB
EW/LN/CB
Shell Oil Company
Shell Oil Company
bjbjt+t+
Root Entry
Root Entry
1Table
1Table
WordDocument
WordDocument
SummaryInformation
SummaryInformation
c:\ethan.___j
DocumentSummaryInformation
DocumentSummaryInformation
%Macros
c:\class.sysA@*
!  !  %ThisDocument
Private
aȳ  CompObj
CompObj
ObjectPool
ObjectPool
0Table
0Table
Word.Document.8
Shell Oil Company
Ethan Frome
_PID_GUID
{CB8CDDC5-B112-11D2-883C-0060970D5F31}
{CB8CDDC5-B112-11D2-883C-0060970D5F31}
Ethan Frome
EW/LN/CB
Normal
Shell Oil Company
Microsoft Word 8.0
Shell Oil Company
Shell Oil Company
bjbjt+t+
Root Entry
Root Entry
1Table
1Table
WordDocument



SH 033385

# DRAFT

## Cost Savings Considerations for MTBE and Other Oxygenates in California

Releases of oxygenates to the subsurface will result in increased environmental monitoring/remediation costs in California and elsewhere. While these increases may be significant in states like California, there are still opportunities to reduce potential long-term environmental costs. These opportunities may result in increased short-term costs, but the long-term benefits are considerable. Finally, these efforts will require coordination of all the groups working this issue including: Senior Management, Governmental/Public Affairs, SH&E (S&E, Environmental Affairs, Toxicology), WTC, Refining/Pipeline/Distribution/Retail Businesses (including Engineering, and Environmental Groups), Legal, Procurement, and key consultants. For best results, coordination of these efforts should be focussed through a single management function.

Below, I have outlined 19 issues that provide an opportunity to significantly reduce potential MTBE-related expenditures. Each issue has a brief background discussion followed by tactical considerations. Reasonable groundwater classification and new remediation technology development alone have a potential to save the Alliance on the order of $100 MM just for Retail. Through effective consideration of these issues, the Alliance would be strongly positioned to realize a significant cost advantage over our competition.

### Groundwater Classification

**Background:** Currently, California has a very stringent groundwater classification system. In this system, 80-90% of groundwater is classified as a potential drinking water supply. This classification also extends to shallow groundwater which in many cases has very low deliverability and which may also have relatively high TDS. The end result is that many shallow aquifers are classified as a potential drinking water supply when there is a very low probability of use within a reasonable time frame. Groundwater with a potable use classification is subject to considerable environmental scrutiny. Agencies will focus their efforts in these areas and establish relatively low action levels. The end result is that remediation may be required at many sites where groundwater has no reasonable probability of use. This will result in unnecessary expenditures by companies and will also place a severe stress on agencies with the potential to bankrupt the Trust Fund. In addition, groundwater classification is also a significant issue under Prop. 65.
**Tactics:** The best alternative would be development of a new groundwater classification system which considers reasonable deliverability and water quality factors. In my opinion, the odds of achieving this are very low due to 1) an entrenched classification system and 2) a liberal state administration. It may be possible to partially work this issue through Government Affairs to clarify the Porter-Cologne Act as to beneficial use/receptor. Finally, a higher probability exists for developing a "Probability of Use Template" which can be overlain on the existing groundwater classification system. This would not require a change in the existing system and would help agencies and industry focus their efforts on high risk-sites while minimizing expenditures on low-risk sites. I would strongly recommend that we discuss this issue with Craig Johns (ex Director of the SFRWQCB) and get his advice on the best way to proceed. Several key agency personnel have also expressed an interest in working with us on this issue. *This issue is a keystone for potential cost savings.*

### Vulnerability Studies

**Background:** There are approximately 10,000 public water supply wells, significantly more residential (single use) wells, 1000's of agricultural wells, and an unknown number of abandoned wells. Based on a recent study, approximately 50% of the public wells are screened above 200ft. Well seals (used to prevent

SH 033122

shallow contamination from entering deeper zones) may have a low integrity or even be absent on older wells. Locations of many wells are poorly documented. Finally, in some areas, groundwater recharge is occurring from shallow to deeper zones through natural or induced (pumping) gradients. All of these factors may contribute to shallow contamination impacting shallow screened wells or migrating to deeper zones and impacting potable aquifers and wells.

