If you have any questions, please e-mail or telephone me.

Sincerely yours,

/s/ *Ramin Pejan*

Ramin Pejan
Assistant Corporation Counsel
Environmental Law Division

Cc: James A. Pardo (via e-mail)
All Counsel (via LNFS)

**EXHIBIT D**

Law Offices of
# MILLER, AXLINE & SAWYER
A Professional Corporation

DUANE C. MILLER  
MICHAEL AXLINE  
A. CURTIS SAWYER, JR.

TRACEY L. O'REILLY  
TAMARIN E. AUSTIN  
EVAN EICKMEYER  
DANIEL BOONE  
JUSTIN MASSEY

March 30, 2009

<u>VIA U.S. MAIL AND FACSIMILE</u>

Matthew T. Heartney, Esq.
Arnold & Porter
44th Floor
777 South Figueroa Street
Los Angeles, California 90017

Re: *Orange County Water District v. Unocal Corp., et al.*
**Bellwether Plumes**

Dear Mr. Heartney:

I am writing in response to your March 20, 2009, letter concerning the Bellwether Plumes designated by plaintiff Orange County Water District's (the District'). Contrary to the assertions in your letter, the District has not revised the Bellwether Plume list, but rather has identified the wells associated with each plume to reflect new water quality data for public drinking water wells, and to comply with several orders from Judge Scheindlin.

The District advised defendants in 2007 that the Bellwether "Plume List will . . . be adjusted to reflect new MTBE and/or TBA water quality data which is being gathered and analyzed by the District on an ongoing basis." (*See* April 23, 2007, Letter from T. O'Reilly to J. Anderson.) As defendants are aware, sampling by the District in Fall 2008 demonstrated that MTBE was detected for the first time in approximately 55 public drinking water wells. (*See* January 23, 2009, Letter from T. O'Reilly to J. Anderson.) The revised list of wells associated with Bellwether Plumes served by the District on January 28, 2009, reflected the newly obtained MTBE water quality data for public drinking water wells within the District.

When we discussed this new data with Judge Scheindlin on January 29, 2009, she pointed out that the District would be entitled to file a new case whenever there were new detections of MTBE in a well (R.T. (Jan. 29, 2009) at 10:15-11:4) and that adding these wells with new detections to the District's existing case is, in reality, "merely an administrative issue . . ." (*Ibid.*) (See Ex. A, attached.) She specifically asked the District to identify the plumes with which the

new detections were associated, and included all plumes (not just focus plumes) in her direction to the District. (R.T. (Jan. 29, 2009) at 22:10-12 ["I want to stick with the 87. If in three weeks from today you can provide all of the well identifications, that's helpful."]) This is precisely what the District did.

During the January 15, 2009, MDL Status Conference, at defendants' request, Judge Scheindlin ordered the District to amend its Bellwether Plume list to reflect only claims which were ripe. (R.T. (Jan. 15, 2009) at 64:7-65:3.) (See Ex. B, attached.) Additionally, during the January 29, 2009, telephonic conference in this matter, Judge Scheindlin ordered the District to provide a "listing of the wells in the vicinity of the [existing] plume that you say are under imminent threat." (R.T. (Jan. 29, 2009) at 19:20-20:2; 21:12-22:12.) In fact, defendants specifically requested that Judge Scheindlin compel the District to identify all wells which were threatened by the Bellwether Plumes. (R.T. (Jan. 29, 2009) at 12:22-13:3.) The identification of wells affect by the District's Bellwether Plume was not only authorized by the Court, but was undertaken to comply with Court orders sought by defendants.

Your critique of the wells designated for plumes is misplaced. The "examples" you give as anomalies are not anomalies at all, but rather reflect the complexities of hydrogeologic reality. As you know from numerous depositions in this case, the direction of groundwater flow depends on a number of factors, including the depth of groundwater being measured and the influence of well pumping. As just one example, groundwater separated into layers by impermeable lenses can flow in one direction at a given depth and the opposite direction at a different depth. Wells can also be threatened by or contaminated from more than one plume. As we stressed to Judge Scheindlin during the January 29, 2009, call, determining the relationship between a source and a contaminated well ultimately is an iterative process that requires expert analysis. Nevertheless, the District agreed to respond to your request for a list that identifies wells with plumes. To the extent you disagree with the conclusions reflected on that list, that is a matter for experts to address.

