

THE CITY OF NEW YORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, N.Y. 10007-2601

MICHAEL A. CARDOZO
*Corporation Counsel*

phone: (212) 788-1568
fax: (212) 788-1619
email: dgreene@law.nyc.gov

April 16, 2009

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1312

Re:  City of New York v. Amerada Hess, 04 CV 3417 (SDNY)
In re MTBE Products Liability Litigation, MDL 1358
*Response to Defendants' Request to Strike Portions of the "Rebuttal Expert Report of David Terry"*

Dear Judge Scheindlin:

The City of New York ("City") submits this letter in response to defendants' April 9, 2009 letter requesting that the Court strike portions of the *Rebuttal Report of David Terry* ("Rebuttal Report") on grounds that these opinions are outside the scope of Federal Rule of Civil Procedure 26(a)(2)(C)(ii). As further set forth in the Declaration of David Terry, dated April 16, 2009, annexed as Attachment "A," defendants' request exhibits a lack of understanding of Mr. Terry's Rebuttal Report as well as the opinions and criticisms offered by defendants' 10 proffered experts in the field of hydrogeology.[1] The changes defendants complain of were largely made in response to critiques of Mr. Terry's initial report by defendants' experts. Mr. Terry has not changed his opinions or underlying modeling or methodology in the Rebuttal Report.

---

[1] The following ten expert reports were submitted by one or more defendants to address issues pertaining to hydrology, and all were submitted on March 9, 2009: (1) Expert Report of Fletcher Driscoll; (2) Expert Report of Thomas F. Maguire (3) Expert Report of James Mercer; (4) Expert Report of James Schaefer, Jr.; (5) Expert Report of David Nichols; (6) Expert Report of John H. Guswa; (7) Expert Report of Kevin T. Russell; (8) Expert Report of Nicole T. Sweetland; (9) Expert Report of John A. Connor; and (10) Expert Report of Lee Wilson. Copies of each of these reports will be provided to the Court.

Moreover, while defendants criticize Mr. Terry for making corrections to his original report, in recent weeks, several of their experts have done the exact same thing. For these reasons, defendants' request to strike portions of Mr. Terry's report should be denied.

A.  **The Context, Scope, and Purpose of Mr. Terry's Analysis**

> "Ground-water quality throughout the Region is of poor quality attributed to hundreds of point sources of contamination including the release from over 1,000 petroleum spill sites and of which the majority of these documented spills released MTBE to the surface and/or subsurface. MTBE is ubiquitous in the Region's shallow aquifers." Opinion #1 of Expert Report of Defense Expert James A. Schaefer, on behalf of defendant Getty Properties Corporation, p. 14 (March 9, 2009)

This opinion, which refers to the groundwater underlying southeast Queens, is not from Mr. Terry's expert report, but from the report of a defense expert, an experienced hydrogeologist at an environmental engineering firm that has managed the investigation and remediation of over 225 groundwater contaminated sites throughout Long Island and New York City. *See* Schaeffer, p. 1. It is cited here to provide context to the difficult question on which Mr. Terry was asked to opine on in this litigation – in this ubiquitously MTBE-contaminated aquifer, impacted by over 1,000 *known* petroleum spills, what is the extent and duration of the MTBE contamination that could be expected to occur in the future at Water Supply Station 6 and the five defendant focus wells?

To answer this question with respect to Station 6, for his initial report, Mr. Terry employed standard hydrogeologic methodologies to assess the future concentrations of MTBE, first conducting a numerical modeling simulation based on actual ambient groundwater data collected in the Station 6 capture zones ("Analysis 1"), and second, conducting a separate numerical modeling simulation based on known releases of petroleum sites in the Station 6 capture zone ("Analysis 2"). Based on the results of these simulations, which are fully set forth in his initial report, Mr. Terry concluded and continues to conclude that MTBE concentrations at Station 6 when it is reactivated will, more likely than not, reach a peak concentration of 35 parts per billion (ppb) and that the concentration of MTBE will remain over 3 ppb until at least 2040.

