

25812871

Jun 24 2009
4:22PM



THE CITY OF NEW YORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

SUSAN E. AMRON
Phone: (212) 788-1578
Fax: (212) 788-1619
E-mail: samron@law.nyc.gov

June 24, 2009

<u>By E-Mail and Hand</u>

Hon. Shira A. Scheindlin
United States District Judge
Southern District of New York
500 Pearl Street, Room 1620
New York, New York 10007

    Re:    *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*,
           MDL No. 1358, Master File No. 1:00-1898 (SAS)
           *City of New York v. Amerada Hess, et al.*, 04 CV 3417 (SDNY)

Dear Judge Scheindlin:

      I write in response to Peter Sacripanti's June 23, 2009 letter concerning the City of New York's identification of Douglas Greeley, Kathryn Garcia and Angela Licata as possible witnesses in Phase I of the trial and the City's production of certain budget documents to ExxonMobil.

## I.    <u>The City's Witness List</u>

      Contrary to the assertions in Mr. Sacripanti's letter, ExxonMobil had more than sufficient knowledge of the City's witnesses and for its own reasons, chose either not to depose them or not to seek further discovery on the subject matter of their possible testimony before now. ExxonMobil is simply seeking to blame the City on the eve of trial for discovery decisions made by defendants during the last five years. The City appropriately responded to defendants' discovery requests and appropriately designated each of these potential witnesses. In this regard, ExxonMobil's assertion that the City failed to live up to its obligations under Rule 26(e) is wrong. Rule 26(e) requires supplementation of disclosure if the additional information "has not otherwise been made known to the other parties during the discovery process ..." Not only has ExxonMobil not identified any inadequate disclosure but, as detailed below, the information it complains about was made known to it during discovery.

Dockets.Justia.com

As an initial matter, the City notes that both Mr. Greeley and Ms. Licata were listed on the City's draft witness list provided to defendants on April 13, 2009, more than two months ago. If ExxonMobil had issues with the City's identification of potential witnesses, it should have raised them then, rather waiting until less than a month before trial.

Douglas Greeley

Far from being "sandbagged," ExxonMobil had full notice of Mr. Greeley and his role with respect to the City's groundwater system as early as 2005. On March 1, 2005, Mr. Greeley verified one of the City's first discovery responses in this action. More than 3 1/2 years ago, at one of the first depositions of a City witness in this litigation (taken by ExxonMobil's counsel), Mr. Greeley was identified as the then-Deputy Commissioner of the City Department of Environmental Protection's Bureau of Water and Sewer Operations, the Bureau that operates the City's groundwater system. Deposition of John Dydland, dated October 20, 2005, at 104:23-105:6;[1] *see also* Deposition of Thomas Tengelsen, dated October 11, 2005, at 376:3-376:5. In depositions of DEP witnesses in 2005 and early 2006 (again, all taken by ExxonMobil's counsel), Mr. Greeley was repeatedly identified as one of the senior DEP decision-makers on groundwater issues, including budget, water quality, and removal of wells from service. *See* Deposition of Arthur Ashendorff, dated October 18, 2005, at 46:1-11:19; Deposition of William Yulinsky, dated October 25, 2005, at 169:15-171:21; Deposition of William Yulinsky, dated January 30, 2006 ("2006 Yulinsky Dep."), at 469:11-470:13.

The City's witnesses were equally clear about Mr. Greeley's involvement with Station 6. In 2006. Mr. Yulinsky testified that Mr. Greeley assured the community at a November 27, 2001 public information meeting in Jamaica, Queens concerning the status of Station 6, that the City would provide water from the groundwater system that equaled or exceeded the upstate surface water system in quality. 2006 Yulinsky Dep., at 483:1-492:8. More recently, Donald Cohen testified that the City's preliminary design consultant for Station 6, Malcolm Pirnie Inc., discussed proceeding with the treatment facility at Station 6 with Mr. Greeley, and delivered the conceptual design for the Station 6 facility to Mr. Greeley, both times in his position as Deputy Commissioner for Water and Sewer Operations. Deposition of Donald Cohen, dated January 13, 2009, at 28:22-31:21, 169:17-171:22, 237:18-240:5. These are just a few examples from depositions of City witnesses; the City could cite to other deposition testimony and numerous documents provided to defendants over the past five years highlighting Mr. Greeley's involvement in groundwater issues. In light of this, ExxonMobil's protestations of ignorance ring hollow.

The Interrogatory and the City's August 2008 Response that ExxonMobil cites in its letter is not inconsistent with the deposition testimony and documents. Defendants' Interrogatory asked for the *current* status of plans and budget for Station 6. The City's answer is clear that it is identifying persons most knowledgeable about that *current* status. By August 2008, when the City answered the interrogatory (and indeed, well before then), Mr. Greeley was

---

[1] The cited deposition excerpts are attached as Exhibit A.

no longer Deputy Commissioner for Water and Sewer Operations and no longer had responsibility for the City's groundwater system. Consequently, he was not a person most knowledgeable about the then-current status of any aspect of the groundwater system and was appropriately not identified.

Angela Licata

Ms. Licata will not be testifying specifically about Station 6. Rather, as the Deputy Commissioner of DEP's Bureau of Environmental Planning and Assessment, she is prepared to testify, if needed, about City processes applicable to major water and sewer capital construction projects. Ms. Licata's Bureau was identified generally in August 2008, in the City's Response to Interrogatory No. 22 to Defendants' Second Set of Interrogatories.[2] That Interrogatory asked about preparation of a draft environmental impact statement for uses of the Brooklyn-Queens Aquifer. In its August 2008 response, the City stated that "any environmental review for these planned projects [possible uses of the Brooklyn-Queens Aquifer, including Station 6] would be primarily overseen by staff within DEP's Bureau of Environmental Planning and Assessment ("BEPA")." Perhaps indicating defendants' lack of real interest about this and other City process issues, defendants did not follow up this response by seeking to depose anyone from BEPA and did not seek further discovery on this issue.

Again the City's identification of Ms. Licata is not inconsistent with the City's earlier Interrogatory Response cited by ExxonMobil, as Ms. Licata will not testify about the status of plans and budget for Station 6.

Kathryn Garcia

Ms. Garcia will also not be testifying directly about Station 6. As the current DEP Assistant Commissioner for Strategic Projects, Ms. Garcia is involved with the Dependability Study currently underway at DEP, including the 55 million gallon/day groundwater project and facility planning for a possible parallel tunnel to bypass the leaks in the Rondout-West Branch Tunnel portion of the Delaware Aqueduct. We do not think the Dependability Study and the possible parallel tunnel are relevant to the question posed by the Court for Phase I of the trial,[3] and would not have listed Ms. Garcia in connection with that question. She is not directly involved with the day to day planning or oversight of Station 6, is not responsible for the Bureau of Engineering Design and Construction's ("BEDC") budget, which includes Station 6, and was appropriately not identified as a person most knowledgeable about either. But because ExxonMobil, despite the totality of evidence to the contrary, insists

---

[2] A copy of the City's Response is attached as Exhibit B.

[3] The Phase I question is whether assuming the money is available, the City has proven by a preponderance of the credible evidence that Station 6 will be constructed within 15 years. Transcript of June 2, 2009 Court Conference, at 66-74. (A copy of the relevant pages are attached as Exhibit C).

that Station 6 is part of the Dependability Study and has repeatedly stated its intent to explore the City's consideration of a possible parallel tunnel, the City listed Ms. Garcia as a possible witness.[4]

ExxonMobil has had ample notice of Ms. Garcia's role with respect to the Dependability Study. Both representatives of the two firms that comprise the Dependability Joint Venture testified that the DEP decision-makers with respect to the Dependability Study include Kathryn Garcia. Deposition of Richard Peters, dated January 9, 2009, at 450:13-451:8; Deposition of Mark Maimone, dated January 16, 2009, 89:1-89:20. William Meakin, the former senior project manager for Dependability, and the City's Rule 30(b)(6) witness on Dependability, mentioned Ms. Garcia more than 30 times in his deposition (again, a deposition taken by ExxonMobil's counsel), identifying her as a decision-maker, as someone with whom he spoke to prepare for his deposition, and as a liaison with the DEP Commissioner and the Deputy Mayor on Dependability issues. Deposition of William Meakin, dated April 22, 2009, at 109:9-111:11, 164:19-167:19; Deposition of William Meakin, dated April 23, 2009, at 208:2-208:20, 212:18-213:5, 240:19-241:8. Indeed, ExxonMobil's counsel repeatedly asked Mr. Meakin about Ms. Garcia. *See, e.g.*, Deposition of William Meakin, dated April 23, 2009, at 207:13-208:11, 212:5-213:1, 218:14-218:19, 234:24-235:3. And ExxonMobil is obviously knowledgeable about Ms. Garcia; its Phase I trial memorandum repeatedly refers to Ms. Garcia and cites to documents authored by Ms. Garcia that, ExxonMobil incorrectly argues, purportedly establish the City's intent to proceed with the parallel tunnel in lieu of Station 6. Given that ExxonMobil has chosen to raise unrelated Dependability Study issues during phase I of the trial, it cannot complain when the City identifies a witness who can address those issues.

Again, the City's identification of Ms. Garcia is not inconsistent with the City's earlier Interrogatory Response cited by ExxonMobil, as Ms. Garcia will not testify about the status of plans and budget for Station 6.

