



25926986

Jul 1 2009 6:07PM

THE CITY OF NEW YORK

## LAW DEPARTMENT

100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

William Plache
Phone: (212) 788-1574
Fax: (212) 788-1619
E-mail: wplache@law.nyc.gov

July 1, 2009

By E-Mail

Hon. Shira A. Scheindlin
United States District Judge
Southern District of New York
500 Pearl Street, Room 1620
New York, New York  10007

> Re: *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*,
> MDL No. 1358, Master File No. 1:00-1898 (SAS)
> *City of New York v. Amerada Hess, et al.*, 04 CV 3417 (SDNY)

Dear Judge Scheindlin:

      I write in response to Mr. Sacripanti's letter of today in which ExxonMobil continues to claim that the New York City Water Board ("Water Board") and New York City Municipal Water Finance Authority ("Finance Authority") are the real parties in interest to this litigation.  In continuing to pursue this argument, ExxonMobil ignores the declarations of the Water Board's Secretary, and the Water Authority's Chief Executive Officer in which both affirm that: (1) neither the Water Board nor the Water Authority approves individual Water Projects; (2) neither the Water Board nor the Water Authority has a role in planning, designing or constructing individual Water Projects; and (3) neither the Water Board nor the Water Authority has any material interest in this case.  See Declaration of Albert F. Moncure, Jr., dated June 29, 2009 and Declaration of Alan Anders, dated June 30, 2009.  The definitive statements in these two declarations should put an end to all inquiry into this issue.

      At the conference on June 25, the City agreed to provide from the Water Board and the Finance Authority to answer the question whether either entity has "the obligation to approve capital projects before they're undertaken."  Transcript of June 25, 2009 conference, at 44: 21-24.  The City has submitted two declarations affirming that the Water Board and the Water Authority do not approve individual capital projects before they are undertaken.  Instead, as explained by Mr. Anders, the City provides a list of the Water Projects that have been

approved by the City as part of the City capital budget. That list becomes an amendment to Appendix A of the Financing Agreement between the City, the Water Authority, and the Water Board. The Water Authority does not evaluate or approve the individual projects on that list. Anders Declaration at ¶ 7. Rather, representatives of the Authority and the Board merely sign the list, thus indicating their acknowledgment that the listed items must be funded if the City seeks payment for their costs. Id.; see also Moncure Declaration at ¶ 6. A copy of the most recent amendment to Appendix A, dated May 31, 2007, is attached hereto. Because the Moncure and Anders Declarations are clear that neither the Water Board nor the Finance Authority approve individual projects, contract for individual projects or plan or design individual projects, the Court's question is answered, and the issue is closed.

ExxonMobil, not to be deterred by the facts, continues its attempt to derail this trial by pursuing this issue further, and raising new arguments. Those arguments demonstrate a lack of understanding of how costs associated with constructing and operating Water Projects are appropriated, and a refusal to accept the declarations submitted by the City on behalf of the Water Authority and the Water Board. Further, ExxonMobil now also claims that the longstanding process through which Water Projects are funded violates the State Constitution. ExxonMobil is wrong.

First, the City's interest in this case is demonstrated by the explicit statements, by both Mr. Moncure and Mr. Anders, that Water Projects, such as a treatment facility for MTBE at Station 6, are approved and paid for through the City's budget process. See Moncure Declaration ¶ 6 and Anders Declaration ¶¶ 5-6. The costs associated with DEP's proposed budget, including Water Projects, are no different from the costs of all other agencies during the budget process, as all costs incurred by the City are ultimately passed on to residents of the City. In devising the budget, it is the City that has an interest in keeping the overall budget as low as possible. As the City has repeatedly noted, that goal can be achieved with respect to the damage caused to Station 6, by recovering the costs of MTBE treatment from ExxonMobil and the settling defendants. Any amount recovered from ExxonMobil will not be bonded by the Water Authority, will not reflected in rates established by the Water Board, and will not ultimately be paid by City residents. See Moncure Declaration ¶ 8; quoting Lease § 8.1(b).

ExxonMobil argues that the City has no interest in this case because the costs are covered, and that it will be "'paid' in full by the Water Board. Sacripanti Letter at 2. By ExxonMobil's reasoning, the City has no interest in any possible litigation seeking monetary damages, because all expenses in the City budget are ultimately paid by others. Moreover, the flaw in ExxonMobil's reasoning is underscored by the fact that, under ExxonMobil's theory, neither the Water Board nor the Finance Authority could have an interest in this case, as any costs it pays to the City are covered by the ratepayers. The rates charged by the Water Board are set as a matter of law. See Moncure Declaration ¶¶ 7 and 8 (citing N.Y. Pub. Auth. Law § 1045-j; sections 8.1(a) and (b) of the Lease Agreement and Section 6.1 of the Financing Agreement). The Water Authority could have no interest, because the Water Board will pay the principal and interest on the bonds it issues. See Moncure Declaration ¶ 7. The Water Board would have no interest because it merely sets water rates to cover the costs of Water Projects, and passes the fees on to the consumers. Significantly, neither the Water Board nor the Authority has been a

plaintiff in an action to recover expenses associated with operating the City's water system. Moncure Declaration ¶ 10, Anders Declaration ¶ 11.

The structure of financing water projects merely creates and entity through which money flows from the City residents to the City to fund a service provided by the City. The City must budget the expense of addressing the damage caused by defendants, and balance the costs of treatment against the other pressing items in the budget. It is the City that makes these decisions and the City that is the party in interest here.

ExxonMobil also argues that the longstanding agreement between the Water Board, the Finance Authority and the City violates the requirement under the State Constitution that bonds issued by a city be backed by its full faith and credit. N.Y. Constitution, Article VIII, Section 2. This too is wrong for a number of reasons.

The New York State Supreme Court, in a proceeding challenging the constitutionality of a bond issuance by the Water Authority, including claims that it violated Article VIII, Section 2, addressed the issues raised by ExxonMobil. See Schmidt v. Koch, Index No. 13138/89 (Sup. Ct. N.Y. County 1989), a copy of which is attached as Exhibit B. Although the case was dismissed on laches grounds, the Court specifically stated, "lest it be concluded that this proceeding is being dismissed on the basis of some legal technicality, the Court states for the record that, were it to consider the merits of the petitioner, the claims therein would be dismissed as lacking in substance." Id. at 13.

The Court recognized, "The bonds issued by the Water Authority do not constitute indebtedness of New York City, since there is a statutory disclaimer that New York City is not liable on the bonds. There can be no violation of Article VIII… ." Id. at 15, internal citation omitted. Thus the question of Constitutionality with respect to Article VIII, Section 2 is determined by the fact that the bonds are not City bonds. See also Schultz v. N.Y. State Legislature, 244 A.D.2d 146 (3rd Dep't 1998). In that case, the Court addressed the constitutionality of the creation of the Transitional Finance Authority ("TFA"). The TFA issues bonds at the request of the Mayor, based on a declaration of need. The Court held that the bonds of the Authority do not constitute indebtedness of the City, and ruled that the Authority was constitutional.

