

Victor M. Sher
vsher@sherleff.com
415.348.8300 x100

September 18, 2009

*Via Email & Hand Delivery*

Hon. Shira A. Scheindlin
United States District Judge
U.S. District Court, Southern District of New York
500 Pearl Street, Room 1620
New York, New York 10007

      Re:   *City of New York,* et al.*, v. Amerada Hess,* et al., 04 CV 3417 (SAS)
             *In re MTBE Products Liability Litigation,* MDL 1358

Dear Judge Scheindlin:

     In her Supplemental Expert Report, the City's treatment and damage expert, Marnie Bell, does exactly what the City represented she would do: Ms. Bell revised her analysis to address the jury's finding in Phase 2 that MTBE concentrations at Station 6 would peak at 10 parts per billion ("ppb") in 2033. Exxon's motion to strike Ms. Bell's report cherry picks statements from her deposition earlier this week to incorrectly suggest that she ignored the jury's finding. In fact, as she repeatedly explained at her deposition, Ms. Bell made reasonable assumptions and followed standard engineering practices in assessing the treatment required at Station 6, and the cost of building, operating and maintaining that treatment, to remove a peak concentration of 10 ppb of MTBE. While Exxon may disagree with Ms. Bell's conclusions as to the amount of the City's damages, Exxon's disagreement is not a basis for preventing the jury from considering Ms. Bell's opinions.

     Ms. Bell made clear her accurate understanding of the jury's Phase 1 and 2 findings and the scope of her assignment from the outset of her deposition:

> Q. And, with respect to the work that you did in this case, what did you understand your assignment to be in writing the document we marked as Exhibit No. 1 [Ms. Bell's Supplemental Report]?
> A. It was my understanding that the jury had determined that the peak MTBE concentration that would impact the Station 6 plant would be 10 ppb in 2033. And it was also my understanding that the Court had ruled that the City could only claim damages for cost of MTBE treatment of above and beyond what would be incurred if MTBE was not present.
> Q. With respect to the use in the future of Station 6, were you provided any information regarding what use the jury determined would be appropriate in this case?
> A. We did discuss that the jury had determined Station 6 would be a backup supply….

Transcript of the Deposition of Marnie Bell dated September 15, 2009 ("Bell Deposition") at 686:13-687:5. As she explained in her deposition, her opinions were based on this understanding.

Consistent with her earlier reports, in her Expert Supplemental Report, Ms. Bell analyzed the two types of treatment that are effective in removing MTBE from drinking water: Granular Activated Carbon (known at GAC) treatment and Air Stripping. With both, she assumed, as the jury had determined, that MTBE in the combined from of the Station 6 wells into the treatment plant would reach a maximum of 10 ppb. However, as she explained, a drinking water treatment plant must be able to continue to treat water under all operating conditions. If one well is out of service, the plant cannot simply shut down, particularly if as a backup plant, it is operating to alleviate a water shortage. Accordingly, Ms. Bell assessed what would happen to MTBE levels entering the plant if a well were not available. As a reasonable worse case scenario, Ms. Bell chose Well 6C, the MTBE-free deep aquifer well. Without Well 6C, the Station 6 treatment plant would receive less water to treat, but without dilution from the clean 6C water, Ms. Bell calculated that MTBE concentrations in the remaining flow entering the treatment plant would rise from 10 ppb to 15 ppb. *See* Bell Supplemental Report, dated September 9, 2009, at 1-1 to 1-2; Bell Deposition at 695:16-25 ("A worse case condition might occur if Well 6c was off line, which is free of MTBE; therefore, if the plant was operating at 7 a half mgd with Well 6c off line, the MTBE concentration would be 15 ppb at the 7 and a half mgd.") This analysis is entirely consistent with the jury's determination that the "combined outflow" from all the Station 6 wells – defined to include Well 6C – into the plant would peak at 10 ppb.

Ms. Bell further explained that drinking water treatment plants are not designed to treat the only the precise amount of a pollutant expected to flow into the plant. Rather, as Ms. Bell testified, "it is standard engineering practice to incorporate a safety factor when selecting the design maximum to account for possible fluctuations in water quality." Bell Deposition at 728:5-8. Consistent with this standard engineering practice, Ms. Bell incorporated a safety factor in her assessment of the treatment required for the Station 6 plant for both MTBE and PCE. *Id.* at 693:2-15, 694:20-696:2. Using a safety factor of two for MTBE, Ms. Bell concluded that treatment for the Station 6 wells should be designed to handle a maximum of 20 ppb MTBE at full capacity and 30 ppb in the worst case situation of Well 6C being unavailable.[1] *Id.* at ,

---

[1] Standard engineering practice incorporates a safety factor only in designing the treatment plant. Consistent with this, in estimating the costs of operating and maintaining the Station 6 treatment plant, Ms. Bell assumed that the plant would treat no more than 10 ppb MTBE:

    Q. And, with regard to the standard practice, can you cite to us any generally accepted or peer reviewed engineering or scientific publication which says that you should utilize a safety factor and calculate your O&M costs based upon maximum concentration given a safety factor?

