**Robert S. Chapman**



D: 310.201.7493
F: 310.201.2393
RChapman@GreenbergGlusker.com

October 1, 2009

*Via Email & Hand Delivery*

Hon. Shira A. Scheindlin
United States District Judge
U.S. District Court, Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *City of New York v. Amerada Hess*, et al., 04 CV 3417 (SDNY)
              *In re MTBE Products Liability Litigation*, MDL 1358

Dear Judge Scheindlin:

      Following Dr. Montgomery's testimony today, ExxonMobil rested its case. *See* Exhibit A at p. 6403 ("The defense rests"). With the possible exception of Sunoco and Chevron, ExxonMobil presented no testimony or documentary evidence concerning the relative fault of any other Settling Defendants during the trial. Accordingly, the City requests that (1) Question No. 14 of Interrogatory Sheet for Phase III be limited to Sunoco and Chevron and (2) that ExxonMobil be prohibited from arguing that part of the fault for the City's injury is attributable to any of the Settling Defendants other than Sunoco and Chevron.

      New York General Obligations Law Section 15-108 reduces the claim of a "releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest." The latest version of jury charge II(D)(4)(a) which implements the requirements of Section 15-108, states that "ExxonMobil has the burden of showing, by a fair preponderance of the credible evidence, that others are at fault and to what degree." It is not enough for ExxonMobil to merely state what it thinks its relative fault would be based on market share. To satisfy the requirements of Section 15-108 as set forth in jury charge II(D)(4)(a), proof of the *degree* of fault of the Settling Defendants is required.

      During Dr. Montgomery's testimony, certain charts were displayed to the jury as demonstratives which purported to set forth the relative retail market participation of certain of the Settling Defendants. However, Dr. Montgomery did not testify concerning the specifics of those charts and those charts were never moved into evidence. While Dr. Montgomery did fleetingly refer to the relative retail market participation of Sunoco and Chevron, *see* Exhibit A at

**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067
T: 310.553.3610 | F: 310.553.0687

GreenbergGlusker.com

78519-00002/1703899. 1

Dockets.Justia.com

pp. 6352 – 6353 (stating that Sunoco's market share was 12.1 percent); *id.* at pp. 6350 (agreeing that for some years Chevron had around a 3 percent market share), he did not testify about the relative market share of any of the other Settling Defendants, *see id.*

For the foregoing reasons, the City respectfully requests that Question No. 14 of Interrogatory Sheet for Phase III be limited to Sunoco and Chevron and that ExxonMobil be prohibited from arguing that part of the fault for the City's injury is attributable to any of the Settling Defendants other than Sunoco and Chevron.

Respectfully submitted,

Robert S. Chapman

GreenbergGlusker.com

# EXHIBIT A

(Excerpted to Include Entirety
of Montgomery's Testimony
and Page 6403)

9a1dcit1
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ---------------------------------x
2  THE CITY OF NEW YORK, et al,
3
3                           Plaintiffs,
4           -v-                              04 CV 3417
5  EXXON MOBIL CORPORATION, et al,
6                           Defendants.
6  ---------------------------------x
7                                    New York, N.Y.
7                                    October 1, 2009
8                                    10:11 a.m.
8
9  Before:
9
10                  HON. SHIRA A. SCHEINDLIN,
10
11                                    District Judge
11
12                       APPEARANCES
12
13  MICHAEL A. CARDOZO
13       Corporation Counsel of the City of New York
14       Attorneys for City Plaintiffs
14  BY  SUSAN E. AMRON
15
15  SHER LEFF LLP
16  BY: VICTOR M. SHER
16       JOSHUA STEIN
17
17  GREENBERG GLUSKER
18       Attorneys for Plaintiffs
18  BY: ROBERT S. CHAPMAN
19
19  MCDERMOTT, WILL & EMERY
20       Attorneys for Defendant Exxon Mobil
20  BY:  PETER JOHN SACRIPANTI
21       JAMES PARDO
21       WILLIAM STACK
22       JENNIFER KALNINS TEMPLE
22       ANTHONY BONGIORNO
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9a1dcit1
1            (Trial resumed; jury not present)
2            THE COURT:  Good morning, everyone.
3            ALL COUNSEL:  Good morning, your Honor.
4            THE COURT:  Could the witness come up.
5   DAVID HAND,
6          Resumed, and testified further as follows:
7            (Jury present)
8            THE COURT:  Everyone, please be seated.
9            Good morning.
10  CROSS-EXAMINATION (Resumed)
11  BY MR. SHER:
12  Q.  Good morning.

9a1dcit3                    Bell - cross
1  A.  Yes, that's correct.  Again, we've gone from parallel to
2  series.  Costs have increased substantially since that time.
3          MR. STACK:  No further questions, your Honor.
4          THE COURT:  All right.  Anything further, Mr. Sher?
5          MR. SHER:  Just very quickly, your Honor.
6  REDIRECT EXAMINATION
7  BY MR. SHER:
8  Q.  The reference to $30 million just for GAC that counsel just
9  asked you about, Ms. Bell, you couldn't bill, in your opinion,
10  a facility that would remove MTBE for $30 million, could you?
11          MR. STACK:  Objection, your Honor.  Leading.
12          THE COURT:  No, I will allow that.  Go ahead.
13  A.  Yes, that's correct.
14          MR. SHER:  Thank you.
15          No further questions.
16          THE COURT:  OK.  We are done with Ms. Bell?
17          MR. STACK:  I believe we are, your Honor.
18          MR. SHER:  Yes.  Thank you.
19          THE COURT:  Thank you very much.  OK.
20          MR. STACK:  Any questions from the jury?
21          THE COURT:  I don't know.
22          Do you want another chance to ask Ms. Bell any
23  questions?
24          (Pause)
25          JUROR NO. 1:  No.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

9a1dcit3                    Bell - redirect
1          THE COURT:  No.  Thank you.
2          (Witness excused)
3          THE COURT:  All set.  OK.  That takes us to the next
4  witness.
5          MR. STACK:  Dr. Montgomery, your Honor, we would call.
6          THE COURT:  All right.  I have one notebook to give
7  back.
8          (Discussion off the record)
9          THE COURT:  Please, would you raise your right hand.
10  WILLIAM DAVID MONTGOMERY,
11      called as a witness by the defendant,
12      having been duly sworn, testified as follows:
13          THE COURT:  Please state your full name for the
14  record, both first and last, spelling both.
15          THE WITNESS:  My name is William David Montgomery.  I
16  go by my middle name David, D-A-V-I-D, Montgomery,
17  M-O-N-T-G-O-M-E-R-Y.
18          THE COURT:  Thank you.
19          Now Mr. McGill is bringing you some water.  Thank you.
20  DIRECT EXAMINATION
21  BY MR. STACK:
22  Q.  Good afternoon, Dr. Montgomery.
23  A.  Good afternoon.
24  Q.  Can you tell the jury who your employer is?
25  A.  I am employed by Charles River Associates.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

9a1dcit3                    Montgomery - direct
1  Q.  And can you tell the jury, what is Charles River
2  Associates?
3  A.  Charles River Associates is a consulting firm.  We work in
                          Page 34

4  business, finance, and economic consulting.
5  Q.  And what is your current position with Charles River
6  Associates?
7  A.  I'm a vice president at Charles River Associates.
8  Q.  Can you tell the jury in a narrative fashion about your
9  educational background?
10  A.  Yes.  I grew up, attended school, attended high school in
11  Philadelphia.  I have a bachelor's degree from Wesleyan
12  University in Connecticut.  I spent a year as a Fulbright
13  scholar studying economics at Cambridge University in England
14  and I have a Ph.D. in economics from Harvard University.
15  Q.  When did you get your Ph.D.?
16  A.  In 1971.
17  Q.  Did you do a dissertation for your Ph.D.?
18  A.  Yes, I did.
19  Q.  Can you please tell the jury what your dissertation was
20  about?
21  A.  Yes.  The title was Markets and Licenses and Efficient
22  Pollution Control Programs.  It was the first theoretical
23  investigation of how you could design and use an emission
24  trading program for controlling pollution.  Emission trading is
25  the system that the Environmental Protection Agency adopted in

6275

9a1dcit3                    Montgomery - direct
1  about 1990 for controlling one form of emissions from electric
2  power plants and the Congress is now debating in their Cap and
3  Trade Program as a way of controlling carbon dioxide emissions
4  that are indicated for global warming.
5  Q.  After you completed your education, what was your first
6  full-time job?
7  A.  My first full-time job was an assistant professor of
8  economics at the California Institute of Technology.
9  Q.  And how long did you stay at Caltech?
10  A.  I was at Caltech until about 1978.  I took one year off in
11  the middle there.
12  Q.  And what courses did you teach at Caltech?
13  A.  I taught environmental economics, I taught introductory
14  economic theory, and I taught advanced economic theory to our
15  graduate students.
16  Q.  And approximately when was it that you left Caltech?
17  A.  I spent one year in Washington on leave about 1975 to '76
18  at the Congressional Budget Office, and then I came to work in
19  Washington full-time with the Department of Energy in about
20  1978.
21  Q.  And can you tell the jury, what type of work did you do for
22  the Congressional Budget Office back in 1975/'76?
23  A.  I was an analyst in their Natural Resources and Commerce
24  Division.  I came to CBO thinking that I would continue working
25  on what I specialized in before, which was environmental

6276

9a1dcit3                    Montgomery - direct
1  issues, but it was during the energy crisis of the 1970s and
2  the office was working mostly on energy security issues and
3  energy supply issues and so I found myself drawn into doing
4  that.
5  Q.  Did you prepare any papers while you were there?
6  A.  Yes, I did.  At CBO, I prepared papers on synthetic fuels
7  loan guarantees, on energy financing, on evaluation of the -- I
8  think that was the first project on independent energy

 9   strategies that were being proposed during the Ford
10   Administration.  And I was also commissioned at that time by
11   the Senate Government Affairs Committee to do a major study of
12   the oil price regulations, the oil price and allocation
13   regulations that had been developed during the 1970s to try to
14   control prices after the Arab oil embargo.
15   Q.  And the oil price control study you did, did it look at
16   gasoline prices?
17   A.  Yes, it did.  It was a study of -- I mean, the entire
18   industry was regulated.  So it studied everything from the
19   regulations on crude oil production through the regulations on
20   cost pass-through and controls on refined product prices,
21   including gasoline.
22   Q.  You said you returned to the federal government after being
23   with the Congressional Budget Office.  In what capacity did you
24   return to the federal government?
25   A.  Let's see.  Just to keep the narrative going.  I left
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

       9a1dcit3                    Montgomery - direct
 1   Caltech -- sorry.  I left the Congressional Budget Office after
 2   my year on leave.  I went back to Caltech for about a year.
 3   Finished the work I was doing on the Senate Government Affairs
 4   Committee, and continued writing on oil price controls.
 5             Then at the beginning of the Carter Administration, I
 6   came back.  I was recruited by the Department of Energy to help
 7   form the Energy Information Administration, which was a new
 8   independent statistical and analytical group within the
 9   Department of Energy.
10   Q.  And what role did you play in developing and forming the
11   Energy Information Agency?
12   A.  At that time I was in charge of an office that had
13   responsibility for, well, basically all of the economic issues.
14   So we -- I had a group with which we did a study of actually it
15   was an interesting set of regulations then, the Fuel Use Act.
16   The Fuel Use Act was going to ban use of natural gas by
17   electric power plants and force their conversion to coal.  And
18   we did an extensive analysis of the costs of that.
19             We did analyses of tax policy and competition issues.
20   I had that role at EIA for about two years, and then I was
21   offered the job of Deputy Assistant Secretary in the Policy
22   Office at the Department of Energy, and I couldn't resist doing
23   that.
24   Q.  With regard to your time at EIA, can you tell the jury what
25   the SEDS database is?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

       9a1dcit3                    Montgomery - direct
 1   A.  Yes.
 2             THE COURT:  How do we spell "SEDS" for the record?
 3             MR. STACK:  All caps, S-E-D-S.
 4             THE COURT:  Thank you.
 5   A.  Yes.  The SEDS database is the State Energy Data System.
 6             Just to kind of continue my career, after three
 7   years -- I guess, two years in the Policy Office as Deputy
 8   Assistant Secretary, we came to the end of the Carter
 9   Administration.  I then took a couple of year -- two years when
10   I was a researcher at basically the environmental think tank,
11   Resources for the Future.  And after that I returned to the
12   Department of Energy and spent most of the 1980s back at the
13   Energy Information Administration.  So I moved around a bit in
                            Page 36

14    the government.
15            The State Energy Data System, or SEDS, was --
16    actually, was a product of my office.  It was one of the things
17    that I was in charge of.  And it was a system where we used
18    kind of a full range of data from EIA, from the Federal Highway
19    Administration, others, to do a comprehensive calculation of
20    use of energy of all types by state.  And gasoline consumption
21    by state was one of the primary parts of that activity to
22    figure out what gasoline consumption actually was.
23    Q.  And the SEDS system, is it still in use today?
24    A.  Yes, it is.
25    Q.  You mentioned that you were the Deputy Assistant Secretary

6279

9a1dcit3                    Montgomery - direct
1    in the Department of Energy.  What were your duties and
2    responsibilities at that time in handling policy?
3    A.  That I was Deputy Assistant Secretary in the -- it was the
4    late '80s to 1981.  This was the period of the Iran/Iraq war
5    and the second big oil price shock.  In that office I was
6    responsible for developing our, essentially, the outlook for
7    energy supply and demand, mostly focusing on oil markets.  What
8    was going to happen to oil supply and demand in the U.S. and
9    the world?  How was that going to affect prices?
10            And that kind of provided the guidance for the
11    planning and budgeting system within the Department of Energy.
12    I kind of -- I was brought into the Policy Office when the
13    former Deputy Secretary of Defense took over as Secretary, and
14    my boss had worked for him in the Department of defense.  We
15    were trying to put into place a programming and budgeting
16    system like they had in the Defense Department.  So I was
17    responsible for the overall guidance on where energy markets
18    were going to go.
19            We worked on a number of topical issues, including
20    energy taxation, economic impact studies, and some of the big
21    issues then -- well, we were trying to look at how can we more
22    efficiently allocate supplies in the United States.  How can we
23    protect against supply emergencies?  So we were looking at
24    issues like should Alaskan oil be exported and -- well, one of
25    the perineal fights has always been about tankers and how they

6280

9a1dcit3                    Montgomery - direct
1    move gasoline and crude oil around between different ports in
2    the United States.  Because the Jones Act says that those
3    shippers -- that those shipments can only go on ships with U.S.
4    flags owned by U.S. companies with U.S. crews.  There are only
5    a limited number of them and they are very expensive.  So the
6    question then was could we adequately supply the needs of the
7    United States or do we need to waive the Jones Act to let other
8    ships come along.
9    Q.  Were there supply problems during that period of time in
10    the early '80s?
11    A.  Yes, there were.  We had gasoline lines appear both in
12    immediately after the first Arab oil embargo in '74/'75 and
13    then they returned during the Carter Administration in '78/'79,
14    basically because there was more demand than there was supply.
15    And we were -- and the things we were trying to -- and
16    California, in particular, was very short on gasoline, which
17    was one of the reasons we were looking at issues like Jones Act
18    tankers and Alaskan oil exports, trying to figure out how to

19    get oil to California.
20    Q.  You mentioned that you worked for Resources for the Future.
21    Did you do any publications while you were there?
22    A.  Yes, I did.  I wrote a book kind of basically based on my
23    experience as Deputy Assistant Secretary.  It was titled "Oil
24    Prices, Energy Security and Import Policy," and it was a
25    thorough economic investigation of those three issues.

9a1dcit3              Montgomery - direct
1     Q.  Did you do any work at all in your government service on
2     the interagency task forces relative to oil distribution and
3     supply?
4     A.  Yes.  While I was at the Energy Information Administration,
5     between say '83 and 1989, I chaired an international -- an
6     interagency task force that we called Data and Analysis Group.
7     Its responsibility was for developing the information and the
8     analytical tools that we needed in order to understand how
9     likely oil supply disruptions were, where they might occur, and
10    what kind of policies we could use to deal with them.  We were
11    also going to be the operational entity that would actually
12    provide the government with data in the event that something
13    actually happened.
14           And I was the chairman but the group was made up of
15    representatives from the CIA, the Defense Department, the other
16    economic agencies that would be involved and the Council of
17    Economic Advisors.
18    Q.  When you were with EIA, did you look at transportation and
19    supply of gasoline in the United States?
20    A.  Yes, I did.  We were responsible for, first of all, the
21    overall statistics that EIA calculated.  And that included
22    petroleum supply and demand, natural gas supply and demand, and
23    integrating all of the different data systems that were run by
24    basically the Petroleum Division, the Electricity Division of
25    the agency.  And the SEDS database in particular was one of

9a1dcit3              Montgomery - direct
1     trying to figure out exactly where the gasoline was getting to.
2           I was also in charge of our international activities.
3     And in the international activities, we studied basically
4     supply and demand for oil and refined products worldwide, kept
5     track of tanker movements, tanker rates, how the United States
6     was dependent on imports both of crude and product from
7     different regions of the world.
8     Q.  Now, in looking at transportation supply of gasoline, did
9     you become familiar with the pipeline system of supplying
10    gasoline throughout the United States?
11    A.  Yes, I did.  It was something that I worked on for both
12    because we were doing in fact a lot of work on both overall
13    energy security.  I chaired another group that produced a
14    report for the -- for President Reagan on options for improving
15    energy security.  We were looking at all of those issues there
16    about transportation, transportation links, their
17    vulnerability, but, in particular, issues about regional
18    petroleum reserves.  Because the issue there -- again, it comes
19    up perennially -- should there be a regional petroleum reserve
20    in the Northeast in order to supply the Northeast if there are
21    interruptions like happened a few years ago with Katrina, when
22    the Gulf Coast was cut off.  So we were studying those things,
23    in the process looking at issues of transportation.  I have

24    done a lot more of that since then.
25    Q.  With respect to EIA, did you play any role at all in
        9a1dcit3                 Montgomery - direct
1     developing forms to gather information about the transportation
2     and movement of petroleum products like gas in the United
3     States?
4     A.  We participated in kind of the reviews of those forms
5     because, in particular, many of them are collected either by --
6     much of that data was collected either by our Oil and Gas
7     Office in EIA or by the Federal Energy Regulatory Commission,
8     but we were a major user of those data.  We were a user in two
9     ways.
10            One way was in preparing our publications, which were
11    kind of EIA's flagship publications putting the data out.  But
12    in particular, we were concerned about understanding how
13    gasoline was consumed and where it was consumed.  Because we
14    were responsible for the demand picture, what are people
15    actually doing with energy.  So we were very concerned about
16    the quality of the data that was being collected from the oil
17    and gas producers and whether it gave an accurate picture of
18    how much was being shipped to various regions and how much was
19    being consumed.  So I was part of all of those reviews of the
20    other data.
21            And some other -- something -- there is more to that
22    but I can't remember the rest of my answer right now.
23    Q.  Fair enough.  Consolidated Energy Statistics, is there a
24    report that is generated by EIA of that title?
25    A.  Yes.
        9a1dcit3                 Montgomery - direct
1     Q.  Can you tell the jury what that is for the period of time
2     that you worked with the EIA?
3     A.  When I was at the EIA, the Consolidated Energy Statistics
4     were published in our Monthly Energy Review, in which every
5     month we tried to give a picture -- it is about two or three
6     months out of date -- of exactly what was happening in all of
7     the energy markets.  We published an Annual Energy Review which
8     kind of contained updated and corrected data and went back in
9     history.  And then we also published both the State Energy Data
10    System and the state energy price reports.  They took us about
11    two years to complete, because we had to wait for all of the
12    rest of the data to come in and be checked both at EIA, at the
13    other agencies, and then we could put all of that together.  So
14    it was a little slow but we believed it was a much more
15    accurate picture of what was going on.
16    Q.  When the agency collected this data, did they collect data
17    about what gasoline was being refined in the United States?
18    A.  Yes, they did.
19    Q.  Did you also collect data about what gasoline was being
20    imported into the United States?
21    A.  Yes, they did.
22    Q.  And within the imports, were there statistics for both
23    finished gasoline, which the jury has heard about, or
24    components to be blended into gasoline?
25    A.  Yes.

