# EXHIBIT 1

Dockets.Justia.com

9847CIT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
THE CITY OF NEW YORK, et al,

                              Plaintiffs,

              -v-                        04 CV 3417
EXXON MOBIL CORPORATION, et al,
                              Defendants.
-----------------------------------x
                                        New York, N.Y.
                                        August 4, 2009
                                        10:00 a.m.

Before:

                    HON. SHIRA A. SCHEINDLIN,

                                        District Judge

                         APPEARANCES

MICHAEL A. CARDOZO
     Corporation Counsel of the City of New York
     Attorneys for City Plaintiffs
BY  SUSAN E. AMRON

SHER LEFF LLP
BY: VICTOR M. SHER
     JOSHUA STEIN

GREENBERG GLUSKER
     Attorneys for Plaintiffs
BY: ROBERT S. CHAPMAN

MCDERMOTT, WILL & EMERY
     Attorneys for Defendant Exxon Mobil
BY:  PETER JOHN SACRIPANTI
     JAMES PARDO
     WILLIAM STACK
     JENNIFER KALNINS TEMPLE
     ANTHONY BONGIORNO

9847CIT5                    Roberts - cross
1   the sewers in the street are under me by and large.
2   Q.  OK, that's fine.  And can we agree, deputy commissioner,
3   that the mission of the DEP as a whole is to provide clean
4   water, manage storm water and remove waste water from the City
5   of New York?
6   A.  In part.
7   Q.  In part?
8           Can we see tab 1, please.  It's right there in your
9   book, Exhibit D-2919.  It's in evidence.
10          And this was a presentation given January 8, 2008 to
11  Deputy Mayor Skyler.  Do you know Deputy Mayor Skyler?
12  A.  I do.
13  Q.  If you turn to the page marked 033419.
14          If you could bring that up, Dave, one page over.
15          You talk about the agency's mission statement.  It is
16  to promote the public health, the economic development and the
17  quality of life for New York City by providing clean water,
18  managing storm water and removing waste water.  You wouldn't
19  disagree with that, would you?
20  A.  No.
21  Q.  And in order to do that, DEP gets involved in construction
22  projects, correct?
23  A.  In part.
24  Q.  In part.  And you call those construction projects capital
25  projects, am I right?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

EXHIBIT 2

9867CIT1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
THE CITY OF NEW YORK, et al,

                              Plaintiffs,

              -v-                          04 CV 3417
EXXON MOBIL CORPORATION, et al,
                              Defendants.
------------------------------------x
                                    New York, N.Y.
                                    August 6, 2009
                                    10:15 a.m.

Before:

                HON. SHIRA A. SCHEINDLIN,

                                    District Judge

                    APPEARANCES

MICHAEL A. CARDOZO
     Corporation Counsel of the City of New York
     Attorneys for City Plaintiffs
BY   SUSAN E. AMRON

SHER LEFF LLP
BY: VICTOR M. SHER
     JOSHUA STEIN

GREENBERG GLUSKER
     Attorneys for Plaintiffs
BY: ROBERT S. CHAPMAN

MCDERMOTT, WILL & EMERY
     Attorneys for Defendant Exxon Mobil
BY:  PETER JOHN SACRIPANTI
     JAMES PARDO
     WILLIAM STACK
     JENNIFER KALNINS TEMPLE
     ANTHONY BONGIORNO

