


Victor M. Sher
vsher@sherleff.com
415.348.8300 x100

27437767

Oct 6 2009
10:10PM

October 6, 2009

**BY ELECTRONIC MAIL AND HAND DELIVERY**

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007-1312

  Re: Master File C.A. No. 1:00-1898 (SAS), M21-88, MDL No. 1358 (SAS)
     City of New York v. Amerada Hess Corp., et al, Case No. 04 Civ. 3417

Dear Judge Scheindlin:

This responds to Mr. Sacripanti's letter of this evening. The City's closing argument provides no basis for revisiting the Court's consistent rulings holding inadmissible City consent decrees. In addition, the City's closing properly drew an inference from the evidence presented that ExxonMobil supplied 27.7 percent of the gasoline in the capture zone, representing a "substantial factor" in causing the City's injury. Moreover, evidence that states banned MTBE once they learned of its properties supports the City's failure to warn claim. Finally, the City did not improperly suggest that the jury should punish ExxonMobil, and the Court's existing instruction already makes clear that the jury's task in this Phase extends only to compensatory damages.

First, nothing in the City's closing argument opened the door for admission of the two City consent orders that the Court has consistently refused to admit.[1] In his letter, Mr. Sacripanti quotes only part of my argument concerning the two City police precincts in the Station 6 capture zone and importantly omits the two sentences that place the quoted language in context. When the omitted sentences are included, it is clear that I was comparing Exxon's role in producing and distributing MTBE gasoline and knowledge about MTBE with the City's lack of participation and knowledge. Quoted more completely, I stated:

> Let me talk finally about the city's share of fault. This is another issue on which ExxonMobil bears the burden. You heard Mr. Stack refer to a couple of police stations that are within the capture zone. This is a classic attack of victims' strategy.

---

[1] Although Exxon persists in referring to three consent orders, one of the orders concerns the New York City Transit Authority, a subsidiary of the State Metropolitan Transportation Authority that is neither part of nor controlled by the City. See N.Y. Pub. Auth. L. §1200.

> There is no evidence that the city undertook any conduct comparable to what Exxon is being held responsible for here. *There is no testimony that the city produced gasoline, that it knew in the 1980s about MTBE's properties, that it had any control over the composition of the gasoline it received.* By the way, odds are -- not odds are. The testimony has been that nearly 30 percent of the gasoline in the city's tanks, 27.7 percent, came probably from ExxonMobil.
>
> So there is really no comparison between what the city did or didn't do and what ExxonMobil did in this case.

Tr. at 6557:15-6558:4 (emphasis added).

The consent orders concern underground storage tanks owned by the City located throughout the five boroughs. Nothing the City said during closing argument suggested anything about the City's compliance with federal or state underground storage tank requirements. Indeed, as Your Honor noted at the end of closing argument, when Mr. Sacripanti first complained about my reference to the two police precincts, I did not even mention the City's tanks in my argument:

> MR. SACRIPANTI: Your Honor, we also would like to write your Honor on an issue that Mr. Sher has raised with respect to what the city knew and its underground storage tanks. We believe, again, the door has been opened to the consent order.
>
> THE COURT: I knew you were going to say that, but he carefully avoided the word "tanks." I listened. I don't know if anybody notices body language around here, but I sat up and really leaned forward and listened hard. He didn't say one word about tanks or tank inspections or being careful with tanks. He left the word "tanks" completely out of it. And I thought that consent decree focused on the care and feeding of the tanks, so to speak.
>
> \* \* \*
>
> THE COURT: You will have to look at the transcript because I sat up and really listened, thinking Mr. Sacripanti is going to bring up that consent decree and I know this is coming. So I listened really hard and he stayed away from tanks. He said he didn't know about the properties of MTBE. What else? You probably know what you said but that was one thing. Something about properties and maybe dangers and things like that, but he didn't come anywhere near the word "tanks."
>
> MR. SHER: I didn't.

Tr. at 6586:24-6588:5.

In sum, the City's carefully focused closing argument does not warrant reconsideration of the Court's prior rulings excluding evidence of the two consent order.[2]

