


27464166

Victor M. Sher
vsher@sherleff.com
415.348.8300 x100

Oct 8 2009
11:23AM

October 8, 2009

*Via Email and Hand Delivery*

Hon. Shira A. Scheindlin
United States District Judge
U.S. District Court, Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *City of New York v. ExxonMobil*, 04 CV 3417 (SDNY)
              Proffer of Punitive Damages Evidence

Dear Judge Scheindlin:

This letter follows up on your questions of yesterday concerning the City's intended additional proof to support an award of punitive damages, assuming the jury returns a favorable verdict in Phase III. In addition to Mr. Burke and Dr. Fogg, we intend to present, inter alia, the following evidence of Exxon's conscious disregard of MTBE's hazards and potential to cause harm and conscious indifference and utter disregard of MTBE's effect upon the health, safety, and rights of others:

- By 1990, Exxon had detected MTBE at more than 100 of its stations in New Jersey alone, along with dozens more sites in Rhode Island, North Carolina, and Maine. (PL 623 (list of Exxon sites/MTBE mitigation) (Ex. 1).)

- By 1995, Exxon was well aware that the USGS had found MTBE to be one of the most commonly detected VOCs in drinking water nationwide. (Exxon document dated May 19, 1995, "Oxygenate Strategy Review" (PL 477 (Ex. 2)); USGS Pub. 105-01, "MTBE and other volatile organic compounds—New findings and implications on the quality of source waters used for drinking-water supplies" (PL 916) (Ex. 3).)

- According to the EPA, in August of 1995 the city of Santa Monica discovered MTBE in its drinking water supply wells at the Charnock Well Field. Those wells supplied approximately 45 % of the drinking water for the city's 87,000 residents and approximately 200,000 daytime customers. In 1996, the levels of MTBE at the Charnock well field rose to more than 600 parts per billion. By June 13, 1996 all of the supply wells at the Charnock well field were shut down due to

450 Mission Street, Suite 400 • San Francisco, California 94105 tel (415) 348-8300 fax (415) 348-8333

increasing levels of MTBE contamination. Unilateral Administrative Order for Participation and Cooperation in Water Replacement ("Order") at p. 3, para. A.2. (Ex. 4). The Charnock contamination followed a Mobil station's contamination of the City's smaller Arcadia wellfield. July 1998 U.S. EPA Fact Sheet, MTBE Project (PL-5587). (available at http://epa.gov/region09/mtbe/charnock/techdocs/july_98_fs.pdf) (Ex. 5) As explained more thoroughly *infra*, Exxon and Mobil stations were directly implicated in the Charnock contamination, and, state and federal agencies issued unilateral orders requiring Exxon, Mobil and ExxonMobil to (1) help pay for replacement water for the City, and (2) investigate and cleanup the contamination. Order at 11-12, 18-19.

- In 1997, Exxon learned that results of a survey by the Santa Clara (California) Water District "indicate that 88% of contaminated (existing cases) sites that look for MTBE find it." (email from Craig Knoeller, "Emerging Product Quality Issues – MTBE" (Nov. 21, 1997) (PL 5586) (Ex. 6).) The author noted "We have about 2300 active case sites. If we expect the California rules to spread across the nation requiring us to look for MTBE at all these sites (and we do) a very rough cost estimate for cleanup is 2300 * .88 * $.25MM = $550MM. This does not include any estimate for potential litigation – which in the case of water supplies … could be very substantial." (Id.)

- By early 1998, Exxon conducted a survey of MTBE at its retail stores in 23 regions. (Memo from V. Dugan to Carol Fairbrother "EUSA Marketing Environmental Engineering MTBE Survey – Retail Stores" (Apr. 24, 1998) (PL 3074) (Ex. 7).) The survey revealed widespread MTBE impacts in every region that responded to the survey. In New York State, for example, Exxon tested 98 sites and its state engineer estimated average MTBE concentrations of 50,000 – 100,000 ppb, with upper end of 1,000,000 ppb in monitor wells. (Id. at p. 12 of 18.) In New Jersey, nearly 200 sites were tested, revealing concentrations up to 300,000,000 ppb. In California, Exxon tested about 150 of its stations in Northern California; the responsible Exxon engineer reported "75% of sites are > 1,000 ppb. Some have been > 100 ppm." (Id. at p. 2 of 18.) Overall, average concentrations "varied but the majority reported and [sic] average MTBE concentration in the 5-10 ppm range." (Id. at Attachment 7 (Bates 00032).) Highest concentrations "varied but majority were in the 200-500 ppm range." (Id.)

