**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE METHYL TERTIARY BUTYL ETHER**
**PRODUCTS LIABILITY LITIGATION**

**This document relates to:**

*City of New York v. Amerada Hess Corporation, et al.,*
No. 04 Civ. 3417 (SAS)

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

**MEMORANDUM OF LAW IN SUPPORT OF EXXON MOBIL DEFENDANTS'**
**MOTION FOR A NEW TRIAL ON DAMAGES OR,**
**ALTERNATIVELY, FOR REMITTITUR**

# TABLE OF CONTENTS

**page**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD ................................................................................................... 2

I.      STANDARD FOR GRANTING NEW TRIAL ON DAMAGES ................................... 2

II.     STANDARD FOR REMITTING DAMAGES AWARD ................................................ 3

ARGUMENT ............................................................................................................... 5

I.      THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND NECESSITATES A NEW TRIAL ON DAMAGES................................................ 5

     A.   The Weight Of The Evidence Demonstrates That Future Treatment For MTBE Will Not Be Necessary................................................................................... 5

     B.   The Evidence Does Not Support The Jury's Award Of Compensatory Damages For Initial Capital Costs ............................................................................... 6

     C.   The Evidence Does Not Support The Jury's Award Of Compensatory Damages For Capital Replacement And O&M Costs .................................................... 7

II.    ALTERNATIVELY, THE JURY'S DAMAGE AWARD DEVIATES MATERIALLY FROM WHAT WOULD BE REASONABLE COMPENSATION, AND THE COURT SHOULD REDUCE IT ................................................................ 12

     A.   The Jury's Award Deviates Materially From What Would Be Reasonable Compensation ............................................................................................ 12

     B.   Remittitur Is Appropriate To Address The Jury's Excessive Award ........................ 13

CONCLUSION .......................................................................................................... 18

# TABLE OF AUTHORITIES

**page**

## FEDERAL CASES

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008) .......................................................3

*Caruolo v. John Crane, Inc.*, 226 F.3d 46 (2d Cir. 2000)..........................................................2, 3

*Consorti v. Armstrong (In re Joint E. & S. Dist. Asbestos Litig.)*,
    9 F. Supp. 2d 307 (S.D.N.Y. 2008) .......................................................................................4

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) ........................................2

*Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415 (1996) .......................................................3

*Gasperini v. Ctr. For Humanities, Inc.*, 149 F.3d 137 (2d Cir. 1998).............................................3

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ..............................................................8, 14

*Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457 (S.D.N.Y. 2003)..............2, 4, 8, 12

*In re MTBE Prods. Liab. Litig.*,
    No. 04 Civ 3417, 2009 U.S. Dist. LEXIS 59287 (S.D.N.Y. July 6, 2009) ...........................11

*In re MTBE Prods. Liab. Litig.*,
    No. 1:00-1898, 2007 U.S. Dist. LEXIS 40484 (S.D.N.Y. June 4, 2007) ...............................13

*In re MTBE Prods. Liab. Litig.*, 458 F. Supp. 2d 149 (S.D.N.Y. 2006).........................................6

*Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420 (S.D.N.Y. 2008)..............................4, 12

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) ............................................................3, 12

*Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2d Cir. 1984) ........................................2

*Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363 (2d Cir. 1988)................................................3

*Song v. Ives Lab., Inc.*, 957 F.2d 1041 (2d Cir. 1992) ..........................................................2, 6, 8

*Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252 (S.D.N.Y. 2007)..............................................4, 5

*Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93 (2d Cir. 1995) ..................................................2

*Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326 (2d Cir. 1993) ............3, 11, 14

**STATE CASES**

*Jansen v. C. Raimondo & Son Constr. Corp.*, 741 N.Y.S.2d 71 (N.Y. App. Div. 2002) ..............12

*Po Yee So v. Wing Tat Realty, Inc.*, 687 N.Y.S.2d 99 (N.Y. App. Div. 1999) ...............................4

**STATUTES**

N.Y. C.P.L.R. § 5501 ...................................................................................................................3

## INTRODUCTION

On October 19, 2009, the jury awarded the City of New York $250,500,000 in compensatory damages for building and operating a future treatment system at the Station 6 facility. (10/19/09 Tr. at 7045:7-13.)  It is clear from trial testimony that this amount awards the City compensation for both the capital costs of constructing a treatment system it does not need (at least not to treat MTBE), and also for equipment replacement costs and operation and maintenance ("O&M") costs based on the City's flawed argument (and its expert's flawed assumption) that the Station 6 facility will operate continuously for 40 years in the future.  (*See* 9/24/09 Tr. at 5884:16-24; 5886:5-5887:9; 5958:4-10 (Bell).)  This flawed argument, unsupported by the weight of the evidence at trial, was erroneously accepted by the jury and increased its damage award by approximately $49 million (replacement costs) and $141 million (O&M costs), respectively.  (*Id.* at 5884:1-3, 5884:25-5885:14; *see also* Pl.'s Demonstrative Slides (attached to the accompanying Declaration of Lauren Handel ("Handel Decl." as Ex. A), at 1.)

