UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
PRODUCTS LIABILITY LITIGATION

This document relates to:

*City of New York v. Amerada Hess Corporation, et al.,*
No. 04 Civ. 3417 (SAS)

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

EXXON MOBIL DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.  THE COURT SHOULD GRANT EXXONMOBIL JUDGMENT AS A MATTER OF LAW BECAUSE THE EVIDENCE ADDUCED AT TRIAL OVERWHELMINGLY SUPPORTS ITS AFFIRMATIVE DEFENSES. ...................................................... 2

    A. Ex xonMobil Proved, And The Jury's Verdict Established, That Plaintiffs' State -Law Claims Are Preempted. .............................................................. 2

    B. The Statute Of Limitations Bars The City's Claims. ...................................... 5

II. THE CITY FAILED TO PROVE THE ELEMENTS OF ITS CLAIMS. ........................... 6

    A. The Cit y Failed To Prove Causation. ............................................................ 6

        1.  The City did not prove the source of any future MTBE impacts to the Station 6 wells. .................................................................................... 6

        2.  The City did not prove "direct spiller" causation. ................................. 7

        3.  The City did not prove that ExxonMobil-supplied or refined product caused its injury. ................................................................................................ 8

        4.  The City did not prove that ExxonMobil's "failure to warn" was a cause of its injury. ...................................................................................... 10

    B. The City Failed To Prove An Actual Or Imminent Legally Cognizable Injury. .......... 12

        1.  The City failed to prove a past or present injury, and its future injury claim is not justiciable. ...................................................................... 12

        a)  The City failed to prove that MTBE will be present in the Station 6 wells at any quantifiable level in the future, such that it needs to build a prophylactic treatment system. ....................................................................... 15

        b)  The jury's finding that MTBE levels will not exceed the maximum contaminant level is dispositive of the "injury" issue. ........................... 17

        2.  The City failed to prove an imminent future injury. ............................. 19

    C. The City Failed To Prove That ExxonMobil Was Negligent. ...................... 20

    D. The City Failed To Prove Its Public Nuisance Claim. ................................. 21

    E. The City Failed To Prove Its Trespass Claim. ............................................ 22

CONCLUSION................................................................................................................... 24

## **TABLE OF AUTHORITIES**

**page**

**FEDERAL CASES**

*In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223 (E.D.N.Y 1985)..............................10

*Allen v. Wright*, 468 U.S. 737 (1984) ........................................................................................13

*Barrett v. Black & Decker Inc.*,
    No. 06 Civ. 1970, 2008 U.S. Dist. LEXIS 108787 (S.D.N.Y. Aug. 5, 2008) .........................12

*Caruolo v. John Crane, Inc.*, 226 F.3d 46 (2d Cir. 2000)..............................................................2

*Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53 (S.D.N.Y. 2001) ......................................................10

*Davis v. City of N.Y.*, 228 F. Supp. 2d 327 (S.D.N.Y. 2002)....................................................8, 12

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) .........................................2

*In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138 (2d Cir. 1993) ...................................14

*Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361 (S.D.N.Y. 2003)...........................................10

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276 (2d Cir. 1998) ............................2

*Knaust v. City of Kingston*, 193 F. Supp. 2d 536 (N.D.N.Y. 2002)................................................19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................................13

*Mehra v. Bentz*, 529 F.2d 1137 (2d Cir. 1975) ...........................................................................10

*Mono v. Peter Pan Bus Lines*, 13 F. Supp. 2d 471 (S.D.N.Y. 1998)................................................1

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ...........................................................2

*In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001).....................................5, 19

*In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 324 (S.D.N.Y. 2006) ...........................................3

*In re MTBE Prods. Liab. Litig.*, 458 F. Supp. 2d 149 (S.D.N.Y. 2006) ..................................17, 18

*In re MTBE Prods. Liab. Litig.*,
    No. 1:00-1898, 2007 U.S. Dist. LEXIS 40484,  (S.D.N.Y. June 4, 2007) ................................5

*In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 249 (S.D.N.Y. 2008)..........................................20

*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 59287
(S.D.N.Y. July 6, 2009) .............................................................................12, 13, 15

*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 62649
(S.D.N.Y. July 21, 2009) ........................................................................................8

*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 78081
(S.D.N.Y. Aug. 25, 2009) ..................................................................................5, 13

*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 96469
(S.D.N.Y. Oct. 19, 2009) ......................................................................................24

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)...........................................1

*Scribner v. Summers*, 84 F.3d 554 (2d Cir. 1996) ........................................................23

*Song v. Ives Lab., Inc.*, 957 F.2d 1041 (2d Cir. 1992) ....................................................2

*Tornheim v. Fed. Home Loan Mtge. Corp.*, 988 F. Supp. 279 (S.D.N.Y. 1997)...........................12

*Transnor Ltd. v. BP North America Petroleum*, 738 F. Supp. 1472 (S.D.N.Y. 1990) ...................9

*Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006) .....................................1

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .............................................................13

## STATE CASES

*Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531 (N.Y. 1981) ................................12

*Copart Indus. v. Consol. Edison Co.*, 362 N.E.2d 968 (N.Y. 1977)........................................13, 21

*Corcoran v. Banner Super Market*, 227 N.E.2d 304 (N.Y. 1967)................................................21

*DeStefano v. Emergency Hous. Group, Inc.*, 281 A.D.2d 449 (N.Y. App. Div. 2001)...........21, 22

*Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222 (N.Y. 2001) ........................................9

*Healey v. Firestone Tire & Rubber Co.*, 663 N.E.2d 901 (N.Y. 1996) ...........................................8

*Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069 (N.Y. 1989) ............................................6

*Kalinowski v. Ryerson*, 272 N.Y.S. 759 (N.Y. App. Div. 1934) .......................................10

*In re Lead Paint Cases*, 191 N.J. 405 (N.J. 2007) .....................................................22

*Morejon v. Rais Constr. Co.*, 851 N.E.2d 1143 (N.Y. 2006) .........................................................21

*New York v. Fermenta ASC Corp.*, 630 N.Y.S.2d 884 (N.Y. Sup. Ct. 1995)..........................21, 22

*People v. Sturm, Ruger & Co.*, 309 A.D.2d 91 (N.Y. App. Div. 2003) .......................................22

*Phillips v. Sun Oil Co.*, 121 N.E.2d 249 (N.Y. 1954)...................................................................23

*Plainview Water Dist. v. Exxon Mobil Corp.*, 2008 N.Y. Slip. Op. 501520U
   (N.Y. Sup. Ct. 2008) ..............................................................................................................19

*Snyder v. Jessie*, 565 N.Y.S.2d 924 (N.Y. App. Div. 1990).........................................................23

*State v. Lead Indus. Ass'n*, 951 A.2d 428 (R.I. 2008) .................................................................22

