# Exhibit G

# McDermott Will & Emery

Boston Brussels Chicago Düsseldorf Houston London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

James A. Pardo
Attorney at Law
212.547.5353

August 24, 2009

**BY ELECTRONIC MAIL**

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1312

Re:  *City of New York v. Amerada Hess,* et al.
     **Response to Plaintiff City of New York's Letter Regarding Phase 3 Issues**

Dear Judge Scheindlin:

Defendants respectfully submit this response to the City's recent letter concerning certain Phase 3 legal and pleading issues. *N. Campins Letter to Court* (August 20, 2009).

1. **None of the Provisions Referred to by the City Requires "Treatment of Contamination Below the MCL" or Treatment to Non-Detect.**

   The City's representation to the Court that it must treat contamination to non-detect has always been wrong a matter of **fact** – *i.e.*, the City has never treated any contaminant, including MTBE, to non-detect, and its own witnesses have admitted that such a standard would be impossible to meet. The City's letter now proves that its representation also is wrong as a matter of **law**. Not one of the codes or regulations cited by the City mandates treatment to non-detect, or even to below the applicable Maximum Contaminant Level ("MCL").

   The DEP Commissioner's administrative duty to preserve water "purity" must be read alongside the myriad other New York state statutes and codes which make clear that drinking water is "potable," and therefore can be served to customers, when it meets the requirements set by New York law. Indeed, the Court recognized long ago that there is no such thing as "pure" drinking water, because almost all water contains some level of organic and/or inorganic matter. *In re MTBE*, 593 F. Supp. 2d 549, 552 (May 7, 2008) ("as a matter of law, plaintiffs' water is not harmed merely because its water contains a minuscule amount of MTBE"; "New York does not have a zero-tolerance policy on contaminants in drinking water."); *In re MTBE*, 2007 WL 1601491 at *6 (June 4, 2007) ("even clean, clear, good-tasting water contains dozens of contaminants at low levels."). The City's own Rule 30(b)(6) witness who was designated to

Honorable Shira A. Scheindlin
August 24, 2009
Page 2

testify about the "quality of water supplied to City consumers" admitted this very point at his deposition, conceding that "non-detect" was unattainable for any contaminant in the City's public drinking water:

> Q. And we talked about previously your opinion as to whether or not it's possible to deliver water to customers without detectable levels of contaminants, correct?
>
> A. Yes.
>
> Q. And you agreed that it isn't possible to deliver water to consumers with zero contaminants, correct?
>
> A. Yes.

*Deposition of Stephen Schindler*, 119:11-20 (April 23, 2009).

Like the Court and Mr. Schindler, New York law recognizes that there is no such thing as "pure" drinking water and, therefore, provides that water is "potable" if the levels of a regulated contaminant do not exceed its applicable MCL, which the State sets to protect public health. The City cannot circumvent State law on what constitutes "potable" drinking water by invoking its own administrative provision to argue that all of its water must be "pure" and contaminant-free, particularly when its own Rule 30(b)(6) witness already has admitted that such a standard would be impossible to meet. Simply put: "purity" means "potable" which, in turn, means drinking water that meets the State's MCLs (10 ppb for MTBE).

The City's misunderstanding is made all the more clear by its reliance on the New York Sanitary Code (N.Y. Comp. Codes R. & Regs., Title 10, Section 5). The City correctly notes that the Sanitary Code requires certain actions in response to "deleterious changes in raw water quality." *Campins Ltr* at 2. However, the City incorrectly concludes that this Sanitary Code language requires it "to monitor and treat contamination even in instances where contamination is present below the MCL." *Id*. Why is the City wrong? Because it has ignored the fact that the Sanitary Code requires a public water provider to install treatment **only** when water does **not** meet the definition of "potability" in Section 5-1.1: *i.e.*, water that contains levels of contaminants which exceed applicable MCLs. 10 N.Y.C.R.R. 5-1.12(a).[1] Even then, the City is not required to treat the water to non-detect but, rather, only to the applicable MCL. *See* 10 N.Y.C.R.R. 5-1.12(a)(1) – (5). Indeed, if the law actually required what the City claims here – *i.e.*, installation of a treatment system whenever any contaminant is detected at any concentration – probably every public water provider in New York would have had to install treatment systems (or shut down) because of other contaminants long ago.

