# Exhibit H



**SHER·LEFF** LLP
LAWYERS PROTECTING WATER

Nicholas G. Campins
ncampins@sherleff.com
415.348.8300 x202

August 20, 2009

*Via Email & Hand Delivery*

Hon. Shira A. Scheindlin
United States District Judge
U.S. District Court, Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:  *City of New York v. Amerada Hess*, et al., 04 CV 3417 (SDNY)
> *In re MTBE Products Liability Litigation*, MDL 1358
> **Phase 3 Legal Issues Raised At Yesterday's Conference**

Dear Judge Scheindlin:

The City of New York ("the City") writes to address the following legal issues raised at yesterday's conference regarding Phase 3: (1) what statutes and regulations apply to treatment of water below the MCL; (2) the relevance of ExxonMobil's statutory violations to the City's public nuisance claim; (3) whether ExxonMobil had notice of the City's negligence-related claim that ExxonMobil failed to use reasonable care by failing to ensure that station owners and others properly stored or dispensed gasoline containing MTBE and (4) ExxonMobil's duty to warn water providers and others about the dangers of gasoline containing MTBE.

1. **Treatment of Contamination Below the MCL**

There are several statutory and regulatory standards applicable to treatment of contamination below the MCL. *First*, New York City Administrative Code Section 24-302 provides, in pertinent part:

> Commissioner of environmental protection; duty in regard to sources of water supply and property of department.
> *It shall be the duty of the commissioner to preserve the purity of all waters from which any part of the city water supply is drawn*, and to protect such supply and the lands adjacent thereto from injury or nuisance.

N.Y.C. Admin. Code § 24-302 (emphasis added). The word "purity" in Section 24-302 in turn should be construed in accordance with its plain meaning. *See Puello v. BCIS*, 511 F.3d 324, 327 (2d Cir. 2007). Purity is commonly understood as meaning "freedom from anything that debases, contaminates, pollutes, etc." *See* "purity," Dictionary.com Unabridged Dictionary (Retrieved May 25, 2009), *see* Exhibit A. The City therefore has a legal right to keep its water

Hon. Shira A. Scheindlin
August 20, 2009
Page 2

free of contaminants. N.Y.C. Admin. Code § 24-302.[1]

Second, state regulations require the City to monitor and treat contamination even in instances where contamination is present below the MCL where there are any "deleterious changes in raw water quality":

> (a) Whenever the supplier of water determines or is advised by the State that one or more of the MCLs set forth in this Subpart are *or may be exceeded; . . . or that any deleterious changes in raw water quality have occurred; or that a change in the character of the . . . or aquifer has been observed which may affect water quality*; or that any combination of the preceding exists, *the supplier of water shall notify the State and do the following*:
>
> (1) undertake a study to determine the cause or causes of such conditions, independent of known or anticipated treatment technology;
>
> (2) modify existing or install treatment to comply, to the extent practicable, with sections 5-1.30, 5-1.50, 5-1.51 and 5-1.60 of this Subpart;
>
> (3) initiate water sampling as needed to delineate the extent and nature of the cause of concern;
>
> (4) investigate all or part of the watershed or aquifer to verify any existing or potential changes in the character of the sources of water supply; . . .

N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.12 (emphasis added); *see also* N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.71 (duty to prevent contamination).[2] *Third*, because it provides drinking water to the public, the City has a particular interest in providing potable water, for example water that does not have an offensive taste and odor and that is not contaminated with VOCs like MTBE. *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 170.3 (defining potable water); *see also* N.Y. Comp. Codes R. &

---

[1] The historical context of this statute is discussed in *People v. Van Buren*, 4 N.Y.3d 640 (2005). In that case, the Court of Appeals explained: "[T]he Legislature eventually decided that permanent protection of the City's infrastructure was necessary, but that the cost of such protection would be borne by the City. In 1937, the Legislature imposed upon the Commissioner of the DEP "the duty . . . to preserve the purity of all waters from which any part of the city water supply is drawn, and to protect such supply and the lands adjacent thereto from injury or nuisance . . . [and] preserve . . . all other property connected with the water supply." *Id.*, 4 N.Y.3d at 645.

[2] The four regulations referenced in Section 5-1.12(a)(2) relate to treatment and water quality standards. Section 5-1.30 details certain minimum treatment requirements. Sections 5-1.50 and 5-1.51 discuss the applicability of MCLs, set forth MCLs (by reference) and address compliance with MCLs. Section 5-1.60 relates to monitoring of disinfection byproducts in surface water systems or groundwater systems under the direct influence of surface water and is not directly relevant to this litigation. *See* N.Y. Comp. Codes R. & Regs. tit. 10, §§ 5-1.30, 5-150, 5-151, 5-160.

Hon. Shira A. Scheindlin
August 20, 2009
Page 3

Regs. tit. 10, § 40-2.160 (every public water system shall provide "a safe, adequate and aesthetically pleasing supply of water for drinking and other domestic uses"). As the Court has held, the level at which MTBE affects the aesthetic acceptability of drinking water requires a "fact-specific" inquiry. *In re MTBE*, 593 F.Supp.2d 549, 551-53 (S.D.N.Y. 2008).

