# Exhibit C

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Peter J. Sacripanti
Attorney at Law
psacripanti@mwe.com
212.547.5583

October 11, 2009

**BY ELECTRONIC MAIL AND HAND DELIVERY**

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1312

    Re: Master File C.A. No. 1:00-1898 (SAS), M21-88, MDL No. 1358 (SAS)
            City of New York v. Amerada Hess Corp., et al, Case No. 04 Civ. 3417

Dear Judge Scheindlin:

    We learned on Friday of serious jury misconduct that ExxonMobil believes has compromised the integrity of the trial. Having now reviewed the transcript of Friday's proceedings and the applicable law, ExxonMobil believes that the jury cannot render a verdict free of improper outside influences, and we therefore move for a mistrial.[1]

    The Court advised us on Friday that Jurors 2 and 5 had signed a note reading as follows:

> Juror No. 8 ... has admitted to researching on the Internet. He proclaimed that the information he found strengthened his opinion. We feel that he will be biased in our deliberations. This information was brought to our attention on Wednesday, October 7th, and we are concerned.

(Tr. at 6753:15-20.) We share the concerns that Jurors 2 and 5 expressed, and our concerns are all the deeper in light of what occurred when the Court conducted a follow-up voir dire.

    Summarizing the results of the voir dire is difficult, because the jurors' stories were often inconsistent on pivotal points. But we know that at least some jurors have been exposed to information that was not introduced during the trial and that would not have been admissible, and we have reason to conclude that many of the jurors were not candid in their responses—a

---

[1] This would not be the first time a court in this district has granted a mistrial "when an overzealous juror conducted internet research related to the action." See *Nicholls v. Tufenkian Import/Export Ventures, Inc.*, 367 F. Supp. 2d 514, 516-17 (S.D.N.Y. 2005).

U.S. practice conducted through McDermott Will & Emery LLP.
340 Madison Avenue New York New York 10173 Telephone: 212.547.5400 Facsimile: 212.547.5444 www.mwe.com

The Honorable Shira A. Scheindlin
October 11, 2009
Page 2

conclusion the Court seemed to share. (*See* Tr. at 6825:5-7.) The Court also expressed its concern about the "serious issues" raised by the revelations and the new information that seemed to emerge from the questioning of each successive juror. (*See* Tr. at 6816:24; *see also* Tr. at 6817:3 ("I feel like a movie director with the pieces").)

We know, of course, that the juror whose conduct triggered the voir dire was Juror 8. The questioning revealed that Juror 8 has participated in deliberations after exposure to "tons of information" (Tr. at 6814:1) that was not part of the evidence at trial. The record reveals that:

1. Juror 8 acknowledged conducting internet research that led him to one of the Court's opinions discussing the commingled-product theory. (Tr. at 6764:6-8.) The Court's own internet search suggests that the opinion Juror 8 found on the internet may have been the Court's decision of June 9, 2009, permitting the City to pursue punitive damages on a commingled-product theory.[2] (Tr. at 6782:9-25.)

2. Juror 8 acknowledged researching on a "Web site" that contained information "about Mr. Sher, it was he was from California and he started this whole commingling thing." (Tr. at 6821:11-14.) Juror 8 revealed this information only on further questioning, after Juror 5 reported that Juror 8 had passed along his research findings that Mr. Sher was "kind of like leading things," presumably for the plaintiffs in MTBE litigation. (Tr. at 6814:10.)

3. Juror 11 revealed that Juror 8 had discussed a "penalty part that is just going to be on Phase IV." (Tr. at 6808:4-6.) Juror 8 denied knowing about the specifics of Phase IV, but he intimated that he and "[a] couple of the jurors" learned about Phase IV from "all the binders." (Tr. at 6830:6-12.)[3]

4. Juror 5 revealed that Juror 8 "said that Exxon was the last oil company to kind of hold out and wasn't settling out of court" (Tr. at 6814:11-12) and that the settling defendants had each paid "$1 million." (Tr. at 6814:25-6815:1.) Juror 6 similarly testified as to Juror 8's report that "money had been awarded"—a revelation that occurred not on October 7 but "a couple of weeks ago." (Tr. at 6797:6-18.) Troublingly, Juror 8 denied knowing about the settlements. (Tr. at 6829:22-24.)

