UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
PRODUCTS LIABILITY LITIGATION

This document relates to:

*City of New York v. Amerada Hess Corporation, et al.,*
No. 04 Civ. 3417 (SAS)

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

# EXXON MOBIL DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL AND/OR REMITTITUR

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION .................................................................................... 1

LEGAL STANDARD ............................................................................... 1

ARGUMENT ........................................................................................... 3

I.     EXXONMOBIL PROVED ITS AFFIRMATIVE DEFENSES. ..................... 3

       A.   Plaintiffs' State-Law Claims Are Preempted. ............................... 3

       B.   The Statute Of Limitations Bars The City's Claims. ..................... 5

II.    THE CITY FAILED TO PROVE, AND THE COURT IMPROPERLY INSTRUCTED
       THE JURY ON, CAUSATION. ............................................................... 6

       A.   The City Did Not Prove The Source Of Any Future MTBE In The Station 6 Wells... 6

       B.   The City Did Not Prove "Direct Spiller" Causation. ..................... 7

       C.   The City Did Not Prove Refiner Or Supplier Causation. .............. 8

       D.   The Court Should Not Have Admitted Evidence Or Instructed The Jury On The
            "Commingled Product" Theory. ................................................... 10

       E.   The City Did Not Prove That A "Failure To Warn" Was A Cause Of Its Injury. ...... 12

III.   THE CITY FAILED TO PROVE A LEGALLY COGNIZABLE INJURY, AND
       THE COURT'S INSTRUCTIONS ON "INJURY" WERE ERRONEOUS. ................. 13

       A.   The City's Asserted Injury Is Not Justiciable. ............................. 13

       B.   The City's "Injury" Is Not Cognizable Under New York Law. ....... 15

       C.   The City Failed To Prove That MTBE Will Be Present In The Station 6 Wells
            At Any Level, Such That It Needs A Prophylactic Treatment System. ..................... 17

       D.   The Jury's Finding That MTBE Levels Will Not Exceed The Maximum
            Contaminant Level Is Dispositive Of The "Injury" Issue. ........................... 19

       E.   The City Failed To Prove An Imminent Future Injury. ................ 20

IV.    THE CITY FAILED TO PROVE ITS LATE-ADDED NEGLIGENCE CLAIM. .......... 21

       A.   The Court Erred In Permitting The City To Change Its Theory Of Negligence
            Mid-Trial. .................................................................................. 21

       B.   The City Failed To Prove ExxonMobil Was Negligent. ................ 22

V.     THE CITY FAILED TO PROVE PUBLIC NUISANCE. ............................ 23

VI.    THE CITY FAILED TO PROVE TRESPASS. ......................................... 24

VII.   THE COURT ERRED IN NOT DECLARING A MISTRIAL. ..................... 27

A. Several Jurors' Outside Research Warrants A Mistrial. ............................................. 27

B. A New Trial Is Warranted Due To The Improper Dismissal Of Juror 2. ................... 29

VIII. ERRONEOUS EVIDENTIARY RULINGS MATERIALLY SWAYED THE JURY'S VERDICT AGAINST EXXONMOBIL. .................................................................................. 31

A. The Court Improperly Limited The Testimony Of Dr. Hand. .................................... 31

B. The Court Admitted Irrelevant And Prejudicial Evidence On "Warnings." .............. 33

C. The Court Abused Its Discretion In Striking Certain Testimony Of Sandra Mohr And In Permitting The Undisclosed Testimony Of Kenneth Rudo. ........................... 34

IX. THE DAMAGE AWARD WARRANTS A NEW TRIAL OR REMITTITUR. ............. 37

A. The Jury's Verdict Was Against The Weight Of The Evidence. ................................ 38

B. Alternatively, The Damage Award Deviates Materially From What Would Be Reasonable Compensation And Remittitur Is Appropriate. ....................................... 41

CONCLUSION ................................................................................................................ 45

## **TABLE OF AUTHORITIES**

**page**

**FEDERAL CASES**

*In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223 (E.D.N.Y 1985)................................10

*Allen v. Wright*, 468 U.S. 737 (1984) ......................................................................13

*Bank of China, New York Branch v. Bank of China, Hong Kong Branch*, No. 04-5557-c,
    2007 U.S. App. LEXIS 18515 (2d Cir. Aug. 2, 2007).................................................3

*Barrett v. Black & Decker Inc.*, No. 06 Civ. 1970,
    2008 U.S. Dist. LEXIS 108787 (S.D.N.Y. Aug. 5, 2008) ..........................................15

*Bayramoglu v. Estelle*, 806 F.2d 880 (9th Cir. 1986)...........................................28, 29

*Berg v. Underwood's Hair Adaption Processes, Inc.*, 751 F.2d 136 (2d Cir. 1984)....................33

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996)......................................32

*Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376 (2d Cir. 2006) .................................3

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008) .......................................37

*Caruolo v. John Crane, Inc.*, 226 F.3d 46 (2d Cir. 2000)........................................2, 11

*Cataldo v. Brunswick Corp.*, 68 F.R.D. 600 (S.D.N.Y. 1975) .......................................11

*Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273 (S.D.N.Y. 2008) ..........16

*Classicberry Ltd. & Black Crowes P'ship., v. Musicmaker.com, Inc.*, No. 02-7054,
    2002 U.S. App. LEXIS 21619 (2d Cir. Oct. 15, 2002)............................................22

*Cocconi v. Pierre Hotel*, 146 F. Supp. 2d 427 (S.D.N.Y. 2001) .....................................28

*Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53 (S.D.N.Y. 2001) .......................................12

*Consorti v. Armstrong (In re Joint E. & S. Dist. Asbestos Litig.)*, 9 F. Supp. 2d 307
    (S.D.N.Y. 2008) ..............................................................................37

*Creative Waste Mgmt. v. Capitol Envt'l Servs., Inc.*, 495 F. Supp. 2d 353
    (S.D.N.Y. 2007) ..............................................................................35

*Davis v. City of New York*, 228 F. Supp. 2d 327 (S.D.N.Y. 2002)....................................13

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) ................................2

*Drake v. Delta Air Lines, Inc.*, No. 94-CV-5944,
    2005 U.S. Dist. LEXIS 14789 (E.D.N.Y. July 21, 2005) ........................................32

*In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138 (2d Cir. 1993) ...................................14

*Duke v. County of Nassau*, No. 02-7049,
    2003 U.S. App. LEXIS 7973 (2d Cir. Apr. 25, 2003) ..............................................29

*Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361 (S.D.N.Y. 2003)...........................................12

*Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415 (1996) ........................................................37

*Gasperini v. Ctr. For Humanities, Inc.*, 149 F.3d 137 (2d Cir. 1998).............................................37

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .....................................................................40, 43

*Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672 (2d Cir. 1985)........................22

*Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, No. 99 Civ. 0275,
    2004 U.S. Dist. LEXIS 15864 (S.D.N.Y. Aug. 12, 2004).......................................25

*Knaust v. City of Kingston*, 193 F. Supp. 2d 536 (N.D.N.Y. 2002)................................................21

*Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir. 1987) .........................................................32

*LNC Invs., Inc. v. First Fid. Bank*, 126 F. Supp. 2d 778 (S.D.N.Y. 2001)..................................2, 34

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................................13, 20

*Malek v. Federal Ins. Co.*, 994 F.2d 49 (2d Cir.1993).......................................................2, 3, 33, 37

*Manley v. AmBase Corp.*, 337 F.3d 237 (2d Cir. 2003) ...............................................................28

*Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457 (S.D.N.Y. 2003)..............37, 40, 41

*Mehra v. Bentz*, 529 F.2d 1137 (2d Cir. 1975) ..........................................................................10

*Millennium Aviation Servs., Inc. v. Gen. Dynamics Co.*, No. 08-0911-cv,
    2009 U.S. App. LEXIS 10187 (2d Cir. May 12, 2009) ..............................................3

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ......................................................2, 11

*Moore v. Amer. Family Mut. Ins. Co.*, 576 F.3d 781 (8th Cir. 2009).......................................28, 29

*In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593 (S.D.N.Y. 2001) ...............................5, 20, 33

*In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005) .......................................11

*In re MTBE Prods. Liab. Litig.*, 447 F. Supp. 2d 289 (S.D.N.Y. 2006) .......................................11

*In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 298 (S.D.N.Y. 2006) .......................................27

*In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 324 (S.D.N.Y. 2006) .........................................4

*In re MTBE Prods. Liab. Litig.*, 458 F. Supp. 2d 149 (S.D.N.Y. 2006) ...............................19, 20

*In re MTBE Prods. Liab. Litig.*, No. 1:00-1898,
    2007 U.S. Dist. LEXIS 40484 (S.D.N.Y. June 4, 2007).....................................5, 42

*In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 249 (S.D.N.Y. 2008) .......................................22

*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417,
    2009 U.S. Dist. LEXIS 59287 (S.D.N.Y. July 6, 2009) ...................14, 15, 16, 17, 41

*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417,
    2009 U.S. Dist. LEXIS 62649 (S.D.N.Y. July 21, 2009) ...............................9, 32, 35

*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417,
    2009 U.S. Dist. LEXIS 78081 (S.D.N.Y. Aug. 25, 2009) .............................5, 15, 16

*In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417,
    2009 U.S. Dist. LEXIS 96469 (S.D.N.Y. Oct. 19, 2009) ............................................26

*Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F. Supp. 2d 514 (S.D.N.Y. 2005)................28

*Norfleet v. Isthmian Lines, Inc.*, 355 F.2d 359 (2d Cir. 1966) .......................................................11

*Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420 (S.D.N.Y. 2008)..............................37, 42

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) ..............................................................37, 41

*Pitasi v. Stratton Corp.*, 968 F.2d 1558 (2d Cir. 1992) ...................................................................3

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)...........................................................2

*Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011 (2d Cir. 1989) ........................22

*Scribner v. Summers*, 84 F.3d 554 (2d Cir. 1996) .............................................................24, 25, 26

*Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2d Cir. 1984) ........................................37

*Simmons v. Blodgett*, 910 F. Supp. 1519 (W.D. Wash. 1996).......................................................29

*Song v. Ives Lab., Inc.*, 957 F.2d 1041 (2d Cir. 1992)..........................................................2, 38, 40

*TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171 (N.D.N.Y. 2002).......................................31

*Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252 (S.D.N.Y. 2007)............................................37, 38

*Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93 (2d Cir. 1995) ...............................................37

*Tornheim v. Fed. Home Loan Mtge. Corp.*, 988 F. Supp. 279 (S.D.N.Y. 1997)............................15

*Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326 (2d Cir. 1993) ..........41, 42, 43

*Transnor Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472 (S.D.N.Y. 1990) .................................9

*United States v. Greer*, 285 F.3d 158 (2d Cir. 2000) ..................................................................28

*United States v. Hernandez*, 862 F.2d 17 (2d Cir. 1988).............................................................29

*United States v. Hooker Chems. & Plastics Corp.*, 850 F. Supp. 993 (W.D.N.Y. 1994)..............33

*United States v. Montgomery*, 42 F.2d 254 (S.D.N.Y. 1930) ......................................................28

*United States v. Samet*, 207 F. Supp. 2d 269 (S.D.N.Y. 2002)...............................................29, 30

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997)................................................................29

*United States ex rel. Evergreen Pipeline Constr. Corp. v. Merritt-Meridian Constr. Corp.*, 890 F. Supp. 1213 (S.D.N.Y. 1995) ......................................................................22

*Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006) ..................................................1

*Waldorf v. Shuta*, 3 F.3d 705 (3d Cir. 1993).............................................................................29

*Walker v. Firestone Tire & Rubber Co.*, 412 F.2d 60 (2d Cir. 1969).............................................3

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ............................................................................20

## STATE CASES

*Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531 (N.Y. 1981) ................................................15

*Copart Indus. v. Consol. Edison Co.*, 362 N.E.2d 968 (N.Y. 1977)..............................15, 23, 26, 27

*Corcoran v. Banner Super Market*, 227 N.E.2d 304 (N.Y. 1967)..................................................22

*DeStefano v. Emergency Hous. Group, Inc.*, 281 A.D.2d 449 (N.Y. App. Div. 2001) ................23

*DiMura v. City of Albany*, 657 N.Y.S.2d 844 (N.Y. App. Div. 1997) ............................................33

*Firmes v. Chase Manhattan Auto. Fin. Corp.*, 852 N.Y.S.2d 148 (N.Y. App. Div. 2008) ...........17

*Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222 (N.Y. 2001) .....................................................9

*Healey v. Firestone Tire & Rubber Co.*, 663 N.E.2d 901 (N.Y. 1996) ...........................................8

*Hellert v. Town of Hamburg*, 857 N.Y.S.2d 825 (N.Y. App. Div. 2008) .................................15, 16

*Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487 (N.Y. 1989) ..................................................6, 11, 12

*Jansen v. C. Raimondo & Son Constr. Corp.*, 741 N.Y.S.2d 71 (N.Y. App. Div. 2002) ..............41

*Kihl v. Pfeffer*, 848 N.Y.S.2d 200 (N.Y. App. Div. 2007) ..............................................................17

*In re Lead Paint Cases*, 191 N.J. 405 (N.J. 2007) ........................................................................24

