**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

In Re: Methyl Tertiary Butyl Ether ("MTBE")               Master File No. 1:00-1898
Products Liability Litigation                             MDL 1358 (SAS)
                                                          M21-88
-------------------------------------------------------------------- x   ECF Case
**This document relates to the following case:**

*City of New York, et al. v. Amerada Hess Corp., et al.*
Case No. 04 Civ. 3417


-------------------------------------------------------------------- x


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO EXXON MOBIL
DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL AND/OR
REMITTITUR**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STANDARD OF REVIEW ............................................................................................... 1

ARGUMENT ....................................................................................................................... 3

   I.   ExxonMobil Failed to Prove Its Affirmative Defenses. ..................................... 3

      A.   The Clean Air Act Amendments Do Not Preempt the City's State Law Claims. ........ 3

      B.   The Statute of Limitations Does Not Bar the City's Claims. ...................................... 6

   II.   The City Proved, and the Court Properly Instructed the Jury on, Causation ...................... 8

      A.   The Clear Weight of the Evidence Shows that ExxonMobil MTBE Has and Will Continue to Injure the City's Wells ......................................................................... 8

      B.   The Clear Weight of the Evidence Supports the Jury's Finding that ExxonMobil Caused the City's Injury as a Direct Spiller ........................................................... 9

      C.   The Clear Weight of the Evidence Supports the Jury's Finding that ExxonMobil Caused the City's Injury as a Refiner/Supplier ....................................................... 10

      D.   The Court Properly Admitted Evidence and Instructed the Jury On the "Commingled Product" Theory ................................................................................................ 11

      E.   The Clear Weight of the Evidence Supports the Jury's Finding that ExxonMobil's Failure to Warn Caused the City's Injury ................................................................ 12

   III.  The City Proved a Legally Cognizable, Justiciable Injury, and the Court Properly Instructed the Jury on Injury ................................................................................... 14

      A.   The City's Injury is Justiciable ................................................................................. 14

      B.   The Court Properly Instructed the Jury on Both the City's Injury and the Appropriate Standard of Proof ................................................................................................ 15

      C.   The Clear Weight of the Evidence Supports the Jury's Finding That the City Will Need to Treat the Water to Remove MTBE ........................................................... 17

      D.   The MCL Does Not Define the City's Injury, and the Evidence Shows The City Must Treat the Water at Station 6 ....................................................................................... 19

      E.   The Clear Weight of the Evidence Demonstrates the City's Impending Injury ......... 21

   IV.  The City Proved its Negligence Claim ........................................................................... 22

      A.   The City Did Not Change its Theory of Negligence Mid-Trial .................................. 22

      B.   The Clear Weight of the Evidence Supports the Jury's Finding that ExxonMobil Was Negligent ................................................................................................................. 23

   V.   The City Proved its Public Nuisance Claim ..................................................................... 25

   VI.  The City Proved its Trespass Claim ................................................................................. 26

   VII. The Conduct of Jurors Warranted Neither a Mistrial Nor a New Trial. ............................ 28

      A.   The Court Responded Appropriately to Jurors' Outside Research ............................ 29

B.      The Dismissal of Juror 2 Does Not Warrant a New Trial. ......................................... 31

VIII.   The Court's Evidentiary Rulings Were Correct. ......................................................... 33

A.      The Court Properly Excluded Dr. Hand's Testimony .................................................. 34

B.      The Court Properly Admitted Evidence On Warnings................................................. 35

C.      The Court Properly Permitted Dr. Rudo's Testimony and Properly Excluded Dr.
Mohr's.............................................................................................................................. 36

IX.  The Jury's Damages Award Warrants Neither New Trial Nor Remittitur. ...................... 38

A.      The Jury's Award Was Supported By The Evidence. ................................................. 38

B.      The Award Does Not Deviate Materially From Reasonable Compensation.............. 40

CONCLUSION........................................................................................................................ 43

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**FEDERAL CASES**

*Anderson v. Branen,*
17 F.3d 552 (2d Cir. 1994)..................................................................................17

*Arlio v. Lively,*
474 F.3d 46 (2d Cir .2007)..................................................................................34

*Atkins v. New York City,*
143 F.3d 100 (2d Cir.1998)..................................................................................2

*B.F. Goodrich v. Betkoski,*
99 F.3d 505 (2d Cir.1996)....................................................................................9

*Bank of the South v. Fort Lauderdale Technical College, Inc.,*
425 F.2d 1374 (5th Cir. 1970) ...........................................................................31

*Barry v. Bergen County Probation Dept.,*
128 F.3d 152 (3rd Cir. 1997) .............................................................................31

*Bayramoglu v. Estelle,*
806 F.2d 880 (9th Cir. 1986) .............................................................................29

*Clinton v. Brown & Williamson Holdings, Inc.,*
498 F.Supp.2d 639 (S.D.N.Y. 2007)..................................................................36

*Cook v. Rockwell Intern. Corp.,*
428 F.Supp.2d ....................................................................................................32

*Cook v. Rockwell Intern. Corp.,*
428 F.Supp.2d 1152 (D. Colo. 2006).................................................................32

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)...........................................................................................34

*Dimarzo v. Cahill,*
575 F.2d 15 (1st Cir.1978).................................................................................25

*Duke v. County of Nassau,*
63 Fed.Appx. 558 (2d Cir. 2003) ..................................................................31, 32

*Florida Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963).............................................................................................3

iii

*Fowler v. New York Transit Auth.*,
  No. 96 Civ. 6796, 2001 WL 83228 (S.D.N.Y. Jan.31, 2001)..............................................3, 40

*Galdieri-Ambrosini v. National Realty & Dev. Corp.*,
  136 F.3d 276 (2d Cir.1998)..............................................2

*Gay v. Carlson*,
  60 F.3d 83 (2d Cir.1995)..............................................6

*Glew v. Cigna Group Ins.*,
  590 F.Supp.2d 395 (E.D.N.Y. 2008) ..............................................17

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*,
  252 F.3d 608 (2d Cir.2001)..............................................2

*In re Martin-Trigona*,
  760 F.2d 1334 (2d Cir.1985)..............................................34

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  457 F.Supp.2d 324 (S.D.N.Y.2006)..............................................3, 13, 27

*In re MTBE*,
  2009 WL 2634749 (S.D.N.Y. Aug. 25, 2009) ..............................................*passim*

*In re MTBE*,
  2009 WL 3347214 (S.D.N.Y. Oct. 19, 2009) ..............................................19, 27

*In re MTBE*,
  379 F.Supp.2d 348 (S.D.N.Y. 2005)..............................................26

*In re MTBE*,
  458 F.Supp.2d 149 (S.D.N.Y. 2006)..............................................19

*In re MTBE*,
  488 F.3d 112 (2d Cir. 2007)..............................................6

*In re MTBE*,
  559 F.Supp.2d 424 (S.D.N.Y. 2008)..............................................23

*In re MTBE*,
  591 F.Supp.2d 259 (S.D.N.Y. 2008)..............................................17

*In re MTBE*,
  643 F.Supp.2d 482 (S.D.N.Y. 2009) ..............................................*passim*

*In re MTBE*,
  644 F.Supp.2d 310 (S.D.N.Y. 2009)..............................................12

*Johnson v. Celotex Corp.*,
    899 F.2d 1281 (2d Cir. 1990)................................................................12

*Maryland v. Louisiana*,
    451 U.S. 725 (1981)..........................................................................6

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir.1992)..................................................................2

*Muller v. Costello*,
    997 F.Supp. 299 (N.D.N.Y. 1998), *aff'd*, 187 F.3d 298 (2d Cir.1999)...................2

*O'Brien v. National Gypsum Co.*,
    944 F.2d 69 (2d Cir. 1991)..................................................................12

*Okraynets v. Metro. Transp. Auth.*,
    555 F.Supp.2d 420 (S.D.N.Y. 2008)...........................................................40

*Oxygenated Fuels Ass'n, Inc. v. Pataki*,
    158 F.Supp.2d 248 (N.D.N.Y. 2001)..........................................................3, 6

*Piesco v. Koch*,
    12 F.3d 332 (2d Cir.1993)...................................................................2

*Pyles v. Johnson*,
    136 F.3d 986 (5th Cir. 1998)...............................................................30

*Salem v. United States Lines Co.*,
    370 U.S. 31 (1962)..........................................................................34

*Scala v. Moore McCormack Lines, Inc.*,
    985 F.2d 680 (2d Cir.1993)..................................................................40

*Smith v. Lightning Bolt Prods., Inc.*,
    861 F.2d 363 (2d Cir.1988)..................................................................2

*Tanzini v. Marine Midland Bank, N.A.*,
    978 F.Supp. 70 (N.D.N.Y.1997)..............................................................40

*Tingley Sys., Inc. v. Norse Sys., Inc.*,
    49 F.3d 93 (2d Cir.1995)....................................................................2

*U.S. v. Abrams*,
    137 F.3d 704 (2d Cir.1998).................................................................28

*U.S. v. Baker*,
    262 F.3d 124 (2d Cir. 2001)................................................................32

*U.S. v. Barnes,*
  604 F.2d 121 (2d Cir.1979)..................................................................28

*U.S. v. Boone*,
  458 F.3d 321 (3rd Cir. 2006) ...............................................................32

*U.S. v. Carmona,*
  858 F.2d 66 (2d Cir.1988)....................................................................28

*U.S. v. Germosen,*
  139 F.3d 120 (2d Cir.1998)..................................................................34

*U.S. v. Local 1804-1, Int'l Longshoremen's Ass'n,*
  44 F.3d 1091 (2d Cir.1995)..............................................................34, 37

*U.S. v. Martorell,*
  81 Fed. Appx. 754 (2d Cir. 2003) ........................................................33

*U.S. v. McGriff,*
  287 Fed. Appx. 916 (2d Cir. 2008) ......................................................29

*U.S. v. Rea,*
  958 F.2d 1206 (2d Cir.1992)................................................................34

*U.S. v. Ruggiero,*
  928 F.2d 1289 (2d Cir. 1991)..........................................................32, 33

*U.S. v. Samet,*
  207 F.Supp.2d 269 (S.D.N.Y. 2002)................................................31, 32

*U.S. v. Symington,*
  195 F.3d 1080 (9th Cir 1999) ...............................................................32

*U.S. v. Thai,*
  29 F.3d 785 (2d Cir.1994).....................................................................28

*U.S. v. Thomas,*
  116 F.2d 606 (2d Cir 1997)...........................................................31, 32, 33

*U.S. v. Williams-Davis,*
  90 F.3d 490 (DC Cir. 1996) .................................................................30

*United States v. Forrester,*
  60 F.3d 52 (2d Cir.1995)........................................................................2

*Urena v. Biro Mfg. Co.,*
  114 F.3d 359 (2d Cir.1997)...................................................................36

*Waldorf v. Shruta*,
  3 F.3d 705 (3rd Cir. 1993) ........................................................................................30


**STATE CASES**

*Altman v. Deepdale Gen. Hosp*,
  508 N.Y.S.2d 485 (2d Dept. 1986) ...........................................................................11

*Bukowski v. CooperVision Inc.*,
  185 A.D.2d 31, 592 N.Y.S.2d 807 (3d Dep't 1993).................................................36

*Burger v. Singh*,
  816 N.Y.S.2d 478 (App. Div. 2006) ..........................................................................28

*Copart Industries, Inc. v. Consolidated Edison Co.*,
  41 N.Y.2d 564 (NY 1977) .........................................................................................25

*Gayle v. City of New York*,
  92 N.Y.2d 936, 680 N.Y.S.2d 900, 703 N.E.2d 758 (1998).....................................24

*Healey v. Firestone Tire & Rubber Co.*,
  87 N.Y.2d 596, 640 N.Y.S.2d 860 (1996) .................................................................12

*Hellert v. Town of Hamburg*,
  857 NYS2d 825 (N.Y. App. Div. 2008) .....................................................................16

*Kronos, Inc. v. AVX Corp.*,
  81 N.Y.2d 90 (1993) ..................................................................................................28

*Matter of Van Etten v. City of New York*,
  226 N.Y. 483, 124 N.E. 201 (1919)...........................................................................27

*Mondello v. Newsday, Inc.*,
  774 N.Y.S.2d 794 (App. Div. 2004) ..........................................................................28

*New York Rubber Co. v. Rothery*,
  132 N.Y. 293 (1892) ..................................................................................................28

*New York Tel. Co. v. Harrison & Burrowes Bridge Contrs.*,
  3 A.D.3d 606, 771 N.Y.S.2d 187 (2004) ...................................................................24

*Pelleschi v. City of Rochester*,
  605 N.Y.S.2d 692 (4th Dept. 1993) ...........................................................................11

