UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION<br><br>**This document relates to:**<br><br>*City of New York v. Amerada Hess Corporation, et al.,* No. 04 Civ. 3417 (SAS) | Master File No. 1:00-1898<br>MDL 1358 (SAS)<br>M21-88 |

## EXXON MOBIL DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL AND/OR REMITTITUR

# TABLE OF CONTENTS

page

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ......................................................................................................1

ARGUMENT ..............................................................................................................1

I.  AFFIRMATIVE DEFENSES ........................................................................ 1

    A. "Impossibility" And "Obstacle" Preemption ................................................. 1

    B. Statute Of Limitations.................................................................................... 3

II.  CAUSATION ................................................................................................ 4

    A. Direct Spiller Causation................................................................................. 5

    B. Refiner/Supplier Causation............................................................................ 6

    C. Commingled Product Theory......................................................................... 7

    D. Failure To Warn ............................................................................................ 8

III.  INJURY ........................................................................................................ 9

    A. The City Cannot Be Injured Unless It Actually Uses The Station 6 Wells. ................... 9

    B. The City Should Have Proven Its Claims By Clear And Convincing Evidence. ......... 10

    C. The City Failed To Prove Any Injury. ......................................................... 11

    D. Detections Below The MCL Will Not Injure The City. ............................... 12

IV.  NEGLIGENCE ........................................................................................... 13

V.  NUISANCE AND TRESPASS .................................................................. 15

VI.  JUROR MISCONDUCT AND DISMISSAL.............................................. 16

VII.  DAMAGES.................................................................................................. 18

    A. The Damage Award Was Not Supported By Credible Evidence. ................ 18

    B. The Damage Award Deviates Materially From Reasonable Compensation. ............... 19

CONCLUSION.........................................................................................................20

## TABLE OF AUTHORITIES

**page**

**FEDERAL CASES**

*Bank of South v. Ft. Lauderdale Technical College, Inc.*, 425 F.2d 1374 (5th Cir. 1970)............16

*Berg v. Underwood's Hair Adaption Processes, Inc.*, 751 F.2d 136 (2d Cir. 1984)......................8

*Carden v. Gen. Motors Corp.*, 509 F.3d 227 (5th Cir. 2007) .........................................................3

*Caruolo v. John Crane, Inc.*, 226 F.3d 46 (2d Cir. 2000)..............................................................12

*Coffey v. Dowley Mfg.*, 187 F. Supp. 2d 958 (D. Tenn. 2002) .......................................................4

*Duke v. Nassau*, 2003 U.S. App. LEXIS 7973 (2d Cir. 2003) ......................................................17

*Gasperini v. Ctr. For Humanities, Inc.*, 149 F.3d 137 (2d Cir. 1998)...........................................19

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000)................................................................1, 2

*Hillsborough Co. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)..........................................1

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .......................................................................................1

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987)..........................................................................1

*Irving v. Mazda Motor Corp.*, 136 F.3d 764 (11th Cir. 1998)........................................................3

*James v. Mazda Motor Corp.*, 222 F.3d 1323 (11th Cir. 2000).......................................................3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .....................................................................3

*Malek v. Fed. Ins. Co.*, 994 F.2d 49 (2d Cir. 1993) ......................................................................18

*In re MTBE Prods. Liab. Litig.*, 364 F. Supp. 2d 329 (S.D.N.Y. 2004)..........................................2

*In re MTBE Prods. Liab. Litig.*, 447 F. Supp. 2d 289 (S.D.N.Y. 2006)..........................................7

*In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 455 (S.D.N.Y. 2006)

*In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 249 (S.D.N.Y. 2008)..........................................8

*In re MTBE Prods. Liab. Litig.*,
  2009 U.S. Dist. LEXIS 59287 (S.D.N.Y. July 6, 2009) ..................................................3, 9, 11

*In re MTBE Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 78081 (Aug. 25, 2009) ..........................11

**page**

**FEDERAL CASES (Cont.)**

*Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420 (S.D.N.Y. 2008)...................................19

*O'Neal v. Smith Kline Beecham Corp.,* 551 F. Supp. 2d 993 (E.D. Cal. 2008) .............................2

*Oxygenated Fuels Ass'n, Inc. v. Pataki*, 158 F.Supp.2d 248 (N.D.N.Y. 2001)..............................1

*Perma Research & Dev. v. Singer Co.*, 542 F.2d 111 (2d Cir. 1976)..............................................4

*Ramchair v. Conway*, 671 F. Supp. 2d 371 (E.D.N.Y. 2009).........................................................17

*Scribner v. Summers*, 84 F.3d 554 (2d Cir. 1996) ........................................................................15

*United States v. Bagley*, 641 F.2d 1235 (9th Cir. 1981) ................................................................16

*United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987) ................................................................17

*United States v. Ruggiero*, 928 F.2d 1289 (2d Cir. 1991) .............................................................17

*United States v. Samet,* 207 F. Supp. 269 (S.D.N.Y. 2002) ..........................................................18

*United States v. Symington*, 195 F.3d 1080 (9th Cir.1999) ...........................................................17

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997)..................................................................17

**STATE CASES**

*Fullerton v. State Water Res. Control Bd.*, 90 Cal. App. 3d 590 (Cal. Ct. App. 1990).................10

*Gale v. City of New York*, 92 N.Y.2d 936 (1998) ..........................................................................14

*Hellert v. Town of Hamburg*, 857 N.Y.S.2d 825 (N.Y. App. Div. 2008)......................................10

*Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487 (N.Y. 1989)...............................................................5

*Mott v. Palmer*, 1 N.Y. 564 (N.Y. 1848) ........................................................................................9

*New York Tel. Co. v. Harrison & Burrowes Bridge Contrs.*,
  3 A.D. 606 (N.Y. App. Div. 2004) ...........................................................................................14

*Phillips v. Sun Oil Co.*, 307 N.Y. 328 (1954) ...............................................................................15

*Sorensen v. Lower Niobrara Natural Resources Dist.*, 376 N.W.2d 539 (Neb. 1985) ..................4

