UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
PRODUCTS LIABILITY LITIGATION

**This document relates to:**

*City of New York v. Amerada Hess Corporation, et al.,*
No. 04 Civ. 3417 (SAS)

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

### DECLARATION OF LAUREN HANDEL IN SUPPORT OF EXXON MOBIL DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL AND/OR REMITTITUR

Lauren Handel, an attorney duly admitted to practice law in the State of New York and in this Court, hereby declares under penalty of perjury:

1.     I am an attorney with the law firm of McDermott Will & Emery LLP, counsel for the Exxon Mobil Defendants in the above-captioned matter.  I submit this Declaration in support of Defendants' Reply Memorandum Of Law In Further Support Of Their Renewed Motion For Judgment As A Matter Of Law Or, In The Alternative, For A New Trial And/Or Remittitur (hereinafter "Reply").  This Declaration authenticates the exhibits attached hereto and relied on in support of the Reply.  In accordance with this Court's Individual Rules and Procedures, the exhibits have been excerpted to include only the relevant material. Copies of each of the exhibits appended hereto were made at my direction on or around June 11, 2010.

2.     Attached hereto as Exhibit A is a true and correct copy of excerpts from Plaintiff's demonstrative slides depicting the capture zone predictions of Mr. David Terry's groundwater model.

3.     Attached hereto as Exhibit B is a true and correct copy of a letter from Peter J. Sacripanti to the Honorable Shira A. Scheindlin, dated October 15, 2009.

4.      Attached hereto as Exhibit C is a true and correct copy of excerpts from the Executed Settlement Agreement between Shell Oil Company, et al. and the City of Santa Monica, California, dated Nov. 25, 2003.

5.      Attached hereto as Exhibit D is a true and correct copy of the California Superior Court Order Granting the Motion by Chevron for the Determination of Good Faith Settlement in *City of Santa Monica v. Shell Oil Company et al.*.

6.      Attached hereto as Exhibit E is a true and correct copy of an excerpt from the United States Environmental Protection Agency, Region IX, Unilateral Administrative Order for Participation and Cooperation in Initial Regional Response issued to Chevron U.S.A. Inc. et al., dated November 30, 2000.

7.      Attached hereto as Exhibit F is a true and correct copy of the following articles: "Park City to spend settlement money," Ark Valley News (Jan. 29, 2009); "Dover contamination lawsuit: settlement money to fund retiree benefits," Wicked Local (May 12, 2009); "Town Meeting continues tonight," Wicked Local (May 12, 2009).


Dated: New York, NY                                    Respectfully submitted,
        June 11, 2010

                                                       Lauren Handel

# EXHIBIT A











6D
6
6C
6B
6A
33
2004
Jamaica Bay
N

6D
6
6C
6B
6A
33
2010
Jamaica Bay
N

6D
6
6C
6B
6A
33
2016
Jamaica Bay
N

# EXHIBIT B

# McDermott
# Will&Emery

Boston  Brussels  Chicago  Düsseldorf  Houston  London  Los Angeles  Miami  Milan
Munich  New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Peter J. Sacripanti
Attorney at Law
psacripanti@mwe.com
+1 212 547 5583

October 15, 2009

**BY ELECTRONIC MAIL**

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York  10007-1312

Re:   Master File C.A. No. 1:00-1898 (SAS), M21-88, MDL No. 1358 (SAS)
      City of New York v. Amerada Hess Corp., et al, Case No. 04 Civ. 3417

Dear Judge Scheindlin:

We understand that Juror #2 reported that Juror #1 has intimidated her with abusive language, shouting, yelling and threats of physical violence.  Juror #1 has apparently confused her service as the foreperson with empowerment to force her fellow jurors to reach a verdict – her verdict.  Juror #1's conduct has been entirely inappropriate and may have tainted the jury's deliberations with coercion and duress.

Upon reflection, we do not believe that a curative instruction will be sufficient to cure the problem.[1]  Given her serious misconduct and the effect it may have had on the entire jury, Juror #1 should be excused from further service.  We also urge the Court to inquire of all of the jurors to determine if others have been similarly threatened and to find out if any purported unanimous decisions reached thus far in the deliberations are truly a consensus or were the product of threats, coercion and duress.

We welcome the opportunity to discuss these matters with the Court before the jury's deliberations resume tomorrow.

---

[1] The Court referenced the recent example of the New York State court in the Astor criminal trial giving a curative instruction when one juror threatened another juror with physical violence. However, in that case, the court could not have excused the offending juror without causing a mistrial because a unanimous verdict of twelve jurors was required.

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue New York New York 10173-1922  Telephone: +1 212 547 5400  Facsimile: +1 212 547 5444  www.mwe.com

Hon. Shira A. Scheindlin
October 15, 2009
Page 2

Respectfully submitted,

*Peter John Sacripanti*

Peter John Sacripanti

cc:     Victor Sher, Esq.

