EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                              :
IN RE METHYL TERTIARY BUTYL ETHER                             :
PRODUCTS LIABILITY LITIGATION                                 :
                                                              :    Master File No. 1:00-1898
-------------------------------------------------------------- X   MDL 1358 (SAS), M21-88
                                                              :
This document relates to:                                     :
                                                              :
*City of Riverside v. Atlantic Richfield Co., et al.,*        :
Case No. 04-CV-4969,                                          :
                                                              :
*Quincy Community Services District v. Atlantic*             :
*Richfield Co., et al.,* Case No. 04-CV-4970                  :
                                                              :
*People of the State of California, et al. v. Atlantic*       :
*Richfield Co., et al.,* Case No. 04-CV-4972                  :
                                                              :
*California-American Water Co. v. Atlantic Richfield*         :
*Co., et al.,* Case No. 04-CV-4974                            :
                                                              :
*Martin Silver, et al. v. Alon USA Energy, Inc., et al.,*     :
Case No. 04-CV-4975                                           :
                                                              :
*Village of Island Lake, a municipal corporation, v.*        :
*Ashland Inc., et al.,* Case No. 04-CV-02053                  :
-------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF SETTLING DEFENDANTS' MOTION
## FOR DETERMINATION OF GOOD FAITH SETTLEMENT

Certain Defendants have entered into a Settlement Agreement dated as of March

12, 2008 (the "Settling Defendants")[1] with certain Plaintiffs in MDL 1358 that are represented

by Baron & Budd, P.C., Weitz & Luxenberg PC, and/or Sher Leff LLP (hereinafter referred to as

the "Settlement Agreement").[2] Settling Defendants, through the undersigned attorneys, hereby

---

[1]    All of the Settling Defendants are set forth in the Settlement Agreement attached to the
Declaration of Sheila L. Birnbaum. Those Settling Defendants who are defendants in one or
more of the cases captioned above are listed on the attached Appendix A.

[2]    All of the California Plaintiffs still before this Court in the individual cases captioned
above have entered into the Settlement Agreement with Settling Defendants, except in the cases

*(cont'd)*

1

submit this memorandum of law in support of their motion that this Court determine that the

subject Settlement Agreement generally, and as applied to the five specific California cases and

the one specific Illinois case captioned above, is a good faith settlement pursuant to the laws of

California and Illinois sufficient to bar joint tortfeasor liability claims against Settling

Defendants.[3]

## I.   INTRODUCTION

After extensive, arm's length and good faith negotiations, the Settling Defendants

reached an aggregate settlement agreement with Settling Plaintiffs identified above that resolves

all of their claims against the Settling Defendants in this Court.  The terms of this Settlement

Agreement generally and as they pertain to the California Plaintiffs and the Illinois Plaintiff

whose settlements are the particular subject of this motion have been agreed to by the Settling

Plaintiffs.[4]  The Settlement Agreement is attached as Exhibit A to the Birnbaum Declaration,

and its terms are outlined below.  This Settlement Agreement does not resolve claims pending

against certain other Defendants (the "non-settling Defendants").  In order to acquire protection

---

*(cont'd from previous page)*
of *City of Roseville v. Atlantic Richfield Co., et al.,* Case No. 04-CV-4971 and *People of the State of California, et al. v. Atlantic Richfield Co., et al.,* Case No. 04-CV-4972, in which Plaintiffs City of Sacramento, Sacramento County Water Agency, Sacramento Groundwater Authority, Sacramento Suburban Water District, and San Juan Water District have not entered into the settlement but are seeking to voluntarily dismiss their claims under Rule 41, claiming that they are not going to re-file the same claims in another court in an effort to circumvent this Court's jurisdiction.  Plaintiff People of the State of California is not included within the terms of the settlement and is no longer a party before this Court.

[3]   All similar joint tortfeasor claims are dismissed by operation of law in the remaining cases in the MDL subject to the Settlement Agreement without the requirement of a good faith determination and, therefore, a motion in those cases is not necessary. *See, infra,* note 9.

[4]   Further, the Settlement Agreement is a comprehensive settlement and treatment protocol, and is not an admission of wrongdoing on the part of any Settling Defendants or of the validity of any claims alleged by Plaintiffs.

from any alleged joint tortfeasor claims, the Settling Defendants seek this Court's determination

that the negotiated Settlement Agreement with Plaintiffs was entered into in good faith and

comports with the applicable requirements of California law and Illinois law as set forth below.

### A.    Litigation Overview

These cases are part of MDL 1358 now pending in the United States District

Court, Southern District of New York.  The MDL proceedings involve over one hundred actions

brought by certain public and private entities from various states as well as individuals in the

State of Wisconsin.  In each of these actions, including the Settling Plaintiffs' cases here, claims

have been brought against various petroleum companies for their design, manufacture, supply,

use, handling, and/or distribution of methyl tertiary butyl ether ("MTBE"), a chemical compound

added to gasoline.  Plaintiffs have alleged that MTBE has contaminated, or threatens to

contaminate, water supplies which are accessed, accessible, managed, owned, operated, used,

and/or protected by Plaintiffs (including but not limited to wells or aquifers owned, operated,

used and/or protected by Plaintiffs).  The actions were transferred to this Court by the Judicial

Panel on Multidistrict Litigation pursuant to §1407 of title 28 of the United States Code.[5]

### B.    The Court-Ordered Mediation Process

In the fall of 2006, the parties and the Court concluded that a mediation could be

helpful in an effort to bring the parties together and potentially reach a settlement.  David

Geronemus, Esq. was selected as the mediator and extensive meetings occurred in January and

February of 2007, even before the formal order appointing Mr. Geronemus Special Settlement

Master was entered on March 12, 2007.  After the Court's order, the parties continued meetings

---

[5]    For a background description of the MDL claims, see *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 364 (S.D.N.Y. 2005).

and discussions with the Special Settlement Master in an attempt to explore and make progress on settlement. These negotiations were wide-ranging and conducted at arm's length and in good faith and all parties to the litigation were invited to participate in the mediation process. *See* Decls. of Sheila L. Birnbaum and Steve L. Leifer; *see also* Decls. of Robert Gordon, Victor M. Sher, and Scott Summy. In addition, with the encouragement of the Special Settlement Master, additional discussions continued with the encouragement of the mediator throughout the late spring, summer and fall of 2007 between representatives of Settling Plaintiffs and Settling Defendants in an effort to overcome obstacles to settlement identified in the discussions with the Special Settlement Master. These discussions subsequently were disclosed to refiner/manufacturer defendants who participated in the mediation process.

