# EXHIBIT 5

# In The Matter Of:

## THE CITY OF NEW YORK, ET AL
## EXXON MOBIL CORPORATION, ET AL

### VOLUME 22
September 2, 2009

### TRIAL
SOUTHERN DISTRICT REPORTERS
500 PEARL STREET
NEW YORK., NY 10007
212-805-0300

Original File 992dcitf.txt, Pages 3174-3367 (194)

**Word Index included with this Min-U-Script®**

Page 3266

[1] Q. Do you also clarify MTBE as mutagenic?
[2] A. Yes, sir.
[3] THE COURT: I think we should pause one more time.
[4] Once again, I know you may have done this, so I apologize.
[5] What does mutagenic mean?
[6] THE WITNESS: Mutagenic, breaking it down, means a
[7] change in the way the DNA or RNA in an animal or human can
[8] express itself. We normally code for a certain way of DNA and
[9] RNA to help the development in a human body from the time that
[10] they are first conceived, from the time the fetus is
[11] developing. There is a process by which genetic coding makes
[12] us what we are, whatever we are, whatever we look like and
[13] however we are.
[14] A mutation is a situation where a chemical is either
[15] binding or breaking up a DNA molecule in such a fashion that it
[16] changes the basic, normal pathway that you would have expected
[17] somebody to develop, say, tissue, like a neurological cell,
[18] neurons or liver tissue or something like that.
[19] THE COURT: Is this the science of gene expression?
[20] THE WITNESS: It is gene expression at its worst, I
[21] guess.
[22] THE COURT: What is a DNA adduct?
[23] THE WITNESS: A DNA adduct is essentially where a
[24] chemical is attaching itself to the DNA molecule and by doing
[25] that it changes how the DNA is going to code for something.

Page 3267

[1] That is one of the ways you cause a mutation.
[2] THE COURT: That's part of mutagenicity, too?
[3] THE WITNESS: Yes, ma'am. You can form an adduct that
[4] may not pose any kind of adverse risk at all and you may form
[5] an adduct that may pose an adverse risk. In a case where you
[6] have a chemical that you know is an animal carcinogen at the
[7] very least and you have partial mutagenic damage in both animal
[8] lines and human lines, then it sort of raises your concern
[9] level.
[10] THE COURT: Is it a mutagenic effect to have an
[11] adduct, DNA adduct?
[12] THE WITNESS: It's the product of the adduct itself
[13] that could give you an effect.
[14] THE COURT: Could be a mutagenic effect?
[15] THE WITNESS: Yes.
[16] THE COURT: Thank you.
[17] BY MR. CHAPMAN:
[18] Q. Dr. Rudo, MTBE, in your opinion, is a probable human
[19] carcinogen and also it's mutagenic?
[20] A. Yes, sir.
[21] Q. Does that mean that even at the lowest levels of exposure,
[22] say, in drinking water, that can cause a mutation which can
[23] possibly lead to cancer?
[24] A. Yes, sir.
[25] Q. Now, sir, from the standpoint of the North Carolina state

Page 3268

[1] toxicologists, do you treat detections of MTBE in groundwater
[2] as detections of a probable human carcinogen?
[3] A. Yes, sir.
[4] Q. In your work on behalf of the State of North Carolina, do
[5] you deal with subjects of MCL's and groundwater standards?
[6] A. Yes, sir.
[7] Q. What are MCL's?
[8] A. MCL, as EPA defines it, is called a maximum contaminant
[9] level. It is a term that EPA uses for public drinking water
[10] systems, like a city water system, something like that. What
[11] it is is it is defined as an economic, technologically feasible
[12] standard which they set for public water supplies. It is not a
[13] health-based standard.
[14] It starts out with a health-based standard, but then
[15] they apply economic and technologically feasible parts to it.
[16] In a public water system you have to set a standard in a manner
[17] by which a water company, a water treatment company, can
[18] control it from an economic standpoint. So it has to take that
[19] into account.
[20] In the EPA process, once you put those factors in
[21] there and you go through the public review process that is very
[22] rigorous in setting these MCL's, you usually have an MCL that
[23] is far from the original health-based number. So it is not in
[24] the end a health-based number.
[25] Q. What is a groundwater standard?

Page 3269

[1] A. Groundwater standard, I will define it as we do in North
[2] Carolina. A groundwater standard is a health-based standard.
[3] In North Carolina it's by law that we do that. We use science-
[4] based information to set a health protective level to protect
[5] the groundwater resource itself. So that is strictly a health-
[6] based standard.
[7] Q. Have you been involved in attempting to change the
[8] groundwater standard in North Carolina?
[9] A. One of my job functions since the day I came here has been
[10] to actually recommend groundwater standards for the laws in
[11] North Carolina. I'm not a regulator. My job is they come to
[12] me, they say calculate what would be a health protective level
[13] for a certain chemical in groundwater. I do that, and then we
[14] submit it to our environmental management commission. They put
[15] it through a review process before they set the standard.
[16] MR. STACK: Your Honor, this is an issue that is
[17] likely irrelevant, but I don't have a problem with him
[18] discussing the concept.
[19] THE COURT: I agree. I will explain to the jury.
[20] This may not be what we call directly on point, but they don't
[21] really object to it otherwise. I will inform the jury it may
[22] not be relevant here.
[23] MR. STACK: Yes. I would object further, Judge, if
[24] there is discussion of what it is in North Carolina.
[25] THE COURT: No, I don't think that is appropriate.

