**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- x

In Re: Methyl Tertiary Butyl Ether ("MTBE")         Master File No. 1:00-1898
Products Liability Litigation                               MDL 1358 (SAS)
                                                                     M21-88
--------------------------------------------------------------------- x      ECF Case
**This document relates to the following case:**

*City of New York, et al. v. Amerada Hess Corp., et al.*
Case No. 04 Civ. 3417

--------------------------------------------------------------------- x


**PLAINTIFFS' BRIEF IN RESPONSE TO QUESTIONS RAISED AT**
**ORAL ARGUMENT ON AUGUST 17, 2010**

The City respectfully submits the following brief response to questions raised at oral argument on August 17, 2010:

## I.   THERE IS NO EVIDENCE OF AN IMPROPER "COMPROMISE" VERDICT

Defendants' assertion that the jury's special verdict finding a peak concentration of MTBE in the Station 6 combined flow of 10 ppb in 2033 constituted an impermissible "compromise" (Aug. 17, 2009, Tr. at 28:19-29:16) is misplaced, and nothing in *Maher v. Isthmian Steamship Co.*, 253 F.2d 414 (2d. Cir. 1958), nor its progeny, supports any such conclusion.  In *Maher*, the Second Circuit held that a court may set aside a jury's liability verdict as a compromise verdict *only* where the record "*clearly demonstrates*" that the verdict is "*inconsistent* with the facts adduced at the trial." 253 F.2d at 419, 416 (emphases added).[1]  In *Maher* the court held that on the critical *liability* issue of comparative negligence "any number of rational conclusions, in one combination or another, could have resulted in the verdict as rendered,"  and therefore the Court of Appeals could find "no basis whatever for the claim that this verdict was arrived at by means of any improper compromise…."  *Id.*  In this case the jury's conclusion falls rationally in the range established by the expert testimony.

In the more than fifty years since *Maher*, the Second Circuit has repeatedly held that "although it is possible that the jury's special verdicts encompassed some undisclosed compromise, absent obvious inconsistencies we will not presume that the jury's findings represent anything other than good faith responses to the questions presented." *Crane v.*

---

[1] As this Court has recognized, "In order to constitute an impermissible compromise the verdict must, at least, be inconsistent with the facts adduced at trial." *Trinidad v. American Airlines*, No. 93 Civ. 4430 (SAS), 1997 U.S. Dist. LEXIS 1931, *11-12 (S.D.N.Y. Feb. 20, 1997) (Scheindlin, J.).

*Consolidated Rail Corp*., 731 F.2d 1042, 1050 (2d Cir. 1984) (internal quotations omitted).[2]
Indeed, courts must not disturb a verdict as a compromise if "there is an equally reasonable and
perhaps even better explanation which involves no jury misconduct."  *Aczel v. Labonia,* 584 F.3d
52, 61 (2d Cir. 2009) (no impropriety "[e]ven if juror misconduct such as a compromise verdict
is a possibility"); *U.S. ex rel Rogers v. La Vallee*, 517 F.2d 1330, 1335 (2d Cir. 1975) ("courts
have been unwilling to upset allegedly 'inconsistent' jury verdicts by speculation as to whether
they might have been the result of compromise or mistake"); *C.P. Apparel Mfg. Corp. v.
Microfibres*, *Inc*., *supra,* 2002 U.S. Dist. LEXIS 1725 ("The Second Circuit has cautioned
district courts not to grant a new trial in circumstances where, 'while a compromise may have
occurred, there is an equally reasonable and perhaps even better explanation which involves no
jury misconduct'").[3]

---

[2] *See, e.g.*, *Keenan v. Waldorf Carting Co.*, No. 02 Civ. 2379, 2004 U.S. Dist. LEXIS 17695
(S.D.N.Y. Sep. 1, 2004)  (no compromise verdict in accident case where trial testimony
supported jury's finding of comparative negligence); *C.P. Apparel Mfg. Corp. v. Microfibres*,
Inc., No. 97 Civ. 8691 (RMB), 2002 U.S. Dist. LEXIS 1725 (S.D.N.Y. Feb. 5, 2002) (no
compromise verdict because damages awarded were not inconsistent with liability, were not
inadequate, and the record did not show any close questions of liability or difficulty in jury
deliberation).

