**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

In Re: Methyl Tertiary Butyl Ether ("MTBE")          Master File No. 1:00-1898
Products Liability Litigation                                      MDL 1358 (SAS)
                                                                              M21-88
-------------------------------------------------------------------- x   ECF Case

**This document relates to the following case:**

*City of New York, et al. v. Amerada Hess Corp., et al.*
Case No. 04 Civ. 3417

-------------------------------------------------------------------- x

**PLAINTIFFS' CORRECTED SUPPLEMENTAL BRIEF IN RESPONSE TO
THE COURT'S POST-TRIAL QUESTIONS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.   AMPLE EVIDENCE SUPPORTS THE JURY'S FINDING THAT MTBE
     CONCENTRATIONS WILL MORE LIKELY THAN NOT PEAK AT 10 PPB
     (COMBINED FLOW OF ALL WELLS) IN 2033, AS BOTH FINDINGS FALL WITHIN
     THE RANGE OF EXPERT TESTIMONY PRESENTED BY THE PARTIES AND GIVEN
     THE JURY'S RIGHT TO INTERPRET, ACCEPT OR REJECT PORTIONS OF THAT
     TESTIMONY AND OTHER EVIDENCE. ................................................................... 3

   A.   Peak Of 10 ppb Falls Within The Peak Ranges To Which The Experts Testified. ............. 5

   B.   The Jury Could Reasonably Conclude That Concentrations Would Peak In 2033. ........... 7

II.  THE JURY'S FINDING THAT MTBE WILL PEAK IN 2033 DOES NOT CHANGE THE
     TOTAL COST OR DURATION OF TREATMENT. ................................................. 9

III. EVEN IF THE COURT SETS ASIDE THE JURY'S SPECIFIC FINDING,
     SUBSTANTIAL EVIDENCE SUPPORTS THE VERDICT, THE CITY'S TRESPASS
     CLAIM AND THE JURY'S DAMAGES AWARD. .................................................. 10

   A.   The Court Found As A Matter Of Law That The City Is Presently Injured, And
        Substantial Evidence Supports The Jury's Injury Finding................................................. 10

   B.   The Jury's Trespass Finding and Damages Award Did Not Depend On The Finding That
        MTBE Would Peak At 10 PPB. ....................................................................................... 13

IV.  THE JURY IS ENTITLED TO ACCEPT PARTS OF MR. TERRY'S CAPTURE
     ZONEMODEL AND REJECT OTHERS, AND SUBSTANTIAL EVIDENCE OTHER
     THAN THE MODEL SUPPORTS THE JURY'S FINDING THAT SPILLS FROM
     MOBIL-BRANDED STATIONS WOULD AFFECT THE STATION SIX WELLS. ......... 17

CONCLUSION .................................................................................................................. 19

i

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Denison v. Shamut Min. Co.*,
   135 F. 864 (2d Cir. 1905) ...................................................................................2

*First Nat. Bank of Kenosha v. U.S.*,
   763 F.2d 891 (7th Cir. 1985) ..............................................................................2

*In re MTBE*,
   2009 WL 2634749 (S.D.N.Y. Aug. 25, 2009) .................................................11

*In re MTBE*,
   2010 WL 1924708 (S.D.N.Y. 2010).................................................................15

*In re MTBE*,
   593 F.Supp.2d 540 (S.D.N.Y. 2008).................................................................11

*In re MTBE*,
   643 F.Supp. 2d 446 (S.D.N.Y. 2009).........................................................14, 15

*Inducraft, Inc. v. Bank of Baroda*,
   47 F.3rd 490 (2d Cir. 1995) ................................................................................1

*Lawrence v. E.I. du Pont de Nemours & Co.*,
   226 Fed.Appx. 498 (6th Cir. 2007).....................................................................2

*Medcom Holding Co. v. Baxter Travenol Laboratories*,
   106 F.3d 1388 (7th Cir. 1997) ............................................................................2

*Merrill v. United Air Lines, Inc.*,
   177 F.Supp 704 (S.D.N.Y. 1959).................................................................1, 17

*Pahuta v. Massey-Ferguson, Inc.*,
   997 F.Supp. 379 (W.D.N.Y. 1998) ....................................................................2

*Robinson v. Shapiro*,
   646 F.2d 734 (2d Cir. 1981)...............................................................................2

*Schroeder v. The Tug Montauk*,
   358 F.2d 485 (2d Cir.1966)..........................................................................1, 17

*Scribner v. Summers*,
   84 F.3d 554 (2d Cir. 1996) ...............................................................................14

*Tuf Racing Products, Inc.v. American Suzuki Motor Corp.*,
223 F.3d 585 (7th Cir. 2000) ................................................................................................1


**STATE CASES**

*B. Hill v. Raziano*,
880 N.Y.S. 2d 173 (App. Div. 2009) ...................................................................14

*Burger v. Singh*,
816 N.Y.S. 2d 478 (App. Div. 2006) ...................................................................14

*De Camp v. Bullard*,
159 N.Y. 450 (1899) ...........................................................................................15

*Hartshorne v. Chaddock*,
135 N.Y. 116 (1892) ...........................................................................................15

*Jenkins v. Etlinger*,
55 N.Y.2d 35 (1982) ...........................................................................................15

*Kronos, Inc. v. AVX Corp.*,
81 N.Y. 2d 90 (1993) ..........................................................................................14

*Ligo v. Gerould*,
665 N.Y.S. 2d 223 (App. Div. 1997) ...................................................................14

*Meija v. JMM Audubon, Inc.*,
767 N.Y.S.2d 427, 1 A.D.3d 261 (2003) ..............................................................2

*New York Rubber Co. v. Rothery*,
132 N.Y. 293 (1892) ...........................................................................................14

*Sakele Brothers, LLC v. Safdie*,
302 A.D.2d 20, 752 N.Y.S.2d 626 ......................................................................15

*Shiffman v. Empire Blue Cross and Blue Shield*,
681 N.Y.S. 2d 511 (App. Div. 1998) ...................................................................14

**INTRODUCTION**

The City respectfully submits this brief in anticipation of oral argument on August 17 to address the four questions posed by the Court to the parties on August 11, and to provide the Court with responsive transcript references.  As explained more thoroughly below:

III.   Ample evidence supports the jury's finding that MTBE concentrations will more likely than not peak at 10 ppb (combined flow of all wells) in 2033, as both findings fall within the range of expert testimony presented by the parties and the jury's right to interpret, accept or reject portions of that testimony.

