# EXHIBIT B

114 (Contract of sale for New York office, commercial and multi-family residential premises. 1-86.    Distributed by Julius Blumberg, Inc.
                                                                                                      NYC 10013

Prepared by the Real Property Committee of the Association of the Bar of the City of New York.

*NOTE: This form is intended to cover matters common to most transactions. Provisions should be added, altered or deleted to suit the circumstances of a particular transaction.*

## Contract of Sale — Office, Commercial and Multi-Family Residential Premises

### Table of Contents

Section  1.   Sale of premises and acceptable title

Section  2.   Purchase price, acceptable funds, existing mortgages, purchase money mortgage, escrow of downpayment and foreign persons

Section  3.   The closing

Section  4.   Representations and warranties of seller

Section  5.   Acknowledgements of purchaser

Section  6.   Seller's obligations as to leases

Section  7.   Responsibility for violations

Section  8.   Destruction, damage or condemnation

Section  9.   Covenants of seller

Section 10.   Seller's closing obligations

Section 11.   Purchaser's closing obligations

Section 12.   Apportionments

Section 13.   Objections to title, failure of seller or purchaser to perform and vendee's lien

Section 14.   Broker

Section 15.   Notices

Section 16.   Limitations on survival of representations, warranties, covenants and other obligations

Section 17.   Gains tax and miscellaneous provisions

Signatures and receipt by escrowee

Schedule A.   Description of premises (to be attached)

~~Schedule B. Permitted exceptions~~

~~Schedule C. Purchase price~~

~~Schedule D. Miscellaneous~~

~~Schedule E. Rent schedule arrearages~~

See Rider For Schedules

CONTRACT dated   January   8 , 19 99   between

TARTAN CORP. with an address at 532 Broadhollow Road, Melville, New York  11747
and its affiliated corporations (see annexed schedule) at the same address

("Seller") and

LEON PETROLEUM, LLC with an address at c/o Allen Leon, 36 Marshmallow Drive,
Commack, New York  11725

("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

**Section 1. Sale of Premises and Acceptable Title**

§1.01. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract: (a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building; and (e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, "Premises"). The Premises are located at or known as

See Rider and Schedule A

§1.02. Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to: (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and (b) such other matters as (i) the title insurer specified in Schedule D attached hereto (or if none is so specified, then any title

insurer licensed to do business by the State of New York) shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises and (ii) will be accepted by any lender described in Section 2.74-a of the Real Property Law ("Institutional Lender") which has committed in writing to provide mortgage financing to Purchaser for the purchase of the Premises ("Purchaser's Institutional Lender"), except that if such acceptance by Purchaser's Institutional Lender is unreasonably withheld or delayed, such acceptance shall be deemed to have been given.

**Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons**

§2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises is provided in Schedule C attached hereto is $ See Rider

§2.02. All monies payable under this contract, unless otherwise specified in this contract, shall be paid by (a) certified checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York or (b) official bank checks drawn by any such banking institution, payable to the order of Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of one-half of one percent of the Purchase Price shall be acceptable for any payments to Seller on the closing or at the option of the Seller, by electronic transfer of funds to a bank account designated by Seller.

TARTAN 1903

§2.03. (a) If Schedule C provides for the acceptance of title by Purchaser subject to one or more existing mortgages (collectively, "Existing Mortgage(s)"), the amounts specified in Schedule C with reference thereto may be approximate. If at the Closing the aggregate principal amount of the Existing Mortgage(s), as reduced by payments required thereunder prior to the Closing, is less than the aggregate amount of the Existing Mortgage(s) as specified in Schedule C, the difference shall be added to the monies payable at the Closing, unless otherwise expressly provided herein.

(b) If any of the documents constituting the Existing Mortgage(s) (or the note(s) secured thereby) prohibits or restricts the conveyance of the Premises or any part thereof without the prior consent of the holder or holders thereof ("Mortgagee(s)") or confers upon the Mortgagee(s) the right to accelerate payment of the indebtedness or to change the rate of interest (the "Existing Mortgage(s)) in the event that a conveyance is made without consent of the Mortgagee(s), Seller shall jointly such Mortgagee(s) of the proposed conveyance to Purchaser within 10 days after execution and delivery of this contract, requesting the consent of such Mortgagee(s) thereto. Seller and Purchaser shall furnish the Mortgagee(s) with such information as may reasonably be required in connection with such request and shall otherwise cooperate with such Mortgagee(s) and with each other to no effect expeditiously to procure such consent, but neither shall be obligated to make any payment to obtain such consent. If such Mortgagee(s) shall fail or refuse to grant such consent in writing on or before the date set forth in Schedule D or shall require as a condition of the granting of such consent (i) that additional consideration be paid to the Mortgagee(s) and neither Seller nor Purchaser if willing to pay such additional consideration or (ii) that the terms of the Existing Mortgage(s) be changed and Purchaser is unwilling to accept such change, then unless Seller and Purchaser mutually agree to extend such date or otherwise modify the terms of this contract, Purchaser may terminate this contract in the manner provided in §13.02. If Schedule C provides for a Purchase Money Mortgage (as defined in §2.04), Seller may also terminate this contract in the manner provided in §13.02. If any of the foregoing circumstances occur or if Seller is unwilling to accept any such change in the terms of the Existing Mortgage(s).

§2.04. (a) If Schedule C provides for payment of a portion of the Purchase Price by execution and delivery to Seller of a note secured by a purchase money mortgage ("Purchase Money Mortgage"), such note and Purchase Money Mortgage shall be drawn by the attorney for the Seller on the most recent forms of the New York Board of Title Underwriters for notes and for mortgages of like lien, as modified by this contract. At the Closing, Purchaser shall pay the mortgage recording tax and recording fees therefor and the Closing fees for any financing statements to be filed in connection therewith.

(b) If Schedule C provides for the acceptance of title by Purchaser subject to Existing Mortgage(s) prior in lien to the Purchase Money Mortgage, the Purchase Money Mortgage shall provide that it is subject and subordinate to the lien(s) of the Existing Mortgage(s) and shall be subject and subordinate to any extensions, modifications, renewals, consolidations, substitutions or replacements thereof (collectively, "Refinancing" or "Refinanced Mortgage"), provided that, (i) the rate of interest payable under a Refinanced Mortgage shall not be greater than that specified in Schedule D as the Maximum Interest Rate or, if no Maximum Interest Rate is specified in Schedule D, shall not be greater than the rate of interest that was payable on the refinanced indebtedness immediately prior to such Refinancing, and (ii) if the principal amount of the Refinanced Mortgage plus the principal amount of other Existing Mortgage(s), if any, remaining after placement of a Refinanced Mortgage exceeds the amount of principal owing and unpaid on all mortgages on the Premises superior to the Purchase Money Mortgage immediately prior to the Refinancing, an amount equal to the excess shall be paid at the closing of the Refinancing to the holder of the Purchase Money Mortgage in reduction of principal payments due thereunder in inverse order of maturity. The Purchase Money Mortgage shall further provide that the holder thereof shall, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements reasonably required by the mortgagor to confirm such subordination.

(c) The Purchase Money Mortgage shall contain the following additional provisions:

(i) "The mortgagor or any owner of the mortgaged premises shall have the right to prepay the entire unpaid indebtedness with accrued interest, at any time without penalty, at any time on or after (insert the day following the last day of the fiscal year of the mortgagee in which the Closing occurs or, if a Prepayment Date is specified in Schedule D, the specified Prepayment Date) on not less than 10 days' written notice to the holder hereof."

(ii) "Notwithstanding anything to the contrary contained herein, the obligation of the mortgagor for the payment of the indebtedness and for the performance of the terms, covenants and conditions contained herein and in the note secured hereby is limited solely to recourse against the property secured by this mortgage, and in no event shall the mortgagor or any principal of the mortgagor, disclosed or undisclosed, be personally liable for any breach or default under the note or this mortgage or for any deficiency resulting from or through any proceedings to foreclose this mortgage, nor shall any deficiency judgment, money judgment or other personal judgment be sought or entered against the mortgagor or any principal of the mortgagor, disclosed or undisclosed, but the foregoing shall not adversely affect the lien of this mortgage or the mortgagee's right of foreclosure."

(iii) "In addition to mortgagor's other obligations under Section 274-a of the Real Property Law, the mortgagee, if agrees that, within 10 days after written request by the mortgagor, but not more than twice during any period of 12 consecutive months, it will execute, acknowledge and deliver without charge a certificate of reduction in recordable form (i) certifying as to (1) the then unpaid principal balance of the indebtedness secured hereby, (2) the maturity date thereof, (3) the rate of interest, (4) the last date to which interest has been paid and (5) the amount of any escrow deposits then held by the mortgagee, and (b) stating, to the knowledge of the mortgagee, whether there are any alleged defaults hereunder and, if so, specifying the nature thereof."

(iv) "All notices required or desired to be given under this mortgage shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed to the mortgagor and mortgagee at the addresses specified in this mortgage or to such other parties or at such other addresses, not exceeding two, as may be designated in a notice given to the other party or parties in accordance with the provisions hereof."

(v) The additional provisions, if any, specified in a rider hereto—

§2.05. (a)-(1) The sum paid under paragraph (a) of Schedule C or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") shall by check or checks drawn to the order of and delivered to Seller's attorney or another escrow agent ("Escrowee"), the Escrowee shall hold the proceeds thereof in escrow in a special bank account (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee need not hold such proceeds in an interest-bearing account, nor if any interest is earned thereon, such interest shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereon. The identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final judgment of court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the land is located. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

§2.06. In the event that Seller is a "foreign person", as defined in Internal Revenue Code Section 1445 and regulations issued thereunder (collectively, the "Code Withholding Section"), or in the event that Seller fails to deliver the certification of non-foreign status required under §10.12(c), or in the event that Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price a sum equal to ten percent (10%) thereof and shall at Closing remit the withheld

amount with Forms 8288 and 8288A (or any successors thereto) to the Internal Revenue Service; and if the cash balance of the Purchase Price payable to Seller at the Closing after deduction of net adjustments, apportionments and credits (if any) to be made or allowed in favor of Seller at the Closing shall be provided is less than ten percent (10%) of the Purchase Price, Purchaser shall have the right to terminate this contract, in which event Seller shall refund the Downpayment to Purchaser and shall reimburse Purchaser for title examination and survey costs as if this contract were terminated pursuant to §13.02. The right of termination provided for in this §2.06 shall be in addition to and not in limitation of any other rights or remedies available to Purchaser under applicable law.

**Section 3.   The Closing**

§3.01. Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and time of closing specified in Schedule D (the actual date of the Closing being referred to as "Closing Date" at the place specified in Schedule D.

**Section 4.   Representations and Warranties of Seller**

Seller represents and warrants to Purchaser as follows:

§4.01. ~~Unless otherwise provided in this contract, Seller is the sole owner of the Premises.~~

§4.02. If the Premises are encumbered by an Existing Mortgage(s), no written notice has been received from the Mortgage(s) asserting that a default or breach exists thereunder which remains uncured and no such notice shall have been received and remain uncured on the Closing Date. If copies of documents constituting the Existing Mortgage(s) and note(s) secured thereby have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals and the Existing Mortgage(s) and note(s) secured thereby have not been modified or amended except as shown in such documents. ~~For purposes of this contract, the only mortgage being assumed is that which presently affects the~~ Premises together with all amendments and modifications thereof ~~which is collectively referred to as "Leases") and any tenancies in the Premises not arising out of the Leases (collectively, "Existing~~ cies") set forth in Schedule B attached hereto ("Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Premises other than those set forth therein and any sublease or subtenancies. Except as otherwise set forth in the Rent Schedule or elsewhere in this contract:

(a) all of the Leases are in full force and effect and none of them has been modified, amended or extended;

(b) no renewal or extension options have been granted to tenants;

(c) no tenant has an option to purchase the Premises;

(d) the rents set forth are being collected on a current basis and there are no arrearages in excess of one month;

(e) no tenant is entitled to rental concessions or abatements for any period subsequent to the scheduled date of closing;

(f) Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured;

(g) no action or proceeding instituted against Seller by any tenant of the Premises is presently pending in any court, except with respect to claims involving personal injury or property damage which are covered by insurance; and

(h) there are no security deposits other than those set forth in the Rent Schedule.

If any Leases which have been exhibited to and initialed by Purchaser or its representative contain provisions that are inconsistent with the foregoing representations and warranties, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to the provisions of the Leases.

§4.04. ~~If the Premises or any part thereof are subject to the New York City Rent Stabilization Law, Seller is and/or the~~ Closing Date will be a member in good standing of the Real Estate Industry Stabilization Association, and, except as otherwise set forth in the Rent Schedule, there are no proceedings with any tenant presently pending before the Conciliation and Appeals Board in which a complaint has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the Conciliation and Appeals Board that have not been complied with by Seller.

§4.05. If the Premises or any part thereof are subject to the New York City Emergency Rent and Rehabilitation Law, the rents shown are not in excess of the maximum collectible rents, and, except as otherwise set forth in the Rent Schedule, no tenants are entitled to abatements as senior citizens, there are no proceedings presently pending before the rent commission in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the rent commission that have not been complied with by Seller.

§4.06. ~~If an insurance schedule is attached hereto, such schedule lists all insurance policies presently affording coverage with respect to the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.~~

§4.07. If a payroll schedule is attached hereto, such schedule lists all employees presently employed at the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and, except as otherwise set forth in such schedule, none of such employees is covered by a union contract and there are no retroactive increases or other accrued and unpaid sums owed to any employee.

§4.08. If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is attached hereto, such schedule lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.09. If a copy of a certificate of occupancy for the Premises has been exhibited to and initialed by Purchaser or its representative, such copy is a true copy of the original and such certificate has not been amended, but Seller makes no representation as to compliance with any such certificate.

