# EXHIBIT 3 –

# Part 2

SETTLEMENT AGREEMENT

Baron & Budd and/or Weitz & Luxenberg, P.C., and/or Sher Leff LLP (except the State of New Hampshire and Orange County Water District), including but not limited to the clients identified on the attached Exhibit A (hereinafter referred to collectively as "Settling Plaintiffs").

2.28    "Stipulation of Dismissal" means the stipulation to be provided by each of the Settling Plaintiffs dismissing with prejudice each of the Settling Defendants and Released Parties from any and all litigation subject to this Settlement Agreement with each party to bear their own costs, and which shall be in a form substantially similar to the attached Exhibit I or other appropriate form for the applicable court in which it is to be filed.

2.29    "TBA" means tertiary butyl alcohol and any associated breakdown products thereof.

2.30    "Treatment Protocol" means the protocol that defines the applicability, criteria, operation, and limitations of the Future Treatment Obligation, which is a material part of this Settlement Agreement and is attached as Exhibit F.

### III.  REPRESENTATIONS AND WARRANTIES OF SETTLING PLAINTIFFS

3.1    Settling Plaintiffs represent and warrant that the Mediator has been provided with a listing of the Allocation of Settlement Proceeds for the distribution of the Aggregate Settlement Payment based upon the objective criteria developed for that purpose, which criteria have been disclosed and agreed to by all Settling Plaintiffs, and that all Settling Plaintiffs have seen the participation of, and allocations to, all other Settling Plaintiffs pursuant to the Allocation of Settlement Proceeds and consents to them.  Settling Plaintiffs further represent and warrant that they have been advised of the total fees and costs to be paid to Plaintiffs' Counsel and the method by which such costs were apportioned among the Settling Plaintiffs.  Settling Plaintiffs acknowledge that the Settling Defendants have not participated in the allocation and do not have any responsibility for the allocation among the Settling Plaintiffs and any fees or costs to the Plaintiffs' Counsel.

3.2    Settling Plaintiffs acknowledge that Plaintiffs' Counsel has recommended to each of them that these settlement terms are fair and reasonable and should be accepted.

-9-

SETTLEMENT AGREEMENT

  3.3 Each respective Settling Plaintiff represents that no other person or entity has any interest in the Released Claims of each respective Settling Plaintiff; that each respective Settling Plaintiff has the sole right and exclusive authority to execute this Settlement Agreement, the Release and Indemnity Agreement, and receive the consideration specified in this Settlement Agreement; and that each respective Settling Plaintiff has not sold, assigned, transferred, conveyed, otherwise disposed of, granted a security interest in or lien on any of the Released Claims within the scope of this Settlement Agreement.

  3.4 Each respective Settling Plaintiff represents and warrants that the execution, delivery and performance by such Settling Plaintiff of this Settlement Agreement, and the execution, delivery and performance by such Settling Plaintiff of the Release and Indemnity Agreement and the Stipulations of Dismissal, and the authority to cause the Escrow Agreement to be entered into for its benefit, have been approved by all necessary corporate authority and Governmental Authority for each respective Settling Plaintiff. Each respective Settling Plaintiff further represents and warrants that in connection with the execution, delivery, and performance of this Settlement Agreement, the Escrow Agreement, the Release and Indemnity Agreement, and the Stipulations of Dismissal, that each respective Settling Plaintiff has complied with all provisions of the Constitution and laws of the respective states of such Settling Plaintiff and the respective charter, rules, and regulations of such Settling Plaintiff, that each Settling Plaintiff has or has obtained the full power and authority to enter into this Settlement Agreement, the Escrow Agreement, the Release and Indemnity Agreement, and the Stipulations of Dismissal, and that their execution, delivery, and performance by each respective Settling Plaintiff, or on its behalf, does not and will not contravene or constitute a default under any provision of applicable law or regulation or of any agreement, judgment, injunction, order, decree, or contractual restriction binding on such Settling Plaintiff or their property, and does not result in or require the creation or imposition of any lien, security interest, or other charge or encumbrance in favor of a third party upon or with respect to such Settling Plaintiff's property.

  3.5 Each respective Settling Plaintiff further represents and warrants that no further approval, authorization, consent, order, notice to, or filing or registration, with any Governmental

-10-

SETTLEMENT AGREEMENT

Authority is required with respect to the participation by such Settling Plaintiff in this Settlement Agreement and the execution, delivery to, and performance by such Settling Plaintiff of this Settlement Agreement, the Escrow Agreement, the Release and Indemnity Agreement, and the Stipulations of Dismissal to which it is a party, except any necessary court approvals that may be required in connection with the settlement of the claims of individual Settling Plaintiffs who are minors.

3.6     Each respective Settling Plaintiff also further represents and warrants that, without limiting the generality of the foregoing, such Settling Plaintiff is not entitled to any immunity on any grounds (i) with respect to the performance of their obligations under this Settlement Agreement or the Release and Indemnity Agreement, or (ii) from any legal proceedings to enforce the obligations hereunder or under the Escrow Agreement, the Release and Indemnity Agreement, and the Stipulations of Dismissal. Each respective Settling Plaintiff further represents and warrants that it will not challenge or contest the validity of this Settlement Agreement, the Escrow Agreement, or the Release and Indemnity Agreement and that each respective Settling Plaintiff forever waives any defense to the validity of the Settlement Agreement, the Escrow Agreement, and the Release and Indemnity Agreement, including any defense based on any claim the Settlement Agreement, the Escrow Agreement, and/or the Release and Indemnity Agreement are ultra vires, violative of sovereign immunity, or otherwise void.

3.7     This Settlement Agreement, the Release and Indemnity Agreement, and the Stipulations of Dismissal to which each respective Settling Plaintiff is a party, and the Escrow Agreement that is entered into for its benefit, have been or will be duly executed and delivered by an authorized representative of each Settling Plaintiff and are, or upon execution will be, the valid and legally binding obligations of such Settling Plaintiff, enforceable against the respective Settling Plaintiff in accordance with their respective terms, except as may apply to the settlement of the claims of individual Settling Plaintiffs who are minors and who may require court approval.

3.8     Each Settling Plaintiff respectively represents and warrants that all of its Public Water System operating wells are listed on the attached Exhibit B, that each Settling Plaintiff owns or operates the respective wells identified as theirs on the attached Exhibit B and are the real

-11-

SETTLEMENT AGREEMENT

parties in interest in connection with those wells with standing to bring the Released Claims and to compromise them.

3.9    Each Settling Plaintiff respectively represents and warrants that all of its Public Water System wells that have ever had a detected level of any amount of MTBE or TBA in a water sample from such well influent at any time are listed on the attached Exhibit G.

3.10    Each Settling Plaintiff respectively represents and warrants that all of its Public Water System operating wells that have never had a detected level of any amount of MTBE or TBA in a water sample from such well influent at any time are listed on the attached Exhibit H.

## IV.  OBLIGATIONS OF SETTLING PLAINTIFFS

4.1    On or before the Date of Execution, each respective Settling Plaintiff shall cause to be delivered to Sheila L. Birnbaum, Esq. at the location set forth in the Notice provisions herein, a validly executed Settlement Agreement.  Execution of the Settlement Agreement shall bind each respective Settling Plaintiff to the terms of the Treatment Protocol, which is incorporated by reference as if fully set forth herein.

4.2    On or before the Date of Execution, the Settling Plaintiffs also shall cause to be delivered to Sheila L. Birnbaum, Esq. at the location set forth in the Notice provisions herein, fully executed and binding Release and Indemnity Agreements substantially in the form of the attached Exhibit C, or where applicable Exhibit D, which must be valid and binding in all respects as against the Settling Plaintiffs on whose behalf each Release and Indemnity Agreement has been executed and any actions by any Governmental Authority required for such Release and Indemnity Agreements to be valid and binding shall have occurred prior to their transmittal to Settling Defendants and copies of such powers and/or authorizations shall be included with the Release and Indemnity Agreements.

4.3    On or before the Date of Execution, the Settling Plaintiffs shall cause to be delivered to Sheila L. Birnbaum, Esq. at the location set forth in the Notice provisions herein fully executed Stipulations of Dismissal substantially in the form of the attached Exhibit I, which must be valid and binding in all respects as against the Settling Plaintiffs on whose behalf such stipulations have been executed and which shall dismiss with prejudice the Settling Defendants and

-12-

SETTLEMENT AGREEMENT

any Released Parties from all litigation covered by this Settlement Agreement, including from all cases, claims and lawsuits identified on the attached Exhibit A.

4.4    Each respective Settling Plaintiff specifically authorizes Robert Gordon, Esq. of Weitz and Luxenberg PC and Scott Summy of Baron and Budd PC to execute on its behalf and for its benefit the Escrow Agreement substantially in the form of the attached Exhibit E and to serve as designated authorized representatives of the Settling Plaintiffs under the terms of the Escrow Agreement. The executed Escrow Agreement shall be delivered to Settling Defendants and the Escrow Agent on or about the Date of Execution. Settling Plaintiffs, jointly and severally, shall indemnify, hold harmless and defend the Escrow Agent and Settling Plaintiffs' designated authorized representatives identified above, from and against any and all losses, claims, liabilities and reasonable expenses which it or they may suffer or incur in connection with the performance of the duties and obligations under the Escrow Agreement, except for those losses, claims, liabilities and expenses resulting solely and directly from its or their own gross negligence or willful misconduct. Further, Settling Plaintiffs agree that they shall be severally responsible to pay 50% of the remaining unpaid fees and expenses, if any, arising from the creation, administration, and regulatory compliance of the Escrow Account that is not covered by interest earned by the Escrow Account. Each Settling Plaintiff's share of such remaining unpaid fees and expenses shall be based on its respective share under the Allocation of Settlement Proceeds. The amount, if any, due and owing by Settling Plaintiffs under this Section may be deducted and paid by Baron & Budd PC from its MTBE Trust Account to which the principal amount of the Escrow Account is disbursed. Further, it is expressly agreed that by serving as a designated authorized representative for the Escrow Agreement, an attorney-client relationship is not created between the designated authorized representatives identified above and any party to this Settlement Agreement, unless such attorney-client relationship existed beforehand. The Settling Plaintiffs, through counsel, shall confirm in a timely manner the appropriateness of the actions to be taken under the Escrow Agreement by the designated authorized representatives upon the request of the designated authorized representatives above.

-13-

SETTLEMENT AGREEMENT

4.5    All executed Settlement Agreements received by Settling Plaintiffs pursuant to Paragraph 6.1 herein shall be held in escrow until the Effective Date is reached.  Upon receipt of the executed documentation delivered pursuant to Paragraph 6.1, the Settling Plaintiffs shall inspect and review such documentation for any deficiencies.

4.6    On or about March 24, 2008, the Settling Plaintiffs shall cause a written statement to be delivered to all parties identified in the Notice provision herein, indicating: (i) the identity of the respective Settling Defendants who have delivered the documentation referred to in Paragraph 6.1 in compliance with the Settlement Agreement, (ii) the identity of any Settling Defendants who have failed to deliver such documentation in compliance with the Settlement Agreement, and (iii) any deficiencies in the documentation submitted pursuant to Paragraph 6.1.

4.7    Any Settling Defendant whose documentation submitted under Paragraph 6.1 is deficient shall have twenty (20) business days following notification pursuant to Paragraph 4.6 above to cure any deficiencies, unless otherwise agreed to in writing by the Settling Defendants and Settling Plaintiffs.

4.8    The inspection and review procedure, and the curing of any deficiencies, as set forth in Paragraphs 4.6 and 4.7 above shall be completed before the occurrence of any court hearing on the good faith nature of the Settlement Agreement.

4.9    Settling Plaintiffs also hereby agree to reduce any judgment for any of the Released Claims that they might recover against any entity other than Settling Defendants by release and discharge in an amount, fraction, portion, or percentage necessary under applicable state or federal law to bar, eliminate, relieve, or satisfy claims against the Settling Defendants for contribution and/or indemnity to the fullest extent permitted by applicable state or federal law arising from any Released Claims, including any amount reallocated by applicable state or federal statute or common law to Settling Defendants resulting from uncollectibility and/or insolvency of other persons or entities determined to be at fault.  This specific provision does not apply to California cases.  Instead, Settling Defendants shall receive all the benefits and protections that California law provides as to contribution and indemnity claims upon a court's good faith approval of the Settlement Agreement.

-14-

SETTLEMENT AGREEMENT

4.10    Settling Plaintiffs shall execute any additional documentation that may be required under applicable state or federal law in order to give effect to this Settlement Agreement and the Release and Indemnity Agreement and/or participate in and support this Settlement Agreement in any necessary good faith hearings before the MDL court or other courts required to make such a finding of good faith or any appeals of any court decisions on this issue.

4.11    Settling Plaintiffs acknowledge that they are not entitled to access to the Defendants' Allocation, which is confidential.  Settling Plaintiffs agree that they will not seek to obtain the Defendants' Allocation in the litigation subject to this Settlement Agreement or any other litigation. Unless the Defendants' Allocation is made public by the Settling Defendants as may be required by law, if necessary to establish the good faith nature of settlements by a court or court(s), or in the event of a default of performance by a Settling Defendant in which case Settling Plaintiffs will be apprised of that Settling Defendant's allocated share under the Defendants' Allocation in order to facilitate enforcement, if Settling Plaintiffs inadvertently or otherwise obtain the Defendants' Allocation, Settling Plaintiffs agree not to use or disseminate the information, but will notify Settling Defendants, return any documents reflecting Defendants' Allocation, and certify to Settling Defendants that the information will not be used or disseminated.  Settling Plaintiffs agree that, Article XIII herein notwithstanding, in the event Settling Defendants must provide a court and/or non-settling defendants with the Defendants' Allocation in connection with establishing the good faith nature of the settlements under Article IX herein, Settling Plaintiffs agree to join in a motion seeking to have the Defendants' Allocation filed under seal and produced pursuant to orders of confidentiality.

4.12    Settling Plaintiffs agree that they shall permit the Mediator to provide to Settling Defendants, or to any of them, the Allocation of Settlement Proceeds with respect to all or some of the Settling Plaintiffs to the extent such information is to be used in connection with (i) establishing the good faith nature of the settlement, (ii) assisting one or more Settling Defendants with any insurance or reinsurance claims, tax issues, or financial or other reporting matters, or (iii) in the event a Settling Plaintiff does not provide executed settlement documentation as required or otherwise decides not to join this settlement.  To the extent Settling Defendants provide the

-15-

SETTLEMENT AGREEMENT

Allocation of Settlement Proceeds to any third-parties pursuant to subsection (ii) above, they shall do so pursuant to a confidentiality agreement.

## V.  REPRESENTATIONS AND WARRANTIES OF SETTLING DEFENDANTS

5.1    Each Settling Defendant represents and warrants that the Defendants' Allocation, which has been agreed to by the Settling Defendants, has been communicated in confidence to the Mediator.

5.2    Each Settling Defendant represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, or other entity validly existing and in good standing under the laws of the jurisdiction of its registration.

5.3    Each Settling Defendant represents and warrants that all required corporate or other approvals have been obtained, permitting such Settling Defendant's undersigned representative to execute this Settlement Agreement and deliver them to the Settling Plaintiffs, through Settling Plaintiffs' counsel, with binding effect upon such Settling Defendant.

5.4    Each Settling Defendant represents and warrants that the execution, delivery, and performance by such Settling Defendant of this Settlement Agreement will not contravene or constitute a default under any provisions of applicable law or regulation or any agreement, judgment, injunction, order, decree, or contractual restriction binding on such Settling Defendant.

5.5    Each Settling Defendant represents and warrants that, except as provided in this Settlement Agreement, no further approval, authorization, consent, order, notice to or filing or registration with any Governmental Authority is required with respect to such Settling Defendant's participation in this Settlement Agreement and entering into and performing this Settlement Agreement or causing the Escrow Agreement to be entered into for its benefit.

5.6    Subject to the provisions of this Settlement Agreement, each Settling Defendant represents and warrants that no other person or entity has any interest in the claims it is releasing pursuant to Article VIII ("Settling Defendants' Release of Claims").

-16-

SETTLEMENT AGREEMENT

## VI.  OBLIGATIONS OF SETTLING DEFENDANTS

6.1     On or before the Date of Execution, each respective Settling Defendant shall cause to be delivered to Robert Gordon, Esq. at the location set forth in the Notice provisions herein, a validly executed Settlement Agreement.  Execution of the Settlement Agreement shall bind each respective Settling Defendant to the terms of the Treatment Protocol, which is incorporated by reference as if fully set forth herein.

6.2     Each respective Settling Defendant specifically authorizes Steve Leifer, Esq. of Baker Botts LLP and Sheila L. Birnbaum, Esq. of Skadden, Arps, Slate, Meagher & Flom LLP to execute on its behalf and for its benefit the Escrow Agreement substantially in the form of the attached Exhibit E and to serve as designated authorized representatives of the Settling Defendants under the terms of the Escrow Agreement.  The executed Escrow Agreement shall be delivered to Settling Plaintiffs and the Escrow Agent on or about the Date of Execution.  Settling Defendants, jointly and severally, shall indemnify, hold harmless and defend the Escrow Agent and Settling Defendants' designated authorized representatives identified above, from and against any and all losses, claims, liabilities and reasonable expenses which it or they may suffer or incur in connection with the performance of the duties and obligations under the Escrow Agreement, except for those losses, claims, liabilities and expenses resulting solely and directly from its or their own gross negligence or willful misconduct.  Further, Settling Defendants agree that they shall be severally responsible to pay 50% of the remaining unpaid fees and expenses, if any, arising from the creation, administration, and regulatory compliance of the Escrow Account that is not covered by interest earned by the Escrow Account.  Each Settling Defendant's share of such remaining unpaid fees and expenses, if any, shall be based on its respective share under the Defendants' Allocation.  Further, it is expressly agreed that by serving as a designated authorized representative for the Escrow Agreement, an attorney-client relationship is not created between the designated authorized representatives identified above and any party to this Settlement Agreement, unless such attorney-client relationship existed beforehand.  The Settling Defendants, through counsel, shall confirm in a timely manner the appropriateness of the actions to be taken under the Escrow

-17-

SETTLEMENT AGREEMENT

Agreement by the designated authorized representatives upon the request of the request of the designated authorized representatives above.

