UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Methyl Tertiary Butyl Ether
("MTBE") Products Liability Litigation

This Document Relates To:

Orange County Water District v.
Atlantic Richfield Co., et al.
(Case No. 04-4968)

Master File No. 1:00-1898
MDL No. 1358 (SAS)
M21-88

**DEFENDANT 7-ELEVEN, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER DETERMINING GOOD FAITH SETTLEMENT**

Defendant 7-Eleven, Inc. ("7-Eleven") respectfully submits the following memorandum of points and authorities in support of its motion for an order determining the good faith of the Settlement Agreement and Release between Plaintiff Orange County Water District (the "District") and 7-Eleven ("Settlement Agreement").

Dated: January 18, 2011

Respectfully submitted,

*[signature]*

**MICHAEL A. WALSH**
(MW 2534)
michael.walsh@strasburger.com
**COURTNEY JONES KIEFFER**
(CK 3714) (pro hac vice)
courtney.jones.kieffer@strasburger.com
**JADD F. MASSO**
(JM 4934) (pro hac vice)
jadd.masso@strasburger.com
**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 4400
Dallas, Texas 75202-3794
Telephone: 214-651-4300
Facsimile: 214-651-4330

**ATTORNEYS FOR DEFENDANT
7-ELEVEN, INC.**

– 2 –

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via LexisNexis File and Serve upon all counsel of record on January 18, 2011.

_____
**MICHAEL A. WALSH**

# **TABLE OF CONTENTS**

I. BACKGROUND ...................................................................................................................1

   A. Case History..................................................................................................................1

   B. Settlement Between the District and 7-Eleven .............................................................2

II. DISCUSSION.......................................................................................................................6

   A. California Code Of Civil Procedure § 877.6 Permits The Court To Determine The Good Faith Of a Settlement Reached By One Of Several Named Defendants. ..................6

   B. The Settlement Between The District And 7-Eleven Was Made In Good Faith And Meets The Standards Governing This Determination. .......................................................7

      1. The settlement is a rough approximation of the District's total recovery as to 7-Eleven. ...............................................................................................................8

      2. The settlement is a rough approximation of 7-Eleven's proportionate liability. ............9

      3. The amount paid in settlement is reasonable. ............................................................10

      4. The allocation of proceeds among plaintiffs does not apply to this settlement. ..........11

      5. The settlement reflects recognition that 7-Eleven should pay less in settlement than after trial..................................................................................................11

      6. The financial condition and insurance policy limits of 7-Eleven are not relevant to the settlement. ......................................................................................12

      7. Neither fraud, collusion, nor tortious misconduct played a role in the negotiations between the District and 7-Eleven. ...............................................12

   C. Any Party Challenging The Settlement Bears The Burden of Proving Lack of Good Faith. ..........................................................................................................................13

    D.  The Court Should Direct Entry of Judgment Pursuant to FRCP 54(b) Regarding the Court's Determination of a Good Faith Settlement. ..........................................................13

III.    CONCLUSION .............................................................................................................14

3267370.4/SP/76088/0420/011811

# **TABLE OF AUTHORITIES**

**CASES**

*Abbott Ford, Inc. v. Superior Court*,
  741 P.2d 124 (Cal. 1987) ..................................................................................................9

*Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*,
  409 F. Supp. 2d 136 (N.D.N.Y. 2005) ..............................................................................14

*Bottoms v. Levin Enters.*,
  No. C-99-4598 MMC, 2001 U.S. Dist. LEXIS 13434, (N.D. Cal. 2001) ........................14

*Heppler v. J. M. Peters Co.*,
  87 Cal. Rptr. 2d 497 (Cal. Ct. App. 1999) ......................................................................8, 9

*In re: Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  578 F. Supp.2d 519 (S.D.N.Y. 2008) .......................................................................4, 8, 10

*North County Contractor's Ass'n v. Touchstone Ins. Servs.*,
  33 Cal Rptr. 2d 166 (Cal. Ct. App. 1994) ..........................................................................8

*Rutgard v. Haynes*,
  61 F. Supp. 2d 1082 (S.D. Cal. 1999) ..............................................................................11

