# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

In Re:  Methyl Tertiary Butyl Ether   :
("MTBE")                              :  Master File
Products Liability Litigation         :  No. 1:00-1898
                                      :  MDL No. 1358 (SAS)
_____:  M21-88
                                      :
This document relates to the          :
following case:                       :
                                      :
Orange County Water District v.       :
Unocal Corp., et al., 04 Civ. 4968    :  VOLUME I
(SAS)                                 :
_____:  Pages 1 - 210


           CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)

                         - - - - -

                      AUGUST 13, 2010

                         - - - - -


        Videotaped Deposition of DAVID P. BOLIN,

Volume I, Orange County Water District's 30(b)(6)

designee in re Site Specific Station Investigations,

held at 650 Town Center Drive, 20th Floor, Costa Mesa,

California, commencing at 9:09 a.m., on the above date,

before Kimberly S. Thrall, a Registered Professional

Reporter and Certified Shorthand Reporter.


                   Golkow Technologies, Inc.
              877.370.3377 ph | 917.591.5672 fax
                      deps@golkow.com



Page 14

1    been produced.
2         I believe what I was indicating when I made
3    that statement, "The first real hydrogeologic evidence
4    MTBE has escaped was MTBE detection in the production
5    well associated with Plume 1," I think what I was saying
6    there was that we knew that there had been a release at
7    the site.
8         I don't know exactly when the District knew
9    there was a release at the site, but it was at some
10   point in time, and that detection of contamination in
11   the designated well drew attention that the
12   contamination at the site had escaped remedial efforts,
13   that there were core remedial efforts going on.
14        There was investigation and cleanup going on by
15   the owner, but it was not clear to us until we detected
16   the MTBE in the production well that whatever measures
17   were being taken at the site were not successful. They
18   were failing in preventing contamination from leaving
19   the site.
20   BY MR. FINSTEN:
21   Q.   And that's because Orange County Water District
22   is not harmed until the contamination escapes
23   remediation, correct?
24        MR. MILLER: Objection. That calls for a legal
25   conclusion. It's vague and ambiguous as to what "harm"

Page 15

1    means.
2         MR. FINSTEN: Let me rephrase.
3    BY MR. FINSTEN:
4    Q.   Orange County Water District believes it does
5    not have a duty to act until the contamination escapes
6    remediation at the site, correct?
7    A.   I --
8         MR. MILLER: Vague on "duty."
9         Go ahead.
10        THE WITNESS: It depends on what you're talking
11   about. Once it has left the site and then there is
12   no -- no effort, no action to try and contain or collect
13   contamination back or recover it or even investigate the
14   extent in which it's left the site, then the District
15   has felt the need to step in and actually investigate
16   and take actions on its own.
17        In this case, that was determined -- I can't
18   say exactly when that was determined, but they decided
19   that the District was going to have to take some action.
20   BY MR. FINSTEN:
21   Q.   Okay. And but prior to that, the District has
22   no need to take any action; is that correct?
23        MR. MILLER: Vague and ambiguous. Are you
24   talking about at this site?
25        MR. FINSTEN: Yes.

Page 16

1         THE WITNESS: Prior to the District's belief or
2    understanding or knowledge that contamination was not
3    going to be captured or contained by any actions done at
4    the site by the owner.
5    BY MR. FINSTEN:
6    Q.   Okay. I'd like you to focus on the phrase
7    "real hydrogeologic evidence."
8         So prior to -- am I correct in reading this
9    statement as saying that prior to the detection in the
10   production well associated with Plume 1, there was no
11   real hydrogeologic evidence that MTBE had escaped?
12   A.   Well, there was none that I had, you know. So
13   I made the statement that that was the first real
14   evidence in my mind that it was clear that any -- any
15   actions taken at the site had failed.
16   Q.   And there was no -- I mean there was none that
17   the District had, correct?
18   A.   I was not aware of any at the District at the
19   time I made the statement. I'm -- I'm not aware of any
20   now.
21   Q.   Okay. I mean, just to clarify -- and I
22   apologize if it seems like I -- I don't mean to be
23   bullying or repeating, you know. I just want to try to
24   understand, because you're here designated to testify on
25   behalf of the District as a designated witness, but the

Page 17

1    District had no real hydrologic -- hydrogeologic
2    evidence that MTBE had escaped prior to the detection in
3    the production well associated with Plume 1?
4         MR. MILLER: That's been asked and answered.
5    BY MR. FINSTEN:
6    Q.   Oh, I'm just trying -- oh, I'm sorry. I'm just
7    trying to clarify. This isn't about personal knowledge
8    of you. This is about the District's knowledge.
9    A.   I'm not aware of any.
10   Q.   Okay. Thank you. Sorry about that.
11        Now, aside from what is stated in the
12   declaration, what other real hydrogeologic evidence
13   exists that MTBE contamination at the station had
14   escaped remediation at the time that you signed this in
15   2009, June?
16   A.   I'm not clear on your question. I believe --
17   are you asking me what -- if there's any evidence
18   subsequent to my declaration?
19   Q.   Yeah. What other real hydrogeologic evidence
20   does the District possess that MTBE had escaped
21   remediation at the site?
22   A.   I have nothing to offer. I'm not aware of any.
23   Q.   Okay.
24   A.   Most of our recent efforts have been focused on
25   the stations that we're going to be investigating. So

Page 18

1  we haven't been spending as much time on -- on these
2  stations.
3    Q.  Okay.  And I asked the question between -- you
4  know, at the time that you signed it in June 2009, does
5  the same answer apply today?  In other words, has the
6  District learned any further -- learned of any further
7  real hydrogeologic evidence that MTBE has escaped
8  between June and now?
9    A.  No.  We have -- we have no well data, no
10 additional data than we had then.
11   Q.  Okay.  Now, the MTBE detection in the
12 production well associated with Plume 1, the production
13 well that is described in your declaration, that would
14 be -- well, I don't want to hide the ball.  And it's not
15 a memory test.  So let me mark the next exhibit.
16       (Bolin Exhibit 3 was marked.)
17 BY MR. FINSTEN:
18   Q.  Exhibit 3 is Plaintiff's Local Rule 56.1
19 Statement in Support of Response to Defendants' Further
20 Supplemental Brief on Statute of Limitations, also filed
21 June 3rd, 2009.
22       And before I -- Mr. Bolin, have you seen this
23 document before?
24   A.  I don't recall.
25   Q.  Okay.  Just by way of explanation, this was

Page 19

1  part of the filing that the Water -- the Orange County
2  Water District made during a supplemental briefing on
3  the statute of limitations.  It was filed at the same
4  time that your declaration was, and it cites to your
5  declaration.  And I would direct you to page 3 of this
6  statement, which includes the data on ARCO 1887.
7    A.  Okay.  I see it.
8    Q.  And the first column contains OCWD's accrual
9  dates and supporting assertions.  And it reads: "Claims
10 alleged to accrue on August 3rd, 2005." And then
11 there's a cite to a letter from Mr. Axline.  "This date
12 is based on an MTBE detection in Production Well
13 NB-TAMD." And then there's a cite to another letter
14 from Mr. Axline.
15       Do you see that?
16   A.  Yes, I do.
17   Q.  Okay.  So does this establish that the
18 production well in Plume 1 that you were referring to in
19 your declaration was a detection in NB-TAMD on
20 August 3rd, 2005?
21   A.  Yes.  That is the date at which we detected
22 MTBE in the well.
23   Q.  Okay.  And prior to August 3rd, 2005, the
24 District had no real hydrogeologic evidence that MTBE
25 had escaped remediation, correct?

