Confidential - Per 2004 MDL 1358 Order

Page 540

1        Go ahead and answer within that constraint.
2        THE WITNESS:  Quite possible.
3   BY MR. CORRELL:
4        Q.    Okay.  Is there any timeline to reach
5   a decision as to whether any modeling will be done by
6   the District outside of the litigation, as it relates
7   to 1921?
8        A.    I am not sure I understand your
9   question.  You're asking me if there's any plans for
10  modeling outside of litigation to determine the
11  impacts on a well from Chevron 1921?
12       I'm not aware of any plans regarding 1921
13  that are outside litigation.
14       Q.    So all the work that's being done for
15  Chevron 1921 is part of the litigation?
16       MR. MILLER:  Objection.  That calls for a
17  legal conclusion.  It's vague.
18       What do you mean by "part of the
19  litigation"?
20       MR. CORRELL:  Well, that's what he -- I'm
21  just trying to follow-up on what the witness said.
22  What did the witness mean when he said that.
23       MR. MILLER:  Well, that's not the question
24  you asked.
25       THE WITNESS:  My understanding is that all

Page 541

1   of our work involving 1921 right now is -- is within
2   the realms of our litigation.
3        If there were no litigation, we would be
4   doing -- it's likely we would be doing this work,
5   anyway, because it's a groundwater contamination
6   problem, and it has to be cleaned up.  But because
7   there is litigation, all of our activities
8   surrounding Chevron 1921 is part of it.
9   BY MR. CORRELL:
10       Q.    You mentioned that there was
11  contamination from 1921 that has to be cleaned up.
12  Has the District undertook any actions to clean up
13  contamination from 1921 since your deposition in
14  2008?
15       A.    Yes.
16       Q.    What actions have -- has the District
17  taken to clean up contamination since June of 2008?
18       A.    The investigation process is part of
19  an overall remedial program.  There has to be
20  investigation to determine the degree and extent of
21  contamination so we can determine how to go about
22  remedying the problem.  And so our investigation is
23  part of that process.
24       Q.    But the District has not undertaken
25  any physical remediation of contamination from 1921,

Page 542

1   correct?
2        A.    Well, in the broadest sense, yes.
3        But if you're asking me if the District has removed
4   any molecules of contamination from the subsurface,
5   the answer is "No."
6        Q.    Okay.
7        A.    Let me clarify.  With the exception
8   of sampling production wells in which there is
9   contamination, I guess technically that's removing
10  molecules from the subsurface, but that's not what
11  I'm referring to.
12       Q.    Okay.  Understood.  The Hargis --
13  other than the Hargis CPT testing, has the District
14  undertaken any other physical action or -- let me ask
15  it -- back it up.
16       As part of the District's analysis of
17  Chevron 1921, you and others have reviewed regulatory
18  filings, correct?
19       A.    Yes.
20       Q.    And then there is a plan now for
21  Hargis to go out and do some -- the CP testing,
22  right?
23       A.    Yes.
24       Q.    And other than those two actions,
25  those two types of actions, what has the District

Page 543

1   done in relation to 1921?
2        MR. MILLER:  That's been asked and answered
3   in a more general question that asked him to describe
4   everything they have done.  So the question has been
5   asked and answered, at least as to the period since
6   his last deposition, which is all this should be.
7        The last question has no time limit.  I
8   trust you're not asking him for -- to repeat what he
9   covered in his 2008 deposition.  Can you rephrase,
10  please.
11       MR. CORRELL:  Can you read the question
12  back.
13       (Record read as follows:  QUESTION:  And
14  other than those two actions, those two types of
15  actions, what has the District done in relation to
16  1921?)
17  BY MR. CORRELL:
18       Q.    Since 2008.
19       MR. MILLER:  And the same objections.
20  BY MR. CORRELL:
21       Q.    Since June of 2008.
22       A.    I am sorry.  The two actions you said
23  were?  Please reread.
24       (Record read as follows:  QUESTION:  And
25  other than those two actions, those two types of

Confidential - Per 2004 MDL 1358 Order

Page 544

1  actions, what has the District done in relation to
2  1921 since 2008?)
3  MR. MILLER: That's already been asked and
4  answered. That was at the beginning of the
5  deposition.
6  Go ahead.
7  THE WITNESS: The actions you described are
8  the crux of the actions that I can talk about.
9  Additional actions fall within privileged discussion.
10 BY MR. CORRELL:
11 Q. Why has it taken the District so long
12 to determine that physical actions, such as CP
13 testing, should be taken in relation to this site?
14 MR. MILLER: It's argumentative. Vague.
15 THE WITNESS: Actually, it hasn't taken that
16 long to determine whether CPT testing should be
17 conducted at this site, especially in -- relative to
18 the time it's taken the defendants to actually do
19 very much of anything at their own site, including
20 investigation and remediation.
21 MR. CORRELL: Okay.
22 THE WITNESS: So in that time frame, it's
23 actually been a very short time.
24 BY MR. CORRELL:
25 Q. As part of the CPT testing at Chevron

Page 545

1  1921, will Hargis test for TAME?
2  A. Hmm. I believe so. I can't recall
3  whether we discussed all of the compounds that Hargis
4  is going to be testing for. I believe it covers
5  the -- the spectrum of oxygenates.
6  Q. As part of the CPT testing by Hargis
7  at Chevron 1921, will the District be looking to
8  determine what, if any, vertical component exists
9  between the shallow and deeper aquifers?
10 A. That's one of the things that we will
11 be looking at with our CPT logs.
12 Q. If we go to the Hargis proposal at
13 page 6, under "Groundwater Assessment." It says,
14 "The data collected during this assessment will be of
15 sufficient quantity and quality to further delineate
16 the extent of MTBE in groundwater."
17 It says, "Further delineate." Is the extent
18 of MTBE in groundwater at Chevron 1921 in some
19 aspects delineated already?
20 MR. MILLER: Vague as to what you mean by
21 "some aspects" and "delineated" in the context of
22 your question.
23 BY MR. CORRELL:
24 Q. You can answer.
25 A. I thought you might rephrase your

Page 546

1  question.
2  It hasn't been delineated. When they talk
3  about "further delineation" in this context, they are
4  referring to determining how much farther off site
5  it's gone. But the fact that it's been identified
6  that it's migrated off site, away from the source, is
7  not -- it's not delineated. It's undelineated.
8  Q. It then says, "This data, in
9  conjunction with existing regional data, will be to
10 evaluate the potential for migration of contaminants
11 from sources at the selected sites to potential
12 receptors along the groundwater pathway."
13 Is that one purpose of the investigation?
14 A. Yes. But this is a common failing
15 with -- with consultants, is they use words like
16 "potential" and "further," and other words like that,
17 when, in fact, they could eliminate those words
18 entirely.
19 There are receptors, and there has -- there
20 is migration. And delineation hasn't been completed.
21 Q. Well, as you've testified for 1921,
22 you have not yet tracked contamination from that site
23 to a production well, correct?
24 MR. MILLER: Objection. Vague as to what
25 you mean by "tracked."

Page 547

1  And if he has testified to it, you shouldn't
2  be asking it again. And it's not limited to the
3  period post 2008, so it's asked and answered and
4  irrelevant as framed.
5  BY MR. CORRELL:
6  Q. You said the word "potential for
7  migration from groundwater contaminants from sources
8  at the selected sites to potential receptors along
9  the groundwater pathway." You could remove the word
10 "potential"?
11 A. Yes.
12 Q. Did you discuss that with Hargis?
13 A. No.
14 Q. It says, "And support the evaluation
15 of remedial alternatives for groundwater." Do you
16 see that?
17 A. Yes. The last part of that first
18 paragraph.
19 Q. And that is one purpose of the CPT
20 testing?
21 A. Yes.
22 Q. Has there been any decision made at
23 this point of any remedial activities that need to be
24 taken by the District in relationship to 1921?
25 A. I can't say. We have to look at the

14 (Pages 544 to 547)

8f6acb2b-e450-48c1-a8ae-a34567a09f14

Confidential - Per 2004 MDL 1358 Order

Page 548

1    merits of the data. It's too premature to say
2    whether we've decided whether we have to do that or
3    not.
4          Q.    Since June of 2008, has the District
5    undertaken any analysis as to whether a release
6    occurred at 1921 after May of 2000?
7          MR. MILLER: Counsel -- 2000? That clearly
8    exceeds the scope of the deposition notice as
9    permitted by Mr. Warner.
10         MR. CORRELL: I don't understand.
11         MR. MILLER: You're asking him about events
12   between 2000 and the present.
13         MR. CORRELL: No. Then my question wasn't
14   clear.
15         All I'm asking him about is since June of
16   2008, has he done any additional analysis as to
17   whether a release happened post May of 2000? What's
18   he done since his last deposition to present, if any,
19   on that topic.
20         MR. MILLER: That's a different question
21   than you originally asked.
22         MR. CORRELL: Well, then I apologize,
23   because that's the question I meant to ask.
24         THE WITNESS: Yes.
25   ///

Page 549

1    BY MR. CORRELL:
2          Q.    What have you done?
3          MR. MILLER: Overbroad. Calls for a
4    narrative.
5          Go ahead.
6          THE WITNESS: We have reviewed subsequent
7    reports to 2008, looking for any indications of new
8    spikes, new compounds, and just reviewing the data
9    and any commentary from regulatory agencies, whether
10   there's been any new Unauthorized Release Reports,
11   although they are not in Geotracker. Mostly looking
12   at the literature to see what the data indicate.
13   BY MR. CORRELL:
14         Q.    In doing so, have you reached any
15   conclusion since June of 2008 whether or not this
16   site had a post May 2000 release?
17         A.    I can't recall. I know that --
18         MR. MILLER: Do you need a minute to review
19   documents before you answer? Because if you do, you
20   should take the time.
21         MR. CORRELL: Definitely.
22         THE WITNESS: I do, but I don't think we
23   need to go off the record. I'm just reviewing some
24   notes that I have.
25         Yeah, there was one indication at this site.

