Confidential - Per 2004 MDL 1358 Order

Page 1082

1    Q. But you have spoken to the District's
2  counsel --
3    A. Yes.
4    Q. -- about those, right?
5    A. Yes.
6    Q. How much time have you spent talking to the
7  District's counsel in preparation for your deposition on
8  Station 18-JMY?
9      MS. O'REILLY: Lacks foundation. Assumes
10 facts.
11     Go ahead.
12     THE WITNESS: For today's deposition, I -- I
13 couldn't -- I can't be certain. Not a lot of time -- 15
14 minutes, 30 minutes, maybe less.
15 BY MR. PARKER:
16   Q. Has Komex, Hargis, or any other consultants on
17 behalf of the District done any work or analysis on
18 Station 18-JMY since your deposition in 2008?
19   A. Yes.
20   Q. Who?
21   A. Hargis has done some work on this station.
22   Q. Okay. Generally, describe what work Hargis has
23 done.
24     MS. O'REILLY: Overbroad.
25     Go ahead.

Page 1083

1      THE WITNESS: Hargis reviewed Komex's work, and
2  they have looked at this site in consideration of the
3  upcoming CPT investigation.
4  BY MR PARKER:
5    Q. And this is one of the sites at which they're
6  planning to do some of the CPT work, correct?
7    A. Yes, I believe that's correct.
8    Q. Did Hargis do any physical work on or in the
9  vicinity of 18-JMY?
10   A. Yes.
11   Q. What work?
12   A. They located the proposed CPT test locations.
13   Q. "Located" meaning went out and painted the
14 locations where they're to go?
15   A. I believe they went out and marked the area to
16 get a utility clearance that's required to con- --
17 notify or contact DigAlert for buried utilities in the
18 area. DigAlert will send out utility contractor or
19 utility owners to verify whether the proposed test
20 location is going to impact any buried utilities.
21   Q. To do that don't they spray paint where they're
22 going to do the borings or mark them somehow on the
23 ground?
24   A. Commonly, but not always. Sometimes they just
25 make appointments with the -- with the contractors who

Page 1084

1  will meet them out there at the site.
2    Q. Okay. Other than Hargis reviewing the Komex
3  report and going out to locate the CPT boring locations,
4  has there been any other work that Hargis has done on
5  18-JMY?
6    A. Well, they evaluated the site for the purpose
7  of including it in the upcoming CPT investigation. If
8  you intended to include that in your question, then no.
9    Q. And by "evaluated," you mean they went through
10 their process of applying whatever criteria they apply
11 to determine whether it would be included or not
12 included in the scopes of work submitted to the
13 District, right?
14     MS. O'REILLY: Compound. Overbroad.
15     THE WITNESS: In general terms, I think that
16 might be correct. They -- they reviewed their previous
17 work about the site and then considered that site along
18 with other sites and then selected it for the upcoming
19 CPT investigation.
20 BY MR. PARKER:
21   Q. You said "they reviewed their previous work."
22 What previous work were you referring to?
23   A. They looked at their prior evaluation. They
24 had already reviewed Komex's work on this site. They
25 probably went back and looked at their file information

Page 1085

1  to see if there was anything different or new or
2  substantial that might affect, you know, their decision
3  to select this one for the investigation.
4    Q. Do you know that happened, or you're presuming
5  that happened?
6    A. Well, we -- we asked them to. I am presuming
7  that happened.
8    Q. Other than locating the CPT boring locations,
9  is there any physical work that Hargis did with respect
10 to 18-JMY such as, for instance, doing any HydroPunches,
11 CPT probes, monitoring wells, excavation, anything else?
12   A. Not that I'm aware of.
13   Q. Hargis did not do a report or assessment on
14 this 18-JMY site, correct?
15   A. I believe they did an assessment, but there is
16 no written document. They don't have a separate report,
17 if that's what you're asking me.
18   Q. Is this the assessment, whatever assessment
19 they've done, memorialized in writing anywhere?
20   A. No. Their evaluation -- they evaluated Komex's
21 work and then reported back to us orally. I don't
22 recall any particular results from that report.
23   Q. What person from Hargis gave you this oral
24 report on Site 18-JMY?
25   A. It would have been Chris Ross.

36 (Pages 1082 to 1085)

adf74290-4692-4737-965e-f0afd9a581a4

Confidential - Per 2004 MDL 1358 Order

Page 1086

1    Q.  Did Chris Ross give you the report on all the
2  sites?  Is that why you say it would have been Chris
3  Ross?
4    A.  Yes.  He is not the only person at Hargis that
5  has worked on this work for the District, but he has
6  been essentially the only person that we've communicated
7  with.
8    Q.  Other than the materials you looked at for
9  today's deposition and the discussions you've had with
10  Hargis for their assessment of 8 -- whether to pick
11  18-JMY as one of the sites for further work, has the
12  District taken any other actions regarding site 18-JMY
13  since your last deposition?
14    A.  I don't know what you mean "by any other
15  actions."
16    Q.  Has it done anything?
17    A.  Yes.
18    Q.  What?
19    A.  We have monitored data that's been available
20  on -- from the Mobil's consultant regarding their work
21  at this site.  We have been monitoring for MTBE in
22  production wells in the proximity of the site, just like
23  the rest of the basin.
24      We worked with our consultant, Hargis, to
25  determine which sites were going to be included in the

Page 1087

1  upcoming investigation.
2    Q.  Now, when you said you monitored data from
3  Mobil's consultant, what specifically are you referring
4  to?  What data?
5    A.  Analytical data and groundwater elevation data,
6  and then any information regarding ongoing remedial
7  activities and correspondence with regulatory agencies.
8    Q.  Is there any data in -- that you specifically
9  recall looking at or are you saying that generally
10  you've done this on this site and the others involved in
11  the litigation?
12    A.  That's correct.
13      MS. O'REILLY:  Vague and ambiguous.
14      Go ahead.
15      THE WITNESS:  That's correct.
16  BY MR. PARKER:
17    Q.  So the latter, meaning you generally followed
18  the data on all the sites involved in the litigation?
19    A.  No.  I didn't say that I followed all of the
20  data.  I said that we generally monitor information that
21  becomes available about this site.  Whether it's all the
22  data, I don't know.
23    Q.  So, sitting here today, can you specifically
24  tell me what data you looked at?
25    A.  I can't give you a better answer than I already

Page 1088

1  have.
2    Q.  Has the District done any physical sampling,
3  testing or remediation on or in the vicinity of 18-JMY
4  since your last deposition?
5    A.  It depends on what you mean by "vicinity."
6    Q.  Well, your plume maps show, quarter, half,
7  1-mile and 2-mile radii around the site.  So let's --
8  let's pick the 1 mile.
9    A.  Yes.
10    Q.  Okay.  What work?
11    A.  We sampled production wells and tested those
12  production wells for the presence of MTBE.
13    Q.  Which production wells did you sample and test
14  for the presence of MTBE?
15    A.  All of them.
16    Q.  Were there any detections of MTBE in any of
17  them that you sampled since your deposition in 2008?
18    A.  I can't recall.
19    Q.  Are you -- sorry.
20    A.  I believe -- I believe so, but I can't recall.
21    Q.  Were there detections in any drinking water
22  wells within the District since June 2008?  By
23  "detections," I mean detections of MTBE or TBA.
24    A.  I -- I can't recall for certain.
25    Q.  Are there any detections of MTBE or TBA in any

Page 1089

1  drinking water well since June of 2008 that you
2  attribute to Mobil Station 18-JMY?
3      MS. O'REILLY:  Calls for expert opinion.
4  Exceeds the scope of the notice.
5      THE WITNESS:  I can't recall for certain
6  whether there were detections.  But whether there were,
7  we have not attributed those detections to any specific
8  sites as yet.
9  BY MR. PARKER:
10    Q.  So even if one of the wells in a half-mile or
11  1-mile or 2-mile radius of 18-JMY had a detection, the
12  District has not attributed that to 18-J -- 18-JMY or
13  any other source, correct?
14      MS. O'REILLY:  Misstates testimony.
15      Go ahead.
16      THE WITNESS:  We haven't yet completed our
17  analysis to identify specific sources for the detections
18  that we know about.  We know that this site is -- we
19  believe it's upgradient and that it is a likely source,
20  but we haven't been able to pinpoint the source of those
21  detections as yet.
22    Q.  Upgradient of which well?
23    A.  Well, it's upgradient of a number of wells.
24  But the wells in which we've had detections are MW --
25  I'm sorry -- MCWD-3B, MCWD-5, MCWD-7, and I believe

37 (Pages 1086 to 1089)

adf74290-4692-4737-965e-f0afd9a581a4

Confidential - Per 2004 MDL 1358 Order

Page 1090

1  MCWD-13, I believe had a detection, and MCWD-8 -- I'm
2  sorry. Not MCWD-13, IRWD-13 and MCWD-8.
3      Q.  What is the gradient direction in the aquifer
4  from which those MCWD wells draw water?
5          MS. O'REILLY:  Calls for expert opinion.  Vague
6  and ambiguous.  Exceeds the scope of the notice.
7          THE WITNESS:  It depends on what level in the
8  groundwater you're talking about.
9  BY MR. PARKER:
10     Q.  Well, the level at which they draw water.
11     A.  These wells are screened across long intervals.
12 And so the gradient at any particular point in that
13 interval may be different than any other particular
14 point in that interval.
15     Q.  Do you know what the screen locations are on
16 the MCWD Wells -3B, -5 and -7?
17     A.  No, I don't, not as I sit here.
18     Q.  Do you know what aquifer MCWD Wells -3B, -5,
19 -7, or -8 are in?
20     A.  They are at least -- I believe they are at
21 least, in part, in the principal aquifer, and I believe
22 they are, in part, in the deep aquifer, but I can't be
23 certain.
24     Q.  Is the deep above or below the principal?
25     A.  The deep is below the principal.

Page 1091

1      Q.  Have you had any discussions with anyone from
2  the regulatory agency or agencies that are overseeing
3  the remediation at Station 18-JMY regarding the work
4  that is being done or that you believe should be done at
5  that station?
6          MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
7          THE WITNESS:  I don't recall -- I don't recall
8  any such discussions since 2008.
9  BY MR. PARKER:
10     Q.  Since 2008, no one from the Orange County Water
11 District has told or suggested to any agency what
12 investigative or remedial work the District believes
13 should be done at 18-JMY, correct?
14         MS. O'REILLY:  Overbroad.
15         THE WITNESS:  That's -- that was not my
16 response.  My response is that I don't recall any such
17 discussions with the regulatory community.
18 BY MR. PARKER:
19     Q.  Well, as the person most -- as the person
20 designated by the District to speak on this topic, are
21 you able to identify any such conversation with any
22 regulator with oversight authority over 18-JMY regarding
23 what investigation or remediation the District believes
24 should be taken at that site?
25     A.  Again, I -- as I said, I don't recall any such

Page 1092

1  discussion with the regulatory community on this site
2  since 2008.
3      Q.  I understand that.  And by you saying "I don't
4  recall," I take that to mean that you personally don't
5  recall.  That's why my question is broader.  You are
6  here as the designee of the entity to testify as to all
7  communications that the entity, Orange County Water
8  District, has had.  That's why I'm asking.  I don't want
9  an opening here where you don't personally know of it,
10 but that I later find that some conversation has taken
11 place.
12         So that's the reason -- I'm not repeating the
13 same question to you.  And I -- I heard your answer that
14 says you don't recall.  I'm trying to find out if there
15 was any other communication.
16         MS. O'REILLY:  And I'm going to object.
17 Argumentative.  Misstates testimony and inaccurate.
18 Go ahead.
19         THE WITNESS:  I think you're asking me is it
20 possible there's a conversation that I don't remember.
21 And I'm telling you I don't recall any such
22 conversation.  I don't think that anybody else had a
23 conversation.  I don't recall any conversation I had.  I
24 don't recall any conversation with the regulatory
25 community.

