# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl:    Master File No. 1:00-1898
Ether ("MTBE")       :    MDL NO. 1358 (SAS)
Products Liability   :    M21-88
Litigation           :
_____

This Document Relates to:
    Orange County Water District
    v. Unocal Corporation, et al.,
    S.D.N.Y. No. 04 Civ. 4968 (SAS)
_____/

CONFIDENTIAL
(Per 2004 MDL 1358 Order)

------

July 8, 2008

------


        Videotaped Deposition of MICHELLE BOYD,

OCWD'S 30(b)(6) DESIGNEE, held in the law offices of

Latham & Watkins, 650 Towne Center Drive, Suite 2000,

Costa Mesa, California beginning at 9:44 a.m., before

Sandra Bunch VanderPol, RPR, RMR, CRR, CSR #3032.

EXHIBIT
2

        GOLKOW TECHNOLOGIES, INC.

    877.370.3377 ph|917.591.5672 fax

        deps@golkow.com

Page 30

1   to see if the location is safe, if there is indeed a
2   streamflow or an area where we can sample. Or if
3   it's a well, they go and check it out to make sure
4   that it's a well that's sample-able and if our
5   equipment we have can actually fit into the
6   well, or that kind of thing.
7       Q.   In addition to wells which take water
8   from the subsurface, you know, did fieldwork also
9   involve sampling surface water sources?
10      A.   Correct.
11      Q.   And is the staff of nine that do this
12  fieldwork, do they do essentially all the groundwater
13  and surface water sampling for the Orange County
14  Water District?
15      A.   Correct.
16      Q.   Are there projects of the department
17  that you coordinate, other than sampling groundwater
18  or surface water or performing recon for new sites?
19      A.   No.
20      Q.   You mentioned that in your current
21  position at Orange County Water District, that you
22  were involved in all the different cities in the
23  district. What did you mean by that?
24      A.   We coordinate their groundwater
25  compliance monitoring. The water district, on their

Page 31

1   behalf, coordinates their groundwater compliance
2   monitoring for the drinking water.
3       Q.   So the Water Quality Department of
4   Orange County Water District coordinates the
5   compliance monitoring of the various cities and water
6   systems within the geographic boundaries of the
7   district?
8       A.   Correct.
9       Q.   What is the compliance monitoring
10  that you refer to?
11      A.   The Title 22 drinking water
12  monitoring.
13      Q.   And for those of us who are not
14  conversant with this technical information, what is
15  the Title 22 drinking water sampling?
16      A.   It's the state drinking water
17  compliance regulations.
18      Q.   And that's done by DHS -- that is a
19  program administered by the Department of Health
20  Services?
21      A.   Yes.
22      Q.   Department of Health Services sets
23  specific standards for various contaminants in water?
24      A.   Correct.
25      Q.   And then it's obligatory for water

Page 32

1   systems around the state that extract water from the
2   ground and serve it to customers to meet those
3   standards; is that your understanding?
4       A.   Correct.
5       Q.   So the various cities and water
6   systems within Orange County's geographic -- Orange
7   County Water District's geographic boundaries has
8   certain obligations to sample the water that they are
9   producing and to analyze it for compliance with the
10  drinking water standards set by Department of Health
11  Services; is that correct?
12      A.   Correct.
13      Q.   And what is the role that Orange
14  County Water District plays in that?
15      A.   We perform the monitoring, the field
16  monitoring and the lab analysis.
17      Q.   And what is involved in performing
18  the field monitoring and lab analysis?
19      A.   Staff goes out and samples drinking
20  water wells for all the different parameters required
21  by the state at the frequency they are required, and
22  we return them to the lab for analysis.
23      Q.   Now, I want to go back to the time
24  that you were employed by the City of Fountain
25  Valley. And I believe you said that during that

Page 33

1   period, the City of Fountain Valley performed the
2   sampling of its own wells for the Department of
3   Health Services; is that correct?
4       A.   No. Not its wells. Its water
5   system.
6       Q.   All right. So maybe you can explain
7   what it is that they sampled themselves and what they
8   didn't sample themselves.
9       A.   The water district samples the water
10  source, the well. The water system municipality,
11  water district, samples the distribution system.
12      Q.   So there's really two different
13  points at which the Department of Health Services
14  requires water to be sampled --
15      A.   Yes.
16      Q.   -- is that correct?
17      A.   Yes.
18      Q.   One of them is the water source,
19  which could be either groundwater or surface water;
20  is that correct?
21      A.   Correct.
22      Q.   And the other is the water in the
23  system that's actually being distributed to
24  customers, correct?
25      A.   Correct.

9 (Pages 30 to 33)

Confidential - Per 2004 MDL 1358 Order

Page 166

1       A.    Correct.
2       MR. CORRELL: I have nothing further.
3       MR. HEARTNEY: Nothing further. Although,
4    we are not completed in this portion of the
5    deposition, in my view, for the reasons that we
6    talked about off line.
7       MR. AXLINE: I'm going to make a statement
8    for the record here. I don't think I have any
9    follow-up questions.
10      But I'm looking at the designated issue --
11   the notice of designated issues for this deposition.
12   There are many, many issues. One -- issue No. 1 is
13   divided into a number of subparts. One subpart of
14   issue No. 1 is sub (e), monitoring of groundwater
15   quality.
16      This witness was produced because she is the
17   person familiar with the processes for monitoring
18   groundwater quality in Orange County. She was asked
19   very few questions about what she actually does in
20   this deposition. And I take it from your comments
21   that you're not going to need to depose her again.
22      There are other issues having to do with
23   regulation, protection, management, enhancement of
24   groundwater quality for which other witnesses will be
25   produced. And I suspect that many of the questions

Page 167

1    that were asked of this witness today may be asked of
2    those witnesses.
3       But in terms of groundwater monitoring, this
4    witness was the District's 30(b)(6) witness on that
5    topic.
6       And I have no questions for the witness.
7       MR. HEARTNEY: All done. I think there's
8    nothing more for us to do right now.
9       So we can go off the record.
10      THE VIDEOGRAPHER: Thank you.
11      Off the record. The time is 3:08 p.m.
12      (The deposition was concluded at 3:08 p.m.)
13      --o0o--
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

1       Please be advised I have read the foregoing
2    deposition, and I state there are:
3    (Check one) _____ NO CORRECTIONS
4       _____ CORRECTIONS PER ATTACHED
5
6
7    _____
8       MICHELLE BOYD
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 169

1       DEPONENT'S CHANGES OR CORRECTIONS
2    Note:  If you are adding to your testimony, print the
3    exact words you want to add.  If you are deleting from
4    your testimony, print the exact words you want to
5    delete. Specify with "Add" or "Delete" and sign this
6    form.
7    DEPOSITION OF:    MICHELLE BOYD
8    CASE:      OCWD VS. UNOCAL, ET AL.
9    DATE OF DEPOSITION: JULY 8, 2008
10   PAGE    LINE    CHANGE/ADD/DELETE
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   DEPONENT'S SIGNATURE _____
25   DATE _____

43  (Pages 166 to 169)

Confidential - Per 2004 MDL 1358 Order

Page 170

```
 1          REPORTER'S CERTIFICATE
 2
 3     I certify that the witness in the foregoing
 4  deposition,
 5          MICHELLE BOYD,
 6  was by me duly sworn to testify in the within-entitled
 7  cause; that said deposition was taken at the time and
 8  place therein named; that the testimony of said
 9  witness was reported by me, a duly Certified Shorthand
10  Reporter of the State of California authorized to
11  administer oaths and affirmations, and said testimony,
12  pages 1 through 169, was thereafter transcribed into
13  typewriting.
14          I further certify that I am not of counsel or
15  attorney for either or any of the parties to said
16  deposition, nor in any way interested in the outcome
17  of the cause named in said deposition.
18          IN WITNESS WHEREOF, I have hereunto set my hand
19  this 17th day of July, 2008.
20
21          _____
22          SANDRA BUNCH VANDERPOL
23          Certified Shorthand Reporter
24          Certificate No. 3032
25
```

Golkow Technologies, Inc. - 1.877.370.DEPS

# EXHIBIT 3

Page 1208

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re:  Methyl Tertiary Butyl Ether | : | |
| ("MTBE") | : | Master File |
| Products Liability Litigation | : | No. 1:00-1898 |
| | : | MDL No. 1358 (SAS) |
| _____ | : | M21-88 |
| | : | |
| This document relates to the | : | |
| following case: | : | |
| | : | |
| Orange County Water District v. | : | |
| Unocal Corp., et al., 04 Civ. 4968 | : | VOLUME VI |
| (SAS) | : | |
| _____ | : | Pages 1208 - 1392 |

CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)

FRIDAY, AUGUST 27, 2010

------

Videotaped Deposition of ROY L. HERNDON,
Volume VI, Orange County Water District's 30(b)(6)
designee in re Site Specific Station Investigations,
held in the Law Offices of Latham & Watkins, 650 Town
Center Drive, 20th Floor, Costa Mesa, California
beginning at 9:04 a.m.

------

**EXHIBIT
3**

Reported by:
Sandra Bunch VanderPol, CSR #3032
Certified Realtime Reporter
Registered Merit Reporter
Realtime Systems Administrator credentialed
Fellow, Academy of Professional Reporters

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Page 1305

1    Station No. 7-4283 as -- it appears to be another
2    site within Plume 1 that is designated as one of the
3    ten. And I'm looking at a map listed as "Figure 1
4    Site Locations" that came right out of the Hargis
5    Work Plan.
6        Q.    And which work plan was that? Do you
7    remember the date of that work plan?
8        A.    I think this was the earlier in July
9    work plan. I think the only thing that changed was
10   just a subsequent addendum or amendment to the work
11   plan. I don't think it changed the body of the work
12   plan.
13       Q.    Now, I know I asked you a moment ago
14   what is in the binder, and we summarized a bunch of
15   categories of documents. I don't think excerpts from
16   the Hargis Work Plan were in your response.
17       So now I'm curious whether there are other
18   things -- again, other things in the binder that were
19   not included either in our discussion or counsel's
20   characterization.
21       A.    Okay. I saw "Mr. Herndon will
22   also" -- I'm looking at the August 24th, 2010 letter
23   to Mr. Heartney from Todd Schmidt, and it states:
24   "Mr. Herndon will also be reviewing the reports
25   prepared by Hargis -- or by Komex and /or Hargis +

Page 1306

1    Associates that relate to the station."
2        So I guess I was thinking that was already
3    included. But, anyway, either way.
4        Q.    Okay. Now, I understood that to
5    mean --
6        A.    No problem.
7        Q.    -- the site specific reports, like
8    Exhibit 98.
9        A.    Oh, okay.
10       Q.    Is there anything else in the binder
11   other than what you've told me about?
12       A.    Let me make sure I haven't missed
13   anything else.
14       A table that is called "Bellwether Plume
15   List Comparison." I don't have a Bates number on it.
16   It's dated April 21st, 2009.
17       And then I have a table that states, "Orange
18   County Water District versus Unocal Corp., et al.
19   Plume List," and it's dated April 23rd, 2007.
20       Q.    Perhaps over the lunch break I will
21   just ask to make copies of the --
22       A.    Sure.
23       Q.    -- three pages that --
24       A.    You bet.
25       Q.    -- seem to be beyond the list that we

Page 1307

1    talked about earlier.
2        A.    Sure.
3        Q.    Thank you.
4        Other than the work that you've testified to
5    this morning, did the District ask Hargis to do any
6    additional work with respect to the station at 9475
7    Warner Avenue?
8        A.    Not that I know of. Not that I can
9    recall.
10       Q.    Has any other consultant been asked
11   to do any work since 2008 regarding the station at
12   9475 Warner Avenue?
13       A.    No.
14       Q.    You testified back in 2008 -- and I'm
15   going to paraphrase. And if you feel that you don't
16   recall it that way, you know, please push back.
17       A.    Okay.
18       Q.    But you testified back in your
19   deposition in 2008 that you were unable to state
20   definitively that the MTBE that had been detected in
21   NB-TAMD was MTBE from the service station site at
22   9475 Warner Avenue. Do you recall that testimony?
23       A.    No, I don't recall that.
24       Q.    Do you recall it differently?
25       A.    No. I'm just saying I don't remember

Page 1308

1    that. I have no reason to believe I didn't testify
2    to that general paraphrase. I just don't -- I just
3    don't remember.
4        MS. O'REILLY: Where are you reading from?
5        MR. TEMKO: Well, I'm reading from, for
6    example, page 3264.
7        MS. O'REILLY: Which date?
8        MR. TEMKO: Oh, I'm sorry. Which
9    deposition?
10       MS. O'REILLY: Yeah.
11       THE WITNESS: The deposition that
12   Mr. Herndon gave on November 17, 2008.
13       MS. O'REILLY: Okay.
14       MR. TEMKO: And I will quote, just to orient
15   you,
16       THE WITNESS: Sure.
17       MR. TEMKO: Quote: "But I -- at this point
18   I cannot definitively say that the MTBE from the
19   Texaco site has -- is the same as the MTBE that was
20   detected. That type of investigation needs to be
21   done," unquote.
22       Q.    And the only reason I'm going back
23   here is to guard against Ms. O'Reilly saying, you
24   know, you're supposed to be asking about what
25   happened since 2008. Otherwise it would probably be

26 (Pages 1305 to 1308)

Page 1309

1    a little bit easier.
2         But I guess my question is:  Is that still
3    true today?
4         A.    I would say the District staff has
5    not performed the type of fate and transport analysis
6    that we talked about similar to the G & M No. 4 site,
7    as with this site that we're talking about, to
8    determine whether the MTBE from this site, at 9475
9    Warner Avenue, is the source of the MTBE that was
10   detected at the NB-TAMD well.
11        Q.    So the answer to the question is,
12   "Yes"?
13        A.    I guess.  Yes, we have not done that
14   analysis.  I still can't make that determination.
15        Q.    And that's true of the other focus
16   stations in Plume 1, correct?  As you said, in 2008,
17   quote, "I can't trace the contamination to a
18   particular site," unquote.
19        Is that still true today?
20        A.    As to the focus stations in Plume 1,
21   that is correct.
22        Q.    You testified back in 2008 that you
23   were, quote, "Not aware of any information that would
24   indicate that -- that there's been a release,
25   bracket, from the 9475 Warner station, closed

Page 1310

1    bracket, since May 6 of 2000."
2         Do you need that read back?  I'm not trying
3    to confuse you.
4         A.    No.  You're just telling me what I
5    testified to at that time.
6         MS. O'REILLY:  I can have him read it.  I
7    have it on my screen right here.  You're at 3266?
8         MR. TEMKO:  I am.
9         MS. O'REILLY:  Roy, do you understand the
10   question?
11        THE WITNESS:  Well, it was more of a
12   statement.
13        MR. TEMKO:  It was a statement setting up
14   the following question.
15        Q.    Is that still true today?
16        A.    Let me check my notes, if I may.
17   And, again, as -- as this morning, when you're saying
18   "a release," do you mean a release of product, fuel
19   essentially, to the soil from the facilities or are
20   you talking about release of contamination moving on
21   downgradient, which I want to make sure I'm clear on
22   which release you might be referring to.
23        Q.    The question back in 2008 and today,
24   both relate to the former, a release from the UST
25   system at the site.

