# EXHIBIT 10

Confidential - Per 2004 MDL 1358 Order

Page 275

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl:  Master File No. 1:00-1898
Ether ("MTBE")        :  MDL NO. 1358 (SAS)
Products Liability    :  M21-88
Litigation            :
_____

This Document Relates to:
    Orange County Water District
    v. Unocal Corporation, et al.,
    S.D.N.Y. No. 04 Civ. 4968 (SAS)
_____/

CONFIDENTIAL
(Per 2004 MDL 1358 Order)

------

July 31, 2008

------

Videotaped Deposition of DAVID P. BOLIN,

Volume 2, OCWD'S 30(b)(6) DESIGNEE, held in the law

offices of Latham & Watkins, 650 Towne Center Drive,

Suite 2000, Costa Mesa, beginning at 9:04 a.m., before

Sandra Bunch VanderPol, RPR, RMR, CRR, CSR #3032.

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|917.591.5672 fax

deps@golkow.com



EXHIBIT
10

Confidential - Per 2004 MDL 1358 Order

Page 448

1  see that?
2      A.  Yes, I do.
3      Q.  Now, did you read the Komex written
4  report, from which I'm reading now, before you made
5  the decision to include Unocal 5226 in plume No. 9?
6      A.  I can't tell you which reports I read
7  at what time with respect to listing these wells.
8      But I can comment on the wells that you're
9  referring to.  These wells -- I don't know what types
10  of wells these are.  WM-8 is identified as a
11  municipal well.  But that does not necessarily mean
12  that it is a drinking water production well.
13      The wells that are included on this map, as
14  I stated earlier, are limited to large system
15  production wells, small system production wells,
16  other system production wells, monitoring wells with
17  MTBE detections, destroyed and sealed wells with MTBE
18  detections, but may not include municipal supply
19  wells and would not include the three wells that are
20  identified in parentheses, W-16927, W-2405, and WM-9.
21      There are a lot of wells, as I stated
22  earlier, thousands of wells, in the basin that are a
23  variety of different kinds of wells, including oil
24  wells, including agricultural wells, including
25  abandoned wells, including -- when I say "abandoned"

Page 449

1  in this context, I mean wells that were not
2  destroyed, they were just walked away from.  They
3  still exist.  In some cases we don't know exactly
4  where, we just know the proximate location.
5      But these are the kind of wells that we're
6  concerned as being potential conduits for
7  contaminated water flowing from the shallow zone into
8  a deeper zone.
9      There's an error, apparently, in the 600
10  feet reference in the report versus the five point
11  something miles referenced in the summary sheet.  But
12  the fact remains that these are the conduits I
13  alluded to earlier that are in proximity to these
14  different sites.
15      Q.  Do you know whether there's been a
16  detection of MTBE in Westminster production Well No.
17  8?
18      A.  I do not.
19      Q.  I'm going to ask you a series of
20  questions limited to the Unocal 5226 station.  Ready?
21      A.  Okay.
22      Q.  Okay.  Have you, or has anyone else
23  from the District, had any communication with
24  consultants or contractors on the Unocal 5226 station
25  for any purpose?

Page 450

1      A.  If you're asking me whether we have
2  had any communication with any consultants, have
3  actually worked on that station excluding Komex, I
4  can't be certain.
5      If there were communication directly with a
6  consultant working on that station for any of the
7  opposing parties in this case, it would have been
8  before I was there, or it might have been during a
9  meeting at one of the regulatory agencies when these
10  kinds of meetings come up on occasion.
11      Q.  In the deposition notice, which is
12  Exhibit 1, category topic No. 8 is the following,
13  quote, "All communications between the District
14  and" -- strike that.  I'm going to ask a different
15  question.
16      Let's go to No. 13.  13 is similar, but in
17  fairness it's not the same question I just asked you.
18      A.  What page are you on?
19      Q.  Category 13, "The efforts the
20  District has made to contact potentially responsible
21  parties or to request that they take additional or
22  different actions regarding focus plumes 2, 7 or 9,
23  which includes the stations."
24      Solely with respect to Unocal 5226, has the
25  District made any contact with Unocal, Tosco,

Page 451

1  ConocoPhillips, or any of its consultants, to request
2  that they take additional or different actions
3  regarding their remediation project?
4      MR. MILLER:  Counsel, I need an agreement on
5  the record so that we don't have to do this
6  repeatedly.  Your client wanted to talk to the
7  District about settlement, and they wanted to do so
8  before they retained law firms, and clients were
9  present.
10      Can we carve all of that out of the
11  question?
12      MR. ANDERSON:  I certainly think so.  And I
13  wouldn't expect this witness to have included that.
14  Agreed.  Agreed.
15      MR. MILLER:  Thank you.  Now, I hope he
16  still has the question in mind.
17      THE WITNESS:  I believe I do.  By the way,
18  that's the first time I've heard of that.
19      I can only speak of what it might have taken
20  place while I've been at the District.  I cannot say
21  what might have happened before I joined the
22  District.  It's possible there was communication
23  before I was there.
24      But it is my belief that there has not been
25  any communication on the part of Orange County Water

45 (Pages 448 to 451)

0aa858e1-1e3d-4ba0-8463-31c8834bcb25

Page 452

1  District with Unocal, in this case, regarding this
2  particular site, about activities that they were
3  doing or should or should not do at this site.
4        It is possible there was some communication
5  with the party at a meeting with -- at a regulatory
6  agency, but if there was -- if there was any
7  communication, if there were any meetings in that
8  regard with Unocal about this site, I'm not aware of
9  it.
10        And if there's any communication that's
11 available that -- if I'm in error, if there's any
12 communication that's available, you should have that
13 in your production.
14 BY MR. ANDERSON:
15     Q.    Has the District taken any actions to
16 remediate MTBE or TBA contamination with respect to
17 the Unocal 5226 site?
18     A.    If you're asking me has the Orange
19 County Water District removed contamination from the
20 site directly through its activities, including
21 installation or operation of a remediation system,
22 whether it's ours or somebody else's, the answer is,
23 no.
24     Q.    Has the District attempted to do so?
25     A.    The Orange County Water District has

