Confidential - Per 2004 MDL 1358 Order

Page 920

1   BY MR. ANDERSON:
2       Q.   So you have made that determination
3   with respect to Unocal 5226?
4       A.   Based on my definition, what I just
5   said, that's what I believe to be true.
6       MR. MILLER:  Are you done with your list?
7   How long is your list?  How many pages?
8       MR. ANDERSON:  I'm really close.
9       MR. MILLER:  You keep promising that.  But
10  it's after 5:00.
11      MR. ANDERSON:  Just be patient.
12  Am I done?
13      MR. KATZ:  Yes.
14      MR. ANDERSON:  I'm done for the day.
15      MR. MILLER:  Thank you.
16      MR. ANDERSON:  So be back at 8:00.
17      MR. MILLER:  Perhaps not.
18      MR. ANDERSON:  Off the record.
19      THE VIDEOGRAPHER:  This is the end of tape
20  two of two and concludes today's deposition of David
21  Bolin.  At 5:09 p.m. we are off the record.
22      (The deposition was concluded on this day at
23  5:09 p.m.)
24          --o0o--
25

Page 921

1       Please be advised I have read the foregoing
2   deposition, and I state there are:
3   (Check one) _____NO CORRECTIONS
4              _____CORRECTIONS PER ATTACHED
5
6
7   _____
8       DAVID P. BOLIN
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 922

1       DEPONENT'S CHANGES OR CORRECTIONS
2   Note:  If you are adding to your testimony, print the
3   exact words you want to add.  If you are deleting from
4   your testimony, print the exact words you want to
5   delete.  Specify with "Add" or "Delete" and sign this
6   form.
7   DEPOSITION OF:     DAVID P. BOLIN, Volume 4
8   CASE:          MTBE MDL (OCWD)
9   DATE OF DEPOSITION:  AUGUST 20, 2008
10  PAGE    LINE    CHANGE/ADD/DELETE
11  _____   _____   _____
12  _____   _____   _____
13  _____   _____   _____
14  _____   _____   _____
15  _____   _____   _____
16  _____   _____   _____
17  _____   _____   _____
18  _____   _____   _____
19  _____   _____   _____
20  _____   _____   _____
21  _____   _____   _____
22  _____   _____   _____
23  _____   _____   _____
24  DEPONENT'S SIGNATURE _____
25  DATE_____

Page 923

1       REPORTER'S CERTIFICATE
2
3       I certify that the witness in the foregoing
4   deposition.
5           DAVID P. BOLIN
6   was by me duly sworn to testify in the within-entitled
7   cause; that said deposition was taken at the time and
8   place therein named; pages 804 through 923 of the
9   testimony of said witness were reported by me, a duly
10  Certified Shorthand Reporter of the State of California
11  authorized to administer oaths and affirmations, and said
12  testimony was thereafter transcribed into typewriting.
13      I further certify that I am not of counsel or
14  attorney for either or any of the parties to said
15  deposition, nor in any way interested in the outcome of
16  the cause named in said deposition.
17      IN WITNESS WHEREOF, I have hereunto set my hand this
18  2nd day of September 2008.
19
20  ------------------------------
21      SANDRA BUNCH VANDER POL, RMR, CRR
22      Certified Shorthand Reporter
23      Certificate No. 3032
24
25

31  (Pages 920 to 923)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 924

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl:  Master File No. 1:00-1898
Ether ("MTBE")       :  MDL NO. 1358 (SAS)
Products Liability   :  M21-88
Litigation           :
_____

This Document Relates to:
    Orange County Water District
    v. Unocal Corporation, et al.,
    S.D.N.Y. No. 04 Civ. 4968 (SAS)
_____/

CONFIDENTIAL
(Per 2004 MDL 1358 Order)

------

August 21, 2008

------

Videotaped Deposition of DAVID P. BOLIN,

Volume 5, OCWD'S 30(b)(6) DESIGNEE, held in the law

offices of Latham & Watkins, 650 Towne Center Drive,

Suite 2000, Costa Mesa, beginning at 9:02 a.m., before

Sandra Bunch VanderPol, RPR, RMR, CRR, CSR #3032.

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|917.591.5672 fax

deps@golkow.com

19cfce74-5e55-4ada-bad9-7aeb1485025d

Confidential - Per 2004 MDL 1358 Order

Page 1113

1  BY MR. CORRELL:
2      Q.    As we can see by your notes in
3  Exhibit 60, remediation or investigation can include
4  the installation of off-site monitoring wells by the
5  responsible party, correct?
6      A.    I believe that's correct, as you
7  state it.
8      Q.    And remediation, if it's designed to
9  do so on site, can capture off-site contamination,
10 correct?
11     A.    Depending on the remedial design and
12 the size of the system, it is possible to capture
13 some off-site contamination.
14     Q.    And so just because contamination has
15 left the site doesn't necessarily mean it's left the
16 reach of the cleanup, correct?
17     A.    It is true that just because it's
18 left the site, it does not mean it has escaped
19 potential cleanup.  But just because there is ongoing
20 cleanup doesn't mean it is being captured by that
21 cleanup.
22     Q.    You would have to do a site-by-site
23 analysis to tell?
24     A.    Well, in this case, yes, you would.
25     Q.    If you go to page 2, sir, of

Page 1114

1  Exhibit 60.  Towards the bottom of the page you list
2  two domestic wells.  By "domestic wells," do you mean
3  private drinking wells?
4      A.    I believe that's what domestic wells
5  are.  They are used for a variety of purposes.  It
6  could be farm, livestock, something like that.  But
7  it's a privately-owned well.
8      Q.    And you say, "Potential migration
9  paths from shallow saturated zones to deeper
10 saturated zones."  Do you see that?
11     MR. MILLER:  Could you help me.  What page?
12     MR. CORRELL:  On page 2.
13     THE WITNESS:  What line are you at, sir?
14     MR. CORRELL:  Right above those two domestic
15 wells.
16     THE WITNESS:  Okay.  I'm looking at the
17 exhibit.  That's where the numbering does help, the
18 line numbering.
19     Oh, I see where you are talking about.
20 There's a well number there.  Would you tell me which
21 well number you're looking at?
22     Q.    Well, there's Well 16785.
23     A.    Yes.
24     Q.    Well 16947.
25     A.    Yes.

Page 1115

1      Q.    And HB-1.  There's three wells listed
2  under the topic of, "Groundwater Conduits are Nearby,
3  paren, potential migration paths from shallow
4  saturated zones to deeper saturated zones."  Do you
5  see that?
6      A.    Right.  I see where you are looking.
7      Q.    And these are listed as potential
8  migration paths.  When will the District know whether
9  or not these are actual migration paths?
10     A.    I don't know when we will be able to
11 make that determination.  There are basically three
12 mechanisms by which the contamination from the
13 surface can get into a drinking water well at depth,
14 whether it flows along the surface and gets into the
15 well itself, whether it migrates down through the
16 geology and then flows to within the capture zone of
17 that particular well within that particular interval,
18 or whether it flows to some other potential conduit,
19 such as I have indicated here, these potential
20 conduits, and then get into a -- down into a lower
21 zone and then is captured by -- by a producing well.
22     I don't know when we will be able to
23 identify.  It's a very difficult thing to do.  I
24 don't know when we are going to be able to identify
25 which conduit and whether a conduit was the cause of

Page 1116

1  migration of the contamination from the surface into
2  a greater depth.
3      Q.    Or whether it has, in fact, migrated,
4  correct?
5      A.    Well, given that we have detections
6  in production wells, we know it's migrated from
7  somewhere.  We can say that categorically.  That if
8  there's a detection in a well of a compound that
9  originated at the surface, then it had to have
10 migrated.
11     Q.    From somewhere?
12     A.    From somewhere.
13     Q.    And as you can possibly imagine, my
14 client is very interested in how it migrated from
15 5123, and that's the question you don't know the
16 answer to, correct?
17     A.    That's correct.
18     MR. MILLER:  Objection, argumentative.
19 Assumes facts not in evidence.
20     And which person within an oil company
21 cares.  I'd like to know.  If you could tell me, I'd
22 like to interview the person.
23     MR. CORRELL:  We all care, Duane.
24     I'd like to mark Exhibit 66.
25     (Exhibit No. 66 was marked.)

49  (Pages 1113 to 1116)

19cfce74-5e55-4ada-bad9-7aeb1485025d

Confidential - Per 2004 MDL 1358 Order

Page 1129

1  60-foot elevation contour at the mean sea level. And
2  the contouring, you can see, indicates a depression
3  in that direction. So eventually the water will flow
4  to the north towards those wells.
5  BY MR. CORRELL:
6      Q.   If it goes to the deeper zone?
7      A.   Well, I believe it goes to the deeper
8  zone because there is a downgradient. We know that
9  the shallow water feeds, replenishes the deeper
10 water. So eventually it gets down there into the
11 principal aquifer and flows into the drinking water
12 wells.
13     Q.   What's the deepest level that MTBE
14 has been detected underneath the Unocal 5123 site?
15     A.   It would be in the deepest well. I
16 don't have the -- oh, I believe the deepest well in
17 the -- let me make sure I'm looking at the right
18 site -- Unocal 5123 is in the C zone, identified as
19 the C zone, which is screened from 40 to 50 feet.
20     Q.   And the drinking water table beneath
21 the site is what level?
22     A.   I will call it a -- we call it the
23 principal aquifer. And the principal aquifer -- the
24 top of the principal aquifer is at about 187 feet
25 below ground surface.

Page 1130

1      Q.   So in excess of 100 feet below the
2  deepest detection of MTBE?
3      A.   The principal aquifer begins at about
4  100 feet below the lowest well that's screened at
5  this site.
6      Q.   Now, during -- from any time that a
7  release was reported to present, has the District
8  taken any action to attempt to influence the remedial
9  activities occurring at the site?
10     MR. MILLER: Objection, vague and
11 argumentative.
12     THE WITNESS: I'd like to add something to
13 my previous answer.
14     MR. CORRELL: Please do.
15     THE WITNESS: I'm sorry. I'm still thinking
16 about your previous question.
17     HB-1, which does not currently have a pump
18 in it, but it is a production well that is in this
19 general area identified as one of the focus wells,
20 but we haven't been able to test it because it's got
21 the -- I'm sorry, the pump, it's been pulled out of
22 the well, is what I meant to say.
23     It is screened -- I lost my place. It's
24 screened at 265. So it's not at the top of the
25 principal aquifer, but it does drawdown water from

Page 1131

1  the upper zone in the principal aquifer where other
2  wells are screened at different zones.
3  BY MR. CORRELL:
4      Q.   It draws down when it has a pump,
5  right?
6      A.   When it has a pump, right.
7      Q.   So it's currently not a production
8  well?
9      A.   It's currently not producing.
10     I'm sorry. What was your last question
11 then? Not that one.
12     Q.   I understand. What was my question?
13     (Record read as follows: QUESTION: Now,
14 from any time that a release was reported to present,
15 has the District taken any action to attempt to
16 influence the remedial activities occurring at the
17 site?)
18     THE WITNESS: The District hasn't taken
19 specific action on this particular site regarding
20 remediation of contaminants, known contaminants at
21 the site.
22 BY MR. CORRELL:
23     Q.   Why hasn't the District offered its
24 expertise to help the Orange County Health Care
25 Agency or the responsible party take any additional

Page 1132

1  action that the District may think necessary?
2      A.   I can't comment on why we haven't
3  helped the responsible party, other than that might
4  involve the fact that we're in litigation.
5      But in terms of helping the Health Care
6  Agency, we're not telling the Health Care Agency how
7  to do their job here. We are looking at the impacts
8  and the threats to drinking water wells in deciding
9  what Orange County Water District is going to have to
10 do.
11     To my knowledge, I don't believe that the
12 Health Care Agency is able to conduct any remediation
13 activities itself. It would actually have to defer
14 to other agencies to implement that kind of activity.
15     Q.   And do you know why the Orange County
16 Water District, prior to the litigation, didn't
17 provide any recommendations to the PRP at the site?
18     MR. MILLER: Objection, assumes facts not in
19 evidence. Argumentative.
20     THE WITNESS: I don't know that it didn't
21 one way or the other.
22 BY MR. CORRELL:
23     Q.   Have you seen any document in the
24 District's file indicating that it did?
25     A.   No, I have not seen a document.

