# EXHIBIT 43

David Bolin

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION )
)
)
)
)   Master File No.:
)   1:00-1898
This Document Relates to:   )   MDL No.:
)   1358 (SAS) M21-99
)
Orange County Water District v.   )
Unocal Corp., et al, Case No. 04   )
Civ 4968 (SAS)   )
)

VIDEOTAPED DEPOSITION OF DAVID P. BOLIN

Thursday, February 24, 2011

10:07 a.m.

3 Park Plaza, Suite 1100

Irvine, California

EXHIBIT
43

REPORTED BY:

Victoria A. Guerrero

CSR No. 8370, RPR, CRR, CLR

1

David Bolin

```
 1                    Irvine, California

 2          Thursday, February 24, 2011; 10:07 a.m.

 3                         ooOoo

 4

 5              THE VIDEOGRAPHER:  Good morning.  We're on the

 6     record.  This is the videotaped deposition of David

 7     Bolin in regards to Methyl Tertiary Butyl Ether products

 8     liability litigation relating to Orange County Water

 9     District versus Unocal et al. Case No. 04CIV4968 (SAS).

10              This deposition is taking place at the 3 Park

11     Plaza, Suite 1100, Irvine, California 92614 on

12     February 24th, 2011, at 10:07 a.m.

13              My name is Rene Hernandez.  I'm the

14     videographer representing US Legal Support.  Video and

15     audio recording will be taking place unless all counsel

16     have agreed to go off the record.

17              Would all present please identify themselves

18     beginning with the witness.

19              THE WITNESS:  David Bolin, Orange County Water

20     District.

21              MS. O'REILLY:  Tracey O'Reilly, Miller, Axline

22     & Sawyer for plaintiff Orange County Water District and

23     the witness.

24              MR. ADAMS:  Mark Adams, G & M Oil.

25              MR. THÉARD:  Olivier Théard at Shepherd Mullin
```

6

David Bolin

```
 1      TBA.

 2      BY MR. ADAMS:

 3          Q    Okay.  And have there been any MTBE releases

 4      from Number 4 since your deposition in 2008?

 5          A    Again, not MTBE.  I'm not certain about TBA.

 6          Q    Now, to your knowledge -- let me ask you

 7      foundationally:  Have you ever informed any regulatory

 8      agency about MTBE releases from Number 4?

 9              MS. O'REILLY:  Asked and answered.

10              THE WITNESS:  I don't recall learning of such

11      releases and then informing the regulatory community

12      about that.

13      BY MR. ADAMS:

14          Q    And so that would include the Regional Water

15      Control Board, right?

16          A    Yes.

17          Q    And the Orange County Healthcare Agency, right?

18          A    Yes.

19          Q    And the Department of Health Services, right?

20          A    Uh --

21              MS. O'REILLY:  That misstates testimony.  Vague

22      and ambiguous.  Lacks foundation.

23              THE WITNESS:  Yes.

24      BY MR. ADAMS:

25          Q    And we talked about actual releases.  Have you
```

11

**David Bolin**

1     informed any governmental agency about a suspected

2     release of MTBE from Number 4?

3              MS. O'REILLY:  Calls for speculation.  Asked

4     and answered.  Calls for an expert opinion.  Go ahead.

5              THE WITNESS:  I don't recall having

6     conversation like that.

7     BY MR. ADAMS:

8         Q   All right.  Are there drinking water wells that

9     have had any MTBE detections within this plume, Number

10    1?

11             MS. O'REILLY:  Calls for expert opinion.  Asked

12    and answered.  Calls for speculation.  Vague.

13    Ambiguous.  Overbroad.

14             THE WITNESS:  Again, I provided previous

15    testimony to that effect.  There is one production well

16    in which MTBE has been detected.

17    BY MR. ADAMS:

18        Q   Do you need to look at your notes?

19        A   No.

20        Q   Okay.  Have there ever -- and what production

21    well was that?

22        A   It's a Huntington Beach well.  I believe it's

23    called LIBM or MB, I forget the actual name of the well.

24    LIBM-HB, I think is what it was.

25        Q   I don't mind if you look through your notes.

                                                          12

David Bolin

```
 1    County Water District.

 2          That was before your tenure with the water

 3    district, correct?

 4        A    Yes.

 5        Q    And to your knowledge, there have never been

 6    any complaints regarding the taste of MTB in any of the

 7    drinking waters, in any of the water from the wells

 8    within the purported Plume 1, correct?

 9          MS. O'REILLY:  I'm going to object and instruct

10    the witness that this is outside the scope of the

11    deposition notice.

12          This is also outside the scope of the

13    district's knowledge.  The district has repeatedly

14    stated that they have no information on taste and odor

15    complaints as that is directed to the water producer and

16    that deposition was taken in this case on taste and odor

17    complaints.  We are not repeating it here.

18          Go ahead.

19          THE WITNESS:  I don't have knowledge about the

20    complaints that have come in about taste and odor.  I

21    can't say whether there has or has not been any

22    complaints.

23    BY MR. ADAMS:

24        Q    And can you tell me what the principal aquifer

25    is relate to go Plume 1?
```

15

David Bolin

1       February 26, 2008?

2           A    That's correct.

3           Q    All right.  And it showed a detection of MTBE

4       of .04 parts per billion, right?

5           A    Yes, it does.

6           Q    All right.  Are you aware of any other MTBE

7       detections in that well other than on that date?

8           A    No.  My answer is the same as before.  I could

9       be wrong.  I don't recall any other detections.

10          Q    All right.  And so my question is, then, is it

11      because testing has not been done for MTBE or it has

12      been done and you just don't recall any detections?

13              MS. O'REILLY:  Asked and answered.  Go ahead.

14              THE WITNESS:  The well is routinely tested for

15      contaminant compounds, MTB being one of them, and TBA.

16      I don't know what the routine is or the schedule for

17      testing this well.  I'm not aware that -- I'm fairly

18      certain it's been tested, but I'm not aware that MTBE or

19      TBA has been detected in the well.

20      BY MR. ADAMS:

21          Q    And you're not aware or you don't know whether

22      any of the MTBE that has been detected in any of the

23      wells has actually come from Number 4, correct?

24              MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.

25      Asked and answered.  Calls for expert opinion.

                                                              22

David Bolin

```
 1              THE WITNESS:  I believe testimony's been
 2     provided discussing the source of MTB detected in these
 3     wells.  These sites are upgradient of these wells.
 4              And while we can't be certain exactly which
 5     site MTB originated from that's been detected in these
 6     wells, this site is considered a likely source based on
 7     the information, the data we have so far.
 8     BY MR. ADAMS:
 9         Q    Okay.  So the answer to my question is you
10     don't know that it's from there, but you suspect that
11     it's from there; is that a fair statement?
12              MS. O'REILLY:  Asked and answered.  Calls for
13     an expert opinion.  Vague and ambiguous.  Go ahead.
14              THE WITNESS:  Um, my answer stands.  We
15     consider this site to be a likely source.
16     BY MR. ADAMS:
17         Q    But you don't know for sure, right?
18         A    No, we don't know for sure.
19              MS. O'REILLY:  Asked and answered.
20     BY MR. ADAMS:
21         Q    Can you tell me -- you might have to refer to
22     the map, but in round numbers, can you give me an
23     estimate of how many feet the nearest threatened
24     drinking water well is to Number 4?
25              MS. O'REILLY:  Asked and answered.  Vague.
```

23

David Bolin

```
1    BY MR. ADAMS:

2        Q    Sorry -- to get into the production wells?

3            MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.

4    Asked and answered.  Lacks foundation.  Calls for

5    speculation.  Calls for a memory test.

6            THE WITNESS:  I'm not sure if I understand your

7    question correctly.  Can I have that read back to me,

8    please?

9    BY MR. ADAMS:

10       Q    Yeah.  I'm asking you, are you aware of any

11   conclusion or determination by any governmental agency

12   that MTBE has escaped remediation from Number 4 and has

13   gotten into production wells?

14           MS. O'REILLY:  Same objections.

15           THE WITNESS:  No.

16   BY MR. ADAMS:

17       Q    And you don't know how much, if any, MTBE the

18   mass has escaped remediation for Number 4, right?

19           MS. O'REILLY:  Calls for expert opinion.  Lacks

20   foundation.  Incomplete hypothetical.  Vague.

21   Ambiguous.  Overbroad.  Asked and answered.

22           THE WITNESS:  No.

23   BY MR. ADAMS:

24       Q    And you don't know when any MTBE has escaped

25   from remediation of Number 4, correct, if it did?
```

36

David Bolin

1      a closure letter?

2          A    I don't believe it has.

3          Q    And I take it that you don't have any

4      complaints about the work done by the oversight agencies

5      concerning Number 4?

6              MS. O'REILLY:  Exceeds the scope of the notice.

7      Vague.  Ambiguous.  Overbroad.  Calls for a memory test.

8      Incomplete hypothetical.  Go ahead.

9              THE WITNESS:  I don't have any complaints.

10              MR. ADAMS:  And the Orange County Water

11     District hasn't undertaken any actions itself to

12     remediate Number 4, right?

13              MS. O'REILLY:  Misstates testimony.  Asked and

14     answered.  Vague and ambiguous.  Overbroad.  Go ahead.

15              THE WITNESS:  In the context of our ongoing

16     investigation, that is part of our overall remediation

17     effort, to delineate the degree and the extent of

18     contamination before we can design an effective remedial

19     program.

20              But to date, we have not exercised any active

21     removal of contamination from the site.

22     BY MR. ADAMS:

23          Q    Okay.  So we can separate it into evaluation

24     and investigation as opposed to any physical contact

25     with the site, correct?

                                                        44

David Bolin

1    done.  He's answered your question.

2              MR. ADAMS:  That's an instruction?

3              MS. O'REILLY:  Yes, it is.

4    BY MR. ADAMS:

5         Q    Have you aware of any facts -- strike that.

6              Are you aware of any facts that show that these

7    wells are actually conduits for contamination into --

8    deeper into the aquifer?

9              MS. O'REILLY:  Asked and answered prior

10   deposition.  Vague and ambiguous.  Go ahead.

11             THE WITNESS:  I'm trying to recall Roy

12   Hearnden's testimony.  I think the answer is no.

13   BY MR. ADAMS:

14        Q    Now, I recall from your 2010 depositions that

15   the district has now engaged Hargus, right?

16        A    Yes.

17        Q    All right.  And so what work, as of today, to

18   your knowledge, what work has Hargus done with respect

19   to -- I'll take it either way.  You can either talk

20   about Plume No. 1 or you can talk about G & M Oil

21   Station No. 4.

22        A    To date, Hargus has evaluated previous work by

23   our prior consultant, Comex, on this site.  It has

24   prepared a work plan for discrete investigation of

25   Bellwether plume sites.  And this site was selected for

                                                    49

David Bolin

1    an investigation and there is a current investigation

2    taking place that is being conducted by Hargus on our

3    behalf.

4        Q   When you said this site, is that Plume 1 or is

5    that Station No. 4?

6        A   Specifically, Station No. 4.

7        Q   All right.  I'm looking at about a one-inch

8    document on Hargus letterhead dated July 1, 2010.

9            Is this the document you're referring to?

10       A   I would have to look at it.

11       Q   Sure.

12       A   I've flipped through the document.  It looks to

13   be the proposal that we received from Hargus to perform

14   this work.  I can't be certain without reviewing it in

15   greater detail.

16       Q   All right.  Let's do this:  As I understand it,

17   this was a proposal that was given in July of 2010.  And

18   then there was a while before the board approved the

19   work plan; is that a fair statement?

20           MS. O'REILLY:  Misstates prior testimony.

21           THE WITNESS:  I don't recall the date when it

22   was first submitted, but I know that there was some

23   discussion about the cost and insurance requirements.

24   And so there was -- the contract was administered for

25   some time.

                                                        50

David Bolin

1           Again, I can't be certain of the time frame

2       between receiving the original proposal and the board's

3       authorization.

4       BY MR. ADAMS:

5           Q   All right.  So how much was ultimately

6       authorized by the board with respect to this project,

7       the Hargus project?

8               MS. O'REILLY:  It's been asked and answered

9       extensively.  Go ahead.

10              THE WITNESS:  Are you asking me the cost?

11      BY MR. ADAMS:

12          Q   Yes.

13          A   And I'm sorry.  Maybe I misunderstood your

14      question.  The cost pertains to all of the sites we were

15      investigating.

16              Did you just ask me about this site

17      specifically?

18          Q   No.  It was the overall cost.  Wasn't the cost,

19      like, $3 million or so?

20          A   Like 2.9 million.  That's approximate.

21          Q   I'm just a lawyer so that's 3 million to me.

22      So -- but that covered all of the sites that it was

23      dealing with, right?

