**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:  Methyl *tertiary* Butyl Ether ("MtBE")<br>Products Liability Litigation | Master File No. 1:00-1898<br>MDL No. 1358 (SAS) |
| This Document Relates To:<br><br>*Orange County Water District v. Unocal*<br>*Corporation, et al.,*<br>Case No. 04 Civ. 4968 (SAS) | |

**DECLARATION OF LESTER FELDMAN**

I, Lester Feldman, hereby declare and state as follows based on my own personal

knowledge and experience.  If called upon to do so, I could and would competently testify.

1.      I am a Principal Scientist with AMEC Geomatrix, Inc. ("AMEC") with extensive

experience in toxic and hazardous material control and regulatory requirements related to such

materials.

2.      I hold a B.S. Degree in Meteorology and Oceanography Engineering and a M.S. Degree

in Civil Engineering from the University of Michigan.  I have over 37 years of employment

experience in development, implementation, and consultation related to toxic and hazardous

material site investigations, assessment, and remedial strategies in California.

3.      I have been a Principal Scientist with AMEC, formerly Geomatrix Consultants, Inc., from

1994 to the present.

4.      Prior to my employment with AMEC, I was employed for approximately 20 years at the

California Regional Water Quality Control Board, San Francisco Bay Region ("San Francisco

Bay Regional Water Board"), which is part of the California Environmental Protection Agency.

At the San Francisco Bay Regional Water Board, I became an Environmental Specialist IV (ES

IV Supervisor) in the Toxics Cleanup Division.  My responsibilities included supervision and

case management of more than 2,000 toxics and hazardous material release sites where soil,

groundwater, and surface water were impacted and/or threatened within the nine San Francisco

Bay Area counties.  My responsibilities also included managing the leaking underground storage

tank program, including petroleum hydrocarbon releases to soil and subsurface waters.

5.     For those sites, I made numerous recommendations to the San Francisco Bay Regional

Water Board at numerous public hearings and to its Executive Officers in cases where no hearing

occurred under the Cleanup and Abatement Order administrative process (Section 13304 of the

California Water Code).  These recommendations included the appropriateness of alternative

cleanup levels as well as the appropriateness of various alternative remedial approaches.

6.      At the Water Board, I provided technical and policy coordination for the Leaking

Underground Storage Tank local oversight programs (LOPs) in the region, including developing

and implementing Memorandums of Understanding with public agencies.  I assisted U.S. EPA

staff in Washington, D.C., in developing and implementing the federal program and participated

in EPA State Program Coordination Conferences. I also served as an original member of the

California State Water Resources Control Board's Task Force on Underground Storage Tanks. I

participated in the development and implementation of the Tri-Regional Board Staff

Recommendations for Preliminary Investigation and Evaluation of Underground Tank Sites.

7.     As a Toxics Section Leader of the San Francisco Bay Regional Water Board, I

participated in numerous case management meetings discussing technical as well as

administrative and policy matters. I participated in numerous appeals of staff technical decisions

and policy interpretations to the Executive Officer of the Water Board.  I also participated in

Water Board responses to Petitions filed with the State Water Resources Control Board on the

appropriateness of Water Board actions and inactions.

2

8.     I have been qualified to testify as an expert in toxic and hazardous materials, leaking underground storage tanks, water quality, and water quality related regulatory matters in both federal and state courts.  I have also testified on water quality related matters representing the San Francisco Bay Regional Water Board.

9.     A true and correct copy of my resume setting forth my credentials in greater detail is attached hereto as Exhibit A.

