UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation** | MDL NO. 1358 (SAS) Master File No. 1:00-1898 |
| | **DEFENDANT PETRO-DIAMOND INCORPORATED'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER DETERMINING GOOD FAITH SETTLEMENT** |

This Document Relates To:
*Orange County Water District v. Unocal Corp., et al.* 04 Civ. 4968 (SAS)

## DEFENDANT PETRO-DIAMOND INCORPORATED'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER DETERMINING GOOD FAITH SETTLEMENT

Defendant Petro-Diamond Incorporated ("PDI") respectfully submits the following memorandum of points and authorities in support of its motion for an

///

///

///

///

///

///

///

///

1

order determining the good faith of the Settlement Agreement and Release between Plaintiff Orange County Water District (the "District") and PDI ("Settlement Agreement").

Respectfully submitted,

DATED:  May 16, 2011

By:_____/s/_____
Brian D. Langa
(pro hac vice)
**Demetriou, Del Guercio, Springer & Francis, LLP**
801 South Grand Avenue, Suite 1000
Los Angeles, California 90017
Tel: (213) 624-8407
Fax: (213) 624-0174
E-mail: blanga@ddsffirm.com

Attorneys for Petro-Diamond
Incorporated

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ............................ 1

**I.     BACKGROUND** ................................................................ 1

   **A.    Case History** ............................................ 1

   **B.    Settlement Between the District and PDI** ................................. 5

**II.    DISCUSSION** ................................................................ 5

   **A.    California Code Of Civil Procedure § 877.6 Permits The
          Court To Determine The Good Faith Of a Settlement
          Reached By One Of Several Named Defendants** ...................... 5

   **B.    The Settlement Between The District And PDI Was Made
          In Good Faith And Meets The Standards Governing This
          Determination** ............................................... 6

      *1.    A rough approximation of the District's total
             potential recovery.* ............................... 8

      *2.    The settlement is a rough approximation of PDI's
             proportionate liability.* .......................... 9

      *3.    The amount paid in settlement is reasonable.* ............... 18

      *4.    The allocation of proceeds among plaintiffs does not
             apply to this settlement.* ........................ 19

      *5.    The settlement reflects recognition that PDI should
             pay less in settlement than after trial.* ............... 19

      *6.    The financial condition and insurance policy limits
             of PDI are not relevant to the settlement.* ........... 20

      *7.    Neither fraud, collusion, nor tortious misconduct
             played a role in the negotiations between the District
             and PDI.* ....................................... 20

   **C.    Any Party Challenging The Settlement Bears The Burden
          of Proving Lack of Good Faith** ............................. 21

     **D.**    **The Court Should Direct Entry of Judgment Pursuant to FRCP 54(b) Regarding the Court's Determination of a Good Faith Settlement** ............................................................... 21

**III.**    **CONCLUSION** ....................................................................... 23

# TABLE OF AUTHORITIES

## <u>Federal Cases</u>

*Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*
409 F. Supp. 2d 136 (N.D.N.Y. 2005) .................................................. 22

*AmeriPride Servs., Inc.*
No. CIV. S-00-113-LKK JFM, 2007 U.S. Dist. LEXIS 51364
(E.D. Cal. 2007).............................................................................. 22

*Bottoms v. Levin Enters. Inc.*
No. C-99-4598 MMC, 2001 U.S. Dist. LEXIS 13434
(N.D. Cal. 2001) ............................................................................. 22

*Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*
819 F.2d 1519 (9th Cir. 1987) ............................................................ 21

*Methyl Tertiary Butyl Ether Products Liability Litigation*
578 F. Supp. 2d 519 (S.D.N.Y. 2008) .................................................. 10

*Methyl Tertiary Butyl Ether Products Liability Litigation*
591 F.Supp.2d 259 (S.D.N.Y. 2008) ..................................................... 3

*Shawmut Bank N.A. v. Kress Assocs.*
33 F.3d 1477 (9th Cir. 1994) ............................................................... 6

## <u>State Cases</u>

*Abbott Ford, Inc. v. Superior Court*
741 P.2d 124 (Cal. 1987)............................................................... 9, 10

*El Escorial Owners' Assn. v. DLC Plastering, Inc.*
65 Cal.Rptr.3d 524 (Cal.Ct.App. 2007)................................................ 10

*Erreca's v. Superior Court*
24 Cal.Rptr.2d 156 (Cal.Ct.App. 1993).................................................. 6

*Heppler v. J. M. Peters Co.*
87 Cal. Rptr. 2d 497 (Cal. Ct. App. 1999)..................................... 7, 9, 19

*Regan Roofing Co. v. Superior Court*
27 Cal.Rptr.2d 62 (Cal.Ct.App. 1994)................................................. 10

*Rutgard v. Haynes*
61 F. Supp. 2d 1082 (S.D. Cal. 1999) ................................................. 19

*Tech-Bilt, Inc. v. Woodward- Clyde & Assocs.*
698 P.2d 159 (Cal. 1985)............................................................ passim

*Torres v. Union Pacific R.R. Co.*
203 Cal. Rptr. 825 (Cal. Ct. App. 1984)................................................. 9

**<u>Statutes and Regulations</u>**

28 U.S.C. §1407 ................................................................................ 1

3 California Civil Procedure Before Trial, § 50.16, p. 2395 (4th ed. 2010)..... 19

California Code of Civil Procedure § 877 ........................................... 6

California Code of Civil Procedure § 877.6 ....................................... 6

California Code of Civil Procedure § 877.6(b).................................... 6

