UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ X
:
IN RE: METHYL TERTIARY BUTYL   :
ETHER ("MTBE") PRODUCTS   :
LIABILITY LITIGATION   :
------------------------------------------------ :
:
This document relates to:   :
:
*Orange County Water District v. Unocal, et*   :
*al.*, 04 Civ. 4968   :
:
:
------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **6/20/11**

**OPINION AND ORDER**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

I.   **INTRODUCTION**

In this consolidated multi-district litigation ("MDL"), plaintiffs seek

relief from contamination, or threatened contamination, of groundwater from

various defendants' use of the gasoline additive methyl tertiary butyl ether

("MTBE") and/or tertiary butyl alcohol, a product formed by the natural

degradation of MTBE in water.  In this case, plaintiff Orange County Water

District ("OCWD" or the "District"), which is responsible for maintaining

groundwater quality within its geographic region, alleges that defendants' use and

handling of MTBE has resulted in contamination and threatened future

1

contamination of groundwater within that region.[1]

In two previous decisions I dismissed a large number of OCWD's common law claims as time-barred.[2]  The claims that survived included common law claims for injuries suffered due to MTBE releases occurring after May 6, 2000 (including nuisance and trespass), statutory claims under the Orange County Water District Act ("OCWD Act" or the "Act") "to recover reasonable costs actually incurred since May 6, 2000," and "declaratory relief with respect to future expenses OCWD may incur."[3]

OCWD now moves for partial summary judgment under Federal Rule of Civil Procedure 56(a) on three claims against *certain* defendants associated with fourteen gasoline service station sites[4] that share four common, undisputed characteristics: *first*, at each of the fourteen sites, MTBE has been detected in

---

[1]     For a thorough recitation of plaintiffs' factual allegations, *see, e.g.*, *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005).

[2]     *See In re MTBE Prods. Liab. Litig.*, 676 F. Supp. 2d 139 (S.D.N.Y. 2009); *In re MTBE Prods. Liab. Litig.*, 475 F. Supp. 2d 286 (S.D.N.Y. 2006).

[3]     OCWD's Fourth Amended Complaint ("Compl.") ¶ 106.

[4]     The sites implicated in this motion are: Arco # 1887; Arco # 1905; Chevron # 9-5401; Chevron # 9-1921; Mobil # 18-JMY; Mobil # 18-G6B; Shell # 6502; Texaco # 121681; Unocal # 5792; Unocal # 5226; Unocal # 5376; Unocal # 5123; G&M Oil # 4; G&M Oil # 24.

groundwater samples drawn mainly from "Shallow" aquifers[5] at levels exceeding

five parts per billion ("ppb");[6] *second*, each defendant either owned or leased the

station *and* any on-site underground storage tanks ("USTs") associated with the

station; *third*, each defendant supplied MTBE gasoline to the station; and *fourth*,

---

[5]      The groundwater basin in Orange County is comprised of three major aquifers – Shallow, Principal, and Deep – all hydraulically connected. The Shallow aquifer reaches a depth of approximately 200 feet, the underlying Principal aquifer reaches depths of approximately 1,500 feet, and the Deep aquifer underlies the Principal aquifer and reaches depths of 2,000 feet or greater. Most of the drinking water *production wells* in OCWD's territory draw groundwater from the Principal aquifer at depths of 300 to 1,000 feet. However, the Principal aquifer is replenished by recharge water that travels from the ground surface, through the Shallow aquifer, and into the Principal aquifer. *See* 5/28/08 Supplemental Declaration of Roy Herndon, OCWD Chief Hydrologist, Ex. 11 to Declaration of Jeremiah Anderson, counsel to Chevron, in Support of Defendants' Opposition to Plaintiff's Motion for Partial summary Judgment ("Anderson Decl."), ¶¶ 5-7.

[6]      The California Department of Health Services ("CDHS") has established a "secondary" Maximum Contaminant Level ("MCL") for MTBE of five ppb. While the "primary" MCL is based on the level of contamination "that, in the judgment of the department, may have an adverse effect on the health of persons," CAL. HEALTH & SAFETY CODE § 116275(c)(1), the "secondary" MCL is based on the level of contamination "that may adversely affect the odor or appearance of the water and may cause a substantial number of persons served by the public water system to discontinue its use, or that may otherwise adversely affect the public welfare." *Id.* § 116275(d). *See Western States Petroleum Ass'n v. Department of Health Servs.*, 122 Cal. Rptr. 2d 117 (Cal. Ct. App. 2002) (upholding California's secondary MCL of five ppb for MTBE and finding "compelling evidence that, at a contamination level of [five ppb], or perhaps even below, a significant number of consumers will be able to detect the presence of MTBE in water supplies").

each defendant has conducted remediation at the site.[7]  While deferring the issue of *damages* for trial, OCWD argues that these undisputed facts establish defendants' *liability* (1) under the OCWD Act and for (2) public nuisance and (3) trespass.  For the reasons set forth below, OCWD's motion is denied.

## II.     BACKGROUND

### A.     Defendants' Remediation Activities

The defendants implicated in this motion are performing remediation under agency supervision pursuant to Chapter 6.7 of the California Health and Safety Code, which relates to unauthorized UST releases.[8]  A "release" is broadly defined as "any spilling, leaking, emitting, discharging, escaping, leaching, or disposing from an underground storage tank into or on the waters of the state, the land, or the subsurface soils."[9]  Spills and overfills "due to the use of improper equipment, faulty equipment, operator error, or inattention or overfilling" that take place while gasoline is being placed in a UST also qualify as unauthorized releases.[10]  When a release is detected, the owner or operator of the UST is

---

[7]      Defendants essentially concede these facts, disputing only their legal significance.

[8]      *See* CAL. HEALTH & SAFETY CODE §§ 25280-25299.

[9]      *Id.* § 25281.

[10]     *Id.* § 25295.5.

responsible for reporting the occurrence to the local designated agency (not OCWD[11]) and describing the details of the spill and any corrective or remedial actions undertaken and any further remedial actions necessary to clean up the release.[12]  The owner or operator then performs any necessary corrective action as identified in a work plan approved by the agency, under the supervision of the agency, until closure.[13]

### B.    OCWD

OCWD is a statutorily-created "special water agency" charged with the responsibility to "maintain, replenish, and manage groundwater resources" within its geographic area.[14]  OCWD is statutorily authorized to "prevent interference [with] . . . [or] diminution . . . [or] pollution or contamination" of that groundwater.[15]  OCWD is also empowered "to conduct any investigations of the quality of the surface and groundwaters within the district . . . to determine whether those waters are contaminated or polluted" and to "expend available funds to

---

[11]     *See infra* Part II.C.

[12]     *See* CAL. HEALTH & SAFETY CODE § 25295.

[13]     *See id.* § 25296.10.

[14]     CAL. WATER CODE APP. § 40-2(6).  OCWD also has the power to "[a]ppropriate and acquire water and water rights within or outside of the district." *Id.* § 40-2(6)(d).

[15]     *Id.* § 40-2(9).

perform any cleanup, abatement, or remedial work required under the circumstances."[16]  Although OCWD owns many *monitoring* wells (*i.e.*, wells used to monitor groundwater contamination), unlike other plaintiffs in this MDL, OCWD does not own any *production wells* (*i.e.*, wells used to provide water to the public).[17]

Earlier in this litigation, OCWD argued, and this Court accepted, that OCWD has usufructuary rights in the groundwater that it alleges defendants have contaminated.[18]  I held that on the basis of these property rights, OCWD is able to pursue its common law claims, such as public nuisance and trespass.[19]  In a later Opinion, I held that, for the purposes of determining when the statute of limitations for those common law claims began to run,[20] "whether OCWD has suffered an

---

[16]     *Id.* §§ 40-8(a) & (b).

