```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE:  METHYL TERTIARY BUTYL          MDL 1358
     ETHER ("MTBE") PRODUCTS                00 Civ. 1898 (SAS)
 4   LIABILITY LITIGATION

 5   ------------------------------x
                                            New York, N.Y.
 6                                          February 24, 2012
                                            4:30 p.m.
 7   Before:

 8           HON. SHIRA A. SCHEINDLIN,

 9                                          District Judge

10

11           APPEARANCES

12

     WEITZ & LUXENBERG, P.C.
13        Attorneys for La Susa
     BY:  WILLIAM A. WALSH
14

15   MILLER AXLINE & SAWYER LLP
          Attorneys for NJ DEP
16   BY:  MICHAEL D. AXLINE

17

     JOHN K. DEMA
18        Attorney for NJ American Water Company

19

     COHN, LIFLAND, PEARLMAN, HERRMANN & KNOPF LLP
20        Attorneys for NJ American Water Company
     BY:  LEONARD Z. KAUFMAN
21

22   McDERMOTT, WILL & EMERY
          Attorneys for ExxonMobil Corp.
23   BY:  STEPHEN J. RICARDELLI

24

25
```

1                    APPEARANCES

2

3    SEDGWICK LLP
          Attorneys for Shell Oil Co.; Texaco Refining and
          Marketing, Inc.; Chevron U.S.A. Inc.; Motiva Enterprises;
4         Equilon Enterprises, LLC
     BY:  PETER C. CONDRON

5

6    BAKER & BOTTS LLP
          Attorneys for Hess and Marathon
7    BY:  STEVEN L. LEIFER

8

9    SHEPPARD MULLIN RICHTER & HAMPTON LLP
          Attorneys for ExxonMobil
     BY:  JEFFREY J. PARKER

10

11   GREENBERG TRAURIG LLP
          Attorneys for El Paso and Coastal Eagle Point
12   BY:  DAWN ELLISON

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Case called)

 2          THE COURT:  Good afternoon.  I have letters from both

 3  sides, letters from both the plaintiffs and defendants, dated

 4  February 16, reply letters from both dated February 21st.

 5  Again I thank you for not inundating us with more than one

 6  letter per side and one reply per side.  That is very helpful.

 7          The first item has to do with the City of Merced case,

 8  which I understand finished a trial in the state court in

 9  California with a verdict for the plaintiffs.  But the

10  California supreme court also recently upheld a law abolishing

11  redevelopment agencies, RDA's, which is the plaintiff, and that

12  raises a question as to whether the Merced RDA has legal

13  standing to continue the case.  Somebody may be able to report

14  to me on what is going on with the Merced case.

15          MR. AXLINE:  Mike Axline, your Honor.  The law that

16  abolished the RDA's provided for several procedures for the

17  orderly wind-up of their business, one of which was the

18  appointment of a board by the governor that would then be

19  charged with winding down the business of the RDA.  That's the

20  direction it has gone in Merced.

21          The governor is in the process of appointing a board.

22  That board will then meet.  We will meet with that board once

23  it has been constituted and discuss how the board wants to

24  proceed with winding up the business of the RDA.  Part of the

25  business of the RDA is the RDA's claim in this case.

 1           That is all I can report to you as to the status of

 2      things.

 3           THE COURT:  I guess I still have two questions.  What

 4      is the time frame by which you would know, and therefore the

 5      Court would know, whether this action continues, whether the

 6      board wants this action to continue?  What do you think the

 7      time frame is?  Secondly, what is the effect of the state court

 8      verdict on this lawsuit?

 9           MR. AXLINE:  The answer to the first question is I

10      don't have a precise time frame.

11           THE COURT:  Not precise.

12           MR. AXLINE:  I know the governor has appointed at

13      least one board member.  He has offered it to several others,

14      who haven't accepted it.  That process is under way.  I would

15      hope that the board would be constituted by the end of next

16      week and we would then have a chance to meet with them.  I

17      think within a couple of weeks we ought to have something to

18      report to you.

19           THE COURT:  Probably by the next status conference if

20      the next status conference is a month away?

21           MR. AXLINE:  Certainly by the next status conference,

22      yes.

23           THE COURT:  Does anybody object to calendaring that

24      for a month from now, either side?

25           MR. PARKER:   No, your Honor, that is fine.

1          MR. AXLINE:  As to your second question, the impact of

2    the jury's verdict, I don't think there is any direct impact on

3    the RDA's case.  I wanted to report that to the Court.

4          THE COURT:  Why is that?

5          MR. AXLINE:  Why did I want to report it?

6          THE COURT:  No.  Why is there no impact?

7          MR. AXLINE:  They are different plaintiffs.

8          THE COURT:  I know they are different plaintiffs.  But

9    is it the same injuries, the same places impacted?  I don't

10   know the relationship between the two cases.

11         MR. AXLINE:  There is some relationship in that sense.

12   The RDA was overseeing the clean-up at two of the worst release

13   sites in Merced and had spent money to do that as the RDA.  The

14   city's case involved some of the city's money separate from the

15   RDA that had been spent on those same stations, but that was

16   relatively small amount.  And other stations that were not

17   within the --

18         THE COURT:  As to the overlapping stations, might

19   there be some collateral estoppel effect, same defendants, same

20   site, same finding that they were liable for an impact to the

21   area?

22         MR. AXLINE:  There may well be, your Honor.  I haven't

23   looked at this yet, but --

24         THE COURT:  I didn't mean to give you any ideas.  Take

25   a look at that and let me know.

 1                MR. AXLINE:  You inadvertently did.  I do think that

 2      that is worth examining.

 3                THE COURT:  Let's go on then, put that item over for a

 4      month and go on to the defendants' agenda item, the first of

 5      which is the privilege log challenge to the plaintiffs'

 6      November 17th and January 27th privilege log.  I think we

 7      discussed the privilege log at the last conference, and I think

 8      in January I said to the plaintiffs that they should update the

 9      November privilege log with respect to some of the descriptions

10      of the deliberative process privilege, claims of privilege.

11                As I understand it, and I don't know if this is true,

12      the plaintiffs did not really take the opportunity to update

13      the November privilege log.  Is that right?

14                MR. KAUFMAN:  That's right, your Honor.  We felt that

15      the descriptions in those were sufficient and were willing to

16      defend them if there is a challenge.

17                THE COURT:  There is a challenge.  If that's that,

18      then do the defendants wish to --

19                MS. ELLISON:  Your Honor, we were hoping you could set

20      a schedule for the challenge.  Given the time constraints of

21      this conference, we didn't think you wanted this.  We

22      anticipate challenging approximately 75 of the entries.  We

23      weren't sure how you wanted to handle that.  We were hoping to

24      get a schedule set for submissions relating to the challenge.

25                THE COURT:  OK.  When do you want to submit?  If

1     you're going to challenge 75 different submissions, it still

2     has to be done in 25 pages.  That doesn't change the length of

3     the brief at all.  The law is the law, and then you group them

4     and say the following 5 are insufficient for this reason, the

5     following 10 are insufficient for this reason, if the Court

6     wishes us to submit all 75 in camera, we will, but here are the

7     reasons that the descriptions are insufficient.

8             MS. ELLISON:  We don't anticipate needing additional

9     page limits.  We think there are categorical challenges, so we

10    anticipate putting in a fairly short submission and attaching

11    the exact entry for plaintiff to challenge.  We can be prepared

12    to put that submission in to you by Tuesday.

13            THE COURT:  Fine.

14            MS. ELLISON:  We would just ask that your Honor set

15    the dates for the response and the ultimate hearing so that we

16    know exactly when it's going to be resolved.

17            THE COURT:  That's what I always do.

18            MS. ELLISON:  Great.

19            THE COURT:  You won't know exactly when it's going to

20    be resolved.  That much I can't promise.  But I can set the

21    schedule.  The brief coming in 2/28.  How long do you need to

22    respond?

23            MR. KAUFMAN:  I would think probably two weeks.

24            THE COURT:  I must be a mind reader.  I knew you are

25    going to say two weeks.  March 13th.  And the reply, Ms.

