C52LMTB1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:  METHYL TERTIARY BUTYL          MDL 1358
    ETHER ("MTBE") PRODUCTS                00 Civ. 1898 (SAS)
4   LIABILITY LITIGATION

5   ------------------------------x
                                          New York, N.Y.
6                                         May 2, 2012
                                          2:10 p.m.
7
    Before:
8
                      HON. SHIRA A. SCHEINDLIN,
9
                                          District Judge
10
                              APPEARANCES
11
    MILLER, AXLINE & SAWYER
12       Attorneys for Plaintiff
    BY:  MICHAEL AXLINE
13
    LAW OFFICES OF JOHN K. DEMA, P.C.
14       Attorneys for Plaintiffs Puerto Rico and New Jersey
    BY:  JOHN K. DEMA
15       SCOTT E. KAUFF

16  McDERMOTT WILL & EMERY LLP
         Attorneys for Defendant Exxon Mobil Corporation
17  BY:  JAMES PARDO
         STEPHEN RICCARDULLI
18
    KING & SPALDING
19       Attorneys for Defendant Chevron
    BY:  JAMES J. MAHER
20
    GREENBERG TRAURIG
21       Attorneys for Defendants
    BY:  DAWN A. ELLISON
22
    BAKER BOTTS LLP
23       Attorneys for Defendants Hovensa
    BY:  CHRISTOPHER DANLEY
24

25

C52LMTB1

1          THE COURT:  Good afternoon, Ms. Greenwald.

2          MS. GREENWALD:  Good afternoon.

3          THE COURT:  It is afternoon.

4          Good afternoon, Mr. Axline.

5          MR. AXLINE:  Good afternoon, your Honor.

6          THE COURT:  Good afternoon, Mr. Dema.

7          MR. DEMA:  Good afternoon.

8          THE COURT:  Good afternoon, Mr. Kauff.

9          MR. KAUFF:  Good afternoon.

10         THE COURT:  Mr. Pardo.

11         MR. PARDO:  Good afternoon, your Honor.

12         THE COURT:  Good afternoon, Mr. Riccardulli.

13         MR. RICCARDULLI:  Good afternoon.

14         THE COURT:  Good afternoon, Mr. Maher.

15         MR. MAHER:  Good afternoon.

16         THE COURT:  Ms. Ellison.

17         Mr. Stack.

18         MR. STACK:  Good afternoon, your Honor.

19         THE COURT:  Mr. Dillon.

20         MR. DILLON:  Good afternoon, your Honor.

21         THE COURT:  Mr. Wallace.

22         MR. WALLACE:  Good afternoon.

23         THE COURT:  Mr. Krainin.

24         MR. KRAININ:  Good afternoon.

25         THE COURT:  Mr. Danley, good afternoon.

C52LMTB1

1                    I don't know the two of you.

2                    MR. WREN:  I'm Tyler Wren with Berger & Montague.

3       We're new counsel for plaintiffs replacing Richardson Patrick

4       law firm.

5                    THE COURT:  In which case?

6                    MR. WREN:  New Jersey.

7                    THE COURT:  You're replacing who?

8                    MR. WREN:  Richardson Patrick law firm.  You signed an

9       order allowing their withdrawal and our pro hac admission a few

10      weeks ago.

11                   THE COURT:  Is that the person, Mr. Kaufman?

12                   MR. AXLINE:  Mr. Kaufman's firm is also one of four

13      firms.

14                   THE COURT:  Is he still on it?

15                   MR. AXLINE:  He is.

16                   THE COURT:  I don't know which one.  So you are who?

17                   MR. WREN:  Tyler Wren, W-R-E-N.

18                   THE COURT:  From what firm is that?

19                   MR. WREN:  Berger & Montague out of Philadelphia.

20                   THE COURT:  Yes, I know the firm.  The New Jersey

21      case.

22                   And you are?

23                   MS. TURNER:  Judith Turner.  I work with the law

24      offices of John K. Dema.

25                   THE COURT:  OK.  So you're on the Puerto Rico case,

C52LMTB1

1    right?  No?

2              MR. DEMA:  Yes, ma'am.  We're both in Puerto Rico and

3    New Jersey.

4              THE COURT:  And New Jersey.  OK.  And your name again

5    is what?

6              MS. TURNER:  Judith Turner.

7              THE COURT:  Turner, OK.  Thank you.

8              All right.  Welcome to the other folks who are sitting

9    in the back.

10             So were you given a copy of the agenda?

11             So the first one is the reply letters came in I think

12   Monday at five for a Wednesday conference.  I realize we were

13   scheduled originally for Thursday afternoon and you did

14   calculate that as 72 hours, but I just want to reiterate less

15   than 72 hours doesn't work.  It's too much of a strain when

16   I've been on trial as much as I've been this last year, namely,

17   nonstop.  So I just want to remind you to please stick with the

18   usual deadline because it's too hard to absorb the material

19   last-minute basis.

20             OK.  The argument on the motion I'll put off until the

21   end.  So that brings us to plaintiffs' agenda item and the

22   first is, oh, the format of electronic document production.

23             MR. DEMA:  Your Honor, we spoke before you came on the

24   bench and I believe it's fair to say that we have agreement on

25   that item.

C52LMTB1

```
1              THE COURT:  What's the agreement?

2              MR. DEMA:  That the format that liaison counsel and

3    plaintiffs had been using will be used with all defendants and

4    so we're going to actually reduce that -- we have it in

5    back-and-forth exchanges, so we're going to reduce it to a

6    specific protocol circulated, everyone will sign off on it.

7              THE COURT:  All right.  And that includes the

8    production in hard copy form because one of the disputes I

9    understood here was a defendant named Hovensa had produced

10   documents in hard copy and said Rule 34 doesn't require them to

11   convert them to electronic format, and then they said PDF is

12   enough and all that.

13             What is the resolution of that?

14             MR. DANLEY:  Your Honor, my name is Chris Danley.  We

15   represent Hovensa.  We understand --

16             THE COURT:  I want to know what it is.

17             MR. DANLEY:  -- that we would go back and redo the two

18   productions in the Puerto Rico case per the agreement between

19   liaison counsel and Puerto Rico.

20             THE COURT:  I know, but I keep trying to find out what

21   is that agreement.  How are you going to produce paper

22   documents, so to speak?  Are they going to be converted to OCR

23   format?

24             MR. DANLEY:  Yes, your Honor, as spelled out in the

25   letter between liaison counsel and Puerto Rico.
```

C52LMTB1

1          MR. RICCARDULLI:  Yes, your Honor.  The hard copy

2      documents will be imaged as single-page TIFFs with load files

3      and OCR.

4          THE COURT:  Very good.  That's what I was going to

5      say.  If that wasn't the agreement, it wouldn't make any sense

6      to me.  So that is the agreement.

7          With electronic documents you've agreed on a format

8      too?  A standard format with the production of documents

9      created electronically, not hard copy converted, but electronic

10     documents.

11         MR. PARDO:  I don't know that we've had that

12     discussion.

13         THE COURT:  You should do that too.

14         MR. PARDO:  It's not been raised as an issue the way

15     we made those productions before.  We're happy to have that

16     discussion with plaintiffs to see if there's some preferred way

17     they want this done.  But there's been no objection to the way

18     the different defendants have done it so far to my knowledge.

19         MR. DEMA:  We will include that in the protocol, your

20     Honor --

21         THE COURT:  You should.

22         MR. DEMA:  -- because we it will come up in the ESI.

23     We have a number of letters out.  We have no idea on the

24     plaintiffs' side whether the defendants have complied.  There's

25     no prefix designations they're using for ESI.  There's

C52LMTB1

1    obviously emails that have staple marks that have been Xeroxed,

2    attachments that are referred to not attached.

3             THE COURT:  Not good.  That's what I'm trying to say.

4    We need ESI protocol for the production format.  These days

5    that's sort of becoming the industry standard in litigation is

6    to have a protocol that both sides are living with.

7             And I know that the Commonwealth has an awful lot of

8    documents and papers.  So the agreement you reached with

9    Hovensa and others has to apply to you too.  That's the paper

10   side.  On the electronic side, we want to get together, and the

11   former production is particularly important with the emails and

12   attachments.  There's certain metadata is included now as

13   standard protocol, certain that isn't dealing with attachments.

14   There's all kinds of protocols.

15            There's samples if you want me to give you samples.

16   There's samples around.

17            MR. PARDO:  We'll have the discussion with plaintiffs,

18   your Honor.

19            THE COURT:  You don't want my samples.  I can tell,

20   Mr. Pardo, you don't want my samples.  But if you change your

21   mind, you're welcome to them.

22            MR. PARDO:  Thank you.

23            THE COURT:  Then the next dispute again had to do with

24   Puerto Rico.  Mutual exchanges of ESI search phrases, the

25   plaintiffs offered to produce their search phrases if defendant

C52LMTB1

1   reciprocate.

2           There I don't think you have an agreement or maybe the

3   same ten minutes in the hall worked out for that one too?

4           MR. DEMA:  The ten minutes in the hall did not work

5   for that one, your Honor.  We just think it practical to avoid

6   future disputes, and we are perfectly willing to show the

7   search terms that we have used, and we simply say let's have an

8   even exchange and a level playing field.

9           THE COURT:  And why don't defendants want to do that?

10          MR. PARDO:  Well, your Honor, it sounds good in

11  theory.

12          THE COURT:  It's not theory anymore.  We have this

13  great big cooperation word running around in civil litigation.

14          MR. PARDO:  And it's in the rules now.

15          THE COURT:  I haven't seen the word in the rules, but

16  the idea is there.

17          MR. PARDO:  The issue that we have is that many of

18  us -- I think most of the defendants already made our ESI

19  productions a long time ago.  Remember, plaintiffs didn't do

20  this and are only now -- and they've a done some, but only now

21  are getting to this.

22          So what he did is we went to them and said, look, we

23  did this in New Jersey and it worked.  If you would like, we're

24  not demanding it, but if you would like to share your search

25  terms with us, we'll look at them and give you our input on

C52LMTB1

1    them to the extent you want it.  We're not asking them to.

2              What they came back and said, OK, we'll give you ours

3    but you got to show us yours.  And here's the problem.  They

4    never -- they've had some of our ESI now for years -- they've

5    never raised an issue about it.  So we're not aware of any

6    disputes.  Presumably they've gone through our ESI.  Our

7    concern, frankly, is they're going to look at our terms and

8    say, guess what, you missed one and we're going to have to go

9    back and redo all this ESI that they never raised an issue

10   about, frankly.

11             And, moreover, if they do have issues with individual

12   defendant's ESI, with all due respect, I love to be liaison

13   counsel and love to talk to my codefendants, but they ought to

14   take those issues up with the individual defendants.

15             If we want to talk about protocols for how to do some

16   ESI going forward --

17             THE COURT:  That's not the search term issue.  That's

18   a format issue.

19             MR. PARDO:  It is.

20             THE COURT:  It's a format or production that should be

21   standardized.  We didn't know that ten years ago when we

22   started working together on this MDL.  It wasn't as in and

23   established an idea as it is today.  We have a production

24   protocol, but OK.

