CAMUMTBC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
    ETHER ("MTBE") PRODUCTS                Master File C.A.
4   LIABILITY LITIGATION                   No. 1:00-1898(SAS)

5   ------------------------------x
                                           New York, N.Y.
6                                          October 22, 2012
                                           4:10 p.m.
7
    Before:
8
                    HON.  SHIRA A. SCHEINDLIN
9
                                           District Judge
10
                           APPEARANCES
11

12  WEITZ & LUXENBERG, P.C.
         Plaintiffs' Liaison Counsel
13  BY:  WILLIAM WALSH

14  MILLER AXLINE & SAWYER
         Attorneys for New Jersey, Puerto Rico Plaintiffs
15  BY:  MICHAEL AXLINE

16  LAW OFFICES OF JOHN K. DEMA, P.C.
         Attorneys for New Jersey, Puerto Rico Plaintiffs
17  BY:  JOHN K. DEMA
         NATHAN SHORT
18
    COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
19       Attorneys for New Jersey Plaintiffs
    BY:  LEONARD Z. KAUFMANN
20
    RAWLE & HENDERSON LLP
21       Attorneys fr Third Party Plaintiff Getty Properties
    BY:  SUSAN M. DEAN
22
    McDERMOTT, WILL & EMERY
23       Attorneys for Defendants Exxon Mobil Corp.
         and Defendants' Liaison Counsel
24  BY:  JAMES A. PARDO
         LISA A. GERSON
25

CAMUMTBC

1    APPEARANCES CONTINUED

2    SHEPPARD MULLIN RICHTER & HAMPTON LLP
          Attorneys for Defendant Exxon Mobil Corporation
3    BY:  JEFFREY J. PARKER

4    SEDGWICK LLP
          Attorneys for Defendant Shell Oil Co.
5    BY:  PETER C. CONDRON

6    KING & SPALDING
          Attorneys for Defendant Chevron
7    BY:  JEREMIAH J. ANDERSON

8    EIMER STAHL
          Attorneys for Defendant Citgo Petroleum
9    BY:  PAMELA R. HANEBUTT

10   McCONNELL VALDES LLC
          Attorneys for Defendant Sol Puerto Rico Ltd.
11   BY:  ALEJANDRO J. CEPEDA-DIAZ

12   BLANK ROME LLP
          Attorneys for Defendant Lyondell
13   BY:  FRANK A. DANTE

14   LIEBERMAN & BLECHER P.C.
          Attorneys for Third Party Defendant HP Delta
15   BY:  MICHAEL G. SINKEVICH, JR.

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAMUMTBC

1        (Case called)

2        THE COURT:  I have the October 4th letter from

3  Mr. Dema requesting a premotion conference to address Sol's

4  alleged discovery deficiencies.

5        THE COURT:  Is anybody here on the defense side

6  representing Sol?

7        MR. CEPEDA-DIAZ:  I am here, your Honor.

8        THE COURT:  Who are you?

9        MR. CEPEDA-DIAZ:  Alejandro Cepeda.

10        THE COURT:  C-E-P-E-D-A?

11        MR. CEPEDA-DIAZ:  That's correct.

12        THE COURT:  And then I have the October 12th

13  plaintiffs' preconference letter and the October 12th

14  defendants' preconference letter.

15        On October 17th, I have the reply letters of

16  plaintiffs and defendants and a separate reply letter from the

17  City of Fresno.

18        I just received what was styled an in camera

19  submission from Mr. Axline's firm regarding the City of Fresno

20  case.  It is dated October 17th, but it is also dated October

21  19th.  So the first page says October 17th, the second page

22  says October 19th.  I don't think it was received by this

23  office until today.

24        And then also today's date, I just received five

25  minutes ago a letter from Ms. Lombardi of the Angelos law firm

CAMUMTBC

1    responding, to some extent, to the documents submitted by the

2    Miller Axline firm for the Court's in camera review.

3          I don't know if you have even seen this yet, Mr.

4    Axline, have you?

5          MR. AXLINE:  I have seen it, your Honor.

6          THE COURT:  We just got it five minutes ago.  When did

7    you get it?

8          MR. AXLINE:  About an hour ago.

9          THE COURT:  I have to say, with respect to the October

10   19th letter from the Axline firm which we got today, and the

11   October 22nd letter that, apparently, came to you an hour ago

12   from the Angelos firm -- I have been on trial all day and I

13   have no idea, really, what these two letters say.  And it is

14   simply not fair to expect the Court to do that on the same day.

15   We have discussed this before.  That's why we have rules about

16   when submissions are to be made.  We do have other cases, most

17   judges, and many of us work seven days and there is not an

18   eighth day in the week.  So that's that.

19          Is anyone here from the Angelos firm?  No.

20          Let's get started.

21          I moved the conference because I have an obligation

22   rather early this evening that I would like to get to.

23          The first one is, again, an update on the document

24   repository situation.  I asked you to keep putting this item on

25   the agenda until I understand what has been done.

CAMUMTBC

1          MR. AXLINE:  Yes, briefly, your Honor, we have

2     accumulated all of the defense references to earlier documents.

3     We broke them out into which firm the previously produced

4     documents were sent to.  We produced a chart for each of those

5     firms.  We sent a letter to each of those firms -- these are

6     plaintiffs firms -- saying, here are all the documents that the

7     defendants claim that they have sent to you.  Would you please

8     provide them to us no later than November 1st.

9          We are getting responses in.  I don't think any firm

10    has said we can't meet that deadline, so by November 1st, we

11    expect to have a complete set of the documents that the

12    defendants claim they previously --

13         THE COURT:  And it will be available to all

14    plaintiffs' counsel in all cases?

15         MR. AXLINE:  We have said that in our letter to the

16    firm saying, send us these documents, told them that we are

17    collecting all of these so that they will be available for all

18    firms.

19         THE COURT:  But you will send a notice to all

20    plaintiffs' counsel that you know of that they can access them

21    either by contacting you directly whenever they want to?

22         MR. AXLINE:  Yes.  So that's the status.

23         THE COURT:  Since they are supposed to do it by

24    November 1st, I will know at the next conference whether it is

25    done?

CAMUMTBC

1          MR. AXLINE:  Yes.

2          THE COURT:  Then there is a proposed case management

3     order in the Puerto Rico case.  I understand it is a joint

4     proposal.  It just seems so excessively long.  The case is an

5     '07 case with a proposed final cutoff date, I guess, for expert

6     discovery of April 2014, another year and a half from now.

7     That does not seem to be wise.  Where can it be tightened up?

8          Well, I suppose that one could start tightening right

9     at the beginning.  Why is the deadline to add third parties

10    July 13 when we are here in October?

11         That is not really your issue, Mr. Pardo, that is a

12    plaintiffs' issue.

13         MR. AXLINE:  That is a defense issue, your Honor.

14         THE COURT:  To add third parties, right.

15         Mr. Pardo.

16         MR. PARDO:  I will try to answer that.

17         May I just step back and address the opening

18    observation --

19         THE COURT:  That it will be a seven-year case?

20         MR. PARDO:  Right.

21         THE COURT:  No.  I think I know the background pretty

22    well.  I am not sure that the plaintiffs pushed the case very

23    hard for a lot of years, but still and all, we are here in

24    October 2012.  The case has been active and busy for at least

25    the last couple of years.  I know that it has been on our

CAMUMTBC

1    active agenda for at least two years so it still seems too

2    long.

