# EXHIBIT 6

## Donald Doyle Deposition Excerpts

- Pages 12-13, 18, 21 from the deposition testimony of Donald Doyle, taken April 4, 2011.

Page 10

1  A. Yes.
2  Q. All right. Sometimes counsel may have
3  objections. So same rules apply. They have to put on
4  that on the record for future discussion with the
5  judge. You can still answer the question but give
6  them a second to get that on the record so we're not
7  all stepping on each other's words? Okay?
8  A. Yes.
9  Q. Sometimes I'm fuzzy. I may not ask a question
10 clearly. Tell me if you have a problem understanding
11 what I am getting at, and I'll try to rephrase. Okay?
12 A. Yes.
13 Q. Sometimes we'll be talking about things that
14 happened a while ago. And so we might talk about a
15 date or a volume and you might not remember a specific
16 date or specific amount, but you can probably ball
17 park.
18    For example, a year or a decade that kind of
19 thing. So to the extent you remember something give
20 us your best recollection, but understand no body
21 wants you to guess. Okay?
22 A. Correct.
23 Q. At the end of the process you do get a written
24 copy that you can revisit our lovely time together and
25 enjoy the memories. At that point in time you will be

Page 11

1  able to make changes to your testimony if you remember
2  something, if something is incorrectly transcribed
3  then you can make those types of changes.
4     I do caution every witness that depending on the
5  kinds of changes you make, I or other counsel can
6  comment on your credibility.
7     For example, if all of your no answers become
8  yes answers, somebody might point out that that was a
9  little fishy.
10 A. Yes.
11 Q. Because I have to ask, are you under the
12 influence of any drugs or alcohol or medication that
13 would impair your memory or ability to testify?
14 A. No.
15 Q. Excellent. We do take breaks, tell me if you
16 need to stretch your legs or get up, and we can go off
17 the record. Okay?
18 A. Yes.
19 Q. Any questions about the process?
20 A. No.
21 Q. The first exhibit I have, I think is a copy of
22 what you received and you can tell me if that's true.
23    The notice is on top, but I think what is
24 attached here is the subpoena.
25    If you Can check to see if that is the same of

Page 12

1  what you received.
2     (Exhibit 1 marked and attached.)
3  A. Yes. This is the same.
4  Q. Okay. And attached to that -- let' see, was
5  there a request for documents? I can't remember if
6  there was or not.
7  A. Yes.
8  Q. Did you have any documents in your possession?
9  A. No, I do not.
10 Q. All right. Just generally, can you tell us how
11 far did you go in school?
12 A. Associate degree.
13 Q. What was your area of emphasis?
14 A. Business.
15 Q. Any courses in chemistry?
16 A. High school.
17 Q. And what about any additional training in
18 hydrogeology?
19 A. No.
20 Q. Toxicology?
21 A. No.
22 Q. Okay. Any professional licences?
23 A. Real estate.
24 Q. Okay. And then let's talk about this station,
25 the Arco station we began talking about. 4594 East

Page 13

1  Tulare, what was your relationship to that station?
2  A. We purchased it, my wife and I, from Martin
3  Oil Company. It was probably purchased under the
4  name -- either been my wife and myself or El Monte
5  Gas Co., Inc.
6  Q. Do you remember the year?
7  A. No.
8  Q. Okay. Do you know who supplied the gas to that
9  station?
10    MS. KLEAVER: Calls for speculation.
11 BY MS. AUSTIN
12 Q. That's an example of an objection she's putting
13 on the record. But you can still answer if you
14 understand it. I know it's a little awkward.
15 A. You know, it is. I know we wanted to brand
16 Exon because that was our brand of choice at the
17 time. I don't know whether we did that or not. I
18 don't remember that.
19 Q. Did you work at the station?
20 A. No.
21 Q. Did you lease it out to someone else?
22 A. Yes. We leased it out to Narinder Singh
23 Dillon.
24    THE REPORTER: What was that?
25    THE WITNESS: Narinder Singh Dillon.

