# EXHIBIT 4

## Van Ness Auto (2740 North Van Ness)

- Chevron U.S.A. Inc.'s Supply Declaration signed by Frank G. Soler (Apr. 18, 2011)

- Chevron Dealer Supply Contract (Aug. 15, 1985)
  (CHEVMDL1358_FRES_00000002419, CHEVMDL1358_FRES_00000002421)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

MDL 1358 (SAS)

**This Document Relates To:**

*City of Fresno v. Chevron U.S.A. Inc., et al.*
04 Civ. 04973

## CHEVRON U.S.A. INC.'S SUPPLY DECLARATION

I, Frank G. Soler, declare:

1. I am Assistant Secretary for Defendant Chevron U.S.A. Inc. ("Chevron"). Chevron maintains electronic records of gasoline deliveries to retail gasoline stations. True and correct copies of printouts from these records are attached as Exhibits A through D. The column headings are defined as follows:

"Month/Year" is an accounting date for each transaction.

"Movement Type" means the type of transaction.

"Plant Name" lists the products terminal from which the gasoline was delivered.

"Trade Class" means the type of station to which it was delivered.

"Cust #/Facililty #" means the distinct number assigned to each Chevron branded station.

"Customer Name" means the name of the dealer or operator at the facility.

"Operator #" means the distinct operator number assigned to each operator for a Chevron branded station.

"MOT" means method of transportation.

"Delivery Date" is the date of delivery.

"Invoice #" is a distinct number assigned to each delivery.

"Material" is the distinct code assigned to each type of gasoline refined by Chevron.

"Material Name" is the name of the product associated with the distinct product code.

"Quantity Gallons" is the amount of gasoline delivered in gallons.

"Quantity in Barrels" is the amount of gasoline delivered in barrels.

"City" is the name of the city in which the retail facility is located or a distinct code assigned to a particular city.

Based on information that is currently available, the following material codes and names represent products that Chevron can identify as having contained MTBE:

- 201058 - CALCO PUL CGAS W/ETHER;
- 201068 - CHEVRON SUP CGAS W/ETHER;
- 201088 - PUL CGAS W/ETHER;
- 201118 - CHEVRON UL CGAS W/ETHER ;
- 201135 - BASE TEST OPRG W/ETHER NV;
- 201158 - CALCO UL CGAS W/ETHER;
- 201188 - UL CGAS W/ETHER;
- 201208 - CHEVRON PLUS GAS W/ETHER;
- 201288 - MUL CGAS W/ETHER;
- 201308 - CHEV REGULAR GASO W/MTBE;
- 201358 - CALCO REGULAR GASO W/MTBE;
- 201388 - REGULAR GASOLINE W/MTBE; and
- 201458 - CALCO MUL CGAS WIETHER.

In addition, the following Material codes represent products that Chevron can identify as containing MTBE or TAME:

- 201272;
- 201275;

2

- 201278;
- 201261;
- 201264;
- 201267;
- 201211; and
- 201217.

2. I have reviewed Chevron's electronic records, and I am familiar with them. In particular, I have reviewed the electronic files to determine whether Chevron delivered gasoline to the sites identified in Plaintiff's discovery responses. Chevron's records reflect deliveries of gasoline to four of those sites and delivery to a jobber whom discovery in this case has revealed delivered some gasoline to two Chevron branded stations listed below.

3. **2740 North Van Ness.** Chevron supplied gasoline to the station located at 2740 North Van Ness from prior to the relevant time period until August 1986. Subsequently, on information and belief, R.V. Jensen delivered gasoline refined by Chevron to this site between 1986 and 1999. For time period of January 1986 until August 1986, the dates and amounts of sales to this site, including a material code and name for each sale, are set forth in the print-out attached to this declaration as Exhibit A. During that time period, Chevron supplied this station with gasoline from a terminal located in Fresno, California. Between 1986 and 1999, Chevron supplied gasoline to R.V. Jensen. Chevron's sales to R.V. Jensen during that time period at the terminals in Richmond, Bakersfield, Banta, and Fresno are set forth in Exhibit E-1 and E-2. After selling the gasoline reflected in Exhibit E-1 and E-2 to R.V. Jensen, Chevron no longer owned the gasoline and did not have control over where the gasoline was delivered. Chevron supplied this station and R.V. Jensen with gasoline refined at its Richmond Refinery. Chevron's Richmond California refinery ("Richmond Refinery") began using MTBE as an octane enhancer in certain premium grades, on an as-needed basis, in 1990.

