# EXHIBIT 5

**Van Ness Auto (2740 North Van Ness)**

- Deposition of James Clements, pgs. 15-16, 25-26 (Mar. 29, 2011)
- Deposition of Garabed Bedirian, pgs. 13-15,41-42, 73 (Apr. 4, 2011)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-oOo-

In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

Master File No. 1:00-1898

This Document Relates To:

Case No. MDL 1358(SAS)

City of Fresno v. Chevron U.S.A. Inc., et al., Case No. 04 Civ. 4973

DEPOSITION OF JAMES CLEMENTS

March 29, 2011 at 9:00 (10:03) a.m.

Before: ERIC L. JOHNSON
RPR, CSR #9771

Taken at:
Fresno, California

764ac69d-c9a5-40fa-bdbb-e3ff0445ee30

the fig business now?
A. Now.
Q. What do you do in the fig business?
A. I sell them.
Q. Is that in the Fresno area?
A. Mm-hmm.
Q. Did you ever work at the Van Ness Auto Repair Station, 2740 Van Ness?
A. You should know that I don't have any connection with Van Ness Auto. I didn't -- I just don't have any relationship with them other than the fact that I am a customer there. But I have no relation to Van Ness Auto, because I see in here that this thing said that "You are believed to be associated with Van Ness Auto Repair." Well, I am not. Not at all.
MR. STEEVES: Let me pull out a couple of exhibits here. I apologize, it is not the best copy, so we will try to work through this.
(Deposition Exhibits 2-3 marked for identification)
MR. STEEVES: Handing you what's been marked as Exhibits 2 and 3. Exhibit 2 is a UST program -- permit Application, Bates numbers FCDEH-FRESNO-006055 --
A. Mm-hmm.
Q. -- through 006058. Then I also provided you

with Exhibit 3 which appears to be the front page of that same document, just a better copy. And this has a Bates number RWQCB-FRESNO-015726.
So just a simple question, I'd like you to look at -- probably better to look at Exhibit 3. Under the property owner, says James R. Clements.
Is that you?
A. That is correct.
Q. So did you own the service station or just the physical property associated with that address?
A. I inherited the station from my dad in 1986, and I ran it -- say I ran it, I had it until 1991.
Q. So you owned the actual service station as well as the property?
A. Mm-hmm.
Q. Did you own the USTs as well?
A. Did I what?
Q. Did you own the underground storage tanks?
A. Sure.
Q. Did you have any day-to-day duties at the station at the time that you owned it?
A. I was an absentee owner. I worked in -- was working in Bakersfield five days a week and then I would be there on Saturday to collect the money. That was all.

Q. At the time that you owned the station, do you recall who the operator was?
A. Well, I owned it.
Q. Right. Do you --
A. I had a guy working for me.
Q. Who was that guy?
A. Terry Kraft.
Q. Terry Kraft. Is that with a K?
A. Yeah, K.
Q. Looks like -- if we go back to Exhibit 3, looks like his name -- is it he or she?
A. It is a he.
Q. He is listed in the emergency contact --
A. Right.
Q. -- information.
A. Yeah, he was the -- he had worked for my dad for 20 years prior to my dad's death. So I just kept him on until I sold the station.
Q. Did you have any involvement with the station prior to 1986 before you inherited it from your dad?
A. No, not directly. My dad operated it -- my dad operated -- the station was built in 1926, my dad bought it in 1928, he operated it until 1986. Now, I was born there -- I mean, raised there, if you will, you know, because the old man made me work at the station. I was

raised in the business, that's the reason I am not in it today. But as far as being involved in the business, no.
Q. But he made you work at the station?
A. Oh, sure.
Q. What kind of jobs did you do?
A. I started out cleaning the bathrooms and ended up pumping gas and greasing cars and changing tires, whatever you do in a service station.
Q. If you look back at Exhibit 2, the second, third, and fourth pages looks like they list underground storage tanks at the facility.
A. Mm-hmm.
Q. Did you fill this document out?
A. You know, I can't even -- this is my writing on the first page here, this one here. But I am looking here, I can't hardly read this thing.
Q. It is difficult to read.
MR. DAVIS: I am sorry to interject, when you said you could read, will you identify the Bates number of the page you said you could identify as your handwriting?
MR. STEEVES: I think he was referring to Exhibit 3.
THE WITNESS: Exhibit 3.

