# EXHIBIT 12

## Beacon #3519 (4591 E. Belmont Ave.)

- Valero Defendants' Responses to Plaintiff City of Fresno's First Set of Interrogatories to Defendants, Rog No. 3, p. 7 (Nov. 5, 2008)

- Beacon Oil Company Intra-Company Memorandum (Dec. 3, 1971) (VLO-FRESNO-0010453)

- Email from Debbie Dirks to Julie Johns (Jan. 29, 2001) (VLO-FRESNO-0010454)

- Ultramar Diamond Shamrock Corp. Memorandum (Mar. 1, 2000) (VLO-FRESNO-0010455)

- Facsimile from Tim Mullen, Gasamat Oil Corp. to Ted, Fresno County Environmental (Aug. 27, 2002) (FCDEH-FRESNO-017903)

- Deposition of Gary Singh, pgs. 9-10, 20-21, 84 (Mar. 22, 2011)

LEXISNEXIS FILE & SERVE
22343365
E-SERVICE
Nov 5 2008
5:47PM

UNITED STATES DISTRICT COURT )   Master File No. 1:00-1898
SOUTHERN DISTRICT OF NEW YORK )   MDL No. 1358 (SAS)
                              )   M21-88
                              )
In re Methyl Tertiary Butyl Ether )
("MTBE") Products Liability Litigation )
                              )
                              )   VALERO DEFENDANTS'
                              )   OBJECTIONS AND RESPONSES
This document relates to:     )   TO PLAINTIFF CITY OF
                              )   FRESNO'S FIRST SET OF
City of Fresno v. Chevron U.S.A., Inc., et )   INTERROGATORIES TO
al., No. 04 Civ. 4973         )   DEFENDANTS
                              )

Pursuant to Federal Rule of Civil Procedure 33 and Local Rule 26.3, Ultramar Inc., Valero Marketing and Supply Company, and Valero Refining Company–California (collectively "Valero Defendants") answer and object to Plaintiff City of Fresno's ("Plaintiff" or "City of Fresno") First Set of Interrogatories served on September 2, 2008 as follows.

Dated: November 5, 2008.

_____
J. Clifford Gunter III
M. Coy Connelly
Amy E. Parker
BRACEWELL & GIULIANI LLP
711 Louisiana St., Suite 2300
Houston, Texas 77002-2770
Telephone: (713) 221-1335
Telecopier: (713) 221-1212

Attorneys for Defendants
ULTRAMAR INC., VALERO MARKETING AND
SUPPLY COMPANY, AND VALERO REFINING
COMPANY-CALIFORNIA

Valero Defendants refer Plaintiff to their responses to Interrogatory Nos. 1 and 3 for information responsive to this request.

**INTERROGATORY NO. 3:**

IDENTIFY the address of all gasoline stations that YOU lease or have leased within the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the lease dates for each station YOU identified.

**RESPONSE:**

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is specifically overbroad both with respect to time, as explained in General Objections Nos. 6 and 7, and to the extent it calls for the identification of all gasoline stations owned by Valero Defendants in the RGA without regard to whether any of those stations is in the vicinity of any drinking water production well or whether any of those stations has ever been identified as the source of a release of gasoline containing MTBE. Subject to, and without waiving, the foregoing objections and the General Objections and Limitations set forth above, Valero Defendants answer as follows:

1. #3481: 6390 N. Blackstone, Fresno, CA 93710 (04/11/66—present)
2. #3615: 1625 N. Chestnut Ave., Fresno CA 93703 (07/24/98—present)
3. #3616: 4001 N. Marks Ave., Fresno, CA 93722 (01/22/85—present)
4. #3659: 4514 W. Shaw Ave., Fresno, CA 93722 (08/05/88—present)
5. #3519: 4591 E. Belmont, Fresno, CA 93702 (03/01/71—10/20/99)

In addition to the foregoing, Ultramar PLC acquired some retail stations leases when it purchased Beacon Oil Company through a stock purchase transaction in November, 1981.[1] To the best of Valero Defendants' current knowledge, most, if not all, of the acquired stations were leased and then sub-leased to third parties who actually operated the station in question. However, given the dates of the transactions at issue, the documentation necessary to confirm Valero Defendants' precise relationship with these stations as well as the dates of the leases is no longer available. Approximate dates have been provided where known.

Several of these leaseholds were terminated prior to 1995 when Ultramar Inc. merged with Diamond Shamrock Corporation. Most, if not all, of the leaseholds were terminated prior to the December 31, 2001 merger of Ultramar Diamond Shamrock Corporation with and into Valero Energy Corporation. Notwithstanding the foregoing, the following is the list of all such stations located within the RGA which may have been leased during the relevant time frame:

1. Beacon #77: B Street, Fresno CA (1935—Lease Termination Date Unknown)

---

[1] Beacon Oil Company changed its name to Ultramar Inc., effective September 18, 1989.

