UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | : : : : : | Master File No. 1:00–1898 MDL 1358 (SAS) M 21-88 |
| This document relates to: | : : | |
| *City of Fresno v. Chevron U.S.A., Inc., et al.,* 1:04-cv-04973 | : : : | |

PLAINTIFF CITY OF FRESNO'S OPPOSITION TO
CERTAIN DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFF'S NUISANCE CLAIMS

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   Legal Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.  Under California Law, A Manufacturer and Supplier of a Product Who
      Provides Improper Storage and Handling Instructions That Fail to prevent
      Contamination May be Liable For The Creation Of A Nuisance . . . . . . . . . . . . . . 3

IV.   Defendants Assisted In The Creation of a Nuisance in Fresno By Failing
      To Provide Proper Training Even When Inspecting Stations, and By Providing
      Improper Handling And Storage Instructions That Contributed To Significant
      Groundwater Contamination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Before MTBE Was Added to Gasoline in California, Defendants Knew
            MTBE Gasoline Posed Different Environmental Risks Than Non-MTBE
            Gasoline And That Additional Storage and Handling Procedures Needed
            to Be Implemented to Avoid Releases Which Would Create Substantial
            Groundwater Contamination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            The 1980s . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            The 1990s . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    Handling and Storage Instructions Provided by Defendants to the Stations
            at Issue Did Not Disclose the Increased Risks Posed by MTBE and the
            Inadequacy of Their USTs to Handle The Risk, Nor Did Defendants
            Instruct Owners and Operators on Storage and Handling Procedures
            Which Would Have Addressed the Increased Risk . . . . . . . . . . . . . . . . . . . 17

            1.    Chevron-Van Ness Auto, 2740 North Van Ness . . . . . . . . . . . . . . . 18

            2.    Shell-M & S Texaco, 2619 South East Avenue . . . . . . . . . . . . . . . 19

            3.    Valero-Exxon, Valley Gas and Beacon #3519 . . . . . . . . . . . . . . . 20

                  a.  Exxon Service Station, 4594 East Tulare Street . . . . . . . . . . . . . 22

                  b.  Valley Gas, 2139 Elm Street . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                  c.  Beacon #3519, 4591 E. Belmont Avenue . . . . . . . . . . . . . . . . . . 23

d. __Beacon-Arco #615, 1625 Chestnut Avenue__ . . . . . . . . . . . . . . . . . . 24

V.   __Conclusion__ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## Table of Authorities

<u>Cases</u>

*Celotex Corp. V. Catrett* (1986)
    477 U.S. 317, 322 ................................................. 2

*City of Modesto Redevelopment Agency v. Superior Court* (2004)
    119 Cal.App.4th 28 .............................. 4, 5, 7, 8, 9, 11, 22, 26, 28, 32

*City of San Diego v. United States Gypsum Co.* (1994)
    30 Cal.App.4th 575 ................................................ 7, 8

*County of Santa Clara v. Atlantic Richfield Co.* (2006)
    137 Cal.App.4th 292 ............................. 4, 6,7, 8, 9, 11, 22, 26, 28, 32

*Gallin v. Poulou* (1956)
    140 Cal.App.2d 638, 642-646 ....................................... 4

*Gallo v. Prudential Residential Servs. Ltd. Partnerships* (2d Cir. 1994)
    22 F.3d 1219, 1223 ................................................ 2

*Hardin v. Sinclair* (1896)
    115 Cal. 460, 463 ................................................. 4

*In Re Methyl Tertiary Butyl Ether Products Liability Litigation* (S.D.N.Y. 2001)
    175 F.Supp.2d 593, 629 ........................................... 1, 5

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation* (S.D.N.Y. 2009)
    676 F.Supp.2d 139, 144 ........................................... 2, 3

*Mangini v. Aerojet-General Corp* (1991)
    230 Cal.App.3d 1125 .............................................. 4

*Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp* (1986)
    475 U.S. 574, 587 ................................................. 2

*Newhall Land & Farming Co. V. Superior Court* (1993)
    19 Cal.App.4th 334, 341 ........................................... 3

*Roy v. Alad Corp.* (1977)
    19 Cal.2d 22, 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Selma Pressure Treating Co. V. Osmose Wood Preserving Co* (1990)
    221 Cal.App.3d 1601 . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 8, 9, 10, 22, 26, 28, 32

*Shurpin v. Elmhirst* (1983)
    148 Cal.App.3d 94, 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State of California v. Campbell* (9th Cir. 1998)
    138 F.3d 772, 782 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

**Statutes**

Federal Rules of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Civil Code §3479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Other Authorities**

Prosser & Keeton, Law of Torts (4th ed. 1984) section 86, p. 618 . . . . . . . . . . . . . . . . . . . . 8

Restatement 2d Torts, § 824 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Witkin, Summary of California Law (10th ed. 2008) Equity, §138, p. 459 . . . . . . . . . . . . . . . . 3

5 Witkin, Summary of California Law (9th ed. 1988) Torts, §204, p. 704 . . . . . . . . . . . . . . . . 4

## I.    **Introduction**

Certain Defendants' Motion for Partial Summary Judgment on Plaintiff's Nuisance

Claims seeks summary judgment for one of three defendant groups (Chevron, Shell, and Valero)

at six stations at issue.  The motion is based "on the ground that the City lacks evidence

demonstrating that the Defendants took 'affirmative acts' that created or assisted in creating a

nuisance" at the stations at issue.  (Certain Defendants' Notice of Motion, at 2.)

