UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | Master File No. 1:00–1898 |
| IN RE:  METHYL TERTIARY BUTYL | : | MDL 1358 (SAS) |
| ETHER ("MTBE") PRODUCTS | : | M 21-88 |
| LIABILITY LITIGATION | : | |
| | : | |
| | : | |
| This document relates to: | : | |
| | : | |
| *City of Fresno v. Chevron U.S.A., Inc.,* | : | |
| *et al.,* 1:04-cv-04973 | : | |
| | : | |

**DECLARATION OF TRACEY L. O'REILLY IN SUPPORT OF PLAINTIFF CITY OF FRESNO'S OPPOSITION TO CERTAIN DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S NUISANCE CLAIMS [EXHIBITS 1-21]**

I Tracey O'Rielly declare:

1.      I am one of the attorneys in this case for plaintiff City o0f Fresno.  I have been personally involved in much of the discovery and pretrial proceedings in this action.  This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of City of Fresno's [First Amended Complaint filed on November 18, 2004.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the deposition of Garabed Bedirian taken on April 4, 2011, in this action.

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the deposition of James Clements and Exhibit 7 thereto, taken on March 29, 2011, in this action.

5.      Attached hereto as Exhibit 4 is a true and correct copy of an Aug. 12, 1991, Memorandum, TIP Letter #237, MTBE Effects [CHEV 09564-09567].

6.      Attached hereto as Exhibit 5 is a true and correct copy of Chevron Material Safety Data Sheet dated February 1993.

7.      Attached hereto as Exhibit 6 is a truce and correct copy of Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants, Exhibit B, filed November 11, 2008.

8.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the Jatinder Dhillon deposition taken on August 11, 2011, in this action.

9.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts from the Joel Mascitelli deposition taken on July 26, 2000, in this action.

10.    Attached hereto as Exhibit 9 is a true and correct copy of the Expert Report of Marcel Moreau dated Nov. 2, 2011.)

11.    Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the deposition of Imtiaz Ahmad, taken on February 16, 2011.

12.    Attached hereto as Exhibit 11 is a true and correct copy of Valero Defendants' Responses to First Set of Interrogatories.

13    Attached hereto as Exhibit 12 is a true and correct copy of the Declaration of Alexander Blagojevic dated May 4, 2000.

14.    Attached hereto as Exhibit 13 is a true and correct copy of a May 13, 1998 Email from C. Stanley to C. Parkinson

15.    Attached hereto as Exhibit 14 is a true and correct copy of excerpts from the May 6, 1999 deposition of Curt Stanley, taken in this action.

16.    Attached hereto as Exhibit 15 is a true and correct copy of a March 31, 1981, Internal Arco Memo from R.N. Roth to MTBE File.

17.    Attached hereto as Exhibit 16 is a true and correct copy of excerpts from the Ben Thomas deposition taken on November 15, 2000, in this case.

18.    Attached hereto as Exhibit 17 is a true and correct copy of an October 17, 2005, Letter from W. Hughes to R. Greenwald.

19.    Attached hereto as Exhibit 18 is a true and correct copy of an October 17, 2005, Letter from P. Condron to R. Greenwald.

20.    Attached hereto as Exhibit 19 is a true and correct copy of a September 15, 2005, Letter from T. Renfroe to R. Greenwald.

3

21.     Attached hereto as Exhibit 20 is a true and correct copy of a June 18, 1984, Memo from S. Cragg, API, to MTBE Task Force.)

22.     Attached hereto as Exhibit 21 is a true and correct copy of a June 14, 1984, Arco Chemical Company Internal Correspondence from B. Hoover to S. Ridlon.

23.     Attached hereto as Exhibit 22 is a true and correct copy of Hydrocarbons and Organic Chemicals in Groundwater Water - Prevention, Detection and Restoration, dated November 12-14, 1986.

24.     Attached hereto as Exhibit 23 is a true and correct copy of Valero Corporate Representative Deposition, Early Knowledge and Taste & Odor at Early Knowledge Issues.

25.  Attached hereto as Exhibit 24 is a true and correct copy of a June 11, 1986, Memorandum, from O.T. Buffalow, San Francisco, CA, to D.W. Callahan, re Marketing Environmental Concerning Regarding the use of MTBE in MOGAS.

26.     Attached hereto as Exhibit 25 is a true and correct copy of a July 14, 1993, Email from C. Stanley to D. McGill.

27.     Attached hereto as Exhibit 26 is a true and correct copy of a May 14, 1998, Email from C. Stanley to K. Bell.

28.     Attached hereto as Exhibit 27 is a true and correct copy of a November 3, 1998, Email from C. Stanley to J. Pedley.

29.     Attached hereto as Exhibit 28 is a true and correct copy of a March 30, 1999, MTBE Release Source Identification at Marketing Sites.

30.     Attached hereto as Exhibit 29 is a true and correct copy of a February 2, 1999, Email from C. Stanley to F. Benton.

4

31.     Attached hereto as Exhibit 30 is a true and correct copy of the Expert Rebuttal Report of Marcel Moreau dated March 5, 2012.

32.     Attached hereto as Exhibit 31 is a true and correct copy of a June 25, 1996, Letter from P. Pugnale, Shell Oil Company, to R. Ghirelli, California Regional Water Quality Control Board.

33.     Attached hereto as Exhibit 32 is a true and correct copy of a September 29, 1997 letter from C Flanikan, Ultramar to California Environmental Protection Agency.

34.     Attached hereto as Exhibit 33 is a true and correct copy of December 30, 1986 Memorandum re: MTBE.

35.     Attached hereto as Exhibit 34 is a true and correct copy of a March 26, 1991 Memorandum, Chemical Entry Review for MTBE.

36.  Attached hereto as Exhibit 35 is a true and correct copy of an April 27, 1995 MTBE MTBE in Groundwater issues.

37     Attached hereto as Exhibit 36 is a true and correct copy of  Defendant Ultramar, Inc.'s Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005 (Oct. 17, 2005).

38.     Attached hereto as Exhibit 37 is a true and correct copy of a May 29, 1998, Email from G. Marshall to C. Stanley.

39.     Attached hereto as Exhibit 38 is a true and correct copy of a June 30, 1994 Ultramar Material Safety Data Sheet.

40.     Attached hereto as Exhibit 39 is a true and correct copy of Chevron U.S.A. Inc.'s Supply Declaration.

41.     Attached hereto as Exhibit 40 is a true and correct copy of Dealer Management Development Program, Health, Safety & Environment Participation Guide.

42.     Attached hereto as Exhibit 41 is a true and correct copy of Shell MSDS.

43.     Attached hereto as Exhibit 42 is a true and correct copy of a March 12, 1999, Email from G. Marshall to C. Stanley.

44.     Attached hereto as Exhibit 43 is a true and correct copy of January 20, 1999 email from Hugh Dickey to multiple recipients attaching "Solving Problems from MTBE Contamination - It's Not Just Regulating Underground Tanks."

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th st day of March, 2013, at Sacramento, California.

TRACEY L. O'REILLY

6

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————————x

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

This Document Relates To:

CITY OF FRESNO

Plaintiff,

CHEVRON U.S.A. INC.; CHEVRON
ENVIRONMENTAL SERVICES COMPANY;
SHELL OIL COMPANY; EXXON CORPORATION;
TOSCO CORPORATION; UNOCAL
CORPORATION; UNION OIL COMPANY OF
CALIFORNIA; KERN OIL & REFINING
COMPANY; VALERO REFINING COMPANY-
CALIFORNIA; VALERO MARKETING AND
SUPPLY COMPANY [DOE 1]; TESORO
PETROLEUM CORPORATION [DOE 2]; TESORO
REFINING AND MARKETING COMPANY, INC.
[DOE 3]; TEXACO REFINING AND MARKETING
INC.; ULTRAMAR INC.; ARCO
CHEMICAL COMPANY; LYONDELL
CHEMICAL COMPANY; COASTAL CHEM, INC.;
EXXON MOBIL CORPORATION;
CONOCOPHILLIPS CORPORATION; ATLANTIC
RICHFIELD COMPANY; EQUIVA
SERVICES LLC; TEXACO INC.; EQUILON
ENTERPRISES LLC; CHEVRONTEXACO
CORPORATION; NEW WEST PETROLEUM;
DUKE ENERGY MERCHANTS, LLC; DUKE
ENERGY TRADING AND MARKETING, LLC;
PACIFIC SOUTHWEST TRADING; NORTHRIDGE
PETROLEUM MARKETING U.S., INC.; DUKE
ENERGY MERCHANTS CALIFORNIA, INC.; NEW
WEST PETROLEUM LLC;
WESTPORT PETROLEUM INC.; NELLA
OIL COMPANY LLC; CITGO PETROLEUM
CORPORATION [DOE 201]; AND DOES 4
THROUGH 200, 202 THROUGH 400, and
401 THROUGH 600, inclusive,

Defendants.

Master File C.A. No. 1:00-Civ.
1898

MDL No 1358 (SAS)

Case No. 04 CV-04973 (SAS)

Transferred from:
United States District Court for
the Northern District of California
Case No. C 03-5378 JSW
(Honorable Jeffrey S. White)

Removed from:
Superior Court of California,
County of San Francisco,
Case No. CGC-03-425649

**FIRST AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

1

13. Defendant Union Oil Company of California ("Union Oil") is a California corporation with its principle place of business in El Segundo, California.

14. Defendant Kern Oil & Refining Company ("Kern Oil") is a California corporation with its principal place of business located in Long Beach, California.

15. Defendant Valero Refining Company-California ("Valero Refining") is a Delaware corporation with its principle place of business in San Antonio, Texas, and doing business in California.

16. Defendant Valero Marketing and Supply Company ("Valero Marketing") is a Delaware corporation with its principal place of business in San Antonio, Texas, and doing business in California. Valero Marketing and Supply Company is named in place of DOE 1.

17. Defendant Tesoro Petroleum Corporation ("Tesoro") is a Delaware corporation with its principal place of business in San Antonio, Texas, and doing business in California. Tesoro is named in place of DOE 2.

18. Defendant Tesoro Refining and Marketing Company, Inc. ("Tesoro Refining"), a wholly owned subsidiary of Tesoro, is a Delaware corporation with its principal place of business in San Antonio, Texas, doing business in California. Tesoro Refining is named in place of DOE 3.

19. Defendant Texaco Refining and Marketing Inc. ("TRMI") is a Delaware corporation with its principal place of business in New York.

20. Defendant Ultramar, Inc. ("Ultramar") is a Nevada corporation with its principal place of business in San Antonio, Texas.

21. Defendant Exxon Mobil Corporation ("ExxonMobil") is a New Jersey corporation with its principal place of business located in Texas. Plaintiff is informed that Exxon Mobil was formed on or about November 30, 1999 as a result of a merger of Mobil Corporation and Exxon Corporation and is a successor in interest to Exxon Corporation and Mobil Corporation.

22. Defendant ConocoPhillips Corporation ("Conoco") is a Delaware Corporation doing business in California and is a successor in interest to Tosco Corporation.

23. Defendant ChevronTexaco Corporation ("ChevronTexaco") is a Delaware corporation with its headquarters in San Ramon California. Plaintiff is informed and believes that

4

ChevronTexaco Corporation is a successor in interest to certain Chevron-related and Texaco-related entities.

24. Defendant Equilon Enterprises LLC ("Equilon") is a Delaware Limited Liability Company. Plaintiff is informed and believes that Equilon Enterprises LLC is a successor in interest to certain Shell-related and Texaco-related entities.

25. Defendants Chevron USA, Shell, Exxon, Tosco, Unocal, Union Oil, Kern Oil, Valero Refining, Valero Marketing, Tesoro, Tesoro Refining, TRMI, Ultramar, ExxonMobil, Conoco, ChevronTexaco, Equilon and DOES 4 through 100, will be collectively referred to hereafter as the "Refiner Defendants." The Refiner Defendants, and each of them, owned and/or operated gasoline refineries that manufactured and supplied gasoline containing MTBE and/or TBA to locations in the vicinity of Fresno's water system, such that releases of such products to the subsurface contaminated and polluted the water system. Among other things, these defendants (1) designed, formulated, refined, manufactured, promoted, marketed, distributed, transported, packaged, exchanged and/or sold gasoline containing MTBE and/or TBA, which is contaminating, polluting and threatening Fresno's public water supplies; (2) owned, operated, and/or controlled gasoline delivery systems including, but not limited to, gasoline stations, gasoline storage, transfer, delivery, and dispensing systems (collectively herein "gasoline delivery systems") in areas affecting Fresno's water system; (3) were legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this complaint; (4) participated in one or more enterprises to promote MTBE and/or TBA and/or gasoline containing MTBE and/or TBA; (5) negligently designed, constructed, installed, fabricated, owned, operated, controlled, inspected and/or repaired gasoline delivery systems from which MTBE and/or TBA is contaminating, polluting, and threatening the water system; (6) negligently and/or intentionally failed and refused to take appropriate remediation action to abate MTBE and/or TBA plumes when MTBE and/or TBA escaped from the gasoline delivery systems; and (7) in doing the tortious and wrongful acts alleged in this complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named defendants.

# Exhibit 2

Page 1

```
 1                    UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF NEW YORK

 3

 4    In re:  Methyl Tertiary Butyl )   Master File No.
       Ether ("MTBE") Products      )   1:00-1898
 5     Liability Litigation         )   MDL 1358 (SAS)
       _____  )

 6

 7

       This Document Relates To:
 8

 9    CITY OF FRESNO,               )
                                    )
10          Plaintiff,              )
                                    )
11       vs.                        )        CASE NO.
                                    )   04 Civ. 4973 (SAS)
12    CHEVRON U.S.A., INC., et al., )
                                    )
13          Defendants.            )
       _____  )

14

15

16

17        VIDEOTAPED DEPOSITION OF GARABED BEDIRIAN

18

19          Monday, April 4, 2011, at 9:41 a.m.

20

21          2800 North Green Valley Parkway

22               Henderson, Nevada

23

24

           REPORTED BY:  PEGGY S. ELIAS, RPR
25     Nevada CCR No. 274 - California CSR No. 8671
```

Deposition of Garabed Bedirian  /  April 4, 2011

Page 37

1    containing MTBE at your station?

2         A.    I don't know.

3         Q.    Do you recall who delivered your gasoline to

4    the station at the time you owned it?

5         A.    From what -- first day till the last day, I

6    always bought it from Jensen.  No one else.

7         Q.    Do you recall if you bought a particular

8    brand of gasoline?

9         A.    There were two kinds, the unleaded and the

10   super unleaded.

11        Q.    Do you recall if you purchased a particular

12   brand from a particular company, oil company?

13        A.    Jensen was Chevron, and I know that all my

14   signs were Chevron, and the trucks that came, they were

15   all Chevron trucks.

16        Q.    The trucks that delivered gasoline to your

17   station were Chevron trucks?

18        A.    Yes, they were.  I have all the Chevron signs

19   on it.

20        Q.    Do you recall how often gasoline was

21   delivered to your station?

22        A.    Every time we felt that it was really low, we

23   used to call them, and the second day morning they were

24   there right away delivering.

25        Q.    Did you generally make the calls for ordering

Deposition of Garabed Bedirian  /  April 4, 2011

1   gasoline?

2        A.    Yes.

3        Q.    Did you keep records of your orders?

4        A.    I used to, but I don't have them.  I threw

5   them away, all.

6        Q.    Do you know where Jensen picked up the

7   gasoline from to deliver it to your station?

8        A.    I don't know.  I don't know.

9              A couple of times I had to go to their

10  office, and I saw the big -- for -- to share problems,

11  accounting problems, and I saw it was a big place, and

12  they had big, big tanks, but I don't know where they

13  bought it from.

14       Q.    When you say "their office," you mean Jensen?

15       A.    Yes.  They have a big place, and they have

16  big tanks, and every tank was hundred meter.

17       Q.    You mentioned that you had Chevron signs at

18  the station.

19              Were you a branded station?

20       A.    Yes, when I bought it, there was signs of

21  Chevron everywhere, and I ordered couple of them, and

22  they brought couple of them more.  But when I got out

23  of it, they came and picked it up, the signs.

24       Q.    What types of signs did you have at your

25  station?  Were they just logo signs?  Did you have --

1    well, strike that.

2           Did you have a logo -- Chevron logo, logo

3    sign, at your station?

4       A.   Yes.   There was one on a pole.   That was the

5    old one that was there for a long time on the pole.   It

6    was beginning of the Chevron, and I bought with the

7    lights, the ones that -- I ordered with the lights.

8       Q.   Did you have any Chevron logos on your

9    gasoline dispensers?

10      A.   Yes.

11           (Exhibit No. 14 was marked for

12    identification.)

13    BY MR. STEEVES:

14      Q.   I'll hand you what has been marked as

15    Exhibit 14 (handing).   This is a copy of a business

16    card you brought in today.

17           Is that the business card you used when you

18    owned the station?

19      A.   Yes.

20      Q.   And is that Chevron's logo in the upper right

21    corner?

22      A.   Yes.

23      Q.   Did Chevron ever provide you any training for

24    operating the station?

25           MR. DAVIS:   Objection, lacks foundation,

Deposition of Garabed Bedirian  /  April 4, 2011

Page 41

1       Q.   So you worked as an auto mechanic?

2       A.   Yes.

3       Q.   You testified that you ordered more signs

4    from Chevron.

5            Did someone from Chevron bring those signs to

6    you?

7       A.   Yes, they came and hooked it up, and then at

8    the end they came and picked it up.

9       Q.   Did anybody from Chevron ever inspect your

10   station?

11           MR. DAVIS:  Objection, lacks foundation,

12   assumes facts not in evidence.

13           THE WITNESS:  They used to come and check it

14   out every time for cleanliness, and even they gave me a

15   prize.  Because my place was an older place, the prize

16   that I got because it was the cleanliest [sic] place,

17   the cleanest place.

18   BY MR. STEEVES:

19      Q.   How often did they inspect your station?

20           MR. DAVIS:  Objection.  Hold on one second.

21           THE WITNESS:  Most of the time I never knew

22   that you could come and fill up a gas tank and go to

23   the bathroom, they asked for the key, and then they

24   checked everywhere, and then suddenly I used to get a

25   letter that they were there.

Deposition of Garabed Bedirian  /  April 4, 2011

Page 65

1    BY MR. STEEVES:

2         Q.   Did Chevron ever give you any warnings

3    regarding environmental contamination from gasoline

4    containing MTBE?

5              MR. DAVIS:  Same objections.

6              THE WITNESS:  I don't remember.  I don't

7    remember getting anything, whatever it contains, the

8    gas, or anything like that.  I know that there's two

9    kinds of gas, and that's all I know.

10   BY MR. STEEVES:

11        Q.   Did Chevron ever give you any material safety

12   data sheets for their gasoline?

13             MR. DAVIS:  Objection, lacks foundation.

14             THE WITNESS:  Yes, they send me safety

15   instructions; like if you spill on the floor, what you

16   have to do, what -- who you have to call, but I never

17   had a problem, so I didn't have to.

18   BY MR. STEEVES:

19        Q.   Do you still have that document?

20        A.   I don't think so.

21             If I was a person that was continuing the

22   business, even though if I sold the place without --

23   had a place, another place that I was continuing, I

24   would have kept all those paperwork, but I got out,

25   completely out of it, so I didn't want to keep anything

Deposition of Garabed Bedirian / April 4, 2011

Page 66

1    anymore.

2         Q.   Do you recall what protocol was described in

3    the material safety data sheets for gasoline spills,

4    for cleaning up gasoline spills?

5         A.   All I remember, there was a number to call in

6    case that happened.  That's all I remember, but I don't

7    remember anything else.

8         Q.   Did you ever have to call that number

9    regarding the gasoline spill?

10        A.   No, no.  No, I never needed...  I'm very

11   clean.  When it comes -- I'm very disciplined and very

12   clean in the business.

13        Q.   You testified that your gasoline was

14   delivered by truck.

15             Do you recall ever seeing gasoline spilled

16   when the underground storage tanks were filled?

17        A.   No.  No, it never happened that way.  In the

18   past there were some trucks, the old trucks, and they

19   had only one pipe, and they told me that it used to

20   leak, but when they came to me, they had the new

21   trucks, and they had the double piping, and we never

22   had any accident, no.  No, nothing like that happened

23   to us.

24        Q.   Do you recall ever seeing any drips or spills

25   when customers filled up their gas -- or their cars

Deposition of Garabed Bedirian / April 4, 2011

Page 84

```
1                  CERTIFICATE OF REPORTER

2    STATE OF NEVADA   )
                       )     ss:
3    COUNTY OF CLARK   )

4         I, Peggy S. Elias, a Certified Court Reporter

5    licensed by the State of Nevada, do hereby certify:

6    That I reported the deposition of GARABED BEDIRIAN, on

7    Monday, April 4, 2011, at 9:41 a.m.

8         That prior to being deposed, the witness was

9    duly sworn by me to testify to the truth.  That I

10   thereafter transcribed my said stenographic notes via

11   computer-aided transcription into written form, and

12   that the typewritten transcript is a complete, true and

13   accurate transcription of my said stenographic notes.

14   That review of the transcript was requested.

15        I further certify that I am not a relative,

16   employee or independent contractor of counsel or of any

17   of the parties involved in the proceeding; nor a person

18   financially interested in the proceeding; nor do I have

19   any other relationship that may reasonably cause my

20   impartiality to be questioned.

21        IN WITNESS WHEREOF, I have set my hand in my

22   office in the County of Clark, State of Nevada, this

23   17th day of April, 2011.

24
                       _____
25                     PEGGY S. ELIAS, RPR, CCR NO. 274
```

# Exhibit 3

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2                        -oOo-

3      _____

4      In re: Methyl Tertiary Butyl
       Ether ("MTBE") Products
5      Liability Litigation
                                         Master File No.
6      _____    1:00-1898

       This Document Relates To:
7                                         Case No.
       City of Fresno                     MDL 1358(SAS)
8      v. Chevron U.S.A. Inc., et al.,
       Case No. 04 Civ. 4973
9      _____

10

11          DEPOSITION OF JAMES CLEMENTS

12          March 29, 2011 at 9:00 (10:03) a.m.

13          Before:   ERIC L. JOHNSON
                      RPR, CSR #9771
14
            Taken at:
15          Fresno, California

16

17

18

19

20

21

22

23

24

25

Page 25

1    think the 1,000 gallon tank was the premium tank and

2    that was the one closest to the office.

3        Q.   Okay.  So you think the tank identified as

4    Tank 1 on this precision test would be the tank south of

5    the store on --

6        A.   That is correct.

7        Q.   Okay.  Under brand supplier, it says Chevron.

8            Do you recall if Chevron supplied the gas for

9    this station?

10       A.   You have to -- no, I didn't buy any gasoline

11   from Chevron when I owned the station.  My dad did from

12   1926 -- or 1928, I should say, until 1986, he dealt

13   directly with Chevron.  When my dad passed away, within

14   a couple of days after his death Chevron cancelled the

15   contract with me, with the station, per se, and I had to

16   go to R.V. Jensen & Company, which is a jobber, a local

17   distributor here in town, and they handled Chevron

18   products.  So I didn't buy anything direct from Chevron.

19   It was through R.V. Jensen & Company here in town.  They

20   were a jobber or a distributor or whatever you want to

21   call it.

22       Q.   And you said R.V. Jensen & Company used Chevron

23   products?

24       A.   They were --

25           MR. DAVIS:  Objection.  One second.  Objection;

Deposition of James Clements / March 29, 2011

Page 26

1    overbroad, vague as to time period and location.

2              THE WITNESS:  What?

3              MR. DAVIS:  I said -- you can read my

4    objections back if you want to.

5              (Record read)

6              MR. STEEVES:  Q.  I think the question pending

7    is you just stated that R.V. Jensen & Company used

8    Chevron products.  Correct?

9         A.  They were a Chevron distributor and I bought

10   from them.

11        Q.  Do you recall the contact person with R.V.

12   Jensen?

13        A.  No.  There were a couple out there, I don't

14   remember who they were.

15        Q.  Do you know if R.V. Jensen & Company used any

16   other suppliers?

17        A.  No, sir, I don't.

18        Q.  Do you recall the date that your contract --

19   your father's contract with Chevron was cancelled?

20        A.  No.

21        Q.  You said it was sometime in 1986; is that

22   correct?

23        A.  Yeah, it was in 1986.

24        Q.  Who is responsible for -- who at the station

25   was responsible for ordering gasoline?

Deposition of James Clements / March 29, 2011

Page 27

1      A.   Terry Kraft.

2      Q.   Do you know where Mr. Kraft is today?

3      A.   I have no idea.  I haven't seen him since '91.

4      Q.   Do you recall how gasoline was delivered to

5   your site by R.V. Jensen?

6      A.   In a truck.  Tanker truck.

7      Q.   Do you know where that gas was picked up from

8   before it was delivered to you?

9      A.   I assume out of their facility, which was south

10   of town there.  They had a -- R.V. Jensen was a

11   distributor for Chevron, and they had a plant out south

12   of town.  I assumed that's where they got it, because it

13   was always in an R.V. Jensen truck, so I --

14      Q.   You stated that you sold the station in 1991;

15   is that correct?

16      A.   Yes.

17      Q.   Do you recall the approximate date?

18      A.   I wish I could tell you, but I don't want to be

19   quoted as to the approximate -- 1991.  I don't remember

20   the month.

21      Q.   Do you recall who you sold the station to?

22      A.   A fellow by the name of Garabed Bedirian.

23          MR. STEEVES:  I will hand you what's been

24   marked as Exhibit 6.

25          / / / /

Page 45

```
 1    I can do it from over here.  I'd just like to mark next
 2    in order, this is Exhibit No. 7.
 3                    (Deposition Exhibit 7 marked
 4                     for identification)
 5              FURTHER EXAMINATION BY MR. DAVIS
 6              MR. DAVIS:  Unfortunately, for the record, I --
 7    for the record, we have got a Bates labeling error here.
 8    I do not believe these are going to be the correct Bates
 9    numbers for the case, but in any event, this is the copy
10    that I have, so I will just refer to this as Exhibit
11    No. 7.  This is a Chevron dealer supply contract dated
12    August 15th, 1985.
13         Q.  Mr. Clements, if you will look at the last
14    page --
15         A.  Okay.
16         Q.  -- it appears to me that your father -- is that
17    J.R. Clements on the last page -- G.R.?
18         Q.  G.R.  I am sorry.  G.R. Clements?
19         A.  That is correct.
20         Q.  And is that his signature?
21         A.  Yes, sir.
22         Q.  Do you know if you have ever seen this document
23    before?
24         A.  I have never seen it.  This is the first time I
25    have seen this.  I have never ever seen it.
```

Page 46

```
1          Q.   So when Chevron -- I believe earlier you

2    testified that Chevron cancelled their supply contract

3    with your father around the time --

4          A.   No, with me.

5          Q.   With you.  Would this be the contract you think

6    they cancelled?

7          A.   Had to be, if this is all you have.

8          Q.   You never saw this before?

9          A.   No, sir.

10         Q.   If you look at eight pages in, I think it is

11   marked page eight at the -- in the bottom, in the center

12   of the page.  There is a section called Unleaded

13   Gasoline.

14         A.   On eight you say, sir?

15         Q.   Yes.

16         A.   What are we looking for now?

17         Q.   There is a section that's titled Unleaded

18   Gasoline, paragraph 12A.

19         A.   Okay.  Right.

20         Q.   Could you take a moment to read that --

21         A.   Sure.

22         Q.   -- paragraph for me?

23         A.   Do you want me to read it?

24         Q.   You can read it to yourself.  It begins with

25   "The motor fuels covered by this contract include
```

Deposition of James Clements / March 29, 2011

Page 47

1     unleaded gasoline."

2          A.   Okay.

3          Q.   Just let me know when you have finished reading

4     it.

5          A.   Okay.

6          Q.   I have shown you this document hoping that it

7     will refresh your recollection of that time period.

8               Does this remind you that as early as 1985,

9     Chevron was providing warnings about the need to handle

10    gasoline with care?

11              MR. STEEVES:   Objection; lack of foundation,

12    calls for speculation.

13              THE WITNESS:   Well, this would indicate they

14    are, but I never had any -- if you are asking me, I

15    never had any direct contact with anybody from Chevron

16    regarding this.

17              MR. DAVIS:   Q.   Based on conversations you had

18    with your father, did you ever find out from him that it

19    was important to Chevron that gasoline was handled with

20    care?

21         A.   No, sir.

22         Q.   You just knew that from your -- from being in

23    business with your father?

24         A.   That's right.

25         Q.   You don't know what the source of -- you

Deposition of James Clements / March 29, 2011

Page 48

1  understood for the entire time you operated the station

2  that you needed to handle with care -- gasoline with

3  care?

4        A.   Yes.

5        Q.   You don't know one way or the other if Chevron

6  was the source of where you learned that information?

7        A.   Correct.

8        Q.   Is that your father's signature on the last

9  page?

10       A.   Yes, it is.

11       Q.   Based on what you have seen here, is it your

12  understanding that Chevron did then inform your father

13  of the importance of handling gasoline with care?

14            MR. STEEVES:  Objection; lack of foundation,

15  calls for speculation.

16            THE WITNESS:  I would suggest, based upon this

17  contract, if he read it he was certainly apprised of the

18  situation.

19            MR. DAVIS:  Was it your father's policy --

20  objection -- strike that.  I will pass the witness.

21            MR. STEEVES:  I have nothing else.

22            MR. DAVIS:  No further questions.

23            MR. STEEVES:  Anybody on the phone?

24            MR. ORLACCHIO:  None for me.

25            MS. WINTTERLE:  No questions.

Deposition of James Clements / March 29, 2011

Page 51

```
 1   STATE OF CALIFORNIA      )
                              (      ss.
 2   COUNTY OF STANISLAUS     )

 3        I, ERIC L. JOHNSON, do hereby certify that I am a

 4   licensed Certified Shorthand Reporter, duly qualified

 5   and certified as such by the State of California;

 6        That prior to being examined, the witness named in

 7   the foregoing deposition was by me duly sworn to testify

 8   to tell the truth, the whole truth, and nothing but the

 9   truth;

10        That the said deposition was by me recorded

11   stenographically at the time and place herein mentioned;

12   and the foregoing pages constitute a full, true,

13   complete and correct record of the testimony given by

14   the said witness;

15        That I am a disinterested person, not being in any

16   way interested in the outcome of said action, or

17   connected with, nor related to any of the parties in

18   said action, or to their respective counsel, in any

19   manner whatsoever.

20

21        DATED:  April 18, 2011

22

23                         _____
                           Eric L. Johnson, CSR, RPR
24

25
```

Dealer Employer Identification No. (EIN)   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          S.S. No.  C019-1328

## CHEVRON DEALER SUPPLY CONTRACT
### (Owner Dealer)

Dated:  August 15, 1985

### PREMISES AND TERM

     1.    Chevron U.S.A. Inc. ("Company") agrees to sell to **G. R. Clements** ("Dealer") and Dealer agrees to purchase from Company such quantities of the Chevron brand gasolines  ----- ("Chevron motor fuels") sold by Company generally to service stations in Dealer's locality as are necessary to serve customer demand for Chevron motor fuels at Dealer's premises at **2740 Van Ness Blvd., Fresno, CA 93704** (the "premises") for a term commencing on the 1st day of January, 1986, and ending on the 31st day of December, 1988.

### USE OF PREMISES

     2.    (a)    Dealer acknowledges that there is a demand for Chevron motor fuels and Chevron brand motor oils (hereinafter sometimes collectively referred to as "Chevron products") at the premises, which is enhanced by Company's advertising and other promotions thereof, and agrees continuously to stock at the premises and to offer for sale such quantities of Chevron products as are necessary to serve customer demand therefor.  Dealer acknowledges the financial benefit to Dealer of selling and prominently displaying Chevron products due to the high regard of the motoring public for service stations selling under the Chevron trademarks and trade names, and Dealer agrees at all times to give the dispensing equipment, displays and advertisements for Chevron products and brands as prominent and convenient positions as those for any other product offered for sale on the premises and not to disparage or diminish in any way by act or omission the good reputation of such trademarks, trade names, products or service stations.

          (b)    Dealer agrees to devote sufficient time to the personal management of the premises so as to provide for the continued proper operation thereof as a service station, to maintain and operate the premises in a clean, safe and healthful manner with an appearance that is inviting to the motoring public, to render professional driveway and automotive service to customers by providing trained, acceptably groomed and uniformed service station personnel in numbers adequate to handle available business, to operate and manage the premises and cause customers to be treated in such a manner as to eliminate customer complaints to the extent possible, to comply with all applicable Federal, state and local laws and regulations relevant to the use and operation of the premises or the resale of all products purchased by Dealer under this Contract, and to supply Company with all information which Company shall reasonably request to enable Company to comply with all applicable Federal, state and local laws and regulations.  Company and its authorized representatives shall have the right at any time to enter upon the premises to confirm the performance by Dealer of Dealer's obligations under this Contract.



**EXHIBIT**
7
Clements 3-29-11

## DELIVERIES--PRICES--TAXES

3.   (a)   Deliveries shall be made (except at Company's option) in full bulk transport quantities and on reasonable notice (preferably at least forty-eight (48) hours) at the premises in Company's customary manner using equipment selected by Company.

(b)   The prices Dealer shall pay Company for Chevron motor fuels hereunder shall be Company's prices to Dealer in effect at the time and place of delivery for the particular product, grade, quantity and type of delivery involved, as established by Company from time to time. Dealer shall, except at Company's option, pay Company net cash at the time of delivery for Chevron motor fuels and any other resale merchandise which Dealer may purchase from Company.

(c)   Any tax, duty, toll, fee, impost, charge or other exaction, or the amount equivalent thereto, and any increase thereof now or hereafter imposed, levied or assessed by any governmental authority upon, measured by, incident to or as a result of the transactions herein provided for (other than local, state and Federal net income taxes measured by the net income of Company from all sources), or the transportation, importation, production, manufacture, use or ownership of the goods the subject of this Contract shall, if collectible or payable by Company, be paid by Dealer on demand by Company. Any such payment shall be in addition to the prices otherwise herein provided for.

## TRADEMARKS, TRADE NAMES AND COLOR SCHEMES

4.   (a)   The products purchased by Dealer under this Contract shall be sold by Dealer as the products of Company and only under the trademarks and trade names authorized for such products by Company. Dealer shall not at any time offer for sale under such trademarks and trade names any product not authorized by Company to be sold thereunder. Dealer shall conduct Dealer's business so as to eliminate any likelihood of confusion between Company's products and those of others and so as to eliminate any likelihood of substitution or commingling of the products of others as or with those of Company. Dealer agrees to abide by such reasonable regulations to this end as Company may from time to time establish by written notice to Dealer. Without limitation on the foregoing, Company shall have the right at any time to take samples of Chevron motor fuels from the premises for testing purposes, compensating Dealer (at Dealer's cost, which for this purpose shall be based on Company's prices to Dealer hereunder in effect at the time the product is taken, or, at Company's option, in kind) for any products so taken.

(b)   Dealer recognizes Company's right to use and authorize others to use all trademarks, service marks, trade names, color schemes and service station designs (collectively "insignia") utilized by Company to identify products and services, and Dealer agrees not to claim any right, title or interest therein. Dealer acknowledges the need to control Dealer's use of such insignia in order to maintain the validity thereof and to assure the continued recognition of, acceptance by and high regard of the motoring public for products and services identified by such insignia. Accordingly, Dealer agrees that Dealer shall use such insignia only in such manner as may be approved by Company and that Company may from time to time change such insignia and its promotional materials as it sees fit. Dealer shall not use any such insignia in Dealer's corporate name if Dealer is a corporation, nor permit the use of any such insignia in the name of any corporation in which Dealer has an interest. All signs advertising Company's products and all signs in the colors used by Company to identify its products or the places at which its products are sold and all rights therein are and shall continue to be the property of Company. Dealer shall not use any such signs except in connection with products manufactured or handled by Company and only in such manner as may be approved by Company. Company may, during the term of this Contract, and within a reasonable period thereafter, remove or obliterate such signs, and repaint so much of the premises as it elects, in a color or colors selected by it. If Company removes or obliterates any signs or repaints any of the premises, Company need not restore any pre-existing signs on or paint schemes of the premises.

-2-

Dealer may not use other signs to advertise products purchased from Company without Company's prior written consent. No other signs (except motor fuel price signs) shall be placed on a sign pole containing a sign advertising a product manufactured or handled by Company. Dealer shall not, during the term of this Contract or thereafter, simulate in any way any insignia identifying Company's products or the places or outlets where they are sold or marketed. Upon termination of this Contract, Dealer shall immediately return to Company all signs supplied to Dealer by Company and shall immediately discontinue any and all use of such insignia and shall obliterate such insignia from all real or personal property utilized by Dealer. Dealer likewise shall obliterate such insignia from any real or personal property of Dealer before selling any such property to a third party.

