UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | : : : : : : : : : : : | Master File No. 1:00–1898 MDL 1358 (SAS) M 21-88 |
| This document relates to: | | |
| *City of Fresno v. Chevron U.S.A., Inc., et al.*, 1:04-cv-04973 | | |

**PLAINTIFF CITY OF FRESNO'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR LACK OF EVIDENCE PERTAINING TO CAUSATION**

## Table of Contents

**Table of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   **Legal Standard** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  **Theories of Defendants' Liability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   **Chevron, Shell and Valero MTBE Gasoline Was Delivered to Terminals Serving
      Fresno In A Comingled State** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    **Shell** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    **Chevron** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    **Valero, Exxon, Ultramar** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      D.    **Kinder Morgan Pipeline and Fresno Terminal** . . . . . . . . . . . . . . . 8

V.    **Coastal Chem Is Liable as an MTBE Manufacturer** . . . . . . . . . . . . . . . . . . 9

      A.    **Tosco #30587, Unocal #6353, and Tosco #39118** . . . . . . . . . . . . . . . 12

      B.    **Red Triangle and East Tulare Street Exxon** . . . . . . . . . . . . . . . . . 13

      C.    **Chevron #9-9093 and Van Ness Auto** . . . . . . . . . . . . . . . . . . . . . . 15

VI.   **Duke Is Liable as a Distributor of MTBE Gasoline and as a Manufacturer of MTBE**
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      A.    **Valley Gas** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    **Red Triangle** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII.  **Kern Is Liable as an MTBE Manufacturer** . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.    **Shell Stations: M&S Texaco and Shell #1212** . . . . . . . . . . . . . . . . . 19

      B.    **Chevron Stations: Tosco #30587, Chevron #9-4374, Unocal #6353, Van Ness
            Auto, Chevron #9-9093, and Tosco #39118** . . . . . . . . . . . . . . . . . . . . 19

i

C.    Valero Stations: Beacon #3519, Beacon-Arco #615, Valley Gas, Red Triangle, East Tulare Street Exxon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VIII.   Tesoro Is Liable as a Refiner and Supplier of MTBE Gasoline . . . . . . . . . . . . . . . 23

A.    U&A and Valley Gas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.    Red Triangle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IX.   Valero Is Liable as a Refiner and Supplier of MTBE Gasoline . . . . . . . . . . . . . . . 24

A.    Beacon-Arco #615 (1625 Chestnut Ave.) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.    Beacon #519 (4591 E. Belmont) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.    East Tulare Street Exxon (4594 East Tulare Street . . . . . . . . . . . . . . . . . . 26

D.    Red Triangle (2809 South Chestnut Ave. . . . . . . . . . . . . . . . . . . . . . . . . . 27

E.    Valley Gas (2139 S. Elm St.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

X.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## Table of Authorities

### Cases

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Gallo v. Prudential Residential Servs. Ltd. Partnership,*
    22 F.3d 1219 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,*
    591 F.Supp.2d 259 (S.D.N.Y. 2008) (*County of Suffolk*) . . . . . . . . . . . . . . 3, 4, 5, 10, 18

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,*
    676 F.Supp.2d 139 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kessler v. Westchester County Dep't of Soc. Servs.,*
    461 F.3d 199 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*McClellan v. Smith,*
    439 F.3d 137 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Miner v. Clinton County, N.Y.,*
    541 F.3d 464 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pyke v. Cuomo,*
    567 F.3d 74 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*SCR Joint Venture L.P. v. Warshawsky,*
    559 F.3d 133 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Sindell v. Abbott Laboratories,*
    26 Cal.3d 588 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Sledge v. Kooi,*
    564 F.3d 105 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Diebold, Inc.,*
    369 U.S. 654 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Rules**

Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Other Authorities**

Judicial Council of California Civil Jury Instruction (CACI) No. 430 . . . . . . . . . . . . . . . . . . . . . 4

iv

I.    **Introduction**

Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to

Causation seeks summary judgment for 1 or more of the Moving Defendants (Coastal Chem,

Duke, Kern, Tesoro, and Valero) against plaintiff City of Fresno (Fresno) at 14 stations where

MTBE has been detected.

There are two categories of Moving Defendants.  First, Duke, Tesoro, and Valero were

distributors of MTBE gasoline, while Tesoro and Valero were also refiners.  Second, Coastal

Chem and Duke supplied "neat" (pure) MTBE to refiners for use in the gasoline manufacturing

process.  Under the alternative theories of liability developed by this Court, at a minimum

Fresno's evidence presents a genuine issue of material fact as to causation for the Moving

Defendants at the respective stations at issue, and the Moving Defendants' motion should be

denied.

II.    **Legal Standard**

Summary judgment may not be granted unless "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In

determining whether summary judgment is appropriate, a court must resolve all ambiguities

against the moving party.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962));  *see also Gallo*

*v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994).

"An issue of fact is genuine if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit

under the governing law." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability*

*Litigation*, 676 F.Supp.2d 139, 144 (S.D.N.Y. 2009) (quoting *SCR Joint Venture L.P. v.*

*Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "[T]he burden of demonstrating that no

material fact exists lies with the moving party . . . ." *In re MTBE*, 676 F.Supp.2d at 144 (quoting

*Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).

      "[A]ll that is required [from a nonmoving party] is that sufficient evidence supporting the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial." *In re MTBE*, 676 F.Supp.2d at 144 (quoting *Kessler v. Westchester*

*County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)).

      In determining whether a genuine issue of material fact exists, the court must "constru[e]

the evidence in the light most favorable to the nonmoving party and draw all reasonable

inferences" in that party's favor. *In re MTBE*, 676 F.Supp.2d at 144 (quoting *Sledge v. Kooi*, 564

F.3d 105, 108 (2d Cir. 2009)).  However, "[i]t is a settled rule that '[c]redibility assessments,

choices between conflicting versions of the events, and the weighing of evidence are matters for

the jury, not for the court on a motion for summary judgment.'" *In re MTBE*, 676 F.Supp.2d at

144-45 (quoting *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006)).  Summary judgment is

therefore "appropriate only if there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law." *In re MTBE*, 676 F.Supp.2d at 145 (quoting *Pyke v.*

*Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009)).

