UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | : : : | Master File No. 1:00–1898 MDL 1358 (SAS) M 21-88 |
| | : : | |
| This document relates to: | : : | |
| *City of Fresno v. Chevron U.S.A., Inc., et al.,* Case No. 1:04-cv-04973 | : : : | |
| | : | |

**DECLARATION OF MICHAEL D. AXLINE IN SUPPORT OF PLAINTIFF CITY OF FRESNO'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR LACK OF EVIDENCE PERTAINING TO CAUSATION (EXHIBITS 17 - 46)**

## DECLARATION OF MICHAEL D. AXLINE

I, Michael D. Axline, declare:

1.     I am an attorney admitted to practice law in the State of California, and I am associated with the law firm of Miller, Axline & Sawyer, attorneys for plaintiff City of Fresno in this action.

2.     All of the exhibits attached hereto are documents are drawn from the litigation files kept in the ordinary course of business at Miller, Axline & Sawyer, and were copied either by me or by someone working directly under my supervision.

3.     Attached as Exhibit 1 is a true and correct duplicate copy of the First Amended Complaint in this Action, filed on November 18, 2004.

4.     Attached as Exhibit 2 is a true and correct duplicate copy of the letter from Mike Axline and Evan Eickmeyer to Jeffrey Parker, dated February 8, 2012.

5.     Attached as Exhibit 3 is a true and correct duplicate copy of the letter from Mike Axline and Evan Eickmeyer to Brian Ledger, dated March 6, 2013.

6.     Attached as Exhibit 4 is a true and correct duplicate copy of Defendant Ultramar, Inc.'s Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005.

7.     Attached as Exhibit 5 is a true and correct duplicate copy of excerpts from the transcript of the August 10, 2011 deposition of Gary Beacom.

8.     Attached as Exhibit 6 is a true and correct duplicate copy of excerpts from the Valero Defendants' Objections and Responses to Plaintiff City of Fresno's First Set of

2

Interrogatories to Defendants.

9.      Attached as Exhibit 7 is a true and correct duplicate copy of Chevron U.SA. Inc.'s Supply Declaration of Frank G. Soler and exhibits thereto, dated April 18, 2011.

10.     Attached as Exhibit 8 is a true and correct duplicate copy of Defendant Union Oil Company of California's Declaration of Grace N. Chan in Response to CMO #75, dated April 11, 2011.

11.     Attached as Exhibit 9 is a true and correct duplicate copy of the Further Response of Defendant Chevron U.S.A Inc. To Plaintiffs' Preliminary Set of Interrogatories re: Defendant Identification, dated August 30, 2004.

12.     Attached as Exhibit 10 is a true and correct duplicate copy of the Valero Defendants' Answers and Objections to Plaintiffs' Preliminary Set of Interrogatories re: Defendant Identification, dated August 30, 2004.

13.     Attached as Exhibit 11 is a true and correct duplicate copy of excerpts from the transcript of the March 16, 2011 deposition of James Shehadey and Exhibit 5 attached thereto.

14.     Attached as Exhibit 12 is a true and correct duplicate copy of excerpts from Marcel Moreau's Expert Report, dated November 2, 2011.

15.     Attached as Exhibit 13 is a true and correct duplicate copy of an excerpt from the transcript of the June 4, 2012 deposition of Sam Williams.

16.     Attached as Exhibit 14 is a true and correct duplicate copy of excerpts from the transcript of the February 16, 2011 deposition of Imtiaz Ahmad.

17.     Attached as Exhibit 15 is a true and correct duplicate copy of Defendant Exxon Mobil Corporation's Responses and Objections to Plaintiffs' Preliminary Set of Interrogatories

3

Regarding Defendant Identification, dated August 30, 2004.

18.     Attached as Exhibit 16 is a true and correct duplicate copy of excerpts from the transcript of the January 11, 2013 Status Conference before Honorable Shira A. Scheindlin.

19.     Attached as Exhibit 17 is a true and correct duplicate copy of the transcript of the May 10, 2001 deposition of Dickman Lum in the *South Tahoe Public Utility District v. Atlantic Richfield Co.* case.

20.     Attached as Exhibit 18 is a true and correct duplicate copy of excerpts from the transcript of the June 8, 1999 deposition of Elwanda Kovich in the *South Tahoe Public Utility District v. Atlantic Richfield Co.* case.

21.     Attached as Exhibit 19 is a true and correct duplicate copy of excerpts from Marcel Moreau's Site Specific Report, dated November 2, 2011.

22.     Attached as Exhibit 20 is a true and correct duplicate copy of Union Oil Company of California's Amendment to Its Supply Declaration with Declaration attached, dated August 9, 2012.

23.     Attached as Exhibit 21 is a true and correct duplicate copy of Union Oil Company of California's Supplemental and Amended Response to Plaintiff City of Fresno's First Set of Interrogatories, dated August 12, 2011.

24.     Attached as Exhibit 22 is a true and correct duplicate copy of excerpts from the transcript of the March 18, 2011 deposition of Gail Blue.

25.     Attached as Exhibit 23 is a true and correct duplicate copy of excerpts from the transcript of the March 17, 2011 deposition of Glen R. Blue.

26.     Attached as Exhibit 24 is a true and correct duplicate copy of excerpts from the transcript of the March 16, 2011 deposition of Narinder Singh.

27.     Attached as Exhibit 25 is a true and correct duplicate copy of excerpts from Defendant Exxon Mobil Corporation's Responses to Plaintiff City of Fresno's First Set of Interrogatories.

28.     Attached as Exhibit 26 is a true and correct duplicate copy of excerpts from the transcript of the March 29, 2011 deposition of James Clements.

29.     Attached as Exhibit 27 is a true and correct duplicate copy of excerpts form the transcript of the April 4, 2011 deposition of Garabed Bedirian.

30.     Attached as Exhibit 28 is a true and correct duplicate copy of excerpts from the February 16, 2011 deposition of Shirley McMurphy Ahmad.

31.     Attached as Exhibit 29 is a true and correct duplicate copy of Exhibit B from the Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants.

32.     Attached as Exhibit 30 is a true and correct duplicate copy of excerpts from the transcript of the February 9, 2011 deposition of Joel Hohenshelt.

33.     Attached as Exhibit 31 is a true and correct duplicate copy of excerpts from the transcript of the August 11, 2011 deposition of Jatinder Paul Dhillon.

34.     Attached as Exhibit 32 is a true and correct duplicate copy of excerpts from the transcript of the August 17, 2011 deposition of Bryan Leonard Moe.

35.     Attached as Exhibit 33 is a true and correct duplicate copy of excerpts from the transcript of the August 17, 2011 deposition of Thomas K. Baughs and exhibits attached thereto.

36.     Attached as Exhibit 34 is a true and correct duplicate copy of excerpts from the

transcript of the August 9, 2011 deposition of David Benjamin.

37.    Attached as Exhibit 35 is a true and correct duplicate copy of excerpts from the transcript of the August 11, 2011 deposition of Ellis (Ike) Pursell.

38.    Attached as Exhibit 36 is a true and correct duplicate copy of the Declaration of the Valero Defendants in Anticipation of 30(b)(6) Deposition, dated _.

39.    Attached as Exhibit 37 is a true and correct duplicate copy of excerpts from the transcript of the July 27, 2011 deposition of Baldev Singh Sandhu.

40.    Attached as Exhibit 38 is a true and correct duplicate copy of Defendant Exxon Mobil Corporation's Supplemental Response to Plaintiff City of Fresno's First Set of Interrogatories, dated August 30, 2011.

41.    Attached as Exhibit 39 is a true and correct duplicate copy of The Shell Defendants' Responses to Plaintiff's First Set of Interrogatories, dated August 30, 2004.

42.    Attached as Exhibit 40 is a true and correct duplicate copy of excerpts from the transcript of the July 29, 1999 deposition of Mary F. Morgan.

43.    Attached as Exhibit 41 is a true and correct duplicate copy of excerpts from the transcript of the July 1, 1999 deposition of Kelly J. Hammar.

44.    Attached as Exhibit 42 is a true and correct duplicate copy of excerpts from the transcript of the September 22, 2000 deposition of Thomas Hooks.

45.    Attached as Exhibit 43 is a true and correct duplicate copy of excerpts from the transcript of the July 22, 1999 deposition of Bob Simonson.

46.    Attached as Exhibit 44 is a true and correct duplicate copy of excerpts from the transcript of the January 12, 2001 deposition of Dixon B. Smith.

47.     Attached as Exhibit 45 is a true and correct duplicate copy of Valero Corporate Representative Depositon - Early Knowledge and Taste & Odor.

48.     Attached as Exhibit 46 is a true and correct duplicate copy of selected Bills of Lading and Highway Receipts provided by Red Triangle.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Respectfully submitted,

DATED: April 12, 2013                    **MILLER, AXLINE & SAWYER**
                                         A Professional Corporation

                                         By: _Michael Axline_____
                                              MICHAEL D. AXLINE
                                              Attorneys for Plaintiff


MILLER, AXLINE & SAWYER
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688

7

# EXHIBIT 17

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

SOUTH TAHOE PUBLIC UTILITY DISTRICT,

               Plaintiff,

        vs.                      No. 999128

ATLANTIC RICHFIELD COMPANY

("ARCO"), et al.,

               Defendants.

_____/

**CERTIFIED COPY**

Deposition of

DICKMAN LUM

Thursday, May 10, 2001

Reported by:
SHARON CABELLO, RPR
CSR No. 3080
Job No. 26204



ESQUIRE™
DEPOSITION SERVICES

1801 I Street • First Floor • Sacramento, CA 95814
916.448.0505 • Fax 916.448.8726 • 800.610.0505

1    refiners, and then it's the refiners who then at that

2    time owning the fuel would be in communication with

3    Kinder Morgan to nominate the tender slots.

4    Q.      MS. O'REILLY:  When you refer to refineries,

5    in the Sacramento area can you identify what refineries

6    -- let's start with the last five years.  What

7    refineries place gasoline into the pipeline for the

8    Sacramento area terminals?

9            MR. DUCHESNEAU:  Excuse me for a moment.

10           Objection, that's compound.

11           THE WITNESS:  There are no refineries in the

12   Sacramento area.  The refineries that supply gasoline

13   to the Sacramento area are located in the San Francisco

14   Bay Area.

15           In the San Francisco Bay Area there is a

16   Chevron refinery, an Equilon refinery, the Valero

17   refinery, and for a period of time there were two Tosco

18   refineries, which now one of the Tosco refineries has

19   been sold to Ultramar Diamond Shamrock.

20   Q.      MS. O'REILLY:  And prior to Valero, who owned

21   that refinery located in Benicia?

22   A.      Exxon.

23   Q.      And prior to Tosco owning two refineries, did

24   anyone own one of those refineries prior to Tosco?

25           MR. DUCHESNEAU:  You are asking his

                                                        44

1    understanding?

2         MS. O'REILLY:  Right.

3         THE WITNESS:  One of the Tosco refineries was

4    previously owned by Unocal.

5    Q.      MS. O'REILLY:  Do you have an understanding as

6    to which refinery was previously owned by Unocal?

7    A.      The one that's referred to as Tosco Rodeo.

8    The other Tosco facility in Avon is the one that was

9    sold to Ultramar Diamond Shamrock, and that has for a

10   long time been a Tosco refinery.

11   Q.      Other than the entities that we have just

12   discussed, are there any other entities -- I want to

13   take it back before the sale of Benicia to Valero and

14   before the sale of Avon to Ultramar Diamond Shamrock.

15        Prior to that time were there any other

16   entities besides Chevron, Exxon, Equilon and Tosco that

17   would nominate tenders in the Kinder Morgan pipeline,

18   to your understanding?

19        MR. DUCHESNEAU:  Objection, assumes facts,

20   vague, lacks foundation.

21        THE WITNESS:  I believe the Equilon refinery

22   was previously owned by Shell.  And I am not sure how

23   far back in time you want to go, but that's probably my

24   extent of my understanding, unless I look back at some

25   records.

45

## REPORTER'S CERTIFICATE

1

2

3        I certify that the witness in the foregoing

4    deposition,

5                    DICKMAN LUM,

6    was by me duly sworn to testify in the within-entitled

7    cause; that said deposition was taken at the time and

8    place therein named; that the testimony of said witness

9    was reported by me, a duly Certified Shorthand Reporter

10   of the State of California authorized to administer

11   oaths and affirmations, and said testimony was

12   thereafter transcribed into typewriting.

13        I further certify that I am not of counsel or

14   attorney for either or any of the parties to said

15   deposition, nor in any way interested in the outcome of

16   the cause named in said deposition.

17        IN WITNESS WHEREOF, I have hereunto set my

18   hand this 17th day of May, 2001.

19

20

21                    _Sharon Cabello_

22                    SHARON CABELLO
                       Certified Shorthand Reporter
23                    State of California
                       Certificate No. 3080

24

25

                                                    111

ESQUIRE DEPOSITION SERVICES (916) 448-0505

# EXHIBIT 18

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF SAN FRANCISCO

3                          --oOo--

4   SOUTH TAHOE PUBLIC UTILITY         )
    DISTRICT,                          )
5                                      )
                   Plaintiff,          )
6                                      )
                   vs                  )        No.   999128
7                                      )
    ATLANTIC RICHFIELD COMPANY         )
8   ("ARCO"); ARCO CHEMICAL COMPANY;)
    SHELL OIL COMPANY; CHEVRON         )
9   U.S.A., INC.; EXXON CORPORATION;)
    B.P. AMERICA, INC.; TOSCO          )
10  CORPORATION; ULTRAMAR, INC.;       )
    BEACON OIL CO.; USA GASOLINE       )
11  CORPORATION; SHELL OIL PRODUCTS )
    CO.; TERRIBLE HERBST, INC.;        )
12  ROTTEN ROBBIE; J.E. TVETEN         )
    CORP.; TAHOE TOM'S GAS STATION; )
13  THE SOUTHLAND CORP.; PARADISE      )
    CHEVRON; and DOES 1 through 600,)
14  inclusive,                         )
                                       )
15                 Defendants.         )
                                       )
16

17                      --oOo--
                  TUESDAY, JUNE 8, 1999
18                    1:05 P.M.
                      --oOo--
19                DEPOSITION OF
                  ELWANDA KOVICH
20                    --oOo--

21

22

23

24  CATHLEEN SLOCUM, CSR
    License No. 2822
25

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    you see.  You'd see the MTBE inventory going down and the

2    finished product tanks going up.

1:45:30 pm   3    Q    Okay.  And then is MTBE ever, does it ever exit the

4    refinery without being blended with gasoline?

5    A    Not to my knowledge.

6    Q    So you never, the refinery never sells MTBE itself as a

7    product?

8    A    I don't recall if we've ever had, if we've ever done

9    that before but typically we use it so we don't -- we're not

10   in the business of selling it.  We're in the business of

11   buying it.

12   Q    Okay.  And then you're in the business of selling

13   gasoline, correct?

1:46:00 pm   14   A    That's correct.  Well, we're in the business of making

15   gasoline.

16   Q    Making gasoline.  At some point the finished gasoline

17   then leaves the refinery, correct?

18   A    The finished gasoline, yes, it leaves the refinery.

19   Q    How may it do that?

20   A    It can do that either by pipeline or it can do it to a

21   marketing rack across the street.

22   Q    What's a marketing rack?

23   A    It's a terminal in which trucks can come up.  But it's

24   a marketing facility, it's not the refinery's.

1:46:30 pm   25   Q    Is that an Equilon facility?

31

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    A    Yes.

2    Q    Okay.  And at the point it goes into a pipeline, is

3    that an Equilon pipeline?

4    A    No.  It is a Kinder-Morgan pipeline.

5    Q    Okay.  And at the point that the finished product

6    enters the Kinder-Morgan pipeline -- and I'll ask about the

7    rack in a moment --

8    A    Uh-huh.

9    Q    -- is there a record kept of that as well?

10   A    Yeah.  We show the shipments.  They're referred to as

11   batches.  As the product leaves we account for that shipment

1:47:00 pm 12   by batch.

13   Q    Okay.  And is that a volumetric record?

14   A    Yes.

15   Q    Is it exclusively volumetric?

16   A    Pretty much, yes.

17   Q    There's no --

18   A    It's a date and the amount of the shipment, gravity and

19   the temperature and so it's the properties around the

20   product.

21   Q    What determines how much product goes into the pipeline?

22   A    There's a meter on the pipeline.  It is a custody

1:47:30 pm 23   transfer meter.  And that's what is used to determine the

24   amount of the shipment.

25   Q    Is there an inspiration for determining the amount, is

                                                              32

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2

3          I, CATHLEEN S. SLOCUM, a Certified Shorthand

4   Reporter, in and for the State of California, duly appointed

5   and commissioned to administer oaths, do hereby certify:

6          That I am a disinterested person herein; that the

7   witness, ELWANDA KOVICH, named in the foregoing deposition,

8   was by me duly sworn to testify the truth, the whole truth,

9   and nothing but the truth; that the deposition was reported

10  in shorthand by me, Cathleen S. Slocum, a Certified

11  Shorthand Reporter of the State of California, and

12  thereafter transcribed into typewriting.

13         IN WITNESS WHEREOF, I have hereunto set my hand as

14  Certified Shorthand Reporter on this __11__ of June, 1999.

15

16

17

18                              _Cathleen Slocum_
                                Cathleen Slocum
19                              Certified Shorthand Reporter
                                License Number 2822
20

21                      --o0o--

22

23

24

25

                                                            88

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

# EXHIBIT 19

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")    Master File No. 1:00-1898

Products Liability Litigation    MDL 1358 (SAS)

    M21-88

## This Document Relates to:

*City of Fresno v. Chevron U.S.A Inc.., et al.*
*No. 04 Civ. 04973 (SAS)*

## Expert Site Specific Report of Marcel Moreau
Marcel Moreau Associates
Portland, Maine

November 2, 2011

# Fresno Valley Gas

## 2139 South Elm St., Fresno

**Note:** Station known as Beacon Station No. 528, Ultramar Station No. 538, and Arco/Ultramart.

## MAJOR MILESTONES

| | |
|---|---|
| 1975 | Three 10,000-gallon steel tanks and piping were installed, with no overfill protection or spill containment [undated document]. |
| Nov 18, 1985 | A new convenience store building was reportedly completed, and one dispenser island was removed. |
| April 17, 1991 | Three soil borings were drilled to evaluate petroleum hydrocarbons in soil and groundwater at the site as part of a real estate transaction. Petroleum hydrocarbons were not found in soil samples; groundwater was not encountered. |
| April 17, 1992 | Several piping leaks were discovered via a helium test. |
| Dec 8, 1998 | New construction permit application included removal of the surface cover to the tanks, internal sandblasting and coating, installation of cathodic protection, installation of a Veeder Root tank monitor and line leak detection. |
| Oct 25, 1999 | A line leak was discovered by helium testing. |
| Nov 29, 1999 | A soil sample collected on the north side of the southern dispenser island, where a hole in a pipe was discovered and repaired, was found to contain 31,000,000 ppb TPHg and 920,000 ppb MtBE. |
| Mar 2004 | Bravo boxes were added beneath the dispensers.  Dispenser containment not present previously [6 26 2003]. |
| May 18, 2004 | Shallow soil beneath the dispensers was reportedly "significantly impacted by fuel hydrocarbons", with a maximum MtBE concentration of 164,000 ppb.  Additional investigation was recommended. |

| Jun 20, 2007 | Official Inspection Report notes: "Facility still under piping replacement and under red tag regulation. Business is still closed." No other references to red tag were reviewed. |
|---|---|
| Feb 28, 2008 | A final construction inspection report documented the presence of: |

- Single-wall steel USTs, with lining and cathodic protection.
- Overspill and overfill prevention.
- DW FRP piping, with continuous monitoring.

## SPILL/LEAK EVENT CHRONOLOGY

| Aug 14, 1989 | A tightness testing report noted a leak at dispenser #4 in the vapor line and a leak at dispenser #6. The unleaded turbine was also found to be leaking. |
|---|---|
| Aug 21, 1989 | An interoffice memo questioned the accuracy of some of the Aug 1989 test results. Further testing confirmed a leak in the premium NL line and the NL turbine, and both were repaired. [8/25/1989] |
| Sept 8, 1989 | A letter to Fresno County stated that the super line failed PetroTite line testing on Aug 14, 1989. The line was uncovered and repaired and passed a line test on 8/15/1989. |
| Oct 5, 1990 | Tank test results indicated a loss of -0.403 on the premium unleaded. |
| Oct 25, 1990 | Inspection Report documented that the super NL product line was repaired; the overfill protection, fill pipe, and vent pipe were also replaced. |
| April 17, 1992 | Official Inspection Report: An assessment of the exposed piping indicated that the metal piping was rusted and corroding; several leaks in the piping were found via a helium test. One leak was reportedly detected at the dispenser riser and another at the fill box. |
| July 30, 1999 | Official Inspection Report: Inspector noted that gasoline was being dispensed at the NL pumps, in violation of an order not to dispense fuel until the dispenser had been repaired, tested, and approved. |
| Oct 25, 1999 | A line leak, discovered by helium testing, was reported on the south island in front of the canopy column. |
| Nov 5, 1999 | UST Installation Inspection Record: Because of a leak (see Oct 25, 1999), the 87 NL piping was replaced between the southern dispenser |

island and the market.  A soil sample was collected for TPHg, BTEX and MtBE analysis, and strong odors were noted.


## SOIL/GROUNDWATER CONTAMINATION CHRONOLOGY

| | |
|---|---|
| April 17, 1991 | Subsurface Environmental Investigation Report:  Three soil borings (B1 to B3) were drilled to 35 to 50 ft bgs (max depth) to evaluate petroleum hydrocarbons in soil and groundwater at the site as part of a real estate transaction.  Soil samples were analyzed for TPHg and BTEX, and the results were ND for the most part (two toluene hits at 15 ft bgs).  Groundwater was not encountered.   [5/8/1991] |
| Nov 29, 1999 | Soil sample S-1 was collected at 5 ft bgs on 11/5/1999 on the north side of the southern dispenser island, where a hole in a pipe was discovered and repaired.  The sample was found to contain 31,000,000 ppb TPHg and 920,000 ppb MtBE. |
| May 18, 2004 | Soil samples were collected from beneath the six dispensers at the site on March 19 and 30, 2004, and tested for TPHg, BTEX, MtBE, and other oxygenates.  The soil beneath the dispensers was reportedly "significantly impacted by fuel hydrocarbons."  Four of six samples had TPHg levels greater than 1,000,000 ppb.  The highest concentrations were in samples taken at the southern dispenser island at 4 ft bgs; the maximum TPHg concentration was 6,022,000 ppb and the maximum MtBE concentration was 164,000 ppb.  Another sample from the southern dispenser island had 38,000 ppb MtBE.  One sample from the northern dispenser island had 5,000 ppb of MtBE.  Additional investigation was recommended. |
| April 9, 2007 | Results of Soil Sampling Report:  Soil samples were collected during the removal of the dispenser system in Dec 2006, but the results were never reported.  Nine samples were collected with hand augers in February of 2007.  MtBE was detected in two samples from the southern dispenser island, at 24 ppb and 27,000 ppb. |


## IDENTIFICATION OF MTBE RELEASES

### Tank Area Releases

The unleaded turbine pump was observed to be leaking in August of 1989 and repaired shortly thereafter.  When this release began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in 1989, so it is unlikely that this release

contributed to the MtBE contamination at this facility.

A leak in a fill riser was detected and repaired in April of 1992.  When this release began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in the spring of 1992, so it is unlikely that this release contributed to the MtBE contamination at this facility.

Piping and Dispenser Area Releases

Releases were observed in the piping associated with dispensers #4 and #6 in August of 1989 and repaired shortly thereafter.  Releases from dispensers are common (see general report in this case).  When these releases began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in 1989, so it is unlikely that these releases contributed to the MtBE contamination at this facility.

A piping leak in a premium dispenser was detected and repaired in October of 1990.  Releases from dispensers are common (see general report in this case).  When this release began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in 1990, so it is unlikely that this release contributed to the MtBE contamination at this facility.

A piping leak in a dispenser riser was detected and repaired in April of 1992.  Releases from dispensers and adjacent piping are common (see general report in this case).  When this release began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in the spring of 1992, so it is unlikely that this release contributed to the MtBE contamination at this facility.

A leak in the unleaded line was repaired in August of 1999.  Unleaded fuel was apparently being dispensed despite the leak.  The exact location of the leak is not known.  When this release began is not known.  The volume released is not known.  MtBE was commonly present in California gasoline in 1999, so it is likely that this release contributed to the MtBE contamination at this facility.

A piping leak near the southern dispenser islands was repaired in November of 1999, and MtBE contaminated soil was detected.  When the leak began is not known.  The volume of the release is not known.

MtBE was detected in three of six soil samples collected in March of 2004 from beneath the dispensers at the site.  When these releases occurred is not known, but they likely occurred intermittently between the fall of 1992 when MtBE was first required to be present in Fresno County gasoline,[1] and 2003 when MtBE was removed from California gasoline.  The exact

---

[1] "Areas Participating in the Oxygenated Gasoline Program," Energy Information Administration, Department of Energy,  http://www.eia.gov/steo/special/oxy2.html#Original,  accessed on 9/15/2011.

dispenser components that leaked are not known, but dispensers and adjacent piping are frequent sources of releases (see general report in this case). The amount released is not known.

MtBE was detected in two of nine soil samples collected in February of 2007 from beneath the dispensers at the site. When these releases occurred is not known, but they likely occurred intermittently between the fall of 1992 when MtBE was first required to be present in Fresno County gasoline,[2] and 2003 when MtBE was removed from California gasoline. The exact components that leaked are not known, but dispensers and adjacent piping are frequent sources of releases (see general report in this case). The amount released is not known.

<u>Customer Spills</u>

Small spills are common during vehicle fueling activities and no doubt occurred throughout the time this facility was in operation. Fueling spills may have contributed to the MtBE contamination detected in the dispenser area at this facility.

---

[2] Ibid.

# EXHIBIT 20



LEXISNEXIS® FILE & SERVE
45825837
E-SERVICE
Aug 9 2012
6:29PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether ("MTBE")   MDL 1358 (SAS)
Products Liability Litigation

**This Document Relates To:**

*City of Fresno v. Chevron U.S.A. Inc., et al.*
04 Civ. 04973

---

## UNION OIL COMPANY OF CALIFORNIA'S AMENDMENT TO ITS SUPPLY DECLARATION

I, Frank G. Soler, declare:

1.      I am an Assistant Secretary for Defendant, Union Oil Company of California ("Union Oil").

2.      In my prior declaration in this case served on April 19, 2011, (attached as Exhibit A), I stated that "MTBE was blended into gasoline at San Francisco Refinery ("SFR") starting in 1986 but was not blended in all grades." Based upon newly discovered information, the actual date that MTBE was first blended into gasoline at the San Francisco Refinery (SFR) by Union Oil was in 1987, and not 1986 as previously stated. It remains accurate that MTBE from the SFR was not blended in all grades of gasoline.

3.      No one person for Union Oil knows all of the matters stated herein, and therefore this declaration was prepared with the assistance and advice of representatives of and counsel for, Union Oil, upon whose assistance and advice I have relied. This declaration is limited by the records and information still in existence and recollected thus far in the discovery of the facts of this case.

4.     Union Oil reserves the right to supplement or amend this declaration should additional information become available.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _____ day of August, 2012, at San Ramon, California.

Frank G. Soler, Assistant Secretary

# EXHIBIT A



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

In Re: Methyl Tertiary Butyl Ether ("MTBE")          MDL 1358 (SAS)
Products Liability Litigation

**This Document Relates To:**

*City of Fresno v. Chevron U.S.A. Inc., et al.*
04 Civ. 04973

_____

## UNION OIL COMPANY OF CALIFORNIA'S SUPPLY DECLARATION

I, Frank G. Soler, declare:

1.      I am Assistant Secretary for Defendant Union Oil Company of California ("Union Oil"). Union Oil maintains electronic records of gasoline deliveries to retail gasoline stations. True and correct copies of printouts from these records are attached as Exhibits A and B. The column headings are defined as follows:

"Customer number" is a distinct number assigned to each retail facility customer.

"Name 1" is the customer name.

"CIF Address 1" is the street address for the retail facility.

"CIF Address 2" is the City, State, and Zip Code for the retail facility.

"State code" is a distinct number assigned to the state for the retail facility.

"Retail unit" is a distinct number assigned to each Union Oil branded facility.

"Class of Trade" describes the type of facility.

"Shipping Point" is a distinct number assigned to the products terminal from which the gasoline was delivered.

"Accounting year" is an accounting date for the transaction.

"Accounting month" is an accounting date for the transaction.

"Invoice Date" is the date of delivery.

"Product Code" is a distinct code assigned to each type of gasoline refined by Union Oil.

"Full Description" is a description of the product associated with a distinct product code.

"Volume" is the volume of product delivered in gallons.

"Price" is the price of product per gallon.

"Gross dollars" is gross amount realized on the transaction.

The following product codes and names represent products that Union Oil can identify as having contained MTBE:

- 00445000000 - UNOCAL PERF PLUS 89 W/10% MTBE;
- 00455000000 - UNOCAL UNLEADED PLUS 87 W/10% MTBE;
- 00945000000 - UNOCAL HIGH PERF 92 W/10% MTBE; and
- 00975000000 - UNOCAL HIGH PERF 92 W/10% MTBE.

In addition, the following product codes represent products that Union Oil can identify as having contained MTBE to the extent they relate to gasoline produced refined after 1992:

- 002310000000;
- 004670000000;
- 004680000000;
- 004730000000;
- 004740000000;
- 004830000000;
- 004840000000;
- 009720000000;
- 09730000000; and
- 009740000000.

In addition, based on information that is currently available, the following Product codes and names represent products that may have contained MTBE:

[Insert list from Exhibit D to Union Oil's CMO #4 response in OCWD].

2.    I have reviewed Union Oil's electronic records, and I am familiar with them. In particular, I have reviewed the electronic files to determine whether Union Oil delivered gasoline to the sites identified in Plaintiff's discovery responses. Union Oil's records reflect deliveries of gasoline to two of those sites.

3.    **1605 North Cedar Avenue.** Union Oil supplied gasoline to the station located at 1605 North Cedar Avenue from prior to the relevant time period until November 1996. The dates and amounts of sales to this site, including the product code and name for each sale, are set forth in the print-out attached to this declaration as Exhibit A. Union Oil supplied this station from a terminal in Fresno, and on two occasions from a terminal in Stockton. On information and belief, Union Oil supplied this station with gasoline refined at its San Francisco refinery. MTBE was blended into gasoline at San Francisco Refinery SFR starting in 1986 but was not blended in all grades.    Due to federal and state oxygenate requirements in 1992 and 1996, MTBE blending increased at such times. On information and belief, Union Oil owned the USTs and real estate at this site from prior to the relevant time period until April 1997. Union Oil did not own or lease the real estate or USTs at the subject site after April 1997, nor did Union Oil supply gasoline to the subject site after that time.

4.    **5785 North 1st Street.** Union Oil supplied gasoline to the station located at 5785 North 1st Street between September 1992 and March 1997. The dates and amounts of sales to this site, including the product code and name for each sale, are set forth in the print-out attached to this declaration as Exhibit B. On information and belief, Union Oil supplied this station with gasoline refined at its San Francisco refinery. On information and belief, Union Oil did not own the real estate or the USTs at the subject site prior to April 1997. Union Oil has searched it s records and has not located any

3

information that shows that it owned or leased the real estate or USTs at the subject site prior to April 1997. Documents produced by third parties suggest that persons other than Union Oil owned the tanks and real estate at the subject site between 1986 and 1997. *See* FCDEH-FRESNO-010618, 010608, 010604, 010602, 010555. Union Oil did not own or lease the real estate or the USTs at the subject site after April 1997, nor did Union Oil supply gasoline to the subject site after that time.

　　　5.　　**101 Roosevelt.** On information and belief, Union Oil supplied this station with gasoline refined at its San Francisco refinery. Union Oil's electronic records do not reflect the sale or delivery of gasoline to this site. Due to the passage of time and the divesture of Union Oil's marketing and refining assets to Tosco in April 1997, Union Oil has not identified records, other than what has been produced, in its possession, custody, or control reflecting gasoline deliveries or sales to this site. Union Oil owned the USTs at the subject site from prior to the relevant time period until December 1995 when they were removed. Union Oil did not supply gasoline to this site after that time. Union Oil has not owned USTs at this site since that time, nor has it supplied gasoline to the subject site after that time. Union Oil owned the real estate at this site from prior to the relevant time period until April 1997 when the property was sold to Tosco.

　　　6.　　Based on Union Oil's records it did not deliver gasoline to, supply, own, lease, or operate any of the other stations identified in Plaintiff's discovery responses.

　　　7.　　No one person for Union Oil knows all of the matters stated herein, and therefore this declaration was prepared with the assistance and advice of representatives of and counsel for, said Union Oil upon whose assistance and advice I have relied. This declaration is limited by the records and information still in existence, presently recollected and thus far discovered.

　　　8.　　Union Oil reserves the right to supplement or amend this declaration should additional information become available.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 18ᵗʰ day of April, 2011, at San Ramon, California.

Frank G. Soler, Assistant Secretary

# EXHIBIT 21

LEXISNEXIS FILE & SERVE
39269742
E-SERVICE
Aug 12 2011
09:15PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")          MDL 1358 (SAS)
Products Liability Litigation

**This Document Relates To:**

*City of Fresno v. Chevron U.S.A. Inc., et al.*
04 Civ. 04973

## UNION OIL COMPANY OF CALIFORNIA'S SUPPLEMENTAL AND AMENDED RESPONSE TO PLAINTIFF CITY OF FRESNO'S FIRST SET OF INTERROGATORIES

Union Oil Company of California ("Union Oil") submits the following supplemental and amended objections and responses to Plaintiff City of Fresno's First Set of Interrogatories to Union Oil dated September 2, 2008 ("Plaintiff's Interrogatories").

### PRELIMINARY STATEMENT

Union Oil limits its responses to the stations identified by Plaintiff in response to case management number sixty (the "Stations"). Union Oil's records reflect deliveries of product to six of those Stations, which are listed below. Due to the passage of time and Union Oil's sale of its marketing and refining assets to Tosco in April 1997, Union Oil no longer has much of the information requested by Plaintiff's Interrogatories.

**1605 North Cedar Avenue.** Union Oil supplied gasoline to the station located at 1605 North Cedar Avenue from prior to the relevant time period until November 1996. The dates and amounts of sales to this site, including the product code and name for each sale, are set forth in the spreadsheet attached to Union Oil's Supply Declaration. During that time period, Union Oil supplied this station with gasoline refined at its San Francisco refinery. MTBE was blended into gasoline at the San Francisco refinery starting in 1986 but was not blended in all grades. Due to

federal and state oxygenate requirements in 1992 and 1996, MTBE blending increased at such times. During that time period, Union Oil supplied this station almost exclusively from a terminal in Fresno. On a few occasions, Union Oil supplied this station from terminals in Bakersfield, Richmond, and Stockton. On information and belief, Union Oil owned the USTs and real estate at this site from prior to the relevant time period until April 1997. Union Oil did not own or lease the real estate or USTs at the subject site after April 1997, nor did Union Oil supply gasoline to the subject site after that time.

For additional information relating to this site, Union Oil refers Plaintiff to:

- CHEVMDL1358_FRES_00000001435 - CHEVMDL1358_FRES_00000002065;
- CHEVMDL1358_FRES_00000006508- CHEVMDL1358_FRES_00000006900; and
- CHEVMDL1358_FRES_00000008439-CHEVMDL1358_FRES_00000008518.

Union Oil also refers Plaintiff to the documents produced by Fresno County and Regional Water Quality Control Board for information relating to this station. The burden of deriving or ascertaining the answers to Plaintiff's Interrogatories from the above documents will be substantially the same for Union Oil and Plaintiff.

**5785 North 1st Street.** Union Oil supplied gasoline to the station located at 5785 North 1st Street between September 1992 and March 1997. The dates and amounts of sales to this site, including the product code and name for each sale, are set forth in the spreadsheet attached to Union Oil's declaration. During that time period, Union Oil supplied this station with gasoline refined at its San Francisco refinery. In addition, during that time period, Union Oil supplied this station almost exclusively from a terminal in Fresno. On a few occasions, Union Oil supplied this station from terminals in Richmond and Stockton. On one occasion, Union Oil supplied this station from a terminal in Sacramento. On information and belief, Union Oil did not own the real estate or the USTs at the subject site during the relevant time period. Documents produced by third parties suggest that persons other than Union Oil owned the tanks and real estate at the subject site between 1986 and 1997. *See* FCDEH-FRESNO-010618, 010608, 010604, 010602,

010555. Union Oil did not own or lease the real estate or the USTs at the subject site after April 1997, nor did Union Oil supply gasoline to the subject site after that time.

Based on documents produced by the RWQCB, it appears that in November 2003, over 7 years after Union Oil had supplied gasoline to the site, an investigation was undertaken at the site in connection with the removal of dispensing and underground storage tank equipment. RWQCB-FRESNO-013019-013049.   Moore Services, Inc, the environmental consultant assessing the site, concluded that based on "analytical results of the subsurface soil samples, concentration of residual gasoline in soils, and separation of these soils to groundwater, which is anticipated to be approximately 95 feet, the risk is very low that continued downward migration will degrade water quality, thus affecting beneficial uses". *Id.* .  Moore Services, Inc. also concluded that "the concentrations of BTEX and MTBE in subsurface soils containing residual gasoline are allowable concentrations, as published by the CSWRCB, and are unlikely to pose a threat to underlying groundwater." *Id.* On August 30, 2006, the Fresno County granted closure for this site, thereby concluding that the site's conditions are fully protective of human health and the environment. FCDEH-FRESNO-010712.

For additional information relating to this site, Union Oil refers Plaintiff to:

- CHEVMDL1358_FRES_00000008212-CHEVMDL1358_FRES_00000008251.

Union Oil also refers Plaintiff to the documents produced by Fresno County and the Regional Water Quality Control Board for information relating to this station.  The burden of deriving or ascertaining the answers to Plaintiff's Interrogatories from the above documents will be substantially the same for Union Oil and Plaintiff.

**101 Roosevelt.** Prior to April 1997, Union Oil supplied this site with gasoline refined at its San Francisco refinery.  Union Oil's electronic records do not reflect the sale or delivery of gasoline to this site.  Due to the passage of time and the divesture of Union Oil's marketing and refining assets to Tosco in April 1997, Union Oil has not identified records, other than what has been produced, in its possession, custody, or control reflecting gasoline deliveries or sales to this site.  Union Oil owned the USTs at the subject site from prior to the relevant time period until

3

December 1995 when they were removed. Union Oil did not supply gasoline to this site after that time. Union Oil has not owned USTs at this site since that time, nor has it supplied gasoline to the subject site after that time. Union Oil owned the real estate at this site from prior to the relevant time period until April 1997 when the property was sold to Tosco. On information and belief, Wholesale Fuels Inc. or Wholesale Fuels LLP, an independently owned business, operated this site from at least 1989 to 1997.

For additional information relating to this site, Union Oil refers Plaintiff to:

- CHEVMDL1358_FRES_00000006473 - CHEVMDL1358_FRES_00000006508. Union Oil also refers Plaintiff to the documents produced by Fresno County and Regional Water Quality Control Board for information relating to this station. The burden of deriving or ascertaining the answers to Plaintiff's Interrogatories from the above documents will be substantially the same for Union Oil and Plaintiff.

**1418 East Shaw Ave.** Union Oil's records reflect that it sold gasoline to the station located at 1418 East Shaw Avenue between 1986 and 1997. The dates and amounts of sales to this site, including the product code and name for each sale, are set forth in the documents bates numbered CHEVMDL1358_Fresno_000000026180-CHEVMDL1358_Fresno_000000026283. During that time period, Union Oil supplied this station with gasoline refined at its San Francisco refinery. Union Oil owned the USTs at this site from at least 1987 until April 1997. On information and belief, Union Oil owned the real estate at this site in April 1997 at the time of the sale of the site to Tosco. Union Oil did not own or lease the real estate or USTs at the subject site after April 1997, nor did Union Oil supply gasoline to the subject site after that time.

**1610 North Palm.** Union Oil's records reflect that it sold gasoline to the station located at 1610 North Palm between 1986 and 1997. The dates and amounts of sales to this site, including the product code and name for each sale, are set forth in the documents bates numbered CHEVMDL1358_Fresno_000000026516-CHEVMDL1358_Fresno_000000026605. During that time period, Union Oil supplied this station with gasoline refined at its San Francisco refinery. Union Oil did not own the real estate at this site during the relevant time period. Union

Oil leased the real estate at this site from prior to the relevant time period until April 1997. On information and belief, Union Oil owned the underground storage tanks at this site from at least 1992 until April 1997. Union Oil did not own or lease the real estate or USTs at the subject site after April 1997, nor did Union Oil supply gasoline to the subject site after that time.

**794 West Shaw Ave.** Union Oil owned the real estate and underground storage tanks at this site from at least 1988 until April 1997. Union Oil supplied this station with gasoline refined at its San Francisco refinery from prior to the relevant time period through at least 1995. Due to the passage of time Union Oil has not located electronic records reflecting sales of gasoline to this site. Union Oil did not own or lease the real estate or USTs at the subject site after April 1997, nor did Union Oil supply gasoline to the subject site after that time. On information and belief, gasoline sold at this site no longer contained MTBE after October 2001. FCDEH-FRESNO-031687-90.

For additional information regarding the above stations, Union Oil refers Plaintiff to Union Oil's Supply Declaration, all of which is incorporated by reference here. Based on Union Oil's records it did not deliver gasoline to, supply, own, lease, or operate any of the other Stations identified by Plaintiff. Union Oil has undertaken a reasonably diligent search to locate responsive information. Union Oil's investigation will continue to and through the trial of this matter. Union Oil reserves the right to supplement or amend its responses in the event they discover the existence of other responsive information and/or documents as evidence at the time of trial.

Union Oil does not concede that any portion of these Interrogatories - or any document produced in connection with them - is admissible at trial or in connection with any non-discovery proceeding. Union Oil reserves all rights to object to the introduction of any portion of these responses - or any document produced pursuant to them - at trial or any non-discovery proceeding.

## GENERAL OBJECTIONS

Union Oil further incorporates the following General Objections by reference into each specific Response below, as if set forth in full in the specific Response:

1.      By making these Responses, Union Oil does not waive any rights or protections afforded to it by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, or any other applicable statutory provisions or protections under common law or any other source.

2.      Union Oil objects to each Interrogatory to the extent it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

3.      Union Oil objects to each Interrogatory to the extent it seeks to discover information or DOCUMENTS protected from disclosure by the attorney-client privilege, the joint defense privilege, the attorney work product doctrine, the consulting expert privilege, privacy rights or any other applicable protection, privilege or exemption at law or pursuant to statute.   Union Oil will not produce any such protected information or DOCUMENT. Inadvertent production of any protected information or DOCUMENTS shall not be deemed a waiver of any applicable exemption, privilege or protection.

4.      Union Oil objects to each Interrogatory to the extent it seeks information or DOCUMENTS not in Union Oil's "possession, custody or control" or otherwise purports to require Union Oil to do any act not required of it under the Federal Rules of Civil Procedure.

5.      Union Oil objects generally to Plaintiff's "Instructions" and "Definitions" to the extent they are inconsistent with: a) the limitations and objections set forth in these General Objections; b) the objections to specific Interrogatories; or c) the Federal Rules of Civil Procedure.

6.      Union Oil objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous.

7.      Union Oil objects to the definition of the terms "RELEVANT GEOGRAPHIC AREA" as defined by Plaintiff as the entire City of Fresno, including, but not limited to, all unincorporated areas served by the City of Fresno's public utilities department, because that

definition is overbroad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and it would be unduly burdensome for Union Oil to locate and produce responsive information. Union Oil objects to producing information relating to its supply of gasoline to any station other than the Stations identified by Plaintiff.

8. Where Union Oil has objected to one or more terms in an interrogatory as "vague" and/or "ambiguous," it may respond to the Interrogatory pursuant to a reasonable good faith interpretation of that Interrogatory or after a meet and confer process.

9. Union Oil objects to each Interrogatory to the extent it seeks information or DOCUMENTS that are not limited in time or scope.

10. Union Oil objects to each Interrogatory to the extent it seeks information or DOCUMENTS that are not limited to the relevant time period in this action.

11. Union Oil objects to each Interrogatory on the ground of undue burden to the extent it seeks copies of scientific, government or other materials that are equally available to Plaintiff and not in Union Oil's actual possession, custody or control. Union Oil does not waive its objection in the event of Union Oil's inadvertent production of such scientific, government or other materials. Furthermore, Union Oil's production of scientific, government or other publicly available materials does not constitute an admission that the material(s) was/were in Union Oil's possession, custody or control at any particular point in time.

12. Union Oil objects to each Interrogatory to the extent they are overbroad and unduly burdensome relative to the utility to Plaintiff of the information requested. Moreover, Union Oil objects to each Interrogatory to the extent that it would be oppressive for Union Oil to search for, locate, review and produce the voluminous information or documents requested, if any exist.

13. Union Oil objects to Plaintiff's Interrogatories to the extent they seek disclosure of confidential or proprietary information, trade secrets and/or confidential business or commercial information. All responses are subject to appropriate confidentiality agreements negotiated, or to be negotiated, between the parties or as may be imposed by the Court.

14.     The information Union Oil produces in response to Plaintiff's Interrogatories, if any, will be produced solely for the purpose of this action. Such information is subject to all objections regarding relevance, authenticity, materiality, propriety and admissibility and any other objections that would require exclusion of the information, if such information were offered as evidence at trial, all of which objections are hereby expressly reserved and may be interposed at the time of trial.

## INTERROGATORY RESPONSES

**1.     IDENTIFY the address of each gasoline station that YOU own or owned within the RELEVANT GEOGRAPHIC AREA since 1979.**

**1a.    State the dates of ownership for each station YOU identified.**

**Response:**

In addition to its general objections, all of which is incorporated by reference here, Union Oil objects to this Interrogatory to the extent it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Union Oil objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Union Oil objects to the definition of the terms "RELEVANT GEOGRAPHIC AREA" as defined by Plaintiff as the entire City of Fresno, including, but not limited to, all unincorporated areas served by the City of Fresno's public utilities department, because that definition is overbroad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and it would be unduly burdensome for Union Oil to locate and produce responsive information. Union Oil objects to this Interrogatory to the extent it is overbroad and unduly burdensome relative to the utility to Plaintiff of the information requested. Moreover, Union Oil objects to this Interrogatory to the extent that it would be oppressive for Union Oil to

search for, locate, review and produce the voluminous information or documents requested, if any exist. Union Oil objects that this interrogatory is not limited to the relevant time period. Union Oil limits its response to the Stations identified by Plaintiff. Subject to and without waiving the foregoing objections and subject to that interpretation, Union Oil responds as follows:

Union Oil refers to its preliminary statement above, all of which is incorporated by reference here.

**2.    IDENTIFY the address of all gasoline stations that YOU operate or operated within the RELEVANT GEOGRAPHIC AREA since 1979.**

**2a.    State the dates of operation for each station YOU identified.**

**Response**:

Union Oil refers to its preliminary statement and objections and responses to Interrogatory No. 1, all of which are incorporated by reference here.

**3.    IDENTIFY the address of all gasoline stations that YOU lease or have leased within the RELEVANT GEOGRAPHIC AREA since 1979.**

**3a.    State the lease dates for each station YOU identified.**

**Response**:

Union Oil refers to its preliminary statement and objections and responses to Interrogatory No. 1, all of which are incorporated by reference here.

**4.    IDENTIFY the address of all gasoline stations with which YOU have or have had a retail supply contract within the RELEVANT GEOGRAPHIC AREA since 1979.**

**4a.    State the retail supply contract dates for each station YOU identified.**

**Response**:

Union Oil refers to its preliminary statement and objections and responses to Interrogatory No. 1, all of which are incorporated by reference here   In addition, Union Oil objects that the term "retail supply contract" is vague and ambiguous.

**5.     IDENTIFY all jobbers, franchisees and/or distributors to whom YOU supplied MTBE gasoline within the RELEVANT GEOGRAPHIC AREA since 1979.**

**5a.     State the dates that YOU supplied MTBE gasoline to each jobber, franchisee, and/or distributor that YOU identified.**

**Response:**

Union Oil refers to its objections and responses to Interrogatory No. 1, all of which are incorporated by reference here.   Furthermore, Union Oil objects that this interrogatory seeks information that is neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence, in that it not limited to deliveries to the Stations identified by Plaintiff, nor is it limited to the jobbers identified in Plaintiff's deposition notice relating to jobbers or April 7 letter relating to jobbers.   Union Oil limits its response to the jobbers and terminals identified in Plaintiff's deposition notice and April 7 letter.   Union Oil no longer has much of the information sought.

Subject to and without waiving the foregoing objections and limitations, Union Oil responds as follows:

Union Oil's investigation is ongoing.   Due to the passage of time and the sale of it marketing and refining assets to Tosco in April 1997, Union Oil no longer has much of the information sought.

**6.     IDENTIFY each refinery that YOU own or owned which provided MTBE gasoline to the RELEVANT GEOGRAPHIC AREA since 1979.**

**6a.** State the dates of ownership for each refinery YOU identified;

**6b.** State the dates that YOU added MTBE to gasoline manufactured by each refinery YOU identified;

**6c.** IDENTIFY each entity which supplied MTBE to each refinery YOU identified.

**Response:**

  In addition to Union Oil's general objections, all of which are incorporated by reference here, Union Oil objects to this Interrogatory to the extent it seeks information that is neither relevant to nor reasonably calculated to lead to the discovery of admissible evidence. Union Oil objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Union Oil objects to the definition of the terms "RELEVANT GEOGRAPHIC AREA" as defined by Plaintiff as the entire City of Fresno, including, but not limited to, all unincorporated areas served by the City of Fresno's public utilities department, because that definition is overbroad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and it would be unduly burdensome for Union Oil to locate and produce responsive information. Union Oil objects to this Interrogatory to the extent it seeks information or DOCUMENTS that are not limited to the relevant time period in this action. Union Oil objects to this Interrogatory to the extent it is overbroad and unduly burdensome relative to the utility to Plaintiff of the information requested. Moreover, Union Oil objects to this Interrogatory to the extent that it would be oppressive for Union Oil to search for, locate, review and produce the voluminous information or documents requested, if any exist. Subject to and without waiving the foregoing objections, Union Oil responds as follows:

  Union Oil refers to its preliminary statement and objections and responses to Interrogatory No. 1, all of which are incorporated by reference here

7.      **IDENTIFY each terminal that YOU own or owned which served the RELEVANT GEOGRAPHIC AREA since 1979.**

7a.     **State the dates of ownership for each terminal YOU identified;**

7b.     **IDENTIFY all Exchange and/or Throughput Partners for each terminal YOU identified;**

7c.     **IDENTIFY each pipeline used to supply gasoline for each terminal YOU identified.**

**Response**:

In addition to Union Oil's general objections, all of which are incorporated by reference here, Union Oil objects to this Interrogatory to the extent it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Union Oil objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Union Oil objects to the definition of the terms "RELEVANT GEOGRAPHIC AREA" as defined by Plaintiff as the entire City of Fresno, including, but not limited to, all unincorporated areas served by the City of Fresno's public utilities department, because that definition is overbroad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and it would be unduly burdensome for Union Oil to locate and produce responsive information. Union Oil objects to this Interrogatory to the extent it seeks information or DOCUMENTS that are not limited to the relevant time period in this action. Union Oil objects to this Interrogatory to the extent it is overbroad and unduly burdensome relative to the utility to Plaintiff of the information requested. Moreover, Union Oil objects to this Interrogatory to the extent that it would be oppressive for Union Oil to search for, locate, review and produce the voluminous information or documents requested, if any exist. Subject to and without waiving the foregoing objections, Union Oil responds as follows:

Union Oil refers to its preliminary statement and Interrogatory No. 5, all of which Union Oil incorporates by reference here.  At the time of the sale of its marketing and refining assets to Tosco, Union oil held a fee interest in terminals located at 1148, 1150, and 1300 Canal Boulevard, Richmond, California and at 79 Broadway, Sacramento, California.  For additional information, Union Oil refers Plaintiff to Union Oil's Supply Declaration, all of which is incorporated by reference here.  Due to the passage of time and the sale of it marketing and refining assets to Tosco in April 1997, Union Oil no longer has much of the information sought.

8.    **IDENTIFY each terminal at which YOU have or had a position which served the RELEVANT GEOGRAPHIC AREA since 1970.**

8a.    **State the dates of during which YOU maintained a position for each terminal YOU identified.**

**Response**:

Union Oil refers to its preliminary statement and it objections and responses to Interrogatory No. 7, all of which are incorporated by reference here.  In addition, Union Oil objects the phrases "have or had a position" and "maintained a position" are vague and ambiguous.

9.    **IDENTIFY the terminals at which YOU have or had the right to use gasoline loading racks which served the RELEVANT GEOGRAPHIC AREA since 1979.**

9a.    **State the dates during which YOU have or had the right to use gasoline loading racks for each terminal YOU identified.**

**Response**:

Union Oil refers to its preliminary statement and objections and responses to Interrogatory No. 7, all of which are incorporated by reference here.

10.     State the annual total volume of MTBE-containing gasoline which YOU supplied, sold, marketed or distributed within the RELEVANT GEOGRAPHIC AREA from 1979 to the present.

**Response:**

　　Union Oil refers to its preliminary statement and objections and responses to Interrogatory Nos. 1, all of which are incorporated by reference here.

11.     For each year from 1986 to 2003, state the annual volume, in U.S. gallons, of MTBE gasoline that YOU produced in the United States that YOU Provided to common carrier pipelines which serve the RELEVANT GEOGRAPHIC AREA.

**Response:**

　　Union Oil objects to this Interrogatory to the extent it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Union Oil objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Union Oil objects to the definition of the terms "RELEVANT GEOGRAPHIC AREA" as defined by Plaintiff as the entire City of Fresno, including, but not limited to, all unincorporated areas served by the City of Fresno's public utilities department, because that definition is overbroad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and it would be unduly burdensome for Union Oil to locate and produce responsive information.  Union Oil objects to this Interrogatory to the extent it is overbroad and unduly burdensome relative to the utility to Plaintiff of the information requested. Moreover, Union Oil objects to this Interrogatory to the extent that it would be oppressive for Union Oil to search for, locate, review and produce the voluminous information or documents

requested, if any exist.  Union Oil limits this request to information relating to the volume of gasoline Union Oil supplied to the Stations identified by Plaintiff.

Union Oil refers to its preliminary statement and objections and responses to Interrogatory Nos. 1, all of which are incorporated by reference here.

**12.** **IDENTIFY the address of each gasoline station where YOU own or owned the underground storage tanks within the RELEVANT GEOGRAPHIC AREA since 1979.**

**12a.** **State the dates of ownership for each station YOU identified.**

**Response**:

Union Oil refers to its preliminary statement and objections and responses to Interrogatory No. 1, all of which are incorporated by reference here.

Dated: Houston, Texas
August 12, 2011

Respectfully submitted,

_James J. Maher b. p._
Robert E. Meadows
Charles C. Correll, Jr.
James J. Maher
KING & SPALDING LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

**Attorneys for Union Oil Company of California**

## VERIFICATION

I, [INSERT NAME], declare and state as follows:

I am [INSERT TITLE] of Union Oil Company of California, and I am authorized to make this verification for and on the behalf of Union Oil Company of California., and I make this verification for that reason.

I have read the foregoing Supplemental and Amended Responses of Union Oil Company of California to Plaintiff's First Set of Interrogatories in this matter entitled In Re Methyl Tertiary Butyl Ether Products Liability Litigation: *City of Fresno v. Chevron U.S.A Inc.., et al.* 04 Civ. 04973 (SAS) MDL 1358, in the United States District Court for the Southern District of New York. I am informed and believe that the matters stated in the interrogatory responses therein are true as they relate to Union Oil Company of California, and on that ground allege that the matters stated therein are true. I do not believe that any one person for Union Oil Company of California knows all of the matters stated therein, and therefore these responses were prepared with the assistance and advice of representatives of, and counsel for, said Union Oil Company of California upon whose assistance and advice I have relied. These responses are limited by the records and information still in existence, presently recollected and thus far discovered in the course of preparation of these responses. Union Oil Company of California reserves the right to change or supplement said responses, or to apply for relief to permit insertion of unintentionally omitted matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at San Ramon, California, this _____ day of August, 2011

_____

[INSERT NAME AND TITLE]

## Certificate of Service

I hereby certify that on the 12 day of August, 2011, a true, correct, and exact copy of the foregoing document was served on all counsel via LexisNexis File & Serve.

_____
James J. Maher

# EXHIBIT 22

Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2                             -oOo-

3        _____

4     In re: Methyl Tertiary Butyl
      Ether ("MTBE") Products
5     Liability Litigation
                                         Master File No.
6        _____  1:00-1898

      This Document Relates To:
7                                          Case No.
      City of Fresno                       MDL 1358(SAS)
8     v. Chevron U.S.A. Inc., et al.,
      Case No. 04 Civ. 4973
9        _____

10

11              DEPOSITION OF GAIL BLUE

12         March 18, 2011 at 1:00 (1:09) p.m.

13         Before:   ERIC L. JOHNSON
                     RPR, CSR #9771
14
           Taken at:
15         Fresno, California

16

17

18

19

20

21

22

23

24

25

Deposition of Gail Blue / March 18, 2011

Page 16

1        A.   No.

2        Q.   Have you ever worked for any other gas or

3   petroleum company other than Red Triangle Oil?

4        A.   No.

5        Q.   Do you recall -- well, strike that.

6             When you sold the business in 2002, you sold

7   the buildings, did you also sell the USTs?

8        A.   Yes, they took everything.

9        Q.   Okay.  Do you know what MTBE is?

10       A.   Yes, it's -- it is something that's put in

11  fuel.  They say that it is -- at this time I guess it is

12  not supposed to be really good for you, but at the time

13  that they put it in there there was -- we were mandated

14  to put it in there by the State of California, so -- I

15  mean, we didn't put it in there, the companies did.  And

16  we bought the fuel from -- from whomever we bought it

17  from.

18       Q.   Who did you buy the fuel from?

19       A.   Oh, we bought from everybody.  We bought from

20  Exxon.  At that time we were an Exxon dealer so, you

21  know, if we had an Exxon station, we put Exxon fuel in

22  the Exxon stations.  But the stations that were

23  unbranded, we could put any fuel into, so we could pull

24  whatever fuel we want, you know, could get at a cheaper

25  price from the refinery.  And so -- and -- and our

Deposition of Gail Blue / March 18, 2011

```
 1    plant, because we sold to farmers.  So --
 2         Q.  And the plant was at 2809 --
 3         A.  Yes.
 4         Q.  -- South Chestnut Avenue?
 5         A.  Yes.
 6         Q.  What other facilities were at that site?  I
 7    assume that's a bulk plant, correct?
 8         A.  It is a bulk plant.
 9         Q.  Yeah.
10         A.  And the station out in front there.  That
11    was -- where we sold fuel to vehicles.
12         Q.  And so who did you buy -- which gas or
13    petroleum companies did you buy from at that site,
14    2809 South Chestnut?
15              MS. KLEAVER:  Calls for speculation.
16              MR. STEEVES:  Q.  From the -- for the years
17    that you were present at the site.
18         A.  Gee.  Well, I know we bought from Exxon.  I
19    don't think we ever bought from Chevron, that I am aware
20    of.  I didn't buy -- purchase the fuel, okay?  I had a
21    purchasing agent that did all the buying, Jack Allen,
22    and he's deceased.
23         Q.  You say Allen?
24         A.  Jack Allen, A-l-l-e-n.
25         Q.  Thank you.
```

Deposition of Gail Blue / March 18, 2011

Page 18

```
 1        A.  And I don't know all the people he bought from.
 2   We -- you know, we bought from a lot of different
 3   sources.  I think we bought from Tesoro, Exxon.  There
 4   was another one.  I am not sure about Atlantic or ARCO.
 5   We might have bought some from ARCO.  I am not really
 6   sure.  BP, I think we bought -- I think we bought some
 7   from them.  I am not aware that we ever bought anything
 8   from Chevron.  We bought Chevron products but not fuel.
 9   The rest of them here I don't -- I don't really
10   recognize those names, but --
11        Q.  Do you recall any time periods for when you
12   bought from those companies?
13        A.  No, I don't.
14        Q.  Okay.  Do you recall who delivered the gasoline
15   to the site at 2809 South Chestnut?
16        A.  We had our own truck and trailers.
17        Q.  And do you know where they picked up from?
18        A.  From the plant -- the place in Fresno out
19   there.  I don't know even the address of it.  But it was
20   a pipeline.  It was a pipeline out not too far from us.
21        Q.  You don't recall the name?
22        A.  No.
23        Q.  Do you recall if you had any agreements to buy
24   a particular brand of gasoline?
25        A.  I think the only one we had was Exxon.  But I
```

Deposition of Gail Blue / March 18, 2011

Page 19

1    am not really sure because I didn't do that, you know.

2    I wasn't into that part of the --

3         Q.   Was there anybody besides Jack Allen who you

4    dealt with purchasing gasoline?

5         A.   Jack was it --

6         Q.   Okay.

7         A.   -- when I was there.

8         Q.   Do you recall when he passed away?

9         A.   I wasn't -- I was in Avila, and it was probably

10   at least six years ago.

11                        (Deposition Exhibit 2 marked for

12                         identification)

13             MR. STEEVES:   I will hand you what's been

14   marked as Exhibit 2.   It is a Business Plan Registration

15   form from the County of Fresno.   Looks like it is dated

16   January 31st, 1991.

17        A.   Mm-hmm.

18        Q.   Has the Bates No. FCDEH-FRESNO-014792 through

19   014800.

20             Have you seen that document before?

21        A.   Yeah.  I do remember it.  I signed it.

22        Q.   I noticed that the --

23        A.   Many years ago.

24        Q.   Did you prepare the document?

25        A.   You know, this doesn't look like my

# EXHIBIT 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-oOo-

In re: Methyl Tertiary Butyl
Ether ("MTBE") Products
Liability Litigation

Master File No.
1:00-1898

This Document Relates To:

Case No.
MDL 1358(SAS)

City of Fresno
v. Chevron U.S.A. Inc., et al.,
Case No. 04 Civ. 4973

/



DEPOSITION OF GLEN R. BLUE

March 17, 2011 at 1:00 (1:17) p.m.

Before: ERIC L. JOHNSON
RPR, CSR #9771

Taken at:
Fresno, California



Court Reporting Services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

Deposition of Glen R. Blue / March 17, 2011

1    period you worked there?

2         A.  Run that by me again.

3              MS. KLEAVER:  Same objection.

4              MR. STEEVES:  Q.  Do you recall if Red Oil

5    (sic) had an agreement to buy a certain brand of

6    gasoline during the time period you worked there?

7              MS. KLEAVER:  Same objection.

8              THE WITNESS:  I can't tell you who had the

9    contracts, but no doubt they did.  They committed to buy

10   a certain amount of gas.

11             MR. STEEVES:  Q.  But you can't recall the --

12   the company?

13             MR. PARSEGHIAN:  Objection; asked and answered.

14             THE WITNESS:  The company bought from various

15   people over a period -- I don't know what time frame you

16   are looking at.

17             MR. STEEVES:  Q.  Let's start with the time

18   period in the 1980s.

19        A.  The biggest supplier is Exxon.  That was the

20   brand.  Then they had various rebrand gas.

21        Q.  You said that was the biggest supplier.  Were

22   there other suppliers?

23        A.  Did the company buy from other people or people

24   delivered in?

25        Q.  Did the company buy from other people?

                                                          22

Deposition of Glen R. Blue / March 17, 2011

```
 1    STATE OF CALIFORNIA      )
                               (      ss.
 2    COUNTY OF STANISLAUS     )

 3         I, ERIC L. JOHNSON, do hereby certify that I am a

 4    licensed Certified Shorthand Reporter, duly qualified

 5    and certified as such by the State of California;

 6         That prior to being examined, the witness named in

 7    the foregoing deposition was by me duly sworn to testify

 8    to tell the truth, the whole truth, and nothing but the

 9    truth;

10         That the said deposition was by me recorded

11    stenographically at the time and place herein mentioned;

12    and the foregoing pages constitute a full, true,

13    complete and correct record of the testimony given by

14    the said witness;

15         That I am a disinterested person, not being in any

16    way interested in the outcome of said action, or

17    connected with, nor related to any of the parties in

18    said action, or to their respective counsel, in any

19    manner whatsoever.

20

21         DATED:  March 28, 2011

22

23         _____

24         Eric L. Johnson, CSR, RPR

25
```

61

# EXHIBIT 24

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2                        -oOo-

 3     _____

 4     In re: Methyl Tertiary Butyl
       Ether ("MTBE") Products
 5     Liability Litigation
                                           Master File No.
 6     _____    1:00-1898

       This Document Relates To:
 7                                         Case No.
       City of Fresno                      MDL 1358(SAS)
 8     v. Chevron U.S.A. Inc., et al.,
       Case No. 04 Civ. 4973
 9     _____

10

11            DEPOSITION OF NARINDER SINGH

12            March 16, 2011 at 9:00 (9:16)  a.m.

13            Before:  ERIC L. JOHNSON
                       RPR, CSR #9771
14
              Taken at:
15            Fresno, California

16

17

18

19

20

21

22

23

24

25
```

Deposition of Narinder Singh / March 16, 2011

Page 22

1       Q.   Did you have any particular course of study in

2   college?

3       A.   No.

4       Q.   How about after you came to the United States,

5   did you have any college?

6       A.   No, sir.

7       Q.   So if we talk about "the station" for

8   shorthand, can we agree --

9       A.   Yes.

10      Q.   -- that we are talking about 4594 East Tulare

11   here in Fresno?

12      A.   Yes.

13      Q.   If I ever ask something about the Selma one,

14   I'll -- I will try -- I will specify that so we are

15   clear, but otherwise I will be asking you about the

16   Fresno station.

17      A.   Yes, sir.

18      Q.   Can you tell us what year you first became

19   affiliated with the Fresno station?

20      A.   1994.  We leased that station and we own

21   inside, and the gas was owned by El Monte Gas.  El Monte

22   Gas, Mr. Don Doyle bought that station from, I believe,

23   Beacon Oil Company.

24      Q.   When you say, "We owned the inside," are you --

25   are you meaning that you owned the building?

Deposition of Narinder Singh  /  March 16, 2011

Page 25

1    from Mr. Doyle and replaced the tank and the piping.

2         Q.   What was the station called starting in 1999?

3         A.   Circle 6.

4         Q.   Did it have another name after Circle 6?

5         A.   It was Tulare Street ARCO before that when

6    Doyle had it, and we called Tulare Street ARCO.

7         Q.   Is it on Tulare Avenue or Tulare Street?

8         A.   Tulare Street.

9         Q.   Okay.  I am sorry.  I think I said Tulare

10   Avenue earlier.  Let me make a note of that.  So it is

11   4594 East Tulare Street in Fresno?

12        A.   Yes, sir.

13        Q.   So when it was an ARCO it was called the Tulare

14   Street ARCO, starting in 1994?

15        A.   Yes, sir.

16        Q.   And then about 1999 it became Circle 6?

17        A.   Yes, sir.

18        Q.   And did it have a name after Circle 6?

19        A.   We kept it Circle 6 where we did brand Exxon.

20   My best knowledge.  I don't know exact year and the

21   date, but I believe in 2003 or 2002 we brand Exxon.

22        Q.   When you say you brand Exxon, you started

23   selling Exxon branded gasoline?

24        A.   Yes, sir.

25        Q.   We might see some documents that say Exxon that

Deposition of Narinder Singh  /  March 16, 2011

Page 28

```
 1    They pull wherever they pull from.  And they always have
 2    bill of lading and say where they pull from, but we
 3    don't pay attention to it so I can't say, you know.
 4        Q.  Do you still have any bills of lading from the
 5    time it was Circle 6 with unbranded gas?
 6        A.  Yes.
 7        Q.  You still have bills of lading in your
 8    possession?
 9        A.  Well, you know, we have to go back so I can
10    find it, yes.
11        Q.  Well, I think -- because that was the kind of
12    thing that we were looking for with the subpoena.  So
13    can we talk to you after --
14        A.  Yes.
15        Q.  -- the deposition about trying to get copies of
16    that?
17        A.  Yes.
18        Q.  For Julien Oil, do you recall where they were
19    located, what city?
20        A.  In Visalia.
21        Q.  And then when you mentioned it was Circle 6 and
22    you switched to Exxon brand about 2002 or 2003, is it
23    correct that you started having deliveries of Exxon
24    brand gasoline at that point?
25        A.  Yes.
```

Deposition of Narinder Singh / March 16, 2011

Page 29

```
 1           MS. KLEAVER:  Objection; calls for speculation,

 2    lacks foundation.

 3           MR. EICKMEYER:  Q.  Now -- when she's done

 4    talking now, you can answer.

 5       A.  Oh, okay.

 6       Q.  So, I am sorry, what was your answer?

 7       A.  Yes.  What your question was again?

 8           MR. EICKMEYER:  Well, if we can get a

 9    read-back.

10           (Record read)

11           THE WITNESS:  Yes.

12           MR. EICKMEYER:  Q.  After the Circle 6 name on

13    the station, has it had another name?

14       A.  No.

15       Q.  So it's still Circle 6 at the present day?

16       A.  Yes.

17       Q.  Is it still Exxon brand gas being sold there to

18    the present day?

19       A.  No, sir.

20       Q.  When did that change?

21       A.  That change in 2006.

22       Q.  And what brand did that change to?

23       A.  Valero.

24       Q.  Is it still Valero gas being sold there to the

25    present day?
```

DEPOBOOK REPORTING SERVICES (800) 830-8885

# EXHIBIT 25



22391451
E-SERVICE
Nov 7 2008
7:29PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

MDL No 1358 (SAS)

DEFENDANT EXXON MOBIL
CORPORATION'S RESPONSES TO
PLAINTIFF CITY OF FRESNO'S
FIRST SET OF INTERROGATORIES

---

This Document Relates To:

*City of Fresno v. Chevron U.S.A., Inc., et al.,*
04 Civ. 04973

---

Defendant Exxon Mobil Corporation ("ExxonMobil"), by and through counsel and

pursuant to the Federal Rules of Civil Procedure and the Local Rules of the Southern District of

New York, hereby responds to Plaintiff's First Set of Interrogatories to Defendants

("Interrogatories") as follows:

## PRELIMINARY STATEMENT

The following response and objections state ExxonMobil's knowledge, information and

belief as of the date of such response and objections. Further investigation, discovery and

analysis may uncover additional information, add meaning to known facts and/or support new

factual conclusions and legal contentions, all of which may lead to changes in ExxonMobil's

responses herein. Such investigation and discovery are continuing, and ExxonMobil specifically

reserves the right to supplement this response and the right to rely at trial on subsequently

discovered information inadvertently omitted from this response as a result of mistake, error or

oversight.

W02-WEST:LWJ\401130470.1

Further, as stated in the October 9, 2008 and October 21, 2008 letters from William Temko to Duane Miller, ExxonMobil objects to the identification of the stations requested by this Interrogatory until such time as Plaintiff identifies the wells and service stations at issue in this case.

Subject to and without waiving the foregoing objections, ExxonMobil responds that Exhibit 4 lists those pre-merger Mobil branded stations which were owned and operated by independent dealers with whom Mobil had a petroleum marketing franchise agreement for the supply of gasoline in the City of Fresno. ExxonMobil is in the process of retrieving archived information from a legacy database which should identify pre-merger Exxon branded stations operating in the City of Fresno from 1987 through 1999. ExxonMobil has identified no ExxonMobil branded stations owned and operated by independent dealers.

## INTERROGATORY NO. 5:

IDENTIFY all jobbers, franchisees and/or distributors to whom YOU supplied MTBE gasoline within the RELEVANT GEOGRAPHIC AREA since 1979.

     a.    State the dates that YOU supplied MTBE gasoline to each jobber, franchisee, and/or distributor that YOU identified.

## RESPONSE TO INTERROGATORY NO. 5:

In addition to its General Objections, which are incorporated herein as if set forth in full, ExxonMobil objects to this interrogatory on the ground that it is overbroad with respect to time, as the Court's CMO No. 4 limits discovery to 1986, and MTBE was phased out of gasoline sold in California no later than December 31, 2003. ExxonMobil further objects on the grounds that this interrogatory seeks information not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence.

ExxonMobil also objects to this interrogatory on the ground of the attorney-client privilege to the extent that it seeks disclosure of information which refers to, relates to or

contains confidential communications between attorney and client. ExxonMobil also objects to this interrogatory on the ground of the attorney-work product doctrine to the extent that it seeks disclosure of information which refers to, relates to or contains research, investigations or analysis prepared under the supervision and/or direction of ExxonMobil's attorneys in the anticipation of or in preparation for litigation.

ExxonMobil further objects to the defined terms "IDENTIFY" and "YOU" on the grounds that they deviate from or purport to impose requirements other than or in addition to those required by Local Civil Rule 26.3, and therefore, this interrogatory is vague and ambiguous, burdensome, overbroad, and seeks information not relevant to the allegations asserted in Plaintiff's complaint. ExxonMobil also states that the term "franchisees" is undefined and, as such, is vague and ambiguous. ExxonMobil understands the term to refer to independent dealers with whom ExxonMobil has entered retail supply contracts and has responded to that question, as is understood by ExxonMobil, in response to Interrogatory No. 4.

Further, as stated in the October 9, 2008 and October 21, 2008 letters from William Temko to Duane Miller, ExxonMobil objects to the identification of jobbers and distributors as requested by this Interrogatory until such time as Plaintiff identifies the wells and service stations at issue in this case.

Subject to and without waiving the foregoing objections, ExxonMobil responds that Exhibits 5A and 5B, respectively, list those pre-merger Mobil branded and post-merger ExxonMobil branded distributors/stations in the City of Fresno. For the distributors supplying product prior to 1995 (Tesei and Burrows), ExxonMobil has been unable to identify the individual station locations to which the distributors supplied product. For the distributors supplying product after 1995 (Stuarts Petroleum and Valero), ExxonMobil has been unable to identify the exact years or volumes which may have been delivered by the distributor to each of the individual stations listed in Exhibit 5A and 5B. However, data indicates that Stuart Petroleum delivered product to the City of Fresno from 1995 through 1999 and that Valero ceased deliveries in September, 2001. ExxonMobil is in the process of retrieving archived

information from a legacy database which should identify pre-merger Exxon branded stations operating in the City of Fresno from 1987 through 1999.

**INTERROGATORY NO. 6:**

IDENTIFY each refinery that YOU own or owned which provided MTBE gasoline to the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the dates of ownership for each refinery YOU identified;

    b.    State the dates that YOU added MTBE to gasoline manufactured by each refinery YOU identified;

    c.    IDENTIFY each entity which supplied MTBE to each refinery YOU identified.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to its General Objections, which are incorporated herein as if set forth in full, ExxonMobil objects to this interrogatory on the ground that it is overbroad with respect to time, as the Court's CMO No. 4 limits discovery to 1986, and MTBE was phased out of gasoline sold in California no later than December 31, 2003. ExxonMobil objects to these discovery requests to the extent they seek information relating to events that occurred prior to the initial manufacture, sale, or distribution by ExxonMobil of gasoline containing MTBE on the grounds that those discovery requests are overbroad, unduly burdensome and oppressive, and on further grounds that they seek information not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence. ExxonMobil also objects on the grounds that this interrogatory generally seeks information not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence.

ExxonMobil further objects to this interrogatory on the grounds that the undefined terms "provided" and "supplied" are vague, ambiguous and unintelligible, in that it fails to describe with specificity or reasonably particularize the information requested, and is thus

-12-

# EXHIBIT 26

Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
2                       -oOo-
3     _____
4     In re: Methyl Tertiary Butyl
      Ether ("MTBE") Products
5     Liability Litigation
      _____        Master File No.
6                                              1:00-1898
      This Document Relates To:
7                                              Case No.
      City of Fresno                           MDL 1358(SAS)
8     v. Chevron U.S.A. Inc., et al.,
      Case No. 04 Civ. 4973
9     _____
10
11            DEPOSITION OF JAMES CLEMENTS
12            March 29, 2011 at 9:00 (10:03) a.m.
13            Before:  ERIC L. JOHNSON
                       RPR, CSR #9771
14
              Taken at:
15            Fresno, California
16
17
18
19
20
21
22
23
24
25

Page 25

1   think the 1,000 gallon tank was the premium tank and

2   that was the one closest to the office.

3        Q.  Okay.  So you think the tank identified as

4   Tank 1 on this precision test would be the tank south of

5   the store on --

6        A.  That is correct.

7        Q.  Okay.  Under brand supplier, it says Chevron.

8            Do you recall if Chevron supplied the gas for

9   this station?

10       A.  You have to -- no, I didn't buy any gasoline

11  from Chevron when I owned the station.  My dad did from

12  1926 -- or 1928, I should say, until 1986, he dealt

13  directly with Chevron.  When my dad passed away, within

14  a couple of days after his death Chevron cancelled the

15  contract with me, with the station, per se, and I had to

16  go to R.V. Jensen & Company, which is a jobber, a local

17  distributor here in town, and they handled Chevron

18  products.  So I didn't buy anything direct from Chevron.

19  It was through R.V. Jensen & Company here in town.  They

20  were a jobber or a distributor or whatever you want to

21  call it.

22       Q.  And you said R.V. Jensen & Company used Chevron

23  products?

24       A.  They were --

25           MR. DAVIS:  Objection.  One second.  Objection;

word

1  overbroad, vague as to time period and location.

2      THE WITNESS:  What?

3      MR. DAVIS:  I said -- you can read my

4  objections back if you want to.

5      (Record read)

6      MR. STEEVES:  Q.  I think the question pending

7  is you just stated that R.V. Jensen & Company used

8  Chevron products.  Correct?

9      A.  They were a Chevron distributor and I bought

10  from them.

11     Q.  Do you recall the contact person with R.V.

12  Jensen?

13     A.  No.  There were a couple out there, I don't

14  remember who they were.

15     Q.  Do you know if R.V. Jensen & Company used any

16  other suppliers?

17     A.  No, sir, I don't.

18     Q.  Do you recall the date that your contract --

19  your father's contract with Chevron was cancelled?

20     A.  No.

21     Q.  You said it was sometime in 1986; is that

22  correct?

23     A.  Yeah, it was in 1986.

24     Q.  Who is responsible for -- who at the station

25  was responsible for ordering gasoline?

1    A.   Terry Kraft.

2    Q.   Do you know where Mr. Kraft is today?

3    A.   I have no idea.  I haven't seen him since '91.

4    Q.   Do you recall how gasoline was delivered to

5    your site by R.V. Jensen?

6    A.   In a truck.  Tanker truck.

7    Q.   Do you know where that gas was picked up from

8    before it was delivered to you?

9    A.   I assume out of their facility, which was south

10   of town there.  They had a -- R.V. Jensen was a

11   distributor for Chevron, and they had a plant out south

12   of town.  I assumed that's where they got it, because it

13   was always in an R.V. Jensen truck, so I --

14   Q.   You stated that you sold the station in 1991;

15   is that correct?

16   A.   Yes.

17   Q.   Do you recall the approximate date?

18   A.   I wish I could tell you, but I don't want to be

19   quoted as to the approximate -- 1991.  I don't remember

20   the month.

21   Q.   Do you recall who you sold the station to?

22   A.   A fellow by the name of Garabed Bedirian.

23        MR. STEEVES:  I will hand you what's been

24   marked as Exhibit 6.

25        / / / /

EXHIBIT 27

Page 1

1                  UNITED STATES DISTRICT COURT
2                  SOUTHERN DISTRICT OF NEW YORK
3
4   In re:  Methyl Tertiary Butyl )  Master File No.
    Ether ("MTBE") Products        )  1:00-1898
5   Liability Litigation           )  MDL 1358 (SAS)
    _____)
6
7
    This Document Relates To:
8
9   CITY OF FRESNO,                 )
                                    )
10        Plaintiff,                )
                                    )
11      vs.                         )        CASE NO.
                                    )  04 Civ. 4973 (SAS)
12  CHEVRON U.S.A., INC., et al.,   )
                                    )
13        Defendants.               )
    _____)
14
15
16
17       VIDEOTAPED DEPOSITION OF GARABED BEDIRIAN
18
19        Monday, April 4, 2011, at 9:41 a.m.
20
21          2800 North Green Valley Parkway
22               Henderson, Nevada
23
24
         REPORTED BY:  PEGGY S. ELIAS, RPR
25  Nevada CCR No. 274 - California CSR No. 8671

1   containing MTBE at your station?

2       A.   I don't know.

3       Q.   Do you recall who delivered your gasoline to

4   the station at the time you owned it?

5       A.   From what -- first day till the last day, I

6   always bought it from Jensen.  No one else.

7       Q.   Do you recall if you bought a particular

8   brand of gasoline?

9       A.   There were two kinds, the unleaded and the

10  super unleaded.

11      Q.   Do you recall if you purchased a particular

12  brand from a particular company, oil company?

13      A.   Jensen was Chevron, and I know that all my

14  signs were Chevron, and the trucks that came, they were

15  all Chevron trucks.

16      Q.   The trucks that delivered gasoline to your

17  station were Chevron trucks?

18      A.   Yes, they were.  I have all the Chevron signs

19  on it.

20      Q.   Do you recall how often gasoline was

21  delivered to your station?

22      A.   Every time we felt that it was really low, we

23  used to call them, and the second day morning they were

24  there right away delivering.

25      Q.   Did you generally make the calls for ordering

# EXHIBIT 28

Page 1

1

2               UNITED STATES DISTRICT COURT

3               NORTHERN DISTRICT OF NEW YORK

4

5    CITY OF FRESNO,                    )
                                        )
6                 Plaintiff,            )
                                        )
7    vs.                                )   No. 04 CIV. 4973
                                        )   (SAS)MDL 1358
8    CHEVRON U.S.A. INC., et al.,       )
                                        )
9                 Defendants.           )
     _____)

10

11

12                   DEPOSITION OF

13               SHIRLEY McMURPHY AHMAD

14                 FREMONT, CALIFORNIA

15            WEDNESDAY, FEBRUARY 16, 2011

16

17

18             DEPOBOOK REPORTING SERVICES

19             Certified Shorthand Reporters

20               1600 G Street, Suite 101

21               Modesto, California 95354

22                    800-830-8885

23

24    REPORTER:    DENISE WHEELER, CSR NO. 8254

25

Page 16

1  were, you know, going through the whole thing and

2  inventories and all that.  So I know we bought them from

3  Beacon.

4      Q.  Do you remember who you dealt with at Beacon as

5  part of that purchase process?

6      A.  I don't.  I didn't really deal with them.  My

7  husband did.

8      Q.  Is it your understanding that the gasoline then was

9  initially supplied by Beacon, and then their name switched

10  to Ultramar at some point.

11      A.  That's what I'm thinking, yes.

12      Q.  At some point did the brand of the station change

13  to Valley Gasoline?

14      A.  Yes, that happened later.

15      Q.  Do you have a knowledge as to who supplied gasoline

16  during the time the station was called Valley Gasoline?

17      A.  I'm not sure.  My husband would know.  I don't

18  know.

19      Q.  Your husband mentioned some companies call Total

20  Energy and Sabek Oil?

21      A.  Okay.  Yes.

22      Q.  Those are familiar?

23      A.  Yes.

24      Q.  Do you recall any other companies besides those two

25  that might have supplied gasoline to the station when it was

Page 17

1   called Valley Gasoline?

2        A.   I'm sorry?

3        Q.   Do you remember any other companies besides those

4   two, Total Energy and Sabek Oil who supplied gasoline to the

5   station when it was called Valley Gasoline?

6        A.   If you say some names, maybe I would know.  But I

7   just don't remember offhand.  Like when you said Sabek and

8   Total, then I knew, yes.

9        Q.   So you don't recall any other names besides those

10  two?

11       A.   Not offhand.  It's been a long time.

12       Q.   Sure.  We just want to get your best recollection,

13  so what you can remember.

14            I'm going to show you what I'm marking as

15  Exhibit 2.  I'm sorry, I'll try to get it close to you

16  there.

17                    (Exhibit No. 2 was marked for

18                     identification.)

19            MR. EICKMEYER:  Q.   This was also Exhibit 2 to

20  your husband's.  This is County of Fresno Environmental

21  Health Application, Bates FCDEH hyphen Fresno hyphen 003657.

22  I want to ask you, Ms. Ahmad, if you look to about the

23  center of the page toward the left, do you recognize that as

24  being your signature?

25       A.   Yes.

# EXHIBIT 29



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
PRODUCTS LIABILITY LITIGATION

Master File No. 1:00-1898
MDL 1358 (SAS)

This Document Relates To:

*City of Fresno v. Chevron U.S.A., Inc., et al.*
Case No. 04 Civ. 04973

### SHELL DEFENDANTS' OBJECTIONS AND RESPONSES TO
### PLAINTIFF CITY OF FRESNO'S
### FIRST SET OF INTERROGATORIES TO DEFENDANTS

Defendants Shell Oil Company, Equilon Enterprises LLC d/b/a Shell Oil

Products US, and TMR Company (collectively, the "Shell Defendants"), through counsel and

pursuant to Rule 33 of the Federal Rules of Civil Procedure, provide the following

Objections and Responses to Plaintiff City of Fresno's First Set of Interrogatories to

Defendants.

### PRELIMINARY STATEMENT

At this time, Defendant Shell Oil Company does not directly refine, market, distribute, or

sell gasoline.  Defendant Equilon Enterprises, doing business as Shell Oil Products US

("SOPUS"), is a Delaware limited liability company that owns and operates certain refining and

marketing assets in the Western United States contributed by Shell Oil Company and Texaco

Refining and Marketing Inc. upon its formation in January 1998.  These assets include refineries,

terminals, and certain Shell- and Texaco-branded service stations in the Western United States.

SOPUS is now a wholly-owned, indirect subsidiary of Shell Oil Company.  TMR Company was

formerly known as Texaco Refining and Marketing Inc., which owned and operated the Western

6323649.1

**Interrogatory No. 6:**   IDENTIFY each refinery that YOU own or owned which provided MTBE gasoline to the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the dates of ownership for each refinery YOU identified;

    b.    State the dates that YOU added MTBE to gasoline manufactured by each refinery YOU identified;

    c.    IDENTIFY each entity which supplied MTBE to each refinery YOU identified.

**Response to Interrogatory No. 6:**   In addition to their General Objections, which are incorporated herein as if set forth in full, the Shell Defendants object to this Interrogatory on the ground that it is overbroad with respect to time, as the Court's CMO No. 4 limits discovery to 1986, the Shell Defendants did not sell gasoline containing MTBE in California until even later, and MTBE was phased out of gasoline sold in California no later than December 31, 2003. The Shell Defendants further object on the grounds that this Interrogatory seeks information not relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence.

The Shell Defendants further object to this Interrogatory on the grounds that the undefined terms "provided" and "supplied" are vague, ambiguous and unintelligible, in that it fails to describe with specificity or reasonable particularity the information requested, and is thus overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. The Shell Defendants further object to the defined terms "IDENTIFY" and "YOU" on the grounds that they deviate from or purport to impose requirements other than or in addition to those required by Local Civil Rule 26.3, and therefore, this Interrogatory is vague and ambiguous, burdensome, overbroad, and seeks information not relevant to the allegations asserted in Plaintiff's complaint.

The Shell Defendants also object to this Interrogatory on the ground that it is compound in that it contains four separate and distinct requests. The Shell Defendants further object to

this Interrogatory to the extent it is duplicative of prior discovery served in this case and other cases in MDL 1358, and therefore, this Interrogatory is burdensome and harassing.  Without obligating themselves to do so, the Shell Defendants reserve the right to update their answer pending further investigations.

Subject to and without waiving the foregoing general and specific objections, the Shell Defendants respond as follows:

*Responses 6a and 6b.*  Following is a list of the refineries that the Shell Defendants own or owned which provided MTBE gasoline to the RGA.  Martinez received MTBE for the first time around 1991 and, on information and belief, did not use it for approximately one year.  Use of MTBE at the Martinez Refinery ended in January 2003.  Bakersfield first used MTBE to make wintertime oxygenated fuel in October 1992, although a few batches may have been run in late spring or early summer to prepare for the change in October.  In 1995, Bakersfield began blending MTBE into gasoline year-round.  MTBE has not been blended into gasoline at Bakersfield since January 2003.

| | |
|---|---|
| Martinez Refinery ...................................... | Owned by Shell 1915-1998; 2002-present |
| 3485 Pacheco Boulevard | Owned by Equilon Enterprises 1998-2002 |
| Martinez, CA  94553 | |
| | |
| Bakersfield Refinery .................................. | Owned by TRMI (now TMR) 1989 to 1998 |
| 6451 Rosedale Highway | Owned by Equilon 1998 to 2004 |
| Bakersfield, CA  93308 | Sold to Big West/Flying J March 2005 |

*Response 6c.*  Prior to the effective date of the Clean Air Act Amendments of 1990 (*i.e.*, November 1992), the Shell Defendants generally obtained neat MTBE from three sources:  Arco Chemical Company, Texas Petrochemical Company, and Texaco Chemical Company.  Following enactment of the Clean Air Act Amendments of 1990, which required increased use of MTBE in gasoline, Shell obtained MTBE from a number of suppliers

depending upon supply and demand issues. Suppliers of neat MTBE to the Shell Defendants in California since approximately 1996 have included Arco Chemical Company, BP West Coast Products LLC, Chevron U.S.A., Inc., ExxonMobil Oil Corporation, Petro Diamond, Inc., SABIC Americas, Inc., Sadaf, Tesoro Alaska Petroleum Co., ConocoPhillips Co., TFAMM, Valero Marketing and Supply Co., Kern Oil & Refining Co., Lyondell Petrochemical Co., Tesoro Refining and Marketing Co., Enron Clean Fuels Co., Murex N.A., Ltd., Ultramar Inc., Ultramar Diamond Shamrock, Star Enterprise, Noble Americas Corp., Vitol S.A., Inc., Oxygenated Marketing and Trading, Tradax Energy, Inc., Ecofuel S.p.A., Huntsman Petrochemical Corporation, American Agip, Oxygenate Division, Astra Oil Co., Inc., ATOFINA Petrochemicals, Inc., BP North American petroleum, BP Products North America, Flint Hills Resources, LP, Global Octanes Corp., Motiva Enterprises LLC, Neste Canada Inc., Texas Petrochemicals Corporation, Trammochem, Equiva Trading, LTC Limited, Tauber Oil Company, Glencore Ltd., and Chevron U.S.A. Products Co. It cannot be determined with precision which company's MTBE was blended into gasoline that was shipped to any particular locality.

**Interrogatory No. 7:** IDENTIFY each terminal that YOU own or owned which served the RELEVANT GEOGRAPHIC AREA since 1979.

  a.  State the dates of ownership for each terminal YOU identified;

  b.  IDENTIFY all Exchange and/or Throughout Partners for each terminal YOU identified;

  c.  IDENTIFY each pipeline used to supply gasoline for each terminal YOU identified.

**Response to Interrogatory No. 7:** In addition to their General Objections, which are incorporated herein as if set forth in full, the Shell Defendants object to this Interrogatory on the ground that it is overbroad with respect to time, as the Court's CMO No. 4 limits discovery

to 1986, the Shell Defendants did not sell gasoline containing MTBE in California until even later, and MTBE was phased out of gasoline sold in California no later than December 31, 2003. The Shell Defendants further object on the grounds that this Interrogatory seeks information not relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence.

The Shell Defendants further object to this Interrogatory on the grounds that the undefined terms "served," "Exchange and/or Throughput Partners" and "supply" are vague, ambiguous and unintelligible, in that they fail to describe with specificity or reasonable particularity the information requested, and are thus overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. The Shell Defendants further object to the defined terms "IDENTIFY" and "YOU" on the grounds that they deviate from or purport to impose requirements other than or in addition to those required by Local Civil Rule 26.3, and therefore, this Interrogatory is vague and ambiguous, burdensome, overbroad, and seeks information not relevant to the allegations asserted in Plaintiff's Complaint.

The Shell Defendants also object to this Interrogatory on the ground that it is compound in that it contains four separate and distinct requests. The Shell Defendants further object to this Interrogatory to the extent it is duplicative of prior discovery served in this case and other cases in MDL 1358, and therefore, this Interrogatory is burdensome and harassing. Without obligating themselves to do so, the Shell Defendants reserve the right to update their answer pending further investigation.

Subject to and without waiving the foregoing general and specific objections, the Shell Defendants respond as follows: The Shell Defendants have owned the Stockton Terminal,

3515 Navy Drive, Stockton, California 95203, which may have served the RGA during the

relevant time period, since February 23, 1940. The Shell Defendants owned the Bakersfield

Refinery Terminal, 6451 Rosedale Highway, Bakersfield, CA 93308, which may have served

the RGA during the relevant time period. The Bakersfield Refinery Terminal was owned by

TRMI (now TMR) from 1989 to 1998, and by Equilon from 1998 to 2004. In addition, the Shell

Defendants have had exchange agreements concerning the locations listed below, which may

have concerned service to the RGA during the relevant time period.

Kinder Morgan
2947 Navy Drive
Stockton, CA 95206

Shore Terminals
2941 Navy Drive
Stockton, CA 95206

Flying J
2436 Fruitvale Avenue
Bakersfield, CA 93308

Occidental Energy Marketing
28590 Highway 119
Tupman, CA 93276

Kern Oil & Refining Co.
7724 East Panama Lane
Bakersfield, CA 93307

EOTT
9224 Tupman Road
Tupman, CA 93276

**Interrogatory No. 8:** IDENTIFY each terminal at which YOU have or had a position which served the RELEVANT GEOGRAPHIC AREA since 1979.

      a.     State the dates of during which YOU maintained a position for each terminal YOU identified.

**Response to Interrogatory No. 8:** In addition to their General Objections, which are

incorporated herein as if set forth in full, the Shell Defendants object to this Interrogatory on

the ground that it is overbroad with respect to time, as the Court's CMO No. 4 limits discovery

to 1986, the Shell Defendants did not sell gasoline containing MTBE in California until even

later, and MTBE was phased out of gasoline sold in California no later than December 31,

2003. The Shell Defendants further object on the grounds that this Interrogatory seeks

information not relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence.

The Shell Defendants further object to the defined terms "IDENTIFY" and "YOU" on the grounds that they deviate from or purport to impose requirements other than or in addition to those required by Local Civil Rule 26.3, and therefore, this Interrogatory is vague and ambiguous, burdensome, overbroad, and seeks information not relevant to the allegations asserted in Plaintiff's complaint.

The Shell Defendants further object to this Interrogatory on the grounds that the undefined phrase "have or had a position" is vague, ambiguous and unintelligible, in that it fails to describe with specificity or reasonable particularity the information requested, and is thus overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. The Shell Defendants also object to this Interrogatory on the ground that it is compound in that it contains two separate and distinct requests. The Shell Defendants further object to this Interrogatory to the extent it is duplicative of prior discovery served in this case and other cases in MDL 1358, and therefore, this Interrogatory is burdensome and harassing. Without obligating themselves to do so, the Shell Defendants reserve the right to update their answer pending further investigations.

Subject to and without waiving the foregoing general and specific objections, the Shell Defendants respond as follows: Because the phrase "have or had a position" is vague, undefined, ambiguous and unintelligible, the Shell Defendants respond with information concerning the terminal that may have served the RGA during the relevant time period and at which the Shell Defendants may have held certain types of leases or other agreements: Kinder Morgan Fresno Terminal, 4149 S. Maple Ave., Fresno, CA 93725.

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 1 | | | | | | | | | | | |
| 2 | 116131 | 1998 | 1998 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 3 | 116131 | 1998 | 1998 | TEXACO | NW CORNER OF FRUIT AND CLINTON | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 4 | 116131 | 1998 | 1998 | TEXACO | NW CORNER OF FRUIT AND CLINTON | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 5 | 116131 | 1999 | 1999 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 6 | 116131 | 2000 | 2000 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 7 | 116131 | 2001 | 2001 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 8 | 116131 | 2002 | 2002 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 9 | 116131 | 2003 | 2003 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 10 | 116132 | 1998 | 1998 | TEXACO | SEC BLACKSTONE AND BARSTOW | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 11 | 116132 | 1998 | 1998 | TEXACO | SEC BLACKSTONE AND BARSTOW | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 12 | 116132 | 1999 | 1999 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 13 | 116132 | 1999 | 1999 | TEXACO | SEC BLACKSTONE AND BARSTOW | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 14 | 116132 | 2000 | 2000 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 15 | 116132 | 2000 | 2000 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 16 | 116132 | 2001 | 2001 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 17 | 116132 | 2002 | 2002 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 18 | 116132 | 2002 | 2002 | TEXACO | 5386 NORTH BLACKSTONE AVENUE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 19 | | | | | | | | | | | |
| 20 | | | | | | | | | | | |
| 21 | | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | | | | | | | | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | | | | | | | | | | | |
| 31 | | | | | | | | | | | |
| 32 | | | | | | | | | | | |
| 33 | | | | | | | | | | | |
| 34 | | | | | | | | | | | |
| 35 | | | | | | | | | | | |
| 36 | | | | | | | | | | | |
| 37 | | | | | | | | | | | |
| 38 | | | | | | | | | | | |
| 39 | | | | | | | | | | | |
| 40 | | | | | | | | | | | |
| 41 | | | | | | | | | | | |
| 42 | | | | | | | | | | | |
| 43 | | | | | | | | | | | |
| 44 | | | | | | | | | | | |
| 45 | | | | | | | | | | | |
| 46 | | | | | | | | | | | |

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | 116484 | 2000 | 2000 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 48 | 116484 | 2001 | 2001 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 49 | 116484 | 2002 | 2002 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 50 | 116484 | 2002 | 2002 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 51 | 116484 | 2002 | 2002 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 52 | 116484 | 2003 | 2003 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 53 | 116484 | 2003 | 2003 | TEXACO | 3085 EAST CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 54 | 116637 | 1998 | 1998 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 55 | 116637 | 1999 | 1999 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 56 | 116637 | 1999 | 1999 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 57 | 116637 | 2000 | 2000 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 58 | 116637 | 2000 | 2000 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 59 | 116637 | 2001 | 2001 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 60 | 116637 | 2002 | 2002 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 61 | 116637 | 2002 | 2002 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 62 | 116637 | 2003 | 2003 | SHELL | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 63 | 116637 | 2003 | 2003 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 64 | 116637 | 2003 | 2003 | TEXACO | 4994 EAST ASHLAN AVENUE | FRESNO | CA | 93726 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 65 | 120584 | 1998 | 1998 | TEXACO | 1280 W BELMONT AVE. | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 66 | 120584 | 1998 | 1998 | | 1280 W BELMONT AVE. | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 67 | 120584 | 1999 | 1999 | TEXACO | 1280 W BELMONT AVE. | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 68 | 120584 | 1999 | 1999 | TEXACO | 1280 W BELMONT AVE. | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 69 | 120584 | 2000 | 2000 | TEXACO | 1280 W BELMONT AVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 70 | 120584 | 2000 | 2000 | TEXACO | 1280 W BELMONT AVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 71 | 120584 | 2001 | 2001 | TEXACO | 1280 W BELMONT AVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 72 | 120584 | 2001 | 2001 | TEXACO | 1280 W BELMONT AVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 73 | 120584 | 2001 | 2001 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 74 | 120584 | 2002 | 2002 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 75 | 120584 | 2002 | 2002 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 76 | 120584 | 2003 | 2003 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 77 | 120584 | 2003 | 2003 | TEXACO | 1280 WEST BELMONT AVENUE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 78 | 120633 | 1998 | 1998 | TEXACO | 138 N MAPLE | FRESNO | CA | 00000 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 79 | 120633 | 1998 | 1998 | | 138 N MAPLE | FRESNO | CA | 00000 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 80 | 120633 | 1999 | 1999 | TEXACO | 138 N MAPLE | FRESNO | CA | 00000 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 81 | 120633 | 1999 | 1999 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 82 | 120633 | 1999 | 1999 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 83 | 120633 | 2000 | 2000 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 84 | 120633 | 2001 | 2001 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 85 | 120633 | 2002 | 2002 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 86 | 120633 | 2003 | 2003 | TEXACO | 138 N MAPLE AVENUE | FRESNO | CA | 93702 | FRESNO | OPEN DEALER | ARCHIVED |
| 87 | 120700 | 1998 | 1998 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 88 | 120700 | 1998 | 1998 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 89 | 120700 | 1999 | 1999 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 90 | 120700 | 1999 | 1999 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 91 | 120700 | 2000 | 2000 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92 | 120700 | 2000 | 2000 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 93 | 120700 | 2001 | 2001 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 94 | 120700 | 2001 | 2001 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 95 | 120700 | 2002 | 2002 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 96 | 120700 | 2002 | 2002 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 97 | 120700 | 2003 | 2003 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93701 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 98 | 120700 | 2003 | 2003 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93701 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 99 | 120700 | 2003 | 2003 | TEXACO | 1536 EAST BELMONT | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 100 | 120715 | 1998 | 1998 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 101 | 120715 | 1998 | 1998 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 102 | 120715 | 1999 | 1999 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 103 | 120715 | 2000 | 2000 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 104 | 120715 | 2001 | 2001 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 105 | 120715 | 2001 | 2001 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 106 | 120715 | 2002 | 2002 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 107 | 120715 | 2002 | 2002 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 108 | 120715 | 2003 | 2003 | TEXACO | 1595 FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 109 | 120733 | 1998 | 1998 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 110 | 120733 | 1998 | 1998 | | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 111 | 120733 | 1998 | 1998 | | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 112 | 120733 | 1999 | 1999 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 113 | 120733 | 2000 | 2000 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 114 | 120733 | 2001 | 2001 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 115 | 120733 | 2002 | 2002 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 116 | 120733 | 2003 | 2003 | TEXACO | 1615 NORTH MAPLE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 117 | 120752 | 1998 | 1998 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 118 | 120752 | 1999 | 1999 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 119 | 120752 | 1999 | 1999 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 120 | 120752 | 2000 | 2000 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 121 | 120752 | 2001 | 2001 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 122 | 120752 | 2002 | 2002 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 123 | 120752 | 2003 | 2003 | TEXACO | CORNER CHAMPLAIN & PERRIN | FRESNO | CA | 93720 | FRESNO | OPEN DEALER | ARCHIVED |
| 124 | 120779 | 1998 | 1998 | TEXACO | 1785 W. SHAW AVE. | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 125 | 120779 | 1998 | 1998 | TEXACO | 1785 W. SHAW AVE. | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 126 | 120779 | 1999 | 1999 | TEXACO | 1785 W. SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 127 | 120779 | 1999 | 1999 | TEXACO | 1785 W. SHAW AVE. | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 128 | 120779 | 2000 | 2000 | TEXACO | 1785 W. SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 129 | 120779 | 2000 | 2000 | TEXACO | 1785 W. SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 130 | 120779 | 2001 | 2001 | TEXACO | 1785 W. SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 131 | 120779 | 2001 | 2001 | TEXACO | 1785 W. SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 132 | 120779 | 2001 | 2001 | TEXACO | 1785 W. SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 133 | 120779 | 2002 | 2002 | TEXACO | 1785 W. SHAW AVE. | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 134 | 120779 | 2002 | 2002 | TEXACO | 1785 W. SHAW AVE | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 135 | 120779 | 2002 | 2002 | TEXACO | 1785 W. SHAW AVE. | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 136 | 120779 | 2003 | 2003 | TEXACO | 1785 W. SHAW AVE. | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 137 | 120953 | 1998 | 1998 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 138 | 120953 | 1998 | 1998 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 139 | 120953 | 1999 | 1999 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 140 | 120953 | 2000 | 2000 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 141 | 120953 | 2001 | 2001 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 142 | 120953 | 2001 | 2001 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 143 | 120953 | 2002 | 2002 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 144 | 120953 | 2002 | 2002 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 145 | 120953 | 2003 | 2003 | TEXACO | 2330 N FRESNO | FRESNO | CA | 93703 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 146 | 120981 | 1999 | 1999 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 147 | 120981 | 1999 | 1999 | | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 148 | 120981 | 2000 | 2000 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 149 | 120981 | 2000 | 2000 | TEXACO | 2407 NORTH FRUIT | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 150 | 120981 | 2001 | 2001 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 151 | 120981 | 2001 | 2001 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 152 | 120981 | 2002 | 2002 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 153 | 120981 | 2002 | 2002 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 154 | 120981 | 2003 | 2003 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 155 | 120981 | 2003 | 2003 | TEXACO | 2407 NORTH FRUIT AVE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 156 | 121049 | 1998 | 1998 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 157 | 121049 | 1998 | 1998 | | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 158 | 121049 | 1998 | 1998 | | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 159 | 121049 | 1999 | 1999 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 160 | 121049 | 2000 | 2000 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 161 | 121049 | 2001 | 2001 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 162 | 121049 | 2002 | 2002 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 163 | 121049 | 2003 | 2003 | TEXACO | 2874 S. CHERRY | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 164 | 121077 | 1998 | 1998 | TEXACO | 3808 N BLACKSTONE/DAKOTA | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 165 | 121077 | 1998 | 1998 | | 3808 N BLACKSTONE/DAKOTA | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 166 | 121077 | 1999 | 1999 | | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 167 | 121077 | 1999 | 1999 | TEXACO | 3808 N BLACKSTONE/DAKOTA | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 168 | 121077 | 2000 | 2000 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 169 | 121077 | 2000 | 2000 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 170 | 121077 | 2001 | 2001 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 171 | 121077 | 2001 | 2001 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 172 | 121077 | 2001 | 2001 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 173 | 121077 | 2002 | 2002 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 174 | 121077 | 2002 | 2002 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | SORO | OPEN FOR BUSINESS |
| 175 | 121077 | 2003 | 2003 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 176 | 121077 | 2003 | 2003 | TEXACO | 3808 N BLACKSTONE AVENUE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 177 | 121081 | 1998 | 1998 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 178 | 121081 | 1998 | 1998 | | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 179 | 121081 | 1999 | 1999 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 180 | 121081 | 1999 | 1999 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 181 | 121081 | 2000 | 2000 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 182 | 121081 | 2000 | 2000 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 183 | 121081 | 2000 | 2000 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 184 | 121081 | 2001 | 2001 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 185 | 121081 | 2001 | 2001 | TEXACO | 3089 E TULARE ST | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 186 | 121081 | 2001 | 2001 | TEXACO | 3089 EAST TULARE ST | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 187 | 121081 | 2001 | 2001 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 188 | 121081 | 2002 | 2002 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 189 | 121081 | 2002 | 2002 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 190 | 121081 | 2003 | 2003 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | CORO | OPEN FOR BUSINESS |
| 191 | 121081 | 2003 | 2003 | TEXACO | 3089 EAST TULARE STREET | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 192 | 121168 | 1998 | 1998 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 193 | 121168 | 1998 | 1998 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 194 | 121168 | 1999 | 1999 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 195 | 121168 | 1999 | 1999 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 196 | 121168 | 2000 | 2000 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 197 | 121168 | 2000 | 2000 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 198 | 121168 | 2001 | 2001 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 199 | 121168 | 2001 | 2001 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 200 | 121168 | 2001 | 2001 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | OPEN FOR BUSINESS |
| 201 | 121168 | 2002 | 2002 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 202 | 121168 | 2002 | 2002 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 203 | 121168 | 2003 | 2003 | TEXACO | 3464 E VENTURA | FRESNO | CA | 93702 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 204 | 121204 | 2001 | 2001 | | 394 EAST OLIVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | ARCHIVED |
| 205 | 121204 | 2002 | 2002 | | 394 EAST OLIVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | ARCHIVED |
| 206 | 121204 | 2003 | 2003 | | 394 EAST OLIVE | FRESNO | CA | 93728 | FRESNO | OPEN DEALER | ARCHIVED |
| 207 | 121221 | 2001 | 2001 | | 4025 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | ARCHIVED |
| 208 | 121221 | 2002 | 2002 | | 4025 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | ARCHIVED |
| 209 | 121221 | 2003 | 2003 | | 4025 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | ARCHIVED |
| 210 | 121237 | 1998 | 1998 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 211 | 121237 | 1998 | 1998 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 212 | 121237 | 1998 | 1998 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 213 | 121237 | 1999 | 1999 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 214 | 121237 | 2000 | 2000 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 215 | 121237 | 2001 | 2001 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 216 | 121237 | 2002 | 2002 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 217 | 121237 | 2003 | 2003 | TEXACO | 4201 E SHIELDS AVE | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | ARCHIVED |
| 218 | 121243 | 1998 | 1998 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 219 | 121243 | 1998 | 1998 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 220 | 121243 | 1999 | 1999 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 221 | 121243 | 1999 | 1999 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 222 | 121243 | 1999 | 2000 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 223 | 121243 | 2000 | 2000 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 224 | 121243 | 2001 | 2001 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 225 | 121243 | 2002 | 2002 | TEXACO | 4245 N. CEDAR | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |
| 226 | 121243 | 2002 | 2002 | TEXACO | 4245 N CEDAR AVENUE | FRESNO | CA | 93703 | FRESNO | OPEN DEALER | ARCHIVED |

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 227 | 121243 | 2003 | 2003 | TEXACO | 4245 N CEDAR AVENUE | FRESNO | CA | 93703 | FRESNO | | ARCHIVED |
| 228 | 121309 | 1998 | 1998 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 229 | 121309 | 1998 | 1998 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 230 | 121309 | 1999 | 1999 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 231 | 121309 | 1999 | 1999 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 232 | 121309 | 2000 | 2000 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 233 | 121309 | 2000 | 2000 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 234 | 121309 | 2001 | 2001 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 235 | 121309 | 2001 | 2001 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 236 | 121309 | 2001 | 2001 | TEXACO | 4805 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 237 | 121309 | 2002 | 2002 | TEXACO | 4805 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 238 | 121309 | 2002 | 2002 | TEXACO | 4805 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 239 | 121309 | 2003 | 2003 | TEXACO | 4805 E SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 240 | 121309 | 2003 | 2003 | TEXACO | 4805 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 241 | 121377 | 1998 | 1998 | TEXACO | 5316 W SHAW  HWY 99 | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 242 | 121377 | 1998 | 1998 | TEXACO | 5316 W SHAW | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 243 | 121377 | 1999 | 1999 | TEXACO | 5316 W SHAW | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 244 | 121377 | 1999 | 1999 | TEXACO | 5316 W SHAW  HWY 99 | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 245 | 121377 | 1999 | 1999 | TEXACO | 5316 W SHAW  HWY 99 | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 246 | 121377 | 1999 | 1999 | TEXACO | 5316 W SHAW | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 247 | 121377 | 2000 | 2000 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 248 | 121377 | 2000 | 2000 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | SORO | OPEN FOR BUSINESS |
| 249 | 121377 | 2001 | 2001 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 250 | 121377 | 2001 | 2001 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 251 | 121377 | 2001 | 2001 | TEXACO | 5316 WEST SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 252 | 121377 | 2002 | 2002 | TEXACO | 5316 WEST SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 253 | 121377 | 2002 | 2002 | TEXACO | 5316 WEST SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 254 | 121377 | 2003 | 2003 | TEXACO | 5316 W SHAW AVENUE | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 255 | 121377 | 2003 | 2003 | TEXACO | 5316 WEST SHAW AVENUE | FRESNO | CA | 93705 | FRESNO | CORO | OPEN FOR BUSINESS |
| 256 | 121402 | 2001 | 2001 | | 1275 WEST SHAW | FRESNO | CA | 93711 | FRESNO | CORO | ARCHIVED |
| 257 | 121402 | 2002 | 2002 | | 1275 WEST SHAW | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 258 | 121402 | 2002 | 2002 | | 1275 WEST SHAW | FRESNO | CA | 93711 | FRESNO | OPEN DEALER | ARCHIVED |
| 259 | 121418 | 1998 | 1998 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 260 | 121418 | 1998 | 1998 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 261 | 121418 | 1999 | 1999 | TEXACO | 5756 N. FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 262 | 121418 | 1999 | 1999 | TEXACO | 5756 N FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 263 | 121418 | 2000 | 2000 | TEXACO | 5756 N FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 264 | 121418 | 2000 | 2000 | TEXACO | 5756 N FIRST STREET | FRESNO | CA | 93706 | FRESNO | SORO | OPEN FOR BUSINESS |
| 265 | 121418 | 2001 | 2001 | TEXACO | 5756 N FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 266 | 121418 | 2001 | 2001 | TEXACO | 5756 N FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 267 | 121418 | 2001 | 2001 | TEXACO | 5756 N FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 268 | 121418 | 2001 | 2001 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 269 | 121418 | 2002 | 2002 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 270 | 121418 | 2002 | 2002 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 271 | 121418 | 2003 | 2003 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 272 | 121418 | 2003 | 2003 | TEXACO | 5756 NORTH FIRST STREET | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 273 | 121419 | 1998 | 1998 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 274 | 121419 | 1998 | 1998 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 275 | 121419 | 1999 | 1999 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 276 | 121419 | 1999 | 1999 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 277 | 121419 | 2000 | 2000 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 278 | 121419 | 2000 | 2000 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 279 | 121419 | 2001 | 2001 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 280 | 121419 | 2001 | 2001 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 281 | 121419 | 2001 | 2001 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 282 | 121419 | 2002 | 2002 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 283 | 121419 | 2002 | 2002 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 284 | 121419 | 2003 | 2003 | TEXACO | 5783 N PALM AVE. | FRESNO | CA | 93704 | FRESNO | SORO | CLOSED FOR BUSINESS |
| 285 | 121488 | 1998 | 1998 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 286 | 121488 | 1998 | 1998 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 287 | 121488 | 1999 | 1999 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 288 | 121488 | 1999 | 1999 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 289 | 121488 | 2000 | 2000 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 290 | 121488 | 2000 | 2000 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 291 | 121488 | 2001 | 2001 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 292 | 121488 | 2001 | 2001 | TEXACO | 6735 N GOLDEN STATE BLVD | FRESNO | CA | 93734 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 293 | 121488 | 2001 | 2001 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 294 | 121488 | 2002 | 2002 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 295 | 121488 | 2002 | 2002 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 296 | 121488 | 2003 | 2003 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 297 | 121488 | 2003 | 2003 | TEXACO | 6735 NORTH GOLDEN STATE BLVD | FRESNO | CA | 93722 | FRESNO | CORO | OPEN FOR BUSINESS |
| 298 | 121525 | 1998 | 1998 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 299 | 121525 | 1998 | 1998 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 300 | 121525 | 1999 | 1999 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 301 | 121525 | 1999 | 1999 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 302 | 121525 | 2000 | 2000 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 303 | 121525 | 2000 | 2000 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 304 | 121525 | 2001 | 2001 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 305 | 121525 | 2001 | 2001 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 306 | 121525 | 2002 | 2002 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 307 | 121525 | 2003 | 2003 | TEXACO | 7216 NORTH BLACKSTONE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 308 | 121746 | 1998 | 1998 | TEXACO | 1016 W SHAW AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 309 | 121746 | 1998 | 1998 | TEXACO | 1016 W SHAW AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 310 | 121746 | 1999 | 1999 | TEXACO | 1016 W SHAW AVE. | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 311 | 121746 | 1999 | 1999 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 312 | 121746 | 2000 | 2000 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 313 | 121746 | 2000 | 2000 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 314 | 121746 | 2000 | 2000 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | SORO | OPEN FOR BUSINESS |
| 315 | 121746 | 2001 | 2001 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 316 | 121746 | 2001 | 2001 | TEXACO | 1016 W SHAW AVE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 317 | 121746 | 2001 | 2001 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 318 | 121746 | 2002 | 2002 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 319 | 121746 | 2002 | 2002 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 320 | 121746 | 2003 | 2003 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 321 | 121746 | 2003 | 2003 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 322 | 121776 | 1998 | 1998 | | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 323 | 121776 | 1998 | 1998 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 324 | 121776 | 1999 | 1999 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 325 | 121776 | 1999 | 1999 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 326 | 121776 | 2000 | 2000 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 327 | 121776 | 2000 | 2000 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 328 | 121776 | 2001 | 2001 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 329 | 121776 | 2001 | 2001 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 330 | 121776 | 2002 | 2002 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 331 | 121776 | 2002 | 2002 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 332 | 121776 | 2003 | 2003 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 333 | 121776 | 2003 | 2003 | TEXACO | 2619 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 334 | 121793 | 1998 | 1998 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 335 | 121793 | 1998 | 1998 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 336 | 121793 | 1998 | 1998 | | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 337 | 121793 | 1999 | 1999 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 338 | 121793 | 1999 | 1999 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 339 | 121793 | 2000 | 2000 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 340 | 121793 | 2001 | 2001 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 341 | 121793 | 2002 | 2002 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 342 | 121793 | 2003 | 2003 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 343 | 121794 | 1998 | 1998 | TEXACO | 4149 N CLOVIS AVE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 344 | 121794 | 1998 | 1998 | | 4149 N CLOVIS AVE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 345 | 121794 | 1998 | 1998 | | 4149 N CLOVIS AVE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 346 | 121794 | 1998 | 1998 | | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 347 | 121794 | 1999 | 1999 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 348 | 121794 | 1999 | 1999 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 349 | 121794 | 2000 | 2000 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 350 | 121794 | 2001 | 2001 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 351 | 121794 | 2002 | 2002 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 352 | 121794 | 2003 | 2003 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 353 | 121853 | 1998 | 1998 | | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 354 | 121853 | 1998 | 1998 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 355 | 121853 | 1999 | 1999 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 356 | 121853 | 2000 | 2000 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 357 | 121853 | 2001 | 2001 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 358 | 121853 | 2002 | 2002 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 359 | 121853 | 2003 | 2003 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 360 | 124005 | 1998 | 1998 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 361 | 124005 | 1998 | 1998 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 362 | 124005 | 1998 | 1998 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | |
| 363 | 124005 | 1999 | 1999 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 364 | 124005 | 1999 | 1999 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 365 | 124005 | 1999 | 1999 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 366 | 124005 | 2000 | 2000 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 367 | 124005 | 2001 | 2001 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 368 | 124005 | 2002 | 2002 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 369 | 124005 | 2003 | 2003 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 370 | 124198 | 1998 | 1998 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 371 | 124198 | 1998 | 1998 | | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 372 | 124198 | 1998 | 1998 | | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | |
| 373 | 124198 | 1999 | 1999 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 374 | 124198 | 1999 | 1999 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 375 | 124198 | 2000 | 2000 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 376 | 124198 | 2000 | 2000 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 377 | 124198 | 2001 | 2001 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 378 | 124198 | 2001 | 2001 | TEXACO | 4205 EAST OLIVE AVE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 379 | 124198 | 2001 | 2001 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 380 | 124198 | 2002 | 2002 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 381 | 124198 | 2002 | 2002 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 382 | 124198 | 2002 | 2002 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 383 | 124198 | 2002 | 2002 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 384 | 124198 | 2003 | 2003 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 385 | 124198 | 2003 | 2003 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 386 | 124198 | 2003 | 2003 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 387 | 124198 | 2003 | 2003 | TEXACO | 4205 EAST OLIVE AVENUE | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 388 | 124200 | 1998 | 1998 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 389 | 124200 | 1998 | 1998 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 390 | 124200 | 1998 | 1998 | | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | |
| 391 | 124200 | 1999 | 1999 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 392 | 124200 | 1999 | 1999 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 393 | 124200 | 2000 | 2000 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 394 | 124200 | 2000 | 2000 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 395 | 124200 | 2001 | 2001 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 396 | 124200 | 2002 | 2002 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 397 | 124200 | 2003 | 2003 | TEXACO | 3110 EAST BELMONT | FRESNO | CA | 93702 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 398 | 124219 | 1998 | 1998 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 399 | 124219 | 1998 | 1998 | | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 400 | 124219 | 1998 | 1998 | | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | |
| 401 | 124219 | 1999 | 1999 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 402 | 124219 | 1999 | 1999 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 403 | 124219 | 2000 | 2000 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 404 | 124219 | 2000 | 2000 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 405 | 124219 | 2001 | 2001 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 406 | 124219 | 2002 | 2002 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 407 | 124219 | 2003 | 2003 | TEXACO | 2111 VENTURA | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 408 | 124227 | 1998 | 1998 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 409 | 124227 | 1998 | 1998 | | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 410 | 124227 | 1998 | 1998 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 411 | 124227 | 1999 | 1999 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 412 | 124227 | 1999 | 1999 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 413 | 124227 | 2000 | 2000 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 414 | 124227 | 2000 | 2000 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 415 | 124227 | 2001 | 2001 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 416 | 124227 | 2001 | 2001 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 417 | 124227 | 2002 | 2002 | SHELL | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 418 | 124227 | 2002 | 2002 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 419 | 124227 | 2002 | 2002 | TEXACO | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 420 | 124227 | 2003 | 2003 | SHELL | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 421 | 124227 | 2003 | 2003 | SHELL | 10091 NORTH MAPLE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 422 | 124236 | 1998 | 1998 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | TULARE | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 423 | 124236 | 1998 | 1998 | | 7995 NORTH CEDAR | FRESNO | CA | 93720 | TULARE | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 424 | 124236 | 1998 | 1998 | | 7995 NORTH CEDAR | FRESNO | CA | 93720 | TULARE | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 425 | 124236 | 1999 | 1999 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 426 | 124236 | 1999 | 1999 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 427 | 124236 | 2000 | 2000 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 428 | 124236 | 2000 | 2000 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 429 | 124236 | 2001 | 2001 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 430 | 124236 | 2001 | 2001 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 431 | 124236 | 2002 | 2002 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 432 | 124236 | 2002 | 2002 | TEXACO | 7995 NORTH CEDAR | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 433 | 124236 | 2002 | 2002 | TEXACO | 7995 NORTH CEDAR AVE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 434 | 124236 | 2003 | 2003 | SHELL | 7995 NORTH CEDAR AVE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 435 | 124236 | 2003 | 2003 | TEXACO | 7995 NORTH CEDAR AVE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 436 | 124236 | 2003 | 2003 | TEXACO | 7995 NORTH CEDAR AVE | FRESNO | CA | 93720 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 437 | 128605 | 2001 | 2001 | | N BLACKSTONE AVE AT W BARSTOW AVE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 438 | 128605 | 2002 | 2002 | | N BLACKSTONE AVE AT W BARSTOW AVE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 439 | 128605 | 2003 | 2003 | | N BLACKSTONE AVE AT W BARSTOW AVE | FRESNO | CA | 93710 | FRESNO | OPEN DEALER | ARCHIVED |
| 440 | 128606 | 2001 | 2001 | | 2407 N FRUIT AVENUE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 441 | 128606 | 2002 | 2002 | | 2407 N FRUIT AVENUE | FRESNO | CA | 93705 | FRESNO | OPEN DEALER | ARCHIVED |
| 442 | 135299 | 1998 | 1998 | SHELL | 5325 W SHAW/HWY 99 | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 443 | 135299 | 1999 | 1999 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 444 | 135299 | 1999 | 1999 | SHELL | 5325 W SHAW/HWY 99 | FRESNO | CA | 93705 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 445 | 135299 | 2000 | 2000 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 446 | 135299 | 2000 | 2000 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 447 | 135299 | 2000 | 2000 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 448 | 135299 | 2001 | 2001 | SHELL | 5325 W SHAW | FRESNO | CA | 93705 | FRESNO | LESSEE | OPEN FOR BUSINESS |

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 449 | 135299 | 2001 | 2001 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 450 | 135299 | 2001 | 2001 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 451 | 135299 | 2002 | 2002 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 452 | 135299 | 2002 | 2002 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 453 | 135299 | 2002 | 2003 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 454 | 135299 | 2003 | 2003 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 455 | 135299 | 2003 | 2003 | SHELL | 5325 W SHAW | FRESNO | CA | 93722 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 456 | 135300 | 1998 | 1998 | SHELL | 1021 E SHAW AVE/FIRST | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 457 | 135300 | 1999 | 1999 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 458 | 135300 | 1999 | 1999 | SHELL | 1021 E SHAW AVE/FIRST | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 459 | 135300 | 2000 | 2000 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 460 | 135300 | 2000 | 2000 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 461 | 135300 | 2001 | 2001 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 462 | 135300 | 2001 | 2001 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 463 | 135300 | 2002 | 2002 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 464 | 135300 | 2002 | 2002 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 465 | 135300 | 2003 | 2003 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 466 | 135300 | 2003 | 2003 | SHELL | 1021 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 467 | 135301 | 1998 | 1998 | SHELL | 2020 W SHAW/WEST | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 468 | 135301 | 1999 | 1999 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 469 | 135301 | 1999 | 1999 | SHELL | 2020 W SHAW/WEST | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 470 | 135301 | 2000 | 2000 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 471 | 135301 | 2000 | 2000 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 472 | 135301 | 2001 | 2001 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 473 | 135301 | 2001 | 2001 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 474 | 135301 | 2002 | 2002 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 475 | 135301 | 2002 | 2002 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 476 | 135301 | 2003 | 2003 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 477 | 135301 | 2002 | 2002 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 478 | 135301 | 2003 | 2003 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | OPEN FOR BUSINESS |
| 479 | 135301 | 2003 | 2003 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 480 | 135301 | 2003 | 2003 | SHELL | 2020 W SHAW | FRESNO | CA | 93711 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 481 | 135302 | 1998 | 1998 | SHELL | 1778 E SHAW AVE/CEDAR | FRESNO | CA | 93710 | FRESNO | CORO | OPEN FOR BUSINESS |
| 482 | 135302 | 1999 | 1999 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 483 | 135302 | 1999 | 1999 | SHELL | 1778 E SHAW AVE/CEDAR | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 484 | 135302 | 1999 | 1999 | SHELL | 1778 E SHAW AVE/CEDAR | FRESNO | CA | 93710 | FRESNO | CORO | OPEN FOR BUSINESS |
| 485 | 135302 | 2000 | 2000 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 486 | 135302 | 2001 | 2001 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 487 | 135302 | 2002 | 2002 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 488 | 135302 | 2002 | 2002 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 489 | 135302 | 2002 | 2002 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 490 | 135302 | 2003 | 2003 | SHELL | 1778 E SHAW AVE | FRESNO | CA | 93710 | FRESNO | CORO | CLOSED FOR BUSINESS |
| 491 | 135303 | 1998 | 1998 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 492 | 135303 | 1999 | 1999 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 493 | 135303 | 2000 | 2000 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 494 | 35303 | 2000 | 2000 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 495 | 35303 | 2001 | 2001 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 496 | 35303 | 2001 | 2001 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 497 | 35303 | 2001 | 2001 | SHELL | 1212 FRESNO/C | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 498 | 35303 | 2002 | 2002 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 499 | 35303 | 2002 | 2002 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 500 | 35303 | 2003 | 2003 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 501 | 35303 | 2003 | 2003 | SHELL | 1212 FRESNO | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 502 | 35304 | 1998 | 1998 | SHELL | 3109 E SHIELDS/FIRST | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 503 | 35304 | 1999 | 1999 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 504 | 35304 | 1999 | 1999 | SHELL | 3109 E SHIELDS/FIRST | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 505 | 35304 | 2000 | 2000 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 506 | 35304 | 2000 | 2000 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 507 | 35304 | 2001 | 2001 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 508 | 35304 | 2001 | 2001 | SHELL | 3109 E SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 509 | 35304 | 2001 | 2001 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 510 | 35304 | 2002 | 2002 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 511 | 35304 | 2002 | 2002 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93721 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 512 | 35304 | 2002 | 2002 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 513 | 35304 | 2003 | 2003 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 514 | 35304 | 2003 | 2003 | SHELL | 3109 EAST SHIELDS | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 515 | 35305 | 1998 | 1998 | SHELL | 5605 E KINGS CYN/CLOVIS | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 516 | 35305 | 1999 | 1999 | SHELL | 5605 E KINGS CYN | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 517 | 35305 | 1999 | 1999 | SHELL | 5605 E KINGS CYN/CLOVIS | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 518 | 35305 | 2000 | 2000 | SHELL | 5605 E KINGS CYN | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 519 | 35305 | 2000 | 2000 | SHELL | 5605 E KINGS CYN | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 520 | 35305 | 2001 | 2001 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 63727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 521 | 35305 | 2001 | 2001 | SHELL | 5605 E KINGS CYN | FRESNO | CA | 63727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 522 | 35305 | 2001 | 2001 | SHELL | 5605 E KINGS CYN | FRESNO | CA | 93702 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 523 | 35305 | 2001 | 2001 | SHELL | 5605 E KINGS CYN | FRESNO | CA | 63727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 524 | 35305 | 2002 | 2002 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 525 | 35305 | 2002 | 2002 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 63727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 526 | 35305 | 2002 | 2002 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 527 | 35305 | 2003 | 2003 | SHELL | 5605 E KINGS CANYON | FRESNO | CA | 93727 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 528 | 35306 | 1998 | 1998 | SHELL | 2595 EAST AVE/JENSEN | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 529 | 35306 | 1999 | 1999 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 530 | 35306 | 1999 | 1999 | SHELL | 2595 EAST AVE/JENSEN | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 531 | 35306 | 2000 | 2000 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 532 | 35306 | 2000 | 2000 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 533 | 35306 | 2001 | 2001 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 534 | 35306 | 2001 | 2001 | SHELL | 2595 S EAST AVE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 535 | 35306 | 2001 | 2001 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 536 | 35306 | 2002 | 2002 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 537 | 35306 | 2002 | 2002 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 538 | 35306 | 2003 | 2003 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 539 | 135306 | 2003 | 2003 | SHELL | 2595 S EAST AVENUE | FRESNO | CA | 93706 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 540 | 135307 | 1998 | 1998 | SHELL | 1014 E BULLARD/FIRST | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 541 | 135307 | 1999 | 1999 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 542 | 135307 | 1999 | 1999 | SHELL | 1014 E BULLARD/FIRST | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 543 | 135307 | 2000 | 2000 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 544 | 135307 | 2000 | 2000 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 545 | 135307 | 2001 | 2001 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 546 | 135307 | 2001 | 2001 | SHELL | 1014 E BULLARD | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 547 | 135307 | 2001 | 2001 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 548 | 135307 | 2002 | 2002 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 549 | 135307 | 2002 | 2002 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 550 | 135307 | 2003 | 2003 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 551 | 135307 | 2003 | 2003 | SHELL | 1014 EAST BULLARD AVENUE | FRESNO | CA | 93710 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 552 | 135308 | 1998 | 1998 | SHELL | 4206 N BLACKSTONE/ASHLAND | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 553 | 135308 | 1999 | 1999 | SHELL | 4206 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 554 | 135308 | 1999 | 1999 | SHELL | 4206 N BLACKSTONE/ASHLAND | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 555 | 135308 | 1999 | 1999 | SHELL | 4206 N BLACKSTONE/ASHLAND | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 556 | 135308 | 2000 | 2000 | SHELL | 4206 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 557 | 135308 | 2001 | 2001 | SHELL | 4206 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 558 | 135308 | 2002 | 2002 | SHELL | 4206 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 559 | 135308 | 2002 | 2002 | SHELL | 4206 N BLACKSTONE AVE | FRESNO | CA | 93726 | FRESNO | LESSEE | ARCHIVED |
| 560 | 135308 | 2002 | 2002 | SHELL | 4206 N BLACKSTONE AVE | FRESNO | CA | 93726 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 561 | 135308 | 2003 | 2003 | SHELL | 4206 N BLACKSTONE AVE | FRESNO | CA | 93726 | FRESNO | LESSEE | ARCHIVED |
| 562 | 135309 | 1998 | 1998 | SHELL | 5405 N BLACKSTONE/BARSTOWN | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 563 | 135309 | 1999 | 1999 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 564 | 135309 | 1999 | 1999 | SHELL | 5405 N BLACKSTONE/BARSTOWN | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 565 | 135309 | 2000 | 2000 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 566 | 135309 | 2000 | 2000 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 567 | 135309 | 2001 | 2001 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 568 | 135309 | 2001 | 2001 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 569 | 135309 | 2002 | 2002 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 570 | 135309 | 2002 | 2002 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 571 | 135309 | 2003 | 2003 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 572 | 135309 | 2003 | 2003 | SHELL | 5405 N BLACKSTONE | FRESNO | CA | 93726 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 573 | 135310 | 1998 | 1998 | SHELL | 4819 N BLACKSTONE/SNTA ANA | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 574 | 135310 | 1999 | 1999 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 575 | 135310 | 1999 | 1999 | SHELL | 4819 N BLACKSTONE/SNTA ANA | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 576 | 135310 | 2000 | 2000 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 577 | 135310 | 2000 | 2000 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 578 | 135310 | 2000 | 2000 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | OPEN FOR BUSINESS |
| 579 | 135310 | 2001 | 2001 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 580 | 135310 | 2002 | 2002 | SHELL | 4819 N BLACKSTONE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 581 | 135310 | 2002 | 2002 | SHELL | 4819 N BLACKSTONE AVENUE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 582 | 135310 | 2003 | 2003 | SHELL | 4819 N BLACKSTONE AVENUE | FRESNO | CA | 93704 | FRESNO | LESSEE | CLOSED FOR BUSINESS |
| 583 | 135312 | 1998 | 1998 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants

Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 584 | 135312 | 1999 | 1999 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 585 | 135312 | 2000 | 2000 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 586 | 135312 | 2000 | 2000 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 587 | 135312 | 2001 | 2001 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 588 | 135312 | 2002 | 2002 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 589 | 135312 | 2002 | 2002 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 590 | 135312 | 2003 | 2003 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 591 | 135312 | 2003 | 2003 | SHELL | 6639 PARKWAY | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 592 | 135313 | 1998 | 1998 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93258 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 593 | 135313 | 1999 | 1999 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93258 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 594 | 135313 | 2000 | 2000 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93258 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 595 | 135313 | 2000 | 2000 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93258 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 596 | 135313 | 2001 | 2001 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 597 | 135313 | 2001 | 2001 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 598 | 135313 | 2002 | 2002 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 599 | 135313 | 2002 | 2002 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 600 | 135313 | 2003 | 2003 | SHELL | 2990 E CENTRAL AVENUE | FRESNO | CA | 93725 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 601 | 145781 | 1999 | 1999 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 602 | 145781 | 2000 | 2000 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 603 | 145781 | 2000 | 2000 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 604 | 145781 | 2001 | 2001 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 605 | 145781 | 2002 | 2002 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 606 | 145781 | 2003 | 2003 | SHELL | 2261 W SHAW | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 607 | 146311 | 1999 | 1999 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 608 | 146311 | 2000 | 2000 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 609 | 146311 | 2000 | 2000 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 610 | 146311 | 2001 | 2001 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 611 | 146311 | 2002 | 2002 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 612 | 146311 | 2002 | 2002 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 613 | 146311 | 2003 | 2003 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 614 | 146311 | 2003 | 2003 | SHELL | 2121 SO 3RD ST | FRESNO | CA | 93725 | FRESNO | BRANDED WHOLESALE | ARCHIVED |
| 615 | 166979 | 2001 | 2001 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | CLOSED FOR BUSINESS |
| 616 | 166979 | 2001 | 2001 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 617 | 166979 | 2002 | 2002 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | CLOSED FOR BUSINESS |
| 618 | 166979 | 2002 | 2002 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | CLOSED FOR BUSINESS |
| 619 | 166979 | 2003 | 2003 | TEXACO | 3403 W ASHLAN AVENUE | FRESNO | CA | 93722 | FRESNO | OPEN DEALER | CLOSED FOR BUSINESS |
| 620 | 167474 | 2001 | 2001 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 621 | 167474 | 2001 | 2001 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 622 | 167474 | 2002 | 2002 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 623 | 167474 | 2002 | 2002 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | CLOSED FOR BUSINESS |
| 624 | 167474 | 2003 | 2003 | TEXACO | HWY 99 & NORTH AVENUE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 625 | 167475 | 2001 | 2001 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 626 | 167475 | 2001 | 2001 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 627 | 167475 | 2002 | 2002 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 628 | 167475 | 2002 | 2002 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|
| LOCATION NO | VALID FROM DATE | VALID TO DATE | LOCATION BRAND NAME | STREET ADDRESS | CITY | STATE | ZIP CODE | COUNTY | PRIMARY BUSINESS OPER DESC | PRIMARY BUSINESS STATUS DESC |
| 167475 | 2003 | 2003 | SHELL | 4204 EAST OLIVE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 167475 | 2003 | 2003 | TEXACO | 4204 EAST OLIVE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 167475 | 2003 | 2003 | TEXACO | CEDAR & OLIVE STREET | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 167693 | 2001 | 2001 | TEXACO | 2330 NORTH FRESNO STREET | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 167693 | 2002 | 2002 | TEXACO | 2330 NORTH FRESNO STREET | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 167693 | 2002 | 2002 | TEXACO | 2330 NORTH FRESNO STREET | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 167693 | 2003 | 2003 | TEXACO | 2330 NORTH FRESNO STREET | FRESNO | CA | 93703 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 169208 | 2003 | 2003 | SHELL | 6745 N WEST AVE | FRESNO | CA | 93711 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 169303 | 2003 | 2003 | SHELL | 2588 S MAPLE | FRESNO | CA | 93706 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3

# EXHIBIT 30

Page 1

<pre>
 1                UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF NEW YORK
 3
    In re:  Methyl Tertiary      ) Master File No.
 4  Butyl Ether ("MTBE")         ) 1:00-1898
    Products Liability Litigation )
 5                               ) The Honorable Shira A.
                                 ) Scheindlin
 6                               )
    This Document Relates To:    )
 7                               )
    City of Fresno v. Chevron    )
 8  U.S.A., Inc., et al, Case    )
    No. 04 Civ. 4973             )
 9  (SAS)                        )
                                _)
10
11
              DEPOSITION OF JOEL HOHENSHELT
12
           Wednesday, February 9, 2011, 9:24 a.m.
13
14         Deposition Officer:
           Patricia Coward, CSR No. 5142
15
           Taken in the offices of:
16
           The Radisson Hotel
17         2233 Ventura Street
           Fresno, California
18
19
20
21
22
23
24
25
</pre>

Page 32

1    think what you described as the FEA handed you off to

2    Chevron; during that time, it sounded like you were,

3    you said resisting that with an injunction of some

4    kind.

5    A.      Yeah.

6    Q.      What was the station branded, if anything, at

7    that time?

8    A.      At that time, it was Gulf.

9    Q.      And after Gulf, was there another brand that

10   your station used?

11   A.      We branded our own station as Triangle.

12   Q.      Not Red Triangle?  Just Triangle?

13   A.      Well, it was Red Triangle.  We had a -- our sign

14   had a Red Triangle in it.

15   Q.      What year did you start using that as your

16   brand?

17   A.      I don't know.  I really don't know.  I can't

18   remember.

19   Q.      Subsequent to Red Triangle, have you gone to any

20   other brand being used?

21   A.      Well, that -- again, Shehadey took it over under

22   the Red Triangle brand, and, excuse me, and as far as I

23   know, one of their main suppliers is Valero.

24   Q.      When it switched from being branded Gulf to Red

25   Triangle, would that have been in the 1970's?

1    decades ago?  Or can you tell us what time frame you

2    were referring to?

3    A.      Well, that still goes on today.

4    Q.      Well, how about, let's say --

5    A.      But I'm not buying the gasoline, of course.  But

6    I know that the Shehadeys buy Valero gas, and there's

7    no Valeros -- refinery here, so somebody is exchanging

8    with Valero.

9    Q.      Well, talking about when you ran Red Triangle,

10   let's say starting --

11   A.      Well, most of the time, I didn't run it.  Glen

12   Blue did.

13   Q.      All right.

14   A.      Okay.

15   Q.      And Glen Blue was your brother-in-law?

16   A.      Correct.  I was an employee there.

17   Q.      But you were a major shareholder?

18   A.      No, not at that time, I wasn't.

19   Q.      Oh, your father was still?

20   A.      My dad was.  My dad was the major stockholder.

21   Q.      Let's say starting in the 1990 time frame, what

22   was your job title then, or would it help to go to

23   your --

24   A.      I wasn't even there.

25   Q.      Maybe it would help to go to your biography?

Page 83

1    wasn't there.

2    Q.     Well, for example, when you mentioned that you

3    and your sister became the two shareholders when your

4    father passed away, did you then review any documents

5    indicating where Red Triangle was acquiring its

6    gasoline supply from?

7    A.     No.

8           MR. PARSEGHIAN:  Objection, asked and answered.

9           THE WITNESS:  No.

10          MR. EICKMEYER:  Go ahead.

11   A.     No.

12   Q.     Did you ever have any discussions with your

13   sister as to whether she had entered into any supply

14   agreements?

15   A.     No.

16   Q.     Since Mr. Shehadey took over, have you had

17   any -- I think you said you understood one of his

18   suppliers was Valero?

19   A.     That's correct.  I assumed they have a supply

20   agreement with Valero, yes.

21   Q.     Are you aware of any other refiners of gasoline

22   being provided to the operation since Mr. Shehadey took

23   over?

24   A.     No.  I have no idea other than Valero.

25   Q.     Did you ever see any of the delivery trucks

# EXHIBIT 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-oOo-

In re: Methyl Tertiary Butyl
Ether ("MTBE") Products
Liability Litigation

Master File No.
1:00-1898

This Document Relates To:

Case No.
MDL 1358(SAS)

City of Fresno
v. Chevron U.S.A. Inc., et al.,
Case No. 04 Civ. 4973


COPY

DEPOSITION OF JATINDER PAUL DHILLON

August 11, 2011 at 9:00 (9:05) a.m.

Before:  ERIC L. JOHNSON
RPR, CSR #9771

Taken at:
Fresno, California


DEPOBOOK
Court Reporting Services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

1        A.  Right.

2        Q.  So was that a container that was used just for

3   the purpose of that cat litter product?

4        A.  Yes.  Yes.

5        Q.  Do you have a recollection as to what company

6   was used to pick that up at --

7        A.  I don't --

8        Q.  -- 26 -- one second here.

9        A.  Sorry.

10       Q.  -- at 2619 South East Avenue?

11       A.  No.

12       Q.  Okay.  I am going to try to just make sure we

13   are clear what station we are talking about --

14       A.  Right.

15       Q.  -- since I think you have had five.  If you are

16   ever not clear, please let me know.  I mean, we are --

17   we are mostly going to be talking about the East Avenue

18   station, but if you are ever not clear, please indicate.

19       A.  Yes.

20       Q.  In fact, why don't we -- why don't I just

21   say if we refer to the station, we are referring to

22   2619 South East Avenue.  Is that fair?

23       A.  That's fair.

24       Q.  All right.  Now, you mentioned a moment ago, I

25   think you asked about a small spill versus a large

                                                          29

1       A.  No, I don't remember.

2       Q.  When you bought the station was it branded

3   Texaco at that point?

4       A.  Yes.

5       Q.  Did the branding on the station ever change

6   over the years?

7       A.  Yes.

8       Q.  What did it first change to?

9       A.  Because Shell and Texaco is bought by Shell, so

10  it was Shell, and it has been Shell after that.

11      Q.  Do you recall approximately what year it

12  changed to Shell?

13      A.  I don't remember.

14      Q.  Do you recall if that was in the '90s or 2000s?

15      A.  I -- I am not sure.  I don't know.

16      Q.  We may see some --

17      A.  Documents I can tell you about?  I don't

18  remember.

19      Q.  So was the station branded Shell at the time

20  you stopped operating it in 2009?

21      A.  Yes.

22      Q.  During the time the station was branded Texaco,

23  where were you obtaining gas deliveries from?

24      A.  In the beginning we used to buy from Texaco.

25      Q.  So when you first took over the station you

39

# EXHIBIT 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-oOo-

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898 MDL 1358 (SAS) |
| CITY OF FRESNO, Plaintiff, vs. | CASE NO. 04CIV4973 (SAS) |
| CHEVRON U.S.A., INC., et al., Defendants. | **COPY** |

VIDEOTAPED DEPOSITION OF
BRYAN LEONARD MOE

August 17, 2011
1:00 p.m.

140 East Shaw Avenue
Fresno, California

Cheryl L. Laboa, CSR No. 10039



DEPOBOOK
Court Reporting Services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

Deposition of Bryan Leonard Moe / August 17, 2011

1      A.    No, that is not correct.

2      Q.    How did you obtain the station at 1212 Fresno

3   Street?

4      A.    I purchased the station from another Shell

5   dealer who purchased it from Ron Stephens named Amir --

6   and I don't remember his last name.

7      Q.    During the time -- well, when you purchased

8   this station at 1212 Fresno Street, what did you

9   actually purchase?

10     A.    The right to sell gasoline through Shell Oil.

11   There wasn't much inventory, but just really the right

12   to purchase and sell Shell products.

13     Q.    You did not purchase the real property

14   underlying the station; is that correct?

15     A.    That is correct.

16     Q.    You did not purchase the buildings or any of

17   the buildings that were on the property; is that

18   correct?

19     A.    Yes, that is correct.

20     Q.    And you didn't purchase the underground

21   storage tanks or underground piping; is that right?

22     A.    That is correct.

23     Q.    Did you understand during the time that you

24   were operating the gas station at 1212 Fresno Street,

25   1994 to 1998 that it was Shell Oil Company that owned

                                                          12

Deposition of Bryan Leonard Moe / August 17, 2011

```
 1   the real property and the building and all of the

 2   underground tanks and piping?

 3      A.   Yes, that is correct.

 4      Q.   When you became a Shell dealer at 1212 Fresno

 5   Street, had you had experience in the gasoline business

 6   before?

 7      A.   Yes, I have.

 8      Q.   Let's step back for a moment and just get some

 9   basic background into our record.  It's possible that

10   some day in the future a jury could be watching the

11   video of the deposition today, so let's give them just

12   a little bit of basic background so they know a little

13   bit about you.  Could you tell me where and when you

14   were born?

15      A.   I was born in Seattle, Washington, October

16   30th, 1950.  Allegedly.  I was too young to remember.

17      Q.   That's what you've been told by others?

18      A.   That's what I've been told by my parents, yes.

19      Q.   Did you grow up in Seattle?

20      A.   No.  Lived there for six months and moved to

21   California.  With my family, of course.

22      Q.   Did you move to the Fresno area at that time?

23      A.   No.  Moved to Chico, California and then to

24   Lindsay, California, and then lived in Visalia,

25   California.  I only lived in Fresno, California for a
```

13

Deposition of Bryan Leonard Moe  /  August 17, 2011

```
 1    while while I was attending the university, Fresno

 2    State University.

 3         Q.   What years was that when you were at Fresno

 4    State?

 5         A.   Well, I was at Fresno State 1979, 1980.  And

 6    then I went back to college at Fresno State, but I

 7    lived in Visalia and commuted.  And I did that from

 8    1999 to 2006 and obtained an undergraduate degree and a

 9    graduate degree.

10         Q.   When did you earn the undergraduate degree

11    from Fresno State?

12         A.   May of 2003.

13         Q.   What was that degree -- what was your degree

14    in?

15         A.   Bachelor of Science in business with an

16    emphasis in management.

17         Q.   What was the Masters degree that you earned

18    from Fresno State?

19         A.   A Masters in business administration in 2006.

20         Q.   Tell me more about your prior experience in

21    the gasoline business before you became the Shell

22    dealer at 1212 Fresno Street.

23         A.   From 1985 to 1994 I worked for a gentleman who

24    owned Shell gas stations in Visalia, Tulare,

25    Bakersfield and Kettleman City.  His name was Cleo
```

14

```
1    another underground storage tank permit application

2    with Form A at the top and then three Form B's

3    following, one for each of the tanks.  It has the

4    identifying number in the lower right-hand corner,

5    FCDEH-Fresno-037341, 037344 and in the lower right-hand

6    corner, the month, day and year on this permit

7    application is October 4, 1996.  So about two years

8    after the one that we just looked at.  You can see

9    reading down the left-hand side of the first page that

10   this is still showing the station as Brian Moe's Shell

11   at 1212 Fresno.  Do you see that?

12        A.   Yes, yes, I do.

13        Q.   And it still lists you as the primary

14   emergency contact person and then to the right of your

15   name then it says Kevin Butler as the secondary

16   emergency contact person.  Was Kevin Butler at some

17   time a manager of the station?

18        A.   Yes, he and Herb both were the manager.

19        Q.   Down at the lower left-hand corner, it says

20   owner's name, printed and signed and it appears to say

21   Jeff John Byram, B-Y-R-A-M, and owner's title given as

22   engineer.  Does that name mean anything to you at all?

23        A.   No, sir, it doesn't.  But I would like to note

24   one thing.

25        Q.   Yes.
```

44

```
 1                REPORTER'S CERTIFICATION

 2

 3          I, CHERYL L. LABOA, Certified Shorthand

 4   Reporter in and for the State of California, do hereby

 5   certify:

 6

 7          That the foregoing witness was by me duly

 8   sworn; that the deposition was then taken before me at

 9   the time and place herein set forth; that the testimony

10   and proceedings were reported stenographically by me

11   and later transcribed into typewritten form under my

12   direction; that the foregoing is a true record of the

13   testimony and proceedings taken at that time.

14

15          IN WITNESS WHEREOF, I have subscribed my name

16   this  September 25, 2011                        .

17

18

19

20

21          Cheryl L. Laboa

22          Cheryl L. Laboa, CSR No. 10039

23

24

25
```

                                                        80

# EXHIBIT 33

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

MASTER FILE NO.
1:00-1898



THIS DOCUMENT RELATES TO:

CITY OF FRESNO

vs

CASE NO.
MDL 1358 (SAS)

CHEVRON U.S.A., INC., et al.,
CASE NO. 04 CIV. 4973
_____/

DEPOSITION OF THOMAS K. BAUHS - VOLUME I

WEDNESDAY, AUGUST 17, 2011 at 9:26 a.m.

Before: LOUISE MARIE SOUSOURES, CSR NO. 3575
Certified LiveNote Reporter

Taken at:
San Francisco, California



## Court Reporting Services
### (800) 830.8885
### www.depobook.com
#### Professional Reporting Services Nationwide!

1   talk about, the topics he is designated on and then it

2   goes into each station, it has notes pertaining to each

3   station.

4           Is that a fair characterization?

5           MR. MAHER:  That's fine.

6           MR. EICKMEYER:  I don't know if there's a way to

7   share it with people or get it out to them later or

8   something.

9   BY MR. EICKMEYER:

10      Q.   Under preparations for deposition, Mr. Bauhs, it

11  has "Search for facilities listed in deposition notice

12  for noticed companies' involvement" and there's a list of

13  I think the stations we're here to discuss.

14          Can you describe for us what you did when you

15  say "search for facilities listed"?

16      A.   The search that I did was to search in

17  Chevron's -- Chevron EMC, Environmental Management

18  Company's STRATA database.  That's where we maintain all

19  the information on the facilities that Environmental

20  Management Company manages on behalf of the Chevron

21  legacy companies.

22          I searched in that database to try to -- to

23  identify which of the facilities listed in the deposition

24  notice were in that database.

25          Generally, that database contains any site

24

1    that -- any facility that we have, Chevron Environmental

2    Management Company has managed or directed any work on.

3        Q.    When you say Chevron EMC, that's Chevron

4    Environmental Management Company?

5        A.    Yes.

6        Q.    You mentioned legacy companies.  Would that be

7    companies such as Unocal?

8        A.    That would be, yes, a legacy company.

9        Q.    Can you describe, if you know, what was done to

10   make sure that information from those legacy companies

11   was put into the Chevron database?

12       A.    Can you repeat the question, please?

13       Q.    Maybe I can ask it a better way.

14             For example, if Chevron acquired one as you

15   described the legacy companies, was something done to put

16   that company's information into the Chevron database?

17       A.    It depends.  Generally, if a facility -- we

18   commonly refer to them as either sites or facilities,

19   pretty much interchangeable.

20             If that site is actively being worked on,

21   meaning Chevron Environmental Management Company is

22   managing or directing work on the facility, if a claim

23   comes in on a facility, it gets entered into that

24   database.

25             There may be facilities that Chevron may have

25

Deposition of Thomas K. Bauhs / August 17, 2011

1    A.   My understanding of why those would not have

2    been in STRATA is that Chevron Environmental Management

3    Company had not managed or directed work on those

4    facilities.

5         So those facilities were not put into STRATA

6    because we weren't doing any work on those, Chevron was

7    not directing work on those.

8    Q.   Now, on the last three listed in this list, 1160

9    Fresno, 1418 East Shaw and 794 West Shaw Avenue, I don't

10   see any comments after that regarding STRATA.

11        Do you recall if those were found in STRATA?

12   A.   Yes, 1160 Fresno is definitely in STRATA.

13        Somehow I missed putting notes on those three.

14        The 1418 East Shaw Avenue is not in STRATA and

15   794 West Shaw Avenue is not in STRATA either.

16   Q.   As to the last addresses, 1418 East Shaw and 794

17   West Shaw, do you have an understanding why those were

18   not in STRATA?

19   A.   It's my understanding that those two

20   facilities -- for those two facilities, Chevron

21   Environmental Management Company never managed or

22   directed work on those facilities.

23        The work that was being directed up until the

24   sites received a no further action letter from the

25   regulatory agencies was being done -- at least at the

27

1    primarily talking to him about the sites listed on the

2    deposition notice.

3          We weren't asking him about any facilities that

4    weren't on the deposition notice.

5    Q.    The information that Mr. Robb provided, would

6    that be included in your notes for this packet for those

7    particular sites?

8    A.    Yes.

9    Q.    It mentions next a discussion with Chevron

10   Environmental Management Company employee Stephanie

11   McKenna, M-C capital K-E-N-N-A, regarding projects she

12   currently manages at Fresno.

13         Can you describe the conversations you had with

14   her?

15   A.    Stephanie does report to me and I know she

16   manages the 1160 Fresno site.

17         So the discussion was primarily regarding that

18   site.  None of the other sites on the deposition notice

19   does she currently manage.

20   Q.    Is the information she provided included in the

21   appropriate section of this packet?

22   A.    In preparing this, I didn't specifically

23   designate what she said, but the information that's here

24   is -- she provided me information that's included here in

25   terms of when I was preparing my notes.

42

Deposition of Thomas K. Bauhs / August 17, 2011

```
1              I, LOUISE MARIE SOUSOURES, duly authorized to

2    administer oaths pursuant to Section 2093(b) of the

3    California Code of Civil Procedure, do hereby certify:

4    That the witness in the foregoing deposition was by me

5    duly sworn to testify the truth in the within-entitled

6    cause; that said deposition was taken at the time and

7    place therein cited; that the testimony of the said

8    witness was reported by me and was hereafter transcribed

9    under my direction into typewriting; that the foregoing

10   is a complete and accurate record of said testimony; and

11   that the witness was given an opportunity to read and

12   correct said deposition and to subscribe the same.

13             Should the signature of the witness not be

14   affixed to the deposition, the witness shall not have

15   availed himself or herself of the opportunity to sign or

16   the signature has been waived.

17             I further certify that I am not of counsel,

18   nor attorney for any of the parties in the foregoing

19   deposition and caption named, nor in any way interested

20   in the outcome of the cause named in said caption.

21   DATE:  9-2-2011

22

23

24

25
```

LOUISE MARIE SOUSOURES, CSR 3575

209

# UNDERGROUND STORAGE TANK UNAUTHORIZED RELEASE (LEAK) / CONTAMINATION SITE REPORT

**EMERGENCY** YES ☐ NO ☑ | **HAS STATE OFFICE OF EMERGENCY SERVICES REPORT BEEN FILED?** YES ☐ NO ☑ | **FOR LOCAL AGENCY USE ONLY** SIGNED: *Lancelot Leitel* 9-1-88

**REPORT DATE** 04 94 04 01 84 84 | **CASE #**

**REPORTED BY**
- NAME OF INDIVIDUAL FILING REPORT: *Lancelot Leitel* | PHONE (209) 445-3171 | SIGNATURE *Lancelot Leitel*
- REPRESENTING: ☑ LOCAL AGENCY | ☐ OWNER/OPERATOR | ☐ REGIONAL BOARD | ☐ OTHER | COMPANY OR AGENCY NAME *Fresno County Environmental Health*
- ADDRESS: *P.O. Box 11867* STREET *1221 Fulton Mall* CITY *Fresno* STATE *Ca* ZIP *93776*

**RESPONSIBLE PARTY**
- NAME: *Chevron USA* ☐ UNKNOWN | CONTACT PERSON *Lisa Marinaro* | PHONE (415) 828-5302
- ADDRESS: *2410 Camino Ramon* STREET CITY *San Ramon* STATE *Ca* ZIP *94583*

**SITE LOCATION**
- FACILITY NAME (IF APPLICABLE): *Chevron USA* | OPERATOR *Lisa Marinaro* | PHONE (415) 828-5302
- ADDRESS: *1160 Fresno Street* STREET CITY *Fresno* COUNTY *Fresno* ZIP *93776*
- CROSS STREET: *C Street* | TYPE OF AREA: ☑ COMMERCIAL ☐ INDUSTRIAL ☐ RURAL ☐ RESIDENTIAL ☐ OTHER | TYPE OF BUSINESS: ☑ RETAIL FUEL STATION ☐ FARM ☐ OTHER

**IMPLEMENTING AGENCIES**
- LOCAL AGENCY: *Fresno County Health Dept* | AGENCY NAME | CONTACT PERSON *Lancelot Leitel* | PHONE (209) 445-3171
- REGIONAL BOARD: *Central Valley Region* | NAME *Cal Koen* | PHONE (209) 445-5116

**SUBSTANCES INVOLVED**
(1) *Gasoline* | NAME | QUANTITY LOST (GALLONS) ☐ UNKNOWN
(2) | ☐ UNKNOWN

**DISCOVERY/ABATEMENT**
- DATE DISCOVERED: 04 64 04 84 84 84 | HOW DISCOVERED: ☐ INVENTORY CONTROL ☐ SUBSURFACE MONITORING ☐ NUISANCE CONDITIONS ☐ TANK TEST ☑ TANK REMOVAL ☐ OTHER
- DATE DISCHARGE BEGAN: ☑ UNKNOWN | METHOD USED TO STOP DISCHARGE (CHECK ALL THAT APPLY): ☐ REMOVE CONTENTS ☐ REPLACE TANK ☐ CLOSE TANK ☐ REPAIR TANK ☐ REPAIR PIPING ☐ CHANGE PROCEDURE ☑ OTHER *Remove Tank*
- HAS DISCHARGE BEEN STOPPED? ☑ YES ☐ NO IF YES, DATE 04 64 04 84 84 84

**SOURCE/CAUSE**
- SOURCE OF DISCHARGE: ☑ TANK LEAK ☐ UNKNOWN ☐ PIPING LEAK ☐ OTHER
- TANKS ONLY: CAPACITY *2-10,000* GAL. AGE ___ YRS ☑ UNKNOWN
- MATERIAL: ☐ FIBERGLASS ☑ STEEL ☐ OTHER
- CAUSE(S): ☐ OVERFILL ☐ RUPTURE/FAILURE ☑ CORROSION ☐ UNKNOWN ☐ SPILL ☑ OTHER *dist lines*

**CASE TYPE** (CHECK ONE ONLY): ☑ UNDETERMINED ☐ SOIL ONLY ☐ GROUNDWATER ☐ DRINKING WATER - (CHECK ONLY IF WATER WELLS HAVE ACTUALLY BEEN AFFECTED)

**CURRENT STATUS** (CHECK ONE ONLY): ☑ SITE INVESTIGATION IN PROGRESS (DEFINING EXTENT OF PROBLEM) ☐ CLEANUP IN PROGRESS ☐ SIGNED OFF (CLEANUP COMPLETED OR UNNECESSARY) ☐ NO ACTION TAKEN ☐ POST CLEANUP MONITORING IN PROGRESS ☐ NO FUNDS AVAILABLE TO PROCEED ☐ EVALUATING CLEANUP ALTERNATIVES

**REMEDIAL ACTION** (CHECK APPROPRIATE ACTION(S)): ☐ CAP SITE (CD) ☐ EXCAVATE & DISPOSE (ED) ☐ REMOVE FREE PRODUCT (FP) ☐ ENHANCED BIO DEGRADATION (IT) ☐ CONTAINMENT BARRIER (CB) ☐ EXCAVATE & TREAT (ET) ☐ PUMP & TREAT GROUNDWATER (GT) ☐ REPLACE SUPPLY (RS) ☐ TREATMENT AT HOOKUP (HU) ☐ NO ACTION REQUIRED (NA) ☐ OTHER (OT)

**COMMENTS**

EXHIBIT 4 *Bauhs*
WIT:
DATE: 8-17-11
LOUISE SOUSOURES, CSR #3575

HSC 85 (4/87)

FCDEH-FRESNO-042590

County of

# FRESNO

Department of Health

George Bleth
Director

September 6, 1988

Lisa Marinaro
CHEVRON SERVICE STATION
2410 Camerino Ramon
San Ramon, CA  94583

Subject:  Leaking Underground Storage
Tank Remediation
Location: 1160 Fresno Street, Fresno

An inspection, sampling, or testing conducted at your underground fuel storage
facility indicates the presence of contamination.  This preliminary evidence
does not quantify or qualify the extent of contamination.

The County of Fresno is responsible for overseeing your efforts to remedy the
contamination.  It is our policy to assist you in interpreting cleanup
requirements and to work with you to develop an effective, efficient approach
to investigating and resolving contamination at your site.

You are requested to secure the services of a qualified consultant within ten
days of receipt of this notice, and contact our office to make an
appointment.  We need to meet with you and your consultant to discuss the
scope of work which will be required to determine the type and extent of
contamination.  A list of firms qualified to do the work is enclosed
(Attachment A).  This list is by no means complete and you are welcome to
consider other consulting firms.

The County's and the State's costs of overseeing remedial action at your site
are funded by the California Hazardous Substance Cleanup Fund or the Federal
Petroleum Leaking Underground Storage Tank Fund.  Both the State and Federal
funding sources require the party (or parties) responsible for a site to
reimburse the State Water Resources Control Board (SWRCB) for all costs
incurred by government agencies while overseeing cleanup.  The agencies
involved may include the County of Fresno, SWRCB, Central Valley Regional
Water Quality Control Board, State Department of Health Services, and U.S.
Environmental Protection Agency.  We are required to notify you, as a
potentially responsible party, of this cost obligation.  Upon completion of
your project or some other work milestone, you will receive a detailed invoice
from the SWRCB.  A copy of the enclosed official notification form has been
forwarded to the SWRCB (Attachment B).

EXHIBIT 5
WIT: Bauhs
DATE: 8-17-11
LOUISE SOUSOURES, CSR #3575

1221 Fulton Mall/P. O. Box 11867/Fresno, California 93775/Phone (209) 445-3271
Equal Employment Opportunity — Affirmative Action — Handicap Employer

Leaking Underground Storage
Tank Remediation
Page Two


The County is committed to ensuring a healthy environment for its citizens.
While an underground storage tank leak may pose a significant threat to
groundwater quality, we understand that site assessment and cleanup are costly
and complex. We will work with you to develop a reasonable cleanup plan for
your situation.

Please contact me at (209) 445-3271 to schedule a meeting and to answer any
questions you may have.

Respectfully,

Lancelot Leitch, R.S.
Environmental Health Analyst
Environmental Health Services


LL:ema
MSM:vlc
EHS #1621
Attachments

cc: Krazan & Associates

# SITE CHARACTERIZATION INVESTIGATION
## CHEVRON STATION #4374
### 1160 FRESNO STREET
### FRESNO, CALIFORNIA

Project No. E88-097
January 10, 1989

Prepared for:

Chevron USA
2410 Camino Ramon
San Ramon, California  94583



EXHIBIT 6
WIT: Bauhs
DATE: 8·17·11
LOUISE SOUSOURES, CSR #3576

RWQCB-FRESNO-040963

# TABLE OF CONTENTS
## Project No. E88-097

| | Page |
|---|---|
| INTRODUCTION | 1 |
| SITE LOCATION | 2 |
| SITE DESCRIPTION | 3 |
| SITE HISTORY | 3 |
| Table I | 4 |
| Table II | 5 |
| GEOLOGIC AND HYDROLOGIC SETTINGS | 6 |
| Geologic Setting | 6 |
| Hydrologic Setting | 6 |
| PURPOSE OF THE INVESTIGATION | 7 |
| SCOPE OF THE INVESTIGATION | 7 |
| METHODOLOGY | 7 |
| FINDINGS OF THIS INVESTIGATION | 12 |
| Soil Profile | 12 |
| Results of Chemical Analysis | 12 |
| Table III | 13-15 |
| Table IV | 16-18 |
| Table V | 19-20 |
| Table VI | 21 |
| DISCUSSION OF FINDINGS | 22 |
| Subsoils | 22 |
| Groundwater | 22 |
| LIMITATIONS | 23 |
| REFERENCES | (following text) |
| Maps | |
| Vicinity Map | (following text) |
| Site Plan | (following text) |
| Appendices | |
| Permits | A |
| Logs of Soil Borings | B |
| Certified Analytical Reports | C |
| Well Installation Reports | D |
| Elevation Survey and Well Sounding Information | E |
| Logs of Nearby Wells | F |

RWOCB-FRESNO-040964

# KRAZAN & ASSOCIATES, INC.

Construction Testing and Inspection
Geotechnical Investigations
Environmental Engineering
Laboratory Soils Testing
Monitoring Wells



January 16, 1989                                    Proj. No. E88-097

## SITE CHARACTERIZATION INVESTIGATION
### CHEVRON STATION #4374
### 1160 FRESNO STREET
### FRESNO, CALIFORNIA

## INTRODUCTION

During demolition of Chevron Station #4374, located at the corner of Fresno and C Streets in Fresno, California, contamination was discovered in the soil below the underground gasoline and waste oil storage tanks. Chevron USA requested that a site characterization investigation be conducted to determine the extent of soil contamination resulting from the release of petroleum constituents.

Prior to this investigation, two sampling events have occurred. The first consisted of obtaining nine soil samples during the tank removal process. These samples were collected from soil gathered by backhoe from a depth of approximately 18 feet below grade. Of the nine samples, two were shown to contain concentrations of petroleum constituents which were of concern to the Fresno County Environmental Health Department. The two samples were identified as:  1) "Tank 2 - North End", which contained 4,797 parts per million

Main Office: Fresno/Clovis  •  3860 N. Winery  •  Fresno, California 93726  •  (209) 291-7337
Bakersfield (805) 393-2343  ☐  Visalia (209) 625-8251  ☐  Merced (209) 383-3993

RWQCB-FRESNO-040965

(ppm) total volatile hydrocarbons, and 2) "Waste Oil Tank," which contained 80 ppm of oil and grease.

In the second sampling event, three soil borings were advanced on the project site. Two soil borings were advanced to a maximum depth of 55 feet through the backfilled tank excavation. The highest level of TVH registered beneath the site was 23,000 ppm at a depth of 55 feet in Boring #2. These borings were terminated approximately 15 feet above the suspected depth of the groundwater table, at the request of Fresno County. Due to the proximity of volatile hydrocarbons to the groundwater table, there is reason to believe that petroleum constituents may have impacted groundwater below the project site. A third boring was advanced near the waste oil tank. Concentrations ranging from 80-140 ppm oil and grease were detected in 4 soil samples obtained from 25 to 40 feet in the boring.

A proposal was developed to outline the additional work necessary for the characterization of the soil and groundwater contamination at the site, and to collect other information that may be necessary for the design of a remedial program. The proposal was accepted by Chevron USA and Fresno County and approval was given to proceed with the soil and groundwater investigation. The results of that investigation are detailed in our report as follows.

## SITE LOCATION

The former Chevron Service Station was located on the southern corner of Fresno and C Streets in Fresno, California. It is found within the SE 1/4 of the NW 1/4 of Section 9, T14S, R20E, Mount Diablo Baseline and Meridian (See Figure 1). The above described property is identified by Fresno County Assessor's Parcel Number 467-152-21. The facility is currently owned by Chevron USA.

Property surrounding the project is primarily residential and commercial. The site is bounded on the northwest by Fresno Street and the northeast by "C" Street. To the southwest of the property is an alley, and to the southeast of the property is a vacant lot.

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040966



NOTE:
TAKEN FROM 1981 PHOTOREVISED
U.S.G.S. "FRESNO SOUTH" 7.5
MINUTE TOPOGRAPHIC QUADRANGLE

1"=2000'

| CHEVRON STATION | Scale: 1"=2000' | Date: 8-88 | **KRAZAN & ASSOCIATES** |
| No. 4374 | Drawn by: RD | Approved by: TM | Merced  Fresno  Visalia  Bakersfield |
| 1160 FRESNO ST. | Project No. E88-057 | Drawing No. 1 of 6 | |
| FRESNO   CA. | | | |

RWQCB-FRESNO-040967

## SITE DESCRIPTION

The project site is relatively level and unpaved.  The removed underground storage tank system consisted of three underground fuel tanks (2-10,000 gallon and 1-5,000 gallon), two dispenser islands, product lines, and a waste oil tank. The service station building has been demolished and no other surface structures remain on-site (see Figure 2 for former tank and island locations).

## SITE HISTORY

The project site was developed as Chevron Station #4374. A service station building, two gasoline dispenser islands, 2-10,000 gallon underground gasoline storage tanks, one 5,000 gallon underground gasoline storage tank, an underground waste oil tank, product line, and utility services were present at the site.

On June 8, 1988, soil samples were obtained from beneath the underground storage tanks, product lines, and dispenser islands at the site. The service station and all facilities were demolished and/or removed at that time. The results of these samplings are presented in the following table:

KRAZAN & ASSOCIATES, INC.

RWOCB-FRESNO-040968

## TABLE I

### Concentration of Petroleum Constituents in Soils

From June 27, 1988 Report; Project No. E88-048

(Concentrations in parts per million)

### GASOLINE TANKS AND PRODUCT LINES

| Sample I.D. | Benzene | Toluene | Xylenes | Ethyl-benzene | TVH |
|---|---|---|---|---|---|
| Tank 1, North | ND | ND | 1.3 | <0.05 | 47 |
| Tank 1, South | ND | ND | ND | ND | ND |
| Tank 2, North | ND | ND | 98 | 4.7 | 4,792 |
| Tank 2, South | ND | ND | ND | ND | ND |
| Tank 3, North | ND | ND | ND | ND | ND |
| Tank 3, South | ND | ND | ND | ND | ND |
| Delivery Lines, North | ND | ND | ND | ND | ND |
| Delivery Lines, East | ND | ND | ND | ND | ND |

### WASTE OIL TANK

| Sample I.D. | Oil & Grease |
|---|---|
| Waste Oil Tank | 80 |

ND = Non-detected
TVH = Total Volatile Hydrocarbons
< = Less Than

Subsequently, based on review of this data, Chevron USA-Environmental Division requested that a site characterization be conducted to determine the extent of contamination below the project site.

During the site characterization investigation at the project site, petroleum constituents were found to be present in the soil. Petroleum constituents were present in the subsoils at a depth near historic groundwater levels, and it was suspected that groundwater contamination may have occurred.

Results of samples obtained during that investigation are included in Table II.

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040969

Page No. 5
Project No. E88-097

## TABLE II
### Concentrations of Petroleum Constituents in Soils
(Concentrations in parts per million)

| Boring No./Depth | Benzene | Toluene | Ethylbenzene | Xylenes | TVH | O&G |
|---|---|---|---|---|---|---|
| Boring 1 at 45' | 5 | 87 | 32 | 200 | 1500 | * |
| Boring 1 at 50' | 2 | 34 | 11 | 79 | 550 | * |
| Boring 1 at 55' | 10 | 100 | 28 | 170 | 1300 | * |
| Boring 2 at 45' | 6 | 12 | 14 | 38 | 940 | * |
| Boring 2 at 50' | 5 | 11 | 13 | 25 | 810 | * |
| Boring 2 at 55' | 2 | 50 | 61 | 140 | 23,000 | * |
| Boring 3 at 25' | * | * | * | * | * | 100 |
| Boring 3 at 30' | * | * | * | * | * | 100 |
| Boring 3 at 35' | * | * | * | * | * | 80 |
| Boring 3 at 40' | * | * | * | * | * | 140 |

ND  =  Non-Detected                    TVH  =  Total Volatile Hydrocarbons
BDL  =  Below Detection Limits          *  =  Sample Not Tested
O&G  =  Oil & Grease

When field screening of the soil samples indicated the presence of petroleum constituents near groundwater, Mr. Lance Leitch of the Fresno County Environmental Health Department was contacted to request a permit to continue a boring to groundwater and install a groundwater monitoring well. At that time, Mr. Leitch denied the request for a monitoring well at those locations in the backfilled excavation. He requested that an additional work plan be submitted for further work.

After several revisions, a work plan dated October 26, 1988, and an addendum dated November 15, 1988, were approved by Chevron U.S.A. and the Fresno County Environmental Health Department.  Permit approval was granted on November 21 and 22, 1988. Field crews began the investigation on November 28, 1988. The results of that investigation are detailed in the report as follows.

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040970

Case 1:00-cv-01898-VSB-VF   Document 3674   Filed 04/13/13   Page 142 of 273

## GEOLOGIC AND HYDROLOGIC SETTING

### Geologic Setting

The project site is located in the central portion of the San Joaquin Valley of California. The San Joaquin Valley makes up the southern portion of the Great Central Valley Geomorphic Province. Subsurface materials are composed primarily of alluvium derived from Sierra Nevada source rocks. These alluvial deposits generally consist of sands, silty sands, and some minor gravels.

The topography of the site is relatively level. Overall, topography surrounding the City of Fresno slopes gently to the west.

### Hydrologic Setting

Fresno is located within the San Joaquin Basin Hydrologic Study Area, which is primarily an arid to semi-arid environment. Within the study area, 39 groundwater basins and areas of potential groundwater storage have been identified. Specifically, the City of Fresno is located within the Kings Basin.

Groundwater beneath the project site exists in a single, unconfined aquifer. It is classified by the U.S. Environmental Protection Agency (EPA) as a sole source aquifer. As such, waters from this aquifer are highly regulated. The aquifer's level is variable and is influenced by the withdrawal of subsurface waters for agricultural uses. According to the State of California Department of Water Resources (DWR) map entitled "Lines of Equal Elevation of Water in Wells, Unconfined Aquifer, San Joaquin Valley, Spring 1986," the elevation of the water surface in the area of the project site was believed to be 205 feet above mean sea level. According to the United States Department of the Interior Geologic Survey (1981 photorevised) Fresno South 7.5 minute topographic quadrangle map, the project site was interpreted to be located at an elevation of 283 feet above mean sea level. Calculations involving these figures indicate a depth to groundwater beneath the project site of 78 feet below existing grade.

Review of the Fall 1984, Spring 1985, Fall 1985, Spring 1986 and Fall 1986 editions of the California State Department of Water Resources maps has shown a depression in the groundwater surface exists under downtown Fresno. This

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040971

depression may be due in part to the large number of wells that are located in this area of limited recharge. Because this depression exists, specific groundwater gradient direction cannot be determined from the maps. However, gradient could be interpreted to be in a northerly direction. Groundwater levels were also shown to vary significantly in the DWR Maps.

## PURPOSE OF THE INVESTIGATION

The purpose of the investigation was to fully define the soil and groundwater contamination by petroleum constituents believed to be present beneath the project site. Additionally, site-specific hydrologic data such as depth to groundwater and groundwater gradient were determined. Preliminary indications as to the impact of petroleum constituents were also to be given.

## SCOPE OF THE INVESTIGATION

The scope of this phase of the investigation was limited to the advancement of seven (7) exploratory soil borings to a maximum depth of 55 feet below existing grade. Additionally, four groundwater monitoring wells were installed within and around the subject property to a maximum depth of approximately 100 feet as necessary to give preliminary definition to the groundwater contamination present. Selected soil and groundwater samples were analyzed for the presence and concentration of petroleum constituents. Groundwater monitoring wells were surveyed for relative elevations and selected site-specific groundwater and aquifer characteristics were determined.

## METHODOLOGY

In order to accomplish the goals established in the purpose and scope of the investigation sections of this report, the following methods were employed:

1. All necessary permits were obtained prior to the commencement of the investigation at the proposed project

KRAZAN & ASSOCIATES, INC.

site.  For  copies  of  the  permits  issued,  please  refer  to
Appendix A.

2.    An additional literature survey of published geologic and
groundwater data in the vicinity of the project site was
conducted in an attempt to more fully describe the conditions
present.

3.    All exploratory soil borings were advanced by means of
a Mobile Drill B-61, truck-mounted drill rig, utilizing 4 1/4"
and 6 5/8" I.D. hollow stem auger.  Drilling fluids were not
used while advancing any of the borings.

4.    Four borings were advanced for the means of installing
groundwater monitoring wells.  Borings MW-A and MW-B were
advanced to a depth of 90 feet below existing grade.  Borings
MW-C and MW-D were advanced to depths of 85 and 100 feet
below grade, respectively.  The depths were selected based
upon review of published data regarding depth to groundwater
in the vicinity of the project site.  The purpose of these
groundwater monitoring wells was to allow the sampling of
groundwater below the site and also to determine the depth
to groundwater and site-specific groundwater gradient.  For
the exact locations of the wells installed, please refer to
Figure 2.

5.    Seven additional soil borings were advanced on the
project site in an attempt to fully define the contamination
present in the subsoils in the area of the underground storage
tanks and their immediate vicinity.  These borings were
advanced to a maximum depth of 55 feet below grade, so as
to leave a 15 foot undisturbed buffer between the bottom of
the boring and the historic groundwater level.

KRAZAN & ASSOCIATES, INC.

6.   Soil samples were obtained for logging purposes at five-foot intervals, commencing at an approximate depth of 10 to 15 feet below existing grade in each boring location. Selected soil samples were also submitted for the chemical analysis of petroleum constituents.

7.   Soil samples were obtained by means of pushing stainless steel tubes at discrete intervals (ASTM D-1587-86, "Thin-Walled Tube Sampling of Soils").

8.   During the drilling process, the soil samples and drilling returns were field screened with an H-nu brand, portable photoionization detector (PID). The PID is a direct reading real-time analyzer that is capable of detecting most of the volatile hydrocarbons constituents present in vapor phase petroleum contaminated soils. The PID that was used for this investigation uses a 10.2 electron volt lamp and is calibrated using an iso-butylene calibration gas. Iso-butylene is a relatively safe calibration gas similar in ionization potential to benzene (the carcinogen of primary concern present in gasoline).

9.   During the advancement of the exploratory soil borings (used for the lateral definition of contaminants in soil), if PID readings indicated petroleum constituents to be absent from four consecutive samples (20 feet), the advancement of that boring was ceased and it was backfilled with a mixture of auger cuttings and bentonite. Any of these borings advanced to a depth greater than 40 feet below grade was backfilled with a six-sack sand/cement slurry with approximately 3% bentonite added to reduce shrinkage.

KRAZAN & ASSOCIATES, INC.

RWOCB-FRESNO-040974

10.   All excess drilling returns were spread out to aerate on site in accordance with Rule 409 of the Fresno County Air Pollution Control District Book of Rules and Regulations.

11.   Equipment used for advancing the soil borings, installation of the monitoring wells, and the sampling of soil and groundwater were steam-cleaned between each boring and/or sampling, before leaving the site each day, or as necessary to minimize the chances of cross contamination.

12.   All groundwater monitoring wells installed generally consist of 4-inch diameter Schedule 40 PVC well screen with 0.020" perforations. Above the screened interval exists 4-inch diameter Schedule 40 PVC well casing. This well casing extends to nearly the surface where the end is enclosed within a locking cap. For details regarding the materials used in constructing these wells, please refer to the well installation reports in Appendix D.

13.   The annulus of each monitoring well consists of a filter medium of #2 or #16 washed sand. This filter medium extends to a depth which would correspond with approximately two feet above the screened interval. Above the filter medium, a seal of a minimum three foot thickness was established using 3/8-inch diameter bentonite pellets. The remaining annulus (from the bentonite seal to approximately 8 inches from grade) consists of a six sack sand/cement slurry. Approximately 3% of the total volume of slurry is composed of a bentonite powder which was added to reduce shrinkage away from the well pipe. A surface vault was installed around each well head to provide a surface access to the locked well cap assembly. The surface vaults were installed in such a way so as to accommodate possible future paving operations. For details regarding the materials used in

KRAZAN & ASSOCIATES, INC.

constructing these wells, please refer to the well installation reports in Appendix D.

14. Each well was sounded then developed by bailing approximately five to ten well volumes. Waters generated from the development of each well and were barreled pending disposal by the property owner or his representative. Following well development, each well was allowed to stabilize, then was re-sounded.

*based on what?*

15. After stabilization, all wells were re-sounded then sampled by means of a Teflon bailer. Water from the bailer was transferred to VOA vials. The VOA vials were laboratory clean and their caps were Teflon lined to insure a tight fit.

16. All samples were collected, maintained, and transported under chain of custody protocol to a state approved laboratory for chemical analysis. Selected samples near the fuel tank cluster were analyzed to detect the presence and concentration of benzene, toluene, ethylbenzene, xylenes, and total volatile hydrocarbons by EPA Methods 8020 (soil)/602 (water) and 8015M. Near the waste oil tank, selected samples were analyzed for volatile organics by EPA methods 8010-8020 (soil)/601-602 (water) and oil and grease.

17. The relative elevation of the well heads were determined by an elevation survey so that the site-specific groundwater gradient could be computed from well sounding information. For information obtained from the elevation or well sounding, please refer to Table VI and VII, respectively.

18. All field work was conducted under standards set forth by industry and deemed acceptable by various regulatory agencies. Hard hats, protective eyewear, steel-toe boots,

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040976



- ⊕ EXPLORATORY SOIL BORING
- ● MONITORING WELL
- T# PREVIOUSLY EXISTING UNDERGROUND TANK

| CHEVRON #4374 FRESNO CA. | Scale: 1"=30' | Date: 6-88 | KRAZAN & ASSOCIATES |
| | Drawn by: PB | Approved by: TM | Merced Fresno Visalia Bakersfield |
| | Project No. E-88-091 | Drawing No. 2 of 6 | |

protective clothing, and respiratory devices were worn by field personnel during steam cleaning and drilling activities around the backfilled tank excavations, as directed by the field geologist present.

## FINDINGS OF THIS INVESTIGATION

During this phase of the investigation seven exploratory soil borings and four groundwater monitoring wells were advanced/installed on the project site to obtain samples to characterize the substances beneath the site.

### Soil Profile

The unconsolidated material comprising the soil profile consisted of well graded/silty sands and silts to the bottoms of our borings. Silty sands were generally present from grade to a depth of 10-15 feet. Lenticular deposits of silts, and well graded/silty sand extend to a depth of 40-50 feet below grade. Silt predominates to a depth of 75 feet below grade. Silty sand appears to extend to a depth of 100 feet below grade.

Graphic representations of the cross section lines represented in Figure 3 are shown in Figures 4 and 5. For specific information regarding our soil borings, please refer to the logs of these borings in Appendix B.

### Results of Chemical Analysis

During the installation of groundwater monitoring wells and the advancement of exploratory soil borings at the project site, soil samples were obtained for logging purposes. Select soil samples were also submitted for chemical analysis. The results of these analyses are summarized in Tables 3-5 as follows.

KRAZAN & ASSOCIATES, INC.

TABLE III

Concentration of Petroleum Constituents in Soil

MW-D at various depths (near former waste oil tank location)

(Concentrations in ppm)

| Constituents | 20 ft. | 35 ft. | 50 ft. | 65 ft. | 70 ft. | 75 ft. | 80 ft. |
|---|---|---|---|---|---|---|---|
| **EPA Method 8020** | | | | | | | |
| Benzene | ND | ND | ND | ND | ND | ND | 0.07 |
| Chlorobenzene | ND | ND | ND | ND | ND | ND | ND |
| 1, 2-Dichlorobenzene | ND | ND | ND | ND | ND | ND | ND |
| 1, 3-Dichlorobenzene | ND | ND | ND | ND | ND | ND | ND |
| 1, 4-Dichlorobenzene | ND | ND | ND | ND | ND | ND | ND |
| Ethylbenzene | ND | ND | ND | ND | ND | ND | 0.03 |
| Toluene $SAL = 0.10 ppm$ | ND | 0.03 | 0.10 | 0.03 | 0.08 | 0.30 | 0.30 |
| Xylene | ND | ND | ND | ND | ND | 0.14 | 0.2 |
| TVH | ND | ND | ND | ND | ND | ND | BDL |
| Oil & Grease | <50 | 220 | 100 | <50 | <50 | 88 | <50 |

TVH = Total Volatile Hydrocarbons
< = Less than
ND = Non-Detected
BDL = Below Detection Limit

KRAZAN & ASSOCIATES, INC.

### TABLE III (CONTINUED)

Concentration of Petroleum Constituents in Soil

B-8 at various depths *near waterfoil*

(Concentrations in ppm)

| Constituents | 20 ft. | 35 ft. | 40 ft. | 45 ft. | 50 ft. |
|---|---|---|---|---|---|
| **EPA Method 8020:** | | | | | |
| Benzene | ND | ND | ND | ND | ND |
| Chlorobenzene | ND | ND | ND | ND | ND |
| 1, 2-Dichlorobenzene | ND | ND | ND | ND | ND |
| 1, 3-Dichlorobenzene | ND | ND | ND | ND | ND |
| 1, 4-Dichlorobenzene | ND | ND | ND | ND | ND |
| Ethylbenzene | ND | ND | ND | ND | ND |
| Toluene | 0.04 | 0.04 | 0.01 | 0.02 | 0.03 |
| Xylene | ND | ND | ND | ND | ND |
| TVH (EPA 8015M) | ND | ND | ND | ND | ND |
| Oil & Grease | 52 | <50 | <50 | <50 | <50 |

TVH = Total Volatile Hydrocarbons
<    = Less than
ND  = Non-Detected
BDL = Below Detection Limit

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040980

## TABLE III (CONTINUED)

### Concentration of Petroleum Constituents in Soil

B-9 at various depths

(Concentrations in ppm)

| Constituents | 20 ft. | 35 ft. | 40 ft. | 45 ft. | 50 ft. |
|---|---|---|---|---|---|
| EPA Method 8020: | | | | | |
| Benzene | ND | ND | ND | ND | ND |
| Chlorobenzene | ND | ND | ND | ND | ND |
| 1, 2-Dichlorobenzene | ND | ND | ND | ND | ND |
| 1, 3-Dichlorobenzene | ND | ND | ND | ND | ND |
| 1, 4-Dichlorobenzene | ND | ND | ND | ND | ND |
| Ethylbenzene | ND | ND | ND | ND | ND |
| Toluene | 0.05 | 0.04 | 0.03 | 0.03 | 0.03 |
| Xylene | ND | ND | ND | ND | ND |
| TVH (EPA 8015M) | ND | ND | ND | ND | ND |
| Oil & Grease | <50 | <50 | <50 | <50 | <50 |

TVH = Total Volatile Hydrocarbons
<  = Less than
ND  = Non-Detected
BDL = Below Detection Limit

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040981

TABLE IV

Concentrations of Petroleum Constituents in Soils

MW-D – EPA Method 8010

(Concentrations in ppm)

| Constituent | 20 ft. | 35 ft. | 50 ft. | 65 ft. | 70 ft. | 75 ft. | 80 ft. |
|---|---|---|---|---|---|---|---|
| Bromodichloromethane | ND | ND | ND | ND | ND | ND | ND |
| Bromoform | ND | ND | ND | ND | ND | ND | ND |
| Bromomethane | ND | ND | ND | ND | ND | ND | ND |
| Carbon tetrachloride | ND | ND | ND | ND | ND | ND | ND |
| Chlorobenzene | ND | ND | ND | ND | ND | ND | ND |
| Chloroethane | ND | ND | ND | ND | ND | ND | ND |
| 2-Chloroethylvinyl ether | ND | ND | ND | ND | ND | ND | ND |
| Chloroform | ND | ND | ND | ND | ND | ND | ND |
| Chloromethane | ND | ND | ND | ND | ND | ND | ND |
| Dibromochloromethane | ND | ND | ND | ND | ND | ND | ND |
| 1,2-Dichlorobenzene | ND | ND | ND | ND | ND | ND | ND |
| 1,3-Dichlorobenzene | ND | ND | ND | ND | ND | ND | ND |
| 1,4-Dichlorobenzene | ND | ND | ND | ND | ND | ND | ND |
| Dichlorodifluoromethane | ND | ND | ND | ND | ND | ND | ND |
| 1,1-Dichloroethane | ND | ND | ND | ND | ND | ND | ND |
| 1,2-Dichloroethane | ND | ND | ND | ND | ND | ND | ND |
| 1,1-Dichloroethene | ND | ND | ND | ND | ND | ND | ND |
| trans-1,2-Dichloroethene | ND | ND | ND | ND | ND | ND | ND |
| 1,2-Dichloropropane | ND | ND | ND | ND | ND | ND | ND |
| cis-1,3-Dichloropropene | ND | ND | ND | ND | ND | ND | ND |
| trans-1,3-Dichloropropene | ND | ND | ND | ND | ND | ND | ND |
| Methylene chloride | ND | ND | ND | ND | ND | ND | ND |
| 1,1,2,2-Tetrachloroethane | ND | ND | ND | ND | ND | ND | ND |
| Tetrachloroethene | ND | ND | ND | ND | ND | ND | ND |
| 1,1,1-Trichloroethane | ND | ND | ND | ND | ND | ND | ND |
| 1,1,2-Trichloroethane | ND | ND | ND | ND | ND | ND | ND |
| Trichloroethene | ND | ND | ND | ND | ND | ND | ND |
| Trichlorofluoromethane | ND | ND | ND | ND | ND | ND | ND |
| Vinyl Chloride | ND | ND | ND | ND | ND | ND | ND |

ND = Non-Detected

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040982

TABLE IV (CONTINUED)

Concentrations of Petroleum Constituents in Soils

B-8 - EPA Method 8010

(Concentrations in ppm)

| Constituent | 20 ft. | 35 ft. | 40 ft. | 45 ft. | 50 ft. |
|---|---|---|---|---|---|
| Bromodichloromethane | ND | ND | ND | ND | ND |
| Bromoform | ND | ND | ND | ND | ND |
| Bromomethane | ND | ND | ND | ND | ND |
| Carbon tetrachloride | ND | ND | ND | ND | ND |
| Chlorobenzene | ND | ND | ND | ND | ND |
| Chloroethane | ND | ND | ND | ND | ND |
| 2-Chloroethylvinyl ether | ND | ND | ND | ND | ND |
| Chloroform | ND | ND | ND | ND | ND |
| Chloromethane | ND | ND | ND | ND | ND |
| Dibromochloromethane | ND | ND | ND | ND | ND |
| 1,2-Dichlorobenzene | ND | ND | ND | ND | ND |
| 1,3-Dichlorobenzene | ND | ND | ND | ND | ND |
| 1,4-Dichlorobenzene | ND | ND | ND | ND | ND |
| Dichlorodifluoromethane | ND | ND | ND | ND | ND |
| 1,1-Dichloroethane | ND | ND | ND | ND | ND |
| 1,2-Dichloroethane | ND | ND | ND | ND | ND |
| 1,1-Dichloroethene | ND | ND | ND | ND | ND |
| trans-1,2-Dichloroethene | ND | ND | ND | ND | ND |
| 1,2-Dichloropropane | ND | ND | ND | ND | ND |
| cis-1,3-Dichloropropene | ND | ND | ND | ND | ND |
| trans-1,3-Dichloropropene | ND | ND | ND | ND | ND |
| Methylene chloride | ND | ND | ND | ND | ND |
| 1,1,2,2-Tetrachloroethane | ND | ND | ND | ND | ND |
| Tetrachloroethene | ND | ND | ND | ND | ND |
| 1,1,1-Trichloroethane | ND | ND | ND | ND | ND |
| 1,1,2-Trichloroethane | ND | ND | ND | ND | ND |
| Trichloroethene | ND | ND | ND | ND | ND |
| Trichlorofluoromethane | ND | ND | ND | ND | ND |
| Vinyl Chloride | ND | ND | ND | ND | ND |

ND = Non-Detected

KRAZAN & ASSOCIATES, INC.

Page No. 18
Project No. E88-097

TABLE IV (CONTINUED)

Concentrations of Petroleum Constituents in Soils

B-9 - EPA Method 8010

(Concentrations in ppm)

| Constituent | 20 ft. | 35 ft. | 40 ft. | 45 ft. | 50 ft. |
|---|---|---|---|---|---|
| Bromodichloromethane | ND | ND | ND | ND | ND |
| Bromoform | ND | ND | ND | ND | ND |
| Bromomethane | ND | ND | ND | ND | ND |
| Carbon tetrachloride | ND | ND | ND | ND | ND |
| Chlorobenzene | ND | ND | ND | ND | ND |
| Chloroethane | ND | ND | ND | ND | ND |
| 2-Chloroethylvinyl ether | ND | ND | ND | ND | ND |
| Chloroform | ND | ND | ND | ND | ND |
| Chloromethane | ND | ND | ND | ND | ND |
| Dibromochloromethane | ND | ND | ND | ND | ND |
| 1,2-Dichlorobenzene | ND | ND | ND | ND | ND |
| 1,3-Dichlorobenzene | ND | ND | ND | ND | ND |
| 1,4-Dichlorobenzene | ND | ND | ND | ND | ND |
| Dichlorodifluoromethane | ND | ND | ND | ND | ND |
| 1,1-Dichloroethane | ND | ND | ND | ND | ND |
| 1,2-Dichloroethane | ND | ND | ND | ND | ND |
| 1,1-Dichloroethene | ND | ND | ND | ND | ND |
| trans-1,2-Dichloroethene | ND | ND | ND | ND | ND |
| 1,2-Dichloropropane | ND | ND | ND | ND | ND |
| cis-1,3-Dichloropropene | ND | ND | ND | ND | ND |
| trans-1,3-Dichloropropene | ND | ND | ND | ND | ND |
| Methylene chloride | ND | ND | ND | ND | ND |
| 1,1,2,2-Tetrachloroethane | ND | ND | ND | ND | ND |
| Tetrachloroethene | ND | ND | ND | ND | ND |
| 1,1,1-Trichloroethane | ND | ND | ND | ND | ND |
| 1,1,2-Trichloroethane | ND | ND | ND | ND | ND |
| Trichloroethene | ND | ND | ND | ND | ND |
| Trichlorofluoromethane | ND | ND | ND | ND | ND |
| Vinyl Chloride | ND | ND | ND | ND | ND |

ND = Non-Detected

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040984

TABLE V

Concentrations of Petroleum Constituents in Soil

EPA Method 8020/8015M

(Concentrations in parts per million)

| Sample Description | Benzene | Toluene | Ethyl-benzene | Xylenes | TVH |
|---|---|---|---|---|---|
| MW-A @ 15' | ND | BDL | ND | ND | ND |
| MW-A @ 30' | ND | ND | ND | ND | ND |
| MW-A @ 45' | 0.20 | 0.40 | BDL | 0.20 | ND |
| MW-A @ 55' | 0.70 | 1.40 | 0.06 | 0.40 | BDL |
| MW-A @ 60' | 4.20 | 7.10 | 0.30 | 2.40 | 24 |
| MW-A @ 65' | 6.90 | 31 | 7.40 | 49 | 630 |
| MW-A @ 70' | 0.40 | BDL | ND | 0.08 | ND |
| MW-B @ 20' | ND | 0.05 | ND | ND | ND |
| MW-B @ 35' | ND | 0.07 | ND | 0.12 | ND |
| MW-B @ 50' | 0.39 | 0.51 | 0.06 | 0.20 | BDL |
| MW-B @ 55' | 0.45 | 0.62 | 0.11 | 0.36 | BDL |
| MW-B @ 60' | 0.14 | 0.48 | BDL | 0.16 | ND |
| MW-B @ 65' | 0.28 | 0.96 | 0.56 | 2.90 | 86 |
| MW-B @ 70' | 0.67 | 3.40 | 1.90 | 11 | 200 |
| MW-C @ 15' | ND | 0.2 | ND | ND | ND |
| MW-C @ 25' | ND | BDL | ND | ND | ND |
| MW-C @ 40' | ND | 0.10 | ND | ND | ND |
| MW-C @ 55' | ND | 0.2 | ND | ND | ND |
| MW-C @ 60' | 0.02 | 0.14 | ND | ND | ND |
| MW-C @ 65' | ND | 0.28 | ND | ND | ND |
| MW-C @ 70' | 0.03 | 0.25 | 0.07 | 0.31 | BDL |
| B-4 @ 25' | ND | ND | ND | ND | ND |
| B-4 @ 40' | 0.04 | 0.10 | ND | 0.08 | ND |
| B-4 @ 45' | 0.05 | 0.20 | ND | BDL | ND |
| B-4 @ 50' | 0.10 | 0.30 | ND | 0.10 | ND |
| B-4 @ 55' | 0.50 | 1.00 | 0.05 | 0.40 | ND |
| B-5 @ 20' | ND | ND | ND | ND | ND |
| B-5 @ 35' | ND | ND | ND | ND | ND |
| B-5 @ 40' | ND | ND | ND | ND | ND |
| B-5 @ 45' | ND | ND | ND | ND | ND |
| B-5 @ 50' | 1.00 | 1.80 | 0.08 | 0.60 | BDL |

KRAZAN & ASSOCIATES, INC.

## TABLE V (CONTINUED)

### EPA Method 8020/8015M

### Concentrations of Petroleum Constituents in Soil

(Concentrations in parts per million)

| Sample Description | Benzene | Toluene | Ethyl-benzene | Xylenes | TVH |
|---|---|---|---|---|---|
| B-6 @ 20' | ND | ND | ND | ND | ND |
| B-6 @ 35' | ND | ND | ND | ND | ND |
| B-6 @ 40' | ND | ND | ND | ND | ND |
| B-6 @ 45' | ND | ND | ND | ND | ND |
| B-6 @ 50' | ND | ND | ND | ND | ND |
| B-7 @ 20' | ND | ND | ND | ND | ND |
| B-7 @ 35' | 0.05 | 0.05 | ND | ND | ND |
| B-7 @ 40' | ND | ND | ND | ND | ND |
| B-7 @ 45' | 0.05 | 0.10 | ND | BDL | ND |
| B-7 @ 50' | 1.20 | 2.20 | 0.10 | 0.80 | BDL |
| B-10 @ 25' | 0.30 | 1.80 | 0.20 | 1.40 | BDL |
| B-10 @ 40' | 0.10 | 0.30 | ND | 0.10 | ND |
| B-10 @ 45' | 0.05 | 0.10 | ND | 0.05 | ND |
| B-10 @ 50' | 0.80 | 1.50 | 0.10 | 0.60 | ND |
| B-10 @ 55' | 1.70 | 3.30 | 0.20 | 1.10 | BDL |

TVH = Total Volatile Hydrocarbons
ND  = Non-Detected
BDL = Below Detection Limits
      Benzene= 0.02 ppm, Toluene= 0.05 ppm, Ethylbenzene= 0.05 ppm,
      Xylenes= 0.05 ppm, and TVH= 10 ppm)

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040986

TABLE VI
Concentrations of Petroleum Constituents in Groundwater
(Concentrations in ppb, unless otherwise noted)

| Constituents | MW-A | MW-B | MW-C | MW-D | Detection |
|---|---|---|---|---|---|
| **EPA 601** | | | | | |
| Bromodichloromethane | * | * | * | ND | 0.5 |
| Bromoform | * | * | * | ND | 0.5 |
| Bromomethane | * | * | * | ND | 0.5 |
| Carbon tetrachloride | * | * | * | ND | 0.5 |
| Chlorobenzene | * | * | * | ND | 0.5 |
| Chloroethane | * | * | * | ND | 0.5 |
| 2-Chloroethylvinyl ether | * | * | * | ND | 0.5 |
| Chloroform | * | * | * | ND | 0.5 |
| Chloromethane | * | * | * | ND | 0.5 |
| Dibromochloromethane | * | * | * | ND | 0.5 |
| 1,2-Dichlorobenzene | * | * | * | ND | 0.5 |
| 1,3-Dichlorobenzene | * | * | * | ND | 0.5 |
| 1,4-Dichlorobenzene | * | * | * | ND | 0.5 |
| Dichlorodifluoromethane | * | * | * | ND | 0.5 |
| 1,1-Dichloroethane | * | * | * | 920 | 0.5 |
| 1,2-Dichloroethane | * | * | * | ND | 0.5 |
| 1,1-Dichloroethene | * | * | * | ND | 0.5 |
| trans-1,2-Dichloroethene | * | * | * | ND | 0.5 |
| 1,2-Dichloropropane | * | * | * | ND | 0.5 |
| cis-1,3-Dichloropropene | * | * | * | ND | 0.5 |
| trans-1,3-Dichloropropene | * | * | * | ND | 0.5 |
| Methylene Chloride | * | * | * | ND | 0.5 |
| 1,1,2,2-Tetrachloroethane | * | * | * | ND | 0.5 |
| Tetrachloroethene | * | * | * | ND | 0.5 |
| 1,1,1-Trichloroethane | * | * | * | ND | 0.5 |
| 1,1,2-Trichloroethane | * | * | * | ND | 0.5 |
| Trichloroethene | * | * | * | ND | 0.5 |
| Trichlorofluoromethane | * | * | * | ND | 0.5 |
| Vinyl Chloride | * | * | * | ND | 0.5 |
| | | | | | |
| **EPA 602:** | | | | | |
| Benzene | 35000 | 14000 | 23000 | 6700 | 0.5 |
| Toluene | 44000 | 18000 | 33000 | ND | 0.5 |
| Ethylbenzene | 3300 | 1700 | 2500 | 1300 | 0.5 |
| Total Xylenes | 22000 | 7400 | 16000 | * | 0.5 |
| | | | | | |
| **EPA 8015M:** | | | | | |
| Total Volatile Hydrocarbons | 320000 | 150000 | 250000 | 120000 | 50 |
| | | | | | |
| Oil & Grease | * | * | * | 4 ppm | * |

ND = Non-Detected
  = Sample Not Tested
 *  Not analyzed

## TABLE VII
## LEVEL CIRCUIT DATA

Proj. Name   Chevron Station Number 4374, Fresno and C, Fresno CA

Project No.   E88-097                          Date   12/16/88

| Location | Reading 1 | Elevation 1 | Reading 2 | Elevation 2 | Difference |
|----------|-----------|-------------|-----------|-------------|------------|
| TBM  | 5.37 | 100.00 | 5.37 | 100.00 | 0.00 |
| MW-A | 4.95 | 100.42 | 4.95 | 100.42 | 0.00 |
| MW-B | 5.39 | 99.98  | 5.39 | 99.98  | 0.00 |
| MW-C | 4.87 | 100.50 | 4.87 | 100.50 | 0.00 |
| MW-D | 4.35 | 101.02 | 4.35 | 101.02 | 0.00 |
| TBM  | 5.37 | 100.00 | 5.37 | 100.00 | 0.00 |

Crew:        Rick Stauber, Ron Holcomb

Equipment:   Lietz CSI B4 Self Leveling Level, No 242165, R.J. Wayte No. 2-1
             Mound City Level Rod, Krazan Number 001
             Well Sounding Cap Number 001

Weather:     Cold, 45 Degrees, Raining Lightly on and off, Cloud cover 100%

TBM:         Chiseled X on curb near corner of Fresno and "C".
             Assigned elevation of 100.00 feet above MSL.

Note:        All measurements made to Sounding Cap.

Krazan and Associates, Inc.



FRESNO ST.

ISLAND (PREVIOUS)

SITE SPECIFIC GROUNDWATER GRADIENT

EXCAVATION (PREVIOUS)

PREVIOUSLY EXISTING SERVICE STATION BLDG

ALLEY

STREET

PREVIOUS ISLAND

WASTE OIL TANK #4 (PREVIOUS)

⊕ EXPLORATORY SOIL BORING
● MONITORING WELL
T# PREVIOUSLY EXISTING UNDERGROUND TANK

| CHEVRON #4374 FRESNO CA. | Scale: 1"=30' | Date: JAN. '89 | **KRAZAN & ASSOCIATES** |
| | Drawn by: PB | Approved by: TM | Merced Fresno Visalia Bakersfield |
| | Project No. E-88-09 | Drawing No. 3 of 10 | |

RWQCB-FRESNO-040989

OVERLAY FOR FIG. 4



▽ GROUNDWATER

 APPROXIMATE LIMITS OF CONTAMINATED SOILS

RWOCB-FRESNO-040990



SECTION A-A'

RWQCB-FRESNO-040991





CLEAR OVERLAY FOR FIG. 5

GROUNDWATER

APPROXIMATE LIMITS
OF CONTAMINATED
SOILS

RWOCB-FRESNO-040992



RWQCB-FRESNO-040993

## DISCUSSION OF FINDINGS

This investigation of the subject property has assessed the nature and approximate extent of petroleum constituents in the subsoils. Additionally, site specific groundwater data such as depth to groundwater, gradient, and the impact of petroleum products has been determined.

### Subsoils

The extent of gasoline constituents in the subsoils appears to be limited to the northwest side of the tank backfilled excavation and its immediate vicinity. Additionally, petroleum constituents are found within 15 feet of groundwater, in several borings where no other significant concentrations exist in the upper soils. It is believed that this contamination is related.

Waste oil constituents are found in the subsoils in the vicinity of the waste oil tank. These petroleum constituents appear to be very limited in their lateral extent.

For further information regarding the approximate areal limits of petroleum constituents in the subsoils, please refer to Figure 3 and its overlay.

### Groundwater

Groundwater beneath the subject property was found at a depth of approximately 72-74 feet below existing grade. The site specific groundwater gradient is towards the east at 0.008 feet/foot.

The extent of groundwater contamination related to this project site is unknown at this time, and is beyond the scope of the work plan approved by the Fresno County Environmental Health Department. However, groundwater contamination was found in all of our monitoring wells. It is suspected that the groundwater contamination related to the subject property has migrated off-site.

Two particular concerns regarding groundwater contaminant types below the project site were present. Concentrations of volatile organics (EPA 602/8015M) were present in all four of our monitoring wells. All detectable concentrations of these volatile constituents were well above the action levels established by the State of California Department of Health Services (DHS). In a

KRAZAN & ASSOCIATES, INC.

Page No. 23
Project No. E88-097

monitoring well located near the waste oil tank a high concentration of *Only MW analyzed for that constituent.* 1,2-Dichloroethane was present above the State action levels.

All four monitoring wells produced groundwater samples which were analyzed for volatile organics by EPA Methods 602 and 8015M. Monitoring wells MW-A,B, and C all contained concentrations of benzene, toluene, ethylbenzene, and total xylenes that exceeded the State of California Department of Health Services (DHS) action levels of 0.7, 100, 680, and 620 parts per billion (ppb), respectively. These samples contained concentrations of these constituents up to 35000 ppb benzene, 44000 ppb toluene, 3300 ppb ethylbenzene, and 22000 ppb total xylenes. The sample obtained from monitoring well MW-D revealed concentrations of 6700 ppb benzene and 1300 ppb ethylbenzene.

Monitoring Well MW-D was sampled and also submitted for chemical analysis by EPA Method 601. The results of this analysis revealed 1,2-Dichloroethane to be present in a concentration of 920 ppb. This concentration is well above the 1 ppb action level established by the State of California DHS.

Ethylene dichloride (1,2-Dichloroethane) is a chlorinated halocarbon which is the largest volume organic derivative of chlorine. It is primarily used in the manufacture of vinyl chloride. The second most common use of this organic compound is as a lead scavenger in tetraethyl lead antiknock additives. Other uses include those associated with the manufacture of ethylenediamine, trichoroethylene, tetrachloroethylene, and 1,1,2-trichloroethane. 1,2-Dichloroethane is insoluble in water, but is soluble in most common solvents. Its specific gravity is greater than water. Its vapor pressure at temperatures equivalent to that of groundwater is 40-100 mm Hg.

## LIMITATIONS

The findings of this report were based upon the results of field and laboratory investigations, coupled with the interpolation of subsurface conditions associated with our soil borings and groundwater monitoring wells. Also incorporated was the interpretation of previous investigations in the vicinity; therefore, the data are accurate only to the degree implied by review of the data obtained and by professional interpretation.

KRAZAN & ASSOCIATES, INC.

Page No. 24
Project No. E88-097

Exploratory soil borings and groundwater monitoring wells were located in the field by review of available maps and by pacing or tape measurement from existing landmarks. Therefore, these should be considered accurate only to the degree implied by the methods used to locate them.

Chemical testing was done by laboratories approved by the State of California Department of Health Services. The results of the chemical testing are accurate only to the degree of the care of ensuring the testing accuracy and the representative nature of the soil samples obtained.

The findings presents herewith are based on professional interpretation using state of the art methods and equipment and a degree of conservatism deemed proper as of this report date. It is not warranted that such data cannot be superseded by future geotechnical, environmental, or technological developments.

If there are any questions or if we can be of further assistance, please do not hesitate to contact our office.

Respectfully submitted,
KRAZAN & ASSOCIATES

Robert A. Martin
Project Geologist

Dean Alexander
Geotechnical Engineer
RGE #002051/RCE#34274

RAM/DA/lc

2c herewith
2c Fresno County Environmental Health Department
    Attn: Mr. Lance Leitch

KRAZAN & ASSOCIATES, INC.

RWQCB-FRESNO-040996



KRAZAN & ASSOCIATES, INC.

Fresno Visalia Bakersfield

CHEVRON STA. No. 4574

1160 FRESNO ST.

FRESNO                    CALIF

RWQCB-FRESNO-040997

# REFERENCES

EPA SW-846, 1986 (3rd Edition), Test Methods for Evaluation Solid Waste; U.S. Government Printing Office, Washington, D.C., Vols. I-II

State of California DOHS, 1986, Site Mitigation Decision Tree Manual; draft working document

State of California Water Resources Control Board, 1987, Leaking Underground Fuel Tank Field Manual (LUFT); draft document

State of California Department of Water Resources, 1975, "California's Ground Water"; Bulletin No. 118

State of California Department of Water Resources, January 1980, "Ground Water Basins in California, a report to the Legislature in Response to Water Code Section 12924"; Bulletin 118-80

State of California Regional Water Quality Control Board, Central Valley Region, 1986, "The Designated Level Methodology for Waste Classification and Cleanup Level Determination"; tentative staff report

State of California Department of Water Resources, Spring 1985, "Lines of Equal Evelvationof Water In Wells, Unconfined Aquifer, San Joaquin Valley, Spring 1985".

State of California Department of Water Resources, Spring 1986, "Lines of Equal Elevation of Water In Wells, Unconfined Aquifer, San Joaquin Valley, Spring 1986".

State of California Department of Water Resources, Spring 1987, "Lines of Equal Elevation of Water In Wells, Unconfined Aquifer, San Joaquin Valley, Spring 1986".

State of California Department of Water Resources, Fall 1984, "Lines of Equal Elevation of Water in Wells, Unconfined Aquifer, San Joaquin Valley, Fall 1984".

State of California Department of Water Resources, Fall 1985, "Lines of Equal Elevation of Water in Wells, Unconfined Aquifer, San Joaquin Valley, Spring 1985".

State of California Department of Water Resources, Fall 1986, "Lines of Equal Elevation of Water in Wells, Unconfined Aquifer, San Joaquin Valley, Fall 1986".

Driscoll, Fletcher G., 1986 Groundwater and Wells; Johnson Division, St. Paul, Minnesota

Hern, Stephen C. and Melancon, Susan M., 1986, <u>Vadose Zone Modeling of Organic Pollutants</u>;  Lewis Publishers, Inc., Chelsea, Michigan

Hill, Mary, 1975, <u>Geology of the Sierra Nevada</u>;  University of California Press, Berkeley, California

Hornbeck, David, 1983 <u>California Patterns, A Geographical and Historical Atlas</u>;  Mayfield Publishing Co., Palo Alto, California

Howard, Arthur D., 1979, <u>Geologic History of Middle California</u>;  University of California Press, Berkeley, California

Schwendeman, T.G. and Wilcox, H.K., 1987, <u>Underground Storage Systems</u>;  Lewis Publishers, Inc., Michigan

United States Department of the Interior, Bureau of Reclamation, Mid Pacific Region, 1987, Annual Water Supply Report, 1986

RWQCB-FRESNO-040999

FRESNO COUNTY DEPARTMENT OF HEALTH
ENVIRONMENTAL HEALTH SYSTEM
P.O. BOX 11867, FRESNO, CALIFORNIA 93775
TELEPHONE (209) 445-3271

PERMIT TO PERFORM SUBSURFACE SITE ASSESSMENT

Date _1-22-88_                    Approved _Peggy Wilkinson_

I.D._86524_  CT. _84_            Fee_____

**A.  Permit to Perform Site Assessment of an Underground Storage Facility:**

    New ☐  ~~Existing~~ REMOVED ☒   YOUR PROJECT NUMBER _5BB-097_

Site Address _1160 FRESNO STREET_  City_____  Zip_____
Facility Name _CHEVRON STATION # 4374_  APN _467-152-21_
Owner/Operator _CHEVRON USA ATTN:LISA MARINARO_  Phone_____
Mailing Address _P.O. BOX 5004_  City _SAN RAMON_ Zip _94583-0804_

**B.  Contractor Information:**

Company _KRAZAN & ASSOC._  Contact Person _TONY MARTIN_ Phone _(209) 291-73??_
Mailing Address _3860 NORTH WINERY_  City _FRESNO_ Zip _93726_
State Contractor License No. _499908_  Class _C-57_

DESCRIBE TYPE OF WORK TO BE PERFORMED

_INSTALL 4 GROUNDWATER MONITORING WELLS TO_
_85 FEET BELOW GRADE AND DRILL UP TO EIGHT_
_SOIL BORINGS TO A MAX. DEPTH OF 60 FEET,_
_AS PER OUR OCTOBER 26, 1988 WORK PLAN AND_
_OUR NOVEMBER 15, 1988 ADDENDUM._

I understand that any changes to the proposals, plans, design, materials or
equipment, for which this permit is issued shall void it, unless prior
approval has been obtained from this office.  (Submit three (3) copies of
Plans for review and approval.)  Two working days (48 hours) advance notice
required.

Signature & Title _Robert A. Mack_  PROJ. GEOLOGIST Date _11/21/88_

Print Name _Robert A. Martin_   Phone _(209) 291-7337_

4890/vc
4/87

RWQCB-FRESNO-041000



**GERAGHTY & MILLER, INC.**
*Environment and Infrastructure*

a **heidemij** company

September 6, 1996 *(recd 25 Sept 1996)*
Project No. RC0042.015



Mr. Russell W. Walls
Regional Water Quality Control Board –
Central Valley Region
3614 East Ashlan Avenue
Fresno, California  93726

SUBJECT:  Site Redevelopment, Former Chevron Service Station #9-4374, 1160 Fresno
          Street, Fresno, California.

Dear Mr. Walls:

The purpose of this letter is to clarify the roles of the Regional Water Quality Control
Board – Central Valley Region (CVRWQCB), the Fresno City Development Department
(City), and the Fresno County Community Health Department (County) in the determination of
developability for the above-referenced site.

The property is a former Chevron Products Company (Chevron) service station site,
closed in 1988.  Fuel released from underground fuel tanks has affected the soil and ground-
water on and beneath this site.  Geraghty & Miller, on behalf of Chevron, has performed soil-
vapor extraction since 1992 as a means of remediating the soil and groundwater on this site.

Chevron is working towards preparing this property for sale and/or lease.  Potential
buyers have expressed an interest in the property's potential for developability.  As described
below, it appears that the CVRWQCB has primary say over the issue of developability.
Specifically, Chevron requests concurrence from the CVRWQCB that the site is developable
and that, if required by the CVRWQCB, guidance be prepared for a potential property buyer
which will allow development of the property.  The guidance for developability might address
considerations relating to the clean-up activities occurring at the site.

In a July 30, 1996 telephone conversation between you and Steve Brussee of this
office, you provided the names of agencies to contact for possible redevelopment guidelines.

RWQCB-FRESNO-039766

GERAGHTY & MILLER, INC.                                                    2

Contact has since been made with the City and the County. In brief, representatives of these agencies have deferred to the CVRWQCB for redevelopment determination and guidelines.

Specifically, in an August 2, 1996 telephone conversation between Jerry Freeman, a Supervising Planner with the City, and Steve Brussee, Mr. Freeman deferred to the CVRWQCB on redevelopment issues. In an August 21, 1996 telephone conversation between Richard Yee of the City and Steve Brussee, Mr. Yee provided clarification of the City's position on redevelopment, as follows:

1)   Approval from the CVRWQCB for redevelopment will virtually assure that City requirements are met.

2)   The City will be involved in any zoning or land-use issues, if redevelopment is proposed.

3)   Because the property is within the downtown Fresno City redevelopment limits, active involvement of the City in any redevelopment proposal could be expected.

4)   The City would like to be cc'd on all correspondence regarding redevelopment, to the attention of Alvin Solis.

Likewise, the County was contacted for input on the developability of this property. A telephone voicemail message left for Steve Brussee by Ms. Lynn Klinkby of the County stated the following:

1)   The County is "out of the loop" on redevelopment criteria for this property.

2)   All concerns for redevelopment of this property are to be directed to you at the CVRWQCB.

3)   The City of Fresno should be involved in any land-use issues.

4)   The County has no direct involvement in redevelopment concerns, but wishes to remain informed by cc's on all correspondence regarding redevelopment issues, treatment issues, and site-closure issues.

In summary, it is Geraghty & Miller's understanding that

1)   the CVRWQCB is to be the lead agency for the determination of developability,

*Project No. RC0042.015*

RWQCB-FRESNO-039767

GERAGHTY & MILLER, INC.                                                    3

2)      the City is to remain informed about any plans for development and may assist
        in aspects of redevelopment pertaining to land use and/or zoning issues, and

3)      the County does not care to be involved in determining the developability of
        this site.

Based on the above, it is Geraghty & Miller's understanding that determining the details
of the requirements for developability should be conducted with the CVRWQCB.

If the position of the CVRWQCB is not in concurrence with the stated positions of the
City and County, please advise us in writing.

Geraghty & Miller appreciates your cooperation in this matter.  If you have any
questions, please call the undersigned at (510) 233-3200.

Sincerely,
GERAGHTY & MILLER, INC.

Steven J. Brussee
Engineer

Kent O'Brien
Project Scientist/Project Manager

Gary W. Keyes, P.E.
Principal Engineer/Associate
San Francisco Regional Manager

cc:     Jim Armstrong, Fresno County Community Health Dept.
        David Pomaville, Fresno County Community Health Dept.
        Lynn Klinkby, Fresno County Community Health Dept.
        Jerry Freeman, Fresno City Development Dept.
        Alvin Solis, Fresno City Development Dept.
        Richard Yee, Fresno City Development Dept.
        John Noonan, Regional Water Quality Control Board – Central Valley Region
        Bob Cochran, Chevron Products Company

*Project No. RC0042.015*



# CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
## CENTRAL VALLEY REGION

3614 East Ashlan Ave
Fresno, CA 93726-3533

Internet www.swrcb.ca.gov/~rwqcb5/rwqcb5.htm

Phone (209) 445-5116
FAX (209) 455-5910



Pete Wilson, *Governor*

10 July 1997

Mr. A. E. Perez
Shell Oil Products Company
P.O. Box 4023
Concord, CA 94524

**PERMISSION TO INSTALL A GROUNDWATER MONITORING WELL AT THE FRESNO AND C STREET SHELL STATION IN FRESNO, FRESNO COUNTY**

We trust you are aware of an ongoing investigation and remediation of petroleum hydrocarbons at the former Chevron Station No. 9-4374, 1160 Fresno Street in Fresno. Significant amounts of gasoline have been extracted from the vadose zone at the site. High concentrations of petroleum constituents occur in groundwater. Data from remediation and groundwater monitoring activities associated with the Chevron station indicate that impacted groundwater extends under the Shell Oil Products Company (Shell) station at 1212 Fresno Street. To define the extent of this impact and improve the efficiency of the Chevron station's remediation system requires collection of a groundwater sample, or samples, from beneath the Shell facility. According to our case file, Chevron U.S.A. Products Company (Chevron) requested access to install a monitoring well at the site, in a 15 December 1995 letter to your company. The request was denied in Shell's 20 December 1995 response letter. It is our understanding that you will not allow access to your site unless the need for the work is required by us. This letter is to inform you that Chevron does need access to your site.

We want you to know that we are in complete agreement with Chevron's proposal to install a well on your property. Please reconsider your denial of Chevron's site access request and allow Chevron to implement the work. Thank you for your kind attention to this matter. Please send your response **by 14 August 1997**. We await your reply.

If you have any questions regarding this matter, please contact Ray Bruun at (209) 445-5504.

JOHN M. NOONAN
Senior Engineer
RCE No. 35206

RB:rb

cc: Mr. Jim Armstrong, Fresno County Environmental Health System, Fresno
    Mr. R. J. Cochran, Chevron U.S.A. Products Company, San Ramon

EXHIBIT 33
WIT: Bachs
DATE: 8-17-11
LOUISE SOUSOURES, CSR #3575

*Our mission is to preserve and enhance the quality of California's water resources, and
ensure their proper allocation and efficient use for the benefit of present and future generations.*

062097A.LTR



# California Regional Water Quality Control Board
## Central Valley Region
Steven T. Butler, Chair



Winston H. Hickox
Secretary for
Environmental
Protection

**Fresno Branch Office**
Internet Address: http://www.swrcb.ca.gov/~rwqcb5
3614 East Ashlan Avenue, Fresno, California 93726
Phone (559) 445-5116 • FAX (559) 445-5910

Gray Davis
Governor

12 October 1999

Mr. R. J. Cochran
Chevron Products Company
P.O. Box 6004
~~Fresno~~ CA  94583
San Ramon

## COMMENT ON WORK PLAN, FORMER CHEVRON STATION 9-4374, 1160 FRESNO STREET, FRESNO COUNTY

We reviewed the *Work Plan for Soil Borings and Monitoring Wells*, dated 22 April 1999, which was prepared by Gettler-Ryan, Inc. on behalf of Mr. R. J. Cochran of Chevron USA Products Company (Chevron). Our comments are presented below following a presentation of background information regarding previous site activities.

### Site Background Information

The following background information was excerpted from a 15 August 1997 *Site-Specific Health Risk Assessment* for the subject site prepared by Geraghty & Miller, Inc. for Chevron.

"In 1988, the service station was demolished; this demolition included the removal of all above- and below-ground structures, including all surface asphaltic- and Portland cement-concrete. Two 10,000-gallon and one 5,000-gallon underground gasoline storage tanks and one 500-gallon underground waste-oil tank were removed and surrounding soil was excavated.

Between September 1988 and December 1988, Krazan & Associates installed groundwater Monitoring Wells MW-A, MW-B, MW-C, and MW-D onsite. In August 1989, RMX Engineering and Construction of Sacramento, California, installed a groundwater extraction and treatment system (pump and treat). The effectiveness of the pump-and-treat system was reportedly limited by low extraction flow rates, small radii of influence, and silt infiltration of the wells. Pump-and-treat system operation ceased in August 1992.

Geraghty & Miller evaluated the remediation approach for the site in October 1992. Geraghty & Miller installed groundwater Monitoring Wells MW-E, MW-F, and MW-G in October 1992; groundwater Monitoring Wells MW-H and MW-I and Vapor Extraction Wells VW-1, VW-2S, and VW-2D in December 1993; and groundwater Monitoring Wells MW-K, MW-L, MW-M, MW-N, and MW-O in February 1994.

*California Environmental Protection Agency*

♻ *Recycled Paper*

EXHIBIT 42
WIT: Bauks
DATE: 8-17-11
LOUISE SOUSOURES, CSR #3575

RWQCB-FRESNO-039681

From 1994 to 1996, Geraghty & Miller operated an SVE and thermal oxidation abatement system at the site, resulting in the destruction of an estimated 291,500 pounds of petroleum hydrocarbons."

Up to 15 groundwater monitoring wells were sampled on a quarterly schedule from May 1991 to May 1997; semi-annual monitoring has been conducted since October 1997. Product sheen or free-phase product was observed in wells MW-B, MW-C, and/or MW-D from late 1989 to mid-1991. Maximum historical BTEX and TPH-g concentrations at the site are 67000 µg/L and 670000 µg/L, respectively.

Between July 1996 and October 1998, MTBE was detected one or more times in groundwater samples from wells MW-E, MW-F, MW-G, MW-H, MW-L, MW-M, and MW-N which were analyzed using EPA Method 8020. The maximum historical MTBE concentration is 2900 µg/L (MW-N). This detection of MTBE was not confirmed by GC/MS methods. The presence of MTBE has not been confirmed in any of the four sampling events between October 1996 and April 1998 in which one or more samples were analyzed by GC/MS Methods 8240 or 8260.

Ethylene dibromide (EDB), 1,2-dichloroethane (1,2-DCA) and methylene chloride were detected in Chevron groundwater monitoring wells at maximum concentrations of up to 230, 3400 µg/L and 150 µg/L, respectively, based on a review of historical analytical data. EDB and 1,2-DCA were regularly analyzed during quarterly groundwater monitoring events from December 1991 to October 1994, but have not been analyzed since then. At the time of the October 1994 groundwater monitoring well sampling, maximum concentrations of EDB and 1,2-DCA were 180 µg/L and 3400 µg/L, respectively. The maximum 1,2-DCA concentration was detected in monitoring well MW-G, where it represented an increasing trend at the time of the last analysis for this constituent.

Monitoring wells MW-E through MW-O were analyzed for the fuel oxygenates ethanol, tertiary butyl alcohol (TBA), di-isopropyl ether (DIPE), ethyl tertiary butyl ether (ETBE), and tertiary amyl methyl ether (TAME) in April 1998. Results were nondetected for all wells. However, detection limits ranged up to 25000 µg/L and 5000 µg/L for ethanol and TBA, respectively; detection limits ranged up to 100 µg/L each for DIPE, ETBE, and TAME.

Review of analytical data also shows that groundwater samples from the site or vicinity monitoring wells have not been analyzed for total lead.

## Work Plan Background

The 22 April 1999 work plan represents the last of multiple iterations of an 18 September 1995 *Work Plan for Additional Off-Site Soil and Groundwater Assessment*. The 18 September 1995 work plan proposed to construct three additional monitoring wells across Fresno and/or "C" Streets from the Chevron site. The wells were proposed to be in Fresno City right-of-way areas (sidewalks) to the northwest (MW-R), north (MW-Q), and northeast (MW-P) of the Chevron site. Proposed well MW-P was planned adjacent to the Shell Service Station that Chevron has contended is a possible source for a portion of the petroleum hydrocarbons detected in Chevron's monitoring well network.

Based on 26 October 1995 comments from the Regional Board to the 18 September 1995 work plan, Geraghty & Miller submitted a 22 November 1995 addendum. The addendum addressed Regional Board concerns that the extent of groundwater contamination had not been defined in any direction, and that more than the three proposed wells would be required. The addendum shifted the well proposed to

RWQCB-FRESNO-039682

be off-site adjacent to the Shell station to on-site at the Shell station. One proposed additional well off-site and to the south of the former Chevron site was added, and the positions for the two remaining proposed wells were modified to be in street areas, not sidewalks. The Regional Board approved this modified work plan in a 26 December 1995 letter.

Shell Oil Company declined access to their property for the proposed well installation in a 20 December 1995 letter to Chevron. In a 26 April 1996 letter, the owners of the proposed well site south of the Chevron site also declined access.

In a 3 September 1996 letter, Geraghty & Miller requested the Regional Board's assistance in gaining access to the Shell property for monitoring well installation. Based on hydrocarbon removal rates from the SVE system at the former Chevron site that were not diminishing in an expected fashion, Geraghty & Miller contended that the adjacent Shell station must be a source for part of the hydrocarbons removed by vapor extraction wells on the Chevron site. Geraghty & Miller also provided analytical evidence in support of their contention.

At the request of Chevron, Gettler-Ryan provided a 5 January 1998 work plan to install three groundwater monitoring wells on the adjacent Shell station site. A 6 May 1998 response letter from Shell Oil Products Company again denied site access and suggested boreholes at the property line would be sufficient to indicate the possible migration of hydrocarbons from one site to the other. The letter stated that based on initial results, Shell would reconsider the proposal for well installation on their property.

At the request of Chevron, Gettler-Ryan provided the subject 22 April 1999 *Work Plan for Soil Borings and Monitoring Wells*. This plan eliminates any of the earlier proposed work on private property, restricting activity to the former Chevron site and public right-of-ways. The scope of this work plan is outlined below.

The 22 April 1999 work plan proposes three main tasks. These tasks are:

1.  Drill and sample two onsite borings to further evaluate residual petroleum hydrocarbons in soil beneath the former Chevron site. One boring is planned immediately adjacent to vapor extraction well VW-1 and the other is planned at the former west dispenser location. The borings will be drilled to a minimum depth of 30 feet and will be terminated after three consecutive nondetect photo-ionization readings.

2.  Install two groundwater monitoring wells in the vicinity of Fresno City Water Division municipal supply wells that are potentially located hydraulically downgradient from the former Chevron site. The monitoring wells will be constructed of 2-inch diameter PVC with 25 feet of screen from 70 to 95 feet below ground surface (bgs).

3.  Install one groundwater monitoring well in the sidewalk adjacent to the Shell service station to evaluate dissolved hydrocarbon and oxygenate concentrations in groundwater across "C" Street from the former Chevron site. Well construction will be similar to that noted in Task 2 above.

Mr. Robert Cochran                          - 4 -                          12 October 1999

## Work Plan Comments

### Onsite Borings

The work plan states the two on-site soil borings will "further evaluate residual hydrocarbon concentrations in the soil beneath the subject site". To determine what hydrocarbon concentrations were originally present in the subject site soils, we reviewed the 31 March 1994 *Supplemental Site Assessment Report* prepared by Geraghty & Miller. Figure 2 (attached) is a cross section from that report onto which the two borings proposed by Gettler-Ryan have been placed in their relative positions. Figure 1 is a plan map of the proposed boring and monitoring well locations with the line of cross section shown.

Review of the analytical data from previous exploratory or monitoring well borings (Figure 2) shows that hydrocarbons are not anticipated to exist in the upper 30 feet of the soil profile in the vicinity of the proposed boreholes. Previous investigations did not detect hydrocarbons until depths of 40 to 60 feet bgs in these areas. Compared with the proposed boring locations, hydrocarbons are more prevalent over a larger vertical soil profile at the location of well MW-E, or are present at higher concentrations at well MW-G. If part of the purpose of the proposed borings is to determine residual soil hydrocarbon concentrations after soil vapor extraction at the site, proposed boring locations in the vicinity of MW-E and MW-G would appear more appropriate. In light of the above discussion, the purpose of the proposed borings is unclear; therefore, we feel *drilling at these locations is not justified.*

### Monitoring Wells Near Municipal Well Sites

The 22 April 1999 work plan also proposes to drill a monitoring well in the vicinity of each of the two nearest active municipal supply wells. Data from the 20 September 1999 *Well Search for Former Chevron Service Station #9-4374* by Gettler-Ryan shows that the screened intervals for the well to the north and the well to the southwest of the subject site start at 200 feet bgs and 230 feet bgs, respectively. The recorded depth of the sanitary seal for the northern well is 52 feet. A seal does not exist at the southwestern well.

Neither municipal supply well is sealed below the present water table. If contamination were present in the upper aquifer at the municipal well site it could be quickly drawn downward along the well pack material and enter the supply well. The fact that the proposed monitoring wells are located very close to the supply wells does not allow any warning time which the monitoring wells might provide if they were located between, and closer to, a potential source of contamination and the supply wells.

In addition, the screening of the proposed monitoring wells only allows detection of potential contaminants near the water table surface. If a contaminant (e.g. MTBE) is carried downward through the aquifer as it migrates away from its source, a well located some distance from the source and screened in the uppermost aquifer may not detect the contaminant migration.

Based on the above discussion, we do not see the utility of the proposed monitoring wells located near the municipal supply wells and do not agree to their installation.

RWQCB-FRESNO-039684

Mr. Robert Cochran                    - 5 -                    12 October 1999

### Monitoring Well Adjacent to the Shell Service Station

The proposed well location is appropriate to help determine the potential for hydrocarbons in groundwater to be sourced at the Shell service station site. This determination will be based on comparison of new well analytical data and analytical data from wells MW-G and MW-N. The Regional Board approves the proposed well installation at the west corner of the Shell station.

It may also be appropriate to install an additional well adjacent to the Shell site immediately southwest of the western Shell dispenser island, north of existing monitoring well MW-O. The Board pre-approves the installation of additional, similarly designed well(s) on the east side of "C" Street (adjacent to the Shell station) during the proposed work activity. **Prior to 31 January 2000,** please provide a report summarizing the results of the proposed work activities.

### Comments Regarding the Remediation System

We received one series of data pages with an 11 March 1995 cover letter summarizing operation of the soil vapor extraction system at the Chevron site during its early period of operation (May 1994 to January 1995). Cumulative mass removal through January 1995 was stated as 105,761 pounds of gasoline (quantified as VOCs). The above site background summary by Geraghty & Miller states that a total of 291,500 pounds of hydrocarbons have been removed from the former Chevron site by vapor extraction. We sent you a letter dated 2 November 1998 requesting submittal of an additional report documenting and summarizing operation of the soil vapor extraction system subsequent to the dates covered in the initial data pages. We have not yet received this report. **Prior to 14 December 1999,** please provide an updated soil remediation summary report covering all dates of operation. At a minimum the report should include:

1. Tabulated data regarding vapor extraction rates and concentrations at each well, and calculated cumulative mass of removed hydrocarbons in sufficient detail so that confirmation calculations may be generated.

2. Graphs showing time series trends of influent concentrations and cumulative mass removed.

3. Dates of remediation system operation including periods of non-operation and an explanation for system down-time.

4. Data regarding the vacuum measured at each wellhead during the pilot test and initial remediation system startup and any subsequent measurements so that the area of influence of the extraction system during testing and during long-term operation may determined.

5. A narrative description of activities associated with remediation system operation during the period covered by the report.

This Board was not supportive of Chevron's decision to shut down the vapor extraction system in 1996. System shut down occurred while a significant amount of hydrocarbons continued to be removed from the subsurface. Chevron's decision to cease remediation activity was based on its assertion that the vapor extraction system was entraining an off-site, non-Chevron hydrocarbon source. Information received to date only weakly supports Chevron's contention that a non-Chevron related source of

bem U:\UGT\BEM_files\Fresno Co\Chev 9-4374 WP comnt.doc

Mr. Robert Cochran                    - 6 -                    12 October 1999.

petroleum hydrocarbons exists in the immediate vicinity of the former Chevron site. A major detractor from the plausibility of a non-Chevron source is the lack of confirmed (GC/MS) detection of MTBE in groundwater. MTBE has only been detected by GC methods in samples that are heavily impacted by other petroleum hydrocarbons. False positives are common under these conditions. Only confirmation of the presence of MTBE in groundwater or in soil vapor below the site by GC/MS methods will allow us to concur that there is a non-Chevron source of gasoline.

Chevron has had the opportunity to demonstrate this off-site impact through additional well installation and sampling, starting with the submittal of the 18 September 1995 *Work Plan for Additional Off-Site Soil and Groundwater Assessment.* Chevron made the decision to move a proposed well from the public right-of-way onto the private property of the suspected off-site source. The subsequent denials for off-site well installation, and associated delays in work plan implementation, would likely have been avoided by adhering to the originally proposed work plan. Therefore, it is the Board's opinion that sufficient time has passed for Chevron to demonstrate the existence of an off-site source. Significant quantities of recalcitrant pollutants have reached groundwater from the former Chevron facility and continue to do so. **Prior to 14 December 1999**, please provide a work plan regarding how you will resume soil remediation activities at the former Chevron site and a reasonable, if not aggressive, time frame for implementation. With submittal of the requested remediation system monitoring information, and the results of implementation of the 22 April 1999 work plan, the Board will be able to make a more informed decision as to the potential for influence by possible off-site sources, and whether continued remediation, in the manner conducted previously, is appropriate at the former Chevron site.

### Additional Comments

All proposed groundwater samples and soil samples must include analysis for 1,2-DCA, EDB, total lead, MTBE, TAME, DIPE, ETBE, TBA, ethanol and methanol. If it can be demonstrated that lead is not present at the site, testing for this constituent can be stopped. If MTBE, TAME, DIPE, ETBE, TBA, ethanol or methanol are detected by EPA Methods 8020 or 8021, their presence must be confirmed by GC/MS (EPA Method 8260). Once the presence of MTBE, TAME, DIPE, ETBE, TBA, ethanol or methanol are confirmed, EPA Methods 8020 or 8021 may be used again. If it can be demonstrated that TAME, DIPE, ETBE, TBA, ethanol and methanol are not present at the site, you may submit a proposal for reducing the frequency of analysis for these constituents.

Analysis of all groundwater samples for EDB and 1,2-DCA should be resumed with the next scheduled groundwater monitoring event. A proposal for reducing the frequency of EDB and 1,2-DCA analyses may be submitted once the current extent and concentrations of these constituents have been established.

In addition, we require that you sample for general minerals, nitrate, and total Kjeldahl nitrogen (TKN) during two nonconsecutive quarterly sampling events (minimum of six months between sampling events). It is not necessary to sample all monitoring wells for these constituents during these sampling events; a minimum of three wells should be sufficient, and must include an upgradient well.

Investigation-derived waste (both soil and groundwater) must be self-certified by the generator as hazardous or not hazardous. Investigation-derived waste must be handled and stored according to appropriate regulations and disposed or recycled at a properly permitted facility. Air emissions from any waste must be kept below the maximum allowed by the local air pollution control district with jurisdiction over the project site. The mass and disposition of fuel constituents removed from the subsurface during investigation or remediation must be estimated and reported.

RWQCB-FRESNO-039686

Mr. Robert Cochran                    - 7 -                    12 October 1999

Our records indicate that Chevron USA Products Company is the "primary or active" responsible party for the subject site. Under the new "landowner notification" of Health and Safety Code, Section 25297.37.2 (copy enclosed), all current record owners of fee title to the site are required to be notified of your proposed actions relating to investigation, cleanup, and closure of this site.

**Prior to 15 November 1999,** please provide us with a complete mailing list of all record fee title owners. You are to certify in writing that the list is complete and contains the names and addresses of all record fee title owners. If you are the only record fee title owner, please so state in your certified list of record fee title owners. You shall copy all future correspondence to us regarding this site to the record fee title owners and they shall be encouraged to comment on your proposed actions to cleanup and close this site. Also, if ownership of fee title to the site changes prior to closure, you shall within 30 days of recording a change in ownership provide to this office, in writing, a complete mailing list of all new record fee title owners and certify that it is complete.

Should you have any questions regarding this matter, please contact Mr. Bruce Myers of this office at (559) 445-5504.

*Bruce E. Myers*

BRUCE E. MYERS
Associate Engineering Geologist
CEG No. 2102

enclosures

cc:     w/ enclosures
        Mr. Paul Mennucci, Fresno
        Mr. Frank Volanti, Fresno
        Mr. Rick Fears, Gettler-Ryan, Inc., Rancho Cordova, CA
        Mr. G. Thomas Caswell, Jr., Caswell, Bell, Hillison, Burnside & Greer LLP, Fresno

cc:     w/o enclosures
        Mr. Jim Armstrong, Fresno County Environmental Health System, Fresno
        Mr. Jerry Freeman, City of Fresno Development Department, Fresno
        Mr. Dean Peterson, DK Engineering, Burlingame, CA

bem U:\UGT\BEM_files\Fresno Co\Chev 9-4374 WP comnt.doc

RWQCB-FRESNO-039687



RWQCB-FRESNO-039688



SITE PLAN
Former Chevron Service Station No. 9-4374
1169 Fresno Street
Fresno, California

DATE
12/97

REVISED DATE
04/99

Gettler – Ryan Inc.
6747 Sierra Ct., Suite J   (510) 551-7555
Dublin, CA 94568

JOB NUMBER
346308

REVIEWED BY

Source: Figure Modified From Drawing Provided
By Pacific Environmental Group, Inc.

FIGURE
1

Scale in Feet
0         60

EXPLANATION:
⊕  Proposed
   Soil Boring
⊕  Proposed Groundwater
   Monitoring Well
•  Soil Boring
◆  Groundwater
   Monitoring Well
▣  Vadose
   Well

A—A'  CROSS SECTION
       LOCATION

RWQCB-FRESNO-039689



RWQCB-FRESNO-039690

BILL NUMBER: AB 681       CHAPTERED
BILL TEXT

CHAPTER   255
FILED WITH SECRETARY OF STATE   AUGUST 4, 1998
APPROVED BY GOVERNOR   AUGUST 3, 1998
PASSED THE ASSEMBLY   JULY 20, 1998
PASSED THE SENATE   JULY 9, 1998
AMENDED IN SENATE   JUNE 23, 1998
AMENDED IN SENATE   JUNE 10, 1998
AMENDED IN ASSEMBLY   JANUARY 15, 1998
AMENDED IN ASSEMBLY   JANUARY 6, 1998
AMENDED IN ASSEMBLY   MAY 23, 1997
AMENDED IN ASSEMBLY   APRIL 16, 1997

INTRODUCED BY   Assembly Member Machado

FEBRUARY 26, 1997

An act to add Sections 25297.15, 25299.37.2, and 25355.8 to the
Health and Safety Code, and to add Section 13307.1 to the Water Code,
relating to the environment.

LEGISLATIVE COUNSEL'S DIGEST

AB 681, Machado.  Environmental remediation:  closure.
(1) Existing law, the Carpenter-Presley-Tanner Hazardous Substance
Account Act, requires the Department of Toxic Substances Control or
a California regional water quality control board to prepare or
approve remedial action plans, which specify, among other things,
removal and remedial actions selected for the cleanup of all
hazardous substance release sites identified and categorized pursuant
to a specified procedure.  The department and the State Water
Resources Control Board are required to concurrently establish
consistent policies and procedures to be used by each agency in
overseeing the investigation and taking of removal and remedial
actions at hazardous substance release sites, in the case of the
department, and in overseeing the investigation of, and cleaning up
or abating the effects of, discharges of a hazardous substance, in
the case of the state board.
   Under existing law, the state board is authorized to develop and
implement a local oversight program for the abatement of, and
oversight of the abatement of, unauthorized releases of hazardous
substances from underground tanks by local agencies.
   Existing law specifies procedures for the taking of corrective
action to unauthorized releases of petroleum from underground storage
tanks.
   This bill would prohibit considering cleanup or site closure
proposals from the primary or active responsible party or discharger,
as the case may be, the issuance of a closure letter, or a
determination that no further action is required by a local agency
with respect to an unauthorized release of hazardous substances from
an underground storage tank, a local agency, a regional board, or the
state board with regard to an unauthorized release of petroleum from
an underground storage tank, or the state board or regional board
with respect to a site subject to a cleanup or abatement order,
unless all current record owners of fee title to the site of the
proposed action have been notified of the proposed action by the
local agency, state board, or regional board, as the case may be.
   The bill would require the above described entities to take all
reasonable steps necessary to accommodate responsible landowner
participation in the cleanup or site closure process and to consider
all input and recommendations from any responsible landowner wishing

RWQCB-FRESNO-039691

to participate.

The bill would prohibit the department, upon receiving a specified request, from overseeing the preparation of, or reviewing, a preliminary endangerment assessment for property if action may be necessary to address a release or threatened release of a hazardous substance and from issuing a letter stating that no further action is necessary with regard to property unless the person requesting department action provides the department with specified information.

The bill would prescribe related matters.

Since the bill would require local agencies to take specified actions with regard to unauthorized releases, the bill would impose a state-mandated local program.

(2) The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.


THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:


SECTION 1.  Section 25297.15 is added to the Health and Safety Code, to read:

25297.15.  (a) (1) The local agency shall not consider cleanup or site closure proposals from the primary or active responsible party, issue a closure letter, or make a determination that no further action is required with respect to a site upon which there was an unauthorized release of hazardous substances from an underground storage tank subject to this chapter unless all current record owners of fee title to the site of the proposed action have been notified of the proposed action by the primary or active responsible party.

(2) Notwithstanding subdivision (g) of Section 25297.1, the local agency shall also notify the primary or active responsible party of their responsibility under this subdivision.

(3) The primary or active responsible party shall certify to the local agency in writing that the notification requirement in this subdivision has been met and provide a complete mailing list of all record fee title owners to the local agency.

(b) The local agency shall take all reasonable steps necessary to accommodate responsible landowner participation in the cleanup or site closure process and shall consider all input and recommendations from any responsible landowner wishing to participate.

SEC. 2.  Section 25299.37.2 is added to the Health and Safety Code, to read:

25299.37.2.  (a) The local agency, the board, or a regional board shall not consider corrective action or site closure proposals from the primary or active responsible party, issue a closure letter, or make a determination that no further corrective action is required with respect to a site upon which there was an unauthorized release of petroleum from an underground storage tank subject to this chapter unless all current record owners of fee title to the site of the proposed action have been notified of the proposed action by the local agency, board, or regional board.

(b) The local agency, board, or regional board shall take all reasonable steps necessary to accommodate responsible landowner participation in the cleanup or site closure process and shall consider all input and recommendations from any responsible landowner wishing to participate.

SEC. 3.  Section 25355.8 is added to the Health and Safety Code, to read:

25355.8.  (a) The department shall not agree to oversee the preparation of, or to review, a preliminary endangerment assessment for property if action is, or may be, necessary to address a release

RWQCB-FRESNO-039692

or threatened release of a hazardous substance, and department shall not issue a letter stating that no further action is necessary with regard to property, unless the person requesting the department action does either of the following:

(1) Provides the department with all of the following:

(A) Proof of the identity of all current record owners of fee title to the property and their mailing addresses.

(B) Written evidence that the owners of record have been sent a notice that describes the actions completed or proposed by the requesting person.

(C) An acknowledgment of the receipt of the notice required in subparagraph (B), from the property owners or proof that the requesting person has made reasonable efforts to deliver the notice to the property owner and was unable to do so.

(2) Proof of the identity of all current record owners of fee title to the property and proof that the requesting person has made reasonable efforts to locate the property owners and was unable to do so.

(b) The department shall take all reasonable steps necessary to accommodate property owner participation in the site remediation process and shall consider all input and recommendations received from the owner of property which is the subject of the proposed action.

(c) This section only applies to instances where a person requests the department to oversee the preparation of, or to review, a preliminary endangerment assessment, or requests the department to issue a letter stating that no further action is necessary with regard to property. Nothing in this section imposes a condition upon, limits, or impacts in any way, the department's authority to compel any potentially responsible party to take any action in response to a release or threatened release of a hazardous substance or to recover costs incurred from any potentially responsible party.

SEC. 4.  Section 13307.1 is added to the Water Code, to read:

13307.1.  (a) The state board and the regional boards shall not consider cleanup or site closure proposals from the primary or active responsible discharger, issue a closure letter, or make a determination that no further action is required with respect to a site subject to a cleanup or abatement order pursuant to Section 13304, unless all current record owners of fee title to the site of the proposed action have been notified of the proposed action by the state board or regional board.

(b) The state board and regional boards shall take all reasonable steps necessary to accommodate responsible landowner participation in the cleanup or site closure process and shall consider all input and recommendations from any responsible landowner wishing to participate.

SEC. 5.  No reimbursement is required by this act pursuant to Section 6 of Article XIIIB of the California Constitution because a local agency or school district has the authority to levy service charges, fees, or assessments sufficient to pay for the program or level of service mandated by this act, within the meaning of Section 17556 of the Government Code.

Notwithstanding Section 17580 of the Government Code, unless otherwise specified, the provisions of this act shall become operative on the same date that the act takes effect pursuant to the California Constitution.

RWQCB-FRESNO-039693

STATE OF CALIFORNIA                                                                 PETE WILSON, Governor

# CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD—
## CENTRAL VALLEY REGION
SAN JOAQUIN WATERSHED BRANCH OFFICE:
3614 EAST ASHLAN AVENUE
FRESNO, CA 93726
PHONE: (209) 445-5116
FAX: (209) 445-5910

CONTROL NO __93-7-..-..__
ENGINEER ____Russo____
DUE DATE ____6/1/93____
☐ INFORMATION REC'D ADEQUATE
☐ INFORMATION REC'D NOT ADEQUATE
OTHER _____
APPROVED BY _____
DATE _____

6 May 1993

Ms. Lucia Chou
Chevron U.S.A. Products Company
P.O. Box 5004
San Ramon, CA  94583-0804

**UNDERGROUND TANK LEAK AT FORMER CHEVRON SS #9-4374, 1160 FRESNO STREET, FRESNO, FRESNO COUNTY**

Your *Scope of Work for Soil and Ground Water Assessment and Remediation Evaluation*, dated 15 June 1992 and prepared by Geraghty & Miller, Inc., was reviewed and verbally approved on 3 September 1992. However, your report has not been received. As we note herein, we expect the report, a proposal for continuing work, and regular monitoring reports.

The scope of work proposed installation of two monitoring wells (MWs) with the option to install a third MW depending on field results. The soil borings for the MWs will be used to determine if soils to the south of the former underground tank area have been degraded by petroleum constituents. Soil samples will be collected at five-foot intervals and selected samples will be analyzed for total petroleum hydrocarbons as gasoline (TPH-gasoline) and EPA Test Method 8020 constituents (BTEX).

The MWs will be constructed of two-inch diameter PVC pipe and will be screened 15 feet below the water table and 10 feet above the water table. Geraghty & Miller plan to use the new MWs in a vapor extraction system. Ground water samples will be analyzed for TPH-gasoline, ethylene dibromide (EDB), and EPA Test Method 8240 constituents.

A vapor extraction pilot test will be conducted in one of the newly installed MWs. One air sample will be collected and analyzed for total volatile hydrocarbons, BTEX, organic lead, carbon dioxide, methane, nitrogen, and oxygen. Geraghty & Miller will evaluate the pilot test results and confirm the economic appropriateness of soil vapor extraction for the site. If a vapor extraction system is appropriate, Geraghty & Miller will design a system under this scope of work.

Geraghty & Miller will also evaluate the existing ground water extraction and treatment system and provide recommendations for enhancing the effectiveness of the system. Lastly, Geraghty & Miller will prepare a report summarizing the results of the investigation. The report will include a soil and ground water remediation work plan for implementing the vapor extraction system, if appropriate, and enhancing the ground water treatment system, as necessary.

EXHIBIT __19__
WIT: __Banks__
DATE: __8-17-11__
LOUISE SOUSOURES, CSR #3575

APPROVED
author __RWW 5/13/93__
senior __TMN 5/12/93__

RWQCB-FRESNO-039803

Ms. Lucia Chou                    -2-                    6 May 1993

On 3 September 1992, Russell Walls of this office spoke to Geraghty & Miller by telephone and informed them that they could proceed with implementation of their proposal.  Mr. Walls also informed Geraghty & Miller during the telephone call that he was not aware of evidence to support Geraghty & Miller's statement in the scope of work that off-site investigation should be a cooperative effort between Chevron, Shell, and Exxon.  Shell has not had a discharge, to our knowledge, and Currie Brothers, Inc. (Exxon) was requested in an 8 February 1993 letter to investigate the extent of soil and possibly ground water degradation at its site. If, at some point, it is conclusively shown that ground water degradation is originating from sources in addition to Chevron, we will require the responsible parties for the additional sources, as well as Chevron, to investigate and remediate ground water.

Your letter of 23 September 1992 indicated that the start date for the proposed investigation was mid-October 1992.  However, we have yet to receive a report on the investigation.       Therefore, prior to 7 June 1993 a report on the investigation should be submitted to this office.  The report should include all items outlined in the scope of work.  In addition, a work plan for further definition of the lateral and vertical extent of soil (if necessary) and ground water degradation, both on-site and off-site, should be submitted by 7 June 1993.

Lastly, we have not received a report on the ground water treatment system's performance since 6 October 1989.  Based on past conversations with RMX, we understand there has been a problem with silt in the extraction wells and a greatly reduced pumping rate.  Please submit a progress report on the ground water treatment system by 7 June 1993.  The progress report should include a description of the quantity of water extracted, the quantity of product removed, treatment system influent and effluent concentrations of petroleum constituents, length and percentage of time the system has been operating, and the overall effectiveness of the system.

Should you have any questions concerning this matter, please call Russell Walls at (209) 445-6192.

*Russell W. Walls for*
*RCE No. C043140*

JOHN M. NOONAN
Senior Engineer
RCE No. C035206

RWW:rww/cjs

cc:  Jim Armstrong, Fresno County Environmental Health Department, Fresno
     John Mitchell, City of Fresno, Fresno
     John Palmer, City of Fresno, Fresno
     Gary Keyes, Geraghty & Miller, Inc., Richmond

# EXHIBIT 34

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### -O0O-

In re:  Methyl Tertiary Butyl
Ether  ("MTBE") Products
Liability Litigation

This Document Relates To:

City of Fresno
V. Chevron U.S.A. Inc., et al.,
Case No. 04 Civ. 4973

Master File No.
1:00-1898

Case No.
MDL 1358 (SAS)

**COPY**

### DEPOSITION OF DAVID BENJAMIN

August 9, 2011 at 9:00 (9:11) a.m.

Before:  MICHELLE ELYSE BANDY
CSR #13590

Taken at:
Fresno, California



## DEPOBOOK
### Court Reporting Services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

1    couldn't give you any further information.  I'm just

2    telling you that's what I believe the lease said.

3        Q. Let me ask you going up into the 1980s, do you

4    recall ever seeing the delivery trucks that brought

5    gasoline to the Shaw station?

6        A. Would I see -- trucks of our branding bring it

7    in there?  Yes.  I'd see over 76 through that time.

8    They were 76, and then I think later they hired one

9    of the other companies, Atlas or somebody of that

10   nature to deliver their -- to 76 fuel.

11       Q. I think you're -- you're getting ahead to my

12   next question already.  That's fine.  You anticipated

13   where I'm going.  So the trucks initially that were

14   delivering gas to the station had the 76 logo on it?

15       A. That's correct.

16           MR. DAVIS:  Objection.  Vague as to time

17   period.

18           MR. EICKMEYER:  You're anticipating my

19   next question, too.

20   BY MR. EICKMEYER:

21       Q. You recall -- you mentioned at some point it

22   changed then from the 76 brand to using what's called

23   the jobber to deliver gas?

24           MR. DAVIS:  Objection.  Mischaracterizes

25   the form of testimony.  He said there was a truck or

                                                      22

```
 1    STATE OF CALIFORNIA                    )
                                             )
 2    COUNTY OF FRESNO                       )

 3

 4         I, Michelle E. Bandy, a Certified Shorthand

 5    Reporter, do hereby certify:

 6         That prior to being examined, the witness in

 7    the foregoing proceedings was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing

 9    but the truth;

10         That said proceedings were taken before me at

11    the time and place therein set forth and were taken

12    down by me in shorthand and thereafter transcribed

13    into typewriting under my direction and supervision.

14    I further certify that I am neither counsel for, nor

15    related to, any party to said proceedings, nor in any

16    way interested in the outcome thereof.

17         In witness whereof, I have hereunto subscribed

18    my name.

19

20    Dated August 17, 2011

21

22

23    Michelle Elyse Bandy

24    CSR No. 13590

25
```

207

# EXHIBIT 35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-oOo-

In re: Methyl Tertiary Butyl
Ether ("MTBE") Products
Liability Litigation

_____

This Document Relates To:

City of Fresno
v. Chevron U.S.A. Inc., et al.,
Case No. 04 Civ. 4973

_____/

Master File No.
1:00-1898

Case No.
MDL 1358(SAS)

COPY

DEPOSITION OF ELLIS (IKE) PURSELL

August 11, 2011 at 1:00 (1:04) p.m.

Before:  ERIC L. JOHNSON
RPR, CSR #9771

Taken at:
Fresno, California



Court Reporting Services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

1      A.   Okay.   In -- I believe in 1988, '89, somewhere

2    in there, we signed a contract with Texaco Oil Company

3    and they revamped the whole station, and it was Texaco.

4    At that time Texaco delivered all the product to it.

5      Q.   Let me break that down a little bit.   When you

6    say a contract was signed with Texaco, was that a

7    franchise agreement or what type of contract, if you

8    know?

9      A.   I am not 100 percent sure, but I am sure it was

10   some type of franchise contract because it was

11   exclusively Texaco.   They delivered the product and

12   everything.

13     Q.   You used the word, I think you said revamped

14   the station.   Can you describe what you mean by that.

15     A.   Prior to that time we had the old key lock

16   system in it.   And when Texaco came in, they redid, put

17   leak detectors, redid the tanks, put in new pumps and

18   put in a card lock system.

19     Q.   Do you recall if there was a change in

20   requirements or regulations that took place around that

21   1988-89 time frame that underground storage tanks were

22   being upgraded?

23     A.   The petroleum industry went through a lot of

24   changes.   I honestly can't go back and say what happened

25   at different times, but they went through a lot of

                                                          19

```
 1   STATE OF CALIFORNIA      )
                              (      ss.
 2   COUNTY OF STANISLAUS     )

 3        I, ERIC L. JOHNSON, do hereby certify that I am a

 4   licensed Certified Shorthand Reporter, duly qualified

 5   and certified as such by the State of California;

 6        That prior to being examined, the witness named in

 7   the foregoing deposition was by me duly sworn to testify

 8   to tell the truth, the whole truth, and nothing but the

 9   truth;

10        That the said deposition was by me recorded

11   stenographically at the time and place herein mentioned;

12   and the foregoing pages constitute a full, true,

13   complete and correct record of the testimony given by

14   the said witness;

15        That I am a disinterested person, not being in any

16   way interested in the outcome of said action, or

17   connected with, nor related to any of the parties in

18   said action, or to their respective counsel, in any

19   manner whatsoever.

20

21        DATED:  August 29, 2011

22

23                              ET.
                                _____
24                              Eric L. Johnson, CSR, RPR

25
```

                                                            100

# EXHIBIT 36

EXHIBIT 37

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

CITY OF FRESNO,

Plaintiff,

vs.

CHEVRON U.S.A. INC., et al.,

Defendants.

_____/

No.: 04 CIV 4973
(SAS) MDL1358



VIDEOTAPED DEPOSITION OF:
BALDEV SINGH SANDHU

July 27, 2011 at 9:05 a.m.

Reported By: SHANNON D. DENNEY
CSR No. 10385



Court Reporting Services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

```
1        Q.    Did you ever have another brand name applied

2   to the station?

3        A.    No.

4        Q.    Did you have any discussions with U.S.A.

5   about continuing to operate it as a U.S.A. branded

6   station?

7        A.    No.

8        Q.    Did you ever have a franchise agreement with

9   anyone while you operated the Fresno station?

10        A.    No.

11        Q.    Did you ever have any discussions with any

12   refiners or distributors about branding your station?

13        A.    No.

14        Q.    Did you ever have any understanding as to who

15   provided the gasoline when U.S.A. operated the

16   station?

17        A.    No.

18        Q.    When you first took over the station, who

19   were you purchasing gasoline from?

20        A.    Different jobbers.

21        Q.    Do you recall their names?

22        A.    One was -- one was Delta Petroleum.  I don't

23   know the name of the company.  I think it was Visalia

24   and Joe Gomes (phonetic).

25        Q.    I'm sorry?
```

31

```
 1        Q.    Well, that's why I mentioned earlier we just
 2   appreciate your best recollection.
 3              When you say out of Sacramento, how about
 4   Beneto Trucking, B-E-N-E-T-O, out of West Sacramento,
 5   was that one?
 6        A.    No.   One was Total Energy, something like
 7   that.  Something like that.  Out of Total, out of
 8   Sacramento.
 9        Q.    Were you done?
10        A.    Yes.
11        Q.    If you think of anyone else, if you can let
12   us know.
13        A.    Mike.   That comes and go.  Whoever is
14   cheaper.  Today he's cheaper.  Tomorrow he's cheaper.
15   Next I'm cheaper.  Whoever is cheaper.
16        Q.    When you needed to order gasoline, how would
17   do you that?
18        A.    Compare the price, pick up the phone.  That's
19   it.
20        Q.    When you say "compare the price", what were
21   you looking at to compare the price?  Or were you
22   making phone calls, or did you have some kind of a
23   printout?  How would you tell who was cheaper?
24        A.    Just phone calls.
25        Q.    For the jobbers that you mentioned, I think
```

33

1       A.    No.

2       Q.    Did that happen every month?

3       A.    No.  It doesn't happen.  There was no

4   overfill that happen.

5       Q.    Do you recall any occasions where the fire

6   department was called to the station?

7       A.    No.

8       Q.    Was the ground near the gas dispensers ever

9   hosed down or rinsed down?

10      A.    No.

11      Q.    Do you recall what the surface was where the

12  customers' cars would park to pump their gas?

13      A.    Surface, what do you mean?  By smooth?  It

14  was paved.

15      Q.    Yeah.  Where the customers' cars would be,

16  was it concrete or asphalt, or what kind of surface?

17      A.    Both concrete and asphalt.

18      Q.    Do you recall if there were any drains in the

19  ground in that area?

20      A.    No.

21      Q.    If there was any kind of a gas leak or spill,

22  where the employees were required to make any kind of

23  report?

24      A.    Yes.

25      Q.    What was that?  How would that happen?

46

1      A.    They would let us know and we would take care

2  of it, if it needs to be cleaned.   If it was spills, we

3  go from there.

4      Q.    Were they required to make any written

5  report?

6      A.    Yes.

7      Q.    Do you still have any of those forms from the

8  Fresno station?

9      A.    No.

10     Q.    Do you recall what kind of form was used for

11 them to make the written report?

12     A.    Just normal note.

13     Q.    Just making a note?

14     A.    Yes.

15     Q.    Do you recall any occasions where a gas

16 dispenser pump malfunctioned that, for example, it

17 wouldn't shut off or was dripping gasoline?

18     A.    No.

19     Q.    Do you recall any occasion where a customers'

20 car ran into any of the gas pumps or dispensers?

21     A.    Never happens.

22           (Whereupon Exhibit 5 was marked for

23           identification.)

24           MR. EICKMEYER:  Q.  Mr. Sandhu, we marked as

25 Exhibit 5.  This is titled Official Inspection Report

                                                          47

```
 1   Fresno County Health Services Agency Community Health
 2   Department.  Date at the top right is 7/13/95.  Bates
 3   is FCDEH, hyphen Fresno, hyphen 035309.  This has the
 4   name of someone from the county of Luis, L-U-I-S,
 5   Ledezma, L-E-D-E-Z-M-A.
 6           Do you recall ever having any conversation
 7   with him?
 8       A.   No.
 9       Q.   This indicates, has the name looks like
10   Kulwinder, K-U-L-W-I-N-D-E-R, Singh, as being at the
11   station.
12           Would that be a misspelling of Balwinder
13   Singh, or is that a different person?
14           MS. MOTAMED:  Objection.  Lacks foundation.
15           The witness indicates he cannot see the
16   document, so I don't know how he can answer question.
17           MR. EICKMEYER:  Q.  You can answer.
18       A.   I have no idea.  Maybe can be employee, maybe
19   can be Balwinder.
20       Q.   Do you remember if there was ever a person
21   name Kulwinder Singh that worked at the station?
22       A.   There was a couple guys they worked there,
23   but I don't remember their name.
24       Q.   The form indicates says, "Mr. Singh doesn't
25   know when tanks are inventoried", end quote.
```

48

Deposition of Baldev Singh Sandhu / July 27, 2011

1          Do you have a recollection as to what the
2    policy was to inventory tanks at the station?
3          A.   Yes.
4          Q.   How was that done?
5          A.   When we take it over, we have inventory every
6    day inventory, whatever we get it.  However, we set it,
7    whenever was balance on the daily records.
8          Q.   How would the inventory be checked every
9    day?
10         A.   Gas you received minus you sold it, with a
11   stick.  The tank was stick.
12         Q.   We heard from other witness, you're
13   describing then a stick was put in the underground
14   storage tank?
15         A.   Yes.
16         Q.   Who was responsible for doing the stick
17   measurements?
18         A.   Mr. Dalbir was doing it.
19         Q.   Did you ever conduct any stick
20   measurements?
21         A.   No.
22              MR. EICKMEYER:  Go ahead and go off the
23   record.
24              THE VIDEOGRAPHER:  The time is -- this ends
25   tape number one, Volume 1 of the video deposition of

                                                        49

1

2

3          I, SHANNON D. DENNEY, CSR 10385, a Certified

4    Shorthand Reporter in and for the State of California,

5    do hereby certify that, prior to being examined, the

6    witness named in the foregoing deposition was by me

7    duly sworn to testify the truth, the whole truth, and

8    nothing but the truth; that said deposition was taken

9    down by me in shorthand at the time and place named

10   therein and was thereafter transcribed under my

11   supervision; that this transcript contains a full, true

12   and correct record of the proceedings which took place

13   at the time and place set forth in the caption hereto.

14          I further certify that I have no interest in

15   the event of this action.

16

17   EXECUTED this ___10___ day of _august_, 2011.

18

19

20

21                    Shannon D. Denney, CSR 10385

22

23

24

25

# EXHIBIT 38



Aug 30 2011
7:38PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

This Document Relates To:

*City of Fresno v. Chevron U.S.A., Inc., et al.,*
04 Civ. 04973

MDL No 1358 (SAS)·

**DEFENDANT EXXON MOBIL
CORPORATION'S SUPPLEMENTAL
RESPONSES TO PLAINTIFF CITY
OF FRESNO'S FIRST SET OF
INTERROGATORIES**

Defendant Exxon Mobil Corporation ("ExxonMobil"), by and through counsel and

pursuant to the Federal Rules of Civil Procedure and the Local Rules of the Southern District of

New York, hereby provides supplemental responses to Plaintiff's First Set of Interrogatories to

Defendants ("Interrogatories") as follows:

## PRELIMINARY STATEMENT

The following response and objections state ExxonMobil's knowledge, information and

belief as of the date of such response and objections. Further investigation, discovery and

analysis may uncover additional information, add meaning to known facts and/or support new

factual conclusions and legal contentions, all of which may lead to changes in ExxonMobil's

responses herein. Such investigation and discovery are continuing, and ExxonMobil specifically

reserves the right to supplement this response and the right to rely at trial on subsequently

discovered information inadvertently omitted from this response as a result of mistake, error or

oversight.

W02-WEST:1ANK1\403845790.1

Fresno. The information available in Exxon's legacy database does not identify the service stations to which these distributors may have delivered Exxon-branded gasoline. The exhibits to the declaration of A. J. Kaberline, served in April 2011, include data concerning deliveries to these distributors, as well as other distributors who may have supplied Exxon-branded gasoline to retail gasoline service stations in the City of Fresno.

## INTERROGATORY NO. 6:

IDENTIFY each refinery that YOU own or owned which provided MTBE gasoline to the RELEVANT GEOGRAPHIC AREA since 1979.

      a.     State the dates of ownership for each refinery YOU identified;

      b.     State the dates that YOU added MTBE to gasoline manufactured by each refinery YOU identified;

      c.     IDENTIFY each entity which supplied MTBE to each refinery YOU identified.

## RESPONSE TO INTERROGATORY NO. 6:

In addition to its General Objections, which are incorporated herein as if set forth in full, ExxonMobil objects to this interrogatory on the ground that it is overbroad with respect to time, as the Court's CMO No. 4 limits discovery to 1986, and MTBE was phased out of gasoline sold in California no later than December 31, 2003. ExxonMobil objects to these discovery requests to the extent they seek information relating to events that occurred prior to the initial manufacture, sale, or distribution by ExxonMobil of gasoline containing MTBE on the grounds that those discovery requests are overbroad, unduly burdensome and oppressive, and on further grounds that they seek information not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence. ExxonMobil also objects on the grounds that this interrogatory generally seeks information not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence.

-13-

ExxonMobil further objects to this interrogatory on the grounds that the undefined terms "provided" and "supplied" are vague, ambiguous and unintelligible, in that it fails to describe with specificity or reasonably particularize the information requested, and is thus overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. ExxonMobil further objects to the defined terms "IDENTIFY" and "YOU" on the grounds that they deviate from or purport to impose requirements other than or in addition to those required by Local Civil Rule 26.3, and therefore, this interrogatory is vague and ambiguous, burdensome, overbroad, and seeks information not relevant to the allegations asserted in Plaintiff's complaint.

Further, as stated in the October 9, 2008 and October 21, 2008 letters from William Temko to Duane Miller, ExxonMobil objects to the identification of proprietary owned refineries as requested by this Interrogatory until such time as Plaintiff identifies the wells and service stations at issue in this case.

ExxonMobil further objects to this interrogatory to the extent it is duplicative of prior discovery served in this case and other cases in MDL 1358, and therefore, this interrogatory is burdensome and harassing.

Subject to and without waiving the foregoing objections, ExxonMobil responds that the pre-merger Exxon proprietary refinery at Benicia, California (3400 East Second Street, Benicia, CA 94510) produced gasoline containing MTBE and that gasoline refined at this facility may have been ultimately delivered to stations in the City of Fresno. Specifically, Exxon began blending MTBE as an oxygenate in gasoline refined at Benicia in April, 1992. At that time, it was used for approximately one week for equipment and pipeline testing purposes, and then its use was discontinued. In order to have supplies of wintertime oxygenated fuel available for the required wintertime oxygenate period beginning November 1, 1992, Exxon began producing wintertime oxygenated fuel containing MTBE at the Benicia refinery in approximately September, 1992. Exxon continued blending MTBE into gasoline until the time of the refinery's sale to Valero Energy Corporation in May, 2000. ExxonMobil has identified the following

-14-

companies as suppliers of MTBE:  Arco Products Company, Chevron Products Company, Coastal Chemical, Inc., EcoFuel, S.P.A., Enron Clean Fuels Company, Lyondell Chemical Worldwide, Inc.; Noble Americas Corp., Neste Canada, Inc., SABIC Americas, Inc., Shell Oil Company, Trammochem and Vitol S.A., Inc.

Due to its geographic location, it is unlikely that pre-merger Mobil or ExxonMobil refined gasoline containing MTBE was delivered to gasoline stations in the City of Fresno. Rather, the pre-merger Mobil and ExxonMobil, after the sale of the Benicia Refinery, purchased gasoline containing MTBE from third parties for shipment to the Kinder Morgan Fresno terminal via the Kinder Morgan Pipeline.

**INTERROGATORY NO. 7:**

IDENTIFY each terminal that YOU own or owned which served the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the dates of ownership for each terminal YOU identified;

    b.    IDENTIFY all Exchange and/or Throughput Partners for each terminal YOU identified;

    c.    IDENTIFY each pipeline used to supply gasoline for each terminal YOU identified.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to its General Objections, which are incorporated herein as if set forth in full, ExxonMobil objects to this interrogatory on the ground that it is overbroad with respect to time, as the Court's CMO No. 4 limits discovery to 1986, and MTBE was phased out of gasoline sold in California no later than December 31, 2003.  ExxonMobil objects to these discovery requests to the extent they seek information relating to events that occurred prior to the initial manufacture, sale, or distribution by ExxonMobil of gasoline containing MTBE on the grounds that those discovery requests are overbroad, unduly burdensome and oppressive, and on further

# EXHIBIT 39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MDL No. 1358 (SAS)

In Re: Methyl Tertiary Butyl Ether
("MTBE") Products Liability Litigation:

This Document Relates To:

*City of Fresno v. Chevron U.S.A. Inc., et al.*

## THE SHELL DEFENDANTS' RESPONSES TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendants Shell Oil Company, Equilon Enterprises LLC, Equiva Services LLC and

Texaco Refining and Marketing Inc. (the "Shell Defendants"), through counsel and pursuant to

Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby responds to Plaintiff's First Set

of Interrogatories.

## INTRODUCTORY STATEMENT

The Shell Defendants are submitting a single answer to the interrogatories served in the

above-captioned case.  In compiling their answers, the Shell Defendants have conducted

interviews of numerous employees, reviewed computer databases and spreadsheets, and have

taken all reasonable efforts to provide information sought by Plaintiff's interrogatories.

Computerized information that would assist in preparing responses to Plaintiff's interrogatories

is generally unavailable for periods prior to 1999.  Although some computerized information

may be available for periods prior to that time, it is contained on computer systems that are no

longer used by the Shell Defendants and those systems are not readily accessible without undue

burden or expense.  Where available, such information has been provided.

Computerized information regarding gasoline supplies for defendants Shell Oil Company

and Texaco Refining and Marketing Inc. is generally unavailable for the time periods requested.

In 1998, the western United States refining and marketing businesses of Shell and Texaco were

combined in a joint venture limited liability company, Equilon Enterprises LLC.  Relatively

Defendants have from time-to-time provided gasoline to stations in the City of Fresno; however, the Shell Defendants make no representations that these suppliers' gasoline necessarily was delivered into the City of Fresno. Product descriptions provided do not always allow the Shell Defendants to ascertain with precision whether particular types of conventional gasoline contained MTBE, as the specification sheets for those varieties of gasoline permitted, but did not require, that gasoline to contain MTBE.

### SUPPLIERS OF GASOLINE TO EQUILON ENTERPRISES LLC

| Company Name | Date Range | Location |
|---|---|---|
| Arco Products | 1999-2002 | Fresno |
| Ultramar Inc./Ultramar Diamond Shamrock | 1999-2002 | Fresno |
| Chevron USA | 1999-2002 | Fresno |
| ExxonMobil | 1999 | Fresno |
| Tosco Refining & Mktg. | 1999-2002 | Fresno |
| Tesoro | 2001-2002 | Fresno |
| Valero Refining & Mktg. | 2002-2003 | Fresno |

The Shell Defendants do not have any readily ascertainable information regarding the refinery at which the gasoline at issue was refined, nor is that information that ordinarily would have been provided to the Shell Defendants.

2.      Please identify the name and address of each entity from which You obtained neat MTBE for use at any Refinery owned or operated by You that supplied gasoline for ultimate delivery into Orange County; the dates or date ranges when MTBE was acquired from each such supplier, and the name and address of Your Refinery(ies).

**RESPONSE:** The Shell Defendants object to this Interrogatory on the grounds that it is overly broad, unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any of their objections, the Shell Defendants respond as follows:

Prior to the effective date of the Clean Air Act Amendments of 1990 (i.e., November 1992), the Shell Defendants generally obtained neat MTBE from three sources: Arco Chemical Company, Texas Petrochemical Company, and Texaco Chemical Company.

7

Following enactment of the Clean Air Act Amendments of 1990, which required increased use of MTBE in gasoline, Shell obtained MTBE from a number of other suppliers depending upon supply and demand issues. Suppliers of neat MTBE to the Shell Defendants in California since approximately 1996 have included Arco Chemical Company, BP West Coast Products LLC, Chevron U.S.A., Inc., ExxonMobil Oil Corporation, Petro Diamond, Inc., SABIC Americas, Inc., Sadaf, Tesoro Alaska Petroleum Co., ConocoPhillips Co., TFAMM, Valero Marketing and Supply Co., Kern Oil & Refining Co., Lyondell Petrochemical Co., Tesoro Refining and Marketing Co., Enron Clean Fuels Co., Murex N.A., Ltd., Ultramar Inc., Ultramar Diamond Shamrock, Star Enterprise, Noble Americas Corp., Vitol S.A., Inc., Oxygenated Marketing and Trading, Tradax Energy, Inc., Ecofuel S.p.A., Huntsman Petrochemical Corporation, American Agip, Oxygenate Division, Astra Oil Co., Inc., ATOFINA Petrochemicals, Inc., BP North American Petroleum, BP Products North America, Flint Hills Resources, LP, Global Octanes Corp., Motiva Enterprises LLC, Neste Canada Inc., Texas Petrochemicals Corporation, Trammochem, Equiva Trading, LTC Limited, Tauber Oil Company, Glencore Ltd., and Chevron U.S.A. Products Co.

It cannot be determined with precision which company's MTBE was blended into gasoline that was shipped to any particular locality.

Addresses of the Shell Defendants' refineries that may have produced gasoline that ultimately was supplied to the City of Fresno are as follows:

> Shell Martinez Refinery
> 3485 Pacheco Boulevard
> Martinez, California 94553
> Dates of Shell Ownership: 1915-1998, 2002-present
> Dates of Equilon ownership: 1998-2002
>
> Shell Bakersfield Refinery
> P. O. Box 1476
> Bakersfield, California 93302
> Dates of Shell Ownership: 2002-present
> Dates of Equilon ownership: 1998-2002
> Dates of Texaco ownership: 1984-1998

Dates of Getty ownership: 1980-1984
Dates of Reserve Oil and Gas Company ownership: 1970-1980
Dates of Mohawk ownership: 1932-1970

3.     Please identify each Terminal You use or used to supply gasoline for ultimate delivery into the City of Fresno, at any time since the date of first MTBE use in the City of Fresno; and the dates or date ranges when you have used such Terminal. For each Terminal You use or used, please also state whether You owned or operated such Terminal or were a Terminalling Partner at such Terminal.

**RESPONSE:** The Shell Defendants object to this Interrogatory on the grounds that it is overly broad, unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any of their objections, the Shell Defendants respond as follows:

Subject to and without waiving any of their objections, the Shell Defendants identify the following terminals from which they may have supplied gasoline to the City of Fresno:

| State | Terminal Name | Terminal Operator |
|-------|---------------|-------------------|
| California | Fresno | Kinder Morgan |

Dated: August 30, 2004            Respectfully submitted,

Richard E. Wallace, Jr.
Peter C. Condron
Rebecca L. Schuller
WALLACE KING MARRARO & BRANSON PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone: (202) 204-1000
Facsimile: (202) 204-1001

Attorneys for Defendants Shell Oil Company,
Equilon Enterprises LLC, Equiva Services LLC and
Texaco Refining and Marketing Inc.

# EXHIBIT 40

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

--oOo--

SOUTH TAHOE PUBLIC UTILITY
DISTRICT,                           )
                                    )
                Plaintiff,          )
                                    )
        vs                          )        No. 999128
                                    )
ATLANTIC RICHFIELD COMPANY          )
("ARCO"); ARCO CHEMICAL COMPANY;    )        THIS TRANSCRIPT
SHELL OIL COMPANY; CHEVRON          )        CONTAINS CONFIDENTIAL
U.S.A., INC.; EXXON CORPORATION;    )        MATERIALS
B.P. AMERICA, INC.; TOSCO           )
CORPORATION; ULTRAMAR, INC.;        )
BEACON OIL CO.; USA GASOLINE        )
CORPORATION; SHELL OIL PRODUCTS     )
CO.; TERRIBLE HERBST, INC.;         )
ROTTEN ROBBIE; J.E. TVETEN          )
CORP.; TAHOE TOM'S GAS STATION;     )
THE SOUTHLAND CORP.; PARADISE       )
CHEVRON; and DOES 1 through 600,    )
inclusive,                          )
                                    )
                Defendants.         )
_____    )

--oOo--
WEDNESDAY, JULY 28, 1999
10:03 A.M.
--oOo--
DEPOSITION OF
MARY F. MORGAN
--oOo--

CATHLEEN SLOCUM, CSR
License No. 2822

**PETERS SHORTHAND REPORTING CORPORATION**

3336 Bradshaw Road. Suite 240
Sacramento. California 95827
(916) 362-2345

1    appeared as counsel on behalf of Kinder Morgan Energy

2    Partners, L.P., and the deponent.

3              MICHAEL B. SCHWERDTFEGER, Esq., in-house counsel

4    for Kinder Morgan Energy Partners, L.P., 1100 Town & Country

5    Road, Orange, California.

6              ALSO PRESENT:  Hiroki Suyama, Manatt, Phelps &

7    Phillips; Ryan Mallen, Kinder Morgan Energy Partners, L.P.

8                            --oOo--

9                         DEPOSITION OF

10   MARY F. MORGAN, called as a witness by the plaintiff who,

11   being first duly sworn by the Certified Shorthand Reporter

12   to tell the truth, the whole truth, and nothing but the

13   truth, testified as follows:

14                        EXAMINATION

15   By DUANE C. MILLER, Esq., counsel on behalf of the

16   plaintiff:

17   Q    Can I have your name and business address for the

18   record, please.

19   A    My name is Mary F. as in Frances Morgan.  Business

20   address is 1100 Town & Country Road, Orange, California

21   92868.

22   Q    And who is your employer and what is your position with

23   them, please?

24   A    My employer is Kinder Morgan Energy Partners, and my

25   title is vice-president of marketing.

                                                            3

1    Area use your employer's pipeline to transport gasoline

2    products?

3    A    Yes.  For the most part, yes.

4    Q    Is it your understanding that that's been true since at

5    least 1987 when you went to work for the company?

6    A    Yes.

7    Q    Let's talk about the Bay Area refineries that are your

8    customers.  Is the Shell refinery in Martinez one of your

9    customers?

10   A    Shell was a shipper of record in our pipeline system as

11   well as a terminal customer prior to some of their

12   reorganization recently where they had a different name.

13   Q    What I'd like to focus on is not so much the name for

14   the moment.  Is it your understanding that the Shell Oil

15   Company refinery in Martinez used your employer's pipeline

16   to deliver gasoline to one of your terminals so that it

17   could be trucked elsewhere?

18        MR. JOHNSON:  This question is any time from '87 to

19   the present?

20        MR. MILLER:  Yes.

21        THE WITNESS:  Yes.

22        MR. MILLER:  Q   Is it also your understanding that

23   the successor entity that took over that refinery under a

24   partnership between Shell and Texaco also uses the same

25   pipeline and services?

16

1    A    I can't say they use the same ones that they might have

2    at a previous date but, yes, they are a customer that uses

3    our pipelines.

4    Q    Okay.  Now, you're familiar with the TOSCO refineries

5    in the Bay Area; is that correct?

6    A    Generally familiar, yes.

7    Q    All right.  And does the TOSCO Avon refinery use your

8    employer's pipeline to deliver gasoline?

9    A    Yes.

10   Q    And does the TOSCO refinery -- what's the name of the

11   second one?  I'm sorry.

12   A    We would refer to it as Rodeo.

13   Q    Does the TOSCO Rodeo refinery use your employer's

14   pipeline to deliver gasoline?

15   A    Yes.

16   Q    And immediately prior to them taking over that refinery

17   is it your understanding that Unocal operated that refinery?

18   A    Yes.

19   Q    Do you recall the approximate date that the ownership

20   changed from TOSCO to Unocal for the Rodeo refinery?

21   A    No, I don't recall the date.

22   Q    A couple of years ago?

23   A    I'd say that's a good characterization.

24   Q    Okay.  And prior to TOSCO's operation of the Rodeo

25   refinery, was it your understanding that the Unocal refinery

17

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

```
 1    at the same location used your employer's pipeline and
 2    terminals?
 3    A    Yes.
 4    Q    Are you familiar with the Exxon refinery in Benicia?
 5    A    Yes.
 6    Q    Are they a customer of your employer's?
 7    A    Exxon is a customer, yes.
 8    Q    And does, is it your understanding that the Benicia
 9    refinery operated by Exxon uses your employer's pipeline to
10    deliver gasoline?
11    A    Again, Exxon is our customer and uses the pipeline, yes.
12    Q    Including for its Benicia refinery?
13    A    It's my understanding the volumes that initiate from
14    the Benicia refinery move through our pipeline, yes.
15    Q    And do you have an understanding of whether or not the
16    Chevron refinery in Richmond is one of your employer's
17    customers?
18    A    Again, Chevron is a customer and it's my understanding
19    that volumes that originate at the Chevron refinery at
20    Richmond move through our pipeline system.
21    Q    Okay.  Is there any technology used by your employer to
22    separate the gasoline from one Bay Area refinery physically
23    so that it will not intermix with refinery gasoline produced
24    by someone else?
25             MR. JOHNSON:  Vague as to "technology."  Vague as
```

18

```
 1              CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2

 3          I, CATHLEEN S. SLOCUM, a Certified Shorthand

 4    Reporter, in and for the State of California, duly appointed

 5    and commissioned to administer oaths, do hereby certify:

 6          That I am a disinterested person herein; that the

 7    witness, MARY F. MORGAN, named in the foregoing deposition,

 8    was by me duly sworn to testify the truth, the whole truth,

 9    and nothing but the truth; that the deposition was reported

10    in shorthand by me, Cathleen S. Slocum, a Certified

11    Shorthand Reporter of the State of California, and

12    thereafter transcribed into typewriting.

13          IN WITNESS WHEREOF, I have hereunto set my hand as

14    Certified Shorthand Reporter on this  /  of August, 1999.

15

16

17

18                        _____
                          Cathleen Slocum
19                        Certified Shorthand Reporter
                          License Number 2822
20

21                        --o0o--

22

23

24

25

                                                               150
```

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

# EXHIBIT 41

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN FRANCISCO
NO. 999128

SOUTH TAHOE PUBLIC UTILITY          *
DISTRICT                            *
                                    *
         Plaintiff,                 *
                                    *
VS.                                 *
                                    *
ATLANTIC RICHFIELD COMPANY          *
("ARCO"); ARCO CHEMICAL             *
COMPANY; SHELL OIL COMPANY;         *
CHEVRON U.S.A., INC.; EXXON         *
CORPORATION; B.P. AMERICA,          *
INC.; TOSCO CORPORATION;            *
ULTRAMAR, INC.; BEACON OIL          *
CO.; USA GASOLINE                   *
CORPORATION; SHELL OIL              *
PRODUCTS CO.; TERRIBLE              *
HERBST, INC.; ROTTEN ROBBIE;        *
J.E. TVETEN CORP.; TAHOE            *
TOM'S GAS STATION; THE              *
SOUTHLAND CORP.; PARADISE           *
CHEVRON; and DOES 1                 *
through 600, inclusive;             *
                                    *
         Defendants.                *

COPY

---

ORAL AND VIDEOTAPED DEPOSITION OF
KELLY J. HAMMAR
July 1, 1999

---

ORAL AND VIDEOTAPED DEPOSITION OF

KELLY J. HAMMAR, produced as a witness at the instance

of the Plaintiff, and duly sworn, was taken in the

above styled and numbered cause on the 1st of July,

1999, from 1:04 p.m. to 2:37 p.m., before Jerusha R.

Simon, CSR in and for the State of Texas, reported by

machine shorthand, at the Hyatt Regency, 1200

Louisiana, Houston, Texas.

1   Corporation, on behalf of Exxon and the witness.

2                    KELLY J. HAMMAR,

3   having been first duly sworn, testified as follows:

4                    EXAMINATION

5   BY MR. SAWYER:

6        Q.   Would you please state your name for the

7   record?

8        A.   Kelly J. Hammar.

9        Q.   No relation to Arm & Hammer, huh?  Too bad.

10       A.   Or Jack.

11       Q.   Do you reside in Texas, ma'am?

12       A.   Yes, I do.

13       Q.   Okay.  And where are your offices located?

14       A.   At 800 Bell.

15       Q.   And what city is that in?

16       A.   Houston, Texas.

17       Q.   All right.  And what's the name of your

18   employer?

19       A.   Exxon Company U.S.A.

20       Q.   And how long have you been employed by Exxon

21   Company U.S.A.?

22       A.   Approximately 9 1/2 years.

23       Q.   And have your job duties always remained the

24   same during that nine-year period?

25       A.   No, they have not.


                    DICKMAN DAVENPORT, INC.
                (214) 855-5100  (800) 445-9548

```
 1      Q.    All right.  Let's take your most recent job

 2   duties and work our way back.  What are your current

 3   job duties?

 4      A.    I'm currently the West Coast coordinator in

 5   our supply organization, and I'm responsible for

 6   coordinating feedstocks and products for the Benicia

 7   refinery and, also, the West Coast from Seattle down

 8   to San Diego.

 9      Q.    And what do you mean by "feedstocks"?

10      A.    Everything from PGO, hydrocracker feed, and

11   MTBE.

12      Q.    Okay.  In other words, your--part of your job

13   duties is dealing with the supply of these various

14   gasoline components for use in northern California?

15      A.    Yes.

16      Q.    And what is your job title at the current

17   time?

18      A.    West Coast coordinator.

19      Q.    And how long have you held that position?

20      A.    One year, approximately.

21      Q.    Okay.  And what position did you hold before

22   you were named West Coast coordinator?

23      A.    I was the Baton Rouge team captain.

24      Q.    It sounds like a softball team or something.

25   What exactly--what does a Baton Rouge team captain do?
```

1   with the company?

2       A.   As far as I know, yes.

3       Q.   All right.   Do they have what are called

4   branded stations in northern California?

5       A.   Yes, they do.

6       Q.   And what do you understand "branded stations"

7   to mean?

8       A.   Exxon-branded stations?

9       Q.   Yes, ma'am.

10      A.   I believe that's a marketing question, but

11  what I understand is that we sell Exxon-branded

12  gasoline.

13      Q.   Do you know if Exxon also sells to unbranded

14  gas stations in California?

15      A.   Yes.

16      Q.   Does Exxon have its own pipeline in northern

17  California?

18      A.   No.

19      Q.   Whose pipeline, if any, do they use?

20      A.   We use Kinder-Morgan.

21      Q.   And I believe that used to be named Santa Fe

22  Pacific Pipeline before it was purchased by

23  Kinder-Morgan?

24      A.   I believe so, yes.

25      Q.   Are you familiar with what--are you familiar

KELLY J. HAMMAR - JULY 1, 1999

```
 1   with the term "rack"?

 2        A.   Yes.

 3        Q.   What does a rack mean to you?

 4        A.   A rack means to me where gasoline is sold.

 5        Q.   In other words, where it's put in a truck of

 6   some sort?

 7        A.   Um-hum.  (The witness nods head.)

 8        Q.   All right.  And did Exxon maintain any racks

 9   in northern California?

10        A.   We have one terminal that we currently own at

11   the Benicia refinery.

12        Q.   Okay.  So, one rack at the Benicia refinery?

13        A.   That's what we own.

14        Q.   Okay.  Do you use other people's racks for

15   purposes of selling gasoline in northern California?

16        A.   Yes.

17        Q.   What other racks are you aware of?

18        A.   I do not know all of them per se, but we do

19   associate with Kinder-Morgan.  So, it would be at

20   Kinder-Morgan's terminals.  I do not know if they own

21   the racks or not.

22        Q.   Okay.  Do you use any other oil company's

23   racks for purposes of selling gasoline in northern

24   California?

25        A.   I do not know.
```

1  the gas Exxon sells in northern California, if the

2  source of that gasoline is their Benicia refinery?

3      A.   I don't think I fully understand the

4  question.

5      Q.   Okay.  Let me ask it this way.

6      A.   I'm sorry.

7      Q.   Does most of the gas that Exxon sells--let me

8  rephrase the question.  Is the Benicia refinery the

9  source of most of the gasoline that Exxon sells in

10  northern California?

11     A.   We--we produce the gasoline.  And most of it

12  is actually sold FOB at the Benicia refinery, which

13  means that it's sold at the pipeline area except for

14  our personal gasoline that's--that moves from there.

15     Q.   And FOB means free on board, right?

16     A.   Um-hum.

17     Q.   All right.  You have to say "yes" or "no" for

18  the record--

19     A.   Yes.

20     Q.   --even though we're on videotape?  Okay.

21  Other than the Benicia refinery, what are the other

22  sources of gasoline that Exxon sells in northern

23  California?

24     A.   As you're aware, we do have exchange

25  agreements, which we have provided you.  And it is

DICKMAN DAVENPORT, INC.
(214) 855-5100   (800) 445-9548

KELLY J. HAMMAR - JULY 1, 1999          26

`:29:26   1       A.    Yes.

13:29:26   2       Q.    Where is Selby located?

13:29:28   3       A.    Selby is across the Carquinez Strait from

13:29:32   4   Benicia refinery.

13:29:33   5       Q.    Now, you mentioned before when we talked

13:29:44   6   about the product codes.

13:29:45   7       A.    Um-hum.

13:29:45   8       Q.    See the second column?  It says "Product."

13:29:49   9   Do you know what those mean?

13:29:51  10       A.    Those are actually described back on this

13:29:55  11   page here.

13:29:56  12       Q.    Okay.

:29:57  13            MR. SAWYER:  For the record, the witness

13:29:58  14   is--we were just looking at some product codes in the

13:30:02  15   second column of Exhibit A to Exxon No. ULT724.  And

13:30:09  16   we flipped back a couple of pages to, again, marked

13:30:12  17   Exhibit A.

13:30:13  18       Q.    (BY MR. SAWYER)  And it looks like a series

13:30:14  19   of footnotes?

13:30:16  20       A.    Um-hum.

13:30:16  21            MR. SAWYER:  And just after Footnote 13,

13:30:20  22   there is a term in the middle that says "products."

13:30:23  23   And, for example, URCA2 apparently means unleaded

13:30:28  24   regular carb--

30:30  25       Q.    (BY MR. SAWYER)  Is that California?

KELLY J. HAMMAR - JULY 1, 1999          72

:37:04    1   STATE   OF   TEXAS )

14:37:04  2   COUNTY OF DALLAS )

14:37:04  3        I, Jerusha R. Simon, Certified Shorthand

14:37:04  4   Reporter, in and for the State of Texas, certify that

14:37:04  5   the foregoing deposition of KELLY J. HAMMAR, was

14:37:04  6   reported stenographically by me at the time and place

14:37:04  7   indicated, said witness having been placed under oath

14:37:04  8   by me, and that the deposition is a true record of the

14:37:04  9   testimony given by the witness.

14:37:04 10        I further certify that I am neither counsel for

14:37:04 11   nor related to any party in this cause and am not

14:37:04 12   financially interested in its outcome.

:37:04   13        Given under my hand on this the _____ day of

14:37:04 14   _____, 1999.

14:37:04 15

14:37:04 16

14:37:04 17        _____

14:37:04 18        Jerusha R. Simon, Certified
              Shorthand Reporter No. 7266
14:37:04 19   in and for the State of Texas
              Dickman Davenport, Inc.
14:37:04 20   3000 Carlisle, Suite 113
              Dallas, Texas 75204
14:37:04 21   (214) 855-5100   (800) 445-9548
              e-mail: info@dickmandavenport.com
14:37:04 22   My commission expires 12-31-99

         23

         24

         25

# EXHIBIT 42

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF SAN FRANCISCO

3                          --oOo--

4    SOUTH TAHOE PUBLIC UTILITY          )
     DISTRICT,                           )
5                                        )
                    Plaintiff,           )
6                                        )
                    vs                   )        No.  999128
7                                        )
     ATLANTIC RICHFIELD COMPANY          )
8    ("ARCO"); ARCO CHEMICAL COMPANY;)
     SHELL OIL COMPANY; CHEVRON          )
9    U.S.A., INC.; EXXON CORPORATION;)
     B.P. AMERICA, INC.; TOSCO           )
10   CORPORATION; ULTRAMAR, INC.;        )
     BEACON OIL CO.; USA GASOLINE        )
11   CORPORATION; SHELL OIL PRODUCTS     )
     CO.; TERRIBLE HERBST, INC.;         )
12   ROTTEN ROBBIE; J.E. TVETEN          )
     CORP.; TAHOE TOM'S GAS STATION;     )
13   THE SOUTHLAND CORP.; PARADISE       )
     CHEVRON; and DOES 1 through 600,)
14   inclusive,                          )
                                         )
15                  Defendants.          )
     _____)

16

17                         --oOo--
                  FRIDAY, SEPTEMBER 22, 2000
18                       9:13 A.M.
                         --oOo--
19                   DEPOSITION OF
                     THOMAS HOOKS
20                       --oOo--

21

22

23

24   CATHLEEN SLOCUM, CSR
     License No. 2822
25

          PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    A    That's okay.

2    Q    I'm entitled to your best recollection, not a guess,

3    but an estimate or a best recollection.  Is that okay?

4    A    Okay.

5         MS. O'REILLY:  Do other counsel want to

6    announce themselves on the record who they represent?

7         MR. DIAL:  My name is Bill Dial.  I'm with

8    Brobeck, Phleger & Harrison in Los Angeles, and I

9    represent Unocal Corporation, a defendant in this case.

10        MR. STILES:  Mike Stiles from McCutchen, Doyle,

11   Brown & Enersen in Los Angeles.  We represent Tesoro

12   Petroleum Company and Exxon Corporation.

13        MR. PRZYBYLKO:  My name is Eric Przybylko with

14   Arnold & Porter in New York, and we represent Atlantic

15   Richfield Company, BP Exploration and BP America.

16        MS. SPRINGER:  My name is Kristi Springer with

17   Manatt, Phelps & Phillips, and we represent defendants

18   Ultramar Inc. and Ultramar Diamond Shamrock Corporation.

19        MR. SAWYER:  I thought you were from McCutchen.

20   Curt Sawyer for the plaintiff.

21        MS. O'REILLY:  Q  Okay.  Can you tell me your

22   current job title, please?

23   A    Manager of inventory and revenue systems.

24   Q    Okay.  How many years have you worked for Kinder

25   Morgan?

                                                    5

1   A      Kinder Morgan came in in 1998.  And I worked with

2   them when they bought out SFPP.

3   Q      Did you work for SFPP?

4   A      Yes.

5   Q      And when did you start working for SFPP?

6   A      1986.

7   Q      What were your prior job titles commencing with your

8   first position?

9   A      Terminal operator in Mission Valley.  Scheduler in

10  the control center and that was about 1990.

11  Q      Which control center?

12  A      At that time our control center was located in Los

13  Angeles.

14  Q      Okay.

15  A      In '92 forecaster.  And sometime after the Kinder

16  Morgan takeover analyst.

17  Q      And when did you assume your current title?

18  A      About a year ago.

19  Q      And what are your responsibilities in your current

20  position?

21  A      We do several of the government reports, DOT.  We

22  handle the reconciliation of stock at the terminal levels

23  as well as data requests as necessary from upper

24  management.  I also work with the IS department.

25  Q      Can you tell me what the IS department is?

6

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    A      Information systems.  Excuse me, now it's

2    information technology.

3    Q      Okay.

4    A      And work as a liaison with the products movement

5    department in designing new reports and helping with any

6    bugs that could be in the system in the schedule lines.

7    Q      So in liaisoning with the products movement

8    department you help design these type of reports that are

9    here on the table?

10   A      I am in the products movement department currently.

11   Q      Okay.

12   A      These reports, everything historically that's

13   generated are designs from back in the eighties.

14   Q      Okay.

15          MR. JOHNSON:  Bill.

16          MR. GILHULY:  No.  Gilhuly.  Is this South

17   Tahoe?

18          MR. JOHNSON:  Yes.  Come on in.

19          (Thereupon a discussion was held off the

20          record.)

21          MS. O'REILLY:  Would you like to introduce

22   yourself on the record?

23          MR. GILHULY:  Morgan Gilhuly with Barg, Coffin,

24   Lewis & Trapp for Chevron U.S.A.

25          MS. O'REILLY:  Q  You can continue if you had

                                                          7

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1  A    Yes, I do.

2  Q    Okay.  That's an input manifold into the north

3  system.  Am I reading this correctly?

4  A    That will go to the north system, yes.

5  Q    Okay.  And the Richmond eight inch is an input line

6  where product is put into the system?

7  A    Correct.

8  Q    A starting point?

9  A    Correct.

10  Q    The Sacramento -- I'm assuming Sac stands for

11  Sacramento; is that correct?

12  A    Yes, it does.

13  Q    Fourteen-inch line.

14  A    Yes, I see that.

15  Q    Okay.  What is that line?

16  A    That's the line that will lead from Concord by

17  Sacramento to Rocklin and then ultimately to Chico, Reno

18  or Beale.

19  Q    What facility is located at Concord, what Kinder

20  Morgan facility is located at Concord?

21  A    We call it the Concord facility.

22  Q    What type of facility is it?

23  A    It's a breakout gathering facility.

24  Q    Okay.  Is that a place where gasoline comes in to be

25  distributed out to other locations, ultimate

                                                      18

1   destinations?

2   A      That is correct.

3   Q      In the Concord facility where would the product

4   originate that came into the Concord facility?

5   A      It comes into what is called breakout storage tanks.

6   Q      Where would it come in from?

7   A      It can come in from several locations.

8   Q      Do you have at the Concord facility input lines

9   directly from refineries?

10  A      Do I have?

11  Q      Does Kinder Morgan have?

12  A      We have some lines up there that come in.  Others

13  are not owned by us.

14  Q      They're proprietary input lines?

15  A      Yes.

16  Q      Does Chevron have a line to the Concord facility in

17  which they can input gasoline into the Kinder Morgan

18  system?

19  A      Chevron can get to Richmond through Richmond to

20  Concord.

21  Q      Okay.  And Exxon's facility in Benicia?

22  A      They can also get to Concord.

23  Q      Do they use the Richmond line?

24  A      For which barrels?  Depends on the destination.

25  Q      Gasoline that would ultimately come to Sacramento?

19

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    A    No.

2    Q    How would Exxon input gasoline into your system?

3    A    They have another line that does not come through

4    the Richmond facility.

5    Q    Goes straight to Concord; is that correct?

6    A    Correct.

7    Q    Okay.  Shell's refinery in Martinez?

8    A    Same.

9    Q    Comes direct into the Concord facility --

10   A    Yes.

11   Q    -- is that correct?

12   A    Uh-huh.  Yes, it is.

13   Q    And Tosco, their Avon refinery?

14   A    Direct to Concord as well.

15   Q    And Tosco's Rodeo refinery?

16   A    Direct to Concord as well.

17   Q    Direct to Concord.  So only Chevron utilizes the

18   Richmond line to input gasoline into your system that

19   goes to Concord, ultimately to Sacramento?

20   A    No.

21   Q    Who else utilizes that line?

22   A    ARCO could utilize the line.  I believe Time Oil was

23   there.  Texaco was there at one time.  Currently I

24   believe it's IMTT.  I'm not sure what that abbreviation

25   is.  And the other facility is, Shore could use that line

                                                          20

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    out of their Richmond facility.

2    Q    Okay.  So may I just recapitulate here.  Gasoline

3    destined for Sacramento or West Sacramento comes in from

4    the Richmond line to Concord?

5    A    Uh-huh.

6    Q    Or Exxon, Shell and Tosco ship directly to Concord

7    from the refineries; is that correct?

8    A    Yes.

9    Q    Okay.  So on this very first report that we're

10   looking at, would this gasoline, based on the system and

11   the line, would this gasoline have been delivered either

12   to a proprietary terminal in West Sacramento or your

13   Bradshaw facility?

14   A    No.

15   Q    No.  Okay.  Then let's move to the next one.  This,

16   so I make sure I understand, the gasoline that's shown on

17   this report would have been delivered to Chico?

18   A    It could have gone to Sacramento, Chico, or Reno.

19   Q    Okay.  I'm not clear on what you said.  Does this

20   report, does it show gasoline, the one that you're

21   looking at, does it show gasoline that would have been

22   delivered to a terminal in Sacramento?

23   A    Not necessarily.  This is pumping product down our

24   14-inch line.  Our 14-inch line runs not only to

25   Sacramento but also Chico and Reno.

21

1    another type.

2         MS. O'REILLY:   Q   So a shipment is received,

3    it's stored in a breakout tank until it's ready to be put

4    back into the system to its ultimate destination.   Would

5    that be a correct assumption?

6    A    Yeah.

7    Q    How long is gasoline generally stored in the

8    breakout tank?

9    A    I don't know.

10   Q    Is there a record of when it comes into the breakout

11   tank?

12   A    I don't have one, no.

13   Q    Does Kinder Morgan generate a record when the

14   gasoline is put into the breakout tank?

15   A    We generate the pumping ticket when it leaves the

16   breakout facility.

17   Q    It is more than one supplier's product stored in a

18   breakout tank at any given time?   Would you like me to

19   clarify?

20   A    Yes, rephrase.

21   Q    If Chevron were to put gasoline into the Kinder

22   Morgan system to be delivered to Sacramento, it would go

23   through the Concord facility; is that correct?

24   A    That's correct.

25   Q    And Shell if it were to put gasoline into the Kinder

37

1  Morgan system to be delivered to Sacramento would also go

2  to the Concord facility first; is that correct?

3  A    Yes.

4  Q    Would it be possible if they shipped in either

5  immediately after each other or even at the same time,

6  would their product that they shipped in be stored

7  together in a, in the same breakout tank?

8  A    That could happen, yes.

9  Q    Is that a normal business practice?

10  A    I believe they try to keep them segregated when they

11  can.

12        MR. JOHNSON:  At Concord?

13        THE WITNESS:   At Concord.  But like product can

14  be combined with like product.

15        MS. O'REILLY:  Q  It's fungible, would you say

16  that like product is fungible?

17  A    Yes.

18  Q    When it comes into the breakout tank, is there, if

19  it is commingled -- would that be the correct term to

20  use, commingled?

21  A    Yes.

22  Q    If it is commingled, is there some record that

23  Kinder Morgan has so that if, say, four or five hours --

24  I don't know the normal period -- if Shell were to

25  contact Kinder Morgan, does Kinder Morgan know how much

                                                    38

1   with, with Exhibit 3, Richmond, input at Richmond through

2   the Sacramento 14-inch line, comes out here on this

3   report, what would be the delay between the time that

4   ARCO put that into the pipeline and then ARCO, say,

5   received it here in their proprietary terminal because my

6   understanding the Sacramento 14 inch goes to proprietary?

7   A    Okay.  In your question you said that, are you

8   referring to a particular batch that ARCO as shipper of

9   record would receive at Sacramento, that same batch?

10  Q    I'm talking about generally what the delay is.  If

11  ARCO put it in the pipeline, you indicated that there's a

12  delay.  In other words, it doesn't pump, you don't put it

13  in it, it doesn't pump in and it doesn't get delivered

14  necessarily simultaneously or my understanding is within

15  the same day.

16       What would be the typical time period for a

17  refinery puts in gasoline into the Richmond line and then

18  for, say, for ARCO as a shipper and then that shipment or

19  tender arrived to ARCO's account or its proprietary

20  terminal in West Sacramento, what would be the time frame

21  for that type of transaction?

22  A    If you're referring to the Richmond system, there

23  could be more of a delay than if it was a direct pumping

24  from Concord.

25  Q    Okay.

                                                        129

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1   A    They can gather it a couple of days in advance and

2   then pump it --

3   Q    And that --

4   A    -- towards the Sacramento.

5   Q    And that would be gathered at the Concord facility?

6   A    Right.   Then since we treat all the product that's

7   like product in the line, they don't necessarily get that

8   batch at Sacramento.   They do get a combination of

9   several batches or that batch or not, no part of that

10  batch.

11  Q    Molecule for molecule they might not get the same

12  gasoline, is that what you're saying?

13  A    That's what I'm trying to say.

14  Q    But if on this report it shows that, referring to

15  Exhibit 3, the Supplier Report, Kinder Morgan is notified

16  that, say, Chevron puts gasoline in for ARCO is the

17  shipper --

18  A    Okay.

19  Q    -- 10,000 barrels.   Eventually that 10,000 barrels

20  is going to be put through the pipeline for ARCO; is that

21  correct?

22  A    Yes.

23  Q    When you're talking about Richmond to the Sacramento

24  14 inch --

25  A    There could be a two-day lag time there.   A

130

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    Q     So each combination of pipelines has a number?

2    A     Yes.

3    Q     Like Richmond would be Richmond when we looked at

4    the Supplier Reports, Richmond, Sacramento, would have a

5    line number, a single digit line number?

6    A     Yes.

7    Q     Is there a list of line numbers that tells us what

8    each line number represents?

9    A     I'm sure there is.

10   Q     Okay.  I need that to be able to interpret these

11   tickets.

12   A     Zero is the Sacramento line.

13   Q     Would that be Richmond Sacramento or would that be

14   Concord?

15   A     The Richmond to Sacramento is the Concord to

16   Sacramento --

17   Q     Okay.

18   A     -- as far as the zero is concerned.

19   Q     Okay.  Is there a two?

20   A     I'll get you a list.

21   Q     Okay.  If you could provide that that would be

22   helpful.  And then 48 you said is the cycle number?

23   A     Correct.

24   Q     And that refers to the cycles that Kinder Morgan --

25   A     We have 48 cycles per year.  That's how we group the

                                                        159

1    product.   We try to base it on about a seven and a half

2    day break between the cycles.

3    Q    So there's a seven and a half day --

4    A    So there's a pattern to the movement for to keep the

5    product running at the terminal.

6    Q    Okay.   So when you say a seven and a half day break,

7    you plan for seven and a half days, there's no product

8    moving in the pipeline?

9    A    No.   That's how long the cycle lasts typically.   It

10   depends on the amount of product moving in the line.   If

11   you start with diesel, work through all the product and

12   end with diesel, you started the next cycle type of

13   thing, and it tries to keep a continuous flow for

14   rateability.   You try to build that into the system.   And

15   typically our tanks have about a ten-day supply, so about

16   a seven and a half day cycle works to keep all the tanks

17   flowing with product.

18   Q    Okay.   And the next -- we're still referring to

19   Exhibit 19.   Is that what that says?   17.   I can't see.

20   It's upside-down.   17, product code EA, that's the same

21   as the product code list that we've been referring to on

22   Exhibit 4?

23   A    Uh-huh.

24   Q    Okay.   And then product 15 R-RFG2EA, is that what

25   you would call the short name and the number?

                                                          160

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, CATHLEEN S. SLOCUM, a Certified Shorthand
Reporter, in and for the State of California, duly
appointed and commissioned to administer oaths, do
hereby certify:

That I am a disinterested person herein; that
the witness, THOMAS HOOKS, named in the foregoing
deposition, was by me duly sworn to testify the truth,
the whole truth, and nothing but the truth; that the
deposition was reported in shorthand by me, Cathleen S.
Slocum, a Certified Shorthand Reporter of the State of
California, and thereafter transcribed into typewriting.

IN WITNESS WHEREOF, I have hereunto set my hand
as Certified Shorthand Reporter on this _28_ of
September, 2000.




Cathleen Slocum
Certified Shorthand Reporter
License Number 2822


--oOo--

235

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

# EXHIBIT 43

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

--oOo--

SOUTH TAHOE PUBLIC UTILITY       )
DISTRICT,                        )
                                 )
                Plaintiff,       )
                                 )
        vs                       )     No. 999128
                                 )
ATLANTIC RICHFIELD COMPANY       )     THIS TRANSCRIPT
("ARCO"); ARCO CHEMICAL COMPANY; )     CONTAINS CONFIDENTIAL
SHELL OIL COMPANY; CHEVRON       )     MATERIALS
U.S.A., INC.; EXXON CORPORATION; )
B.P. AMERICA, INC.; TOSCO        )
CORPORATION; ULTRAMAR, INC.;     )     ORIGINAL
BEACON OIL CO.; USA GASOLINE     )
CORPORATION; SHELL OIL PRODUCTS  )
CO.; TERRIBLE HERBST, INC.;      )
ROTTEN ROBBIE; J.E. TVETEN       )
CORP.; TAHOE TOM'S GAS STATION;  )
THE SOUTHLAND CORP.; PARADISE    )
CHEVRON; and DOES 1 through 600, )
inclusive,                       )
                Defendants.      )
_____)

--oOo--
THURSDAY, JULY 22, 1999
10:00 A.M.
--oOo--
DEPOSITION OF
BOB SIMONSON
--oOo--



CATHLEEN SLOCUM, CSR
License No. 2822

**PETERS SHORTHAND REPORTING CORPORATION**
3336 Bradshaw Road, Suite 240
Sacramento, California 95827
(916) 362-2345

1    objections of lawyers is put down on record by the court

2    reporter sitting next to you and will be typed in the form

3    of a booklet which you'll have an opportunity to review and

4    correct.  A lot of times you'll know where I'm going with my

5    question, and wait until I finish and then provide an answer

6    so we have a clear record.

7           You'll also hear lawyers during the course of the

8    deposition making objections.  They're just preserving that

9    for the record.  Unless your lawyer instructs you not to

10   answer, you should try to answer the question.  We don't

11   want you to speculate, but we're entitled to your best

12   recollection, best estimates, those types of things.  Do you

13   understand that, sir?

14   A    Sure.

15   Q    The other thing is try to articulate your responses

16   since the court reporter can't take down shrugs and uh-huhs

17   and uh-huhs and those types of things we use in everyday

18   language.

19   A    Okay.

20   Q    What's the name of your current employer, sir?

21   A    Exxon Company, U.S.A.

22   Q    And how long have you been employed by Exxon Company,

23   U.S.A.?

24   A    Thirty-one years.  Thirty-one years in June.

25   Q    I smell some retirement money coming up.

                                                            3

1   A   I hope so.

2   Q   And what Exxon facility are you employed at?

3   A   I'm at the Benicia refinery.

4   Q   And that's here in Benicia, California?

5   A   Yes.

6   Q   Before we get to your employment at Exxon, could you

7   briefly describe for me your educational background.

8   A   Educational background, high school graduate, graduated

9   from high school in Ohio.   That's the extent of my formal --

10   Q   Okay.

11   A   -- educational background.

12   Q   And what was your first position with Exxon?

13   A   First position was refinery technician trainee.

14   Q   And what are the job duties as a refinery technician

15   trainee?

16   A   Those duties are part time as a unit operator.   The

17   other part time, if you will, was doing refinery

18   maintenance, mechanical work.

19   Q   And did you engage in these activities at Benicia?

20   A   Yes.

21   Q   And what was your next position after refinery

22   technician trainee?

23   A   After that I was a control supervisor.   That's a first

24   line supervisory position that basically operates half the

25   refinery from a central control room.

4

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1  special reason to go make a check on that, you assume he's

2  going to meet your requirements as he states in the

3  contract.

4  Q    Is there any way for you based on your experience to

5  put a percentage on the total amount of gas that's supplied

6  by Exxon's Benicia refinery in terms of the gasoline sales

7  in northern California?  In other words, do they provide 60,

8  70, 80 percent of all the gasoline sold by Exxon in northern

9  California?

10           MR. GOLDFLAM:  Objection.  Vague as to time.

11           THE WITNESS:   At the current time?

12           MR. WALLIS:  In a month, in a year?

13           MR. SAWYER:  Q  What's easier for you to answer,

14  monthly, on an annual basis?

15  A    On a daily basis is probably easier for me.  The

16  Benicia refinery produces about 100,000, 110,000 barrels a

17  day of gasoline.  That's about ten percent of production in

18  the State of California.  I don't know the breakdown north

19  to south.  Obviously almost all our product goes to

20  northern.

21  Q    Into what?

22  A    Into northern California.

23  Q    You're not aware of any studies or analysis that might

24  have been done for a certain segment of time to determine

25  what percentage of Exxon's gasoline is supplied by the

                                                          12

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2

3         I, CATHLEEN S. SLOCUM, a Certified Shorthand

4    Reporter, in and for the State of California, duly appointed

5    and commissioned to administer oaths, do hereby certify:

6         That I am a disinterested person herein; that the

7    witness, BOB SIMONSON, named in the foregoing deposition,

8    was by me duly sworn to testify the truth, the whole truth,

9    and nothing but the truth; that the deposition was reported

10   in shorthand by me, Cathleen S. Slocum, a Certified

11   Shorthand Reporter of the State of California, and

12   thereafter transcribed into typewriting.

13        IN WITNESS WHEREOF, I have hereunto set my hand as

14   Certified Shorthand Reporter on this *29* of July, 1999.

15

16

17

18                          _Cathleen Slocum_
                            Cathleen Slocum
19                          Certified Shorthand Reporter
                            License Number 2822
20

21                          --o0o--

22

23

24

25

                                                        42

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

# EXHIBIT 44

1           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

3

4    SOUTH TAHOE PUBLIC UTILITY          )
     DISTRICT,                           )
5                                        )
                        Plaintiff,       )
6           vs.                          ) No. 999128
                                         )
7    ATLANTIC RICHFIELD COMPANY,         )
     et al.,                             )
8                                        )
                        Defendants.      )
9    _____)

10

11

12

13

14

15

16                         Deposition of:

17                         DIXON B. SMITH

18                    FRIDAY, JANUARY 12, 2001

19

20

21

22

23

24   Reported by:  MARK I. BRICKMAN, CSR, RPR
                   License No. 5527
25

                    BRICKMAN DEPOSITION REPORTING
                     41 SUTTER STREET, SUITE 700
                    SAN FRANCISCO, CALIFORNIA  94104
                    (415) 788-5095  (800) 728-6903

                                                              1

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:          MILLER, SHER & SAWYER
South Tahoe Public          100 Howe Avenue, Suite S120
Utility District            Sacramento, CA  95825
                            By: DUANE C. MILLER, ESQ.

For the Defendants:         McCUTCHEN, DOYLE, BROWN &
Chevron USA                 ENERSON
                            Three Embarcadero Ctr, 25th Fl
                            San Francisco, CA  94111
                            By: COLLEEN DOYLE, ESQ.

Also Present:               ANNE M. PAYNE, ESQ.

                    BE IT REMEMBERED that, pursuant to Notice

of taking Deposition, and on January 12, 2001, at the

hour of 10:12 AM, at Three Embarcadero Center, San

Francisco, California, before me, MARK I. BRICKMAN, CSR

No. 5527, State of California, there personally

appeared

                    DIXON B. SMITH

who was provided as a witness under the provisions of

the California Code of Civil Procedure.

1    correct?

2        A.       Yes.

3        Q.       When you went to work for Chevron in

4    1955, what were the types of job responsibilities that

5    you had?

6        A.       I was a design engineer at the Richmond

7    refinery.

8        Q.       And could you briefly describe your

9    education starting with college for us?

10       A.       I have a Bachelor of Science Degree in

11    chemical engineering from Stanford University.

12       Q.       And did you obtain that degree before you

13    went to work for Chevron?

14       A.       Yes, I did.

15       Q.       Did you obtain any post-graduate degrees?

16       A.       I did not.

17       Q.       And did you take any post-graduate

18    courses at any university or college?

19       A.       Yes, I have.

20       Q.       Could you describe those for us, please?

21       A.       I've taken a course in petroleum

22    engineering, University of California at Berkeley.

23    I've taken a course in executive management at the

24    University of California-Berkeley.

25       Q.       Have you ever worked as a person

1                Are you talking about the hundred

2    thousand chemicals that are of concern to the Clean Air

3    Act?

4                MS. PAYNE:   Can we get that question

5    read back, please?

6                MR. MILLER:   Let me try it this way:

7       Q.      You're familiar with carbon monoxide and

8    winter ozone concerns that are dealt with in the Clean

9    Air Act?

10       A.      Yes.

11       Q.      With those two considerations in mind,

12    were you told by anyone that research on whether or not

13    MTBE improved exhaust emissions from vehicles of those

14    compounds actually determined that no improvement

15    occurred?

16                MS. DOYLE:   Can we have that question

17    read back because I think he said --

18                THE WITNESS:   I can unwind it --

19                MS. DOYLE:   But I think he said

20    winter --

21                MR. MILLER:   Let's do it one step at a

22    time.

23       Q.      Were you ever told that a scientific

24    study was done that attempted to evaluate whether or

25    not MTBE improved exhaust emissions for carbon monoxide

1    and the result they received is that no improvement in

2    emissions occurred?

3         A.        Not that I recall.

4         Q.        Would your answer be the same for ozone

5    emissions?

6         A.        I have to explain.  All studies I recall

7    seeing said that there was an improvement in carbon

8    monoxide -- reduction in carbon monoxide emissions with

9    the addition of oxygenates in gasoline.

10                  MR. MILLER:   Let me show you Exhibit 14.

11                            (Plaintiff's Exhibit No. 14 was

12                            marked for identification.)

13                  MR. MILLER:   It'S dated June 10, 1993.

14   It's directed to Mary Smith, US-EPA, Washington, D.C.

15   (Indicating).

16                  If you go to the end, it says:  "Original

17   signed by Dixon B. Smith."

18                  THE WITNESS:   Yes.

19                  MR. MILLER:   Q.   Is this a letter you

20   wrote to the EPA?

21        A.        I probably did not write the memo, but

22   I as indicated here did sign the memo.

23        Q.        I assume you would have read it before

24   you signed it, sir?

25        A.        Definitely.

STATE OF CALIFORNIA            )

COUNTY OF SAN FRANCISCO        )


          I, the undersigned, hereby certify that the witness

in the foregoing deposition was by me duly sworn to testify

the truth  the whole truth and nothing but the truth in the

within-entitled cause; that said deposition was taken at

the time and place therein stated; that the foregoing is a

full, true and complete record of said testimony; and that

the witness was given an opportunity to read and correct

said deposition and to subscribe the same.  Should the

signature of the witness not be affixed to the deposition,

the witness shall not have availed himself/herself of the

opportunity to sign or the signature has been waived.

          I further certify that I am not of counsel or

attorney for either or any of the parties in the foregoing

deposition and caption named, or in any way interested in

the outcome of the cause named in said action.

                         IN WITNESS WHEREOF, I have

                         hereunto set my hand this

                         25th day of January,

                         2001.


                         Mark I. Brickman CSR No. 5527

# EXHIBIT 45

## VALERO CORPORATE REPRESENTATIVE DEPOSITION
## EARLY KNOWLEDGE AND TASTE & ODOR

Norman Renfro
Vice President of Health, Safety and Environmental
Valero Services, Inc.

**Employment History**

| | |
|---|---|
| May 7, 1984 | Environmental Engineer |
| 1988 | Chief Environmental Engineer |
| 1992 | Environmental Manager |
| 1995 | Director of Safety and Environmental |
| 1997 | Vice President of Environmental and Safety Affairs |
| 2002 | Vice President of Health, Safety and Environmental |

**For purposes of this deposition, "Valero" includes the following entities:**

Valero Energy Corporation
Valero Marketing and Supply Company
Valero Refining Company
Valero Refining and Marketing Company
Valero Refining Company Louisiana
Valero Refining—Texas, L.P.
Valero Refining Company—New Jersey
Valero Refining Company—California

Norman Renfro testimony applicable to heritage Valero and Basis refineries (1997), Paulsboro (1998), and Benicia (May 2000).

1.  Whether any DOCUMENTS described in the Request to Produce Documents, which is a part of this notice, were destroyed. If so, when were said documents destroyed and by whom?

    **Valero is not aware of any instance in which responsive documents were destroyed. Given the expansive time frame for which the request seeks documents, it is possible that potentially responsive documents were destroyed long before this litigation was initiated.**

2.  Authentication of all DOCUMENTS produced at the deposition.

3.  What efforts were made to locate the DOCUMENTS described in the request to produce documents that accompanies this deposition notice, who performed the search, and when and what was found.



Valero's archive documents were searched and reviewed for purposes of production in previous MTBE litigation matters (MDL I) as well as this litigation (MDL 1358), and for purposes of this subpoena. The files of individual employees thought likely to have relevant information have been collected and reviewed for responsiveness, as have potentially responsive files located at relevant refineries. Documents that were located and determined to be responsive to this subpoena have been produced to Plaintiffs.

The following people were interviewed for preparation for this deposition:

Joe Almarez
Curt Benefield
John Braeutigam
Bobby Broadway
John Cotterel
Gene Edwards
Peter Fasullo
Tim George
Bill Glasscock
Jim Greenwood
Chip Gross
TD Higginbotham
Cal Hodge
Jon Kiggans
George Kain
Baines Manning
Gino Panganucci
Sam Pinizzotto
Roger Rinas
Rick Roat
Les Rucker
Wayne Smithers
Reid Trekell
Geoff Willig
Marty Zanotti

### EARLY KNOWLEDGE ISSUES

3.      The Defendant's early knowledge and understanding of MTBE and/or TBA's characteristics and impact on the environment.

(a)     When Valero First Became Aware That MTBE Had Caused Water Contamination.

A few Valero employees became aware in approximately 1987 of allegations that MTBE had been detected in groundwater in Maine. The information received was

limited and indicated that the release was a unique situation and not likely to recur. Some Valero employees became aware that MTBE had been detected in groundwater in Denver in early-mid 1995. In general, Valero employees became aware of MTBE detections in the City of Santa Monica drinking water wells in connection with news accounts in 1995 or 1996.

(b)   First Several Instances in Which Valero Dealt With MTBE Contamination At Refineries

In September 1998, Valero acquired the Paulsboro refinery from Mobil. Since approximately 1979, the refinery has been operating a system designed to contain hydrocarbon contamination underneath the refinery. MTBE was detected in some wells at the refinery in 1997, prior to Valero's acquisition. The operation of the system, however, has not been modified as result of the MTBE detection in 1997.

In May 2000, Valero acquired the Benicia refinery from ExxonMobil. Prior to Valero's acquisition, MTBE had been detected at the refinery and terminal. ExxonMobil retains liability for this contamination. Since mid-2000, however, Valero has operated and maintained the equipment, including quarterly sampling.

In 2001, Valero detected MTBE in groundwater wells at the Corpus Christi refinery. The Remedial Action Plan (pump and treat 7 wells) does not call for any specific/different treatment in light of the existence of MTBE. The refinery continues to monitor the wells semi-annually for MTBE and BTEX.

In 2002, MTBE was detected in groundwater at the Houston refinery. The existing system has not been modified as a result of the MTBE detection.

(c)   First Instances in Which Valero Dealt With MTBE Contamination at Retail Stations

In 2000, in connection with Valero's purchase of retail stations in California from ExxonMobil, Valero commissioned environmental assessments of 16 retail stations. MTBE contamination was discovered at 12 of these stations. ExxonMobil retained the responsibility for remediating contamination at the sites. Therefore, Valero did not "deal with" MTBE contamination at these sites.

In 2002, in connection with its merger with Ultramar Diamond Shamrock Corporation, Valero entities acquired 1421 retail stations. Valero acquired approximately 840 sites at which there were on-going remediation activities, some of which included remediation of MTBE. A detailed review of all of the remediation site files has not been performed for this deposition.

(d)   First Several Instances in Which Valero Was Provided Information From Others in the Industry About Their Early Experiences With MTBE.

Valero has not located any specific record indicating that it received information from another in the industry about their early experience with MTBE. Valero

- 3 -

acquired information about Mobil's experience with MTBE at the Paulsboro refinery in 1998, and about ExxonMobil's experience with MTBE at the Benicia refinery in 2000.   Valero became aware of Ultramar Diamond Shamrock's experiences with remediation of MTBE after its merger with Ultramar Diamond Shamrock on December 31, 2001.

(e)   When Valero First Became Aware of MTBE's Low Taste and Odor Threshold.

Valero does not contend that MTBE has a "low" taste and odor threshold.   Valero understands that the concentrations in water at which MTBE can be detected by taste or odor varies widely.   In 1995, Valero learned from an OFA Fact Sheet that MTBE's average odor detection threshold in water has been measured in the range of 45-95 ppb and its average taste threshold at 134 ppb.

(f)   When Valero First Became Aware of the Fact that MTBE Flows Further and Faster than BTEX, and is More Likely to Cause Contamination Than a Release of Conventional Gasoline.

Valero became aware of allegations that MTBE flows further and faster than BTEX in 1995.   Valero has not concluded that MTBE is more likely to cause contamination than a release of conventional gasoline.

(g)   When Valero First Became Aware of the Fact That MTBE is More Soluble in Water Than the BTEX Constituents.

As a chemical principle, Valero is aware that MTBE is more soluble in water than the BTEX constituents.   Valero is also aware that MTBE is less soluble in water than some other constituents of gasoline.

(h)   When Valero First Became Aware of MTBE's Resistance to Biodegradation, and the Fact That MTBE is More Difficult and Costly to Remediate.

Valero became aware of allegations that MTBE was resistant to biodegradation in 1995.   Valero agrees that in some specific circumstances, MTBE may be more costly to remove from groundwater than BTEX constituents.   Based on Valero's investigation, it appears that Valero first became aware of this in 1995.

- 4 -

## TASTE AND ODOR DEPOSITION ISSUES

4.    STUDIES done by you, done at your direction, or that you obtained or reviewed that are designed to determine the taste and odor threshold of MTBE and/or TBA in water.

**Valero has not performed any such studies.  With regard to studies conducted by others, Valero has obtained the following documents that may relate to this issue.**

**(a)    U.S. Environmental Protection Agency, November 1993, Assessment of Potential Health Risks of Gasoline Oxygenated with Methyl Tertiary Butyl Ether (MTBE): Washington, D.C., Office of Research and Development;**

**(b)    Oxygenated Fuels Association, 1995, MTBE in Ground Water--Fact Sheet for Local Health and Water Authorities:  Oxygenated Fuels Association;**

**(c)    U.S. Environmental Protection Agency, 1997, EPA Drinking Water Advisory:  Consumer Acceptability Advice and Health Effects Analysis on Methyl Tertiary-Butyl Ether (MTBE) and related Fact Sheet;**

5.    When, and under what circumstances, according to YOUR records, YOU first learned about MTBE's taste and odor threshold in water, and how that knowledge evolved over time.

**Valero first learned of the controversy regarding MTBE's taste and odor threshold in water in 1995.  Valero has not formed an opinion as to MTBE's particular taste and odor threshold in water.  In December 1997, the EPA set a Drinking Water Advisory for MTBE at 20 to 40 ppb.**

6.    When, according to YOUR records, YOU first received a copy of the January 17, 2003, Product Safety Bulletin for Methyl Tertiary Butyl Ether published by Lyondell Chemical Company.

**Valero has no record of ever receiving a copy of the January 17, 2003, Product Safety Bulletin for Methyl Tertiary Butyl Ether published by Lyondell Chemical Company.**

7.    When, according to YOUR records, YOU first received a copy of the 18 March 1993 Campden Food and Drink Research Association STUDY titled Flavor [sic] and Odour [sic] Thresholds of Methyl Tertiary Butyl Ether (MTBE) in Water.

**Valero has no record of ever receiving this document.  Valero understands that it was produced to Ultramar Inc. in the South Lake Tahoe Litigation.**

# EXHIBIT 46

L-4181-C
REV. 11/87

# HIGHWAY TRANSPORTATION RECEIPT

## (LOADING TICKET)

DRIVER COPY 4

## ORIGINAL BILL OF LADING—NOT NEGOTIABLE

RECEIVED, THE PROPERTY DESCRIBED BELOW, IN APPARENT GOOD ORDER WHICH SAID TRANSPORTATION COMPANY (THE WORD "COMPANY" BEING UNDERSTOOD AS INCLUDING ANY PERSON OR CORPORATION IN POSSESSION OF THE PROPERTY) AGREES TO TRANSPORT AND DELIVER TO CONSIGNEE AT HIS USUAL PLACE OF DELIVERY (IF ON ITS OWN LINE OR ROUTE), OTHERWISE TO DELIVER TO ANOTHER CARRIER ON THE ROUTE TO SAID DESTINATION. IT IS MUTUALLY AGREED THAT THE TRANSPORTATION SERVICES HEREUNDER ARE SUBJECT TO ALL THE PRINTED TERMS AND CONDITIONS NOT PROHIBITED BY LAW, OF THE "TRANSPORTATION COMPANY'S" UNIFORM BILL OF LADING. "CONTRACT" OR "ANYWHERE-FOR-HIRE" SERVICES WILL BE SUBJECT TO THE TERMS AND CONDITIONS OF THE CONTRACT, SERVICE ORDER OR OTHER AGREEMENT EXECUTED OR AGREED TO BETWEEN PARTIES HERETO WHEN NOT IN CONTRAVENTION OF ANY EXISTING LAW. WHEN MOVEMENT IS IN A VEHICLE OPERATED BY SHIPPER, OR OWNER OF PRODUCT, THIS DOCUMENT SERVES ONLY AS A RECEIPT FOR PRODUCT LOADED.

STATE EXCISE TAX, IF ANY, ON MOTOR VEHICLE FUEL COVERED BY THIS LOADING TICKET HAS BEEN ASSUMED AND WILL BE PAID BY THE SHIPPER.

CARRIER CERTIFIES THAT THE CARGO TANK SUPPLIED FOR THIS SHIPMENT IS A PROPER CONTAINER FOR THE TRANSPORTATION OF THIS COMMODITY AND COMPLIES WITH THE DEPT. OF TRANSPORTATION SPECIFICATIONS AND REGULATIONS FOR THE TRANSPORTATION OF EXPLOSIVES AND OTHER DANGEROUS ARTICLES.

THIS IS TO CERTIFY THAT THE BELOW-NAMED MATERIALS ARE PROPERLY CLASSIFIED, DESCRIBED, PACKAGED, MARKED, AND LABELED, AND ARE IN PROPER CONDITION FOR TRANSPORTATION, ACCORDING TO THE APPLICABLE REGULATIONS OF THE DEPT. OF TRANSPORTATION.

NOTE: NET VOLUME HAS BEEN ADJUSTED TO 60°F.

SIGNATURE OF DRIVER: *Joel Munguia*

JOEL MUNGUIA

**FOR PRODUCT EMERGENCY**
Spill, Leak, Fire, Exposure or Accident
**CALL CHEMTREC-DAY OR NIGHT**
# 800-424-9300

DESTINATION
RED TRIANGLE
2809 SO. CHESTNUT
FRESNO

| TRUCK NO. | TRUCK LICENSE NO. | TRAILER NO. | TRAILER LICENSE NO. |
|---|---|---|---|
| 1001 | 3V13173 | 1041 | YC8453 |

| TERM NO. | HTR NO. | TIME | DATE | CUSTOMER NO. | DRIVER NO. | CARRIER |
|---|---|---|---|---|---|---|
| 0002 | 681163 | 12:49 | 02/14/03 | 00009000S | 0005 | REDT |

4149 SOUTH MAPLE AVENUE, FRESNO, CA 93725

PAGE 1 OF 1

| SHIPPER | CONSIGNEE |
|---|---|
| TESORO REFINING & MRKTING | 129 TESORO REFING 8700 TESORO DR. SAN ANTONIO, TX 78217 |

SPOT 4E

| PRODUCT CODE | PRODUCT NAME | OCT. | TEMP. | GRAVITY | GROSS GALLONS | NET GALLONS |
|---|---|---|---|---|---|---|
| | GASOLINE 3, UN1203, P.G. II | | | | 4004 | 4015 |
| B 187 | REG RFG W/A10 | 87.0 | 96 | 60.0 | | |
| 87 | REG RFG (BASE) | | | | 4004 | 4015 |

THIS GASOLINE CONTAINS DETERGENT ADDITIVE AS REQUIRED BY
40 CFR PART 80
THIS PRODUCT DOES NOT MEET THE OXYGENATE REQUIREMENTS FOR EPA
RFG II  AND MAY NOT BE USED IN ANY EPA RFG II COVERED AREA
CONTAINS GREATER THAN 0.6 VOL% MTBE

REDTRIANGLE-SHE-000053

L-4181-C
REV. 11/97

# HIGHWAY TRANSPORTATION RECEIPT

DRIVER COPY 4

## (LOADING TICKET)

## ORIGINAL BILL OF LADING—NOT NEGOTIABLE

RECEIVED, THE PROPERTY DESCRIBED BELOW, IN APPARENT GOOD ORDER WHICH SAID TRANSPORTATION COMPANY (THE WORD "COMPANY", BEING UNDERSTOOD AS INCLUDING ANY PERSON OR CORPORATION IN POSSESSION OF THE PROPERTY) AGREES TO TRANSPORT AND DELIVER, TO CONSIGNEE AT HIS USUAL PLACE OF DELIVERY (IF ON ITS OWN LINE OR ROUTE), OTHERWISE TO DELIVER TO ANOTHER CARRIER ON THE ROUTE TO SAID DESTINATION. IT IS MUTUALLY AGREED THAT THE TRANSPORTATION SERVICES HEREUNDER ARE SUBJECT TO ALL THE PRINTED TERMS AND CONDITIONS NOT PROHIBITED BY LAW, OF THE "TRANSPORTATION COMPANY'S" UNIFORM BILL OF LADING, "CONTRACT" OR "ANYWHERE-FOR-HIRE" SERVICES WILL BE SUBJECT TO THE TERMS AND CONDITIONS OF THE CONTRACT, SERVICE ORDER OR OTHER AGREEMENT EXECUTED OR AGREED TO BETWEEN PARTIES HERETO WHEN NOT IN CONTRAVENTION OF ANY EXISTING LAW. WHEN MOVEMENT IS IN A VEHICLE OPERATED BY SHIPPER OR OWNER OF PRODUCT, THIS DOCUMENT SERVES ONLY AS A RECEIPT FOR PRODUCT LOADED.

STATE EXCISE TAX, IF ANY, ON MOTOR VEHICLE FUEL COVERED BY THIS LOADING TICKET HAS BEEN ASSUMED AND WILL BE PAID BY THE SHIPPER.

CARRIER CERTIFIES THAT THE CARGO TANK SUPPLIED FOR THIS SHIPMENT IS A PROPER CONTAINER FOR THE TRANSPORTATION OF THIS COMMODITY AND COMPLIES WITH THE DEPT. OF TRANSPORTATION SPECIFICATIONS AND REGULATIONS FOR THE TRANSPORTATION OF EXPLOSIVES AND OTHER DANGEROUS ARTICLES.

THIS IS TO CERTIFY THAT THE BELOW-NAMED MATERIALS ARE PROPERLY CLASSIFIED, DESCRIBED, PACKAGED, MARKED, AND LABELED, AND ARE IN PROPER CONDITION FOR TRANSPORTATION, ACCORDING TO THE APPLICABLE REGULATIONS OF THE DEPT. OF TRANSPORTATION.

NOTE: NET VOLUME HAS BEEN ADJUSTED TO 60°F.

SIGNATURE OF DRIVER: _JOEL MUNBUIA_

**FOR PRODUCT EMERGENCY**
Spill, Leak, Fire, Exposure or Accident
**CALL CHEMTREC-DAY OR NIGHT**
# 800-424-9300

DESTINATION
RED TRIANGLE
2809 SO. CHESTNUT
FRESNO, CA

| TRUCK NO. | TRUCK LICENSE NO. | TRAILER NO. | TRAILER LICENSE NO. |
|---|---|---|---|
| 1001 | 3Y13198 | 1011 | 4G3463 |

| TERM NO. | HTR. NO. | TIME | DATE | CUSTOMER NO. | DRIVER NO. | CARRIER |
|---|---|---|---|---|---|---|
| 0002 | 696119 | 10:55 | 07/25/03 | 000090003 | 0005 | REDT |

4149 SOUTH MAPLE AVENUE, FRESNO, CA  93725

PAGE 1 OF 1

| SHIPPER | CONSIGNEE |
|---|---|
| TESORO REFINING & MRKTING | 129  TESORO REFING  8700 TESORO DR.  SAN ANTONIO, TX 78217 |

SPOT 2E

| PRODUCT CODE | PRODUCT NAME | OCT. | TEMP. | GRAVITY | GROSS GALLONS | NET GALLONS |
|---|---|---|---|---|---|---|
| S 187 | GASOLINE 3, UN1203, P.G. II  REG RFG W/A10 | 87.0 | 86 | 60.0 | 8801 | 8642 |
| 87 | REG RFG (BASE) | | | | 8801 | 8642 |

THIS GASOLINE CONTAINS DETERGENT ADDITIVE AS REQUIRED BY
40 CFR PART 80
THIS PRODUCT DOES NOT MEET THE OXYGENATE REQUIREMENTS FOR EPA
RFG II  AND MAY NOT BE USED IN ANY EPA RFG II COVERED AREA
CONTAINS GREATER THAN 0.6 VOL% MTBE

REDTRIANGLE-SHE-000102

L-4181-C
REV. 11/97

## HIGHWAY TRANSPORTATION RECEIPT

### (LOADING TICKET)

DRIVER COPY 5

### ORIGINAL BILL OF LADING—NOT NEGOTIABLE

RECEIVED, THE PROPERTY DESCRIBED BELOW, IN APPARENT GOOD ORDER WHICH SAID TRANSPORTATION COMPANY (THE WORD "COMPANY" BEING UNDERSTOOD AS INCLUDING ANY PERSON OR CORPORATION IN POSSESSION OF THE PROPERTY) AGREES TO TRANSPORT AND DELIVER TO CONSIGNEE AT HIS USUAL PLACE OF DELIVERY (IF ON ITS OWN LINE OR ROUTE), OTHERWISE TO DELIVER TO ANOTHER CARRIER ON THE ROUTE TO SAID DESTINATION. IT IS MUTUALLY AGREED THAT THE TRANSPORTATION SERVICES HEREUNDER ARE SUBJECT TO ALL THE PRINTED TERMS AND CONDITIONS NOT PROHIBITED BY LAW, OF THE "TRANSPORTATION COMPANY'S" UNIFORM BILL OF LADING. "CONTRACT" OR "ANYWHERE-FOR-HIRE" SERVICES WILL BE SUBJECT TO THE TERMS AND CONDITIONS OF THE CONTRACT, SERVICE ORDER OR OTHER AGREEMENT EXECUTED OR AGREED TO BETWEEN PARTIES HERETO WHEN NOT IN CONTRAVENTION OF ANY EXISTING LAW. WHEN MOVEMENT IS IN A VEHICLE OPERATED BY SHIPPER, OR OWNER OF PRODUCT, THIS DOCUMENT SERVES ONLY AS A RECEIPT FOR PRODUCT LOADED.

STATE EXCISE TAX, IF ANY, ON MOTOR VEHICLE FUEL COVERED BY THIS LOADING TICKET HAS BEEN ASSUMED AND WILL BE PAID BY THE SHIPPER.

CARRIER CERTIFIES THAT THE CARGO TANK SUPPLIED FOR THIS SHIPMENT IS A PROPER CONTAINER FOR THE TRANSPORTATION OF THIS COMMODITY AND COMPLIES WITH THE DEPT. OF TRANSPORTATION SPECIFICATIONS AND REGULATIONS FOR THE TRANSPORTATION OF EXPLOSIVES AND OTHER DANGEROUS ARTICLES.

THIS IS TO CERTIFY THAT THE BELOW-NAMED MATERIALS ARE PROPERLY CLASSIFIED, DESCRIBED, PACKAGED, MARKED, AND LABELED, AND ARE IN PROPER CONDITION FOR TRANSPORTATION, ACCORDING TO THE APPLICABLE REGULATIONS OF THE DEPT. OF TRANSPORTATION.

NOTE: NET VOLUME HAS BEEN ADJUSTED TO 60°F.

SIGNATURE OF DRIVER: *Joel Munguia*
JOEL MUNGUIA

| FOR PRODUCT EMERGENCY |
| Spill, Leak, Fire, Exposure or Accident |
| CALL CHEMTREC-DAY OR NIGHT |
| **800-424-9300** |

DESTINATION  RED TRIANGLE
2809 SO. CHESTNUT
FRESNO, CA 93735

| TRUCK NO. | TRUCK LICENSE NO. | TRAILER NO. | TRAILER LICENSE NO. |
|---|---|---|---|
| 1001 | 3Y13198 | 1011 | YC8153 |

| TERM NO. | HTR NO. | TIME | DATE | CUSTOMER NO. | DRIVER NO. | CARRIER |
|---|---|---|---|---|---|---|
| 0002 | 739864 | 17:04 | 11/03/03 | 000090003 | 6005 | REDT |

4149 SOUTH MAPLE AVENUE, FRESNO, CA  93725

PAGE 1 OF 1

SHIPPER  TESORO REFINING & MARKETING

CONSIGNEE  129
TESORO REFNG
8700 TESORO DR.
SAN ANTONIO, TX 78217

SPOT 4N

| PRODUCT CODE | PRODUCT NAME | OCT. | TEMP. | GRAVITY | GROSS GALLONS | NET GALLONS |
|---|---|---|---|---|---|---|
| | GASOLINE 3, UN1203, P.G. II | | | | 8801 | 8740 |
| R 110 | REG CARBOB/5.7ETH W/AIO | 87.0 | 78 | 60.0 | | |
| 72 | REG CARBOB (BASE) | | | | 8299 | 8242 |
| 38 | ETH (BASE) | | | | 502 | 498 |

THIS GASOLINE CONTAINS DETERGENT ADDITIVE AS REQUIRED BY THIS SHIPPER'S
SPECIFICATIONS AS REQUIRED BY 40 CFR PART 80
THIS PRODUCT CONTAINS 5.7 VOL% ETHANOL
CONTAINS GREATER THAN 0.5 VOL% MTBE

REDTRIANGLE-SHE-000127