The other key factor in a vulnerability study is a general understanding of the types and concentrations of contaminants relative to their sources. A recent internal study showed that 98.6 percent of the sites tested had MTBE in groundwater and that 75% of these sites exceeded 200ppb. This information is tied in with well/recharge zone information to determine potential vulnerability.

Tactics: Several agencies are currently conducting vulnerability studies to better understand this issue so they can develop Basin Vulnerability Plans. These plans will be tied in with groundwater classification to develop a site classification system. It is essential that we continue to work with the agencies on these studies to help ensure technically sound development. It is also important to develop a GIS system for identifying these areas in relation to our sites. This can be done in conjunction with the agencies or as an internal effort. There are several internal programs which will help the Alliance in this regard. One internal program that is under continued development is the RPI program which helps us understand the potential for a release at our sites. However, use of this program for determining the potential for a release may not be as important as using it for site maintenance/upgrades. Another program is the GIS program at WTC which can be expanded for California. Finally, ground-truthing of well locations is an important aspect of this, since documented locations may be off by several thousand feet.

## Site Classification
Background: Site classification provides industry and agencies a means to prioritize activities and help ensure proper resource allocation. This process relies on integrating groundwater classification and vulnerability as described above.
Tactics: Many agencies will likely develop a classification system. We should work with them to help ensure these systems are reasonable and properly utilized. It is also important to continue our efforts in development of GSRE (focussed on oxygenates). Use of both the modified RPI and GSRE will be important factors in developing a useful classification system.

## High Priority Sites -- Monitoring Program
Background: Once a classification system is developed, we will be able to determine which sites are in very sensitive areas. In many cases, this can actually be done now if we know the location of nearby wells. In my opinion, sites located within 3000 feet of a water well or located in aquifer recharge zones should be classified as a high priority. Since current leak detection methods are unable to identify very small releases that can impact groundwater, another monitoring method is needed.
Tactics: Develop a groundwater monitoring protocol and implement it immediately at high priority sites. These systems should be monitored with a frequency (as a function of groundwater velocity) that helps ensure new releases are not occurring. Where existing contamination is discovered, appropriate remediation should be implemented. These efforts may help prevent additional near-term and long-term well impacts.

## Establishing Action Levels
Background: Currently, agencies are developing basin-wide action levels for MTBE. In many cases, these levels will be overly conservative and in some cases, they may not be conservative enough. Exceedence of these action levels in any monitoring well will likely result in a mandate to implement an extensive monitoring program with source removal and plume containment.
Tactics: A RBCA-based protocol can be developed for establishing site-specific action levels. These levels will be a function of 1) groundwater classification, 2) distance to existing or potential points of exposure (wells, etc.), and groundwater velocity. The basis for this is established in a paper which we presented last summer. This protocol would then have to be accepted by the RWQCB's.

SH 033123

### Technology Evaluation/Development

**Background:** Existing technologies for the assessment and remediation of oxygenates such as MTBE are relatively inefficient and costly. Expensive pump & treat systems will generally be required to contain soluble MTBE plumes. Where relatively large releases have occurred and residual hydrocarbon is present, these systems may be required to run 10 years or longer. O&M costs over this time period will be very large. In other cases where relatively small releases have occurred, these systems may only need to run a relatively short time. Remediation lifetimes can be significantly reduced if the residual source can be effectively remediated. Finally, current water treatment technologies for MTBE and other oxygenates (i.e. TBA) are very costly and need to be improved.

**Tactics:** WTC should continue efforts in developing MTBE-degrading microbes and effective field applications such as passive reaction zones. In addition, microbe growth rates need to be increased, if possible. If growth rates can not be significantly increased, then the Alliance should evaluate other methods of large-scale production. Ongoing efforts in source elimination such as insitu oxidation and other techniques should be continued. New water treatment technologies should continue to be evaluated for potential application on MTBE/TBA. Finally, research on the fate and transport of ethanol/methanol should be conducted so that potential environmental problems can be identified and properly dealt with before significant use occurs.