Finally, defendants have been aware for some time of the public drinking water wells and their relationship to various plumes. Maps of the District's Bellwether Plumes have routinely included information on all drinking water wells in the vicinity of the designated stations. Moreover, defendants have already conducted discovery regarding several of the revisions made by the District. For example, during his deposition concerning Bellwether Plume No. 1, Roy Herndon identified additional public drinking water wells that are in the proximity of the Bellwether Plume No. 1 stations. (Herndon Depo. (Nov. 4, 2008) at 2230:18-2231:10.) To the extent that defendants question whether the new data provides an adequate basis for identifying the additional wells, such inquiries may be addressed in expert discovery.

Sincerely,

Michael Axline
Counsel for Orange County Water District

# EXHIBIT A

```
91tWmtbC
```

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  IN RE: METHYL TERTIARY BUTYL         00 MDL 1358
3  ETHER ("MTBE") PRODUCTS              Master File C.A.
4  LIABILITY LITIGATION                 No. 1:00-1898(SAS)
4
5  ------------------------------x
6  This Document relates to:
6  ORANGE COUNTY WATER DISTRICT v.
7  UNOCAL CORPORATION, et al,
7  S.D.N.Y. No. 04 Civ. 4968 (SAS)
8
9  ------------------------------x
10                 January 29, 2009
10                 11:30 a.m.
11 Before:
11
12         HON. SHIRA A. SCHEINDLIN,
12
13                 District Judge
13
14         APPEARANCES
14 MILLER AXLINE & SAWYER
15    Attorneys for Plaintiff Orange County Water District
15 BY: MICHAEL AXLINE
16    DUANE MILLER
16    TRACEY L. O'REILLY
17
17 SHEPPARD MULLIN RICHTER & HAMPTON, LLC
18    Attorneys for Defendants
18    Exxon Mobil (Orange County)
19 BY: JEFFREY J. PARKER
19
20 KING SPALDING, LLP
20    Attorneys for Defendant Chevron U.S.A., Inc.
21 BY: CHARLES CORRELL, Jr.
21
22 McDERMOTT, WILL & EMERY
22    Attorneys for Defendant Exxon Mobil Corp.
23    and defendants' liaison counsel
23 BY: JAMES PARDO

```
24
24   ARNOLD & PORTER
25       Attorneys for Defendant BP
25   BY:  MATTHEW T. HEARTNEY
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```

1  but in writing from each of these that they've designated to
2  know specifically why, applying their four-prong test, a given
3  plume and everything in that plume is in the case, why the
4  claim has accrued and it's ripe. That should have been, as I
5  said, known before the lawsuit was filed. You know, to get
6  these results which they have had in their possession since
7  October or November --
8      THE COURT: October or November of what year?
9      MR. PARKER: 2008. For the new wells that were just
10 disclosed to us yesterday, they have had that in their
11 possession. To then drop this on us the day before this
12 hearing and suggest that therefore everything is thrown off and
13 that we don't get an accrual chart or can't get an accrual
14 chart is just wrong.
15     THE COURT: There's a lot of things going on here now
16 at once. One is this issue of newly threatened wells, shall we
17 call them, or newly contaminated wells. You are in a situation
18 that, without meaning to make a pun, is a fluid situation,
19 meaning within the Orange County Water District there can
20 indeed be new contaminations that occur all the time, every
21 month, every six months, every year. And what Mr. Miller is
22 saying is we can keep filing suit every time a new one occurs,
23 or we can add it to the great big Orange County Water District
24 suit that we have. If we did it separately every time, in
25 addition to the Court getting a filing fee of $275 or

91tWmtbC
1  something, basically it would be consolidated. Basically, we
2  would be putting this all together until someday there's a
3  resolution either by settlement or trial. So that's one issue.
4      To me, that's merely an administrative issue, what do
5  you do when there's a new hit in the same plaintiffs' property,
6  so to speak, so it's all Orange County. We're not talking
7  about a different case, a different county, a different state.
8  It's all Orange County. There's a new hit. What do we do, add
9  it to the new case, bring a separate case, consolidate now?
10  That's a new issue that I think should be put to the side.
11      I think we need to go to the now 80 plumes that have
12  been in this case since the beginning where I think your point