To answer this question with respect to the defendants' five wells, Mr. Terry conducted a modeling analysis using the ATRANS analytical model. While none of the five defendants' wells is currently pumping, each defendant focus well is included in the City's current water supply permit and is available for operation at any time if needed, such as in a drought. Because the purpose of Mr. Terry's analysis was to provide a basis for the design of a treatment system at these wells, Mr. Terry utilized a standard Well Head Protection Area ("WHPA") approach to assess potential MTBE concentrations at these wells, which assumes that each well is pumped in a steady state condition beginning in the year 2009. Based on this analysis, Mr. Terry concluded and continues to conclude that, for the purpose of establishing an appropriate treatment process, it would be reasonable and prudent for the treatment plant design engineer to expect and anticipate that the MTBE concentrations could remain at or above 3 ppb

at Well 5 until 2027, at Well 22 until 2035, at Well 39 until 2020, and at Well 45 until at least 2040.

A simple comparison between the opinion set forth in Section 5 of Mr. Terry's Initial Report and Section 9.0 of Mr. Terry's Rebuttal Report demonstrates that, contrary to the defendants' accusations, Mr. Terry has not in any way changed his opinions regarding the future extent or duration of MTBE at Station 6. As fully explained in Mr. Terry's annexed declaration, defendants have mistakenly characterized Mr. Terry's responses to defendants' experts and his supporting analyses, as well as two minor corrections to the original analysis, as changes in Mr. Terry's methodologies and opinions.

**B.     Modeling Analysis Contained in the Terry Rebuttal Report**

Defendants claim that the four modeling simulations discussed in Section 8 of the Rebuttal Report – (§ 8.1) "Revised Analysis 1," (§ 8.2) "Additional Analysis 1 Run with Lower Dispersivity Value," (§ 8.3) "Revised Analysis 2 Run," and (§ 8.4) "Drought Simulations for Focus Wells" – are beyond the scope of what is permitted in a rebuttal report. However, as fully explained in the Terry Declaration, the modeling analyses set forth in §§ 8.2, 8.3, and 8.4 were specifically included to rebut comments made by one or more of defendants' experts. *See* Terry Declaration, at ¶¶ 2. The analysis included in § 8.1 corrected discrepancies in the original Analysis. *See* Rebuttal Report, p. 21 *and* Terry Declaration, 2. These analyses were all appropriate under Rule 26 of the Federal Rules of Civil Procedure.

*(i) Rebuttal s Set Forth in §§ 8.2 through 8.4*

Rule 26(a)(2)(C)(ii) defines rebuttal evidence as "evidence [that] is intended solely to contradict or rebut evidence *on the same subject matter identified by another party.*" (emphasis added); *see also Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 636 (D. Haw. 2008) (noting that expert reports "are proper rebuttal reports if they contradict or rebut the subject matter of the [opposing party's expert report]"); *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 180 (N.D.N.Y. 2002) (interpreting "same subject matter" in Rule 26(a)(2)(C)(ii) as allowing rebuttal experts to use a different methodology to analyze the same facts considered by the expert in chief). The "archetypal rebuttal testimony" identifies a "flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise." *See Sci. Components Corp. v. Sirenza Microdevices*, 2008 U.S. Dist. LEXIS 92703 *7-*8 (E.D.N.Y. 2008) Here, it is clear that §§ 8.2 through 8.4 of the Rebuttal Report directly contradicted and rebutted the "same subject matter" that was expressly contained in one or more of the defendants' experts reports.

Section 8.2 was expressly included in the Rebuttal Report to contradict several defense experts criticisms regarding the dispersivity value used by Mr. Terry in his numerical transport model.[2] *See* Rebuttal Report, § 8.2; *see* Report of Fletcher G. Driscoll, dated March 9, 2009, at pp. 51-53; *see also* Expert Report of Thomas Maguire, dated March 9, 2009, at p. 6, para. 6, p. 16; Expert Report of Nicole T. Sweetland, dated March 9, 2009, pp. 14-15. In

---

[2] Defendants seek to strike the following portions of the report related to the dispersivity analysis: Section 8.2 and Section 3.0 (first full paragraph and last full paragraph), and Figure 6.

3

addition to defending the dispersivity value used in Analysis 1, *see* Rebuttal Report § 3.0, Mr. Terry conducted an additional modeling simulation using the dispersivity value that was specifically identified by defense expert Fletcher Driscoll. As stated by Mr. Terry in his rebuttal report, the purpose of that modeling simulation was to determine whether Mr. Driscoll's dispersivity value would have changed any results. Mr. Terry concluded that it would not "substantially alter the results of Analysis 1 ...." *See* Rebuttal Report, § 8.3. Accordingly, defendants have no basis for requesting that this section of the report be stricken.