## II.    The Budget Documents

The City listed and provided ExxonMobil with 7 two-page excerpts from publicly available budget documents containing, in an easy to read format, a summary of the Mayor's proposed and the City's adopted capital budget commitments for Station 6 for fiscal years 2007 through 2009 and the Mayor's proposed capital budget commitment for Station 6 for fiscal year 2010. With the exception of the fiscal year 2010 document, the City had already produced to

---

[4] ExxonMobil questions why the City did not list William Meakin, the City's Rule 30(b)(6) witness on the Dependability Study, rather than Ms. Garcia. While Mr. Meakin was the DEP employee directly responsible for managing the Dependability Study, as he explained in his deposition, his job responsibilities have recently changed. Deposition of William Meakin, dated April 22, 2009, at 11-12. Notably, ExxonMobil did not seek any additional depositions upon learning this.

defendants all of the information contained in these exhibits.[5] The fiscal year 2010 document was released only in May 2009. Further, the complete City capital budgets from which these Station 6 entries are excerpted are, and have long been, publicly available on the web site of the City's Office of Management and Budget, the City agency responsible for the City budget.

ExxonMobil took a Rule 30(b)(6) deposition of the City on Station 6 and the City budget in April 2009. It did not complain at the time that that deposition was inadequate and did not seek to depose a second witness on the City's budget.[6] Having waited three months, it should not be allowed another deposition on the same topic now.

## Conclusion

ExxonMobil has had almost five years to take discovery of the City and depose City witnesses. It should not now be allowed to complain about the City's designation as potential witnesses of three employees whom ExxonMobil knew about and, for whatever reason, decided not to depose during those five years. Further, requiring the City less than a month before trial to make available, prepare, and defend four witnesses at depositions that ExxonMobil could have taken long ago would prejudice the City for strategic discovery decisions made by ExxonMobil. ExxonMobil's last-minute attempts to divert the Court and burden the City with belated discovery issues should be rejected.

Respectfully yours,

Susan E. Amron
Deputy Chief
Environmental Law Division

c:   Peter Sacripanti
     Victor Sher

---

[5] Documents with the same budget information include NYC-DS-067598_YTD Registrations 12.27.06_to Bureaus.xls; NYC-DS-067508_YTD Registrations 12.27.06_to Bureaus.xls; NYC-DS-067676_2008 Sept Plan Exercise_To_Bureaus.xls; NYC-DS-067395_Budget Tracking 070908.xls; NYC-DS-067719_Year Plan 08-12(2008CPJP)_FINAL_to-Bureau.xls; NYC-DS-067737_Sept_Plan_FY-09_by_DIVISION_DRAD.xls; NYC-DS-029570_Budget Tracking 050908.xls; Meakin Exhibits 41-43.

[6] Joseph Murin, from whom the City submitted an affidavit to oppose ExxonMobil's recent motion to require production of documents withheld under the deliberative process privilege, is an employee of the City Department of Environmental Protection and not the separate City budget agency, the Office of Management and Budget.


25812871

Jun 24 2009
4:22PM

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE:                    : MDL No. 1358 (SAS)
                          :
Methyl Tertiary           :
Butyl Ether               :
("MTBE")                   :
Products                  :
Liability                 :
Litigation                :

CONFIDENTIAL (Per 2004 MDL 1358 Order)

- - -

October 18, 2005

- - -

Videotape deposition of ARTHUR J.
ASHENDORFF, held in the offices of
McDermott Will & Emery, 50 Rockefeller
Plaza, New York, New York 10020,
commencing at 10:21 a.m., on the above
date, before Linda L. Golkow, a
Federally-Approved Registered Diplomate
Reporter and Certified Shorthand
Reporter.

- - -

ESQUIRE DEPOSITION SERVICES
Four Penn Center
1600 John F. Kennedy Boulevard
Suite 1210
Philadelphia, Pennsylvania  19103
(215) 988-9191

1    Q.    Who was that point of
2  contact for you folks in operations?
3    A.    It was Doug Greeley's group,
4  and it probably was -- it was Doug
5  Greeley's people.
6    Q.    Do you recall any instances
7  where you conferred with Mr. Dydland
8  concerning shutdown of the wells?
9    A.    I think Dydland was one of
10 the people.
11   Q.    Other than Mr. John Dydland,
12 is there anyone else who you can identify
13 that was in the operations group that you
14 would consult with relative to shutting
15 down a well or starting up a well for
16 water quality problems?
17   A.    There may have been other
18 names, but I recall Greeley, Dydland,
19 mainly.
20   Q.    In the course of your work
21 with the city, did you ever have any
22 occasion to work with Mr. Odd Larsen?
23   A.    On rare occasions.
24   Q.    With regard to Mr. Larsen's

00001
1   IN THE UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2

3   IN RE:

4   Methyl Tertiary    :MDL NO. 1358 (SAS)
    Butyl Ether ("MTBE"):
5   Products Liability :
    Litigation        :
6

7   CONFIDENTIAL (Per 2004 MDL 1358 Order)

8          ------
           October 20, 2005
9
           ------
10
           CONFIDENTIAL Videotaped
11  Deposition of JOHN E. DYDLAND, held in
    the law offices of McDermott, Will &
12  Emery, 50 Rockefeller Plaza, New York,
    New York 10020, beginning at
13  approximately 10:13 a.m., before Ann V.
    Kaufmann, a Registered Professional
14  Reporter, Certified Realtime Reporter,
    Approved Reporter of the U.S. District
15  Court, and a Notary Public of the
    Commonwealth of Pennsylvania.
16

17         ------

18

19

20

21

22     ESQUIRE DEPOSITION SERVICES
       1600 John F. Kennedy Boulevard
23     Four Penn Center, Suite 1210
       Philadelphia, Pennsylvania 19103
24       (215) 988-9191

1  York City 12053 through New York City

2  17192. And I will note that the pages

3  which are charts are not sequentially

4  numbered with respect to the other

5  documents.

6      The tables of organizations

7  run from NYC-0017150 through the last

8  page, which is 192. And I flagged in

9  red the chart. And the two purple

10  charts, I believe, are the table of

11  organization.

12      Dan, those pages, so you

13  will know, the table of organization

14  where Mr. Dydland's name appears, are

15  Page 158 and 163.

16      (Above-described document

17  marked as Dydland Exhibit 5.)

18  BY MR. STACK:

19  Q.  Have you had an opportunity

20  to review the table of organization

21  pages that were flagged?

22  A.  Yes.

23  Q.  And the first page is a

24  page Bates numbered 17158. It says:

1 "Bureau of Water and Sewer Operations,

2 Director for Distribution Operations."

3 It indicates that the deputy

4 commissioner is Mr. Greeley; am I

5 correct?

6    A.    That is correct.

7    Q.    And you are indicated as

8 being in the Distribution Operations,

9 the chief of Groundwater Supply?

10    A.    That is correct.

11    Q.    With regard to your

12 reporting, do you report to Mr. Coleman?

13    A.    That is correct.

14    Q.    And what is Mr. Coleman's

15 position?

16    A.    Director for Distribution

17 Operations.

18    Q.    With respect to the two

19 groups -- there is a group supervised by

20 yourself, sir, and then by Mr. Larsen --

21 how are those two groups distinguished?

22    A.    The group that I supervise

23 is the Groundwater Division. The group

24 that Mr. Larsen supervises is the

00001
IN THE UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

2

3  IN RE:

4  Methyl Tertiary Butyl:MDL NO. 1358 (SAS)
   Ether ("MTBE")    :
5  Products Liability  :
   Litigation      :
6

7     In Re:

8        City of New York
            ------
9
     CONFIDENTIAL (Per 2004 MDL 1358 Order)
10
           ------
11
         January 13, 2009
12
           ------
13

14

15        Videotaped Deposition of
    DONALD K. COHEN, CPG, 30(b)(6) witness
16  for the City of New York, held in the law
    offices of McDermott, Will & Emery, 340
17  Madison Avenue, New York, New York 10173,
    beginning at approximately 10:22 a.m.,
18  before Ann V. Kaufmann, a Registered
    Professional Reporter, Certified Realtime
19  Reporter, Approved Reporter of the U.S.
    District Court, and a Notary Public.
20

21        ------

22
     GOLKOW TECHNOLOGIES, INC.
23   877.370.3377 ph|917.591.5672 fax
        deps@golkow.com
24

1    A.   That's true.

2    Q.   Has that issue been

3 resolved?

4    A.   Yes, it has.

5    Q.   And it was resolved by the

6 streets being demapped, I believe they

7 call it?

8    A.   No, that is not the way it

9 was taken care of.

10    Q.   How was it taken care of?

11    A.   It was taken care of

12 through the BSA, Board of Standards and

13 Appeals. We were able to get an

14 exemption to that. The City has,

15 however, reserved the right to formally

16 demap those streets in the future.

17    Q.   Once it was recommended by

18 Malcolm Pirnie to build a Station 6

19 facility in the 1998 BQA study, did you

20 have any discussions with the City as to

21 whether that project should go forward?

22    A.   Yes.

23    Q.   With whom did you have

24 those discussions?

1    A.   At that time it was

2 primarily William Yulinsky and Doug

3 Greeley, both at the time with BWSO.

4    Q.   And that's the Bureau of

5 Water Supply Operations?

6    A.   Bureau of Water and Sewer

7 Operations.

8    Q.   And has that department now

9 been reorganized?

10    A.   I'm not sure I could answer

11 that. I mean, there are new people

12 there, but personnel changes. I don't

13 know about a reorganization.

14    Q.   What discussions did you

15 have with Mr. Yulinksy and Mr. Greeley

16 about the Station 6 project going

17 forward?

18       MR. SHER:  Can you give a

19 time frame?

20       MR. CONDRON:  Yes.  After

21 the BQA study came out, he indicated

22 that he had some discussions with them

23 as to whether or not the project should

24 go forward.

1       THE WITNESS: We talked

2 about the feasibility of it, the scope

3 that might be included in that, the

4 approach to it, the value of that

5 project, potential costs, an overall

6 approach to how it might be implemented.

7    Q.   With respect to potential

8 costs, what do you recall discussing

9 with Mr. Yulinsky and Mr. Greeley during

10 this time frame?