ExxonMobil relies on the State Comptroller's Report to the Governor on S-9660 (the New York City Municipal Water Finance Authority Act), dated July 31, 1984, to argue that because the Finance Authority does not review and approve individual Water Projects, it is a "mere instrumentality of the City" and thus violates the State Constitution. A copy of the Report is attached to the Sacripanti letter as Exhibit A. In that Report, however, the State Comptroller does not indicate in any way that the Finance Authority must review individual projects or will otherwise be deemed a "mere instrumentality of the City," as ExxonMobil alleges. To the contrary, the State Comptroller appeared to be concerned with the makeup of the Finance Authority, which is a matter of law. The Comptroller, in fact, concluded that the inclusion of the DEC Commissioner of DEC and a member appointed by the Governor "should hopefully preclude the Water Authority from being deemed an entity of the City and, thus, will avoid this constitutional question."

Significantly, the State Supreme Court, in <u>Schmidt v. Kock</u>, answered the State Comptroller's concerns on this issue as well, as it noted that the close relationship between the City, the Water Board and the Water Authority was of no relevance: "the fact that the Mayor plays a large role in the designation of the members of both boards is legally insignificant…" <u>Id.</u> at 14. "The statutory scheme complies with the letter of the constitutional requirement, which is sufficient." <u>Id.</u> This subsequent court decision addressing the makeup of the Finance Authority demonstrates that the State Comptroller's musings, issued over 25 years ago, on unexplored legal questions, have minimal value.

Thus, there is simply no basis for ExxonMobil's claim that under the State Constitution, the Finance Authority must evaluate and approve individual projects.

Finally, ExxonMobil relies on a 2006 State Comptroller Audit to claim that the City must "obtain reasonable assurance about the reasonableness of [the] costs" of approved projects. Scaripanti Letter at 5, Sacripanti Exhibit D. The Comptroller Audit is not a statement of the law. Moreover, the Finance Authority, in fact, responded to the Comptroller Audit, and demonstrated that its conclusions on this, and other points, were incorrect. <u>See</u> Letter from Mark Page, Finance Authority, to Carmen Maldonado, Office of the State Comptroller, dated June 27, 2008, a copy of which is attached as Exhibit C. Mr. Page explains:

> The Authority's staff is made up of finance professionals. The Authority is not qualified, and under is agreement with the City is not permitted, to substitute its own judgment for that of the City as to whether the costs of water projects are reasonable. The Authority is entitled, and in fact is required, to rely on the professional determinations as well as the procurement, internal controls and accounting systems of the City of New York.

<u>Id.</u> pp. 3-4. Accordingly, the Finance Authority has no expertise or qualifications to review individual Water Projects, and the discussion of this point in the State Comptroller Audit, which was quoted by ExxonMobil, is simply wrong.

As demonstrated in the City's June 24, 2009 letter to the Court, and in the Moncure and Anders Declarations, the Finance Authority and the Water Board have no direct interest in this litigation, and are not proper parties. Rather, the City is the only proper plaintiff.

We look forward to answering any questions you may have at the conference tomorrow.