    A. I haven't calculated my O&M cost based on the design maximum concentration that includes a safety factor.

694:20-696:2. This is the same factor of safety Ms. Bell incorporated in her original expert report when she analyzed treatment based on David Terry's modeling results. *See, e.g.*, Transcript of the Deposition of Marnie Bell dated April 21, 2009 at 380:19-381:24.[2]

Exxon's assertion that Ms. Bell's adherence to standard engineering practices in opining on the appropriate design of treatment for the Station 6 wells led her to double the cost of the treatment system is simply wrong. With respect to a GAC treatment system, Ms. Bell testified that the size of the system (and thus the capital construction costs) does not differ whether the design maximum concentration of MTBE is assumed to be 10 ppb, 20 ppb or 30 ppb. Bell Deposition at 730:31-731:1 ("Q. If you were to have used 10 parts per billion as the maximum concentration as a safety factor, would it change your analysis of the GAC design criteria for MTBE? A. No, it would not change my analysis of the GAC design criteria."); *see also id.* at 734:19-23, 770:6-771:20. She testified that she had not performed a similar analysis for an air stripping system. *Id.* at 732:2-10. Nowhere in her deposition or her report does she offer any basis to conclude, as Exxon asserts, that her design maximum flow of MTBE would double the cost of the plant.

Exxon's second complaint about Ms. Bell's report – that she assumed that a backup treatment plant may need to run continuously – has already been rejected by the Court. Denying Exxon's motion to strike the testimony of David Terry, the City's expert hydrologist, on the ground that he assumed that Station 6 would operate continuously in the future despite the jury's finding that Station 6 was a backup source, the Court stated:

> I don't understand what a backup scenario is. What I'm trying to tell you is that his testimony was there's no such thing as a backup scenario. The scenario is if I need it I might need it continuously

---

> Q. You've utilized an average of 9 parts per billion in all years for O&M?
> A. I've used a 10 ppb MTBE concentration for 2033 and 9 ppb for the remaining years.

Bell Deposition at 728:25-729:12.

[2]
> Q. …And my question to you is, is it standard engineering practice to assume double the influent concentration of a contaminant that you are designing a treatment system to address?
> A. I would say it's standard engineering practice to apply a factor of safety.
> Q. And is it a standard engineering practice to apply a factor of safety that involves doubling the influent concentration of a contaminant that you are designing a treatment system to address?
> A. I'm not aware of any particular number; however, in my opinion, two is a very reasonable number….

Hon. Shira A. Scheindlin
September 18, 2009
Page 4

> for an indefinite amount of time, so the only scenario is that which has the pump pumping full time and then if it's less, all to the good, but I've got to be ready for the full use full time.

August 20, 2009 Trial Transcript at 2390:23-2391:4.

Ms. Bell concluded, similar to Mr. Terry, that as a backup water supply system, Station 6 would need to operate immediately when needed and continue to operate at full capacity for as long as the need for water persisted. *See* Bell Deposition at 717:23-718:2, 751:6-25. Earlier City witnesses testified as to the range of situations under which a backup supply might be needed, including repairs to the upstate West Branch-Rondout Tunnel that carries the majority of the City's drinking water, drought, failure of critical components of City Water Tunnel No. 2 that supplies Queens, and problems with other key water supply structures. *See, e.g.*, August 4, 2009 Trial Transcript at 87:18-89:1, 92:25-95:25 (James Roberts); August 5, 2009 Trial Transcript at 2:21-4:11 (Kathryn Garcia). According to Kathryn Garcia, a replacement for the West Branch-Rondout Tunnel alone could take as long as twenty years to construct. August 5, 2009 Trial Transcript at 7:4-13. Ms. Bell did not assume that Station 6 would operate as anything other than a backup supply; she concluded that as a backup supply, Station 6 might need to operate continuously and appropriately analyzed the treatment plant's operation and maintenance costs based on that conclusion.

In sum, Ms. Bell did not ignore the jury's findings in her Supplemental Expert Report. Rather, based on her expertise and applying the same standard engineering practices used in her previous reports, she opined on the design and costs of treatment required to remove a peak of 10 ppb of MTBE in the combined Station 6 well water entering the plant assuming the City uses the Station 6 wells as a backup source of supply. Exxon's motion to strike that Report should be denied.

Respectfully submitted,

*/s/ Victor Sher*

Victor M. Sher

Cc: All Counsel (via LNFS & Email)