9a1dcit3                    Montgomery - direct
1  Q.  Did the EIA data that you were involved in compiling and
2  reviewing in the period you were with the government also talk
3  about demand or use of gasoline?
4  A.  Yes.
5  Q.  And did you look at use of gasoline in different regions of
6  the country?
7  A.  Yes, we did.
8  Q.  Now, in the period of time that you were in government
9  service, have you had occasion to testify -- in the period of
10 time you were in government service, have you had occasions to
11 testify to Congress?
12 A.  Yes, I have.
13 Q.  And how many times have you testified to Congress,
14 approximately?
15 A.  I've testified to Congress probably 30 or 40 times.  I
16 think probably a dozen or so times while I was in government
17 service.
18 Q.  And on what topics have you testified?
19 A.  Let me see.  This is going back aways.  I've testified on
20 several of the studies that I did when I was in the
21 Congressional Budget Office which dealt with energy issues, the
22 Synthetic Fuels Loan Guarantee Program.  That is a very old
23 one.
24        When I returned to the Congressional Budget Office,
25 which was may last job in government in the late 1980s, I was
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9a1dcit3                    Montgomery - direct
1  responsible for the Natural Resources and Commerce Division.
2  So I testified to Congress on most of the major things that we
3  had worked on.  That included gasoline taxes, the Highway Trust
4  Fund -- the place where gasoline taxes go -- infrastructure
5  developments in the United States, there were a couple of other
6  topics there.  And I believe I testified a few times when I was
7  working at the other agencies; I don't remember the exact
8  topics.
9  Q.  How many years total were you in government service?
10 A.  About 15.
11 Q.  And after you left government service, where did you go to
12 work?
13 A.  After I left government service, I came to work at Charles
14 River Associates.
15 Q.  And with regard to your work at Charles River Associates,
16 have you been involved in doing analyses of market shares for
17 energy use in the industries?
18 A.  Yes, I have.
19 Q.  With respect to the work that you've done for Charles
20 River, have you also done work in defining and analyzing energy
21 markets by geographic area?
22 A.  Yes, I have.
23 Q.  Could you tell the jury about your experience in that
24 regard?
25 A.  Yes.  I started out when I came to Charles River Associates
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9a1dcit3                    Montgomery - direct
1  with the background we talked about in energy, but Charles
2  River Associates does a great deal of work in antitrust
3  litigation and in mergers.  And so I spent a few years, if you
4  like, in an apprenticeship, working with some of my senior
Page 40

5  colleagues -- with some colleagues who had been working in that
6  field for a long time.  And what I was doing with them was
7  applying the FTC and Department of Justice guidelines for how
8  to define geographic markets in order to -- and actually worked
9  on projects dealing with a number of retail markets -- grocery
10  stores, drug stores, food distribution systems -- and became
11  expert in that process in both the data and the techniques for
12  defining geographic markets and calculating market shares.
13              Then I started testifying myself on energy issues, and
14  I've testified on geographic market definition and market
15  shares.  I submitted testimony to the Federal Energy Regulatory
16  Commission dealing with mergers of electric utilities, with
17  development of natural gas storage fields.  And I have
18  testified in actually several either other antitrust cases
19  dealing, again, with the market definition of the geographic
20  markets and market shares.
21  Q.  At CRA, have you done studies of the economic impact of
22  fuel regulations?
23  A.  Yes, I have.
24  Q.  Can you give the jury an idea of some of those studies?
25  A.  Yes.  We start in the -- in my early period of work with

1  Charles River Associates was during the development of the
2  reformulated gasoline regulations.  And I testified before the
3  Environmental Protection Agency on some of the economic issues
4  associated with the reformulated gasoline regulations.  I
5  testified for the Air Resources Board on issues about the cost
6  effectiveness of reformulated gasoline versus other
7  alternatives for reducing emissions from motor vehicles.  And
8  then have more recently done a series of studies on specific
9  regulatory programs and how they would affect the refining
10  industry.
11              I did a study of low sulfur diesel regulations, how
12  they would affect refining capacity and the supply and
13  distribution of diesel fuel.
14              There have been a couple of others.
15  Q.  With regard to your work at CRA, have you done studies of
16  U.S. and global oil markets and oil distribution for products?
17  A.  Yes, I have.  I didn't mention when I was at the Energy
18  Information Administration, in addition to doing data, I was
19  also responsible there for our forecast and our market
20  analysis.  And we had models of the world oil market as well as
21  managing our big integrated model of the United States.  That's
22  one of the reasons we cared about the data system, because we
23  needed data on petroleum supply and demand and distribution in
24  order to get those models to work properly.
25              I have actually developed similar models to that with

1  coming to CRA.  I hired a staff of trained modelers and
2  mathematicians into our company, too.  And there we developed a
3  model of the world natural gas market which includes shipping
4  rates, supply in the various regions of the world, demand in
5  the various regions of the world, and, similarly, a model of
6  the U.S. natural gas market with pipeline connections.
7              On the petroleum side, we have an integrated world
8  model of energy markets and economies.  And a key feature of
9  that is our model of the world oil market, which tracks both

10  refined product supply and demand, refined product exports and
11  imports, and crude oil supply and demand and imports.  And
12  we've used that in a number of studies to look in particular at
13  issues of how government policies that would affect the costs
14  of refining in the United States would affect the viability of
15  the U.S. refining industry, and the complementary part of that
16  is if U.S. refiners produce less, where is it going to come
17  from.  That entails, again, looking carefully at where refined
18  products are available in other parts of the world.
19  Q.  Have you done studies of the horizontal and vertical
20  structure of the oil industry in the United States?
21  A.  Yes, I have.
22  Q.  Tell the jury about that.
23  A.  That first started at the Energy Information
24  Administration.  One of the things that I took responsibility
25  for during the '80s was something we call the Financial
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Reporting System.  The Financial Reporting System collected
2   information on the financial performance, obviously, and kind
3   of some operating data on the major oil companies.  There was a
4   data -- it was a survey that we had designed ourselves, and it
5   is published every year in performance profiles.  That really
6   involved taking a look at both the horizontal and vertical
7   structure of those industries.
8           It was the first place that any -- well, congress
9   mandated it because they wanted to understand how much money
10  the industry was making in refining versus how much money it
11  was making in crude oil.  So we were able to separate that
12  vertical structure and then look at the marketing performance
13  of the industry.  And that was the beginning of my experience
14  with it.
15          I've continued and have done several studies dealing
16  with refined product distribution in the United States.
17  They've included, for example, studies I mentioned.  Low sulfur
18  diesel was in part an investigation of where the diesel fuel
19  would be available.  I have done studies of what you may
20  remember, the Northeast heating oil crisis about ten years ago,
21  when the heating oil prices went through the roof and it was
22  not available in much of New England.  And, more recently, I
23  had a study published in the Journal of Competition Law and
24  Economics, which was in part looking at the effects of Katrina
25  and how that affected both import demand and the movement of
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   products within the United States in order to actually quite
2   successfully get enough gasoline down to the Gulf Coast so that
3   people could get away from their homes, could get out and get
4   away from the hurricanes.
5   Q.  In the studies that you have done of horizontal and
6   vertical structure of the oil industry, have you looked also at
7   gasoline and the gasoline marketing?
8   A.  Yes, I have.  That was a important part in particular of
9   what I was doing with -- well, yes, I have all the way through
10  because gasoline marketing has consistently been an important
11  part of the issue on energy security.  Will it be possible to
12  get gasoline delivered to consumers to avoid gasoline lines,
13  how did that work during the period of Katrina when we had a
14  sudden drastic shutoff in one part of the country.  So I have

15    looked carefully at marketing there as well as, in a couple of
16    other studies, looking at the market structure of both the
17    refined products versus the ethanol industry.
18    Q.  With respect to your professional work, have you published
19    articles in peer-reviewed journals?
20    A.  Yes, I have.
21    Q.  Approximately how many have you had published in
22    peer-reviewed journals?
23    A.  I would say journals probably about 35, and then probably
24    another 15 chapters in peer-reviewed books.
25    Q.  Have you previously testified for ExxonMobil?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                6292
      9a1dcit3                    Montgomery - direct
1     A.  No.
2     Q.  Have you previously testified against ExxonMobil?
3     A.  I don't think so.
4             MR. STACK:  With regard to Dr. Montgomery, your Honor,
5     we would proffer him an expert in energy economics, including
6     the calculation of market share for refined product share in
7     geographic areas of the country, as well as national and
8     international petroleum transportation and distribution, and
9     the analysis of data relating to energy markets, including
10    gasoline supply.
11            MR. CHAPMAN:  I'll go into that on cross-examination
12    but it is acceptable now, your Honor.
13            THE COURT:  OK.  Good.  All right.
14            You may proceed, then.
15            MR. STACK:  Thank you, your Honor.
16    BY MR. STACK:
17    Q.  What tasks were you asked to undertake in this case?
18    A.  The first task that I was asked to undertake was to
19    calculate the share of gasoline containing MTBE that was
20    refined or manufactured by ExxonMobil and delivered to New York
21    Harbor, the ratio of those deliveries to New York Harbor by
22    ExxonMobil to the total pool of gasoline in New York Harbor.
23            THE COURT:  During what time period?
24            THE WITNESS:  Ah, during the time period -- during
25    entire time period from 1983 to 2005.  As I'll describe, I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                6293
      9a1dcit3                    Montgomery - direct
1     broke that up into the -- sorry, I misspoke.  From 1983 -- 1985
2     to 2003.  I broke that up into the 1995 to 2003 period, which I
3     will be talking about first.
4             THE COURT:  I'm sorry.  Say that again.  You broke it
5     up into?
6             THE WITNESS:  The 1995 to 2003 period, which was the
7     reformulated gasoline regulations, and then the prior period
8     from 1985 to 1994.
9             THE COURT:  OK.  Thank you.
10    BY MR. STACK:
11    Q.  In addition to calculating the share of ExxonMobil gasoline
12    in New York Harbor, were you asked to do any other tasks?
13    A.  Yes.  I was also asked to calculate the retail market
14    shares in the New York region for ExxonMobil and for other
15    participants in the retail market for other brands in the
16    retail markets.
17    Q.  And can you explain to the jury at this point what the
18    difference is between percentage of refined gasoline versus
19    market share in the retail markets?
                          Page 43

20  A.  Yes.  The difference has to do with both the logistics and
21  the supply practices of basically the oil industry.
22          The first calculation that I did looked at how much
23  gasoline was actually manufactured in an Exxon or Mobil
24  refinery and how much of that actually reached New York Harbor
25  from all the different routes.  And I took the ratio of that to

6294
9a1dcit3                    Montgomery - direct
1   the total amount of gasoline in what I believe you have -- in
2   what has been called a commingled pool of gasoline in New York
3   Harbor.  So that's one calculation.
4           And my understanding was that that was intended to
5   assist the jury in allocating responsibility or liability under
6   a commingled product theory of liability, where all of those
7   products are commingled and where what matters is who actually
8   refined or manufactured the gasoline containing MTBE.
9           Now --
10  Q.  Why retail market share?
11  A.  I understand that retail market share was intended to
12  assist the jury in allocating liability under different
13  theories that do not focus on the question of who manufactured
14  the gasoline and how was it commingled.
15          MR. CHAPMAN:  Your Honor.
16          THE COURT:  Let me review that answer.  One moment.
17          (Pause)
18
19          MR. CHAPMAN:  Your Honor, I have no problem with
20  Dr. Montgomery testifying about what his assignment was, but
21  his understanding of issues of liability is beyond the scope of
22  his expertise.  It is not relevant.  I move to strike both this
23  and the prior answer about his understanding of the liability
24  issues.
25          THE COURT:  Yes.  I suppose that's right.  I will

6295
9a1dcit3                    Montgomery - direct
1   strike both answers.
2           But he meant well.  He was just trying to explain his
3   assignment.  I don't think he meant to take over the Court's
4   function.
5           So the Court will explain to you, the jury, different
6   theories of liability and allocations of responsibility.  That
7   is my job.  But he was just trying to explain why he undertook
8   the analyses he undertook.  I'll leave it at that.
9           Is that acceptable?
10          MR. CHAPMAN:  Thank you, your Honor.
11          THE COURT:  All right.  Go ahead.
12  BY MR. STACK:
13  Q.  With respect to calculating the share of Exxon gasoline in
14  New York Harbor, did you actually break that out by years?
15  A.  Yes, I did.
16  Q.  And can you tell the jury, what data did you look at to
17  actually break that out?
18  A.  The data that I look at -- again, this is for the first
19  calculation -- how much gasoline containing MTBE did ExxonMobil
20  manufacture, how much of it got to New York Harbor, and what's
21  that as a ratio of total demand.
22          The basic data sources that I used for that for demand
23  for gasoline, the total amount of gasoline in New York Harbor,
24  all came from public data sources.  It came from the EIA SEDS,

25  S-E-D-S, data system.  It came from EIA data on petroleum

9a1dcit3                    Montgomery - direct
1   imports into the United States, and on petroleum shipments
2   between big regions of the country and/or U.S. Army Corps of
3   Engineers data on shipments between smaller parts of the
4   country.
5           For Exxon's shares, I used data that were obtained as
6   part of this process from Exxon, from the Colonial Pipeline and
7   other pipelines that serve New York, and then from the same
8   data sources, from the Corps of Engineers and from EIA.  Again,
9   essentially getting back the forms that Exxon and Mobil had
10  filled out and sent to EIA so that I could get the data on
11  their shipments.  I think that's comprehensive but I'm probably
12  forgetting something.
13          Ah, I also used some data from the Federal Energy
14  Regulatory Commission on pipeline shipments.
15  Q.  Is there any one place where the Court or the jury can go
16  and actually find this number, or is it something you have to
17  calculate?
18  A.  It's something you have to calculate.
19  Q.  And with regard to the number, did you express it as a
20  volume or a percentage?
21  A.  I had expressed it in my opinion about the shares as a
22  percentage, but I did all the calculations in volumes.
23  Q.  And were you able to, in the course of your work, actually
24  calculate the volume that every other refiner, blender,
25  supplier is putting into the New York market?

9a1dcit3                    Montgomery - direct
1   A.  Yes.
2   Q.  And did you do that by individual companies or did you do
3   it in the aggregate?
4   A.  No.  I had to do it in the aggregate, because we have no
5   data on all -- there is no source of comprehensive data on
6   every individual company.  So that to put together -- so that
7   for the demand side, that is, the total amount of gasoline that
8   goes through New York Harbor in a year, I had to use aggregate
9   statistics for doing that.
10  Q.  Now, in your work in this case, did you prepare a chart
11  showing percentages of gasoline in New York Harbor refined by
12  Exxon and Mobil during the years 1985 to '94?
13  A.  Yes, I did.
14  Q.  Can you tell the jury, and I believe the judge asked you as
15  well but I will make sure, why did you pick the period '85 to
16  '94?
17  A.  The reason I picked the period '85 to '94 is that's prior
18  to the promulgation of the reformulated gasoline regulations by
19  the Environmental Protection Agency.  And it differs from the
20  period from '95 through 2003, because from 2003 -- from 1995 to
21  2003, all of the county -- no, the region that we're looking at
22  in New York Harbor was pretty much required to use reformulated
23  gasoline.  Therefore, I could focus on data on reformulated
24  gasoline.  I had to focus on data on reformulated gasoline to
25  calculate those shares properly.