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

9867CIT3                    Lawitts - direct
1    A.  In the final budget for fiscal year 2009, yes.
2    Q.  Now, sir, can you assure the jury that as soon as the city
3    has the money for Station 6 it will be built?
4            MR. BONGIORNO:  Objection.
5            THE COURT:  Repeat that question for me, please.
6            (Record read)
7            THE COURT:  I sustain the objection as to the form.  I
8    don't know about sure, but maybe there is another way to phrase
9    that.
10   Q.  Sir, if the City had the money for Station 6, would that
11   project go forward?
12   A.  Yes, it would.
13   Q.  Now, sir, from your standpoint as commissioner, what is the
14   importance of Station 6?
15   A.  Following up on my earlier statement that one of my primary
16   responsibilities as acting commissioner is to ensure the
17   continued delivery of safe drinking water to 9 million people,
18   Station 6 will be a critical element in ensuring our ability to
19   continue to deliver adequate quantities of water, because the
20   Station 6 project will allow us to tap an additional source of
21   water that we're not currently tapping, and provide an
22   additional 10 million gallons per day of treated drinking water
23   to be able to be distributed throughout the New York City water
24   system.
25   Q.  Now, sir, what does 10 million gallons a day translate to?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

EXHIBIT 3

| From: | Pardo, James [jpardo@mwe.com] | Sent: Thu 10/1/2009 6:03 PM |
|---|---|---|
| To: | Seth Ard | |
| Cc: | New York - MTBE; Sacripanti, Peter; Asquith, Lillian | |
| Subject: | NYC | |
| Attachments: | | |

View As Web Page

Dear Seth,

There was a discussion with the Court, after testimony wrapped up today, about whether the City had connected up its testimony about carcinogenicity (Dr. Burns) to the Station 6 treatment system and, specifically, to the City's professed need to treat chemicals like MTBE to levels below the MCL because of carcinogenicity concerns.

We wanted to inform the Court of the testimony that, we believe, supports our point that the City has not made this connection. The City's treatment expert, Ms. Bell, testified in response to questions from both counsel and the Court that she did not take into account carcinogenicity risks for any contaminant (including MTBE and PCE) when she designed the Station 6 facility for the City.  Specifically at 9/24/09 Tr. 5954:25 - 5955:21:

24   BY MR. STACK:
  25   Q.  With regard to the compounds that are present, have you, as

                             5955
    1   part of your work, looked to see whether any of these are
  2   listed as carcinogens and factored that into your design?
  3   A.  As part of my work, we look at the contaminants that are
  4   present and we look at the MCLs and we identify what's present.

  5   THE COURT:  His only question is when you looked to
  6   see whether anybody is classifying this as a carcinogen, is
  7   that part of your consideration?

  8   THE WITNESS:  Not typically.  I mean, generally based
  9   on doing the work there is some compounds you are aware of.
  10  But I'm not a toxicologist.

  11  THE COURT:  I know.  He didn't ask whether you are a
  12  toxicologist.  But have you made a point of looking for
  13  research on that, or you don't, when you're designing the
  14  treatment?

  15  THE WITNESS:  I guess it would depend on the project
  16  and the goals.

  **17  THE COURT:  OK.  Well, how about here, Station 6, did**
  **18  you go around looking for literature on that subject as part of**
  **19  designing the treatment?**

  **20  THE WITNESS:  To my recollection, I don't recall doing**
  **21  that specifically.**

  22  THE COURT:  OK.

Thanks.

- Jim

********************************************************************************************************************

IRS Circular 230 Disclosure: To comply with requirements imposed by the IRS, we inform you that any U.S. federal tax advice

contained herein (including any attachments), unless specifically stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter herein.

This message is a PRIVILEGED AND CONFIDENTIAL communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.
*****************************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

EXHIBIT 4

9a1dcit1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
THE CITY OF NEW YORK, et al,

                                Plaintiffs,

            -v-                                04 CV 3417

EXXON MOBIL CORPORATION, et al,
                                Defendants.
------------------------------------x
                                          New York, N.Y.
                                          October 1, 2009
                                          10:11 a.m.