Second, the jury certainly can conclude from the evidence that more than one-quarter of the gasoline in all the plumes came from ExxonMobil. Exxon does not dispute that it is the largest retailer and supplier of gasoline into Queens (27.7 percent, per ExxonMobil's witness, Dr. Montgomery). Indeed, Exxon's final witness, Dr. Montgomery testified as to this substantial Exxon share of the retail supply market. (Tr. at 6333:11-6334:16.) Using different data, the City's expert, Martin Tallet, reached a similar conclusion, testifying that Exxon supplied 25.7 percent of the MTBE-gasoline into Queens. (Tr. at 4281:8-4284:4.) Mr. Tallett's analysis expressly included ExxonMobil's share of the "wholesale" market – that is, ExxonMobil's share of total supply in New York including for other brands and independents. (Tr. 9/14/2009 at 4278:20-4279:5 (Tallett) (EIA Form 782C records on which he relied reflect volumes supplied into each state and sold for final distribution and sale).) So did Dr. Montgomery's. (10/1/09 Tr. 6331:19-6333:20 (relying on Lundberg survey data).) Plaintiff's expert Mr. Burke testified expressly that EOM gasoline made it into every UST/plume over time. (9/10/09 Tr. 4103:6-4105:20.) ExxonMobil's expert Mr. O'Brien agreed that ExxonMobil-produced gasoline makes it to virtually every gas station due to trades and exchanges along the chain of distribution. (9/15/09 Tr. 4508:1-17.) And Your Honor has already held that the jury can rely on ExxonMobil's share of the supplier and other markets as circumstantial evidence to support "substantial causation." (9/25/09 Tr. at 5829:6-5830:13; *accord* Amended Jury Charge Phase III, 2b.)[3] All of these facts support a reasonable inference that every plume contains more than 25% MTBE from ExxonMobil.

Third, the inference in plaintiffs' closing that the numerous state bans of MTBE support the failure to warn claim is entirely proper: When the facts about MTBE's impacts on water came out, New York, California, and other states banned MTBE. The jury can certainly conclude that

---

[2] As the Court noted in its original decision excluding the consent orders, ExxonMobil could have offered evidence concerning tanks at City-owned facilities without using the consent orders. The City produced thousands of pages of spill-related documents to Exxon during discovery. ExxonMobil also listed the City employee in charge of the City's tank compliance program on its Phase 3 witness list and subpoenaed one of the City tank consultants to testify at trial. Had ExxonMobil really concluded that it needed to present evidence of the City's tank program, it could have easily done so without offering evidence of the consent orders. July 29, 2009 Pre-trial Conference Transcript at 55:2-6. ("Notably, in its opposition papers Exxon cites mostly to reports and tests relating to the underlying circumstances that led to the consent order. Exxon may rely on such evidence without signing [sic – "citing"] the consent order itself, which is a sole subject of this motion.")

[3] Of course, even the lower "refiner" share to which Dr. Montgomery testified would support a jury finding of substantial causation.

had the states known about MTBE's pernicious effects sooner, it would have been banned sooner (or never used at all). Even ExxonMobil's air quality expert Mr. Austin told the jury that water quality was the only reason MTBE was banned. (9/17/09 Tr. at 4963:16-18 (Austin) (responding to jury question).) Even the USEPA issued an Advance Notice of Proposed Rulemaking of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate Or Limit The Use of MTBE Fuel Additive In Gasoline (Mar. 24, 2000) (PL 614.) But more importantly, the jury can use the irrefutable fact that states banned MTBE once they learned of its impacts on water to conclude that warnings about MTBE would have been material -- to gas station owners and operators, as well as others. Mr. Moreau, for example, testified that "ExxonMobil could have done a lot more in the realm of publicity in terms of letting people know that this was a different kind of gasoline that people hadn't had before, that you needed to handle it very carefully and make sure that there were no releases of gasoline into the ground." (9/03/09 Tr. 3377:10-14.)

ExxonMobil's reliance on *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) is baffling. Plaintiffs in that case sought damages on a direct "but for" basis: but for defendants' misrepresentations to the FDA concerning a medical device, the FDA would not have approved it and plaintiffs would not have suffered injuries. The Supreme Court held, however, that "the fraud claims exist solely by virtue of the FDCA disclosure requirements," id. at 352, and that the Federal Food, Drug and Comestic Act preempted the claim. Here, this Court has concluded (along with all others that have examined the question) that nothing in federal law preempts the City's state tort claims (including failure to warn). Moreover, the City need not show any form of but-for causation with respect to ExxonMobil's failure to warn the federal government (even though in 2000 the USEPA moved toward banning MTBE). Rather, the jury can reasonably conclude that the multiple state bans demonstrate that information not shared by ExxonMobil about MTBE's pernicious water-related characteristics would have made a difference to others who learned of them – as Mr. Moreau, for example, testified.

Finally, the City sees no improper punitive tinge to Mr. Chapman's closing. But it does not matter: the Court's planned instruction already tells the jury that the purpose of its damages consideration in this Phase "is to restore the [City] … to the position it would have occupied had the wrong not occurred." Clarity requires nothing more.

We ask that the Court please forward this letter to the Clerk's office for docketing so that it is part of the official trial record, along with Mr. Sacripanti's.

Respectfully submitted,

Victor M. Sher

cc: Service on all counsel via Lexis Nexis File & Serve (LNFS)