- In 1998, Lawrence Livermore National Laboratory submitted a report to the Western States Petroleum Association (of which ExxonMobil is a member (9/23/09 Tr. at 5647:7-8)), titled "An Evaluation of MTBE Impacts to California Groundwater Resources." (PL-557 (Ex. 8)) That report concluded that "MTBE is a frequent and widespread contaminant in shallow groundwater throughout California." (*Id.* at p. iv.)

- In early 1999, Exxon Research & Engineering conducted a study of "MTBE Release Source Identification at Marketing Sites." (PL-580 (Ex. 9).) The study "is important to EUSA ... because MTBE contamination is increasingly being found in surface and ground waters near gasoline service stations, and has been identified as a potential threat to public drinking water supply systems." (Id. at 2.) The study acknowledged "Public and Regulatory Agency Concerns:"

    > The increase in the presence of MTBE found in surface, ground and drinking waters has generated public, government regulatory agency, and industry concerns. With uncertain human health and environmental potential effects, public concerns about the need for control or elimination of MTBE in gasoline has accelerated. .... Many questions are being posed by regulators, including:
    >
    > - What is the potential carcinogenicity of MTBE?
    > - Where is the MTBE coming from? ....
    > - Should MTBE be banned and replaced with alternative oxygenates or alcohols?
    > - With such a high concentration in the gasoline and such a low cleanup threshold limit, can this issue be managed?

    (Id. at 3.) Exxon's study reviewed data "from selected EUSA Service Stations with MTBE contaminated ground water...." (Id. at 6.) "In New Jersey data from 38 sites was reviewed and in California, 71 sites. The range of maximum MTBE concentrations found in the ground water data was 2 to 1,040,000 ppb." (Id.)

- In 2000 the USEPA concluded that MTBE has "caused widespread and serious contamination of the nation's drinking water supplies." (PL 614 (Ex. 19), USEPA, "Advance Notice of Intent to Initiate Rulemaking ... to Eliminate or Limit the Use of TBE as a Fuel Additive in Gasoline" (65 Fed.Reg. 16094 (Mar. 24, 2000).) USEPA noted "numerous and widespread instances of groundwater contamination...." (Id. at 16096.)

By the time ExxonMobil *knew* that MTBE would contaminate groundwater and was a major problem nationwide, ExxonMobil had long been on notice that underground storage tanks leak:

- By the early 1980s, ExxonMobil was fully aware that underground storage tanks could and did leak – like the one in East Meadow, Long Island that leaked 50,000 gallons of leaded gasoline into the subsurface. (9/02/09 Tr. at 3227:5-3229:4 (Scala)). ExxonMobil also knew that underground storage tanks were prone to leakage as early as 1984, when it expressed concerns about "possible leakage of S/S tanks into underground water systems of a gasoline component that is soluble in water to a much greater extent" – i.e., MTBE. (PL-247 (a memo from Jack

> Spell to J.S. Dick and R.C. Peters dated April 1984) (Ex. 10); see also PL-283 (Ex. 11), PL-270 (Ex. 12), PL-271 (Ex. 13), PL-323 (Ex. 14))
>
> - By the mid-1980s, ExxonMobil knew that gasoline with MTBE in it tended to cause more contamination when it leaked out of underground storage tanks, because it travels further underground and tends to impact groundwater wells. (9/04/09 Tr. at 3571:2-3572:18 (Mickelson); PL-292 (Ex. 15).)