In other words, more than three-quarters of the jury's compensatory award ($190 million out of $250 million) was based on speculative testimony about the length of time that a Station 6 treatment plant will operate in the future, if it ever operates at all.  The remaining $60 million of the jury's award – attributable to initial capital costs – is for installation of an unnecessary, top-of-the-line, "gold-plated" treatment system – a system the City initially predicted would cost no more than $9.9 million at a time when predicted MTBE detections were 20 times *higher* than the peak concentration of 10 ppb that the jury found would be reached.  (*See* 9/24/09 Tr. at 5884:16-24; 9/30/09 Tr. at 5995:14-23.)  The jury's award is against the weight of the evidence, is contrary to the jury's own Phase 1 finding, and is a serious miscarriage of justice.  For these reasons, unless the Court grants ExxonMobil's separately filed motion for judgment as a matter

of law,[1] the Court should order a new trial on the issue of damages or, in the alternative, remit the jury's award to an amount that would not be excessive.[2]

## LEGAL STANDARD

Where a district court finds that a damages verdict is excessive, it may order a new trial on damages, or, under the practice of remittitur, may condition the denial of a motion for a new trial on the plaintiff's acceptance of a reduced amount. *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995); *see also Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984) ("Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.").

## I.    STANDARD FOR GRANTING NEW TRIAL ON DAMAGES

A new trial may be granted when the verdict is "against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). Unlike a motion for judgment as a matter of law, a court may grant a new trial "even if there is substantial evidence to support the jury's verdict." *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 462 (S.D.N.Y. 2003) (quoting *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000)). In considering a motion for a new trial, the court is "free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner." *Song v. Ives Lab., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992). Following such a review, a "'new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or … the verdict is

---

[1] ExxonMobil is filing its renewed motion for judgment as a matter of law concurrently with this motion. ExxonMobil maintains that the City's evidence was insufficient as a matter of law to sustain a verdict in its favor and reserves its right of appeal on that issue even if the Court grants a new trial or remits the excessive damages award.

[2] Defendant's proposal for an appropriate award amount is discussed *infra* at Section II.B.

a miscarriage of justice.'" *Id.* (ellipses in original) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)); *see also Caruolo*, 226 F.3d at 54 (same).

## II.    STANDARD FOR REMITTING DAMAGES AWARD

The Second Circuit has found remittitur appropriate in at least two situations: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, [and] (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993). In reviewing the excessiveness of damages awarded on a plaintiff's state-law claim, the district court must apply New York law. *See Gasperini v. Ctr. For Humanities, Inc.*, 149 F.3d 137, 140 (2d Cir. 1998); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 137 (2d Cir. 2008) ("Because the compensatory damages were allocated entirely to the state law claim, the remittitur is evaluated under state law."); *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (citing *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 430-31 (1996)).

Under New York law, a damage award is excessive if it "deviates materially from what would be reasonable compensation." *Patterson*, 440 F.3d at 119; N.Y. C.P.L.R. § 5501(c)). The New York standard "is less deferential to the jury and thus more favorable to the party challenging the award than is the federal 'shocks the conscience'" standard. *Gasperini*, 149 F.3d at 140; *see also Gasperini*, 518 U.S. at 425 ("The 'deviates materially' standard ... influences outcomes by tightening the range of tolerable awards."); *Consorti v. Armstrong (In re Joint E. & S. Dist. Asbestos Litig.)*, 9 F. Supp. 2d 307, 310 (S.D.N.Y. 2008) ("[I]n 1986, in an effort to curb

escalating awards, the New York legislature created a statutory standard ["materially deviates"] designed to give courts greater discretion in monitoring verdicts.").[3]