## FEDERAL STATUTES

15 U.S.C. § 7545(k)(1)(A)................................................................................................................3

## STATE STATUTES

N.Y. C.P.L.R. § 214(4) ...................................................................................................................5

N.Y. C.P.L.R. § 214-c(2) ...............................................................................................................5

## RULES

Fed. R. Civ. P. 50(a) ......................................................................................................................1

Fed. R. Civ. P. 59(a) ......................................................................................................................2

## MISCELLANEOUS

New York Pattern Jury Instructions 2:70.......................................................................................20

New York Pattern Jury Instructions 3:8.........................................................................................23

## INTRODUCTION

Defendants Exxon Mobil Corporation, ExxonMobil Chemical Company, Inc., Exxon

Mobil Oil Corporation, and Mobil Corporation (collectively "ExxonMobil" or "Defendants") are

entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50(b) because no

reasonable jury could have found for the City on ExxonMobil's defenses based on preemption

and the statute of limitations, and because Plaintiffs City of New York, New York City Water

Board and the New York City Municipal Water Finance Authority's (collectively "the City" or

"Plaintiffs") failed to prove essential elements of their claims, including injury and causation.[1] In

the alternative, because the jury's findings for Plaintiffs were against the weight of the evidence,

the Court should grant a new trial pursuant to Federal Rule of Civil Procedure 59(a).[2]

## ARGUMENT

The standard for granting a Rule 50(b) motion "is set forth in Rule 50(a)." *Mono v. Peter*

*Pan Bus Lines*, 13 F. Supp. 2d 471, 474-75 (S.D.N.Y. 1998). There must be a "legally sufficient

evidentiary basis" for a reasonable jury to find for the nonmoving party. Fed. R. Civ. P. 50(a);

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000). A plaintiff fails to overcome

---

[1] Defendants incorporate by reference their Phase 1 and 2 Rule 50(a) motions for judgment as a matter of law, which were presented orally on the record (*see* 8/12/09 Tr. at 1160:10-1161:11; 8/26/09 Tr. at 2712:22-2713:10), as well as the arguments made in Defendants' October 1, 2009, Memorandum in support of their motion for judgment as a matter of law pursuant to Rule 50(a).

The Court has instructed the parties to disclose when they are raising issues on which the Court has previously ruled. With a few exceptions, the Court has ruled on all of the issues raised in this motion, but ExxonMobil raises in this motion all of the issues as to which it believes it is entitled to judgment as a matter of law, as the case law under Rule 50 requires. *See, e.g., Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400-01 (2006).

[2] In addition to the evidentiary arguments for a new trial which are raised in this motion, ExxonMobil is concurrently filing two separate motions – (1) for a new trial on the issue of damages, or in the alternative for remittitur; and (2) for a new trial based on several errors of law that, ExxonMobil respectfully submits, occurred at trial.

Rule 50(a) or (b) when "'(1) there is such a complete absence of evidence [to] support [a plaintiff's] verdict that the jury's findings [w]ould only [be] the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded [persons] could not arrive at a verdict against [it]." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)).

Pursuant to Federal Rule of Civil Procedure 59(a), a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Such grounds include "claim[s] that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Unlike a motion for judgment as a matter of law, a court may grant a new trial "even if there is substantial evidence to support the jury's verdict." *Caruolo*, 226 F.3d at 54. The court is "free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner." *Song v. Ives Lab., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992). A new trial may be granted when the verdict is "against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998).

## I.   THE COURT SHOULD GRANT EXXONMOBIL JUDGMENT AS A MATTER OF LAW BECAUSE THE EVIDENCE ADDUCED AT TRIAL OVERWHELMINGLY SUPPORTS ITS AFFIRMATIVE DEFENSES.

### A.   ExxonMobil Proved, And The Jury's Verdict Established, That Plaintiffs' State-Law Claims Are Preempted.

Because the jury found that there was not "a safer, feasible alternative design at the time ExxonMobil's gasoline containing MTBE was marketed," the City's claims are preempted as a

matter of law. (*See* 10/19/09 Tr. at 7043:15-19 (Phase 3 verdict on feasible alternative).)

ExxonMobil previously argued that all of the City's claims are preempted by the Clean Air Act

Amendments of 1990 ("CAAA") because: (1) Congress specifically intended for refiners to be

able to choose among oxygenates, including MTBE, for purposes of complying with the

CAAA's gasoline oxygen content requirements; and (2) eliminating MTBE would interfere with

the CAAA's goals.[3] In addition, the City's state-law tort claims conflict with the decision of the

U.S. Environmental Protection Agency to permit the use of MTBE as an oxygenate, "taking into

consideration the cost of achieving such emission reductions, any *nonair-quality* and other air-

quality related *health and environmental impacts* and energy requirements." 15 U.S.C. §

7545(k)(1)(A) (emphasis added). ExxonMobil acknowledges that the Court rejected these

arguments in its June 23, 2006 Order, *In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 324, 343

(S.D.N.Y. 2006), and respectfully notes its objection to that ruling.

But the Court's ruling did not foreclose a finding of preemption. To the contrary, the

Court left the preemption question open, reasoning that preemption might be found if defendants

presented evidence that "eliminating MTBE would have prevented the growth of the RFG

Program" because the legally-permissible alternative to MTBE – which Plaintiffs have always

contended was *only* ethanol – was not available in commercially-feasible quantities to meet the

federal mandate for RFG. *Id.* at 340. ExxonMobil did present that evidence at trial and, in fact,

the jury found that ethanol was *not* a commercially-feasible, safer substitute for MTBE for

purposes of complying with Congress' oxygenate mandates. (*See* 10/19/09 Tr. at 7043:15-19

---

[3] ExxonMobil hereby incorporates by reference the argument and analysis set forth in
Defendants' Motion For Summary Judgment Based on Conflict Preemption, filed July 29, 2005,
in *MDL No. 1358*, and all associated memoranda, reply papers, letter-briefing and/or oral
argument on that motion. (Attached to 10/1/09 Declaration of James Pardo (ECF Filing # 2853)
("10/1/09 Pardo Decl.") as Ex. F.)

("Has the city proven, by a fair preponderance of the credible evidence, that there was a safer, feasible alternative design at the time ExxonMobil's gasoline containing MTBE was marketed? And [the jury] answered 'No.'".) The jury's finding on this issue was well supported by the evidence that ExxonMobil presented, including the following:

- Exxon's analysis of available oxygenates concluded that there would be significant shortfalls of both MTBE and ethanol combined to meet the industry-wide demand under the Clean Air Act requirements. (9/21/09 Tr. at 5314:12-22, 5327:25-5330:3 (Eizember).)

- Because ethanol plants were located mainly in the Midwest, transporting ethanol to the coasts posed increased complications and costs. (9/15/09 Tr. at 4457:13-4459:2 (O'Brien).)