---

[1] Apparently recognizing this definitional flaw in its argument, the City refers to the Court to other sections of the Sanitary Code (*e.g.*, Section 170) which simply do not apply here.

Finally, the City's reliance on "Recommended Standards for Water Works" is both misplaced and, candidly, disingenuous. *N. Campins Ltr.* at 3. It is misplaced because this particular guidance document is referred to nowhere in the Code provisions cited by the City in its letter. *Id.* It is disingenuous because the Rule 30(b)(6) witness who the City designated to testify about the "quality of water supplied to City consumers" admitted that he (and, therefore, the City) had never even seen these "recommended standards" before the witness's April 2009 deposition:

> Q: And who gave you the *Recommended Standards for Water Works, 2003*?
>
> A: Bill [Plache] did.
>
> Q: And when did he give that document to you?
>
> A: That was last night.
>
> Q: Had you seen it before?
>
> A: No.

*Deposition of S. Schindler* (Apr. 23, 2009), at 59:16-60:60:4. Indeed, Mr. Schindler admitted that he (and, therefore, the City) had never relied on the *Recommended Standards for Water Works* to operate the City's water system:

> Q: Is it a document that you reference in your daily practice as the director of drinking water control?
>
> A: Reference in our daily practice? I would say no.

*Id.*

In sum: none of the provisions referred to by the City require treatment of any contaminant (including MTBE) to a "non-detect" level, or even to a concentration below the applicable MCLs, which New York law says are sufficient for the water to be "potable" and, therefore, suitable for use as drinking water.

### 2. The City Has Misstated Both Law and Facts Relative to Its Public Nuisance Claim.

ExxonMobil most certainly did **not** have "fair notice" that the City would seek to prove its public nuisance claim by reference to alleged statutory violations. Nor is the City correct that establishing such statutory violations would excuse it from proving the most fundamental element of a public nuisance claim: *i.e.*, injury to the public.

Not one of the City's five amended complaints references any of the Administrative Code provisions that it now says it will rely on to prove up a public nuisance.[2] Indeed, not one of the City's complaints even refers to "nuisance *per se*." As if those intentional and repeated omissions were not a clear enough statement to ExxonMobil (and the Court) that the City was **not** changing course on its public nuisance claim, the City stipulated weeks ago, in the parties' joint pre-trial papers, that there were no changes to its complaint relative to any of its claims, including public nuisance.[3] It was not until last week's conference and letter that the City gave any notice – "fair" or otherwise – that it would assert a claim for public nuisance based on alleged violations of various administrative provisions that have never before been pled or otherwise identified by the City.

Nor does the City's operative complaint (or any complaint) link its Navigation Law cause of action to its separately pled public nuisance claim. In fact, as pled, the City's public nuisance claim is based strictly on ExxonMobil's alleged "manufacture, sale, supply, marketing and design of [gasoline containing MTBE, which] contaminated . . . groundwater[.]"[4] *City of New York Fourth Amended Complaint* ("Complaint") ¶¶ 160-61. The City's public nuisance claim says absolutely nothing about spills, leaks or other discharges of gasoline which are the subject

---

[2] In addition to not having been pled in the City's complaint, the New York City Administrative Code provisions that the City now wants to assert are inapplicable here. Code Section 17-142 is a definitional section, which has not been applied in any reported case concerning discharges to water. All of the cases that have discussed this section concern nuisances related to uses of land. *E.g., Osipova v. N.Y. City Dep't of Health*, 2002 U.S. Dist. LEXIS 14800, *1-*2 (S.D.N.Y. 2002) (notice of violation based on smell from apartment); *City of New York v. Casbar, Nicobel LLC*, 2009 WL 1026593 (N.Y. Sup. April 15, 2009) (action to enjoin unlawful use of property for sexual activity); *German v. Federal Home Loan Mortgage Corp.*, 885 F. Supp. 537, 571 (S.D.N.Y. 1995) (action by tenants against landlords for unabated lead paint). Code Section 24-303, on its face, says nothing about the "deposit" of anything into groundwater or wells like those at Station 6. Moreover, it would unreasonably strain the meaning of this particular administrative code provision – which prohibits throwing into aquifers and other waters "any dead animal or other offensive matter or anything whatever" – to interpret it as encompassing the unintentional release of MTBE.