*Finally*, once treatment has been placed on a well, NYSDOH regulations specify that "[i]n all cases, public exposure to organic contamination must be *minimized*," and that "[w]here treatment is proposed, best available technology shall be provided to reduce organic contaminants to the *lowest practical levels*." N.Y. Comp. Codes R. & Regs. tit. 10, §§ 5-1.22, 5-6.5 (incorporating by reference "Recommended Standards for Water Works, 2003 Edition" (Ten States 2003) (emphasis added)) (attached for convenience as **Exhibit B**).

### 2. ExxonMobil had Fair Notice that the City Would Assert Statutory Violations As Part of Its Public Nuisance Claim

Statutory violations are relevant to a municipality's public nuisance claim because, upon a showing that a defendant has violated a statute, the plaintiff need not show "injury to the public" to obtain injunctive relief. *See Incorporated Village of Freeport*, 556 N.Y.S.2d at 152 ("no special injury or damage to the public need be alleged, and the commission of the prohibited act is sufficient to warrant granting the injunction"); *City of New York*, 499 N.Y.S.2d at 1013 (same); *City of New York v. Casbar, Nicobel LLC*, 2009 WL 1026593, *2 (N.Y. Sup. April 15, 2009) (holding that where conduct "violates a statutory scheme designed to protect the public health, that the conduct constitutes a violation and may be considered a public nuisance subject to the Administrative Code" "relief may be granted without a demonstration of special damages or injury to the public. The proof of the violation alone is sufficient grounds for the issuance of injunctive relief"); *Shore Realty Corp.*, 759 F.2d at 1051 (violations of N.Y. Envtl. Conserv. Law §§ 27-0913(1), 27-0914(1) and 27-0914(2) constituted public nuisance per se).

Here, the City intends to show that ExxonMobil violated applicable statutes. For example, the City will show that ExxonMobil's conduct is illegal pursuant to New York City Administrative Code Section 17-142, which defines "nuisance:"

> *The word "nuisance"*, shall be held to embrace public nuisance, as known at common law or in equity jurisprudence; whatever is dangerous to human life or detrimental to health; whatever building or erection, or part or cellar thereof, is overcrowded with occupants, or is not provided with adequate ingress and egress to and from the same or the apartments thereof, or is not sufficiently supported, ventilated, sewered, drained, cleaned or lighted in reference to its intended or actual use; and *whatever renders* the air or human food or *drink, unwholesome. All such nuisances are hereby declared illegal.*

*Id.* (emphasis added). The City will likewise show that ExxonMobil violated New York City Administrative Code Section 24-303, which provides:

> a. It shall be unlawful for any person to throw or deposit, or cause to be thrown or

>  deposited any dead animal or other offensive matter or anything whatever in
>  either of the reservoirs or in any lake, pond or stream, or in any aqueduct or pipe
>  from or through which the water supply of the city shall be drawn.

*Id.* Finally, the City will show that ExxonMobil illegally discharged petroleum in violation of New York Navigation Law Section 173. *See id.* ("discharge of petroleum is prohibited"); *see also* N.Y. Navig. § 172 ( defining "Discharge"); *id.* (defining "Petroleum"). Proof of each of these statutory violations is relevant to the City's public nuisance claim.

Finally, ExxonMobil was on fair notice of such claims pursuant to Federal Rule of Civil Procedure 8. Here, the New York Navigation Law was specifically pleaded, New York City Administrative Code Section 17-142 is a statute defining "nuisance" and New York City Administrative Code Section 24-303 is a criminal statute defining duties relevant to public nuisance. ExxonMobil therefore had sufficient notice of the nature of the City's public nuisance claim pursuant to Rule 8. *See Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004) ("we defined fair notice as that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial.") (citing cases); *see also id.* (*citing Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)) (fair notice is judged by whether the complaint enables defendants "to answer and prepare for trial"). In the alternative, in the event that the Court were to find the alleged statutory violations are inadequately pleaded, the City requests that the Court exercise its authority pursuant to Federal Rule of Civil Procedure 15(b)(1) and allow the City to amend the pleadings accordingly. *See Fisher v. Vassar College*, 66 F.3d 379, 408 (2d Cir. 1995) ("Fed. R. Civ. P. 15(b) allows a party to amend its pleadings to conform to the proof received into evidence. The decision of whether to allow such an amendment is left to the discretion of the district court judge.")