---

[2] *City of N.Y. v. Amerada Hess Corp. (In re MTBE Prods. Liab. Litig.)*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 52432 (S.D.N.Y. June 9, 2009).

[3] ExxonMobil also believes, in light of Juror 8's testimony about the "binders," that the Court should review the binders to which the jury has had access to ensure that they do not include anything the Court and the parties did not intend them to include.

The Honorable Shira A. Scheindlin
October 11, 2009
Page 3

In addition to Juror 8's misconduct, there is evidence in the record that Jurors 4, 6, and 10 have also engaged in improper outside research.[4] Juror 4 attempted to drive to Station 6 (the site of the City's claimed damages), Juror 6 conducted internet research on Your Honor's background and has read recent newspaper accounts of water contamination,[5] and Juror 10 performed research on unknown topics at the beginning of Phase I of the trial. (*See* Tr. at 6777:9-18, 6795:11-12, 6796:3-10, 6829:19-20.)

This clearly shows that several jurors failed to follow the Court's instructions (*see* Tr. at 6761:25-6762:8) and violated their oaths. Until Friday we had no idea this had occurred.

Nor can there be any real dispute about the prejudice resulting from the jury's access to the information that Juror 8 and others have shared. "It is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2000). *Cf. Manley v. AmBase Corp.*, 337 F.3d 237, 252 (2d Cir. 2003) ("extra record information" raises "prejudice concerns"); *see also Cocconi v. Pierre Hotel*, 146 F. Supp. 2d 427, 430 n.2 (S.D.N.Y. 2001) ("[T]here is a presumption that extraneous information communicated to the jury is prejudicial . . . .").[6] It is likely, given the lack of candor we observed on Friday, that Juror 8 has more extrajudicial information than he and the other jurors revealed. But the information we know establishes that he has read one of Your Honor's opinions, has investigated Mr. Sher, anticipates a punitive-damages phase, and has learned about other defendants' settlements. All of this information is highly prejudicial and has no place in the minds of the fact-finders deliberating ExxonMobil's liability.

The Court's June 2009 opinion alone is a wealth of highly prejudicial information. It may have been the basis of Juror 8's anticipation of a punitive phase, which a layperson might take into consideration in reaching a verdict in Phase 3. The same opinion includes a holding that a lay juror could easily use in resolving some of the facts at issue in Phase 3—that under the "commingled theory, 'the product of each supplier is *known* to be present . . . .'" *See City of N.Y. v. Amerada Hess Corp. (In re MTBE Prods. Liab. Litig.)*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 52432, at 11 (S.D.N.Y. June 9, 2009) (quoting *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 379 (S.D.N.Y. 2005) (emphasis in original)). The same opinion could lead a layperson to draw all manner of unwarranted conclusions. Among them: that ExxonMobil is responsible for the entirety of the City's damages, *see id.* at *6; that ExxonMobil engaged in a conspiracy with other refiners, *see id.* at *3 n.4; and that a multiplier of ten is an appropriate

---

[4] We use numbers here that correspond to the numbers from the voir dire transcript. The juror identified in the voir dire transcript as Juror 10 has elsewhere been listed as Juror 11. We refrain from listing her full name here, but this is the juror whom Juror 8 identified as "Cynthia."

[5] Juror 8 testified that several other jurors had read relevant articles in *The New York Times*. (Tr. at 6832:6-8.)

[6] "While the Second Circuit has not squarely addressed the issue, other circuits have held that the same presumption of prejudice applies in civil cases." *Cocconi*, 146 F. Supp. 2d at 430 n.2.

The Honorable Shira A. Scheindlin
October 11, 2009
Page 4

measurement for punitive damages in this case. *See id.* at *14. Although we do not know with certainty that Juror 8 read the June 2009 opinion, the Court's other opinions could just as easily mislead a lay juror into these or other equally prejudicial conclusions.

At this point, then, the salient question is the one the Court posed on Friday: whether the outside research "has infected the entire process." (*See* Tr. at 6782:11.) We think it has. And, while we understand the Court has already decided to dismiss Juror 8 from further deliberations, we do not believe that removing him can cure the infection. We believe, for two fundamental reasons, that the only acceptable course is to declare a mistrial.