*Leone v. Leewood Serv. Station Inc.*, 624 N.Y.S.2d 610  (N.Y. App. Div. 1995).........................25

*Morejon v. Rais Constr. Co.*, 851 N.E.2d 1143 (N.Y. 2006) .......................................................22

*Mortensen v. Mem'l Hosp.*, 483 N.Y.S.2d 264 (N.Y. App. Div. 1984) ........................................11

*New York v. Fermenta ASC Corp.*, 630 N.Y.S.2d 884 (N.Y. Sup. Ct. 1995).........................23, 24

*People v. DeLucia*, 282 N.Y.S.2d 526 (N.Y. 1967) ......................................................................28

*People v. Sturm, Ruger & Co.*, 309 A.D.2d 91 (N.Y. App. Div. 2003) .........................................24

*Phillips v. Sun Oil Co.*, 307 N.Y. 328 (N.Y. 1954) ..................................................................24, 25

*Plainview Water Dist. v. Exxon Mobil Corp.*, 2008 N.Y. Slip. Op. 501520U,
    (N.Y. Sup. Ct. 2008) ................................................................................................................21

*Ruby v. Budget Rent A Car Corp.*, 806 N.Y.S.2d 12 (N.Y. App. Div. 2005)................................17

*Schultz v. Harrison Radiator Div. Gen. Motors Corp.*, 660 N.Y.S.2d 685 (N.Y. 1997)...............16

*Snyder v. Jessie*, 565 N.Y.S.2d 924 (N.Y. App. Div. 1990)........................................................24

*State v. Lead Indus. Ass'n*, 951 A.2d 428 (R.I. 2008) ................................................................24

*Sternfeld v. Forcier*, 679 N.Y.S.2d 219 (N.Y. App. Div. 1998)...................................................17

*Sweet v. Syracuse*, 129 N.Y. 316 (1891)..............................................................27

*Westphal v. New York*, 78 N.Y.S. 56 (N.Y. App. Div. 1902)........................................15

## FEDERAL STATUTES

15 U.S.C. § 7545(k)(1)(A) ............................................................................4

## STATE STATUTES

N.Y. C.P.L.R. § 214(4) ...............................................................................5

N.Y. C.P.L.R. § 214-c(2) .............................................................................5

N.Y. C.P.L.R. § 5501(c) .............................................................................37

## RULES

Fed. R. Civ. P. 26(a)(2) ............................................................................35

Fed. R. Civ. P. 37(c)(1) ............................................................................35

Fed. R. Civ. P. 50(a) ................................................................................1

Fed. R. Civ. P. 59(a) ................................................................................2

Fed. R. Evid. 401 ....................................................................................34

Fed. R. Evid. 403 ....................................................................................34

Fed. R. Evid. 702 ................................................................................31, 32

Fed. R. Evid. 703 ....................................................................................32

## MISCELLANEOUS

N.Y. Pattern Jury Instruction 3:8 ..................................................................24

W. PAGE KEETON ET AL., PROSSER & KEETON ON TORTS § 13 (5th ed. 1984) ..............................26

# INTRODUCTION

Defendants Exxon Mobil Corporation, ExxonMobil Chemical Company, Inc., Exxon Mobil Oil Corporation, and Mobil Corporation (collectively "ExxonMobil" or "Defendants") are entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50(b) because ExxonMobil proved its preemption and statute-of-limitations defenses, and because Plaintiffs City of New York, New York City Water Board and the New York City Municipal Water Finance Authority's (collectively "the City" or "Plaintiffs") failed to prove essential elements of their claims, including injury and causation.[1] Alternatively, the Court should grant a new trial pursuant to Rule 59(a) because the jury's findings for the City were against the weight of the evidence and because ExxonMobil was materially prejudiced by multiple errors of law, including erroneous jury instructions,[2] improper evidentiary rulings, and the Court's failure to declare a mistrial. Lastly, should the Court decide not to grant ExxonMobil judgment as a matter of law or a new trial on all issues, it should order a new trial on damages or remit the jury's damage award to a non-excessive amount because it is against the weight of the evidence and a serious miscarriage of justice.

# LEGAL STANDARD

A motion for judgment as a matter of law should be granted if there is no "legally sufficient evidentiary basis" for a reasonable jury to find for the nonmoving party. Fed. R. Civ.

---

[1] Defendants incorporate by reference their Phase 1 and 2 Rule 50(a) motions for judgment as a matter of law (*see* 8/12/09 Tr. 1160:10-1161:11; 8/26/09 Tr. 2712:22-2713:10), as well as the arguments made in Defendants' October 1, 2009, Memorandum in support of their motion for judgment as a matter of law pursuant to Rule 50(a). With a few exceptions, the Court has ruled against ExxonMobil on the issues raised in this motion, but ExxonMobil raises again all of the issues as to which it believes it is entitled to judgment as a matter of law, as case law under Rule 50 requires. *See, e.g., Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400-01 (2006).

[2] Although ExxonMobil is not moving for a new trial on the basis of each jury instruction and ruling of law to which it previously objected, it reserves all such objections.

P. 50(a); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000). A plaintiff fails to

overcome Rule 50(a) or (b) when "(1) there is such a complete absence of evidence [to] support

[a plaintiff's] verdict that the jury's findings [w]ould only [be] the result of sheer surmise and

conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that

reasonable and fair-minded [persons] could not arrive at a verdict against [it]." *Caruolo v. John*

*Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000).

A court may grant a new trial "for any reason for which a new trial has heretofore been

granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Such grounds include

"claim[s] that the verdict is against the weight of the evidence, that the damages are excessive, or

that, for other reasons, the trial was not fair to the party moving; and may raise questions of law

arising out of alleged substantial errors in admission or rejection of evidence or instructions to

the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *see also DLC Mgmt.*

*Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998). Unlike a motion for

judgment as a matter of law, a court may grant a new trial "even if there is substantial evidence

to support the jury's verdict." *Caruolo*, 226 F.3d at 54. The court is "free to weigh the evidence

[itself] and need not view it in the light most favorable to the verdict winner." *Song v. Ives Lab.,*

*Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992).

In addition, "erroneous evidentiary rulings may furnish a basis for granting a post-verdict

motion for a new trial under Rule 59." *LNC Invs., Inc. v. First Fid. Bank*, 126 F. Supp. 2d 778,

787 (S.D.N.Y. 2001). For example, "a court's failure to admit highly probative evidence" or its

improper admission of evidence "may warrant the grant of a motion for new trial." *Id.* A new

trial is warranted if the admission or exclusion "affected a substantial right of one of the parties,"

*Malek v. Federal Ins. Co.*, 994 F.2d 49, 55 (2d Cir.1993), "as when a jury's judgment would be

swayed in a material fashion by the error." *Bank of China, New York Branch v. Bank of China, Hong Kong Branch*, No. 04-5557-c, 2007 U.S. App. LEXIS 18515, at *4 (2d Cir. Aug. 2, 2007). "If one cannot say, with fair assurance … that the judgment was *not* substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Malek*, 994 F.2d at 55 (emphasis added); *see also Walker v. Firestone Tire & Rubber Co.*, 412 F.2d 60, 64 (2d Cir. 1969).

An erroneous jury instruction "requires a new trial unless the error is harmless." *Millennium Aviation Servs., Inc. v. Gen. Dynamics Co.*, No. 08-0911-cv, 2009 U.S. App. LEXIS 10187, at *3 (2d Cir. May 12, 2009); *see also Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 390 (2d Cir. 2006). "It is the responsibility of the trial judge to provide the jury with sufficient instruction to enable it to assess the evidence within the proper legal framework and to reach a rational verdict." *Pitasi v. Stratton Corp.*, 968 F.2d 1558, 1563 (2d Cir. 1992). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law," and is harmless *only* "if it is clear that it did not influence the jury's verdict." *Millennium Aviation*, 2009 U.S. App. LEXIS 10187, at *3.

## ARGUMENT

### I.   EXXONMOBIL PROVED ITS AFFIRMATIVE DEFENSES.

#### A.   Plaintiffs' State-Law Claims Are Preempted.

Because the jury found that there was no "safer, feasible alternative design at the time ExxonMobil's gasoline containing MTBE was marketed," the City's claims are preempted as a matter of law. (*See* 10/19/09 Tr. 7043:15-19.) ExxonMobil previously argued that all of the City's claims are preempted by the Clean Air Act Amendments of 1990 ("CAAA") because: (1) Congress specifically intended for refiners to be able to choose among oxygenates, including MTBE, for purposes of complying with the CAAA's gasoline oxygen content requirements; and

(2) eliminating MTBE would interfere with the CAAA's goals.[3]  In addition, the City's state-law

tort claims conflict with the decision of the U.S. Environmental Protection Agency ("EPA") to

permit the use of MTBE as an oxygenate, "taking into consideration the cost of achieving such

emission reductions, any *nonair-quality* and other air-quality related *health and environmental*

*impacts* and energy requirements." 15 U.S.C. § 7545(k)(1)(A) (emphasis added).

Although the Court previously rejected these arguments based on the record at the

summary judgment phase, ExxonMobil proved at trial that eliminating MTBE would have

conflicted with the CAAA because the only alternative to MTBE – namely, ethanol – was not a

feasible substitute for MTBE for purposes of complying with the oxygen mandates. *See In re*

*MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 324, 340 (S.D.N.Y. 2006).  The jury's finding that

there was no feasible, safer alternative to MTBE was well supported by the evidence

ExxonMobil presented, including the following:

- Exxon's analysis of available oxygenates concluded that the supply of both MTBE and ethanol combined would be substantially short of industry-wide demand under the CAAA requirements.  (9/21/09 Tr. 5314:12-22, 5327:25-5330:3 (Eizember).)

- Gasoline blended with ethanol could not be transported by pipeline – the principal mode for distributing gasoline from refineries in the U.S.  (9/10/09 Tr. 4095:9-12 (Burke).)

- Refiners who shared common distribution systems all had to use either MTBE or ethanol in the areas served by those systems.  (9/21/09 Tr. 5318:16-23 (Eizember); 9/23/09 Tr. 5614:9-5615:7 (Eizember).)

- The commercial viability of ethanol depended, in part, on refiners being able to obtain a waiver from the EPA from volatility rules, which was denied.  (9/15/09 Tr. 4454:14-4455:5, 4455:21-24. (O'Brien); 9/16/09 Tr. 4714:1-4715:13 (Reynolds).)

---

[3] ExxonMobil hereby incorporates by reference the argument and analysis set forth in Defendants' Motion For Summary Judgment Based on Conflict Preemption, filed July 29, 2005, in *MDL No. 1358*, and all associated memoranda, reply papers, letter-briefing and/or oral argument on that motion. (Attached to 10/1/09 Declaration of James Pardo (Docket Entry 2853) ("10/1/09 Pardo Decl.") as Ex. F.)

In short: the evidence at trial proved – and the jury's verdict confirms – that "it would be impossible for the defendants to comply with both the state law sought to be imposed and the federal requirements" because alternatives (*i.e.*, ethanol) were not "available to the defendants for their use in the RFG Program." *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 614, 616 (S.D.N.Y. 2001). Accordingly, the City's claims are preempted.

**B.     The Statute Of Limitations Bars The City's Claims.**

An action for injury to property must be commenced within three years after a plaintiff "actually or constructively discovers its injury." *In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2007 U.S. Dist. LEXIS 40484, at *23, *25 (S.D.N.Y. June 4, 2007); N.Y. C.P.L.R. §§ 214(4), 214-c(2). Because the City filed this suit on October 31, 2003, the relevant bar date is October 31, 2000.[4] The City's alleged injury is that MTBE interferes with its planned future use of the Station 6 wells because it will have to install treatment to remove the MTBE. The evidence proved that the City was aware of this alleged injury long before the bar date. The City's former water quality manager, Mr. Kunsch, testified that he told the City's Department of Health, by memo dated June 14, 1995, that MTBE was a growing concern as a potential groundwater contaminant and, on that basis, he requested that wells be tested for MTBE going forward. (9/23/09 Tr. 5752:23-5753:2, 5754:7-15, 5756:3-21.) Kunsch also testified that

---

[4] ExxonMobil has previously argued that the City's claims are time-barred by the applicable statute of limitations and hereby incorporates by reference the argument and analysis set forth in Defendants' Motion For Summary Judgment Based On the Statute of Limitations, filed on April 14, 2006; Defendant's Motion For Summary Judgment Of Plaintiff City Of New York's Claims Related To Station 6 Based On The Statute Of Limitations, filed August 12, 2009; and all associated memoranda, reply papers, letter briefing and oral argument on each of these motions. (10/1/09 Pardo Decl., Exs. I-J). ExxonMobil reiterates these arguments while acknowledging that the Court previously rejected them. *See In re MTBE*, 2007 U.S. Dist. LEXIS 40484 (S.D.N.Y. June 4, 2007); *In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 78081 (S.D.N.Y. Aug. 25, 2009).