*People v. Sturm, Ruger & Co., Inc.*,
  309 A.D.2d 91, 761 N.Y.S.2d 192 (1st Dept. 2003) .................................................26

*Phillips v. Sun Oil Co.*,
  307 N.Y. 328 (N.Y. 1954) ........................................................27

*Polimeni v. Minolta Corp.*,
  227 A.D.2d 64, 653 N.Y.S.2d 429 (3d Dep't 1997)....................36

*State v. Fermenta ASC Corp.*,
  238 A.D.2d 400, 656 N.Y.S.2d 342 (2d Dept 1997) ..................27

*Westphal v. City of New York*,
  75 A.D. 252, 78 N.Y.S. 56 (2d Dep't 1902)..............................27


STATE STATUTES

N.Y. C.P.L.R. § 5501(c) ...............................................................3


RULES

Fed .R.Civ.P. 26(a)(2)(B) ............................................................36

Fed.R.Civ.P. 61...........................................................................34


REGULATIONS

N.Y. Comp. Codes R. & Regs. Title 10, § 5-1.12 ......................19

N.Y. Comp. Codes R. & Regs. Title 10, §§ 5-1.22, 5-6.5 ..........19

N.Y. Comp. Codes R. & Regs. Title 10, § 40-2.160 ..................19


OTHER AUTHORITIES

78 Am. Jur.2d, Waters § 35 .........................................................27

36 N.Y. Jur. 2d Damages, § 113 .................................................16

Lee S. Kreindler et al. New York Law of Torts, vol. 16 (1997) § 20.2.........................17

## INTRODUCTION

ExxonMobil's invitation to discard the jury's verdict and damages award identifies no errors of law, mistakes by the jury, or prejudice that would support judgment as a matter of law, a new trial, or a reduction in the City's damages.  The weight of the evidence does *not* show that it would have been physically impossible for ExxonMobil to use ethanol, nor that the City's claims are barred by the statute of limitations, and ExxonMobil's affirmative defenses therefore fail.  The clear weight of the evidence shows that the City is and will be injured; that ExxonMobil caused that injury both as a direct spiller and as a manufacturer, refiner, supplier and seller of gasoline by acting negligently, by failing to warn of the dangers posed by MTBE, by creating a public nuisance, and by trespassing on City property; and that the jury's award would reasonably compensate the City for its damages.

The Court properly ensured the impartiality of the jury, properly excluded expert testimony that had not been disclosed or was not based on relevant experience, and properly admitted relevant evidence helpful to the trier of fact.  The jury's verdict and damages award were grounded squarely in credible evidence resting on reasonable assumptions, and the total award represents reasonable compensation.  For these reasons, the Court should deny in its entirety ExxonMobil's motion for judgment as a matter of law, new trial, and remittitur.

## STANDARD OF REVIEW

A trial court must *deny* a post-trial motion for judgment pursuant to Rule 50(b) unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Galdieri-Ambrosini v. National Realty &*

1

*Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998) (citations omitted) (alterations in original).  The

Court must "consider the evidence in the light most favorable to the party against whom the

motion was made and to give that party the benefit of all reasonable inferences that the jury

might have drawn in his favor from the evidence. The Court cannot assess the weight of

conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of

the jury." *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir.1988) (internal

quotation marks and citations omitted).

A district court should *not* grant a new trial unless convinced "that the jury has reached a

seriously erroneous result or that the verdict is a miscarriage of justice." *Hugo Boss Fashions,*

*Inc. v. Fed. Ins. Co.,* 252 F.3d 608, 623 (2d Cir.2001) (quoting *Atkins v. New York City*, 143 F.3d

100, 102 (2d Cir.1998)); *Piesco v. Koch,* 12 F.3d 332, 344 (2d Cir.1993) (same).  "While the

Court need not necessarily weigh the evidence in a light most favorable to the non-moving party,

disagreement with the verdict alone is insufficient to justify the ordering of a new trial." *Muller*

*v. Costello,* 997 F.Supp. 299, 302 (N.D.N.Y. 1998), *aff'd,* 187 F.3d 298 (2d Cir.1999).  Where an

issue turns on the credibility of a witness, the jury's assessment should not be disturbed.  *United*

*States v. Forrester*, 60 F.3d 52, 63 (2d Cir.1995) ("As a matter of law, the credibility of

witnesses is exclusively for the determination by the jury."); *Metromedia Co. v. Fugazy,* 983

F.2d 350, 363 (2d Cir.1992) (district court must "bear[ ] in mind ... that [w]here the resolution of

the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to

refrain from setting aside the verdict and granting a new trial")

In evaluating a motion for new trial on the issue of damages or remittitur in a case

decided under New York law, a district court must apply New York law to determine whether

the award is excessive.  *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir.1995).  N.Y.

C.P.L.R. § 5501(c) provides that "an award is excessive or inadequate if it deviates materially

from what would be reasonable compensation."  The "deviates materially" standard means that a court may not "sustain a damage award that is out of line with other awards for similar injuries." *Fowler v. New York Transit Auth.,* No. 96 Civ. 6796, 2001 WL 83228, at *10 (S.D.N.Y. Jan.31, 2001).

## ARGUMENT

**I.    ExxonMobil Failed to Prove Its Affirmative Defenses.**

### A.  The Clean Air Act Amendments Do Not Preempt the City's State Law Claims.

ExxonMobil's conflict preemption defense fails because it did not prove that it would be physically impossible to comply with both state tort law and federal regulation.  "'[C]onflict preemption' arises when 'compliance with both federal and state regulations is a physical impossibility.'" *Oxygenated Fuels Ass'n, Inc. v. Pataki,* 158 F.Supp.2d 248, 252-253 (N.D.N.Y. 2001), *quoting Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963). "Impossibility does not depend on whether events in the physical world would have made it *difficult* to comply with both standards, but on whether the two standards are expressly incompatible." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 457 F.Supp.2d 324, 355 (S.D.N.Y.2006) (emphasis added), citing *Florida Lime, supra.*  If it is "not *physically impossible* for defendant[s] to comply with both standards," state law claims will not be preempted.  *Id.*

The jury found the City had failed to prove by a preponderance of the evidence that ethanol was a safer, feasible alternative to MTBE.  They made no finding that it would have been physically impossible to use ethanol to comply with federal oxygenate mandates.  Rather, the record – unrebutted by ExxonMobil – demonstrates that ethanol-blended gasoline would have been available in sufficient quantities had ExxonMobil and other refiners demanded it, and that

3

ethanol gasoline was not only technically possible, it was in fact widely used (including by ExxonMobil itself).

Thus, the City showed – and ExxonMobil's own witnesses conceded – that the supply of ethanol could rise to meet demand and did as soon as MTBE was banned.  9/10/09 Tr. 4093:6-24; 4097:22-4098:10 (Burke) (ethanol industry would have built more plants to meet demand, and in fact supply rose dramatically once demand increased); 4099:9-23 (no reason more ethanol plants could not have been built); 4102:2-19 (ramp-up time for producing more ethanol same as for MTBE); 9/16/09 Tr. 4635:10-21 (Reynolds) (ethanol supply increased to meet demand); 9/15/09 Tr. 4484:16-4484:10 (O'Brien) (same); 9/17/09 Tr. 4830:15-17 (McGraw) (same); 9/23/09 Tr. 5623:17-5624:3 (Eizember) (ethanol production capacity grew substantially in response to MTBE bans and anticipated demand).   The City also showed – and ExxonMobil's own witnesses also conceded – that reformulated gasoline (RFG) containing ethanol would have complied with the Clean Air Act Amendments of 1990 (CAAA). 9/16/09 Tr. 4640:8-16 (Reynolds) (ethanol-blended gasoline met emissions standards ); 9/16/09 Tr. 4799:21-4802:10 (McGraw) (ethanol-blended gasoline complied with all Phase I and Phase II requirements for the RFG program); 9/23/09 Tr. 5625:9-5626:2 (Eizember) (ethanol-blended gasoline complied fully with the CAAA, even without a waiver of any other air quality standards).

ExxonMobil submitted no evidence to rebut either of these points, and so could not have proven that it was physically impossible for ExxonMobil to have used ethanol.   Instead, the jury clearly relied on ExxonMobil's evidence that ethanol was a less desirable – and/or more expensive – blendstock for gasoline than MTBE, for the following reasons:[1]

--------------------------------

[1]The City respectfully disagrees with the jury's determination that ethanol was not a safer, feasible alternative to MTBE, and lists this evidence solely to demonstrate that the jury's decision could not have been based on the *physical impossibility* of using ethanol, but on several

4

- In the 1980s, the supply of ethanol was less stable and reliable than the supply of MTBE.  9/16/09 Tr. 4777:15-23 (McGraw) (ethanol supply was uncertain)[2]

- Car manufacturers and consumers had driveability concerns related to ethanol.  9/9/09 Tr. 3896:9-20 (Curran);[3] 9/8/09 Tr. 3799:16-3800:13 (Larkins video testimony, 3/08/08 Deposition at 141:11-148:5).

- Using ethanol would have been more expensive, in part because distributing ethanol presented more complicated and expensive logistical problems.  9/9/09 Tr. 3718:3-14 (Dugan) (ethanol could not be shipped by pipeline); 9/21/09 Tr. 5306:25-5307:18 (Eizember) (physical changes to distribution system were needed to use ethanol) [4]

- Although ethanol would have satisfied EPA emissions regulations (9/16/09 Tr. 4641:10-19 (Burke)), its benefit to air quality was less (9/17/09 Tr. 4889:24-4890:13 (Austin)).

- The greenhouse gas emissions/life cycle environmental effects of ethanol caused concern.  9/17/09 Tr. 4934:19-4935:14 (Austin)[5]

None of this evidence suggests that it would have been physically *impossible* for ExxonMobil to use ethanol instead of MTBE.  The relative expense or inconvenience of using ethanol does not establish conflict preemption.  *In re MTBE*, 488 F.3d 112, 130 (2d Cir. 2007) ("That it may have been more convenient or less expensive for the defendants to use MTBE does not mean it would have been impossible for them to use other, less-polluting additives.")

---

other reasons tending to make ethanol an infeasible alternative to MTBE.  Evidence in the record showing it was *not* physically impossible to use ethanol to comply with the federal oxygen mandate includes testimony that Getty Oil used ethanol in its gasoline in the Northeast (9/11/09 Tr. 4223:16-4224:21 (Stendardi)), other refiners were blending ethanol into their gasoline in the 1980s (9/8/09 Tr. 3770:25-3771:19 (Dugan)), and ExxonMobil used ethanol in the Midwest (9/16/09 Tr. 4787:8-16 (McGraw)).

[2] Other evidence in the record indicates refiners were able to purchase both MTBE and ethanol from third-party producers.  See 9/16/09 Tr. 4630:15-4631:14 (Reynolds).

[3] These concerns were alleviated by vapor pressure requirements for all gasolines, "whether ethanol-blended or not" (9/16/09 Tr. 4626:15-22 (Reynolds)), and in fact auto manufacturers did not consider driveability an issue by the mid-1980s (9/17/09 Tr. 4823:4-4825:10 (McGraw)).

[4] But see 9/16/09 Tr. 4628:17-18; 4633:5-12 (Reynolds) (ethanol was and is easily shipped by rail).

[5] Evidence in the record indicates these environmental effects were an issue neither "for the small volumes of ethanol that were talked about for the Clean Air Act programs," nor at the time refiners were choosing between MTBE and ethanol.  9/16/09 Tr. 4639:13-22 (Reynolds).

In short, even if the evidence supports the jury's finding that ethanol was not a feasible alternative because it was more expensive, less reliable as a supply, and/or provided less air quality benefit than MTBE gasoline, it does not establish (and the jury did not find) that it would have been physically impossible for ExxonMobil to comply with the CAAA using ethanol.

Finally, even if the City's defective design claim were preempted, its other claims based on state law would not be. In the absence of explicit statutory language signaling an intent to preempt state law in traditional state areas of regulation,[6] there is a strong "basic assumption" that Congress did not intend to displace state law. *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981); *see also Gay v. Carlson,* 60 F.3d 83, 88 (2d Cir.1995) (plaintiff's intentional infliction of emotional distress claim (among other claims) not preempted by federal law because "state law provides the only source of the rights asserted by [plaintiff]...."); *Oxygenated Fuels Ass'n v. Pataki*, 158 F.Supp.2d at 253-254 (the Clean Air Act "does not expressly [or implicitly] preempt state action taken for the purpose of protecting the state's groundwater supply from contamination by MTBE"). None of the City's other claims implicate ExxonMobil's choice of oxygenate; whether or not it has a feasible alternative to MTBE, ExxonMobil must still warn of MTBE's dangers and refrain from trespassing, creating a nuisance, or acting negligently.