**page**

**STATE CASES (Cont.)**

*Squaw Island Freight Terminal Co. v. City of Buffalo*, 273 N.Y. 119 (1937)...........................9, 10

*Sweet v. Syracuse*, 129 N.Y. 316 (1891)..................................................................................10

*Tech-Bilt, Inc. v. Woodward-Clyde & Assoc.*, 28 Cal.3d 488 (1985)...........................................19

*Westphal v. New York*, 75 A.D. 252 (N.Y. App. Div. 1902).....................................................9, 10

**FEDERAL STATUTES**

42 U.S.C. § 7545(k).................................................................................................................2

42 U.S.C. § 7545(m)...............................................................................................................2

**STATE STATUTES & REGULATIONS**

N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.12.......................................................................12

N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.30.......................................................................12

N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.50.......................................................................12

N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.51.......................................................................12

N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.60.......................................................................12

N.Y. Nav. § 181(1) .................................................................................................................13

**MISCELLANEOUS**

136 Cong. Rec. S 2288 (Mar. 7, 1990) ......................................................................................2

136 Cong. Rec. S 3500 (Mar. 29, 1990) ....................................................................................2

36 N.Y. Jur. 2d Damages, § 113 ...............................................................................................9

L.H. Tribe, American Constitutional Law, § 6-29 (3d ed. 2000) ....................................................2

William X. Weed, Warren's Weed New York Real Property, Ch. 39 § 39.01 ................................9

## INTRODUCTION

Given page constraints, ExxonMobil can only substantively address in this reply what it believes to be the most significant inaccuracies made in the City's Memorandum in Opposition ("P's Opp."). ExxonMobil reiterates each of the arguments and points made in its opening papers, incorporating them by reference here by way of further reply, as well as each of the other points it (and other defendants) have made to the Court over the years that relate to the factual and legal issues addressed by this motion.

## ARGUMENT

### I.   AFFIRMATIVE DEFENSES

#### A.   "Impossibility" And "Obstacle" Preemption

The City argues that ExxonMobil failed to prove its preemption defense because the evidence did not establish that it was "physically impossible to comply with both state tort law and federal regulation." (P's Opp. at 3.) But while impossibility of simultaneously complying with both federal and state regimes will satisfy the requirements for conflict preemption, "physical impossibility" is not the conflict preemption standard. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000). The City's state-law claims are preempted because they impose an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (quoted in *Hillsborough Co. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13 (1985) and *Oxygenated Fuels Ass'n, Inc. v. Pataki*, 158 F.Supp.2d 248, 253 (N.D.N.Y. 2001)). Such an obstacle exists where a state law duty "interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). A state law duty poses such an obstacle if it would restrict the range of choices granted by federal law. *Geier*, 529 U.S. at 886.

The jury's finding that there was no feasible alternative to MTBE establishes that all of

the City's claims are preempted.  In fact, the Court included on the verdict form a separate

question about feasible alternatives precisely because "it answers the conflict preemption point

…." (9/21/09 Tr. 5433:22-25; *see also* 9/22/09 Tr. 5510:18-5511:10.)  In the Clean Air Act,

Congress mandated the use of oxygenates and intended to promote the use of MTBE, as well as

other oxygenates.  42 U.S.C. §§ 7545(k)(2)(B), 7545(m)(2); *see also, e.g.,* 136 Cong. Rec. S

2288, 2289 (March 7, 1990); 136 Cong. Rec. S 3500-3525 (March 29, 1990).  The jury's

conclusion that there was no feasible alternative to MTBE means that it was not feasible for

ExxonMobil to comply with the Clean Air Act without using MTBE and, thus, that "plaintiffs'

state law claims . . . present an obstacle to the enforcement of federal law." *In re MTBE Prods.*

*Liab. Litig.*, 364 F. Supp. 2d 329, 336 (S.D.N.Y. 2004).  Indeed, state law manifestly stands as an

obstacle to federal law when it imposes massive tort liability – here, more than $100 million – on

a manufacturer that uses the only feasible means of complying with a federal mandate.

Thus, *all* of the City's state law claims are preempted.  A plaintiff's claim may not force

a defendant "to choose between avoiding state tort liability and complying with federal law."

*O'Neal v. Smith Kline Beecham Corp.,* 551 F. Supp. 2d 993, 1002 (E.D. Cal. 2008) (citing *Geier*,

529 U.S. at 823); *accord* L.H. Tribe, *American Constitutional Law* § 6-29, 1181-82 (3d ed. 2000)

("state action must ordinarily be invalidated if its manifest effect is to penalize or discourage

conduct that federal law specifically seeks to encourage").  Yet, at bottom, all of the City's

claims are based on the allegation that the use of MTBE in gasoline – whether manufactured,

supplied or directly spilled by ExxonMobil – caused its harm in violation of various tort duties.

According to the City, because of MTBE's allegedly pernicious qualities, gasoline containing

MTBE (1) is a defective product, (2) requires special care in handling and storage to prevent

spills, (3) requires special warnings and (4) causes trespasses and nuisances that would never

occur with non-MTBE gasoline. A verdict for the City on any of its claims imposes a duty not to use MTBE and penalizes conduct that was necessary to comply with federal law. Moreover, the City's failure to warn claim is preempted because, where a product defect claim is preempted, "there [i]s no defect about which to warn." *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769-70 (11th Cir. 1998); *Carden v. Gen. Motors Corp.*, 509 F.3d 227, 233 (5th Cir. 2007); *James v. Mazda Motor Corp.*, 222 F.3d 1323, 1325 (11th Cir. 2000).