**EXHIBIT C**

CONTRACT 8293((

E-SERVED
12/01/03
08:27 PM ET
01-CC-0433

SETTLEMENT AGREEMENT

BETWEEN

**SHELL OIL COMPANY, SHELL OIL PRODUCTS COMPANY, SHELL PIPELINE COMPANY, EQUILON ENTERPRISES LLC, EQUILON PIPELINE COMPANY, TEXACO REFINING & MARKETING, INC.,  EXXON MOBIL CORPORATION, CHEVRON U.S.A. INC., CHEVRONTEXACO CORPORATION, THRIFTY OIL CO., BEST CALIFORNIA GAS, Ltd.,**

**AND**

**THE CITY OF SANTA MONICA, INDIVIDUALLY AND AS THE ASSIGNEE OF THE SOUTHERN CALIFORNIA WATER COMPANY**

FINAL AGREEMENT 11-25-2003



E-SERVED
12/01/03
08:27 PM ET
01-CC-0455?

CVX, XOM, TOC and Best. This release shall not apply to any suit that may hereafter be filed by a person or entity that is not a party to the Litigation, other than a governmental entity, for property damage or personal injury. This release shall not affect any rights or obligations of the Settling Defendants under this Settlement Agreement or other agreements related hereto.

### 3.7   TREATMENT FACILITY COSTS

During the term of this Settlement Agreement and included as part of the Approved Annual Budget the Settling Defendants will fund, by Treatment Facility Payments, the "Treatment Facility Costs." "Treatment Facility Costs" shall mean the full reasonable costs of remediating MTBE, TBA, and/or Related Petroleum Hydrocarbons in the water produced from COSM's Charnock Well Field from releases of gasoline, including, but not limited to:

3.7.1   the full reasonable costs of design and construction of the Treatment Facility, including, but not limited to:

3.7.1.1   any pilot tests for the evaluation of treatment processes;

3.7.1.2   professional services to prepare plans and specifications used to solicit bids for construction projects;

3.7.1.3   construction management services;

3.7.1.4   amounts due under approved construction contract(s) and any approved change orders;

3.7.1.5   conveyance piping costs to support the Treatment Facility;

3.7.1.6   necessary demolition/reconstruction costs;

3.7.1.7   permitting costs and mitigation measures as required by the permitting process (including operational plans for Treatment Facility, environmental impact and assessment reports [including public participation costs], construction permits, and associated professional services);

3.7.1.8   any needed modifications or additions to existing water treatment equipment or processes to assure adequate treatment;



E-SERVED
12/01/03
08:27 PM ET
01-CC-0455

3.7.1.9   any facilities or processes needed to dispose of treated water that cannot be delivered to customers pending the approval of the DHS;

3.7.1.10   any and all other costs incurred to comply with California or federal requirements for the Treatment Facility; and

3.7.1.11   cost of insurance for design and construction of the Treatment Facility.

3.7.2   the full reasonable costs of operating and maintaining the Treatment Facility, including, but not limited to:

3.7.2.1   labor, power, chemical and analytical costs;

3.7.2.2   costs for treatment media replacement and disposal, and vessel repairs or replacements, regeneration of treatment media (if required) as incurred;

3.7.2.3   costs associated with equipment repair and replacement;

3.7.2.4   all costs related to compliance with California operating permit requirements, and/or the Extremely Impaired Source Policy;

3.7.2.5   the cost of operating and maintaining any modifications or additions to water treatment and processes for Aquifer water; and

3.7.2.6   cost of insurance for the operation and maintenance of Treatment Facility.

3.7.3   an annual fee to cover internal charges of COSM, including but not limited to, access fees for the use of COSM property and salary of COSM employees overseeing the Treatment Facility and participating on the Engineering Committee.  This fee shall be Five Hundred Thousand Dollars ($500,000) per Operating Year from the date of this Agreement until drinking water is delivered from the Treatment Facility.  After drinking water is delivered from the Treatment Facility, the fee shall be Three Hundred Thousand Dollars ($300,000) per Operating Year until the Funding Termination Date.  Payments under this sub-paragraph 3.7.3 shall be pro rated as appropriate.

E-SERVED
12/01/03
08:27 PM ET
01-CC-0428

3.7.4    Legal and expert costs paid to third parties reasonably necessary to permit or construct, operate, or maintain the Treatment Facility.

3.7.5    If additional or alternative real property is needed for the Treatment Facility, then the Settling Defendants will fund costs of acquisition (including any eminent domain costs).  If COSM continues to use such property for treatment of water after the Funding Termination Date, then COSM will pay a reasonable rent to Settling Defendants until such use ceases, and when COSM ceases using the real property for water treatment, COSM shall deliver a quitclaim deed on an undivided basis in the Settling Defendants as permitted by state or federal law; provided that if not so permitted, COSM shall reimburse such acquisition costs.

3.7.6    replacement water, including:

3.7.6.1    future unreimbursed costs for such water from the Charnock Well Field.  Nothing in this Settlement Agreement, however, is intended to relieve any non-settling Defendant of its obligations under existing or future EPA orders and/or RWQCB orders;

3.7.6.2    should decisions of the Engineering Committee require that the Arcadia and/or Olympic well(s) be removed from service, the Settling Defendants shall supply replacement water until these wells are returned to service;

3.7.6.3    future costs of replacement water if, through no fault of COSM, the quantity of water delivered from the Treatment Facility is diminished.  In such case the Settlilng Defendants will pay the costs of replacing the diminished flow.  In no event will Settling Defendants be required to pay for replacement water due to diminished yield from the Aquifer due to natural causes.