These discussions ultimately culminated in an agreed upon proposed outline of basic terms of a settlement, and in December of 2007, a proposed settlement term sheet, subject to agreement on final terms and documentation, was circulated to refiner/manufacturer defendants who participated in the mediation process. This proposed term sheet was accepted by the Settling Defendants. *See* Decls. of Sheila L. Birnbaum and Steve L. Leifer.

After receiving indications of acceptance of the proposed settlement terms from the Settling Plaintiffs and the Settling Defendants, these parties worked extensively throughout the period from December 2007 through February 2008 to arrive at final settlement terms and other ancillary settlement documents, including an extensive treatment protocol.[6] As shown more fully below, the settlement terms, generally and as applied to the Settling Plaintiffs

---

[6]   All Settling Defendants have executed the Settlement Agreement. All Settling Plaintiffs have executed the Settlement Agreement with the exception of those 6 California plaintiffs and 32 Wisconsin individual plaintiffs who are now seeking dismissals without prejudice under Rule 41.

identified herein, were arrived at in good faith and are reasonable under both California law and Illinois law.

### C.    Overview of the Settlement Terms

As discussed above, settlement discussions occurred in this case in connection with the Baron & Budd P.C. and Weitz & Luxenberg P.C., and certain Sher Leff LLP cases pending in MDL 1358. The settlement includes 59 separate cases filed under the laws of 17 different states on behalf of over 550 plaintiffs. Generally, under the terms of the Settlement Agreement, the Settling Plaintiffs fully release Settling Defendants from past, present or future claims of any type or under any theory, including but not limited to all claims asserted in MDL 1358, arising from: (1) the use of MTBE or Other Authorized Oxygenates[7] in gasoline, at any time and for any reason; (2) the actual or threatened presence of MTBE and/or TBA in water or on property accessed, accessible, managed, owned, operated, used, and/or protected by Releasor (including but not limited to wells or aquifers owned, operated, used and/or protected by Releasor), whether past, present or future or on account of acts or omissions that occurred before or after the Effective Date, due to their use, or either of them, in gasoline, at any time and for any reason; and (3) the actual or threatened presence of gasoline, BTEX[8], Other Authorized Oxygenates, and/or other components of gasoline beyond those released in subsections (1) and (2)

---

[7]    Other Authorized Oxygenate means any chemical compound certified for use as an oxygenate under the provisions of the Clean Air Act Amendments of 1990 or as a Renewable Fuel under the provisions of the Energy Policy Act of 2005, including but not limited to, tertiary butyl alcohol ("TBA"), diisopropyl ether ("DIPE"), ethanol, methanol, tertiary amyl methyl ether ("TAME"), and ethyl tertiary butyl ether ("ETBE"), whether used in gasoline at any time as an octane enhancer, oxygenate pursuant to the requirements of the Clean Air Act Amendments of 1990, or for any other reason, and any associated breakdown products thereof.

[8]    BTEX means benzene, toluene, ethyl benzene, trimethyl benzene, and all xylenes.

above, or other petroleum products or any associated breakdown products thereof, in any well in which as of, or prior to, March 12, 2008 the presence of MTBE or Other Authorized Oxygenates was detected at or in such well at any level. The Settling Plaintiffs do not release claims pertaining to gasoline components other than MTBE or TBA due to spills occurring after March 12, 2008. The Settling Plaintiffs also do not release any claims against the non-settling Defendants.

In return for Settling Plaintiffs' release and attendant dismissals of their cases with prejudice, Settling Defendants, *inter alia*, agreed to (i) pay a certain amount of money in settlement, and (2) undertake certain defined future treatment of eligible wells in the event of certain triggering events. An extensive treatment protocol covering this future treatment obligation, which may run for up to 30 years, was negotiated and agreed upon as part of the Settlement Agreement. *See* Exhibit A to Decl. of Sheila L. Birnbaum.

Under the Settlement Agreement, Settling Defendants are paying an aggregate settlement amount in excess of $422 million dollars, inclusive of attorneys fees and costs. This amount is being funded by the Settling Defendants pursuant to a confidential allocation formula developed and approved by the Settling Defendants. The Settling Defendants' settlement funding allocation formula was the result of arm's length negotiations that took into account a variety of objective factors. These negotiations: (1) commenced on or about January of 2007, (2) proceeded independently of negotiations with Plaintiffs, (3) accelerated in the fall of 2007, (4) were disclosed to and/or involved refiner/manufacturer defendants involved in the mediation process, and (5) were completed prior to an agreement-in-principle with Plaintiffs. The resulting settlement cost allocation formula was approved by most refiner/manufacturer defendants as a reasonable approach to allocating any resulting settlement cost among Settling Defendants. The

6

resulting Defendants' allocation chart setting forth the amounts due from each Settling Defendant is being held in confidence by Special Master David Geronemus to independently verify compliance by each Settling Defendant. *See* Decl. of Steve L. Leifer.