In The Matter Of:

*THE CITY OF NEW YORK, ET AL v.*
*EXXON MOBIL CORPORATION, ET AL*

*VOLUME 39*
*September 21, 2009*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 99LDCITF.txt, Pages 5160-5333 (174)

**Word Index included with this Min-U-Script®**

Page 5172

A. Well, the smoke from a smokestack illustrates a couple of concepts of contaminant transport.

One would be a plum will reach some stabilized length or distribution of impact on groundwater just as the smoke leaving a smokestack would. If you look out as you're driving by, you'll see smoke coming out of a smokestack. At some point the smoke disappears. It is because the particles or whatever is producing that smoke is mixed with the air and at some point you can no longer can visually see that smoke.

Groundwater contaminant plumes go through the attenuation processes I described before. That same process generally occurred. At some point you can no longer find detectable concentrations as you move downgrading or away from where the source of contamination is.

That length of the smoke coming out of the smokestack or the length of the groundwater contaminant plume is dictated in part by how much contamination is being dissolved at the source, the rate of that contamination dissolved at the source.

As I said on Thursday, that is a term that, as a contamination hydrogeologist, the term we use is mass flux. That is a term that defines the rate that new contamination is being added to the system.

You can also think of a groundwater flow system as a conveyer belt. To maintain a plume of contamination, it is smoke from a smokestack or dissolved plume in groundwater, you

Page 5173

have to keep adding contamination to the conveyer belt, which is the groundwater flow system. That rate you're adding defines how long this plume will become.

When you compare that rate that contamination is being added to the capacitor, the aquifer to offset that or attenuate that contamination, that is that whole concept of life cycle, how long will this plume become before it reaches some kind of stabilized condition.

It is that balance between the rate of contamination is being introduced at the source and the capacitor of the aquifer to offset that contamination that defines the life cycle of a plume.

Q. Will that also define how long the plume from a particular source may be in groundwater?
A. Yes. Again that is a function of the balance between the rate it is being introduced at the source and the rate it is being attenuated by the aquifer.
Q. Now, when the mediation takes place and the contamination at the site, the dirt is dug up, how does that relate to your analogy of a smokestack?
A. What you're doing is reducing the amount of contamination at the source so then ultimately reducing the rate that that contamination can be introduced into the groundwater system. You're pumping less smoke out of your smokestack.
Q. What information do you need to assess how far a plume will

Page 5174

go when you use a mass flux analysis?
A. Generally mass flux calculations can be done in the order of magnitude calculations source of screening level calculations. There are three data you need.

One will be the groundwater velocity, the area, the source area at the site, how big is this area where the contamination exists or was released and then the average concentration in that source area.
Q. Now, the jury has seen service stations which are identified within the plume. If we can go to Slide No. 3. Go back to Merrick.

We talked about the 113-21 Merrick Boulevard site. Do you recall that, Mr. Maguire?
A. Yes, I do.
Q. In the context of the analysis that was done by Mr. Terry, if we look at Slide 43, the 113-21 Merrick Boulevard station is located within the year 1 capture zone. Am I correct?
A. That's correct.
Q. Will a release at the service station at 113-21 Merrick result in a detectable concentration of MTBE in the future in all cases?
A. Well, no. I know what the concentrations are at the site.

There are two generally two factors that need to be considered whether a release site would affect or produce concentrations, detectable concentrations of contamination in

Page 5175

the supply well. One is first whether the site is truly in the capture zone. I have identified a number of problems with Mr. Terry's model, groundwater flow model. I don't think it accurately and fairly represents groundwater flow in this area; and, therefore, doesn't fairly represent the capture zones.

The other factor you need to consider is the strength of the source. Is the mass flux at the site sufficient to produce a plume that is long enough to sustain transport from a site to the well to produce detectable concentrations?

So accepting Mr. Terry's model for the purposes of this discussion, let's assume it is in the capture zone, we know the distance between 113-21 Merrick Boulevard and the Station 6 wells is about 2000 feet. So the other relevant fact to consider is whether this site can produce a plume that is 2000 feet long.

Assuming the groundwater flow field can be reversed, right now the groundwater beneath the site is actually moving to the south and west. It is moving this way under the regional groundwater flow field. It is not moving towards Station 6, but assuming pumping of these wells could reverse the groundwater flow, that is not enough of a test to determine whether this site will impact these wells.

You have to also consider the mass flux or the quantity of contamination that is being introduced into that site to evaluate whether that site will produce a plume 2,000

Page 5176

[1] feet and sustain transport from that site to the wells.
[2] **Q.** With respect to evaluating the mass flux or the quantity of
[3] contamination, you would look at the measured levels of MTBE
[4] beneath the service station?
[5] **A.** Yes, that's right.
[6] **Q.** Go to Slide 5, Dave, again.
[7] With respect to to this amount of contamination, can
[8] you explain to the jury what 10.2 represents in terms of mass
[9] flux and the ability to create a 2,000 foot plume?
[10] **A.** When you consider groundwater velocity, you consider the
[11] area that would be a source area like this site and you
[12] consider these concentrations. The mass flux in this site will
[13] generally be substantially less than one gram per day of MTBE
[14] to sustain this concentration, which is 10 micrograms per liter
[15] beneath that site.
[16] That mass flux is insufficient to produce a plume that
[17] will be 2,000 feet long, to sustain a transport, assuming the
[18] groundwater flow can be reverse, to sustain transport to
[19] Station 6 if pumped and produce detectable concentrations.
[20] **Q.** Now, the jury has heard testimony about the 177-97 South
[21] Conduit site. The plume at that site -- look at Slide 9,
[22] please -- the plume at that site was approximately how long?
[23] **A.** About 1200 feet long, I believe.
[24] **Q.** With regard to the 1200 foot long plume, that was the
[25] result of contamination -- go to Slide 11, please --