[3] Courts have found compromise verdicts only where the verdict clearly departs from the
evidence.  *See, e.g., Atkins v. New York City*, 143 F.3d 100  (2d Cir 1998) (finding compromised
verdict where jury awarded plaintiff only nominal damages despite evidence clearly
demonstrating that plaintiff suffered actual injury in police altercation); *Taylor v. Sullivan*, 980 F.
Supp. 697, 703 (S.D.N.Y. 1997) (finding compromise because the jury's verdict that a parole
officer intentionally filed false reports lacked any supporting  evidence, and awarded only
nominal damages that would have been  "grossly inadequate" had the record supported
plaintiff's allegations); *cf. Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437, 448  (2d Cir.
1959) (no compromise verdict even where off-record, post-trial interaction between judge and
juror suggested that the jury could not agree on liability and compromised by awarding minimal
damages).

Additionally, where there is no imbalance between the jury's finding of liability and its damages award courts will not find any improper compromise.[4]  The jury's finding in Phase II of a peak MTBE concentration of 10 ppb in 2033 conforms harmoniously with its damages award of $250.5 million, which rests on voluminous evidence about the characteristics of MTBE, its behavior in the aquifer, and the costs of treatment to remove it from Station 6 -- specifically (according to Ms. Bell) at the levels found by the jury in Phase II.   The balance between liability and damages demonstrates that the jury's finding was not a compromise, as defendants contend, but a careful consideration of the complex facts presented during the lengthy trial.

Defendants' argument thus fails in its fundamental premise:  Nothing in *Maher* or its progeny (or any other line of cases) prevented the jury in this case from applying its normal prerogative to "weigh ... and accept or reject the whole or a part of each [expert's] testimony." *Schroeder v. The Tug Montauk*, 358 F.2d 485, 488 (2d Cir. 1966).[5]  Moreover, nothing in this verdict is so inconsistent with the record as a whole to suggest – much less compel – a finding that the jury impermissibly compromised.  As we have already explained, both the jury's peak

---

[4] *See, e.g., Atkins v. New York City*, *supra,* 143 F.3d at 104 ("We may infer that a verdict is a compromise where damages are awarded in an amount inconsistent with the theory of liability offered at trial together with other indicia such as a close question of liability"). In virtually all cases in both the federal and New York courts either the trial or the appellate court found an improper verdict where the verdict was inexplicably *low* in relation to a finding of liability.  *See, e.g., Atkins v. New York City*, *supra,* 143 F.3d at 104; *Taylor v. Sullivan*, *supra,* 980 F. Supp. at 703; *Califano v. Auto. Rentals, Inc.,* 293 A.D.2d 436, 437, 740 N.Y.S.2d 117, 119 (2d Dept. 2002) (reversing trial court's judgment because of strong likelihood of compromise where jury awarded no damages for pain and suffering in a car crash*); Rivera v. City of New York*, 253 A.D.2d 597, 600, 677 N.Y.S.2d 537, 540 (1st Dept. 1998) (reversing trial court judgment because of an "inexplicably low award" for plaintiff's "serious" injuries); *but see Tse v. UBS Fin. Servs.,* 568 F.Supp.2d 274, 300 n.14 (S.D.N.Y. 2008) (remitting excessively large verdict because the "only other 'plausible explanation' ... is that the jurors settled on this amount 'by means of an illegitimate compromise verdict").   Here, of course, the jury's award tracks exactly the costs of treatment proffered by plaintiffs' expert Marnie Bell, which she expressly calculated based on the jury's Phase II verdict.