IV.   The jury's finding that MTBE will peak in 2033 rather than earlier does not affect the City's damages.

V.   Even setting aside the jury's specific finding that MTBE would peak at 10 ppb, substantial evidence supports the jury's injury finding, trespass finding and damages award.

VI.   The jury may accept parts of Mr. Terry's capture zone model and reject others, and substantial evidence other than the model supports the jury's finding that spills from Mobil-branded stations will affect the Station 6 wells.

**ARGUMENT**

It is well settled in the Second Circuit -- and everywhere else -- that juries are not bound strictly by expert opinions. Juries may accept all or parts of expert opinions, they may resolve disputes between competing opinions by adopting determinations somewhere in the middle, and they may interpret different experts' opinions and extrapolate from them.[1] Juries may

---

[1] *See, e.g., Schroeder v. The Tug Montauk*, 358 F.2d 485, 488 (2d Cir.1966) (where expert evidence conflicts, fact-finder may "weigh it and accept or reject the whole or a part of each [expert's] testimony); *Merrill v. United Air Lines, Inc.,* 177 F.Supp 704, 705 (S.D.N.Y. 1959) ("Expert opinion testimony is, of course, not conclusive or binding upon the jury… It is to be treated in the same manner as other evidence in the case.  The jury may accept or reject all or part of such testimony"); *Inducraft, Inc. v. Bank of Baroda,* 47 F.3rd 490, 496 (2d Cir. 1995) (trial court should not have set aside the jury verdict because verdict was within range testified to by expert). In *Tuf Racing Products, Inc.v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th

also properly adopt a value higher than that proposed by an expert by relying on, making assumptions about, and attaching values to additional factors contained in the record. For example, in *Robinson v. Shapiro,* 646 F.2d 734, 744 (2d Cir. 1981), the Court of Appeals affirmed the trial court's explanation (by Judge Lasker of this Court) that the jury could have attached value to the decedent being a "devoted" father and competent at work so he "might" have been promoted in the future, all of which resulted in a jury verdict substantially greater than the plaintiff's expert's testimony.[2]   Juries may even revise and adjust an expert's complex model. In *Medcom Holding Co. v. Baxter Travenol Laboratories*, 106 F.3d 1388, 1398-99 (7th Cir. 1997), for example, the Seventh Circuit reversed a district court's finding that the jury "cannot be expected to appropriately revise [an expert's] model;" such a view "denigrates the historic and practical abilities of the jury," *id.* at 1398, and "underestimates the jury's abilities," *id.* at 1399. Especially where the expert was the subject of lengthy cross-examination and a responsive expert also testified, "the jury could reasonably adjust the analysis ...."  (*Id.*)  In short, juries have long been free to use expert opinion testimony "as a guide" and then exercise independent judgment.  *Denison v. Shamut Min. Co*., 135 F. 864, 864-865 (2d Cir. 1905).

---

Cir. 2000), the court rejected defendant's argument that the jury's award of $137,000 was so low as to be speculative because the plaintiff's expert had testified the damages should have been $1.2 million, explaining that "the court looks only at the 'bottom line,' to make sure it's reasonable, and doesn't worry about the mental process that led there").  *Accord, e.g., First Nat. Bank of Kenosha v. U.S.*, 763 F.2d 891, 896 (7th Cir. 1985) (affirming verdict where the jury was "presented (as is often the case) with widely divergent opinions," "did not accept whole-cloth the view of either of the experts, and arrived at its figure independently (very possibly, we suspect, by splitting the difference)")*; Meija v. JMM Audubon, Inc*., 767 N.Y.S.2d 427, 1 A.D.3d 261, 262 (2003) ("in considering the conflicting testimony of the parties' respective expert witnesses, the jury was not required to accept one expert's testimony over that of the other, but was entitled to accept or reject either expert's position in whole or in part").

[2] *Accord, e.g., Lawrence v. E.I. du Pont de Nemours & Co.*, 226 Fed.Appx. 498 (6th Cir. 2007) (unpublished) (jury award at low end of expert testimony "shows that it critically considered [the] expert testimony rather than unthinkingly speculating about an appropriate award"); *Pahuta v. Massey-Ferguson, Inc.*, 997 F.Supp. 379, 384 (W.D.N.Y. 1998) (jury awarded annual medical costs at higher rate than plaintiff's expert).

As demonstrated below, the jury's conclusions on the magnitude and date of future peak MTBE levels in Station 6 were well within the ranges testified to by Mr. Terry and the defense expert Mr. Maguire, especially given potential variations in locations and sizes of releases, dates of pumping, and volume of pumping. Those opinions were subject to extensive cross-examination and testimony by opposing experts.  In addition, the verdict is consistent with the testimony of other witnesses concerning the treatment plant and the impact of MTBE contamination. Given the deference the Court must show the jury verdict, there is more than enough evidence in this record to support the verdict, and much more than in other cases where verdicts have been upheld.