§4.10. ~~If a assessed valuation and real estate taxes set~~ forth in Schedule D, if any, are the assessed valuation of the Premises and the taxes paid or payable with respect thereto for the fiscal year indicated in such schedule. Except as otherwise set forth in Schedule D, there are no tax abatements or exemptions affecting the Premises.

§4.11. Except as otherwise set forth in a schedule attached hereto, if any, if the Premises are used for residential purposes, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of personal property (or replacements thereof) listed in such schedule, if any, are and on the Closing Date will be owned by Seller free of liens and encumbrances other than the lien(s) of the Existing Mortgage(s), if any.

§4.12. Seller has no actual knowledge that any incinerator, boiler or other burning equipment on the Premises is being operated in violation of applicable law. If copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.13. Except as otherwise set forth in Schedule D, Seller has no actual knowledge of any assessment payable in annual installments, or any part thereof, which has become a lien on the Premises.

§4.14. Seller is not a "foreign person" as defined in the Code Withholding Section.

**Section 5.   Acknowledgments of Purchaser**

Purchaser acknowledges that:

§5.01. Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §3.03, §7.01 and §9.04, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this contract.

§5.02. Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or orally, and/or has express knowledge of,

**Section 6.   Seller's Obligations as to Leases**

§6.01. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld/(a) amend, renew or extend any Lease in any respect, unless required by law; (b) grant a written lease to any tenant occupying space pursuant to a Tenancy; or (c) terminate any Lease or Tenancy except by reason of a default by the tenant thereunder. (x delayed)

§6.02. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant without first giving Purchaser written notice of the identity of the proposed tenant, together with (a) either a copy of the proposed lease or a summary of the terms thereof in reasonable detail and (b) a

*[handwritten margin notes:]* ex. 1064-56 Hempstead Turnpike, East Meadow

**TARTAN 1905**

statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof. If Purchaser fails to accept such proposed lease, Purchaser shall so notify Seller within 4 business days after receipt of Seller's notice if such notice was personally delivered to Purchaser, or within 7 business days after the mailing of such notice by Seller to Purchaser, in which case Seller shall not enter into the proposed lease. Unless otherwise provided in a schedule attached to this contract, Purchaser shall pay to Seller at the Closing, in the manner specified in §2.02, the rent and additional rent that would have been payable under the proposed lease from the date on which the tenant's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less the amount of the brokerage commission specified in Seller's notice and the reasonable cost of decoration or other work required to be performed by the landlord under the terms of the proposed lease to suit the premises to the tenant's occupancy ("Reletting Expenses"), prorated in each case over the term of the proposed lease and apportioned as of the Closing Date. If Purchaser does not so notify Seller of its objection, Seller shall have the right to enter into the proposed lease with the tenant identified in Seller's notice and Purchaser shall pay to Seller, in the manner specified in §2.02, the Reletting Expenses, prorated in each case over the term of the lease and apportioned as of the later of the Closing Date or the rent commencement date. Such payment shall be made by Purchaser to Seller at the Closing. In no event shall the amount so payable to Seller exceed the sums actually paid by Seller on account thereof. **reasonably**

§6.03. If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this contract. Seller shall not grant any concessions or rent abatements for any rental following the Closing without Purchaser's prior written consent. Seller shall not apply to any part of the security deposit of any tenant unless such tenant has vacated the Premises.

§6.04. Seller does not warrant that any particular Lease or Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing ~~by reason of the tenant's default~~ shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

~~§6.05. Seller hereby indemnifies and agrees to defend Purchaser against any claims made pursuant to §7-107 or §7-108 of the General Obligations Law (the "GOL") by tenants who resided in the Premises on or prior to the Closing Date other than (a) claims with respect to security deposits paid, credited or assigned to Purchaser pursuant to §10.03; (b) claims made pursuant to §7-107 of the GOL with respect to funds for which Seller was liable, and (c) claims made pursuant to §7-108 of the GOL by tenants to whom Purchaser failed to give the written notice specified in §7-108(e) of the GOL within thirty days after the Closing Date. The foregoing indemnity and agreement shall survive the Closing and shall be in lieu of any escrow permitted by §7-108(d) of the GOL, and Purchaser hereby waives any right it may have to require any such escrow.~~

Section 7. — Responsibility for Violations

§7.01. Except as provided in §7.02 and §7.03, all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued up to the date of this contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing, pursuant to the Administrative Code of the City of New York, if applicable, shall be removed or complied with by Seller. If such removal or compliance has not been completed prior to the Closing, Seller shall pay to Purchaser at the Closing the reasonably estimated unpaid cost to effect or complete such removal or compliance, and Purchaser shall be required to accept title to the Premises subject thereto, except that Purchaser shall not be obliged to accept such title and may terminate this contract as provided in §13.02 if (a) Purchaser's Institutional Lender reasonably refuses to provide financing by reason thereof or (b) the Building is a multiple dwelling and either (i) such violation is rent impairing and causes rent to be unrecoverable under Section 302-a of the Multiple Dwelling Law, or (ii) a proceeding has been validly commenced by tenant(s) and is pending with respect to such violation for a judgment affecting deposit and use of rents under Article 7-A of the Real Property Actions and Proceedings Law. All such notes or notices of violations noted or issued on or after the date of this contract shall be the sole responsibility of Purchaser.

§7.02. If the reasonably estimated aggregate cost to remove or comply with any violations or liens which Seller is required to remove or comply with pursuant to the provisions of §7.01 shall exceed the Maximum Amount specified in Schedule D (or if none is so specified, the Maximum Amount shall be one-half of one percent of the Purchase Price), Seller shall have the right to cancel this contract, in which event the sole

liability of Seller shall be as set forth in §13.02, unless Purchaser elects to accept title to the Premises subject to all such violations or liens, in which event Purchaser shall be entitled to a credit of an amount equal to the Maximum Amount against the monies payable at the Closing.

§7.03. Regardless of whether a violation has been noted or issued prior to the date of this contract, Seller's failure to remove or fully comply with any violation which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use of occupancy shall not be an objection to title. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, except that if Purchaser's Institutional Lender reasonably refuses to provide financing by reason of a violation described above, Purchaser shall not be required to accept the Premises subject thereto and Purchaser shall have the right to terminate this contract in the manner provided in §13.02.

§7.04. If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

Section 8. — Destruction, Damage or Condemnation

§8.01. The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this contract.

Section 9. — Covenants of Seller

Seller covenants that between the date of this contract and the Closing:

§9.01. The Existing Mortgage(s) shall not be amended or supplemented or prepaid in whole or in part. Seller shall pay or make, as and when due and payable, all payments of principal and interest and all deposits required to be paid or made under the Existing Mortgage(s). **at 1864 Hempstead Tpke.**

~~§9.02. Seller shall not modify or amend any Service Contract~~ **East tract or enter into any new service contract unless the same is terminable without penalty by the then owner of the Premises upon not more than 30 days' notice.** **Meado**

§9.03. If an insurance schedule is attached hereto, Seller shall maintain in full force and effect until the Closing the insurance policies described in such schedule or renewals thereof ~~for no more than one-year of those expiring before the Closing.~~

§9.04. No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing. **or delayed**

§9.06. Seller shall allow Purchaser or Purchaser's representatives access to the Premises, the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

Section 10.  Seller's Closing Obligations

At the Closing, Seller shall deliver the following to Purchaser:

~~§10.01. A statutory form of bargain and sale deed with-out covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law,~~ **and properly executed in proper form for recording so as to convey the required** ~~by this contract.~~

§10.02. All Leases initialed by Purchaser and all others in Seller's possession.

~~§10.03. A schedule of all security deposits (and, if the Premises contain six or more family dwelling units, the most recent reports with respect thereto issued by each banking organization in which they are deposited pursuant to GOL §7-103) and a check or credit to Purchaser in the amount of any cash security deposits, including any interest thereon, held by Seller on the Closing Date or, if held by an Institutional Lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments of transfer or assignment with respect to any security deposits which are other than cash.~~

§10.04. A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.05. All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller

§10.06. Assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in those Service Contracts, insurance policies, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and not assignable by Seller.

§10.07. (a) Written consent(s) of the Mortgagee(s), if required under §2.01(b), and (b) certificate(s) executed by the Mortgagee(s) in proper form for recording and certifying (i) the amount of the unpaid principal balance thereof, (ii) the maturity date thereof, (iii) the interest rate, (iv) the last date to which interest has been paid thereon and (v) the amount of any escrow deposits held by the Mortgagee(s). Seller shall pay the fees for recording such certificate(s). Any Mortgagee which is an Institutional Lender may furnish a letter complying with Section 274-a of the Real Property Law in lieu of such certificate.

§10.08. An assignment of all Seller's right, title and interest in escrow deposits for real estate taxes, insurance premiums and other amounts, if any, then held by the Mortgagee(s).

§10.09. All original insurance policies, with respect to which premiums are to be apportioned or, if unobtainable, true copies or certificates thereof.

§10.10. To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.11. Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name.

§10.12(a) Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof. (b) the Transfer Assessment and Return Statement of No Tax Due or affidavit (whichever is applicable) and the checks and other items (if any) required under §10.12(a), and (c) a certification of non-foreign status, in form required by the Code Withholding Section, signed under penalty of perjury. Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

§10.13. (10.1) To the extent they are then in Seller's possession, copies of current painting and repair records. Seller shall make all other building plans and tenant files and records available to Purchaser as co-owner of files with Seller.

§10.14. An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises to Purchaser and directing that rents and other payment thereafter be sent to Purchaser or as Purchaser may direct.

§10.15. Notice(s) to the Mortgagee(s), executed by Seller or by its agent, advising of the sale of the Premises to Purchaser and directing that future bills and other correspondence should thereafter be sent to Purchaser or as Purchaser may direct.

§10.16. If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deed referred to in §10.01 shall also contain a recital sufficient to establish compliance with such law.

§10.17. Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

§10.18. Any other documents required by this contract to be delivered by Seller.

## Section 11.   Purchaser's Closing Obligations

At the Closing, Purchaser shall:

§11.01. Deliver to Seller checks in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12, plus the amount of escrow deposits, if any, assigned pursuant to §10.08.

§11.02. Deliver to Seller a Purchase Money Mortgage, if any, in proper form for recording, the note secured thereby, financing statements covering personal property, fixtures and equipment included in this sale and replacements thereof, all properly executed and Purchaser shall pay the mortgage recording tax and recording fees for any Purchase Money Mortgage.

§11.03. Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claim made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.03 and the Rider hereto.

and other applicable documents.

§11.04. Cause the deed to be recorded, duly complete and required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.05. Deliver any other documents required by this contract to be delivered by Purchaser.

## Section 12.   Apportionments

§12.01. The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a) prepaid rents and Additional Rents (as defined in §12.03);                    Only East Meadow mortgage

(b) interest on the Existing Mortgage(s), if applicable

(c) real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(d) wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises whose employment was not terminated at or prior to the Closing;

(e) value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes; and gasoline

(f) charges under transferable Service Contracts or permitted renewals or replacements thereof;

(g) permitted administrative charges, if any, on tenants' security deposits;

(h) dues to rent stabilization association, if any;

(i) insurance premiums on transferable insurance policies listed on a schedule hereto or permitted renewals thereof;

(j) Retelling Expenses under §6.02, if any; and

(k) any other items listed in Schedule D.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02. If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority: (a) first to the month preceding the month in which the Closing occurred; (b) then to the month in which the Closing occurred; (c) then to any month or months following the month in which the Closing occurred; and (d) then to the period prior to the month preceding the month in which the Closing occurred. If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

§12.03. If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing, which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing.

## Section 13.   Objections to Title, Failure of Seller to Perform and Vendee's Lien

§13.01. Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days or until the expiration date of any written commitment of Purchaser's Institutional Lender delivered to Purchaser prior to the scheduled date of Closing, whichever occurs first, to remove any defects in or objections to title noted in such title report or any other defects or objections which may be disclosed on or prior to the Closing Date.   *with First

§13.02. If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of American this contract or if Purchaser shall have any other grounds under this contract for refusing to consummate the purchase Title provided for herein, Purchaser, nevertheless, may elect Insurance to accept such title as Seller can convey with a credit Company against the monies payable at the Closing equal to the reasonably estimated cost to cure the same (up to the Maximum Expense described below), but without any other credit or liability on the part of Seller. If Purchaser shall not elect to accept such Pur-

chaser may terminate this contract and the sole liability of Seller shall be to refund the Downpayment to Purchaser and to reimburse Purchaser for the net cost of title examination, but not to exceed the net amount charged by Purchaser's title company therefor without issuance of a policy, and the net cost of updating the existing survey of the Premises or the cost of a new survey of the Premises if these was no existing survey or the existing survey was not capable of being updated and a new survey was required by Purchaser's institutional Lender. Upon such refund and reimbursement, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in Schedule D (or if none is so specified, the Maximum Expense shall be one-half of one percent of the Purchase-Price) to cure any title defect or to enable Seller otherwise to comply with the provisions of this contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to the extent of the monies payable at the Closing, mortgages on the Premises, other than Existing Mortgages, of which Seller has actual knowledge.

§13.03. Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against the corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request and a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §2.02. If Purchaser's title insurance company is willing to insure both Purchaser and Purchaser's Institutional Lender, if any, that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, unless Purchaser's Institutional Lender reasonably refuses to accept such insurance in lieu of actual payment and discharge, Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such funds or assurances as to any such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed to so insure shall not be considered objections to title.

§13.04. If Purchaser shall default in the performance of its obligation under this contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain.

§13.05. Purchaser shall have a vendee's lien against the Premises for the amount of the Downpayment, but such lien shall not continue after default by Purchaser under this contract.