6.3     All executed Settlement Agreements, Release and Indemnity Agreements and Stipulations of Dismissal received by Settling Defendants pursuant to Paragraphs 4.1, 4.2 and 4.3 above, shall be held in escrow until the Effective Date is reached.  In the event the Effective Date is not reached and this Settlement Agreement is terminated, the Release and Indemnity Agreements and the Stipulations of Dismissal shall be returned to the Settling Plaintiffs and said documents shall be considered null and void. Upon the occurrence of the Effective Date, Settling Defendants may cause the Stipulations of Dismissal with prejudice executed by each of the Settling Plaintiffs to be filed with the appropriate courts.

6.4     Upon receipt of the executed documentation delivered pursuant to Paragraphs 4.1, 4.2, and 4.3, the Settling Defendants shall inspect and review such documentation for any deficiencies.

6.5     On or about March 24, 2008, the Settling Defendants shall cause a written statement to be delivered to all parties identified in the Notice provision herein, indicating: (i)  the identity of the respective Settling Plaintiffs who have delivered the documentation referred to in Paragraphs 4.1, 4.2, and 4.3 in compliance with the Settlement Agreement, (ii) the identity of any Settling Plaintiffs who have failed to deliver such documentation in compliance with the Settlement Agreement, and (iii) any deficiencies in the documentation submitted pursuant to Paragraphs 4.1, 4.2, and 4.3.

6.6     Any Settling Plaintiff whose documentation submitted under Paragraphs 4.1, 4.2, and 4.3 is deficient shall have twenty (20) business days following notification pursuant to Paragraph 6.4 above to cure any deficiencies, unless otherwise agreed to in writing by the Settling Defendants and Settling Plaintiffs.  Unless otherwise agreed to in writing, if a Settling Plaintiff takes more than twenty (20) days to cure any such deficiencies, that Settling Plaintiff shall forfeit to Settling Defendants any interest or income that is earned during the period of the deficiency up to the time the deficiency is cured and to which that Settling Plaintiff would otherwise be entitled to under the provisions of the Escrow Agreement.

-18-

SETTLEMENT AGREEMENT

6.7    The inspection and review procedure, and the curing of any deficiencies, as set forth in Paragraphs 6.5 and 6.6 above shall be completed before the occurrence of any court hearing on the good faith nature of the Settlement Agreement.

6.8    All obligations of the Settling Defendants pursuant to this Settlement Agreement (including but not limited to the Payment Obligation and the Future Treatment Obligation) are intended to be, and shall remain, several and not joint obligations.

6.9    The Payment Obligation of each Settling Defendant shall be limited to the confidential percentage allocated share for that specific Settling Defendant of the Aggregate Settlement Payment.  The Future Treatment Obligation of each Settling Defendant shall be limited to 70.6606% of the confidential percentage allocated share for that specific Settling Defendant of the Aggregate Settlement Payment, and any deficiency in the costs of future treatment not satisfied by the Future Treatment Obligation of Settling Defendants, or any of them, shall be the responsibility and obligation of Settling Plaintiffs and not the Settling Defendants in connection with the Future Treatment Obligation under this Settlement Agreement.

6.10    In consideration of the representations and warranties of Settling Plaintiffs, the delivery of valid and binding Release and Indemnity Agreements in the form of the attached Exhibit C, or where applicable Exhibit D, by Settling Plaintiffs to Settling Defendants, the delivery of valid and binding Stipulations of Dismissal in the form of the attached Exhibit I by Settling Plaintiffs to Settling Defendants, Settling Plaintiffs' compliance with the other provisions of this Settlement Agreement and the occurrence of the Effective Date, each Settling Defendant shall cause an amount equal to its respective share of the Aggregate Settlement Payment as determined by the Defendants' Allocation to be paid within 10 Business Days following the Effective Date to the Escrow Account subject to the Escrow Agreement for payment by the Escrow Agent to the Settling Plaintiffs pursuant to the terms of this Settlement Agreement and the Escrow Agreement. The Payment Obligation of each Settling Defendant is fully satisfied when its respective share of the Aggregate Settlement Payment is transferred into the Escrow Account.

6.11    In further consideration of the representations and warranties of Settling Plaintiffs, the delivery of valid and binding Release and Indemnity Agreements in the form of the attached

-19-

SETTLEMENT AGREEMENT

Exhibit C, or where applicable Exhibit D, by Settling Plaintiffs to Settling Defendants, the delivery of valid and binding Stipulations of Dismissal in the form of the attached Exhibit I by Settling Plaintiffs to Settling Defendants, Settling Plaintiffs' compliance with the other provisions of this Settlement Agreement, and the occurrence of the Effective Date, Settling Defendants further agree to the obligations set forth in the Treatment Protocol attached as Exhibit F. Notwithstanding anything to the contrary, the following wells of United Water of New York are ineligible for future treatment under the Future Treatment Obligation: Pomona 38, Monsey 30, Birchwood 70, Eckerson 71, and Willow Tree 56.

6.12    Settling Defendants will have no Future Treatment Obligation under this Settlement Agreement or the Treatment Protocol with respect to a specific well if the presence of MTBE or TBA in or at that well is attributable either to (i) intentional misconduct of a Settling Plaintiff or its subsidiaries, affiliates, employees or agents, (ii) intentional discharge, dumping or disposal by any persons or entities other than the Settling Defendants, or (iii) the use of MTBE or TBA in the future in connection with products, processes, or uses other than gasoline. The mere fact of a release from an underground storage tank ("UST") leak or from an UST overfill, in and of itself, will not constitute an intentional discharge, dumping or disposal by a third party.

6.13    In accordance with the Treatment Protocol, prior to the initiation of any treatment pursuant to the Future Treatment Obligation, Settling Defendants may propose to a Settling Plaintiff a buy-out option in lieu of treatment that the Settling Plaintiff may accept, which if accepted, will completely satisfy all present and future obligations of Settling Defendants under this Settlement Agreement with respect to the well subject to that buy-out.

6.14    Settling Plaintiff will assign to Settling Defendants rights against all potentially responsible parties with respect to any treatment or a buy-out provided under the Treatment Protocol to the extent of the share of the treatment or buy-out provided by Settling Defendants under the Treatment Protocol.

6.15    If a conflict or inconsistency arises between the terms of this Settlement Agreement and the Treatment Protocol in connection with the eligibility, treatment, discharge or satisfaction of the Future Treatment Obligation, the terms of the Treatment Protocol shall govern.

-20-

SETTLEMENT AGREEMENT

6.16    Settling Plaintiffs and Settling Defendants shall direct the Escrow Agent to communicate in writing to the Settling Defendants and the Mediator the identity of each Settling Defendant that deposits funds into the Escrow Account and the amount of each such deposit. The Mediator, using the confidential Defense Allocation, shall determine whether each Settling Defendant has met its Payment Obligation under the terms of this Settlement Agreement and shall inform Settling Plaintiffs and Settling Defendants of the identity of any Settling Defendants who have not met its Payment Obligation. The Escrow Agent shall cause the release of the Aggregate Settlement Payment from Escrow to the Settling Plaintiffs in accordance with the Escrow Agreement no sooner than ten (10) Business Days following the Effective Date.

6.17    If for any reason, one or more Settling Defendants exercise a right of withdrawal or termination under Article VII or Article IX of this Settlement Agreement following the payment of funds by said Settling Defendants into Escrow, the funds will be returned to each Settling Defendant who exercised a right of withdrawal or termination under this Settlement Agreement with interest according to the payments made by said Settling Defendants under the Defendants' Allocation.

6.18    The Aggregate Settlement Payment includes Settling Plaintiffs' attorneys fees and costs.

6.19    If an appeal or collateral attack is made on this Settlement Agreement and/or any court finding that this Settlement Agreement is a good faith settlement, thereby preventing the occurrence of the Effective Date, and all other preconditions for the occurrence of the Effective Date have been satisfied, the payments described in Paragraph 6.10 above shall be made into Escrow within ten (10) Business Days of the receipt of the pleading or other paper that prevents and/or delays the Effective Date from otherwise occurring. The sums paid into Escrow pursuant to this paragraph shall be deposited into an interest bearing depository account or other investment permitted by the Escrow Agreement pending the occurrence of the Effective Date or the termination of the Settlement Agreement.

-21-

SETTLEMENT AGREEMENT

## VII. SETTLING DEFENDANTS RIGHT OF TERMINATION

**7.1** In the event fewer than 100% of all Settling Plaintiffs accept these terms and validly execute this Settlement Agreement and deliver valid and binding Settlement Agreements, Release and Indemnity Agreements and Stipulations of Dismissal as provided herein by the Date of Execution of this Settlement Agreement and/or the period permitted to cure deficiencies in their submission following the Date of Execution as set forth in Paragraph 6.6 above, each Settling Defendant, individually at its sole option, may terminate its participation under this Settlement Agreement, without prejudice to any parties and without any further obligation under the terms of this Settlement Agreement, by giving written notice to counsel for Settling Plaintiffs and counsel for Settling Defendants as set forth in the Notices provision of this Settlement Agreement on or before May 6, 2008 or ten (10) days of receipt of notification from the Mediator of the identity and allocated shares of interest of those Plaintiffs declining to execute this Settlement Agreement or who failed to submit the required Releases and Stipulations of Dismissal within the period permitted under this Settlement Agreement, whichever is later.

**7.2** In the event this Settlement Agreement is not terminated by Settling Defendants and continues with less than 100% participation by Settling Plaintiffs, the amount of the Aggregate Settlement Payment to be paid by Settling Defendants shall be reduced by the percentage amount allocated to any Settling Plaintiff who did not accept the terms of the Settlement Agreement and failed to validly execute this Settlement Agreement in addition to any other reductions to the Aggregate Settlement Payment under the terms of this Settlement Agreement, and any Future Treatment Obligations shall not extend to such Settling Plaintiffs who failed to execute or otherwise comply with this Settlement Agreement and any wells owned, operated, or accessed by said Settling Plaintiff on or before the Date of Execution of this Settlement Agreement.

**7.3** In the event that Settling Defendants withdraw from this Settlement Agreement under the provisions of paragraph 7.1 above or Article IX herein in sufficient numbers that remaining in the settlement are Settling Defendants whose allocated shares represent less than 85% of the Aggregate Settlement Payment, the remaining Settling Defendants may individually elect to withdraw from and terminate this Settlement Agreement without prejudice and with no further

SETTLEMENT AGREEMENT

obligations under these terms by providing written notification to counsel for Settling Plaintiffs and counsel for Settling Defendants as set forth in the Notices provision of this Settlement Agreement and the Escrow Agent on or before May 6, 2008 or ten (10) Business Days of receipt of notification of all Settling Defendants who terminated their participation in this Settlement Agreement under the provisions of paragraph 7.1 above or Article IX herein, whichever is later.

## VIII.   SETTLING DEFENDANTS' RELEASE OF CLAIMS

Within 10 Business Days of the Effective Date, those Settling Defendants who asserted claims against Settling Plaintiffs arising from the Released Claims in declaratory judgment actions or counterclaims agree to provide releases and stipulations of dismissal with prejudice as to those Settling Defendants to those Settling Plaintiffs against whom such declaratory judgment actions or counterclaims were brought, including any claims for fees and costs arising from the litigation that is subject to this Settlement Agreement.

## IX.   GOOD FAITH DETERMINATIONS

9.1     Within 30 days following the Date of Execution and following the delivery to Settling Defendants as set forth herein of the executed Release and Indemnity Agreements and Stipulations of Dismissal by Settling Plaintiffs, the parties shall cause a motion to be filed in MDL 1358, seeking the court's order approving each Settling Plaintiffs' settlement that may require such an order to extinguish claims for contribution and indemnity against Settling Defendants, as a good faith settlement under applicable law in connection with those cases that are pending in MDL 1358.

9.2     Within 10 days of filing the motion in MDL 1358 referred to in paragraph 9.1 above, the parties shall cause applicable procedures to be commenced or motions to be filed in those courts other than in MDL 1358 where cases subject to this Settlement Agreement are pending and the applicable law may require a court finding that the Settlement Agreement is a good faith settlement or other procedure in order to extinguish claims for contribution and indemnity against Settling Defendants, seeking to have the Settlement Agreement adjudged a good faith settlement.

-23-

SETTLEMENT AGREEMENT

9.3    If any court finds any of the Settling Plaintiff's settlements not to be in good faith, any Settling Defendant to this Settlement Agreement may, within 30 days of written notice of such event, declare in writing to those listed under the Notice provision of this Settlement Agreement that this Settlement Agreement is void as to that Settling Defendant.  Notwithstanding this provision, a Settling Defendant may seek an appeal of such ruling without prejudice to its ability to terminate its participation under the provisions of paragraph 9.4 below.

9.4    If any appellate court (including any Court of Appeals or Supreme Court) finds that this Settlement Agreement does not constitute a good faith settlement in connection with any Settling Plaintiff, any Settling Defendant to this Settlement Agreement may, within 30 days of written notice of such event, declare in writing to those listed under the Notice provision of this Settlement Agreement that this Settlement Agreement is void as to that Settling Defendant.

9.5    If this Settlement Agreement becomes void due to the exercise of any provision of Article IX following the payment of the Aggregate Settlement Payment, or any part thereof, into Escrow pursuant to paragraph 6.19 above, then the funds with any accrued interest shall be repaid to the Settling Defendants who terminated their participation under this Settlement Agreement according to the payments made by the Settling Defendants into Escrow.  In such event, the parties shall take such steps and execute such documents as may be required to restore the Settling Plaintiffs and such Settling Defendant to their respective positions as if this Settlement Agreement had never been entered into.

9.6    If any appellate court were to find that any trial court lacked subject matter jurisdiction to decide the good faith of this Settlement Agreement, then the Settling Plaintiffs and Settling Defendants shall execute and file such motions or other papers with a court or courts of competent jurisdiction as may be necessary to obtain a final order(s) finding that the settlement is a good faith settlement under applicable law.  The funds in Escrow will remain in Escrow until following the granting of all good faith approvals and the occurrence of the Effective Date or until the Settlement Agreement is terminated as set forth in the Escrow Agreement.

9.7    Settling Defendants agree that, Article XIII herein notwithstanding, in the event either Settling Defendants or Settling Plaintiffs must provide a court and/or non-settling defendants

-24-

SETTLEMENT AGREEMENT

with the Allocation of Settlement Proceeds in connection with establishing the good faith nature of
the settlements under this Article IX, Settling Plaintiffs agree to provide the Allocation of
Settlement Proceeds and Settling Defendants agree to join in a motion seeking to have the
Allocation of Settlement Proceeds filed under seal and produced pursuant to orders of
confidentiality.

## X.  NO ASSIGNMENT WITHOUT CONSENT

Except as otherwise provided in Exhibit F, neither the Settling Defendants, on the
one hand, nor Settling Plaintiffs, on the other hand, may assign their rights or obligations under this
Settlement Agreement without the consent of the other(s).  That consent shall not be unreasonably
withheld; provided, however, that no such assignment shall relieve the Settling Defendants or
Settling Plaintiffs of their obligations under this Settlement Agreement.  A merger, or divestiture of
a subsidiary or division, or merger or reorganization of a Settling Defendant or Settling Plaintiff
shall not be deemed an assignment for purposes of this Settlement Agreement.  If some or all of the
Settling Defendants seek to assign to a third party the responsibility for fulfilling their Future
Treatment Obligations, Settling Plaintiffs shall not withhold consent to such an assignment unless
Settling Plaintiffs can show that the third party is incapable of fulfilling or guaranteeing the
performance of the Future Treatment Obligations.

## XI.   NO VICARIOUS LIABILITY FOR FUTURE TREATMENT

Neither Settling Plaintiffs nor the Settling Defendants shall be vicariously liable for
actions or inactions of any contractor selected by any Settling Defendants and approved by any
Settling Plaintiffs to design, construct, or operate any treatment facility in the future pursuant to
this Settlement Agreement and Treatment Protocol, except that the contracting party with any such
contractor, shall be responsible for enforcing the terms of the underlying contract.

-25-

SETTLEMENT AGREEMENT

## XII.  ALTERNATIVE DISPUTE RESOLUTION PROCESS

12.1   In the event of any dispute between any parties to this Settlement Agreement arising out of or relating to this Settlement Agreement, Treatment Protocol, or Escrow Agreement, those parties agree to try in good faith to settle the dispute by negotiation and/or mediation.

12.2   If the dispute cannot be resolved to those parties' mutual satisfaction through negotiation and/or mediation within thirty (30) days, the dispute shall be resolved through binding arbitration.  It is the intent of the parties that any dispute between any parties to this Settlement Agreement arising out of or relating to this Settlement Agreement, Treatment Protocol, or Escrow Agreement which is not promptly resolved through negotiation or mediation shall be resolved through binding arbitration and that the arbitration be structured in such a way as to minimize costs and delay.  The arbitration shall be conducted in accordance with the Judicial Arbitration and Mediation Service ("JAMS") Comprehensive Arbitration Rules and Procedures ("JAMS RULES") as attached hereto as Exhibit J with the following stipulations:

12.2.1   The arbitration hearing shall be held before a single arbitrator to be selected by the parties.  The parties shall endeavor to agree upon an arbitrator as soon as practicable after the Date of Execution.  If the parties are unable to select a single arbitrator, then, no later than 10 days after the first dispute is referred to arbitration pursuant to paragraph 12.2 above, the single arbitrator will be selected by David Geronemus, Esq., or if David Geronemus, Esq. is unavailable to make a selection, then by the President of JAMS.  The single arbitrator selected should be a person who has some experience or fluency in the technical areas which are the subject of the Treatment Protocol.  If for any reason the selection procedures above fail, then each party to the dispute shall select an arbitrator, and those arbitrators shall select a third arbitrator utilizing the technical criteria above, who shall be the single arbitrator for the dispute.  If the two arbitrators are unable to agree upon a third arbitrator within 15 days, the third arbitrator shall be selected by the President of the Bar Association of the City of New York utilizing the same technical criteria referred to above.  Any reference to an "arbitrator" in this Settlement Agreement shall be deemed a reference to an arbitrator selected pursuant to this paragraph.