*Tech-Bilt, Inc v. Woodward-Clyde & Assocs.*,
  698 P.2d 159 (Cal. 1985) ......................................................................................7, 8, 9, 13

*Torres v. Union Pacific R.R. Co.*,
  203 Cal. Rptr. 825 (Cal. Ct. App. 1984) .............................................................................9

**STATUTES**

California Code Of Civil Procedure § 877.6 .............................................................................6

California Code of Civil Procedure § 877.6(a)(1) .....................................................................6

§ 1407 of Title 28 of the United States Code ............................................................................1

**RULES**

FRCP 54(b) .........................................................................................................................13, 14

**OTHER AUTHORITIES**

Case Management Order #52 .....................................................................................................2

# I.
# BACKGROUND

**A.** **Case History**

In 2003, the District initiated this action in Orange County Superior Court, Case No. 03CC00176, against numerous defendants, including 7-Eleven, to "protect the groundwater resources of northern Orange County from oil industry pollution," for "compensatory damages and all other damages" associated with methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol ("TBA") in groundwater, to "protect the quality of the common water supplies of the District," and to "assure that the responsible parties…bear the expense" (the "Litigation"). *See* Third Amended Complaint. The District alleges causes of action for strict liability, negligence, trespass, nuisance, Orange County Water District Act Claim, and declaratory and injunctive relief. The District also claims industry-wide fraud and conspiracy, seeking punitive damages against refiners and manufacturers related to the use of MTBE in gasoline in California beginning in or about 1986 until the end of 2003.

The Litigation was transferred to the United States District Court, Southern District of New York by the Judicial Panel on Multidistrict Litigation, pursuant to §1407 of title 28 of the United States Code, and now is part of MTBE MDL 1358.

Since 2004, 7-Eleven has been party to three cases that were transferred to this Court as part of MDL 1358. Since December 2007, the Litigation has been the sole remaining case in this MDL to which 7-Eleven is a party. Declaration of Michael A. Walsh ("Walsh Decl."), ¶3.

7-Eleven owned and/or operated various convenience stores within the District's service area and near the service area that are potentially within the geographic scope of the Litigation (the "7-Eleven Stores"). *See* Exhibit A to Walsh Decl. At no time relevant to the District's claims did 7-Eleven manufacture any constituent of gasoline or refine gasoline, nor did it

– 1 –

distribute, ship, transport, or supply any retail locations with gasoline or any "gasoline product." Walsh Decl., ¶7.  It was the responsibility and obligation of 7-Eleven's gasoline suppliers to arrange for the delivery of gasoline directly to the underground storage tanks ("USTs") at the 7-Eleven Stores.  *Id.*  7-Eleven did not take title to the gasoline from its suppliers before the gasoline entered the USTs at the 7-Eleven Stores, and no entity took title to the gasoline between 7-Eleven and the consumer.  *Id.*

On July 2, 2009, pursuant to Case Management Order #52, the District submitted information to the Court identifying accrual dates for its alleged plumes, reflecting that the District is currently asserting claims regarding two 7-Eleven Stores:  store #26216, located at 107 Ball Road, Anaheim; and store #24559, located at 10499 Beach Boulevard, Stanton.[1]  Walsh Decl., ¶5.  On January 15, 2010, the District and the defendants identified "focus plumes," and no 7-Eleven Store was included in any focus plume.  Walsh Decl., ¶6.  Discovery has been proceeding in connection with focus plumes and stations associated with the focus plumes, but not with respect to non-focus plume stations.  Walsh Decl., ¶6.

**B.**     <u>**Settlement Between the District and 7-Eleven**</u>

Beginning in or about August 2006, plaintiffs and defendants in MDL 1358 began discussions to explore terms upon which the parties might resolve the large number of cases then pending, and the Court appointed a Special Settlement Master.  Walsh Decl., ¶8.  7-Eleven participated in those proceedings to resolve the Litigation, but those proceedings were not conducive to a retailer settling a single case involving a relatively small number of stores.  *Id.*  Beginning in or about October 2006, until in or around May 2007, counsel for the District and

---

[1] The District has disclosed that it intends to conduct additional low-level (i.e. below 1.0 ppb) MTBE testing and claims that the cost of such testing is recoverable under the Orange County Water District Act.  The District has indicated that costs for this testing would increase damages sought against 7-Eleven and that additional 7-Eleven Stores could be added to plumes for which the District seeks damages, adding to the potential scope, duration, and expense of the Litigation.