Page 20

1       MR. MILLER:  That's been asked and answered,
2  Counsel.
3       MR. FINSTEN:  Well, no, I'm just trying to get
4  the date, because that hasn't -- this date is not in his
5  declaration.
6       THE WITNESS:  Yes.  I believe this is the first
7  occurrence where we work and -- we had real
8  hydrogeologic evidence that MTBE had left the -- all the
9  remedial actions at the site.
10      (Bolin Exhibit 4 was marked.)
11 BY MR. FINSTEN:
12   Q.  Okay.  Next I'd like to mark Exhibit 4.  And
13 Exhibit -- I'm sorry.  Sorry about that.
14      Exhibit 4 is a quarterly update report
15 submittal for ARCO Station 1887, dated June 9, 2005.
16 It's addressed to Ms. Kathryn Cross of the Orange County
17 Health Care Agency from Delta Environmental Consultants.
18      And you are familiar with quarterly monitoring
19 reports for station cleanup, correct?
20   A.  I know what they are.
21   Q.  Okay.  And -- let's see.  And this was
22 available to you prior to your June 3rd, 2009,
23 declaration, correct?
24   A.  Available to me in what way?
25   Q.  Let me rephrase it.  This is a publicly

Page 21

1  available document, correct?
2    A.  To my knowledge.
3    Q.  Okay.  And it was publicly available prior to
4  June 3rd, 2009, correct?
5    A.  I believe it was.
6    Q.  Okay.
7    A.  That's not always true.  Sometimes these
8  documents come in and they aren't released to the public
9  until sometime after the date of the document.
10   Q.  I understand.  But the District was aware of
11 the contamination issues at this site in 2005, correct?
12   A.  I believe we were, but I don't know --
13      MR. MILLER:  Excuse me, Counsel.  You're now
14 asking about events predating 2008.
15      MR. FINSTEN:  No.  I was just trying to
16 establish, is it available to him in 2009.
17      MR. MILLER:  I understand that, but that's not
18 the question that was asked.  And we should confine
19 ourselves to the appropriate period.
20      MR. FINSTEN:  I will.
21 BY MR. FINSTEN:
22   Q.  And this is all the appropriate period, because
23 I'm asking about whether it was -- the first question
24 was:  Is it available in 2009?  And if that wasn't the
25 first question, let me rephrase.

Page 26

1  BY MR. FINSTEN:
2    Q. Let's see. All right. Let's go back to the
3  declaration, Exhibit 2. We were talking about 1887,
4  page 6. I want to focus on the asserted detection in
5  the production well.
6        Does the District have real hydrogeologic
7  evidence that MTBE contamination, specifically from this
8  station, reached NB-TAMD?
9    A. We can't be certain which station it came from,
10 but there is a very strong likelihood that this is a
11 source of that contamination.
12   Q. Okay. That likelihood is not real
13 hydrogeologic evidence, is it?
14       MR. MILLER: Objection. That's argumentative
15 and vague.
16       THE WITNESS: The detection in the well is.
17 BY MR. FINSTEN:
18   Q. Okay. The detection in the well is real
19 hydrogeologic evidence that there's been a detection in
20 the well?
21   A. We know that MTBE does not occur naturally in
22 our environment. We know that the source of MTBE is
23 fuel related. We know that we have confirmed sources
24 all within reach of that well. We know that those
25 sources are upgradient of that well. We know that there

Page 27

1  has been releases from those sources that could have
2  migrated down into the well.
3        In this case, we can't be certain which station
4  it is, but this particular station is certainly one of
5  the likely sources of the contamination.
6    Q. Okay. What is the basis for the District's
7  belief that this station is certainly one of the likely
8  sources?
9    A. We covered all this before.
10   Q. Well, except -- all right. Except that we
11 haven't because we didn't talk -- we didn't have your
12 declaration.
13       MR. MILLER: Then, Counsel, this is -- what
14 you're asking about is not in the declaration, and you
15 did ask about it in the prior deposition.
16       MR. FINSTEN: It is most certainly in the
17 declaration. It says right here, "The first real
18 hydrogeologic evidence that MTBE escaped was the MTBE
19 detection in the production well associated with the
20 plume." That's the first time that we had heard that in
21 this 2009 declaration. So I, you know --
22       MR. MILLER: But the testimony he just gave was
23 given in 2008. Asking him to repeat it is an abuse --
24       MR. FINSTEN: Okay.
25       MR. MILLER: -- of the discovery process. It's

Page 28

1  the very reason I had concerns about these depositions.
2        MR. FINSTEN: Okay. Let me rephrase it to
3  alleviate your concerns.
4  BY MR. FINSTEN:
5    Q. Since 2008, has the District learned of any
6  new real hydrogeologic evidence that links Station
7  1887 -- the contamination at 1887 with the Production
8  Well NB-TAMD?
9    A. We don't have any new evidence of our own.
10 We're in the process of conducting our own
11 investigation.
12   Q. All right. Have any of the District's
13 contractors gotten any evidence of any real
14 hydrogeologic evidence that MTBE at the station has
15 traveled to the well since 2008?
16   A. Not yet.
17   Q. Thanks.
18       (Bolin Exhibit 5 was marked.)
19 BY MR. FINSTEN:
20   Q. Let's mark Exhibit 5. Exhibit 5 is a Hargis
21 Site Summary for ARCO 1887. It's marked Global ID
22 No. T0605900790. And it is Bates-marked
23 OCWD-MTBE-001417668 through -720.
24       And, Mr. Bolin, you've seen this document
25 before?

Page 29

1    A. Yes.
2    Q. Okay. And this is a site summary as discussed
3  and produced by Hargis as -- and this is just
4  foundation, Mr. Miller -- as discussed in Mr. Herndon's
5  deposition on Monday, the 9th, correct?
6        MR. MILLER: This document wasn't shown to
7  Mr. Herndon in his depo.
8        MR. FINSTEN: But he described what these were.
9  All I'm trying to -- I'll withdraw the question. I'm
10 just trying to establish what it is. And if he knows
11 what it is, that's good enough for me.
12 BY MR. FINSTEN:
13   Q. Now, the first page of this, the fourth line
14 down, it says, "Last document reviewed September 19,
15 2008," correct? The front page.
16   A. I'm looking -- you said fourth line down?
17   Q. Fourth line from the top, not a
18 bullet point. Above -- the first line
19 above --
20   A. Oh, I see it.
21   Q. -- the first three issues.
22   A. Yes, I see it.
23   Q. Okay. And the documents that Hargis reviewed
24 in preparation of this report include documents produced
25 by the parties in the litigation and documents that are

Page 30

1  publicly available on GeoTracker, correct?
2      A. I believe that's correct.
3      Q. Do you know of any other documents that might
4  have been reviewed by Hargis in preparation of this
5  report?
6      A. I do --
7          MR. MILLER: Calls for speculation. Lacks
8  foundation.
9          THE WITNESS: I do not.
10 BY MR. FINSTEN:
11     Q. Okay. Has anyone from the District or Hargis
12 reviewed any documents from the station since the date
13 of this report, September 19th, 2008?
14         MR. MILLER: Same objections.
15         MR. FINSTEN: Let me break it down. It was
16 compound.
17 BY MR. FINSTEN:
18     Q. Has anyone from the District reviewed any
19 documents for this station since September 19th, 2008?
20     A. Yes.
21     Q. Whom?
22     A. I did.
23     Q. And when did you review documents for the
24 station?
25     A. I can't be specific as to what the dates are.

Page 31

1  We generally keep up with activities at the various
2  stations as time goes on.
3      Q. Okay. So this review typically includes
4  review of the quarterly monitoring reports of the
5  station?
6      A. Yes.
7      Q. Okay. And you try to do this
8  contemporaneously, but you're not exactly sure --
9      A. We --
10     Q. -- what dates, right?
11     A. We do this occasionally. We don't always
12 access or look to see if there's any new documents. We
13 don't do this every day.
14     Q. Understood.
15     A. We don't do this every week. We may not even
16 do this every month, but we do it periodically to catch
17 up with activities --
18     Q. Okay.
19     A. -- at various sites.
20     Q. Does the District know whether or not Hargis
21 has reviewed any more documents from this station?
22         MR. MILLER: Since?
23 BY MR. FINSTEN:
24     Q. Since the last document reviewed in the report.
25     A. I can't be certain.