Page 550

1    And I couldn't -- actually, I couldn't remember which
2    site it was where I had seen this.
3          There was one indication. This is in the
4    February 23, 2010 first quarter semi-annual progress
5    groundwater monitoring report for this site. There
6    is a graph for a well MW-13, and it indicates that
7    TBA is increasing in that well. MW-13 is off the
8    property, but it indicates a -- increasing
9    contamination could indicate a new release. I can't
10   tell when the release might have occurred, but it's
11   not one that we had identified before in -- before
12   2008 or earlier.
13         MR. CORRELL: May I see that, sir.
14         THE WITNESS: Yes. I have got it marked
15   with a yellow tab here.
16         (Witness handing document to Counsel.)
17   BY MR. CORRELL:
18         Q.    And the date of the spike to which
19   you're referring, is that January '05 or January '09?
20         A.    Let me see. No, it's actually -- the
21   trend began prior to 2008, but it indicates that it's
22   been a continuing trend upwards, indicating
23   increasing contamination. So the trend itself was
24   not identified until after my last deposition.
25         Q.    And could that increasing trend of

Page 551

1    TBA indicate that MTBE is biodegrading at the site?
2          MR. MILLER: Objection. That calls for
3    expert opinion.
4          If you have analyzed that and formed an
5    opinion, you can answer. But you're not to start
6    testifying as an expert, not based on prior work and
7    analysis you've done, but based on his questions that
8    call for expert opinion.
9          THE WITNESS: I don't think so. As counsel
10   has commented, I'm not an expert in this area. But I
11   don't think that that's what that indicates.
12   BY MR. CORRELL:
13         Q.    And why not?
14         A.    I don't see a changing trend in MTBE.
15   And MTBE seems to be fairly stable in the well, at
16   least for this short period, but we see an increase
17   in TBA.
18         Q.    Since June of 2008, have you reported
19   to the OCHCA any opinions about a release that may
20   have occurred at Chevron 1921?
21         A.    No.
22         Q.    Since your last deposition, have you
23   seen any indication that additional remedial actions
24   are occurring at the site?
25         MR. MILLER: Additional would be new

15 (Pages 548 to 551)

8f6acb2b-e450-48c1-a8ae-a34567a09f14

Confidential - Per 2004 MDL 1358 Order

Page 556

1     Q.   Have you provided any comments on the
2  proposed remedial action to either Chevron or the
3  regulators since 2008?
4     A.   No.
5     Q.   Do you have any opinion whether the
6  remediation system, DPE remediation system, is AN
7  appropriate remediation system for the site?
8        MR. MILLER:  For this site, is part of your
9  question?
10        MR. CORRELL:  Yes.
11        THE WITNESS:  It depends on what you mean by
12  "appropriate."
13        Is DPE going to contain and control the
14  contamination that's been released at the site?  In
15  my opinion the answer is no.
16        Is it appropriate for removing contamination
17  from the subsurface?  Yes, I guess any remedial
18  technology that removes contamination is considered a
19  good thing, but it is -- applying this -- this
20  technology and only this technology is not preventing
21  the threat to groundwater supplies and impact to City
22  production wells.
23  BY MR. CORRELL:
24     Q.   And why do you say that?
25        MR. MILLER:  That calls for a narrative, and

Page 557

1  it's not limited to the period since his last
2  deposition.  It requires him to repeat testimony he's
3  given before.
4  BY MR. CORRELL:
5     Q.   Well, let me -- did you -- the
6  opinion that you just gave, that the DPE system will
7  not contain contamination on the site, did you have
8  that opinion before June 2008?
9     A.   I didn't say that it would contain
10  contamination on the site.  We're talking about
11  containing the contamination that's been released
12  from the site.  And that contamination has escaped
13  the site.  It's moved beyond the core remedial
14  efforts at the site.
15        Dual phase extraction involved some
16  groundwater pumping, mostly it's vapor extraction,
17  and so there is some groundwater control.  But the
18  radius of influence of a dual phase extraction system
19  is not going to capture contained contamination that
20  has migrated away from the site.
21     Q.   At this site would the DPE
22  system that has been installed, will it contain
23  the contamination on site?
24        MR. MILLER:  That calls for an expert
25  opinion.

Page 558

1        THE WITNESS:  I don't know.
2  BY MR. CORRELL:
3     Q.   And in your duties at the District,
4  you haven't undertaken to perform that analysis?
5     A.   I have not.
6     Q.   Is there a technology that could be
7  installed at the site that would contain
8  contamination that you believe has already escaped
9  the site?
10        MR. MILLER:  That calls for expert opinion.
11  Go ahead.
12        THE WITNESS:  That's probably more expertise
13  than I have, but it's hard for me to imagine that a
14  remediation system installed at the site is going to
15  capture and contain contamination that's already been
16  detected in a production well.
17  BY MR. CORRELL:
18     Q.   When did you reach your conclusion
19  that remedial activities on this site, that are being
20  conducted on this site, will not capture MTBE
21  contamination that's already escaped?
22        MR. MILLER:  That asks him for potential
23  events before 2008.  It's impermissible.  Please
24  rephrase.
25        MR. CORRELL:  No.  I'm going to ask him

Page 559

1  because I want to see if it was before or after 2008.
2  I've got to lay the foundation.
3        MR. MILLER:  I'm sorry.  But that's the same
4  thing as taking discovery that could have been done
5  in the last deposition, and the discovery master
6  limited this deposition.
7        MR. CORRELL:  We don't know that yet, Duane.
8  I don't know -- I'm just asking, did you reach your
9  opinion before or after June of 2008.  If he says
10  before, you're probably right.  If he says after,
11  we're going to have some questions.  Not that I'm
12  trying to influence your answer.
13        MR. MILLER:  Yes, you are trying to take the
14  deposition for the period before.  I'm going to
15  instruct him not to answer, consistent with
16  Mr. Warner's ruling on how these depositions were to
17  proceed.
18        MR. CORRELL:  Just so the record is very
19  clear on the instruction, I'm going to ask you a very
20  simple, straightforward question.
21     Q.   Did you reach the conclusion that
22  remedial activity on this site would not capture
23  off-site contamination after 2008?
24        MR. MILLER:  Same objection -- oh, after
25  2008.  Go ahead.

17 (Pages 556 to 559)

Confidential - Per 2004 MDL 1358 Order

Page 604

1  know.
2         MR. MILLER:  It's not in the topics as
3  asked.
4         MR. CORRELL:  Whether such nuisance or
5  trespass can be abated at a reasonable cost, that's
6  topic D.
7         Q.   So let me ask you that straight up,
8  out of the topic.  So on Station 1921, can the
9  contamination that has escaped from the site be
10  cleaned up at a reasonable cost?
11         MR. MILLER:  Calls for a legal conclusion.
12  Vague.
13         Go ahead and answer, if you can.
14         THE WITNESS:  It depends on what you mean by
15  "reasonable cost."  It can be cleaned up.  It can be
16  cleaned up for a cost.  Whether the cost is
17  reasonable is -- is very subjective.
18         In this case we don't know the extent of the
19  contamination.  We're unsure of the extent of the
20  contamination.  We don't know the degree of the
21  contamination.  That's why we're investigating it.
22         And once we're able to collect information
23  that will allow us to -- to decide on what size
24  remediation system or what technology to apply, then
25  we would have a better answer.  But at this stage we

Page 605

1  don't know.
2  BY MR. CORRELL:
3         Q.   So at this stage the District doesn't
4  know what the cost will be to clean up the
5  contamination that allegedly has left the site,
6  correct?
7         MR. MILLER:  Objection.  As asked, the
8  question is argumentative.  Vague and ambiguous.  And
9  lacks the appropriate time frame.
10         You're not asking about work done since
11  2008.
12         THE WITNESS:  At this stage I don't think
13  anybody knows what it's going to cost to clean up the
14  contamination that came from Chevron 1921, including
15  the parties responsible for the contamination that
16  came from 1921.
17  BY MR. CORRELL:
18         Q.   And so, therefore, since we don't
19  know what the cost is going to be yet, we can't make
20  a determination as to whether the cost is going to be
21  reasonable, correct?
22         A.   I --
23         MR. MILLER:  Argumentative.
24         THE WITNESS:  I don't think that's
25  completely correct.  That's going to require more

Page 606

1  expertise than I have and more experience at
2  remediating these kinds of contamination problems
3  than I have.
4         We haven't made that estimation now.  Or,
5  should I say, District staff and District consultants
6  have not made those kinds of inroads to determining
7  what cost it's going to be.
8  BY MR. CORRELL:
9         Q.   All right, sir, let's proceed to
10  5401.
11         Well, before we do that, we just went
12  through a series of questions and answers on topic 9.
13  We're here today to offer -- ask questions and get
14  answers on three other stations.
15         Would your answers be the same for the three
16  other stations?
17         MR. MILLER:  Objection.  Compound.  Vague.
18  Go ahead.
19         MR. CORRELL:  Well, let's --
20         MR. MILLER:  And I'm incorporating the
21  objections I made to the individual questions.
22         MR. CORRELL:  I understand.  Let me just --
23  I just want to make sure we're on the same page of
24  music, Duane.  You're right; it is a compound
25  question.