Page 1093

1  BY MR. PARKER:
2      Q.  So as far as you know, as the designee of the
3  District testifying on this topic, no such conversation
4  occurred; is that right?
5      A.  As far as I know, no such conversation
6  occurred.
7      Q.  That may be vague.  I will restate it.
8          As the designated representative of Orange
9  County Water District to discuss the topic of
10 communications between the District, which means any
11 person acting on behalf of the District, and any
12 regulator, including without limitations, the Santa Ana
13 Regional Water Quality Control Board, California
14 Department of Health Services, the Orange County Health
15 Care Agency, concerning Station 18-JMY, are you able to
16 identify any conversation that occurred related to the
17 investigation at 18-JMY or remedial actions the District
18 thinks should be taken at -JMY?
19     A.  I don't know of any.
20     Q.  What did you do in preparation for today's
21 deposition to determine what communications the District
22 had with any regulator regarding Station 18-JMY or MTBE
23 Plume No. 2 as identified by the District?
24     A.  I looked at the District files, and I looked at
25 my e-mail and any other correspondence I could put my

38 (Pages 1090 to 1093)

adf74290-4692-4737-965e-f0afd9a581a4

Confidential - Per 2004 MDL 1358 Order

Page 1094

1  hands on.
2      Q.  So those are things you reviewed in preparation
3  for today's deposition?
4      A.  Yes.
5      Q.  Aside from what's listed in the letter stating
6  what you'd reviewed and the stuff you brought today and
7  went through the list of what you reviewed?
8      A.  That's correct.
9      Q.  Okay.  When you say the "District's files,"
10 what District files did you review?
11     A.  There is a file that we keep on this station.
12 I call that the District files.
13     Q.  How long ago did you review the District's file
14 on Station 18-JMY?
15     A.  Yesterday or the day before.
16     MR. PARKER:  Ms. O'Reilly, with respect to the
17 deposition notice and the disclosure letter stating what
18 the witness was reviewing, we obviously are entitled to
19 know specifically what the witness has reviewed in
20 preparation for his deposition.  And the letter is
21 deficient in the respect that it does not state he
22 reviewed anything other than three items listed plus
23 GeoTracker.  And the witness has identified a few more
24 things.
25     MS. O'REILLY:  I think the witness has already

Page 1095

1  told you what he's reviewed at the beginning of the
2  deposition today.  The file is the same documents that
3  he's described at the beginning of his deposition today
4  that were produced to you for his last deposition and
5  were part of his binder in his last deposition.
6      MR. PARKER:  Well, you're saying that right
7  now.  That's not what he said.
8      MS. O'REILLY:  Well --
9      MR. PARKER:  He said he's has got a file
10 related to this station.
11     MS. O'REILLY:  And that file was produced to
12 you as part of his last deposition and what he -- what
13 he described to you this morning.  Any additional
14 documents that he's been provided for this deposition
15 are described in Mr. Schmidt's letter.
16 BY MR. PARKER:
17     Q.  Mr. Bolin, is there any communication that you
18 looked at?  You mentioned you looked at your e-mails.
19     A.  Yes.
20     Q.  Are there any e-mails related to this station
21 dated after your deposition from 2008?
22     MS. O'REILLY:  And I'm going to object.  You
23 can identify e-mails, nonprivileged e-mails.
24     THE WITNESS:  I did not identify any
25 nonprivileged e-mails.

Page 1096

1  BY MR. PARKER:
2      Q.  Are there privileged e-mails?
3      A.  I have had communication with the District's
4  counsel.
5      Q.  Regarding Site 18-JMY?
6      A.  Probably did.
7      Q.  In preparation for your deposition, did you
8  review any e-mails that you have had to or from the
9  District's counsel that related in any way to 18-JMY or
10 MTBE Plume No. 2?
11     MS. O'REILLY:  I'm going to instruct the
12 witness not to answer.  You've asked the question.  The
13 answer asked for substantive information and assumes
14 that the e-mails contain information, factual
15 information.  I'm going to instruct the witness not to
16 answer.  You've asked him if he's communicated with us
17 on 18-JMY.  He's answered "yes."
18     MR. PARKER:  He already said he did.  And that
19 doesn't reveal the privileged substance of any
20 communication.
21     MS. O'REILLY:  And simply because I -- yes, it
22 does.  And simply because he's communicated with us on
23 18-JMY does not make those communications disclosed --
24 disclosable.
25     MR. PARKER:  I didn't -- I'm not asking him to

Page 1097

1  disclose the communications.  I'm asking him to
2  establish -- actually, if the court reporter would
3  please reread the question I asked.
4      THE COURT REPORTER:  The question is:
5      (The following record was read by the reporter:
6      "Q.  In preparation for your deposition,
7  did you review any e-mails that you had had to
8  or from the District's counsel that related in
9  any way to 18-JMY or to MTBE Plume No. 2?")
10     MS. O'REILLY:  You're asking the substance.
11     MR. PARKER:  No.  That's a topic.  That's not a
12 substance.
13     MS. O'REILLY:  I --
14     MR. PARKER:  That's not -- there's no
15 substantive content one way or the other.
16     MS. O'REILLY:  I dis- -- I disagree.  You're
17 asking him if -- you're asking him if the substance of
18 the conversation, was it about 18-JMY or Plume No. 2.
19 You're also asking if he reviewed it to prepare for his
20 deposition, which is also a substantive question.
21     MR PARKER:  You're not allowing him to
22 establish on the record what would be necessary to
23 determine whether there's even a privileged
24 communication at issue.
25     MS. O'REILLY:  A communication between

39 (Pages 1094 to 1097)

adf74290-4692-4737-965e-f0afd9a581a4

Confidential - Per 2004 MDL 1358 Order

Page 1098

1  counsel -- between the District's counsel and Mr. Bolin
2  is privileged.
3      MR. PARKER: If Mr. Bolin reviewed it in
4  preparation for this deposition?
5      MS. O'REILLY: Absolutely not. Absolutely not.
6      MR. PARKER: Absolutely not what?
7      MS. O'REILLY: If he reviews a communication
8  from me to him in relation to this deposition, that does
9  not make it nonprivileged. And that's absolutely wrong.
10     MR. PARKER: Well, unless we establish what he
11 reviewed and the extent to which he reviewed it and
12 relied on it for this deposition, that's where the
13 dividing line is in privilege --
14     MS. O'REILLY: I disagree.
15     MR. PARKER: -- and that's what I'm entitled to
16 get into.
17     MS. O'REILLY: I disagree.
18     MR. PARKER: It's a topic.
19 BY MR. PARKER:
20     Q. Have you, Mr. Bolin, reviewed any e-mails to or
21 from District's counsel related to -JMY or MTBE Plume
22 No. 2 in preparation for this deposition?
23     MS. O'REILLY: And I'm going to instruct the
24 witness not to answer. That gets into privileged
25 communication.

Page 1099

1      MR. PARKER: Will you, Kim, please mark each
2  instruction. Thanks.
3      THE COURT REPORTER: Sure.
4  BY MR. PARKER:
5      Q. Mr. Bolin, are you going to abide by counsel's
6  instructions?
7      A. Yes.
8      Q. Are there any other documents that you reviewed
9  in the District's file related to Station 18-JMY that
10 are dated after June of 2008 for purposes of preparing
11 for your deposition?
12     A. I don't think so.
13     Q. Has the District itself done any investigation,
14 physical investigation, including sampling borings or
15 other, that you've not previously mentioned with respect
16 to 18-JMY since June of 2008?
17     A. No.
18     Q. Has the District conducted any remediation of
19 contamination it contends emanated from 18-JMY any time
20 since June of 2008?
21     A. No.
22     Q. Has the District prepared an investigation work
23 plan or remediation work plan related to 18-JMY since
24 June of 2008?
25     A. The District staff has not, but the District's

Page 1100

1  hired consultant has.
2      Q. And that is Hargis?
3      A. That's Hargis.
4      Q. Okay. Setting aside the Hargis work, has the
5  District or anyone else on behalf of the District
6  prepared a work plan for any investigation or
7  remediation related to 18-JMY?
8      A. Not by the District staff or the District's
9  hired consultant.
10     Q. Anyone else?
11     A. Not -- yes. Probably so. I believe Mobil's
12 consultant did.
13     Q. Anyone on behalf of the District? I can't tell
14 from your answer because you haven't just answered my --
15 you've -- you've possibly limited your answer by saying
16 neither the District nor its hired consultant have done
17 so. I'm trying to find out if there's anyone else who
18 the District may not consider to be a consultant who did
19 this work on behalf of the District, though? I realize
20 ExxonMobil's people may have done work. I'm not asking
21 you about that.
22     MS. O'REILLY: And I'm going to object to the
23 extent it calls for attorney-client privileged
24 communication and work product.
25     THE WITNESS: I'm not aware that any work plans

Page 1101

1  have been prepared on behalf of the District.
2  BY MR. PARKER:
3      Q. Now, the one that you mentioned that had taken
4  place was the Hargis work plan, correct?
5      A. That's correct.
6      Q. Or whatever you call Hargis work. I don't know
7  if it's actually a work plan. Would you consider that a
8  work plan?
9      A. Yes.
10     Q. Okay. It -- and we will discuss that briefly
11 later, the general plan. Is there a specific work plan
12 related to 18-JMY that Hargis has prepared, other than
13 the map that shows the location or proposed location of
14 CPT locations?
15     A. There's not a separate work plan. They have
16 one work plan for all of the sites that have been
17 identified for the upcoming investigation. There are
18 portions of that work plan that are specific to Mobil
19 18-JMY, but there is not another work plan that is
20 specific to Mobil 18-JMY.
21     Q. So there's the one document, and that's the
22 July 1st or July 10th proposal. Early July there's a
23 pretty thick proposal and then July 28th there's an
24 amendment to that, right?
25     A. The July 28th was really to refine the costs.

40 (Pages 1098 to 1101)

adf74290-4692-4737-965e-f0afd9a581a4

Page 1102

1  But there's just the one work plan, and I forget the
2  exact date. July sounds about right.
3      Q. I think it's here somewhere. We will get to
4  that.
5      Has the District, or anyone on behalf of the
6  District, evaluated whether there are conduits in the
7  vicinity of 18-JMY that would act as conduits for
8  contamination from the station into the aquifers from
9  which the Mesa Consolidated Water District wells drop?
10     MS. O'REILLY: Vague. Ambiguous. Compound.
11  Overbroad. Calls for expert opinion.
12     THE WITNESS: Nobody -- no District staff, and
13  the District's hired consultant hasn't performed any
14  such evaluation since 2008, as far as I know.
15  BY MR. PARKER:
16     Q. In your prior deposition, you mentioned that
17  there were -- that that -- both fate and transport
18  studies and conduit studies was work that needed to
19  be done. I'm generally paraphrasing what you said
20  there. That's what I'm trying to follow up on.
21     Neither of those types of work has been
22  done on behalf of the District since June of 2008,
23  correct?
24     A. That evaluation hasn't been completed, but the
25  investigation that is coming up would be part of the

Page 1103

1  that evaluation. I guess in that sense, it's an ongoing
2  effort, but no -- no evaluation of conduits has been
3  completed, certainly, since 2008.
4      Q. Since June of 2008, has the District or anyone
5  on its behalf concluded that either MTBE or TBA from
6  station Mobil -- Mobil Station 18-JMY has impacted or
7  threatened any drinking water well?
8      A. I'm sorry. Maybe I didn't hear all of the
9  question correctly. May I have that --
10     MR. PARKER: Please reread.
11     THE COURT REPORTER: Sure.
12     (The following record was read by the reporter:
13         "Q. Since June of 2008, has the District
14     or anyone on its behalf concluded that either
15     MTBE or TBA from Mobil Station 18-JMY has
16     impacted or threatened any drinking water
17     well?")
18     THE WITNESS: I'm not an expert. I think it --
19  I think it threatens the groundwater supplies, but
20  District staff and District's hired consultant hasn't
21  completed that kind of evaluation.
22  BY MR. PARKER:
23     Q. And you, likewise, have not completed -- I
24  mean, you include yourself within when you say District
25  staff has not created -- completed that evaluation,

Page 1104

1  right?
2      A. Well, that's correct. And I have my opinion,
3  but I'm not an expert in this area. And that is an area
4  that requires expertise beyond my capability. And we
5  have not -- no District staff, and we have -- the
6  District's consultant has not completed that. We
7  haven't asked them to do that yet.
8      Q. And your belief, although you've not done the
9  analysis and have indicated you don't have the expertise
10  necessary to do so, but your belief that you hold is
11  based, what on -- proximity, groundwater, flow
12  direction, and the data you've seen in the vicinity of
13  the site?
14     MS. O'REILLY: Objection. Overbroad. Vague
15  and ambiguous.
16     Go ahead.
17     THE WITNESS: It's based on the fact that there
18  are impacts to wells, that I believe that MTBE
19  contamination has escaped remedial efforts at the site.
20  It's in off-site wells. The off-site wells are not
21  being addressed by the on-site remediation system.
22     And because MTBE flows fairly freely with
23  groundwater and the groundwater eventually gets down
24  into the production zone, the production zone's pumped
25  from the production wells, I believe contamination from