Page 1311

1         A.    No, I am not aware of any new release
2    since June of 2008 or --
3         Q.    May.
4         A.    -- May of 2000, yes.
5         Q.    Thank you.
6         During the deposition in 2008 -- and,
7    Counsel, I'm looking at testimony and questioning
8    around pages 3278 to 3281 in the November 17th, 2008
9    deposition of Mr. Herndon.
10        Back in your November 2008 deposition, I
11   asked you about a feasibility study document that was
12   in your binder that had been prepared by the
13   consultant working on this site, a company called
14   WGR.  And in particular I referenced a statement in
15   the WGR Feasibility Study document dated
16   February 20th, 2006, talking about some modeling that
17   had been done by WGR.  It basically -- again,
18   paraphrasing,
19        "The WGR modeling suggested that over the
20   20-year period that the -- because the plume seemed
21   to be relatively static, that over the next 20 years,
22   quote, it appears the closest production well
23   receptor will not be impacted."
24        And I asked you at that point, quote, "Do
25   you have any reason, as you sit here today, to

Page 1312

1    disagree with that statement in the WGR report from
2    February 2006?"
3         And you answered, in part, quote, "I would
4    need to spend a lot more time to be able to give you
5    an answer to that, whether I would agree with this or
6    disagree with this conclusion."
7         Since your deposition in 2008, have you or
8    the District taken any steps to consider whether the
9    District agrees or disagrees with the statements made
10   by WGR in the 2006 report?
11        A.    Well, the District has not undertaken
12   the type of fate and transport analysis, I think,
13   that would need to be done to -- really be able to
14   answer that question or draw a more definitive
15   conclusion as to that -- a response to that statement
16   in a WGR report.
17        Q.    I asked you in November of 2008,
18   quote, "As you sit here today, you can't say that
19   they are wrong?
20        "ANSWER:  I can't say they are wrong,"
21   unquote.
22        Is that still your testimony today?
23        A.    Well, I think one of their comments
24   was that the plume is stable.  And I guess the data I
25   have seen since June of 2008 -- I saw changes in

## Page 1317

1    MS. O'REILLY: Vague. Ambiguous.
2  Overbroad.
3        THE WITNESS: Well, I know as part of
4  Hargis's scope of work, when they prepared the
5  Summary Report, they did indicate an oil production
6  well is located about 600 feet southeast of the site,
7  and that there is the possibility that that well
8  could provide a preferential pathway for
9  contamination.
10       So it appears as though that was part of
11 Hargis's scope of work to at least identify local
12 potential conduits.
13 BY MR. TEMKO:
14       Q.    And just so the record is clear,
15 you're looking at the last bullet on the first page
16 of Exhibit 98; is that correct?
17       A.    Yes.
18       Q.    Since December 23rd, 2008, which
19 appears to be the date of this document, if we look
20 at the footer, has the District done anything to
21 investigate whether the oil production well referred
22 to in the document was a potential preferential
23 pathway for contaminant migration?
24       MS. O'REILLY: Vague. Ambiguous.
25 Overbroad.

## Page 1318

1        THE WITNESS: Not that I know of. I don't
2  believe so.
3  BY MR. TEMKO:
4        Q.    Since June of 2008, has the District
5  had any communications with the Orange County Health
6  Care Agency regarding remediation activities at 9475
7  Warner Avenue?
8        A.    I'm not aware of any discussions
9  between our agency and regulatory agencies.
10       Q.    Since June of 2008, has the District
11 had any communications with anyone at the Santa Ana
12 Regional Water Quality Control Board regarding the
13 remediation activities at 9475 Warner Avenue?
14       A.    Not that I know of.
15       Q.    Since June of 2008, has the District
16 had any communications with anyone at Shell
17 concerning the remediation activities at 9475 Warner
18 Avenue?
19       MS. O'REILLY: Vague. Ambiguous.
20       THE WITNESS: I don't believe so.
21 BY MR. TEMKO:
22       Q.    Since June of 2008, has anyone at the
23 District had any communications with any of Shell's
24 remediation consultants regarding the remediation
25 activities at that site?

## Page 1319

1        MS. O'REILLY: Same objection.
2        Go ahead.
3        THE WITNESS: Not that I know of.
4  BY MR. TEMKO:
5        Q.    Since June of 2008, has the District
6  had any communications with anyone at the City of
7  Fountain Valley regarding the remediation activities
8  at the 9475 Warner Avenue site?
9        MS. O'REILLY: Vague. Ambiguous.
10       THE WITNESS: Not that I'm aware of.
11 BY MR. TEMKO:
12       Q.    Since June of 2008, has the District
13 had any communications with any other water producers
14 in the area, including the City of Newport Beach,
15 regarding the remediation activities at the 9475
16 Warner Avenue site?
17       A.    Not that I know of.
18       MR. TEMKO: I think we're coming to the end
19 of the tape. And this is a decent time to break. So
20 let's go off the record.
21       THE VIDEOGRAPHER: With the approval of
22 counsel, we are going off the record. The time is
23 approximately 12:11.
24       (Lunch recess taken at 12:11 p.m.)
25            --o0o--

## Page 1320

1  AFTERNOON SESSION              1:22 P.M.
2            --o0o--
3        THE VIDEOGRAPHER: With the approval of
4  counsel, we are back on the record. The time is
5  approximately 1:22. This is the beginning of tape
6  No. 3.
7  BY MR. TEMKO:
8        Q.    Now I can really say good afternoon.
9  We are still talking about the site at 9475 Warner
10 Avenue. And we're almost done. I have a couple of
11 follow-up questions.
12       Mr. Herndon, since June of 2008, has the
13 District discovered any evidence to indicate that
14 that the contaminant plume at 9475 Warner Avenue has
15 commingled with the contaminant plume from any of the
16 other focus stations in Focus Plume 1?
17       MS. O'REILLY: I'm going to object to the
18 extent it calls for an expert opinion. Lacks
19 foundation.
20       Go ahead.
21       THE WITNESS: I don't recall seeing any data
22 since June of 2008 that indicated commingling of MTBE
23 of this station with another station.
24 BY MR. TEMKO:
25       Q.    Mr. Herndon, since June of 2008, what

29 (Pages 1317 to 1320)

Confidential - Per 2004 MDL 1358 Order

Page 1389

1        REPORTER'S CERTIFICATE
2
3        I certify that the witness in the foregoing
4    deposition.
5              ROY HERNDON
6    was by me duly sworn to testify in the within-entitled
7    cause; that said deposition was taken at the time and
8    place therein named; pages 1204 through 1386 of the
9    testimony of said witness were reported by me, a duly
10   Certified Shorthand Reporter of the State of
11   California authorized to administer oaths and
12   affirmations, and said testimony was thereafter
13   transcribed into typewriting.
14       I further certify that I am not of counsel or
15   attorney for either or any of the parties to said
16   deposition, nor in any way interested in the outcome
17   of the cause named in said deposition.
18       IN WITNESS WHEREOF, I have hereunto set my hand
19   this 1st day of September, 2010.
20
21
22       ----------------------------------
23       SANDRA BUNCH VANDER POL, RMR, CRR
24       Certified Shorthand Reporter
25       Certificate No. 3032

Page 1391

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do
     hereby certify that I have read the
     foregoing pages, and that the same
4    is a correct transcription of the answers
     given by me to the questions therein
5    propounded, except for the corrections or
     changes in form or substance, if any,
6    noted in the attached Errata Sheet.
7
8    ROY L. HERNDON              DATE
9
10
11
12
13
14
15   Subscribed and sworn
     to before me this
     _____ day of _____, 20____.
16
17   My commission expires:_____
18
     _____
19   Notary Public
20
21
22
24
25

Page 1390

1        - - - - - -
         E R R A T A
2        - - - - - -
3    PAGE LINE CHANGE
4        _____
5    REASON: _____
6        _____
7    REASON: _____
8        _____
9    REASON: _____
10       _____
11   REASON: _____
12       _____
13   REASON: _____
14       _____
15   REASON: _____
16       _____
17   REASON: _____
18       _____
19   REASON: _____
20       _____
21   REASON: _____
22       _____
23   REASON: _____
24       _____
25   REASON:

Page 1392

1        LAWYER'S NOTES
2    PAGE LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25   ____  ____  _____

47 (Pages 1389 to 1392)

Page 1663

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re:  Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | : : : : : | Master File No. 1:00-1898 MDL No. 1358 (SAS) M21-88 |
| This document relates to the following case: | : : : | |
| Orange County Water District v. Unocal Corp., et al., 04 Civ. 4968 (SAS) | : : : : | VOLUME VIII Pages 1663-1893 |

CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)

- - - -

SEPTEMBER 1, 2010

- - - -

Videotaped Deposition of ROY L. HERNDON,

Volume VIII, Orange County Water District's 30(b)(6)

Designee in Re Site Specific Station Investigations,

held at 650 Town Center Drive, 20th Floor, Costa Mesa,

California, commencing at 9:49 a.m., on the above date,

before Kimberly S. Thrall, a Registered Professional

Reporter and Certified Shorthand Reporter.

Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

aab2f876-0ea2-4571-b129-8563c392817b

Confidential - Per 2004 MDL 1358 Order

Page 1676

1    A.   That's correct.
2    Q.   Has OCWD received the overall project
3  site-specific health and safety plan with emergency
4  information for five sites at this site?
5    A.   No, we haven't.
6    Q.   Okay.  Has work begun on the plan?
7    A.   I -- I'd be speculating.  It very well may
8  have.  I just don't know.
9    Q.   So Hargis -- if Hargis has started, they
10 haven't communicated that to the District?
11   A.   I would need to check with Mr. Bolin, who would
12 be able to confirm that.  It wasn't communicated to me,
13 but it doesn't mean it wasn't communicated to Mr. Bolin.
14   Q.   Has Hargis completed the encroachment and well
15 installation permits process for this station?
16   A.   I don't believe so.
17   Q.   How about the traffic -- traffic control plan?
18   A.   I -- I don't believe so.
19   Q.   Do you know if it started either of those two
20 initiatives?
21   A.   I believe Mr. Bolin had indicated to me that
22 those activities have -- have started.
23   Q.   Okay.  When did he communicate that to you?
24   A.   I think it was either earlier this week or late
25 last week.

Page 1677

1    Q.   I'll try to figure out what's the best
2  orientation for this next exhibit.  I will mark it --
3  Exhibit 19 is --
4        MR. AXLINE:  Counsel, do you mean 119 or 19?
5        MR. FINSTEN:  I'm sorry.  Exhibit 119.  Thank
6  you, sir.
7        (Herndon Exhibit 119 was marked.)
8  BY MR. FINSTEN:
9    Q.   Exhibit 119 is a Hargis map for ARCO 1905 dated
10 July 2010.  It is Bates-marked OCWD-MTBE-001-418781.
11       You've seen this map before, Mr. Herndon?
12   A.   I believe so.
13   Q.   And there are seven conceptual CPT/HydroPunch
14 locations for dissection purposes only on this map; is
15 that correct?  Those are the squares.
16   A.   That's what is indicated on this map, yes.
17   Q.   Okay.  Have there been any discussions between
18 OCWD and Hargis regarding the locations of the
19 CPT/HydroPunch locations?
20   A.   Yes.
21   Q.   And when did those discussions take place?
22   A.   It was subsequent to the July work plan
23 submittal by Hargis to the District, that we met with
24 them and Chris Ross from Hargis, and he walked us
25 through the proposed CPT locations for 10 --

Page 1678

1  10 stations.
2    Q.   And he did that for -- for 1905?
3    A.   And I believe this was one of them.
4    Q.   And what did he -- let me just ask you this:
5  Are these locations now confirmed locations, or have any
6  of them changed?
7    A.   I'm not aware that they have changed.
8    Q.   Did OCWD agree to start the CPT testing at
9  these locations?
10   A.   The District approved the scope of work and
11 work plan by Hargis, and so the -- the scope has been
12 approved.  The question will be if a CPT can, in fact,
13 be constructed at each of these locations or whether
14 issues such as utility clearance might require the
15 location to be adjusted somewhat, because those issues
16 have -- are part of the -- the details that need to be
17 completed before we can actually make sure can we put a
18 CPT at that -- at that spot.
19   Q.   Okay.  But as of this time, there are no plans
20 to change the locations unless circumstances require it?
21   A.   If -- if there's a site-specific circumstance
22 that would cause us to have to adjust the location,
23 that -- that is a possibility, but there's -- I'm not
24 aware of any other overriding reasons why we would not
25 proceed with the locations as generally shown on this