Page 453

1  not started remediation at this site, insofar as we
2  have designed and installed a remediation system or
3  operated somebody else's system.
4        What we have done is to begin to understand
5  and are working to understand the nature of the
6  problem, the degree, the extent, and whether any
7  activity by Orange County Water District is necessary
8  for remediating the site.
9      Q.    Has any determination been made by
10 the District that any activities to remediate or
11 clean up that site are appropriate?
12     A.    I'm sorry.  Would you -- would you
13 repeat that question, please.
14       (Record read as follows: QUESTION: Has any
15 determination been made by the District that any
16 activities to remediate or clean up that site are
17 appropriate?)
18     MR. ANDERSON:  That's a bad question.
19     Q.    Has the District made any
20 determination that it needs to take action to
21 remediate or clean up that site?
22     A.    No.  That -- that determination is
23 still in progress.
24     Q.    Has the District made any
25 determination that any different remediation or

Page 454

1  cleanup actions for that site are necessary or
2  appropriate?
3      A.    That determination is still in
4  progress, including hiring some additional expertise
5  to help us evaluate the appropriate remediation
6  technology, its application, the operation, whether
7  it's existing, existed in the past, or might exist in
8  the future.
9      Q.    You're the person designated as most
10 knowledgeable about the District's investigation into
11 these particular sites and what has and hasn't been
12 done.
13       My question is:  Have you personally
14 concluded that there's any urgent need to address any
15 particular problems at the 5226 Unocal site?
16     A.    My determination is that there has
17 been a release at this site that's in groundwater
18 that is spreading.  When I say "release," I mean MTBE
19 and/or TBA, as -- excuse me.  I don't want to
20 misspeak.  I want to say, in general terms, MTBE
21 and/or TBA is released from this site, gotten into
22 groundwater, is flowing within the groundwater, and
23 is threatening drinking water production wells.
24       Whether there is the need or requirement on
25 the part of Orange County Water District to take

Page 455

1  active steps in remediating the site has not yet been
2  determined.
3      Q.    Have you spoken to any regulators who
4  have oversight responsibility for that site?
5      A.    I don't remember whether I have
6  talked to regulators specifically about this site.
7      Q.    Do you know who the regulators are
8  who are responsible for that site?
9      A.    Not off the top of my head.
10     Q.    Do you know which regulatory body is
11 in charge of the remediation at that site?
12     A.    I can check, if you give me just a
13 moment, instead of going on memory.
14       As of April 2008, or close to that time,
15 Shamala, and forgive me, I cannot pronounce the last
16 name, with the Orange County Health Care Agency, is
17 the case manager for that site.
18     Q.    Do you know that person?
19     A.    I know her.
20     Q.    You know her.  Do you consider her to
21 be competent in her job?
22     A.    I think she's good.
23     Q.    Do you believe the Orange County
24 Health Care Agency takes its responsibility seriously
25 when it oversees remediation projects?

46 (Pages 452 to 455)

0aa858e1-1e3d-4ba0-8463-31c8834bcb25

Confidential - Per 2004 MDL 1358 Order

Page 456

1    A.   I do.
2    Q.   Do you have any reason to believe
3  that the Orange County Health Care Agency is not
4  doing an adequate job of overseeing the remediation
5  activities at the Unocal 5226 site?
6    MR. MILLER:  Vague.
7    THE WITNESS:  I believe that Orange County
8  Health Care Agency, as well as the Water Resources
9  Control Board and Santa Ana, in this case, they have
10  jurisdiction over this part of the state, and other
11  agencies, don't have all of the resources available
12  to them, readily available to them, to make some
13  determinations, and that the vast majority of the
14  data and the information that they have to rely on
15  actually comes from consultants doing work at the
16  site.
17    Based on that limited information, and the
18  limited understanding of perhaps the hydrogeology in
19  proximity to the site, the conceptual hydrogeology,
20  which in many cases has not been evaluated, would
21  cause someone like Ms. -- I think she goes by
22  Sundaram -- Ms. Sundaram to come to different
23  conclusions that she otherwise might come to if she
24  had all of the information available to her.
25    Q.   And does Orange County Water District

Page 457

1  have superior information and resources to those
2  available to the Orange County Health Care Agency and
3  the Orange County -- or the Santa Ana Regional Water
4  Quality Control Board, with respect to overseeing
5  remediation projects?
6    MR. MILLER:  Compound.
7    THE WITNESS:  It depends on how you're
8  defining superior.
9    I will say that Orange County Water District
10  has more knowledge and understanding of the
11  hydrogeology in the basin, including in some cases
12  specifically around some of these sites where we have
13  done further localized evaluation and, consequently,
14  might have a different opinion about contamination
15  releases and movement and potential threats to
16  drinking water wells.
17  BY MR. ANDERSON:
18    Q.   Can you think of a single release
19  site -- and let's -- let's limit it to gasoline
20  release sites.  Let's not worry about other
21  chemicals.
22    Can you think of a single release site where
23  Orange County Water District has become actively
24  involved in overseeing or making recommendations on
25  the remediation activities?

Page 458

1    A.   I can't think of specific example off
2  the top of my head where Orange County Water District
3  has instructed or indicated the type of remediation
4  that should be done in lieu of the remediation that
5  might be taking place.
6    But that's not to say that they haven't done
7  it or that it hasn't been discussed by someone else
8  at the District on different occasions.  The numbers
9  of meetings the District has had with regulatory
10  agencies on the number of sites is fairly limited, in
11  terms of how many sites are out there.
12    Q.   Isn't it true that the District
13  relies on the investigation and remediation oversight
14  by the regulatory agencies to prevent MTBE and other
15  contaminants from escaping gas station spill sites?
16    A.   It is true that we do rely on the
17  regulatory agencies to oversee those activities.
18    Q.   And that is the presumption at Orange
19  County Water District, that the regulatory agencies
20  will be the ones overseeing those remediation
21  projects, right?
22    A.   I'm not certain I --
23    MR. MILLER:  Vague on "presumption."
24    THE WITNESS:  I was going to say, I'm not
25  certain what you mean.