Golkow Technologies, Inc. - 1.877.370.DEPS

19cfce74-5e55-4ada-bad9-7aeb1485025d

Confidential - Per 2004 MDL 1358 Order

Page 1133

1    Q.    And I take it that you, in reaching
2  your opinions, reviewed the documents on this site in
3  the District's file?
4    A.    Yes, I have seen all the District's
5  documents in their file.
6    Q.    And I apologize if I asked you this
7  before. I can't remember if I did on this site or
8  the previous site.
9    But as of today, you cannot trace the
10 contamination in any production well to this site,
11 correct?
12   A.    I think you might have asked me that,
13 But if you didn't, I can't remember either. We
14 haven't determined that the specific detections
15 identified in production wells were specifically from
16 this site.
17   Q.    In going back to Exhibit No. 2 for
18 the stations listed in plume 9, other than the
19 Huntington Beach ARCO, as you sit here today, you do
20 not know whether the Unocal 5123 contamination, if
21 any, has commingled with the contamination from the
22 other sites, if any?
23   A.    I think you asked me that question
24 already. And I think I was talking about the south
25 Huntington Beach ARCO site to the south across the

Page 1134

1  street.
2    Q.    And that's why I asked the follow-on
3  question. When I asked that question initially, you
4  said the Huntington Beach ARCO.
5    A.    I am sorry. I misunderstood.
6    Q.    So now I'm trying to put a bow on the
7  rest of them.
8    A.    Okay.
9    Q.    So let me ask it again.
10   As you sit here today, do you have any
11 evidence that any contamination from Unocal 5123 has
12 commingled with the other sites listed in plume 9,
13 other than the Huntington Beach ARCO?
14   A.    I apologize. Thank you.
15   I don't have specific information, other
16 than the fact that there's been a detection in
17 drinking water wells, and that the source of that
18 detection is likely from one or more of these sites.
19 It might possibly have commingled at this point. It
20 might not have. We don't know.
21   We do believe that it is still traveling.
22 And that if it hasn't commingled already, it will
23 eventually.
24   Q.    And when you say, "we believe it will
25 eventually," you have reached that opinion not even

Page 1135

1  knowing the amount from any of these sites that --
2  amount of contamination from any of these sites that
3  have left the sites, correct?
4    MR. MILLER: Objection, argumentative.
5  Vague.
6    THE WITNESS: We don't have specific
7  information. This is where our modeling and further
8  analysis will -- will generate some conclusions along
9  these lines.
10   In the meantime, we have reason to believe
11 that substantial releases at early dates,
12 understanding that MTBE is resistant to retardation,
13 it's resistant to degradation, it's a fairly stable
14 product that moves fairly freely with groundwater,
15 that there is a great likelihood that it has traveled
16 all the way into the production wells in which MTBE
17 has been detected.
18 BY MR. CORRELL:
19   Q.    What do you base your opinion on that
20 MTBE is resistant to degradation?
21   A.    Scientific documents that I have
22 seen.
23   Q.    Would you consider that an area of
24 your expertise?
25   A.    No, I am not an expert in that area.

Page 1136

1    Q.    How much money has the District
2  expended to date related to the Unocal 5123 station?
3    A.    We don't have any records that break
4  out our expenses for individual sites, so I can't say
5  how much time and effort has been focused on this
6  site relative to another one. I can't quantify what
7  that expense would be.
8    Q.    It was one of the sites that Komex
9  reviewed, correct?
10   A.    Yes.
11   Q.    And the -- the tab for the Komex
12 reports was approximately $600,000?
13   A.    It was more than that. But --
14   Q.    About 700,000?
15   A.    Yes.
16   Q.    So if we divided that by the 40
17 sites, we would come to less than $20,000?
18   A.    Calculate. Do the math. I don't
19 know what -- how much time they spent on this site
20 relative to another one.
21   If the size of the binder is any indication,
22 it looks like there is more information on this site
23 than there was on other sites. But I didn't quantify
24 or begin to guess how much money or time they spent
25 on this site.

54 (Pages 1133 to 1136)

19cfce74-5e55-4ada-bad9-7aeb1485025d

Confidential - Per 2004 MDL 1358 Order

Page 1137

1    Q.   Okay. What specific future actions
2  does the District plan in relation to Unocal 5123?
3    A.   My answer to that question is going
4  to be substantially the same as the same question
5  regarding other sites. And that is that we have a
6  list of activities that we know we're going to have
7  to take. We don't -- we're going to have to take
8  some of those activities. We just don't know which
9  activities we're going to have to take yet.
10    Q.   If you go back to Exhibit No. 63 from
11  your binder, which was detections -- it's this one.
12    A.   Does that look familiar? I believe
13  that's it.
14    Q.   We are to the right page. Does do
15  you see the February 13, 2008 MTBE test?
16    A.   Yes, I do.
17    Q.   Of 0.01?
18    A.   Yes, I do.
19    Q.   Is that significant?
20    A.   It's certainly meaningful to me. It
21  indicates to me that MTBE has reoccurred in the well,
22  based on this report.
23    Q.   And if we look down in August 25th of
24  1999, it has the same level of detection?
25    A.   I see that.

Page 1138

1    Q.   Was it significant then?
2    A.   I believe it was -- had the same
3  meaningfulness. It's a reoccurrence in that well.
4    Q.   Okay. In your review of the
5  regulatory files, did you see where any regulatory
6  agency had concluded that MTBE escaped remediation
7  from this site?
8    A.   I can't recall a statement by the
9  regulatory agency saying that MTBE has escaped from
10  the site. Only that MTBE has been detected off site.
11  The site has never been closed. And that there is a
12  continuing ongoing effort -- apparently ongoing
13  effort at the site. But given that the -- it depends
14  on how you define escape again. It's outside the
15  site boundary. It's escaped the site.
16    If there's a remediation system that is
17  proposed to drawdown water and capture the water
18  that's contaminated -- that has escaped the site,
19  then it hasn't escaped -- then it might not escape
20  the remedial capture. But, to my knowledge, no
21  remedial design has been implemented, and there is no
22  plan for a remedial design to do that.
23    Q.   And I appreciate that. But I'm
24  asking from your review of the regulatory files, have
25  you seen that another regulatory agency, for example,

Page 1139

1  the Orange County Health Care Agency, has determined
2  that remediation -- that MTBE has escaped the
3  remediation at the site?
4    A.   I don't remember seeing a statement
5  from the Health Care Agency. You would only have to
6  look at the data and draw a conclusion as to whether
7  the contamination outside the site boundary is within
8  the remedial capture zone or it is not. I do not
9  believe that it is. I believe it is outside the
10  remedial capture zone.
11    Q.   What current remediation is operating
12  at the site, sir?
13    A.   I can't be certain. The last
14  document that I reviewed from my deposition is dated
15  January 2008. And I believe that the remediation
16  system was discontinued, according to my notes,
17  discontinued and is not currently operating.
18    Q.   Did that influence your opinion that
19  MTBE has escaped remediation?
20    A.   That -- if you're asking me whether
21  the fact that the status of the current remediation
22  system has been discontinued influenced my opinion
23  that contamination escaped remediation, no, it did
24  not.
25    Q.   So whether remediation is active --

Page 1140

1  never mind.
2    A.   Well, I don't think the -- I don't
3  think it can be captured by an on-site remediation
4  system now.
5    Q.   Okay.
6    A.   I think it's escaped. It's gone to
7  too far.
8    Q.   Even though you don't know the amount
9  that has escaped?
10    A.   That's correct.
11    Q.   And I probably asked you this
12  already, but it's sort of my last question on this
13  station.
14    What specific actions do you have planned
15  for this site in the future?
16    MR. MILLER: I believe that's been asked and
17  answered.
18    But go ahead.
19    THE WITNESS: I think you did ask me that.
20  And my answer is that we have a list of activities
21  that we're considering for this site -- all these
22  sites, but specifically we're talking about this
23  site, and my answer for this site is substantially
24  the same as the other sites.
25    We don't know exactly which activities we're

Confidential - Per 2004 MDL 1358 Order

Page 1141

1 going to have to take involving investigation and
2 remediation, only some of those activities leading up
3 to the investigation, remediation, which is continued
4 evaluation of the data that we already have, possibly
5 some mathematical modeling and fate and transport
6 modeling, as well as retaining an expert to help us
7 do those services.
8         MR. CORRELL:  I would now like to switch to
9 my last station.  Let's go off the record for one
10 second.
11         (Exhibit No. 67 was marked.)
12         THE VIDEOGRAPHER:  It is 3:35 p.m.  We are
13 off the record.
14         (Off the record.)
15         THE VIDEOGRAPHER:  It is 3:45 p.m.  We are
16 back on the record.
17         MR. CORRELL:  We have taken a break.  The
18 witness has stated that he is tired and that he would
19 like to end the deposition at least for today.
20         As of now I have one station left, but I
21 have no objection, since the witness is tired, to
22 ending the deposition now.
23         There's a dispute between the parties as to
24 if Mr. Bolin will be brought back, and if so, for how
25 long.  But that dispute shouldn't impose on the

Page 1142

1 witness.
2         Sir, we thank you for your time.
3         THE WITNESS:  Thank you.
4         MR. MILLER:  Thank you.
5         THE VIDEOGRAPHER:  This is the end of tape
6 three of three and concludes today's deposition with
7 David Bolin.  At 3:46 p.m. we are off the record.
8         (The deposition was concluded on this day at
9 3:46 p.m.)
10         --o0o--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1143

1         Please be advised I have read the foregoing
2 deposition, and I state there are:
3 (Check one) _____ NO CORRECTIONS
4                        _____ CORRECTIONS PER ATTACHED
5
6
7         _____
8         DAVID P. BOLIN
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1144

1         DEPONENT'S CHANGES OR CORRECTIONS
2 Note:  If you are adding to your testimony, print the
3 exact words you want to add.  If you are deleting from
4 your testimony, print the exact words you want to
5 delete.  Specify with "Add" or "Delete" and sign this
6 form.
7 DEPOSITION OF:     DAVID P. BOLIN, Volume 5
8 CASE:          MTBE MDL (OCWD)
9 DATE OF DEPOSITION:  AUGUST 21, 2008
10 PAGE    LINE   CHANGE/ADD/DELETE
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 DEPONENT'S SIGNATURE _____
25 DATE_____