24          A   That's correct.

25          Q   And you said that G & M Site No. 4 was one of

51

David Bolin

1        the sites?

2            A    Yes.

3            Q    Okay.  And were there any costs that were

4        direct costs for Site No. 4?

5                 MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.

6        Asked and answered.  This has been covered in detail in

7        prior depositions and in discovery responses.

8                 THE WITNESS:  The costs that were presented to

9        us were for the total investigation and were not site

10       specific.

11       BY MR. ADAMS:

12           Q    Right.  And I have the cost tab here, but I'm

13       just going to ask you if you know.  You can refer to

14       this if you need to refresh your recollection.

15                What has been done as you sit here today by

16       Hargus?  What of its tasks have been completed?

17                MS. O'REILLY:  Vague and ambiguous.  You can

18       ask him with respect to the two G & M Oil stations only.

19       Go ahead.

20                THE WITNESS:  They reviewed previous reports

21       and established an approach to doing the investigation.

22       And this is true for all the sites as well as G & M

23       Station No. 4.  And they have since initiated an

24       investigation at this site, collected samples, and have

25       submitted those for testing.

                                                              52

David Bolin

1              MS. O'REILLY:  -- is an expert issue.  This is

2        a lay deposition.  It's an incomplete hypothetical.

3        Assumes facts.  Lacks foundation.  Calls for

4        speculation.  Go ahead.  Answer again.

5              THE WITNESS:  I stand by my answer.  We can

6        read it back.  Maybe there's something specific.

7        BY MR. ADAMS:

8          Q    Let me cross you on your answer, then.

9              Have you seen anything from an expert -- it's

10       foundational.

11             Have you seen anything from an expert that

12       models showing that MTBE from Number 4 has, in fact,

13       gotten into drinking water?

14             MS. O'REILLY:  I'm instructing him not to

15       answer.

16             MR. ADAMS:  A foundational question?

17             MS. O'REILLY:  It is not a foundational

18       question.

19             MR. ADAMS:  Okay.

20             MS. O'REILLY:  I am instructing him not answer.

21       if you want to ask him if the district itself has

22       created a model, you can do so and he can answer that.

23       BY MR. ADAMS:

24         Q    Has the district created a model?

25         A    Yes.

                                                          75

David Bolin

```
 1          Q    When did it create the model?

 2          A    Actually, I don't know the answer to that.

 3    Long before I joined the district.

 4          Q    So it was before '05?

 5          A    Yes.

 6          Q    And was that created by somebody inside the

 7    district or was it created by an outsider?

 8          A    By somebody within the district.

 9          Q    Okay.  Who is that?

10          A    Tim Sovich.

11          Q    Is he still there?

12          A    Yes, he is.

13          Q    And so did that model conclude that MTBE from

14    Station No. 4 has gotten into drinking water?

15               MS. O'REILLY:  Counsel, you're misunderstanding

16    Mr. Bolin's answer.  The model is a groundwater flow

17    model --

18               MR. ADAMS:  Okay.  I get that.

19               MS. O'REILLY:  -- not a transport contaminant

20    model.  Has nothing to do with tracking contamination.

21    BY MR. ADAMS:

22          Q    Just let him testify, please.  Go ahead.

23          A    No.

24          Q    I want to turn now to G & M Oil No. 24.

25               Are you familiar with that site?
```

76

David Bolin

1     questions about Site No. 4.  I'm going to go through a

2     series of questions that I asked you this morning, but

3     this time I want to focus only on Site 24.  Okay?

4          A    Okay.

5          Q    All right.  So have you ever informed any

6     regulatory agency of any releases of MTBE relating to

7     Number 24?

8               MS. O'REILLY:  Asked and answered.  Vague and

9     ambiguous.  Assumes facts.  Lacks foundation.  Go ahead.

10              THE WITNESS:  I -- I don't think so.  That was

11    covered in my prior testimony, though.

12    BY MR. ADAMS:

13         Q    And to your knowledge, has the Orange County

14    Water District informed any agents, agent, governmental

15    agencies about releases relating to Number 24?

16              MS. O'REILLY:  And I'm going to object to the

17    extent it's been asked and answered.  Assumes fact.

18    Lacks foundation.  Calls for speculation.  Go ahead.

19              THE WITNESS:  My answer is the same.

20    BY MR. ADAMS:

21         Q    That you don't think so, but it was covered

22    before?

23         A    Yes.

24         Q    And now suspected releases; you haven't

25    notified any government agencies about any suspected

                                                        92

David Bolin

```
1        releases from 24 of MTBE, correct?

2                MS. O'REILLY:  Incomplete hypothetical.

3        Assumes facts.  Lacks foundation.

4                THE WITNESS:  I don't recall having a specific

5        conversation about G & M 24 with the regulators.

6        BY MR. ADAMS:

7           Q    And likewise, you're not aware of any Orange

8        County Water District people other than yourself that

9        has communicated any suspected releases of MTBE to any

10       governmental agencies, correct?

11               MS. O'REILLY:  Same objections.

12               THE WITNESS:  That's correct.

13       BY MR. ADAMS:

14          Q    And there are not any drinking water wells that

15       have been contaminated with MTBE or TBA relating to

16       Number 24, correct?

17               MS. O'REILLY:  I'm going to object.  It calls

18       for an expert opinion.  Exceeds the scope of the

19       deposition.  Lacks foundation.  Assumes facts.

20       Incomplete hypothetical.  Vague.  Ambiguous.  Overbroad.

21               THE WITNESS:  I don't know.  All I can say is

22       the wells that were designated for this plume have not

23       had detections of MTBE or TBA that I'm aware of.

24       BY MR. ADAMS:

25          Q    I know we talked about it this morning, and I
```

93

David Bolin

```
 1    think you might have covered it with all of them, but
 2    you're not aware of any complaints or odors on any
 3    drinking water from MTBE; is that right?
 4              MS. O'REILLY:  Exceeds the scope of the
 5    deposition.  Exceeds the scope of permissible discovery
 6    in this case, which is limited to the Bellwether
 7    stations.  Calls for expert opinion.  Lacks foundation.
 8    Assumes facts.
 9              MR. ADAMS:  I withdraw the question.  Let me
10    try again.
11    BY MR. ADAMS:
12         Q    With respect to 24, you haven't -- you're not
13    aware of any complaints of odor or taste relating to
14    MTBE, correct?
15              MS. O'REILLY:  Asked and answered.  Calls for
16    speculation.  Exceeds the scope of the notice.  Vague
17    and ambiguous.  Go ahead.
18              THE WITNESS:  I'm not, but then they -- if --
19    such complaints would not necessarily have been brought
20    to my attention.  So I can't say that there weren't any.
21    BY MR. ADAMS:
22         Q    And are you aware of any drinking water wells
23    that are being threatened from MTBE that you believe
24    came from Number 24?
25              MS. O'REILLY:  Calls for expert opinion.
```

94

David Bolin

1    Exceeds the scope of the notice.  Lacks foundation.

2    Assumes facts.  Calls for speculation.  Vague.

3    Ambiguous.  Overbroad.  Asked and answered.

4          THE WITNESS:  To be able to say there is or is

5    not requires expertise that I don't have and that I've

6    only engaged in so far as I'm working with district's

7    experts.  But I don't have any actual knowledge of that

8    myself.

9          MR. ADAMS:  As I understand it, Counsel, you're

10   going to instruct him not to answer questions on what

11   the consultants have told him regarding --

12         MS. O'REILLY:  Consultants and experts, that's

13   correct.

14   BY MR. ADAMS:

15      Q   Now, focusing on Number 24, you haven't

16   communicated with any well owners concerning your

17   knowledge of contamination in the area, correct?

18         MS. O'REILLY:  Assumes facts.  Lacks

19   foundation.  Incomplete.  Go ahead.

20         THE WITNESS:  I have not, but the district has.

21   BY MR. ADAMS:

22      Q   And in what way has the district communicated

23   that?

24      A   The district has a -- what they call a pumpers

25   meeting or producers meeting.  And periodically they

                                                        95

David Bolin

```
 1        you haven't communicated that to consumers with respect

 2        to Number 24?

 3                 MS. O'REILLY:  Vague.  Ambiguous.  Misstates

 4        testimony.  Go ahead.

 5                 THE WITNESS:  I didn't say I don't know why.  I

 6        said I don't have a reason.

 7        BY MR. ADAMS:

 8           Q    Okay.  And that applies to Number 24 also,

 9        right?

10           A    Yes.

11           Q    With respect to Plume No. 8, other than gas

12        stations, are you aware of any other possible sources of

13        MTBE contamination?

14                 MS. O'REILLY:  Exceeds the scope of the notice.

15        Calls for expert opinion.  Vague.  Ambiguous.

16        Overbroad.  Assumes facts.  Lacks foundation.

17        Incomplete hypothetical.

18                 THE WITNESS:  Your question's very -- very

19        broad.  It sounds like you're asking me, are there any

20        other possible sources of MTBE besides gas stations?

21        BY MR. ADAMS:

22           Q    Relating to Plume No. 8, yes.

23                 MS. O'REILLY:  Same objections.

24                 THE WITNESS:  There very well might be other

25        maintenance shops and manufacturing facilities that have
```

97

David Bolin

1    gasoline that contained MTBE. But I can't name them

2    specifically. I don't know about them specifically.

3    BY MR. ADAMS:

4        Q    And with respect to Number 24, you haven't seen

5    any conclusion or determination by any regulatory agency

6    that MTBE has escaped remediation from Number 24, right?

7            MS. O'REILLY: Can I have the question read

8    back again?

9                MADAM COURT REPORTER: "QUESTION: And

10               with respect to Number 24, you haven't seen

11               any conclusion or determination by any

12               regulatory agency that MTBE has escaped

13               remediation from Number 24, right?"

14           MS. O'REILLY: Lacks foundation. Assumes

15   facts. Calls for a memory test. Vague. Ambiguous.

16   Overbroad.

17           THE WITNESS: As I sit here, I can't recall

18   anything that I can remember, but it doesn't mean there

19   isn't something that exists or that I haven't read it.

20   BY MR. ADAMS:

21       Q    But that would have been significant to you,

22   right?

23           MS. O'REILLY: Objection. Misstates testimony.

24   Go ahead.

25           THE WITNESS: I don't know what you mean by

98

David Bolin

1   significant.

2   BY MR. ADAMS:

3       Q   In other words, meaningful, I think, is the way

4   you usually phrase it.

5       A   You read my testimony.

6       Q   Twenty-one days worth.

7       A   Yes.   There's more days than that, but, um,

8   yes.  That would be important enough to act on it.

9       Q   Have you personally concluded that MTBE has

10  escaped remediation from 24?

11          MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.

12  Potentially calls for expert opinion.  Go ahead.

13          THE WITNESS:  Let me check my notes, if you

14  would, please.  I believe that MTBE released from this

15  site has not been remediated by any of the remedial

16  efforts at this site.

17          Therefore, all the actions taken by G & M at

18  this site to remediate the groundwater contamination has

19  not captured or contained all the contamination released

20  from the site.

21  BY MR. ADAMS:

22      Q   And do you know how much mass has escaped

23  remediation?

24      A   No.

25      Q   Do you know where it's heading?

99

David Bolin

1    determined what that acceptable limit is, that's beyond

2    my expertise.  We have experts looking at that.

3           But if you're asking me as a person, as an

4    individual that drinks water from this basin, my answer

5    would be none.  No MTBE in my water.

6    BY MR. ADAMS:

7    Q    I'll ask you personally and then with respect

8    to the district.  So as to you personally, have you

9    determined whether there needs to be any additional

10   remediation for Number 24?

11          MS. O'REILLY:  And I'm going to object to the

12   extent it exceeds the scope of this notice.  Mr. Bolin's

13   being produced as an employee of Orange County Water

14   District, not in his individual capacity as citizen or

15   resident of Orange County.

16          And he's being produced as the PMQ.  And you're

17   asking him a question that relates to the litigation.

18   And also it is vague, ambiguous, overbroad.  Calls for

19   an expert opinion.  Lacks foundation.  Go ahead.

20          THE WITNESS:  Whether additional remediation is

21   necessary and appropriate is still an answer that our

22   experts are dealing with.  That's, again, beyond my

23   expertise, as I've been offered up as the PMQ.