10.    To prepare to make this Declaration, I have reviewed the following case-specific materials:

- Portions of the deposition transcripts of the District's corporate representative for Arco #1887, Arco #1905, Chevron #9-5401, Chevron #9-1921, Mobil #18-JMY, Mobil #18-G6B, Shell #6502, Texaco #121681, Unocal #5792, Unocal #5226, Unocal #5376, Unocal #5123, G&M Oil #4, and G&M Oil #24 (together, the "Sites");

- The District's Memorandum of Understanding with the Regional Board (the "MOU");

- Portions of the OCWD Act, Cal. Water Code App. Section 40-8(a-c);

- The summaries prepared by Komex and Hargis + Associates, Inc. (together, the "Consultants") for the Sites (the "Consultant Summaries"); and

- Certain documents available on Geotracker for each of the Sites.

11.    The Consultant Summaries are based on the Consultant's review of publicly available data and documents, and not on any independent investigation or analysis by the Consultants. The Consultant Summaries are historical summaries of the remediation history of each of the Sites.  They do not recommend or otherwise suggest what additional remedial actions, if any,

need to be taken at any individual one of the Sites. Similarly, they do not identify a particular type of remediation system that the Consultants or the District think is necessary or should be installed at any individual one of the Sites.

12. I have not seen any evidence that the Consultant Summaries were submitted to the agencies with primary oversight responsibilities at the Sites. Nor have I seen any evidence that the Consultant Summaries were submitted to the Sites' responsible parties or environmental consultants (other than through this litigation). Indeed, at most of the Sites, the District's corporate representative confirmed that the Consultant Summaries had not been shared outside of the District and this litigation. Similarly, I have not seen any evidence that the agencies overseeing the remediation at the Sites have requested summaries similar to the Consultant Summaries, which suggests that the Consultant Summaries were unnecessary and duplicative.

13. I am familiar with the District's MOU with the Regional Board. It requires the District to "coordinate with [the Regional Board] regarding any investigations, actions or activities" related to contamination or threatened contamination. MOU at ¶6. I have seen no evidence that the District has coordinated with the Regional Board regarding the Consultant Summaries.

14. The Consultant Summaries therefore are not part of the remedial activities at any of the Sites. For these same reasons, the preparation of the Consultant Summaries is not "other necessary remedial activity." Similarly, in my opinion it was not necessary or reasonable for the District to expend funds to obtain these summaries.

15. I have not seen any evidence in the materials that I have reviewed that show that the District has taken any action to clean up or abate contamination at the Sites. The District has admitted as much in depositions.

4

16.     From a regulatory standpoint, the costs associated with regular testing of the District's wells for contaminants are not remedial costs related to any individual Site.  Regular testing costs are considered operating costs, not remedial costs or other necessary remedial action costs.  The District admits that it would perform its regular testing regardless of the contamination at any particular Site.

17.     As part of my experience in and with the California regulatory system, I am familiar with California agencies' polices, guidelines, and procedures regarding groundwater contamination, and how the agencies have interpreted and applied them.  California has adopted a set of policies, guidelines, and procedures that allow for cost-effective regulatory action (including the allowance for alternative clean up levels) and that allow regulators to conclude that active abatement is not reasonable or necessary in certain circumstances.  *See, generally,* State Board Resolution 92-49.

18.     Each of the Sites is being remediated under regulatory oversight.  I have seen no evidence that the District takes issue with the agencies' oversight at the Sites or any work performed at the Sites pursuant to their oversight.  This is consistent with testimony of the District's witnesses confirming that the District has not communicated with the regulators about any one of the Sites.

19.     The correct remediation system for a site is determined based on a number of factors.  What may work at one site, may not be feasible at another site as a result of the geology, extent of contamination, groundwater flow, property access, and other factors.  As a result, one cannot evaluate whether contamination can be reasonably abated without evaluating, on a site-by-site basis, the specific abatement plan, corrective action plan, remedial action plan, feasibility study, or similar evaluation.  The first step in this process is having a such a plan for each site—without

it, the reasonableness of any abatement cannot be evaluated for that site.  I have seen no evidence that the District has prepared such a plan for any one of the Sites.

20.     All groundwater with MTBE in it is not unusable.  For example, such water still prevents subsidence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at _Oakland_, California, this _14_ day of March, 2011.

_____

Lester Feldman

6