California Code of Civil Procedure § 877.6(c).................................... 6

California Code of Civil Procedure § 877.6(d).............................. 6, 21

Federal Rule of Civil Procedure 54(b)................................... 21, 22, 23

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   BACKGROUND

### A.   <u>Case History</u>

On May 6, 2003, the Orange County Water District ("District") initiated this action in Orange County Superior Court, Case No. 03CC00176, against numerous defendants for alleged "compensatory damages and all other damages" associated with methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol ("TBA") in groundwater and to allegedly "protect the quality of the common water supplies of the District," (the "Litigation").  See, Third Amended Complaint, *Orange County Water Dist. v. Unocal Corp. et al.*, Case No. 04-CV-4968-SAS, Southern District, New York (Filed April 2, 2008, Docket No. 27).  The District alleges causes of action for strict liability, negligence, trespass, nuisance, Orange County Water District Act Claim, and declaratory and injunctive relief.  The District also claims fraud and conspiracy as to certain refiners and manufacturers related to the use of MTBE in gasoline in California beginning in or about 1986 until the end of 2003.

The Litigation was transferred to the United States District Court, Southern District of New York by the Judicial Panel on Multidistrict Litigation, pursuant to §1407 of title 28 of the United States Code, and now is part of MTBE MDL 1358. On October 29, 2004, the District filed its Second Amended Complaint naming Petro-Diamond Incorporated ("PDI") in place of DOE 6.  PDI was named as a "Supplier Defendant" and "MTBE Refiner and Suppler Defendant" as opposed to a "Refiner Defendant" or "Owner/Operator Defendant."

PDI operates a petroleum products distribution terminal located in the Port of Long Beach, Los Angeles County, California.  Declaration of Brian D. Langa in Support of PDI Motion for Order Determining Good Faith Settlement, filed concurrently herewith at ¶6, hereafter "Langa Decl."  PDI does not manufacture or refine gasoline or MTBE, and it does not own or operate any gasoline station sites.

1

*Id*.  Thus, PDI believes that the only potential basis of liability asserted by the District that could involve PDI is a products liability theory.  Under such a theory, the District would contend that every entity in the chain of commerce for gasoline with MTBE that contributed to the alleged contamination is liable for the "defective" MTBE product, even a middleman distributor such as PDI.  Accordingly, to establish liability against PDI, at a minimum, the District must prove that product once owned by PDI reached a station which then leaked that product to groundwater.  However, there are no records that indicate product once owned by PDI was transported to any of the 150 stations on the District's February 20, 2009 plume list ("Plume List").

PDI does sell product that may be transported to station sites in Orange County.  PDI's sales occur in a limited number of manners.[1]  First, PDI may contract with an independent contractor trucking company to directly deliver the PDI product to PDI customers who operate station sites ("Direct Deliveries").  PDI has records dating back to 1996 identifying this product's station site destination.  There are no records of Direct Deliveries to any of the 150 station sites on the Plume List.  Langa Decl., ¶8.

Second, PDI posts a price, typically daily or even more frequently, and wholesale customers direct their trucks to the PDI terminal in Los Angeles County and load from the PDI terminal's truck racks ("Wholesale Sales").  This practice is not unlike a customer filling up at the corner station upon recognizing the posted price is a good deal.  These customers, (so-called "jobbers"), fill up and take the product to destinations unknown to PDI.  Indeed, as competitors with PDI's Direct Deliveries, the Wholesale Sales' purchasers guard such destination information

---

[1]In addition, third parties may utilize PDI's port and/or terminal to offload, store, and pass through their product; PDI does not take title to such product and does not believe it could be liable in this matter for such product.

from PDI.  PDI is not aware of any records of Wholesale Sales indicating PDI product with MTBE was taken to a station site on the Plume List. Langa Decl. ¶9.

Third, PDI may sell product via pipeline or in tankage to refiners or others in Los Angeles County ("Head of Pipe Sales").  For the most part, these are sales in which PDI takes a position on a product in the Los Angeles market with a delivery location at Kinder Morgan ("KM") Watson in Los Angeles County.  (KM Watson is not a terminal; it is a hub in the KM distribution system from which product can be transported via the KM pipelines or other pipelines to eventually reach a terminal from which a truck would take the product to a station site.)  PDI has no knowledge of where the purchaser is sending the product in the intrastate and interstate KM system, much less at which gas station that product will end up. Finally, there are no records of the endpoint destination of other similar sales, e.g., sales in commingled tankage or via proprietary pipeline to a refiner.[2]  Langa Decl., ¶10.

Further, PDI's records reflect that it purchased and sold approximately 110,000 barrels total of neat MTBE to blenders or refiners from 1996 through 2003.  PDI may have engaged in similar sales prior to 1996.  Langa Decl., ¶11.

Although no records linking PDI product to a relevant station site have been presented to date, it is possible such records may exist.  The District has asserted that, for example, there may be yet unproduced or undiscovered jobbers' records

---

[2]  PDI does not believe the District could avail itself of this Court's commingled product theory to overcome this lack of records.  This is because PDI understands this theory is limited to manufacturers and refiners. *In re: Methyl Tertiary Butyl Ether Products Liability Litigation,* 591 F.Supp.2d 259, 276 (S.D.N.Y. 2008). ("…"[m]anufacturers are in the best position to know when products are suitably designed and properly made, as well as to diffuse the cost of safety in design and production."  *Retailers and distributors*, on the other hand, are often "innocent conduits in the sale of the product" and are held liable only because product liability is strict." [Emphasis added.])