[17]     *See In re MTBE Prods. Liab. Litig.*, No. 1:00-1898, MDL 1358, M21-88, 2007 WL 700819, at *3 (S.D.N.Y. Mar. 7, 2007).

[18]     *See In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 455, 461 (S.D.N.Y. 2006).

[19]     *See In re MTBE Prods. Liab. Litig.*, 676 F. Supp. 2d at 146 n.40.

[20]     In California, a plaintiff will be deemed to have suffered injury sufficient to give rise to a cause of action when it has suffered some "appreciable and actual harm."  *San Francisco Unified Sch. Dist. v. W.R. Grace & Co.*, 44 Cal. Rptr. 2d 305 (Cal. Ct. App. 1995).  Although the harm incurred must be more than nominal, a plaintiff need not have ascertained the full scope of its injury and "'neither the speculative nor uncertain character of the damages nor the difficulty of proof will toll the period of limitation.'"  *Id.* (quoting *Davies v. Krasna*, 121

6

injury turns on whether [] contamination caused or should have caused OCWD to act in furtherance of its charge[ ][of] protecting all groundwater within the District's territory."[21]   I concluded that "OCWD was appreciably harmed as a matter of law when MTBE was detected at or above five ppb at any monitoring well within OCWD's territory."[22]

### C.   OCWD's Regulatory Context

OCWD is one of at least two other agencies with concurrent oversight of the water supply in and around its service area.  *First*, California's State Water Resources Control Board comprises nine regional water boards, one of which is the Santa Ana Regional Water Quality Control Board ("Regional Board").  The

--------

Cal. Rptr. 705 (1975).  *Accord Nodine v. Shiley, Inc.*, 240 F.3d 1149, 1153 (9th Cir. 2001) ("[Under California law,] [w]here an injury, although slight, is sustained . . . the statute of limitations attaches at once.  It is not material that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later time.").

[21]   *In re MTBE Prods. Liab. Litig.*, 475 F. Supp. 2d at 295 (quotation marks omitted).  *Accord In re MTBE Prods. Liab. Litig.*, 676 F. Supp. 2d at 147-48 ("OCWD incurred appreciable harm when groundwater within its territory was sufficiently contaminated with MTBE that a government agency charged with protecting the quality of that water *reasonably should have responded to that contamination*.") (emphasis added); *In re MTBE Prods. Liab. Litig.*, 475 F. Supp. 2d at 295 ("Thus, where MTBE was present at low levels or located in areas that did not, at that time, threaten the groundwater, OCWD suffered no appreciable harm.").

[22]   *In re MTBE Prods. Liab. Litig.*, 676 F. Supp. 2d at 149.

Regional Board's territory encompasses several water districts, including OCWD. *Second*, the Orange County Health Care Agency ("OCHCA") is a regional public health agency tasked with, *inter alia*, investigation and remediation of certain MTBE spill sites.  Both the Regional Board and OCHCA have been active in remediation of MTBE at spill sites within OCWD's service area, including those owned by defendants, but neither agency has undertaken MTBE remediation efforts beyond those spill sites.

In a previous decision, I held that OCWD's usufructuary rights in its groundwater were not subservient to the rights of other agencies such as the Regional Board, and denied defendants' motion to stay or remand based on a theory of primary jurisdiction.[23]  That motion was based in part upon defendants' contention that various other regulatory agencies were already active in the on-site remediation at various sites within OCWD's territory, and that California's regulatory scheme had already provided or would provide the relief sought by OCWD in this suit.[24]  In denying that motion, I noted that "[w]hile other agencies such as the Regional Board or OCHCA may engage in *spill-site* remediation, they do not attempt remediation or containment of MTBE *plumes that may have*

---

[23]    *See In re MTBE Prods. Liab. Litig.*, 2007 WL 700819, at *4.

[24]    *See id.* at *1.

*escaped the spill site before remediation efforts began* (or may persist despite such efforts). . . ."[25]

### D.    OCWD's Efforts

"OCWD became acquainted with MTBE contamination in 1995 . . . . Soon after, OCWD began systematic testing for MTBE contamination within its district."[26]  Since then, the District has retained environmental consultants to prepare reports regarding MTBE contamination at gas stations in the District's service area, including the stations that are the subject of this motion.[27]  The consultants' reports generally characterize MTBE levels, movement in

---

[25]      *Id.* at *6 (emphasis added).

[26]      *In re MTBE Prods. Liab. Litig.*, 475 F. Supp. 2d at 289.

[27]      *See* Plaintiff's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 3.  *See also* 3/23/05 Minutes of OCWD Board of Directors Meeting ("3/23/05 OCWD BOD Minutes"), Ex. 1 to Declaration of Michael Axline, counsel to OCWD, in Support of Plaintiff's Motion for Partial Summary Judgment ("Axline Decl."), at 9 (adopting a resolution "[f]inding and reaffirming that available funds have been and may continue to be expended to perform investigation, cleanup, abatement, and remedial work to address MTBE contamination, and the threat of MTBE contamination, in the District's service area . . . .").  Defendants object to the minutes on the ground that Axline "does not have the required personal knowledge to authenticate these purported meeting minutes."  Defendants' Objections to Plaintiff's Summary Judgment Evidence at 1. The objection fails, however,  because public records "do[] not require any foundational testimony" from a qualified witness to be admissible, and Defendants offer no evidence indicating a lack of trustworthiness.  *United States v. Doyle*, 130 F.3d 523, 546 (2d Cir. 1997).

groundwater, migration pathways, and potentially vulnerable production wells near each of the sites.[28]  The District has not yet performed any actual MTBE cleanup at or around any of the sites involved in this motion.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[29]  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"[30]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[31]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a

---

[28]     *See* Pl. 56.1 ¶ 3.

[29]     Fed. R. Civ. P. 56(c).

[30]     *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[31]     *Miner v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008).  *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

lack of evidence . . . on an essential element of the nonmovant's claim."[32]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[33] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[34] However, "'all that is required [from the non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[35]

      "In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."[36]

---

[32]    *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, 500 F. Supp. 2d 356, 361 (S.D.N.Y. 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks and citations omitted).

[33]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[34]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[35]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

[36]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 242, 255).

11

However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[37]  Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[38]

Summary judgment is not an all-or-nothing proposition; Rule 56(a) permits a party to move for summary judgment as to a claim, defense, or part of a claim or defense.

## IV.   DISCUSSION

I address in turn each of the claims for which OCWD moves for partial summary judgment.

### A.   Orange County Water District Act

#### 1.   The Act

Section 40-8 of the OCWD Act ("Investigations of quality of surface and groundwaters; cleanup; liability") provides:

> (a) The district may conduct any *investigations of the quality of the surface and groundwaters within the district* which the district determines to be necessary and appropriate to determine whether

---

[37]   *Id.* (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[38]   *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).  *Accord Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

12

those waters are contaminated or polluted.

(b) The district may expend available funds to perform any *cleanup, abatement, or remedial work* required under the circumstances which, in the determination of the board of directors, is required by the magnitude of the endeavor or the urgency of prompt action needed *to prevent, abate, or contain any threatened* or existing *contamination* of, or pollution to, the surface or groundwaters of the district. This action may be taken in default of, or in addition to, remedial work by the person causing the contamination or pollution, or other persons. The district may perform the work itself, by contract, or by or in cooperation with any other governmental agency.