1    Ellison?

2              MS. ELLISON:  Your Honor, one week?

3              THE COURT:  Sure.  That will be fully submitted March

4    20th.  I can't tell you now about a hearing and I can't tell

5    you now about a decision.  When the papers come in, that's when

6    I'll have a chance to look at it.

7              MS. ELLISON:  Thank you, your Honor.

8              THE COURT:  The next agenda item it sounded like you

9    might have resolved.  I'm summarizing it.  Are you ready, Mr.

10   Ricardelli?

11             MR. RICARDELLI:  Yes.  We have met and conferred on

12   that, which is agenda item 3, and we don't have any issues for

13   the conference day.

14             THE COURT:  The record will never know what that was.

15   I was going to say I would summarize it as update on the use of

16   market share liability theory, private damages, and site

17   designations pursuant to CMO 78.  Is that fair?

18             MR. RICARDELLI:  That's fair.

19             THE COURT:  That's one for now that there is no

20   dispute for me?

21             MR. RICARDELLI:  That's correct.

22             MR. LEIFER:  Your Honor, may I interrupt?  I know we

23   are making a lot of progress.

24             THE COURT:  Yes.

25             MR. LEIFER:  We actually had an agenda item at the

 1    front that we may have skipped over.  The deliberative process

 2    debate had two aspects to it.

 3              THE COURT:  It did.

 4              MR. LEIFER:  We can address it in whatever order you

 5    would like, of course.

 6              THE COURT:  Right.  I was going to get back to it

 7    later in this agenda.  I do know there is a second issue on

 8    deliberative process.  Is this the one about even if the

 9    privilege log is adequate, you're saying because they have a

10    failure to warn theory, your need to know what they knew and

11    when they knew it overrides any deliberative process privilege

12    anyway?

13              MR. LEIFER:  There is that overriding argument.  It is

14    partly based on the failure to warn, as your Honor points out.

15    We have some other reasons why we think the necessity outweighs

16    the government's interest in nondisclosure.  We had proposed in

17    our correspondence with you that we set an expedited briefing

18    schedule on that subject.

19              THE COURT:  Yes, but I'm worried about that because I

20    don't want to do that in a vacuum.  It seems to me your theory

21    is even if a document satisfied all the requirements of

22    asserting the privilege as a policy matter, since it is a

23    qualified privilege, we can override it even if it's properly

24    asserted.

25              MR. LEIFER:  Yes, as relates to the documents on the

1     one hand.  But we also have an issue coming up with --

2              THE COURT:  Depositions?

3              MR. LEIFER:  Depositions.

4              THE COURT:  Right.

5              MR. LEIFER:  We know that those issues are going to be

6     contested.  They already have been in a prior deposition that

7     was somewhat similar.  That is why we had proposed this rather

8     short briefing schedule, so that we could get, hopefully, a

9     resolution before early April, when these two high-level DEP

10    officials are scheduled to be deposed.

11             THE COURT:  Do the plaintiffs agree this is ripe for

12    resolution by the Court in this somewhat general way that they

13    are saying, even if properly asserted?  That's how the motion

14    would have to start.  It wouldn't start attacking the way it's

15    asserted; that would be double work.  You would have to say,

16    assuming for the sake of this motion only that they properly

17    asserted it, we can override it because.  That's right, Mr.

18    Leifer, that's how you framed the motion?

19             MR. LEIFER:  Yes.

20             THE COURT:  Not challenging the way in which it's

21    asserted?

22             MR. LEIFER:  Not relative to, obviously, deposition

23    testimony.

24             THE COURT:  Or even the documents.

25             MR. LEIFER:  We are taking that on the other side.

```
1            THE COURT:  That's right.  This would only say,

2    assuming for the sake of argument only that it has been

3    properly asserted, we now say we can override it on the

4    qualified basis because our need for the information and the

5    failure to be able to get it anywhere else overrides any

6    privilege.

7            MR. LEIFER:  That's correct, your Honor.

8            THE COURT:  That's the motion.  Mr. Kaufman?

9            MR. KAUFMAN:  I'm not sure I heard the question.  If

10   the question is do we think it is ripe, the answer is no.  Do

11   we think it is necessary?  The answer for that is also no.

12   Under no circumstances have we or do we intend to withhold

13   information.  Facts have always been provided to them.

14           THE COURT:  Mr. Leifer said it already came up at one

15   deposition.

16           MR. KAUFMAN:  That's correct.  No facts were withheld.

17   In fact, the direction to the witness was don't withhold facts.

18   You may withhold deliberations and opinions, but do not --

19           THE COURT:  Apparently that is what he wants to have a

20   motion about, that your direction to withhold the opinions and

21   deliberations he feels is inappropriate in this circumstance

22   because his need for the information and his inability to get

23   it from any other source outweighs the qualified privilege.

24   It's not an absolute privilege.

25           MR. KAUFMAN:  The problem I have, your Honor, is when
```

1  the defendants say that they need information, they use that in

2  two different ways.  On the one hand, they say they need

3  information as facts.  If that's how they use it --

4          THE COURT:  No.  We have covered that.  You just said,

5  I told my witness to give them the facts, I'm going to tell

6  each witness to give them facts.  It's not a matter of the

7  facts, it's a matter of the deliberations and the opinions.  Do

8  you understand that, Mr. Leifer?  He is giving you the facts.

9          MR. LEIFER:  I do understand that, your Honor.

10          THE COURT:  You want the deliberations and opinions?

11          MR. LEIFER:  That's right.

12          THE COURT:  So we all know the motion we are talking

13  about.  There is no confusion.  It's not about the facts.

14          MR. KAUFMAN:  Again, your Honor, we don't think that

15  that is ripe.

16          THE COURT:  That's what the motion is about.  Of

17  course you don't think it is right.

18          MR. KAUFMAN:  Ripe.  I'm sorry.

19          THE COURT:  Why is that not ripe?

20          MR. KAUFMAN:  Because they haven't identified any

21  question where the privilege has been asserted at a deposition

22  and information, as they now define it, has been withheld from

23  them.

24          THE COURT:  I thought Mr. Leifer said --

25          MR. KAUFMAN:  Otherwise, it is just an advisory

1    opinion.

2            THE COURT:  I don't want to do that.  I thought Mr.

3    Leifer said this has already arisen at a deposition.

4            MR. LEIFER:  I was at that deposition and I was taking

5    it.  What happened is we deposed a woman named Nancy

6    Wittenberg, who is somewhat of a marginal player in this drama.

7    I asked her about her opinions and the opinions of the

8    department about the risks and benefits of oxygenates, ethanol

9    as an example.

10           Mr. Kaufman gave an instruction.  He said, when you

11   answer, do not disclose any deliberative information.  She gave

12   an answer.  I asked her, did you withhold anything based on Mr.

13   Kaufman's instruction?  She said no, because she didn't have

14   any information.

15           I'm not saying that relevant to her we didn't get

16   information.  What I'm saying is that when we depose in early

17   April the big cheeses in the department, we need to be able to

18   ask about these opinions and considerations about the risks and

19   benefits of ethanol and MTBE at that time.  I know this is

20   going to come up.  If we have any doubt about whether it is

21   going to come up or not, with your Honor's permission, we could

22   ask Mr. Kaufman, If I ask this question, are you going to

23   assert the privilege? and there won't be any question.

24           THE COURT:  I agree.  Now I understand it has not yet

25   come up in a concrete way, but depositions are scheduled in

1   April of senior people and Mr. Leifer wants to ask those senior

2   people what happened during deliberations, what was your

3   opinion, why was that your opinion.  Those are the questions

4   you want to ask, Mr. Leifer?

5           MR. LEIFER:  Yes.

6           THE COURT:  Are you going to let your witness answer

7   those questions?

8           MR. KAUFMAN:  Not as presently constituted, no.  I

9   would think that the privilege would clearly apply to those

10  questions.

11          THE COURT:  Last I heard it's a qualified privilege,

12  it's not absolute.  If it were attorney-client it would clearly

13  apply, but this is a qualified privilege.  It can always be

14  overridden, just like work product can be overridden.

15          MR. KAUFMAN:  That's correct.  The burden is on the

16  defendants.

17          THE COURT:  Agreed.  That's why he wants to make the

18  motion.

19          MR. KAUFMAN:  I guess I can't stop him from making the

20  motion.