25             MR. PARDO:  I don't even know if I had email ten years

C52LMTB1

1    ago.

2               THE COURT:  Oh, you had email.  We, the courts,

3    weren't advanced.

4               MR. PARDO:  Mutuality assumes we're kind of in the

5    same spot but we're not because many of us, most of us are done

6    with it.  They're just kind of getting into it.  If they don't

7    want to share their search terms with us, that's OK, they don't

8    have to.  But don't come back to those of us who have finished

9    our productions and say let's go through what you did now.

10              THE COURT:  Are you saying you did it case specific or

11   these were productions, you made generalized productions years

12   ago such that you're off the hook permanently?  If there was a

13   brand-new plaintiff in a brand-new case tomorrow, would you say

14   we're just going to give you all the discovery we've given over

15   the years?  It isn't case specific, there's no generalized

16   discovery.

17              MR. PARDO:  This is what we're talking about here,

18   your Honor, is case specific.  Obviously, there have been lots

19   of productions made over the years.  Liaison counsel, we have

20   these things.  We're not even talking about those.  And I

21   haven't heard plaintiffs to say they want us to go back and do

22   anything like that.  Some of these productions are ten, 11, 12

23   years old.

24              Talking just about the Puerto Rico productions, but

25   even in that case, many defendants, including my client, we

C52LMTB1

made these well more than a year, I think even two years ago.
We don't want to revisit this now.  We're done.

Again, if they don't want to avail themselves of what
we thought was something of a courtesy, if you want to share
them with us, please do.  Then that's OK, we don't need to see
them.  We just don't want to go back and have to do this, share
our whatever search terms we used.  Many of these productions
were made multiple times.  I don't even know we would be able
to unwind all the different search terms we might have used for
these different ones.  So it's a real burden on those of us who
are done.

MR. DEMA:  Were that an accurate recital I would have
no problem.  The problem is that liaison counsel does not
necessarily speak for the other defendants.  When we have an
issue, they say don't come to them, go to the individual
defendants.

THE COURT:  And he said that again.

MR. DEMA:  And we have at least four letters, maybe
five out to other defense groups of the ten, at least half,
saying we don't know that you have produced any ESI.

THE COURT:  You said that to them?

MR. DEMA:  Yes, individually.  Shell, Hovensa, there's
a number.  And so the presentation that they are finished is
inaccurate.  Exxon may be finished.  We don't have any letter
out to them.

C52LMTB1

1          THE COURT:  Right.

2          MR. DEMA:  But, in general, it's not, and we believe

3     the pushback is simply because the ESI searches were not done.

4     And the Commonwealth is being characterized as being late to

5     the party.

6          THE COURT:  I understand.  So we happen to have

7     lawyers for some of those people to whom you have letters out.

8          So, you know, Mr. Wallace, you took a risk coming, I

9     realize that, because I remember you.  So you still represent

10    Shell?

11         MR. WALLACE:  Indeed.

12         THE COURT:  I'm using you as an example because he

13    mentioned there's a letter out.

14         Has Shell done its ESI production in the Commonwealth

15    of Puerto Rico case or not?

16         MR. WALLACE:  So far as I know, the answer is yes.

17    But I must confess that I'm at something of a disadvantage

18    because I'm not familiar with this particular letter.

19         I know that Shell has produced ESI.  I also know that

20    there is something of a misunderstanding between Shell and the

21    Commonwealth about their expectations and it turns on this.

22    There's another defendant in the Puerto Rico case named Sol --

23         THE COURT:  Sol?

24         MR. WALLACE:  S-O-L.

25         THE COURT:  Thank you.

C52LMTB1

1          MR. WALLACE:  -- which at one time was Shell and that

2     company, to my understanding, has produced ESI and we have as

3     well, that is to say, there are other defendants in the Shell

4     family that have produced ESI.

5          My guess is, but this is only a guess, that the

6     Commonwealth was expecting from Shell production of materials

7     that really came from Sol, but I would have to work that out

8     with Mr. Dema.

9          THE COURT:  Sure.  Let me try this as a hypothetical

10    instead.  Hypothetically -- this can be back to Mr. Pardo or

11    Mr. Wallace or whoever -- hypothetically, if a particular

12    defendant has not yet reviewed their ESI in the Commonwealth

13    case, then why shouldn't there be an exchange of these search

14    terms along the idea that cooperation in the development of

15    search terms is good for everybody.  It eliminates disputes

16    down the road, eliminates motions to compel or for protective

17    orders.  People work cooperatively.  They figure out what they

18    need.

19          I can understand your argument you did this two years

20    ago and there's been no complaints.  It's like opening up a can

21    of worms and say here's what you did, a-ha, you didn't look for

22    this word.  I understand your point.  But if you hadn't done it

23    at all, hypothetically, I don't know who that may apply to, if

24    you hadn't searched your ESI yet, why isn't this the way we're

25    conducting all litigation nowadays in the federal court?

C52LMTB1

 1           We're trying to.  We're trying to get lawyers, we're

 2    trying to get lawyers to share their search terms and work

 3    together to develop search terms that will be applied to both

 4    sides' sets of data.  It's the better way to go.  My experience

 5    in this most recently is in a slew of securities cases, not

 6    your field, luckily, not this MDL, even more luckily, but it

 7    eliminates a lot of disputes to make the lawyers work together

 8    on search terms.

 9           So if there were hypothetically a case that the

10    defendant hadn't done it yet, why shouldn't they exchange

11    search terms?

12           MR. PARDO:  I sat long enough, Mr. Wallace would jump

13    up.

14           THE COURT:  But he didn't do that for you.  He left

15    you out to dry by yourself.

16           MR. PARDO:  Hypothetically, if there's such a party

17    out there who has not done any ESI --

18           THE COURT:  You have to reluctantly admit.

19           MR. PARDO:  -- I have to say it sounds reasonable.  I

20    think they need to take that up though with the individual

21    defendants.

22           THE COURT:  Fair enough.  I think there's a bit of a

23    concession here that going forward, if a party has not searched

24    its ESI at all, it's at square one, you are to work

25    cooperatively to develop the search terms for both sides.  This

C52LMTB1

1   would be true of any new case, but certainly in this case, if

2   that fact is a fact.

3          Now, I gather what the defendants are saying is

4   they're disagreeing with you that there are five such

5   defendants but only you and they know.  Even Mr. Wallace said

6   I'm not certainly saying that's not the case because I'm not

7   familiar with the letter.  I have to sit down with you.

8          If it turns out in fact that either Shell itself or

9   one of the Shell companies hasn't done it yet, then I would say

10  he has to work with you to develop the appropriate search

11  terms.

12         But I agree with Mr. Pardo, if you did it two years

13  ago and there's been no complaints, it's not a good thing.

14  It's just opening the proverbial can of worms.

15         So you understand that is a ruling.  I'm done with

16  that topic.  So, going forward.

17         MR. DEMA:  Yes, ma'am.  Just a footnote is that the

18  other letter out is to SOL that was mentioned by Mr. Wallace.

19         THE COURT:  Sounds like Mr. Wallace has to meet with

20  you.

21         MR. DEMA:  Yes, ma'am.

22         THE COURT:  That would be a good thing.  I think you

23  get the point of the ruling, so to speak, and I hope the

24  defense does as well.

25         MR. PARDO:  We do, your Honor.  Thank you.

C52LMTB1

1          THE COURT:  So now we go to defendants' agenda items.

2          The first one is this delineation of the Tamcrest site

3     where plaintiffs incorrectly delineated that particular site

4     accidentally, I guess allegedly accidentally, delineated a

5     different country club.  And this error has been discussed.

6          And in the April 25 letter defendant asked the Court

7     to order production of the correct delineation and instruct the

8     plaintiffs to expedite responses, to cite specific discovery

9     requests defendants might need after receiving the revised

10    delineations.

11          In the April 30 letter, plaintiffs said they now

12    provided the revised delineation on April 27, is that right,

13    did you get a revised delineation?

14          MR. PARDO:  We did, your Honor.  There are other

15    issues about the delineations.  But this issue I believe with

16    the country club has been resolved.

17          THE COURT:  Is there an issue that I need to address

18    today or no?

19          MR. PARDO:  Specific to that, no, your Honor.

20          THE COURT:  So we go to the next one.  The next one is

21    called Puerto Rico plaintiffs' failure to delineate its trial

22    sites.

23          Defendants' April 25 letter said plaintiffs had not

24    yet delineated its trial sites.  On April 27, plaintiffs did

25    advise the defendant which three of their ten they were

C52LMTB1

dropping and they say they produced delineations for the

remaining seven.  But they also called them preliminary

delineations.  They want to reserve the right for the expert to

amend or modify the delineations.

Apparently, in June of 2011, which of course I can't

remember but that's why God created transcripts, June 2011 I

said that the delineations should be final and the plaintiffs

should live with the delineations they drew.

But, apparently, October in the transcript I said

something like oh, no, that was earlier, October 2010, I

supposedly said with reference to a number of private wells

that were near the trial sites, I said this is far from final

and it would take more time to ascertain all the number of

private wells as opposed to public wells without an expert.

So I wasn't talking about the same subject, sounds

like it was two different subjects.

Also plaintiffs say that their nontestifying

consultants attempted to draw the site geographic boundaries

so-called generously so the discovery could cover the entire

scope of ground water contamination.

If these were drawn generously, it seems to me that

these delineations should be final and binding and not amended

and modified because they could change dramatically.  That

wouldn't be fair.

MR. AXLINE:  Your Honor, with respect to all of the

C52LMTB1

delineations that we've provided today in both New Jersey and

Puerto Rico, we have made it clear and the defendants have

accepted and I thought your Honor had understood that these

delineations were for the purpose of narrowing down what the

defendants had to look at.  They've been produced by our

consulting experts, not by our testifying experts.

THE COURT:  Right.  But they delineate the geographic

limitations of the site.

MR. AXLINE:  Correct.  But we've always reserved the

right when we have our testifying experts do a closer analysis

of these.

THE COURT:  But you can't expand the site at that

point.  You can contract it.  You could find more things within

it, but you can't expand the geographic limitation.  That could

change the site entirely.

MR. AXLINE:  That's why we drew them generously.

THE COURT:  I understand that.  So now you're bound to

that.  You can draw the line narrower or make less of it, but

you can't suddenly double it.  That would not be fair.  It

would change entirely.

So I'm saying the delineations you drew are final on

the outer limits.  You can always contract them.  That seems to

be OK, but you can't expand them.

MR. AXLINE:  Understood, your Honor.

THE COURT:  OK.  With that understanding, what's left,

C52LMTB1

         1    Mr. Pardo?  Seriously.  It won't be more, it could be less of a

         2    space, but not more.

         3              MR. PARDO:  I guess the problem with that is we may

         4    end up doing more unnecessarily.  And as much as I would like

         5    to see these, as much as I would like to see these delineations

         6    be drawn realistically since they have experts today who can do

         7    this for them, that was the point last year, you know, if

         8    they're going to get smaller, I suppose that's certainly better

         9    than them getting larger.