3            The reason I was concerned when I saw the deadline to

4    add third parties, usually we are talking about amending a

5    complaint to add defendants, but I understand this is any

6    defendants that the defendants would like to add as third party

7    defendants.  Why should that be July, because everything seems

8    to flow after that?  If I got that date where it should be by

9    January or February, I start moving many things up by many

10   months.  It is not right that it is going to take another year

11   and a half to have this case teed up.  It is just not right.

12           MR. PARDO:  You may be right, your Honor --

13           THE COURT:  I don't know may be right.  If I don't

14   order this one but order my schedule, then that will be

15   schedule.  Anybody who violates the schedule, I guess could

16   have their pleadings stricken.  I don't know about may be.

17           MR. PARDO:  Your schedule will control.

18           THE COURT:  Yes, it will.

19           MR. PARDO:  The reason I think that date is set where

20   it is set is because it will depend on the fact discovery that

21   will be taken on the sites.

22           Now, I will remind the Court what I think you probably

23   already know, which is that we only know -- and specifically I

24   think it was June 11th of this year -- as of June 11th finally

25   were able to define what the first tranche of this case was

CAMUMTBC

1    about.  That's when we finally landed on what the trial sites

2    are, which is really what all of the site-specific discovery

3    tees off of.

4              Now, discovery proceeds significantly slower in Puerto

5    Rico for any number of reasons that your Honor is already aware

6    of than it has in New Jersey.  That is nobody's fault.  It is

7    just the way it is.

8              There are language issues.

9              We have had trouble just getting vendors to copy

10   documents.

11             There was a lot of turnover on plaintiffs' side in

12   terms of not the lawyers --

13             THE COURT:  So what is proposed is close of fact

14   discovery a year from now and that is just on the trial sites?

15             MR. PARDO:  That would be on the 19 trial sites and it

16   would also be any non-site-specific discovery.

17             THE COURT:  It doesn't purport to be every site in

18   Puerto Rico?

19             MR. PARDO:  No.  If you look at to compare it to New

20   Jersey -- and this case has moved slower than New Jersey,

21   generally -- we had from the time trial site was selected in

22   New Jersey, by early last year, we had about 18 months to do

23   the fact discovery on those sites as well as the

24   non-site-specific discovery we needed to do in New Jersey.

25   Under the schedule both parties have proposed here from the

CAMUMTBC

1    time trial sites have been picked --

2                THE COURT:  Which was when?  You say June?

3                MR. PARDO:  June 11, 2012.

4           And we are going to try to work this out with

5    plaintiffs, but there is actually even today one other issue

6    that we have with the trial sites.  One of the sites we picked

7    is on their list of sites that they are going to dismiss, but

8    we have not had a chance to talk to them about that.  We will

9    get that worked out.

10          We have under the schedule that we have proposed, 21

11   months from the time the trial sites were picked.  Now, 21 is

12   more than 18, I will give you that, but Puerto Rico is a little

13   different than New Jersey.  We know that things are going to

14   move much more slowly.  And we simply have not been able to do

15   site-specific discovery because we have not had the sites

16   picked until June.

17          I hear you.  It is a 2007 case.  There has been a fair

18   amount of discovery done already on the non-site-specific

19   stuff, but we have spent a lot of time in the last year trying

20   to narrow the case, which we have been able to do, trying to

21   get rid of sites that we thought shouldn't be in the case

22   which, working with plaintiffs, we have been able to do.

23   That's where our focus has been.  We have now picked the sites

24   that will be the first tranche for trial and, again, taking our

25   cues from New Jersey, we tried to build a schedule that at

CAMUMTBC

1    least on the front end, the fact discovery side, looks a lot --

2    as much as it can -- like the New Jersey case where we had 18

3    months.

4              In this case we said 18 months, let's be realistic.

5    We can't go in and ask for 36, three years, that won't fly.  So

6    we talked.  We said we think that 21 is doable.  I know that it

7    pushes us out a ways, but given the realities of Puerto Rico,

8    your Honor, I respectfully submit, it is probably aggressive,

9    but it will get done.

10             THE COURT:  I will issue the schedule that I will

11   issue.

12             Do you want to say anything else?

13             I am not going to do it on the spot.  I will issue a

14   schedule.  I will sign it, and that's the Court's order.

15             MR. AXLINE:  I just wanted to share with you some of

16   the practical problems we are facing.

17             THE COURT:  I know you always have translation issues,

18   among other things.  And a lot of things are not stored

19   electronically, I know that too.

20             MR. AXLINE:  Even just for the basic station operator

21   depositions where we have to prepare to take a deposition of

22   what would ordinarily take 10 days to prepare for, we have to

23   have thousands of pages of documents translated --

24             THE COURT:  Then drop the case, that's all I know.

25   Nobody told you you had to bring it.

CAMUMTBC

1          MR. AXLINE:  In fairness, your Honor, the plaintiffs

2     have identified some new parties that we intend to bring to the

3     Court's attention at the next status conference.

4          THE COURT:  You want to add some defendants.  That I

5     am not surprised by, plaintiffs want to add defendants.  When

6     do you want to do that by?  Usually there is a cutoff for

7     amending a complaint to add new parties.

8          MR. AXLINE:  We will identify them before the next

9     status conference and ask for you permission to file a motion.

10         THE COURT:  I don't need a motion.  If you are going

11    to add any defendants, you just need to have a cutoff date.  Is

12    December 1st acceptable, I would think?

13         MR. AXLINE:  Yes.

14         THE COURT:  December 1st to add any new defendants.

15         How many do you think you might be adding?

16         MR. AXLINE:  No more than 10.

17         THE COURT:  Are these local stationary people or big

18    oil companies?

19         MR. AXLINE:  These are large international companies

20    that it turns out as we are going through the discovery

21    supply --

22         THE COURT:  What is the largest you can think of as an

23    example, just give me an example.

24         MR. AXLINE:  International company Vitol S. A., I

25    think is one of them.  There is a Shell-related company that's

CAMUMTBC

1    European based.

2          THE COURT:  The next topic on the agenda is the

3    deadline for defendants' submission of ESI search terms.  And I

4    was led to believe that the parties were trying to reach

5    agreement on this issue and I don't know if you did.

6          MR. DEMA:  Yes, your Honor.  I think that the parties

7    are essentially in agreement on this issue.  In fact, all the

8    defendants but for Lyondell and Citgo, who promised to give

9    their ESI terms over today, have exchanged and we have been

10   working well together.

11         THE COURT:  So what about the last two?  What about

12   Lyondell and Citgo?

13         MR. DEMA:  The deadline was today that we agreed with

14   them and the day is not over.

15         THE COURT:  But is anybody here to speak on behalf of

16   Lyondell or CITGO, whether they are going to join in this

17   effort to get the search terms by today?

18         You are?

19         MS. HANEBUTT:  Pamela Hanebutt on behalf of CITGO

20   Petroleum.  We indicated that we don't have any ESI terms to

21   give them because, with respect to this particular set of

22   discovery, we had no ESI that hadn't already been produced and

23   we turned over our hard copy documents.

24         THE COURT:  Then you can't be heard to complain later

25   that the search terms weren't appropriate, right?  Maybe you

CAMUMTBC

1    are not adding any, you are living with the ones that other

2    defendants have asked for for use, right?

3            MS. HANEBUTT:  To the extent that they propounded

4    additional discovery, we would have to make sure that the terms

5    that other defendants have proposed match our system.