Page 18

1    A. They owned the business.
2    Q. Okay. And then did they lease it out to
3  someone else?
4    A. I think they probably had -- may have became a
5  partner his name is Paul. I don't remember his last
6  name, but Paul I think was operating the station.
7    Q. Do you know if that was Paul Wonder Singh?
8    A. Probably.
9    Q. Do you know if he was related?
10   A. You know, I don't think so. But I could be
11 wrong. He may be a relative.
12   Q. All right. Down below under the comments it
13 states that the UGTs, and I'm meaning that to mean the
14 underground tanks sold to El Monte Gas. And that was
15 you, right?
16   A. That's correct.
17   Q. And the date on this one was May 30th of '95.
18 Does that sound the like the right date when your
19 purchased the station?
20   A. I don't remember. I really don't know.
21   Q. Okay. Is it --
22   A. But by this. It's probably is true.
23   Q. I don't want to put words in your mouth. I'm
24 hoping it refreshes your recollection about the
25 timing.

Page 19

1      The next Exhibit I have is number 6. And this
2  is an underground storage tank permit application
3  again, different names though. This one identifies El
4  Monte Gas as the tank owner.
5      Is this familiar to you?
6      (Exhibit 6 was marked and attached.)
7    A. Yes.
8    Q. Okay. The signature at the bottom, do you
9  recognize that one?
10   A. That's mine.
11   Q. Okay. Did you have any responsibility -- I see
12 that you signed this particular permit application.
13     Did you have additional responsibilities for
14 communicating with the county regarding anything
15 pertaining to the station?
16   A. At this time I had to of in order -- whatever
17 this is for, yes.
18   Q. Okay.
19   A. Permits for the tanks, yes.
20   Q. Did you have any involvement in communicating
21 with the county concerning, for example, upgrades to
22 the underground storage tanks?
23   A. If at this time they needed to be done, yes.
24   Q. Okay. And what about inventory? Did you
25 communicate with the county regarding the inventory in

Page 20

1  the tanks?
2    A. It would have been -- well, it would have been
3  Narinder reporting to me, then I would be responding
4  to what they told me.
5    Q. Say you were in the loop?
6    A. I was in the loop, yes.
7    Q. Looking at the descriptions of the tanks on the
8  following pages. It appears that there were four
9  ten-thousand gallon tanks.
10     Does that sound right to you?
11   A. Looks correct.
12   Q. Okay. And do you know -- you don't know the
13 date when these were installed; is that correct?
14   A. No, I don't.
15   Q. Okay. The next document I have is Exhibit 7.
16 It is a permit to operate and this is again, for the
17 same address, and it's listing the owner as El Monte
18 again.
19     Do you recall receiving permits to operate that
20 looks like this document?
21     (Exhibit 7 was attached and marked.)
22   A. You know, I don't remember this document.
23 But, yes, I'm sure we got this. I'm sure -- that
24 looks correct.
25   Q. The issue date on this is 1996, and the

Page 21

1  expiration is 1998.
2    A. '98.
3    Q. When did you actually operate the station
4  until?
5      I didn't ask that very well. How long did you
6  own the station?
7    A. I don't remember. We didn't own it very long.
8  We sold it to Narinder.
9    Q. Do you know if he still owned it at the
10 expiration in 1998?
11   A. No, I don't.
12   Q. Let's see if this will help us out here.
13 Sometimes the documents end up telling the story.
14   A. Well, they are so far.
15   Q. They are. I appreciate that you recognize a
16 few in here.
17     So number 8 this is the underground storage
18 permit application again, a different form. And this
19 time it is listing property owner as Kupral and
20 Narinder Singh. Does this help refresh your
21 recollection that you resolved these things by May of
22 1998?
23     (Exhibit 8 was marked and attached.)
24   A. That sounds correct. This looks correct.
25   Q. Flying right through here. Let's see.