3

In 1992, Chevron began using MTBE at the Richmond Refinery during the wintertime months for purposes of meeting the oxygenate requirements mandated by the 1990 Clean Air Act Amendments. Then, in January 1995, Chevron began adding MTBE to gasoline manufactured at the Richmond Refinery on a year round basis to comply with the Clean Air Act's Reformulated Gasoline Program. Chevron notes that certain areas of Northern California did not have an oxygenate requirement, and that Chevron did not blend MTBE into all of the gasoline manufactured at its Richmond Refinery during the relevant time period. In 2003, Chevron stopped using MTBE at the Richmond Refinery and completed its transition from MTBE to ethanol in Northern California. Chevron's deliveries of gasoline to this station prior to 1990 did not contain MTBE. Chevron did not own the real estate or the USTs at this site, nor did it operate this site during the relevant time period. The RWQCB granted case closure for this site on September 2, 2008, stating that "necessary remediation has been completed at this site", "groundwater monitoring data suggests that no significant groundwater impact remains from the gasoline release at this site", and "residual petroleum hydrocarbons may be expected to attenuate naturally by the action of naturally-occurring soil bacteria".

4. **225 North H Street.** Chevron supplied gasoline to the station located at 225 North H Street from prior to the relevant time period until October 1990. Subsequently, on information and belief, R.V. Jensen delivered gasoline refined by Chevron to this site between October 1990 and 2003. The dates and amounts of sales to this site between 1986 and October 1990, including a material code and name for each sale, are set forth in the print-out attached to this declaration as Exhibit B. During that time period, Chevron supplied this station with gasoline from terminals located in Richmond, Bakersfield, Banta, and Fresno, California. Between October 1990 and 2003, Chevron supplied gasoline to R.V. Jensen. Chevron's sales to R.V. Jensen during that time period at the terminals in Richmond, Bakersfield, Banta, and Fresno are set forth in Exhibit E-1 and E-2. After selling the gasoline in Exhibit E-1 and E-2 to R.V. Jensen,

Chevron no longer owned the gasoline and did not have control over where the gasoline was delivered. Chevron supplied this station and R.V. Jensen with gasoline refined at its Richmond Refinery. Chevron did not blend MTBE into gasoline at the Richmond Refinery prior to 1990. Therefore, Chevron's gasoline supplied to this station prior to 1990 did not contain MTBE. Chevron stopped using MTBE at the Richmond Refinery in 2003. Thus, gasoline refined by Chevron that may have been supplied to this station after that time did not contain MTBE. Chevron did not own the real estate or the USTs at this site, nor did it operate this site during the relevant time period. Three underground storage tanks were excavated and removed from this site in 1999. FCDEH-FRESNO-004641. Environmental consultants investigating the site in 1999 concluded that the "site does not appear to pose a risk to groundwater". FCDEH-FRESNO-004641. In March 2000, the County of Fresno issued a no further action letter for this site.

5. **5756 North 1st Street.** Chevron supplied gasoline to this site from prior to the relevant time period until June 1988. Chevron terminated its dealer supply contract with this station on May 31, 1988, and did not supply gasoline to the subject site after that time. The dates and amounts of sales to this site, including a material code and name for each sale, are set forth in the print-out attached to this declaration as Exhibit C. Chevron supplied this station with gasoline from terminals located in Richmond, Bakersfield, Banta, and Fresno, California. Chevron supplied this station with gasoline refined at its Richmond Refinery. Chevron did not blend MTBE into gasoline at the Richmond Refinery prior to 1990. Therefore, the gasoline that Chevron supplied to this station did not contain MTBE. Chevron owned the USTs at the subject site from prior to the relevant time period until June 1988, when they were removed. Chevron did not own the land at the subject site during the relevant time period. After removal of the tanks from this site, Chevron assessed and remediated this site. On May 23, 1996, Fresno County Health Services Agency advised Chevron that:

A. The leak has been stopped and ongoing sources have been removed.
B. The site has been adequately characterized.
C. Little or no groundwater impact currently exists.
D. No water wells, deeper drinking water aquifers, surface water, or other sensitive receptors are likely to be impaired....
E. The site poses no significant risk to human health.
F. The site poses no significant risk to the environment.