764ac69d-c9a5-40fa-bdbb-e3ff0445ee30

Page 22

MR. STEEVES: Q. And then let's look to the south of the store, looks like there's another excavation boundary.
A. Mm-hmm.
Q. Do you see that, and another dotted box?
A. Yes.
Q. Do you recall if an underground storage tank was --
A. Yes.
Q. -- located there?
And do you recall the type of gasoline that was in the underground storage tank?
MR. DAVIS: Objection; vague as to time. Also Mr. Clements, if you can just, going forward, just give a minute before you answer, that way he can finish his question and if I want to --
THE WITNESS: Sure.
MR. DAVIS: -- insert an objection, I will have a moment to get in there as well.
THE WITNESS: Yeah.
MR. DAVIS: Thank you very much.
THE WITNESS: Sure.
MR. STEEVES: Q. I am sorry, I don't know if we actually got the answer to that question, so I will ask it again: Do you recall the type of gasoline that

Page 23

was in that underground storage tank?
A. I think we had premium in that one.
MR. DAVIS: Same objections to that question.
(Deposition Exhibit 5 marked for identification)
MR. STEEVES: Handing you what's been marked as Exhibit 5, it is a Fresno County Department of Health document, the title is Permit Application for Underground Storage Tanks, Bates numbers FCDEH-FRESNO-005969 through 005976.
Q. Have you seen this document before?
A. I probably have.
Q. Was it submitted under your oversight at the time that you were at the station?
A. Are you asking me was this test made while I was on the property? Is that what you are saying?
Q. I am actually just asking you about the document right now, but we will get to that. The document itself, was this submitted under your -- or filled out under -- sorry. Strike that.
Was this document filled out under your oversight?
A. Well, in answer to your question, I am sure that I had to give him some answers but he probably knew as much about the tanks as I did, to be honest with you.

Page 24

Q. It looks like the -- under precision tester information, the company is Able Service Company.
A. Yeah, right.
Q. Do you recall if Able Service Company was a company used for precision testing during your time as station owner?
A. As a matter of fact, yeah. Yeah, they were.
Q. If you could turn to the second page --
A. Mm-hmm.
Q. In box five, tank involved.
A. Okay.
Q. It lists, it looks like, three tanks. And are these the underground storage tanks you talked about?
A. Yes, sir.
Q. Looks like one tank has a capacity of 1,000 gallons and the other two a capacity of 5,000 gallons.
A. That is correct.
Q. I see tank three listed here as premium gasoline. If you go back to Exhibit 4, to the best of your recollection, Exhibit 4 is the map we were just looking at?
A. Right. And I think that he's wrong there. I never paid that much attention to it, in looking at this. I think the -- I think we had -- we didn't sell as much premium gas as we did regular unleaded, so I

Page 25

think the 1,000 gallon tank was the premium tank and that was the one closest to the office.
Q. Okay. So you think the tank identified as Tank 1 on this precision test would be the tank south of the store on --
A. That is correct.
Q. Okay. Under brand supplier, it says Chevron.
Do you recall if Chevron supplied the gas for this station?
A. You have to -- no, I didn't buy any gasoline from Chevron when I owned the station. My dad did from 1926 -- or 1928, I should say, until 1986, he dealt directly with Chevron. When my dad passed away, within a couple of days after his death Chevron cancelled the contract with me, with the station, per se, and I had to go to R.V. Jensen & Company, which is a jobber, a local distributor here in town, and they handled Chevron products. So I didn't buy anything direct from Chevron. It was through R.V. Jensen & Company here in town. They were a jobber or a distributor or whatever you want to call it.
Q. And you said R.V. Jensen & Company used Chevron products?
A. They were --
MR. DAVIS: Objection. One second. Objection;

Deposition of James Clements / March 29, 2011

Page 26

overbroad, vague as to time period and location.
THE WITNESS: What?
MR. DAVIS: I said -- you can read my objections back if you want to.
(Record read)
MR. STEEVES: Q. I think the question pending is you just stated that R.V. Jensen & Company used Chevron products. Correct?
A. They were a Chevron distributor and I bought from them.
Q. Do you recall the contact person with R.V. Jensen?
A. No. There were a couple out there, I don't remember who they were.
Q. Do you know if R.V. Jensen & Company used any other suppliers?
A. No, sir, I don't.
Q. Do you recall the date that your contract -- your father's contract with Chevron was cancelled?
A. No.
Q. You said it was sometime in 1986; is that correct?
A. Yeah, it was in 1986.
Q. Who is responsible for -- who at the station was responsible for ordering gasoline?