2. Beacon #78: Belmont at 12th Street, Fresno CA (1935—Closure Date Unknown)
3. Beacon #80: Tulare & Chestnut, Fresno CA (Dates of Leasehold Unknown)
4. Beacon #496: 4809 E. Kings Canyon, Fresno CA (Dates of Leasehold Unknown)
5. Beacon #595: 3768 S. Highway 99, Fresno CA (09/01/83—03/27/96)
6. Beacon #620: 4594 E. Tulare, Fresno CA (01/22/85—08/28/95)
7. Beacon #658: 1334 N. First St., Fresno CA (Lease terminated 11/01/96)
8. Beacon #257: 9th & McKenzie, Fresno CA (Site leased 10/46. Lease Termination Date Unknown)
9. Beacon #432: 2950 E. Ventura, Fresno CA (Dates of Leasehold Unknown)
10. Beacon #433: 1372 N. First St., Fresno CA (Dates of Leasehold Unknown)
11. Beacon #437: 4652 Belmont, Fresno CA (Dates of Leasehold Unknown)
12. Beacon #438: 4005 E. Jensen, Fresno CA (Dates of Leasehold Unknown)
13. Beacon #460: 603 G. Street, Fresno CA (04/28/75—04/30/90)
14. Beacon #472: 2295 S. Elm Ave., Fresno CA (Dates of Leasehold Unknown)
15. Beacon #516: 2430 E. Olive St., Fresno CA (07/15/85—10/31/91)
16. Beacon #538: 2139 S. Elm, Fresno CA (Lease terminated 11/01/91)
17. Beacon #579: 5190 E. Olive, Fresno CA (Lease terminated 11/01/91)
18. Beacon #619: 3076 E. Gettysburg, Fresno CA (01/22/85—08/03/89)
19. Beacon #9-1: 6900 N. Motel Dr., Fresno CA (Dates of Leasehold Unknown)

**INTERROGATORY NO. 4:**

IDENTIFY the address of all gasoline stations with which YOU have or have had a retail supply contract within the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the retail supply contract dates for each station YOU identified.

**RESPONSE:**

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is specifically overbroad both with respect to time, as explained in General Objections Nos. 6 and 7, and to the extent it calls for the identification of all gasoline stations owned by Valero Defendants in the RGA without regard to whether any of those stations is in the vicinity of any drinking water production well or whether any of those stations has ever been identified as the source of a release of gasoline containing MTBE. Valero Defendants further object to the extent this Interrogatory seeks information outside of Valero Defendants' possession, custody and control. Valero Defendants are not in possession of information pertaining to the operation, maintenance or environmental remediation which may be associated with any of the following stations. Notwithstanding the foregoing or the General Objections set forth above, Valero Defendants respond as follows:

1. #2339: 1919 W. Clinton Ave., Fresno, CA 93705 (06/13/03—present)
2. #2365: 603 G. Street, Fresno, CA 93722 (05/01/93—present)
3. #2516: 2837 N. Parkway Drive, Fresno, CA 93722 (07/18/03—present)

BEACON OIL COMPANY                                    INTRA-COMPANY MEMORANDUM

To:    W. L. Marconi                                  Date:    12/3/71

cc:    V. L. Anderson, R. C. Ingram, D. E. Bacigalupo, J. D. Robertson, G. W. Echols,
       C. J. Sharbaugh, C. L. Davies, L. M. Lockhart, K. Walsh, J. Tash

## LEASE INFORMATION

Lessor:    Irene Armey                        Address:    3481 Mayfair Dr., South, Fresno 3, Calif.

Service Station No.: 519                      Beacon Charge No.:

Address of SS:  4591 E. Belmont, Fresno       Takeover Date: October 11, 1971

Rent Payable:    $165.00 per month *          Account:    18

Term:    15 years                             Options:    one 5 year option

Tax Status:  Beacon pays all taxes            Agencies notified re mailing of
                                              Tax Statements:  Fresno County Assessor by John Tash

Rent Receivable:
    Rent Payable                   $  165.00
    Improvements Depreciation         750.00
    Land Amortized @ 6%               N/A
    Maintenance                        70.00
    Insurance                          10.00
    Taxes                             125.00
                                   $1,120.00

Company Operated:   Yes               Subleased:   No

Insurance:   Clancy Childs by this memo.

Remarks:   * The lease calls for an increase of rent in the amount of 5% per month over
           the rental paid during the preceeding year for the duration of the lease and any
           extension. As an example, rental for the first year is $165.00 and the 5th year
           it will be $206.25, the 10th year $247.50 and the 15th year $288.75.