Defendants' motion defines "affirmative acts" so narrowly as to foreclose nuisance

liability unless defendants' own personnel were directly involved in causing the release.

Defendants assert that they can only be liable for nuisance if they (1) owned or operated the sites,

(2) manufactured the equipment which released the gasoline or (3) affirmatively instructed an

operator to improperly dispose of MTBE gasoline.  This is not the standard for establishing that a

defendant created or assisted in the creation of a nuisance.  Under California law, affirmative acts

leading ot nuisance can encompass a wide variety of activities.  The focus is, and should be, on

the connection between defendants' affirmative actions and the nuisance.

The City's evidence, as set forth below, establishes that defendants took affirmative acts

to assist in the creation of a nuisance.  These acts included exercising control over their product

at the gasoline stations and promoting and marketing MTBE while concealing from regulators,

station operators and the public the dangers posed by MTBE.  *See In Re Methyl Tertiary Butyl*

*Ether Products Liability Litigation* (S.D.N.Y. 2001) 175 F.Supp.2d 593, 629 ("*In Re MTBE*")

(evidence that defendants "marketed and promoted the use of MTBE by misrepresenting its

chemical properties . . . and actively conspired to conceal the threat posed by MTBE . . . are

sufficient to demonstrate defendant's participation and assistance in the creation of a nuisance.")

1

## II.   Legal Standard for Summary Judgment.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994).

"An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 676 F.Supp.2d 139, 144 (S.D.N.Y. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ." *In re MTBE*, 676 F.Supp.2d at 144 (quoting *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)). "[A]ll that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *In re MTBE*, 676 F.Supp.2d at 144 (quoting *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)).

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the nonmoving party and draw all reasonable

inferences" in that party's favor. *In re MTBE*, 676 F.Supp.2d at 144 (quoting *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009)). However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *In re MTBE*, 676 F.Supp.2d at 144-45 (quoting *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006)). Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *In re MTBE*, 676 F.Supp.2d at 145 (quoting *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009)).

## III.    Under California Law, A Manufacturer and Supplier of a Product Who Provides Improper Storage and Handling Instructions That Fail To Prevent Contamination May Be Liable For The Creation Of A Nuisance.

In California, "[a]nything which is injurious to health ... or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance." (Cal. Civ. Code § 3479.) Those who pollute groundwater – and threaten a public water supply – unquestionably commit a nuisance. (See, e.g., 13 Witkin, Summary of Cal. Law (10th ed. 2008) Equity, § 138, p. 459 [citations omitted] ["[c]ases holding that the deposit of material or pollution on land is a nuisance are legion."]; Rest.2d Torts, § 832 ("nuisance includes an invasion of one's interest in the use and enjoyment of . . . water resulting from another's pollution of . . . ground waters"); *Newhall Land & Farming Co. v. Sup. Ct.* (1993) 19 Cal.App.4th 334, 341 ("Pollution of water constitutes a public nuisance . . . ."); *State of California v. Campbell* (9th Cir. 1998) 138 F.3d 772, 782 ("Under [California] laws, polluted water is a public nuisance, . . . and any person who creates or helps create or maintain a nuisance is liable for its abatement and damages").)

3

Adopting the Restatement Second of Torts standard, California imposes nuisance liability on those who "negligently" cause a "third person" or a "thing" to enter plaintiff's property. (*Gallin v. Poulou* (1956) 140 Cal.App.2d 638, 642-646 (adopting Rest.2d Torts, § 165)  Thus, "not only is the party who maintains the nuisance liable but also the party or parties who *create or assist in its creation* are responsible for the ensuing damages." (*Shurpin v. Elmhirst* (1983) 148 Cal.App.3d 94, 101 [emphasis added]; *State of California v. Campbell, supra,* at 778 (applying California law); *Hardin v. Sinclair* (1896) 115 Cal. 460, 463; *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125.)

Applying these basic principles, California courts have found that a manufacturer of a product can be held liable under nuisance for groundwater contamination caused by the manufacturer's products when the manufacturer participates in the creation of the nuisance by providing instructions for use and handling of the product which make groundwater contamination inevitable, and by failing to provide warnings about environmental risks known to the manufacturer which could have mitigated or prevented the contamination. (*Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601 ("*Selma Pressure Treating*"); *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 (*City of Modesto*); and *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292 (*County of Santa Clara*).)

*Selma Pressure Treating* one of the first cases to consider application of nuisance liability to a manufacturing defendant expressly found that it is the connection between the defendants' conduct and the creation of a nuisance which is the critical factor:

> [I]f we *can say improper disposal or storage of the chemicals was the likely*

4

> *consequence of the chemical supplier's failure to warn, . . .* we find that, in failing
> to warn an unknowledgeable [customer] of the hazards to the environment which
> [the chemical manufacturers and distributors] knew could flow from the improper
> handling and disposal of the wood treating chemicals, *their failure could be found*
> *to be a substantial factor in the creation of the nuisance.*

(*Id.* at 1624 [emphasis added].)  Other courts have followed and applied similar reasoning in

denying summary adjudication of nuisance claims such as those asserted by the City of Fresno.

In *City of Modesto*, for example, building on *Selma*, the Court found that "affirmative

acts or instructions could support a finding that those defendants assisted in creating a nuisance .