(c) Company shall have the right at any time during the term of this Contract to change, alter or amend any of the trademarks and trade names under which the motor fuels covered by this Contract are now or may hereafter be sold. If Company shall at any time during the term of this Contract discontinue the marketing in Dealer's locality of any or all of the motor fuels covered by this Contract, Company shall be relieved of all obligation to sell or deliver such discontinued product to Dealer and, if Company shall market any other product in lieu of the discontinued product, this Contract shall embrace the new product and all of the terms and conditions hereof previously applicable to the discontinued product shall apply to the new product.

CONDUCT OF DEALER'S BUSINESS

5.   (a) Dealer is engaged in an independent business and nothing herein contained shall be construed as granting to Company any right to control Dealer's business or operations or the manner in which the same shall be conducted, Dealer's obligation to Company hereunder being the performance of the terms and conditions of this Contract. Company has no right to hire or fire any employees of Dealer or to exercise any control over any of Dealer's employees, all of whom are entirely under the control and direction of Dealer, who shall be responsible for their acts and omissions. Dealer accepts exclusive liability for all contributions and payroll taxes required under Federal Social Security laws and State Unemployment Compensation laws or other payments under any laws of similar character as to all persons employed by or working for Dealer.

(b)   Dealer shall indemnify, defend and hold harmless Company, Company's parent company, Chevron Corporation, the subsidiary and affiliated companies of each of them (collectively "Company and its affiliates"), and their respective directors, officers, agents and employees, from and against all expense (including attorneys' fees), liability and claims of whatsoever kind and nature, including but not limited to those for damage to property (including Dealer's property) or injury to or death of persons (including Dealer), directly or indirectly resulting, or alleged to result, from anything occurring from any cause on or about or in connection with the maintenance, upkeep, repair, replacement, operation or use of the premises, or anything located thereon.

PREVENTION OF PERFORMANCE--SHORTAGE OF SUPPLY

6.   (a) There shall be no obligation to sell or deliver or to receive or use the petroleum products covered by this Contract when and while, and to the extent that, the receiving or using or manufacture or making deliveries in the customary manner are prevented or hindered by act of God, fire, riot, labor disturbances (whether involving employees of the party affected or of others and regardless of whether the disturbance could be settled by acceding to the demands of a labor group), accident, war or the acts of any government (whether foreign or domestic, Federal, state, county or municipal) or any causes beyond the reasonable control of the party affected, whether or not similar to any of the foregoing causes. In cases of partial or total interruption or loss or shortage of transportation facilities or supplies, or shortage of products deliverable hereunder, Company may allocate deliveries of available products among Dealer, Company's other customers, contract or

-3-

otherwise, including Company's affiliates, and Company for its own use, on any basis which in Company's sole judgment is fair and reasonable, allowing for such priorities as Company deems appropriate.

(b)  Due to uncertainties in the supply/demand situation (which may include a decision by Company that the costs of some crude oil and petroleum products which might be available are unreasonable), Company may not have sufficient supplies of one or more of the petroleum products covered by this Contract to meet the full requirements of Dealer, of Company's other customers, contract or otherwise, including Company's affiliates, and of Company for its own use. Whenever that situation exists and Company's performance hereunder is not otherwise excused, Company may allocate deliveries of available products on any basis which in Company's sole judgment is fair and reasonable, allowing for such priorities as Company deems appropriate.

(c)  Allocation is fair and reasonable even if it is based on a shortage in the then contemplated sources of supply or a general shortage in Company's system or on historical or planned deliveries. "Company's system" means the supply system of Company and its affiliates.

TERMINATION

7.    (a)  Dealer may terminate this Contract without cause at any time during the term hereof upon giving Company written notice of such termination.

(b)  Company may, in addition to such other remedies as Company may have (including but not limited to the right to terminate this Contract as otherwise provided herein) and subject to any valid requirements of any applicable statute, terminate this Contract upon giving Dealer ninety (90) days' prior written notice of such termination or, if it would not be reasonable for Company to give ninety (90) days' prior written notice, at Company's election upon giving Dealer prior written notice for such lesser period as is reasonable in the circumstances, if any one of the following occurs:

(1)    Dealer by act or omission breaches or defaults on any covenant, condition or other provision of this Contract, which breach or default can be cured, and Dealer fails to cure such breach or default within ten (10) days after such written notice of termination from Company which shall specify such breach or default; or

(2)    Dealer by act or omission breaches or defaults on any covenant, condition or other provision of this Contract which breach or default cannot be cured, or in the event of any breach or default by Dealer after notice of two previous breaches or defaults of any kind has been given hereunder, regardless of Dealer's curing such previous breaches or defaults; or

(3)    Dealer fails to exert good faith efforts to carry out the provisions of this Contract following written notice to Dealer from Company of such failure and a reasonable opportunity to exert good faith efforts to carry out such provisions; or

(4)    Dealer fails to pay to Company in a timely manner when due all sums to which Company is legally entitled (whether or not such sums are owed to Company under this Contract); or

(5)    Dealer knowingly fails to comply with Federal, state or local laws or regulations relevant to the use or operation of the premises; or

(6)    Willful adulteration, commingling, mislabeling or misbranding of motor fuels or other violations by Dealer of trademarks utilized by Company; or

-4-

(7)   This Contract, or any interest therein, is assigned or otherwise transferred contrary to the provisions of section 9 hereof; or

(8)   Dealer vacates, abandons, transfers or is deprived of possession of the premises; or

(9)   Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Dealer relevant to the operation of the premises; or

(10)   Continuing severe physical or mental disability of Dealer of three (3) months' duration which renders Dealer unable to provide for the continued proper operation of the premises as a service station; or

(11)   Failure by Dealer to operate the premises as a service station for seven (7) consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time; or

(12)   Conviction of Dealer of any felony involving moral turpitude; or

(13)   Dealer's death.

Without limitation on the foregoing, it is agreed that upon the occurrence of any of the events specified in clauses (6) through (13) of this subsection (b) it would not be reasonable for Company to give ninety (90) days' prior written notice, that ten (10) days' notice would be reasonable in such circumstances, and that in any such circumstance Company may elect to terminate this Contract upon giving Dealer ten (10) instead of ninety (90) days' prior written notice of such termination.

(c)   If during the term hereof Company decides to withdraw from marketing motor fuels through retail outlets in the relevant geographic market area in which the premises are located, Company may terminate this Contract by giving Dealer one hundred eighty (180) days' prior written notice of such termination and otherwise complying with any applicable requirements of law, including the Federal Petroleum Marketing Practices Act.

(d)   Waiver by Company of one or more breaches or defaults hereunder shall not be deemed to be a waiver of any other or continuing breach or default hereunder. No modification of this Contract, and no waiver of any provision hereof, shall be binding on Company unless in writing and signed by Company. Termination of this Contract shall not relieve Dealer of responsibility for obligations incurred prior to termination. Upon termination of this Contract, subject to any valid requirements of any applicable statute, neither Company nor any incoming Dealer shall have any obligation to purchase from Dealer any of Dealer's inventory, tools, equipment or supplies.

(e)   If Company continues to accept orders from Dealer for motor fuels following expiration of the term of this Contract, such sales shall be upon all of the terms and conditions hereof; provided that such sales shall not be construed to evidence a renewal of this Contract by operation of law or otherwise, but shall imply only an agreement from day to day, which Company may (subject to any valid requirements of any applicable statute) terminate without cause at any time upon giving Dealer written notice of such termination.

-5-

FACILITIES

8.   Company has delivered to or installed for (or shall deliver to or install for) Dealer the following facilities to be used by Dealer at the premises:

| | | | | Monthly Rent |
|---|---|---|---|---|
| Chevron I.D. Signs: | of Type | @ | $ /mo. | $ -0- |
| Chevron I.D. Signs: | of Type | @ | $ /mo. | $ |
| Pump Block | | | | |
| Lighter Boxes: | No. of | @ | $ /mo. | $ -0- |
| | | TOTAL MONTHLY RENT | | $ -0- |

Dealer shall pay Company, in advance, each month for use of such facilities the total monthly rent specified above.  In connection with the use by Dealer of such facilities, Dealer agrees to be responsible for loss of or damage to such facilities and agrees not to remove any of such facilities from the premises.  Title to such facilities and all trademark and service mark rights Company may have in the same shall at all times remain in Company, and Company shall have the right at any time to remove any or all of such facilities on notice to Dealer thereof, refunding to Dealer any unearned, prepaid rental.

ASSIGNMENT

9.   This Contract is personal to Dealer, and Dealer shall not, subject to any valid requirements of any applicable statute: assign this Contract, or any interest therein (either voluntarily or by operation of law) by assignment or other arrangements having similar effect; or become associated with any other person, directly or indirectly, as a partner or otherwise in regard to Dealer's interest or operations under this Contract.

INSURANCE

10.   (a)   Dealer shall maintain, at Dealer's own expense during the term hereof, insurance with respect to Dealer's business, the premises and all activities on or about or in connection with the premises of the types and in the minimum amounts described generally as follows:

(1)   Garage Liability Insurance or Comprehensive General Liability Insurance (bodily injury and property damage) of not less than $500,000 combined single limit per occurrence, including explosion hazard, personal injury, premises-operations, products and completed operations, blanket contractual and independent contractors liability coverages; and

(2)   Business Auto Liability Insurance (bodily injury and property damage) of not less than $500,000 combined single limit per occurrence on all nonowned automobiles, all tow trucks and service vehicles which are owned, hired or leased by Dealer, and all vehicles bearing the hallmark or other insignia used by Company, which are owned, hired or leased by Dealer ; and

(3)   Environmental Impairment Liability Insurance (bodily injury and property damage) of not less than $500,000 combined single limit of liability, including gradual seepage, pollution and cleanup costs; and

-6-

(4)     Full Worker's Compensation and Employer's Liability Insurance covering all employees of Dealer; and

(5)     Any other insurance or surety bonding that may be required by applicable Federal, state and local laws and regulations; and

(6)     Excess liability insurance of not less than $1,000,000 per occurrence in excess of the insurance required under clauses (1), (2), (4) (except Worker's Compensation) and (5) above, affording not less than the same coverage and including personal injury and property damage coverage.

(b) The insurance required under clauses (1), (2), (3), (5) and (6) of subsection (a) above shall include Company and its affiliates as additional insureds except with regard to occurrences that are the result of their sole negligence.

(c) The insurance required under clauses (1), (2), (3), (5) and (6) of subsection (a) above shall provide that it is primary coverage with respect to Dealer, Company and all other additional insureds.

(d) The insurance required above shall provide that no cancellation or material change in any policy shall become effective except upon thirty (30) days' prior written notice to Company.

(e) The insurance companies shall have no recourse against Company, or any other additional insured, for payment of any premiums or assessments under any policy issued by a mutual insurance company.

(f) Dealer shall furnish certificates satisfactory to Company as evidence that the insurance required under subsection (a) above is being maintained.

(g) Dealer shall be responsible for all deductibles in all of Dealer's insurance policies.

(h) Dealer's indemnity and other obligations shall not be limited by the foregoing insurance requirements.

## CORPORATE DEALER--OPERATOR

11.   (a)   The personal qualifications of each Company dealer are of material significance to Company, other retail service stations displaying Company's insignia, and the motoring public. When Company accommodates an individual's desire to do business in corporate form by entering into this Contract with the corporation, this is done with the understanding that, although it is only the corporate Dealer that enjoys rights under this Contract, those rights are conditioned on the individual remaining actively involved with and responsible for the operation of the service station and retaining control of the corporation. Accordingly, if Dealer is a corporation and subject to any valid requirements of any applicable statute, Dealer agrees that the references to "Dealer" in clauses (9), (10), (12) and (13) of subsection 7(b) hereof are amended hereby to read "Dealer or any Operator" and that Dealer's rights under this Contract are subject to the following conditions being met throughout the term of this Contract, which Dealer shall cause the following named individual N/A ("Operator") to meet:

(1)     Operator shall perform Dealer's obligations under subsection 2(b) hereof to devote sufficient time to the personal management of the premises so as to provide for the continued proper operation thereof as a service station; and

-7-

CONFIDENTIAL (per 2004 MDL 1358 Order)

(2)     Operator shall own all right, title and interest, legal and beneficial, in and to a majority of the voting stock and any other stock of Dealer (as well as a majority thereof after giving effect to the conversion of all securities convertible into stock of Dealer and taking into account the issuance of any additional stock or securities convertible into stock) and Operator shall not pledge or otherwise hypothecate any such stock or securities, or permit or suffer any lien or encumbrance to be placed thereon, or grant proxies or enter into stockholder or other agreements which limit in any manner Operator's control of Dealer, or otherwise create, permit or suffer legal, beneficial or other rights or interests to exist in others with regard to any such stock or securities; and

(3)     Operator shall guarantee the performance of all of Dealer's obligations under this Contract.

(b)     The occurrence of any event, whether voluntary, involuntary, direct or indirect, by operation of law, by merger or other corporate proceedings or otherwise caused, which results in Operator having less than a majority of the voting and other stock of Dealer as required by clause (2) of subsection (a) above or any action otherwise in breach of clause (2) of subsection (a) above shall be construed as an assignment of this Contract for the purposes of section 9 hereof.

## UNLEADED GASOLINES

12.     (a) The motor fuels covered by this Contract include unleaded gasolines, which products are subject to Federal air pollution laws and regulations on fuels and fuel additives. Those regulations impose directly on Dealer and Company specific legal obligations regarding the quality control, distribution, sale and dispensing of unleaded gasolines.  Accordingly, Company has established certain programs and procedures for the handling of unleaded gasolines.  Dealer recognizes the importance to Company and to Dealer of Dealer meeting fully all governmental requirements covering unleaded gasolines.  Dealer agrees to comply with Company's programs and procedures for handling unleaded gasolines in their present or future form and promptly to contact Company if Dealer has any indication whatsoever that contamination of unleaded gasolines may occur or may have occurred in order that Company may, at its option, conduct a test of such product. Company's representatives shall have the right at any time to enter upon the premises where unleaded gasolines purchased hereunder are stored by or for Dealer and to take such quantities of unleaded gasolines as they deem necessary to check the quality of such products, compensating Dealer (at Dealer's cost, which for this purpose shall be based on Company's prices to Dealer hereunder in effect at the time the product is taken, or, at Company's option, in kind) for any products so taken. Dealer shall comply fully with all applicable Federal, state and local laws and regulations pertaining to unleaded gasolines, including but not limited to specific compliance with the regulatory provisions which:

(1)     Prohibit the sale, dispensing or offering for sale of gasoline represented to be unleaded gasoline unless it meets the requirements for unleaded gasoline defined in the Federal regulations; and

(2)     Prohibit introduction, or causing or allowing introduction of leaded gasoline into any motor vehicle which is labeled "unleaded gasoline only," or which is equipped with a gasoline tank filler inlet which is designed only for the introduction of unleaded gasoline; and

(3)     Require that all gasoline pumps, from which leaded gasoline is introduced into motor vehicles, be equipped with a nozzle spout having a terminal end with an outside diameter of not less than 0.930 inches (2.363 centimeters); and

-8-

CONFIDENTIAL (per 2004 MDL 1358 Order)

(4)     Require that all gasoline pumps, from which unleaded gasoline is introduced into motor vehicles, be equipped with a nozzle spout which meets the following specifications: (i) the outside diameter of the terminal end shall not be greater than 0.840 inches (2.134 centimeters); (ii) the terminal end shall have a straight section of at least 2.5 inches (6.34 centimeters) in length; (iii) the retaining spring shall terminate 3.0 inches (7.6 centimeters) from the terminal end; and

(5)     Require that the following notice be displayed in the immediate area of each pump island:

"Federal Law Prohibits the Introduction of Any Gasoline Containing Lead or Phosphorus Into Any Motor Vehicle Labeled 'UNLEADED GASOLINE ONLY' "; and

(6)     Require that unleaded gasoline pumps have affixed a label stating: "Unleaded Gasoline"; and

(7)     Require that leaded gasoline pumps have affixed a label stating: "Contains lead anti-knock compounds."

(b)  Dealer shall comply fully with all documents, manuals and other written communications pertaining to unleaded gasolines, which Company has distributed or may distribute at any time in the future to Dealer.

(c)  Dealer's indemnity obligation under subsection 5(b) of this Contract shall include, but not be limited to, any and all expense (including attorneys' fees), liability, claims, fines, civil penalties or demands which may arise or be assessed as a result of any act or omission of Dealer or Dealer's agents or employees in handling unleaded gasolines hereunder, or as a result of failure by any of them to follow Company's programs and procedures for handling unleaded gasolines.

(d)  If Dealer fails to comply with the requirements regarding unleaded gasolines as hereinabove set forth, then Company, in addition to such other remedies as Company may have, shall have the right to terminate delivery of unleaded gasolines to Dealer or to suspend such delivery until Company is satisfied that Dealer is again in compliance therewith.

## PRIOR SUPPLY CONTRACTS

13.   This Contract shall not become effective if, prior to the commencement of the term hereof, Company notifies Dealer of Company's election to exercise any right Company may have to terminate any prior supply contract with Dealer covering the delivery of motor fuels to the premises. In such event this Contract shall be null and void.  Subject to the foregoing, effective as of the commencement of the term hereof, this Contract supersedes and terminates all prior supply contracts between Company and its affiliates and Dealer covering the delivery of motor fuels to the premises, provided that any outstanding breach by Dealer of any such prior supply contract shall be deemed to be a breach of this Contract and the occurrence of any event authorizing the termination of any such prior supply contract shall authorize the termination of this Contract.

## NOTICE

14.   All notices to be given under this Contract shall be in writing and shall be posted by certified mail or personally delivered to Company at **2 Annabel Lane, Suite 200, San Ramon, CA 94583** and to Dealer at the premises or such other address as either party may designate by written notice to the other in the manner herein provided.

-9-

CONFIDENTIAL (per 2004 MDL 1358 Order)     CHEVMDL1358_FRES_ 00000002428

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

CHEVRON U.S.A. INC.

By _____

_____
G. R. Clements

_____
                                                    Dealer

The undersigned Operator hereby agrees that Operator shall perform and comply with the provisions of section 11 of this Contract and hereby guarantees to Company the performance of all of Dealer's obligations under this Contract.

_____
                                                  Operator

MS-9266(7-85)

-10-

CONFIDENTIAL (per 2004 MDL 1358 Order)

CHEVMDL1358_FRES_ 00000002429

# Exhibit 4

MEMORANDUM

San Francisco, CA
August 12, 1991

TIP Letter # 237
MTBE Effects

REGIONAL MANAGERS:

As you all know Methyl-tertiary-butyl-ether (MTBE) is widely used in gasoline throughout our distribution network. The oxygenated fuel requirements in the recent reauthorization of the federal Clean Air Act will only increase the use of MTBE and its concentration in our gasolines. In light of this, we thought it prudent to pass on some facts concerning the potential effects, both environmental and budgetary, of a spill or leak of gasoline containing MTBE into the groundwater. This information may help you to prioritize sites due for UST upgrades (ie. spill containment, release detection, etc.).

Typically, benzene is the component that determines the extent of a dissolved hydrocarbon plume and is the component with the most stringent cleanup standards. While benzene concentrations in the groundwater are the driving force for most cleanups, benzene is relatively easy to remove by carbon adsorption or air stripping and it will naturally biodegrade in most subsurface environments.

MTBE on the other hand is a different situation. The solubility of benzene in water is 1,800 parts per million (ppm), while the solubility of MTBE in water is 43,000 ppm! The dissolved plume that results from a leak into groundwater is directly related to the solubility in water of the chemical. The higher the solubility the larger the plume and the faster it will migrate.

When MTBE gets into the water then the trouble really starts. Removal of a compound by air stripping is governed by the Henry's Law constant; the constant for MTBE is 1/7 that of benzene; the biodegredation of MTBE is 1/5 that of benzene; the carbon adsorption of MTBE is 1/5 that of benzene. MTBE has two additional characteristics that only exacerbate the problem. Dissolved benzene transport in water is retarded due to adsorption; MTBE transport is not significantly slowed since it does not adsorb to soil as well. Water containing over 1,500 ppm of MTBE is flammable and can lead to explosive vapors. Attached you will find a summary of MTBE properties provided by R.J. Hinds of CRTC.

CONFIDENTIAL: This document is subject to the September 21, 1989 Stipulated Protective Order entered in the San Francisco Superior Court, Case No. 999128.

CHEV 09564

As you can see, a groundwater cleanup where MTBE is present has the potential to be 2-3 times as expensive as our present groundwater cleanups. The resulting plume will be much larger and the removal of MTBE is very difficult at best.

Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE. The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run. As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent.

J.L. KOERBER

JLK

DJL/

cc. A.M. Caccamo
    D.N. Perkins
    J.L. Pease
    R.J. Kinds
    Compliance Specialists
    TIP Coordinators
    Env. Engineering Supervisors
    H.W. Riggs

CONFIDENTIAL: This document is subject to the September 21, 1999 Stipulated Protective Order entered in the San Francisco Superior Court, Case No. 999128.

CHEV 09565

# Exhibit 5

MATERIAL SAFETY DATA SHEET
MATERIAL SAFETY DATA SHEET

CHEVRON
CHEVRON

CHEVRON UNLEADED GASOLINE W/MTBE

PAGE   1 OF 1

THIS MATERIAL SAFETY DATA SHEET CONTAINS ENVIRONMENTAL, HEALTH AND
TOXICOLOGY INFORMATION FOR YOUR EMPLOYEES. PLEASE MAKE SURE THIS
INFORMATION IS GIVEN TO THEM. IT ALSO CONTAINS INFORMATION TO HELP
YOU MEET COMMUNITY RIGHT-TO-KNOW/EMERGENCY RESPONSE REPORTING
REQUIREMENTS UNDER SARA TITLE III AND MANY OTHER LAWS. IF YOU RESELL
THIS PRODUCT, THIS MSDS MUST BE GIVEN TO THE BUYER OR THE INFORMATION
INCORPORATED IN YOUR MSDS. DISCARD ANY PREVIOUS EDITION OF THIS MSDS.

MSDS DISCONTINUED. THIS MATERIAL SAFETY DATA SHEET WILL NO LONGER
BE UPDATED. SEE MSDS #2855.

1. CHEMICAL PRODUCT AND COMPANY IDENTIFICATION

CHEVRON UNLEADED GASOLINE W/MTBE

COMPANY IDENTIFICATION

CHEVRON USA PRODUCTS COMPANY
ENVIRONMENTAL, SAFETY, AND HEALTH
575 MARKET ST.
SAN FRANCISCO, CA  94105-2856

PRODUCT INFORMATION: (800)822-5823 MSDS REQUESTS
                     (510)242-5357 TECHNICAL

EMERGENCY TELEPHONE NUMBERS

CHEMTREC (24 HR):
(800)424-9300 OR (202)483-7616

REVISION NUMBER: 2     REVISION DATE: 02/03/93     MSDS NUMBER: 004276
                 NDA - NO DATA AVAILABLE      NA - NOT APPLICABLE

PREPARED ACCORDING TO THE OSHA HAZARD COMMUNICATION
STANDARD (29 CFR 1910.1200) BY THE CHEVRON ENVIRONMENTAL

EXHIBIT 2

HEALTH CENTER, INC., P.O. BOX 4054, RICHMOND, CA 94804.
CHEVRON UNLEADED GASOLINE W/MTBE

PAGE    2 OF 1

## 2. COMPOSITION/INFORMATION ON INGREDIENTS

SPECIAL NOTES: ETHYL ALCOHOL IS ONLY ADDED IN LIMITED SPECIFIC
DISTRIBUTION AREAS.
COMPOSITION COMMENT:
ALL THE COMPONENTS OF THIS MATERIAL ARE ON THE TOXIC SUBSTANCES CONTROL
ACT CHEMICAL SUBSTANCES INVENTORY.

THE PROPORTION COMPOSITIONS ARE GIVEN TO ALLOW FOR THE VARIOUS RANGES
OF THE COMPONENTS PRESENT IN THE WHOLE PRODUCT AND MAY NOT EQUAL 100%.

100.0 %    CHEVRON UNLEADED GASOLINE W/MTBE

CONTAINING

| COMPONENTS | AMOUNT | LIMIT/QTY | AGENCY/TYPE |
|---|---|---|---|
| GASOLINE (GENERIC) | | | |
| | 100.0% | 300PPM | ACGIH TWA |
| | | 500PPM | ACGIH STEL |
| | | 300PPM | OSHA TWA |
| | | 500PPM | OSHA STEL |
| INCLUDING | | | |
| BENZENE | | | |
| CHEMICAL NAME: BENZENE | | | |
| CAS71432 | < 4.9% | 10PPM | ACGIH TWA |
| | | 1PPM | OSHA TWA |
| | | 5PPM | OSHA STEL |
| | | 25 PPM | OSHA CEILING |
| | | 10 LBS | CERCLA 302.4 RQ |

REFER TO THE OSHA BENZENE STANDARD (29 CFR 1910.1028) FOR DETAILED
TRAINING, EXPOSURE MONITORING, RESPIRATORY PROTECTION AND MEDICAL
SURVEILLANCE REQUIREMENTS BEFORE USING THIS PRODUCT.

| ETHYL BENZENE | | | |
|---|---|---|---|
| CHEMICAL NAME: ETHYLBENZENE | | | |
| CAS100414 | < 1.4% | 100PPM | ACGIH TWA |
| | | 125PPM | ACGIH STEL |
| | | 100PPM | OSHA TWA |
| | | 125PPM | OSHA STEL |
| | | 1,000 LBS | CERCLA 302.4 RQ |
| XYLENE-P | | | |
| CHEMICAL NAME: XYLENE-P | | | |
| CAS106423 | < 0.9% | 150 PPM | ACGIH STEL |

```
                                               1,000 LBS            CERCLA 302.4 RQ

    XYLENE-M

REVISION NUMBER: 2.         REVISION DATE: 02/03/93      MSDS NUMBER: 004278
              NDA - NO DATA AVAILABLE        NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE
                                                                   PAGE   3 OF 1
CHEMICAL NAME: XYLENE-M
CAS108383                       < 4.6%       100PPM              ACGIH TWA
                                             150PPM              ACGIH STEL
                                             100PPM              OSHA TWA
                                             150PPM              OSHA STEL
                                             1,000 LBS           CERCLA 302.4 RQ

    XYLENE-O
CHEMICAL NAME: XYLENE-O
CAS95476                        < 2.2%       100PPM              ACGIH TWA
                                             150PPM              ACGIH STEL
                                             100PPM              OSHA TWA
                                             150PPM              OSHA STEL
                                             1,000 LBS           CERCLA 302.4 RQ

    TOLUENE
CHEMICAL NAME: TOLUENE
CAS108883                       < 6.5%       100PPM              ACGIH TWA
                                             150PPM              ACGIH STEL
                                             100PPM              OSHA TWA
                                             150PPM              OSHA STEL
                                             300 PPM             OSHA CEILING
                                             1,000 LBS           CERCLA 302.4 RQ

    HEXANE
CHEMICAL NAME: HEXANE
CAS110543                       < 3.0%       50PPM               ACGIH TWA
                                             1000 PPM            ACGIH STEL
                                             50PPM               OSHA TWA

    CYCLOHEXANE
CHEMICAL NAME: CYCLOHEXANE
CAS110827                       < 2.4%       300PPM              ACGIH TWA
                                             300PPM              OSHA TWA
                                             1,000 LBS           CERCLA 302.4 RQ

      CAN CONTAIN

    MTBE
CHEMICAL NAME: METHYL TERT-BUTYL ETHER
CAS1634044                      < 15.0%      1 LBS               CERCLA 302.4 RQ

      OR

    ETHANOL
CHEMICAL NAME: ETHYL ALCOHOL
```

CAS64175          < 10.0%          1,000PPM          ACGIH TWA
                                   1000PPM           OSHA TWA

TLV  - THRESHOLD LIMIT VALUE       TWA - TIME WEIGHTED AVERAGE
STEL - SHORT-TERM EXPOSURE LIMIT   TPQ - THRESHOLD PLANNING QUANTITY
RQ   - REPORTABLE QUANTITY         CPS - CUSA PRODUCT CODE
CC   - CHEVRON CHEMICAL COMPANY     CAS - CHEMICAL ABSTRACT SERVICE NUMBER

REVISION NUMBER: 2      REVISION DATE: 02/03/93      MSDS NUMBER: 004276
               NDA - NO DATA AVAILABLE      NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE                          PAGE   4 OF 1

‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗

3. HAZARDS IDENTIFICATION

*********************** EMERGENCY OVERVIEW ***************************

     - HARMFUL OR FATAL IF SWALLOWED - CAN ENTER LUNGS
       AND CAUSE DAMAGE
     - VAPOR HARMFUL
     - LONG-TERM EXPOSURE TO VAPOR HAS CAUSED CANCER IN
       LABORATORY ANIMALS
     - MAY CAUSE EYE AND SKIN IRRITATION
     - EXTREMELY FLAMMABLE
     - KEEP OUT OF REACH OF CHILDREN

********************************************************************

POTENTIAL HEALTH EFFECTS

EYE CONTACT:
THIS SUBSTANCE IS SLIGHTLY IRRITATING TO THE EYES AND COULD CAUSE
PROLONGED (DAYS) IMPAIRMENT OF YOUR VISION. THE DEGREE OF THE INJURY WILL
DEPEND ON THE AMOUNT OF MATERIAL THAT GETS INTO THE EYE AND THE SPEED AND
THOROUGHNESS OF THE FIRST AID TREATMENT. SIGNS AND SYMPTOMS MAY INCLUDE
PAIN, TEARS, SWELLING, REDNESS, AND BLURRED VISION. EYE CONTACT WITH THE
VAPORS, FUMES, OR SPRAY MIST FROM THIS SUBSTANCE COULD ALSO CAUSE SIMILAR
SIGNS AND SYMPTOMS.
SKIN IRRITATION:
PROLONGED OR FREQUENTLY REPEATED CONTACT MAY CAUSE THE SKIN TO BECOME
CRACKED OR DRY FROM THE DEFATTING ACTION OF THIS MATERIAL.
DERMAL TOXICITY:
IF ABSORBED THROUGH THE SKIN, THIS SUBSTANCE IS CONSIDERED PRACTICALLY
NON-TOXIC TO INTERNAL ORGANS.
RESPIRATORY/INHALATION:
THIS SUBSTANCE IS SLIGHTLY TOXIC TO INTERNAL ORGANS IF INHALED. THE
DEGREE OF INJURY WILL DEPEND ON THE AIRBORNE CONCENTRATION AND DURATION OF
EXPOSURE. THE TARGET ORGAN(S) IS THE NERVOUS SYSTEM. INHALATION OF
GASOLINE VAPOR AT AIRBORNE CONCENTRATIONS EXCEEDING 1000 PPM MAY CAUSE
SIGNS AND SYMPTOMS OF CENTRAL NERVOUS SYSTEM EFFECTS SUCH AS HEADACHE,
DIZZINESS, LOSS OF APPETITE, WEAKNESS AND LOSS OF COORDINATION. VAPOR

CONCENTRATIONS IN EXCESS OF 5000 PPM MAY CAUSE LOSS OF CONSCIOUSNESS, COMA AND DEATH.   BRIEF EXPOSURES TO HIGH VAPOR CONCENTRATIONS MAY ALSO CAUSE PULMONARY EDEMA AND BRONCHITIS.  INTENTIONAL EXPOSURES TO EXCESSIVELY HIGH CONCENTRATIONS (E.G., WHEN USED AS A DRUG OF ABUSE) HAVE BEEN REPORTED TO RESULT IN CLINICAL MANIFESTATIONS THAT MAY INCLUDE CONVULSIONS, DELIRIUM, AND HALLUCINATIONS.   THESE MANIFESTATIONS ARE NOT KNOWN TO OCCUR FOLLOWING ACCIDENTAL INHALATION OF GASOLINE VAPOR DURING NORMAL OPERATIONS.
INGESTION:
THIS SUBSTANCE IS SLIGHTLY TOXIC TO INTERNAL ORGANS IF SWALLOWED.  THE DEGREE OF INJURY WILL DEPEND ON THE AMOUNT ABSORBED FROM THE GUT.  THE TARGET ORGAN(S) IS THE NERVOUS SYSTEM.  SIGNS AND SYMPTOMS OF CENTRAL NERVOUS SYSTEM EFFECTS MAY INCLUDE ONE OR MORE OF THE FOLLOWING:
HEADACHE, DIZZINESS, LOSS OF APPETITE, WEAKNESS AND LOSS OF COORDINATION.

REVISION NUMBER: 2        REVISION DATE: 02/03/93       MSDS NUMBER: 004276
          NDA - NO DATA AVAILABLE     NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE                            PAGE   5 OF 1

BECAUSE OF THE LOW VISCOSITY OF THIS SUBSTANCE, IT CAN DIRECTLY ENTER THE LUNGS IF IT IS SWALLOWED (THIS IS CALLED ASPIRATION).  THIS CAN OCCUR DURING THE ACT OF SWALLOWING OR WHEN VOMITING THE SUBSTANCE.  ONCE IN THE LUNGS, THE SUBSTANCE IS VERY DIFFICULT TO REMOVE AND CAN CAUSE SEVERE INJURY TO THE LUNGS AND DEATH.

4 ▨▨▨▨▨ MEASURES

EYE CONTACT:
▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ FRESH WATER FOR AT LEAST 15 MINUTES WHILE HOLDING THE EYELIDS OPEN.  REMOVE CONTACT LENSES IF WORN.  NO ADDITIONAL FIRST AID SHOULD BE NECESSARY.  HOWEVER, IF IRRITATION PERSISTS, SEE A DOCTOR.
SKIN CONTACT:
NO FIRST AID PROCEDURES ARE REQUIRED.  AS A PRECAUTION, ▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ REMOVE AND WASH CONTAMINATED CLOTHING.
▨▨▨▨▨▨▨▨:
IF RESPIRATORY IRRITATION OR ANY SIGNS OR SYMPTOMS AS DESCRIBED IN THIS DOCUMENT OCCUR, MOVE THE PERSON TO FRESH AIR.  IF ANY OF THESE EFFECTS CONTINUE, SEE A DOCTOR.
INGESTION:
IF SWALLOWED, GIVE WATER OR MILK TO DRINK AND TELEPHONE FOR MEDICAL ADVICE.  DO NOT MAKE PERSON VOMIT UNLESS DIRECTED TO DO SO BY MEDICAL PERSONNEL.  IF MEDICAL ADVICE CANNOT BE OBTAINED, THEN TAKE THE PERSON AND PRODUCT CONTAINER TO THE NEAREST MEDICAL EMERGENCY TREATMENT CENTER OR HOSPITAL.  NOTE TO PHYSICIAN: INGESTION OF THIS PRODUCT OR SUBSEQUENT VOMITING CAN RESULT IN ASPIRATION OF LIGHT HYDROCARBON LIQUID WHICH CAN CAUSE PNEUMONITIS.

5. FIRE FIGHTING MEASURES

FLASH POINT: (P-M) < -49F  (-46C)

AUTOIGNITION: NDA
FLAMMABILITY LIMITS (% BY VOLUME IN AIR): LOWER: 1.4  UPPER: 7.6
EXTINGUISHING MEDIA:
    FIRE FIGHTING FOAM: ALCOHOL RESISTANT TYPE (AR)
    AFFF, CO2, DRY CHEMICAL.
FIRE FIGHTING PROCEDURES:
THIS PRODUCT PRESENTS AN EXTREME FIRE HAZARD.  LIQUID VERY QUICKLY
EVAPORATES, EVEN AT LOW TEMPERATURES, AND FORMS VAPOR (FUMES) WHICH CAN
CATCH FIRE AND BURN WITH EXPLOSIVE VIOLENCE.  INVISIBLE VAPOR SPREADS
EASILY AND CAN BE SET ON FIRE BY MANY SOURCES SUCH AS PILOT LIGHTS,
WELDING EQUIPMENT, AND ELECTRICAL MOTORS AND SWITCHES.