## III.   Theories of Defendants' Liability

      In *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 379

F.Supp.2d 348 (S.D.N.Y. 2005), this Court traced the rationale behind the theory of collective

liability fashioned by the California Supreme Court in *Sindell v. Abbott Laboratories*, 26 Cal.3d

588 (1980): "The *Sindell* court based its decision on two policy considerations: (1) 'as between

an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury'; and

(2) holding manufacturers liable would create an incentive to produce safer products." *In re*

*MTBE*, 379 F.Supp.2d at 375 (fns. omitted).  After reviewing theories of liability, this Court

developed the "commingled product theory" of liability:

> The review of the various theories of collective liability set forth above reveals
> that from time to time courts have fashioned new approaches in order to permit
> plaintiffs to pursue a recovery when the facts and circumstances of their actions
> raised unforeseen barriers to relief.  Those courts made a policy decision that in
> balancing the rights of all parties, it would be inappropriate to foreclose plaintiffs
> entirely from seeking relief merely because their actions did not fit the parameters
> of existing liability theories.  These MTBE cases suggest the need for one more
> theory, which can be viewed as a modification of market share liability,
> incorporating elements of concurrent wrongdoing.

*In re MTBE*, 379 F.Supp.2d at 377.

In *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 591

F.Supp.2d 259 (S.D.N.Y. 2008) (*County of Suffolk*), this Court discussed five possible avenues

by which a plaintiff could prove causation in an MTBE case. *Id.* at 267-68.  The Court noted that

"market share liability may not even be applicable on these facts, because the product alleged to

have caused the harm is undeniably a blended product manufactured by multiple defendants,

rather than a product manufactured by a single defendant that cannot be identified." *Id.* at 267.

The Court explained that the "substantial factor" standard for causation, which is the law in

California[1] as it is in New York, "recognizes that often many acts can be said to have caused a particular injury, and requires only that defendant's actions be a substantial factor in producing the injury.  A plaintiff need not eliminate every other possible cause, and the fact '[t]hat another possible cause concurs with defendant's negligent act or omission to produce an injury does not relieve defendant from liability.'"  *Id.* at 266.  The Court further explained the commingled product theory:

> [P]laintiffs may rely on the commingled product theory, which this Court developed to address the particular facts of this case, to prove their claims against gasoline and MTBE manufacturers.  As discussed below, the commingled product theory, while still an alternative means of proving causation, is closer to traditional causation than to market share liability.  Under this theory, a reasonable jury could conclude, based on the evidence in the record, that all defendants contributed to the commingled gasoline that caused contamination in plaintiffs' wells.  Defendants may still exculpate themselves by showing that their product could not have been part of the commingled gasoline spilled in Suffolk County, but the burden shifts to them to do so.

*Id.* at 268 (fn. omitted).

The Court made clear:  "even when the jury concludes that plaintiffs have not met their burden to prove that any particular spill of gasoline caused contamination in a well, plaintiffs may still prove their claims against gasoline manufacturers under the commingled product theory."  *In re MTBE*, 591 F.Supp.2d at 268.

The Court rejected defendants' argument "that because plaintiffs cannot identify which refiners were responsible for producing the particular gallons of gasoline that were released into the environment and caused contamination in the wells, [plaintiffs'] claims against the refiners must fail."  591 F.Supp.2d at 269.  The Court explained:  "[I]t is likely that *some* of each

---

[1] *See* Judicial Council of California Civil Jury Instruction (CACI) No. 430, "Causation: Substantial Factor."

4

defendant's gasoline was spilled somewhere in Suffolk County, leading to contamination in some of the wells.  Moreover, because of the blended nature of the gasoline, it is impossible to determine whose product was in any particular spill.  However, defendants' argument that this impossibility is fatal to plaintiffs' claims is contrary to New York policy and precedent, and to prior rulings in this case."  *Id.* (original emphasis).

In the *County of Suffolk* case, MTBE manufacturers Lyondell and Equistar did not refine, distribute, or market gasoline, nor did they own or operate retail gas stations.  591 F.Supp.2d at 277.  The MTBE manufacturers argued "that because plaintiffs cannot identify the manufacturer of the MTBE contaminating any of the focus wells, their claims must fail.  Although their arguments are similar to those made by gasoline refiners . . . the commingled product theory applies to claims against Lyondell and Equistar, and operates in the same was as it does for claims against gasoline refiners."  *Id.*

The MTBE manufacturers, Lyondell and Equistar, noted that many other companies manufactured MTBE for blending into gasoline, including refiners.  "Indeed, MTBE from various producers is probably commingled before it enters the distribution system, because each refiner appears to have blended MTBE from multiple producers into its gasoline."  *Id.* at 278.  The Court denied the MTBE manufacturers' motions for summary judgment:  "Plaintiffs cannot prove, either through direct or circumstantial evidence, that any particular molecules of MTBE contaminating their wells were manufactured by Lyondell or Equistar.  A reasonable jury could conclude, however, that because refiners blended Lyondell and Equistar's MTBE into gasoline that was placed in the Colonial Pipeline or shipped to the New York Harbor, some of Lyondell or Equistar's MTBE was likely found in groundwater within the capture zones of various focus

wells in Suffolk County.  For this reason, under the commingled product theory Lyondell and

Equistar can be held liable for the contamination in the wells, unless they are able to prove that

their MTBE was not in the relevant place at the relevant time." *Id.*

## IV.    Chevron, Shell and Valero MTBE Gasoline Was Delivered To Terminals Serving Fresno In A Comingled State.

During the time that MTBE was present in gasoline in Northern California five refineries,

all located in Northern California, supplied gasoline, including MTBE gasoline, to the Northern

California Region where Fresno is located.  Dickman Lum, the California Air Resources Board

employee charged with enforcing gasoline composition regulations, testified that Northern

California gasoline is supplied by five Bay Area refineries and these refineries were owned

during the relevant time period by Exxon, Chevron, Shell, Unocal, and Tosco.  (Rule 56.1 St. at ¶

105.)