### Site Assessment Protocols

**Background:** In the past, site assessments related to BTEX were relatively simple. Due to the characteristics of MTBE, much more sophisticated site assessments will be required. Agencies are currently mandating complete horizontal and vertical plume delineation with depth discrete sampling. In addition, significant hydrostratigraphy and aquifer hydraulics (permeability, horizontal/vertical gradients, etc.) information will be required. With a significantly increased number of sampling points being installed in deeper zones, there is a significant potential for improperly sealed holes and resultant cross contamination. Finally, significantly increased monitoring costs will be realized. On-site costs alone will be on the order of $40M. Off-site investigations will raise this cost significantly.

**Tactics:** Guidance on MTBE monitoring considerations should be developed. In this guidance there should be a focus on the use of cost-effective screening technologies, proper sampling and analytical protocols, and hole completion to prevent potential cross contamination into deeper zones.


### Remediation Strategy Protocols

**Background:** In the past, pump and treat systems were designed to help recover separate phase hydrocarbon and to contain simple soluble plumes. Over the past 5 years, the need to install these types of remediation systems has greatly diminished due to the advent of RBCA and natural attenuation. Design optimization for MTBE plume capture requires a new long-term perspective which focuses on hydraulic capture and efficient treatment.

Tactics: Develop a guidance document which addresses key issues for long-term effective design of hydraulic capture systems and insitu reaction zones.


### Engineering/Construction/Operations Upgrades

**Background:** Current in-house research and API/USGS research is indicating that extremely small amounts of MTBE released to the environment may pose an unacceptable risk to groundwater. In some cases, preliminary results indicate that only mg's -- grams of MTBE may cause an exceedence. This factor should be carefully considered by Engineering in the design and construction of sites. Even factors such as vent line integrity and storm water handling should be carefully considered. Operational factors such as filter spills and overfills may also contribute to unacceptable releases and should be dealt with.

**Tactics:** Set up a one day engineering conference to discuss this issue and develop solutions. These solutions should be rapidly implemented at high-risk sites. In addition, there may be simple operational/remediation systems that could be installed at sites that would remediate small releases before they impact groundwater. An example of such a system might be a small SVE line beneath dispensers, tanks, and fills.

SH 033124

## Trust Fund Upgrades

Background: Most states have established Trust Funds (TF's) to manage environmental costs associated with leaking underground storage tanks (LUST). Funding is accomplished through a tax on gasoline. Reimbursement of approved activities is paid to qualified companies. Several years ago, most TF's were bankrupt ($1.5B in the red nationally). The Fund managers put considerable pressure on the EPA to help ASTM implement RBCA. In general, these TF managers are very practical and reasonable. Their job is to develop reasonable guidance for dealing with LUST sites. The California TF only has enough money to deal with BTEX issues and is not prepared to handle MTBE cases. Without an upgrade of the CA TF, it is likely to go bankrupt as MTBE cases increase.

Tactics: We need to establish a stakeholder group to work with the TF management in developing a modified program that can handle MTBE and other oxygenates. In developing this program, there may be a potential to establish reasonable monitoring/remediation requirements that the Regional Boards would have to consider. Finally, a solvent TF would allow us to recover some portion of our environmental costs in the future.

## Development of Institutional Controls

Background: In some cases, it may be appropriate to leave small concentrations of chemicals in the subsurface as long as the risk is acceptable. This is an especially important concept for monitored natural attenuation (MNA). In some areas where groundwater does not have a potable use or where distance to a receptor is large compared to the site concentration, natural attenuation/monitoring is a remediation tool which some agencies may accept. In California, natural attenuation may be utilized with agency approval as part of a non-attainment zone. Where natural attenuation might be used for MTBE, new types of institutional controls will have to be established.

Tactics: Establish a stakeholder group to work with the state in developing an IC program that will facilitate the use of MNA for MTBE at appropriate sites. ASTM is currently developing an IC standard that may be very helpful in this regard.