13  is well taken. There, these plumes, these 80, have been around
14  for years, and you're still struggling to get an accrual chart,
15  so to speak, pin down the date -- wait, wait, I'm still
16  speaking -- the date on which the claim accrued as to that
17  particular source, and you either have it or you don't have it.
18      Now, was that Mr. Axline? Did I hear his voice, or
19  somebody?
20      MR. AXLINE: Yes, your Honor. I'm sorry for
21  interrupting.
22      THE COURT: Do you think you've produced such a chart?
23      MR. AXLINE: Your Honor, I don't think that such a
24  chart is capable of being produced in the form that the
25  defendants are referring to because the factors that go into

1  making that determination are too complex and require expert
2  testimony.
3             THE COURT: That's what I said before. I said from
4  the answer Mr. Miller gave, you would have to sit down with a
5  hydrogeologist and take 80 plumes one by one by one and say how
6  did you determine this particular plume is ripe now, and the
7  hydrogeologist would have to say the geography, the down
8  gradient, the distance, the rate of flow, all those scientific
9  words, he'd have to say all of that, say I put all those
10 factors together and I decided there's a threat either now or
11 within a year or two. But it would be one by one by one.
12            But he certainly could list out the criteria, like,
13 for example, the words I just said, and I'm no scientist, but
14 I've been reading these reports for years. He could certainly
15 list these are the kinds of factors that I consider for every
16 plume. Then I analyzed -- let me finish. Hold on.
17            Then I analyzed each of those factors, I measured each
18 of those factors, the distances, the rate of flow and the
19 direction, this and that, I measured all these factors for each
20 of these plumes. Based on the totality of all these factors, I
21 reached the conclusion.
22            MR. CORRELL: Judge, one problem with the new standard
23 that was just articulated now about within one to two years a
24 drinking water well, and I don't have the exact numbers with
25 me, but I think out of these 80 plumes they've only designated

1  a well with about 20 of them. So on the remainder of the
2  plumes if that is truly the criteria, there should have been a
3  well identified associated with it.
4    THE COURT: I'm glad somebody else is picking up on
5  this difference between plumes and wells because Mr. Miller
6  started out about ten minutes ago talking about 50, 60 new
7  wells, and I didn't understand the connection between that and
8  the plumes. You're saying with 80 of these plumes, 60 aren't
9  associated with any wells. Is that what you just said?
10    MR. CORRELL: If you look at their plume list, you'll
11  see there's a column for well, and most of the focus plumes
12  have wells associated with them. And then you go down that
13  list, and very few have a well associated.
14    THE COURT: Let's talk to Mr. Miller who was the one
15  who provided a definition of what is an imminent threat.
16    Mr. Miller, if 60 of these plumes have no well
17  associated with it, then how does the expert say, Oh, within a
18  year or two, the well is under threat of being contaminated?
19  There is no well.
20    MR. MILLER: Your Honor, we recently received the
21  reports from the lab and the experts are going through the
22  process of comparing those to plumes to determine where the
23  impact of the well came from, and because these detections
24  occurred so recently, they have not completed that process yet.
25    THE COURT: I don't know --

91tWmtbC

1  commingle with another plume? Why do you say ARCO is the same
2  plume? Don't know, we're still doing our investigation.
3       But going back to the chart, you would think at a
4  minimum on their plume list they would have to identify the
5  well that they claim is threatened in the next one or two years
6  because you've got, estimating 60 plus of these plumes, under
7  the well column, no well identified.
8       THE COURT: That is very troubling. I agree with
9  that. I'm trying desperately to pin down Mr. Miller about
10 that. If a plume is not linked to a well, I don't understand
11 the imminency of the threat. It should be off the list, not on
12 the list.
13      MR. MILLER: Your Honor, in prior discussions, listing