The same is true for the analysis set forth in § 8.3. Four of defendants ten hydrogeologists claimed that Mr. Terry's Analysis 2 modeling simulation was flawed because it did not contain all sources of gasoline contamination in the Station 6 capture zone.[3] *See, e.g.*, Expert Report of Nicole Sweetland on behalf of Sunoco, Inc., p. 18 ("In order to be consistent with his own methodology, Mr. Terry should include any known sites of MTBE release in his analysis if they fall within his calculated capture zone."); *see also* Maguire Report, pp. 4, 12; Driscoll Report, 51; Schaeffer Report, pp. 29, 31. In his Initial Report, Mr. Terry fully acknowledged that there were additional release sites within the Station 6 capture zone and concluded that "the presence of additional release sites in which significant releases occurred would add additional MTBE mass to the groundwater system which is not explicitly represented in the model." *See* Initial Report, p. 1. In other words, by including every site, as Dr. Sweetland suggests, Analysis 2 would be simulating additional mass of MTBE, correlating to higher expected concentrations at Station 6. The analysis in Section 8.3 of the Rebuttal Report simply proves that taking an approach such as the one recommended by defendants' expert would have no impact on the modeling output except to increase the expected MTBE concentrations. It bears noting that Mr. Terry's opinion as to the maximum concentration of MTBE to be expected at Station 6 is based on the modeling output of Analysis 1, and remains unchanged from the Initial Report. *Compare* Initial Report, § 5 with Rebuttal Report, § 9 (each stating that Station 6 will more likely than not reach a peak concentration of 35 ppb, and that the concentration will remain at or above 3 ppb until 2040).

Finally, the drought simulations for Wells 5 and 22 were included in the Rebuttal Report as a result of comments from John Connor, yet another of defendants' ten experts.[4] *See* Expert Report of John Connor on behalf of Chevron, dated March 9, 2009, p. 7 and Table 2. To summarize, Mr. Connor claimed that, under a different pumping scenario, the MTBE impacts to Well 22 would be less severe. In response, Mr. Terry ran modeling simulations of Well 5 and 22 under drought pumping simulations. The simulation for Well 22 indicated that, under intermittent pumping conditions, Well 22 would still be impacted by future concentrations of MTBE. Se Rebuttal Report, § 8.3. The Well 5 analysis showed a reduction in MTBE concentrations under intermittent pumping conditions. Although defendants did not explicitly criticize Mr. Terry for not modeling Well 5 under drought conditions, the City nonetheless disclosed to defendants that Well 5 decreased MTBE results. Mr. Terry's recommendation and opinion regarding the concentration of MTBE that should be considered in the design of a

---

[3] Defendants seek to strike the following portions of the Rebuttal Report related to this issue Section 2.0 (pp. 3-5); Section 8.3, and Figures 7 through 9.

[4] Defendants seek to strike the following portions of the Rebuttal Report related to the drought simulations: Section 6.4 (last three paragraphs); Section 8.4, and Figures 10 and 11.

drinking water treatment for these two wells remains unchanged from his initial report. *Compare* Initial Report, § 5 with Rebuttal Report, § 9.

Based on the foregoing, sections 8.2 through 8.4 (and the related sections and figures as referenced above) of Mr. Terry's Rebuttal Report were proper under Rule 26 because they rebutted or contradicted the same subject matter raised by defendants' experts. Therefore, the City respectfully requests that the defendants' motion to strike these portions of the Rebuttal Report be denied.

*(ii) Corrections Set Forth in § 8.1*

Defendants' request to strike § 8.1 of the Rebuttal Report is equally improper.[5] Section 8.1 explicitly states that it is intended to correct two errors or "discrepencies" identified in the original Analysis 1. *See* Rebuttal Report, § 8.1 and Terry Declaration, ¶¶ 32 - 36. As explained by Mr. Terry, these modifications are minor and only result in moving the 35 ppb peak concentration from 2024 to 2026.

Each party has an obligation to supplement information included in an expert's report or given during an expert's deposition "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). Absent a court order directing otherwise, supplemental disclosures must be made at least 30 days before trial. *See* Fed. R. Civ. P. 26(a)(3)(B), 26(e). Mr. Terry has a right and obligation to make corrections to his expert report, and defendants' argument to the contrary should be rejected.