11    A.   At that time it was

12 extremely rough estimates because we

13 hadn't even done a conceptual plan at

14 that point. It was more of just using

15 published information to say, you know,

16 facilities of a certain size have, you

17 know, rough costs associated with them.

18 It wasn't even a level 6 type cost

19 estimate at that point. It was to get a

20 ballpark idea of how much money would

21 need to be allowed or accounted for in

22 the capital budget for the future.

23    Q.   How much money did you

24 indicate would be necessary to be

1      THE WITNESS:  As far as I am

2  aware sitting here today, that's

3  correct.

4      MR. SHER:  And, Pete, again,

5  I don't want to interrupt your

6  questioning here, but with respect to

7  this, I do not contest that it is

8  appropriate for you to inquire of

9  Mr. Cohen at the appropriate time into

10  those topics.

11      MR. CONDRON:  Okay.

12      MR. SHER:  I'm just not

13  going to allow him to testify with

14  respect to the matters that I mentioned

15  today, and the reason is the ongoing --

16  his ongoing work as an expert.  We can

17  get to that when we get to specific

18  questions.

19      MR. CONDRON:  We may need to

20  do that.

21  BY MR. CONDRON:

22    Q.  In addition, Mr. Cohen, it

23  is the case that Malcolm Pirnie has made

24  a number of submissions and

1 recommendations to the City regarding

2 proposed treatment for the wells at

3 Station 6; correct?

4     A.   We have prepared reports

5 that --

6         MR. SHER:  It calls for a

7 yes or no answer, Don.

8         THE WITNESS:  Yes, we have.

9 BY MR. CONDRON:

10     Q.   And you have prepared

11 reports that you have provided to the

12 City in connection with that work;

13 correct?

14     A.   Yes.

15     Q.   And that work was done in

16 your capacity as a consultant to the

17 City of New York; correct?

18     A.   Yes.

19     Q.   It was not done as an

20 expert witness; correct?

21     A.   That's correct.

22     Q.   And those reports were

23 provided to whom at the City -- to who

24 at the City of New York?

1       MR. SHER:  Objection and

2  instruct not to answer to the extent

3  that you are calling for attorney-client

4  communications.

5       You can answer other than to

6  attorneys, if you can.

7       THE WITNESS:  In general,

8  our reports were submitted to the New

9  York City DEP, Department of

10  Environmental Protection.

11  BY MR. CONDRON:

12     Q.  Were they submitted to any

13  particular individual at the DEP?

14       MR. SHER:  Objection,

15  compound.

16       Are you able to answer with

17  respect to all of the documents that you

18  have in mind?

19       THE WITNESS:  Our

20  contractual arrangements with the DEP

21  are with the Bureau of Water and Sewer

22  Operations.  There are a number of

23  individuals within that bureau to whom

24  those documents would be submitted.

 1  BY MR. CONDRON:

 2     Q.   Okay.  Can you identify

 3  those individuals for me?

 4     A.   William Yulinsky was the --

 5  an original project manager for this

 6  project.  Douglas Greeley.  More

 7  currently, Thomas Tipa.

 8     Q.   I'm sorry.  Could you spell

 9  that, please?

10     A.   T-I-P-A.

11     Q.   And what is Mr. Tipa's role

12  at DEP?

13        MR. SHER:  If you know.

14     A.   I'm not sure I recall his

15  exact title, but he is involved in

16  development, current development of the

17  New York City groundwater system.

18     Q.   And Mr. Greeley was an

19  assistant commissioner; is that correct?

20     A.   Deputy Commissioner for the

21  Bureau of Water and Sewer Operations.

22     Q.   Is he with the City

23  currently?

24     A.   Yes.

 1  answer to the extent that the question

 2  is calling for inquiry into 2007 and

 3  more recently, but you can answer.

 4       THE WITNESS: Effectiveness

 5  is always the first criteria. We have

 6  to produce water that meets MCLs as

 7  protective of human health. That does

 8  not change.

 9       MR. SHER: Should we keep

10  Exhibit 13 available or are you moving

11  on?

12       MR. CONDRON: I'm going to

13  move on for now. You can probably put

14  that to the side.

15       (Below-described document

16  marked as Cohen Exhibit 15.)

17  BY MR. CONDRON:

18  Q.  Mr. Cohen, the court

19  reporter is handing you what has been

20  marked as Cohen Exhibit 15. For the

21  record, it does not have a Bates -- oh

22  yes, it does have a Bates number. I

23  take that back, although the cover,

24  apparently, does not. The Bates number

1  on the second page of the document is

2  NYC2_0001931 through 2115. And for the

3  record, it appears to be a report

4  entitled "Conceptual Design Report for

5  the Station 6 Demonstration Plant,

6  December 2004." And my question to you

7  initially, Mr. Cohen, is this a document

8  that was submitted to DEP reflecting

9  Malcolm Pirnie's recommendations with

10  respect to the design of the Station 6

11  demonstration plant?

12     A.   With respect to the

13  conceptual design of the Station 6

14  plant.

15     Q.   What is a conceptual

16  design?

17     A.   It is a preliminary

18  document that lays out the approach and

19  perhaps, in this case, what were

20  considered the more important

21  components, but is not a complete

22  design.

23     Q.   And when you say it is not

24  a complete design, what sort of things

1 are lacking from it that would be

2 necessary for a complete design?

3     A.    In this case things that

4 had not been developed beyond a very

5 preliminary stage might be the

6 electrical detail, the structural detail

7 for the building, the civil site work

8 that would be required at the location,

9 the HVAC systems wouldn't be built. But

10 because, as you saw, we concentrated on

11 treatment process from the -- coming out

12 of the pilot testing and through the

13 process selection, this report also

14 advanced a bit of the architecture. But

15 some of those other factors that would

16 still remain to be developed in a higher

17 percentage completion up to a complete

18 design were not yet developed fully at

19 this point.

20     Q.    Is this particular document

21 a deliverable under the contract between

22 Malcolm Pirnie and DEP?

23     A.    Yes, it was.

24     Q.    That's why it was prepared?

1    A.   Yes, yes.

2    Q.   To whom was this delivered?

3    A.   Again, to Doug Greeley and

4 Bill Yulinsky as our primary contacts at

5 the DEP under this contract.

6    Q.   If you can go to the page

7 that's marked NYC2_0001933 --

8    A.   Okay.

9    Q.   -- and to save transcript

10 space and my voice, I will probably

11 limit it to the last four numbers from

12 here on out.

13    A.   That's fine.

14    Q.   At the top of the page the

15 first full paragraph in the last

16 sentence it states: "Due to the

17 occurrence of groundwater flooding in

18 the area, the number of out-of-service

19 wells in the...vicinity" -- "in the

20 Station 6 vicinity, and its central

21 location, it was determined that the

22 first 'Demonstration Plant' of this

23 approach should be located at this

24 site."

1   IN THE UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2

3  IN RE:

4  Methyl Tertiary Butyl:MDL NO. 1358 (SAS)
   Ether ("MTBE")    :
5  Products Liability  :
   Litigation      :
6

7    In Re:

8     City of New York
       ------
9
   CONFIDENTIAL (Per 2004 MDL 1358 Order)
10
      ------
11
     January 16, 2009
12
     ------
13
     CONFIDENTIAL Videotaped
14  Deposition of MARK MAIMONE, Ph.D., P.E.,
   30(b)(6) witness for the City of New
15  York, held in the law offices of
   McDermott, Will & Emery, 340 Madison
16  Avenue, New York, New York, beginning at
   approximately 10:00 a.m., before Ann V.
17  Kaufmann, a Registered Professional
   Reporter, Certified Realtime Reporter,
18  Approved Reporter of the U.S. District
   Court, and a Notary Public.
19

20     ------

21

22
   GOLKOW TECHNOLOGIES, INC.
23  877.370.3377 ph|917.591.5672 fax
     deps@golkow.com
24

1    Q.    Within this decision

2  process, what is the City's role?

3    A.    They participate in it, and

4  they are ultimately the decision-makers.

5    Q.    Who at the City

6  participates in the decision process, as

7  you've called it?

8    A.    At various times a very

9  large number of City employees.  I

10  couldn't come up with all the names.  I

11  can come up with some, if that's what

12  you are looking for.

13    Q.    Sure.

14    A.    Certainly William Meakin

15  Florence Mak, Esther Siskind.  Kathryn

16  Garcia has been very active.  Jim

17  Mueller has been very active.  Mike

18  Borsykowsky has been active.  There are

19  more, but I -- a lot of the managers at

20  times have participated.

21    Q.    Who developed the Tier 1,

22  2, and 3 selection criteria?

23    A.    The JV worked out a series

24  of criteria and then passed them by the

00001
1   IN THE UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

2

3 IN RE:

4 Methyl Tertiary Butyl:MDL NO. 1358(SAS)
  Ether ("MTBE")       :
5 Products Liability   :
  Litigation           :
6

7 CONFIDENTIAL (Per 2004 MDL 1358 Order)

8       In Re: City of New York

9           ------
        April 22, 2009
10
            ------
11
        CONFIDENTIAL Videotaped
12 Deposition of WILLIAM A.T. MEAKIN,
   P.E., held in the law offices of
13 McDermott, Will & Emery, 340 Madison
   Avenue, New York, New York, beginning at
14 approximately 10:13 a.m., before Ann V.
   Kaufmann, a Registered Professional
15 Reporter, Certified Realtime Reporter,
   Approved Reporter of the U.S. District
16 Court, and a Notary Public.

17
            ------
18

19

20

21

22
        GOLKOW TECHNOLOGIES, INC.
23   877.370.3377 ph|917.591.5672 fax
        deps@golkow.com
24

1    Q.    And Mr. Meakin, what is

2 your current business address?

3    A.    It is 59-17 Junction

4 Boulevard, Flushing, New York.

5    Q.    And who is your current

6 employer?