Respectfully submitted,

*William S. Plache*

William Plache
Senior Counsel
Environmental Law Division

c:      Peter Sacripanti, via email
        all parties, via LNFS



25926986

Jul 1 2009 6:07PM

EXHIBIT A

| Budget Line | Description | Funding | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| EP-D999 | CONSTRUCTION OR ACQUISITION OF A NON-CITY OWNED PUBLIC BETTERMENT | CITY | $0 | $150 | $0 | $0 | $0 |
| EP-M999 | CONSTRUCTION OR ACQUISITION OF A NON-CITY OWNED PUBLIC BETTERMENT | CITY | $0 | $500 | $0 | $0 | $0 |
| EP-0004 | PURCHASE OF EQUIPMENT FOR USE BY THE DEPT. OF ENVIRONMENTAL | CITY | $14,134 | $30,631 | $7,000 | $9,500 | $7,124 |
| EP-0005 | PURCHASE OF EQUIPMENT FOR USE BY THE DEPT. OF ENVIRONMENTAL | NON CITY | $963 | $2,188 | $1,000 | $0 | $0 |
| EP-0005 | PURCHASE OF ELECTRONIC DATA PROCESSING EQUIP. FOR D.E.P. | CITY | $6,615 | $28,246 | $21,561 | $8,675 | $5,356 |
| EP-0007 | PURCHASE OF ELECTRONIC DATA PROCESSING EQUIP. FOR D.E.P. | NON CITY | $6,000 | $2,000 | $2,000 | $0 | $0 |
| EP-0008 | ACQUISITION/RECON/CON LEASED & OWNED FACILITIES BY DEP | CITY | $34,629 | $57,139 | $44,928 | $3,640 | $48,400 |
| EP-0008 | MANDATED PAYMENTS FOR PRIVATE GAS UTILITY RELOCATION, DEP, C | CITY | $29,930 | $32,544 | $38,499 | $38,980 | $37,709 |
| EP-0009 | REMEDIAL ACTION AT CLOSED LANDFILLS, | NON CITY | $21,755 | $43,623 | $0 | $0 | $0 |
| EP-0009 | REMEDIAL ACTION AT CLOSED LANDFILLS, | CITY | $0 | $106,767 | $34,000 | $0 | $0 |
| EP-0010 | IMPROVEMENTS FOR WATER | CITY | $0 | $128,937 | $121,000 | $22,361 | $12,500 |
| SE-D002R | INSTALLATION OF WATER MEASURING AND MEASUREMENT, CITYWID | CITY | $3,702 | $429 | $0 | $0 | $0 |
| SE 116 | CONST & RECONST OF SANITARY & COMBINED SEWERS, STATEN ISLAND | CITY | $350 | $0 | $0 | $0 | $0 |
| SE-02000 | LAND ACQUISITION, STORM WATER MANAGEMENT, STATEN ISLAND | CITY | $0 | $0 | $0 | $0 | $0 |
| SE-R001 | CONSTRUCTION & RECONSTRUCTION OF STORM SEWERS, QUEENS | CITY | $250 | $0 | $0 | $0 | $0 |
| SE-0001 | CONSTRUCTION AND RECONSTRUCTION | CITY | $100 | $0 | $0 | $0 | $0 |
| SE-0002 | PROFESSIONAL FEE/CONST. OF STORM WATER SEWERS, NOT TO EXCEED $400,000, S.I. | CITY | $2,132 | $2,251 | $61,590 | $67,735 | $77,895 |
| SE-0002K | CONSTRUCTION AND RECONSTRUCTION OF SANITARY AND COMBINED DRAINAGE PLA | CITY | $16,970 | $12,436 | $4,200 | $4,419 | $4,630 |
| SE-0002M | CONSTRUCTION AND RECONSTRUCTION OF SANITARY AND COMBINED SEWERS | CITY | $6,385 | $8,507 | $33,657 | $31,721 | $25,903 |
| SE-0002Q | CONSTR & RECONSTR. SANITARY & COMBINED SEWERS, | CITY | $14,412 | $34,038 | $16,622 | $5,997 | $333 |
| SE-0002R | CONSTRUCTION AND RECONSTRUCTION OF SANITARY AND COMBINED SEWERS, MANHATTAN | CITY | $27,924 | $15,631 | $12,146 | $2,197 | $25,904 |
| SE-0002V | CONST. & RECONST. OF SANITARY & COMBINED SEW | CITY | $18,008 | $9,269 | $9,403 | $27,245 | $409 |
| SE-0002X | CONSTRUCTION & RECONSTRUCTION OF SANITARY & COMBINED SEWERS, STATEN ISLA | CITY | $88 | $868 | $4,455 | $54 | $2,368 |
| SE-0100 | PROFESSIONAL SERVICES FOR PREPARATION OF SANITARY & COMBINED SEWERS, | CITY | $750 | $750 | $54 | $0 | $0 |
| SE-0145 | RECONSTRUCTION & RECONSTRUCTION FOR PREPARATION OF STORMWATER DRAINAGE | CITY | $3,513 | $4,500 | $0 | $0 | $0 |
| SE-0200K | CONSTRUCTION AND RECONSTRUCTION OF PERMANENT PIPE COMBINED SEWERS, BROOK | CITY | $4,500 | $4,849 | $240 | $3,263 | $3,214 |
| SE-0200M | CONSTR. & RECONSTR. STORM SEWERS, BROOKLYN | CITY | $2,979 | $4,900 | $0 | $0 | $0 |
| SE-0200N | CONSTRUCTION AND RECONSTRUCTION OF STORM WATER SEWERS, NOT T | CITY | $2,135 | $13,886 | $4,272 | $0 | $1,000 |
| SE-0200Q | CONSTRUCTION & RECONSTRUCTION OF STORM WATER SEWERS, MANHATTAN | CITY | $4,900 | $11,557 | $2,392 | $0 | $0 |
| SE-0200R | CONSTRUCTION & RECONSTRUCTION OF STORM SEWERS, QUEENS | CITY | $15,637 | $0 | $61,361 | $46,886 | $71,171 |
| SE-0200X | CONSTRUCTION & RECONSTRUCTION OF STORM SEWERS, STATEN ISLAND | CITY | $21,362 | $0 | $19,340 | $42,958 | $15,928 |
| SE-0208 | CONSTRUCTION & RECONSTRUCTION OF STORM SEWERS, STATEN ISLAND | NON CITY | $2 | $2 | $0 | $0 | $0 |
| SE-0208X | CONSTRUCTION & RECONSTRUCTION OF STORM SEWERS, BRONX | CITY | $1,852 | $1,000 | $1,253 | $0 | $0 |
| SE-0362 | STORM SEWER IN VICTORY BOULEVARD, ETC. | CITY | $49 | $4,000 | $4,587 | $0 | $0 |
| SE-0413 | SANITARY SEWERS IN NEPTUNE AVE, BKLYN | CITY | $438 | $90 | $676 | $0 | $0 |
| SE-0414 | SANITARY SEWER IN MILTON AVENUE, ETC. | CITY | $547 | $49 | $0 | $0 | $0 |
| SE-0424 | SANITARY SEWERS IN MARINE WAY FROM CEDAR GROVE AVE. TO WINHA | CITY | $35 | $4,000 | $0 | $34,414 | $0 |
| SE-0432 | STORM SEWERS IN THE PROLONGATION OF BEACH 132ND STREET, ETC. | CITY | $1,200 | $0 | $0 | $10,587 | $0 |
| SE-0495 | ENGINEERING CONTR, ADMINS & OTHER COSTS ETC., DEPT. OF EN | CITY | $49 | $0 | $0 | $0 | $0 |
| SE-0552 | COMBINED SEWER (IN SOUTH OF 14TH STREET, MANHATTAN | CITY | $3,429 | $0 | $1,500 | $1,500 | $0 |
| SE-0569 | STORM SEWERS CARSON ST. FROM SPRINGFIELD BLVD, 225TH ST. QU | CITY | $0 | $0 | $0 | $600 | $0 |
| SE-0585 | RECON CEMENT PIPE, QUEENS | CITY | $12 | $0 | $0 | $0 | $0 |
| SE-0610 | SANITARY SEWER IN NEPTUNE AVE, BKLYN | CITY | $17 | $0 | $0 | $0 | $0 |
| SE-0666 | CONSTRUCTION OF STORM SEWERS IN BEACH 28TH STREET, QUEENS | CITY | $32,538 | $10,424 | $0 | $0 | $0 |
| SE-0716 | PROGRAMMATIC RECONSTRUCTION OF CEMENT PIPE SEWERS, BRKLYN | CITY | $6,160 | $1,284 | $0 | $0 | $9,990 |
| SE-0723 | LAND ACQUISITION, STORM WATER MANAGEMENT, STATEN ISLAND | CITY | $2,041 | $7,002 | $15,000 | $15,000 | $0 |
| SE-0727 | CITYWIDE MAPPING OF SEWER SYSTEM | CITY | $0 | $20 | $0 | $0 | $0 |
| SE-0734 | CONSTRUCTION OF STORM SEWERS IN ROCKAWAY BOULEVARD, QUEENS | CITY | $49 | $0 | $0 | $0 | $37,800 |
| SE-0740 | CONSTRUCTION OF SANITARY SEWERS IN RICHARD AVENUE, STATEN IS | CITY | $953 | $3,010 | $0 | $0 | $0 |
| SE-0750 | CONSTRUCTION OF SANITARY SEWERS IN ROCKLAND AVENUE, STATEN I | CITY | $0 | $0 | $0 | $0 | $0 |
| SE-0751 | CONSTRUCTION AND RECONSTRUCTION OF CATCH BASINS, CITYWIDE | CITY | $307 | $0 | $0 | $0 | $0 |
| SE-0754 | CONSTRUCT SANITARY SEWERS IN CHESTER AVE., STATEN ISLAND | CITY | $4,087 | $3,010 | $6,760 | $7,764 | $0 |
| SE-0758 | RECONSTRUCTION OF COMBINED SEWERS IN 10TH AVE, BROOKLYN | CITY | $4 | $0 | $6,104 | $5,898 | $5,768 |
| SE-0761 | GUNITING OF SEWERS, CITYWIDE | CITY | $29 | $0 | $4,618 | $0 | $0 |
| SE-0763 | STORM SEWER CONSTRUCTION, CHESTER AVE, STATEN ISLAND | CITY | $0 | $6,760 | $0 | $0 | $0 |
| SE-0763 | SANITARY SEWERS IN CLERMONT AVE, STATEN ISLAND | CITY | $0 | $6,104 | $0 | $0 | $0 |
| SE-0764 | STORM SEWERS IN CLERMONT AVE, STATEN ISLAND | CITY | $0 | $5,000 | $0 | $0 | $0 |