9a1dcit3                    Montgomery - direct
Page 45

1          Before 1994, there was no reformulated gasoline so the
2   only data that were available that were useful were data on all
3   gasoline.  So it's essentially two different very similar but
4   different calculations that I had to do for those two different
5   periods.
6   Q.  And did you prepare a graphic to illustrate what the
7   percentage of ExxonMobil gasoline was in New York Harbor during
8   the years 1985 to '94?
9   A.  Yes, I did.
10  Q.  Are those statistics in your report?
11  A.  Yes, they are.
12  Q.  Could we go to slide one, please.
13          Can you explain to the jury what this bar chart
14  illustrates?
15  A.  What this bar chart illustrates is the top is 100 percent,
16  and the gray bars at the bottom represent Exxon's share of that
17  total amount of gasoline that flowed through New York Harbor in
18  each of those years.
19          The percentages vary over time.  It starts out rather
20  low.  It gets up in the 20 to 25 percent range.  And then from
21  1993 on -- no, between 1993 and '94, it drops down to about
22  5 percent.  So the average, taking the total volume that was
23  refined and manufactured by Exxon and got to -- and Mobil that
24  got to New York Harbor and dividing it by the total of
25  everyone's gasoline that was delivered to New York Harbor comes
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6299
1   out to an average of just over 14 percent.
2   Q.  And did you also for the period from 1995 to 2003 calculate
3   the percentage of reformulated gasoline made by Exxon that
4   actually was delivered to and transported out of New York
5   Harbor?
6   A.  Yes, I did.
7   Q.  And could we go to slide two, please.
8           Can you explain slide two to the jury?
9   A.  Yes, slide two is now based on reformulated gasoline.  So
10  the 100 percent represents 100 percent of the reformulated
11  gasoline that was delivered into New York Harbor by anyone, and
12  the gray bars at the bottom represent the share of that that
13  was -- that I calculate to have been refined and manufactured
14  by Exxon or Mobil, or ExxonMobil.
15  Q.  ExxonMobil is a very big company.  There are a lot of Mobil
16  stations in New York, a lot of Exxon stations in New Jersey.
17  Can you explain why this percentage is so low that we see so
18  many of these ExxonMobil stations?
19  A.  Yes.  It really looks strange; there is no question about
20  that.  But the reason is that most of the gasoline that is
21  being sold in those stations was actually refined by someone
22  else, and was through the various types of exchange and
23  purchase agreements that go on in the industry, was then moved
24  to -- was then delivered to those stations as branded gasoline.
25          But it's just very -- but only a very small part of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6300
1   that gasoline was actually refined or manufactured by
2   ExxonMobil.  And the reason for that is there are really two
3   big routes by which gasoline gets to New York Harbor.  One of
4   them is by pipeline coming from the U.S. Gulf Coast, where
5   Exxon and everybody else has lots of refineries in the Texas,

9A1JCITF

6 Louisiana area.  The problem is that although Exxon has a lot
7 of gasoline there, only a very small part of Exxon's gasoline
8 actually makes it all way up that -- it is 5500 miles of
9 pipeline going in various directions that it gets onto in
10 Louisiana.  Most of it comes off that pipeline before it gets
11 to New York.
12         So although Exxon starts out manufacturing a lot of
13 gasoline with MTBE in the Gulf Coast during these years, only a
14 relatively small fraction of it reaches New York on the
15 pipeline from the Gulf Coast.
16 Q.  Where does it go?
17 A.  It goes to all of the rest of the regions between here and
18 there.  It supplies markets in -- it goes through Mississippi,
19 so there is the Birmingham, Montgomery area.  It goes through
20 Georgia.  It swings up through North Carolina.  Those -- the
21 Sun Belt has just grown tremendously and takes off a lot of
22 that demand.  There is a huge interchange in Greensburg, North
23 Carolina, where product comes off of the pipeline and then it
24 proceeds up through Virginia, through the Washington area.  In
25 Philadelphia -- another big slug of gasoline is put into it by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6301

9a1dcit3                    Montgomery - direct

1 the Philadelphia refineries, which dilutes what's left of the
2 Exxon or Mobil gasoline.  And then what's left gets up here.
3 Q.  Now, if we look at the slide number one, we see percentages
4 of 23, 11, 5.6.  Why the big drop from?  92 to '94?  And if you
5 go to the next one, Dave, continuing into '95.  Why is that
6 drop there?
7 A.  That is the Bayway Refinery.
8         The other big source of gasoline for New York Harbor,
9 of course, is refineries in New York Harbor.  And as we see
10 here -- let me use the pointer.
11         There are two refineries in New York Harbor, a Hess
12 refinery and the Bayway Refinery near Linden, New Jersey.
13 Bayway was owned by Exxon through the -- from the 1985 up to
14 1993 -- sorry.  Bayway was owned by Exxon through the entire
15 earlier period, from '85 to '94.  It's Bayway's production
16 that's responsible for those 25 to 30 percent shares of
17 production during most of the 1980s.
18         It was sold to Tosco in 1993, if I remember correctly.
19 And at that point Exxon's share dropped off, because it was no
20 longer manufacturing the gasoline in New York Harbor.
21         I guess I should mention the other thing in the later
22 period, from 1994 through 2003, the biggest source of gasoline
23 for New York Harbor was imports from overseas.  And Exxon and
24 Mobil just were responsible for only a tiny share, a really,
25 really tiny share, a couple of percent of the imports that were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6302

9a1dcit3                    Montgomery - direct

1 coming from other countries, and that's because the refineries
2 that were affiliated with Exxon and Mobil in other countries
3 just weren't in regions where it was economic to serve the
4 United States.
5 Q.  Now, on this particular slide, slide three, you identify
6 sources of gasoline?
7 A.  Yes.
8 Q.  Can you explain what the various arrows are and, touching
9 on it, explain to the jury what that indicates?
10 A.  Yes.  The foreign countries' arrow indicates imports that
Page 47

11    are coming in from outside the United States.  We have good
12    data on those from the EIA 8/14 survey.  We know what country
13    they come from.  We know who was the importer.
14            By water from the Gulf Coast, it is possible to ship
15    refined products, gasoline, all the way from Texas and
16    Louisiana by barge or small ship up to New York Harbor.  It
17    doesn't happen very often because much cheaper to put it on
18    that big pipeline.
19            We also -- I'm sorry.
20    Q.  No.  Go ahead.
21    A.  We also have a big refining complex in Philadelphia, and
22    some refineries in Virginia and that come out of the Potomac
23    and the James River.  So we also have shipments from those
24    mid-Atlantic refineries.  And then the big part of the story
25    for our purpose is the big pipeline that picks up the product

6303

9a1dcit3                     Montgomery - direct
1     in the Gulf Coast, makes deliveries along the way, and then
2     picks up more product in the Philadelphia area.
3     Q.  Does all of the gasoline that finds its way to New York
4     Harbor actually stay there?
5     A.  No.
6     Q.  Where does gasoline in New York Harbor go once it is
7     delivered to the harbor?
8     A.  Well, it -- again, this depends on the period.  And maybe
9     we could take a look at the next slide.
10    Q.  Yes.  Slide four.
11    A.  This is a map that helps us with the period from 1994 to
12    2000 -- for the RFG period, from 1995 to 2003.  Essentially,
13    the New York Harbor serves in that period these counties that
14    are outlined in dark blue with reformulated gasoline.  Those
15    are the counties in New York State that were required to use
16    reformulated gasoline.  So we know that all of the gasoline
17    that's consumed in these counties is reformulated gasoline.
18    Q.  Do we know how much in terms of annual RFG demand?
19    A.  Yes, we do.
20    Q.  Could you go to slide five, please.
21    A.  It's about 70 million barrels per year in the New York
22    area, which is just what's outlined in blue, and that's
23    reformulated gasoline.
24            The New Jersey -- the entire State of New Jersey was
25    required to use reform --

6304

9a1dcit3                     Montgomery - direct
1             MR. CHAPMAN:  Your Honor, if we might, just for
2     foundation, if it's true that there are statistics and they
3     know how much it is, why is this an approximate figure, which
4     is what the title is?
5             THE WITNESS:  It's an approximate figure because it
6     was the only -- because I could remember 70, 55, 45 to talk to
7     the jury, but I'm not very good at remembering more precise
8     fractions.  All of my calculations were done with the exact
9     underlying numbers, as I showed in the previous slides.
10            THE COURT:  Do you mean you rounded?
11            THE WITNESS:  I rounded this to the nearest zero or
12    five so that I could remember.
13            THE COURT:  Instead of 69.324, or something?
14            THE WITNESS:  It probably was 54 and I think 46 or 47,
15    but this was just something I was trying to do to give a

Page 48

16 representation of the relative magnitudes in the different --
17 during this period in the different regions.  The precise
18 numbers are there, and any calculations where I talk about
19 shares, I've used the exact numbers and made the exact
20 calculations.
21          THE COURT:  OK.  Thank you.
22 BY MR. STACK:
23 Q.  Apart from delivery of gasoline to these areas, is there
24 gasoline that actually goes to areas outside the areas depicted
25 on this map?
          SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

          9a1dcit3                Montgomery - direct
1 A.  Yes.  The area that I've depicted in blue is what I would
2 call the area served directly -- well, blue and orange is what
3 I would call the areas served directly by New York Harbor.
4          In addition, New York Harbor is the source of a large
5 part of the gasoline that's consumed by New England because
6 it's the last stop for those pipelines that come up to Linden,
7 New Jersey, and then from there it moves from the kind of
8 commingled pool in New York Harbor up to New England.  And I
9 calculated that that was about 45 million barrels per year.
10 Q.  And did you also calculate for the entirety of New England
11 what the total number of millions of barrels per year would be
12 for all of New England based on shipping out of the New York
13 Harbor?
14 A.  Yes, I did.  This 45 -- I'm sorry.  Go back for a second.
15          This 45 was actually one of the harder things to come
16 up with, because we do not have data on shipments of
17 reformulated gasoline from New York Harbor to New England
18 because it's only the Army Corps of Engineers that has that
19 data, and they don't care whether it is reformulated gasoline
20 or regular gasoline.  So I had to do a more complicated set of
21 calculations to essentially back out that 45 million barrels
22 per year.
23 Q.  And with regard to New England, did you prepare a graphic
24 showing the area you were looking at for analysis of what the
25 demand would be in New England for the entire area?
          SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

          9a1dcit3                Montgomery - direct
1 A.  Yes, I did.
2 Q.  The next slide, please.
3          Can you tell jury what this shows?
4 A.  What this shows is essentially the area of new England for
5 which I was calculating demand.  I'm sorry about cutting off
6 Maine, but it was the Maine, New Hampshire, Vermont,
7 Massachusetts, Rhode Island, Connecticut area.  And for that I
8 calculated the demand for reformulated gasoline of 125 million
9 barrels per year.
10 Q.  And can you tell the jury why it is 45 on one side and 125
11 on the other?
12 A.  Yes, I can.  The reason is that, like New York Harbor, New
13 England's demand is satisfied from several different sources.
14 New England also receives a large amount of its gasoline from
15 imports from foreign countries and some that moves directly
16 from either the mid-Atlantic, you know, this region down here,
17 or all the way from the U.S. Gulf Coast.
18 Q.  Now, when you calculated your percentages for RFG, did you
19 take into account all of the supply and demand into the harbor?
20 A.  Yes.
          Page 49

21 Q.  And did you prepare a graphic to show the jury how you
22 calculated this percentage of fraction?
23 A.  Yes.
24              MR. STACK:  Can you go to slide 17, please.
25              THE COURT:  Actually, how would you feel about not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              6307
        9a1dcit3                  Montgomery - direct
1  doing slide 17?
2              MR. STACK:  Perfect.
3              THE COURT:  All right.
4              So, ladies and gentlemen, we'll take our luncheon
5  recess now, and we will reconvene hopefully at 10 after 2.  So
6  you have 70 minutes because we have some work to do.  Ten after
7  2.  Thank you.
8              (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              6308
        9a1dcit3                  Montgomery - direct
1              (Jury not present)
2              THE COURT:  All right.  Please be seated.
3              You can go.  Please be seated.  I need a couple of
4  minutes of the lawyers' time but it doesn't matter if you
5  remain in the courtroom because you are on direct, you are
6  welcome to talk to those lawyers.  You just don't need to stay
7  here for a moment.  I need to talk to them about another quick
8  matter.
9              I said that I would place some reasoning on the record
10 with respect to the public nuisance decision that I sent you
11 last night, basically that there needs to be an injury to
12 support the claim.  I am just going to read a short little
13 memo.
14             The city agrees that if it cannot show an actual or
15 future injury, it may not recover money damages for the public
16 nuisance claim, although it does say it might still be able to
17 get injunctive relief, and there is some support for this
18 position in the case law.  I cite, in particular, State v.
19 Fermenta.  I know you are all familiar with that.
20 F-E-R-M-E-N-T-A, 630 N.Y.S.2d 884, a 1995 case, which says, and
21 I quote:  "It has been said that a court of equity will lend
22 its aid to enjoin a threatened public nuisance wherever it
23 clearly appears that the acts sought to be restrained will
24 necessarily result in the creation or maintenance of a
25 nuisance."
                         Page 50

9A1JCIT4                Montgomery - direct
1       "When a harm feared does not yet exist, the state must
2  show a menace of imminent and substantial import to the public
3  welfare to obtain the equitable relief.
4       "The problem, however, is if the jury finds that the
5  city has not and will not be injured by MTBE within the next 30
6  years, then the city surely cannot prove that the MTBE poses a
7  menace of imminent and substantial import to the city or that
8  Exxon's conduct will necessarily result in a nuisance."
9       In other words, once it has been determined there will
10 be no future injury, then there clearly can't be a threatened
11 injury that would support the injunctive relief.
12      So if the jury finds that there is no present or
13 future injury, there is nothing left for the jury to decide
14 with respect to that claim.  If there is anything remaining of
15 the public nuisance claim with respect to injunctive relief,
16 that will be for the court, but the city's hurdle would be very
17 high because the city hasn't shown what injunctive relief it
18 can get or ask for absent a showing of past or future injury.
19 So the bottom line is there is no point in sending this on to
20 the jury if the jury answers "no" to Question 1, unlike the
21 trespass claim.  So that issue has been put to bed.
22      Then I have a letter from the city which I haven't had
23 a chance to study, but I want you to know I received it.  The
24 title is regarding inventory control issues raised today.
25             MR. SHER:  Your Honor, there was a question yesterday.

9A1JCIT4                Montgomery - direct
1             THE COURT:  I understand why you wrote it.  I
2  understand it responds to the question the court asked about
3  Exxon/Mobil's control over the lessee dealer stations, and
4  while I haven't had a chance to even read it yet, I think in
5  summary it does say that the stations had to report to Exxon,
6  something like that.  It re-raises that question of control,
7  which reminds me, you also had homework, too, with respect to
8  the consent decree.  You were going to show me the actual
9  language.  Do you have it?
10            MR. SACRIPANTI:  As I understand it, the city agrees
11 they owned and controlled the tanks.
12            THE COURT:  So that --
13            MR. SACRIPANTI:  I believe that is what Ms. Amron said
14 this morning.
15            MS. AMRON:  We agree the city owns and controls -- one
16 of the tanks isn't there any more -- tanks at the two
17 precincts.
18            THE COURT:  So, therefore, essentially you're agreeing
19 on the res ipsa charge with respect to the contributory?
20            MS. AMRON:  No.  We think we're in a different
21 position than retail gasoline stations in that we are not in
22 the gasoline business, we are not selling it.
23            THE COURT:  Right.
24            MS. AMRON:  We have gasoline that we are using simply
25 for our own purposes or at the precincts.

9A1JCIT4                Montgomery - direct
1             THE COURT:  True, but if you had control over the
Page 51

2  property and control over the tanks, and the tanks leaked, the
3  whole idea of res ipsa, there is no way it leaked unless
4  something was defective in that tank, and you own and control
5  them.  So it happened, you must have been negligent -- in other
6  words, you had the tanks.  It got out of the tanks.  The only
7  thing that skips is the filling aspect.
8          MS. AMRON:  It skips the filling aspect.  It skips any
9  knowledge we would have about the nature of MTBE in the tanks
10  or in the petroleum which we don't -- we are not Exxon, we are
11  not part of the --
12          THE COURT:  I understand.  Yes, I understand the
13  argument.  I have no decision yet, but I understand the
14  argument.
15          I think I made much of that argument yesterday myself
16  about vertically integrated and you're not in the oil business
17  and you don't deliver and all the rest of it.
18          MS. AMRON:  We have no duty with respect to --
19          THE COURT:  Now --
20          MS. AMRON:  -- MTBE or warning anyone about MTBE.
21          THE COURT:  And the warnings point, right.
22          MR. SACRIPANTI:  Your Honor, I know of no exception to
23  the res ipsa rule.  Obviously, we objected to res ipsa
24  generally.
25          THE COURT:  Correct.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                6312
1          MR. SACRIPANTI:  If the court is going to imply
2  because of our exclusive control over the tanks at the station
3  at issue for us or one or possibly two?
4          THE COURT:  I don't know where that is up to.
5          MR. SACRIPANTI:  That applies to them.
6          THE COURT:  I haven't made that decision yet.  The
7  difference is only the control over the whole process, so to
8  speak, the knowledge issue, the warnings issue, the delivery
9  issue even though Mr. Stack informed me yesterday about the
10  different trucks and different companies that deliver, I
11  understand all of that.
12          MR. SACRIPANTI:  Can I make one other point on this
13  issue, your Honor?  And that point is again I come back to the
14  fact that the city was sued for not complying with the federal
15  and state regulations regarding its tanks.  It leaked gasoline
16  as a result of that.
17          THE COURT:  Right.
18          MR. SACRIPANTI:  I think that's a critical element in
19  this issue as well because it shows the city knew its tanks
20  were leaking, ignored that, continued to allow it, had to be
21  pursued.
22          THE COURT:  I suppose their argument there is while
23  that might be true, they didn't know the consequence of their
24  negligence, so to speak, with respect to MTBE.  So they knew
25  that gasoline would get out.  Did they know that what MTBE
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                6313
1  does?  It travels faster and further, lasts longer, is not
2  biodegradable?  Did they know all of that?
3          It raises some issues.  I am not prepared to rule on
4  anything.  I wanted to announce what I could rule on, which was
5  the public nuisance, that I got this letter and I am awaiting
6  your changes.  I was now told they would be here by 2:00 with
                              Page 52

7    respect to the charge.  I hope to turn around the charge.
8    You'll have it before summations.  You have one change by
9    e-mail because I know you're getting e-mail as you sit here,
10   just a stylistic change where I think we improved the charge by
11   getting a little repetition out.  You will see.  We'll
12   distribute those two pages to you soon.  You can take a look at
13   that.  That is not substantive.
14              With that we can break for lunch?
15              MR. SACRIPANTI:  Just on the record, your Honor, there
16   are documents in this case in evidence that shows the city's
17   knowledge of MTBE I think as early as I believe it is 1995, but
18   it may be beforehand.
19              THE COURT:  Let's say it is 1995.  When was this
20   accused conduct with the consent decree?  When was that?  I
21   don't know the dates of that.  Do you?
22              MR. SACRIPANTI:  I don't have the consent order in
23   front of me.
24              MS. AMRON:  At least one of them was after that, your
25   Honor.  I don't recall precisely with the first one.  I know