Before:

                    HON. SHIRA A. SCHEINDLIN,

                                          District Judge

                        APPEARANCES

MICHAEL A. CARDOZO
        Corporation Counsel of the City of New York
        Attorneys for City Plaintiffs
BY  SUSAN E. AMRON

SHER LEFF LLP
BY: VICTOR M. SHER
        JOSHUA STEIN

GREENBERG GLUSKER
        Attorneys for Plaintiffs
BY: ROBERT S. CHAPMAN

MCDERMOTT, WILL & EMERY
        Attorneys for Defendant Exxon Mobil
BY:  PETER JOHN SACRIPANTI
        JAMES PARDO
        WILLIAM STACK
        JENNIFER KALNINS TEMPLE
        ANTHONY BONGIORNO

9A1JCIT2                    Bell - cross
1   remove it to a certain level, that is whatever the lowest
2   practical level is for that technology?
3          If I can go to 1, that goes to 1, that is the lowest
4   practical level, correct?  If it goes to 3, that is the lowest
5   practical level?
6   A.  The lowest practical level is based on a number of factors
7   which can include the capability of the technologies and also
8   includes economic considerations.
9   Q.  With regard to economics, it is a consideration for
10  engineers that you try to design, as you said in your technical
11  memo on VOC removal, the objective is to do the most efficient
12  and cost effective method, correct?
13  A.  While still protecting public health and meeting the
14  utility's goals for providing the water quality they want to
15  provide to their consumers.
16  Q.  But in terms of costs, the cost objective is the most cost
17  efficient, the most cost effective method.  Am I correct?
18  A.  I think it would depend on the situation.  Cost is
19  obviously an issue and considered when selecting technologies.
20  Q.  In the goals that you stated -- I can read it back -- the
21  goals you stated for your technical memo, you stated the goal
22  was you were going to come up with the most cost effective
23  technology for treatment and removal of PCE and MTBE.  Am I
24  correct?
25  A.  I'd have to look at the statement.  Again, cost effective
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

# EXHIBIT 5

# NEW YORK CITY DEPARTMENT OF ENVIRONMENTAL PROTECTION
## BROOKLYN-QUEENS AQUIFER FEASIBILITY STUDY
### PUBLIC INFORMATION MEETING – November 27, 2001

The New York City Department of Environmental Protection (NYCDEP) held its first Public Information Meeting on the Brooklyn-Queens Aquifer (BQA) Feasibility Study on Tuesday, November 27, 2001 at York College, Jamaica, NY. In preparation for the meeting, letters of invitation were mailed to over 100 individuals and organizations. In addition, flyers announcing the meeting were sent to Community Board #12 for inclusion in its monthly mailing, as well as to area churches and libraries for posting. Advertisements were also placed in 9 newspapers. (See Attachment A for copy of ad and flyer.)

The meeting was scheduled to inform the public on the background and scope of the overall BQA Feasibility Study; the status of current work at the Station 6 site, which is located at 110th Avenue and 164th Place; and a summary of the project's community outreach program. The meeting also included a review of NYCDEP's efforts, in cooperation with the New York State Department of Environmental Conservation (NYSDEC), to clean up groundwater at the West Side Corporation (WSC), a class 2 inactive hazardous waste disposal site located on 180th Street in Jamaica. (See Attachment B for copy of meeting agenda.) Representatives of NYCDEP, NYSDEC, the New York State Department of Health (NYSDOH), and the consultant team answered questions during the meeting.

Handouts, including a project Fact Sheet, Glossary of water supply terms, Comment Sheet and Community Outreach Program Survey were distributed to all meeting attendees. Over 120 persons, including public officials, community groups, residents and agency representatives attended the meeting. (See Attachment C.)

## PRESENTATION
Helen Neuhaus, Helen Neuhaus & Associates Inc., expressed appreciation to members of the public for attending the meeting, acknowledging in particular the presence of NYCDEP Commissioner Joel A. Miele, Sr.; Jeff Diggs of Councilman Archie Spigner's Office; and Community Board #12 (CB #12) Chairperson James Davis and District Manager Yvonne Reddick. She then introduced members of the BQA study team, including Douglas Greeley, Deputy Commissioner, Bureau of Water Supply and Sewer Operations, NYCDEP; Roman Kensy, Deputy Director of Distribution Operations - Bureau of Water and Sewer Operations, NYCDEP; Bill Yulinsky, Chief of Facility Engineering - Bureau of Water and Sewer Operations, NYCDEP; Donald Cohen, Project Director, Malcolm Pirnie, Inc. and Nicole Brown, Project Engineer, Malcolm Pirnie Inc.