ExxonMobil continued to manufacture and sell MTBE gasoline that it knew would be stored in underground storage tanks despite the foregoing evidence, demonstrating Exxon's *conscious* indifference to MTBE's potential harms. *See Hartford Accident & Indemnity Co. v. Hempstead*, 48 N.Y.2d 218, 227-228 (proof of conscious disregard of the rights of others warrants a punitive damages award). Although it was aware of MTBE's tendency to contaminate groundwater, ExxonMobil deliberately disregarded the foregoing facts simply to save money – evincing a culpable indifference to the rights of others:

- Despite its knowledge of MTBE's widespread and growing impacts on the nation's groundwater, including specifically from its own stations, ExxonMobil recklessly clung to MTBE. Indeed, in 2000 the company concluded that "There is no economic incentive to remove MTBE from gasoline production earlier than mandated by law." (PL 5585 (Ex. 16).)

- ExxonMobil would not stop using MTBE until forced to do so by regulatory changes. In December 2000, ExxonMobil corporate representative Tom Eizember wrote, "At this point, Americas Refining has no plans to voluntarily eliminate MTBE or other ethers from domestic gasoline production. Rather elimination is expected to be driven by legal requirements, such as California's ban effective YE 2002." (12/14/00 e-mail between ExxonMobil employees (PL-3999) (Ex. 17).)

- In 2001, ExxonMobil acknowledged that "MTBE removal from mogas would be costly for Exxon" – estimated at $50-100 million per year. (USGC MTBE Phase Out Assessment & Scoping of Potential Ethanol Legislative Proposals (PL-631) (Ex. 18).)

"Evidence of actual harm to nonparties can help to show the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007). ExxonMobil not only placed the general public at risk, but caused actual harm to nonparties in California, by recklessly allowing MTBE to contaminate drinking water wells the same way it has in this case. On March 9, 2000, ExxonMobil became the subject of a Unilateral Administrative Order For Participation and Cooperation in Water Replacement issued by the United States EPA. That order concerned the groundwater supply in the city of Santa Monica, California. That order states, in pertinent part,

> "EPA, in consultation with the State, determined that a joint state and federal response was necessary to effectively protect human health and the environment from the threat created by MTBE contamination in the Charnock Sub-Basin and at the City's Charnock well field." (Ex. 4, pg. 6 paragraph D-11)

The order also recites, at paragraph E-17, that the EPA's December 1997 Drinking Water Advisory stated that "the weight of evidence indicates that MTBE is an animal carcinogen and the chemical poses a carcinogenic potential to humans (NTSC, 1997, pg. 4-26)." The order further states,

> "EPA has determined that the release, threat of release and presence of MTBE and other gasoline constituents in the Charnock Sub-Basin may present an imminent and substantial endangerment to health and the environment as those terms are used in RCRA Section 7003, 42 USC § 6973 (pg. 10 paragraph E-23).

The order specifically identifies an Exxon site as having released gasoline containing MTBE which has impacted the soil and groundwater in the Charnock Sub-Basin. (paragraph G 1 through 9, pp. 11-12). Mobil was specifically identified as owning and or operating another gasoline service station which released gasoline containing MTBE that impacted the soil and groundwater in the Charnock Sub-Basin. (Order pp. 18-19). ExxonMobil was ordered to provide replacement water to the City of Santa Monica and was subject to penalties of five thousand dollars per day for each day for which there was a violation of the order (Order p. 50 and Attachment A "Scope of Work For Participation and Cooperation in Water Replacement").

Punitive damages have been awarded under New York law for conduct affecting property alone, including trespass with no personal injury or health issues. *See Fareway Heights, Inc. v. Hillock,* 300 A.D.2d 1023, 752 N.Y.S.2d 515, 516-517 (4th Dep't 2002). In that case, defendant developers believed they had received permission to lengthen and widen a drainage ditch on plaintiff's property. The relative who granted the permission was not "authorized" and the Court awarded punitive damages of over seven times the amount of the compensatory damages. The opinion stated that the punitive damages award would serve to punish, would be a warning to others and was for the good of the public. (752 N.Y.S.2d at 517).

The City reserves the right to supplement the evidence described above with other evidence in the record from earlier phases of this trial that also goes to show malice, conscious disregard for the rights of others, and the reprehensibility of ExxonMobil's conduct.

We appreciate the Court's time and attention to this matter and respectfully ask that this letter be filed with the Clerk's Offices so that it is part of the trial record for this case.

Respectfully submitted,

*/s/ Victor M. Sher*

Victor M. Sher

Cc: All Counsel via LNFS & Email