In the context of future expenses, a court will consider whether the verdict "closely approximate[s] the evidence of the *probable* future expenses in the record." *Marcoux*, 290 F. Supp. 2d at 479-80 (emphasis added) (finding award for future medical expenses of 31-year-old materially deviated from reasonable compensation where "it is not definite that plaintiff will undergo any or all of the aforementioned procedures"). The "deviates materially" standard requires the court to "examine the evidence underlying the award and compare the verdict to awards in similar cases[.]" *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 436-37 (S.D.N.Y. 2008) (recognizing, however, that modification of damages "cannot be based upon case precedent alone") (citing *Po Yee So v. Wing Tat Realty, Inc.*, 687 N.Y.S.2d 99, 101 (N.Y. App. Div. 1999)). When a court determines that a jury award is excessive it should remit the award to the "maximum amount that would not be excessive." *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 257 (S.D.N.Y. 2007).

---

[3] Even under the federal "shock the conscience" standard, the percentage of the jury's award here that is attributable to speculation and is unsupported by the weight of the evidence – in short, *more than 75% of the damages awarded* – certainly shocks the conscience.

# ARGUMENT

## I. THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND NECESSITATES A NEW TRIAL ON DAMAGES.

At trial, Plaintiff's damages expert, Marnie Bell, testified that the treatment system required for Station 6 would cost approximately $250 million. (9/24/09 Tr. at 5886:5-10.) The jury presumably accepted Ms. Bell's testimony, as this is the amount it awarded. *See Thomas*, 508 F. Supp. 2d at 260 (inferring length of time for which jury awarded front pay based upon number suggested by plaintiff's expert). Ms. Bell's estimate included approximately $60 million in initial capital costs, $49 million in capital replacement costs, and $141 million for forty years of O&M costs. The competent evidence, however, supports none of these numbers, and the Court should order a new trial.

### A. The Weight Of The Evidence Demonstrates That Future Treatment For MTBE Will Not Be Necessary.

The evidence shows that treatment of a potential contaminant is not required unless the MCL is exceeded. (9/30/09 Tr. at 6129:9-10 (Hand).) The evidence shows that *PCE* levels in the Station 6 wells are above the MCL and require treatment. (9/24/09 Tr. at 5958:4-10 (Bell); 9/30/09 Tr. at 6161:20-21 (Hand).) The evidence also shows that the New York State MCL for MTBE is 10 parts per billion. (8/31/09 Tr. at 2947:8-9 (Schindler).) In contrast to PCE, the City introduced no evidence that its Station 6 wells are presently contaminated with *any* level of MTBE – and the vast majority of its prior detections, years ago, were below the applicable MCL. Rather, the City relied on testimony and argument about predicted MTBE levels years, even decades, in the *future*. But even then, the jury determined that MTBE levels in the combined outflow of the Station 6 wells will never exceed the State of New York's 10 ppb MCL standard. (8/26/09 Tr. at 2711:2-15 (Phase 2 verdict).) Thus, the Station 6 wells do not require treatment

for MTBE based on State regulations today, and will never require treatment for MTBE in the future. (9/30/09 Tr. at 6129:9-10 (Hand).) Nor will the wells require treatment for MTBE based on the City's status as a public water provider.[4] (*See* 9/1/09 Tr. at 2991:12-17; 8/31/09 Tr. at 2982:4-7, 2982:18-23 (despite historically serving water contaminated with MTBE both below and above the MCL, the City has never had a taste or odor complaint it can attribute to MTBE and has never increased sampling frequency because of MTBE (Schindler)); 9/2/09 Tr. at 3277:3-5, 3280:2-25 (City expert, Dr. Rudo, testified that, based on his experience investigating "several thousand" incidents of MTBE in wells, "it's pretty difficult to detect under 50 parts per billion [by taste or odor]").) None of what the jury heard supports a damages award of $250.5 million.

**B.      The Evidence Does Not Support The Jury's Award Of Compensatory Damages For Initial Capital Costs.**

An award of $60 million in initial capital costs is completely against the weight of credible evidence – the only support for this large number being the dubious testimony of the City's expert, Ms. Marnie Bell. Defendants urge the Court to carefully consider the weight and credibility of her testimony. *See Song*, 957 F.2d at 1047 (on a motion for a new trial, the court is "free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner."). Specifically, Ms. Bell attempted – unconvincingly – to explain away the exponential increase between the 2004 capital cost estimate of $9.9 million and the revised 2009 estimate of $59.9 million. (*See* 9/30/09 Tr. at 6026:2-17 (Bell).) Bell blamed at least some of this 500% increase on "escalation of prices." (*Id.* at 6026:17-19 (Bell).) But one is hard pressed to believe