- Compared to MTBE, using ethanol increases the cost of shipping gasoline from "several cents per gallon" to "10 cents a gallon." (9/14/09 Tr. at 4291:9-17 (Tallett).)

- Because ethanol separates from gasoline in the presence of water, and all pipelines tend to contain some water, gasoline blended with ethanol could not be transported by pipeline – the principal mode for distributing gasoline from refineries in the United States. (9/10/09 Tr. at 4095:9-12 (Burke).)

- Because EPA rules prohibited mixing gasoline containing MTBE with gasoline containing ethanol during summer months, refiners who shared common distribution systems all had to use either MTBE or ethanol in the areas served by the common distribution systems. (9/21/09 Tr. at 5318:16-23 (Eizember); 9/23/09 Tr. at 5614:9-5615:7 (Eizember).)

- The commercial viability of ethanol depended, in part, on refiners being able to obtain a waiver from the U.S. EPA from rules regarding volatility, and that waiver was denied by the federal government. (9/15/09 Tr. at 4454:14-4455:5, 4455:21-24. (O'Brien).) The waiver was denied because EPA was concerned about increased air emissions from ethanol use. (9/16/09 Tr. at 4714:1-4715:13 (Reynolds).)

- The commercial viability of ethanol also depended, in part, on federal subsidies, which were scheduled to expire and created further uncertainty about the viability of the ethanol industry. (9/15/09 Tr. at 4470:4-16 (O'Brien); 9/23/09 Tr. at 5612:9-5613:7 (Eizember).)

In short: the evidence at trial proved – and the jury's verdict confirms – that "it would be impossible for the defendants to comply with both the state law sought to be imposed and the federal requirements" because alternatives (*i.e.,* ethanol) have not "been available to the

defendants for their use in the RFG Program." *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 614, 616 (S.D.N.Y. 2001). Accordingly, ExxonMobil proved that the City's claims are preempted.

**B.**     **The Statute Of Limitations Bars The City's Claims.**[4]

An action for injury to property must be commenced within three years after a plaintiff "actually or constructively discovers its injury[.]" *In re MTBE Prods. Liab. Litig.*, 2007 U.S. Dist. LEXIS 40484, at *23, *25 (S.D.N.Y. June 4, 2007); N.Y. C.P.L.R. § 214(4); N.Y. C.P.L.R. § 214-c(2). Because the City filed this suit on October 31, 2003, the relevant bar date for statute of limitations purposes is October 31, 2000.

The City's alleged injury is that MTBE interferes with its planned future use of the Station 6 wells because it will have to install treatment to remove the MTBE. The evidence proved that the City was aware of this alleged injury long before the bar date. Mr. Kunsch (the City's former water quality manager) testified that he told the City's Department of Health – by memo dated June 14, 1995 – that MTBE was a growing concern as a potential groundwater contaminant and, on that basis, he requested that wells be tested for MTBE going forward. (9/23/09 Tr. at 5752:23-5753:2, 5754:7-15, 5756:3-21.) Kunsch also testified that MTBE's resistance to biodegradation, high mobility in soils, and propensity to disperse rapidly in water, were detailed in an April 7, 1997, memorandum to the City. (*Id.* at 5761:1-9.) As to Station 6

---

[4] ExxonMobil has previously argued that the City's claims are time-barred by the applicable statute of limitations and hereby incorporates by reference the argument and analysis set forth in Defendants' Motion For Summary Judgment Based On the Statute of Limitations, filed on April 14, 2006; Defendant's Motion For Summary Judgment Of Plaintiff City Of New York's Claims Related To Station 6 Based On The Statute Of Limitations, filed August 12, 2009; and all associated memoranda, reply papers, letter briefing and oral argument on each of these motions. (10/1/09 Pardo Decl., Exs. I-J). ExxonMobil reiterates these arguments while acknowledging that the Court previously rejected them. *See In re MTBE Prods. Liab. Litig.*, No. 1:00-1898, 2007 U.S. Dist. LEXIS 40484 (S.D.N.Y. June 4, 2007); *In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 78081 (S.D.N.Y. Aug. 25, 2009).

specifically, Mr. Yulinksy (another City employee) testified that (1) by September 1999 the City

was discussing with its consultant, Malcolm Pirnie, the anticipated need to treat MTBE at Station

6 (*id.* at 5781:24-5782:15); (2) by May 2000 the City had "planned for treatment of VOCs and

MTBE at Station 6" (*id.* at 5776:25-5777:4); and (3) by August 2000 the City knew that "the

presence of highly [soluble] VOCs such as MTBE will greatly impact the design" of the

treatment system at Station 6 (*id.* at 5772:25-5773:15). Thus, the City's own employees

conclusively established that the City incurred, and was aware of, its asserted "injury" long

before the October 30, 2000, limitations date.

## II.   THE CITY FAILED TO PROVE THE ELEMENTS OF ITS CLAIMS.

### A.   The City Failed To Prove Causation.

The City failed to prove that ExxonMobil was a substantial cause of its asserted injury.

#### 1.   The City did not prove the source of any future MTBE impacts to the Station 6 wells.

In New York, "identification of the exact defendant whose product injured the plaintiff is,

of course, generally required." *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, 1073 (N.Y.

1989). Thus, the City was required to establish that MTBE from particular release sites will

impact the Station 6 wells if and when they are used in the future. Otherwise, there would be no

evidentiary basis for a finding that ExxonMobil caused the City's harm either as a direct spiller

or as a refiner or supplier of other stations' gasoline.

The City's evidence that MTBE from known or potential release sites would impact the

Station 6 wells depended entirely on the speculative capture zone analysis of its expert, David

Terry. Terry acknowledged that the shape, size and location of Station 6's theoretical, future

capture zone would vary significantly, depending on multiple factors, none of which can be

predicted with reasonable certainty (or, really, any certainty). For example, the capture zone

varies depending on the duration and rate at which the Station 6 wells will pump in the future, as well as any future pumping of other nearby wells, such as the dependability wells. (8/18/09 Tr. at 1896:10-21; 8/19/09 Tr. at 2148:2-13, 2149:10-13, 2150:5-24; 8/20/09 Tr. at 2210:8-2211:21 (Terry).) Terry admitted that "no one really knows . . . how they're going to use [the Station 6 wells]" in the future. (8/20/09 Tr. at 2213:9-10.) Indeed, the model Terry used to predict the future capture zone relied on the implausible assumption that the Station 6 wells will operate continuously for 24 years at a rate of 10 million gallons per day, even though Terry conceded that, in reality, wells are rarely run non-stop for long periods of time. (8/19/09 Tr. at 2155:17-2156:1.) In addition, Terry's assumption that the dependability wells will be activated in 2020 and will pump 55 million gallons per day, for 20 years, is unsupported by any evidence. (*See* 8/18/09 Tr. at 1899:13-21; 8/20/09 Tr. at 2210:8-10.)