[3] See June 26, 2009 Joint Pretrial Order for Phase III, § 4 (parties stipulating to City's need to seek leave to dismiss its GBL § 349 claim. No further amendments were necessary).

[4] The public nuisance allegations in the City's Fourth Amended Complaint obviously are based on the common law standard for public nuisance caused by intentional and unreasonable conduct – *i.e.*, "conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all ... in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568 (1977).

of Navigation Law liability. Simply put: the City cannot convert the public nuisance claim it pled – one based on intentional and unreasonable conduct – to one based on nuisance *per se*.

Under New York law, the jury must not be charged on nuisance *per se* when it has not been alleged in the complaint. *Driscoll v. New York City Transit Authority*, 53 A.D.2d 391, 395 (N.Y. App. Div. 1976) ("Where 'the gravamen of the complaint is nuisance which arises out of negligence' as compared and contrasted with a complaint where the gravamen 'is an absolute nuisance or a nuisance *per se*, that is a nuisance based on an act which is unlawful even if performed with due care,' the jury should be given the case on the negligence theory (quoting *Delaney v. Philhern Realty Holding Corp.*, 280 N.Y. 461, 465 (N.Y. 1939)). This rule makes good sense because nuisance *per se* – which requires no showing of fault – is a markedly different tort than ordinary public nuisance, which requires proof of wrongdoing or strict liability under the law of ultrahazardous activity. *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 487 (E.D.N.Y. 2003) ("Even in cases where it is obvious that there is a substantial interference with a public right, a defendant cannot be held liable unless it is proven that it, by virtue of conduct or omissions which are intentional, are negligent, or amount to abnormally dangerous or ultrahazardous activity, created, contributed to, or maintained that interference."). The Court should not allow the City to literally rewrite its public nuisance claim in the middle of trial.

Finally, there is no legal basis for the City's argument that it need not prove harm to the public if it were to establish a statutory violation sufficient to support public nuisance *per se*. Whether based on a statutory violation (*i.e.*, nuisance per se or absolute nuisance) or on intentional, negligent or ultrahazardous conduct, New York law holds that a common law claim for public nuisance requires clear evidence of endangerment or harm to a considerable number of persons. *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568 (1977); *Sorenson v. Newark Star Ledger*, 2004 U.S. Dist. LEXIS 14781 (S.D.N.Y. July 30, 2004) ("In order to assert a nuisance per se claim, a party must establish that the defendant violated the law and, in so doing, created a situation which endangers or injures the property, health, safety, or comfort of a considerable number of persons."). None of the cases cited by the City suggest otherwise. In fact, three of the cases Plaintiff cites have nothing to do with common law public nuisance or any claim in this case. The cases Plaintiff relies on involved claims brought by municipalities pursuant to statutes to obtain preliminary injunctions for statutory violations. *Incorporated Village of Freeport v. Jefferson Indoor Marina, Inc.*, 556 N.Y.S.2d 150 (N.Y. App. Div. 1990) (claim for temporary restraining order brought pursuant to local zoning law); *City of New York v. Bilynn Realty Corp.*, 499 N.Y.S.2d 1011 (N.Y. App. Div. 1986) (claim for preliminary injunctions brought under Nuisance Abatement Law to enforce zoning ordinances); and *City of New York v. Casbar, Nicobel LLC* (2009 WL 1026593 (N.Y. Sup. April 15, 2009) (claim for preliminary injunction brought pursuant to New York City Administrative Code § 7-706 and § 7-714). The cases stand for the proposition – wholly inapplicable here – that where a city brings a suit pursuant to statutory authority and proves a violation of statutory law, it can obtain a preliminary injunction without meeting the traditional three-part test for preliminary injunctions. *Freeport*, 556 N.Y.S.2d at 152; *Bilynn Realty Corp.*, 499 N.Y.S.2d at 1013; *Casbar, Nicobel LLC*, 2009 WL 1026593 at *2.