### 3. ExxonMobil had Fair Notice Of the City's Negligence Claim Asserting Liability for Conduct At ExxonMobil Owned Stations

ExxonMobil is correct that – as part of its negligence claim -- the City did not specifically plead that ExxonMobil failed to use reasonable care by failing to ensure that station owners and others properly stored or dispensed gasoline containing MTBE. However, the City should nonetheless be allowed to pursue this theory, because ExxonMobil was on notice that City would seek to prove that it failed to use reasonable care by failing to ensure that station owners and others properly stored or dispensed gasoline containing MTBE of its liability theory. Specifically, the City pleaded a Navigation Law claim which this Court has held requires direct spiller liability. *See In re MTBE*, 591 F.Supp.2d 259, 282 n. 111 (SDNY 2008) (*quoting State of New York v. Montayne*, 604 N.Y.S.2d 978, 978 (App. Div. 1993) (to be held liable as a discharger of petroleum products, there must be proof that the manufacturer or refiner "was in a position to prevent the discharge or effect a cleanup"). ExxonMobil was therefore on "fair notice" that enabled it "to answer and prepare for trial," and such that it will "allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial" and as such, pursuant to Federal Rule of Civil Procedure 8 the Complaint should be read as stating a claim for negligence against ExxonMobil for failing to use reasonable care by failing to

Hon. Shira A. Scheindlin
August 20, 2009
Page 5

ensure that station owners and others properly stored or dispensed gasoline containing MTBE. *See Wynder*, 360 F.3d at 79.

*In the alternative*, if the Court were to find that the pleading in the Fourth Amended Complaint is inadequate on this matter, the Court should exercise its authority pursuant to Federal Rule of Civil Procedure 15(b)(1), which provides:

> (1) Based on an Objection at Trial. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

*Id.* Allowing such amendment will aid in the presentation of the merits, and the Court should exercise its discretion to freely permit it. *See Fisher*, 66 F.3d at 408. Similarly, there is no prejudice, where, as here, ExxonMobil is on notice of the Navigation Law claim which requires substantially similar, if not identical proof to a negligence claim asserting that ExxonMobil failed to use reasonable care by failing to ensure that station owners and others properly stored or dispensed gasoline containing MTBE.

### 4. The Nature of the Warnings and to Whom They Should Be Given is a Fact Question for the Jury

New York law concerning the need to warn persons or entities other than the user is far less constrained than ExxonMobil makes it out to be. Instead, "the nature of the warning to be given and to whom it should be given likewise turn upon a number of factors, including the harm that may result from use of the product without notice, the reliability and any possible adverse interest of the person, *if other than the user*, to whom notice is given, the burden on the manufacturer or vendor involved in locating the persons to whom notice is required to be given, the attention which it can be expected a notice in the form given will receive from the recipient, the kind of product involved and the number manufactured or sold, and the steps taken, other than the giving of notice, to correct the problem." *Cover v. Cohen,* 61 N.Y.2d 261, 276 (1984) (emphasis added); *see also Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 240 (N.Y. 1998)("This Court has also recognized that, in certain circumstances, a manufacturer may have a duty to warn of dangers associated with the use of its product even after it has been sold"). Accordingly, "generally, the issue will be one of fact for the jury whose function will be to assess the reasonableness of the steps taken by the manufacturer or vendor in light of the evidence concerning the factors listed above." *Cover,* 61 N.Y.2d at 276-77; see also *Liriano v. Hobart Corp.*, 92 N.Y.2d at 240 ("Such a duty will generally arise where a defect or danger is revealed by user operation and brought to the attention of the manufacturer; the existence and scope of such a duty are generally fact-specific."). Here, the jury should be allowed to assess whether ExxonMobil should have warned water providers and other entities that were not direct users of gasoline containing MTBE, but who may have been nonetheless injured through the use of gasoline containing MTBE.

Hon. Shira A. Scheindlin
August 20, 2009
Page 6

The case cited by ExxonMobil, *Berg v. Underwood's Hair Adaption Process, Inc.*, 751 F.2d 136, 137 (2d Cir. 1984), is easily distinguished. As an initial matter, that case did not cite nor even consider the New York Court of Appeals decision in the *Cover* case cited above. Instead, it relied on decisions in matters related to the same series of transactions and occurrences as the case and on the extraordinary nature of the facts in the case in which "Plaintiffs were injured by a bizarre and deliberate abuse by a licensed medical practitioner of a nonmedical commercial product." *Id.* at 137. The issue there was whether the manufacturer of certain fibers had a duty to forsee that it would be misused as hair implants on fraud victims and whether it had a concomitant duty to warn against this misuse. *Id.* In contrast, the injury to persons and entities other than users is a direct result of the intended use of the product – gasoline containing MTBE. *Berg* is plainly distinguishable on its face.

Accordingly, ExxonMobil's interpretation of the law is simply incorrect and the City should be allowed to pursue its claim that ExxonMobil failed to warn water providers (including the City) and others who were likely to be injured by the intended use of gasoline containing MTBE.

### Conclusion

We look forward to discussing these issues with Your Honor. Please contact me if the Court requires any additional information. The City appreciates Your Honor's attention to these matters.

Respectfully submitted,

*/S/ NICHOLAS G. CAMPINS*

Nicholas G. Campins

Cc: All Counsel via LNFS & Email