*First*, we know that Juror 8 communicated prejudicial information to the remaining members of the jury. Juror 8 told Juror 5 that the jury had not "seen really anything compared to what is out there." (Tr. at 6814:2-2.) Several jurors acknowledge having conversations with Juror 8, overhearing those conversations, or hearing about them. And Juror 2 testified that *all the jurors* except Juror 1 were present in the jury room when Juror 8 "did share" some of his outside research. (Tr. at 6823:3-9.) Of course, even if only some of the jurors have had access to Juror 8's information, the deliberations are tainted. *See, e.g., Mayhue v. St. Francis Hosp., Inc.*, 969 F.2d 919, 921 (10th Cir. 1992). At this point, then, removing Juror 8 is an insufficient cure— especially considering that the jurors have now all deliberated about the misconduct. (*See* Tr. at 6786:16-18.)

*Second*, it is likely that Juror 8 has *already* infected the proceedings. *See Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000) ("length of time [information] was available to the jury" is relevant to prejudice analysis) (citation omitted). Juror 8 did not limit the timing of his outside research to Phase III, so he may well have conducted improper investigations during earlier phases of the trial. Thus, the Phase I and Phase II verdicts are already tainted. Furthermore, Juror 6 testified that Juror 8 reported "a couple of weeks ago" that "money had been awarded," so the misconduct in Phase III goes back further than last week. (Tr. at 6797:6-18.) Thus, for weeks an unknown number of jurors listened to the evidence through the prism of knowing that "money had been awarded." Nor is Juror 8 the only offender; indeed, Juror 10 did her outside research during Phase I. Finally, even if all the misconduct were recent, it would already have infected the entirety of the Phase III deliberations, *i.e.* the only two days of deliberations in the Phase, both of which occurred after Juror 8 shared his information on October 7.

We recognize that the remaining jurors indicated that these events would not prevent them from continuing to deliberate without bias. Those statements, however well-intentioned, are inadequate to permit this jury to proceed, even without Juror 8. For one thing, the statements cannot cure the prejudice that may already have resulted from Juror 8's deliberations to date, including in the Phase I and Phase II verdicts. For another, we are constrained to agree with the Court that not all of the remaining jurors have presented credible accounts of what has occurred. For example, Juror 10 denied having engaged in outside research of her own, even though Juror 8 insisted that she did. (Tr. at 6811:15-17.) And several jurors denied having heard the substance of Juror 8's information, even though there is evidence suggesting that they all did, with the possible exception of Juror 1. (*See* Table Summarizing Evidence Related to Jurors' Outside

The Honorable Shira A. Scheindlin
October 11, 2009
Page 5

Research (attached as Exhibit A).) No other juror acknowledged hearing "weeks ago" about the money award that Juror 8 shared, as related by Juror 6. (Tr. at 6797:6-18.) Thus, we really have no reliable way to determine precisely what the remaining members of the jury heard and what they will consider—purposely or subconsciously—if they continue deliberating. And that uncertainty is inherently prejudicial. *See United States v. Bristol-Martir*, 570 F.3d 29, 43 (1st Cir. 2009).

Candor issues aside, "jurors' subjective assessments of whether they were influenced by extrajudicial information are generally accorded very little weight because jurors are usually reluctant to admit to bias or fail to recognize it." *Simmons v. Blodgett*, 910 F. Supp. 1519, 1528 (W.D. Wash. 1996). The Third Circuit has explained this very phenomenon in rejecting a claim that jurors were rehabilitated by their promise to remain fair in the face of knowledge of a verdict in a similar case (analogous to the million-dollar settlement payments Juror 8 described to our jury):

> The fact that the five individually examined jurors stated that they could disregard their knowledge of the Queens verdict and decide the case solely on the evidence adduced in court does not alter our view.... Recognizing that the effect of exposure to extrajudicial, collateral information on a juror's deliberations may be substantial even though it is not perceived by the juror himself and recognizing that a juror's good faith may not be sufficient to counter this effect, courts have concluded that such assurances from jurors may not be adequate to eliminate the harm done by exposure to prejudicial information, including news reports.

*Waldorf v. Shuta*, 3 F.3d 705, 711 (3d Cir. 1993) (collecting cases). There is simply no way to discern, at this point, whether Juror 8's information has "unduly influenced" any other member of the jury, and on that basis alone the Court must grant a mistrial. *See Bristol-Martir*, 570 F.3d at 43.