MTBE's resistance to biodegradation, high mobility in soils, and propensity to disperse rapidly in water, were detailed in an April 7, 1997, memorandum to the City. (*Id.* at 5761:1-9.) As to Station 6 specifically, Mr. Yulinksy testified that (1) by September 1999 the City was discussing with its consultant the anticipated need to treat MTBE at Station 6 (*id.* at 5781:24-5782:15); (2) by May 2000 the City had "planned for treatment of VOCs and MTBE at Station 6" (*id.* at 5776:25-5777:4); and (3) by August 2000 the City knew that "the presence of highly [soluble] VOCs such as MTBE will greatly impact the design" of the treatment system at Station 6 (*id.* at 5772:25-5773:15). Thus, the City's own employees established that the City incurred, and was aware of, its asserted "injury" long before the October 30, 2000, bar date.

## II.   THE CITY FAILED TO PROVE, AND THE COURT IMPROPERLY INSTRUCTED THE JURY ON, CAUSATION.

The City failed to prove that ExxonMobil was a substantial cause of its asserted injury.

### A.   The City Did Not Prove The Source Or Any Future MTBE In The Station 6 Wells.

In New York, "identification of the exact defendant whose product injured the plaintiff is, of course, generally required." *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 504 (N.Y. 1989). To establish that ExxonMobil caused the City's harm either as a direct spiller or as a refiner or supplier of other stations' gasoline, the City needed to prove the source of the MTBE it claims will impact the Station 6 wells if and when they are used in the future. The City's evidence that MTBE from known or potential release sites would impact the Station 6 wells depended entirely on the speculative "capture zone" analysis of its expert, David Terry.[5] Terry admitted that the shape, size and location of Station 6's theoretical, future capture zone would vary significantly,

---

[5] ExxonMobil acknowledges but respectfully disagrees with the Court's ruling on its pre-trial motion to exclude the opinions of David Terry. (*See* 8/11/09 Tr. 1018-24.)

depending on multiple factors, none of which can be predicted with reasonable certainty. For example, the capture zone varies depending on the duration and rate at which the Station 6 wells will pump in the future, as well as any future pumping of other nearby wells, such as the "dependability" wells. (8/18/09 Tr. 1896:10-21; 8/19/09 Tr. 2148:2-13, 2149:10-13, 2150:5-24; 8/20/09 Tr. 2210:8-2211:21 (Terry).) Terry admitted that "no one really knows . . . how they're going to use [the Station 6 wells]" in the future. (8/20/09 Tr. 2213:9-10.) Yet, the model Terry used to predict the future capture zone relied on the implausible assumption that the Station 6 wells will operate continuously for 24 years at a rate of 10 million gallons per day, even though Terry conceded that, in reality, wells are rarely run non-stop for long periods of time. (8/19/09 Tr. 2155:17-2156:1.) He also assumed without foundation that the dependability wells will be activated in 2020 and will pump 55 million gallons per day for 20 years. (*See* 8/18/09 Tr. 1899:13-21; 8/20/09 Tr. 2210:8-10.)

Given the uncertainty inherent in his capture zone analysis, Terry had to admit that he could not determine which of the sites within his capture zone would be a source of MTBE impacts to the Station 6 wells if they are ever operated in the future. (9/23/09 Tr. 5706:17-25.) Moreover, Terry's analysis did not determine when MTBE from any site within his predicted capture zone might reach Station 6. (*See* 8/19/09 Tr. 2151:12-2152:14; 9/23/09 Tr. 5704:1-4.) This is significant because a molecule of MTBE near the perimeter of the predicted capture zone would take up to 30 years to reach the wells. (*See* 8/18/09 Tr. 1912:14-25 (Terry); 9/21/09 Tr. 5164:25-5165:23 (Maguire).) Thus, depending on the distance of a release from Station 6 and the length of time that the wells are pumped, MTBE from the site might never reach the wells.

### B.   The City Did Not Prove "Direct Spiller" Causation.

Having failed to prove that *any* particular release or site could be the source of an MTBE detection in the Station 6 wells, the City also failed to establish that gasoline allegedly released

years ago at any of the six "Mobil" branded service stations identified by Terry would be a substantial factor (or any factor at all) in causing any future MTBE detection at Station 6.  Terry admitted that he could not quantify what impact, if any, a particular station might have in causing any such MTBE detection.  (9/23/09 Tr. 5702:23-5703:5, 5704:5-11, 5710:2-8.)  Thus, the jury's finding that ExxonMobil is liable as a direct spiller lacks any evidentiary basis.

### C.   The City Did Not Prove Refiner Or Supplier Causation.

The City also failed to prove that "it is reasonably probable, not merely possible or evenly balanced," that gasoline manufactured or supplied by ExxonMobil has caused the City's alleged injury.  *See Healey v. Firestone Tire & Rubber Co.*, 663 N.E.2d 901, 903 (N.Y. 1996).  The City's only evidence that ExxonMobil-refined gasoline would reach Station 6 was the testimony of Bruce Burke, who could not say which company's gasoline was in a particular station's USTs at any given time.  (9/11/09 Tr. 4180:24-4181:7.)  Burke admitted that:

- He could not place Exxon or Mobil-refined gasoline into every commingled shipment on the Colonial pipeline. (9/11/09 Tr. 4138:19-4139:5.)

- Only about 25-30% of the gasoline put onto Colonial reaches New York Harbor.  (*Id.* at 4178:9-12.)  And he did not know how much Exxon or Mobil-refined gasoline went from Colonial to the Buckeye Pipeline and, potentially, into Queens.  (*Id.* at 4175:5-11.)

Nor did the City prove that ExxonMobil-supplied gasoline will impact the Station 6 wells. As explained, the City failed to prove that any "spill" at an ExxonMobil-branded station caused its injury.  In addition, the City introduced no direct evidence that any of the other service stations in Terry's putative capture zone (or anywhere in Queens) were supplied by ExxonMobil.  Having no direct evidence that ExxonMobil supplied relevant stations at relevant times, the City offered testimony about ExxonMobil's "wholesale" market share, based on data reported on Energy Information Agency ("EIA") 782C forms, as circumstantial evidence that gasoline ExxonMobil supplied in New York State was discharged from service stations within Station 6's

hypothetical, future capture zone. ExxonMobil reiterates its objection to the Court's ruling that EIA 782C "prime supplier" data may be used as circumstantial evidence for proving traditional causation because it inappropriately allowed the City to substitute market share liability for actual causation.[6] *See In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 62649, at *18 (S.D.N.Y. July 21, 2009); 9/21/09 Tr. 5340:4-5341:18. Given that New York law severely limits the application of market share liability – and the fact that the City disclaimed reliance on market share – the jury could not premise a finding of causation on market share evidence and the Court should not have admitted the evidence. *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 241-42 (N.Y. 2001).

Even if market share evidence could be used to prove actual causation, the City's evidence of ExxonMobil's state-wide, wholesale market share is far too attenuated to establish that a release of gasoline at any site in Queens contained ExxonMobil-manufactured or supplied product. *See Transnor Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1483 (S.D.N.Y. 1990) (a jury may rely on circumstantial evidence when such evidence "permits a rational inference" from one fact to another). The City's expert, Martin Tallett, admitted that EIA 782C data tells us nothing about who actually manufactured the gasoline, and that such data was reported on a state-wide (*i.e.*, all of New York) basis. (9/14/09 Tr. 4307:9-4308:13.) Even accepting Tallett's opinion that ExxonMobil "wholesaled" about 25% of the gasoline that was supplied somewhere in New York State (9/14/09 Tr. 4281:8-11), a reasonable jury could not have inferred that this fact makes it more likely than not that gasoline spilled at any time in Queens was supplied by ExxonMobil. "[T]he established rule [is] that a plaintiff must offer evidence that causation was

---

[6] *See* Exxon Mobil Corporation's Motion To Exclude Testimony And Opinion Of Martin Tallett (5/13/09); September 20, 2009, Letter from J. Pardo to Court (10/1/09 Pardo Decl. Exh. E).

- 9 -

more than 50 percent probable," not merely 25 percent likely. *See In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1262 (E.D.N.Y 1985). "[W]hile inferences of negligence may be drawn from circumstantial evidence, those inferences must be the only ones which reasonably could be drawn from the evidence presented. ... '[A] possibility of causation will not suffice to impress liability upon a defendant.'" *Mehra v. Bentz*, 529 F.2d 1137, 1139 (2d Cir. 1975). Tallett's opinion did not even make it *equally* probable that ExxonMobil manufactured or supplied the gasoline alleged to have caused the City's injury here. In fact, if any inference could be drawn from Tallett's opinion, it is that ExxonMobil, more likely than not, *did not* supply the gasoline, as there is a 75% chance that ExxonMobil-supplied product was not present.

### D.   The Court Should Not Have Admitted Evidence Or Instructed The Jury On The "Commingled Product" Theory.

The only way that the jury could conclude from the City's evidence that ExxonMobil supplied or manufactured gasoline containing MTBE that will impact the Station 6 wells in the future would be if it assumed that ExxonMobil's product was so commingled with that of other refiners and suppliers that it was, essentially, present in every gallon of gasoline at every release site. Such an assumption was not supported by the evidence, but would be understandable given the extensive impermissible testimony and erroneous instructions that the jury heard about the commingled product theory – a theory that has no basis in New York law.[7] Even though the jury

---

[7] ExxonMobil hereby incorporates by reference the arguments made in Certain Defendants' Motion To Certify The Court's May 13, 2008 Opinion And Order For Interlocutory Appeal, filed on May 29, 2008, related to *County of Suffolk v. Amerada Hess Corp.*, 04 Civ. 05424, and all associated memoranda and replies; Defendant's Motion In Limine Regarding Application Of The Commingled Product Theory, Consideration Of Fault Of Nonparties By Jury, And Proof Of Date Of Harm, filed April 27, 2009, and all associated memoranda and replies; Letter-Brief from P. Sacripanti to the Court (June 4, 2009); Letter-Brief from P. Sacripanti to the Court (June 22, 2009); Letter-Brief from J. Pardo to the Court (September 20, 2009) (attached to 10/1/09 Pardo Decl. as Exs. C-E).

did not render a verdict on the commingled product theory – ostensibly finding liability under a "traditional" causation theory – the erroneous commingled product theory so permeated the trial as to make it impossible for the jury to comprehend traditional causation. Because the erroneous admission of extensive evidence about the commingled product theory, as well as the jury charge, influenced the jury to reach a seriously erroneous verdict on traditional causation, a new trial should be granted. *See Montgomery Ward*, 311 U.S. at 251; *Caruolo*, 226 F.3d at 54; *Cataldo v. Brunswick Corp.*, 68 F.R.D. 600, 601 (S.D.N.Y. 1975); *cf. Norfleet v. Isthmian Lines, Inc.*, 355 F.2d 359, 362-63 (2d Cir. 1966) (jury instructions must "show no tendency to confuse or mislead the jury as to principles of law which are applicable").

In creating the "commingled product" theory and allowing its application in this case, the Court impermissibly relieved the City of its burden to identify the defendant who caused its harm. *See Hymowitz*, 73 N.Y.2d at 504. The commingled product theory of "alternative" liability departs from New York law in at least three significant ways: (1) by establishing a presumption that the MTBE detected in a plaintiff's wells is the commingled product of every refiner whose gasoline was shipped in the distribution systems that ultimately supply New York (and many other locales), even without evidence that a specific refiner's gasoline actually reached New York Harbor or the capture zone of the wells in question at a relevant time; (2) by permitting the City to pursue a theory of alternative causation even if it could otherwise identify responsible parties who could provide complete relief, *see In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 371 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.*, 447 F. Supp. 2d 289, 304-05 (S.D.N.Y. 2006); and (3) by allowing a refiner to be held liable without a showing that its (possibly very small) contribution to the alleged contamination made it a substantial cause of the injury, *see Mortensen v. Mem'l Hosp.*, 483 N.Y.S.2d 264, 269 (N.Y. App. Div. 1984). It was

inappropriate for the Court to allow evidence and to instruct the jury on the commingled product theory because New York courts have only rarely departed from traditional causation, doing so only in cases involving "personal injury liability." *Hymowitz*, 73 N.Y.2d at 505. There is no precedent in New York for the development of new rules to adjust causation burdens in property damage cases.

### E.   The City Did Not Prove That A "Failure To Warn" Was A Cause Of Its Injury.

A failure to warn claimant must prove that (1) a manufacturer had a duty to warn (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that the failure to do so was the proximate cause of the harm. *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 84 (S.D.N.Y. 2001). "To constitute proximate cause, an inadequate warning must be a *substantial cause* of the events leading to the injury." *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 370 (S.D.N.Y. 2003) (emphasis in original). "An act cannot be the 'substantial cause' if the injury would have occurred regardless of the content of defendant's warning." *Id.* The City introduced no evidence to prove that an omitted or better warning from ExxonMobil about MTBE would have prevented its injury. No evidence established that anyone who might have received a "warning" about MTBE would have done anything differently to prevent a gasoline release or cause a more rapid cleanup. No gasoline distributor, service station operator, or City employee testified that they would have taken extra precautions, or done anything differently, had ExxonMobil warned them.