### B. The Statute of Limitations Does Not Bar the City's Claims.

ExxonMobil argues that evidence concerning the City's actions in the pre-limitations period - specifically, (1) Mr. Kunsch's recommendation in 1995 to the City Department of Health that the Jamaica Water Supply Co. test its wells for MTBE, (2) Mr. Kunsch's awareness in 1997 of MTBE's environmental characteristics, and (3) the City's planning for MTBE

---

[6] The only express preemption language in the Clean Air Act prohibits state regulations "for purposes of motor vehicle emission control." *See Oxygenated Fuels Ass'n v. Pataki*, 158 F.Supp.2d 248, 253-254 (N.D.N.Y. 2001) (citing CAA § 211(c))

treatment at Station 6 in 1999 and 2000 (Mtn. at 5-6) – establishes both that the City (1) incurred its injury, and (2) was aware of that injury, before the bar date of October 31, 2000.  This argument fails because it hinges on the legally erroneous assertion that "[t]he City's alleged injury is that MTBE interferes with its planned future use of the Station 6 wells because it will have to install treatment to remove the MTBE" (Mtn. at 5), *not* the actual presence of MTBE in the combined outflow of Station 6.

As this Court explained in *In re MTBE,* 2009 WL 2634749, *2 (S.D.N.Y. Aug. 25, 2009), "[t]he design and construction cost of the Station 6 treatment plant is not the City's injury.  The injury is the contamination of the City's groundwater."  Therefore, "[t]he clock starts, at the earliest, when the injury occurred, not when the City first incurred costs in anticipating and preparing to ameliorate the injury."  *Id.; see also id.* ("[a] plaintiff's claims accrue when it first knows of both (1) the *presence* of MTBE at a level sufficient to constitute an injury and (2) the harmful impact of MTBE [at that level] on drinking water." (quoting *In re MTBE*, 2007 WL 1601491, at *7)).  Therefore, "in determining the timeliness of the City's recurring injury claim, the question is not, as Exxon suggests, when the City first knew of its future damages, but rather when the City was first *injured by MTBE contamination in its water* and first knew that it was so injured."  *Id. at* *4 (emphasis added).

The record shows, at most, only that the City was aware of MTBE's *potential* to contaminate groundwater and that it was designing Station 6 to remove *potential* MTBE from groundwater, not that MTBE was present "at a level sufficient to constitute an injury."  *In re MTBE*, 2007 WL 1601491, *7 (S.D.N.Y., June 4, 2007).  Because, "under New York law, the clock cannot start to run until the *injury* occurs, regardless of when one begins to take preventive steps to thwart or mollify an anticipated injury" (2009 WL 2634749 at *3), ExxonMobil's statute of limitations defense fails.

II.     **The City Proved, and the Court Properly Instructed the Jury on, Causation**

      **A.  The Clear Weight of the Evidence Shows that ExxonMobil MTBE Has and Will Continue to Injure the City's Wells**

ExxonMobil contends that the City failed to prove that its MTBE will in fact reach Station 6 once the wells start pumping because David Terry's capture zone model relied on certain assumptions about how the Station 6 and Dependability wells would operate in the future. But the jury, first, was entitled to evaluate the credibility of Terry's assumptions and model, and second, reasonably determined that Terry's capture zone model, in conjunction with other evidence, showed that ExxonMobil MTBE would enter the Station 6 wells.  The evidence showed the following:

- All gas stations leak, and releases from gas stations can be substantial, can occur on a daily basis, and can continue for long periods of time (8/12/09 Tr. 1117:4-23; 8/13/09 Tr. 1335:1-21; 8/14/09 Tr. 1389:4-11, 1451:8-1452:2 (Moreau)).

- MTBE leaked from ExxonMobil-branded stations into the capture zone of Station 6, and would peak at 35 ppb in 2024 (8/18/09 Tr. 1895:7-16, 8/19/09 Tr. 1977:7-1990:3 (Terry)).

- Plumes from known sources of contamination have not been adequately delineated either horizontally or vertically, and MTBE has escaped the remediation activities at the known release sites (8/18/09 Tr. 1756:7-24 (inadequate delineation); 1781:1-6 (84-04 Parsons), 1806:14-1807:12 (177-90 South Conduit); 1821:22-1822:16 (148-27 Liberty) (Beckett)).

- ExxonMobil's MTBE was present in gasoline that leaked from other stations into the capture zone of Station 6 (9/10/09 Tr. 4103:6-4105:20 (Burke)).

- MTBE will remain in the groundwater supplying Station 6 for at least 40 years (8/17/09 Tr. 1533:5 – 14; 1533:15 – 1534:8; 1561:17 – 1562:14 (Fogg)).

- MTBE will be drawn into the wells as soon as Station 6 is turned on (8/19/09 Tr. 2011:11-20 (Terry); 8/20/09 Tr. 2249:11-17 (Cohen); 8/17/09 Tr. 1560:15-1561:4 (Fogg)).

Given this evidence, the jury could reasonably conclude that ExxonMobil's MTBE traveled (and

will travel) through the subsurface from gas stations near Station 6 into the capture zone and into the wells.

Terry's model was not speculative. As discussed below in Section III.C, the model makes reasonable assumptions about what will most likely happen while accounting for variables and alternative pumping scenarios. See 8/19/09 Tr. 2087:3 – 2089:1 (Terry) (even under alternate pumping scenarios and even if Station 6 comes online later than planned, MTBE will still impact Station 6). ExxonMobil had the opportunity to, and did, cross-examine Terry on his model to apprise the jury of its concerns.[7] *See, B.F. Goodrich v. Betkoski,* 99 F.3d 505, 525-26 (2d Cir.1996) ("if the appellees honestly believe this scientific evidence is weak, they should cross-examine [the expert witness] vigorously at trial and present contrary evidence to refute his findings and conclusions"); *In re MTBE*, 643 F.Supp.2d 482, 499 (S.D.N.Y. 2009) ("concerns about the adequacy of data underpinning an expert opinion are best addressed via cross-examination."). The jury was then entitled to give the model (and other evidence) enough weight and credibility to determine that ExxonMobil caused MTBE to injure the City's property. It is possible that a given molecule of MTBE released from a station might never reach the wells, but Terry did not need to track each molecule in order to give the jury enough information to reasonably conclude that ExxonMobil's MTBE was, more likely than not, a substantial cause of the City's injury.

### B. The Clear Weight of the Evidence Supports the Jury's Finding that ExxonMobil Caused the City's Injury as a Direct Spiller

The clear weight of evidence in the record showed that six Mobil-branded service

---

[7] The City has already discussed in detail the scientific basis underlying Terry's assumptions, and hereby incorporates by reference the argument and analysis set forth in Plaintiffs' Memorandum of Law in Opposition to Exxon Mobil Corp.'s Motion to Exclude Opinions of Plaintiffs' Expert David Terry, filed July 28, 2009.

stations in Terry's capture zone leaked MTBE gasoline. This evidence is set forth in Section

IV.B (ExxonMobil's negligence as a direct spiller). The jury's conclusion that MTBE released

from these stations was a substantial factor in causing the City's injury was perfectly reasonable

given the evidence: for example, Terry testified that given the high concentrations of MTBE

found in the soil and groundwater near just one of the sites, 113-21 Merrick Boulevard, a

substantial amount of MTBE must have been released at the site and traveled into the capture

zone of Station 6. (8/19/09 Tr. 1977:7-1990:3.)

Given evidence in the record about spills from these stations in the capture zone (see

Section IV.B), the jury could reasonably conclude it was more likely than not that spills from

ExxonMobil stations would impact Station 6. Terry did not need to quantify each station's

individual impact in order for the jury to conclude that spills from those stations were a

substantial factor in causing the City's injury.

### C. The Clear Weight of the Evidence Supports the Jury's Finding that ExxonMobil Caused the City's Injury as a Refiner/Supplier

The record demonstrates that over time, ExxonMobil-produced gasoline was present in

*every* underground storage tank that leaked. (9/10/09 Tr. 4103:6-4105:20 (Burke).) Even

ExxonMobil's witness Mr. O'Brien conceded that over time, ExxonMobil-produced gasoline

reaches virtually *every* gas station, due to trades and exchanges along the chain of distribution.

(9/15/09 Tr. 4508:1-17) The City's expert Martin Tallett testified that ExxonMobil supplied

approximately a quarter of the gasoline sold in Queens (9/14/09 Tr. 4281:8-11), and

ExxonMobil's expert Dr. Montgomery testified that ExxonMobil's market share in New York

was 27.7 percent (10/1/09 Tr. 6334:12-16). ExxonMobil knew that all tanks leak, including (and

especially) those owned by independent operators to whom its products were sold. 9/15/09 Tr.

4595:17-4596:16 (Biles); 9/10/09 Tr. 3998:1-4001:11 (Stone); 9/2/09 Tr. 3306:15-3307:4

(Moreau); 9/4/09 Tr. 3659:6-18 (Dugan); 9/9/09 Tr. 3905:1-3910:23 (Curran); 9/02/09 Tr.

3227:5-3229:4 3235:10-3239:25; 3243:3-3243:6 (Scala); 9/4/09 Tr. 3545:20-3546:10, 3549:18-

3561:25, 3563:7-3567:13 (Mickelson).From these facts, a reasonable jury could easily conclude

that ExxonMobil was, over time, responsible for about a quarter of the MTBE-containing

gasoline that leaked into the City's groundwater, and that this fraction was substantial.

Given this evidence, the jury need not have placed ExxonMobil gasoline in every

shipment on the Colonial pipeline, identified which company's gasoline was in a UST at a

particular moment, or traced particular molecules of MTBE from refiner to well before it could

reasonably conclude that ExxonMobil refined and supplied a substantial portion of the MTBE

gasoline that leaked from tanks in the Station 6 capture zone.

### D.  The Court Properly Admitted Evidence and Instructed the Jury On the "Commingled Product" Theory

The Court's instruction on the commingled product theory (i.e., Manufacturer or Refiner

Contribution) was correct, but because the jury did not reach the question of liability based on

contribution to a commingled product, any error in the jury charge was harmless.  *See Pellescki*

*v. City of Rochester*, 605 N.Y.S.2d 692, 698 (4th Dept. 1993) (plaintiffs not prejudiced by

improper missing witness charge and error did not require reversal where, in arriving at its

verdict, jury did not reach the issue to which witness' testimony was relevant); *Altman v.*

*Deepdale Gen. Hosp*, 508 N.Y.S.2d 485, 487 (2d Dept. 1986) (where jury did not reach issue of

proximate cause, any alleged error in supplemental charge on proximate cause was harmless).

ExxonMobil has not specified which testimony or other evidence it contends was

erroneously admitted, other than evidence "about the commingled product theory" in general

(Mtn. at 11.)   Regardless, evidence that ExxonMobil's product was commingled with that of

other refiners and suppliers supports the City's traditional theories of causation.  This evidence

11

tends to make it more likely than not that – as the jury found – MTBE manufactured, refined, supplied or sold by ExxonMobil reached the City's wells and caused its injury.[8]  In other words, as discussed in Section II.C, MTBE gasoline manufactured, refined, supplied or sold by ExxonMobil was (1) so commingled in the distribution network, and (2) represented such a substantial fraction of the total gasoline sold in the Queens area, that the jury concluded it was not only present, but present in such quantity at leaking stations (ExxonMobil-branded or not) as to be a substantial factor in bringing about the City's injury.  The Court properly admitted this evidence because it tended to prove traditional causation of the City's injury.  *See Healey v. Firestone Tire & Rubber Co.*, 87 N.Y.2d 596, 601, 640 N.Y.S.2d 860 (1996) ("The identity of the manufacturer of a defective product may be established by circumstantial evidence."); *In re MTBE,* 644 F.Supp.2d 310, 318 (S.D.N.Y. 2009) (City may show through circumstantial evidence "that MTBE from a refiner defendant is, more likely than not, present in every release that contaminated the City's wells.")