**B.   Statute Of Limitations**

ExxonMobil's primary position is that the City has not suffered a cognizable injury with respect to the Station 6 wells. New York law requires an actual injury and Article III requires that an injury be actual or imminent. *Infra* Part III.A; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The City asserts that its injury is "contamination of the City's groundwater." But contamination, standing alone, is insufficient: the City's only right as to groundwater is to use it. If the City does not (or will not imminently) use water from a well, the presence of a pollutant in that well does not injure the City. Quite simply, the City must prove actual or imminent *use* of the water. And because Station 6 has never been used, this case stands or falls on whether use of contaminated water at Station 6 is "imminent."[1]

This Court held that, even in the absence of any concrete plans to use Station 6, it is sufficient that the City have a "good faith intent" to take steps in the next 15 years to begin to use Station 6, and then if use ever begins decades from now, that it may lead to contamination. *In re MTBE Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 59287, *36 (S.D.N.Y. July 6, 2009). This ruling cannot stand. If the concept of an "imminent" threat means anything, it means that a threat cannot be this remote, contingent, and conjectural. The correct view, therefore, is that this

---

[1] This case also should be dismissed for lack of injury under New York law. *Infra* Part III.A.

Court lacks jurisdiction because the suit is not ripe and there is no cognizable injury. On this view, the City's statute of limitations has not yet even started to run.

However, if the concept of an "imminent" threat can be stretched so far as to reach a "good faith intention" to act 15 years into the future to put into motion a series of contingent events, then the statute of limitations has not merely started to run – it has expired. At trial, the evidence proved that, before the October 2000 bar date, the City knew (or reasonably should have known) that it intended to use Station 6's water and that, to do so, it would need to remove MTBE. The requirement of an imminent injury is either meaningful, in which case this Court lacks jurisdiction, or it is nearly meaningless, in which case this suit is time barred. But the City cannot have it both ways, with both an expansive concept of "injury" providing standing and, at the same time, a cramped conception of that same term that saves its suit from being untimely.

## II.   CAUSATION

The City's proof of causation rested entirely on the flawed capture zone predictions of its expert, Mr. Terry, which were based on an inherently unreliable computer model. Computer-generated evidence is vulnerable to the so-called "garbage in, garbage out" phenomenon – that is, the results are only as good or valid as the inputs. *See Coffey v. Dowley Mfg.*, 187 F. Supp. 2d 958, 974 (D. Tenn. 2002); *Sorensen v. Lower Niobrara Natural Resources Dist.*, 376 N.W.2d 539, 544 (Neb. 1985). Because assumptions used in Terry's model had no "solid relationship with the real world," the results of his model cannot be considered valid. *Perma Research & Dev. v. Singer Co.*, 542 F.2d 111, 121-22 (2d Cir. 1976) ("A computer model is valid only insofar as it enables us to make valid inferences about the real-world system being simulated.") The shape, size and location of the capture zone predicted by Terry's model are critical to identifying the location and number of MTBE sources that allegedly will impact the Station 6 wells in the future. However, that predicted capture zone is entirely contingent on unknown (and

- 4 -

unproven) factors, especially the pumping scenarios of wells included in the model.[2]  For

example, Terry's model assumed that, beginning in 2020 and continuing through 2040, the City

will pump the planned "dependability wells" at a rate of 55 million gallons per day.  (8/18/09 Tr.

1908:20-23, 1910:25-1911:5.)  But that assumption was pure speculation:  those wells do not yet

exist, are only in the initial 10% design phase, and the City has not even decided where to put

them (if it goes ahead with them at all).  (8/6/09 Tr. 639:25-640:5 (Meakin).)  Terry admitted that

if the dependability wells do not actually come on, the capture zone would be "significantly

different than I had before."  (8/19/09 Tr.  2087:20-21.)  Likewise, his unfounded assumption

that the Station 6 wells will pump nonstop from 2016 through 2040 has a profound effect on the

capture zone he predicts.  In defending Terry's unfounded assumptions, the City points only to

his testimony that, even under alternate pumping scenarios, MTBE (from some source) will

impact Station 6.  (P's Opp. at 9.)  But, even if it is true that MTBE from one source or another

will reach Station 6 no matter what the capture zone looks like, that tells us nothing about where

the MTBE came from – which, of course, is the City's burden to prove.  *See Hymowitz v. Eli*

*Lilly & Co.*, 73 N.Y.2d 487, 504 (N.Y. 1989).

### A.    Direct Spiller Causation

Given the unreliability of Terry's capture zone predictions, no reasonable jury could have

concluded that MTBE from an ExxonMobil-branded station ever will reach Station 6.  Even if

---

[2] The effect of Terry's pumping assumptions on the predicted capture zone can be seen in the
demonstratives used at trial (June 11, 2010 Declaration of L. Handel ("Handel Decl.") Ex. A).
Compare the slides for year 2004 (when no wells are pumping) to year 2010 (when the Station
24 wells are assumed to begin pumping) to 2016 (when Station 6 is assumed to begin pumping)
to 2020 (when the dependability wells are assumed to begin pumping). (8/18/09 Tr. 1905:7-8,
1906:9-10, 1907:10-11, 1908:20-23, 1910:25-1911:5; 8/19/09 Tr. 2155:11-16.)  The changes in
the shape and size of the capture zone require not only that these wells start pumping in a
specific year, but also that they remain pumping, nonstop, through 2040.

Terry's capture zone predictions can be believed – and they cannot – it could take up to 32 years

for MTBE from the sites to reach Station 6, provided that the capture zone is maintained

throughout that time by the continuous pumping of the Station 6 and other wells and that the

MTBE does not first dissipate through remediation or natural processes. (*See* 8/17/09 Tr.

1589:1-1592:25, 1605:5-14; 8/18/09 Tr. 1912:14-22; 8/21/09 Tr. 2420:5-14, 2422:15-19.)  No

evidence was offered at trial to show that the likelihood of this occurring is anything but

vanishingly small.

In the absence of proof that ExxonMobil caused the City's injury as a direct spiller, and

given the jury's rejection of strict product liability, ExxonMobil should be entitled to judgment

without even considering refiner/supplier causation because, in the pure refiner/supplier context,

ExxonMobil lacked the requisite control over the product necessary to support the City's trespass

or nuisance claim, and its actions are so far removed from the spiller's conduct that they could

not constitute proximate cause as a matter of law.