3.7.7    any other costs incurred pursuant to Paragraph 3.11 ("Alternative Technology or Remedies"), subject to the limits provided in Paragraph 3.11.2.

3.7.8    fees and expenses payable to the Bank for administration of the Operating Account.

3.7.9    any costs to fund the reconstruction of the Treatment Facility in the



event of casualty to, or condemnation or other taking for public or quasi-public use of, the Treatment Facility or any portion thereof that are not reimbursed by insurance proceeds or condemnation/taking awards.

        3.7.10  Settling Defendants shall have the right to seek ADR pursuant to Paragraph 3.28 ("Alternative Dispute Resolution Process") if they contend that COSM has incurred or will incur unreasonable Treatment Facility Costs.

### 3.8  RELEASE PREVENTION

        XOM and Best shall record deed/use restrictions substantially in the form of Exhibit "E" with respect to the following properties owned by them within the immediate vicinity of the Charnock Well Field to avoid future contamination problems for the Charnock Well Field: 3505 South Sepulveda Boulevard, Los Angeles, California (Best) and 3800 South Sepulveda Boulevard, Los Angeles, California (XOM).

### 3.9  OPERATIONAL REQUIREMENTS

        COSM shall own and operate the Treatment Facility, and shall be responsible for the Treatment Facility activation, staffing, maintenance and performance monitoring.  COSM retains the right to make all operational decisions concerning the Charnock Well Field and the Treatment Facility.  The Settling Defendants specifically acknowledge that COSM has the right and obligation to operate the Charnock Well Field and the Treatment Facility in a manner that:

        3.9.1  preserves COSM's water rights;

        3.9.2  satisfies the water quality and water quantity requirements of COSM;

        3.9.3  assures a safe and reliable supply of water to COSM's customers; and

        3.9.4  is consistent with the reasonable management objectives of COSM in the management of its water system.

### 3.10  FEDERAL AND STATE REQUIREMENTS

        3.10.1  All design, construction, operation, and maintenance of the Treatment Facility shall comply with applicable federal and California requirements.

        3.10.2  DHS currently reviews and approves operating plans for all public



3.37   **WAIVER**

With respect to the release of Claims contained in Paragraph 3.5 ("COSM's Release of Claims") above, COSM expressly waives any rights or benefits available under section 1542 of the California Civil Code, which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO**
> **CLAIMS WHICH THE CREDITOR DOES NOT KNOW**
> **OR SUSPECT TO EXIST IN HIS FAVOR AT THE**
> **TIME OF EXECUTING THE RELEASE, WHICH IF**
> **KNOWN BY HIM MUST HAVE MATERIALLY**
> **AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

The parties understand and acknowledge the significance and consequence of the specific waiver of California Civil Code section 1542 described above.

3.38   **NO ADMISSION**

This Settlement Agreement is a compromise of disputed claims and fully and finally settles all Claims by COSM and Shell against the Released Parties, and prevents any further action against the Released Parties in the Litigation.  Neither the payment of any consideration hereunder nor anything contained in this Settlement Agreement shall be interpreted or construed to be an admission on the part of, nor to the prejudice of, any person hereto.  The Released Parties expressly deny any and all liability associated with or related to the Claims.

3.39   **WARRANTY OF RIGHTS**

COSM represents and warrants to the Settling Defendants that it has exclusive right and title to COSM's Charnock Well Field wells.  COSM further represents and warrants to the Settling Defendants, TOC and Best, that it has full authority to release the Claims of COSM as set forth in this Settlement Agreement, and full authority, subject to the provisions and conditions of the Assignment Agreement, to release the Claims of SCWC as set forth in this Settlement Agreement.

**EXHIBIT D**



E-SERVED
12/23/03
12:16 PM ET
01-CC-04331

1  Victor M. Sher, # 96197
**SHER & LEFF**
2  450 Mission Street - 5th Floor
San Francisco, CA 94105
3  Telephone: (415) 348-8300
Facsimile:  (415) 348-8333

4  Duane C. Miller, #57812
A. Curtis Sawyer, Jr. #101324
5  **MILLER & SAWYER**
1651 Response Road, Second Floor
6  Sacramento, CA 95815
Telephone: (916) 927-8600
7  Facsimile: (916)  927-9267

8  Fred Baron (Admitted in Texas)
Scott Summy (Admitted in Texas)
9  Alicia Butler (Admitted in Texas)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
10  Dallas, Texas 75219-4281
Telephone: (214) 521-3605
11  Facsimile: (214) 523-9159

12  [Other Counsel Listed on  Signature Page]

13  Attorneys for Plaintiff
City of Santa Monica

Exempt From Filing and Motion Fees
[Govt. Code, § 6103]

14            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                **IN AND FOR THE COUNTY OF ORANGE**