Further, separate and independent from Defendants, an objective formula was developed by counsel for Settling Plaintiffs for allocating the proceeds of the settlement among the Settling Plaintiffs. The allocation distribution formula utilizes, among other criteria: (1) the number of wells with detections of MTBE or TBA, (2) the levels of those detections in those wells, (3) the operating capacity of the well(s), (4) the length of time over which detections occurred, (5) how recently the detections occurred, (6) whether the last detection was so remote as to create a statute of limitations issue, (7) the relationship of the detections to applicable regulatory standards, (8) whether any regulatory agency had ordered the wells to modify or cease operations, or whether the wells otherwise modified or ceased operations because of MTBE/TBA contamination, (9) the historical use of the wells, (10) whether the Settling Plaintiffs' case was a focus case in the MDL requiring active discovery and expenditure of plaintiff's costs and time, (11) how close a Plaintiff's case was to trial, and (12) whether Settling Plaintiff was foregoing natural resource damage claims in settling their case. This distribution formula has resulted in set amounts to be distributed to each Settling Plaintiff, which has been fully disclosed and agreed to by all of the Settling Plaintiffs. These distribution amounts for each Settling Plaintiff also is being held by the Special Settlement Master to independently verify these amounts when necessary under the Settlement Agreement. *See* Decls. of Robert Gordon, Vic Sher, and Scott Summy, Plaintiffs' Counsel.

7

The California and Illinois Settling Plaintiffs subject to this motion should recover from the Settlement Agreement as follows[9]:

## California Cases

- *City of Riverside v. Atlantic Richfield Co., et al.*, Case No. 04-CV-4969

  o Plaintiff City of Riverside's allocation of the settlement proceeds is $1,014,097.00. It has 4 wells that have or have had detections of MTBE and/or TBA. It also has 100 wells without past or current detections of MTBE that may be eligible to receive treatment in the future under the Settling Defendants' future treatment obligations under the Settlement Agreement.

- *Quincy Community Services District v. Atlantic Richfield Co., et al.*, Case No. 04-CV-4970:

  o Plaintiff Quincy Community Services, Inc.'s allocation of the settlement proceeds is $2,663,840.00. It has 1 well that has or has had detections of MTBE and/or TBA. It also has 5 wells without past or current detections of MTBE that may be eligible to receive treatment in the future under the Settling Defendants' future treatment obligations under the Settlement Agreement.

- *California-American Water Co. v. Atlantic Richfield Co., et al.*, Case No. 04-CV-4974:

  Plaintiff California-American Water Company's allocation of the settlement proceeds is $8,029,550.00. It has 3 wells that have or have had detections of MTBE and/or TBA. It also has 184 wells without past or current detections of MTBE that may be eligible to receive treatment in the future under the Settling Defendants' future treatment obligations under the Settlement Agreement.

---

[9] Two cases remanded by this Court and now pending in California state court; namely, *California Water Service Co. v. Atlantic Richfield Co., et al.*, Case No. CV-443990 (Cal. Super. Ct., San Mateo County) [former MDL Case No 05 CV 3227 (SAS)] and *Riverview Water District (now Lakeside Water District as a result of merger) v. Atlantic Richfield Co., et al., Case No. CV-37-2007-00080789 (Cal. Super. Ct., San Diego County)* [former MDL Case No. 06 CV 0877 (SAS)] are part of this settlement. Plaintiff California Water Service Company, which is allocated $49,716,872.00 of the aggregate settlement amount, has identified 27 wells with past or current detections of MTBE or TBA and 786 wells without past or current detections of MTBE or TBA. Further, Plaintiff Riverview (now Lakeside), which is allocated $11,415,569.00 of the aggregate settlement amount, has identified 4 wells with past or current detections of MTBE or TBA and 3 wells without past or current detections of MTBE or TBA. *See* Decls. of Victor M. Sher and Scott Summy. Motions for good faith determinations will be submitted to the California courts where these cases are now pending.

- *People of the State of California, et al. v. Atlantic Richfield Co., et al.,* Case No. 04-CV-4972:

    o The terms with respect to Plaintiff California-American Water Company are set forth in connection with Case No. 04-CV-4974 cited above.

    o Plaintiff Citrus Heights Water District's allocation of the settlement proceeds is $264,853.00. It does not have any wells that have or have had detections of MTBE and/or TBA. It has 5 wells without past or current detections of MTBE that may be eligible to receive treatment in the future under the Settling Defendants' future treatment obligations under the Settlement Agreement.

    o Plaintiff Del Paso Manor Water District's allocation of the settlement proceeds is $264,853.00. It does not have any wells that have or have had detections of MTBE and/or TBA. It has 8 wells without past or current detections of MTBE that may be eligible to receive treatment in the future under the Settling Defendants' future treatment obligations under the Settlement Agreement.

    o Plaintiff Fair Oaks Water District's allocation of the settlement proceeds is $264,853.00. It does not have any wells that have or have had detections of MTBE and/or TBA. It has 9 wells without past or current detections of MTBE that may be eligible to receive treatment in the future under the Settling Defendants' future treatment obligations under the Settlement Agreement.

    o Plaintiff Florin Resource Conservation District's allocation of the settlement proceeds is $264,853.00. It does not have any wells that have or have had detections of MTBE and/or TBA. It has 15 wells without past or current detections of MTBE that may be eligible to receive treatment in the future under the Settling Defendants' future treatment obligations under the Settlement Agreement.

    o Plaintiff Rio Linda Elverta Community Water District's allocation of the settlement proceeds is $264,853.00. It does not have any wells that have or have had detections of MTBE and/or TBA. It has 12 wells without past or current detections of MTBE that may be eligible to receive treatment in the future under the Settling Defendants' future treatment obligations under the Settlement Agreement.