Page 5177

[1] contamination of what concentration?
[2] **A.** Well, early on in the history of the site you can see there
[3] were substantially elevated concentrations of MTBE. I believe
[4] the maximum was about 170,000 parts per billion. If you do a
[5] mass flux calculation on that concentration, you end up with
[6] several hundred grams per day of MTBE sort of being put onto
[7] the conveyer belt to produce that concentration. That mass
[8] flux does have the capacity to produce a long plume, something
[9] in the range of several thousand feet.
[10] We actually did have a plume at this site produced
[11] about 1200 feet long. Ultimately, though, there was
[12] remediation on the site, remediation off the site, and as you
[13] can see, the concentrations as a result of those clean-up
[14] activities have substantially declined. Now the current
[15] maximum concentration at this site is just about 39 parts per
[16] billion.
[17] **Q.** The contamination at the 177-97 Conduit -- go back to Slide
[18] 9, please, Dave -- so we're clear, in what direction has that
[19] contamination been moving since it was first detected back in
[20] the groundwater at that site in 1996?
[21] **A.** It was and had moved in response to the regional
[22] groundwater flow field to the south and southwest, this
[23] direction down towards the bottom of the page away from Station
[24] 6.
[25] **Q.** If you go to 11, we look at the contamination at that site,

Page 5178

[1] Slide 11, and that generates a plume 1200 feet long?
[2] **A.** Yes -- well, at the point in time you went out and started
[3] cleaning up the contamination.
[4] **Q.** If we looked then at the results for the Merrick site -- go
[5] back to Slide 5 -- with regard to this amount of contamination,
[6] can you form an opinion within a reasonable degree of
[7] scientific certainty concerning the length of a plume that
[8] might be generated by concentrations on the order of 10.2 parts
[9] per billion?
[10] **A.** Yes, it would generally be several hundred feet would be
[11] the maximum length of a plume.
[12] **Q.** Enough to reach a well 2,000 feet away?
[13] **A.** No, it would not sustain transport 2,000 feet.
[14] **Q.** You have looked at other service stations. Go to Slide 18,
[15] please. This particular site was analyzed by Mr. Terry at
[16] 165-01 Hillside Avenue. Did you look at the files pertaining
[17] to this site?
[18] **A.** Yes, I have.
[19] **Q.** Did you prepare a slide summarizing your findings for the
[20] jury?
[21] **A.** Yes, I have.
[22] **Q.** Go to Slide 19, please. Tell the jury what your findings
[23] were relative to this site.
[24] **A.** Well, first, as I've identified all the other sites, I've
[25] identified the relative distance to this site to the Station 6

Page 5179

[1] wells 5,000 feet to the northwest. It is located outside the
[2] capture zone defined by Mr. Cohen, so Mr. Cohen did not
[3] identify this as a site that has historically impacted Station
[4] 6 with MTBE concentrations.
[5] As far as remediation, there has been soil excavation
[6] at this site, 285 tons of soil were excavated in 2007.
[7] **Q.** With regard to the contaminant levels observed on this site
[8] over time, have there been monitoring events which have
[9] monitored the MTBE in groundwater?
[10] **A.** Yes, there have been periodic monitoring events regarding
[11] groundwater quality in this site.
[12] **Q.** Go to Slide 20, please. The tanks are removed in 2007. Is
[13] that correct?
[14] **A.** That's correct.
[15] **Q.** After the tanks are removed, are monitoring wells
[16] installed?
[17] **A.** Yes.
[18] **Q.** Can you tell the jury what this depicts.
[19] **A.** This is, as all the other charts that I've included are
[20] shown for the service station, this represents the maximum
[21] concentration of MTBE in any monitoring well at this site over
[22] time.
[23] So initially there were some elevated concentrations
[24] of MTBE, I believe the maximum was 1770 parts per billion which
[25] would be this data point here. As time has gone on, the

Page 5224

[1] A. Well, accepting that assumption, more likely than not, it
[2] would be a source that's close to Station 6 that would produce
[3] contamination.
[4] Q. Which sources are you referring to?
[5] A. Well, there are three that I've identified as historically
[6] being responsible either individually or together for the
[7] historic contamination of Station 6. That would be the Atlas
[8] site, the Citgo site, and/or the BP site.
[9] Q. Is it your opinion, to a reasonable degree of scientific
[10] probability, that if future contamination were to be detected
[11] using Station 6 as a backup source, it would come from those
[12] stations?
[13] A. Yes. It would more likely come from a local source.
[14]   MR. STACK: I have no further questions, your Honor.
[15]   THE COURT: All right. Thank you, Mr. Stack.
[16]   Mr. Sher.
[17]   MR. SHER: Thank you, your Honor.
[18] CROSS-EXAMINATION
[19] BY MR. SHER:
[20] Q. Good morning, sir.
[21] A. Good morning.
[22] Q. Let's start with 165-01 Hillside Avenue.
[23]   Now I am going to skip to slide 20, please.
[24]   This is your summary of site testing data for MTBE
[25] associated with this station, correct?