[5] We discussed this rule at length in "Plaintiffs' Supplemental Brief in Response to the Court's Post-Trial Questions" (filed Aug. 15, 2010) ("Pls' Supp. Br.") at 1-3 and notes 1 & 2.

concentration of 10 ppb and its date of 2033 (and the two findings together) fall reasonably within the ranges presented by Mr. Terry, when considering his testimony and the evidence as a whole, including points raised on cross-examination and the testimony of defendants' expert Mr. Maguire.[6]

Finally, defendants have waived any objection to the jury's verdict by failing to object that the jury could not find a peak number other than zero or 35 ppb. *See Fox v. City Univ. of New York*, 187 F.R.D. 83 (S.D.N.Y. 1999) ("'a party's failure to object to the form of the special interrogatories submitted to the jury precluded a subsequent argument that the answers indicated a compromise verdict'") *quoting Phav v. Trueblood, Inc.,* 915 F.2d 764, 769 (1st Cir. 1990). The special verdict form for Phase II did not even present a 35 ppb peak as an option, and defendants never suggested it should. They cannot now complain that the jury failed to find what defendants claim was the jury's only proper option, when they never even asked to have that option on the form of verdict. Having failed to complain about the choices presented to the jury in the Phase II interrogatories, defendants cannot now attack the verdict on the basis that it represents an improper compromise.

## II. THE JURY'S TRESPASS VERDICT SUPPORTS ITS DAMAGES AWARD

The City's damages award represents the quantified cost of restoring its injured property to an MTBE-free condition – the appropriate measure of damages where the jury had sufficient

---

[6] Defendants' suggestion that because Mr. Terry could not answer certain arbitrary hypotheticals posed during cross-examination with specific numbers, the jury would have to "run the model" itself (Aug. 17 Tr. At 29:4-11) to reach its verdict is plainly incorrect. Mr. Terry testified that he used several different input assumptions to generate a range of values in a situation of considerable uncertainty. *See* Pls' Supp. Br. at 3-9. The jury's special verdict falls appropriately within those values.

information to reasonably ascertain the cost of building a treatment plant to remove MTBE from

the water supplying Station 6.  The court in *Wells Fargo v. Tyson*, 27 Misc.3d 684, 897 N.Y.S.2d

610, 616 (N.Y.Sup. 2010), found nominal damages appropriate where, *unlike here*, "the actual

*amount of damages* is not capable of calculation nor is it readily quantifiable . . ." (emphasis

added).[7]  Where there is some injury to property, damages may be calculated as "the cost of

restoring the property to its state before the trespass."  *Id.*  It is this *cost,* not the injury, that

"must be ascertainable with a reasonable degree of certainty."  *Long Island Airports Limousine*

*Service Corp. v Northwest Airlines*, 124 A.D.2d 711, 713, 508 N.Y.S.2d 223 (2d Dept.,1986)

(citing cases).  In *Jenkins v. Etlinger,* 55 N.Y.2d 35, 39, 432 N.E.2d 589, 591 (1982), the court

affirmed an award of the costs of removing silt from a pond where the injury claimed was

discoloration of the water.  Here, the City has been – and will continue to be – injured by the

presence of MTBE (a toxic chemical at any measurable level), and the cost of restoring the water

to a non-MTBE condition can both be quantified and is the appropriate measure of the City's

damages.

      First, independently of its answer regarding the timing and concentration of MTBE, in

---

[7]Trespass does not *require* actual injury to the plaintiff.  *In re MTBE,* 643 F.Supp.2d 446, 459
(S.D.N.Y. 2009) (damage is not part of a trespass claim).  Given that trespass can be found in the
absence of injury, nominal damages are appropriate where the property owner has suffered *no*
actual injury to his or her possessory interest as a result of the trespass.  See *Guilderland v
Swanson*, 29 A.D.2d 717, 286 N.Y.S.2d 425(N.Y.A.D. 1968) (town showed no monetary
damage but was still awarded nominal damages); *Burger v Singh*, 28 A.D.3d 695, 816 N.Y.S.2d
478 (2nd Dept.,2006) (unauthorized entry that caused no injury to premises supported award of
nominal damages); *Ligo v Gerould*, 244 A.D.2d 852, 853, 665 N.Y.S.2d 223 (where damage to
property was not proven, plaintiffs still eligible for nominal damages); see *Kronos, Inc. v AVX
Corp.,* 81 N.Y.2d 90, 595 N.Y.S.2d 931, 612 N.E.2d 289; *Shiffman v Empire Blue Cross & Blue
Shield*, 256 A.D.2d 131, 131, 681 N.Y.S.2d 511 (1st Dept.,1998) (unlawful but non-disruptive,
non-injurious trespass still gave rise to nominal damages); *Long Island Airports Limousine
Service Corp. v Northwest Airlines*, 124 A.D.2d 711, 713, 508 N.Y.S.2d 223 (2nd Dept.,1986)
(although all evidence of injury was speculative, plaintiff nonetheless was entitled to nominal
damages).  But here the City has suffered and continues to suffer injury.