I.    **AMPLE EVIDENCE SUPPORTS THE JURY'S FINDING THAT MTBE CONCENTRATIONS WILL MORE LIKELY THAN NOT PEAK AT 10 PPB (COMBINED FLOW OF ALL WELLS) IN 2033, AS BOTH FINDINGS FALL WITHIN THE RANGE OF EXPERT TESTIMONY PRESENTED BY THE PARTIES AND GIVEN THE JURY'S RIGHT TO INTERPRET, ACCEPT OR REJECT PORTIONS OF THAT TESTIMONY AND OTHER EVIDENCE.**

David Terry, the City's expert, testified based on several different runs of his hydrogeologic model that the most likely peak concentration of MTBE would be about 35 ppb "[i]n or about the year 2024.".  (*See* Tr. 2088:16 – 2089:1 (8/19/09))  Mr. Terry never claimed absolute precision.  Rather, he explained that his model "did not have perfect information" about the contamination near Station 6 (2014:7-9 (8/19/09)).  He intended the model to operate in the face of uncertainties including, for example, "how much gasoline had spilled" at release sites, when the releases occurred, and where.  (*See* Tr.  2014:18-19 ("how much gasoline had spilled"); *See* Tr. 2136:20-22 ( "hard to estimate specifically when the release started") (8/19/09); *See* Tr. 2224:21-2225:1 ("depending on where they're located … might affect the concentration [of MTBE] that you find") (8/20/09)). Terry's opinion concerning the likely peak level and timing

was not an attempt to resolve definitively all of these uncertainties, but an estimate to be used in planning the design (and cost) of the City's treatment plant at Station 6 based on the most likely range of future MTBE impacts.  (*See* Tr. 2017:2-5 (8/19/09))

Accordingly, in modeling MTBE impacts, Mr. Terry "consider[ed] a range of possible input values [to] see what the effect is at the output"  (*See* Tr. 2014:23-24 (8/19/09)), in order to "understand the range of potential impacts at Station 6." (*See* Tr. 2016:1-2 (8/19/09)).  To examine the effect of changing variables, Terry conducted two different basic analyses, producing several model runs of each (*See* Tr. 2015:3-15 (8/19/09)).  He explained that this was appropriate, because "[t]he way we deal with uncertainty is to consider a range of values." (*See* Tr. 2015:18-21 (8/19/09))

Mr. Terry's Analysis 1, which rested on reported detections of MTBE at various monitoring locations in 2004, assumptions about the operation of Station 6 and other wells, as well as MTBE's fate and transport characteristics (including mobility, persistence, and biodegradation), provided what Mr. Terry considered the most likely scenario.  He also, however, presented the jury with several other model runs ("Analysis 2") based on a somewhat different set of assumptions.

As explained below, the jury's determination that MTBE will peak at 10 ppb in the combined flow of Station 6 falls within Mr. Terry's own range, as well as within the range between Mr. Terry and defendants' expert Mr. Maguire.  Similarly, a variety of factors presented by Mr. Terry – including the location of release sites, the timing of releases, MTBE's dispersivity, and when other wells commence pumping, among others – supports the jury's finding that MTBE will reach that peak in 2033.

**A.**     **Peak Of 10 ppb Falls Within The Peak Ranges To Which The Experts Testified.**

Mr. Terry presented the jury two runs of Analysis 1, both of which predicted a future peak of about 35 ppb of MTBE in the combined flow of Station 6.  (*See* Tr. 2088:16-23 (8/19/2009) ("a peak concentration of 35 parts per billion should be expected at Station 6 in the future"); *See* Tr. 2090:16-2091:4 (8/19/2009) and PL 14855 (comparing two runs of Analysis 1.) His Analysis 2 runs, in turn, provided a range of peak values from non-detect (Analysis 2A at 50 gallons per release), to about 6 ppb (Analysis 2B at 500 gallons), to about 17 -23 ppb (Analysis 2C at 2000 gallons).)  (*See* Tr. 2084:2-2085:15 (8/19/09) and PL 1682 (original Analyses 2A, B, C).)  Mr. Terry explained that the different peak predictions result from different assumptions about the magnitude, location, and timing of MTBE releases in the vicinity of Station 6.  (*See* Tr. 2072:8-18 (Analysis 2 incorporated more information about "where discharges of gasoline to groundwater had occurred"); *See* Tr. 2084:2-2085:15 (release volume will affect concentration) (8/19/09); *See* Tr. 2224:15-2225:1 (number and location of sources will affect concentration) (8/20/09).)

The jury was entitled to assess those assumptions independently, separately and in the aggregate.  Its finding that MTBE will peak at 10 ppb falls reasonably within the range of Mr. Terry's testimony, standing alone.[3]

---

[3] The graphic in the text "Terry Peak Ranges (Original Analyses 1 and 2)" combines Terry's *original* two analyses (shown to the jury in PL 1680 (Analysis 1) and PL 1682 (Analysis 2)), demonstrating that Terry presented the jury with a range of possible concentration and peak year scenarios.  The top red line represents the results of his *original* Analysis 1 run, showing a peak of about 35 ppb in 2024 for the combined flow of all Station 6 wells.  The bottom three lines represent the results of his *original* Analysis 2 run assuming three different release sizes, and the peak concentrations range from 0 ppb (for Scenario A - 50 gallon releases), to approximately 7 ppb (for Scenario B - 500 gallon releases), to approximately 17 ppb (for Scenario C).  Terry also presented *revised* runs for Analysis 1 and Analysis 2C, based on certain changed inputs

Terry Peak Ranges (Original Analyses 1 and 2)



PL 1680 (Analysis 1); PL 1682 (Analysis 2)

In addition, defendants' expert Mr. Maguire testified that peak concentrations of MTBE in the Station 6 wells would be "less than one part per billion."  (*See* Tr. 2473:3-14 (8/21/09)) Mr. Maguire prepared no model, but the gist of his testimony was that MTBE releases from gas stations in the vicinity of Station 6 were smaller than Mr. Terry believed, were disappearing naturally, and their impacts would be minor and short-lived.  (*See* Tr. 2490:6-21; 2473:3-12 (8/21/09).)