### Section 14.   Broker

§14.01. If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D. If no broker is specified in Schedule D, the parties acknowledge that this contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

### Section 15.   Notices

§15.01. All notices under this contract shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed as set forth in Schedule D, or as Seller or Purchaser shall otherwise have given notice as herein provided.

### Section 16.   Limitations on Survival of Representations, Warranties, Covenants and other Obligations

§16.01. Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of

no action based thereon shall be commenced after the Closing. The representations, warranties, covenants and other obligations of Seller set forth in §4.03, §6.01 and §6.02 shall survive until the Limitation Date specified in Schedule D (or if none is so specified, the Limitation Date shall be six months after the Closing Date), but no action based thereon shall be commenced after the Limitation Date.

§16.02. The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

### Section 17.   Gains Tax and Miscellaneous Provisions

§17.01. If consent of the Existing Mortgagee(s) is required under §2.03(b), Purchaser shall not assign this contract or its rights hereunder without the prior written consent of Seller. No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§17.02. This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03. This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§17.04. The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§17.05. This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.06. This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§17.07. As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.08. If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail. Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

§17.09. (a) Seller and Purchaser agree to comply in a timely manner with the requirements of Article 31-B of the Tax Law of the State of New York and the regulations applicable thereto, as the same from time to time may be amended (collectively, the "Gains Tax Law"). Purchaser agrees to deliver to Seller a duly executed and acknowledged Transferee Questionnaire simultaneously with the execution of this contract or within five (5) business days after subsequent written request from Seller or Seller's attorney. At the Closing, Seller shall deliver (i) an official Statement of No Tax Due or (ii) an official Tentative Assessment and Return accompanied by a certified check or official bank check drawn on any banking institution described in §2.02(b), payable to the order of the State Tax Commission in the amount of the tax shown to be due thereon (it being understood, however, that if Seller has duly elected to pay such tax in installments, the amount so required to be paid shall be the minimum installment of such tax then permitted to be paid), or (iii) if applicable, a duly executed and acknowledged affidavit in form permitted under the Gains Tax Law claiming exemption thereupon.

(b) Seller agrees (i) to pay promptly any installment(s) or additional tax due under the Gains Tax Law, and interest and penalties thereon, if any, which may be assessed or due after the Closing, (iii) to indemnify and save the Purchaser harmless from any against any of the foregoing and any damage, liability, cost or expense (including reasonable attorneys' fees) which may be suffered or incurred by Purchaser by reason of the non-payment thereof, and (iii) to make any other payments and execute, acknowledge and deliver such further documents as may be necessary to comply with the Gains Tax Law.

(c) If this contract is assignable by Purchaser, no assignment of any rights hereunder shall be effective unless every assignee and assignor complies in a timely manner with the requirements of the Gains Tax Law applicable to the

**TARTAN 1908**

~~livers to Seller at or before the Closing the applicable items referred to in subparagraph (a) of this Section, all as may be required as a prerequisite to the recording of the deed. In addition to making the payments and delivering the instruments and documents referred to above, Purchaser and any assignor or assignee of this contract shall promptly (i) make any other payments and (ii) execute, acknowledge and deliver such further documents and instruments as may be necessary to comply with the Gains Tax Law.~~

~~(d) Purchaser, if request is made within a reasonable time prior to the Closing Date, shall provide at the Closing a separate certified or official bank check drawn on any banking institution described in §2-12(a) in the amount of the tax shown to be due on the official Tentative Assessment and Return, which amount shall be credited against the balance of the Purchase Price payable at the Closing.~~

~~(e) The provisions of this §12.09 shall survive the delivery of the deed.~~

Except for Schedule A, all schedules referred to in this printed form contract should be disregarded. See rider for schedules annexed thereto.

See rider annexed hereto and made part hereof.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date first above written.

Seller: TARTAN CORP. and its affiliated
corporations (see annexed schedule)

By: _____
Stanley Kleinberg, President

By: _____
Robert Tepper, Vice-President

Purchaser: LEON PETROLEUM, LLC

By: _____
Allen Leon, Managing Member

_____
ALLEN LEON

_____
STEVEN LEON

Receipt by Escrowee

~~The undersigned Escrowee hereby acknowledges receipt of $_____, by check subject to collection, to be held in escrow pursuant to §2.05.~~

See signature page to Rider annexed hereto

**TARTAN 1909**

### RIDER TO CONTRACT OF SALE

Seller:                TARTAN CORP.

Purchaser/Buyer:       LEON PETROLEUM, LLC

Date:                  January  8 , 1999

Subject to the terms hereof, Tartan Corp. and/or its affiliated corporations (see annexed schedule) shall sell and Leon Petroleum, LLC in which Allen Leon and Steven Leon control and own a One Hundred (100%) interest ("Buyer" or "Purchaser") shall purchase, the assets of Tartan Corp. and its affiliated corporations (collectively known as "Tartan" or "Seller") as more fully described below for the price and upon the terms as follows:

1)    Assets:  All real estate owned in fee and all leases to real property, together with all trade fixtures, equipment, storage tanks and personal property owned or leased by Tartan, free and clear of all mortgages, title encumbrances and liens except as otherwise provided but subject to the rights of any Master Landlord as hereinafter defined.  The locations of the fee properties ("Fee Properties") and leased properties ("Leased Properties") are annexed hereto as Schedule "A" (collectively "Properties" or "Premises").  A schedule of the trade fixtures, equipment, storage tanks and personal property owned by Tartan is annexed hereto as Schedule "B".

2)    Purchase Price:  The price shall be        Redacted        Redacted        Dollars, payable at Closing by, at the option of Seller, certified or bank check, or electronic transfer to Seller's bank account, drawn on a bank having an office in New York State.

3)    Downpayment:  The sum of        Redacted        rs from Purchaser payable simultaneously with execution hereof by certified, bank or attorney's check to the Escrowee (as hereinafter defined) to be held in accordance with this Agreement.

4)    a)   Lease Consents:  Seller shall commence obtaining any necessary consents to assign the Leased Properties if required under the terms of any Master Lease as hereinafter defined.  In addition, Purchaser shall commence obtaining the consents from Master Lessors further described in the environmental security provisions of ¶ 10(a)(i) herein.  In the event the assignment of Seller's interest in the lease for any respective Leased Property where Seller is the tenant ("Master Lease" or "Over-Lease"), requires, by its terms, consent of the Landlord under the Master Lease ("Master Landlord") and such consent is being withheld or delayed by the Master Landlord (of which Purchaser shall be notified of), the following shall apply at Seller's option:

1

**TARTAN 1910**

i) Seller shall be given a reasonable adjournment to obtain said consents;

ii) In the event the provisions of any Master Lease state that the Master Landlord's consent may not be unreasonably withheld (or delayed), then at Seller's option, Purchaser shall accept assignment of the Master Lease and Seller shall defend, indemnify and hold Purchaser harmless for a period of eighteen (18) months from the date of closing against any action by Master Landlord to terminate Purchaser's interest in the Master Lease by reason of Master Landlord's claim that the assignment was invalid; and/or

iii) If the provisions of any Master Lease effectively state that Master Landlord may arbitrarily and/or unreasonably withhold consent or Landlord is unsuccessful in any action or proceeding against the Master Landlord (including Landlord's option to appeal any adverse determination) pursuant to the foregoing ¶ (4)(a)(ii), Seller shall elect from the following options: A) The purchase price shall be appropriately adjusted by the amount of the purchase price attributable to that property as described on Schedule "C" and, if applicable, the property shall be assigned back to Seller (any amount on Schedule "C" in parenthesis is a negative amount resulting in a credit to Seller); or B) The property shall be assigned back to Seller, if applicable, Purchaser shall pay the entire Purchase Price and Seller and Purchaser shall enter into a management agreement, to be negotiated in good faith, with Purchaser as manager, and the Management Agreement shall include, but not be limited to, Purchaser's agreements, assumptions, covenants, representations, obligations, indemnities, releases, warranties and personal guarantees contained herein ("Management Agreement"). Purchaser shall be an independent contractor. Seller's expenses including, rent, additional rent, real estate taxes, insurance and other obligations

2

TARTAN 1911

relating to the applicable Property and Master Lease, shall be paid for first out of income and Purchaser shall retain the balance of any income. Notwithstanding, in the event there is insufficient income to pay all or any of Seller's expenses, Purchaser, Allen Leon and Steven Leon shall be obligated to pay same. The Management Agreement shall be for a term equivalent to the applicable Master Lease and any options thereunder. Seller shall exercise any Master Lease options if required by Purchaser in writing. The Management Agreement shall be terminated in the event of an uncured default by Purchaser.

A schedule of Master Leases is set forth in Schedule H hereto.

b)    Amoco Consents:  Within fifty (50) days hereof, Purchaser shall provide applicable assignment consents from Amoco Oil Company ("Amoco") for Amoco subleases designated on Schedule "A".

c)    Master Lease Personal Guarantees:  Allen Leon and Steven Leon shall personally guarantee any Master Lease, in the form as requested by any Master Landlord, if same was personally guaranteed by Barry Tallering.

d)    Master Lease Provisions:  Purchaser shall comply with the conditional provisions of any Master Lease required by Master Landlord so that the applicable Master Landlord shall provide consent for an assignment and Purchaser shall otherwise comply with reasonable requests from any Master Landlord e.g. Master Lease for 200 Hillside Avenue, New Hyde Park, New York requires assignee to pay security equivalent to two (2) months rent.

e)    Master Lease Modifications:  Seller may not agree to material modifications of the Master Lease to obtain consents from Master Landlords without consent of Purchaser. Purchaser shall be notified of any modifications requested by a Master Landlord.  Purchaser shall not unreasonably withhold or delay consent to modifications necessary to obtain said consents.

5)    Title:

Seller shall give and Purchaser shall accept, such title as First American Title Insurance Company shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract. Permitted exceptions shall include, without limitation, those described on Schedule "D" hereto. Subject to the foregoing, in the event Purchaser has

3

**TARTAN 1912**

permissible objections, Purchaser shall notify Seller in writing at least thirty (30) days prior to closing of title of said objections to title and the Seller shall have a reasonable time to remove same.  Seller shall not be required to bring any actions or proceedings or expend any monies in excess of Ten Thousand ($10,000.00) Dollars per property to remove these permitted objections to title but shall have the option to elect to do so.  In the event the Seller shall be unable to remove the permitted objections, subject to the encumbrances and exceptions herein specifically enumerated, Purchaser shall, at Purchaser's election, have the right to accept such title as Seller is able to convey, without any claim on the part of the Purchaser for abatement except Purchaser shall receive a credit of the said $10,000.00 required expenditure by Seller less that portion of same that Seller incurred.  In the event Purchaser elects not to accept such title as Seller is able to convey without an abatement, at Seller's option, Seller shall elect from the following with respect to any applicable Property:

       a)    Purchaser shall pay the entire Purchase Price and Seller and Purchaser shall enter into a Management Agreement, to be negotiated in good faith, with Purchaser as manager, the terms and provisions of which are further described in ¶ 4a)iii) herein except the term thereof shall be for the term of any action or proceeding that Seller commences to remove any objections to title.  Seller's attorney shall hold in escrow, the amount, if any, allocated to any applicable Property set forth in Schedule C.  Escrowee shall hold the money pending determination of any action or proceeding and based upon such determination, the money shall be distributed to the appropriate party. · In the event any applicable Property has a negative value as indicated by parentheticals on Schedule "C" and notwithstanding that Seller may not transfer any applicable Property to Purchaser, such Property(ies) shall be deemed included as one or more of the Additional Properties defined in ¶ 9 herein.  During the term of the Management Agreement, Seller's expenses, including, rent, additional rent, real estate taxes, insurance and other obligations relating to the applicable Property and Master Lease, shall be paid for first out of income and Purchaser shall retain the balance of any income.  Purchaser shall be an independent contractor;

       b)    Seller shall have the right to rescind this contract as it relates to the applicable Property, and Purchaser shall receive a credit to the purchase price applicable to that Property as set forth on Schedule "C" or if the Property has a negative value as indicated by parentheticals on Schedule "C" and notwithstanding that Seller may not transfer any applicable Property to Purchaser, such Property(ies) shall be deemed included as one or more of the Additional Properties defined in ¶ 9 herein.  Purchaser shall be reimbursed the applicable reasonable net cost of title examination and survey for that Property; or

       c)    In the event Seller cannot remove objections to title after diligent efforts, Purchaser shall accept a quit claim deed with appropriate assignment of Seller's rights under the applicable title insurance policy.

4

**TARTAN 1913**

6)     Closing:

(a)   "Closing" means the settlement of the obligations of Seller and Purchaser to each other under the contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of Bargain and Sale with Covenant deeds in proper statutory short form for recording, and assignments of leases, all duly executed and acknowledged, so as to convey to Purchaser fee simple title or all of Seller's right, title and interest to the Leases (subject to Seller's security interest) for all the Properties in accordance herewith. Delivery and acceptance thereof shall be considered full compliance with the terms hereof by Seller. Additionally, Seller shall deliver one or more duly executed bills of sale in the form as annexed hereto, for any equipment, fixtures, personalty and storage tanks owned by Seller. Purchaser shall pay any sales tax due thereon and defend, hold harmless and indemnify Seller (as defined in ¶ 9A herein) against any claim, demand, action, proceeding, penalties, interest, fines or judgment relating thereto.

(b)(i)   Supplementing Section 12 of the printed form, at Closing, the parties shall make customary adjustments including, without limitation, rents, real estate taxes, merchandise inventory, prepaid tank insurance premiums from Seller's tenants set forth on Schedule J if the tenants are still in possession on the Closing date, security deposits and rent or lease payments relating to ¶ 19(ix) herein, utility deposits, other additional rents and petroleum products inventory. Price of inventory shall be Seller's costs. Lease securities shall be transferred and are set forth on Schedule G hereto subject to same being returned or being applied to rent and/or additional rent in arrears between the date hereof and Closing. Purchaser shall furnish Seller a credit for Master Lease securities (additionally set forth on said Schedule G hereto) plus interest thereon if applicable. With the exception of the current tenant at 1007 Jericho Turnpike, Smithtown, N.Y., if any of Seller's tenants are in arrears in the payment of rent and/or additional rent excluding deficiency payments relating to gasoline shortfall, on the Closing date, Purchaser shall credit Seller with the amount of said arrears and Seller shall assign to Purchaser, all of its rights and claims against such tenants. Purchaser shall reimburse Seller the amount of $1,850.00 for work performed at the North Babylon Premises.