-26-

SETTLEMENT AGREEMENT

       12.2.2   The arbitrator selected must be free of any interest affecting his/her impartiality and must make all appropriate disclosures to the parties.

       12.2.3   The arbitrator(s) may impose reasonable and equitable time limits on each arbitrating party's presentation at the arbitration hearing, and shall endeavor to complete the hearing in ten (10) business days or less from the day the hearing is commenced.

       12.2.4   The arbitration decision shall be rendered not later than thirty (30) days after the final day of the hearing and shall be judicially enforceable and binding in accordance with New York law.

       12.2.5   Summaries of any expert testimony, along with copies of all documents to be submitted as exhibits, shall be exchanged at least ten (10) business days before the arbitration hearing under procedures set up by the arbitrator.

       12.2.6   Except as otherwise specified herein or in the Treatment Protocol, there shall be no discovery or dispositive motion practice except as may be permitted by the arbitrator(s), who may authorize only such discovery as is shown to be necessary to ensure a fair hearing.

       12.2.7   The arbitrator(s) may retain a technical expert to aid in deciding the dispute between the parties, in which event the technical expert shall be chosen by agreement of the arbitrating parties or, absent such agreement, by the arbitrator(s) (subject to the arbitrating parties' right to disqualify the expert for conflict of interest).   Arbitration costs and fees shall be divided equally between the Settling Plaintiff(s) on one hand and the Settling Defendant(s) on the other hand, and paid subject to reallocation as set forth in the next subparagraph.   As among multiple Settling Plaintiffs, or multiple Settling Defendants, participating in the same arbitration, the costs and fees to be paid by each side shall be allocated among the multiple parties on that side in accordance with their relative allocations for purposes of the payments to or distributions from the Aggregate Settlement Payment, or as may be agreed to among the Settling Defendants or Settling Plaintiffs.

       12.2.8   Arbitration costs, arbitrator's fees and reasonable attorneys' fees and costs shall be awarded to the prevailing parties, if any, by the arbitrator(s).

SETTLEMENT AGREEMENT

12.2.9    For disputes concerning construction and/or interpretation of this
Settlement Agreement or Treatment Protocol, the arbitrator's decision shall be governed by JAMS
Rule 24(c).

12.2.10  The parties to this Settlement Agreement agree that any decision by the
arbitrator that is not overturned by a reviewing court under applicable law shall have the same issue
preclusion effect as a final judgment rendered by a court of competent jurisdiction.

12.2.11  The parties to this Settlement Agreement agree, notwithstanding the
common law and to the fullest extent permitted by law, that the arbitrator may order the parties to
take actions required to implement the terms of this Settlement Agreement or refrain from taking
actions that are contrary to the terms of this Settlement Agreement.

## XIII.  CONFIDENTIALITY PROVISIONS

The parties to this Settlement Agreement shall keep confidential the content of the
negotiations, points of discussion, documents, communications, and supporting data utilized or
prepared in connection with, or exchanged at, the mediation that preceded this Settlement
Agreement as well as all other negotiations and settlement discussions taking place outside of the
mediation, including but limited to other negotiations and settlement discussions occurring prior to,
contemporaneous with, or after the mediation in this case, as contemplated by Federal Rule of
Evidence 408, except as otherwise required by law.

## XIV.  NOTICES

All notices, requests, demands, claims, and other communications that are required
or may be given pursuant to this Settlement Agreement must be in writing and delivered personally
against written receipt, by a recognized overnight delivery service, or by telecopy, to the parties at
the addresses below (or to the attention of such other, different or additional person or entity or
such other address as any party may provide to the other party by notice in accordance with this
paragraph).  Any such notice or other communication will be deemed to have been given (i) if
personally delivered, when so delivered, against written receipt, (ii) if sent by a nationally

-28-

SETTLEMENT AGREEMENT

recognized overnight delivery service which guarantees next day delivery, one Business Day after

being so sent, or (iii) if given by telecopier, once such notice or other communication is transmitted

to the facsimile number specified below and the appropriate answer back or telephonic

confirmation is received, provided that such notice or other communication is promptly thereafter

delivered in accordance with the provisions of clauses (i) or (ii) hereof, in each case addressed to

the intended recipient as set forth below.  Any notice, request, demand, claim, or other

communication given hereunder using any other means (including mail, electronic or otherwise)

shall not be deemed to have been duly given unless and until there is evidence that such notice,

request, demand, claim or other communication actually is received by the individual for whom it

is intended.  Further, nothing in this Settlement Agreement nor by serving as a Designated

Representative for notice purposes shall be construed as creating an attorney-client relationship

between any of the Designated Representatives for notice purposes identified below and any party

to this Settlement Agreement, unless such attorney-client relationship existed beforehand.

FOR SETTLING PLAINTIFFS:

Robert Gordon, Esq.
Weitz and Luxenberg PC
180 Maiden Lane
New York, NY  10038
Telephone:  (212) 558-5500
FAX:  (212) 344-5461

Scott Summy, Esq.
Baron & Budd PC
3102 Oaklawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone:  (214) 521-3605
FAX:  (214) 520-1181

Victor M. Sher, Esq.
Sher Leff LLP
450 Mission Street, Ste. 400
San Francisco, CA  94105
Telephone:  (415) 348-8300, ext. 100
FAX:  (415) 348-8333

SETTLEMENT AGREEMENT

FOR SETTLING DEFENDANTS:

David B. Garten
or Current Vice President and General Counsel
Chevron Global Downstream LLC
6111 Bollinger Canyon Road, Suite 485, Rm 4730
San Ramon CA 94583
Telephone: (925) 543-1630
FAX: (925) 543-2313

Steve Leifer, Esq.
Baker Botts LLP
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Telephone: (202) 639-7723
FAX: (202) 585-1040

and:

Sheila L. Birnbaum, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036
Telephone: (212) 735-2450
FAX: (917) 777-2450

## XV. WARRANTY OF AUTHORITY

Each person who executes this Settlement Agreement on behalf of a corporation,

partnership, joint venture, unincorporated association, public authority, municipal corporation,

government, other entity, or minor child, represents and warrants to each party that he or she has

the authority to do so and has enclosed a certified copy of the requisite board or legislative

resolution, power of attorney, secretary's certificate, or other documentation evidencing the

authority of each person below to enter into this Settlement Agreement on behalf of the respective

settling person or entity indicated below.

## XVI. GOVERNING LAW

Except as otherwise provided, this Settlement Agreement and all actions arising out

of or in connection with this Settlement Agreement shall be governed by and construed in

accordance with the laws of the State of New York without regard to the conflicts of law or choice

of law provisions thereof. With regard to those Settling Plaintiffs in the California cases subject to

-30-

SETTLEMENT AGREEMENT

this Settlement Agreement, this Settlement Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflicts of law or choice of law provisions thereof because they do not have New York counsel representing them in connection with this Settlement Agreement.

### XVII.   WAIVER

With respect to the release of the Released Claims, Settling Plaintiffs expressly waive any rights or benefits available under section 1542 of the California Civil Code, which provides as follows, or any other similar statute or law:

> A GENERAL RELEASE DOES NOT EXTEND TO
> CLAIMS WHICH THE CREDITOR DOES NOT KNOW
> OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
> THE TIME OF EXECUTING THE RELEASE, WHICH IF
> KNOWN BY HIM OR HER MIGHT HAVE
> MATERIALLY AFFECTED HIS OR HER
> SETTLEMENT WITH THE DEBTOR.

The parties understand and acknowledge the significance and consequence of the specific waiver of California Civil Code section 1542 described above and of any similar statute or law.

### XVIII.   NO ADMISSION

This Settlement Agreement is a compromise of disputed claims and fully and finally settles all claims by Settling Plaintiffs against the Released Parties, and prevents any further action in connection with the Released Claims against the Released Parties in the litigation that is the subject of this Settlement Agreement or in any other litigation.  Neither the payment of any consideration hereunder nor anything contained in this Settlement Agreement, the Treatment Protocol, the Escrow Agreement, or the Release and Indemnity Agreement shall be interpreted or construed to be admission of liability or of any facts on the part of, nor to the prejudice of, any of

-31-

SETTLEMENT AGREEMENT

the Settling Plaintiffs, Settling Defendants, and/or Released Parties. The Released Parties expressly deny any and all liability associated with or related to the Released Claims.

## XIX. WARRANTY OF RIGHTS

Settling Plaintiffs, and each of them, represents and warrant to the Settling Defendants that they, respectively, have exclusive right and title to the wells listed on the attached Exhibits B and G. Settling Plaintiffs further represent and warrant to the Settling Defendants that each Settling Plaintiff has full authority to release the Released Claims in favor of the Released Parties as set forth in this Settlement Agreement and the Release and Indemnity Agreement.

## XX. ENTIRE AGREEMENT

Each party to this Settlement Agreement, individually and collectively, declares and represents that no promises, inducements, or other agreements not expressly contained herein between (1) Settling Plaintiffs and (2) Settling Defendants have been made with regard to the settlement of the Released Claims; that this Settlement Agreement contains the entire agreement between (1) Settling Plaintiffs and (2) Settling Defendants with respect to said subject matter; and that the terms of this Settlement Agreement, including all words, phrases, sentences, and paragraphs, including the recitals hereto, are contractual and not recitals only, and are material to the execution of this Settlement Agreement. All prior agreements and understandings, oral agreements and writings between (1) Settling Plaintiffs and (2) Settling Defendants regarding the matters set forth herein, including without limitation, that certain Outline of Proposed Settlement Terms ("Term Sheet") entered into among Settling Plaintiffs and the Settling Defendants on or about December 7, 2007, are expressly superseded hereby and are of no further force or effect. No part of this Settlement Agreement may be altered, amended, or modified in any respect, except by a writing duly executed by Settling Plaintiffs and the Settling Defendants.

-32-

SETTLEMENT AGREEMENT

## XXI. BINDING EFFECT

This Settlement Agreement hereto shall be binding upon and inure to the benefit of the Released Parties and the Settling Plaintiffs.

## XXII. FURTHER DOCUMENTS

To the extent any documents are required to be executed by any of the parties to this Settlement Agreement to effectuate this Settlement Agreement, each party agrees to execute and deliver such other and further documents as may be required to carry out the terms of this Settlement Agreement.

## XXIII. REPRESENTATION

Each party to this Settlement Agreement represents and acknowledges that it has been represented by counsel with respect to this Settlement Agreement and any and all matters covered by or related to such Settlement Agreement. Each party has been fully advised with respect to all rights which are affected by this Settlement Agreement.

## XXIV. NEUTRAL CONSTRUCTION

The parties to this Settlement Agreement agree that this Settlement Agreement was negotiated fairly between them at arms' length and that the final terms of this Settlement Agreement are the product of the parties' negotiations. The parties agree that this Settlement Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Settlement Agreement therefore should not be construed against a party or parties to it on the grounds that the party or parties drafted or was more responsible for drafting the provision(s).

SETTLEMENT AGREEMENT

### XXV. VOLUNTARY AND KNOWING EXECUTION

Each party signing represents and warrants that it read, knows, and understands the contents of this Settlement Agreement, has executed this Settlement Agreement voluntarily, and has not been influenced by any person or persons or attorney acting on behalf of any other party.

### XXVI. HEADINGS, NUMBER AND GENDER

Headings are used herein for convenience only and shall have no force or effect in the interpretation or construction of this Settlement Agreement. As used in this Settlement Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter genders.

### XXVII. TIME IS OF THE ESSENCE

Time is of the essence for each and every provision of this Settlement Agreement.

### XXVIII. GOOD FAITH EFFORT

The parties to this Settlement Agreement shall use their respective good faith efforts to comply with their obligations under this Settlement Agreement.

### XXIX. NO WAIVER; REMEDIES

No failure on the part of any party to this Settlement Agreement to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

-34-

SETTLEMENT AGREEMENT

## XXX.  SURVIVAL OF REPRESENTATIONS AND WARRANTIES

All representations and warranties of the parties to this Settlement Agreement have been and will be relied on by the other parties to this Settlement Agreement notwithstanding any investigation made by them.

## XXXI.  PAYMENT OF ATTORNEYS' FEES AND COURT COSTS

Each party to this Settlement Agreement shall be responsible for the payment of its own court costs, attorneys' fees, and all other expenses, costs, and fees in connection with the matters referred to in this Settlement Agreement, except as expressly set forth herein.

## XXXII.  ATTORNEYS' FEES AND COSTS TO ENFORCE AGREEMENT

If any action is required to be taken by any party to enforce any decision of an arbitrator as provided in this Settlement Agreement, the prevailing party in any such action shall be entitled to reasonable attorneys' fees and costs.

## XXXIII.  ADMISSIBILITY OF AGREEMENT

The parties expressly agree that this Settlement Agreement is a protected communication under Federal Rule of Evidence 408 and any equivalent code or common law rule of evidence of any state; however, the same shall be admissible in (i) an arbitration or any proceeding to enforce an arbitral decision under this Settlement Agreement, (ii) a proceeding the sole purpose of which is to enforce the terms of this Settlement Agreement and its Exhibits hereto, (iii) any proceeding to establish an insurance or reinsurance claim by a Settling Defendant or Released Party, (iv) any proceeding to establish an appropriate set-off or credit to a judgment entered or to be entered in favor of a Settling Plaintiff against an entity other than a Settling Defendant or any Released Parties, or (iv) other proceeding where such admission is necessary to effectuate the terms of this Settlement Agreement.

-35-

SETTLEMENT AGREEMENT

## XXXIV. EXECUTION BY COUNTERPARTS

This Settlement Agreement may be executed in one or more counterparts. All counterparts will constitute one instrument binding on the signatories upon execution of one or more counterparts by all parties. Counsel for any party shall be authorized to assemble a composite counterpart which shall consist of one copy of each page, except the signature pages, together with multiple counterpart signatures pages executed on behalf of every party to this Settlement Agreement. The composite counterpart may then be used by any party for all purposes as the complete signed and executed Settlement Agreement among the parties.

IN WITNESS WHEREOF, the parties hereto have duly executed this Settlement Agreement as of March 12, 2008.

Approved as to Form:

Scott Summy, Esq.
Baron & Budd, P.C.
Settling Plaintiffs' Counsel

LIST OF EXHIBITS, SIGNATURE PAGE INDEX, SIGNATURE PAGES

AND EXHIBITS FOLLOW THIS PAGE

EXHIBIT F – TREATMENT PROTOCOL

# TREATMENT PROTOCOL

**SECTION I**        <u>Definitions</u>

A.    "Treatment Contaminant" shall mean either methyl tertiary butyl ether ("MTBE"), defined as the chemical substance with the CAS Number 1634-04-4, or tertiary butyl alcohol ("TBA"), defined as the chemical substance with the CAS Number 75065-0, whichever compound was the reason for the well qualifying for treatment under this Treatment Protocol.

B.    "Well Treatment Contract" shall mean a contract between a PWS and the contractor that shall design, install, maintain and terminate the Treatment Method for a public water supply well that qualifies for treatment under this Treatment Protocol.

C.    "Treated Well" shall mean any public water supply well that qualifies for treatment under this Treatment Protocol and for which a Well Treatment Contract has been entered to treat the well.

D.    "Treatment Method" shall mean any technology, method, procedure or action, or combination thereof, that is capable of reducing the level of MTBE below 0.51 ppb or TBA at or below 2 ppb, and is not prohibited by law in the jurisdiction in which the treated well is located. Treatment methods specifically include the following, as long as the following are allowed by law in the jurisdiction in which the treated well is located, not prohibited by the governing regulatory authority, and consistent with this paragraph:

    <u>1.</u>  "GAC" shall mean treatment of water by filtration using granular activated carbon.

    <u>2.</u>  "Air Stripping" shall mean treatment of water by enhanced volatilization via an air stripping system.

    <u>3.</u>  "Blending" shall mean mixing of water from an impacted well with water from another source.

    <u>4.</u>  "Wellfield Optimization" shall mean the operation and pumping of supply wells in a manner that minimizes the concentrations of MTBE or TBA in water pumped from a PWS.

    <u>5.</u>  "Offsite Remediation" shall mean treatment of the MTBE or TBA sources and/or dissolved plumes that are causing the well to be impacted.

    <u>6.</u>  "Alternative Water Supply" shall mean other wells owned by or accessible to the PWS, new wells drilled for water supply, or any other source of water supply such as surface water systems or other public water supply (e.g., "city water").

    <u>7.</u>  "Other Treatment Methods" shall include advanced oxidation, bio-GAC, or other treatment methods or mitigation measures available at the time of treatment.

The Treatment Method must be feasible and will take into consideration the likely future demand for water of the PWS's customers with respect to total water demand but not necessarily increased production rates above normal production rates.  The Treatment Method should not

EXHIBIT F – TREATMENT PROTOCOL

unreasonably interfere with the PWS's daily operations for providing water or materially reduce the PWS's existing system capacity.

B.    "Treatment Costs" shall include all the reasonable costs incurred by the contractor under the Wellhead Treatment Contract to treat the Treatment Contaminant. These cost may include the full reasonable costs of designing, building, and installing a treatment facility; the full reasonable costs of operating and maintaining the treatment facility; the full reasonable costs of drilling a new supply well (if that is the most cost effective treatment method); and other costs incurred by the contractor under the Wellhead Treatment Contract. Treatment costs do not include costs caused by or in an effort to increase production rate or well yield above normal production rate or yield (gallons per minute).

F.    "Settling Defendants' Full Share of Costs" is 70.6606% if no Settling Defendant exercises its right to terminate its participation under the Settlement Agreement. In the event one or more Settling Defendants terminate their participation under the Settlement Agreement, the Settling Defendants' Full Share of Costs shall be reduced by the respective allocated shares under the Defendants' Allocation of those Settling Defendants who terminate their participation under the Settlement Agreement. Each Settling Defendant's liability is limited to its allocated share under the Defendants' Allocation, and such liability is several and not joint.