– 2 –

7-Eleven met on a number of occasions, both in person and on the telephone, to (i) identify the 7-Eleven Stores at issue in the Litigation, (ii) identify the District's claims that were pertinent to a retailer in the District's service area, (iii) discuss how liability for the District's claims might be apportioned (i.e., "Gas Station Claims" (the District's claims regarding the presence of gasoline, MTBE and/or TBA in the soil or groundwater at retail locations) as opposed to "Product Claims" (the District's product liability claims)), and (iv) discuss how any potential range of verdict might be allocated to a defendant such as 7-Eleven for Gas Station Claims.  Walsh Decl., ¶9. Settlement discussions between the District and 7-Eleven resumed in earnest in August 2010, and continued until the parties entered into the Settlement Agreement.  Walsh Decl., ¶10.

Recognizing that the Litigation will become increasingly expensive and time-consuming as it proceeds towards trial, and that all of the 7-Eleven Stores might be implicated in the Litigation, 7-Eleven elected to pursue settlement discussions to avoid the uncertainty of further litigation and incurring additional expense.  Walsh Decl., ¶11.  As a result of the settlement discussions, 7-Eleven has agreed to pay the District $1,700,000 in settlement of the Litigation regarding the 7-Eleven Stores.  Walsh Decl., ¶12.

The anticipated uncertainty and expense associated with preparing any single site for trial is significant.  Walsh Decl., ¶14.  7-Eleven has two sites currently identified by the District as being part of the Litigation and many additional sites in or near the District's service area.  *Id.* Therefore, the prospect of defending the Litigation through trial for all 7-Eleven Stores is daunting and worth consideration for settlement.  *Id.*

The presence of MTBE and/or TBA at or near a 7-Eleven Store will not in and of itself establish that there was a release at the 7-Eleven Store or that any release was the result of negligent, intentional, reckless, or otherwise culpable conduct on the part of 7-Eleven.  The

– 3 –

District would be required to undertake extensive factual discovery and expert analysis to establish that such MTBE and/or TBA emanated from a 7-Eleven Store and was a substantial factor in causing appreciable harm to the District. *In re: Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 578 F. Supp.2d 519, 530 (S.D.N.Y. 2008). Other discovery that would be anticipated if the Gas Station Claims against 7-Eleven were not settled and were to proceed to trial, even regarding only one 7-Eleven Store, would include the following:

    a.    Discovery of 7-Eleven and its consultants regarding site history, including UST and gasoline delivery system acquisition; prior site owners or operators; installation, monitoring, testing, maintenance, repair and removal of UST and delivery systems, and site remediation.

    b.    For 7-Eleven Stores where gasoline or its constituents were identified in either the soil or groundwater, extensive discovery to determine issues such as the volume of any gasoline release; duration that the condition existed at the site; vertical and horizontal distance to any drinking water source; groundwater gradient; fate and transport; geological and hydrogeological factors and conditions such as permeability, potential "passageways," and existence of conditions favorable to natural attenuation; and pumping rates and capture zone data regarding nearby drinking water wells.

    c.    For 7-Eleven Stores where neither gasoline releases nor the presence of gasoline or its constituents are known to exist in either the soil or groundwater, the District has indicated that gasoline detections in or threatening drinking water near such stores may require testing at the 7-Eleven Stores to determine if the site has had an "unreported release."

      d.      Discovery regarding other potential UST and gasoline delivery system sources of gasoline or its constituents in the groundwater, some of which will include abandoned sites.

      e.      Discovery regarding potential non-UST or gasoline delivery system sources of gasoline or its constituents in the groundwater, such as delivery overfills, customer overfills, accidents, run-off from rain water, and concentrations attributable to water used to recharge the basin.

      f.      Discovery regarding potential liability of equipment suppliers, equipment installers, maintenance companies, and consultants.

      g.      Discovery of the state agencies, including the District, that participated in the oversight of the relevant 7-Eleven Stores.