Page 32

1      Q. Okay.
2      A. I -- I believe they -- I believe they have, but
3  I -- I couldn't tell you which documents or when they
4  were reviewed.
5      Q. Understood.
6          Now, in authorizing the work by Hargis at this
7  station, what sort of guidance did the Water District
8  give Hargis about what it was supposed to do?
9          MR. MILLER: That's overbroad. Calls for a
10 narrative. The best evidence is the work plan.
11         THE WITNESS: We asked them for a cost
12 estimate, and we provided them an outline of scope of
13 work, which was consistent with our prior contractor,
14 Komex, that became WorleyParsons, who was no longer able
15 to serve us. The work had been outlined for Komex, and
16 Hargis was asked to put together a work plan and cost
17 for doing essentially the same work.
18 BY MR. FINSTEN:
19     Q. Okay. Did the District -- in terms of what
20 they were looking for, did the District give Hargis any
21 instruction about, for instance, looking for commingling
22 of contamination with other stations?
23     A. I don't recall specifically highlighting that
24 as a task. I know we've had discussions with Hargis
25 that it is possible there has been some commingling, but

Page 33

1  we didn't specifically tell them to look for that, that
2  I recall.
3      Q. What about potential pathways to the wells and
4  the stations focused on?
5      A. If you're asking about the -- the designated
6  wells, we weren't asking them -- that was not part of
7  their task at the time. They were looking at the sites.
8      Q. No. I'm sorry. Let me clarify. I'm asking --
9          MR. MILLER: Excuse me. You cut off his
10 answer. I'm concerned about that.
11         MR. FINSTEN: Well, then it's because of the
12 way that I asked the question. Let me retract that.
13 And I apologize.
14         MR. MILLER: If you want to withdraw both the
15 question and partial answer, that's fine.
16         MR. FINSTEN: That's fine. I will take back,
17 because I could just tell that I -- that I asked the
18 question wrong. I was asking about potential migration
19 paths to the wells in the production -- in the focus
20 plume or any wells.
21 BY MR. FINSTEN:
22     Q. Did the District give any guidance to Hargis
23 about that?
24     A. It's still how I understood your previous
25 question. I think that's what I was answering, is we

Page 34

1  didn't specifically ask them to identify -- to focus
2  on -- on working on pathways from the station to the
3  designated wells. That was something coming up in the
4  future.
5       This -- this round of work was specifically to
6  summarize the stations and contaminations; identify
7  releases and look at the localized hydrogeology; and
8  then determine whether contamination was leaving --
9  was -- it migrated beyond property boundaries, the --
10 the limits of the wells, whether the wells or
11 investigations that had been conducted thus far had
12 delineated contamination laterally or vertically.
13      Q. Okay. Now, who at the Water District received
14 the Hargis reports?
15      A. I believe they came directly to me.
16      Q. Okay. And did you -- and you read it, correct?
17      A. Yes.
18      Q. Okay. Did you give the report to anybody else
19 at the District for review?
20      A. They were available to Roy Herndon.
21      Q. Do you know if Mr. Herndon reviewed the report
22 of the station?
23      A. I do not.
24      Q. Did you ever have any conversations with
25 Mr. Herndon about the Hargis report of the station?

Page 35

1       A. In general terms, I don't recall having any
2  discussions with Mr. Herndon specifically about this
3  station and this report.
4       Q. Okay. Do you recall any conversations with
5  anybody else at the Water District about this station or
6  this report?
7       A. Not specifically about this station and this
8  report.
9       Q. Okay. Were there any meetings at OCWD where
10 this station or this report would have been discussed?
11      A. No meetings -- I'm assuming you're talking
12 about with Hargis, but no meetings where we had
13 discussed this particular station and this report with
14 any specificity.
15      Q. What about internally within the Water
16 District, excluding Hargis, are there any discussions
17 about the conclusions in this report about this station?
18      A. I don't recall, again, any specific
19 conversation about this station and this report. I do
20 remember making some comments that everything that was
21 stated was not surprising to me or not new, that I had
22 already believed the conclusions or understood the
23 conclusions even before I had the report.
24      Q. Who -- and I apologize. Who is the -- who were
25 the comments made to?

Page 36

1       A. I believe it was Roy Herndon.
2       Q. Okay. So you weren't surprised -- you weren't
3  surprised by anything that you had seen in this report?
4       A. No.
5       Q. Okay. Aside from commissioning and receiving
6  this report, has the District taken any other steps to
7  investigate or remediate MTBE or TBA contamination at
8  this station since 2008?
9       A. Other than reviewing new documents as they were
10 made available, we have -- yes. Actually, the answer to
11 your question is yes.
12      Q. Okay. And what would those steps have been,
13 besides reviewing documents as they became available, as
14 you just mentioned?
15      A. Evaluating these sites. Because this is a site
16 in a designated plume that's been targeted for
17 investigation, this is one of the sites that we had
18 evaluated to determine whether this was a station we
19 were going to investigate specifically or not.
20      Q. Okay. And so this is a -- the District made
21 the determination to investigate this station further?
22      A. No. Not with the upcoming round of
23 investigation. This station was identified as one that
24 we were not going to include in this next round of
25 investigation.

Page 37

1       Q. And the next round of investigation that you're
2  referring to, that would be the next round of physical
3  investigation by Hargis?
4       A. Yes.
5       Q. That would involve the cone penetration testing
6  probes?
7       A. That's correct.
8       Q. And then the following round -- and this is,
9  again, just for my own understanding and background, not
10 to repeat what's been covered. The following round
11 would be construction of monitoring wells at the sites?
12      A. That's the plan.
13      Q. Okay. Sorry. I didn't mean to -- is that -- I
14 realize that was just for my own edification.
15      Why is this station not -- why -- let me
16 rephrase that.
17      Why did the District decide not to include this
18 station in the next round of investigation?
19      A. That's a discussion -- that was our conclusion
20 or our recommendation from our -- from Hargis. They had
21 looked at all the sites and discussed the sites,
22 presented their information to us, and they recommended
23 which stations that we would be investigating. This was
24 not one of them.
25      In this case, we chose G&M Oil No. 2 and --

Page 38

1   Q. You mean No. 4?
2   A. I'm sorry. No. 4.
3   Q. Yeah. A new station in the case. Sorry.
4   A. And Exxon 4283.
5   Q. Okay. And when Hargis made these
6   recommendations, that was not part of the site summary,
7   correct?
8   A. That is correct.
9   Q. Okay. So when did Hargis convey its
10  recommendation about this station to the District?
11  A. It was in a meeting -- and I can't recall the
12  date of the meeting -- where Chris Ross from Hargis came
13  in and presented his -- his information. We'd had
14  discussions over the phone. I -- I couldn't give you a
15  specific date as to when it became clear that this was
16  going -- this was not going to be targeted for this next
17  round of investigation, that we would defer this to a
18  future round of investigation.
19  Q. Okay. And did the District have any -- well,
20  let me ask you. So this was a meeting with Chris Ross
21  of Hargis and yourself, and anybody else at the
22  District? Mr. Herndon?
23  A. It was Mr. Herndon.
24  Q. Okay. Anybody besides the three of you?
25  A. Yes.

Page 39

1   Q. Who was that?
2   A. Counsel.
3   Q. Okay. Which counsel?
4       MR. MILLER: This was already covered in the
5   deposition of Mr. Herndon.
6       MR. FINSTEN: I'm talking about this station,
7   Duane.
8       MR. MILLER: No. The meeting.
9       MR. FINSTEN: The meeting where this station
10  was discussed.
11      MR. MILLER: That meeting was covered.
12      MR. FINSTEN: Okay. I'll withdraw it. I trust
13  you.
14  BY MR. FINSTEN:
15  Q. And I should have asked you this earlier. This
16  document appears to be dated February 9th, 2009; is that
17  correct? The bottom left corner.
18  A. I see it. It's in the footer.
19  Q. Yes.
20  A. I -- I don't know what that means.
21  Q. Well, is that about when the District received
22  the document?
23  A. That seems about right. And I honestly can't
24  recall.
25  Q. Okay. Let's see. Has the District discussed

Page 40

1   the Hargis site summary with anybody outside of the
2   District? For instance -- let me be more specific --
3   has the District discussed the Hargis report with
4   anybody from the Regional Board?
5   A. No, I don't believe so.
6   Q. Or the Orange County Health Care Agency?
7   A. I don't believe so.
8   Q. Or any other local, state or federal
9   regulators?
10  A. Not that I'm not aware.
11  Q. Hasn't released it to the public?
12  A. No.
13  Q. Okay.
14  A. Well, let me -- no, we haven't released it to
15  the public, but it -- I don't know whether it is subject
16  to a public information request.
17  Q. Okay. Fair enough. I would imagine that most
18  things are.
19  A. Well, with the --
20  Q. Something for lawyers to fight about.
21  A. With the proper protocol.
22  Q. Right. Okay. Then the station generally, has
23  the District discussed Station 1887 since 2008 with --
24  have they discussed it with -- this 1887, with the
25  Regional Board?