Page 607

1         I can either ask that general question for
2  each site; I can ask it for the three sites, or we
3  can go through the same line of questioning for each
4  site.  And I'm happy to do it any way you want.  I'm
5  trying to save everybody time.
6         MR. MILLER:  And I'm trying to avoid waiver
7  of my prior objections.
8         MR. CORRELL:  Well, but can we agree to
9  incorporate all your prior objections.  You objected
10  to compound, which is different.  And, you're right,
11  it is compound.  And I can fix that.  But that takes
12  a lot of time.
13         MR. MILLER:  I am trying to be reasonable
14  about this.  I'm less interested in repeating the
15  same answer than I am in making sure my objections
16  are preserved.  I thought I made that clear on the
17  record.
18         So if you want to get the answer with that
19  understanding, it's fine.
20         THE WITNESS:  In general terms, the answer
21  is the same.  An important distinction, of course, is
22  the fact that the other three stations that I believe
23  we're going to be talking about today are not
24  targeted for this next round of investigation;
25  whereas, the one we just talked about is.

Golkow Technologies, Inc. - 1.877.370.DEPS

8f6acb2b-e450-48c1-a8ae-a34567a09f14

Page 612

1  changed.
2      Q.    And prior to June 2008, had you
3  looked at the monitoring well installation that was
4  going to happen in the property west of the site?
5      MR. MILLER: Objection. As asked, it's
6  been -- it's outside the scope of Mr. Warner's order
7  concerning this deposition. It explicitly seeks
8  pre-deposition opinions. And it's impermissible.
9  And it's not relevant.
10  BY MR. CORRELL:
11      Q.    What do you mean by "your opinion had
12  not changed"?
13      A.    My opinions that there doesn't seem
14  to be an earnest interest in delineating the
15  contamination from the site. I still hold that to be
16  true.
17      Q.    Have you since June of 2008 sent any
18  correspondence to the appropriate regulatory agencies
19  critiquing the investigation/remediation activities
20  at this site?
21      A.    I don't recall for certain. We have
22  communicated with both the Water Board and the Health
23  Care Agency on a number of sites. I don't recall
24  whether this is one of the sites we've communicated
25  on or not.

Page 613

1      Q.    Were any of those communications
2  since June 2008 in writing?
3      A.    Again, there have -- some
4  communications have been in writing. I just can't
5  recall whether it was on this site.
6      Q.    In your preparation for your
7  deposition on this site, did you come across any
8  communications between the District's -- the District
9  and regulators concerning Chevron 9-5401?
10      A.    No, I didn't.
11      Q.    Since June of 2008, has the District
12  incurred any cost related to outside consultants for
13  this site?
14      A.    Since June 2008, yes, we have.
15      Q.    What costs has the District incurred?
16  And I understand you don't know the amount. But just
17  to whom has the District paid money related to this
18  site?
19      A.    Hargis + Associates.
20      Q.    Any other consultant?
21      MR. MILLER: This, again, is post 2008?
22      MR. CORRELL: Post 2008.
23      THE WITNESS: No, I don't believe so.
24  BY MR. CORRELL:
25      Q.    And what activities has Hargis done

Page 614

1  since June 2008 related to this site?
2      A.    This is one of the sites that was
3  considered for investigation, this next round of
4  investigation.
5      Q.    But was not selected?
6      A.    It was not selected.
7      Q.    And do you know the reasons this site
8  was not selected?
9      A.    There were other sites selected. We
10  had to create a short list. This was not one of them
11  that made the short list.
12      Q.    And why do you say you had to create
13  a short list?
14      A.    We can't investigate all the sites
15  all at once.
16      Q.    And why is that?
17      A.    We don't have the resources.
18  Having said that, this is a site that I'm
19  recommending be on the next round of investigation.
20      Q.    When you say "recommending for
21  the next round of investigation," when will the
22  next round of investigation occur?
23      A.    We don't have detailed plans for the
24  next round of investigation. It may be within the
25  year, but it's unlikely that the next round would be

Page 615

1  completed within the year.
2      Q.    Okay. And when you say "the next
3  round," as I understand it, on the current testing,
4  like we saw at 1921, there are a series of tasks that
5  may be completed, correct?
6      A.    Yes.
7      Q.    And some of those tasks are dependent
8  upon what you find in a previous task, right?
9      A.    That's correct.
10      MR. MILLER: It's been asked and answered.
11      MR. CORRELL: I'm just trying to set the
12  stage.
13      Q.    Now, this is what I'm trying to
14  understand. Are you going to go through all the
15  tasks in the first round to those ten sites before
16  you start the second round?
17      A.    Not necessarily.
18      Q.    Has a decision been made which way
19  you will go with that?
20      A.    No.
21      Q.    Has Hargis submitted a proposal for
22  conducting CPT testing at Chevron 9401 [sic]?
23      A.    No.
24      Q.    Do you have your plume map for this
25  site?

Confidential - Per 2004 MDL 1358 Order

Page 616

1    A.    I believe I do.  Would you like to
2  see it?
3    Q.    Sure.  It may help to ask a better
4  question.  And mainly for you to see it.
5        Has Friedman & Bruya incurred any costs
6  relating to sampling wells in the vicinity of Chevron
7  9-5401 since June 2008?
8    A.    No.
9    Q.    Or the wells that are on the plume
10  map, of which Chevron 9-5401 is a part, are they
11  going to be included in the upcoming Friedman & Bruya
12  testing?
13    A.    Yes.
14    Q.    Since June 2008, other than the cost
15  attributable to Hargis, has the District incurred any
16  costs related to 5401?
17    A.    Yes.
18    Q.    Okay.  And what are those costs?
19    A.    That would be staff's time and
20  resources.
21    Q.    Okay.  And since June 2008, have you
22  kept track of the staff time and resources to this
23  particular site?
24    A.    No.
25    Q.    Do you know if there's been any

Page 617

1  expenditures out of the toxic reserve fund
2  represented to this site?
3    A.    I don't.  I'm not sure whether the
4  toxic reserve funds is strictly for investigation,
5  remediation efforts, or whether it covers any of the
6  District's staff time.
7    Q.    Since June of 2008, have you come
8  across any new evidence of commingling of
9  contamination from site 5401 with the other sites
10  listed on your plume map for Plume 9?
11    A.    No.  District staff and District's
12  consultants has not come up with any new information
13  or data on commingling.
14        MR. CORRELL:  I'd like to show what we will
15  mark as Exhibit 39.
16        (Exhibit No. 39 was marked.)
17  BY MR. CORRELL:
18    Q.    5401 is a site which Hargis has
19  prepared a site report, correct?
20    A.    I am sorry.  Will you say that again.
21    Q.    Site 5401 is a site for which Hargis
22  has prepared a site summary, correct?  Site report.
23    A.    Yes.  Yes.
24    Q.    And so, if I refer to these
25  correctly, if I look at Exhibit 39, what would you

Page 618

1  call that?
2    A.    This is a Site Summary Report
3  prepared for Chevron Station 9-5401, prepared by
4  Hargis + Associates for Orange County Water District.
5    Q.    Under it it says "Global I.D." and
6  gives a number.  What does that mean?
7    A.    I believe that is an I.D. in the
8  Health Care Agency's or Regional Water Quality
9  Control Board's database.  And it is specific to this
10  site.
11    Q.    Under "Key issues," the third bullet
12  point states that, "Low to moderate concentrations of
13  MTBE, 230 micrograms per liter and TBA as 6600" -- is
14  that micrograms per liter?
15    A.    Yes.
16    Q.    -- "are currently detected in
17  semi-perched aquifer groundwater beneath the site."
18        Do you see that?
19    A.    Yes.
20    Q.    Upon receiving this report -- first
21  of all, you received this report, too, in February of
22  '09?
23    A.    I don't know exactly when we received
24  it.  But I see that that is the date in the footer
25  for this document.  So I believe we received it

Page 619

1  approximately that time.
2    Q.    Okay.  And did you agree with
3  Hargis's conclusions that low to moderate
4  concentrations have been detected?
5        MR. MILLER:  Objection.  Vague and
6  argumentative.
7        THE WITNESS:  I didn't agree or disagree
8  that low to moderate concentrations were detected,
9  only that concentrations of MTBE and TBA were
10  detected.
11  BY MR. CORRELL:
12    Q.    And as we discussed with the previous
13  site in which we saw Hargis + Associates report, did
14  you ever send Hargis anything in writing that you
15  disagreed with any conclusions in this report?
16    A.    No.
17    Q.    If you turn to page 2.  The full
18  bullet point on that page talks about, "Production
19  well WM-RES2 is the nearest potentially vulnerable
20  production well, located approximately 1400 feet
21  north of the site."
22        Do you know why in this report Hargis
23  only looked at one production well and in the other
24  report it looked at more than one?
25        MR. MILLER:  Calls for speculation.  Lacks

32  (Pages 616 to 619)