Page 1105

1  this site, at least, threatens groundwater resources, if
2  it hasn't already gotten into the wells.
3      There are some wells that have had
4  detections -- all we -- although we don't have -- we
5  haven't been able to say with specificity that this site
6  is the one and only source of that contamination. It is
7  the likely source. So at the very least, there's the
8  threat, if not the impact.
9  BY MR. PARKER:
10     Q. That's your belief, but you have indicated that
11  that has not been determined by the District nor anyone
12  with the expertise to do so, right?
13     A. That's right.
14     Q. Your belief that you've just expressed is
15  actually the same belief you have with respect to all of
16  the focus plume stations involved in this litigation,
17  isn't it?
18     A. It so happens, of the hundreds of stations in
19  which there have been MTBE released, the -- the few that
20  we're looking at now all fall in that category:
21  Contamination in groundwater that's not being captured
22  by the on-site remediation system. Whether those
23  systems are currently being operated or whether they've
24  been closed, the groundwater hasn't been contained or
25  captured, which, in my mind, poses a clear and real

41 (Pages 1102 to 1105)

Page 1106

1  threat to groundwater resources.
2      Q.  With respect to Station 18-JMY, since June of
3  2008, you haven't spoken to any person at the Regional
4  Board or the State Department of Public Health or the
5  county to express that opinion, have you?
6      A.  That's not true of all of the sites.  That's
7  just true of some of the sites, and that includes Mobil
8  18-JMY.  As I mentioned in my earlier testimony, I don't
9  recall or have any knowledge of any such conversations
10  since 2008,
11          MR. PARKER:  Kim, do you have your exhibit
12  list?
13          THE COURT REPORTER:  Yes.
14          MR. PARKER:  What is his supplemental
15  declaration?  I have both 2 and 35 written on it.
16          THE COURT REPORTER:  Correct.  2 --
17          MR. PARKER:  So I can take my pick?
18          THE COURT REPORTER:  -- is 32 pages.  5, what
19  did you say?
20          MR. PARKER:  35.
21          THE COURT REPORTER:  I'm sorry.  That's
22  correct.  Same one, 32 pages.
23  BY MR. PARKER:
24      Q.  Mr. Bolin, here's a copy you can look at.
25      A.  Oh, okay.

Page 1107

1      Q.  We're not marking that because it's already
2  been marked twice, so I'm just going to refer to it as
3  Exhibit 35.
4      A.  Okay.
5      Q.  For your reference, you can use that.
6      A.  I believe I have my copy with me.
7      Q.  Please turn to page 12 of Exhibit 35.  There's
8  a section there on Station 18-JMY.
9      A.  I don't have all my pages.  May I see that one
10  again, please?
11      Q.  No.  You --
12      A.  Sorry.
13      Q.  You already passed on that.
14      A.  I'm stuck.
15      Q.  Page 12.
16      A.  Yes.
17      Q.  Five lines down it references that "The shallow
18  groundwater flow is principally to the southeast to
19  southwest at that station," correct?
20      A.  That's the way it reads, yes.
21      Q.  Is that a truthful statement?
22      A.  Yes, I believe it is.
23      Q.  When you say "shallow groundwater flow," what
24  are you referring to?
25      A.  I think I am referring to -- I'm recalling,

Page 1108

1  since June 2009, or a year ago, I'm referring to what I
2  believe is the Mobil's consultant's reference to shallow
3  groundwater.
4      Q.  Down, a couple lines further down you refer to
5  Monitoring Wells MW-17 and MW-19 as being further away
6  from the property boundary, but you say -- state:
7  "Neither is downgradient from the release site and both
8  appear to be part of characterizing the plume for the
9  purpose of remedial efforts."
10          Did I read that correctly?
11      A.  Yes.
12      Q.  Isn't it true that any well that's put in there
13  is intended to characterize the site?
14          MS. O'REILLY:  Calls for expert opinion.
15  Vague.  Ambiguous.
16          THE WITNESS:  It depends.  Sometimes wells are
17  installed for other reasons.
18  BY MR. PARKER:
19      Q.  Well, what's the distinction you're trying to
20  draw here?  These are further off-site, and you're
21  trying to draw some distinction that they are not
22  relevant for purposes of determining whether the plume
23  has escaped because they are not -- they are part of
24  characterizing the plume for purposes of remedial
25  efforts.

Page 1109

1          What do you mean by they're further
2  downgradient, but appear to be part of characterizing
3  the plume?  You're distinguishing them --
4      A.  No.  Actually, I said --
5          MS. O'REILLY:  Hold on.  Let him finish his
6  question.
7          THE WITNESS:  Was there more to your question?
8  BY MR. PARKER:
9      Q.  Hang on.  I'm going to look at the figure.
10          You're distinguishing Wells 17 and 19 from 15
11  on the grounds that 17 and 19 appear to be part of
12  characterizing the plume for remedial efforts.
13          And, apparently, you believe 15 is not; is that
14  right?
15      A.  I think -- I think what I'm saying here is that
16  distinguish between MW-15, MW-17, MW-19 that MW-17 and
17  MW-19 are upgradient and MW-15 is downgradient.
18      Q.  But 17 and 19 are off-site, correct?
19      A.  Yes.  They're outside the property boundary,
20  yes.
21      Q.  They're even further away than 15, aren't they?
22      A.  Yes.  I said so.
23      Q.  Okay.  Well, you're making some distinction.  I
24  said off-site, and you responded, yes, they're off the
25  site boundary.  I'm trying to figure out why you're --

Page 1142

1   and ambiguous.
2        Go ahead.
3        THE WITNESS: I'm not sure I caught all of your
4   question. May I have that repeated, please.
5        (The following record was read by the reporter:
6        "Q. Has the District, since June of 2008,
7        come to any conclusions as to whether any plume
8        of MTBE or TBA from Station 18-JMY has
9        commingled with a plume from any other station
10       or source?")
11       THE WITNESS: No conclusion as yet. I -- I
12   really don't know.
13   BY MR. PARKER:
14       Q. Previously, you had testified to a domestic
15   well southeast of the site that you said was a potential
16   conduit for contamination to flow through. Since June
17   of 2008, has the District done anything to investigate
18   whether there was a potential -- whether there was an
19   actual conduit for contamination to flow through?
20       A. We haven't conducted a physical investigation,
21   meaning we have not gone out to drill our own test wells
22   or anything like that. Monitoring literature and
23   analytical data in the area, we have done that.
24       Q. How does monitoring analytical data in the area
25   and literature inform you as to whether a well in the

Page 1143

1   vicinity of the site is a conduit?
2        A. That data can be -- can serve as an indicator,
3   depending on where it is and the depths and some other
4   matters. Sometimes that information will indicate a
5   conduit or point to something that we feel we might need
6   to investigate further.
7        Q. Specifically with respect to the area in the
8   vicinity of 18-JMY, has the District done anything
9   affirmatively to determine whether the well it had
10  previously identified as being in that area served as a
11  conduit for contamination?
12       A. I'm looking to see which wells you might be
13  referring to.
14       MS. O'REILLY: Vague. Ambiguous.
15       MR. PARKER: His answer or my question?
16       MS. O'REILLY: Your question.
17       MR. PARKER: Okay.
18       THE WITNESS: You have a sense of humor.
19  BY MR. PARKER:
20       Q. I can read you a passage. I don't have --
21  because this is an older exhibit, and I don't have
22  copies, but of the supplemental response to
23  interrogatories. It was Exhibit 21. It's not the one
24  that was used today, though --
25       A. Okay.

Page 1144

1        Q. -- unfortunately.
2        A. Well, if you can perhaps tell me which well
3   you're referring to.
4        Q. Sure. It says, with respect to 18-JMY at
5   page 21, "A domestic well approximately 200 feet
6   southeast of this site provides a potential conduit from
7   the shallow, saturated zone to the deeper aquifers."
8        A. Okay. There are a couple of wells that I think
9   might be domestic wells. According to the information I
10  have from 2008, again, this has all been discussed in
11  2008, there's a couple of wells.
12       The use of one -- the status of one well is not
13  known, but it's identified as a private well. And then
14  the other one is identified as a domestic well. They
15  are, I think, within that distance southwest of the
16  Mobil 18-JMY site. And we, to my knowledge, have not
17  done any specific testing of those wells regarding
18  contamination.
19       Q. And I only clarify because you said "specific
20  testing." I want to find out if you've done anything,
21  not necessarily testing of those wells, but other
22  testing activity, investigation directed at determining
23  whether those wells serve as conduits.
24       MS. O'REILLY: I'm going to object to the
25  extent it misstates testimony.

Page 1145

1        Go ahead.
2        THE WITNESS: The activities on these wells,
3   I -- I didn't research that. Let me -- let me say this.
4   To the -- to the best of my knowledge, we haven't done
5   anything on those wells. If anything was done, it might
6   have included -- in our operations or our field
7   inspectors might have gone to look at the status of the
8   wells or to see if they were operating or something like
9   that. Periodically we do that and provide updated
10  information on, you know, a variety of wells in the
11  basin. I can't say whether that kind of thing was done
12  for these particular wells, but it's possible they might
13  have.
14  BY MR. PARKER:
15       Q. The same response also says, "This site is
16  located above a pumping depression in the principal
17  aquifer."
18       Has the District done anything since June of
19  2008 to investigate or determine the extent of this
20  depression?
21       A. We update our regional maps, I believe it's
22  twice a year. And so have we done anything, the answer
23  would be, yes, we're contouring -- recontouring our --
24  our various aquifers twice a year, and the pumping
25  depression does move around a little bit. But there has

Confidential - Per 2004 MDL 1358 Order

Page 1202

1    Q.  I asked you earlier what you did to prepare for
2  your deposition on 18-JMY, and you told me something
3  about you met with District's counsel, but we didn't go
4  into the details.
5    A.  Uh-huh.
6    Q.  I'm trying to find out if you had a separate
7  meeting on HDR or if you had one meeting, which was
8  generally to prep for this deposition?
9    A.  Yes.  It is the latter.
10    Q.  Is 18-HDR one of the Hargis -- one of the
11  stations that is the subject of the upcoming Hargis
12  work?
13    A.  I believe it is.
14    Q.  With respect to 18-HDR, has the District had
15  any discussions with any regulator, meaning the Regional
16  Board, the Local Oversight Program or any other
17  regulator with respect to critique of prior remedial
18  actions or suggestions for what future remedial actions
19  should take place at the station since 2008?
20      MS. O'REILLY:  Vague and ambiguous.
21      THE WITNESS:  I don't recall any such
22  discussions with any of the regulators.
23  BY MR. PARKER:
24    Q.  Has the District, or anyone on its behalf, had
25  discussions with ExxonMobil's engineering people who

Page 1203

1  are, as you've seen, identified on various reports or
2  ExxonMobil's outside consultant who's doing the
3  investigation/remediation at 18-HDR regarding what
4  additional actions the District thinks should be taken
5  at that site?
6      MS. O'REILLY:  Vague and ambiguous.  Overbroad.
7  Go ahead.
8      THE WITNESS:  I don't think the District has
9  had any such discussions with those entities since 2008.
10      MR. PARKER:  All right.  I think at this point,
11  it would probably be a good time to stop, because the
12  rest of my questions kind of go into the data on the
13  station.  And once we get into that, we'll be in it for
14  a little while.  Okay?
15      THE WITNESS:  All right.
16      MR. PARKER:  Thank you.
17      THE VIDEOGRAPHER:  With the approval of
18  counsel, this adjourns today's deposition of Volume V of
19  David Bolin, corporate designee of Orange County Water
20  District in regard to productions of documents of Mobil
21  18-G6B, 18-HDR, 18-JMY and World Oil 39 Plume 127.  The
22  time is approximately 5:30.  We are now off the record.
23      (The deposition was concluded at 5:30 p.m.)
24
25

Page 1204

1        REPORTER'S CERTIFICATION
2
3      I, Kimberly Thrall, Certified Shorthand
4  Reporter and Registered Professional Reporter, in and
5  for the State of California, do hereby certify:
6
7      That the witness named in the foregoing
8  deposition was, before the commencement of the
9  deposition, duly administered an oath in accordance
10  with the Code of Civil Procedure Section 2094; that
11  the testimony and proceedings were reported
12  stenographically by me and later transcribed through
13  computer-aided transcription under my direction and
14  supervision; that the foregoing is a true record of the
15  testimony and proceedings taken at that time.
16
17      IN WITNESS WHEREOF, I have hereunto subscribed
18  my name this 8th day of September, 2010.
19
20
21      _____
22      Kimberly S. Thrall, RPR, CSR No. 11594
23
24
25

Page 1205

1      - - - - - -
        E R R A T A
2      - - - - - -
3  PAGE LINE CHANGE
4  _____
5  REASON: _____
6  _____
7  REASON: _____
8  _____
9  REASON: _____
10  _____
11  REASON: _____
12  _____
13  REASON: _____
14  _____
15  REASON: _____
16  _____
17  REASON: _____
18  _____
19  REASON: _____
20  _____
21  REASON: _____
22  _____
23  REASON: _____
24  _____
25  REASON: _____

66 (Pages 1202 to 1205)

adf74290-4692-4737-965e-f0afd9a581a4

Confidential - Per 2004 MDL 1358 Order

Page 1393

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

In Re:  Methyl Tertiary Butyl Ether     :
("MTBE")                                 :     Master File
Products Liability Litigation           :     No. 1:00-1898
                                         :     MDL No. 1358 (SAS)
——————————————————————————————————————  :     M21-88
                                         :
This document relates to the            :
following case:                         :
                                         :
Orange County Water District v.         :
Unocal Corp., et al., 04 Civ. 4968      :     VOLUME VII
(SAS)                                    :
——————————————————————————————————————  :     Pages 1393-1662

CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)

- - - - -

AUGUST 30, 2010

- - - - -

Videotaped Deposition of DAVID P. BOLIN,

Volume VII, Orange County Water District's 30(b)(6)

designee in re Site Specific Station Investigations,

held at 650 Town Center Drive, 20th Floor, Costa Mesa,

California, commencing at 9:09 a.m., on the above date,

before Kimberly S. Thrall, a Registered Professional

Reporter and Certified Shorthand Reporter.

Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Per 2004 MDL 1358 Order

Page 1418

1  BY MR. ANDERSON:
2    Q.  Yes.  And I understand how logic goes.  And I
3  want to know whether in determining that 5792 was a
4  likely source, did you also determine that it was the
5  only source?
6    MS. O'REILLY:  And I'm going to object to the
7  extent it exceeds the scope of the notice per Special
8  Master Warner.  It's not focused on anything post-2008.
9  It calls for an expert opinion.  Misstates prior
10  testimony and documents.
11    THE WITNESS:  The District staff and consultant
12  hired by the District has not performed the analyses
13  that are necessary since 2008 to determine that this
14  station is the one and only source of that contamination
15  detected in the well.
16  BY MR. ANDERSON:
17    Q.  Indeed, the District staff and consultants
18  hired by the District has not determined that the
19  station, in fact, contaminated that well, has it?
20    MS. O'REILLY:  Misstates testimony.  Incomplete
21  hypothetical.  Misstates the document.
22    Go ahead.
23    THE WITNESS:  No.  The District's staff and the
24  District's consultant has not specifically identified
25  this site as the source of contamination in the well

Page 1419

1  that we mentioned.
2  BY MR. ANDERSON:
3    Q.  Has the District's staff or its consultants
4  identified Site 5792 as a source of the contamination
5  that was detected in that well?
6    MS. O'REILLY:  Asked and answered.  Incomplete
7  hypothetical.  Misstates testimony.  Argumentative.
8  Exceeds the scope of the notice.
9    Go ahead.
10    THE WITNESS:  I believe I answered that
11  question, that we have not completed the analyses to
12  determine that this is the one and only source.  We
13  cannot specifically tie it to this station, but we
14  believe that given the conditions that we've seen thus
15  far, it is a very likely source.
16  BY MR. ANDERSON:
17    Q.  I understand that you said you think it's a
18  likely source.  I want to know whether you or your
19  consultants have determined that, in fact, MTBE from
20  5792 has been detected in the well you identified
21  earlier?
22    MS. O'REILLY:  Asked and answered.
23  Argumentative.  Incomplete hypothetical.  Exceeds the
24  scope of the notice.
25    Go ahead.

Page 1420

1    THE WITNESS:  Based on the knowledge that we
2  have thus far, we have determined that this station is a
3  likely source for the contamination detected in the
4  production well.
5  BY MR. ANDERSON:
6    Q.  And it is one of more than one sources that you
7  believe are likely, correct?
8    MS. O'REILLY:  Misstates testimony.  Incomplete
9  hypothetical.  Vague.  Ambiguous.  Exceeds the scope of
10  the notice.
11    THE WITNESS:  I can't currently tell you what
12  other sources that we have identified as likely or
13  potential sources for the contamination detected in that
14  well.  As I sit here today in preparation for my
15  deposition, it's really the only one I can identify.
16  BY MR. ANDERSON:
17    Q.  One of the things you did to prepare for your
18  deposition was to review e-mails, correspondence and
19  notes of any communication you've had with regulatory
20  agencies concerning this site since your deposition was
21  taken in 2008, correct?
22    A.  Yes.
23    Q.  And you found no evidence of any communication
24  between you and a regulatory agency concerning this
25  site, correct?

Page 1421

1    MS. O'REILLY:  Misstates testimony.
2    Go ahead.
3    THE WITNESS:  I don't -- I didn't come across
4  any written communication between the District's staff
5  and this site.
6  BY MR. ANDERSON:
7    Q.  And you can't recall any verbal communications
8  with -- between you or the District's staff and any
9  regulator concerning this site, did you?
10    A.  I can't recall any specific discussions about
11  this site, whether it was in the context of many sites
12  or this site by itself.  I don't recall the specifics.
13    Q.  When you said in your declaration, the first
14  "real hydrogeologic evidence," what did you mean by
15  "real hydrogeologic evidence"?
16    A.  The detection in this well -- it's a production
17  well.  Screen intervals are relatively deep compared to
18  the site-specific monitoring wells.  MTBE was detected
19  in the well.
20    So based on our understanding, that was the
21  first undisputable evidence that contamination has
22  escaped a remediation system and gotten into a receptor,
23  or in this case the production well.
24    Q.  Did you consider the detection of MTBE in the
25  production well to be undisputable evidence that MTBE

8 (Pages 1418 to 1421)

d1027793-3b28-4c9c-b806-46c020487aaf

Confidential - Per 2004 MDL 1358 Order

Page 1446

1    Company?
2        A.  That's my recollection.
3        Q.  Okay.  And it was either LABL or LABL-2, right?
4        A.  I believe that's correct.
5        Q.  All right.  Was that detection determined by
6    the Friedman & Bruya laboratory, as far as you know?
7        A.  As far as I know, it was.
8            (Bolin Exhibit 105 was marked.)
9    BY MR. ANDERSON:
10       Q.  Exhibit 105 is a letter dated February 20,
11   2009, from Ms. O'Reilly to me.
12           Have you seen that letter before?
13       A.  I -- I recognize the -- the information
14   contained in the table.
15       Q.  That's what I'm going to focus on anyway.
16       A.  Yeah.  I just can't recall specifically whether
17   I saw this letter or not.
18       Q.  Let's turn to the table.  And on page 3 of 8,
19   there's a reference to Plume No. 30.
20           Do you see that?
21       A.  Yes.
22       Q.  And what was then called Plume No. 30 included
23   four service station sites, Shell No. 4001, Texaco
24   No. 3311, Tosco/76 No. 5792, and Unocal No. 4727,
25   correct?

Page 1447

1        A.  Yes, I see that.
2        Q.  And they have four unique addresses for those
3    four sites, right?
4        A.  Yes.
5        Q.  Which of those four sites has the District
6    concluded as candidates for contributing the MTBE that
7    was detected in SCWC Well LABL or LABL-2?
8            MS. O'REILLY:  I'm going to the extent it
9    exceeds the scope of the notice because it's not based
10   on information learned past 2008.  Incomplete
11   hypothetical.  Calls for expert opinion.  Vague.
12   Ambiguous.  Overbroad.
13           Go ahead.
14           MR. TEMKO:  And I'm going to object on the
15   basis, as I understand it, that a number of these sites
16   are no longer in the case.
17           MS. O'REILLY:  You're objecting to his
18   question?
19           MR. TEMKO:  Yes.
20           MS. O'REILLY:  Okay.
21           MR. TEMKO:  I'm not going to let you have all
22   of the fun.
23           MS. O'REILLY:  Feel free.
24           THE WITNESS:  I'm sorry.  I believe you asked
25   me which of these sites is the source?  Would you repeat

Page 1448

1    your question, please.
2    BY MR. ANDERSON:
3        Q.  Which of these sites were candidates for the --
4    in the District's mind for the contamination that was
5    found by Friedman & Bruya in Well SCWC-LABL or LABL-2?
6            MS. O'REILLY:  Same objection.
7            THE WITNESS:  They were all candidates.
8    BY MR. ANDERSON:
9        Q.  Have any of them been eliminated by Orange
10   County Water District as candidates for that
11   contamination?
12           MS. O'REILLY:  Objection.  Potentially calls
13   for attorney-client privilege.  Incomplete hypothetical.
14   Vague and ambiguous.
15           Go ahead.
16           THE WITNESS:  The District's staff and the
17   District's hired consultant has not made a determination
18   as yet.  Again, I think I've answered this question
19   already.
20           I haven't completed any analysis since 2008,
21   and the District's staff and hired consultant hasn't
22   completed the necessary expert fate and transport
23   analyses to make a determination which of these sites
24   and whether they are the one and only site of the source
25   of contamination.

Page 1449

1    BY MR. ANDERSON:
2        Q.  So that determination has yet to be made,
3    right?
4        A.  That is correct.
5        Q.  When do you anticipate, if at all, that that
6    determination will be made?
7            MS. O'REILLY:  Calls for attorney-client
8    privilege.  Vague and ambiguous.
9            Go ahead.
10           THE WITNESS:  Well, the District does not have
11   a specific plan or schedule for completing that
12   analysis.
13   BY MR. ANDERSON:
14       Q.  In your declaration, I think that's
15   Exhibit 103, in paragraph 54 you state in the
16   next-to-the-last sentence -- this is five lines up from
17   the bottom of that paragraph.  You say, "The most recent
18   remediation reports for the Unocal No. 5792 do not
19   indicate that further efforts to define the plume or
20   expand the area of remediation are under way or
21   anticipated."
22           Do you see that?
23       A.  Yes, I do.
24       Q.  Did you draw that conclusion solely based on
25   whatever documents it was that you reviewed concerning

15 (Pages 1446 to 1449)

Page 1474

1    A. That's correct.

2    Q. Are you aware of any place in the Hargis report

3  concerning Station 5792 that concludes or observes or

4  even speculates that MTBE has been detected in a

5  production well associated with this site?

6    MS. O'REILLY: I'm going to object. Asked and

7  answered. Vague. Ambiguous. Overbroad. Lacks

8  foundation.

9    THE WITNESS: No. Based on my review of the

10  report, I don't recall Hargis identifying a production

11  well.

12  BY MR. ANDERSON:

13    Q. Do you recall approximately when you first

14  received this Hargis report?

15    A. No, I don't. It states on the first page that

16  the latest document reviewed was March 26, 2010. So I

17  believe it was sometime in the first half of this year.

18    Q. And when you received the report from Hargis,

19  did you read it?

20    A. Yes. I'm sure I believe I did.

21    Q. And when you did so, did you bring to Hargis'

22  attention that there had been a detection in a Southern

23  California Water Company well in 2008 that you

24  associated with this site?

25    A. No, I did not.

Page 1475

1    Q. Why not?

2    A. I can't say. Honestly it may be an oversight

3  on my part that I didn't catch that when I read the

4  report or what I did with the information. It may have

5  been an error on my part.

6    Q. With respect to Site 5792, are you able to

7  quantify any expenses that OCWD has incurred

8  specifically relating to that site?

9    MS. O'REILLY: Vague. Ambiguous. Overbroad.

10  Asked and answered. Assumes facts.

11    Go ahead.

12    THE WITNESS: This is a question that has been

13  asked about all the sites we've been covering in this

14  current round of depositions. The cost -- the costs

15  associated with our activities are not site specific.

16  We couldn't break down our costs.

17    (Bolin Exhibit 110 was marked.)

18  BY MR. ANDERSON:

19    Q. And that would apply to all the stations we're

20  asking about?

21    A. That's correct.

22    Q. I'll try not to ask it for my other two. I

23  know when I met you before, I asked some general

24  questions to help short-cut that, so thank you --

25    A. That would be the case, yes.

Page 1476

1    Q. -- thank you for doing that again.

2    Exhibit 110 is a -- and I -- you can help me

3  with my confusion. Was there a Komex report on this

4  site?

5    A. I don't believe there was.

6    Q. Okay. I was confused and thought there might

7  have been, and I was here looking for it while you were

8  laughing at me. Actually, it was Tracey who was

9  laughing at me.

10    MS. O'REILLY: Yes, I was. It is one or the

11  other, Mr. Anderson.

12    MR. ANDERSON: Yes.

13  BY MR. ANDERSON:

14    Q. Does the District have any plans for future

15  remediation or other activities to address the MTBE at

16  Site 5792?

17    A. The District doesn't currently have specific

18  plans detailed for Unocal 5792.