Page 1679

1  map.
2    Q.   Have there been any discussions between Orange
3  County Water District and the Santa Ana Regional Water
4  Quality Control Board about the District's plans to
5  conduct CPT and HydroPunch sampling at this site?
6    A.   Not that I'm aware of.
7    Q.   How about the Orange County Health Care Agency?
8    A.   Not that I'm aware of.
9    Q.   Have there been any other communications since
10 2008 between OCWD and the Regional Board or Health Care
11 Agency regarding this site?
12   A.   Not that I'm aware of.
13   Q.   Okay.  Now, looking at the map that is
14 Exhibit 19, there are --
15   A.   119.
16   Q.   119.  Thank you for correcting me.  And I'll
17 probably keep doing that.  When I call you Mr. Bolin,
18 just reach across and slap me.
19       Now looking at the map, there are three CPT
20 locations to the south of the ARCO station and four to
21 the north of the station.  Do you see that?
22   A.   Yes.
23   Q.   And then of the four that are to the north of
24 the station, there are three that are actually northeast
25 of the station apparently in Talbert Avenue, in the

5  (Pages 1676 to 1679)

aab2f876-0ea2-4571-b129-8563c392817b

Confidential - Per 2004 MDL 1358 Order

Page 1680

1  road, that that's where the plan is to do that; is that
2  correct?
3      A.  It's -- it looks like three of the C -- of the
4  proposed CPTs are -- it looks like they're either in the
5  road or potentially in the sidewalk.  But I think the
6  goal in general is to have as many of the CPTs in public
7  rights-of-way, whether it's the road or the sidewalk, as
8  possible.
9      Q.  And we're talking now about what's labeled
10 A-1905A, A-1905B, and A-1905C, correct?
11     A.  Yes.
12     Q.  And so the idea there is to do them in public
13 right-of-ways.
14     And I may have asked you this already, but the
15 permits and traffic-control issues we think are under
16 way for those locations?
17     A.  That's my understanding.
18     Q.  Now, there's four CPT and HydroPunch locations
19 that are apparently on private property, one to the
20 north of the Station A-1905D that's across Talbert
21 Avenue?
22     A.  Yes.
23     Q.  And then 1905E, 1905F and 1905G, which all
24 appear to be not in public right-of-ways; is that
25 correct?

Page 1681

1      A.  Based on this map, it -- it appears as though
2  they're -- they -- they appear to be just outside -- or
3  certainly A-1905E and A-1905G clearly appear to be
4  outside public rights-of-way.  A-1905F looks to be maybe
5  just west of Magnolia Street, at least as shown on this
6  map.
7      Q.  Okay.  Has the District or Hargis taken any
8  steps to gain access to this private property such as
9  pursuing easements or eminent domain?
10     A.  My understanding is that -- is that those
11 efforts are -- have been initiated.  They're -- they're
12 in progress.
13     Q.  Has Hargis contacted the owners of the private
14 property?
15     A.  I don't know.
16     Q.  Do you know what has been done to initiate the
17 process?
18     A.  I believe -- I recall that the property
19 ownership was -- was being or had been researched to
20 identify the property owners.
21     Q.  But do you know if Hargis or the District has
22 reached out to the owners or even established who the
23 owners are?
24     A.  I don't know if they've reached out to the
25 owner -- to the owners.  I don't know if the ownership

Page 1682

1  has been identified in -- in all of these cases or -- or
2  any of these cases.
3      Q.  Once the owners are identified, what are the
4  District's plans to gain access?
5          MR. AXLINE:  Objection.  Calls for speculation.
6  Calls for a legal conclusion.
7          THE WITNESS:  I -- I don't know specifically
8  what is -- what is going to be done.  I can -- in
9  general, our -- my experience is that in these cases, we
10 would try to contact the property owner and -- and make
11 a straightforward simple request to -- to allow us to
12 have access on their property.
13 BY MR. FINSTEN:
14     Q.  I am going to pass you a copy of what has
15 previously been marked as Exhibit 2 in this deposition.
16 I'm not going to mark it again.  This is the
17 supplemental declaration of David Bolin in support of
18 Plaintiff Orange County Water District's Response to
19 Defendants' Further Supplemental Memorandum, Re:
20 Summary Judgment Motion on Statute of Limitations.  It
21 was filed on June 3rd, 2009.
22     And I would ask you to look at paragraph 26 of
23 Exhibit 2, which discusses this plume -- this station,
24 1905, and I'd like you to go about six lines down into
25 the paragraph, and there's a sentence that reads:

Page 1683

1  "Groundwater contour maps demonstrate that the shallow
2  groundwater flow is principally to the southeast at this
3  station."
4      Do you see that?
5      A.  Yes.
6      Q.  Do you agree with Mr. Bolin's statement here?
7          MR. AXLINE:  I'm going to object for the record
8  that this document refers, at the point following the
9  sentence you just read, to Exhibit 9, and the document
10 is incomplete.  It doesn't have Exhibit 9 attached to
11 it.
12         MR. FINSTEN:  That is correct.  I did not mark
13 the exhibits.  They're rather thick.  I will represent
14 that it is a contour -- a groundwater contour map from
15 the ARCO consultant at this station, but if you want, I
16 can probably find another source.  Let me rephrase this
17 and back up a second.
18 BY MR. FINSTEN:
19     Q.  In preparing for the deposition, did you come
20 across any documents that showed the directional flow of
21 the groundwater at the site?
22     A.  Yes, I did.
23     Q.  And do you remember what those documents were?
24     A.  I believe one is the Hargis report on that
25 site.

6  (Pages 1680 to 1683)

aab2f876-0ea2-4571-b129-8563c392817b

Confidential - Per 2004 MDL 1358 Order

Page 1684

1    Q.  That would actually be what I would refer to
2  probably.  So why don't we just mark that real quick and
3  go to it.  That would be Exhibit 120.
4        (Herndon Exhibit 120 was marked.)
5  BY MR. FINSTEN:
6    Q.  And Exhibit 120 is the Hargis & Associates site
7  summary for ARCO 1905.  It is labeled Global ID No.
8  T0605900033, and it is Bates-marked OCWD-MTBE-001-418086
9  through -133.
10        And if you turn to page 3 of the document, it
11  reads, the third paragraph, "The direction of
12  groundwater flow in the upper zone of the semi-perched
13  aquifer at the site is generally towards the southeast
14  during times when the soil vapor extraction, dual phase
15  extraction or remediation system were not in operation."
16        MR. AXLINE:  Objection.  Mischaracterizes the
17  document.  You did not read that full sentence.
18        MR. FINSTEN:  I was going to ask if I read it
19  correctly.  So if I didn't, please correct -- what I'm
20  leaving out?
21        MR. AXLINE:  I believe you left out the word
22  "generally" when you said, "Towards the southeast."
23        MR. FINSTEN:  Oh.  Well, thank you for the
24  correction.
25  ///

Page 1685

1  BY MR. FINSTEN:
2    Q.  "The semi-perched aquifer at the site was
3  generally towards the southeast during times when the
4  soil vapor extraction, dual phase extraction or
5  remediation system were not in operation."
6        Did I read it correctly?
7    A.  I think you got it that time.
8    Q.  Do you agree that this statement is accurate?
9    A.  I -- I don't disagree with this sentence.
10    Q.  Okay.  And the sentence above that, actually, I
11  did skip.  "Regional data from OCWD WRMS indicate the
12  direction of groundwater flow in the Talbert Aquifer
13  beneath the site is toward the south."
14        Did I read that correctly?
15    A.  Yes.
16    Q.  Do you agree with that statement?
17    A.  I -- I don't disagree with it.  Yes, I think
18  it -- it's accurate.
19    Q.  Okay.  Now, looking back at what had been
20  marked as Exhibit 119, the map, why does the District
21  feel -- the District or Hargis, I should say, feel the
22  need to do cone penetration testing and HydroPunch
23  testing at this particular station?
24        MR. AXLINE:  Objection.  Vague.  Calls for
25  speculation.

Page 1686

1        THE WITNESS:  I would say my understanding
2  is -- is because MTBE has not been contained at this
3  site and has escaped the remediation.  And the District
4  wants to know more about the delineation and the extent
5  of -- of the MTBE that has escaped.
6  BY MR. FINSTEN:
7    Q.  Now, there are three proposed CPT locations to
8  the south and the southeast, A-1905E, F, and G.
9        Do you agree?
10    A.  I agree that those proposed locations are south
11  and slightly southeast of the site.
12    Q.  So those would be downgradient from the
13  potential contamination source, correct?
14        MR. AXLINE:  Objection.  Mischaracterizes prior
15  testimony.
16        THE WITNESS:  They are -- as was indicated,
17  the -- in the semi-perched aquifer, Hargis indicates
18  that the flow is generally towards the southeast.
19  However, has varied at times.  So at times when the flow
20  is to the southeast, again, generally, these wells could
21  be considered downgradient.
22        But then as you go down into the -- the deeper
23  aquifer, which I guess has been referred to as the
24  deeper A zone by Hargis, the flow -- and I guess --
25  they're calling it deeper A zone.  I think somewhere

Page 1687

1  else in the report, Hargis indicates that the deeper A
2  zone may correlate with the Talbert Aquifer, so --
3  BY MR. FINSTEN:
4    Q.  So they indeed say that --
5    A.  Yeah.
6    Q.  -- in the prior paragraph?
7    A.  Yes.
8    Q.  So the upper semi-perched zone -- I didn't mean
9  to interrupt you --
10    A.  Sure.
11    Q.  -- but just for clarification point, the upper
12  semi-perched zone correlates with the upper portion of
13  the regional semi-perched aquifer, and the deeper A zone
14  may correlate with the regional Talbert Aquifer?
15    A.  I see that.
16    Q.  Do you see that?
17        MR. AXLINE:  Counsel, do you mind specifying
18  for the record where you are reading?
19        MR. FINSTEN:  I am reading from page 3 of the
20  Hargis site summary, Exhibit 120, the middle paragraph.
21        MR. AXLINE:  Thank you.
22        THE WITNESS:  So -- so in the Talbert Aquifer,
23  or if we also want to call it the deeper A zone, then
24  Hargis indicates that the direction of groundwater flow
25  in that vicinity is -- is towards the south.  So, again,

7  (Pages 1684 to 1687)

aab2f876-0ea2-4571-b129-8563c392817b

Confidential - Per 2004 MDL 1358 Order

Page 1688

1 those monitoring wells -- or those proposed CPT
2 locations would appear to be generally downgradient from
3 the site.
4 BY MR. FINSTEN:
5    Q. Now, there are four other CPT locations
6 associated with this site, but they are all to the north
7 or northeast of the station; is that correct?
8    A. That's correct.
9    Q. Why is the District seeking to conduct CPT and
10 HydroPunch testing at those locations?
11       MR. AXLINE: Objection. Vague. Calls for
12 speculation.
13       THE WITNESS: I'm sure Hargis described --
14 described this to us when we met. I recall having
15 detailed explanations from them on their rationale for
16 the locations proposed. As we sit here right now, I --
17 I would be speculating as to why there are four
18 locations proposed to the north or northeast of the
19 site.
20 BY MR. FINSTEN:
21    Q. Now, three of those locations are along the
22 northern edge or perhaps the sidewalk, as we discussed,
23 along Talbert Avenue, correct?
24    A. Yes.
25    Q. All right. And there is another service

Page 1689

1 station with monitoring wells to the north -- on the
2 northeast corner of the intersection.
3       Do you see that?
4    A. I do.
5    Q. So my next question would be if the
6 CPT/HydroPunching does result in findings of MTBE
7 contamination, how can the District or Hargis be certain
8 that that contamination originates from the ARCO
9 station?
10       MR. AXLINE: Objection. Vague. Calls for
11 speculation.
12       THE WITNESS: It -- if MTBE is found in any of
13 those northerly or northeasterly CPT locations, it would
14 remain to be seen whether that information would be
15 definitive as to the source of the MTBE, and it may
16 warrant additional investigation before Hargis could
17 draw a conclusion.
18 BY MR. FINSTEN:
19    Q. Could you explain that a little bit?
20       MR. AXLINE: Same objection.
21       THE WITNESS: Well, the proposed CPT locations
22 are the first round of CPTs of potentially a few lines
23 or -- or series of locations of CPTs that are in the
24 Hargis work plans. So additional CPT locations are
25 planned, if needed, based on the results of the first

Page 1690

1 round.
2       After that, it is contemplated that monitoring
3 wells would be constructed to further refine the
4 information from the CPTs. And if monitoring wells are
5 constructed, then they would allow further information
6 in terms of gradient determination, and that information
7 could be used to help evaluate the source of this -- of
8 the MTBE if it's found in those four
9 northerly/northeasterly CPTs.
10 BY MR. FINSTEN:
11    Q. So if monitoring wells were constructed and
12 they determined that those CPT tests are actually
13 upgradient from the ARCO station, that would indicate
14 that ARCO wouldn't have been the source of the MTBE
15 there?
16       MR. AXLINE: Objection. Mischaracterizes
17 testimony. Vague. Calls for speculation.
18       THE WITNESS: The monitoring wells would
19 provide further information as to the gradient both in
20 the semi-perched zone and the deeper A zone or Talbert
21 Aquifer, and that may change possibly the existing
22 interpretation of the gradient in that -- in that area,
23 because it will be providing additional information that
24 may change whether they are upgradient or downgradient
25 of the ARCO 1905 site.

Page 1691

1 BY MR. FINSTEN:
2    Q. Are there any circumstances where -- let me
3 rephrase that.
4       Under what circumstances would the results of
5 the CPT testing indicate that there would be no need for
6 further CPT testing at the site?
7       MR. AXLINE: Objection. Vague. Calls for
8 speculation.
9       THE WITNESS: My understanding is that -- and I
10 can't remember if it was -- I don't remember that we --
11 that it wasn't the same for all the sites, but that if
12 the first round of CPT testing did not identify any MTBE
13 in any of the CPTs or potentially -- you know, one
14 follow-up option that we may employ that's part of the
15 scope is to do infill CPTs, where we would potentially
16 install CPTs in between some of the first round of CPTs.
17       And so that is something that could very likely
18 be done if we -- even if we don't find MTBE or even if
19 we do find MTBE in some of those locations, Hargis may
20 recommend installing more closely spaced CPTs in between
21 the ones that we see on this map.
22 BY MR. FINSTEN:
23    Q. Okay. Are there any circumstances where
24 there -- where Hargis could conclude that no further CPT
25 testing would be necessary at the site?