Page 459

1  BY MR. ANDERSON:
2    Q.   Okay.  That unless there are
3  exceptional circumstances, Orange County Water
4  District depends on and allows the regulatory
5  agencies to provide that oversight?
6    MR. MILLER:  Vague.
7    THE WITNESS:  I want to answer your question
8  the best way I can.
9    Orange County Water Districts rely on the
10  regulatory agencies to do their job to oversee all
11  activities associated with a particular site:
12  Environmental activities, operations, that kind of
13  thing.  Whatever their jurisdiction is.
14    We do not rely entirely that all of the
15  decisions or all of the actions that have taken
16  place -- that took place, that are taking place, or
17  that will take place, will resolve the issue of MTBE
18  or fix the problems, the releases from the sites.
19  BY MR. ANDERSON:
20    Q.   Can you think of any examples with
21  respect to MTBE contamination and remediation where
22  Orange County Water District has made even a single
23  suggestion to a responsible party or its consultant
24  about how to conduct the remediation of MTBE?
25    A.   I can't speak about what took place

47  (Pages 456 to 459)

0aa858e1-1e3d-4ba0-8463-31c8834bcb25

Confidential - Per 2004 MDL 1358 Order

Page 460

1  before I joined the District.  And since litigation
2  had already been initiated after I joined the
3  District, I don't believe there's been any occasion
4  where any staff at the District has made a case to
5  any one of the RPs, the responsible parties, as to
6  how to conduct a remediation program at their site.
7       Q.   Is it true that the District has no
8  reason to take action in response to a release of
9  gasoline containing MTBE, where the Regional Board or
10 other local authority has received notice of the
11 release?
12      MR. MILLER:  Are you going to include any
13 other facts in your hypothetical?
14      MR. ANDERSON:  It's not a hypothetical.
15      THE WITNESS:  Would you read that question,
16 please.
17      (Record read as follows:  QUESTION:  Is it
18 true that the District has no reason to take action
19 in response to a release of gasoline containing MTBE,
20 where the Regional Board or other local authority has
21 received notice of the release?)
22      MR. ANDERSON:  I will add something.
23 Although, I'm not doing it because Mr. Miller
24 objected.  I'm doing it purely on my own.
25      MR. MILLER:  You have your own

Page 461

1  self-interest.
2       MR. ANDERSON:  I have my own self-interest.
3       MR. MILLER:  You finally figured it out.
4  BY MR. ANDERSON:
5       Q.   Is it true that the District has no
6  reason to take action in response to a release of
7  gasoline containing MTBE at a gasoline station where
8  the Regional Board or other local authority has
9  received notice of a release and has ordered or
10 undertaken remedial efforts at the site?
11      A.   It looks like you're reading from
12 something that's in --
13      Q.   That's something that's private
14 that's in front of me.  I asked you the question --
15      A.   It's in a binder.  I thought perhaps
16 it was in the material in front of me.
17      Q.   It's not in the binder, no.  I'm
18 asking you a question.
19      MR. MILLER:  He doesn't want to show you.
20      THE WITNESS:  I understand.  I thought it
21 was material in my binder.
22      MR. ANDERSON:  It's not.
23      THE WITNESS:  You've asked me two questions
24 that I haven't answered yet.  Do you want to --
25      MR. ANDERSON:  I withdrew the question --

Page 462

1  not because of Mr. Miller -- and then I asked you a
2  better question.
3       THE WITNESS:  Could you read that second
4  question for me, please.
5       (Record read as follows:  QUESTION:  Is it
6  true that the District has no reason to take action
7  in response to a release of gasoline containing MTBE,
8  where the Regional Board or other local authority has
9  received notice of the release?)
10      THE WITNESS:  That neither causes the
11 District to take action or not take action.  Because
12 there has been a release that has been noticed -- do
13 we need to change the tape?
14      MR. ANDERSON:  Let's change the tape, then
15 we will read back your partial answer, in fairness to
16 you, so you can be refreshed.
17      THE WITNESS:  Thank you.
18      THE VIDEOGRAPHER:  This is the end of tape
19 two in the videotape deposition of David Bolin.  At
20 2:50 p.m. we are off the record.
21      (Recess taken.)
22      THE VIDEOGRAPHER:  This is the beginning of
23 tape three in the videotape deposition of David
24 Bolin.  At 3:05 p.m. we are back on the record.
25 ///

Page 463

1  BY MR. ANDERSON:
2       Q.   Mr. Bolin, would you like your
3  partial answer read back before you complete it or do
4  you have it in mind?
5       A.   I have it in mind, but it would still
6  help to have that partial answer reread.  I don't
7  want to contradict myself.
8       (Record read as follows:  QUESTION:  Is it
9  true that the District has no reason to take action
10 in response to a release of gasoline containing MTBE,
11 where the Regional Board or other local authority has
12 received notice of the release?  ANSWER:  That
13 neither causes the District to take action or not
14 take action.  Because there has been a release that
15 has been noticed...)
16      THE WITNESS:  I'm going to begin from the
17 beginning.
18      The notice that you described that there's
19 been a release, and I believe you described -- you
20 were reading from text -- I believe you described
21 where the regulatory agency has taken action or
22 prompted or requested remediation, correct me --
23 please correct me if I am wrong.
24      MR. ANDERSON:  That's the gist of it.
25      THE WITNESS:  And you're asking whether the

48  (Pages 460 to 463)

0aa858e1-1e3d-4ba0-8463-31c8834bcb25

Confidential - Per 2004 MDL 1358 Order

Page 496

1  drillings monitoring wells, right?
2      A.   Yes.
3      Q.    Taking property by eminent domain in
4  order to have access to property to do remediation
5  work?
6      A.   They can do that.
7      Q.    And physically entering property to
8  physically remediate contamination, right?
9      A.    Only under certain circumstances.  So
10 the last part of your question is, it depends.
11      I'm not aware Orange County Water District
12 has police authority to enter any property outside of
13 its -- the authority that it might have, including
14 eminent domain, to apply eminent domain to take
15 property and do what we have described, or to install
16 wells or do anything that's off the property, on some
17 other property, either by easement or lease or
18 cooperation with another property owner, or in the
19 public right-of-way, including roads and sidewalks,
20 and things like that.
21      Q.    How much money has the District
22 expended with respect to focus plumes 2, 7 and 9?
23      A.    I don't know how much the District
24 has spent specific to focus plumes 2, 7 and 9.
25      Q.    Did you study or investigate that

Page 497

1  topic in preparation for your deposition?
2      A.    No, I did not break out the costs
3  that Komex -- that the District has excised or
4  expended on behalf of just plumes 2, 7 and 9.
5      Q.    How much money, if anything, has the
6  District expended in connection with the Unocal 5226
7  station?
8      A.    I don't know the answer to that.
9      Q.    Do you have an estimate?
10      A.    I don't have an estimate.
11      Q.    Do you have an estimate of how much
12 the District has spent regarding focus plumes 2, 7
13 and 9?
14      A.    I think you just asked me that.
15      Q.    I didn't say how much.  I'm now
16 asking if you have an estimate, because you said you
17 didn't know how much.
18      A.    I'm sorry.  I didn't catch the
19 distinction.
20      I don't have an estimate of how much the
21 District has spent specific to focus plumes 2, 7 and
22 9.
23      Q.    How much money does the District
24 expect to spend in the future regarding focus plumes
25 2, 7 and 9?