Golkow Technologies, Inc. - 1.877.370.DEPS

19cfce74-5e55-4ada-bad9-7aeb1485025d

Confidential - Per 2004 MDL 1358 Order

Page 1145

```
 1            REPORTER'S CERTIFICATE
 2
 3        I certify that the witness in the foregoing
 4   deposition.
 5            DAVID P. BOLIN
 6   was by me duly sworn to testify in the within-entitled
 7   cause; that said deposition was taken at the time and
 8   place therein named; pages 925 through 1145 of the
 9   testimony of said witness were reported by me, a duly
10   Certified Shorthand Reporter of the State of California
11   authorized to administer oaths and affirmations, and said
12   testimony was thereafter transcribed into typewriting.
13        I further certify that I am not of counsel or
14   attorney for either or any of the parties to said
15   deposition, nor in any way interested in the outcome of
16   the cause named in said deposition.
17        IN WITNESS WHEREOF, I have hereunto set my hand this
18   2nd day of September, 2008.
19
20        ----------------------------------
21        SANDRA BUNCH VANDER POL, RMR, CRR
22        Certified Shorthand Reporter
23        Certificate No. 3032
24
25
```

Golkow Technologies, Inc. - 1.877.370.DEPS

19cfce74-5e55-4ada-bad9-7aeb1485025d

Page 1146

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl:  Master File No. 1:00-1898
Ether ("MTBE")       :  MDL NO. 1358 (SAS)
Products Liability    :  M21-88
Litigation            :
_____

This Document Relates to:
   Orange County Water District
   v. Unocal Corporation, et al.,
   S.D.N.Y. No. 04 Civ. 4968 (SAS)
_____/

CONFIDENTIAL
(Per 2004 MDL 1358 Order)

------

OCTOBER 20, 2008

------


     Videotaped Deposition of DAVID P. BOLIN,

Volume 6, OCWD'S 30(b)(6) DESIGNEE, re Focus Plumes

2, 7 and 9, held in the law offices of Latham &

Watkins, 650 Town Center Drive, Suite 2000, Costa

Mesa, California, beginning at 9:08 a.m., before

Sandra Bunch VanderPol, RPR, RMR, CRR, CSR #3032.



GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|917.591.5672 fax

deps@golkow.com

da05583d-536a-4345-8ac1-79c2a11a8813

Confidential - Per 2004 MDL 1358 Order

Page 1163

1   more detail, there are more figures in the copy -- in
2   this exhibit that you gave me than I have in my copy.
3         Q.    Okay. And the copy you're referring
4   to is under what tab in your binder?
5         A.    It's under Tab 1 in my binder.
6         Q.    Okay. Okay. Well, maybe on a break
7   we will go through and compare them to make sure that
8   it's exact.
9         If I were to want to go get a complete
10  copy of this Komex report, where would you direct me
11  to look? Would it be from your binder or some other
12  location, to be certain that I had the complete copy?
13        A.    This binder has been produced. You
14  have a complete copy. You could go to this binder
15  and make another copy.
16        Just a quick glance, it looks like the
17  figures have been duplicated. Maybe that's why there
18  are so many.
19        Q.    Oh. You think there's repeats within
20  here?
21        A.    Yes.
22        Q.    Okay. All right. We will figure it
23  out on a break.
24        Were you -- did you ever make any edits or
25  revision to this report?

Page 1164

1         A.    No. I have marked my copy, if that's
2   what you're asking me.
3         Q.    No, no, no.
4         I'm asking you, did you see sort of a
5   preliminary draft from Komex and then give them
6   feedback on things that you wanted to have revised or
7   changed within the report?
8         A.    Not that I recall. There were one or
9   two reports where there was an error in the address
10  that we had corrected. But other than that, I
11  don't -- I did not make any comments or direct any
12  changes to the contents of the report.
13        Q.    Did you form any conclusions as to
14  the accuracy of the report after you received it?
15        A.    I don't recall --
16        MR. AXLINE: Objection. I'm going to object
17  to that question. It calls for an opinion from the
18  witness rather than his knowledge.
19        THE WITNESS: I don't recall seeing anything
20  that I thought was contradictory in nature. The
21  general statements, I thought, were reasonably
22  accurate, as they were written.
23  BY MS. ROY:
24        Q.    Did you provide a copy of the report
25  to your attorneys?

Page 1165

1         A.    I can't recall sending copies of the
2   reports to my -- to the district's counsel. I know
3   that they have seen the report.
4         Q.    Do you know whether or not anyone
5   from Mr. Miller's office has provided comments or
6   edits to the report?
7         A.    No, I do not.
8         Q.    Was -- after receiving this report,
9   was Komex charged with any sort of follow-up work
10  related to Mobil 18-JMY?
11        A.    There was an additional scope of work
12  that we had prepared in anticipation of additional
13  work. That work was not completed.
14        Q.    Specific to Mobil 18-JMY, what was
15  Komex charged with doing?
16        A.    I'm reflecting on the scope of work.
17  They were asked to review agency files, summarize the
18  current status of knowledge about this particular
19  station, evaluate the occurrence of MTBE and TBA
20  historically and currently, and provide some general
21  hydrogeologic input about the site.
22        Q.    And when were they charged with doing
23  that?
24        A.    This was a scope of work that they
25  entered into in 2005.

Page 1166

1         Q.    And that project was not completed?
2         A.    There is still an outstanding budget.
3   While Komex is not currently doing any work on this
4   site there, we have not closed the budget or closed
5   the contract.
6         Q.    You mentioned that it's not
7   completed. Was it ever started with respect to Mobil
8   18-JMY?
9         A.    I'm not sure I understand your
10  question.
11        Q.    Okay. I'm talking about follow-up
12  work, subsequent to this report. You've testified
13  that Komex was charged with doing a variety of things
14  related to this station. And I'm wondering if any of
15  that work was actually begun by Komex.
16        A.    Not additional work. The follow --
17  if you're referring to follow-up work, no.
18        Q.    Was any other outside consultant
19  charged with doing anything related to Mobil 18-JMY
20  after you received this report?
21        A.    No other outside consultant has
22  provided input on this station for us yet.
23        Q.    All right. After you received
24  this Komex report, other than the scope of work
25  that you discussed with Komex, did OCWD do

6 (Pages 1163 to 1166)

da05583d-536a-4345-8ac1-79c2a11a8813

Confidential - Per 2004 MDL 1358 Order

Page 1171

1       A.    This is summary information that I
2   compiled, I put together for the deposition to answer
3   questions.
4       Q.    And what did you review in order to
5   compile this summary?
6       A.    Most of this information is compiled
7   from the documents that are in the binder that you
8   have before you and that I have before me.
9          They consist of quarterly monitoring
10   reports, communications between regulatory agencies
11   and the RP's consultant. It includes a map and
12   tables of data that are compiled.
13          One thing that is in this exhibit that is
14   not in this binder are tables of some well
15   specification information tables that I had compiled
16   also. These are nearby wells -- or wells located
17   near Mobil JMY. They are not in the binder, but I
18   printed them out to help me identify them by wells.
19       Q.    And when you say you "printed them
20   out," where did you print them from?
21       A.    From the District's database. It's
22   called WRMS, W-R-M-S, database.
23       Q.    And the charts that you're
24   referencing now, the ones that you have printed from
25   WRMS, is that starting on page 192522?

Page 1172

1       A.    Yes.
2       Q.    Through the end of the document?
3       A.    Yes.
4       Q.    All right. So referencing now the
5   beginning of the document, the first two pages. How
6   did you decide what pieces of information you wanted
7   to include in these summary notes for yourself?
8       A.    I was looking at the date, the
9   occurrence of MTBE and TBA at the station. I was
10   looking at which wells they were -- the compounds
11   were detected in. I was looking at the
12   concentrations that were detected. And I was looking
13   at whether the well's located on site or off site.
14   And was looking to help me determine or try and
15   qualify the trend for MTBE and TBA occurrence.
16       Q.    And why is the trend significant to
17   you?
18       A.    Because we have contamination, MTBE
19   contamination, in production wells that are in
20   proximity to this site. We know that this site and
21   other sites are suspect sites for the sources of that
22   contamination. So we wanted to try and understand
23   what the -- what the occurrence is or the
24   contamination association is with this particular
25   site.

Page 1173

1       Q.    Did anyone assist you in preparing
2   this chart?
3       A.    Not this chart. I did have some
4   legal assistance in compiling some of the documents
5   through discovery. I did not acquire all these
6   documents myself. Some of them were acquired from --
7   I believe from Mobil, ExxonMobil, some from
8   regulatory agencies, and so on. But the first two
9   sheets is exclusively mine.
10       Q.    All right. If you could turn to Tab
11   2 of your binder. I believe that's your map of plume
12   2.
13          And this was previously marked as Exhibit 12
14   earlier in your deposition. But I think the copy you
15   have in front you have is a lot better than the
16   photocopy that I have, so let me work with your copy.
17          Do you need one, Mike?
18       MR. AXLINE: Yes, if you have an extra.
19       MS. ROY: It's not that pretty, but....
20       Q.    So looking at Exhibit 12. Can you
21   tell me which wells on this map you've determined
22   have actually been contaminated with MTBE from Mobil
23   18-JMY?
24       A.    I can tell you which wells are
25   contaminated with MTBE. I can't tell you that the

Page 1174

1   contamination in those wells specifically came from
2   JMY. We are still looking at that station, as we are
3   the other stations on this map in proximity to those
4   wells, because they are all suspect sources for that
5   contamination.
6       Q.    Which are the ones that actually have
7   MTBE in them?
8       A.    Well, they are marked in yellow. I
9   believe you have that on your map. Wells MCWD-5,
10   MCWD-3B, MCWD-7.
11       Q.    And has OCWD done anything to
12   determine precisely whether the MTBE in those wells
13   actually came from Mobil 18-JMY?
14       A.    We are doing that now. We are
15   evaluating these stations as other stations here, and
16   we are working to understand the hydrogeology locally
17   for JMY, as well as these other suspect source
18   locations, and regionally in this area to try and
19   quantify where the contamination is coming from.
20       Q.    Okay. So what exactly are you doing
21   right now specific to Mobil 18-JMY?
22       A.    We are watching the trends in
23   contamination in the quarterly monitoring for the
24   various wells, and then we are determining -- trying
25   to understand what kind of mass might be in the

8  (Pages 1171 to 1174)

da05583d-536a-4345-8ac1-79c2a11a8813

Page 1175

1  ground, how far that mass might have moved, and what
2  the timing on that mass might be in reaching the
3  wells.
4       Q.    Okay.  So it sounds like you told me
5  you're doing two separate things.  One, you're
6  keeping an eye on the monitoring reports for the
7  various wells in the area to look for trends in the
8  concentration; is that correct?
9       A.    We're reading the documents
10 as they come out for the station.  I mean, it's
11 quarterly monitoring reports, any remediation
12 reports, communications with the agencies, and so on.
13      Q.    Okay.  So you're monitoring the
14 reports that are being generated by the consultant
15 that's working on the Mobil 18-JMY site; is that what
16 you're doing?
17      MR. AXLINE:  Objection.  Asked and answered.
18      THE WITNESS:  That's one of the things
19 we are doing for this site and many other sites as
20 well.
21 BY MS. ROY:
22      Q.    Other than monitoring those reports,
23 what else is OCWD doing specific to Mobil 18-JMY?
24      A.    We prepared a scope of work that
25 we're seeking assistance on implementing to -- which