24          However, if you're asking me personally, my

25   answer is yes, I think additional remediation is

103

David Bolin

```
 1     plumes move as slugs and the mass doesn't necessarily
 2     spread.  Sometimes the migration paths are very, very
 3     narrow and elongated.  And you can see a mass traveling
 4     into a drinking water supply in its entirety.
 5             So there might be more water involved, but it's
 6     the same amount of mass that's been released.
 7     BY MR. ADAMS:
 8        Q    Do you know whether there was a closure letter
 9     on this site?
10        A    I don't recall.  I don't think so, but I don't
11     recall.  Can you give me just a minute?  I think I can
12     answer the question.
13             I don't think a closure letter's been provided
14     for this site.
15        Q    Do you have any complaints about the activities
16     over the oversight agency for this site?
17        A    No.
18             MS. O'REILLY:  I'm going to object.  Exceeds
19     the scope of the deposition.  Vague and ambiguous.  Go
20     ahead.
21             THE WITNESS:  No, I have not complained about
22     the oversight of the site.
23     BY MR. ADAMS:
24        Q    And do you know whether the district has?
25             When you say "I", I assume you're talking about
```

105

David Bolin

1    you.  Do you know when anybody else in the district has?

2        A.    In this case --

3            MS. O'REILLY:  Same objections.  Go ahead.

4            THE WITNESS:  In this case I'm including the

5    district.

6    BY MR. ADAMS:

7        Q    I was going to ask you about Hargus.  And I'm

8    mindful of what counsel said about Hargus this morning.

9    But as far as what's been done now, as I understand it,

10   we talked about somewhere between a fourth and --

11   25 percent to 30 percent of the work has been done

12   already.

13           Would your answers for Site No. 24 be any

14   different than the things that we talked about this

15   morning with respect to Site No. 4?

16           MS. O'REILLY:  I'm going to allow a limited

17   response.  You can respond just very limited to the

18   scope of the question with respect to work done for

19   G & M No. 24 only.

20           THE WITNESS:  Actually, this is different.  You

21   brought something to mind that I didn't talk about

22   before.

23           We have more than one contract with Hargus.  We

24   had a contract to evaluate sites, write summary reports,

25   and then we have another contract for conducting an

106

David Bolin

1    asked and answered.  To the extent that's been

2    disclosed.

3            THE WITNESS:  No, I can't.

4    BY MR. ADAMS:

5        Q   And was the $452,000 contract only for Sites 4

6    and 24?

7        A   No.

8            MS. O'REILLY:  Asked and answered.

9            THE WITNESS:  No.  It included, um, attention

10   on -- I believe it was about 40 sites.

11   BY MR. ADAMS:

12       Q   Okay.  So let me ask you this:  In round

13   numbers, the contract that we talked about this morning

14   was $3 million.  In round numbers, the contract you're

15   talking about now is roughly 500,000.  Okay.  So let's

16   just call it 3.5 million.

17           Is that 3.5 million equally applicable to all

18   the sites or can it be delineated on a per site basis?

19           MS. O'REILLY:  Asked and answered extensively

20   in his prior deposition.  Vague.  Ambiguous.  Overbroad.

21   Calls for speculation.

22           THE WITNESS:  I want to clarify.  The first

23   contract, 400 -- $500,000.  I call it 450 -- that

24   applied to 40 sites.  The contract for 2.9 million

25   applies to 10 sites.

                                                      108

David Bolin

```
 1              So it's not accurate or appropriate to combine
 2    the two and then just divide.  You can't do that.  I
 3    cannot distinguish how much money was spent on any
 4    particular site.  The invoices we received from Hargus
 5    did not break out the various sites.
 6    BY MR. ADAMS:
 7         Q    And so I think you referred to it as the first
 8    contract, but the roughly $500,000 contract, that has
 9    all been spent, right?
10         A    Yes.
11         Q    And all of the work that was associated with
12    that contract has been done?
13         A    That's correct.
14         Q    Other than that, the answers regarding costs
15    and time and timelines for Site No. 24 are the same as
16    for Site No. 4 with respect to Hargus?
17         A    The time and timelines.  I'm not sure what
18    you're asking me.
19         Q    Well, they have a work plan, they gave you the
20    work plan, we went over the contract this morning.
21         A    Oh.
22         Q    For the 2. -- for the $3 million contract, as
23    it relates to Hargus, is the same for Site 24 as it was
24    for Site 4?
25         A    Uh.--
```

                                                        109

David Bolin

```
 1    STATE OF CALIFORNIA      )
                               ) SS
 2    COUNTY OF ORANGE         )

 3

 4            I, VICTORIA A. GUERRERO, a Certified Shorthand

 5    Reporter do hereby certify:

 6            That prior to being examined, the witness in

 7    the foregoing proceedings was, by me, duly sworn to

 8    testify to the truth, the whole truth, and nothing but

 9    the truth;

10            that said proceedings were taken before me at

11    the time and place therein set forth and were taken down

12    by me in shorthand and thereafter transcribed into

13    typewriting under my direction and supervision;

14            I further certify that I am neither counsel

15    for, nor related to, and party to said proceedings, not

16    in any way interested in the outcome thereof.

17

18    Dated:  Thursday, March 10, 2011

19

20

21

22    _____
      Victoria A. Guerrero, CSR No. 8370
23

24

25

                                                          114
```

# EXHIBIT 44

Confidential - Per 2004 MDL 1358 Order

Page 4367

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

| | |
|---|---|
| Methyl Tertiary Butyl: | Master File No. 1:00-1898 |
| Ether ("MTBE")      : | MDL NO. 1358 (SAS) |
| Products Liability  : | M21-88 |
| Litigation          : | |

This Document Relates to:
    Orange County Water District
    v. Unocal Corporation, et al.,
    S.D.N.Y. No. 04 Civ. 4968 (SAS)

CONFIDENTIAL
(Per 2004 MDL 1358 Order)

------

Wednesday, December 3, 2008

------


    Videotaped Deposition of DAVID P. BOLIN,
Volume 19, OCWD'S 30(b)(6) DESIGNEE re Focus Plume
#1, held in the law offices of Latham & Watkins,
650 Town Center Drive, Suite 2000, Costa Mesa,
California, beginning at 9:09 a.m., before Sandra
Bunch VanderPol, RPR, RMR, CRR, CSR #3032.



GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|917.591.5672 fax

deps@golkow.com



EXHIBIT
44

Confidential - Per 2004 MDL 1358 Order

Page 4400

1    THE WITNESS:  The District has not tested
2 any of these wells to determine whether MTBE is, in
3 fact, migrating down into the wells.  So we don't
4 have that data.  And well testing is yet to be
5 completed on a variety of wells along those lines.
6 Right now we don't have any specific data.
7 BY MR. KATZ:
8    Q.   With regard to the production wells
9 identified on Exhibit 306 --
10    A.   Yes.
11    Q.   -- have there been any taste and odor
12 complaints with regard to any of those wells that
13 have been attributed to MTBE or TBA?
14    MR. SAWYER:  Objection.  Vague.  Ambiguous.
15 Overly broad.  Compound.
16    THE WITNESS:  I don't know.
17    MR. KATZ:  I am going to hand to the court
18 reporter what I believe will be marked Exhibit 309,
19 which is a two-page document entitled, "76 Station
20 No. 5792," Bates No. OCWD-MTBE-001-268736 through
21 737.
22    (Exhibit No. 309 was marked.)
23    MR. SAWYER:  Are these the notes?  Okay.  I
24 have got my copy here.
25    What exhibit number are we marking it as?

Page 4401

1    THE WITNESS:  309.
2    MR. SAWYER:  Thank you very much.
3 BY MR. KATZ:
4    Q.   Mr. Bolin, have you reviewed
5 Exhibit 309?
6    A.   Yes, I have.
7    Q.   What is it?
8    A.   These are summary notes that I had
9 prepared to help answer questions today.
10    Q.   When did you start preparing
11 Exhibit 309?
12    A.   Probably -- well, the information
13 contained in here I began learning about when I first
14 was aware of the station.  I don't recall exactly
15 when that was.  Probably some time in 2005.
16    Q.   My question was specifically with
17 regard to when did you first prepare the document
18 that became Exhibit 309?
19    A.   I finished preparing it on Sunday.
20 Now, I can't recall.  It might have been yesterday.
21 No, no, not yesterday.  I am sorry.  It would have
22 been Monday.
23    Q.   Monday, December 1st?
24    A.   The day before yesterday.
25    Q.   And when did you start preparing what

Page 4402

1 became Exhibit 309?
2    MR. SAWYER:  I will just object to the use
3 of the term "start preparing" as vague and ambiguous.
4    THE WITNESS:  Well, it depends.  I don't --
5 I think the first entry in my notes -- in these notes
6 would have been Monday.  But the information gleaned
7 to prepare the notes I obtained long before that.
8 BY MR. KATZ:
9    Q.   Looking at the middle, at least on my
10 version what is the middle of the page, the row that
11 begins, "Off-site wells."
12    A.   Huh-huh.
13    Q.   I will just read the line.  Some
14 folks don't have a copy of the exhibit.  "Off-site
15 wells, only one location, MW-7S, MW-7I and MW-7D,
16 about 200 feet south/southwest of site, not optimal
17 location."
18    Do you see that?
19    A.   Yes, I do.
20    Q.   And you wrote those -- that line?
21 These are your words?
22    A.   Yes, those are my words.
23    Q.   What did you mean by "not optimal
24 location"?
25    A.   The wells -- it's essentially one

Page 4403

1 sample location, MW-7.  There are three wells
2 installed at that location, 7S, 7I and 7D.  They
3 designated a shallow zone, an intermediate zone and a
4 deep zone.  But they are all within the -- the
5 semi-perched zone.
6    The 7D was 45 to 49 feet below ground
7 surface.  7S and 7I are above that, screened above
8 that.  And this -- they are not in the optimal
9 location for an off-site well because the flow
10 direction has been predominantly in a southwesterly
11 direction, and these wells are more south of the
12 site.
13    So I made note here that if there was going
14 to be any off-site investigation trying to delineate
15 the lateral extent of contamination, these are not
16 the best location to do that.  These are more
17 cross-gradient than downgradient.
18    Q.   And that if you were going to do that
19 investigation, would a better location for the well
20 have been in a -- west of the site as opposed to
21 south of the site?
22    A.   Well, if -- first of all, they only
23 sampled one location.  You can't delineate a plume
24 with just one well.  And it was the only effort
25 that's been made to drill off site for contamination

10 (Pages 4400 to 4403)

6dc03def-2da7-4af4-9cd7-d44e632050df

Confidential - Per 2004 MDL 1358 Order

Page 4588

```
1            REPORTER'S CERTIFICATE
2
3       I certify that the witness in the foregoing
4   deposition.
5            DAVID BOLIN
6   was by me duly sworn to testify in the within-entitled
7   cause; that said deposition was taken at the time and
8   place therein named; pages 4368 through 4588 of the
9   testimony of said witness were reported by me, a duly
10  Certified Shorthand Reporter of the State of
11  California authorized to administer oaths and
12  affirmations, and said testimony was thereafter
13  transcribed into typewriting.
14      I further certify that I am not of counsel or
15  attorney for either or any of the parties to said
16  deposition, nor in any way interested in the outcome
17  of the cause named in said deposition.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  this 14th day of December, 2008.
20
21
22      -----------------------------------
23      SANDRA BUNCH VANDER POL, RMR, CRR
24      Certified Shorthand Reporter
25      Certificate No. 3032
```

57 (Page 4588)

76 Station #5792
4002 Ball Road, Cypress, CA

Unknown how many Unauthorized Release Reports were prepared. However, fuel leaks identified in literature and Geotracker in at least 1987; GW remediation has been limited, MTBE migrated off site, there has been no groundwater capture, site remains unremediated.

Regulating Agency cited multiple deficiencies, made multiple requests for additional investigation and remediation.

MTBE 1st tested in gw: 5/11/98 in B-2.
MTBE 1st detected in groundwater: 5/11/98 in B-2 - 19,000 ug/L.
Max MTBE detected in a gw monitoring well: 5/17/99 in B-2 - 69,000 ug/L.
TBA 1st tested in gw: 8/2/00 in well B-2 (RDL 50,000 ug/L, detected 9 mo later when RDL lowered, max TBA in well).
TBA 1st detected in gw: 6/8/01 in well B-1 - 4,400 ug/L - NW site margin well, 1st time tested.
Max TBA detected in a gw monitoring well: 6/24/02 in well B-2 - 7,800 ug/L.
also max ETBE and TAME.

3 saturated zones are identified (URS reports).
[upper] semi-perched gw zone (MW-7s) - ~5 to 20 ft bgs.
[intermediate] semi-perched gw zone (MW-7i) - ~33 to 38 ft bgs.
[deep] semi-perched gw zone (MW-7d) - ~45 to >49 ft bgs, max depth investigated (Wayne Perry).
shallow gw zone approximated top - ~60 ft bgs (OCWD).

semi-perched zone is WNW to SSW, predominantly SW (TRC).
shallow gw flow direction is estimated to be westerly (OCWD).