3

evidencing a pickup of product by the jobber from PDI's terminal which was then taken to a relevant station site.  Similarly, a third party may have records of pre-1996 Direct Deliveries from PDI to a relevant station site.  Further, product purchased by a refiner or other supplier may have been transported by the purchaser to a relevant station site.  Additionally, the District has indicated other sites may be added to the plume list in the future, and there may be records linking PDI to these sites.  In support of this potential eventuality occurring, the District has noted that in the Defendant Identification Response, (see, footnote 6, infra), certain defendants in the Litigation identified PDI as a supplier of gasoline with MTBE or of neat MTBE that may have been distributed into the District's service area.

With this settlement, PDI resolves all past and future, known and unknown liability connected to, arising out, of or in any way related to: (a) the use of MTBE or other oxygenates in gasoline, at any time and for any reason; and (b) the actual or threatened presence of MTBE, TBA, other authorized oxygenates, gasoline, benzene, toluene, ethylbenzene, xylenes, and/or other components of gasoline and fuel in water or on property (including but not limited to wells, aquifers, and water resources) accessed, accessible, managed, owned, operated, used, and/or protected by the District ("Gasoline Contamination").[3]  See, Exhibit 1 to Langa Decl.

---

[3] PDI enters into the agreement and seeks a contribution bar both in its individual capacity and on behalf of its successors, assigns, joint venturers, partners, parents, subsidiaries, affiliates, predecessors-in-interest, successors-in-interest, predecessors-in-name, successors-in-name, beneficiaries, and each of its respective past, present, and future officers, directors, employees, partners, shareholders, officials, board members,  trustees, fiduciaries, agents, accountants, attorneys, insurance carriers, sureties, representatives, independent contractors, consultants, experts and advisors.  This includes, but is not limited to, PDI's subsidiary Petro-Diamond Terminal Company.

### B.    Settlement Between the District and PDI

Beginning in or about Fall of 2006, PDI's counsel and Plaintiffs' counsel initiated settlement communications.  Langa Decl., ¶13.  Thereafter, counsel periodically exchanged written communications and telephone calls further discussing settlement.  *Id*.  On March 30, 2011, PDI and the District engaged in a mediation before retired Judge Alfred G. Chinatelli, who, among other accomplishments, has successfully mediated other MTBE matters.  This mediation culminated in the agreed upon settlement presently before the Court.  Langa Decl., ¶14.

Recognizing that the Litigation will become increasingly expensive and time-consuming as it proceeds towards multiple trials, PDI elected to settle to avoid the uncertainty of further litigation and incurring additional litigation related expense. Langa Decl., ¶15.  As a result of the settlement discussions, PDI has agreed to pay the District $2,000,000 in settlement of the Litigation and forever resolving all Gasoline Contamination claims against PDI.  Langa Decl., ¶16.

The anticipated uncertainty and expense associated with preparing for any single trial are significant. Langa Decl., ¶17.  PDI does not know how many sites, if any, to which it could or would be linked.  The prospect of defending the Litigation through trial for all potential sites to which PDI could be linked is daunting and worth consideration for settlement.  *Id*.  In fact, this is the primary driver of settlement for PDI.

## II.    DISCUSSION

### A.    California Code Of Civil Procedure § 877.6 Permits The Court To Determine The Good Faith Of a Settlement Reached By One Of Several Named Defendants

The issue of the good faith of a settlement is determined by the court upon motion or other application of any party, on the basis of declarations served in

support of the motion, any counter declarations filed in opposition, the settlement

papers, or, in the discretion of the court, upon other evidence at the hearing.  Cal.

Code of Civil Procedure § 877.6(b).  The burden of proof is on the party opposing

the good faith motion.  Cal. C.C.P. § 877.6(d).  Any party who opposes a motion

for determination of good faith settlement must demonstrate that "the settlement is

so far 'out of the ballpark'. . . as to be inconsistent with the equitable objectives of

the statute."  Cal. C.C.P. § 877.6(d); *Tech-Bilt, Inc. v. Woodward- Clyde &

Assocs.*, 698 P.2d 159, 167 (Cal. 1985).  Whether the settlement is in good faith

pursuant to Sections 877 and 877.6 also rests in the sound discretion of the trial

court.  See, *Erreca's v. Superior Court*, 24 Cal.Rptr.2d 156, 166 (Cal.Ct.App.

1993). A determination by the court that the settlement was made in good faith

bars any other joint tortfeasor from any further claims against the settling tortfeasor

for equitable comparative contribution, or partial or comparative indemnity, based

on comparative negligence or comparative fault.  Cal. C.C.P. § 877.6(c).

      As discussed below, the settlement between the District and PDI was made

in good faith, and PDI's request for an order determining the good faith of the

parties' settlement should be granted.

    **B.**    <u>**The Settlement Between The District And PDI Was Made In**</u>
<u>**Good Faith And Meets The Standards Governing This**</u>
<u>**Determination**</u>

      Determination of the good faith of a settlement of one of several alleged

joint tortfeasors is assessed based on a variety of factors identified in *Tech-Bilt, Inc*

*v. Woodward-Clyde & Assocs.*, 698 P.2d 159, 166 (Cal. 1985). Federal courts have

authority to apply the *Tech-Bilt* factors when ruling on such a motion.  *Shawmut*

*Bank N.A. v. Kress Assocs.*, 33 F.3d 1477, 1504-1505 (9th Cir. 1994).  The key

consideration for the Court is whether the proposed settlement is within the

"reasonable range" of the settling defendant's proportional share of comparative

liability for the plaintiff's injuries.  *Tech-Bilt*, 698 P.2d at 166.  The Court will balance the relevant factors to ensure that the settlement is not "so far out of the ballpark . . . to be inconsistent with the equitable objectives of the statute."  *Id.* at 167.