(c) If, pursuant to subdivision (b), the contamination or pollution is cleaned up or contained, the effects thereof abated, or *in the case of threatened contamination or pollution, other necessary remedial action is taken*, the person causing or threatening to cause that contamination or pollution shall be liable to the district to the extent of the reasonable costs actually incurred in cleaning up or containing the contamination or pollution, abating the effects of the contamination or pollution, *or taking other remedial action*. The amount of those costs, together with court costs and reasonable attorneys' fees, shall be recoverable in a civil action by, and paid to, the district. In any such action, the necessity for the cleanup, containment, abatement, or *remedial work*, and the reasonableness of the costs incurred therewith, shall be presumed, and the defendant shall have the burden of proving that the work was not necessary, and the costs not reasonable.[39]

Thus, the OCWD Act sets forth a three-step right to recovery for

OCWD. *First*, the District conducts "*investigations* of the quality of the surface

and groundwaters within the district . . . to determine whether those waters are

---

[39]     CAL. WATER CODE APP. § 40-8(c) (emphases added).

13

contaminated or polluted."[40]  *Second*, the District may "expend funds to perform any *cleanup, abatement, or remedial work* required under the circumstances," discovered in the initial investigation.[41]  *Third*, the District can seek reimbursement for the "reasonable costs actually incurred" in cleaning up or containing *actual contamination*, or for "other necessary remedial action" in the case of *threatened contamination*.[42]

### 2.    Application

OCWD moves for recovery of costs incurred under the OCWD Act.[43] According to OCWD, as a result of the contamination at the service stations at issue on this motion, "the District Board determined, pursuant to the Act, that it is necessary to remediate MTBE contamination, and the threat of contamination, in order to prevent, abate, and contain threatened and existing contamination of

---

[40]    *Id.* § 40-8(a) (emphasis added).

[41]    *Id.* § 40-8(b).

[42]    *Id.* § 40-8(c).

[43]    OCWD also seeks a judicial declaration that it is entitled to "future costs" incurred under the OCWD Act.  *See* Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment ("Pl. Reply") at 12.  However, the plain language of the OCWD Act – which permits recovery only for "reasonable costs *actually incurred*," CAL. WATER CODE APP. § 40-8(c) – clearly prohibits this.

groundwater supplies in the District's service area."[44]  Allegedly acting pursuant to

that determination, the District (1) "has conducted testing for MTBE at drinking

water production wells associated with stations where MTBE was released"[45] and

(2) "retained consultants to investigate and characterize the groundwater impacts

from MTBE . . . released at gasoline stations within the District's service area"[46] at

a cost of at least six-hundred thousand dollars.[47]  Those consultants "have now

completed their initial assessment and vulnerability analysis for each of the stations

for which the District now seeks partial summary judgment."[48]

       The District is seeking to recover for the costs associated with these

two endeavors.  Recognizing that these costs are not "costs actually incurred" in

remediating *actual* contamination, OCWD argues that they are reimbursable as

---

[44]     Plaintiff's Memorandum of Law in Support of Motion for Partial
Summary Judgment ("Pl. Mem.") at 1 (citing Pl. 56.1 ¶ 2; 3/23/05 OCWD BOD
Minutes).

[45]     *Id.* at 7 (citing Pl. 56.1 ¶ 3).

[46]     *Id.* at 6 (citing Pl. 56.1 ¶ 3).

[47]     *See* OCWD's Responses and Objections to Certain Defendants' Third,
Fourth, Fifth, Sixth, Seventh, and Eighth Sets of Requests for Production of
Documents (Re: Cost Recovery at Focus Plumes 1, 2, 3, 8, and 9), Ex. 2 to Axline
Decl., ¶ 2.

[48]     Pl. Mem. at 7 (citing Pl. 56.1 ¶ 9).

"other necessary remedial action" taken in response to *threatened* contamination.[49]

The plain language of the Act clearly prohibits recovery for these costs. The Act expressly distinguishes between "investigations . . . to determine whether [water] [is] contaminated" and subsequent efforts to remediate water found to be contaminated or threatened.[50] The costs incurred for remediation are recoverable, but the costs incurred for investigation are not. Testing and report-commissioning constitute *investigatory* work, not "remedial action."[51] The District conducts testing as part of its regular course of business. As for the consultant reports, creating summaries of the activities of others at the sites at issue in this motion[52] has nothing to do with remedying threatened contamination. Nor is there

---

[49]     *See id.* at 9.

[50]     CAL. WATER CODE APP. § 40-8(a).

[51]     *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Opp. Mem.") at 8 (citing the Webster's Dictionary definition of "remedial" ("intended as a remedy") and "remediation" ("the act of remedying")). Defendants also argue that the contamination at issue was "actual," not "threatened" contamination, for which only the cost of *cleanup* or *containment* is reimbursable. *See id.* at 9. The District has made clear, however, that its investigatory efforts are directed toward containment of *threatened* contamination of groundwater *off-site* in the event MTBE escapes *on-site* remediation.

[52]     *See* Declaration of Lester Feldman, Scientist with AMEC Geomatrix, in Support of Defendants' Opposition to OCWD's Motion for Partial Summary Judgment ("Feldman Decl."), ¶¶ 11-12 ("The Consultant Summaries are based on the Consultant's review of publicly available data and documents, and not on any

any evidence that the District's consultants' file review has led or will lead to

remedial action at these sites, or off-site.[53]  In fact, there is no evidence that the

District has done anything with these consultant reports outside of this litigation.[54]

For these reasons, and because the words of the statute are unambiguous, summary

judgment is denied as to the costs incurred by OCWD in testing production wells

_____

independent investigation or analysis by the Consultants.  The Consultant
Summaries are historical summaries of the remediation history of each of the Sites.
They do not recommend or otherwise suggest what additional remedial actions, if
any, need to be taken at any individual one of the Sites . . . .  I have not seen any
evidence that the agencies overseeing the remediation at the Sites have requested
summaries similar to the Consultant Summaries, which suggests that the
Consultant Summaries were unnecessary and duplicative.").

[53]        *See, e.g.*, Arco 1887 Site Summary Prepared by Hargis + Associates,
Ex. 4 to Axline Decl., at 2 ("Production well HB-3A is the nearest major active
supply well located approximately 2,000 feet southwest of the Site. . . .  MTBE and
TBA has not historically been detected in this well."); *id.* at 2-3 ("Production wells
HB-5 and FURU-HB1 are potentially vulnerable production wells located
approximately 3,600 feet southeast and 2,800 feet southwest of the Site,
respectively . . . .  MTBE and TBA have not historically been detected in these
wells."); *id.* at 13 (explaining that although "[g]roundwater contamination is not
fully hydraulically contained," the "historical lateral extent of the MTBE and TBA
plumes *has not been fully delineated*" and the "vertical extent of MTBE and TBA
in groundwater beneath the Site *has not been fully investigated*") (emphasis
added); *id.* ("Contaminant migration from the Semi-perched Aquifer to deeper
production aquifers *could* occur with natural downward flow of groundwater.")
(emphasis added).

[54]        The scope of work of at least one of the reports states that it is being
used "in support of [this] litigation related to [MTBE] contamination," not to aid
remediation of the sites.  5/27/05 Komex Scope of Work Proposal, Ex. 46 to
Anderson Decl., at 1.

17

for MTBE and in commissioning the reports.[55]  OCWD is directed to show cause

within twenty-one days of this Order why summary judgment on this claim should

not be granted to defendants.[56]

    **B.**   **Public Nuisance**

    Under OCWD's theory of public nuisance, defendants have

"substantially interfered with and obstructed the District's ability to provide a

water supply free from unacceptable health risk, taste, odor, color, pollution and

contamination, and to protect groundwaters within its territory from such harm."[57]

According to OCWD, "the MTBE causing the District appreciable harm is in the

groundwater immediately beneath each of the defendants' stations, a fact which

defendants admit makes the MTBE 'almost always traceable to' the overlying

---

[55]    *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)
("We have stated time and again that courts must presume that a legislature says in
a statute what it means and means in a statute what it says there . . . . When the
words of a statute are unambiguous, then, this first canon is also the last: judicial
inquiry is complete.").