21          THE COURT:  You can.  It doesn't have to be today, but

22  it sounds like you will only lose time if he goes through those

23  questions at the deposition of the senior official, you object

24  and instruct the witness not to answer, then you have to break

25  the deposition, and then he has to make the motion.

1          Since he knows you are not going to let that witness

2     talk about deliberations or opinions, he says, I'm ready to go.

3     He knows it's his burden and he is willing to make the motion.

4     The only problem is, Mr. Leifer, to make it concrete I think

5     you had better put in your brief the questions you would ask.

6          MR. LEIFER:  That's fair, your Honor.  We will do

7     that.

8          THE COURT:  What you seek to elicit, maybe when you

9     put it in writing, Mr. Kaufman will analyze it and say, you

10    know what, he can answer that.  It depends how you say it.

11    Even now, when I pretended I was you and asked the questions,

12    he said I would object as constituted.  You might not ask it

13    that way.

14          MR. LEIFER:  Fair enough, your Honor.

15          THE COURT:  I think you are pretty much required to

16    say here is what I want to ask and attach a small script of the

17    kinds of information you would like the witness to answer.

18    When he sees it, he can decide whether he actually would

19    instruct the person not to give it or he could say you can have

20    that.

21          With respect to documents, however, Mr. Leifer, other

22    than the problems of the alleged inadequacy of the log, are you

23    also moving with respect to them?

24          MR. LEIFER:  Not yet.

25          THE COURT:  What do you mean not yet?  I don't want to

1   do this three times.  If I'm doing the legal principles on the

2   very question of the opinions and deliberations that might

3   otherwise be subject to the privilege but for the fact that you

4   can prove the need and inability to get it elsewhere, might as

5   well do the same thing for the documents at the same time.

6          MR. LEIFER:  Fair enough, your Honor.  I'm splitting

7   hairs a little bit, admittedly.  On the one hand we have a

8   situation where we are alleging they have not improved the

9   descriptions in the privilege log.

10          THE COURT:  I hadn't heard that part.

11          MR. LEIFER:  Let's say we now agree that the privilege

12   log has been adequately -- at least that they described it

13   properly.  One issue that has arisen is doesn't the allegedly

14   privileged document have to be predecisional and doesn't have

15   to relate to a particular decision?  When you look at the

16   document, it might be clear or it might be clear from an in

17   camera review that it doesn't really relate to a decision,

18   which is a different issue from whether it is facially

19   deficient.  I know that is a little bit of a subtle difference.

20          THE COURT:  Not really.  I've written, I'm sure, half

21   a dozen opinions on this identical subject over the last 17

22   years.

23          MR. LEIFER:  I know.

24          THE COURT:  It's not even hard to find them anymore.

25   Just plug in the words "deliberative process."

 1          MR. LEIFER:  I believe that second argument that I'm

 2    making, that it is not predecisional, will essentially be moot

 3    relative to the 75 documents that Ms. Ellison talked about.

 4          THE COURT:  Because they are not?

 5          MR. LEIFER:  Because they don't really relate to any

 6    decision and they don't say that they do.  Putting aside

 7    whether they actually do or not, they don't say that they do.

 8    So I think this issue will probably, I hope, be decided in our

 9    favor on those documents and I won't have to worry about it any

10    further.  That's why I was thinking of it sequentially.  I know

11    you don't want to draw this out.

12          THE COURT:  It's not even that.  I don't want three

13    motions on deliberative process.

14          MR. LEIFER:  Here is what we will do.  We will include

15    in our brief a mention of this issue so it's in front of your

16    Honor and we can get rid of it.

17          THE COURT:  With respect to documents also.

18          MR. LEIFER:  Yes.

19          THE COURT:  To the extent the document is in fact

20    predecisional, in other words, it meets all of the

21    qualifications of the privilege, we make the same argument for

22    overriding that privilege that we make with respect to the

23    deposition questions.

24          MR. LEIFER:  Fair enough, your Honor.  Now, we had

25    proposed a schedule, but we are flexible on what that would be.

```
 1                THE COURT:  What did you propose?

 2                MR. LEIFER:  We proposed a week after this hearing for

 3     our brief.  We said we would do it simultaneously with theirs.

 4                THE COURT:  No.

 5                MR. LEIFER:  Then we'll set a time period for them to

 6     respond.  Then we would like a reply.  We are trying to do this

 7     pretty quickly because of the upcoming depositions.

 8                THE COURT:  I know.  You're proposing March 2nd.

 9     That's a week.

10                MR. LEIFER:  Yes.

11                THE COURT:  Mr. Kaufman, again, how long do you want

12     to respond?

13                MR. KAUFMAN:  Maybe I should have asked for three

14     weeks for the other one.

15                THE COURT:  No, no.  Let's not work backwards.

16                MR. KAUFMAN:  I suppose two weeks would be --

17                THE COURT:  March 16th.  And the reply?

18                MR. LEIFER:  A week later, I guess.

19                THE COURT:  Which takes us to March 23rd.  I can't

20     make the promise that --

21                MR. LEIFER:  I know.

22                THE COURT:  When is the deposition?

23                MR. LEIFER:  It's April 2nd and 3rd.  I was hoping

24     that we would give --

25                THE COURT:  I'm not going to have it in time.  You may
```

1   have to adjourn those depositions to wait for the ruling.  I

2   would like it not to be that way, but there are only 7 days a

3   week, and most of those days have 24 hours.

4           MR. LEIFER:  We have been exchanging correspondence

5   and calls with the plaintiffs.  I was hoping that they would

6   need a full two weeks, given that these issues have been on the

7   table.

8           THE COURT:  I have already written on this to some

9   extent, even in the MTBE cases.  I have written on it in other

10  cases maybe more clearly, but on this case absolutely.

11          MR. LEIFER:  The law is clear whether we can meet our

12  burden to override.  That's where the intricacies of this case

13  come to the fore.  It's very clear.  I was hoping that maybe

14  one week and one week and one week.  That would give at least

15  more time for your Honor to rule.  If your Honor does not rule,

16  fine, we'll deal with it then.

17          MR. KAUFMAN:  Your Honor, I really do not think that

18  we could give this its proper attention in a one-week span.

19  They have had whatever time they had to prepare up to this.  We

20  have only had sort of these vague, unclear ideas of what this

21  is all about.  I really would request more time.

22          THE COURT:  You should just stop at "I need two

23  weeks."  The rest of it sounds weak.

24          Now we are up to Puerto Rico.  There are sites that

25  are nondetect and there are sites that are nontest.  With

1     respect to the nondetect, I thought -- it's you?  OK, Mr. Dema.

2     I thought with respect to the nondetect you were ready to

3     dismiss.

4                MR. DEMA:  Yes, your Honor, and we had suggested a

5     meet-and-confer with the defendants to go through and discuss

6     with them particular sites.

7                THE COURT:  But nondetect in theory you're ready to

8     dismiss?

9                MR. DEMA:  Certainly they are not ripe with regard to

10    any claim, and we put the nontest in that same category.

11               THE COURT:  You are ready to dismiss them.  The only

12    issue is with or without prejudice, and you would certainly

13    argue without prejudice because they could become contaminated

14    five years from now.

15               MR. DEMA:  That that is exactly the same as your Honor

16    addressed a month ago.

17               THE COURT:  Yes.

18               MR. RICARDELLI:  Your Honor, there are two issues

19    here.

20               THE COURT:  I'm only focusing on nondetect so far.

21               MR. RICARDELLI:  Agreed.  But there are two universes

22    of nondetect that this relates to.  At the last status

23    conference we did talk about the 18 discovery sites that were

24    fully worked up where they were nondetect.  We spend a year

25    taking discovery at that time, and there seems to be a

1    discrepancy between the question I asked your Honor and the way

2    it was recorded in the transcript.  I actually asked if those

3    18 sites would be dismissed with prejudice because we had spent

4    a year frankly taking full discovery on them and now they were

5    being dismissed.

6         The issue we put on the agenda here in terms of

7    nontest/nondetect relates to the remaining universe of sites.