        10              THE COURT:  Correct.

        11              MR. PARDO:  You know, this is, as you've noted, I

        12    think, this is the exact same issue we went through in New

        13    Jersey last year.

        14              And what you said to them then was not even really

        15    that they could get smaller.  You have experts, I understand

        16    you have report deadlines and deposition deadlines, but you

        17    have experts today who will draw the circle or whatever it

        18    looks like that you're going to live with.  That's it.  It will

        19    not change.

        20              Now it's going to get smaller.  That's what they're

        21    saying.

        22              THE COURT:  In fairness, while I realize you may do

        23    some unnecessary work, not to make a pun, the less exposure you

        24    have the better.  So if it gets smaller, that's only to your

        25    advantage in defending and/or in damages.  I don't see how

C52LMTB1

```
1    you're hurt by the site shrinking.  You're hurt by the site
2    doubling.
3              Now, I understand you may spend time on the periphery
4    and it becomes irrelevant.  You spend precious resources,
5    defense moneys unnecessarily, but life isn't perfect.  And, you
6    know, the same thing is true in any commercial case.  If three
7    claims are dismissed and summary judgment of five remain, the
8    defense is happy that the three are gone even though they took
9    discovery as to those three.  They're still happy the case is
10   pared down to five claims, not three.
11             MR. PARDO:  I agree.  But if we're talking about an
12   area, OK, I understand it can't get bigger.
13             THE COURT:  He just agreed.  He said he understands
14   that.
15             MR. PARDO:  What if it just moves?  You could take the
16   area --
17             THE COURT:  What does that mean, rotates?
18             MR. PARDO:  What if they move it --
19             THE COURT:  Wait, Mr. Pardo, I don't know what moves
20   means.
21             MR. PARDO:  Well, we're dealing with a physical area,
22   call it what it is, an acre.
23             THE COURT:  It's not any acre.  It's delineated on a
24   map or grid.  It's a specified acre.
25             MR. PARDO:  So it could get smaller within that area.
```

C52LMTB1

1    What I don't want them to come back and say is I got a new area

2    but it's the same size moved over.

3         THE COURT:  No.  I told them they can't change the

4    boundaries out.  You can change the boundaries in.  So it's not

5    going to move.

6         MR. RICCARDULLI:  Your Honor, there's just one other

7    point here, and I understand that plaintiffs have drawn these

8    generously and understand the scope may change.  But in the New

9    Jersey case, where they did in fact draw some of these

10   generously and when we then went to take discovery within that

11   boundary, the state then complained this was too much work for

12   us, now that we're taking too much discovery of the state

13   within that geographic boundary, and we've been limited on

14   depositions on third party sites.

15        THE COURT:  Who did the limiting?

16        MR. RICCARDULLI:  We're in front of Special Master

17   Warner now trying to work this dispute out.  But plaintiffs

18   draw these delineations, capture lots of sites.  But when we go

19   to take discovery from them in those delineations, they

20   complain it's too much work.

21        THE COURT:  I don't want to step on any toes, but if

22   it's within the delineation, it seems to me it's an open field

23   for discovery.

24        MR. AXLINE:  I think Mr. Riccardulli is mixing apples

25   and oranges, your Honor.  The defendants attempted to take

C52LMTB1

<pre>
 1    discovery on every conceivable release site, whether it was
 2    MTBE or not within the delineated sites.  We offered to make
 3    the files for those sites available to them but objected to
 4    them taking depositions and extensive discovery as to every
 5    conceivable site.  I think that's what Mr. Riccardulli is
 6    referring to.
 7              THE COURT:  Again, not to step on anybody's toes, but
 8    if it's within the delineated site and it shows no release of
 9    MTBE, then I don't see why they would take discovery of it.  I
10    would like them not to.  But if it's within the delineated area
11    and there's any MTBE, they're entitled to discovery.
12              MR. RICCARDULLI:  In terms of the sites that are not
13    MTBE sites, we have taken discovery of the State of New Jersey
14    on those because, obviously, there's other contaminant issues
15    within that area.  If the Commonwealth is going to say this is
16    the area of ground water that's impacted, it should be fair for
17    us to take that discovery because --
18              THE COURT:  Of every single site in the delineated
19    area not matter what --
20              MR. RICCARDULLI:  Where there's been a release.
21              THE COURT:  I know, the release of something else
22    completely unrelated.
23              MR. RICCARDULLI:  Until we get their expert reports,
24    we won't know they're saying this is in fact the full area of
25    ground water that's contaminated by your site and now we need
</pre>

C52LMTB1

1    to know what else is in that water.  So this does cut both

2    ways.  It's fine if it doesn't get any bigger.

3              THE COURT:  It's not going to get any bigger.

4              MR. RICCARDULLI:  And it's great if it shrinks, but we

5    won't know that it shrinks until expert phase.  And we don't

6    want to now start taking discovery and hear you can't take that

7    discovery in those areas even though it's at issue because then

8    it's too much work on the plaintiff.

9              I mean it needs to be either, if they want more time

10   to narrow these down, you may recall in the New Jersey case

11   when we served these requests even for site files, the

12   plaintiff said let me go back and look at a handful of these

13   which we think were drawn too big.  Let's cut those back and we

14   will narrow the work on ourselves.

15             If they need to do that here in Puerto Rico, I think

16   we should set a deadline by which that happens.  Otherwise,

17   it's difficult for us to know what discovery we can take.

18             THE COURT:  Well, it's kind of hard to have it both

19   ways.  If there are release sites within this larger

20   delineation that may shrink but hasn't, even if it's not MTBE

21   release site, it may introduce other contaminants into the

22   ground water because it may be proximate to a contamination

23   that you claim is all caught by MTBE, but, in fact, the other

24   contaminants have a big portion of that contamination.  You

25   can't have it both ways.  If there are other sites within the

C52LMTB1

1    delineations that are important to the defense, how could you

2    say you can't take discovery of those?

3            MR. AXLINE:  Well.

4            THE COURT:  This is really kind of a big issue.

5            MR. AXLINE:  It is.  And the way that we resolved it

6    in New Jersey was Mr. Riccardulli is correct, we gained

7    additional time to have our experts do a more complete analysis

8    of the areas and we were able to reduce those.  Even after

9    reducing those, the conclusion the Court came to after

10   extensive discussion was the defendants did not get to take

11   complete discovery on every single site that had a release

12   site, MTBE or not.

13           THE COURT:  What did I rule?

14           MR. AXLINE:  How you resolved it was you told the

15   defendants, look, you can copy the state's files for these

16   other sites that don't involve MTBE but that are release sites

17   within the geographic area and you can give those to your

18   experts and that's it.  That's all you get.  You don't get to

19   conduct depositions on every single one of those sites --

20           THE COURT:  Is Mr. Axline accurate in his memory?

21           MS. ELLISON:  No, that's not my memory.  I think that

22   discussion was in the context of full expert discovery on other

23   sites and expert reports.  I don't think we briefed this in the

24   context of closing down all discovery on the delineations.  And

25   I believe that in that very same transcript we were discussing

C52LMTB1

the plaintiff's appeal of PTO68 and you expressly said certain

discovery has to be permitted within the delineations.  If you

don't want it, it's within your control to make them smaller.

          MR. AXLINE:  Your Honor, the transcript is what it is.

But what you said was to the State of New Jersey, give them the

files that are on the sites that they say they're interested

in -- this had nothing to do with expert analysis -- and put

them in a room and the defendants get to copy those files,

that's it.

          THE COURT:  I don't know if that's it.  Up until then,

they agree with you.  Produce the site files, put them in a

room, let them review them.  I don't know if they agree with

the last phrase, "and that's it."  After they review them they

may say as to this particular release, we think we need XYZ

more.  As to this, we don't, we're satisfied.  But the first

step is to put them in a room with the site files and see what

happens next.

          MR. AXLINE:  If I could just continue, I think the

transcript did say, because I've read it several times, that's

it.

          The defendants nevertheless came back and are now in

front of Special Master Warner saying for a couple of these

sites -- they talked to us saying for a couple of these sites,

we do have a few additional questions we would like to ask at

the depositions of the site managers for those sites.  Some of

C52LMTB1

1   them we heard their question, we said OK, that's going to be

2   short, no problem.  Others are going to Special Master Warner.

3          So I guess what I would say here, your Honor, is that

4   the parties have an opportunity to meet and confer.

5          THE COURT:  OK.

6          MR. AXLINE:  First to look at the number of non-MTBE

7   release sites that are within the delineated area to see what

8   the size of the problem is, and then to see how many of those

9   the defendants are truly interested in and see if we can work

10  that out.

11         THE COURT:  OK.  So the suggestion is that the

12  plaintiffs will produce the site files for all releases in the

13  delineated area.  The defendants will review them on-site or

14  wherever and then there will be a meet and confer where the

15  defendants say we're satisfied with this one but on this one we

16  want to ask some questions of the site manager and this one we

17  want to depose so and so and this one we don't more and then

18  you'll tee up the dispute if there is one.

19         MS. ELLISON:  Your Honor, that is my concern.  I'll

20  admit my client isn't in Puerto Rico, which is how we started

21  discussing this.  But our concern is the statement you made

22  which we perceive to be during the back and forth you often

23  have between the parties where you say "and that's it," and the

24  plaintiffs have grabbed on to that as if you foreclosed all

25  discovery.  And we just want to make clear that there may be

C52LMTB1

situations where additional discovery is warranted.

          THE COURT:  I understand.  Look, the problem is we
have conference after conference with the judge for year after
year where you're going to say things that aren't so perfect.
So if I used the phrase "and that's it," it doesn't mean it was
a thought-out ruling.

          It sounds like the better way is to say site by site,
after you produce the site file, after they review them, they
let you know whether they're satisfied or whether they need
more.  You may agree on some, disagree on others, which is
what's happening.  And then somebody resolves it, either the
special master or this Court.  That's really the better way.  I
can't really say "and that's it," even though I may have said
those words.

          So now we turn to the discovery request regarding the
non-test site which was the subject of our last conference.  We
went on and on about that for a while.

          At the last conference, I guess it was April 12,
plaintiffs said they thought there was going to be some
laboratory data that may exist for the non-test sites.  And I
did say we may learn that some of these so-called non-test
sites were in fact tested and it was too early -- this is a
quote -- too early to dismiss with prejudice because some of
them may indeed have been tested.  Even if not by the
Commonwealth, they may have been tested either by one of the

C52LMTB1

1    defendants or by other property owners.

2          And so there was going to be service of Rule 34

3    document requests on some defendants and administrative orders

4    against certain nonparties.  Some things have been done.  I

5    understand plaintiffs served some discovery requests on

6    April 23.

7          And as far as administrative orders, on April 12,

8    Mr. Dema said they were going to go out the following week.

9    There was some delays, but counsel was told that the

10   information sought will be provided in time to get the report

11   back to the Court within the 60-day time frame.

12         So it sounds like this process is moving forward with

13   respect to so-called non-test sites.