6            THE COURT:  You are?

7            MR. DANTE:  Frank Dante from Blank Rome on behalf of

8    Lyondell, and we will be sending our search terms this

9    afternoon.

10           THE COURT:  So I think that takes care of that agenda

11   item.

12           The next situation is Sol which involves you,

13   Mr. Cepeda.  The plaintiffs still say that Sol has not provided

14   the discovery that it promises to do.  So, for example,

15   plaintiffs say they have been requesting ESI from Sol since

16   September 15, 2008 and from November 2011 to May 2012, they

17   have asked me to confer.

18           Sol responded on June 6, 2012 that it would produce

19   ESI and an index by August 15, 2012.  And here we are at the

20   end of October and it has not done so, right?

21           MR. CEPEDA-DIAZ:  That's correct, your Honor.

22           THE COURT:  What is that about?  How can you promise

23   to do something and two and a half months later say, that's

24   correct, we didn't do it?

25           MR. CEPEDA-DIAZ:  Your Honor, we have run into some

CAMUMTBC

1   issues, technical issues with converting these files into the

2   appropriate format for production and this has slowed our

3   ability to be able to get these files --

4           THE COURT:  You seem to think that the way to do this

5   is to have no deadline, you will get to it when you get to it,

6   and any court deadline will be ignored anyway.  So if I said

7   absolutely the last drop-dead date is November 9, if you can't

8   make it, you will say, we tried but we couldn't, right?

9           MR. CEPEDA-DIAZ:  No, your Honor.

10          THE COURT:  What would you do?

11          MR. CEPEDA-DIAZ:  Right now, we would just ask for

12   another 45 days.

13          THE COURT:  Denied.  I have had it with Sol.  That's

14   one failure.

15          Another one.  Failure to produce archive documents in

16   response to an 2008 discovery request.

17          In pretrial order 58A which was issued in February

18   2010, you were ordered to review certain archive documents that

19   you identified as potentially responsive.

20          Plaintiffs say that they received nothing for two

21   years, but then they received more than 105,000 pages on

22   roughly 30 disks, but they still don't know whether that is

23   everything and which interrogatories or document requests these

24   105,000 documents respond to.

25          MR. CEPEDA-DIAZ:  That part was taken care of last

CAMUMTBC

1    week.  We gave them a supplemental response which identified

2    documents.

3              THE COURT:  Is that right, Mr. Dema, Mr. Short, you

4    got the supplemental response that explained which request

5    these documents were responding to?

6              MR. SHORT:  Your Honor, I don't recall seeing any

7    Bates ranges that are referenced for any particular

8    interrogatories or documents requests.  I don't recall seeing

9    that.

10             THE COURT:  You do recall the supplemental response?

11             MR. SHORT:  Vaguely -- I'm sorry -- no, I don't

12   specifically.  But I do not recall seeing any Bates range that

13   would lead us to the documents that are individually responsive

14   to --

15             THE COURT:  You don't have a hard copy of that

16   supplemental response with you?

17             MR. CEPEDA-DIAZ:  No.  I don't have it with me.

18             THE COURT:  And it was served when?

19             MR. CEPEDA-DIAZ:  I believe it was on the 10th of

20   October.  If I am not mistaken, it was served by Lexis-Nexis.

21             THE COURT:  You say it does give Bates ranges?

22             MR. CEPEDA-DIAZ:  It does.

23             THE COURT:  Document X to Document Y in response to

24   question 10?

25             MR. CEPEDA-DIAZ:  At least until the 105,000 that we

CAMUMTBC

 1   have been able to produce today.

 2          THE COURT:  Is that complete?  They said that they

 3   don't know whether the 105,000 represents all or some.

 4          MR. CEPEDA-DIAZ:  That's most of it.  I believe that

 5   the total is 130.

 6          THE COURT:  And when is the remaining 25,000 coming

 7   in?

 8          MR. CEPEDA-DIAZ:  It should be coming in the next few

 9   weeks, your Honor.  Again, it is a technical issue with

10   converting --

11          THE COURT:  I'm sorry.  At some point deadlines are

12   set and if they are not, the consequences are paid.

13          Then there was a document request served on July 8,

14   2011 that requested leases, contracts, franchise agreements as

15   to each site.

16          They say you have produced maybe three documents but

17   no agreements that are earlier than 2006.

18          MR. CEPEDA-DIAZ:  There were documents produced that

19   responded directly to the focus sites.  We supplemented that

20   response back in July, I believe.

21          THE COURT:  They say that there is a total of three

22   responsive documents.  Is that accurate?

23          MR. CEPEDA-DIAZ:  No.  In addition to that, we

24   submitted the contracts that Sol has with -- the purchase

25   agreement whereby Sol acquired what used to be the Shell

CAMUMTBC

1    company Puerto Rico Limited, and there is a marketing and

2    trademark agreement through which Sol continues to distribute

3    Shell brand of gasoline in Puerto Rico.  But those are all

4    markets with other parties, not directly with the sites.  And

5    for those, they are dated 2006.  We don't have documents that

6    predate 2006.

7            THE COURT:  You have nothing that predates 2006?

8            MR. CEPEDA-DIAZ:  We have not found any.  It was a

9    different company then.  The company distributed gas in Puerto

10   Rico for a few years before then.  At least between Sol and any

11   Shell entities, but with respect to the focus sites, the

12   response, I believe it was RV 29, the focus sites, the Bates

13   ranges were given where those documents could be found.

14           THE COURT:  As I understand the answer, they have

15   searched and they are not able to find anything pre-2006.  If

16   things don't exist, there is nothing more I can do.

17           MR. DEMA:  I would agree, your Honor.  I would just

18   like that representation as part of their formal discovery.

19           THE COURT:  It is also on the record here.

20           Do you want him to respond to the July 8, 2011

21   document request with a responsive pleading that says response

22   to document request and says, we were not able to locate any

23   documents other than the few we produced to you?

24           MR. DEMA:  Usually that is either for deposition

25   purposes --

CAMUMTBC

1           THE COURT:  Make it a formal pleading then.  Make it a

2     response to July 8, 2011 request and say that you produced

3     everything that you can find and you have looked everywhere and

4     cannot find any responsive documents pre-2006, and that you

5     have produced everything else.

6           Now, we have a form of production problem.  It says

7     that when you produced documents in response to plaintiffs'

8     non-test site discovery, you produced a single 14,000-page PDF

9     file without load files with no metadata.  It can't be used.

10    It is not formatted in a usable way.  So it is a failed

11    production.  It has to be done again and done right.

12          We don't accept productions in a format that is not

13    usable.  That's the Federal Rules of Civil Procedure and there

14    are opinions now out there that talk about how files have to be

15    produced -- at least one of them is mine, but others have

16    written about it too.  You have to produce TIFFs with load

17    files, with minimum metadata so that people can tell what

18    documents go with which other ones and where the breaks are

19    between documents.

20          It is just not an adequate production.  You have to

21    redo it.

22          MR. CEPEDA-DIAZ:  We will but, like I said, we have

23    been having issues with this conversion --

24          THE COURT:  You keep saying that you will.  I will set

25    a date and it is a drop-dead date.