CHEVMDL1358_FRES_0000003252-54. On May 22, 1997 the County of Fresno's Health Services Agency advised Chevron that no further action was need in connection with this site. CHEVMDL1358_FRES_0000003330-32. Other than a single unconfirmed detection in 2003 at 0.54 ppb, MTBE has not been detected at this site.

6. **3996 Parkway Drive.** Chevron supplied gasoline to this site from prior to the relevant time period until 1998. During that time period, Chevron owned the USTs at the subject site. During the relevant time period, Chevron leased the real estate at this site from a third-party. Chevron did not own the real estate at this site during the relevant time period. The dates and amounts of sales to this site, including a material code and name for each sale, are set forth in the print-out attached to this declaration as Exhibit D-1 and D-2. Chevron supplied this station with gasoline from terminals located in Richmond, Bakersfield, Banta, Fresno, and San Jose California. Chevron supplied this station with gasoline refined at its Richmond Refinery. Chevron did not blend MTBE into gasoline at the Richmond Refinery prior to 1990. Therefore, Chevron's gasoline supplied to this station prior to 1990 did not contain MTBE. The RWQCB issued a no further action letter to Chevron for this site on May 14, 2002.

7. Based on Chevron's records it did not deliver gasoline to, supply, own, lease, or operate any of the other stations identified in Plaintiff's discovery responses.

8. No one person for Chevron knows all of the matters stated herein, and therefore this declaration was prepared with the assistance and advice of representatives of and counsel for, said Chevron upon whose assistance and advice I have relied. This

declaration is limited by the records and information still in existence, presently recollected and thus far discovered.

9. Chevron reserves the right to supplement or amend this declaration should new information become available.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 18th day of April, 2011, at San Ramon, California.

_____
Frank G. Soler, Assistant Secretary

Dealer Employer Identification No. (EIN)   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          S.S. No.   C019-1328

## CHEVRON DEALER SUPPLY CONTRACT
(Owner Dealer)

Dated: August 15, 1985

PREMISES AND TERM

    1.    Chevron U.S.A. Inc. ("Company") agrees to sell to **G. R. Clements** ("Dealer") and Dealer agrees to purchase from Company such quantities of the Chevron brand gasolines ----- ("Chevron motor fuels") sold by Company generally to service stations in Dealer's locality as are necessary to serve customer demand for Chevron motor fuels at Dealer's premises at **2740 Van Ness Blvd., Fresno, CA 93704** (the "premises") for a term commencing on the 1st day of **January, 1986**, and ending on the **31st day of December, 1988**.

USE OF PREMISES

    2.    (a)    Dealer acknowledges that there is a demand for Chevron motor fuels and Chevron brand motor oils (hereinafter sometimes collectively referred to as "Chevron products") at the premises, which is enhanced by Company's advertising and other promotions thereof, and agrees continuously to stock at the premises and to offer for sale such quantities of Chevron products as are necessary to serve customer demand therefor. Dealer acknowledges the financial benefit to Dealer of selling and prominently displaying Chevron products due to the high regard of the motoring public for service stations selling under the Chevron trademarks and trade names, and Dealer agrees at all times to give the dispensing equipment, displays and advertisements for Chevron products and brands as prominent and convenient positions as those for any other product offered for sale on the premises and not to disparage or diminish in any way by act or omission the good reputation of such trademarks, trade names, products or service stations.