Page 27

A. Terry Kraft.
Q. Do you know where Mr. Kraft is today?
A. I have no idea. I haven't seen him since '91.
Q. Do you recall how gasoline was delivered to your site by R.V. Jensen?
A. In a truck. Tanker truck.
Q. Do you know where that gas was picked up from before it was delivered to you?
A. I assume out of their facility, which was south of town there. They had a -- R.V. Jensen was a distributor for Chevron, and they had a plant out south of town. I assumed that's where they got it, because it was always in an R.V. Jensen truck, so I --
Q. You stated that you sold the station in 1991; is that correct?
A. Yes.
Q. Do you recall the approximate date?
A. I wish I could tell you, but I don't want to be quoted as to the approximate -- 1991. I don't remember the month.
Q. Do you recall who you sold the station to?
A. A fellow by the name of Garabed Bedirian.
MR. STEEVES: I will hand you what's been marked as Exhibit 6.
////

Page 28

(Deposition Exhibit 6 marked for identification)
MR. STEEVES: It is a Notice of Requirements in the Sale of a Business, Bates numbers RWQCB-FRESNO-015550 through 015551.
Q. On the second page there is a grant deed, it looks like it is recorded on March 20th, 1991.
A. That would be it.
Q. That seems about right, the date that you sold this?
A. Yeah, that would be it. Yeah, this is it.
Q. And when you sold the business, did you sell the property and the station and the USTs all together?
A. The what?
Q. The property, the station, and the USTs all together?
A. Yeah, everything.
Q. Okay. Do you know what MTBE is?
A. No, sir.
Q. It refers to methyl tertiary butyl ether. It is an additive that some companies put into gasoline.
Do you know if you ever sold gasoline containing MTBE?
A. I have no idea what it had in it.
Q. Are you familiar with the method of inventory

Page 29

that was used for the USTs at your station during the time that you owned it?
A. What are you talking about?
Q. Are you familiar with the method of inventory that was used to check --
A. Oh, you mean how much gas we had in the tanks? Oh, sure. We had meters on the pumps and we also had a dip stick.
Q. Who was responsible for --
A. That was Terry Kraft.
Q. Do you recall ever being made aware of an inventory discrepancy at the station?
A. No, sir.
Q. Did you have a procedure in place in case there ever was an inventory discrepancy?
A. No, it was just Terry and I. No, I never had any problem with the inventory, that I know of.
Q. Were you ever present when the USTs were filled with gas?
A. When what?
Q. When the USTs were filled with gas by the jobber.
A. What are USGs (sic)? What are you talking about?
Q. I am sorry. Underground storage tanks.

8 (Pages 26 to 29)

DEPOBOOK REPORTING SERVICES, LLC (800) 830-8885

764ac69d-c9a5-40fa-bdbb-e3ff0445ee30

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898 MDL 1358 (SAS) |

This Document Relates To:

| | |
|---|---|
| CITY OF FRESNO, Plaintiff, vs. CHEVRON U.S.A., INC., et al., Defendants. | CASE NO. 04 Civ. 4973 (SAS) |

VIDEOTAPED DEPOSITION OF GARABED BEDIRIAN

Monday, April 4, 2011, at 9:41 a.m.