                                              J. C. Montgomery

JCM:es

BH003663

VLO-FRESNO-0010453

## Dirks, Debbie

**From:** Fishburn, Rob
**Sent:** Tuesday, January 30, 2001 12:45 PM
**To:** Dirks, Debbie
**Cc:** Johns, Julie
**Subject:** FW: Unit # 3519 - 4591 E. Belmont, Fresno, CA

Debbie Dirks,
We are in the early stages of assessment at the above-mentioned site. However, there appears to be hydrocarbon impacts to soil. Therefore, I anticipate being directed to do more assessment work in the future. At this point, I would predict a two to three year period of addressing the environmental issues at the site. Feel free to contact me if you have more specific questions regarding these matters. Thanks, Rob F.

-----Original Message-----
**From:** Johns, Julie
**Sent:** Monday, January 29, 2001 8:59 AM
**To:** Fishburn, Rob
**Subject:** FW: Unit # 3519 - 4591 E. Belmont, Fresno, CA

Julie Johns
Retail Environmental Services
Hanford CA
Phone 559-583-3251
Rightfax #210-370-5194

-----Original Message-----
**From:** Dirks, Debbie
**Sent:** Monday, January 29, 2001 8:58 AM
**To:** Johns, Julie
**Cc:** Holeman, Tim; Miller, Doug (Real Estate)
**Subject:** Unit # 3519 - 4591 E. Belmont, Fresno, CA

We assigned this location to Gasamat and retained a remediation agreement at closing. Is this an ongoing remediation or to be followed for an extended length of time?

If we will be following for a while, do we have any idea for length of time? 3 years?

Thanks

**Debbie Dirks**
*Real Estate Dept. - Ext. 4523*
Debbie_Dirks@udscorp.com

# ULTRAMAR DIAMOND SHAMROCK
## CORPORATION

## MEMORANDUM

TO: Distribution

FROM: Debbie Dirks

DATE: March 1, 2000

SUBJECT: **UPDATED – Additional Money Received for Inventory**
Final three of the five units sold to Gasamat

---

On October 20, 1999, UDS completed the sale of 5 branded operating gasoline convenience stores located in California. The Buyer was Gasamat Oil Corporation of Colorado. The properties were sold under the terms of a Purchase Agreement and Escrow Instructions between Ultramar Inc. and Gasamat Oil Corp. of Colorado dated August 20, 1999.

The owned equipment at each property was included in the sales price. This equipment was conveyed by Bill of Sale to Gasamat. The inventory of motor fuel and merchandise was conveyed under the same Bill of Sale. The inventory was conducted the evening of October 19, 1999 and the total inventory amount was $224,406.79. This amount was escrowed to Tulare Title Company by wire transfer from American Title Company on October 20, 1999. This money is held in escrow until all the ABC licenses are transferred.

The ABC licenses are now being transferred one by one to Gasamat Oil Corporation. Attached is the information for closing of escrow on the inventory for the final 3 of the 5 locations.

Unit # 3361 – Tulare - $76,513.83
Unit # 3519 – Fresno - $68,869.90
Unit # 3638 – Fresno - $71,774.99

The documents pertaining to this closing will be retained in the Real Estate files. Copies of select documents have been distributed as noted below as hard copies. If you have any questions or need additional documents, please contact Debbie Dirks or Doug Miller in the Real Estate Department at extension # 4523 or # 4346.

**DISTRIBUTION**

| | | |
|---|---|---|
| Cathy Lane | Sharon Kaltenbacher | Tom Austin |
| Chuck Weber | Cheryl Ornelas | Gary Rosa |
| Steve Blank | Cara Whiteside | Doug Miller |
| Peggy Gowans | Diane LaValley | Tim Holeman |
| Jan Williams | Ron Mechler | Debbie Dirks |
| Diane Allison | Connie Gannon | Shirley Myers |
| John Fitzgibbons | Cheryl Trevor | Marilyn York |

M:dkd:Closing/documents/gasamat closing memo

Page Two
February 15, 2000
UDS Sale of 5 Operating Units in California
To Gasamat Oil Corporation of Colorado

**Hard Copy Documents Sent to the Following Via Interoffice Mail:**

| | |
|---|---|
| Diane LaValley: | Settlement Statement |
| Connie Gannon: | Settlement Statement |
| Cheryl Ornelas: | Settlement Statement |
| John Fitzgibbons: | Settlement Statement |
| Cara Whiteside | Settlement Statement, checks |