. ." (*Id.* at 41.)  The *City of Modesto* Court, in fact, specifically rejected defendants' arguments,

stating that "liability for nuisance does not hinge on whether the defendant owns, possesses or

controls the property, nor on whether he is in a position to abate the nuisance; the critical

question is whether the defendant created or assisted in the creation of the nuisance." (*Id.* at 38,

citing *Newhall Land & Farming Co., supra* at 343.)  *City of Modesto* thus rejected the broad

proposition that all product manufactures are automatically immune from nuisance claims, and

affirmed the reasoning that nuisance liability turns on the "affirmative acts" of the defendant, not

on the defendant's position in the chain of distribution.

Based on California law, including *Selma Pressure Treating,* this Court in *In Re Methyl*

*Tertiary Butyl Ether Products Liability Litigation* (S.D.N.Y. 2001) 175 F.Supp.2d 593 ("*In Re*

*MTBE*") also rejected the contention that ownership, possession or control of the property is the

deciding factor in determining a defendants' liability for nuisance:

> Although defendants argue that they cannot be held liable for public nuisance because
> they had no control over the product at the time it was 'released' onto plaintiff's property,
> '[o]ne is subject to liability for a nuisance caused by an activity, not only when [i]t carries
> on the activity, but also when [i]t participates to a substantial extent in carrying it on' . . .
> (citations omitted)

5

. . .

> Here, plaintiffs allege that defendants have extensive knowledge of all phases of the petroleum business, from the extraction of crude oils, to the refining and/or distribution, marketing and retail sale of gasoline, including the design and manufacture of gasoline containing MTBE . . . defendants added MTBE to gasoline, marketed and distributed gasoline containing MTBE, all with the knowledge of the dangers MTBE poses to groundwater . . . in addition, plaintiffs allege that defendants failed to warn the downstream handlers, retailers, gasoline purchasers, government officials and well owners of the dangers associated with MTBE . . . according to the plaintiffs, defendants marketed and promoted the use of MTBE by misrepresenting its chemical properties . . . and actively conspired to conceal the threat posed by MTBE . . . *these allegations are sufficient to demonstrate defendant's participation and assistance in the creation of a nuisance.*

(*Id.* at 628-629, emphasis added.) The *In re MTBE* opinion also noted that "a key sentence from [*County of Santa Clara*] bears repeating": "'[L]iability is premised on defendants' promotion of lead paint for interior use with knowledge of the hazard that such use would create.'" *Id.* at 464. The Court concluded: "If the allegations made by OCWD are true, such allegations would be sufficient to sustain a nuisance claim against the defendants." *Id.* The Court's identification of this key factor is consistent with California law, and demonstrates that defendants' overly narrow definition of "affirmative acts" is inconsistent with the law recognized by this Court and California Courts.

Defendants' motion selectively quotes and distorts the holdings of a number of these cases. Defendants, for example, assert that *City of Modesto* mandates that nuisance liability can only be imposed if a defendant (1) manufactured or designed the equipment which caused the releases, or (2) provided instruction on the disposal of the product. (Mot. at 6.) The *City of Modesto* court, however, states that the types of affirmative acts it lists are merely *examples* ("for instance") of circumstances which would warrant application of nuisance liability. Providing instructions on disposal is simply one example of how a manufacturer not at the site may

6

nevertheless take "affirmative steps directed toward the improper discharge of . . . wastes . . ." and may therefore be liable for nuisance. (*City of Modesto* at 43.)

Defendants further reliance upon *City of San Diego v. United States Gypsum Co.* (1994) 30 Cal.App.4th 575 ("*City of San Diego*") and *County of Santa Clara* are also misplaced.

In *City of San Diego*, plaintiff City pled a nuisance cause of action against manufacturers and distributors of asbestos-containing materials which had been installed in, and were then deteriorating in, city-owned and city-leased buildings. The *City of San Diego* court dismissed plaintiff City's nuisance cause of action because it was "a products liability action in the guise of a nuisance action." (*Id.* at p. 587.) The court's holding was based on the fact that the City's allegations were not "land-connected," and did not concern the "use or condition of property." (*Id.* at pp. 584 ["nuisance, generally a land-connected tort"] and 586 ["nuisance cases 'universally' concern the use or condition of property, not products."].) *City of San Diego* quoted and relied on Prosser & Keeton, Law of Torts (5th ed. 1984) section 86, page 618 (fns. omitted): "If 'nuisance' is to have any meaning at all, it is necessary to dismiss a considerable number of cases which have applied the term to matter not connected either with land or with any public right, as mere aberration . . . ." (*Id.* at p. 586.) By contrast, the circumstances here are classic examples of nuisance, i.e., the City alleges (and has evidence to prove) that defendants delivered MTBE gasoline to stations in the City of Fresno, and that as a result of defendants' handling instructions, directions, and failure to warn station owners and operators about significant risks posed by MTBE, defendants' MTBE gasoline was released from these stations and has contaminated groundwater in the City of Fresno. Significantly, *City of San Diego* favorably cited, and distinguished, *Selma Pressure Treating* on this basis. (*Id.* at p. 586 ("California law

7

has permitted recovery in nuisance . . . where a defendant has created a nuisance on another's property. . .")