FOR FIRES INVOLVING THIS MATERIAL, DO NOT ENTER ANY ENCLOSED OR CONFINED
FIRE SPACE WITHOUT PROPER PROTECTIVE EQUIPMENT.  THIS MAY INCLUDE
SELF-CONTAINED BREATHING APPARATUS TO PROTECT AGAINST THE HAZARDOUS
EFFECTS OF NORMAL PRODUCTS OF COMBUSTION OR OXYGEN DEFICIENCY.  READ THE
ENTIRE DOCUMENT.
COMBUSTION PRODUCTS:

REVISION NUMBER: 2        REVISION DATE: 02/23/93      MSDS NUMBER: 004276
            NDA - NO DATA AVAILABLE      NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE
                                                  PAGE   6 OF 1

NORMAL COMBUSTION FORMS CARBON DIOXIDE AND WATER VAPOR; INCOMPLETE
COMBUSTION CAN PRODUCE CARBON MONOXIDE.
NFPA RATINGS: HEALTH 1; FLAMMABILITY 3; REACTIVITY 0; SPECIAL NDA;
LEAST-0, SLIGHT-1, MODERATE-2, HIGH-3, EXTREME-4).  THESE VALUES ARE
OBTAINED USING THE GUIDELINES OR PUBLISHED EVALUATIONS PREPARED BY THE
NATIONAL FIRE PROTECTION ASSOCIATION (NFPA) OR THE NATIONAL PAINT AND
COATING ASSOCIATION.


6  ENVIRONMENTAL CONCERNS, SPILL RESPONSE AND DISPOSAL


CHEMTREC EMERGENCY NUMBER (24 HR): (800)424-9300 OR (202)483-7616
SPILL OR LEAK PRECAUTIONS:
ELIMINATE ALL SOURCES OF IGNITION IN VICINITY OF SPILL OR RELEASED VAPOR.

CLEANUP STAFF SHOULD BE PROTECTED AGAINST ... PROTECTIVE EQUIPMENT
SECTION.  THIS MATERIAL IS CONSIDERED TO BE A WATER POLLUTANT AND RELEASES
OF THIS PRODUCT SHOULD BE PREVENTED FROM CONTAMINATING SOIL AND WATER AND
FROM ENTERING DRAINAGE AND SEWER SYSTEMS.

STATE REGULATIONS REQUIRE REPORTING SPILLS OF THIS MATERIAL THAT COULD
REACH ANY SURFACE WATERS.  THE TOLL FREE NUMBER FOR THE U.S. COAST GUARD
NATIONAL RESPONSE CENTER IS (800) 424-8802.

DISPOSAL METHODS:
CLEAN UP SMALL SPILLS USING APPROPRIATE TECHNIQUES SUCH AS SORBENT
MATERIALS OR PUMPING.  WHERE FEASIBLE AND APPROPRIATE, REMOVE CONTAMINATED
SOIL.  FOLLOW PRESCRIBED PROCEDURES FOR REPORTING AND RESPONDING TO LARGER
RELEASES.  PLACE CONTAMINATED MATERIALS IN DISPOSABLE CONTAINERS AND
DISPOSE OF IN A MANNER CONSISTENT WITH APPLICABLE REGULATIONS.  CONTACT

LOCAL ENVIRONMENTAL OR HEALTH AUTHORITIES FOR APPROVED DISPOSAL OF THIS
MATERIAL.

## 7. STORAGE, HANDLING, AND REACTIVITY

HAZARDOUS DECOMPOSITION PRODUCTS:
NDA.
STABILITY:
STABLE.
HAZARDOUS POLYMERIZATION:
POLYMERIZATION WILL NOT OCCUR.
INCOMPATIBILITY:
MAY REACT WITH STRONG OXIDIZING AGENTS, SUCH AS CHLORATES, NITRATES,
PEROXIDES, ETC.
SPECIAL PRECAUTIONS:
NEVER SIPHON GASOLINE BY MOUTH.  READ AND OBSERVE ALL PRECAUTIONS ON
PRODUCT LABEL.  USE ONLY AS A MOTOR FUEL.  DO NOT USE FOR CLEANING,
PRESSURE APPLIANCE FUEL, OR ANY OTHER SUCH USE.  DO NOT USE OR STORE NEAR
FLAME, SPARKS OR HOT SURFACES.  USE ONLY IN WELL VENTILATED AREA.  KEEP
CONTAINER CLOSED.  DO NOT TRANSFER LIQUID TO AN UNLABELED CONTAINER.  DO

REVISION NUMBER: 2          REVISION DATE: 02/03/93          MSDS NUMBER: 884276
              NDA - NO DATA AVAILABLE      NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINES (PMR)                              PAGE   7 OF 1

NOT WELD, HEAT OR DRILL CONTAINER.  REPLACE CAP OR BUNG. EMPTIED CONTAINER
STILL CONTAINS HAZARDOUS OR EXPLOSIVE VAPOR OR LIQUID.

## 8. PROTECTIVE EQUIPMENT

EYE PROTECTION:
DO NOT GET THIS MATERIAL IN YOUR EYES.  EYE CONTACT CAN BE AVOIDED BY
WEARING CHEMICAL GOGGLES.
SKIN PROTECTION:
NO SPECIAL SKIN PROTECTION IS USUALLY NECESSARY.  AVOID PROLONGED OR
FREQUENTLY REPEATED SKIN CONTACT WITH THIS MATERIAL.  SKIN CONTACT CAN BE
MINIMIZED BY WEARING PROTECTIVE CLOTHING.
RESPIRATORY PROTECTION:
NO SPECIAL RESPIRATORY PROTECTION IS NORMALLY REQUIRED.  HOWEVER, IF
OPERATING CONDITIONS CREATE AIRBORNE CONCENTRATIONS WHICH EXCEED THE
RECOMMENDED EXPOSURE STANDARDS, THE USE OF AN APPROVED RESPIRATOR IS
REQUIRED.  REFER TO THE OSHA BENZENE STANDARD TO DETERMINE WHAT TYPE OF
RESPIRATOR IS REQUIRED BASED ON EXPOSURE LEVELS.
VENTILATION:
USE THIS MATERIAL ONLY IN WELL VENTILATED AREAS.

## 9. PHYSICAL AND CHEMICAL PROPERTIES

```
APPEARANCE:          ORANGE TO BRONZE LIQUID.
ODOR:                NDA
PHYSICAL STATE:      NDA
PH:                  NDA
VAPOR PRESSURE:      5 - 15 PSI  (MAX.) @ 100F (VARIABLE)
VAPOR DENSITY
 (AIR=1):            3-4
BOILING POINT:       25 - 225C  (VARIABLE)
FREEZING POINT:      NDA
MELTING POINT:       NA
SOLUBILITY:          SOLUBLE IN HYDROCARBONS INSOLUBLE IN WATER
SPECIFIC GRAVITY:    0.7 - 0.8
DENSITY:             NDA
EVAPORATION RATE:    NDA
PERCENT VOLATILE
 (VOL):              99+%
```

## 10. TOXICOLOGICAL INFORMATION

EYE IRRITATION:
THE DRAIZE EYE IRRITATION SCORE (RANGE, 0-110) IN RABBITS IS 0.
SKIN IRRITATION:
THE DRAIZE SKIN PRIMARY IRRITATION SCORE (RANGE, 0-8) FOR A 4-HOUR
EXPOSURE (RABBITS) IS 0.08.  THIS MATERIAL WAS NOT A SKIN SENSITIZER IN

REVISION NUMBER: 2          REVISION DATE: 02/03/93          MSDS NUMBER: 004276
              NDA - NO DATA AVAILABLE     NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE
                                                              PAGE   8 OF 1

THE MODIFIED BUEHLER GUINEA PIG SENSITIZATION TEST.
DERMAL TOXICITY:
THE DERMAL LD50 IN RABBITS IS > 5 ML/KG.
RESPIRATORY/INHALATION:
NO PRODUCT TOXICOLOGY DATA AVAILABLE.
INGESTION:
THE ORAL LD50 IN RATS IS > 5 ML/KG.
ADDITIONAL TOXICOLOGY DATA:
LIFETIME INHALATION OF WHOLE GASOLINE VAPOR HAS CAUSED INCREASED LIVER
TUMORS IN FEMALE MICE.  THE MECHANISM OF THIS RESPONSE IS STILL BEING
INVESTIGATED BUT IT IS THOUGHT TO BE AN EPIGENETIC PROCESS UNIQUE TO THE
FEMALE MOUSE.  INHALATION EXPOSURE TO WHOLE GASOLINE VAPOR ALSO CAUSED
KIDNEY DAMAGE AND EVENTUALLY KIDNEY CANCER IN MALE RATS.  NO OTHER ANIMAL
MODEL STUDIED HAS SHOWN THESE ADVERSE KIDNEY EFFECTS AND THERE IS NO
PHYSIOLOGICAL REASON TO BELIEVE THAT THEY WOULD OCCUR IN MAN.

THE DATA ABOVE IS OBTAINED FROM STUDIES SPONSORED BY THE AMERICAN
PETROLEUM INSTITUTE (API).

## 11. TRANSPORT INFORMATION

THE DESCRIPTION SHOWN MAY NOT APPLY TO ALL SHIPPING SITUATIONS.
CONSULT 49CFR, OR APPROPRIATE DANGEROUS GOODS REGULATIONS, FOR
ADDITIONAL DESCRIPTION REQUIREMENTS (E.G., TECHNICAL NAME) AND
MODE-SPECIFIC OR QUANTITY-SPECIFIC SHIPPING REQUIREMENTS.

DOT SHIPPING NAME: NDA
DOT HAZARD CLASS: NDA
DOT IDENTIFICATION NUMBER: NDA
DOT PACKING GROUP: NDA

12. REGULATORY INFORMATION

SARA 311 CATEGORIES:    1.  IMMEDIATE (ACUTE) HEALTH EFFECTS:  YES
                       2.  DELAYED (CHRONIC) HEALTH EFFECTS:  YES
                       3.  FIRE HAZARD:                       YES
                       4.  SUDDEN RELEASE OF PRESSURE HAZARD: NO
                       5.  REACTIVITY HAZARD:                 NO

REGULATORY LISTS SEARCHED:

01=SARA 313              11=NJ RTK              21=TSCA SECT 4(E)
02=MASS RTK             12=CERCLA 302.4         22=TSCA SECT 5(A)(E)(F)
03=NTP CARCINOGEN       13=MN RTK               23=TSCA SECT 6
04=CA PROP 65-CARCIN    14=ACGIH TWA            24=TSCA SECT 12(B)
05=CA PROP 65-REPRO TOX 15=ACGIH STEL           25=TSCA SECT 8(A)
06=IARC GROUP 1         16=ACGIH CALC TLV       26=TSCA SECT 8(D)
07=IARC GROUP 2A        17=OSHA TWA             28=CANADIAN WHMIS
08=IARC GROUP 2B        18=OSHA STEL            29=OSHA CEILING

REVISION NUMBER: 2            REVISION DATE: 02/03/93        MSDS NUMBER: 004276
            NDA - NO DATA AVAILABLE        NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE
                                                            PAGE  9 OF 1
09=SARA 302/304         19=CHEVRON TWA          30=CHEVRON STEL
10=PA RTK               20=EPA CARCINOGEN

THE FOLLOWING COMPONENTS OF THIS MATERIAL ARE FOUND ON THE REGULATORY
LISTS INDICATED.

ETHYLBENZENE
    IS FOUND ON LISTS:  01,02,10,11,12,13,14,15,17,18,26,28,
XYLENE-P
    IS FOUND ON LISTS:  01,02,10,11,12,15,26,28,
XYLENE-M
    IS FOUND ON LISTS:  01,02,10,11,12,15,26,28,
TOLUENE
    IS FOUND ON LISTS:  01,02,10,11,12,14,15,17,18,26,28,
HEXANE
    IS FOUND ON LISTS:  01,02,04,10,11,12,13,14,15,17,18,26,28,28,
HEXANE
    IS FOUND ON LISTS:  02,10,11,12,14,15,17,28,

CYCLOHEXANE
   IS FOUND ON LISTS:  B1,B2,1B,11,12,13,14,17,26,2B,
METHYL TERT BUTYL ETHER
   IS FOUND ON LISTS:  B4,71B,11,21,24,26,
ETHYL ALCOHOL
   IS FOUND ON LISTS:  B2,1B,11,13,14,17,2B,
BENZENE
   IS FOUND ON LISTS:  B1,B2,B3,B4,B6,1B,11,12,13,14,17,1B,2B,26,2B,29,
XYLENE-O
   IS FOUND ON LISTS:  B1,B2,1B,11,12,14,15,17,1B,26,2B,
GASOLINE (GENERIC)
   IS FOUND ON LISTS:  B4,BB,14,15,17,1B,2B,

13. ADDITIONAL HEALTH DATA

ADDITIONAL HEALTH DATA COMMENT:
THIS PRODUCT CONTAINS BENZENE.  THE OSHA BENZENE STANDARD (29 CFR
1910.1028) CONTAINS DETAILED REQUIREMENTS FOR TRAINING, EXPOSURE
MONITORING, RESPIRATORY PROTECTION AND MEDICAL SURVEILLANCE TRIGGERED BY
THE EXPOSURE LEVEL.  REFER TO THE OSHA STANDARD BEFORE USING THIS PRODUCT.
REPEATED OR PROLONGED BREATHING OF BENZENE VAPORS HAS BEEN ASSOCIATED WITH
THE DEVELOPMENT OF CHROMOSOMAL DAMAGE IN EXPERIMENTAL ANIMALS AND VARIOUS
BLOOD DISEASES IN HUMANS RANGING FROM APLASTIC ANEMIA TO LEUKEMIA (A FORM
OF CANCER).  ALL OF THESE DISEASES CAN BE FATAL.  NO BIRTH DEFECTS HAVE
BEEN SHOWN TO OCCUR IN PREGNANT LABORATORY ANIMALS EXPOSED TO DOSES NOT
TOXIC TO THE MOTHER.  HOWEVER, SOME EVIDENCE OF FETAL TOXICITY SUCH AS
DELAYED PHYSICAL DEVELOPMENT HAS BEEN SEEN AT SUCH LEVELS.  THE AVAILABLE
INFORMATION ON THE EFFECTS OF BENZENE ON HUMAN PREGNANCIES IS INADEQUATE
BUT IT HAS BEEN ESTABLISHED THAT BENZENE CAN CROSS THE HUMAN PLACENTA.

THIS PRODUCT CONTAINS N-HEXANE.  PROLONGED OR REPEATED SKIN CONTACT OR
BREATHING OF VAPORS MAY CAUSE NERVE DAMAGE CHARACTERIZED BY PROGRESSIVE
WEAKNESS AND NUMBNESS IN THE ARMS AND LEGS.  RECOVERY RANGES FROM NO
RECOVERY TO COMPLETE RECOVERY DEPENDING UPON THE SEVERITY OF THE NERVE
DAMAGE.

REVISION NUMBER: 2          REVISION DATE: B2/B9/B9      MSDS NUMBER: BB4276
          NDA - NO DATA AVAILABLE     NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE
                                                  PAGE  1B OF 1

THIS PRODUCT CONTAINS TOLUENE. TOLUENE HAS BEEN REPORTED TO DECREASE
IMMUNOLOGICAL RESPONSES IN TEST ANIMALS. IT HAS ALSO BEEN REPORTED THAT
WHEN YOUNG RATS WERE EXPOSED TO 1000 PPM TOLUENE FOR 14 HOURS DAILY, FOR
TWO WEEKS, IRREVERSIBLE HEARING LOSS WAS DETECTED. THE SAME DAILY EXPOSURE
TO 700 PPM FOR AS LONG AS 16 WEEKS WAS WITHOUT EFFECT. SINCE THE LEVEL
NECESSARY TO PRODUCE HEARING LOSS IS GREATER THAN 7 TIMES THE ACGIH
TLV-TWA FOR TOLUENE, WORKER EXPOSURES AT OR BELOW 100 PPM IS NOT EXPECTED
TO CAUSE ANY ADVERSE EFFECTS.  THERE ARE ALSO REPORTS THAT CHRONIC SOLVENT
ABUSERS (GLUE SNIFFERS, SOLVENT HUFFERS) WHO DELIBERATELY INHALE HIGH
CONCENTRATIONS (SEVERAL THOUSAND PPM) OF TOLUENE FOR PROLONGED PERIODS (UP
TO TEN HOURS/DAY) HAVE SUFFERED LIVER, KIDNEY AND BRAIN DAMAGE. TOLUENE

MAY ALSO CAUSE MENTAL AND/OR GROWTH RETARDATION IN THE CHILDREN OF FEMALE
SOLVENT ABUSERS WHO DIRECTLY INHALE TOLUENE WHEN THEY ARE PREGNANT.
TOLUENE CAUSED GROWTH RETARDATION IN RATS WHEN ADMINISTERED AT DOSES THAT
WERE TOXIC TO THE MOTHERS (1500 PPM). CONCENTRATIONS OF UP TO 5000 PPM
DID NOT CAUSE BIRTH DEFECTS. THERE WERE NO EFFECTS IN THE OFFSPRING AT
DOSES THAT DID NOT INTOXICATE THE PREGNANT RATS. THE EXPOSURE LEVEL AT
WHICH NO EFFECTS WERE SEEN (NO OBSERVED EFFECT LEVEL, NOEL) IS 750 PPM. WE
RECOMMEND THAT THE PRECAUTIONS OUTLINED IN THIS MSDS BE FOLLOWED TO KEEP
TOLUENE CONCENTRATIONS BELOW THE RECOMMENDED EXPOSURE STANDARDS.

THIS PRODUCT CONTAINS XYLENE, A CHEMICAL THAT HAS BEEN REPORTED TO CAUSE
DEVELOPMENTAL TOXICITY IN RATS AND MICE EXPOSED BY INHALATION DURING
PREGNANCY. THE EFFECTS NOTED CONSISTED OF DELAYED DEVELOPMENT AND MINOR
SKELETAL VARIATIONS; ADDITIONALLY, WHEN PREGNANT MICE WERE EXPOSED BY
INGESTION TO A LEVEL THAT KILLED NEARLY ONE-THIRD OF THE TEST GROUP,
LETHALITY (RESORPTIONS) AND MALFORMATIONS (PRIMARILY CLEFT PALATE)
OCCURRED. MALFORMATIONS HAVE NOT BEEN REPORTED FOLLOWING INHALATION
EXPOSURE. BECAUSE OF THE VERY HIGH LEVELS OF EXPOSURE USED IN THESE
STUDIES, WE DO NOT BELIEVE THAT THEIR RESULTS IMPLY AN INCREASED RISK OF
REPRODUCTIVE TOXICITY TO WORKERS EXPOSED TO XYLENE LEVELS AT OR BELOW THE
EXPOSURE STANDARD.

XYLENE HAS GIVEN NEGATIVE RESULTS IN SEVERAL MUTAGEN TESTING ASSAYS
INCLUDING THE AMES ASSAY. IN A CANCER STUDY SPONSORED BY THE NATIONAL
TOXICOLOGY PROGRAM (NTP), TECHNICAL GRADE XYLENE GAVE NO EVIDENCE OF
CARCINOGENICITY IN RATS OR MICE DOSED DAILY FOR TWO YEARS.

THIS PRODUCT CAN CONTAIN METHYL TERT BUTYL ETHER (MTBE). MOST
MUTAGENICITY DATA ON MTBE, EXCEPT FOR THE IN VITRO MOUSE LYMPHOMA TEST,
INDICATE THAT IT IS NOT MUTAGENIC. MTBE CAUSED BIRTH DEFECTS IN MICE
EXPOSED TO 8,000 PPM THROUGHOUT PREGNANCY. NO BIRTH DEFECTS WERE OBSERVED
IN MICE AT 1,000 PPM OR IN RATS OR RABBITS AT ANY DOSE OF MTBE. THESE
RESULTS SUGGEST THAT THE RISK OF BIRTH DEFECTS IN HUMANS FROM MTBE IS
NEGLIGIBLE AT THE ANTICIPATED EXPOSURE CONCENTRATIONS.

WHOLE GASOLINE EXHAUST WAS REVIEWED BY THE INTERNATIONAL AGENCY FOR
RESEARCH ON CANCER (IARC) IN THEIR MONOGRAPH VOLUME 46 (1989). EVIDENCE
FOR CAUSING CANCER WAS CONSIDERED INADEQUATE IN ANIMALS AND INADEQUATE IN
HUMANS. IARC PLACED WHOLE GASOLINE EXHAUST IN CATEGORY 2B, CONSIDERING IT
POSSIBLY CARCINOGENIC TO HUMANS.

REVISION NUMBER: 2          REVISION DATE: 02/03/93
          NDA - NO DATA AVAILABLE .          MSDS NUMBER: 004376
CHEVRON UNLEADED GASOLINE W/MTBE          NA - NOT APPLICABLE
                                                        PAGE 11 OF 1

***************************************************************************

THE ABOVE INFORMATION IS BASED ON THE DATA OF WHICH WE ARE AWARE AND IS
BELIEVED TO BE CORRECT AS OF THE DATE HEREOF. SINCE THIS INFORMATION MAY
BE APPLIED UNDER CONDITIONS BEYOND OUR CONTROL AND WITH WHICH WE MAY BE

UNFAMILIAR AND SINCE DATA MADE AVAILABLE SUBSEQUENT TO THE DATE HEREOF MAY
SUGGEST MODIFICATION OF THE INFORMATION, WE DO NOT ASSUME ANY RESPONSIBIL-
ITY FOR THE RESULTS OF ITS USE.   THIS INFORMATION IS FURNISHED UPON
CONDITION THAT THE PERSON RECEIVING IT SHALL MAKE HIS OWN DETERMINATION
OF THE SUITABILITY OF THE MATERIAL FOR HIS PARTICULAR PURPOSE.

REVISION NUMBER: 2          REVISION DATE: 02/03/93          MSDS NUMBER: B84276
          NDA - NO DATA AVAILABLE          NA - NOT APPLICABLE

TOTAL P.13

Exhibit 3

# Exhibit 6

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 2 | 116131 | 1998 | 1998 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 3 | 116131 | 1998 | 1998 | TEXACO | NW CORNER OF FRUIT AND CLINTON | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 4 | 116131 | 1998 | 1998 | TEXACO | NW CORNER OF FRUIT AND CLINTON | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 5 | 116131 | 1999 | 1999 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 6 | 116131 | 2000 | 2000 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 7 | 116131 | 2001 | 2001 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 8 | 116131 | 2002 | 2002 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 9 | 116131 | 2003 | 2003 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 10 | 116132 | 1998 | 1998 | TEXACO | SEC BLACKSTONE AND BARSTOW | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 11 | 116132 | 1998 | 1998 | TEXACO | SEC BLACKSTONE AND BARSTOW | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 12 | 116132 | 1999 | 1999 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 13 | 116132 | 1999 | 1999 | TEXACO | SEC BLACKSTONE AND BARSTOW | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 14 | 116132 | 2000 | 2000 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 15 | 116132 | 2000 | 2000 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 16 | 116132 | 2001 | 2001 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 17 | 116132 | 2002 | 2002 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 18 | 116132 | 2002 | 2002 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 19 | | | | | | | | | | | |
| 20 | | | | | | | | | | | |
| 21 | | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | | | | | | | | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | | | | | | | | | | | |
| 31 | | | | | | | | | | | |
| 32 | | | | | | | | | | | |
| 33 | | | | | | | | | | | |
| 34 | | | | | | | | | | | |
| 35 | | | | | | | | | | | |
| 36 | | | | | | | | | | | |
| 37 | | | | | | | | | | | |
| 38 | | | | | | | | | | | |
| 39 | | | | | | | | | | | |
| 40 | | | | | | | | | | | |
| 41 | | | | | | | | | | | |
| 42 | | | | | | | | | | | |
| 43 | | | | | | | | | | | |
| 44 | | | | | | | | | | | |
| 45 | | | | | | | | | | | |
| 46 | | | | | | | | | | | |

Nov 11 2008
2:29 PM

Wallace King Docume[...]

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | 116484 | 2000 | 2000 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 48 | 116484 | 2001 | 2001 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 49 | 116484 | 2002 | 2002 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 50 | 116484 | 2002 | 2002 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 51 | 116484 | 2002 | 2002 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 52 | 116484 | 2003 | 2003 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 53 | 116484 | 2003 | 2003 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 54 | 116637 | 1998 | 1998 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 55 | 116637 | 1999 | 1999 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 56 | 116637 | 1999 | 1999 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 57 | 116637 | 2000 | 2000 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 58 | 116637 | 2000 | 2000 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 59 | 116637 | 2001 | 2001 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 60 | 116637 | 2002 | 2002 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 61 | 116637 | 2002 | 2002 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 62 | 116637 | 2003 | 2003 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 63 | 116637 | 2003 | 2003 | SHELL | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 64 | 116637 | 2003 | 2003 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 65 | 120584 | 1998 | 1998 | TEXACO | 1280 W BELMONT AVE. | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 66 | 120584 | 1998 | 1998 | TEXACO | 1280 W BELMONT AVE. | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 67 | 120584 | 1999 | 1999 | TEXACO | 1280 W BELMONT AVE. | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 68 | 120584 | 1999 | 1999 | TEXACO | 1280 W BELMONT AVE. | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 69 | 120584 | 2000 | 2000 | TEXACO | 1280 W BELMONT AVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 70 | 120584 | 2000 | 2000 | TEXACO | 1280 W BELMONT AVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 71 | 120584 | 2001 | 2001 | TEXACO | 1280 W BELMONT AVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 72 | 120584 | 2001 | 2001 | TEXACO | 1280 W BELMONT AVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 73 | 120584 | 2001 | 2001 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 74 | 120584 | 2002 | 2002 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 75 | 120584 | 2002 | 2002 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 76 | 120584 | 2003 | 2003 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 77 | 120584 | 2003 | 2003 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 78 | 120633 | 1998 | 1998 | TEXACO | 138 N MAPLE | FRESNO | CA | 00000 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 79 | 120633 | 1998 | 1998 | TEXACO | 138 N MAPLE | FRESNO | CA | 00000 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 80 | 120633 | 1999 | 1999 | TEXACO | 138 N MAPLE | FRESNO | CA | 00000 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 81 | 120633 | 1999 | 1999 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 82 | 120633 | 1999 | 1999 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 83 | 120633 | 2000 | 2000 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 84 | 120633 | 2001 | 2001 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 85 | 120633 | 2002 | 2002 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 86 | 120633 | 2003 | 2003 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 87 | 120700 | 1998 | 1998 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 88 | 120700 | 1998 | 1998 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 89 | 120700 | 1999 | 1999 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 90 | 120700 | 1999 | 1999 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 91 | 120700 | 2000 | 2000 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92 | 120700 | 2000 | 2000 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 93 | 120700 | 2001 | 2001 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 94 | 120700 | 2001 | 2001 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 95 | 120700 | 2002 | 2002 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 96 | 120700 | 2002 | 2002 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 97 | 120700 | 2003 | 2003 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93701 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 98 | 120700 | 2003 | 2003 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93701 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 99 | 120700 | 2003 | 2003 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 100 | 120715 | 1998 | 1998 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 101 | 120715 | 1998 | 1998 | | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 102 | 120715 | 1999 | 1999 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 103 | 120715 | 2000 | 2000 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 104 | 120715 | 2001 | 2001 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 105 | 120715 | 2001 | 2001 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 106 | 120715 | 2002 | 2002 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 107 | 120715 | 2002 | 2002 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 108 | 120715 | 2003 | 2003 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 109 | 120733 | 1998 | 1998 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 110 | 120733 | 1998 | 1998 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 111 | 120733 | 1998 | 1998 | | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 112 | 120733 | 1999 | 1999 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 113 | 120733 | 2000 | 2000 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 114 | 120733 | 2001 | 2001 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 115 | 120733 | 2002 | 2002 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 116 | 120733 | 2003 | 2003 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 117 | 120752 | 1998 | 1998 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 118 | 120752 | 1998 | 1998 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 119 | 120752 | 1999 | 1999 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 120 | 120752 | 1999 | 1999 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 121 | 120752 | 2000 | 2000 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 122 | 120752 | 2001 | 2001 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 123 | 120752 | 2002 | 2002 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 124 | 120752 | 2003 | 2003 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 125 | 120779 | 1998 | 1998 | TEXACO | 1785 W. SHAW AVE. | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 126 | 120779 | 1998 | 1998 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 127 | 120779 | 1999 | 1999 | TEXACO | 1785 W. SHAW AVE. | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 128 | 120779 | 2000 | 2000 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 129 | 120779 | 2000 | 2000 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 130 | 120779 | 2001 | 2001 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 131 | 120779 | 2001 | 2001 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 132 | 120779 | 2001 | 2001 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 133 | 120779 | 2002 | 2002 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 134 | 120779 | 2002 | 2002 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 135 | 120779 | 2003 | 2003 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 136 | 120779 | 2003 | 2003 | TEXACO | 1785 W SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 137 | 120953 | 1998 | 1998 | | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 138 | 120953 | 1998 | 1998 | | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 139 | 120953 | 1999 | 1999 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 140 | 120953 | 2000 | 2000 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 141 | 120953 | 2001 | 2001 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 142 | 120953 | 2001 | 2001 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 143 | 120953 | 2002 | 2002 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 144 | 120953 | 2002 | 2002 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 145 | 120953 | 2003 | 2003 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 146 | 120981 | 1999 | 1999 | | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 147 | 120981 | 1999 | 1999 | | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 148 | 120981 | 2000 | 2000 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 149 | 120981 | 2000 | 2000 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 150 | 120981 | 2001 | 2001 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 151 | 120981 | 2001 | 2001 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 152 | 120981 | 2002 | 2002 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 153 | 120981 | 2002 | 2002 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 154 | 120981 | 2003 | 2003 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 155 | 120981 | 2003 | 2003 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 156 | 121049 | 1998 | 1998 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 157 | 121049 | 1998 | 1998 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 158 | 121049 | 1998 | 1998 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 159 | 121049 | 1999 | 1999 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 160 | 121049 | 1999 | 1999 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 161 | 121049 | 2001 | 2001 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 162 | 121049 | 2002 | 2002 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 163 | 121049 | 2003 | 2003 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 164 | 121077 | 1998 | 1998 | | 3808 N BLACKSTONE/DAKOTA | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 165 | 121077 | 1998 | 1998 | | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 166 | 121077 | 1999 | 1999 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 167 | 121077 | 1999 | 1999 | TEXACO | 3808 N BLACKSTONE/DAKOTA | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 168 | 121077 | 2000 | 2000 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 169 | 121077 | 2000 | 2000 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 170 | 121077 | 2001 | 2001 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 171 | 121077 | 2001 | 2001 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 172 | 121077 | 2002 | 2002 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 173 | 121077 | 2002 | 2002 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 174 | 121077 | 2003 | 2003 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 175 | 121077 | 2003 | 2003 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 176 | 121077 | 2003 | 2003 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 177 | 121081 | 1998 | 1998 | | 3089 E. TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 178 | 121081 | 1998 | 1998 | | 3089 E. TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 179 | 121081 | 1999 | 1999 | TEXACO | 3089 E. TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 180 | 121081 | 1999 | 1999 | TEXACO | 3089 E. TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 181 | 121081 | 2000 | 2000 | TEXACO | 3089 E. TULARE ST | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 182 | 121081 | 2000 | 2000 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 183 | 121081 | 2000 | 2000 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 184 | 121081 | 2001 | 2001 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 185 | 121081 | 2001 | 2001 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 186 | 121081 | 2001 | 2001 | TEXACO | 3089 EAST TULARE ST | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 187 | 121081 | 2001 | 2001 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 188 | 121081 | 2002 | 2002 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 189 | 121081 | 2002 | 2002 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 190 | 121081 | 2003 | 2003 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 191 | 121081 | 2003 | 2003 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 192 | 121168 | 1998 | 1998 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 193 | 121168 | 1998 | 1998 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 194 | 121168 | 1999 | 1999 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 195 | 121168 | 1999 | 1999 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 196 | 121168 | 2000 | 2000 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 197 | 121168 | 2000 | 2000 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 198 | 121168 | 2001 | 2001 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 199 | 121168 | 2001 | 2001 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 200 | 121168 | 2002 | 2002 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 201 | 121168 | 2002 | 2002 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 202 | 121168 | 2003 | 2003 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 203 | 121168 | 2003 | 2003 | | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 204 | 121204 | 2001 | 2001 | | 394 EAST OLIVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | ARCHIVED |
| 205 | 121204 | 2003 | 2003 | | 394 EAST OLIVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | ARCHIVED |
| 206 | 121204 | 2003 | 2003 | | 394 EAST OLIVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | ARCHIVED |
| 207 | 121221 | 2001 | 2001 | | 4025 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | ARCHIVED |
| 208 | 121221 | 2002 | 2002 | | 4025 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | ARCHIVED |
| 209 | 121221 | 2003 | 2003 | | 4025 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | ARCHIVED |
| 210 | 121237 | 1998 | 1998 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 211 | 121237 | 1998 | 1998 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 212 | 121237 | 1998 | 1998 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 213 | 121237 | 1999 | 1999 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 214 | 121237 | 2000 | 2000 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 215 | 121237 | 2001 | 2001 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 216 | 121237 | 2002 | 2002 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 217 | 121237 | 2003 | 2003 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 218 | 121243 | 1998 | 1998 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 219 | 121243 | 1998 | 1998 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 220 | 121243 | 1999 | 1999 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 221 | 121243 | 1999 | 1999 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 222 | 121243 | 1999 | 1999 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 223 | 121243 | 2000 | 2000 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 224 | 121243 | 2001 | 2001 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 225 | 121243 | 2002 | 2002 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 226 | 121243 | 2002 | 2002 | TEXACO | 4245 N CEDAR AVENUE | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 227 | 121243 | 2003 | 2003 | TEXACO | 4245 N CEDAR AVENUE | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 228 | 121309 | 1998 | 2003 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 229 | 121309 | 1998 | 1998 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 230 | 121309 | 1999 | 1999 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 231 | 121309 | 1999 | 1999 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 232 | 121309 | 2000 | 2000 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 233 | 121309 | 2000 | 2000 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 234 | 121309 | 2001 | 2001 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 235 | 121309 | 2001 | 2001 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 236 | 121309 | 2001 | 2001 | TEXACO | 4805 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 237 | 121309 | 2002 | 2002 | TEXACO | 4805 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 238 | 121309 | 2002 | 2002 | TEXACO | 4805 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 239 | 121309 | 2003 | 2003 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 240 | 121309 | 2003 | 2003 | TEXACO | 4805 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 241 | 121377 | 1998 | 1998 | TEXACO | 5316 W SHAW  HWY 99 | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 242 | 121377 | 1998 | 1998 | TEXACO | 5316 W SHAW | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 243 | 121377 | 1999 | 1999 | TEXACO | 5316 W SHAW | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 244 | 121377 | 1999 | 1999 | TEXACO | 5316 W SHAW  HWY 99 | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 245 | 121377 | 1999 | 1999 | TEXACO | 5316 W SHAW  HWY 99 | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 246 | 121377 | 2000 | 2000 | TEXACO | 5316 W SHAW | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 247 | 121377 | 2000 | 2000 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 248 | 121377 | 2000 | 2000 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 249 | 121377 | 2001 | 2001 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 250 | 121377 | 2001 | 2001 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 251 | 121377 | 2001 | 2001 | TEXACO | 5316 WEST SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 252 | 121377 | 2002 | 2002 | TEXACO | 5316 WEST SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 253 | 121377 | 2002 | 2002 | TEXACO | 5316 WEST SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 254 | 121377 | 2003 | 2003 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 255 | 121377 | 2003 | 2003 | TEXACO | 5316 WEST SHAW AVENUE | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 256 | 121402 | 2001 | 2001 | | 1275 WEST SHAW | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 257 | 121402 | 2002 | 2002 | | 1275 WEST SHAW | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 258 | 121402 | 2003 | 2003 | | 1275 WEST SHAW | FRESNO | CA | 93711 | FRESNO | | ARCHIVED |
| 259 | 121418 | 1998 | 1998 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 260 | 121418 | 1998 | 1998 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 261 | 121418 | 1999 | 1999 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 262 | 121418 | 1999 | 1999 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 263 | 121418 | 2000 | 2000 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 264 | 121418 | 2000 | 2000 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 265 | 121418 | 2000 | 2000 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 266 | 121418 | 2001 | 2001 | TEXACO | 5756 N FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 267 | 121418 | 2001 | 2001 | TEXACO | 5756 N FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 268 | 121418 | 2001 | 2001 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 269 | 121418 | 2002 | 2002 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 270 | 121418 | 2002 | 2002 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 271 | 121418 | 2003 | 2003 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 272 | 121418 | 2003 | 2003 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 273 | 121419 | 1998 | 1998 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 274 | 121419 | 1998 | 1998 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 275 | 121419 | 1999 | 1999 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 276 | 121419 | 1999 | 1999 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 277 | 121419 | 2000 | 2000 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 278 | 121419 | 2000 | 2000 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 279 | 121419 | 2001 | 2001 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 280 | 121419 | 2001 | 2001 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 281 | 121419 | 2001 | 2001 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 282 | 121419 | 2002 | 2002 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 283 | 121419 | 2002 | 2002 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 284 | 121419 | 2003 | 2003 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 285 | 121488 | 1998 | 1998 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 286 | 121488 | 1998 | 1998 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 287 | 121488 | 1999 | 1999 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 288 | 121488 | 1999 | 1999 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 289 | 121488 | 2000 | 2000 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 290 | 121488 | 2000 | 2000 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 291 | 121488 | 2001 | 2001 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 292 | 121488 | 2001 | 2001 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 293 | 121488 | 2001 | 2001 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 294 | 121488 | 2002 | 2002 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 295 | 121488 | 2002 | 2002 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 296 | 121488 | 2003 | 2003 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 297 | 121488 | 2003 | 2003 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 298 | 121525 | 1998 | 1998 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 299 | 121525 | 1998 | 1998 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 300 | 121525 | 1999 | 1999 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 301 | 121525 | 1999 | 1999 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 302 | 121525 | 2000 | 2000 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 303 | 121525 | 2000 | 2000 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 304 | 121525 | 2001 | 2001 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 305 | 121525 | 2001 | 2001 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 306 | 121525 | 2002 | 2002 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 307 | 121525 | 2003 | 2003 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 308 | 121746 | 1998 | 1998 | TEXACO | 1016 W SHAW AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 309 | 121746 | 1998 | 1998 | TEXACO | 1016 W SHAW AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 310 | 121746 | 1999 | 1999 | TEXACO | 1016 W SHAW AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 311 | 121746 | 1999 | 1999 | TEXACO | 1016 W SHAW AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 312 | 121746 | 2000 | 2000 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 313 | 121746 | 2000 | 2000 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 314 | 121746 | 2000 | 2000 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 315 | 121746 | 2001 | 2001 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 316 | 121746 | 2001 | 2001 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 317 | 121746 | 2001 | 2001 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 318 | 121746 | 2002 | 2002 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 319 | 121746 | 2002 | 2002 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 320 | 121746 | 2003 | 2003 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 321 | 121746 | 2003 | 2003 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 322 | 121776 | 1998 | 1998 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 323 | 121776 | 1998 | 1998 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 324 | 121776 | 1999 | 1999 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 325 | 121776 | 1999 | 1999 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 326 | 121776 | 2000 | 2000 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 327 | 121776 | 2000 | 2000 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 328 | 121776 | 2001 | 2001 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 329 | 121776 | 2001 | 2001 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 330 | 121776 | 2002 | 2002 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 331 | 121776 | 2002 | 2002 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 332 | 121776 | 2003 | 2003 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 333 | 121776 | 2003 | 2003 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 334 | 121793 | 1998 | 1998 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 335 | 121793 | 1998 | 1998 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 336 | 121793 | 1998 | 1998 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 337 | 121793 | 1999 | 1999 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 338 | 121793 | 1999 | 1999 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 339 | 121793 | 2000 | 2000 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 340 | 121793 | 2001 | 2001 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 341 | 121793 | 2002 | 2002 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 342 | 121793 | 2003 | 2003 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 343 | 121794 | 1998 | 1998 | | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 344 | 121794 | 1998 | 1998 | | 4149 N CLOVIS AVE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 345 | 121794 | 1998 | 1998 | | 4149 N CLOVIS AVE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 346 | 121794 | 1998 | 1998 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 347 | 121794 | 1999 | 1999 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 348 | 121794 | 1999 | 1999 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 349 | 121794 | 2000 | 2000 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 350 | 121794 | 2001 | 2001 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 351 | 121794 | 2002 | 2002 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 352 | 121794 | 2003 | 2003 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 353 | 121853 | 1998 | 1998 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 354 | 121853 | 1998 | 1998 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 355 | 121853 | 1999 | 1999 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 356 | 121853 | 2000 | 2000 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 357 | 121853 | 2001 | 2001 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 358 | 121853 | 2002 | 2002 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 359 | 121853 | 2003 | 2003 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 360 | 124005 | 1998 | 1998 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 361 | 124005 | 1998 | 1998 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |

Wallace King Document No. 9041v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 362 | 124005 | 1998 | 1998 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | |
| 363 | 124005 | 1999 | 1999 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 364 | 124005 | 1999 | 1999 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 365 | 124005 | 1999 | 1999 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 366 | 124005 | 2000 | 2000 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 367 | 124005 | 2001 | 2001 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 368 | 124005 | 2002 | 2002 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 369 | 124005 | 2003 | 2003 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 370 | 124198 | 1998 | 1998 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 371 | 124198 | 1998 | 1998 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 372 | 124198 | 1998 | 1998 | | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | |
| 373 | 124198 | 1999 | 1999 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 374 | 124198 | 1999 | 1999 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 375 | 124198 | 2000 | 2000 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 376 | 124198 | 2000 | 2000 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 377 | 124198 | 2001 | 2001 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 378 | 124198 | 2001 | 2001 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 379 | 124198 | 2001 | 2001 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 380 | 124198 | 2002 | 2002 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 381 | 124198 | 2002 | 2002 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 382 | 124198 | 2002 | 2002 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 383 | 124198 | 2002 | 2002 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 384 | 124198 | 2003 | 2003 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 385 | 124198 | 2003 | 2003 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 386 | 124198 | 2003 | 2003 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 387 | 124198 | 2003 | 2003 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 388 | 124200 | 1998 | 1998 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 389 | 124200 | 1998 | 1998 | | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | |
| 390 | 124200 | 1998 | 1998 | | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | |
| 391 | 124200 | 1999 | 1999 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 392 | 124200 | 1999 | 1999 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 393 | 124200 | 2000 | 2000 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 394 | 124200 | 2000 | 2000 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 395 | 124200 | 2001 | 2001 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 396 | 124200 | 2002 | 2002 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 397 | 124200 | 2003 | 2003 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 398 | 124219 | 1998 | 1998 | | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 399 | 124219 | 1998 | 1998 | | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 400 | 124219 | 1998 | 1998 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 401 | 124219 | 1999 | 1999 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 402 | 124219 | 1999 | 1999 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 403 | 124219 | 2000 | 2000 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 404 | 124219 | 2000 | 2000 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 405 | 124219 | 2001 | 2001 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 406 | 124219 | 2002 | 2002 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 407 | 124219 | 2003 | 2003 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 408 | 124227 | 1998 | 1998 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 409 | 124227 | 1998 | 1998 | | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 410 | 124227 | 1998 | 1998 | | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 411 | 124227 | 1999 | 1999 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 412 | 124227 | 1999 | 1999 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 413 | 124227 | 2000 | 2000 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 414 | 124227 | 2000 | 2000 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 415 | 124227 | 2001 | 2001 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 416 | 124227 | 2001 | 2001 | SHELL | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 417 | 124227 | 2002 | 2002 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 418 | 124227 | 2002 | 2002 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 419 | 124227 | 2003 | 2003 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 420 | 124227 | 2003 | 2003 | SHELL | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 421 | 124227 | 1998 | 1998 | SHELL | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 422 | 124227 | 1998 | 1998 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 423 | 124236 | 1998 | 1998 | | 7995 NORTH CEDAR | FRESNO | CA | 93720 | TULARE | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 424 | 124236 | 1998 | 1998 | | 7995 NORTH CEDAR | FRESNO | CA | 93720 | TULARE | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 425 | 124236 | 1999 | 1999 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | TULARE | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 426 | 124236 | 1999 | 1999 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | TULARE | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 427 | 124236 | 2000 | 2000 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 428 | 124236 | 2000 | 2000 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 429 | 124236 | 2001 | 2001 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 430 | 124236 | 2001 | 2001 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 431 | 124236 | 2002 | 2002 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 432 | 124236 | 2002 | 2002 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 433 | 124236 | 2002 | 2002 | TEXACO | 7995 NORTH CEDAR AVE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 434 | 124236 | 2003 | 2003 | SHELL | 7995 NORTH CEDAR AVE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 435 | 124236 | 2003 | 2003 | TEXACO | 7995 NORTH CEDAR AVE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 436 | 124236 | 2003 | 2003 | TEXACO | 7995 NORTH CEDAR AVE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 437 | 128605 | 2001 | 2001 | | N BLACKSTONE AVE AT W BARSTOW AVE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 438 | 128605 | 2002 | 2002 | | N BLACKSTONE AVE AT W BARSTOW AVE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 439 | 128605 | 2003 | 2003 | | N BLACKSTONE AVE AT W BARSTOW AVE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 440 | 128606 | 2001 | 2001 | | 2407 N FRUIT AVENUE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 441 | 128606 | 2002 | 2002 | | 2407 N FRUIT AVENUE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 442 | 135299 | 1998 | 1998 | SHELL | 5325 W SHAW/HWY 99 | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 443 | 135299 | 1999 | 1999 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 444 | 135299 | 1999 | 1999 | SHELL | 5325 W SHAW/HWY 99 | FRESNO | CA | 93705 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 445 | 135299 | 2000 | 2000 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 446 | 135299 | 2000 | 2000 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 447 | 135299 | 2000 | 2000 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 448 | 135299 | 2001 | 2001 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 449 | 135299 | 2001 | 2001 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 450 | 135299 | 2001 | 2001 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 451 | 135299 | 2002 | 2002 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 452 | 135299 | 2002 | 2002 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 453 | 135299 | 2002 | 2002 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 454 | 135299 | 2003 | 2003 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 455 | 135299 | 2003 | 2003 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 456 | 135300 | 1998 | 1998 | SHELL | 1021 E SHAW AVE/FIRST | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 457 | 135300 | 1999 | 1999 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 458 | 135300 | 1999 | 1999 | SHELL | 1021 E SHAW AVE/FIRST | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 459 | 135300 | 2000 | 2000 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 460 | 135300 | 2000 | 2000 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 461 | 135300 | 2001 | 2001 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 462 | 135300 | 2001 | 2001 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 463 | 135300 | 2002 | 2002 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 464 | 135300 | 2002 | 2002 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 465 | 135300 | 2003 | 2003 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 466 | 135300 | 2003 | 2003 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 467 | 135301 | 1998 | 1998 | SHELL | 2020 W SHAW/WEST | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 468 | 135301 | 1999 | 1999 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 469 | 135301 | 1999 | 1999 | SHELL | 2020 W SHAW/WEST | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 470 | 135301 | 2000 | 2000 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 471 | 135301 | 2000 | 2000 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 472 | 135301 | 2001 | 2001 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 473 | 135301 | 2001 | 2001 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 474 | 135301 | 2002 | 2002 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 475 | 135301 | 2002 | 2002 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 476 | 135301 | 2002 | 2002 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 477 | 135301 | 2003 | 2003 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 478 | 135301 | 2003 | 2003 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 479 | 135301 | 2003 | 2003 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 480 | 135301 | 2003 | 2003 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 481 | 135302 | 1998 | 1998 | SHELL | 1778 E SHAW AVE/CEDAR | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 482 | 135302 | 1999 | 1999 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | OPEN FOR BUSINESS |
| 483 | 135302 | 1999 | 1999 | SHELL | 1778 E SHAW AVE/CEDAR | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 484 | 135302 | 1999 | 1999 | SHELL | 1778 E SHAW AVE/CEDAR | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 485 | 135302 | 2000 | 2000 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | OPEN FOR BUSINESS |
| 486 | 135302 | 2001 | 2001 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 487 | 135302 | 2002 | 2002 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 488 | 135302 | 2002 | 2002 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 489 | 135302 | 2002 | 2002 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 490 | 135302 | 2003 | 2003 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 491 | 135303 | 1998 | 1998 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 492 | 135303 | 1999 | 1999 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 493 | 135303 | 2000 | 2000 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 494 | 135303 | 2000 | 2000 | SHELL | 1212 E FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 495 | 135303 | 2001 | 2001 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 496 | 135303 | 2001 | 2001 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 497 | 135303 | 2001 | 2001 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 498 | 135303 | 2002 | 2002 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 499 | 135303 | 2002 | 2002 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 500 | 135303 | 2003 | 2003 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 501 | 135303 | 2003 | 2003 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 502 | 135304 | 1998 | 1998 | SHELL | 3109 E SHIELDS/FIRST | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 503 | 135304 | 1999 | 1999 | SHELL | 3109 E SHIELDS/FIRST | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 504 | 135304 | 1999 | 1999 | SHELL | 3109 E SHIELDS/FIRST | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 505 | 135304 | 2000 | 2000 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 506 | 135304 | 2000 | 2000 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 507 | 135304 | 2001 | 2001 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 508 | 135304 | 2001 | 2001 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 509 | 135304 | 2001 | 2001 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 510 | 135304 | 2002 | 2002 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 511 | 135304 | 2002 | 2002 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 512 | 135304 | 2002 | 2002 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 513 | 135304 | 2003 | 2003 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 514 | 135304 | 2003 | 2003 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 515 | 135305 | 1998 | 1998 | SHELL | 5605 KINGS CYN/CLOVIS | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 516 | 135305 | 1998 | 1998 | SHELL | 5605 KINGS CYN | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 517 | 135305 | 1999 | 1999 | SHELL | 5605 KINGS CYN/CLOVIS | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 518 | 135305 | 1999 | 1999 | SHELL | 5605 KINGS CYN/CLOVIS | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 519 | 135305 | 2000 | 2000 | SHELL | 5605 KINGS CYN | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 520 | 135305 | 2000 | 2000 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 521 | 135305 | 2001 | 2001 | SHELL | 5605 KINGS CYN | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 522 | 135305 | 2001 | 2001 | SHELL | 5605 KINGS CYN | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 523 | 135305 | 2001 | 2001 | SHELL | 5605 KINGS CYN | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 524 | 135305 | 2002 | 2002 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 525 | 135305 | 2002 | 2002 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 526 | 135305 | 2002 | 2002 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 527 | 135305 | 2003 | 2003 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 528 | 135306 | 1998 | 1998 | SHELL | 2595 S EAST AVE/JENSEN | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 529 | 135306 | 1999 | 1999 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 530 | 135306 | 1999 | 1999 | SHELL | 2595 S EAST AVE/JENSEN | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 531 | 135306 | 2000 | 2000 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 532 | 135306 | 2000 | 2000 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 533 | 135306 | 2001 | 2001 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 534 | 135306 | 2001 | 2001 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 535 | 135306 | 2001 | 2001 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 536 | 135306 | 2002 | 2002 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 537 | 135306 | 2002 | 2002 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 538 | 135306 | 2003 | 2003 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 539 | 135306 | 2003 | 2003 | SHELL | 2695 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 540 | 135307 | 1998 | 1998 | SHELL | 1014 E BULLARD/FIRST | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 541 | 135307 | 1999 | 1999 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 542 | 135307 | 1999 | 1999 | SHELL | 1014 E BULLARD/FIRST | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 543 | 135307 | 2000 | 2000 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 544 | 135307 | 2000 | 2000 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 545 | 135307 | 2001 | 2001 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 546 | 135307 | 2001 | 2001 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 547 | 135307 | 2002 | 2002 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 548 | 135307 | 2002 | 2002 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 549 | 135307 | 2002 | 2002 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 550 | 135307 | 2003 | 2003 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 551 | 135307 | 2003 | 2003 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 552 | 135308 | 1998 | 1998 | SHELL | 4206 N BLACKSTONE/ASHLAND | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 553 | 135308 | 1999 | 1999 | SHELL | 4206 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 554 | 135308 | 1999 | 1999 | SHELL | 4206 N BLACKSTONE/ASHLAND | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 555 | 135308 | 1999 | 1999 | SHELL | 4206 N BLACKSTONE/ASHLAND | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 556 | 135308 | 2000 | 2000 | SHELL | 4206 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 557 | 135308 | 2001 | 2001 | SHELL | 4206 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 558 | 135308 | 2002 | 2002 | SHELL | 4206 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 559 | 135308 | 2002 | 2002 | SHELL | 4206 N BLACKSTONE AVE | FRESNO | CA | 93726 | FRESNO | LESSEE | ARCHIVED |
| 560 | 135308 | 2002 | 2002 | SHELL | 4206 N BLACKSTONE AVE | FRESNO | CA | 93726 | FRESNO | LESSEE | ARCHIVED |
| 561 | 135308 | 2003 | 2003 | SHELL | 4206 N BLACKSTONE AVE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 562 | 135309 | 1998 | 1998 | SHELL | 5405 N BLACKSTONE/BARSTOWN | FRESNO | CA | 93726 | FRESNO | LESSEE | ARCHIVED |
| 563 | 135309 | 1999 | 1999 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 564 | 135309 | 1999 | 1999 | SHELL | 5405 N BLACKSTONE/BARSTOWN | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 565 | 135309 | 2000 | 2000 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 566 | 135309 | 2000 | 2000 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 567 | 135309 | 2001 | 2001 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 568 | 135309 | 2001 | 2001 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 569 | 135309 | 2002 | 2002 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 570 | 135309 | 2002 | 2002 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 571 | 135309 | 2003 | 2003 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 572 | 135309 | 2003 | 2003 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 573 | 135310 | 1998 | 1998 | SHELL | 4819 N BLACKSTONE/SNTA ANA | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 574 | 135310 | 1999 | 1999 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 575 | 135310 | 1999 | 1999 | SHELL | 4819 N BLACKSTONE/SNTA ANA | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 576 | 135310 | 2000 | 2000 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 577 | 135310 | 2000 | 2000 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 578 | 135310 | 2001 | 2001 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 579 | 135310 | 2001 | 2001 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 580 | 135310 | 2002 | 2002 | SHELL | 4819 N BLACKSTONE AVENUE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 581 | 135310 | 2002 | 2002 | SHELL | 4819 N BLACKSTONE AVENUE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 582 | 135310 | 2003 | 2003 | SHELL | 4819 N BLACKSTONE AVENUE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 583 | 135312 | 1998 | 1998 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 584 | 135312 | 1999 | 1999 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 585 | 135312 | 2000 | 2000 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 586 | 135312 | 2000 | 2000 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 587 | 135312 | 2001 | 2001 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 588 | 135312 | 2002 | 2002 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 589 | 135312 | 2002 | 2003 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 590 | 135312 | 2003 | 2003 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 591 | 135312 | 2003 | 2003 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 592 | 135313 | 1998 | 1998 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93258 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 593 | 135313 | 1999 | 1999 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93258 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 594 | 135313 | 1999 | 2000 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93258 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 595 | 135313 | 2000 | 2000 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93258 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 596 | 135313 | 2001 | 2001 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 597 | 135313 | 2001 | 2001 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 598 | 135313 | 2002 | 2002 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 599 | 135313 | 2002 | 2003 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 600 | 135313 | 2003 | 2003 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 601 | 145781 | 1999 | 1999 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 602 | 145781 | 2000 | 2000 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 603 | 145781 | 2000 | 2000 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 604 | 145781 | 2001 | 2001 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 605 | 145781 | 2002 | 2002 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 606 | 145781 | 2003 | 2003 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 607 | 146311 | 1999 | 1999 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 608 | 146311 | 2000 | 2000 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 609 | 146311 | 2000 | 2000 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 610 | 146311 | 2001 | 2001 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 611 | 146311 | 2002 | 2002 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 612 | 146311 | 2002 | 2003 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 613 | 146311 | 2003 | 2003 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 614 | 146311 | 2003 | 2003 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 615 | 169979 | 2001 | 2001 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | CLOSED FOR BUSINESS |
| 616 | 169979 | 2001 | 2001 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 617 | 169979 | 2002 | 2002 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | CLOSED FOR BUSINESS |
| 618 | 169979 | 2002 | 2002 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | CLOSED FOR BUSINESS |
| 619 | 169979 | 2003 | 2003 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | CLOSED FOR BUSINESS |
| 620 | 167474 | 2001 | 2001 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 621 | 167474 | 2001 | 2001 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 622 | 167474 | 2002 | 2002 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 623 | 167474 | 2003 | 2003 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | CLOSED FOR BUSINESS |
| 624 | 167474 | 2003 | 2003 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 625 | 167475 | 2001 | 2001 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 626 | 167475 | 2001 | 2003 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 627 | 167475 | 2002 | 2002 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 628 | 167475 | 2002 | 2002 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |

Wallace King Document No. 9041v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 629 | 167475 | 2003 | 2003 | SHELL | 4204 EAST OLIVE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 630 | 167475 | 2003 | 2003 | TEXACO | 4204 EAST OLIVE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 631 | 167475 | 2003 | 2003 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 632 | 167693 | 2001 | 2001 | TEXACO | 2330 NORTH FRESNO STREET | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 633 | 167693 | 2002 | 2002 | TEXACO | 2330 NORTH FRESNO STREET | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 634 | 167693 | 2002 | 2002 | TEXACO | 2330 NORTH FRESNO STREET | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 635 | 167693 | 2003 | 2003 | TEXACO | 2330 NORTH FRESNO STREET | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 636 | 169208 | 2003 | 2003 | SHELL | 6745 N WEST AVE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 637 | 169303 | 2003 | 2003 | SHELL | 2588 S MAPLE | FRESNO | CA | 93706 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

# Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-oOo-

In re: Methyl Tertiary Butyl
Ether ("MTBE") Products
Liability Litigation

Master File No.
1:00-1898

This Document Relates To:

City of Fresno
v. Chevron U.S.A. Inc., et al.,
Case No. 04 Civ. 4973

Case No.
MDL 1358(SAS)



DEPOSITION OF JATINDER PAUL DHILLON

August 11, 2011 at 9:00 (9:05) a.m.

Before:  ERIC L. JOHNSON
RPR, CSR #9771

Taken at:
Fresno, California



Court Reporting Services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

1    Q.  I'm sorry.  Is that yes?

2    A.  Yes.

3    Q.  Just to get an answer out loud.  Thank you.

4         Do you recall what instructions you were given

5    by the area rep about how to respond to a gas leak or

6    spill at the station?  What did they tell you to do, in

7    other words?

8    A.  They -- they told us if spill happen what we

9    are supposed to do, how to clean up, and if it was more

10   than that we are to call the fire department, or

11   whatever.  Details and everything was in that book.

12   Q.  When you say how to clean up, do you remember

13   anything more specifically about how you were told to

14   clean up?

15   A.  Small spill or large spill?

16   Q.  Start with a small spill.

17   A.  Okay.  We put like a cat litter and we have a

18   drum there which is picked up by a -- some company who

19   used to take care of those -- what you call -- we

20   dispose them through one company.

21   Q.  When you say it was a cat litter, we have heard

22   some people talk about a product that was like kitty

23   litter.

24   A.  Like kitty litter, yes.

25   Q.  Do you remember the name of the product that

27

1       A.  Right.

2       Q.  So was that a container that was used just for

3   the purpose of that cat litter product?

4       A.  Yes.  Yes.

5       Q.  Do you have a recollection as to what company

6   was used to pick that up at --

7       A.  I don't --

8       Q.  -- 26 -- one second here.

9       A.  Sorry.

10      Q.  -- at 2619 South East Avenue?

11      A.  No.

12      Q.  Okay.  I am going to try to just make sure we

13  are clear what station we are talking about --

14      A.  Right.

15      Q.  -- since I think you have had five.  If you are

16  ever not clear, please let me know.  I mean, we are --

17  we are mostly going to be talking about the East Avenue

18  station, but if you are ever not clear, please indicate.

19      A.  Yes.

20      Q.  In fact, why don't we -- why don't I just

21  say if we refer to the station, we are referring to

22  2619 South East Avenue.  Is that fair?

23      A.  That's fair.

24      Q.  All right.  Now, you mentioned a moment ago, I

25  think you asked about a small spill versus a large

29

Deposition of Jatinder Paul Dhillon / August 11, 2011

1          A.   No, I don't remember.

2          Q.   When you bought the station was it branded

3    Texaco at that point?

4          A.   Yes.

5          Q.   Did the branding on the station ever change

6    over the years?

7          A.   Yes.

8          Q.   What did it first change to?

9          A.   Because Shell and Texaco is bought by Shell, so

10   it was Shell, and it has been Shell after that.

11         Q.   Do you recall approximately what year it

12   changed to Shell?

13         A.   I don't remember.

14         Q.   Do you recall if that was in the '90s or 2000s?

15         A.   I -- I am not sure.  I don't know.

16         Q.   We may see some --

17         A.   Documents I can tell you about?  I don't

18   remember.

19         Q.   So was the station branded Shell at the time

20   you stopped operating it in 2009?

21         A.   Yes.

22         Q.   During the time the station was branded Texaco,

23   where were you obtaining gas deliveries from?

24         A.   In the beginning we used to buy from Texaco.

25         Q.   So when you first took over the station you

                                                              39

1    selling you Shell branded gas, or did you have an

2    understanding?

3         A.   That's what contract says, yes.

4         Q.   So is it correct, maybe if I can summarize it

5    this way, is it your understanding, then, you were

6    always buying company branded gas either from Texaco or

7    then Shell?

8         A.   Yes.

9                   (Deposition Exhibit 3 marked

10                      for identification)

11             MR. EICKMEYER:   Let me show you what I am

12   marking as Exhibit 3.   Exhibit 2, you can just put

13   aside in the pile if you'd like.   Exhibit 3 is the

14   letterhead of Fresno County Health Services Agency,

15   date November 13, 1995, addressed to Mr. Dhillon.

16   Bates is FCDEH-FRESNO-050249 through 050252.

17        Q.   Mr. Dhillon, do you recall having received this

18   letter?

19        A.   My signature.   Yes.

20        Q.   And I was going to get to that, on the third

21   page of the packet, Bates ending in 251.   Do you

22   recognize your signature where it says "Received By"?

23        A.   Yes.

24        Q.   And at the bottom of the last page in the

25   packet Bates ending in 252, would that be your signature

                                                          52

1    at the bottom left?

2         A.   Yes.

3         Q.   Now, on the -- going back to the front of the

4    packet, the Bates ending in 249, under your name I see

5    there's an address on Huntington Boulevard.  Was that

6    your home address, or what was that?

7         A.   That's the landlord's address.

8         Q.   Oh, the Pricketts' address?

9         A.   Pricketts' address.

10        Q.   I want to ask you about some of the numbered

11   items on the first page.  It says No. 1, Annual tank

12   test -- sorry.  "Annual tank tightness tests have not

13   been performed.  Tests must be performed annually," end

14   quote.

15             Do you recall being told this by the county

16   inspector, that there needed to be annual tank tightness

17   tests?

18        A.   Yeah, that's what the letter says.  Yes.

19        Q.   Do you recall if you took any action in

20   response to this letter?

21        A.   Yes.

22        Q.   Whose responsibility was it during this 1995

23   time frame to conduct tank tightness tests?

24        A.   Mine.  I was responsible.

25        Q.   Did that responsibility ever change during the

                                                            53

```
 1    years you operated that station?

 2        A.  No.

 3        Q.  For item No. 2, it says, "Line leak detectors

 4    have not been installed.  Detectors must be installed,

 5    maintained, and tested annually," end quote.

 6            Do you recall taking any action in response to

 7    that?

 8        A.  Yes.

 9        Q.  What did you do?

10        A.  To get the things done what they want us to do.

11        Q.  Do you recall if you hired a company or service

12    to --

13        A.  Yes.

14        Q.  -- install any detectors?

15        A.  Yes.

16        Q.  Do you recall if you had any conversations with

17    Kerry Oil, Mr. Kerry or the company, as to why there had

18    not been any line leak detectors installed before?

19        A.  I think they were not required before that.

20        Q.  No. 3 says, "A hazardous materials business

21    plan has not been updated.  A current business plan must

22    be submitted to this office," end quote.

23            Do you recall if you took any response in

24    regard to that?

25        A.  Yes.
```

                                                          54

Deposition of Jatinder Paul Dhillon / August 11, 2011

1      Q.   What did you do?

2      A.   We submitted it.

3      Q.   No. 4 says, "Annual tightness tests have not

4  been performed on pressurized product lines," end quote.

5  Do you recall if you took any response to that?

6      A.   Yes.

7      Q.   What was that?

8      A.   If I remember right, this was delayed because

9  we were in process to -- landlord was in process to

10 change the new tanks and the new pipes and everything.

11 That's the reason they are in the permit -- time of

12 getting permits and everything.  That's why it was not

13 done timely after that because we were putting in new

14 tanks and new pipes, and all kind of this.

15     Q.   Do you recall if anyone from the county ever

16 indicated that Kerry Oil, the previous owners, had not

17 been submitting the information requested here?

18     A.   No.

19     Q.   Let me ask you, on the very back page of the

20 packet, there's a couple of checked lines.  And I think

21 there's one that wasn't mentioned in the cover letter.

22 It is the third X down, about the middle of the page.

23 Says starting with "inventory."  You see that line?

24     A.   Mm-hmm.

25     Q.   I will read that into the record.  It says,

55

1    "Inventory reconciliation or tank gauging annual summary

2    reports are not being submitted.  Annual summary reports

3    must be submitted to this office," end quote.

4         Do you recall if you took any response to that

5    item?

6         A.  We gave them the copies.  We never knew that we

7    were supposed to, but at that time the law changed, we

8    give them all the copies, yes.

9         Q.  Now, when it mentions inventory reconciliation

10   or tank gauging, was there something being done at this

11   time frame, 1995, to check the amount of gas in the

12   underground storage tanks?

13        A.  Yes.

14        Q.  We have heard from other witnesses about taking

15   a stick measurement.  Were you doing that kind of

16   process?

17        A.  That time it was stick, yes.

18        Q.  Did that later change from stick measurement to

19   something else?

20        A.  Something else, yes.

21        Q.  Do you recall, did that change when the tanks

22   were replaced or when did that change?

23        A.  When the tanks were replaced.

24        Q.  What kind of system was used after the tanks

25   were replaced?  I am just asking generally, was it an

56

1    electronic system?

2        A.   Electronic system.

3        Q.   During the time the stick measurements were

4    being taken, how often were those taken?

5        A.   Every morning.

6        Q.   Who is responsible for the stick measurements?

7        A.   The employee who opens the store.

8        Q.   Was there some kind of reconciliation done to

9    try and determine if what was measured with the stick

10   matched what was expected to be in the tank?

11       A.   Yes.

12       Q.   Can you describe that process?

13       A.   Our bookkeeping system was like that to --

14   because they know how much gas we sold and how much gas

15   we missing from the tank, should match.

16       Q.   Was there a particular amount of gallons of

17   discrepancy that would cause reason for investigation if

18   what was measured in the tank didn't match what you

19   expected to be there?

20       A.   If it is difference between more than 20, 30

21   gallons, we do check it around there.

22       Q.   Do you recall how many times there was a

23   difference of more than 20 or 30 gallons found at the

24   station?

25       A.   Never.  I don't remember that happening.

57

```
 1              (Break taken at 10:06 a.m.)

 2         THE VIDEOGRAPHER:  This begins videotape No. 2

 3    in the deposition of Paul Dhillon.  We are on the record

 4    and the time is 10:11 a.m.

 5         MR. EICKMEYER:  Q.  Mr. Dhillon, before we go

 6    on to the next exhibit, I think you mentioned a moment

 7    ago before the break that someone from the company would

 8    come by on occasion and look at your purchase records to

 9    see you were purchasing gas from the company?

10         A.  Yes.

11         Q.  When that person came by, was that called an

12    area rep, or what was their title?

13         A.  Area rep.

14         Q.  Did that area rep ever give you any training

15    about how to respond to a gasoline leak or spill at the

16    station?

17         MR. YBARRA:  Objection; asked and answered.

18         THE WITNESS:  I already answered this question.

19    They already trained me, they gave me the booklet to do

20    all those kind of things.

21         MR. EICKMEYER:  Well, okay.  Thank you.  I'm

22    sorry.  Let me -- let me try to ask it a little better.

23         Q.  Beside that initial training that you

24    mentioned, when they would come out to the station

25    periodically, did they ever give you any more training?
```

                                                        62

1        A.   They send us some videos to update those

2   things, yes, they do.

3        Q.   Did they ever give you any different

4   instructions other than using the kitty litter product

5   that you discussed earlier?

6        A.   For small spills or what?

7        Q.   Right.   Did they ever tell you any different

8   way that you should be cleaning up a small spill or leak

9   at the station?

10        A.   Yes, there are different ways, too.

11        Q.   What else did they tell you beside the kitty

12   litter product?

13        A.   Some other product come on the market, to buy

14   those if you want to, or use this products, or different

15   products are available.

16        Q.   Did they ever tell you that you should switch

17   from the kitty litter product --

18        A.   No.

19        Q.   -- to some other one?

20        A.   No.

21        Q.   Did you continue using the kitty litter product

22   during the entire time you operated the East Avenue

23   station?

24        A.   Yes.

25        Q.   Approximately how often would the area rep come

63

1      Q.   Now, the next sentence says, "Sampling of soils

2   in the vicinity of the former USTs indicated a

3   releases of" -- releases, plural -- "of petroleum

4   product.  Subsequent work showed that the leaking USTs

5   had caused extensive soil contamination.  We believe the

6   vertical extent of soil impacts have reached the water

7   table," end quote.

8          Do you recall when you received this letter

9   taking any action in response to this information?

10      A.   Yes.

11      Q.   What did you do?

12      A.   I gave it to Saboor, ASR Engineering to handle

13   this.

14      Q.   Had you heard before this letter that there

15   were releases of petroleum product that had been found

16   to cause soil contamination and reached the water table?

17      A.   Yes.

18      Q.   Now, the next sentence says, "In our review of

19   the case file, we found that petroleum hydrocarbons were

20   detected in soils at the site at concentrations as high

21   as 98,000 mg/kg as diesel, 43,000 mg/kg as TPH-G, 390

22   mg/kg as benzene and 10,000 mg/kg as methyl T-butyl

23   ether (MTBE)."

24          As far as the numbers that I just read here, do

25   you recall ever hearing those numbers before you

92

1    received this letter?

2        A.   Honestly, we don't really know -- understand

3    what this says over here because we give it to ASR

4    Engineering to handle the problem.

5        Q.   The MTBE that was listed here at the end of the

6    sentence, had you ever heard of MTBE before receiving

7    this letter?

8        A.   I just explain to you because this kind I have

9    no knowledge.  Above my head.  So we just gave it to

10   Saboor, ARS Engineering to handle this problem.

11       Q.   Well, I am asking a little different question

12   now, not as far as this specific number there.  But had

13   you ever heard of MTBE from anywhere before this letter?

14       A.   No.

15       Q.   Do you recall ever hearing or learning that

16   MTBE was used as an additive in gasoline?

17       A.   Yes, I heard that.

18       Q.   Do you recall when you heard that MTBE started

19   being used in gasoline?

20       A.   Started being used?

21       Q.   Right.  What year?  What time frame?

22       A.   I don't remember.

23       Q.   Do you recall ever hearing that MTBE was no

24   longer being added to gasoline?

25       A.   I remember that.

93

1        Q.  Do you recall when that occurred?

2        A.  No.

3        Q.  Do you recall if you were ever given any kind

4   of stickers mentioning MTBE to put on the gas

5   dispensers?

6        A.  I think they come -- they put stickers on my

7   pump, yes, long time ago.

8        Q.  Do you recall what those stickers said?

9        A.  I don't remember.

10       Q.  Do you recall where you received those stickers

11  from?

12       A.  I think the gas company did the -- put the

13  stickers there.

14       A.  Do you recall ever being told that gasoline

15  that contained MTBE needed to be handled differently

16  from gas that did not contain MTBE?

17            MR. YBARRA:  Objection; lacks foundation.

18            THE WITNESS:  No, I didn't.

19            MR. EICKMEYER:  Q.  Do you recall if you ever

20  received a Material Safety Data Sheet, or MSDS, for

21  gasoline?

22       A.  I don't understand.

23       Q.  Any document called an MSDS, do you remember

24  ever receiving one of those?

25       A.  I don't remember.

94

 1          MR. EICKMEYER:  I have got a few follow up.  I

 2    think I can ask from here, if everybody can hear me.

 3               EXAMINATION BY MR. EICKMEYER

 4          MR. EICKMEYER:  Q.  Let me just ask, sir, I'm

 5    not sure if we clarified.  We talked before about, I

 6    think you called them area reps that would come by on

 7    occasion?

 8          A.  Yes.

 9          Q.  During the years it was a Texaco branded

10    station, were those area reps coming out from the Texaco

11    company?

12          A.  Yes.

13          Q.  During the years it was a Shell branded

14    station, were those area reps from the Shell Company?

15          A.  Yes.

16          MR. EICKMEYER:  Okay.  Nothing further.  Thank

17    you.