### A.    Shell

Shell's refinery was located in Martinez, California.  Shell admitted that it owned and

operated two refineries, Martinez Refinery and Bakersfield Refinery, which supplied MTBE

gasoline to the City of Fresno.  (Rule 56.1 St. at ¶ 106.)

Shell's product account supervisor at the Martinez refinery, Elwanda Kovich, testified

that gasoline manufactured at the Martinez refinery was either distributed in Martinez or shipped

to the rest of Northern California via the Kinder Morgan pipeline system.  (Rule 56.1 St. at ¶

107.)

Shell admitted that it owned the Stockton Terminal, located at 3515 Navy Drive, in

Stockton and the Bakersfield Refinery Terminal, located at 6451 Rosedale Highway in

6

Bakersfield, CA, both of which served the City of Fresno. (Rule 56.1 St. at ¶ 108.)

Shell admitted that it shipped gasoline to Kinder Morgan's Fresno terminal and that gasoline from this terminal served the City of Fresno. (Rule 56.1 St. at ¶ 109)

### B.    Chevron

Chevron's refineries were located in Richmond, California and El Segundo Refinery. Chevron admitted that its Richmond Refinery supplied MTBE gasoline to terminals used to distribute gasoline to the City of Fresno. (Rule 56.1 St. at ¶ 110.)

Chevron supplied gasoline products to terminals in Bakersfield, Banta, Fresno, and San Jose to serve the City of Fresno. (Rule 56.1 St. at ¶ 111.)

### C.    Valero, Exxon, Ultramar

The Exxon refinery Valero acquired in 2000 was located in Benecia, California. Kelly Hammer, Exxon's coordinator for supplies to the Benicia refinery, confirmed that the Benicia refinery was used by Exxon to supply both branded and unbranded gasoline in Northern California, and that Exxon utilized Kinder Morgan's pipelines and terminals to supply gasoline to all areas other than Benicia. (Rule 56.1 St. at ¶ 112.) Robert Simonson, employed nearly thirty-one years at the Benicia refinery, confirmed that "almost all" of the gasoline manufactured by the Benicia refinery is distributed in Northern California, and that the Benicia refinery produces approximately 10% of all gasoline in California. (Rule 56.1 St. at ¶ 112.)

When Valero acquired Exxon's northern California assets, those included not only the Benecia Refinery, but also Exxon's stations, supply agreements, etc.

### D.    Kinder Morgan Pipeline And Fresno Terminal

Mary Morgan, Vice-President of Marketing for pipeline company Kinder Morgan Energy

7

Partners confirmed that Chevron, Exxon and Shell each operated and owned one of five gasoline refineries in Northern California which supplied MTBE gasoline to the Northern California market through the Kinder Morgan pipelines.  (Rule 56.1 St. at ¶ 113.)

Thomas Hooks, a scheduler and specialist on the movement of gasoline through Kinder Morgan's Northern California pipeline and terminal system, testified that Chevron, Exxon, and Shell utilized the Kinder Morgan system to distribute gasoline from their Bay Area Refineries to terminals.  (Rule 56.1 St. at ¶ 114.)  Mr. Hooks also confirmed that each of these refiners utilizes the same system, and that when gasoline from several refiners is shipped out to a terminal, the terminal receives "a combination of several batches . . ."  (Rule 56.1 St. at ¶ 114.)  Mr. Hooks also confirmed that terminals typically keep a ten-day supply which is continually replenished by shipments via pipeline.  (*Ibid.*)

Chevron, Exxon, and Shell were three of the five refiners which supplied the gasoline distributed by the Kinder Morgan pipelines and terminals.  (Rule 56.1 St. at ¶ 115)

## IV.    Coastal Chem Is Liable as an MTBE Manufacturer

Liability of defendant Coastal Chem, Inc. ("Coastal Chem"), is based upon Coastal Chem's supplying neat MTBE to Chevron and Exxon for use in gasoline delivered into Fresno. Both Exxon's and Chevron's discovery responses identified Coastal Chem as a supplier of neat MTBE to their respective Northern California refineries, which produced MTBE gasoline sold in Fresno.  (Rule 56.1 St. at ¶ 13.)  Exxon purchased MTBE from Coastal for California in 1994 and 1997-1998.  (*Ibid.*)  Chevron purchased MTBE from Coastal from August to December 1993.  (Rule 56.1 St. at ¶ 13.)

As discussed above, in *In re MTBE*, 591 F.Supp.2d at 277, this Court applied the

8

commingled product theory to two other neat MTBE suppliers, Lyondell and Equistar.  Under
this theory, Coastal Chem is liable at sites where the refiners who used Coastal Chem MTBE are
liable.

Coastal Chem's counsel's February 19, 2013, pre-motion letter asserted: "the Court
emphasized at the January 11 hearing that in order to defend against a motion for summary
judgment, Plaintiff must be able to provide evidence connecting an individual supplier's product
to deliveries of MTBE gasoline to the stations at issue."  This is not accurate.

At the January 11, 2013, status conference, in a discussion of Fresno's claims against
Duke Energy, this Court rejected defendants' argument that Fresno would have to amend its
complaint to allege the commingled product theory, and made clear that use of the theory is
simply "a matter of proof."  (Tr. at 40:20-21.)  The Court also made clear that it was not
interested in re-visiting its prior commingled product rulings.  (Tr. at 40:11-16 ["I said what I had
to say about that theory, and it's old news."].)