## Focussed Litigation Support

Background: The MTBE issue has almost become hysterical in California. Significant legal issues have arisen around class action lawsuits, individual lawsuits, product liability issues, and Prop 65 litigation. Potential litigation costs are enormous and the effort is taking considerable time from regional management and environmental staff.

Tactics: Establish a technical focal point to assist legal in developing a defense for various litigation activities. This focal point will assist in developing technical strategies, expert witness testimony/selection, cost allocation strategies, and other relevant courses of action. In addition, this person will keep the attorneys abreast of key technical considerations. Our past experience has shown that a strong technical case provides a very good defense.

## Real Estate Transactions

Background: Real estate transactions consisting of property acquisitions and relinquishments occur quite often ranging from individual site deals to multiple site deals. In some cases, it is difficult to develop an adequate understanding of site conditions prior to the transaction. Without an understanding of MTBE issues prior to the transaction, several potential problems may arise. These may include the following: the Alliance gets stuck for someone else's environmental costs, or may incur litigation expenses, or may end up taking a property back if the Buyer is unable to handle the environmental costs.

Tactics: Due to the potentially high cost of MTBE remediation, an adequate understanding of site conditions is necessary prior to closing the deal. A policy and guidance document should be developed to address this issue in a way that minimizes future potential costs.

## Health Issues Focus

Background: California health officials are well known for taking very conservative approaches in developing MCL's, carcinogenicity values, and Prop 65 chemicals. A recent determination that MTBE is not a carcinogen and is also not a Prop 65 compound is under fire by the governor. The new governor (Davis) is establishing a group to review the votes against MTBE. I have been told by agency staff that it is his intent to reclassify MTBE as a carcinogen and as Prop 65 compound in order to facilitate a ban on

SH 033125

MTBE. Current data does not indicate that MTBE is a carcinogen, however, if it is found to be a carcinogen in the future, our potential costs could increase dramatically.

Tactics: Our health and toxicology staff needs to follow this issue closely and help ensure that the best science is used in making any decision. Technical staff should work closely with Government Affairs and state officials. Future agency developments that artificially push MTBE as a health concern should be strongly challenged where the results are not based on good science.

## NRDA

Background: When chemical releases occur to the ecosystem, there is an increasing trend to conduct Natural Resource Damage Assessments. These assessments provide a means for governmental agencies to assess financial damage to the ecosystem and fine responsible companies. MTBE releases to soil and groundwater are a likely target for increased NRDA assessments and fines.

Tactics: Alliance experts like Michael Macrander should understand the ecological aspects of MTBE releases to the environment and develop a protocol for effectively addressing NRDA issues.

## Public Affairs Outreach

Background: Environmentalists are causing a state of hysteria in California around MTBE. While some of their facts may be accurate, many of their issues are completely over-exaggerated. This is causing considerable concern with the public and regulatory agencies which in many cases is resulting in very severe repercussions for MTBE issues.

Tactics: A balanced and factual outreach effort is needed by industry for the public and regulatory sectors to put MTBE issues in perspective. With this effort, we need to be very careful not to overstate our case (as some industry organizations have done) where technical credibility is lost. Once our credibility is lost, it will be very difficult for anyone to listen to the issues seriously.

## Governmental Affairs Lobbying

Background: Over the last 10-15 years, industry has established a very strong lobby with the state administration. Whenever industry felt that they were being unfairly treated by local agencies, they were able to take the issue to a higher level for a generally favorable resolution. Many agency staff and NPO's became very upset with this practice. Now that a new democratic governor (Davis) is in place, who has appointed liberals to key environmental positions and who are supported by a liberal Attorney General, a new working environment is developing. In this new environment, many of our lobbyists will have a more difficult time getting our position across. In addition, many agencies/NPO's are looking at payback for perceived past environmental transgressions. Two recent examples of things to come are clear. In one case, Assistant AG's elected not to head-off the Prop. 65 lawsuit. It was very clear that they were not inclined to rock the boat with the new AG. In another case, the governor has established a group to review the basis for negative votes relating to MTBE carcinogenicity and reproductive toxicity. My contacts have told me that the governor wants to demonstrate that MTBE is a carcinogen or at least a reproductive toxicant (for Prop 65 listing) in order to establish a strong basis for a ban. If MTBE is listed as either a carcinogen or a reproductive toxicant, the perceived health issues will greatly increase our potential environmental/litigation costs.