14 the well has never been part of the accrual chart. It's been a
15 part of the chart for the focus cases. And if that would
16 assist matters within a reasonable amount of time, we can come
17 up with a list that explains this part of it. It will be
18 complex testimony by hydrogeologists about how they made those
19 determinations.
20      THE COURT: First there should be a listing of the
21 wells in the vicinity of the plume that you say are under
22 imminent threat. That can be just done as a chart. Just as
23 with some plumes you do list a well or wells, I don't
24 understand why you can't do that for the remaining 60. If
25 there's a good faith basis for them to be on the list of ripe

1   claims as you've defined it, then you have to link it to a
2   threat to a well. Why can't you identify --
3         MR. MILLER: We did, but there's been no prior
4   suggestion to the defendants that the key to the accrual chart
5   is identifying the well. That's not what they've asked us to
6   do in the past, and we can try that approach and take some
7   time, but it can be done.
8         MR. CORRELL: In the past, I think it's been the
9   position of the district that their claims weren't based on
10  wells.
11        THE COURT: But today, it seems it is. Today the
12  definition I heard and, thankfully, I have a reporter. Today,
13  Mr. Miller's definition is that within a reasonable period of
14  time, somewhere in the vicinity of one to two years, the well
15  will be threatened.
16        MR. AXLINE: This is Mike Axline again.
17        As you know, the process of developing accrual in the
18  case is a definitive process, and that's particularly true with
19  complex contamination issues such as this, as you have
20  previously recognized. Your reference to a good faith belief
21  that stations are linked to particular wells is, I think,
22  helpful, because the district is sort of in a jam. If it jumps
23  the gun and identifies a station with a well before it develops
24  complex proof, then it gets called to task by the defendants
25  for not having adequate proof. On the other hand, if the

1 district doesn't link the station to the well, then the
2 defendants claim that there's no basis for it.
3     THE COURT: Right.
4     MR. AXLINE: The reality is that the district is
5 making cuts as it goes along, and it's done that in good faith
6 with respect to the sites that it dropped as not being ripe and
7 it can do that again for linking stations to wells,
8 particularly now that we have this new information. So long as
9 that's done with the understanding that this isn't an interim
10 process, I think it could actually be done fairly quickly.
11     THE COURT: Like how fast?
12     MR. MILLER: Your Honor, we think we should do this in
13 a two-step process. We think we should deal with the 80 that
14 we've had on the list in the past and still have.
15     THE COURT: Yes, and they need to be linked to wells.
16 How long would it take to list the wells that you're speaking
17 of?
18     MR. MILLER: If we do that list, we can get it out in
19 a mere two to three weeks.
20     THE COURT: You mean within two to three weeks, you
21 can identify the wells?
22     MR. MILLER: Yes. The newer detections, if they
23 overlap, with an existing plume would also be done within that
24 two-, to three-week period. If they're in what I'm going to
25 call a new area that don't overlap, basically we have a new

plume not previously identified, we need some information from the defendants.

THE COURT: But that's a different issue. That's outside the 80 or 87 that we're talking about.

MR. MILLER: That's correct.

THE COURT: Okay. So I just put those off to one side, because, as you pointed out, you could go through the ridiculous process of filing new lawsuits, which would end up consolidated, or you could add them. We don't even need to face that now. But they're different. I want to stick with the 87. If in three weeks from today you can provide all of the well identifications, that's helpful.

Then the question is I'm still not satisfied that we've had a decent conversation about accrual dates because I agree with defense counsel, you need to fix a time, and defense counsel says it's not the time at which plaintiffs' attorneys learn for the first time that there was, what should I say, a cause of action. That's not the accrual date, what an attorney learned. There has to be a different definition of accrual date, and I think I gave that in an opinion three years ago.