Further, no fewer than four defense experts have attempted to correct serious oversights in their own analyses without complaint from the City:

- In his "Supplemental Expert Report," dated March 30, 2009, ExxonMobil's market share expert David Montgomery "revised calculations for ExxonMobil's percentage for the period between 1992 and 2003 which yielded changes in the results for the years 1992 through 1994." Mr. Montgomery based his so-called "refinements" on the use of "data sets that had not previously been made available to me and from minor changes in certain assumptions." Mr. Montgomery did not provide any explanation as to which assumptions he changed between his original supplemental reports. Supplemental Expert Report of David Montgomery, dated March 30, 2009, p. 11.

- Defense expert Dr. Alan Uhler, who was retained by several defendants, including Exxon and Shell, issued a report on March 9, 2009 that set forth broad opinions regarding the City of New York's sampling data for MTBE. *See* Expert Report of Dr. Alan Uhler, dated March 9, 2009. However, at the time Dr. Uhler issued these opinions he had *never reviewed* any raw sampling data from the New York City Department of Environmental Protection – including more than 150,000 pages of

---

[5] It is unclear to the City why defendants have moved to strike section 7.1 of the Rebuttal Report, however, at most, it should be considered acceptable under Rule 26(e).

historical sampling information produced to defendants in July 2008, months before Dr. Uhler was retained as an expert. Dr. Uhler had only reviewed sampling data collected by the City's consultant, Malcolm Pirnie. Between his expert report and his deposition, Dr. Uhler was summoned to defendants' counsels' office to review, for the first time, the raw data supporting MTBE concentrations detected by the City's internal laboratory. Following this review, Dr. Uhler modified two key statistical tables in his report verbally at his deposition. *See* Rough Transcript of Uhler Deposition 4/8/2009, p. 31, lns. 10-16 ("[S]ubsequent to my report, in fact, I recognize[d] that some of the data, in fact, resided in another larger database of City documents that I've looked at since my expert report. And so my view of the types of data and the sources of data since my report have changed somewhat.")

- On April 3, 2009, defense expert David Hand submitted a revised report that that, in additional to correcting several mathematical errors, revised his estimation of future operation and maintenance costs from 11 million to 21 million dollars. *Compare* Expert Report of David Hand, dated March 9, 2009, at p. 13 with Revised Expert Report of David Hand, dated April 1, 2009. Defendants submitted Dr. Hand's revised report one business day before the City's rebuttal report on these issues was due.

- Defense market share expert Peter J. Killen, retained by defendant Flint Hills Resources, included new and additional information, including new data regarding a shipment of more than 50,000 barrels of RFG gasoline made in 2001. Mr. Killen's rebuttal report also corrected "a numerical error in [his] earlier accounting." See Expert Rebuttal Report of Peter J. Killen, dated March 30, 2009, pp. 7, 9.

Defendants' motion to strike corrections made by Mr. Terry, when at the same time their own experts have corrected similar discrepencies after their original reports were issued, is inappropriate, heavy-handed, and misconstrues the Federal Rules of Civil Procedure. The purpose of Rule 26(e) is to allow for such corrections, which are then properly subject to questioning by defendants at deposition and trial. Rather than take the Draconian measure of moving to strike, Defendants could have simply asked Mr. Terry questions regarding these changes at his deposition on April 6 and 7. Accordingly, defendants' motion to strike section 8.1 should be denied.

*(iii). Additional Corrections under Rule 26(e)*

As further explained in the Terry Declaration, in re-reviewing the report in response to defendants' letter, Mr. Terry and his staff discovered an error in the report that requires correction. The version of Table 4 included in the original report was a draft version that did not have the final hydrological input values for Analysis that were used in the modeling simulation. This was a clerical made when the report was being assembled. The correct version of Table 4 – which was provided during expert discovery – will be promptly submitted and/or identified to defendants.

### C.     Conclusion

The scope of Mr. Terry's rebuttal report was consistent with Rule 26 generally and Rule 26(c)(2)(C)(ii) specifically, and defendants (and their ten hydrogeologists) have not been prejudiced as a result of the rebuttal analysis. Defendants have had not only Mr. Terry's reports, but also the modeling files underlying this analysis for several weeks. The City respectfully requests that defendants' motion to strike be denied.

Respectfully Submitted,

*Daniel Greene*

Daniel Greene
Senior Counsel
Environmental Law Division


cc:     Defendants' Liaison Counsel
        All Counsel (by LNFS)