7    A.    New York City Department of

8 Environmental Protection.

9    Q.    How long have you been an

10 employee of the City of New York?

11    A.    Since July of 1987, so

12 that's coming up to 22 years.  Coming up

13 to 22 years.

14    Q.    And in your current

15 position, what is your title?

16    A.    My current position title

17 is chief.

18    Q.    You are chief of what

19 bureau or division?

20    A.    My division is Capital

21 Planning and Prioritization.

22    Q.    How long have you held that

23 position?

24    A.    Since February of this

1 information, putting an informed

2 decision on the projects needed to allow

3 us to take that tunnel. So I can't

4 predict what's going to happen in three

5 years from now, but I can see a whole

6 host of projects going forward. In

7 fact, there will be a whole host of

8 projects going forward.

9    Q.    With respect to the

10 ultimate decision as to which projects

11 within the Dependability Program will

12 proceed forward and on what schedule,

13 who ultimately makes that decision?

14    A.    The ultimate person in

15 charge of the City is the Mayor.

16 Obviously, my old job -- it's not my job

17 anymore -- was to present all the

18 information needed for them to make that

19 informed decision. It will be brought

20 to all the DCs, the deputy commissioners

21 of all the bureaus involved. There will

22 be other Deputy Commissioners involved.

23 BEPA, Kathryn Garcia will be involved.

24 They will be bringing it to the

1 Commissioner at the time from three

2 years from now at the moment. Steve

3 Lawitts, the person who's running our

4 department. And I'm sure the Mayor's

5 office and OMB will be involved in those

6 decisions as well and then ultimately it

7 would go to the Mayor's office on the

8 recommendations to take forward.

9    Q.    With respect to Ms. Garcia,

10 what is her position with the

11 department?

12    A.    Right now?

13    Q.    Yes.

14    A.    She is an assistant

15 commissioner.

16    Q.    And does Ms. Garcia have

17 responsibility for supervising the

18 activity of the Dependability Program?

19    A.    I wouldn't say she

20 supervises the activity. That's my role

21 as the administrator of this contract.

22        She is in charge of special

23 projects under DEP, so I guess that

24 encompasses a lot of things, whatever

1 she deems to be special projects.

2 Dependability is one of her interests,

3 yes.

4    Q.    With respect to Ms. Garcia,

5 does she report to a particular Deputy

6 Mayor or Mayors relative to decision-

7 making on the Dependability Program?

8        MR. REO:  If you know.

9    Q.    If you know.

10   A.    I only know she reports to

11 our Acting Commissioner.

12   Q.    With respect to the

13 ultimate decision in two to three

14 years --

15       MR. REO:  Regarding the

16 Dependability Program?

17       MR. STACK:  Regarding the

18 Dependability Program by the Mayor.

19       MR. REO:  As opposed to the

20 specific projects?

21       MR. STACK:  Absolutely.

22       MR. REO:  I'm sorry.

23 BY MR. STACK:

24   Q.    With regard to the ultimate

1   A.   I probably mentioned all

2 the CDM people and I've actually added a

3 couple of other joint venture people.

4   Q.   And with regard to Hazen

5 and Sawyer, you mentioned Mr. Peters.

6 Anyone else that you have spoken to at

7 Hazen and Sawyer specifically to get an

8 update to assist you in testifying here

9 today?

10   A.   Rick is a member of Hazen

11 and Sawyer, I believe.  Eileen Feldman,

12 I believe, is Hazen and Sawyer.  As I

13 said, I know them as JV.

14   Q.   Right.

15   A.   I don't care which firm

16 they work for.  So, yes, I believe

17 Ellen was in many progress meetings.

18 Elaine?  Ellen?  Elaine.  Sorry.

19   Q.   In preparation to give

20 testimony here today, did you speak to

21 any City employees to assist you in

22 getting information to testify?

23   A.   Yes, I have.

24   Q.   And who did you speak to?

00165

1   A.   I have talked to Joe Murin,

2 sorry, Larry Delacruz, Kathryn Garcia.

3   Q.   Anyone else you can think

4 of?

5   A.   I generally talked to my

6 director, Jerry Cox, I have talked to

7 Jerry about Dependability; my deputy

8 commissioner, Jim Mueller; the acting --

9 assistant commissioner, Michael

10 Borsykowsky are all involved -- are all

11 people I report up to that I would have

12 been talking to about Dependability and

13 information would come out.

14   Q.   Did you specifically speak

15 to any of these people and say I'm going

16 to have my deposition taken about the

17 Dependability Project. I need some

18 information about a certain aspect of

19 it. What do you know about this?

20   A.   Yes. Joe Murin, Larry

21 Delacruz, Kathryn Garcia.

22   Q.   And Mr. Murin, what

23 division or bureau is he with?

24   A.   He is our budget person for

1 the DEP.

2    Q.   Did he provide you with the

3 document we've marked as Exhibit No. 8?

4    A.   I have no -- I assume he

5 did.  It would have come from his --

6        MR. REO:  This document?

7    A.   Sorry.

8    Q.   Exhibit No. 8.  I

9 apologize.

10    A.   This document came from me.

11    Q.   You produced this from your

12 own computer files?

13    A.   This was produced by my new

14 staff to be submitted to me, yes, and I

15 may have moved the columns around and

16 such things.

17    Q.   Mr. Delacruz, what did you

18 speak to him about?

19    A.   He is also part of the

20 budget.  He works for Joe Murin, and I

21 was talking to both of them to get an

22 understanding of the January plan, what

23 was done, the ten-year, the four-year

24 plans, who negotiates.

1  Q. Kathy Garcia, what did you

2 speak to her about relative to your

3 testimony?

4  A. I wanted to make sure

5 that -- I know the position of our last

6 commissioner, Emily Lloyd, was that

7 Dependability is foremost important to

8 DEP and it carried, I think, a high

9 place in DEP to make sure it gets done.

10 I wanted to make sure, under the new

11 acting commissioner, Steve Lawitts, that

12 he also shared the same views of Emily

13 Lloyd on Dependability and did he know

14 about Dependability.

15      And she confirmed to me

16 that he also, yes, shares the same views

17 as Emily Lloyd and has actually talked

18 to many people within the Mayor's office

19 and OMB about this project.

20  Q. What did you speak to

21 Mr. Cox about relative to testimony here

22 today?

23  A. It was more of, when I was

24 assigned to my new position, I wanted to

1          VOLUME II

2   IN THE UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3

4 IN RE:

5 Methyl Tertiary Butyl:MDL NO. 1358 (SAS)
 Ether ("MTBE")      :
6 Products Liability   :
 Litigation          :
7

8 CONFIDENTIAL (Per 2004 MDL 1358 Order)

9      In Re:  City of New York

10          ------
         April 23, 2009

11
           ------

12
         Continued CONFIDENTIAL
13 Videotaped Deposition of WILLIAM A.T.
 MEAKIN, P.E., held in the law offices of
14 McDermott, Will & Emery, 340 Madison
 Avenue, New York, New York, beginning at
15 approximately 9:44 a.m., before Ann V.
 Kaufmann, a Registered Professional
16 Reporter, Certified Realtime Reporter,
 Approved Reporter of the U.S. District
17 Court, and a Notary Public.

18
           ------
19

20

21

22

23      GOLKOW TECHNOLOGIES, INC.
   877.370.3377 ph|917.591.5672 fax
24      deps@golkow.com

1 as proceeding forward with other

2 projects to replace water which may be

3 lost if the tunnel was taken out of

4 service?

5     A.   I remember having

6 discussions with him, saying I didn't

7 understand this e-mail and that we -- to

8 develop a Dependability Program, that

9 all these options are still on the table

10 and they need to be developed further so

11 DEP, the City of New York, can make an

12 informed decision.

13     Q.   And in making an informed

14 decision, did you have any discussions

15 with Kathryn Garcia concerning

16 recommendations to personnel within the

17 DEP in management positions recommending

18 which options to pursue within the

19 Dependability Program?

20     A.   I have had many discussions

21 with Kathryn Garcia, where I have said

22 that I could argue either way depending

23 on advancing a project, but my role is

24 to gather the information to allow us to

1 make an informed decision.

2    Q.   And with regard to your

3 discussions with Ms. Garcia, did she

4 ever ask you specifically as to whether

5 or not you could endorse a

6 recommendation to any of the deputy

7 mayors or to the Commissioner to pursue

8 developing a parallel tunnel for the

9 Rondout-West Branch Tunnel system and to

10 not pursue any other Dependability

11 Program projects?

12    MR. REO:  Objection.

13    A.   I have told Kathryn, again,

14 I could argue for both ways and I have

15 said that we definitely need to get more

16 information on -- hence the contract we

17 are now letting to gather more

18 information on this. I would not --

19 this is not in a substitute of

20 Dependability projects that are ongoing.

21    Q.   And with regard to the

22 ongoing nature of the Dependability

23 projects, those projects are being

24 pursued to bring them to a point at

1 information to bring it into a point

2 where we could make an informed decision

3 on what will be the Dependability

4 Program.

5    Q.   Did there come a point in

6 time in 2008 when Kathryn Garcia

7 consulted you to ask whether or not you

8 could support a recommendation to pursue

9 constructing a parallel tunnel for the

10 Rondout-West Branch Tunnel?

11       MR. REO:  Objection.

12    A.   I think the only way I can

13 answer that is once again saying, I

14 could support arguing for both ways and

15 I need to develop -- we need to develop

16 more information to make an informed

17 decision.

18    Q.   With respect to Ms. Garcia,

19 did she specifically talk to you about

20 and solicit your input on a presentation

21 to a Mr. Skyler in the department

22 recommending that the department pursue

23 constructing a parallel tunnel to the

24 Rondout-West Branch Tunnel leakage

1 areas?