| Code | Description | Type | | | | | |
|------|-------------|------|---|---|---|---|---|
| SE-0767 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $3 | $0 | $0 | $0 | $0 |
| SE-0768 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $2,513 | $0 | $0 | $0 | $0 |
| SE-0772 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $46 | $0 | $0 | $0 | $0 |
| SE-0774 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $233 | $0 | $0 | $0 | $0 |
| SE-0775 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $0 | $6,063 | $0 | $0 | $0 |
| SE-0776 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $0 | $6,508 | $0 | $0 | $0 |
| SE-0777 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $14,917 | $0 | $0 | $0 | $0 |
| SE-0778 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $12,680 | $0 | $0 | $0 | $0 |
| SE-0780 | IMPROVEMENTS TO PROPERTY USED BY DEPARTMENT FOR THE AGING, C | CITY | $2,413 | $0 | $0 | $0 | $0 |
| SE-0785 | RECONSTRUCT SANITARY SEWER IN JAMAICA AVE AREA, QUEENS | CITY | $762 | $0 | $0 | $0 | $0 |
| SE-0786 | STORM SEWER IN FORMER FLUSHING AREA, QUEENS | CITY | $1,562 | $0 | $0 | $0 | $0 |
| SE-0789 | STORM SEWER IN B. 63RD STREET, QUEENS | CITY | $1,513 | $0 | $0 | $0 | $0 |
| SE-0790 | STORM SEWER IN BROOKVILLE - EDGEWOOD TRIANGLE, QUEENS | CITY | $0 | $0 | $0 | $0 | $4,065 |
| SE-0791 | COMBINED SEWERS IN PAULDING AVENUE, BRONX | CITY | $4,843 | $4,843 | $11,761 | $0 | $0 |
| SE-0987HW | SEWER CONTRACTS IN CONJUNCTION WITH DOT WORK | CITY | $0 | $0 | $4,538 | $4,538 | $0 |
| SE-0994 | PRIVATE PORTION FOR HIGHWAY PROJECTS, CITYWIDE | NON CITY | $15,027 | $14,614 | $4,678 | $0 | $1,782 |
| SE-1000 | CONSTRUCTION OF SEWER PROJECTS, CITYWIDE | CITY | $0 | $133 | $0 | $0 | $0 |
| WM-0001 | WATER MAIN EXTENSIONS | CITY | $250 | $22 | $0 | $0 | $0 |
| WM-0006 | TRUNK MAIN EXTENSIONS | CITY | $1,181 | $133 | $0 | $0 | $0 |
| WM-0011 | THE CONSTRUCTION OF CROTON FILTRATION PLANT | CITY | $58,933 | $62,648 | $110,124 | $76,116 | $55,726 |
| WM-0030 | IMPROVEMENTS AND IMPROVEMENTS TO PUMPING PLANTS A & B | CITY | $26,112 | $58,325 | $46,711 | $139,044 | $211,070 |
| WM-0030 | IMPROVEMENTS TO STRUCTURES INCL. EQUIP. ON WATER SHEDS OUTSI | NON CITY | $1,463,452 | $267,711 | $115,763 | $86,750 | $25,000 |
| WM-0105 | IMPROVEMENTS TO STRUCTURES INCL. EQUIP. ON WATER SHEDS OUTSI | CITY | $584,430 | $880,399 | $816,722 | $318,264 | $376,134 |
| WP-0056 | WATER SUPPLY IMPROVEMENTS, CITYWIDE | CITY | $3,109 | $0 | $0 | $0 | $0 |
| WP-0101 | HUNTS POINT WATER POLLUTION CONTROL PROJECT | CITY | $3,974 | $43,433 | $24,990 | $13,320 | $13,262 |
| WP-0103 | PORT RICHMOND WATER POLLUTION CONTROL PROJECT | CITY | $20,704 | $1,000 | $35,000 | $0 | $0 |
| WP-0103 | WARD'S ISLAND WATER POLLUTION CONTROL PROJECT | NON CITY | $0 | $0 | $0 | $0 | $165,000 |
| WP-0112 | WARD'S ISLAND WATER POLLUTION CONTROL PROJECT | CITY | $35,332 | $11,711 | $44,360 | $10,000 | $0 |
| WP-0112 | RECONSTRUCTION OF WATER POLLUTION CONTROL PROJECTS | NON CITY | $16,543 | $128,185 | $256,473 | $0 | $165,000 |
| WP-0136 | RECONSTRUCTION OF WATER POLLUTION CONTROL PROJECTS | CITY | $98,466 | $0 | $0 | $179,831 | $132,544 |
| WP-0152 | OAKWOOD BEACH WATER POLLUTION CONTROL PROJECT | NON CITY | $2,563 | $0 | $0 | $0 | $0 |
| WP-0154 | RED HOOK WATER POLLUTION CONTROL PROJECT | CITY | $0 | $0 | $0 | $13,000 | $0 |
| WP-0169 | NORTH RIVER WATER POLLUTION CONTROL PROJECT | CITY | $20,130 | $2,909 | $11,500 | $115,000 | $12,500 |
| WP-0169 | COMBINED SEWER OVERFLOW ABATEMENT FACILITIES, CITYWIDE | CITY | $84,827 | $112,816 | $117,095 | $145,411 | $181,691 |
| WP-0206 | COMBINED SEWER OVERFLOW ABATEMENT FACILITIES, CITYWIDE | NON CITY | $0 | $0 | $64,784 | $246,070 | $0 |
| WP-0225 | TWENTY SIXTH WARD WATER POLLUTION CONTROL PROJECT | CITY | $1,107 | $16 | $0 | $0 | $36,000 |
| WP-0237 | SPRING CREEK AUXILIARY WATER POLLUTION CONTROL PROJECT | NON CITY | $2,215 | $0 | $0 | $0 | $0 |
| WP-0237 | UPGRADE BOWERY BAY WATER POLLUTION CONTROL PROJECT | CITY | $288,642 | $0 | $0 | $0 | $165,000 |
| WP-0247 | ROCKAWAY WATER POLLUTION CONTROL PROJECT, IMPROVEMENT | CITY | $0 | $2,270 | $71,200 | $246,070 | $0 |
| WP-0249 | UPGRADE JAMAICA WATER POLLUTION CONTROL PROJECT | CITY | $21,867 | $2,599 | $9,170 | $10,010 | $82,500 |
| WP-0249 | UPGRADE TALLMANS ISLAND WATER POLLUTION CONTROL PROJECT | NON CITY | $63,422 | $0 | $15,000 | $15,000 | $0 |
| WP-0269 | CONSTRUCTION, RECONSTRUCTION OF WATER POLLUTION CONTROL PROJECT | CITY | $14,844 | $0 | $0 | $25,000 | $0 |
| WP-0282 | ENG., ARCH., ADMIN. AND OTHER COSTS, DEPT. OF WATER RESOURCE | NON CITY | $17,066 | $105,988 | $40,185 | $57,610 | $114,960 |
| WP-0283 | UPGRADE NEWTOWN CREEK WATER POLLUTION CONTROL PROJECT | CITY | $10,194 | $47,181 | $89,767 | $10,225 | $50,115 |
| WP-0284 | CONSTRUCTION, RECONSTRUCTION OF PUMPING STATION/FORCE MAINS, | CITY | $354,183 | $1,052,451 | $558,553 | $168,000 | $0 |
| WP-0285 | CITY-WIDE SLUDGE DISPOSAL FACILITIES | CITY | $6,547 | $424 | $6,500 | $0 | $0 |
| WP-0285 | BIONUTRIENT REMOVAL FACILITIES, CITYWIDE | NON CITY | $120,092 | $16,722 | $17,083 | $0 | $30,000 |
| WP-0287 | UPGRADE CONEY ISLAND WATER POLLUTION CONTROL PROJECT | CITY | $742 | $17 | $0 | $0 | $0 |
| WP-0298 | UPGRADE OWLS HEAD WATER POLLUTION CONTROL PROJECT | CITY | $274 | $1,855 | $0 | $0 | $0 |
| W-0002 | DELAWARE WATER SYSTEM (FIRST STAGE) | CITY | $37,754 | $0 | $0 | $0 | $12,500 |
| W-0005 | ADDITIONAL WATER SUPPLY EMERGENCY AND PERMANENT | CITY | $0 | $2,500 | $10,103 | $0 | $12,500 |
| W-0010 | CITY TUNNEL NO. 3 STAGE 1 | CITY | $7,095 | $282 | $10,000 | $32,000 | $118,900 |
| W-0013 | CITY TUNNEL NUMBER 3, STAGE 2 | CITY | $24,313 | $12,154 | $81,765 | $0 | $99,000 |
| W-0014 | KENSICO CITY TUNNEL | CITY | $34,110 | $0 | $112,890 | $75,290 | $153,812 |
| W-0015 | RECONSTRUCTION OF CITY WATER TUNNEL NO. 1 | CITY | $0 | $3,100 | $44,500 | $0 | $30,000 |
| **Totals** | | | $3,778,844 | $3,535,607 | $3,088,269 | $2,120,221 | $2,588,442 |
| **Total City** | | | $3,733,778 | $3,424,630 | $3,083,269 | $2,120,221 | $2,588,442 |

| | Total Non-City | Total Water Authority |
|---|---|---|
| | $45,066 | $3,712,023 |
| | $110,977 | $3,381,007 |
| | $3,000 | $3,063,269 |
| | $0 | $2,120,221 |
| | $0 | $2,588,442 |

EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
————————————————————————————— x

In the Matter of the Application of
FREDERICK SCHMIDT, JAMES BRENNAN,
THOMAS CATAPANO, PETER ABBATE, JR.