                                                                6314
1    the tank that was at one of the stations that was removed was
2    removed in '96 -- not station -- precinct was removed in '96,
3    and the evidence with respect to the city's knowledge was that
4    MTBE moved farther and faster, we knew that at the end of '96
5    after we acquired the system and found MTBE.
6              There is no evidence about any knowledge about the
7    impacts or injury caused by MTBE, that the city had any of that
8    knowledge previously.
9              THE COURT:  All of this is my problem to sort through.
10   I will.  If there is nothing further right now?
11              MR. SACRIPANTI:  Yes.
12              THE COURT:  What happens after Montgomery?
13              MR. CHAPMAN:  That may well be it, your Honor.
14              THE COURT:  You don't have a person on this subject?
15              MR. CHAPMAN:  We do, but what I am hearing from Mr.
16   Montgomery so far, I don't think we are going to do it.
17              THE COURT:  Do they know that?
18              MR. CHAPMAN:  Tallett.
19              THE COURT:  Okay.  See you at 2:10.
20              (Luncheon recess)
21              (Continued on next page)
22
23
24
25

                                                                6315
1              AFTERNOON SESSION
2              2:10 pm
3              (Trial resumes)
4              (In open court; jury present)
5              THE COURT:  Please be seated.
6              Let me use this moment as I have on other occasions to
7    talk about tomorrow.  I think even though I don't love it and I
8    am sure you don't, either, we still need to meet at 9:00 even
9    though we're staying till 4:00.  We want to be sure we can
10   accomplish what we think we can accomplish.  Let's not risk it.
11              On the other hand, the court is more than happy to buy

12  you a full, full lunch, ordered lunch from a vendor, either the
13  lunch from the diner or the pizza or whatever it is you want.
14  When you come in, I guess Mr. Riley will leave menus and you'll
15  write him notes.  If you go for the pizza deal, tell us what
16  topics you want.  If you go for individual orders, that is
17  fine, too.
18          We'll do lunch, real lunch, but we'll start at 9:00.
19  We'll still have the coffee break at some point to keep you
20  going because it will be a long day.  We'll have coffee at
21  11:00 or something, lunch at 1:00 and see where we end.  That
22  is the only announcement I need to do right now.
23  WILLIAM DAVID MONTGOMERY, resumes
24  DIRECT EXAMINATION (Continued)
25  BY MR. STACK:
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                6316
        9A1JCIT4                    Montgomery - direct
1   Q.  When we broke, we were looking at Slide 17.  This graphic
2   is entitled RFG calculation methodology.  Can you tell the jury
3   what this illustrates?
4   A.  The first thing this illustrates is that I'm simply
5   calculating a fraction, and there is nothing more complicated
6   to it than that each year, also to sort out what goes in the
7   numerator on top and what goes on the denominator on top the
8   bottom.
9           The top is the amount of gasoline, in this case
10  reformulated gasoline, refined or manufactured by Exxon/Mobil
11  and it can get to New York Harbor by one of three sources:  The
12  Colonial Pipeline, by water from other parts of the U.S. as we
13  were looking at the map or by water from international sources.
14  So that is the top part.
15          The bottom part is the demand for reformulated
16  gasoline from New York Harbor.  In looking at the share of
17  Exxon/Mobil's produced gasoline in the co-mingled product in
18  New York Harbor, we need a number for how much of that
19  co-mingled product there is.
20          The basic idea in economics is supply equals demand.
21  Each year what I have done is calculate the total demand for
22  reformulated gasoline from New York Harbor because that is the
23  total amount everyone has delivered to the harbor.  That will
24  equal New York, New Jersey consumption in this case plus
25  deliveries go out of New York Harbor to somewhere else from
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                6317
        9A1JCIT4                    Montgomery - direct
1   that same pool.
2   Q.  Looking at the denominator, in the bottom, looking at New
3   York City consumption and deliveries out of the harbor, how did
4   you calculate demand?
5   A.  I calculated demand by actually each of those cases I
6   calculated it with slightly different data source.  For New
7   York, if you remember back to that map we had up there, we have
8   a specific set of counties that had used reformulated gasoline.
9   The New York State Energy Research & Development Administration
10  for most of this period was actually reporting gasoline
11  consumption in those counties.  We know it is reformulated
12  gasoline because that is all they can consume.  I added it up
13  for the right set of counties.
14          For New Jersey, the state did not collect county level
15  data on gasoline consumption, but it did collect data on
16  vehicle miles traveled, how much driving there was in each
                              Page 54

17    county.  I took the total amount of driving in of these North
18    Jersey counties, divided it by the total amount of driving in
19    the state, and used that to calculate how much of the
20    reformulated gasoline was consumed in these counties.
21            The border counties, Monmouth, Sandy Hook and on down
22    the shore, Hunterdon and Warren along the Delaware River, they
23    are probably supplied mostly from other places than New York
24    Harbor, but I included 50 percent of the consumption in those
25    places.  That is New Jersey.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              6318

9A1JCIT4              Montgomery - direct
1            One more point I can make about that.  For New
2    England, I had to calculate the consumption a little bit
3    differently because for New England I had to start -- the Army
4    Corps of Engineers did not calculate how much moves from New
5    York Harbor up to New England.  They calculate the total
6    gasoline, not reformulated.
7            I can calculate how much reformulated gasoline is
8    consumed in New England.  We showed that.  I put data on how
9    much came in from other sources.  The difference between those
10   gives me the amount of demand for gasoline coming out of New
11   York Harbor.
12   Q.  Did you identify and chart out for the jury the sources of
13   RFG to New England from 1995 to 2003 to show backed out?
14   A.  Yes.
15   Q.  Slide 7, please.
16            Explain what this slide shows.
17   A.  Yes, this shows in schematic form, there is New England and
18   there are new -- New England has no production of its own of
19   gasoline.  So it gets gasoline from international refineries,
20   it gets it from New York Harbor.  These numbers show the rough
21   amounts.
22            It gets it from Mid-Atlantic refineries, the
23   Philadelphia, Wilmington, Virginia area.  It gets some that
24   comes all the way around from the Gulf Coast by barge, and
25   that's because everything that comes up from the Gulf Coast

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              6319

9A1JCIT4              Montgomery - direct
1    except by barge ends up in New York Harbor and it goes to New
2    England from New York Harbor.
3            Those are the four sources and those are the numbers I
4    calculated from generally the data sources I indicated which
5    are, for the shipments, EIA, international data, EIA data
6    on shipments from the Mid-Atlantic -- sorry, the Gulf Coast to
7    Pad 1 B, and I did have to make one assumption.
8            For these shipments from the Mid-Atlantic refineries
9    to New England, all I had was Corps of Engineers' data.  The
10   Corps of Engineers only reports total gasoline, so in order to
11   be conservative, I assumed all of the gasoline that was shipped
12   out of the Mid-Atlantic refineries went to New England and it
13   was all reformulated gasoline.
14            I know when I do that, I am overestimated
15   Exxon/Mobil's share because surely not all of it was
16   reformulated, but I was trying to make the assumptions, tried
17   throughout these calculations to make sure I didn't miss
18   anything that might be contributing to their share.
19   Q.  Did you ultimately determine what percentage of the
20   gasoline in RFG during the '95 to 2003 period went to these
21   three different areas, New York, New Jersey and New England?

22   A.  Yes, I did.
23   Q.  Can we see Slide 8, please.
24          Explain to the jury what this shows.
25   A.  This shows where the total amount of gasoline that was
1    delivered by everyone into New York Harbor went.  They're
2    roughly equal, 40 percent for New York, a little over 30
3    percent for New Jersey, a little over a quarter for New
4    England.
5    Q.  With regard to this information, did you use it to
6    calculate the percentages for RFG attributed to Exxon?
7    A.  Yes, I did -- well, no.
8           These are a representation to try to help explain
9    where the demand was.  So what this -- the underlying numbers,
10   the actual total volumes made up the denominator of that
11   fraction that I was showing you, that is the total amount of
12   gasoline.
13   Q.  So this illustrates what is on the bottom here?
14   A.  On the bottom here, yes.  Sorry, I can't always get this
15   over the desk.  Yes, the bottom there.
16   Q.  What you're then going to do is divide that into the
17   Exxon/Mobil RFG supply to New York Harbor.  Am I correct?
18   A.  That's correct.
19   Q.  That came from what three areas that you identified are
20   means of shipment?
21   A.  Well, it comes from pipeline shipment, and I looked at all
22   of the pipelines that come from the Gulf Coast or from the
23   Mid-Atlantic states in this general area.  It is only the
24   Colonial Pipeline on which Exxon/Mobil product could reach New
25   York by pipeline.
1           There are border rights by barge from the Gulf Coast
2    and from the Mid-Atlantic.  There are some imports coming from
3    refineries in other countries that Exxon or Mobil was
4    affiliated with.
5    Q.  Did you do a similar calculation for the period prior to
6    1995 to determine the percentage of Exxon refined or
7    Mobil-refined gasoline in New York?
8    A.  Yes.
9    Q.  Go to Slide 18, please.
10          Can you explain to the jury what this fraction of the
11   calculation is.
12   A.  The idea of the fraction is exactly the same thing, what
13   was refined or manufactured by Exxon/Mobil that got to New York
14   on top and the total amount of motor gasoline in this New York
15   Harbor pool on the bottom.
16          I had to use different data because there was no such
17   thing as reformulated gasoline, so I used total motor gasoline.
18   The good news was that I had slightly better data because of
19   that on some things.
20          So New York and New Jersey consumption, I calculated
21   essentially the same way I did for the earlier period, but
22   there were some missing years.  So I had to make -- so I --
23   here we go -- so for the New York and New Jersey consumption,
24   you see they come out to be the same as they were before.  For
25   New York, I'm including these two additional counties which are

9A1JCIT4                    Montgomery - direct
1  counties that consumed conventional gasoline.  They're not RFG
2  counties.
3          So there is a bit of a -- so they would always have
4  been served from New York Harbor, but they would have not have
5  been getting reformulated gasoline in the early period.  I had
6  to make this area a little bit bigger here.
7          The 70,000 barrels a day I calculated, the state
8  stopped -- the state did not -- the state did not provide data
9  on county-level gasoline consumption this far back.  So instead
10 I used the SEDS data from EIA on state level gasoline
11 consumption, and for each county I calculated its share of
12 total state consumption during the period when I did have data
13 on the county, and then I multiplied the total state
14 consumption by that in these earlier years to estimate
15 consumption for most of the 1985 to '91 period.
16 Q.  With respect to New Jersey, how did you estimate the demand
17 in New Jersey for 1985 to 1994?
18 A.  For New Jersey I did essentially the same thing.  During
19 this period the stopped record EMT so I took the share of North
20 Jersey and total New Jersey demand during the period when I did
21 have data and I multiplied that by the total demand in New
22 Jersey that came from the SEDS data for the years where it was
23 missing.
24         So basically I took the -- for both of these, I took
25 the information that I had about let's call it regional
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9A1JCIT4                    Montgomery - direct
1  gasoline consumption and I assumed that the regional share of
2  the total states stayed the same in the earlier period, but I
3  did have data on how the states' total consumption was
4  changing.
5  Q.  Now, with regard to this analysis for the period 1985 to
6  '94, did you take account of shipments on the Buckeye Pipeline
7  System west into Pennsylvania and Upstate New York?
8  A.  Yes.  Some of the gasoline that arrived into New York
9  Harbor actually did get shipped out in this period.  The
10 Buckeye Pipeline goes to Pennsylvania and Upstate New York.  It
11 can carry conventional gasoline, but that's what we're talking
12 about now, so I had to add this 30 million barrels per year
13 going out of New York Harbor to get on Buckeye.
14 Q.  The deliveries to New England, how did you calculate those
15 on the basis of thousands of barrels per year?
16 A.  That was straightforward.  The Army Corps of Engineers did
17 provide data on shipments out of New York Harbor of total
18 gasoline.  So I simply took all of those shipments and that
19 gave me my number for New England with one adjustment.
20         Some of the barges loaded here in New York Harbor down
21 in this area went up to terminals up here in Westchester,
22 Putnam, maybe Dutchess Counties.  Some of them went to Long
23 Island, so I didn't include that because I would have
24 double-counted that.  I didn't want to include that both in the
25 shipments out of New York and the consumption in New York.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9A1JCIT4                    Montgomery - direct
1  Q.  Did you during the period '85 to '94 prepare a chart
2  summarizing what percentage of gasoline went in different
Page 57

3   directions out of the harbor?
4   A.  Yes, I did.
5   Q.  Slide 10, please.
6   A.  Again, these are the shares.  Because it is now total
7   gasoline, not all of New England had to use reformulated
8   gasoline, so more of it was going to New England in the earlier
9   period.
10          Some was going to Pennsylvania and Upstate New York,
11  so the shares shifted a little bit, but I needed to take into
12  account all of those in order to have all of the gasoline that
13  was supplied to New York Harbor by somebody.
14  Q.  Now, with respect to demand, that's the bottom of the
15  calculation, did you also look at sources of supply for
16  Exxon/Mobil gasoline to calculate how much Exxon/Mobil gasoline
17  during this time period was making its way to New York Harbor?
18  A.  Yes, I did.
19  Q.  With respect to your work in this case, did you prepare an
20  illustration showing the routes for Exxon's reformulated
21  gasoline to get to New York Harbor?
22  A.  Yes, I did.
23  Q.  Slide 12, please.
24          Can you explain to the jury what Slide 12 illustrates.
25  A.  Slide 12 illustrates the four sources of gasoline that

1   Exxon shipped through into New York Harbor.  There is
2   international, there are FOUR countries in which Exxon or Mobil
3   was affiliated with a refinery and reported on their EIA data
4   forms that they had imported gasoline from those countries.
5   That accounts from there.
6   Q.  The 1 MB/Y, what does that mean?
7   A.  That is one million barrels per year.
8   Q.  That is imported Exxon gasoline?
9   A.  Imported gasoline imported into New York Harbor for which
10  Exxon was the importer.  It was Exxon that owned title to the
11  product when it arrived in New York Harbor and where Exxon had
12  a refinery in the country of origin.
13          There is an exception to that.  In Saudi Arabia there
14  is a refinery at Yanbu, referred to as SAMR, Saudi Arabian
15  Mobil Refinery.  I had some data that came from Exxon reporting
16  loadings of ships in Saudi Arabia that were at that point
17  destined to New York Harbor.
18          So whenever that number was larger than what Exxon
19  reported as imported to New York Harbor, I took the larger
20  number, so I was inflating, if you like, Exxon's import.  I
21  generally did this if I had two numbers and one gave me a
22  bigger number for Exxon, I took the bigger number pretty much
23  without worry which number was more plausible.
24  Q.  1,000 barrels per year, is that the average for 1995 to
25  2003?

1   A.  That is the average from 1995 to 2003, that's correct.
2   Some years were very large, some were small, but --
3           THE COURT:  Yes, is that what you were going to say.
4           MR. CHAPMAN:  Yes.
5           THE COURT:  Millions of barrels?
6           THE WITNESS:  Yes.  It should be a big M or two M's,
7   but I didn't quite do that this time.

 8    BY MR. STACK:
 9    Q.  How about the Mid-Atlantic region which you have less than
10    1 million barrels per year for RFG on average.  What does that
11    entail?
12    A.  The Mid-Atlantic region indicates that one of Exxon's
13    refineries which is located at Paulsboro, New Jersey reported
14    occasional shipments by water from the Mid-Atlantic region,
15    from there to Staten Island, and that is pretty much what we
16    have there.
17    Q.  Gulf Coast, less than 1 million barrels per year?
18    A.  Again, that is water-borne shipments.  They're pretty
19    straightforward.  Exxon/Mobil reported them on their EIA form
20    817 as going from the Gulf Coast to the New York, Pennsylvania
21    area.  I took all of those shipments as going to New York
22    Harbor.
23    Q.  With regard to the Colonial Pipeline, what were the
24    loadings for Exxon/Mobil refineries on average '95 to 2003?
25    A.  Well, the amount that actually reached New York Harbor, by

 1    my calculations, was about 8 million barrels per year.  That is
 2    from their four refineries in Texas and Louisiana.
 3    Q.  With respect to the Colonial Pipeline, you indicated that
 4    there were offloading of product.  Can you tell the jury where
 5    that product was offloaded and did you prepare a graphic to
 6    illustrate that?
 7    A.  Yes, I did.
 8    Q.  Slide 13, please.
 9    A.  This again is a general schematic just to give a sense of
10    how this particular pipeline works.
11         The Exxon refineries basically are where the train
12    starts.  There is Baytown, Beaumont, Baton Rouge and Chalmette.
13    The big arrows indicate that.  There is a lot of product that
14    goes in from the Gulf Coast, and for Exxon, my memory is that
15    it was about 30 million barrels per year.
16    Q.  Out of that 30 million, about 8 million made it to New
17    York?
18    A.  About 8 million made it to New York.
19         What happened along the way, the other places that
20    Colonial gets a lot coming in from Plantation in Greensburg,
21    North Carolina because those two pipelines have an interchange
22    there, lots of tanks and terminals, and then Colonial gets a
23    big injection of gasoline in the Philadelphia-Wilmington area.
24         In total, about a hundred million barrels per year get
25    shipped on the Colonial Pipeline, so Exxon was about a third of

 1    that, but most of that hundred million barrels gets delivered
 2    in Mississippi, Birmingham -- Mississippi here, Alabama,
 3    Birmingham, Montgomery, Georgia, Atlanta, South Carolina, big
 4    deliveries in North Carolina because there are pipelines that
 5    go up toward Kentucky down into the Tidewater, Washington area.
 6         It comes off and then gets refilled again, if you
 7    like, up in Philadelphia before it gets on there.
 8    Q.  Now, go ahead.
 9    A.  So I think about this, it is like getting a cup of coffee,
10    which I did at lunch.  Suppose you have a 10 ounce cup and
11    first you go and put 3 ounces of milk in it.  You fill it up
12    with 7 ounces of coffee so you have 10 ounces of coffee with

13  cream.  You drink three quarters of it.  That is the little
14  arrows coming off.  What you have left is about 25 percent of
15  what you started off with, and so if you ask how much cream is
16  left there, well, it's going to be 25 percent of the three
17  ounces or about three quarters of an ounce.
18          If you multiply by 10, that is exactly what we have
19  here because about 25 million barrels in total get delivered
20  from Colonial into New York Harbor.  Exxon was about 30 percent
21  of what went in, and so it's about 8 million barrels or about
22  30 percent of what comes out because again we're working on the
23  theory here everything is co-mingled and it is co-mingled in
24  the pipeline, too.
25  Q.  Did you do a similar analysis for the source of Exxon/Mobil

6329

9A1JCIT4                  Montgomery - direct
1  gasoline to New York Harbor from the period '85 to '94?
2  A.  Yes, I did.
3  Q.  Slide 15, please.
4  A.  I won't repeat myself, but essentially all exactly the same
5  calculations and pretty much the same data sources were
6  involved here.  The same coffee cup calculation coming up the
7  Colonial Pipeline except in this period it was more like one of
8  those restaurants where the waiter keeps coming along and
9  refilling your cup whether you want him to or not, so it ends
10  up with less and less cream in it.
11          I split the output of Exxon's Baton Rouge refinery
12  between Colonial and Plantation.  The amount on Plantation got
13  diluted on Plantation, and then when it came into the Colonial
14  Pipeline, it got diluted again, a little bit more complicated
15  calculation there.
16          The other numbers are pretty much the same.  They're
17  quite straightforward.  There is a little bit of product being
18  shipped by pipeline from the Paulsboro refinery that I assume
19  got to New York.  The big difference is the Bayway Refinery.
20  Up until 1993, Exxon owned the Bayway Refinery in Linden, New
21  Jersey, and that made a big contribution to the supply and
22  changed its share quite dramatically from what it was after
23  Bayway was sold.
24  Q.  After Bayway was sold in 1993, who was the refiner of the
25  gasoline?