Commissioner Miele welcomed residents to the meeting, thanked them for their attendance, and stated that both he and the Department are committed to continuing to provide all New Yorkers with potable water of the highest quality. He continued, by saying that he was present at tonight's meeting to discuss the importance of making the best possible use of groundwater (a plentiful local natural resource), while reducing local area groundwater flooding. The Commissioner pointed out that drawing water from the aquifers will enhance New York City's ability to meet water supply contingencies, including periods of severe drought and shutdowns of the upstate reservoir system for maintenance and repair.

D-547

Commissioner Miele briefly discussed the Jamaica Water Supply Company (JWS), which was taken over by NYCDEP. He noted that, prior to its closing, the Company was producing some of the poorest quality water and charging customers approximately 40% more than residents elsewhere in the City. Residents are now receiving a substantial quantity of upstate water at the same rate paid by all New Yorkers.

The Commissioner then enumerated the project's three major goals:
- production of high quality drinking water from Jamaica area wells by removing impurities and contaminants;
- control of groundwater flooding in the surrounding community; and
- groundwater cleanup at and surrounding the WSC site, in cooperation with NYSDEC's cleanup of the soil.

Commissioner Miele characterized the quality of area groundwater as being high in manganese and iron. In addition, there are other contaminants, many of which are due to the WSC site. Use of the aquifers to supply drinking water will require removal of these contaminants. He stressed that all water used from former JWS wells is tested by NYCDEP on a regular basis. Commissioner Miele acknowledged community concerns regarding the quality of its drinking water and reiterated that any groundwater introduced into the City's water supply will meet all Federal, State and City standards.

Deputy Commissioner Greeley continued, by noting that when NYCDEP assumed ownership of JWS, the Department understood that the system required improvement and that it was imperative to integrate the reservoir and groundwater supply systems. This effort began in 1997 and continues through the Department's own water distribution main installation projects, as well as in connection with roadway reconstruction projects that are undertaken jointly with the New York City Departments of Transportation and Design and Construction. He also pointed out that NYCDEP recognizes the need to plan for the City's future potable water demand and for potential disruptions, including downtime to repair leaks in the reservoir system. Bearing in mind the recent terrorist attacks, even more consideration is being given to use of the groundwater supply, since it is believed that it will be easier to safeguard multiple, smaller underground water reserves than a few, large surface reservoirs.

Deputy Commissioner Greeley discussed NYCDEP's initiatives to identify potable and non-potable uses of aquifer water. He indicated that the Long Island Water Corporation has expressed interest in purchasing potable water to supplement its supplies. With respect to non-potable uses, discussions concerning industrial uses continue with John F. Kennedy Airport officials. The sole non-potable use recommended in a study conducted by the Greater Jamaica Development Corporation was commercial use by the laundry industry. Use of aquifer water to produce electricity and steam for the Brooklyn Union Gas Company has also been suggested. Deputy Commissioner Greeley emphasized that these early explorations are tentative and that no agreements have been reached.

In concluding his remarks, Deputy Commissioner Greeley stressed that, if NYCDEP is not able to demonstrate to the community that the groundwater can be treated satisfactorily, it will not be introduced into the City's drinking water supply. Ultimately, NYCDEP is looking to provide drinking water from Jamaica aquifers that equals, if not exceeds in excellence, that of the reservoir supply.