---

[4] This Court previously held that to recover for MTBE detections below the MCL, a public water provider plaintiff would have to show that these low-level detections caused taste and odor complaints or increased monitoring costs. *See In re MTBE Prods. Liab. Litig.*, 458 F. Supp. 2d 149, 159-60 (S.D.N.Y. 2006). As noted above, the City's own witness admitted at trial that the City has *never* had a taste or odor complaint it can attribute to MTBE and has *never* increased sampling frequency because of MTBE. (8/31/09 Tr. at 2982:4-7, 2982:18-23 (Schindler).)

this factor had anything but the most minimal effect on cost estimates; after all, the $9.9 million

price tag already had been adjusted to 2007 dollars and the $59.9 million was in 2009 dollars.

(*See* Handel Decl., Ex. A. at 2.)  Ms. Bell also tried to rationalize the cost increase based on

redesign of the system from a "parallel" to "in series" configuration.  (9/30/09 at 6026:19-20

(Bell).)  While this may have some facial appeal, the system redesign cannot account for the

huge cost inflation, because in 2007, when the proposed design still was based on a "parallel"

formation, – *i.e.* before reconfiguration – the cost estimate already had jumped more than 300%

to $43.4 million.  (9/24/09 Tr. at 5913:21-5914:3 (Bell).)

So the decisive question is:  what caused the increase from $9.9 million (in 2004) to

$43.4 million (in 2007)?  Even though the 2007 estimate was calculated in year 2012 dollars,

inflation cannot justify the four-fold increase.  The answer, according to Ms. Bell, is that she and

her colleagues "ended up *lowering* the maximum design criteria [for MTBE influent] from

approximately 210 parts per billion [in 2004] to approximately 50 to 70 parts per billion" based

on modeling predictions performed in 2007.  (*See id.* at 5914:5-20 (Bell) (emphasis added).)  In

other words, despite the fact that predicted influent concentrations were *reduced* by

approximately 66%, Ms. Bell *increased* her capital cost estimates by more than 300% – from

$9.9 million to $43.4 million.  (*See id.* at 5910:3-7; 5913:21-5914:20 (Bell).)

Ms. Bell's estimates are not only dubious, they are contrary to logic and common sense.

Her opinions cannot withstand this Court's scrutiny, and an award of $60 million in initial capital

costs is against the weight of the credible evidence.

C.       **The Evidence Does Not Support The Jury's Award Of Compensatory
          Damages For Capital Replacement And O&M Costs.**

The portion of the jury's award attributable to capital replacement and O&M costs,

totaling $190 million – *more than 75%* of the total award – is dependent on speculative and

- 7 -

wholly unsupported assumptions about the length of time that the Station 6 treatment system will operate in the future. Specifically, Ms. Bell's O&M cost estimate assumes that the Station 6 treatment plant will operate continuously (*i.e.*, 24 hours a day, 7 days a week, 365 days a year) for 40 years. (9/24/09 Tr. at 5904:18-21; 9/30/09 Tr. at 6020:18-21 (Bell).) The capital replacement cost estimate assumes that investment for equipment replacement will be needed twice (once every 20 years) regardless of whether or how long the Station 6 plant operates during that period of time. (9/30/09 Tr. at 6023:12-18; *see also* 9/24/09 Tr. at 5886:15-17 ("Q: Did you assume that the facility operated continuously for 40 years? A: Yes, I did assume that."), 5888:5-9 (Court questions assumption on replacement).)

The Court should reject these assumptions because they were unsupported by the evidence and conflict with the jury's finding that Station 6 will be used only as a "back-up" source of drinking water if and when needed because of drought or outages in the City's tunnel system for delivering water. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."). That the jury apparently accepted Ms. Bell's testimony and adopted these assumptions in no way prevents the Court from granting Defendants' motion for a new trial if it finds that the verdict is against the weight of the evidence or constitutes a miscarriage of justice. *See Song*, 957 F.2d at 1047 (the court is "free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner"); *DLC Mgmt. Corp.*, 163 F.3d at 133 (correct standard is whether verdict is against the weight of the evidence); *Marcoux*, 290 F. Supp. 2d at 462 ("a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict").