Given the uncertainty inherent in his capture zone analysis, Terry had to admit that he could not determine which of the sites within his capture zone would be a source of MTBE impacts to the Station 6 wells if they are ever operated in the future. (9/23/09 Tr. at 5706:17-25.) Moreover, Terry's analysis did not determine when MTBE from any site within his predicted capture zone might reach Station 6. (*See* 8/19/09 Tr. at 2151:12-2152:14; 9/23/09 Tr. at 5704:1-4.) This is significant because Terry testified that a molecule of MTBE near the perimeter of his future capture zone would take up to 30 years to reach the wells. (*See* 8/18/09 Tr. at 1912:14-25 (Terry); *see also* 9/21/09 Tr. at 5164:25-5165:23 (Maguire).) Thus, depending on the distance of a release site from Station 6 and the length of time that the wells are pumped, MTBE from a site within Terry's capture zone might never reach the wells.

### 2.    The City did not prove "direct spiller" causation.

Having failed to prove that any particular release or site could be the source of an MTBE detection in the Station 6 wells, the City also failed to establish that gasoline allegedly released

years ago at any of the six "Mobil" branded service stations identified by Terry would be a substantial factor (or any factor at all) in causing any future MTBE detection at Station 6. Terry admitted that he could not quantify what impact, if any, a particular "ExxonMobil" or other station might have in causing any such MTBE detection. (9/23/09 Tr. at 5702:23-5703:5, 5704:5-11, 5710:2-8.) The jury's finding that ExxonMobil is liable as a direct spiller lacks any evidentiary basis. *See also* Section II.C *infra* (Negligence).

**3.    The City did not prove that ExxonMobil-supplied or refined product caused its injury.**

The City also failed to prove that "it is reasonably probable, not merely possible or evenly balanced," that gasoline manufactured or supplied by ExxonMobil has caused the City's alleged injury. *See Healey v. Firestone Tire & Rubber Co.*, 663 N.E.2d 901, 903 (N.Y. 1996). As explained, the City failed to prove that any "spill" event at an ExxonMobil branded station caused its injury. In addition, the City introduced no direct evidence that any of the other service stations in Terry's putative capture zone (or anywhere in Queens for that matter) were actually supplied with ExxonMobil gasoline. "[T]here [was] such a complete absence of evidence [to] support[] [a plaintiff's] verdict that the jury's finding [must] only have been the result of sheer surmise and conjecture." *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 330 (S.D.N.Y. 2002).

Having no direct evidence that ExxonMobil supplied the relevant stations during the relevant times, the City offered testimony about ExxonMobil's "wholesale" market share – *i.e.*, data reported on Energy Information Agency 782C forms – as circumstantial evidence that gasoline sold at wholesale by ExxonMobil was discharged from retail service stations (including the myriad stations operated by other refiners and marketers) and made its way into groundwater within the hypothetical "capture zone" that Station 6 theoretically will create in the future. We acknowledge the Court's ruling that EIA 782C "prime supplier" data may be used as

- 8 -

circumstantial evidence for proving traditional causation. *See In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 62649, at *18 (S.D.N.Y. July 21, 2009); 9/21/09 Tr. at 5340:4-5341:18. We reiterate our objection to that ruling because it inappropriately allowed the City to substitute market share liability for actual causation.[5] Given that the New York Court of Appeals has severely limited the application of market share liability – and the fact that the City disclaimed reliance on market share liability – the Court should not have allowed such irrelevant evidence of ExxonMobil's market share. *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 241-42 (N.Y. 2001).

Even if market share evidence could be used to prove actual causation, the City's evidence of ExxonMobil's state-wide, wholesale market-share is far too attenuated to establish that a release of gasoline at any particular service station in Queens actually contained ExxonMobil-manufactured or supplied product. *See Transnor Ltd. v. BP North America Petroleum*, 738 F. Supp. 1472, 1483 (S.D.N.Y. 1990) (a jury may rely on circumstantial evidence when such evidence "permits a *rational* inference" from one fact to another (emphasis added)). The City's expert, Martin Tallett, admitted that EIA 782C data tells us nothing about who actually manufactured the gasoline, and that such data was reported on a state-wide (*i.e.*, all of New York) basis. (9/14/09 Tr. at 4307:9-4308:13.) Even accepting Tallett's opinion that ExxonMobil "wholesaled" about 25 percent of the gasoline supplied somewhere in New York State (9/14/09 Tr. at 4281:8-11), a reasonable jury could not have concluded – and it was improper for this jury to infer – that this fact makes it more likely than not that gasoline spilled at any time, from any service station, in all of Queens was supplied by ExxonMobil. "[T]he

---

[5] *See* Defendant Exxon Mobil Corporation's Motion To Exclude Testimony And Opinion Of Martin Tallett (5/13/09); September 20, 2009, Letter from J. Pardo to Court (10/1/09 Pardo Decl. Exh. E).

established rule [is] that a plaintiff must offer evidence that causation was more than 50 percent probable," not merely 25 percent likely. *See In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1262 (E.D.N.Y 1985). As the Second Circuit has stated, "The rule in New York is that, while inferences of negligence may be drawn from circumstantial evidence, those inferences must be the only ones which reasonably could be drawn from the evidence presented. ... '[A] possibility of causation will not suffice to impress liability upon a defendant.'" *Mehra v. Bentz*, 529 F.2d 1137, 1139 (2d Cir. 1975) (quoting *Kalinowski v. Ryerson*, 272 N.Y.S. 759, 762 (N.Y. App. Div. 1934), *aff'd* 270 N.Y. 532 (1936)). Tallett's opinion did not even make it *equally* probable that ExxonMobil manufactured or supplied the gasoline alleged to have caused the City's injury here. In fact, if any circumstantial inference could be drawn from Tallett's opinion, it is that ExxonMobil, more likely than not, *did not* supply the gasoline – as there is a 75 percent chance that ExxonMobil-supplied product was not present.

### 4. The City did not prove that ExxonMobil's "failure to warn" was a cause of its injury.

A failure to warn claimant must prove that (1) a manufacturer had a duty to warn (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that the failure to do so was the proximate cause of the harm. *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 84 (S.D.N.Y. 2001).[6] "To constitute proximate cause, an inadequate warning must be a *substantial cause* of the events leading to the injury." *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 370 (S.D.N.Y. 2003) (emphasis in original). "An act cannot be the 'substantial cause' if the injury would have occurred regardless of the content of defendant's warning." *Id.*

---

[6] The Court has ruled that ExxonMobil had a duty to warn the general public. (9/08/09 Tr. at 3787:14- 3788:22.) ExxonMobil respectfully reiterates its prior objection to that ruling.