Honorable Shira A. Scheindlin
August 24, 2009
Page 6

### 3. The City's Untimely Attempt to Amend its Compliant Should be Denied.

The City admits that it failed to plead any claim based on ExxonMobil's alleged negligence in operating certain service stations which have been put at issue in the litigation. *N. Campins Ltr.* at 3. However, the City now asks the Court for leave to pursue such a claim, arguing that ExxonMobil had "fair notice." Alternatively, the City requests leave to amend its complaint. Because ExxonMobil would be prejudiced by the late addition of this claim, both requests should be denied.

Federal Rule of Civil Procedure 15 provides that "[i]n the absence of any apparent or detailed reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue *prejudice to the opposing party by virtue of allowance of the amendment*, futility of the amendment, etc., the leave sought should, as the rules require, be freely given." *Foman v. Davis*, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962) (emphasis added). However, the Second Circuit has suggested that the proffered amendments "should be tendered no later than the time of pre-trial, unless compelling reasons why this could not have been done are presented." *Evans v. Syracuse City School District*, 704 F.2d 44, 47 (2d Cir. 1983).

Here, the City provides no excuse for this delay. The parties spent the better part of five (5) years taking discovery in support of their claims and defenses. Throughout those five years, the City — and the defendants — never took station-specific discovery regarding the circumstances of the alleged releases at the service stations: no service station owners/operators were deposed; no station-specific analyses were conducted. Instead, the focus was (and has always been) on the City's product liability claims. While certain station files were obtained and reviewed by the City, that was to establish source and causation — not to put product manufacturers on notice that they would have to defend specific station conduct. Even after obtaining those files, the City did not seek to amend to add the claim that it now asks to inject into the ongoing trial. Indeed, at no time was the parties' focus ever on the conduct of the specific station owner/operators.[5]

ExxonMobil had no notice of the City's new and untimely claim. Allowing the City to add it now — in the middle of trial — clearly would prejudice ExxonMobil's ability to defend itself, as it has not taken the necessary discovery. The City has offered no excuse for it failure to plead this claim earlier. Accordingly, the City's request should be denied.

---

[5] Indeed, the record contains no proof as to the conduct of the specific owners/operators of the stations at issue. Because the addition of this claim would be futile, the Court should deny Plaintiffs' request to add this claim. *See* FRCP 15 (motion to cure deficiencies should be denied if amendment would be futile).

4.  **To Whom a Warning Is Owed is a Legal Question for the Court, Not the Jury.**

New York law is well-settled that the question of to whom the duty of a warning is owed is a question of law to be resolved by the court. *Adeyinka v. Yankee Fiber Control, Inc.*, 564 F. Supp. 2d 265 (S.D.N.Y. 2008); *see also Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722, 729 (6th Cir. 1996) ("The question of whether a manufacturer has a duty to warn is purely a question of law"). In their August 20th letter, Plaintiffs confuse the question of a duty to warn with the adequacy of the warning. Indeed, this Court recognized the distinction in *Adeyinka*. To whom a duty to warn extends is a question for the Court. The adequacy of any required warning is a question of fact for the jury. *Id.*, citing *Liriano v. Hobart Corp.*, 92 N.Y.2d 232 (N.Y. 1998); *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997).

While the facts of *Berg v. Underwood's Hair Adaption Processes, Inc.* may be distinguishable, the legal premise of that case is controlling here. A manufacturer does not owe the "general public" a duty to warn about its products. Rather, any such "duty" runs exclusively to the product's "foreseeable users." 751 F.2d 136, 137 (2d Cir. 1984); *see also DeMura v. City of Albany*, 239 A.D.2d 828, 829 (N.Y. App. Div. 1997); *United States v. Hooker Chems. & Plastics Corp.*, 850 F. Supp. 993, 1060 (W.D.N.Y. 1994) ("in the products liability realm, the duty to warn encompasses an obligation to advise *foreseeable users* of the nature and mechanism of the injury which is known to be associated with product use, along with appropriate precautions" (emphasis added).)

Here, the City argues that ExxonMobil owed a duty to warn "water providers" and other entities (*e.g.*, the public, the United States government, and the State of New York). As a matter of New York law, these entities are not owed a general warning because, to the extent such entities are relevant to this case, it is not in their role as foreseeable users of ExxonMobil's gasoline.

Respectfully submitted,

*James A. Pardo*

James A. Pardo

cc:   All Counsel of Record (by LNFS)