Finally, we also have reason to believe that Juror 8 was disliked by at least some of the other jurors. Juror 4 publicly expressed anger over Juror 8's absence from Court on Friday morning. (Tr. at 6752:10-11.) Juror 8 himself testified that he has "heard comments" from the other jurors and feels "[t]hey don't want me because I'm usually the last hold out on all the questions." (Tr. at 6835:23-25.) Given this dynamic, it is conceivable that the remaining jurors, who have now discussed the misconduct (*see* Tr. at 6787:16-18), would be influenced to reach verdicts contrary to the positions Juror 8 has already expressed in deliberations, if only in a misguided effort of their own to remove the taint. But such a verdict would be no less tainted than the verdict the jury might reach based directly on the improper information Juror 8 has shared with them.

In short, there is no solution that will protect the integrity of any verdict in this case other than to declare a mistrial and submit the case to a different jury. We recognize this is a distasteful

The Honorable Shira A. Scheindlin
October 11, 2009
Page 6

step given the length of time the Court, the parties, and the jurors have already invested in this case. But we cannot allow that investment of time to override our client's right to ensure that its potential liability, including for any punitive damages, will be adjudicated by impartial fact-finders free from the influence of improper facts and argument.

We also ask that the Court docket this letter so that it is included in the record.

Respectfully submitted,

*Peter John Sacripanti*

Peter John Sacripanti

cc:   Counsel for the City of New York

EXHIBIT A

## TABLE SUMMARIZING EVIDENCE RELATED TO JURORS' OUTSIDE RESEARCH

| Juror | Evidence That Juror Engaged in Outside Research? | Juror Admits to Engaging in Outside Research? | Evidence That Juror Heard No. 8 Speak About Substance of His Outside Research? | Admits to Knowing Substance of No. 8's Outside Research? | Knows Now About Fact of No. 8's Outside Research? |
|---|---|---|---|---|---|
| No. 1 | No | N/A | No | N/A | Yes |
| No. 2 | No | N/A | Yes; on 10/7/09; first with only Nos. 5 and 9 (in food court) and then with all jurors except No. 1 (in jury room) | No (No. 8 "did share," but No. 2 claims did not pay attention) | Yes |
| No. 3 | No | N/A | Yes; see No. 2 | No | Yes |
| No. 4 | Yes; tried to find Station 6 site | Yes (but claims could not find Station 6 site) | Yes; see No. 2 | No | Yes |
| No. 5 | No | N/A | Yes; see No. 2; on morning of 10/7/09; No. 8 told her and Nos. 2 and 9 that he found "tons of information," including about Mr. Sher and settlement ($1 million per company). Then, the next morning, discussed the info further with Nos. 2 and 9 | Yes | Yes |
| No. 6 | Yes; researched Judge Scheindlin on Wikipedia and New York Times article on water contamination | Yes | Yes; see No. 2; also heard No. 8 talking "a couple of weeks ago" about one of the lawyers and prior suits and that money had been awarded; this was one morning "[p]rior to deliberations" during Phase 3 trial; took place in jury room; three or four jurors present | Yes | Yes |
| No. 7 | Yes; did outside research early on according to No. 8 | No | Yes; see No. 2 | No | Yes |

| Juror | Evidence That Juror Engaged in Outside Research? | Juror Admits to Engaging in Outside Research? | Evidence That Juror Heard No. 8 Speak About Substance of His Outside Research? | Admits to Knowing Substance of No. 8's Outside Research? | Knows Now About Fact of No. 8's Outside Research? |
|---|---|---|---|---|---|
| No. 8 | Yes; kids showed him internet articles; did his own research and discovered prior court opinion (probably June 2009 on availability of punitive damages); researched Vic Sher and commingled-product theory; researched settlement history; knows about Phase 4 (claims from jury binders) | Yes, but not candidly and denies knowing about settlements | N/A | N/A | N/A |
| No. 9 | No | N/A | Yes; see No. 2; No. 9 claims took place on morning of 10/9/09 | No | Yes |
| No. 10 | No | N/A | Yes; see No. 2 | No | Yes |
| No. 11 | No | N/A | Yes; see No. 2; also, on 10/8/09 No. 8 said he learned from internet research that there will be a Phase 4 | Yes | Yes |