Furthermore, the evidence proved that any additional or different warning would have been inconsequential. First, the jury found that there was not "a safer, feasible alternative design at the time ExxonMobil's gasoline containing MTBE was marketed." (10/19/09 Tr. 7043:15-19.) Second, the release of any gasoline to the environment, with or without MTBE, is illegal in

- 12 -

New York State, so distributors and retailers already understood that gasoline should not be released. (9/03/09 Tr. 3426:1-5 (Moreau); *id.* at 3495:19-3496:6 (Roman).) The City's own expert, Marcel Moreau, admitted that the state law prohibition against spilling petroleum was "very direct," and he could not testify to what additional or different warning refiners like ExxonMobil should have given. (9/3/09 Tr. 3426:1-5.) Third, ExxonMobil did provide warnings to gasoline distributors and retailers that no gasoline, with or without MTBE, should be released into the environment. (*Id.* at 3498:15-22, 3515:1-11 (Roman).) Fourth, it is common knowledge that all gasoline must be handled carefully, and that no gasoline should be allowed to leak into the environment. (9/08/09 Tr. 3742:14-3743:1 (Dugan); 9/02/09 Tr. 3318:22–25 (Moreau).) Yet, releases of gasoline containing MTBE occurred from locations in Queens that were not within ExxonMobil's control. Because there was a complete lack of evidence supporting the jury's finding that ExxonMobil's purported failure to provide sufficient warnings was a substantial factor in causing the City's alleged injury, the verdict could "only [have been] the result of sheer surmise and conjecture." *See Davis v. City of New York*, 228 F. Supp. 2d 327, 330 (S.D.N.Y. 2002).

## III.   THE CITY FAILED TO PROVE A LEGALLY COGNIZABLE INJURY, AND THE COURT'S INSTRUCTIONS ON "INJURY" WERE ERRONEOUS.

### A.   The City's Asserted Injury Is Not Justiciable.

Article III demands, as an essential component of the "proper – and properly limited – role of the courts in a democratic society," that federal courts not become entangled in abstract disagreements about contingent future events. *Allen v. Wright*, 468 U.S. 737, 750, 752 (1984). A plaintiff lacks standing absent an injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And a suit is not ripe if it "turns on whether there are nebulous future events so contingent in nature that there is no

- 13 -

certainty they will ever occur." *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146

(2d Cir. 1993).[8] Here, the City's theory of liability could hardly have been more attenuated and,

thus, failed to meet the requirements of Article III.

   The City asserts that it has a "good faith intention" to begin constructing a treatment plant

at some unknown point in the next 15 years to ameliorate predicted future MTBE detections in

the Station 6 wells; that if it begins construction, the plant will be completed within 5 years; that

if it constructs the plant, it might (or might not) use the Station 6 wells as a back-up supply; that

if it ever actually uses Station 6, the wells might draw in MTBE from otherwise remote spills,

and thus might increase MTBE levels to a maximum of 10 ppb; that if it ever uses Station 6 and

its MTBE levels increase, the treatment of that water to reduce PCE will not materially reduce

MTBE levels; that if the City ever serves water with such low levels of MTBE, some City

residents might complain about the water's taste or odor – even though the City has never

received such a complaint when it has served water with similarly low MTBE concentrations in

the past; and that, to avoid these future taste or odor complaints that it may never receive, the

Station 6 treatment plant must be more robust. The City's "good faith intention" to act within 15

years to set into motion a series of highly contingent events is far too tenuous and remote to

satisfy Article III. Any such harm that might occur is neither "imminent" nor "ripe" if those

words are to have any meaning at all. But if the concept of an "injury" can encompass the City's

mere "good faith intention" to use Station 6 water while knowing of the possibility of needing to

treat low-level MTBE detections, then that "injury" must also be sufficient to trigger the statute

---

[8] ExxonMobil acknowledges that the Court decided that the City's Station 6 claim was ripe and
that the City had standing to assert it. *In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009
U.S. Dist. LEXIS 59287 (S.D.N.Y. July 6, 2009).

of limitations.  And because the City has presumably had such a "good faith intention" plus

knowledge since at least 1999, this suit should be dismissed as time barred.  In short, the City's

theory of "injury" is untenably elastic – but, if "injury" is going to be stretched so far as to

encompass the City's claims, then it stretches all the way back to 1999.

**B.**    **The City's "Injury" Is Not Cognizable Under New York Law.**

Under New York law, proof of actual injury is required for all of Plaintiffs' claims.  *See*

*Barrett v. Black & Decker Inc.*, No. 06 Civ. 1970, 2008 U.S. Dist. LEXIS 108787, at *23-*24

(S.D.N.Y. Aug. 5, 2008) (design defect, failure to warn); *Tornheim v. Fed. Home Loan Mtge.*

*Corp.*, 988 F. Supp. 279, 282 (S.D.N.Y. 1997) (trespass)[9]; *Akins v. Glens Falls City Sch. Dist.*,

424 N.E.2d 531, 535 (N.Y. 1981) (negligence); *Copart Indus. v. Consol. Edison Co.*, 362 N.E.2d

968, 971-72 (N.Y. 1977) (nuisance).  The City's only legally protected interest is a usufructuary

right to appropriate water – in this case, via the Station 6 wells.  *In re MTBE*, 2009 U.S. Dist.

LEXIS 59287, at *19; *see also Westphal v. New York*, 78 N.Y.S. 56, 75 A.D. 252, 256 (N.Y.

App. Div. 1902) (plaintiff "has the right to use the water, but he has no property in the water as

such").  Because the City has *never used* the Station 6 wells, it cannot already have suffered any

injury to its usufructuary rights as a matter of law.[10]  *See Hellert v. Town of Hamburg*, 857

N.Y.S.2d 825, 828 (N.Y. App. Div. 2008) (summary judgment granted because plaintiffs had not

used contaminated water "for drinking purposes or, indeed, for any other purpose.")

---

[9] ExxonMobil respectfully objects to the Court's previous ruling that "damage is not part of a
trespass claim." *In re MTBE*, 2009 U.S. Dist. LEXIS 59287, at *31.  ExxonMobil incorporates
by reference the argument made in its Reply Memorandum Of Law In Support Of Defendants'
Motion In Limine To Preclude Evidence And Argument Regarding Plaintiff's Past And Future
Investigation And Treatment Costs Until It Proves Actual Injury, at 3-4 (6/2/2009) (10/1/09
Pardo Decl. Exh. B).

[10] ExxonMobil respectfully objects to the Court's prior ruling that the City already has been
injured by virtue of past MTBE detections in Well 6D at levels above the MCL (*In re MTBE*,
2009 U.S. Dist. LEXIS 78081, at *17 n.30).

Thus, the Court erred in instructing the jury to decide in Phase 1 "whether the City has proven by a preponderance of the evidence that it intends in good faith to begin construction of the Station 6 facility within the next 15 years" (8/10/09 Tr. 915:7-10), and, if yes, "whether the City has proven by a preponderance of the evidence that it intends in good faith to use the water from the Station 6 wells within the next 15 to 20 years." (*Id.* at 917:3-6.) The instructions and questions posed to the jury were based on the Court's erroneous ruling that, to establish a right to recover, the City need not prove that it will actually *use* the Station 6 wells, but rather that it *intends* in good faith to use them. *See In re MTBE*, 2009 U.S. Dist. LEXIS 59287, at *34-*35.[11] Under New York law, a plaintiff has no legal right to recover for an "injury" to groundwater that it merely *intends*, even in good faith, to use; rather, the plaintiff must *actually use* the water. *E.g., Hellert*, 857 N.Y.S.2d at 828.

Moreover, because the City's alleged injury is a future (and highly contingent) one, the Court erred in instructing the jury that the City had to prove its claims only by a preponderance of the evidence.[12] "New York has required a *high degree of probability* that a future injury will occur before allowing a plaintiff to recover damages for the potential injury." *Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 281 (S.D.N.Y. 2008) (emphasis added); *see also Schultz v. Harrison Radiator Div. Gen. Motors Corp.*, 660 N.Y.S.2d 685, 689 (N.Y. 1997). Even where a plaintiff seeks to recover for the "apprehended future consequences" of an *existing* injury, "there must be such a degree of probability of their occurring, as amounts to a reasonable certainty." *Caudle*, 580 F. Supp. 2d at 281; *see also In re MTBE*, 2009 U.S. Dist. LEXIS 59287,

---

[11] ExxonMobil acknowledges and respectfully objects to the Court's ruling and to the Phase 1 jury charge and verdict questions. (*See* 8/7/09 Tr. 852:15-853:6.)

[12] ExxonMobil respectfully objects to the Court's prior rulings that the appropriate standard of proof is preponderance of the evidence. *In re MTBE*, 2009 U.S. Dist. LEXIS 78081, at *15-*18; *In re MTBE*, 2009 U.S. Dist. LEXIS 59287, at *32; 8/7/09 Tr. 852:1-4; 9/21/09 Tr. 5348:17-22.

at *22. This standard "is understood as involving a quantum of proof that is greater than a preponderance of evidence but less than proof beyond a reasonable doubt." *Kihl v. Pfeffer*, 848 N.Y.S.2d 200, 207 (N.Y. App. Div. 2007). It has been interpreted "as akin to the clear and convincing evidence standard." *Id.*; *see also Firmes v. Chase Manhattan Auto. Fin. Corp.*, 852 N.Y.S.2d 148, 160 (N.Y. App. Div. 2008); *Ruby v. Budget Rent A Car Corp.*, 806 N.Y.S.2d 12, 13 (N.Y. App. Div. 2005); *Sternfeld v. Forcier*, 679 N.Y.S.2d 219, 220 (N.Y. App. Div. 1998). Thus, the Court should have instructed the jury that the City was required to prove each element of its claims by clear and convincing evidence.

### C.   The City Failed To Prove That MTBE Will Be Present In The Station 6 Wells At Any Level, Such That It Needs A Prophylactic Treatment System.

The Court has ruled that a public water provider may be injured by the presence of MTBE in groundwater if the water provider "took, or should have taken, steps to investigate, clean up, abate and/or remediate the alleged contamination." *In re MTBE*, 2009 U.S. Dist. LEXIS 59287, at *20. Yet, the City failed to prove that MTBE will be present in the Station 6 water at *any* level – much less a level that should be treated. In addition, even if there was adequate evidentiary support for the jury's finding that MTBE will peak at a concentration of 10 ppb (and there was not), that finding – *i.e.*, MTBE levels that will never exceed the MCL – establishes that the City cannot be injured as a matter of law.

The City's only evidence about the concentration levels and timing of future MTBE impacts to the Station 6 wells was the unfounded and speculative testimony of its expert, David Terry, who testified that, according to his computer modeling, MTBE levels at Station 6 will reach a peak concentration of 35 ppb in the year 2024. (8/18/09 Tr. 1895:7-16.) However, his assumptions for this prediction had no foundation in the facts. For example, Terry assumed that the Station 6 wells would be activated in the year 2016 and, thereafter, would continuously pump

10 million gallons per day, 365 days per year, for 24 years. (8/18/09 Tr. 1899:9-11; 8/19/09 Tr. 2155:11-16; 8/20/09 Tr. 2206:12-15.) This assumption was not supported by the evidence, and was contradicted by the jury's finding that the Station 6 wells would be used (if at all) only a back-up source. (*See* 8/12/09 Tr. 1049:14-1050:1.) The evidence was that 2020 would be the earliest that Station 6 could begin operation. (8/6/09 Tr. 706:18-23 (Lawitts); 8/5/09 Tr. 439:8-15 (Garcia).) Moreover, the evidence indicated that the absolute *longest* that Station 6 might operate continuously would be about four years while the Rondout-West Branch tunnel is out of service for repairs. (8/6/09 Tr. 701:9-15 (Lawitts).) But because Terry's model did not simulate any scenario in which the Station 6 wells operate only as a back-up source – or for any period of time less than 24 years – Terry had to admit that he was unable to predict the levels of MTBE that might be present in the Station 6 wells if and when they are operated as a back-up source. (8/20/09 Tr. 2211:22-2212:19.)

In addition, in building his "Analysis 1" transport model – which was intended to predict the peak MTBE concentration in the future – Terry input only the *highest* concentrations of MTBE ever detected at release sites and in other wells in the year 2004. (8/19/09 Tr. 2020:23-2021:16.) Such values are not representative of actual MTBE concentrations because Terry failed to account for reams of other available data showing substantially *lower* concentrations at those sites in 2004 and in more recent years. Worse, Terry's "Analysis 2" transport model – which was intended to predict the duration of future MTBE concentrations – relied entirely on fictional values to represent the volume of gasoline released at 22 sites. Specifically, Terry arbitrarily assumed that the volume of gasoline released was 50, 500 or 2000 gallons. (8/19/09 Tr. 2074:6-20.) Furthermore, his Analysis 2 relied on the flawed assumption that releases occurred on the date when a "spill event" was reported to NYSDEC, even though Terry admitted

- 18 -

that the actual release dates were likely earlier.  (8/19/09 Tr. 2082:8-25, 2136:23-2137:4.)

Given these multiple flawed assumptions, the models' outputs and Terry's opinions have no credibility.  Indeed, the jury must have concluded that Terry's models were unreliable because it did not accept his conclusion that future MTBE concentrations at Station 6 would peak at 35 ppb in 2024.  Rather, in its Phase 2 verdict, the jury determined that the MTBE concentration will peak at 10 ppb in the year 2033.  In so finding, the jury ignored the only evidence quantifying the concentration and timing of MTBE impacts – unreliable though it was – and substituted sheer speculation in its place.