### E.  The Clear Weight of the Evidence Supports the Jury's Finding that ExxonMobil's Failure to Warn Caused the City's Injury

The record supports the jury's finding that MTBE-specific warnings could have prevented the City's injury.  ExxonMobil's generic warnings against spilling any kind of gasoline made no mention of the special risks of *MTBE* gasoline, nor did they indicate the more severe environmental consequences of spilling *MTBE* gasoline – and in some cases they never

---

[8] Courts have used similar circumstantial evidence in this way to support traditional causation. *See O'Brien v. National Gypsum Co.*, 944 F.2d 69, 71, 73 (2d Cir. 1991) ("Given testimony that asbestos products were used interchangeably on virtually all of the warships under construction in the Navy Yard [and testimony placing Philip Carey products at the Navy Yard during the relevant period], O'Brien's disease might reasonably be attributed in part to exposure to Philip Carey products."); *Johnson v. Celotex Corp.,* 899 F.2d 1281, 1286-87 (2d Cir. 1990) ("an unusually detailed circumstantial case" showing likely use of manufacturer's product allowed jury to conclude that it was a substantial factor causing plaintiff's injury).

reached the people handling ExxonMobil's gasoline at all.  9/4/09 Tr. 3668:10-3669:16 (Dugan)
(Exxon's MSDS sheets contained no information about incremental environmental risk of
MTBE, and ExxonMobil never ensured they reached unbranded stations).  Marcel Moreau
testified that "ExxonMobil could have done a lot more in the realm of publicity in terms of
*letting people know* that this was a different kind of gasoline that people hadn't had before, that
you needed to handle it very carefully and make sure that there were no releases of gasoline into
the ground."  (9/03/09 Tr. 3377:10-14, emphasis added)  Had ExxonMobil provided appropriate
warnings, precautionary measures ranging from an MTBE ban to the use of double-walled tanks
to pavement sealing[9] would have been taken, many more releases of MTBE gasoline would not
have occurred, and the City's injury would have been prevented.   (*See* 9/03/09 Tr. 3376:6-11
(Moreau.)  "[U]ltimately," Mr. Moreau testified, "I think we needed just a gigantic public
awareness program.  We needed to really change the behavior of pretty much everybody in the
industry."  (9/03/09 Tr. 3379:11-13)

--------

[9] Mr. Moreau testified that the following steps were necessary "to prevent MTBE
contamination of groundwater" (9/03/09 Tr. 3375:24-3377:14), and if MTBE were not present,
they would not have been needed (9/02/09 Tr. 3353:18-24 (Moreau)):

- "The first thing to do would be not to use MTBE."  (9/02/09 Tr. 3352:19)"secondary
  containment, have double-walled tanks, double-walled pipe"  (9/02/09 Tr. 3352:22-23)
- "very reliable and very secure leak detection"  (9/02/09 Tr. 3353:1-2)
- "pay attention when you were doing maintenance"  (9/02/09 Tr. 3353:3-4)
- "measures to prevent customer spills from entering the ground," including pavement
  sealing (9/02/09 Tr. 3353:7-12)
- "improve your delivery practices to make sure there were no delivery spills" (9/02/09 Tr.
  3353:13-14)
- "educate consumers not to top off their cars" (9/02/09 Tr. 3353:14-15)
- "make sure…that your spill containment manholes are liquid tight and not leaking stuff
  into the ground"  (9/02/09 Tr. 3354:6-8)
- "restricted where MTBE was going to be used" to "parts of the country where the
  groundwater was not as vulnerable to contamination"  (9/03/09 Tr. 3375:9-14)
- vapor monitoring to find releases from all parts of the storage system "very soon after
  they occurred" (9/03/09 Tr. 3378:25-3379:2)

Mr. Dugan testified that when ExxonMobil made the decision to use MTBE, inventory control was the leak detection technology in use.  (9/08/09 Tr. 3750:15-22 (Dugan).)  Had the gasoline not contained MTBE, small leaks "would probably not become very big issues." (9/03/09 Tr. 3376:6-11 (Moreau).)  But Mr. Moreau testified that inventory control could not detect leaks as large as 25 gallons a day – more than enough to contaminate substantial amounts of groundwater with MTBE, over time.  (8/13/09 Tr. 1171:19-22.)  Specific warnings about the dangers of MTBE gasoline would have resulted in improved public awareness, secondary containment, vapor monitoring, greater care in preventing customer spills, and potentially a ban of MTBE entirely.  (9/03/09 Tr. 3377:10-3380:17 (Moreau).)  Indeed, the evidence shows that as regulators learned about MTBE's pernicious impact on water, states around the country banned it.  (9/23/09 Tr. at 5624:22-23 (Eizember) (MTBE banned in NY and CA); 9/16/09 Tr. at 4729:9-13 (Reynolds) (MTBE banned in at least 18 states); 9/17/09 Tr. at 4963:16-18 (Austin) (responding to jury question by stating that MTBE was banned in NY and CA because of groundwater contamination).)  Given this evidence, the jury was entitled to find that ExxonMobil's failure to warn the public of MTBE's dangers caused the City's injury.

### III.    The City Proved a Legally Cognizable, Justiciable Injury, and the Court Properly Instructed the Jury on Injury

#### A.  The City's Injury is Justiciable

As this Court has already held, the City's injuries, both present and future, are sufficiently actual and imminent to confer standing.  *In re MTBE,* 643 F.Supp.2d 446 at 457-458. MTBE is *already* present in the groundwater such that the combined outflow of Station 6 will contain MTBE as soon as it begins operation.  (8/19/09 Tr. 2011:11-20 (Terry).)  *See id.* at 458 (the City is injured where (1) MTBE is already present in the groundwater; (2) the City expended

14

funds designing a treatment facility due to the presence of MTBE in the Brooklyn-Queens Aquifer; and (3) a reasonable well owner would take steps to remediate the contamination currently present in the aquifer). The City did not just "assert" that all of the future events ExxonMobil describes (i.e., that it will build Station 6 and use it as a back-up supply and that MTBE will enter the water at harmful levels) will come to pass (Mtn. at 14); the jury *found* that they would, based on the evidence, detailed in Section II.

That the City's injury is actual and imminent does not render its suit time-barred. The injury did not arise until "there was sufficient MTBE in the capture zone of *all the Station 6 wells* such that, if the wells were turned on, the combined outflow of the Station 6 wells would contain an injurious level of MTBE." *In re MTBE*, 2009 WL 2634749 at n. 21. This condition did not happen until the City's pilot test plant was built and operated in 2002-2003 and detected MTBE in Well 6D at 350 parts per billion (ppb) in 2003 (8/19/09 Tr. 1975:14-25 (Terry)), which "translates into more than a 35ppb detection in the combined flow of the Station 6 wells-which is more than 3.5 times higher than the MCL and constitutes an injury as a matter of law." *Id* at n. 30. At the earliest, the claim accrued in 2002, when Well 6D first exceeded the MCL. See 8/19/09 Tr. 1972:7-1975:25; 8/20/09 Tr. 2234:4-25 (Terry) (discussing PL 23233, listing MTBE detections in Well 6D). Because the City's injury is both justiciable and not time-barred, the Court should deny ExxonMobil's motion for judgment as a matter of law and new trial on this ground.

### B. The Court Properly Instructed the Jury on Both the City's Injury and the Appropriate Standard of Proof

In Phase III, the jury found that the City's usufructuary interest in the groundwater supplying Station 6 "is, or will be, injured by the MTBE that will be in the combined outflow of the Station 6 wells," predicated on its Phase I findings that the City intends to construct Station 6

and use the water from the Station 6 wells. (10/19/09 Tr. 7042:10-19.)  ExxonMobil argues that

the Court's Phase I instructions were improper because  there can be no injury to a usufructuary

interest in groundwater until the water is actually used (Mtn. at 16).   But New York law only

requires the City to prove that it "'actually intends, in good faith, to make such use' of the

property."  *In re MTBE,* 643 F.Supp.2d at 459-460, quoting 36 N.Y. Jur. 2d Damages, § 113.

Thus, much as the City "need not go through the curious exercise of turning the wells on to

injure itself" (*id.* at 458 n. 7), it need not "actually use" the water before it can recover damages

for contamination.

This rule still holds when the property at issue is an interest in groundwater.  The sole

authority ExxonMobil cites to the contrary is *Hellert v. Town of Hamburg*, 857 NYS2d 825, 828

(N.Y. App. Div. 2008).  But *Hellert's* holding was more limited: because "none of the plaintiffs

used groundwater or well water for drinking purposes," it was "immaterial that certain metals

detected in the groundwater samples taken from plaintiffs' properties exceeded drinking water

standards."  *Id.*  The *Hellert* court did *not* address whether plaintiffs could recover for damage to

groundwater they *intended* to use in the future.  This Court has already held that one can.  643

F.Supp.2d at 459-60.

The Court correctly instructed the jury that the City must prove its claims by a

preponderance of the evidence.  The City has brought a recurring injury claim, "which seeks past

and future damages for a recurring injury that has *already begun* and that will recur in the

future."  *In re MTBE,* 2009 WL 2634749 at *4, citing *In re MTBE,* 643 F.Supp.2d at 459 ("the

City's claims relate primarily to future damages for a present injury, rather than future damages

arising from a future injury.")  "Although there is some future element to these claims, the nature

of the injury is known, distinguishing this case from one concerning future earnings or lost

services" in which the clear and convincing evidence standard might otherwise apply.[10]  643 F.Supp.2d at 459.  Because the City's future damages are not speculative, the "reasonable certainty" standard ExxonMobil refers to "does *not* require [the City] to meet a heightened burden of proof."  *Id.,* emphasis added.  Preponderance of the evidence is therefore the proper standard of proof.  *See In re MTBE,* 591 F.Supp.2d 259, 289 (S.D.N.Y. 2008) ("burden of proof in civil cases is only a preponderance of the evidence"); *Glew v. Cigna Group Ins.,* 590 F.Supp.2d 395 (E.D.N.Y. 2008) ("the proper standard is the same as other civil cases in the federal court, namely, by a preponderance of the evidence."); 16 Kreindler *et al.*, New York Law of Torts, § 20.2 (plaintiff in a tort case (including product liability) has the burden of proving each element of the tort by preponderance of the evidence).

Because the Phase I jury instructions correctly reflected that the City may recover for injury to property it intends to use, and the jury instructions reflected the correct standard of proof, they were proper.  *See Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir. 1994) (jury instruction erroneous if it misleads the jury as to correct legal standard).

### C.  The Clear Weight of the Evidence Supports the Jury's Finding That the City Will Need to Treat the Water to Remove MTBE

Given the evidence, the jury reasonably determined that MTBE will be present at Station 6 at levels the City will need to treat.  First, as detailed in Section II.A, the record supports the jury's finding that MTBE will be present at Station 6 far into the future.  Terry's testimony was

---

[10] This Court identified the three situations requiring proof by clear and convincing evidence:  (1) cases involving collateral source offset to a damages award; (2) cases concerning medical treatment and future risk, "as the injury itself - and not merely the resultant damages - has yet to occur;" and (3) "cases requesting damages for 'future damages for loss of household services' or similar future income, as they are special damages, 'separate and apart from pain and suffering, unrelated to the injury alleged in the case, and inherently speculative and difficult to prove." *In re MTBE*, 643 F.Supp.2d at 457 (citations omitted).  None applies here.

17

not the only evidence demonstrating that MTBE would impact Station 6, nor was it speculative. His model accommodates evidence that Station 6 may not turn on until 2020. 8/19/09 Tr. 2087:10-16 (if Station 6 turns on somewhat later than 2016 – "a few years difference either way, it shouldn't have a substantial effect. I would still have the same opinion.") The length of operation assumed in his model is also supported by the evidence: as several witnesses testified, the jury's finding that Station 6 would be used as a backup water supply does not preclude it from operating continuously or for long periods of time; given this evidence, 24 years is a conservative assumption. (8/20/09 Tr. 2219:3-11 (Terry) (for planning purposes, appropriate to assume "that Station 6 would turn on and remain on"); 2155:14 – 2156:16 (continuous operation of Station 6 in the model is standard practice for planning purposes); 6017:20-6018:4 (Bell) ("you need to plan for the worst case in designing and costing a treatment plant," and "the only reasonable assumption to make was to assume it would operate continuously"); 8/31/09 Tr. 2945:7-19 (Schindler) (a backup plant could need to operate for long periods of time); 8/04/09 Tr. 345:11-346:19, 349:10-16, 351:24-353:16 (Roberts) (Station 6 will be used to make up shortfall if part of the upstate infrastructure fails or if there is a drought).

Contrary to ExxonMobil's assertion, Terry did not testify that he could not model a "backup scenario;" he testified that he did not model scenarios that involved Station 6 operating for arbitrary short periods of time. (8/20/09 Tr. 2212:9-19.) Terry's assumptions about the volumes of gasoline released were hardly "fictional;" he testified that in his experience, 50 gallons represented the smallest spills likely to impact groundwater (8/19/09 Tr. at 2074:13-17) and 2,000 gallons represented a "moderate-sized release" – and given his knowledge of "releases in this area that are larger than that," 2,000 gallons, although the highest-volume release that he modeled, may have been a conservative figure (8/19/09 Tr. 2074:21-2075:8). ExxonMobil cross-examined Terry on each of these points and the jury determined that Terry's testimony, in

combination with other evidence, credibly supported a finding that MTBE would be present at a harmful level in the groundwater at Station 6.