### B.      Refiner/Supplier Causation

The City's market share evidence did not prove that ExxonMobil-supplied gasoline will

impact the Station 6 wells.  As the Court has already found, the City put on "no evidence [about]

what went into Queens." (10/7/09 Tr. 6595:25-6596:26.)  Indeed, the City's market share expert

admitted that he assumed, without any data at the county level, that ExxonMobil's share of the

gasoline supplied to Queens matched its supplier data for the entire state of New York. (9/14/09

Tr. 4281:15-22 (Tallet).)  But even if, over time, ExxonMobil-supplied gasoline comprised about

25% of the product distributed in New York State, or even Queens, such evidence does not

permit a rational inference that ExxonMobil-supplied gasoline was present at particular service

stations, at the exact time when a release occurred, such that the specific molecules of gasoline

supplied by ExxonMobil will migrate into the theoretical, future capture zone of the Station 6

wells decades from now.[3]  And, of course, "supplier" data says nothing about whether ExxonMobil-refined product reached the capture zone.

### C.    Commingled Product Theory

The City's argument about commingled product evidence illustrates the very confusion caused by that erroneous theory's influence on the trial – confusion that caused the jury to draw the illogical conclusion that the City had proven "traditional" refiner or supplier causation despite the enormous gaps in its proofs.  The City's argument mixes the concept of title tracing with that of tracing molecules manufactured by a defendant.  The Court created the commingled product theory because of the presumed unfairness of requiring plaintiffs to prove which defendant *manufactured* the MTBE in its wells, given the commingling of product that occurs in the distribution system.  *In re MTBE Prods. Liab. Litig.*, 447 F. Supp. 2d 289, 301 (S.D.N.Y. 2006).  However, the commingling of gasoline refined by different companies is irrelevant to establishing the liability of a supplier in the chain of title, which can be established through contracts and transactional records (although the City introduced none at trial).  Thus, the City's argument that "traditional" causation was proven by evidence of commingling in the distribution network, together with evidence that ExxonMobil supplied a "substantial fraction" (*i.e.*, 25%) of the gasoline sold in Queens, makes no sense.  (P's Opp. at 12.)  The fact that gasoline *manufactured* by ExxonMobil may be commingled with that produced by other refiners, does not tie the 25% of gasoline that ExxonMobil *sold* at the wholesale level, statewide, to Queens or the future capture zone of Station 6.  Nor does the fact that ExxonMobil *supplied* (*i.e.*, transferred

---

[3] Contrary to the City's mischaracterization (P's Opp. at 10), ExxonMobil's expert, Mr. O'Brien, testified that just because refiners trade and exchange gasoline "doesn't mean necessarily that Exxon's gasoline is in every service station or every alleged spill of gasoline in the Queens County."  (9/15/09 Tr. 4507:4-6.)

title to) 25% of the wholesale gasoline statewide, establish that product *manufactured* by
ExxonMobil reached Queens or the future capture zone of Station 6. However, the jury likely
confused such evidence as sufficient proof of causation because of the unfounded testimony and
argument it heard that gasoline is so hopelessly commingled that every spill contains product
refined or supplied by everyone in the market. (*See, e.g.,* 8/27/09 Tr. 2736:14-19.) As the Court
previously found, "even drawing all inferences in plaintiffs' favor, no reasonable jury could find,
by a preponderance of the evidence, that each defendant's gasoline caused the contamination of
each well." *In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 249, 273 (S.D.N.Y. 2008).

ExxonMobil was prejudiced by the Court's application of the commingled product theory
because it effectively relieved the City of its burden to prove traditional manufacturer or supplier
causation. Even if New York law recognized the commingled product theory, the Court should
not have allowed the alternative theory of causation to be presented to the jury unless and until
the City established that – due to no lack of diligence on its part – it could not prove true,
traditional causation.

### D.     Failure To Warn

The City has identified no evidence that any additional or different warning by
ExxonMobil would have prevented the City's harm. The City cites testimony of Mr. Moreau
about several things he believes ExxonMobil could have done differently with regard to
warnings about MTBE. (P's Opp. at 13-14.) But Moreau did not testify that any such measures
actually would have prevented the City's harm. Indeed, had Moreau so testified he would have
been resorting to sheer speculation. Moreover, Moreau's testimony that ExxonMobil should
have mounted "a gigantic public awareness program" is irrelevant because there is no duty to
warn the general public. *See Berg v. Underwood's Hair Adaption Processes, Inc.*, 751 F.2d 136,
137 (2d Cir. 1984). In addition, the City's argument that warnings about MTBE might have led

- 8 -

to a complete ban on MTBE is meritless because the Court has already found, and instructed the jury, that there is no evidence of that. (10/7/09 Tr. 6596:6-6597:2, 6601:4-15.)

## III.  **INJURY**

### A.   **The City Cannot Be Injured Unless It Actually Uses The Station 6 Wells.**

The Court's ruling and jury instruction that the City had to prove only that it intends, in good faith, to use the Station 6 wells – not that it actually will use them – contravenes New York law. *See In re MTBE*, 2009 U.S. Dist. LEXIS 59287, *34-*35. In setting the "good faith intent" standard, the Court relied on two sources, neither of which support its ruling. First, the Court relied on a New York damages law treatise, which states only that "damages for loss of possible use of property where the plaintiff did not actually intend, in good faith, to make such use of it cannot be allowed." 36 N.Y. Jur. 2d Damages, § 113 (cited at 2009 U.S. Dist. LEXIS 59287, *34). Although this statement makes clear that *damages* may not be awarded for lost use where a plaintiff does not intend to use the property, it says nothing about whether a mere good faith intention to exercise a usufructuary right is sufficient for purposes of establishing a cognizable *injury. See id.* Second, the Court relied on *Squaw Island Freight Terminal Co. v. City of Buffalo*, 273 N.Y. 119, 125 (1937). *In re MTBE*, 2009 U.S. Dist. LEXIS 59287, *35. The plaintiff's injury in that case was markedly different than that claimed by the City here. Whereas the City's legally protected interest is the right to make reasonable use of groundwater it does not own, *Westphal v. New York*, 78 N.Y.S. 56, 75 A.D. 252, 256 (N.Y. App. Div. 1902), the plaintiff in *Squaw Island* actually held title to the sand on its property, which it dredged for commercial purposes. *Squaw Island*, 273 N.Y. at 124; *see also* William X. Weed, Warren's Weed New York Real Property, Ch. 39 § 39.01 ("Earth, soil, and stone, so long as they remain in their original condition, are a part of the land. They belong to the person owning the land." (citing *Mott v. Palmer*, 1 N.Y. 564, 569 (N.Y. 1848)). The court held that Squaw Island was entitled to