16  CITY OF SANTA MONICA,                          )  **CASE NO. 01-CC-04331**
                                                   )
17                  Plaintiff,                      )  (Assigned to Judge Sundvold)
                                                   )
18  vs.                                            )
                                                   )
19  SHELL OIL COMPANY; SHELL OIL                   )  **NOTICE OF ENTRY OF ORDER**
PRODUCTS COMPANY; SHELL PIPELINE               )  **GRANTING THE MOTION BY**
20  CORPORATION; CHEVRON                           )  **CHEVRON FOR THE**
CORPORATION; CHEVRON U.S.A. INC.;              )  **DETERMINATION OF GOOD**
21  CHEVRON PRODUCTS COMPANY;                      )  **FAITH SETTLEMENT**
ATLANTIC RICHFIELD COMPANY; MOBIL              )
22  OIL CORPORATION; EXXON MOBIL                   )
CORPORATION; TOSCO  CORPORATION;               )  Date: December 19, 2003
23  ULTRAMAR, INC.;  TEXACO REFINING              )  Time: 10:00 a.m.
AND MARKETING, INC.; EQUILON                   )  Dept.: 105
24  ENTERPRISES LLC; ARCO CHEMICAL                )
COMPANY;  LYONDELL CHEMICAL                   )
25  COMPANY; EXXON CORPORATION;                    )  [Complaint Filed: June 19, 2000]
UNOCAL  CORPORATION; EQUILON                  )  [Transfer Date: April 2, 2001]
26  PIPELINE COMPANY LLC; and DOES 1             )  [Trial Date: None]
through 600, inclusive,                        )
27                                                 )
                  Defendants,                   )
28

------

                               1



TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT THE Court entered and filed the attached Order Granting the Motion by Chevron for the Determination of Good Faith Settlement hereon for the Determination of Good Faith Settlement on December 19, 2003.

All parties or attorneys for parties will be electronically served with this Notice of Entry by means of transmitting the document to Verilaw in accordance with the Court's Case Management Order for Electronic Service.

SIGNED: This 22 day of December, 2003.

Respectfully submitted,

By: _____
Frederick M. Baron
Scott Summy
Alicia Z. Butler
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone: (214) 521-3605
Facsimile: (214) 520-1181

Other Counsel:
Marsha Jones Moutrie, #69711
City Attorney
Joseph Lawrence, #99039
Assistant City Attorney
Carol E. Kurtz, #158956
Deputy City Attorney
CITY OF SANTA MONICA
1685 Main Street, Room 310
Santa Monica, CA 90401-3295
Telephone: (310) 458-8336
Facsimile: (310) 395-6727

2
NOTICE OF ENTRY OF ORDER



Having taken the matter under submission, the Court Rules as follows:

The Motion by Chevron for the Determination of Good Faith Settlement is granted based on the following:

### The Bay Development Mandate

Lyondell argues that before this Court can determine the good faith nature of the Settlement it must determine the extent to which Settling Defendants breached their contractual duties to Lyondell. Lyondell asserts that Lyondell's liability to the City, if any, is attributed directly to the Settling Defendants' failure to adhere to the express representations under the Contracts of Sale. It then refers to provisions in those Contracts which provide that "Buyer assumes all risk and responsibility for the transportation, handling, storage, use and disposal of (MTBE)" and imposes a duty to warn it agents, customers, etc., of the hazards and risks.

In **dicta**, the Supreme Court stated that "if the trial court finds that the settling defendant is primarily responsible for the plaintiff's damages because the loss is largely attributable to the settling defendant's failure to properly fulfill its contractual obligations, the court should find the settlement in good faith only if the settlement requires the settling defendant to bear an proportionate share of the damages and leaves the nonsettling with a remaining liability that is not grossly disproportionate to its own responsibility for the loss". The Supreme Court is stating nothing more than what it had already stated in **Tech Bilt**, a settlement is only in good faith if the amount of the settlement is proportionate to liability.

That brings us to the Opposition to the Motion for Good Faith and the burden on that Motion. In Opposition to the Motion, Lyondell has submitted the Declaration of its attorney, who has attached various documents previously filed with this Court. The only document attached to that Declaration which would remotely address proportionate liability is the Declaration of Dale Young, which sets forth what Lyonell does and does not do with regard to MTBE. It doesn't discuss how Lyonell or any other Defendant in this Action is or is not liable to the City.

Lyondell has also submitted the Declaration of Karen Bowling which merely authenticates the various contracts entered into between Lyondell and the other Defendants and nothing more.

In order to meet its burden of proof, Lyondell must prove that the Settling Defendants are paying an amount totally disproportionate to their liability. Lyondell seems to be arguing that they are not liable at all and that the breaches of contract caused the entire injury to Plaintiffs. Lyondell's arguments fail for several reasons. First of all, Lyondell can be held liable to Plaintiff in strict liability for the manufacture of a defective product and nothing in the contracts makes the other Defendants liable for the manufacturing of the product. The fact is Lyondell placed the product into commerce. Liability can be found from that even if it didn't transport it, put it in pipe lines, own any stations etc. Its involvement with the



product is sufficient to impose liability.

Second, Lyondell can be held liable for failure to warn. Even if the other Defendants had an equal contractual obligation to warn, that does not absolve Lyondell of their duty to warn and therefore all liability. Lyondell's liability arises from its own acts and omissions. If that is so, and the alleged breaches of contract are not the sole source of liability; Lyondell faces some liability.