- *M & P Silver Family Partners II v. Alon USA Energy, Inc., et al.,* Case No. 04-CV-4975:

    o Plaintiff M & P Silver Family Partners II's allocation of the settlement proceeds is $3,937,202.00. It has 2 wells that have or have had detections of MTBE and/or TBA. It does not have any wells without past or current detections of MTBE that would be subject to the future treatment obligations set forth in the settlement agreement.

**Illinois Case**

- *Village of Island Lake, a Municipal corporation v. Ashland Inc., et al.,*
  *Case No. 04-CV-02053*:

  - Plaintiff Village of Island Lake's allocation of the settlement proceeds is
    $3,834,158.00. It has 3 wells that have or have had detections of MTBE and/or
    TBA. It also has 5 wells without past or current detections of MTBE that may be
    eligible to receive treatment in the future under the Settling Defendants' future
    treatment obligations under the Settlement Agreement.

*See* Decls. of Victor M. Sher and Scott Summy, Plaintiffs' Counsel.

## II.  THE SETTLEMENT BETWEEN SETTLING DEFENDANTS AND SETTLING PLAINTIFFS IS A GOOD FAITH SETTLEMENT.

### A.  The Substantive Law of the Transferor States Will Be Applied To The Settlements Of State Law Claims Giving Rise To Potential Claims for Contribution and Indemnity.

The district court to which an action is transferred pursuant to 28 U.S.C. § 1407(a)

must apply the substantive law of the jurisdictions from which these cases originated and were

transferred (the "Transferor States" ), including the Transferor States' choice of law rules. *In re*

*Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007). Due to the fact that the

state law claims in these cases pertain to the use and marketing of gasoline containing MTBE in

the respective states, and the contamination or threatened contamination of wells and

groundwater in those same states, it is likely that under any available choice of law rules, the

substantive law of the respective Transferor States will be applied to those state law claims.

Indeed, this Court has, for example, already performed a state-by-state analysis of the substantive

state law as it pertained to the MTBE claims. *See, e.g., In re Methyl Tertiary Butyl Ether Prods.*

*Liab. Litig.*, 379 F. Supp. 2d 348.

10

Likewise, the respective substantive law of each Transferor State will determine the preclusive impact of the Settlement Agreement on the potential state law contribution and indemnity claims, if any. *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 307 (2d Cir. 2000). As explained below, under applicable state law, this settlement will have the effect of protecting the Settling Defendants from such claims. Further, in analyzing questions of federal law in connection with any cognizable federal claims, a multi-district transferee court will apply the law of the circuit where it is located so long as that law is not divergent from predominant interpretation. *Moore v. Sulzer Orthopedics, Inc.*, 337 F.Supp.2d 1002, 1009 (N.D. Ohio 2004). Thus, to the extent that any federal claims are relevant, the rules in the Second Circuit will apply. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, CCH Prod. Liab. Rep. P17,292 (S.D.N.Y. 2005). Decisions of the Southern District have indicated that similar protection against contribution and indemnity claims is available for any federal claim that is the subject of a settlement.[10]

**B.    This Court Can Make Any Necessary Findings Regarding the Settlement.**

Both California and Illinois law require that a Court determine that a settlement was entered into in good faith in order for a party to obtain protection against alleged joint tortfeasor liability. *See* Cal. Code Civ. Proc. § 877(b) (2007) (a release, a dismissal with or without prejudice, or a covenant not to sue or not to enforce a judgment given in good faith, "shall discharge the party to whom it is given from all liability for any contribution to any other parties"); *see* 740 ILCS 100/2 (a tortfeasor who settles with a claimant in good faith "is

---

[10]    In *Sabater v. Lead Indus. Ass'n, Inc.*, No. 00 CIV. 8026, 2001 WL 1111505, at *5 (S.D.N.Y. Sept. 21, 2001), the court held that because the defendant was released in good faith by the settlement, the co-defendants could not maintain a claim for contribution. *See also Eichenholtz v. Brennan*, 52 F.3d 478 (3d Cir. 1995) (affirming trial court order barring contribution claims against settling joint tortfeasor).

discharged from all liability for any contribution to any other tortfeasor"); *Johnson v. United Airlines*, 784 N.E.2d 812, 818 (Ill. 2003) ("when a trial court is notified that a settlement has been reached and a good-faith ruling is sought, the trial court should rule on the good faith of the settlement as soon as practicable, apart from and in advance of any trial on the tort issues").

A federal court may hold a hearing and make any good faith finding required by certain states' laws. In *Trujillo v. Crescent Jewelers*, 2000 U.S. App. LEXIS 30235, *5 (9th Cir. 2000), the Ninth Circuit upheld the Southern District of California's good faith determination of a settlement between the plaintiff and one of the defendants. The Ninth Circuit also upheld the district court's dismissal of a cross-claim by the non-settling joint tortfeasor against the settling joint tortfeasor for equitable indemnity, contribution, and declaratory relief for equitable indemnity, with regard to the state claims. The court stated:

> [Plaintiff's] state law claims are governed by California's substantive good-faith settlement provision, Cal. Code Civ. Proc. § 877, which bars cross-claims for 'all liability for any contribution to any other parties.' The district court was thus correct in dismissing Crescent's cross-claim against Chapman with respect to Trujillo's state law claims.... [W]e affirm the district court's determination of good faith settlement and affirm the sua sponte dismissal of [non-settling defendant's] cross-complaint against [settling defendant].