Page 5225

[1] A. Yes, the maximum concentration.
[2] Q. The first monitoring result is in January 2008?
[3] A. Yes, that's correct.
[4] Q. And that was after there had been a soil excavation at the
[5] site?
[6] A. Yes. That is when they removed the tanks.
[7] Q. When did the release occur?
[8] A. It's not clear from the site data when the release would
[9] have occurred.
[10] Q. These are measurements of MTBE, correct?
[11] A. Yes.
[12] Q. And MTBE was banned from gasoline in New York as of
[13] January 2004, wasn't it?
[14] A. Yes.
[15] Q. So this release occurred presumably before January 1, 2004?
[16] A. Yes, I would agree.
[17] Q. There was at least four years during which the MTBE
[18] contamination had been released, at least four years, before
[19] there was even a monitoring event, correct?
[20] A. That is certainly possible, yes.
[21] Q. How long a plume would you predict was the maximum flux
[22] from 1770 parts per billion?
[23] A. Well, 1770 is not the mass flux. Mass flux would be in
[24] some units per period of time.
[25] Q. Well, all right. You testified that you thought that the

Page 5226

[1] 88 parts per billion at the last measurement in 2009 was
[2] insufficient mass to support a plume long enough to reach
[3] Station 6, correct?
[4] A. Yes.
[5] Q. What unit of time would you assume from your mass flux
[6] analysis on that?
[7] A. Well, the units in time for mass flux are days. So the
[8] total units for mass flux would be, for example, grams per day.
[9] Q. All right. And --
[10] A. If you looked at the 1770, that would produce a mass flux
[11] probably at about one or less than one gram per day.
[12] Q. For how long, sir? We don't know, do we?
[13] A. Well, you could assume whatever period of time you want.
[14] But what will happen, as I described, is the plume, given that
[15] mass flux, all other conditions remaining a constant, the plume
[16] will reach some stable plume length given that balance between
[17] the source drain and the capacity for aquifer to attenuate
[18] that.
[19] Q. We don't know when the release occurred of MTBE at the
[20] station, do we?
[21] A. No, we do not know exactly.
[22] Q. We don't not know what volume of gasoline was released at
[23] this station, do we?
[24] A. We could make some reasonable assumptions regarding the
[25] volume.

Page 5227

[1] Q. Indeed, given that the first measurement is four years
[2] after and after what was 200 tons of contaminated soils
[3] removed, 285 tons?
[4] A. You could make some assumptions or approximations of the
[5] time of release, yes.
[6] Q. Sir, you don't know whether the release at this site
[7] occurred in 1990 or in 2000, do you?
[8] A. No. It is not necessarily relevant, again, given a certain
[9] mass flux --
[10] Q. You don't know when it occurred, do you?
[11] A. I think I said that, yes.
[12] Q. Right. That was my question.
[13]   And you don't know how long the MTBE has been
[14] migrating from that source, do you?
[15] A. Again, without knowing the specific release date, you don't
[16] know that. But what you do know is what the relevant strength
[17] of the source is and its capacity to produce a relative length
[18] plume.
[19]   (Continued on next page)

Page 5240

[1] chart, specifically say which do and do not, but there are, as
[2] I said, graphics in his report identifying which of these
[3] stations by designation as Station 6-3003, for example, whether
[4] they fall within this capture zone.
[5] Q. I am asking about your testimony and your ability to
[6] identify off of your demonstrative which of the stations fall
[7] within or without of the state's 6 capture zone, the fixed one,
[8] the 32 year one?
[9] A. I have not included a column on this chart to identify
[10] whether it falls within or outside its capture zone,
[11] recognizing the capture zone changes over time.
[12] Q. Let's actually talk about that for a minute.
[13]   Lets let's start with your demonstrative. Could I
[14] impose again, could I have Slide 43, please -- actually, 46.
[15]   Now, you told us that this is Mr. Terry's early
[16] capture zone when the Station 6 wells are turned on, Station 24
[17] is on, but it is before the dependability wells are turned on,
[18] correct?
[19] A. That's correct.
[20] Q. When Mr. Terry did his analysis, assuming Station 6 came on
[21] in 2016, this would be the most established at this capture
[22] zone would be assuming that the dependability wells come on in
[23] 2020?
[24] A. If I follow your question, the most fully formed capture
[25] zone between the dependability wells come on.

Page 5241

[1] Q. Yes, that is what I am trying to say.
[2] A. I think that's right, yes.
[3] Q. You looked at 113-21 Merrick Boulevard which falls within
[4] that capture zone, correct?
[5] A. Yes.
[6] Q. In fact, that station falls within every iteration of Mr.
[7] Terry's capture zone, doesn't it?
[8] A. I think it might, yes.
[9] Q. Did you look at any of the other Exxon/Mobil gas stations
[10] that would be in the capture zone in this iteration of the --
[11] that is, before the dependability wells come on?
[12] A. Look at them in what respect?
[13] Q. Well, consider any stations that were located that would
[14] fall within the capture zone when it was this shape?
[15] A. Well, I looked at them, as I described before, to see what
[16] files and what information was available, to see if there was a
[17] release at those sites.
[18]   MR. SHER: These should have been arranged in groups,
[19] but I can hand out packets instead. They're grouped by slide.
[20]   (Pause)
[21] BY MR. SHER:
[22] Q. Let me sort this out and make sure I give you the right
[23] ones. These are in reverse order.
[24] A. Okay.
[25] Q. I will ask you about them in the other order.