Phase II the jury found that MTBE will be present in the groundwater of the capture zone of the

Station Six wells when they begin operation.  Abundant evidence supports this finding, including

the testimony of Donald Cohen (Tr. 2249:11-17 (8/20/09) ("I believe that the MTBE will be

there when those wells are turned on.")); and David Terry (one does not "really need to run a

transport model to see that MTBE will affect Station 6 in the future." (08/19/09 Trial Tr. at

2012:10 – 2012:21)).  The presence of *any* level of MTBE injures the City:   Dr. Rudo and Dr.

Burns testified that *any* level of exposure to MTBE in drinking water poses unacceptable public

health risks (see Tr. 3267:18-3267:24 (9/2/09); Tr. 2803:24-2804:2; 2809:16-17 (8/27/09));

James Roberts and Donald Cohen testified – even before the jury determined the peak level and

timing of MTBE – that Station 6 must be built to treat MTBE contamination   (Tr. 410:10-410:14

(8/04/09); Tr. 790:5-790:12; 791:5-791:7 (8/07/09)); City employee William Meakin testified

that Station 6 is needed in order to supply high-quality water to New Yorkers  (Tr. 612:13-612:17

(8/4/09));  and MTBE detections in the Station 6 pilot testing phase impelled the construction of

Station 6.  ( Tr. 410:10-410:14 (08/04/09); Tr. 612:13-612:17 (08/06/09); Tr. 790:5-790:12;

791:5-791:7 (08/07/09); Tr. 2240:20-2242:5; 2242:6-2242:1 (08/20/09)); PL 147.   James

Roberts testified that the City was committed to providing "the best quality water we can" to

City residents (Tr. 335:7-11 (8/04/09)) and William Yulinsky testified that Station 6 would

ensure that Queens residents had the same quality of drinking water as City residents served

upstate water (Tr. 536:7-11 (8/05/09)).  This evidence supports a jury finding that the presence of

MTBE at *any* level is an injury, and must be removed.

Ample evidence independent of the jury's specific findings of peak concentration or date

also supports the jury's conclusion that MTBE will be present in the Station 6 water for decades.

Both Mr. Terry and Dr. Fogg so testified.  *See* Pls' Supp. Br. at 11-12 & n.10.

In short, even setting aside the jury's finding in Phase II that MTBE concentrations will more likely than not peak at 10 ppb in 2033, there is evidence that the City must remove MTBE at any level, that MTBE will be present when Station 6 starts up, and that it will be present (and require removal) for decades.  This constitutes on-going and recurring injury, for purposes of trespass (and otherwise), and fully supports the jury's award of damages to restore the water to its non-MTBE condition.[8]

 "It is 'well established' that '[t]he rule of certainty as applied to the recovery of damages does not require mathematical accuracy or absolute certainty or exactness, but only that the loss or damage be capable of ascertainment with reasonable certainty.'"  *In re MTBE*, 643 F.Supp.2d 446, 456 (S.D.N.Y. 2009).  Reasonable certainty "is akin to the ordinary preponderance of the evidence standard, [footnote omitted] which requires only that damages are 'capable of measurement based upon known reliable factors without undue speculation.'"  *Id.* at 456-457 (citing *Ashland Mgmt. Inc. v. Janien,* 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) ("Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision").)