Both Mr. Terry and Mr. Maguire testified at length and endured extensive cross-examinations.  The jury was entitled to conclude that the likely peak called for by the Court's Phase II Interrogatory would fall between those predicted by Mr. Terry's various analyses (on the one hand) and Mr. Maguire's (on the other), based on the assumptions and opinions expressed by each expert.  While lower than Mr. Terry's Analysis 1 prediction, 10 ppb is higher than two of Mr. Terry's Analysis 2 peak values (Analyses 2A and 2B) – as well as higher than Mr. Maguire's.  The jury's finding of 10 ppb falls within the range of the experts' testimony concerning peak concentrations, and was reasonable.

---

suggested by defendants, which showed slightly different results, all of which he explained to the jury.  (PL 14855 (revised Analysis 1); PL 14682 (revised Analysis 2).)

**B.      The Jury Could Reasonably Conclude That Concentrations Would Peak In 2033.**

Mr. Terry pointed out that although he believed peak MTBE concentrations would occur most likely in "about 2024" (*See* Tr. 2088:24-2089:1 (8/19/2009)), several factors could cause delay.  For example, using *defendants'* proposed value for "dispersivity"[4] would move the peak several years later.  (*See* Tr. 2221:19-2223:9 (8/20/09); PL 14862 (original Analysis 1 peak moves from 2024 to 2027.)



Moreover, Mr. Terry changed certain model inputs, including, *inter alia*, using a lower MTBE concentration at one site, and this too delayed the peak date predicted by Analysis 1. (*See, e.g.,* Tr. 2118:3-16 (8/19/09); 2224:1-22 (8/20/09); PL 14855 (comparing original Analysis 1 peak in 2024 to revised run peaking in 2027).)  Thus, while Mr. Terry's *original* Analysis 1

---

[4] Dispersivity is a measurement of how quickly a contaminant spreads in an aquifer.  (*See* Tr. 2221:19-24 (8/20/09).)

predicted a peak in 2024, his *revised* Analysis 1 predicted a similar peak in about 2027.  (*See* Tr. 2090:16-2091:4 (8/19/09); PL 14855.)[5]



Delaying the start of the Dependability wells, and/or Station 24, and/or other wells in the area would also likely have a similar effect of delaying the peak date.  This is because, as Mr. Terry testified, turning on the Dependability wells in particular causes contamination to flow back toward Station 6, and it takes awhile for the new capture zone to stabilize in response to those wells coming online.[6]  Because Mr. Terry's model showed that the final Station 6 capture

---

[5] Mr. Terry did not consider the difference in peak dates significant to his basic opinion that MTBE would be in the Station 6 wells in about 2024. (*See* Tr.  2091:2-4 (8/19/09).)

[6] (*See* Tr. 2065:15-21 (movement of groundwater is affected by pumping of all wells in the area); *See* Tr. 2210:8-23 (altering date of dependability well operation will alter movement of capture zone); *See* Tr.1986:6- 24 (capture zone shifts when dependability wells turn on; full extent of capture zone only reached some years after dependability wells turn on; larger capture zone pulls in MTBE from farther away, increasing concentration at Station 6); *See* Tr. 2060:17-2061:8 (peak concentration year occurs after dependability wells are pumping for some time; dependability wells affect development of capture zone); *See* Tr. 2063:8-13 (turning on dependability wells causes contaminants to flow back toward Station 6); *See* Tr. 2063:25-2064:9 (four years after dependability wells turn on, plume flowing toward Station 6 causes MTBE to peak) (8/19/09)).

zone will form "after the dependability wells [which the model assumes would start in 2020] are pumping for some time," (*See* Tr. 2060:17-2061:8 (8/19/09)), and because peak MTBE concentrations do not appear until several years after the Dependability wells start pumping, the jury could reasonably conclude that a shift in the Dependability wells' startup date would also shift the peak MTBE concentration date.[7]

This evidence alone supported the jury's finding. But the jury also heard Dr. Fogg's testimony that a contaminant may reach its peak concentration "over a period of years to *decades*," depending on groundwater speeds and the scale of the system. (*See* Tr. 1533:5-22 (8/17/09).)[8]

The jury found a peak date (2033) some years later than predicted by Mr. Terry under his revised Analysis 1 scenario (2026). Given the totality of the testimony, however, the jury's finding falls reasonably within the evidence.

## II.    THE JURY'S FINDING THAT MTBE WILL PEAK IN 2033 DOES NOT CHANGE THE TOTAL COST OR DURATION OF TREATMENT.

The jury's finding that the concentration of MTBE will peak in 2033 does not materially change any aspect of the jury's verdict. If anything, the later date indicates the jury's agreement

---

[7]The evidence makes a delay in the start of Dependability pumping not unreasonable. James Roberts testified that the Delaware aqueduct, a major source of New York City water, is leaking 30 to 35 million gallons a day. (*See* Tr. 371:4-10 (8/04/09)) To take that tunnel out of service and repair it, the City may construct a redundant parallel tunnel (*See* Tr. 371:20-372:21 (8/04/09)) that will take around 17 years to build (*See* Tr. 518:10-519:2 (8/05/09)) The City's Capital Commitment Plan Executive Budget (FY 2010) includes a schedule for design and construction of the Delaware Rondout Aqueduct (Parallel Tunnel) showing design costs in 2009 and construction *costs* beginning in 2014 (*See* Tr. 706:19-707:16 (8/06/09); PL-164). The Delaware aqueduct would then be taken out of service sometime between 2026 (at the earliest) and 2031 – and the 55 million gallons of water provided by the dependability wells would then become very necessary.