(b)(ii) At Closing, Purchaser shall pay to Seller, the amount of any costs and expenses relating to environmental contamination and any other environmental conditions paid by Seller between the date hereof and Closing. In the event Seller has not received an invoice by Closing, then upon Purchaser's receipt of an invoice from Seller subsequent to Closing, Purchaser shall immediately pay to Contractor directly (and provide proof of payment to Seller), such unreimbursed costs and expenses incurred by Seller between the date hereof and Closing. At Closing, this sum shall be paid in the same manner as the Purchase Price as described in ¶ 2 herein. Costs and expenses relating to standard periodic fixed costs shall not require consent of Purchaser prior to Seller incurring and/or paying same. Non-standard costs and expenses relating to additional governmental requirements shall require the consent of Purchaser prior to Seller incurring same, consent not to be unreasonably withheld or delayed. Notwithstanding, Seller may nonetheless comply with said governmental requirements without waiver of its rights to seek reimbursement from Purchaser. No employee salaries of Seller or costs incurred relating to a pending lawsuit that would not otherwise have been incurred to remediate the Properties, shall be credited to Seller as part of this sub-paragraph (b)(ii).

5

TARTAN 1914

(c)   Closing will take place at the office of Louis Algios, Esq., (or upon reasonable prior notice, at Purchaser's lender) on or about seventy (70) days subsequent to the date hereof.

7)   Liquidated Damages:

(a)   In the event of the default hereunder by Seller, inasmuch as there is no accurate way to determine the amount of damages that may be sustained by Purchaser, the parties hereto agree that Seller shall pay Purchaser as liquidated damages, the sum o:  *Redacted* . The parties agree that the foregoing constitute a fair and reasonable amount of damages under the circumstances and is not a penalty.  Thereafter, neither party shall have any further claim against the other party with regard to this agreement.  In the event the purpose of Seller's default and termination of this contract is to sell the Properties to another buyer, Seller and Purchaser shall terminate the Employment Agreement defined in ¶ 7(b) herein and within thirty (30) days thereof, pay Allen Leon the Separation Payment defined in ¶ 7(b) herein.

(b)   Except as otherwise expressly provided in ¶ 7(c) below, in the event of a default hereunder by Purchaser, inasmuch as there is no accurate way to determine the amount of damages that may be sustained by Seller. the parties hereto agree that Purchaser shall pay Seller as liquidated damages, the sum of  *Redacted*  Dollars including the Downpayment hereunder which shall be paid by Escrowee to the Seller.  The balance of *Redacted*  shall be paid by Allen Leon hereby waiving, in the event of said default, all rights and claims against Tartan that he may have at law and under the Employment Agreement ("Employment Agreement") dated December 24, 1996 between Tartan and Allen Leon including but not limited to, the Separation Payment in the amount of *Redacted*  Dollars as defined in the Employment Agreement.  Thereafter, neither party shall have any further claim or obligation as against the other party with regard to this Agreement.  The parties agree that the foregoing constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(c)   In the event Purchaser has complied with ¶ 16 herein and does not receive a loan commitment from Chase Manhattan Bank, N.A. within fifty (50) days hereof, the parties agree as follows:

i)   The sum of  *Redacted* rs from the Downpayment being held hereunder shall be paid to Purchaser;

ii)   The balance of the Downpayment in the sum *Redacted* Dollars shall be paid to Seller; and

6

**TARTAN 1915**

(iii)  Allen Leon hereby waives all rights and claims against Tartan that he may have at law and under the Employment Agreement, including but not limited to, the Separation Payment in the amount of [ Redacted ] Dollars as defined in the Employment Agreement except in the event of the following: A) Purchaser, Allen Leon and Steven Leon furnish Seller ("Seller" as defined in ¶ 9A herein) a general release of all claims Purchaser, Allen Leon and Steven Leon may have against Seller ("Seller" as defined in ¶ 9A herein) from the beginning of the world to the date of termination, including without limitation, relating to Seller's termination of this agreement; and B) Allen Leon continues in the employ of Seller in accordance with the Employment Agreement which Allen Leon and Tartan expressly agree shall be amended to reduce the Separation Payment from *Redacted*

Thereafter, this contract shall be terminated and deemed null and void and neither party shall have any further claim against the other party except as is otherwise provided in ¶¶ 7(d) and 27 herein. Inasmuch as there is no accurate way to determine the amount of damages that may be sustained by Seller, the parties agree that the foregoing constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty. Notwithstanding anything else contained herein to the contrary and without prejudice to, or waiver of any of Seller's rights and remedies contained in ¶ 7(b) above, this Contract of Sale is not conditioned on financing and in the event Purchaser does not obtain financing in accordance with ¶ 16 herein, Purchaser expressly agrees that ¶¶ 7(c) (ii) and 7(c)(iii) above shall be applicable and Purchaser shall forfeit the amounts set forth therein.

     d)    The parties agree that in the event of any legal action or proceeding relating to this ¶ 7, the non-prevailing party shall pay to the prevailing party, attorney's fees, costs and disbursements incurred by the prevailing party in such action or proceeding.

    8)    <u>Use and Occupancy</u>: Notwithstanding anything to the contrary contained herein, the Properties shall be sold "as is" subject to all tenancies and all governmental laws, ordinances, rules and regulations that affect use and occupancy, including without limitation, violations relating thereto. Purchaser represents and acknowledges that Purchaser is not relying on any information, representations and/or warranties given by Seller, knows the condition of the Properties and Additional Properties hereinafter defined; and is fully familiar with all leases and any other agreements relating to the Properties and Additional Properties hereinafter defined or that are otherwise being assigned and/or assumed.

7

**TARTAN 1916**

9)    Environmental (includes 9A through 9G inclusive):

9.A.)    Allen Leon, Steven Leon, Purchaser and any assignee thereof (collectively "Purchaser" for purposes of ¶ 9) shall defend, indemnify and hold harmless, Tartan, its employees, officers, directors, shareholders, successors, assigns, agents and representatives, including the Estate of Arnold Barry Tallering, its beneficiaries, distributees and executors (collectively "Tartan" or "Seller" for purposes of this ¶ 9) against any and all liabilities, losses, costs, expenses, penalties, fees (including attorney's fees), fines, judgments, claims, suits, orders, recoveries and damages relating directly or indirectly to any contamination at, beneath or offsite of, the Properties and the additional properties located at 303 Main Road, Greenport; 927 Jericho Turnpike, Smithtown; and 140 Little East Neck Road, West Babylon ("Additional Properties" or "Additional Property") except for certain limited third party liability as specifically defined in ¶ 9F herein. Notwithstanding anything to the contrary contained herein, Purchaser shall not have any claim against Seller for any costs and expenses. Purchaser agrees to perform such remediation as is required to bring each of the Premises and Additional Properties into compliance with applicable federal, state and local laws, ordinances, rules and regulations and to obtain closure of all New York State Department of Environmental Conservation ("DEC") spill files and unconditional "no further action" letters from DEC or the then equivalent thereof. A form of unconditional "no further action" letter is annexed hereto.

9.B.)    Obligations of Purchaser:

(i)    Purchaser shall, at Purchaser's cost and expense, diligently comply with the applicable laws, ordinances, rules and regulations relating to the environmental condition of the Properties and Additional Properties and remediate the environmental contamination and other environmental conditions on, at, beneath, off-site of, or otherwise affecting, the Properties and Additional Properties including, without limitation, petroleum, chemical, hazardous or toxic materials or substances in the soil, groundwater, drains and drywells. Purchaser is absolutely and unequivocally assuming these obligations and liabilities. Purchaser shall be solely responsible for whatever remediation steps the state or governmental agency exercising jurisdiction of the Properties or Additional Properties require or would require for the remediation of the Properties and Additional Properties.

(ii)    As of the Closing, Purchaser, expressly (a) assumes all responsibility and liability for compliance with environmental laws and regulations and for any environmental assessment, inspection, monitoring and remediation relating to the Properties and Additional Properties and/or resulting from Seller's or Seller's predecessors' use of the Properties and Additional Properties; (b) agrees at Seller's request, to provide to Seller assurance of compliance with all environmental laws and regulations; and (c) agrees to promptly notify Seller of all leaks, spills or releases of hydrocarbons or other regulated substances which occur or of which Purchaser becomes aware at the Properties and/or Additional Properties until Purchaser has completed its obligations hereunder.

8

TARTAN 1917

(iii)   Upon completion of Purchaser's obligations hereunder, Purchaser shall warrant that the condition of the Properties and Additional Properties are in compliance with all federal, state and local laws, ordinances, rules and regulations, including, but not limited to, those which apply to the environment, health and safety and that Purchaser has performed any and all remedial removal or other actions necessary so that the condition of the Properties and Additional Properties are in compliance with applicable laws, ordinances, rules or regulations. Purchaser shall diligently remediate in as short a time period as possible but in any event, within the time period(s) required to comply with governmental requirements, any and all petroleum, chemical, hazardous or toxic materials, substances and conditions on, beneath, off-site or otherwise affecting the Properties and Additional Properties. At completion, Purchaser shall immediately furnish to Seller, a certification, in writing, from an independent, certified engineer with applicable expertise and reasonably acceptable to Seller, that the Properties and Additional Properties are fully in compliance with all applicable federal, state and local laws, ordinances, rules and regulations and that there are no contaminants, hazardous or toxic substances at the Premises in excess of minimum levels set forth in such applicable laws, ordinances, rules and regulations. Notwithstanding anything to the contrary contained in this Contract of Sale , Seller may, but shall not be obligated to at Seller's expense, inspect and/or perform independent testing prior to dismantling by Purchaser or Purchaser's agent, of any remediation system and/or equipment.

(iv)   For each contaminated Property and Additional Property, Purchaser agrees to obtain closure of all New York State Department of Environmental Conservation ("DEC") spill files and unconditional "no further action" letters from DEC or the then equivalent thereof. Same shall be furnished to Seller by Purchaser immediately upon receipt. Whenever DEC is referred to herein, it is deemed to be defined as DEC or other state or governmental agency(ies) then exercising equivalent jurisdiction of the Properties or Additional Properties.

(v)   Purchaser shall endeavor to complete the remediation at a respective Property prior to its sale, assignment or other transfer. Any sale, assignment or other transfer of a Property (not including a lease by Purchaser to an operator of any Property in the ordinary course of Purchaser's business), prior to completion by Purchaser of its obligation to remediate such Property in accordance herewith, shall require the consent of Seller, such consent not to be unreasonably withheld or delayed except Seller, in its absolute discretion, may withhold consent for any secured property pursuant to ¶ 10(a) herein. However, in the event consent is granted and any Property is sold prior to completion of remediation and/or obtaining closure of a spill file and a "no further action" letter, Purchaser's indemnities, agreements, releases and representations shall survive such sale and shall be assumed jointly and severally by the subsequent purchaser in writing to Seller, and the collateral and security attributable to the remediation of the Premises shall be maintained. Notwithstanding, Purchaser as defined in ¶ 9.A. herein, shall remain liable. Purchaser shall provide Seller with sixty (60) days prior written notice of any pending sale. In addition, the guaranteed fixed price contract, performance bond and environmental clean up cost cap insurance described in ¶ 11 shall be assignable to and assumed by, a subsequent purchaser. At Seller's option, Seller and Purchaser shall duly execute a memo of this Agreement for recording in the land records of the respective Properties that Purchaser is obligated to remediate.

9

TARTAN 1918

vi)   In the event of foreclosure by Chase Manhattan Bank N.A. ("Chase") under its loan documents with Purchaser for the purchase hereunder ("Chase loan") resulting in the sale of fee properties that are collateral for the Chase loan, Chase shall not be required to obtain Seller's consent or an indemnity to Seller from any transferee pursuant to ¶ 9B(v) above so long as Chase provides to Seller ("Seller" as defined in ¶ 9A herein) a duly executed general release from Chase including without limitation, the terms and provisions substantially in the form as set forth in ¶ 9E herein.

vii)   In the event Amerada Hess purchases the Premises located at Central Islip and Bayport from Purchaser with Purchaser retaining all obligations to remediate any environmental contamination, Purchaser shall not have to obtain Seller's consent to such transfer or an indemnity from Amerada Hess as described in ¶ 9B(v) above so long as Amerada Hess furnishes to Seller ("Seller" as defined in ¶ 9A herein), a duly executed general release from Amerada Hess including without limitation, the terms and provisions substantially in the form as set forth in ¶ 9E herein.