G.    "Dispute Resolution Procedures" shall mean those procedures applicable to disputes set forth in the Settlement Agreement. Any dispute arising out of or related to this Treatment Protocol shall be governed by the Dispute Resolution Procedures. The Settling Defendants agree that the Arbitrator referred to in the Dispute Resolution Procedures shall have access to Defendants' Allocation (as defined in Section 2.8 of the Settlement Agreement) if necessary to resolve disputes under this Treatment Protocol.

H.    "PWS" shall mean a Settling Plaintiff public water system.

I.    "Settling Defendants' Designated Representatives" and "Settling Plaintiffs' Designated Representatives" mean those representatives specified in Section XIV of the Settlement Agreement.

J.    All terms not specifically defined herein are defined as set forth in the Settlement Agreement.

SECTION II    Qualification of a Well for Treatment
A.    A well is eligible for future treatment under the terms of the Settlement Agreement dated March 12, 2008 if it satisfies all of the following criteria:

    1.    The well was owned or operated by a PWS as of the Date of Execution of the Settlement Agreement ("Execution Date") and listed on Exhibit H of the Settlement Agreement. The well must not have been one of the wells listed on either Exhibit G (wells with detections) or in Paragraph 6.5 of the Settlement Agreement (United Water threatened wells).

    2    As of the Execution Date: (a) samples of effluent from the well never had a

2

EXHIBIT F – TREATMENT PROTOCOL

detection for MTBE or TBA at any level (including detections below 0.51 ppb); and (b) the well has never been shut down because of detections of MTBE or TBA in nearby supply wells or monitoring wells, unless water from the well was delivered to customers under normal operating conditions from December 16, 2007 through the Execution Date. Shutting down a well for purposes of routine or emergency maintenance, emergency conditions unrelated to the presence in groundwater of chemical contaminants, or operational changes necessary to meet system demands, shall not be considered in determining whether a well meets the requirements of this Paragraph.

3.     It shall be the obligation of the PWS to demonstrate that there have been no detections of the Treatment Contaminant in samples collected from the well on or before the Execution Date for the well to be eligible for treatment.  If a well is listed on Exhibit H, and if the well was regularly tested for the Treatment Contaminant prior to the Execution Date, there is a rebuttable presumption that the well did not have any such detections.  The PWS must have maintained all sampling data covered by the March 15, 2005 order of the Court for the Preservation of Documents, and all sampling data pertaining to samples taken between March 15, 2005 and the one year anniversary of the Execution Date, regardless of detection level achieved by the laboratory that analyzed the samples.  The PWS must provide all such data to the Settling Defendants' Designated Representatives when requesting treatment under this Treatment Protocol to verify that samples of water collected from the well never had a detection of MTBE or TBA as of the Execution Date.  Failure to provide all such data will not disqualify a well for treatment if the failure could not reasonably be expected to materially affect Settling Defendants' ability to verify the lack of earlier detections.  If the PWS is seeking treatment for TBA under this Treatment Protocol on or before January 1, 2013, then the PWS must also provide 4 consecutive quarterly samples of TBA with a detection level no higher than 2 ppb showing non-detect for TBA in the four quarters immediately following the Execution Date; otherwise, the well will not qualify for treatment for TBA prior to January 1, 2013.  After January 1, 2013, the lack of analytical data for TBA before the Execution Date or from the four quarters after the Execution Date shall not disqualify a well for treatment, but the PWS must otherwise demonstrate that the well did not have detections of TBA prior to the Execution Date.

4.     During the 20 year period following the Execution Date, there have been detections of MTBE in 4 consecutive calendar quarters, each at a level equal to or greater than 5 parts per billion (5 ppb) (4 ppb in California), or detections of TBA in 4 consecutive calendar quarters, each at a level equal to or greater than 10 ppb (8 ppb in California).

5.     The four samples noted in Paragraph II.A.4. above all must have been the first properly QA/QC'd samples of water withdrawn by the well in the calendar quarters in which they were taken. If applicable law requires that a confirmatory sample be taken of the first properly QA/QC'd sample, then the first sample shall be whichever sample is deemed controlling by applicable law as between the original sample and the confirmatory sample. "Properly QA/QC'd samples" shall be those that have been collected, analyzed and reported in a manner substantially in conformance with the standards and protocols set forth in ANSI/ASQ E4, *Quality Systems for Environmental Data and Technology Programs - Requirements with guidance for use, Section 6 (Part B)* or other data quality guidelines or standards established by the State or local agency that regulates chemical testing of groundwater produced by the PWS.

3

## EXHIBIT F -- TREATMENT PROTOCOL

The sampling, laboratory packages and other data or information gathered as part of the QA/QC procedures for such samples must be provided to the Settling Defendants' Designated Representatives along with the sampling results within 30 days of receipt by a PWS. In the case of the second, third and fourth quarterly samples, the Settling Defendants shall be entitled to split samples and to observe actual sampling of the water to be submitted for chemical analysis for the presence of MTBE and TBA. If a PWS does not provide data for a sample within the time required herein, then the samples taken up through and including those for which timely notice should have been provided will not count toward the requirement for four consecutive calendar quarters. Nothing herein prevents the well from qualifying for treatment in the future if the PWS subsequently submits four new consecutive calendar quarters of sampling results and notice to Settling Defendants' Designated Representatives in a timely manner (as set out above) and the other requirements of this Treatment Protocol are satisfied.

6.    To assure that the four samples noted in Paragraph II.A.4. above provide representative levels of the Treatment Contaminant, the samples will be taken under normal operating conditions for the well. "Normal operating conditions" mean pumping conditions that are typical for the well when operating at normal flow rates and supplying water for potable use by customers. If the well operates seasonally or intermittently, then results from samples drawn during normal operating conditions will be used in determining if the well qualifies for treatment under this Treatment Protocol. Sampling results should be supplemented with operational records to confirm the requisite pre-sampling operating time for intermittent or seasonal wells. All samples of effluent from the well shall be taken at a point prior to any treatment of the well water and prior to any blending with water from other sources.

7.    The MTBE or TBA detected in the samples must be attributable to the use of MTBE or TBA in gasoline and not some other use of MTBE or TBA. The burden to establish that the MTBE or TBA is attributable to a non-gasoline use shall be on the Settling Defendants.

8.    The MTBE or TBA detected in the samples must not be attributable either to intentional misconduct of the PWS or to intentional dumping or disposal by any persons or entities other than the Settling Defendants. A release from an underground storage tank ("UST") or from an UST overfill by itself will not constitute an intentional dumping or disposal by a third party.

9.    The well and water withdrawn from the well have not received treatment due to the presence of MTBE or TBA in the well at any point in time prior to the first of the four consecutive quarterly samples found to contain MTBE at or above 5 ppb (4 ppb in California) or TBA at or above 10 ppb (8 ppb in California) except as provided in Paragraphs II.A.10. and X.E. below.

10.    Paragraph II.A.4. notwithstanding, a PWS may begin the process of appointing a contractor, entering into a Well Treatment Contract, and selecting and implementing the most cost effective Treatment Method, provided that the PWS will be solely responsible for payment of all costs incurred until the well qualifies for treatment under this paragraph, and the Well Treatment Contract specifies that the PWS is solely responsible for all costs. A well with treatment will qualify under this paragraph for future treatment, and Settling Defendants will

4

**EXHIBIT F – TREATMENT PROTOCOL**

reimburse the PWS for the Settling Defendants' Full Share of Costs, in accordance with Section VI, of the amount that was paid to the contractor under the Well Treatment Contract prior to the well qualifying for treatment if, and only if:

      a.      At least 60 days prior to the selection of a contractor the PWS provided Settling Defendants' Designated Representatives and Settling Plaintiffs' Designated Rrepresentatives with written notice of its intent to implement treatment and whether the PWS is required to select a contractor by competitive bidding; and

      b.      Within 45 days of receipt of such notice the Settling Defendants' Designated Representative(s) notified the PWS in writing of either (i) the contractor whom Settling Defendants have selected pursuant to Section V.A., or (ii) the contractor whom the Settling Defendants have selected to participate in competitive bidding pursuant to Section V.B. If the Settling Defendants provided such notice then the contractor must have been selected pursuant to Section V. If the Settling Defendants did not provide such notice then the requirements of this subparagraph II.A.10.b. will have been met; and

      c.      The Treatment Method was selected in accordance with Section VII if Defendants provided notice pursuant to Paragraph II.A.10.b., or the Treatment Method was selected in substantial compliance with Section VII if they did not; and

      d.      One of the following occurs:

         i.      There have been detections of MTBE in samples meeting the requirements of Paragraphs II.A.5 and II.A.6 in 4Aggregate Consecutive Calendar Quarters, each at a level equal to or greater than 5 ppb (4 ppb in California), or detections of TBA in 4Aggregate Consecutive Calendar Quarters, each at a level equal to or greater than 10 ppb (8 ppb in California); OR

         ii.      All of the following occur: (1) there has been a detection above the then applicable MCL in the quarter immediately prior to the well being shut down or treatment installed; (2) there have been detections of MTBE in 4Aggregate Consecutive Calendar Quarters that average greater than the applicable MCL, which must include at least one detection after treatment is installed equal to or greater than 4 ppb; (3) the PWS demonstrates that without the treatment the PWS has implemented, use of the well to supply water for potable use by customers would violate legally applicable statutory or regulatory provisions because of the presence of MTBE after 4Aggregate Consecutive Calendar Quarters, and (4) the then applicable MCL must be equal to or greater than 5 ppb for MTBE or 10 ppb (8 ppb in California) for TBA. If a well qualifies for treatment under this Paragraph and a Treatment Contaminant is the only contaminant required under legally applicable statutory or regulatory provisions to implement treatment, then Settling Defendants shall be responsible for Settling Defendants' Full Share of Costs. If other contaminants treatable by the same Treatment Method are also required to be treated under legally applicable statutory or regulatory provisions, then Settling Defendants shall only be responsible for the incremental costs of treating the Treatment Contaminant. Allocation of such costs shall be determined pursuant to Section VI.

5

### EXHIBIT F – TREATMENT PROTOCOL

"Aggregate Consecutive Quarters" means the sum of: (1) the consecutive calendar quarters prior to the well being shut down due to the Treatment Contaminant or treatment being installed, which must include the calendar quarter immediately prior to the well being shut down due to the Treatment Contaminant or treatment installed, that satisfy the detection criteria in Paragraphs II.A.10.d.i. or ii; and (2) consecutive calendar quarters within 18 months after treatment has been implemented that satisfy the detection criteria in Paragraphs II.A.10.d.i. or ii.

The samples from calendar quarters used to identify the four "Aggregate Consecutive Calendar Quarters" required by Paragraphs II.A.10.d.i. or ii. must meet the requirements of Paragraphs II.A.5. and must have been taken under normal operating conditions as that term is defined in Paragraph II.A.6.

Nothing in this Paragraph II.A.10. shall prevent a PWS that begins the process of implementing treatment before any calendar quarter sample contains MTBE at or above 5 ppb (4 ppb in California) or TBA at or above 10 ppb (8 ppb in California), but fails to meet the requirements of Paragraph II.A.10.d.i. or ii, from being eligible for reimbursement in accordance with Paragraph II.E.

The following examples are intended to explain the paragraphs above:

Example 1.    If a well has two consecutive calendar quarters of detections of MTBE at or above 5 ppb before treatment is installed pursuant to this Section, and then there are two more consecutive calendar quarters of detections of MTBE at or above 5 ppb within 18 months of installing treatment, there would be 4 Aggregate Consecutive Calendar Quarters.

Example 2.    If a well has one calendar quarter where MTBE was detected at or above 5 ppb immediately before treatment is installed pursuant to this Section, and then there are three more consecutive calendar quarters of detections of MTBE at or above 5 ppb within 18 months of installing treatment, there would be 4 Aggregate Consecutive Calendar Quarters.

Example 3.    A well has one calendar quarter where MTBE was detected at or above 5 ppb, and solely because of MTBE, a PWS is required under legally applicable statutory or regulatory provisions to implement treatment, but the well is operated for one additional quarter prior to treatment being installed. For purposes of determining whether the well is eligible for treatment, the results of samples from both quarters prior to treatment installation must be included as 2 of the 4 Aggregate Consecutive Calendar Quarters.

        11.    If a PWS wishes to install treatment before the Effective Date because the Well would otherwise have qualified for treatment had the Effective Date existed as of the Execution Date, then a PWS may install treatment at its own cost before the Effective Date as long as it satisfies all of the requirements of this Treatment Protocol. If a well qualifies for treatment and the PWS does satisfy the requirements of this Treatment Protocol, then Settling Defendants will reimburse the PWS the Settling Defendants' Full Share of Costs for the Treatment Costs incurred prior to the Effective Date.

        12.    The well is still owned or operated by the same PWS referenced in Paragraph

6

**EXHIBIT F – TREATMENT PROTOCOL**

II.A.1. above, or its successors, on the date when treatment under this provision commences.

13.    The PWS has provided written notice to both the Settling Defendants' and Settling Plaintiffs' Designated Representatives within 30days of the PWS receiving notice from a laboratory (whether internal or outside) of any and every sampling result showing a detection of MTBE equal to or greater than 5 ppb (4 ppb in California) in the well or 10 ppb of TBA (8 ppb in California) in the well. Such notice to the Settling Defendants' Designated Representatives is to be provided by the Chief Executive Officer, Chief Operating Officer or Manager of Water Quality, or one of their equivalents, of the PWS or by someone designated in writing by one of those officials as responsible for providing such notice to the Settling Defendants. If a PWS does not provide notice of a sampling result within the time required herein, then that sampling result cannot be used to meet the qualification requirements of Section II. Nothing herein prevents the well from qualifying for treatment in the future, after the requirements of Section II, including this Paragraph II.A.13. have been met.

14.    All well detections of MTBE or TBA are subject to retesting and verification by the Settling Defendants and their representatives and contractors, at Settling Defendants' expense.

B.    A well shall be eligible for treatment if, during the 10 year period following the 20 year period described in Paragraph II.A.4., MTBE is detected in the well at a level that exceeds the applicable state MCL for MTBE for four consecutive calendar quarters and the water from the well has not been receiving treatment for MTBE. In the event a well covered under this provision was receiving treatment for another contaminant and that treatment was also capable of treating for MTBE, the Settling Defendants shall be responsible only for any additional treatment costs incurred as a result of the presence of MTBE in a detected amount qualifying under the terms of this paragraph for the periods of time set forth in this Treatment Protocol. Such costs shall be determined in accordance with Section VI.H. In addition, the well must satisfy the criteria of items A.1., 2., 3., 7., 8., 9., 12. and 13. above and the MTBE must have been detected in samples meeting the requirements of Paragraphs II.A.5. and 6. above. Notwithstanding the foregoing provisions, if the governing state or federal MCL during this 10 year period is below 5 ppb (4 ppb in California), then the future treatment obligations under this paragraph will be governed by detections that are equal to or in excess of 5 ppb (4 ppb in California). During the period described in this Paragraph II.B., a PWS may institute a Treatment Method prior to the well qualifying for treatment under this Section, provided that PWS complies with the provisions of Paragraph II.A.10. except that the detection levels qualifying the well for treatment shall be determined by this Paragraph II.B.

C.    A new public supply well drilled after the Execution Date by a PWS for the purpose of increasing operational capacity (and not due to the presence of contaminants other than MTBE in other wells), shall be eligible for treatment under this Treatment Protocol if that new well is not drilled into a known plume of MTBE or TBA, the PWS complies with all requirements imposed by applicable statutory and regulatory authorities, including but not limited to such requirements for site investigations, well siting studies, and/ or sanitary surveys, and the new well satisfies one of the following:
1.    all of the requirements of Paragraphs II.A.3. through II.A.14. above, or

7

**EXHIBIT F – TREATMENT PROTOCOL**

    2.   all of the requirements of Paragraph II.B., except for the requirements of Paragraphs II.A.1., 2., and 3.

If a new well qualifies for treatment under this Paragraph II.C., then notwithstanding Paragraph VI.F, the PWS and Settling Defendants will severally and not jointly be responsible for the Treatment Costs according to the following schedule:

    1.   Qualification in the first 3 years of the well being installed - PWS will be responsible for 65% of such costs and Settling Defendants 35% of such costs

    2.   Qualification after three but prior to 7 years of the well being installed – PWS will be responsible for 50% of such costs and Settling Defendants 50% of such costs

    3.   Qualification after 7 years but before 11 years of the well being installed -- PWS will be responsible for 35% of the such costs and Settling Defendants 65% of such costs

    4.   Qualification after 11 years of the being installed -- PWS will be responsible for 29.3394% of such costs and Settling Defendants 70.6606% of such costs.

    5.   Should any Settling Defendant exercise its right of Termination under the Settlement Agreement the percentages shown for Settling Defendants' share of the costs in (1)-(4) shall be reduced by multiplying the Settling Defendants' percentages shown in (1)-(4) by the following:

        (70.6606 minus (the terminating Settling Defendant's percentage under Defendants' Allocation))/70.6606

and the amount of the percentage reduction shall be added to the costs in (1)-(4) for which Plaintiffs are responsible.

D.    Notwithstanding the foregoing, if:

    1.   a new public supply well is selected pursuant to this Treatment Protocol as a Treatment Method, then Settling Defendants' share of the costs associated with installing such well shall be Settling Defendants' Full Share of Costs; or

    2.   if appropriate engineering studies conducted by an engineering firm acceptable to the Settling Defendants demonstrate that additional capacity necessary to meet anticipated future demand during the twenty year period following the Execution Date can not be acquired except by placing a new public supply well in an area where MTBE contamination is reasonably suspected and likely to impact the well, Settling Defendants will be responsible for Settling Defendants' Full Share of Costs of the lesser of the following costs:

        a)   the incremental costs associated with placement of the new well outside the area of suspected MTBE contamination;

        b)   the costs of treating the new well with a Treatment Method selected in accordance with Section VII; or

        c)   the cost of providing an alternative water supply.