Walsh Decl., ¶15.

Approval of the Settlement Agreement will not end 7-Eleven's obligation to comply with state or federal law or relieve 7-Eleven of its obligations as may arise to the extent, for example, the Regional Water Quality Control Board, or other state or governmental agency, requires 7-Eleven to undertake testing, remediation, or other work in connection with continued operations at any of the 7-Eleven Stores.  Walsh Decl., ¶18; Declaration of Duane C. Miller ("Miller Decl."), ¶3.

While 7-Eleven has already collectively expended many millions of dollars in connection with meeting its obligations under state and federal law concerning its gasoline operations at the 7-Eleven Stores, no dollar amount paid for such work was credited or considered when reaching this settlement.  Walsh Decl., ¶19.  7-Eleven's prior remedial work at the 7-Eleven Stores was considered only in general terms to determine how to categorize sites.  *Id.*

– 5 –
3267370.4/SP/76088/0420/011811

The 7-Eleven Stores involved in the Settlement Agreement fall into the following six broad categories:

    a.    Stores regarding which the District is currently asserting claims (2 stores) ($725,000.00);

    b.    Stores with previous gasoline releases that have achieved regulatory closure from the appropriate agency (6 stores) ($570,000.00);

    c.    Stores that sold gasoline while MTBE was on the market but had no reported release (7 stores) ($335,000.00);

    d.    Stores that discontinued gasoline sales prior to 1986 (non-MTBE sites) (4 stores) ($40,000.00);

    e.    Stores that began selling gasoline in 2004 or later (non-MTBE sites) (2 stores) ($20,000.00); and

    f.    Stores where 7-Eleven never sold gasoline but is remediating gasoline and MTBE (1 store) ($10,000.00).

Walsh Decl., ¶20.

## II.
## DISCUSSION

**A.** **California Code Of Civil Procedure § 877.6 Permits The Court To Determine The Good Faith Of a Settlement Reached By One Of Several Named Defendants.**

California Code of Civil Procedure § 877.6(a)(1) provides in pertinent part:

> Any party to an action in which it is alleged that two or more parties are joint tortfeasors . . . shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors . . .

The issue of the good faith of a settlement is determined by the court upon motion or other application of any party, on the basis of declarations served in support of the motion, any counter declarations filed in opposition, the settlement papers, or, in the discretion of the court, upon other evidence at the hearing. Cal. C.C.P. § 877.6(b). The burden of proof is on the party opposing the good faith motion. Cal. C.C.P. § 877.6(d). A determination by the court that the settlement was made in good faith bars any other joint tortfeasor from any further claims against

– 6 –

the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault. Cal. C.C.P. § 877,6(c).

As discussed below, the settlement between the District and 7-Eleven was made in good faith, and 7-Eleven's application for an order determining the good faith of the parties' settlement should be granted.

### B. The Settlement Between The District And 7-Eleven Was Made In Good Faith And Meets The Standards Governing This Determination.

Determination of the good faith of a settlement of one of several alleged joint tortfeasors is assessed based on a variety of factors identified in *Tech-Bilt, Inc v. Woodward-Clyde & Assocs.*, 698 P.2d 159, 166 (Cal. 1985). The key consideration for the Court is whether the proposed settlement is within the "reasonable range" of the settling defendant's proportional share of comparative liability for the plaintiff's injuries. *Tech-Bilt*, 698 P.2d at 166. The Court will balance the relevant factors to ensure that the settlement is not "so far out of the ballpark . . . to be inconsistent with the equitable objectives of the statute." *Id*. at 167.

The factors considered include:

- A rough approximation of the plaintiff's total potential recovery;

- A rough approximation of the settling defendant's proportionate liability;

- The amount paid in settlement;

- The allocation of settlement proceeds among plaintiffs;

- A recognition that the settling defendant should pay less in settlement than if it were found liable at trial;

- The financial condition of the settling defendant;

- The insurance policy limits of the settling defendant; and

- The existence of fraud, collusion, or tortious misconduct on the part of the settling party aimed to injure the interests of the nonsettling defendants.