Page 41

1   A. I don't recall any specific discussions about
2   1887 with the Regional Board.
3   Q. Or the Health Care Agency?
4   A. Or the Health Care Agency.
5   Q. Or any other regulators?
6   A. I believe it's under the oversight of the
7   Health Care Agency. Geniece Higgins is the case manager
8   over there. I've had conversations with her about
9   sites. I don't recall whether this was one of the sites
10  or not.
11  Q. What else has the District done with the Hargis
12  report since receiving it? Anything that we haven't
13  covered?
14      MR. MILLER: That's overbroad. Calls for a
15  narrative. It's not covered by the notice, so he's not
16  testifying as a PMK.
17      MR. FINSTEN: Why not? Why is it not covered
18  by the notice? This report was produced -- I mean, was
19  created and produced after 2000. I'm talking about the
20  Hargis reports.
21      MR. MILLER: It's not in the designated issues.
22      MR. FINSTEN: Specifically the Hargis? All
23  right. It -- I think it relates very clearly to
24  designated -- parts of Designated Issues 2 through 4, as
25  well as 7 through 8. But we don't have to fight about

Case 1:00-cv-01898-VSB-VF   Document 3315-2   Filed 03/15/11   Page 9 of 20

Confidential - Per 2004 MDL 1358 Order

Page 42

that.
BY MR. FINSTEN:
Q. You can answer the question.
A. Would you repeat the question, please?
MR. FINSTEN: Kim, if you would.
(The following record was read by the reporter:
"Q. What else has the District done with the Hargis report since it received it?")
THE WITNESS: It's in the file. It's been the topic of general discussion, not necessarily specific discussion, this report specifically. We have not sent it out to any parties outside of the District that I am aware of. I would say we haven't done -- if you can be specific what else have we done, maybe I could answer your question better.
BY MR. FINSTEN:
Q. I think that we've covered it.
All right. Let's move on. I'm going to mark Exhibit 60 -- I'm -- 60 -- 6.
MR. MILLER: Where did the day go?
(Bolin Exhibit 6 was marked.)
BY MR. FINSTEN:
Q. This is an exhibit you should undoubtedly be familiar with. Thank you.
Exhibit 6, today's Exhibit 6, is previously

Page 43

marked Exhibit 50 on the 8/20/08 deposition of Roy Herndon. And I believe it was marked Exhibit 48 in one of your prior depositions. It's Bates-marked OCWD-MTBE-001-186470 through -72.
MR. MILLER: Counsel, this exhibit was the subject of extensive questioning in 2008.
MR. FINSTEN: I know. I know. And I will limit all of my questions to post-2008 regarding this district.
BY MR. FINSTEN:
Q. Bearing in mind what the District learned from the Hargis report and whatever else the District has learned about the station since 2008 -- let's see.
Has the District made any decision about -- let's see. Let's see, looking at the -- has it conducted any detailed contaminant hydrogeologic analysis regarding existing data and information?
A. Yes.
Q. Okay. And that would be the Hargis report?
A. Well, the Hargis is a detailed analysis. We also do routine MTBE testing in our wells.
Q. Those would be the production wells?
A. Production wells and monitoring wells.
Q. All right. I want to limit this to the context of the site, the detailed -- this particular question,

Page 44

detailed contaminant hydrogeologic analysis of the site. The District did that with the Hargis report, right?
A. Yes.
Q. Okay. Has it taken any other steps to accomplish this, besides the Hargis report?
A. No. No other -- if you're -- are you asking me about sample collection or drilling or other data collection along those lines?
Q. I'm going to go through this as it applies to the station in the last -- but I'm starting with what's described as "detailed contaminant hydrogeologic analysis."
A. Okay. That was what Hargis had conducted for us.
Q. Okay. Does the District have any plans to do any further detailed contaminant hydrogeologic analysis at the site?
A. Tentative plans. As I said already, this station wasn't targeted for this -- this next round of investigation, but it was deferred to a future round of investigation.
Q. "Conceptual hydrogeologic investigation, define vertical and lateral." I assume that means delineation.
Has the District taken any steps to accomplish

Page 45

that since 2008?
A. Actually, that is to -- the conceptual hydrogeologic investigation is putting together the hydrogeologic understanding of how water flows and moves in this area, and that's what the vertical and lateral talks about.
Q. Oh, okay.
A. Looking at it vertically as well as laterally. That, again, is part of Hargis' work. That's one of the things they were doing for us.
Q. Okay. And the next one down is "contaminant delineation, three dimensions."
Has the District taken any steps to acquire sites for monitoring wells: Land purchases, easements or eminent domain at the station?
A. No.
Q. Okay. And does it have any plans to do so in the future?
A. We have tentative plans to do that.
Q. Okay. Permitting?
A. All of that.
Q. Has not done yet --
A. That is correct.
Q. But it has tentative plans?
A. Yes.

12 (Pages 42 to 45)

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 50

1  estimate -- can the District estimate when in the future
2  they might engage in any of these steps at this station?
3      MR. MILLER: What steps? The question is vague
4  and ambiguous.
5      MR. FINSTEN: Well, I'm -- I can ask it for
6  each --
7      MR. MILLER: Or compound.
8      MR. FINSTEN: It is very compound. I can go
9  back to the list.
10     MR. MILLER: Are you talking about the
11 contaminant flow analysis you just asked about?
12 BY MR. FINSTEN:
13     Q. Well, let's do that. Okay. Let's start with
14 contaminant flow analysis.
15     Does the District have any estimate to -- when
16 it might start any of this at 1887?
17     A. No, not -- not at this site. Frankly, we have
18 targeted sites that we're going to be conducting our
19 investigation. As I said already, this is not one of
20 the sites that's targeted for this next round. It's
21 deferred to the future.
22     But we wish we would could do it all -- all at
23 once. We wish there was enough money to do that. We
24 wish we had the staff to do that, but frankly we don't.
25 So we had to defer -- we have to be selective, and we

Page 51

1  deferred this station to sometime in the future. We
2  don't have specific dates.
3      Q. Okay. What I -- all right. I guess what I'm
4  asking is, when you say "sometime in the future," and I
5  realize that you can't give me an exact answer, I'm
6  asking you to estimate. Let me try to be a little more
7  concrete.
8      Is it safe to say that there won't be any
9  contaminant flow analysis done at the station during the
10 coming year?
11     A. In 2011, probably not.
12     Q. Okay. Certainly -- all right. Let me
13 narrow it a little further. How about in the
14 next 12 months through August of 2011?
15     A. Okay. I think I just answered that. If I said
16 not in 2011, then probably not within the next 12 months
17 either.
18     Q. Okay. Okay. During 2012?
19     A. I don't know.
20     Q. Okay.
21     A. I can't say.
22     Q. "Fate and transport analysis," do you have
23 any estimation when that would take place at the
24 station?
25     A. That's the same answer.

Page 52

1      Q. Okay. "Routine groundwater monitoring," any
2  idea when that might start?
3      A. The same answer.
4      Q. Okay. "Aquifer testing"?
5      A. That would be the same answer.
6      Q. Okay. "Soil vapor studies"?
7      A. That's possible, but we don't have a specific
8  date targeted for doing that.
9      Q. Okay. Would that be something that would be --
10 if it were to happen, would it be after aquifer testing
11 and routine groundwater monitoring sampling?
12     A. No.
13     Q. No?
14     A. No.
15     Q. Okay. Could you explain?
16     A. Soil vapor testing is sometimes used as a
17 screening method for identifying target horizons that we
18 want to investigate further. So vapor surveys are
19 relatively cheap and fast compared to some of the other
20 activities. So we might go in and do that first and
21 then follow up with more -- and use that information,
22 that data, to help us optimize the target locations for
23 doing additional investigation.
24     Q. What about "acquisition of sites for monitoring
25 wells, land purchase easements, eminent domain"?

Page 53

1      A. Possible. It's very time consuming. Sometimes
2  those activities are started early on in an
3  investigation. But right now I couldn't tell you when
4  we would do that. We don't usually do that until we
5  have an idea where we want to install wells.
6      Q. So that would be something that would take
7  place after the groundwater sampling -- routine
8  groundwater monitoring -- I'm sorry. It would be before
9  that or -- let me rephrase, because I'm a little
10 confused. And I apologize.
11     The routine groundwater monitoring that's
12 listed on this, would those be in currently existing
13 monitoring wells at the site or in wells that the
14 District would intend to construct?
15     A. It could be both.
16     Q. Okay. So would you go about acquiring sites
17 for monitoring wells before or after you started routine
18 groundwater monitoring at the site?
19     A. It could be after. If we decided we were going
20 to start collecting data from existing wells, the site
21 acquisition would be for new wells.
22     Q. Okay. Let's look at page 2 of the exhibit.
23     MR. MILLER: How about if we take our morning
24 coffee break? We've been going about an hour.
25     MR. FINSTEN: We can do that.