8f6acb2b-e450-48c1-a8ae-a34567a09f14

Confidential - Per 2004 MDL 1358 Order

Page 620

1  foundation.
2      THE WITNESS: No.
3  BY MR. CORRELL:
4      Q.   Did you ask them -- did you ask
5  Hargis, after reviewing this report, why production
6  well WM-RES2 was the only one discussed under the
7  "General Site Information Key Issues"?
8      A.   I honestly don't recall.
9      Q.   And if we go to page 11 -- actually,
10  10.  10 mentions -- on page 10, at the bottom,
11  mentions a couple of other wells, correct?
12      A.   In the bottom paragraph on page 10
13  there are a couple of wells that are mentioned.
14      Q.   Okay.  And then it goes, and page 11
15  it talks about WM-RES2 again, correct?
16      A.   ·Yes.
17      Q.   It says, "MTBE and TBA have not
18  historically been detected in this well."
19      Since June of 2008 has MTBE been detected in
20  WM-RES2?
21      A.   I'm sorry.  I don't see where you're
22  reading.
23      Q.   Page 11.  The last sentence.
24      A.   Oh, the last sentence.
25      Q.   "MTBE and TBA have not historically

Page 621

1  been detected in this well." And it cites OCWD WRMS
2  data and Friedman & Bruya sampling results.
3      My question is:  Since June of 2008, has
4  MTBE been detected in this well?
5      A.   No.
6      Q.   If we turn, as we did with the other
7  Hargis report, to the appendix that talks about the
8  Preliminary Service Station Summary Sheet, an
9  eight-page appendix.  I'm on page 2 of 8, Bates
10  No. 403843.
11      Actually, I don't have any questions on
12  that.
13      Was the Geotracker report something else
14  that you looked at to prepare for your deposition?
15      A.   Yes.
16      Q.   And did you print off a current
17  report from Geotracker when preparing for your
18  deposition?
19      A.   Current.  The date I printed it was
20  August 15.
21      Q.   2010?
22      A.   2010.
23      MR. CORRELL:  I have a version, so I don't
24  have to take yours, that's a few days before that.
25  But you can keep yours out, if you want.  We will

Page 622

1  mark this as Exhibit No. 40.
2      (Exhibit No. 40 was marked.)
3  BY MR. CORRELL:
4      Q.   And you can verify whether yours says
5  the same thing, not verbatim.  But under "Potential
6  Media Affected," what does the report that you
7  printed off say, under "Potential Media Affected"?
8      A.   They both are the same.  It says,
9  "Other groundwater, open paren, (uses other than
10  drinking water)," closed paren.
11      Q.   In reviewing the report that you
12  printed off on Geotracker, did you have an
13  understanding of what was meant by "Uses other than
14  drinking water"?
15      A.   Actually, I didn't notice that part.
16      Q.   Have you seen that in other
17  Geotracker reports you've reviewed?
18      A.   I don't -- I don't recall having seen
19  that in other reports.  It doesn't mean it's not
20  there; I just don't recall having seen it.
21      Q.   Since June of 2008, has the District
22  obtained any additional information that MTBE has
23  escaped remediation at this site?
24      A.   Well, it's an indication that we can
25  refer to the Geotracker report under the heading,

Page 623

1  "Impediments to Closure."  There are several
2  statements made by Orange County Health Care Agency,
3  since they are the lead agency on this site.
4      And under "Site Assessment, Incomplete,"
5  concerning the impediment to closure, it states that
6  the extent of contamination has not been determined.
7      And the -- under "Plume Instability" it
8  states that groundwater contamination plume is not
9  stable or not decreasing and verification monitoring
10  is not complete.  These are indicators of the ongoing
11  problem.
12      Q.   Now, other than seeing the
13  conclusions in the Geotracker report since 2008, has
14  Orange County obtained any data that would indicate
15  that contamination has escaped the site?
16      MR. MILLER:  You're talking about new data
17  since 2008?
18      MR. CORRELL:  Yeah.
19      MR. MILLER:  You didn't say that, just so
20  you know.
21      THE WITNESS:  No, I have no new data.
22  BY MR. CORRELL:
23      Q.   Since 2008, has -- let me ask a
24  broader question.
25      Since June of 2008, what work, if any, has

33  (Pages 620 to 623)

8f6acb2b-e450-48c1-a8ae-a34567a09f14

Confidential - Per 2004 MDL 1358 Order

Page 624

1  the District done related to this site?
2       A.    Our District's consultant has
3  evaluated this site for consideration to be included
4  in our next round, our upcoming round of
5  investigation.
6       We have reviewed documents being generated
7  by the defendants' consultants.  We have been
8  monitoring some of the data and been testing District
9  monitoring wells and the groundwater producers' --
10  groundwater production wells, testing for MTBE, and
11  so on.
12      Q.    Has the District undertaken any
13  remediation activities that are related to this site
14  since June of 2008?
15      A.    Similar to my response to the same
16  question on a previous site.  The investigation is
17  part of the remediation process.  And so we have
18  been -- all of our investigation activities,
19  including the preparation for investigation, as well
20  as the planning for investigation, are part of the
21  remedial effort.  However, we have not exercised any
22  physical removal of any contaminants from the
23  subsurface.
24      Q.    And the investigation activities
25  you're talking about since 2008 has been to review

Page 625

1  and summarize the public filings?
2       MR. MILLER:  Objection.  As asked, compound.
3  Argumentative.
4       THE WITNESS:  No.  It includes evaluating
5  this site for including in the next round of
6  investigation.
7  BY MR. CORRELL:
8       Q.    Has a decision been made that this
9  site will, in fact, be included in the next round?
10      A.    Yes.
11      Q.    Okay.  And has the --
12      A.    I'm sorry.  Maybe I misunderstood
13  your question.  Would you please ask that again.
14      Q.    Sure.
15      Has a decision been made by the District
16  that this site will be included in the next round of
17  testing?
18      A.    No.  It will not be included in the
19  next round of testing.  I misstated -- I
20  misunderstood your question, so I answered you
21  incorrectly.
22      Q.    You probably answered the question I
23  meant to ask.
24      Okay.  And so let's just clear up the
25  record.

Page 626

1       MR. MILLER:  It's not included in the Hargis
2  round, is what you're asking?
3       MR. CORRELL:  No.
4       Q.    I was asking, there's going to be a
5  next round.  The District is considering a second
6  round of Hargis testing, correct?
7       A.    Oh.  Yes.  Okay.  Let me clarify.
8       There is an upcoming round of investigation.
9  This site is not targeted for the upcoming round.
10  There will be subsequent rounds of investigation.
11  This site will be included in a subsequent round of
12  investigation.
13      Q.    Now I'm going to focus on what -- can
14  we call it round 2?
15      A.    We can call it round 2, if you wish.
16      Q.    Has a decision been made whether this
17  site will be included in round 2 as opposed to round
18  3, or 4, whatever?
19      A.    Not a final decision.
20      Q.    And has a decision, in fact, been
21  made definitively to conduct a round 2 test?
22      A.    No.  Because that decision really
23  does require Board of Directors' approval.  And so
24  until we get Board of Directors' approval, that would
25  be actually the point at which a definitive decision

Page 627

1  is made.
2       However, I have no reason to believe that
3  the Board of Directors would not approve staff's
4  recommendation to do an investigation, and the
5  investigation will in all likelihood include this
6  site.
7       Q.    For round 2?
8       A.    For round 2.
9       Q.    And then before you can make a
10  definitive decision, you would need Hargis to come up
11  with a proposal?
12      A.    Hargis or a consultant, whoever we're
13  using, will have to provide a proposal to us.
14      Q.    So there hasn't been a decision made
15  whether or not to use Hargis for this second round of
16  this type of testing?
17      A.    None of those things have been
18  determined yet.  We have no reason to think they
19  wouldn't, but....
20      Q.    What current remediation activities
21  are happening at the site?
22      MR. MILLER:  Overbroad.  Calls for a
23  narrative.
24      Go ahead.
25      THE WITNESS:  No active remediation

34 (Pages 624 to 627)

8f6acb2b-e450-48c1-a8ae-a34567a09f14

Page 640

```
 1        And if we go to page 8 of 10, the previous
 2  station that we were discussing, Chevron 5568, is
 3  listed under plume 72.
 4        And the accrual date is listed as October
 5  1997.  Did you prepare the accrual chart?
 6     A.    I did a portion of the accrual chart.
 7     Q.    Were you the person that reached the
 8  conclusion that the accrual date was October '97 in
 9  this -- for this site?
10     A.    I honestly don't recall.
11     Q.    All right.
12     A.    And I forgot to ask about the other
13  exhibit downstairs.
14     Q.    Okay.
15     MR. MILLER:  Do we need to get something?
16     THE WITNESS:  No.
17     MR. CORRELL:  No.  This was something from a
18  previous site that they were making a copy of so he
19  could take his home with it.
20     THE WITNESS:  I was going to pick it up on
21  the way up.  I forgot to ask.
22     MR. CORRELL:  I will get it when we finish
23  this site.
24     Q.    Since June of 2008, have you
25  learned -- has the District incurred any cost related
```