19    Q. Does the District have any specific or general

20  plan that, to your understanding, would affect

21  Site 5792?

22    MS. O'REILLY: Vague. Ambiguous. Overbroad.

23    Go ahead.

24    THE WITNESS: We don't have a written plan.

25  We -- we have a general plan to address additional

Page 1477

1  stations, and this is likely to be one of the candidate

2  sites, but that has not been determined yet.

3  BY MR. ANDERSON:

4    Q. So it's something that will be determined in

5  the future?

6    A. Yes.

7    Q. And do you expect that if a determination is

8  made, one of the things you're considering doing, but

9  haven't done yet is to have some kind of a study done

10  with respect to this site?

11    A. I'm not sure.

12    MS. O'REILLY: Vague. Ambiguous. Overbroad.

13    MR. ANDERSON: Well, let me do this.

14    MS. O'REILLY: Asked and answered.

15    Go ahead.

16  BY MR. ANDERSON:

17    Q. You say nothing has been determined yet. Is

18  there something that you think is likely to be proposed

19  for this site in the future?

20    MS. O'REILLY: Asked and answered in prior

21  depositions. Exceeds the scope of the notice. Vague

22  and ambiguous. Overbroad.

23    Go ahead.

24    THE WITNESS: My answer to this line of

25  questioning was that we don't have a specific plan with

22 (Pages 1474 to 1477)

Confidential - Per 2004 MDL 1358 Order

Page 1510

1     (Bolin Exhibit 114 was marked.)
2   BY MR. ANDERSON:
3     Q.  Exhibit 14 is a site map apparently prepared by
4   Hargis with respect to 5226.
5       MR. TEMKO:  Exhibit 14?
6       MR. ANDERSON:  114.
7       MR. TEMKO:  Thank you.
8       MR. ANDERSON:  1-1-4.
9   BY MR. ANDERSON:
10    Q.  Have you seen that before?
11    A.  Yes, I have.
12    Q.  And does this propose the location of where the
13  CPT borings would occur?
14    A.  Yes.
15    Q.  Where are they proposed?
16    A.  These borings are identified as squares located
17  and annotated on the map that are -- there are several
18  of them.  They are west of the site, southwest of the
19  site, and south of the site.
20    Q.  What do they say?  Is there a label?  Is it
21  the U-5226C, U-5226B, and U-5226A?
22    A.  Yes.
23    Q.  And were those site locations determined by
24  Hargis?
25    A.  Yes.

Page 1511

1     Q.  Did you consult with them on their choice of
2   those locations?
3     A.  It wasn't so much consult.  They presented what
4   they proposed to do, and we acknowledged it.
5     Q.  Did the District or Hargis consult with the
6   Regional Board or Health Care Agency, whichever the
7   regulatory board is for this site, to get their views on
8   the wisdom of doing this work?
9     A.  I'm not aware --
10      MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
11  Go ahead.
12      THE WITNESS:  I'm not aware that they did.
13      MR. ANDERSON:  Okay.  Let's take our lunch
14  break now.
15      THE VIDEOGRAPHER:  With the approval of
16  counsel, we are going off the record.  The time is
17  approximately 12:15.
18      (The luncheon recess was taken at 12:15 p.m.)
19      THE VIDEOGRAPHER:  With the approval of
20  counsel, we are back on the record.  The time is a
21  approximately 1:16.  This is the beginning of Tape
22  No. 3.
23  BY MR. ANDERSON:
24    Q.  Mr. Bolin, a few follow-up questions on 5226.
25  I didn't write down the exhibit number, but the closure

Page 1512

1   request that Conestoga-Rovers & Associates had submitted
2   in May with respect to Site 5226.
3     A.  I believe that is Exhibit 110.
4     Q.  110.  Has Orange County Water District ever
5   objected or otherwise weighed in on the closure request
6   that was submitted on behalf of ConocoPhillips in
7   connection with Station No. 5226?
8       MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
9   Lacks foundation.
10  Go ahead.
11      THE WITNESS:  Not the request that was made in
12  May 2010, but we have mentioned in general terms the
13  need for the additional investigation.  Again in my
14  earlier testimony, I said I couldn't recall specifics to
15  any discussion of this site, but the answer is -- in
16  regards to the May 10, 2010 closure request as prepared
17  by Conestoga-Rovers, the answer is no.
18  BY MR. ANDERSON:
19    Q.  And once again, remind me, what's the exhibit
20  number for the map that was done by Hargis on that site?
21    A.  I have Exhibit No. 114.
22    Q.  Okay.  114.  Does that map -- I take it this is
23  a map you've seen prior to today, right?
24    A.  Yes.
25    Q.  Did Hargis consult with you at all on the

Page 1513

1   decision about where to place the CPT borings?
2       MS. O'REILLY:  For 5226?
3       MR. ANDERSON:  I'm sorry?
4       MS. O'REILLY:  For 5226?
5       MR. ANDERSON:  For 5226, yes.
6       THE WITNESS:  You had asked me that question
7   already, and I said that Hargis had presented their
8   proposed locations to the District, and we had
9   acknowledged them.
10  BY MR. ANDERSON:
11    Q.  Does the District have a contingent plan on
12  what to do if the result of the borings is that MTBE has
13  migrated to the locations of the borings?
14      MS. O'REILLY:  Could you repeat the question
15  again.
16      (The following record was read by the reporter:
17      "Q.  Does the District have a contingent
18      plan on what to do if the result of the borings
19      is that MTBE has migrated to the locations of
20      the borings?")
21      MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
22  Lacks foundation.  Calls for expert opinion.
23  Go ahead.
24      THE WITNESS:  It's a -- not a contingent plan.
25  It's part of the plan.  And that is -- this is the first

31  (Pages 1510 to 1513)

Confidential - Per 2004 MDL 1358 Order

Page 1518

1      MS. O'REILLY: And I'm going to object. It
2  lacks foundation. Misstates facts. Calls for
3  speculation. Assumes facts. There's nothing to
4  indicate that that is true. Exceeds the scope of the
5  notice. In particular, it violates Special Master
6  Warner's order that this deposition be limited to 2008.
7      If you want to ask him since 2008, you may do
8  so, but I'm going to instruct him not to answer. We're
9  going well beyond -- I've allowed some leniency, but
10 we're going into areas that should have been covered in
11 his prior depositions, particularly defendants served
12 their notices on the Talbert Gap prior to that date.
13     MR. ANDERSON: Is that because, Ms. O'Reilly,
14 you're representing to me that the recharge
15 contamination of MTBE occurred in or before 2008 as
16 opposed to after that?
17     MS. O'REILLY: No. My instruction is based on
18 the fact that defendants were aware of this theory and
19 have propounded this theory prior to the depositions in
20 2008 and, therefore, it could have been covered at that
21 time. If you want to ask him if he's learned anything
22 since 2008 and limit your question to the time period
23 Special Master Warner ordered, then I'll allow you to do
24 so, but you're going way -- well beyond the notice and
25 what's permitted.

Page 1519

1  BY MR. ANDERSON:
2      Q. Is the budget for the CPT borings roughly
3  $100,000 per boring?
4      MS. O'REILLY: For 5226?
5      MR. ANDERSON: For the CPT boring that is
6  contemplated in general.
7      MS. O'REILLY: And I'm going to object to the
8  extent it's been covered by Mr. Herndon on August 9th in
9  response to the notice from ARCO.
10     THE WITNESS: No.
11 BY MR. ANDERSON:
12     Q. What is the projected cost of the three CPT
13 borings at Site No. 5226?
14     A. I couldn't tell you. I didn't do that
15 analysis, but it is a fraction of what you say is a
16 hundred thousand dollars. I do know that we're
17 projected to do about 166 CPT borings, including
18 step-outs for groundwater sampling for the entire
19 investigation program. I can't say how many of those
20 CPTs will be conducted specific to Unocal 5226 or any
21 other site.
22     Q. Did Orange County Water District solicit any
23 competing bids to the bid by Hargis & Associates for the
24 CPT borings?
25     MS. O'REILLY: Lacks foundation. Assumes

Page 1520

1  facts. Misstates the document. And it's been covered
2  by Mr. Herndon in detail on the August 9th deposition in
3  response to the notice from ARCO. Exceeds the scope of
4  this notice.
5      Go ahead.
6      THE WITNESS: If you're asking me whether the
7  CPT work was bid out, I understand that it was.
8  BY MR. ANDERSON:
9      Q. What type of remediation activities does the
10 District plan to do in the future with respect to Site
11 No. 5226?
12     MS. O'REILLY: Vague and ambiguous.
13     Go ahead.
14     THE WITNESS: Remedial activities will include
15 groundwater treatment using granular activated carbon to
16 treat the MTBE in groundwater. We don't have sufficient
17 data to decide which technology or technologies is going
18 to be the most appropriate technology or the optimum
19 technology for this site. We still were collecting our
20 data.
21     One of the things we need to know is what
22 the -- what the flow regime is going to be and the depth
23 and how many extraction points and all of that sort of
24 thing. So we haven't -- we don't have a detailed
25 remedial action plan.

Page 1521

1  BY MR. ANDERSON:
2      Q. But you have decided to introduce GAC treatment
3  of the groundwater in and around the 5226 site sometime
4  in the future?
5      MS. O'REILLY: I'm going to object. Misstates
6  testimony. Vague. Ambiguous.
7      Go ahead.
8      THE WITNESS: That's not exactly what I said.
9  I said that we know the GAC works. It's a proven
10 technology. It's an affordable technology, and it's one
11 that we'll likely provide here, but I don't know what
12 other technologies we might use. We're still evaluating
13 all the data to determine what technology or
14 technologies would be best.
15 BY MR. ANDERSON:
16     Q. Have you ever been involved in a gasoline
17 release site remediation project where the remediation
18 activity included GAC treatment of the groundwater at
19 the site?
20     MS. O'REILLY: Exceeds the scope of the notice.
21 In particular, Mr. Bolin is here in his capacity as a
22 Rule 30(b)(6) witness for the District, and you're
23 asking him a question about activity or work that he's
24 done prior to being employed by the District.
25     THE WITNESS: I'm not sure I heard your

33  (Pages 1518 to 1521)

d1027793-3b28-4c9c-b806-46c020487aaf

Confidential - Per 2004 MDL 1358 Order

Page 1542

1  in a day? No. Does it have to be cleaned up in a week?
2  No. But it does have to be prevented from impacting
3  drinking water resources.
4  BY MR. ANDERSON:
5      Q. And if the District becomes convinced that
6  contamination is going to contaminate drinking water
7  resources, it will step in and act with all deliberate
8  speed, right?
9      MS. O'REILLY: And I'm going to instruct the
10 witness not to answer. You're covering subject matters
11 that have been gone over in detail in 2008. You're
12 violating Special Master Warner's order that this
13 deposition is limited to post-2008 activities and
14 information. It exceeds the scope of the notice. It's
15 vague. Ambiguous. Overbroad. Misstates testimony.
16 Misstates days of testimony from Mr. Herndon and
17 Mr. Bolin in 2008.
18     MR. ANDERSON: Does anyone have any Advil?
19     MS. REASS: I can get some.
20     MR. ANDERSON: No, it's all right.
21 BY MR. ANDERSON:
22     Q. Let me go ahead and limit -- go ahead and limit
23 my question since 2008. Okay. With that limitation, if
24 the District determined between 2008 and now that
25 groundwater contamination was threatening a drinking

Page 1543

1  water resource, would it act with all deliberate speed
2  to make sure that the resource was not impacted?
3      MS. O'REILLY: Misstates testimony. Vague.
4  Ambiguous. Overbroad.
5      Go ahead.
6      THE WITNESS: Well, it depends on what you mean
7  by "act." We're currently acting. The legal process
8  may seem a little bit slow at times. Maybe it seems
9  fast to you. It seems like it could be slow to me. But
10 we're in the process of trying to address this as best
11 we can. There's so much of it. There's so many sites
12 and so much contamination and mass out there, we're
13 addressing all of that as best we can.
14 BY MR. ANDERSON:
15     Q. How have you addressed the contamination at
16 5226 and 5792 and Beacon Bay during the last two years?
17     A. We've --
18     MS. O'REILLY: Asked and answered.
19     Go ahead.
20     THE WITNESS: We've evaluated these sites and
21 determined which sites we want to investigate to
22 delineate the contamination, which is all part of our
23 core remedial effort. The investigation will help
24 delineate that contamination, determine the degree and
25 the extent of the problem, and then we can design an

Page 1544

1  appropriate and proper remediation system to address it.
2  BY MR. ANDERSON:
3      Q. Is it the District's position that the
4  remediation consultants working for ConocoPhillips on
5  Site 5226 are not competent?
6      MS. O'REILLY: And I'm going to object again.
7  It exceeds the scope of the notice. Violates Special
8  Master Warner's order that this deposition is to cover
9  only issues that have arisen post-2008. I've allowed a
10 lot of leeway in this area, but we're going over issues
11 that have been covered in detail in prior depositions on
12 these stations. Vague. Ambiguous. Overbroad. Calls
13 for speculation.
14     THE WITNESS: I wasn't aware we were switching
15 back from site to site. I didn't look at materials to
16 make a determination whether I thought they were
17 competent or incompetent.
18 BY MR. ANDERSON:
19     Q. Well, let me alter the question. Has the
20 District ever concluded that the remediation consultants
21 at Site 5226 were incompetent?
22     MS. O'REILLY: And I'm going to instruct the
23 witness to limit his answer post-2008 as ordered by
24 Special Master Warner. It's vague. Ambiguous.
25 Overbroad. Lacks foundation. Calls for speculation.