8 (Pages 1688 to 1691)

Golkow Technologies, Inc. - 1.877.370.DEPS

aab2f876-0ea2-4571-b129-8563c392817b

Confidential - Per 2004 MDL 1358 Order

Page 1692

1       MR. AXLINE: Objection. Vague. Calls for
2   speculation.
3       THE WITNESS: Well, one, I don't think Hargis
4   would be in a position to make that final conclusion. I
5   think it would be up to the District to decide. They
6   may make a recommendation, but I think it ultimately
7   would be up to the District to decide whether it agrees
8   or doesn't agree with recommendations from Hargis.
9   BY MR. FINSTEN:
10      Q.  Are there any circumstances where the District
11  would conclude that no further CPT testing would be
12  necessary at the site?
13      MR. AXLINE: Same objection.
14      THE WITNESS: As we state here right now, I --
15  I don't see any particular circumstances that would
16  cause us to not do any additional CPT testing after
17  these initial CPTs are constructed.
18  BY MR. FINSTEN:
19      Q.  So if there's no MTBE found in any of the CPT
20  borings, the District will then -- it is likely to --
21  will have Hargis do infill testing. What if there's
22  still no CPT -- MTBE found in the CPT testing? Is there
23  a point where the District would plan on stopping this?
24      MR. AXLINE: Same objection. Vague. Calls for
25  speculation.

Page 1693

1       THE WITNESS: Infill testing is one follow-up
2   action that is an option for the District. Another
3   follow-up option is stepping outward or in a different
4   direction to make sure that we have not missed the
5   escape of MTBE.
6   BY MR. FINSTEN:
7       Q.  And we've already marked the Hargis site
8   summary, Exhibit 120. If we could flip to that.
9       Hargis has done work relating to the station
10  prior to including it in the July work plan in the form
11  of this site summary, correct?
12      A.  That's correct.
13      Q.  Now, looking at the site summary, it says on
14  the first page, "Latest document reviewed May 22nd,
15  2008."
16      Do you see that?
17      A.  Yes.
18      Q.  Now, the documents that were reviewed by Hargis
19  in preparation of this report were either publicly
20  available GeoTracker reports for the station or
21  documents produced by the parties in this litigation,
22  correct?
23      A.  That would be my understanding.
24      MR. FINSTEN: Sorry. Did you have an objection
25  to make?

Page 1694

1       MR. AXLINE: No. That's -- go ahead.
2   BY MR. FINSTEN:
3       Q.  Has anyone from the District or Hargis reviewed
4   documents more recently than May 22nd, 2008?
5       A.  Yes.
6       Q.  And who has done that?
7       A.  I did.
8       Q.  And you did that in preparation for the
9   deposition?
10      A.  Yes.
11      Q.  Had anybody -- prior to preparing for the
12  deposition, had anybody from the District or Hargis
13  reviewed documents relating to this station that had
14  been created since May 22nd, 2008?
15      A.  Just to make sure I'm clear, did -- are you
16  asking if Hargis reviewed any documents subsequent to
17  May 22nd, 2008?
18      Q.  Hargis or the District.
19      A.  Or the District?
20      MR. AXLINE: Objection. Partially asked and
21  answered.
22      MR. FINSTEN: I --
23      MR. AXLINE: Maybe you could -- maybe you could
24  limit it to -- do it one bite at a time, Counsel.
25      MR. FINSTEN: Okay. Sure.

Page 1695

1   BY MR. FINSTEN:
2       Q.  Limited to the District.
3       A.  And I -- and I answered, yes, I have reviewed
4   documents --
5       Q.  Right.
6       A.  -- since that date.
7       Q.  Setting aside preparation for this deposition,
8   has anybody at the District reviewed documents relating
9   to this station since two thousand -- since May 22nd,
10  2008? This is a little confusing. And I apologize. I
11  said that I was going to be as clear as possible about
12  the dates, and that we had a deposition in --
13  December 1st.
14      And just to clarify, this -- well, let's
15  establish one -- one thing before that. This document
16  is dated February 20th, 2009 on the bottom left. Do you
17  see that in the footer?
18      A.  I see that. It appears to be a date notation.
19      Q.  Yes. Do you know when the District received
20  this document from Hargis?
21      A.  No, I don't.
22      Q.  It would be sometime subsequent to
23  February 20th, 2009?
24      A.  That -- that is my understanding.
25      Q.  When did you first review this document?

9 (Pages 1692 to 1695)

aab2f876-0ea2-4571-b129-8563c392817b

Confidential - Per 2004 MDL 1358 Order

Page 1696

1    A. In -- within the last week.
2    Q. Do you know who at the District received this
3  document when it was sent from Hargis?
4    A. I believe David Bolin.
5    Q. Okay. And do you know when Mr. Bolin received
6  it?
7    A. No, I don't.
8    Q. It would be somewhere in the neighborhood of
9  February of 2009?
10    A. I don't know that.
11    Q. All right. Now, going back to what I was
12  originally asking about. This document -- the first
13  page says, "The latest document reviewed by Hargis" --
14  well, it says, "The latest document reviewed is
15  May 22nd, 2008."
16      Now, I take that to mean that in preparing this
17  document, Hargis reviewed -- the last document dated --
18  I can't say this properly. Strike that.
19      Hargis did not review any documents that were
20  created after May 22nd, 2008 in preparing this site
21  summary. That's -- is that your understanding as well?
22    A. Based on what they state here, I -- I don't
23  have any reason to disagree with that.
24    Q. Okay. So to try to focus the question here in
25  an appropriate way, aside from your review of documents

Page 1697

1  relating to the station in preparation for the
2  deposition, had anybody at the Water District reviewed
3  documents relating to this station created after
4  May 22nd, 2008?
5      MR. AXLINE: Objection. Vague. Calls for
6  speculation.
7      THE WITNESS: Other than the Hargis report
8  itself, which was created after May 22nd, 2008 and --
9  and I have reviewed documents as I've -- the third time
10  I think I've said, I -- I have reviewed documents that
11  have been created since May 22nd, 2008 relating to this
12  site. Oh, you said other than for the preparation of
13  this deposition. David Bolin may have, but I don't
14  know.
15  BY MR. FINSTEN:
16    Q. Did he make any effort to communicate whether
17  he reviewed documents?
18    A. I don't recall him mentioning that, if he did
19  or not.
20    Q. How about Hargis? Do you know if anybody at
21  Hargis had reviewed documents subsequent to May 22nd --
22  documents created subsequent to May 22nd, 2008 relating
23  to this station?
24    A. It's possible they did for preparation of the
25  work plan, but I don't know if they did or not.

Page 1698

1    Q. What sort of guidance did Orange County Water
2  District give Hargis about this station in preparation
3  of the site summary?
4      MR. AXLINE: Objection. Lacks foundation.
5  Assumes facts. Vague.
6      THE WITNESS: I believe it would have been --
7  the details of -- of their scope of work would have been
8  stated in their -- in their proposal to us for that --
9  for that work that they were proposing on. I just --
10  I'd have to refer to that to see specifically what --
11  what they proposed and what the District approved in
12  terms of a -- a -- a scope of work.
13  BY MR. FINSTEN:
14    Q. Let me see if I can ask it in a little
15  different way. Did the District give Hargis any
16  instructions about identifying potential pathways to
17  the -- to wells in the station's focus plume, for
18  instance?
19    A. I believe that was -- that issue was covered
20  in -- in this -- in this document.
21    Q. Okay.
22    A. So it appears to be it was part of their scope
23  of work.
24    Q. Did the District give Hargis any guidance about
25  what they were supposed to do in creating this document?

Page 1699

1  Is really what I'm trying to get at.
2      MR. AXLINE: Objection. Asked and answered.
3      THE WITNESS: Yeah. I think I -- I answered
4  that question.
5  BY MR. FINSTEN:
6    Q. Okay. What about did the District give any
7  guidance to Hargis or instructions to Hargis about
8  looking for commingling with other stations relating to
9  ARCO 1905?
10    A. I don't recall if that specific objective was
11  stated individually, but that certainly to me would have
12  been within their scope of work to evaluate that
13  possibility.
14    Q. Now, you mentioned that you had reviewed the
15  site summary within the last week, and that Mr. Bolin,
16  you believe, was the one that received the document when
17  it was sent from Hargis.
18      Was it ever discussed -- "it" being
19  Exhibit 120 -- at any meetings within Orange County
20  Water District?
21    A. I don't recall having discussions about this
22  particular Hargis report.
23    Q. Do you know if Mr. Bolin discussed it with
24  anybody else at the Water District?
25    A. Not that I know of.

Page 1700

1    Q.   And aside from commissioning and receiving this
2    report, has the District taken any other steps to
3    investigate or remediate MTBE contamination at this
4    station since 2008?
5    A.   Yes.
6    Q.   And what would those steps have been?
7    A.   We -- we commissioned Hargis to evaluate the
8    stations -- a number of stations, including this one,
9    for potential future investigation and -- and, in fact,
10   Hargis did make a recommendation and developed at least
11   an initial scope of work to -- to do CPT work or CPT
12   investigation at -- at this station.
13   Q.   And I already asked you about communications
14   with the Regional Board and the Health Care Agency.
15        Has the District contacted any other local,
16   state or federal regulator about this station since
17   2008?
18   A.   Not that I'm aware of.
19   Q.   How about, has the District made any public
20   statements relating to this station since 2008?
21   A.   Not specific to this station that I'm aware of.
22   Q.   What else has the District done with this
23   report, Exhibit 120, since receiving it?
24        MR. AXLINE:  Objection.  Vague.
25        THE WITNESS:  Other than what we've talked

Page 1701

1    about, I can't think of anything.
2    BY MR. FINSTEN:
3    Q.   Okay.  Let's -- you can flip back to the
4    notice.  I just want to confirm that this station is --
5    and, in fact, I believe all of these stations are in
6    Focus Plume 3, and the current wells in Focus Plume 3
7    are OCWD M-10, OCWD M-11, and OCWD M-45, and no others,
8    correct?
9        Before -- I referred you to that for
10   convenience.  There's another exhibit that I can show
11   you which should confirm that if you -- because that's
12   just my own representations.
13   A.   Sure.  I guess -- you said there were no other
14   wells in the focus plume.  I -- I guess I would clarify
15   that I believe those three wells that you mentioned
16   are -- were designated wells or wells designated by
17   OCWD.
18        I'm sorry.  I thought I turned this off.
19        So I -- I don't know that these are the --
20   those were the only wells in Focus Plume 3, but they
21   were the designated wells for Focus Plume 3.
22   Q.   Could you explain the difference?
23   A.   Well, there may be other wells such as
24   production wells in -- that are within Focus Plume 3,
25   but they aren't necessarily wells that were designated

Page 1702

1    as wells impacted by the sites in Focus Plume 3.
2    Q.   Okay.  Just to clarify, I want to show you what
3    has previously been marked as Exhibit 7.  And this is --
4    I'm not going to mark it again.  It's not labeled as
5    Exhibit 7, but it's a -- it is a copy of the Plaintiff
6    Orange County Water District's motion to amend the
7    bellwether plume designation.  It is -- was filed on
8    April 22nd, 2009.  And I have -- just to be clear about
9    what you're looking at, this is the motion letter to
10   Judge Scheindlin.  And I included only one exhibit,
11   which was Exhibit 2, which is the back page of this, and
12   that lists the bellwether plume list comparison that was
13   proposed.
14        And if you look at the back page for Plume
15   No. 3, we see OCWD M-10, M-11, M-45, and then no changes
16   proposed.  The only thing I would caution is that the
17   final column here, final bellwether plume well
18   designations, was proposed and not ordered by the Court.
19   The Court ordered something different.
20        But at least as of the time of this motion,
21   there were no changes; these were the only three wells
22   that were designated as part of this focus plume,
23   correct?
24        MR. AXLINE:  I'm going to object to that as
25   vague.  Compound.  Calls for a legal conclusion.  Calls

Page 1703

1    for speculation as to what occurred with this document
2    and with the Court.  So maybe, Counsel, you -- if
3    there's a question here, you could phrase it in the form
4    of a question?
5        MR. FINSTEN:  Okay.
6    BY MR. FINSTEN:
7    Q.   OCWD M-10, M-11, and M-45 were the only three
8    wells in this focus plume, correct?
9        MR. AXLINE:  Object.  It misstates prior
10   testimony.  The witness has been distinguishing between
11   wells present and wells designated.  The exhibit that
12   you're referring him to says final bellwether plume well
13   designations.  You're now repeating the question without
14   acknowledging the witness' distinction.
15        MR. FINSTEN:  Okay.
16   BY MR. FINSTEN:
17   Q.   What other wells besides these three wells are
18   in the focus plume?
19   A.   And not to be cute or anything, obviously there
20   are a number of wells in focus plume.  There are
21   monitoring wells constructed by the various stations.
22   So there's all those wells.  They're in
23   the plume.  But there are also production wells within
24   Focus Plume 3.
25        I am referring to a Plume 3 location map, which

11 (Pages 1700 to 1703)

Confidential - Per 2004 MDL 1358 Order

Page 1704

1  has I think been produced in the past, and I see some
2  Newport Beach production wells. I see some Mesa
3  Consolidated production wells. I see a couple of
4  Fountain Valley production wells, and I see at least
5  another monitoring well that are within the focus plume.
6      Q.  So the focus plume is a geographic area on the
7  surface that contains all of the wells within it?
8      A.  I think the focus plume description and
9  definition have been covered in prior depositions, but
10  the focus plume map I'm referring to shows a geographic
11  area, and it does -- at least this particular map shows
12  the wells that I mentioned fall within that geographic
13  area.
14      Q.  None of those wells are designated by the
15  District as part of this focus plume, correct?
16      A.  The only designated wells are the Wells M-10,
17  M-11, and M-45.
18      Q.  You mentioned some Newport Beach, Fountain
19  Valley and Mesa Consolidated wells that are allegedly in
20  the plume?
21      A.  They are within the geographic area of this
22  focus -- of Focus Plume 3, yes.
23      Q.  And which wells are you referring to?
24      A.  I see NB-DALS, NB-DALD, FV-4, FV-10, MCWD-5,
25  MCWD-7. It looks like MCWD-3B may be right on the edge.