Page 498

1      A.    It's impossible for me to estimate.
2      Q.    Have you attempted to come up with an
3  estimate?
4      A.    No.  Of course not.  It would be
5  premature to estimate how much money the District
6  plans to spend on focus plumes 2, 7 and 9, or any of
7  the individual stations within those plumes, without
8  doing more determination, more evaluation, and then
9  deciding what it is the District thinks it might have
10 to do.
11      Q.    Do you have any, any idea when that
12 evaluation and determination will be completed?
13      A.    No.  Some time in the future.
14      Q.    It could be two years?
15      A.    It could be two years.
16      Q.    It could be five years?
17      A.    It could be five years.
18      Q.    It could be ten years?
19      A.    I don't know.  We can keep going on.
20 But I don't know how long it will take for the
21 District to come to a determination and decide what
22 it is that it's going to have to do to address the
23 contamination in plumes 2, 7 and 9, or with regards
24 to any specific station, because we haven't made a
25 determination as to what actions would be appropriate

Page 499

1  and necessary by the District.
2      Q.    Did you determine in your
3  investigation, either as part of your project manager
4  job or preparing for this deposition, for how long
5  the District has been aware of the MTBE releases at
6  Unocal 5226?
7      A.    No.
8      MR. MILLER:  Where is that in the issues?
9      MR. ANDERSON:  I'm sorry?
10      MR. MILLER:  Where is that in the issues?  I
11 don't believe it's there.
12      MR. ANDERSON:  We're talking about the
13 District's work, how much it's spent, and when it
14 expects to get the work done, and I'm trying to get a
15 time frame of how long the work has been going on.
16      Q.    For how long has the District been
17 aware of an MTBE release at station 5226?
18      A.    I don't know when the District first
19 became aware of the release.  I can only comment on
20 when I became aware of the release.
21      Q.    And that was in 2005?
22      A.    It was in approximately 2005, in
23 relation to Komex's work.
24      Q.    How much time do you think it should
25 take for the District to be able to evaluate a

57 (Pages 496 to 499)

Confidential - Per 2004 MDL 1358 Order

Page 532

1      DEPONENT'S CHANGES OR CORRECTIONS
2   Note:  If you are adding to your testimony, print the
3   exact words you want to add.  If you are deleting from
4   your testimony, print the exact words you want to
5   delete.  Specify with "Add" or "Delete" and sign this
6   form.
7   DEPOSITION OF:      DAVID P. BOLIN, Volume 2
8   CASE:             MTBE MDL (OCWD)
9   DATE OF DEPOSITION: JULY 31, 2008
10  PAGE    LINE    CHANGE/ADD/DELETE
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  DEPONENT'S SIGNATURE  _____
25  DATE_____

Page 533

1       REPORTER'S CERTIFICATE
2
3       I certify that the witness in the foregoing
4   deposition.
5            DAVID P. BOLIN,
6   was by me duly sworn to testify in the within-entitled
7   cause; that said deposition was taken at the time and
8   place therein named; that the testimony of said witness
9   was reported by me, a duly Certified Shorthand Reporter
10  of the State of California authorized to administer oaths
11  and affirmations, and said testimony, pages 275 through
12  533, was thereafter transcribed into typewriting.
13      I further certify that I am not of counsel or
14  attorney for either or any of the parties to said
15  deposition, nor in any way interested in the outcome of
16  the cause named in said deposition.
17      IN WITNESS WHEREOF, I have hereunto set my hand this
18  6th day of August, 2008.
19
20      _____
21      SANDRA BUNCH VANDER POL
22      Certified Shorthand Reporter
23      Certificate No. 3032
24
25

Golkow Technologies, Inc. - 1.877.370.DEPS

0aa858e1-1e3d-4ba0-8463-31c8834bcb25

Confidential - Per 2004 MDL 1358 Order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

| | | |
|---|---|---|
| Methyl Tertiary Butyl: | Master File No. 1:00-1898 | |
| Ether ("MTBE") | : | MDL NO. 1358 (SAS) |
| Products Liability | : | M21-88 |
| Litigation | : | |

_____

This Document Relates to:
    Orange County Water District
    v. Unocal Corporation, et al.,
    S.D.N.Y. No. 04 Civ. 4968 (SAS)
_____/

CONFIDENTIAL
(Per 2004 MDL 1358 Order)

------

August 20, 2008

------


        Videotaped Deposition of DAVID P. BOLIN,

Volume 4, OCWD'S 30(b)(6) DESIGNEE, held in the law

offices of Latham & Watkins, 650 Towne Center Drive,

Suite 2000, Costa Mesa, beginning at 2:29 p.m., before

Sandra Bunch VanderPol, RPR, RMR, CRR, CSR #3032.




            GOLKOW TECHNOLOGIES, INC.

        877.370.3377 ph|917.591.5672 fax

            deps@golkow.com

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 868

1  notice in November 2005, according to the e-mail
2  messages that were sent.
3      I'm looking at Exhibit 42, for example.
4      Q.   So if you look at Exhibit 45, this is
5  January of 2008. Scope of work includes -- it looks
6  like it's basically the completion of what had been
7  started before; is that a fair, gross generalization?
8      A.   The completion of some of what --
9  some of the work that had been started before. Much
10 of the work had been completed, but there were -- but
11 not everything was completed.
12     Q.   Right. So you wanted to get it
13 finished so you have a usable final work product from
14 Komex, right?
15     A.   We wanted Komex, that is the District
16 wanted Komex to complete the work that they were --
17 agreed to do.
18     Q.   And has Komex now completed the work
19 contemplated by the 2005 agreement and the scope of
20 work described in Exhibit 45?
21     A.   They have substantially completed the
22 work that was originally agreed to in the first phase
23 of work.
24     Q.   Is there anything --
25     MR. MILLER: Excuse me. Somebody needs to

Page 869

1  mute. We are hearing background conversation.
2  BY MR. ANDERSON:
3      Q.   Is there anything that you can think
4  of that Komex has not completed, that it has agreed
5  to complete as part of its scopes of work in '05
6  through '08?
7      A.   They have substantially completed the
8  work that we have asked them to do. There were
9  things that they were working on as part of their
10 analyses that I don't believe they are continuing to
11 do. To my knowledge, they have completed everything
12 that we are asking them to do.
13     MR. ANDERSON: Exhibit 46 is a Professional
14 Services Agreement No. 0454, between WorleyParsons
15 Komex and Orange County Water District.
16     (Exhibit No. 46 was marked.)
17 BY MR. ANDERSON:
18     Q.   Is this an agreement between Orange
19 County Water District and WorleyParsons Komex for
20 work in connection with the MTBE litigation project?
21     A.   I'm still looking over it.
22     Q.   I'm not going to get real detailed,
23 but look to the extent you want to.
24     A.   Yes, I believe that it is.
25     Q.   Okay. Is this the most recent