Page 1176

1  will eventually help us to model the fate and
2  transport of contamination in that area.
3       Q.    And this is the scope of work that
4  was presented to Komex that you referenced earlier,
5  or is this something else?
6       A.    This is -- part of the scope of
7  work is work that Komex was going to help us on,
8  and we have been working to acquire a new
9  consultant in their replacement.
10      Q.    Has one been found yet?
11      A.    We are working to contract with one.
12 We have prepared a contract, but we don't have one on
13 contract as yet.
14      Q.    And which consultant is that?  What
15 company?
16      A.    Well, we have looked at several
17 consultants.  So many of them are already doing work
18 for ExxonMobil and some of the other oil companies
19 that it's difficult to find one that has the kind of
20 expertise that we need and isn't conflicted for this
21 work.
22      But we're -- Roy Herndon and other managers
23 are looking at a number of companies.
24      Q.    You mentioned that a contract was
25 prepared.  With whom was that contract going to be

Page 1177

1  with?
2       A.    Well, it's a draft contract.
3  We're still waiting to get proposals and all
4  the viable information so we can make that
5  determination.
6       Q.    So this was a draft contract, and you
7  were going to insert the name of the contractor
8  later?  Or I mean, was there a particular
9  contractor that this contract was intended for?
10      A.    Well, the scope of work.  The scope
11 of work and the terms and conditions have been
12 prepared for whoever we are going to be able to
13 contract with.
14      Q.    Is there a time frame as to when you
15 expect to have a contractor in place?
16      A.    No.  I couldn't venture to say.  Not
17 without proper authorization.
18      Q.    What do you mean by "not without
19 proper authorization"?
20      A.    Well, we -- staff will prepare
21 contracts and estimate budgets, and so forth.  But
22 it's really our Board of Directors that make the
23 determination.  We're not authorized to do anything
24 without their authorization.
25      Q.    Other than -- going back to the map,

Page 1178

1  other than the three yellow squares that you said
2  reflect wells that have MTBE in them, does OCW
3  believe that any of the other wells in the area are
4  threatened by MTBE from Mobil 18-JMY?
5       A.    Those three wells are production
6  wells.  So they are the ones that are -- that have
7  been impacted already.
8       There are other production wells in the area
9  that we think are threatened by MTBE.  I did not
10 mention the monitoring wells that have MTBE detected
11 in them, but because they are not production wells,
12 we don't consider them to be the same kind of threat
13 as we would a production well.
14      Q.    Understood.  Focusing on production
15 wells.  What specific wells on this map does OCWD
16 believe are threatened by Mobil 18-JMY?
17      A.    There's a number of wells that
18 are indicated by a well symbol.  You will see a
19 large system symbol in the legend.  I can name a few
20 of them, if you want me to.
21      Q.    Well, what I would like to know is
22 specifically which ones do you think are threatened
23 by Mobil 18-JMY?  Is your understanding that if
24 it's on the map, any of these production wells are
25 threatened, or are there specific ones that you

Confidential - Per 2004 MDL 1358 Order

Page 1195

1 contamination. Can you tell me what specifically
2 they should have done at this station in order to
3 contain the contamination?
4     A.   I can't comment specifically what --
5 what a company should do to contain it, only that it
6 needs to be contained. There's a variety of measures
7 that might be available that would be effective, but
8 whatever was done at the site did not contain the
9 contamination.
10     Q.   All right. So your opinion is that
11 merely that it escaped, and so they weren't working
12 adequately, is that what your -- is that what your
13 opinion is?
14         I'm trying to understand what else do you
15 think they could have possibly done at this site?
16     MR. AXLINE: Objection. Asked and answered.
17     THE WITNESS: I can't comment specifically
18 on what steps should have been taken, only that the
19 steps that were taken did not stop the contamination
20 from leaving the site and getting into groundwater.
21 BY MS. ROY:
22     Q.   Do you have any opinion as to what
23 should have been done to further delineate the
24 contamination?
25     A.   They should have collected samples

Page 1196

1 from deeper saturated zones and from farther away
2 from the station, at least in the downgradient
3 direction.
4     Q.   And when did you form that opinion?
5     A.   Well, I can't give you a specific
6 date, but it was in the process of evaluating the
7 site.
8     Q.   Have you ever relayed to anyone at
9 ExxonMobil or their consultants that they needed to
10 be doing more to delineate at the site?
11     A.   No, I haven't, because I
12 actually didn't join the District until after the
13 suit had been filed, and so I didn't think I was able
14 or allowed to have that kind of discussion with the
15 ETIC and have had no conversations with ETIC in
16 regard to this site.
17     Q.   Are you aware of any communication by
18 OCWD prior to your arrival at OCWD with either
19 ExxonMobil or their consultants regarding this site?
20     A.   No. I am not.
21     Q.   Did you attempt to determine whether
22 or not any communication like that occurred?
23     A.   I have talked with Roy Herndon and
24 other staff that I thought might have been involved
25 with all of the sites that are associated with our

Page 1197

1 claim, and have not determined that they have had any
2 conversations regarding this site.
3     Q.   All right. Has OCWD had any
4 communications with anyone at the Santa Ana Regional
5 Water Quality Control Board specific to Mobil 18-JMY?
6     A.   I can't recall who the regulatory
7 -- who the regulator is for this site, that's been
8 assigned this site. But I -- we have had some
9 conversations with Ken Williams, who is the chief
10 of the Water Board UST unit, with -- that involved
11 all the sites. So this site was in the context of
12 our discussion, but it wasn't specific about just
13 this site.
14     Q.   Okay. Other than those general
15 conversations with Ken Williams, do you recall any
16 other communications with the Regional Water Quality
17 Control Board specific to this site?
18     A.   I don't recall.
19     Q.   I do have a couple letters from Ken
20 Williams that I want to go over with you.
21     A.   Okay.
22     Q.   In preparation for today's
23 deposition, did you do anything to determine the
24 scope and extent of OCWD's communications with the
25 Regional Water Quality Control Board regarding this

Page 1198

1 site?
2     A.   I wasn't aware there was a specific
3 scope for communications that were specific to this
4 site.
5     Q.   I'm not sure I understood that.
6         You weren't aware that there were any
7 specific communications, is that --
8     A.   Maybe I misunderstood your question.
9 Can you ask that again?
10     Q.   Absolutely.
11         Did you do anything in preparation for the
12 deposition to determine whether or not OCWD had any
13 specific communications with the Regional Water
14 Quality Control Board regarding Mobil 18-JMY?
15     A.   Oh. I certainly asked Roy Herndon,
16 chief hydrogeologist at the District, about
17 communications with the sites. Also discussed
18 communications with our Public Relations or
19 Communications Department to find out whether they
20 had had any discussion. And Craig Miller, who is
21 assistant general manager in charge of our
22 department as well, but none of them recalled any
23 communications with the Water Board on this site.
24     Q.   Okay. You referenced Roy Herndon and
25 Craig Miller, and then you said there were some

14 (Pages 1195 to 1198)

da05583d-536a-4345-8ac1-79c2a11a8813

Confidential - Per 2004 MDL 1358 Order

Page 1207

1  OCWD, you've never seen other leaking underground
2  storage tank lists; is that correct?
3      A.   I'm not certain what you asked me.
4  Are you asking -- if you're asking me have I seen
5  lists before I joined the District, it's possible,
6  but I can't recall.
7      Q.   Once you joined the District, though,
8  did you do anything to review prior lists that were
9  dated prior to your joining the OCWD?
10     A.   Yes.  I had a discussion with Ken
11 Williams at the Regional Water Quality Control Board
12 in Santa Ana region and acquired a list of sites that
13 the Water Board had been maintaining.
14     I also talked to the Health Care Agency
15 about sites that it might have been looking at where
16 MTBE has been impacted.
17     And I talked to the City of Anaheim about
18 sites that -- on a list that it might have for
19 MTBE-impacted sites.
20     Q.   And did all of those agencies provide
21 you with lists?
22     A.   No.
23     Q.   Which ones did?
24     A.   I got a list from the Water Board.
25 The Anaheim had an old list.  It was not a current

Page 1208

1  list, or it was not a list that they were using
2  to track stations.  So, in that sense, it wasn't
3  the same kind of list that the Water Board had,
4  where they were actually tracking sites and data
5  and information from those sites.
6      So I got some information from all of them.
7  Whether I prepared a list from my discussions with
8  them or whether they gave me actual lists, I can't
9  recall.
10     MS. ROY:  All right.  This might be what you
11 might be referring to.
12     THE REPORTER:  Exhibit 74.
13     (Exhibit No. 74 was marked.)
14 BY MS. ROY:
15     Q.   Exhibit 74 is a document with a Bates
16 label of OCWD MTBE 001-168135 through 168141.
17     Mr. Bolin, are you familiar with this
18 document?
19     A.   I see my name, my signature on the
20 second page of the document.  But I actually don't
21 remember the document.
22     Q.   Okay.  Going to the second page.  You
23 said you see your signature.  You don't recall
24 preparing this request for public records?
25     A.   I do remember receiving a list of

Page 1209

1  sites that Orange County Health Care Agency
2  considered to be their priority sites for MTBE
3  impacts, but my memory is failing me because it
4  doesn't -- what I remember doesn't look like this.
5  It looks different than this.  But apparently this
6  must be it.
7      Q.   All right.  But you're not certain?
8      A.   But I'm not certain.  I just -- it's
9  a subtle difference.  I seem to remember a landscape
10 format rather than a portrait format.  And I don't
11 remember the staff names associated with the
12 different sites.
13     Q.   All right.  Do you recall, though,
14 specifically asking for their highest priority list?
15     A.   I don't remember using the terms
16 "highest priority list," but asking them if they had
17 a list of sites they considered to be key MTBE sites
18 that they were tracking.
19     Q.   Did you give them sort of a set of
20 criteria, in terms of the type of sites that you were
21 interested in getting a list on?
22     A.   Only that it involved MTBE and TBA.
23     Q.   Flipping to the third page of the
24 document, which has got the Bates label 168137.  I
25 notice that the first several line entries here talk

Page 1210

1  about a criteria.
2      Do you know whether that's something that
3  you created or that Orange County Health Care Agency
4  created?
5      A.   I don't think that's anything
6  that I would have given the Health Care Agency.
7  I wouldn't ask them to identify what the greatest
8  potential to impacted drinking water was, but I
9  don't remember the conversation.  So I can't recall
10 exactly what exchanged.
11     Q.   Flipping several more pages in, to
12 168140.
13     A.   I'm reading -- I'm sorry.
14     Q.   Go ahead.
15     A.   I beg your pardon.  I'm reading page
16 3.
17     I can't recall specifically, but I believe
18 those are the Health Care Agency's criteria for the
19 list.
20     Q.   All right.  If you could flip a few
21 pages in to page 168140.  Several lines down it looks
22 like there's an entry that Mobil 18-JMY is on their
23 list.
24     A.   Huh-huh.
25     Q.   Did you have any conversations with