Off Site wells - only one location: MW-7s, MW - 7i, & MW-7d - ~200 feet SSW of site, NOT OPTIMAL LOCATION.
MW-7s - MTBE 1st tested 7/27/01 - occasional detection <10 ug/L, no TBA detection at or above 50 ug/L.
MW-7i - MTBE 1st tested 7/27/01 - occasional detection <10 ug/L, occasional TBA detection up to 47 ug/L.
MW-7d - MTBE 1st tested 7/27/01 - occasional detection <10 ug/L, occasional TBA detection up to 97 ug/L.
DOWNGRADIENT wells - shallow gw flow direction WNW to SSW - site margin wells B-6 (West) and MW-6 (SW).
MTBE detected in both farthest downgrad directions 1st time tested, still present.
TBA occasionally detected in both farthest downgrad directions.
B-6 - MTBE 1st tested & 1st detected 3/24/99 (1,600 ug/L), still pres; TBA occasionally detected up to 3,300 ug/L.
MW-6 - MTBE 1st tested & 1st detected 1/27/00 (59 ug/L), still pres; TBA occasionally detected up to 41 ug/L.

Remediation: DPE briefly initiated 2002 - GW NOT CAPTURED, CONTAMINATION NOT CONTAINED.
Aug-97 - USTs removed & replaced, soil contamination detected, soil excavated, OCHCA requires Corr. Action.
Sep-97 - Unocal consultant requested site closure following UST removal w/out testing gw, OCHCA rejected request.
Apr-98 - monitoring wells B-1 to B-4 installed in UST area, gw contamination detected.
Nov-99 - downgrad (SW) site margin well MW-6 installed (MTBE detected 1st time tested in Jan-00).
Oct-00 - overpurging in UST area wells - six 8-hour purging events.
Oct-00 - Unocal consultant states soil remediation is not warranted, OCHCA rejects statement.
May-01 - additional investigation in UST area (borings B-7, B-8, and B-9).
Jul-01 - installed 1st & only off-site wells (MW-7s, -7i, & -7d) ~200 feet SSW of site - cross-gradient.
Jan & Feb-02 - DPE tests for total of 24 hours - almost 5 years after contamination discovered.
Aug-02 - installed wells MW-6 (E site margin - upgrad) and MW-9 (S site margin - cross-grad).
Jul-03 - ozone injection points installed (CS-1 to CS-11) - remain unused for >2 years.
Dec-05 - began ozone injection - >7 years after gw contamination confirmed, operated only 50% of time.

MTBE and TBA groundwater plumes have migrated off site SW (1/21/08 TRC - Quarterly Monitoring Report, October Through December 2007, 76 Station 5792, 4002 Ball Road, Cypress, California, OCHCA Case #: 97UT28).

Exhibit No. 5-09
Date: 12-3-08
Witness: Barri
Sarah Buich, CSR 9022

76 Station #5792
4002 Ball Road, Cypress, CA

Historic MTBE and TBA gw plumes have not been delineated laterally.
Recent MTBE and TBA gw plumes have not been delineated laterally.
MTBE and TBA gw plumes have not been delineated vertically.

Groundwater conduits (potential migration paths from shallow saturated zones to deeper saturated zones):
     Nearest well in Shallow Aquifer: W-5516 - domestic well ~600 ft N of site - cross-gradient semi-perched zone:
          Drilled to 188 ft bgs (Shallow Aquifer).
          Screened: - 170 to 178 ft bgs.
          Sanitary seal - unknown (probably not - completed 1954).
          pump rate - unknown.
          Top of Shallow zone - ~68 ft bgs.
          Bottom of Shallow zone - ~325 ft bgs.
          Top of Principal Aquifer - ~354 ft bgs.
     Nearest well in Shallow Aquifer WEST downgradient: W-14850 - ag/irr well ~1,130 ft W of site:
          Drilled to 190 ft bgs (Shallow Aquifer).
          Screened: - 150 to 161 and 182 to 189 ft bgs.
          Sanitary seal - unknown (probably not).
          pump rate - unknown.
          Top of Shallow zone - ~61 ft bgs.
          Bottom of Shallow zone - ~304 ft bgs.
          Top of Principal Aquifer - ~335 ft bgs.

     Nearest drinking water prod well: SCWC_LABL2 - (Principal Aquifer) ~650 ft SSW of site - downgradient:
          Drilled to 708 ft bgs (Principal Aquifer)
          Screened: 460 to 690 ft bgs.
          Sanitary seal - YES.
          pump rate - .
          Top of Shallow zone - ~58 ft bgs.
          Bottom of Shallow zone - ~311 ft bgs.
          Top of Principal Aquifer - ~340 ft bgs.

OCWD-MTBE-001-268737

# EXHIBIT 45

Confidential - Per 2004 MDL 1358 Order

Page 803

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

Methyl Tertiary Butyl:     Master File No. 1:00-1898
Ether ("MTBE")       :     MDL NO. 1358 (SAS)
Products Liability   :     M21-88
Litigation           :
_____

This Document Relates to:
    Orange County Water District
    v. Unocal Corporation, et al.,
    S.D.N.Y. No. 04 Civ. 4968 (SAS)
_____/

CONFIDENTIAL
(Per 2004 MDL 1358 Order)

------

August 20, 2008

------

Videotaped Deposition of DAVID P. BOLIN,

Volume 4, OCWD'S 30(b)(6) DESIGNEE, held in the law

offices of Latham & Watkins, 650 Towne Center Drive,

Suite 2000, Costa Mesa, beginning at 2:29 p.m., before

Sandra Bunch VanderPol, RPR, RMR, CRR, CSR #3032.

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|917.591.5672 fax

deps@golkow.com



EXHIBIT
45

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 868

1  notice in November 2005, according to the e-mail
2  messages that were sent.
3      I'm looking at Exhibit 42, for example.
4      Q.   So if you look at Exhibit 45, this is
5  January of 2008.  Scope of work includes -- it looks
6  like it's basically the completion of what had been
7  started before; is that a fair, gross generalization?
8      A.   The completion of some of what --
9  some of the work that had been started before.  Much
10 of the work had been completed, but there were -- but
11 not everything was completed.
12     Q.   Right.  So you wanted to get it
13 finished so you have a usable final work product from
14 Komex, right?
15     A.   We wanted Komex, that is the District
16 wanted Komex to complete the work that they were --
17 agreed to do.
18     Q.   And has Komex now completed the work
19 contemplated by the 2005 agreement and the scope of
20 work described in Exhibit 45?
21     A.   They have substantially completed the
22 work that was originally agreed to in the first phase
23 of work.
24     Q.   Is there anything --
25     MR. MILLER:  Excuse me.  Somebody needs to

Page 869

1  mute.  We are hearing background conversation.
2  BY MR. ANDERSON:
3      Q.   Is there anything that you can think
4  of that Komex has not completed, that it has agreed
5  to complete as part of its scopes of work in '05
6  through '08?
7      A.   They have substantially completed the
8  work that we have asked them to do.  There were
9  things that they were working on as part of their
10 analyses that I don't believe they are continuing to
11 do.  To my knowledge, they have completed everything
12 that we are asking them to do.
13     MR. ANDERSON:  Exhibit 46 is a Professional
14 Services Agreement No. 0454, between WorleyParsons
15 Komex and Orange County Water District.
16     (Exhibit No. 46 was marked.)
17 BY MR. ANDERSON:
18     Q.   Is this an agreement between Orange
19 County Water District and WorleyParsons Komex for
20 work in connection with the MTBE litigation project?
21     A.   I'm still looking over it.
22     Q.   I'm not going to get real detailed,
23 but look to the extent you want to.
24     A.   Yes, I believe that it is.
25     Q.   Okay.  Is this the most recent

Page 870

1  contract between the District and WorleyParsons
2  Komex?
3      A.   I believe that it is.
4      Q.   Do you anticipate any further
5  agreements with WorleyParsons Komex in connection
6  with the MTBE litigation project?
7      A.   I don't know whether we will have any
8  additional agreements with Komex regarding the MTBE
9  project.
10     Q.   You don't have any in the works right
11 now, do you?
12     A.   There is nothing that we are
13 preparing at this moment.
14     Q.   The term of this agreement set forth
15 on page 2, Section 5, was to end on June 30, 2008; do
16 you see that?
17     A.   Yes.
18     Q.   And do you know if the work was
19 completed under the agreement?
20     A.   I believe that it was.
21     Q.   Does this refresh your recollection
22 that -- I'm looking at Section 7.  This talks about
23 returning documents at the end of the project.
24     Is it still your recollection that Komex has
25 not returned the documents described in this

Page 871

1  agreement back to Orange County Water District?
2      A.   We still have an open agreement with
3  Komex.  I believe they substantially completed the
4  work that they were asked to do, but I don't know
5  whether all of their materials have been returned to
6  Orange County Water District.
7      MR. ANDERSON:  Okay.  Why don't we take a
8  short break, and we will change gears when we get
9  back.
10     THE VIDEOGRAPHER:  This is the end of
11 tape 2.  At 4:00 p.m. we are off the record.
12     (Recess taken.)
13     THE VIDEOGRAPHER:  Correction, that was the
14 end of tape 1.  This is the beginning of tape 2.  At
15 4:13 p.m. we are back on the record.
16     (Exhibit No. 47 was marked.)
17 BY MR. ANDERSON:
18     Q.   Mr. Bolin, I handed you Exhibit 47,
19 which is a lengthy spreadsheet produced to us by your
20 counsel the night before last relating to Unocal
21 Station 5226.  Do you see that?
22     A.   Yes.
23     Q.   Do you have any idea why it was
24 produced to us on August 18th as opposed to ten days
25 before your deposition started?

18  (Pages 868 to 871)

27ee06b0-b8f2-4b6d-9e34-4fa16c642483

Confidential - Per 2004 MDL 1358 Order

Page 872

1     A.    Because that's when I finished it.
2     Q.    You finished this document on
3  August 18th. And why were you working on this
4  document up to and including August 18th?
5     A.    The first two days in my deposition I
6  brought some binders with various notes and documents
7  to help me answer questions that I might be asked and
8  left those documents behind to have copied.
9           And when I was able to re-access those
10 documents, after those two days of deposition, I know
11 that a number of the tabs that I had put on there had
12 been moved. A couple of them were not there.
13          And so I went back and reattached those
14 tabs, went through those documents again and decided
15 that it would help me further to answer questions if
16 I could have some summary notes for each of those
17 binders instead of trying to flip through the binders
18 to find answers to questions that I might be asked.
19    Q.    Now, let's take a look at the first
20 page of this exhibit. On line item -- starting with
21 line item 35, "Remediation." These are all your
22 notes?
23    A.    These are my notes.
24    Q.    These are typed in? They are not cut
25 and pasted from something else?

Page 873

1     A.    That is correct.
2     Q.    You say, "Remediation: First
3  groundwater capture began in March of '02," right?
4     A.    And the squiggly mark means
5  approximately.
6     Q.    Approximately?
7     A.    Approximately in March of '02.
8     Q.    So this is something you got -- you
9  were pulling this out of some documents you were
10 looking at, right?
11    A.    That's correct.
12    Q.    And what were the documents you were
13 looking at?
14    A.    These are the documents that are in
15 the binders for which you have copies.
16    Q.    And the source of the documents in
17 the binder would include the quarterly reports
18 provided by the ConocoPhillips consultant?
19    A.    Yes.
20    Q.    And the document that said that the
21 capture began in March of '02, was that something
22 dated back in 2002, or something dated later than
23 that?
24    A.    I would have to look through the
25 documents to determine which document, at what date,

Page 874

1  mentioned when groundwater was being removed from the
2  site.
3     Q.    You note that the responsible
4  party -- that's RP, right?
5     A.    That is correct.
6     Q.    "Pump groundwater from monitoring
7  Well 2 in April of '99 and September of '00." Right?
8     A.    Yes.
9     Q.    And then you have the statement,
10 "Concluded that vacuum extraction was not feasible."
11 What does that mean?
12    A.    That was a statement or an indication
13 made by the consultant in a report that said that the
14 vacuum extraction was not a feasible remediation
15 technology.
16    Q.    Did you find any indication, as you
17 went through all these records as recently as two
18 days ago, that Orange County Water District had
19 provided any direction or suggestions or criticisms
20 to either the responsible party, its consultants, or
21 the Orange County Health Care Agency concerning this
22 particular project?
23          MR. MILLER: Objection. That's compound.
24          THE WITNESS: I don't have any documents
25 saying -- that discusses communication between Orange

Page 875

1  County Water District and anybody else about this --
2  this particular site.
3          Of course, I'm only knowledgeable about
4  activities that might have taken place after I joined
5  the District in 2005. Whether such conversations
6  were had with any of these particular RPs or
7  regulatory agencies about this site or any of the
8  sites before I joined the District, I don't know.
9  BY MR. ANDERSON:
10    Q.    You noted that the responsible party
11 had conducted soil excavation of 119 tons in 1992,
12 1994 and 1995. Right?
13    A.    I'm trying -- I'm trying to follow
14 along. All these notes kind of run together.
15          Can you identify which line?
16    Q.    Oh, I see. No, apparently that's
17 something that's missing from your report.
18          Were you aware the responsible party had
19 excavated 119 tons of soil in those three years? You
20 didn't note it in the report. I'm just asking if you
21 knew that?
22    A.    I might have -- I might be aware of
23 that. I might have noted that or read that in one of
24 the reports.
25    Q.    Is soil excavation a method of