The factors considered include:

- A rough approximation of the plaintiff's total potential recovery;

- A rough approximation of the settling defendant's proportionate liability;

- The amount paid in settlement;

- The allocation of settlement proceeds among plaintiffs;

- A recognition that the settling defendant should pay less in settlement than if it were found liable at trial;

- The financial condition of the settling defendant;

- The insurance policy limits of the settling defendant; and

- The existence of fraud, collusion, or tortious misconduct on the part of the settling party aimed to injure the interests of the nonsettling defendants.

*Id.* at 166-67. Each of these factors is evaluated on the basis of the information available to the parties at the time the settlement is entered into, and no one factor is determinative.  *Id.* at 167.  "The fundamental inquiry ... is whether the settling defendant is paying the plaintiff an amount that is so far below defendant's proportionate share of liability as to be completely 'out of the ballpark.'"  *Heppler v. J. M. Peters Co.*, 87 Cal. Rptr. 2d 497, 514 (Cal. Ct. App. 1999) (quoting *Tech-Bilt*, 698 P.2d at 167).

### 1.   *A rough approximation of the District's total potential recovery.*

PDI denies any liability to the District, and PDI believes (i) there is insufficient evidence to bring PDI to any of the plume trials in that, among other things, the District has no evidence that PDI product ever reached a relevant station site, and PDI could succeed upon exculpatory motions or other dispositive motions, (ii) assuming PDI was brought to a plume trial, a jury would not find it liable, (iii) assuming a jury were to find liability for PDI, its proportionate share of liability would be a small percentage of any total verdict, (iv) any verdict would be further reduced by the amount attributable to other causes, such as other contaminants, and (v) any recovery would be further reduced by the amount of any settlements.

The settlement terms recognize that the District faces a risk of an adverse verdict if it proceeded to trial against PDI. Langa Decl., ¶18; Declaration of Duane C. Miller in Support of PDI Motion for Order Determining Good Faith Settlement at ¶4, hereafter, "Miller Decl."  As set forth previously, PDI believes that, as a middleman distributor, the District must show discrete product specifically once owned by PDI reached the groundwater at issue.  To date, PDI product has not been shown to have been sent to a single station on the entire Plume List.  Thus, among the potential outcomes of any trial is that the District may recover nothing with respect to its claims as to PDI.

Notably, the District's claims against PDI represent only a small percentage of the District's claims in the Litigation against all current defendants, e.g., even if PDI product was linked to a specific station, other potentially responsible parties would include: multiple station site operators; multiple other suppliers to the station; multiple other parties in the chain of commerce of the PDI product; and possibly multiple other stations linked to the plume (and their respective operators,

suppliers, etc.).  Thus, any PDI percentage would be significantly reduced based on site-specific discovery and the inclusion of additional potentially responsible parties.  This is further discussed in section 2, infra, addressing the rough approximation of PDI's proportionate liability.

As to the total rough approximation amount of the District's total recovery in this matter, at the hearing in connection with 7-Eleven's Motion for Good Faith Settlement, counsel for the District noted that damages at the 7-Eleven stations, "range from a low of a single CPT which would be $17,000 at a site up to as much as $5 million at a site where a lot of MTBE [is located in groundwater]."  March 11, 2011 Hearing Transcript; 6:17-18.  One category of the costs PDI seeks to avoid is the investigation and expert costs of determining and disputing these damages amounts on a site by site basis over the Plume List's 150 stations, plus any other stations that are listed later.  For purposes of the Court's evaluation of this Motion only, if one were to roughly approximate $2 million per station over 150 stations, then a rough approximation of the District's total potential recovery is $300 million.

## 2.    *The settlement is a rough approximation of* **PDI'**s *proportionate liability.*

"[A] good faith settlement does not call for perfect or even nearly perfect apportionment of liability."  *Abbott Ford, Inc. v. Superior Court*, 741 P.2d 124, 134 (Cal. 1987).  The law requires only that the settlement is not "grossly disproportionate to what a reasonable person, at the time of settlement, would estimate the settling defendant's liability to be."  *Tech-Bilt*, 698 P.2d at 167 (quoting *Torres v. Union Pacific R.R. Co.*, 203 Cal. Rptr. 825 (Cal. Ct. App. 1984). Again, the "fundamental inquiry ... is whether the settling defendant is paying the plaintiff an amount that is so far below the defendant's proportionate share of liability as to be completely 'out of the ballpark.'"  *Heppler*, 87 Cal. Rptr. 2d at

514.  Further, "it is quite proper for a settling defendant to pay less than his proportionate share of the anticipated damages."  *Abbott Ford*, 741 P.2d at 134.

The Court's evaluation of a settling defendant's proportional liability is based on the evidence available at the time of settlement.  *Tech-Bilt*, 698 P.2d at 167.  The limited documents exchanged in the Litigation support a finding that the District's and PDI's settlement is in good faith.  The amount PDI has agreed to pay the District in settlement of the Litigation is "not completely out of the ballpark" of a rough approximation of the District's total recovery as to PDI.  Miller Decl., ¶5.