[56]    *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000)
("District courts are well advised to give clear and express notice before granting
summary judgment *sua sponte*, even against parties who have themselves moved
for summary judgment.  The provision of such notice requires relatively little time
or effort, and it permits appellate courts much more readily to determine – as they
are required to do – whether the absence of a cross motion affected the result.").

[57]    Compl. ¶ 97.

gasoline stations."[58]  OCWD prays for "compensatory and exemplary damages, . . .
including, but not limited to, equitable relief in the form of an order requiring
Defendants to abate the nuisance properly *as to the District*."[59]

The groundwater "immediately beneath" each of defendants' stations
is the nuisance of which OCWD complains – the interference that has "appreciably
harmed" it.  However, OCWD is not seeking to investigate, clean up, or abate
contamination at any one of the fourteen sites at issue in this motion.  Instead,
OCWD's alleged "damages" will relate to the costs associated with investigating
and abating *off-site* groundwater contamination allegedly caused by the migration
of contaminated water from the fourteen sites at issue in this motion.[60]  Although
OCWD (apparently) does not believe proof of off-site groundwater or drinking
water contamination is necessary for summary adjudication as to liability on its

---

[58]    Pl. Mem. at 8 (quoting Pl. 56.1 ¶ 4 (quoting Arco/BP's Third
Amended Master Answer and Affirmative Defenses (filed July 2, 2007))).

[59]    Compl. ¶ 100 (emphasis added).

[60]    *See* Pl. Mem. at 18 ("In the damages phase of this case, the District
will establish that significant amounts of [] MTBE moved off-site long before
groundwater remediation efforts began, and that on site remediation efforts have
been too little, too late."); Pl. Reply at 11 ("OCWD . . . is primarily concerned with
off-site contamination and remediation[]."); *In re MTBE Prods. Liab. Litig.*, 2007
WL 700819, at *6 ("OCWD asks this Court for monetary relief necessary to
proactively identify and remediate or contain MTBE *plumes* that have already
escaped a spill site and may eventually make their way into the groundwater basins
served by OCWD.") (emphasis in original).

public nuisance claim, it nevertheless asserts – *once* in its brief – that it has "determined that MTBE has escaped on-site remediation and moved off-site at each of the stations."[61]  As evidence, it cites the Declaration of David Bolin, a certified hydrogeologist for OCWD, submitted in opposition to a previous motion for summary judgment filed by defendants in this case.[62]  However, it does not direct the Court to any specific statement within that declaration proving that MTBE has "escaped on-site remediation and moved off-site at each of the stations."  Moreover, a close examination of the declaration reveals that any "determinations" as to off-site contamination were inconclusive at best.[63]  Certainly, nothing in the Bolin Declaration states with any specificity what level of contamination has been detected off-site or is threatened.  Meanwhile – and perhaps not surprisingly in light of the ambiguity surrounding OCWD's bold,

---

[61]     Pl. Mem. at 7.

[62]     *See id.* (citing 6/3/09 Supplemental Declaration of David Bolin in Support of OCWD's Response to Defendants' Further Supplemental Motion for Summary Judgment on the Statute of Limitations [Docket No. 105]).

[63]     For example, when discussing "Bellwether Plume No. 1" in relation to Arco # 1887, Bolin declared that "the first real hydrogeologic evidence that MTBE has escaped [the site] was the MTBE detection in the production well associated with Plume 1."  *Id.* ¶ 14.  In his deposition, however, Bolin explained that "I think what I was saying there was that we knew that there had been a release at the site."  8/13/10 Deposition of David Bolin ("8/13/10 Bolin Dep."), Ex. 1 to Anderson Decl., at 14:2-7.

unsupported factual assertion – defendants contend that "[d]iscovery has shown" that

> [t]he drinking water wells that the District associates with the fourteen stations at issue in its Motion have never had a detection of MTBE above the California 5 ppb secondary MCL or even the 3 ppb California "detection level for reporting" (meaning the District has never reported a detection to the State for any of these wells). [OCWD's] case rests on "microdetections," which are of questionable validity and are legally "non-detects."[64]

Defendants, in turn, cite no evidence for *this* assertion.  This is all to say that, if there is evidence that on-site contamination is affecting groundwater off-site (or drinking water), OCWD has not submitted that evidence in support of *this* motion, apparently believing such evidence to be irrelevant to establishing a public nuisance in light of the other facts it has established as to each site.

### 1.     Applicable Law

Nuisance is defined as

> [a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to *interfere with* the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . .

---

[64]     Opp. Mem. at 1.  *Accord id.* at 9 ("The District has brought forth no evidence concerning whether any alleged offsite contamination is above the MCL or that the contamination on these sites is a threat to any drinking water offsite.").

.[65]

A *public* nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."[66]

> Of course, not every interference with collective social interests constitutes a public nuisance. To qualify, and thus be enjoinable [or abatable], the interference must be both *substantial and unreasonable*. It is substantial if it causes significant harm and unreasonable if its social utility is outweighed by the gravity of the harm inflicted.[67]

"The remedies against a public nuisance are: [¶] 1. Indictment or information; [¶] 2. A civil action; or, [¶] 3. Abatement."[68]

To prove its public nuisance claim, OCWD must show, *first*, that defendants, by acting or failing to act, **created** a condition that (1) was harmful to health *or* (2) was indecent or offensive to the senses *or* (3) was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property *or* (4) unlawfully obstructed the free passage or use, in the customary

---

[65]   CAL. CIV. CODE § 3479 (emphasis added).

[66]   *Id.* § 3480.

[67]   *County of Santa Clara v. Atlantic Richfield Co.*, 40 Cal. Rptr. 3d 313, 325 (Cal. Ct. App. 2006) (quotation marks and citations omitted).

[68]   CAL. CIV. CODE § 3491.

22

manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway; *second*, that the condition affected a ***substantial*** number of people at the same time (*i.e.*, caused ***significant harm***[69]); *third*, that an ordinary person would be reasonably annoyed or disturbed by the condition; *fourth*, that the ***seriousness of the harm*** outweighs the social utility of defendants' conduct (*i.e.*, that the interference is ***unreasonable***[70]); *fifth*, that OCWD did not consent to defendants' conduct; *sixth*, that OCWD suffered harm that was different from the type of harm suffered by the general public;[71] and *seventh*, that

---

[69]    *See County of Santa Clara*, 40 Cal. Rptr. 3d at 325.

[70]    *See id.*

[71]    *See In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d at 463 ("[I]n public nuisance suits, where a plaintiff seeks to recover damages *rather than simply abatement of the nuisance*, it must show that it has suffered an injury distinct from that suffered by the general public.") (emphasis added). Although *part* of the relief OCWD seeks is abatement – relief it may seek in its *representative* capacity without proving special injury – its public nuisance claim also rests on the theory that it was "specially and adversely affected by the nuisance," Compl. ¶ 97, and that "[t]he District's injury is separate and distinct from that of the public," *id.* ¶ 98.  *See* CAL. CIV. CODE § 3493 ("A private person may maintain an action for a public nuisance, *if it is specially injurious to himself*, but not otherwise.") (emphasis added).

        I previously held that the scope of OCWD's statutory authority is broad enough to include actions for abatement of a public nuisance generally, *see In re MTBE Prods. Liab. Litig.*, No. 1:00-1898, MDL 1358, M21-88, 2005 WL 1500893, at *18 (S.D.N.Y. June 24, 2005), and that "OCWD may seek abatement in its representative capacity," *In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d at 466.  I also held that "OCWD has established a valid usufructuary interest which is independent of the State or the People's general interest in groundwater."  *Id.*

defendants' conduct was a ***substantial factor in causing*** OCWD's harm (causation).[72]

Defendants argue that OCWD has not shown (1) that defendants' alleged interference was "substantial and unreasonable" or (2) that defendants' conduct was a substantial factor in causing OCWD's alleged harm.