8         THE COURT:  Breaking it out, with respect to the 18

9    sites, Mr. Ricardelli thinks those should be dismissed with

10   prejudice because they were selected as focus sites, a year's

11   worth of work was put into it, and only after a lot of time and

12   money was spent did you say, we concede they never had a

13   detection.  He is saying that already warrants a dismissal with

14   prejudice, it's just not fair to have a second bite at that

15   ample.

16        However, with respect to all the other nondetects, Mr.

17   Ricardelli, I assume you can't oppose a without prejudice

18   dismissal.

19        MR. RICARDELLI:  We would accept the without prejudice

20   dismissal.

21        THE COURT:  I think that takes care of the nondetects

22   other than the focus sites.  With respect to the 18, I assume

23   Mr. Dema still wants to be heard.

24        MR. DEMA:  Yes, your Honor.  The transcript was quite

25   clear.  This was addressed on page 21/lines 11 to 14.  I truly

1    believe the court reporter, happily, recorded this Court

2    agreeing that absolutely Mr. Ricardelli's words without

3    prejudice would be how it came down.

4              THE COURT:  Mr. Ricardelli's words?

5              MR. DEMA:  That's in the transcript.  Now Mr.

6    Ricardelli is essentially saying the court reporter got it

7    wrong.

8              THE COURT:  Do you have those pages with you?

9              MR. DEMA:  I do not have the transcript with me.  Yes,

10   Exhibit C.

11             THE COURT:  I didn't bring the letters.

12             MR. DEMA:  I'm sorry.  I do have them with me.

13             THE COURT:  If you have it with you, I'd like to look

14   at those pages and see what error you're pointing to or what

15   alleged error.

16             MR. DEMA:  May I hand it up, your Honor?

17             THE COURT:  Please.  Mr. Ricardelli asked the

18   question.  The transcript quotes Mr. Ricardelli as saying, "We

19   will have to go back and take a look at that.  For the 18 that

20   we've taken discovery now and confirmed they are without, Mr.

21   Axline said they were dismissed."

22             The Court said, "He did."

23             Mr. Ricardelli says, "Without prejudice?"

24             I say, "It should be, absolutely.  I need a paper to

25   sign."

1         It is a little unclear.  It's not maybe a

2    transcription error.  He might have asked the question, did the

3    Court mean without prejudice, and apparently I said it should

4    be.  I thought you were trying to say Mr. Ricardelli said it

5    should be without prejudice.

6         MR. DEMA:  No.  I totally agree he asked the question,

7    and I totally agree the transcript does reflect that your

8    answer was "absolutely."  I would suggest to the Court that the

9    lament that they conducted all this discovery on these sites is

10   certainly overshooting the mark, because we had given 2,000

11   some-odd sites showing what the plaintiffs said were leaking

12   sites.

13        A year ago in February we gave a list of the 276 sites

14   that had detentions of MTBE.  The defendants chose not to

15   select a single site from that list.  This Court gave them the

16   opportunity to come back with eight.

17        THE COURT:  We're getting there.

18        MR. DEMA:  It's the plaintiffs' suggestion, your

19   Honor, that indeed they did not have to spend this time.  It

20   was a burden they chose, and it's an exercise in gamesmanship

21   as to which sites to select.  The Court said last time that

22   they don't have to select a site that's worse for them, that's

23   true.  But they also have some choice in what they do select.

24        If they had the files, they knew there were no MTBE

25   when they made the selection.  So the sympathy that could arise

1   by saying we selected sites without MTBE and then we deposed

2   people has only certain limited appeal, I would suggest.

3          MR. RICARDELLI:  Your Honor, that sounds great, but it

4   ignores the sequence of events in this case.  The site files

5   that we relied on to pick our sites were produced to us in

6   April of 2010.  The original order by this Court for us to

7   designate sites was at the end of 2010, four months before we

8   got their list of 276 sites.  We didn't have the benefit of

9   that list where they said this is where we have confirmed there

10  were hits.

11         THE COURT:  If there are going to be potentially

12  thousands of sites on which they could come back if and when

13  they are impacted, it hardly troubles me that this might be

14  true for those 18 also.  They are all in the same position.

15  These are all nondetect sites.  Whether they are part of the 18

16  or part of the couple thousand, either way you face future

17  claims if there is an impact.

18         I'm going to stick with the without prejudice for the

19  nondetects both in the focus group and outside the focus group,

20  which apparently amounts to thousands of locations.  They are

21  all dismissed.  The case is narrowed significantly.  But if

22  some day they are impacted, they are impacted.  What can I do?

23  Worry about it then.

24         MR. RICARDELLI:  That is for the nondetect, your

25  Honor?

```
 1              THE COURT:  For the nondetect, yes.  Now, what are we
 2   going to do about the nontest locations?
 3              MR. DEMA:  Our suggestion, your Honor, is that this is
 4   a question of ripeness that hasn't even come into play.
 5              THE COURT:  But you have sued with respect to those.
 6   How could you sue if there is no claim?  You can't to that.
 7              MR. DEMA:  Puerto Rico was not a jurisdiction that
 8   tested.  As of March 2011 they now have a policy in place where
 9   they are requiring testing.  More sites, it runs in the high 80
10   percentile, are showing MTBE as the testing goes forward.
11   Obviously, those sites are introduced into the case because
12   they have evidence of MTBE.
13              With regard to the claims with regard to the sites
14   that have not been tested, they are not ripe.
15              THE COURT:  They are not ripe, so they are not in the
16   suit.
17              MR. DEMA:  We never claimed that we are suing on the
18   sites where we haven't tested.
19              THE COURT:  How do we do this as a piece of paper?
20              MR. RICARDELLI:  Your Honor, what we had proposed and
21   I think the way to do this here -- we got an amended confirmed
22   site list last night with approximately 80,000 pages of
23   documents that.  Despite representations that we had had
24   everything, it showed up last night.  The letter said they were
25   coming.
```

1          Now we have apparently just under 300 sites with

2     confirmed hits, at least as far as plaintiffs understand it.

3     The three sites that we designated as trial sites, defendants

4     designated in this case, are not on their list.  One of them is

5     out of the three we designated.  So out of the 296 plus 2, they

6     have got a list here of 298 sites, and that should be the

7     entire universe for this case.  Everything is sort of gone at

8     this point.

9          THE COURT:  It is gone.  We need to put it in a paper.

10    But here is the question.  If this is an ongoing testing effort

11    and on Monday the test is run somewhere in Puerto Rico and it

12    tests positive, what do they have to do, file an amended

13    complaint every day as the testing continues?

14         MR. RICARDELLI:  Your Honor, we took discovery last

15    year.  While Mr. Dema is right that there was no statutory

16    requirement previous to now that the commonwealth tested for

17    MTBE or didn't require it, it certainly had the authority to

18    require the persons or the companies handling the clean-up to

19    conduct that testing.  Frankly, that's what these records are.

20    So it's not as though there wasn't testing being done.

21         THE COURT:  I understand.  But you don't test

22    thousands of sites on the same day.  It's a process.  It takes

23    time to go to so many sites.  It could take a year.  All I'm

24    asking you is if a site is tested next Monday or next Friday

25    and it turns out positive, what do they do?  If today we say

1   this case has 298 sites and that's what it has, that's the

2   whole case, then another site tests positive, what do we do?

3           MR. RICARDELLI:  I can confer with my colleagues for a

4   moment.  Maybe that is the best way for me.

5           THE COURT:  OK.

6           MR. DEMA:  The last time you did address this, Judge.

7   You said it's not about the hundreds of other sites, it's about

8   the trial sites.

9           THE COURT:  Frankly, I don't remember a thing I said

10  the last time.  Let them confer.

11          (Pause)

12          MR. RICARDELLI:  Your Honor, this does pose a little

13  bit of a problem because we don't want this just to continue

14  indefinitely.  There was a case filed in 2011.  It's already

15  approaching being 5 years old.  We think if the commonwealth is

16  going to go out and test these sites, there needs to be a date

17  by which they to it.

18          The original site files were produced to us in 2010,

19  and this was the total universe of sites that were at issue:

20  Leaking underground storage tanks, MTBE, no MTBE.  But we have

21  been dealing with this trying to define the landscape for two

22  years.  Now it sounds like this is going to go on indefinitely.