14         Now, one of the problems is in these requests to the

15   defendants, they didn't just seek testing data, which is what I

16   thought we were going to do only.  Now they wanted site

17   documents, mediation files, property ownership records, a lot

18   more than just simple question whether or not there were tests

19   for contaminants, which is all I thought we were going to do at

20   this phase, Mr. Axline or Mr. Dema, so that we could find out

21   which of the 400 non-tests remain non-tests or cross over to a

22   different category.

23         So I understand the defendants' frustration, so to

24   speak, instead of getting the simple question, do you have test

25   results, you want everything, site documents, mediation or

C52LMTB1

1    property ownership.

2            Why all that now, why not just find out if it's a test

3    or non-test site?

4            MR. DEMA:  It all relates to the universe of the tests

5    that were done.  We want to, A, be sure that the tests were

6    done are within a particular area and not leave it out because

7    the defendants have challenged us on a Commonwealth-wide basis

8    to show every place there was MTBE.  So all we've done, and I

9    didn't know that there was any restriction on discovery because

10   certainly --

11           THE COURT:  This wasn't really full-blown discovery on

12   a site.  All it was supposed to be was to take 400 sites in

13   column A and see if any of them go over to column B because, in

14   fact, even if the Commonwealth didn't test, somebody might have

15   tested for MTBE and there may be a test result, in which case

16   it moves out of the non-test category.  That's all I was trying

17   to do and I was trying to do it fast.

18           Once you say produce all your litigation files, your

19   ownership files, you're basically taking full discovery on the

20   very sites that you shouldn't have any discovery on if there's

21   no positive tests, so to speak.

22           Is that what you were going to say, more or less,

23   Mr. Pardo?

24           MR. PARDO:  Your Honor, you're making my arguments for

25   me, which makes me feel smarter than I am.

C52LMTB1

1          THE COURT:  Maybe I'm smarter than I thought.  Anyway,

2     one of us is.

3          All I'm trying to say, that was their position, at

4     this point --

5          MR. DEMA:  That position may well have been cured had

6     they come to us and not teed it up directly to you because

7     we're certainly willing to discuss this.  And if they thought

8     that was over the top --

9          THE COURT:  It's not over the top down the road.

10    Right now let's see what moves out of column A.  So right now

11    if there are Rule 34 requests that you served on them, they're

12    limited to whether testing was done, give them an up or down,

13    let them know whether there was a test and if it's positive for

14    MTBE.

15         MR. DEMA:  The testing was done and all the results

16    from that test.

17         THE COURT:  If a test was done, obviously, we need the

18    results, yes.  That's it for now, and then we'll see with

19    respect to anything that moves over to a different column.  It

20    may go into full discovery, but not just yet.

21         MR. PARDO:  So if a test was done, the test results.

22         THE COURT:  Yes, absolutely.

23         MR. PARDO:  Fair enough.

24         THE COURT:  Now, what about those 22 sites that were

25    not identified on plaintiffs' 2010 site list and never been at

C52LMTB1

1   issue in this litigation, what about those 22?  I don't really

2   quite understand what that one is about.

3            MR. PARDO:  These are sites, your Honor, that were

4   never on their site list.

5            THE COURT:  Why are they here now?

6            MR. PARDO:  I don't know.

7            THE COURT:  How did they get here?

8            MR. DEMA:  They get here because life goes on, your

9   Honor.  We have a regulatory agency.  We have, for example, one

10  company that bought another oil company and so as part of the

11  process of purchase and sale, there was a requirement that

12  tests be done of all the underground storage tanks and, voila,

13  leaking underground storage tanks showed up.

14           I didn't know that this Court, based on your ruling of

15  nondetects without prejudice being dismissed and bring them

16  back whenever you wish, I never thought that anything was

17  frozen in time.

18           And so these are -- if sites come up on a regulatory

19  basis that should be added, then we produce that information to

20  defendants, I think that's our obligation, and that's where the

21  sites come from.

22           THE COURT:  What's wrong with that answer?

23           MR. PARDO:  The problem is it's a constantly moving

24  target.

25           THE COURT:  So is the world.  All he's saying is it's

C52LMTB1

1    a fairly big geographic area and new information turns up all

2    the time.  Who knows.

3              MR. PARDO:  I'm not hearing an explanation for how

4    this turned up, OK.  All I know --

5              THE COURT:  He just gave one example.  Somebody

6    purchased somebody and tested the ground water or the land or

7    something and got a positive test or something.

8              MR. DEMA:  If Mr. Pardo would like me to after this

9    conference give him an explanation of each of the 22 sites and

10   how the regulator came with them, I will, and we can address it

11   outside the scope.  But essentially it was never the impression

12   of the Commonwealth that there was a freeze.

13             THE COURT:  Right.  But I think what I think he's

14   saying is there may not be a freeze, but if one of these 22,

15   contrary to what you're representing, didn't just turn up but

16   in fact was five or six or seven years old, then you shouldn't

17   be able to add it now.

18             MR. DEMA:  And I'm more than happy to meet with him,

19   go over each of the 22 locations.

20             THE COURT:  And explain that they're really new within

21   the last whatever it is, 12 months, six months.

22             MR. DEMA:  Certainly the discovery would have to be

23   new.

24             MR. PARDO:  At the last conference, your Honor did say

25   if there are new sites that come up, it's a different lawsuit.

C52LMTB1

And here's the problem.  This happens now.  Who's to say in two
weeks I'm not going to get another list and then there will be
another list?

             THE COURT:  It would be, one would think, if there was
so-called another list, it would have one or two sites.  But in
any six-week or six-month period, you might think a site would
be added if the regulatory agency discovers a new problem.  It
may not be a new problem, but it's a test that shows the
problem created by an old release.

             MR. PARDO:  We've had this list of about 700 for
years, OK, and what we've just done now and some -- gotten rid
of some, some we think should go.  What we're now at is 722
kind of thing.  Next week, it could be 750 and who knows.

             THE COURT:  Look, I think the right thing to do here
is Mr. Dema says I can meet with Mr. Pardo or Mr. Riccardulli
and explain why each of these 22 are new to the list.  And
after you hear the explanation, you may want to come right back
to court and say now I can make a very precise motion, your
Honor.  They should have known about this no later than two
years ago, and if you're right about that, you're right, and it
should be gone.  But if in fact it pretty much just turned up,
then it either can be added to the suit because there's no harm
done or it should be a new suit.  I don't know which.  It may
depend on what caused it to be discovered now.  Is it a
release, old release but new test.  I don't know what it is.

C52LMTB1

1          I think at first instance he should meet with you and
2     go over all 22 factually.

3          MR. DEMA:  And certainly, your Honor, it's not going
4     to affect the tests, the trial sites that Commonwealth picked
5     nor will it affect, just doesn't have an effect.

6          THE COURT:  Well, I accept your offer and instruct the
7     defendants to meet with you.  They should meet with you and
8     listen to the story on each of the 22 sites and then you're
9     welcome to come back to contest any or all of them being added
10    at this point.  I doesn't want to rule until he tells you the
11    story.

12         MR. PARDO:  Fair enough.  If that's the instruction,
13    we will honor it, of course.  I will meet with him.

14         THE COURT:  OK.  And please do that before the next
15    conference.

16         MR. DEMA:  Yes, your Honor.

17         THE COURT:  These things are usually a month apart.

18         MR. DEMA:  Yes, your Honor.

19         THE COURT:  Now, as far as those administrative
20    requests, they're out?

21         MR. DEMA:  I am told this morning that they started to
22    go out today and there's a ten-day turnaround and that will be
23    followed, if it's not honored, by orders to test.  And so we're
24    trying to do it within the 60-day frame that you set on
25    April 12.

C52LMTB1

1            THE COURT:  Sixty days from then?

2            MR. DEMA:  From then, yes, your Honor.

3            THE COURT:  That expires June 12, give or take.

4            MR. DEMA:  We hear the clock ticking, your Honor.

5            THE COURT:  OK.  I think that takes care of this

6     topic.

7            So that takes us to the last topic other than the oral

8     argument which is the New Jersey plaintiffs so-called delay in

9     scheduling 30(b)(6) depositions.  I thought this one might be

10    worked out.

11           MR. PARDO:  This has, I believe, been worked out.

12           THE COURT:  I think so too.

13           MR. PARDO:  They will get us these dates for all the

14    outstanding depositions for the next three weeks.

15           MR. KAUFF:  Your Honor, the agreement Mr. Riccardulli

16    and I reached was that we would both mutually try to set for

17    all depositions on both sides 30(b)(6) fact witnesses that have

18    been noticed as of yesterday within the next three weeks.

19           THE COURT:  OK.  So that's not for me right now.

20           MR. RICCARDULLI:  That's correct, your Honor.

21           THE COURT:  OK.  Then that's done too.

22           MR. RICCARDULLI:  Your Honor, before we move on, there

23    was an original item on the agenda that we submitted to the

24    Court last week which was defendants' outstanding discovery

25    request of the New Jersey DEP plaintiffs.

C52LMTB1

1              THE COURT:  I missed that.

2              MR. RICCARDULLI:  In plaintiffs' reply letter.  And

3    just so you understand, your Honor, this issue has been, the

4    parties met and conferred and did resolve it, but we had

5    indicated to the plaintiffs that we just wanted that the

6    agreement be put on the record so I'm going to do that now.

7              We had asked that the plaintiffs either produce

8    certain requested materials that were outstanding by May 11,

9    2012.  However, if unavailable, that they explain sort of the

10   search that they used to try to find these documents or these

11   materials.  And we've reached agreement that that schedule is

12   agreed to, so we just wanted to put it on the record so it was

13   clear.

14             THE COURT:  OK.  Good.

15             MR. PARDO:  Two other minor issues very, very briefly.

16   We have your Honor's order.  I guess it's a partial order on

17   the motion.

18             THE COURT:  The in camera on the deliberative process,

19   that one you mean?  What I've done so far is to say these I'm

20   sure are not subject to deliberative process at all or they are

21   only in part.

22             The remainder of the documents submitted for in camera

23   review that are not part of that order may indeed qualify for

24   the deliberative process privilege but, as you know, it's not

25   an absolute privilege.

C52LMTB1

1          So I still haven't done the second half of the inquiry

2     which was briefed which is that even if it falls under the

3     deliberative process, we should get it because -- and I have

4     not reached that issue.  But these aren't even covered, I've

5     decided, based on the in camera review.

6          MR. PARDO:  OK.  There's a second outstanding motion

7     in New Jersey that we talked about and we had asked if there's

8     going to be argument.  I understand we're not asking that.  Is

9     your Honor going to want oral argument on that motion?

10          THE COURT:  Which motion?

11          MS. ELLISON:  Your Honor, there's a pending motion

12     challenging the facial sufficiency of plaintiffs' privilege log

13     entries.  And the reason we're still interested in a schedule

14     is that plaintiffs have indicated that they're withholding

15     privilege logs until that is resolved.

16          THE COURT:  They're withholding privilege logs?

17          MS. ELLISON:  We haven't had a privilege log produced

18     for we believe the bulk of the ESI.  The last privilege log --

19          THE COURT:  Until I tell them whether the log they did

20     produce is adequate.