CAMUMTBC

```
 1              MR. CEPEDA-DIAZ:  But the PDF was served.  It did have
 2        Bates stamps on them and --
 3              THE COURT:  It is useless.  It is one continuous
 4        14,000 page PDF file.  That is not a usable or acceptable form
 5        of production.
 6              The are enough opinions out there, form of production,
 7        all you have to do is find them, but I will tell you what it
 8        says.  It says TIFFs with load files and minimum metadata
 9        fields so people can tell what the documents are, where they
10        start and where they end -- just for starters.
11              They also say that you have not responded at all to
12        the fourth set of discovery requests where the response was due
13        August 30th.  What about that one?
14              MR. CEPEDA-DIAZ:  Your Honor, we have had issues
15        responding to that as well.  The attorneys were basically
16        working on the discovery responses before and we had to bring
17        in new people and get them up to speed and it has all been
18        delayed, but those should be coming out this week.
19              THE COURT:  Look.  It is an impossible situation, but
20        given the lengthy schedule you are all proposing anyway, it is
21        somewhat harmless.  So what I would say is, that it is time, as
22        I said, to have a drop-dead date after which time you can make
23        a motion for any type of sanction you want.  It is not really a
24        motion to compel.  At this point it would be a motion for
25        sanctions.  The motion to compel is orally granted.  Obviously,
```

CAMUMTBC

1  they have to do all of this.  We have covered each problem

2  today on the record.

3          So the new drop-dead date is Friday, November 30th.

4  If by Friday, November 30th you don't get the materials that I

5  said you have to get at this conference, you may move for

6  sanctions at all levels of sanctions, whatever you deem

7  appropriate.

8          Now we turn to defendants' agenda items.

9          There seem to be three disputes that remain to New

10 Jersey.  The first is the remedial priority system requests.  I

11 have already had a long discussion about this.  The remedial

12 priority system exists to assist New Jersey DEP to determine

13 which sites require regulatory oversight.  DEP assigns sites

14 rankings and uses that ranking to determine how to allocate its

15 own resources but it is not used to evaluate compliance with

16 the remediation obligations.

17         So after we discussed this at some length at a prior

18 conference, I held that the background information sought by

19 defendants was not relevant and I struck the 30(b)(6) notice,

20 but I did say that certain site-specific information could be

21 sought, and it comes out of that July 31, 2012 transcript at

22 pages 66 through 67.  I don't know if it is worth reading into

23 the record, you probably know it.  Maybe I should, just to be

24 complete.  This is what I said then, that for the 19 sites, if

25 they are ranked, I think that defendants are entitled to know

CAMUMTBC

1   what digitized deposition interrogatory, what's the range, was

2   it 1, 2, 3, 4, 5, and if there is a document explaining those

3   rankings, give them the document.

4          So like the last ruling, send out a document request

5   that has one request and one interrogatory and ask for the 19

6   sites, what was each one ranked -- for the document request, is

7   there a final document that explains how the rankings are

8   developed and what they mean.   That, I would allow -- no

9   depositions.

10         Then there was an August 23rd deposition of a DEP

11  employee, a Mr. Crammer, and he did testify that DEP had

12  generated RPS information and calculations for each of the 19

13  trial sites and went into detail regarding what type of

14  information had been generated.

15         Then the defendant sent DEP a letter requesting

16  additional RPS related data.  And the parties are in a dispute

17  as to which of this data is relevant and site-specific or just

18  trying to get reargument on my prior ruling.

19         So I don't see a reason to change my prior ruling.  It

20  seems to me defendants are entitled only to the site-specific

21  input data that DEP uses to generate the rankings, but not the

22  DEP's subsequent calculations or the details of how the RPS

23  functions because this is only relevant to the failure to warn

24  claim up until the time that DEP became aware of MTBE's alleged

25  negative effects, but not what happens after that.  It doesn't

CAMUMTBC

 1    bear on that failure to warn claim.

 2            You both seem to be confused and wish to be heard, Mr.

 3    Kaufmann, or not?

 4            MR. KAUFMANN:  No, if you stop there, I don't think I

 5    need to say anything else.

 6            THE COURT:  Mr. Pardo.

 7            MR. PARDO:  I hope that I am not confused, but I do

 8    want to make sure that the record of what you just said is

 9    clear.  We are not seeking to reargue anything.  We just want

10    the ruling that we think your Honor entered last time and has

11    since repeated here enforced.

12            What we understood the Court to have said then and now

13    is that we are not allowed to go ask general questions about

14    RPS and what it is doing or how it is set up —— none of that

15    macro type stuff —— but for the 19 trial sites, we are entitled

16    to know not only the score, but what's the data that the state

17    has used and input into this model that they have to generate

18    those scores.

19            THE COURT:  But that would be in a linear analysis up

20    to a point in time —— you said it just now, to generate the

21    rankings, but then not further application —— if there is

22    subsequent calculations, not that.

23            MR. PARDO:  Understood.  Of course, there is a general

24    duty to supplement.  I mean, if those numbers are as Mr.

25    Kaufmann represents them to be preliminary, not final —— I

CAMUMTBC

1    understand they are.  In fact, their own web site says that

2    these numbers are intended to be updated every six months, so

3    they are never going to be final, final.  As long as

4    investigations are going on those numbers will be changed every

5    six months or so and --

6           THE COURT:  Yes, but that is what you are not entitled

7    to because that is not the purpose of these rankings, as I

8    understand it.  It is to determine internally how to allocate

9    resources, not to evaluate compliance with remediation

10   obligations.  That's what I said twice, right?

11          MR. PARDO:  Right.

12          THE COURT:  So it has limited relevance, and I said

13   that.  I said, what is the ranking, and if it is constantly

14   updated and changing, I am not sure what relevance that really

15   is to you.  At one time a ranking was developed for certain

16   limited purposes, which we discussed, to allocate resources is

17   not an evaluation tool to check compliance, which I think you

18   are trying to turn it into.

19          MR. PARDO:  Actually, no, I am not.  What I am most

20   interested in, I think, how they allocated for their own

21   compliance purposes is for them.

22          THE COURT:  Right.

23          MR. PARDO:  What we are really interested in is the

24   inputs that they are using.  So, for example, they have values

25   that they have assigned to determine something called the MTBE

CAMUMTBC

1   exceedance quotient at a specific site.

2          So for the 19 sites there is a number, a quotient

3   called the MTBE exceedance quotient which is based on some

4   input for MTBE solubility, for MTBE mobility, for MTBE

5   degradation -- all of these characteristics of MTBE that you

6   heard about.

7          THE COURT:  What was the first one?

8          MR. PARDO:  Solubility, how it breaks down.

9          You have heard these words for 15 years now.  They

10  have values for them.  And of course they have brought a case

11  where they are contending certain things about those

12  characteristics of MTBE.

13         And our argument is that we are entitled to know what

14  values the state itself is putting on those particular factors.

15  Now, we are not asking for it statewide.  It is just for the 19

16  sites.  There's a site ranking, a site conditions score, a site

17  pathway score that they come up with.

18         That's the information we want for these 19 sites, and

19  I think that your Honor was clear at the last conference in

20  July that --

21         THE COURT:  I have said that you are entitled to

22  site-specific input data that the DEP used to generate the

23  rankings.  But my concern is, you say continues to change, it

24  has to be updated every six months.  I am not sure what that

25  goes to after a while.  The original input data, I understand.

CAMUMTBC

1    I don't know what the change would be.  Why would it change?

2              Is there new data being input in terms of these words

3    that you just said, starting with solubility and then you said

4    two other words.

5         MR. PARDO:  I think I feel like I might be close to

6    making Mr. Kaufmann's argument, but I am happy to make it for

7    him because I won't do as well as he might.