    (b)    Dealer agrees to devote sufficient time to the personal management of the premises so as to provide for the continued proper operation thereof as a service station, to maintain and operate the premises in a clean, safe and healthful manner with an appearance that is inviting to the motoring public, to render professional driveway and automotive service to customers by providing trained, acceptably groomed and uniformed service station personnel in numbers adequate to handle available business, to operate and manage the premises and cause customers to be treated in such a manner as to eliminate customer complaints to the extent possible, to comply with all applicable Federal, state and local laws and regulations relevant to the use and operation of the premises or the resale of all products purchased by Dealer under this Contract, and to supply Company with all information which Company shall reasonably request to enable Company to comply with all applicable Federal, state and local laws and regulations. Company and its authorized representatives shall have the right at any time to enter upon the premises to confirm the performance by Dealer of Dealer's obligations under this Contract.



EXHIBIT 7
Clements 3-29-11

CONFIDENTIAL (per 2004 MDL 1358 Order)                                              CHEVMDL1358_FRES_ 00000002419

Dealer may not use other signs to advertise products purchased from Company without Company's prior written consent. No other signs (except motor fuel price signs) shall be placed on a sign pole containing a sign advertising a product manufactured or handled by Company. Dealer shall not, during the term of this Contract or thereafter, simulate in any way any insignia identifying Company's products or the places or outlets where they are sold or marketed. Upon termination of this Contract, Dealer shall immediately return to Company all signs supplied to Dealer by Company and shall immediately discontinue any and all use of such insignia and shall obliterate such insignia from all real or personal property utilized by Dealer. Dealer likewise shall obliterate such insignia from any real or personal property of Dealer before selling any such property to a third party.

(c) Company shall have the right at any time during the term of this Contract to change, alter or amend any of the trademarks and trade names under which the motor fuels covered by this Contract are now or may hereafter be sold. If Company shall at any time during the term of this Contract discontinue the marketing in Dealer's locality of any or all of the motor fuels covered by this Contract, Company shall be relieved of all obligation to sell or deliver such discontinued product to Dealer and, if Company shall market any other product in lieu of the discontinued product, this Contract shall embrace the new product and all of the terms and conditions hereof previously applicable to the discontinued product shall apply to the new product.

CONDUCT OF DEALER'S BUSINESS

5. (a) Dealer is engaged in an independent business and nothing herein contained shall be construed as granting to Company any right to control Dealer's business or operations or the manner in which the same shall be conducted, Dealer's obligation to Company hereunder being the performance of the terms and conditions of this Contract. Company has no right to hire or fire any employees of Dealer or to exercise any control over any of Dealer's employees, all of whom are entirely under the control and direction of Dealer, who shall be responsible for their acts and omissions. Dealer accepts exclusive liability for all contributions and payroll taxes required under Federal Social Security laws and State Unemployment Compensation laws or other payments under any laws of similar character as to all persons employed by or working for Dealer.

(b) Dealer shall indemnify, defend and hold harmless Company, Company's parent company, Chevron Corporation, the subsidiary and affiliated companies of each of them (collectively "Company and its affiliates"), and their respective directors, officers, agents and employees, from and against all expense (including attorneys' fees), liability and claims of whatsoever kind and nature, including but not limited to those for damage to property (including Dealer's property) or injury to or death of persons (including Dealer), directly or indirectly resulting, or alleged to result, from anything occurring from any cause on or about or in connection with the maintenance, upkeep, repair, replacement, operation or use of the premises, or anything located thereon.

PREVENTION OF PERFORMANCE--SHORTAGE OF SUPPLY

6. (a) There shall be no obligation to sell or deliver or to receive or use the petroleum products covered by this Contract when and while, and to the extent that, the receiving or using or manufacture or making deliveries in the customary manner are prevented or hindered by act of God, fire, riot, labor disturbances (whether involving employees of the party affected or of others and regardless of whether the disturbance could be settled by acceding to the demands of a labor group), accident, war or the acts of any government (whether foreign or domestic, Federal, state, county or municipal) or any causes beyond the reasonable control of the party affected, whether or not similar to any of the foregoing causes. In cases of partial or total interruption or loss or shortage of transportation facilities or supplies, or shortage of products deliverable hereunder, Company may allocate deliveries of available products among Dealer, Company's other customers, contract or

CONFIDENTIAL (per 2004 MDL 1358 Order)　　　　　　　　　　　　　　　　　　　　　CHEVMDL1358_FRES_ 00000002421