2800 North Green Valley Parkway

Henderson, Nevada

REPORTED BY: PEGGY S. ELIAS, RPR
Nevada CCR No. 274 - California CSR No. 8671

33e70f58-3086-407f-a292-28d9f8cf8331

Page 10

patient with me.
Q. I do appreciate that, and I understand. Like I said, if you can't remember something, you know, we're just looking for your best recollection, but if you can't remember, I don't want you to guess.
A. Yes.
Q. Did you do anything to prepare for today's deposition?
A. I brought some paperwork in case you asked me a question that I don't know, and the dates are on those papers, and then I can tell you, so I can tell you the right dates.
MR. STEEVES: Okay. And we did speak off the record. You indicated that you did bring some documents in. I'd like to show you what I've marked as Exhibit 1 (handing).
(Exhibit No. 1 was marked for identification.)
BY MR. STEEVES:
Q. Have you seen that document before?
A. Yes. I have a copy of this.
Q. And did you bring documents with you today in response to that document?
A. Yes.
However I could understand what was written

Page 11

on this paper; that some things I don't have, but whatever I have I brought it.
Q. I'd like to quickly go over your education and background.
Do you have a college degree?
A. No.
Q. Do you have any specialized training?
A. No. I didn't continue studying. I left school really early, when I was around thirteen years old, but I've learned mechanic, and that's all I know about.
Q. Do you have any professional licenses?
A. I have taken little classes, like three days, four days, for a week. It's called like mobile school, and that's how I have gone forward in my life learning things.
Q. Were these classes just general education, or were they -- did you have a specific focus?
A. There was no special to go to school in my business line, but whatever invitation I had to take classes, general classes, regarding my business, I did it.
Q. Could you tell me the dates you were associated with the service station at 2740 North Van Ness in Fresno?

Page 12

A. Yeah, I have the dates. It was in '91.
Q. You purchased the station in 1991?
A. Yes, yes, March 20, 1991.
(Exhibit No. 2 was marked for identification.)
BY MR. STEEVES:
Q. I'd like to hand you what's been marked as Exhibit 2 (handing).
A. The date is a bit different, but those -- this one, the date is when the documents were recorded already. It was...
Q. Okay. And we'll actually get to the second document. What I'd like to do is -- what I'll do is I'll hand you documents and let -- give you a second to look over the document, and then I'll start asking you questions at that point. So just go ahead and take a look at the document real quick, and then we'll start asking -- I'll start asking some questions.
So what I've handed you is a two-page document. The first page is Notice of Requirements in the Sale of a Business, and the second page is a Grant Deed. It's Bates stamps RWQCB-FRESNO-015550 to 015551.
MR. STEEVES: Could we go off the record for just a minute.
THE VIDEOGRAPHER: This is the videographer.

Page 13

The time is approximately 9:55 a.m. We're going off the record.
(Discussion off the record.)
THE VIDEOGRAPHER: This is the videographer. The time is approximately 9:56 a.m. We are now on the record.
BY MR. STEEVES:
Q. So have you seen these documents before?
A. No.
Q. It looks like on the second page is a Grant Deed to you regarding Russ Clements Service at 2740 Van Ness, and it looks like the seller was James Russell Clements.
Does that comport with your recollection?
A. Yes.
(Exhibit No. 3 was marked for identification.)
BY MR. STEEVES:
Q. And I'm handing you what's been marked as Exhibit 3 (handing), and this is a document that you brought in with you today, correct?
A. Yes.
Q. It looks like it's an escrow statement dated March 20th, 1991, correct?
A. Yes.

33e70f58-3086-407f-a292-28d9f8cf8331

Q. It's payroll to James Clements, correct?
A. Yes.
Q. And this is in regards to the service station at 2740 North Van Ness Boulevard in Fresno?
A. Yes.
Q. Do you recall how long you owned the station?
A. I gave it to -- I gave the property to my daughter in '98, but I still stayed with it.
Q. You still stayed with it, is that what you said?
A. I stayed with it because we had to remove the tanks.
Q. Okay. So you sold the property to your daughter in 1998?
A. Yes.
Q. But you still had an association with the station outside of ownership, correct?
A. Yes.
Q. And how long did that association last?
A. I didn't work anymore. We shut the doors because we had to remove the tanks, and we start working on removing the tanks, and that took a while.
Q. So you no longer sold gasoline at the station after 1998?
A. In '98 we got a letter from the government

saying that the law has changed, and we needed to remove the tanks, and I wanted to abide by the law, so I stopped and took care of whatever it -- needed to be done.
(Exhibit No. 4 was marked for identification.)
BY MR. STEEVES:
Q. I'd like to hand you what has been marked as Exhibit 4 (handing), and this is also a document you brought with you today, correct?
A. Yes.
Q. And this is a Grant Deed to Siranoush Bedirian, correct?
A. Correct.
Q. And who is Siranoush Bedirian?
A. My daughter. My daughter.
Q. And it's dated February 17th, 1998.
Does this comport with your recollection about the time you sold the station to your daughter?
A. Yeah, this is the right date that I had to sell it to her because I didn't have the funds to remove the tanks, and I needed her help, so I put it -- I sold it to her.
(Exhibit No. 5 was marked for identification.)