The properties sold with the ownership status and owning entity are as follows:

| Unit # | Street Address | Fee/Lease | Entity |
|---|---|---|---|
| 3361 | 610 West Inyo<br>Tulare, California | Fee | Ultramar Inc. |
| 3519 | 4591 East Belmont<br>Fresno, California | Lease | Ultramar Inc. |
| 3534 | 2519 Esplanade<br>Chico, California | Fee | Ultramar Inc. |
| 3638 | 525 South Clovis Avenue<br>Fresno, California | Fee | Ultramar Inc. |
| 3697 | 7282 Franklin Boulevard<br>Sacramento, California | Fee | Ultramar Inc. |

M:dkd:Closing/documents/gasamat closing memo

08/28/2002 WED 14:36 FAX 303 442 0930 GASAMAT ☒001/002

PREL

Gasamat Oil Corp
3223 Arapahoe Avenue
Boulder, Colorado 80303
Tel 303-442-2520
Fax 303-442-0930

## facsimile transmittal

| To: | Ted  Fresno County Environmental | | |
|---|---|---|---|
| From: | Tim Mullen ext 224 | Date: | 08/27/02 |
| Re: | 4591 E Belmont Purchase & Sale Agreement | Pages: | 2 |
| CC: | | | |

x For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

Ted,

Reference is made to the subject matter. Included in this fax is page one of the referenced document. Paragraphs 1(b) and 1(c) clearly state that Mr. Gill purchased all improvements, buildings and equipment, the only exceptions being the computer system, software & credit card machine.

Please call if you need additional information.

Thanks,

Tim Mullen

CONFIDENTIAL

FCDEH-FRESNO-017903

08/28/2002 WED 14:37 FAX 303 442 0930 GASAMAT ☒002/002

08/17/2001 14:08 FAX 312 64_ 7807     N R C      P.01  ☒003

96.1

## PURCHASE AND SALE AGREEMENT

Part I

THIS AGREEMENT made and entered into this _17_ day of _July_, 2001 by and between Gasamat Oil Corp. of Colorado hereinafter referred to as ("Seller") and _Nirmal S.G.H_ (hereinafter referred to as "Purchaser")

Part II

1. Seller agrees to sell and convey and Purchaser agrees to purchase and accept conveyance of:

    (a) The ~~real~~ lease Property ("Property") located at _4591 E. Belmont, Fresno, CA._ store # _961_. The real Property is more fully described on Exhibit "A" attached hereto, and it is agreed that should the description set forth on Exhibit "A" not be the same as the legal description finally determined for the purposes of the title insurance or title opinion to be issued pursuant hereto, then the description set forth on Exhibit "A" shall be deemed to be amended to conform to the legal description finally determined for the purposes of such title insurance or title opinion, and the documents to be provided or executed at Closing shall contain, where necessary, such amended legal description.

    ~~(b) The improvements and buildings including, without limitation all electrical, mechanical, plumbing, security systems, as well as signs, sign posts, plants, trees and shrubbery, all rights, privileges, easements, right-of-way and appurtenances thereon or relating to the beneficial use thereof. Gasamat identity signs and logos are the property of the Seller and will be removed at closing. The Gasamat Trade name is the property of the Seller, and is not included with the Property. Purchaser must apply for all branding and licenses which include: UDS, Cardlock Fuels, Beacon, Arco, and Smoker Friendly brands. Computer systems, proprietary software and credit card machines will be removed prior to closing. Lottery, and ABC licenses are not transferable, and Purchaser must make it's own applications.~~

    ~~(c) The personal property including those furniture, fixtures and equipment which are owned by Seller and located on Property.~~

    (d) The merchandise and motor fuel inventory and supplies to be purchased separately at closing at 66% of retail price for merchandise, at Seller's cost for cigarettes and at Seller's landed cost for motor fuel including all applicable taxes. Deli and fountain ingredients and supplies shall be at Seller's cost.

    (e) The sale is subject to the Terms and Conditions which have been provided to Purchaser in the sales brochure and PSP package. Should the Terms and Conditions conflict with this Agreement, this Agreement shall prevail.

2. PURCHASE PRICE The purchase price for the Property is $ _300,000_ ("Purchase Price"), payable all in cash as follows:

    (a) Bid Deposit of $ _7500_ which is equal to 2.5% of the purchase price stated above.