In *County of Santa Clara*, a recent case implementing *City of Modesto*, the court upheld the public nuisance claim against the manufacturers of lead paint, finding that liability "premised on defendants' *promotion of lead paint for interior use* with knowledge of the hazard that such use would create . . . is distinct from and far more egregious than simply producing a defective product or failing to warn of a defective product." (*Id.* at p. 309 [emphasis in original].) The court specifically concluded that knowingly concealing environmental risks that will create a nuisance "is quite similar to instructing the purchaser to use the product in a hazardous manager, which *Modesto* found *could* create nuisance liability." (*Id.* at p. 309 [emphasis in original].) Contrary to defendants' arguments, *County of Santa Clara* actually *supports* the imposition of nuisance liability in this case where defendants knew that presence of MTBE in their gasoline required different storage and handling procedures from non-MTBE gasoline, that, if released, MTBE would inevitably contaminate groundwater, that the storage and handling procedures being utilized by gasoline station owners and operators were inadequate to prevent this groundwater contamination, and that defendants failed to disclose these risks to the station owners and operators, regulators, or the public or to provide adequate instructions on appropriate storage and handling procedures which would have prevented the contamination.

*County of Santa Clara*, *Selma Pressure Treating*, and *City of Modesto* are all in fact, consistent with the Restatement of Torts' general principles concerning the types of conduct which create nuisance liability. (Rest.2d Torts, § 824.) Specifically, that under certain circumstances, the "failure to act" to prevent or abate a nuisance can be the basis for nuisance

liability. (*Ibid.*)  The court *County of Santa Clara* articulated this concept in finding the paint

manufacturers liable in nuisance for promoting a product which the manufacturers knew would

create a nuisance and then actively concealing the nuisance hazards of that product which made

the creation of the nuisance inevitable.

### IV.    Defendants Assisted In The Creation of a Nuisance in Fresno By Failing To Provide Proper Training Even When Inspecting Stations, and By Providing Improper Handling And Storage Instructions That Contributed To Significant Groundwater Contamination.

Defendants seeking summary judgment on nuisance at certain stations are Chevron USA,

Inc. ("Chevron"), Shell Oil Company ("Shell"), Valero Marketing and Supply Company

(VMSC), and Valero Refining Company-California (collectively Valero).  Notice of Motion at 1.

These defendants, however, were well aware of the fact that releases of gasoline containing

MTBE posed far different groundwater contamination risks than gasoline without MTBE, that

MTBE gasoline, therefore, needed to be handled and stored differently at gasoline stations than

gasoline without MTBE, that the gasoline storage and handling systems in place at gasoline

stations were inadequate to address the environmental risks posed by MTBE, and that different

equipment and safety precautions would reduce the environmental risks posed by MTBE

gasoline.  Defendants nevertheless failed to instruct as to proper handling (even during station

inspections) or warn of the increased risks as well as the need for additional equipment and safety

procedures.  Below and in the City's separate opposition to defendants' Rule 56.1 Statement are

highlights and key documents from the larger body of substantial evidence that, at a minimum,

create disputed issues of material fact as to whether defendants created, or assisted in creating, a

nuisance.  The City's expert concerning underground storage tanks, Marcel Moreau, has decades

of experience concerning this issue, and provided a detailed history of defendants' knowledge

concerning the problems of storing and handling MTBE gasoline at service stations.  (Opp. to

Rule 56. 1 Statement at ¶36.)

**A.   Before MTBE Was Added to Gasoline in California, Defendants Knew MTBE Gasoline Posed Different Environmental Risks Than Non-MTBE Gasoline And That Additional Storage and Handling Procedures Needed to Be Implemented to Avoid Releases Which Would Create Substantial Groundwater Contamination in Fresno.**

*Selma Pressure Treating* specifically identified the failure to provide instructions on the

proper handling and/or storage of a product as the type of "participation" which can support

nuisance liability, particularly where the manufacturer knew that release of the product would

"flow" from the lack of proper handling and storage.  (*Selma Pressure Treating Co. v. Osmose*

*Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1624 ["If we can say *improper disposal or*

*storage* of the chemicals was the likely consequence of the chemical supplier's failure to warn, . .

. we find that, in failing to warn an unknowledgeable [customer] of the hazards to the

environment which [the chemical manufacturers and distributors] knew could *flow from the*

*improper handling and disposal* of the wood treating chemicals . . ."] (emphasis added).)   *City of*

*Modesto* and *County of Santa Clara* [failure to give proper instructions that would avoid harm. . .

"is quite similar to instructing the purchaser to use the product in a hazardous manner."] similarly

focused on the inadequacy of instructions which were necessary to addressed the increased risks.

The evidence shows that the moving defendants engaged in the very type of acts described as

sufficient to support a nuisance claim in all of these cases.

After supervising remediation of MTBE releases at Shell gasoline stations across the

country for nearly twenty years, Curtis Stanley, an engineer and hydrogeologist at Shell,

10

described MTBE as the "biggest environmental" issue facing United States oil companies.  (Rule
56.1 St. at ¶ 38.)  Mr. Stanley's statement is a prophetic commentary on the fallacy of the oil
industry's decision to continue to utilize MTBE in the face of known environmental risks.

California refiners, particularly Chevron's Northern California refinery, started adding
MTBE to gasoline in 1986, and continued to utilize MTBE until the early 2000s when it was
banned.  (Rule 56.1 St. at ¶ 37.)   The evidence described below shows that the refiners knew
about the increased environmental risks of MTBE gasoline *before* they started adding MTBE in
large quantities to gasoline in California.  The evidence also demonstrates that while defendants
developed improved underground storage tank systems and instructions for their own wholly
owned operations, they failed to provide this same information to service stations operated by
others or to jobbers who delivered their gasoline to these stations.