18          MR. YBARRA:  Nothing on mine.

19          MR. EICKMEYER:  Anybody else on the phone?

20          Hearing nothing, I guess we can conclude.

21          THE VIDEOGRAPHER:  One moment, please.  This

22    concludes today's proceedings in the deposition of Paul

23    Dhillon.  The number of videotapes used is a total of

24    three.  We are now going off the record, and the time is

25    12:06 p.m.

                                                        149

```
1    STATE OF CALIFORNIA     )
                             (     ss.
2    COUNTY OF STANISLAUS    )

3          I, ERIC L. JOHNSON, do hereby certify that I am a

4    licensed Certified Shorthand Reporter, duly qualified

5    and certified as such by the State of California;

6          That prior to being examined, the witness named in

7    the foregoing deposition was by me duly sworn to testify

8    to tell the truth, the whole truth, and nothing but the

9    truth;

10         That the said deposition was by me recorded

11   stenographically at the time and place herein mentioned;

12   and the foregoing pages constitute a full, true,

13   complete and correct record of the testimony given by

14   the said witness;

15         That I am a disinterested person, not being in any

16   way interested in the outcome of said action, or

17   connected with, nor related to any of the parties in

18   said action, or to their respective counsel, in any

19   manner whatsoever.

20

21   DATED:  August 29, 2011

22

23                          _____

24                          Eric L. Johnson, CSR, RPR

25
```

152

# Exhibit 8

```
 1            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                IN AND FOR THE COUNTY OF SAN FRANCISCO

 3                           --oOo--

 4    SOUTH TAHOE PUBLIC UTILITY           )
      DISTRICT,                            )
 5                                         )
                      Plaintiff,           )
 6                                         )
                      vs                   )    No.   999128
 7                                         )    THIS TRANSCRIPT
      ATLANTIC RICHFIELD COMPANY           )    CONTAINS
 8    ("ARCO"); ARCO CHEMICAL COMPANY;)    CONFIDENTIAL
      SHELL OIL COMPANY; CHEVRON           )    MATERIALS
 9    U.S.A., INC.; EXXON CORPORATION;)
      B.P. AMERICA, INC.; TOSCO           )
10    CORPORATION; ULTRAMAR, INC.;         )
      BEACON OIL CO.; USA GASOLINE         )
11    CORPORATION; SHELL OIL PRODUCTS )
      CO.; TERRIBLE HERBST, INC.;          )
12    ROTTEN ROBBIE; J.E. TVETEN           )
      CORP.; TAHOE TOM'S GAS STATION; )
13    THE SOUTHLAND CORP.; PARADISE        )
      CHEVRON; and DOES 1 through 600,)
14    inclusive,                           )
                                           )
15                    Defendants.          )
      _____)
16

17                           --oOo--
                      WEDNESDAY, JULY 26, 2000
18                         10:07 A.M.
                            --oOo--
19                      DEPOSITION OF
                        JOEL MASCITELLI
20                          --oOo--

21

22

23

24    CATHLEEN SLOCUM, CSR
      License No. 2822
25
```

PETERS SHORTHAND REPORTING CORPORATION  (916) 362-2345

```
 1   product specifications for the company.  So I'm sure
 2   that he may have had some responsibility at that time.
 3   Q    At the time you left the company, were these
 4   three gentlemen still employed by Ultramar?
 5   A    Yes, they were.
 6   Q    As far as you know are they still employed by the
 7   company?
 8   A    I believe they, all three of them still are.
 9   Q    Prior to 1996, and let's take the 1990 through
10   1996 time period, was Ultramar a member of the
11   American Petroleum Institute?
12   A    We were a member, and I don't remember the exact
13   year, up until sometime in -- it could have been, you
14   know, right after the IPO which was in '92.  '93, '94
15   we dropped our membership in the API.
16   Q    And was there a particular reason why the
17   membership was dropped?
18   A    Cost.
19   Q    Was the American Petroleum Institute a source of
20   information regarding other gasoline companies'
21   experiences with gasoline in terms of environmental
22   fate?
23   A    They were one of the sources, yes.
24   Q    And just so I'm clear, Ultramar stopped becoming
25   a member of American Petroleum Institute in
```

10:33:00 am (line 5)
10:33:30 am (line 14)
10:34:00 am (line 22)

20

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1  approximately 1992 because of cost?

2  A    Yeah, '92, '93.  Cost and the fact that we felt

3  that we were getting similar type information from

4  other associations.

5  Q    All right.  And what other associations would

6  those be?

7  A    The main one was the NPRA, National Petroleum

10:34:30 am 8  Refiners Association, and then there was also a West

9  Coast association.  I believe it was WSPA, Western

10  States Petroleum Association.

11  Q    And when was Ultramar a member of the NPRA?

12  A    They were, they've been a member, you know, from

13  when I started with the company until when I left.

14  Q    Okay.  And how long has Ultramar been a member of

10:35:00 am 15  WSPA?

16  A    My recollection would be they probably were,

17  became a member after the acquisition of the

18  Wilmington refinery which was in '89.  I mean, excuse

19  me, prior to that they could have been an associate

20  member, but I don't remember that.

21  Q    And did the NPRA generate materials that it

10:35:30 am 22  shared with members regarding the environmental fate

23  of gasoline?

24  A    The NPRA shares materials on environmental

25  matters, gasoline and otherwise, yes.

21

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1   testified earlier that Ultramar was also involved in

2   the retail gasoline business at the time?

3   A    Yes.

4   Q    As part of the choice of oxygenates, was any

5   consideration given to the underground storage tanks

6   at the retail facilities in terms of the choice of

7   oxygenates?

11:01:30 am  8   A    No.

9   Q    Was there any, in conjunction with this

10  decision-making process on the choice of oxygenates,

11  was any program instituted regarding tank upgrades or

12  tank inspections of any sort?

13  A    Well, at that same period of time the company was

14  upgrading all of their underground storage tanks and

11:02:00 am 15  their retail stations to meet, you know, a deadline

16  when you were supposed to have these, you know, there

17  was a deadline.  I can't remember what it was.  It

18  could have been sometime in '98, '99.  But we were

19  upgrading, basically on a program to upgrade all of

20  the underground storage tanks to meet the new

21  regulations.

22  Q    And you think that this program culminated either

11:02:30 am 23  in 1998 or 1999?

24  A    I believe so.  And I think -- and, again, it's my

25  recollection that we were, you know, somewhere like 60

40

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    to 70 percent done when I left the company in '97.

2    And I know that at that point in time we were

3    essentially ahead of the program as far as the number

4    of sites we needed to get done on a yearly basis.

5    Q    So when you left the company in 1977, taking the

11:03:00 am 6    converse of what you said, approximately 30 to 40

7    percent of the Ultramar retail stations had not yet

8    had their underground storage systems upgraded?

9    A    Yeah, they would be less than 30 percent.

10   Q    Less than 30 percent but more than 25 percent?

11   A    Hell, again, it's somewhere in that range.

12   Q    All right.  And do you know what type of storage

11:03:30 am 13   tanks were being installed to meet the California

14   government regs which required upgraded storage tank

15   facilities at retail stations?

16   A    I'm pretty sure that in all sites that we were

17   working on we were going to double-walled tanks.

18   Q    Do you know if the upgraded -- well, did

11:04:00 am 19   Ultramar own a number of its own stations?

20   A    Yes, they did.

21   Q    When I say own, that means they own the site

22   where the gas station was located?

23   A    I believe in most of the cases they owned the

24   land where the station was located, yes.

25   Q    And that would also include obviously the

                                                          41

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1   A    Yes.

2   Q    From 1996 until you retired from the company, are

3   you aware of any program by Ultramar that required

11:10:00 am  4   independent dealers that purchased gasoline from

5   Ultramar to certify that their tanks weren't leaking

6   to Ultramar prior to a purchase of gas from Ultramar?

7   A    I was not aware of that, no.

8   Q    Are you aware of any program at Ultramar to

9   determine if the non-branded stations receiving

10   Ultramar gas after 1996 in California -- strike that

11:10:30 am  11   question.

12         Do you know if Ultramar after 1996 in

13   California had any program to inspect unbranded

14   stations that received Ultramar gasoline in terms of

11:11:00 am  15   whether they had any leaks in their underground

16   storage tank systems?

17   A    No, I was not aware of any.

18   Q    Now, going back to the decision-making analysis

19   that was undertaken when Ultramar was determining

20   which oxygenate to select, do you know if any members

11:11:30 am  21   of Ultramar ever asked ARCO Chemical to discuss their

22   experiences with MTBE in terms of its environmental

23   fate?

24   A    I'm not aware of any, any requests, no.

25   Q    Do you recall as you sit here today ever seeing

46

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

11:16:30 am 1   an oxygenate in 1996?

2   A     No, I'm not.

3   Q     Did you attempt to contact anybody at Shell to

4   discuss their experience with the use of MTBE in

5   gasoline --

6   A     No.

7   Q     -- prior to 1996?

8   A     No, I did not.

9   Q     Do you know of anybody at Ultramar that attempted

10   to contact anybody at Shell regarding their experience

11:17:00 am 11   with MTBE in gasoline prior to 1996?

12   A     No.

13   Q     Are you aware of anybody at Ultramar that

14   attempted to contact anybody at ARCO regarding its

15   experience with MTBE in conjunction with the

16   decision-making process to use MTBE in 1996?

17   A     No, I'm not.

18   Q     Did Ultramar engage in any independent research

19   regarding the environmental fate of MTBE before it

11:17:30 am 20   decided to use it as an oxygenate in gasoline?

21           MS. MILNER:  Objection.  Asked and answered.

22           MR. SAWYER:  Go ahead, sir.

23           THE WITNESS:  Did we do independent research?

24           MR. SAWYER:  Q  Yes, sir, in-house research.

25   A     No, we did not.

50

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1        Q    In conjunction with the Environmental Impact

11:18:00 am 2    Report with respect to the Wilmington refinery

3        modifications when you were going to go to MTBE, do

4        you know if Ultramar did any independent in-house

5        analysis of the environmental effects of MTBE as part

6        of the EIR process?

7             MS. MILNER:  Objection.  Misstates the

8        witness' prior testimony.  He testified that the

9        construction and the permitting was done for, not for

11:18:30 am 10   MTBE but for the CARB RFG requirements.

11            MR. SAWYER:  That's a point.

12       Q    Was any environmental impact analysis done with

13       respect to the use of or the introduction of MTBE at

14       the Wilmington refinery?

15       A    Not that I'm aware of unless -- I mean, here

16       again, it potentially could have been required under

17       the Environmental Impact Report but I wasn't aware of

18       an independent study.

19       Q    So you're not sure whether or not it was included

11:19:00 am 20   as part of the Environmental Impact Report?

21       A    No, I'm not.

22       Q    When MTBE was first introduced into gasoline and

23       Ultramar at its Wilmington refinery facility, was

24       there any analysis undertaken as to whether any

25       warning should accompany the sale of the gasoline?

51

11:19:30 am   1   A      Again, it would fall under the regulations as far

              2   as any kind of product labeling requirements that were

              3   required at that time.  And so if there, if there was

              4   a requirement to have the products labeled

              5   appropriately, I mean, you know, with the use of MTBE,

              6   then I'm sure that we would have followed that.

              7   Q      Just so I'm clear on your testimony then, if the

11:20:00 am   8   government required Ultramar to issue a warning, then

              9   they'd issue a warning, but they weren't going to do

             10   any warnings on their own; is that correct?

             11   A      Correct.

             12           MS. MILNER:  Objection.  Argumentative.

             13           MR. SAWYER:  Did you get the answer,

             14   "Correct"?  All right.  Thank you.

             15   Q      In conjunction with the decision-making process

11:20:30 am  16   of selecting the oxygenate to use to meet CARB

             17   requirements, were there any discussions regarding the

             18   affects of MTBE on groundwater?

             19           MS. MILNER:  I'm sorry, could I ask the

             20   court reporter to repeat that.

             21           MR. SAWYER:  Absolutely.

             22           MS. MILNER:  Thanks.

             23           (Thereupon the record was read back.)

             24           THE WITNESS:  I don't remember any specific

11:21:00 am  25   discussions about that, no.

                                                                    52

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1          MR. SAWYER:   Q   Do you have any recollection

2    whatsoever regarding that particular subject matter

3    coming up during the decision-making process?

4    A    No, I don't.

5    Q    At some point after the decision was made to use

11:21:30 am 6    MTBE at the Wilmington refinery and to the point that

7    you retired from the company, do you recall any

8    discussions regarding the effects of MTBE on

9    groundwater?

10   A    No.

11   Q    From the point that Ultramar first used MTBE as

11:22:00 am 12   an oxygenate at the Wilmington refinery until the

13   point you retired, do you recall whether or not there

14   were any meetings at which the subject of MTBE

15   groundwater contamination was discussed?

16   A    I don't remember any.  No, I don't.

17   Q    Now, you indicated that Ultramar relied on what

11:22:30 am 18   you called its outside experts to, on the issue of

19   choice of oxygenates and its impact on the

20   environment.  Do you recall ever reviewing any

21   literature from any of the organizations that Ultramar

22   belonged to regarding the effects of MTBE on

23   groundwater?

24   A    I don't remember any, receiving anything on

11:23:00 am 25   that.

53

1              CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2

3          I, CATHLEEN S. SLOCUM, a Certified Shorthand

4    Reporter, in and for the State of California, duly

5    appointed and commissioned to administer oaths, do

6    hereby certify:

7          That I am a disinterested person herein; that

8    the witness, JOEL MASCITELLI, named in the foregoing

9    deposition, was by me duly sworn to testify the truth,

10   the whole truth, and nothing but the truth; that the

11   deposition was reported in shorthand by me, Cathleen

12   S. Slocum, a Certified Shorthand Reporter of the State

13   of California, and thereafter transcribed into

14   typewriting.

15         IN WITNESS WHEREOF, I have hereunto set my

16   hand as a Certified Shorthand Reporter on this _31_ of

17   July, 2000.

18

19

20

21         _Cathleen Slocum_

22         Cathleen Slocum
           Certified Shorthand Reporter
23         License Number 2822

24              --o0o--

25

                                                116

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

# Exhibit 9

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether ("MTBE")     Master File No. 1:00-1898
Products Liability Litigation                          MDL 1358 (SAS)
                                                                   M21-88

---

## This Document Relates to:

*City of Fresno v. Chevron U.S.A Inc.., et al.*
*No. 04 Civ. 04973 (SAS)*

---

## Expert Report of Marcel Moreau

Marcel Moreau Associates

Portland, Maine

*Marcel Moreau*                                    November 2, 2011

# INTRODUCTION

### Qualifications

I am a nationally recognized expert in underground petroleum storage systems. Since 1983 I have worked exclusively in the petroleum storage field, chiefly in the areas of regulation, storage system design, leak detection technology, and regulatory compliance assessment.

I have served as consultant to many private and governmental clients, including the U.S. Environmental Protection Agency (EPA), the Chesapeake Division of the U.S. Navy, the Petroleum Equipment Institute, the American Petroleum Institute (API), and the California State Water Resources Control Board.

I have provided technical training concerning underground storage tank systems to state regulatory personnel in Alabama, Alaska, Arizona, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, New Hampshire, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

I have authored a chapter discussing the federal underground tank regulatory program in the *Handbook of Storage Tank Systems,* a textbook sponsored by the Steel Tank Institute. I am a regular columnist for *L.U.S.T.Line*, a U.S. EPA-funded bulletin that covers issues associated with underground storage tank systems.

I have co-authored a paper entitled "MTBE as a Ground Water Contaminant," published in the 1986 *Proceedings of the Petroleum Hydrocarbons and Organic Chemicals in Ground Water – Prevention, Detection and Restoration – A Conference and Exposition* co-sponsored by the API and the National Water Well Association (NWWA).

As a consultant to the Petroleum Equipment Institute (PEI), I have worked with PEI committees to produce eight industry recommended practices, including:

- *Recommended Practices for Installation of Underground Liquid Storage Systems* (1997, 2000, and 2005 editions)

- *Recommended Practices for Installation of Aboveground Storage Systems for Motor Vehicle Fueling* (1999 and 2003 editions)
- *Recommended Practices for Installation and Testing of Vapor-Recovery Systems at Vehicle-Fueling Sites* (2004 edition)
- *Recommended Procedure for Testing Electrical Continuity of Fuel-Dispensing Hanging Hardware* (2002 edition)
- *Recommended Practices for Inspection and Maintenance of Motor Fuel Dispensing Equipment* (2005 edition)
- *Recommended Practices for Overfill Prevention for Shop-Fabricated Aboveground Tanks* (2007 edition)
- *Recommended Practices for the Inspection and Maintenance of UST Systems* (2008 edition)
- *Recommended Practices for the Design and Maintenance of Fluid-Distribution Systems at Vehicle Maintenance Facilities* (2009 edition)
- *Recommended Practices for the Installation of Marina Fueling Systems* (2009 edition)

I have discussed storage tank issues with editors from the trade publications *National Petroleum News* (NPN) and *Convenience Store News* and reporters from the television news magazine *60 Minutes*.

Since 1991, I have been the president of Marcel Moreau Associates in Portland, Maine, a consulting firm providing information and educational services related to petroleum storage tank systems for government, industry trade organizations, and private sector clients.

A significant facet of my professional career is the analysis of underground storage tank system failure.

I have testified as an expert witness regarding the sources and potential effects of MtBE releases from underground gasoline storage tanks in several prior MtBE litigations, including:

- *City of New York v. Amerada Hess et al.,* United States District Court, Southern District of New York, MDL No. 1358, Master File C.A. No. 1:00-1898 (SAS)
- *South Tahoe Public Utility District v. Atlantic Richfield Co., et al.* San Francisco Superior Court Case No. 999128
- *Communities for a Better Environment v. Unocal Corp., et al.,* San Francisco Superior Court Case No. 997013

- *Dunne, et al. v. Shell Oil Company*, Index #96-13856T, Supreme Court of the State of New York, County of Westchester

## Disclosures

A listing of my publications and the cases for which I have provided deposition and trial testimony is contained in my curriculum vitae which is attached to this report as Appendix A.

I am being compensated for my time at the rate of $275 per hour. No portion of my compensation is contingent upon the outcome of this litigation.

It is my understanding that discovery in this case is ongoing. I reserve the right to supplement this report and modify any opinions presented herein based on any additional documents or information that I may review or that may be produced in conjunction with this case.

## Overview

At the request of plaintiffs, I have been asked to review industry documents and draw on my knowledge and experience in underground storage tank systems, which I will refer to as "UST systems" throughout this document, to render opinions concerning the following six topics:

I.   What are the components of UST systems and how do petroleum releases typically occur from these systems?

II.   What is the efficacy of leak detection methods in detecting leaks from underground petroleum storage systems, especially if the petroleum leaking from the storage system contains MtBE?

III.   What information was available to the petroleum marketing industry concerning the integrity of UST systems during the time when gasoline/MtBE mixtures were stored in UST systems?

IV.   What is the MtBE problem, what did the oil industry know during the 1980s and 1990s about the MtBE problem, what steps did they take to address the problem, and what warnings did they provide in response to the problem?

V.   What does the widespread occurrence of MtBE in groundwater tell us about the standard-of-care required to store and handle gasoline that contains MtBE?

**October 1978 - We are Headed for a Catastrophe in Underground Leaks**

In October 1978, the *TulsaLetter* quoted a top-level engineer with a major oil company as stating, "We are headed for a catastrophe in underground tank leaks. Over the next five years, U.S. oil companies will spend far more money on the consequences of leaks than they would have spent if they had insisted on the proper installation of the 'right' tanks in the first place."[87] This quote highlights the long-standing understanding of the nature of the problem of leaks and the reluctance of oil marketing companies to implement technology that would address the leakage problem.

**January 1979 – No Cure for Tank Leaks**

An article in the January 1979 issue of *NPN* entitled, "Tank Leaks: Like the Common Cold, Nobody's Found a Cure," stated, "Aside from (Stage II) vapor recovery, tank leaks continue to be the biggest concern of gasoline marketers..."[88] The article went on to describe preliminary results of an ongoing API study that found corrosion was the cause of 82 percent of tank leaks, that 54 percent of leaks occurred in tanks 11 to 15 years old, and that 24 percent of tanks had nine or more perforations when they were removed.[89] The API study produced results that were of no great surprise to anyone involved with the petroleum marketing industry. The multiple perforations observed in many tanks also pointed to the ineffectiveness of inventory control, the primary method of leak detection in use at the time, in the early detection of leaks.

**April 1979 – MtBE Introduced into Gasoline**

In April 1979, ARCO Chemical began commercial production of MtBE for use in gasoline.[90]

---

[87] "We are headed for catastrophe in underground tank leaks," *TulsaLetter*, October 26, 1978.
[88] "Tank Leaks: Like the Common Cold, Nobody's Found a Cure," *NPN*, January 1979, pp. 64-66.
[89] Ibid.
[90] "Information Review, tert-Butyl methyl ether," CRCS Inc., in collaboration with Dynamac Corporation, March 7, 1986, p. 2.

**December 1979 – API's Killmar Reports on Leaks**

In December 1979, the *TulsaLetter* published a presentation given by F. B. Killmar, API specialist in the detection and prevention of underground leaks, to the National Oil Jobbers Council the previous October.[91] Mr. Killmar pointed out that the root cause of the leakage problem was the hundreds of thousands of unprotected steel tanks that had been installed in the 1950s and 1960s. Mr. Killmar noted that "The industry has experienced underground leaks for years." The difference now, he indicated, was that leaks were more likely to be noticed because of the encroachment of development on UST system facilities, the increasing number of underground utilities that could be adversely affected by leaks, and the failure of UST system operators to detect leaks in a timely fashion.[92]

**1980 – Major Oil Companies Begin Tank Upgrade Programs**

Several major oil companies began overhauls of their UST system populations that would continue through most of the 1980s. Common features of these programs included:

- Classifying the station population into "keepers" and "non-keepers." The distinction between the two populations was usually made on an economic basis, with major expenditures reserved for keeper locations while non-keepers were to be divested to other parties as expeditiously as possible.
- Replacing storage systems at keeper locations with single-walled storage systems constructed of fiberglass or corrosion-protected steel.
- Marginal facilities, keeper locations that were lower priority on the risk scale, and facilities that could not be divested immediately were upgraded with cathodic protection or tank lining that were generally viewed as interim measures to forestall leaks.

---

[91] "Underground Gasoline Leakage," *TulsaLetter*, December 3, 1979.
[92] Ibid.

- Efforts to bolster inventory-control programs to improve their effectiveness in detecting leaks.[93]

These upgrade programs were not in response to the introduction of MtBE into the nation's fuel supply but were undertaken to reduce environmental liabilities from leaking UST systems.

While many major oil companies initiated tank-upgrading programs in the early 1980s, they owned less than 20 percent of the UST systems in the US.[94] Smaller fuel retailers, many of who had recently acquired the oil companies' "non-keeper" storage systems, owned approximately another 20 percent of the UST systems.[95] The majority of UST systems were owned by government agencies, such as military, state, and municipal transportation departments, farmers, and private fleet operators, such as construction and taxi companies.[96] As of the mid-1980s, most of these smaller tank owners were unaware of the condition of their tanks and would have been "amazed" to learn that the federal government was considering a program to regulate them.[97] Most of these tank owners did not upgrade their storage system until well into the 1990s.[98]

**1980 – First Detections of MtBE in Water Supplies**

In 1980, MtBE was detected in a public water well located 1,300 feet from a Shell gas station in Rockaway, New Jersey.[99] In a separate incident, Gulf, Amoco, and Exxon

---

[93] For examples of specific upgrading programs, the Exxon program is described in a 1983 document entitled, "UGT Program – 1983 Management Committee Presentation"; the ARCO program in a January 31, 1984 document entitled, "Retail Marketing 1984-1986 Tank Integrity Program"; the Mobil program is described in a April 2, 1982 document entitled, "Underground Service Station Product Tank Replacement"; and the Texaco program is described in a February 9, 1982 document entitled, "Proposal to Reduce Costs and Exposure Due to Underground Product Leaks."

[94] Testimony of William O'Keefe, Vice-President of the API before the Committee on Environment and Public Works of the United States Senate, March 1, 1984, p. 327.

[95] Letter, with attachment, from Matt Troy, Executive Director of the Long Island Gasoline Retailers Association to Thomas J. Downey, Member of Congress, dated June 27, 1985.

[96] Testimony of William O'Keefe, Vice-President of the API before the Committee on Environment and Public Works of the United States Senate, March 1, 1984, p. 327.

[97] Statement of Frederick Killmar, President of Killmar Associates, before the Committee on Environment and Public Works of the United States Senate, March 1, 1984, p. 280.

[98] "Let's take a brief look at the prospects..." *TulsaLetter,* August 31, 1994, p. 1.

[99] "Removing Organics From Groundwater Through Aeration Plus GAC," Ronald J. McKinnon and John E. Dyksen, Journal of the American Water Well Association, May 1984.

were involved in an MtBE release in 1981 in Jacksonville, Maryland[100] (see Section IV below).

**February 1981 – API Publishes Results of Leak Survey**

Since 1977, the API had been collecting survey forms designed to document the nature and causes of UST system leaks. In February 1981, the API published its final report summarizing the results of this survey.[101] Some 1,717 survey forms were submitted to the API. Sixty-two percent of the reported leaks were in steel tanks, 31 percent were in steel piping. Ninety-one percent of the tank leaks and 67 percent of the piping leaks were attributed to corrosion.[102] The final results of the API study were, again, no surprise to the petroleum marketing industry. This study pointed again to the widespread awareness and the importance of the UST system leakage problem to the marketing members of the API.

**March 1981 – Shell Estimates that 20 Percent of Tanks Leak**

Shell Oil employee Ben Thomas estimated that, "…approximately 20 percent of all underground storage tanks leak, leading to the possibility of groundwater contamination."[103]

**May 1981 – Rogers Predicts 77 Percent of Tanks Will Leak in 5 to 10 Years**

In May 1981, the *TulsaLetter* reported that Chevron was embarking on a program to measure soil properties at 4,500 facilities to determine when the tanks installed there could be expected to leak due to corrosion.[104] Chevron was utilizing the services of Dr. Warren Rogers, who estimated there were one million unprotected steel tanks in the

---

[100] Anderson deposition in *South Tahoe Public Utility District v. Atlantic Richfield Co. et al.*, August 4, 2000, pp. 36-41; Mickelson deposition in *South Tahoe Public Utility District v. Atlantic Richfield Co. et al.*, January 13, 2000, pp 36-47.
[101] "Results of API Tank and Piping Leak Survey," API, February 5, 1981.
[102] Ibid..
[103] Internal ARCO memo from R. N. Roth to the MTBE file, with a subject line of "Pre Study Conference," March 31, 1981.
[104] "New Computer Service Predicts when Underground Steel Tanks will Leak," *TulsaLetter,* May 29, 1981.

ground at U.S. service stations and that as many as 77 percent of them would begin leaking over the next five to ten years.[105]  Dr. Rogers had been retained by the API to determine a formula to be used in predicting when UST would begin leaking.

**June 14, 1981 – Jury Returns $200,000,000 Verdict Against Chevron**

In June of 1981, a jury found Chevron guilty of negligence, trespass, nuisance, and posing an "ultra-hazard" in connection with a gasoline leak in Northglenn, Colorado that entered sewer lines and caused several explosions.  News reports indicated the jury verdict could cost Chevron up to $200 million dollars, although Chevron later denied that the leak was this costly (see July 1982, *The Tank Leak Mess*, in Section III of this report).

**March – July 1981 – NFPA Describes the Leaking UST System Problem**

A series of three articles written by Martin Henry, the flammable liquids specialist for the NFPA, appeared in the *NFPA Fire Journal* in 1981.  The first article presented an overview of the leaking UST system problem and noted that, "In one eastern state, in a two-and-half year period, 115 homes had to be temporarily vacated; 8 homes were destroyed; 3 explosions occurred; 17 persons were injured; 14 public water supplies, which affected 800,000 users, were threatened; and the water quality of 104 wells was seriously damaged."[106]  These numbers make clear the emerging magnitude of the leaking UST system problem and the potential liability posed by the many tens of thousands of storage systems owned by major oil companies.  The article also noted that, "…it is widely acknowledged that most leaks are never reported.  Most states require that the individuals responsible for the leak make official notification to the proper authorities.  Yet, almost every reported case of leakage results from a third-party complaint involving pollution or fire hazard."[107]  Despite the rising awareness and the increasing numbers of reported incidents, it was clear that the true magnitude of the problem was still unknown.

---

[105] Ibid.
[106] "Underground Leakage of Hydrocarbons – An Overview of a Potential Fire Problem," Martin F. Henry, *NFPA Fire Journal*, March 1981.
[107] Ibid.

## January 1982 – API Considers a Tank Leak Strike Force

The API considered the formation of a "Tank Leak Strike Force" that would provide immediate response to leak incidents.[108]  The purpose of the strike force was to respond to "…the growing number of underground tank leaks before things get out of hand."[109]  A recurring problem had been that when petroleum product appeared in sewers, basements, and water supplies no tank owner would assume responsibility for the incident.  This frequently led to adverse publicity for the oil marketing industry.  The committee charged with putting together this strike force included Gulf, Texaco, Union Oil, Amoco, Chevron, and Shell.  Chevron's marketing vice-president, Don Mulit, apparently "…urged the group to tackle the problem as quickly as possible, noting that his company was only one of a number of firms that had been clobbered in the courts and held responsible for underground leaks at hinterland service stations."[110]  Despite Chevron's pleas, the tank leak strike force was never created.

## February 1982 – Major Oil Companies Divest Themselves of Storage Systems

Texaco personnel wrote a document at about this time entitled "Proposal to Reduce Costs and Exposure to Underground Product Leaks."[111]  This document provides an example of a cost reduction strategy that was extensively used by major oil marketers from the mid-1970s to the mid-1980s.  This strategy was to "…divest ownership of underground storage systems at locations other than Investment Stations."[112]  The basic strategy was to reduce the costs and risks posed by UST leaks by transferring ownership of the storage systems to the facility owners or operators.

This document presents the numeric results of Texaco's divestment strategy.  In 1976, Texaco owned tanks at 11,254 service stations.  In 1980, Texaco owned tanks at

---

[108] "API Ponders Tank Leak Strike Force," *NPN*, January 1982.
[109] Ibid.
[110] Ibid.
[111] "Proposal to Reduce Costs and Exposure Due to Underground Product Leaks," February 9, 1982 (date approximate), Hitchcock deposition *In re: MtBE Products Liability Litigation*, May 2, 2007, Exhibit 4.
[112] Ibid., Bates # CITYNY 201123.

5,271 service stations.[113]  In four years, Texaco had sold off more than half of the UST systems it owned.

Prior to the 1980s, it was common practice for oil suppliers to own the UST systems at retail facilities, even at facilities where they did not own the property or directly operate the facility.  By owning the storage systems, oil companies could control what product went into them and effectively prevent a facility from buying a different brand of product.  For example, if Texaco owned the tanks, then it could prohibit the facility operator from buying lower-quality gasoline and selling it under the Texaco brand.

As the cost of leaks increased, however, this practice became unattractive to the oil companies.  A facility that only sold a small amount of product might have a very expensive leak, so it was not worth accepting this large liability for only a small profit on the sale of gasoline.  The small profits also did not justify the cost of replacing the storage system with a more leak-resistant one.  The easy answer to this problem was to sell the storage system, often for a nominal sum, such as one dollar, to the facility owner or operator.[114]  The new owner typically continued to operate the UST system, generally unaware of the risks he had just acquired.

## May, 1982 – Major Oil Companies Describe Tank-Upgrading Programs

The May 1982 edition of the *TulsaLetter* reported, "Most marketers, by this time, have had at least one costly experience with an underground oil spill.  They have discovered that the expense of coping with liability claims and environmental requirements, growing out of tank leaks, can far exceed other routine marketing costs."[115]  This issue of the *TulsaLetter* also summarized presentations given by three major oil companies (Texaco, Shell, and Exxon) at the spring meeting of the API marketing division concerning the nature and scope of their UST upgrading and replacement programs.

---

[113] Ibid., Bates# CITYNY 201116.
[114] Letter, with attachment, from Matt Troy, Executive Director of the Long Island Gasoline Retailers Association to Thomas J. Downey, Member of Congress, dated June 27, 1985.
[115] "Testing and replacement of underground tanks..." *TulsaLetter,* May 20, 1982.

### July 1982 – *NPN* Describes the "Tank Leak Mess"

In July 1982, *NPN* published a cover article entitled, "The Tank Leak Mess."[116]  The article presented a comprehensive overview of the tank problem, how expensive it could be, and what some in the petroleum marketing industry were doing about it.  An incident in Northglenn, Colorado, which reportedly cost Chevron over 10 million dollars, was described.[117]

### November 1982 – Rogers Estimates 50,000 Tanks are Leaking

In November 1982, *Petroleum Marketer* magazine reported on Dr. Warren Rogers' methodology for predicting the life expectancy of USTs.[118]  The magazine also reported that Chevron had requested that Dr. Rogers estimate how many tanks were leaking on a national basis.  Based on his model and data provided by "a whole spectrum of oil companies," Dr. Rogers estimated that there were 50,000 leaking tanks at that time, and that the number would increase to 75,000 in about a year.[119]

### December 1983 – Oil Companies Compare Upgrading Programs

Rival petroleum marketers were very interested in what their competitors were doing relative to their USTs.  A December 12, 1983, Texaco memo from Marvin Dimond to P.D. McNaughton presented brief summaries of what ten different oil companies were doing with regard to tank replacement or upgrading.[120]  Companies included in the survey were Exxon, Shell, Amoco, Chevron, Getty, Gulf, Mobil, Phillips, SOHIO, and Union.  A similar survey conducted in about 1981, also included Marathon and ARCO.[121]  A survey dated April 2, 1982, conducted by Mobil, also summarized the activities of competitive companies with regard to tanks as part of the justification for ramping up

---

[116] "The Tank Leak Mess," *NPN*, July 1982, pp. 36-40.
[117] Ibid.  p. 38.
[118] "Rogers Finds Leaks By Using Statistics," *Petroleum Marketer*, November-December 1982
[119] Ibid.
[120] "Underground Leak Protection Ten Year Tank Replacement Program," internal Texaco memo from Marvin Dimond to P. D. McNaughton, December 12, 1983.
[121] Ibid., Bates #TEX 0036444.

Mobil's tank program.[122]  Mobil's survey included Exxon, Shell, Chevron, Amoco, Texaco, Gulf, ARCO, Union, Getty, SOHIO, Marathon, and Sun.[123]

These surveys documented that nearly all of the significant players in petroleum marketing in the 1980's were very much aware of the tank leak problem.

**May 1984 – Protecting Groundwater from Leaking Tanks Dominant Issue for API**

The *TulsaLetter* reported on the spring 1984 meeting of the API O & E Committee and stated that, "Issues connected with protecting groundwater from leaking underground tanks dominate the thinking of the marketing industry these days.  There is more concern about the ramifications of state and federal regulations, related to tank systems, than with vapor recovery, lead phasedown, alcohol fuels, or any of the other issues which have held center stage in the thinking of marketing operations people in recent years."[124]  At this point, federal legislation to regulate UST systems had been proposed and tank owners were very interested in the progress, content, and cost of the impending legislation.

**November 8, 1984 – National Tank Regulatory Program Established**

President Reagan signed into law Subtitle I of the Resource Conservation and Recovery Act (RCRA), establishing a national program to regulate UST systems.[125] The fact that this far reaching and expensive legislation was proposed in spring 1984 and signed into law that same fall (with little opposition from the petroleum marketing industry) indicates the industry had finally recognized the time had come to do something about the leaking UST system problem.

**May 7, 1985 – The End of the Bare Steel Tank Era**

The authors of Subtitle I of RCRA recognized it would be some time before regulations implementing the provisions of this law could be promulgated.  Because it was well

---

[122] "Underground Service Station Product Tank Replacement," internal Mobil memo from R. L. Abbott to H. Hokamp, April 2, 1982.
[123] Ibid., Bates# XOM-UST-000021916
[124] "Underground Storage Systems," *TulsaLetter*, May 31, 1984.
[125] Solid Waste Disposal Act, Title II, Solid Waste Disposal, Subtitle I, Regulation of Underground Storage Tanks, November 8, 1984.

understood that bare steel tanks were a significant component of the leaking UST system problem, Subtitle I included a measure known as "interim prohibition," designed to stop the use of bare steel tanks for regulated underground petroleum storage systems.[126] The interim prohibition specified that after May 7, 1985, all newly installed UST systems had to be protected against corrosion, structurally sound, and compatible with the contents. Interim prohibition officially ended the era of the bare steel tank. While this step was long overdue, the fact remained that millions of bare steel tanks were already in service, and many of these would remain in service for another decade or more.