After stating that Fresno did not need to amend its complaint to allege commingled
product theory, the Court asked: "can you *also* do it with direct product, Tracey [tracing?] or do
you *have* to rely on the blended, you know, total product and the markets?"  (Tr. at 41:4-6.)
Fresno's counsel, Ms. Tracey O'Reilly, stated in the context of the discussion of Duke that
"[w]e're not going with commingled in the pipeline.  We're going with direct evidence, is what
we explained [with respect to Duke in the City's pre-conference letter]."  (Tr. at 41:12-13.)  Ms.
O'Reilly went on to explain the City has evidence that "Duke Energy mixed several gas station
sites, received delivery, deliveries of MTBE gasoline from jobbers to whom Duke Energy sold
MTBE gasoline."  (Tr. at 42:11-13.)

This discussion, and Ms. O'Reilly's statements, merely clarified that with respect to some defendants – including Coastal Chem, Duke, and Kern – Fresno's evidence will allow the jury to conclude that the defendants' product was delivered directly to some stations. Ms. O'Reilly did *not* state that the City would not rely on the commingled product theory for all defendants or even all stations. Since, as the Court's commingled product opinion makes clear, it is impossible to trace neat MTBE to individual release sites, such a conclusion would never have been reached in such an off-hand and indirect way.

During the in-person meet-and-confer session on March 4, 2013, Fresno's counsel advised defendants that Fresno is relying on the commingled product theory method of proof for defendants, including neat MTBE suppliers, against whom Fresno does not have direct evidence of delivery to particular stations.

Union Oil purchased Chevron gasoline in California from 1989 through 1997. (Rule 56.1 St. at ¶ 116.) As noted above, Coastal sold MTBE to Chevron in 1993. Thus the Chevron MTBE gasoline purchased by Union Oil during the period when Coastal Chem sold MTBE to Chevron would have contained Coastal Chem MTBE.

Coastal's Motion (at 26) claims that Unocal (Union Oil) supplied the Unocal sites with gasoline from Union Oil's San Francisco refinery during the relevant time. Union Oil, however, plainly purchased Chevron gasoline during this time period, and in any event terminalled its own MTBE gasoline from the San Francisco refinery at the Fresno terminal, where it commingled with other products, including Chevron products containing Coastal Chem's MTBE. Accordingly, Coastal is liable under the commingled product theory at these sites.

A.    Tosco #30587, Unocal #6353, and Tosco #39118

10

Unocal supplied gasoline to these Unocal and Tosco sites.

Tosco #30587:  Union Oil branded gasoline was supplied to this site from approximately 1974 until at least 1998-1999, which includes the time period in which Coastal Chem supplied neat MTBE to Chevron, who supplied gasoline to Union Oil.  (Rule 56.1 St. at ¶ 53.)  Union Oil owned the USTs at this site from at least 1974 until at least 1998-1999.  (*Id.*)

Unocal #6353:  The site was branded Union Oil from before the early 1990's until at least 1997, which includes the time period in which Coastal Chem supplied neat MTBE to Chevron, who supplied gasoline to Union Oil.  (Rule 56.1 St. at ¶ 79.)  Union Oil owned the USTs at the site from at least the early 1990's until at least 1997.  (*Id.*)  Union Oil branded gasoline was supplied to this site from at least the early 1990's until at least 1997.  (*Id.*)

Tosco #39118:  Union Oil supplied gasoline to this site from prior to the relevant time period until at least November 1996, which includes the time period in which Coast Chem supplied neat MTBE to Chevron, who supplied gasoline to Union Oil.  (Rule 56.1 St. at ¶ 96.)  Union Oil owned the USTs and the real estate at the site from prior to the relevant time period until at least April 1997.  (Rule 56.1 St. at ¶ 95.).

**B.**   **Red Triangle and East Tulare Street Exxon**

Exxon supplied gasoline to these sites.  Red Triangle was an Exxon dealer and bought gasoline from Exxon.  (Rule 56.1 St. at ¶ 84.)  The East Tulare Street Exxon station sold Exxon-branded gasoline from 2002 or 2003 until 2006.  (Rule 56.1 St. at ¶ 84.)

As noted above, Coastal sold MTBE to Exxon in 1994 and 1997-98.  Coastal's Motion (at 27-28) suggests there is no evidence that these stations bought and distributed Exxon gasoline during the relevant time period.

11

With respect to the Red Triangle station, Exxon identified Valero as a jobber used by Exxon in the Fresno area through at least September 2001. (Rule 56.1 St. at ¶ 87.) Exxon began putting MTBE in its gas in 1992. Valero's interrogatory responses indicate that it sold significant volumes of gasoline in Fresno from 1996 through 2003.[2] (Rule 56.1 St. at ¶ 87.) Valero supplied gasoline containing MTBE to Red Triangle from 1997 through 2002. (Rule 56.1 St. at ¶ 87.)

After James Shehadey's purchase of Red Triangle in 2002, Valero remained as one of the main suppliers of gasoline to Red Triangle in 2002-2003. (Rule 56.1 St. at ¶ 87.) Accordingly, there is evidence that a jobber used by Exxon during the relevant time period delivered gasoline to the Red Triangle station.