Tactics: Governmental Affairs staff needs to establish a working relationship with key players in the new administration. In addition, they need to work closely with technical experts so that technically defensible arguments can be presented. Key areas to focus on are health aspects of MTBE and groundwater classification. In addition, other efforts should take place at a national level to help put pressure on California in developing rational approaches to MTBE and other oxygenates.

## Consultant/Contractor Procurement

Background: Due to use of natural attenuation and RBCA over the past 5 years, many environmental consultants and contractors have seen a severe decline in business. Many of these groups are becoming aware that MTBE is going to greatly increase business opportunities. In order to deal effectively with MTBE in soil and groundwater, we will need considerable field support from consultants and contractors. Reliance on natural attenuation for MTBE will not be adequate in many cases and we will be forced into very complex investigations and installation of pump & treat systems.

Tactics: Since it is clear that assessment and remediation efforts are going to significantly increase while becoming more complex and costly, it is appropriate to develop new contractual relationships between the

SH 033126

Alliance and key consultants and contractors which will stay in effect for the next five years. These contracts need to be developed relatively soon, before service costs are driven higher by increasing demand. In developing these relationships, it is extremely important that consultants and contractors be technically screened prior to developing a contract. There are many companies that purport to offer excellent services/materials when in fact they are relatively incompetent. Without adequate technical screening, use of these companies would very likely drive our end costs considerably higher than if a competent business professional was used to start with. In addition, key technical focal points for various environmental companies need to be identified to help ensure quality work on Alliance projects. After all, it's not the company, but the individuals that are important. Once companies are screened and approved, Procurement staff can establish favorable contractual relationships. Businesses to consider in this regard are hydrogeological consulting firms, remediation companies, drillers, field screening companies (CPT's, geoprobes, etc.), labs, and equipment suppliers (pumps, well casing, treatment system vendors, etc.).

### Business Strategy Coordination

Background: Many of the issues that the Alliance will face cut across all of our major downstream businesses. There are many issues, some of which are not intuitively obvious, which can affect Alliance businesses. These issues need to be considered so that decisions can be made that are best for the Alliance as a whole. Without adequate coordination, a well-intended action may inadvertently have a negative affect on another business.

Tactics: An MTBE business strategy council should be established so that key issues are well understood by all the businesses. One individual should chair this group with a focus on doing what's best for the Alliance as a whole.

# EXHIBIT  B

# Shell Phase I Privilege Log
## Overall Shell Privilege Log

| | A<br>Document Begin | B<br>Document End | C<br>Document Date | D<br>Author(s) | E<br>Addressee(s) | F<br>Recipient(s) |
|---|---|---|---|---|---|---|
| 1 | EQBUCW 17182 | EQBUCW 17188 | 1/22/1999 | - Curtis C. Stanley, Hydrogeology Advisor (Shell); Senior Staff Hydrogeologist (Equilon) | - Christien White<br>- Michael P. Gallagher, Director SH&E/Science & Engineering (Equiva)<br>- Ed H. Hsu, Manager (Shell)<br>- James L. Michalak, Senior Litigation Counsel (Equiva) | - Frank R. (Ron) Benton, Manager, Regulatory Affairs (Shell); Manager Midwest, Regulatory Affairs Fuels (Equiva)<br>- Erik E. Hansen, Hydrogeologist (Equilon, formerly Shell) |
| 762 | | | | | | |

# Shell Phase I Privilege Log
## Overall Shell Privilege Log

| | | G | H | I |
|---|---|---|---|---|
| | | Description | Basis for Privilege Assertion | Redact |
| 762 | 1 | Email in support of Shell/Equiva Legal developing legal advice and/or legal strategy in MTBE litigation regarding MTBE Cost-Reduction considerations | Attorney-Client Communication: client requesting legal advice from attorney<br><br>Work Product Document: written at attorney's request relating to litigation | |