MR. AXLINE: You did, your Honor. You chose from among three different options. The options that you gave were when MTBE gasoline was released. That was the first option. The second option was when MTBE was detected in groundwater. That was the second option. And the third option was when the

# EXHIBIT B

91fWmtbC

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  IN RE: METHYL TERTIARY BUTYL        00 MDL 1358
3  ETHER ("MTBE") PRODUCTS             Master File C.A.
4  LIABILITY LITIGATION                No. 1:00-1898(SAS)
4
5  ------------------------------x
5
6                  January 15, 2009
6                  2:20 p.m.
7
7  Before:
8
8          HON. SHIRA A. SCHEINDLIN,
9
9                  District Judge
10
10                 APPEARANCES
11
11
12 WEITZ & LUXENBERG, P.C.
12     Plaintiffs' Liaison Counsel
13 BY: ROBIN L. GREENWALD
13    -and-
14 SHER LEFF, LLP
14 BY: VICTOR M. SHER
15
15 BARON & BUDD
16    Attorneys for Plaintiffs
16    Suffolk County Water Authority
17    United Water of New York
17 BY: CARLA M. BURKE
18
18 NAPOLI BERN RIPKA, LLP
19    Attorneys for Plaintiffs Nassau County, et al.
19 BY: WILLIAM J. DUBANEVICH
20
20 MICHAEL A. CARDOZO
21    Corporation Counsel of the
21    City of New York
22    Attorney for New York City plaintiffs

22  BY: SUSAN E. AMRON
23      AMANDA C. GOAD
23
24  MILLER AXLINE & SAWYER
24      Attorneys for Plaintiff Orange County Water District
25  BY: TRACEY L. O'REILLY
25

91fWmtbC

1    MR. PARKER: That is fine, your Honor, although as we
2    noted in our reply letter, there's sort of an intervening
3    issue.
4    THE COURT: This is about identifying which of these
5    plumes really are ripe for proceeding?
6    MR. PARKER: That's correct, your Honor.
7    THE COURT: I agree. That's the next issue I want to
8    take up. The next issue on the agenda is the, I don't know,
9    104, was that it, plumes that are still in the case supposedly
10    except every time they pick three, those three turn out to be
11    not ripe and they're no longer in the case. It's like death by
12    slow cuts. Eliminate three every three weeks, 104, 101, 98,
13    95. I'll be here the rest of my life.
14    This is not the way to do it. This is a
15    five-and-a-half-year-old case, Ms. O'Reilly. Has the time come
16    where I should just say to you are required to look at all 104
17    and tell me whether you have ripe claims on any of them? I've
18    kind of had it, because every time they pick three,
19    miraculously, those are the wrong three. It's not right. This
20    is not the way to do it.
21    They make a fair argument under Rule 11 that this
22    should have all been done at the time of the pleading. They
23    didn't say Rule 11, but it comes to that. They said Rule 12.
24    But it comes to the same thing. You had an obligation at the
25    time you filed the complaint to tell them whether you had a

1   claim or not. Ripeness is jurisdictional, so 104 of these, I'm
2   afraid you've got to stop everything and try to figure out
3   whether you have any ripe claims on these plumes.
4          MS. O'REILLY: Your Honor, we already told them that a
5   week ago.
6          THE COURT: If that's true, I should have gotten that
7   in a letter. Is that true?
8          MR. PARKER: Your Honor, in their reply letter, which
9   I think came in on the 14th -- excuse me, the 12th they gave us
10  the topics.
11         THE COURT: The what?
12         MR. PARKER: When they gave us their expert topics,
13  they mentioned that they were going to give us a list tomorrow,
14  not that that list would do anything that would really advance
15  the ball in identifying what they were doing on any of these
16  topics.
17         THE COURT: The letter I got on January 12, from Ms.
18  O'Reilly says nothing like that. It says, "The district hereby
19  submits its separate response." That's the first sentence.
20  That's one of three sentences. "The district has served its
21  identification of expert testimony. The district agrees with
22  defendants that the previously agreed to pretrial deadlines
23  need to be adjusted. The district will be prepared to discuss
24  this issue at the status conference."
25         That's the whole letter I got. It didn't say on the