2    A.   All right. I was going to

3 look at the document. I know she had

4 discussions with Deputy Mayor Skyler on

5 this 3 CDA.

6    Q.   And who is Deputy Mayor

7 Skyler?

8    A.   I only know him as Deputy

9 Mayor Skyler -- I think you just

10 mentioned his name, first name.

11    Q.   Yes. Does Deputy Mayor

12 Skyler have any responsibility over

13 supervising the activities of the New

14 York City DEP?

15    A.   I do not know that as a

16 fact. I believe --

17    Q.   That he may?

18    A.   -- that he may be our first

19 deputy, whatever his title is.

20    Q.   With respect to the

21 organization of the executive branch,

22 are there deputy mayors who have

23 explicit responsibility for certain

24 departments within the City government?

1 suggest that the tunnel may be

2 experiencing an increase in the volume

3 of water leaking."

4       Was it the position of the

5 Dependability Project team that in July

6 of 2008 data indicated that the tunnel

7 was experiencing an increase in the

8 volume of water leaking?

9    A.   The joint venture would not

10 be privy to this kind of information.

11 This tunnel investigation is run by

12 another consultant. They may have had

13 hearsay.

14    Q.   My question, though, is in

15 terms of Ms. Garcia, was she informed by

16 individuals in the department that

17 events in Wawarsing suggested that the

18 tunnel was experiencing an increase in

19 the volume of water leaking?

20    A.   There was a lot of press

21 releases during last year about flooding

22 in Warwarsing and I do not know who she

23 was talking to about those.

24    Q.   As the person most

1 my best recollection, from her.

2     MR. STACK: Now I would like

3 to ask the court reporter to mark

4 another document. This is a document

5 dated September 10, 2008. This

6 particular document is an e-mail, again

7 sent from Kathryn Garcia to William

8 Meakin and James Mueller. It is the

9 attached draft of the Commissioner's

10 briefing for the Commissioner, assumedly

11 by Mr. Mark Page. It is Bates labeled

12 NYC-DS-035874 through 035904.

13     I will ask the court

14 reporter to mark it as Exhibit No. 37

15 and I'll provide a copy of this memo

16 from Ms. Garcia to yourself dated

17 September 10, 2008. Provide that to you

18 and provide a copy as well to your

19 counsel, provide a copy to co-counsel of

20 what now has been marked as Exhibit 37.

21     (Above-described document

22 marked Meakin Exhibit 37.)

23 BY MR. STACK:

24     Q.   Do you recall in September

1 of 2008 discussing with Ms. Garcia a

2 presentation to the Commissioner

3 concerning the Dependability Project?

4       MR. REO:  I think if you

5 would, Mr. Stack, just allow the witness

6 to review the document, please.

7       THE WITNESS:  I have looked

8 at the PowerPoint presentation.  Your

9 question was?

10      MR. STACK:  The pending

11 question was --

12      (The court reporter read the

13 record as follows:

14      "QUESTION:  Do you recall

15 in September of 2008 discussing with

16 Ms. Garcia a presentation to the

17 Commissioner concerning the

18 Dependability Project?")

19      THE WITNESS:  This is

20 Kathryn Garcia presenting to Jim and

21 myself the presentation that the

22 commissioner gave Mark Page.

23 BY MR. STACK:

24    Q.   Who is Mark Page?

1 to be the recommendation.

2    Q.   Since September of 2008 has

3 anyone in the Department of

4 Environmental Protection told you that

5 at the senior levels of management the

6 decision is made -- has been made to

7 construct the 3rd Catskill/Delaware

8 Aqueduct Tunnel to parallel the Rondout-

9 West Branch Tunnel and address the

10 tunnel leakage problem that way?

11    A.   No one from senior staff

12 has told me that.

13    Q.   Have you ever had any face-

14 to-face meetings with Commissioner Lloyd

15 when she was in office to discuss what

16 her preferred option was on the

17 Dependability Program?

18    A.   I did not.

19    Q.   Have you had any face-to-

20 face meetings with the current acting

21 commissioner relative to what his

22 current recommendation is as the

23 preferred option in pursuing the

24 Dependability Program?

1    A.    I have not talked to him

2 directly, but I did ask Kathryn Garcia

3 what his opinion was, as stated I

4 believe yesterday, and I was told that

5 he is behind the Dependability Program.

6 And as I mentioned that he has mentioned

7 it at many meetings with other agencies

8 and with the Mayor's office.

9    Q.    Prior to appearing here to

10 testify as the person most knowledgeable

11 concerning the Dependability Program

12 pursued by the City of New York, have

13 you specifically had conversations with

14 the commissioner who is currently acting

15 as commissioner to determine whether or

16 not he endorses the recommendation of

17 Commissioner Lloyd to pursue, as the

18 preferred option, constructing a

19 parallel tunnel or 3rd Catskill/Delaware

20 Aqueduct Tunnel to address the issue of

21 leakage from the Rondout-West Branch

22 Tunnel?

23        MR. REO:  Objection.

24    A.    I have not personally

1        VOLUME II

2   IN THE UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3

4  IN RE:

5  Methyl Tertiary Butyl:MDL NO. 1358 (SAS)
   Ether ("MTBE")     :
6  Products Liability  :
   Litigation          :
7

8     In Re:

9        City of New York
              ------
10
    CONFIDENTIAL (Per 2004 MDL 1358 Order)
11
            ------
12
         January 9, 2009
13
            ------
14

15        Continued Videotaped
   Deposition of RICHARD E. PETERS, P.E.,
16  held in the law offices of McDermott,
   Will & Emery, 345 Madison Avenue, New
17  York, New York, beginning at
   approximately 10:15 a.m., before Ann V.
18  Kaufmann, a Registered Professional
   Reporter, Certified Realtime Reporter,
19  Approved Reporter of the U.S. District
   Court, and a Notary Public.
20

21        ------

22

23        GOLKOW TECHNOLOGIES, INC.
    877.370.3377 ph|917.591.5672 fax
24        deps@golkow.com

1 whatever the final number would be, the

2 City's emphasis changed to let's make

3 sure that the projects that we want to

4 move forward are viable and we can move

5 forward. So it was a de-emphasis of

6 selecting an entire program and an

7 emphasis towards making sure projects

8 that had merit were progressing, but not

9 to forget about a program will follow.

10 And some of the work I'm trying to

11 express, there is ongoing work to help

12 to firm that up.

13    Q.   Do you have an

14 understanding as to who the ultimate

15 decision-makers are as to what will

16 constitute a dependability program?

17    A.   My understanding is that

18 would be at the commissioner level

19 within New York City DEP. Steve Lawitts

20 is the acting commissioner at the

21 moment. Kathryn Garcia I anticipate

22 will be part of that, as well as some of

23 the other names I mentioned, James

24 Mueller, Angela Licata. I believe they

1 would be decision-makers. And certainly

2 it would be beyond New York City DEP.

3 If we're talking about investments of

4 very large amounts of money, there's

5 other City agencies that would, I'm

6 certain, be pulled into that discussion,

7 the Mayor's Office, the Office of

8 Management and Budget, et cetera.

9    Q.   Have you seen any documents

10 which sort of outline the steps that

11 have to be undertaken to get to from

12 where the City is now to a decision by

13 the ultimate decision-makers?

14    A.   There have been -- it's not

15 contained in a single document.

16    Q.   In multiple documents?

17    A.   It's something that I think

18 has been talked about and discussed with

19 DEP, but not contained within a

20 document.

21    Q.   So these are verbal

22 discussions so far as you know?

23    A.   Well, there are verbal

24 discussions that are ongoing. Some of

00296

UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

 2

 3          - - -

 4  IN RE:        : MDL No. 1358 (SAS)
                  :
 5  Methyl Tertiary   :
    Butyl Ether       :
 6  ("MTBE")          :
    Products          :
 7  Liability         :
    Litigation        :
 8

 9  CONFIDENTIAL (Per 2004 MDL 1358 Order)
          - - -
10
          October 11, 2005
11
          - - -
12      Continued videotape deposition of

13  THOMAS G. TENGELSEN, held in the offices

14  of McDermott Will & Emery, 50 Rockefeller

15  Plaza, New York, New York 10020,

16  commencing at 10:02 a.m., on the above

17  date, before Linda L. Golkow, a

18  Federally-Approved Registered Diplomate

19  Reporter and Certified Shorthand

20  Reporter.

21          - - -

22

23

24

**Tengelsen, Thomas**       **10-11-05**        **Page 296**

1    A.   I believe that was sent to

2  Doug Greeley.

3    Q.   What position does he hold

4  with the department?

5    A.   Deputy commissioner.

6    Q.   When was it that you

7  conducted a survey to determine which

8  wells operated by the City had dry wells?

9    A.   It was this year. I don't

10  remember the actual time.

11    Q.   Other than the deputy

12  commissioner, was there anyone else who

13  received a copy of the report relative to

14  the survey that you conducted for dry

15  wells being present at well sites?

16    A.   There could have been, but I

17  don't recall.

18    Q.   When you say "this year,"

19  you're saying that the survey you

20  referred to to determine where dry wells

21  were located at well sites was conducted

22  in 2005?

23    A.   That is correct.

24    Q.   With regard to the location

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2

3         - - -

4  IN RE:        : MDL No. 1358 (SAS)
              :
5  Methyl Tertiary   :
   Butyl Ether     :
6  ("MTBE")        :
   Products Liability :
7  Litigation      :
              :
8

9  CONFIDENTIAL (Per 2004 MDL 1358 Order)
          - - -
10
        October 25, 2005
11
        - - -
12     Videotape deposition of WILLIAM A.