         Petitioners,

       against
EDWARD I. KOCH, Mayor of the City of
New York, RICHARD MENDES as Director of
the New York City Water Board, MARK
PAGE as Director of the New York City
Municipal Water Authority, and ROBERT
TIERNEY as Chairman of the New York City
Water Authority, and HARVEY SCHULTZ as
Commissioner of the New York City
Department of Environmental Protection,

         Respondents.
————————————————————————————— x

ORDER AND JUDGMENT
AND NOTICE OF ENTRY

Index No. 13138/89

        PLEASE TAKE NOTICE that an Order and Judgment,
of which the attached is a copy, was duly entered and filed in
the office of the Clerk of the County of New York on July 24,
1989.


Dated:  New York, New York
       August 2, 1989

                 HAWKINS, DELAFIELD & WOOD
                 Attorneys for the
                   New York City
                   Water Board Respondents
                   Tierney and Mendes
                 67 Wall Street
                 New York, New York 10005
                 (212) 820-9300

To:          JAMES F. BRENNAN
             Attorney for Petitioners
             1663 10th Avenue
             Brooklyn, New York 11215
             (718) 788-7221

             FREDERICK SCHMIDT
             Petitioner Pro Se
             85-14 86 Street
             Queens, New York 11421

             ROBERT ABRAMS
             Attorney General of the
                State of New York
             Attorney for the State of New York
             120 Broadway
             New York, New York 10271
             (212) 341-2019
             Att:  HARVEY BERMAN
                   Assistant Attorney General

             WILKIE, FARR & GALLAGHER
             Attorneys for the New York City
                Water Authority Respondents
                Paul Dickstein and Mark Page
             153 East 43rd Street
             New York, New York 10022
             (212) 935-8000
             Att:  CHESTER J. STRAUB

             PETER L. ZIMROTH
             Corporation Counsel of the
                City of New York
             Attorney for Respondents
                Koch and Schultz
             100 Church Street
             New York, New York 10007
             (212) 566-5500

             Att:  DORON GOPSTEIN
                   First Assistant
                   Corporation Counsel

                   ROBERT KATZ
                   Assistant Corporation Counsel

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------x

In the Matter of the Application of
FREDERICK SCHMIDT, JAMES BRENNAN,
THOMAS CATAPANO, PETER ABBATE, JR.,

Petitioners,

- against -

EDWARD I. KOCH, Mayor of the City of
New York, RICHARD MENDES as Director of
the New York City Water Board, MARK
PAGE as Director of the New York City
Municipal Water Authority, and ROBERT
TIERNEY as Chairman of the New York City
Water Authority, and HARVEY SCHULTZ as
Commissioner of the New York City
Department of Environmental Protection,

Respondents.

------------------------------------------------x

**ORDER AND JUDGMENT
AND NOTICE OF ENTRY**

Index No. 13138/89

   **PLEASE TAKE NOTICE** that an Order and Judgment, of
which the attached is a copy, was duly entered and filed in the office
of the Clerk of the County of New York on July 24, 1989.


Dated:  New York, New York
    July 25, 1989

               PETER L. ZIMROTH
               Corporation Counsel of the
                 City of New York
               Attorney for Respondents
                 Koch and Schultz
               100 Church Street
               New York, New York 10007
               (212) 566-5500

              By: DORON GOPSTEIN
                First Assistant Corporation Counsel

                ROBERT KATZ
                Assistant Corporation Counsel

To:  JAMES F. BRENNAN
     Attorney for Petitioners
     1663 10th Avenue
     Brooklyn, New York 11215
     (718) 788-7221

     FREDERICK SCHMIDT
     Petitioner Pro Se
     85-14 86 Street
     Queens, New York 11421

     ROBERT ABRAMS
     Attorney General of the
        State of New York
     Attorney for the State of New York
     120 Broadway
     New York, New York 10271
     (212) 341-2019
     Att:  HARVEY  BERMAN
           Assistant Attorney General

     W. CULLEN MacDONALD
     HAWKINS, DELAFIELD & WOOD
     Attorneys for the New York City
        Water Board Respondents
        Tierney and Mendes
     67 Wall Street
     New York, New York 10005
     (212) 820-9300

     CHESTER J. STRAUB
     WILKIE, FARR & GALLAGHER
     Attorneys for the New York City
        Water Authority Respondents
        Paul Dickstein and Mark Page
     153 East 53rd Street
     New York, New York 10022
     (212) 935-8000

PRESENT:

Hon. __EVE M. PREMINGER__ _Justice._

Schmidt

— against —

Koch

INDEX NUMBER  13138/89

MOTION DATE_____

MOTION SEQ. NO._____

TRIAL CAL. NO._____

The following papers numbered 1 to_____ read on this motion to_____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/Order to Show Cause - Affidavits - Exhibits | |
| Answering Affidavits - Exhibits | |
| Replying Affidavits | |

Upon the foregoing papers it is ordered that ~~this motion~~ the cross motions by various respondents to dismiss the petition on the ground of laches are granted, in accordance with the court's decision read int. the record following oral argument on July 13, 1989.

This memorandum, when annexed to the transcript of the Court's July 13, 1989 decision, shall constitute the order and judgment of the Court.

FILED

JUL 24 1989

COUNTY CLERK'S OFFICE
NEW YORK

EVE M. PREMINGER

Dated ___7/17/89___

_____ S.C.
Clerk

SUPREME COURT OF THE STATE OF NEW YORK

IAS PART 26: COUNTY OF NEW YORK
------------------------------------------------x
APPLICATION BY FREDERICK SCHMIDT,        :
JAMES F. BRENNAN, THOMAS CATAPANO,
PETER ABBATE,                            :

        Petitioners,              :

For other judgment pursuant to           :
Article 78 of the CPLR
                                          :                Index No

    -against-                                          13138/89

EDWARD I. KOCH, Mayor of the City of      :
New York; RICHARD MENDES, as Director
of the New York City Water Board;         :
MARK PAGE, as Director of the
New York City Municipal Water Authority;  :
and ROBERT TIERNEY, as Chairman of
the New York City Water Board; and        :
PAUL ECKSTEIN, as Chairman of the
New York City Water Authority; and        :
HARVEY SCHULTZ, as Commissioner of the
New York City Department of               :
Environmental Protection;
                                          :
        Respondents.              :
------------------------------------------------x
                July 13, 1989

                60 Centre Street
                New York, New York 10007


BEFORE:          HONORABLE EVE FREMINGER, J.S.C.