6330

9A1JCIT4                  Montgomery - direct
1  A.  Tosco was the original purchaser and the refiner.  They
2  were then I believe purchased by Phillips, and they merged with
3  Conoco Phillips, that succession of the companies where they
4  were the refiner and manufacturer for that point.
5  Q.  After 1993 for your purposes of your calculations to
6  determine how much Exxon refined gas gasoline was in New York
7  Harbor, did you count the Bayway Refinery as product that was
8  being refined by Exxon and Tosco?
9  A.  No, I didn't because my intention here was to calculate a
10  fraction based on who refined and manufactured the gasoline,
11  not who was selling it in the harbor.  You come up with two
12  very different calculations.
13  Q.  For the period 1985 to 1994, did you determine what the
14  overall percentage was for Exxon and Mobil-refined gasoline
15  into New York Harbor?
16  A.  Yes.
17  Q.  Slide 19, please.

18  A.  Taking the shipments for the whole period from all of those
19  sources and dividing by the deliveries for that whole period
20  from everyone else, I came up with 14.1 percent as Exxon/Mobil
21  share.
22  Q.  With respect to the period for '95 to 2003, did you also
23  develop an opinion as to the percentages of supply that went
24  into New York Harbor of Exxon/Mobil refined product?
25  A.  Yes.  That is the next slide.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1   Q.  20, please.
2   A.  Yes, that is 5.2 percent again of the product refined and
3   manufactured by Exxon/Mobil that reached New York Harbor.
4   Q.  In your opinion, to a reasonable degree of economic
5   certainty, what was the percentage on average of Exxon and
6   Mobil-refined gasoline delivered in New York Harbor for the
7   period 1995 to 2003?
8   A.  5.2 percent.
9   Q.  Go back to 19.
10          During the period from 1985 to 1994, what, in your
11  opinion, to a reasonable degree of economic certainty, was the
12  percentage of Exxon and Mobil-refined gasoline delivered in New
13  York Harbor?
14  A.  14.1 percent.
15  Q.  With respect to the work that you did in this case, did you
16  also look at and determine what retail market share Exxon/Mobil
17  had in New York?
18  A.  Yes.
19  Q.  With respect to the retail market share, what was the basis
20  of your calculation of retail market share for Exxon and Mobil
21  in New York State?
22  A.  I used data on market shares that is produced by the
23  private company Lundberg surveys.  Lundberg is an industry
24  standard source of data and it was the only one that I know of
25  that provided comprehensive data for this entire period on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1   shares not just for Exxon/Mobil, but for all of the other
2   participants in the market, and my instructions were to develop
3   an estimate of market shares for the group of refiners whose
4   brands were being sold in New York Harbor.
5   Q.  Does Lundberg provide data for counties on a state-by-state
6   basis?
7   A.  No.
8   Q.  What is the lowest geographic area that they provide market
9   share data for?
10  A.  Their market share service only goes down to the state
11  level.
12  Q.  Based on your experience in the industry, what is the basis
13  for the Lundberg calculation?  What do they look at?
14  A.  Lundberg looks at data on state tax receipts because they
15  report shares -- well, essentially they collect data on the
16  volumes, the total sales by state.  They do that for taxable
17  gasoline, and they collect the data on the total sales from
18  each of the state's tax departments by collecting data on how
19  much taxes were paid for how much -- excise tax paid on the
20  gasoline.
21          They include sales to government because even though
22  they're not taxable, the refiner actually has to pay the tax to
                            Page 61

23  begin with, so it gets caught in their method of calculating
24  the sales.
25  Q.  In looking at the Lundberg data, did you analyze every year
                                                                    6333
 1  that you did in determining the share of refined gasoline?
 2  A.  No, I didn't.  The document production in this case
 3  provided me with copies of original Lundberg survey documents
 4  back through I believe it was 1992.
 5          Prior to that we didn't have the data, and since I was
 6  doing this under a very short deadline, we purchased data from
 7  Lundberg for every other year from 1985 to 1991.
 8          It was my judgment -- and was confirmed looking at the
 9  data -- that that would give us a reasonable basis for
10  estimating the market shares in the intervening years.
11  Q.  What sellers did you identify in the Lundberg survey for
12  the purposes of your opinions in this case on retail market
13  share?
14  A.  I identified all of the sellers that Lundberg has been
15  tracking over this entire period of time.  They track about 30
16  refiners, major marketers and other firms who sell to branded
17  stations in the New York area.  The numbers changed over time
18  as some of them entered the market, some of them leave the
19  market, some of them merged with others.  So I actually
20  reported that several different ways.
21  Q.  Did you prepare a graphic showing what the primary
22  suppliers were based on information you had for the New York
23  City area in Queens?
24  A.  Yes.
25  Q.  Can you explain to the jury what this bar chart shows.
                                                                    6334
 1  A.  Yes.  What I've done here is take the data that I got from
 2  Lundberg from 1985 to 2003.  I actually goat their sales data
 3  as well as their share data, so I was able to do the same
 4  proper aggregation over this period by adding up the total
 5  sales attributed by Lundberg to each of these companies and
 6  then dividing it by what Lundberg reported to be the total
 7  sales in all of New York State.
 8  Q.  With respect to this, is this going to add up to a hundred?
 9          Is this counting everybody or did it exclude certain
10  parties?
11  A.  I excluded certain parties.
12  Q.  With regard to the average for Exxon/Mobil during the
13  period 1985 to 2003, what in your opinion to a reasonable
14  degree of economic certainty was the retail market share that
15  Exxon/Mobil had in the State of New York?
16  A.  I believe the best estimate of that is 27.7 percent.
17  Q.  With regard to the Lundberg data, does that allow you to
18  break out how much was reformulated gasoline?
19  A.  No.
20  Q.  Does it allow to you break out how much the market share
21  may have been in the County of Queens?
22  A.  No.
23  Q.  With regard to the numbers that we looked at, we're looking
24  at very different --
25          THE COURT:  May I interrupt?

9A1JCIT4                    Montgomery - direct
1          MR. STACK:  Sure, by all means.
2          THE COURT:  You could have done that year by year?
3    That is the average for 18 years, but you could have done it
4    year by year by year, right?
5          THE WITNESS:  Yes, your Honor.  In the appendix to my
6    third report, I have the year-by-year data laid out there.
7          THE COURT:  If one looked at only at the '94 through
8    '03 period, you still wouldn't have RFG only because it is the
9    whole state?
10         THE WITNESS:  That's correct.
11         THE COURT:  I see.  That is why you can't do RFG only?
12         THE WITNESS:  That's correct, yes.
13         THE COURT:  You would know in those years it was more
14   or less of the same?
15         THE WITNESS:  Yes.
16         THE COURT:  Thank you.
17   BY MR. STACK:
18   Q.  This is an average based on all of the parties' reporting
19   for all of the years you looked at from 1985 to 2003.  Am I
20   correct?
21   A.  That's correct.
22   Q.  You indicated some of these people come in and out of the
23   market?
24   A.  Yes.
25   Q.  When you look at the average for these parties based on the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

6336

9A1JCIT4                    Montgomery - direct
1    number of years that are in the market, do some of the
2    percentages change?
3    A.  Yes, they do.
4    Q.  Can you look at 24, please.  Can you explain to the jury
5    what 24 A is.
6    A.  What I did in 24 A is I took for some of these -- for
7    example, El Paso is a good example because it changed a lot.
8    El Paso was only in the market for maybe a half a dozen years
9    out of this entire, what, 18 or so year period.
10         So when I take its -- so if I divide it, so if I take
11   its sales during 8 years and then divide it by the total amount
12   of gasoline that was sold into New York Harbor over the entire
13   18 years, I get a very small number.
14         So what I did for these calculations was I took for El
15   Paso its sales just in the years when it actually was operating
16   in New York and divided that by the total sales just in those
17   specific years.  So they gave me a larger number.
18         It gave, I thought, a better impression of what the
19   presence was of El Paso, for example, during the time it was
20   operating, not diluting that by all of the years when it just
21   wasn't here at all.
22   Q.  Did you actually prepare a chart that actually shows what
23   the changes are for by dividing all 18 years versus years in
24   the market?
25   A.  Yes, I did.  I hope I remembered right that El Paso was on
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

6337

9A1JCIT4                    Montgomery - direct
1    it.  Yes, good.  As you can see, for some of the smaller
2    entries it made a significant difference in the larger presence
3    they had during the years they were actually in the market.
                         Page 63

4    Q.  The green color is market share based on how many years
5    being divided by?
6    A.  The green color is based on being divided by the full 18
7    years.
8    Q.  If we divide the market share by the number of years in the
9    market, that's depicted in what color?
10   A.  That is in the blue color.
11   Q.  With regard to the work that you did in this case, did you
12   analyze for all these companies what their aggregate was for
13   years in the market if we reported just on years in the market,
14   would they report sales?
15   A.  Yes.
16   Q.  25, please.
17   A.  Go back, yes.  That is the one we just looked at, yes.
18   Q.  If we are looking at the numbers of years the company was
19   actually selling gasoline, percentages would be as set forth
20   here, Exxon/Mobil doesn't change because why?
21   A.  Because Exxon/Mobil was in the market every year.
22   Q.  With respect to the work that you did in this case, did you
23   look at the EIA prime supplier data that Mr. Tallett looked at?
24   A.  Yes, I did.
25   Q.  With respect to the EIA data, did you use it for your
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                              6338
9A1JCIT4                    Montgomery - direct
1    opinions in this case?
2    A.  I used it in just really -- in one part of the calculation
3    which is to determine the share of reformulated gasoline in
4    total New England consumption.
5            I needed to use that data in order to split New York
6    consumption into RFG and non-RFG.  That was the only use I made
7    of it.  I didn't make any use of it in calculating the retail
8    shares.  It did provide some interesting insights about some
9    other things, though.
10   Q.  Why did you not choose to use EIA prime supplier data for
11   New York and New Jersey?
12   A.  Because EIA itself indicates that the data are not reliable
13   for New York and New Jersey.
14   Q.  Why not?
15   A.  Because the prime supplier data are reported by the either
16   refiner or the marketer who sells the product to a local
17   distribution company.  It could be a jobber, it could be a
18   big -- you know, the owner of a chain of retail stations, but
19   it is someone who, you know, they think is going to be
20   distributing the gasoline at retail or selling it itself.
21           The report is done by the seller, by the refiner who
22   in this case is sitting back in the Gulf Coast of what they
23   think is going to happen to the gasoline where they've sold it
24   and so when the gasoline is sold to a buyer in New Jersey who
25   they know is a distributor, which means they have to report it
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                              6339
9A1JCIT4                    Montgomery - direct
1    on the 782 (c), and when it is delivered to a terminal in New
2    Jersey, they tend to say, "New Jersey."
3            The problem is -- and EIA itself points it out -- that
4    New Jersey is actually, most of the terminals are in New
5    Jersey.  When the tank trucks go somewhere to pick up the
6    gasoline to take it somewhere else other than New York Harbor,
7    like New York State, they have a tendency to pick it up in New
8    Jersey more often than they do in New York.  We can see this in
                                Page 64

9 the data because the EIA data for the prime supplier data
10 overestimate the consumption in New Jersey by up to 30 percent
11 in many years compared to the SEDS data which measures the
12 actual consumption.
13        And the EIA data, remarkably enough, underestimate
14 consumption in New York by a large amount relative to the SEDS
15 data.  So I do not believe that the EIA 782 (c) data gives
16 anything resembling an accurate picture of what sales are in
17 New Jersey, what consumption is in either New Jersey or New
18 York at the retail level.
19 Q.  Did you do anything to try to make certain that the
20 Lundberg data that you were relying on was accurately
21 reflecting people's market shares?
22 A.  Yes, I did.
23 Q.  Tell the jury what did you do.
24 A.  Well, I checked the data itself for any anomalies that I
25 could detect to see whether there was anything strange as I

6340
9A1JCIT4                    Montgomery - direct
1 looked at the data from one year to another.
2        I also checked it against the SEDS data.  I performed
3 the same test for the Lundberg data for New York that I
4 performed for the 782 (c) data for New York.  I found that the
5 Lundberg data was generally within about 5 percent, very
6 consistently of the SEDS data for the total state.
7        Therefore, I concluded it was, in fact, capturing
8 accurately the New York shares, as it would since it was
9 collecting the data based on -- since the data were based on
10 tax collections in New York State.
11 Q.  Now, with regard to the work you did in this case, did you
12 calculate for the purposes of refined product what the average
13 percentage of Exxon/Mobil refined product was in New York
14 Harbor during the entire period 1985 to 2003?
15 A.  Yes, I did.
16 Q.  Slide 23, please.
17        Can you tell the jury what this illustrates.
18 A.  This is jumping back again.
19 Q.  Correct.
20 A.  I am not talking about the retail market share in this
21 case, 27.7 percent.  This is going back for the entire period
22 1985 to 2003 of the gasoline that was refined and manufactured
23 by Exxon/Mobil, for that 10 percent.
24 Q.  With regard to market share, your opinion is that it is as
25 reflected on Slide 25, those percentages reflect the market

6341
9A1JCIT4                    Montgomery - direct
1 share at retail of Exxon and each of the companies reported by
2 Lundberg?
3 A.  Yes, they do.
4        MR. STACK:  I have no further questions.
5        THE COURT:  Thank you.  Mr. Chapman.
6        MR. CHAPMAN:  Thank you, your Honor.
7 CROSS EXAMINATION
8 BY MR. CHAPMAN:
9 Q.  Good afternoon, sir.
10 A.  Good afternoon.
11 Q.  Now, you've worked for Charles River Associates as an
12 economist for 19 years?
13 A.  Yes.

14  Q.  Exxon has been a client of Charles River Associates for the
15  whole time you've been there, right?
16  A.  Yes, that's probably true.  I have not worked for them
17  myself for that whole time, but I think they probably have been
18  a client.
19  Q.  But you've personally done significant work for Exxon over
20  the past five or six years, right?
21  A.  Yes.
22  Q.  You've also done work for four or five other oil companies,
23  correct?
24  A.  At various times.  I am not sure that is true of the last
25  four to five years.

1   Q.  But while you've been at Charles River Associates?
2   A.  Yes.
3   Q.  You've done work for the American Petroleum Institute,
4   right?
5   A.  Yes.
6   Q.  Exxon is a member of the American Petroleum Institute?
7   A.  That's correct.
8   Q.  Exxon is paying $650.00 an hour for your work and testimony
9   here today, correct?
10  A.  That's correct.  That is my standard rate that Charles
11  River Associates charges all clients.
12  Q.  $650.00 an hour?
13  A.  Yes.
14  Q.  How much have you charged Exxon for your work in this
15  matter so far?
16  A.  I think that CRA's total billings, which include a project
17  team, have been about $750,000.
18  Q.  Three quarters of a million dollars for your work on this
19  case?
20  A.  Yes.
21  Q.  How much has Exxon paid Charles River Associates for your
22  work over the past five to six years?
23  A.  I do not have any -- I have no idea.
24  Q.  You have done significant work for Exxon over the past five
25  or six years, you're an economist and you have no idea how much

1   you have been paid over that period of time?
2   A.  I don't add it up over that entire period of time.
3   Q.  Let's try to add it up, sir.
4   A.  Okay.
5   Q.  How much did you get -- how much did Charles River get paid
6   by Exxon last year?
7   A.  I am telling you my memory is inexact, but in projects that
8   I had anything to do with, I believe it was several hundred
9   thousand dollars.  My guess would be 200,000 to 300,000.
10  Q.  That was for the significant work you did for them, right?
11  A.  Well, "significant" is your word.  That is the work that I
12  did for them.
13  Q.  No, sir, that was your word, "significant."  I asked you
14  whether you had done significant work, and you said you had.
15       So $203,000 plus the 750,000 they paid you, how much
16  for the year before that?
17  A.  I would say that the work that I've done for Exxon has
18  ranged probably between $200,000 a year to $500,000 a year over