### Community Outreach Program

Ms. Neuhaus clarified that her consulting company is not a marketing firm and that she envisions her role in the BQA project as that of a facilitator of dialogue with the community and a conduit between the project team and the community to enhance residents' understanding of the project. She also announced that beginning with this meeting, the community outreach effort will be an ongoing collaboration between the project team and community, permeating every aspect of the project. Ms. Neuhaus continued her remarks by enumerating the following specific elements of the outreach program:

- Conduct of additional formal meetings, similar to tonight's, as well as informal presentations and issue-specific discussions affording more opportunity for face-to-face interaction.
- Conduct of regular, typically quarterly, briefings of Elected Officials and CB #12.
- Distribution of quarterly project Fact Sheets.
- Establishment of a Citizens Advisory Committee (CAC), which is considered critical to the success of the Outreach Program. The CAC will reflect the diversity and interests of the community; investigate local water resource, flooding, health and environmental issues; and facilitate outreach to the broader community to ensure its full and active involvement in the project.
- Selection of a Science Review Panel, a group of distinguished scientists, who will serve as an independent resource to provide technical expertise to the CAC and community, either individually or collectively, as issues require. CAC members will screen candidates for the Panel.

### Brooklyn-Queens Aquifers and Proposed Facilities

Mr. Cohen began his presentation by discussing the composition of Brooklyn-Queens aquifers, explaining that, in cross-section, they appear as a series of water-saturated, striated layers of sand, gravel and clay. These aquifers extend from Long Island, beneath Brooklyn, Queens and Staten Island and beyond, to New Jersey and Delaware. The BQA consists of three major aquifers: the Upper Glacial, nearest the earth's surface and where groundwater flooding occurs, and two deeper aquifers, that extend to bedrock (900' - 1000' below ground). Mr. Cohen noted that groundwater is the source of potable water for the majority of Americans.

Mr. Cohen explained that the impetus for the current Study originated with a challenge issued by Commissioner Miele: to demonstrate that NYCDEP can provide high quality drinking water from the groundwater system and simultaneously control groundwater flooding by reactivating wells. He then showed the locations of proposed project facilities and provided a synopsis of their prior, as well as intended, uses. Station 6, located at 110th Street and 164th Avenue in Jamaica, is a water pumping station that continues in limited use. As part of the BQA project, groundwater drawn from Station 6 wells will be tested, treated and combined with upstate reservoir water to supplement New York City's water supply. Wells at Station 24, located at 180th Street and 106th Road, were closed a number of years ago due to the presence of perchloroethylene (PCE), a volatile organic compound (VOC). A new high-capacity well will be drilled at this site and water pumped to extract contaminated groundwater that will be treated and discharged into City storm sewers; it will not be used for drinking. Mr. Cohen indicated that the project team is aware of other problem sites in the area, including the nearby New York City Transit Authority (TA) Bus Depot and leaking gasoline tanks at gas stations. He added that during recent meetings, TA personnel indicated that groundwater extraction at Station 24 may, in

fact, assist in cleanup of residual contamination at the Depot. Mr. Cohen stressed that state-of-the-art technologies are available to effectively remove all of the contaminants that have been detected in the groundwater.

### Pilot Testing/Station 6 Operations
Ms. Brown reiterated that an essential goal of the BQA project is to supplement and enhance the quality of the drinking water supply. She then provided a description of the small-scale pilot testing program that will be conducted exclusively in an existing building at Station 6, where new wells have recently been drilled. Groundwater (approximately 100 gallons per minute) will be tested and treatment technologies investigated during a 6-month pilot program. Ms. Brown reported that results from recent testing at Station 6 wells have identified groundwater contaminants that include iron, manganese, and very low concentrations of PCE. The water is also considered to be hard, a naturally occurring phenomenon. Water treatment and softening technologies will be tested to assure that contaminants, including VOC's, can be removed and hardness reduced effectively. Ms. Brown noted that many of these technologies are being used at water treatment facilities nationally and internationally. Results of the water testing and technology investigations will be shared with the public while the pilot testing program is under way.

Once the community is convinced of the validity of the pilot testing program, a multi-faceted/ multi-phased treatment program will be developed and Station 6 operations expanded. Existing structures at the site will be razed to make way for a new, state-of-the-art water treatment facility. It is anticipated that the layout of the facility will permit visitors to observe plant operations. Initial considerations for public use of the facility include an environmental education center and meeting space. However, additional recommendations for community use will be solicited at the time that the building is under design.