In Phase 1 of this trial, the jury found that the City intended to use the Station 6 water as a *back-up source only*. (8/12/09 Tr. at 1049:14-1050:1.)  The jury also heard evidence regarding what it means to use Station 6 as a back-up source.  Specifically, the parties presented evidence on two possible "back-up situations" – a drought emergency and a failure of the Rondout-West Branch tunnel.  With regard to the former, the jury heard evidence that the City previously faced a drought emergency; that during that emergency certain Queens groundwater wells were used for "short periods of time" (not 40 years straight); but that the drought ended before the wells were put into full-time service.  (8/6/09 Tr. at 758:3-18 (Cohen).)  With regard to a failure of the Rondout-West Branch tunnel, the jury heard evidence from the City itself that repairing the tunnel would take approximately *four* years. (*Id.* at 701:9-15 (Lawitts); *see also* Def.'s Exh. 12279 (Handel Decl. Ex. B).)

Most importantly, the jury heard *no* evidence that "back-up" usage would require operating the Station 6 treatment system continuously for four decades.  To the contrary, the jury heard that continuous pumping could "overstress" the aquifer and cause saltwater intrusion.  (*See* 8/21/09 Tr. at 2438:12-17 (Maguire) ("the supply wells in Queens were pumped fairly heavily up through about the mid-'70s … actually, the groundwater was being overpumped and salt water was being pulled into Queens.  So the aquifers here were overstressed.").)  Moreover, it defies common sense and reason for anyone, including the jury in this case, to accept that a "back-up" source would be used continuously for any extended period of time, to say nothing of 40 years.

In accepting Ms. Bell's damages numbers, the jury relied on nothing more than her *ipse dixit* statements.  Ms. Bell offered the following:

> It's my understanding that the Station 6 plant will be a backup supply, but the only reasonable assumption to make was that the facility would need to operate continuously.  The city has a number of planned repairs on its tunnels and aqueducts.  There is the

> potential for a failure of that supply. And when the system needs
> to operate, it needs to operate continuously *for as long as it is
> needed.*

(9/24/09 Tr. at 5886:20-5887:1 (emphasis added).) But what the evidence shows is that it is *not*

reasonable to assume that the City's well system in Queens – which it has *never* used for an

extended period of time – will somehow need to be operated continuously for 40 years. Rather,

such an assumption is against the weight of the evidence. At most, the jury heard evidence that

the City will need a back-up supply for the four years that the Rondout tunnel is being repaired.

Taking Ms. Bell's own words, there was no evidence presented at trial that operating the system

"for as long as it is needed" means operating the system for 40 continuous years. Indeed, the

evidence showed that doing so would cause grave problems in the groundwater aquifer.

Ms. Bell attempted to justify her assumption about the length of operation with the

following testimony:

> Q: Why did you assume 40 years?
>
> A: This was based on Dave Terry's modeling which showed
> MTBE concentrations sustaining at significant levels out to
> 2040. And we projected those trends outwards to try and
> identify the entire timeframe in which Station 6 would need to
> provide MTBE treatment.

(*Id.* at 5885:15-20.) There are least two reasons why this testimony fails to support Ms. Bell's

speculative conclusion. First, contrary to Mr. Terry's testimony about the length of time MTBE

will be present in the Station 6 wells and the concentrations at which it will be detected, the

weight of the evidence showed that MTBE levels are steadily decreasing nationwide. (*See*

8/17/09 Tr. at 1589:1-6, 1592:12-25 (Dr. Fogg predicted in 2000 that MTBE would remain in the

South Tahoe wells for 90-120 years. However, at trial he admitted that 2003 data shows that

concentrations in those wells are "essentially zilch."); 8/21/09 Tr. at 2423:4-2425:22 (Mr.

Maguire testified that MTBE was not a pervasive problem and explained, "generally what we are

seeing are very low concentrations if MTBE is found.  There are certain locations where it's not

found at all.  And in 2004, of all the monitoring wells that USGS has, the maximum

concentration was 3.3 parts per billion.").)  In fact, the jury presumably rejected Mr. Terry's

opinions on this issue, finding that MTBE levels would *peak* at 10 ppb, rather than the 35 ppb

Mr. Terry projected.  (8/26/09 Tr. at 2707:3-4; *see also* 8/19/09 Tr. at 2067:17-19 (Terry).)

Second, and most importantly, only the length of time during which the City requires a

back-up source of drinking water supply is relevant to the calculation of the City's compensatory

damages.  At most, the evidence at trial established that the Station 6 wells would be needed as a

back-up source for approximately four years while repairs are made to the Rondout-West Branch

tunnel.[5]  Thus, the jury's acceptance of the assumption that the treatment system would operate

for 40 years is based on pure speculation.  Indeed, it contradicts the jury's own prior conclusion

that the Station 6 wells would be used *only* as a "back-up" water source.