The City introduced no evidence to suggest (let alone prove) that an omitted or better warning from ExxonMobil about MTBE somehow would have prevented its alleged injury. No evidence established that anyone who might have received a "warning" about MTBE would have done anything differently to prevent a gasoline release or cause a more rapid cleanup. No gasoline distributor, service station operator, or City employee testified that they would have taken extra precautions, or done anything differently, had they received an additional or different warning from ExxonMobil. Indeed, other than ExxonMobil employees, the only witness from a company involved in the operation of service stations was Paul Stendardi of Getty, and he testified that his company did not issue any additional or different warnings related to MTBE in gasoline, and saw no reason to do so. (*See* 9/11/09 Tr. at 4251:22-4252:16.)

The evidence proved that any additional or different warning would have been inconsequential. First, the jury found that there was not "a safer, feasible alternative design at the time ExxonMobil's gasoline containing MTBE was marketed." (See 10/19/09 Tr. at 7043:15-19.) Second, the release of any gasoline to the environment, with or without MTBE, is illegal in New York State, so distributors and retailers already understood that gasoline should not be released. (9/03/09 Tr. at 3426:1-5 (Moreau); *id.* at 3495:19-3496:6 (Roman).) Third, ExxonMobil did provide warnings to gasoline distributors and retailers that no gasoline, with or without MTBE, should be released into the environment. (*Id.* at 3498:15-22, 3515:1-11 (Roman).) Fourth, it is common knowledge that all gasoline must be handled carefully, and that no gasoline should be allowed to leak into the environment, so no extra warning was necessary due to the addition of MTBE to gasoline. (9/08/09 Tr. at 3742:14-3743:1 (Dugan); 9/02/09 Tr. at 3318:22–25 (Moreau).) Yet, releases of gasoline containing MTBE occurred from locations in Queens that were not within ExxonMobil's control.

Indeed, the City's own expert (Mr. Moreau) admitted that (1) despite co-authoring the seminal report warning about the dangers of MTBE [*i.e.*, "MTBE as a Groundwater Contaminant"] in 1986, he never gave that report to EPA (9/3/09 Tr. at 3436:17-3437:1); (2) despite giving petroleum handling training sessions to EPA and other regulators for years, he had never warned those regulators about the alleged incremental risks posed by gasoline containing MTBE, or that it required more careful handling practices or training (*id.* at 3456:6-19); and (3) he had never formulated his own version of the warning that he alleges should have been given about MTBE (*id.* at 3424:9-13). Moreau admitted that the state law prohibition against spilling petroleum was "very direct" (*id.* at 3426:1-5), and he could not testify to what additional or different warning refiners like ExxonMobil should have given.

Because there was a complete lack of evidence supporting the jury's finding that ExxonMobil's purported failure to provide sufficient warnings was a substantial factor in causing the City's alleged injury, the verdict could "only [have been] the result of sheer surmise and conjecture." *See Davis*, 228 F. Supp. 2d at 330.

**B.    The City Failed To Prove An Actual Or Imminent Legally Cognizable Injury.**

   **1.    The City failed to prove a past or present injury, and its future injury claim is not justiciable.**

Proof of actual injury is required for all of Plaintiffs' claims. *See Barrett v. Black & Decker Inc.*, No. 06 Civ. 1970, 2008 U.S. Dist. LEXIS 108787, at \*23-\*24 (S.D.N.Y. Aug. 5, 2008) (design defect, failure to warn); *Tornheim v. Fed. Home Loan Mtge. Corp.*, 988 F. Supp. 279, 282 (S.D.N.Y. 1997) (trespass)[7]; *Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531, 535

---

[7] In ruling that "damage is not part of a trespass claim" (*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 59287, at \*31 (S.D.N.Y. July 6, 2009)) the Court rejected ExxonMobil's argument that a trespass claim based on migration of groundwater contamination

(continued…)

(N.Y. 1981) (negligence); *Copart Indus. v. Consol. Edison Co.*, 362 N.E.2d 968, 971-72 (N.Y. 1977) (nuisance). The City's only legally protected interest is a usufructuary right to appropriate water – in this case, via the Station 6 wells. *In re MTBE Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 59287, at *19. Because the City has *never used* the Station 6 wells, it cannot have already suffered any injury to its usufructuary rights as a matter of law.[8]

Indeed, the issue at trial was not whether *past or current* MTBE detections have caused the City an injury, but rather, whether MTBE actually will be present – at some time in the future – in the predicted "capture zone" of the Station 6 wells at levels that interfere with the City's intended *future* use of those wells. This is a question replete with future contingencies that may never occur, and it is not ripe for judicial review.[9] Article III demands, as an essential component of the "proper – and properly limited – role of the courts in a democratic society," that federal courts not become entangled in abstract disagreements about contingent future events. *Allen v. Wright*, 468 U.S. 737, 750, 752 (1984). A plaintiff lacks standing absent an injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

---

requires proof of actual injury. ExxonMobil respectfully objects to that ruling and incorporates by reference the argument made in the Reply Memorandum Of Law In Support Of Defendants' Motion In Limine To Preclude Evidence And Argument Regarding Plaintiff's Past And Future Investigation And Treatment Costs Until It Proves Actual Injury, at 3-4 (6/2/2009) (10/1/09 Pardo Decl. Exh. B).

[8] Defendants acknowledge the Court's prior ruling that the City already has been injured by virtue of past MTBE detections in Well 6D at levels above the MCL (*In re MTBE Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 78081, at *17 n.30 (S.D.N.Y. Aug. 25, 2009)), and respectfully note their objection to it.

[9] ExxonMobil maintains its objections that this issue was not ripe for adjudication and that no case or controversy existed at the time of trial as to the City's past or ongoing use of the wells. ExxonMobil acknowledges that the Court decided otherwise. *In re MTBE Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 59287 (S.D.N.Y. July 6, 2009).

Moreover, a suit is not ripe if it "turns on whether there are nebulous future events so contingent in nature that there is no certainty they will ever occur." *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993).

The City's suit satisfies neither requirement, as the City's theory of liability could hardly be more attenuated. The City argues that it has a "good faith intention" to begin constructing a water treatment plant at Station 6 at some unknown point in the next 15 years to ameliorate predicted future MTBE detections in the Station 6 wells; that if it begins construction, the plant will be completed within 5 years after that; that if it constructs the plant, it might (or might not) use the Station 6 wells as a back-up supply someday in the future; that if it ever actually uses Station 6, the wells might draw in MTBE from otherwise remote spills, and thus might increase MTBE levels to a maximum of 10 ppb; that if the City ever uses Station 6 and its MTBE levels increase, the City's treatment of that water to reduce PCE contamination will not materially reduce MTBE levels; that if the City ever serves water with such low levels of MTBE, some City residents might begin to complain about the water's taste or odor – even though the City has never received such a complaint when it has served water with similarly low MTBE concentrations in the past; and that, to avoid these taste or odor complaints it may never receive, the Station 6 treatment plant must be more robust.