D.    **The Jury's Finding That MTBE Levels Will Not Exceed The Maximum Contaminant Level Is Dispositive Of The "Injury" Issue.**

Even if there was evidentiary support for the jury's Phase 2 finding, its determination that MTBE levels will peak at 10 ppb entitles ExxonMobil to judgment as a matter of law.  The Court has held that whether the presence of MTBE in groundwater at or below the MCL is a legally cognizable injury is a question of fact for the jury.  *In re MTBE Prods. Liab. Litig.*, 458 F. Supp. 2d 149, 159 (S.D.N.Y. 2006).  ExxonMobil objects to that ruling because MTBE levels at or below the MCL do not impair the City's usufructuary right.[13]  Water containing MTBE at or below 10 ppb is deemed potable as a matter of New York law and, in fact, the City admits that it serves such water to its customers. Any contrary conclusion would violate separation of powers principles by interfering with legislative and regulatory determinations that water containing MTBE up to 10 ppb is permissible and safe.  Moreover, the City failed to prove that it is or will be injured by MTBE concentrations at or below the MCL because it did not establish that it

---

[13] ExxonMobil incorporates by reference the arguments made in Defendants' Motion For Summary Judgment On All Claims For Lack Of Justiciability (1/23/2006) (10/1/09 Pardo Decl. Ex. A).

would receive taste or odor complaints or incur increased sampling costs. *See In re MTBE*, 458 F. Supp. 2d at 159-60. For example:

- The City employee responsible for water quality (Mr. Schindler) admitted that despite serving water containing MTBE (9/1/09 Tr. 2991:12-17), the City *never* has had a taste or odor complaint it can attribute to MTBE and *never* has had to increase sampling frequency because of MTBE. (8/31/09 Tr. 2982:4-23.)

- The City's taste and odor expert (Dr. Lawless) admitted he could not opine about the ability of City residents to smell or taste MTBE in their water at any level in the future. (8/31/09 Tr. 2920:15-20.)

- The City's rebuttal toxicology expert (Mr. Rudo) testified that, based on his experience investigating "several thousand" incidents of MTBE in wells, "it's pretty difficult to detect [by taste or odor] under 50 parts per billion." (9/2/09 Tr. 3280:2-25.)

Most importantly, Schindler admitted that water containing up to 10 ppb MTBE was "safe to drink" and would be reported to customers as "safe to drink" by the City. (8/31/09 Tr. 3017:16-24.) Thus, the jury having concluded that MTBE will peak at 10 ppb more than two decades from now, the only reasonable conclusion for it to reach was that the City has not suffered any injury because of MTBE, and will not suffer any such injury in the future.

### E.     The City Failed To Prove An Imminent Future Injury.

Because the City is not using, and has never used, its Station 6 wells, any injury to the City's usufructuary interest must arise, if at all, by virtue of a putative threat that MTBE poses to that interest today. But as the Court previously ruled, threat of injury may satisfy the actual-injury element only if a plaintiff proves that the threat is imminent and certainly impending. *In re MTBE*, 175 F. Supp. 2d at 607, 610; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1993); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). The City has not proven an imminent, certainly impending threat of injury. Even accepting the jury's Phase 1 and 2 findings, the jury found only that the City has a good-faith intent to build a treatment system at Station 6 in the next 15-20 years and, assuming it ever builds and uses the Station 6 wells as a

back-up water source, that MTBE may peak at a level of 10 ppb 23 years from now.  (8/12/09 Tr.

1049:14-1050:1; 8/26/09 Tr. 2711:4-15.)  As a matter of law, speculative events that may occur,

if at all, 15-20 years in the future are not sufficiently "imminent and certainly impending" to

support a threat claim.  *See e.g., Knaust v. City of Kingston*, 193 F. Supp. 2d 536, 543 (N.D.N.Y.

2002) (threat of water contamination not imminent when no impact had occurred in five years);

*Plainview Water Dist. v. Exxon Mobil Corp.*, 2008 N.Y. Slip. Op. 501520U, at *25 (N.Y. Sup.

Ct. 2008) (threat not imminent where MTBE impact had not occurred in six years of litigation),

*aff'd*, 66 A.D.3d 754 (2d Dep't 2009).

     Moreover, the City failed to prove even a good-faith intent to begin the construction of

Station 6 within the next 15 years.  Rather, the City's own planning documents show that, for

years, the City's construction budget has had more than enough money to build Station 6, yet the

project repeatedly has been pushed into the future.  (8/7/09 Tr. 818:22-821:2 (Paolicelli); 8/5/09

Tr. 482:5-483:18 (Garcia).)  The evidence also proved that the City would not build Station 6

unless and until the Westside Corporation PCE plume was contained – which the City admits has

yet to occur.  (8/7/09 Tr. 775:3-776:6, 781:19-785:6 (Cohen).)  In short: to this day, the City

cannot state when, if ever, it will build the Station 6 treatment facility.

## IV.   THE CITY FAILED TO PROVE ITS LATE-ADDED NEGLIGENCE CLAIM.

### A.   The Court Erred In Permitting The City To Change Its Theory Of Negligence Mid-Trial.

     The Court erred in allowing the City, over ExxonMobil's objection, to assert a theory of

negligence based on ExxonMobil's ownership or operation of service stations, which it first

alleged a mere week before the Phase 3 opening statements.  (*See* 8/19/09 Tr. 2197:2-5.)  In all

five versions of the City's complaint, its negligence claim related only to ExxonMobil's conduct

in manufacturing and supplying an allegedly defective product.  There was no reason for the City

- 21 -

not to have asserted its new theory of negligence long before trial. *See Classicberry Ltd. &*

*Black Crowes P'ship., v. Musicmaker.com, Inc.*, No. 02-7054, 2002 U.S. App. LEXIS 21619, at

\*5 (2d Cir. Oct. 15, 2002). ExxonMobil was gravely prejudiced by the Court's decision to allow

the claim because, by the time it was added, ExxonMobil had no opportunity to prepare station-

specific witnesses or evidence. *See Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d

1011, 1017-18 (2d Cir. 1989); *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672,

680 (2d Cir. 1985). Thus, the Court's decision to allow the never-pled negligence claim was an

error of law that warrants a new trial. *See United States ex rel. Evergreen Pipeline Constr. Corp.*

*v. Merritt-Meridian Constr. Corp.*, 890 F. Supp. 1213, 1223 (S.D.N.Y. 1995).

### B.   The City Failed To Prove ExxonMobil Was Negligent.

To succeed on its late-added negligence claim the City had to prove that ExxonMobil's

negligence in the ownership or operation of certain service stations was a substantial factor in

causing its injury. *In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 249, 266 (S.D.N.Y. 2008).

The City did not come close to satisfying its burden. The City failed to put on any evidence

about ExxonMobil's conduct, or even any dealer's conduct, at any of these stations, nor how

such unidentified conduct breached any "duty" to the City or was a substantial factor in causing

the City's alleged injury. The City's only "proof" of negligence was circumstantial evidence that

releases of gasoline occurred, or may have occurred, at "ExxonMobil" branded stations in the

vicinity of Station 6. The City's argument was, essentially, a *res ipsa loquitor* argument – *i.e.*,

because gasoline allegedly was released at those station sites some "negligence" must have

occurred. However, for *res ipsa loquitor* to apply "(1) the event must be of a kind which

ordinarily does not occur in the absence of someone's negligence; [and] (2) it must be caused by

an agency or instrumentality within the exclusive control of the defendant ...." *Morejon v. Rais*

*Constr. Co.*, 851 N.E.2d 1143, 1147 (N.Y. 2006) (quoting *Corcoran v. Banner Super Market*,

227 N.E.2d 304, 305 (N.Y. 1967)).  Here, the City's own expert, Mr. Moreau, testified that

gasoline spills happen *without any negligence ever occurring*.  (8/12/09 Tr. 1114:25-1115:16

(Moreau).)  Furthermore, ExxonMobil did not have exclusive control over the gasoline alleged to

have caused the City's harm because all but one of the "ExxonMobil" branded stations at issue

were, at all relevant times, operated by independent dealers.  In light of Moreau's testimony –

and absent proof of any failure of care by ExxonMobil – it was not reasonable for the jury to

infer that ExxonMobil was negligent.

## V.   THE CITY FAILED TO PROVE PUBLIC NUISANCE.

To recover for public nuisance, the City had to prove by *clear and convincing evidence*

that future MTBE contamination at Station 6 will "offend, interfere with or cause damage to the

public in the exercise of rights common to all ... in a manner such as to offend public morals, ...

or endanger or injure the property, health, safety or comfort of a considerable number of

persons."  *See Copart*, 362 N.E.2d at 970-71; *DeStefano v. Emergency Hous. Group, Inc.*, 281

A.D.2d 449, 450 (N.Y. App. Div. 2001).  Moreover, "the annoyance, discomfort or interference

experienced by a considerable number of persons must be substantial."  *New York v. Fermenta

ASC Corp.*, 630 N.Y.S.2d 884, 890 (N.Y. Sup. Ct. 1995).  The presence of regulated chemicals

in groundwater, even at concentrations above applicable MCLs, does not constitute a public

nuisance unless the contamination has caused actual harm to humans or is reasonably certain to

cause such harm imminently.  *Id.* at 890-91.

Just as the City failed to prove that the presence of MTBE will interfere with its

usufructuary right to appropriate water via the Station 6 wells in the future, the City also failed to

prove that the presence of MTBE substantially interferes with the public's health, safety or

comfort with respect to its potential use of that water.  Nor can it.  The jury found in Phase 2 that

any future MTBE at Station 6 will *not* exceed the New York State MCL of 10 ppb.  Therefore,

even accepting the jury's determination that these low levels of MTBE constitute an "injury" to the City's usufructuary rights, it was unreasonable for the jury to find that such "injury" substantially endangers the property, health, safety or comfort of a considerable number of persons. In addition, the jury's verdict for the City on its public nuisance claim is inconsistent with its verdict for ExxonMobil on the claim of private nuisance, which requires the lesser, preponderance of the evidence, standard of proof. *See id.* at 892. And, for the same reasons that the City failed to prove direct spiller causation, it also failed to prove that ExxonMobil had control over the product, as required to impose public nuisance liability. *See People v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 95 (N.Y. App. Div. 2003); *State v. Lead Indus. Ass'n*, 951 A.2d 428, 446 (R.I. 2008); *In re Lead Paint Cases*, 191 N.J. 405, 429 (N.J. 2007).

## VI.   THE CITY FAILED TO PROVE TRESPASS.

The City failed to prove, and the Court improperly instructed the jury on, the intent required for trespass under New York law. The City was required to prove that ExxonMobil (1) "intend[ed] the act which amounts to or produces the unlawful invasion [of property]," and (2) the intrusion was "the immediate or inevitable consequence" of its willful act. *Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331 (N.Y. 1954). Put another way, the City had to prove that ExxonMobil's actions were "substantial[ly] certain[]" to result in MTBE contamination of the Station 6 property. *Id.*; *see also* N.Y. Pattern Jury Instruction 3:8. In a case involving contamination of a plaintiff's land, "even when the polluting material has been deliberately put onto, or into, defendant's land, he is not liable for his neighbor's damage therefrom, unless he (defendant) had good reason to know or expect that subterranean and other conditions were such that there would be *passage from defendant's to plaintiff's land* ...." *Phillips*, 307 N.Y. at 331 (emphasis added); *see also Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996); *Snyder v. Jessie*, 565 N.Y.S.2d 924, 929 (N.Y. App. Div. 1990). The intrusion onto plaintiff's land must be "the *immediate or*

*inevitable consequence* of what [the trespasser] willfully does." *Scribner*, 84 F.3d at 557 (emphasis added).

The Court failed to instruct that ExxonMobil could be found liable for trespass only if it intentionally committed some act with knowledge that its act would immediately or inevitably cause MTBE to enter the City's Station 6 property.[14] Given the specific intent required under New York law, a defendant who merely supplies a product to a market with knowledge that it may spill somewhere and may reach someone's property cannot be held liable to a particular plaintiff for trespassing on his property. Even if, in finding ExxonMobil liable for trespass, the jury considered only ExxonMobil's conduct as a "direct spiller" (as opposed to its conduct as a refiner or supplier), the trespass charge failed to inform the jury that it could find ExxonMobil liable only if it found that ExxonMobil knew or should have known that MTBE would travel from the specific "Mobil" spill sites to the Station 6 property. *See Phillips*, 307 N.Y. at 332; *see also Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, No. 99 Civ. 0275, 2004 U.S. Dist. LEXIS 15864 (S.D.N.Y. Aug. 12, 2004); *Leone v. Leewood Serv. Station Inc.*, 624 N.Y.S.2d 610, 612 (N.Y. App. Div. 1995). The failure to so instruct the jury was prejudicial to ExxonMobil because the City introduced no evidence that ExxonMobil knew or should have known that MTBE released at any site in the vicinity of Station 6 would immediately or inevitably reach the Station 6 property.

---

[14] ExxonMobil acknowledges and respectfully objects to the Court's rulings rejecting ExxonMobil's arguments that the City had to prove that ExxonMobil knew or should have known that its actions would result in MTBE entering the Station 6 property, and that, given the intent required under New York law of trespass, the City's trespass claim can only be based on ExxonMobil's conduct as an alleged spiller at specific service stations in the vicinity of Station 6, not its manufacture and supply of gasoline containing MTBE. (9/22/09 Tr. 5552:8-5566:15.)