### D. The MCL Does Not Define the City's Injury, and the Evidence Shows The City Must Treat the Water at Station 6

Substantial evidence supports the jury's conclusion that MTBE levels below the MCL should be treated.  First, as a matter of law, the Court has held that MTBE concentrations that do not exceed the MCL may injure the City because a reasonable water provider may deem it best to clean up even low concentrations of MTBE.  *In re MTBE*, 458 F.Supp.2d 149, 156-157 (S.D.N.Y. 2006); *see also In re MTBE*, 2009 WL 3347214, *6 (S.D.N.Y. Oct. 19, 2009).  State regulations require the City to monitor and treat contamination even below the MCL, if it detects any "deleterious changes in water quality."  N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.12.  The City must also provide "a *safe*, adequate and aesthetically pleasing supply of water for drinking and other domestic uses." N.Y. Comp. Codes R. & Regs. tit. 10, § 40-2.160, emphasis added. And once treatment has been placed on a well, NYSDOH regulations specify that "[i]n all cases, public exposure to organic contamination must be *minimized*," and "[w]here treatment is proposed, best available technology shall be provided to reduce organic contaminants to the *lowest practical levels*."  N.Y. Comp. Codes R. & Regs. tit. 10, §§ 5-1.22, 5-6.5 (incorporating by reference "Recommended Standards for Water Works, 2003 Edition" (Ten States 2003) (emphasis added)).

The record demonstrates that a reasonable water provider would remediate concentrations of MTBE below the MCL:

- City employee Roberts testified that the City Department of Environmental Protection's goal is to promote public health by providing clean water (8/4/09 Tr. 362:20; D-2919);

- Acting DEP Commissioner Steven Lawitts testified that his job "is to ensure the continued delivery of *safe* drinking water to 9 million people," in part by constructing

Station 6 (8/6/09 Tr. 681:13-24);

- The City's expert Dr. Lawless testified that 25 percent of the population would detect MTBE in water at 3 to 4 parts per billion, and that 10 percent of the population would detect it at 1 or 2 parts per billion (8/31/2009 Tr.  2889:14-2889:25, 2896:3-2897:1);

- City employee Steven Schindler testified that such a rate of impact on taste and odor would raise concerns by the public about the quality of the water supply (8/31/2009 Tr. 2943:4-2943:14);

- City employees testified that a reasonable water provider in the City's position must treat water so that its quality is equal to or better than the water in the rest of its system (8/5/2009 TR at 541:9-19 (Yulinsky testimony that "we had to show them that the groundwater *is safe to drink*"); 8/31/2009 at 2937:8-2937:21 (Schindler testimony regarding "commitment" "DEP made the residents of Queens that groundwater from Station 6 would be comparable in quality to the Cat\Del water");

- City expert Marnie Bell testified that once the City installs treatment, applicable regulations and guidance require treatment to the lowest practical level (10/1/2009 Tr. 6250:6-6251:8) and that a prudent water provider would apply a safety factor to its treatment protocols when a contaminant of concern is present (9/30/2009 Tr. 6049:15-6051:10);

- City experts Ken Rudo and Kathleen Burns testified that MTBE is a probable human carcinogen, is mutagenic, and that even at the lowest levels of exposure in drinking water it can cause a mutation that may lead to cancer (9/2/2009 Tr. 3267:18-3267:24; 8/27/09 Tr. 2803:24-2804:2; 2809:16-17);

- City employee Steven Schindler testified that DEP's water  quality goals "are not the MCL's … the MCL is really the worst-case scenario," and that DEP's "goal is to deliver the highest quality possible and to minimize the level of contaminants as best we can." 8/31/09 Tr. 2948:18-23.

- City expert Marnie Bell testified that "It's standard engineering practice to design a treatment system to treat the water to below an MCL," because to do otherwise "would place a water utility at risk for violating the MCL and possibly delivering contaminated water to its customers."  9/25/09 Tr. 5881:12-18.

- Both Marnie Bell and defendants' expert David Hand testified that if one or more of the Station 6 wells are taken offline or out of service for any reason, the concentration of MTBE in the combined outflow of the remaining wells will be 15 ppb or higher – a violation of the MCL.  9/25/09 Tr. 5860:10-5861:20 (Bell); 9/30/09 Tr. 1677:23-6178:4 (Hand).

Given the clear weight of the foregoing evidence, the jury was entitled to conclude that a

20

reasonable water provider would be injured by concentrations of MTBE below 10 ppb.

### E.  The Clear Weight of the Evidence Demonstrates the City's Impending Injury

As discussed above in Section III.A, the City's injury is not only imminent and impending, but has already occurred and will recur in the future.  Imminence is not "a strict temporal requirement that a future injury occur within a particular time period following the filing of the complaint."  *Connecticut v. American Elec. Power Co., Inc.*, 582 F.2d 309, 342 (2d Cir. 2009), citing *520 South Michigan Ave. Assocs. Ltd. v. Devine,* 433 F.3d 961, 962 (7th Cir.2006) ("[s]tanding depends on the probability of harm, not its temporal proximity").  The clear weight of the evidence supports the jury's finding that the City is and will be injured by MTBE contamination, and that it intends to build Station 6 to remedy that injury:

- Terry, Fogg and Cohen testified that MTBE contamination will be present as soon as the City turns on the wells (8/19/09 Tr. 2011:11-20 (Terry); 8/20/09 Tr. 2249:11-17 (Cohen); 8/17/09 Tr. 1560:15-1561:4 (Fogg))

- Fogg testified that MTBE will persist in the groundwater supplying Station 6 for 40 years (8/17/09 Tr. 1533:5 – 14; 1533:15 – 1534:8; 1561:17 – 1562:14)

- Roberts testified that treated water from Station 6 will be put to use, and that mains serving Station 6 have already been built (8/04/09 Tr.  358:23 – 359:16)

- Garcia testified that Station 6 will be used if any piece of infrastructure – a dam, aqueduct, or street water main – failed (8/05/09 Tr. 420:9 – 421:11)

- Meakin testified that Station 6 will help "restore long-term sustainable capacity of Queens aquifer system to service using new and existing wells"  (8/05/09 Tr. 636:17 – 637:6) and that there are many infrastructure issues that Station 6 will ameliorate (Tr. 652:15 – 655:20; 656:19 – 657:9; 665:4 – 665:18; 666:1 – 668:18)

Given the foregoing evidence, the jury was entitled to conclude that the City intends to build Station 6 in response to an existing injury.  The Court should therefore deny ExxonMobil's motion for judgment as a matter of law and for a new trial on this ground.

## IV.    The City Proved its Negligence Claim

### A.  The City Did Not Change its Theory of Negligence Mid-Trial

ExxonMobil claims that it was unaware that the City contended its ownership or operation of service stations was negligent until mid-trial and that it "had no opportunity to prepare station-specific witnesses or evidence" to rebut the claim that its operation of these service stations was negligent.  Mtn. at 21-22.  This is not plausible.  The City has consistently alleged that ExxonMobil owned or operated six service stations in the vicinity of Station 6, and that these stations spilled gasoline containing MTBE.  ExxonMobil's liability as a direct spiller was an issue before trial and throughout pre-trial discovery.  *See* 8/18/09 Tr. 1759:2-4 (Beckett reviewed spills at ExxonMobil stations in his expert report).  The City presented expert testimony demonstrating that ExxonMobil allowed these stations to leak MTBE gasoline into the capture zone (summarized in Section II.B, *supra*).

ExxonMobil was clearly aware before trial that negligent spills at its stations were an issue: its expert Thomas Maguire specifically reviewed the site remediation files for service stations in the vicinity of Station 6 (8/21/09 Tr. 2403:8-2404:15; 2412:13-15), and testified about the remedial actions taken at certain sites to address MTBE contamination.  8/21/09 Tr. 2412:17-2413:9 (113-21 Merrick); 2416:9-20 (177-90 South Conduit).  ExxonMobil had every opportunity to exculpate itself by presenting contrary evidence that its stations *did not* leak, that spills at its stations occurred in spite of ExxonMobil taking reasonable care to prevent them, or that spills at its stations did not contribute substantially to the MTBE contamination at Station 6.

As the Court pointed out, the City was entitled to "conform the pleadings to the proof." 9/19/09 Tr. 5098:7-8.  Because it was aware of the City's contentions about spills at Mobil stations all along, ExxonMobil was neither unfairly surprised nor prejudiced by this evidence.

22

The Court's decision to allow the City to plead negligence that it proved at trial was not an error of law and does not warrant a new trial.

### B.  The Clear Weight of the Evidence Supports the Jury's Finding that ExxonMobil Was Negligent

Based on the evidence, the jury reasonably found ExxonMobil negligent in its ownership or operation of service stations.  "Negligence may be defined as the failure to use that degree of care which a 'reasonably prudent' person would use under similar circumstances."  *In re MTBE*, 559 F.Supp.2d 424, 438 (S.D.N.Y. 2008).   The clear weight of the evidence supports the jury's finding that ExxonMobil failed to use reasonable care to ensure that its MTBE gasoline would not leak or spill, and this failure was a substantial factor in causing the City's injury.

As detailed in Section II.E, ExxonMobil was aware both that underground storage tanks leaked, and that those leaks could be substantial, but it continued to market and store MTBE gasoline in underground storage tanks near vulnerable groundwater supplies and use inventory control as its primary method of leak detection.   Given these risks, a reasonably prudent defendant would have done any or all of the following:  "not … use MTBE" in the first place (9/02/09 Tr. 3352:19); implement "secondary containment, have double-walled tanks, double-walled pipe"  (9/02/09 Tr. 3352:22-23); take "measures to prevent customer spills from entering the ground," including pavement sealing (9/02/09 Tr. 3353:7-12); and/or "restrict[] where MTBE was going to be used" to "parts of the country where the groundwater was not as vulnerable to contamination"  (9/03/09 Tr. 3375:9-14).

Since ExxonMobil took none of these steps, the following releases occurred:

- At 165-01 Hillside Avenue, an MTBE spill was reported for the first time in 2007, three years after MTBE was banned.  The date and size of the spill are uncertain, but about 285 tons of contaminated soil were removed from the site after the spill was discovered.  The plume has not been adequately delineated.  (9/21/09 Tr. 5229:11-5236:23 (Maguire)).

23

- At 113-21 Merrick Boulevard, a spill was reported in 1999 and has not yet been cleaned up.  Some MTBE-contaminated soil was removed in early 2001, but MTBE was found in the groundwater later that year at 1500 parts per billion.  Active cleanup of the site did not begin until 2008, nine years after the spill was reported.  (8/13/2009 Tr. 1267:1–1277:16; 9/21/2009 Tr. 5253:19-5254:1.)

- At 84-04 Parsons Boulevard, a spill was originally reported to DEC in the late 1980s, and internal Mobil records indicated a discrepancy of 4,300 gallons.  Floating gasoline was found at the site.  By 1996, 1100 gallons of free product remained unaccounted for and the remediation site remained open.  (8/13/2009 Tr. 1230:7-1267:1; 9/21/2009 Tr. 5244:19-5244:20).

- Spills also occurred at the following ExxonMobil stations:  138-50 Hillside Avenue (8/13/2009 Tr. 1289:9–1301:1); 162-35 North Conduit (8/13/2009 Tr. 1308:2-1308:25); and 177-90 South Conduit (8/13/2009 Tr. 1277:17 – 1288:24).

- MTBE has escaped the remediation activities at the known release sites.  (8/18/09 Tr. 1756:7-24 (inadequate delineation); 1781:1-6 (84-04 Parsons), 1806:14-1807:12 (177-90 South Conduit); 1821:22-1822:16 (148-27 Liberty) (Beckett)

Under New York law, a prima facie case of negligence may be proven by circumstantial evidence that a defendant's actions were the "more likely or more reasonable" cause of a plaintiff's injuries, without resort to *res ipsa loquitur*.[11]  *New York Tel. Co. v. Harrison & Burrowes Bridge Contrs.,* 3 A.D.3d 606, 608, 771 N.Y.S.2d 187 (2004); *see also Gayle v. City of New York,* 92 N.Y.2d 936, 937, 680 N.Y.S.2d 900, 703 N.E.2d 758 (1998) (plaintiff need not positively exclude every other possible cause).   The City's proof established that ExxonMobil knew the risks of MTBE gasoline and of underground storage tanks but chose to rely on inventory control, a flawed method, as its main leak detection technique.  Spills and leaks then occurred, contaminating the City's groundwater.  The jury was entitled to conclude, given this evidence, that ExxonMobil's negligent acts were more likely than not a substantial cause of the City's injury.

_____

[11] If *res ipsa loquitur* were applicable, the jury could still find negligence because ExxonMobil admits at least *one* of its branded stations was under its exclusive control.  Mtn. at 23.