injunctive relief and possible damages due to pollution of the sand constituting a continuing trespass and nuisance on its property. 273 N.Y. at 128-130. The holding that the property owner was entitled to relief, even though the lapse of its dredging permit prevented it from using the sand at the time, does not support the view that a plaintiff holding only usufructuary rights has a legally protected right in groundwater it "might" (or even intends in good faith to) use some day in the future. *See id.* at 130.

To the contrary, under New York law, a landowner's interest in groundwater derives exclusively from its actual use. *Sweet v. Syracuse*, 129 N.Y. 316, 335 (1891) ("Neither sovereign nor subject can acquire anything more than a mere usufructuary right [in waters]"); *Friedland v. State*, 314 N.Y.S.2d 935, 937 (N.Y. App. Div. 1970) ("As to the use of percolating waters, a land owner has the right upon its own lands to make use of them as he reasonably can...."); *Westphal v. New York*, 78 N.Y.S. 56, 75 A.D. 252, 256 (N.Y. App. Div. 1902) (plaintiff "has the right to use the water, but he has no property in the water as such"); *see also In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 455, 461 (S.D.N.Y. 2006) ("Usufructuary rights generally arise from 'some physical act with respect to the water by the appropriator to manifest the possessory right.'" (quoting *Fullerton v. State Water Res. Control Bd.*, 90 Cal. App. 3d 590, 598 (Cal. Ct. App. 1990)). Accordingly, in *Hellert v. Town of Hamburg*, in holding that the plaintiffs could not defeat summary judgment on their trespass, nuisance and negligence claims, the court found that, even though the groundwater on their property was contaminated at levels exceeding state drinking water standards, that was "immaterial" because "none of the plaintiffs used groundwater or well water for drinking purposes or, indeed, for any other purpose." 857 N.Y.S.2d 825, 828 (N.Y. App. Div. 2008).

**B.    The City Should Have Proven Its Claims By Clear And Convincing Evidence.**

The City could not have proven a past or present injury because it has not yet used the

Station 6 wells and it introduced no meaningful evidence of past or present MTBE detections.[4]
In fact, no one knows whether MTBE is presently in the Station 6 wells because they have not
been tested for MTBE since April 2007. (*See* 8/20/09 Tr. 2226:22-2227:7 (Terry); 9/24/09 Tr.
5954:3-4(Bell).)  The only evidence that the City offered related to its future injury claim:

> The City's future injury claim is that even if some of these wells are not currently
> contaminated by MTBE at a level that establishes injury, once the wells are turned
> on the MTBE contamination will substantially and immediately increase to a level
> that constitutes a cognizable injury to the City.

*In re MTBE*, 2009 U.S. Dist. LEXIS 59287, *29.  Having no evidence that MTBE is presently in
the Station 6 wells at levels requiring treatment (or, indeed, at any level), the City should have
been required to "prove by clear and convincing evidence that MTBE will remain in the capture
zone by the date of the City's intended use of the groundwater and that when the wells are turned
on the influx of water will raise MTBE concentrations to an injurious level." *Id.* at *34.

**C.    The City Failed To Prove Any Injury.**

To prove its injury, the City had to show not only that MTBE will be in the wells when
they are used in the future, but that it will be there at a level that interferes with its usufructuary
rights – *i.e.*, a level that requires treatment.  It failed to do so.  The only evidence quantifying
future concentrations and timing of MTBE in the Station 6 wells was based on Mr. Terry's
speculative and inherently unreliable model.  As Mr. Terry testified, to make "numerical
predictions" about "how high of a concentration of MTBE will occur at Station 6 in the future,

---

[4] ExxonMobil respectfully disagrees with the Court's prior decision that the City has already
been injured as a matter of law because, in January 2003, MTBE levels in the combined outflow
of the Station 6 wells allegedly exceeded the MCL.  *In re MTBE Prods. Liab. Litig.*, 2009 U.S.
Dist. LEXIS 78081, *16 n. 30 (Aug. 25, 2009).  Even assuming for the sake of argument that the
City was injured at that time, its claim should be limited to damages caused by that discrete, past
injury, which was not presented at trial.  Moreover, the past MCL exceedance does not establish
an ongoing, continuing injury or trigger a cause of action for a separate, future injury.

- 11 -

and how long it will last" it was necessary to use a transport model. (8/19/09 Tr. 2012:22–2013:5.)  Yet, because Mr. Terry's model was based on unsupported and speculative facts (*see supra* Part II), its predictions have no credibility and should not have been admitted in evidence. The City argues that it was reasonable for Terry to assume that the Station 6 wells would pump continuously for 24 years because such a "conservative assumption" is appropriate for a water provider's "planning purposes."  Yet, Mr. Terry's model was not built and introduced at trial for the City's "planning purposes" but, rather, for purposes of proving what levels of MTBE will actually be in the Station 6 wells in the future.  Even if it may be appropriate to make conservative – *i.e.*, overstated – assumptions for "planning purposes," it is not appropriate for purposes of trying to prove whether, in fact, MTBE will be in the wells at an injurious level.  In any event, the jury's finding that MTBE will peak at 10 ppb in 2033 was not based on Terry's prediction or any other evidence and, therefore, could only have been the result of impermissible "surmise and conjecture."  *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000).