The question is what percentage of liability? And here is where Lyondell fails on its burden. Lyondell does not show how the amount being paid by Defendants is disproportionate to those Defendants liability and it really can't given its position that it is not liable at all. Since it has not proven that the breaches of the contract caused all of the damages, as Lyondell's acts potentially caused them also, Lyondell has not met its burden.

### Must Lyondell Be Dismissed?

No. In order for Lyondell to be dismissed Lyondell would have to prove that it has no liability because the breaches of contract have caused all damages. As it has not proved that, Lyondell will remain in the Case.

### Does the Settlement Discourage Settlement?

This same argument was made with regard to a prior Settlement in this Action, and that argument turned out to be invalid; several more settlements have been made subsequent to that settlement.

### Is the Valuation of the Settlement Proper?

The valuation was negotiated, through mediators, at arms length, in an adversarial proceeding. It relates to the numbers being proffered by the various Parties and is therefore rationally based. The valuation is sufficient for Settlement purposes.

**EXHIBIT E**

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION IX

In the Matter of:                )
                                 )
Chevron U.S.A. Inc.,             )        U.S. EPA Docket No.
Exxon Mobil Corporation,         )        RCRA 7003-09-2001-0001
Atlantic Richfield Company,      )
Conoco, Inc., Kayo Oil Company,  )
Douglas Oil Company of           )
California, UNOCAL Corporation,  )
Mobil Oil Corporation,           )
Tosco Corporation,               )
Thrifty Oil Company,             )
Best California Gas, Ltd.,       )
Kazuho Nishida,                  )
HLW Corporation, and             )
Winall Oil Company               )
                                 )
                 Respondents.    )
_____)


**UNILATERAL ADMINISTRATIVE ORDER**

**FOR PARTICIPATION AND COOPERATION**

**IN INITIAL REGIONAL RESPONSE**

## INTRODUCTION

This Order requires Respondents, Chevron USA Inc. ("Chevron"), Exxon Mobil Corporation ("Exxon"), Atlantic Richfield Company (d.b.a. ARCO) ("Arco"), Conoco, Inc. ("Conoco"), Kayo Oil Company ("Kayo"), Douglas Oil Company of California ("Douglas"), Unocal Corporation ("Unocal"), Mobil Oil Corporation ("Mobil"), Tosco Corporation ("Tosco"), Thrifty Oil Company ("Thrifty"), Best California Gas, Ltd. ("Best"), Kazuho Nishida ("Nishida"), HLW Corporation ("HLW"), and Winall Oil Corporation ("Winall") (collectively "Respondents"), to participate and cooperate with parties named in EPA's Administrative Order on Consent ("AOC") dated July 25, 2000(Docket No. RCRA 7003-09-2000-0003)(hereinafter "the Shell Order") in performing the Initial Regional Responses required by the Scope of Work ("SOW") to that AOC.  These Initial Regional Responses are necessitated by the presence of the gasoline additive methyl tertiary-butyl ether ("MTBE") and other gasoline constituents in the Charnock Sub-Basin, formerly a drinking water supply for the City of Santa Monica ("City") and the Southern California Water Company ("SCWC")(collectively "the Impacted Parties").  Respondents have responsibility for releases from gasoline service stations that have discharged MTBE and other gasoline constituents adversely affecting the Charnock Sub-Basin and its beneficial use as a drinking water supply.

## I.    JURISDICTION AND PROCEDURE

1.  This Administrative Order is issued to Respondents Chevron, Exxon, Arco, Conoco, Kayo, Douglas, Unocal, Mobil, Tosco, Thrifty, Best, Nishida, HLW and Winall by the United States Environmental Protection Agency ("EPA") pursuant to the authority vested in the Administrator of EPA by Section 7003 of the Solid Waste Disposal Act, commonly referred to as the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. Section 6901 et seq. ("RCRA"), which authority has been duly delegated to the Regional Administrator of EPA, Region IX, and redelegated to the Director of the Waste Management Division, Region IX.  Notice of this Order has been provided to the State of California ("State"), as may be required by Section 7003(a) of RCRA, 42 U.S.C. Section 6973(a).

## II.  PARTIES BOUND

1. This Order shall apply to and be binding upon the Respondents identified in paragraph I.1, above, and their directors, officers, employees, agents, successors and assigns and upon all other persons and entities who are under the direct or indirect control of Respondents including, but not limited to, any contractors or independent agents or consultants acting under or for each of the Respondents in performing their obligations under this Order, until such time as the Work to be performed under Section VI has been completed.

2. No change in the ownership or legal status of Respondents, or of any property to which access is required for performance of the Work, will in any way alter Respondents' obligations and responsibilities under this Order.

3. Respondents shall provide a copy of this Order and all other documents approved under or pursuant to this Order which are relevant to conducting the Work to each contractor, sub-contractor, laboratory, or consultant retained to perform any Work under this Order, within five (5) days after the Effective Date of this Order or on the date such services are retained, whichever date occurs later.  Respondents shall also provide a copy of this Order to each person representing any Respondent with respect to the Work and shall condition all contracts and subcontracts entered into for that purpose upon performance of the Work in conformity with the terms of this Order.  Notwithstanding the terms of any contract, Respondents, and each of them, are responsible for compliance with this Order and for ensuring that their contractors, subcontractors and agents comply with this Order, and perform all Work in accordance with this Order.