*Id.* at *5; *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 648 (3d Cir. 2006) (Third Circuit upheld a good faith determination by the District Court of New Jersey under the Illinois Contribution Act, finding no abuse of discretion). This Court is the appropriate court to hold any good faith hearing under the laws of California and Illinois regarding this settlement, and such a finding would be binding in those jurisdictions. *See AmeriPride Servs. Inc. v. Valley Indus. Servs., Inc.*, Case Nos. CIV. S-00-113-LKK/JFM & S-04-1494-LKK/JFM, 2007 U.S. Dist. LEXIS 51364, at *8-9, 12-13 (E.D. Cal. July 2, 2007) (finding settlement made in good faith under § 877.6 and entering judgment pursuant to Fed. R. Civ. P. 54(b): "A settling party in

a federal action involving California claims can file a motion seeking a good faith

determination."); *Bottoms v. Levin Enters., Inc.*, No. C-99-4598-MMC, 2001 U.S. Dist. LEXIS

13434, at *3-4 (N.D. Cal. Aug. 22, 2001) (finding settlement in good faith under § 877 and §

877.6; entering judgment pursuant to Fed. R. Civ. P. 54(b)).

C.   **The Settlement Comports with California's Requirement of Good Faith in Order to Protect Against Contribution and Indemnity Claims.**

Under California law, a determination that a settlement was entered into in good

faith results in a bar on alleged joint tortfeasor claims against the Settling Defendants.[11]  *See* Cal.

Code Civ. Proc. § 877.6(c) ("A determination by the court that the settlement was made in good

faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling

tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative

indemnity, based on comparative negligence or comparative fault").  It is a challenger's burden to

demonstrate a lack of good faith.  For the reasons set forth, the Settling Defendants request that

this Court find that the Settlement Agreement is in good faith overall, and additionally is in good

faith as to each California Plaintiff.

---

[11]   California and Illinois are the only two transferor states that require a good faith hearing in order for settling defendants to receive joint tortfeasor protection.  Although not requiring a good faith hearing, several additional states generally require the presence of good faith for the statutory protection provided settling defendants against alleged joint tortfeasor claims to be effective.  *See* Fla. Stat. § 768.31(5)(b) (a release or a covenant not to sue or not to enforce a judgment given in good faith "discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor"); Va. Code Ann. § 8.01-35.1(A) (2007) (requiring release or covenant not to sue to be given in good faith); Mass. Gen. Laws Ann. Ch. 231B, § 4 (requiring same); N.Y. Gen. Oblig. Law § 15-108 (McKinney) (Amended June 4, 2007) (requiring same); N.H. Rev. Stat. Ann. § 507:7-h (requiring same); *Bd. of Educ. v. Zando, Martin & Milstead, Inc.*, 390 S.E.2d 796, 805 (W. Va. 1990) ("[A] party in a civil action who has made a good faith settlement with the plaintiff prior to a judicial determination of liability is relieved from any liability for contribution."); *see also* Wis. Stat. § 113.05 (2006) (containing requirement similar to good faith).

13

The goal of a good faith hearing is to determine that there has been no collusion between the settling parties and "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." *Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*, 698 P.2d 159, 166 (Cal. 1985). In making that determination, the court may examine numerous factors, including:

> [1] a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, [2] the amount paid in settlement, [3] the allocation of settlement proceeds among plaintiffs, [4] [] a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial . . . [5] financial conditions and insurance policy limits of settling defendants, as well as [6] the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants.

*Id.* at 166-67.[12]   However, "[a] judge charting the boundaries of good faith of necessity must avoid a rigid application of the factors set forth in *Tech-Bilt.*" *N. County Contractor's Ass'n, Inc. v. Touchstone Ins. Servs.*, 27 Cal. App. 4th 1085, 1090 (Cal. Ct. App. 1994).

It is recognized that in determining good faith a court must make an educated guess that the settlement is not grossly disproportionate to the settlor's fair share of anticipated damages "on the basis of information available at the time of the settlement." *Tech-Bilt, Inc.*, 698 P.2d at 167 (emphasis added); *see also N. County Contractor's Ass'n, Inc.*, 27 Cal. App. 4th at 1090-91.   Indeed, the determination of good faith does not require that, in effect, a trial of the merits occur before there can be a good faith settlement.   As one court put it:

---

[12]   These factors, however, are typically considered when the good faith nature of a settlement is contested. *See City of Grand Terrace v. Superior Court*, 192 Cal. App. 3d 1251, 1261 (Cal. Ct. App. 1987) ("We are unaware of any reported decision which has reversed an uncontested good faith determination and we, therefore, conclude that only when the good faith nature of a settlement is disputed, it is incumbent upon the trial court to consider and weigh the *Tech-Bilt* factors. That is to say, when no one objects, the barebones motion which sets forth the ground of good faith, accompanied by a declaration which sets forth a brief background of the case is sufficient.") (emphasis omitted).

14

> [T]he determinant of good faith is not the liability figure ultimately reached at
> trial, but whether the settlement is grossly disproportionate to what a
> reasonable person, at the time of the settlement, would estimate the settling
> defendant's liability to be.

*Barth-Wittmore Ins. v. H.R. Murphy Enters., Inc.*, 169 Cal. App. 3d 124, 132 (Cal. Ct. App.

1985). Precision is not only not required, but also recognized as unattainable. Further, "bad

faith is not 'established by a showing that a settling defendant paid less than his theoretical

proportionate or fair share.'" *N. County Contractor's Ass'n, Inc.*, 27 Cal. App. 4th at 1090

(quoting *Tech-Bilt, Inc.*, 698 P.2d at 166).

The burden is upon the party objecting to the proposed settlement to prove an

absence of good faith and the challenger must prove "that the settlement is so far 'out of the

ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the

statute." *Tech-Bilt, Inc.*, 698 P.2d at 167. Given that the dimensions and playing surfaces of

ball parks are anything but uniform, the court "has wide discretion in deciding whether a

settlement is in good faith and in arriving at an allocation of valuation of the various interests

involved." *N. County Contractor's Ass'n, Inc.*, 27 Cal. App. 4th at 1092, 1095. As set forth in

these motion papers, the evidence shows that the settlement was made in good faith to buy peace

among the settling parties and that the settling parties in no way aimed to injure the interests of

the non-settling defendants.