Page 5242

[1]   MR. SHER: Liz, if you can bring up 2019 A, please.
[2] BY MR. SHER:
[3] Q. This is another version of a slide we were just looking at
[4] that you had prepared, and on this, on this slide marked in
[5] yellow squares with red dots are Exxon/Mobil stations that have
[6] reported gasoline releases.
[7]   Did you consider -- and you'll see right here is the
[8] Merrick Boulevard station that we have been discussing -- did
[9] you consider as part of your analysis at all the station at
[10] 179-18 -- Liz, can you blow up the plume portion -- did you
[11] consider at all in your analysis the station at 179-18
[12] Hillside?
[13] A. You represented the yellow box with the red dot as
[14] Exxon/Mobil stations with reported releases. I am not aware of
[15] a reported release at that particular site.
[16] Q. Did you examine information concerning that site?
[17] A. This was the subject of my discussion when we look at the
[18] other identified Exxon/Mobil sites. There are limited data
[19] available, but my recollection is but for one, there were no
[20] reported releases.
[21] Q. Didn't you only look at sites that were in the 32 year
[22] fixed capture zone?
[23] A. Well, the universe of sites I looked at were the sites I
[24] believe you had identified last week during your opening.
[25] Q. That included all of the stations on the original map or

Page 5243

[1] just the ones that counsel provided to you that were within the
[2] final capture zone?
[3] A. Honestly, I am not quite certain. It was your
[4] representation, I believe, of the universe of sites, and I
[5] looked at those sites. That is not quite clear to me.
[6] Q. Did you look at a site at 84-12 164th Street?
[7] A. I don't recall now.
[8] Q. Sir, let's go back to your Slide 42. We can't do that, can
[9] we? Is the station at 84-12 164th Street on your list?
[10]   MR. STACK: Your Honor, I object to this line of
[11] questioning. If you want, I'll state the objection in open
[12] court. It may not be appropriate to do so.
[13]   MR. SHER: We can do a sidebar if you like.
[14]   THE COURT: We are very close to the lunch recess,
[15] although, as I said, it has been kind of a choppy and slow
[16] morning, but we have to take it sometime.
[17]   MR. STACK: It might be appropriate, your Honor.
[18]   THE COURT: I know you think so. It is not the best
[19] for me. It should be more important --
[20]   MR. SHER: We can set this issue aside and I can move
[21] on to something else and we can come back to it.
[22]   THE COURT: All right. I prefer that.
[23]   MR. SHER: I am happy to do that.
[24] BY MR. SHER:
[25] Q. Can we turn to 84-04 Parsons Boulevard. If I could have

Page 5252

[1]     AFTERNOON SESSION
[2]     2:15 pm
[3]     (Trial resumes)
[4]     (In open court; jury not present)
[5]     THE COURT: We left off with the discussion just
[6] before lunch. You know it?
[7]     MR. SHER: Yes, I understand.
[8]     THE COURT: I am not sure how explicit a ruling it
[9] was, but as long as you got it, that is fine.
[10]    Call in the jury. My clerk was inquiring about food.
[11] I don't have an interest in food, so you can act as you wish.
[12] In other words, if you would like to order food without me,
[13] that is okay, too, because I don't know how long it will be. I
[14] don't know if it will take three hours or four hours or five
[15] hours. I don't know. You have to use your own judgment as far
[16] as food.
[17]    (Jury present)
[18] THOMAS FRANCIS MAGUIRE, resumes
[19] CROSS-EXAMINATION (Continued)
[20] BY MR. SHER:
[21] Q. If could bring up, Mr. Maguire, Slide 12.
[22]    When we broke, we were talking about 84-04 Parsons
[23] Boulevard, and you testified this morning that of the three
[24] factors that you listed that were important to understanding
[25] contamination in groundwater.

Page 5253

[1]     Flow is one of them, correct?
[2] A. Groundwater flow velocity.
[3] Q. Direction is important, too, is it not?
[4] A. It can be.
[5] Q. With respect to 84-04 Parsons Boulevard, we don't know the
[6] groundwater flow, do you?
[7] A. We don't know the direction of groundwater flow in the
[8] regional aquifer.
[9] Q. In the regional aquifer, which is the more important one
[10] for longer transport of contamination, correct?
[11] A. The question you asked before, does it have a greater
[12] potential to move contamination, and the answer is yes.
[13] Q. So for this 20-year-old site that is still open, we don't
[14] know the groundwater flow, correct, according to your
[15] testimony?
[16] A. We know the groundwater flow direction in the perch. We
[17] don't have sufficient data to define the groundwater flow
[18] direction in the regional aquifer.
[19] Q. If we could turn to the 113-21 Merrick Boulevard site,
[20] which is Slide 3 in your presentation.
[21]    This is actually one of the reported spills that is
[22] closest to Station 6 of all spills, correct?
[23] A. Of the Mobil sites we discussed, yes.
[24] Q. This is still an open petroleum spill on this property. Am
[25] I right about that?

Page 5254

[1] A. Yes, it is.
[2] Q. If we could go to your Slide 5, can you explain the
[3] relationship between the geoprobe data from 2001 and the
[4] groundwater monitoring data that you showed starting in April
[5] or May of '03?
[6] A. Certainly. This is something I discussed in my prior
[7] testimony. Geoprobe is a technique to explore the subsurface
[8] at, for example, a gasoline service station site.
[9]    Basically a rod is driven down through the soils, and
[10] at some point that rod extends into the water table itself, and
[11] the groundwater sample is collected through that rod; that is,
[12] made its way down through the soils.
[13]    A number of soils have looked at whether the geoprobe
[14] data fairly and accurately represent the groundwater conditions
[15] as compared to monitoring wells ultimately installed in the
[16] same area.
[17] Q. What I am asking is why you included the 1500 PPE data site
[18] data point on this graph in relation to the others?
[19] A. Sorry. Because it is a data point for the site and the
[20] graph is meant to represent the maximum MTBE concentration at
[21] the site. It was a groundwater sample, although the concern I
[22] have about it, and I explained this before, the geoprobe
[23] samples can be affected by the soils that the rod is driven
[24] through, so you can get elevated concentrations in geoprobe
[25] samples as compared to --