The City's damages in the amount of $250 million are reasonably certain.  The City's expert Marnie Bell separated the cost of Station 6 into three categories:  capital costs, equipment replacement costs, and operating and maintenance (O&M) costs.  (Tr 5883:22-5886:12 (9/24/09).)  The vast majority of the costs of Station 6 are *not* concentration-dependent:  they are costs that must be incurred whether MTBE is at 1, 10, or 100 ppb, and the jury's failure to specifically identify a particular concentration (that is, if the jury's verdict were discarded) does

---

[8] *See, e.g., Jenkins v. Etlinger, supra,* 55 N.Y.2d at 39, 432 N.E.2d at 591 (award to remove silt from pond allowed when injury was discoloration of the water); *Holmes v. State,* 32 Misc.2d 1077, 1081-82, 226 N.Y.S.2d 626 (Ct. Cl. 1962) (cost to repair foundation from storm water intrusion proper measure of damages for actual injury).

not make the non- O&M costs of Station 6 any less necessary.  Ms. Bell testified that only the O&M costs "will vary based on the concentrations [of MTBE]" – not any other cost.   (Tr. 6048:8-17 (9/30/09).)  The number of granular activated carbon (GAC) vessels does not differ between scenarios, even if concentrations of MTBE differ.  (Tr. 5905:19-5906:7; 5905:19-22 (9/24/09).)   Ms.  Bell calculated the costs of Station 6 for two scenarios that differed only in the concentration of MTBE present in the water.  (*Id.*)  Because concentrations do not affect the size of the system, but only "how much time the water needs to be in the [GAC] vessels," O&M costs are the only costs that change as the concentration of MTBE changes; "the capital costs are the same." (Tr. 5905:23-5906:7 (9/24/09).)  The capital costs of a GAC facility – for any concentration of MTBE – are approximately $59.9 million.  (Tr. 5915:16-18 (9/24/09).)  The equipment replacement costs are $48.8 million, also independent of concentration.  (Tr. 6022:19-22 (9/30/09).)  The remainder, O&M costs, ranged from a *minimum* of approximately $141 million (Tr.  6155:13-6156:3 (9/30/09)) to $8 million more, i.e., about $149 million (Tr. 5905:13-22 (9/24/09)).

Therefore, the total cost of Station 6, under different concentration scenarios, ranged from $250 million (MTBE at 10 ppb) to $258 million (MTBE at a concentration *3.5 times greater*).  (Tr. 5905:8-18 (9/24/09)).  In other words, $8 million represents the change in O&M costs corresponding to a change in MTBE concentration of 25 ppb over 40 years – or approximately $320,000 per additional part per billion removed by GAC.  *See id.*  Reducing the MTBE concentration treated by Station 6 from 10 ppb down to any other lesser concentration would, based on that ratio, reduce the O&M costs – and therefore the costs of treating MTBE at Station 6 – by at most $3.2 million.

III.    **THE EVIDENCE SUPPORTS THE JURY'S DIRECT SPILLER VERDICT.**

Mr. Terry testified directly and unequivocally that "if there is MTBE that is in the groundwater and it is in the capture zone for Station 6, then I would expect that MTBE to migrate to Station 6 ...."  (Tr. 5708:5-7.)  He expressed the same opinion specifically with respect to the two ExxonMobil stations discussed at oral argument, 165-01 Hillside[9] and 113-21 Merrick[10] (*see* Pls' Supp. Br. at 18-19), as well as the station at 84-04 Parsons.[11] .

To demonstrate the reach of the capture zone created by Station 6 when it starts pumping, Mr. Terry showed the jury a series of  demonstrative maps,[12] one of which we presented at oral argument, and copies of which are attached to this brief.  These demonstratives showed the capture zone for Station 6 evolving over time.   These demonstratives -- to which there was no objection raised during Mr. Terry's testimony -- were based on exhibits PL 14845A-X (evolution of capture zone per flow model), PL 14844A-C (location of sites with known gasoline releases around Station 6, with 0.5 mile, 1.0, and 2.0 radii shown), and PL 3167, PL 5582, Pl 5583, and PL 5584 (addresses of ExxonMobil stations in vicinity of Station 6).  And these exhibits showed,

---

[9] Tr. 5675:17-24 ("Q.  Do you conclude that when the Station 6 wells are turned on, that contamination from this site would be -- any plume from this site would be caught by the capture zone of the wells and drawn into it eventually?  A.  The plume from this site would extend to the south, as I just described, and this area is in the capture zone for Station 6 when it is pumpted so, therefore, it would be intercepted at Station 6 in the region.")