[8] On the other hand, defendants' Mr. Maguire opined that MTBE impacts in the vicinity of Station 6 would continue to decline. (*See* Tr. 2472:3-21(8/21/09).)

that MTBE will persist for decades, a view supported by Mr. Terry's testimony and shared by Dr. Fogg (*See* Tr. 1561:18-1562:14 (8/17/09)) (MTBE will persist in groundwater for decades). Given the evidence, the jury reasonably determined that the City has not only been injured but that it will need to remove MTBE from its drinking water for decades.

Moreover, the damages award rested on an analysis that used the jury's determination of both peak concentration and peak date. Marnie Bell expressly evaluated the cost of treating MTBE at Station 6 assuming a peak concentration of 10 ppb in 2033 and 9 ppb in other years (*See* Tr. 6014:7-19 (9/30/09)), and found that using those values to calculate operation and maintenance (O&M) costs, added to other cost components, yielded a total treatment cost of $250,450,000 – exactly the total damages figure awarded by the jury. This was approximately $8 million less than the cost of treatment that she calculated by using Terry's Analysis 1 results as inputs (*See* Tr. 5886:5-12 (9/24/09)). Ms. Bell explained that the difference in operating cost stems from the difference in MTBE concentration, not peak date: different concentrations affect "how much time the water needs to be in the vessels," and "[a]t the 35 ppb scenario, you'll have to replace the carbon more frequently." (*See* Tr. 5905:19-5906:7 (9/24/09))

In short, the jury's finding that MTBE concentrations will peak in 2033, rather than 2024, simply does not affect the jury's damages award.

## III.   EVEN IF THE COURT SETS ASIDE THE JURY'S SPECIFIC FINDING, SUBSTANTIAL EVIDENCE SUPPORTS THE VERDICT, THE CITY'S TRESPASS CLAIM AND THE JURY'S DAMAGES AWARD.

### A.   The Court Found As A Matter Of Law That The City Is Presently Injured, And Substantial Evidence Supports The Jury's Injury Finding.

Whether or not the jury's Phase II findings of peak concentration stands, its Phase III verdict should. The City is presently injured as a matter of law and substantial evidence supports the

10

ongoing need to remove MTBE from the City's water for decades to come.  Ruling on

ExxonMobil's second motion for summary judgment based on the statute of limitations, the Court

held:  "there can be no dispute that the City's recurring injury at Station 6 has already begun, even

when the injury is measured in terms of the combined flow from the Station 6 wells," because "the

350 ppb detection at well 6D translates into more than a 35ppb detection in the combined flow of

the Station 6 wells - which is more than 3.5 times higher than the MCL and constitutes an injury as

a matter of law."   *In re MTBE*, 2009 WL 2634749, *4 n. 30 (S.D.N.Y. Aug. 25, 2009).

Evidence supporting this recurring present injury, not just the extent of the City's potential

future injury, was before the jury when it determined ExxonMobil's liability.  This substantial

evidence included  Plaintiff's Exhibit 23233 (*See* Tr. 1974:5-9 (8/19/09 )), which showed MTBE at

350 ppb in well 6D in January 2003 (*See* Tr. 1975:14-21 (8/19/09)), and remaining until 2007 at 77

ppb – and still present as of the last time the well was sampled (*See* Tr. 1976:10-13 (8/19/09)).    All

of the other wells supplying Station 6, except 6C, already contain MTBE as well.  *See* PL 23233.

Mr. Terry concluded that "MTBE *is* present in the groundwater in the vicinity of Station 6" (*See* Tr.

1976:13-15 (8/19/09) ( and that it "[ha]s been present in all of the Station 6 wells in the upper

glacial aquifer at one time or another between 2000 and 2007."  (*See* Tr. 1976:6-8 (8/19/09)).

These detections, including the 350 ppb detection in Well 6D, constitute injury as a matter of law.

*In re MTBE*, 2009 WL 2634749, *4 n. 30; *In re MTBE*, 593 F.Supp.2d 540, 544 (S.D.N.Y. 2008).

Furthermore, as soon as the wells are turned on – regardless of the *eventual* peak concentrations or

dates – Mr. Terry testified that MTBE will be present at significant levels (approximately 21 to 22

ppb) in the wells.   (*See* Tr. 2067:20-2068:1 (8/19/09)).[9]

---

[9] The jury also heard testimony from William Yulinsky that MTBE was detected in Well 6D at
350 ppb in 2003, during a pilot test (*See* Tr. 545:9-18 (8/5/09)) and the same from Mr. Terry (*See*

Neither Mr. Terry's specific model runs, nor a quantified peak date, are necessary to support the jury's conclusion that the City will need to remove MTBE from Station 6 for years.  Indeed, Mr. Terry testified that given the location and density of spills and the location and density of gasoline stations near the Station 6 well field, one wouldn't even "really need to run a transport model to see that MTBE will affect Station 6 in the future." (*See* Tr. 2012:10 -2012:21 (8/19/09)).[10]  Donald Cohen agreed.  (*See* Tr. 2249:11-17 (8/20/09) ("I believe that the MTBE will be there when those wells are turned on.")).  The jury also heard testimony from Marcel Moreau concerning the frequency and severity of MTBE releases from gasoline stations (*See* Tr. 1117:4-23 (8/12/09); *See* Tr. 1335:1-21 (8/13/09); *See* Tr. 1389:4-11, 1451:8-1452:2 (8/14/09)), as well as from Gerry Beckett concerning the universal inadequacy of clean-up efforts at stations near Station 6 (*See* Tr. 1756:7-24; 1781:1-6; 1806:14-1807:12; 1821:22-1822:16 (8/18/09)).  Independent of the jury's specific finding of peak concentration of MTBE in Phase II, the evidence supports the jury's conclusion that MTBE from multiple sources has injured the City and will continue to bedevil Station 6 for years.