9.C.)  Seller's Rights:

a)   Prior to Closing, Seller, at its option, may report the following Properties to the New York State Department of Environmental Conservation or any other applicable government agency to obtain a spill file and number so that same would become regulated by said government agency:

1)   1797 Route 111, Central Islip;
2)   200 Hillside Avenue, New Hyde Park;
3)   186 Portion Road, Lake Ronkonkoma;
4)   382 Portion Road, Lake Ronkonkoma;
5)   1878 Hempstead Turnpike, East Meadow; and
6)   1614 Route 112, Medford.

b)   Seller reserves the right to report additional properties if circumstances change but agrees to notify Purchaser prior to reporting.  Purchaser acknowledges this may affect Purchaser's ability to obtain underground tank insurance.

c)   Purchaser agrees that all of the files, records, reports, communications, tests, analysis and any other documents relating to Purchaser's environmental remediation and the environmental condition at the Properties and Additional Properties, shall be provided to Seller, upon request, for review by Seller and/or its environmental consultants.  This obligation shall include, but not be limited to, any environmental reports, records, communications, tests, analysis and other documents, prepared for or by Purchaser or Purchaser's lender prior to Closing.  At Seller's option, and upon request from Seller to inspect and/or perform independent testing, Seller and its representatives shall be granted access to the Properties and Additional Properties by Purchaser, including successors and assigns.  Any inspection and/or testing by Seller shall be

10

conducted at reasonable hours in a manner that does not materially interfere with the business operations at the applicable Property. Upon request of Seller, Purchaser shall along with Purchaser's environmental contractors and consultants and DEC, act in good faith in communicating with Seller's environmental consultants and considering Seller's consultants' opinion(s) on remediation activities. Notwithstanding anything to the contrary contained herein, Seller shall have no duty or obligation whatsoever, to review records, monitor or communicate to Purchaser, Purchaser's contractors and consultants and/or DEC about Purchaser's remediation activities. Additionally, Seller and its consultants shall not be liable or accountable for any monitoring, communicating, reviewing and/or opining relating to Purchaser's remediation activities. Purchaser shall have absolute control over the remediation activities.

　　　　d) Seller and any designee of Seller, shall be named as additional insureds on insurance policies of Purchaser and its environmental contractors, relating to the environment and remediation. Seller shall be provided copies of all policies and shall have the right to reasonably require specific terms, provisions and limits.

　　　　e) Any default by Purchaser, Allen Leon or Steven Leon, under the Chase loan, including the expiration of any cure periods, if applicable, shall be deemed a default hereunder.

　　　　f) At Closing, Purchaser shall duly execute an agreement transferring by Bill of Sale to be attached thereto, at Seller's sole option, any of the remediation equipment at any Premises in the event Purchaser has breached its obligations hereunder.

　　9.D.)  Environmental Indemnity:

　　　　Without limiting the generality of Purchaser's agreements contained herein, Purchaser agrees to the following:

　　　　i) Purchaser shall, defend, indemnify and hold Seller harmless from and against any and all liabilities, losses, costs, expenses, penalties, fees (including reasonable attorney's fees), fines, judgments, claims, suits, orders, recoveries and damages which presently exist or which may arise from any and all environmental contamination and other environmental conditions on, at, beneath, off site of, or otherwise affecting, the Properties and Additional Properties, whether known or unknown, including without limitation, petroleum, chemical, hazardous or toxic materials and substances in the soil, groundwater, drains and drywells.

　　　　ii) Purchaser shall defend, indemnify and hold Seller harmless from and against any and all liabilities, losses, costs, expenses, penalties, fees (including reasonable attorney fees), fines, judgments, claims, suits, orders, recoveries and damages which may arise or be alleged by any person (including the Federal, State or local government) for any violation of Article 12 of the New York State Navigation Law; the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sec. 9601, et seq., as Amended (CERCLA/SARA); the Clean Water Act, 33 U.S.C. Sec. 1251. et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6901, et seq. (RCRA); and any regulations, promulgated thereunder, and any other Federal, State or local environmental statute, code, regulation or ordinance, including those yet to be enacted.

TARTAN 1920

iii) Purchaser shall defend, indemnify and hold Seller harmless from and against any and all liabilities, losses, costs, expenses, penalties, fees (including reasonable attorney's fees), fines, judgments, claims, suits, orders, recoveries and damages of whatever kind or nature, known or unknown, contingent or otherwise, arising out of Purchaser's failure to comply with this Agreement including, without limitation, Seller's reasonable attorney's, consultant and expert fees and Seller's cost of investigation and laboratory fees, if applicable.

9.E.) Environmental Release:

Purchaser shall for itself and on behalf of Purchaser's agents, employees, heirs, personal representatives, grantees, successors and assigns, release and forever discharge Tartan, its affiliates and each of their respective agents, representatives, employees, officers, directors, shareholders, successors and assigns including the Estate of Arnold Barry Tallering, its executors, distributees and beneficiaries, from all claims, demands, losses, liabilities, judgments, penalties, fines, recoveries, suits, actions, costs and expenses whatsoever, that may now exist or hereafter accrue, whether known or unknown, with respect to environmental contamination and other environmental conditions on, at, beneath or off-site of, or otherwise affecting, the Properties and Additional Properties, including, without limitation, petroleum, chemical, hazardous or toxic materials or substances in the soil, groundwater, drains and drywells; and shall further covenant and agree to forever refrain and desist from instituting or asserting against Tartan, its parent, affiliates and each of their respective agents, representatives, employees, officers, directors, shareholders, successors and assigns, including the Estate of Arnold Barry Tallering, its executors, distributees and beneficiaries, any claim, demand, action or suit whatsoever, either directly or indirectly, arising or resulting from environmental contamination or other environmental condition at, on, beneath or off site of, the Properties or Additional Properties.

9.F.) Third Party Liability:

Notwithstanding anything to the contrary contained in ¶ 9 herein, Purchaser shall not release, defend, indemnify or hold Seller (Seller as defined in ¶ 9A herein) harmless with regard to any liabilities, claims, suits, actions or demands relating only to the following: 1) for a period of five (5) years subsequent to the date of Closing, personal injury (defined as bodily injury or death) to a third party individual caused by contamination at, below or offsite of the Properties and Additional Properties and relating to the time period prior to Closing; 2) during the pendency of the action entitled National Amusements, Inc. v. Tartan Oil Corporation. (Supreme Court, Nassau County, Index No. 025950/96), property damage caused by contamination at, below or offsite of the Premises at 700 Sunrise Highway, Valley Stream and relating to or arising out of events occurring prior to Closing; or 3) any liability arising under a certain Stipulation of Settlement in Gorman v. Tartan Corp., (Supreme Court, Suffolk County, Index Nos.: 09737/96 and 13328/96) except to the extent Purchaser's insurance policy(ies) insure (including without limitation, defense or defense costs) against any of the above.

12

TARTAN 1921

To the extent permitted by Seller's insurance policy(ies) and any applicable law: i) Seller agrees to cooperate with Purchaser in connection with any claims that Purchaser shall desire to assert against Seller's insurance company(ies) with respect to those matters covered under this ¶ 9F for which Purchaser is or may be liable; and ii) Seller agrees not to settle any matter for which Purchaser is or may be liable under this ¶ 9F without the prior written approval of Purchaser, such approval not to be unreasonably withheld or delayed, and under no circumstances shall Seller release such insurance company(ies) from liability in connection with such settlement or otherwise without Purchaser's prior written approval, such approval not to be unreasonably withheld or delayed.

9.G.)    Survival:

The foregoing provisions of this ¶ 9 shall survive Closing with the exception of ¶¶ 9.C.(a) and 9.C.(b).

10)    Environmental Security:

(a)    Leases:

As security for compliance by Purchaser of its environmental obligations described hereunder, including but not necessarily limited to, in ¶ 9 herein, and/or as security for payment by Purchaser of all costs and expenses related thereto, Purchaser agrees to collaterally assign to Seller at Closing, all of the Master Leases and to grant Seller a priority security interest (first lien) therein. Chase Manhattan Bank, N.A. shall be granted a subordinated security interest so long as Chase Manhattan Bank, N.A. agrees in writing not to exercise any of its rights or remedies thereunder prior to default by Purchaser under its agreement with Seller and Seller affirmatively exercising its rights and remedies pursuant to its priority security interest. Purchaser shall exercise all options extending the term of any applicable Master Lease and shall provide, prior to Closing, duly executed consents from all Master Lessors that each respective Master Lessor shall: i) notify Seller of any default and provide opportunity for Seller to cure; ii) consent to an assignment back to Seller in the event of any uncured default by Purchaser; and iii) notify Seller of any failure by Purchaser to exercise any option to extend the term and provide Seller opportunity for Seller to cure. Purchaser shall duly execute for recording and/or filing, all agreements and documents furnished by Seller (including but not limited to, Seller's right to collect attorney's fees in the event, of Purchaser's default), to effectuate Seller's priority security interest (first lien), including payment of all costs and fees in connection therewith but not including Seller's attorney's fees for preparation of documents. Purchaser shall not otherwise encumber or cause to be encumbered, the Master Leases. Any breach hereof by Purchaser or event of default by Purchaser of the terms and conditions of any Master Lease, shall be deemed a material default hereunder. Master Landlord or Purchaser shall send Seller a copy of any notice of default by Purchaser, and Seller, without waiving any rights and remedies it has against Purchaser, may, at its option, cure such default. In the event Purchaser is offered a right of first refusal to purchase or lease for additional term, Purchaser shall notify Seller of same. In the event

13

TARTAN 1922

Purchaser purchases any Premises covered by a Master Lease, that Premises shall replace the applicable Master Lease as security. Notwithstanding anything to the contrary contained herein, these Master Leases shall not be transferrable by Purchaser except with the written consent of Seller which may be withheld, in the absolute discretion of Seller until completion by Purchaser of Purchaser's obligations hereunder. Upon Purchaser's completion of its obligations hereunder, provided there are no claims outstanding against Tartan and subject to Seller's rights hereunder, Seller shall provide Purchaser with appropriate documents duly executed for recording and/or filing terminating Seller's security interest.

    b)    <u>Release Provision</u>:

    (i)  Seller shall, at the expense of Purchaser, release Master Lease(s) from the lien of its security described above provided that the ratio, as hereinafter defined, after the release will not exceed 50%. The ratio is defined as (x) the then estimated costs of Purchaser to complete remediation of the Properties and Additional Properties in accordance herewith ("remaining cost") to (y) the then cumulative value of the Master Leases (see below) comprising Seller's security interest.

    The Purchaser shall cause to be set forth in writing, to Seller from Purchaser's environmental contractor a certification of the then remaining cost to remediate the Properties and Additional Properties including, without limitation, a cost breakdown thereof per property, which must be approved by Seller's environmental consultant in his reasonable discretion.

    The value of the Master Leaseholds shall be as set forth on Schedule C hereto <u>less</u> depreciation (as reasonably determined by Seller's experts and accountants who shall consider, <u>inter alia</u>, expiration of the terms of the Master Leases between the Closing Date and the then date of valuation, and any other facts and circumstances which may have contributed to decline or increase in respective values of the Master Leases).

    (c)    <u>Bank Account</u>:

    (i)    Seller shall be granted a security interest in an interest bearing environmental remediation account ("remediation account") to be established at Chase Manhattan Bank, N.A. ("Chase") for the purpose of contributing to funding of Purchaser's environmental remediation obligations hereunder. Within fifty (50) days hereof, Purchaser shall provide an agreement from Chase that Seller's security interest in the remediation account shall be at least equal in priority to any security interest of Chase and any monies in this account shall be used for environmental remediation notwithstanding any default by Purchaser under, or any other terms and provisions of, the Chase loan documents. Purchaser and Chase shall duly execute for recording and/or filing, all agreements and documents furnished by Seller to effectuate Seller's security interest and Purchaser shall pay all costs and fees relating thereto. At Closing, Purchaser shall initially fund the remediation account by depositing the sum of Five Hundred Thousand

14

TARTAN 1923

($500,000.00) Dollars into the account by certified or bank check less any amount paid to Seller by Purchaser pursuant to ¶ 6(b)(ii) herein. Commencing one month subsequent to Closing and continuing each month thereafter, Purchaser shall deposit the sum of $58,333.00 each month into the remediation account until Purchaser has complied with all of its obligations hereunder as verified by Seller at its option. Failure by Purchaser to make any deposit shall be a material default hereof entitling Seller to enforce all of its rights and remedies hereunder and at law including but not limited to, with regard to its security interests. Upon Purchaser's completion of its obligations hereunder, provided there are no claims outstanding against Tartan and subject to Seller's rights hereunder, Seller shall provide Purchaser with appropriate documents duly executed for recording and/or filing terminating Seller's security interest.

      (ii)   Expenditures from the remediation account are only for remediation described herein. In addition, Purchaser agrees that unexpended deposits plus interest shall be accrued and remain in the remediation account for on-going remediation use, and shall not be withdrawn in the event, in any particular month, deposits plus interest exceed expen.'itures.

      (iii)   At Seller's sole option, Kenneth L. Robinson ("Seller's representative") will serve as a co-signatory on the remediation account as agent of Seller. Purchaser shall pay within thirty (30) days of receipt, all invoices relating to its environmental obligations hereunder ("environmental invoice"), except if Purchaser reasonably disputes an environmental invoice in writing with a copy to Seller's representative and Seller. Upon receipt of an environmental invoice, a copy shall be provided to Seller's representative. Thereafter, proof of payment shall be provided to Seller's representative. In the event same is not paid within thirty (30) days and Purchaser does not have a reasonable dispute, as determined in the sole discretion of Seller's representative, Purchaser shall be deemed in default hereof and, without notice to Purchaser, Seller's representative may pay the invoice without prejudice to, or waiver of, any other rights and remedies Seller may have. In any event, Purchaser and Chase, shall provide to Seller's representative each month, an accounting of monies paid in and out of the remediation account and shall cause Chase to send a copy of the monthly bank statement for the remediation account directly to Seller's representative. Seller may object to any payment but shall not have any obligation or duty to object, and Seller's failure to object, shall not act as a waiver by, or in any other way prejudice, or create any liability against, Seller. In the event Kenneth L. Robinson cannot serve for any reason, at Seller's option, another attorney or person acceptable to Seller shall replace him and be deemed Seller's representative. Any replacement shall be reasonably competent in environmental matters and reasonably acceptable to Purchaser. Purchaser shall agree, in writing, to the following with regard to Seller's representative:

      (1)   So long as Seller's representative performs his duties in good faith, Seller's representative shall be relieved and discharged of all further obligations and responsibilities hereunder and no claim shall be made upon him by any party.