E.    If a treatment system capable of removing the Treatment Contaminant already exists on a

EXHIBIT F – TREATMENT PROTOCOL

well at the time the well qualifies for treatment under this Treatment Protocol, Settling Defendants will be responsible only for the Settling Defendants' Full Share of Costs for the increased costs of treatment caused by the presence of the Treatment Contaminant for the period in which the well qualifies for treatment in accordance with Sections II and X. The increased costs of treatment caused by the presence of the Treatment Contaminant will be the lower of the following costs:

    a.  The difference in operation and maintenance costs of the treatment system that already exists that would be incurred if the Treatment Contaminant was not present in the water and the cost given the existence of other all substances, including the Treatment Contaminant. If the Treatment Contaminant is the only substance present that the treatment system is capable of treating, operation and maintenance costs that would be incurred if the Treatment Contaminant was not present will be considered $0. The operation and maintenance costs shall be re-evaluated annually so as to consider changes in the nature of the chemical contaminants present in the existing treatment system influent.

    b.  The construction, installation, or implementation of additional Treatment Methods, or the modification of the existing treatment system, provided any such Treatment Method or modification does not materially reduce the existing PWS system capacity.

The increased costs of treatment shall be determined by a contractor selected in accordance with Section V and using the methods set forth in Section VII.

**SECTION III**      **The Sale or Purchase of a Well**

A.    A well owned by a PWS on the Execution Date of this Treatment Protocol or that would be covered as a new well under Section II.C that is subsequently sold or otherwise transferred by the PWS will continue to be governed by the Settlement Agreement, the Release and Indemnity Agreement ("Release") and this Treatment Protocol. The PWS must specify in the sale or transfer documents of any such well that the sale or transfer is subject to the Settlement Agreement, the Release and this Treatment Protocol and that the purchaser agrees: (a) to abide by the Settlement Agreement, the Release and this Treatment Protocol and (b) not to subsequently sell or transfer the well to a party that will not agree to abide by the Settlement Agreement, the Release and this Treatment Protocol. The PWS agrees not to sell or transfer a well to a third party that will not agree to the foregoing terms. The PWS will provide Settling Defendants 30days advanced written notice of any such sale or transfer. A Settling PWS shall not be in breach of the obligations imposed by this paragraph in connection with sales or transfers of wells to third parties that occur as a result of condemnation or in anticipation of condemnation where the condemning public governing body has passed a resolution of necessity.

B.    A well in existence on the Execution Date that a PWS purchases or otherwise acquires after the Execution Date shall be covered by this Treatment Protocol if: (1) except for meeting the requirements of Section II.A.1. it qualifies for treatment in accordance with Section II and (2) there has not been a detection of MTBE at or above 5 ppb (4 ppb in California) or a detection of TBA at or above 10 ppb (8 ppb in California) in the well within a year before or a year after the PWS purchases or otherwise acquires the well.

9

**EXHIBIT F – TREATMENT PROTOCOL**

C.     A well that is constructed after the Execution Date that a PWS purchases or otherwise acquires shall be covered by this Treatment Protocol if: (1) except for meeting the requirements of Section II.A.1. the well qualifies for treatment in accordance with Paragraphs II.B. or II.C. and (2) there has not been a detection of MTBE at or above 5 ppb (4 ppb in California) or a detection of TBA at or above 10 ppb (8 ppb in California) in the well within a year before or a year after the PWS purchases or otherwise acquires the well.

**SECTION IV     Generic Buy-Out Provisions**

A.     In the event that there is a future detection of MTBE equal to or greater than 5 ppb (4 ppb in California) for a period of three consecutive calendar quarters, or detections of TBA in 3 consecutive calendar quarters each at a level equal to or greater than 10 ppb (8 ppb in California), in a well owned and operated by a PWS, that PWS shall provide the Settling Defendants' Designated Representatives and Settling Plaintiffs' Designated Representatives, within 30 days after receipt of the report of such detection, written notice of such detection ("Third Quarter Notice"). Such notice shall include:

       (i)     A written acknowledgement that in the event that the well qualifies for treatment in the next calendar quarter in accordance with Section II, the PWS agrees to fund fully its allocated share ("PWS's Obligation").  **OR**

       (ii)    A written declaration ("Written Declaration") that in the event that the well qualifies for treatment in the next calendar quarter in accordance with Section II, the PWS does not have the financial capability to commit to fund PWS's Obligation. The Written Declaration must provide the Settling Defendants' Designated Representatives with an explanation of the PWS's financial status and the basis for its inability to fund PWS's Obligation.

B.     If the PWS fails to provide a Third Quarter Notice as described above, other than for wells that qualify for treatment under Section II.A.10., then the samples taken up through and including those for which timely Third Quarter Notice should have been provided will not count toward the requirement for four consecutive calendar quarters. Nothing herein prevents the well from qualifying for treatment in the future, if the PWS subsequently submits four new consecutive calendar quarters of sampling timely and the other requirements of this Treatment Protocol are satisfied.

C.     If a PWS has provided Settling Defendants with a Third Quarter Notice that includes a Written Declaration of its inability to fund PWS's Obligation for a well that qualifies for treatment under Section II in the next calendar quarter, Settling Defendants shall submit to the PWS a payment that is equal to the Generic Costs described below, within 60 days following the end of the calendar quarter in which the well qualifies for treatment. Payment of the Generic Costs to the PWS will completely satisfy Settling Defendants' obligation under this Treatment Protocol with respect to that well, and that well will not be subject to future treatment under this Treatment Protocol.

D.     Generic Costs shall be defined as the present value, determined using the real discount rates specified by the Office of Management and Budget in the most current version of Appendix C to OMB Circular No. A-94 entitled *Guidelines and Discount Rates for Benefit-Cost Analysis*

## EXHIBIT F – TREATMENT PROTOCOL

*of Federal Program*, of the Settling Defendants' Full Share of Costs of the lowest of either of the following costs:

1. Cost of well replacement, calculated as the cost of constructing a replacement well in the same general area and of the same depth, size and pumping capacity as the well that has qualified for treatment, less depreciation costs. Depreciation costs will be calculated by multiplying the total construction costs for a replacement well, by the age of the well to be replaced, and then dividing by the expected life span of that well, as set forth in operational plans published by the PWS seeking Generic Costs. In the event that no such documents have been published, a 40 year life span will be used.

2. Costs of installation and operation of a treatment system, calculated by multiplying the Expected Treatment Time by the Recent Cost Experience.

    a. Expected Treatment Time is hereby defined as 5 years for the first 5 years after the effective date of this Treatment Protocol. After 5 years and providing the PWS has provided all data and analyses called for by this Treatment Protocol, the Expected Treatment Time will remain 5 years, provided that the Expected Treatment Time may be adjusted up or down to reflect the actual time for treatment required, if any, based on the PWS operational experience for wells that have had detections of MTBE in 4 consecutive calendar quarters, each at a level equal to or greater than 5 parts per billion ( 5 ppb) (4 ppb in California), or detections of TBA in 4 consecutive calendar quarters, each at a level equal to or greater than 10 ppb (8 ppb in California).

    b. Recent Yearly Cost Experience will be determined during the first 5 years after the effective date of this Treatment Protocol in accordance with the Table shown below. Beginning July 1, 2009, the Recent Cost Experience values shown in the Table will be annually adjusted for inflation based on the ENR 20 City Average Construction Cost Index published by Engineering News Record, or if such Index is unavailable, such other appropriate measure of inflation established by the Arbitrator. After 5 years and providing the PWS has provided all data and analyses called for by this Treatment Protocol, Recent Yearly Cost Experience will continue to be based on the Table below, provided that the Recent Yearly Cost Experience may be adjusted up or down to reflect the PWS's operational experience for all wells that have had operational *Air-Stripping* systems for MTBE in place for at least 3 years.

| Average GPM[1] | | Recent Yearly |
|---|---|---|
| Greater Than | But Less Than | Cost Experience |
| 5 | 300 | $81,500 |
| 300 | 600 | $120,500 |
| 600 | 900 | $159,500 |
| 900 | 1200 | $198,500 |
| 1200 | 1500 | $237,500 |
| 1500 | 1800 | $276,500 |
| 1800 | 2100 | $315,500 |
| 2100 | 2400 | $159,500 |
| 2400 | 2700 | $198,500 |
| 2700 | 3000 | $432,500 |

11

**EXHIBIT F – TREATMENT PROTOCOL**

| | | |
|---|---|---|
| 3000 | 3300 | $471,500 |
| 3300 | 3600 | $510,500 |
| 3600 | 3900 | $549,500 |
| 3900 | 4200 | $588,500 |
| 4200 | 4500 | $627,500 |
| 4500 | 4800 | $666,500 |
| 4800 | 5100 | $705,500 |
| 5100 | 5400 | $744,500 |
| 5400 | 5700 | $783,500 |
| 5700 | 6000 | $822,500 |
| 6000 | 6300 | $861,500 |
| 6300 | 6600 | $900,500 |

1. Average GPM is the average gallons per minute of water pumped by the well for either the preceeding 5 years or the age of the well whichever is shorter.

*EXAMPLE*
- Assume that a well that qualifies for treatment has pumped at an average of 500 gallons per minute for either the preceding 5 years or the age of the well, whichever is shorter:
  a. The cost of installing and operating a treatment system for 5 years (the Expected Treatment Time) would be $602,500 (5 multiplied by the $120,500 from the above Table)
  b. Settling Defendants' share of the cost of installing and operating a treatment system would be $425,730.12 (70.6606% of $602,500)
  c. The Generic Costs would be the present value of a sum that would provide equal monthly payments over 5 years (the Expected Treatment Time) that total $425,730.12
- Assuming a rate of 4% for purposes of calculating the present value, Generic Costs would be $385,279.

E.     If a treatment system already exists on a well at the time the Third Quarter Notice is received by Settling Defendants, Generic Costs will be considered to be the present value, determined using the real discount rates specified by the Office of Management and Budget in the most current version of Appendix C to OMB Circular No. A-94 entitled *Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Program*, of a sum that will provide Settling Defendants Full Share of Costs of the additional monthly treatment costs due to MTBE, to be incurred over the Expected Treatment Time.  Additional monthly treatment costs due to MTBE will be calculated as a percentage of the average total monthly treatment costs of an existing treatment system for the 3 year period prior to the well qualifying for treatment, or the time the well has been on treatment, whichever is shorter.   The percentage will be calculated by dividing 5 ppb (the assumed average concentration of MTBE that will be treated during the Expected Treatment Time) by the sum of 5 ppb and the average monthly total of all concentrations of organic chemical substances removed by the treatment system during the preceding 3 years or the time the well has been on treatment, whichever is shorter.

*EXAMPLE*
- Assume that during the first 5 years after the effective date of this Treatment Protocol the *average* total monthly treatment costs of an existing treatment system for the 3 year period prior to the well qualifying for treatment was $7,000.
- Assume also that the average monthly total sum of all of the concentrations of all organic chemical substances removed by the treatment system during the

12

**EXHIBIT F – TREATMENT PROTOCOL**

preceding 3 years was 20 ppb
- o The percentage of additional treatment costs due to MTBE would be 20%, *i.e.*, 5 divided by the sum of 5 plus 20
- o The additional monthly treatment costs due to MTBE would be $1,400, *i.e.*, 20% of $7,000
- o Settling Defendants' share of the additional monthly treatment costs due to MTBE would be $989; *i.e.*, 70.6606% of $1,400
- o The Generic Costs would be the present value of a sum that would provide for a payment of $989 per month for *60 months* (the Expected Treatment Time).
- Assuming a rate of 4% for purposes of calculating the present value, Generic Costs would be $53,702.

**SECTION V      Appointment of Contractor**

A.      If regulations governing the operations of the PWS require competitive bidding, then the contractor shall be determined in accordance with Paragraph B. below. Otherwise, the contractor shall be chosen as follows.

(1) Within 60 days of a well qualifying for treatment under this Treatment Protocol, Settling Defendants shall notify the PWS in writing of the contractor whom Settling Defendants have selected to design, implement and maintain the treatment facility or other workable solution.

(2) The PWS has 30 days to approve of the selected contractor. Such approval shall not be unreasonably withheld. If the PWS objects to the selected contractor, it must do so in writing within 30 days. Its written objection must state the grounds for its objection with specificity. If the PWS does not disapprove in writing of the selected contractor within 30 days, the contractor shall be deemed approved without further action.

(3) If Settling Defendants disagree with an objection made by the PWS to the selected contractor, then the parties will meet and make good faith efforts to suggest an alternative contractor. If the parties cannot resolve the issue within 30 days, then Settling Defendants may invoke the Dispute Resolution Procedures. While the dispute is pending, Settling Defendants are under no obligation to provide treatment or to take any other action.

(4) If Settling Defendants agree to select another contractor should the PWS object to Defendants' initial selection, then Defendants will have 30 days to select another contractor. Paragraphs V.A.2. through V.A.4. shall then apply to the subsequent selection.

(5) The PWS will enter into a Well Treatment Contract with the agreed contractor. The terms and conditions of such contract shall be consistent with the terms of this Treatment Protocol and shall also contain those terms reasonably required to permit contractor to perform the treatment specified for the duration required and may impose such obligations and duties on the PWS as are required to ensure the economically efficient completion of such activities.

B.      If the law requires the PWS to use a competitive bidding process to select the contractor,

13

**EXHIBIT F – TREATMENT PROTOCOL**

then and only then shall the contractor be selected according to the following provisions, provided that if the applicable law requires a different procedure for competitive bidding, the selection shall be made pursuant to applicable law:

(1) The PWS will prepare the competitive bid documents. Settling Defendants shall have the right to nominate at least one contractor to participate in the bid. The bid documents will require any other bidder to demonstrate that it has, for the work to be performed, the appropriate (i) work experience, (ii) technical expertise, (iii) financial wherewithal, and (iv) insurance, bonding, or other forms of financial assurance. The PWS will select the bidder in accordance with the governing law for competitive bids. The PWS shall notify Settling Defendants of the selection within three days of the selection of the contractor.

(2) If Settling Defendants object to the selected contractor, they must do so in writing within 30 days. Their written objection must state the grounds for their objection with specificity. If Settling Defendants do not disapprove in writing of the selected contractor within 30 days, the contractor shall be deemed approved without further action.

(3) If Settling Defendants reject the selection made following the bidding process described herein or pursuant to applicable law, the PWS will select the next lower bidder if allowed by law. If the law does not permit the PWS to select the next lowest bidder, the PWS will re-do the bidding process, and will include criteria so that the issues raised by the Settling Defendants' objections will be addressed. Only a contractor acceptable to Settling Defendants shall be selected, and such acceptance shall not be unreasonably withheld.

(4) If the PWS disagrees with an objection made by Settling Defendants to the selected contractor, the PWS may invoke the Dispute Resolution Procedures provided herein. While the dispute is pending, Settling Defendants are under no obligation to provide treatment or to take any other action.

**SECTION VI.      Payment of Contractor and Allocation of Costs**

A.      Once the contractor is selected, the PWS shall enter into a Well Treatment Contract with the contractor. The contract shall expressly contain the payment provisions contained herein.

B.      Each Settling Defendant shall only be liable to pay its portion of the Treatment Costs. The contract may require the creation of a fund for payment with a minimum evergreen balance of $100,000. If Settling Defendants assign their responsibilities under this Treatment Protocol to a third party, they will remain liable to the PWS for fulfilling the terms of this Treatment Protocol in the event the third party fails to comply with the Treatment Protocol. In such event, the PWS must provide Settling Defendants thirty (30) days notice of any such failure by the third party. Any disputes related to whether the third party has breached the Treatment Protocol will be subject to the Dispute Resolution Procedures.

C.      The PWS will be liable to pay its portion of the Treatment Costs, plus any additional costs described herein for treatment of other contaminants or substances.

E.      The contractor will be responsible for collecting payments due under the contract or to replenish the evergreen fund. The PWS and each Settling Defendant will pay their portion of the

14

contractor's cost directly to the contractor. The contract may provide for interest and penalties in the event that payments are not made in timely fashion.

F. The Well Treatment Contract shall specifically state each party's portion of the costs; that each party shall only be liable for such portion of the costs; and that each party shall directly pay contractor that party's portion of costs. Settling Defendants' total portion of costs shall be Settling Defendants' Full Share of Costs, and the PWS portion of costs shall be the remainder (those costs will be 70.6606% and 29.3394% respectively if no Settling Defendant exercises its right to termination under the Settlement Agreement or otherwise does not participate) except for new wells, for which the percentages are established by Section II.C. The further division among Settling Defendants will be confidential and not be disclosed to the PWS, although it may be disclosed to the contractor.

G. If the PWS fails to pay contractor any amount that the PWS owes under the Well Treatment Contract within the time provisions provided in the Well Treatment Contract, including any provisions for dispute resolution, it shall be given written notice and 30 days to cure its failure to timely pay, provided that it has not been given notice twice before. If it fails to pay the amounts owed within 30 days of notice, or if it has failed to timely provide payment three times, then Settling Defendants' obligations to pay for any treatment to the well in question automatically terminate. Failure of Settling Defendants to timely pay costs under the Well Treatment Contract shall not terminate their obligation to pay their portion of treatment for the well in question.

H. The PWS is solely responsible for all increased costs caused by the presence of chemicals, substances, or contaminants other than the Treatment Contaminant. The contractor shall present an estimate of such increased costs at the time of the selection of the technology or solution under Section VI. The increased cost shall be the difference in the costs that would have been incurred if the Treatment Contaminant was the only substance in the water and the cost given the existence of other substances. If any party disagrees with the initial estimate, it may invoke the Dispute Resolution Procedures. While the dispute is pending, the parties shall pay their portion of the total costs in accordance with their standard percentages under this Treatment Protocol, but the PWS will have to reimburse Settling Defendants should it be determined that the existence of other contaminants increased the treatment costs. The contractor may from time to time update the costs based upon actual treatment of the well. If any party disagrees with a subsequent adjustment, it may invoke the Dispute Resolution Procedures. While the dispute is pending, the parties shall continue to pay their then current portion of the total costs, but the credits will be allocated in accordance with the arbitrator's decision.