– 7 –

*Id.* at 166-67.  Each of these factors is evaluated on the basis of the information available to the parties at the time the settlement is entered into, and no one factor is determinative. *Id.* at 167. "The fundamental inquiry . . . is whether the settling defendant is paying the plaintiff an amount that is so far below defendant's proportionate share of liability as to be completely 'out of the ballpark.'"  *Heppler v. J. M. Peters Co.*, 87 Cal. Rptr. 2d 497, 514 (Cal. Ct. App. 1999) (quoting *Tech-Bilt*, 698 P.2d at 167).

The determination of whether a settlement is in good faith is left to the sound discretion of the trial court.  *Tech-Bilt*, 698 P.2d at 168; *North County Contractor's Ass'n v. Touchstone Ins. Servs.*, 33 Cal Rptr. 2d 166, 172 (Cal. Ct. App. 1994).

1. The settlement is a rough approximation of the District's total recovery as to 7-Eleven.

7-Eleven denies any liability to the District and believes (i) a jury would not find it liable in this action, (ii) assuming a jury were to find liability for 7-Eleven, its proportionate share of liability would be a small percentage of any total verdict, (iii) any verdict would be further reduced by the amount attributable to other causes, such as other contaminants, and (iv) any recovery would be further reduced by the amount of any settlements. The amount 7-Eleven has agreed to pay the District in settlement of the Litigation is a rough approximation of the District's total recovery as to 7-Eleven.  Miller Decl., ¶5.

The settlement terms recognize that the District faces a risk of an adverse verdict if it proceeded to trial against 7-Eleven.  Walsh Decl., ¶21; Miller Decl., ¶4.  As with other settlements this Court has approved, the District will "lack standing to bring a claim if tests of their wells 'have shown *no* MTBE contamination, and there are no allegations of any known releases of gasoline containing MTBE' near their wells."  *In re: MTBE*, 578 F. Supp.2d at 530.

– 8 –

Thus, among the potential outcomes of any trial is that the District may recover nothing with respect to its claims as to 7-Eleven.

Notably, the claims against 7-Eleven relate to its alleged conduct in the operation of UST systems in Orange County. The District's claims against 7-Eleven represent only a small percentage of the District's claims in the Litigation against all current defendants, and that percentage would be significantly reduced based on site-specific discovery and the inclusion of additional potentially responsible parties.

### 2. The settlement is a rough approximation of 7-Eleven's proportionate liability.

"[A] good faith settlement does not call for perfect or even nearly perfect apportionment of liability." *Abbott Ford, Inc. v. Superior Court*, 741 P.2d 124, 134 (Cal. 1987). The law requires only that the settlement is not "grossly disproportionate to what a reasonable person, at the time of settlement, would estimate the settling defendant's liability to be." *Tech-Bilt*, 698 P.2d at 167 (quoting *Torres v. Union Pacific R.R. Co.*, 203 Cal. Rptr. 825 (Cal. Ct. App. 1984). Again, the "fundamental inquiry . . . is whether the settling defendant is paying the plaintiff an amount that is so far below the defendant's proportionate share of liability as to be completely 'out of the ballpark.'" *Heppler,* 87 Cal. Rptr. 2d at 514. Payment of less than the defendant's "theoretical proportional share does not necessarily render a settlement in bad faith. Exact proportionality is not required." 3 Cal. Civ. Proc. Before Trial (4th Ed.) (CEB 2009) § 50.13 at 2393. In fact, "it is quite proper for a settling defendant to pay less than his proportionate share of the anticipated damages." *Abbott Ford*, 741 P.2d at 134.

The Court's evaluation of a settling defendant's proportional liability is based on the evidence available at the time of settlement. *Tech-Bilt*, 698 P.2d at 167. The limited documents

– 9 –

exchanged in the Litigation support a finding that the District's and 7-Eleven's settlement is in good faith.