Page 58

1  it.
2      Has the District, since 2008 -- and I
3  apologize, because we got a little bit sidetracked
4  here -- taken any steps to do a technology review and
5  selection for remediation, action planning purposes
6  relating to contamination at this station, 1887?
7      A. No, not specific to this station. Broadly
8  speaking, we looked at the technologies that are being
9  applied to this station in kind of keeping up with the
10 station activities. We've looked to see what has been
11 done since -- you know, as -- as we move on in time.
12     And at this station, they have changed their
13 technology a little bit, but I don't think that's what
14 you're asking me. You're not asking me what has been
15 happening at this station. You're asking me what the
16 District plans to do at this station.
17     Q. Correct. And so the District has engaged in
18 some review of available technologies that they may or
19 may not want to see implemented at this station relating
20 to contamination at this station?
21     A. No, not the part where you say "may or may not
22 want to see implemented." I simply look to see what the
23 station is doing about cleaning up their own
24 contamination.
25     Q. Okay. Has the District got any plans to do

Page 59

1  this in the future?
2      A. We have tentative plans to investigate and
3  remediate all of these sites. We don't have specific
4  plans, and we have not selected a technology to apply at
5  this station, other than granular activated carbon, GAC,
6  which is common technology used today for MTBE.
7      There -- there may be other technologies that
8  we'll take a close look at. We might want to augment
9  using GAC, G-A-C, at this station, but we haven't come
10 to a definitive conclusion yet.
11     Q. Well, let me ask you about what's ongoing at
12 this station for a second. You mentioned that there
13 have been some -- the District observed some changes in
14 their remedial technologies at the station.
15     Could you explain what those changes were?
16     A. Yes. I -- there's a document, it's a public
17 document, that I copied and brought with me just for the
18 purpose of answering questions. And it is a -- a letter
19 by the Health Care Agency dated March 15, 2010. It
20 addresses a work plan for oxidant injection pilot
21 testing dated August 11, 2009. It just talks about what
22 the site owner is planning to do to clean up
23 contamination of the site. This is not a -- a
24 technology that had been applied previously, so this is
25 new.

Page 60

1      Q. What was the technology? I'm sorry.
2      A. Oxidant injection --
3      Q. Oxidant?
4      A. -- pilot. Yeah.
5      Q. Okay. Is persulfate an oxidant?
6      A. I don't know.
7      Q. Okay. Has the District --
8      A. Oh, yes. I'm sorry. Yes --
9      Q. Okay.
10     A. -- it is.
11     Q. Could I just see it? I don't even know
12 if I want to mark it, but I just want to see it.
13     A. I had forgotten they were using persulfate as
14 their oxidant.
15     Q. Okay. Did you bring any other documents that
16 haven't been produced in the litigation? And I realize
17 it's a publicly available document. I just want to --
18     MR. MILLER: And we alerted you -- the
19 record should reflect that we were going to be using
20 certain types of documents in the deposition, which we
21 understood you already have copies of. And it didn't
22 seem useful to --
23     MR. FINSTEN: I was told the quarterly -- the
24 most recent quarterly monitoring reports.
25     MR. MILLER: Yes.

Page 61

1      MR. FINSTEN: That's not --
2      MR. MILLER: And things that have already been
3  produced to you, like the Hargis reports were mentioned.
4      MR. FINSTEN: Right. Okay. I mean --
5      MR. MILLER: And it didn't seem productive to
6  give you still another copy of what we all have.
7      MR. FINSTEN: Okay.
8      MR. MILLER: So we alerted you to that, but
9  didn't separately produce it because it's our
10 understanding that these reports are virtually
11 ubiquitous among the local law firms.
12     MR. FINSTEN: Okay.
13 BY MR. FINSTEN:
14     Q. Did the District approach the Health Care
15 Agency or have any conversations with the Health Care
16 Agency about proposed changes in their remediation
17 technology at the station?
18     A. No. But you've asked me that question already,
19 whether we had discussions about this site. So the
20 answer is no.
21     Q. Okay. Does the District have any position as
22 to about whether or not that the proposed changes are
23 appropriate at this station?
24     A. No.
25     Q. Continuing along the list. "Remedial

Page 86

BY MR. FINSTEN:
Q. Okay. Now, at the time that Hargis wrote its report for ARCO 1887, however, the only well designated for this plume was NB-TAMD, correct?
A. I don't recall the timing.
Q. All right. Well, let's go back and look at Exhibit 5. And that's got the -- that's the Hargis site summary for the station.
A. Oh, yeah. Okay. Yeah.
Q. It's dated February 9th, 2009.
A. Uh-huh.
Q. So at that point in time, the only well in the focus plume was NB-TAMD, correct?
A. I believe that's correct.
Q. Okay. Did the District find it surprising when it received the Hargis report, that Hargis did not consider NB-TAMD in its station summary for ARCO 1887?
MR. MILLER: Assumes facts not in evidence.
THE WITNESS: No. That isn't necessarily what we asked them to do. We asked them to give us a summary of the site itself. And we didn't ask them to look for pathways to production wells. That's coming in a future phase of work.
BY MR. FINSTEN:
Q. Well, it discusses production wells, correct?

Page 87

A. Well, I'm not -- maybe I don't understand what you're asking me.
Q. Let's look at Exhibit 5 again. The second page of Exhibit 5, first bullet -- first full bullet point discusses the location of HB-3A. The second bullet point discusses the location of HB-5.
No discussion of NB-TAMD, correct?
MR. MILLER: And HB-1.
MR. FINSTEN: And H -- well, wait. Which HB-1 are you talking about?
MR. MILLER: Well, you pointed to a paragraph that doesn't just discuss HB-5. It also discusses FURU and HB-1.
MR. FINSTEN: Correct. But I'm mentioning two stations -- or two wells that the District attempted to have newly added to the focus plume.
BY MR. FINSTEN:
Q. So it discusses HB-3A and HB-5, correct?
A. Yes.
Q. And it doesn't discuss HB -- or NB-TAMD, the only focus plume well at the time, correct?
A. That's correct.
Q. And the District didn't find it surprising at all?

Page 88

A. No. We didn't -- the paragraphs refer to the nearest major active supply well. It's just drawing attention to the nearest wells. We didn't ask them to look at all of the wells in the area, including the designated wells. So it didn't surprise us at all.
Q. Okay. By the way, there's no real hydrogeologic evidence in this site summary suggesting MTBE had escaped remediation prior to August 3rd, 2005, is there?
A. I believe there is.
Q. What could you point to?
A. Expert's opinion.
Q. All right. Well, I'm talking about in this Hargis report.
A. Yes.
Q. Okay.
A. It hasn't been -- contamination was released to the site. It's been connected to the site from the shallow zone, from the point of release, all the way into groundwater. It's been tracked to points where it has been identified and detected, but has not been delineated. Those are hydrogeologic conclusions.
Q. All right. Let me rephrase the question. There's only -- there's no real hydrogeologic evidence in this site summary suggesting that MTBE had escaped

Page 89

remediation at the site prior to August 3rd, 2005, correct?
A. No, I don't think that's correct.
Q. Okay. But this was available to you when you made your declaration, correct?
A. Yes.
Q. Okay. Then why is the evidence that you believe is there not discussed in your declaration?
MR. MILLER: Assumes facts not in evidence.
THE WITNESS: The --
MR. MILLER: Calls for speculation.
Go ahead.
THE WITNESS: The evidence at the time of the declaration and -- what was the date of the declaration?
BY MR. FINSTEN:
Q. The declaration is dated June 3rd, 2009.
A. Yes. After the report.
Q. Yeah.
A. Is that contamination was detected in NB-TAMD. And so we're attributing to -- that to a likely source, this being one of the likely sources. And that's hydrogeologic evidence that contamination has escaped a site and escaped remediation from the site.
Q. Well, there's no discussion of NB-TAMD in the Hargis report, right?

23 (Pages 86 to 89)

**Page 90**

1   A. No, there isn't.
2   Q. Okay. So what is the evidence that you believe
3   demonstrates the contamination at the station had
4   escaped remediation prior to August 3rd, 2005?
5       MR. MILLER: Counsel, as asked, that goes into
6   subjects covered in the 2008 deposition.
7       MR. FINSTEN: This report was issued in 2009.
8   And his declaration is from 2009 --
9       MR. MILLER: I know --
10      MR. FINSTEN: -- subsequent to this report, and
11  that's what I'm asking.
12      MR. MILLER: But that's not the way it was
13  phrased. You need to listen to what you said.
14      MR. FINSTEN: Okay. You can repeat the
15  question.
16      (The following record was read by the reporter:
17          "Q. What is the evidence that you believe
18          demonstrates MTBE contamination escaped
19          remediation prior to August 3rd, 2005?")
20      MR. MILLER: It doesn't reference his report.
21      MR. FINSTEN: Okay.
22  BY MR. FINSTEN:
23  Q. What is the evidence in this report?
24  A. August 3rd, 2005. I'm not -- is that the date
25  of the detection? Is that what you're referring to?