Page 641

```
 1  to Unocal 5123?
 2     A.    Yes.
 3     Q.    And what are those costs?
 4     A.    Similar to Chevron 5401, I think it
 5  is the District's staff time and District's
 6  consulting time.
 7     Q.    Well, and that District consultant
 8  would be limited to Hargis + Associates?
 9     A.    That's correct.
10     Q.    Now, Komex had previously issued a
11  summary of this site, correct?
12     A.    Yes.
13     Q.    Was Hargis asked to do a summary of
14  this site?
15     A.    No.  They were asked to review
16  Komex's work and then prepare summaries for other
17  sites.
18     Q.    Okay.  Were all the tasks that
19  Hargis + Associates did related to this site,
20  reviewing the Komex report?
21     A.    No.  They also considered this site
22  for the upcoming round of investigation.
23     Q.    And was this site selected?
24     A.    No, it was not.
25     Q.    And why wasn't this site selected?
```

Page 642

```
 1     A.    Let me confirm that.  I didn't just
 2  lie, did I?  I don't think it was.
 3     Q.    You would go straight to jail if you
 4  did.  I'm sorry.  That's the way the system works.
 5     A.    That would be a new experience.
 6     MR. MILLER:  Charles, you're going to jail.
 7     THE WITNESS:  I'll try anything once.
 8     No, it was not selected.
 9     MR. MILLER:  Shall we have a beer now or
10  later?
11  BY MR. CORRELL:
12     Q.    And do you know why the site was not
13  selected?
14     A.    No.  There were other sites that were
15  selected.  This just didn't make the list for this
16  next round of investigation.
17     Q.    Does the -- since June 2008, has the
18  District undertaken any remedial actions at this
19  site?
20     A.    Similar to the other sites.  Our
21  evaluation, investigation, ongoing monitoring of
22  activities at the site and monitoring water levels
23  and analytical data for the nearby production wells
24  and monitoring wells, all of that is part of the
25  overall remedial process.
```

Page 643

```
 1     However, the District has not exercised any
 2  active remediation at the site or -- such as to
 3  remove molecules of contamination from the
 4  subsurface.
 5     Q.    Since June of 2008, have you seen any
 6  data to indicate there was a post May 2000 release at
 7  this site?
 8     MR. MILLER:  Objection.  Assumes facts not
 9  in evidence he's done the analysis.
10     Go ahead and answer, if you can.
11     THE WITNESS:  Give me just a minute to check
12  my notes, please.
13     Make sure I heard the question correctly.
14  Would you please repeat the question.
15     MR. CORRELL:  I will just ask it again.
16     Q.    Since June of 2008, have you seen any
17  evidence indicating that a release occurred at this
18  site after May of 2000?
19     A.    Yes.
20     Q.    Okay.  What evidence is that?
21     A.    In a report, First Quarter 2010
22  Groundwater Monitoring Report prepared by ARCADIS,
23  the defendants' consultant for Chevron -- I'm sorry,
24  for Unocal Station 5123.  On page 7 of that report it
25  talks about the remediation system ongoing, and it
```

8f6acb2b-e450-48c1-a8ae-a34567a09f14

Page 644

1   makes a statement that -- in the paragraph on page 6,
2   spills onto page 7, it says, "Due to a discharge
3   exceedance report in July 2009, the DEP system was
4   shut down until the exceedance issues are resolved or
5   alternative remedial technology are evaluated for the
6   site."
7        My understanding is that that suggests that
8   there was contamination that had escaped the
9   remediation system itself.
10       Q.   Okay.  When was the site closed as a
11  gas station?
12       MR. MILLER:  Counsel, with all due respect,
13  that's not limited to information gathered since 2008
14  and was covered, in all likelihood, in the prior
15  deposition.
16       THE WITNESS:  I don't know the answer to
17  that question.
18  BY MR. CORRELL:
19       Q.   Okay.  Any other indications that
20  you've seen since June of 2008 that there has been a
21  post May 2000 release of gasoline containing MTBE or
22  TBA at the site?
23       A.   No.
24       Q.   And the release that you referred to
25  there, was it of gasoline containing MTBE or of MTBE

Page 645

1   [sic]?
2        A.   I don't know what the release
3   consisted of, only that there was a release, and it
4   came from the remediation system that is designed to
5   treat for gasoline and those compounds.
6        Q.   When Hargis reviewed the Komex
7   report, was it -- was part of its task to determine
8   whether or not it agreed with the statements
9   contained therein?
10       MR. MILLER:  Vague.  Compound.
11       THE WITNESS:  I don't think we asked them to
12  decide whether they concurred with the statements
13  made by Komex, so much as to provide us with updates
14  or any new information, since Komex had prepared
15  their summary.
16  BY MR. CORRELL:
17       Q.   Did Hargis provide any new
18  information or update related to this site?
19       A.   Nothing in writing.
20       Q.   What did it report orally, if
21  anything?
22       A.   I don't recall.  Only that anything
23  that they reported was not a surprise to me or of
24  significant change.
25       Q.   What remediation activities, if any,

Page 646

1   does the District plan to do at or related to this
2   site in the future?
3        A.   Well, it was going to investigate
4   this site.  What sort of remediation activities
5   remain to be seen, and they will be pertinent or
6   subsequent to our -- at least the initial part of the
7   investigation will make that determination.
8        Q.   Since June of 2008, have you seen any
9   evidence to indicate that contamination has left this
10  site?
11       MR. MILLER:  Ever?  Or since 2008?
12       MR. CORRELL:  Since June 2008.
13       THE WITNESS:  Yes, we've seen some
14  indicators.
15  BY MR. CORRELL:
16       Q.   Since June of 2008?
17       A.   Yes.
18       Q.   Okay.  And what are those indicators,
19  sir?
20       A.   The Water Board has identified -- I'm
21  referring to Water Board Geotracker database, a
22  Geotracker report that I printed out on August 15,
23  2010, in preparation for this deposition -- reports
24  "Impediments to closure, include site access is
25  incomplete by way of the extent of contamination has

Page 647

1   not been determined and potential risk, threats and
2   other environmental concerns have not been adequately
3   identified and assessed."
4        And then for regarding the plume
5   instability, they state that, "Groundwater
6   contamination plume is not stable or not decreasing,
7   and that there is a significant rebound in
8   concentrations after remediation and that
9   verification monitoring is not complete."
10       This indicates to me that contamination is
11  still moving -- still migrating and still escaping
12  the site.
13       MR. CORRELL:  And I'd like to mark as
14  Exhibit No. 43, I believe a copy of that report that
15  we printed out on August 5th.  So a few days -- ten
16  days before you printed it out.
17       (Exhibit No. 43 was marked.)
18  BY MR. CORRELL:
19       Q.   And those statements that you read
20  from the August 15 printout on included in
21  Exhibit 43, correct?
22       A.   Yes, it appears they are the same
23  statements.
24       Q.   And other than the regulators'
25  conclusions there in the Geotracker report, have you

Confidential - Per 2004 MDL 1358 Order

Page 664

REPORTER'S CERTIFICATE

1
2
3      I certify that the witness in the foregoing
4   deposition.
5      DAVID P. BOLIN, VOLUME II, 30(b)(6)
6   was by me duly sworn to testify in the within-entitled
7   cause; that said deposition was taken at the time and
8   place therein named; pages 211 through 492 of the
9   testimony of said witness were reported by me, a duly
10  Certified Shorthand Reporter of the State of
11  California authorized to administer oaths and
12  affirmations, and said testimony was thereafter
13  transcribed into typewriting.
14      I further certify that I am not of counsel or
15  attorney for either or any of the parties to said
16  deposition, nor in any way interested in the outcome
17  of the cause named in said deposition.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  this 24th day of August, 2010.
20
21
22      ----------------------------------
23      SANDRA BUNCH VANDER POL, RMR, CRR
24      Certified Shorthand Reporter
25      Certificate No. 3032

Page 666

ACKNOWLEDGMENT OF DEPONENT

1
2
3   I, _____, do
    hereby certify that I have read the
    foregoing pages, and that the same
4   is a correct transcription of the answers
    given by me to the questions therein
5   propounded, except for the corrections or
    changes in form or substance, if any,
6   noted in the attached Errata Sheet.
7
8   _____    _____
    DAVID P. BOLIN              DATE
9
10
11
12
13
14
15  Subscribed and sworn
    to before me this
    _____ day of _____, 20____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24
25

Page 665

    - - - - - -
     E R R A T A
    - - - - - -
1
2
3   PAGE LINE CHANGE
4   _____
5   REASON: _____
6
7   REASON: _____
8
9   REASON: _____
10
11  REASON: _____
12
13  REASON: _____
14
15  REASON: _____
16
17  REASON: _____
18
19  REASON: _____
20
21  REASON: _____
22
23  REASON: _____
24
25  REASON: _____

Page 667

LAWYER'S NOTES

1
2   PAGE LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25  ____ ____ _____

44 (Pages 664 to 667)