Page 1545

1      Go ahead.
2      THE WITNESS: Well, I -- I don't know that
3  we've ever really looked at a consultant with the idea
4  that they were incompetent in what they were doing. I
5  think our consideration was we looked at them in
6  somewhat -- we're -- we're looking at whether they were
7  limited and not prevented from actually doing the kinds
8  of things that perhaps they know should be done to clean
9  up the site or prevent contamination from escaping the
10 site.
11     And then I -- I know in some sites there's been
12 statements by the defendants' consultants that talk
13 about how contamination escaped and certain measures
14 should be taken or recommended. But I also know that
15 the responsible parties don't always allow their
16 consultants to speak so freely. So they're somewhat
17 limited to what they're able to put in print or
18 recommend in their -- in their reports.
19     So I never really looked at any of that as --
20 with an idea that, oh, this -- this consultant doesn't
21 know what he's doing because he's incompetent. I looked
22 at it as though this consultant may know what he's
23 doing, but he's -- he's being limited.
24 BY MR. ANDERSON:
25     Q. Well, let's go with that definition, then.

39 (Pages 1542 to 1545)

d1027793-3b28-4c9c-b806-46c020487aaf

Page 1550

1  we were just obtaining a new consultant we could work
2  with in 2008 since -- we had Komex. Komex had joined
3  the WorleyParsons group, and they were conflicted from
4  being able to provide these kind of services for the
5  District.
6      So I believe at that time we were looking for a
7  new consultant to help us with the -- with the activity.
8  Insofar as we had people or resources to -- to spend to
9  do the work, we might have. And, again, it's just a
10 hypothetical now, but we didn't have the technical
11 assistance to -- you know, to move forward with that
12 kind of work.
13 BY MR. ANDERSON:
14     Q.  With respect to 5226, that's on the list for
15 the CPT borings by Hargis, right?
16     A.  Yes.
17     Q.  And that will be done sometime in the next six
18 months, right?
19     A.  Yes.
20     Q.  And after that, do you expect to know whether
21 additional remediation work would be required at 5226?
22     A.  We -- we might -- we might know that.
23 Actually, the next phase of work at this site will be to
24 install groundwater monitoring wells. And so I don't
25 know exactly when that's going to occur.

Page 1551

1      This -- this phase of work that we're doing now
2  is for the cone penetration testing and does not include
3  the additional tasks that we talked about in the work
4  plan. I think that was 6 through 9 or 6 through 10 or
5  whatever it was. Those tasks involved installing wells.
6  And so that will probably be right on the tail end of
7  this -- this phase that we're doing now.
8      Q.  Okay. So within the next six months or so, you
9  expect to have the initial results back from the CPT
10 borings, right?
11     A.  We should have initial results within the next
12 six months.
13     Q.  And you expect that those initial results would
14 inform you as to whether you should take the next step,
15 which would be to put in monitoring wells, right?
16     MS. O'REILLY: Misstates testimony.
17     Go ahead.
18     THE WITNESS: We think that monitoring wells
19 are going to be necessary. Of course, we will review
20 all the data as it comes in, and then we will allow
21 ourselves some flexibility to make adjustments as is
22 appropriate. But we believe that wells -- as -- as I
23 sit here now, we believe that wells are going to be
24 necessary. And so that will come in or we will enter
25 into that after we see the data and the information from

Page 1552

1  the CPT --
2  BY MR. ANDERSON:
3      Q.  All right.
4      A.  -- investigation.
5      Q.  So how much after the CPT data comes in to you,
6  how long will it take to get the monitoring wells
7  installed?
8      MS. O'REILLY: Calls for speculation. Vague.
9  Ambiguous. Argumentative.
10     Go ahead.
11     THE WITNESS: I don't know that. There are
12 some hurdles that we have to address to be able to do
13 that, including we have to find the -- the optimum
14 location, the optimum depth. We have to go out to bid
15 to find the driller that can do the work for us. We
16 have to prepare the work plan or the bid sheets to do
17 that. So there's the bidding process.
18     There is the site-access process. It's likely
19 to be -- well, I can't be certain, but, you know, it may
20 be on private property, and so we have to work out an
21 arrangement where we can get access to private property.
22     There is the -- the permitting process. We
23 have to permit these wells, obtain encroachment permits
24 for construction, well permits, and traffic control
25 permits, and all that. I really can't give you a date

Page 1553

1  as to when we'll be able to accomplish all this.
2  BY MR. ANDERSON:
3      Q.  Would it be fair to say that it would be at
4  least an additional six months after the CPT project is
5  finished?
6      MS. O'REILLY: Misstates testimony.
7      THE WITNESS: No. I -- I can't give you an
8  approximate date. I -- I really don't know when. It
9  might take six months. Depending on certain factors,
10 it -- it could possibly happen earlier or it could
11 possibly happen later.
12 BY MR. ANDERSON:
13     Q.  Okay. Right now you just don't have enough
14 information to make that prediction, right?
15     A.  We just don't.
16     Q.  And that's for 5226. Now, if we look at
17 Beacon Bay and -- and 5792, those are not even on the
18 list to have the CPT boring done at the present time,
19 right?
20     A.  That's correct.
21     Q.  How long will it be into the future before the
22 District decides whether or not to do any additional
23 site assessment at those two site?
24     MS. O'REILLY: And I'm going to object.
25 Misstates testimony. Lacks foundation.

Page 1554

1    Go ahead.
2         THE WITNESS:  We might have a decision on that
3    at an earlier date, even before wells are installed for
4    the current round of sites that we're looking at.  We're
5    in the process of evaluating these sites to decide which
6    additional sites we're going to be investigating for the
7    next round of investigation, but we're doing this in
8    phases because we simply don't have the resources or
9    the -- the labor to address it all at one time.
10   BY MR. ANDERSON:
11        Q.  Okay.  How many different phases do you
12   anticipate?
13        A.  We haven't decided that.
14        Q.  At least two, because you have one going now
15   and you still have 19 on the list that are not part of
16   that first phase, right?
17        A.  That's right.  But evaluating these sites is --
18   and all the data and the -- the problems or whether
19   contamination is being addressed, is going to be
20   addressed, that's an ongoing process.  So as I sit here,
21   I really can't tell you how many sites we're going to
22   investigate, or when we're going to investigate them, or
23   give you any clear idea as to when we'll accomplish all
24   of this.
25        Q.  Okay.  So you certainly don't expect that to be,

Page 1555

1    completed in the year 2010, right?
2         A.  That's correct.
3         Q.  And do you have any idea whether it will be
4    completed in 2011?
5         MS. O'REILLY:  Calls for speculation.
6    Misstates testimony.
7    BY MR. ANDERSON:
8         Q.  Would it be speculation for you to tell me when
9    it's going to be that you know whether any additional
10   assessment needs to be done on the balance of the
11   sites?
12        A.  No.  I can tell you that I think additional
13   assessment is needed on -- I don't know about the
14   balance of the sites, because I don't know what you mean
15   by "the balance."  There's over 400 sites.
16        Q.  I mean --
17        A.  Are you talking about --
18        Q.  I mean, the other 19.
19        A.  Well, I think it -- I know at least some of
20   them real- -- well, I think -- I think they all need
21   some assessment.  How we are going to do that assessment
22   remains to be seen.  The decision to do some of that
23   might be made before we complete the first round of
24   work, but the decision hasn't been made yet.  And so to
25   say anything more would be speculation.

Page 1556

1         Q.  Would it be speculation for you to tell me now
2    when it will be that Orange County Water District
3    decides whether or not any additional remediation work
4    needs to be done on the Beacon Bay site or the 5792
5    site?
6         A.  You're ask-- well, we haven't even
7    collected -- we haven't even investigated these sites
8    yet.
9         Q.  I --
10        A.  We still need to investigate --
11        Q.  I know.  That's why I asked the question.
12        A.  So I can't make that determination as I sit
13   here.
14        Q.  So it would be speculation to try to pick a
15   date in the future when the District would know whether
16   or not additional remediation work needed to be on those
17   two sites, right?
18        MS. O'REILLY:  Misstates testimony.
19   Argumentative.
20        Go ahead.
21        THE WITNESS:  It means I don't know when that
22   decision will be made.  We don't have the data to
23   support making a decision.
24        MR. ANDERSON:  Okay.  I have finished my
25   questions on my three sites.  I know Mr. Temko is

Page 1557

1    anxious to ask you questions on a couple of other sites.
2    But let's just take a break and we'll -- we'll change --
3    change chairs.
4         THE VIDEOGRAPHER:  With the approval of
5    counsel, we're going off the record.  The time is
6    approximately 2:20.
7         (Recess.)
8         THE VIDEOGRAPHER:  With the approval of
9    counsel, we are back on the record.  The time is
10   approximately 2:30.  This is the beginning of Tape
11   No. 4.
12
13              EXAMINATION
14   BY MR. TEMKO:
15        Q.  Good afternoon, Mr. Bolin.
16        A.  Mr. Temko.
17        Q.  I am going to ask you questions about two sites
18   this afternoon, the site at 6502 Bolsa and the site at
19   5981 Westminster in Westminster, California.
20        Is that your understanding?
21        A.  Yes.
22        Q.  And is it your understanding that you are the
23   designated witness for the District to answer the
24   questions in the deposition notice that we sent out that
25   related in part to those two stations?

Page 1570

1  for sampling the wells in the District's basin. There
2  are different schedules for different wells, and I
3  honestly don't know what those schedules are.
4  BY MR. TEMKO:
5      Q.  Since 2008, has the District ever detected MTBE
6  in HB-4?
7      A.  No.
8      Q.  Since 2008, has the District ever detected TBA
9  in HB-4?
10     A.  No.
11     Q.  Since 2008, has the District ever detected TAME
12 in HB-4?
13     A.  No.
14     Q.  Since 2008, has the District ever detected MTBE
15 in HB-7?
16     A.  No.
17     Q.  Since 2008, has the District ever detected TBA
18 in HB-7?
19     A.  No.
20     Q.  Since 2008, has the District ever detected TAME
21 in HB-7?
22     A.  No.
23     Q.  Since 2008, has the District ever detected MTBE
24 in HB-13?
25     A.  No.

Page 1571

1      Q.  Since 2008, has the District ever detected TBA
2  in HB-13?
3      A.  No.
4      Q.  Since 2008, has the District ever detected TAME
5  in HB-13?
6      A.  No.
7      Q.  Since 2008, has the District ever detected MTBE
8  in HB-1?
9      A.  No.
10     Q.  Since 2008, has the District ever detected TBA
11 in HB-1?
12     A.  No.
13     Q.  Since 2008, has the District ever detected TAME
14 in HB-1?
15     A.  No.
16     Q.  Since 2008, has the District asked Friedman &
17 Bruya to do follow-up sampling for MTBE, TBA or TAME in
18 either HB-4, HB-7, HB-13 or HB-1?
19     A.  Well, you asked me if Friedman & Bruya has been
20 asked to do the sampling, and the answer is no.
21     Q.  Are you being a little cute by half? In other
22 words, you do the sampling and they analyze the
23 sampling?
24     A.  That is correct.
25     Q.  Okay. So I caught you. Touche by Mr. Bolin.