Page 1705

1  And I also see -- well, those are the production wells
2  that I -- that I see that appear to fall within the --
3  the Focus Plume No. 3.
4      Q.  Okay. Just stopping with MCWD-5, MCWD-7 and
5  MCWD-3B, those were designated by the District as part
6  of a different focus plume, correct?
7      A.  I believe they were designated as part of a --
8  I think we have the --
9      Q.  Focus Plume 2.
10     A.  Focus Plume 2, correct.
11     Q.  Okay. And the Newport Beach and Fountain
12  Valley Beach -- Fountain Valley wells that you just
13  identified, those are not designated as part of this
14  plume, correct?
15     A.  That's correct.
16     Q.  Okay. All right. I'll move on.
17         Since 2008, has the District determined that
18  MTBE from the station has impacted or threatens any of
19  these three designated focus wells, MC -- OCWD M-10,
20  M-11, and M-45?
21         MR. AXLINE: Was your -- sorry, Counsel. Just
22  to clarify, was your question since 2008?
23         MR. FINSTEN: Yes.
24  BY MR. FINSTEN:
25     Q.  Do you want it read back?

Page 1706

1      MR. AXLINE: I'm going to object to that as
2  vague.
3      THE COURT REPORTER: Do you want it read back?
4      THE WITNESS: Sure.
5      (The following record was read by the reporter:
6      "Q.  Since 2008, has the District
7      determined that MTBE from the station has
8      impacted or threatened any of these three
9      designated focus wells, OCWD M-10, M-11, and
10     M-45?")
11     MR. AXLINE: Same objection.
12     THE WITNESS: I believe the District had made
13  that conclusion prior to 2008, and I don't think
14  anything subsequent to 2008 has changed that.
15  BY MR. FINSTEN:
16     Q.  What has the District based its determination
17  on?
18     MR. AXLINE: I'm going to object to that as
19  outside the scope of the notice and the order from
20  Special Master Warner. The witness just testified that
21  the determination was made before 2008. And I'm not
22  going to allow you to question the witness with respect
23  to that determination prior to 2008.
24  BY MR. FINSTEN:
25     Q.  Has the District uncovered any information

Page 1707

1  since 2008 specifically that supports or confirms its
2  determination that MTBE from 1905 had affected or had
3  impacted or threatened these three focus wells?
4      A.  I believe the Hargis report that the District
5  received subsequent to 2008 supports that District
6  determination.
7      Q.  Okay. Well, let's take a look at the Hargis
8  report again. The Hargis site summary mentions OCWD
9  M-10 on the first page, the last bullet point on the
10  first page. "Regional Monitoring Well M-10 located
11  approximately one hundred" -- "1,160 feet south of the
12  site. It was installed in 1967 and is screened between
13  80 and 305 feet below ground surface in the Talbert,
14  Beta, Lambda and Omicron Aquifers with unknown sanitary
15  seal status."
16     Did I read that correctly?
17     A.  I believe so.
18     Q.  Okay. And aside from that mention of M-10,
19  which again is identified in the -- on Bates
20  page 418099, what is the indication that -- or what is
21  the -- what are you referring to, I guess, from the
22  report other than mentioning those -- other than the
23  identification of that well on those two instances?
24     A.  Well, I guess I was thinking maybe a little
25  more broadly, but the report identifies a number of

12 (Pages 1704 to 1707)

aab2f876-0ea2-4571-b129-8563c392817b

Confidential - Per 2004 MDL 1358 Order

Page 1708

1  issues such as plumes -- MTBE plumes not being fully
2  investigated, including vertical extent, the lateral
3  extent, no hydraulic containment.  That that basically
4  indicates that plumes have escaped remediation and,
5  therefore, are likely sources of the MTBE that was found
6  in -- in the M-10, M-11, and M-45.
7      Q.  I guess my specific question was:  What is the
8  basis for the District's determination that that
9  contamination specifically from this station impacted or
10 threatened these three production wells?
11     MR. AXLINE:  Okay.  And that's the question
12 that I objected to on the grounds that it had been the
13 subject of the prior deposition, so --
14     MR. FINSTEN:  And I clarified the question to
15 say since 2008, what has the District learned about --
16 to support that determination, and he pointed me towards
17 this.  So I want to know what's in this that
18 specifically supports the District's contention
19 regarding this station.
20     MR. AXLINE:  Okay.  And if that's the question,
21 I'm going to object that it's been asked and answered.
22     THE WITNESS:  I think I -- I answered that.  I
23 mentioned that I mentioned some of the findings in the
24 report that support our -- our --
25 ///

Page 1709

1  BY MR. FINSTEN:
2      Q.  There's no mention --
3      A.  -- feeling.
4      Q.  There's no mention of MC -- OCWD M-11 in this
5  report, correct?
6      A.  I would have to refer to the whole report to
7  see if there's no mention of -- of OCWD M-11 anywhere
8  in -- in this whole report.
9      Q.  Or M-45?
10     A.  Of -- or M-45.
11     Q.  Why don't you go ahead and take a minute.
12     MR. AXLINE:  Should we do that off the record,
13 Counsel?
14     MR. FINSTEN:  How long will it take?
15     MR. AXLINE:  Well, I don't know.  It's a
16 lengthy document.
17     THE WITNESS:  Well, I -- I found a figure,
18 Bates No. 418120, that shows a location map, and I see
19 M-11 on that -- on that map.  I have to spend a little
20 bit more time to see if M-45 is on it, but I --
21 BY MR. FINSTEN:
22     Q.  I see it's on there, but there's no discussion
23 of either of these two wells in the document, is there?
24     MR. AXLINE:  Okay.  For the record, I'm going
25 to note that this document is some, I don't know, 75 or

Page 1710

1  80 pages long.  You're asking the witness to search the
2  documents for references to wells, and I'm not going to
3  have the witness do that in front of the camera.
4      MR. FINSTEN:  All right.  We can go off the
5  record.  If you want to go off the record, that's fine.
6  I mean, I just thought it would save time.  I didn't
7  mean to be rude.  You can go off the record.
8      THE VIDEOGRAPHER:  With the approval of
9  counsel, we are going off the record.  The time is
10 approximately 10:53.
11     (Brief recess.)
12     THE VIDEOGRAPHER:  With the approval of
13 counsel, we are being back on the record.  The time is
14 approximately 10:54.
15 BY MR. FINSTEN:
16     Q.  Mr. Herndon, were you able to identify any
17 discussion of OCWD M-11 or M-45 in the Hargis site
18 summary?
19     A.  I was not able to find any narrative discussion
20 on those two monitoring wells in this Hargis report.
21     Q.  Looking at page 2, they do -- there are --
22 there is some discussion of production wells NB-TAMS and
23 TAMD in the bullet point in the middle of the paragraph
24 there, correct?
25     A.  Yes.

Page 1711

1      Q.  And those are part of a different -- those have
2  been designated as part of a different focus plume,
3  correct, Focus Plume 1?
4      A.  I -- I -- believe so.  I know at least one of
5  those has been designated as part of Focus Plume 1.
6  Actually, as I look at the exhibit --
7      Q.  Exhibit 7?
8      A.  Yes.
9      Q.  And I would just again caution you that that
10 last column was proposed by the District, not accepted
11 by the Court.
12     A.  Okay.
13     Q.  But -- you know, but I -- that being said, I'm
14 fairly certain that we did not object to TAMS being
15 added to that focus plume.
16     A.  Okay.  I -- just so you know, I -- this -- this
17 hasn't been marked as a -- as an exhibit.
18     Q.  Yeah.  I gave you a copy.
19     A.  Oh, okay.
20     Q.  It had been previously marked as Exhibit 7.
21     A.  Oh, okay.
22     Q.  And I apologize.  If you want to mark it, I
23 mean, there's -- it's a part of the record already.
24     A.  Oh, okay.
25     Q.  I may do that with a few other documents.

13 (Pages 1708 to 1711)

aab2f876-0ea2-4571-b129-8563c392817b

Page 1716

1     MR. AXLINE: Objection. Vague. Lacks
2  foundation. Mischaracterizes prior testimony.
3     THE WITNESS: Could you clarify if we're
4  talking about any of the four stations for today's depo?
5     MR. FINSTEN: We're talking about -- we're just
6  taking about 1905.
7     THE WITNESS: Okay.
8     MR. AXLINE: I'm going to object again as vague
9  and lacking foundation. And you're not being clear in
10  the context in which you're asking this question. I'm
11  sincere. I think it's incredibly vague.
12     MR. FINSTEN: Since 2008, I just asked him, has
13  the District engaged in any soil vapor survey at this
14  station. He said he didn't believe so.
15     MR. AXLINE: Oh, okay. That's a fair question.
16     MR. FINSTEN: Okay. I'm limiting all of this
17  to 2008, if that was your objection.
18     MR. AXLINE: No. No. You prefaced the
19  question with some references to Mr. Bolin's testimony
20  and a few other things. But if your question is simply
21  has the District conducted soil vapor surveys of the
22  station since 2008, I have no objection to that
23  question.
24     MR. FINSTEN: The Bolin thing was just for
25  context. Sorry. It probably should been left alone.

Page 1717

1  BY MR. FINSTEN:
2     Q. All right. Has the District ruled out the need
3  to do a soil vapor survey at this site?
4     A. We have not ruled that out.
5     Q. Is that something that you would do subsequent
6  to the CPT testing?
7     A. It's possible -- it -- it's possible it could
8  be, but it's not -- it's not currently in our -- in the
9  immediate scope of work.
10     Q. Would it be something that would not be done
11  until after the immediate scope of work was completed?
12     A. It's -- it's not within the current scope of
13  work. So unless we made some determination that it
14  should be done, even though we haven't maybe finished
15  the -- this CPT scope of work, that we somehow decided
16  we needed this soil vapor survey information and we need
17  to either add it to Hargis' scope or develop another
18  parallel activity. If we don't make that determination,
19  then I suppose it would come after -- afterwards.
20     Q. Okay. Is this -- are there any circumstances
21  where -- that it might not -- where the District might
22  not wait until the first scope of work is complete at
23  this station to initiate this?
24     MR. AXLINE: Objection. Vague. Calls for
25  speculation.

Page 1718

1     THE WITNESS: I -- I suppose there could be
2  a -- a circumstance hypothetically where the District
3  could make that determination.
4  BY MR. FINSTEN:
5     Q. What kind of circumstances would cause the
6  District to determine that it needed to do a soil vapor
7  survey prior to the completion of the CPT first scope of
8  work?
9     MR. AXLINE: Same objection.
10     THE WITNESS: I -- I would be speculating on a
11  hypothetical. I think it's -- it's really hard for me
12  to -- to come up with something that I could draw back
13  to -- to this particular site.
14  BY MR. FINSTEN:
15     Q. Does the District have any concrete plans to do
16  a soil vapor survey at any point in time in the future?
17     A. On this ARCO station?
18     Q. On this ARCO station. All these questions are
19  limited to this ARCO station.
20     A. It's not currently in our plans.
21     MR. FINSTEN: Okay. Could I have my question
22  read back.
23     THE COURT REPORTER: The last question was:
24  "Does the District have any concrete plans to do any
25  soil vapor surveys at any point in the future?"