Page 870

1  contract between the District and WorleyParsons
2  Komex?
3      A.   I believe that it is.
4      Q.   Do you anticipate any further
5  agreements with WorleyParsons Komex in connection
6  with the MTBE litigation project?
7      A.   I don't know whether we will have any
8  additional agreements with Komex regarding the MTBE
9  project.
10     Q.   You don't have any in the works right
11 now, do you?
12     A.   There is nothing that we are
13 preparing at this moment.
14     Q.   The term of this agreement set forth
15 on page 2, Section 5, was to end on June 30, 2008; do
16 you see that?
17     A.   Yes.
18     Q.   And do you know if the work was
19 completed under the agreement?
20     A.   I believe that it was.
21     Q.   Does this refresh your recollection
22 that -- I'm looking at Section 7. This talks about
23 returning documents at the end of the project.
24     Is it still your recollection that Komex has
25 not returned the documents described in this

Page 871

1  agreement back to Orange County Water District?
2      A.   We still have an open agreement with
3  Komex. I believe they substantially completed the
4  work that they were asked to do, but I don't know
5  whether all of their materials have been returned to
6  Orange County Water District.
7      MR. ANDERSON: Okay. Why don't we take a
8  short break, and we will change gears when we get
9  back.
10     THE VIDEOGRAPHER: This is the end of
11 tape 2. At 4:00 p.m. we are off the record.
12     (Recess taken.)
13     THE VIDEOGRAPHER: Correction, that was the
14 end of tape 1. This is the beginning of tape 2. At
15 4:13 p.m. we are back on the record.
16     (Exhibit No. 47 was marked.)
17 BY MR. ANDERSON:
18     Q.   Mr. Bolin, I handed you Exhibit 47,
19 which is a lengthy spreadsheet produced to us by your
20 counsel the night before last relating to Unocal
21 Station 5226. Do you see that?
22     A.   Yes.
23     Q.   Do you have any idea why it was
24 produced to us on August 18th as opposed to ten days
25 before your deposition started?

18 (Pages 868 to 871)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 872

1    A.    Because that's when I finished it.
2    Q.    You finished this document on
3  August 18th. And why were you working on this
4  document up to and including August 18th?
5    A.    The first two days in my deposition I
6  brought some binders with various notes and documents
7  to help me answer questions that I might be asked and
8  left those documents behind to have copied.
9      And when I was able to re-access those
10  documents, after those two days of deposition, I know
11  that a number of the tabs that I had put on there had
12  been moved. A couple of them were moved.
13      And so I went back and reattached those
14  tabs, went through those documents again and decided
15  that it would help me further to answer questions if
16  I could have some summary notes for each of those
17  binders instead of trying to flip through the binders
18  to find answers to questions that I might be asked.
19    Q.    Now, let's take a look at the first
20  page of this exhibit. On line item -- starting with
21  line item 35, "Remediation." These are all your
22  notes?
23    A.    These are my notes.
24    Q.    These are typed in? They are not cut
25  and pasted from something else?

Page 873

1    A.    That is correct.
2    Q.    You say, "Remediation: First
3  groundwater capture began in March of '02," right?
4    A.    And the squiggly mark means
5  approximately.
6    Q.    Approximately?
7    A.    Approximately in March of '02.
8    Q.    So this is something you got -- you
9  were pulling this out of some documents you were
10  looking at, right?
11    A.    That's correct.
12    Q.    And what were the documents you were
13  looking at?
14    A.    These are the documents that are in
15  the binders for which you have copies.
16    Q.    And the source of the documents in
17  the binder would include the quarterly reports
18  provided by the ConocoPhillips consultant?
19    A.    Yes.
20    Q.    And the document that said that the
21  capture began in March of '02, was that something
22  dated back in 2002, or something dated later than
23  that?
24    A.    I would have to look through the
25  documents to determine which document, at what date,

Page 874

1  mentioned when groundwater was being removed from the
2  site.
3    Q.    You note that the responsible
4  party -- that's RP, right?
5    A.    That is correct.
6    Q.    "Pump groundwater from monitoring
7  Well 2 in April of '99 and September of '00." Right?
8    A.    Yes.
9    Q.    And then you have the statement,
10  "Concluded that vacuum extraction was not feasible."
11  What does that mean?
12    A.    That was a statement or an indication
13  made by the consultant in a report that said that the
14  vacuum extraction was not a feasible remediation
15  technology.
16    Q.    Did you find any indication, as you
17  went through all these records as recently as two
18  days ago, that Orange County Water District had
19  provided any direction or suggestions or criticisms
20  to either the responsible party, its consultants, or
21  the Orange County Health Care Agency concerning this
22  particular project?
23    MR. MILLER: Objection. That's compound.
24    THE WITNESS: I don't have any documents
25  saying -- that discusses communication between Orange

Page 875

1  County Water District and anybody else about this --
2  this particular site.
3      Of course, I'm only knowledgeable about
4  activities that might have taken place after I joined
5  the District in 2005. Whether such conversations
6  were had with any of these particular RPs or
7  regulatory agencies about this site or any of the
8  sites before I joined the District, I don't know.
9  BY MR. ANDERSON:
10    Q.    You noted that the responsible party
11  had conducted soil excavation of 119 tons in 1992,
12  1994 and 1995. Right?
13    A.    I'm trying -- I'm trying to follow
14  along. All these notes kind of run together.
15      Can you identify which line?
16    Q.    Oh, I see. No, apparently that's
17  something that's missing from your report.
18      Were you aware the responsible party had
19  excavated 119 tons of soil in those three years? You
20  didn't note it in the report. I'm just asking if you
21  knew that?
22    A.    I might have -- I might be aware of
23  that. I might have noted that or read that in one of
24  the reports.
25    Q.    Is soil excavation a method of