17  (Pages 1207 to 1210)

da05583d-536a-4345-8ac1-79c2a11a8813

Confidential - Per 2004 MDL 1358 Order

Page 1211

1    Orange County Health Care Agency as to why Mobil
2    18-JMY was on the list?
3        A.    No.
4        Q.    Did you have any conversation with
5    them about to what extent they were monitoring Mobil
6    18-JMY?
7        A.    No.
8        Q.    Okay.  And did you have any
9    conversations with them about what should be done to
10   address the contamination from Mobil 18-JMY?
11       A.    I don't believe so.
12       Q.    Other than asking Orange County
13   Health Care Agency for their list of highest priority
14   sites, did you have any other sort of communication
15   with that entity about Mobil 18 JMY?
16       A.    I don't recall any specific
17   communications that were specific about 18 JMY.
18       MS. ROY:  Okay.  Let's do one last big one,
19   and then maybe take a break.  Does that sound good to
20   you?
21       THE WITNESS:  Yes.
22       MS. ROY:  All right.  75?
23       THE REPORTER:  Exhibit 75.
24           (Exhibit No. 75 was marked.)
25   BY MS. ROY:

Page 1212

1        Q.    Exhibit 75 is a pretty large
2    document.  It's Bates labeled OCWD-MTBE-001-064112
3    through 064246.
4        Mr. Bolin, have you ever seen this document
5    before?
6        A.    I don't recall having seen this
7    document.
8        Q.    Have you seen printouts similar to
9    this one that perhaps were from a different date?
10       A.    I don't think so.
11       Q.    I notice that -- well, first of all,
12   the title of it is, "County of Orange environmental
13   health groundwater cleanup program, all Site Summary
14   Report by city, name, by street address."
15       I notice there's a stamp here that says,
16   "Received January 09, 1997, OCWD."  Do you see that?
17       A.    Yes.
18       Q.    Is that something that's commonly
19   applied to documents when they come in to OCWD?
20       A.    I can't comment whether it's common,
21   but I have seen it often.
22       Q.    All right.  Is it safe to trust the
23   stamp and assume that it was received roughly on
24   January 9th, 1997, by OCWD?
25       A.    That would be my conclusion.

Page 1213

1        Q.    All right.  Are you aware of any sort
2    of practice that relates -- for OCWD when they
3    receive these sort of lists?
4        A.    No.
5        Q.    Okay.
6        A.    I don't know what the context of
7    the document is or -- I mean, I don't know what the
8    content is.  I don't know what the purpose of
9    receiving the document is, so I can't comment on
10   what was done with it.
11       Q.    And do you have any idea as to who at
12   OCWD it would have been forwarded to?
13       A.    No, I don't know.  I haven't seen it.
14   It appears to have come from an OCWD file, but I
15   don't know whose file this would have been.
16       Q.    All right.  Is there any way that we
17   can determine where it came from within OCWD?
18       A.    I honestly don't know how you would
19   do that, except to query each department, and show it
20   around, and try and find somebody who recognizes it.
21       MS. ROY:  All right.  Thank you.  Why don't
22   we go ahead and take a short break and resume.
23       THE VIDEOGRAPHER:  Going off the record.
24   The time is 10:28 a.m.
25           (Recess taken.)

Page 1214

1        THE VIDEOGRAPHER:  We are back on the
2    record.  The time is 10:51 a.m.  This marks the
3    beginning of video No. 2 in the deposition of David
4    P. Bolin.
5    BY MS. ROY:
6        Q.    All right.  Mr. Bolin, directing your
7    attention back to Mobil 18-JMY.  So far we have
8    talked about OCWD's communications with the Orange
9    County Health Care Agency and the Santa Ana Regional
10   Water Quality Control Board.
11       Has OCWD had any communications with the
12   California Department of Health related to Mobil
13   18-JMY?
14       A.    Not that I'm aware of.
15       Q.    Okay.  Are you aware of
16   communications by OCWD with any other regulator of
17   any kind related to Mobil 18-JMY?
18       A.    I can't recall any other
19   communications.
20       Q.    Now, shifting your attention to
21   actual water users.  Has OCWD had any communications
22   with Mesa Consolidated Water District about Mobil
23   18-JMY?
24       A.    I don't know that they had any
25   conversations that were specific to that station.

18 (Pages 1211 to 1214)

da05583d-536a-4345-8ac1-79c2a11a8813

Confidential - Per 2004 MDL 1358 Order

Page 1223

1   BY MS. ROY:
2       Q.   Is there a way to break it down by
3   plume and to attribute costs specific to plume 2?
4       MR. AXLINE: Objection. Asked and answered.
5       THE WITNESS: No.
6   BY MS. ROY:
7       Q.   All right. We have talked now about
8   what OCWD has done in the past with respect to Mobil
9   18-JMY. I'd like to know now what OCWD intends to do
10  in the future with respect to Mobil 18-JMY. Can you
11  give me a list of what you plan to do?
12      A.   Actually, this is Exhibit 48, I think
13  you called it. There are two exhibit numbers on
14  here. But this is basically the list.
15      Q.   All right. Why don't we walk through
16  it, and you tell me specifically which tasks you
17  think need to happen with respect to the Mobil
18  18-JMY.
19      A.   I can comment on some of the tasks
20  that are going to be necessary, such as retaining an
21  expert to provide technical assistance to us. But
22  I can't be specific as to which ones we definitely
23  are or definitely are not going to do, because
24  that hasn't been determined yet.
25      Q.   Is there a timetable set for when it

Page 1224

1   will be determined what needs to be done with respect
2   to Mobil 18-JMY?
3       A.   This question has been asked a couple
4   of times for other stations, but the answer is the
5   same. There is no timetable. I can't give you a
6   specific time. Certainly not before we're able to
7   secure an expert -- or technical expert to assist us
8   with these -- with the evaluations and the remedial
9   planning.
10      Q.   So if I understand your testimony
11  correctly -- and tell me if I am wrong -- basically
12  all the future action that OCWD intends to take with
13  respect to Mobil 18-JMY is contingent on first hiring
14  a new consultant to assist you; is that correct?
15      MR. AXLINE: Objection. Mischaracterizes
16  testimony.
17      THE WITNESS: I don't know if that's fair to
18  say, that we won't do anything until we're able to
19  hire an expert. I won't say that we will do -- what
20  we will do before we hire the expert. I guess it
21  depends on who the expert is and when we're able to
22  retain them.
23  BY MS. ROY:
24      Q.   Okay. Now, we've sort of talked
25  about sort of this time frame, and you can obviously

Page 1225

1   understand from my perspective why I kind of want to
2   know when you guys are going to decide what you want
3   to do with respect to this station.
4       Have you personally been charged with trying
5   to get a consultant in place by a certain date?
6       A.   No.
7       Q.   Okay. Has anyone given you sort of a
8   general time frame as to when they would like to see
9   a consultant hired for OCWD?
10      A.   As soon as we can. But no specific
11  deadlines.
12      Q.   Okay. Now, focusing on remediation.
13  Has OCWD taken any action with respect to remediation
14  of any sort of contaminant release from Mobil 18-JMY?
15      A.   No.
16      Q.   Okay. Do they plan to in the future?
17      A.   We think it's substantially likely
18  that we are going to need to, given that this station
19  has had a release of MTBE and TBA, it's migrated off
20  site, it's not being captured by remediation at the
21  site, nor has it ever been captured or contained by
22  remediation at the site, and that we have nearby
23  production wells that have been impacted by the same
24  compound that has been released at this site. We
25  don't -- we know that all of the stations in this area

Page 1226

1   are suspect source locations for that contamination.
2       So I can't give you a plan as to when a lot
3   of this will occur. I simply don't know. We have a
4   lot of work to do yet.
5       Q.   And you don't know, in terms of the
6   type of remediation that OCWD intends to engage in;
7   is that correct?
8       A.   No. No.
9       Q.   All right. Okay. You mentioned
10  earlier that you have reviewed some of the regulatory
11  files for Mobil 18-JMY; is that correct?
12      A.   Documents pertaining to this site
13  that are in agency files, yes.
14      Q.   And is OCWD's view that -- with
15  respect to OCHCA, that the work that's been done
16  related to this site has been competent?
17      MR. AXLINE: Objection. Asked and answered.
18      THE WITNESS: I'm not rendering an opinion
19  whether it's competent or incompetent, either way.
20  But the oversight of this site thus far has not
21  resulted in containment of the contamination.
22  Contamination has escaped the site.
23  BY MS. ROY:
24      Q.   Okay. So what should the Orange
25  County Health Care Agency have done differently, in

21 (Pages 1223 to 1226)

da05583d-536a-4345-8ac1-79c2a11a8813

Page 1227

1  terms of overseeing this site?
2       A.   I don't know if they have been able
3  to do anything differently. They cannot dictate the
4  kind of remediation that should be implemented. They
5  can only complement -- comment on remediation that is
6  planned or proposed by the RP, the responsible party,
7  or the consultant working for that site.
8       Therefore, they can -- they can't dictate
9  where wells will be positioned or the specifications
10 of those wells or what technology will be used to
11 install those wells. They can only comment on work
12 plans or proposals provided by the consultant working
13 for the site.
14      So what could they have done? I don't know
15 that they could have done anything differently. Or
16 if they had done anything differently, it would have
17 resulted in a different situation, different set of
18 circumstances.
19      The one having control over the site is
20 the -- is the site owner/operator/generator and their
21 consultant.
22 BY MS. ROY:
23      Q.   Did you -- having reviewed the
24 various files, were there any instances where -- that
25 Health Care Agency did not provide comments in a

Page 1228

1  timely fashion?
2       A.   I can't recall any specific instances
3  in this case specific to this site.
4       Q.   Okay. Do you recall any instances
5  where you felt that the Health Care Agency's comments
6  were insufficient or inadequate?
7       A.   I don't recall any specific examples
8  where I thought their comments -- the Health Care
9  Agency's comments were insufficient or inadequate.
10      Q.   And am I correct that OCWD never told
11 the Health Care Agency that they should be doing
12 anything differently? Is that correct?
13      A.   I don't recall any specific comments
14 to the Health Care Agency that they should be doing
15 anything different.
16      Q.   Now, focusing on the Regional Board.
17      Having reviewed the various files that are
18 out there, did you see any instances where the
19 Regional Board was not responding in a timely fashion
20 to issues related to Mobil 18 JMY?
21      A.   My answer is the same as it was for
22 the Health Care Agency. I don't recall any such
23 instances,
24      Q.   Okay. Do you recall any instances
25 where you felt that their response was insufficient

Page 1229

1  or inadequate?
2       A.   I don't recall any specific occasions
3  when I thought their response was insufficient or
4  inadequate.
5       Q.   And are there any instances where the
6  OCWD has told the Regional Board that they should be
7  doing something differently with respect to Mobil 18
8  JMY?
9       A.   I don't recall any specific such
10 instances.
11      Q.   All right. Now, I'm going to totally
12 shift focus on you.
13      You mentioned earlier that you felt that
14 there was contamination that had escaped remediation
15 at Mobil 18-JMY; is that correct?
16      A.   Yes.
17      Q.   Okay. Do you have a sense as to how
18 much contamination has escaped?
19      A.   No, I don't. You're asking me to
20 quantify the mass, and I can not.
21      Q.   Do you have even sort of a
22 guesstimate as to the mass?
23      A.   No.
24      MR. AXLINE: Objection. Calls for
25 speculation.