Confidential - Per 2004 MDL 1358 Order

Page 920

1  BY MR. ANDERSON:
2      Q.   So you have made that determination
3  with respect to Unocal 5226?
4      A.   Based on my definition, what I just
5  said, that's what I believe to be true.
6      MR. MILLER:  Are you done with your list?
7  How long is your list?  How many pages?
8      MR. ANDERSON:  I'm really close.
9      MR. MILLER:  You keep promising that.  But
10 it's after 5:00.
11     MR. ANDERSON:  Just be patient.
12 Am I done?
13     MR. KATZ:  Yes.
14     MR. ANDERSON:  I'm done for the day.
15     MR. MILLER:  Thank you.
16     MR. ANDERSON:  So be back at 8:00.
17     MR. MILLER:  Perhaps not.
18     MR. ANDERSON:  Off the record.
19     THE VIDEOGRAPHER:  This is the end of tape
20 two of two and concludes today's deposition of David
21 Bolin.  At 5:09 p.m. we are off the record.
22     (The deposition was concluded on this day at
23 5:09 p.m.)
24     --o0o--
25

Page 921

1      Please be advised I have read the foregoing
2  deposition, and I state there are:
3  (Check one) _____NO CORRECTIONS
4             _____CORRECTIONS PER ATTACHED
5
6
7  _____
8  DAVID P. BOLIN
9

Page 922

1      DEPONENT'S CHANGES OR CORRECTIONS
2  Note:  If you are adding to your testimony, print the
3  exact words you want to add.  If you are deleting from
4  your testimony, print the exact words you want to
5  delete.  Specify with "Add" or "Delete" and sign this
6  form.
7  DEPOSITION OF:     DAVID P. BOLIN, Volume 4
8  CASE:        MTBE MDL (OCWD)
9  DATE OF DEPOSITION:  AUGUST 20, 2008
10 PAGE   LINE   CHANGE/ADD/DELETE
11 _____  _____  _____
...
24 DEPONENT'S SIGNATURE _____
25 DATE_____

Page 923

1      REPORTER'S CERTIFICATE
2
3      I certify that the witness in the foregoing
4  deposition.
5          DAVID P. BOLIN
6  was by me duly sworn to testify in the within-entitled
7  cause; that said deposition was taken at the time and
8  place therein named; pages 804 through 923 of the
9  testimony of said witness were reported by me, a duly
10 Certified Shorthand Reporter of the State of California
11 authorized to administer oaths and affirmations, and said
12 testimony was thereafter transcribed into typewriting.
13     I further certify that I am not of counsel or
14 attorney for either or any of the parties to said
15 deposition, nor in any way interested in the outcome of
16 the cause named in said deposition.
17     IN WITNESS WHEREOF, I have hereunto set my hand this
18 2nd day of September 2008.
19
20 ----------------------------------
21 SANDRA BUNCH VANDER POL, RMR, CRR
22 Certified Shorthand Reporter
23 Certificate No. 3032

31 (Pages 920 to 923)
Golkow Technologies, Inc. - 1.877.370.DEPS

| | A |
|---|---|
| 1 | Unocal #5226 |
| 2 | 6322 Westminster Blvd, Westminster |
| 3 | |
| 4 | |
| 5 | Site had least two reportable fuel leaks in 1994 and 1996; fuel leaks were discovered, identified, and/or detected on 12/6/84 and 9/2/96. |
| 6 | |
| 7 | Only one UST integrity test was reviewed.  That test failed on 5/19/1999. |
| 8 | |
| 9 | Regulatory Agency has issued more than 12 notifications to RP from 4/14/1992 to 6/8/2006 for inadequate or ineffective investigations or remediation, and missing work plans, reports, or data. |
| 10 | |
| 11 | MTBE 1st tested in groundwater; 1/8/96 in MW-12 |
| 12 | MTBE 1st detected in groundwater; 1/8/96 in MW-12 - 1,100 ug/L |
| 13 | Max MTBE detected in a gw monitoring well; 5/11/98 in MW-2 - 480,000 ug/L |
| 14 | |
| 15 | TBA 1st tested in groundwater; 4/11/01 in MW-1 |
| 16 | TBA 1st detected in groundwater; 4/11/01 in MW-1 - 21,000 ug/L |
| 17 | Max TBA detected in a gw monitoring well; 10/21/01 in MW-1 - 410,000 ug/L |
| 18 | |
| 19 | 2 saturated zones are identified. |
| 20 | semi-perched gw zone; from ~ 5 to >30 ft bgs (all mont wells screened from 5 to 25 or 30 ft bgs) |
| 21 | Alpha Aquifer - ~79 to 90 ft bgs |
| 22 | |
| 23 | Farthest downgradient well MW-15: |
| 24 | 1st tested for MTBE on 7/19/01 (at laboratory detection limit of 50 ug/L). |
| 25 | 1st detected MTBE on 2/1/02 - 43 ug/L |
| 26 | Max MTBE detected 8/16/04 - 5,600 ug/L |
| 27 | 1st tested for TBA on 7/19/01 (at laboratory detection limit of 5,000 ug/L). |
| 28 | 1st detected TBA on 8/16/04 - 890 ug/L |
| 29 | Max TBA detected 8/16/04 - 890 ug/L |
| 30 | |
| 31 | Semi-perched groundwater flow direction is SW to SE before Feb-2003, and NW after that (Komex report) |
| 32 | Deeper groundwater flow direction is SW (Komex report) |
| 33 | Vertical groundwater gradient is down. |
| 34 | |
| 35 | Remediation, 1st groundwater capture began in ~Mar-02. |
| 36 | RP pumped gw from MW-2 in Apr-98 and Sep-00. |
| 37 | RP conducted DPE test - concluded that vacuum extraction was not feasible, recommended P&T. |
| 38 | RP initiated gw P&T remediation in Mar-02. |
| 39 | 10 yrs after gw contamination was detected on site. |
| 40 | 6 yrs after MTBE was detected on site. |
| 41 | 1 yr after TBA was detected on site. |
| 42 | the same year MTBE was detected off site (MW-15). |
| 43 | 2 years before TBA was detected off site (MW-15). |
| 44 | |
| 45 | MTBE and TBA groundwater plumes have migrated off site to the NW (4/23/08 TRC - 76 Station 5226, 6322 Westminster Avenue, Westminster, California, OCHCA Case #84UT021, Quarterly Monitoring Report, January Through March 2008). |
| 46 | |
| 47 | Historic MTBE and TBA gw plumes have not been delineated laterally. |
| 48 | Recent MTBE and TBA gw plumes have not been delineated laterally. |
| 49 | MTBE and TBA gw plumes have not been delineated vertically. |

Exhibit No. 47  Date: 8/22/08  Witness: Busch  Sandra Busch, CSR 3822

OCWD-MTBE-001-192569

OCWD-MTBE-001-192570



OCWD-MTBE-001-192571

| | A |
|---|---|
| 51 | Groundwater conduits are near by (potential migration paths from shallow saturated zones to deeper saturated zones): |
| 52 | Nearest well: W-16927 - domestic well; ~800 ft S of site. |
| 53 | Drilled to 120 ft bgs. |
| 54 | Screened: unknown _ ft bgs. |
| 55 | pump rate - inactive, abandoned. |
| 56 | Nearest drinking water production well: HB-7 - ~3500 ft SW of site. |
| 57 | Drilled to 930 ft bgs. |
| 58 | Screened 283 to 551; 591 to 699; 735 to 879 ft bgs. |
| 59 | Pump rate - 3500 gpm. |
| 60 | Top of Shallow zone - ~46 ft bgs. |
| 61 | Bottom of Shallow zone - ~159 ft bgs. |
| 62 | Top of Principal Aquifer - ~189 ft bgs. |
| 63 | |
| 64 | Nearest MTBE detection in drinking water production well: |
| 65 | HB-7: 0.16 ug/L in 2006 (LIMS). |
| 66 | HB-13: 0.17 ug/L in 2005 (LIMS). |

# EXHIBIT 46

Attorney Work Product
Privileged and Confidential



KOMEX • H2O SCIENCE • INC
5455 GARDEN GROVE BOULEVARD, SECOND FLOOR
WESTMINSTER, CA 92683, USA
TEL.: (714) 379-1157 · FAX.: (714) 379-1160
EMAIL: info@losangeles.komex.com
WEB SITE: www.komex.com

*ENVIRONMENT AND WATER RESOURCES*

May 27, 2005

**Orange County Water District**
10500 Ellis Avenue
P.O. Box 8300
Fountain Valley, CA  92728-0300
*Attn.:  Roy Herndon*

sent via email to:
rherndon@ocwd.com

Re:    **Proposal for Environmental Consulting Support**
       **OCWD Litigation Related to Methyl tertiary Butyl Ether (MTBE)**

Dear Mr. Herndon:

Komex is pleased to submit this proposal to the Orange County Water District (OCWD) to provide environmental consulting services in support of your litigation related to Methyl tertiary Butyl Ether (MTBE) contamination.  This proposal has been prepared by Komex at your request, and in response to our recent discussions about this matter, and a briefing given by Komex to the OCWD Board of Directors on May 18, 2005.

Based upon discussions with your legal counsel, we understand that, as part of the litigation, OCWD needs to identify which aquifer resources and water supply wells are imminently threatened by MTBE and/or other fuel oxygenate contamination.  To identify these resources, Komex has met with OCWD staff to develop a multi-phased approach.  This proposal addresses the first phase of the approach.

The first phase will attempt to qualitatively identify the likelihood, magnitude and extent of the threat posed by MTBE and other fuel oxygenates.  This will be accomplished by reviewing information for the following:

- Select water wells that are believed to be susceptible to contamination
- Sites in the vicinity of these wells believed to be sources of contamination
- Sites in the basin known to local regulators as being significant sources of contamination
- Water wells in the immediate vicinity of these significant sources

1

***KOMEX***
*USA, CANADA, UK AND WORLDWIDE*



EXHIBIT
46
tabbies

OCWD-MTBE-001-186956

Attorney Work Product
Privileged and Confidential

## Task 10:  Identify problem source sites

Komex will meet with regulatory personnel in an attempt to identify those release sites that are known to have significant groundwater contamination problems.  At a minimum, we will meet with the following agencies:

- Regional Water Quality Control Board (RWQCB), Santa Ana region
- Orange County Health Care Agency (OCHCA)
- City of Anaheim Utilities Department (AUD)

It is hoped that we will be able to identify between 30 and 40 "problem" sites within the basin upon which we can initially focus our analysis.

## Task 11:  Document Scanning

All documents related to the "problem" source sites and susceptible wells will be scanned and "bates stamped" to allow cataloging, and electronic access and storage of these materials.

## Task 12:  Document Profiling

Komex will develop database fields for scanned documents and profile each document according to the fields.  This will allow for standard query searches using field descriptors to identify available documents.

## Task 13:  Develop a document management system

Komex will meet with OCWD staff to perform a "needs assessment" for document and data management, access and retrieval.  The database structure will be compatible with, and hopefully based on, OCWDs existing platforms.  All scanned and profiled documents would be entered into the database.  In addition, databases for source site and water well information will also be developed.  All information will be geo-referenced and linked to the existing GIS system.  The document database will be accessible to OCWD staff and counsel through a web portal.  Once fully populated, the databases will be provided to OCWD to supplement their existing databases.

## Task 14:  Source site survey

Komex will obtain a report of all potential contaminant source sites in the basin listed in Federal and State regulatory databases.  This information will be obtained from a regulatory search company such as Vista, Eris or EDR.  Komex will also conduct a geographic positioning system (GPS) survey of approximately 40 leaking underground storage tank (LUST) sites, 10 non-

**KOMEX**
*USA, CANADA, UK AND WORLDWIDE*

**OCWD-MTBE-001-186960**

# EXHIBIT 47

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


IN RE:  METHYL TERTIARY BUTYL
ETHER ("MtBE")

This Document Relates to:
ORANGE COUNTY WATER DISTRICT
v. UNOCAL CORPORATION, et al.,
Case No. 04CIV.4968 (SAS)

_____/



Videotape Deposition of

ROY L. HERNDON

OCWD'S 30(b)(6) DESIGNEE RE PRIMARY JURISDICTION

Volume 2 (Pages 144 - 413)

Tuesday, January 10, 2006






Reported by:

SANDRA M. BUNCH, RMR, CRR, CSR

License No. 3032

Certified Realtime Reporter

Job No. 11894LR



Page 385

1   A.   Yes.
2   Q.   Okay.  And you understand that the Orange
3   County Health Care Agency has at least the
4   procedures, if not the absolute authority, to compel
5   the responsible parties to take action to clean up
6   the contamination, right?
7   A.   Yes.
8        MR. MILLER:  Objection, vague as to whether
9   or not you're talking about on site or off site.
10       But go ahead.
11       THE WITNESS:  In general, I understand that
12  they have the authority to attempt to compel
13  responsible parties to undertake actions.
14  Q.   BY MR. ANDERSON:  Okay.  And if they did so
15  with respect to the 76 site, to compel my client to
16  clean up contamination that they were responsible for
17  that has migrated off site, wouldn't that take care
18  of the district's concern?
19  A.   In that specific case, if they took it all
20  the way to that level and the responsible party
21  implemented all of those actions, then that would
22  take care of that.
23  Q.   Okay.  And I just want to clarify.
24       You haven't asked them to do that, have you?
25  A.   Not on that particular site.