In approving a prior good faith settlement in this MDL, this Court stated that "the means of allocating liability in these cases remains highly contested."  *In re Methyl Tertiary Butyl Ether Products Liability Litigation*, 578 F. Supp. 2d 519, 528 (S.D.N.Y. 2008).  Indeed, and as this Court recognized in overruling objections to a global MDL settlement in 2008, "...there is no evidentiary basis for estimating the individual liability of each defendant in these cases, making [the objecting defendant's suggested allocation] purely hypothetical."  *Id.* at 529.

PDI asserts that it is paying $2 million more than its proportionate share of liability.  PDI makes this assertion based upon the limited evidence related to PDI available at this stage of the litigation.  In connection with this description of the limited evidence below, PDI offers the following basis of allocation for the Court's evaluation of the settlement:[4]

---

[4] This allocation is not binding and is utilized only for this Court's evaluation.  In keeping with the parameters set by *Tech-Bilt*, with regards to complex multiparty cases, "a trial court may have to use 'rough categories' to initially determine good faith settlement allocations"  *El Escorial Owners' Assn. v. DLC Plastering, Inc.* 65 Cal.Rptr.3d 524, 536 (Cal.Ct.App. 2007): see also *Regan Roofing Co. v. Superior Court* 27 Cal.Rptr.2d 62, 73 (Cal.Ct.App. 1994).  This flexibility is necessary in complex multiparty cases, because "the allocations may involve some degree of overlap." and "in some cases, 'complete precision of allocation' may be achieved only at trial." *El Escorial*, at 536.  The court would reserve the right of other parties to challenge those allocations at a later date.  *Id.*

a.  Stations on the Plume List alleged by the District to be linked to PDI and potentially linked to Litigation Defendants who indicated they have purchased product from PDI, (although such Defendants have not identified any stations to which such PDI product may have been taken). [134 stations] - $1,800,000.

b.  Stations on the Plume List not linked to the Litigation Defendants who indicated they have purchased product from PDI.[5] [16 stations]  - $100,000.

c.  Other potential stations or bases of liability - $100,000

Langa Decl., ¶19.  These categories are more fully described below and further in paragraphs 19 through 22 of the concurrently submitted Declaration of Brian D. Langa.

On February 20, 2009, the District produced the Plume List of 150 station sites associated with 87 Bellwether plumes.  PDI is not aware of any records indicating that product once owned by it reached a station site on the Plume List. (The District noted that discovery and additional sampling is ongoing such that additional plumes and stations may be added to the litigation.)  The District's present case against PDI is set forth in the District's August 18, 2010 Responses to PDI's Second Set of Interrogatories ("District Responses"); the District Responses list 27 stations.  However, these District Responses are limited to examining those stations associated with the District's five selected focus plumes.  (For example, the District alleges PDI is linked to all ARCO stations, but the District Responses do not list all ARCO stations on the Plume List; it lists only those ARCO stations that the District alleges are linked to the five District selected Focus Plumes.[6])

_____

[5] This distinction is based solely upon PDI's review of the Plume List station site names.  PDI is not aware of whether discovery into the historic and/or actual owner and operators of these stations has occurred.

[6] The Court adopted a procedure in which Plaintiff selected five plumes and

Still, from its review of the District Responses and these specified station names, PDI understands those stations to which the District presently alleges a link with PDI.[7]  There are 134 of these stations on the Plume List.  Langa Decl. ¶¶20-22.  PDI allocates $1.8 million to these stations resulting in $13,432.83 per station.

The remaining stations not yet linked to a defendant in this matter, (pursuant to PDI's review of the Plume List), numbers 16 stations.  Langa Decl. ¶¶20-22.  PDI allocates $100,000 to these stations resulting in $6,250 per station.

PDI allocates more to the first category because there is a potential triable issue of fact as to some of these stations that arguably may survive a PDI Motion for Summary Judgment.  As explained below, PDI does not believe there is.  PDI allocates less to the second group of stations because any alleged link is entirely speculative.  When and if discovery proceeds as to these stations, there is a remote possibility that evidence sufficient to withstand a PDI Motion for Summary Judgment may arise, but PDI believes such is doubtful.  With respect to both sets of stations, PDI knows there are no Direct Deliveries to these stations from 1996 to 2003.

With respect to the third category, PDI is not certain what links could arise, but PDI is resolving all Gasoline Contamination claims.  For example, as explained below, the District implies liability to PDI for its use of the KM system and the

---

Defendants selected five plumes, with the goal that these plumes would be set for trial.  These ten plumes are referred to as the Focus Plumes.  The District Responses appear limited only to the District's selected five Focus Plumes.
[7] In the District Responses, the District alleges links between PDI and stations associated with the following: G&M, USA Gasoline, Unocal, Thrifty, Texaco, Shell, Conoco, 7-Eleven, Valero, and Ultramar.   Although the District does not list any specific Chevron station, it implies PDI would be linked to such stations because Chevron utilizes the KM system. Ostensibly, this would be due to PDI "head of the pipe" sales at the KM Watson facility in Los Angeles County.  Given this tenuous link, PDI also necessarily includes Exxon-Mobil stations in this analysis since PDI may have sold product to this entity at KM Watson facility.

lease of a Chem-Oil tank in Los Angeles County. PDI does not believe any such alleged transactions create a triable issue. The District also alleges that its investigation for MTBE plumes and alleged stations from which such releases occurred is ongoing. Accordingly, PDI allocates a portion of its settlement ($100,000) to this category.

   a.   *Based upon the limited information available, PDI does not believe there is a triable issue linking PDI to any specific station.*

PDI herewith addresses the "evidence" produced to date allegedly linking PDI to relevant stations. As set forth herein, PDI's proportionate liability is minimal because PDI does not believe there is evidence to create a triable issue of fact connecting PDI to a station on the Plume List.