### 2.   Application

#### a.   Substantial and Unreasonable Interference

OCWD contends that my previous finding that "*OCWD was appreciably harmed as a matter of law when MTBE was detected at or above five ppb at any monitoring well within OCWD's territory*"[73] proves "substantial and reasonable" interference as a matter of law.[74]  But that finding was made in the

---

"Accordingly," I held, "OCWD may seek damages on its public nuisance claim to the extent that the alleged nuisance has interfered with that right." *Id.  See, e.g.*, *Mangini v. Aerojet-General Corp.*, 281 Cal. Rptr. 827, 834 (Cal. Ct. App. 1991) ("*Mangini I*") ("[P]laintiffs have alleged, among other things, that they have been required to undertake testing of the property.  These testing costs are sufficient to constitute 'special injury' to plaintiffs under section 3493.").

[72]    *See* Judicial Council of California, Civil Jury Instructions ("CACI") § 2020 (2011) (emphases added to highlight elements contested by defendants).

[73]    *In re MTBE Prods. Liab. Litig.*, 676 F. Supp. 2d at 149 (emphasis added).

[74]    *See* Pl. Mem. at 16.

24

context of determining when the statute of limitations for OCWD's common law claims began to run.  The reason I found *OCWD* to be "appreciably harmed" when MTBE was detected at or above five ppb in any monitoring well within its territory was because, at that level, the contamination "caused or should have caused OCWD to act in furtherance of its charge[ ][of] protecting all groundwater within the District's territory."[75]  But a finding that *OCWD* "should have responded to that contamination"[76] does not establish that the MTBE contamination "substantially and unreasonably" interfered with *the public*'s collective social interests such that OCWD has proven a *public* nuisance as a matter of law.

While subtle, this distinction is important – and OCWD gives it scant attention in its briefing.[77]  Although a required element of OCWD's public nuisance claim (given its prayer for damages) is a showing of special injury to *its* property interest – its usufructuary interest in groundwater independent of the State

---

[75]     *In re MTBE Prods. Liab. Litig.*, 475 F. Supp. 2d at 295 (quotation marks omitted).

[76]     *In re MTBE Prods. Liab. Litig.*, 676 F. Supp. 2d at 147-48.

[77]     *See, e.g.*, Pl. Reply at 9 ("Defendants . . . argue that OCWD must show 'substantial and unreasonable' interference with its property interests.  [But] [d]efendants made no such argument when asking the Court to apply the statute of limitations . . . .") (citations omitted); Pl. Mem. at 19 (arguing that "[s]ummary judgment is . . . appropriate" because "the Court has determined that such contamination appreciably harms the District's property interests as a matter of law").

or the People's general interest in groundwater[78] – the primary "injury" that it must show to sustain its public nuisance claim is an in injury to the *public* – an "offense[] against, or interference with, *the exercise of rights common to the public*."[79]  The fact that OCWD *the regulatory body* is harmed by MTBE detection at five ppb in shallow aquifers beneath gasoline service stations – to the extent such detection causes it to incur costs while acting in furtherance of its charge to protect all groundwater within its territory – does not prove, as a matter of law, that such contamination has substantially and unreasonably interfered with *the public*'s use of the water.

I am not holding that OCWD *cannot* prove that MTBE contamination or threatened contamination constitutes a public nuisance.  Rather, the evidence submitted in support of the instant motion for partial summary judgment does not support it.  OCWD submits no evidence, for example, that the contamination at any of the fourteen sites has prevented the public from using the District's water, or has offended the senses of a substantial number of individuals in the district.  The contamination at five ppb found at each monitoring well identified by OCWD was drawn from shallow aquifers – water which is *already unusuable*, as OCWD has

---

[78]        *See In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d at 466.

[79]        *People ex rel. Gallo v. Acuna*, 60 Cal. Rptr. 2d 277, 284 (1997).

26

conceded.[80]  Indeed, on a previous motion in this case, the District submitted a

declaration claiming that "virtually all drinking water wells within the District's

area draw from several hundred feet below ground surface, and certainly none

draw water from shallow depths close to service stations."[81]  Thus, although a

secondary MCL *in drinking water* "may adversely affect the odor or appearance of

the water and may cause a substantial number of persons served by the public

water system to discontinue its use,"[82] strongly supporting a finding of public

nuisance, a finding of secondary MCLs in water drawn from *shallow aquifers* does

not prove the existence of such a nuisance.[83]

      OCWD directs the court to *State of California v. Campbell*, where the

Ninth Circuit upheld a district court decision granting summary judgment to the

State on its public nuisance claim against a manufacturer that had dumped

trichloroethylene on its property (the "20th Street Property"), resulting in the

---

[80]    *See* 2/28/07 Declaration of Roy Herndon, OCWD Chief Hydrologist ("2/28/07 Herndon Decl."), Ex. 12 to Anderson Decl., ¶ 3 ("[S]hallow groundwater at service station sites . . . is simply not useable drinking water.").

[81]    *Id.*

[82]    CAL. HEALTH & SAFETY CODE § 116275(d).

[83]    Nor has OCWD introduced any evidence that it uses the shallow groundwater surrounding these stations for any other activity, including its recharge activities.

contamination of groundwater at the site itself and also in municipal and private

wells located downgradient from the site.[84]   According to OCWD, *Campbell* stands

for the proposition that "'[p]olluted water is a public nuisance.'"[85]   Leaving aside

for the moment whether this is an accurate statement of California law,[86] it is

certainly taken out of context, for OCWD has offered no undisputed evidence that

the water in its district is "polluted" as the *Campbell* court used that word:

> Where . . . it is claimed that a substance underlying [defendants']
> land creates a public nuisance, it is not enough that some water on
> or in the land may come into contact with the substance.  Rather,
> it must be shown that the substance has, or at least is likely to
> have, invaded the water supplies of the public or of a considerable
> number of persons with one or more of the effects set forth in
> Civil Code section 3479.[87]

---

[84]    *See* 138 F.3d 772, 776 (9th Cir. 1998).

[85]    Pl. Reply at 9 (quoting 138 F.3d at 776 (paraphrasing *Carter v. Chotiner*, 210 Cal. 288, 291 (1930))).

[86]    *See Beck Dev. Co., Inc. v. Southern Pac. Transp. Co.*, 52 Cal. Rptr. 2d 518, 549 (Cal. Ct. App. 1996) (rejecting a trial court finding that "oil contamination beneath Beck's property is a nuisance per se.").

[87]    *Id.* at 552.  As the *Beck* court explained,
"Groundwater is water within the earth's zone of saturation. Vadose water – water above the zone of saturation and in the zone of aeration, and not capable of withdrawal by wells – is generally excluded from this definition."  (Tarlock, Law of Water Rights and Resources, Environmental Law Series (1995 rev.) § 4.02, p. 4-2, fn. omitted.)  Despite this explanation, "groundwater" is not a word with fixed meaning under California law, and it is sometimes used simply to refer to any water which is under rather

Such a showing was made in *Campbell.* After the California Department of Toxic Substances Control detected the presence of trichloroethylene and other hazardous chemicals in the soil beneath the 20th Street Property,

> [s]ubsequent testing indicated that high concentrations of trichloroethylene and other hazardous substances were present not only in the soil but also in the groundwater at the 20th Street Property. The Department tested the groundwater in municipal and private wells that are located downgradient from the 20th Street Property and determined that trichloroethylene had contaminated that groundwater as well. One of the polluted wells was located at Stanley Park, a housing subdivision located about a mile downgradient from the 20th Street Property.[88]

Here, unlike in *Campbell* – but as in *Beck* – OCWD has presented "no evidence that the [MTBE] under [defendants'] property has invaded other property or the water supplies of other persons"[89] or that drinking water has been contaminated.