23          There needs to be a cutoff.  MTBE is not being used in

24  gasoline anymore.  If they have MTBE detected at these sites,

25  it could be determined now and this case can be done.  We would

1   ask for a dates by which they have to either put sites on the

2   list or not.

3          THE COURT:  That seems like a fair idea also.  What

4   they are saying is the defendants should be in a position of

5   closing out their liability either by settlement or a favorable

6   verdict or a motion.  They need to wrap up all this exposure,

7   not to make a pun.

8          You need to tell us by when you close the universe of

9   what's at issue in the Puerto Rico case.  I think that is fair.

10  Things can always happen later.  Here is a product that is not

11  in use.  At some point finish your testing and that is the

12  case.

13         MR. DEMA:  Your Honor, the law banning MTBE in Puerto

14  Rico has just passed within the last several months.

15         THE COURT:  That may be true of the law, but the

16  defendants have stopped using this product.

17         MR. RICARDELLI:  Correct.

18         MR. DEMA:  The defendants in their discovery for the

19  most part claim they never used the product, that it's sort of

20  some deus ex machina appearance because Puerto Rico is a

21  nonattainment jurisdiction.

22         THE COURT:  To the extent they did, they stopped.

23  When did they stop?

24         MR. DEMA:  We don't know, because a lot of them say

25  they never started.

 1              THE COURT:  Mr. Ricardelli?

 2              MR. RICARDELLI:  2006 for the majority of us.  I don't

 3    speak for everybody.

 4              MR. DEMA:  We have a regulatory agency, your Honor,

 5    and it just changed its policy as of March.  I would

 6    respectfully suggest you give us an opportunity to talk to our

 7    client.  Perhaps, since the problem of introduction of MTBE

 8    into Puerto Rico and its soils and groundwater was caused by

 9    the defendants, we could have a meeting with them with the

10    regulatory agency.

11              What is likely to happen is the regulatory agency will

12    make the defendants test.  Then they will answer their own

13    question as to when they could complete the test.  They have

14    the leaking underground storage tanks, not the commonwealth,

15    and they put the MTBE in the water.

16              If we could in the intervening month before we have

17    the next conference meet with the regulator and meet with the

18    defendants, we could probably come out, because I'm sure the

19    defendants are eager to test what the results of their leaking

20    tanks were.

21              THE COURT:  Are you doing testing there?

22              MR. RICARDELLI:  Yes, your Honor, at the sites that we

23    control.  But this is a historical UST list.  To be fair, your

24    Honor, the list they gave us originally with close to 750 sites

25    was a list they inherited, the commonwealth inherited, from

1    EPA.  EPA has regularly told them this list is overbroad.  You

2    have sites on there which are really nothing more than tank UST

3    registration violations; they are not even real leaking sites.

4          In this case, and this is the commonwealth's failure

5    to maintain accurate records, there are sites on here which we

6    have no affiliation to.  These are not sites that are operated

7    by the defendants due to common law statute that doesn't allow

8    us to operate them.

9          THE COURT:  Let me tell you where I come out.  The

10   issue is not terribly well developed for setting a deadline

11   today, but we certainly have opened the discussion.  I'm

12   putting it on the agenda for one month from today, at which

13   time I will set a deadline for testing but do it with more

14   information.

15         Maybe plaintiff will make a proposal before that

16   conference.  Maybe they will meet and confer with you and you

17   will agree on a proposal.  I was thinking six months maximum,

18   but I don't know if that is realistic.  They haven't talked to

19   their client.  You haven't thought about it with them.

20         Meet and confer, that is always a good idea.  Giving

21   them time to a talk to their client is a good idea.  A month

22   from today or whatever we pick I will set a deadline.  Then, I

23   agree with you, Mr. Ricardelli, either they test or they don't.

24         MR. RICARDELLI:  Thank you, your Honor.  Just for our

25   purposes now, the other sites are out?

 1              THE COURT:  We went through that.  Without prejudice.

 2   Prepare an order.

 3              MR. RICARDELLI:  Do you want us to submit a list or do

 4   you want us to hold off until the next conference.

 5              THE COURT:  We shouldn't hold off the nondetects.  We

 6   talked about it.  That's what I'm going to do.  They are all

 7   dismissed without prejudice.

 8              MR. AXLINE:  Your Honor, I assume they will run that

 9   by us.

10              THE COURT:  They are not in the habit of submitting

11   proposed others to the Court ex parte.

12              Now the trial sites issue, still Puerto Rico.

13   Defendants were given the opportunity to select additional

14   sites.  I gave them the opportunity to select eight additional

15   sites.  They say, we have only been able to designate one

16   additional site, so now it's not fair because we only have one

17   and the plaintiffs have ten, so you should make them drop a

18   bunch.  Why is it you only added one site, Mr. Ricardelli?

19              MR. RICARDELLI:  Your Honor, frankly we did a lot of

20   work trying to get to that additional site.  We are working off

21   incomplete site files.  A lot of these were in Spanish.  The

22   last time we went and picked 20 discovery sites and it took a

23   lot of time to get to those 20.  Then we took a year to get to

24   our ten for trial.  A lot of stuff goes into that in terms of

25   location, proximity to other sites, proximity to wells.

1          THE COURT:  One issue you don't have which you had in

2    New Jersey is you will have all defendants in, as I understand

3    it.  You don't have to worry about getting the defendants in by

4    picking a number of sites.  Do you know what I mean, that issue

5    we had in New Jersey?

6          MR. RICARDELLI:  That's a little bit different.  But

7    that may not be true here, either, so it does matter as to who

8    operates the service station, proximity to other locations.

9    Unlike New Jersey, though, where we have it electronically in

10   terms of we are able to plot the sites, plot the wells, here it

11   is not that easy.

12         We are working with Spanish documents.  We actually

13   had to have our consultants in 30 days, once we narrowed the

14   universe down, run around the island and try to spot-check

15   sites to make sure we knew where they were.  Frankly, in 30

16   days the best we could do in terms of comfort level for

17   designating for them --

18         Again, this isn't saying we can go take discovery on

19   them.  This is we are going to go to trial on this site.  We

20   were able to find one where we were comfortable.  Frankly, we

21   weren't all that comfortable anyway, but we did.

22         THE COURT:  I don't see why the plaintiffs should be

23   required to drop sites.  You had the opportunity to add sites.

24   I said you could add up to eight.  I just need to hear the

25   explanation of why you couldn't do it and whether you say, I

1   need 30 more days to do it and I can do it, give me 30 more

2   days, and I'll extend it.

3          But I don't know that the answer is they should cut

4   back.  The argument has been made that you went out of your way

5   to pick sites that you knew, frankly, were nondetect all along

6   and wasted time doing so.  That argument was made a moment ago

7   about the 18.

8          MR. RICARDELLI:  Your Honor, I didn't address it then,

9   but I have verified interrogatory responses for those 18 sites

10  where they said that the releases from those sites threatened

11  wells with the presence of MTBE.  I've got delineations for all

12  18 of those sites where the MTBE would go.  I understand that

13  we picked bad sites.  But, frankly, they verified

14  interrogatories --

15         THE COURT:  You picked the weakest sites you could

16  find, which is natural.  They are going to pick the strongest,

17  you're going to pick the weakest.  But if you intentionally

18  pick a bunch that are so weak that they are going to be

19  dismissed because they are nondetect, it is sort of a waste of

20  time.  I don't truly understand the explanation yet about why

21  you couldn't add more than one in the time you had.

22         MR. RICARDELLI:  30 days wasn't enough for us to run

23  the traps that we need to run on the sites because of the

24  condition of the files, the location.  For example, your Honor,

25  we picked one of the sites that we designated last week was a

1    facility in St. Germain, I'm probably mispronouncing that, in

2    Puerto Rico.  Last night we received the updated site list from

3    plaintiffs that included two new sites with confirmed MTBE

4    releases that were never before identified for us, and they are

5    in St. Germain, Puerto Rico.

6            We didn't have the benefit of being able to plot the

7    site we designated against two new sites now that have MTBE.

8    You know from the New Jersey case when they delineate these

9    sites, they at times capture other sites.  One of the things we

10   looked for was proximity to other service stations.