21          MS. ELLISON:  Right.  They told us that they will

22     produce new logs one week after a decision from the Court on

23     the pending motion.

24          THE COURT:  OK.  I really don't have an explanation

25     other than very busy trial schedule.  I'm trying to get to it.

C52LMTB1

1          MS. ELLISON:  And it's the defendants' position that

2     argument may not be necessary on all the entries, but we're

3     happy to provide whatever argument you deem necessary.

4          THE COURT:  Right now I don't think I need oral

5     argument.  The submissions are satisfactory.  And I hope to

6     have a decision very soon.

7          MS. ELLISON:  Thank you, your Honor.

8          MR. PARDO:  I believe Mr. Maher wanted to report

9     briefly on Yosemite.

10          MR. MAHER:  Your Honor, on behalf of my client,

11     Chevron, and I'm here to report on behalf of the plaintiff

12     also, Yosemite Springs, the lawyers in that case have reached

13     an agreement about the settlement of the case and recommended

14     it to our respective clients who we're waiting to hear back for

15     final approval from the clients on the resolution of that case.

16          THE COURT:  That's good news.

17          MR. MAHER:  We wanted to let you know that and that we

18     would be able to report back next month on, hopefully, our

19     final report on whether or not it's resolved or not.

20          THE COURT:  Who are the plaintiff's lawyers in that

21     case?

22          MR. MAHER:  Baron & Budd.

23          THE COURT:  Good.  Next conference, that will be

24     great.

25          So this takes us to the motion to dismiss the claims

C52LMTB1

for the natural resources damages, and I received three

submissions on that:  the March 16 motion from the defendants,

April 13 opposition from plaintiffs, and the April 23 reply

from the defendants.

           This is this long, drawn-out saga about defendants'

interrogatories.  Plaintiffs objected to them in 2008 and 2010

saying they were overbroad.  Nevertheless, plaintiffs produced

some documentation, some interrogatories to the extent they

didn't object.

           The objections were never ruled on because there was

never a motion for protective order or motion to compel.

           And then in September 2011, Special Master Warner

suggested to defendants that they reword their discovery

request and to address some of the concerns that plaintiffs

had.

           Defendants attempted to do that and they served a new

set on October 5.  Plaintiffs still had objections, attempted

to meet and confer again.  But, as I understand it, defendants

agreed to table the request in order to prioritize discovery on

trial sites.

           Then defendants began pressing the issue again

beginning with an email to plaintiffs on January 5 and asking

the Court to put it on the agenda on January 20, 2012.

           And we did take that up on January 20.  Plaintiffs

said then that the parties had reached an agreement and that

C52LMTB1

1    plaintiffs would respond substantively to these interrogatory

2    requests by February 17.

3              And, apparently, I said you agreed on the 17th and if

4    it doesn't come in then, then don't need a premotion

5    conference, just make a motion.

6              Now they say, now the defendants say whatever came in

7    was not substantive, it was not adequate, and the Court said it

8    was not in February 17, make a motion, so they did.

9              The problem is there's some dispute about whether the

10   Commonwealth needs to provide information with respect to

11   nonpotable waters such as coastal and estuarine -- is that how

12   you pronounce it?

13             MR. AXLINE:  That's close enough, estuarine.

14             THE COURT:  -- estuarine, such as coastal and

15   estuarine waters because it's not relevant to the calculation

16   of damages because nonpotable water differs a lot to how you

17   calculate damages to fresh water, surface water, and ground

18   water.

19             In the end, plaintiffs produced documents and

20   information regarding to only one site which Commonwealth says

21   is the only site for which it sought natural resources damages

22   with respect to ground water contamination.  With respect to

23   fresh water, surface water, plaintiffs say that they can't

24   locate any responsive information about injuries to the waters

25   themselves, and no other information regarding fish or loss of

C52LMTB1

1   biota is not relevant.

2            So let me see if I can understand all of this.  If the

3   plaintiffs produced documents and information regarding only

4   one site and says it's the only site for which it sought

5   natural resource damage with respect to ground water

6   contamination, then are the plaintiffs ready for an order to

7   issue saying NRD damages are limited to this one single site

8   with respect to ground water contamination, are you ready for

9   that?  I mean because that's what you seem to be saying, by

10  that deadline we only did one site and so that's it.

11            MR. DEMA:  We are not ready for that, your Honor.

12            THE COURT:  Why?

13            MR. DEMA:  They asked for discovery with regard -- on

14  September 28, Special Master Warner heard this and he went and

15  dealt with it very specifically.  And on page 33 of the

16  transcript, line 17 to 21, he said to Mr. Riccardulli, with

17  regard to the discovery outstanding, make it have some type of

18  focus that would focus in on an analogous situation that are

19  not oil spills but would be of a type that would be informative

20  to you for the ground water situation that's confronted here.

21  And he said, again, I do not see how we are going to get, you

22  know, this resolved without a new set that we can enforce.

23            In other words, to paraphrase him, the efforts they

24  had made to that date were simply unenforceable.  To this date,

25  there is not a single order with regard to interpreting the

C52LMTB1

1    discovery.  So when they did the new set, your Honor --

2              THE COURT:  Yeah, they did a new set on October 5.

3              MR. DEMA:  Exactly right.  And you said in the

4    transcript, well, they did a new set and if they got it right,

5    Mr. Axline, they got it right in October of 2011 and what did

6    you do.  The plain answer is they didn't get it right.  They

7    still asked for marine, they still asked for all the other

8    items that have nothing to do with this case that were

9    specifically excluded.

10             THE COURT:  So what?  If you put verbiage in a request

11   that you're not entitled to discovery on, ignore it, but give

12   them what they are entitled to.  So they went off with certain

13   marine or whatever they're not supposed to, who cares.

14             Did you answer what is relevant?

15             MR. DEMA:  Absolutely.  We answered their discovery.

16             THE COURT:  If you say absolutely, I understand you

17   only identified a single site which you say is the only site

18   for which you sought or seek NRD nonresource -- sorry, I was

19   going to say the words -- natural resource damages with respect

20   to ground water contamination.  So I said fine, if that's the

21   only one you identified, you should be limited to that.

22             MR. DEMA:  The foundational premise is incorrect.

23   They asked from 1986 to now what sites did you have NRD

24   analysis done with regard to in Puerto Rico, and so we defined

25   it according to the water resources definition of our second

C52LMTB1

1    amended complaint, and that is the only time that Puerto Rico

2    in the past, your Honor, had done an analysis for natural

3    resource damage and ground water.

4         We did not say that we are limiting our analysis to

5    the one site.  The question was show us your past calculations

6    so we can be informed as to what you're doing in the future.

7    We did that.  There is one.  We gave them everything and we

8    gave them a very detailed privilege log.  If they didn't like

9    the content of the privilege log, they could object.  But with

10   regard to the extreme sanction that's at issue here --

11        THE COURT:  Because it may be my problem but I'm not

12   really following anything you're saying.  It sounds like lawyer

13   double talk to me, frankly.  Either you responded and

14   identified where you're seeking NRD damages or you didn't.  To

15   the extent you didn't, it's now May.  There can't be any more

16   pity.  There has to come a point where a Court rules.

17        So I'm not understanding what the request was and what

18   the response was.  On January 20 -- wrong -- on October 5, they

19   rewrote the questions.  OK, they made a request for some

20   information that you say is unnecessary, overbroad, ignore

21   that, but the heart of it was there.  And I said on January 20,

22   answer it by February 17.

23        Did they answer what you asked or not?

24        MR. RICCARDULLI:  They did not, your Honor.

25        THE COURT:  What did you ask for with respect to NRD

C52LMTB1

1    damages?

2            MR. RICCARDULLI:  We asked for a number of things and

3    let me try to run through them.  They're in broad categories.

4            We asked them for which waters in this case they're

5    seeking NRD damages for.

6            THE COURT:  What answer did you get to that?

7            MR. RICCARDULLI:  They said go look at the thousands

8    of pages we produced to you previously and you can figure it

9    out.  That included -- and notwithstanding that this does not

10   comply with the Rule 33(d) standards that your Honor and the

11   special master have set forth in this case, but they used

12   phrases like, if you see it in a soil sample, MTBE detected in

13   the soil sample, the ground water that's adjacent to it is

14   threatened and it's sort of vagaries like that in terms of

15   where are you seeking for it here in this case.

16           With response to the issue Mr. Dema was just

17   addressing, we did ask where in the past has the Commonwealth

18   done natural resource damages assessments, sort of how have you

19   calculated natural resource damages --

20           THE COURT:  And there's only one.

21           MR. RICCARDULLI:  -- in the past.  Here's the problem

22   with that, there's only one.  When we served these discovery

23   requests for the first time in September of 2008, we weren't

24   told we only did it once with respect to ground water.

25           THE COURT:  Is that right, Mr. Dema, you only did it

C52LMTB1

 1    once with respect to ground water?  It's not an example; it's

 2    the only one.

 3              MR. DEMA:  We answered the ones we could in 2008.

 4              THE COURT:  I'm asking a question of you now:  Is this

 5    the only one you did it for or is it an example?

 6              MR. DEMA:  This site, Vega Alta, that is the only site

 7    that the Commonwealth has analyzed for natural resource

 8    damages.

 9              THE COURT:  OK.

10              MR. RICCARDULLI:  The only ground water site.

11              THE COURT:  It is the only ground water site that has

12    been analyzed and they gave you the information.

13              MR. RICCARDULLI:  And we got it now.

14              THE COURT:  You got it now.

15              MR. RICCARDULLI:  Here's the problem with sort of why

16    it's -- and we're happy to have this now, but here's the

17    problem with why it's a problem getting it three and a half

18    years later.

19              One, for those three years, there were fights over the

20    definitions we contained and they said they were confused by

21    the definitions we included here.  But during the meet and

22    confers, and even in front of the special master, it was these

23    requests were so broad that they captured hundreds if not

24    thousands of assessments.  And it wasn't you got the one ground

25    water assessment and hundreds of thousands of sea water

C52LMTB1

1   references, but it was just vaguely hundreds if not thousands

2   of assessments.

3          We then say and, frankly, I said it and Mr. Warner

4   said, look, if you're going to get something, and I even said,

5   look, if that's the case, produce what's responsive.  That's

6   what you should have done.  You stood on a burden argument for

7   almost two years.  I withdrew those requests, served a new set.

8   We previewed them for them and I actually said if there's going

9   to be widespread objections, I want an immediate hearing on

10  this so we can move this case forward.  That's on the record

11  what Mr. Warner said and quoted -- Mr. Dema quoted before what

12  I said.  Mr. Warner said why don't you withdraw this.  And I

13  said I'm not prepared to do that at this time.  I will re-serve

14  a set so we have a final set we can work on.

15         Here's the problem with this relevancy issue now.  It

16  turns out that that burden argument that they have answered for

17  two and a half years wasn't a burden argument.  It really was

18  here's the Vega Alta NRD assessment which, frankly, this

19  counsel was well aware of because they were actually counsel of

20  record in that case for the Commonwealth.  So when we served

21  these in 2008, they knew right then there's the Vega Alta site.