8              I think what Mr. Kaufmann has argued, correct me if I

9    am wrong --

10        MR. KAUFMANN:  I am going to go back to this table.

11        MR. PARDO:  I want to take my seat at that table.

12             I think what he has said -- and I get it because we

13   deal with this all the time on our own sites -- you do an

14   investigation, but it is an ongoing investigation.  Remediation

15   is ongoing.  Site conditions change.

16             You said it yourself at the last conference in the

17   context of delineations.  The world is not static.  Things

18   change.  So as things change and the state gets more

19   information, it gets put into that model and that site score --

20   The site might start off at a 5 and become a 3.  It may become

21   a 1.  It may come off.  It becomes less of a priority or it

22   could go the other way.

23             For right now, though, I hear you and I take your

24   point.  We are entitled at least right now to the data that

25   they have and the scores they have generated.  Whether we are

CAMUMTBC

1    entitled to get the new data or the updated scores, I don't

2    know.

3             Actually, eventually some of this, I suspect, will be

4    will be publicly available anyway, although it is not now.  For

5    now, we can only get it in discovery --

6             THE COURT:  When does it become publicly available?

7             MR. KAUFMANN:  We believe, the plan is, by the end of

8    the year.

9             THE COURT:  End of 2012?

10            MR. KAUFMANN:  Yes.

11            THE COURT:  It will be publicly available to anyone?

12            MR. KAUFMANN:  The scores are expected to be.

13            THE COURT:  The score, but that would not tell us the

14   input data anyway?

15            MR. KAUFMANN:  The input data that we have now, we

16   have told them that we will give them.  We have said that all

17   along.  That is not a problem.

18            Data to me are facts.  We are happy to share with them

19   any facts that we have.  What they are asking for now are sort

20   of evaluative process and that's what --

21            THE COURT:  That's what I don't think I have ever said

22   you are entitled to.  I said you were entitled to this data.  I

23   have used the word "data" repeatedly -- the input data not the

24   evaluation.

25            MR. PARDO:  You have said this, and I don't

CAMUMTBC

1   understand.  I think we just want the data.

2          THE COURT:  Apparently, this is resolved.  The input

3   data has to be produced that you have now.  The only open item

4   is if the data changes, will you update it six months from now?

5   It should be publicly available anyway.  You certainly should

6   turn it over, and there may be no good argument not to turn it

7   over, public or not.  But it remains just the data, not the

8   internal evaluation what to do about that.

9          MR. PARDO:  Understood.

10          MR. KAUFMANN:  The other two items under this

11   category --

12          THE COURT:  One was the 30(b)(6) request.

13          MR. KAUFMANN:  I think that we have agreement on dates

14   that we would ask the Court to sign.

15          THE COURT:  What is it?

16          MR. KAUFMANN:  One of them is October 31st and on the

17   costs it is November 9th.

18          THE COURT:  On the other one?

19          MR. KAUFMANN:  One issue has to do with some costs

20   information, and that was November 9.  That was from the

21   deposition --

22          THE COURT:  That will be November 9th, and then?

23          MR. KAUFMANN:  The other is October 31st.

24          THE COURT:  What is that one for?

25          MR. KAUFMANN:  That was for some of the site

CAMUMTBC

1   information, skyline --

2                THE COURT:  OK, and that will be October 31st.

3                MR. KAUFMANN:  Yes, your Honor.

4                MR. PARDO:  We actually have a proposed order.

5                THE COURT:  All right.

6                MR. PARDO:  Mr. Kaufmann, you have seen this, right?

7                MR. KAUFMANN:  Yes, I have.

8                THE COURT:  Now, there is this issue about

9   Dr. Costanza.  Is there a real dispute left there because, as I

10  understand it, the plaintiffs really don't object to the

11  defendants trying to attempt service of a so-called second

12  amended subpoena on Dr. Costanza, is that right?

13

14                (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

CAMTMB2

1          MR. KAUFMAN:  We have no objection to that.

2          THE COURT:  You don't object to that?  Is there any

3   dispute left?

4          MS. GERSON:  I don't believe so.

5          THE COURT:  So that takes care of the Dr. Costanza

6   issue.

7          Expert deadline for third-party claims.  Again,

8   defendants request and plaintiffs don't object that the Court

9   approve the following deadline for the exchange of expert

10   reports in the third-party action.

11          What is the third-party action?

12          MS. DEAN:  Good afternoon, your Honor, Susan Dean, I

13   represent the defendant and third-party plaintiff Getty

14   Properties Corp.  We joined three third-party defendants a

15   number of months ago.

16          THE COURT:  Are you the only third-party plaintiff in

17   the case?

18          MS. DEAN:  Yes.

19          THE COURT:  Go ahead.

20          MS. DEAN:  And we had not previously asked for expert

21   deadlines because the three third-party defendants were

22   actually the four that my client and the three third-party

23   defendants were involved in a state court litigation, and

24   expert reports had been produced in that lawsuit.  That lawsuit

25   has been stayed since the joinder of those parties in this

CAMTMB2

1    action.  And over the course of discovery, and now confirmed

2    through plaintiff's answer to discovery, they do consider my

3    client as a possible liable party for the HP Delta site that's

4    the trial site at issue, that we may want to produce separate

5    expert reports in the third-party action.

6            THE COURT:  All right.  Again, we are rounding it up.

7    We're at November 1st.  You want three months from now to start

8    the process.  Why do you need three months?  And what are these

9    experts on?  The proposal is third-party plaintiff to serve

10   expert reports.  Expert reports on what?  What kind of experts?

11           MS. DEAN:  As to the contamination at issue at the

12   site.  Very specifically there's an issue --

13           THE COURT:  So that's not awaiting any further

14   discovery, the expert could be working on that today.

15           MS. DEAN:  Absolutely, your Honor.

16           THE COURT:  Why can't we tighten this schedule, which

17   also runs too long, it runs until June.  It's only

18   November 1st.

19           MS. DEAN:  And I agree with you.  After submitting it

20   to your Honor and looking at the dates, the original dates were

21   based upon the final deadline for the plaintiffs to submit

22   their rebuttal reports, but I think that we could move the date

23   and agree that we will produce our expert report as to the

24   third-party claims on the same day that the defendants cite

25   specific --

CAMTMB2

1           THE COURT:  Which is when?

2           MS. DEAN:  January 7, your Honor.

3           THE COURT:  That's just what I was going to suggest

4  without even knowing that.  January 7.

5           And then the defendants could respond -- why can't

6  they respond in a month?

7           MS. DEAN:  They asked to have 60 days because --

8           THE COURT:  Because that's what lawyers do, they ask

9  for the most amount of time they think the Court will go along

10  with.  I don't see why they need 60 days, why can't they do it

11  in 30 days?

12           MS. DEAN:  If I may, your Honor, I believe they asked

13  for 60 days because in the original CMO the defendants are

14  provided 60 days to respond to the plaintiffs' site specific

15  report.

16           THE COURT:  But they're responding to many more sites.

17  How many sites are we talking about?

18           MS. DEAN:  Just one.

19           THE COURT:  Exactly, that's the difference.

20           Are you for one of the third-party defendants?

21           MR. SINKEVICH:  Yes, your Honor, good afternoon,

22  Michael Sinkevich on behalf of HP Delta, Incorporated.

23           THE COURT:  Right.  I don't see why you can't get this

24  done in 30 days by February 8.

25           MR. SINKEVICH:  We understand, your Honor.

CAMTMB2

1              THE COURT:  Then the rebuttal report, surely another

2       month is fine, that would be March 8.