BY MR. STEEVES:
Q. I hand you what's been marked as Exhibit 5 (handing). It's an Underground Storage Tank Fee Return document. It looks like it's dated July 31st, 1991, Bates stamps number RWQCB-FRESNO-015549 through 015546.
Have you seen this document before?
A. Yes, yes. And I have signed right there.
Q. So that is your signature at the bottom?
A. Yes, this is my signature right there.
Q. And you're listed as the owner in this document, correct?
A. Yes.
Q. And the business name is Van Ness Auto Repair; is that correct?
A. Correct.
Q. And when you owned this station, was it known by any other name?
A. Before I had it, it was under Russ Clements, and I changed it, Van Ness Auto Repair.
Q. Do you recall how long your daughter owned the station?
A. Till we sold it. Till we sold it.
Q. And you don't recall the general -- the general time period when it was sold?
A. Yes.

It's -- this is the date that -- when they started making the payments on this property.
Q. I'll ask you -- I have some documents that I can use to refresh your recollection.
(Exhibit No. 6 was marked for identification.)
BY MR. STEEVES:
Q. I'm handing you what's been marked as Exhibit 6 (handing). It's a -- the first page is a letter with Van Ness Auto Repair letterhead dated May 10th, 2004, Bates numbers FCDEH-FRESNO-005569 through 005571.
Have you seen this document before?
A. No, I don't remember.
Q. It's signed Jim Medina, owner.
Do you know who Jim Medina is?
A. The one that we sold it to.
Q. And if you look at the second paragraph, it says: I'm in the process of buying the building and land from the present owner with a final purchase date of January 2006.
Do you recall if the property, the business, was sold to Mr. Medina around January 2006?
A. Yes.
///

gasoline?
A. Yes.
Q. Did you keep records of your orders?
A. I used to, but I don't have them. I threw them away, all.
Q. Do you know where Jensen picked up the gasoline from to deliver it to your station?
A. I don't know. I don't know.
A couple of times I had to go to their office, and I saw the big -- for -- to share problems, accounting problems, and I saw it was a big place, and they had big, big tanks, but I don't know where they bought it from.
Q. When you say "their office," you mean Jensen?
A. Yes. They have a big place, and they have big tanks, and every tank was hundred meter.
Q. You mentioned that you had Chevron signs at the station.
Were you a branded station?
A. Yes, when I bought it, there was signs of Chevron everywhere, and I ordered couple of them, and they brought couple of them more. But when I got out of it, they came and picked it up, the signs.
Q. What types of signs did you have at your station? Were they just logo signs? Did you have --

well, strike that.
Did you have a logo -- Chevron logo, logo sign, at your station?
A. Yes. There was one on a pole. That was the old one that was there for a long time on the pole. It was beginning of the Chevron, and I bought with the lights, the ones that -- I ordered with the lights.
Q. Did you have any Chevron logos on your gasoline dispensers?
A. Yes.
(Exhibit No. 14 was marked for identification.)
BY MR. STEEVES:
Q. I'll hand you what has been marked as Exhibit 14 (handing). This is a copy of a business card you brought in today.
Is that the business card you used when you owned the station?
A. Yes.
Q. And is that Chevron's logo in the upper right corner?
A. Yes.
Q. Did Chevron ever provide you any training for operating the station?
MR. DAVIS: Objection, lacks foundation,

assumes facts not in evidence.
THE WITNESS: They didn't teach me any classes or anything, but my experience wasn't on gas. It was a mechanic. You see the number 45 here? I've been 45 years in the business (indicating).
BY MR. STEEVES:
Q. 45 years in the business, do you mean 45 years as an auto mechanic?
A. Yes, yes.
Q. Did you operate any gas stations prior to opening the Van Ness Auto Repair?
A. No. I had a garage, mechanic garage, body shop.
(In English) But no gas. First time I work in this place as a gas station and mechanic.
(Through interpreter) Well, the first time I work in this place, gas station and mechanic, it's -- it's a small place. This is the smallest business I did in my lifetime. Before that -- because of my age, but before that I have big businesses.
Q. Did you ever work directly for an oil or gas company?
A. Yes, I have worked oil and gas companies, but in order to take care of their cars but not gas part specific.