    (b) Additional Earnest Money $ _22,500_. This is the difference between ten percent (10%) of the Purchase Price and the Bid Deposit. The Additional Earnest Money is due

1

NRC 108 P&S AGMT

FCDEH-FRESNO-017904

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-oOo-

In re: Methyl Tertiary Butyl
Ether ("MTBE") Products
Liability Litigation
                            Master File No.
                            1:00-1898
This Document Relates To:
                            Case No.
City of Fresno              MDL 1358(SAS)
v. Chevron U.S.A. Inc., et al.,
Case No. 04 Civ. 4973

DEPOSITION OF GARY SINGH
March 22, 2011 at 9:00 (9:09) a.m.
Before: ERIC L. JOHNSON
RPR, CSR #9771

Taken at:
Fresno, California

Page 2

INDEX OF EXAMINATION

Examination by:                              PAGE
MR. MASSEY............................... 8
MR. PATTON............................... 101
MR. FINSTEN.............................. 114
FURTHER EXAMINATION BY MR. MASSEY........ 117

-oOo-

Page 3

EXHIBITS MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | List of service stations in Fresno | 10 |
| 2 | Deposition Notice | 14 |
| 3 | Map dated April 5th, 2001, Bates RWQCB-FRESNO 16239 | 39 |
| 4 | Underground Storage Tank Permit Application, Bates No. FCDEH-FRESNO 17103 - 17106 | 49 |
| 5 | List of jobbers, beginning with Ace Oil Company and ending with Yakima Oil Company | 51 |
| 6 | Product Safety Bulletin for MTBE | 55 |
| 7 | Exhibit 7 is an Underground Storage Tank Abandonment Inspection Report Bates numbered RWQCB-FRESNO-16344 | 62 |
| 8 | Letter dated February 18th, 1999, transmitting a Tank Removal/Closure Report, Bates RWQCB-FRESNO 16887 - 16913 | 69 |
| 9 | Letter dated July 22nd, 1999, Bates RWQCB-FRESNO 16323 | 73 |
| 10 | Letter dated November 24th, 1999, Bates RWQCB-FRESNO 16315 - 16316 | 75 |
| 11 | Letter dated September 7th, 2000, Bates RWQCB-FRESNO 16301 | 77 |
| 12 | Results of Soil and Groundwater Investigation dated April 6th, 2001, Bates RWQCB-FRESNO-16620 through 16760 | 81 |
| 13 | Environmental Health Application dated January 9th, 2002, Bates FCDEH-FRESNO 17647 | 81 |

////

Page 4

EXHIBITS (CONTINUED)

| 14 | Letter dated May 18th, 2001, Bates RWQCB-FRESNO 16289 - 16291 | 86 |
|---|---|---|
| 15 | Underground Storage Tank Upgrade Certificate dated February 22nd, 2002 | 89 |
| 16 | Permit to Operate an Underground Storage Tank, Bates FCDEH-FRESNO 17860 - 17861 | 91 |
| 17 | Fax dated August 27th, 2002, FCDEH-FRESNO 17903 - 17904 | 93 |
| 18 | Environmental Health Application, Bates FCDEH-17824 | 96 |
| 19 | Letter dated February 4th, 2003, Bates FCDEH-FRESNO-18060 - 18061 | 97 |
| 20 | Facility Information Record/Change Form, Bates FCDEH-FRESNO 17629 | 99 |
| 21 | Letter from the California Regional Water Quality Control Board titled Case Closure Leaking Underground Storage Tank Site, Bates BEACON3519 | 112 |

-oOo-

Page 9

1  No. 3519 that was located at 4591 East Belmont in
2  Fresno. Did you operate that station for a period of
3  time?
4    A. No. When I -- when I purchased that place, it
5  was ARCO, not the Beacon.
6    Q. Okay. Did you operate a station -- a gas
7  station at that address, 4591 East Belmont in Fresno?
8    A. Yeah, I am still doing it.
9    Q. Okay. And when did you start operating it?
10   A. 2001.
11   Q. Okay. Do you recall the month?
12   A. In January.
13   Q. Okay.
14   A. I think January 10th.
15   Q. And you have been operating it continuously --
16   A. Yes.
17   Q. -- since that time?
18   A. Yes.
19   Q. All right. And do you own the station?
20   A. I own -- I'm not own the property, but I own
21  the equipment and the building and everything.
22   Q. Okay. And do you own the underground storage
23  tanks?
24   A. Yes.
25   Q. And who owns the property?

Page 10

1    A. His name Melvin Armey.
2       MR. MASSEY: I have marked as Exhibit 1 a list
3  of service stations in Fresno. And I want to give it to
4  you and have you look at it and tell me if you have
5  worked at any of the other stations that are on this
6  list.
7          (Deposition Exhibit 1 marked for
8           identification)
9       THE WITNESS: That's the one we have, 319245
10 (sic), that's -- that's the one, we own it.
11      MR. MASSEY: Q. Okay.
12   A. Yes.
13   Q. And that's the third or fourth one on the list?
14   A. That's the third one.
15   Q. Okay. So the only one is the one that we are
16 here to talk about today?
17   A. Yes.
18   Q. Okay. And what do you call the station?
19   A. Now? ARCO Gas and Food.
20   Q. Okay. If I refer to it as "the station," will
21 you understand what I am talking about?
22   A. Yes.
23   Q. Okay. And for exhibits, you want to keep them
24 in front of you. You can just turn them over like that
25 and stack them.