### The 1980s

In 1981, Ben Thomas of Shell reported to an American Petroleum Institute ("API")
committee that "approximately 20 percent of all underground storage tanks leak, leading to the
possibility of groundwater contamination.  (Rule 56.1 St. at ¶39.) Chevron and Shell were long
standing members of API.  (Rule 56.1 St. at ¶ 40.) Ultramar, Valero's wholly owned subsidiary,
was a member of API from approximately 1989 to 1993.  (Rule 56.1 St. at ¶ 40.) Joel Masticelli
testified that Ultramar received information on the environmental fate of MTBE gasoline from
the API.  (Rule 56.1 St. at ¶ 44.)  Thus, even before the addition of MTBE, the oil industry was
aware that USTs were inadequate to prevent releases of gasoline or the contamination of
groundwater by constituents of gasoline.

Just a few years later, in 1984, API had already formed an Methyl-tertiary-Butyl Ether

Task Force ("MTBE Task Force") to address "emerging issue[s] of MtBE in ground water." (Rule 56.1 St. at ¶ 41.)  The minutes of a June 1984 meeting state:

> "Some of the task force members indicated that MTBE had been found in ground water near leaking underground storage tanks from their service stations . . . It appears that the oxygenate components of gasoline, such as MTBE, migrate most rapidly underground . . ."

(*Ibid.*)

In 1986, Dr. Peter Garrett, Marcel Moreau, and Jerry B. Lowry of the Maine Department of Environmental Protection drafted a paper entitled "Methyl tertiary Butyl Ether as a Ground Water Contaminant" (the "Maine Paper") which was intended to be presented at an API sponsored conference.  (Rule 56.1 St. at ¶ 43.)  The Maine Paper detailed multiple problems with releases of MTBE gasoline from service stations, including: (1) MTBE is more soluble in water and thus "spreads both further and faster than the gasoline." (2) "Groundwater contaminated with MTBE is difficult to remediate;" (3) MTBE will migrate out beyond gasoline and appear as a "halo" around the gasoline groundwater plume; (4) relatively small spills of MTBE gasoline ("a small driveway spill") can result in "large" plumes of MTBE only groundwater contamination. (*Ibid.*)  The Maine Paper recommended that either MTBE be removed from gasoline or that several changes be made to USTs before MTBE gasoline is stored in them.  (*Ibid.*)  Valero admitted that its employees were aware of the Maine Paper at the time of its publication.  (Rule 56.1 St. at ¶ 44.)  These findings were consistent with defendants' experience at their own service stations, and clearly put defendants on notice that one of the key defenses against widespread MTBE groundwater contamination was the upgrading of USTs and handling practices for MTBE gasoline.

12

In June 1986, in a memo entitled "Marketing Environmental Concerns Regarding the Use of MTBE in MOGAS, D.W. Callahan, a Chevron employee, also noted that MTBE had "several disturbing properties." (Rule 56.1 St. at ¶ 45.) These "disturbing" properties included the high solubility and mobility of MTBE as compared to the regular components of gasoline. (*Ibid.*) Mr. Callahan specifically warned that "MTBE utilization could increase the costs to clean up leaks at service stations . . ." (*Ibid.*) In December 1986, Chevron personnel circulated an article published in a oil industry trade publication reporting on significant MTBE groundwater contamination problems, highlighting, in particular, the Maine Paper and its call for changes to USTs at gasoline stations. (Rule 56.1 St. at ¶ 46.)

There can be no doubt that by the 1990s the oil industry, including the defendants, was well of the increased environmental risks posed by MTBE, and the need to upgrade USTs and to provide improved handling and storage instructions to service station owners and operators to avoid MTBE groundwater contamination.

**The 1990s**

At the time Ultramar commenced distributing MTBE gasoline to its service stations in California , approximately 30-40 percent of its underground storage tanks had not yet been upgraded, effectively guaranteeing the MTBE would be released to the environment and cause groundwater contamination. (Rule 56.1 St. at ¶ 47.) Indeed, when Ultramar first introduced MTBE into gasoline in California, it made no effort to provide a warning with the gasoline unless it was ordered to do so by the Government. (Rule 56.1 St. at ¶47.

In 1991, Chevron recognized that the introduction of MTBE to California gasoline would substantially change the consequences of a gasoline spill or leak. (Rule 56.1 St. at ¶ 50.) The

memo warns that while non-MTBE gasoline plumes are "relatively easy" to address, "MTBE on the other hand is a different situation." Specifically, the memo warns Chevron management that "[w]hen MTBE gets into the water then the trouble really starts." (*Ibid.*) The memo concludes that:

> "Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE. The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run. **As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent.**"

(*Id.* at 2.)

Another 1991 Memorandum by Chevron notes multiple additional safety precautions and amended handling instructions need to be provided when MTBE gasoline is being stored and distributed, including at service stations. The additional precautions and handling instructions identified by Chevron included: (1) "Spills or leaks of MTBE must be contained and prevented from contacting the ground or entering the waste water drainage system," (2) "Tanks containing MTBE should have double bottoms and leak detections systems," (3) "Provide proper facilities for shutdowns and tank cleaning to prevent any MTBE from being spilled or washing into the drainage system." (Rule 56.1 St. at ¶ 51.) In the mid-1990s, Chevron also acknowledged that MTBE was driving factor to implement upgrades to USTs and improve instructions on storage and handling practices at service stations:

> "The USGS report points out that gasoline blended with MTBE may pose a greater risk to drinking water than non-oxygenated gasoline . . . . These concerns are not new, as Marketing raised the same issue ten years ago in connection with the Tank Integrity Program. . . .
>
> Marketing believes that MTBE in groundwater issue is just one more additional

14

justification for the large Marketing capital investments in avoid terminal and
service station leaks and spills."

(Rule 56.1 St. at ¶ 53.)