### November 1988 – Suffolk County Completes Corrosion Study

The EPA Office of Underground Storage Tanks contracted with the Suffolk County, New York, Department of Health Services to conduct a tank autopsy study to determine the nature and extent of corrosion on USTs that were being removed.[127] A large number of tanks were being removed in Suffolk County because of a local regulation requiring all bare steel storage tanks to be removed from service by January 1, 1990. In the course of the study, detailed observations of the nature and extent of corrosion were made on 500 individual bare steel tanks located at 199 different facilities. Tank sizes ranged from 175 to 50,000 gallons, and tank ages ranged from 2 to 70 years, with 87 tanks of unknown age. Overall, 28.6 percent of the 500 tanks inspected had perforations, although only about 58 percent of perforated tanks showed signs of leakage.[128] Among the perforated tanks, the average number of perforations was seven.[129] Consistent with the API study (see February, 1981 ), 96 percent of the tank failures were due to corrosion.[130]

### December 22, 1988 – EPA Tank Rules Go into Effect

On December 22, 1988, the regulations developed by the EPA pursuant to Subtitle I of the 1984 RCRA Amendments went into effect. The regulations established notification, installation, leak detection, removal, corrective action, and financial responsibility

---

[126] Ibid., Section 9003(g).
[127] *Tank Corrosion Study,* EPA 510-K-92-802, November 1988.
[128] Ibid., p. 10.
[129] Ibid., p. 32.
[130] Ibid., p. 37.

requirements for USTs.  All regulated storage systems installed after this date had to meet the new requirements immediately.  The regulations included a five-year timetable for instituting leak detection at all existing UST systems subject to the regulations, and a ten-year timetable for upgrading existing storage systems to meet corrosion protection, spill containment, and overfill prevention requirements.  In short, the regulations defined a ten-year program for improving the nation's UST systems.

However, the regulations stopped short of mandating the replacement of all of the nation's bare steel tanks.  Instead, bare steel tanks could meet the new requirements by adding either a lining inside the tank or cathodic protection on the outside surface of the tank.  These technologies had long been used in the petroleum marketing industry and were generally considered to be temporary fixes rather than long-term solutions to the leaking tank problem.   Thus, the petroleum marketing industry had reason to believe that the EPA's approach would prove to be less than satisfactory in the long term.


**August 31, 1994 – National Tank-Upgrading Program Goes Slowly**

In August 1994, Robert Renkes, executive director of the Petroleum Equipment Institute, published an estimate in the *TulsaLetter* that only 400,000 out of the 1,300,000 regulated UST systems met the corrosion protection, spill containment, and overfill prevention requirements of the federal regulations that were required to be in place by December 1998.[131]  He estimated that the rate of upgrading would continue at about 100,000 tanks per year until 1998.  This meant that "…we will enter 1998 with 600,000 USTs not yet in compliance with the federal tank upgrade requirements."[132]

In November 1996, the API cited an EPA estimate that only 40 percent of active tanks met the 1998 requirements at that time.  The API briefing paper also indicated that 80 percent of API member UST systems met the 1998 upgrade requirements.[133]

API member companies were well ahead of smaller tank owners in upgrading the tanks they owned, but API member companies also knew that bare steel tanks still represented a very large portion of the UST systems receiving gasoline with MtBE.  The

---

[131] "Let's take a brief look at the prospects…" TulsaLetter, August 31, 1994, p. 1.
[132] Ibid.
[133] "Attachment B, MtBE Status/Strategy," API briefing paper, November 27, 1996.

petroleum marketing industry was well aware that many tank owners would be waiting until the last minute to upgrade their storage systems, and that many old and substandard bare steel UST systems would be storing gasoline containing MtBE for many years before they were upgraded.

### August 1996 – Shell had Long Recognized that Tanks and Pipes Were Not the Only Sources of Releases

In 1996, Glen Marshall, a Shell Engineer responsible for the setting Shell's UST standards, gave a presentation on the evolution of Shell's storage tank system program. Mr. Marshall gave a historical overview of the program and noted that as of the mid-1980's Shell had recognized that tanks and piping were not the only sources of releases:

> Originally it was thought that leaks came from holes in tanks and pipes. What was found, however, was that those were only the massive leaks that required significant remediation efforts. Most service station sites had minor contamination that was not associated with a tank or pipe leak. We found that each tank fill connection, submerged turbine, and under every single island pump or dispenser was a leak source that required containment.[134]

Shell's solution was to provide containment for these problem areas, but as of 1996, less than 25% of Shell's storage tank systems were equipped with this containment.[135]

Mr. Marshall was asked whether Shell was doing better with regard to leak prevention than other oil companies. He replied, "Yes, our leak history has gone down dramatically as the steel tanks were replaced by fiberglass ones. Our remediation costs have reduced as we began to contain spills. However, we still do have problems. The weak link now is not necessarily the hardware, but how it was installed."[136]

Mr. Marshall was also asked whether there were still any steel tanks in use at Shell stations. He answered, "The fiberglass tank replacement program started in 1979, but after almost 20 years there are still a low number of steel tanks."[137]

---

[134] *Spill and Leak Prevention Practices at Retail Sites,* presentation by Glen Marshall of Shell at "An Environmental Symposium on MtBE," August 31, 1996.
[135] Ibid.
[136] Ibid.
[137] Ibid.

**September 1997 – Supposedly Tight Storage Systems Aren't**

In a 1997 e-mail chain, Glen Marshall explained that storage tank systems are designed to be tight (i.e., have leak rates of less than a drip), but that lack of proper supervision because of insufficient manpower results in installations that are not tight: "I believe a significant source of the problem is the embarrassing fact that supposedly "tight" systems aren't. This is directly attributable to the fact that both field and corporate personnel have been historically under staffed and overloaded making it almost impossible to give all projects/tasks the full and knowledgeable attention they deserve."[138] Other factors which led to leaks identified by Mr. Marshall included the lack of tightness of vapor containing portions of storage systems, vacuum-assisted Stage II vapor recovery systems that pressurized tanks (leading to increased vapor leaks from leaky vapor piping and tank top fittings), and poor maintenance practices (especially when combined with single-wall storage systems).[139]

**May 1998 – Shell Employee States the "Bubba Factor" is the Achilles Heel of Storage Systems**

In 1998, Curtis Stanley was notified by API of a study being initiated by the Santa Clara Valley Water Authority.[140] One aspect of the Santa Clara study was to investigate the occurrence of MtBE at facilities that met the 1998 upgrade requirements. In an e-mail to Glen Marshall, Stanley indicated that he had urged API to "…evaluate existing [storage tank] systems and new system design, installation and operations. I already have a good idea of what Santa Clara is going to find and if the industry isn't ready with an adequate response/solution, we are all going to look bad."[141] In response to Stanley's e-mail, Glen Marshall stated that the "'Achilles Heel' of [storage tank] systems has always been the 'Bubba factor' …the best intentions of hardware manufacturers and designers being ultimately defeated by poor installation and maintenance practices."[142]

---

[138] "MtBE – Soil and Groundwater Technology Team," internal Shell e-mail chain primarily between C. Stanley and G. Marshall, October 8, 1997.
[139] Ibid.
[140] Untitled e-mail chain involving Judy Shaw (API), C. Stanley and G. Marshall, May 29, 1998.
[141] Ibid.
[142] Ibid.

## December 22, 1998 – The Federal Tank-Upgrading Deadline

EPA regulations that went into effect on December 22, 1988, established a ten-year timeline for upgrading the nation's UST systems with corrosion protection, spill containment, and overfill prevention.  The deadline for adding these three components to UST systems already in service in 1988 was December 22, 1998.[143]

As predicted in the *TulsaLetter* in 1994,[144] a great many tank owners opted to wait until the last minute to upgrade their storage systems.  California authorities estimated that only 52 percent of approximately 60,000 active UST facilities in California had been upgraded by July 1998.[145]  This meant that for most of the 1990s, when MtBE was in widespread use, it was being stored in a great many storage systems still subject to corrosion failure and delivery spills.

Annual MtBE consumption in the United States in 1998 was estimated at 4 billion gallons, with California consuming almost one-third of this amount.[146]

## February 1999 – Upgraded Storage Systems are Not Enough to Contain MtBE

In a February 1999 e-mail message concerning a review of an industry document on MtBE, Curtis Stanley commented that, "You may, however, want to carefully consider what you say when the new tank upgrades are our first line of defense.  While this is very true and the size of leaks has decreased substantially over the years, we are still finding MtBE at sites that have been upgraded."[147]

## March 1999 – Storage System Upgrades do Not Address Root Causes of Leaks

In a March 12, 1999 e-mail to Curtis Stanley, Glen Marshall stated, "'98 upgrade work [i.e., the 1998 EPA UST upgrade requirements for corrosion protection, spill containment and overfill prevention] will have no affect [sic] on MTBE issues.  Any [storage tank]

---

[143] 40 CFR 280.21
[144] "Let's take a brief look at the prospects…" TulsaLetter, August 31, 1994, p. 1.
[145] "MtBE Project Fact Sheet," Los Angeles Regional Water Quality Control Board and US Environmental Protection Agency, July 1998, p. 4
[146] "Status and Impact of State MtBE Bans," Energy Information Administration, March 27, 2003
[147] "Draft WSPA Q & A on MTBE," internal Shell e-mail from Curt Stanley to F. R. Benton, February 2, 1999.

system that was going to have problems is still going to have problems.  Upgrades addressed inadvertent spills and releases, not root causes of tank or line leaks."[148]

**Summary**

Leaks from UST systems have long been recognized by petroleum marketers and were considered "inevitable."[149]  In 1980, at the time when MtBE began to be blended into gasoline, the petroleum industry was acutely aware of the decrepit nature of the nation's population of UST systems.  Any company that owned substantial numbers of underground petroleum storage systems in the latter part of the twentieth century knew or should have known that these storage systems were common sources of groundwater contamination.

Recognizing this problem, trade press and internal company documents show that major oil companies undertook expensive UST system upgrading programs in the 1980s. It was well known in the industry, however, that many other storage tank owners put off upgrading their storage systems until the late 1990s.  Most of these station owners were not aware of the MtBE problem (see Section IV) and the hazards posed by even small gasoline releases from their storage systems.  Thus, in the time frame when MtBE was prevalent in the nation's gasoline supply, the nation's UST population was poorly suited to contain it.

---

[148] "Draft Agenda; Roster; Info Items," internal Shell e-mail from G. Marshall to C. Stanley, March 12, 1999.
[149] "Tank Leaks: Like the Common Cold, Nobody's Found a Cure," *NPN*, January 1979.

# Exhibit 10

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF NEW YORK

4

5    CITY OF FRESNO,                    )
                                        )
6                   Plaintiff,          )
                                        )
7    vs.                                )      No. 04 CIV. 4973
                                        )      (SAS)MDL 1358
8    CHEVRON U.S.A. INC., et al.,       )
                                        )
9                   Defendants.         )
     _____)

10

11

12                    DEPOSITION OF

13                    IMTIAZ AHMAD

14                  FREMONT, CALIFORNIA

15            WEDNESDAY, FEBRUARY 16, 2011

16

17

18             DEPOBOOK REPORTING SERVICES

19            Certified Shorthand Reporters

20              1600 G Street, Suite 101

21             Modesto, California 95354

22                   800-830-8885

23

24   REPORTER:   DENISE WHEELER, CSR NO. 8254

25

Deposition of Imtiaz Ahmad / February 16, 2011

```
 1        Q.  There's an indication about four lines down that
 2   says, "Date of business commencement 11, slash, 1, slash,
 3   91."  Do you see that?
 4        A.  Yes, I do.
 5        Q.  And does that match your approximate recollection
 6   as to when Petro Group II started operating that station?
 7        A.  Yes.
 8        Q.  Now, in about the middle section here below the
 9   heavy bar it looks like UST Annual Fees.  It says, "Three
10   non-upgraded tanks."  Do you see that?
11        A.  Yes.
12        Q.  Do you recall were -- were there three underground
13   storage tanks at the time that Petro Group II took over that
14   station on Elm?
15        A.  Yes.
16        Q.  Did you have any knowledge whether these tanks were
17   singled walled or double walled?
18        A.  They were single walled.
19        Q.  Do you have any knowledge as to what those tanks
20   were made out of?
21        A.  They were made out of steel.
22        Q.  Do you have any knowledge as to when those tanks
23   were first installed?
24        A.  First installed?  They were old tanks.  I would not
25   know exactly, no.
```

31

Deposition of Imtiaz Ahmad / February 16, 2011

```
 1        Q.   Is it correct the tanks were not changed out at the

 2   time that Petro Group II took over the station?

 3        A.   No, sir.

 4        Q.   Do you know at the time the Petro Group II took

 5   over was there any kind of leak detection system for those

 6   underground storage tanks?

 7        A.   No, other than manual inspection we do on a daily

 8   basis.

 9        Q.   Okay.  Set that aside.  Thanks.

10                      (Exhibit No. 6 was marked for

11                       identification.)

12             MR. EICKMEYER:  Q.    Handing you Exhibit 6, this is

13   Business Plan Registration Form Department of Health, Bate

14   stamped at the bottom right RWQCB hyphen Fresno hyphen

15   001732.  Do you recognize having seen this form before?

16        A.   When you say recognize, the -- the answer would be,

17   no, I don't recognize.  All I know is, yes, we did these

18   things, and you had to file certain forms.  And I can see

19   just my wife's writing.  So the answer -- when you said

20   recognize, tell me what you're saying?

21        Q.   Well, if you remember having seen this page before.

22   You're saying you remember seeing similar forms?

23        A.   Yes.

24        Q.   You're not sure if you've seen this exact page

25   before?
```

32

Deposition of Imtiaz Ahmad / February 16, 2011

```
 1        A.   That's exactly what I'm saying.

 2        Q.   Do you recognize your wife's signature down at the

 3   very bottom?

 4        A.   Yes, I do.

 5        Q.   Now, in about the middle of the page under

 6   emergency contacts has your name listed?

 7        A.   Yes.

 8        Q.   And below that it says title of manager?

 9        A.   Uh-huh.

10        Q.   Is that yes?  I think you said uh-huh.

11        A.   Yes.  Yes.  I'm sorry.

12        Q.   Were you considered the manager of the station on

13   Elm?

14        A.   Yes.

15        Q.   Were you present there during the station

16   operations?

17        A.   Not every day but a good part of -- part of it.

18        Q.   When you or Petro Group took over that station,

19   were you given any training in what to do in the event of a

20   gasoline leak or spill?

21        A.   I believe we went through that process.

22        Q.   Who did you go through that process with?

23        A.   I believe Beacon did it or someone from Beacon came

24   in who did it.

25        Q.   Do you have any recollection of what you were told
```

                                                                    33

Deposition of Imtiaz Ahmad / February 16, 2011

1   to do in the event of a gasoline leak or spill?

2        A.   I believe we had what you guys called an

3   environmental kit.  Its a 55-gallon drum.

4              THE COURT REPORTER:  What, kit?

5              THE WITNESS:  Kit, K-I-T.  So it has a sack or two

6   sacks of chemical that wipes up the gasoline or oil.  That

7   it has some kind of bonds that are supposed to contain the

8   oil.  There was a bunch of stuff in there, some rags and

9   that kind of stuff in that tub.

10             MR. EICKMEYER:  Q.   I've heard different witnesses

11  describe a product that had the consistency of kitty litter.

12  Did you have something like that?

13       A.   Yeah, you can say that.  You can say that.  That's

14  the term they used, yes.

15       Q.   Do you recall how often you would have to use that

16  kitty litter type product to clean up a gasoline leak or

17  spill at the station?

18       A.   Not that very often.

19       Q.   Can you quantify how often that would be, weekly,

20  daily, monthly?

21       A.   I wouldn't be able to say how often, but I would

22  say probably about -- I would say probably at least once --

23  once a month or so you would end up using it.

24       Q.   After that kitty litter product was applied to the

25  ground was it then swept up or scooped up somehow?

34

Deposition of Imtiaz Ahmad / February 16, 2011

1    A.  Yes.

2    Q.  And then where would that used product be placed?

3    A.  That product was supposed to go back in that drum

4  basically.

5    Q.  So the product would be reused?

6    A.  Not reuse.  I think the -- the kitty litter would

7  be sitting in our -- in our storage room, and then you have

8  the plastic bags.  That's where the stuff is supposed to go

9  back once you sweep up the floor.  And then I think every so

10  often somebody came in or we took it someplace else I

11  believe.

12    Q.  So after the kitty litter product was swept up, it

13  would be put into a plastic bag?

14    A.  It was put in a plastic bag.

15    Q.  Were these kept inside the station building or a

16  storage shed?

17    A.  No, the outside building.  There was always a

18  storage somewhere there.  So, like, this particular location

19  you're talking about, there's a main building, and then

20  there's a side building.  A little bit of a -- you can call

21  a storage room where we keep the -- the tanks have a

22  measuring sticks in the old days.  So this was like a 10, 15

23  feet long stick that you put in the tank to measure how much

24  the gas is there on a daily basis.

25       And then also the chemical kit would be in that

35

Deposition of Imtiaz Ahmad  /  February 16, 2011

1      Q.  Were you ever told at a particular time that MTBE
2  was being added to the gasoline?
3      A.  Yes.
4      Q.  Do you recall when you first heard that?
5      A.  When we took over the gas station back in '91.
6      Q.  Do you recall ever being told while Petro Group
7  operated the station that MTBE was no longer being added to
8  the gasoline?
9      A.  I think that came in effect after we sold the gas
10  stations.
11      Q.  Did you ever hear from any source why MTBE was
12  being added to the gasoline?
13      A.  I think I need to add something at this point.  As
14  a CPA I specialized in gasoline service station accounting.
15  So as such I have, let's say, more than 50 gas station owner
16  operator.  So on a daily basis I hear everything there is to
17  hear about the industry.
18      Q.  Do you recall hearing from any sources as to why
19  MTBE was added to gasoline?
20      A.  Why it was added to the -- I think Arco who came up
21  with this product to boost the oxygenation I believe.
22  That's what it was.
23      Q.  Do you recall ever hearing that gasoline with MTBE
24  in it needed to be treated differently than gasoline that
25  did not contain MTBE?

110

Deposition of Imtiaz Ahmad / February 16, 2011

```
 1        A.  I would not know at this point, no.

 2        Q.  Do you recall when gasoline was being delivered to

 3   the station, did you ever receive an MSDS or Materials

 4   Safety Data Sheet for gasoline?

 5        A.  The answer would be have no idea at this time.  But

 6   I can tell you on every single pump we had notice about MTBE

 7   so that buyers of the gasoline, the consumer of the

 8   gasoline, would know that this product included MTBE.

 9        Q.  Did you ever hear from any source why those labels

10   needed to be put on the pumps?

11        A.  I think it could have many, many reasons.  But the

12   biggest reason the customer wanted to know or let the

13   customer know it could affect their converter system in

14   their cars.

15        Q.  Were those labels that you mentioned on the pumps

16   the entire time you operated the station?

17        A.  I'm sorry, say it again.

18        Q.  You described I think it was a label on the pump?

19        A.  Yeah, these are called decals.

20        Q.  Decal.  Were these decals indicating there was MTBE

21   in the gasoline on the pumps during the entire time you

22   operated the station?

23        A.  That is correct, yes.  I believe MTBE was added on

24   during the cold season like starting October to February,

25   and then it would come off I believe.
```

111

Deposition of Imtiaz Ahmad / February 16, 2011

Page 139

```
 1    actual scheduling reasons for it, but I apologize for it
 2    being somewhat awkward.
 3          Can you hear me?
 4      A.  I can hear you pretty good at this point.
 5      Q.  As I said in the beginning, I represent the Valero
 6    defendants in this case, and I just wanted to clarify a few
 7    things you discussed with Mr. Eickmeyer if that's okay?
 8      A.  That's okay with me.
 9      Q.  I know that you said that after Petro Group II
10    purchased the Elm Street station from Ultramar, that it was
11    Beacon and Ultramar gasoline that was delivered to the
12    station; is that correct?
13      A.  That is correct.
14      Q.  And do you recall if there was a specific agreement
15    between Petro Group II and Ultramar that allowed for that
16    delivery of gasoline?
17      A.  I believe we signed the -- what do you guys call in
18    this business branded versus not branded gasoline, so that
19    particular place was branded as Beacon, so we signed a
20    contract with them.
21      Q.  Like a brand distribution marketing agreement,
22    something like that?
23      A.  Yes.
24      Q.  Okay.  And do you recall if there was a specific
25    number of years that that was set for?
```

Deposition of Imtiaz Ahmad / February 16, 2011

Page 140

1      A.   That I don't know.   I think it was three-year

2  agreement or five-year agreement.

3      Q.   Okay.   And do you recall if there was any other

4  specific terms in that agreement, whether there were

5  specific amounts of gasoline specified or whether it set out

6  other requirements for either party?

7      A.   I believe we couldn't buy from anybody else other

8  than Ultramar during -- during the product term.

9      Q.   Okay.   And I believe that you just told my

10  associate -- my colleague that you ceased the brand name

11  agreement in 1995; is that correct?

12      A.   That is correct.

13      Q.   And at that time you stopped accepting Beacon or

14  Ultramar gasoline at the station; is that correct?

15      A.   That's right.

16      Q.   And did you have Beacon or Ultramar signs at the

17  station, do you recall?

18      A.   After we stopped buying from Beacon?

19      Q.   When you were buying from Beacon?

20      A.   Yeah, every time -- yeah, so -- so while we were

21  buying from Beacon, what we were called in the market is

22  called branded location -- so as such we were branded

23  Beacon.   So every location had a sign called Ultramar Beacon

24  sign.   And this particular location had an Arco sign.

25      Q.   Okay.   And do you recall if you needed new gasoline

Deposition of Imtiaz Ahmad  /  February 16, 2011

Page 146

1

2                    REPORTER'S CERTIFICATION

3

4        I, DENISE WHEELER, CSR No. 8254, Certified Shorthand

5   Reporter, certify:

6        That the foregoing proceedings were taken before me at

7   the time and place therein set forth, at which time the

8   witness was put under oath by me;

9        That the testimony of the witness, the questions

10  propounded, and all objections and statements made at the

11  time of the examination were recorded stenographically by me

12  and were thereafter transcribed;

13       That the foregoing is a true and correct transcript of

14  my shorthand notes so taken.

15       I further certify that I am not a relative or employee

16  of any attorney of the parties, nor financially interested

17  in the action.    I declare under penalty of perjury under

18  the laws of the California that the foregoing is true and

19  correct.

20       Dated this 28th day of February, 2011.

21

22

23       _____

         DENISE WHEELER, C.S.R. No. 8254

24

25

# Exhibit 11

UNITED STATES DISTRICT COURT  )    Master File No. 1:00-1898
SOUTHERN DISTRICT OF NEW YORK  )    MDL No. 1358 (SAS)
                                                      )    M21-88
                                                      )

In re Methyl Tertiary Butyl Ether  )
("MTBE") Products Liability Litigation  )
                                                      )
                                                      )    VALERO DEFENDANTS'
                                                      )    OBJECTIONS AND RESPONSES
This document relates to:  )    TO PLAINTIFF CITY OF
                                                      )    FRESNO'S FIRST SET OF
*City of Fresno v. Chevron U.S.A., Inc., et*  )    INTERROGATORIES TO
*al.*, No. 04 Civ. 4973  )    DEFENDANTS
                                                      )

       Pursuant to Federal Rule of Civil Procedure 33 and Local Rule 26.3, Ultramar Inc.,

Valero Marketing and Supply Company, and Valero Refining Company–California (collectively

"Valero Defendants") answer and object to Plaintiff City of Fresno's ("Plaintiff" or "City of

Fresno") First Set of Interrogatories served on September 2, 2008 as follows.

       Dated: November 5, 2008.

                                       _____
                                       J. Clifford Gunter III
                                       M. Coy Connelly
                                       Amy E. Parker
                                       BRACEWELL & GIULIANI LLP
                                       711 Louisiana St., Suite 2300
                                       Houston, Texas 77002-2770
                                       Telephone: (713) 221-1335
                                       Telecopier: (713) 221-1212

                                       Attorneys for Defendants
                                       ULTRAMAR INC., VALERO MARKETING AND
                                       SUPPLY COMPANY, AND VALERO REFINING
                                       COMPANY-CALIFORNIA

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Valero Defendants' Answers and Objections to Plaintiff City of Fresno's First Set of Interrogatories was served upon counsel via LexisNexis File & Serve on the 5th day of November 2008.

_____
Amy E. Parker

## GENERAL OBJECTIONS

1.    Valero Defendants object to the instructions and definitions set forth in Plaintiff City of Fresno's First Set of Interrogatories to Defendants ("Plaintiff's Interrogatories") to the extent they deviate from or purport to impose requirements other than or in addition to those required by the Federal Rules of Civil Procedure and the Local Civil Rules for the Southern District of New York.

2.    Valero Defendants object to Plaintiff's Interrogatories to the extent they seek information outside the restricted scope of discovery permissible under the Local Civil Rules of this Court, and in particular Rule 33.3 which strictly limits the type of interrogatories that are permitted.

3.    Valero Defendants object to Plaintiff's Interrogatories to the extent that they seek documents or information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. None of these answers is intended as, or should be construed as, a waiver or relinquishment of any part of the protections afforded by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. In the event of the inadvertent production of any information protected by such applicable privileges or immunities, Valero Defendants do not waive their right to assert such protections under the applicable privileges or doctrines. Valero Defendants reserve the right to withdraw or recover such information to the extent it is inadvertently produced.

4.    Valero Defendants object to Plaintiff's Interrogatories to the extent that they seek information beyond that in the possession, custody, or control of Valero Defendants. Valero Defendants further object to Plaintiff's Interrogatories to the extent they seek information relating to service stations owned or operated by entities other than Valero Defendants.

5.    Valero Defendants object to Plaintiff's Interrogatories to the extent that they seek information from any of Valero Defendants' subsidiary or affiliated companies that are not parties to this case, because such information is irrelevant, and such requests are not reasonably calculated to lead to the discovery of admissible evidence. To the extent Valero Defendants provide information for subsidiary or affiliated companies, it shall not be construed as waiving this objection.

6.    Valero Defendants object to Plaintiff's Interrogatories to the extent that they seek information relating to events that occurred from 1979 to the present on the grounds that such requests are overbroad, unduly burdensome, and oppressive. Further, to the extent Plaintiff's Interrogatories seek information relating to events that occurred prior to 1986, Valero Defendants object on the grounds that such requests are irrelevant to the subject matter of this case and are not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants have limited their responses accordingly.

7.    Valero Defendants further object to Plaintiff's Interrogatories to the extent they seek information regarding events that took place after December 31, 2003, the date the MTBE ban took effect in California. Such requests are irrelevant, overbroad, unduly burdensome and

not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants have limited their responses accordingly.

8.    Valero Defendants object to Plaintiff's Interrogatories to the extent that they seek information pertaining to events or operations outside the RGA for this case on the grounds that such requests are overbroad, unduly burdensome, and oppressive and on the further grounds that they seek information not relevant to the subject matter of this case and are not reasonably calculated to lead to the discovery of admissible evidence.

9.    Valero Defendants object to Plaintiff's Interrogatories to the extent Plaintiff has defined the RGA to include the entire City of Fresno, thereby disregarding areas of the City that are not actually served by the City of Fresno Water Division. Valero Defendants have limited their responses accordingly and will only be providing information for stations located within the City of Fresno Water Division's Service Area as defined by the City of Fresno Urban Water Management Plan dated August 2008.

10.   Valero Defendants further object to Plaintiff's Interrogatories on the grounds that the RGA is defined to include the entire City of Fresno, without regard to the location of Plaintiff's wells or which wells may have experienced a detection of MTBE. The Court has not confirmed whether the City may even be permitted to seek damages for any so-called "threatened wells" or any wells which have experienced "micro-detections" of MTBE. As such, these requests are overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

11.   Valero Defendants object to Plaintiff's Interrogatories on the grounds that Plaintiff has established neither the right nor any valid factual or legal basis to rely on the alternative theories of market share or "commingled product" liability as a theory of, or method for assessing or allocating, liability.

12.   Valero Defendants object to Plaintiff's Interrogatories because they contain undefined terms which make them vague, ambiguous, overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.

13.   Valero Defendants object to Plaintiff's Interrogatories to the extent they seek disclosure of confidential or proprietary information, trade secrets, and/or confidential business or commercial information. Valero Defendants' answers are subject to all appropriate confidentiality agreements negotiated, or to be negotiated, between the parties or as may be imposed by the Court.

14.   Valero Defendants expressly limit their answers to Plaintiff's Interrogatories to the information that can be located after a reasonable search of their records believed most likely to contain the responsive information.

15.   Valero Defendants object to Plaintiff's Interrogatories to the extent that they request information beyond the limitations and parameters agreed among the parties or imposed by the Court or the Special Master. Valero Defendants' answers are subject to all such limitations and parameters and incorporate by reference the discovery parameters imposed by the Court and the Special Master.

16.     Valero Defendants' investigation into the facts alleged in Plaintiff's First Amended Complaint is continuing, and Valero Defendants continue to search for information responsive to Plaintiff's Interrogatories.  If additional information becomes available, Valero Defendants will amend, modify, and/or supplement these answers and objections as appropriate.

17.     The information Valero Defendants provide, if any, in answer to Plaintiff's Interrogatories is provided solely for the purpose of this action.  Such information is subject to all objections regarding relevance, authenticity, materiality, propriety, and admissibility and to any other objections that would require exclusion of the information, if such information were offered as evidence at trial, all of which objections are hereby expressly reserved and may be interposed at the time of trial.

18.     Valero Defendants' decision to provide information notwithstanding the objectionable nature of any of Plaintiff's Interrogatories is not to be construed as an admission that the information is relevant, a waiver of Valero Defendants' general or specific objections, or an agreement that future requests for similar discovery will be treated in a similar manner.

19.     Valero Defendants reserve the right to amend or supplement their answers as well as the right to object to other discovery directed to the subject matter of Plaintiff's Interrogatories.

20.     These General Objections and Limitations apply to each of Plaintiff's Interrogatories as though restated in full in response thereto.  To the extent Valero Defendants assert objections to individual requests, those objections shall apply equally to any subparts of the request.

21.     Documents referenced herein that have not already been produced pursuant to Local Civil Rule 33.1 will be produced subject to protective orders and/or confidentiality agreements acceptable to Valero Defendants at the offices of their counsel, Bracewell & Giuliani LLP, on dates mutually agreeable to the parties.

## OBJECTIONS & RESPONSES

### INTERROGATORY NO. 1:

IDENTIFY the address of each gasoline station that YOU own or owned within the RELEVANT GEOGRAPHIC AREA since 1979.

    a.      State the dates of ownership for each station YOU identified.

### RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is specifically overbroad both with respect to time, as explained in General Objections Nos. 6 and 7, and to the extent it calls for the identification of all gasoline stations owned by Valero Defendants in the RGA without regard to whether any of those stations is in the vicinity of any drinking water production well or whether any of those stations has ever been identified as the source of a release of gasoline containing MTBE. Valero Defendants do not own or operate any stations located within a mile of Well No. 219.

Subject to, and without waiving, the foregoing objections and the General Objections and Limitations set forth above, Valero Defendants answer as follows:

    1.  #3406: 1105 W. Shields Ave., Fresno, CA 93705 (01/24/81—present)
    2.  #3787: 5783 N. Palm Ave., Fresno, CA 93704 (04/26/01—present)
    3.  #3638: 525 S. Clovis Ave., Fresno, CA 93727 (05/07/58—12/20/99)

### INTERROGATORY NO. 2:

IDENTIFY the address of all gasoline stations that YOU operate or operated within the RELEVANT GEOGRAPHIC AREA since 1979.

    a.      State the dates of operation for each station YOU identified.

### RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is specifically overbroad both with respect to time, as explained in General Objections Nos. 6 and 7, and to the extent it calls for the identification of all gasoline stations owned by Valero Defendants in the RGA without regard to whether any of those stations is in the vicinity of any drinking water production well or whether any of those stations has ever been identified as the source of a release of gasoline containing MTBE. Valero Defendants further object on the grounds that this Interrogatory is unnecessarily duplicative of Interrogatory Nos. 1 and 3. Subject to, and without waiving, the foregoing objections and the General Objections and Limitations set forth above, Valero Defendants answer as follows:

Valero Defendants refer Plaintiff to their responses to Interrogatory Nos. 1 and 3 for information responsive to this request.

**INTERROGATORY NO. 3:**

IDENTIFY the address of all gasoline stations that YOU lease or have leased within the RELEVANT GEOGRAPHIC AREA since 1979.

      a.      State the lease dates for each station YOU identified.

**RESPONSE:**

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is specifically overbroad both with respect to time, as explained in General Objections Nos. 6 and 7, and to the extent it calls for the identification of all gasoline stations owned by Valero Defendants in the RGA without regard to whether any of those stations is in the vicinity of any drinking water production well or whether any of those stations has ever been identified as the source of a release of gasoline containing MTBE. Subject to, and without waiving, the foregoing objections and the General Objections and Limitations set forth above, Valero Defendants answer as follows:

    1.   #3481: 6390 N. Blackstone, Fresno, CA 93710 (04/11/66—present)
    2.   #3615: 1625 N. Chestnut Ave., Fresno CA 93703 (07/24/98—present)
    3.   #3616: 4001 N. Marks Ave., Fresno, CA 93722 (01/22/85—present)
    4.   #3659: 4514 W. Shaw Ave., Fresno, CA 93722 (08/05/88—present)
    5.   #3519: 4591 E. Belmont, Fresno, CA 93702 (03/01/71—10/20/99)

In addition to the foregoing, Ultramar PLC acquired some retail stations leases when it purchased Beacon Oil Company through a stock purchase transaction in November, 1981.[1] To the best of Valero Defendants' current knowledge, most, if not all, of the acquired stations were leased and then sub-leased to third parties who actually operated the station in question. However, given the dates of the transactions at issue, the documentation necessary to confirm Valero Defendants' precise relationship with these stations as well as the dates of the leases is no longer available. Approximate dates have been provided where known.

Several of these leaseholds were terminated prior to 1995 when Ultramar Inc. merged with Diamond Shamrock Corporation. Most, if not all, of the leaseholds were terminated prior to the December 31, 2001 merger of Ultramar Diamond Shamrock Corporation with and into Valero Energy Corporation. Notwithstanding the foregoing, the following is the list of all such stations located within the RGA which may have been leased during the relevant time frame:

    1.  Beacon #77: B Street, Fresno CA (1935—Lease Termination Date Unknown)

---

[1] Beacon Oil Company changed its name to Ultramar Inc., effective September 18, 1989.

2.  Beacon #78: Belmont at 12th Street, Fresno CA (1935—Closure Date Unknown)
3.  Beacon #80: Tulare & Chestnut, Fresno CA (Dates of Leasehold Unknown)
4.  Beacon #496: 4809 E. Kings Canyon, Fresno CA (Dates of Leasehold Unknown)
5.  Beacon #595: 3768 S. Highway 99, Fresno CA (09/01/83—03/27/96)
6.  Beacon #620: 4594 E. Tulare, Fresno CA (01/22/85—08/28/95)
7.  Beacon #658: 1334 N. First St., Fresno CA (Lease terminated 11/01/96)
8.  Beacon #257: 9th & McKenzie, Fresno CA (Site leased 10/46.  Lease Termination Date Unknown)
9.  Beacon #432: 2950 E. Ventura, Fresno CA (Dates of Leasehold Unknown)
10.  Beacon #433: 1372 N. First St., Fresno CA (Dates of Leasehold Unknown)
11.  Beacon #437: 4652 Belmont, Fresno CA (Dates of Leasehold Unknown)
12.  Beacon #438: 4005 E. Jensen, Fresno CA (Dates of Leasehold Unknown)
13.  Beacon #460: 603 G. Street, Fresno CA (04/28/75—04/30/90)
14.  Beacon #472: 2295 S. Elm Ave., Fresno CA (Dates of Leasehold Unknown)
15.  Beacon #516: 2430 E. Olive St., Fresno CA (07/15/85—10/31/91)
16.  Beacon #538: 2139 S. Elm, Fresno CA (Lease terminated 11/01/91)
17.  Beacon #579: 5190 E. Olive, Fresno CA (Lease terminated 11/01/91)
18.  Beacon #619: 3076 E. Gettysburg, Fresno CA (01/22/85—08/03/89)
19.  Beacon #9-1: 6900 N. Motel Dr., Fresno CA (Dates of Leasehold Unknown)

## INTERROGATORY NO. 4:

IDENTIFY the address of all gasoline stations with which YOU have or have had a retail supply contract within the RELEVANT GEOGRAPHIC AREA since 1979.

      a.     State the retail supply contract dates for each station YOU identified.

## RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  This Interrogatory is specifically overbroad both with respect to time, as explained in General Objections Nos. 6 and 7, and to the extent it calls for the identification of all gasoline stations owned by Valero Defendants in the RGA without regard to whether any of those stations is in the vicinity of any drinking water production well or whether any of those stations has ever been identified as the source of a release of gasoline containing MTBE.  Valero Defendants further object to the extent this Interrogatory seeks information outside of Valero Defendants' possession, custody and control.  Valero Defendants are not in possession of information pertaining to the operation, maintenance or environmental remediation which may be associated with any of the following stations.  Notwithstanding the foregoing or the General Objections set forth above, Valero Defendants respond as follows:

1.  #2339: 1919 W. Clinton Ave., Fresno, CA 93705 (06/13/03—present)
2.  #2365: 603 G. Street, Fresno, CA 93722 (05/01/93—present)
3.  #2516: 2837 N. Parkway Drive, Fresno, CA 93722 (07/18/03—present)

4. #3165: 3076 E. Gettysburg Ave., Fresno, CA 93726 (Branded Beacon prior to 2003. Date of initial branding is unknown. Re-branded Valero 10/17/03—present)
5. #4984: 4591 E. Belmont Ave., Fresno, CA 93702 (10/20/99—present)
6. #21854: 1460 "P" Street, Fresno CA 93721 (1/22/85—10/22/04, 01/27/05—present)
7. #24087: 1785 W. Shaw Ave., Fresno, CA 93711 (12/10/01—09/26/03, 11/27/07—present)
8. #21788: 2414 N. Marks Ave., Fresno CA 93705 (03/01/91—05/16/05, 11/27/07—present)
9. #23972: 388 E. Shaw, Fresno, CA 93710 (Dates of operation unknown, station closed prior to 2002).
10. #21753: 394 E. Olive Ave., Fresno, CA 93728 (09/21/95—04/12/00)
11. #24049: 1680 W. Olive Ave., Fresno, CA 93728. (Date of initial branding unknown. De-branded 07/17/01).
12. #23990: 525 S. Clovis Ave., Fresno, CA 93727. (10/20/99—01/09/02, 11/09/04—present)
13. #21894: 5687 E. Kings Canyon Rd, Fresno, CA 93722, (04/19/95—11/03/02, 01/27/05—present)

## INTERROGATORY NO. 5:

IDENTIFY all jobbers, franchisees and/or distributors to whom YOU supplied MTBE gasoline within the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the dates that YOU supplied MTBE gasoline to each jobber, franchisee, and/or distributor that YOU identified.

## RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants further object to this Interrogatory on the grounds that the term "franchisees" is vague, ambiguous, and undefined. Further, Valero Defendants object to this Interrogatory to the extent it seeks information regarding sales of gasoline containing MTBE made within the RGA. Valero Defendants do not keep such information in the regular course of business. Valero Defendants' sales records are kept by county. This response will therefore provide information regarding sales made to entities in Fresno County.

Valero Defendants further object on the grounds that this Interrogatory seeks information outside of Valero Defendants' possession, custody and control. For example, apart from deliveries made to Valero Defendants' aforementioned retail and branded stations, Valero Defendants are not in possession of information regarding the ultimate delivery point of any gasoline sold to third parties in Fresno County. Notwithstanding the foregoing, Valero Defendants respond as follows:

Valero Defendants refer Plaintiff to Exhibit A attached to these responses which provides information responsive to Interrogatory No. 5 and Subpart (a) for Fresno County.

**INTERROGATORY NO. 6:**

IDENTIFY each refinery that YOU own or owned which provided MTBE gasoline to the RELEVANT GEOGRAPHIC AREA since 1979.

      a.      State the dates of ownership for each refinery YOU identified;

      b.      State the dates that YOU added MTBE to gasoline manufactured by each refinery YOU identified;

      c.      IDENTIFY each entity which supplied MTBE to each refinery YOU identified.

**RESPONSE:**

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants further object on the grounds that the terms "provided" and "supplied" are vague, ambiguous and undefined. Valero Defendants further object to this Interrogatory to the extent it seeks information outside of Valero Defendants' possession, custody, and control. For example, Valero Defendants are not in possession of information regarding whether gasoline containing MTBE sold to third parties may have been delivered to service stations located in the RGA after it left Valero Defendants' possession, custody and control. Notwithstanding the foregoing, Valero Defendants respond as follows:

The following refineries delivered gasoline containing MTBE to terminals located in Northern California during the relevant timeframe. The provision of this information should not be understood as an admission that any such gasoline was ultimately delivered to retail service stations in the City of Fresno.

      1.      Valero Refining Company—California owns the Benicia Refinery located at 3400 E 2nd St., Benicia, CA 94510.

            a.      05/15/00—present
            b.      05/15/00—2003
            c.      The Benicia Refinery manufactured neat MTBE during the relevant time frame. Valero Refining Company—California also purchased neat MTBE from the following entities for the years indicated:

| Vendor Name | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| American AGIP Company Inc. | X | | | |
| Chevron U.S.A., Inc. | | | | X |
| Ecofuel S.P.A. | X | X | X | X |
| Equiva Trading Company | | X | | |
| Neste Canada Inc. | X | X | X | X |
| Neste USA LLC | | | | X |
| Noble Americas Corp. | X | | X | X |
| Oceana Petrochemicals AG | | X | | |

| | | | | |
|---|---|---|---|---|
| Sabic Americas Corp. | X | X | X | X |
| Tesoro Refining and Marketing | | | | X |
| Tosco Refining LP | X | | | |
| Trammochem | | X | X | |
| Ultramar Inc. | | X | | |
| Vitol S.A. Incorporated | | | X | X |

2.   Ultramar Inc. previously owned the Golden Eagle Refinery located at 150 Solano Way, Martinez, CA 14553.

    a.   09/01/00—05/17/02.

    b.   09/01/00—05/17/02.

    c.   The Golden Eagle Refinery did not manufacture neat MTBE during the timeframe in which it was owned by Ultramar Inc. Ultramar Inc. purchased neat MTBE from the following entities for the years indicated:

| Vendor Name | 2000 | 2001 | 2002 |
|---|---|---|---|
| American AGIP Company Inc. | | X | |
| Chevron U.S.A., Inc. | | X | |
| Ecofuel S.P.A. | | X | |
| Neste Canada Inc. | X | X | |
| Noble Americas Corp. | X | | |
| Sabic Americas Corp. | X | X | X |
| Tosco | X | X | |
| Valero Refining Company | | X | |
| Vitol S.A. Incorporated | X | X | |

3.   Ultramar Inc. owns the Wilmington Refinery located at 2402 E. Anaheim St., Wilmington, CA 90744.

    a.   12/23/88—present

    b.   The Wilmington Refinery manufactured gasoline containing MTBE during the time frame from 1990 to 1991 and 1995 to 2003. To the best of Valero Defendants' knowledge however, only one shipment of gasoline containing MTBE was ever delivered from the Wilmington Refinery to Northern California; a barge with gasoline containing MTBE was delivered to the Golden Eagle Refinery in the year 2000.

    c.   During the year 2000, Ultramar Inc. purchased neat MTBE from American AGIP Company Inc., Environ Clean Fuels Company, Equiva Trading Company, Neste Canada, Inc., Noble Americas Corp., Sabic Americas Corp., and Vitol.

**INTERROGATORY NO. 7:**

IDENTIFY each terminal that YOU own or owned which served the RELEVANT GEOGRAPHIC AREA since 1979.

        a.      State the dates of ownership for each terminal YOU identified.

        b.      IDENTIFY all Exchange and/or Throughput Partners for each terminal YOU identified.

        c.      IDENTIFY each pipeline used to supply gasoline for each terminal YOU identified.

**RESPONSE:**

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants further object on the grounds that the phrase "served the RELEVANT GEOGRAPHIC AREA" and the term "supply" are vague, ambiguous and undefined. Valero Defendants further object to this Interrogatory to the extent it seeks information outside of Valero Defendants' possession, custody, and control. For example, Valero Defendants are not in possession of information regarding whether gasoline containing MTBE sold to third parties may have been delivered to service stations located in the RGA after it left Valero Defendants' possession, custody and control. Notwithstanding the foregoing, Valero Defendants respond as follows:

Valero Refining Company—California owns a truck rack associated with the Benicia Refinery.

        a.  05/15/00—present
        b.  Valero Refining Company—California does not have any exchange or thruput partners at this terminal.
        c.  The Benicia truck rack does not deliver product via pipeline.

**INTERROGATORY NO. 8:**

IDENTIFY each terminal at which YOU have or had a position which served the RELEVANT GEOGRAPHIC AREA since 1979.

        a.      State the dates of during which YOU maintained a position for each terminal YOU identified.

**RESPONSE:**

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants further object on the grounds that the term "position" and the phrase "served the RELEVANT GEOGRAPHIC AREA" are vague, ambiguous and undefined. Valero Defendants further object to this Interrogatory to the extent it seeks information outside of

              

Valero Defendants' possession, custody, and control. For example, Valero Defendants are not in possession of information regarding whether gasoline containing MTBE sold to third parties may have been delivered to service stations located in the RGA after it left Valero Defendants' possession, custody and control. Notwithstanding the foregoing, Valero Defendants respond as follows:

Valero Defendants maintained Terminal ThruPut Agreements with the following terminals for the storage and distribution of gasoline during the timeframes indicated:

    1. SFPP Fresno (01/93—Present)
    2. ST Stockton (01/01/92—Present)

## INTERROGATORY NO. 9:

IDENTIFY the terminals at which YOU have or had the right to use gasoline loading racks which served the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the dates of during which YOU have or had the right to use gasoline loading racks for each terminal YOU identified.

## RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants further object on the grounds that the term "position" and the phrase "served the RELEVANT GEOGRAPHIC AREA" are vague, ambiguous and undefined. Valero Defendants further object to this Interrogatory to the extent it seeks information outside of Valero Defendants' possession, custody, and control. For example, Valero Defendants are not in possession of information regarding whether gasoline containing MTBE sold to third parties may have been delivered to service stations located in the RGA after it left Valero Defendants' possession, custody and control. Valero Defendants further object on the grounds that this Interrogatory is unnecessarily duplicative of Interrogatory No. 8. Notwithstanding the foregoing, Valero Defendants respond as follows:

Valero Defendants refer Plaintiff to their response to Interrogatory No. 8 for information responsive to this request.

## INTERROGATORY NO. 10:

State the annual total volume of MTBE-containing gasoline which YOU supplied, sold, marketed or distributed within the RELEVANT GEOGRAPHIC AREA from 1979 to the present.

## RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants further object to this Interrogatory on the grounds that it is both premature

and irrelevant to the extent it seeks information upon which to base a market share calculation of damages in this case. At this stage of the litigation Plaintiff has not demonstrated its entitlement to damages or its right to seek to apportion any such damages based upon a market share theory of liability. Notwithstanding the foregoing, Valero Defendants respond as follows:

Valero Defendants sold the following volumes of gasoline containing MTBE in Fresno county during the years indicated:

1996: 6,729.36 bbl
1997: 2,270,990.19 bbl
1998: 2,492,110.83 bbl
1999: 2374236.91 bbl
2000: 2,925,807.54 bbl
2001: 3,554,431.97 bbl
2002: 3,398,118.93 bbl
2003: 2,439,079.98 bbl

**INTERROGATORY NO. 11:**

For each year from 1986 to 2003, state the annual volume, in U.S. gallons, of MTBE gasoline that YOU produced in the United States that YOU provided to common carrier pipelines which serve the RELEVANT GEOGRAPHIC AREA.

**RESPONSE:**

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants further object to this Interrogatory on the grounds that it is both premature and irrelevant to the extent it seeks information upon which to base a market share calculation of damages in this case. At this stage of the litigation Plaintiff has not demonstrated its entitlement to damages or its right to seek to apportion any such damages based upon a market share theory of liability. Valero Defendants further object on the grounds that the term "serve the RELEVANT GEOGRAPHIC AREA," is vague, ambiguous, and undefined. Notwithstanding the foregoing, Valero Defendants respond as follows:

Valero Defendants state that the Benicia Refinery and the Golden Eagle Refinery produced the following volumes of gasoline containing MTBE during the years indicated. While both refineries delivered product into regional pipeline systems, they also shipped gasoline to customers via barge. Therefore the following volumes are inclusive of all gasoline containing MTBE produced at each refinery without regard to the means of shipment or delivery. Valero Defendants reserve the right to supplement this Interrogatory at a later date should the precise volumes shipped via pipeline ever become relevant to the resolution of this matter.

**Benicia Refinery:**
2000: 2,946,000 bbl CARB
2001: 4,504,000 bbl CARB

2002: 4,175,000 bbl CARB; 15,807 bbl Conventional with MTBE
2003: 3,571,900 bbl CARB

**Golden Eagle Refinery:**
2000: 5,790,423.00 bbl RFG; 41,934.00 bbl Conventional with MTBE
2001: 15,424,463 bbl RFG
2002: 5,102,946 bbl RFG

## INTERROGATORY NO. 12:

IDENTIFY the address of each gasoline station where YOU own or owned the underground storage tanks within the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the dates of ownership for each station YOU identified.

## RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is specifically overbroad to the extent it seeks the identification of all responsive gasoline stations in the RGA without regard to whether any such stations actually experienced a leak of gasoline containing MTBE. Valero Defendants further object on the grounds that this Interrogatory is unnecessarily duplicative of Interrogatory No. 1. Notwithstanding the foregoing or the General Objections set forth above, Valero Defendants respond as follows:

Valero Defendants refer Plaintiff to their responses to Interrogatory No. 1 for information responsive to this request.

## EXHIBIT A

| CUSTOMER | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|
| 513 MARINE CORPS RECRUIT DEPT | | | | | | | | X |
| AMBER RESOURCES LLC | | | | | X | X | | |
| ARCO PRODUCTS COMPANY | | X | X | | | | | |
| ARIA OIL INC | | | | | X | | X | |
| ARMY & AIRFORCE EXCHANGE SERVICE | | | | | | | X | X |
| AVIS RENT A CAR SYSTEM INC | | X | X | X | | | | |
| BABA | | | X | X | | | | |
| BAFAIZ BROTHERS | | | | X | | | | |
| BAHADAR S. JOHAL | X | X | X | X | X | X | X | |
| BAY AREA / DIABLO PETROLEUM CO | | X | X | X | X | X | X | X |
| BENETO, INC | | X | X | X | X | X | X | X |
| BLACKBURN OIL COMPANY LLC | | | | | X | X | X | |
| BOB JACOBS | | | | | X | X | X | X |
| BONG UN & SOUK JA KANG | | X | X | X | X | | | |
| BOYETT PETROLEUM | | | | | X | X | X | X |
| BSKF DENIS, INC. | | | | | | | X | |
| BUFORD OIL CO | | X | X | X | X | X | X | X |
| C & L MINI MART | X | X | X | X | X | X | X | X |
| C & N ENERGY LTD. | | X | | | | | | |
| C L BRYANT | | X | X | X | X | X | X | X |
| C P PHELPS, INC. | | X | X | X | X | X | X | X |
| CALICO PETROLEUM EXCHANGE | | | | | | | X | |
| CALIFORNIA FRESNO OIL CO. | | X | X | X | X | X | X | X |
| CALIFORNIA HIGHWAY PATROL | | X | | X | X | X | X | |
| CHANG BOK KIM | | | | | X | X | | |
| CHASE'S FOOTHILL PETROLEUM | | X | X | X | X | X | X | X |
| CHEVRON U.S.A., INC. | | X | X | X | | | | |
| CIRCLE K STORES INC. | | X | X | | | | | |
| COOL FUEL INC | | | | X | | | | |
| COSBY OIL CO  INC | | | | X | X | X | | |
| COX PETROLEUM TRANSPORT | | | | | | X | | |
| DARLING & DURST | | X | X | X | X | X | X | X |
| DASSEL'S PETROLEUM INC | | | X | X | X | X | X | X |
| DBA KAWEAH LEMON CO | | X | X | | | | | |
| DBA RED TRIANGLE OIL CO. | | X | X | X | X | X | X | |
| DBA: GOSHEN TRAVEL PLAZA | | X | X | | | | | |
| DELHI MINI MART | | X | | X | X | X | X | |
| DON ROSE OIL COMPANY, INC. | | X | X | X | X | X | X | X |
| DUNIGAN FUELS, INC. | | | | | | | X | |
| DWELLE BROTHERS | | | | | X | X | X | |
| E & J  AKHANA | | X | X | X | X | X | X | |
| E & J ARCO | | X | | | | | | |
| E. R. VINE & SONS, INC. | | | | | X | X | | X |
| EL MONTE GAS CO. INC. | | X | X | X | X | X | | |
| EQUILLON ENTERPRISES LLC | | | X | X | | | | |
| EQUIVA TRADING CO | | X | | | | | X | X |
| EXXON COMPANY, U.S.A. | | X | X | | | | | |
| EXXONMOBIL OIL CORPORATION (S&D) | | | | | | | X | X |
| FALCON FUELS INC | | | | | | X | X | X |
| FEDERAL EXPRESS CORPORATION | | X | X | | | | | |
| FIFTH WHEEL TRUCK STOP | | X | X | X | X | X | X | X |

# EXHIBIT A

| CUSTOMER | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|
| FOOTHILL GAS BEACON | | X | | | | | | |
| FRANK DENIS INC | X | X | X | X | X | X | X | |
| Freight Adjustment | | | | | X | | | |
| G P RESOURCES INC | | | | X | X | X | X | |
| GASAMAT OIL CORP OF COLORADO | | | | X | X | X | X | |
| GEORGE W. LOWRY, INC. | | | | | | | | X |
| GEORGE'S BEACON SERVICE | | X | X | X | X | X | X | X |
| GOLDEN GATE PETROLEUM | | | | | X | X | | |
| GOODRICH OIL COMPANY | | X | | | | | | |
| GOSHEN TRAVEL PLAZA | X | X | X | X | X | X | X | X |
| GRAPEVINE OIL CO INC | | X | X | | | X | X | |
| GURDIP S DHILLON | | | | | | X | X | X |
| GUTHRIE PETROLEUM INC. | | | | | | | | X |
| H & S SERVICES | X | X | X | X | X | X | X | |
| HANFORD TRI-MART | | X | X | X | X | X | | |
| HIRA PETROLEUM | | | | | | | X | |
| INTER-STATE OIL COMPANY | | | | | | | X | X |
| ITL, INC. | | | | | | | | X |
| J A FISCHER INC | | X | X | X | X | X | X | |
| J B DEWAR INC | | X | | X | X | X | X | X |
| J C LANDSDOWNE INC | | X | X | X | X | X | | |
| J.A. FISCHER INC. | | | | | | X | | |
| J.C. LANSDOWNE, INC. | | | | | X | X | X | X |
| JACK GRIGGS INC | | X | X | X | X | X | X | X |
| JACO OIL CO. INC | | X | X | X | X | X | X | X |
| JEFFRIES BROS. INC. | | | | | | X | X | |
| JERRY'S BEACON | | X | | | | | | |
| JOE GOMES & SON INC | | X | X | X | X | X | X | X |
| JOHN DRAB | | | | | X | | | |
| JULIEN OIL CO INC | | X | X | X | X | X | X | X |
| KANG'S ARCO GAS STATION | | X | | X | X | | | |
| KAWEAH LEMON CO | | X | | X | X | X | X | X |
| KERN OIL & REFINING COMPANY | | | | | | | X | |
| LARRY GAITHER | | X | X | | | | | |
| LAWRENCE J. COATES | | | | | | | X | |
| LEON H BARTLETT INC | | X | X | X | X | X | X | X |
| LITTLEROCK MINI N GAS | | | | | X | | | |
| LUU THIEN LE | | | X | | | | | |
| Madera Beacon Ultramart | | | | | | | X | X |
| MANOUHER SHAHNEMATOLLAHI | X | X | X | X | X | X | X | X |
| MANSFIELD OIL CO | | | | X | | X | X | X |
| MERRIMAC PETROLEUM INC | | X | | X | X | X | X | |
| MORRO BAY FUEL DOCK INC | X | X | | | | | | |
| MUSKET CORPORATION | | | | | | | X | X |
| NATIONAL CAR RENTAL | | | | X | X | | | |
| NATIONAL PETROLEUM MARKETING | | X | | | | | | |
| NAVY EXCHANGE 110-350 | | | X | | | | | |
| NAVY EXCHANGE SERVICE CENTER | X | X | X | X | X | X | | |
| NELLA OIL COMPANY | | X | X | X | X | X | X | X |
| NEW WEST PETROLEUM | | X | X | | | X | X | |
| NICOLETTI OIL CO | | X | X | X | X | X | X | X |

# EXHIBIT A

| CUSTOMER | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|
| NIRMAL GILL | | | | | | | X | X |
| ONYX PETROLEUM INC | | X | X | X | | | | |
| P S TRADING | | X | | | | | | |
| PENCE PETROLEUM | | | | | X | X | X | |
| PETRO-DIAMOND, INC. | | | | | | X | X | X |
| PETROLEUM TRADERS CORP | | | X | X | X | X | X | X |
| PILOT OIL CORP | | X | X | X | X | X | X | |
| PILOT TRAVEL CENTERS, LLC | | | | | | | X | X |
| PINNACLE PETROLEUM, INC. | | | | | X | X | X | X |
| PRIME GAS, INC | | | | | | | | X |
| R M PARKS | | X | X | X | X | X | | |
| R V JENSEN INC | | | | X | | | | |
| R. M. PARKS INC. | | | | | X | X | X | X |
| RATHMANN OIL CO | | X | X | X | X | X | X | X |
| RAVITEZ SINGH SEKHON | | | | | | | X | |
| RED TRIANGLE OIL CO. | | | | | X | X | X | X |
| RENES BEACON | | X | | X | X | | X | X |
| RHODES INC | | X | X | X | X | X | X | X |
| RIVER CITY PETROLEUM | | X | X | X | X | X | X | |
| ROBERT L VERNON INC | | X | X | X | X | X | X | X |
| ROBERT V. JENSEN, INC. | | | | | X | X | X | X |
| ROCHE OIL CO | | X | X | X | X | X | X | X |
| ROE OIL CO | | X | X | | | | X | |
| SAFEWAY, INC | | | | | | X | X | |
| SAI ENTERPRISES | | X | | | | | | |
| SAWYER OIL & CHEMICAL CORP. | | X | X | X | | | | |
| SC FUELS | | | | | | X | X | X |
| SEBASTIAN OIL DISTRIBUTOR | | | | | | | X | X |
| SEIBERTS OIL CO | X | X | X | X | X | X | X | X |
| SHELL OIL COMPANY | | | X | | | | | |
| SHERWIN PETROLEUM, INC. | | | X | | | | | |
| SHOA ESHRAGHI | | | | | X | X | | |
| SILVAS OIL CO INC | | X | X | X | X | X | X | X |
| SILVEIRA PETROLEUM, INC. | | | | | X | X | X | X |
| SO COUNTIES OIL | | X | | | | | | |
| SOCO GROUP INC | | | | | X | X | | |
| SOUTHERN COUNTIES OIL | | X | X | X | X | | X | |
| SPARTAN TANK LINES | | X | | | | | | |
| SPOLSDOFF ENTERPRISES | X | X | X | X | X | X | X | X |
| STAN BOYETT & SON | | | | | | X | X | |
| STAN ROBERTSON'S BEACON | | X | | X | X | | X | |
| STUART'S PETROLEUM | | X | | | | | | |
| SUNNYSIDE FOOD & LIQUOR | | | | | | | X | X |
| TESEI PETROLEUM | | X | X | X | X | X | X | X |
| TESEI PETROLEUM INC. | | X | | | X | X | X | X |
| TESORO REFINING MARKETING & SUPPLY | | | | | | | X | |
| TEXACO REFINING AND MKTG, INC. | | X | X | | | | | |
| THE HERTZ CORPORATION | | | | | | X | | |
| THE SOCO GROUP INC | | X | X | X | X | X | | |
| TOM R. WARD INC. | | X | X | X | X | X | X | X |
| TOMS SIERRA CO | | X | | | | | | |

## EXHIBIT A

| CUSTOMER | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|
| TOSCO REFINING CO (EXCH) | | | X | | X | | | |
| TOWER ENERGY GROUP  (P/L) | | | | X | | | | |
| TOWER GAS | X | X | X | X | X | | | |
| TRINIS OIL INC | | X | X | X | X | X | X | X |
| TRUCKERS OIL COMPANY | | | | | | | | X |
| TRUMAN ARNOLD COMPANIES | | | | | | | X | X |
| ULTRAMAR INC. | | | | X | X | X | X | |
| ULTRAMAR SERVICE STATIONS | X | X | X | X | X | | | |
| ULTRAMAR TRUCK STOPS/CARDLOCKS | X | X | X | X | X | | | |
| ULTRAMAR, INC. (RETAIL) | | | | | | | X | X |
| USA PETROLEUM CORP | | X | X | X | X | X | X | X |
| VALLEE FOOD STORES | X | X | X | X | X | X | X | X |
| VALLEY CONVENIENCE STORES INC | X | X | X | X | X | X | X | X |
| VALLEY PACIFIC PETROLEUM SERVICES | | | | | | X | X | X |
| VISA PETROLEUM INC | | X | X | X | X | X | X | X |
| W. P. DAVIES OIL COMPANY | | | | | X | X | X | X |
| WEST & SHAW ARCO | | | | | | X | X | X |
| WEST HILLS OIL CO | | X | X | X | X | X | X | X |
| WHITE RANCH COMPANY | | X | X | X | X | X | X | X |
| WHOLESALE FUELS INC | | X | X | X | X | X | X | X |
| WILLIAMS TANK LINES | | | | | | X | | |
| ZOLLIE KNIGHT, INC. | | | | | | | X | |

# Exhibit 12

## DECLARATION OF ALEXANDER BLAGOJEVIC



I, ALEXANDER BLAGOJEVIC, declare:

1.    I am employed by Lyondell Chemical Company as marketing manager for the Oxyfuels Business Group.  My duties specifically include the marketing and sales of MTBE to refining customers in the Americas.  Having previously been employed by Arco Chemical Company,  I have held my current position since November 1992. I believe I am the person most knowledgeable presently in the employ of Lyondell Chemical Company with regard to the history of sales of MTBE by Arco Chemical Company to customers on the U.S. West Coast.

2.    This Declaration is based upon both my personal knowledge and upon a review of certain sales records.

3.    Given the nature of our sales and transportation arrangements with various customers, the ultimate location and use of a parcel of MTBE was not always known to us.  Largely because our company's MTBE manufacturing units are located in Channelview, Texas, most of our sales contracts for MTBE have included the shipping term "FOB HOUSTON".  We did enter into contracts with some customers by which we agreed to arrange for shipment to terminals in California.  In many instances, however, the customer arranged shipment for itself and we delivered into the customer's rail cars, tankships, barges, storage tanks or pipelines at Houston.  Although in those circumstances we had no way to be certain whether or not the

1

product was eventually delivered to the West Coast, our Customer Service employees made attempts to obtain and record that information.

4.      In answer to Questions 13 and 14 of the "Notice of Taking Deposition of Arco Chemical", dated March 10, 2000, the first sales and deliveries of MTBE in and to California were made on a spot basis to Oxbow Resources (April 1986), Union Chemical (April 1986), Chevron Research (July 1986) and Kern Oil (October 1986).

5.      Question 20 attached to the Notice asked whether or not Arco Chemical Company had sold MTBE, directly or indirectly, to certain companies.  The answer to that question is "yes" as to the following companies (or their affiliates):  Shell Oil Company; Shell Oil Products Company; Equilon Enterprises, LLC; Exxon Corporation; Tosco Corporation (both directly and as the assignee of certain sales contracts originally negotiated with Unocal Corporation); Chevron U.S.A. Inc.; Atlantic Richfield Co.; Texaco Inc.; BP America Inc.; BP Exploration & Oil Inc.; Ultramar, Inc.; Ultramar Diamond Shamrock Corporation; Unocal Corporation and Wickland Oil Company.  I have no recollection and have found no record indicating that Arco Chemical Company ever made sales of MTBE to "Pacific Refining". However, the sales records do show a sale in 1992 of less than 500 gallons to a company in Los Angeles referred to as "PRC".

6.      I attach a spreadsheet derived from our sales records showing MTBE sales by Arco Chemical Company to certain customers at destinations within

2

California between 1986 and 1999, inclusive. See Exhibit "A". The destinations identified on our sales records are in most cases either the port or place of delivery by Arco Chemical or the port or place to which the customer had indicated an intention to ship the product. As shown by the spreadsheet, the answer to Question 15 of the Notice is "yes".

7.     The answers to Questions 16 and 17 of the Notice are "yes", as indicated above.

8.     The types of documents which were generally created by Arco Chemical Company pertaining to the sale, transport, delivery, supply and/or exchange of MTBE to or with any of the defendants in the South Tahoe Public Utility District ("STPUD") case and any Northern California refineries were:

Invoices to customers;

Product Purchase Agreements;

MTBE Sales Contracts;

Exchange Agreements;

Telexes or Letters confirming spot orders;

Shipping Contracts with customers;

Shipping bills of lading;

Charter Parties or other contracts with transport providers; and

Invoices from transport providers.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is made this 4th day of May, 2000 at Houston, Texas.

Alexander Blagojevic

EXHIBIT "A"

## SALES OF MTBE BY ARCO CHEMICAL COMPANY TO SPECIFIED CALIFORNIA CUSTOMERS BY DESTINATIONS, 1986-1999

(Volume in Gallons rounded to nearest thousand)[1]

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARCO PRODUCTS CO. | | | | | | | | | | | | | | |
| EL SEGUNDO | | | | | | | | | 6604 | | | | | |
| MARTINEZ | | | | | | | | 2098 | | | | | | |
| ANAHEIM | | | | | | | 0 | | | | | | | |
| CARSON | | | | | | | | 2068 | | | | | | |
| CROCKETT | | | | | | | 3576 | 12252 | | | | | | |
| LONG BEACH | | | | | | 34137 | 35631 | 111551 | 79469 | 9441 | 11150 | 47928 | 59934 | 52126 |
| LOS ANGELES | | | | | | 1259 | 6347 | 18685 | 1051 | 2100 | | 47 | | |
| SAN PEDRO | | | | | | 2077 | 11456 | 10868 | | | | | | |
| ATLANTIC RICHFIELD | | | | | | | | | | | | | | |
| LOS ANGELES | | | 2985 | 15207 | 2966 | | | | | | | | | |
| LONG BEACH | | | | | 14478 | | | | | | | | | |

[1]Blank box indicates no sales in given year; "0" indicates sales of at least 1 gallon but less than 500 gallons.

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHEVRON, USA (INCLUDING CHEVRON RESEARCH) | | | | | | | | | | | | | | |
| CROCKETT | | | | | | | | | | | | | | |
| EL SEGUNDO | | 3578 | 8320 | 5472 | 25763 | 3602 | | 8586 | | 3318 | 5460 | 5521 | | |
| RICHMOND | | | 1252 | | 6448 | 8073 | 0 | 2031 | 11130 | 0 | 16580 | 22499 | | |
| LONGBEACH | | | | | | | | | | 3732 | | | | |
| WALNUT CREEK | | | | | | 3024 | | | | | 2330 | | | |
| LOS ANGELES | | | | | | | | | | | | 2700 | | |
| EQUILON ENTERPRISES MOPECO | | | | | | | | | | | | | | 38605 |
| BAKERSFIELD | | | | | | | | | | | | | | 392 |
| EQUIVA TRADING CO. | | | | | | | | | | | | | | |
| MOPECO | | | | | | | | | | | | | 35022 | |
| LONGBEACH | | | | | | | | | | | | | 3780 | |
| EXXON CO. USA | | | | | | | | | | | | | | |
| BENICIA | | | | | | | 3053 | | | | | | | |
| CARSON | | | | | | | 3282 | | | | | | | |
| CROCKETT | | | | | | | 39362 | | 15457 | | 35239 | | | |
| HERCULES | | | | | | | 506 | | | | | | | |

2

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EXXON CO. USA (CONT.) | | | | | | | | | | | | | | |
| LONG BEACH | | | | | 6182 | 1010 | 3248 | | | | | | | |
| SIGNAL HILL | | | | 8169 | 3150 | | 125 | | | | | | | |
| EXXON SUPPLY CO. | | | | | | | | | | | | | | |
| CROCKETT | | | | | | | | 34000 | | | | | | |
| EL SEGUNDO | | | | | | | | 9783 | | | | | | |
| LONG BEACH | | | | | | | | 755 | | | | | | |
| KERN | | | | | | | | | | | | | | |
| BAKERSFIELD | 49 | 76 | 383 | | | | | | | | | | | |
| LONG BEACH | | 2049 | 5680 | 6262 | | | | | | | | | | |
| EL SEGUNDO | | | | 174 | | | | | | | | | | |
| PRC | | | | | | | | | | | | | | |
| LOS ANGELES | | | | | | | 0 | | | | | | | |
| SHELL OIL CO. | | | | | | | | | | | | | | |
| SEBASTOPOL | | | | | | | | | | | 5072 | | | |
| CARSON | | | | | | | 2847 | 1760 | | | | 2280 | | |
| MARTINEZ | | | | | | | | 2432 | | | | | | |
| SELBY | | | | | 1673 | | | | | | | | | |
| WILMINGTON | | | | 1034 | 26583 | 8986 | | | | | | | | |
| LONG BEACH | | | | | 3871 | | | | | | | | | |

3

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TEXACO REFINING & MARKETING | | | | | | | | | | | | | | |
| BAKERSFIELD | | | | | | | 318 | | | | | | | |
| EL SEGUNDO | | | | | | 3822 | | | | | | | | |
| SIGNAL HILL | | | | 7768 | 9822 | 5327 | | | | | | | | |
| SAN FRANCISCO | | | | 1966 | | | | | | | | | | |
| WILMINGTON | | 669 | | | | 1531 | | | | | | | | |
| CROCKETT | | | | | | | 2112 | | 6183 | | 10219 | | | |
| LONG BEACH | | | | 11207 | 9054 | 17140 | 11790 | 5411 | 12241 | 12453 | 14776 | 8968 | | |
| LOS ANGELES | | | | | | | | 672 | | | | | | |
| MOPECO | | | | | | | 10752 | 14830 | 12212 | 14682 | 33620 | 41520 | | |
| RICHMOND | | | | | | 2721 | 2076 | | | | | | | |
| SAN PEDRO | | | | | 11182 | 2940 | 1655 | 3937 | 2662 | | 152.17 | 7654 | | |
| SIGNAL HILL | | | | | | | 8668 | 14906 | 6300 | | | | | |
| UNIVERSITY CITY | | | | | | | 1483 | 9008 | | 3310 | | | | |
| TOSCO REFINING CO. | | | | | | | | | | | | | | |
| MARTINEZ | | | | | | | | | | 0 | | | | |
| CROCKETT | | | | | | | | | | | | 3088 | | |
| LOS ANGELES | | | | | | | | | | | | 47132 | 68319 | |
| SAN FRANCISCO | | | | | | | | | | | | 3212 | | |
| LONG BEACH | | | | | | | | | | | | | 2062 | |

4

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ULTRAMAR, INC. | | | | | | | | | | | | | | |
| WILMINGTON | | | | | | | | | | | 1680 | 5852 | | |
| LONG BRANCH | | | | | | | | | | | | 2108 | | |
| ULTRAMAR DIAMOND SHAMROCK | | | | | | | | | | | | | | |
| WILMINGTON | | | | | | | | | | | | 2100 | | |
| UNION CHEMICALS | | | | | | | | | | | | | | |
| LOS ANGELES | 7131 | | | | | | | | | | | | | |
| LONG BEACH | 790 | | | | | | | | | | | | | |
| SAN FRANCISCO | 1307 | | | | | | | | | | | | | |
| UNOCAL (CHEMICAL or REFINING) | | | | | | | | | | | | | | |
| LOS ANGELES | 6276 | 25460 | 34114 | 20772 | 14059 | 30669 | 27616 | 42653 | 14423 | 101951 | 83949 | 23201 | | |
| LONG BEACH | | | | | | | | | | 2315 | | | | |
| BREA | | | | | 0 | 1 | 1 | | | | | | | |
| SAN FRANCISCO | | 2242 | 8971 | 9 | 1687 | 5148 | | | | | 7324 | 6276 | | |
| WICKLAND OIL CO | | | | | | | | | | | | | | |
| SELBY | | | | | 453 | | | | | | | | | |

5

# Exhibit 13

Legal Retention at MSXSOC

From:           Stanley CC (Curtis)  at MSXWHWTC
Sent:           Wednesday, May 13, 1998 11:49 PM
To:             Parkinson CD (Chris) at OPC
Cc:             Gustafson JB  at SHELL RESEARCH THORNTON; Sykes RM  at SIEP
Subject:        MTBE issues

Chris,

I'm sorry that it has taken me awhile to get back to you on MTBE issues.  I know that you are beginning to feel the heat (it will get much hotter).  As you are aware, MTBE is one of the biggest environmental issues that US oil companies are facing due to 1) MTBE's wide occurrence in groundwater, 2) MTBE's high migration potential, 3) MTBE's impact on several high visibility municipal well systems, 4) MTBE's very low odor and taste thresholds, and 5) the difficulty and high cost associated with treating MTBE in water.  My first association with MTBE was in 1980 at Rockaway, NJ where 4,000 people were tasting ether (MTBE and DIPE) in their water supplied from a municipal well.  The problem in the US is now much worse.  I hope that the following information will help put the issue in perspective for you.  As you are reviewing this information and have any questions, please feel free to call me.