With respect to the East Tulare Street Exxon station, Coastal's Motion (at 28) cites Exxon's discovery responses for the proposition that this site did not sell Exxon gasoline until 2002 at the earliest, after the time period in which Coastal Chem supplied neat MTBE to Exxon, and suggests that MTBE at the site therefore could not have come from Coastal Chem. This

---

[2] Valero and Ultramar submitted a unified response to interrogatory requests, and the City has relied on these discovery responses in identifying "Valero" as a supplier prior to 2000. Although Valero subsequently argued that it did not come into the California market as "Valero" until 2000, Valero's and Ultramar's responses to this Court's orders, and to other discovery, reveal that Ultramar ultimately merged into Valero Energy Corp. Since Ultramar became Valero in 2000 through merger, references to Valero simply use the current name of the entity that was then known as Ultramar. Defendants' Statement of Facts for their nuisance motion admits that the Valero defendants' history can be traced back to Beacon Oil Company, which was acquired by and merged into Ultramar Inc. in 1989. (SSUF para. 50.) Ultramar then merged with Diamond Shamrock, Inc. to form Ultramar Diamond Shamrock Inc. in 1996. (*Id.*) Ultramar Diamond Shamrock Corp. then merged with and into Valero Energy Corp. on December 31, 2001. (*Id.*) With each merger, the successor company assumed the liabilities of the merging entities. See *Ray v. Alad Corp.* (1977) 19 Cal.2d 22, 28, 560 P.2d 3, 7. Ultramar Inc. is now known as Valero Energy Corp., and Ultramar's liability rests with Valero.

site, however, was a Circle K site beginning in 1999, shortly after Coastal Chem supplied neat

MTBE to Exxon.  (Rule 56.1 St. at ¶ 100.)  Three jobbers delivered gasoline to this site: El

Monte Gas, Julien Oil Company, and Boyett Petroleum.  (Rule 56.1 St. at ¶ 100.)  Because these

jobbers would have lifted from the Fresno terminal where Exxon gas was terminalled and

commingled with the gas of other refiners, Coastal is liable under the commingled product theory

at this site.

       **C.**      **Chevron #9-9093 and Van Ness Auto**

As noted above, Coastal sold MTBE to Chevron.  Both of these sites sold Chevron

gasoline.

At Chevron #9-9093, 3996 Parkway Drive, Chevron supplied gasoline to this site from

prior to the relevant time period until at least 1998.  This included the time period when Coastal

supplied MTBE to Chevron.  (Rule 56.1 St. at ¶ 94.)

At Van Ness Auto, Chevron supplied gasoline to this site from prior to the relevant time

period until at least August 1986.  Subsequently, R.V. Jensen delivered gasoline refined by

Chevron from 1986 until at least 2006.  This included the time period in which Coastal supplied

MTBE to Chevron.  (Rule 56.1 St. at ¶ 81.)

**V.**    **Duke Is Liable as a Distributor of MTBE Gasoline and as a Manufacturer of MTBE**

Duke was both a distributor of MTBE gasoline and a manufacturer of MTBE.  As noted

above in the section pertaining to Coastal Chem, Fresno is relying on the commingled product

theory method of proof for defendants, including Duke in its role as a neat MTBE supplier,

against whom Fresno does not have direct evidence of delivery to particular stations.

       **A.**      **Valley Gas**

13

Duke's Motion (at 13) admits that Duke sold gasoline to jobber Total Energy during the relevant time period. Duke's Motion (at 12) concedes that the Valley Gas station at 2139 South Elm Street received gasoline from Southern Counties Oil (d/b/a Total Energy). Several witnesses testified that Total Energy delivered gasoline to the Valley Gas station. (Rule 56.1 St. at ¶ 15.)

Duke's Motion (at 12) argues it should not be liable because the station also received gasoline from another jobber, Sabek Oil. This Court explained, however, that "because all entities in the chain of distribution may be liable for product liability claims," such entities may be held jointly and severally liable with the defendants shown under the commingled product theory to have manufactured the gasoline that spilled. *In re MTBE*, 591 F.Supp.2d at 268.

In addition, Duke sold "neat" MTBE to Valero from 2000 through 2003. (Rule 56.1 St. at ¶ 15.) Valero also supplied gasoline to this station. The Declaration of the Valero Defendants in Anticipation of 30(b)(6) Deposition provides that Ultramar maintained a branded relationship with the station from November 1, 1991, until May 31, 1994, whereby the station purchased Beacon-branded gasoline. (Rule 56.1 St. at ¶ 70.) After the site was purchased from Ultramar, Beacon and Ultramar gasoline were delivered to the station. (Rule 56.1 St. at ¶ 70.) Mr. Ahmad testified there was a brand distribution marketing agreement between Petro Group II and Beacon that prohibited him or Petro Group from buying gasoline from anyone other than Ultramar. (Rule 56.1 St. at ¶ 70.)

As noted above, while branded Valley Gas, the station received gasoline supplies from Total Energy and Sabek Oil. (Rule 56.1 St. at ¶ 70.) The Valero Defendants' collective discovery responses listed Southern Counties Oil (dba Total Energy) as a jobber from 1997

14

through 2002.  (Rule 56.1 St. at ¶ 70.) During this time period, a line leak was discovered in

October 1999, and a soil sample taken after a hole in a pipe was discovered and repaired in

November 1999 was found to contain 920,000 ppb MTBE.  (Rule 56.1 St. at ¶ 70.)

Mr. Moreau's report explains that MTBE releases likely occurred intermittently between

the Fall of 1992 and 2003.  (Rule 56.1 St. at ¶ 69.)  Because these releases occurred during times

that Ultramar and Valero had relationships with the station, Duke is liable at the site for its

supply of MTBE to Valero, in addition to being liable for its supply of gasoline to this site.

### B.    Red Triangle

Duke's Motion (at 16) acknowledges that Duke sold MTBE gasoline to InterCity

Petroleum Products, dba Red Triangle, during the relevant time period.  In fact, Duke

acknowledges that there were some 290 sales of gasoline to Red Triangle in 2000-2002.  (Rule

56.1 St. at ¶ 85.)

At the in-person meet-and-confer session, Duke's counsel noted that Red Triangle had

seven stations[3] and there was therefore only a one-in-seven chance that any particular load would

have been delivered to the Red Triangle at 2809 South Chestnut.  This fails to account for the

fact that there were 290 sales during the time period.  The odds that at least some of these loads

of Duke gasoline were delivered to the Red Triangle at 2809 South Chestnut are certainly high

enough to warrant submitting the issue to a reasonable jury.