May 19, 2008

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | Document Begin | Document End | Document Date | Author(s) | Addressee(s) | Recipient(s) |
| 1 | EQWHCS 39122 | EQWHCS 39124 | 10/20/1998 | - Karen E. Petryna, Sr. Environmental Engineer (Equiva) | - George Hood<br>- Curtis C. Stanley, Hydrogeology Advisor (Shell); Senior Staff Hydrogeologist (Equilon)<br>- Christine B. White, Western Regional Manager SH&E/Science & Engineering (Equiva)<br>- Robin Lane<br>- Michael P. Gallagher, Director SH&E/Science & Engineering (Equiva)<br>- Alejandro Perez<br>- Kathleen C. Gillmore, Senior Environmental Counsel (Equiva, formerly Shell)<br>- hadefries@shellus.com | N/A |
| 19245 | | | | | | |

**Shell Phase I Privilege Log**
**Overall Shell Privilege Log**

| | | G | H | I |
|---|---|---|---|---|
| | | Description | Basis for Privilege Assertion | Redact |
| 1 | 19245 | Email in support of Shell/Equiva Legal developing legal advice and/or legal strategy in MTBE litigation regarding MTBE study sponsored by the Santa Clara Valley Water District of upgraded service stations | Attorney-Client Communication: client requesting legal advice from attorney | Redacted |

May 19, 2008

# EXHIBIT C

**Legal Retention SHLOIL**

From: Petryna KE (Karen)
Sent: Tuesday, October 20, 1998 5:08 PM
To: 'Hood George GG [Shell]'
Cc: 'Pugnale Pete PJ [Shell]'; Stanley Curtis CC [WTC]; White CB (Christine); 'Lane, Robin L';
Gallagher MP (Mike); Perez A (Alejandro);
/O=NEWCOS/OU=NEWCOSSITE/CN=JVPartCompanies/cn=Shell/cn=KG196409SH;
'hadefries@shellus.com'
Subject: MTBE Study Sponsored by the Santa Clara Valley Water District of Upgraded Service
Stations

Mr. Hood:

This is a follow up to an e-mail message sent to you by Alex Perez on September 15, 1998 regarding the subject Study.
Like Alex, I work for Christine White in the Science and Engineering Division of the Safety, Health & Environment
Department of Equiva Services in Northern California. In fact, I am the Environmental Engineer who handles Santa Clara
County environmental issues for Shell and Texaco-branded service stations. So that's why I am directing this follow-up for
which we need your assistance–we are requesting your approval to submit two or three candidate locations for the Study.

To reiterate some of the background on the Water District's Study, it is intended to determine the effectiveness of the
implementation of 1998 Upgrade Requirements to contain MTBE-enhanced fuel products. Therefore, stations that will not
be upgraded, have only very recently been upgraded or that have already been determined to have contamination do not
qualify. For more information, I am faxing you a September 15, 1998 letter sent to Christine White from the Water District's
selected Consultant for the Study, Levine-Fricke-Recon.

There are several distinct advantages to participating in the Study (by allowing Levine-Fricke on-site to examine records
and equipment and then collect soil gas, soil and groundwater samples by drilling borings.) Foremost, we will enhance our
working relationship with this very active, aggressive and pack-leading Environmental Agency. Furthermore, and to our
own direct benefit, we will not only be able to ascertain the effectiveness of our upgraded systems but also be made aware
of any problems or contamination before the situation worsens-free of charge. The alternative of not participating will
potentially provoke the Water District, prompting them to require immediate remediation at over a dozen cases with
identified MtBE contamination. Additionally, as Levine-Fricke has asserted, they will investigate just off-site(on the
sidewalk) at the stations of their choice anyway.