13  YULINSKY, P.E., held in the offices of

14  McDermott Will & Emery LLP, 50

15  Rockefeller Plaza, New York, New York

16  10020, commencing at 10:20 a.m., on the

17  above date, before Linda L. Golkow, a

18  Federally-Approved Registered Diplomate

19  Reporter and Certified Shorthand

20  Reporter.

21         - - -

22     ESQUIRE DEPOSITION SERVICES
          Four Penn Center
23     1600 John F. Kennedy Boulevard
            Suite 1210
24     Philadelphia, Pennsylvania 19103
            (215) 988-9191

1    Q.   With regard to the budget

2  process, in each of the years following,

3  I take it you would be required to

4  prepare an individual capital budget for

5  that fiscal year?

6    A.   Yes.

7    Q.   With respect to the projects

8  that you estimated, for example, for VOC

9  removal at station 48, did the City

10  actually budget monies, as best you

11  recall, for capital improvements in 1998

12  and 1999?

13    A.   I can't recall.

14    Q.   Can't recall.

15        When we started the

16  discussion of budgets, you had indicated

17  that there were ten-year horizons that

18  you looked at. Do you prepare an annual

19  budget for capital improvements for the

20  Jamaica water system, as well as

21  associated facilities?

22    A.   Yes.

23    Q.   And with regard to the

24  annual budget, do you maintain,

1 electronically or otherwise, copies of

2 the budget proposals that you make to

3 management in the City of New York?

4     A.   Yes.

5     Q.   And for how many years do

6 you have budget proposals which contain

7 recommendations for VOC removal

8 facilities, including removal of MTBE?

9     A.   Probably, from this year,

10 probably until now, with perhaps a year

11 or two when there was a lapse.

12     Q.   And when you say "from this

13 year," you mean from 1997 to the present?

14     A.   Yes.

15     Q.   With respect to the budgets

16 that you would prepare, are those stored

17 electronically by yourself?

18     A.   Yes.

19     Q.   And they are stored on your

20 hard drive in your budget file?

21     A.   In Lotus.

22     Q.   In Lotus?

23     A.   Yes. I've been having some

24 trouble with that.

1    Q.    Not Excel?

2    A.    The initial ones were in

3 Lotus, and I have got a computer that I

4 can convert. Nobody else does.

5    Q.    You've converted to Excel?

6    A.    It's not converted yet. I

7 have stuff, and it's old. I probably

8 have some paper copies. No. I probably

9 just have the hard copies.

10    Q.    Within the chain of command,

11 who do you submit your budget proposals

12 to in the department?

13    A.    Presently?

14    Q.    Presently.

15    A.    Doug Greeley.

16    Q.    And historically, when you

17 first came on board, was Mr. Greeley also

18 in a position where you submitted things

19 to him?

20    A.    I think they got to him

21 eventually.

22        MR. STACK: And I'll try to

23    help you, if I can. I'll pull out

24    the City's organization chart, and

1           VOLUME II

2   IN THE UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3

4   IN RE:

5   Methyl Tertiary Butyl:MDL NO. 1358 (SAS)
    Ether ("MTBE")     :
6   Products Liability :
    Litigation         :
7

8   CONFIDENTIAL (Per 2004 MDL 1358 Order)

9           ------
        January 30, 2006
10
            ------
11
            CONFIDENTIAL Continued
12   Videotaped Deposition of WILLIAM
     YULINSKY, held in the law offices of
13   McDermott, Will & Emery, 50 Rockefeller
     Plaza, New York, New York 10020,
14   beginning at approximately 10:08 a.m.,
     before Ann V. Kaufmann, a Registered
15   Professional Reporter, Certified
     Realtime Reporter, Approved Reporter of
16   the U.S. District Court, and a Notary
     Public of the Commonwealth of
17   Pennsylvania.

18
            ------
19

20

21

22      GOLKOW LITIGATION SERVICES
        1600 John F. Kennedy Boulevard
23      Four Penn Center, Suite 1210
        Philadelphia, Pennsylvania 19103
24      877.DEPS.USA  917.591.5672

1   Q.  Sorry for the size of the

2  print, Bill, but that's as good as it

3  gets, unfortunately.

4   A.  That's what the print size

5  was.

6   Q.  And if you copy it a few

7  times, it gets real fuzzy. I

8  apologize. I suffer through it, as do

9  the lawyers in this case from both

10  sides.

11     Have you had an opportunity

12  to review what was marked as Exhibit 41?

13   A.  Yes, I have.

14   Q.  Prior to your deposition,

15  had you ever seen that document before?

16   A.  In some various states,

17  yeah.

18   Q.  And with respect to this

19  particular document, do you know why

20  Mr. Lane was sending it directly to

21  Mr. Greeley?

22   A.  Yes.

23   Q.  And why was that?

24   A.  It was most -- I'm sorry.

1  I need to say this would be hearsay, so

2  I don't have the exact reason.

3      Q.    And what do you understand

4  to be the reason?

5      A.    The City was in the midst

6  of a drought at this point in time. We

7  needed additional -- we needed to

8  supplement the supply system. Deputy

9  Commissioner Greeley was aware of the

10  Brooklyn/Queens Aquifer Study and its

11  scope and wanted to see how fast we

12  could get supplemental water into the

13  system by using the groundwater system

14  more than we had been.

15      Q.    Okay. And did you play a

16  role in categorizing the various wells

17  that were in the Jamaica Water Supply

18  system?

19      A.    Yes.

20      Q.    And did you assist Malcolm

21  Pirnie in identifying the wells in each

22  of the Categories A through --

23      A.    F.

24      Q.    -- F?

1      MR. STACK:  I'm going to ask

2  the court reporter to mark another

3  document as Exhibit 45, and Exhibit 45

4  is a Malcolm Pirnie document, MP00005355

5  through 3564, and it pertains to a

6  public information meeting which is in

7  2001, but, nonetheless, refers to

8  comments of and participation of

9  Commissioner Miele and Deputy

10  Commissioner Greeley.

11  BY MR. STACK:

12      Q.   And I will refer this to

13  you. Let me note for the record that in

14  this document I will refer your

15  attention to the second page, which I

16  will place a flag on, as well as a third

17  page and the sixth page of the text.

18        I provide a copy of

19  Exhibit 45 to you, I provide a copy to

20  your counsel, and provide a copy to

21  co-counsel of what has now been marked

22  as Exhibit 45.

23        I will give you an

24  opportunity to look at that and I will

1 ask you some questions concerning that.

2      (Above-described document

3 marked Yulinsky Exhibit 45.)

4 BY MR. STACK:

5    Q.  Have you had an opportunity

6 to review what was marked as Exhibit 45?

7    A.  I got a chance to briefly

8 look at it and see the areas you had

9 indicated.

10    Q.  With regard to your

11 recollection, did you attend a meeting

12 on or about November 27, 2001, at York

13 College in Jamaica concerning the

14 Brooklyn/Queens Aquifer Feasibility

15 Study public information meeting?

16    A.  Yes, I did.

17    Q.  And was Commissioner Miele

18 present at that time?

19    A.  Long enough.

20    Q.  And he made remarks to the

21 group?

22    A.  Yes, he did.

23    Q.  And did Deputy Commissioner

24 Greeley also attend?

1    A.   Yes, he did.

2    Q.   And did he make remarks to

3  the group?

4    A.   Yes, he did.

5    Q.   And with regard to

6  Ms. Neuhaus, did she also attend and

7  make a presentation?

8    A.   She coordinated the

9  meeting, if you will.

10    Q.   Did Mr. Cohen at that

11  meeting make a presentation regarding

12  the Brooklyn/Queens Aquifer Feasibility

13  Study?

14    A.   I would say most likely.  I

15  can't recall specifically.

16    Q.   And with respect to you,

17  personally, did you have a role in

18  addressing the group?

19    A.   No.

20    Q.   Why do you say it that way?

21    A.   I -- large groups put me

22  off.

23    Q.   And with respect to this

24  large group, were some of these meetings

1 hostile?

2    A.   Yes.

3       MR. GREENE:  Objection to

4 the characterization; but go ahead.

5    A.   It was a -- you could

6 characterize it somewhat hostile.

7    Q.   And I'm not referring to

8 vegetables being thrown or anything.

9    A.   Correct.

10    Q.   But the citizens were

11 attending.  How many people attended

12 this meeting with the advance notice

13 that you gave?

14    A.   I believe that there was

15 almost 200 people there.

16    Q.   And with regard to

17 Commissioner Miele, did he make clear to

18 the residents that part of the objective

19 of the study was to address flooding and

20 groundwater flooding problems in the

21 area?

22    A.   Yes.

23    Q.   Did he also remark to the

24 people at this meeting in 2001 that the

1 City was also attempting to evaluate

2 using the Jamaica Water Supply wells for

3 drought and shut down an upstate supply

4 system?

5    A.   Yes.

6    Q.   There is a statement at the

7 top of Page 2 which reads:

8 "Commissioner Miele briefly discussed

9 the Jamaica Water Supply Company (JWS),

10 which was taken over by NYCDEP. He

11 noted that, prior to its closing, the

12 Company was producing some of the

13 poorest quality water and charging

14 customers approximately 40% more than

15 residents elsewhere in the City.

16 Residents are now receiving a

17 substantial quantity of upstate water at

18 the same rate paid by all New Yorkers."

19     Do you recall him making

20 comments to that effect to the public

21 group?

22    A.   Pretty much.

23    Q.   And with regard to the

24 comments, it goes on to read saying:

1 "Commissioner Miele characterized the

2 quality of area groundwater as being

3 high in manganese and iron. In

4 addition, there were other contaminants,

5 many of which are due to the WSC site.

6 Use of the aquifers to supply drinking

7 water will require removal of this" --

8 "these contaminants."

9       Did Commissioner Miele

10 assure the residents that wells to be

11 used from the former Jamaica Water

12 Supply Company would be treated prior to

13 distribution to the system?

14       MR. GREENE: Object to the

15 form; but go ahead.