                Donna Evans,
                Official Court Reporter

A p p e a r a n c e s:

        FREDERICK SCHMIDT, ESQ.
        Petitioner Pro Se
            85-14 86th Street
            Queens New York 11121

        BY:  FREDERICK SCHMIDT, ESQ.,
             JAMES F. BRENNAN, ESQ.,
             of Counsel




        ROBERT ABRAMS, ESQ.
        Attorney General of the State of New York
        For the State of New York
            120 Broadway
            New York, New York

        BY:  HARVEY M. BERMAN, ESQ.,
             Assistant Attorney General




        PETER L. ZIMROTH, ESQ.
        Corporation Counsel
            100 Church Street
            New York, New York 10007

        BY:  DORON GOPSTEIN, ESQ.,
             of Counsel

A p p e a r a n c e s   (Continued):

WILLKIE, FARR & GALLAGHER, ESQS.
Attorneys for New York City Municipal
Water Finance Authority
      153 East 53rd Street
      New York, New York 10022

BY:   CHESTER J. STRAUB, ESQ.,
      of Counsel


HAWKINS, DELAFIELD & WOOD, ESQS.
Attorneys for Tierney, Mendes and
New York City Water Board
      67 Wall Street
      New York, New York 10005

BY:   W. CULLEN MACDONALD, ESQ.,
      of Counsel

Proceedings

THE COURT: Good afternoon again.

The Court has heard argument from
all of the parties, and has read the
extensive record herein. Because of the
cloud which this proceeding may cast upon
past, pending and future bond offerings
by the New York City Municipal Water
Finance Authority, hereinafter referred
to as the "Water Authority," and because
I believe that the issues presented here
are clear-cut and easily disposed of, the
Court is prepared to immediately issue
its decision.

This Article 78 proceeding is
brought by several New York State
Assemblymen, presumably in their capacity
as state taxpayers. The petition alleges
that any and all acts, contracts and
obligations of the Water Authority and
the respondent New York City Water Board,
hereinafter the "Water Board," are
unconstitutional and null and void, as
violative of Article X, Section Five,
Paragraph 1, and Article VIII, Section

Two of the New York State Constitution.

The Water Authority and the Water Board were established in 1984 pursuant to Title 2-A of the Public Authorities Law, in furtherance of a plan fashioned by the Legislature for obtaining funds to finance the improvement and maintenance of the New York City water and sewer system. The Water Authority is empowered to borrow money and issue notes or bonds, to acquire real or personal property, and to enter into agreements with the City and the Water Board for financing of water projects; Public Authorities Law Section 1045-C.

The Water Board is a separate municipal instrumentality which is authorized to acquire or lease title to the water and sewer system from the City, and to establish and collect rents for the use of the water and sewer system, Public Authority Law Section 1045-G. A portion of these rents is paid over to the Water Authority to support the notes,

bonds or other obligations of the

Authority.

Title 2-A went into effect on July

24th, 1984.  In each year since 1984, the

Water Authority has issued and sold

bonds, aggregating more than 2 billion

dollars, to finance various capital

improvements.  The Water Board has

established and collected rents for water

and sewer users, including several

increases, the latest of which was

effective July 1, 1989.

In 1987, the Water Board instituted

a plan for the installation of water

meters, thousands of which have already

been installed.

Apparently because of unhappiness

with the recent 24 percent increase in

water and sewer rates and the plan to

equip City residences with water meters,

petitioners now challenge the

constitutionality of Title 2-A of the

Public Authorities Law, the Water

Authority and the Water Board.

The petition specifically seeks,

(1) to preliminarily and permanently
enjoin the respondents from implementing
any further water and sewer service rate
increases, and,

(2) a declaration as to the
unconstitutionality of the Water
Authority and the Water Board.

The respondents each move and
cross-move to dismiss the petition as
follows:

(1) Respondents Water Board, Richard
Mendes and Robert Tierney, Executive
Director and Chairman, respectively, of
the Water Board, move to dismiss pursuant
to CPLR Section 217 and 7804(f), on the
grounds of failure to state a cause of
action, statute of limitations, and
laches.

(2) Respondents Paul Dickstein and
Mark Page, Chairman and Executive
Director, respectively, of the Water
Authority, move to dismiss pursuant to
CPLR 3211(a)(7) and 3211(a)(2), and

Public Authorities Law Section 1045-i(7),

on the grounds of failure to state a

cause of action, lack of subject matter

jurisdiction and laches.

(3) Respondents Mayor Koch and

Harvey Schultz, Commissioner of the New

York City Department of Environmental

Protection, cross-move to dismiss

pursuant to CPLR 3211(a)(5), 3211(a)(7),

and Section 7804(f), for failure to state

a cause of action and laches.

The Court notes that certain

Assemblymen have been given leave to join

in the proceeding as party petitioners.

The Court further notes that a brief was

received from the Office of the Attorney

General, as intervenor, in support of the

position of the respondents.

The motion by respondents Dickstein

and Page to dismiss for lack of subject

matter jurisdiction is denied.  Public

Authorities Law Section 1045-i concerns

only the procedure for challenging the

constitutionality of the July 1, 1985

agreement among New York City, the Water

Board, and the Water Authority relating

to the operation of the City's water and

sewer system.  The petition does not

directly contest the validity of that

agreement.  There is no basis for

respondents' arguments that Section

1045-j should be extended to this

proceeding.

The motion by the Water Board

respondents to dismiss the petition as

barred by the statute of limitations is

also denied.  It is true that it has been

almost five years since the enactment of

the acts which establish the Water Board

and Water Authority, and two years since

the adoption of regulations requiring the

installation of water meters.

Ordinarily, CPLR 217 establishes a four

month limitations period in Article 78

proceedings.  There is, however, no

statute of limitations applicable to an

attack on the constitutionality of a

statute or the act of a governmental body

pursuant to such statute.

As the Appellate Division stated in
Lutheran Chuch in America v. City of New
York, 27 AD2d 237. "the exercise of a
power defense against the Constitution
may be attacked at any time." Although
the Appellate Division noted that a
challenge to the constitutionality of a
statute is properly brought as an action
for declaratory judgment and not, as
here, as an Article 78 proceeding, under
CPLR 103(c) this Court may, and hereby
does, convert this proceeding into an
action for declaratory judgment.  See
Matter of Friedman v. Cuomo, 349 NY2d 81
(1976).

The motions by the various
respondents to dismiss the petition for
failure to state a cause of action are
denied.  For the purpose of such motions,
the allegations of the petition must be
deemed true and considered in the light
most favorable to petitioners.
Lichtensteiger v. Housing and Development

Administration, 40 AD2d 810; Board of
Education of Mt. Vernon v. Allen, 32 AD2d
985. When the petition here is given the
required liberal construction, the Court
finds that it sufficiently states a cause
of action against the respondents.

The remaining ground offered by all
of the respondents for dismissal of the
petition is the alleged laches on the
part of the petitioners. Laches, which
is unexcused delay prejudicial to the
opposing party, may bar an action or
proceeding without regard to the
applicability of the Statute of
Limitations, and has been held applicable
to constitutional challenges. See Burns
v. Egan, 117 AD2d 38, appeal dismissed 68
NY2d 806; New York Public Interest
Research Groups, Inc. v. Levitt, 62 AD2d
1074, appeal dismissed. 46 NY2d 849.