Page 66

19  the past five years.  There are probably some years where it
20  was minimal.
21  Q.  It was minimal even though you did significant work during
22  that time?
23          MR. STACK:  Objection, your Honor.
24          THE COURT:  That is a little bit argumentative.
25          You could by now add up and approximate, I think -- or
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1   I could.  For the four years prior to this year at the average
2   of maybe, I don't know, 250, that is a million and this year
3   three, three quarters of a million.  Maybe all altogether the
4   five years, 2 million -- did I go too fast?
5           THE WITNESS:  You didn't go too fast.
6           THE COURT:  You have better math than me.
7           THE WITNESS:  Yes, I would say 2 million over the five
8   or six years.
9           THE COURT:  Give or take?
10          THE WITNESS:  This case this year and the other years
11  you talked about, I would say that's probably a reasonable
12  estimate.
13          As far as "significant" goes, I would also say it is
14  probably somewhere between 10 and 20 percent of the business
15  I'm responsible for at most.
16  BY MR. CHAPMAN:
17  Q.  At least a couple of million dollars and up to 20 percent
18  of the work that you do for Exxon, right?
19  A.  That would be in a high year, yes.
20  Q.  Could you describe the matters that you've worked on for
21  Exxon over the past five or six years?
22  A.  Well, they really haven't been matters.  Most of the work I
23  have done for Exxon -- as I said, I have never testified for
24  Exxon before -- most of the work I have done for Exxon over the
25  past five years has been strategy consulting work and business
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1   consulting work and advisory work to the company itself.
2   Q.  Well, can you give me an example of the business consulting
3   work you've done for this couple of million dollars?
4   A.  I've made presentations to internal task forces and
5   planning departments within the company about the kind of
6   current status and outlook of issues in energy markets and
7   environmental policy that I work on.
8   Q.  Do you have any specifics about what you have advised on?
9   A.  Our work for our clients at CRA is covered by very tight
10  confidentiality agreements.  That controls what I am doing for
11  Exxon.  What I have told you is about all I understand I can
12  disclose about those assignments.
13          MR. CHAPMAN:  Your Honor, Exxon is a party.
14          THE COURT:  I was expecting an objection.  I was
15  planning to sustain it.
16          The specifics of other consulting that may have
17  involved confidential information is just not relevant here.
18  The jury has the idea.  He worked a lot for Exxon, billed a lot
19  for Exxon.  what percentage of that do you think was litigation
20  related?  This potential total of 2 million over five years,
21  how much involved litigation?
22          THE WITNESS:  Only this case.
23          THE COURT:  Okay.
                        Page 67

24  BY MR. CHAPMAN:
25  Q.  Now, sir, the gasoline that you talked about that comes
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6346

9A1JCIT4                    Montgomery - cross
1   into New York Harbor through the pipelines and which goes into
2   the storage terminals is co-mingled product, right?
3   A.  That is what I understand has been discussed in this case
4   and is one of the theories that the jury is considering.
5   Q.  That is not my question, sir.
6           My question is --
7           THE COURT:  Based on your knowledge and expertise, is
8   it co-mingled in the pipeline?
9           THE WITNESS:  Sometimes it is and sometimes it isn't.
10          THE COURT:  Okay.
11  BY MR. CHAPMAN:
12  Q.  Well, when you say sometimes it is and sometimes it isn't,
13  what do you mean?
14          MR. STACK:  Objection, your Honor.  This is beyond the
15  scope of his expert report.
16          THE COURT:  I will allow it.  He talked about
17  knowledge of this --
18          THE WITNESS:  Let me say for the purposes of doing my
19  calculation, I assumed that a hundred percent of the gasoline
20  was co-mingled everywhere.
21          I am quite sure that is not true because I know that
22  there are companies that ship gasoline in segregated products.
23  BP does it because they have a particular formulation that they
24  like that they want to keep separate.  Exxon has done it at
25  times for particular grades of gasoline and has not done it at
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6347

9A1JCIT4                    Montgomery - cross
1   times.
2           I remember perfectly well that Amoco was the only
3   company that had unleaded gasoline.  That kept that strictly
4   segregated.  Some companies have their own tanks in which they
5   keep their own product.
6           On the Colonial product there is a tarrif.  You can
7   pay extra if you want to keep your product segregated, and it
8   is cheaper if you let them mix it up with everybody else's.
9           Sometimes it is, sometimes it isn't.
10  Q.  Sir, you have got a notebook in front of you.
11  A.  Ah-huh.
12  Q.  Would you turn to Tab 2, which is your supplemental report
13  of March 30th, 2009.
14  A.  Ah-huh.
15  Q.  Turn to Page 5, Paragraph 10.  Do you have that in front of
16  you?
17  A.  Yes.
18  Q.  If you would look at the second sentence that starts with,
19  "It is well established."  Do you see that?
20  A.  Yep.
21  Q.  Would you read that sentence to the jury, please.
22  A.  "It is well established that due to co-mingling -- I am
23  sorry -- it is well established that due to co-mingling of
24  shipments in pipelines and storage terminals, it is correct to
25  treat gasoline in New York Harbor as a mixed combination of
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6348

9A1JCIT4                    Montgomery - cross
1  gasoline for multiple sources at any point in time."
2  Q.  Those are your words, right?
3  A.  Yes.
4  Q.  Exxon paid you for those words?
5          MR. STACK:  Objection, your Honor.
6          THE COURT:  Sustained as argumentative.  He was a
7  retained expert.
8          (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                            6349
9a1dcit5                    Montgomery - cross
1  Q.  Sir, you said that you performed a market share calculation
2  for retail sales, correct?
3  A.  Yes.
4  Q.  And you based that calculation primarily on the Lundberg
5  survey, correct?
6  A.  Yes.
7  Q.  Now, if you would turn to Tab 4 of your notebook, which is
8  your third supplemental report dated September 28, '09, and if
9  you would look at the chart, which is Exhibit 1, on page 6, and
10 tell me when you get there.
11         THE COURT:  I'm sorry, I got lost.  Say it again.
12 Which exhibit?  Just tell me again.
13         MR. CHAPMAN:  Tab 4, page 6.  The chart is called
14 Appendix B-Exhibit 1.
15         THE COURT:  Thank you.
16 A.  Yes.
17 Q.  Do you have that in front of you, sir?
18 A.  Yes, I would call it a table.
19 Q.  It is entitled Appendix B-Exhibit 1, right?
20 A.  Yes.
21 Q.  Can we put that up, please.
22         Now, what this shows is --
23         THE COURT:  Excuse me.  Can that be made any larger,
24 if you can?
25 Q.  Can we go up to the top lines, first, the top few lines.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                            6350
9a1dcit5                    Montgomery - cross
1          There we go.
2          This shows historical market share of gasoline sold in
3  New York by present day companies, right?
4  A.  Yes.
                          Page 69

```
5    Q.  And so the years are on the line, and they go from '86 to
6    2003, right?
7    A.  Yes.
8    Q.  And so that shows, for example, for 1988, ExxonMobil's
9    share was 25.4 percent, right?
10   A.  Yes.
11   Q.  And in '91 Exxon's share was 27.4 percent?
12   A.  Yes.
13   Q.  And in '96, it was as much as 29.9 percent?
14   A.  That's correct.
15   Q.  And now if we can continue on there.
16           So Exxon's share got up above 30 percent for a couple
17   of years, '98, 2002, right?
18   A.  Yes.
19   Q.  And the average was 27.7 percent?
20   A.  Correct.
21   Q.  And other companies, if you go back over to the left, the
22   other major companies, Chevron, for example, for some years
23   3 percent, 3.2 percent, etc., right?
24   A.  Yes.
25   Q.  So based on this, Exxon was clearly the retail leader,
```

                                                                        6351
```
1    right?
2            THE COURT:  Do you want to see the --
3            THE WITNESS:  No, I'm just trying to be sure I
4    understand your question.
5    A.  No, it doesn't tell us that.  It tells us that the
6    combination of Exxon and Mobil had the largest market share
7    during that period when you add them together.  Actually, Sun,
8    in most years, had a very substantial market share.  And if you
9    look at Exhibit 2, you will see it is much, much larger than
10   Exxon's ever was.
11   Q.  OK.  Sir, why don't we just see if we can make sense of the
12   numbers.
13           Can we go over to the right, Liz, please, the
14   right-hand column.
15           Just so -- to keep this very simple:  27.7 percent on
16   that right-hand column, that's ExxonMobil, right?
17   A.  Yes.
18   Q.  On the chart you prepared?
19   A.  Yes.
20   Q.  And that's the biggest number in that column, right?
21   A.  Well, if you go down further, you will see that the next
22   biggest number is something you didn't include.
23   Q.  Sir --
24           THE COURT:  That is OK.  Excuse me.
25           What is the next biggest number?
```

                                                                        6352
```
1            THE WITNESS:  Sun.  And I believe it's 13 --
2            THE COURT:  When you say Sun, do you mean Sunoco?
3            THE WITNESS:  Sunoco, yes.
4            THE COURT:  And what number is it?
5            THE WITNESS:  Let's see.  Let me go back here.  Sunoco
6    is 12.1 percent.
7            THE COURT:  You are not saying 12.1 is bigger than 27?
8            THE WITNESS:  No, I am not.
9            THE COURT:  So ExxonMobil together is the biggest,
```

10    right?
11                THE WITNESS:  It is the biggest, yes.
12                THE COURT:  It is the biggest, OK.  All right.
13                MR. CHAPMAN:  All right.
14    BY MR. CHAPMAN:
15    Q.  And, sir, in describing the oil -- you can take the chart
16    down.
17                In describing the supply into New York Harbor, as you
18    describe it, you assumed that for purposes of your analysis,
19    once the gasoline manufactured by Exxon entered the pipeline
20    system, it was commingled with that of other manufacturers,
21    right?
22    A.  Yes.
23    Q.  So let me ask you about your methodology.  Let's say Exxon
24    puts 20,000 barrels into the Colonial Pipeline at one point and
25    it was then commingled.  OK?

                                                                6353

       9a1dcit5              Montgomery - cross
1     A.  Yes.
2     Q.  And while it was on the pipeline, in the pipeline, Exxon
3     exchanged 10,000 barrels.
4     A.  While it is in the pipeline?
5     Q.  While it is in the pipeline.
6     A.  OK.
7     Q.  And further up the pipeline Exxon purchased 10,000 barrels.
8                How many thousand barrels did you credit Exxon with
9     when it arrived in New York Harbor?  10,000?  20,000?  Which
10    one?
11    A.  None of those.  That's -- I explained in my calculation, it
12    was not based on transactions at all.  It was based on the
13    physical volumes that were refined and manufactured by Exxon
14    and put into the pipeline.  And there were basically four
15    steps.  The first is how much did Exxon put into the pipeline.
16    As I said, over this period, that was roughly 30 million
17    barrels per year.  How much did everyone put into the pipeline
18    physically?  That was 100 million barrels per year.  Exxon was
19    three-tenths of that.  How much came out in New York Harbor?
20    25 million barrels.  We know that three-quarters of what was
21    put on the Colonial didn't get to New York Harbor, and if it's
22    commingled, that means that three-quarters of what Exxon put
23    into the pipeline didn't get to New York Harbor.
24    Q.  So you didn't take into account the amount of gasoline that
25    ExxonMobil took title to out of the Colonial Pipeline in New

                                                                6354

       9a1dcit5              Montgomery - cross
1     York Harbor, is that right?
2     A.  Of course not.  The purpose of this calculation was to
3     track how much gasoline was refined and manufactured by
4     ExxonMobil, and, by definition, if they took title to someone
5     else's gasoline in New York Harbor, that gasoline was
6     manufactured by someone else.
7     Q.  But it's a commingled product, so you don't know that, do
8     you?
9     A.  Yes, I do.  I know perfectly well that if the gasoline was
10    put into the Colonial pipeline, when it arrived in New York
11    Harbor it was not commingled with Irving Oil Company's
12    shipments to New York Harbor that came by ship.  The
13    commingling occurred after it came into New York Harbor.  I
14    calculated the shares as they were going into New York Harbor.
                            Page 71

15            THE COURT:  So you're saying --
16            Wait.  Excuse me.
17            -- there was no commingling in the pipeline process?
18            THE WITNESS:  There was commingling in the pipeline
19   but in each pipeline it occurred separately.
20            THE COURT:  So there are two stages to the
21   commingling; one in the pipeline itself?
22            THE WITNESS:  Yes.
23            THE COURT:  One in the harbor?
24            THE WITNESS:  Yes.  Exactly right.  So what I'm saying
25   is the 25 -- sorry, the 8 million barrels of Exxon gasoline
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

9a1dcit5                    Montgomery - cross
1    that was its share of the commingled 25 million that came out
2    of the Colonial Pipeline, that 8 million was then commingled
3    with the remaining -- I'm sorry, 33 million barrels say that
4    had come in from other sources so that you had a commingled
5    total, Exxon is just part of that commingled total.  And,
6    therefore, when we further go to ask, well, you know, what are
7    the likely shares in Queens, what are the likely shares in
8    Queens of what was manufactured by different refiners, it is
9    the same as the shares that they delivered into the pool in New
10   York Harbor.
11            It is like, I mean, suppose you have a -- never mind,
12   you had a bathtub that has four jets going into it.  Each one
13   of those jets may have -- let's make this fancy.  Suppose
14   you're doing a party and you have a jet that has yellow, a jet
15   that has green, a jet that has blue, going into your tub.  You
16   can tell exactly what color they are when they are going into
17   the tub.  They end up purple.  And we're saying that, you know,
18   in New York Harbor it's purple.  But it is not purple when it
19   comes in; it is entirely separate.
20            We know that the ship that's carrying Irving Oil's
21   product down toward Staten Island is not yet commingled with
22   the 25 percent Exxon product that's in the Colonial Pipeline.
23   BY MR. CHAPMAN:
24   Q.  Sir, what was the percentage of that purple product which
25   Exxon took title to in New York Harbor coming out of the
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

9a1dcit5                    Montgomery - cross
1    Colonial Pipeline?
2    A.  I have no idea because it is completely irrelevant to my
3    calculation.
4    Q.  You have no idea.
5            Now, sir --
6    A.  Actually, could I stop you?
7            THE COURT:  Yes, you can.
8    Q.  Yes, you can.
9    A.  I have a reasonable estimate -- first of all, I was not
10   asked to give an opinion on that.  I haven't looked into it
11   carefully.  But if pushed, I believe there is enough data in my
12   report that I could come up with the back-of-the-envelope
13   calculation.  Because I do know from the Lundberg data how much
14   they attributed to Exxon as a sale.  So the difference must be
15   it.
16            THE COURT:  I don't think anybody is asking you right
17   now to do that.
18            THE WITNESS:  OK.
19   Q.  But your number from Lundberg is 27.7 percent, right.
                            Page 72

20    A.  Yes.
21    Q.  OK.  Now, sir, you said that you -- you were asked to
22    calculate Exxon's market share as a manufacturer from 1985 to
23    2003, right?
24         MR. STACK:  Objection.  That mischaracterizes his
25    testimony.  He was not asked to calculate their market share as

9a1dcit5                    Montgomery - cross
1     a manufacturer.
2          THE COURT:  I don't know.  You mean as a manufacturer
3     and refiner; is that your point?
4          MR. STACK:  Yes, your Honor.
5          THE COURT:  That is all.  That is the only point he is
6     making.
7     Q.  You calculated the market share as a manufacturer and
8     refiner, right?
9     A.  Yes.  The fraction that they produced that reached New York
10    Harbor as relative to the total in New York Harbor.
11    Q.  OK.  Manufacturer and refiner, right?
12    A.  Mm-hmm, that's right.
13    Q.  What is the difference, based on what you did, between a
14    manufacturer and a refiner?
15    A.  They are words that have been used in the court proceedings
16    here and I am treating them as synonymous, that is, that
17    refining is a manufacturing activity.
18    Q.  So when you say manufacturer or refiner, there is no
19    difference in your mind, right?
20    A.  I'm not sure what you're getting at.  There are many
21    differences in my mind.  When I use the word refiner and
22    manufacturer, I didn't intend any difference.
23         THE COURT:  Right.  In terms of the math and
24    calculations that you did, whether the question was posed as
25    manufacturer only or manufacturer and refiner would make no

9a1dcit5                    Montgomery - cross
1     difference; it would make no difference for your calculations?
2          THE WITNESS:  No, it would make no difference because
3     what I was calculating was just gasoline.
4          THE COURT:  It would make no difference?
5          THE WITNESS:  OK.
6     BY MR. CHAPMAN:
7     Q.  Sir, what is a manufacturer, as you use that term in your
8     testimony?
9     A.  A manufacturer is someone who falls into the SIC codes that
10    we call manufacturing, and refining does.
11    Q.  Could you define that for us?
12    A.  Yes.  The standard industrial classification lists
13    industries as being, you know, of different types.  There are
14    the kind of primary industries that mine metals.  There are the
15    retail industries, the distribution industries.  Manufacturing
16    is a category.  And the last I remembered, refining was a
17    manufacturing industry.
18    Q.  What is a manufacturer, sir, as you use the term in your
19    opinion?
20         MR. STACK:  Objection, your Honor.  I think we are
21    getting a little repetitive and argumentative.
22         THE COURT:  No, I don't think he has gotten the simple
23    definition yet that he is looking for.  I will allow it.
24    A.  A manufacturer is someone who essentially takes goods that
Page 73