### Groundwater Flooding
Mr. Cohen explained the difference between groundwater flooding and flooding that results from storm runoff. The latter occurs particularly during heavy rains when water accumulates in streets and yards. A network of catch basins, retention basins and storm sewers removes storm runoff. Groundwater flooding, on the other hand, is the result of a rise in the water table toward the surface of the ground. Unlike storm runoff, groundwater is not accommodated by catch basins and storm sewers but can only be controlled by pumping, which results in lowering the water table. Mr. Cohen explained that the rise in the water table in the Jamaica area began shortly after JWS reduced its pumping of groundwater from area wells. He identified several local facilities that experience chronic groundwater flooding, including the TA's Archer Avenue Subway Station, Intermediate School 8, and the Carter Community and South Jamaica Houses residential complexes. He also explained that some homeowners may be affected by groundwater flooding, because their houses were built in low lying areas when the water table level was lower. Due to the rise in the water table, these homes may now be experiencing groundwater flooding problems.

### West Side Corporation (WSC) Site/Station 24
Mr. Cohen began his discussion of this issue by sharing NYCDEP's concerns that contaminated soil and groundwater at the neighboring WSC site pose a serious and immediate threat to area groundwater reserves. He reported that groundwater cleanup related to the WSC site must be under way before pumping at Station 6 can begin. This will be accomplished by installing a

new, high-capacity containment well at Station 24 to pump and collect the plume of groundwater contaminants that has spread into the surrounding neighborhood. NYCDEP is ready to begin construction of the well and is working closely with NYSDEC and NYSDOH. Extracted water will be treated to required standards prior to being discharged into storm sewers that drain into Bergen Basin and ultimately Jamaica Bay. He reiterated that the water will not be used for the drinking water supply. NYCDEP is prepared to begin this effort in cooperation with NYSDEC, which has committed to cleaning up soil at the site. Mr. Cohen indicated that operations at Station 6 will not begin for at least one to two years after pumping begins at Station 24.

In summary, Mr. Cohen characterized the BQA Project as very complex but extremely important and emphasized that it will ultimately address the early apprehensions of the community. He reiterated that the Public Outreach Program has been established to ensure that the community is well informed and actively involved in all aspects of the project throughout its duration. Mr. Cohen concluded by recapping the Project's three goals: to increase and improve the City's water supply, reduce groundwater flooding and clean up the WSC site in cooperation with NYSDEC.

**DISCUSSION**
A summary of project-related questions, comments and concerns raised during the meeting and in written statements is provided below.

Water Supply and Quality
A number of persons noted the need for immediate improvements to the current water supply system, citing such problems as odor and rust, which often affect the color of clothes and food. Although many believe that the need for good drinkable water is long overdue and that plans for an upgrade are refreshing, encouraging and informative, meeting participants expressed concern and skepticism regarding the overall project. One person suggested that groundwater not be included in the local water supply system unless it is also sent to Nassau County for use.

Several questions and comments related to procedures for testing the current drinking water supply, as well as groundwater. Meeting participants wanted assurance that all contaminants, including PCE and its breakdown products, would be detected and could safely be treated. Mark Knudsen, NYSDOH, reassured meeting participants that the Department will be working closely with NYCDEP and NYSDEC throughout the project. He indicated that although water testing will be the responsibility of NYCDEP, NYSDOH will review all data to ensure that drinking water meets State standards.

In response to a question, it was explained that residents of some areas of Queens, including in the vicinity of Station 6, are currently supplied with potable water that is a blend of reservoir water and groundwater. As a follow-up to additional questions, it was stressed that this groundwater only comes from wells that produce water that meets State standards. Similar to the entire City water supply system, this water is closely monitored and tested daily, prior to and after treatment. Any water that does not meet standards is not introduced into the drinking supply system. For example, use of the wells at 193rd Street was discontinued because Methyl tert-butyl ether (MTBE) was found in the water.