Under New York law, damages may not be awarded for such speculative losses.  *See*

*Trademark Research Corp.*, 995 F.2d at 334 ("New York law does not countenance damage

awards based on speculation or conjecture; there must be a definite and logical connection

between what is proved and the damages a jury is asked to find." (internal quotations omitted));

*see also In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 59287, at *22

(S.D.N.Y. July 6, 2009) ("Under New York Law, recovery of damages based on future

consequences of a present injury may be had only if such consequences are reasonably certain.

---

[5] That the City cannot predict with certainty future drought emergencies does not justify the
speculative assumption that the Station 6 wells will operate continuously for 40 years.  The City
was free to put on evidence of the expected frequency and typical duration of drought
emergencies.  The City failed to do so.  Conversely, as outlined above, the jury heard evidence
from the City's own expert that, in a previous drought emergency, certain Queens groundwater
wells were used for "short periods of time," and the drought ended before the wells were put into
full-time service.  (8/6/09 Tr. at 758:3-18 (Cohen).)

Recovery of damages for speculative or conjectural future consequences is not permitted." (internal quotations omitted)); *Marcoux*, 290 F. Supp. 2d at 479 ("To ensure that [damages] do not materially deviate from reasonable compensation, the plaintiff must prove her future medical expenses with reasonable certainty." (internal quotations omitted)); *Jansen v. C. Raimondo & Son Constr. Corp.*, 741 N.Y.S.2d 71, 73 (N.Y. App. Div. 2002) (striking award for future occupational therapy as speculative).  Allowing an award of damages, more than 75% of which is based on nothing more than speculation and the *ipse dixit* statements of a single witness, is a miscarriage of justice.  The Court should therefore order a new trial on the issue of damages.

II.    **ALTERNATIVELY, THE JURY'S DAMAGE AWARD DEVIATES MATERIALLY FROM WHAT WOULD BE REASONABLE COMPENSATION, AND THE COURT SHOULD REDUCE IT.**

In the event the Court does not grant a new trial on damages, then based on the evidence submitted the jury award should be reduced because (1) the award deviates materially from what would be a reasonable compensation, and (2) remittitur would address the excessiveness of the award.

A.    **The Jury's Award Deviates Materially From What Would Be Reasonable Compensation.**

Under New York law, a damage award is excessive if it "deviates materially from what would be reasonable compensation." *Patterson*, 440 F.3d at 119.  In making such a determination, courts will "compare the verdict to awards in similar cases" while recognizing that a direct "comparison of injuries in different cases is virtually impossible." *Okraynets*, 555 F. Supp. 2d at 436-37.  The present case is indeed unique, making comparison to verdicts in similar cases difficult, if not impossible.

That said, comparison to the costs previously incurred by the City to bring Queens wells online as a back-up water source during a drought emergency is instructive and demonstrates the

- 12 -

shocking inflation of the damage award here.[6]  Specifically, evidence was presented that the City

previously addressed MTBE contamination in five wells readied for use in a drought emergency

by installing temporary GAC units at a total cost of $3.16 million dollars, or approximately

$632,000 per well.  (9/24/09 Tr. at 5962:4-6 (Bell).)  In comparison, the $250.5 million awarded

to the City for future treatment of the Station 6 wells when (and if) they are needed as a back-up

source is shockingly excessive and materially deviates from what would be reasonable

compensation.

### B.        Remittitur Is Appropriate To Address The Jury's Excessive Award.

Remittitur is appropriate to address an excessive damages award:  "(1) where the court

can identify an error that caused the jury to include in the verdict a quantifiable amount that

should be stricken, [and] (2) more generally, where the award is intrinsically excessive in the

sense of being greater than the amount a reasonable jury could have awarded, although the

surplus cannot be ascribed to a particular, quantifiable error."  *Trademark Research Corp.*, 995

F.2d at 337.

In the present case three errors are readily identifiable.  First, the jury inappropriately

awarded $141 million for O&M costs based on nothing more than the *ipse dixit* statements of

Ms. Bell and her speculative assumption that Station 6 will operate continuously for 40 years.