The City's "good faith intention" to act within 15 years to set into motion a series of highly contingent events years in the future after that is far too tenuous and remote to satisfy Article III. Any such harm that might occur is neither "imminent" nor "ripe" if those words are to have any meaning at all. But if the concept of an "injury" can encompass the City's mere "good faith intention" to use Station 6 water while knowing of low-level MTBE detections, then that "injury" must also be sufficient to trigger the statute of limitations. And because the City

has presumably had such a "good faith intention" plus knowledge since at least 1999, this suit should be dismissed as time barred. In short, the City's theory of "injury" is untenably elastic, but if "injury" is going to be stretched so far as to encompass the City's claims, then it stretches all the way back to 1999.

### a) The City failed to prove that MTBE will be present in the Station 6 wells at any quantifiable level in the future, such that it needs to build a prophylactic treatment system.

The Court has ruled that a public water provider may be injured by the presence of MTBE in groundwater if the water provider "took, or should have taken, steps to investigate, clean up, abate and/or remediate the alleged contamination." *In re MTBE Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 59287, at *20. Yet, the City failed to prove that MTBE will be present in the Station 6 wells at a level that should cause it to treat the contamination. In addition, even if there was adequate evidentiary support for the jury's finding that MTBE will peak at a concentration of 10 ppb (and there was not), that finding – that MTBE levels will never exceed the MCL – establishes that the City cannot be injured as a matter of law.

The City's only evidence about the concentration levels and timing of future MTBE impacts to the Station 6 wells was the unfounded and speculative testimony of its expert, David Terry.[10] Mr. Terry testified that, according to his computer modeling, MTBE levels in the Station 6 wells will reach a peak concentration of 35 ppb in the year 2024. (8/18/09 Tr. at 1895:7-16.) However, his assumptions were unrealistic and contradicted by real-world facts. For example, Terry assumed that the Station 6 wells would be activated in the year 2016 and, thereafter, would continuously pump 10 million gallons per day, 365 days per year, for 24 years. (8/18/09 Tr. at 1899:9-11; 8/19/09 Tr. at 2155:11-16; 8/20/09 Tr. at 2206:12-15.) This

---

[10] ExxonMobil acknowledges and respectfully disagrees with the Court's ruling on its pre-trial motion to exclude the opinions of David Terry. (*See* 8/11/09 Tr. at 1018-24.)

assumption was not supported by the jury's finding or the evidence that the Station 6 wells

would be only a back-up water source.  (*See* 8/12/09 Tr. at 1049:14-1050:1 (Phase 1 verdict).)

Based on the evidence, the earliest Station 6 could begin operation would be in about the year

2020.  (8/6/09 Tr. at 706:18-23 (Lawitts) (Station 6 construction planned to begin in 2015);

8/5/09 Tr. at 439:8-15 (Garcia) (construction will take approximately five years).)  Moreover, the

evidence at trial indicated that the absolute *longest* that Station 6 might operate continuously

would be about four years while the Rondout-West Branch tunnel is out of service for repairs.

(8/6/09 Tr. at 701:9-15 (Lawitts).)  But because Terry's model did not simulate any scenario in

which the Station 6 wells operate only as a "back-up" source – or for any period of time less than

24 years – Terry had to admit that he was unable to predict the levels of MTBE that might be

present in the Station 6 wells if and when they are actually operated as a back-up source, as the

jury concluded in Phase 1.  (8/20/09 Tr. at 2211:22-2212:19.)

        In addition, in building his "Analysis 1" transport model – which was intended to predict

the peak MTBE concentration in the future – Terry input only the *highest* concentrations of

MTBE ever detected at release sites, and in other wells, in the year 2004.  (8/19/09 Tr. at

2020:23-2021:16.)  Such values selectively chosen by Terry are not representative of actual

MTBE concentrations in groundwater because Terry failed to take into account reams of other

available data showing substantially *lower* concentrations at those sites in 2004 and in more

recent years.  Even worse, in his "Analysis 2" transport model – which was intended to predict

the duration of future MTBE concentration – Terry used entirely fictional values to represent the

volume of gasoline released at 22 sites.  Specifically, Terry arbitrarily assumed three release

scenarios in which the volume of gasoline discharged was either 50, 500 or 2000 gallons.

(8/19/09 Tr. at 2074:6-20.)  Furthermore, his Analysis 2 relied on the flawed assumption that

releases actually occurred on the date when a "spill event" was reported to the New York State

Department of Environmental Conservation, even though Terry admitted that he had no

reasonable basis for this assumption. (8/19/09 Tr. at 2082:8-25, 2136:23-2137:4.) Given these

multiple flawed assumptions, the models' outputs – and Terry's opinions – have no credibility.

Indeed, the jury necessarily concluded that Terry's models were unreliable because it did

not accept his conclusion that future MTBE concentrations at Station 6 would peak at 35 ppb in

2024. Rather, in its Phase 2 verdict, the jury determined that the MTBE concentration will peak

at 10 ppb in the year 2033 – or, put another way, that the concentration of any MTBE at the

Station 6 wells will never exceed New York's MCL. In so finding, the jury ignored the only

actual evidence quantifying concentrations and timing of MTBE impacts to the Station 6 wells,

and substituted sheer speculation in its place.

### b)   The jury's finding that MTBE levels will not exceed the maximum contaminant level is dispositive of the "injury" issue.

Even if there were evidentiary support for the jury's Phase 2 finding (and there is not), its

determination that MTBE levels in the Station 6 wells will peak at 10 ppb (8/26/09 Tr. at 2711:4-

13) would entitle ExxonMobil to judgment as a matter of law. The Court has held that whether

the presence of MTBE in groundwater at or below New York's maximum contaminant level

("MCL") of 10 ppb is a legally cognizable injury is a question of fact for the jury. *In re MTBE*

*Prods. Liab. Litig.*, 458 F. Supp. 2d 149, 159 (S.D.N.Y. 2006). ExxonMobil acknowledges that

ruling and reiterates its objection to it. ExxonMobil's position is that MTBE levels at or below

the MCL do not constitute injury because they do not impair the City's usufructuary right[11] – *i.e.*,

water containing MTBE at or below 10 ppb is deemed potable as a matter of New York law and,

---

[11] ExxonMobil incorporates by reference the arguments and analysis made in Defendants'
Motion For Summary Judgment On All Claims For Lack Of Justiciability (1/23/2006) (10/1/09
Pardo Decl. Exh. A).

in fact, the City admits that it serves such water to its customers.  Indeed, any contrary

conclusion would violate separation of powers principles by interfering with legislative and

regulatory determinations that water containing up to 10 ppb of MTBE is permissible, lawful and

safe.