The City offered only generalized proof that, at the time ExxonMobil was manufacturing and selling gasoline containing MTBE (*i.e.*, approximately 1985 – 2003), ExxonMobil knew that underground storage tanks could leak and, therefore, knew (or should have known) that groundwater *somewhere* may become impacted by MTBE. But even if such generalized proof were true, it did not prove the intent required under New York law to support trespass. It defies logic to even suggest that simply by making and distributing gasoline in the 1985-2003 timeframe ExxonMobil knew (or should have known) that MTBE in that gasoline would trespass on the Station 6 property years and decades in the future. Notably, the Court already seems to have reached this very conclusion. In its October 19, 2009, opinion on punitive damages the Court, "draw[ing] all reasonable inferences in the City's favor," found that "there is no indication that … ExxonMobil was aware of precisely how the MTBE concentrations that it had detected would *affect groundwater at a distance from the spill site* after the MTBE had dissolved and dissipated into a very large volume of groundwater." *In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 3417, 2009 U.S. Dist. LEXIS 96469 at *3, *8 (S.D.N.Y. Oct. 19, 2009) (emphasis added). That conclusion remains exactly right. The City's failure to introduce evidence of the specific intent required for its trespass claim requires that judgment be entered for ExxonMobil on this claim or, at a minimum, a new trial granted.

The Court's trespass instruction also failed to inform the jury that trespass requires an invasion of real property. Trespass is an intentional "invasion of a person's interest in the exclusive possession of land." *Copart*, 362 N.E.2d at 972; *see also Scribner*, 84 F.3d at 557. Trespass, therefore, requires interference with *possession – i.e.,* dispossession – rather than a mere interference with use or enjoyment. *Copart*, 362 N.E.2d at 972; *see also* W. PAGE KEETON ET AL., PROSSER & KEETON ON TORTS § 13, at 70 (5th ed. 1984). Accordingly, contamination of

groundwater not actually present on a plaintiff's real property cannot constitute a trespass because no one "can acquire anything more than a mere usufructuary right" in groundwater. *Sweet v. Syracuse*, 129 N.Y. 316, 335 (1891). The Court failed to instruct the jury on this crucial aspect of the City's interest because it told the jury that it could find ExxonMobil liable for trespass if its "conduct caused any MTBE to enter the *groundwater in the capture zone* of the Station 6 wells." (10/7/09 Tr. 6619:7-11 (emphasis added); *see also* 9/22/09 Tr. 5556:8-5557:7 (ExxonMobil's objection to instruction).) This instruction misled the jury about the appropriate legal standard because it incorrectly presumed that the City holds a right to exclusive possession of the water within the (theoretical, future) capture zone of Station 6. This instruction was particularly misleading in light of the evidence presented through the City's expert, David Terry, that the "capture zone" of the Station 6 wells will extend for miles in any direction from the wells, far beyond the City's real property. (*See* 8/18/09 Tr. 1907:4-18, 1909:1-1910:2, 1911:6-1912:22 (Terry); *see also* Declaration of Lauren Handel ("Handel Decl.") Ex. A, Pl.'s Ex. 14844; Handel Decl. Ex. B, Pl.'s Ex. 14845.)

The Court also erred in instructing the jury that it could find ExxonMobil liable for trespass even if it found that the City failed to prove that it was or will be injured. (*See* 10/7/09 Tr. 6642:22-6643:9.) Trespass by "invisible particles," such as MTBE, requires "proof of substantial damage." *In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 298, 314 (S.D.N.Y. 2006).

## VII.   THE COURT ERRED IN NOT DECLARING A MISTRIAL.

ExxonMobil is entitled to a new trial due to the Court's errors in (1) not declaring a mistrial as a result of jurors' serious misconduct; and (2) improperly dismissing a holdout juror.

### A.   Several Jurors' Outside Research Warrants A Mistrial.

The Court erred in not declaring a mistrial due to jurors' outside research. "It is well-settled that any extra-record information of which a juror becomes aware is presumed

prejudicial." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2000); *see also Manley v. AmBase Corp.*, 337 F.3d 237, 252 (2d Cir. 2003); *Cocconi v. Pierre Hotel*, 146 F. Supp. 2d 427, 430 n.2 (S.D.N.Y. 2001). Exposure of jurors to materials not admitted into evidence mandates a new trial if there is "a 'reasonable possibility' that it could have affected the verdict." *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986); *see also Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F. Supp. 2d 514, 516-17 (S.D.N.Y. 2005); *cf. Moore v. Amer. Family Mut. Ins. Co.*, 576 F.3d 781, 787 (8th Cir. 2009) (denying mistrial where juror admitted to performing internet research on defendant's earnings but was "immediately removed from the jury room" and "repeatedly assured the court that he had not shared that information with the other jurors").

On October 11, 2009, ExxonMobil moved for a mistrial on the basis that the jury could no longer render a verdict free from improper outside influences due to outside research conducted by several jurors. (*See* Handel Decl. Ex. C, Oct. 11, 2009, Letter from P. Sacripanti to Court.) That motion was based in large part on the admission by Juror 8 that he had conducted internet research leading him to substantive, material information about the case – *e.g.*, the Court's prior decision on the commingled product theory; Mr. Sher's role in "start[ing] this whole commingling thing"; and that all of the other defendants had settled for about $1 million each – and the fact that Juror 8 shared the information he learned from his outside research with several other jurors.[15] (*See* 10/9/09 Tr. 6764:6-8, 6797:6-18, 6808:4-8, 6813:18-6815:16, 6823:3-9, 6829:4-14.) Despite the jury's stated belief that it could continue deliberating

---

[15] In addition, Jurors 4 and 6 admitted to doing their own improper outside research. (10/9/09 Tr. 6777:9-18, 6795:25-6796:14.) These instances of misconduct were not explored as extensively as that of Juror 8, but also are grounds for a new trial. *See, e.g. People v. DeLucia*, 282 N.Y.S.2d 526, 530 (N.Y. 1967); *United States v. Montgomery*, 42 F.2d 254, 256 (S.D.N.Y. 1930).

impartially, "jurors' subjective assessments of whether they were influenced by extrajudicial information are generally accorded very little weight because jurors are usually reluctant to admit to bias or fail to recognize it." *Simmons v. Blodgett*, 910 F. Supp. 1519, 1528 (W.D. Wash. 1996); *see also Waldorf v. Shuta*, 3 F.3d 705, 711 (3d Cir. 1993) ("assurance from jurors may not be adequate to eliminate the harm done by exposure to prejudicial information"). Because there is at the very least a "reasonable possibility" that Juror 8's outside research infected the jury's deliberations, a new trial is warranted. *See Bayramoglu*, 806 F.2d at 887; *see also Moore*, 576 F.3d at 787.

**B.    A New Trial Is Warranted Due To The Improper Dismissal Of Juror 2.**

The Court erred in dismissing Juror 2, rather than declaring a mistrial, when it was revealed that she was threatened for being a holdout. "[A] juror's status as a holdout [is] a 'red flag' that will result in the closest scrutiny of the District Court's decision to discharge the juror." *United States v. Samet*, 207 F. Supp. 2d 269, 281 (S.D.N.Y. 2002). A juror ought not be removed if the evidence "discloses any possibility" that the request stems from the juror's status as a holdout. *See United States v. Thomas*, 116 F.3d 606, 622 (2d Cir. 1997); *see also United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir. 1988); *cf. Duke v. County of Nassau*, No. 02-7049, 2003 U.S. App. LEXIS 7973, at *5-*6 (2d Cir. Apr. 25, 2003) (dismissal of threatened juror not abuse of discretion where there was no evidence that juror was holdout).

The circumstances leading up to the dismissal of Juror 2 were almost identical to those in *Samet*, in which the court was faced with a juror who had become "unhinged by the process of deliberation" due to her holdout status. 207 F. Supp. 2d at 281. After several sessions of *voir dire*, the *Samet* Court learned that the juror had been feeling abused by a fellow juror, *id.* at 273, was emotionally distressed by the treatment she had experienced during deliberations, *id.* at 279, and had reached the point of voting against her conscience because she "could not take it any

- 29 -

more." *Id.* The court concluded that the juror could not continue to deliberate due to physical and emotional distress. *Id.* at 277. At the same time, the court recognized that it could *not* discharge the juror because it was apparent that "the source of her distress was some difference of opinion between her and the other jurors" – *i.e.* "her inability to withstand the pressure of being in the minority." *Id.* Faced with this predicament, the court declared a mistrial. *Id.* at 282.

Here, on October 15, 2009, the Court received a distressed call from Juror 2 in which she revealed that she was experiencing abusive treatment from the jury foreperson who had threatened to "cut" her. (10/16/09 Tr. 6994:5-13, 6994:24-6995:3.) During subsequent *voir dire*, Juror 2 stated that she no longer felt she could reach a verdict based on her own conscience, but instead would be acting under threat of duress or coercion. (*Id.* at 7010:24-7011:2.) In addition, Juror 2 revealed that "they said I was stupid, I can't form my own opinion *because it doesn't match the rest of them.* And I feel – I feel that I'm not safe." (*Id.* at 7017:9-12 (emphasis added).)

The record establishes that Juror 2 suffered abuse because she was a holdout – *i.e.* because her opinion didn't "match the rest of them." (*Id.*) Juror 2 was dismissed on Friday, October 16. When the jury returned the following Monday – without this holdout juror – it returned a verdict against ExxonMobil within "about 20 minutes." (10/19/09 Tr. 7041:7-10.) Because Juror 2 was intimidated for being a holdout among the jurors and, consequently, could not proceed in the deliberations, a mistrial would have been the only appropriate remedy. *See Samet*, 207 F. Supp. 2d at 282. Rather, the Court improperly dismissed this holdout juror and allowed deliberations to proceed, to ExxonMobil's grave prejudice, after denying ExxonMobil's request for a mistrial. (*See* 10/16/09 Tr. 7022:14-15.)

## VIII.   ERRONEOUS EVIDENTIARY RULINGS MATERIALLY SWAYED THE JURY'S VERDICT AGAINST EXXONMOBIL.

Several erroneous evidentiary rulings materially influenced the jury's findings against ExxonMobil and warrant a new trial.

### A.      The Court Improperly Limited The Testimony Of Dr. Hand.

During the testimony of Defendants' damages expert, Dr. David Hand, Plaintiffs' counsel objected that Dr. Hand was not familiar with the New York City Department of Environmental Protection's Cost Estimating Standards and, therefore, should not be permitted to offer opinions on the cost of building and maintaining the proposed Station 6 treatment system. (*See* 9/30/09 Tr. 6121:4-18.) The Court sustained the objection, ruling that Dr. Hand could testify as to the relative cost of different treatment technologies, but could not offer opinions that "it would cost X dollars to build a treatment plant … in New York City." (*See id.* at 6125:1-23.) Had the Court permitted Dr. Hand to testify on the subject, he was prepared to offer the opinion – as he had disclosed in his expert report – that the treatment of MTBE from 10 ppb down to 1 ppb would cost the City an additional $900,000 per year in operation and maintenance costs beyond the costs it would otherwise incur for treating other contaminants. (*See id.* at 6191:2-12.)

The Court's ruling was an abuse of discretion because Dr. Hand's proffered testimony met all of the requirements for admissibility of expert opinion: (1) Dr. Hand is a qualified expert on water treatment costs; (2) his testimony would have assisted the jury in determining an appropriate amount of damages; and (3) his testimony was based on sufficient facts and data and was the product of reliable principles and methods. *See* Fed. R. Evid. 702. That Dr. Hand lacked experience specific to New York City (*see* 9/30/09 Tr. 6125:21-6126:10) was irrelevant to the admissibility of his testimony because there is no requirement that an expert have "practical experience directly on point." *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 174

(N.D.N.Y. 2002); *see also Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1308 (7th Cir. 1987). An expert may be qualified "by knowledge, skill, experience, training, or education...." Fed. R. Evid. 702; *see also In re MTBE*, 2009 U.S. Dist. LEXIS 62649, at *9. Dr. Hand has both extensive education and experience in estimating water treatment costs. (*See, e.g.* 9/30/09 Tr. 6122:6-6124:8.) Indeed, Dr. Hand created two of the models used by the City's expert, Ms. Bell, in her analysis and evaluation of water treatment alternatives. (*See* 9/30/09 Tr. 5990:23-5992:6.) Furthermore, Dr. Hand appropriately consulted and relied on materials to form an opinion about the City's treatment costs. *See* Fed. R. Evid. 703. For example, as disclosed in his expert report, where necessary to determine New York-specific costs, Dr. Hand consulted local materials. (*See* Handel Decl., Ex. D, Excerpts from Expert Report of David W. Hand, Ph.D. (Mar. 9, 2009), at 28 (citing cost information from the NYC Office of Management and Budget); *see also Drake v. Delta Air Lines, Inc.*, No. 94-CV-5944, 2005 U.S. Dist. LEXIS 14789, *26-*27 (E.D.N.Y. July 21, 2005) (in post-trial motion, the court may review "not only the evidence adduced at trial but also the underlying expert report, which was not admitted at trial.").) Whatever experience Dr. Hand lacked in New York City was a proper topic for cross examination and went to the weight, not the admissibility, of his opinions. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *see also Liquid Air Corp.*, 834 F.2d at 1308.