## V.     The City Proved its Public Nuisance Claim

The clear weight of the evidence supports the jury's finding that levels of MTBE below 10 ppb substantially endangers the property, health, safety or comfort of a considerable number of persons.  As described above in Section III.D, the City's experts Dr. Burns and Dr. Rudo testified that MTBE was mutagenic and carcinogenic at levels below 10 ppb, endangering the health and safety of those who drink water containing it, and the City's expert Dr. Lawless testified that a significant percentage of the population could detect MTBE in drinking water at levels below 10 ppb, endangering the comfort of those who drink it.  These dangers are imminent because MTBE will be present in the outflow of the Station 6 wells as soon as the wells are turned on.  8/19/09 Tr. 2011:11-20 (Terry) ("you can expect to see MTBE contamination when Station 6 is first turned on").  *See Dimarzo v. Cahill,* 575 F.2d 15, 18 (1st Cir.1978) (plaintiffs "need not wait for the conflagration before concluding that a real and present threat exists").  Because the evidence shows that MTBE presents an imminent threat to the public's health, safety and comfort, the jury was entitled to find ExxonMobil liable for public nuisance.

The jury's findings on public and private nuisance are not inconsistent.  First, it found that ExxonMobil "endangered or injured the property, health, safety or comfort of a considerable number of persons."  *Copart Industries, Inc. v. Consolidated Edison Co.,* 41 N.Y.2d 564, 567 (NY 1977) (public nuisance).  It need not also find that ExxonMobil intentionally interfered with the City's right to use and enjoy its property, creating a private nuisance (*id.* at 570).  ExxonMobil retained sufficient control over the product in the tanks to be liable in public nuisance:  it manufactured MTBE gasoline, stored that gasoline underground near water, and allowed it to leak and spill before it was ever sold to a third party.  In contrast, the cases cited by ExxonMobil involve products that were sold to third parties over whom defendants had no control.  *See, e.g., People v. Sturm, Ruger & Co., Inc.,* 309 A.D.2d 91, 99, 761 N.Y.S.2d 192 (1st

25

Dept. 2003) (harm actually resulted from "unlawful and frequently violent acts of criminals –

over whom defendants have absolutely no control").

## VI.    The City Proved its Trespass Claim

The evidence indicates ExxonMobil knew that all tanks leak, spilling MTBE gasoline

into the subsurface, where it travels faster and farther than other gasoline components and

contaminates groundwater.  9/15/09 Tr. 4595:17-4596:16 (Biles); 9/10/09 Tr. 3998:1-4001:11

(Stone); 9/2/09 Tr. 3306:15-3307:4 (Moreau); 9/02/09 Tr. 3227:5-3229:4; 3235:10-3239:25;

3243:3-3243:6 (Scala); 9/9/2009 Tr. 3902:25-3939:22 (Curran); 9/4/09 Tr. 3545:20-3546:10,

3549:18-3561:25, 3563:7-3567:13 (Mickelson). ExxonMobil's own witnesses conceded that they

knew that gasoline refined and/or supplied by ExxonMobil would reach stations owned and

operated by third parties, and that many of these stored gasoline in corrosion-prone single-walled

tanks –  notorious as the worst leakers.  9/4/09 Tr. 3659:6-18 (Dugan); 9/9/09 Tr. 3905:1-

3910:23 (Curran).  By manufacturing, refining, supplying and selling MTBE gasoline where it

would be stored in underground storage tanks (whether its own or someone else's) that would

surely result in releases to groundwater, therefore, ExxonMobil knew MTBE gasoline was

reasonably certain to reach the City's property.  *See In re MTBE*, 379 F.Supp.2d 348, 426-427

(S.D.N.Y. 2005) ("defendants' intentional creation and distribution of MTBE-containing gasoline

could be construed as the act which amounted to or produced the unlawful invasion of plaintiffs'

property … [and] given defendants' alleged awareness of the vulnerabilities in the gasoline

distribution and storage system, a reasonable inference is that it was substantially certain that

MTBE would enter plaintiffs' property.")  Trespass requires no more; the showing this Court has

required for punitive damages is greater. The Court's opinion regarding punitive damages[12] held that ExxonMobil would be required to know not only the foregoing, but "precisely how the MTBE concentrations that it had detected would affect groundwater at a distance from the spill site." *In re MTBE*, 2009 WL 3347214, *3 (S.D.N.Y., October 19, 2009).

The jury charge on trespass was therefore proper because under New York law, the specific injury resulting from the trespass need not be foreseen. *See State v. Fermenta ASC Corp.,* 238 A.D.2d 400, 656 N.Y.S.2d 342, 346 (2d Dept 1997) ("The foreseeability of a plaintiff's specific injury … is not a requirement of liability under a trespass theory"), citing *Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331, 121 N.E2d 249  (N.Y. 1954) ("the trespasser, to be liable, need not intend or expect the damaging consequence of his intrusion").

The charge was also proper because the City's usufructuary interest is a possessory interest in land.  Under New York law, water rights are property rights, and groundwater contamination can constitute a trespass.   *See Westphal v. City of New York,* 75 A.D. 252, 78 N.Y.S. 56, 59 (2d Dep't 1902) ("[the plaintiff's] property in the water is in its use while it remains upon or under his lands; it is the usufructuary right, the same as in flowing water."); *Matter of Van Etten v. City of New York*, 226 N.Y. 483, 486-487, 124 N.E. 201 (1919) (usufructuary right to water " is properly classified at common law, equally with the land itself, as real property"); 78 Am. Jur.2d, Waters § 35; *see also In re MTBE*, 457 F.Supp.2d at 461 ("usufructuary interests are possessory property rights and the interference with those rights may give rise to liability for trespass. Groundwater contamination can constitute a trespass, where there is a physical invasion that results in the presence of contamination on the property." (citation omitted)).  Thus, evidence that MTBE has contaminated the City's groundwater

---

[12] The City acknowledges the Court's decision not to allow it to present a case for punitive damages, but respectfully reserves its rights on this issue for purposes of appeal.

supports the jury's trespass finding.

Proof of substantial damage is not required to show a trespass.  *See, e.g., Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95 (1993) (nominal damages "protect a landowner's right to be free of trespass"); *New York Rubber Co. v. Rothery*, 132 N.Y. 293, 295-96 (1892) (it is error to limit the issue to the interference with the plaintiff's present use of water rights and to refuse to instruct the jury that plaintiff's right to recover nominal damages does not depend on showing actual injury); *Burger v. Singh*, 816 N.Y.S.2d 478, 480 (App. Div. 2006) ("nominal damages are presumed from a trespass"); *Mondello v. Newsday, Inc.*, 774 N.Y.S.2d 794, 794-95 (App. Div. 2004) ("[e]ven without pleading actual damages for trespass, a plaintiff is entitled to nominal damages").  The analysis of Maryland law regarding trespass and damages in *In re MTBE*, 457 F.Supp.2d at 314 that ExxonMobil cites does not conform to New York law on the issue, is tangential, and – given the jury's finding that the trespass did, in fact, cause substantial damage to the City – any error was harmless.

## VII.    The Conduct of Jurors Warranted Neither a Mistrial Nor a New Trial.

 "Although we cannot lightly brush aside allegations of juror misconduct, we recognize that the trial judge has broad discretion to decide questions involving such misconduct." *U.S. v. Carmona,* 858 F.2d 66, 69 (2d Cir.1988).  The district court, which "observ[es] the jury on a day to day basis ... is in the best position to sense the atmosphere of the courtroom as no appellate court can on a printed record" (*U.S. v. Barnes,* 604 F.2d 121, 144 (2d Cir.1979)), and therefore has broad flexibility in handling potential juror misconduct and devising a remedy.  *U.S. v. Thai,* 29 F.3d 785, 803 (2d Cir.1994).  If other, less drastic remedies (such as dismissing a juror) are available, a trial judge should grant a mistrial only as a last resort and only if the movant demonstrates actual prejudice.  *U.S. v. Abrams,* 137 F.3d 704, 708-09 (2d Cir.1998) (mistrial warranted only upon showing of actual prejudice).  The decision to remove a juror rests in the

trial judge's sound discretion. *See U.S. v. McGriff,* 287 Fed. Appx. 916, 918 (2d Cir. 2008) (district court within its discretion to conduct voir dire and dismiss jurors who were frightened). ExxonMobil conveniently ignores these basic principles. The Court should deny the motion because there was no unremedied juror misconduct.

### A.  The Court Responded Appropriately to Jurors' Outside Research

Juror 8 admitted that his children exposed him to information from the internet about this case. But his exposure would warrant a mistrial only if the information could have affected the verdict. *Bayramoglu v. Estelle,* 806 F.2d 880, 887 (9th Cir. 1986). Here, the Court prevented any impact on the integrity of the verdict by dismissing Juror 8 before the verdict and, as detailed below, establishing that no prejudicial or material substantive information from outside the proceedings reached any other juror.

Juror 8 admitted that he was exposed to extra-record information, including a document about commingling that might have been an opinion of this Court (10/9/09 Tr. 6764:3-21.). But the Court's voir dire established that none of the other jurors received any prejudicial substantive information from Juror 8.[13]  Indeed, only Juror 11 and Juror 5 reported knowing any information that could be deemed substantive, but the information they reported was neither material nor prejudicial to ExxonMobil. Juror 11 did no research about the case himself (6807:14-19), and the only potentially substantive information about the case that Juror 11 claimed he heard from Juror 8 was "something about some other penalty part that is just going to be on Phase IV," and

---

[13] Most jurors did no research about the case themselves (Juror 1: 10/9/09 Tr. 6786:9-22; Juror 2: 6820:16-21; Juror 3: 6779:11-6781:3; Juror 4: 6776:16-20, 6777:2-8; Juror 6: 6795:6-20; Juror 7: 6801:24-6802:5; Juror 9: 6804:11-16; Juror 10: 6811:11-17) and did not know the substance of the information found by Juror 8. ( Juror 1: 6786:24-6789:18; 6793:6-6794:4; Juror 2: 6821:22-6823:9; Juror 3: 6779:11-6781:3; Juror 4: 6776:16-20, 6777:2-8; Juror 6: 6797:4-6799:1; Juror 7: 6802:7-21; Juror 9: 6806:7-13; Juror 10: 6812:4-13).

nothing more.  (6808:3-8; 6809:7-6810:4)  But according to Juror 8, the information about Phase

IV came from the Court itself, not from an external source.  (6830:14-20).   Furthermore, the

possibility of a fourth phase of the trial was not material to any claim or issue, and ExxonMobil

cannot demonstrate prejudice – not least because no such fourth phase took place.  Juror 5 did no

research about the case herself (6813:11-17) and did not know the substance of the information

found by Juror 8, except that ExxonMobil "wasn't settling out of court" (but as a juror, this

information would not have been news to her).  (6814:5-6815:1).   Although she may have heard

Juror 8 say "something about maybe $1 million for each company," she was not sure (6814:22-

6815:2). The information did not affect her ability to serve as a juror or deliberate impartially

(6815:21-6816:8), and ExxonMobil has not demonstrated any prejudice attributable to the

information.

Neither instance of outside research cited by ExxonMobil in footnote 15 of its motion

justifies a new trial, because (1) those instances did not rise to the level of misconduct and (2)

even if they did, ExxonMobil has made no showing of prejudice.  Even though a juror's

unauthorized viewing of the property or scene involved in the litigation may be misconduct

(*Pyles v. Johnson*, 136 F.3d 986, 992 (5th Cir. 1998)), such misconduct is rarely ground for

mistrial because it is seldom prejudicial (*U.S. v. Williams-Davis*, 90 F.3d 490, 503 (DC Cir.

1996)) – and Juror 4 did *not* in fact view the property involved in this litigation.  He drove "past"

the site, but "didn't go to the site," "couldn't find it," and did not see anything. (10/9/09 Tr. at

6777:9-18.)

There is *no* presumption of prejudice based on media exposure alone.  *U.S. v. Williams-

Davis*, 90 F.3d 490, 501 (DC Cir. 1996); *Waldorf v. Shruta*, 3 F.3d 705, 710 (3rd Cir. 1993)

(defendant has the burden of showing likelihood of actual prejudice).  Although jurors may not

receive media information *about the case* from an outside source, such misconduct does not

require a mistrial unless the news coverage is prejudicial. *Barry v. Bergen County Probation Dept.,* 128 F.3d 152, 161 (3rd Cir. 1997).  Juror 6 reviewed a newspaper article about water pollution, but the article was not about this case, not about MTBE, and the events described in the article took place in another state.  (6795:25-6796:14).  In any event, the Court determined that the article did not affect her ability to judge the case fairly.  (6796:15-17.)