## D.     Detections Below The MCL Will Not Injure The City.

The City incorrectly says that State regulations require it to treat contamination at levels below the MCL, if it detects "any deleterious changes in raw water quality." (P's Opp. at 19 (citing N.Y. Comp. Codes R. & Regs. tit. 10, § 5-1.12).)  That section of the Sanitary Code requires a water provider to "modify existing or install treatment" only for purposes of complying with other sections of the Code regarding bacteria (§ 5-1.30), MCLs (§§ 5-1.50, 5-1.51) and disinfection byproducts (§ 5-1.60).  Sanitary Code § 5-1.51(a) requires that water providers "take the necessary steps to comply with this section, to ensure the protection of the public health, including the undertaking of remedial feasibility studies and the installation of a suitable treatment process" only when contamination *exceeds* a regulatory limit.

Moreover, the City introduced no credible evidence that MTBE concentrations below the

- 12 -

MCL pose health risks or taste and odor concerns. In setting the MCL of 10 ppb for the purpose

of protecting human health, the State considered the very same studies that the City's expert Dr.

Burns relied on for her opinion that the lowest levels of MTBE exposure can cause cancer.

(8/27/09 Tr. 2869:11-21, 2870:8-20, 2871:1-5.) With regard to taste and odor, the EPA has set

an advisory level of 20 to 40 ppb as the range in which MTBE can be detected by some people.

(9/1/09 Tr. 3063:1-17.) And, as the City's expert Dr. Rudo testified, MTBE was not generally

detected by taste or odor at levels below 50 ppb (five times the MCL). (9/2/09 Tr. 3280:2-25.)

## IV.    NEGLIGENCE

The City's mid-trial amendment of its negligence claim was severely prejudicial to

ExxonMobil because, until that time, it could not have known that the reasonableness of its

conduct with regard to the ownership or operation of service stations would be at issue.

Ownership and operation of service stations is not mentioned *anywhere* in the City's complaint.

In fact, until the City first raised its new negligence theory twelve days into the trial,

ExxonMobil understood that alleged spills at its branded stations were relevant only with regard

to the City's (later-abandoned) Navigation Law claim and causation. However, the degree of

care ExxonMobil exercised at those stations would not have been relevant because the

Navigation Law imposes strict liability without regard to fault. *See* N.Y. Nav. § 181(1). Having

no reason to know that it would have to defend the degree of care taken at its branded stations in

the vicinity of Station 6, ExxonMobil had no opportunity to present such a defense by, for

example, calling witnesses with knowledge of the operations at those stations. Furthermore,

allowing the City to change its negligence theory mid-trial was not a matter of conforming the

pleadings to the proof (P's Opp. at 22) because the City presented no evidence – at any point

during the trial – that ExxonMobil's conduct vis-à-vis the six Mobil stations was negligent.

Indeed, because it presented no evidence that ExxonMobil failed to exercise reasonable

- 13 -

care at the stations, the City failed to prove its late-amended negligence claim.  Nor did circumstantial evidence that releases occurred at Mobil stations relieve the City of its burden to prove a failure of care.  The cases cited by the City in arguing that circumstantial evidence may be used to prove negligence stand only for the proposition that such evidence may be used to prove the *causation* element of a negligence claim – not the breach of a relevant duty.  (*See* P's Opp. at 24 citing *New York Tel. Co. v. Harrison & Burrowes Bridge Contrs.*, 3 A.D. 606, 608 (N.Y. App. Div. 2004); *Gale v. City of New York*, 92 N.Y.2d 936, 937 (1998).)

If anything, the City's evidence established that ExxonMobil's conduct exceeded the standard of care.  The testimony of the City's expert, Mr. Moreau, contradicts the City's assertion that "ExxonMobil took none of [the] steps" that, according to Moreau, a "reasonably prudent" person would have done to prevent the risk of harm from MTBE.  (P's Opp. at 23.)  Mr. Moreau testified that, since the late 1980s, ExxonMobil used secondary containment (double-walled tanks and piping) at stations in the vicinity of Station 6.  (8/13/09 Tr. 1233:5-19, 1234:9-13, 1268:19-20, 1280:16-19; 1289:19-21.)  He also described ExxonMobil's UST systems as "state of the art" and about 10 years ahead of federal requirements for leak prevention and detection.  (8/13/09 Tr. 1237:1-3, 1238:2-18.)  He also acknowledged that the inventory control methods on which ExxonMobil relied were the state of the art.  (9/3/09 Tr. 3402:5-3403:2.)

Likewise, ExxonMobil demonstrated that it exceeded the standard of care.  For example, ExxonMobil worked to develop improved technologies for gasoline storage and leak detection, even providing its new technology free of charge to contractors in the field.  (9/9/09 Tr. 3823:1-19, 3852:6-3853:25.)  When Mobil began using fiberglass USTs, that technology was so far ahead of its time that it was not yet permitted by New York City regulations.  (*See* 9/10/09 Tr. 4020:13-4021:9 (Hilchey).)  Furthermore, ExxonMobil's methods for conducting inventory

control exceeded regulatory requirements. (9/9/09 Tr. 3824:1-14 (Curran); 9/10/09 Tr. 4035:14-4036:3 (Hilchey).) And because inventory control was so important to ExxonMobil, it trained its station managers, dealers and branded distributors on the topic. (9/10/09 Tr. 4019:6-25 (Hilchey); *see also* 9/3/09 Tr. 3481:13-3482:1, 3514:4-21, 3515:6-14 (Roman).)

## V.   **NUISANCE AND TRESPASS**

The City argues that ExxonMobil had sufficient control over the product to be held liable for a public nuisance because it not only manufactured the gasoline, but also "stored that gasoline underground near water, and allowed it to leak and spill before it was ever sold to a third party." (P's Opp. 25.) Thus the City acknowledges that ExxonMobil could have exercised the control required for public nuisance liability only to the extent that its conduct as a direct spiller, and not as a manufacturer or supplier, caused such a nuisance. Because the Court failed to instruct the jury on this aspect of nuisance law – and because the evidence did not prove direct spiller causation – judgment should be awarded for ExxonMobil on the public nuisance claim.