4. At all times after service of this Order, Respondents shall provide a copy of this Order to any prospective owners or successors before a controlling interest in Respondents' assets, property rights or stock are transferred to the prospective owner or successor.  Respondents shall notify EPA at least seven (7) days prior to such transfer.

2

## III.  FINDINGS OF FACT

### A.   Discovery of MTBE Contamination at Santa Monica's Charnock Wellfield and Shutdown of the Charnock Wellfields

1. In August 1995, the City discovered the gasoline additive MTBE in drinking water supply wells at its Charnock Wellfield, located at 11375 Westminster Avenue, Los Angeles, California.

2. As of August 1995, the City's Charnock Wellfield had five operating municipal supply wells which provided approximately 45% of the drinking water for the City's 87,000 residents (1990 U.S. Census) and approximately 200,000 daytime customers.  In 1996, levels of MTBE at the City's Charnock Wellfield rose to more than 600 parts per billion ("ppb")(Well No. 19) and, by June 13, 1996, all of the supply wells at the City's Charnock Wellfield were shut down due to persistent and increasing levels of MTBE contamination. (See Draft Investigation Report, MTBE Contamination, City of Santa Monica Charnock Wellfield, Los Angeles, California prepared by Komex•H2O Science, March 21, 1997, at page 29 and Appendix C.)

3. In October 1996, following the shutdown of the City's Charnock Wellfield, the SCWC, another water purveyor utilizing the Charnock Sub-Basin, shut down its wellfield in the Sub-Basin, in order to avoid drawing the contamination toward the SCWC Wellfield.  Prior to this shutdown, SCWC had two operating municipal supply groundwater wells, at 11607 and 11615 Charnock Road, Los Angeles, that provided a portion of the drinking water for approximately 10,000 residences and businesses in Culver City.

### B.   Water Replacement Quantities and Costs

4. As a result of the discovery of MTBE in the City's Charnock Wellfield and the shutdown of both of the wellfields in the Charnock Sub-Basin, the Impacted Parties began purchasing alternative water supplies from the Metropolitan Water District.

5. The Impacted Parties have documented the costs of water replacement.

3

**EXHIBIT F**

Ark Valley News - People

Page 1 of 2



Search





Park City

# Park City to spend settlement money

**By Chris Hunter**
Last Updated: January 29, 2009

After months of discussing where to spend the $6.1 million settlement the city received from a lawsuit against oil companies, the Park City council took action Jan. 27.

After members of the audience spoke to the council about their wishes, council President John Lehnherr outlined his wish list. He shocked the council when he made a motion to approve it.

Lehnherr's nearly $3.8 million list included over $200,000 for paying off debts on an excavator, a bucket truck and city hall; $600,000 to $800,000 on the Broadway bridge; $15,000 on fire hydrants; $30,000 on the McLean Park bridge; $200,000 on the beautification of 53rd and 61st streets; and $1 million on the Park City library. Lehnherr also designated $1.5 million for a new sewer headworks, but the council passed that on a previous motion. Council member David Oldham seconded.

Several members of the council agreed in part with Lehnherr. However, some thought the motions should be made separately.

Council member George Capps said he was worried about infrastructure more than anything.

"We have got some serious problems with our infrastructure," Capps said. "The fire hydrants are public safety and that is our number one issue."

Emil Bergquist said Lehnherr's motion seemed "politically driven."

"You have quite a large package here, John," Bergquist said. "Several people came to speak tonight, some did not. All of Park City did not get to speak."

Lehnherr said his motion came from listening to people.

Council member Chris Youngers said he was in favor of paying off debts, but felt Lehnherr's list represented reckless spending.

"I see how some of the things you have mentioned make sense," Youngers said. "I think it is a mixture of needs and wants. I certainly want a new library. I would fully support a ballot question that asks if the citizens want to put a million dollars towards a library."

Bergquist said he felt a ballot issue was a good idea for the library.

"It is not a matter of whether people want it," Bergquist said. "It is a matter of whether they tell us they want it. If a few people have enough fortitude and speak up at a council meeting to do a library, we need to get a ballot issue going in the community so we know that is what people want us to spend the money on."

Council member Carol Flower said she felt like the council should decide on issues instead of having a separate ballot issue for every new issue.

"It seems like anytime we have a major issue, we get back to the topic of government by consensus," Flower said to audience applause. "I do not think that is why we were elected to fill these seats. We were elected to these seats to make decisions."

After a 10-minute break, Bergquist said he wanted to hear from the people of Park City.

"Carol said we need to be taking the actions instead of asking the community," Bergquist said.

"That is not what I said," Flower said. "I said they did not elect us to perform election by consensus. I think you saw an example of when people don't want something. They show up. The rec center was a defining moment. If they didn't want a library, they would be showing up, sending us an e-mail or stopping us in a grocery store."

Bergquist said he felt the group that spoke about the library had probably talked about it together before coming to the council.

"That doesn't represent the community," Bergquist said. "That represents people with a common concern."