### 1. The Settlement Agreement Was Negotiated at Arm's Length, Fairly and in Good Faith.

Under California law, the court examines whether there was the "existence of

collusion, fraud, or tortious conduct," in connection with the settlement agreement and/or

whether the settlement agreement was "aimed to injure the interests of non-settling defendants."

*Id.* at 166. Here, all parties were invited to engage in settlement negotiations through the court-

ordered mediation process. In addition, with the encouragement of the Special Settlement

15

Master, additional discussions continued under the general auspices of the mediation throughout the summer and fall of 2007 in an effort to overcome obstacles to settlement identified in the mediation process. These discussions, which involved multiple counsel, subsequently were disclosed to all of the refiner/manufacturer defendants who participated in the mediation process. A proposed outline of settlement terms in December of 2007, which was subject to agreement on final terms and documentation, was distributed to all refiner/manufacturer defendants who participated in the mediation process. These terms were not arrived at in an effort to unfairly prejudice other defendants, but were offered in the hopes that all refiner defendants would find them acceptable. Simply put, these terms were arrived at fairly. Those defendants that chose not to participate in the settlement did so based upon their own independent evaluation. That this settlement arose from a court-ordered process, initially involving all parties, incorporating the use of a neutral mediator, and resulting in terms offered to all refiner/manufacturer defendants, belies any suggestion of bad faith or collusion. Further, no tactical gain has been achieved by the settling parties in reaching this settlement, other than a resolution of all of their pending claims between them, nor is the settlement aimed at injuring the non-settling Defendants' interests.

These facts alone are sufficient to defeat any claim of fraudulent conduct, bad faith, or collusion. *Compare Horton v. Super. Ct.*, 238 Cal. Rptr. 467, 472-74 (Cal. Ct. App. 1987) (affirming finding of good faith where challengers argued, *inter alia*, that the parties settled to enable plaintiffs to suppress settling defendant's expert testimony; the court found that while avoiding the testimony may have been one of plaintiffs' inducements to settle, petitioners failed to establish that it was agreed to as a *condition* of the settlement) *with Mattco Forge, Inc. v. Arthur Young & Co., 45 Cal. Rptr. 2d 581, 588* (Cal. Ct. App. 1995) (overturning a finding of good faith where, *inter alia*, there was no viable claim against the settling defendant, and the

16

settlement was aimed at injuring the non-settling defendant's interests by cutting off its cross-complaint against settling defendants).

### 2.    The Settlement Amount Is Reasonable.

California law requires that the settlement amount itself be examined in the context of numerous factors to determine its propriety. *See Tech-Bilt, Inc.*, 698 P.2d at 166. These claims seek to impose liability in large measure based upon a claim that MTBE in gasoline made the gasoline a defective product. No court has ever issued a final judgment upholding such a claim, nor has any appellate court ever upheld such a judgment. Numerous appellate issues confront Plaintiffs making these claims, including but not limited to: (1) the statute of limitations, (2) the fact that most of the wells at issue have detections of MTBE, if at all, at levels well below both the applicable primary and secondary maximum contamination levels or MCL for MTBE, (3) the preemption doctrine, and (4) the serious issues confronting Plaintiffs ability to prove causation, either in the traditional sense or by way of alternative and novel causation theories untested in this context.

As this Court has recognized, the Plaintiffs' claims for compensatory, exemplary, and injunctive relief are highly contested both on the facts and the law, and Plaintiffs' ultimate recovery at trial, the amount of such recovery, if any, or its ability to be sustained on appeal is far from certain. It is within this context that the Court is to look at the amount of the settlement in the aggregate and as applied to these Settling Plaintiffs.

The settlement agreement here provides for significant consideration, in a total amount in excess of $422 million. *See* Exh A. to Birnbaum Decl. In addition, the Settling Defendants have agreed to certain defined future treatment obligations that would cover approximately 70.66% of certain future treatment costs in accordance with the treatment protocol. Therefore, in addition to cash payments to Settling Plaintiffs, the Settlement Agreement's

17

Treatment Protocol provides a highly valuable means of providing compensation to Settling

Plaintiffs for remedying qualifying detected levels of MTBE/TBA in the future in qualifying

wells. Consequently, the Settlement Agreement constitutes a comprehensive resolution of

Plaintiffs' claims that provides current as well as potential future compensation to Settling

Plaintiffs that is, without doubt, reasonable.

Consequently, the settlement relief provided by Settling Defendants to the

Settling Plaintiffs generally, as well as for the specific California Plaintiffs detailed above, can in

no way be said to be "so far 'out of the ballpark'" as to be "inconsistent with the equitable

objectives of the statute." *Tech-Bilt, Inc.*, 698 P.2d at 167; *see also North County Contractor's*

*Ass'n Inc. v. Touchstone Ins. Serv.*, 27 Cal.App.4th 1085, 1092 (1994). The total settlement

figure itself coupled with the future treatment obligation which could extend for 30 years is very

substantial, and is not unreasonable when compared to the damages initially sought by Plaintiffs,

or the genuinely disputed issues surrounding their likely recovery at trial, if any, or legal

obstacles on appeal, especially given the recognition by courts that settling parties should pay

less in settlement. *Id.* Further, each California and Illinois Plaintiffs' specific distribution under

the Plaintiffs' allocation is not unreasonable for the same reasons.