Page 5255

[1] Q. You don't know when the spill occurred on this site, do we?
[2] A. That's correct, we don't know specifically when.
[3] Q. We don't know what volume was released?
[4] A. Again we don't know specifically, but again you can make
[5] certain determinations based on the concentrations at this
[6] site.
[7] Q. This site is now 10 years' old and still open. Am I right?
[8] A. The first data point was collected in 2001 and it is now --
[9] it is 2009, about 800.
[10] Q. Wasn't the spill report in '99?
[11] A. It might have. Might be. I just don't recall.
[12] Q. Again we don't know when the first release of MTBE occurred
[13] from the site, correct?
[14] A. We don't know specifically.
[15] Q. Do we know generally?
[16] A. Well, we know what occurred more likely certainly after
[17] MTBE was used in gasoline. We have some end points to put on
[18] it.
[19] Q. It happened sometime between roughly the mid-80's and 1999?
[20] A. That would certainly -- those would be the end points I
[21] would define, yes.
[22] Q. Has there been any active remediation at the site?
[23] A. Yes, I believe there is slow vapor traction.
[24] Q. And there has been some soil removal as well in 2001,
[25] correct?

In The Matter Of:

*THE CITY OF NEW YORK, ET AL v.*
*EXXON MOBIL CORPORATION, ET AL*

*VOLUME 37*
*September 24, 2009*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 99odcitf.txt, Pages 5797-5985 (189)

**Word Index included with this Min-U-Script®**

Page 5885

[1] that refer to?
[2] A. Basically, over time your equipment will wear out and
[3] you'll have to replace it periodically. So I've included costs
[4] related to replacement of the GAC vessels and piping as it
[5] wears out over time.
[6] Q. How long did you assume -- well, let me come back to that
[7] in a minute.
[8]      And then the next column is, it says, "O&M Cost."
[9] What does that mean?
[10] A. "O&M" stands for operation and maintenance. That's
[11] basically the costs to maintain and operate your treatment
[12] plant on an average annual basis.
[13] Q. And it says 40 years. What does that refer to?
[14] A. This is the total O&M cost over a 40-year timeframe.
[15] Q. Why did you assume 40 years?
[16] A. This was based on Dave Terry's modeling which showed MTBE
[17] concentration sustaining at significant levels out to 2040.
[18] And we projected those trends outwards to try and identify the
[19] entire timeframe in which Station 6 would need to provide MTBE
[20] treatment.
[21]      It actually went out past 40 years. For purposes of
[22] our analysis, we just conducted the analysis over a 40-year
[23] period.
[24] Q. And does that figure, did you simply take the cost each
[25] year and add them all up, or was there some form of reducing it

Page 5886

[1] to a present value?
[2] A. Exactly. The costs that are incurred in the future are
[3] adjusted backwards so that we can represent them in 2009
[4] dollars.
[5] Q. And you came up with a total. Looking at the 10 ppb
[6] scenario, tell the jury what you have concluded would be the
[7] total net present value of the cost of operating the system to
[8] remove MTBE.
[9] A. For the 10 ppb, the total cost would be approximately $250
[10] million.
[11] Q. And for the 35 ppb scenario, what did you conclude?
[12] A. The total costs would be approximately $258 million.
[13] Q. Now, let's look at a couple of these things.
[14]      Why -- strike that.
[15]      Did you assume that the facility operated continuously
[16] for 40 years?
[17] A. Yes, I did assume that.
[18] Q. And why did you make that assumption in developing these
[19] cost estimates?
[20] A. It's my understanding that the Station 6 plant will be a
[21] backup supply, but the only reasonable assumption to make was
[22] that the facility would need to operate continuously. The city
[23] has a number of planned repairs on its tunnels and aqueducts.
[24] There is the potential for a failure of that supply. And when
[25] the system needs to operate, it needs to operate continuously

Page 5887

[1] for as long as it is needed.
[2] Q. With respect to equipment replacement, can you explain a
[3] little bit more about what that means and what assumptions you
[4] made to go into the figures that you have given?
[5] A. Yes. The equipment replacement cost basically includes
[6] replacing the equipment every 20 years. So after the equipment
[7] wears out, the GAC vessels and piping will be replaced, and
[8] this cost includes replacement of equipment twice over the 40
[9] years.
[10] Q. If the plant were run less than continuously, would the
[11] equipment replacement costs go down?
[12]      MR. STACK: Objection, your Honor. This is beyond the
[13] scope of the expert's report. It was not mentioned at all or
[14] discussed in the text of the report.
[15]      THE COURT: This is a point you are going to want to
[16] make anyway. If it is used less than all the time, does the
[17] cost decrease?
[18]      MR. STACK: Understood, your Honor, but we have no
[19] quantitative opinion being expressed.
[20]      THE COURT: That may be. But if you want to know the
[21] general answer?
[22]      MR. STACK: Yes, your Honor, the general answer.
[23]      THE COURT: Let's start with that.
[24]      If it is used less than continuously, in other words,
[25] if it is used sporadically, that would decrease costs, or not?