[10] Tr. 5678:4-14 ("Q.  So in your opinion, would a plume from this site be captured by Station 6 when it operates?  A.  Yes, the plume from this site would extend to the south-southwest ....  The MTBE plume from this site would extend to the southwest in general from the regional flow direction, and this area where the plume would be located is in a future capture zone of Station 6. When Station 6 starts pumping, that plume would be drawn back into the Station 6 wells.")

[11] Tr. 5677:20-5678:12 (although station itself falls outside of capture zone, MTBE from the site could be a source of contamination at Station 6 because "There is still a substantial amount of MTBE that has been discharged at this site.  There is 20 years after the discharge occurred, there is still 2,600 parts per billion in the perched aquifer and there is 400 parts per billion in the peak aquifer, which indicates a substantial impact on the underlying groundwater").

[12] Tr. 5678:13-5681:13 (9/23/09).

9

as defendants' expert Mr. Maguire conceded,[13] that in *every* stage of the evolution of the Station

6 capture zone (including, for example, if the Dependability wells never come on line), MTBE

from the ExxonMobil station at 113-21 Merrick will reach Station 6.


Dated:  San Francisco, California
        August 20, 2010                    Respectfully submitted,

                                        MICHAEL A. CARDOZO
      Corporation Counsel of the City of New York
      100 Church Street
      New York, New York 10007
      (212) 788-1568

         /s/ *VICTOR M. SHER*
      VICTOR M. SHER *(pro hac vice)*
      TODD E. ROBINS *(pro hac vice)*
      NICHOLAS G. CAMPINS *(pro hac vice)*
      MARNIE E. RIDDLE (*pro hac vice*)

      SHER LEFF LLP
      450 Mission Street, Suite 400
      San Francisco, CA 94105
      (415) 348-8300

      *Attorneys for Plaintiffs City of New York, New*
      *York Municipal Water Finance Authority, and*
      *New York City Water Board*

---

[13] TR 5241:3-8 (9/21/09).

# DEMONSTRATIVES



2019

2 Mile

1 Mile

1/2 Mile

6D • 6
33 • 6A • 6C • 6B

N

Legend
• Reported Gasoline Discharge
○ Gasoline Tank Location
☐ Reported Exxon Mobil Station
▨ Reported Exxon Mobil Station In Capture Zone
▨ Station 6 Capture Zone



**Legend**

- Reported Gasoline Discharge
- Gasoline Tank Location
- Reported Exxon Mobil Station
- Reported Exxon Mobil Station In Capture Zone
- Station 6 Capture Zone



**2020**

2 Mile

1 Mile

1/2 Mile

6D   6   6C
      6A   6B
   33

**Legend**
• Reported Gasoline Discharge
○ Gasoline Tank Location
☐ Reported Exxon Mobil Station
▣ Reported Exxon Mobil Station In Capture Zone
▨ Station 6 Capture Zone

N





2021

2 Mile

1 Mile

1/2 Mile

6B
6C
6
6A
6D
33

**Legend**

- Reported Gasoline Discharge
- Gasoline Tank Location
- Reported Exxon Mobil Station
- Reported Exxon Mobil Station In Capture Zone
- Station 6 Capture Zone

N



185-01 HILLSIDE AVENUE

113-21 MERRICK BOULEVA

168-07 Baisley Blvd

129-01 Guy R Brewer Bl

117-07 Guy R Brewer Bl

112-06 Sutphin Blvd /

117-04 Sutphin Blvd

6D
6
6A 6C
6B
33 6A

155-25 Styler Rd

137-21 LIBERTY AVENUE

St Ave

126-01 101

**Legend**

- • Reported Gasoline Discharge
- ○ Gasoline Tank Location
- □ Reported Exxon Mobil Station
- ▨ Reported Exxon Mobil Station In Capture Zone
- ▨ Station 6 Capture Zone

N