Moreover, Ms. Bell testified that if one or more of the Station 6 wells go out of service for any period, the concentrations of MTBE in the remaining wells would likely rise significantly.  (*See*

Tr. 1975:14-21 (8/19/09); *See* Tr. 2234:7-15 (8/20/09)).  Mr. Cohen pointed out that this peak at Well 6D occurred "very shortly after the well was turned on." (*See* Tr. 2241:3-9 (8/20/09)).

[10] (*See* Tr. 2011:12-21 (8/19/09) ("What we can say is that there are sources of MTBE contamination that are very close to Station 6 that are at a medium distance from Station 6 and also farther away from Station 6.  And there's all high density of sources.  I think you can see on the maps there's a lot of different dots on there, a lot of potential sources and a lot of known sources.  What that says to me is that ***you can expect to see MTBE contamination when Station 6 is first turned on, as well as over time as it draws water from farther and farther away***") (emphasis added); *See* Tr. 2012:12-21 ("when I look at the map that shows where these spill locations are, the density of those spill locations, I'm looking at the presence of numerous gasoline stations, and the density of those stations, they're really in 360 degrees all the way around the Station 6 well field.  That really -- no matter the pumping scheme, there are sources in all different directions.  So I don't think that you need to run a transport model ... to see that MTBE will affect Station 6 in the future")).

Tr. 6265:21-24 (10/1/09))   In particular, if Well 6C (which is not at issue in the case and which draws from a different aquifer) goes offline, concentrations in the remaining combined flow would exceed 15 ppb -- a facial violation of the NY State MCL.  (*See* Tr. 5860:10-20 (9/24/09))   As the Court recognized, "that leaves open the possibility of less than all six running at the same time.  So [the jurors] aren't ever bound to 10."  ( *See* Tr. 6658:18-19 (10/7/09))  And even before the jury returned a verdict on the future peak concentration of MTBE, James Roberts testified that Station 6 will cost $250 million to build (*See* Tr. 357:16-19 (8/4/2009)), and evidence showed that MTBE detections in the Station 6 pilot testing phase impelled the construction of Station 6.  (*See, e.g.,  See* Tr. 410:10-410:14 (08/04/09); *See* Tr. 612:13-612:17 (08/06/09); *See* Tr. 790:5-790:12; 791:5-791:7 (08/07/09); *See* Tr. 2240:20-2242:5; 2242:6-2242:1 (08/20/09)); PL 147.   This evidence supports the jury's injury finding even in the absence of expert modeling predicting *future* peak concentrations of MTBE.

Given the Court's ruling on recurring present injury, and the evidence of that injury before the jury, the finding that the City is or will be injured is not only a finding that future MTBE concentrations of 10 ppb are injurious (*see* Phase III Jury Charge at p. 3), but that the City *is presently suffering a recurring injury* because MTBE is already present in the wells.  *This* injury alone, even if the jury's determination of likely future MTBE concentration were unreasonable (and it is not) is enough to support the jury's liability and damages findings.

### B.       The Jury's Trespass Finding and Damages Award Did Not Depend On The Finding That MTBE Would Peak At 10 PPB.

Even if the Court rejects the jury's determination that MTBE will peak at 10 ppb and decides that the City's recurring present injury does not support the jury's liability findings other than trespass, the trespass finding will both stand and will support the full extent of the City's

damages. New York law does not require proof of injury to establish trespass. This is consistent with the Phase III jury questionnaire and allows the verdict on trespass to stand even without a specific finding on peak concentration or timing. *See In re MTBE*, 643 F.Supp. 2d 446, 459 (S.D.N.Y. 2009) (damage is not part of a trespass claim); *see also Kronos, Inc. v. AVX Corp.*, 81 N.Y. 2d 90, 95 (1993) ("landowner's right to be free of trespass," independent of injury); *New York Rubber Co. v. Rothery*, 132 N.Y. 293, 295-96 (1892) (it is error to limit the issue to the interference with the plaintiff's present use of water rights, and to refuse to instruct the jury that plaintiff's right to recover does not depend on showing actual injury); *B. Hill v. Raziano*, 880 N.Y.S. 2d 173, 175 (App. Div. 2009) (plaintiff can recover for trespass independent of injury ); *Burger v. Singh*, 816 N.Y.S. 2d 478, 480 (App. Div. 2006) (same); *Shiffman v. Empire Blue Cross and Blue Shield*, 681 N.Y.S. 2d 511, 512 (App. Div. 1998) (same); *Ligo v. Gerould*, 665 N.Y.S. 2d 223, 224 (App. Div. 1997) (same).[11]

To establish a trespass, the City had only to show that defendants infringed a real property right – not that MTBE would peak at 10 ppb. *See Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) ("Under New York law, trespass is the intentional invasion of another's property"); N.Y. Pattern Jury Instr.--Civil 3:8 (same). As outlined in Plaintiffs' Opposition to Exxon Mobil Defendants' Renewed Motion for Judgment as a Matter of Law (filed May 27, 2010), at p. 26, substantial evidence supports the jury's trespass verdict even in the absence of a specific injury finding.