**TARTAN 1924**

(2)   Seller's representative undertakes to perform only such duties as are expressly set forth in this Agreement. The Seller's representative may rely upon and shall be protected in acting or refraining from acting in reliance upon any written or oral notice, instruction or request furnished to him thereunder and believed by him to be genuine and believed by him to have been signed or presented by the proper party or parties. The Seller's representative shall not be liable for any action taken by him in good faith and believed by him to be authorized or within the rights and powers conferred on him by this Agreement or any other agreement, oral or written, and may consult with counsel of his choice and have full and complete authorization and protection for any action taken or suffered by him hereunder and in good faith. Each signatory hereto hereby jointly and severally agrees to indemnify the Seller's representative for and to hold him harmless against any and all loss or expense incurred by him without gross negligence or bad faith on his part, arising out of or in connection with him entering into this arrangement and performing his duties hereunder.

(3)   Without limitation of the "Notice" provision hereinafter set forth, a copy of any notice relating to ¶ 10(c) herein shall be sent to Seller's representative at an address to be provided.

11)   <u>Environmental Contractor, Bond and Insurance</u>:

Purchaser shall contract with Tyree Organization, Ltd. ("Contractor") to perform the remediation of the Properties and Additional Properties except for those properties with existing environmental remediation contracts being assumed by Purchaser. Contractor shall provide a guaranteed fixed price contract(s) for the remediation of environmental conditions and a performance and completion guaranty issued by an insurer acceptable to Seller for the benefit of Buyer and Seller, their shareholders, officers, and directors as well as other named parties to be designated by Seller. Contractor will provide Seller with monthly reports describing all up to date remediation status and progress. Within thirty (30) days after execution hereof, Purchaser shall provide Seller with the following in accordance herewith:

a)   Guaranteed Fixed Price Contract between Purchaser and Tyree Organization, Ltd. including but not limited to, representations as contained in the letter dated October 23, 1997 from Contractor to Allen Leon, a copy of which is annexed hereto ("Tyree letter"), acceptable to Seller in its reasonable discretion;

b)   Additionally, as described in the Tyree letter, performance bond in the amount of at least Four Million ($4,000,000.00) Dollars and in a form as acceptable to Seller in its reasonable discretion;

16

**TARTAN 1925**

c)   Compliance with the terms of the Tyree letter;

d)   Duly executed letter from Tyree dated December 3, 1998, a copy of which is annexed hereto; and

e)   Environmental Clean Up Cost Cap Insurance policy including declaration page from AIG to Purchaser outlined in a letter dated November 18, 1997 from Kron Associates, Inc. to Tartan Oil Corp. Attn: Allen Leon, a copy of which is annexed hereto. The limits, terms and conditions thereof shall be acceptable to Seller in its discretion.

Seller, in its reasonable discretion, may grant an extension of said thirty (30) day period for Purchaser to comply with ¶s 11(a) and (c), but in any event, the extension period shall not exceed fifteen (15) days.

12)   <u>General Indemnity and Release</u>:

a)   Allen Leon, Steven Leon, Purchaser and any assignee thereof (collectively "Purchaser" for purposes of this ¶ 12), shall defend, hold harmless and indemnify Seller, its agents, representatives, employees, officers, directors, shareholders, successors and assigns including the Estate of Arnold Barry Tallering, its beneficiaries, distributees and executors (collectively "Tartan" or "Seller" for purposes of this ¶ 12) from and against any and all liabilities, losses, costs, penalties, fees (including reasonable attorney's fees), judgments, fines, claims, suits, damages, orders and recoveries relating directly or indirectly to the Properties and Additional Properties including but not limited to, all leases, agreements, associated contracts, related contracts, Amoco Release Agreements described in ¶ 19 viii) herein, licenses, permits, retainers (relating to Schedule E), environmental agreements (including but not limited to the Malin Agreements) and all ancillary agreements relating to the Properties and Additional Properties, including without limitation, those agreements described in ¶ 19 herein.

b)   Allen Leon, Steven Leon and Purchaser shall for itself and on behalf of Purchaser's agents, employees, heirs, personal representatives, grantees, successors and assigns, release and forever discharge Tartan, its affiliates and each of their respective agents, employees, officers, directors, shareholders, successors and assigns including the Estate of Arnold Barry Mr. Tallering, its executors, distributees and beneficiaries, from all claims, demands, losses, liabilities, judgments, penalties, fines, suits, actions, costs and expenses whatsoever, that may now exist or hereafter accrue, whether known or unknown, with respect to the Properties and Additional Properties including but not limited to, all leases, agreements, associated contracts, licenses, permits, retainers (relating to Schedule E), environmental agreements (including, but not limited to, the Malin Agreements) and any all ancillary agreements relating to the Properties and Additional Properties including, without limitation, those agreements described in ¶ 19 herein; and

17

TARTAN 1926

shall further covenant and agree to forever refrain and desist from instituting or asserting against Tartan, its affiliates and each of their respective agents, representatives, employees, officers, directors, shareholders, successors and assigns, including the Estate of Arnold Barry Tallering, its executors, distributees and beneficiaries, any claim, demand, action or suit whatsoever, either directly or indirectly, arising or resulting from the Properties and Additional Properties including but not limited to, all leases, agreements, associated contracts, licenses, permits, retainers, environmental agreements (including, but not limited to, the Malin Agreements) and any and all ancillary agreements relating to the Properties and Additional Properties including, without limitation, those agreements described in ¶ 19 herein.

13)   Broker Contracts:  Within fifty (50) days hereof, Purchaser shall cause to be provided by Amoco to Seller, a termination of Amoco's Broker Agreement to become effective on the Closing Date hereof (and will be deemed null and void if a Closing does not occur for any reason) and waiver of Amoco's preferential right contained in the Broker Agreement (and in Amoco subleases) with respect to a transfer to Purchaser.  Prior to Closing, Tartan shall terminate its Broker Agreement with Mobil Oil Corp. ("Mobil") in accordance therewith and shall be granted a reasonable adjournment in the event of delay by Mobil.

14)   Leases:  Any information concerning written leases (which together with all amendments, modifications, and extensions thereof are collectively referred to as "Leases") set forth in  Schedule H hereto is accurate as of the date hereof, and, to the best of the Seller's knowledge, there are no written Leases other than those set forth therein and any subleases or subtenancies. Except as otherwise set forth in this contract:

a)   to the best of the Seller's knowledge,  all of the Leases are in full force and effect and none of them has been modified, amended or extended in writing except as set forth therein and except to the extent that Allen Leon had actual knowledge of same.

b)   to the best of the Seller's knowledge, no renewal or extension options, or other options, have been granted to tenants in writing except as set forth in the Leases and except to the extent Allen Leon had actual knowledge.

c)   to the best of the Seller's knowledge, no action or proceeding instituted against Seller, which is not being retained by Seller, by any tenant of the Premises is presently pending in any court, except with respect to claims involving personal injury or property damage which are covered by insurance, or except as set forth on Schedule I hereto; and d) to the best of the seller's knowledge, there are no security deposits relating to current tenancies set forth on Schedule H other than those set forth in Schedule G annexed hereto.

18

**TARTAN 1927**

If any Leases which have been exhibited to and initialed by Purchaser or its representative contain provisions that are inconsistent with the foregoing representations and warranties, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to the provisions of the Leases.

15) <u>Tank Insurance</u>: Underground tank insurance, substantially in the form as Seller currently has in full force and effect, shall be maintained by Purchaser if same can be obtained on commercially reasonable terms. Seller, and its designees, shall be named as additional insureds. At Seller's option, Purchaser shall assume Seller's tank insurance policies.

16) <u>Financing</u>: Subject to the terms and provisions hereof, including but not necessarily limited to, ¶ 7 herein, Purchaser shall within fifty (50) days of execution hereof, ("Financing Period"), obtain a written loan ~~~~~~~~~~~~ from Chase Manhattan Bank, N.A. in the amount of ___Redacted___ , ___ rs or such lesser amount as Purchaser is willing to accept, whether or not conditional. Purchaser shall comply with the following:

a) apply for such loan to Chase not later than three (3) days after the date of this Contract and thereafter submit all documentation required therefore. Purchaser shall promptly give notice to Seller that the application was submitted;

b) furnish accurate and complete information regarding Purchaser, members of Purchaser's family, Seller's assets and Amoco, as required;

c) pay all fees, points and charges required in connection with such application and loan;

d) pursue such application with diligence;

e) cooperate in good faith with Chase and Amoco to obtain such commitment; and

f) Purchaser shall comply with all requirements of such commitment (or of any other commitment accepted by Purchaser) and shall furnish Seller with a copy thereof, as well as any other correspondence, documents, term sheets or commitments received by Purchaser, promptly after Purchaser's receipt from any lender.

Upon obtaining such commitment, Purchaser shall within three (3) days, notify Seller in accordance with this Agreement whether i) Purchaser is accepting such commitment notwithstanding any conditions that may be contained therein, or ii) Purchaser is terminating this contract. In the event Purchaser notifies Seller that Purchaser is not accepting the commitment because of any conditions contained therein, Seller or Purchaser may terminate this contract in

19

**TARTAN 1928**

accordance with ¶ 7(c) herein.  Thereafter, neither party shall have any further claim against the other.  In the event this contract is not terminated by either party in accordance herewith within the time period described, or Purchaser notifies Seller that Purchaser is accepting the commitment, whether or not the commitment contains conditions, then, in any of such events, this ¶ 16 and ¶ 7(c) herein shall be deemed waived by Purchaser, and of no further force and effect as if they were never contained herein as terms and provisions of this contract of sale.

17)    Amoco Subleases:  Purchaser understands there are agreements relating to five (5) Premises set forth as "AS" on Schedule "A" hereto which require break-up payments to Amoco in the event they do not continue to be operated as Amoco stations.  Within fifty (50) days hereof, Purchaser shall cause to be provided to Seller from Amoco, to be effective as of the Closing Date hereof, a release relating to these obligations and any other fees and/or charges claimed by Amoco.

18)    Employment Agreement:  At Closing, Allen Leon will provide a release of any amounts due from and/or obligations of, Seller in connection with his employment at Tartan including, without limitation, pursuant to his Employment Agreement, except for payment of his annual salary (pursuant to Schedule A thereof) prorated through the date of Closing. The Employment Agreement shall terminate upon Closing.

19)    Assumption of Obligations:

Purchaser shall assume and defend, indemnify, hold Seller harmless and generally release Seller from (in the form as contained in ¶'s 12(a) and 12(b) herein), the obligations under all tenancies, leases and lease obligations (Master Leases and Sub-leases), mortgage and note (relating to 1864-66 Hempstead Turnpike, East Meadow), environmental agreements, associated contracts, licenses, violations relating to the Properties or Additional Properties, agreements with George Malin ("Malin Agreements"), agreements relating to equipment, fixtures, storage tanks and personal property, and ancillary agreements relating at all, to the Properties, Additional Properties and/or environmental remediation including, but not limited to, the following:

    i)    Tank buyout in the lease with Getty for Premises at 540 Plandome Rd., Manhasset, NY;

    ii)   All obligations under lease for 1577 Merrick Rd., Merrick, NY, including but not necessarily limited to, canopy, drainage, regrading, refacing building and other obligations;

    iii)  Residential leases with landlord and tenant for residence located at 225 Sunset Lane, Mattituck, NY;

20

**TARTAN 1929**

iv)   Residential month-to-month tenancies at 1801, 1805 and 1809 Joshua's Path, Central Islip, NY;

v)   Obligations relating to changing of carbon filters to potable water supplies in Mattituck and agreement with Cheryl Reeve regarding access agreement for remediation system in Mattituck;

vi)   The zoning and/or permit proceedings which are or may be affirmative obligations of Seller and annexed hereto as Schedule "E";

vii)   Any service, maintenance, supply (other than gasoline supply) and management contracts; and

viii)   Agreements titled "Release" between Amoco and Seller relating to the following properties more specifically described as follows:

1)   Bayport dated April 26, 1994, para. 5;
2)   Bay Shore dated March 14, 1995, para. 5;
3)   Bohemia (635 Smithtown Ave.) dated October 25, 1994, para. 5;
4)   Huntington (272 E. Jericho Tpke.) dated September 29, 1992, para. 5;
5)   Lake Ronkonkoma (382 Portion Rd.) dated August 13, 1996, para. 5;
6)   Miller Place dated May 10, 1995, para. 5;
7)   Mineola dated November 14, 1995, para. 5;
8)   New Hyde Park (200 Hillside Ave.) dated March 29, 1996, para. 5;
9)   Valley Stream dated January 27, 1995, para. 5; and
10)   Wyandanch dated November 13, 1996, para. 5.

ix)   Seller's office lease at 532 Broad Hollow Road, Melville, N.Y. along with any leases and agreements relating thereto.

x)   In addition to the Purchase Price set forth in ¶ 2 herein, at Closing, the mortgage payable by Tartan to Maria Kassl, her successors and/or assigns, for the Premises at 1864-66 Hempstead Turnpike, East Meadow shall be assumed by Purchaser and Purchaser shall pay Seller any principal and interest paid and/or due and owing pursuant to said East Meadow mortgage between the date hereof and Closing.  This amount shall be paid to Seller by Purchaser in the same manner as the Purchase Price as described in ¶ 2 herein.