I. In the event that the PWS does not own or lease property on which the treatment equipment needed for the Treatment Method could be placed, making it necessary to purchase additional property in order to be able to install the treatment equipment required by the Treatment Method, and an alternative Treatment Method that does not require the purchase of property is not more cost effective taking into consideration the costs of purchasing additional property, then the PWS will purchase the property necessary to install the treatment equipment. Settling Defendants will reimburse the PWS for Settling Defendants' Full Share of Costs of the purchase price of the property. The PWS will be solely responsible for the property, including paying all necessary insurance and taxes and any and all damages associated with the property. Once the well no longer is being treated by the equipment on the purchased property, the PWS will either sell the property and pay Settling Defendants the Settling Defendants' Full Share of

## EXHIBIT F – TREATMENT PROTOCOL

Costs of the sales price or pay Settling Defendants the Settling Defendants' Full Share of Costs of the fair market value of the purchased property. Any dispute as to the fair market value will be resolved through the Dispute Resolution Procedures.

J.      The parties shall have no liability associated with the actions of the contractor, and the Well Treatment Contract shall provide that the contractor will indemnify and hold the PWS and Settling Defendants harmless for such actions. Nothing herein shall relieve Settling Defendants from fulfilling their obligations under this Treatment Protocol, which are several and not joint.

**SECTION VII**      Selection of Most Cost-Effective Treatment Method

A.      The contractor will perform a feasibility study of all Treatment Methods. The Treatment Method selected will be the most economical Treatment Method which can be permitted in accordance with the standard engineering practices of the time and location. If there are substances other than the Treatment Contaminant that the PWS desire to treat, the contractor may design the system to treat them also, but PWS will be responsible for any and all increased costs incurred to treat any substance other than the Treatment Contaminant, including but not limited to design, implementation, operation and maintenance costs.

B.      PWS may select a Treatment Method other than most economical Treatment Method under this Section conditioned upon the PWS's agreement to pay any and all additional costs above the contractor's estimate of the total costs for the most economical Treatment Method.

C.      The use of Air Stripping is a viable Treatment Method if it is permitted in the locale and the contractor can obtain any necessary permits. However, there may be sensitive areas, such as the close proximity of residential neighborhoods, highly populated areas or schools to the well, where air stripping may be inappropriate. The PWS may raise these issues, and the contractor will give consideration to these issues in the feasibility study outlined in Paragraph VII.A.

D.      If either the PWS or Settling Defendants disagree with the contractor's recommended Treatment Method, they will notify the contractor and the other parties of the reasons for that disagreement in writing within 30 days. If the parties cannot reach an agreement as to the Treatment Method to be utilized, then the objecting party may invoke the Dispute Resolution Procedures. While the dispute is pending, no action will be required. If the parties agree on the Treatment Method or other workable solution, or if no party objects to it within 30 days in writing, the contractor shall implement the Treatment Method within a reasonable time thereafter.

E.      The contractor shall seek to avoid disruption of the PWS's operations in the implementation of the Treatment Method as is reasonably possible.

**SECTION VIII**      Maintenance of Treatment Facilities

A.      The contractor shall be responsible for maintaining the treatment facilities. The contractor shall submit monthly invoices for operational costs and maintenance, as will be more specifically set forth in the Well Treatment Contract.

B.      A Treated Well must operate on a normal basis during treatment. The PWS will not operate its system or wells in a manner that prolongs, alters or interferes with treatment unless such action is necessary for the PWS to meet its commercially reasonable operational

16

**EXHIBIT F – TREATMENT PROTOCOL**

requirements. If Settling Defendants believe that the PWS has taken an action that prolongs, alters or interferes with treatment, they will provide the PWS written notice setting forth the grounds for their belief. The parties will then meet and confer on the issue. If the parties are unable to resolve the issue within 30 days of Settling Defendants' sending such notice, Settling Defendants may invoke the Dispute Resolution Procedures.

C. The treatment will be carried out in a manner that allows the PWS to maintain service of water from the Treated Well with as little disruption as possible.

D. The treatment obligations shall only exist for the Treatment Contaminant. Settling Defendants have no obligation to pay for treatment of any other chemicals, substances, or contaminants.

**SECTION IX      Monitoring and Testing**

A. A Treated Well will be tested quarterly. The sample will be taken from the Treated Well's effluent at the wellhead or other point immediately upstream of the treatment system each quarter. The laboratory testing the sample must be certified in the state in which the sample is taken and use generally accepted testing and reporting methods. The person or entity taking the sample and the laboratory must comply with all applicable state laws, regulations, and guidance governing sample collection, analysis, and reporting. If the PWS's testing program meets these requirements, then the PWS's test results will be used subject to the right of Settling Defendants to take samples as described herein. If the PWS does not regularly test quarterly or its testing procedures do not meet the requirements of this Treatment Protocol, then the contractor will conduct the tests in conformance with the requirements herein. The contractor may also sample treated effluent as well as points within the treatment system, as required by any applicable permit, or in accordance with good operating procedures.

B. Additionally, any tests of a Treated Well conducted by the PWS must be shared with the contractor and Settling Defendants within 30 days of the PWS obtaining the results of any such tests, including any routine or required tests the PWS conducts in the regular course of its business.

C. Settling Defendants and the PWS shall have the right to collect their own samples and have them tested at a laboratory of their choice, but such laboratory must be certified in the state in which the sample is taken, use generally accepted testing methods, and comply with state requirements. If Settling Defendants elect to collect and test their own samples, they will provide the PWS notice of their intent to do so 7 days before the sample is collected. The party taking the sample shall provide the other party a copy of the results of the sample within 30 days of obtaining them.

**SECTION X      Cessation of Treatment**

A. Treatment will be performed until there are four consecutive calendar quarters readings for MTBE below 0.51 ppb if it is the Treatment Contaminant, or TBA at or below 2 ppb if it is the Treatment Contaminant at the wellhead or other point immediately upstream of the treatment system, at which time all treatment obligations under this Treatment Protocol shall terminate.

B. If the conditions in Paragraph A are not reached within 10 years after the commencement of treatment, all treatment obligations shall terminate after 10 years from the commencement of

17

EXHIBIT F – TREATMENT PROTOCOL

treatment, provided that detections of the Treatment Contaminant in the well at that time as the result of the use of MTBE in gasoline do not exceed 5 ppb (4 ppb in California) for MTBE or 10 ppb (8 ppb in California) for TBA. If the detection level of the Treatment Contaminant due to the use of MTBE in gasoline exceeds 5 ppb (4 ppb in California) for MTBE or 10 ppb (8 ppb in California) for TBA, treatment will continue for another 5 years, unless four consecutive calendar quarters of readings for the Treatment Contaminant are below 0.51 ppb for MTBE or 5 ppb for TBA, whichever occurs earlier. In the unlikely event that at the end of 15 years of treatment, the well still contains levels of the Treatment Contaminant equal to or in excess of 5 ppb (4 ppb in CA) for MTBE or 10 ppb (8 ppb in California) for TBA, due to the use of MTBE in gasoline, then Settling Defendants can elect to either: (1) continue treatment until the requirements of Section X.A have been met; or (2) offer an acceptable buy-out to the PWS based upon the present value of the reasonably expected future operating and maintenance costs. The PWS will not unreasonably refuse to accept such offer. If the PWS does not accept such offer, Settling Defendants can invoke the Dispute Resolution Procedures.

C.      Once the treatment obligations cease as to a Treated Well, the PWS will retain ownership of the treatment equipment. It shall be solely responsible for the disposal of said equipment and is entitled to whatever proceeds are obtained if the equipment is sold.

D.      If the PWS desires to continue treatment of a well after the treatment obligations of the Settling Defendants cease under this Treatment Protocol, it shall enter into a new agreement with contractor or a third-party for such treatment. Settling Defendants shall have no obligations to the PWS or contractor related to a Treated Well or concerning the related Treatment Method after the treatment obligations in this Treatment Protocol terminate.

E.      Nothing in this Section shall prevent a Treated Well from subsequently qualifying for treatment if, after treatment is completed, it would otherwise qualify in the future for treatment under the terms of this Treatment Protocol.

SECTION XI      Other Responsibilities of the Parties
A.      *Access to Facilities and Records*: The PWS must provide the contractor and Settling Defendants' representatives reasonable access to all facilities and records (to the extent they exist) needed to determine whether treatment is required under this Treatment Protocol, to determine the type of treatment, to install treatment technology, to conduct treatment and to monitor and sample wells as provided in this Treatment Protocol. Records may include, but may not be limited to, the following, whether prepared by the PWS or its consultant, contractor, agent or representative: geologic reports and cross sections; boring logs and well construction diagrams; aquifer and pump testing results and/or reports; results of any geophysical, flowmeter, or video logging of the PWS's wells or boreholes; records of any well rehabilitation efforts, historic water quality data, including non-Treatment Contaminants; historic water level records; historic pumping records; past and current permits pertaining to the pumping and/or treatment of groundwater. If required by applicable law, the PWS shall provide access to the above-described information subject to an appropriate confidentiality agreement. Access to facilities shall allow Settling Defendants' technical representative to perform additional testing (including but not limited to geophysical logging, video logging, flowmeter logging, depth-discrete groundwater sampling, etc.) at the sole expense of the Settling Defendants. Results of such testing shall be provided to the PWS upon request. The access called for by this paragraph shall be provided for

18

**EXHIBIT F – TREATMENT PROTOCOL**

any well for which treatment is being sought under this Treatment Protocol, as well as other wells and test borings owned by the PWS. During the term of this Treatment Protocol, the PWS shall make every effort to preserve all records referenced in this Paragraph and shall not destroy or discard any such records.

B.    *Reasonable Space:* To the extent it exists, the PWS will provide reasonable space on real property owned or leased by the PWS for the installation of the selected Treatment Method.

C.    *Permitting and Other Approvals:* PWS will not oppose any application by contractor or Settling Defendants made in conjunction with, and in compliance with, this Treatment Protocol and will provide all reasonable assistance to obtain any permits or other forms of regulatory approval related to the Well Treatment Contract.

D.    *Assistance to Contractor:* The PWS will provide reasonable assistance to the contractor as needed to carry out the objectives of this Treatment Protocol. Without limitation to the foregoing, the PWS must provide a contact person (as discussed in Section XII below) to assist the contractor with any problems that may arise during installation and operation of the Treatment Method selected pursuant to Section VII.

**SECTION XII.    Appointment of Contact Persons**

A.    When requesting that a well be treated under this Treatment Protocol, the PWS will designate a contact person with whom the Settling Defendants and contractor will communicate concerning this Treatment Protocol. That contact person will be knowledgeable about the PWS's operations, wellhead treatment, other workable responses and remediation. The contact person will be the only person with whom Settling Defendants will be required to communicate concerning the handling of the well at issue, except as otherwise provided herein. From time to time the PWS can change its contact person as reasonably required, but at no time will it have more than one contact person.

B.    Settling Defendants will designate a contact person with whom the PWS and the contractor will communicate concerning this Treatment Protocol regarding a well for which treatment is requested. That contact person will be knowledgeable about wellhead treatment, other workable responses and remediation. The contact person will be the only person with whom the PWS will be required to communicate concerning the handling of the well at issue, except as otherwise provided herein. From time to time Settling Defendants can change their contact person as reasonably required, but at no time will they have more than one contact person. Pending the assignment by Settling Defendants of their obligations under this Treatment Protocol to a third party, if any, as contemplated by Section VI.B. above, the Settling Defendants' contact person shall be empowered, on behalf of Settling Defendants, to submit bids, approve contracts, accept bills and serve as a collection point for payments and reimbursements by the Settling Defendants.

19

EXHIBIT "D"

EXHIBIT D
LIST OF ALL WELLS

| | State | PWS Name | ID | Source Name | GPM | Max MTBE | NOTES |
|---|---|---|---|---|---|---|---|
| 1 | CA | California-American Water Company (Monterey) | Manor 02 | MANOR 02 - RAW | 714 | 7 | |
| 2 | CA | California-American Water Company (Monterey) | Scarlet 08 | Scarlet 08 | 1258 | 0.5 | |
| 3 | CA | Cal-Am Water Co. (Hidden Hills) | 2710022-001 | Mutuel | unhit | | |
| 4 | CA | Cal-Am Water Co. (Hidden Hills) | 2710022-002 | Standex | unhit | | |
| 5 | CA | Cal-Am Water Co. (Ryan Ranch) | 2701468-001 | Ryan Ranch 7 | unhit | | |
| 6 | CA | Cal-Am Water Co. (Ryan Ranch) | 2701468-006 | Ryan Ranch 6 | unhit | | |
| 7 | CA | Cal-Am Water Co. (Ryan Ranch) | 2701468-007 | Ryan Ranch 11 | unhit | | |
| 8 | CA | Cal-Am Water Co. (Bishop) | 2701862-016 | Bishop 1 | unhit | | |
| 9 | CA | Cal-Am Water Co. (Bishop) | 2701862-017 | Bishop 2 | unhit | | |
| 10 | CA | Cal-Am Water Co. (Hidden Hills) | 2710002-002 | Bay Ridge | unhit | | |
| 11 | CA | Cal-Am Water Co. (Ambler) | 2710006-002 | Well 01 | unhit | | Destroyed |
| 12 | CA | Cal-Am Water Co. (Antelope) | 3410031-015 | Rhine Way | unhit | | |
| 13 | CA | Cal-Am Water Co. (Antelope) | 3410031-001 | Twin Trails | unhit | | |
| 14 | CA | Cal-Am Water Co. (Antelope) | 3410031-002 | Patterson | unhit | | |
| 15 | CA | Cal-Am Water Co. (Antelope) | 3410031-003 | Davidson | unhit | | |
| 16 | CA | Cal-Am Water Co. (Antelope) | 3410031-004 | Prior Way | unhit | | |
| 17 | CA | Cal-Am Water Co. (Antelope) | 3410031-005 | Scotland | unhit | | |
| 18 | CA | Cal-Am Water Co. (Antelope) | 3410031-006 | Watt Avenue | unhit | | |
| 19 | CA | Cal-Am Water Co. (Antelope) | 3410031-007 | PFE/Billy Mitchell | unhit | | |
| 20 | CA | Cal-Am Water Co. (Antelope) | 3410031-008 | Vandenberg | unhit | | |
| 21 | CA | Cal-Am Water Co. (Antelope) | 3410031-009 | Don Julio | unhit | | |
| 22 | CA | Cal-Am Water Co. (Antelope) | 3410031-010 | Eagle Ridge | unhit | | |
| 23 | CA | Cal-Am Water Co. (Antelope) | 3410031-011 | Fox Park | unhit | | |
| 24 | CA | Cal-Am Water Co. (Antelope) | 3410031-012 | North Loop | unhit | | |
| 25 | CA | Cal-Am Water Co. (Antelope) | 3410031-013 | Colonnade | unhit | | |
| 26 | CA | Cal-Am Water Co. (Antelope) | 3410031-014 | Covered Wagon | unhit | | |
| 27 | CA | Cal-Am Water Co. (Antelope) | 3410031-016 | Cook Riolo | unhit | | |
| 28 | CA | Cal-Am Water Co. (Antelope) | 3410031-017 | Falcon View | unhit | | |
| 29 | CA | Cal-Am Water Co. (Antelope) | 3410031-018 | Elverta | unhit | | |
| 30 | CA | Cal-Am Water Co. (Arden) | 3410045-001 | Fairlake 1 | unhit | | |
| 31 | CA | Cal-Am Water Co. (Arden) | 3410045-002 | Fairlake 2 | unhit | | |
| 32 | CA | Cal-Am Water Co. (Arden) | 3410045-003 | Howe Avenue | unhit | | |
| 33 | CA | Cal-Am Water Co. (Arden) | 3410045-004 | Watkoo | unhit | | |
| 34 | CA | Cal-Am Water Co. (Arden) | 3410045-005 | Wyda Way | unhit | | |
| 35 | CA | California-American Water Company (Baldwin Hills) | Vernon 02 | Vernon Well 02 | 700 | 6.7 | |
| 36 | CA | Cal-Am Water Co. (Baldwin Hills) | 1910052-004 | Vernon 1 | unhit | | |
| 37 | CA | Cal-Am Water Co. (Baldwin Hills) | 1910052-001 | 48th Street | unhit | | |
| 38 | CA | Cal-Am Water Co. (Baldwin Hills) | 1910052-003 | Crenshaw | unhit | | |
| 39 | CA | Cal-Am Water Co. (Baldwin Hills) | 1910052-005 | Vernon 3 | unhit | | |
| 40 | CA | Cal-Am Water Co. (Chuster) | 2701202-002 | Chuster 3 | unhit | | |
| 41 | CA | Cal-Am Water Co. (Chuster) | 2701202-004 | Chuster 4 | unhit | | |
| 42 | CA | Cal-Am Water Co. (Duarte (Irwindale)) | 1910166-003 | Crown Haven | unhit | | |
| 43 | CA | Cal-Am Water Co. (Duarte) | 1910166-005 | Mountain Avenue | unhit | | |
| 44 | CA | Cal-Am Water Co. (Duarte) | 1910166-001 | Buena Vista | unhit | | |
| 45 | CA | Cal-Am Water Co. (Duarte) | 1910166-002 | Bacon | unhit | | |
| 46 | CA | Cal-Am Water Co. (Duarte) | 1910166-004 | Fish Canyon | unhit | | |
| 47 | CA | Cal-Am Water Co. (Duarte) | 1910166-007 | Santa Fe | unhit | | |
| 48 | CA | Cal-Am Water Co. (Duarte) | 1910166-008 | Wiley | unhit | | |
| 49 | CA | Cal-Am Water Co. (Duarte) | 1910166-009 | Encanto | unhit | | |
| 50 | CA | Cal-Am Water Co. (Duarte) | 1910166-010 | Los Lomas 2 | unhit | | |
| 51 | CA | Cal-Am Water Co. (Felton) | 4410002-005 | Felton Acres Well | unhit | | |
| 52 | CA | Cal-Am Water Co. (Felton) | 4410002-001 | Bennet Spring | unhit | | |
| 53 | CA | Cal-Am Water Co. (Felton) | 4410002-002 | Bull Spring 01 | unhit | | |
| 54 | CA | Cal-Am Water Co. (Felton) | 4410002-003 | Bull Spring 02 | unhit | | |
| 55 | CA | Cal-Am Water Co. (Isleton) | 3410012-001 | Well 1 | unhit | | |
| 56 | CA | Cal-Am Water Co. (Isleton) | 3410012-003 | Well 2 | unhit | | |
| 57 | CA | Cal-Am Water Co. (Isleton) | 3410012-004 | Well 3A | unhit | | |
| 58 | CA | Cal-Am Water Co. (Isleton) | 3410012-005 | Well 3B | unhit | | |
| 59 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-013 | Lomena Drive | unhit | | |
| 60 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-017 | Oakberry | unhit | | |
| 61 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-020 | Sandalwood | unhit | | |
| 62 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-025 | Villaview | unhit | | |
| 63 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-001 | Andrea 2 | unhit | | |
| 64 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-002 | Andrea 1 | unhit | | |
| 65 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-003 | Auburn/Halfax | unhit | | |
| 66 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-004 | Carriage Drive | unhit | | |
| 67 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-005 | Chipping Way | unhit | | |
| 68 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-006 | Crosswoods | unhit | | |
| 69 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-007 | Diablo | unhit | | |
| 70 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-008 | Fort Sutter | unhit | | |
| 71 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-009 | Glass Slipper | unhit | | |
| 72 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-010 | Hemlock | unhit | | |
| 73 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-012 | Laurel Oaks | unhit | | |
| 74 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-014 | Linda Sue | unhit | | |
| 75 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-015 | Rushmore | unhit | | |
| 76 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-016 | Oak Forest | unhit | | |
| 77 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-019 | Roseville Road | unhit | | |
| 78 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-021 | Shenandoah | unhit | | |
| 79 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-022 | Treelark | unhit | | |
| 80 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-023 | Twin Parks | unhit | | |