In approving a prior good faith settlement filed by refiner defendants, this Court stated that "the means of allocating liability in these cases remains highly contested." *In re: MTBE*, 578 F. Supp. 2d at 528. Allocation is no less contested with respect to the District's claims against the owner/operator defendants. This Court addressed the issue of allocating liability in the context of the commingled product theory and stated, "Some theory of collective liability will likely be applied in these cases, in which case many refiners would be liable for contamination of each well regardless of the entity that spilled the gasoline." *Id.* Indeed, and as this Court recognized in overruling objections to the global MDL settlement in 2008, "…there is no evidentiary basis for estimating the individual liability of each defendant in these cases, making [the objecting defendant's suggested allocation] purely hypothetical." *Id.* at 529. It is for these reasons that when attempting to determine how to resolve the Litigation, the District and 7-Eleven focused on resolving liability related to the 7-Eleven defendant-specific and site-specific claims.

3.  The amount paid in settlement is reasonable.

7-Eleven denies any liability to the District and believes a jury would not find it liable in this action. 7-Eleven also desires to end the continued expense associated with the defense of the protracted Litigation. Furthermore, uncertainty remains as to whether the District would prevail on a product defect theory against a retailer and, if so, whether and how much a jury might award. As such, and for the reasons discussed above, the settlement is reasonable and reflects the reasonable range of 7-Eleven's proportional share of comparative liability at the time of settlement.

– 10 –

Notwithstanding that for the past three years 7-Eleven has been in only one MDL case with only two convenience stores at issue, the Litigation has been costly and time-consuming for 7-Eleven. Walsh Decl., ¶16. Because of the nature of MDL proceedings, where discovery is generally applicable in all cases, 7-Eleven has had to monitor developments in MDL cases to the extent proceedings, including motion practice and discovery, bear on its liability (i.e. issues such as UST, fate and transport, health effects, etc.). *Id.* While much public information is available concerning sites where remediation has been undertaken, only limited discovery of certain 7-Eleven Stores has been conducted to date, and no discovery has been conducted with respect to 7-Eleven Stores with no reported releases or remediation. Walsh Decl., ¶16. Nevertheless, the settlement amount is reasonable based on the information available and the District's assessment of its total potential recovery and 7-Eleven's assessment of its proportionate liability at the time of settlement. *Id.*

It is significant to note that, irrespective of the amount allocated in the proposed settlement to any 7-Eleven Store or category of sites, no sites are relieved of their obligation to comply with state and federal laws and regulations as they relate to the operation of UST and gasoline delivery systems. Walsh Decl., ¶18; Miller Decl., ¶3.

    4.    <u>The allocation of proceeds among plaintiffs does not apply to this settlement.</u>

The District is the only party bringing this action. As such, allocation of settlement proceeds among multiple plaintiffs does not apply. *See* Miller Decl., ¶3.

    5.    <u>The settlement reflects recognition that 7-Eleven should pay less in settlement than after trial.</u>

"The uncertainty and expense of litigation make a settlement for less than the total potential liability sometimes in the best interest of the plaintiff." 3 Cal. Civ. Proc. Before Trial, § 50.16 at 2395; *see Rutgard v. Haynes,* 61 F. Supp. 2d 1082, 1089 (S.D. Cal. 1999) ("…even if it

– 11 –

could be shown that Defendant's settlement was less than the amount of a possible judgment against him at trial, this settlement amount is still appropriate as plaintiffs avoided the risks and costs of going to trial, where their proof against Defendant might have failed, or the amount of damages awarded might have been markedly less."). The parties' settlement was reasonable at the time of settlement and reflects recognition by both parties that the Litigation will be complicated and protracted and that it is difficult and often entirely speculative to predict what damages, if any, a court may impose for environmental contamination, even if it can be proved. Moreover, recovery could be delayed and further complicated by possible appeals from any judgment. Of course, the cost of the extensive litigation activities in an environmental clean-up case could well exceed the amount of the settlement. All of these considerations are brought to bear in assessing whether this settlement is in a "ballpark" range.