**Page 91**

1   Q. That, yes.
2   A. Okay. I don't know exactly when it escaped,
3   except for the detections in wells that are downgradient
4   and at the time of those detections.
5   Q. Okay. And the only well that is discussed
6   would have been N- -- it would been part of the focus
7   plume is NB-TAMD, correct?
8   A. That's part of the focus plume. There's the
9   site-specific wells themselves.
10  Q. You're talking about monitoring wells at the
11  site?
12  A. Yes.
13  Q. Okay. All right. Well, looking back at your
14  declaration, Exhibit 2, there is no real hydrogeologic
15  evidence that MTBE had escaped the site from any of the
16  monitoring wells, correct?
17  A. Yeah, I -- I think there is. It's detected in
18  the well, the downgradient direction, no --
19  Q. I'm sorry. And I apologize.
20      MR. MILLER: Excuse me. You're cutting off an
21  answer.
22      MR. FINSTEN: Okay. I just want to clarify
23  which well -- what well he's talking about.
24      MR. MILLER: You need to let him finish his
25  answer.

**Page 92**

1   BY MR. FINSTEN:
2   Q. What kind of wells? Monitoring wells -- I'm --
3   distinguishing between monitoring wells and the
4   production well associated with Plume 1 as discussed in
5   your declaration.
6   A. I'm referring to site-specific monitoring
7   wells.
8   Q. Okay. There are no real hydrogeologic evidence
9   from those monitoring wells that suggested MTBE had
10  escaped remediation prior to the detection in the
11  production well that you mentioned in your declaration,
12  correct?
13  A. The detections in the site-specific monitoring
14  wells downgradient, the farther extent from the -- from
15  the well had detections that were not delineated
16  afterwards. We don't know how far the contamination
17  might have gone. We weren't certain of it until we had
18  a detection in the Production Well N- -- NB-TAMD.
19  That's when we were certain of it.
20      But before that, it was undelineated, and we
21  had no reason to believe that activities at the site
22  weren't going to delineate the contamination, capture it
23  and contain it. Only until we had the detection in the
24  designated well were we certain that it would -- it had
25  failed.

**Page 93**

1   Q. But you cannot confirm that the -- I'm sorry.
2   Are you done?
3   A. I am done.
4   Q. You cannot confirm that the detection in
5   NB-TAMD is directly attributable to the contamination
6   from 1887 --
7       MR. MILLER: Counsel --
8   BY MR. FINSTEN:
9   Q. -- can you?
10      MR. MILLER: -- that was asked in 2008. You
11  haven't laid a foundation for something occurring after
12  to give him any basis for giving you an answer based on
13  new information. So you're basically replowing old
14  ground --
15      MR. FINSTEN: I disagree.
16      MR. MILLER: -- that was covered at length.
17      MR. FINSTEN: I disagree.
18      MR. MILLER: Well, that's fine. But if you
19  stated the question as asked that has no temporal limit,
20  you're repeating the prior deposition, and I'm going to
21  have to instruct him not to answer.
22  BY MR. FINSTEN:
23  Q. When you wrote this declaration in 2009, you
24  believed that there was no real hydrogeologic evidence
25  that MTBE had escaped the remediation at the site

Page 94

1  attributable to any monitoring well at the site,
2  correct?
3  A. It is correct that all we had were indicators,
4  and the first real hydrogeologic evidence was the
5  detection in NB-TAMD.
6  Q. Okay. I'm going to move on.
7       Since 2008, has the District done anything else
8  to learn about the hydrogeologic conditions and
9  circumstances in the areas that may -- that have been or
10 may be affected by contamination from the station, other
11 than the Hargis site summary?
12      MR. MILLER: That's compound. It's vague.
13      Go ahead and answer if you can.
14      THE WITNESS: I'm not certain what you're
15 asking me. If you're -- if you're talking about the
16 specific site, we've been monitoring reports that have
17 been generated by ARCO and ARCO's consultants.
18      If you're talking about geology, you know, in
19 the general proximity in that region, we're doing that
20 all the time. That's an ongoing endeavor.
21 BY MR. FINSTEN:
22 Q. Specifically in the region around the site?
23 A. Not specifically to this location, but just
24 understanding the hydrogeology in the basin, we're
25 looking at data all the time.

Page 95

1  Q. Okay. Since 2008, has the District learned any
2  facts to suggest any new releases of gasoline containing
3  MTBE at the station that has affected or may threaten
4  one of the focus wells?
5       MR. MILLER: Counsel, with all due respect, I
6  think it is beyond dispute that MTBE is not a legal
7  component of gasoline after December of 2003, if I
8  recall the date exactly.
9       MR. FINSTEN: I understand. Right. No.
10      MR. MILLER: So --
11 BY MR. FINSTEN:
12 Q. I'll specify. It's going -- you're not going
13 to -- I mean, I'm asking about new releases post-May 6,
14 2000.
15      Have you learned anything in the last two
16 years -- have you learned any facts in the last two
17 years to suggest any post-May 6, 2000, releases of
18 gasoline up until 2003?
19      MR. MILLER: That's not in the deposition
20 notice.
21      MR. FINSTEN: That's 2008. Yeah, sure it is,
22 Duane.
23      MR. MILLER: Show me.
24      MR. FINSTEN: This is directly responsible --
25 responsive to -- I'm going to say 3.

Page 96

1       MR. MILLER: That's whether or not there was
2  data. That's not --
3       MR. FINSTEN: With respect to any focus
4  station.
5       MR. MILLER: Right, but --
6       MR. FINSTEN: Any information data reports or
7  documents obtained, received by the District. Okay.
8  Let me limit it to that.
9       MR. MILLER: Let me explain something, just so
10 you can understand. In order to determine if there is
11 evidence of a post, I believe you used, 2005 release.
12      MR. FINSTEN: No. I used May 6, 2000.
13      MR. MILLER: Fine. In order to determine that,
14 you would have to have that date in mind and you'd have
15 to do a detailed review of the data.
16      MR. FINSTEN: This is a yes-or-no question.
17      MR. MILLER: That question --
18      MR. FINSTEN: I --
19      MR. MILLER: Excuse me. When you look at this
20 notice, it focuses on June 1, 2008, in almost all the
21 questions.
22      MR. FINSTEN: You're right. Okay.
23      MR. MILLER: So you're presuming that he has
24 had an opportunity, as a person most knowledgeable, to
25 sit down, go through the data with the question you just

Page 97

1  framed, that isn't in this notice, and develop an
2  informed answer, which he could do if it was in the
3  notice, but that's not what's here.
4       MR. FINSTEN: Okay. Are you done?
5       MR. MILLER: So you're asking for testimony
6  that exceeds --
7       MR. FINSTEN: All right.
8       MR. MILLER: -- the notice.
9       MR. FINSTEN: I'm going to -- I appreciate the
10 guidance that you've attempted to give me. I don't mind
11 the speeches to an extent. But this is really not
12 something that can continue if we're going to finish
13 these stations today and finish the stations. So
14 if you've got an objection, make it and --
15      MR. MILLER: I'm going to object on the grounds
16 that the question as asked is not relevant in the sense
17 that it is not covered by the deposition notice given.
18 There are dates in the notice. They vary from June 1,
19 2008, to July 2nd, 2010.
20      MR. FINSTEN: All right. It was --
21      MR. MILLER: None of them suggest that the
22 witness, in order to properly prepare, should be looking
23 at the time period involved. In addition, Mr. Warner
24 ruled that the questions should be limited to the period
25 after the last notice.