8f6acb2b-e450-48c1-a8ae-a34567a09f14

Page 668

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
In Re:  Methyl Tertiary Butyl Ether  :
("MTBE")                              :    Master File
Products Liability Litigation        :    No. 1:00-1898
                                     :    MDL No. 1358 (SAS)
_____ :    M21-88
                                     :
This document relates to the         :
following case:                      :
                                     :
Orange County Water District v.      :
Unocal Corp., et al., 04 Civ. 4968   :    VOLUME IV
(SAS)                                :    Pages 668-945
_____ :
```

CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)

MONDAY, AUGUST 23, 2010

------

Videotaped Deposition of DAVID P. BOLIN,
Volume IV, Orange County Water District's 30(b)(6)
designee in re Site Specific Station Investigations,
held in the Law Offices of Latham & Watkins, 650 Town
Center Drive, 20th Floor, Costa Mesa, California
beginning at 9:08 a.m.

------

Reported by:
Sandra Bunch VanderPol, CSR #3032
Certified Realtime Reporter
Registered Merit Reporter
Realtime Systems Administrator credentialed
Fellow, Academy of Professional Reporters

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

fb31ed1f-bcb8-416c-a634-4d426ee02a76

Confidential - Per 2004 MDL 1358 Order

Page 685

1    Go ahead.
2    THE WITNESS: Oh, I can't be certain of the
3  frequency. It's occasional. It depends. If there's
4  something of particular interest that I want to
5  follow-up on, or if it comes up in a discussion with
6  regulators, or if there's some other issue that draws
7  my attention, then it might be a couple of days in a
8  row, or several days in a row, or it might be a
9  couple of weeks in a row, or it might be a couple of
10  months in a row.
11  BY MR. ANDERSON:
12    Q.    Is there any way we could figure out
13  how often you're looking at these monitoring reports
14  relating to Unocal 5376?
15    MS. O'REILLY: I'm going to object. It
16  exceeds the scope of the notice.
17    Go ahead.
18    THE WITNESS: I don't know if you're able to
19  figure that out or not.
20  BY MR. ANDERSON:
21    Q.    Do you know of any way in which we
22  could figure it out?
23    MS. O'REILLY: Asked and answered. Exceeds
24  the scope of the notice.
25    THE WITNESS: No.

Page 686

1  BY MR. ANDERSON:
2    Q.    Since the last deposition related to
3  Unocal 5376, what has the District done in terms of
4  this station generally?
5    MS. O'REILLY: Vague. Ambiguous.
6  Overbroad.
7    THE WITNESS: Generally, we have monitored
8  analytical results, that is, chemical results from
9  production wells; and we have looked at the status of
10  contamination in some of the site-specific monitoring
11  wells that comes in the Quarterly Monitoring Reports;
12  we have looked at some correspondence associated with
13  the -- with the site from and to the regulatory
14  community; we have looked at this site and considered
15  it for upcoming groundwater investigation with our
16  consultant.
17  BY MR. ANDERSON:
18    Q.    Anything else?
19    A.    In general terms, I think that covers
20  everything.
21    Q.    And the data that you mentioned is
22  coming from the Orange County Water District
23  production and monitoring wells, as well as the
24  consultant site-specific wells; is that right?
25    A.    Yes. That's what I said.

Page 687

1    Q.    Any other data?
2    A.    I can't think of any.
3    Oh, sorry.
4    Q.    And before I move on, let me -- I
5  know you brought your notes from the last deposition
6  here today, correct?
7    A.    Some of my notes. Not all of them.
8    Q.    And you have also brought the
9  regulatory correspondence, the recent regulatory
10  correspondence you reviewed in preparation for your
11  deposition, correct?
12    A.    Yes.
13    Q.    As well as a map of the -- what looks
14  to be the monitoring wells at this site; is that
15  correct?
16    A.    Yes.
17    Q.    Is that also a plume map that you
18  have in front of you?
19    A.    Yes.
20    Q.    Related to Plume 1?
21    A.    Yes, it is. This is the same plume
22  map that I had in the 2008 deposition.
23    Q.    Have you created any additional notes
24  related to this site since your last deposition?
25    A.    I thought you had asked me that. The

Page 688

1  answer is, no, no additional summary notes. But I
2  have written on the latest groundwater quality
3  monitoring report in preparation for this deposition.
4    Q.    Okay. Let me hand you what's
5  previously been marked as Exhibit 2. This does not
6  have all of the exhibits, but this is your
7  supplemental declaration.
8    A.    Would you care to mark this?
9    Q.    It was previously marked. I was just
10  going to -- is that --
11    A.    I will take your word for it, that is
12  Exhibit 2.
13    Q.    Do you want me to write on it just so
14  you can keep track of it?
15    A.    If you don't mind. If we're going to
16  come back to it, that would be helpful.
17    Q.    Yes. Definitely.
18    A.    Thank you.
19    Q.    Sure.
20    A.    Huh-huh.
21    Q.    Can I get you to turn to paragraph
22  21, which is on page 9.
23    A.    Yes.
24    Q.    And that deals with Unocal 5376,
25  correct, that paragraph?

6 (Pages 685 to 688)

Page 697

1    THE WITNESS: I can't tell you exactly where
2  it is. Again, it may be within the reaches of a
3  potential remediation system at the site. But since
4  there is no additional investigation, no -- doesn't
5  seem to be any apparent plan to try and delineate the
6  contamination, I think it is in the process of
7  escaping the site.
8    MR. ANDERSON: Do you mind if I take a look
9  at your document right there real quick?
10    (Witness handing document to Counsel.)
11    MR. ANDERSON: Thank you.
12    Q.   You also mentioned spikes in BTEX,
13  correct?
14    A.   No, I don't think I did say spikes in
15  BTEX.
16    Q.   Okay. You mentioned several spikes
17  at various compounds, like benzene in this report; do
18  you recall that?
19    A.   There are benzene compounds but not
20  benzene per se.
21    Q.   Got you. Do you know whether or not
22  those compounds are still constituents of gasoline
23  today?
24    A.   No, I don't.
25    Q.   In the original question was evidence

Page 698

1  since June 2008 that MTBE has escaped remediation.
2  And I think that you said that the evidence you were
3  just talking about, in terms of spikes, was actually
4  evidence that you had seen that there is actually a
5  new release since June 2008; is that correct?
6    MS. O'REILLY: Vague.
7    MR. ANDERSON: I just want to make sure I'm
8  on the same page with you.
9    MS. O'REILLY: Vague. Ambiguous. Misstates
10  testimony.
11    Go ahead, David.
12    THE WITNESS: The spikes indicate a -- to me
13  indicate a release. I don't know when the release
14  occurred.
15    BY MR. ANDERSON:
16    Q.   You understand that MTBE has not been
17  in gasoline since 2003, correct?
18    A.   That's right. No, your original
19  question asked me about MTBE. My response said that
20  it wasn't -- the spikes were not in MTBE. That's not
21  what I was referring to.
22    It was one spike in TBA. The other spikes
23  were associated with gasoline compounds, not MTBE.
24  So I was talking about a release of contamination and
25  not necessarily MTBE.

Page 699

1    Q.   Understood. So these additional
2  spikes that you've identified do not indicate a new
3  release of MTBE, correct?
4    A.   Not that I'm aware of.
5    Q.   Has OCWD told the Orange County
6  Health Care Agency that they think there's been a
7  recent release of gasoline?
8    MS. O'REILLY: Vague. Ambiguous.
9    THE WITNESS: Not -- I don't believe we have
10  said that since 2008.
11    BY MR. ANDERSON:
12    Q.   Since 2008, have you told Chevron
13  that you think there's been a new release of
14  gasoline?
15    A.   Yes.
16    Q.   Other than just five minutes ago,
17  have you told Chevron that -- has the District told
18  Chevron that they think there's been a release of
19  gasoline at this site?
20    A.   No.
21    Q.   And has the District told any other
22  regulators since 2008, since June 2008, that they
23  think there's been a release at Unocal 5376?
24    A.   I don't recall seeing that.
25    Q.   Do you know what type of remediation

Page 700

1  is currently occurring at this site?
2    A.   I have to check my notes on that.
3    Q.   Sure.
4    A.   I don't believe there are any active
5  remedial efforts going on at the site right now.
6    Q.   What do you mean by "active remedial
7  efforts"?
8    A.   Well, I'm reading from AECOM's
9  report, again, the quarterly Groundwater Monitoring
10  Report Third Quarter 2009. This was the latest
11  report that was available. If there's new
12  information, then I'm not aware of it. The report is
13  dated October 21st, 2009.
14    But in that report on page -- they don't
15  appear to have their pages numbered, but it looks
16  like it would be page 5, including the cover letter.
17    Under item 7 it starts, "Describe corrective
18  and remedial techniques to be implemented," so on and
19  so forth. And the response here is that, "No active
20  remediation techniques are scheduled, based on
21  current site conditions."
22    Q.   Do you have an understanding of what
23  "active remediation techniques" mean?
24    A.   I believe I do.
25    Q.   What is it?

9 (Pages 697 to 700)

Page 709

1    nearby development.
2        Do you see that?
3        A.   Yes, I do.
4        Q.   Does the District disagree with
5    OCW -- excuse me, OCHCA's determination that soil
6    vapor sampling is not required at this site at this
7    time?
8        MS. O'REILLY: Lacks foundation. Calls for
9    speculation. Calls for expert opinion. There's no
10   information concerning the soil vapor survey or the
11   purpose of the reason why Orange County Health Care
12   did not require it. Vague. Ambiguous. Overbroad.
13   And exceeds the scope of the notice.
14       THE WITNESS: Would you repeat the question
15   one more time, please.
16       (Record read as follows: QUESTION: Does
17   the District agree [sic] with OCHCA's determination
18   that soil vapor sampling is not required at this site
19   at this time?)
20       MR. ANDERSON: That wasn't correct. It was
21   actually "Does the District disagree...."
22       THE REPORTER: Do you want to repeat it,
23   then.
24   BY MR. ANDERSON:
25       Q.   Does the District disagree with

Page 710

1    OCHCA's determination that soil vapor sampling is not
2    required at this site at this time?
3        MS. O'REILLY: Same objections.
4        THE WITNESS: I don't have an opinion either
5    way. I'm not sure why the Health Care Agency decided
6    it wasn't required at this time. They don't comment
7    on whether it's required or encouraged, and they
8    don't comment on why they made that decision at this
9    time. So I don't have an opinion.
10   BY MR. ANDERSON:
11       Q.   Well, it says it's not going to be
12   required at this time based on the current site use
13   and proximity of nearby development, correct?
14       A.   It does, but I don't --
15       MS. O'REILLY: The document speaks for
16   itself.
17       THE WITNESS: I am sorry.
18       MS. O'REILLY: Go ahead.
19       THE WITNESS: I don't know what that means.
20   BY MR. ANDERSON:
21       Q.   That doesn't indicate to you what
22   OCHCA's reason was for not requiring the soil vapor
23   sampling?
24       MS. O'REILLY: Vague. Ambiguous.
25   Overbroad. Calls for speculation. Lacks foundation.

Page 711

1        You haven't given him a copy of the survey
2    or any other correspondence.
3        Go ahead.
4        THE WITNESS: It tells me that whatever
5    their basis is, it is somewhat -- somehow connected
6    to the proximity of nearby development greater than
7    100 feet. But that doesn't tell me why they decided
8    the soil vapor survey's not required at this time.
9    BY MR. ANDERSON:
10       Q.   Has the District had any
11   communications with the Orange County Health Care
12   Agency regarding the soil vapor -- or potential soil
13   vapor sampling at this site?
14       A.   No.
15       Q.   Has the District had any contact with
16   OCHCA since June 2008 relating to this station, that
17   you know of?
18       A.   I can't be certain, but I don't
19   recall -- let me think. I don't recall any for
20   certain.
21       Q.   Do you recall any contact with DHS
22   since June 2008 related to this station?
23       A.   No.
24       Q.   Any contact with the Regional Board
25   since June 2008 related to this station?

Page 712

1        A.   No, I don't think so.
2        MR. ANDERSON: I will mark Exhibit 50.
3        (Exhibit No. 50 was marked.)
4    BY MR. ANDERSON:
5        Q.   Exhibit 50 is a Hargis + Associates
6    Inc. Site Summary for Unocal 5376.
7        Have you seen this document before?
8        A.   Yes.
9        Q.   I believe that certain Hargis +
10   Associates Site Summaries contain a date in the lower
11   left-hand corner. This one does not contain such a
12   date.
13       Do you know -- do you recall when you --
14   approximately when you first saw this?
15       A.   No, I don't.
16       Q.   Do you know if it was in the February