Page 1572

1      A.  I just want to make sure I'm answering your
2  question specifically.
3      Q.  You knew what I was getting at, but that's okay
4  if that's --
5      A.  That's --
6      Q.  We can play that way.
7      A.  I don't mean to be cute.
8          MS. O'REILLY:  I'm going to object to the
9  extent it's argumentative. You're aware that the
10 District takes the samples and Friedman & Bruya does the
11 analysis. And the witness is simply trying to make sure
12 his answers are accurate.
13         THE WITNESS:  I was going to clarify. I don't
14 mean to be cute.
15 BY MR. TEMKO:
16     Q.  Okay.
17     A.  Friedman & Bruya is doing the testing, and that
18 is what we have asked them to do.
19     Q.  Has Friedman & Bruya tested samples from HB-4
20 since 2008?
21         MS. O'REILLY:  I'm going to object to the
22 extent the question is overbroad. Are you asking as he
23 sits here today whether he knows they've completed the
24 analysis? He has just answered the question that
25 they're doing the analysis. Are you asking whether they

Page 1573

1  completed the analysis for that well as of today?
2          MR. TEMKO:  I'm -- I'm trying to figure out
3  what wells they're done with, what they're not done
4  with.
5          MS. O'REILLY:  Okay.
6          THE WITNESS:  These wells are on the list to be
7  tested by Friedman & Bruya. I don't know whether they
8  have completed those tests or not. I'm -- in fact, I'm
9  not even certain whether all the samples have been
10 collected, but we are in the process of collecting those
11 samples, and Friedman & Bruya is in the process of
12 testing them.
13 BY MR. TEMKO:
14     Q.  What production wells are on that list for this
15 next phase of Friedman & Bruya testing?
16     A.  These are wells that are associated with the --
17 the designated plumes, the five designated plumes now
18 that we are evaluating. And these are sites for which
19 Roy Herndon and myself are being deposed these last
20 several weeks.
21     Q.  Has Friedman & Bruya tested any of those wells
22 since 2008?
23         MS. O'REILLY:  Asked and answered. Vague and
24 ambiguous.
25 ///

46 (Pages 1570 to 1573)

Page 1634

1   showing up in HB-1.
2        The consensus is given enough time and enough
3   mass, we're -- we're going to get detections. And
4   because of the proximity of HB-1 to 6502, we think
5   that's a likelihood.
6        Q.  Well, doesn't it cut the other way, that given
7   the proximity of 6502 Bolsa to HB-1, don't you think
8   that if it was going to impact HB-1, it would have done
9   it by now?
10       MS. O'REILLY:  Incomplete hypothetical.
11   Misstates testimony.  Calls for expert opinion.  Exceeds
12   the scope of the notice.  Violates Special Master
13   Warner's order.  Vague.  Ambiguous.  Compound.
14       MR. TEMKO:  Let me just see if I understand,
15   Ms. O'Reilly.  When it suits you, he can talk to his
16   heart's content and give whatever opinions, but when I
17   ask a follow-up question that you don't like, then you
18   object.  I just -- I don't understand -- it would be one
19   thing if you were consistent, but it does seem to me
20   it's a little bit unfair to allow your witness to opine
21   about his views on these topics, and then when I ask a
22   follow-up question, you go, oh, my goodness, not now.
23       MS. O'REILLY:  I've stated my objections --
24       MR. TEMKO:  Okay.
25       MS. O'REILLY:  -- for the record.

Page 1635

1        MR. TEMKO:  I think it's inappropriate and a
2   speaking objection.
3   BY MR. TEMKO:
4        Q.  But go ahead, Mr. Bolin.
5        A.  I believe you asked me if it was going to --
6   and I'm paraphrasing, if the contam-- -- MTBE
7   contamination from 6502 was going to get into Well HB-1,
8   wouldn't it have done so by now?
9        Q.  That's a good paraphrase.
10       A.  And my response is, well, not necessarily.
11   Because we haven't done fate and transport analysis, I
12   really don't know how long it takes MTBE contamination
13   from Shell 6502 to get into HB-1.  But there's -- I know
14   there's a lot of factors.  While I'm not an expert in
15   fate and transport analysis and I couldn't do such a --
16   an evaluation myself, I am familiar with some -- many of
17   those factors, the tortuous path that it might flow or,
18   you know, whether it encounters a conduit which would --
19   which would accelerate the movement of MTBE, or whether
20   the well itself is constructed in such a way that it
21   is -- is well protected from contamination getting in.
22        I -- I -- I'm familiar with several different
23   mechanisms by which contamination might get in the well,
24   but I can't say which mechanism would be faster or
25   shorter or, you know, whether it absolutely should have

Page 1636

1   gotten in there now, or whether it won't, you know, for
2   another year or two years or however long.  I -- I
3   really don't know.
4        Q.  But there could be factors that would prevent
5   the well from getting contaminated as well, correct?
6        MS. O'REILLY:  Calls for speculation.
7   Incomplete hypothetical.
8        THE WITNESS:  I don't know if I would go so far
9   as to say prevent.  There are factors that would inhibit
10   contamination from getting in the well.  The only
11   certain way to prevent it is by containing it or
12   capturing it and preventing it from moving towards a
13   well in the first place.
14   BY MR. TEMKO:
15       Q.  Yeah.  So if it doesn't get within the capture
16   zone, it can't get in the well, correct?
17       A.  Even that is not completely correct.  The
18   capture zone -- well, I'm getting a little bit outside
19   my area of expertise here.  As I understand it, the
20   capture zone is going to be within the aquifer from
21   which it's pumping.  And it is possible for
22   contamination to flow, for example, along the surface
23   and somehow get down to -- short-circuit down into a
24   well.  Maybe there is a -- a hole in the well or maybe
25   there's a crack in the -- in a weld or something like

Page 1637

1   that.
2        It is possible for contamination to flow around
3   the surface and then get into the well even though that
4   might not technically be part of the capture zone.  So
5   it's -- it's actually quite complex.
6        Q.  Again, see if we can move this along, on HB-1
7   there has been no MTBE detected, correct?
8        A.  That's correct.
9        Q.  Would the two wells as to which there have been
10   Friedman & Bruya detections, HB-7 and HB-13, is it fair
11   to say that your testimony with respect to 6502 Bolsa is
12   the same that you gave with respect to the Westminster
13   site?
14        And, again, I'm going to paraphrase and perhaps
15   short-circuit it, and you tell me if I'm wrong.  The
16   District's staff and its consultants cannot say
17   categorically that the MTBE detected in HB-7 or HB-13 is
18   MTBE that came from 6502 Bolsa, but you also can't say
19   that it isn't?
20        A.  I -- I think that's a -- that's a fair
21   statement.  We have not identified specifically which
22   site or sites the contamination in HB-7 and 13 has come
23   from.
24        Q.  You were awaiting the next phase of work with
25   respect to 6502 Bolsa, and based on your testimony from

62  (Pages 1634 to 1637)

Page 1650

BY MR. TEMKO:
1   Q.  You know, I think you know the script. I'm
2   going to try to finish up, and I'm going to do a speed
3   version of this. And, again, with the express
4   understanding that if I'm going too quickly, you're
5   going to tell me to slow down.
6       A.  Okay.
7       Q.  Okay? But I'm going to try to refer, if you
8   don't mind, maybe in a little bit of shorthand to the
9   testimony you gave with respect to 5981 and see if your
10  answer is the same with respect to 6502 Bolsa.
11      A.  Okay.
12      Q.  Is that okay?
13      A.  That's fine.
14      Q.  Thanks.
15          Is it fair to say that if I asked you whether
16  you've done anything to determine whether wells in the
17  vicinity of 6502 Bolsa may potentially be acting as
18  possible conduits for contamination, if you've done
19  anything since October of 2008, that your answer
20  would -- would be similar to what you gave me earlier
21  this afternoon, that is, you looked at the database;
22  there is information in your database about other wells,
23  but there's no evidence in your review of the database
24  that you've come up with any new information or

Page 1651

1   identified new wells since October of 2008?
2       A.  That's correct.
3       Q.  Since October of 2008, has the District had any
4   communications with the Orange County Health Care Agency
5   regarding 6502 Bolsa?
6       A.  I don't recall any specific conversations about
7   Shell 6502 with the Health Care Agency since 2008.
8       Q.  Since October of 2008, has the District had any
9   communications with the Santa Ana Regional Water Quality
10  Control Board regarding 6502 Bolsa?
11      A.  I don't think so.
12      Q.  Since October of 2008, has the District had any
13  communications with Shell regarding 6502 Bolsa?
14          MS. O'REILLY: Vague and ambiguous.
15          Go ahead.
16          THE WITNESS: No.
17  BY MR. TEMKO:
18      Q.  Since October of 2008, has the District had any
19  communications with any Shell consultant regarding the
20  work being done at 6502 Bolsa?
21          MS. O'REILLY: Same objection.
22          Go ahead.
23          THE WITNESS: No.
24  BY MR. TEMKO:
25      Q.  Other than the general meeting you testified to

Page 1652

1   earlier with the water producers, since October of 2008
2   has the District had any communications with the City of
3   Huntington Beach regarding 6502 Bolsa?
4       A.  I don't think so.
5       Q.  And let me just be clear. I don't mean to
6   suggest by my question that you were testifying that --
7   well, let me just ask you. As you sit here today, do
8   you recall discussing -- having discussions with the
9   City of Huntington Beach where the topic of 6502 Bolsa
10  in particular came up?
11      A.  No. And I was trying to recall any
12  conversations that Roy Herndon might have had as well.
13  I don't think that's the case.
14      Q.  Thanks.
15          Since October of 2008, has the District had
16  conversations with any other water producers in the area
17  regarding 6502 Bolsa?
18          MS. O'REILLY: Vague and ambiguous.
19          Go ahead.
20          THE WITNESS: Except for that -- the one
21  meeting that I'm aware of, I think -- again, I think
22  that was January 2009 where we talked to all of the
23  producers. No, I don't think there have been other
24  conversations with producers about Shell 6502.
25  ///

Page 1653

1   BY MR. TEMKO:
2       Q.  Is it fair to say that you have not attempted
3   to calculate the costs that the District has incurred
4   since October of 2008 with respect to work relating to
5   6502 Bolsa?
6           MS. O'REILLY: It misstates prior testimony.
7   Vague and ambiguous.
8           Go ahead.
9           THE WITNESS: The -- the costs we have, we have
10  not broken down to site specific -- or related with
11  specific sites, so we -- we don't have a breakdown for
12  those costs.
13  BY MR. TEMKO:
14      Q.  Right. And just so we're clear. I'm not
15  trying to mischaracterize. We understand that you
16  testified to the interrogatory responses where you do
17  have some effort to estimate your costs broken down in
18  various buckets, but it's not similarly broken down
19  by -- by particular station sites, correct?
20      A.  Yes. Your -- your question asked me whether I
21  had made any attempt to do so, and I actually did go
22  back and look at the costs and see if there was a way to
23  break them out, including looking at our consultants'
24  invoices, and I haven't been able to do so.
25      Q.  Did you ask the consultants whether they could

66 (Pages 1650 to 1653)

Confidential - Per 2004 MDL 1358 Order

Page 1658

1      This deposition consists of five videotapes.
2   The time is approximately 5:31.  We are now off the
3   record.
4      (The deposition was concluded at 5:31 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1660

1      ------
         E R R A T A
2      ------
3   PAGE LINE CHANGE
4   _____
5   REASON: _____
6   _____
7   REASON: _____
8   _____
9   REASON: _____
10  _____
11  REASON: _____
12  _____
13  REASON: _____
14  _____
15  REASON: _____
16  _____
17  REASON: _____
18  _____
19  REASON: _____
20  _____
21  REASON: _____
22  _____
23  REASON: _____
24  _____
25  REASON: _____

Page 1659

1      REPORTER'S CERTIFICATION
2
3      I, Kimberly Thrall, Certified Shorthand
4   Reporter and Registered Professional Reporter, in and
5   for the State of California, do hereby certify:
6
7      That the witness named in the foregoing
8   deposition was, before the commencement of the
9   deposition, duly administered an oath in accordance
10  with the Code of Civil Procedure Section 2094; that
11  the testimony and proceedings were reported
12  stenographically by me and later transcribed through
13  computer-aided transcription under my direction and
14  supervision; that the foregoing is a true record of the
15  testimony and proceedings taken at that time.
16
17      IN WITNESS WHEREOF, I have hereunto subscribed
18  my name this 16th day of September 2010.
19
20
21      _____
22      Kimberly S. Thrall, RPR, CSR No. 11594
23
24
25

Page 1661

1      ACKNOWLEDGMENT OF DEPONENT
2
3      I, _____, do
    hereby certify that I have read the
4   foregoing pages, and that the same
    is a correct transcription of the answers
5   given by me to the questions therein
    propounded, except for the corrections or
6   changes in form or substance, if any,
    noted in the attached Errata Sheet.
7
8   DAVID P. BOLIN        DATE
9
10
11
12
13
14
    Subscribed and sworn
15  to before me this
    _____ day of _____, 20____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24
25

68 (Pages 1658 to 1661)

Golkow Technologies, Inc. - 1.877.370.DEPS

d1027793-3b28-4c9c-b806-46c020487aaf

Page 1894

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


IN RE:  METHYL TERTIARY BUTYL
ETHER ("MTBE")

This Document Relates to:
ORANGE COUNTY WATER DISTRICT
v. UNOCAL CORPORATION, et al.,
Case No. 04CIV.4968 (SAS)
_____/


------


CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)

------

FRIDAY, SEPTEMBER 3, 2010

------


Videotaped Deposition of DAVID P. BOLIN, Volume
IX, Orange County Water District's 30(b)(6) designee
in re Site Specific Station Investigations, held in
the Law Offices of Sheppard Mullin Richert & Hampton,
650 Town Center Drive, 4th Floor, Costa Mesa,
California beginning at 9:06 a.m.