Page 1719

1  BY MR. FINSTEN:
2     Q. Okay. Let's look up a little higher in the
3  document, "Detailed contaminant hydrogeologic analysis,
4  existing data and information."
5     Is this a step that Hargis completed by
6  compiling the site summary?
7     A. I would say what they did certainly falls
8  within that category, within that description. I don't
9  know if the -- the -- I wouldn't necessarily say that
10  the work that Hargis did completes that entire activity,
11  but certainly what they did I would say falls within
12  that -- that description.
13     Q. What else needs to be done to complete that
14  activity?
15     A. Well, there could be -- I mean, again, I'm not
16  saying that the District has made decisions as to what
17  additional activities or -- or analyses need to be done
18  for this site as it pertains to this description. So,
19  again, I -- I could be hypothetically saying what
20  additional work might need to be done, but this implies
21  existing data and information.
22     It tells me that the idea here was to not --
23  that this was not to go out and collect existing -- or
24  collect additional data, but to look at existing data
25  and information and to perform detailed contaminant

15  (Pages 1716 to 1719)

Page 1720

1  hydrogeologic analysis. And the District has not
2  completed that -- that work.
3  Q. I guess -- and my question is: What does the
4  District need to do to complete that work?
5  A. Okay. And your word is "need to do." And I
6  guess we don't know yet what we need to do to complete
7  the work. It's -- to me it's what additional work could
8  be done within that, and I would say fate and transport
9  analysis could be -- could be performed and would likely
10  need to be performed, and that that could be done using
11  existing data information. It doesn't necessarily have
12  to wait for additional information. And the District
13  has not done that work.
14  Q. Okay. Does the District have any plans to do
15  any fate or transport analysis at this station in the
16  next year?
17  A. I would say that is likely, but the District
18  has not made that determination yet.
19  Q. Has the District made any determination to do
20  any fate and transport analysis prior to the completion
21  of the data that it is about to gather through Hargis?
22  MR. AXLINE: Objection. Vague.
23  THE WITNESS: I guess, would you -- would
24  you -- do you consider fate and transport analysis to be
25  modeling? Is that -- would that be part of your

Page 1721

1  question or can -- I'm just trying to narrow it down.
2  BY MR. FINSTEN:
3  Q. Well, it's on -- I mean, it's on the list here.
4  We have modeling and interpretation under fate and
5  transport analysis. And this is -- the question came up
6  in fate -- you raised fate and transport analysis in
7  relation to the line here about detailed contaminant
8  hydrogeologic analysis of existing data and information.
9  And the question that I raised is: Are you
10  going to be doing any fate and transport analysis prior
11  to collecting the data that you plan on collecting at
12  this site?
13  MR. AXLINE: Same objection.
14  THE WITNESS: Not that the District is planning
15  on doing.
16  BY MR. FINSTEN:
17  Q. Why would the District continue doing any fate
18  and transport analysis prior to gathering data about the
19  site?
20  MR. AXLINE: Objection. Vague. Argumentative.
21  THE WITNESS: Since I answered that we are not
22  currently planning to do fate and transport analysis for
23  this station prior to -- and I'm talking modeling type
24  of fate and transport analysis, prior to Hargis' CPT
25  investigation, I would be then answering kind of a

Page 1722

1  hypothetical. If we were to be thinking of doing fate
2  and transport analyses prior to the CPT, why -- why
3  would we do that or why not? So it's kind of a
4  hypothetical on something that we're not planning on
5  doing.
6  Q. Okay.
7  THE VIDEOGRAPHER: A minute.
8  MR. FINSTEN: All right. Why don't we take a
9  break here with that answer to change tapes.
10  THE VIDEOGRAPHER: With the approval of
11  counsel, we are going off the record. The time is
12  approximately 11:11.
13  (Recess.)
14  THE VIDEOGRAPHER: With the approval of
15  counsel, we are back on the record. The time is
16  approximately 11:24. This is the beginning of Tape
17  No. 2.
18  BY MR. FINSTEN:
19  Q. Welcome back, Mr. Herndon. We were discussing
20  Exhibit 6. And I'm now going to ask you about a couple
21  of other items on the -- on the first page of the
22  exhibit, "Contaminant delineation, three dimension,
23  acquire sites for monitoring wells, land purchase,
24  easement, eminent domain."
25  Do you see that?

Page 1723

1  A. Yes.
2  Q. Now, this is on hold until Hargis completes the
3  CPT/HydroPunch sampling, correct?
4  A. As currently scoped, the plan is to -- is to
5  perform the CPT work and then construct the monitoring
6  wells. But during the course of the CPT investigation,
7  I won't rule out the possibility that the District may
8  decide, through discussions with Hargis, that we want to
9  at least begin the process of constructing monitoring
10  wells. So I'm just leaving that option open.
11  Q. But you won't know where to put the monitoring
12  wells until -- until after you have some CPT/HydroPunch
13  analysis, correct?
14  MR. AXLINE: Objection. Vague. Calls for
15  speculation. Mischaracterizes testimony.
16  THE WITNESS: I think our current plan is to at
17  least get the first round of CPTs installed before we
18  would make a determination of -- as to where and how
19  many monitoring wells might be necessary.
20  BY MR. FINSTEN:
21  Q. How likely is it that you will make
22  determinations about where and how many monitoring wells
23  prior to completing the CPT/HydroPunch testing,
24  including whatever infill or outfill you later deem
25  necessary.

16 (Pages 1720 to 1723)

Confidential - Per 2004 MDL 1358 Order

Page 1724

1    MR. AXLINE: Objection. Asked and answered.
2  Calls for speculation.
3    THE WITNESS: At this -- at this point, it's
4  hard for me to say how -- how likely it would be. I --
5  I guess it's -- it's just -- I -- I think at this point,
6  I -- I think we need to start getting the first round of
7  CPTs in before I'd be able to get a better idea of how
8  likely it would be.
9  BY MR. FINSTEN:
10   Q.  And just to confirm, no steps have been taken
11 regarding acquiring sites for monitoring wells, correct?
12   A.  Not specific for monitoring wells, no.
13   Q.  Now, the CPT and HydroPunch testing is not on
14 the list of investigative remediation activity outline
15 that is Exhibit 6, is it?
16   MR. AXLINE: Objection. It's outside of the
17 scope of this deposition notice. You're not asking
18 about something that has happened since 2008. You're
19 asking about this list, and you had prior opportunity to
20 do that. So I'm going to instruct the witness not to
21 answer.
22 BY MR. FINSTEN:
23   Q.  Let me rephrase the question so we can avoid
24 the objection.
25   The next step that you have decided to

Page 1725

1  pursue -- that the District has decided to pursue, that
2  of CPT/HydroPunch testing, which it has decided to
3  pursue since 2008, is not on the list of remediation
4  activities, is it?
5    A.  Well, I would consider it to be within
6  contaminant delineation, even though it is not the
7  words -- the initials CPT is not specifically listed
8  under that, but I would consider it to be part of
9  contaminant delineation.
10   Q.  But it's a precursor to installation of
11 monitoring wells, aquifer testing, monitoring of
12 those -- groundwater monitoring of the monitoring wells
13 that are to be installed, correct?
14   MR. AXLINE: Objection. Mischaracterizes
15 testimony. Argumentative.
16   THE WITNESS: As -- as I said, it's possible
17 that we may decide even as we're continuing the CPT
18 investigation, that monitoring well installation should
19 happen sooner even as we continue with the CPT
20 investigation. So it -- it -- it doesn't necessarily
21 have to happen sequentially, that CPT happens first,
22 then monitoring wells, and so on.
23   We can sometimes -- there may be some
24 iterations there, that we may actually put CPTs in,
25 drill some monitoring wells, put additional CPTs in.

Page 1726

1  BY MR. FINSTEN:
2    Q.  The District currently has no concrete plans to
3  install any monitoring wells at the site, correct?
4    MR. AXLINE: Objection. Asked and answered.
5    THE WITNESS: I would say it is very likely
6  that we will be installing monitoring wells, but we
7  would like to get at least the initial CPT data before
8  we make that final determination and -- and -- which
9  would also help us in terms of location and number of
10 monitoring wells.
11 BY MR. FINSTEN:
12   Q.  Has the District since 2008 engaged in any slug
13 tests, pump tests, or piezometric testing at this site?
14 Pardon me.
15   A.  To my knowledge, the District has not performed
16 any aquifer testing or pump testing specific to this
17 site, nor -- nor has the District installed any
18 piezometers specifically to -- for this site.
19   Q.  Does the District have any plans to install
20 piezometers or conduct any slug tests or pump tests at
21 this site?
22   MR. AXLINE: Objection. Lacks foundation.
23 Vague. Calls for speculation.
24   THE WITNESS: Well, the piezometers -- the
25 monitoring wells that we talked about would -- would

Page 1727

1  serve as piezometers. They -- they would provide water
2  level data and -- and they also could be used for -- for
3  slug tests or pump tests. And I -- those types of tests
4  are -- would be very reasonable things to expect to be
5  done in the course of constructing and monitoring
6  monitoring wells.
7  BY MR. FINSTEN:
8    Q.  But they will not be done prior to the
9  installation of monitoring wells, correct?
10   A.  I -- I would not anticipate that to be done
11 prior to the installation of monitoring wells.
12   Q.  Okay.  And the routine groundwater monitoring
13 that's referenced here, sample collection, laboratory
14 sample analysis, data review and analysis, data
15 interpretation and reporting, aside from the groundwater
16 monitoring -- aside from monitoring the reports that are
17 provided by the remediation consultant at the station,
18 the District hasn't engaged in any of these steps on its
19 own, correct, since 2008?
20   A.  Well, it has in terms of the well testing
21 within Plume 3. It's -- it's collected samples for
22 monitoring and production wells and performed lab
23 analysis on it.
24   Q.  Sorry.  I'm specific --
25   A.  Sure.

17 (Pages 1724 to 1727)

Page 1728

1      Q.  -- to 1905, the station.
2      A.  Well, I guess to the degree that we have
3  designated wells associated with Plume 3, of which 1905
4  is one of the stations, then I guess I could -- I would
5  say that the monitoring or the testing of -- of the
6  designated wells at a minimum would be associated with
7  this station.
8      Q.  You're referring to M-10, M-11, and M-45?
9      A.  Yes.
10      Q.  Okay.  But in terms of the monitoring wells
11  that are currently installed at the station, the
12  District has not conducted any of its own monitoring of
13  those -- or sampling of those monitoring wells?
14      A.  No.
15      Q.  Does it plan to in the future?
16      MR. AXLINE:  Objection.  Vague.  Calls for
17  speculation.
18      THE WITNESS:  We don't have current plans for
19  that, but I could see that that would be a -- a likely
20  possibility that the District would -- if -- if it
21  decides to proceed with constructing its own monitoring
22  wells, it might wish to access the existing monitoring
23  wells to be -- that have already been constructed to be
24  able to utilize that information in concert with its own
25  monitoring wells.

Page 1729

1  BY MR. FINSTEN:
2      Q.  And fate and transport -- well, let's just
3  handle fate and transport and contaminant flow analysis
4  together.
5      Since 2008, has the District taken any actions
6  towards a fate and transport or contaminant flow
7  analysis?
8      A.  Well, the District has taken initial steps by
9  utilizing Hargis to at least initially look at I think
10  what they call pathway analysis.
11      Q.  Okay.  And that would fall under the category
12  of contaminant flow analysis?
13      A.  I would say -- I would say, yes, that it
14  probably more -- generally more falls under that --
15  under that category.
16      Q.  Has the District taken any steps to engage in
17  any modeling for fate and transport or contaminant flow
18  since 2008 at this station, 1905?
19      A.  The District has not undertaken modeling for
20  those activities for this site in -- since May of 2008
21  or since -- since 2008.
22      Q.  Okay.  Having testified that this is something
23  the District intends on doing, when does the District
24  intend on doing this for this station?
25      MR. AXLINE:  Objection.  Vague.  Calls for

Page 1730

1  speculation.  I believe it mischaracterizes prior
2  testimony.
3      THE WITNESS:  We have not put together a -- a
4  schedule.  So I don't have a specific time -- time
5  schedule in mind as to when this work would be done.
6  BY MR. FINSTEN:
7      Q.  Looking at the next section here, it says,
8  "Production well testing."
9      For Plume 3, this section doesn't apply because
10  these are not production wells, correct?
11      MR. AXLINE:  Objection.  Mischaracterizes prior
12  testimony.  And vague as to "applies."
13  BY MR. FINSTEN:
14      Q.  Well, let's see.  Let me rephrase.
15      There's no need to perform any capture zone
16  analysis of OCWD M-10, M-11, or M-45 because they don't
17  have capture zones, correct?
18      A.  Well, M-10, M-11, and M-45 are wells designated
19  for Plume 3, but as we've talked about, there are
20  wells -- other production -- there are production wells
21  within Plume 3 for which it's possible that capture zone
22  analysis for those production wells would -- would be
23  appropriate to be done.
24      Q.  I'm just talking about the wells that are
25  designated for this focus plume.

Page 1731

1      A.  I would not see -- specific to doing a capture
2  zone, since those wells are not production wells, they
3  would not have really a -- they would not create a
4  capture zone in the sense that a production well would.
5      Q.  What about nonpumping versus pumping
6  conditions, same false distinction for monitoring wells?
7      A.  For monitoring wells, I -- I don't see that
8  that would really apply.
9      Q.  Okay.  And I'm not going to ask these questions
10  again when we cover the other stations.  This was --
11  we're talking about the production or the focus -- the
12  designated wells for the focus plume.  I'll just go
13  through this once, and then we won't have to --
14      A.  Okay.
15      Q.  -- deal with it with the rest of the stations.
16      MR. AXLINE:  I would support that approach.
17  BY MR. FINSTEN:
18      Q.  And what is the volume of water that is pulled
19  from these production wells -- or these designated focus
20  plume wells?
21      A.  I don't know specifically, but it would be in
22  the several-gallons-per-minute range when the wells are
23  being purged and sampled, is -- is my general
24  understanding.
25      Q.  Okay.  And what's done with the water that is

18  (Pages 1728 to 1731)

Confidential - Per 2004 MDL 1358 Order

Page 1732

1   sampled?
2       MR. AXLINE: Objection. Vague.
3       THE WITNESS: I don't -- my general
4   understanding is that it is -- it is discharged under
5   a -- under a permit from the Regional Board.
6   BY MR. FINSTEN:
7    Q.  All right. Let's look at page 2 of the
8   exhibit. And we'll just skip the nonsite-specific
9   portion of this, because we are after all at a
10  site-specific deposition.
11      Remediation action, system design, system
12  installation and system operation, maintenance,
13  telemetry, just going down the list here. The District
14  has not taken any steps since 2008 in regard to design
15  or installation or operation of its own remediation
16  system, correct?
17      MR. AXLINE: Objection. Mischaracterizes prior
18  testimony.
19      THE WITNESS: I think the work that -- that the
20  District commissioned Hargis to do is a step toward
21  remediation.
22  BY MR. FINSTEN:
23   Q.  Okay. Well, let's look at the first one,
24  remediation action, remedial action planning, technology
25  review and selection.