19 (Pages 872 to 875)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 888

1 say as of today, August 20th, 2008. That's all I can
2 ask of you.)
3     THE WITNESS: I haven't identified specific
4 damages, so I can't comment on what damages you might
5 be referring to. I can only speculate. And I'm not
6 going to do that here.
7     But I can comment that there's been a
8 substantial release from this site, and that it -- of
9 MTBE and TBA, and that the contamination MTBE and TBA
10 has gotten into groundwater. Groundwater provides a
11 drinking water source for the community in the Orange
12 County Basin.
13     The Orange County Water District's act
14 authorizes the District to take steps to evaluate,
15 mitigate, remediate, investigate, so on and so forth,
16 contamination and water quality issues in the basin.
17     This is one of the keen issues that the
18 Orange County Water District is addressing now. We
19 are looking at the sources and the potential threat
20 and impacts to drinking water supplies.
21     In this particular case, MTBE has been
22 detected in two of the wells that are identified as
23 focus wells for this plume focus 9, and indicates
24 that a more detailed and greater study needs to be
25 done to determine if we can identify in a better way

Page 889

1 where the contamination might be coming from, and
2 then also what we're going to do about the
3 contamination.
4     We have a list of activities that are being
5 considered but cannot at this point identify exactly
6 what activities are going to be necessary.
7 BY MR. ANDERSON:
8     Q.    By the way -- and I'm not going to
9 cover it with you again because Mr. Herndon did a
10 good job, but he pulled out a exhibit, or produced an
11 exhibit that he said you and you collaborated on
12 recently that listed a lot of investigative
13 activities, and site specific, non-site specific, and
14 remediation activities.
15     Do you recall working on that document with
16 him recently?
17     A.    I believe I know which document you
18 might be referring to.
19     Q.    Is that what you were thinking of
20 when you gave your last answer?
21     A.    That document contains a list of
22 activities that we potentially might take, might have
23 to take in cases where we decide we need to
24 investigate or remediate contamination identified at
25 the various sites.

Page 890

1     MR. ANDERSON: Just for the record, I will
2 get it.
3     MR. CORRELL: Here it is.
4     MR. ANDERSON: Do you have a copy?
5     Q.    Take a look at Exhibit 50 in your
6 stack. And I think it's probably in order. It looks
7 like that.
8     THE REPORTER: Here it is.
9     MR. ANDERSON: I have an extra copy. Let me
10 give you a copy.
11     THE WITNESS: I don't have that.
12 BY MR. ANDERSON:
13     Q.    Is Exhibit 50 the document you were
14 just referring to?
15     A.    This is the document that you're
16 referring to, but this is the one that I thought you
17 were referring to.
18     Q.    Yes. But let's get back to the
19 business at hand.
20     I think I heard you say that you have not
21 yet determined for site 5226 which, if any, of these
22 things or other acts will be required by the District
23 to deal with any remediation problem at that site; is
24 that correct?
25     A.    That's a conclusion we haven't come

Page 891

1 to yet.
2     Q.    I'm sorry?
3     A.    That's a conclusion we haven't come
4 to yet.
5     Q.    Okay. And do you have an estimate as
6 to when you will come to that conclusion with respect
7 to the Unocal site 5226?
8     A.    I believe you asked me that question
9 the first two days of the deposition. I don't
10 remember which day.
11     Q.    Yes, but we now have a little more
12 specific. I think the last time you said you didn't
13 have an estimate.
14     MR. MILLER: That document was available
15 last time, Counsel.
16     MR. ANDERSON: Maybe it was; maybe it
17 wasn't.
18     MR. MILLER: And it's been asked and
19 answered. You've already gone into it once. How
20 many times do you have to go into it?
21     MR. ANDERSON: No. I didn't have this
22 document last time.
23     MR. MILLER: It was produced before the
24 deposition.
25     MR. ANDERSON: Mr. Miller, we didn't talk

23 (Pages 888 to 891)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Page 892

1 about this document in Mr. Bolin's deposition until
2 three minutes ago.
3        My question -- and I will ask it a different
4 way.
5        Q.   Does this document refresh your
6 recollection or assist you in estimating the time
7 frame in which the District expects to know the
8 nature of the activities that were required -- would
9 be required to perform in connection with Unocal
10 5226?
11       A.   No.
12       Q.   I take it, with respect to that
13 station, you're not able to quantify a cost of any of
14 the activities that you might decide to do in the
15 future, right?
16       A.   That's correct.
17       Q.   And you don't have any estimate of
18 when you will be able to quantify those costs, right?
19       A.   No.  There's quite a list of
20 activities we would need to be -- need to complete
21 before we came to that conclusion, including
22 mathematical modeling, fate and transport analysis,
23 and some other activities that we're still proposing
24 to do.
25       Q.   And when you say "proposing to do,"

Page 893

1 you haven't yet contracted with your outside
2 consultants to do that work yet, have you?
3       A.   We do not have a contract with an
4 expert to help us with that work right yet.
5       Q.   And you don't have an estimate of
6 when you will have such a contract, right?
7       A.   Not yet.
8       Q.   Now, I had asked a more open-ended
9 question earlier.  You answered with respect to
10 Unocal 5256.
11       Let me do this.  If you look at Exhibit 2,
12 and it lists, I think, 39 or 40 different stations.
13 And just to clarify, remember we had that USA Station
14 that we -- that isn't listed here, but we understood
15 the District had effectively added to one of the
16 plumes?  Do you remember that?
17       MR. MILLER:  That was with Mr. Herndon.
18       MR. ANDERSON:  But we talked about it last
19 week too, or two weeks ago.
20       Q.   I will just represent to you that in
21 addition to the stations listed here, there has been
22 some indication by your lawyers and by Mr. Herndon
23 that there's a USA Station involved as well.
24       A.   Yes, there is a USA Station involved
25 that I do not see here -- listed here for focus plume

Page 894

1 No. 9.
2       Q.   Understood.  But for my questioning
3 from this point forward --
4       MR. MILLER:  You're going to limit it to 2,
5 7 and 9 for a change?
6 BY MR. ANDERSON:
7       Q.   -- assume that that USA Station is on
8 the list, okay?
9       A.   Okay.
10      Q.   And my question is:  You just
11 answered a series of questions about Unocal 5226, and
12 the studies that are going on, and the time frame,
13 and the uncertainty about what, when and where you're
14 going to have to do work.  And it is what it is.
15 It's on the record.
16      Do you recall that testimony?
17      MR. MILLER:  Objection, mischaracterizes
18 testimony.  I don't think the witness used the word
19 "uncertainty."  You did.  You're misstating the
20 testimony.
21 BY MR. ANDERSON:
22      Q.   Do you recall the subject matter we
23 talked about, about the Unocal 5226 station and
24 whether the District had determined what, if any,
25 work was going to have to be done in connection with

Page 895

1 the contamination and the remediation of the
2 contamination at that station?
3       A.   I'm not certain whether you're
4 talking about discussions we've had today or in prior
5 occasions.
6       Q.   Today.
7       A.   Today?
8       Q.   Today.
9       A.   I remember.
10      Q.   Just in the last ten minutes.
11      A.   I remember.
12      Q.   What I want to do is try to shortcut
13 the process and ask you whether your -- the state of
14 your development of information on that station is
15 typical of the other stations listed on Exhibit 2,
16 including the USA Station, or whether there is one or
17 more station where you have more concrete information
18 you can give me?
19      MR. MILLER:  Counsel.
20      MR. ANDERSON:  Yes, Mr. Miller.
21      MR. MILLER:  That question should definitely
22 be limited to 2, 7 and 9.  He hasn't reviewed the
23 files on the other stations.
24      MR. ANDERSON:  Let's limit the question to
25 2, 7 and 9.