Page 1230

1  BY MS. ROY:
2       Q.   Do you have an idea as to when the
3  contamination escaped remediation at Mobil 18 JMY?
4       A.   I'm going to refer to my summary.
5       I don't know when the contamination escaped
6  remediation. I can only comment on when remediation
7  was initiated. It was in April 1997. I began
8  pumping out selected wells in which I assume
9  groundwater contamination had been detected and
10 started pumping out the tank cavity in February '98.
11 I don't know when the releases occurred that resulted
12 in off-site contamination, so I can't -- I can't
13 quantify what that time frame is between the release
14 and when remediation occurred. Only that there is
15 contamination detected off site, and that it's
16 unlikely, more than unlikely, that any on-site
17 remediation will capture or contain that off-site
18 contamination.
19      Q.   And what are you relying upon to draw
20 that conclusion?
21      A.   Analytical results and data and
22 information provided in the report -- I believe was
23 submitted as an exhibit, but let me refer you to the
24 binder in Tab 8. There is a report, which I believe
25 I've cited already, ETIC's engineering report dated

Page 1283

1  BY MR. ANDERSON:
2        Q.    Am I correct that that is a no, then,
3  that you have not looked through defendants'
4  documents?
5        A.    Well, I don't know what is in
6  defendants' documents.  So I can't say that I have
7  seen them or haven't seen them.  I'm assuming that
8  everything that's in this binder is in defendants'
9  documents, but I could be wrong.
10       Q.    Do you understand that defendants,
11  like Chevron, have produced documents to OCWD in this
12  litigation?
13       A.    I understand that defendants in this
14  dispute have provided documents, but I don't know
15  that they have all come to Orange County Water
16  District.
17       Q.    Have you looked at any of the
18  documents Chevron has provided to Orange County Water
19  District in this litigation?
20       A.    I don't know if I have or haven't.  I
21  haven't searched the documents.  I don't have a
22  specific set of documents that I think you're
23  referring to.  So I don't know whether I have seen
24  any documents that are --
25       Q.    I understand.  And I think maybe

Page 1284

1  we're miscommunicating.  I understand that maybe some
2  of the same documents in Chevron's productions may be
3  part of these other productions, but have you ever
4  looked at a set of documents, whether or not they are
5  repetitive of other documents or not, that Chevron
6  has produced in this litigation?
7        A.    I have not gone through the exercise
8  of sifting through a set of documents that was
9  specifically produced by Chevron.  But documents that
10  I have looked through might have been some of those
11  documents.  I simply don't know.
12       Q.    Sure.  Have you ever been out to
13  personally see Chevron site 9-5401?
14       A.    I have gone out to see some of them,
15  but I haven't recorded which ones.  And I can't say
16  whether I've seen this site or not.
17       Q.    Do you know if OCWD has ever
18  communicated with the owners of Chevron 9-5401 or its
19  consultants regarding any alleged gasoline releases
20  at this site?
21       A.    I can't recall any such conversations
22  I'm not aware of whether anybody else has talked to
23  Chevron, or Chevron's consultant.  Cambria is listed
24  here.  I don't know who all their consultants have
25  been.

Page 1285

1        Q.    Have you ever seen any letters from
2  OCWD to Chevron or any of its consultants regarding
3  this site?
4        A.    I don't recall any.
5        Q.    And you've never personally called
6  Chevron or any of their consultants, correct?
7        A.    I wouldn't do that.
8        Q.    Is that a "no"?
9        A.    That's a "no."
10       Q.    Do you have any firsthand knowledge
11  about the alleged gasoline releases at this site?
12       A.    I have not personally observed
13  releases from this site.  I think that's what you're
14  asking me.  The answer is no.
15       Q.    Sure.  You're only relying on reports
16  from other people in terms of your knowledge
17  regarding any releases at this site?
18       A.    I'm relying on reports that are
19  prepared by Chevron's consultant.  I have no reason
20  to dispute those reports, and so the information I
21  glean from the reports, I think, is reasonably
22  accurate.  Or if it's not accurate, it's reasonably
23  reliable.
24       Q.    Do you recall which regulatory agency
25  is overseeing the remediation at this site?

Page 1286

1        A.    I don't, off the top of my head.  I
2  believe it is Orange County Health Care Agency.
3        Q.    Has OCWD spoken with Orange County
4  Health Care Agency about this site?
5        A.    Not that I recall.
6        Q.    Have they ever written to -- has OCWD
7  ever written to the Orange County Health Care Agency
8  about this site?
9        A.    I have not -- I'm not aware of
10  whether anybody else has.
11       Q.    Did you check Orange County Water
12  District's files to determine whether or not anybody
13  from OCWD had written to the Health Care Agency?
14       A.    I have the files, and I don't recall
15  seeing anything in there.
16       Q.    Does OCWD disagree with anything that
17  the Health Care Agency has done in regards to their
18  remediation at this site?
19       A.    I'm sorry.  I'm not sure I heard your
20  whole question.
21       Q.    Sure.  Does OCWD disagree with
22  anything that the Health Care Agency has done in
23  regards to remediation at Chevron 9-5401?
24       A.    The Health Care Agency does not
25  actually conduct the remediation.  They provide

36 (Pages 1283 to 1286)

Page 1287

1  comments to -- to the consultant. And we're not
2  disputing comments that might have been provided. I
3  may not have seen all of them. In fact, I'm sure I
4  haven't. So I haven't seen anything that I would
5  argue with the Agency about.
6      Q.   Has OCWD spoken with any other
7  regulatory agencies about this site?
8      A.   Specific to the site, I'm not certain
9  of. But I know that the site was probably included
10 in general discussions, the general context in
11 discussions with -- with the Santa Ana Regional Water
12 Quality Control Board.
13     Q.   When you say "general discussions,"
14 do you think that the site 9-5401, was it ever
15 specifically named in any of those discussions?
16     A.   I don't recall. We didn't talk about
17 this site specifically. But it was certainly on the
18 list of sites we got from the Water Board.
19     Q.   When you say, "got from the Water
20 Board," what do you mean?
21     A.   The Water Board provided us with a
22 list of sites in which -- at which there's been MTBE
23 releases. This site is on that list.
24     Q.   And you asked for that list; is that
25 correct?

Page 1288

1      A.   Yes.
2      Q.   Do you know what the -- let me
3  just -- what exhibit are we on?
4      THE REPORTER: We are on 80.
5          (Exhibit No. 80 was marked.)
6  BY MR. ANDERSON:
7      Q.   Exhibit 80 is Bates labeled OCWD
8  MTBE-001192504 through 192511.
9      Can you identify that document?
10     A.   It looks like a list of some of the
11 materials that I had prepared for deposition.
12     Q.   And I have some specific questions
13 about this, but just for right now I wanted you to
14 have that in front of you labeled as an exhibit,
15 because I'm going to ask you some questions where you
16 may want to refer to it.
17     Do you know what the closest drinking water
18 production well is to this site? "This site" being
19 9-5401.
20     MR. AXLINE: Do you mean production well,
21 Counsel?
22     MR. ANDERSON: Drinking water production
23 well.
24     THE WITNESS: I believe the closest well is
25 WM-RES2.

Page 1289

1  BY MR. ANDERSON:
2      Q.   And I would direct you to the second
3  page of Exhibit 80, where you note that it's HB-1.
4  Excuse me. Did I say HB-1? I meant to say HB-4.
5      A.   Oh. Yes. I stand corrected.
6      Q.   Should we rely on the notes that you
7  have here on Exhibit 80, or do you think it's
8  different now after having looked at this Tab 2 in
9  your binder?
10     A.   Well, I'm confused by the
11 inconsistency. This -- allow me just a second to
12 refer to the attached tables.
13     No, I cannot account for why it's not on the
14 map, but I think it's probably correct in the table.
15     Q.   So that -- the table says that HB-4
16 is the closest well, so that's what you think is the
17 closest well?
18     A.   Well, with the information I have in
19 front of me right here now, I think that's correct.
20     Q.   Do you know whether or not HB-4 is
21 downgradient from Chevron 9-5401?
22     A.   Well, it's not on my map. I cannot
23 recall where it's located. So I can't say for
24 certain.
25     Q.   You can't find -- HB-4 is right there

Page 1290

1  on your map, if you're looking for it.
2      A.   Oh, I'm sorry. I can read. Yeah.
3  It's right here in front of me. You're right.
4  This is the -- I can't -- I can't explain
5  the discrepancy.
6      Q.   What discrepancy?
7      A.   Well, the map indicates that HB-4 is
8  not the closest well, nearest drinking water well,
9  and yet that is what I have written in these notes.
10     Now, it's possible I had indicated that that
11 is the nearest production well downgradient from the
12 site, but there appears to be -- there is a possible
13 error here, and I can't explain it.
14     Q.   But you think looking at the map,
15 that WM-RES2 is the closest drinking well?
16     A.   WM-RES2 is closer to the Chevron site
17 than HB-4.
18     Q.   Do you know if that's a drinking well
19 or not?
20     A.   It is a production well.
21     Q.   Production well. Is this map drawn
22 to scale?
23     A.   I believe that it is.
24     Q.   Who superimposed these logos and the
25 station names on this map?