Page 386

1   Q.   And you haven't asked -- you haven't asked
2   Conoco-Phillips, formerly Tosco, formerly Unocal, to
3   do that either, have you?
4        MR. MILLER:  Argumentative.
5        Go ahead.
6        THE WITNESS:  I don't recall having
7   correspondences with those entities on that
8   particular site.  But I have had that correspondence
9   or that type of exchange on other sites.
10  Q.   BY MR. ANDERSON:  I'm not going to ask you
11  about those other sites, because I think I would draw
12  an objection.
13  A.   I understand.
14  Q.   Now, other than plume delineation and
15  off-site remediation, is there anything else about
16  the 76 site where the district is seeking something
17  in this litigation more than you perceive is being
18  sought by the Orange County Health Care Agency?
19  A.   I guess it would be a matter of having
20  sufficient monitoring information to ensure that the
21  public water supply is being protected.  And I'm not
22  sure if the facilities are in place to do that, given
23  the potential unknown extent of contamination.
24       But assuming that an adequate coverage of
25  data can establish the extent of a plume, then -- and

Page 387

1   that that plume has some kind of containment system,
2   so it's not moving and getting bigger, encapsulating
3   that issue on that one site, other than district cost
4   to oversee that activity and satisfy itself that,
5   indeed, those actions have been implemented, I would
6   say that, in general, that would cover the majority
7   of what costs or damages or expenses that the
8   district could incur with that given site.
9   Q.   Understood.  And with respect to -- you just
10  made -- had a lengthy description.  But you're
11  talking about monitoring data and things --
12  A.   Analysis.
13  Q.   Analysis.  All that?
14  A.   Yes.
15  Q.   Okay.  Have you discussed any of that with
16  Orange County Health Care Agency with respect to the
17  76 site?
18  A.   Not that I know of.
19  Q.   And have you discussed any of that or raised
20  any of those concerns with Tosco, Conoco-Phillips or
21  Unocal historically as to that site?
22  A.   Not that I'm aware of.
23  Q.   Now, even in this deposition you have
24  mentioned a time when the district raised concerns to
25  a regulatory authority about what was being done.

Page 388

1   You mentioned the Yorba Linda, which you called the
2   Concerto site, right?
3   A.   Yes.
4   Q.   So you have had experience where you've gone
5   to regulatory agencies, asked that more be done, and
6   had your wish granted, right?
7   A.   If you're using that as an example of where
8   our wish was granted, I wouldn't agree with that.
9   Q.   In that example you think your wish was not
10  granted?
11  A.   I can think of an example on that site that
12  it was not granted.
13  Q.   All I can tell you is that your counsel has
14  represented to the court that the district is
15  satisfied with the result in Southern California
16  Water District Concerto wells.
17       MR. MILLER:  Counsel, you're --
18       MR. ANDERSON:  I was there.
19       MR. MILLER:  -- overstating, and you're also
20  getting into representations.  And you would have to
21  make them accurately to do that.  So I've got --
22       MR. ANDERSON:  And I did.
23       MR. MILLER:  Well, I don't agree that that's
24  what was said.  And I don't think we ought to go
25  there.

62  (Pages 385 to 388)

OCWD VS. UNOCAL, ET AL.   ROY HERNDON, Volume 1                    1-10-06

Page 413

```
 1              REPORTER'S CERTIFICATE
 2
 3        I certify that the witness in the foregoing
 4     deposition.
 5              ROY L. HERNDON,
 6     was by me duly sworn to testify in the
 7     within-entitled cause; that said deposition was taken
 8     at the time and place therein named; that the
 9     testimony of said witness was reported by me, a duly
10     Certified Shorthand Reporter of the State of
11     California authorized to administer oaths and
12     affirmations, and said testimony was thereafter
13     transcribed into typewriting.
14        I further certify that I am not of counsel or
15     attorney for either or any of the parties to said
16     deposition, nor in any way interested in the outcome
17     of the cause named in said deposition.
18        IN WITNESS WHEREOF, I have hereunto set my
19     hand this 19th day of January, 2006.
20
21        _____
22              SANDRA M. BUNCH
23              Certified Shorthand Reporter
24              Certificate No. 3032
25
```

Page 414

```
 1              PHILLIPS LEGAL SERVICES
                350 University Avenue, Suite 270
 2              Sacramento, California 95825
                (916) 927-3600
 3
 4
 5     ROY L. HERNDON
       c/o OCWD
 6     P. O. Box 8300
       Fountain Valley, California 92728-8300
 7
       Re: OCWD VS. UNOCAL, ET AL.
 8     Date Taken: JANUARY 10, 2006 (Volume 2)
 9     Dear Mr. Herndon:
10     Your deposition is now ready for you to read, correct
       and sign. The original will be held in our office
11     for 35 days from the date of this letter.
12     If you are represented by counsel, you may wish to
       discuss with him/her the reading and signing of your
13     deposition. If your attorney has purchased a copy of
       your deposition, you may review that copy. If you
14     choose to read your attorney's copy, please fill out,
       sign and submit to our office the DEPONENT'S CHANGE
15     SHEET located in the back of your deposition.
16     If you choose to read your deposition at our office,
       it will be available between 9:00 a.m. and 4:00 p.m.
17     Please bring this letter as a reference.
18     If you do not wish to read your deposition, please
       sign here and return within 30 days of the date of
19     this letter.
20
       _____
       ROY L. HERNDON              DATE
21
       Sincerely,
22
23     SANDRA M. BUNCH, CMR, CRR, CSR No. 3032
       PHILLIPS LEGAL SERVICES
24     Job No. 11894LR
25     cc:  ALL COUNSEL APPEARING
```

Page 415

```
 1              PHILLIPS LEGAL SERVICES
                350 University Avenue, Suite 270
 2              Sacramento, California 95825
                (916) 927-3600
 3
 4
 5
 6
       LATHAM & WATKINS
 7     JON D. ANDERSON, Esq.
       650 Town Center Drive, Suite 2000
 8     Costa Mesa, California 92626-1925
 9     Re: OCWD vs. UNOCAL, ET AL.
       Deposition of: ROY L. HERNDON, Volume 2
10     Date Taken: JANUARY 10, 2006
11     Dear Mr. Anderson:
12     We wish to inform you of the disposition of this
       original transcript. The following procedure is
13     being taken by our office:
14     _____ The witness has read and signed the
               deposition. (See attached.)
15
       _____ The witness has waived signature.
16
       _____ The time for reading and signing has
17             expired.
18     _____ The sealed original deposition is being
               forwarded to your office.
19
           Other:
20
21
       Sincerely,
22
23
       Phillips Legal Services
24     Ref No. 11894LR
25
```

PHILLIPS LEGAL SERVICES                           916.927.3600
Reported by:  SANDRA M. BUNCH, RMR, CRR, CSR #3032        E-mail:  realtimecsr@calweb.com

# EXHIBIT 48

paprocki deposition transcript.txt
Paprocki, Lee, Vol. 1 (pp 001-233)

     0001
1
2                          UNITED STATES DISTRICT COURT
3                          SOUTHERN DISTRICT OF NEW YORK
4
5
6        IN RE:  METHYL TERTIARY BUTYL
7        ETHER ("MtBE")
8        This Document Relates to:
9        ORANGE COUNTY WATER DISTRICT
10       v. UNOCAL CORPORATION, et al.,
11       Case No. 04CIV.4968 (SAS)
12       _____/  /
13
14
15                          Videotape Deposition of
16                             LEE PAPROCKI
17       OCWD'S 30(b)(6) DESIGNEE RE PRIMARY JURISDICTION
18                          Tuesday, January 17, 2006
19
20
21       Reported by:
22       SANDRA M. BUNCH, RMR, CRR, CSR
23       License No. 3032
24       Certified Realtime Reporter
25       Job No. 11989LR

page 1
_Paprocki, Lee, Vol. 1 (pp 001-233)

1                              APPEARANCES
2
3        For the Plaintiffs:
4               MILLER, AXLINE & SAWYER
5               By:  TRACEY O'REILLY, Esq.
6               1050 Fulton avenue, Suite 100
7               Sacramento, California 95825-4272
8               (916) 488-6688
9
10       For Defendant ConocoPhillips Company as
11       successor-in-interest to Tosco Corporation and
12       Phillips Petroleum Corporation:
13              LATHAM & WATKINS
14              By:  JON D. ANDERSON, Esq.
15              650 Town Center Drive, Suite 2000
16              Costa Mesa, California 92626-1925
17              (714) 540-1235
18
19       For the Defendant EXXON MOBIL:
20              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
21              By:  JEFFREY PARKER, Esq.
22              333 South Hope Street, 48th Floor
23              Los Angeles, California 90071-1448
24              (213) 620-1780
25

page 2
_Paprocki, Lee, Vol. 1 (pp 001-233)

1                          APPEARANCES (Continued)
2
                              Page 1

EXHIBIT
48

```
                         paprocki deposition transcript.txt
22  though.
23          HB-3A is located approximately 1,350 feet
24  west of the site.
25  Q.      BY MR. ANDERSON:  And it was first released
```

page 124
_Paprocki, Lee, Vol. 1 (pp 001-233)

```
 1  in 1996, right?
 2  A.      Some time --
 3          MS. O'REILLY:  I am --
 4          THE WITNESS:  I am sorry.
 5          MR. ANDERSON:  Prior to.
 6          MS. O'REILLY:  I am going to object.  It
 7  calls for speculation.
 8          Go ahead.
 9          THE WITNESS:  We know that MTBE was released
10  at the site sometime prior to May 1996.
11  Q.      BY MR. ANDERSON:  So in the last nine-plus
12  years it hasn't gone a thousand feet, right?
13  A.      That calls for speculation.  Because we --
14  Q.      So it's speculation where it is?
15  A.      To properly know how far it moved, I would
16  need more monitoring wells to assess that.
17  Q.      Okay.  And has Komex recommended that more
18  monitoring wells be put in?
19  A.      That was not part of our scope.
20  Q.      Okay.  And has Komex -- has Komex given an
21  opinion that any aspect of the remediation project is
22  inadequate?
23  A.      Komex has not given an opinion on that.
24  Q.      Okay.  And has Komex given an opinion that
25  the regulatory agency should have done or should be
```