- G&M Oil Company, Inc. ("G&M") - G&M's September 15, 2004 Defendant Identification Response[8] identifies PDI as one of three suppliers to G&M that provided product to G&M within the boundaries of Orange County; the person who verified this statement has since passed away.

_____

[8] In 2003, the District propounded "Plaintiff's Preliminary Set of Interrogatories Re: Defendant Identification." The District received discovery responses from most of the then defendants, ("Defendant Identification Response"), and many defendants identified PDI, (among scores of other entities), as a supplier of product that *may* have been sent to unspecified stations in Orange County. PDI did not learn of these Defendant Identification Response prior to 2010. PDI was not a party when this discovery occurred, and this discovery was not cited in District discovery responses to PDI prior to 2010. In July 2010, the District first provided to PDI these 2003 and 2004 Defendant Identification Responses. Fact discovery closed in August 2010, so PDI has not had an opportunity to investigate these parties' statements in discovery. PDI is unaware of any records indicating that such sales resulted in formerly owned PDI product reaching a station from which there has been a release of gasoline with MTBE. Most of the District's "evidence" against PDI relates to these vague, general Defendant Identification Responses. PDI contends such evidence does not establish a triable issue, and in any event, is inadmissible as to PDI since it was not timely identified to PDI.

PDI's records date back to1996, and it has no records of sales to G&M. Recently, G&M reviewed all of its records and confirmed it had no records of purchases from PDI.  Further, there is testimony and records that the G&M stations at issue had branding agreements for all relevant periods and could not receive product from PDI.  Langa Decl., ¶27.  Thus, PDI does not believe there is a triable issue that PDI product reached the G&M stations which the District alleges G&M operated and from which a release occurred.

- USA Gasoline- USA Gasoline's August 30, 2004 Defendant Identification Response identifies PDI as one of three terminals from which it received product that may have been delivered into Orange County.  USA Gasoline has not produced any records identifying dates of deliveries or stations that accepted such deliveries, and PDI is informed and believes no records exist identifying a sale of PDI product to any of the USA Gasoline stations on the Plume List.  *Id.*

- Ultramar, Inc., Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing Company, and Valero Refining Company-California (collectively, "Valero") -  In its Defendant Identification Responses, Valero identified PDI as one of 80 entities from which it acquired neat MTBE from 1997 to 2003 for use at a refinery from which it supplied product into the relevant area.  (Valero states the sales with PDI were from 2000 to 2003; PDI's records reflect it sold neat MTBE to Valero in 1997.)  Langa Decl., ¶27.  PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.  The District also notes that PDI stored MTBE for Ultramar at its facility from 1996 to 2002.  However, this is in connection with a terminalling agreement, and PDI did not take title to the product.  Accordingly, PDI does not believe

it could be liable under a products liability theory.  The District notes that, in connection with a terminalling agreement, during a flush exchange to move Ultramar's MTBE from the PDI facility to Ultramar's Wilmington Refinery, "a limited amount of PDI product will end up in the refinery or in Ultramar pipelines."  This may be a correct statement, but PDI believes this would be a de minimis amount and does not create a triable issue linking PDI product to a release at any specific station.

- 7-Eleven-  OCWD's Discovery Responses note that 7-Eleven identified Ultramar as a supplier of gasoline containing MTBE.  Based upon the alleged link between PDI and Ultramar, the District alleges a link between PDI and 7-Eleven.  PDI believes this does not create a triable issue linking PDI product to a release at any specific station.  Langa Decl., ¶27.

- ConocoPhillips Company ("Conoco")-  Conoco's August 30, 2004 Defendant Identification Responses provides a table of entities which, "supplied ConocoPhillips with MTBE blended gasoline which may have ultimately been delivered into one or more of the geographic areas listed in Plaintiffs' [California] Complaints."  The table lists 36 entities, including PDI, but it does not specify which entities are linked to which geographic areas; i.e., it does not specify which entities apply to which Complaints.  PDI sold product to Conoco "head of the pipe," but PDI has no knowledge where such product ultimately went.  Langa Decl., ¶27.  Because of this, the District alleges a link between PDI and the Unocal stations on the Plume List.  PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.

- Shell Oil Company, Equilon Enterprises LLC, and Texaco Refining and Marketing Inc. (collectively, "Shell") -  In its 2004 Defendant Identification Responses, Shell asserted that PDI sold it product that "may" have had MTBE at a location from which Shell, from time to time, transports into Orange County.  PDI sold product to Shell "head of the pipe," but PDI has no knowledge where such product ultimately went.   Langa Decl., ¶27.  Shell also identified PDI as one of 41 suppliers of neat MTBE.  The District Responses assert also that Valero provide Shell with product, and link PDI to Shell through the alleged Valero connection above.  PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.

- Union Oil Company of California ("Unocal") – Unocal's August 30, 2004 Defendant Identification Responses identify PDI as one of 78 suppliers of gasoline containing MTBE for delivery into the Orange County service area.  Unocal's responses note various specific months from 1991 to 1997 during which it purchased fuel product from PDI, (often just one month a year but ranging up to 7 months in 1996).  PDI's records indicate these refer to "head of the pipe" transactions.  Langa Decl., ¶27.  Because of this, the District alleges a link between PDI and Unocal stations.  PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.