Nor has the District presented evidence of "the potential for *future contamination* of public water supplies,"[90] a separate basis for its public nuisance

---

> than upon the ground. . . . *The resolution of a particular claim of nuisance cannot be resolved definitionally and instead must be determined by reference to the peculiar facts and circumstances shown by the evidence.*

*Id.* (emphasis added).

[88]    *Campbell*, 138 F.3d at 775.

[89]    *Beck*, 52 Cal. Rptr. 2d at 552.

[90]    *Id.* at 553 (emphasis added).

29

claim.  As in *Beck*,

> [t]he evidence is that any contamination of the soil on [defendants'] property . . . is at relatively shallow depths . . . .  The shallow groundwater in the area is of poor quality and water users draw their supplies from much deeper sources . . . .[91]

Moreover, all fourteen sites are undergoing remediation and, as I discussed earlier, OCWD has presented no undisputed evidence that the contamination has migrated off-site, or the extent of that contamination.  But when a plaintiff pursues a public nuisance claim based on a fear of future harm, "the burden must be on the plaintiff to establish some measure of such things as the magnitude and likelihood of the danger and it cannot be enough to merely suggest a danger and assert that it has not been ruled out."[92]  In other words, proving that "significant amounts of [] MTBE

---

[91]    *Id.*

[92]    *Id.* at 554.

There was no evidence [submitted by plaintiff] to establish any likelihood that the substance under [defendants'] property will invade the deeper groundwaters from which public water supplies are drawn.  There was no evidence of the effect on the public, if any, that the substance would have if it migrated off [defendants'] property and came into contact with the shallow groundwaters in the area. And there was no evidence to establish any measure of the likelihood that such an event might occur.  Instead, *the evidence was simply to the effect* that the testing that was done was inadequate to support firm factual conclusions, and *that the possibility of migration and contact with the shallow groundwater off [defendants'] property could not be ruled out*.

*Id.* (emphasis added).

moved off-site long before groundwater remediation efforts began, and that on site remediation efforts have been too little, too late" is not an issue for "the damages phase of this case"[93]; it is a crucial component of perhaps the most important element of OCWD's public nuisance claim, and a component that OCWD did not support with sufficient evidence on this motion.  Thus, although I cannot conclude as a matter of law that "it is unlikely that the contamination under [defendants'] property will invade public water supplies,"[94] I certainly cannot grant partial summary judgment to OCWD on the substantial and unreasonable harm element of its public nuisance claim.

### b.    "Substantial Factor"

While OCWD has not offered undisputed evidence that the interference of which it complains is substantial and unreasonable, it *has* proven, as a matter of law, that the acts of defendants associated with the fourteen sites implicated in this motion were a "substantial factor" in causing the MTBE contamination detected beneath those sites, thereby satisfying the causation requirement for a public nuisance claim.[95]

---

[93]    Pl. Mem. at 18.

[94]    *Beck*, 52 Cal. Rptr. 2d at 553.

[95]    To be clear, whether that contamination amounts to a public nuisance has not yet been established.

31

A substantial factor in causing harm is

a factor that a reasonable person would consider to have
contributed to the harm.  It must be more than a remote or trivial
factor [, but it] does not have to be the only cause of the harm.
Conduct is not a substantial factor in causing harm if the same
harm would have occurred without that conduct.[96]

### i.      UST-Operated Sites

In addition to sharing three of the four primary characteristics based

on which OCWD argues *all* defendants may be held liable – namely, (1) ownership

of (or a lease on) a now-contaminated site and any on-site USTs, (2) responsibility

for supplying MTBE gasoline to the station, and (3) responsibility for remediation

at the site – the defendants associated with five of the fourteen sites implicated in

this motion also (4) *operated* the USTs located on-site.[97]  Under these facts, the

possibility that these defendants were *not* a substantial factor in causing the MTBE

contamination detected on-site amounts to "metaphysical doubt."[98]  *First*, because

---

[96]      CACI § 430 (2011).  *See also Rutherford v. Owens-Illinois, Inc.* 67
Cal. Rptr. 2d 16, 26-27 (1997).

[97]      Defendants argue that using remediation activities as evidence of
responsibility for contamination runs the risk of creating perverse incentives
against remediation, because choosing to remediate would be considered evidence
of liability.  The argument in nonsensical, however, because UST owners and
operators are legally required to conduct remediation of unauthorized UST releases
– they have no choice.

[98]      *Matsushita Elec. Indus.*, 475 U.S. at 586.

each defendant is engaged in remediation at each site pursuant to Chapter 6.7 of

the California Health and Safety Code, and because an unauthorized release from a

UST precipitates any cleanup under Chapter 6.7, it follows that an unauthorized

release from a UST caused at least *some* of the contamination at each site.  (Thus,

defendants' contention that a "customer drive-off [or] tank over-fill" could be

responsible for the contamination[99] is untenable.)  *Second*, the defendants

associated with these stations supplied the gasoline stored in the leaking USTs,

owned the leaking USTs, and operated the leaking USTs.  Thus, there can be no

explanation for the UST leaks that "created or assisted in the creation of the

[alleged] nuisance" other than some act by these defendants.[100]  Accordingly,

partial summary judgment as to these five sites on the issue of causation is granted.

### ii.    Non UST-Operated Sites

However, defendants proffer evidence that nine of the fourteen

stations at issue on this motion were *operated* by independent dealers during

periods when MTBE was detected beneath them – some of whom testified at their

depositions that they were responsible for all daily duties at the sites, including

gauging USTs for inventory loss, verifying inventory, recording product deliveries,

---

[99]    *See* Opp. Mem. at 5.

[100]   *City of Modesto Redevelopment Agency v. Superior Court*, 13 Cal.
Rptr. 3d 865, 872 (Cal. Ct. App. 2004).

33

inspecting island and tank fill areas, and monitoring for alarms.[101]   Defendants

argue that this evidence "raises a factual issue as to whether the non-Defendant

operators or someone other than the station owner may have been responsible for

the contamination."[102]   But under California law, one party's contribution to the

creation of a nuisance does not preclude another party's (joint) liability for

"causing" it; both can be "substantial factors" in causing the harm alleged.   And

here, the undisputed fact remains that the defendants associated with these nine

sites "create[d] or assist[ed] in creating a system that cause[d] hazardous

[chemicals] to be disposed of improperly."[103]   Whatever part the independent

dealers may have played in causing the UST leaks, there can be no genuine dispute

that these defendants' conduct in setting up the systems that caused the

contamination was "more than a slight, trivial, negligible, or theoretical factor in

producing [the contamination]."[104]

---

[101]     *See* Defendants' Statement of Material Facts that Give Rise to
Genuine Disputes Pursuant to Local Rule 56.1(B) ¶¶ 16-18 (Arco # 1887), 40-41
(Arco #1905), 63-64 (Chevron # 9-5401), 75 (Chevron # 1921), 99 (Mobil # 18-
G6B), 109-110 (Unocal # 5792), 130 (Unocal # 5376), 142 (Unocal # 5123), 176
(Texaco # 121681).

[102]     Opp. Mem. at 5.

[103]      *City of Modesto*, 13 Cal. Rptr. 3d at 874.

[104]     *Espinoza v. Little Co. of Mary Hosp.*, 31 Cal. App. 4th 1304, 1314
(1995).