11           THE COURT:  If you had another 30 days, could you

12   complete the selection process?  I would like to get the cohort

13   set and immovable.  That would be a big help.  But I don't

14   think the way to achieve it is to cut the plaintiffs back from

15   10 to 3.

16           MR. RICARDELLI:  I don't know how far we could get,

17   your Honor.  We certainly could use the 30 days.  I don't know

18   that we could get to 10, 7 more sites in 30 days.

19           We look at this as your Honor put this process in

20   place two years ago.  We worked through this, worked in good

21   faith, and we relied on this.  Frankly, this is a case

22   management process.  Plaintiffs have said they went and picked

23   sites based on geographic region.  So did we originally.  We

24   picked 20 sites dispersed around the commonwealth.  We are now

25   stuck with 3 because we had sites plaintiffs told us --

 1              THE COURT:  I'm still having trouble making a fair

 2    evaluation of the statement that you purposely picked sites

 3    that were going to fall out.  Now you're saying to me, yes, but

 4    the information you gave us, if you look at it, which I

 5    haven't, would lead one to conclude that they wouldn't fall

 6    out, because the plaintiffs themselves said there were leaks

 7    from this site that could have affected other locations.

 8              You're telling me that for the first time.  I can't

 9    verify it.  I don't know if the plaintiffs agree with that.

10    And if that really is true, I don't know why they had to fall

11    out.  I don't know why they didn't stay in.

12              MR. RICARDELLI:  Your Honor, last fall, for example,

13    we got the delineations.  We didn't know until we deposed their

14    witness in December, when we asked them is there MTBE, they

15    said no.  We said, it's in the well here, these delineations

16    you gave us, is that well impacted by MTBE?  No, it's not.

17              THE COURT:  You're saying you were given incorrect

18    information by the plaintiffs, completely incorrect

19    information?

20              MR. RICARDELLI:  I have delineations in wells that

21    they then backed away from.  Mr. Axline said at the last status

22    conference, we delineated those as to where the MTBE would have

23    gone if it was released from the service station.  But that's

24    not how his delineations, your CMO that required the

25    delineations, or this process contemplated.

 1          So, while the answer said these are the areas at issue

 2    from the release from that service station, these wells are

 3    threatened by the presence of MTBE, later we find out but MTBE

 4    was never at that site.

 5          THE COURT:  It was never at that site, how could it

 6    threaten anything?

 7          MR. RICARDELLI:  That's our point, your Honor.

 8          THE COURT:  You were given misinformation, that's what

 9    you are saying.

10          MR. RICARDELLI:  Yes.  That's why we are left with 3

11    sites.

12          THE COURT:  If you're given misinformation, then

13    you're really saying there should be a sanction, it should be

14    cut back to 3 as a sanction, misinformation should not be

15    tolerated.

16          What is it, Mr. Axline?  Did you provide

17    misinformation?

18          MR. AXLINE:  No, we did not, your Honor.

19          THE DEFENDANT:  I may have to look at the actual

20    document you provided.  They said you said that the MTBE

21    released at this location threatened that location.  Now you,

22    quote, backed off and there was no MTBE at the release site

23    threatening anything.

24          MR. AXLINE:  They picked the sites, they gave us the

25    locations.  They asked us to delineate where the MTBE from

 1   those sites would go.

 2          THE COURT:  Would go if it was there in the first

 3   place?

 4          MR. AXLINE:  If it was there in the first place.

 5          THE COURT:  He is trying to tell me that you said it

 6   was there and that because it was there, it would travel to

 7   this or that location.  You're saying the opposite.

 8          MR. AXLINE:  We did not go and verify their focus

 9   sites as having MTBE releases.  We assumed that they picked

10   sites that had MTBE releases.

11          THE COURT:  But they picked from sites that you

12   identified as having MTBE releases.

13          MR. AXLINE:  No, that's not true.

14          THE COURT:  I have to solve this, and I can't solve it

15   at 5:20 with no documents in front of me.  I must solve it.  I

16   guess, Mr. Ricardelli, if you're moving for a sanction, you're

17   saying 7 of theirs should be mocked out so it's 3 each because

18   they gave us misinformation, prove it to me.  Write a brief or

19   a letter attaching as exhibits what you were told, what you

20   were shown.

21          MR. RICARDELLI:  Yes.

22          THE COURT:  If you have Mr. Axline saying, quote, the

23   MTBE at this location threatens that location, then I think

24   he's stuck.  That's what he said, that's what he said.

25          MR. RICARDELLI:  Thank you.

 1          THE COURT:  I can't tell in oral argument.  I have to

 2   either have comments or transcript cites or letters or

 3   something that he does proveably.

 4          MR. RICARDELLI:  Understood, your Honor.  We can file

 5   that in a week.

 6          THE COURT:  All right.  What else can I do, Mr.

 7   Axline?  I can't take it as representations from lawyers that

 8   he said, he didn't say.

 9          MR. AXLINE:  Understood, your Honor.  If he is making

10   that representation, I'm just trying to give you the context in

11   which the delineation that he is basing this all on came up.

12          THE COURT:  I understand you're saying if there was

13   MTBE there, our experts say it would travel in this or this way

14   and threaten this or that.  But the real question is did you

15   ever represent that it was there, so then you were predicting

16   the delineation from the fact it was there.  You're saying, no,

17   we never said it was there.  That's the issue.  If you did,

18   that's one thing.  If you didn't, that's another thing.  I

19   can't solve it tonight.

20          MR. AXLINE:  Could we have ten days to respond?

21          THE COURT:  Yes.

22          MR. AXLINE:  One other thing do I want to point out,

23   your Honor.  It is unquestioned, this is an exhibit to our

24   reply brief that, we provided them with a list of 276 sites

25   where we did say there is MTBE.

1          THE COURT:  You mean last night?

2          MR. DEMA:  No, your Honor, a year ago.

3          MR. AXLINE:  They have had this for a year.  They had

4    this while they were making their trial site selections.  They

5    didn't use it.

6          THE COURT:  They didn't use any of those 276?

7          MR. DEMA:  No.

8          MR. RICARDELLI:  This is the list I talked about that

9    came a year after you originally ordered us to go pick sites.

10   We were working off their site files for one year.  The

11   earlier, original deadline for us to pick trial sites was in

12   December of 2010.  That list came in in February 2011.

13         THE COURT:  But that is a full year ago.  Once you got

14   it and you cross-checked it against your selections, did you

15   wake up then and say, gee, those sites are not on this list?

16         MR. RICARDELLI:  No, we didn't, your Honor, and here

17   is why.  What they did is they said here is a list of a

18   thousand release sites that are in the case, we are only going

19   summarize for you and do the work here as to where there are

20   confirmed releases at branded service stations, we are not

21   going to give you a list of the unbranded, the government-owned

22   facilities, the third party facilities.

23         THE COURT:  So this list of 276 is only branded?

24         MR. RICARDELLI:  Yes.  Then they are asking us, we

25   already picked our 20 best sites, now, defendants, you go pick

1    from the next 276 best on our list, ignore the other 500 that

2    are in the case for now and deal with it later.  Of the 3 sites

3    that we designated in this case, 2 of them are not on this

4    list.

5            THE COURT:  Because they are not branded stations.

6            MR. RICARDELLI:  That's right, your Honor.

7            THE COURT:  Now I understand.  They never told you the

8    276 was the extent of the case?

9            MR. RICARDELLI:  That's right, your Honor.  They just

10   said these are 276 where we know there were hits and they are

11   all branded service stations.

12           THE COURT:  So they are not backing off that there are

13   many hundreds of other sites where there are known releases but

14   they are not branded stations?

15           MR. RICARDELLI:  That's right, your Honor.

16           MR. DEMA:  Your Honor, when you look through Exhibit D

17   of our reply letter, I'm just paging through it now, with the

18   list of 276, there are quite a number of independent service

19   stations that are not branded.  What Mr. Ricardelli is saying

20   is factually inaccurate.

21           THE COURT:  That makes it bad for you, frankly.  Are

22   you saying this is the universe, these 276 are all there is,

23   branded and unbranded?  I thought you were in a better position

24   when you said this is just the branded list.

25           MR. DEMA:  This is not the universe.  This was a list

1     we gave them in February of 2011, a month before they had to

2     pick their first 12 trial sites and a month and a half after

3     that they picked their second 8.