22  At minimum, I can give it to you, and we would have that for

23  two and a half years.  Instead, these are way too broad.

24         We now re-served this set.  We get these answers and

25  they say, well, here's the one and I'm not turning everything

C52LMTB1

1   over because it's irrelevant.  But here's the problem.  They

2   say they're irrelevant because it's coastal waters or sea

3   water.  Well, one, if the Commonwealth hadn't done it before,

4   assessed ground water other than this one instance and that was

5   in the context of litigation --

6         THE COURT:  Correct, just this one.

7         MR. RICCARDULLI:  -- we didn't see how they've

8   assessed other resources within the Commonwealth.  We're not

9   asking them for how they may have assessed injuries to animal

10  life or plant life.  We're talking about water here, coastal

11  water, at least by way of comparison --

12        THE COURT:  Is it a real comparison?  It's nonpotable

13  water.  It does have at best injury to animal life or plant

14  life.  It's a completely different kettle of fish, so to speak.

15        MR. RICCARDULLI:  Maybe, except that we can see how

16  they value it.

17        For example, the example I think they use in their

18  papers was an oil spill off the coast that lands on a beach.

19  Now you've got loss of use of the beach, damages to soil, plant

20  life, animal life.  We get to see what number the Commonwealth

21  placed on that because now --

22        THE COURT:  Why?  It's still not potable water.

23        MR. RICCARDULLI:  When I get their expert report in

24  this case and they say, well, there's ground water here,

25  frankly, that's not being used, and look at the great big

C52LMTB1

1     number we put on it, we can say, wait a minute, here's a beach

2     that was completely impacted by a chemical.

3                THE COURT:  And you put a much lower number on it.

4     But it is a different kind of water.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C52VMTB2                        Conference

1          MR. RICCARDULLI:  It is a different kind of water.

2     This is no different than, for example, when we said in the

3     Suffolk County case, which you recall Suffolk County Water

4     Authority case, we said to the Suffolk County Water Authority,

5     how did you treat other contaminants?

6          THE COURT:  But that was the other contaminants of the

7     groundwater.  You should be comparing the same water.

8          MR. RICCARDULLI:  One last point, your Honor.

9          When we got their delineations, the Puerto Rico

10    delineations, on Friday of -- this past Friday, we got a

11    delineation for a particular cite.  And I can hand up a copy of

12    this, your Honor.  But it is for the CPPRC petroleum refinery

13    site which includes apparently a stretch of beach, and includes

14    a recharge area that includes seawater.

15         THE COURT:  So that would move seawater into the

16    potable water category, because it sort of transmogrifies

17    itself into groundwater.

18         MR. RICCARDULLI:  It certainly suggests that -- now,

19    again, we're talking about whether or not this information is

20    discoverable.

21         THE COURT:  No, I know.

22         MR. RICCARDULLI:  It's not if it's admissible.

23    There's a very different standard for --

24         THE COURT:  Mr. Riccardulli, that I know.  I've been

25    doing this for a very long time.

C52VMTB2                    Conference

1          MR. RICCARDULLI:  This suggests now, of course, that

2     this information is at least discoverable.

3          THE COURT:  Not necessarily.  It can't be discoverable

4     under the principle that discovery is broader than

5     admissibility.  I mean, as I say, morning and night difference.

6     I understand that.

7          But it has to be relevant to the subject matter in the

8     suit.  And if they are not going to be claiming these NRD

9     damage or nonpotable -- what do they call them, marine --

10         MR. DEMA:  Just to inform the record, your Honor, with

11    regard to that -- with regard to that circle, I mean it's a

12    circle, our complaint specifically excludes marine waters and

13    waters that are brackish.  And so to the extent there are any

14    waters that are marine or brackish in the circle, we have not

15    sued for them.

16         THE COURT:  Except for one thing.  If you can use

17    those areas, the so-called recharge area, to convert the water

18    resource, so to speak, to add to your reserve of groundwater,

19    then you bring it back in.  I don't know if you can do that.  I

20    mean I'm just repeating what I hear.

21         MR. DEMA:  It's technically possible, but that's not

22    within the scope of what our damages are.  We are looking for

23    groundwater, and we have excluded brackish water, even though

24    in certain instances you can bring it and recycle it and put it

25    through an RO and add to the groundwater stop.

C52VMTB2                        Conference

1              THE COURT:  But you're not doing that.

2              MR. DEMA:  We are not doing that.

3              THE COURT:  So we still say, Mr. Riccardulli, he's not

4    seeking any damages for coastal or estuarine waters; and so the

5    NRD assessment really is irrelevant.

6              MR. RICCARDULLI:  Except, your Honor, we don't think

7    it is, and here's the point:

8              This is not the plaintiff in the other MTBE cases that

9    have been before you where this type of analysis of damages

10   model, for example, is purely expert-related and

11   litigation-driven.

12             What we are trying to --

13             THE COURT:  No.  They've already done this assessment

14   with respect to groundwater only once, which they've now given

15   you.  So we're talking about a motion to dismiss.  What would I

16   dismiss as a sanction when, in fact, apart from the sanction,

17   it may be that the ruling is they didn't have to produce

18   anything more than they did; they gave you the one groundwater

19   site where they had calculated NRD damages in the past.

20             MR. RICCARDULLI:  That's one of the failures, and we

21   identified many in here.

22             For example, we did -- I mean throughout this their

23   reference was go look at the files that they produced to us.

24   These were the same site files, for example, that are at issue

25   on which sites belong in the case and which do not.  So it was

C52VMTB2                          Conference

1   go look at all the site files; now we know 400 of which don't

2   have any evidence of MTBE.  So they didn't comply with the Rule

3   33(d) standard in answering these.  They produced no new

4   documents on behalf of PRASA or, frankly, the agency charged

5   with doing assessments, the Department of Environmental and

6   Natural Resources.  So no new documents come in the door two

7   and-a-half years later after we served these.

8         THE COURT:  I guess my question to the plaintiff is

9   are there any such new documents to produce?

10         MR. DEMA:  Your Honor, the tabulation of natural

11   resource damages is an expert-intensive exercise.  And Vega

12   Alta was a PCE site.  We produced the documents that were

13   producible, not subject to attorney-client privilege, and we

14   produced a log, as well, because that was -- that's the sole

15   site in the past at which this exercise occurred.

16         This exercise is intensively expert-driven, and it has

17   not been done commonwealth-wide, which is what these

18   interrogatories request.  The case is managed by trial sites.

19         THE COURT:  I was going to ask that of the defendants.

20   I mean this would relate to all release sites; and I thought we

21   were trying at this point to focus on the trial sites.

22         MR. RICCARDULLI:  Your Honor, that's true.  But in

23   terms of frankly -- and they could respond to this in many

24   ways.  What we are trying to get at is in the past -- and we've

25   been asking this since 2008, how did you calculate --

C52VMTB2                         Conference

1         THE COURT:  We've covered that.  There's only one

2    groundwater site where they've calculated NRD damages in the

3    past.

4         MR. RICCARDULLI:  It may be the same formula that's

5    used for the coastal waters.  The problem is I don't know that.

6    And it's simple, I mean they didn't have to produce hundreds of

7    files; but, frankly, I don't even know what it is anymore.  For

8    years we heard there's hundreds of analyses, and you're asking

9    for way too much.  Now it turns out there's one.  Why didn't we

10   have this file in 2008?

11        THE COURT:  I don't know that.  But there's one

12   groundwater site that calculated NRD damages, and they gave it

13   to you.  The rest are not groundwater.

14        He can't blow hot and cold.  He can't come in the next

15   time and say, Well, it turns out there's 75 groundwater sites

16   in the past.  He can't do that.  He's committed to the one.

17        MR. RICCARDULLI:  And even for this one groundwater

18   site, we didn't get the calculations, because they stood on the

19   objection that well those were performed by consultants, so

20   therefore we don't have to turn them over.

21        So to say that we got the file on this other site --

22        THE COURT:  What's that about, Mr. Dema?  Why

23   shouldn't you have to turn over the calculations?  These

24   weren't litigation consultants, were they?

25        MR. DEMA:  They absolutely were, your Honor.  This was

C52VMTB2                        Conference

1     Jim Brewin out of San Francisco was our opposing counsel.  We

2     had sent them a draft of the complaint.  The consultants were

3     hired by my firm.  They reported to my firm.  They did the

4     analysis.  Commonwealth did not have the expertise to conduct

5     that analysis.  It was all expert-driven.

6            We have just been through this in another

7     contamination case with Chief Judge Bartle out of Philadelphia

8     in *HOVENSA* where they had consultants retained by K&L Gates,

9     who did work, and my sovereign client wished to see that work.

10    And Judge Bartle said no way.  You haven't shown the

11    extraordinary circumstances under 26, and you don't get to

12    see --

13           THE COURT:  I don't know about that case and that

14    judge, but this is somewhat different to me.  This is the

15    commonwealth's standing on this as a way that NRD damages are

16    calculated.  It is the commonwealth's position.  I can't

17    explain it.  It's not like a private litigation.  This is their

18    position as to how they, the commonwealth, will calculate

19    groundwater damages going forward forever after.  This is the

20    method.  And if that's the method the commonwealth has adopted,

21    then you have to disclose it.  There's no way to defend against

22    it without knowing.

23           MR. DEMA:  Exactly.  With the hypothesis you put

24    forward, I totally agree with you.

25           THE COURT:  I thank you for that.

C52VMTB2                          Conference

1          MR. DEMA:  But that didn't happen.

2          So what happened is the law firms, the outside counsel

3    for GE and the outside counsel for the commonwealth, each hired

4    experts, reported to my Department of Justice and their

5    hierarchy as to what they thought was a fair number.  We gave

6    the settlement documents over.

7          THE COURT:  I realize that.

8          They want to know how the calculation was done.

9          I still say if this is the commonwealth's position as

10   to how the commonwealth, as a state, an entity, is going to

11   calculate damages for all contamination of groundwater going

12   forward, then it's not limited to this old litigation; it's

13   this litigation.  They are entitled to know how damages are

14   calculated.  The rules require you explain your damage

15   calculation.  I don't understand -- I don't know this other

16   case, and I'm not criticizing your appraising it, but I don't

17   know that I agree with it.  This is this case.  We are entitled

18   to know how the plaintiff is calculating damages.

19         MR. DEMA:  With regard to a regulatory regime that

20   would go forward, ONR in New Jersey has a formula that's a

21   regulator; they have a formula.  The commonwealth did not adopt

22   this formula; the commonwealth accepted a settlement demand.

23         THE COURT:  Is the commonwealth adopting this standard

24   or method when it calculates damages in this case?  Is it going

25   to use the same methodology?

1            MR. DEMA:  It is going to use the same type of

2      expertise to determine the --

3            THE COURT:  Sounds like the identical methodology.

4      Turn it over.  Turn it over.

5            How the damages were calculated, they are entitled to

6      know that.  This is not cat-and-mouse.  This is a case.  This

7      is a case.  They are entitled to know it.  I don't even know

8      why you want to hide it.  Turn it over.