3              MS. DEAN:  Absolutely.

4              THE COURT:  That's a weekday, March 8 for the

5       rebuttal.  And so the deadline to complete expert discovery is

6       another month, so that leaves the time for depositions to be

7       complete.  Is that what the additional --

8              MS. DEAN:  Correct, your Honor.

9              THE COURT:  So that's April 8, also a weekday.

10             So we picked up 60 days in the schedule and that's

11      done.  We'll put that in our order.

12             MS. DEAN:  Very good.

13             MR. SINKEVICH:  Thank you.

14             THE COURT:  And that takes to us to City of Fresno.

15             At the last conference I ordered the city to produce a

16      matrix with three categories of stations: those to which the

17      city asserts claims and the particular defendants against which

18      those claims are being asserted per site; second category,

19      those to which the city's expert concluded that no further

20      remedial and/or clean-up action necessary, and therefore, as I

21      understand, are going to be dismissed with prejudice; and those

22      to which the city's expert lacks sufficient information to form

23      an opinion.

24             The defendants are requesting, and the plaintiffs

25      don't object, to a case management order that incorporates

CAMTMB2

1    plaintiff's three charts.  And this case management order would

2    reflect the agreement of the parties to dismiss the stations

3    that were in the second category, that is, there's no further

4    remedial and/or clean-up action necessary.  But there's a

5    disagreement as to whether the third category should -- the

6    dismissal in the third category, that is, those which the

7    city's expert lacks sufficient to form an opinion, should be a

8    dismissal with prejudice or without prejudice.

9            It seems to me that if there's no claim for damage,

10   there's no to reason to dismiss with prejudice.  When and if

11   there's a lawsuit, you'll handle it.  You could handle it by

12   saying it's time barred, you should have known years ago, or I

13   don't know what they the other "ors" are.  There's not enough

14   evidence now to be dismissed as a matter of law or that summary

15   judgment, so I don't see why it should be with prejudice

16   dismissal when they're essentially saying there's no

17   information now to sustain a claim and so we're dropping it for

18   now and you can always, when and if they ever bring it, you can

19   certainly assert time or latches or anything else you went to.

20           Mr. Parker.

21           MR. PARKER:  Thank you, your Honor.

22           On that issue, with respect to the third category,

23   these are sites that were specifically identified by the

24   plaintiff as being in this case, and there was a lot of

25   discovery.  So it's akin to an attack by the defendants at the

CAMTMB2

```
 1    end of the case for a lack of causation, for instance, if we

 2    were to file a motion for summary judgment on lack of

 3    causation, because they have not --

 4              THE COURT:  It may be akin, but there's a difference.

 5    You're not required to file a motion.  It's not the end of the

 6    case.  They're voluntarily dismissing them maybe a year in

 7    advance of the final date in this case.  I don't know what the

 8    final New Jersey date is, you told me it was endlessly long,

 9    but whatever is the final, final date, it's a ways off, so it's

10    a big difference.  It may be akin that you had to move and win

11    maybe with prejudice, but what they're saying is we understand

12    we don't have a case now, if and when we ever do, we will bring

13    it and you will have all the defenses in the world.

14              I have a feeling this is the big one, so to speak.

15    We'll all learn a lot from the way it's resolved, by motion, by

16    verdict, by settlement.  I don't know that you will ever see

17    that other case, so I think we may be worrying about an issue

18    that may not be an issue down the road, but we'll find out.  If

19    and when they bring a lawsuit, I'm sure you will defend it

20    vigorously, but I don't see the purpose of "with prejudice"

21    now.

22              MR. PARKER:  That's what we would want the opportunity

23    to brief.

24              THE COURT:  Why do I need more paper in my life?  Look

25    at the desk.  I really don't need it.  I don't see the big
```

CAMTMB2

difference to you right now.  I already predicted the future,
it could be wrong.  I don't think you'll ever see that lawsuit.
One of us will be right and one of us might be wrong, but we'll
see.  Why worry today?  We have a lot to do.  You have a lot to
do in New Jersey, a lot to do in Puerto Rico, it's not an
issue.  The first time they try to file, there's an issue.  If
they do, worry about it.

          MR. PARKER:  But these are items that they have
already identified and gone through, and that's why we think
it's different than --

          THE COURT:  But people voluntarily dismiss claims all
the time.  They bring claims and voluntarily dismiss claims.
It happens in many lawsuits big and small.  I'm only saying:
Where's the prejudice?  Maybe you know where the prejudice is.
Maybe you have already done discovery on some of these sites,
spent time and money, or maybe you haven't.

          MR. PARKER:  We have done full discovery on all sites,
which is why --

          THE COURT:  These were trial sites?

          MR. PARKER:  This is Fresno where we do not have trial
sites.  We have identified sites that they picked, and then
they added sites to their list and your Honor said OK, you get
time to do discovery on those.  We have had full fact discovery
and full expert discovery on these sites.  Maybe I wasn't
clear.

CAMTMB2

```
 1            THE COURT:  I'm sure that's my fault, I have a lot

 2    going on.

 3            MR. PARKER:  That's why I was analogizing it to the

 4    summary judgment.  Because we're at the post-expert phase,

 5    post-fact discovery phase of this case, and at some point that

 6    would be the attempt to get rid of these.  That's why there are

 7    the three categories.

 8            THE COURT:  I understand that.  They're paring down

 9    the lawsuit, which is generally perceived as a good thing, and

10    the second category is dismissed with prejudice.  You're

11    worrying about this third category, and I'm thinking if there's

12    no evidence, there's no evidence.  If there's ever evidence,

13    they may choose to bring a lawsuit and you may have very strong

14    defenses to that.

15            What's your position, Mr. Axline?  I hadn't fully

16    appreciated there's been so much time and money spent on

17    discovery, now you want to walk away with no penalty

18    essentially.  And one could talk about Rule 11 saying you

19    shouldn't have pressed the case which you didn't have evidence

20    in the first place, so they could trade that up for a dismissal

21    with prejudice.

22            So what is your position?  You brought the lawsuit,

23    now you say so sorry, we really don't have any evidence of

24    harm.  Sorry we put you through this for a year and a half,

25    sorry you spent money on discovery, but that's the way it is.
```

CAMTMB2

1        MR. AXLINE:  Well, with respect to Fresno, your Honor,

2   there were quite a few sites in the city, and in an excess of

3   caution we identified all those where there was some evidence

4   of MTBE.

5        THE COURT:  Some evidence, but apparently not enough

6   to make a case, and they spent a lot of time.

7        MR. AXLINE:  I wouldn't say a lot of time.

8        THE COURT:  Mr. Parker thinks it's a lot of time, and

9   apparently his client does.

10       MR. AXLINE:  Well, I suspect if he wants to make that

11   case, we can brief that.  We're offering to dismiss these

12   without prejudice and take them out of the case.

13       THE COURT:  But not take them out of the case

14   permanently, you're saying if the harm ratchets up and it

15   suddenly crosses a certain threshold, you want to bring them

16   right back in.

17       MR. AXLINE:  It would not be the same case, your

18   Honor.  We would have to file a completely different case and

19   identify new sites.  There may be some sites --

20       THE COURT:  New sites?  I didn't understand that.  I

21   thought it would be the same sites that you would say now we

22   have the evidence, we're bringing those sites back in.  So then

23   if you're going to bring in new sites, you should dismiss the

24   old sites with prejudice because you're saying I don't intend

25   to bring the old sites back, I'm going to bring in new sites.