Q. So you worked as an auto mechanic?
A. Yes.
Q. You testified that you ordered more signs from Chevron.
Did someone from Chevron bring those signs to you?
A. Yes, they came and hooked it up, and then at the end they came and picked it up.
Q. Did anybody from Chevron ever inspect your station?
MR. DAVIS: Objection, lacks foundation, assumes facts not in evidence.
THE WITNESS: They used to come and check it out every time for cleanliness, and even they gave me a prize. Because my place was an older place, the prize that I got because it was the cleanliest [sic] place, the cleanest place.
BY MR. STEEVES:
Q. How often did they inspect your station?
MR. DAVIS: Objection. Hold on one second.
THE WITNESS: Most of the time I never knew that you could come and fill up a gas tank and go to the bathroom, they asked for the key, and then they checked everywhere, and then suddenly I used to get a letter that they were there.

Page 42

I never knew they were there. Two, three times I had letters from them thanking me for letting them look, look around.
MR. DAVIS: Okay. I just wanted to object. The "term" inspection is vague and ambiguous, lacks foundation.
And if you could tell the witness for -- sometimes I'm going to assert an objection. If you'd just give me one second, a slight pause before you answer, that way I have a chance to get the objection in.
THE INTERPRETER: Sorry.
MR. DAVIS: That's okay. No problem.
BY MR. STEEVES:
Q. Did anybody from Chevron ever inspect your gasoline dispensers?
MR. DAVIS: Objection, assumes facts not in evidence.
THE WITNESS: Well, not from Chevron, they never came to look at that. From the city, they came and checked out the pumps.
BY MR. STEEVES:
Q. Did anyone from Chevron ever provide you with any manuals or instructions for operating your station?
MR. DAVIS: Same objections.

Page 43

THE WITNESS: I don't remember that. I don't remember, but when I bought the place, there was a person that was still working there for a year, and he used to do everything that needed to be done till he left, and then I brought Ashod, after he left.
BY MR. STEEVES:
Q. Do you recall the name of that person?
A. I think his name was Bill, but I think he passed away, and he was there ten years before I bought the place. He was there working ten years, and then he stayed for a year. He used to work for Jim Clements.
(Exhibit No. 15 was marked for identification.)
BY MR. STEEVES:
Q. I'm handing you what has been marked as Exhibit 15 (handing). It's an Official Inspection Report from the Fresno County Health Services Agency, Bates numbers FCDEH-FRESNO-006012 through 006013.
Have you seen this document before?
A. I'm sure I've seen it before.
Q. It looks like it was filled out by a Luis Ledezma, L-e-d-e-z-m-a.
Do you know who Luis Ledezma is?
A. I don't remember who it is. They would -- he used to come and ask us questions, and they would look

Page 44

at everything.
Q. On the first page under observations, it says: We discussed tank lining and tank replacements. Mr. Bedirian is seriously considering replacing or lining, in parentheses, upgrading tanks.
Do you recall having a conversation with the county regarding tank lining or replacement?
A. We used to get... Well, we used to get letters, and when the law started changing, that -- we used to get letters about double-face, and when I changed the tanks and I decided that this was not my business anymore; I had to get out of it.
Q. So you decided rather than upgrading tanks, you would close your gas station; is that correct?
A. Yes.
(Exhibit No. 16 was marked for identification.)
BY MR. STEEVES:
Q. I'm handing you what has been marked as Exhibit 16 (handing). It looks like it's an interoffice memo, County of Fresno, with handwritten notes, Bates number FCDEH-FRESNO-005999.
It looks like it describes a meeting between you and the County of Fresno, including Lisa Smoot and Jim Armstrong, regarding removing the tanks at your