Page 11

1    A. Okay.
2    Q. We may refer back --
3    A. Okay.
4    Q. -- to exhibits we have previously looked at
5  during the course of the day. Have you ever had your
6  deposition taken before?
7    A. No.
8    Q. Okay. I am going to go over some basic ground
9  rules so you understand how we will proceed today.
10   A. Yeah.
11   Q. You understand that you just took an oath to
12 tell the truth --
13   A. Yes.
14   Q. -- and your testimony here is under penalty of
15 perjury as if we were in a court of law.
16   A. Okay.
17   Q. Okay. It is important that the court reporter
18 can clearly type your testimony and any questions or
19 objections that are made. So even if you know what I am
20 going to ask you, allow me to finish my question before
21 you give your answer.
22      Do you understand that?
23   A. Okay. Yes.
24   Q. Okay. And from time to time counsel in the
25 room or on the phone may object to the question being

Page 12

1  asked. If you would wait until those objections are
2  made until you -- to give your answer, that will allow
3  the court reporter to make a clear record.
4    A. Okay.
5    Q. It is also important that you give verbal
6  responses. So if we were talking like a normal
7  conversation, you might nod your head to say yes or no,
8  but here you want to say yes or no, or otherwise give a
9  verbal response to questions.
10      Do you understand that?
11   A. Yes.
12   Q. You are doing great so far.
13   A. Thanks.
14   Q. It is also important that you understand my
15 questions. If you don't, just let me know and I will
16 restate or clarify.
17   A. Okay.
18   Q. We are entitled to your best recollection.
19 That includes if you have partial information, an
20 estimate of some type of information based on what you
21 know. I don't want you to guess if you have no
22 information.
23   A. Okay.
24   Q. I will draw the distinction this way: If I
25 asked you to estimate the size of this table, you could

Deposition of Gary Singh  /  March 22, 2011

Page 17

1   Q. Okay. Have you ever studied chemistry?
2   A. No, only -- we did but until in the 10th grade,
3   not in college.
4   Q. Do you have any specialized training in
5   handling chemicals?
6   A. No.
7   Q. Do you have any specialized training in
8   toxicology?
9   A. No.
10  Q. Do you have any specialized training in
11  epidemiology?
12  A. No.
13  Q. Okay. Did you receive any specialized training
14  in handling chemicals or gasoline at the time you
15  started operating the station?
16  A. Yes. I have the lady who does the monthly
17  service, and she -- show her how to do it, if spill the
18  gas and all that stuff. So we have that training.
19  Q. And that was when you first started operating
20  the station?
21  A. Yes.
22  Q. Okay. And do you recall the name of the lady?
23  A. Her name is June, J-u-n-e.
24  Q. Okay. Do you recall her last name?
25  A. No, I don't remember.

Page 18

1   Q. And who does she work for?
2   A. She have own company. They call J&J, so she
3   does inspection monthly for the city, you know, so --
4   Q. Okay. And how did you come to have training by
5   her? Was it suggested to you by somebody or was it your
6   own choice?
7   A. No, we -- we don't have a choice, but we have
8   to be hire somebody to do that, monthly service.
9   Because if you want to do the monthly service you have
10  to attend some kind of classes, and we don't have a
11  time, but she did. So that we pay every month to her
12  and she -- teach her how to do it, you know.
13  Q. Okay. What do you mean by monthly service?
14  A. That's for the health department. We have to
15  be checked on all nozzles and everything, you know, and
16  the buckets and everything is clean and all the
17  paperwork and everything.
18  Q. Okay. And so it was a requirement from the
19  county?
20  A. Yes. Because when we have the test, like every
21  year so they see all the paperwork.
22  Q. Okay. And so that training was designed to
23  help you meet the regulations?
24  A. The regulations, yes, sir.
25  Q. Okay. Did anybody from ARCO provide you any

Page 19

1   training at the time you started operating the station?
2   A. No.
3   Q. Did anybody from Beacon or Ultramar or Valero
4   provide you any training when you started operating the
5   station?
6   A. Yeah, they did -- because basically we ARCO but
7   we through Valero. So when we bought, whatever the
8   manager there, they like give us training like for a
9   complete month, you know, do this, do that, you know,
10  all the paperwork, and help us to -- how to run that,
11  you know, gas station and all that stuff.
12  Q. Okay. And did the gas station have a
13  convenience store in it at the time you started --
14  A. Yes, the little mini-market.
15  Q. Okay. And was the training designed to help
16  you run the accounts at the convenience store?
17  A. Yes.
18  Q. Okay. And also do the accounting for the
19  gasoline sales?
20  A. Yeah, but our bookkeeper does all that stuff.
21  Q. Okay. And did the training include how to keep
22  the station clean or how to maintain it?
23  A. Yes. Because from ARCO we have every month --
24  I mean, they call, check up every month, so they give us
25  the point, you know, so they go through every single