In 1993, in discussing the increased problem of MTBE groundwater contamination from
service station releases, Curtis Stanley wrote to one of his colleagues: "We need to convince
management to implement dual containment NOW!"  (Rule 56.1 St. at ¶ 52.) Stanley later
concluded that, based on "research . . . extremely small releases can cause groundwater
problems." and that "**[v]ery small releases** of MTBE (even small overfills seeping into cracks in
the pavement) have the potential to adversely impact groundwater." (Rule 56.1 St. at ¶¶ 54-55.)
Mr. Stanley further stated that "[m]y professional opinion is that MTBE . . . should not be used at
all in areas where groundwater is a potential drinking water supply."  (*Id.*)

In 1999, Chevron's"White Paper" addressing questions about stricter regulation of USTs.
observed that [i]t is because of the differences in physical and chemical properties of MTBE that
it is more likely to reach groundwater [at service stations], as a result of incidental spills, overfills
and gasoline deliveries, even without underground storage tank leaks." (Rule 56.1 St. at ¶ 58.)
Chevron also recognized that even small "incidental" spills and releases, caused by individual
handling gasoline at the station, had the capacity to reach and contaminate groundwater.  More
importantly, these types of leaks are only preventable through appropriate education and
instruction of the individuals handling the gasoline.

In 1999, Curtis Stanley further observed that MTBE releases capable of causing
groundwater contamination arose not only from the USTs themselves, but also from improper
handling practices at gasoline stations by owners, operators, and jobbers delivering gasoline to

the stations:

> "You may, however, want to carefully consider what you say when the new tank upgrades are our first line of defense.  While this is very true and the size of leaks has decreased substantially over the years, we are still finding MTBE at sites that have been upgraded.  The presence of MTBE may not be due to a leak but could also be due to operational and construction factors."

(Rule 56.1 St. at ¶ 59.)

Shell's engineering coordinator, Glen Marshall, echoed the caution that releases of MTBE gasoline at service stations was dependent on improved and alternative instructions as well as upgrades of the entire UST system.  In 1998, Mr. Marshall warned that the "'Achilles Heel'" of [UST] systems has always been the 'Bubba-factor' . . . the best intentions of hardware manufacturers and designers being ultimately defeated by poor installation and maintenance practices." (Rule 56.1 St. at ¶ 60.)  The maintenance practices Mr. Marshall is referring to are clearly the maintenance practices of service station owners and operators.  A year later, Mr. Marshall continued to advised that "[u]pgrades addressed the inadvertent spills and releases, no root causes of tank or line leaks." (*Ibid.*)

When Ultramar was making the decision to use MTBE as an oxygenate, no consideration was given to the underground storage tanks at retail facilities.  (Rule 56.1 St. at ¶ 22.)  Ultramar engaged in no independent research regarding the environmental fate of MTBE before it decided to use it as an oxygenate in gasoline.  (*Id.* at pp. 50:18-25.)   The Vice President of Ultramar recalled no discussions regarding the effects of MTBE in groundwater when Ultramar elected to use MTBE in gasoline.  (*Id.* at p. 52:15-25, p. 53:1-10.)

The California regulatory authorities responsible for oversight of releases from underground storage tanks were not advised by the oil industry, including Shell and Ultramar,

16

until the late 1990s that MTBE poses a serious threat to groundwater and drinking water in the State of California.  (Rule 56.1 St. at ¶ 63.)

Overall, the evidence shows that, similar to the defendants in *Selma Pressure Treating*, *City of Modesto*, and *County of Santa Clara*, defendants knew, at the time they added MTBE to gasoline in California, that without the provision of additional instructions and precautionary measures, MTBE gasoline would be released from gasoline stations and inevitably contaminate groundwater and public drinking water supplies causing a nuisance.

**B.**   **Handling and Storage Instructions Provided by Defendants to the Stations at Issue Did Not Disclose the Increased Risks Posed by MTBE and the Inadequacy of Their USTs to Handle This Risk, Nor Did Defendants Instruct Owners and Operators on Storage and Handling Procedures Which Would Have Addressed the Increased Risk.**

Oil industry defendants upgraded their gasoline storage systems ("USTs"), including upgrading from bare steel USTs to fiberglass, at their own gasoline stations in an effort to address the increased risks posed by MTBE.  (Rule 56.1 St. at ¶ 61.)  Defendants were aware of numerous upgrades to USTs, safety devices, warning systems, and alternative and improved instructions to service station owners and operators as well as jobbers who delivered gasoline, that were necessary to prevent releases of MTBE gasoline which would contaminate groundwater in Fresno.  (*Ibid.* at pp. 11-14, 17-29, 31-34].)

The Fresno gasoline stations at issue in this motion, unaware of the need for fiberglass tanks or other upgrades, continued to utilize inadequate bare steel UST systems "well past the time when MtBE was prevalent in California gasoline."   (*Ibid.* at 11, and fn 36.) Many, if not all, of the station owners and operators associated with stations at issue were unsophisticated, and relied upon others, including defendants, to instruct them on how to safely and properly operate

17

and maintain their USTs and gasoline. (*Ibid.* at 11].) The materials that were provided to station owners and operators by defendants, however, did not containing adequate instructions on how to safely and properly handle gasoline with MTBE, including the need to upgrade the USTs. Defendants also continued to deliver MTBE gasoline to these stations even though they knew that the gasoline storage and handling systems were inadequate to prevent releases of MTBE which would cause significant groundwater contamination.