Cal EPA Brfg 3 98.doc

a very well written and balanced paper from a state perspective

MTBE research table 4-98.doc

This is MTBE research conducted by API's Soil/Groundwater Technical Task Force which I chair

EPA MTBE Proj. list

California activities mandated by the legislature

MTBE editorial.doc

This is an editorial that the National Ground Water Association requested that I write for the Association of Ground Water Scientists and Engineers (May/June issue 1998)

mtbefaq.doc

This is an API fact sheet from my Task Force

MTBE National Perspective 3.ppt

This is a presentation that I have made to Shell Mgmt

EQ 028732



This is a table that I modified from some of John's work for my editorial



This is an MTBE remediation presentation that I made to Shell's remediation managers

In addition to the above references, I am in the process of writing two papers on MTBE considerations for RBCA. These papers will be presented 1) next week at the Battelle Conf on Recalcitrant Compounds, and 2) at the NGWA conf on MTBE in LA in June. We are also conducting work with decision analysis tools to help guide our remediation efforts for MTBE.

I'm sure this is much more  than you bargained for, but like I said, if you have any questions, I'm only a call away.

Best Regards,

## Curtis C. Stanley
Environmental Technology Directorate – Soil and Groundwater
Westhollow Technology Center
(phone-☺2) 281-544-7675  (fax-☺) ) 281-544-8727
e-mail: ccstanley@shellus.com
(This communication per applicable agreements between our respective companies.)

2

EQ 028733

# Exhibit 14

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF SAN FRANCISCO

3                           --oOo--

4   SOUTH TAHOE PUBLIC UTILITY        )
    DISTRICT,                         )
5                                     )
                    Plaintiff,        )
6                                     )
                    vs                )        No.  999128
7                                     )        VOLUME I
    ATLANTIC RICHFIELD COMPANY        )
8   ("ARCO"); ARCO CHEMICAL COMPANY;  )
    SHELL OIL COMPANY; CHEVRON        )
9   U.S.A., INC.; EXXON CORPORATION;  )
    B.P. AMERICA, INC.; TOSCO         )
10  CORPORATION; ULTRAMAR, INC.;      )
    BEACON OIL CO.; USA GASOLINE      )
11  CORPORATION; SHELL OIL PRODUCTS   )
    CO.; TERRIBLE HERBST, INC.;       )
12  ROTTEN ROBBIE; J.E. TVETEN        )
    CORP.; TAHOE TOM'S GAS STATION;   )
13  THE SOUTHLAND CORP.; PARADISE     )
    CHEVRON; and DOES 1 through 600,  )
14  inclusive,                        )
                                      )
15                  Defendants.       )
    _____)
16

17                           --oOo--
                    THURSDAY, MAY 6, 1999
18                       10:03 A.M.
                           --oOo--
19                  DEPOSITION OF
                    CURTIS STANLEY
20                       --oOo--

21

22

23

24  CATHLEEN SLOCUM, CSR
    License No. 2822
25

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

<u>EXAMINATION</u>

By DUANE C. MILLER, Esq., counsel on behalf of the

plaintiff:

Q    Can we have your name and business address, please?

A    Sure.  My name is Curtis Stanley.  My business address

is the Equilon Westhollow Technology Center in Houston,

Texas.  Is that enough?

Q    That's sufficient.

THE VIDEOGRAPHER:  Excuse me.  We need to swear in

the witness.

MR. MILLER:  Correct.

(Witness sworn.)

MS. DOYLE:  So now really tell him your true

address.

THE WITNESS:  The same.

MR. MILLER:  Q  Mr. Stanley, I'd like you to

briefly relate your educational background starting with

college for us, please.

A    I have a bachelor of science in geology from North

Carolina State University with a specialization in

engineering.  That is my formal education and then other

education that I've received was on-the-job training while

at Shell and now Equilon.

Q    And basically you were employed by the Shell Oil

Company since you graduated from North Carolina State

5

1    University?

2    A    That's correct.

3    Q    And you are currently responsible for hydrogeological

4    evaluation of Shell's facilities nationwide and on the West

10:06:30 am 5    Coast immediately prior to Equilon becoming involved; is

6    that correct?

7    A    In my career I've had responsibility for evaluating

8    facilities.   Currently my primary responsibility is in

9    regard to development and implementation of risk-based

10   corrective action.

11   Q    When you were employed by Shell you had responsibility

12   to evaluate retail gasoline stations; is that correct?

10:07:00 am 13   A    Yes.

14   Q    And you had that responsibility for the West Coast for

15   a period of time for manufacturing facilities; is that

16   correct?

17   A    That's correct.

18   Q    And you also had that responsibility nationwide for

19   Shell for gasoline stations at one time; is that correct?

20   A    That's correct.

21   Q    And what period of time are we talking about when you

22   had that responsibility?

23   A    For retail?

24   Q    Yes.

25   A    As I recall probably starting in 1980 extending into

6

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

07:30 am 1    the mid-eighties.

2    Q    And when you had those responsibilities, were you

3    responsible among other things for investigating leaks of

4    gasoline?

5    A    Yes.

6    Q    And in that respect did you go to Rockaway, New Jersey

7    in approximately 1980?

8    A    Yes.

9    Q    What was the problem in Rockaway, New Jersey?

10:08:00 am 10    A    MTBE and diisopropyl ether had been found in the

11    municipal water supply for Rockaway, New Jersey.

12    Q    And why as a Shell Oil Company employee were you

13    interested in that?

14    A    There was an indication that that, the concentrations

10:08:30 am 15    of those oxygenates, those oxygenates in the water supply,

16    were potentially from one of our service stations located

17    upgradient of the site.

18    Q    Didn't you confirm that Shell was the source of that

19    problem?

20    A    We confirmed that we were part of that problem.

21    Q    In 1980?

22    A    1980, 1981.

23    Q    Okay.  And during that investigation were you in charge

10:09:00 am 24    of that investigation on behalf of Shell?

25    A    Yes.

7

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, CATHLEEN S. SLOCUM, a Certified Shorthand Reporter, in and for the State of California, duly appointed and commissioned to administer oaths, do hereby certify:

That I am a disinterested person herein; that the witness, CURTIS STANLEY, named in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition was reported in shorthand by me, Cathleen S. Slocum, a Certified Shorthand Reporter of the State of California, and thereafter transcribed into typewriting.

IN WITNESS WHEREOF, I have hereunto set my hand as Certified Shorthand Reporter on this _15_ of May, 1999.

Cathleen Slocum
Certified Shorthand Reporter
License Number 2822

--o0o--

181

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

# Exhibit 15

Atlantic Richfield Company          Internal Correspondence      MAT-9

Date:        March 31, 1981

Subject:     Pre Study Conference

From/Location:  R. N. Roth, AP-479

To/Location:    File, MTBE

On March 27, 1981, I attended a conference of the MTBE study
group.  The purposes of this meeting were to review the status
of the pre-study work for Phase I of the MTBE toxicity studies;
review the studies with the third party auditor Tracor-Jitco
and to review any protocol changes made to the planned teratol-
ogy and reproduction studies.

Highlights of the discussion are given below:

General

1.  ARCO has sent technical material to the laboratory for use
    in the inhalation studies.  Analytical information on the
    material is available and will be sent out by API.

2.  Although not present, Ben Thomas of Shell sent a message
    that Shell has been involved in the contamination of a
    township's drinking water with DIPE (disopropyl ether) and
    100 ppb MTBE.  According to Ben, approximately 20% of
    all underground gasoline storage tanks leak, leading to the
    possibility of ground water contamination.
    This ground water contamination may have to be considered
    when long term testing is considered.  It might also make
    the NTRP rat study of TBA in the drinking water more appli-
    cable .
    To date, Shell and ARCO are the only ones with MTBE in
    gasoline.

Reproduction - Teratology Studies

A question arose over what supplier to obtain rats from.
Bio/dynamics has a history of SDA virus.  Charles River's
Kingston facility, the original supplier, is supposedly SDA
free.  If animals were ordered from Kingston, they were likely
to develop SDA symptoms after arrival.  The group considered
ordering animals from CR's Portage facility, where animals
would already have been exposed to SDA.

The decision was made to stay with Kingston since Bio/dynamics
has been getting animals from there for the last nine months
and has not experienced any problems.  To insure the animals
will be SDA-free when the exposure begins, animals will be
acclimated for three weeks.

ARC 035844

A.R.CO.-1-A
(5-79)

File, MTBE
March 31, 1981
Page 2

The concentrations of MTBE given in the justification document
which were said to produce narcosis were questioned by C.
Conoway.  I said I would check them.

Details of the study monitoring by Tracor-Jitco will be sent
to members by API.

The dates of the reproductive studies depend on when the nine-
day probe study is completed.

At my suggestion, a complete water analysis will be done in the
middle of the teratology study.  This is required by GLP's.

Metabolism Studies

The methods development segment of the metabolism studies is
completed.  It has been found that the majority of MTBE is
eliminated via the lungs within an hour after dosing in the
aqueous soluble phase.

Since problems were encountered with hemolysis when MTBE was
given I.V., future studies will use the I.P. method of dosing.

Nine-Day Inhalation Study

Prestudy work with the chambers and analytical methods has
been completed.  The material is being atomized without heating,
to consistently generate levels of 100, 300, 1000 and 3000 ppm.

Chamber concentrations will be analyzed using I.R.   For future
studies, an online GC analysis will be available.  Analysis will
be done automatically every 15 minutes for 100, 300, and 1000
ppm and manually every ½ hour for 3000 ppm.

Bio/dynamics recommends eliminating the charcoal grab samples
of chamber concentration.  This was accepted by the group since
the accuracy of these samples is questionable.

Tracor-Jitco will monitor the study once during early exposures
and the day of necropsy.  C. Kerwin, of Phillips Oil will also
monitor the study during the necropsies.

Mr. Van Dyke of Bio/dynamics raised a point which deserves
further consideration.  The metabolic studies which have shown
most of the MTBE blown off in the first hour have been done in
an unsaturated atmosphere.  However, all the toxicity studies
will be done in atmospheres in which MTBE concentration is
quite high, preventing MTBE from being eliminated so rapidly
or completely.  This may change the pharmacokinetic profile of

ARC 035845

File, MTBE
March 31, 1981
Page 3


MTBE and result in the metabolic studies not giving an accurate
profile of MTBE's fate in the rat.  Mr. Van Dyke felt the group
may want to do future metabolic work in an MTBE saturated
atmosphere.  However, the group felt the planned metabolic
studies should be completed before considering Mr. Van Dyke's
suggestion.

It would appear that the unsaturated atmosphere in the metabolic
studies more closely approximates the atmosphere workers will be
exposed to.

Overall, I think the planned MTBE studies are moving along
very well.  If we could be assured of receiving accurate and
regular progress reports from Dr. S. Ridlon, I do not think
our presence would be necessary at the group meetings since
ARCO seems adequately represented by Dr. Ridlon.


cc:  J. A. Budny
RNR:mp


ARC 035846

# Exhibit 16



1

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| SOUTH TAHOE PUBLIC UTILITY DISTRICT, | * |
| Plaintiff | * |
| | * |
| VS. | *   NO. 999128 |
| | * |
| ATLANTIC RICHFIELD COMPANY ("ARCO"); | * |
| ARCO CHEMICAL COMPANY; SHELL OIL | * |
| COMPANY; CHEVRON U.S.A., INC.; | * |
| EXXON  CORPORATION; B.P. AMERICA, | * |
| INC.; TOSCO CORPORATION; ULTRAMAR, | * |
| INC.; BEACON OIL CO.; USA | * |
| GASOLINE CORPORATION; et al., | * |
| Defendants | * |

# COPY

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### VIDEOTAPED DEPOSITION OF

### BEN THOMAS, Ph.D.

### November 15, 2000

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Portions of this transcript contain confidential
documents, information or other things.

VIDEOTAPED DEPOSITION OF BEN THOMAS, Ph.D., produced
as a witness at the instance of the plaintiff, was taken
in the above styled and numbered cause on November 15,
2000, from 10:15 a.m. to 4:50 p.m., before Kay Howell,
Certified Shorthand Reporter in and for the State of
Texas, reported by machine shorthand, at Doubletree
Hotel, 400 Dallas, Houston, Texas.



14:10:33  1        A.  Only in detail.  I'm afraid I don't remember him.

:10:39  2        Q.  Were you a member of the Toxicology Committee

14:10:42  3   until you left Shell in 1990?

14:10:45  4        A.  I was.

        5                  (Marked Thomas Exhibit No. 5.)

14:11:15  6        Q.  (BY MR. SHER)  I'm handing you a copy of what

14:11:17  7   I've marked as Exhibit 5 to your deposition.  This is on

14:11:24  8   Atlantic Richfield Company letterhead.  It's internal

14:11:29  9   correspondence dated March 31, 1981, from R. N. Roth to

14:11:34 10   file, MTBE, and it's Bates stamped ARC 035844 through 46.

14:11:40 11   Let's go off the record so you can have a chance to look

14:11:43 12   this over.

14:11:44 13                  THE VIDEOGRAPHER:  The time is 2:11 p.m.

        14                  (Discussion off the record.)

14:14:52 15                  THE VIDEOGRAPHER:  Back on the record at

14:14:53 16   2:14 p.m.

14:14:54 17        Q.  (BY MR. SHER)  Have you had a chance to look over

14:14:57 18   Exhibit 5 while we were off the record?

14:14:59 19        A.  I have.

14:14:59 20        Q.  Do you have any recollection in the first part of

14:15:03 21   1981 being involved with a group known as the MTBE Study

14:15:09 22   Group?

14:15:09 23        A.  This memorandum refreshes my memory, yes.

14:15:12 24        Q.  What is your recollection about that?

:15:14 25        A.  This was some early studies.  As I recall, they

14:15:19  1   were -- it was a program ongoing when I joined the

:15:22  2   committee, or at least under discussion when I joined the

14:15:26  3   Toxicology Committee.  You know, I apparently have sent

14:15:32  4   information over to Randy Roth of Arco saying that we are

14:15:36  5   involved with a contamination of a township's drinking

14:15:42  6   water with disopropyl ether and MTBE at 100 part per

14:15:45  7   billion.  And I reflect the information that I had, that

14:15:48  8   20 percent of all underground storage tanks leak, leading

14:15:53  9   to the possibility of groundwater contamination.

14:15:53 10       Q.  In the middle of the page there is a reference

14:15:55 11   that says to date Shell and Arco are the only ones with

14:15:59 12   MTBE in gasoline.  Do you see that?

14:16:00 13       A.  I do.

14:16:01 14       Q.  Do you have a recollection of a time when Shell

14:16:03 15   and Arco were the only companies with MTBE in their

14:16:07 16   gasoline?

14:16:09 17       A.  I know Shell was a user of MTBE, but I don't know

14:16:13 18   what other companies used it.

14:16:16 19       Q.  Are you aware that over the course of the 80's

14:16:19 20   other companies also started using MTBE?

14:16:23 21       A.  Yes.

14:16:23 22       Q.  Can you recall when the additional companies

14:16:30 23   started using MTBE in rough terms?

14:16:33 24       A.  No, but I would assume it was in the mid-1980's,

:16:37 25   mid to late 1980's.

1   STATE OF TEXAS      )
    COUNTY OF HARRIS    )
2

3                   REPORTER'S CERTIFICATION

4          TO THE DEPOSITION OF BEN THOMAS, Ph.D.

5               Taken on November 15, 2000

6

7   I, KAY HOWELL, Certified Shorthand Reporter in and for
    the State of Texas, hereby certify that this deposition
    transcript is a true record of the testimony given by the
8   witness named herein, after said witness was duly sworn
    by me.

9

    I further certify that I am neither attorney nor counsel
10  for, related to, nor employed by any of the parties to
    the action in which this testimony was taken.  Further, I
11  do not have any existing or past financial, business,
    professional, family, or social relationships with any of
12  the parties or their attorneys which to some might
    reasonably create an appearance of partiality.

13

    Upon conclusion of the deposition, the deponent
14  requested the opportunity to review the transcript and
    make changes in form or substance.

15

16  Subscribed and sworn to on this the 27th day of November,
    2000.

17

18

19                         _____
                           KAY HOWELL, CSR, RPR, FAPR
20                         Supreme Court of Texas
                           Certification No. 501
21                         Expiration:  12-31-02
    Dickman Davenport, Inc.
22  3000 Carlisle, Suite 113
    Dallas, Texas 75204
23  214-855-5100

24

25

# Exhibit 17



 Wallace
King
Domike
&
Branson

WALLACE KING DOMIKE & BRANSON, PLLC
1050 THOMAS JEFFERSON STREET, N.W.
WASHINGTON, DC 20007

Oct 17 2005
9:03PM

Phone 202.204.1000
Fax 202.204.1001

William F. Hughes
Direct Dial 202.204.3727
bhughes@wallaceking.com

October 17, 2005

*Via LexisNexis File & Serve*

Robin L. Greenwald
Weitz & Luxenburg, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038-4925

> Re:     *In re: MDL 1358 Products Liability Litigation*

Dear Ms. Greenwald:

On behalf of the Chevron Defendants, this letter provides information responsive to Judge Scheindlin's August 12, 2005 directive regarding disclosure of involvement in national and regional trade associations on issues related to oxygenates and/or underground storage tanks ("USTs"). Based upon their investigation thus far, the Chevron Defendants provide the following information:

## American Petroleum Institute

Defendant Chevron Corporation[1] has been a member of the American Petroleum Institute ("API") since a date prior to the relevant time. On various occasions during the relevant time period, certain employees of Chevron Corporation and/or affiliated entities, including defendant Chevron U.S.A. Inc., participated in various API committees that may have addressed certain matters related to oxygenates and/or USTs. These committees include: (1) Ad Hoc MTBE Coordination Group; (2) Soil/Groundwater Technical Task Force; (3) MTBE Research Group; (4) RFG Certification Work Group; (5) Ad Hoc RFG Certification Protocol Subgroup; (6) Section 211(b) Research Group; (7) Ad Hoc Oxygenates Group; (8) Clean Air Act Ad Hoc Committee on PPC; (9) Toxicology Committee; (10) Petroleum Industry Workgroup on Methanol Research; (11)

---

[1] Chevron Corporation has operated under several names during the relevant time period: (1) Standard Oil Company of California (from a date prior to 1979 until July 1984), (2) Chevron Corporation (July 1984-Oct. 2001 and May 2005-present), and (3) ChevronTexaco Corporation (Oct. 2001-May 2005). These entities are referred to collectively herein as Chevron Corporation.


Wallace
King
Domike
Branson

Robin L. Greenwald
October 17, 2005
Page 2

Fuels Committee; (12) Fuels Task Force; (13) Water Subcommittee Water Quality and
Water Protection Task Force; and/or (14) Vehicle Emissions Task Force.[2]

## Western States Petroleum Association

Defendant Chevron Corporation and/or affiliated entities have belonged to the
Western States Petroleum Association ("WSPA") since a date prior to the relevant time
period.[3] On various occasions during the relevant time period, employees of Chevron
Corporation and/or affiliated entities participated in the following WSPA committees that
may have addressed certain matters related to oxygenates and/or USTs: (1) MTBE Task
Force; (2) Ad Hoc MTBE Task Force; (3) Ad Hoc WSPA MTBE Treatability Task
Force; (4) RFG Advocacy Task Force; (5) Fuels Subcommittee RFG Compatibility
Issues Technical Task Force; (6) Ad Hoc RFG Group; (7) Remediation Task Force; (8)
Toxic Air Contaminant Task Force; and/or (9) Ad Hoc Group on MTBE.

## Other Industry Organizations

On various occasions during the relevant time period, Chevron Corporation
and/or affiliated entities (including defendant Chevron U.S.A. Inc.) were members of
and/or participated in the following industry associations that may have addressed certain
matters involving oxygenates and/or USTs: (1) Independent Petroleum Association of
America; (2) Interstate Technology Resource Council; (3) National Petrochemical
Refiners Association; (4) National Petroleum Council; (5) Petroleum Environmental
Research Forum; (6) Reformulated Gasoline Survey Association; (7) Resource
Environmental, LLC; (8) Society of Automotive Engineers; (9) Society of Independent
Gasoline Marketing America; (10) Western Petroleum Marketers Association; and/or
(11) certain divisions of U.S. Oil & Gas.

The Chevron Defendants provide this information to the best of their knowledge.
The Chevron Defendants are continuing their investigation and reserve the right to amend
and/or supplement this response should they discover additional information.

---

[2] Prior to 1984, defendant Chevron U.S.A. Inc. was known as Gulf Oil Corporation. From a date prior to
the relevant time period until approximately 1984, Gulf Oil Corporation was a member of API. Defendant
Texaco Inc. was a member of API from a date prior to the relevant time period until 2001.

[3] Prior to 1988, WSPA was known as the Western Oil and Gas Association.


Wallace
King
Domike
&
Branson

Robin L. Greenwald
October 17, 2005
Page 3

Sincerely,

William F. Hughes

cc:   All Counsel (via LNFS)

# Exhibit 18

**Wallace**
**King**
**Domike**
**Branson**

WALLACE KING DOMIKE & BRANSON, PLLC
1050 THOMAS JEFFERSON STREET, N.W.
WASHINGTON, DC 20007

Phone 202.204.1000
Fax 202.204.1001

PETER C. CONDRON
Direct Dial 202.204.3707
pcondron@wallaceking.com

October 17, 2005

**VIA LEXIS/NEXIS FILE AND SERVE**

Robin L. Greenwald, Esq.
Weitz & Luxenburg, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038-4925

Re:     ***In re: MDL 1358 Products Liability Litigation***

Dear Ms. Greenwald:

On behalf of the Shell Defendants, this letter provides information responsive to Judge Scheindlin's August 12, 2005 directive regarding disclosure of participation in national and regional petroleum industry trade associations that focus on issues related to oxygenates and/or underground storage tanks ("USTs"). Based upon their investigation thus far, the Shell Defendants submit the following membership information:

**American Petroleum Institute (API)**

Shell Oil Company has been a member of API from 1950 though the present. During this period, representatives of Shell Oil Company and/or its various affiliates and subsidiaries may have participated in the following subcommittees and task forces: the 211(b) Research Group, the Ad Hoc Committee on MTBE, the Ad Hoc MTBE Coordination Group, the Fuels Committee, the Fuels Group Program, the Fuels Task Force, and the Soil/Groundwater Technical Task Force.

**Louisiana Mid-Continent Oil & Gas Association (LMOGA)**

Shell Oil Company and members of its various affiliates and subsidiaries, including Equiva Enterprises, Motiva Enterprises and Shell Oil Products US f/k/a Equilon Enterprises, have been members of LMOGA since at least 1980. During this period, representatives of Shell Oil Company and/or its various affiliates and subsidiaries may have participated in the Subcommittee on Air that was originally formed to consider the Clean Air Act Amendments of 1990.

Wallace
King
Domike
Branson

## Mid-Continent Oil and Gas Association

Shell Oil Company and/or its various affiliates and subsidiaries are current members of the Mid-Continent Oil and Gas Association.

## National Petrochemical and Refiners Association (NPRA)

Shell Oil Company has been a member of NPRA from 1999 through the present.

## National Petroleum Council (NPC)

Shell Oil Company and/or its various affiliates and subsidiaries have been members of NPC since 1946.

## Petroleum Environmental Research Forum (PERF)

Shell Oil Company and/or its various affiliates and subsidiaries are current members of PERF.

## Petroleum Marketers Association of America (PMAA)

Shell Oil Company has never been a member of PMAA.  Shell Oil Company does support PMAA, though, through a corporate sponsorship.

## Reformulated Gasoline Survey Association

Shell Oil Company and/or its various affiliates and subsidiaries are current members of the Reformulated Gasoline Survey Association.

## Society of Independent Gasoline Marketers of America (SIGMA)

Shell Oil Company and/or its various affiliates and subsidiaries have been members of SIGMA since 1992 through the present.

## Western Petroleum Marketers Association (WPMA)

Shell Oil Company and/or its various affiliates and subsidiaries, excluding Motiva Enterprises and Equiva Enterprises, are current members of WPMA.

## Western States Petroleum Association (WSPA)

Shell Oil Company has been a member of WSPA since a date prior to the relevant time period.  During this time, representatives of Shell Oil Company and/or its various affiliates and subsidiaries may have participated in the MTBE Task Force subcommittee.

Wallace
King
Domike
Branson

Robin L. Greenwald
October 17, 2005
Page 3

The Shell defendants have provided this information, including dates of membership, to the best of their knowledge. The Shell defendants are continuing their investigation and reserve the right to supplement this response should they discover additional information.

Very truly yours,

Peter C. Condron

cc:     Counsel of Record (via LexisNexis File and Serve)

# Exhibit 19





Tracie J. Renfroe
Partner

711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Office 713.221.1404  800.887.1993
Fax 713.221.2123
tracie.renfroe@bracewellgiuliani.com

September 15, 2005

***Via LexisNexis File & Serve***

Robin L. Greenwald
Weitz & Luxenberg
180 Maiden Lane, 17th Floor
New York, New York 10038

Re:   MDL 1358 – Valero and Ultramar Defendants' Trade Organization Information

Dear Ms. Greenwald:

In accordance with the Court's directive at the August 12, 2005 Status Conference and in your capacity as Plaintiffs' liaison counsel, this letter provides information on Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing Company, and Valero Refining Company-California's[1] ("Valero Defendants") and Ultramar Inc., Ultramar Energy, Inc., Ultramar Limited, TPI Petroleum, Inc., and Colorado Refining Company's ("Ultramar Defendants") membership in the American Petroleum Institute ("API"), Oxygenated Fuels Association ("OFA"), and OFA MTBE Committee.

API

Valero Defendants have never been members of API.  API records indicate that Hill Petroleum Company was a member of API from 1980-81, prior to this entity's affiliation with Valero Defendants beginning in 1997.  Additionally, API records indicate that Ultramar Refining was a member of API from 1989-90; Ultramar Inc. was a member of API in 1991; and Ultramar Corporation was a member of API from 1992-93.

---

[1] Plaintiffs' complaints filed in Connecticut, Iowa, and New York also name Valero Refining Company, a non-existent entity.



Robin L. Greenwald
September 15, 2005
Page 2

<u>OFA</u>

Valero Energy Corporation was a member of OFA from 1993 until the organization's dissolution in 2004. Phibro Energy was apparently a member of OFA from 1994-95, prior to this entity's affiliation with the Valero Defendants in 1997. Ultramar Defendants have never been members of OFA.

<u>MTBE Committee</u>

Valero Defendants and Ultramar Defendants have never been members of the MTBE Committee.

Valero Defendants and Ultramar Defendants reserve the right to amend or supplement this information in the future if necessary.

Very truly yours,

Bracewell & Giuliani LLP

Tracie J. Renfroe

TJR/tds

cc:     All counsel via LexisNexis File & Serve

# Exhibit 20

XJAT — 9

American Petroleum Institute
1220 L Street. Northwest
Washington, D C 20005
202-682-8000

**ÆP**

RECEIVED

JUN 2 0 1984

R. N. ROTH

S.T. Cragg, Ph.D.
Toxicologist
202/682-8342

TO:          Methyl tertiary-Butyl Ether Task Force

FROM:        Steven T. Cragg STC

DATE:        June 18, 1984

Enclosed are the minutes of the MtBE meeting.  If there are
items which are of sufficient importance to be added or changed,
please send your marked copy to K.A. Hazer, Ph.D. in Chuck's
absence.  As you know, I will not be available after this date
as well.

xc: K.A. Hazer (API)
    C.E. Holdsworth (API)
    E.O. Siebert (Huels)
    N.K. Weaver (API)

ARC 035444

THE AMERICAN PETROLEUM INSTITUTE

Medicine and Biological Science Department

Methyl tertiary-Butyl Ether Meeting


API Offices                          Tuesday, June 12, 1984
Washington, D.C.                     9:30 a.m.


Participants:

R.C. Anderson (API)                  S.C. Lovre (ARCO Pet.)
C.C. Conaway (Texaco)                S.A. Ridlon (ARCO Chem.)
S.T. Cragg (API)                     E.O. Seibert (Huels)
B.K. Hoover (ARCO Chem.)             F.B. Thomas (Shell)
C.J. Kirwin (Phillips)


The purpose of the meeting was to discuss the status of the
composite final report of the toxicity and metabolism studies
conducted on MtBE by Bio/dynamics Laboratory, Inc.  In addition,
the disposition of any future studies was also evaluated, as was
the emerging issue of MtBE in ground water.  Also considered were
such items as: publication of results, longterm storage of study
data and materials, final audit of study results, and ACGIH
deliberations on an MtBE TLV.

Regarding the composite report, task force comments for the
initial draft have been submitted and revisions by the laboratory
have been made.  The task force still had some minor concerns
which it desired changed and decided to extend the deadline for
further comment until July 1, 1984.  It was realized that the
contract laboratory is under no obligation to make further
revisions.  The changes will be asked for, however.  Following
this, the decision was reached to accept the report with the
additional task force comments.  The task force may decide at a
later date to have the summarized comments accompany the report
or be incorporated into the MtBE file, if Bio/dynamics does not
further revise the report.

Several other decisions were reached concerning the Bio/dynamics
studies.  First, Bio/dynamics will be instructed to discard the

ARC 035445

2

radiolabeled tissues from the metabolism study as the metabolites
within them may have volatilized/sublimed over time to the point
that if they were now analyzed, misleading values might be
generated.  Second, the remaining tissues and data will be sent
to the API repository for those studies specifying short storage
intervals in the contract.  Third, a follow-up quality assurance
audit was recommended by the task force to be performed on the
reproduction/teratology study.  The task force realized, however,
that API staff was presently understaffed and left the decision
of prioritization of this effort to staff.

Dr. Conaway recommended that, if possible, at least three papers
be published from the Bio/dynamics MtBE studies.  These would
include publications on; 1) two-species teratology, 2)
reproduction, and 3) metabolism.  Concern was expressed that the
metabolism data may not be sufficient for publication.  Various
names were recommended as authors for these papers.  Dr. Von
Bulow will be encouraged to submit a paper on the Huels sponsored
90-day study and ARCO may submit its genetox data.  An attempt
will be made to submit all of these as a package to a single
journal such as the Journal of Environmental Contamination and
Toxicology.  Dr. Conaway asked that all draft papers be submitted
to API no later than September 1, 1984.  API will act as the
"clearing-house" for the papers and will submit the packet to the
journal.

In View of the NTP's deprioritization for conducting a
carcinogenicity bioassay on tertiary-butyl alcohol (TBA), a known
metabolite of MtBE, the task force decided little need existed
for additional metabolism studies at this time.

Some of the task force members indicated that MtBE had been found
in ground water near leaking underground storage tanks from their
service stations.  Usually the service stations having these
problems have not been directly owned by the company, but are
franchise stations with older storage tanks.  It appears that the
oxygenate components of gasoline, such as MtBE, migrate most
rapidly underground and are the most noticable from an
organoleptic standpoint.  Pending votes from Exxon, Tenneco and
Dr. Von Bulow of Huels, the task force decided to give the
remaining funds in the MtBE budget to the API research effort on
gasoline in groundwater.  This is contingent upon API's testing
of oxygenates (and MtBE in particular) in such a program.
However, if such an API research effort does not include the
testing of oxygenates/MtBE, the remaining funds of $28,000 will
be returned to the companies participating in the MtBE testing
program.

Regarding a similar issue, the proposal by Dr. Finn on
groundwater contamination will be referred back to Dr. David Chen
(API staff to the Environmental Biology and Community Health
Committee) for review by this committee.

Finally, as a point of information, Ms. Hoover reported that all

ARC 035446

3

data in API files concerning MtBE had been forwarded to J. Gesser representing the ACGIH. This organization will propose a TLV for MtBE in the near future. It was speculated that such a level might be similar to other ethers (i.e., 400 ppm).

prepared by;


Steven T. Cragg, Ph.D.
API Toxicologist
6/15/84

ARC 035447

# Exhibit 21

ARCO Chemical Company                    Internal Correspondence        MAT-9



Date:           June 14, 1984

Subject:        API MTBE Meeting Highlights

From/Location:  B. K. Hoover

To/Location:    S. A. Ridlon

EXHIBIT
5
799/28

A meeting of the API Ad Hoc Committee on MTBE was held in
Washington on June 12, 1984. Those in attendance included:
F. B. Thomas (Shell), C. C. Conaway (Texaco), S. T. Cragg (API),
E. Seibert (Huls), C. Kirwin (Phillips), R. C. Anderson (API),
S. C. Lovre (ARCO), S. A. Ridlon (ARCO Chemical), and B. K.
Hoover (ARCO Chemical).

The status of the composite final report of the API studies was
discussed. Although the report was generally good, some com-
mittee members had minor comments that they would like to have
the laboratory address. It was decided that these remaining com-
ments would be sent to API staff for submission to the laboratory.
The report was given provisional approval providing that the lab-
oratory address these comments either by letter or by changes in
the report.

Dr. Conaway expressed a desire to submit these studies for publi-
cation to the Journal of Environmental Health and Toxicology.
Authorship on the various papers was determined. Dr. Conaway
stated that he had asked Larry Andrews of ARCO to review the
metabolism study and prepare a draft for publication. ARCO is
currently reviewing this request since problems noted in that
study may make it less suitable for publication. Dr. Conaway
also asked Br. Ridlon of ARCO to review the possibility of pub-
lishing the acute studies that it submitted to the committee as
background for the API work.

The future plans of the group were considered. It was decided
that no attempt would be made to pursue plans to perform any new
metabolism study. The cost of future work as well as the quali-
tative data obtained in the earlier metabolic study were cited as
reasons for this decision.

MTBE is a possible contaminant of groundwater, especially in asso-
ciation with leaking gasoline storage tanks. Dr. Conaway
expressed a desire to obtain taste and odor threshold data for
MTBE. Dr. Thomas explained that he is chairman of the API task
force on groundwater contamination. Their plans are presently
only tentative due to a need for greater direction from API man-
agement committees. He stated that oxygenates such as MTBE were
considered proprietary and not sufficiently generic to the indus-
try to be considered in an API project at the present time. He
further indicated that the Environmental Biology and Community

ARC 035448

S. A. Ridlon
June 14, 1984
Page 2

Health Committee of API is considering taste and odor problems
associated with the soluble components of gasoline.  They may be
willing to consider MTBE, as well as other oxygenates, on their
list of contaminates for study.  The Ad Hoc Committee decided to
make their remaining funds available to that group providing that
they specifically study MTBE and that they are allowed to review
and comment on the proposal prior to the initiation of work.  If
this is not possible, they instructed API to distribute the
remainder of the money back to each member company serving on the
MTBE committee.

On other matters, the committee decided to dispose of the radio-
labelled tissues from the metabolism study pending appropriate
file documentation.  They decided to ask API to make arrangements
to store data and specimens from all MTBE studies at Experimental
Pathology Laboratories in Herndon, Virginia.  A request was made
to API to revisit Bio/dynamics to quality assure the portions of
the studies that were rejected during previous audits.  If API
needs assistance in this area, ARCO agreed to send B. K. Hoover
to aid in this effort.  ARCO staff reported on the latest informa-
tion on a possible TLV for MTBE which is being considered by
ACGIH.  A draft document has been prepared along with a recom-
mended TLV for consideration by the full committee of ACGIH at
their next meeting.  This TLV is expected to be in the range of
300-500 ppm which is consistent with other ethers and above cur-
rent workplace exposures.

It was decided that it would not be necessary for the Ad Hoc
Committee to meet again since it had completed its mission.  The
meeting was adjourned at noon.

BKH:mrr

[API/MTBE/MTG]

ARC 035449