Duke's Motion (at 15-16) argues it should not be liable at the Red Triangle site because

the site operator, InterCity Petroleum, was also a jobber that bought gasoline from other

suppliers.  As noted above as to Valley Gas, however, all entities in the chain of distribution may

---

[3] Duke's Motion (at 15) now claims "at least eight other gasoline stations."

be liable for product liability claims. *In re MTBE*, 591 F.Supp.2d at 268.

In addition, Duke sold "neat" MTBE to Valero, which also supplied gasoline to this station. Valero supplied gasoline containing MTBE to Red Triangle from 1997 through 2002. (Rule 56.1 St. at ¶ 87.) After James Shehadey's purchase of Red Triangle in 2002, Valero remained as one of the main suppliers of gasoline to Red Triangle in 2002-2003. (Rule 56.1 St. at ¶ 87.)

## VI.   Kern Is Liable as an MTBE Manufacturer

As noted above in the section pertaining to Coastal Chem, Fresno is relying on the commingled product theory method of proof for defendants, including neat MTBE supplier Kern, against whom Fresno does not have direct evidence of delivery to particular stations.

Fresno's interrogatories to Chevron, Shell, and Valero asked them to identify the suppliers of neat MTBE to their respective Northern California refineries, which produced MTBE gasoline sold in Fresno. Chevron, Shell, and Valero each identified Kern Oil as a supplier of neat MTBE in their discovery responses. The Further Response of Defendant Chevron U.S.A. Inc. to Plaintiffs' Preliminary Set of Interrogatories re: Defendant Identification shows that Chevron purchased MTBE from Kern Oil from August to October 1989. (Rule 56.1 St. at ¶ 30.) Similarly, The Shell Defendants' Responses to Plaintiff's First Set of Interrogatories lists Kern Oil as being a supplier of neat MTBE to Shell since approximately 1996. (Rule 56.1 St. at ¶ 30.) Finally, the Valero Defendants' Answers and Objections to Plaintiffs' Preliminary Set of Interrogatories (Re: Defendant Identification) shows that Kern Oil supplied MTBE to Valero from 2000 through 2003. (Rule 56.1 St. at ¶ 30.)

### A.   Shell Stations:  M&S Texaco and Shell #1212

16

<u>M&S Texaco:</u>  This site became a Shell-branded station in 1998 and remained Shell-branded until at least 2009.  (Rule 56.1 St. at ¶ 25.)

<u>Shell #1212:</u>  This site was Shell branded from the 1960's through 1998.  (Rule 56.1 St. at ¶ 25.)  Shell owned the underground storage tanks, piping, real property, and station building from at least 1994 or 1995 through 1998.  (Rule 56.1 St. at ¶ 25.)

**B.      Chevron Stations:  Tosco #30587, Chevron #9-4374, Unocal #6353, Van Ness Auto, Chevron #9-9093, and Tosco #39118**

<u>Tosco #30587:</u>  Union Oil branded gasoline was supplied to this site from approximately 1974 until at least 1998-1999.  (Rule 56.1 St. at ¶ 53.)  Union Oil owned the USTs at this site from at least 1974 until at least 1998-1999.  (Rule 56.1 St. at ¶ 53.)  Union Oil is a wholly owned subsidiary of Chevron.

<u>Chevron #9-4374:</u>[4]  Chevron currently manages remediation for this site, which is referenced in Chevron, Regional Board, and County DEH documents as a Chevron branded station.  (Rule 56.1 St. at ¶ 77.)  As a Chevron branded station, Chevron gasoline would have been supplied to the site.  (Rule 56.1 St. at ¶ 77.)

<u>Unocal #6353:</u>  The site was branded Union Oil from before the early 1990's until at least 1997.  (Rule 56.1 St. at ¶ 79.)  Union Oil owned the USTs at the site from at least the early 1990's until at least 1997.  (Rule 56.1 St. at ¶ 79.)  Union Oil branded gasoline was supplied to this site from at least the early 1990's until at least 1997.  (Rule 56.1 St. at ¶ 79.)  Union Oil is a wholly owned subsidiary of Chevron.

<u>Van Ness Auto:</u>  Chevron supplied gasoline to this site from prior to the relevant time

---

[4] Erroneously referenced in Moving Defendants' Motion as "Chevron #9-43474."

period until at least August 1986.  Subsequently, R.V. Jensen delivered gasoline refined by Chevron from 1986 until at least 2006.  (Rule 56.1 St. at ¶ 81.)

Chevron #9-9093:  At Chevron #9-9093, 3996 Parkway Drive, Chevron supplied gasoline to this site from prior to the relevant time period until at least 1998.  (Rule 56.1 St. at ¶ 94.)

Tosco #39118:  Union Oil supplied gasoline to this site from prior to the relevant time period until at least November 1996.  (Rule 56.1 St. at ¶ 96.) Union Oil owned the USTs and the real estate at the site from prior to the relevant time period until at least April 1997.  (Rule 56.1 St. at ¶ 95.) Union Oil is a wholly owned subsidiary of Chevron.

### C.   Valero Stations:  Beacon #3519, Beacon-Arco #615, Valley Gas, Red Triangle, East Tulare Street Exxon

Beacon #3519:  Valero leased this station from 1971-1999.  (Rule 56.1 St. at ¶ 55.) Valero had a retail supply contract with this station, 10/20/99 to present.  (Rule 56.1 St. at ¶ 55.)

Beacon-Arco #615:  Valero leased this station from 1998 to present.  (Rule 56.1 St. at ¶ 60.)

Valley Gas:  The Declaration of the Valero Defendants in Anticipation of 30(b)(6) Deposition provides that Ultramar maintained a branded relationship with the station from November 1, 1991, until May 31, 1994, whereby the station purchased Beacon-branded gasoline. (Rule 56.1 St. at ¶ 70.)  After the site was purchased from Ultramar, Beacon and Ultramar gasoline were delivered to the station.  (Rule 56.1 St. at ¶ 70.) Mr. Ahmad testified there was a brand distribution marketing agreement between Petro Group II and Beacon that prohibited him or Petro Group from buying gasoline from anyone other than Ultramar.  (Rule 56.1 St. at ¶ 70.)