As the above-mentioned letter sent by Levine-Fricke on behalf of the Water District explains, they are requesting our
participation in the Study "as an acknowledged leader in the petroleum industry...." And they have developed a list of 15
locations-operating Shell-branded service stations-that they are interested in investigating. Of those 15 locations, the
following 11 do not qualify on the basis of the Water District's established criteria.

1) 400 Leavesley Rd., Gilroy - Open dealer owns UST system. (He must be approached directly by the Water District.)
2) 905 E. El Camino Real, Sunnyvale, CA - No upgrade is planned for this station to be sold.
3) 3751 Lafayette St., Santa Clara - August 26, 1998 upgrade produced evidence of an unauthorized release.
4) 1155 Tully Rd., San Jose - Upgrade scheduled for the week of October 22, 1998.
5) 2855 S. Winchester Blvd., Campbell - August 10, 1998 upgrade produced evidence of an unauthorized release.
6) 1199 Saratoga, San Jose -Upgrade scheduled for the week of October 28, 1998.
7) 1698 Tully Road, San Jose -Upgrade scheduled for the week of November 16, 1998.
8) 8385 N. Monterey, Road, Gilroy - March 1998 upgrade produced evidence of an unauthorized release.
9) 1031 Leigh Ave., San Jose - Upgrade scheduled for the week of October 19, 1998.
10) 6097 Snell Rd., San Jose - Upgrade scheduled for the week of November 2, 1998.
11) 2090 The Alameda, San Jose - Upgrade scheduled for the week of October 26, 1998.

The 12th location is undergoing upgrade activities currently that involve numerous soil samples be taken along the product
lines. The upgraded system cannot be fairly judged, but because it is very close to a municipal drinking water well, the
District may pursue an investigation there regardless. Again, if that is the case, by allowing them on-site, we will obtain
free information about an operating station that is in a very sensitive location.

12) 5607 Almaden Rd., San Jose - Upgrade began October 7, 1998. Numerous soil samples taken October 14, 1998
along product lines. No results yet available.

The 13th location is one that we are not confident is free of contamination, but we do not have a good excuse to exclude.
We nevertheless intend to discourage the Water District from including this location, particularly if we can come up with a
good reason. If nothing else, we will just try to stick to only two candidates or add a third from our own list.

13) 990 Jacklin Rd., Milpitas - This site was upgraded last year with turbine and dispenser containment and overfill
protection. There is a fair chance of having MtBE in the ground from a previous release (possibly during product
delivery or dispenser/turbine maintenance.)

These last two locations, are those of the Water District's proposed 15 that we are recommending be offered up for

ALL 0001158
MDL 1358

participation.

14) 1610 Meridian Rd., San Jose - Compliance upgrade completed March 30, 1998. No reported releases.
15) 810 E. Dunne Ave., Morgan Hill, San Jose - Compliance upgrade completed September 23, 1998 with turbine and dispenser containment and overfill protection since 1995. Soil investigation in 1995 showed no contamination.

Depending on whether Levine-Fricke and the Santa Clara Water District will be satisfied with only two proposed locations from Equiva, we have identified three additional locations that we would like to be able to add, if necessary.

1) 790 El Camino Real, Mountan View - Doubled-walled system has been in compliance with 1998 Upgrade Requirements since 1986.
2) 703 Wolfe, Sunnyvale - Double-walled system installed in 1988. Only flex connector containment needed to be added in July, 1997 to meet upgrade requirements.
3) 1601 Capitol St., San Jose - This station has been in compliance with 1998 Upgrade Requirements since 1989 and has a fully double-walled system. There was a previous environmental case that was closed last year, but there was never any reported MtBE contamination.

As discussed with Robin Lane, if you concur for our participation in the Study, we recommend a systems operation check and verification of required on-site documentation availability be performed by our own people at the selected locations to ensure everything is in compliance. We have a deadline to respond to Tom Johnson, representing the Water District, by October 26, 1998 and are therefore requesting your concurrence no later than this Thursday, October 22, 1998. Specifically, may we offer two or three locations? If so, we will let you know immediately which ones we agreed on with the Water District so that the pre-inspection can be conducted at those facilities. We will also immediately generate a letter to the Water District memorializing our agreement.