16    A.   I would -- the best

17 thing -- the most clear recollection I

18 can have is that essentially we would be

19 provided -- we would attempt to provide

20 the customers good quality drinking

21 water.

22    Q.   There is a comment here,

23 though, and I will focus on it. And I

24 realize these are not your notes, right,

1 Mr. Yulinsky?

2    A.   These are the -- these are

3 the -- probaly, most likely, these are

4 Helen Neuhaus' minutes of the meeting.

5    Q.   And with respect to Helen

6 Neuhaus, did she keep minutes of all the

7 public meetings that were set up for the

8 Brooklyn/Queens Aquifer Feasibility

9 Study?

10    A.   Yes, she did.

11    Q.   And with respect to this

12 particular quote that I read, and I will

13 hyperfocus here, there is a statement to

14 the effect: "Use of the aquifers to

15 supply drinking water will require

16 removal of these contaminants."

17       MR. GREENE: Where are you

18 looking?

19       MR. STACK: Second -- pardon

20 me -- third full paragraph, Page 2,

21 Bates label 5356.

22 BY MR. STACK:

23    Q.   Do you recall Commissioner

24 Miele indicating to the residents that

1 use of the aquifers beneath Queens will

2 require removal of contamination?

3     A.   I would say that he

4 probably said that.  He would have said

5 that.

6     Q.   With respect to

7 Commissioner Greeley, were you present

8 when he made his comments to the group?

9     A.   Yes.

10     Q.   And with regard to

11 Commissioner Greeley, did he represent

12 to the group that the department,

13 meaning the New York City DEP,

14 understood that the Jamaica Water Supply

15 system required improvement and that it

16 was imperative to integrate the

17 reservoir and groundwater supply

18 systems?

19     A.   Yes.

20     Q.   And did he report to the

21 residents in that meeting that the

22 effort to integrate the Jamaica Water

23 Supply system into the reservoir system

24 began in 1997?

1    A.   Yes, he did.

2    Q.   And did Commissioner

3 Greeley report to the residents that

4 during the period from 1997 up to the

5 time of this meeting in November of 2001

6 the Department had undertaken water

7 distribution main installation projects

8 to interconnect the Jamaica Water Supply

9 system to the City reservoir system and

10 integrate them into one?

11    A.   Yes.

12    Q.   And with regard to the

13 concluding remarks there at the bottom

14 of the page, it states in

15 Exhibit No. 45: "In concluding his

16 remarks, Deputy Commissioner Greeley

17 stressed that, if NYCDEP is not able to

18 demonstrate to the community that the

19 groundwater can be treated

20 satisfactorily, it will not be

21 introduced into the City's drinking

22 water supply."

23        Do you recall him making

24 that statement?

1   A.  Yes.

2   Q.  And did he also say:

3  "Ultimately, the New York City DEP is

4  looking to provide drinking water from

5  Jamaica aquifers that equals, if not

6  exceeds in excellence, that of the

7  reservoir supply"?

8   A.  Yes.

9   Q.  Now, further on there are

10  comments attributed to Mr. Cohen, and

11  Mr. Cohen talked about the

12  Brooklyn/Queens Aquifer Study and

13  specifically Station 6; am I correct?

14   A.  Yes.

15   Q.  And did he advise the

16  residents during the course of the

17  public meeting, as is indicated on the

18  bottom of Page 3, it says: "Mr. Cohen

19  indicated the project team is aware of

20  other problem sites in the area,

21  including the nearby New York City

22  Transit Authority (TA) Bus Depot and

23  leaking gasoline tanks at gas

24  stations"?

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- x

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

_____ x

**This document relates to the following case:**

*City of New York v. Amerada Hess Corp., et al.*, 04 Civ.
3417

**PLAINTIFF CITY OF NEW
YORK'S RESPONSES AND
OBJECTIONS TO
DEFENDANTS' SECOND
SET OF
INTERROGATORIES TO
PLAINTIFF CITY OF NEW
YORK**

MDL No. 1358
Master File C.A. No.
1:00-1898 (SAS)

Plaintiff City of New York ("the City"), by its attorney, Michael A. Cardozo,

Corporation Counsel of the City of New York, hereby responds to Defendants' Second Set of

Interrogatories ("Interrogatories"),[1] dated May 12, 2008, as follows:

## GENERAL STATEMENT

1.      By responding to any interrogatory, the City does not concede the

materiality of the subject to which it refers. The City's responses are made expressly subject to,

and without waiving or intending to waive, any questions or objections as to the competency,

relevancy, materiality, privilege, or admissibility as evidence, or for any other purpose, of any of

the documents or information produced, or of the subject matter thereof, in any proceeding

including the trial of this action or any subsequent proceeding.

---

[1] Defendants' characterization of these interrogatories as the "second set" of Interrogatories served on the City of
New York is inaccurate. Previous to this request Defendants have served the City with the following sets of
interrogatories: (i) Defendants' First Set of Interrogatories on the Issue of Standing; (ii) Defendants' First Set of
Interrogatories; (iii) Defendants First Set of Written Discovery to Plaintiff Regarding Well Contamination; (iv) Flint
Hills Resources, LP's First Set of Interrogatories; (v) Defendants' First Set of Interrogatories Under CMO-19; (vi)
and Defendants' First Set of Supplemental Interrogatories.  This is at least the Defendants' seventh set of
interrogatories. Additionally, since August 1, 2008, Defendants have served seven additional sets of interrogatories
on the City.

2003, Malcolm Pirnie performed a preliminary assessment of possibly using groundwater pumped from Stations 3 and 24 for beneficial non-potable uses (irrigation) at JFK Airport. The City is presently preparing documents related to this issue for production and will make them available to Defendants shortly.

Persons most knowledgeable of this issue are Don Cohen, Malcolm Pirnie; Marnie Bell, Malcolm Pirnie; Nabeel Miscalani, Malcolm Pirnie; Mark Lenz, Malcolm Pirnie; and Julie Kim, Malcolm Pirnie.

## INTERROGATORY 22

State whether the City has prepared, or has selected or contracted with any third party for the preparation of, a Draft Environmental Impact Statement ("DEIS") concerning possible uses of the Brooklyn-Queens Aquifer. If a DEIS has been prepared, is in the process of being prepared, or if the City is planning to prepare one in the future, identify all documents concerning the DEIS and each Person with knowledge of its preparation or its planned preparation. If a DEIS has not been prepared, is not in the process of being prepared, or if the City is not planning to prepare or have a consultant prepare a DEIS, state the bases of the decision not to proceed with its preparation and when such decision was made, and identify all documents concerning such decision as well as each Person involved in such decision.

## RESPONSE TO INTERROGATORY NO. 22

The City objects to this request as overbroad, vague and ambiguous, burdensome, and not likely to lead to the production of relevant information. The City further objects to this request as it call for the City to speculate on "whether the City is planning to prepare one in the future." The decision to prepare a DEIS is a legal determination governed by the standards set forth in the State Environmental Quality Review Act ("SEQRA"), and the City Environmental Quality Review ("CEQR") regulations.

Without waiving any objection, the City answers as follows:

The original contract with Malcolm Pirnie for the BQA Study contained an allotment for the preparation of a DEIS. Malcolm Pirnie was never authorized under the contract to prepare the DEIS and, through a contract change order issued by DEP in or around 2008, preparation of a DEIS was removed from the scope of the contract. The City is presently preparing additional documents response to this request which will be made available for production shortly.

Currently, DEP has not prepared, or has not contracted with any third-party for the preparation of a DEIS concerning the possible uses of the Brooklyn-Queens Aquifer. The City continues to pursue and plan for projects regarding the possible uses of the Brooklyn Queens Aquifer, including the Station 6 Project and as part of the Dependability Program. The City has not, at this juncture, formally commenced the environmental review process as set forth in SEQRA and CEQR. However while the City has not commenced the formal environmental review process for these projects, the City has never made any decision not to proceed with the preparation of a DEIS in the future and anticipates commencing environmental review regarding these projects, if required, before they are implemented.

The City objects to the Defendants' request for persons most knowledgeable as described in Interrogatory No. 22 because the request presupposes that persons have knowledge of certain legal decisions that have not, at this juncture, been formally made. Without waiving any objection, the City states that any environmental review for these planned projects pursuant to SEQRA or CEQR would be primarily overseen by staff within DEP's Bureau or Environmental Planning and Analysis ("BEPA")

# EXHIBIT C

962UMTBEC

| | |
|---|---|
| UNITED STATES DISTRICT COURT | |
| SOUTHERN DISTRICT OF NEW YORK | |
| -------------------------------x | |
| | |
| IN RE:  METHYL TERTIARY BUTYL | 00 MDL 1358 |
| ETHER ("MTBE") PRODUCTS | Master File C.A. |
| LIABILITY LITIGATION | No. 1:00-1898(SAS) |
| | |
| -------------------------------x | |

June 2, 2009
5:40 p.m.