This Court has never seen a clearer
example of laches than appears from the
undisputed facts in this case.
Petitioners waited five years to commence

this proceeding. During that period, the
Water Authority has issued and sold over
2 billion dollars of bonds to the public
in several series of offers. The Water
Board has increased water and sewer
charges on four separate occasions, and
thousands of water meters have been
installed pursuant to the metering
regulations adopted by the Water Board.

To now undo any, much less all, of
these acts would wreak havoc in the
financial community and the public at
large. Petitioners, some of whom even
voted in favor of the legislation they
now seek to challenge, offer not one iota
of an excuse for their delay.

There can be no question that this
lack of diligence on the part of
petitioners in bringing this proceeding,
and the prejudice which would result
therefrom, constitutes laches which
requires dismissal of this petition. See
Burns v. Egan and New York Public
Interest Research Group, Inc. v. Levitt,

supra.

Accordingly, those portions of the
respondents' motions which seek dismissal
of the petition as barred by laches, are
granted.

However, lest it be concluded that
this proceeding is being dismissed on the
basis of some legal technicality, the
Court states for the record that, were it
to consider the merits of the petitioner,
the claims therein would be dismissed as
lacking in substance.

Article X, Section Five of the State
Constitution prohibits any public
corporation from being given both the
power to contract indebtedness and to
collect fees for a service formerly
supplied by a City. These powers as they
relate to the New York City water and
sewer system are, in fact, split between
the Water Authority and the Water Board.
No member of the Water Authority may sit
on the Water Board. Public Authority Law
Section 1045-f. The fact that the Mayor

plays a large role in the designation of
the members of both boards is legally
insignificant as is the fact that offices
may or may not be in the same building.
The statutory scheme complies with
the letter of the constitutional
requirement, which is sufficient.
See Hotel Dorset Co. v. Trust for
Cultural Resources of New York, 46 NY2d
358, 1979; Comerski v. City of Elmira,
308 NY 248, 1955.

Additionally, a review of the
legislative history of Article X, Section
Five, as it concerns the problems which
surrounded the Buffalo Sewer Authority in
the early 1930s, demonstrates that the
statutes involved here unlike there, also
comport with the spirit of Article X of
the Constitution, since they in no way
impinge upon the areas which the drafters
of Article X sought to establish as "off
limits."

Article VIII, Section Two of the
State Constitution provides that no

indebtedness shall be contracted by any
city unless such city shall have pledged
its faith and credit for the payment of
principal and interest.  The bonds issued
by the Water Authority do not constitute
indebtedness of New York City, since
there is a statutory disclaimer that New
York City is not liable on the bonds.
There can be no -- there can thus be no
violation of Article VIII.  See Wein v.
City of New York 36 NY2d 610, 1975.

Finally, the Court must comment on
petitioners' claim, raised for the first
time in oral argument, that if the
petition here is denied, no remedy exists
for challenging any particular action of
the Water Authority or the Water Board,
with respect to any allegedly arbitrary
actions or any actions beyond their
powers.

Nothing decided here today dilutes
in any way the right of any individual to
challenge any act of a governmental
agency as arbitrary, capricious or in

excess of the agency's powers.

In accordance with the foregoing,
the petition and this proceeding are
hereby dismissed.  All applications for
injunctive relief are denied.  This shall
constitute the order and judgment of the
Court.

Thank you.


===============


Certified to be a true and correct
transcript of the stenographic minutes
taken herein.

_____

DONNA EVANS, Official Court Reporter

In the Matter of the Application of FREDERICK SCHMIDT, JAMES BRENNAN, THOMAS CATAPANO, PETER ABBATE, JR.

          Petitioners

       - against -

EDWARD I. KOCH, Mayor of the City of New York, RICHARD MENDES as Director of the New York City Water Board, MARK PAGE as Director of the New York City Municipal Water Authority, and ROBERT TIERNEY as Chairman of the New York City Water Authority, and HARVEY SCHULTZ as Commissioner of the New York City Department of Environmental Protection,

          Respondents

## ORDER AND JUDGMENT
## AND NOTICE OF ENTRY

*Hawkins, Delafield & Wood*

*Attorneys for*

*Office and Post Office Address, Telephone*

*67 Wall Street*

*Borough of Manhattan*

*New York, N.Y. 10005*

*Telephone (212) 820-9300*

**To**

**Attorney(s) for**

Service of a copy of the within                  is hereby admitted.

**Dated,**

                         **Attorney(s) for**

EXHIBIT C



New York City Municipal Water Finance Authority

75 Park Place, 6th Floor
New York, NY 10007
Tel. (212) 788-5889
Fax. (212) 788-9197
http://www.nyc.gov/nyw

June 27, 2008

Carmen Maldonado
Office of the State Comptroller
123 William Street, 21st Floor
New York, NY 10038-3804

Re: Draft Report on "Selected Financial and Management Practices"

Dear Ms. Maldonado:

The above-referenced draft report was received by the New York City Municipal Water Finance Authority (the "Authority") on May 29, 2008, following the conclusion of your audit which commenced in November 2006. As the report correctly notes, the Authority was created by New York State ("State") law in 1984 at the request of the City of New York (the "City"). Its powers and duties are limited to the financing of the City's water and sewer system (the "System") and are set forth in the New York City Municipal Water Finance Authority Act (the "Act").

The Authority is housed within the offices of the City's Office of Management and Budget ("OMB") and is overseen by a statutorily-created Board of Directors consisting of three *ex-officio* City officials, an *ex-officio* State official, two appointees of the Mayor of the City and one appointee of the Governor of the State. The Act effectively provides that no board action will be taken without the participation of at least two of the three City *ex-officio* board members. Pursuant to the Act, the Authority efficiently and cost-effectively manages the capital financing program of the System, which includes managing a portfolio of over $19 billion of outstanding bonds and, for the current fiscal year, issuing over $2 billion of bonds. The Authority has achieved a credit rating higher than that of the City of New York, which allows the Authority to issue bonds at lower interest rates, which is ultimately a savings for ratepayers. The Authority performs these services at minimal cost to the ratepayers and with limited overhead, including only five full-time-equivalent employees. We note however that, contrary to the assertions in your report, only a small portion of the Authority's operating budget is for professional consulting services. The majority of the budget is for fees to the New York State Environmental Facilities Corporation and to banks issuing letters of credit and liquidity facilities, in each case as required in connection with the issuance of Authority bonds. Additionally, we note that your report states that surplus revenues of the Water Board are to be used by the Authority towards its debt obligations. This is not accurate. While these funds may be used to pay debt service, pursuant to the Financing Agreement (incorrectly referred to in your report as the "Memorandum of Agreement") by and among the City, the Authority and the Water Board, the Authority can choose to apply the funds to any of the enumerated purposes set forth in the Financing Agreement, including pay as you go capital.

The following are our responses to your recommendations.

*Policies and Procedures.* The Authority is in the process of developing additional written policies and procedures for key operational areas, as your report proposes.

*Procurement Guidelines.* The Authority's procurement guidelines are appropriate for a small entity such as the Authority which enters into very few contracts each year. The Authority's procurement guidelines contain provisions covering requests for proposals, sole source procurements, price negotiations and competitive sealed proposals, contrary to the assertion in your report. The guidelines also set standards for small purchases. These guidelines are adequate to ensure proper procurement processes while allowing the Authority to carry out its procurements in an efficient manner. There is no need to amend our current procurement guidelines.