25  are -- you know, a manufacturer is someone who produces -- I
        9a1dcit5                Montgomery - cross
1   cannot think of a general definition of manufacturer because I
2   don't at this point know exact -- remember exactly what it is
3   that the Department of Commerce uses as a criterion.  It's
4   something that's not an extractive industry.  It's something
5   that is not a service industry.  It is something that produces
6   something.
7   Q.  Sir, all I am asking for is the definition that you used in
8   reaching your opinions that you testified to today about what a
9   manufacturer is?
10          MR. STACK:  Your Honor, he has indicated manufacturer
11  is synonymous with refiner.
12          THE COURT:  He has.  Is that all you are looking for?
13          MR. CHAPMAN:  Let me test that a little bit.
14          THE COURT:  All right.
15  BY MR. CHAPMAN:
16  Q.  Let's take Boeing Aircraft, is that an aircraft
17  manufacturer?
18  A.  Yes, it is.
19  Q.  So if Boeing has another company make wings to its
20  specifications, Boeing takes those wings, puts it on the plane,
21  and Boeing is the manufacturer of the airplane, right?
22  A.  That is correct.
23  Q.  So that's a definition that you used here in your
24  testimony, right?
25  A.  No.  The definitions that I used were, first of all, I
        9a1dcit5                Montgomery - cross
1   mean, I calculated some numbers.  The definition of the
2   denominator in my shares is simply the total amount of gasoline
3   consumed out of New York Harbor.  So the definition -- so that
4   is defined based on what it is, motor gasoline, finished motor
5   gasoline.  When I calculated --
6           THE COURT:  OK.  I think I kind of see what
7   Mr. Chapman is trying to say.
8           Are you trying to say -- let me see if I can re-ask
9   the question -- that if ExxonMobil contracted with somebody
10  else to manufacture for it --
11          MR. CHAPMAN:  Right.
12          THE COURT:  -- and then ExxonMobil takes that
13  manufactured gasoline as its own, because it asked somebody to
14  manufacture that gasoline for it, did you count that as
15  ExxonMobil's gasoline?
16          THE WITNESS:  No.  I counted the finished motor
17  gasoline that was produced by ExxonMobil in the refinery.
18          THE COURT:  You excluded that which was manufactured
19  for ExxonMobil; ExxonMobil asked company X please manufacture
20  this for me and sell it to me, you did not include that?
21          THE WITNESS:  Yes.  But I likewise included all of the
22  gasoline that ExxonMobil manufactured for someone else.
23          THE COURT:  True, but --
24          THE WITNESS:  And Bayway always was in an excess
25  position.  They were always manufacturing for someone else as
        9a1dcit5                Montgomery - cross
                            Page 74

```
 1   well as Exxon.
 2           THE COURT:  Right.  But not the other way around.  If
 3   ExxonMobil contracted with somebody else to manufacture for it,
 4   you did not count that?
 5           THE WITNESS:  I didn't count that.  I did count what
 6   it manufactured for other people.
 7           THE COURT:  OK.
 8   BY MR. CHAPMAN:
 9   Q.  Sir, let's turn to Tab 3 in your notebook, which is your
10   report of August 28, 2009, and I would like you to turn to page
11   20 and there is a chart, I believe.
12           THE COURT:  You said August 28, 2009, right?
13           MR. CHAPMAN:  August 28, 2009, your Honor, Tab 3.
14           THE COURT:  And you said page 20?
15           MR. CHAPMAN:  Page 20.
16           THE COURT:  OK.
17   Q.  Do you have that, sir?
18   A.  Yes, I do.
19   Q.  Could we have that up on the screen, please.
20           This is your opinion of Exxon's percentage into New
21   York Harbor as a refiner/manufacturer for '85 to 2003, correct?
22   A.  Yes.  I think these are the same numbers that I showed in
23   my first two charts.
24   Q.  This is from one of your reports, right?
25   A.  Yes, and from my testimony today.
```

```
                9a1dcit5          Montgomery - cross
 1   Q.  So from the years, say, '88 to '92, Exxon's market share as
 2   a manufacturer or refiner is about 22 percent, right?
 3   A.  I can't say that I could do that arithmetic exactly in my
 4   head, but I'll take it that that's about right.
 5   Q.  That sounds about right?
 6   A.  Yeah.
 7   Q.  OK.  During that time period Exxon owned the Bayway
 8   Refinery, right?
 9   A.  Yes.
10   Q.  And in 1993 Exxon sold the Bayway Refinery to Tosco, is
11   that correct?
12   A.  Yes.
13   Q.  And after that sale, you didn't count the Bayway production
14   in Exxon's market share, did you?
15   A.  Of course not.  Exxon was not the -- Exxon was not
16   physically refining the gasoline.  It no longer owned and
17   controlled the refinery that it was being refined in.
18   Q.  So you didn't count it in your calculation, is that right?
19   A.  Of course not.  I think I made that clear in all my
20   reports.
21   Q.  You didn't count it in your calculation?
22           MR. STACK:  He said that.
23           THE COURT:  I think he just said that four times.
24   BY MR. CHAPMAN:
25   Q.  All right.  Now, did anyone from Exxon show you the supply
```

```
                9a1dcit5          Montgomery - cross
 1   contract between Exxon and Tosco dated April 8, 1993,
 2   concerning the Bayway Refinery?
 3   A.  No.  I didn't look at any supply contracts.
 4   Q.  OK.  Why don't we turn to Tab 5.  That is PL-5572.  It is
 5   in evidence.  There has been testimony on it in this case.
```

9A1JCITF
```
 6      MR. STACK:  Your Honor, I'm objecting on the
 7 grounds -- three grounds:  First, he has indicated he hasn't
 8 looked at it.  Second of all, it is not relevant to his opinion
 9 concerning who refined the gasoline.  And, thirdly, counsel has
10 prepared not only these exhibits but other graphic exhibits
11 which are misleading, confusing --
12      THE COURT:  I can't rule on other exhibits which we
13 are not up to.  But the first two grounds of objection are both
14 overruled.  He is allowed to try to impeach him and he has
15 brought out that he didn't consider that which Exxon contracted
16 to buy from other manufacturers.
17      So, Mr. Chapman, you can question him about that.  I
18 understand he has not looked at it.  He is showing it to him
19 now.  It is in evidence.  He is allowed to do that.
20 Q.  Sir, did anyone from Exxon tell you, or did you become
21 aware that there was a five-year agreement for Tosco to provide
22 Exxon with 32.9 million barrels of product for delivery in New
23 York Harbor for the first year of the contract?
24 A.  I can't say that I know the exact numbers, but I was
25 certainly aware that Exxon was purchasing product from Bayway.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6364

9a1dcit5                    Montgomery - cross
```
 1 It's obvious because that was the only source it could have
 2 used to supply its gasoline stations.
 3 Q.  Were you aware that the contract required Tosco to supply
 4 25.6 million barrels to Exxon each year thereafter for delivery
 5 to New York Harbor?
 6 A.  No.  But I would say it strikes me as being a perfectly
 7 standard contract for purchasing -- a perfectly standard
 8 long-term contract for purchasing.
 9 Q.  OK.  And were you aware that the contract required Bayway
10 to add a corrosion inhibitor specified by Exxon into all grades
11 of gasoline it produced for Exxon?
12 A.  It doesn't surprise me.
13 Q.  OK.
14 A.  Again, it's common practice in purchasing gasoline from a
15 different refiner when logistically your refineries are not
16 appropriately located to serve a market.
17 Q.  Were you aware that even though Exxon sold Bayway to Tosco,
18 Exxon was still obligated to pay all additive system upgrades
19 at Bayway to comply with all laws and regulations?
20 A.  Excuse me?
21 Q.  Were you aware that even though Exxon sold Bayway to Tosco,
22 Exxon was still obligated to pay for all additive system
23 upgrades at Bayway to comply with all laws and regulations?
24      MR. STACK:  Is counsel reading from a document?  Can
25 he produce it?
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6365

9a1dcit5                    Montgomery - cross
```
 1      THE COURT:  I assume.  But the real question is were
 2 you aware of that?  If the answer is no, you can say no.
 3      THE WITNESS:  Actually, I don't understand what you
 4 are talking about.
 5      THE COURT:  I guess you weren't aware of it.  So the
 6 answer must be no.
 7      THE WITNESS:  I don't understand what you mean by an
 8 additive system.
 9      THE COURT:  There must be words in the contract.  But,
10 better yet, it is 3:30.  So if the jury would like their
```
Page 76

11   ten-minute recess, we will reconvene at 20 of 4.  Thank you.
12          (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              6366
     9a1dcit5                    Montgomery - cross
 1          (Jury not present)
 2          THE COURT:  Mr. Chapman, during the recess, can you
 3   point Dr. Montgomery to the language you are referring to?
 4          MR. CHAPMAN:  I will.
 5          THE COURT:  Would you watch that step.  You are making
 6   me very nervous.
 7          THE WITNESS:  I'm sorry.  I always hold on.  Thank
 8   you.
 9          THE COURT:  As usual, I have a couple of matters that
10   I have to take up with you during the recess.  I'll try to be
11   very quick so that we do get our so-called bio break.
12          Be seated.  Two quick issues.  One has to do with the
13   res ipsa business.
14          You know, on further thought about the res ipsa charge
15   and it has to be the city and which stations of the defense, I
16   think we should drop the res ipsa charge.  I don't think it
17   adds anything to this case.  I think you can argue to the jury
18   there were sources and there were leaks and you can put two and
19   two together and you can draw an inference and you will hear
20   the judge explain what negligence is, but I think it doesn't
21   add very much.  It is confusing.  And if you have to start
22   adding it here and adding it there, and for me to decide who
23   has control and it is really a fact issue, I think I am going
24   to leave it out of the charge entirely.
25          Any objection?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              6367
     9a1dcit5                    Montgomery - cross
 1          MR. CHAPMAN:  No objection, your Honor.
 2          MR. SACRIPANTI:  No objection, your Honor.
 3          THE COURT:  Done.  Good.
 4          Next.  On this offset for preexisting contamination,
 5   which you have in your draft charge, the ground seems to have
 6   shifted to me.  The way the charge reads now, and I have to
 7   spend a minute reading it:  ExxonMobil contends that the water
 8   in the capture zone in Station 6 is polluted by other
 9   contaminants.  ExxonMobil further contends that these other
10   contaminants also required treatment to make the water fit for
11   use as a backup supply of water, that the city's planned
12   treatment facility will treat these other contaminants as well
13   as MTBE.  ExxonMobil finally contends that it can demonstrate
14   how much it would have cost the city to treat these
15   contaminants in isolation.
                      Page 77

16          Then it says, and here is the important part:  The
17  city contends that by the time it intends to use this water, it
18  will no longer need to treat the water for other contaminants
19  in order to use the water for backup purposes.
20          Then it asks the jury three questions.  It says:  If
21  find that ExxonMobil has shown, by a fair preponderance of the
22  credible evidence, that, one, the water in the capture zone at
23  Station 6 is polluted by other contaminants that renders the
24  water unfit to serve for backup purposes; two, the city's
25  treatment for MTBE will also treat these other contaminants in

9a1dcit5                    Montgomery - cross
1   a manner that is necessary to make the water fit to serve; and,
2   three, the cost of treating the other contaminants in isolation
3   can be fairly estimated.
4           Now, my question is that after listening to
5   Ms. Bell -- it could have been afternoon, it could have been
6   between 12 and 1 o'clock this afternoon -- I'm not so sure that
7   the city is making the contentions that are in the charge any
8   longer or that the jury has to make these findings.
9           It seems now that the city agrees that it must treat
10  the PCE, that its treatment for MTBE will end up treating the
11  PCE, and that the cost of treating PCE in isolation can be
12  estimated, because she did it.  The only factual dispute seems
13  to be how much it would cost.
14          And this charge could be changed to reflect the
15  testimony now.
16          MR. CHAPMAN:  Your Honor, I agree.  And may we submit
17  some new language to your Honor this evening and we'll submit
18  it to counsel?
19          THE COURT:  Yes.  Could "this evening" be like before
20  7?
21          MR. CHAPMAN:  It absolutely will be.  Right,
22  Mr. Campins.
23          MR. CAMPINS:  Yes, your Honor.
24          THE COURT:  OK.  Did you want your break?
25          MR. SACRIPANTI:  Your Honor, we will get to comment on

9a1dcit5                    Montgomery - cross
1   that, I assume?
2           THE COURT:  You can't change the city's contention.
3   If the city no longer wants to contend --
4           MR. SACRIPANTI:  No.
5           THE COURT:  You can look at what they submit.
6           MR. SACRIPANTI:  Here is why I am at a loss, your
7   Honor, because my Mr. Campins is not here.  That is Mr. Pardo.
8           THE COURT:  I know that.  All I am trying to say is
9   that this seems somewhat favorable to you.
10          MR. SACRIPANTI:  It is, yes.
11          THE COURT:  You can look at what they submit.
12          MR. SACRIPANTI:  Thank you.
13          THE COURT:  But not for long if you want to sum up
14  because I need to know what I am going to charge.
15          MR. SACRIPANTI:  I just wanted to reserve --
16          THE COURT:  Yes.
17          MR. SACRIPANTI:  Thank you, your Honor.
18          (Recess)
19          (Continued on next page)
20

```
21
22
23
24
25
```

9a1dcit5                    Montgomery - cross
```
 1              (Jury present)
 2              THE COURT:  OK.  Please be seated.
 3              Mr. Chapman.
 4    BY MR. CHAPMAN:
 5    Q.  Dr. Montgomery, over the break, were you able to take a
 6    look at PL-5572?
 7    A.  Yes, I was.
 8    Q.  And are you now able to answer the question I asked you
 9    about the additive system upgrades?
10    A.  Yes.  I see what it is.  I understand what it is.
11              And, no, I have not seen this provision.
12    Q.  Now, sir, would you turn to Tab 3, which is your report of
13    August 28, 2009, and specifically go to page 24.  There is a
14    chart there.
15    A.  Yes.
16    Q.  Now, sir, this is the ExxonMobil percentage of gasoline in
17    New York Harbor 1985 to 2003, correct?
18    A.  Yes.
19    Q.  And it says on bottom of it -- this is your report -- that
20    the ExxonMobil average percentage of gasoline from '85 to 2003
21    is 10.6 percent, right?
22    A.  Yes.
23    Q.  So on the graphic you testified to on direct, you rounded
24    .6 down to zero, right?
25    A.  Yes, it must have been --
```

9a1dcit5                    Montgomery - cross
```
 1    Q.  More proper to have rounded it up?
 2    A.  You are right.  It was unintentional.
 3    Q.  Sir, if you counted the Bayway production for five years
 4    after sale as part of Exxon's manufacturer share, how would
 5    that change the numbers on this chart?
 6    A.  It would change them to something different.  They would no
 7    longer, in my opinion, be a share of the amount that Exxon had
 8    refined that was delivered to New York Harbor.
 9    Q.  OK.  I understand that, sir.  But the numbers all go up,
10    wouldn't they?
11    A.  Not necessarily, because if I applied that rule
12    consistently, I would be subtracting everything that someone
13    else contracted with Exxon to produce for them.
14    Q.  Maybe you missed my question, sir.
15              I said, if you added the Bayway production, because
16    Bayway was obligated to deliver gasoline to Exxon in New York
17    Harbor, if you added that production to the five years of the
18    contract, the numbers on your chart would go up, wouldn't they?
19              THE COURT:  Mr. Stack is standing because he didn't
20    miss your question at all.  He understood your question
21    perfectly, and your answer.  He said, no, they wouldn't
22    necessarily go up because I would have to subtract out that
23    which Exxon manufactured for somebody else.  I would have to no
24    longer count that as manufactured by Exxon.  So he is saying it
25    would be a plus and a minus.
```

9a1dcit5                    Montgomery - cross
1  Q.  Well, sir, let me --
2          THE COURT:  I'm sorry to translate.
3          THE WITNESS:  Thank you.
4  Q.  Let me ask you this about your chart.
5          Prior to '92, where you see Exxon with percentages of
6  23 percent, 22 percent, 16 percent, you were subtracting the
7  amounts which Exxon sold to others, right?
8  A.  No, I was not.
9  Q.  You were not.
10          When did you start doing that?
11 A.  I never did that, because that was not an appropriate --
12 neither of those adjustments would be an appropriate thing to
13 do when I am calculating the share of the amount of gasoline
14 that Exxon produced in New York Harbor.
15 Q.  Well, how much did Exxon produce for others, say, in 1995?
16 A.  I don't know.  You would need to give me that number along
17 with the number for what was produced at Bayway after 1995 --
18 after 1992.
19          THE COURT:  At this point, just sitting here, you
20 don't have any idea if they were a large producer for others or
21 a small producer for others?
22          THE WITNESS:  I do know they were a producer for
23 others because they had excess product beyond what they needed,
24 but I don't have a precise number.  I think it was in between.
25 BY THE WITNESS:

9a1dcit5                    Montgomery - cross
1  Q.  So you don't know whether the numbers would go up or down
2  if you added Bayway and subtracted what Exxon made for others,
3  right?
4  A.  It would be an incorrect thing to do but I don't know which
5  way it would turn out.
6  Q.  Now, sir, in making all of these calculations, based upon
7  the evidence that was available to you, did you use the Mobil
8  computer program named PACE-CTR concerning refiners and
9  manufacturers for the years 1994 to 1999?
10 A.  No, I didn't.  I was aware of it but it hadn't -- it
11 provided no useful information.
12 Q.  So you looked at the program?
13 A.  I am aware, from statements in the documentation, of what
14 the program was intended to do.
15 Q.  But let me ask you:  Did you look at the information on
16 that computer program or not?
17 A.  No.  I looked at the description of what the information
18 was, and the description was of something that had nothing to
19 do with this calculation.
20 Q.  Whose description was that?
21 A.  It was the -- it was the description in the -- in the
22 responses to questions.  You have it, too.
23 Q.  I'm trying to figure out what you said you looked at.
24 Responses to what questions and responses by who?
25 A.  It was responses to rogs, to interrogatories.  I would have

9a1dcit5                    Montgomery - cross
1  to go dig back to find the particular piece of paper.  It was a
Page 80

2    long time back, and it was kind of essentially dropped out of
3    the calculations because all it was showing, if I remember it
4    correctly, is the amount of gasoline that was delivered and
5    sold in New York by Mobil, but told nothing about the origin of
6    that gasoline.  It was no better than the 782C responses as far
7    as determining what the amount of gasoline was that Mobil
8    refined and produced.
9    Q.  But you also looked at the retail figures for ExxonMobil,
10   right?
11   A.  No, not in calculating this.  They had nothing to do with
12   this calculation.
13   Q.  I am not talking about this calculation anymore.
14          You gave us a figure of 27.7 percent for ExxonMobil's
15   retail share, right?
16   A.  Yes.  Could we take this down, then?  It is confusing me.
17   Q.  Sure, we could take that down.
18   A.  Thank you.
19   Q.  Let's go back.
20          Did you use the PACE-CTR program of Mobil's for the
21   years 1994-1999 in doing your retail calculations?
22   A.  No, because I was -- I needed to do a retail calculation
23   for every year that was not available for every year and for
24   every company.  I could not calculate a share for ExxonMobil
25   using data that was different and possibly inconsistent with

9a1dcit5                    Montgomery - cross
1    the Lundberg data I was using for everyone else.  The shares
2    would be meaningless.
3    Q.  Did you use the Exxon computer program named MARS, M-A-R-S,
4    concerning the movement of gasoline from terminals to gas
5    stations in Queens for the years 1987 to 2001 to verify your
6    opinions?
7    A.  No, I didn't, because, again, the Lundberg data was
8    providing the only comprehensive data source for doing that.
9    Q.  Well, sir, why don't we take a look at Tab No. 6, page 4,
10   which is the CMO 4, prepared by Exxon in this case.
11   A.  I'm sorry.  Where?
12   Q.  Tab 6, page 4.  Unfortunately, these were not numbered
13   pages when Exxon prepared it.
14   A.  Yes.
15   Q.  OK.  And it says --
16          I have highlighted some language there.  This is from
17   Exxon.
18          -- "From approximately 1987 to 2001, Exxon used a
19   database in the ordinary course of business named 'MARS' which
20   recorded movement of gasoline from terminals to service
21   stations in the Queens County area."
22          Do you see that?
23   A.  Yes, I do.  Give me just a chance to look at this and make
24   sure it is what I think it is.
25          (Pause)

9a1dcit5                    Montgomery - cross
1          Yes.
2    Q.  First of all, sir, were you given this document to look at?
3    A.  It looks --
4    Q.  Or are you talking about something else?
5    A.  No, I'm trying to look at the document to determine that
6    this particular section looks familiar but the rest of the

7   document doesn't.  So I'm not sure.
8   Q.  Well, did anyone at Exxon ever tell you that Exxon had a
9   computer program from '87 to 2001 that it used in the ordinary
10  course of business to record the movements of gasoline into the
11  particular geographic area you were looking at?
12  A.  Yes -- well, excuse me.  That was not the geographic area I
13  was looking at.  The geographic area I was looking at was what
14  I described, which is New York Harbor.  Because the presumption
15  that we were starting with, a commingled product theory, and
16  that the appropriate way to measure market shares of what was
17  delivered to Queens was to look at market shares in the total
18  New York Harbor, because essentially Queens was just dipping
19  out of New York Harbor.
20          Knowing what one company delivered to Queens would be
21  of absolutely no use in calculating either of the shares that
22  I've talked about.
23  Q.  It is your opinion, is it not, that a refiner's share of
24  gasoline delivered to New York Harbor is the best estimate of
25  that refiner's share of supply to Queens County, right?