---

[6] It is also instructive to compare the damages awarded to the City with those pled by the
plaintiff in another MTBE contamination case.  In 2002, in *United Water of N.Y. v. Amerada
Hess Corp.*, the plaintiff offered evidence that the actual construction of a treatment facility to
remove MTBE contamination cost it approximately $860,000.  *In re MTBE Prods. Liab. Litig.*,
No. 1:00-1898, 2007 U.S. Dist. LEXIS 40484, at *83 (S.D.N.Y. June 4, 2007).  The $60 million
in capital costs awarded to the City here for a future treatment system to treat speculative, future
MTBE, is almost a 70-fold increase over the costs *actually* incurred by United Water of N.Y. to
treat *actual* MTBE.  (*See* 9/24/09 Tr. at 5884:16-24.)  It simply is not feasible that this 70-fold
increase is attributable to higher costs of construction in Queens.  To the contrary, the costs
alleged in *United Water* are remarkably in line with the evidence presented in this case about the
City's previous costs to install GAC treatment during a drought emergency (approximately
$632,000 per well).

*See Gen. Elec. Co.*, 522 U.S. at 146; *Trademark Research Corp.*, 995 F.2d at 334.  In doing so, the jury ignored its prior Phase 1 decision that Station 6 would operate as a back-up supply only, and disobeyed the Court's instruction that it "should not revisit" prior findings.  (10/7/09 Tr. at 6661:12 (answering jury's question regarding weight of phase 2 finding).)  Second, the jury inappropriately awarded the City $60 million in capital costs despite Ms. Bell's irrational explanation for how she arrived at her capital cost estimate.  (*See* 9/24/09 Tr. at 5958:4-10 and discussion *infra* Section I.B.)  Lastly, the jury implausibly credited Ms. Bell's dubious testimony that certain equipment at Station 6 will require replacement every 20 years, regardless of whether that equipment is ever used or for how long.  (*See id.* at 5888:5-9 (Court questioning Bell's assumptions on replacement costs); *see also* 9/30/09 Tr. at 6159:22-6160:2 ("Q:  [A]re there any anticipated replacement costs that you, in your experience, would include in an estimate for this type of project? A:  No.  Q:  Why not?  A:  Because there shouldn't be any.  It is not being used." (Hand)).)  There is absolutely no evidence to support the jury awarding the City $49 million in capital replacement costs for equipment that may never be used or, if used, will only be used as a "back-up" system for a short period of time.

In the alternative, the jury's award is intrinsically excessive when compared to the costs the City previously incurred to install GAC treatment on its wells during a drought emergency. *See* discussion *supra* at p. 12. The jury's award, which compensates the City for unfounded capital costs; for replacement costs that are unsupported by competent evidence; and for 40 years of operation and maintenance costs based on speculative assumptions, is "greater than the amount a reasonable jury could have awarded." *See Trademark Research Corp.*, 995 F.2d at 337.

- 14 -

For these reasons, ExxonMobil believes that the maximum, non-excessive award that would compensate the City for alleged future MTBE contamination is $1 million to $4 million. This amount is entirely consistent with the City's previous costs (of $3.16 million dollars) for treating five wells during a drought emergency. The City's prior real-world costs, therefore, support a non-excessive award in the range of $1 million to $4 million.

This same range is also separately supported because it represents a reasonable amount of O&M costs attributable to MTBE for a length of operating time based upon competent, non-speculative, evidence – *i.e.*, one to four years, the length of time that the City may require Station 6 as a "back-up" to its tunnel supply – while excluding Ms. Bell's dubious and unsupported estimates for initial capital costs and replacement costs. At trial, ExxonMobil preserved an objection[7] to the exclusion of Dr. David Hand's per-year estimate for O&M costs attributable to MTBE.[8] As defense counsel explained:

> [Dr. Hand] was prepared to quantify an amount of operation and maintenance costs … if you have MTBE there over and above what it would cost for PCE, and he would proffer that the costs for a GAC system would be an annual increase of … about *$900,000 per year*. … I deliberately avoided the amounts, your Honor, because you had cautioned. We obviously object to the ruling, and we preserve that for the record here. But, you know, we moved on and we avoided the costs.

(*See* 9/30/09 Tr. at 6191:3-22 (emphasis added).)  Had the jury been permitted the opportunity to hear Dr. Hand's improperly excluded testimony, it would have had a basis for quantifying the

---

[7] ExxonMobil acknowledges and respectfully disagrees with the Court's ruling excluding Dr. Hand's testimony about O&M costs. *See* Exxon Mobil Defendants' Motion for a New Trial Based on Errors of Law at Section IV.A.