Moreover, the Court held that to prove "injury" for MTBE concentrations at levels below

New York's MCL – *i.e.*, what the jury concluded in this case – the City had to prove that it

incurred taste or odor complaints or increased costs (*e.g.*, sampling costs).  *In re MTBE*, 458 F.

Supp. 2d at 159-60.  But the evidence at trial proved exactly the opposite: *i.e.*, that the City has

*never* incurred any such taste or odor complaints or costs attributable to MTBE (the City offered

no evidence of any taste and odor complaints); that the City has incurred no past costs at Station

6 because of MTBE (the City offered no evidence of any past costs); and the City has not been,

and will not be, injured because of any *future* MTBE concentrations at or below the 10 ppb

maximum found by the jury.  For example:

- The City employee responsible for water quality (Mr. Schindler) admitted that despite
  serving water containing MTBE (9/1/09 Tr. at 2991:12-17), the City *never* has had a
  taste or odor complaint it can attribute to MTBE (8/31/09 Tr. at 2982:4-7) and *never*
  has had to increase sampling frequency because of MTBE. (8/31/09 Tr. at 2982:18-23.)

- The City's taste and odor expert (Dr. Lawless) admitted he could not opine about the
  ability of City residents to smell or taste MTBE in their water at any level in the future.
  (8/31/09 Tr. at 2920:15-20.)

- The City's rebuttal toxicology expert (Dr. Rudo) testified that, based on his experience
  investigating "several thousand" incidents of MTBE in wells, "it's pretty difficult to
  detect [by taste or odor] under 50 parts per billion." (9/2/09 Tr. at 3280:2-25.)

Most importantly, Schindler admitted that water containing MTBE at up to 10 ppb was "safe to

drink" and would be reported to customers as "safe to drink" by the City.  (8/31/09 Tr. at

3017:16-24).  Thus, the only reasonable conclusion for the jury to reach was that the City has not

suffered any injury because of MTBE, and will not suffer any such "injury" in the future.

- 18 -

### 2.   The City failed to prove an imminent future injury.

Because the City is not using, and has never used, the Station 6 wells, any injury to the City's usufructuary interest must arise, if at all, by virtue of a putative threat that MTBE poses to that interest today. But as the Court previously ruled, threat of injury may satisfy the actual-injury element only if a plaintiff proves that the threat is imminent and certainly impending. *In re MTBE Prod. Liab. Litig.*, 175 F. Supp. 2d at 607, 610. The City has not proven an imminent, certainly impending threat of injury.

Even accepting the jury's Phase 1 and 2 findings, the jury found only that the City has a good-faith intent to build a treatment system at Station 6 in the next 15-20 years and, assuming it ever builds and uses the Station 6 wells as a back-up water source, that MTBE may peak at a level of 10 ppb twenty-three years from now. (8/12/09 Tr. at 1049:14-1050:1; 8/26/09 Tr. at 2711:4-15.) As a matter of law, speculative events that may occur, if at all, 15-20 years in the future are not sufficiently "imminent and certainly impending" to support a threat claim. *See e.g., Knaust v. City of Kingston*, 193 F. Supp. 2d 536, 543 (N.D.N.Y. 2002) (threat of water contamination not imminent when no impact had occurred in five years); *Plainview Water Dist. v. Exxon Mobil Corp.*, 2008 N.Y. Slip. Op. 501520U, at *25 (N.Y. Sup. Ct. 2008) (finding no imminent threat where MTBE impact had not occurred during six years of litigation).

Moreover, the City failed to prove a good-faith intent to begin the construction of Station 6 within the next 15 years. Rather, the City's own planning documents show that, for years, the City's construction budget has contained funds to build Station 6, yet the project has slipped into the future. (8/7/09 Tr. at 818:22-821:2 (Paolicelli); 8/5/09 Tr. at 482:5-483:18 (Garcia).) The evidence also proved that the City would not build Station 6 unless and until the Westside Corporation PCE plume was contained – which the City admits has yet to occur. (8/7/09 Tr. at

775:3-776:6, 781:19-785:6 (Cohen).)  In short: to this day, the City cannot state when, if ever, it will build the Station 6 treatment facility.

**C.    The City Failed To Prove That ExxonMobil Was Negligent.**

The City alleged that ExxonMobil negligently operated certain service stations in Queens, causing gasoline releases and injury to the Station 6 facility.[12]  To succeed on this claim the City had to prove, *inter alia*, that ExxonMobil's alleged negligence in the operation of certain service stations was a substantial factor in causing the injury it alleges has occurred at Station 6. *In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 249, 266 (S.D.N.Y. 2008); *see also N.Y. Pattern Jury Instructions* 2:70 (an act or omission is regarded as a cause of an injury if it was a substantial factor in bringing about the injury).

The City did not come close to satisfying its burden.  The evidence at trial was that five of the six "ExxonMobil" service stations at issue here were operated by independent dealers – not ExxonMobil or its employees.  The City failed to put on any evidence about ExxonMobil's conduct (or even any dealer's conduct) at any of these stations, and certainly no evidence of how such conduct either breached any "duty" to the City or was a substantial factor in causing the City's alleged injury at Station 6.

The City's only "proof" of negligence was circumstantial evidence that releases of gasoline occurred, or may have occurred, at "ExxonMobil" branded stations in the vicinity of Station 6.  The City's argument was, essentially, a *res ipsa loquitor* argument – *i.e.*, because

---

[12] Although the City never pled this claim in any of its five complaints, the Court granted the City's motion to add this claim – over ExxonMobil's objection – on September 18, 2009, in the middle of trial. (9/18/09 Tr. at 5099:19-5100:02.) ExxonMobil respectfully submits that the Court erred when it permitted this untimely and improper amendment, resulting in prejudice to ExxonMobil, and respectfully reiterates it objection to that amendment. *See* Exxon Mobil Defendants' Memorandum Of Law In Support Of Their Motion For A New Trial Based On Errors Of Law, at 23-24.

there is gasoline contamination at those service station sites, some "negligence" must have occurred. However, for *res ipsa loquitor* to apply "(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; [and] (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant ...." *Morejon v. Rais Constr. Co.*, 851 N.E.2d 1143, 1147 (N.Y. 2006) (quoting *Corcoran v. Banner Super Market*, 227 N.E.2d 304, 305 (N.Y. 1967)). Here, the record is replete with testimony – from the City's own expert, Marcel Moreau – that spills happen at every service station *without any negligence ever occurring.* (8/12/09 Tr. at 1114:25-1115:16 (Moreau).) Furthermore, there was no proof that ExxonMobil had exclusive control over the gasoline alleged to have caused the City's harm. In fact, all but one of the ExxonMobil stations at issue were, at all relevant times, operated by dealers independent of ExxonMobil. In light of Moreau's testimony – and absent proof of any failure of care by ExxonMobil – it was not reasonable for the jury to infer that a release at any particular "ExxonMobil" branded station was a result of some never-disclosed negligence on the part of ExxonMobil.