Although the City had ample notice of the opinions Dr. Hand would give at trial, it failed to challenge the testimony before trial in accordance with the schedule set for *Daubert* motions. Thus, because of the Court's ruling during trial, ExxonMobil was prevented from eliciting any testimony about dollar amounts of treatment costs and left with no opportunity to present such evidence through alternative means. (*See* 10/1/09 Tr. 6222:3-9; *see also* 9/30/09 Tr. 6191:10-22 (complying with ruling by "deliberately avoid[ing] the amounts," but preserving Defendants'

objection).)  As a result, the only quantified estimate of treatment costs that the jury heard was that of Plaintiffs' expert, Ms. Bell.  With no number to compare to Ms. Bell's, it is not surprising that the jury adopted her cost estimate in its entirety.  Given the jury's damage award, it cannot be said "with fair assurance ... that the judgment was *not* substantially swayed by the error" and, therefore, "it is impossible to conclude that substantial rights were not affected."  *Malek*, 994 F.2d at 55.

**B.    The Court Admitted Irrelevant And Prejudicial Evidence On "Warnings."**

The Court long ago acknowledged that warnings "to the world or even directly to private well owners" did not "seem feasible" and that "in certain circumstances, a manufacturer may escape liability for failure to warn if adequate warnings are given to the immediate vendee of the product." *In re MTBE*, 175 F. Supp. 2d at 625 n.49.  Abandoning that reasoning, the Court took an extremely broad and legally incorrect view of the duty to warn in this case, finding that "because most everybody has a vehicle that requires gasoline ... the general public is owed the duty to warn because the duty to warn is for foreseeable users, which almost everybody is." (9/8/09 Tr. 3787:19-22.)  This ruling was incorrect under New York law, which provides that a manufacturer does not owe the "general public" a duty to warn; rather, any duty runs exclusively to the product's "foreseeable users." *Berg v. Underwood's Hair Adaption Processes, Inc.*, 751 F.2d 136, 137 (2d Cir. 1984); *see also In re MTBE*, 175 F. Supp. 2d at 625; *United States v. Hooker Chems. & Plastics Corp.*, 850 F. Supp. 993, 1060 (W.D.N.Y. 1994); *DiMura v. City of Albany*, 657 N.Y.S.2d 844, 845 (N.Y. App. Div. 1997).

Thus, the Court erroneously permitted the jury to hear evidence about ExxonMobil's alleged "failure to warn" the EPA and the public at large about risks of MTBE.  For example, the Court admitted the videotaped deposition testimony of Mr. George Dominguez as evidence that ExxonMobil failed to disclose "everything" about MTBE to EPA.  (See 9/9/09 Tr. 3966:11-18.)

- 33 -

In addition, the Court permitted Plaintiffs' counsel to ask ExxonMobil employee Michael Roman

whether "[ExxonMobil] provide[d] any notice of those features of gasoline containing MTBE to

any water suppliers?" (9/3/09 Tr. 3495:9-11.) All such evidence should have been excluded as

irrelevant and highly prejudicial. *See* Fed. R. Evid. 401, 403. Indeed, the admission of this

legally irrelevant evidence necessarily affected ExxonMobil's rights given the complete lack of

proof as to whether a warning would have prevented the City's alleged injury.

### C.    The Court Abused Its Discretion In Striking Certain Testimony Of Sandra Mohr And In Permitting The Undisclosed Testimony Of Kenneth Rudo.

In deciding to strike portions of the testimony of defense expert, Sandra Mohr, and to

allow never-disclosed testimony from the City's rebuttal expert, Kenneth Rudo, the Court

committed error that undoubtedly influenced the jury's beliefs about the health risks of MTBE.

The Court found that Dr. Mohr "did not properly disclose her testimony about mutagenicity of

MTBE in her pretrial expert reports," and therefore struck her testimony that mutagenicity

findings in animal studies had little to no relevance to MTBE's carcinogenicity in humans.

(9/18/09 Tr. 5069:2-11; *see also* 9/1/09 Tr. 3098:15-18.) Although the Court struck this

testimony on the grounds that it was not properly disclosed, the Court permitted the City to

introduce surprise rebuttal testimony from an expert it *never* disclosed before trial, reasoning that

ExxonMobil's counsel had cross examined Mr. Rudo in another matter and because "Dr. Mohr

in some sense … gave surprising testimony…." (9/2/09 Tr. 3248:12-19.) These decisions were

substantially erroneous and had a "profound impact on the outcome of the trial." *See LNC Invs.*,

126 F. Supp. 2d at 787.

Dr. Mohr's testimony about the irrelevance of mutagenicity findings was admissible

because it was highly probative whether the City should (or would) treat the Station 6 water to

remove the low-level MTBE – *i.e.*, below New York's legal limit – that the jury found would be

present. Moreover, Dr. Mohr's expert report was "sufficiently complete" to put the City on notice of her opinions. *In re MTBE*, 2009 U.S. Dist. LEXIS 62649, at *24. The Federal Rules of Civil Procedure do not require an explicit recitation of all testimony an expert will present at trial. *See, e.g., Creative Waste Mgmt. v. Capitol Envt'l Servs., Inc.*, 495 F. Supp. 2d 353, 357 (S.D.N.Y. 2007). Dr. Mohr's report satisfied the Rules' notice requirements because it critiqued the City's expert, Kathleen Burns, for relying "solely on mutagenicity assays and animal studies and fail[ing] to review the published human literature of MTBE exposure." (Handel Decl., Ex. E, Excerpts from Expert Report of Dr. Sandra N. Mohr, MD, MPH (Mar. 9, 2009), at 17.) Her report also states that "data indicative of genotoxicity are very weak ... except for the mutagenicity in mouse lymphoma cells." (*Id.* at 18.) These statements put the City on notice that Dr. Mohr would criticize the relevancy of mutagenicity assays on which the City's expert relied in opining that MTBE causes cancer in humans.

The prejudicial effect of the Court's decision to strike parts of Dr. Mohr's testimony was compounded by its decision to allow testimony from a wholly undisclosed "rebuttal" witness, Kenneth Rudo. Rule 26 requires a party to disclose before trial "the identity of *any* witness it *may* use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A) (emphasis added). In addition, Rule 26 requires submission of an expert report and requires that rebuttal evidence be disclosed within 30 days of the opposing party's disclosure. *Id.* 26(a)(2)(B), (C). And, as this Court has recognized, "[t]he purpose of an expert report is to eliminate unfair surprise to the opposing party." *In re MTBE*, 2009 U.S. Dist. LEXIS 62649, at *24; *cf. Creative Waste Mgmt.*, 495 F. Supp. 2d at 357. As the City met none of these requirements with respect to Mr. Rudo, he should not have been permitted to testify. *See* Fed. R. Civ. P. 37(c)(1).

- 35 -

The Court justified its decision to permit Mr. Rudo's testimony on the grounds that his opinions would be no surprise to counsel for ExxonMobil who had examined him in another case. However, even if such "disclosure" in a different case satisfied Rule 26 here (and it does not), a key opinion that Mr. Rudo gave at trial differed substantially from the opinion he gave in the prior litigation and in the draft disclosure the City provided two weeks before his testimony (when it attempted to substitute Rudo for Burns).[16] (*See* Handel Decl. Ex. F, Declaration of Kenneth M. Rudo in Support of Plaintiff City of New York's Motion for Leave to Designate Substitute Expert Witness (Aug. 13, 2009).) In this draft disclosure, which Mr. Rudo described as "encompass[ing] the opinions I am able and willing to offer in this case," Mr. Rudo's *sole* opinion on mutagenicity was that "there is *some* evidence of MTBE being a *potential* mutagenic compound." (*Id.* at ¶ 12; *id.* at Ex. 6, ¶ 4 (emphasis added).) In contrast, at trial, Mr. Rudo testified that MTBE *is mutagenic* and "that even at the *lowest levels* of exposure ... can cause a mutation which can possibly lead to cancer." (9/2/09 Tr. 3267:18-24 (emphasis added).)

In striking Dr. Mohr's opinion and then allowing Rudo to testify, the Court bolstered the implausible (and remarkably prejudicial) opinions of Plaintiffs' experts that mutagenicity studies in animals show that exposure to as little as one molecule of MTBE has the potential to cause cancer in humans. (*See* 8/27/09 Tr. 2829:10-15 (Burns); 9/2/09 Tr. 3263:6-11 (Rudo).) Given the jury's finding that the City is or will be injured by the presence of MTBE at levels already determined by the State of New York to be safe, as well as the jury's finding for the City on its public nuisance claim, it cannot be said "with fair assurance ... that the judgment was *not* substantially swayed by" the Court's decisions to strike Mohr's testimony or to allow Rudo's.

---

[16] The Court rejected the City's initial attempt to have Mr. Rudo testify in place of its disclosed toxicology expert, Kathleen Burns. (*See* 8/14/09 Tr. 1514:4-23.)

*Malek*, 994 F.2d at 55.

## IX.   THE DAMAGE AWARD WARRANTS A NEW TRIAL OR REMITTITUR.

Where a district court finds that a damages verdict is excessive, it may order a new trial

on damages, or, under the practice of remittitur, condition the denial of a motion for a new trial

on the plaintiff's acceptance of a reduced amount. *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d

93, 96 (2d Cir. 1995); *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984).

In reviewing the excessiveness of damages awarded on a plaintiff's state-law claim, the district

court must apply New York law. *See Gasperini v. Ctr. For Humanities, Inc.*, 149 F.3d 137, 140

(2d Cir. 1998); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 137 (2d Cir. 2008).

Under New York law, a damage award is excessive if it "deviates materially from what would be

reasonable compensation." *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006); N.Y.

C.P.L.R. § 5501(c)). The New York standard "is less deferential to the jury and thus more

favorable to the party challenging the award than is the federal 'shocks the conscience'"

standard. *Gasperini*, 149 F.3d at 140; *see also Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S.

415, 425 (1996); *Consorti v. Armstrong (In re Joint E. & S. Dist. Asbestos Litig.)*, 9 F. Supp. 2d

307, 310 (S.D.N.Y. 2008). In evaluating damages for future expenses, a court will consider

whether the verdict "closely approximate[s] the evidence of the *probable* future expenses in the

record." *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 479-80 (S.D.N.Y. 2003)

(emphasis added). The "deviates materially" standard requires the court to "examine the

evidence underlying the award and compare the verdict to awards in similar cases." *Okraynets v.

Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 436-37 (S.D.N.Y. 2008) (recognizing, however, that

modification of damages "cannot be based upon case precedent alone"). When a court

determines that a jury award is excessive it should remit the award to the "maximum amount that

would not be excessive." *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 257 (S.D.N.Y. 2007).

A.      **The Jury's Verdict Was Against The Weight Of The Evidence.**

Plaintiff's damages expert, Marnie Bell, testified that the Station 6 treatment system would cost the City approximately $250 million. (9/24/09 Tr. 5886:5-10.) The jury presumably accepted Ms. Bell's testimony, as this is the amount it awarded. *See Thomas*, 508 F. Supp. 2d at 260 (inferring length of time for which jury awarded front pay based upon number suggested by plaintiff's expert). Ms. Bell's estimate included approximately $60 million in initial capital costs, $49 million in capital replacement costs, and $141 million for operating and maintenance ("O&M") costs. (*See* Handel Decl. Ex. G, at 1, Plaintiff's Demonstrative Slides.) Because the competent evidence supports none of these numbers, the Court should order a new trial.

Treatment of a potential contaminant is not required unless the MCL is exceeded. (9/30/09 Tr. 6129:9-10 (Hand).) The evidence shows that *PCE* levels in the Station 6 wells are above the MCL and require treatment. (9/24/09 Tr. 5958:4-10 (Bell); 9/30/09 Tr. 6161:20-21 (Hand).) In contrast to PCE, the City introduced no evidence that its Station 6 wells are presently contaminated with *any* level of MTBE – and the vast majority of its prior detections, years ago, were below the applicable MCL. Moreover, the jury determined that future MTBE levels in the combined outflow of the Station 6 wells will *never* exceed the State of New York's 10 ppb MCL standard. (8/26/09 Tr. 2711:2-15.) Thus, the Station 6 wells do not today – and will never in the future – require treatment for MTBE based on State regulations. (9/30/09 Tr. 6129:9-10 (Hand).) Nor will the wells require treatment for MTBE to prevent taste and odor complaints. (*See supra* p. 19.)

The only support for the jury's award of $60 million in initial capital costs is the dubious testimony of the City's expert, Ms. Bell. Defendants urge the Court to carefully consider the weight and credibility of that testimony. *See Song*, 957 F.2d at 1047 (on a motion for a new trial, the court is "free to weigh the evidence"). Specifically, Ms. Bell unconvincingly attempted to

- 38 -

explain the exponential increase between the 2004 capital cost estimate of $9.9 million and the revised 2009 estimate of $59.9 million. (*See* 9/30/09 Tr. 6026:2-17 (Bell).) Bell blamed at least some of this 500% increase on "escalation of prices." (*Id.* at 6026:17-19 (Bell).) But one is hard pressed to believe this factor had anything but the most minimal effect on cost estimates; after all, the $9.9 million price tag already had been adjusted to 2007 dollars and the $59.9 million was in 2009 dollars. (*See* Handel Decl. Ex. G, at 2.) Ms. Bell also tried to rationalize the cost increase based on redesign of the system from a "parallel" to "in series" configuration. (9/30/09 at 6026:19-20 (Bell).) While this may have some facial appeal, the system redesign cannot account for the huge cost increase because, in 2007, when the proposed design still was based on a "parallel" formation – *i.e.* before reconfiguration – the cost estimate already had jumped more than 300% to $43.4 million. (9/24/09 Tr. 5913:21-5914:3 (Bell).)