### B.  The Dismissal of Juror 2 Does Not Warrant a New Trial.

ExxonMobil never moved for a mistrial based on Juror 2's putative "holdout" status and therefore waived the argument.  In fact, at the time, ExxonMobil *agreed* that the Court should excuse Juror 2 (10/16/09 Tr. 7013:24-25) ("We think if [Juror 2] cannot go forward, then she needs to be excused").  After further examination of Juror 2, ExxonMobil subsequently moved for a mistrial, but only because "an actual instrument was used in the jury room, at least in the mind of [Juror 2]" (7022:14-17) – i.e., on the ground that Juror 2 had alleged a more detailed threat, not because she was a "holdout."  The Court denied that motion.   (7022:14-24.) ExxonMobil's challenge on this new ground is therefore waived.  *See Bank of the South v. Fort Lauderdale Technical College, Inc.*, 425 F.2d 1374, 1374 (5th Cir. 1970) (right to new trial waived by failure to request a mistrial when grounds for motion arose).

The Second Circuit's "holdout" rule of *U.S. v. Thomas*, 116 F.2d 606 (2d Cir 1997) ("*Thomas*"), relied on in *U.S. v. Samet*, 207 F.Supp.2d 269, 281 (S.D.N.Y. 2002) ("*Samet*"), does not apply here, for two reasons.  First, this rule was developed in the jury nullification context and has been applied solely in criminal contexts[14] to prevent the improper dismissal of jurors on

---

[14] The rule was held not applicable in one civil case, *Duke v. County of Nassau*, 63 Fed.Appx. 558, 561 (2d Cir. 2003), where "there was *no* evidence before [the trial court] that Juror No. 7 was determined to vote without regard to the evidence or was a holdout" (emphasis added). Dismissing a holdout juror in a *criminal* case would implicate constitutional considerations not at play in a civil case like this onebecause a unanimous verdict in a *criminal* case is a constitutional

the basis of their views for or against acquittal. *Thomas* at 622. Second, the rule eliminates the risk that a juror will be dismissed because of his or her views on the merits – and here, the juror's views are unknown. *Samet* at 273.

Without information indicating *how* a juror intends to vote, the fact that one juror's opinions merely *differ* from those of other jurors will not trigger the "holdout" rule. In *Thomas* and similar cases where the "holdout" rule has been applied, the views of the juror in question were known. *Thomas* (the juror in question "was adamant for acquittal" according to five other jurors and "indicated an unwillingness to convict"); *U.S. v. Symington*, 195 F.3d 1080, 1088 (9th Cir 1999) (dismissal improper where a juror's "views on the merits of the case provided the impetus for her removal"); *cf. Duke v. County of Nassau*, 63 Fed. Appx. 558, 560 (2d Cir. 2003) (dismissal of juror permissible because there was no evidence that the juror "was determined to vote without regard to the evidence"). Here, Juror 2 stated only that her opinion differed, not what that opinion was. *See U.S. v. Baker,* 262 F.3d 124, 132 (2d Cir. 2001) ("If the judge has not learned the views of the misbehaving juror, the court's remedial action is less likely to be subject to challenge as an effort on the court's part to shape the verdict."); *U.S. v. Boone*, 458 F.3d 321, 330 (3rd Cir. 2006) (allowing examination that "avoided inquiry into the content of the deliberations or the views of the juror"). "In the absence of evidence that a judge's decision to excuse a juror for inability to perform duties was influenced by a juror's view of the case, the refusal to declare a mistrial is not error." *Cook v. Rockwell Intern. Corp.*, 428 F.Supp.2d at n. 2.

In *U.S. v. Ruggiero,* 928 F.2d 1289, 1294-1298 (2d Cir. 1991) ("*Ruggiero*"), Juror 9 sent the judge a note saying that there was a lack of tolerance and patience in the jury room, expressing a fear that his residence was known, expressing concern for his family, and saying "I

---

imperative. *See Samet* at 277; *Cook v. Rockwell Intern. Corp.*, 428 F.Supp.2d 1152, 1154 n. 2 (D. Colo. 2006) (discussing and distinguishing *Samet*).

simply can't be persuaded [sic] or forced to vote against my belief and conscience."  The following morning, the jury sent a note claiming that "due to the fears of one juror relating to alleged threats he received prior to deliberations, the jury is unable to reach a formal unanimous verdict on any of the 4 counts."  The district court granted the government's motion to excuse Juror 9 and denied the defendant's motion for a mistrial.  After Juror 9 was dismissed, the rest of the jury reached a unanimous verdict on the same evening.  *Ruggiero* at 1294-1298.  The Second Circuit refused "to second guess the conclusion of the experienced trial judge" that Juror 9 should be dismissed.  *Ruggiero* at 1300.[15]

ExxonMobil assumes that Juror 2's dismissal was prejudicial simply because the jury returned a verdict "against ExxonMobil," in her absence, early in the next day of deliberations. (Mtn. at 30.)  But the relative speed of deliberations proves neither that Juror 2 was a "holdout" who was blocking the verdict, nor even that Juror 2 favored ExxonMobil rather than the City. *See U.S. v. Martorell*, 81 Fed. Appx. 754, 757 (2d Cir. 2003) ("that the jury returned with a verdict so quickly after the removed juror was excused proves nothing about what the trial judge should have known about her views at the time he removed her from the jury").  Furthermore, the jury answered many questions on the multiple-question jury form in a way *favorable* to ExxonMobil – including the jury's findings that ethanol was not a safer, feasible alternative to MTBE, that the award should be reduced substantially to account for PCE contamination, and that ExxonMobil did not create a private nuisance.

## VIII.   The Court's Evidentiary Rulings Were Correct.

A trial court's discretion with respect to "the regulation of the course and scope of

---

[15] The *Thomas* court was aware of *Ruggiero,* and in fact cited it as an example of an *appropriate* dismissal  "where the trial court found that a juror was no longer capable of rendering an impartial verdict." *Thomas* at 613.

examination of witnesses" is "broad indeed." *U.S. v. Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1095 (2d Cir.1995). Even an erroneous evidentiary ruling will warrant a new trial only where "a substantial right of a party is affected." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir .2007). *In re Martin-Trigona*, 760 F.2d 1334, 1344 (2d Cir.1985) (evidentiary rulings are generally not to be disturbed unless " 'manifestly erroneous' " (quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 35 (1962)), and even an erroneous ruling does not warrant a new trial or setting aside a jury verdict "[u]nless justice [so] requires," Fed.R.Civ.P. 61.)

Even manifestly erroneous evidentiary rulings do not warrant a new trial if the the improperly admitted evidence was "harmless - i.e., [that] the evidence was unimportant in relation to everything else the jury considered on the issue in question." *U.S. v. Germosen,* 139 F.3d 120, 127 (2d Cir.1998). An error is harmless if the Court "can conclude with fair assurance that the evidence did not substantially influence the jury." *U.S. v. Rea*, 958 F.2d 1206, 1220 (2d Cir.1992). None of the Court's rulings in this case warrants a new trial.

## A.  The Court Properly Excluded Dr. Hand's Testimony

The Court properly held that Dr. Hand was not qualified to testify about the costs of major construction in a major urban market like New York City:  he had estimated construction costs only for a small number of projects in two small towns in the Midwest, had never done so in New York or any other major city, and before this case had never worked with the cost estimating standards used for municipal projects like Station 6.  9/30/09 Tr. 6125:2-6126:3; 6118:17-6121:18; 6123:1-25.  Therefore, his opinions regarding the cost of construction in New York City were not based on superior knowledge or experience and would not be reliable, and the Court properly excluded them.  *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 & n. 7 (1993) (holding that pursuant to the trial judge's "gatekeeping responsibility," she "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but

reliable"). ExxonMobil's objection that the City failed to challenge Dr. Hand's opinion before trial overlooks the fact that he did not submit an opinion about the cost of treating MTBE from 10 ppb down to 1 ppb before trial, and could not have done so before the jury determined that MTBE would be present at a maximum of 10 ppb. Thus, the City had no advance notice of the $900,000 per year O&M figure ExxonMobil claims should have been allowed. Mtn. at 31.

Any error in excluding his testimony was harmless because Dr. Hand repeatedly made his true opinion quite clear: the real cost of treating MTBE from 10 ppb to 1 ppb is $0, because at 10 ppb, "no treatment is necessary." 9/30/09 Tr. 6129:9-10;6140:1-3 ("I don't think I've ever designed a system in my life that's treated a compound at the MCL to below the MCL"); 6141:7-9 (no "need to expend monies to install additional adsorbers just to remove MTBE"); 6166:15-16; 6166:17-18 (at 10 ppb, more frequent carbon change-outs would *not* be necessary, because it meets the MCL); 10/1/09 Tr. 6205:12-18 ("no increased operating and maintenance costs because treatment for MTBE is not necessary" at 10 ppb). The jury heard this testimony and rejected it in favor of the City's evidence that treatment *is* necessary. Because the testimony ExxonMobil contends Dr. Hand was prepared to offer directly conflicts with the testimony that he *did* in fact offer, it is irrelevant and the Court did not err by excluding it.

### B. The Court Properly Admitted Evidence On Warnings.

The Court's ruling that the duty to warn extends to the general public accords with New York law specifying that the duty to warn extends to "foreseeable users," where, as here, "almost everybody is" a foreseeable user of the product. 9/8/09 Tr. 3787:19-22. It is consistent with Second Circuit jurisprudence on the duty to warn the general public of dangers associated with a widespread or publicly-available product: under New York law, the "duty generally extends to warning ultimate consumers of the dangers resulting from the foreseeable use of the product."

*Urena v. Biro Mfg. Co.,* 114 F.3d 359, 366 (2d Cir.1997) (citing *Polimeni v. Minolta Corp.,* 227 A.D.2d 64, 65-66, 653 N.Y.S.2d 429 (3d Dep't 1997); *Bukowski v. CooperVision Inc.,* 185 A.D.2d 31, 592 N.Y.S.2d 807 (3d Dep't 1993) ("[t]he manufacturer's duty extends to warning *consumers* of latent dangers resulting from the foreseeable use of its product of which the manufacturer knew or should have known."); *see also Clinton v. Brown & Williamson Holdings, Inc.*, 498 F.Supp.2d 639, 643 (S.D.N.Y. 2007) (denying motion for summary judgment where there was triable issue of fact as to the state of the *public's* knowledge regarding the dangers of cigarettes).

Evidence regarding warnings not given to the public, the EPA, or water suppliers is relevant and probative, because it tends to show that ExxonMobil did not meet its duty to warn the public of the dangers specific to MTBE gasoline.  The Court properly admitted evidence related to ExxonMobil's failure to warn and a new trial is not warranted.

## C.  The Court Properly Permitted Dr. Rudo's Testimony and Properly Excluded Dr. Mohr's.

ExxonMobil's sole ground for excluding Dr. Rudo's testimony is the fact that he was not disclosed as an expert before trial.  But the City could not have named an expert to rebut testimony by Dr. Mohr that she *never disclosed* before trial.  ExxonMobil argues that it need not have provided "an explicit recitation of all testimony" (Mtn. at 35), but the Rules do require, if not a word-for-word script, "a complete statement of all opinions to be expressed and the basis and reasons for them."  Fed .R.Civ.P. 26(a)(2)(B).

Instead, Dr. Mohr opined for the first time at trial that mutagenicity is not particularly relevant at all to understanding carcinogenicity or toxicology (9/01/09 Tr. 3098:15-18; 3108:6-15), and that the evidence "showed that MTBE is at best a weak mutagen and may not be particularly mutagenic at all."  9/01/09 Tr. 3104:17-21.  Although ExxonMobil claims something

like these opinions could be construed or inferred from Dr. Mohr's expert report, (1) they could not have been, and (2) the Rules require a complete statement, including bases and reasons – the parties should not be forced to guess, construe, or infer.  The only mention of mutagenicity occurred during a critique of Dr. Burns' opinions, and in fact, Dr. Mohr's report *acknowledged* that MTBE's mutagenicity had been demonstrated in mouse lymphoma cells.  Finally, not only were the opinions undisclosed, they were unsupported by existing data and therefore did not meet the requirements of FRE 702.  For these reasons, the Court properly excluded Dr. Mohr's testimony on mutagenicity.