Likewise, the City did not prove, and the Court failed to properly instruct the jury on, the intent required for trespass. Although New York law does not require a defendant to foresee or intend the *consequences* of a trespass (*i.e.*, the plaintiff's resulting damages), it does require that a defendant who causes pollution have "good reason to know or expect" that the contaminants will enter the plaintiff's land (*Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331 (1954)), and that the trespass be "the immediate or inevitable" result of the defendant's intentional conduct. *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996). It simply defies logic to suggest that, in its capacity as a manufacturer and supplier, ExxonMobil had "good reason to know or expect" that MTBE gasoline it made and distributed years ago would, decades later, be drawn onto the City's Station 6 property by the pumping of wells that the City has never operated. Nor could such manufacture or supply have immediately or inevitably resulted in a trespass on the Station 6

- 15 -

property.  Thus, the Court should have instructed the jury that it could consider ExxonMobil's

liability for trespass only as a direct spiller; and, because the City did not prove direct spiller

causation, judgment should be entered for ExxonMobil on the trespass claim.  In addition, the

authorities cited by the City (*see* P's Opp. at 27) support ExxonMobil's argument that a trespass

occurs by groundwater contamination only if it enters the plaintiff's property, as opposed to a

"capture zone" which may extend far off the property limits.

## VI.    JUROR MISCONDUCT AND DISMISSAL

In arguing that jurors' exposure to outside information did not warrant a mistrial, the City

misconstrues the relevant inquiry.  The question is not whether it can be concluded that outside

information had an effect on the verdict that was prejudicial to ExxonMobil, but rather "whether

it can be concluded beyond a reasonable doubt that extrinsic evidence did *not* contribute to the

verdict." *United States v. Bagley*, 641 F.2d 1235, 1241 (9th Cir. 1981) (emphasis added).

With regard to Juror No. 2's dismissal, ExxonMobil did not waive its argument for a

mistrial by failing to use the word "holdout" in its brief, oral motion for a mistrial.  The single

case on which the City relies says nothing of the specificity with which a party must assert its

grounds for a mistrial. *See Bank of South v. Ft. Lauderdale Technical College, Inc.*, 425 F.2d

1374 (5th Cir. 1970).  While it is true that ExxonMobil *initially* agreed that Juror No. 2 had to be

dismissed because she felt so threatened that she "cannot go forward," that was before counsel

learned of Juror No. 2's holdout status.[5]  (*See* 10/16/09 Tr. 7013:24-25; *id.* at 7017:9-12 (later,

Juror No. 2 first reveals evidence of holdout status).)  Upon learning that Juror No. 2 was

threatened with a physical instrument because of her "holdout" status, ExxonMobil made a

---

[5] ExxonMobil's first request was that the Court dismiss Juror No. 1, the one who had made the
threat, a step which might have allowed Juror No. 2 to continue deliberations.  (10/15/09 Letter
from P. Sacripanti to Court (Handel Decl. Ex. B); *see also* 10/16/09 Tr. 7014:3-4.)

timely motion for a mistrial. In determining whether there was any ambiguity about the purpose for which the mistrial was sought, the court should consider the context in which the motion was made. *See Ramchair v. Conway*, 671 F. Supp. 2d 371, 380-31 (E.D.N.Y. 2009).

The City attempts to limit the "holdout" rule by arguing that a mistrial is appropriate only where the specific opinion of the holdout juror is known, *e.g.* whether the juror was pro-defendant or pro-plaintiff. (P's Opp. at 32.) However, the City relies on *United States v. Thomas*, a case that turned not on allegations that the dismissed juror was a "holdout" but rather on his "purposeful refusal to apply the law as set forth in a jury charge," *i.e.*, his determination for acquittal regardless of the evidence. *See Thomas*, 116 F.3d 606, 617, 621 (2d Cir. 1997).[6] While the *Thomas* Court did mention dismissal of "holdout" jurors in the context of protecting jury deliberations from the court's investigatory powers, *see id.* at 620-21, the case is relevant, only tangentially, for its adoption of the rule in *United States v. Brown* that a juror ought not be removed if the evidence "discloses any possibility" that the request stems from the juror's view of the evidence, *id.* at 621-22 (citing *Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)). The court in *Thomas* also specifically stated that it did "not intend to confine the limitation set out in *Brown* to criminal cases...." *Id.* at 622 n.11. The Second Circuit subsequently recognized that the *Brown* and *Thomas* rule against removal has been further expanded "to apply when the record includes evidence that a juror is a 'holdout.'" *See Duke v. Nassau*, 2003 U.S. App. LEXIS 7973,

---

[6] The remaining cases on which the City relies are equally unpersuasive. *United States v. Symington*, to the extent it is a "holdout" case at all, only supports Defendants' argument. 195 F.3d 1080, 1085-86 (9th Cir.1999) ("[I]f the jurors did seek to remove Cotey because they disagreed with her views on the merits – then dismissal of Cotey was improper ... the judge must either declare a mistrial or send the juror back to deliberations ...."). And *United States v. Ruggiero* simply is not a "holdout" case. 928 F.2d 1289, 1295 (2d Cir. 1991) (in Gotti racketeering trial, juror who wanted to vote *with* rest of jury feared doing so after receiving threats from two "well built" men at his home).

at \*5 (2d Cir. 2003) (citing *United States v. Samet,* 207 F. Supp. 269, 281 (S.D.N.Y. 2002)).

Lastly, ExxonMobil cited the speed with which the jury returned a verdict following Juror No. 2's dismissal in order to draw a connection between the juror's holdout status, evidence of which already was revealed during *voir dire*, and the final verdict against ExxonMobil. While the speed of the jurors' deliberations may not say anything "about what the trial judge should have known about [the juror's] views *at the time* [of removal]" (*see* P's Opp. at 33 (emphasis added)), other evidence of the Juror No. 2's holdout status was before the Court at that time, and the quickness with which the jury concluded deliberations after her removal is evidence that ExxonMobil was prejudiced by the Court's failure to grant a mistrial. *See Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993) ("If one cannot say, with fair assurance … that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.").