After Bergquist finished, Mayor Dee Stuart said she did not agree with all of Lehnherr's plan, but felt it would be an "investment in the community."

When she finished, the council voted. Lehnherr, Flower, Davis and Oldham supported the motion with Jones, Bergquist, Capps and Youngers opposing it, forcing a 4-4 tie and sending the tiebreaker to Stuart.

"There has been some discussion regarding consensus leadership," Stuart said. "Consensus leadership is a failure of leadership. That is five people calling you and using that to make your decision instead of doing your own background research, listening to experts and, as Carol said, the job you are elected to do. The mayor votes 'aye.' It is the right thing to do."

Several in the crowd applauded Stuart's vote.



○ Home

- Cars
- Homes
- Jobs
- Shop
- Classifieds
- Ads

**News**

# Dover contamination lawsuit: settlement money to fund retiree benefits

**By Ben Kossak/Correspondent**

**Tue May 12, 2009, 01:17 PM EDT**

Dover - $1.9 million in settlement money from a class-action suit against oil companies over MBTE contamination of Dover's water supply will be put towards a trust fund for non-pension benefits for retirees following a key Town Meeting vote.

The Other Post-Employment Benefits Trust Fund would pay for health coverage and other such non-pension benefits for retirees. As of 2004, the Governmental Accounting Standards Board has required employers to report total liability accrued from providing these benefits. Dover's accrued liability amounts to $9.6 million now, and is continually increasing. GASB does not require that employers fund these liabilities, but by doing so, Dover will help its credit rating. Putting up the sum of $1.9 million at the beginning of a 30-year funding schedule will save the town an estimated $39 million over the three decades.

The money comes from settlements with oil companies over contamination of the Church Street wells with MTBE, a gasoline additive which can give drinking water a harsh chemical taste, and which at high concentrations is a carcinogen. The contamination led to the closure of the Church Street wells in 1990. Dover was one of approximately 150 cities and towns that entered into a group lawsuit. The suit continues to generate settlements with major oil companies.

There were some objections to this use of the settlement money during discussion at the annual Town Meeting earlier this month. Opponents pointed to the extended timeframe for benefits, long enough that some Dover residents may not see the payoff. Some also believed the money should benefit those more directly affected by the closure of the Church Street wells. Others questioned the wisdom of spending the entire amount of money at once, rather than keeping some back in cash reserves during the current uncertain economy.

However, proponents such as Park and Recreation Commissioner Peter Davies argued that the town's liabilities, which have been accruing for the past 20 years, and continue to compound, require a "proactive approach," and that applying this lump sum would be best for Dover's long-term economic health.

○ Home

- Cars
- Homes
- Jobs
- Shop
- Classifieds
- Ads

**Government** 

# Town Meeting continues tonight

**By Casey Meserve**

**Tue May 12, 2009, 03:58 PM EDT**

Halifax - Town Meeting will continue Tuesday at 7:30 p.m. at the elementary school.

Monday night, residents ran through the first 12 articles of the annual Town Meeting and all 17 articles of the special Town Meeting.

Residents approved, with some amendments, the $19 million budget for 2010, nearly $10 million Silver Lake and Halifax school budgets.

**More work equals more pay?**

The biggest debate of the night involved the creation of a Grade 9 in the Wage and Personnel position scale. The addition would create a pay scale for a position below a supervisor's responsibilities and pay scale, but higher than the responsibilities of a Grade 8. An employee at the top of the Grade 8 pay scale would jump up to the next grade rate of pay. The Wage and Personnel Board recommended the change at the selectmen's request. Because one employee has been at the top of the Grade 8 scale for 15 years.

"We don't currently have a Grade 9, so employees jump from 8 to 10," Wage and Personnel Board member Maureen Rogers said. "We felt to make it financially feasible, we should create a Grade 9, in order to not put people in supervisor capacity who shouldn't be there."

Rogers said no employee has been before the board to request a bump to the new grade. "We just know the jump from 8 to 10 is too big a gap," she said.

"No one at this time can be put into that grade," Town Clerk Marcia Cole answered one resident. "The Wage and Personnel Board has not had a hearing where a person has proposed to go into that grade now."

The selectmen however, had put in a request to reassign the board's assistant from a Grade 8 to a Grade 10, which would increase her pay from $45,614 annually to $51,634 at the lowest end of the Grade 10 payscale.

"It is the selectmen's intention to regrade this person to a Grade 9, and if this article fails, we'll ask the reclassification to move to Grade 10," Selectmen Chairman Margaret Fitzgerald said.

The item failed by a majority vote.

As debate turned to Article 5, the town's budget, the question of a raise for the selectmen's assistant arose again.

Residents approved a salary increase for the Board of Selectmen's clerical staff, but not as big an increase as the selectmen and the the assistant to the selectmen, Beverly Smith, wanted.

The selectmen recommended a $6,993 total raise for both employees from $72,443 in the line item to $79,890. Jeff Bolger of Brandeis Circle suggested an amendment to a 2 percent increase, to $73,892. "So that the clerical position is no higher than the other positions," he explained.

Fitzgerald said the raise would reflect an increase for the assistant's position to a Grade 10, and was included as a Grade 10 to ensure the raise could be funded.