Additionally, the Settling Defendants have, over the last few years of litigation,

incurred significant costs and expended considerable resources in their individual defenses of

each of the involved cases. Though the Settling Defendants maintain that they are not liable for

Plaintiffs' alleged damages, if any, the decision to reach this Settlement Agreement is based, in

part, on each party's desire to avoid incurring further costs associated with the continuation of

this litigation, as well as a desire to avoid the uncertainty of trial. Further, the allocation of

18

proceeds amongst Plaintiffs, and in particular with respect to the California and Illinois Plaintiffs, demonstrates a thoughtful and complex analysis of the claims involved in this case.

Given these facts, there is no question that the total value of the substantial monetary payment and future treatment obligation to be undertaken by Settling Defendants is within the reasonable range of settlement, and thus was arrived at in good faith. *See Horton*, 238 Cal. Rptr. at 471-72 (affirming finding of good faith; holding that a settlement amount of $50,000 was not "out of the ballpark" where plaintiffs' claimed damages were $325,000, but the court estimated that the case was worth less than $150,000, and recognized that a settling party should pay less in settlement); *see also Bay Dev., Ltd. v. Super. Ct.*, 791 P.2d 290, 298-99 (Cal. 1990). The Settlement Agreement between Settling Defendants and these Settling Plaintiffs, therefore, was made in good faith in accordance with California law.

**D.     The Settlement Agreement Is A Good Faith Settlement Under The Law of Illinois.**

Illinois law also requires that a settlement be in good faith to protect against a non-settling defendant's claims. *See* 740 ILCS 100/2 (a tortfeasor who settles with a claimant in good faith "is discharged from all liability for any contribution to any other tortfeasor"). Pursuant to case law, Illinois requires that the trial court be notified and rule on good faith as soon as practicable following the settlement. *See Johnson v. United Airlines*, 784 N.E.2d 812, 818 (Ill. 2003). Once the settling parties make a preliminary showing of good faith, the burden of proof shifts to anyone challenging the good faith of the settlement. *Id.* at 818, 820.

In its good faith analysis, Illinois looks to the policies of its statute, 740 ILCS 100/2, and "the totality of the circumstances" of the settlement, in addition to the absence of collusion. *Id.* at 821 ("A settlement will not be found to be in good faith if it is shown that the settling parties engaged in wrongful conduct, collusion, or fraud. Nor will a settlement

19

agreement satisfy the good-faith requirement if it conflicts with the terms of the Act or is inconsistent with the policies underlying the Act.") (citations omitted). The relevant policies considered are the encouragement of settlement, along with the "equitable apportionment of damages among tortfeasors." *Id.* In doing so, the court also examines whether the settlement is "within the range of reasonableness." *In re Nutraquest, Inc.*, 434 F.3d 639, 648 (3d Cir. 2006) (applying Illinois Joint Tortfeasor Contribution Act).

Similar to California, courts in Illinois have "repeatedly and consistently held that a separate evidentiary hearing is not required and that a trial court need not decide the merits of the tort case or rule on the relative liabilities of the parties before making a good faith determination." *Johnson*, 784 N.E.2d at 824 (collecting cases). The determination of a good faith settlement is left to the discretion of the court based upon the totality of the circumstances and does not require "a precise determination of the overall damages suffered by the plaintiff and the settling tortfeasor's proportionate liability." *Id.*

Here, as discussed above, there was no collusion or wrongful conduct, or any other reason to prevent a finding of good faith. Indeed, the evidence here demonstrates that the Settlement Agreement was arrived at as a result of extensive and difficult negotiations conducted at arm's length and in good faith. *See, e.g., id.* at 822-23 (defendant's desire to avoid litigation costs and plaintiffs' admitted marginal likelihood of success were sufficient to preliminarily establish good faith for nominal $1000 payment to each plaintiff; any disparity between the settlement amount and the demand in the Complaint was not an accurate measure of good faith, nor did a small settlement amount alone, or the fact that a settlement was advantageous, require a finding of bad faith); *In re Nutraquest, Inc.*, 434 F.3d at 648-49 (affirming finding of good faith where, *inter alia*, the difference between the $75,000 settlement and the millions of dollars

20

originally claimed by plaintiffs did not undermine a good faith finding since the value of the claims may have been marginal, nothing in the record suggested that the settlement was aimed at frustrating non-settling defendants' contribution claims, and the settlement was not grossly disproportionate).

Additionally, the settlement here is aligned with the policies of encouraging settlement, and the equitable apportionment of damages. *See, e.g.*, *In re Nutraquest, Inc.*, 434 F.3d at 648 (a finding that defendants were not "dumping a 'large and inequitable portion' of their liability onto" the non-settling defendant satisfied the policies of Illinois law, and made it unnecessary for the court "to make detailed findings about how much liability was being shifted to [non-settling defendant] to find good faith."). Thus, the settlement here satisfies any requirements under Illinois law for a settlement to be in good faith.

E.     **The Court Should Direct Entry of Judgment Under FRCP 54(b) With Respect to the Court's Determination of a Good Faith Settlement.**

As both California and Illinois law require that a court determine that a settlement was entered into in good faith in order for a party to obtain protection against alleged joint tortfeasor liability, this Court should enter such a judgment on the basis of Federal Rule of Civil Procedure 54(b). Rule 54(b) states in relevant part:

> When an action presents more than one claim for relief — whether as a claim, counterclaim, crossclaim, or third-party claim — or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

Because there is no just reason for delay, this Court should enter final judgment under Rule 54(b) determining that the Settlement Agreement is a good faith settlement, thereby protecting Settling Defendants from any alleged joint tortfeasor claims and effectuating the terms of the Settlement Agreement. (*See* Settlement Agreement at 4, 23.). *See, e.g., AmeriPride Servs.*

21

*Inc.*, 2007 U.S. Dist LEXIS 51364, at *9, 11-12 (finding good faith of settlement under

California law, court entered judgment under Rule 54(b) because there no reason for delay and

that the settling parties were entitled to an order protecting them from contribution actions

brought by third parties); *see also Bottoms*, 2001 U.S. Dist. LEXIS 13434, at *3-4 (N.D.Cal.)