Page 5888

[1]      THE WITNESS: Not necessarily. When you let equipment
[2] sit and you don't use it, when you need it, things could have
[3] failed and you might have to spend more money and more funds to
[4] get the system up and running.
[5]      THE COURT: If you use it less than all the time,
[6] don't you have less wear and tear and less replacement costs?
[7]      THE WITNESS: Not necessarily. If you are using it
[8] all the time, you are operating and maintaining the equipment
[9] on a normal basis --
[10]      THE COURT: You had a replacement cost figure, right?
[11]      THE WITNESS: Yes.
[12]      THE COURT: If you use something less -- in other
[13] words, I can't say how much less, but make it up, 50 percent
[14] less, don't you have lower replacement costs? Things wear out
[15] less if they are used less; is that not right?
[16]      THE WITNESS: Not necessarily. Again, equipment wears
[17] out over time. It can wear out just sitting there not being
[18] used.
[19]      THE COURT: OK. Let me ask you another question. You
[20] may have said this; I don't remember.
[21]      Why did you pick 40 years, as opposed to 30 or 35, or
[22] whatever other number?
[23]      THE WITNESS: That was based on Dave Terry's modeling.
[24]      THE COURT: Right.
[25]      THE WITNESS: Which we projected that out to show --

Page 5905

[1] be present past 40 years and require treatment. So we included
[2] an equipment replacement in the year 40 in order to continue to
[3] treat the MTBE.
[4] However, the O&M costs, once we get into years 41, 42,
[5] when we adjust them back to today's dollars, they start getting
[6] a lot smaller. So we simplified the analysis around the
[7] 40-year timeframe.
[8] Q. Thank you. Now, so to tie a bow around your cost opinions
[9] for MTBE treatment, if we used GAC at -- assuming a normal peak
[10] of 10 parts per billion, your total MTBE cost was a little over
[11] $250 million, correct?
[12] A. Yes.
[13] Q. And if we assume that the MTBE level, again for GAC
[14] treatment, is 35 parts per billion, your opinion is that it
[15] will cost about $258 million. Both of these figures, that is
[16] the $250 million figure and the $258 million figure, are over
[17] 40 years of operation, am I right?
[18] A. Yes, that's correct.
[19] Q. Why is the difference only $8 million, given that the peak
[20] levels are so different for MTBE?
[21] A. For the GAC system, the number of vessels is going to be
[22] the same for both the 10 ppb and the 35 ppb concentrations.
[23] The driver for sizing those systems is really how much
[24] time the water needs to be in the vessels, that 15 minutes of
[25] contact time in each vessel. So for those range of

Page 5906

[1] concentrations, we want the same number of vessels. So the
[2] capital costs are the same.
[3] So the main difference comes into the O&M costs. At
[4] the 10 ppb, the carbon will last longer before you have to
[5] change it out. At the 35 ppb scenario, you'll have to replace
[6] the carbon more frequently. So that's the main difference in
[7] the costs.
[8] Q. And for air stripping at 10 parts per billion, you
[9] concluded that the plant would cost, over the 40 years of
[10] operation, a little over $127 million, correct?
[11] A. Yes, that's correct.
[12] Q. And at 35 parts per billion, almost $161 million; do I have
[13] that right?
[14] A. Yes, that's correct.
[15] Q. And why the big difference between the -- the bigger
[16] difference between the cost there? It is about a $32 million
[17] difference?
[18] A. Yes.
[19] Q. Why is that?
[20] A. One of the differences is in the capital costs. At the 35
[21] ppb concentration, another tower needs to be provided.
[22] Additionally, we need more air to remove the MTBE. So we need
[23] bigger blowers, bigger heaters, the vapor phase carbon system
[24] is bigger. So the costs to build the plant for the 35 ppb are
[25] greater than the 10 ppb.

Page 5907

[1] Q. Did you make a recommendation as between GAC and air
[2] stripping for this facility?
[3] A. Yes, I did.
[4] I recommended air stripping based solely on the cost
[5] analyses. I presented both costs because the city often
[6] considers other factors when selecting a treatment technology
[7] to actually build for the plant. And in some cases they may
[8] select a technology that could be more expensive than others.
[9] For example, they might consider the operational
[10] flexibility that a GAC system offers over an air stripping
[11] system. The GAC system, as contaminant levels increase, it can
[12] still operate. You don't have to shut the plant down. You
[13] just have to change out the carbon more frequently. The air
[14] stripping tower, if you exceed that peak value that you
[15] designed the plant for, you may risk losing the plant or, you
[16] know, providing contaminated water to the consumers.
[17] The city also might consider the height of the
[18] building. The air stripping towers are 60 feet tall. They are
[19] going to be a large presence in a community. Whereas the GAC,
[20] they are not as tall, not as great of an impact.
[21] So the city would consider additional factors in
[22] ultimately selecting a technology. So I presented both costs
[23] for that purpose.
[24] Q. Are you aware of any situations in which the city has
[25] chosen a more expensive alternative?

Page 5908

[1] A. Yes, I am. For example, the Hillview Reservoir in Yonkers,
[2] New York, it is a 90-acre reservoir. We looked at a couple of
[3] options to cover the reservoir. One was a concrete cover.
[4] Another was a floating cover which it is kind of like a pool
[5] cover. It is a thin membrane floating on the surface of the
[6] reservoir. And the concrete cover was approximately 700
[7] million more dollars than the floating cover in capital costs.
[8] Approximately $400 million more based on the total life cycle
[9] costs, the initial replacement of the floating cover over time,
[10] the O&M. And the main driver for that decision was really, you
[11] know, they wanted a cover that would protect water quality,
[12] protect against vandalism, and be easier to operate and
[13] maintain in the long term.
[14] Q. With respect to your goals of removing -- I'm sorry, I did
[15] not mean to start that sentence.
[16] Have you in the last six years or so come up with
[17] other cost projections for this project?
[18] A. Yes, I have.
[19] Q. Liz, could you bring up the next slide, please.
[20] And is this a chart that you helped prepare
[21] illustrating your historical cost projections for Station 6?
[22] A. Yes, it is.
[23] Q. And in July of 2004, did you prepare a technical memorandum
[24] that estimated that the cost of the GAC system would be -- now,
[25] these are just capital costs on this chart, correct?