Second, the jury's damages award can rest on the trespass finding alone, because under New York law, a plaintiff may recover more than nominal damages for trespass even if the full extent of the injury is unproven. "[R]equiring a plaintiff to prove actual injury to recover more than nominal

---

[11] The City reaffirms its objection to the Court's finding that its public nuisance action requires a finding of injury, *see* 10/1/2009 Ruling from the bench, (*See* Tr. 6308:2 – 6309:21 (10/1/09)).

damages for trespass 'would place a premium on trespassing' by 'mak[ing] the position of the

trespasser more favorable than that of one lawfully contracting.'" *Sakele Brothers, LLC v. Safdie,*

302 A.D.2d 20, 27, 752 N.Y.S.2d 626, 632 - 633 (N.Y.A.D. 1 Dept.,2002) (quoting *De Camp v.*

*Bullard,* 159 N.Y. 450, 454 (1899).  Instead, the victim of a trespass is entitled to either restoration

costs or the diminution in value of their property.  *See Jenkins v. Etlinger*, 55 N.Y.2d 35, 38-39

(1982) ("measure of damages for permanent injury to real property is the lesser of the decline in

market value and the cost of restoration").  As the Court of Appeals observed over a century ago,

the effect on the value of the property may be measured by the cost of restoring the resource, even if

the injury cannot be directly quantified:

> If my neighbor remove from my land, by means of a trespass, a load of sand or
> gravel, the act might have no appreciable effect upon the value of the property as a
> whole, and yet I would be entitled to damages, but in that case they would be
> measured by the value of the sand or gravel removed, and the expenses of repairing
> any injury caused by its removal. … There are many cases of injury to real estate
> where the cost of repairing the injury may be the proper measure of damages.

*Hartshorne v. Chaddock*, 135 N.Y. 116, 121-22 (1892); *see also* Jenkins, 55 N.Y.2d at 39-40 (1982)

("That they did not prove their injury under every potentially applicable measure should not operate

to deprive them of recovery. Therefore, the award for the cost of removing the silt must stand").

Here, "while the jury did take into account the cost of treating the contaminated water, that cost *was*

*only used as a proxy to measure 'the value to [the City] of the property before and after the*

*damage*.'  The City was awarded compensatory damages for a loss in property value."  *In re MTBE*,

2010 WL 1924708, * 2 (S.D.N.Y. 2010) (emphasis added).

The City's loss in property value need not depend on the future peak concentration of

MTBE, but may rest entirely on the cost of treating the City's recurring present injury.  *See In re*

*MTBE,* 643 F.Supp.2d 446, 459 (S.D.N.Y. 2009 ("the City's claims relate primarily to future

damages for a present injury, rather than future damages arising from a future injury").  Evidence in

the record supports the amount awarded, even without a specific finding that MTBE would peak at

10 ppb:

- James Roberts' testimony concerning the critical utility of the Queens wells and their value to the City.  (*See* Tr. 340:18- 348:2 (8/04/09));

- James Roberts' testimony during Phase 1 (prior to the jury's finding concerning the extent and severity of the contamination) that Station 6 will cost $250 million. (*See* Tr. 357:16-19 (8/04/09));

- James Roberts' and Donald Cohen's testimony that Station 6 must be built to treat MTBE contamination.  (*See* Tr. 410:10-410:14 (8/04/09));  (*See* Tr. 790:5-790:12; 791:5-791:7 (8/07/09));

- William Meakin's testimony that Station 6's purpose is to deliver high-quality water to the water distribution system.  (*See* Tr. 612:13-612:17 (8/04/09));

- Dr. Fogg's testimony that in the area of Station 6 the "main exit" for MTBE plumes would be the wells, (*See* Tr. 1560:15-1561:4 (8/17/09)), and that MTBE will persist in the aquifer for at least 40 years.   (*See* Tr. 1561:18-1562:14 (8/17/09));

- The testimony of Mr. Moreau and Mr. Beckett concerning the proclivity of gas stations to leak, MTBE's mobility and persistence, the multiplicity of sources in the vicinity of Station 6, and the inadequacy of efforts even to delineate plumes at known release sources (*See* Tr. 1117:4-23 (8/12/09); *See* Tr. 1335:1-21 (8/13/09); *See* Tr. 1389:4-11, 1451:8-1452:2 (8/14/09); *See* Tr. 1756:7-24; 1781:1-6; 1806:14-1807:12; 1821:22-1822:16  (8/18/09)).

- Mr. Terry's testimony that even without running a model, "MTBE will affect Station 6 in the future."  (*See* Tr. 2012:20-21 (08/19/09)).

- Ms. Bell's testimony that the Station 6 treatment plant will cost approximately $250 million to remove MTBE at 10 ppb and $258 million to remove MTBE at 35 ppb, that is, treatment costs will not vary significantly as MTBE levels change because concentration affects the frequency of carbon change-outs (rather than other cost factors).  (*See* Tr. 5905:19-5906:7 (9/24/2009)).

- Dr. Rudo's and Dr. Burns' testimony that MTBE is a probable human carcinogen, is mutagenic, and that even at the lowest levels of exposure in drinking water it can cause a mutation that may lead to cancer. (*See* Tr. 3267:18-3267:24 (9/2/09); Tr. 2803:24-2804:2; 2809:16-17 (8/27/09)).

No matter what the future may hold for precise levels of MTBE in Station 6, evidence of the

cost to restore the City's property to its prior condition supports the jury's damages award, which

should stand whether or not the jury's finding that MTBE concentrations of 10 ppb will occur is upheld.