21

**TARTAN 1930**

20)    Post-Closing:

a)  Allen Leon and Purchaser, without compensation, shall diligently cooperate with Seller in its effort to obtain reimbursements, settlements and/or awards from third parties and/or insurance companies with respect to environmental claims including, but not limited to, by furnishing to Seller, invoices in connection with remediation costs and providing access to the site to support claims.  Purchaser acknowledges that Seller is seeking reimbursements, settlements and/or awards from third parties and/or insurance companies for a substantial amount of money.

b)  Purchaser shall, immediately after closing, diligently proceed with and complete, remediations on those properties described on Schedule F hereto or any other Properties or Additional Properties which may be designated by Seller and added to Schedule F prior or subsequent to Closing.  Schedule F shall consist of those Properties or Additional Properties relating to Seller's claims for reimbursements, settlements and/or awards described in ¶ 20(a) above and relating to Release Agreements between Amoco and Seller described in ¶ 19 (viii) above.  This shall not be construed as detracting from Purchaser's obligation to diligently proceed with and complete remediation of all Properties and Additional Properties but rather provides that if the remediations are prioritized and such prioritization complies with the directives of DEC and/or other governmental agency as well as Purchaser's obligations hereunder, Purchaser represents that the properties described on Schedule F shall be accorded priority status.

c)  Allen Leon and Purchaser, without compensation, shall cooperate with Seller on any on-going litigation in which Seller is, or may be, a party, including without limitation, those relating to remediation of any respective Property.  Purchaser hereby waives any rights or claims to obtain reimbursement for environmental monies credited by Seller to Purchaser in accordance herewith.

d)  At no cost or expense to Seller, Purchaser shall provide Seller and its representatives with reasonable office space, including use of a conference room, in Nassau/Suffolk County, NY (along with use of office equipment and telephone) to conduct any business, including but not limited to, the winding-up of corporate matters, for a period of two years from closing.

e)  Purchaser acknowledges that the obligations of Purchaser described in this ¶ 20 are material terms hereof.

21)    Condemnation and Damage and Destructic ::

a)  Purchaser acknowledges notice of a possible condemnation at 382 Portion Road, Lake Ronkonkoma, New York and notwithstanding, Purchaser agrees to proceed in accordance with the terms and conditions hereof.  In the event of additional notification of condemnation of any Properties between the date hereof and Closing, Purchaser shall proceed in accordance with the terms hereof and Seller shall at Closing, assign all of its rights, if any, relating to the condemnation to Purchaser.

22

**TARTAN 1931**

b)  In the event of damage or destruction of the buildings and improvements at any Premises, Seller shall make its best efforts to repair or replace same prior to Closing.  In the event same cannot be repaired or replaced prior to Closing, Purchaser shall take title or assignment "as is" with an appropriate assignment of Seller's insurance proceeds.

22)   Approvals:  This Contract is conditioned upon the approval of the Board of Directors and Shareholders of Seller and in the event Seller, at its sole option, elects to submit it for approval, the Surrogate's Court, Nassau County, N.Y.  In the event this executed Contract of Sale is submitted to the Surrogate's Court for approval and the Court renders a determination that Seller should not proceed and Seller elects not to proceed based on that determination, then, in such event, this Contract shall be deemed terminated and Seller shall reimburse Purchaser its costs incurred to Chase and Purchaser's attorney for the following:

1)  Appraisal fees incurred by Chase but not exceeding $50,000.00, such fee to be certified by Chase, Purchaser and the appraiser.  The appraisals shall be recertified to Seller or its designee and furnished to Seller.

2)  Chase's working fee not to exceed $17,000.00 due upon application, such fee to be certified by Chase and Purchaser.

3)  Chase's reasonable and necessary attorney's fees incurred between executed contract and termination of this contract, such fees to be certified by Chase and its attorneys.

4)  Purchaser's reasonable and necessary attorney's fees incurred subsequent to contract and relating directly to the contract, such fees to be certified by Purchaser and its attorney.

5)  Chase's reasonable and necessary environmental consulting fees incurred by Chase between executed contract and termination of this contract, such fees to be certified by Chase, Purchaser and the environmental consultant (unless the environmental consultant is an employee of Chase).

6)  Reasonable cost of title examination, such costs to be certified by First American Title Company and Purchaser. The title reports shall be recertified to Seller or its designee and furnished to Seller.

All invoices for the above fees shall be clearly and specifically itemized.

23

**TARTAN 1932**

23)    Ownership of Purchaser:  The Purchaser shall be one hundred (100%) percent owned by Allen Leon and Steven Leon until Purchaser has completed the remediation obligations described hereunder as verified by Seller at its option.  Purchaser shall provide appropriate written consent from the members of Purchaser for this sale as well as a copy of the Articles of Organization and Operating Agreement of Purchaser.

24)    Notice of Default:  In the event of a default hereunder, the non-defaulting party shall notify the defaulting party of the default and, except for ¶¶ 13, 16 and 17, the defaulting party shall have ten (10) days from the date of the notice to cure said default.

25)    Escrow Agreement:  The Downpayment furnished by Purchaser herein  shall be held in an interest bearing account at Citibank, N.A., Mineola, N.Y., by Seller's attorney, as escrowee ("Escrowee"), pending distribution in accordance with the terms of this Agreement and any related written agreement(s) with each of the signatories hereto.  The party receiving the Downpayment or portion thereof, shall receive interest earned on the amount paid.  Upon such distributions as aforesaid, and if same is performed in good faith, Escrowee, including its officers, members, attorneys and employees, shall be relieved and discharged of all further obligations and responsibilities hereunder and no further claim shall be made upon them by any party.  Escrowee undertakes to perform only such duties as are expressly set forth in this Agreement.  In the event the Escrowee becomes involved in litigation by reason hereof, it is hereby authorized to deposit with the Clerk of the Court which has jurisdiction of such pending litigation all funds being held pursuant hereto and, thereupon, the Escrowee shall be fully relieved and discharged of any further duties hereunder.  The Escrowee may rely upon and shall be protected in acting or refraining from acting in reliance upon any written or oral notice, instruction or request furnished to it thereunder and believed by it to be genuine and believed by it to have been signed or presented by the proper party or parties so long as seven (7) business days prior written notice is provided to the parties hereto.  The Escrowee shall not be liable for any action taken by it in good faith and believed by it to be authorized or within the rights and powers conferred on it by this Agreement or any other agreement, oral or written, and may consult with counsel of its choice and have full and complete authorization and protection for any action taken or suffered by it hereunder and in good faith.  Each signatory hereto hereby jointly and severally agrees to indemnify the Escrowee for and to hold it harmless against any and all loss or expense incurred by it without gross negligence or bad faith on its part, arising out of or in connection with its entering into this escrow arrangement and performing its duties hereunder.  Nothing contained herein shall be construed as prohibiting Escrowee from acting as Seller's attorney prior or subsequent to any dispute.

26)    Purchase of Central Islip and Bayport:  In the event Purchaser shall enter into a Contract(s) of Sale with Amerada Hess Corp. ("Hess") for the sale to Hess of any Premises including, without limitation, the Premises located at 1797 Route 111 and 1801, 1805 & 1809 Joshua's Path, Central Islip, New York, and/or 640 Montauk Highway, Bayport, New York, the contract(s) of sale with Hess shall be assignable, at Seller's option, to Seller or its designee, in the event this contract between Seller and Purchaser is terminated for any reason.  A duly executed original Contract(s) between Purchaser and Hess with a duly executed assignment(s) from Purchaser to Seller (to be held in escrow) shall be immediately provided to Seller upon its execution by Hess and Purchaser.

24

TARTAN 1933

27)    Wrongful Acts:  In the event Seller terminates this agreement for any reason in accordance with this Contract of Sale and Purchaser performs or causes to be performed, any act which wrongfully interferes with Seller's ability to finance, sell, lease or otherwise transfer the Properties, including, without limitation, the commencement of an action or proceeding and/or filing of a lis pendens or any other attachment, in bad faith, then in such event, Allen Leon and Steven Leon shall be jointly and severally liable for any damages sustained by Seller, including but not limited to, Seller's attorney's fees, costs and disbursements, due to said wrongful act of Purchaser.

28)    General:

a)  Assignment.  This Agreement is not assignable by Purchaser without consent of Seller which may be withheld in Seller's absolute discretion.  Notwithstanding any assignment or anything else herein contained to the contrary, Allen Leon and Steven Leon hereby personally guarantee to Seller, which personal guarantee shall survive Closing, all of Purchaser's agreements, assumptions, assignments, covenants, representations, obligations, indemnities, releases and warranties contained herein.

b)  Notice.  Any notices required hereunder shall be in writing, either personally delivered or sent by certified mail, return receipt requested, postage prepaid or by recognized overnight carrier to the respective party at the address stated at the top of Page "1" of the printed form of this contract (or to any applicable change of address as requested by the applicable party in a written notice) with a copy sent by ordinary first class mail to such party's attorney.

c)  Acts.  Wherever it is provided herein that a party may perform an act or do anything, it shall be construed that the party may, but shall not be obligated to, so perform or so do.

d)  Amendments.  This Agreement may not be changed or terminated orally.

e)  Severability.  If any provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and be enforced to the full extent permitted by law.

f)  Singular.  The singular includes the plural and the plural includes the singular.

g)  Captions.  The captions and headings throughout this Agreement are for convenience or reference only and the words contained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of or the scope or intent of this Agreement, nor in any way affect this Agreement.

25

**TARTAN 1934**

h) <u>Including</u>. Whenever the word "including" is used herein, it shall be deemed to mean "including but not limited to."

i) <u>Prior Agreements</u>. All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

j) <u>Authorization</u>. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

k) <u>Effectiveness</u>. This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

l) <u>Reporting</u>. Seller and Purchaser shall comply with any and all reporting requirements, if applicable. This subparagraph shall survive Closing.

m) <u>Exclusivity</u>. This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

n) <u>Confidential</u>. The parties hereto agree that the terms and conditions of this Agreement are confidential and shall not be communicated to any third parties except if otherwise agreed in writing or required to comply with the terms hereof and/or any legal requirements.

o) <u>Further Assurances</u>. Seller and Purchaser shall at Closing and from time to time following Closing, at the request of any party hereto, execute and deliver, or cause to be executed and delivered, all such further documents and instruments as may be reasonably requested or required by the other, to more effectively evidence and give effect to, the agreements, terms, provisions, intent and purposes of this Agreement. At Seller's request, at Closing, Allen Leon, Steven Leon and any assignees thereof, shall execute separate agreements which contain the agreements, assumptions, assignments, covenants, representations, obligations, indemnities, releases and warranties of Allen Leon, Steven Leon and any assignee thereof, contained herein.

p) <u>Survival</u>. All of the agreements, representations, obligations, indemnities, releases and warranties of Allen Leon, Steven Leon and any assignee thereof, to Seller, shall survive Closing.

q) <u>Applicable Law and Venue</u>. This Agreement shall be construed, interpreted and governed in accordance with the laws of New York State. In the event of any litigation or other proceeding by reason of a dispute hereunder, the venue shall be the court with applicable jurisdiction and located in Nassau County, New York.

26

**TARTAN 1935**

r) <u>Errors.</u> Any errors or omissions in the Schedules annexed hereto shall be corrected.

29) In the event of a conflict between the terms and provisions of the printed form contract annexed hereto and the terms and provisions of this Rider, the terms and provisions of this Rider shall supersede and control.

REDACTED

TARTAN CORP. and its affiliated corporations (see annexed schedule)

By: _____
Stanley Kleinberg, President

By: _____
Robert Topper, Vice President

LEON PETROLEUM, LLC

By: _____
Allen Leon, Managing Member

_____
ALLEN LEON

_____
STEVEN LEON

The undersigned Escrowee hereby acknowledges receipt of $500,000.00 subject to collection to be held in escrow pursuant to ¶ 25.

_____
LOUIS ALGIOS, ESQ.

27

**TARTAN 1936**

-2

## AMENDMENT OF CONTRACT

Amendment of Contract, dated as of the 12th day of April 1999, by and between TARTAN CORP. and its affiliated corporations, with principal offices at 532 Broadhollow Road, Melville, New York 11747 ("Seller"), and LEON PETROLEUM, LLC, with an address at c/o Allen Leon, 36 Marshmallow Drive, Commack, New York 11725 ("Purchaser" or "Buyer").

WHEREAS, Seller and Purchaser entered into a Contract of Sale dated January 8, 1999 ("Contract");

WHEREAS, Purchaser, based upon requests of Chase Manhattan Bank, N.A. ("Chase") and Amoco Oil Company ("BP/Amoco" or "Amoco"), has requested modifications to the Contract so that Buyer can comply with its obligations under the Contract and close the transaction in accordance with the Contract.

Now therefore in consideration of One ($1.00) Dollar and other good and valuable consideration the parties agree to amend the Contract as follows:

1)     The monthly payments to be made by Buyer into the Environmental Remediation Account ("Remediation Account") as described at ¶ "10(c)(i)" of the Contract shall be reduced to Forty Thousand ($40,000.00) Dollars (the "Escrow Payments") and Purchaser shall provide an agreement from Chase in its commitment that Seller shall have a priority security interest (first lien) in the Remediation Account including but not limited to, the Five Hundred Thousand ($500,000.00) Dollars payment required to be deposited by Purchaser at Closing.

2)     a)  Purchaser may request either the Tyree Company, Baltec or Handex ("Purchaser's Consultant") to evaluate and determine whether there is then, sufficient money on deposit in the Remediation Account to complete Purchaser's obligations relating to remediation of the designated properties with spill numbers set forth on a Schedule to be annexed hereto ("designated properties"). In the event Purchaser's Consultant determines there is sufficient money therein, it shall, in writing, certify same to Seller, Purchaser, Chase and BP/Amoco and along therewith, provide copies of all its backup documentation supporting such conclusion including but not necessarily limited to, testing results, data, files, records, reports, communications and analysis ("Purchaser's Consultant's Determination").

b)  Upon receipt by Seller of Purchaser's Consultant's Determination, the Escrow Payments required to be paid into the Remediation account shall be suspended pending the third consultant's determination as hereinafter described or Seller's Consultant's agreement with Purchaser's Consultant's Determination. Notwithstanding, Purchaser shall provide an agreement in its commitment with Chase that Chase shall require Purchaser to continue the Escrow Payments into a designated account with Chase ("Chase account") at least until there is a determination by said third consultant and otherwise comporting with ¶ 2(g) herein.