EXHIBIT D
LIST OF ALL WELLS

| | State | PWS Name | ID | Source Name | GPH | Max MTBE | NOTES |
|---|---|---|---|---|---|---|---|
| 81 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-024 | Van Maren | unhit | | |
| 82 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-026 | Charbourg | unhit | | |
| 83 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-027 | Summerplace | unhit | | |
| 84 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-028 | Daly | unhit | | |
| 85 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-002 | Begonia 2 | unhit | | |
| 86 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-006 | Berwick B | unhit | | |
| 87 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-007 | Rancho Cañada | unhit | | destroyed |
| 88 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-072 | Rancho Cañada 02 | unhit | | |
| 89 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-006 | Cypress | unhit | | Destroyed |
| 90 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-073 | Cypress Well 02 | unhit | | |
| 91 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-028 | Pearce | unhit | | |
| 92 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-052 | Schulte 2 | unhit | | |
| 93 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-054 | San Carlos 2 | unhit | | |
| 94 | CA | Cal-Am Water Co. (Parkway) | 3410017-009 | Parkside 1 | unhit | | |
| 95 | CA | Cal-Am Water Co. (Parkway) | 3410017-010 | Persimmon | unhit | | |
| 96 | CA | Cal-Am Water Co. (Parkway) | 3410017-003 | Conrad | unhit | | |
| 97 | CA | Cal-Am Water Co. (Parkway) | 3410017-004 | Elsie | unhit | | |
| 98 | CA | Cal-Am Water Co. (Parkway) | 3410017-018 | Wilbur Way 2 | unhit | | |
| 99 | CA | Cal-Am Water Co. (Parkway) | 3410017-002 | Briggs | unhit | | |
| 100 | CA | Cal-Am Water Co. (Parkway) | 3410017-009 | Gerber Road | unhit | | |
| 101 | CA | Cal-Am Water Co. (Parkway) | 3410017-006 | Lippi | unhit | | |
| 102 | CA | Cal-Am Water Co. (Parkway) | 3410017-011 | Rockhurst | unhit | | |
| 103 | CA | Cal-Am Water Co. (Parkway) | 3410017-012 | Sky Parkway | unhit | | |
| 104 | CA | Cal-Am Water Co. (Parkway) | 3410017-013 | Southgate | unhit | | |
| 105 | CA | Cal-Am Water Co. (Parkway) | 3410017-014 | Stocker | unhit | | |
| 106 | CA | Cal-Am Water Co. (Parkway) | 3410017-015 | Vintage 1 | unhit | | |
| 107 | CA | Cal-Am Water Co. (Parkway) | 3410017-016 | Vintage 2 | unhit | | |
| 108 | CA | Cal-Am Water Co. (Parkway) | 3410017-017 | Vintage 3 | unhit | | |
| 109 | CA | Cal-Am Water Co. (Parkway) | 3410017-021 | Countryside 1 | unhit | | |
| 110 | CA | Cal-Am Water Co. (Parkway) | 3410017-022 | Countryside 2 | unhit | | |
| 111 | CA | Cal-Am Water Co. (Parkway) | 3410017-023 | Aubarry | unhit | | |
| 112 | CA | Cal-Am Water Co. (Parkway) | 3410017-024 | Parkside 2 | unhit | | |
| 113 | CA | Cal-Am Water Co. (Parkway) | 3410017-026 | Power Inn | unhit | | |
| 114 | CA | Cal-Am Water Co. (Parkway) | 3410017-029 | Hemingway | unhit | | |
| 115 | CA | Cal-Am Water Co. (Rosemont) | 3410034-010 | Jackson Hwy Well 1 | unhit | | |
| 116 | CA | Cal-Am Water Co. (Rosemont) | 3410034-002 | Montezuma | unhit | | |
| 117 | CA | Cal-Am Water Co. (Rosemont) | 3410034-001 | Caldera | unhit | | |
| 118 | CA | Cal-Am Water Co. (Rosemont) | 3410034-004 | Southport | unhit | | |
| 119 | CA | Cal-Am Water Co. (Rosemont) | 3410034-005 | Sutters Gold | unhit | | |
| 120 | CA | Cal-Am Water Co. (Rosemont) | 3410034-006 | Tallyho 2 | unhit | | |
| 121 | CA | Cal-Am Water Co. (Rosemont) | 3410034-007 | Tallyho 1 | unhit | | |
| 122 | CA | Cal-Am Water Co. (Rosemont) | 3410034-008 | Westporter | unhit | | |
| 123 | CA | Cal-Am Water Co. (Rosemont) | 3410034-009 | Wikirose | unhit | | |
| 124 | CA | Cal-Am Water Co. (Ralph Lane) | 2702004-001 | Ralph Lane | unhit | | |
| 125 | CA | Cal-Am Water Co. (Ambler Park) | 2710006-004 | Ambler 4 | unhit | | |
| 126 | CA | Cal-Am Water Co. (Ambler Park) | 2710006-005 | Ambler 5 | unhit | | |
| 127 | CA | Cal-Am Water Co. (Ambler Park) | 2710006-006 | Ambler 6 | unhit | | |
| 128 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-013 | Iver 2 | unhit | | |
| 129 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-015 | Blue Ribbon 1 | unhit | | |
| 130 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-016 | Blue Ribbon 2 | unhit | | |
| 131 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-018 | Guess | unhit | | |
| 132 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-026 | Richardson 1 | unhit | | |
| 133 | CA | Cal-Am Water Co. (San Marino) | 1910139-028 | Richardson Well 02 | unhit | | |
| 134 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-001 | Iver 1 | unhit | | |
| 135 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-01D | Grand | unhit | | |
| 136 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-044 | Rosemead | unhit | | |
| 137 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-019 | Hall | unhit | | |
| 138 | CA | Cal-Am Water Co. (San Marino) | 1910139-032 | Hall Well 02 | unhit | | |
| 139 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-020 | Howland | unhit | | |
| 140 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-023 | Mariposa 3 | unhit | | |
| 141 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-024 | Mission View 2 | unhit | | |
| 142 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-003 | Oak Knoll Circle | unhit | | |
| 143 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-005 | Patton | unhit | | destroyed |
| 144 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-004 | Oswego | unhit | | |
| 145 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-006 | Weston | unhit | | |
| 146 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-008 | Lacanda Park | unhit | | |
| 147 | CA | Cal-Am Water Co. (San Marino (Upper System)) | 1910139-009 | Roanoke | unhit | | |
| 148 | CA | Cal-Am Water Co. (San Marino (Upper System)) | 1910139-007 | Longdon | unhit | | |
| 149 | CA | Cal-Am Water Co. (San Marino (Upper System)) | 1910139-017 | Del Mar | unhit | | |
| 150 | CA | Cal-Am Water Co. (San Marino) | 1910139-029 | Lombardy Well 02 | unhit | | |
| 151 | CA | Cal-Am Water Co. (San Marino) | 1910139-044 | Patton Well #2 | unhit | | |
| 152 | CA | Cal-Am Water Co. (Seaside) | 2710004-070 | Santa Margarita | unhit | | |
| 153 | CA | Cal-Am Water Co. (Seaside) | 2710004-009 | Darwin | unhit | | |
| 154 | CA | Cal-Am Water Co. (Seaside) | 2710004-021 | Military | unhit | | |
| 155 | CA | Cal-Am Water Co. (Seaside) | 2710004-024 | Ord Grove 2 | unhit | | |
| 156 | CA | Cal-Am Water Co. (Seaside) | 2710004-029 | Playa 3 | unhit | | |
| 157 | CA | Cal-Am Water Co. (Seaside) | 2710004-046 | Paralta | unhit | | |
| 158 | CA | Cal-Am Water Co. (Seaside) | 2710004-050 | Luzern 2 | unhit | | |
| 159 | CA | Cal-Am Water Co. (Seaside) | 2710004-051 | Plumas 4 | unhit | | |
| 160 | CA | Cal-Am Water Co. (Security Park) | 3410027-001 | Beta A | unhit | | |

EXHIBIT D
LIST OF ALL WELLS

| | State | PWS Name | ID | Source Name | GPM | Max MTBE | NOTES |
|---|---|---|---|---|---|---|---|
| 161 | CA | Cal-Am Water Co. (Security Park) | 3410027-002 | Beta B | unht | | |
| 162 | CA | Cal-Am Water Co. (Security Park) | 3410027-003 | Central 2 | unht | | |
| 163 | CA | Cal-Am Water Co. (Sonoma) | 4910023- | Faught Rd Well | unht | | |
| 164 | CA | Cal-Am Water Co. (Sonoma) | 4910023-004 | Well 4A, 8040 Redwood Hwy | unht | | |
| 165 | CA | Cal-Am Water Co. (Sonoma) | 4910023-005 | Well 5, Lavell Road | unht | | |
| 166 | CA | Cal-Am Water Co. (Sonoma) | 4910023-006 | Well 1A, 4760 Londonberry Dr | unht | | |
| 167 | CA | Cal-Am Water Co. (Sonoma) | 4910023-007 | Well 3A, 537 Mayfield Drive | unht | | |
| 168 | CA | Cal-Am Water Co. (Suburban) | 3410010-002 | Cheltenham | unht | | |
| 169 | CA | Cal-Am Water Co. (Suburban) | 3410010-008 | Mars | unht | | |
| 170 | CA | Cal-Am Water Co. (Suburban) | 3410010-018 | Whitewater | unht | | |
| 171 | CA | Cal-Am Water Co. (Suburban) | 3410010-001 | Butterfield | unht | | |
| 172 | CA | Cal-Am Water Co. (Suburban) | 3410010-004 | Folsom Bradshaw | unht | | |
| 173 | CA | Cal-Am Water Co. (Suburban) | 3410010-005 | College Greens | unht | | |
| 174 | CA | Cal-Am Water Co. (Suburban) | 3410010-006 | Gould | unht | | |
| 175 | CA | Cal-Am Water Co. (Suburban) | 3410010-007 | Malaga | unht | | |
| 176 | CA | Cal-Am Water Co. (Suburban) | 3410010-009 | Moonbeam | unht | | |
| 177 | CA | Cal-Am Water Co. (Suburban) | 3410010-010 | Nut Plains | unht | | |
| 178 | CA | Cal-Am Water Co. (Suburban) | 3410010-011 | Oaken Bucket | unht | | |
| 179 | CA | Cal-Am Water Co. (Suburban) | 3410010-012 | Point Reyes | unht | | |
| 180 | CA | Cal-Am Water Co. (Suburban) | 3410010-013 | Rockingham | unht | | |
| 181 | CA | Cal-Am Water Co. (Suburban) | 3410010-014 | Rogue River | unht | | |
| 182 | CA | Cal-Am Water Co. (Suburban) | 3410010-015 | Salmon Falls | unht | | |
| 183 | CA | Cal-Am Water Co. (Suburban) | 3410010-016 | Swansea | unht | | |
| 184 | CA | Cal-Am Water Co. (Suburban) | 3410010-017 | West La Loma | unht | | |
| 185 | CA | Cal-Am Water Co. (Suburban) | 3410010-019 | Winchester | unht | | |
| 186 | CA | Cal-Am Water Co. (Suburban) | 3410010-020 | Woodman | unht | | |
| 187 | CA | Cal-Am Water Co. (Suburban) | 3410010-021 | Countryside Way | unht | | |
| 188 | CA | Cal-Am Water Co. (Toro System) | 2710021-001 | Golf Club Well | unht | | |
| 189 | CA | Cal-Am Water Co. (Toro System) | 2710021-002 | Markham Ranch Well | unht | | |
| 190 | CA | Cal-Am Water Co. (Toro System) | 2710021-003 | Well 01 | unht | | |
| 191 | CA | Cal-Am Water Co. (Toro System) | 2710021-004 | Well 02 | unht | | |
| 192 | CA | Cal-Am Water Co. (Toro System) | 2710021-005 | Well 03 | unht | | |
| 193 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-016 | Los Laureles 6 | unht | | |
| 194 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-017 | Los Laureles 5 | unht | | |
| 195 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-033 | Robles 3 | unht | | |
| 196 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-034 | Russell 2 | unht | | |
| 197 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-035 | Russell 4 | unht | | |
| 198 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-044 | Panetta 1 | unht | | |
| 199 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-045 | Panetta 2 | unht | | |
| 200 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-046 | Garzas 3 | unht | | |
| 201 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-047 | Garzas 4 | unht | | |
| 202 | CA | Cal-Am Water Co. (Walnut Grove) | 3410047-001 | Grove 1 | unht | | |
| 203 | CA | Cal-Am Water Co. (Walnut Grove) | 3410047-003 | Grove 3 | unht | | |
| 204 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-074 | Berwick 09 | unht | | |

EXHIBIT "E"

EXHIBIT E
LIST OF HIT WELLS

|   | State | PWS Name | ID | Source Name | GPM | Max MTBE |
|---|-------|----------|-----|-------------|-----|----------|
| 1 | CA | California-American Water Company (Monterey) | Manor 02 | MANOR 02 - RAW | 714 | 7 |
| 2 | CA | California-American Water Company (Monterey) | Scarlett 08 | Scarlett 08 | 1256 | 0.6 |
| 3 | CA | California-American Water Company (Baldwin Hills) | Vernon 02 | Vernon Well 02 | 700 | 5.7 |

EXHIBIT "F"