6. <u>The financial condition and insurance policy limits of 7-Eleven are not relevant to the settlement.</u>

The settlement negotiations did not include consideration of insurance policy limits, and such limits were not discussed. Walsh Decl., ¶13; Miller Decl., ¶8. Moreover, the amount agreed to in settlement was not limited in amount by the potential existence of insurance or insurance policy limits. *Id.* Nor was the financial condition of 7-Eleven a factor in any way to increase or decrease the agreed settlement amount. *Id.*

7. <u>Neither fraud, collusion, nor tortious misconduct played a role in the negotiations between the District and 7-Eleven.</u>

The Settlement Agreement was reached after extensive negotiations, in light of the specific sites identified by the District as requiring further clean-up effort, and amounts necessary to reimburse costs. Walsh Decl., ¶14. There is no fraud, collusion, or tortious misconduct in this settlement that was aimed at injuring the interests of the non-settling defendants. Walsh Decl. ¶ 14; Miller Decl. ¶9.

> C.  **Any Party Challenging The Settlement Bears The Burden of Proving Lack of Good Faith.**

In the event a party challenges the good faith of 7-Eleven's settlement with the District, that party bears the burden of proving the lack of good faith. Cal. C.C.P. § 877.6(d). Again, this burden is to show that the settlement "is so far 'out of the ballpark' . . . to be inconsistent with the equitable objectives of the statute." *Tech-Bilt*, 698 P.2d at 167. As summarized above, this settlement meets all of the *Tech-Bilt* factors needed to establish that it is within a "reasonable range" of 7-Eleven's potential liability given the uncertainties and unpredictability of the Litigation and its costs, and the nature of the environmental contamination alleged and its remedial clean-up, and the other factors that apply. The Settlement Agreement is neither fraudulent nor collusive but was reached in arm's-length negotiations, and is easily within the reasonable range of 7-Eleven's potential and comparative liability. Walsh Decl., ¶14; Miller Decl., ¶¶2, 5, and 9.

> D.  **The Court Should Direct Entry of Judgment Pursuant to FRCP 54(b) Regarding the Court's Determination of a Good Faith Settlement.**

In order for a party to obtain protection against alleged joint tortfeasor liability, California law requires that a court determine that the party's settlement was entered into in good faith. Therefore, 7-Eleven respectfully requests that the Court enter such a judgment pursuant to Federal Rule of Civil Procedure 54(b), which states in relevant part:

> When an action presents more than one claim for relief – whether as a claim, counterclaim, crossclaim, or third-party claim – or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

There is no just reason for delay here to prevent the Court entering final judgment under Rule 54(b) determining that the Settlement Agreement was made in good faith, which would

– 13 –

protect 7-Eleven from any alleged joint tortfeasor claims and effectuate the terms of the Settlement Agreement.  *See AmeriPride Servs., Inc.*, No. CIV. S-00-113-LKK JFM, 2007 U.S. Dist. LEXIS 51364, at *9, 11-12; *see also Bottoms v. Levin Enters.*, No. C-99-4598 MMC, 2001 U.S. Dist. LEXIS 13434, at *3-4 (N.D. Cal. 2001).

One court considered the benefits of settlement over extended litigation and stated that "the desirability of promoting settlement of litigated claims, particularly when presented in the context of complex litigation such as that now before the court, cannot be understated."  *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, 409 F. Supp. 2d 136, 140 (N.D.N.Y. 2005).  By entering judgment on the good faith of the settlement and the corresponding bar order pursuant to Rule 54(b), the *Agway* court's determination was immediately appealable, which "would serve the desirable purpose of allowing any disgruntled non-settling defendant to challenge this court's approval of the settlement and the entry of a bar order on appeal at an interlocutory stage when the parties, including significantly [the settling defendant], would be able to determine whether it was required to remain and participate in the litigation."  *Id.* at 147-48.  Therefore, by entering a Rule 54(b) judgment, the Court would provide finality under the Settlement Agreement.

### III. CONCLUSION

For the foregoing reasons, 7-Eleven respectfully requests that the Court grant 7-Eleven's motion for order determining good faith settlement and enter the proposed order and judgment pursuant to Rule 54(b), such that all pending and future claims or cross-claims against 7-Eleven for equitable comparative contribution, or comparative or partial indemnity, based on comparative fault or comparative negligence, be dismissed and forever barred.