Page 114

1  suited for cleaning up MTBE? What regions are we
2  finding a lot of contamination? Where are the wells
3  that have been designated for the various plumes? Where
4  are the plumes? What are we going to do about that?
5  These kinds of discussions.
6       So in that sense, 1887 was included in most, if
7  not all of the discussions. If you're asking me how
8  many discussions there were or specifically when they
9  were, I couldn't tell you.
10      Q. Was it ever individually and specifically
11 identified in any of these discussions?
12      A. Oh, I -- I can't recall any specific reference
13 to 1887. I -- I can't say that it absolutely was never
14 discussed specifically. I'm sure I've had discussions
15 with Roy Herndon about 1887. I'm excluding discussions
16 with counsel.
17      I can't -- I don't recall having any specific
18 discussions with board members about any individual
19 station. Unless they came to us and asked us, we
20 wouldn't undertake a -- a discussion with them on that
21 level.
22      Q. Okay. On the next page, page 19, there's a
23 chart that lists reports that defendants have been
24 provided with copies of relating to each station and the
25 focus plumes. And I direct you to the second entry on

Page 115

1  the chart, site summary ARCO 1887, which references the
2  Hargis summary previously marked as Exhibit 5, correct?
3       A. Yes, I see that.
4       Q. Okay. Was this report ever provided to the
5  board of directors?
6       A. No.
7       Q. Okay. Fair enough.
8       Now, the answer to this interrogatory, as I
9  mentioned on page 17, references answers to
10 Interrogatories 1 and 2 of this set. So I would direct
11 you back to the answers to Interrogatory 1, which start
12 on page 5 and it states -- the answer starts: "On
13 March 23rd, 2005, during a regular meeting of the Orange
14 County Water District board of directors, the board
15 adopted the following resolution: Finding and
16 reaffirming that available funds had been and may
17 continue to be expended to perform investigation,
18 cleanup, abatement and remedial work to address MTBE
19 contamination and the threat of MTBE contamination in
20 the District service area, and that such expenditures
21 are required by the magnitude of the endeavor and the
22 urgency of prompt action necessary to prevent, abate and
23 contain threatened and existing MTBE
24 contamination"...
25      Did I read that correctly?

Page 116

1       A. I believe so.
2       Q. Okay. Did the resolution mention Station 1887
3  specifically?
4       A. No, I don't believe it did.
5       Q. Did the board of directors ever specifically
6  authorize expenditure of available funds to perform
7  cleanup, abatement or remedial work at 1887?
8       A. No. They leave those decisions to the staff.
9       Q. Okay. Did the board ever make any findings,
10 determinations or decisions with respect to any of the
11 work done or needed to address the detection or presence
12 of MTBE or TBA at 1887?
13      A. Yes, they did.
14      Q. When did they do that?
15      A. Every time they authorized funds to be expended
16 for investigation and evaluation, it was understood
17 staff identifies those sites without communicating the
18 specific sites to board members. They don't get
19 involved in those details. So the expenditures or the
20 authorization of expenditures includes whatever sites we
21 identify as staff.
22      Q. So the board doesn't get into details about
23 expenditures at individual stations?
24      A. No.
25      Q. All right. On page 7 of this answer, which I

Page 117

1  think a lot of this is repeated in the chart that we've
2  already covered, halfway through the page -- this
3  doesn't appear to be -- there's a discussion of the
4  Toxic Cleanup Fund begins in 1986.
5       I'm mostly interested -- actually, I'm going to
6  ask about the sentence that begins four lines from the
7  bottom. "The District has expended $892,230 from the
8  Toxic Reserve Fund in response to MTBE and/or TBA
9  contamination issues within the District's service area
10 as of June 2008."
11      Did I read that correctly?
12      A. I didn't -- oh, I see where you're looking.
13 Yes, I believe you did.
14      Q. Okay. What portion -- I'm sorry. What has
15 been -- first of all, what has been spent from the fund
16 since -- actually, I'm going to strike that question,
17 because that's not really specific to the station.
18      What portion has been spent on the station of
19 this 892,000.
20      A. I believe you're asking me what portion of the
21 $892,230 has been spent on ARCO 1887?
22      Q. Right.
23      A. I don't know. I -- I can't be certain. I
24 don't have a way of breaking that out.
25      Q. Okay. And of the funds that have been spent

Page 206

1  Bolin, corporate designee of the Orange County Water
2  District in regards to production of documents of
3  ARCO 1887, 3085, 6131. The time is approximately 3:18.
4  We are now off the record.
5       (The deposition was concluded at 3:18 p.m.)

Page 208

E R R A T A

PAGE  LINE  CHANGE

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

____  ____  _____

REASON: _____

Page 207

REPORTER'S CERTIFICATION

    I, Kimberly Thrall, Certified Shorthand
Reporter and Registered Professional Reporter, in and
for the State of California, do hereby certify:

    That the witness named in the foregoing
deposition was, before the commencement of the
deposition, duly administered an oath in accordance
with the Code of Civil Procedure Section 2094; that
the testimony and proceedings were reported
stenographically by me and later transcribed through
computer-aided transcription under my direction and
supervision; that the foregoing is a true record of the
testimony and proceedings taken at that time.

    IN WITNESS WHEREOF, I have hereunto subscribed
my name this 24th day of August, 2010.


       _____
       Kimberly S. Thrall, RPR, CSR No. 11594

Page 209

ACKNOWLEDGMENT OF DEPONENT

    I,_____, do
hereby certify that I have read the
foregoing pages, and that the same
is a correct transcription of the answers
given by me to the questions therein
propounded, except for the corrections or
changes in form or substance, if any,
noted in the attached Errata Sheet.


_____
DAVID P. BOLIN         DATE


Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Confidential - Per 2004 MDL 1358 Order

Page 495

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | : Master File : No. 1:00-1898 : MDL No. 1358 (SAS) : M21-88 |
| This document relates to the following case: | : |
| Orange County Water District v. Unocal Corp., et al., 04 Civ. 4968 (SAS) | : VOLUME III : Pages 494-667 |

    Videotaped Deposition of DAVID P. BOLIN, Volume III, Orange County Water District's 30(b)(6) designee in re Site Specific Station Investigations, held in the Law Offices of Latham & Watkins, 650 Town Center Drive, 20th Floor, Costa Mesa, California, beginning at 9:03 a.m.

------

CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)

------

AUGUST 19, 2010

Reported by:
Sandra Bunch VanderPol, CSR #3032
Certified Realtime Reporter
Registered Merit Reporter
Realtime Systems Administrator credentialed
Fellow, Academy of Professional Reporters

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Page 504

1  Unocal 5123, and Unocal 5399.
2      Q.   I thought the fourth one was Chevron
3  9-5568.
4      A.   Oh, I stand corrected. I think you
5  are correct. The numbers are kind of running
6  together. I think -- it is Chevron 5568. Yes, it
7  is.
8      Q.   Okay. And you are designated as the
9  corporate representative of the Orange County Water
10 District on the topics contained in Exhibit 26 for
11 those four stations today?
12     A.   That is my understanding.
13     Q.   What did you do to prepare for your
14 deposition?
15     A.   I reviewed prior documents, including
16 documents and in a binder, which I brought with me,
17 from the last deposition. And then more current
18 documents that are either generated as part of this
19 ongoing process, including the declaration by me,
20 responses to interrogatories, the District's claim,
21 and then some public documents for these various
22 sites that we're going to talk about today that I
23 obtained from Geotracker.
24     Q.   Okay.
25     A.   Those documents include Groundwater

Page 505

1  Monitoring Reports and a few correspondence, letters
2  from the various agencies involved in these sites.
3      MR. CORRELL: We will mark as
4  Exhibit No. 27, which is a letter from Miller,
5  Axline & Sawyer to Matt Heartney, dated August 17,
6  2010.
7      (Exhibit No. 27 was marked.)
8  BY MR. CORRELL:
9      Q.   And I will ask you to look it over.
10 And the question will be: As far as the Geotracker
11 documents that you reviewed for these four sites, is
12 this a complete list of those documents?
13     A.   I can't be certain that I've seen all
14 of these documents.
15     Q.   Okay. Did you prepare a list of the
16 documents you reviewed from Geotracker?
17     A.   No.
18     Q.   You said you brought a binder with
19 you per station?
20     A.   Yes.
21     Q.   We are going to start with Chevron
22 1921. Could I see the binder.
23     A.   This is the same binder that was
24 produced for the prior deposition covering this site.
25 There hasn't been any changes to that binder. In

Page 506

1  fact, there may be a couple of documents missing from
2  there, including a map or a report, or something like
3  that.
4      Q.   Okay. Did you review your prior
5  deposition testimony on this site in preparation for
6  today?
7      A.   No.
8      Q.   In regards to these four stations,
9  did you talk to anyone other than counsel about them?
10     A.   Only insofar as that I was going to
11 be deposed on these stations, but not details about
12 these stations.
13     Q.   What do you mean by that?
14     A.   Roy Herndon is my supervisor. I
15 informed him I was going to be in deposition and that
16 I would be covering Chevron sites. I can't even say
17 whether I mentioned which Chevron sites. But I just
18 mentioned that I was going to be in deposition
19 covering Chevron site.
20     Q.   And when you said "but not details,"
21 you mean you didn't give him much detail in your
22 conversation?
23     A.   Yes. We didn't talk about any of the
24 technical merits of any of these sites.
25     Q.   Okay. As far as Chevron Site 9-1921,