17   2009 time frame, when you saw the other Hargis
18   reports?
19       A.   Let me make sure I understood your
20   question.
21       You're asking me when I saw other Hargis
22   reports.
23       Q.   No. My understanding from prior
24   depositions is you saw a first round of Hargis
25   reports in February 2009. And I was wondering if

12 (Pages 709 to 712)

Confidential - Per 2004 MDL 1358 Order

Page 713

1  that refreshed your recollection that this is about
2  the same time that you saw this one?
3      A.    No, it does not.
4      Q.    Do you know when Hargis prepared this
5  report?
6      A.    No, I don't.
7      Q.    On page 24 -- 404248. It has a
8  history of releases. Do you see that?
9      A.    There is a box at the top of the page
10 titled, "Releases."
11     Q.    And what do you understand that box
12 to contain?
13     A.    They are a list of dates. It appears
14 to be a list of dates at the time that releases were
15 detected. It looks like gasoline releases.
16     Q.    Do you see any gasoline releases
17 listed in that box after May 2000?
18     A.    No.
19     Q.    Did you talk with Hargis about this
20 report when you received it?
21     A.    I don't recall specifically. I would
22 say probably, but I can't recall anything specific.
23     Q.    Do you recall speaking with any other
24 regulators about this report?
25     MS. O'REILLY: Asked and answered.

Page 714

1      THE WITNESS: No, not about this report.
2  BY MR. ANDERSON:
3      Q.    Do you recall any internal
4  discussions at the District about this particular
5  report?
6      A.    No, I don't.
7      Q.    On page 11 of the report. Are you
8  there?
9      A.    Huh-huh.
10     Q.    There's a -- it says, "Pathway
11 analysis." Do you see that?
12     A.    At the heading of the page, yes.
13     Q.    Since OCWD has received this report,
14 has it done anything to investigate the potential
15 pathways related to the MTBE contamination at this
16 site?
17     MS. O'REILLY: Vague. Ambiguous.
18 Overbroad. Calls for expert opinion. Exceeds the
19 scope of the notice.
20     THE WITNESS: District staff and District's
21 consultant have not conducted detailed or specific
22 pathway analysis of this site. Any additional
23 discussion or work on the pathway analysis for this
24 site, I believe, is protected by the attorney-client
25 privilege.

Page 715

1  BY MR. ANDERSON:
2      Q.    Okay. Does the District currently --
3  scratch that question.
4      What type of cost has OCWD incurred since
5  June 2008 related to this site?
6      MS. O'REILLY: Vague. Ambiguous.
7  Overbroad. Exceeds the scope of the notice. I
8  believe this deposition notice is focused on cost.
9  That deposition was already done with Mr. Herndon.
10     Go ahead.
11 BY MR. ANDERSON:
12     Q.    And if I can just be clear for the
13 record. I know in the past depositions you've
14 testified to this, and I know that there's been a lot
15 of back and forth about you not knowing specific --
16 the specific costs incurred.
17     So in the past depositions there would be
18 kind of an agreement that you would talk about the
19 general types of costs. And that was my question.
20 So with that framing the question, I will ask this
21 question again.
22     What type of -- what type or types of costs
23 has OCWD incurred since June 2008 related to this
24 site?
25     A.    The cost --

Page 716

1      MS. O'REILLY: Same objections.
2      THE WITNESS: The costs associated with this
3  site are substantially the same as the costs
4  associated with the other sites. In general terms,
5  District staff's labor in evaluating this site and
6  data associated with this site and the general
7  proximity to this site, this plume, Plume 1. Also
8  consultant's time in evaluating various sites in
9  anticipation or at the request of the District for
10 this next round of investigation.
11 BY MR. ANDERSON:
12     Q.    And the only consultant's time you're
13 referring to is Hargis; is that correct?
14     A.    Yes.
15     Q.    And if I understand your prior
16 testimony correctly, just to speed things along here,
17 the District has not specifically segregated its
18 staff time and data collection time to any particular
19 site in the plume; is that correct?
20     A.    That's correct.
21     Q.    And the same thing with the
22 consultant time, it's not specifically allotted to
23 one of the stations?
24     A.    That's correct.
25     Q.    Okay. The District hasn't incurred

13 (Pages 713 to 716)

fb31ed1f-bcb8-416c-a634-4d426ee02a76

Confidential - Per 2004 MDL 1358 Order

Page 717

1  any additional Komex cost attributable to the site
2  since June 2008?
3      A.   No.
4      Q.   The same for H2O, Komex H2O, there's a
5  slight difference, no additional cost?
6      A.   No.
7      Q.   Any Friedman & Bruya costs
8  attributable to this site since 2008?
9      A.   Since 2008.
10      Q.   And do you know whether or not
11  there's been any expenditures out of the toxic
12  reserve fund related to this site since June 2008?
13      A.   I think there has. This question has
14  been asked of me before. And my understanding of the
15  District's accounting, which funds or accounts it
16  pays for its services and the staff's time, is not
17  entirely clear to me. I think it has been, but I --
18  I don't know for sure.
19      Q.   Do you know if any expenditures
20  related to this site have been approved by the Orange
21  County Water District Board of Directors to deal with
22  the contamination at this site?
23      A.   I'm not sure about your question. If
24  you're asking me whether expenditures were approved
25  by the District with this site in mind, specific to

Page 718

1  this site, the answer is, no, because we don't
2  prevent -- we don't present site specifics to the
3  Board. That's beyond their information. It's beyond
4  their involvement.
5      However, they do recognize the District is
6  working on a variety of sites, and the choice of
7  those sites and the expenditures of funds on one site
8  versus another is left to the staff.
9      So if you're asking me did the Board of
10  Directors approve expenditures that happen to include
11  this site, yes.
12      Q.   And what expenditures would that be,
13  if you know?
14      MS. O'REILLY:  Asked and answered.
15      Go ahead.
16      THE WITNESS:  Actually, the expenditures
17  themselves, I believe, were covered in Mr. Herndon's
18  testimony.
19  BY MR. ANDERSON:
20      Q.   I just wanted to make sure we're on
21  the same page. Are the only expenditures you're
22  referring to are Hargis expenditures that the Board
23  has approved, where this site could be included in
24  the overall scope of work that Hargis is doing?
25      A.   No.

Page 719

1      Q.   What else?
2      A.   There's staff time and -- there is
3  additional testing that -- that we're doing, not
4  specific to the site so much as associated with the
5  plume. We are going to be doing some additional --
6  our water quality staff, for example, does routine
7  sampling and testing, our laboratory does routine
8  testing of those samples for wells throughout the
9  basin.
10      Q.   And it would do that testing
11  regardless of whether or not this site existed,
12  correct?
13      MS. O'REILLY:  Vague. Ambiguous.
14  Overbroad. Exceeds the scope of the notice. Lacks
15  foundation. Calls for speculation.
16      MR. ANDERSON:  And let me back up.
17      Q.   The water quality staff would do its
18  routine sampling and testing throughout the basin
19  regardless of this site, correct?
20      MS. O'REILLY:  Same objections.
21      THE WITNESS:  Yes, it would.
22  BY MR. ANDERSON:
23      Q.   Okay. What evidence does the
24  District have that MTBE from this station has reached
25  a production well since June 2008?

Page 720

1      A.   If you're asking me is there any new
2  evidence of the -- since 2008 that MTBE has reached a
3  nearby production well, the answer is no.
4      Q.   Is there any new evidence that MTBE
5  from this station threatens a production well since
6  June 2008?
7      MS. O'REILLY:  Vague. Ambiguous.
8  Overbroad.
9      Go ahead.
10      THE WITNESS:  Not MTBE.
11  BY MR. ANDERSON:
12      Q.   TBA?
13      MS. O'REILLY:  Same objections.
14      THE WITNESS:  I believe there is.
15  BY MR. ANDERSON:
16      Q.   Is that what we were talking about
17  earlier, that one spike in TBA you had noted?
18      A.   Yes.
19      Q.   TAME?
20      MS. O'REILLY:  Same objections.
21      THE WITNESS:  If you don't mind, I will have
22  to check my notes on that.
23      MR. ANDERSON:  Sure.
24      (Witness reviewing document.)
25      THE WITNESS:  I don't have any new evidence

14  (Pages 717 to 720)

fb31ed1f-bcb8-416c-a634-4d426ee02a76

Confidential - Per 2004 MDL 1358 Order

Page 729

1    Q.    Despite all my paper, I don't know
2  that I have a list of all the stations.
3    A.    Yes.  In -- I think I recall in Plume
4  9 there were -- and my problem is that the names kind
5  of run together.  I'm having difficulty, without my
6  notes in front of me, remembering all the details
7  about one station versus another.
8         But I believe the stations identified
9  include, but are not limited to, Chevron 9-5401,
10 Huntington Beach ARCO, Thrifty 368.  There's probably
11 several others.  I just -- honestly, I just can't
12 recall.
13   Q.    Any others in the other plumes, or do
14 you have -- I don't know what you're looking at right
15 there.  Is that a plume list?
16   A.    It is a plume list for the five
17 designated plumes that we're discussing today and
18 which stations are associated with which plumes.
19   Q.    Okay.  And other than those three you
20 mentioned, you just can't recall which other ones you
21 might have suggested?
22   A.    I honestly just can't recall.
23   Q.    Okay.  I hand you what was previously
24 marked Exhibit 6 to, I believe, this deposition and
25 Exhibit 50 to Mr. Herndon's deposition.

Page 730

1    A.    I recognize this.
2    Q.    You have seen it before a few times,
3  huh?
4    A.    A couple.
5    Q.    This is an Investigation/Remediation
6  Activity Outline that was used in the 2008
7  depositions.  Do you recall that?
8    A.    Yes.
9    Q.    I will just go through a few things
10 on here.  Has the District performed any fate and
11 transport analysis related specifically to Unocal
12 5376?
13   A.    The District's staff and the
14 District's consultant have not conducted fate and
15 transport analyses specific to this site.  However, I
16 cannot discuss -- I can't discuss whether any other
17 entities have performed or are performing a fate and
18 transport analysis, because I believe it's covered by
19 the attorney-client privilege.
20   Q.    Has the District or its -- similar
21 question, but for capture zone analysis.  Has the
22 District performed any capture analysis related --
23 excuse me, related specifically to Unocal 5376,
24 putting aside any attorney-client privileged --
25   MS. O'REILLY:  Since 2008?

Page 731

1    MR. ANDERSON:  Yes.  Since June 2008.
2    THE WITNESS:  My answer is substantially the
3  same, with the exception of evaluating the -- the
4  ongoing remedial efforts at the site.  It's more than
5  apparent to me.
6         It's obvious to me that current remedial
7  efforts at the site have nothing to do with
8  contaminant -- capturing or containing the
9  contamination.
10 BY MR. ANDERSON:
11   Q.    Has the District itself performed any
12 active remediation at this site since June 2008?
13   MS. O'REILLY:  At the station?
14   MR. ANDERSON:  Right.  At this station.
15   THE WITNESS:  No.  Well, I'm sorry.
16        All investigation or remedial effort
17 includes investigation.  Investigation is part of the
18 remedial process.  So, in general terms, the
19 District's ongoing investigation efforts are part of
20 an overall remediation program.
21        If you're asking me specifically if the
22 District has removed any molecules of contamination
23 at the site since 2008, the answer is no.
24 BY MR. ANDERSON:
25   Q.    I think your answer to this is going

Page 732

1  to be the same as it's been to the other questions,
2  but I was a little bit confused in reading the
3  transcript.  And this deals with nuisance and
4  trespass.
5         And when asked what does the District
6  contends creates a nuisance at this site, you were
7  referred to some interrogatory responses.  Do you
8  recall that?
9    A.    Yes.
10   Q.    Were those the interrogatory
11 responses to the third through eighth set of
12 interrogatories; do you recall?
13   A.    I recall a response.  But what I
14 don't recall is which document amongst the mountain
15 of paperwork it is.  I just don't remember which one.
16   Q.    Okay.  This has previously been
17 marked Exhibit 36.  And I think this is it.  I just
18 want -- I believe you testified that the description
19 began at page 27.
20        Does that look familiar to you?
21   A.    It all looks familiar to me.
22        If you don't mind, if I may check my notes.
23   Q.    Sure.
24   A.    Let's see.  Third, fourth, fifth,
25 sixth, seventh and eighth set of interrogatories.  I

17  (Pages 729 to 732)

fb31ed1f-bcb8-416c-a634-4d426ee02a76

Confidential - Per 2004 MDL 1358 Order

Page 941