------


Reported by:
Sandra Bunch VanderPol, CSR #3032
Certified Realtime Reporter
Registered Merit Reporter
Realtime Systems Administrator credentialed
Fellow, Academy of Professional Reporters
_____


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Page 1907

1  today's deposition -- and I will run through the
2  numbers or letters of them right now.  But when I
3  talk today about the "four sites" or the "four Mobil
4  sites," you will understand it, I will be referring
5  to these four sites, which are Mobil 18-G6B, Mobil
6  18-HDR, Mobil 18-HEP, and Mobil 18-668, okay?
7       A.   Yes.
8       Q.   With respect to these four stations,
9  what actions has the District taken since June of
10 2008 either on a analysis front, in terms of
11 analyzing materials, or on an active -- or activity
12 front in terms of investigations at the site,
13 borings, anything else like that?
14      MS. O'REILLY: Vague. Ambiguous. Compound.
15 Go ahead.
16      THE WITNESS:  My answer will be in response
17 to essentially all the sites.  The answer would be
18 substantially the same for the sites, all four sites
19 we're talking about today.
20      The District staff and the District's
21 consultant has evaluated these sites and considered
22 them for an upcoming investigation, our CPT
23 investigation, which I'm sure we will be referring
24 to.
25      Some of these sites are included in that

Page 1908

1  investigation, some are not, but all of them were
2  considered.  And there was some in-depth analysis
3  performed by the District consultant to decide
4  whether to include one or more of these sites in that
5  investigation.
6  BY MR. PARKER:
7       Q.   And when you refer to the in-depth
8  analysis by the District's consultant, you're
9  referring to Hargis + Associates --
10      A.   Yes.
11      Q.   -- is that correct?
12      Okay.  Has there been any physical work
13 conducted by the District or Hargis on any of these
14 four Mobil sites, aside from physical work of --
15 which we talked about the other time -- of marking or
16 going out to identify locations for purposes of
17 utility clearances?
18      A.   We have not yet collected data from
19 the field.  All of our work thus far has been
20 preliminary in preparing for that work.
21      Q.   And there's been no remediation in
22 terms of putting in a remediation system or, you
23 know, putting a shovel in the ground to excavate
24 anything at these four sites, correct?
25      A.   There has been no active remediation

Page 1909

1  activities by the District's staff or the District's
2  consultant as yet.
3       Q.   Has the District or its consultant
4  done any contaminant flow analysis, fate and
5  transport analysis, or soil vapor studies --
6  actually, strike that.
7       Has the District or its consultant done any
8  contaminant flow analysis or fate and transport
9  analysis at any of these four Mobil stations?
10      MS. O'REILLY:  I'm going to object to the
11 extent it calls for attorney-client privileged
12 communication.
13      Go ahead.
14      THE WITNESS:  The District's consultant,
15 Hargis, who is conducting this work, has completed
16 some fate and transport or pathway evaluation. But
17 they have not been asked to do any detailed modeling,
18 or anything to that degree, as yet.  Therefore, part
19 of the work they have been doing might be attributed
20 to fate and transport analysis or pathway analysis
21 when they selected their sample locations for the
22 investigation.  But there's still a lot of that to be
23 done.
24      So my answer would be, yes, some, but not
25 complete.

Page 1910

1  BY MR. PARKER:
2       Q.   Now, with respect to any of that path
3  flow or fate and transport analysis, would that be
4  reflected in writings by either the District's
5  consultant or someone at the District?
6       A.   If I understand your --
7       MS. O'REILLY:  Misstates the testimony.
8  Vague and ambiguous.
9       THE WITNESS:  If I understand your question
10 correctly, we don't have a writing that discusses
11 fate and transport analysis outside of Hargis's work
12 plan.
13      We had a previous report which they covered
14 on this site, but -- I mean, actually, if I remember
15 correctly now, it was a Komex report, but Hargis had
16 reviewed this site, and there is no subsequent
17 writing discussing fate and transport analysis or
18 pathway analysis.
19 BY MR. PARKER:
20      Q.   Okay.  So they haven't done a report
21 of any kind, is what I was getting at?  They have got
22 their work plan, which is one document that arguably
23 look at the sites and the site conditions.
24      Aside from that work plan or the July 28
25 supplement, which is a budgetary issue, they have not

5 (Pages 1907 to 1910)

87823e97-f940-418e-bc80-919edaace568

Confidential - Per 2004 MDL 1358 Order

Page 2059

1  detection limits of 2 parts per billion, according to
2  that figure, on the easterly side.
3      A.   I see that.
4      Q.   Would you agree that, based on that,
5  there appears to be adequate delineation to the east?
6      MS. O'REILLY: I'm going to object to the
7  extent it calls for an expert opinion. Calls for
8  speculation. Incomplete hypothetical. Lacks
9  foundation. Assumes facts. Vague and ambiguous and
10 exceeds the scope of the notice.
11     THE WITNESS: My answer would be the same.
12 The only difference here is the reportable detection
13 limit is 2 rather than 5. I don't know why Hargis
14 did not apply the reportable detection limit of 2 on
15 their Figure 8 because the result is basically the
16 same.
17 BY MR. PARKER:
18     Q.   Wouldn't that suggest to you, though,
19 that maybe at some time historically they tested at
20 5 --
21     MS. O'REILLY: Calls for --
22 BY MR. PARKER:
23     Q.   And that --
24     MS. O'REILLY: Go ahead.
25 BY MR. PARKER:

Page 2060

1      Q.   -- and that may be why they are
2  reporting that? Because that's the highest east side
3  detection limits, so at that point I guess there
4  could have been something in the 4s?
5      MS. O'REILLY: Calls for speculation. Lacks
6  foundation. Assumes facts. Incomplete hypothetical.
7  Connect check.
8      THE WITNESS: No.
9      MR. PARKER: Whatever --
10     THE WITNESS: I think that's probably an
11 oversight. I really do think -- it doesn't make
12 sense to me that they would have applied a higher
13 detection limit and there might have been a detection
14 of 4.
15     I think it's just an oversight, that they
16 should have reported the 2 -- the reportable
17 detection limit of 2 on November 7 rather than the
18 reportable detection limit of 5 on January 8.
19 BY MR. PARKER:
20     Q.   So you're in agreement that Hargis is
21 not a competent contractor?
22     MS. O'REILLY: Argumentative. You don't
23 need to answer that.
24     MR. PARKER: Tracey, it was a joke. You
25 could smile. The witness laughed.

Page 2061

1      You can answer, if you want to.
2      THE WITNESS: I think Hargis is outstanding.
3  BY MR. PARKER:
4      Q.   All right. With respect to this
5  Station 18-G6B, since June of 2008 has the District
6  seen any data showing that MTBE escaping from the
7  site has impacted a drinking water well?
8      MS. O'REILLY: Calls for expert opinion.
9  Lacks foundation. Assumes facts. Vague and
10 ambiguous.
11     Go ahead.
12     THE WITNESS: We have no new data since
13 2008.
14 BY MR. PARKER:
15     Q.   And is it correct that with respect
16 to potential conduits in the vicinity of 18-G6B,
17 other than Hargis noting them in its 2009 Site
18 Summary, the District and its contractors or
19 consultants have not done any field survey,
20 investigation, or analysis of whether there are
21 conduits acting as contaminant flow paths in the
22 vicinity of the site?
23     MS. O'REILLY: Incomplete hypothetical.
24 Vague. Ambiguous. Calls for speculation.
25     THE WITNESS: If I understand your question

Page 2062

1  correctly, the District has -- the District staff and
2  the District's consultant, the hired consultant, has
3  not done any additional analysis since 2008, with the
4  exception of their valuation of these sites for the
5  upcoming investigation. I think that was spelled out
6  in their work plan.
7  BY MR. PARKER:
8      Q.   With respect to site 18-G6B, has the
9  District, or anyone acting on its behalf, had any
10 communication with the Regional Board or other
11 oversight agency, or ExxonMobil or ExxonMobil's
12 consultant regarding the investigation or remediation
13 at the site?
14     A.   I don't believe we have had any
15 communication since 2008.
16     Q.   Do you know what the current status
17 of the remediation system at Station G6B is?
18     MS. O'REILLY: Vague and ambiguous.
19     THE WITNESS: I will have to check my notes.
20 I apologize that all these sites tend to run
21 together.
22     I know that -- that -- who is it? -- ERI is
23 conducting a rebound test. And I believe it is --
24 they are doing vapor extraction, dual phase
25 extraction, but I don't know the status of what their

43 (Pages 2059 to 2062)

87823e97-f940-418e-bc80-919edaace568

Confidential - Per 2004 MDL 1358 Order

Page 2139

1   I don't have any history from the site after November
2   2008, but let me -- let me keep checking. I will do
3   this as quick as I can.
4       Let's see. Well, based on the most recent
5   documents I've looked at, I can't confirm that there
6   has been any soil vapor testing since 2008 in
7   either -- I just simply can't remember it, that it
8   was done at this site, or I'm confusing this site
9   with another site. I just don't have any
10  recollection of soil vapor testing after 2008.
11      Q.   You have not seen any soil vapor or
12  soil testing of any kind that indicates there is
13  significant MTBE still located on the site 18-668,
14  correct?
15      MS. O'REILLY: I'm going to object.
16  Misstates testimony. Lacks foundation.
17      To the extent you're asking about soil vapor
18  sampling done before 2008, it exceeds the scope of
19  the notice.
20      THE WITNESS: All I can say is that I
21  haven't seen any soil vapor data since 2008 or soil
22  sample data since 2008 that tells me whether there is
23  or is not MTBE or TBA contamination left in the soil
24  or the soil vapor.
25      MR. PARKER: All right. Tracey, I'm done

Page 2140

1   for now. I am reserving on instructions in areas
2   that I was not allowed to inquire into.
3       I just want to be clear on the record, with
4   respect to all days of Mr. Bolin's deposition, that
5   we are going to evaluate that and determine whether
6   to bring it before Special Master Warner for what we
7   believe were improper instructions.
8       MS. O'REILLY: You know that our position is
9   that we have given you what been produced and given
10  you what he was asked to do by the notice.
11      THE VIDEOGRAPHER: This adjourns Volume IX
12  of the corporate designee of Orange County Water
13  District, represented by David Bolin, in regards to
14  production of documents for specific sites HRD-18, I
15  am sorry, HDR-18, 18-G6B, 18-668. Excuse me.
16      This deposition consists of five videotapes.
17  We are now off the record. The time is approximately
18  5:11.
19      (The deposition was concluded at 5:11 p.m.)
20          --o0o--
21
22
23
24
25

Page 2141

1           REPORTER'S CERTIFICATE
2
3       I certify that the witness in the foregoing
4   deposition.
5           DAVID BOLIN
6   was by me duly sworn to testify in the within-entitled
7   cause; that said deposition was taken at the time and
8   place therein named; pages 1894 through 2143 of the
9   testimony of said witness were reported by me, a duly
10  Certified Shorthand Reporter of the State of
11  California authorized to administer oaths and
12  affirmations, and said testimony was thereafter
13  transcribed into typewriting.
14      I further certify that I am not of counsel or
15  attorney for either or any of the parties to said
16  deposition, nor in any way interested in the outcome
17  of the cause named in said deposition.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  this 19th day of September, 2010.
20
21
22      --------------------------------
23      SANDRA BUNCH VANDER POL, RMR, CRR
24      Certified Shorthand Reporter
25      Certificate No. 3032

Page 2142

1       ------
2        E R R A T A
3   ------
4   PAGE LINE CHANGE
5   _____
6    REASON: _____
7   _____
8    REASON: _____
9   _____
10   REASON: _____
11  _____
12   REASON: _____
13  _____
14   REASON: _____
15  _____
16   REASON: _____
17  _____
18   REASON: _____
19  _____
20   REASON: _____
21  _____
22   REASON: _____
23  _____
24   REASON: _____
25   REASON: _____

63 (Pages 2139 to 2142)

87823e97-f940-418e-bc80-919edaace568