Page 1733

1       Now, so the Hargis -- I don't mean to
2   mischaracterize testimony. The Hargis would include
3   technology review of remediation -- remediation
4   technologies?
5    A.  Their current scope of work, to my knowledge,
6   did not include technology review.
7    Q.  What else has the District done to review
8   technology or select technology relating to remediation
9   at this station?
10   A.  In terms of technology for extraction wells and
11  treatment processes, I don't believe the District has
12  undertaken that activity as of yet --
13   Q.  Okay.
14   A.  -- for this station.
15   Q.  Okay. The District hasn't ruled out the need
16  to do so in the future, correct?
17   A.  That's correct.
18   Q.  When does the District plan on getting around
19  to selecting remedial technology for the site?
20      MR. AXLINE: Objection. Calls for speculation.
21      THE WITNESS: I'm not aware -- I -- I -- the
22  District has not put together a -- a specific time
23  schedule for performing those activities.
24  BY MR. FINSTEN:
25   Q.  What steps does the -- sorry. What does the

Page 1734

1   District need to know about this station prior to
2   selecting a remediation technology?
3       MR. AXLINE: Objection. Vague. Calls for
4   speculation.
5       THE WITNESS: I think the District would need
6   to understand more about the extent and distribution
7   of -- of MTBE and TBA in order to be able to put
8   together a specific remediation design, a system design.
9   BY MR. FINSTEN:
10   Q.  So what steps does the District need to take
11  prior to determining a remedial system -- design for
12  remedial system at the site?
13      MR. AXLINE: Same objection. Vague. Calls for
14  speculation.
15  BY MR. FINSTEN:
16   Q.  We're going to get CPT and HydroPunch testing.
17  We're going to get monitoring well installation.
18      Anything else?
19   A.  Well, that type of information is certainly
20  very useful. Fate and transport analysis would be
21  useful as well and -- I'm trying to think of -- those --
22  those would all be key pieces of information that the
23  District could use to start to develop a remedial system
24  specific to this site.
25      It's possible that the District could at least

Page 1735

1   begin and likely will begin the process of at least
2   looking at remedial technology given certain assumptions
3   in terms of flow rates, concentrations. That kind of
4   activity can be done very quickly even before all the
5   data are coming in. And then it could be modified or
6   the system could be modified or refined based on
7   site-specific information.
8    Q.  Has the District -- never mind. I think it was
9   already asked.
10      Does the District plan to take any of those
11  steps prior to the conclusion of the first round of CPT
12  testing?
13   A.  I don't think we're going to be starting
14  that -- that type of remedial design work prior to the
15  first round of CPT testing.
16   Q.  How about prior to the installation of
17  monitoring wells?
18   A.  It's possible. I -- I won't rule it out, but
19  I -- I don't know if that -- if that will be the case or
20  not.
21   Q.  Can you estimate at the earliest when the
22  District will be in a position to install a remedial
23  system at this site?
24      MR. AXLINE: Objection. Vague. Calls for
25  speculation.

19  (Pages 1732 to 1735)

aab2f876-0ea2-4571-b129-8563c392817b

Confidential - Per 2004 MDL 1358 Order

Page 1736

1    And I'm going to instruct the witness not to
2  speculate. If you can estimate, you can do so, but
3  you're not required to speculate.
4    MR. FINSTEN: Agreed. That's why I asked him
5  to estimate.
6    MR. AXLINE: And that's why I told him not to
7  speculate.
8    THE WITNESS: Yeah. I -- I -- I would be
9  speculating. I -- I don't have -- I don't have a -- an
10 idea of that at this time.
11 BY MR. FINSTEN:
12   Q. Okay. Let's look at page 3. Technology --
13 technical assistance, intersite investigations.
14    Has the District endeavored to conduct any
15 intersite investigations or remediations involving this
16 station since 2008?
17   A. Well, I would say some of the Hargis CPT
18 locations arguably could be, particularly the
19 northerly/northeasterly CPTs -- locations that we talked
20 about could provide data that would be useful in
21 determining if there is a relationship between the
22 ARCO 1905 site and the other adjacent site gas station.
23 So that work may also be considered an intersite
24 activity.
25   Q. Since 2008, has the District uncovered any

Page 1737

1  evidence of commingling of MTBE contamination involving
2  this station and other stations?
3    A. I don't recall seeing any data that indicate
4  that there is -- is commingling. I won't rule out that
5  possibility certainly, but I don't recall seeing data
6  that indicate that there has been commingling of -- of
7  this station's plume with other stations' plumes.
8    Q. Since 2008, has the District done anything
9  else -- strike that. Strike that. I jumped ahead.
10    Just looking at page 3, land purchase, public
11 and community relations, real estate specialist, legal
12 assistance, insurance and security.
13    Excepting Hargis, has the District received any
14 outside technical assistance relating to any of these
15 issues relating to 1905, land purchase, public community
16 relations, real estate specialist, legal assistance,
17 insurance and security?
18   A. Well --
19   Q. And I should caution -- sorry. I don't mean to
20 interrupt you.
21   A. Sure.
22   Q. But legal assistance doesn't mean what
23 Mr. Axline is doing right here, relating to site
24 acquisitions for wells or remediation systems, or I will
25 expand that to CPT/HydroPunch testing, also.

Page 1738

1    A. Taking them one at a time, in terms of public
2  and community relations, the District -- we have
3  internal public and community relations staff. That's
4  where the staff subheader comes in. So they've -- they
5  are at least aware of the CPT work, and they may get
6  more involved as we get closer to actually being out
7  doing those CPTs. But I'm not aware of any outside
8  public relations firms being brought in.
9    Q. Anything else?
10   A. As far as real estate, I believe we have
11 involved our in-house real estate person to help us
12 begin identifying property owners, but I'm not aware of
13 bringing in any outside real estate specialist as of yet
14 for that.
15    In terms of legal assistance, I guess that
16 maybe gets into attorney-client privilege, so I don't
17 know if I can really get into those issues.
18   Q. Well, the question would be, have you engaged
19 any legal assistance? That would not be -- I think
20 Mr. Axline would probably agree that question would not
21 call for attorney-client privileged information.
22   A. I -- I guess --
23   Q. If I were to ask you --
24   A. Yeah.
25   Q. -- what did they say, that would clearly

Page 1739

1  intrude, but --
2    A. Okay. Well, the answer is yes on the site
3  acquisition.
4    Q. And who have you engaged?
5    A. Miller Axline.
6    Q. And when did that occur?
7    A. Subsequent -- I'd say --
8    MR. AXLINE: Hold on.
9    THE WITNESS: Oh, sure.
10    MR. AXLINE: Let me object here that you're now
11 asking questions that are not limited to the time period
12 between Mr. Herndon's last deposition.
13    MR. FINSTEN: All of these questions are
14 intended to be limited since 2008, so --
15    MR. AXLINE: That specific question, I think
16 needs to be clarified, then.
17 BY MR. FINSTEN:
18   Q. When, since 2008, did you engage Miller Axline
19 to do work relating to site acquisition relating to this
20 station?
21    MR. AXLINE: Objection. Vague as to the term
22 "engage."
23 BY MR. FINSTEN:
24   Q. Go ahead.
25   A. I recall having discussions sometime in July,

20  (Pages 1736 to 1739)

aab2f876-0ea2-4571-b129-8563c392817b

Page 1752

1    Q.  Okay.  Now, since 2008, has the District
2  learned of any other real hydrogeologic evidence that
3  MTBE had escaped remediation at the site?
4    A.  I believe the detections of MTBE since 2008 in
5  Monitoring Well M-45 are also evidence of plume escape
6  from remediation.
7    Q.  And does the District have any evidence linking
8  the detections in MW -- I'm sorry -- in OCWD M-45 with
9  the release at this station?
10   MR. AXLINE:  Objection.  Asked and answered in
11 his prior deposition.  Can you --
12   MR. FINSTEN:  This is in relation to new
13 detections in MW-45 -- in OCWD 45.  So I think that the
14 question is fair.
15   THE WITNESS:  I think the conditions -- the
16 groundwater conditions that have -- that were discussed
17 in my prior deposition or likely that were discussed in
18 my prior deposition in terms of vertical gradient and
19 groundwater flow directions would continue to indicate
20 that the MTBE found in M-45 since 2008 reasonably could
21 have come from -- would have been concluded to have come
22 from this site.
23 BY MR. FINSTEN:
24   Q.  And just to confirm, there is -- in the Hargis
25 report, 120, Exhibit 120, then, there is no real

Page 1753

1  hydrogeologic evidence that MTBE had escaped remediation
2  at the site in that summary, correct?
3    MR. AXLINE:  Objection.  Mischaracterizes the
4  document.  Mischaracterizes prior testimony.  Vague.
5  Calls for speculation.
6    THE WITNESS:  I believe the Hargis report makes
7  a number of statements that indicate that the plume has
8  not been hydraulically contained.  It has not been
9  laterally or vertically delineated, and that there are
10 various natural and manmade conduits that could allow
11 for contamination to migrate down into deeper aquifers.
12 BY MR. FINSTEN:
13   Q.  Is any of that real hydrogeologic evidence that
14 the contamination had escaped remediation at 1905?
15   MR. AXLINE:  Objection.  Argumentative.
16 BY MR. FINSTEN:
17   Q.  I'm sorry.  I don't mean to be argumentative.
18 It's Mr. Bolin's phrase, "real hydrogeologic evidence."
19 I agree coming out of nowhere, that sounds obnoxious,
20 but it's not my own words.
21   A.  In terms of specific concentrations
22 associated -- of MTBE associated with this site, I guess
23 those hydrogeologic conditions are not specific in terms
24 of a -- of a given time frame associated with this site.
25   Q.  Well, to confirm, the Hargis report was

Page 1754

1  available to Mr. Bolin at the time he made his
2  declaration, right?
3    A.  I guess -- what was the date of his declaration
4  again?  I forgot.
5    Q.  June 3rd, 2009.
6    A.  I guess -- I'm not sure if the Hargis report
7  was available to him at that time.
8    Q.  Well, looking at the Hargis report real
9  quickly, it's dated in the footer, February 20, 2009,
10 correct?
11   A.  That -- that's what the date notation
12 indicates, yes.
13   Q.  Do you have any reason to believe that
14 Mr. Bolin didn't look at it until after June?
15   A.  I don't know if the District received that
16 document before June of 2009.
17   Q.  Okay.  All right.  Let's take a look at another
18 exhibit that has been previously marked.  This has been
19 previously marked as Exhibit 8.  This is Plaintiff
20 Orange County Water District's combined responses to
21 certain defendants' third, fourth, fifth, sixth, seventh
22 and eighth sent of interrogatories, re:  Cost recovery at
23 Focus Plumes 1, 2, 3, 8, and 9.  I'm going to try to
24 speed through this.
25   Mr. Herndon, are you familiar with this

Page 1755

1  document?
2    A.  Yes.
3    Q.  Did you participate in its creation?
4    A.  I believe I assisted with that, yes.
5    Q.  Okay.  If I could get you to look at page 29.
6  There's a chart that was included in response to
7  Interrogatory No. 6.  Part of the chart, it says, "The
8  District has expended funds for consulting services,
9  investigative costs and District staff costs, as well
10 analytical costs" -- I'm sorry -- "analytical testing
11 with associated costs of sample collection.  A summary
12 of those costs below."
13   Did I read that correctly?
14   A.  "Summary of those costs is as follows," yes.
15   Q.  Thank you.  Thank you.
16   And then there's a chart that goes over to
17 page 29 and page 30.  The first line item in the chart
18 refers to investigation costs for H2O R2 Consultants.
19   This is not an expense that was related to
20 ARCO 1905, correct?
21   MR. AXLINE:  Objection.  Vague.
22   THE WITNESS:  Boy, it's been a while since I
23 reviewed the work done by H2O R2.
24 BY MR. FINSTEN:
25   Q.  I'll give you a hint.  If you turn the page,

24 (Pages 1752 to 1755)

Confidential - Per 2004 MDL 1358 Order

Page 1888

1    A.  Okay.
2    Q.  -- which identifies ARCO 1912 in the agenda
3  items submittal to the board.
4       Is this the first time that this station was
5  specifically identified to the board of directors of
6  Orange County Water District?
7       MR. AXLINE:  If you're asking about post-2008,
8  Counsel?
9       MR. FINSTEN:  This is dated August 18, 2010.
10  And I think that the prior testimony from the prior
11  deposition was that there was no discussion of any
12  station with the board of directors.  I'm just trying to
13  ask if there was any other time before August 18, 2010
14  that this station was identified to the board.
15       MR. AXLINE:  Well, the prior deposition
16  testimony is what it is.
17       MR. FINSTEN:  That's right.
18       MR. AXLINE:  So I'm going to allow him to
19  answer the question with respect to time periods
20  subsequent to 2008.
21       THE WITNESS:  Subsequent to 2008, I don't
22  recall another time, other than August 18, 2010, where
23  this station was specifically identified to the board.
24       MR. FINSTEN:  Okay.  I'm done.  I have no
25  further questions today.

Page 1889

1       MR. AXLINE:  No questions from me.
2       MR. FINSTEN:  Anybody on the phone?
3       MR. AXLINE:  We lost everyone.
4       MR. FINSTEN:  No one.  They all gave up on us.
5       THE VIDEOGRAPHER:  This concludes Volume VIII
6  of the corporate designee of Orange County Water
7  District, represented by Roy Herndon, in regards to
8  production of documents for site-specific ARCO 1905,
9  ARCO 1912, Thrifty 383, and Beacon Bay Car Wash Fountain
10  Valley.
11       This video deposition consists of five
12  videotapes.  The time is approximately 5:22.  We are now
13  off the record.
14       (The deposition was concluded at 5:22 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 1890

1              REPORTER'S CERTIFICATION
2
3       I, Kimberly Thrall, Certified Shorthand
4  Reporter and Registered Professional Reporter, in and
5  for the State of California, do hereby certify:
6
7       That the witness named in the foregoing
8  deposition was, before the commencement of the
9  deposition, duly administered an oath in accordance
10  with the Code of Civil Procedure Section 2094; that
11  the testimony and proceedings were reported
12  stenographically by me and later transcribed through
13  computer-aided transcription under my direction and
14  supervision; that the foregoing is a true record of the
15  testimony and proceedings taken at that time.
16
17       IN WITNESS WHEREOF, I have hereunto subscribed
18  my name this 21st day of September, 2010.
19
20
21       _____
22       Kimberly S. Thrall, RPR, CSR No. 11594
23
24
25

Page 1891

1       - - - - - -
2       E R R A T A
3       - - - - - -
2  PAGE LINE CHANGE
4  _____
5  REASON:  _____
6
7  REASON:  _____
8
9  REASON:  _____
10
11  REASON:  _____
12
13  REASON:  _____
14
15  REASON:  _____
16
17  REASON:  _____
18
19  REASON:  _____
20
21  REASON:  _____
22
23  REASON:  _____
24
25  REASON:  _____

58 (Pages 1888 to 1891)

aab2f876-0ea2-4571-b129-8563c392817b

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Methyl *tertiary* Butyl Ether ("MtBE") Products Liability Litigation<br><br>This Document Relates To:<br>*Orange County Water District v. Unocal Corporation, et al.,*<br>Case No. 04 Civ. 4968 (SAS) | MDL No. 1358 (SAS)<br><br>**DECLARATION OF CHARLES R. LINES IN COMPLIANCE WITH CASE MANAGEMENT ORDER NO. 4, SECTION III.B.1.(b).(ii)**<br><br>The Honorable Shira A. Scheindlin |

<u>**DECLARATION OF CHARLES R. LINES**</u>

I, Charles R. Lines, under penalty of perjury, hereby declare as follows:

1.      I am Manager – Policies, Legislation and Regulation for ChevronTexaco Products Company, a division of Chevron U.S.A. Inc.  I submit this declaration on behalf of Chevron U.S.A. Inc. ("Chevron"), pursuant to Case Management Order No. 4.  Except as otherwise stated, I have personal knowledge of the facts set forth herein.