24  (Pages 892 to 895)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 896

1    THE WITNESS: We have not completed any
2  modeling studies or fate and transport analysis on
3  the stations listed for plumes 2, 7 and 9.
4    These are fundamental activities that we're
5  going to need to perform to determine whether these
6  are stations in which pose the kind of threat that we
7  think exists or whether these -- any of these
8  stations could be discounted such that we would
9  expend resources that might be more necessary on
10  another station.
11  BY MR. ANDERSON:
12    Q.   Okay.  With respect to the stations
13  listed in plumes 2, 7 and 9, does the District know
14  when it will be able to complete its analysis to be
15  able to determine whether, in fact, additional work
16  needs to be done?
17    A.   Not insofar as giving you a date.
18  But I can say that it will be after we're able to
19  complete the activities I just described and after
20  we're able to get some expert assistance in
21  completing those activities.
22    Q.   And in terms of, quote, "after you're
23  able to complete the activities you describe," end
24  quote, do you have an estimate of when you will
25  complete that work?

Page 897

1    A.   I just answered that question.
2    Q.   You just answered a question as to
3  5226.  I don't think you've answered it as to the
4  general question I asked.  How about the other
5  stations?
6    A.   Okay.  Maybe I did not understand you
7  were referring to the other stations.
8    May I have that question read back to me.
9    Q.   Let me just ask.  I think I can do it
10  in a couple of short questions.
11    You've shown us the list of activities on
12  Exhibit 50, some of which I understand are under
13  consideration to be performed in connection with each
14  of the stations, right?
15    A.   That's partly correct.  Actually, I
16  didn't provide that to you.  It was -- it was
17  discovered.  It was produced prior to your discussion
18  with Mr. Herndon, but I believe he's the one that
19  gave it to you.
20    Q.   Mr. Miller actually claims that I got
21  it before.  So either way.
22    A.   I believe you did.
23    Q.   It's a document you're familiar with?
24    A.   Yes.
25    Q.   And it's your efforts with

Page 898

1  Mr. Herndon to list the things that need to be done
2  in order to evaluate future activities that may be
3  required by OCWD, that might cost money to perform,
4  which would provide the basis for damages claims
5  against the defendants, right?
6    MR. MILLER:  Objection, as asked it's
7  compound.  It's vague.  There are numerous items.  It
8  calls for gross overgeneralization.
9    Answer, if you can.
10    THE WITNESS:  I don't think I can answer
11  that question.  It's very broad.
12    I can comment on the list of items that were
13  prepared by Roy Herndon and myself as items that
14  we're aware of.  But the list of items was prepared
15  to help us to be able to check off a list of items
16  that might help answer your questions.
17    And this particular document was not
18  prepared in anticipation or in preparation for our
19  depositions, but these are all activities that are
20  considered necessary and proper for dealing with
21  these particular sites.
22    As to which activities we're going to
23  expend -- or conduct, we don't know yet.
24  BY MR. ANDERSON:
25    Q.   Okay.  And with respect -- I'm trying

Page 899

1  to shortcut this as much as I can.  But with respect
2  to the stations listed in plumes 2, 7 and 9 on
3  Exhibit 2, you, meaning the District, have not yet
4  determined which, if any, of these activities will be
5  necessary, correct?
6    A.   That's a very specific question.  Let
7  me take a quick look at this list.
8    No, actually, there are some items on here
9  that we are in the process of doing now.
10    I believe you might be referring to
11  remediation activities in mind, with that in mind.
12  But actually on page 3, there's a list of activities
13  that we're also -- already involved in, and that is
14  the technical assistance.
15    We're still trying to identify and secure
16  some expert -- experts to help us with these kinds of
17  activities, including staffing.  We're entertaining
18  the idea of hiring new staff, which involves
19  recruiting, consultant contracting, and those kinds
20  of activities.  Long, labor intensive activities.
21    Q.   Would you characterize those
22  activities as being investigation and information
23  gathering activities?
24    A.   Investigation and information
25  activities would be included in that but not

25 (Pages 896 to 899)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 912

1  been any taste and odor complaints, or taste or odor
2  complaints, with respect to any Huntington Beach
3  wells where those complaints were attributed to MTBE
4  or TBA?
5      A.    I do not know one way or the other.
6      Q.    With respect to Huntington Beach
7  Wells 1, 4, 7 and 13, did you investigate whether any
8  of those wells had been threatened by contamination
9  from any service stations, other than those listed
10 with plumes 2, 7 and 9?
11     A.    There are a lot of stations in the
12 basin that have not been identified on this list that
13 have had releases.
14     As I have indicated in earlier testimony, we
15 looked at over 400 release sites that are listed for
16 Orange County Basin, and we went through an
17 evaluation process, a preliminary process, and
18 decided that these were the sites that we were going
19 to concentrate on and do further evaluation.
20     MR. MILLER:  We're at five o'clock.
21     MR. ANDERSON:  I'm pretty close to finishing
22 my questions on my station, if you don't mind going a
23 little bit longer.
24     MR. MILLER:  If you ask about your station.
25     MR. ANDERSON:  That's what I'm asking about.