37 (Pages 1287 to 1290)

Page 1291

1       A.    Our GIS specialist.
2       Q.    And who is that?
3       A.    It is Linda Cokey.
4       Q.    Do you know what she did to determine
5   where on this map to place these stations?
6       A.    I gave her addresses for these
7   stations. She located them in our database. It's a
8   Thomas Brothers Guide database.
9       Q.    Do you know how she decided where to
10  put these drinking water wells on this map?
11      A.    They are already located in our GIS
12  database system.
13      Q.    Do you know who the water producer is
14  associated with WM-RES 2?
15      A.    The City of Westminster.
16      Q.    Have you contacted the City of
17  Westminster to discuss Chevron 9-5401?
18      A.    No.
19      Q.    Do you know what the water producer
20  is associated with HB-4?
21      A.    It's the City of Huntington Beach.
22      Q.    Have you contacted the City of
23  Huntington Beach to discuss Chevron 9-5401?
24      A.    No.
25      Q.    Do you plan to contact either of

Page 1292

1   those water producers to discuss Chevron 9-5401?
2       A.    That's not my authority.
3       Q.    Does OCWD plan to contact either of
4   those water producers concerning Chevron 9-5401?
5       A.    I don't know whether they will be
6   doing that or not.
7       Q.    Has OCWD ever told the City of
8   Westminster or the City of Huntington Beach that MTBE
9   may impact their wells as a result of a leak from
10  9-5401?
11      A.    They know about leaks from various
12  stations. I don't know -- this discussion is had
13  with the producers. I didn't have the discussion.
14  It was in a producers' meeting.
15          I don't know whether Chevron was
16  specifically mentioned as one of the suspect sources
17  or not. But I know that it has been conveyed that
18  all the defendants have been identified as suspect or
19  associated with suspect source locations for -- in
20  all the plumes. I can't say that Chevron was singled
21  out specifically.
22      Q.    And if you could explain the second
23  part of that sentence -- or your answer, excuse me.
24  When you said that Chevron has been identified as a
25  suspect source, they were identified to the water

Page 1293

1   producers as a suspect source?
2       A.    A Chevron station.
3       Q.    A Chevron station. But you don't
4   know if it was specifically named 9-5401?
5       A.    That's correct.
6       Q.    So Orange County Water District has
7   told the City of Westminster that a Chevron station
8   could be susceptible source of the contamination?
9       A.    No. I'm saying -- I haven't -- I
10  didn't participate in the conversation. I know that
11  the gist of the conversation is that there's been
12  some detections of MTBE in drinking water production
13  wells. And that there is a list of defendants in a
14  dispute -- list of defendants in a dispute, an
15  ongoing dispute, and the list is known to the
16  producers.
17          But you're asking me whether this Chevron
18  station was identified with regards to any specific
19  wells. I don't think so.
20      Q.    And within Orange County Water
21  District, have you had any conversations with any
22  other OCWD employees about Chevron 9-5401?
23      A.    I don't recall any specific
24  discussions, unless -- well, I might have had a
25  discussion with Roy Herndon, but only in the context

Page 1294

1   of the stations in which we were evaluating. But not
2   anything specific, and it certainly would have been
3   before the deposition.
4       Q.    Before this deposition, you mean?
5       A.    Not today. Before we started the
6   deposition process.
7       Q.    Do you recall any specifics of that
8   conversation dealing with 9-5401?
9       A.    No. But I'm sure there must have
10  been some discussion when we identified -- when we
11  selected sites, focus sites, Chevron station 9-5401
12  was identified as one of the focus sites. So their
13  name must have come up, but I don't know what the
14  context would have been outside of "This is going to
15  be a focus site."
16      Q.    Do you recall when that conversation
17  might have happened?
18      A.    No, I don't.
19      Q.    Do you know if the Orange County
20  Water District Board of Directors has ever discussed
21  this site?
22      A.    No, I don't.
23      Q.    Do you know whether any subcommittees
24  of the Board of Directors, the Orange County Water
25  District Board of Directors, has ever discussed this

38 (Pages 1291 to 1294)

Page 1307

1      A.   No. No. That's what I just said. I
2  can't. I can't, because MTBE moves fairly freely.
3  It's resistant to retardation and it's resistant to
4  degradation. So because it moves so freely, and I
5  cannot imagine, I cannot think of any circumstances
6  where MTBE is not going to move in its natural state,
7  or in the natural state -- in hydrogeology. In the
8  hydrogeologic regime beneath the site, I cannot think
9  of any passive remedial technology that will
10  effectively prevent impacts drinking water.
11      Q.   So then my original question was:
12  Does OCWD think that active remediation is required
13  at each site to remediate MTBE? And the answer would
14  be, yes, you do think that active remediation is
15  always required?
16      A.   No. I think active containment is
17  always required, not necessarily remediation.
18      Like I said, once it's contained, as long as
19  the contamination is contained, it doesn't really
20  matter what kind of remediation is going to take
21  place. I would suggest -- in fact, I would submit
22  that active remediation would be the better choice.
23  But it's not necessary as long as you can control the
24  risk.
25      Q.   How would you contain the MTBE

Page 1308

1  without active remediation?
2      A.   Creating a groundwater depression.
3  Changing flow direction. Putting up barriers to
4  flow. Again, I'm not an expert in this area, but
5  there's several different ways to control flow.
6      Q.   And, generally speaking about
7  remediation again, does OCWD think that remediation
8  should begin before the groundwater flow or the
9  extent of the plume are known?
10      A.   It depends. It depends on what kind
11  of release has occurred. It depends on the
12  complexity of the subsurface. Hydrogeology is very
13  complex throughout this basin. It's not consistent.
14  It's not the same throughout the basin. It's very
15  complex.
16      And so it depends on how old the release is,
17  again, the size of the release; the circumstances of
18  the release. If you're close to a drinking water
19  well, I would suggest that rapid response would be
20  more appropriate. If it's close to a storm drain or
21  if it's close to some -- to other wells, not
22  necessarily production wells, but other wells that
23  might act as conduits, or if it's close to some
24  sensitive receptor, then rapid response would be the
25  order of the day.

Page 1309

1      In other cases, if it's a nominal release,
2  if it is within a tank pit and the tank pit is lined,
3  for example, then a more casual response would
4  probably be okay.
5      Q.   Has OCWD evaluated the remediation
6  occurring at site 9-5401?
7      A.   Well, we have looked to see what the
8  remediation is. We know -- I mean, we have reviewed
9  the remedial history of site. I'm not sure what you
10  are asking me.
11      Q.   And have you -- what remediation has
12  occurred at the site?
13      A.   Oh. None, according to the records I
14  saw.
15      Q.   Has anything begun in the last year,
16  that I know of?
17      A.   I -- I don't know.
18      Q.   Do you know whether or not oxygen
19  injection and over-purging were approved in 2008 by
20  the Orange County Health Care Agency?
21      A.   I know that it was -- now that you
22  have mentioned it, I do recall that it was proposed,
23  but I don't know whether it's been approved. I know
24  it was awaiting approval or some determination by the
25  Agency.

Page 1310

1      Q.   Do you disagree with the fact that
2  active remediation has not occurred at the site yet?
3      A.   I don't know what's happened at the
4  site.
5      Q.   Well --
6      A.   All I'm saying is that the records I
7  reviewed did not indicate that there was remediation
8  at the site.
9      Q.   And if that's --
10      A.   I --
11      Q.   Go ahead.
12      A.   I was going to say, if oxygen is
13  being injected in the site to react with the
14  compounds, if you're saying that's being done now,
15  then I believe you.
16      But that's still passive remediation, and it
17  does not prevent the contamination from flowing off
18  site.
19      Q.   So you think something more needs to
20  be done at this site to prevent the MTBE from leaving
21  the site; is that correct?
22      A.   Well, yes. I think something needs
23  to be done at this site to prevent MTBE from leaving
24  the site.
25      Q.   And how would you propose doing that?

42  (Pages 1307 to 1310)

Confidential - Per 2004 MDL 1358 Order

Page 1327

1    A.  Oh, okay. Because the amount that
2  has gone off site is exactly the same amount that has
3  escaped remediation. There hasn't been any
4  remediation.
5    Q.  So what's your answer?
6    A.  It's the same.
7    Q.  Could you please repeat that answer?
8    A.  It's the same.
9    MR. AXLINE: Objection. Asking the witness
10  to answer the same question repeatedly is obviously
11  subject to an asked and answered objection.
12    THE WITNESS: Maybe I'm a little confused.
13  Perhaps you could ask me the question again.
14  BY MR. ANDERSON:
15    Q.  Do you contend the amount of MTBE --
16  does OCWD think the amount of MTBE that has escaped
17  remediation is significant?
18    A.  Well, I think my previous answer --
19  well, it depends on what you mean by "significant."
20    It's meaningful, in that it causes us
21  to have to take some steps to determine what the
22  threat is to drinking water wells, to production
23  wells.
24    We have a source in proximity to drinking
25  water wells. There's been impacts in those wells.

Page 1328

1  There are a number of sources in this area that we
2  think are the potential sources of the impacts in
3  those wells, so we have to go to some lengths to
4  understand what the impact from this particular site
5  is.
6    That is what I would consider to be a
7  significant escape or significant off-site migration
8  or a significant mass, whatever -- however you want
9  to refer to it.
10    Q.  So you're still investigating?
11    A.  Yes.
12    Q.  Do you think that the MTBE -- that
13  the allegedly -- that the alleged release of MTBE
14  gasoline has impacted the deep aquifer from this
15  station?
16    A.  I don't know.
17    Q.  Have you tested the deep aquifer
18  beneath this site?
19    A.  Directly beneath the site?
20    Q.  Yes.
21    A.  No.
22    Q.  Do you know if any other regulatory
23  agencies have tested the deep aquifer beneath this
24  site?
25    A.  No, I don't. I know that the

Page 1329

1  consultants for Chevron have not tested it;
2  otherwise, it would have been in their reports.
3    Q.  Do you think that MTBE will
4  migrate -- MTBE from this site will migrate to the
5  deep aquifer?
6    A.  Yes.
7    Q.  What do you base that on?
8    A.  My understanding of hydrogeology and
9  my understanding of hydrogeology in the pressure
10  zone.
11    It -- testing groundwater directly beneath
12  the site might not detect anything, but it doesn't
13  necessarily flow straight down. It flows laterally,
14  and then it drops.
15    There is a downward gradient in this area
16  between the shallow aquifer and the deeper aquifer.
17  Water is being pumped out of that deeper aquifer,
18  called the principal aquifer, to provide drinking
19  water to the community. And that actually pulls in
20  contamination, in this case MTBE and TBA, into the
21  well when that happens, when it gets down into the
22  principal aquifer.
23    We have downward gradient. It's moving
24  laterally towards the wells. I think it's going to
25  get in there.

Page 1330

1    Q.  Does there need to be a conduit for
2  it to get down to the deep aquifer?
3    A.  It doesn't necessarily -- it doesn't
4  have to be an artificial conduit. It could be just a
5  natural conduit.
6    Q.  Have you identified -- has OCWD
7  identified any conduits, whether they are artificial
8  or natural, in the area that would allow MTBE to get
9  to the deep aquifer?
10    A.  The production wells themselves can
11  sometimes serve as conduits. Sometimes contamination
12  will get into the shallow regions of a production
13  well and then flow down the annulus or flow down the
14  filter pack, or what have you.
15    In this case, there are a number of wells
16  that are in proximity to this site. I'm loaning to
17  see if I have screen intervals. I have boring
18  depths. I don't have the screen intervals.
19    But given that water doesn't necessarily
20  have to go into the screen; it can go into just a
21  hole in the ground. Some of these wells go well into
22  the production aquifer.
23    Q.  Now, on your notes you say it's a
24  potential migration path. Have you confirmed whether
25  or not it's a migration path or not?