page 125
_Paprocki, Lee, Vol. 1 (pp 001-233)

```
 1  doing more than it has done?
 2  A.      Komex has not given an opinion on that.
 3  Q.      And has Komex given an opinion that the
 4  responsible party should have done more than it has
 5  done?
 6  A.      Again, Komex has not given an opinion on
 7  that.
 8  Q.      And, by the way, that -- in terms of those
 9  last few questions I asked about whether Komex has an
10  opinion as to whether the responsible party, the
11  regulatory agency, or anybody else associated with
12  the G & M oil site, would those answers be the same
13  for the Unocal/76 site as well as the ExxonMobil
14  site?
15          MS. O'REILLY:  And, Jon, I'm just -- I'm
16  just going to clarify your question as respect to
17  these reports that we're discussing today, correct?
18          MR. ANDERSON:  Right.
19          MS. O'REILLY:  Not getting into any work
20  product issues, or anything like that.
21          Go ahead.
22          THE WITNESS:  Correct.
23  Q.      BY MR. ANDERSON:  Okay.  Has Komex told
24  anyone at OCWD that it believes that it's a problem
25  of any kind that the plumes have not been fully
```

```
                        paprocki deposition transcript.txt
 3   make it clear.  Exhibit 57?
 4           MR. ANDERSON:  Exhibit 57.
 5           THE WITNESS:  For Exhibit 57, the source was
 6   Orange County Water District.
 7   Q.        BY MR. ANDERSON:  Okay.  And was -- did the
 8   document itself come from Orange County Water
 9   District or did the data showing where the wells were
10   come from the district?
11   A.        The data came from Orange County Water
12   District.
13   Q.        So Komex took the data and plotted the map?
14   A.        No.
15   Q.        How did it happen?
16   A.        From the Orange County data we could -- we
17   could view this well location map.
18   Q.        Okay.  Let's turn to the Mobil site summary.
19   That's Exhibit 54.
20           Anything on there that would tell you when
21   it was created?
22   A.        Just a second.
23   Q.        I didn't even see a drive-by date.
24   A.        I have got so many exhibits.  Hold on a
25   second.

page 192
_Paprocki, Lee, Vol. 1 (pp 001-233)

 1           (Discussion held off the written record.)
 2   Q.        BY MR. ANDERSON:  Do you have Exhibit 54?
 3   A.        I do.  And your question was?
 4   Q.        Can you determine either from the document
 5   itself or your recollection when it was prepared?
 6   A.        Not exact date, no.
 7   Q.        When is the last time -- is this something
 8   you did the Q.A. review on?
 9   A.        I looked at this just fairly recently, a
10   few -- a few weeks ago.  I did more Q.A./Q.C. on the
11   figures for this one.
12   Q.        Okay.  But was it prepared some time in the
13   last three or four months?
14   A.        Yes.
15   Q.        All right.  And has Komex determined that
16   plume delineation should occur at this site?
17   A.        That wasn't an objective of Komex.
18   Q.        So the answer is, no?
19   A.        No.
20   Q.        Has Komex determined that any additional
21   remediation on this site is necessary?
22   A.        Komex has not determined that at this time.
23   Q.        That's also true of the Unocal site?
24   A.        Yes.  I believe we have gone through that.
25   Yes.

page 193
_Paprocki, Lee, Vol. 1 (pp 001-233)

 1   Q.        I think we need to go through it three or
 2   four different times.
 3           MS. O'REILLY:  We need to go through it
 4   twice, and then I'm going to cut you off.
 5           MR. ANDERSON:  Right.
 6   Q.        Has Komex assessed the adequacy of the
 7   regulatory actions and oversight for the ExxonMobil
                        Page 89
```

paprocki deposition transcript.txt

```
 8   site?
 9   A.        No.
10   Q.        Has it assessed the adequacy of the
11   regulatory actions and oversight at the Unocal/76
12   site?
13   A.        No.
14   Q.        Has it assessed the adequacy of the
15   regulatory actions and oversight for the G & M Oil
16   site?
17   A.        No.
18   Q.        Is that also true of the Chevron site?
19   A.        No data has been analyzed for that.
20   Q.        So the answer is the same for Chevron?
21   A.        Right.
22             MS. O'REILLY:  Are you at the bottom of your
23   list of questions?
24             MR. ANDERSON:  Huh?
25             MS. O'REILLY:  Are we at the bottom of your
```

page 194
_Paprocki, Lee, Vol. 1 (pp 001-233)

```
 1   checklist?
 2             MR. ANDERSON:  We're on page 15 of 15.   Does
 3   that satisfy you?
 4             MS. O'REILLY:  Yes, it does.
 5             MR. ANDERSON:  We haven't seen Mr. Parker's
 6   list yet.
 7             What's our next exhibit?
 8             THE REPORTER:  58.
 9             MR. ANDERSON:  58 is a Service Station
10   Summary Sheet for the ExxonMobil site.
11                  (Exhibit No. 58 was marked.)
12   Q.        BY MR. ANDERSON:  What is Exhibit 58?
13   A.        It's a database summary report for site 33
14   for the ExxonMobil Station 18-668.
15   Q.        Okay.  Remember our discussion about the
16   similar document to this for the 76 station?
17   A.        Yes.
18   Q.        In terms of preparation, purpose and those
19   types of things, would your answers all be the same?
20   A.        They would.
21   Q.        I have one page.  It's the Komex Bates
22   number that ends with 43.
23   A.        Yes.
24   Q.        In the upper left-hand corner it says,
25   "Service station status active."  And then there's
```

page 195
_Paprocki, Lee, Vol. 1 (pp 001-233)

```
 1   a -- it looks like it's a computer program generated
 2   arrow down to active service station.  I don't think
 3   I saw anything like this.
 4             Can you tell me the significance of that
 5   kind of information on this page?
 6   A.        It's just like the other site that you asked
 7   me when there was some notes.  In this case the
 8   person did it on Acrobat Reader, where they could
 9   write electronically on to note it.
10   Q.        Okay.  Okay.
11   A.        So the upper left is from a Komex.
12   Q.        Someone took the note and they kind of
```

Page 90

```
                         paprocki deposition transcript.txt
 1   deposition, and I state there are:
 2   (Check one)   _____NO CORRECTIONS
 3                 _____CORRECTIONS PER ATTACHED
 4
 5
 6        _____
 7        LEE PAPROCKI
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

page 229
_Paprocki, Lee, Vol. 1 (pp 001-233)

```
 1              DEPONENT'S CHANGES OR CORRECTIONS
 2   Note:   If you are adding to your testimony, print
 3   the exact words you want to add.  If you are deleting
 4   from your testimony, print the exact words you want
 5   to delete.  Specify with "Add" or "Delete" and sign
 6   this form.
 7   DEPOSITION OF:      LEE PAPROCKI
 8   CASE:               OCWD VS. UNOCAL, ET AL.
 9   DATE OF DEPOSITION:  JANUARY 17, 2006
10   PAGE      LINE    CHANGE/ADD/DELETE
11   _____   _____ _____
12   _____   _____ _____
13   _____   _____ _____
14   _____   _____ _____
15   _____   _____ _____
16   _____   _____ _____
17   _____   _____ _____
18   _____   _____ _____
19   _____   _____ _____
20   _____   _____ _____
21   _____   _____ _____
22   _____   _____ _____
23
24   DEPONENT'S SIGNATURE _____
25   DATE_____
```

page 230
_Paprocki, Lee, Vol. 1 (pp 001-233)

```
 1                REPORTER'S CERTIFICATE
 2
 3        I certify that the witness in the foregoing
 4   deposition.
 5                     LEE PAPROCKI,
```
                                        Page 106

```
                          paprocki deposition transcript.txt
 6    was by me duly sworn to testify in the
 7    within-entitled cause; that said deposition was taken
 8    at the time and place therein named; that the
 9    testimony of said witness was reported by me, a duly
10    Certified Shorthand Reporter of the State of
11    California authorized to administer oaths and
12    affirmations, and said testimony was thereafter
13    transcribed into typewriting.
14           I further certify that I am not of counsel or
15    attorney for either or any of the parties to said
16    deposition, nor in any way interested in the outcome
17    of the cause named in said deposition.
18           IN WITNESS WHEREOF, I have hereunto set my
19    hand this 23rd day of January, 2006.
20
21                       _____
22                       SANDRA M. BUNCH
23                       Certified Shorthand Reporter
24                       Certificate No. 3032
25

page 231
_Paprocki, Lee, Vol. 1 (pp 001-233)