- Chevron U.S.A. ("Chevron") - Chevron's Defendant Identification responses reference a disk identifying customers from whom Chevron may have purchased gasoline with MTBE product that may have entered the District service area.  PDI could not obtain a copy of that CD, but PDI may have sold product "head of the pipe" to Chevron.  Langa Decl., ¶27.

16

Chevron also identified PDI as an entity that sold it neat MTBE in October 1992. However, the District's Responses do not identify the above. Instead, the District's only assertion linking PDI and Chevron is that Chevron utilizes the Kinder-Morgan system. (See, footnote 5, above.) PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.

- Atlantic Richfield Company, BP Products North America, Inc., and BP West Coast Products, LLC (collectively, "ARCO") - The District's Responses state ARCO utilized the Kinder Morgan Orange County Terminal and thus allege a link between PDI and ARCO stations. It is not clear to PDI how this alleged fact implies liability to PDI. PDI may have sold product "head of the pipe" to ARCO. Langa Decl., ¶27. PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.

- Tesoro- The District's Responses discussing PDI's ties to Tesoro are unclear with respect to PDI liability. The responses cite various evidence indicating PDI purchased product from Tesoro. However, PDI believes the District must, at a minimum, link product once owned by PDI to a relevant station site. Since Tesoro is upstream in these alleged transactions, PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.

- Kinder Morgan system- The District's Responses note that PDI utilized the Kinder Morgan distribution system. It is correct that most of PDI's "head of the pipe" related sales resulted in product in which PDI was in the chain of title being introduced to or within the KM system. Such product is sold to be delivered at KM Watson in Los Angeles County. (Notably, many KM

customers "book out" certain product purchases and sales on the marketplace, so many PDI sales involved product that never entered the KM system.)  In all of the remaining PDI head of pipe transactions, PDI has no knowledge of where the actual product went.  In fact, the purchaser likely has no such knowledge, and PDI does not believe it can be traced throughout the KM interstate and intrastate system, much less to a specific station. Langa Decl., ¶27.  PDI did utilize the truck racks at various KM terminals on an extremely limited basis,[9] but PDI knows the endpoint for all truck sales from those terminals because it is used these terminals only for Direct Deliveries.  *Id*.  PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.

- ChemOil- The District's Responses allege that PDI leased tankage at the ChemOil terminal in Los Angeles County, and this terminal is adjacent to the KM Carson terminal.  PDI is unsure how this creates liability in this matter.  PDI does not believe that this creates a triable issue linking PDI product to a release at any specific station.

### 3.    *The amount paid in settlement is reasonable.*

PDI denies any liability to the District and believes a jury would not find it liable in this action.  PDI also desires to end the continued expense associated with the defense of the protracted Litigation.  Furthermore, uncertainty remains as to whether the District would prevail on a product defect theory against a distributor and, if so, whether and how much a jury might award.  As such, and for the reasons discussed above, the settlement is reasonable and is not "completely out of the ballpark" of the reasonable range of PDI's proportional share of comparative

---

[9] Typically, it makes little fiscal sense for PDI to utilize the KM terminal rather than PDI's own terminal.

liability at the time of settlement.  *Heppler v. J. M. Peters Co.*, 87 Cal. Rptr. 2d 497, 514 (Cal. Ct. App. 1999) (quoting *Tech-Bilt*, 698 P.2d at 167).

Notwithstanding that for the past three years PDI has been in only this single MDL case without any connection to a specific station, the Litigation has been costly and time-consuming for PDI.  Langa Decl., ¶23.  Because of the nature of MDL proceedings, where rulings, law and motion, and discovery is generally applicable to many or all cases, PDI has had to monitor developments in MDL cases to the extent proceedings, including motion practice and discovery, bear on its alleged liability (i.e. issues such as UST, fate and transport, health effects, etc.). *Id.*  Further, because PDI has not definitively been linked to a single station site and is instead generally alleged to most every site, it must monitor discovery relating to all station sites in this matter.  Langa Decl., ¶23.  The settlement amount is reasonable based on the information available, the ever rising litigation costs, the District's assessment of its total potential recovery and PDI's assessment of its proportionate liability at the time of settlement.  *Id.*

> ### 4.    *The allocation of proceeds among plaintiffs does not apply to this settlement.*

The District is the only party bringing this action. As such, allocation of settlement proceeds among multiple plaintiffs does not apply. See Miller Decl., ¶3.

> ### 5.    *The settlement reflects recognition that* **PDI** *should pay less in settlement than after trial.*

"The uncertainty and expense of litigation make a settlement for less than the total potential liability sometimes in the best interest of the plaintiff."  3 Cal. Civ. Proc. Before Trial, § 50.16, p. 2395 (4th ed. 2010); *see Rutgard v. Haynes*, 61 F. Supp. 2d 1082, 1089 (S.D. Cal. 1999) ("...even if it could be shown that Defendant's settlement was less than the amount of a possible judgment against him at trial, this settlement amount is still appropriate as plaintiffs avoided the risks

and costs of going to trial, where their proof against Defendant might have failed, or the amount of damages awarded might have been markedly less.").  The parties' settlement was reasonable at the time of settlement and reflects recognition by both parties that the Litigation will be complicated and protracted and that it is difficult and often entirely speculative to predict what damages, if any, a court may impose upon an upstream distributor that provided product which may have been released to the environment, even if it can be proved.  Moreover, recovery could be delayed and further complicated by possible appeals from any judgment.  Of course, the cost of the extensive litigation activities in any number of trials could well exceed the amount of the settlement.  All of these considerations are brought to bear in assessing whether this settlement is in a "ballpark" range.