"[A plaintiff] is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. . . . Conduct can be considered a substantial factor in bringing about harm if it has created a force or series of forces which are in continuous and active operation up to the time of the harm . . . ."[105]

Defendants emphasize this Court's previous decision holding that ownership and supply alone are not enough to establish liability for nuisance.[106] But that decision, as well as the decision on which it was based, addressed (1) manufacturer liability for nuisance in the absence of property ownership[107] as well as (2) landowner liability for nuisance in the absence of any affirmative conduct on the part of the landowner.[108] They are inapposite.  These defendants not only manufactured MTBE and owned the land that was contaminated, but supplied MTBE to the stations and owned the USTs where it was stored – the USTs that

---

[105]    *Id.* (quoting *Osborn v. Irwin Mem'l Blood Bank*, 7 Cal. Rptr. 2d 101, 108 (1992)).

[106]    *See* Opp. Mem. at 4 (citing *In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d at 463 (relying on *City of Modesto*, 13 Cal. Rptr. 3d at 865)).

[107]    *See In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d at 463 (explaining that a defendant's actions "must amount to more than simply the manufacture or distribution of the defective product – rather, a defendant must take other 'affirmative acts' that have contributed 'directly' to the nuisance") (quoting *City of Modesto*, 13 Cal. Rptr. 3d at 865).

[108]    *See City of Modesto*, 13 Cal. Rptr. 3d at 871 ("[U]nder the common law, a landowner's liability for a public nuisance could result from the failure to act as well as from affirmative conduct . . . .").

leaked, necessitating remedial action on their part.  As the *City of Modesto* court explained, "liability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is *whether the defendant created or assisted in the creation of the nuisance*."[109]  Because "reasonable minds could not dispute" this question as to the defendants associated with these nine sites,[110] even *if* the independent dealers' actions may also have been a substantial factor in causing the nuisance, partial summary judgment on the issue of causation is granted.

### 3.    "Continuing" or "Permanent" Nuisance

OCWD moves for partial summary judgment not only as to *liability* for public nuisance, but also that the nuisance is "continuing" such that the claim is timely (i.e., the statute of limitations has not run).  In a public nuisance cause of action in which the plaintiff prays for damages incidental to the abatement of the public nuisance (as OCWD does here), the nuisance must be characterized as either "continuing" or "permanent."  If the nuisance is permanent, a plaintiff must bring one action for all past, present, and future damages within the three-year statute of

---

[109]    *City of Modesto*, 13 Cal. Rptr. 3d at 872 (emphasis added).

[110]    *See Lombardo,* 110 Cal. Rptr. 2d at 699.

limitations after the permanent nuisance is created.[111]  On the other hand, if the

nuisance is continuing, then "'[e]very repetition of [the] continuing nuisance is a

separate wrong,' subject to a new and separate limitation period, 'for which the

person injured may bring successive actions for damages until the nuisance is

abated, even though an action based on the original wrong may be barred.'"[112]

"The classic example of a continuing nuisance is an ongoing or repeated

disturbance, such as . . . one . . . caused by noise, vibration or foul odor."[113]  To

show a continuing violation, the plaintiff must demonstrate that the damage is

"reasonably abatable," which means that the condition can be removed "without

unreasonable hardship and expense."[114]  However, the fact that an abatement "may

take considerable time and may never be wholly successful" does not dictate a

---

[111]        *See Capogeannis v. Superior Ct.*, 15 Cal. Rptr. 2d 796, 800 (Cal. Ct.
App. 1993); CAL. CIV. PROC. CODE § 338.  Findings of permanent nuisance have
typically been limited to those resulting from "solid structures, such as buildings,
railroads, or pipelines," where there is a legitimate interest served by permitting the
contamination to persist.  *Mangini v. Aerojet-General Corp.*, 51 Cal. Rptr. 2d 272,
285 (1996) ("*Mangini II*") (quotation marks omitted).

[112]        *Capogeannis*, 15 Cal. Rptr. 2d at 800 (quoting *Phillips v. City of
Pasadena*, 27 Cal. 2d 104, 107 (1945)).

[113]        *Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 39 Cal. 3d 862,
870 (1985).

[114]        *Mangini II*, 51 Cal. Rptr. 2d at 278.

37

finding that it is not abatable.[115]  "Whether contamination . . . is a permanent or continuing injury is ordinarily a question of fact turning on the nature and extent of the contamination."[116]

In support of its motion, OCWD presents three arguments intended to prove the reasonable abatability of the contamination at the sites at issue.[117]  *First*, OCWD argues that the contamination must be abatable because the defendants are engaging in remediation.[118]  *Second*, the defendants' Master Answers state that gasoline leaks are generally remediable.[119]  *Third*, the District is authorized by law to determine whether MTBE can and should be abated, and has made the decision that it should be.[120]

Abatability is not proven by defendants' on-site remediation efforts, however, because the District's theory of damages is based on *off-site contamination*, and the tactics used to remediate MTBE vary depending on where

---

[115]    *Capogeannis*, 15 Cal. Rptr. 2d at 805.

[116]    *Mangini I*, 281 Cal. Rptr. at 841.

[117]    *See* Pl. Mem. at 22-23.

[118]    *See id.* at 22.

[119]    *See, e.g.*, BP Master Answer at 22 ("[G]asoline leaks, whether containing MTBE or not, are almost always traceable to a specific source, limited to the immediate geographic area of the source, and remediable.").

[120]    *See* Pl. Mem. at 22-23.

it is being conducted.  For instance, remediation at the spill site might involve the excavation of contaminated soil.  But the successful excavation and treatment of contaminated soil from the spill site does not prove that a recovery well designed to treat an off-site MTBE plume will be similarly successful.

OCWD's argument that abatability is established by defendants' Answers is also unconvincing, for two reasons.  *First*, not every defendant's Answer contains the assertion that gasoline spills can generally be remediated.[121] *Second*, the California Supreme Court has rejected the contention that "mere technological feasibility proves abatability."[122]  Thus, there must be a determination that remediation is not merely possible, but reasonable in light of all the circumstances of the contamination at issue.  The broad, general language contained in the Answers is insufficient evidence of the abatability of the contamination at each site at issue.

Finally, OCWD's reliance on its own determination that MTBE can and should be abated is unavailing.  The District points to minutes from a 2005 Board of Directors meeting adopting a resolution that funds should be expended "to perform investigation, cleanup, abatement, and remedial work to address

---

[121]    At a minimum, G&M Oil's Answer does not contain the assertion at issue.

[122]    *Mangini II*, 51 Cal. Rptr. 2d at 279.

39

MTBE."[123]  This general resolution does not constitute a *determination* that MTBE can be reasonably abated at the fourteen sites at issue in this motion.

In the absence of any expert reports demonstrating that the groundwater contamination can be remedied at a reasonable cost by reasonable means at these sites, and because I must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, I must conclude that there is a genuine issue of material fact whether the contamination is reasonably abatable at all fourteen sites at issue in this motion, and that the nuisance is therefore continuing.

### C.    Trespass

#### 1.    Applicable Law

"A trespass is an invasion of the interest in the *exclusive* possession of land, as by entry upon it . . . ."[124]

#### 2.    Application

The theory of OCWD's trespass claim is that defendants' alleged contamination of on-site groundwater constitutes an invasion of OCWD's

---

[123]    3/23/05 OCWD BOD Minutes.