4          THE COURT:  I thought he said they picked in December.

5          MR. RICARDELLI:  We had to pick in December, your

6     Honor.  That deadline got moved.  But we had already spent a

7     ton of time and work.

8          THE COURT:  That is all history.  The real question

9     is, is this 276 the universe or not?  You're saying it's not,

10    Mr. Dema, right?

11         MR. DEMA:  Correct, your Honor.  The testing goes on.

12    We give discovery as we --

13         THE COURT:  Not just testing.  Five minutes ago I was

14    told this list is just the branded stations so that's why it's

15    276, there are hundreds of other known releases that are not

16    branded.  Then you stood up and said, no, this includes

17    unbranded.  What do I make of the 276?  What does it purport to

18    be, all known releases or not?

19         MR. DEMA:  It purports to be as of February 2011 known

20    releases from service stations.

21         THE COURT:  Service stations.

22         MR. DEMA:  Yes.

23         THE COURT:  Branded and unbranded?

24         MR. DEMA:  Not a complete list of unbranded, but the

25    ones, your Honor, that had been tested.  We have already dealt

 1   with the nontest, and there are nontested sites.  These are

 2   tested.  We actually went through the files --

 3            THE COURT:  What was given in February 2011?  Were

 4   those all the locations throughout Puerto Rico where you had

 5   tested and knew there was a release?

 6            MR. DEMA:  At service stations, yes.

 7            THE COURT:  There wasn't another service station out

 8   there where you knew of a release and didn't put it on the

 9   list?

10            MR. DEMA:  With regard to MTBE, that would be correct.

11   In other words, there were other leaking service stations, but

12   we did not know of MTBE, because MTBE was not particularly

13   being tested for.

14            THE COURT:  I understand.  At that point in time that

15   list of 276 was all known releases at service stations, both

16   branded and unbranded?

17            MR. DEMA:  Correct.

18            THE COURT:  But only service stations?

19            MR. DEMA:  Only service stations.

20            THE COURT:  Some of the ones that you picked, Mr.

21   Ricardelli, that were not on that list, are they service

22   stations?

23            MR. RICARDELLI:  They are not.  Well, one of them is a

24   service station.  It's currently in our 3 sites.  And it does

25   have a confirmed release of MTBE based on the records we were

1    given.

2           THE COURT:  It's not on that list?

3           MR. RICARDELLI:  It's not on that list.

4           THE COURT:  Do we know why?  Mr. Dema just said that

5    list was complete as of that date.  Why is it not on that list,

6    Mr. Dema?

7           MR. DEMA:  I would have to check the dates.  I'm

8    talking about a list as of February 2011.

9           THE COURT:  I know that.  Which service station is

10   that?

11          MR. RICARDELLI:  Your Honor, let me double-check here.

12          MR. DEMA:  The only service station I believe on here

13   is Maysonet service station.

14          THE COURT:  Don't look at me.  He's checking.

15          MR. DEMA:  I was just saying that for the record.

16          MR. RICARDELLI:  Your Honor, that site is on this

17   list.  The other 2 sites that we picked are not on this list

18   and they are not service stations.

19          THE COURT:  They are not service stations.  Then you

20   knew they weren't on that list.

21          MR. RICARDELLI:  I said that before.  There was 1 on

22   the list and 2 that were not.

23          THE COURT:  Now I understand why you knew all along.

24   They are not service stations.

25          MR. RICARDELLI:  That's correct, your Honor.

```
 1              THE COURT:  So, what are you complaining about?  I
 2    don't understand the complaint about this list.  It never was
 3    anything but service stations.  Now I know it included branded
 4    and unbranded, but it's only service stations.
 5              MR. RICARDELLI:  What I'm complaining about the list,
 6    your Honor, is that this was not, when it was delivered to us a
 7    year ago or, frankly, last night, the updated one, ever
 8    communicated to us to be this is the total universe of sites at
 9    issue in this case.
10              THE COURT:  It's not.  It's the service stations.
11              MR. RICARDELLI:  That's correct.  But we are now being
12    criticized --
13              THE COURT:  You're not learning that tonight, are you?
14              MR. RICARDELLI:  No.  What I'm saying is we should not
15    be criticized last year for not just picking from this.
16              THE COURT:  Right.
17              MR. RICARDELLI:  I guess that's our complaint about
18    this.  Plaintiffs have suggested you guys wasted your own time
19    because you should have just picked off the service station
20    sites.  Our point has been, frankly, that is not what this case
21    is about, there are more sites at issue, we want to test our
22    theories as to government-owned sites, nonbranded sites.
23    That's why we picked.
24              We have been criticized for not picking off the 2011
25    service station list.  Then we got one yesterday that now
```

1   includes new sites that were never identified to us before even

2   as early as yesterday.  That's our complaint.

3            THE COURT:  Obviously, you can't be limited to a list

4   that doesn't purport to be complete.  It doesn't.  It's just

5   service stations.  You're welcome to pick off the list.  I

6   still don't understand why I should cut them back to 3 and why

7   you can't add 7.

8            MR. RICARDELLI:  Your Honor, one, it's the timing for

9   us.  We couldn't get it done in 30 days.  We had original asked

10  for 60, your Honor said no, do it in 30.

11           Two, it is a discovery sanction at this point.  They

12  had two years to go and pick sites around the island where they

13  could make sure they accomplished certain things with this

14  first trial.  We are now being asked to do it quickly.  We are

15  not getting the benefit of the discovery process.

16           We have to designate just for trial.  We haven't taken

17  discovery on any of these other sites.  We didn't get

18  delineations.  We don't have the benefit of that.  We are just

19  picking.  Then, we are going to find out later what their

20  theory of the case is as to the sites we are designating for

21  trial at this point.  So it is a sanction, frankly.

22           THE COURT:  A trial is hardly imminent in this case.

23  I don't think it is around the corner.

24           MR. RICARDELLI:  Your Honor, then there is no

25  finality.

```
 1              THE COURT:  There is no finality, because you didn't
 2    get it done in 30 days.  You say there is Spanish language, the
 3    site files are incomplete, it's so hard.  But there has to be
 4    finality.
 5              MR. RICARDELLI:  That's our point, your Honor, once
 6    they delineate these sites for us.
 7              THE COURT:  They gave you that a year ago but for a
 8    few changes on the service station sites.  You have had that
 9    since February 2011.  It was 276 and now it's what, 280.  It's
10    not changed very much.
11              MR. RICARDELLI:  Now that this represents the
12    universe, your Honor --
13              THE COURT:  It did a year ago.  The numbers have
14    hardly changed.  It was 276 then.  What is it now?  You told me
15    the number before.  What is it now?  280?
16              MR. DEMA:  290-something.
17              MR. RICARDELLI:  290-something.
18              THE COURT:  It's a tiny change.  What's the deal?
19    It's a tiny change, going from 276 to 290.  You basically had
20    this list for a year.  If you had started pick station sites in
21    addition to whatever else you picked, you would be further
22    along.  You have had this list for a year.
23              MR. RICARDELLI:  We were looking at other nonstations.
24              THE COURT:  I know you were.  You can't have it both
25    ways.  Pick some service sites, pick some nonservice sites, and
```

1   whatever you can get down in the next 30 days, that's it.

2   There won't be anymore.  If you can only add 3 more, you will

3   have 5, they will have 10.  That's it.

4           MR. RICARDELLI:  Your Honor, earlier you suggested

5   that if we did get misinformation though --

6           THE COURT:  That's different.  You're going to make

7   your motion on misinformation.  But this list isn't

8   misinformation.  It only purported to be service stations, and

9   that's what it is.  It doesn't purport to list nonservice

10  station sites.

11          MR. RICARDELLI:  That's correct, your Honor.

12          THE COURT:  There is no misinformation there.

13          MR. RICARDELLI:  That's correct.

14          THE COURT:  If you made a decision not to choose

15  service stations, that's your problem.  You have an additional

16  30 days to find 7 more sites or not.  Whatever you find, that's

17  the number.

18          MR. RICARDELLI:  We can file the motion to ask that

19  this be cut back at the same time?