9            MR. DEMA:  We will turn it over, your Honor, with the

10     realization it's a different set of experts.

11           THE COURT:  That may be.  But how --

12           MR. DEMA:  The different chemical and the like.

13           THE COURT:  All those reservations, turn it over.

14           Thank you.

15           What is it, Mr. Riccardulli?

16           MR. RICCARDULLI:  Well, I was going to suggest, your

17     Honor, this is exactly sort of our frustration that led to this

18     motion.

19           THE COURT:  All right.  But that part is done.  Now

20     you're going to get that, how the damages were calculated.

21     That's ordered.  That was an order.

22           MR. RICCARDULLI:  Your Honor, I mean these are briefs

23     in our papers.  For example, there's been a number of

24     categories of information or requests that, frankly, the

25     response we got was not even go look at the files we produced

to you, but why don't you go look on the Internet.  And I'm not
going to tell you what website I'm even referring to.

         Now, notwithstanding that, that issue came up in a New
Jersey matter where Special Master Warner ruled on that and
said that's just not even sufficient response, even if you're
pointing me to a specific website.

         Here it was you can go, and as we put in our papers,
go on Google, run a search, and see what you can come up with;
here are some names.  And, again, this is the type of response
we got.

         I mean you told them in January, go respond to these
requests.  We did get a response.  But when you go through
these and look at them in terms of the Rule 33(d) failures --

         THE COURT:  Did the plaintiffs produce any ESI in
response to this interrogatory?

         MR. RICCARDULLI:  They produced some.  And then, of
course, we complained in our opening paper that we had not yet
received the privilege log.  It has come in since obviously we
filed the motion.

         THE COURT:  How about ESI?

         MR. RICCARDULLI:  We have not.  There has been some
ESI, but I don't believe it's --

         THE COURT:  Is it complete?  They are saying it is
complete.

         MR. DEMA:  Yes.  Any ESI that was attorney-client

1    privilege we put on the privilege log.

2            THE COURT:  I understand.  Otherwise you're saying

3    your production is --

4            MR. DEMA:  Yes, ma'am.

5            THE COURT:  They're saying production is up to date.

6            MR. DEMA:  With regard to Mr. Riccardulli's comment,

7    it is inaccurate.  They wished to know about marine oil spills.

8    We sent them to the web, and we gave them, on Page 13 of our

9    responses, the specific sites, the specific freighters that

10   were involved.

11           And when you go to that web, because it's marine it is

12   a Noah trustee.  And so what you find at the sites to which we

13   referred them is how the Noah trustee calculated the damages.

14   And the commonwealth was just a poor cousin player in that

15   because the federal trustee has jurisdiction.  It says the

16   amount of damages, how the assessment was done, what the

17   damages were, what the priming restoration was, what the

18   compensatory restoration was.  We didn't, quote/unquote, say go

19   Google.  We gave them the specific details.  The federal

20   government has to publish each settlement.  So those

21   settlements give infinite detail.

22           THE COURT:  I see.  And you directed them to --

23           MR. DEMA:  And we directed them right to it.  And just

24   for grins, I did it this morning; it's right there.  It's the

25   federal government.  It's the official settlement and NRD

1    assessment that has it.  It goes on and on and on.

2             MR. RICCARDULLI:  Your Honor, here's the problem:  Is

3    the commonwealth adopting that method?  Can I now say you

4    should do it this way?

5             THE COURT:  That's what I just said on the other

6    point, the litigation one.  I just said that when I ruled.  I

7    said if that's how the commonwealth intends to calculate NRD

8    damages here, that's it.  And he gave some lawyerly answer,

9    again it's going to be up to the experts.  And I said turn it

10   over.  That's the method.

11            And if the same thing is true with these published

12   settlements on the government's website, so you directed them

13   to it, but they want a representation.  Is that --

14            MR. DEMA:  I will represent that we will not use that

15   method, because none of the natural resources at issue in those

16   marine oil spill cases have anything to do with this instant

17   litigation.

18            THE COURT:  Because it's not groundwater.

19            MR. DEMA:  It is not groundwater.

20            THE COURT:  So then the calculation is the one that I

21   just told him he had to turn over.

22            MR. RICCARDULLI:  Your Honor, and for the record, I'm

23   looking at Page 13 of Mr. Dema's response where he says he

24   included the website and the name of the freighter, and he

25   checked the Internet for the site that's listed in here.

C52VMTB2                    Conference

1              And unless I'm looking at the wrong document here, I

2       don't see a single reference here to the website that I should

3       have turned to.  Instead, I've got a listing of a couple of --

4       I'll quote it.  "Plaintiffs refer defendants to publicly

5       available information on the Internet regarding the TB Vista

6       Bella oil spill, which occurred on March 6, 1991, the Marche

7       Berman oil spill, which occurred on January '94, and the

8       Fortuna Reefer threatened release of oil, when the Fortuna

9       Reefer container ran aground on a coral reef surrounding Mona

10      Island in Puerto Rico in 1997."

11             I didn't get a list of websites, I didn't get referred

12      to these.  Instead, it's go run Google search.  I didn't even

13      know -- I found a Noah search and went and put those terms into

14      the Internet.  So I don't know where those are on Page 13.

15             THE COURT:  Well, the bottom line is if you search for

16      those releases on those dates and then how the damages

17      calculated, you could find it; but he's not adopting that.

18             MR. RICCARDULLI:  It's irrelevant.

19             THE COURT:  Right.  Because it's not groundwater.  The

20      groundwater, you've got one, the one that the expert did in the

21      other litigation.  And I pinned down today that that's the one;

22      that is the methodology that will be applied to figure out the

23      NRD damages here for groundwater.  That's all that's needed.

24             Yes, Mr. Pardo.

25             MR. PARDO:  Is that a ruling?  Is that a finding?  Are

1   they locked in on this?

2            THE COURT:  Oh, yeah.  I told them that when I said

3   produce it, and he said we will.  But there are other issues

4   that I think were raised in this motion that we didn't touch,

5   and I understand there's some objection about not being

6   required to produce baseline data.  The commonwealth says the

7   baseline isn't relevant.  But I don't see how that could be.

8            MR. DEMA:  We do not say that the baseline data is not

9   relevant.  We say, as we do in New Jersey, the baseline data is

10  pre-contamination of MTBE.

11           THE COURT:  So it's always zero?

12           MR. DEMA:  Yes, it is before they introduced MTBE or

13  TBA into the groundwaters of the commonwealth.

14           THE COURT:  So essentially it's always zero.

15           MR. DEMA:  It's zero in terms of their contaminants,

16  yes, your Honor.

17           MR. RICCARDULLI:  Your Honor, that unfortunately may

18  have been the position New Jersey took, but it's one that your

19  Honor dismissed and said of course we get other contaminant

20  data.  It's also an issue that the special master handled last

21  September and said of course you get other contaminant

22  information.

23           THE COURT:  Oh, that's true.  That goes to baseline?

24           MR. RICCARDULLI:  Of course, because if MTBE at the

25  time it was introduced, for example, into the groundwater, that

C52VMTB2                    Conference

1   water had already been unusable as a result of other

2   contamination, we're entitled to know that.  It goes to the

3   baseline condition, the condition of that water, before MTBE

4   entered.

5         THE COURT:  What about that?  I've always said other

6   contaminants matter.  I didn't know if they go into the

7   baseline calculation, but surely they matter.  I mean water

8   isn't 100 percent pure just because MTBE hasn't been spilled,

9   there are other contaminants.  The water is either already

10  usable or not usable, or it's usable but only with treatment.

11  So there is a different baseline with zero, even if there's no

12  MTBE released yet.

13        MR. DEMA:  That is a factually rich argument also that

14  is made relevant by the opinions of experts opining it.

15        THE COURT:  I don't know about that.  I think it's the

16  Court.  The Court has ruled repeatedly that other contaminants

17  matter.  And the quality of the water before the MTBE release

18  matters.  So if you have something theoretically 100 percent

19  pure and then you pour MTBE in it, and it becomes unusable,

20  then we all know that the damage is 100 percent due to MTBE.

21        But if the water has something else in it, TCE or --

22  and it was already contaminated to some extent, then the MTBE

23  comes along, they may say it may be damaged water, but it was

24  damaged before we released.  And that's fair argument.  It's

25  not for experts, it's for me.  And I'm telling you that's the

1    answer.

2            So they are entitled to know the condition of that

3    water as a baseline before the release.  And it can't always be

4    zero if it had other contamination.

5            MR. DEMA:  And I have no problem with that, your

6    Honor, with regard to the trial sites at issue.  They are

7    asking for every groundwater site in Puerto Rico.

8            THE COURT:  And I ask, why is that for now, Mr. Pardo,

9    when most of the focus --

10           MR. DEMA:  The other thing --

11           THE COURT:  Wait, wait.  Let's finish trial sites.

12           Have you done it for the trial sites?

13           MR. RICCARDULLI:  We are in the process of doing it

14   for the trial sites.

15           But there's another entity out here, your Honor.  And

16   in terms of ESI, for example, you asked the question is it

17   complete.

18           THE COURT:  I did.

19           MR. RICCARDULLI:  I think plaintiffs have said that it

20   is for the commonwealth but their objections here in response

21   to these interrogatories were that they were not -- they

22   objected to us including PRASA, which is the Puerto Rico

23   Aqueduct Sewer Authority in the definition of plaintiff as we

24   use it in terms of the interrogatory requests.

25           We did not get anything from ESI, from PRASA.  In

C52VMTB2                      Conference

1    response to these, frankly, they operate the water system

2    largely within Puerto Rico.  This is an entity that these

3    plaintiffs have taken the position that they'll treat them as a

4    covered person.  You may recall we actually went years ago and

5    tried to take -- treat them as a third party, and they said

6    we'll handle their production.

7             THE COURT:  Let's say they are a covered person.  Then

8    what?  That makes them a plaintiff, the equivalent of a

9    plaintiff, and they should respond?

10            MR. RICCARDULLI:  Their documents certainly were

11   captured by these requests and owed to us.  And here's the

12   problem.  And they make references to invitations for us to

13   come down to PRASA to review the files.

14            We just conferred again with this last month, and we

15   said, You know what?  We'll follow the same protocol we'll

16   follow in New Jersey.  And we actually said, Fine, we'll do

17   that.  We'll find a vendor.  You guys put the responsive

18   information in a room, and we'll have it photocopied.

19            And they said, We're not even going to do that.  Just

20   come down, and you go look through all of our files, and you

21   pick and choose what you want.  But we are not even going to do

22   a search for -- we are not going to segregate the responsive

23   from the nonresponsive.

24            THE COURT:  Why isn't that your duty, Mr. Dema, to

25   segregate the responsive from the nonresponsive, put it in a

C52VMTB2                    Conference

1    room?  Then they'll send their vendor in to copy it and

2    eventually search it.  But why shouldn't you have to gather it?

3    That's what all litigants do.

4              MR. DEMA:  We did gather it some many months ago.  And

5    our good friends came down.  And we said, These are examplar

6    files.  Please tell us the type of file that you would like.