CAMTMB2

1          MR. AXLINE:  Well, maybe I misspoke.  What I meant was

2     a new case with new evidence.

3          THE COURT:  On the old sites, on the same old sites.

4          MR. AXLINE:  Yeah.

5          THE COURT:  That's right.  That's what I thought.  And

6     he is saying that isn't entirely fair, is it?  Why are they

7     allowed to walk away for free, essentially?

8          MR. AXLINE:  Well, we're not walking away for free,

9     your Honor, we're losing the sites.

10         THE COURT:  Only for now.  You could bring it back two

11    months from now if the evidence sort of appears.  If things

12    change, you can bring it back.  So they're saying you really

13    are walking away at no cost, no cost to you for having brought

14    a case where you say in excess of caution I brought it because

15    maybe it was too little, below the thresholds, but I wanted to

16    to be sure if there was a trace that I did.

17         That's why I said to Mr. Parker in the first place he

18    could probably have a good statute of limitations argument when

19    and if you decided to bring these, because he could say as

20    proof that you knew of the harm, you filed this lawsuit back

21    in -- I don't know what year the Fresno case is, but 2007, now

22    you are bringing it for the first time in 2014, you're barred.

23    I don't know that he's in that much risk either, but it seems

24    odd to me you'll ever do that, but OK.

25         MR. AXLINE:  I don't think that we are, frankly, your

CAMTMB2

1   Honor, but there's a big difference, obviously, between

2   dismissing with prejudice and without prejudice.

3            THE COURT:  Right.  One says you can't bring it even

4   if things change, the other says I will take my chances that

5   they will raise a defense that is successful.

6            MR. AXLINE:  Frankly, one of the purposes of discovery

7   is to narrow the case.

8            THE COURT:  Well, it's true, but the discovery in our

9   system is not there to make a case.  You're supposed to have

10  evidence of a harm before you file a complaint.  That's very

11  clear in our jurisprudence.  You can't just bring a case

12  without the evidence.  So discovery might show there's no harm,

13  generally that would be a dismissal with prejudice.  What

14  you're saying is I'm entitled to try again whenever the

15  evidence changes.

16           MR. AXLINE:  But not in this case, your Honor.

17           THE COURT:  Not in this what?

18           MR. AXLINE:  Not in this case.

19           THE COURT:  I understand, but you file a separate case

20  tomorrow, what's the difference if it's this case or another

21  case?

22           MR. AXLINE:  Well, the difference is that if it was a

23  new case it would be based on new evidence.  And as you said,

24  the defendants would be able to argue whatever they want to

25  argue in terms of statute of limitations.  We didn't fight them

CAMTMB2

1    on the sites where you suggested and they argued that we

2    dismissed with prejudice because our expert had been able to

3    reach an opinion.  But I think if the Court is unsure about

4    this category, we join with the defendants in asking for

5    briefing on it.

6            THE COURT:  I think that's such a wasted effort, I

7    must say, on everybody's side, I must say.  But it's important

8    enough for you to want to brief it?

9            MR. AXLINE:  Yes, your Honor.

10           THE COURT:  Even though you suspect you will never

11   bring a case, that's your own suspicion.  I know you're on the

12   record, I realize that, but I think you said it already anyhow,

13   so you don't need to say it twice.  You will read the

14   transcript.  I think you did.  Be that as it may.

15           MR. AXLINE:  Your Honor, I think the fair resolution,

16   your instinct was the last conference, I think your instinct

17   was at this conference, the plaintiff dismiss these without

18   prejudice, we're willing to do that.

19           THE COURT:  Of course you're willing to do that.

20   There's no cost to you.

21           What kind of costs have you incurred on these,

22   Mr. Parker?

23           MR. PARKER:  Your Honor, I have not tried to calculate

24   that, amongst all the defendants, but we are looking at eleven

25   sites.  We went through depositions --

CAMTMB2

1          THE COURT:  Eleven sites fall in this category three?

2          MR. PARKER:  Yes.

3          THE COURT:  How many are going to remain in the case?

4          MR. PARKER:  I believe there are --

5          THE COURT:  There was out of --

6          MR. PARKER:  -- fourteen left in, so this is an

7   equivalent amount of discovery as the ones left in the case.

8   Fairly close to it.  And for these --

9          THE COURT:  What about that number two category?

10          MR. PARKER:  Sorry, your Honor, so that I think was

11   seven, so a third -- more than a third of the case was spent

12   doing discovery on these sites, and that meant operators, at

13   some stations there were more than one operator, it meant

14   regulators, it meant defendants having their experts have to

15   analyze these.  There was a significant amount of work.  I have

16   not calculated it, but I know that it was very significant in

17   terms of the whole case and discovery on the whole case.

18          MR. AXLINE:  Your Honor, all sites are not created

19   equal.  These were sites with marginal -- at least at an

20   initial marginal MTBE detection.  Most of the efforts were

21   focused on the sites that remain in the case.

22          THE COURT:  I understand it's not proportional to the

23   number, you can't say 11 out of 20 or -- yeah, 11 one side of

24   the ledger and 21 on the other, you can't do it that way

25   because you're saying there was less work to do on these 11 by

CAMTMB2

1  far than the 14 that remain.

2          MR. PARKER:  And your Honor, I don't have the numbers,

3  I was trying to give some measure of the number of cases or the

4  number of sites, but I know for instance there are several --

5  there's a Dave's Exxon, there's a Shell, there's a Texaco.  For

6  all the stations multiple operators were deposed at length.

7          THE COURT:  That discovery wouldn't go to waste

8  totally.  If they ever did bring a case, that could be used.

9  Why would that change?

10          Not that I think they will bring a case, as I said

11  three times already, and I think you would have strong defenses

12  to it, but putting all that aside, if it did go forward for

13  some reason, why would this discovery not be able to be used?

14          MR. PARKER:  Well, the factual discovery as to the

15  operators probably could be used.  With respect to the

16  environmental discovery related to the regulators and the

17  consultants and the experts, if they're doing a do over

18  supposedly based on them going out to do work -- and that's the

19  only way they would get this other data is if they went out and

20  developed it.  They sued claiming there was injury, they went

21  and did certain station specific fact discovery on operations,

22  deliveries and the like and affiliations with the operators,

23  but the environmental discovery is what it comes down to.  And

24  if they're doing it again, that means they're essentially

25  getting a do over there.  And the point is we have done a

CAMTMB2

1    significant amount of work here and they want a free pass to

2    bring it.  And if there are other sites, that's a different

3    story.

4            THE COURT:  I understand.  That's if there are other

5    sites, of course that's different.

6            So we never confronted this exact question before in

7    this MDL, or have we?  I feel like we have.

8            MR. AXLINE:  Your Honor, I think we have in the Orange

9    County Water District case and we ended up dismissing some of

10   the sites voluntarily without prejudice as basically not ripe.

11   I think that was the basis.

12           THE COURT:  And that was after a period of time,

13   including some discovery on those sites?

14           MR. AXLINE:  Yes.

15           MR. PARKER:  I believe that's not correct, your Honor.

16   There was -- initially they identified based only on geography

17   sites and proximity to a well, and then your Honor ordered

18   Orange County Water District to identify focus plumes and they

19   identified pairs.  That's the point where then the discovery

20   took off on the focus plumes.  There were designations that

21   were due and then discovery.

22           THE COURT:  But dismissals of some sites without

23   prejudice, or you said you're not sure that's correct, you want

24   to look into that?