Page 45

station.
Do you recall having that meeting?
A. Yes. That's when we made the decision.
Q. There's a name here, and I'm going to butcher it, Latche, L-a-t-c-h-e, and a last name of --
THE INTERPRETER: V.
MR. STEEVES: That's a V?
THE INTERPRETER: Uh-huh.
MR. STEEVES: Vatche.
THE INTERPRETER: Vatche.
MR. STEEVES: V-a-t-c-h-e.
THE WITNESS: Vatche is my cousin. I used to take him along with me to translate.
BY MR. STEEVES:
Q. Did he work at the station?
A. No.
Q. And in this memo Lisa Smoot describes a conversation about removing the tanks without the use of a contractor.
Do you recall if you used a contractor to remove the USTs from your station?
A. Of course, yeah. I have it here. You took the copy. You have it. I used the same contractor.
(Exhibit No. 17 was marked for identification.)

33e70f58-3086-407f-a292-28d9f8cf8331

We are so careful -- in my business we are so careful not to spill any gas because we are afraid of the fire because if you spill gas and there is fire, that's the worst thing.
Q. So you always did everything you could to prevent spills?
A. Yes.
Q. Earlier you were shown a document, an Underground Storage Tank Unauthorized Release form that discussed or referenced the discovery of contaminants at your station in connection with the tank removals.
Do you recall being shown that document?
A. Of course, I remember that. When I used -- the law used to send me all the time letters to have the tanks removed, and I took that precaution, and I took care of it, and I was a foreigner that came here.
I didn't know the law. I wanted to abide by the laws. If I knew all this, I would have never bought the place.
Q. Other than the release discussed in this one document, were you aware of any other leaks that occurred at your station during the time you operated it?
A. I already came to United States in 1990, and

I bought this place in '91, and if I knew there was any leak, I wouldn't have bought it.
Q. I mean during the time period when you operated it, were you aware of any leaks that occurred?
A. No.
Q. And did you always handle gasoline with the utmost care?
A. I just want to let you know, in my business, gasoline is my enemy. That's why you have to be so careful.
Q. And is that true for all blends of gasoline?
A. Of course. Because like I said, in my business, there's always -- we're afraid of fire, and that's a danger of fire that we have to be careful. We never leave gallons of gas in the garage or anywhere, never.
Q. And you always did everything you could to prevent any spillage of gasoline or releases?
A. Of course.
Q. And that was true for all grades of gasoline?
A. All grades of gasoline.
Q. That was true of gasoline with MTBE in it?
A. I'll tell you the truth, MTBE I never knew what it was, and I'm hearing it -- about it now.
Q. Regardless of the blend? So if gasoline

had -- if it was premium gasoline, you always handled it with care, right?
A. Yes.
Q. And if it had -- if it didn't have MTBE in it, you always handled it with care, right?
A. Yes.
Q. And if it had MTBE in it, you still handled it with a care, right?
A. Of course.
Q. So, to you, it didn't really matter what was the components in the gasoline; no matter what, you always had to handle it with care?
A. Yes.
There is some kind of fluid that we used to bring, I don't remember the name, but we used to clean the tools all with that. So it's anti-fire thing.
Q. Would it be fair to say that you did not need additional warnings from Chevron because no matter what was going to be in the gasoline, you were always going to do everything you could to prevent spills?
A. I never needed... I never needed anything. Yes, I would really take care of everything myself, but maybe in future I would have gotten eventually asked for those kind of papers.
Q. You testified that you obtained your gasoline

from -- was it R.V. Jensen?
A. Yes.
Q. Am I correct that you did not have a direct supply contract with Chevron?
A. No, my work was all with Jensen from beginning to end.
Q. And Chevron didn't operate the station, either, right? You were an independent businessman?
A. (In English) Yes.
Q. Chevron didn't own the tanks or anything like that at the site, either, correct?
A. (Through interpreter) No.
Q. They did not?
THE INTERPRETER: They didn't have, no.
THE WITNESS: Why did I pay to remove them?
BY MR. DAVIS:
Q. Chevron didn't have any authority or control over the tank removal process, did they?
A. No, they never helped me out at all. I even asked them, and they didn't want to help.
Q. Chevron was not involved with the selection of the environmental consultant at your station?
A. No.
Q. You did, though, work with the government in selecting the environmental consultants for the site?