Page 20

1   item.
2   Q. So somebody comes out from ARCO each month?
3   A. Each month to do the inspection, you know, all
4   the pumps clean and all the -- you know, the trash cans
5   properly in the right place and all that stuff.
6   Q. And did the training that you got from Valero,
7   as I recall it, when you started operating the station,
8   include how to respond to a spill of gasoline, if one
9   were to occur at the station?
10  A. Yeah, but we don't have the big one like
11  someone trying to fill up the tank, you know, they just
12  overfill, you know, so -- so we have -- so they show us
13  how to clean it, get the stuff, and just -- just that
14  kind of basic stuff. So --
15  Q. And then if there is a bigger one, you had
16  instructions for how to respond to that, to call
17  somebody, for example, or --
18  A. Yes. Yes. We have the company who take care
19  of that. So if we have that kind of problem so we call
20  them and they came right away and --
21  Q. Was the station branded ARCO when you started
22  operating it?
23  A. Yes.
24  Q. So the price sign said ARCO on it?
25  A. Yes.

5 (Pages 17 to 20)

Deposition of Gary Singh  /  March 22, 2011

Page 21

1   Q. And the fuel canopy said ARCO on it?
2   A. Yes.
3   Q. And the station building itself said ARCO on
4   it?
5   A. Yes.
6   Q. Okay.
7   A. When we -- when I purchased that gas station,
8   it had been six years before I purchased, it was ARCO.
9   Q. So going back six years prior to your purchase
10  it had been an ARCO station?
11  A. It was ARCO, yes.
12  Q. Okay. And beginning in 2001 when you first
13  started operating the station, did you purchase the
14  buildings and the underground storage tanks at that
15  time?
16  A. Yes.
17  Q. And has it been your responsibility during the
18  time that you have operated the station to test the
19  tanks for tightness, make sure that --
20  A. Yes.
21  Q. -- they are not leaking?
22  A. Yes.
23  Q. Is it also your responsibility to test the
24  piping, the product lines that connect the tanks to the
25  dispensers?

Page 22

1   A. Yes. Because I have a company from Sacramento,
2   so they like three year they did the test and
3   everything, because we have a double-walled tanks. So
4   after that they said we don't have any problem, so we
5   good for like at least 50 years, so --
6   Q. Okay. How often are they -- how often are the
7   tanks tested to see if they leak?
8   A. I think that is from the -- I think they are
9   from state, they came from, so they don't tell us, they
10  just do automatically whenever they want. And they
11  just -- probably they have some kind of period of time
12  so they have to check. And they check, and after that
13  they give us the final paper, hey, you good, you know,
14  we don't have any problems. So --
15  Q. And do you get a bill for that?
16  A. No, we don't.
17  Q. So you don't have a service that comes out --
18  A. No.
19  Q. -- periodically to test the tanks?
20  A. No, we do have that. They have a different
21  test, not for the tanks.
22  Q. Okay. What about for the tanks and the product
23  lines? Who comes out to test those to make sure that
24  they are not leaking?
25  A. It is underground, the tank?

Page 23

1   Q. Yes.
2   A. They did, but they said we good for like almost
3   30 years. I don't -- we don't have to do anything.
4   Q. Who is "they"?
5   A. That company from Sacramento who did the test.
6   Q. Okay. And so they are not coming out regularly
7   anymore?
8   A. No, no more. They stop like when I purchased
9   the place, they came like once or twice, and they said
10  they don't have to come down here anymore. We are good,
11  and there isn't any problem and all that stuff.
12  Q. Okay. And was that in 2001 or 2002?
13  A. I am not sure.
14  Q. And are you responsible for maintaining the
15  dispensers themselves?
16  A. Yes.
17  Q. Okay. That includes the nozzles and the hoses
18  and the --
19  A. Yes, everything.
20  Q. Okay. And changing the fuel filters and the
21  dispensers?
22  A. Yes.
23  Q. Regarding the training that you received when
24  you first started operating the station, did you get
25  anything in writing, with instructions or training for