      1.     **Chevron-Van Ness Auto, 2740 North Van Ness.**

Chevron had a clear and direct "relationship" with Van Ness Auto even though there may not have been written contract in place. Chevron signs were installed at the Van Ness Auto station demonstrating a clear relationship between the station and Chevron. Chevron supplied gasoline directly to this site from prior to the relevant time period until at least August 1986, thereby gaining direct knowledge of the station's configuration as well as its operation. (Rule 56.1 St. at ¶6.) Subsequently, Chevron supplied gasoline to this station through a jobber named R.V. Jensen who delivered gasoline refined by Chevron from 1986 until at least 2006. (Rule 56.1 St. at ¶ 6.)

Chevron personnel inspected the station. (Rule 56.1 St. at ¶ 6.) Chevron provided Material Safety Data Sheets to the Van Ness Auto which contained detailed instructions for the handling of MTBE gasoline, including responding to spills. (Rule 56.1 St. at ¶ 6.) Chevron personnel, more importantly, gave the station operator instructions on cleaning up gasoline releases. (Rule 56.1 St. at ¶ 6.) As early as 1985, Chevron's Dealer Supply Contract required the station to "comply with Company's programs and procedures for handling unleaded gasolines in their present or future form. . ." (Rule 56.1 St. at ¶ 6.)

The station operator promptly complied with changes to tank regulations because he "wanted to abide by the law" and he "took care of whatever it – need to be done." (Opp to Rule 56.1 Statement at ¶ 6.) He complied with the requirement to have the USTs tested for leaks annually, and conducted inventory reconciliation. (Rule 56.1 St. at ¶ 6.) The station operator, moreover, admitted that operating a gasoline station "was all new stuff" to him, and that he relied on third parties to assist him with testing and safety procedures. (Rule 56.1 St. at ¶ 6.) The owner and operator of the Van Ness Auto station routinely complied with safety instructions that were provided to him, and undertook safety precautions that were made known to him.

Chevron knew, before it supplied Van Ness Auto, that it was critical for service stations to upgrade their gasoline storage and handling systems in order to prevent substantial MTBE contamination of groundwater, including the installation of "spill containment manholes." (Rule 56.1 St. at ¶ 7.) Chevron, however, did not provide instructions that would have prevented or reduced the MTBE releases Chevron knew were likely to occur. Chevron Materials Safety Data Sheets ("MSDSs") for MTBE gasoline, which were provided to the Van Ness Auto station, do not contain any of the warnings or precautions known to Chevron at the time it was supplying the station. (Rule 56.1 St. at ¶ 7.)

Pursuant to *Selma Pressure Treating*; *City of Modesto*; and *County of Santa Clara*, Chevron should be held liable under nuisance for groundwater contamination caused by the release of MTBE gasoline at the Van Ness Auto station.

## 2.   Shell-M & S Texaco, 2619 South East Avenue

This site became a Shell-branded station in 1998 and remained Shell-branded until at least 2009. (Rule 56.1 St. at ¶ 11.) When Mr. Dhillon became a branded, he was provided

19

training by Shell on the safe operation of a gasoline station. (*Ibid.*) Company representatives also gave him a manual ("book") on how to operate the station, including instructions for cleaning up gasoline releases. (*Ibid.*) Company representatives would also visit the station to inspect it. (*Ibid.*) The only spill clean up instructions Mr. Dhillon could recall was the use of kitty litter to absorb spills. (*Ibid.*) Mr. Dhillon, moreover, had only heard that MTBE was in gasoline, he did not recall any specific instructions provide by Shell for the handling of MTBE gasoline (*Ibid.*)

Mr. Dhillon confirmed that upgrades to the UST system were not implemented until actually required by governmental regulation. (*Ibid.*) He also confirmed that the station did not change from the long inadequate stick method of inventory reconciliation until the time when the tanks were replaced. (*Ibid.*)

Manuals produced Shell have little to no information concerning additional safety and handling procedures for MTBE gasoline. (Rule 56.1 St. at ¶ 48.) Shell's MSDSs during the relevant time period similarly lacked information concerning additional safety and handling instructions for MTBE gasoline. (Rule 56.1 St. at ¶ 48.)

Pursuant to *Selma Pressure Treating*; *City of Modesto*; and *County of Santa Clara*, Shell should be held liable under nuisance for groundwater contamination caused by the release of MTBE gasoline at the M&C Texaco station.

### 3.   <u>Valero-Exxon, Valley Gas and Beacon #3519.</u>

Valero's concedes that its wholly owned subsidiary had ownership, operational control, supply agreements, or other sufficient connections which each of these stations during the relevant time period. The Valero Defendants contend for the first time in this litigation they are

20

not successors to Ultramar Inc. Defendants' Statement of Facts, however, admits that the Valero

Defendants' history can be traced back to Beacon Oil Company, which was acquired by and

merged into Ultramar Inc. in 1989. (SSUF para. 50.) Ultramar then merged with Diamond

Shamrock, Inc. to form Ultramar Diamond Shamrock Inc. in 1996. (*Id*.) Ultramar Diamond

Shamrock Corp. then merged with and into Valero Energy Corp. on December 31, 2001. (*Id*.)

With each merger, the successor company assumed the liabilities of the merging entities. See

*Ray v. Alad Corp.* (1977) 19 Cal.2d 22, 28, 560 P.2d 3, 7. Ultramar Inc. is now known as Valero

Energy Corp., and Ultramar's liability rests with Valero.