As noted above, while branded Valley Gas, the station received gasoline supplies from

18

Total Energy and Sabek Oil.  (Rule 56.1 St. at ¶ 70.)  The Valero Defendants' collective

discovery responses listed Southern Counties Oil (dba Total Energy) as a jobber from 1997

through 2002.  (Rule 56.1 St. at ¶ 70.)  During this time period, a line leak was discovered in

October 1999, and a soil sample taken after a hole in a pipe was discovered and repaired in

November 1999 was found to contain 920,000 ppb MTBE.(Rule 56.1 St. at ¶ 70.) Mr. Moreau's

report explains that MTBE releases likely occurred intermittently between the Fall of 1992 and

2003.  (Rule 56.1 St. at ¶ 75.)

    Red Triangle:  Valero's interrogatory responses indicate that it sold significant volumes

of gasoline in Fresno from 1996 through 2003.  (Rule 56.1 St. at ¶ 45.)  Valero supplied gasoline

containing MTBE to Red Triangle from 1997 through 2002.  (Rule 56.1 St. at ¶ 92.)  After James

Shehadey's purchase of Red Triangle in 2002, Valero remained as one of the main suppliers of

gasoline to Red Triangle in 2002-2003. (Rule 56.1 St. at ¶ 92.)

    East Tulare Street Exxon:  Ultramar leased the station through its Beacon acquisitions

from January 22, 1985, through August 28, 1995.  (Rule 56.1 St. at ¶ 98.)

## VII.   Tesoro Is Liable as a Refiner and Supplier of MTBE Gasoline

### A.   U & A and Valley Gas

    With respect to the U & A station, Southern Counties (Total Energy) a jobber used by

Tesoro for many years, supplied gasoline to the station.  (Rule 56.1 St. at ¶ 40.)  Similarly, with

respect to Valley Gas, several witnesses testified that Southern Counties (Total Energy), the

jobber used by Tesoro, delivered gas to this station.  (Rule 56.1 St. at ¶ 40.)

### B.   Red Triangle

    With respect to the Red Triangle station at 2809 South Chestnut, Gail Blue recalled

19

Tesoro gasoline being delivered. (Rule 56.1 St. at ¶ 38.) In addition to this testimony, bills of lading and highway receipts provided by Red Triangle show Tesoro gasoline was delivered to the Red Triangle station. (Rule 56.1 St. at ¶ 38.) Since 100% of the gasoline supplied to the Red Triangle station came from the Fresno terminal, and Tesoro was a major supplier at the terminal, even without jobber and operator testimony a reasonable jury could conclude that Tesoro gasoline was delivered to the Red Triangle station during the relevant time period.

## VIII. Valero Is Liable as a Refiner and Supplier of MTBE Gasoline

Valero's Motion claims (at 19), "Valero did not do business in California prior to March 16, 2000." The Valero Defendants' Objections and Responses to Plaintiff City of Fresno's First Set of Interrogatories to Defendants ("Responses to First Set of Interrogatories"), however, stated that the Valero Defendants supplied gasoline containing MTBE to Fresno customers prior to the year 2000. (Rule 56.1 St. at ¶ 45.) The Valero Defendants also admit to selling 2-3 million barrels of gasoline containing MTBE within Fresno County each year from 1997 to 2000, with a smaller amount sold in 1996. (Rule 56.1 St. at ¶ 45.) These interrogatory responses were served on behalf of Ultramar and two Valero entities, referenced collectively as the "Valero Defendants."

Some MTBE gasoline shipments and releases may have occurred before "1995 when Ultramar Inc. merged with Diamond Shamrock Corporation," or before "the December 31, 2001 merger of Ultramar Diamond Shamrock Corporation with and into Valero Energy Corporation." *Id.* Whether or not Valero gasoline was delivered to or released at the site, however, Valero has successor liability for Beacon's activities regarding each site. **[\*\*\*ADD CITES FOR SUCCESSOR LIABILITY.]**

20

This Court recognized that the time that the contamination of groundwater occurred is an issue of fact for the jury and the jury may estimate, from evidence presented, a range of time during which the contamination occurred.  591 F. Supp.2d at 275.  The Court's ruling is consistent with expert testimony.  As Marcel Moreau explains, during the time that MTBE gasoline was in use at this station, releases of gasoline were routine, due not only to the ineffectiveness of underground storage tanks, piping systems to dispenser islands, and dispensers themselves, but also due to vapor leaks, individually small but cumulatively significant releases that occur during fuel deliveries, and customer overfilling and dripping during fueling.(Rule 56.1 St. at ¶ 57.)  As defendants' own expert Sam Williams testified:  "I don't know, except under certain specific sites, when an individual release occurred.  The release occurred over a certain time period, usually during the period from '92 to '97 or '98 or '99 . . . ." (Rule 56.1 St. at ¶ 57.) For these reasons, defendants cannot escape liability on the purported ground that Mr. Moreau did not identify a release after a particular date.

A.     <u>**Beacon-Arco #615 (1625 Chestnut Ave.)**</u>

Valero's Motion (at 21-22) asserts that (1) Mr. Moreau did not identify releases after June 1998, and (2) Valero did not do business in California prior to the year 2000.

First, for the reasons explained by the Court, Mr. Moreau, and Mr. Williams, discussed *supra*, Valero is liable regardless of the date of the last identified release.  (Rule 56.1 St. at ¶ 57.)

Second, the Valero Defendants' collective discovery responses stated that they leased the 1625 Chestnut Avenue station from July 24, 1998, to the date of the responses.  (Rule 56.1 St. at ¶ 60.)  As discussed *supra*, even if the station was leased by Ultramar, Valero would have successor liability.

**B.     Beacon #519 (4591 E. Belmont)**

Valero's Motion (at 22) claims that it cannot be liable for this site, because Mr. Moreau noted that a release was discovered in December 1998, and because Valero did not do business in the State of California prior to the year 2000.  (Rule 56.1 St. at ¶ 57.)