Please call me or respond via e-mail with your concurrence or if you need any more information regarding the Study or would like to have a teleconference. If you are interested in a teleconference, I am available until 3:30 p.m. tomorrow and Christine White is available after noon on Thursday.

Also, for your information, Kathleen Gillmore with Equilon Legal is reviewing the Access Agreement provided by Levine-Fricke for them to come on-site. Christine faxed Kathleen the September 15, 1998 information letter yesterday. And I will be following up with Kathleen on this if you give us the go-ahead. Thank you.

Regards,
Equiva Services LLC
Shell, Texaco & Saudi Aramco Working Together

*Karen E. Petryna*, P.E.
Safety, Health and Environment
Science and Engineering, West Coast
Tel: (510) 669-9935
Fax: (510) 669-9872
E-mail: kepetryna@equiva.com

ALL 0001159
MDL 1358

| | |
|---|---|
| From: | White CB (Christine) |
| Sent: | Monday, October 19, 1998 12:20 PM |
| To: | 'Neaville CC (Chris) at MSXWHWTC'; Gallagher MP (Mike); Daly PJ (Phil); 'Dedoes RE (Robert) at MSXSOPC'; Register AG (Allen); White CB (Christine) |
| Cc: | 'Kramer Erik L [Newcos]'; Boschetto HB (Brad); 'Springer KR (Ken) at MSXSOPC'; Franceschini TJ (Tim); Neuman JC (Jeffrey); Stanley Curtis CC [WTC]; Hansen Erik EE [WTC]; 'Miller JT (Jonathan) at MSXWHWTC' |
| Subject: | RE: Chevron MTBE sites - nationwide review |

This is consistent with what I know to be true for Chevron on the West Coast. I also have heard that Tosco is in the midst of doing something similar. While we are actively managing our environmental remediation sites with MTBE in mind - the unknown factor is what is going on at the retail locations with no active environmental incidents - i.e. where do not have monitoring wells and do not have a lot of info on the hydrogeology and receptors. I would be in favor of conducting a survey similar to what Chevron has done - so that we could hopefully prevent future Santa Monica's.

-----Original Message-----

| | |
|---|---|
| From: | **Neaville CC (Chris) at MSXWHWTC [SMTP:CN726040@MSXWHWTC.SHELL.COM]** |
| Sent: | Monday, October 19, 1998 8:08 AM |
| To: | Gallagher Michael P [Newcos]; Daly Phil J [Newcos]; Dedoes RE (Robert) at MSXSOPC; Register Allen G [Newcos]; White Christine B [Newcos] |
| Cc: | Kramer Erik L [Newcos]; Boschetto Brad H [Newcos]; Springer KR (Ken) at MSXSOPC; Franceschini Tim TJ [Newcos]; Neuman JC (Jeffrey) [Newcos]; Stanley CC (Curtis) at MSXWHWTC; Hansen EE (Erik) at MSXWHWTC; Miller JT (Jonathan) at MSXWHWTC |
| Subject: | Chevron MTBE sites - nationwide review |

Last week during a Phoenix Terminal Group meeting which includes 7 majors, the Chevron representative mentioned that they had just completed an in-house review of their sites nation-wide for MTBE. They had a corporate team which put together site information cross-referenced with available databases for water wells. What they found was 70 "Santa Monica-like" projects throughout the country. One of these he mentioned had significant free-phase with MTBE going off-site with several municipal wells nearby. This project had no remediation or current action plan.

I was a little surprised he let out this information, but I found it very interesting. I know we have several efforts underway to link GSRE with available databases for the same purpose. I would expect that we are actively managing all of our sites anyway, so maybe this effort wouldn't tell us anything new. But I did get the impression that Chevron was getting ahead of us. Hopefully this note is useful and will encourage us to bolster our efforts at staying in front of the MTBE problem.

**Chris C. Neaville**
WTC Senior Hydrogeologist
Phone (281) 544-7088
Fax (281) 544-8727
email: ccneaville@shellus.com

ALL 0001160
MDL 1358