Before:

HON. SHIRA A. SCHEINDLIN

District Judge

APPEARANCES

MICHAEL A. CARDOZO
    Corporation Counsel of the
    City of New York
    Attorney for City Plaintiffs
BY:  SUSAN E. AMRON
    -and-
SHER LEFF LLP
BY:  VICTOR M. SHER

GREENBERG GLUSKER
    Attorneys for Plaintiffs
BY:  ROBERT S. CHAPMAN

McDERMOTT, WILL & EMERY
    Attorneys for Defendants Exxon Mobil Corp.
    and Defendants' Liaison Counsel
PETER JOHN SACRIPANTI
JENNIFER KALNINS TEMPLE
WILLIAM STACK

1    It may not be this Station 6 spending, and that is what may end
2    up with a directed verdict.  We might as well go right to the
3    trial.  As long as we all agree that's what we would try, and
4    we will try it first and now go back to the threshold issue.
5             MR. SACRIPANTI:  Can you state it again for us, your
6    Honor?
7             THE COURT:  Sure.  Although it has been said a number
8    of times:  Do you find by a preponderance of the credible
9    evidence that the City has proved that there is a reasonable
10   probability that the Station 6 water supply source will
11   actually be available to be online if needed within X years?
12            MR. SACRIPANTI:  Shouldn't the issue be used?
13            THE COURT:  No.  We have been down that road.  If
14   there is never a drought or never an outage, you will still
15   have to have a backup system ready.
16            MR. SACRIPANTI:  I think that's where we take issue --
17            THE COURT:  That's fine, but you can try that.
18            MR. SACRIPANTI:  In other words, I get to try that
19   issue?
20            THE COURT:  Sure.  I thought that that was inherent in
21   that question.  It is not inherent in that question?
22            If you convince the jury that the answer is no because
23   they will never do that because they have many other ways to
24   handle a drought or outage that are much more advanced or much
25   more available, then you will win the point, I think.

962UMTBEC

 1          All that we need to complete tonight, in a way, and we
 2     will have done a good evening's work is plan phase 1 carefully.
 3     Who are the witnesses?  What is the question?  What does a jury
 4     need to know?
 5          And I know Mr. Sher and I think that we have real
 6     disagreement, that we talk about properties of MTBE, and I
 7     don't think so.  I don't think that that is inherent in this
 8     question.  It is just more, I think, of what the defense has
 9     said:  Does the City have evidence, real evidence that could
10     convince a trier of fact that this is their real backup plan?
11          MR. SHER:  Your Honor, two points, if I may.  The
12     first one is on what the City would do in the event of a
13     drought and what Ms. Amron said previously.  If you would like
14     a declaration from a witness to that effect, we could provide
15     it.
16          THE COURT:  For tonight's purposes I accept that,
17     which is why I have a case that could be tried because I have
18     jurisdiction, in other words.
19          MR. SHER:  In addition, there is really no question
20     that there is already MTBE in these wells.
21          THE COURT:  That doesn't interest me much because, if
22     there is MTBE in a well, for example, that you will say we know
23     that we would never use, I would say, who cares.  Let's just
24     say that is a hypothetical.  You say there is this old well, it
25     is boarded up.  It is shuttered.  I will never use it.  Do you

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

962UMTBEC
```
 1   have a case?
 2           It is a hypothetical.  Don't get too excited.
 3           You said, I am never ever going to use it, but there
 4   is MTBE in it.  Do you have a case?
 5           MR. SHER:  I think there is an academic, perhaps,
 6   question about the nature of the property interests if the well
 7   could be sold to some third party if there has been a
 8   diminution in value of the City's property interest.  The
 9   presence of the contamination as, for example, a trespass
10   requires only nominal damages.
11           THE COURT:  So you think that even that hypothetical
12   which is very clear on the record is not this case, there is an
13   old boarded up thing you concede that you never want to use,
14   you think that you still have a case?
15           MR. SHER:  I think if the City has abandoned a well, I
16   think it is a hard case to make.
17           THE COURT:  But technically, at least, if you are a
18   professor you will say it is a case?
19           MR. SHER:  Right.  And in addition, in our
20   circumstances, the issue might be, do we have another right to
21   drill another well there to make use of the water that is
22   contaminated.
23           I think that you have to assume for purposes of
24   finding that there is no issue at all that the water will ever
25   be used, not that the well has been abandoned.  And even then I
```

962UMTBEC

```
 1   can probably make an argument.  I concede the practical point,
 2   why would we spend the Court's time, the jury's time and our
 3   time over a well that we never intend to use.
 4            THE COURT:  I have to tell you, I think that we moved
 5   past the jurisdictional question.
 6            MR. SACRIPANTI:  I am addressing the --
 7            THE COURT:  I just think that was floated, but
 8   abandoned.
 9            MR. SACRIPANTI:  I understand that.  I guess what I am
10   addressing is the academic point.
11            THE COURT:  Why bother?  We need to talk about stage
12   1.
13            MR. SACRIPANTI:  We did discovery on whether they were
14   damaged and they said no, we are not damaged for these wells,
15   OK.
16            THE COURT:  Not damaged?
17            MR. SACRIPANTI:  There are no past damages for a
18   number of these wells.  The only wells that they are claiming
19   past damages for is the Station 6 wells.  So when he says we
20   have this interest --
21            THE COURT:  I thought it can't be past damages.  I
22   don't understand what is past?
23            MR. SACRIPANTI:  Again, we don't think it is past
24   damages, but where they have been out-of-pocket and where they
25   are alleging it is caused by MTBE is this $900,000.
```

962UMTBEC

```
 1            The point that I was responding to, your Honor's
 2    hypothetical where Mr. Sher said, theoretically, if we were
 3    going to sell it, the point is that we have asked questions
 4    along those lines and the City has said they don't have
 5    damages, and the only damages they have pointed to, current
 6    damage, is for Station 6.  That was my only --
 7            THE COURT:  That is only because they have already
 8    spent money to begin the treatment.
 9            MR. SACRIPANTI:  Precisely.
10            THE COURT:  But they are still saying the others are
11    damaged.  We have not yet incurred the cost of fixing the
12    damages, and that's where nominal damages come in.  If the MTBE
13    isn't near the wells you pick, the defense focus wells, they
14    are damaged but they are only nominal damages because they have
15    yet to spend some money to fix the problem, but they could
16    spend it anytime.
17            MR. SACRIPANTI:  I would say this.  With a
18    usufructuary right, they have to show that they are going to
19    use the wells --
20            THE COURT:  We have been down that road.  I understand
21    that they have to show they are going to use it.  We have been
22    down that road, that's why they offered the declaration to
23    support what Ms. Amron said.
24            One of the ones that would be brought on most quickly
25    are actually the ones that would be turned to first, and they
```

962UMTBEC

```
1    too would need some money spent even if it is only for two or
2    three weeks' treatment.  The big money is Station 6 where it is
3    a $200 million project.
4              So I do think that with all the time we spent, the
5    first issue, though, that should be tried to the jury is
6    whether the plaintiff can prove by a preponderance of the
7    evidence a reasonable probability that this will be done, that
8    money will be spent to bring this thing around as a backup
9    system.
10             MR. SACRIPANTI:  Station 6?
11             THE COURT:  Yes.  You agreed to that, that it would be
12   just Station 6 which is really the big money.  It is the not
13   the whole case, but it is the first issue that should be tried.
14             So we are back to where we were about an hour ago
15   which is what is the X.
16             MR. SHER:  Also, the scope of the proof.
17             THE COURT:  Let's do one at a time.  I still think we
18   need -- you think that we need a time frame.  You thought that
19   we needed none.  I think that it is so speculative that any
20   verdict would not stand, so we need some time frame.
21             Why is 10 not good enough?
22             MR. SHER:  If the question is do we need the backup
23   generator, as it were, rather than does it need to be actually
24   turned on --
25             THE COURT:  Not turned on, but ready to be turned on
```

962UMTBEC
```
 1   as needed in the emergency, ready.
 2              MR. SHER:  I think 20 years would do it.
 3              MR. SACRIPANTI:  We would object.  20 years, why are
 4   we here?
 5              THE COURT:  Because you have to start spending money
 6   to have something ready to go online in 20 years.
 7              I am the last person in this room to know how many
 8   years it would take to be ready.  I don't know this, and I
 9   didn't go to the depositions.  I don't know the answer.
10              MR. SACRIPANTI:  But we have their own evidence.
11              THE COURT:  I don't know what it is, Mr. Sacripanti.
12              MR. SACRIPANTI:  I think Mr. Stack -- and forgive me,
13   I don't think that the Court should remember everything
14   Mr. Stack said -- what Mr. Stack said is that their own expert
15   said it would be planned in a certain period of time, there
16   were three ifs -- if they went forward for planning, if they
17   went to design, and then if they constructed it, it would be
18   online by X date.
19              THE COURT:  What was the X date?
20              MR. STACK:  It depends on how you want to slice and
21   dice it.  The bottom line is, there is time built into that
22   schedule to make the decision.  But if you talk about when you
23   make the decision to the point where you actually are going to
24   bring it online, that is four to six years.
25              THE COURT:  Once you have made the decision, you
```

962UMTBEC

1    believe the evidence shows it can be accomplished in four to
2    six years?
3           MR. STACK:  That's what Mr. Meekin testified.
4           MR. SHER:  I think it is actually a little longer,
5    your Honor.
6           THE COURT:  What do you think it is, the decision?
7           MS. AMRON:  Once the decision and the money is there?
8           THE COURT:  Let's assume that the decision is made and
9    the money is there.  Assume both of those, how long would the
10   work take?
11          MS. AMRON:  There is the City's contracting process,
12   then the design, then the contracting process, then the
13   construction and then the start-up period.  And all of that
14   together -- and this is the rough estimate based on what I
15   remember from the testimony -- is about seven to eight years
16   once the money is there if everything goes smoothly, if you
17   don't have to disqualify a contractor --
18          THE COURT:  Then 10 would be safe.
19          MS. AMRON:  When you are planning something that you
20   think will take seven to eight if everything goes smoothly, 10
21   from a trial before you had the money on hand, actually, that
22   has no buffer built into it because it doesn't account for the
23   trial time, but it also doesn't account for the problems of
24   disqualifying a contractor or having something take longer than
25   expected.

962UMTBEC

```
1              THE COURT:  It is an arbitrary number, but it has to
2    be fair to everybody.  I am just going to say 15 and be done
3    with it.  And that's a question that I would ask the jury, and
4    the witnesses would have to be prepared to prove it.  That's
5    the first phase.
6              Now I think that we do need to turn to the question
7    that Mr. Sher has begun to ask, what evidence would I allow in
8    this first phase?  What has to be in this first phase?
```