*Documentation of Reasons for Contractor Selections.* The Authority's contractor selections (except for small purchases) are made by a committee consisting of Authority staff and representatives of the City Comptroller and Mayor. Contracts are also approved by the Authority's Board of Directors. All of the Authority's contracts have been unanimously approved by all such parties, including representatives of the separately-elected officials. The Authority keeps records of all proposals submitted and has explained the rationale for each contractor selection about which you have inquired.

*Written Contracts.* The Authority always enters into written contracts with vendors, unless purchases fall within the small purchase category such as purchases of office supplies. Your report has identified one instance in which your report states, incorrectly, that the Authority did not enter into a written contract. In that case, your report states that the Authority obtained printing services "from a number of vendors that printed materials for bond issuances." The Authority selects only one financial printer following a request for proposals process. The Authority uses that printer for a period of years, after which a new request for proposals process is issued to select a printer for the subsequent period. The request for proposals includes a detailed scope of work and specifications along with terms and conditions for the completion of work. Proposers submit bids based on the specifications, terms and conditions within the request for proposals. When the Authority selects a printer, a legal and binding contract exists based on the detailed specifications, terms and conditions provided by the Authority and the fees bid by the printer. No additional writing is necessary to form a valid, legal and binding contract. Furthermore, because all of the terms of the engagement are spelled out within the existing documents between the parties, an additional document would be superfluous and would not provide any legal benefit to the Authority.

*MacBride Principles.* The Authority now includes the MacBride Principles as an attachment to its contracts.

*Investment Compliance Reports.* Your report states correctly that the Authority did not receive separate investment compliance reports that auditors were required to deliver under the Authority's auditor contract. The Authority has received that report for

fiscal year 2007 and will ensure that it continues to receive the report in the future. However, your report incorrectly states that the Authority was charged for the investment compliance reports when they were not delivered. The Authority paid its auditors only for the financial statement audit, which did not include the investment compliance report. Had the auditors completed that report, it would have been billed separately at the hourly rates specified in their contract.

*Hiring Policies.* The Authority has agreed to comply with the personnel policies of OMB. Your report incorrectly states that the Authority did not comply with such policies in connection with the hiring of its Executive Director. Although OMB's personnel policies generally require that open positions be advertized, the agency has discretion to use other means of selecting a candidate when the situation warrants. In this case, less than one year prior, the Authority had conducted a nationwide search for an officer to assume primary responsibility for running the Authority. This search involved advertizing and interviewing many candidates for the position. Based on its experience with that recent search and after receiving new resumes from senior officials at State agencies, the Authority determined that it would not be fruitful to repeat a lengthy search process. The Authority interviewed two candidates and selected a highly-qualified individual with extensive experience at one of the largest municipal borrowers in the State. Therefore, this process complied with OMB policy and was appropriate under the circumstances. Please see the attached memo from OMB's Director of Personnel concurring that the hiring procedure followed by the Authority did not violate OMB's personnel policies.

In addition, your report incorrectly states that the Executive Director was appointed prior to action by the Authority's Board of Directors. Although the candidate began working at the Authority as a staff member pending approval by the Board, he was not appointed Executive Director until the Board took action to appoint him.. Furthermore, his continued employment with the Authority was contingent on his appointment as Executive Director by the Board.

*Directive 1 Questionnaire.* Your report correctly states that the Authority did not complete the City Comptroller's annual questionnaire referred to as Directive 1 and that it did not file the required annual investment report and annual personnel report with the State. The Authority completed such questionnaire and reports commencing with fiscal year 2007 and will continue to do so in the future.

*Project Cost Review.* The Authority has entered into agreements with the City and the New York City Water Board that define the role of each party in connection with the operation and financing of the water and sewer system and the rate setting with respect thereto. Your report states incorrectly that the Authority's agreement with the City "only calls for the Authority to sell bonds." In fact, the Financing Agreement among the Authority, the City and the New York City Water Board sets forth in detail the duties and obligations of the Authority. Section 3.2 of that agreement requires that the Authority pay the City amounts that it has certified to reimburse the City for the cost of water projects. The Authority's staff is made up of finance professionals. The Authority

is not qualified, and under its agreement with the City is not permitted, to substitute its own judgment for that of the City as to whether the costs of water projects are reasonable. The Authority is entitled, and in fact is required, to rely on the professional determinations as well as the procurement, internal controls and accounting systems of the City of New York.

*Telephone Charges.* In 2005, the Authority purchased eight Blackberry devices for members of its staff and members of OMB staff who allocate time to work for the Authority. You requested authorization forms for those purchases and received such forms for six of the eight devices. The other two devices were for the Comptroller and the Assistant Comptroller of the Authority, positions at a level consistent with other personnel at the Authority and OMB that were entitled to receive Blackberry devices. The costs of the devices attributable to time spent by staff members on OMB matters has now been charged by the Authority to OMB. However, this represents only a portion of the total cost of $6,800 for all the devices. Your suggestion that the entire costs of these devices be charged to OMB is inappropriate. The Authority will not charge OMB for devices that are not attributable to OMB work.

*Public Notice of Board Meetings.* The Authority has always posted notice of Board meetings. The Authority now posts notice of all committee meetings as well, even when they are held in conjunction with Board meetings where a notice has been posted.

*Board Member Training.* The Authority Budget Office ("ABO") was created by State law to oversee the implementation of the Public Authorities Accountability Act ("PAAA"), including the PAAA's Board Member training requirement. ABO Policy Guidance No. 06-01 states that Board Members should participate in training by the end of the fiscal year beginning in 2006 (i.e., by June 30, 2007, in the case of the Authority).That Guidance further provides that, although the ABO expects that best efforts will be made to complete training by that date, it understands that full compliance may not be possible until, in the case of the Authority, by June 30, 2008. As of June 30, 2007, six of the required ten Board Members and delegates had completed training. The four who had not completed training by that date submitted letters to the Authority stating that they had made best efforts to attend training, but were unable to do so and further stated that they would attend training by the ABO-established deadline. All Board Members and delegates who are required to attend training have now completed the training, in advance of the June 30, 2008 deadline. *Ex-officio* Board Members are permitted by law to delegate their responsibilities to "a deputy or assistant in their respective departments or offices...." (Public Authorities Law Section 1045-c(4)). The ABO has determined that "[b]oard members are not required to participate in training only if they have effectively delegated their responsibilities as a board member to a designee." (ABO "Frequently Asked Questions") Therefore, it is the delegate, rather than the *ex-officio* Board Member who is required to attend training. The Authority does not take issue with the ABO's conclusion; it seems appropriate that the individuals who are designated to attend board meetings would be the ones to participate in training.

*Audit and Governance Committees.* The Authority established audit and governance committees when required under applicable law.

*Minutes of Committee Meetings.* The Authority has always prepared minutes of committee meetings in accordance with the New York State Public Officers Law. Minutes are not required when a committee takes no action.

*Audit Committee Reports.* The Authority's Audit Committee filed an annual report of its activities with the City Comptroller for calendar year 2007 and will continue to do so in the future.

*Annual Budgets.* The Authority's Board adopted budgets for fiscal years 2008 and 2009 and will continue to do so in the future.

Very truly yours,

Mark Page