6377

9a1dcit5                    Montgomery - cross
1           MR. STACK:  Are you talking about retail now or
2   refiners?
3           MR. CHAPMAN:  I said refiners right in my question.
4   A.  You are taking that completely out of context.  That was in
5   a report when I was describing my methodology for calculating
6   the share of Exxon's refined product that Exxon had produced at
7   its refineries and what the share of that was in the total
8   amount of gasoline that was delivered into New York Harbor.
9   Q.  In your opinion, that was the best estimate of that
10  refiner's share of supply to Queens County, right?
11  A.  That was -- that was the best estimate of the amount -- you
12  might go on and read the next sentence.
13  Q.  I just asked you a question, sir.
14  A.  You're taking my words out of context.
15          THE COURT:  Let's not quibble about it.  Let's read
16  the next sentence.  "Rachel Taylor" --
17          THE WITNESS:  No.  Back in what Mr. Sher is citing,
18  which is a completely different document.
19          THE COURT:  Oh, Mr. Chapman.
20  A.  Mr. Chapman.  I'm sorry.  I have been looking at everyone
21  from the back.  So I'm sorry, Mr. Chapman.
22          MR. CHAPMAN:  I take that as a compliment.
23  Q.  Let's look at your March 30, 2009 report, page 5, and that
24  is --
25          MR. STACK:  Tab 2.

6378

9a1dcit5                    Montgomery - cross
1   Q.  Tab 2.
2   A.  OK.  Yes.  Which part were you quoting?  OK.
3           Right.  That was the introductory sentence here.  I
4   said it is well established that due to commingling of
5   shipments -- that's what I'm saying.  If the shipments are
6   commingled, it's correct to treat gasoline in New York Harbor
7   as a mixed combination of gasoline from multiple sources at any
8   point in time.  It is the next sentence which applies to the
9   question you are asking me, which is:  "Because Queens County
10  is supplied from New York Harbor, market shares" -- that is,
11  the share of the gasoline that is produced by Exxon in the pool

12  in New York Harbor, the amount of cream that came from an Exxon
13  refinery in the cup of coffee is going to be the same in that
14  big cup of coffee as it is in the sip that Queens County takes
15  from the cup of coffee.  That's what I'm saying.  That's what
16  my testimony has been, and that's what the report says.
17          "Because Queens County is supplied from New York
18  Harbor, market shares of gasoline delivered to Queens County
19  from New York Harbor will be in the same proportions as the
20  percentage of any particular refinery's gasoline produced and
21  delivered to New York Harbor divided by total deliveries to New
22  York Harbor."
23          That's my definition.  That's my statement.  And it
24  only applies to the commingled product of gasoline produced by
25  ExxonMobil.

6379

9a1dcit5              Montgomery - cross
1   Q.  Take that down.  Let me ask you a prior question, sir.
2           Did you look at the database called MARS that
3   ExxonMobil identified?
4   A.  No, I did not, because it was irrelevant to either this
5   calculation or to the calculation of market shares in the State
6   of New York for which information about deliveries to Queens
7   tells me nothing.
8   Q.  Did you even know about MARS when you prepared your report?
9   A.  I believe I did but it didn't matter because it had nothing
10  to do with what I was measuring.
11  Q.  So you didn't take the time to have any of your staff look
12  at that database to see if the description was actually
13  accurate, that there might have been information you needed on
14  it, is that correct?
15  A.  I took the sworn statements of the Exxon affidavits as
16  being correct.
17  Q.  Sir, how many people worked with you on your reports at
18  Charles River Associates?
19  A.  Five or six.
20  Q.  And you didn't ask any of those five or six people to look
21  at the MARS database, correct?
22  A.  No.  We examined other things in great detail when they
23  were relevant in order to check things, but for an irrelevant
24  database that I could tell from the description was not going
25  to contribute to my calculations, I don't believe they looked

6380

9a1dcit5              Montgomery - cross
1   at it.
2   Q.  But you don't know?
3   A.  We looked at a great many things.  We looked at PACE-CTR,
4   which you mentioned before, I know.  We looked at the reporting
5   systems that both Exxon and Mobil had for what they called
6   their Clean Air Act reporting systems, which told us a lot
7   about how much they produced in their refineries but nothing
8   about where it went.  And we realized that none of those were
9   going to help us in calculating these market shares.
10  Q.  Well, OK.  Now you say you did look at the PACE-CTR?
11  A.  Yes.
12  Q.  You looked at that even though you knew that was
13  irrelevant?
14  A.  We looked into the database.  Someone may well have taken a
15  check to see what was in it.  I'm not aware of that check
16  because, at best, what it would have told us is what we knew

17    already from the documents that were describing it from Exxon.
18    Q.  Sir, all I'm trying to understand:  Did you look at the
19    PACE-CTR or not, yes or no?
20    A.  I think I've answered that.
21    Q.  You said no and then you said yes.  I know you've answered
22    it.  I'm trying to get to the fact of whether you did or not.
23    A.  I did not look at the database.  I examined every database
24    that appeared to have any relevant information based on the
25    representations that were made by the Exxon staff who swore to

6381

9a1dcit5               Montgomery - cross
1    these affidavits.
2    Q.  Who on the Exxon staff did you talk to about the PACE-CTR?
3    A.  No one.  I read what was stated by Ms. -- sorry, where were
4    you in the CMO?
5    Q.  Tab 6.  Tab 6, page 4.
6    A.  I believe it says Rachel Taylor compiled the transactional
7    information, and I believe this is signed by someone.  I had no
8    reason to question whether the transactional information was
9    what it was since it's very hard for something that says it is
10   to be movement of gasoline from terminals to service stations
11   in the Queens County area to be anything other than that.
12   Q.  In preparing your opinions, who did you speak to on behalf
13   of Exxon?
14   A.  I can't remember specific Exxon people that I or my team
15   discussed things with.  For the most part, we relied on
16   documents, and the documents were provided to us by the
17   attorneys and they were this kind of production that was
18   distributed to everyone.
19   Q.  Did you speak to any Exxon executives in connection with
20   preparing your opinions in this matter?
21   A.  No.
22   Q.  So you just spoke to the lawyers and you got documents,
23   right?
24   A.  Yes.
25          MR. CHAPMAN:  I have no more questions, your Honor.

6382

9a1dcit5               Montgomery - cross
1          THE COURT:  OK.  Any redirect?
2          MR. STACK:  Just one brief issue.
3    REDIRECT EXAMINATION
4    BY MR. STACK:
5    Q.  You indicated, Doctor, that your opinion with respect to
6    refined gasoline was that Exxon had a 10 percent or so share in
7    the period of 1985 to 2003, am I correct?
8    A.  Yes.
9    Q.  And can we put up 23.
10          Counsel indicated that was actually 10.6 percent?
11   A.  Correct.
12   Q.  You were asked a series of questions about purchasing
13   gasoline and Exxon taking title to gasoline.
14        Could you tell the jury why, in answering
15   Mr. Chapman's questions, you said that's not relevant to the
16   analysis that I did?
17   A.  It's not relevant because it's a common practice; different
18   companies will exchange, purchase, sell gasoline in order to
19   get the gasoline to the particular geographic area or even the
20   particular stations that they contractually serve.  And those
21   stations could be ones that they own or one that independent

22 dealers own that sell under their brand.  There has been a lot
23 of testimony, which I would corroborate but don't need to bore
24 you by expanding on, that if you go to an Exxon station or a
25 Mobil station or a Citgo station, you're very likely getting
        9a1dcit5                  Montgomery - redirect
 1 gasoline that was not refined by them; it contains their
 2 additive package.
 3          That's really the difference that we're talking about
 4 here, that under that -- my understanding was that I was
 5 providing you with information that would be helpful to
 6 identify what the share was of gasoline that was produced by
 7 ExxonMobil, that is, ExxonMobil was responsible for producing
 8 the gasoline that had MTBE in it, and how large that share was
 9 relative to the total amount of gasoline that everybody
10 produced in New York Harbor.
11          I won't speak to why you might want that information
12 but I just understood it would be helpful to you.
13          And that has nothing to do with the amount of gasoline
14 that was sold by Exxon in New York Harbor, because we know many
15 things about that.  We know that a large part of it came from
16 Irving Oil Company in Canada, which had long-term contracts to
17 supply Exxon.  We know that Exxon's gasoline couldn't
18 physically have gotten to the New York Harbor in undiluted form
19 in large enough amounts to serve the stations.
20          But that's one of the reasons I think why I was asked
21 to do the second calculation of its retail market share.
22 Because the retail market share accounts for all the gasoline
23 that was sold by ExxonMobil to, you know, to its retail
24 outlets, to its branded dealers, to even unbranded dealers that
25 it supplied the gasoline to.  But the difference between those
        9a1dcit5                  Montgomery - redirect
 1 two numbers, the difference between 10.6 percent and 27.7
 2 percent is the amount of gasoline that was refined by somebody
 3 else that, as is the common industry practice, Exxon purchased
 4 and delivered to its branded stations.
 5 Q.  Slide 25 shows us the average of the sales of these
 6 companies in the State of New York for gasoline that they sold
 7 but didn't necessarily make, am I correct?
 8 A.  That's correct.
 9          (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

9A1JCIT6                    Montgomery - redirect
1    Q.  When you go back to Slide 23, Slide 23 is your opinion
2    regarding the percentage of gasoline that Exxon/Mobil actually
3    made that made its way to New York Harbor and was distributed.
4            Is that correct?
5    A.  That's correct.
6            MR. STACK:  No further questions, your Honor.
7    RECROSS EXAMINATION
8    BY MR. CHAPMAN:
9    Q.  Can we go back to the chart that was just up about for the
10   years the companies reported sales.
11   A.  I think that is it.
12   Q.  Now, you said that Exxon/Mobil reported sales for all of
13   the years, right?
14   A.  Well, Exxon or Mobil or Exxon/Mobil as the merged company.
15   Q.  Right for all the years.  Did those other companies report
16   them for all the years also?
17   A.  No.
18   Q.  So you're comparing 27.7 percent to a calculation that is
19   different for the other companies?
20   A.  Yes, that is why I presented both charts.  I felt this one
21   gave a useful perspective how large their presence was when
22   they were in the market.  The other gives a perspective on what
23   the average was over the entire time period.  I wasn't trying
24   to do anything with it other than provide those two separate
25   pieces of information.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9A1JCIT6                    WILLIAM DAVID MONTGOMERY
1    Q.  So how many years did Cumberland Farms report for, do you
2    know?
3    A.  Yes.  Let me go back.  I just need to refresh my memory and
4    make sure I can read.
5            Cumberland Farms reported in -- it appears they
6    started reporting in 1997 through 2003.  Obviously, they're
7    still around.
8    Q.  So that excluded 14 years when Exxon was reporting, right?
9    A.  Actually, no.  I am sorry.  I take it back.  Cumberland
10   Farms, the current Cumberland Farms entity reported in every
11   year.  There was a merger with Gulf so some years it was
12   Cumberland Farms, some years it was Gulf Cumberland, those two
13   names, the same company.
14   A.  You can see which companies had a difference, which
15   companies did not report in every year by looking at the other
16   slide which listed them.
17   Q.  Can you look at No. 21, I think it is.
18   A.  Try it the other way.
19   Q.  Did those companies all report all those years?
20   A.  No.
21   Q.  How do we know which companies reported all the years by
22   looking at your charts?
23   A.  We need to look at a different chart.  We need to look at
24   the chart that has two columns for each of the companies.  It's
25   there.  We talked about it during my direct.  That's it.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9A1JCIT6                    WILLIAM DAVID MONTGOMERY
1    Q.  I see.
2    A.  Everyone other than these companies reported in every year.

3   Q.  These companies did not report every year?
4   A.  That's correct.
5   Q.  Do you have a chart that shows every company that reported
6   every year so they can be compared to Exxon?
7   A.  Every company that reported every year?
8            That is in Exhibit 1 and Exhibit 2 of my report.
9   There are several companies that are not included in these
10  charts, this chart because of they were not settling parties,
11  and so I was asked to take them off.  There is a data in the
12  other chart that is not here but it is all -- we can put it up
13  on the screen.
14           MR. CHAPMAN:  No more questions.
15           MR. STACK:  Nothing further.
16           THE COURT:  This time I won't forget.  The timing is
17  perfect.  Could the jury gather inside whether they have some
18  questions for this expert.
19           (Jury excused)
20           THE WITNESS:  Sorry, your Honor, I didn't want to take
21  the chance tumbling down the step again.
22           THE COURT:  Good, good.  Okay.  Yes?
23           MR. CHAPMAN:  Your Honor, I believe that was Exxon's
24  last witness.  We don't intend to call another witness.  Do we
25  have a couple of pieces of evidence to move in, but then I
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              6388
        9A1JCIT6              WILLIAM DAVID MONTGOMERY
1   think we rest for the -- I haven't spoken to Mr. Stack.
2            MR. STACK:  We have nothing to move in at this time,
3   your Honor.  I believe we have everything in the record that we
4   need.  I'll confer with Mr. Sacripanti and he will tell me
5   whether I am wrong.
6            THE COURT:  What are you moving in?
7            MR. CHAPMAN:  I believe we've got some excerpts of
8   interrogatory answers that have been referred to by Mr. Burke,
9   and we have excerpted them with the question and answer for
10  verification.
11           THE COURT:  Have you shown them with the defense?
12           MR. STACK:  We were provided them with this afternoon.
13  We have not looked at them.  We previously objected to another
14  version offered.  We attempted to reach a stipulation on some
15  of the points.  I have not had a chance to look at them.  I can
16  take a moment here to look at them, your Honor.
17           THE COURT:  Yes, we'll stay after the jury stays, sit
18  in the back, do it and we'll reconvene and close the record.
19           MR. STACK:  Fine, your Honor.
20           THE COURT:  So at 9:00 o'clock tomorrow morning we
21  will begin defense summation?
22           MR. STACK:  Correct, your Honor.
23           MR. CHAPMAN:  Yes, your Honor.
24           MR. SACRIPANTI:  Two hours, your Honor, is that the
25  allocated time?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              6389
        9A1JCIT6              WILLIAM DAVID MONTGOMERY
1            THE COURT:  I don't recall.
2            MR. CHAPMAN:  An hour and a half to two hours was my
3   recollection.
4            THE COURT:  If that is what I said, then up to that.
5            What about the burden of proof?  What did we decide to
6   do with that?  There was a request for rebuttal and I said no,
7   and I said with respect to the small issue or two issues.
                          Page 87

```
 9   to come back to New York.
10          THE COURT:  Okay.  Did you -- sorry?
11          A JUROR:  We are talking about the 30.2 piece.  It is
12   obviously the other one.  The other one is 30.2, what
13   percentage of that?
14          THE WITNESS:  That is all consumed in New York, in the
15   counties right around New York City.  It goes up below Albany
16   and it is just one or two counties west from here.
17          THE COURT:  Okay.  Did you take into consideration
18   sales of unbranded, that is, mom and pop type gas stations?
19          THE WITNESS:  Yes, and I would say that is true for
20   both of the calculations that I did.  They're included in the
21   gasoline that is refined by Exxon and delivered in New York
22   Harbor.  It doesn't matter who that goes to.  That would be
23   included.
24          My understanding of the Lundberg data is that if a
25   major company like Exxon was included in their data was also
```

```
 1   making sales to unbranded outlets, they included that as Exxon
 2   sales as well.
 3          THE COURT:  Finally, did you assume that the gas that
 4   Exxon produced for someone else ended up in New York Harbor?
 5          THE WITNESS:  Yes.  It wouldn't make any difference.
 6   The way I was doing the calculation, if Exxon produced the
 7   gasoline in Bayway, I assume it all was going to be in New York
 8   Harbor whether they produced it for themselves or someone else.
 9          If Exxon produced the gasoline in the Gulf Coast, then
10   I assumed that all of that gasoline, no matter who it was
11   produced for, went into the pipeline, got co-mingled and the
12   share of it that made its way to New York came out.  So, yes, I
13   included production that they did, they sold to someone else in
14   everything.
15          THE COURT:  The jurors asked one other question I am
16   not going to ask the witness about because I hope that will be
17   answered in my charge, that is where you asked about the
18   purpose of analyzing supply market share, retail share, is one
19   more accurate or relevant.  Hopefully my charge will answer
20   that question rather than the witness.  I will explain the
21   different uses of those two different markets.
22          Okay.  I understand one of the defense is resting?
23          MR. STACK:  The defense rests.
24          THE COURT:  The plaintiff is resting subject to your
25   working out exhibits with the defense?
```

```
 1          MR. CHAPMAN:  Correct.
 2          MR. STACK:  Correct.
 3          THE COURT:  There are no further witnesses at this
 4   time and so as promised, tomorrow at 9:00 we begin summations,
 5   and I think they'll end tomorrow, too, with good luck.  We'll
 6   start and finish all summations tomorrow and have the charge on
 7   Wednesday.  Please don't discuss the case with each other or
 8   with anyone else.  Leave your materials.  See you tomorrow.
 9   Hopefully have a good evening.
10          (Jury excused)
11          THE COURT:  Thank you.
12          (Witness excused)
13          THE COURT:  Do you want to pick up some notebooks?
```