[8] The excluded opinions refer to the supplemental O&M costs attributable to MTBE if the treatment goal is a reduction from 10 ppb to 1 ppb. (*See* 10/1/09 Tr. at 6205:19-21.)  However, Dr. Hand also testified that no O&M costs should be attributed to MTBE because it will never exceed the State of New York's 10 ppb MCL. (9/30/09 Tr. at 6129:4-10, 6166:8-21.)

annual O&M costs actually attributable to MTBE. Because Dr. Hand's testimony was so

limited, the jury heard only the following:

> Q:     Dr. Hand, if we use the liquid phase GAC system with the big
> vessels filled with carbon that Ms. Bell has proposed, would there
> be more frequent change-outs of that carbon if MTBE were present
> as opposed to just PCE alone?
>
> A.      If you're going from 10 to 1 [ppb], yes.
>
> Q.      And did you determine how many additional change-outs would
> occur in a year if MTBE was present versus just PCE alone?
>                                     …
> A.      [A]bout 19/20, yes.

(10/1/09 Tr. at 6222:18-6223:6.) This was crucial testimony. However, hearing no dollar

amount that it could attribute to these 19 to 20 carbon change-outs attributable to MTBE, the jury

resorted to Ms. Bell's unsupported O&M number based on 40 years of assumed operation.

While ExxonMobil believes that the award should be reduced to a range of $1 million to

$4 million, to the extent the Court disagrees and intends to credit the City's view of its costs –

projections that are not credible for all the aforementioned reasons – the award should in all

events be reduced to cover only the four-year period during which the Rondout-West Branch

tunnel will supposedly be repaired and then further reduced to account for settling defendants'

contribution and for the cost of treating other contaminants. That is, while ExxonMobil believes

a new trial is necessary, strenuously disagrees with the City's initial capital cost and O&M

projections, and provides the following alternative award amounts solely to aid the Court without

waiving its other arguments, the evidence at most supports an award of either $10.02 million or

$30.94 million, because the Court should assume that the Station 6 wells will continuously

operate, at most, over a four-year period.

Accordingly, at best, the Court should add O&M costs only for the maximum, non-speculative four-year period of continuous operation either to the City's consultants' 2004 estimate of initial capital costs (of $9.9 million) or, as a worst case, to Ms. Bell's trial estimate of initial capital costs ($60 million).  As discussed above, the alleged replacement costs have no support in the record and should not be included in the damages calculation at all.  Thus, using the erroneous 2004 capital cost estimate of $9.9 million, the additional O&M costs should be at most $14.1 million,[9] and the resulting $24 million award reduced by 28 percent for the "pre-existing contamination" found by the jury,[10] resulting in $17.28 million attributable to MTBE. (See 10/19/09 Tr. at 7045:15-22.)  The Court should then apply the jury's finding that 42% of the City's injury was caused by other companies, leaving ExxonMobil responsible for 58%, or $10.02 million.  (Id. at 7046:1-16.)  Alternatively, applying the same methodology to the erroneous $60 million initial capital cost estimate, the award should be reduced to $30.94 million.  Again, ExxonMobil does not adopt these alternative calculations and does not believe they are appropriate, but they provide further examples of the ways in which the jury's award was excessive and should be reduced.

---

[9] The $14.1 million O&M number is the four-year equivalent of Ms. Bell's $141 million estimate for O&M costs over her hypothetical 40-year period – i.e., $141 million divided by 40, which is $3.525 million per year, multiplied by four years.

[10] The jury attributed $70 million (or 28 percent) of its $250.5 million award to "pre-existing contamination." (10/19/09 Tr. at 7045:15-22.)  Applying that same percent reduction to the $24 million total costs results in $17.28 million attributable to MTBE.

## **CONCLUSION**

For all of the foregoing reasons, ExxonMobil respectfully requests that the Court grant a

new trial on the issue of damages, or, in the alternative, order remittitur.

DATED:  April 21, 2010                          Respectfully submitted,

Peter John Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Lauren E. Handel (LH 0755)
Lisa A. Gerson (LG 4340)
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10017-4613
Tel. (212) 547-5400
Fax (212) 547-5444

James W. Quinn (JQ 6262)
David J. Lender (DL 1554)
Theodore E. Tsekerides (TT 5946)
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Tel:  212.310.8000
Fax:  212.310.8007

*Counsel for Exxon Mobil Corporation,*
*ExxonMobil Chemical Company, Inc., Exxon*
*Mobil Oil Corporation, and Mobil Corporation*