**D.     The City Failed To Prove Its Public Nuisance Claim.**

To recover for public nuisance, the City had to meet the high burden of establishing by *clear and convincing evidence* that future MTBE contamination at its Station 6 wells will "offend, interfere with or cause damage to the public in the exercise of rights common to all ... in a manner such as to offend public morals, ... or endanger or injure the property, health, safety or comfort of a considerable number of persons." *See Copart*, 362 N.E.2d at 970-71; *DeStefano v. Emergency Hous. Group, Inc.*, 281 A.D.2d 449, 450 (N.Y. App. Div. 2001). Moreover, "the annoyance, discomfort or interference experienced by a considerable number of persons must be substantial." *New York v. Fermenta ASC Corp.*, 630 N.Y.S.2d 884, 890 (N.Y. Sup. Ct. 1995), *aff'd*, 656 N.Y.S.2d 342, 346 (N.Y. App. Div. 1997). The presence of regulated chemicals in

- 21 -

groundwater, even at concentrations above applicable MCLs, does not constitute a public

nuisance unless the contamination has caused actual harm to humans or is reasonably certain to

cause such harm imminently. *Id.* at 890-91.

      The City failed to prove a substantial interference. That is, just as the City failed to prove

that the presence of MTBE will interfere with its usufructuary right to appropriate groundwater

via the Station 6 wells in the future, (*see supra* Section II.B.1), the City also failed to prove that

the presence of MTBE substantially interferes with the public's health, safety or comfort with

respect to its potential use of water from Station 6 in the future. Nor can it. The jury found in

Phase 2 that any future MTBE at Station 6 will *not* exceed the New York State MCL of 10 ppb.

Therefore, even accepting for the sake of argument the jury's determination that these low levels

of MTBE constitute an "injury" to the City's usufructuary rights – a determination that directly

contradicts New York law – it was unreasonable for the jury to find that such "injury"

substantially endangers the property, health, safety or comfort of a considerable number of

persons. In addition, the jury's verdict for the City on its public nuisance claim is inconsistent

with its verdict for ExxonMobil on the claim of private nuisance, which requires the lesser,

preponderance of the evidence, standard of proof. *See DeStefano*, 281 A.D.2d at 450; *Fermenta*,

630 N.Y.S.2d at 892. And, for the same reasons that the City failed to prove direct spiller

causation, it also failed to prove that ExxonMobil had control over the product that caused its

alleged injury, as required under the law of public nuisance. *See People v. Sturm, Ruger & Co.*,

309 A.D.2d 91, 95 (N.Y. App. Div. 2003); *State v. Lead Indus. Ass'n*, 951 A.2d 428, 446 (R.I.

2008); *In re Lead Paint Cases*, 191 N.J. 405, 429 (N.J. 2007).

    **E.**    **The City Failed To Prove Its Trespass Claim.**

      Trespass is an intentional tort. Thus, the City was required to prove that ExxonMobil (1)

"intend[ed] the act which amounts to or produces the unlawful invasion," and (2) the intrusion

was "the immediate or inevitable consequence" of its willful act. *Phillips v. Sun Oil Co.*, 121 N.E.2d 249, 251 (N.Y. 1954).[13]  Put another way, the City had to prove that ExxonMobil's actions were "substantial[ly] certain[]" to result in MTBE contamination of the Station 6 property.  *Id.* (citing Restatement of Torts § 158, comment h)); *see also N.Y. Pattern Jury Instruction 3:8.*  In a case of trespass by groundwater contamination, "even when the polluting material has been deliberately put onto, or into, defendant's land, he is not liable for his neighbor's damage therefrom, unless he (defendant) had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land ...."  *Phillips*, 121 N.E.2d at 251; *see also Scribner v. Summers*, 84 F.3d 554, 558 (2d Cir. 1996); *Snyder v. Jessie*, 565 N.Y.S.2d 924, 929 (N.Y. App. Div. 1990).

The City offered only generalized proof that, at the time ExxonMobil was manufacturing and selling gasoline containing MTBE (*i.e.*, approximately 1985 – 2003), ExxonMobil knew that underground storage tanks could leak and, therefore, knew (or reasonably should have known) that groundwater *somewhere* may become impacted by MTBE.  But even if such generalized proof were true, it did not prove the intent required under New York law to support trespass.  The evidence is *not* that ExxonMobil intentionally supplied or spilled MTBE gasoline with knowledge that it would travel to the Station 6 property.  It defies logic, as well as the evidence adduced (or never introduced) at trial, to even suggest that simply by making and distributing gasoline in the 1985-2003 timeframe ExxonMobil knew (or should have known) that MTBE in that gasoline would trespass on the Station 6 property years and decades in the future.

---

[13] *See* Exxon Mobil Defendants' Memorandum Of Law In Support Of Their Motion For A New Trial Based On Errors Of Law, at 8.

Notably, the Court already seems to have reached this very conclusion. Indeed, in its

October 19, 2009, opinion on punitive damages the Court, "draw[ing] all reasonable inferences

in the City's favor," found that "there is no indication that ... ExxonMobil was aware of

precisely how the MTBE concentrations that it had detected would *affect groundwater at a*

*distance from the spill site* after the MTBE had dissolved and dissipated into a very large volume

of groundwater." *In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS

96469 at *3, *8 (S.D.N.Y. Oct. 19, 2009) (emphasis added). That conclusion remains exactly

right. The City's failure to introduce evidence of the specific intent required for its trespass

claim requires that judgment be entered for ExxonMobil on this claim or, at a minimum, a new

trial granted.

## CONCLUSION

For all of the foregoing reasons, including the analysis and argument incorporated herein

by reference, ExxonMobil respectfully moves this Court to enter judgment as a matter of law in

ExxonMobil's favor or grant a new trial.

DATED: April 21, 2010

Respectfully submitted,

Peter John Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Lauren E. Handel (LH 0755)
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10017-4613
Tel. (212) 547-5400
Fax (212) 547-5444

James W. Quinn (JQ 6262)
David J. Lender (DL 1554)
Theodore E. Tsekerides (TT 5946)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: 212.310.8000
Fax: 212.310.8007

*Counsel for Exxon Mobil Corporation,*
*ExxonMobil Chemical Company, Inc., Exxon*
*Mobil Oil Corporation, and Mobil Corporation*

## CERTIFICATE OF SERVICE

Lisa A. Gerson, pursuant to 28 U.S.C. 1746, hereby declares under penalty of perjury,

that on the 21st day of April, 2010, I caused to be served by electronic means upon counsel for

plaintiff, a true and correct copy of:

1. EXXON MOBIL DEFENDANTS' NOTICE OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL.

2. EXXON MOBIL DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL.

Lisa A. Gerson