So the decisive question is: what caused the increase from $9.9 million (in 2004) to $43.4 million (in 2007)? Even though the 2007 estimate was calculated in year 2012 dollars, inflation cannot justify the four-fold increase. The answer, according to Ms. Bell, is that she and her colleagues "ended up *lowering* the maximum design criteria [for MTBE influent] from approximately 210 parts per billion [in 2004] to approximately 50 to 70 parts per billion" based on modeling predictions performed in 2007. (*See id.* at 5914:5-20 (Bell) (emphasis added).) In other words, despite the fact that predicted MTBE influent concentrations were *reduced* by approximately 66%, Ms. Bell *increased* her capital cost estimates by more than 300% – from $9.9 million to $43.4 million. (*See id.* at 5910:3-7; 5913:21-5914:20 (Bell).) Ms. Bell's estimates are not only dubious, they are contrary to logic and common sense. Thus, the award of $60 million in initial capital costs is unsupported by credible evidence.

The portion of the jury's award attributable to capital replacement and O&M costs,

- 39 -

totaling $190 million – *more than 75%* of the total award – is dependent on the unfounded

assumption that the Station 6 treatment system will operate continuously (*i.e.*, 24 hours a day, 7

days a week, 365 days a year) for 40 years. (9/24/09 Tr. 5904:18-21; 9/30/09 Tr. 6020:18-21

(Bell).) The capital replacement cost estimate assumes that equipment replacement will be

needed twice (once every 20 years) regardless of whether or how long the Station 6 plant

operates during that period of time. (9/30/09 Tr. 6023:12-18; 9/24/09 Tr. 5886:15-17, 5888:5-9.)

The Court should reject these assumptions because they were unsupported by the evidence and

conflict with the jury's finding that Station 6 will be used only as a "back-up" source of drinking

water if and when needed because of drought or outages in the City's tunnel system for

delivering water. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Song*, 957 F.2d at

1047; *Marcoux*, 290 F. Supp. 2d at 462.

　　　In Phase 1 of this trial, the jury found that the City intended to use Station 6 as a *back-up

source only.* (8/12/09 Tr. 1049:14-1050:1.) The jury heard evidence about two possible "back-

up situations" – a drought emergency and a failure of the Rondout-West Branch tunnel. With

regard to the former, the jury heard that the City previously faced a drought emergency; that

during that emergency certain Queens groundwater wells were used for "short periods of time";

but that the drought ended before the wells were put into full-time service. (8/6/09 Tr. 758:3-18

(Cohen).) With regard to a failure of the Rondout-West Branch tunnel, the jury heard evidence

from the City itself that repairing the tunnel would take approximately *four* years. (*Id.* at 701:9-

15 (Lawitts); *see also* Handel Decl. Ex. H, Def.'s Ex. 12279.) Most importantly, the jury heard

*no* evidence that "back-up" usage would require operating the Station 6 treatment system

continuously for four decades. Moreover, it defies common sense and reason for anyone,

including the jury in this case, to accept that a "back-up" source would be used continuously for

any extended period of time, to say nothing of 40 years.

Ms. Bell explained that her assumption about the length of time the Station 6 wells would operate was "based on Dave Terry's modeling which showed MTBE concentrations sustaining at significant levels out to 2040. And we projected those trends outwards to try and identify the entire timeframe in which Station 6 would need to provide MTBE treatment." (9/24/09 Tr. 5885:15-20.) But the length of time during which MTBE will be present in the groundwater tells us nothing about how long the City will operate the wells as a back-up source. Furthermore, Ms. Bell's reasoning is circular and fails to justify her assumption because Mr. Terry's modeling similarly was based on a speculative, inflated assumption about the length of time that the wells continuously would operate (24 years). (*See supra* p. 17.) Because, at most, the evidence established that the Station 6 wells would be needed as a back-up source for approximately four years while repairs are made to the Rondout-West Branch tunnel, the assumption that the treatment system would operate for 40 years is based on pure speculation.

Under New York law, damages may not be awarded for such speculative losses. *See Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 334 (2d Cir. 1993); *see also In re MTBE*, 2009 U.S. Dist. LEXIS 59287, at *22; *Marcoux*, 290 F. Supp. 2d at 479; *Jansen v. C. Raimondo & Son Constr. Corp.*, 741 N.Y.S.2d 71, 73 (N.Y. App. Div. 2002). Allowing an award of damages, more than 75% of which is based on nothing more than speculation and the *ipse dixit* statements of a single witness, is a miscarriage of justice. The Court should therefore order a new trial on the issue of damages.

### B.   Alternatively, The Damage Award Deviates Materially From What Would Be Reasonable Compensation And Remittitur Is Appropriate.

Under New York law, a damage award is excessive if it "deviates materially from what would be reasonable compensation." *Patterson*, 440 F.3d at 119. In making such a

determination, courts will "compare the verdict to awards in similar cases" while recognizing

that a direct "comparison of injuries in different cases is virtually impossible." *Okraynets*, 555 F.

Supp. 2d at 436-37. The present case is indeed unique, making comparison to verdicts in similar

cases difficult, if not impossible. That said, comparison to the costs previously incurred by the

City to bring Queens wells online as a back-up water source during a drought emergency is

instructive and demonstrates the shocking inflation of the damage award here.[17] Specifically,

evidence was presented that the City previously addressed MTBE contamination in five wells,

readied for use in a drought emergency, by installing temporary GAC units at a total cost of

$3.16 million dollars, or approximately $632,000 per well. (9/24/09 Tr. 5962:4-6 (Bell).) In

comparison, the $250.5 million awarded to the City for future treatment of the Station 6 wells if

and when they are needed as a back-up source is shockingly excessive and materially deviates

from what would be reasonable compensation.

Remittitur is appropriate to address an excessive damage award "(1) where the court can

identify an error that caused the jury to include in the verdict a quantifiable amount that should

be stricken, [and] (2) more generally, where the award is intrinsically excessive in the sense of

being greater than the amount a reasonable jury could have awarded, although the surplus cannot

be ascribed to a particular, quantifiable error." *Trademark*, 995 F.2d at 337. In the present case

three errors are readily identifiable. First, the jury inappropriately awarded $141 million for

---

[17] It is also instructive to compare the damages awarded to the City with those pled by the
plaintiff in another MTBE case. In 2002, in *United Water of N.Y. v. Amerada Hess Corp.*, the
plaintiff offered evidence that the actual construction of a treatment facility to remove MTBE
contamination cost it approximately $860,000. *In re MTBE*, 2007 U.S. Dist. LEXIS 40484, at
*83. The $60 million in capital costs awarded to the City here for a future system to treat
speculative, future MTBE, is almost a 70-fold increase over the costs *actually* incurred by United
Water of N.Y. to treat *actual* MTBE. (*See* 9/24/09 Tr. 5884:16-24.) It simply is not plausible
that this 70-fold increase is attributable to higher construction costs in Queens.

O&M costs based on nothing more than the *ipse dixit* statements of Ms. Bell and her speculative assumption that Station 6 will operate continuously for 40 years. *See Gen. Elec. Co.*, 522 U.S. at 146; *Trademark*, 995 F.2d at 334. In doing so, the jury ignored its prior Phase 1 decision that Station 6 would operate as a back-up supply only, and disobeyed the Court's instruction that it "should not revisit" prior findings. (10/7/09 Tr. 6661:12.) Second, the jury inappropriately awarded the City $60 million in capital costs despite Ms. Bell's irrational explanation for how she arrived at her capital cost estimate. Lastly, the jury implausibly credited Ms. Bell's dubious testimony that certain equipment at Station 6 will require replacement every 20 years, regardless of whether that equipment is ever used or for how long. (9/24/09 Tr. 5888:5-9; 9/30/09 Tr. 6159:22-6160:2 (Hand).) There is absolutely no evidence to support the jury awarding the City $49 million in capital replacement costs for equipment that may never be used or, if used, will only be used as a "back-up" system for a short period of time. In the alternative, the jury's award is intrinsically excessive when compared to the costs the City previously incurred to install GAC treatment on its wells during a drought emergency. (*See supra* at p. 42.) The jury's award, which compensates the City for unfounded capital costs; for replacement costs that are unsupported by competent evidence; and for 40 years of operation and maintenance costs based on speculative assumptions, is "greater than the amount a reasonable jury could have awarded." *See Trademark*, 995 F.2d at 337.

ExxonMobil believes that the maximum, non-excessive award that would compensate the City for alleged future MTBE contamination is $1 million to $4 million. This amount is entirely consistent with the City's previous real-world costs (of $3.16 million dollars) for treating five wells during a drought emergency. This same range is also separately supported because it represents a reasonable amount of O&M costs attributable to MTBE for a length of operating

time based upon competent, non-speculative, evidence – *i.e.*, one to four years, the length of time

that the City may require Station 6 as a "back-up" to its tunnel supply – while excluding Ms.

Bell's dubious and unsupported estimates for initial capital and replacement costs.  Had the

Court not erroneously excluded Dr. Hand's testimony about treatment costs (*see supra* p. 31), the

jury would have heard that the City's per-year O&M costs attributable to MTBE, if the treatment

goal is a reduction from 10 ppb to 1 ppb, would be about $900,000.[18]  (*See* 9/30/09 Tr. 6191:3-

22; 10/1/09 Tr. 6205:19-21.)

     While ExxonMobil believes that the award should be reduced to a range of $1 million to

$4 million, to the extent the Court disagrees and intends to credit the City's view of its costs –

projections that are not credible for all the aforementioned reasons – the award should in all

events be reduced to cover only the four-year period during which the Rondout-West Branch

tunnel will supposedly be repaired and then further reduced to account for settling defendants'

contribution and for the cost of treating other contaminants.  That is, while ExxonMobil believes

a new trial is necessary, strenuously disagrees with the City's initial capital cost and O&M

projections, and provides the following alternative award amounts solely to aid the Court without

waiving its other arguments, the evidence at most supports an award of either $10.02 million or

$30.94 million, because the Court should assume that the Station 6 wells will continuously

operate, at most, over a four-year period.  Accordingly, at best, the Court should add four years

of O&M costs either to the City's consultants' 2004 estimate of initial capital costs (of $9.9

million) or, as a worst case, to Ms. Bell's trial estimate of initial capital costs ($60 million).  As

discussed above, the alleged replacement costs have no support in the record and should not be

---

[18] Dr. Hand also testified that no O&M costs should be attributed to MTBE because it will never exceed the State of New York's 10 ppb MCL.  (9/30/09 Tr. 6129:4-10, 6166:8-21.)

included in the damages calculation at all. Thus, using the erroneous 2004 capital cost estimate of $9.9 million, the additional O&M costs should be at most $14.1 million,[19] and the resulting $24 million award reduced by 28 percent for the "pre-existing contamination" found by the jury,[20] resulting in $17.28 million attributable to MTBE. (*See* 10/19/09 Tr. 7045:15-22.) The Court should then apply the jury's finding that 42% of the City's injury was caused by other companies, leaving ExxonMobil responsible for 58%, or $10.02 million. (*Id.* at 7046:1-16.) Alternatively, applying the same methodology to the erroneous $60 million initial capital cost estimate, the award should be reduced to $30.94 million. Again, ExxonMobil does not adopt these alternative calculations and does not believe they are appropriate, but they provide further examples of the ways in which the jury's award was excessive and should be reduced.

## CONCLUSION

For all of the foregoing reasons, including the analysis and argument incorporated herein by reference, ExxonMobil respectfully moves this Court to enter judgment as a matter of law in ExxonMobil's favor or to grant a new trial and/or remittitur.

---

[19] The $14.1 million O&M number is the four-year equivalent of Ms. Bell's $141 million estimate for O&M costs over her hypothetical 40-year period – *i.e.*, $141 million divided by 40, which is $3.525 million per year, multiplied by four years.

[20] The jury attributed $70 million (or 28 percent) of its $250.5 million award to "pre-existing contamination." (10/19/09 Tr. 7045:15-22.) Applying that same percent reduction to the $24 million total costs results in $17.28 million attributable to MTBE.

DATED:  April 27, 2010

Respectfully submitted,

*Lauren Handel*

Peter John Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Lauren E. Handel (LH 0755)
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10017-4613
Tel: 212.547.5400
Fax: 212.547.5444

James W. Quinn (JQ 6262)
David J. Lender (DL 1554)
Theodore E. Tsekerides (TT 5946)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Tel: 212.310.8000
Fax: 212.310.8007

*Counsel for Exxon Mobil Corporation,
ExxonMobil Chemical Company, Inc., Exxon
Mobil Oil Corporation, and Mobil Corporation*