Because Dr. Mohr's mutagenicity opinions were not disclosed before trial, the City was "deprived of the chance to prepare its best evidence."  9/18/09 Tr. 5068:23-24.  The Court, exercising its discretion to "regulat[e] the course and scope of examination of witnesses" (*U.S. v. Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1095 (2d Cir.1995)), devised an appropriate remedy to lessen "the harm caused by this unexpected live testimony… because the City was able on short notice to present its own rebuttal witness to Dr. Mohr."  5068:15-17.  Prejudice to ExxonMobil, if any, was minimal because ExxonMobil, from prior litigation involving Dr. Rudo, was already aware that Dr. Rudo believed the evidence supported MTBE's mutagenicity – i.e., that it "can cause a mutation which can possibly lead to cancer."  9/2/09 Tr. 3267:18-24. Furthermore, any error in admitting Dr. Rudo's testimony regarding mutagenicity was harmless, because Dr. Burns had already testified that MTBE was mutagenic.  8/27/09 Tr. 2829:10-15.  Given Dr. Burns' unchallenged testimony and the lack of admissible testimony from Dr. Mohr, the clear weight of the evidence supports the jury's finding that the City is or will be injured by the presence of MTBE at levels below 10 ppb on this ground alone, in addition to the evidence described in Section III.D, *supra*.  Dr. Rudo's testimony, though relevant and probative, did not tip the scales in the City's favor, and its admission was not prejudicial.

37

**IX.     The Jury's Damages Award Warrants Neither New Trial Nor Remittitur.**

ExxonMobil has not pointed to any error in the jury's damages award, nor any way in which it deviates from reasonable material compensation.  Its motion for new trial therefore fails.  Not only is the jury's award reasonable, but it is in line with the cost of comparable treatment plants built elsewhere to treat similar injuries.

**A.  The Jury's Award Was Supported By The Evidence.**

The clear weight of the evidence in this case supports the jury's award of $250 million.  The evidence outlined in Sections III.C and III.D, *supra*, establishes that the wells are injured and will require treatment at levels of 10 ppb and below.  The jury agreed that the City must build Station 6, and therefore awarded the full cost of building and operating it.

Each subcategory of the total cost figure is amply supported by credible evidence in the record.  First, the City's $59.9 million figure for capital costs is reasonable.  ExxonMobil conflates "escalation of prices" and inflation, and argues that a substantial increase from 2004 to 2009 is implausible because the earlier figure "had already been adjusted to 2007 dollars and the $59.9 million was in 2009 dollars."  Mtn. at 39.  But Bell testified to "a number of reasons" the capital costs had increased in addition to inflation, including "escalation of prices over time" and a change in design.  9/30/09 Tr. 6026:17-20.  Specifically, "the main drivers in the increasing costs are that costs of the GAC [granular activated carbon] tanks have increased substantially since 2004. Additionally, costs of construction and materials have increased." 6044:20-23.  The *amount* of carbon required increased as well:  from 18 20,000-pound GAC vessels in the 2004 design (360,000 pounds total) to 24 40,000-pound GAC vessels in the 2009 design (960,000 pounds total), an almost three-fold increase.  6045:1-7.

Ms. Bell also provided a reasonable explanation for the increase in carbon required despite the decreased MTBE concentration in the design parameters: after 2004, she and other

engineers recognized that "series operation," which requires more carbon and more vessels than the parallel operation used in the 2004 design, was needed to treat MTBE at low levels, because "it does not stick well to the carbon. 6045:15-17. Furthermore, she testified "series operation is consistent with industry practices and consistent with what other utilities are currently implementing for MTBE removal." 6045:17-19.

The City's figure of $190 million in equipment replacement and operating and maintenance costs finds firm support in the record as well. As the testimony detailed above in Section III.E shows, Station 6 is likely to operate continuously for a substantial portion, if not all, of the next 40 years – even as a "backup" water supply. Therefore, Bell testified "the only reasonable assumption to make was to assume it would operate continuously" – eminently reasonable given testimony that Station 6 will be used both during planned replacement of tunnels and aqueducts (which could take years), and during emergencies and unplanned failures of other water facilities. 6017:20-6018:4. The need to account for the cost of equipment replacement once every 20 years follows naturally from the conclusion that Station 6 will operate continuously for 40 years. Bell testified the useful lives "for these types of equipment are typically on the order of 20 years."[16] (9/30/09 Tr. 6023:4-5; see also 9/25/09 Tr. 5895:6-13 (unused GAC vessels deteriorate and require substantial maintenance).) Assuming Station 6 will operate for at least 40 years, the capital equipment will need to be replaced twice. The jury was entitled to accept Bell's conclusions about O&M and equipment replacement costs, which were subjected to rigorous cross-examination at trial. "When a verdict turns on theories of future damages presented by expert witnesses based upon such assumptions, the testimony of those

---

[16] Even if the wells were assumed to operate for some period less than 40 years – an assumption not supported by the record, given the need for a ready, operational back-up water supply – Bell testified that the equipment may deteriorate even without use and require replacement. 6023:16-18.

experts is appropriately left to the considered discretion of the jury." *In re Air Crash Disaster*, 720 F.Supp.1467, 1486 (D. Colo. 1989)*; see also State of New York v. Hendrickson Bros ., Inc.,* 840 F.2d 1065, 1077 (2d Cir.) (noting in antitrust case that "the jury is … is entitled to make a just and reasonable estimate of the damages based on relevant data, and render its verdict accordingly") (internal citations and quotations omitted), *cert. denied,* 488 U.S. 848 (1988).

Based on this evidence, the jury was entitled to conclude that $250 million would fairly and reasonably compensate the City for the damages it suffered or will suffer because of MTBE contamination at Station 6.  Indeed, anything less would risk undercompensating the City and giving ExxonMobil a windfall.  ExxonMobil has not demonstrated and cannot demonstrate any way this award is erroneous, egregious, or a miscarriage of justice, and it should stand.

### B.  The Award Does Not Deviate Materially From Reasonable Compensation.

In determining whether a jury award is excessive, the district court should review awards in similar cases. *See Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 684 (2d Cir.1993); *see also Fowler,* 2001 WL 83228, at *12; *Tanzini v. Marine Midland Bank, N.A.,* 978 F.Supp. 70, 77 (N.D.N.Y.1997).  While all cases rest on different facts, making "a *direct* comparison of injuries in different cases…virtually impossible" (*Okraynets v. Metro. Transp. Auth.*, 555 F.Supp.2d 420, 466-67 (S.D.N.Y. 2008) (emphasis added)), ExxonMobil has deemed a comparison to verdicts in similar cases "difficult, if not impossible" and declined to suggest any. ExxonMobil instead invites the Court to compare the jury's verdict – which included the cost in 2009 dollars of building, operating and maintaining a permanent, 24-vessel GAC treatment facility to ensure clean water for a 40-year period – to the cost in 2002 of installing temporary GAC units at five wells during a single, transient drought emergency.  9/25/09 Tr. 5960:2-10, Mtn. at 42.  This comparison is patently unfair; the two projects differ too greatly in purpose, duration and time to be comparable.

40

However, defendants have agreed to pay amounts ranging in the hundreds of millions of dollars to treat similar contamination of similar water supplies.  For example, the City of Santa Monica, California, sued a group of MTBE gasoline refiners including ExxonMobil after the city shut down a wellfield contaminated with MTBE (*City of Santa Monica v. Shell Oil Company, et al.,* Orange County Sup. Ct. Case No. 01-CC-04331).   In 2004, Shell, Chevron, and ExxonMobil agreed to settle the case with a cash payment plus "guaranteed funding by Shell, Chevron and ExxonMobil for construction and operation of a water treatment facility" serving the five affected wells, which all parties agreed to value at **$220.05 million** for purposes of a good-faith settlement determination. [17]   Declaration of Marnie Riddle ("Riddle Dec.") Ex. 1 at pp. 3, 5, 10 (Memo of ChevronTexaco et al. in Support of Mtn. for Determination of Good Faith Settlement).

ExxonMobil's own expert, Barbara Mickelson (also a witness in this trial), testified in 2003 that a GAC treatment facility with a 7,000 gallon per minute treatment capacity would have capital costs between $73.9 million and $78.3 million, depending on configuration (far exceeding Bell's capital cost estimate of $59.9 million in 2009 dollars).  RJN Exh. 3, p. 4 (Mickelson Declaration).  The City of Santa Monica's expert, Anthony Brown, estimated the value of the same treatment facility as ranging from $240 million to $527 million, in 2002.  RJN Ex 4, p. 4 (Brown Declaration).  The number of treated wells and the amount of water produced are similar here.  The evidence establishes that Station 6 will provide 10 million gallons of water per day (or 6,944 gallons per minute –equivalent to the *Santa Monica* plant's capacity).  8/6/09 Tr. 681:15-682:3 (Lawitts). That the jury found Station 6 a "back-up" plant is of no consequence because, as Marnie Bell explained, determining the capital and operating costs of a backup

_____

[17] The court found the agreed-upon settlement value reasonable and assigned the settlement a total value of $312,850,000.  Riddle Dec. Ex. 2 (Amended Order on Motion for Determination of Good Faith Settlement).

treatment plant requires the same assumptions about its size and operational life as a "non-backup" or primary facility.  9/30/09 Tr. 6017:20-6018:4.  The $220.05 million (in 2004 dollars) agreed-upon cost estimate for the *Santa Monica* plant is, therefore, a far better point of comparison than ExxonMobil's $3 million figure for some temporary drought-relief treatment units.

ExxonMobil contends that the portion of the award attributable to O&M costs should be stricken because it is based on the assumption that Station 6 will operate continuously for 40 years.  As Bell and other witnesses repeatedly explained, however, this design assumption was entirely reasonable – even necessary.[18]  This assumption does not conflict with the jury's Phase 1 decision that Station 6 would serve as a back-up supply.  The jury was entitled to accept Bell's testimony that a 40-year operating period was "the only reasonable assumption" to make when estimating operating and maintenance costs for a backup facility that could be needed for 40 years. Second, as discussed above, the basis for Bell's capital cost estimate was explained and cross-examined on the record, was not controverted by any other evidence, and the jury was entitled to accept it.  Finally, Bell's equipment replacement cost estimate was grounded in the assumption of a 40-year operating period –a reasonable assumption that the jury also accepted.

ExxonMobil's suggested figure of $1 million to $4 million is unrealistic because, as Ms. Bell explained, the cost of building temporary treatment vessels for a short period in 2002 to 2004 is not a reasonable point of comparison.  (9/25/09 Tr. 5962:7-14 (lower total flow rate than Station 6; installed in 2002-2004); 9/30/09 Tr. 6015:25-6017:1 (thirteen GAC vessels installed temporarily; "a few wells were pumped to distribution for a short period of time.")) ExxonMobil

---

[18] Given evidence indicating that MTBE will be present for 40 years and the range of reasons the treatment facility might be needed over the entire period, it would be unreasonable to deliberately design a backup facility to operate for *less* time.

also contends that the City should be awarded operating costs for a maximum of four years only, but the record established that "the only reasonable assumption to make was to assume it would operate continuously," and that Station 6 could be in operation not only during planned replacement of tunnels and aqueducts, but also during emergencies and unplanned failures of other water facilities.  (9/30/09 Tr. 6017:20-6018:4 (Bell)).

ExxonMobil's claim that Dr. Hand would have testified to annual O&M costs attributable to MTBE of $900,000 is belied by Dr. Hand's own testimony that the O&M costs attributable to MTBE are $0 (see Section VIII.A).  The jury heard that testimony and declined to accept it, finding the weight of the evidence backing Ms. Bell's cost estimates instead.  The jury also declined to accept the 2004 capital cost estimate of $9.9 million, which did not account for inflation, price increases, labor cost increases, or a changed design.  The trial record contravenes ExxonMobil's alternative damages calculations, the jury rejected the evidence on which those calculations are based, and this Court should not consider them.

The evidence supports the jury's award.  ExxonMobil has pointed to no manifest errors and no reasonable points of comparison to other jury verdicts.  In contrast, a group of defendants including ExxonMobil *agreed* to pay an amount strikingly similar to the jury's award in this case to remediate MTBE contamination of the same number of wells, serving a similar number of people.  For all of these reasons, ExxonMobil's assertions that the maximum reasonable award is between $1 and $4 million (or no more than $30.94 million) have no merit, and justify neither a new trial nor remittitur.

## CONCLUSION

For all of the foregoing reasons, the Court should deny ExxonMobil's renewed motion for judgment as a matter of law and should neither grant a new trial on any ground, nor remit the City's damages award.

Dated: San Francisco, California
   May 27, 2010     Respectfully submitted,


       MICHAEL A. CARDOZO
       Corporation Counsel of the City of New York
       100 Church Street
       New York, New York 10007
       (212) 788-1568

        */s/ MARNIE E. RIDDLE*
       VICTOR M. SHER *(pro hac vice)*
       TODD E. ROBINS *(pro hac vice)*
       NICHOLAS G. CAMPINS *(pro hac vice)*
       MARNIE E. RIDDLE *(pro hac vice)*

       SHER LEFF LLP
       450 Mission Street, Suite 400
       San Francisco, CA 94105
       (415) 348-8300

       *Attorneys for Plaintiffs City of New York, New*
       *York Municipal Water Finance Authority, and*
       *New York City Water Board*