## VII.   DAMAGES

### A.   The Damage Award Was Not Supported By Credible Evidence.

The City's assumption that the Station 6 treatment plant "is likely to operate continuously for a substantial portion, if not all, of the next 40 years – even as a 'backup' water supply" makes no sense. (P's Opp. at 39.) By definition, a "backup" supply is one that is used only on occasion, not continuously for the better part of four decades. Whatever the City believes the evidence showed, the jury found that Station 6 will be operated only on a backup basis. (8/12/09 Tr. at 1049:14-1050:1.) This finding came after testimony from City employees that they would use Station 6 if the Rondout-West Branch tunnel is taken off-line for repairs – a project that would take only four years. (8/6/09 Tr. 701:9-15 (Lawitts).) Alternatively, the jury heard that Queens groundwater wells may be needed, as they have been once or twice in the past, to address a drought emergency for "short periods of time." (8/6/09 Tr. at 758:3-18 (Cohen).)

- 18 -

Thus, no reasonable jury could have credited Ms. Bell's estimates for O&M costs spanning forty

years or her opinion that certain equipment at Station 6 will require replacement every 20 years,

regardless of whether that equipment is ever used or for how long.  (*See* 9/24/09 Tr. 5888:5-9.)

**B.    The Damage Award Deviates Materially From Reasonable Compensation.**

New York law invites judicial scrutiny of jury's damage awards, *Gasperini v. Ctr. For

Humanities, Inc.*, 149 F.3d 137, 140 (2d Cir. 1998), and requires the court to "examine the

evidence underlying the award and compare the verdict to awards in similar cases." *Okraynets v.

Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 436-37 (S.D.N.Y. 2008).  Knowing of no verdicts in

comparable cases, ExxonMobil suggested comparing the jury's damage award to highly relevant,

real world treatment costs incurred by the City itself and by United Water New York.  In

contrast, the City's proposal that the Court compare the damages awarded here to the amount

defendants agreed to pay *to settle* Santa Monica's MTBE case is both irrelevant and unfair.

ExxonMobil never admitted that the settlement amount of that case represented Santa

Monica's actual damages.[7]  Nor did any court or jury determine the amount of Santa Monica's

damages.  In approving the settlement, the California court did not make findings about the

plaintiff's treatment costs and considered only whether the amount paid by a settling defendant

was "within the ballpark" of the defendant's proportionate liability.  *See Tech-Bilt, Inc. v.

Woodward-Clyde & Assoc.*, 28 Cal.3d 488, 499 (1985).[8]  Moreover, the amount paid in

settlement is of no relevance because many factors, including the desire to avoid litigation costs,

---

[7] The parties to the settlement agreed that the defendants' payment of consideration would not be
construed as an admission or to the prejudice of any party.  (Handel Decl. Ex. C p. 58.)

[8] The only findings made by the California court with regard to the settlement amount were:
"The valuation was negotiated, through mediators, at arms length, in an adversarial proceeding.
It relates to the numbers being proffered by the various Parties and is therefore rationally based.
The valuation is sufficient for Settlement purposes." (Handel Decl. Ex. D.)

undoubtedly influence the amount a defendant will pay.[9]

More importantly, because of significant factual differences, no meaningful comparison can be made between the amount of the Santa Monica settlement and the City's damage award. In Santa Monica, MTBE impacts greater than 600 ppb forced the shutdown of five *actively operating* wells, which provided nearly half of that city's water supply. (Handel Decl. Ex. E p. 3.) These MTBE concentrations far exceeded the MCL and were more than 60 times higher than the peak levels the jury found will be reached in the Station 6 wells, which the City has never before used and which the jury found will be used, at most, as a backup source of water supply. In addition, the $220.05 million value that the Santa Monica parties attributed to "Treatment Facility Costs" for purposes of the good-faith settlement determination included a number of substantial costs of no relevance to the City of New York's damages, including costs for acquiring real property, to obtain replacement water and for a fee of $300,000 to $500,000 per year to cover internal charges. (Handel Decl. Ex. C pp. 19-22.) Thus, even if the settlement value approximated Santa Monica's actual damages, those damages are far too different from the City's to provide any useful guidance.

## CONCLUSION

For all of the foregoing reasons, and for the reasons stated in ExxonMobil's opening brief, including the arguments incorporated herein by reference, the Court should grant ExxonMobil judgment as a matter of law or, in the alternative, grant a new trial and/or remittitur.

---

[9] To understand that the settlement value of a case has little, if any, relevance to the plaintiff's actual damages, one need only read some of the news reports of how other plaintiffs from settled MDL 1358 cases are spending the money they recovered – for example, on things like libraries, retirement benefits and algae clean-up. (Handel Decl. Ex. F.)

DATED:  June 11, 2010

Respectfully submitted,

Peter John Sacripanti (PS 8968)
James A. Pardo (JP 9018)
Lauren E. Handel (LH 0755)
Lisa A. Gerson (LG 4340)
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10017-4613
Tel:  212.547.5400
Fax:  212.547.5444

James W. Quinn (JQ 6262)
David J. Lender (DL 1554)
Theodore E. Tsekerides (TT 5946)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Tel:  212.310.8000
Fax:  212.310.8007

*Counsel for Exxon Mobil Corporation,*
*ExxonMobil Chemical Company, Inc., Exxon*
*Mobil Oil Corporation, and Mobil Corporation*

## CERTIFICATE OF SERVICE

Lauren Handel, pursuant to 28 U.S.C. 1746, hereby declares under penalty of perjury,

that on the 11th day of June, 2010, I caused to be served by electronic mail upon counsel for

plaintiff, and upon all counsel of record by Lexis Nexis File and Serve, a true and correct copy

of:

1.  EXXON MOBIL DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER
    SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF
    LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL AND/OR REMITTITUR.

2.  JUNE 11, 2010 DECLARATION OF LAUREN HANDEL IN SUPPORT OF EXXON
    MOBIL DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF
    THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN
    THE ALTERNATIVE, FOR A NEW TRIAL AND/OR REMITTITUR.

Lauren Handel