"We felt it would go to a Grade 9," she said. "We did not request this lightly. The responsibilities of this position have increased dramatically and its been at a Grade 8 for 15 years.

Smith, the employee in question, took the microphone and gave her job desription.

"Over the past 15 years, this position has changed significantly," Smith said. "This is a multifaceted job that requires someone to work independently with little supervision."

Smith said she prepares Town Meeting warrants, and the annual town report, as well as the selectmen's agenda, correspondence with the board members, outside contractors, lawyers, and residents, as well as numerous other duties. She requested that Town Meeting approve the full $6,993 increase. Town Meeting disagreed and approved Bolger's amendment and the amended line item unanimously.

As Town Meeting adjourned at 11 p.m., Smith said she would ask Town Meeting to reconsider the increase tonight.

**The budget**

Halifax residents will be asked to vote on a budget totaling $18,488,249 an increase of $71,159 over the current budget. That figure includes $4,757,264 for the elementary school and an assessment of $4,023,067 for the Silver Lake Regional School district.

The newly merged Treasurer-Collector position was given a $60,798 salary. Tonight, residents will decided to make the elected position an appointed one, or keep it elected. The Finance Committee recommended an amendment to increase salaries for the treasurer's clerical staff by $1,365, from $47,630 which was recommended to $48,995. The amendment passed.

Police wages were amended to $853,210 from $793,210 to reflect the contract signed last year. The $853,210 is a 14 percent increase over the $748,875 police offiers earned this fiscal year. Town Meeting approved the amendment and the line item.

Acting Fire Chief Henry Bosworth requested an additional $50,421 in the firefighters wages line item

and an additional administrative position for the day shift. He said having one administrator on the day shift means things are left undone if he, or another administrator, leaves the fire station on a call. Residents did not pass his amendment.

The recommended number was $495,632, from $493,813 this fiscal year. The Finance Committee recommended an amendment to increase firefighters wages to $521,632, a five percent increase, for a potential contract settlement in fiscal year 2010.

Town Meeting approved a 5 percent raise for the highway surveyor from $63,236 to $64,501 and a 7 percent raise for the water superintendent from $65,727, to $70,359. The Finance Committee originally recommended $67,032, a 2 percent raise.

Residents approved a 10 percent, from $32,292 to $35,487, raise for the town clerk, which is now a separate position from the treasurer-collector.

**Capital purchases**

Town Meeting approved spending more than $75,000 for three pieces of road repairing equipment and $125,000 on road repairs in addition to $196,034 in state funds. Highway Surveyor Robert Badore requested $15,000 for a vibratory roller used to press asphalt into patches. He requested $20,546.92 for a hotbox, which would keep hot asphalt warm while patching roads in the winter. He requested $40,375 for a crack-filling machine to fill cracks in the roads.

Laurie Maker, a Halifax School Committee member, questioned the need for the equipment and the timing of the articles.

"I see so many departments cutting their base budgets down and then requesting an additional $200,000 at 10:30 at night to get what they need. It's not fair," she said.

Curt MacLean of Holmes Street, and the vice president of the Plymouth County Highway Association, said there is no need to purchase the equipment when it is cheaper to contract a company to do it.

"If you bid the job properly, you can get a mile of road patched for $1,732," MacLean said. "If we took the $40,000 and bid the crack-filling job properly we fill every crack for 23 miles of roads. This is crazy for residents to spend when companies can do it much more efficiently."

The Finance Committee recommended the purchases and Town Meeting did not agree with MacLean on close votes. MacLean asked for a hand count on Article 12, a $40,375 crack-filling machine, but Moderator Jan Whiting did not receive the required seven residents to request it.

**Special Town Meeting**

Residents approved the creation the Monponsett Pond Stabilization Fund, and transferred $254,198.80 from legal settlement into the fund. The fund will be used to pay for the pond's care and maintenance, including preservation and the ongoing weed remediation project. Residents also approved using $90,000 from this settlement to continue algae cleanup of the pond for another year.

The settlements is a class-action lawsuit which claims that oil companies used methyl tert-butyl ether (MTBE), a gasoline additive, knowing that it is toxic to people and animals in drinking water. Trace amounts of MTBE has been found in sediment in the pond. Water Commissioner Bonnie Wood said

residents should not be concerned that the chemical is in the drinking water supply.

Town Meeting approved a request by the water commissioners to lease land surrounding the water tower to cell phone companies for up to 20 years. Companies could attach cell phone antennas to the water tower. Funds from the lease will be split between the water department and the general fund. The article was amended to split the revenue 50/50 rather than have the full amount go to the water department.

Town Meeting approved transferring $44,230 help pay for this winter's snow removal costs.

Comments (0)
Login or register to post a comment:

# Login

Username: [                    ]
Password: [
Forgot password
[ Login ]

# Register

Email: [                    ]
First Name: [                    ]  .
Last Name: [
☐ I agree to the terms of use
☐ I am over 13 years of age
NOTE: Your inbox must accept emails from "no-reply@gatehousemedia.com"
[ Register ]

### Halifax Area Content

WEB BROWSING REDEFINED  FIREFOX 3