(finding settlement in good faith under Cal. Code Civ. Proc. § 877 and § 877.6, court entered

judgment pursuant to Fed. R. Civ. P. 54(b)).

   There is "no just reason for delay" that would prevent an entry of judgment under

Rule 54(b) finding that the Settlement Agreement was made in good faith and that claims for

contribution and indemnity are barred.  Reviewing the myriad benefits of settlement over

protracted litigation, one court explained that "the desirability of promoting settlement of

litigated claims, particularly when presented in the context of complex litigation such as that now

before the court, cannot be understated." *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v.*

*Magnuson*, 409 F. Supp. 2d 136, 140 (N.D.N.Y 2005).  The court in *Agway* entered judgment on

the good faith of the settlement and the corresponding bar order pursuant to Rule 54(b) because

making such determination immediately appealable "would serve the desirable purpose of

allowing any disgruntled non-settling defendant to challenge this court's approval of the

settlement and the entry of a bar order on appeal at an interlocutory stage when the parties,

including significantly [the settling defendant], would be able to determine whether it was

required to remain and participate in the litigation." *Id.* at 147-48. *See also Comerica Bank-*

*Detroit v. Allen Indus., Inc.*, 769 F. Supp. 1408, 1410 (E.D. Mich. 1991) ("The inquiry into the

issue of contribution protection would not involve any duplication of effort if done separately

from the rest of the issues presented in this case.") (internal quotation marks omitted).  Thus, an

entry of judgment under Rule 54(b) would help provide finality under the Settlement Agreement.

## III.    CONCLUSION

Based on the foregoing and all of the proceedings in these cases, Settling Defendants respectfully request that this Court make a determination that the Settlement Agreement was one made in good faith, and specifically that the settlements between the California and Illinois Plaintiffs identified herein and the Settling Defendants were made in good faith and were reasonable in accordance with the respective application of California and Illinois law to those settlements.   Accordingly, the proposed order and judgment should be entered pursuant to Rule 54(b).

Dated: May 7, 2008

Respectfully submitted on behalf of the
Settling Defendants,

Richard E. Wallace, Jr.
WALLACE KING DOMIKE & REISKIN, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, DC 20007

*Counsel for Chevron U.S.A. Inc., Motiva
Enterprises LLC, Shell Oil Company, TMR
Company and other defendants, and liaison counsel
for Settling Defendants*

John J. Lyons
LATHAM & WATKINS LLP
633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007

*Counsel for ConocoPhillips Company and other
defendants*

23

s/J. Andrew Langan, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

*Attorney for Defendants BP Products North
America Inc., Atlantic Richfield Company, BP West
Coast Products LLC and BP Amoco Chemical
Company*

24

## APPENDIX A

The following Settling Defendants are defendants in one or more of the cases referred to in this motion: (1) BP Amoco Chemical Company, BP Products North America Inc. (f/k/a Amoco Oil Company and including by merger BP Exploration & Oil Inc.), BP West Coast Products LLC, and Atlantic Richfield Company, (2) Chevron Corporation (f/k/a ChevronTexaco Corporation), Chevron U.S.A. Inc. (f/k/a Gulf Oil Corporation), in its own name and on behalf of its operating divisions, Chevron Products Company and Chevron Chemical Company, Texaco Inc., Unocal Corporation, Union Oil Company of California (3) ConocoPhillips Company, Tosco Corporation, (4) Equilon Enterprises LLC (d/b/a Shell Oil Products US, and as successor-by-merger to Equiva Services LLC), Motiva Enterprises LLC (individually and also incorrectly named as f/k/a Star Enterprises), Shell Oil Company, Shell Oil Products Company LLC (individually and d/b/a Shell Oil Products Company), Shell Petroleum Inc., Shell Trading (US) Company (individually and also incorrectly named as f/k/a Equiva Trading Company), and TMR Company (f/k/a Texaco Refining and Marketing, Inc. individually and as successor-by-merger to TRME Company f/k/a Texaco Refining and Marketing (East) Inc.); (5) Marathon Oil Company, and Ashland Inc., (6) The Premcor Refining Group Inc., Ultramar Inc., Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing Company, Valero Refining Company-California, (7) CITGO Petroleum Corporation, CITGO Refining and Chemicals Company L.P., PDV Midwest Refining, L.L.C., and LYONDELL CITGO Refining L.P., (8) Sunoco, Inc. (individually and f/k/a Sun Oil Company and f/k/a Sun Company, Inc., and as successor-in-interest to Coastal Eagle Point Oil Company), Sunoco, Inc. (R&M) (individually and f/k/a Sun Refining and Marketing Company and f/k/a Sun Company, Inc. (R&M)), (9) Hess Corporation (f/k/a Amerada Hess Corporation), Hess Oil Virgin Islands Corporation (a/k/a

25

HOVIC), Hess Energy, Inc., Hess Energy Trading Company (a/k/a HETCO), and HOVENSA, Inc., (10) Flint Hills Resources, LP (f/k/a Koch Refining Company and Koch Petroleum Group), (11) El Paso Corporation, El Paso Merchant Energy-Petroleum Company (individually and f/k/a Coastal Refining and Marketing, Inc., and as successor by merger to Coastal States Trading, Inc.), El Paso CGP Company, L.L.C. (individually and f/k/a El Paso CGP Company), Coastal Eagle Point Oil Company, Coastal Oil New England, Inc., Coastal Mobile Refining Company, and (12) Tesoro Corporation (f/k/a Tesoro Petroleum Corporation) and Tesoro Refining and Marketing Company (erroneously named in some cases as Tesoro Refining and Marketing Company, Inc.).