## In The Matter Of:

*THE CITY OF NEW YORK, ET AL v.*
*EXXON MOBIL CORPORATION, ET AL*

*VOLUME 38*
*September 30, 2009*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 99udcitf.txt, Pages 5986-6200 (215)

**Word Index included with this Min-U-Script®**

THE CITY OF NEW YORK, ET AL vs.
EXXON MOBIL CORPORATION, ET AL

VOLUME 38
September 30, 2009

Page 6014

[1] report.
[2] You have testified that you projected O&M costs for
[3] the various types of treatment you were proposing in your
[4] opinions here in court, and you offered opinions about those
[5] O&M costs. Do you recall that last Thursday?
[6] A. Yes, I do.
[7] Q. With regard to those O&M costs, you base them on a maximum
[8] of 10 parts per billion for 2033, and can you tell the jury for
[9] your own end cost, what the concentration of MTBE in the other
[10] years other than 2033?
[11] MR. SHER: Objection; mischaracterizes testimony. She
[12] gave two scenarios. One was at 10, one was at 35.
[13] MR. STACK: I am referring to the one at 10.
[14] THE COURT: All right.
[15] BY MR. STACK:
[16] Q. For the analysis you did for 10, Ms. Bell, tell the jury
[17] apart from the year 2033, in those other years what
[18] concentration did you assume for MTBE?
[19] A. I assumed a concentration of 9 PPB for the remaining years.
[20] Q. You developed O&M costs for both GAC system and
[21] air-stripping. Am I correct?
[22] A. Yes, that's correct.
[23] Q. For the GAC system, if you want to double-check, you can,
[24] but I believe you projected O&M costs of 141.5 million over 40
[25] years. Am I correct?

Page 6015

[1] A. Yes, that's correct.
[2] Q. And for the air-stripping system, you estimated O&M costs
[3] of 45.2 million over 40 years. Am I correct?
[4] A. Yes, that's correct.
[5] Q. Both of these O&M estimates were based on 40 years of
[6] continuous pumping at Station 6?
[7] A. Yes, that is correct.
[8] Q. With regard to Station 6, you understand, I believe you
[9] indicated in your September report, that Station 6 would not be
[10] used as a water supply. Am I correct?
[11] A. It is my understanding that Station 6 will be used as a
[12] backup water supply; and, therefore, when it needs to run, it
[13] needs to run continuously for as long as it is needed.
[14] Q. With regard to the O&M costs that you testified to here in
[15] court for Station 6, did you ever develop any cost estimates
[16] based on its use as a backup source for drought, supply outages
[17] or plant maintenance?
[18] A. Again I assumed continuous operation based on the fact that
[19] when it needs to run, it needs to run continuously and for as
[20] long as it's needed.
[21] Q. Did you, as part of your work in this case, do any analysis
[22] to determine how many years Station 6 would be used as a
[23] drought backup well based on historical drought records?
[24] A. No, I didn't do that analysis, but it wasn't needed.
[25] Q. You've testified to the jury that you installed

Page 6016

[1] granular-activated carbon on I believe it was 13 wells in 2002.
[2] Am I correct?
[3] A. It was on 9 wells in 2002. It was 13 GAC systems.
[4] Q. 13 GAC systems and 9 wells?
[5] Those wells were being installed -- pardon me -- being
[6] provided with GAC to be used as backup drought emergency wells.
[7] Am I correct?
[8] A. They were being installed for that drought only as
[9] temporary facilities to get the city through that drought.
[10] Q. In the drought in 2002-2003, were the backup wells that you
[11] equipped with GAC ever pumped?
[12] A. A few of the wells were pumped to distribution for a short
[13] period of time.
[14] Q. Since 2002-2003, have those wells ever been pumped?
[15] A. They have not been pumped to distribution. Some of them
[16] have been pumped to waste.
[17] Q. What do you mean, explain to the jury what you mean by
[18] pumped to waste?
[19] A. Pumping to waste means discharging the water to a sewer,
[20] whether it is a storm sewer or sanitary sewer.
[21] Q. Fair to say since 2003, the drought emergency wells that
[22] you equipped with GAC systems have not pumped water that was
[23] supplied to customers?
[24] A. Well, some of them pumped in end of 2003, beginning of
[25] 2004, but since that time they haven't provided water to

Page 6017

[1] consumers.
[2] Q. In the course of your work on this matter, did you do any
[3] analysis looking at statistics to determine how many years
[4] Station 6 might be pumped in the future based on emergency
[5] outages of water supply?
[6] A. No, I did not do that analysis, but it wasn't needed.
[7] Q. Did you do any statistical analysis to determine how many
[8] years Station 6 would be pumped in the future as a supplemental
[9] supply when and if the Rondout-West Branch tunnel were taken
[10] out of service for maintenance?
[11] A. No, I didn't do that analysis.
[12] Q. Did anyone from the city provide you with a written
[13] schedule to indicate to you how many years the Station 6 wells
[14] would be pumped in the future.
[15] A. No, that information was not provided.
[16] Q. As you sit here today, can you state any opinion to a
[17] reasonable degree of scientific or engineering certainty
[18] regarding how many years Station 6 will actually be pumped as a
[19] backup source in the future?
[20] A. No, that was not part of my analysis. Again for the
[21] purposes of designing costing, the only reasonable assumption
[22] to make was to assume it would operate continuously.
[23] THE COURT: Why do you call that the only reasonable
[24] assumption?
[25] THE WITNESS: Because there are a number of scenarios