**IV.   THE JURY IS ENTITLED TO ACCEPT PARTS OF MR. TERRY'S CAPTURE ZONE MODEL AND REJECT OTHERS, AND SUBSTANTIAL EVIDENCE OTHER THAN THE MODEL SUPPORTS THE JURY'S FINDING THAT SPILLS FROM MOBIL-BRANDED STATIONS WOULD AFFECT THE STATION SIX WELLS.**

As discussed *supra*, it is well settled that the jury need not adopt a particular expert's opinion in full, but may elect to adopt only parts of it and weigh it in light of other evidence. *See, e.g., Schroeder v. The Tug Montauk*, 358 F.2d at 488 (fact-finder could "accept or reject *the whole or a part* of each [expert's] testimony") (emphasis added); *Merrill v. United Air Lines, Inc.,* 177 F. Supp. at 705 ("jury may accept or reject all or part of [expert] testimony").  Even if the jury disagreed with Mr. Terry's conclusion about the most likely peak MTBE concentration and date, it was still entitled to accept his conclusions about the extent of the Station 6 capture zone – or, even if not as large as Mr. Terry opined, that it was large enough to encompass at least one ExxonMobil-owned station.

Changes in several different variables could affect the peak date and concentration of MTBE at Station 6 without substantially changing the extent of the capture zone.  Mr. Terry defined the capture zone as "an area underground where water will flow to Station 6 in the future when it's turned on, so *if* there are sources of contamination in that area, those are the sources that potentially can affect water quality at Station 6 in the future."  (*See* Tr. 1895:24-1896:4 (8/18/09) (emphasis added)).  The assumptions Mr. Terry used to develop the capture zone and the assumptions he used to determine the peak date and concentration of MTBE are different: the capture zone depends on "the proposed pumping scenario" for Station 6 and nearby wells (*See* Tr. 1896:1021 (8/18/09)), but the peak date and concentration of MTBE depend on

17

variables including the amount, timing, and location of gasoline spills at sources within the capture zone (*see* Section I, *supra*).  The jury could easily have accepted the proposed pumping scenario on which Mr. Terry's capture zone was based, but modified other variables in addressing peak values and timing. In short, the jury obviously listened to the testimony, drew its own conclusions about the capture zone, and determined that MTBE affecting Station 6 came from Mobil stations.

The evidence readily supports this finding.  Plaintiff's Exhibit 14844A (*See* Tr. 1977:1-16 (8/19/09)) not only illustrates the boundaries of Mr. Terry's proposed capture zone, but also shows several gas stations that are "in close proximity… a few blocks from Station 6[,] that have known gasoline discharges and that have known MTBE releases into the groundwater from those sites." (*See* Tr. 1977:20-23(8/19/09))   These gas stations include "a Mobil station at 113-21 Merrick Boulevard" (*See* Tr. 1978:12 (8/19/09)).  113-21 Merrick is located *inside* the smallest circle on Mr. Terry's map, i.e., within "half a mile from Station 6."  (*See* Tr. 1977:4-6 (8/19/09)). Even defendants' expert Mr. Maguire (who believed that MTBE at Station 6 would "more likely come from a local source" (*See* Tr. 5224:9-13 (9/21/09)) acknowledged that the station was only "about 2000 feet" from the Station 6 wells (*See* Tr. 5175:11-15 (9/21/09)) and that it falls within *every* iteration of Mr. Terry's capture zone, from smallest to largest (*See* Tr. 5241:3-8 (9/21/09)).

Mr. Terry testified that given the high concentrations of MTBE found in the soil and groundwater near 113-21 Merrick (300 parts per billion), a substantial amount of MTBE must have been released at the site ( *See* Tr. 1977:7-1990:3 (8/19/09)). He also testified that "MTBE plumes are thousands of feet long … if there is an MTBE release at a site, given enough time it will form a long plume that extends for thousands of feet" (*See* Tr. 1998:23-1999:2; 2029:3-8 (8/19/09)). The jury also heard Dr. Fogg testify that spills and leaks at gasoline stations often

18

generate plumes that are thousands of feet long (*See* Tr. 1499:18-24 (4500 feet)), ( *See* Tr. 1503:13-21 (7000 feet) (8/17/09)).  Finally, Mr. Beckett testified that none of the MTBE plumes at sites he reviewed – including this one – was characterized adequately as to depth or extent. (*See* Tr. 1749:18-1750:2 (8/18/09)).  Given this testimony, the jury could reasonably conclude that a Mobil station within 2000 feet of the site would generate an MTBE plume that would affect the Station 6 wells, even if it rejected other parts of Mr. Terry's model.[12]

## CONCLUSION

Ample evidence supports the jury's determinations of peak MTBE  concentration in Station 6, and the date on which that will occur.  There is no basis for disturbing the jury's verdict.

Dated: San Francisco, California
         August 20, 2010                              Respectfully submitted,

                                                      MICHAEL A. CARDOZO
                                                      Corporation Counsel of the City of New York
                                                      100 Church Street
                                                      New York, New York 10007
                                                      (212) 788-1568


                                                      ____/s/ *VICTOR M. SHER*
                                                      VICTOR M. SHER (*pro hac vice*)
                                                      TODD E. ROBINS (*pro hac vice*)
                                                      NICHOLAS G. CAMPINS (*pro hac vice*)
                                                      MARNIE E. RIDDLE (*pro hac vice*)

                                                      SHER LEFF LLP
                                                      450 Mission Street, Suite 400
                                                      San Francisco, CA 94105
                                                      (415) 348-8300

---

[12] Although Maguire disagreed that the 113-21 Merrick site would produce a 2,000 foot plume (*See* Tr. 5178:4-13 (9/21/09), he acknowledged that there was still an open petroleum spill on the property that had not yet been cleaned up, the volume of which was unknown (*See* Tr. 5253:24-5254:1; 5255:1-9 (9/21/09)).

*Attorneys for Plaintiffs City of New York, New York Municipal Water Finance Authority, and New York City Water Board*