1

TARTAN 1937

c) Seller may accept Purchaser's Consultant's Determination (in which event Purchaser's Consultant's Determination shall be deemed binding) or may designate within twenty (20) days of receipt, one of the following as its consultant so long as at least one (1) of them does not then perform services for BP/Amoco or Purchaser. In the event all of the following consultants perform services for BP/Amoco or Purchaser, Seller may elect a consultant outside the following ("Seller's Consultant"):

> Groundwater Technologies, Inc.
> ERM Northeast
> Arcadis Geraghty & Miller

Seller's Consultant shall review Purchaser's Consultant's Determination and may elect to perform additional tests and analysis and to review additional data, but shall act with diligence to complete its review. Upon completion of its review, Seller's Consultant shall render a determination in writing. In the event Seller's Consultant agrees with Purchaser's Consultant's Determination, in writing, then Purchaser's Consultant's Determination shall be deemed binding.

d) In the event Seller's Consultant does not agree with Purchaser's Consultant's determination, then H2M Group ("third consultant") shall be retained to determine whether the amount certified by Purchaser's consultant is correct. In the event H2M Group cannot perform its duties in accordance herewith for any reason, then Rue Associates shall be deemed the third *Roux* consultant. Seller, BP/Amoco and Purchaser agree they do not and will not use the services of either designated third consultant, it being understood that the third consultant shall be an objective party. The determination of the third consultant shall be binding.

e) The first time that Purchaser's Consultant's Determination is furnished to Seller, the expense of each party's consultant shall be borne by such party and the cost of the third consultant shall be shared equally and each party shall bear their own costs, expenses and fees (including attorney fees). Thereafter, with regard to any subsequent determinations of Purchaser's Consultant, Purchaser shall reimburse Seller or pay directly to Seller's Consultant, at Seller's option, for all fees, costs and disbursements incurred to Seller's Consultant and the third consultant including but not limited to, expert, testing and laboratory fees but not Seller's attorney's fees. Purchaser agrees to defend, indemnify and hold Seller harmless with regard to these fees, costs and disbursements.

f) In the event the third consultants designated above cannot perform in accordance herewith for any reason, the parties hereto shall agree to act in good faith to designate a replacement third consultant.

g) In the event the third consultant does not agree with Purchaser's Consultant's Determination and the third consultant determines that the estimated cost of Purchaser to complete remediation of the designated properties ("Third Consultant Amount") exceeds the amount in the Remediation Account, then, in such event, Purchaser shall have thirty (30) days

2

TARTAN 1938

from notice thereof to pay the amount which is deficient (deemed to equal the lesser of, the amount of payments not made into the Remediation Account during the period of suspension which commenced pursuant to ¶ 2(b) herein or the difference between the Third Consultant Amount and the amount then on deposit in the Remediation Amount) into the Remediation Account ("deficient amount"). BP/Amoco shall guarantee payment of this deficient amount into the Remediation Account subject to the conditions set forth in ¶ 3(a) herein if applicable. Purchaser shall provide an agreement from Chase in Chase's commitment that all monies then in the Chase account shall be deposited into the Remediation Account to the extent necessary to equal the deficient amount so long as Purchaser has not then been given notice of default under its loan documents by Chase. Notwithstanding such default, BP/Amoco's guarantee of the deficient amount shall remain in full force and effect. In the event the default is effectively cured or otherwise withdrawn, the requirement that Chase deposit the Chase Account monies into the Remediation Account shall again be operative.

h)  If it shall be determined that the Remediation Account is over-funded, then such overage shall remain in the Remediation Account until BP/Amoco's guaranty, as described in ¶ "4" herein, expires.

3)  a)  BP/Amoco shall guaranty Buyer's obligation to make the Escrow Payments for a period of five (5) years from Closing. This guarantee shall not apply to any requirement by Chase for Purchaser to deposit payments into the Chase account. In the event Chase commences a foreclosure action against Purchaser by filing and serving a summons and complaint (and lis pendens), then in such event, the following shall apply:

| | |
|---|---|
| 1st Year after Closing | No effect on BP/Amoco's guarantee. |
| Years 2-5 after Closing (condition to BP/Amoco's guarantee in the event Chase commences a foreclosure action) | BP/Amoco's guaranty shall be effective so long as BP/Amoco sells or causes to be sold, directly or indirectly, at least 20,000,000 gallons in each of such years to, at or through the properties set forth in Schedule A of the Contract and any additional stations which may be set forth in any BP/Amoco agreement with Purchaser ("existing stations"). For purposes hereof, BP/Amoco shall be deemed to include its affiliated entities, assignees, successors in interest and/or designees ("BP/Amoco and designees"). BP/Amoco's guarantee shall continue until it may be determined, if applicable, that this condition to BP/Amoco's guarantee has not been satisfied and thereupon, the guarantee shall not again be effective until the condition is thereafter satisfied by determining at the end of the following year whether 20 million gallons were sold that year in |

3

TARTAN 1939

accordance herewith e.g. the parties and BP/Amoco determine on the 1st day after the expiration of year 2 that less than 20 million gallons were sold during year 2. BP/Amoco's guarantee would cease during year 3 but could be effective again in year 4 if 20 million gallons or more were sold as determined in accordance herewith during year 3.

b)  Subsequent to the commencement of a foreclosure action by Chase, BP/Amoco and designees shall continue to sell or cause to be sold, gasoline to, at or through the existing stations ("Gasoline Sales") so long as BP/Amoco and designees is not prohibited by virtue of the foreclosure action from Gasoline Sales. In the event BP/Amoco and designees are not prohibited by virtue of the foreclosure action from Gasoline Sales but nevertheless, do not engage in Gasoline Sales, then in such event, the foregoing 20 million gallon condition to BP/Amoco's guarantee as set forth in ¶ 3(a) herein shall not be applicable

c)  In the event the foreclosure action by Chase is discontinued for any reason or BP/Amoco and designees is the transferee of at least fifty (50%) percent of the properties as a result of the foreclosure action, the foregoing 20 million gallon condition to BP/Amoco's guarantee as set forth in ¶ 3 (a) herein shall not be applicable.

4)  BP/Amoco shall guaranty, up to the sum of Five Hundred Thousand ($500,000.00) Dollars, the payment of claims for which Buyer is responsible as indemnitor or otherwise under Contract ¶ "9" so long as:

a)  A written claim is made by any federal, state or local government or agency thereof for which Buyer is responsible as indemnitor under Contract ¶ "9" or an action by any other third party is commenced, within five (5) years of Closing;

b)  Such action by the government or any third party results in a judgment entered against Buyer within seven (7) years of Closing; and

c)  Nothing herein shall cause BP/Amoco's guaranty to make BP/Amoco liable for claims arising under the excluded actions set forth in Contract ¶ "9.F.(2) and (3)".

5)  Seller waives any and all security interests and claims against the master leases as is otherwise contemplated by ¶ "10(a)" of the Contract, it being intended that Chase be secured by such master leases. Notwithstanding anything else to the contrary contained herein, Purchaser agrees, and shall provide agreement from Chase in its commitment, that Chase will make available as additional security for the Contract ¶ "9" obligations and indemnities of Purchaser, the Master Lease for 400 South Oyster Bay Road, Hicksville, N.Y., including the buildings and improvements thereon and thereunder. Chase shall agree that the Seller shall be granted a priority security interest (first lien) therein until BP/Amoco's guarantee, as described in ¶ "4" herein, expires. Chase shall retain a second position as to such master lease. While Seller has

4

TARTAN 1940

exercising its rights and remedies pursuant to its priority security interest. Purchaser shall comply with its obligations to Seller under Contract ¶ 10(a) with regard to the Hicksville Master Lease.

6)   Except for the Hicksville Master Lease, there shall be no restrictions on the ability of Chase to sell collateral, particularly any obligation by Chase or any successor in interest to Chase or purchaser of the collateral, to assume the obligation of Buyer. Notwithstanding anything to the contrary, Purchaser shall be required to provide an agreement from Chase in its commitment, requiring Chase to furnish Seller (as Seller is defined in Contract ¶ 9), with a general release for environmental liabilities except as to third-party claims.

7)   Seller, Seller's designees, Chase and BP/Amoco will be named as additional insureds on all Buyer's insurance.

8)   After all loans due and owing by Purchaser to Chase are repaid, BP/Amoco may be granted a security interest against the Leon collateral, except the Hicksville Master Lease (if Seller still has secured interest), up to the amount it has paid under any Guaranty and provided that BP/Amoco shall not be in default under its guarantee to Seller.

9)   Purchaser acknowledges that the mortgage commitment described in Contract ¶ 16 has been issued by Chase. The timing provisions described in the Contract are amended as follows:

(a) The three day time period within which Purchaser shall notify Seller whether Purchaser elects to accept the mortgage commitment or terminate the Contract as set forth in the last paragraph of Contract ¶ 16, is hereby amended in part so that such election shall be received by Seller by April 16, 1999.

(b) The time period set forth in ¶ "11" is extended until April 16, 1999.

(c) The time periods set forth in ¶ 's 13 and 17 are extended until April 12, 1999.

(d) The closing date is rescheduled until July 20, 1999 and shall be Time of the Essence with regard to Purchaser's obligation to Close.

10)   At Closing, BP/Amoco shall release Seller (as Seller is defined in Contract ¶ 9) and its affiliated corporations from their obligations, including but not limited to, indemnities, to BP/Amoco, under the agreements set forth in Contract ¶ 19 (viii) with the exception of the excluded third-party actions set forth in Contract ¶ 9F(2).

5

TARTAN 1941

11)   Seller shall be granted a reasonable extension to obtain approval of the Surrogate's Court. If, based on the Surrogate's Court's determination, Seller elects not to proceed pursuant to Contract ¶ 22, Seller shall not be required to reimburse Purchaser for the attorney's fees of Purchaser and Chase relating at all to the modifications to the Contract requested by Purchaser, Chase and/or BP-Amoco, including but not limited to, this agreement.

12)   Deleted.

13)   Seller shall be granted a reasonable extension to obtain a termination of its Mobil Broker Agreement. In the event Seller elects to Close prior to it obtaining a termination from Mobil for all then existing Mobil locations, Purchaser shall Close, at Seller's option, under one of the following options to be elected by Seller:

a)   With the Mobil trademark in place at the Lake Grove (3089 Middle County Road) and Commack (260 Commack Rd.) with an assignment of the Mobil Broker Agreement from Seller to Purchaser except Purchaser agrees to permit Mobil to debrand and terminate the Broker Agreement upon demand. Seller shall defend and indemnify Purchaser against any action or claim by Mobil relating to Seller's assignment of the Broker Agreement and costs attributable to Seller's termination of the Mobil Broker Agreement, including but not necessarily limited to, the unamortized repayment to Mobil for station improvements; or

b)   With the Mobil trademark in place at all six (6) existing Mobil stations described in ¶¶ 13(a) and 16 (b) herein with an assignment of the Mobil Broker Agreement from Seller to Purchaser except Seller agrees to cause termination of the Broker Agreement within ninety (90) days of Closing (with a reasonable extension if necessary). Seller shall provide the following in such event:

1)   Defend and indemnify Purchaser against any action or claim by Mobil relating to Seller's assignment of the Broker Agreement and costs attributable to Seller's termination of the Mobil Broker Agreement; and

2)   Seller shall grant Purchaser a credit of $150,000.00 at Closing and Purchaser shall provide Seller with a promissory note in equivalent amount payable upon demand by Amoco within sixty (60) days of when the Mobil Broker Agreement is terminated and the station debranded of Mobil insignia. The interest on the note shall be equal to the current amortization, based on gallons sold, of monies paid by Mobil for station improvements that Seller (or Purchaser if the Mobil Broker Agreement is assigned) is receiving under the Mobil Broker Agreement. Seller will continue to receive the benefit of this amortization.

14)   This agreement is conditioned upon the approval of the shareholders of Seller.

15)   Deleted.

6

**TARTAN 1942**

16)   In addition to the documents Purchaser is required to furnish from BP/Amoco pursuant to the Contract, Purchaser shall furnish the following from BP/Amoco in writing on or before April 12, 1999 duly executed by Amoco:

a)   Agreement(s) from BP/Amoco acknowledging the guarantees and agreements described hereunder and which are to be provided at Closing;

b)   BP/Amoco's agreement to brand the following stations prior to Closing, at Seller's option, upon sixty (60) days prior written notice of debranding of the Mobil trademark:

a)   North Bellmore (2425 Jerusalem);

b)   Peconic;

c)   East Farmingdale; and

d)   Wyandanch;

c)   BP/Amoco's agreement to extend, at Seller's option, the current Broker Agreement between Seller and Amoco for a period of up to ninety (90) days. This extension shall not extend or otherwise modify, the expiration date(s) of any preferential rights which had been granted to Amoco therein; and

d)   BP/Amoco's agreements relating to ¶¶ 10, 13(b)(2) and 17 herein.

17)   All guarantees from BP/Amoco described hereunder shall contain a provision that BP/Amoco will pay Seller's attorney's fees and costs related to any action or proceeding by Seller to enforce the guarantee(s) so long as the guarantee(s) applies.

7

**TARTAN 1943**

18)   All other terms and provisions of the Contract shall remain in full force and effect except as otherwise specifically and expressly amended hereby.

TARTAN CORP. and its affiliated corporations

By: _____
       Stanley Klinberg, Presidt

By: _____
       Robert Topper, Vice President

LEON PETROLEUM, LLC

By: _____
       ALLEN LEON, MANAGING MEMBER

_____
Allen Leon, Managing Member

_____
ALLEN LEON

_____
STEVEN LEON

8

**TARTAN 1944**