EXHIBIT F
LIST OF UNHIT WELLS

| | State | PWS Name | ID | Source Name | GPH | MAX MTBE | Notes |
|---|---|---|---|---|---|---|---|
| 1 | CA | Cal-Am Water Co. (Hidden Hills) | 2710022-001 | Mohsel | unhit | | |
| 2 | CA | Cal-Am Water Co. (Hidden Hills) | 2710022-002 | Standex | unhit | | |
| 3 | CA | Cal-Am Water Co. (Ryan Ranch) | 2701460-001 | Ryan Ranch 7 | unhit | | |
| 4 | CA | Cal-Am Water Co. (Ryan Ranch) | 2701456-005 | Ryan Ranch 6 | unhit | | |
| 5 | CA | Cal-Am Water Co. (Ryan Ranch) | 2701456-007 | Ryan Ranch 11 | unhit | | |
| 6 | CA | Cal-Am Water Co. (Bishop) | 2701882-016 | Bishop 1 | unhit | | |
| 7 | CA | Cal-Am Water Co. (Bishop) | 2701882-017 | Bishop 2 | unhit | | |
| 8 | CA | Cal-Am Water Co. (Hidden Hills) | 2710022-004 | Bay Ridge | unhit | | Destroyed |
| 9 | CA | Cal-Am Water Co. (Amblar) | 2710308-002 | Well 01 | unhit | | |
| 10 | CA | Cal-Am Water Co. (Antelope) | 3410001-016 | Rhine Way | unhit | | |
| 11 | CA | Cal-Am Water Co. (Antelope) | 3410031-001 | Twin Trails | unhit | | |
| 12 | CA | Cal-Am Water Co. (Antelope) | 3410031-002 | Palmerson | unhit | | |
| 13 | CA | Cal-Am Water Co. (Antelope) | 3410031-003 | Davidson | unhit | | |
| 14 | CA | Cal-Am Water Co. (Antelope) | 3410031-004 | Prior Way | unhit | | |
| 15 | CA | Cal-Am Water Co. (Antelope) | 3410031-005 | Scotland | unhit | | |
| 16 | CA | Cal-Am Water Co. (Antelope) | 3410031-006 | Well Avenue | unhit | | |
| 17 | CA | Cal-Am Water Co. (Antelope) | 3410031-007 | PFERRELY Mitchell | unhit | | |
| 18 | CA | Cal-Am Water Co. (Antelope) | 3410031-008 | Vandenberg | unhit | | |
| 19 | CA | Cal-Am Water Co. (Antelope) | 3410031-009 | Don Julio | unhit | | |
| 20 | CA | Cal-Am Water Co. (Antelope) | 3410031-010 | Eagle Ridge | unhit | | |
| 21 | CA | Cal-Am Water Co. (Antelope) | 3410031-011 | Fox Park | unhit | | |
| 22 | CA | Cal-Am Water Co. (Antelope) | 3410031-012 | North Loop | unhit | | |
| 23 | CA | Cal-Am Water Co. (Antelope) | 3410031-013 | Colonnade | unhit | | |
| 24 | CA | Cal-Am Water Co. (Antelope) | 3410031-014 | Covered Wagon | unhit | | |
| 25 | CA | Cal-Am Water Co. (Antelope) | 3410031-015 | Cook Riole | unhit | | |
| 26 | CA | Cal-Am Water Co. (Antelope) | 3410031-017 | Falcon View | unhit | | |
| 27 | CA | Cal-Am Water Co. (Antelope) | 3410031-018 | Elverta | unhit | | |
| 28 | CA | Cal-Am Water Co. (Arden) | 3410045-001 | Fairlake 1 | unhit | | |
| 29 | CA | Cal-Am Water Co. (Arden) | 3410045-002 | Fairlake 2 | unhit | | |
| 30 | CA | Cal-Am Water Co. (Arden) | 3410045-003 | Howe Avenue | unhit | | |
| 31 | CA | Cal-Am Water Co. (Arden) | 3410045-004 | Willkop | unhit | | |
| 32 | CA | Cal-Am Water Co. (Arden) | 3410045-005 | Watt Way | unhit | | |
| 33 | CA | Cal-Am Water Co. (Baldwin Hills) | 1910052-004 | Vernon 1 | unhit | | |
| 34 | CA | Cal-Am Water Co. (Baldwin Hills) | 1910052-001 | 48th Street | unhit | | |
| 35 | CA | Cal-Am Water Co. (Baldwin Hills) | 1910052-003 | Crenshaw | unhit | | |
| 36 | CA | Cal-Am Water Co. (Baldwin Hills) | 1910052-006 | Vernon 3 | unhit | | |
| 37 | CA | Cal-Am Water Co. (Chusler) | 2701292-002 | Chusler 3 | unhit | | |
| 38 | CA | Cal-Am Water Co. (Chusler) | 2701292-004 | Chusler 4 | unhit | | |
| 39 | CA | Cal-Am Water Co. (Duarte (Irwindale)) | 1910186-003 | Crown Haven | unhit | | |
| 40 | CA | Cal-Am Water Co. (Duarte) | 1910186-006 | Mountain Avenue | unhit | | |
| 41 | CA | Cal-Am Water Co. (Duarte) | 1910186-001 | Buena Vista | unhit | | |
| 42 | CA | Cal-Am Water Co. (Duarte) | 1910186-002 | Bacon | unhit | | |
| 43 | CA | Cal-Am Water Co. (Duarte) | 1910186-004 | Fish Canyon | unhit | | |
| 44 | CA | Cal-Am Water Co. (Duarte) | 1910186-007 | Santa Fe | unhit | | |
| 45 | CA | Cal-Am Water Co. (Duarte) | 1910186-008 | Wiley | unhit | | |
| 46 | CA | Cal-Am Water Co. (Duarte) | 1910186-009 | Encanto | unhit | | |
| 47 | CA | Cal-Am Water Co. (Duarte) | 1910186-010 | Los Lomas 2 | unhit | | |
| 48 | CA | Cal-Am Water Co. (Felton) | 4410002-005 | Felton Acres Well | unhit | | |
| 49 | CA | Cal-Am Water Co. (Felton) | 4410002-001 | Bennet Spring | unhit | | |
| 50 | CA | Cal-Am Water Co. (Felton) | 4410002-002 | Bull Spring 01 | unhit | | |
| 51 | CA | Cal-Am Water Co. (Felton) | 4410002-003 | Bull Spring 02 | unhit | | |
| 52 | CA | Cal-Am Water Co. (Isleton) | 3410012-002 | Well 1 | unhit | | |
| 53 | CA | Cal-Am Water Co. (Isleton) | 3410012-003 | Well 2 | unhit | | |
| 54 | CA | Cal-Am Water Co. (Isleton) | 3410012-004 | Well 3A | unhit | | |
| 55 | CA | Cal-Am Water Co. (Isleton) | 3410012-005 | Well 3B | unhit | | |
| 56 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-013 | Lorenzo Drive | unhit | | |
| 57 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-017 | Oakberry | unhit | | |
| 58 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-020 | Sandalwood | unhit | | |
| 59 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-025 | Villaview | unhit | | |
| 60 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-001 | Andrea 2 | unhit | | |
| 61 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-002 | Andrea 1 | unhit | | |
| 62 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-003 | Auburn/Halfax | unhit | | |
| 63 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-004 | Carriage Drive | unhit | | |
| 64 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-005 | Chipping Way | unhit | | |
| 65 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-006 | Crosswoods | unhit | | |
| 66 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-007 | Diablo | unhit | | |
| 67 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-008 | Fort Sutter | unhit | | |
| 68 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-009 | Glass Slipper | unhit | | |
| 69 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-010 | Hemlock | unhit | | |
| 70 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-012 | Laurel Oaks | unhit | | |
| 71 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-014 | Linda Sue | unhit | | |
| 72 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-016 | Rushmore | unhit | | |
| 73 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-018 | Oak Forest | unhit | | |
| 74 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-019 | Roseville Road | unhit | | |
| 75 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-021 | Shenandoah | unhit | | |
| 76 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-022 | Treelark | unhit | | |
| 77 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-023 | Twin Parks | unhit | | |
| 78 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-024 | Van Maren | unhit | | |
| 79 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-026 | Cherbourg | unhit | | |
| 80 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-027 | Summerplace | unhit | | |

EXHIBIT F
LIST OF UNHIT WELLS

| | State | PWS Name | ID | Source Name | GPM | Max MTBE | Notes |
|---|---|---|---|---|---|---|---|
| 81 | CA | Cal-Am Water Co. (Lincoln Oaks) | 3410013-026 | Daly | unhit | | |
| 82 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-002 | Begonia 2 | unhit | | |
| 83 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-006 | Berwick 6 | unhit | | |
| 84 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-007 | Rancho Canada | unhit | | Destroyed |
| 85 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-012 | Rancho Canada 02 | unhit | | Destroyed |
| 86 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-008 | Cypress | unhit | | |
| 87 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-073 | Cypress Well 02 | unhit | | |
| 88 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-026 | Pearce | unhit | | |
| 89 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-002 | Schulte 2 | unhit | | |
| 90 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-054 | San Carlos 2 | unhit | | |
| 91 | CA | Cal-Am Water Co. (Parkway) | 3410017-009 | Parkside 1 | unhit | | |
| 92 | CA | Cal-Am Water Co. (Parkway) | 3410017-010 | Persimmon | unhit | | |
| 93 | CA | Cal-Am Water Co. (Parkway) | 3410017-003 | Conrad | unhit | | |
| 94 | CA | Cal-Am Water Co. (Parkway) | 3410017-004 | Gale | unhit | | |
| 95 | CA | Cal-Am Water Co. (Parkway) | 3410017-018 | Wilbur Way 2 | unhit | | |
| 96 | CA | Cal-Am Water Co. (Parkway) | 3410017-002 | Briggs | unhit | | |
| 97 | CA | Cal-Am Water Co. (Parkway) | 3410017-005 | Garber Road | unhit | | |
| 98 | CA | Cal-Am Water Co. (Parkway) | 3410017-008 | Lool | unhit | | |
| 99 | CA | Cal-Am Water Co. (Parkway) | 3410017-011 | Rockhurst | unhit | | |
| 100 | CA | Cal-Am Water Co. (Parkway) | 3410017-012 | Sky Parkway | unhit | | |
| 101 | CA | Cal-Am Water Co. (Parkway) | 3410017-013 | Southgate | unhit | | |
| 102 | CA | Cal-Am Water Co. (Parkway) | 3410017-014 | Stocker | unhit | | |
| 103 | CA | Cal-Am Water Co. (Parkway) | 3410017-016 | Vintage 1 | unhit | | |
| 104 | CA | Cal-Am Water Co. (Parkway) | 3410017-016 | Vintage 2 | unhit | | |
| 105 | CA | Cal-Am Water Co. (Parkway) | 3410017-017 | Vintage 3 | unhit | | |
| 106 | CA | Cal-Am Water Co. (Parkway) | 3410017-021 | Countryside 1 | unhit | | |
| 107 | CA | Cal-Am Water Co. (Parkway) | 3410017-022 | Countryside 2 | unhit | | |
| 108 | CA | Cal-Am Water Co. (Parkway) | 3410017-023 | Asberry | unhit | | |
| 109 | CA | Cal-Am Water Co. (Parkway) | 3410017-024 | Parkside 2 | unhit | | |
| 110 | CA | Cal-Am Water Co. (Parkway) | 3410017-025 | Power Inn | unhit | | |
| 111 | CA | Cal-Am Water Co. (Parkway) | 3410017-026 | Hemingway | unhit | | |
| 112 | CA | Cal-Am Water Co. (Rosemont) | 3410034-010 | Jackson Hwy Well 1 | unhit | | |
| 113 | CA | Cal-Am Water Co. (Rosemont) | 3410034-002 | Montezuma | unhit | | |
| 114 | CA | Cal-Am Water Co. (Rosemont) | 3410034-001 | Caldera | unhit | | |
| 115 | CA | Cal-Am Water Co. (Rosemont) | 3410034-004 | Southport | unhit | | |
| 116 | CA | Cal-Am Water Co. (Rosemont) | 3410034-005 | Stutlers Gold | unhit | | |
| 117 | CA | Cal-Am Water Co. (Rosemont) | 3410034-006 | Tallyho 2 | unhit | | |
| 118 | CA | Cal-Am Water Co. (Rosemont) | 3410034-007 | Tallyho 1 | unhit | | |
| 119 | CA | Cal-Am Water Co. (Rosemont) | 3410034-008 | Westporter | unhit | | |
| 120 | CA | Cal-Am Water Co. (Rosemont) | 3410034-009 | Wildrose | unhit | | |
| 121 | CA | Cal-Am Water Co. (Ralph Lane) | 2702004-001 | Ralph Lane | unhit | | |
| 122 | CA | Cal-Am Water Co. (Ambler Park) | 2710006-004 | Ambler 4 | unhit | | |
| 123 | CA | Cal-Am Water Co. (Ambler Park) | 2710006-005 | Ambler 5 | unhit | | |
| 124 | CA | Cal-Am Water Co. (Ambler Park) | 2710006-006 | Ambler 6 | unhit | | |
| 125 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-013 | Iver 2 | unhit | | |
| 126 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-015 | Blue Ribbon 1 | unhit | | |
| 127 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-016 | Blue Ribbon 2 | unhit | | |
| 128 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-018 | Guess | unhit | | |
| 129 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-026 | Richardson 1 | unhit | | |
| 130 | CA | Cal-Am Water Co. (San Marino) | 1910139-026 | Richardson Well 02 | unhit | | |
| 131 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-001 | Iver 1 | unhit | | |
| 132 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-010 | Grand | unhit | | |
| 133 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-014 | Rosemead | unhit | | |
| 134 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-032 | Hall | unhit | | |
| 135 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-032 | Hall Well 02 | unhit | | |
| 136 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-020 | Howland | unhit | | |
| 137 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-023 | Mariposa 3 | unhit | | |
| 138 | CA | Cal-Am Water Co. (San Marino (Lower System)) | 1910139-024 | Mission View 2 | unhit | | |
| 139 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-003 | Oak Knoll Circle | unhit | | |
| 140 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-005 | Patton | unhit | | |
| 141 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-004 | Oswego | unhit | | |
| 142 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-006 | Weston | unhit | | |
| 143 | CA | Cal-Am Water Co. (San Marino (Raymond Basin)) | 1910139-008 | Lamanda Park | unhit | | |
| 144 | CA | Cal-Am Water Co. (San Marino (Upper System)) | 1910139-009 | Roanoke | unhit | | |
| 145 | CA | Cal-Am Water Co. (San Marino (Upper System)) | 1910139-007 | Longden | unhit | | |
| 146 | CA | Cal-Am Water Co. (San Marino (Upper System)) | 1910139-017 | Del Mar | unhit | | |
| 147 | CA | Cal-Am Water Co. (San Marino) | 1910139-029 | Lombardy Well 02 | unhit | | |
| 148 | CA | Cal-Am Water Co. (San Marino) | 1910139-044 | Patton Well #2 | unhit | | |
| 149 | CA | Cal-Am Water Co. (Seaside) | 2710004-070 | Santa Margarita | unhit | | |
| 150 | CA | Cal-Am Water Co. (Seaside) | 2710004-009 | Darwin | unhit | | |
| 151 | CA | Cal-Am Water Co. (Seaside) | 2710004-021 | Military | unhit | | |
| 152 | CA | Cal-Am Water Co. (Seaside) | 2710004-024 | Ord Grove 2 | unhit | | |
| 153 | CA | Cal-Am Water Co. (Seaside) | 2710004-029 | Playa 3 | unhit | | |
| 154 | CA | Cal-Am Water Co. (Seaside) | 2710004-048 | Paralta | unhit | | |
| 155 | CA | Cal-Am Water Co. (Seaside) | 2710004-050 | Luzern 2 | unhit | | |
| 156 | CA | Cal-Am Water Co. (Seaside) | 2710004-051 | Plumas 4 | unhit | | |
| 157 | CA | Cal-Am Water Co. (Security Park) | 3410027-001 | Bela A | unhit | | |
| 158 | CA | Cal-Am Water Co. (Security Park) | 3410027-002 | Bela B | unhit | | |
| 159 | CA | Cal-Am Water Co. (Security Park) | 3410027-003 | Central 2 | unhit | | |
| 160 | CA | Cal-Am Water Co. (Sonoma) | 4910023- | Feught Rd Well | unhit | | |

EXHIBIT F
LIST OF UNHIT WELLS

| | State | PWS Name | ID | Source Name | GPH | Max MTBE | Notes |
|---|---|---|---|---|---|---|---|
| 161 | CA | Cal-Am Water Co. (Sonoma) | 4910023-004 | Well 4A, 5040 Redwood Hwy | unhit | . | |
| 162 | CA | Cal-Am Water Co. (Sonoma) | 4910023-005 | Well 6, Lavell Road | unhit | | |
| 163 | CA | Cal-Am Water Co. (Sonoma) | 4910023-006 | Well 1A, 4790 Londonberry Dr | unhit | | |
| 164 | CA | Cal-Am Water Co. (Sonoma) | 4910023-007 | Well 3A, 637 Mayfeld Drive | unhit | | |
| 165 | CA | Cal-Am Water Co. (Suburban) | 3410010-002 | Cheltenham | unhit | | |
| 166 | CA | Cal-Am Water Co. (Suburban) | 3410010-008 | Mars | unhit | | |
| 167 | CA | Cal-Am Water Co. (Suburban) | 3410010-018 | Waterwheel | unhit | | |
| 168 | CA | Cal-Am Water Co. (Suburban) | 3410010-001 | Butterfield | unhit | | |
| 169 | CA | Cal-Am Water Co. (Suburban) | 3410010-004 | Folsom Bradshaw | unhit | | |
| 170 | CA | Cal-Am Water Co. (Suburban) | 3410010-005 | College Greens | unhit | | |
| 171 | CA | Cal-Am Water Co. (Suburban) | 3410010-006 | Gould | unhit | | |
| 172 | CA | Cal-Am Water Co. (Suburban) | 3410010-007 | Malaga | unhit | | |
| 173 | CA | Cal-Am Water Co. (Suburban) | 3410010-009 | Moonbeam | unhit | | |
| 174 | CA | Cal-Am Water Co. (Suburban) | 3410010-010 | Nut Plains | unhit | | |
| 175 | CA | Cal-Am Water Co. (Suburban) | 3410010-011 | Oaken Bucket | unhit | | |
| 176 | CA | Cal-Am Water Co. (Suburban) | 3410010-012 | Point Reyes | unhit | | |
| 177 | CA | Cal-Am Water Co. (Suburban) | 3410010-013 | Rockingham | unhit | | |
| 178 | CA | Cal-Am Water Co. (Suburban) | 3410010-014 | Rogue River | unhit | | |
| 179 | CA | Cal-Am Water Co. (Suburban) | 3410010-015 | Salmon Falls | unhit | | |
| 180 | CA | Cal-Am Water Co. (Suburban) | 3410010-016 | Swansea | unhit | | |
| 181 | CA | Cal-Am Water Co. (Suburban) | 3410010-017 | West La Loma | unhit | | |
| 182 | CA | Cal-Am Water Co. (Suburban) | 3410010-018 | Winchester | unhit | | |
| 183 | CA | Cal-Am Water Co. (Suburban) | 3410010-020 | Woodman | unhit | | |
| 184 | CA | Cal-Am Water Co. (Suburban) | 3410010-021 | Countryside Way | unhit | | |
| 185 | CA | Cal-Am Water Co. (Toro System) | 2710021-001 | Golf Club Well | unhit | | |
| 186 | CA | Cal-Am Water Co. (Toro System) | 2710021-002 | Markham Ranch Well | unhit | | |
| 187 | CA | Cal-Am Water Co. (Toro System) | 2710021-003 | Well 01 | unhit | | |
| 188 | CA | Cal-Am Water Co. (Toro System) | 2710021-004 | Well 02 | unhit | | |
| 189 | CA | Cal-Am Water Co. (Toro System) | 2710021-005 | Well 03 | unhit | | |
| 190 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-016 | Los Laureles 6 | unhit | | |
| 191 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-017 | Los Laureles 5 | unhit | | |
| 192 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-033 | Robles 3 | unhit | | |
| 193 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-034 | Russell 2 | unhit | | |
| 194 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-035 | Russell 4 | unhit | | |
| 195 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-044 | Penolla 1 | unhit | | |
| 196 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-045 | Penolla 2 | unhit | | |
| 197 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-046 | Garzas 3 | unhit | | |
| 198 | CA | Cal-Am Water Co. (Upper Carmel Valley) | 2710004-047 | Garzas 4 | unhit | | |
| 199 | CA | Cal-Am Water Co. (Walnut Grove) | 3410047-001 | Grove 1 | unhit | | |
| 200 | CA | Cal-Am Water Co. (Walnut Grove) | 3410047-003 | Grove 3 | unhit | | |
| 201 | CA | Cal-Am Water Co. (Lower Carmel Valley) | 2710004-074 | Berwick 09 | unhit | | |