Page 507

1  what has the District done in regards to that site
2  since your last deposition?
3      MR. MILLER: Objection. Overbroad. Calls
4  for a narrative.
5      THE WITNESS: We have monitored some of the
6  new data that has come out since the last deposition.
7  We've looked at -- I've been monitoring data in the
8  general region.
9      We have prepared an investigation that will
10 be going forward, as soon as we can implement it in
11 the field, that will include -- I believe it will
12 include this station as one of the target sites we're
13 going to be investigating.
14     Q.   That's the work that's to be
15 performed by Hargis?
16     A.   That's correct.
17     Q.   We will come back to that in a
18 second.
19     So other than the monitoring the new data
20 and monitoring data in general in the region and
21 preparing for the Hargis investigation, has the
22 District taken any other actions in regard to this
23 site since your last deposition?
24     A.   No.
25     MR. MILLER: Objection. By incorporating

4 (Pages 504 to 507)

Page 508

1  prior answers and altering them in a question, it
2  becomes argumentative and misstates the evidence.
3       It's better to ask a fresh question.
4       MR. CORRELL: Let me try to deal with that
5  deposition.
6       Q.  Any other actions, other than the
7  ones you've previously mentioned, has the District
8  taken since your last deposition in relation to this
9  site?
10      MR. MILLER: Vague and overbroad.
11      Go ahead.
12      THE WITNESS: I can't think of any.
13 BY MR. CORRELL:
14      Q.  And you are the person at the
15 District that oversees any investigation or work at
16 this site?
17      A.  No. That's not correct.
18      Q.  Okay. How would you describe your
19 job responsibilities for the District in relationship
20 to Chevron 9-1921?
21      A.  I'm the project manager for this
22 project or this litigation. It currently involves
23 this site.
24      Q.  Okay. The -- you say "the project
25 manager." Let me just ask it this way.

Page 509

1       What -- in that role, what are your duties,
2  if any, in relationship to this site?
3       A.  I manage consultants and contractors
4  associated with any work for this site. I facilitate
5  and am involved in selecting wells that are being
6  tested, whether they are District wells or producer
7  wells, the production wells, or any other sample and
8  data collection.
9       I monitor some of the ongoing activities at
10 this site that are being conducted by the defendants'
11 consultants and read some of those reports.
12 Discussions that may come up with regulatory
13 community, I'm often involved in those discussions,
14 and other general responsibilities.
15      Q.  As far as reading the reports from
16 Chevron's consultants on this site, do you do that
17 regularly?
18      MR. MILLER: Vague as to "regularly." And
19 vague as to whether or not you're talking about the
20 sites or generally.
21 BY MR. CORRELL:
22      Q.  I thought I meant -- my questions now
23 are going to be specific to this site.
24      So in regard to Chevron Site 9-1921, do you
25 regularly review the reports of Chevron's

Page 510

1  consultants?
2       MR. MILLER: Same objections.
3       THE WITNESS: There's not a -- I don't have
4  a calendar or a fixed schedule for reviewing
5  documents associated with this site. I check on
6  available information for this site, as well as other
7  sites, as time allows and as some of those documents
8  are made available.
9  BY MR. CORRELL:
10      Q.  Okay. Well, in regard to Chevron
11 9-1921, between the time of your last deposition and
12 preparing for this deposition, had you reviewed any
13 consultant reports?
14      A.  It depends on what you mean by
15 "review." But I have read over several consultant
16 reports.
17      Q.  In that intervening time period?
18      A.  Yes.
19      Q.  And if the District would have
20 contracted any work to be done at or related to
21 Chevron 9-1921 between the time of your last
22 deposition and today, given your role, you would have
23 been informed of that, correct?
24      A.  Yes, I believe so.
25      Q.  Now, you mentioned part of your role

Page 511

1  would be to have discussions with regulators. What
2  discussions have you had with any regulators
3  concerning Chevron 9-1921?
4       A.  I don't recall any specific
5  discussions with regulators involving this site.
6       Q.  What new data have you reviewed for
7  this site between your last deposition and presently?
8       MR. MILLER: Overbroad. Calls for a
9  narrative.
10      Are you asking for the types of data?
11 Vague.
12      THE WITNESS: This is what I believe is the
13 latest Quarterly Monitoring Report for this site. It
14 was prepared by SAIC. It's dated February 23rd,
15 2010, entitled, "The submittal of First Quarter 2010
16 Semi-Annual Progress and Groundwater Monitoring
17 Report." And it is for Chevron Service Station
18 No. 9-1921.
19 BY MR. CORRELL:
20      Q.  And have you reviewed other type of
21 reports -- let me -- have you reviewed reports, other
22 than that report between your last deposition and
23 today regarding this site?
24      A.  Yes. Actually, I wasn't finished.
25      Q.  Oh, I am sorry.

5 (Pages 508 to 511)

Confidential - Per 2004 MDL 1358 Order

Page 536

```
 1   the site?
 2       A.   No.
 3       Q.   Is one purpose of the work to
 4   determine whether any contamination that has escaped
 5   the site threatens drinking water?
 6       A.   No.
 7       Q.   Is one purpose of the work to
 8   determine if any MTBE that has escaped the site
 9   threatens a drinking water well?
10       A.   No.
11       Q.   Is one purpose of the work to
12   determine whether MTBE that has escaped the site is
13   currently impacting a drinking water well?
14       A.   No.
15       Q.   Since your deposition in June of
16   2008, have you seen any data that indicates that MTBE
17   that has escaped this site is impacting a drinking
18   water well?
19       A.   I believe there has been an
20   additional well in which MTBE was detected, but I
21   can't recall for certain when that detection
22   occurred. I believe it is MCWD-8.
23       Q.   You're looking at a plume map?
24       A.   I'm looking at a plume map. This was
25   a map that was produced in the prior deposition.
```

Page 537

```
 1       Q.   What is MCWD-8?
 2       A.   It's a groundwater production well.
 3       Q.   And what analysis have you done to
 4   determine whether any MTBE detected in MCWD-8 came
 5   from Chevron 1921?
 6       A.   Just the proximity of that well to
 7   Chevron 1921. It is downgradient. It is
 8   downgradient from the direction in which
 9   contamination has left the site.
10           So it -- we haven't determined specifically
11   that the contamination detected in that well -- and
12   let me preface that by saying I'm not certain it is
13   that well. My memory may be failing me. I seem to
14   recall that there was an additional well. It also
15   might have been MCWD-11. I just can't recall. I
16   might be in error.
17           But we have not done additional detailed
18   analysis to determine the specific source of the
19   contamination.
20       Q.   And the CPT testing won't help answer
21   that question?
22       A.   Actually, that will help answer the
23   question.
24       Q.   Okay. So, then, is one of the
25   purposes of the CPT testing to determine whether
```

Page 538

```
 1   contamination from Chevron 1921 is impacting these
 2   drinking water wells?
 3       A.   That information will help the
 4   overall analysis. But mostly the CPT testing will
 5   help us delineate the plume that's emanated from the
 6   site.
 7       Q.   And in delineating the plume
 8   emanating from the site, is it your goal to find a
 9   zero detect line?
10       A.   That hasn't been determined yet.
11       Q.   Has the District established any
12   standards for when or under what conditions it will
13   conclude that the plume from Chevron 1921 is fully
14   delineated?
15       A.   No.
16       Q.   If the plume -- once the plume is
17   fully delineated, wouldn't that tell you whether or
18   not it's impacting a drinking water well?
19           MR. MILLER: Objection. Insufficient facts
20   on which to base a hypothetical. Calls for
21   speculation.
22           You're asking him to assume what conclusions
23   can be drawn from data that presently are being
24   gathered.
25           THE WITNESS: I don't have a straight answer
```

Page 539

```
 1   to your question. It depends on what the boundaries
 2   are that are defined for full delineation. And
 3   delineation includes more than just drilling and
 4   sampling. There are other analyses that go into
 5   delineation, including modeling and fate and
 6   transport tracking, and so on.
 7           I can't say. I don't have a good answer for
 8   that.
 9   BY MR. CORRELL:
10       Q.   Okay. Does the District currently
11   have any plans to do any modeling of the
12   contamination from 1921?
13           MR. MILLER: Do not go into communications
14   concerning experts retained by my firm or other work
15   product. You can discuss the question, which asks if
16   the District plans to do the work.
17           THE WITNESS: District staff and District
18   consultants aren't actually tasked with doing
19   groundwater modeling for this.
20   BY MR. CORRELL:
21       Q.   Are or are not? I'm sorry.
22       A.   Are not.
23       Q.   Any plans in the future to task them
24   with that?
25           MR. MILLER: Same objection.
```