```
 1        MS. O'REILLY:  Vague.  Ambiguous.
 2   Overbroad.  Misstates testimony.
 3        Go ahead.
 4        THE WITNESS:  I think you've asked me that
 5   question, because what you just described are
 6   components of fate and transport analysis.  And I
 7   already said that District staff and District's hired
 8   consultant has not completed fate and transport
 9   analysis since 2008.
10        MS. O'REILLY:  It's 5:59.
11        MR. PARKER:  I think I'm done.
12        THE VIDEOGRAPHER:  We are off the record at
13   6:02 p.m.  And this marks the end of this deposition.
14        (The deposition was concluded on this day at
15   6:02 p.m.)
16        --o0o--
17
18
19
20
21
22
23
24
25
```

Page 943

```
 1   - - - - - -
     E R R A T A
 2   - - - - - -
 3   PAGE  LINE  CHANGE
 4   _____
 5   REASON: _____
 6   _____
 7   REASON: _____
 8   _____
 9   REASON: _____
10   _____
11   REASON: _____
12   _____
13   REASON: _____
14   _____
15   REASON: _____
16   _____
17   REASON: _____
18   _____
19   REASON: _____
20   _____
21   REASON: _____
22   _____
23   REASON: _____
24   _____
25   REASON: _____
```

Page 942

```
 1        REPORTER'S CERTIFICATE
 2
 3        I certify that the witness in the foregoing
 4   deposition.
 5        DAVID P. BOLIN
 6   was by me duly sworn to testify in the within-entitled
 7   cause; that said deposition was taken at the time and
 8   place therein named; pages 665 through 940 of the
 9   testimony of said witness were reported by me, a duly
10   Certified Shorthand Reporter of the State of
11   California authorized to administer oaths and
12   affirmations, and said testimony was thereafter
13   transcribed into typewriting.
14        I further certify that I am not of counsel or
15   attorney for either or any of the parties to said
16   deposition, nor in any way interested in the outcome
17   of the cause named in said deposition.
18        IN WITNESS WHEREOF, I have hereunto set my hand
19   this 29th day of August, 2010.
20
21
22   ----------------------------------
23   SANDRA BUNCH VANDER POL, RMR, CRR
24   Certified Shorthand Reporter
25   Certificate No. 3032
```

Page 944

```
 1   ACKNOWLEDGMENT OF DEPONENT
 2
          I, _____, do
 3   hereby certify that I have read the
     foregoing pages, and that the same
 4   is a correct transcription of the answers
     given by me to the questions therein
 5   propounded, except for the corrections or
     changes in form or substance, if any,
 6   noted in the attached Errata Sheet.
 7
 8   _____
     DAVID P. BOLIN            DATE
 9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires: _____
17
18   _____
     Notary Public
19
20
21
22
23
24
25
```

Confidential - Per 2004 MDL 1358 Order

Page 945

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re:  Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | : : : : : | Master File No. 1:00-1898 MDL No. 1358 (SAS) M21-88 |
| This document relates to the following case: | : : : | |
| Orange County Water District v. Unocal Corp., et al., 04 Civ. 4968 (SAS) | : : : : | VOLUME V  Pages 945 - 1207 |

CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)

- - - - -

AUGUST 26, 2010

- - - - -

Videotaped Deposition of DAVID P. BOLIN,

Volume V, Orange County Water District's 30(b)(6)

designee in re Site Specific Station Investigations,

held at 650 Town Center Drive, 4th Floor, Costa Mesa,

California, commencing at 9:04 a.m., on the above date,

before Kimberly S. Thrall, a Registered Professional

Reporter and Certified Shorthand Reporter.

Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com