2.      Attached hereto as Exhibit A is a chart identifying the addresses of the gasoline stations that Chevron has owned, operated, leased, and/or that have been subject to a Chevron retail supply contract, since 1986, with the dates of such ownership, operation, lease, and/or retail supply contract, within Orange County, California (the "Station Chart").

3.      I am informed and believe that the Station Chart attached hereto was prepared using the information provided by Chevron employees Tony Dong and Lorrine Griswold, who have knowledge regarding the databases containing the service station operational histories reflected in the charts.  I am further informed that these operational histories were derived from two primary databases:  the SAP eFoundation database downloaded into the MARketing Viewable Electronic Library ("MARVEL") reporting tool, and the Chevron

1-LA/809847.1



EXHIBIT
4

Products System ("CPS") database.

4.     The SAP eFoundation and CPS databases encompass various systems that track customer and product transactions for various Chevron businesses. These include sales, contracts, invoices, payments, bank transfers, credit, tax, price, customer and production information for gasoline and other petroleum products supplied by Chevron to Chevron-branded retail service station facilities. CPS was replaced by SAP eFoundation on January 1, 2003. CPS data was imported into SAP eFoundation. Data from SAP is downloaded into MARVEL each day.

5.     The accuracy of the service station information contained in the SAP eFoundation and CPS databases is limited, as the databases rely on the precision of the party inputting the data into them. In addition, on occasion, the older CPS data may be overridden by newer SAP data that is entered, such as date information, which may alter the original data entry. In obtaining information from the databases and preparing the attached Station Chart, Chevron did not review or compare the underlying service station files, which may contain more accurate and complete information.

6.     The Station Chart lists the subject service station sites by address, with three rows identifying the type and years of operation for each site: "Owned/Leased," which refers to stations that were either operated by Chevron ("company operated" sites), or stations where Chevron owned the real property or leased it from a third party ("three-party" sites); "Operated," which refers to company operated sites; and "Retail Supply Contract," which refers to three-party sites and to sites where the real property and service station facilities were owned or leased and operated by a third party ("two-party" sites).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of December, 2004 at Brea, California.

Charles R. Lines

## Exhibit A to Declaration of Charles R. Lines

MDL No. 1358 (SAS) - Orange County Water District
Station Chart

---

45.   Station Address:   2261 N FAIRVIEW ST, SANTA ANA, CA 92706-2244

    Owned/Leased:    1986-1998
    Operated:
    Retail Supply Contract:    1986-2004

46.   Station Address:   32852 VALLE RD, SAN JUAN CAPISTRANO, CA 92675-4502

    Owned/Leased:
    Operated:
    Retail Supply Contract:    1986-1994

47.   Station Address:   400 N STATE COLLEGE BL, ANAHEIM, CA 92806-2916

    Owned/Leased:
    Operated:
    Retail Supply Contract:    1986

48.   Station Address:   3801 S BRISTOL ST, SANTA ANA, CA 92704-7426

    Owned/Leased:    1986-2000, 2002-2004
    Operated:    2002-2004
    Retail Supply Contract:    1986-2000

49.   Station Address:   2590 NEWPORT BLVD, COSTA MESA, CA 92627-5179

    Owned/Leased:    1986-1987
    Operated:
    Retail Supply Contract:    1986-1987

50.   Station Address:   604 S COAST HWY, LAGUNA BEACH, CA 92651-2476

    Owned/Leased:    1986-2004
    Operated:
    Retail Supply Contract:    1986-2004

51.   Station Address:   4991 E LINCOLN BLVD, CYPRESS, CA 90630-2655

    Owned/Leased:    1999
    Operated:
    Retail Supply Contract:    1999

52.   Station Address:   10972 KATELLA AVE, ANAHEIM, CA 92804-6134

    Owned/Leased:    1986-2004
    Operated:
    Retail Supply Contract:    1986-2004

## Exhibit A to Declaration of Charles R. Lines

MDL No. 1358 (SAS) - Orange County Water District
Station Chart

99.   Station Address:   633 WILLIAMSON AVE, FULLERTON, CA 92832-2155

Owned/Leased:
Operated:
Retail Supply Contract:     1986-1988

100.   Station Address:   5395 E LA PALMA AVE, ANAHEIM, CA 92807-2086

Owned/Leased:
Operated:
Retail Supply Contract:     1986-1999

101.   Station Address:   1000 W ORANGETHORPE AVE, FULLERTON, CA 92833-4734

Owned/Leased:            1986-2000
Operated:
Retail Supply Contract:     1986-2000

102.   Station Address:   1801 S HARBOR BLVD, ANAHEIM, CA 92802-3509

Owned/Leased:            1986-2004
Operated:               2003-2004
Retail Supply Contract:     1986-2002

103.   Station Address:   10511 GARDEN GROVE BLVD, GARDEN GROVE, CA 92843-1128

Owned/Leased:
Operated:
Retail Supply Contract:     1986-1989

104.   Station Address:   1071 NORTH BLUE GUM ST, ANAHEIM, CA 92806-2406

Owned/Leased:
Operated:
Retail Supply Contract:     1986

105.   Station Address:   361 N HARBOR BLVD, LA HABRA, CA 90631-4846

Owned/Leased:
Operated:
Retail Supply Contract:     1986-2002

106.   Station Address:   5992 WESTMINSTER BLVD, WESTMINSTER, CA 92683-3546

Owned/Leased:            1986-2001
Operated:               2001
Retail Supply Contract:     1986-2000, 2002-2004

# EXHIBIT 5



LEXISNEXIS® FILE & SERVE
32951488
E-SERVICE
Aug 31 2010
11:00AM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Methyl *tertiary* Butyl Ether ("MtBE") Products Liability Litigation | Master File No. 1:00-1898 MDL No. 1358 (SAS) |
| This Document Relates To: | DECLARATION OF TAM BUI |
| *Orange County Water District v. Unocal Corporation, et al.,* Case No. 04 Civ. 4968 (SAS) | |

Tam Bui hereby declares and states as follows:

1.      I am the Manager of the Huntington Beach Terminal (located in Huntington Beach, CA) for Chevron U.S.A. Inc. (Chevron"). Chevron maintains electronic records of gasoline deliveries to retail gasoline stations. I have reviewed these electronic records, and I am familiar with them. True and correct copies of those records have been produced at:

| | |
|---|---|
| Chevron 9-5401 | CHEVMDL135800000583389 – 585345, CHEVMDL135800000585346 – 585564; |
| Chevron 9-1291 | CHEVMDL135800000583389 – 585345, CHEVMDL135800000585346 – 585564; |
| Chevron 208554 | CHEVMDL135800000583389 – 585345, CHEVMDL135800000585346 – 585564; |
| Chevron 9-5568 | CHEVMDL135800000706814 – 707182; |
| G&M Oil No. 4 | CHEVMDL135800000666080 – 666274; |
| G&M Oil No. 24 | CHEVMDL135800000666275 – 666486; and |
| G&M Oil No. 38 | CHEVMDL135800000707284 – 707415. |



EXHIBIT
**5**

Chevron has no record of delivering gasoline to any other stations that have been designated as part of a Focus Plume not listed above.

The column headings on the spreadsheets identified above are defined as follows:

"Cal.year/ Month" is the date of delivery.

"Movement Type" is a sale or stock transfer. (A stock transfer is Chevron product taken

to a Chevron station.)

"Ship-to part Trade Class" means the type of station to which the gasoline was delivered.

"Ship to party Facility #" means the distinct number assigned to each Chevron-branded station.

"Ship to Party Name" means the name of the dealer or operator at the facility.

"MOT" means method of transportation.

"Billing document" means Bill of Lading used to invoice dealer or station.

"Pricing date" means the price on the day of loading.  The price typically changes every 24 hours.

"Product Code" is the distinct code assigned to each type of gasoline refined by Chevron.

"Product Name" is the name of the product associated with the distinct product code.

"Billed Quantity Gallons" is the amount of gasoline delivered in gallons.

"Quantity in Barrels" is the amount of gasoline delivered in barrels.

2.   Chevron 9-1921 at 3801 Bristol is a Chevron-branded station.  It was owned by Chevron U.S.A. Inc. from a date prior to 1986 until a date after December 31, 2003.  During this time period, the station was operated by the following independent businessmen/businesses: Louis J. Bacca, Mustang Marketing, Inc., and Chevron.

3.   Chevron does not know the precise dates when gasoline containing MTBE was first stored at Chevron-branded stations because its delivery records do not differentiate gasoline with or without MTBE until late 1992.  In general, Chevron-branded stations likely had MTBE in certain premium gasoline grades commencing some time in the late 1980s.  Starting in late 1992, all grades of gasoline sold at the Chevron-branded stations contained MTBE during the wintertime months in order to comply with the federal Wintertime Oxygenate Program.  In 1995, Chevron started adding MTBE on a year-round basis to all gasoline grades in order to comply

with the federal Reformulated Gasoline Program.  Chevron stopped selling gasoline containing MTBE at the Chevron-branded stations in 2003, pursuant to the Governor's Executive order on MTBE Phase Out.  Consistent with its general practice, Chevron's delivery records show that it delivered gasoline containing MTBE to Chevron 9-1921 on the following dates:

October 29, 1992 through February 28, 1993;

October 1, 1993 through February 28, 1994;

September 29, 1994 through February 28, 1995; and

September 20, 1995 through January 14, 2003.

The specific dates and amounts of those deliveries are set forth in the spreadsheets produced at CHEVMDL135800000583389 – 585345 and CHEVMDL135800000585346 – 585564.

After a diligent search of its records, Chevron was unable to locate any dealership agreements related to this station during the relevant time period.

4.     Chevron 9-5401 at 5992 Westminster is a Chevron-branded station.  It was owned by Chevron U.S.A. Inc. from a date prior to 1986 until January 7, 2002.  During this time period, the station was operated by the following independent businessmen/companies: Keith Van Hoesen, Adartse Enterprises, Inc., Chevron Stations Inc., Hassan & Sons Inc., and G&M Oil Co., Inc.  From January 8, 2002 until a date after December 31, 2003, Chevron #9-5401 was owned and operated by G&M Oil Co., LLC.

5.     Chevron does not know the precise dates when gasoline containing MTBE was first stored at Chevron-branded stations because its delivery records do not differentiate gasoline with or without MTBE until late 1992.  In general, Chevron-branded stations likely had MTBE in certain premium gasoline grades commencing some time in the late 1980s.  Starting in late 1992, all grades of gasoline sold at the Chevron-branded stations contained MTBE during the

3

wintertime months in order to comply with the federal Wintertime Oxygenate Program. In 1995, Chevron started adding MTBE on a year-round basis to all gasoline grades in order to comply with the federal Reformulated Gasoline Program. Chevron stopped selling gasoline containing MTBE at the Chevron-branded stations in 2003, pursuant to the Governor's Executive order on MTBE Phase Out. Consistent with its general practice, Chevron's delivery records show that it delivered gasoline containing MTBE to Chevron 9-5401 on the following dates:

October 29, 1992 through February 28, 1993;

October 1, 1993 through February 28, 1994;

September 30, 1994 through February 28, 1995; and

September 18, 1995 through January 14, 2003.

The specific dates and amounts of those deliveries are set forth in the spreadsheets produced at CHEVMDL135800000583389 – 585345 andCHEVMDL135800000585346 – 585564.

True and correct copies of certain dealership agreements and related documents for Chevron 9-5401 can be found at:

CHEVMDL135800000585933 - 585943,
CHEVMDL135800000585977 - 585986,
CHEVMDL135800000585988 - 585991,
CHEVMDL135800000585995,
CHEVMDL135800000586023 - 586048,
CHEVMDL135800000586054 - 586063,
CHEVMDL135800000586089 - 586109,
CHEVMDL135800000586121 - 586131,
CHEVMDL135800000586134 - 586135,
CHEVMDL135800000666618 - 666624,
CHEVMDL135800000666625 - 666632, and
CHEVMDL135800000666633 - 666673.

6.      Chevron 208554 at 8980 Warner is a Chevron-branded station. It was owned by G&M Oil Co., Inc. from June 25, 1999 through December 31, 2001 and was owned by G&M Oil Co., LLC from January 1, 2002 until a date after December 31, 2003. During that time period,

4

I declare under penalty of perjury that the foregoing is true and correct.

Executed at HUNTINGTON BEACH, California, this 27 day of August, 2010.

Tam Bui

11

## CERTIFICATE OF SERVICE

I hereby certify that on the 31ST day of August 2010, a true, correct, and exact copy of the foregoing document was served on all counsel via LexisNexis File & Serve.

Jeremiah J. Anderson