Page 913

1      Q.    Has Orange County Water District
2  performed a detailed analysis of what is needed to
3  evaluate the Unocal 5226 site in terms of future
4  remediation efforts?
5      A.    I don't know what you mean by the
6  first part of your question.
7      Q.    I probably don't know either.
8      Focus on Unocal 5226, okay?  Has Orange
9  County Water District performed a detailed analysis
10 of what additional steps need to be taken in order to
11 complete a satisfactory remediation of that site?
12     MR. MILLER:  Objection, vague as to what you
13 mean by "detailed analysis."
14     Do you want the witness to discuss with you
15 what he thinks at this point in time, which is in
16 your deposition notice, or do we want to fight about
17 whether or not it's detailed?
18     MR. ANDERSON:  We can take the word
19 "detailed" out.
20     THE WITNESS:  That was the word I was going
21 to ask about, because I don't know what you mean by
22 "detailed."
23     I have completed a detailed analysis insofar
24 as I have looked at this site, and I can talk to you
25 about some of my findings.  But if you're asking me

Page 914

1  about a detailed analysis that includes mathematical
2  modeling, fate and transport evaluations, that hasn't
3  been completed yet.
4  BY MR. ANDERSON:
5      Q.    Let's stick with what you have done.
6  So what have you concluded from your analysis that
7  should be done at that site that hasn't been done?
8      A.    Contamination should have been
9  contained.  It hasn't been contained.  It hasn't been
10 captured.  It hasn't been removed.  And it is
11 continuing -- we believe it is continuing to flow
12 from the site.  If not from the site, then certainly
13 contamination that flowed from the site already is
14 still continuing to flow from the site, meaning --
15 I'm sorry.  For clarification, I mean that it has
16 escaped the site and will not be captured at the
17 site.
18     Q.    Is the amount of contamination that
19 has been escaped the site significant?
20     A.    We believe that it is significant
21 insofar as that it's meaningful.  Meaning that we're
22 going to have to address it.  And it still presents a
23 threat to drinking water wells.
24     Q.    Have you decided what you're going to
25 need to do to address it?

Page 915

1      A.    I believe you asked me that already.
2  But at the risk of repeating myself, we're going to
3  have to do some -- at least some of the activities
4  identified on the list of activities that Mr. Herndon
5  had presented to you.
6      Q.    Exhibit 50?
7      A.    Exhibit No. 50, yes.  We haven't
8  identified exactly which of these items are going to
9  be necessary, but you can bet it's going to be some
10 of the items on the list.
11     Q.    Maybe I can bet to that, but you
12 haven't yet determined it, right?
13     A.    Well, I -- I've answered that
14 question also.
15     We haven't decided exactly which items on
16 this list are going to be necessary, but we're
17 certain that some of them will be.
18     Q.    Right.  I saw -- when I asked you
19 about 5226, you pulled out a piece of paper.  What is
20 that you're looking at?
21     A.    Oh, this is my copy of Exhibit 47.
22 Your copy of Exhibit 47 has smaller print, and it's a
23 difficult little difficult for my eyes.
24     Q.    Understood.  So it's that exhibit.
25 And that would contain all of your observations on

29  (Pages 912 to 915)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 916

1    your analysis of that station to date?
2        A.    Not necessarily my observations.
3    These are notes that I prepared so I could answer
4    questions in this deposition.
5        Q.    Have you determined that the MTBE or
6    TBA that you believe has escaped remediation at site
7    5226 constitutes a threat to groundwater resources
8    used for drinking water?
9        A.    Yes, I believe it does.
10       Q.    What is the basis for that belief?
11       A.    There's substantial concentrations of
12   MTBE that has been released from this site.  That
13   contamination has gotten into groundwater and has
14   flowed away from the site.  I believe that the
15   contamination has not been nor will it be captured by
16   remediation at the site.  And given that it is in
17   water, which is the transport mechanism, and that
18   these same compound, MTBE, has been detected in
19   drinking water wells associated with this plume, we
20   believe that this site poses a significant threat to
21   drinking water sources in the basin.
22       Q.    With respect to the series of
23   conclusions you've just given me in the last two or
24   three answers about site 5226, keep those in mind.  I
25   mean not specifically, but just the fact that you

Page 917

1    have reached a number of conclusions that you've
2    testified about, right?
3        A.    Okay.
4        Q.    Have you communicated any of those
5    conclusions to the Orange County Health Care Agency?
6        A.    Specific to this site?
7        Q.    Yes.
8        A.    Not specific to this site.
9        Q.    Have you communicated any of those
10   conclusions to the station operator?
11       A.    No.
12       Q.    Have you visited --
13       A.    Not directly.
14       Q.    Have you visited the site?
15       A.    I can't be certain whether I've been
16   on this site or not.
17       Q.    Has the District installed any
18   monitoring wells in connection with that site?
19       A.    No.
20       Q.    Has the District actively considered
21   installing monitoring wells at that site?
22       A.    Yes.
23       Q.    And what has it determined as a
24   result of that active consideration?
25       A.    That additional evaluation is

Page 918

1    necessary so we can decide what additional activities
2    are going to be appropriate and proper.
3        Q.    Have you discussed site 5226 with
4    anyone else at Orange County Water District?
5        A.    Yes.
6        Q.    Who?
7        A.    I discussed 5226 in the general
8    context with other sites with Roy Herndon.
9        Q.    Anybody else?
10       A.    In terms of the general discussion of
11   contamination at various sites, other staff might
12   include -- or would include Craig Miller, assistant
13   general manager.  I've had a meeting with Mike
14   Marcus, the general manager, with Virginia Grebbien,
15   the previous general manager.  And I can't think of
16   anybody else off the top of my head, but these
17   conversations, although general in nature, included
18   this site.
19       Q.    Has the District performed any
20   cleanup work with respect to site 5226?
21       A.    No.
22       Q.    Has the District performed any
23   abatement work in connection with 5226?
24       A.    Not work specific to 5226.
25       Q.    Has the district performed any

Page 919

1    remedial work in connection with 5226?
2        A.    Not work specific to 5226.
3        Q.    Has the District taken any steps to
4    prevent MTBE contamination or the spread of MTBE
5    contamination from Unocal Station 5226?
6        MR. MILLER:  Compound.  Vague.
7        Go ahead.
8        THE WITNESS:  At this stage it's premature
9    to determine whether we need to do anything about
10   station 5226.  So we haven't identified what those
11   activities are.  We haven't completed our analysis.
12       Until we complete our analysis, we won't
13   know what we are going to do.
14   BY MR. ANDERSON:
15       Q.    Has the District determined that a
16   release of MTBE from Unocal 5226 constitutes an
17   immediate threat to the groundwater basin or its
18   producers or its users?
19       MR. MILLER:  Compound.
20       Go ahead.
21       THE WITNESS:  If you're -- I'm not certain
22   what you're talking about, an immediate threat.
23       I would say the threat is immediate when we
24   have detected MTBE in a drinking water well.  In that
25   context, I would say the threat is immediate.

30  (Pages 916 to 919)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483