47 (Pages 1327 to 1330)

da05583d-536a-4345-8ac1-79c2a11a8813

Confidential - Per 2004 MDL 1358 Order

Page 1331

1       A.   No.  That's why we wrote it was a
2  potential migration path.
3       Q.   Does OCWD think that any releases
4  from 9-5401 have impacted any production wells?
5       A.   We don't know.  This is a suspect
6  site, along with the other sites in this proximity.
7  We know we've had detections in production wells,
8  given that this is a suspect site, suspect source
9  site for that contamination, this is certainly a
10  possibility.
11       Q.   What are you doing to determine
12  whether or not gasoline containing MTBE allegedly
13  released from this site has impacted any production
14  wells?
15       A.   Well, we're continuing to test water
16  in the basin.  We're trying to evaluate this site,
17  along with other sites, and at some point in time
18  we'll be conducting some mathematical modeling, some
19  fate and transport modeling, to determine what the
20  disposition of contamination from this site might be
21  with regards to the wells.
22       Q.   You haven't started any of that
23  modeling yet?
24       A.   No.
25       Q.   What additional information do you

Page 1332

1  need to start that modeling?
2       A.   I'm not a modeler, so I can't really
3  say what information is going to be required.
4       I'm assuming most of the information will be
5  in our database, and when we select a modeler for
6  doing that, I suppose they will tell us what they
7  need.
8       Q.   Do you have a timetable for when that
9  may happen?
10       A.   I don't.
11       Q.   Have you ever looked at the capture
12  zones for any of the nearby wells, production wells?
13       A.   No.  That involves mathematical
14  modeling, such as I was describing.
15       Q.   Has OCWD done that?
16       A.   No, not to my knowledge.  Well, I
17  take that back.
18       There has been some rudimentary analysis for
19  capture zones, but it -- it's in regards to a program
20  called drinking -- let's see -- source water
21  assessment and protection.  Drinking -- drinking
22  water assessment and protection, where there is a
23  simple formulas determined for evaluating the risk of
24  wells or vulnerability of wells to certain sources of
25  potential pollutants.  Gas stations are on the list,

Page 1333

1  but other -- there's other pollutants on the list as
2  well.
3       Q.   That's not a true capture zone
4  production, is it not?
5       A.   No, it is not.
6       MR. ANDERSON:  I don't think I have that
7  much longer.  But if you guys need to take a break,
8  we can take one.
9       MR. AXLINE:  It's up to you.
10       THE WITNESS:  I could use one, if you don't
11  mind.
12       THE VIDEOGRAPHER:  Going off the record.
13  The time is 2:43 p.m.
14       (Recess taken.)
15       THE VIDEOGRAPHER:  Okay.  We are back on the
16  record.  The time is 3:00 p.m.
17            (Exhibit No. 83 was marked.)
18  BY MR. ANDERSON:
19       Q.   Mr. Bolin, I have just handed you
20  Exhibit 83, which is marked and Bates labeled OCWD
21  MTBE-001-190415 through 190416.
22       Have you seen this document before?
23       A.   I feel I must have, but it doesn't --
24  I don't recall the content of the document.
25       Q.   I think it's the first document

Page 1334

1  behind Tab 8.
2       Did you rely on this document in reaching
3  your opinions regarding this site?
4       A.   I don't remember to what degree I
5  referred to this document.  My copy is highlighted
6  for leak discovery, leak reported, and leak began,
7  and I'm --
8       MR. AXLINE:  I'm going to object to that
9  question.  Mr. Bolin is not offering an opinion with
10  respect to this site.  He's appearing as the
11  District's 30(b)(6) witness with respect to this
12  site.
13  BY MR. ANDERSON:
14       Q.   Did you rely on this document in
15  preparing for your testimony today as OCWD's
16  representative?
17       A.   I think I referred to the leak
18  discovery and leak reported dates on this document.
19       Q.   And for the record, this document is
20  from the State Water Resources Control Board,
21  correct?
22       A.   Geotracker database, yes.
23       Q.   And I don't see a date on this
24  document, but I note that in the middle it's -- at
25  least it's current as of March 21st, 2008 because it

Confidential - Per 2004 MDL 1358 Order

Page 1335

```
 1   references a March 21st, 2008 letter?
 2        A.   Maybe I wasn't clear.  I'm referring
 3   to that section under "regulatory activities."
 4        Q.   I understand.  I'm just trying to put
 5   a date on this --
 6        A.   Oh, okay.
 7        Q.   And I would say it was drafted
 8   sometime after March 21st, 2008 because it makes
 9   reference to another --
10        A.   I understand.
11        Q.   Yeah.
12        On the right-hand column, near the top, it
13   says, "Potential media affected."  Do you see that?
14        A.   Yes.
15        Q.   What does it say underneath that?
16        A.   "Other groundwater.  Uses other than
17   drinking water."
18        Q.   So at least in this document, the
19   State Water Resources Control Board is representing
20   that groundwater, other than drinking water, would be
21   affected by this release?
22        A.   That's a little -- that's confusing.
23   To my knowledge, there isn't any water in the basin
24   that isn't attached or associated with the drinking
25   water, including water in the shallow-most horizon.
```

Page 1336

```
 1   That's where leaks first occur, is in the
 2   shallow-most horizon.
 3        Eventually, that water replenishes drinking
 4   water, and that's very true in the pressure zone
 5   where this site is located.  The first releases are
 6   going to get into that shallow groundwater; the
 7   shallow groundwater will flow and eventually there is
 8   a downward gradient, and so it is drinking water.
 9        MR. ANDERSON:  And I'm going to object to
10   that as nonresponsive.
11        Can you read my question back, please?
12        (Record read as follows:  QUESTION:  So at
13   least in this document, the State Water Resources
14   Control Board is representing that groundwater, other
15   than drinking water, would be affected by this
16   release?)
17   BY MR. ANDERSON:
18        Q.   Can you answer the question, please.
19        A.   Yes.  They're distinguishing that
20   there is groundwater in the basin that is not
21   considered to be drinking water, but it -- it's
22   all connected.  This is my point.
23        There isn't water in the basin that isn't
24   drinking water, unless you're looking at seawater.
25   Seawater would not be the drinking water.
```

Page 1337

```
 1        But, in this case, in the proximity to this
 2   site, they are referring to water in the uppermost
 3   zone that is not a direct source of drinking water,
 4   but it replenishes drinking water.
 5        MR. ANDERSON:  I'm going to object to
 6   everything after "yes" as nonresponsive.
 7        Q.   Have you told the State Water
 8   Resources Control Board that you disagree with the
 9   representation in this document?
10        A.   I haven't talked to the State Water
11   Resources Control Board.
12        Q.   So is that a "no"?
13        A.   That's a "no."
14        Q.   Thanks.
15        Does OCWD think that the plume related to
16   Chevron 9-5401 has commingled with plumes from any
17   other stations?
18        A.   We don't know what degree the plumes
19   might have commingled thus far.  We know that there's
20   been detections in drinking water wells.  We know
21   that there's been a release from the site.  The
22   contamination has migrated off site.  This is a
23   suspect source for the detections in those wells, so
24   we don't know what degree commingling has occurred.
25        Q.   Has OCWD spent any money remediating
```

Page 1338

```
 1   MTBE contamination at this site to date?
 2        A.   No.
 3        Q.   Does OCWD plan to remediate any
 4   contamination at this site?
 5        A.   Probably.  But right now there are no
 6   specific steps that have been identified to remediate
 7   groundwater at this site.
 8        Q.   Has OCWD anticipated how much money
 9   it plans to spend remediating contamination at this
10   site?
11        A.   No.
12        Q.   Is there a timetable for when it may
13   have an estimate for its potential remediation
14   expenditures?
15        A.   No.
16        Q.   Do you still have Exhibit 48, which
17   is the exhibit --
18        A.   I do.
19        Q.   -- Whitney was speaking with you
20   about?
21        A.   Yes.
22        Q.   What actions on Exhibit 48 has OCWD
23   taken at Chevron 9-5401 to date?
24        A.   Well, we're in the process of
25   evaluating the site.  This is, by the way, the same
```

49 (Pages 1335 to 1338)

da05583d-536a-4345-8ac1-79c2a11a8813

Confidential - Per 2004 MDL 1358 Order

Page 1339

1 question I have received on other sites. The answer
2 is going to be substantially the same.
3 We are in the process of evaluating this
4 site, which is considered to be part of the
5 investigation phase and actually lends itself to a
6 remediation phase. Remediation always begins with an
7 investigation. So there is some overlap between
8 remedial investigation and site investigation.
9 We've -- we retained an expert to help us
10 with the evaluation. They've completed -- well,
11 Komex didn't complete a site on this one, but we're
12 in the process of obtaining another consultant to
13 help us with evaluating this site.
14 Q. Is that it?
15 A. Yes. That's substantially the same
16 as the other sites.
17 Q. Which consultants is OCWD evaluating
18 to use for the process that you just described?
19 A. Well, I called the office after I --
20 my earlier deposition this morning, and there is a
21 contract that has been agreed by Hargis &
22 Associates to provide threat assessment services to
23 Orange County Water District. It's not an executed
24 contract, but it is waiting for signatures at the
25 District.

Page 1340

1 Q. And I'm an awful speller. Is it
2 H-A-R-G-I-S?
3 A. Yes, it is.
4 Q. Ah, well.
5 A. It's Hargis Plus. They don't use the
6 ampersand or "and." It's Hargis Plus Associates.
7 Q. Do you know if there was a dollar
8 amount of that contract?
9 A. Yes.
10 Q. What was that dollar amount?
11 A. I can't recall the exact dollar
12 amount. It's something in the neighborhood of
13 $450,000.
14 Q. What exactly -- well, do you know
15 generally what the scope of work is that Hargis Plus
16 Associates is going to be performing for OCWD?
17 A. Yes.
18 Q. Will you describe that to me, please.
19 A. It's a continuation of some of what
20 Komex was doing where they left off.
21 They will review some of the Komex work.
22 They will complete site -- similar site evaluations
23 for sites, the focus sites we're looking at now for
24 which Komex had not been able to complete
25 evaluations. And it would be looking at helping us

Page 1341

1 prepare a scope of work to begin our Phase II
2 investigation, which involves monitoring wells.
3 Q. When you said, "finish the
4 evaluations for the focus sites," is that referring
5 to stations in plaintiff's focus plumes or referring
6 to the Phase I 39 sites in Komex's initial
7 evaluation?
8 A. Well, they are going to look at some
9 of the work that Komex has already done in their
10 original list of sites, but the sites we're looking
11 at now, the present focus sites with these focus
12 plumes, there are some sites, including Chevron, this
13 Chevron site, that Komex had not reported on and
14 Hargis will be doing that.
15 Q. Is there a timetable for when this
16 work should be completed?
17 A. There was. It's changed dramatically
18 given our current circumstances. We were hoping to
19 have reports available to assist with depositions.
20 But that's changed.
21 Q. Is there a new timetable between the
22 parties?
23 A. No. We haven't -- we haven't gone
24 that far.
25 The scope of work was based on a different

Page 1342

1 timetable. Now the scope is going to change a little
2 bit. We don't know to what degree.
3 Q. Is there a particular environmental
4 consultant who's heading up the project?
5 A. Point of contact is a good friend
6 whose name just escapes me. In San Diego. He's the
7 regional operations manager.
8 Q. Well, if you think about it later,
9 just let me know, or let Pete know.
10 A. That's embarrassing.
11 Q. How long have they been engaged and
12 working on this? Do you know?
13 A. Chris Ross.
14 Q. Chris Ross, okay.
15 A. Well, they haven't been.
16 Q. Right. So I understand that they are
17 still waiting to sign the contract, but have they
18 performed any work yet to date?
19 A. No.
20 Q. No.
21 Is OCWD paying the $450,000 contract price
22 out of their own pocket?
23 A. Yes.
24 Q. All right. If I can transfer back to
25 Exhibit 48. I'd like -- will you tell me what future

50 (Pages 1339 to 1342)

Golkow Technologies, Inc. - 1.877.370.DEPS

da05583d-536a-4345-8ac1-79c2a11a8813