 1                     PHILLIPS LEGAL SERVICES
                    350 University Avenue, Suite 270
 2                    Sacramento, California 95825
                           (916) 927-3600
 3
 4
 5    LEE PAPROCKI
      c/o KOMEX
 6    5455 Garden Grove Blvd., Second Floor
      Westminster, California 92683
 7
      Re:  OCWD VS. UNOCAL, ET AL.
 8    Date Taken:  JANUARY 17, 2006
 9    Dear Ms. Paprocki:
10    Your deposition is now ready for you to read, correct
      and sign.  The original will be held in our office
11    for 35 days from the date of this letter.
12    If you are represented by counsel, you may wish to
      discuss with him/her the reading and signing of your
13    deposition.  If your attorney has purchased a copy of
      your deposition, you may review that copy.  If you
14    choose to read your attorney's copy, please fill out,
      sign and submit to our office the DEPONENT'S CHANGE
15    SHEET located in the back of your deposition.
16    If you choose to read your deposition at our office,
      it will be available between 9:00 a.m. and 4:00 p.m.
17    Please bring this letter as a reference.
18    If you do not wish to read your deposition, please
      sign here and return within 30 days of the date of
19    this letter.
20    _____    _____
      LEE PAPROCKI                        DATE
21
      Sincerely,
22
23    SANDRA M. BUNCH, CMR, CRR, CSR No. 3032
      PHILLIPS LEGAL SERVICES
24    Job No. 11989LR
25    cc:   ALL COUNSEL APPEARING
                                      Page 107
```

paprocki deposition transcript.txt

page 232
_Paprocki, Lee, Vol. 1 (pp 001-233)

1                      PHILLIPS LEGAL SERVICES
                   350 University Avenue, Suite 270
2                    Sacramento, California 95825
                          (916) 927-3600
3

4

5

6    LATHAM & WATKINS
     JON D. ANDERSON, Esq.
7    650 Town Center Drive, Suite 2000
     Costa Mesa, California 92626-1925
8

     Re:  OCWD vs. UNOCAL, ET AL.
9    Deposition of:  LEE PAPROCKI
     Date Taken:  JANUARY 17, 2006
10

     Dear Mr. Anderson:
11

     We wish to inform you of the disposition of this
12   original transcript.  The following procedure is
     being taken by our office:
13

     _____        The witness has read and signed the
14                    deposition.  (See attached.)
15   _____        The witness has waived signature.
16   _____        The time for reading and signing has
                      expired.
17

     _____        The sealed original deposition is being
18                    forwarded to your office.
19                    Other:
20

21   Sincerely,
22

23   Phillips Legal Services
     Ref No. 11896LR
24

25

page 233
8

# EXHIBIT 49

1  Duane C. Miller, #57812
   Michael D. Axline, #229840
2  A. Curtis Sawyer, Jr., #101324
   Tracey L. O'Reilly, #206230
3  Tamarin E. Austin, #207903
   Evan Eickmeyer, #166652
4  Daniel Boone, #148841
   **MILLER, AXLINE & SAWYER**
5  A Professional Corporation
   1050 Fulton Avenue, Suite 100
6  Sacramento, CA  95825-4272
   Telephone:  (916) 488-6688
7  Facsimile:  (916) 488-4288

8  Attorneys for Plaintiff
   Orange County Water District

9

                                                    (Exempt from filing fees
                                                      per Govt. Code, § 6103)

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11               IN AND FOR THE COUNTY OF ORANGE

12  ORANGE COUNTY WATER DISTRICT,       )   CASE NO.  30-2008-00078246-CU-TT-CXC
                                        )
13          Plaintiff,                  )   **NOTICE OF RULING**
                                        )
14          v.                          )   Date: October 10, 2008
                                        )   Time: 8:30 a.m.
15  SABIC INNOVATIVE PLASTICS US, LLC;  )   Dept: CX-105
    BRENNTAG WEST, INC.; GALLADE        )   Judge: Hon. Stephen J. Sundvold
16  CHEMICAL INC.; EMBEE INC.; SANMINA- )
    SCI CORPORATION; UNIVERSAL          )   Complaint Filed: June 23, 2008
17  CIRCUITS, INC.; RADIOSHACK          )
    CORPORATION; MOBIL CHEMICAL         )
18  COMPANY, INC.; ALCOA GLOBAL         )
    FASTENERS; TROY GROUP INC.; BELL    )
19  INDUSTRIES, INC.; EMERSON ELECTRIC  )
    CO.; PRO-DEX INC.; ACCURATE CIRCUIT )
20  ENGINEERING, INC.; ITT CANON        )
    INTERNATIONAL, INC.; RICOH          )
21  ELECTRONICS, INC.; UNISYS           )
    CORPORATION and DOES 1 through 400, )
22  inclusive,                          )
                                        )
23          Defendants.                 )

24

25

26                                          **EXHIBIT**
                                               **49**
27

28

                              0
                        Notice of Ruling

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE**

2    **NOTICE** that on October 10, 2008, the Court adopted the tentative ruling as the final with the

3    exception that the plaintiff shall have 30 days to file their amended complaint.  Defendants shall

4    have 30 days from the filing of the amended complaint to file their answer.

5        The Court's Ruling is attached hereto as Exhibit A.

6

7    Dated: October 20 , 2008            MILLER, AXLINE & SAWYER

8                                  A Professional Corporation

9               By:

10                       TAMARIN E. AUSTIN

11                     Attorneys for Plaintiff
                           Orange County Water District

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

( ( 

#7 ORANGE COUNTY WATER DISTRICT v. SABIC INNOVATIVE

1. **MOTION:** DEMURRER & MOTION TO STRIKE

DEMURRER TO 1ST CAUSE OF ACTION

The First Cause of Action is not for declaratory relief. It seeks costs that will be incurred in the future and all past, present and future response costs as well as damages to natural resources. *Section 8 (c)* is clear. Plaintiff can only recover costs it has already incurred for clean up, containing or abating the contamination or other remedial acts taken. The First Cause of Action is uncertain in that it appears to seek costs which may be incurred in the future. Those are not recoverable.

Defendant is correct that a particular Defendant cannot discern from the pleading the exact nature of its alleged wrongdoing. Defendant is correct that the phrase "and/or" is uncertain.

MOTION TO STRIKE PUNITIVE DAMAGES

The allegations of the Complaint do not support a prayer for punitive damages. The allegations are nothing more than legal conclusions. The decision in *SKF v. Superior Court* does not support Plaintiff's position.

The Complaint does not set forth sufficient facts to establish the elements necessary to seek punitive damages against corporate defendants pursuant to *Code of Civil Procedure Section 3294*. Plaintiff must plead facts to support a prima facie claim for punitive damages. If Plaintiff does not have those facts at this time, it must conduct discovery and seek to amend its Complaint at a later time.

MOTION TO STRIKE CERTAIN OTHER ALLEGATIONS

Defendant is correct that the *Health and Safety Code* does not provide for injunctive relief and it therefore is not an available remedy.

Plaintiff cannot recover damages to natural resources; those damages are wrongfully pled in the Complaint.

JOINDER

The Joinder is proper and is GRANTED.

SUMMARY

Defendant's evidentiary objections are SUSTAINED. The documents attached to the Declaration are STRICKEN. The Demurrer is SUSTAINED. The Motion to Strike is GRANTED. Plaintiff shall have 20 days leave to amend

## PROOF OF SERVICE BY MAIL

    I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action.  My business address is 1050 Fulton Avenue, Suite 100, Sacramento, California, 95825, which is located in the county in which this mailing occurred.  I am familiar with my office's business practice for collection and processing of correspondence for mailing with the United States Postal Service, and under such practice the correspondence would be deposited with the United States Postal Service, postage pre-paid, the same day in the ordinary course of business.

    On October 20, 2008, I served the foregoing document(s) described as:

### NOTICE OF RULING

on the following persons or parties by placing a true copy thereof in a sealed envelope, showing the addresses set forth below, for collection and deposit in the United States Postal Service on that date following ordinary business practices:

### SEE ATTACHED LIST

    I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

    Executed on October 20, 2008, at Sacramento, California.

Denise Carruth

# EXHIBIT 50



1 | Gary J. Smith (State Bar No. 141393)
2 | Ryan R. Tacorda (State Bar No. 227070)
  | Beveridge & Diamond, P.C.
3 | 456 Montgomery Street, Suite 1800
  | San Francisco, CA 94104-1251
  | Telephone: (415) 262-4000
4 | Facsimile: (415) 262-4040

5 | Attorneys for Defendant
6 | Unisys Corporation

7

8 |                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 |                         FOR THE COUNTY OF ORANGE

10 |                         CIVIL COMPLEX CENTER

11

12 | ORANGE COUNTY WATER DISTRICT,            Case No. 30-2008-00078246-CU-TT-CXC

13 |                  Plaintiff,              NOTICE OF RULING ON GENERAL
                                             DEMURRER AND MOTION TO
14 |      vs.                                 STRIKE REGARDING THE FIRST
                                             CAUSE OF ACTION OF PLAINTIFF'S
15 | SABIC INNOVATIVE PLASTICS US, LLC;       FIRST AMENDED COMPLAINT AND
    | BRENNTAG WEST, INC.; GALLADE           REQUESTS FOR JUDICIAL NOTICE
16 | CHEMICAL INC.; EMBEE INC.; SANMINA-SCI   IN SUPPORT THEREOF
    | CORPORATION; UNIVERSAL CIRCUITS, INC.;
17 | RADIOSHACK CORPORATION; MOBIL           Hearing:      January 23, 2009, 9:00am
    | CHEMICAL COMPANY, INC.; ALCOA GLOBAL   Dep't:        No. CX105
18 | FASTENERS; TROY GROUP INC.; BELL        Hearing Judge: Hon. Nancy W. Stock
    | INDUSTRIES, INC.; EMERSON ELECTRIC CO.; Action filed:  June 23, 2008
19 | PRO-DEX INC.; ACCURATE CIRCUIT          Trial date:   TBD
    | ENGINEERING, INC.; ITT CANNON
20 | INTERNATIONAL, INC.; RICOH
    | ELECTRONICS, INC.; UNISYS CORPORATION
21 | and DOES 1 through 400, inclusive,

22 |                  Defendants.

23

24

25 | 

26

27

28

---

Notice of Ruling on General Demurrer and Motion to Strike Regarding First Cause of Action of Plaintiff's First
Amended Complaint and Requests for Judicial Notice in Support Thereof; Case No. 30-2008-00078246-CU-TT-CXC

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

   **PLEASE TAKE NOTICE** that on January 23, 2009, at 9:00 a.m., certain Defendants' General Demurrer to the First Cause of Action of Plaintiff Orange County Water District's ("OCWD") First Amended Complaint,[1] Defendants' Motion to Strike Certain Allegations from the First Cause of Action of OCWD's First Amended Complaint, and Defendants' Requests for Judicial Notice in Support of the General Demurrer and All Motions to Strike, came on for hearing in this Court, the Honorable Nancy W. Stock presiding.

   On January 23, 2009, Judge Stock ordered that: (1) certain Defendants' General Demurrer to OCWD's First Cause of Action under the Orange County Water Act ("Water District Act") is OVERRULED; (2) Defendants' motion to strike OCWD's allegations seeking damages for injury to Plaintiff's interest in contaminated aquifers under the Water District Act is DENIED; (3) Defendants' motion to strike OCWD's allegations concerning declaratory relief in the First Cause of Action is GRANTED; (4) Defendants' Request for Judicial Notice in Support of the General Demurrer to OCWD's First Cause of Action is GRANTED; and (5) Defendants' Request for Judicial Notice in Support of all Motions to Strike is GRANTED.

   On February 10, 2009, the Court entered its Order on the General Demurrer and Motion to Strike Regarding the First Cause of Action of Plaintiff's First Amended Complaint and Request for Judicial Notice in Support Thereof. A true and correct file-stamped copy of this Order is attached hereto as Exhibit A.

Dated: February 12, 2009          BEVERIDGE & DIAMOND, P.C.

                                  By
                                  Gary J. Smith
                                  Ryan Tacorda
                                  Attorneys for Defendant Unisys Corporation

---

[1] This demurrer was filed by the following Defendants: Accurate Circuit Engineering, Inc., Alcoa Global Fasteners, Bell Industries, Inc., Brenntag West, Inc., Embee, Inc., Emerson Electric Co., Gallade Chemical, Inc., ExxonMobil Oil Corporation, ITT Cannon International, Inc., Pro-Dex, Inc., Radioshack Corporation, Ricoh Electronics, Inc., Sabic Innovative Plastics US, Sanmina-SCI Corporation, Troy Group, Inc., Unisys Corporation, and Universal Circuits, Inc.

-1-

EXHIBIT A TO
NOTICE OF RULING ON GENERAL DEMURRER
AND MOTION TO STRIKE REGARDING THE
FIRST CAUSE OF ACTION OF PLAINTIFF'S FIRST AMENDED
COMPLAINT AND REQUESTS FOR
JUDICIAL NOTICE IN SUPPORT THEREOF

ELECTRONICALLY
RECEIVED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CIVIL COMPLEX CENTER

Feb 05 2009

ALAN CARLSON, Clerk of the Court

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

FEB 10 2009

ALAN CARLSON, Clerk of the Court

L Brown

BY L BROWN

1  Gary J. Smith (State Bar No. 141393)
   Ryan R. Tacorda (State Bar No. 227070)
2  Beveridge & Diamond, P.C.
   456 Montgomery Street, Suite 1800
3  San Francisco, CA 94104-1251
   Telephone: (415) 262-4000
4  Facsimile: (415) 262-4040

5  Attorneys for Defendant
   Unisys Corporation

6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF ORANGE

10                     CIVIL COMPLEX CENTER

11

12  ORANGE COUNTY WATER DISTRICT,            Case No. 30-2008-00078246-CU-TT-CXC

13                 Plaintiff,                [PROPOSED] ORDER ON GENERAL
                                             DEMURRER AND MOTION TO
14        vs.                                STRIKE REGARDING THE FIRST
                                             CAUSE OF ACTION OF
15  SABIC INNOVATIVE PLASTICS US, LLC;       PLAINTIFF'S FIRST AMENDED
    BRENNTAG WEST, INC.; GALLADE             COMPLAINT AND REQUESTS FOR
16  CHEMICAL INC.; EMBEE INC.; SANMINA-SCI   JUDICIAL NOTICE IN SUPPORT
    CORPORATION; UNIVERSAL CIRCUITS, INC.;   THEREOF
17  RADIOSHACK CORPORATION; MOBIL
    CHEMICAL COMPANY, INC.; ALCOA GLOBAL     Hearing:       January 23, 2009, 9:00am
18  FASTENERS; TROY GROUP INC.; BELL         Dep't:         No. CX105
    INDUSTRIES, INC.; EMERSON ELECTRIC CO.;  Hearing Judge: NANCY WIEBEN STOCK
19  PRO-DEX INC.; ACCURATE CIRCUIT           Action filed:  June 23, 2008
    ENGINEERING, INC.; ITT CANNON            Trial date:    TBD
20  INTERNATIONAL, INC.; RICOH
    ELECTRONICS, INC.; UNISYS CORPORATION
21  and DOES 1 through 400, inclusive,

22                 Defendants.

23

24

25

26

27

28

   [Proposed] Order on Demurrer and Motion to Strike Regarding First Cause of Action and
   Requests for Judicial Notice in Support Thereof; Case No. 30-2008-00078246-CU-TT-CXC

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

1. On January 23, 2009, certain Defendants' General Demurrer to the First Cause of Action of Plaintiff Orange County Water District's ("OCWD") First Amended Complaint,[1] Defendants' Motion to Strike Certain Allegations from the First Cause of Action of OCWD's First Amended Complaint, and Defendants' Requests for Judicial Notice in Support of the General Demurrer and All Motions to Strike, came on for hearing in the above-captioned matter, the Honorable Nancy W. Stock presiding. The appearances of counsel are noted in the record. After full consideration by the Court of the papers and after hearing oral arguments of the parties,

IT IS HEREBY ORDERED that:

1. Certain Defendants' General Demurrer to OCWD's First Cause of Action under the Orange County Water District Act is OVERRULED.

2. Defendants' Motion to Strike OCWD's allegations seeking damages for injury to Plaintiff's interest in contaminated aquifers under the Orange County Water District Act, Cal. Water Code App. § 40-8, at page 13, lines 10-12, is DENIED.

3. Defendants' Motion to Strike OCWD's allegations concerning declaratory relief in the First Cause of Action is GRANTED. The words appearing at page 13, lines 20-22, of OCWD's First Amended Complaint, are stricken as follows: "and declaratory relief with respect to defendants' liability for future costs, as described in the District's Sixth Cause of Action."

4. Certain Defendants' Request for Judicial Notice in Support of the General Demurrer to the First Cause of Action of Plaintiff's First Amended Complaint is GRANTED. The Court judicially notices OCWD's Notice of Ruling which attaches this Court's October 10, 2008 ruling on the demurrers and motions to strike with respect to Plaintiff's original Complaint.

5. Defendants' Request for Judicial Notice in Support of All Motions to Strike is GRANTED. The Court judicially notices OCWD's Notice of Ruling which attaches this Court's

[1] This demurrer was filed by the following Defendants: Accurate Circuit Engineering, Inc., Alcoa Global Fasteners, Bell Industries, Inc., Brenntag West, Inc., Embee, Inc., Emerson Electric Co., Gallade Chemical, Inc., ExxonMobil Oil Corporation, ITT Cannon International, Inc., Pro-Dex, Inc., Radioshack Corporation, Ricoh Electronics, Inc., Sabic Innovative Plastics US, Sanmina-SCI Corporation, Troy Group, Inc., Unisys Corporation, and Universal Circuits, Inc.

-1-

[Proposed] Order on Demurrer and Motion to Strike Regarding First Cause of Action and Requests for Judicial Notice in Support Thereof, Case No. 30-2008-00078246-CU-TT-CXC

1  October 10, 2008 ruling on the demurrers and motions to strike with respect to Plaintiff's original

2  Complaint and Defendants' October 23, 2008 Notice of Ruling on Defendants' Motions to Strike

3  which attaches this Court's October 20, 2008 Order Striking Plaintiff's Claim for Injunctive Relief

4  and Natural Resource Damages and Order Striking Plaintiff's Claim for Punitive Damages.

5       6.       These rulings are set forth in the hearing transcript attached as Exhibit A.

6       **IT IS SO ORDERED.**

7

8  Dated: _____                         _____

9                                                 **NANCY WIEBEN STOCK**  bk lb
                                                   Judge of the Superior Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-