> ### 6.     The financial condition and insurance policy limits of PDI are not relevant to the settlement.

PDI insurers were involved in the mediation and settlement, but negotiations did not include consideration of insurance policy limits, and such limits were not discussed.  Langa Decl., ¶24; Miller Decl., ¶7.  Moreover, the amount agreed to in settlement was not limited in amount by the potential existence of insurance or insurance policy limits.  *Id.*  Nor was the financial condition of PDI a factor in any way to increase or decrease the agreed settlement amount.  *Id.*

> ### 7.     Neither fraud, collusion, nor tortious misconduct played a role in the negotiations between the District and PDI.

The Settlement Agreement was reached after extensive negotiations culminating in a March 30, 2011 mediation before retired Judge Chiantelli.  Langa Decl., ¶14; Miller Decl. ¶2.  There is no fraud, collusion, or tortious misconduct in this settlement that was aimed at injuring the interests of the non-settling defendants.  Langa Decl. ¶25; Miller Decl. ¶8.

**C.**      **Any Party Challenging The Settlement Bears The Burden of Proving Lack of Good Faith**

In the event a party challenges the good faith of PDI's settlement with the District, that party bears the burden of proving the lack of good faith. Cal. C.C.P. § 877.6(d).  Again, this burden is to show that the settlement "is so far 'out of the ballpark' ... to be inconsistent with the equitable objectives of the statute." *Tech-Bilt*, 698 P.2d at 167.  As summarized above, this settlement meets all of the *Tech-Bilt* factors needed to establish that it is within a "reasonable range" of PDI's potential liability given the uncertainties and unpredictability of the Litigation and its costs, and the nature of the environmental contamination alleged and its remedial clean-up, and the other factors that apply.  The Settlement Agreement is neither fraudulent nor collusive but was reached in arm's-length negotiations, and is easily within the reasonable range of PDI's potential and comparative liability. Langa Decl., ¶¶25-26; Miller Decl., ¶¶2, 5, 8.

**D.**      **The Court Should Direct Entry of Judgment Pursuant to FRCP 54(b) Regarding the Court's Determination of a Good Faith Settlement**

When multiple parties or claims are involved, the Court is empowered to direct entry of final judgment as to some of the claims or parties.  FRCP 54(b); *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1524-1525 (9th Cir. 1987).  In order for a party to obtain protection against alleged joint tortfeasor liability, California law requires that a court determine that the party's settlement was entered into in good faith.  Therefore, PDI respectfully requests that the Court enter such a judgment pursuant to Federal Rule of Civil Procedure 54(b), which states in relevant part:

> When an action presents more than one claim for relief -
> whether as a claim, counterclaim, crossclaim, or third-
> party claim - or when multiple parties are involved, the
> court may direct entry of a final judgment as to one or
> more, but fewer than all, claims or parties only if the court
> expressly determines that there is no just reason for delay.

There is no just reason for delay here to prevent the Court entering final judgment under Rule 54(b) determining that the Settlement Agreement was made in good faith, which would protect PDI from any alleged joint tortfeasor claims and effectuate the terms of the Settlement Agreement. *See AmeriPride Servs., Inc.*, No. CIV. S-00-113-LKK JFM, 2007 U.S. Dist. LEXIS 51364, at *9, 11-12 (E.D. Cal. 2007); *see also Bottoms v. Levin Enters. Inc.*, No. C-99-4598 MMC, 2001 U.S. Dist. LEXIS 13434, at *3-4 (N.D. Cal. 2001).

One court considered the benefits of settlement over extended litigation and stated that "the desirability of promoting settlement of litigated claims, particularly when presented in the context of complex litigation such as that now before the court, cannot be understated." *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, 409 F. Supp. 2d 136, 140 (N.D.N.Y. 2005). By entering judgment on the good faith of the settlement and the corresponding bar order pursuant to Rule 54(b), the *Agway* court's determination was immediately appealable, which "would serve the desirable purpose of allowing any disgruntled non-settling defendant to challenge this court's approval of the settlement and the entry of a bar order on appeal at an interlocutory stage when the parties, including significantly [the settling defendant], would be able to determine whether it was required to remain and participate in the litigation." *Id.* at 147-48. Therefore, by entering a Rule 54(b) judgment, the Court would provide finality under the Settlement Agreement.

## III.    CONCLUSION

For the foregoing reasons, PDI respectfully requests that the Court grant PDI's motion for order determining good faith settlement and enter the proposed order and judgment pursuant to Rule 54(b), such that all pending and future claims or cross-claims against PDI for equitable comparative contribution, or comparative or partial indemnity, based on comparative fault or comparative negligence, be dismissed and forever barred.

DATED:  May 16, 2011                          DEMETRIOU, DEL GUERCIO,
                                              SPRINGER & FRANCIS, LLP


                                              By:_____/s/_____
                                                      Brian D. Langa
                                                      (pro hac vice)
                                              **Demetriou, Del Guercio, Springer &
                                              Francis, LLP**
                                              801 South Grand Avenue, Suite 1000
                                              Los Angeles, California 90017
                                              Tel: (213) 624-8407
                                              Fax: (213) 624-0174
                                              E-mail: blanga@ddsffirm.com

                                              Attorneys for Petro-Diamond
                                              Incorporated

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via LexisNexis File and Serve upon all counsel of record on May 16, 2011.

_____/s/_____

Brian D. Langa