[124]    *Wilson v. Interlake Steel Co.*, 185 Cal. Rptr. 280, 283 (1982) (quotation marks omitted) (emphasis added).  By contrast, "a nuisance is an interference with the interest in the private use and enjoyment of the land and does not require interference with the possession."  *Id.* (quotation marks omitted).

usufructuary interests – interests I held, on a previous motion for summary

judgment, to be possessory property rights.[125]  In opposing that motion, OCWD

had argued that through its replenishment of the groundwater basin, it acquired a

corollary "'legal [usufructuary] right to withdraw an equivalent amount of water

from the basin.'"[126]  I agreed with OCWD, explaining that

> OCWD's enabling Act specifically charges it with the power to
> [a]ppropriate and acquire water and water rights within or outside
> of the district.  In accordance with this mandate, OCWD has
> acquired a usufructuary right through its replenishment activities
> under California law.[127]

On this basis, I rejected defendants' argument – in support of its motion to dismiss

OCWD's trespass claim – that OCWD has no "'possessory interest in real

property' with which the alleged MTBE contamination has interfered."[128]

Defendants now argue that OCWD's motion for partial summary

judgment as to liability for trespass must fail because "[t]he District's usufructuary

---

[125]   *See In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d at 462.

[126]   *Id.* at 461 (quoting OCWD's Memorandum of Law).  *See id.*
("Usufructuary rights generally arise from some physical act with respect to the
water by the appropriator to manifest the possessory right.  The appropriative right,
however, may also be based on *conservation* of groundwater through substitution
of, *or replenishment from*, an alternative supply.") (quotation marks and footnotes
omitted) (emphasis added).

[127]   *Id.* at 461 (quotation marks and citations omitted).

[128]   *Id.* at 462 (quoting defendants' Memorandum of Law).

right to water – to the extent it has one – is subordinate to other water users, and as

such, the District does not have *exclusive* control of the water and cannot assert a

trespass claim."[129]   In California, "the right of property in water is usufructuary,

and consists not so much of the fluid itself as the advantage of its use."[130]

> Courts typically classify water rights in an underground basin as
> *overlying*, *appropriative*, or prescriptive.  An *overlying* right,
> analogous to that of the riparian owner in a surface stream, is the
> owner's right to take water from the ground underneath for use on
> his land within the basin or watershed; it is based on the
> ownership of the land and is appurtenant thereto.[131]

Conversely, an *appropriative* right is based not on the ownership of land above the

groundwater, but on the *taking* of groundwater.[132]  "One with *overlying* rights has

rights superior to that of other persons who lack legal priority [such as

appropriative rights-holders], but is nonetheless restricted to a reasonable

beneficial use."[133]  The right of an appropriator (like OCWD) is thus subordinate to

---

[129]    Opp. Mem. at 19 (footnote omitted) (emphasis added).

[130]    *National Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 441
(1983).

[131]    *City of Barstow v. Mojave Water Agency*, 23 Cal. 4th 1224, 1240-41
(2000) (emphasis added).

[132]    *See National Audubon Soc'y*, 33 Cal. 3d at 441 ("The appropriation
doctrine contemplates the diversion of water and applies to 'any taking of water for
other than riparian or overlying uses.'") (quoting *City of Pasadena v. City of
Alhambra*, 33 Cal. 2d 908, 925 (1949)).

[133]    *City of Barstow*, 23 Cal. 4th at 1240-41 (emphasis added).

an overlying right-holder.  This is true for groundwater rights even if the overlying

right-holder is not exercising its right.[134]

　　　　To the extent the District has *any* usufructuary rights,[135] those rights

are appropriative, and are therefore subordinate to the State (acting pursuant to the

---

[134]　　*See Wright v. Goleta Water Dist.*, 174 Cal. App. 3d 74, 86 (1985)
(appropriative rights have a lower priority than an overlying owner's unexercised
rights).

　　　　OCWD relies on *Newhall Land & Farming Co. v. Superior Court* for
the proposition that "[d]ischarging hazardous waste into soil and groundwater
constitutes a trespass."  Pl. Mem. at 24 (citing 23 Cal. Rptr. 2d 377, 383-84 (Cal.
Ct. App. 1993)).  But in *Newhall*, the court sustained a trespass claim by plaintiffs
– owners of *property* contaminated by USTs – against the prior owners of the
property.  *See* 23 Cal. Rptr. 2d at 383-84.  Plaintiffs were not even asserting
exclusive possessory rights in groundwater beneath that land, let alone
(subordinate) appropriative rights.

[135]　　While I previously stated that "OCWD has acquired a usufructuary
right through its replenishment activities," that statement was based upon a limited
factual record because full discovery had not yet commenced.  *In re MTBE Prods.
Liab. Litig.*, 457 F. Supp. 2d at 461.  As the case has developed, defendants have at
least raised a genuine issue of material fact whether, even if OCWD possessed a
usufructuary right in the groundwater, it (1) has abandoned that right by failing to
exercise it or (2) does not intend to exercise it with respect to the shallow
groundwater where MTBE has been detected.  *See* 1/16/07 Declaration of Roy
Herndon, OCWD Chief Hydrogeologist, Ex. 12 to Anderson Decl.; 2/28/07
Herndon Decl. (noting that OCWD does not use the shallow groundwater near the
stations); *Cardoza v. Calkins*, 117 Cal. 106, 112 (1897) ("[T]he water was open
[for OCWD's] appropriation . . . , [but] the acts of [OCWD] never amounted to a
valid appropriation."); *Nicoll v. Rudnick*, 72 Cal. Rptr. 3d 879, 883 (Cal. Ct. App.
2008) ("Appropriative rights are subordinate to the rights of riparian owners and
prior appropriators, and may be lost by nonuse."); 12 Witkin: Summary of
California Law: Real Property § 954 (10th ed. 2005) ("[T]he appropriator forfeits
the right to take the water by abandonment or nonuse.").

public trust), any overlying right holders (such as the defendants as owners of the sites), and the purveyors that actually pump the water out of the ground and provide it to customers.[136]  Thus, OCWD does not have *exclusive* – or even *primary* – possession of the property interest allegedly invaded by the MTBE contamination, and therefore cannot assert a claim for continuing trespass.[137] Accordingly, as with the OCWD Act claim, OCWD is directed to show cause within twenty-one days of the date of this Order as to why summary judgment should not be granted to defendants on the trespass claim.[138]

## V.   CONCLUSION

For the aforementioned reasons, OCWD's motion for partial summary judgment of liability on all three of the claims at issue in this motion is denied. The Clerk of the Court is directed to close this motion (Docket No. 186).  A

---

[136]    *See City of Barstow*, 23 Cal. 4th at 1241 ("Proper overlying use . . . is paramount and the rights of an appropriator must yield[.]"); *Wright*, 174 Cal. App. 3d at 87 ("Private property rights in water fall before decisions made pursuant to the public trust doctrine[.]").

[137]    Moreover, even if OCWD had proven its trespass claim as a matter of law, there would remain for trial a genuine issue of material fact as to whether that trespass was continuing or permanent – for the same reasons there is a genuine issue of material fact whether the MTBE contamination constitutes a continuous or permanent nuisance (if a nuisance at all).  *See Mangini II*, 51 Cal. Rptr. 2d at 275 ("[T]he crucial test of the permanency of a trespass or nuisance is whether the trespass or nuisance can be discontinued or abated.").

[138]    *See Bridgeway Corp.*, 201 F.3d at 139.

conference is scheduled for August 2, 2011 at 4:30 p.m.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.


Dated:      New York, New York
            June 20, 2011

## -Appearances-

**Counsel for Orange County
Water District:**

Michael Axline, Esq.
Tracey O'Reilly, Esq.
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825
Tel: (916) 488-6688
Fax: (916) 488-4288

**Counsel for Atlantic Richfield
Company and BP Products North
America, Inc.:**

Matthew T. Heartney, Esq.
Arnold & Porter LLP
777 South Figueroa Street 44th
Floor
Los Angeles, CA 90017
Tel: (213) 243-4000
Fax: (213) 243-4199

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
Tel: (212) 547-5583
Fax: (212) 547-5444