20          THE COURT:  Yes.  You already said you were going to

21  do it a week from today, which was March 2nd; ten days to

22  respond, which was March 12th.  You didn't tell me what you

23  wanted for a reply, but I figure you want a week.

24          MR. RICARDELLI:  A week, your Honor.

25          THE COURT:  March 19th.  That is solely based on if

1    you were given misinformation, there should be a preclusion

2    sanction.

3              MR. RICARDELLI:  Understood.  Thank you, your Honor.

4              THE COURT:  I think that took us to the end of the

5    agenda.

6              MR. RICARDELLI:  There is one more issue, your Honor,

7    the last one for Puerto Rico.

8              THE COURT:  Yes?

9              MR. RICARDELLI:  We did submit two proposed orders for

10   you.  One was on the 18 sites.

11             THE COURT:  We covered that.

12             MR. RICARDELLI:  We did.  There was one other order we

13   gave you which related to receptors.  Last year your Honor gave

14   the plaintiffs a deadline by which they had to produce all well

15   coordinates.

16             THE COURT:  Right.  You want to dismiss those wells

17   for which they failed to produce any such information, any

18   location information?

19             MR. RICARDELLI:  That's right, your Honor.  We did

20   work over the summer with plaintiffs.  We did meet and confer.

21   This was actually the topic of a hearing with Special Master

22   Warner last August, where we thought additional information was

23   coming.  We just want this case cleaned up once and for all.

24   That's the list of wells where we don't think we have well

25   coordinates where we can locate them.

```
 1              THE COURT:  They were ordered to produce coordinates
 2    and haven't produced any to date.  Why shouldn't they be
 3    dismissed, Mr. Dema?
 4              MR. DEMA:  Because that is not an accurate
 5    foundational statement.
 6              THE COURT:  Meaning there is none, there is not a
 7    single well for which you haven't produced any coordinates?
 8              MR. DEMA:  Yes.  This Court discussed this last
 9    spring.
10              THE COURT:  How about you answer my question.  It's
11    late.  I'm out of patience.  I have a question for you.  Are
12    there some wells for which you have not produced any location
13    coordinates?  Yes or no.
14              MR. DEMA:  With regard to PRASA -- PRASA is the water
15    supply.
16              THE COURT:  I can't even spell that.
17              MR. DEMA:  P-R-A-S-A.
18              THE COURT:  Thank you.
19              MR. DEMA:  We have produced by July 31, 2011, which is
20    your deadline, all the truthed-out GIS information.
21              THE COURT:  That's great.  Now could you answer my
22    question?  Are there any wells for which you have not produced
23    any GIS coordinates, any location coordinates?
24              MR. DEMA:  None that we know of with regard to PRASA.
25    But it's not the list that the defendants have put in their
```

1   moving papers.  That was the list that we disregarded when we

2   went out to get, in accordance with your instructions --

3          THE COURT:  Let's try again.  Yes, there are many

4   locations for which you have not produced coordinates, but you

5   are saying you were never required to?

6          MR. DEMA:  Correct.

7          THE COURT:  I got it.  He concedes there were many

8   wells for which he has not produced coordinates, but he said I

9   never ordered it, I only ordered it for PRASA sites.  I don't

10  know the answer to that, Mr. Ricardelli, do you?

11         MR. RICARDELLI:  Your Honor, this did come up in the

12  context of PRASA sites.  They did produce certain well

13  information and then later produced this list of wells to us

14  and said here it is.  Instead of going around the island, and

15  that was actually what we discussed at that conference, and

16  then geolocating these wells, they went and asked the USGS to

17  give them a list of wells.  So instead of the PRASA well data,

18  they said here is a list of all the wells.

19         THE COURT:  For all of Puerto Rico?

20         MR. RICARDELLI:  For all of Puerto Rico.  We are

21  saying there is no way to locate these.  We spent the summer

22  asking for the well coordinates for these wells.

23         THE COURT:  When you say "these," you're holding up a

24  piece of paper.

25         MR. RICARDELLI:  It's the wells that are on the list

1  in the order that we gave you, the 150.  In the order attached

2  to our letter, there's a list of wells on there.

3       THE COURT:  For 150 or so that are on that list?

4       MR. RICARDELLI:  Or so in which they gave us in lieu

5  of the PRASA well coordinates that they were ordered to give

6  us.

7       THE COURT:  In lieu of?  They didn't give you the

8  coordinates?

9       MR. RICARDELLI:  They said here is another list of

10  wells and the data.  That's what they gave us.  We kept saying

11  to them, are these the same wells that are being identified

12  differently?  We had lots of questions.

13       THE COURT:  Do you have coordinates on those wells?

14       MR. RICARDELLI:  For some, not for others, your Honor.

15       THE COURT:  How many of those 150 or so do you know

16  the have location coordinates for?

17       MR. RICARDELLI:  None of these, your Honor, for the

18  153 we don't have any coordinates for.

19       THE COURT:  Why is that, Mr. Dema?

20       MR. DEMA:  That is not accurate.  When the

21  commonwealth --

22       THE COURT:  Wait.  It cannot be accurate and not

23  accurate.  Mr. Ricardelli said no coordinates for any of those

24  150-plus.  You say not accurate.  When do you think you gave

25  them coordinates on any portion of those 150?

1          MR. DEMA:  By July, which was your deadline of 2011,

2     we gave all the GIS information for each well that PRASA owned.

3          THE COURT:  You have an art now, I see, of answering

4     my questions, and it's frustrating me terribly, Mr. Dema.  I

5     want to talk about the 150 or so on the list he's holding up as

6     an exhibit.  Do you know what list he's holding up?

7          MR. DEMA:  Yes, I do.

8          THE COURT:  With respect to those, he said for none of

9     them does he have coordinates.  Does he or doesn't he?

10         MR. DEMA:  He does.  Some of them on the list he's

11    holding up do not exist.  Last spring he held up that list and

12    said like, for example, two of these are a quarter of mile in

13    the Caribbean Sea.  So we ignored that list and we went and got

14    every PRASA well and produced every PRASA well coordinate by

15    July of 2011 and gave them a new list.

16         THE COURT:  Why did you give them that list if we are

17    all supposed to ignore it, put it in the shredder, and forget

18    you ever gave it to them?  What was that list?

19         MR. DEMA:  That was the previous discovery from PRASA,

20    PRASA's own list, which proved to be inaccurate.

21         THE COURT:  Mr. Ricardelli, he is saying the list you

22    are waving around is supposed to be in the wastebasket or the

23    shredder, it is inoperative, doesn't exist.

24         MR. RICARDELLI:  Your Honor, think that is not fair.

25    These wells exist on the island.

1          THE COURT:  No, no.  The list goes in the shredder.

2     It has no relevance in this case, he is saying, throw that list

3     out.

4          MR. RICARDELLI:  Then, your Honor, I guess the way to

5     do this is for any well that comes up in this litigation, if

6     it's not on the list of wells that they provided coordinates

7     for, we don't want to hear about it later.  What we are trying

8     to do here is clean this up.  If we can't do it this way, if we

9     later find out about a well, we don't want to find out about

10    here are the files now and here are the locations.  We want to

11    clean this up.

12         THE COURT:  Right.  There has to be a deadline.  He

13    said he did it as of July.  He gave you the coordinates on all

14    the PRASA wells.  The case is limited to that.  That's it.

15    Those are the ones he provided coordinates for, that is the

16    limitation.

17         MR. DEMA:  I understand.

18         THE COURT:  Mr. Dema said, I understand.  That's it.

19    Put that old list in the shredder.

20         MR. RICARDELLI:  Thank you.

21         MR. DEMA:  Thank you, your Honor.

22         THE COURT:  Now you need a new date.  Given the amount

23    of work you have to do, how about Friday, March 30th, same time

24    as today.  I know that doesn't make it easy to return to the

25    West Coast, but New York is a wonderful place to spend the

```
1    weekend, Mr. Axline.

2              MR. RICARDELLI:  That's fine for defendants, your

3    Honor.

4              THE COURT:  March 30th at 4:30.

5              MR. KAUFMAN:  4:30, your Honor?

6              THE COURT:  Yes, sir.  Lots of motions coming in.  All

7    page limits apply.  Don't make them one word longer.  Thank

8    you.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```