7    And because there's no sense in replicating everything that

8    PRASA has.  So they came down as a team.  We have yet to be

9    able to narrow it with PRASA based on feedback from that

10   exercise.  We have said that PRASA files are available to them.

11             THE COURT:  What did you put in the room for their

12   review when they came down?  What was in the room?

13             MR. RICCARDULLI:  Your Honor, the doors were open to

14   us at that time.  There was no, Here's a room full of stuff.

15             THE COURT:  There was no gathering.

16             MR. RICCARDULLI:  No, there was no gathering.

17             THE COURT:  It was, Here are all of PRASA's files.

18             MR. RICCARDULLI:  And here's an employee who may be

19   able to guide you through the files and how they are organized.

20             THE COURT:  It seems to me a litigant has the duty to

21   review their records and cull out that which is responsive.  In

22   the first instance it could be more than will eventually be

23   needed, but it should at least be a culling.  Then the

24   requesting party goes through that room and decides what it

25   wishes to copy or what it wishes to ask for more of.  But you

C52VMTB2                    Conference

1   can't just say, Come to the company and look at everywhere.

2            MR. DEMA:  We are just asked for guidance because

3   certain of the --

4            THE COURT:  I just gave you guidance.

5            You got requests; put the responsive documents in a

6   room.

7            MR. DEMA:  And certain of the requests we answered

8   specifically.  For example, they asked us all the PRASA files

9   that relate to MTBE contamination.  And PRASA and the EPA had

10   done this exercise.  We gave them all those -- it's not as if

11   we didn't give them any PRASA files.  So we had been feeding

12   them PRASA files and ESI to the extent that we are capable of

13   understanding their desires.

14            We certainly will continue to work with them, because

15   we agree, it's our duty to -- it's not as if we just say, Well,

16   these are all the files from payroll records to everything.  We

17   do wish to narrow it, and we are in the process --

18            THE COURT:  Then I'm hearing two different stories.

19            Mr. Riccardulli says the team goes down there.  Then

20   you say, Here are the keys to the entire plant.  Pick what you

21   want.

22            That's not good enough.  You have to segregate

23   documents.

24            MR. DEMA:  I think memories differ as to how that

25   exercise went down.

C52VMTB2                    Conference

1              THE COURT:  I wasn't in Puerto Rico, sadly, this

2     January, February, or March, so I couldn't supervise this on

3     site, which is a thought.  Next winter.

4              MR. RICCARDULLI:  Maybe Mr. Dema is referencing two

5     different sort of situations here.

6              We did go down; we did review certain files.  There

7     was a PRASA production in 2010.  But in response to these

8     discovery requests, which they've agreed that they are a

9     covered person, we did not get documents responsive from PRASA

10    to these.  We didn't get a response.

11             THE COURT:  What do you mean you didn't get a

12    response?  What did you do with PRASA documents after these

13    document requests or these interrogatories were rewritten and I

14    said answer them by February 17th?  You produced no PRASA

15    documents after that, between the January 20th status

16    conference and my saying you've got to do this by February

17    17th?

18             MR. DEMA:  We had produced the PRASA documents that in

19    any way -- that are possessed by PRASA that in any way relate

20    to contamination in their water well.

21             PRASA is the water authority in Puerto Rico.

22             We had produced.  So when they say produce any

23    contaminants in the wells, including MTBE, in fact, we had

24    produced those files; they have those files.  They have all the

25    files with regard to --

C52VMTB2                        Conference

1           THE COURT:  It sounds like we're going to practically

2   need an evidentiary hearing, because everything you say,

3   Mr. Riccardulli -- you can't see through the back of your

4   head -- is shaking his head left to right saying no.  You can't

5   see that.

6           So there's a fact dispute here as to what was

7   produced.  And if you cannot resolve it, I'm going to have to

8   set aside two whole days and have hearings, which is kind of

9   sad.

10          MR. DEMA:  Very sad.  I would certainly be happy to

11  talk to Mr. Riccardulli because perhaps we don't understand

12  what he is looking for.

13          THE COURT:  Right.

14          MR. RICCARDULLI:  Your Honor, with all due respect to

15  Mr. Dema, I think we've heard for far too long that there's

16  confusion among the parties.

17          I think our requests were clear at this time.  Your

18  instruction in January was very clear in this time.  And PRASA

19  was to be included here.

20          There's been no production since that time.  And I'll

21  go back and check, but I don't even think there's a Rule 33(d)

22  response on behalf of PRASA.  Instead, they objected and said,

23  We object to you even including PRASA in the definition of

24  plaintiff.  We're not going to respond --

25          THE COURT:  We're past that.  They are admitting that

C52VMTB2                        Conference

1    they are in control.

2              MR. RICCARDULLI:  We agree --

3              THE COURT:  I think Mr. Dema is admitting that he has

4    control, the old possession, custody, and control of those

5    documents.  And he knows it's his obligation to produce them.

6    But where you're differing is he says we have, and you say he

7    hasn't.  And I'm not in a position to resolve that.

8              MR. RICCARDULLI:  The way to start, your Honor, might

9    be for them to get us a set of responses to these requests on

10   behalf of PRASA with a proper Rule 33(d) response so we know

11   which answers here they believe they produced documents in

12   response to.  That may help narrow this and alleviate the need

13   for an evidentiary hearing, but at least we'll know which

14   requests they think they answered on behalf of PRASA.

15             THE COURT:  I'll take that suggestion, because it

16   means I don't have to have a hearing in the next 30 days, which

17   I'm not for anyway.

18             MR. DEMA:  I will take it, as well, your Honor.

19             THE COURT:  But instead, today being May 2nd, by May

20   18th, just a mere two and-a-half weeks away, by May 18th you

21   have to identify to Mr. Riccardulli what you say you produced

22   from PRASA in response to what.  And if you can't do it to your

23   own surprise and shock, then do it now and identify responsive

24   documents in PRASA if you look at your own records and find out

25   you didn't.

C52VMTB2                    Conference

 1              MR. DEMA:  And I am assuming that we're talking about

 2     groundwater and not any other type of definition.

 3              THE COURT:  That's what I've ruled here today.  This

 4     is a groundwater case.  And to the extent the interrogatory as

 5     rewritten go beyond that, they are narrow for now.

 6              MR. DEMA:  And could you answer me, your Honor,

 7     whether this is every -- is this commonwealth-wide or is this

 8     site --

 9              THE COURT:  Is this 296 different locations or is this

10     the trial sites?

11              MR. RICCARDULLI:  It's my understanding that the

12     commonwealth does not have -- that PRASA does not do testing at

13     the sites.  They run water systems.  This is a different

14     situation.  We're not asking them for 296 --

15              THE COURT:  It's not site-specific, but it's

16     commonwealth-wide.

17              MR. RICCARDULLI:  Well, it's not site-specific and

18     then 296 sites.  They operate wells, they have testing data.

19              THE COURT:  But it's the whole commonwealth.

20              MR. RICCARDULLI:  That's right, your Honor.

21              THE COURT:  It's not site-specific, so to speak;

22     that's not the way PRASA runs it.  But it's all of their

23     records.

24              MR. RICCARDULLI:  Which were opened up to us.

25              MR. DEMA:  If they are 80 miles apart, your Honor --

C52VMTB2                    Conference

 1    just so I understand.  I'm happy to comply.  But if you're

 2    saying if the water is drawn from a source 80 miles away from

 3    any of the test sites, do we produce the --

 4                THE COURT:  Let's get it over with.  It's been two

 5    and-a-half years.  And for that alone there's a reason to say

 6    all PRASA files.  Identify responsive materials.

 7                MR. DEMA:  Okay.  All contaminants.

 8                THE COURT:  It's time to do it.

 9                That's right.

10                I think that is a ruling, and you've made some

11    progress.

12                Now what?

13                MR. PARDO:  When do we get the Vega Alta files?

14                THE COURT:  Ask him.

15                MR. PARDO:  Can I suggest five days?

16                MR. DEMA:  I'll do it by the same --

17                THE COURT:  May 18th?

18                MR. DEMA:  May 18th, your Honor.

19                Just so I understand the ruling, it's groundwater,

20    it's PRASA wells.

21                THE COURT:  Correct.

22                MR. DEMA:  Period.

23                THE COURT:  Correct.  For the entire commonwealth.

24    Right.  OK.

25                Yes, Mr. Riccardulli?

C52VMTB2                    Conference

1           MR. RICCARDULLI:  Your Honor, I just want to be -- I

2      don't know what he means by PRASA wells.  I want to make sure

3      if -- they have testing data that's not affiliated with a well,

4      but it's groundwater data, that's not linked to a potable

5      drinking water well.

6           THE COURT:  But it's groundwater.

7           MR. RICCARDULLI:  It's groundwater.

8           THE COURT:  If it's groundwater, it's covered, even if

9      it's not linked to a particular well.  If it's groundwater,

10      it's covered by this ruling.

11           MR. RICCARDULLI:  That's fine, your Honor.

12           THE COURT:  Now, should I try to see you in a month or

13      six weeks or what?  What do you think is best for the next

14      date?

15           MR. RICCARDULLI:  A month, your Honor.

16           THE COURT:  A month is what you think.  OK.

17           The week of June 4th.  I'm going to be on trial the

18      entire week of June 4th, so I can do any day, there's no

19      difference, at 4:30.  We'll go as long as we go.  So June 4th,

20      6th and 7th -- no, 6th and 7th are much better.  I'm sorry, the

21      6th and 7th.  I have no 4:30s Wednesday or Thursday, which

22      means you could have the entire chunk of time 4:30 to 6.

23           MR. PARDO:  I'm sorry, what days are those?

24           THE COURT:  Wednesday or Thursday.  I can go 4:30 to

25      6.

C52VMTB2                        Conference

1          MR. PARDO:  Could we have the Thursday?

2          THE COURT:  Yup.  Better for me.  Well, no, it was the

3     other way around, but that's OK.

4          You said the Thursday, right?

5          MR. RICCARDULLI:  Yes, your Honor.

6          THE COURT:  OK.  June 7th, 4:30.

7          Please keep your letters coming in enough advance so I

8     know what I'm doing, because I'm going to be on trial.  In

9     fact, that will be the third week of a six-week trial; I'll be

10    very tired.  So I need notice.

11         MR. RICCARDULLI:  We will, your Honor.

12         MR. DEMA:  So for clarity of the record, your Honor,

13    the motion of defendants to dismiss all the NRD claims --

14         THE COURT:  Decision reserved.  I want to see what you

15    come up with.  It's not closed yet, this motion; it's still,

16    let's call it, pending.  We can always revisit it when I see

17    what you've done.  I'd rather keep it open.

18         MR. PARDO:  Thank you, your Honor.

19         THE COURT:  So all cases, status conference June 7th.

20    Whatever issues have arisen by then we'll take up.

21         MR. RICCARDULLI:  Thank you, your Honor.

22         MR. PARDO:  Thanks, your Honor.

23         THE COURT:  I hope I have that privilege log decision

24    to you very soon.

25         MR. PARDO:  Better yet.  Thank you.   (Adjourned)