25           MR. PARKER:  They definitely dropped sites.

CAMTMB2

1          THE COURT:  Without prejudice.

2          MR. PARKER:  But without discovery, without doing any

3   work other than listing them on a plume list, because that case

4   started with a list of 400 focus plumes and no discovery.

5          THE COURT:  So the big difference here is that you

6   have done discovery.

7          MR. PARKER:  Right.  We worked up the case, and it's

8   at the point of them being unable to prove causation.

9          THE COURT:  Well, we have one topic left, which also

10  relates to City of Fresno, but as I said, the materials are

11  coming late and it's also late in the afternoon.  So what I'm

12  thinking is that these are two issues I should hear more about,

13  and you will have a chance to research the statement that

14  Mr. Axline just made that you said you didn't think was

15  correct, he made certain representations.  You could have a

16  little more information about what was done in the past in the

17  Orange County case.

18          We could go again over this Dr. Rudo or Dr. Tan

19  problem, because materials were coming in at the last minute

20  that I haven't had a chance to review.  And I know that

21  plaintiffs' counsel generally comes in from California, they

22  would be reduced to doing it by phone at the next available

23  date, those two City of Fresno issues, and that would end

24  today's conference today I think without a ruling on either of

25  those two.  So the first day that I have any time, as I said in

CAMTMB2

1    the previous trial, was November 5th or 6th, that week is a

2    good week, no trial that week for the first time in a long

3    time.  So I don't think -- November 6 is fine.

4             MR. PARKER:  Your Honor, on that point, the two items

5    that came in, one of them was submitting the e-mail that

6    Dr. Rudo relied on, and then the other was the Angelos firm, I

7    read it on my phone before coming in, so I can't quote it

8    verbatim, but essentially talking about that and saying Dr. Tan

9    didn't really do this analysis.  I think those are not issues

10   that go to the core of what we have here, which is Dr. Rudo

11   relying on someone outside of his specialty.  I think they

12   actually --

13            THE COURT:  I already ruled on that.  I said either he

14   can give these opinions without any reference to Dr. Tan or he

15   can't.  If he relies on Tan at all, Tan has to be deposed.  If

16   he really can give an opinion that cuts out whatever it is Tan

17   gave him, then that's fine, but I think then you tried to

18   redact and you couldn't agree on anything.

19            MR. PARKER:  Right.  The core of that was from our

20   perspective, Dr. Rudo said he's not a statistician and

21   everything related to the pathology work under PWG and statics

22   related to that are outside his expertise.  It's clear in his

23   deposition that he says he doesn't have that expertise, he

24   relied on Tan.  Those are the sections that we went through and

25   attempted to excise.  Plaintiffs gave us seven words in the

CAMTMB2

1    first draft and seven words plus one sentence in their second.

2    They want to delete the name, which your Honor said on the

3    phone on September 11 that is so transparent, we think that is

4    so transparent.  There are sections that talk about the

5    statistics --

6                THE COURT:  Do I have the two proposed redacted

7    versions, yours and theirs?

8                MR. PARKER:  Yes, your Honor, if you look at --

9                THE COURT:  I can't --

10               MR. PARKER:  I don't mean now, but to identify for the

11   record where it is.  It is on defendant's letter of October 12,

12   so that's our opening 72-hour letter, Exhibit L, and it's noted

13   as combined mark up showing the plaintiffs' and the defendants'

14   deletions.  And the one other sentence that they have added is

15   not marked.  I can submit, your Honor, an updated mark up for

16   you that will identify the two -- the one clause and the one

17   sentence.

18               THE COURT:  After I do find the time, which won't

19   happen until the week of November 5th, to really look at it, it

20   may be that plaintiffs are going to have a choice.  They're

21   either going to take your version, which really cuts out

22   everything that Rudo says that relies on somebody else, or have

23   this deposition.  It may be whatever comes down.

24               So I suggest that we have a conference on November 6th

25   at 11 o'clock.  And because of Mr. Axline's travel, I will do

CAMTMB2

```
 1   it by phone.  I don't usually like the phone, but it's limited
 2   to the City of Fresno case.
 3              MR. AXLINE:  Thank you.  And FYI, there may have been
 4   a development this will make this unnecessary.
 5              THE COURT:  That will be good.
 6              MR. AXLINE:  I will give you as much advance notice as
 7   possible.
 8              THE COURT:  That would be great, but I still will
 9   probably have the conference to continue the argument about the
10   dismissal of certain sites in the Fresno case, particularly
11   after -- Mr. Parker can read the transcript of your statement
12   and see if it is accurate or not when I asked you:  Hasn't this
13   come before?  And you said it did in Orange County.  He
14   distinguished it, but he also indicated that he might want to
15   check into some facts.  So we will probably have that telephone
16   conference on the 6th at 11:00, but it will be really nice if
17   this Dr. Tan issue went away.
18              MR. AXLINE:  I will go back and look at that.  I gave
19   you my best recollection of what happened in the Orange County
20   case.
21              THE COURT:  You did.  You also may have good news on
22   the Dr. Tan situation, possibly.
23              MR. AXLINE:  Yes.
24              THE COURT:  Let me put down the telephone conference.
25              Do we have a next date for an all-issues conference?
```

CAMTMB2

1    Do we have a new date for all issues, if we need another?

2              MR. PARDO:  We don't have one yet.

3              THE COURT:  Do you think we need one in a month, or is

4    that too soon?

5              I have to issue the case management order for Puerto

6    Rico.  I said I would just consider it and come up with

7    something.  That's one left over from today, and a couple of

8    other things.  One you put in front of me to sign, one I said I

9    adjusted some dates on the third-party thing and said I would

10   issue it as an order.

11             MR. AXLINE:  We will be adding new parties, your

12   Honor, you said by December 1st, and --

13             THE COURT:  Whatever I said here will find its way

14   into the order.  We take the transcript and pull out the

15   rulings.

16             MR. AXLINE:  There may be issues surrounding that.

17             THE COURT:  What was the date I said you should do

18   that by?

19             MR. AXLINE:  December 1st.

20             THE COURT:  Do you think we should plan a conference

21   for either November or December or skip all the way to January?

22             MR. PARDO:  Your Honor, I think we do well scheduling

23   these.  We can always cancel, and the existence of a conference

24   is, for both sides, an incentive.

25             THE COURT:  Good.

CAMTMB2

1           MR. AXLINE:  Maybe the first week of December, if

2    that's available.

3           THE COURT:  That would take us away from Thanksgiving.

4           Maybe Wednesday, December 5th, because I expect to

5    have a trial first two days, and then I'm out of town the last

6    two days, so that would sandwich it in the middle if the trial

7    ends.  I would say 12 noon on Wednesday, but we'll be in touch

8    if the trial schedule makes that difficult.

9           OK?  So that is scheduled subject to cancellation if

10   you have no issues ready.

11          MR. PARDO:  Right.

12          THE COURT:  We'll see.  Then we can always pick

13   another date anything else today.

14          MR. PARKER:  Just, your Honor, I assume you want me to

15   submit that combined mark up.

16          THE COURT:  That would be helpful.

17          MR. PARKER:  I will do that.  Then we have the agreed

18   order for the first set of stations.  Should I give that to

19   your clerk?

20          THE COURT:  Sure.

21          Anything further today?

22          MR. PARDO:  I don't think so.

23          THE COURT:  Thank you.

24          MR. AXLINE:  Thank you.

25                              o0o