Page 24

1   how to operate the station?
2   A. Not really. Probably I don't remember if
3   I did, because it has been like a while, ten, 11 years
4   ago, so -- at that time we have too much stuff and
5   headaches, you know, do this, do that, so I'm not
6   remember if they give to us or not. So --
7   Q. Let's talk a little bit more in detail. What
8   was the instructions regarding keeping the station clean
9   or maintaining the station?
10  A. Just like now -- now it is totally different,
11  like seven, eight years ago they changed the law. Every
12  morning we have to go outside, check the nozzles, check
13  the hoses and all that stuff. There isn't any spill or
14  anything. If little holes, we have to change the
15  nozzles or hose right away. If the air pollution guys
16  come to our site, usually they call us to come down
17  here, they can stop anytime they want. So if they find
18  anything, you know, like nozzles breaking and hoses
19  breaking, so we have to pay a fine for it. And, plus, I
20  have to keep all the record, paperwork, whatever
21  inspection I do every morning. When they do tests every
22  six month or year, they look at all the paperwork.
23  Q. And have you ever found in those daily
24  inspections you do any of the nozzles leaking?
25  A. If we find it we change right away.

6 (Pages 21 to 24)

DEPOBOOK REPORTING SERVICES, LLC (800) 830-8885

Deposition of Gary Singh  /  March 22, 2011

Page 81

and Groundwater Investigation dated April 6th, 2001, Bates No. RWQCB-FRESNO-16620 through 16760.
          (Deposition Exhibit 12 marked for identification)
     MR. MASSEY: You were operating the station by April 6th, 2001; is that correct?
     A. I think so, yeah.
     Q. Okay.
     A. I think 2001 or 2002. I think it is 2001 or 2002.
     Q. Okay.
     A. I am not pretty sure it was 2002 or 2001. I have to look at the date. Okay. I am not sure it is 2001 or 2002, because it is in the paper, so --
     Q. Let's put this exhibit aside just for a second.
     A. Okay.
     Q. We are going to use it in a second. But I'll mark as Exhibit 13 an Environmental Health Application which is dated apparently January 9th, 2002.
     A. Yeah, so that's -- that's the date we probably purchased, 2002, then.
          (Deposition Exhibit 13 marked for identification)
     MR. MASSEY: And it has got Bates number FCDEH-FRESNO-17647.

Page 82

     Q. Have you seen this document before?
     A. Yeah, that's my handwriting.
     Q. Okay. Is that your signature on this document?
     A. Yes.
     Q. All right. And is this a true and correct copy of the application that you filed on this date?
     A. Yes.
     Q. Okay. And it indicates at the bottom, about three-quarters of the page down, ownership change, and then business name change and billing address change.
          Do you see that?
     A. Billing address? You are talking about right here?
     Q. Little bit up a few -- like three lines up from there.
     A. Yes, this is the ownership change -- yeah, food, gas only, yes.
     Q. Okay. It says for food only; is that right?
     A. For food only, yes.
     Q. Okay. And then it says, "Gas-O-Mat Corp. is to remain UST owner." Do you see that?
     A. Yes.
     Q. Okay. Was there some point in your purchase of the equipment and starting operating the site that you were going to just operate the mini-mart and not operate

Page 83

the gas stations?
     A. No, we were going to operate the gas station, too, I think so, yeah. That's what we still doing since that.
     Q. Okay. And that was your -- as you recall it, that was the intention from the very beginning?
     A. Yeah, like it is.
     Q. Okay. Do you recall at any point in time that Gas-O-Mat Corporation was to remain the underground storage tank owner as is written here?
     A. I don't know. I am not sure because -- whatever the paper say, so it might be this though.
     Q. Okay. It is your understanding that you bought the buildings and the underground storage tank at the same time to start operating the businesses?
     A. Yes, I think that's probably the agreement. Yeah.
     Q. All right. And then at that same time you started leasing the property from Melvin Armey?
     A. Yeah, but I am not sure who is the owner of the underground tanks and all that because we purchased business from Valero, so I am not sure what comes with it, you know, so -- because before that property owner and Valero have the lease. I don't know how the lease there work. So --

Page 84

     Q. You recall you purchased everything from Valero --
     A. Valero, yeah.
     Q. -- not from Gas-O-Mat?
     A. Yeah.
     Q. So not from Gas-O-Mat, from Valero?
     A. Yeah. From Beacon or Diamond Shamrock, whatever, no Gas-O-Mat, yes.
     Q. Okay. Does this document refresh your recollection as to the time frame of your taking over the business?
     A. Yes.
     Q. Okay. And what time frame was that?
     A. I think we take over on the 10th.
     Q. Of what year?
     A. 2002. Yeah, before we fill up the application here.
     Q. Okay. So let's put that aside for now and let's look back at Exhibit 12, which we were just looking at. And if you would turn to Figure 2, which is Bates Page 16633.
     A. 16663?
     Q. 16633. This map is similar to the one that we looked at earlier, correct?
     A. Yes.