Ultramar has never contended that it was erroneously named in the complaint. In fact,

eight years ago Ultramar admitted in a disclosure to the Court that Valero Marketing and Supply

Company (VMSC) took over and continued Ultramar's duties and obligations relating to MTBE

activities. Ultramar had engaged in wholesale/bulk marketing and/or selling gas with MTBE in

California from 1994 to 2002. (Rule 56.1 St. at ¶ 21.) This occurred at the time Ultramar

Diamond Shamrock merged with and into Valero Energy Corp. As Ultramar disclosed to the

Court in 2005, VMSC took over and continued Ultramar's MTBE activities:

> "Ultramar ceased the above-described wholesale/bulk and/or
> selling activity on or about July 1, 2002, when this activity was
> undertaken by Valero Marketing and Supply Company ("VMSC"),
> an indirectly held subsidiary."

(*Id*.) According to Ultramar's own description, then, VMSC was a mere continuation of

Ultramar, and is therefore liable for Ultramar's activities.

This Court specifically required Defendants to disclose successor liability issues back in

2005, so that Defendants would not be playing corporate shell games at the end of the litigation.

21

When the Valero defendants answered the City's interrogatories, they answered them as a single entity, without distinguishing between Ultramar and Valero. For the Valero Defendants to assert *now* that some of them are separate entities and not successors to Ultramar – eight years after it was disclosed to the Court and Plaintiff that VMSC had taken over and continued Ultramar's MTBE operations – is disingenuous. The Court should reject the Valero Defendants' assertion that they are not successors-in-interest to Ultramar's MTBE operations and activities. At a minimum, the Court should allow the City to amend "Ultramar" in the complaint to "Valero Energy Corporation," Ultramar's post-merger name.

There are more than sufficient facts to demonstrate that Valero is liable for a nuisance at each of these stations. When Ultramar was making the decision to use MTBE as an oxygenate, for example, no consideration was given to the underground storage tanks as retail facilities. (Rule 56.1 St. at ¶ 21.) at ¶ 22.)

The City incorporates these general facts, and relies upon them, with respect to each station discussed below.

### a. <u>Exxon Service Station, 4594 East Tulare Street</u>

Valero's Separate Statement of Facts concedes that the property and business were turned over to Ultramar (referred to as "Beacon") in approximately 1985 (Defs' Fact No. 23), and that Ultramar leased and operated the station from 1985 to 1995 (Defs' Fact No. 24). Valero thus had direct control and ownership over the station during the relevant time period, and would be directly liable for nuisance.

### b. <u>Valley Gas, 2139 South Elm Street</u>

Valero admits that Ultramar owned the station until October 29, 1991. (Defs' Fact No.

22

29.) After the site was purchased from Ultramar, Beacon and Ultramar gasoline were delivered to the station. (Rule 56.1 St. at ¶ 29.) Mr. Imtiaz Ahmad testified there was a brand distribution marketing agreement which prohibited from buying gasoline from anyone other than Ultramar. (*Ibid.*)

Ultramar failed to upgrade the old single wall steel tank system before transferring the station to the new owners in 1991. (*Ibid.*) Mr. Ahmad testified that he received training from Ultramar on how to operate the station when he bought it from them. (*Ibid.*) He was only told to utilize kitty litter to clean up spills, and then dump dirty litter and rags into a drum. (*Ibid.*) Mr. Ahmad was aware that MTBE was being added to gasoline, but was never told that it had to be stored or handled differently than gasoline without MTBE. (*Ibid.*) Ultramar's MSDSs did not provide appropriate instructions on the safe handling and storage of MTBE gasoline. (Opp. to Rule 56. 1 Statement at ¶ 48.)

Pursuant to *Selma Pressure Treating*; *City of Modesto*; and *County of Santa Clara*, Valero should be held liable under nuisance for groundwater contamination caused by the release of MTBE gasoline at Valley Gas station.

### c.   Beacon #3519, 4591 E. Belmont Avenue

Valero concedes that the station was leased by Beacon/Ultramar from March 1, 1971, until October 20, 1999. (Defs' Fact No. 31.) After October 20, 1999, Ultramar assigned its rights in the lease to another party, but retained a remediation agreement. (Defs' Fact No. 31.) Valero had a retail supply contract with this site, identified as Beacon #4984, from October 20, 1999, to the date of the responses. (Rule 56.1 St. at ¶ 31.) Valero thus had direct control and ownership over the station during a significant portion of the relevant time period, and would be

23

directly liable for nuisance, and also had a supply relationship with the station for the rest of the relevant time period.  The City contends, as outlined in Section 3 above, that Valero would still have nuisance liability during the time period when Valero had a supply agreement with this station.

**d.    Beacon-Arco #615, 1625 Chestnut Avenue**

Valero's Separate Statement of Facts admits that on November 29, 1984, well before the introduction of MTBE into California gasoline, Martinoil, which owned the station franchise, sold and assigned its right, obligations, and interests under the Franchise Agreement to Beacon. (Defs' Fact No. 34.)  Valero thus had direct control and ownership over the station during a significant portion of the relevant time period, and would be directly liable for nuisance.

## V.    Conclusion

For the foregoing reasons, the Certain Defendants' Motion for Partial Summary Judgment on Plaintiff's Nuisance Claims should be denied.

Respectfully submitted,

Dated:  April 12, 2013

**MILLER, AXLINE & SAWYER**
A Professional Corporation

By:

TRACEY O'REILLY
MICHAEL AXLINE
Attorneys for plaintiff City of Fresno
MILLER, AXLINE & SAWYER
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688

24