The Valero Defendants' collective discovery responses show that this station was leased by them from 1971 through October 20, 1999.  (Rule 56.1 St. at ¶ 55.) The discovery responses further reveal that Valero had a retail supply contract with this site, identified as Beacon #4984, from October 20, 1999, to the date of the responses.  (Rule 56.1 St. at ¶ 55.)  The Declaration of the Valero Defendants in Anticipation of 30(b)(6) Deposition establishes that Arco-branded gasoline was purchased from Ultramar, Inc., and Valero Marketing and Supply Company from September 22, 1999, through December 31, 2003, for resale at the station. (Rule 56.1 St. at ¶ 55.)

Because leaks of gasoline were routine at stations, per Mr. Moreau, and because Ultramar's and Valero's activities continued through the years that MTBE was added to Fresno gasoline, Valero is liable for Fresno's claims for this site.

**C.     East Tulare Street Exxon (4594 East Tulare Street)**

Valero's Motion (at 22-23) claims that it cannot be liable for this site because Mr. Moreau noted that a release was discovered in January 1999, and because Valero did not do business in the State of California prior to the year 2000.

As discussed above, Mr. Moreau established that leaks of gasoline were routine at stations.  In addition, Ultramar leased the station through its Beacon acquisitions from January 22, 1985, through August 28, 1995.  (Rule 56.1 St. at ¶ 98.)  Accordingly, Valero would have successor liability.

22

**D.**     **Red Triangle (2809 South Chestnut Avenue)**

The Valero Defendants' interrogatory responses stated that Valero supplied gasoline containing MTBE to Red Triangle from 1997 through 2002.  (Rule 56.1 St. at ¶ 92.)

There is sufficient evidence for Fresno to pursue its claims against the entities that delivered to Red Triangle, Ultramar, and/or Valero.  Mr. Shehadey produced bills of lading and highway transportation receipts showing deliveries by Red Triangle to Fleet Card Fuels at 2809 South Chestnut Avenue.  (Rule 56.1 St. at ¶ 84.)  All of the gas delivered by Red Triangle to 2809 South Chestnut Avenue came from the Fresno terminal, because they were in such close proximity, only about 2 miles apart.  (Rule 56.1 St. at ¶ 84.)  Mr. Shehadey's testimony and production establish that gasoline containing MTBE was picked up at the Kinder Morgan terminal by Red Triangle, then delivered to 2809 South Chestnut Avenue.  (Rule 56.1 St. at ¶ 84.)

In addition, Mr. Shehadey's documents show that Nella Oil was a shipper of gasoline to Red Triangle.  (Rule 56.1 St. at ¶ 92.)  The Valero Defendants list Nella Oil as a jobber from 1997 through 2003.  (Rule 56.1 St. at ¶ 92.)

**E.**     **Valley Gas (2139 S. Elm St.)**

Valero's Motion (at 24-25) claims that it is not liable for this site because Mr. Moreau's testimony that MTBE releases occurred intermittently between 1992 and 2003 is conjecture, and because Valero did not do business in the State of California prior to the year 2000.  (Rule 56.1 St. at ¶ 69.)

The Valero Defendants' collective discovery responses stated that the Valley Gas site was formerly Beacon #538.  (Rule 56.1 St. at ¶ 70.)  Beacon's lease was terminated November 1,

23

1991. (*Id.*)  Whether or not Valero gasoline was delivered to the site, however, Valero has successor liability for Beacon's lease of the site.

The Valero Defendants' relationship with the site continued beyond the Fall of 1992, when MTBE was first required to be present in Fresno County gasoline.(Rule 56.1 St. at ¶ 70.) The Declaration of the Valero Defendants in Anticipation of 30(b)(6) Deposition provides that Ultramar maintained a branded relationship with the station from November 1, 1991, until May 31, 1994, whereby the station purchased Beacon-branded gasoline.  After the site was purchased from Ultramar, Beacon and Ultramar gasoline were delivered to the station.  (Rule 56.1 St. at ¶ 70.)  Mr. Ahmad testified there was a brand distribution marketing agreement between Petro Group II and Beacon that prohibited him or Petro Group from buying gasoline from anyone other than Ultramar.  (Rule 56.1 St. at ¶ 70.)  The brand name agreement ceased in 1995.  (Rule 56.1 St. at ¶ 70.)

While branded Valley Gas, the station received gasoline supplies from Total Energy and Sabek Oil.  (Rule 56.1 St. at ¶ 70.)  The Valero Defendants' collective discovery responses listed Southern Counties Oil (dba Total Energy) as a jobber from 1997 through 2002.  (Rule 56.1 St. at ¶ 70.)  During this time period, a line leak was discovered in October 1999, and a soil sample taken after a hole in a pipe was discovered and repaired in November 1999 was found to contain 920,000 ppb MTBE.  (Rule 56.1 St. at ¶ 70.)

Mr. Moreau's report explains that MTBE releases likely occurred intermittently between the Fall of 1992 and 2003.  Valero's motion (at 24-25) merely asserts that Mr. Moreau's expert opinions are "mere conjecture."  To the contrary, Fresno's evidence demonstrates the existence of a material question of fact that precludes a grant of summary judgment.

24

## IX.    Conclusion

For the foregoing reasons, the Moving Defendants' Motion for Summary Judgment for

Lack of Evidence Pertaining to Causation should be denied.

Respectfully submitted,

Dated:  April 12, 2013                MILLER, AXLINE & SAWYER
                                      A Professional Corporation


By:    _Michael Axline_____
       MICHAEL AXLINE
       Attorneys for plaintiff City of Fresno
       MILLER, AXLINE & SAWYER
       A Professional Corporation
       1050 Fulton Avenue, Suite 100
       Sacramento, CA  95825-4225
       Telephone:  (916) 488-6688

25