UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | : : : | Master File No. 1:00–1898 MDL 1358 (SAS) M 21-88 |
| | : : | |
| This document relates to: | : : | |
| *City of Fresno v. Chevron U.S.A., Inc., et al.,* Case No. 1:04-cv-04973 | : : : : | |

PLAINTIFF CITY OF FRESNO'S LOCAL RULE 56.1 STATEMENT OF MATERIAL
FACTS SUBMITTED IN OPPOSITION TO CERTAIN DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S NUISANCE

Pursuant to Local Rule 56.1, plaintiff City of Fresno (the "City") submits this statement

of rebuttal and additional material facts for which the City contends there is a genuine issue to be

tried in support of the City's opposition to certain defendants' motion for partial summary

judgment of the City's nuisance claims for six gasoline stations in the City of Fresno.

A.      RELEVANT PROCEDURAL HISTORY

1.      Admit.

2.      Deny that the First Amended Complaint was filed on October 28, 2004.  Admit

that Fresno filed a First Amended Complaint on November 18, 2004.  (O'Reilly Decl., Ex. 1

[First Amended Complaint].)

3.      The City cannot admit or deny the way it is phrased.  The City admits that the

Court directed the parties to meet and confer, but denies that the City was required to lay out its

entire legal and factual arguments supporting its nuisance claims by February 8, 2013.  It would,

1

in fact, have been impossible for the City to have set forth of its legal arguments and factual basis

in meet and confer due to the breadth of that information as well as the fact that defendants had

not clearly stated the basis on which they were moving for summary judgment.

4.      The City cannot admit or deny the way it is phrased.  The City admits that through

meet and confer it reached agreements with defendants concerning certain stations.  The City

again denies that it was required to lay out its entire legal and factual arguments supporting its

nuisance claims by February 8, 2013, and therefore denies that the letter "establish[es] what the

City is claiming" in its entirety.  It would, in fact, have been impossible for the City to have set

forth of its legal arguments and factual basis in meet and confer due to the breadth of that

information as well as the fact that defendants had not clearly stated the basis on which they were

moving for summary judgment.

5.      Admit.

**B.   VAN NESS AUTO – 2740 NORTH VAN NESS**

6.      Denied.  Chevron had a clear and direct "relationship" with Van Ness Auto even

though there may not have been written contract in place.  Chevron supplied gasoline directly to

this site from prior to the relevant time period until at least August 1986, thereby gaining direct

knowledge of the station's configuration as well as its operation.  (Defendants' Rule 56.1

Statement at ¶ 6.)  Subsequently, Chevron supplied gasoline to this station through a jobber

named R.V. Jensen who delivered gasoline refined by Chevron from 1986 until at least 2006.

(O'Reilly Decl., Ex. 3, Clements Depo. at 25-27; , Ex. 2, Bedirian Depo., at 37:11-19, 38:17-

39:10; Ex. 40, Chevron U.S.A. Inc.'s Supply Declaration of Frank G. Soler].)

Even after Chevron started supplying the station through a jobber, Chevron signs

continued to be displayed at the station. Upon the station operator's request, in fact, Chevron installed more Chevron signs at the station even after 1986. (O'Reilly Decl., Ex. 2, Bedirian Depo. at 41:3-8.)  Chevron personnel inspected the station.  (*Id.* at 41:9-10, 41:13-17.)  Chevron provided Material Safety Data Sheets to the Van Ness Auto which were intended to contain instructions concerning the safe handling of MTBE gasoline, including responding to spills.  (*Id.* at 65:11-12, 65:14-17, 66:2-7.)  Chevron personnel, more importantly, gave the station operator instructions on cleaning up gasoline releases, including a phone number to call in case of a gasoline spill.  (*Id.* at 65:11-12, 65:14-17, 66:2-7.)

As early as 1985, Chevron's Dealer Supply Contract required the station to "comply with Company's programs and procedures for handling unleaded gasolines in their present or future form," and mandated that "Company's representatives shall have the right at any time to enter upon the premises where unleaded gasolines purchased hereunder are stored by or for Dealer and to take such quantities of unleaded gasolines as they deem necessary to check the quality of such products."  (O'Reilly Decl., Ex. 3, Clements Depo. at 45:6-21, 46:10-47:10, 47:13-16, 48:8-10, and Ex. 7 thereto.)

The station operator testified that when he received notification from the government that the underground storage tanks had to be removed, he immediately complied because he "wanted to abide by the law" and he "took care of whatever it – need to be done." (O'Reilly Decl., Ex. 2, Bedirian Depo. at 14:23-15:4.)  The station operator further testified that he also complied with the requirement to have the USTs tested for leaks annually, and that he hired a third party to conduct the testing.  (*Id.* at 20:11-22, 28:25-29:5, 34:5-35:17.)  The station operator also testified that he hired a third-party to conduct inventory reconciliation, and that they utilized a "stick"

method of reconciliation. (*Id.* at 31:23-32:25, 33:13-25.) This testimony establishes that the owner and operator of the Van Ness Auto station routinely complied with safety instructions that were provided to him, and undertook safety precautions that were made known to him. The station operator, moreover, admitted that operating a gasoline station "was all new stuff" to him, and that he relied on third parties to assist him with testing and safety procedures. (*Id.* at 31:23-32:25, 34:5-35:17.)

In 1991, Chevron recognized that the introduction of MTBE into gasoline in California would substantially change the consequences of a gasoline spill or leak. (O'Reilly Decl., Ex. 4, Aug. 12, 1991, Memorandum, TIP Letter #237, MTBE Effects [CHEV 09564-09567].) The internal memo warns that while non-MTBE gasoline plumes are "relatively easy" to address, "MTBE on the other hand is a different situation." (*Id.,* at 1.) The memo warns that MTBE gasoline releases will result in "larger" plumes of contamination that "will migrate" faster. (*Ibid.*) Specifically, the memo warns Chevron management that "[w]hen MTBE gets into the water then the trouble really starts." (*Ibid.*) The memo concludes that:

> "Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE. The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run. **As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent.**"

(*Id.,* at 2.) Chevron unequivocally knew in 1991, before it became a supplier to the Van Ness Auto, that it was critical for California service stations to upgrade their gasoline storage and handling systems in order to prevent substantial MTBE contamination of groundwater. Chevron, however, failed to notify any of the owners or operators of the Van Ness Auto station, any of the

4

regulatory agencies overseeing the stations, or even any of the third parties performing safety

testing of the storage system at the station, of the need to implement additional safety precautions

and procedures to prevent releases of MTBE gasoline which would cause groundwater

contamination.

Chevron Materials Safety Data Sheets ("MSDSs") for MTBE gasoline, which were

provided to the Van Ness Auto station, do not contain any of the warnings or precautions called

out in the above memorandum.  In the 1993 MSDS, there is not one single mention of the need to

implement "spill containment manholes" to prevent releases of MTBE gasoline during deliveries

that could result in significant groundwater contamination.  (O'Reilly Decl., Ex. 5, Chevron

Material Safety Data Sheet (March 19, 1993) at ¶ 7.)

7.      Admit.  Chevron, however, provide signs, inspected the premises, and provided

instructions on how to handle MTBE gasoline. *See* Response to ¶ 6.

8.      Admit.

9.      Denied.  *See* Response to ¶ 6.

10.      Denied.  *See* Response to ¶ 6.

**C.      M&S TEXACO – 2619 S. EAST AVENUE**

11.      Denied.  The site became a Shell-branded station in 1998 and remained Shell-

branded until at least 2009.  (O'Reilly Decl., Ex.6, Shell Defendants' Responses to City of

Fresno's First Set of Interrogatories to Defendants, Ex. B, at 8; O'Reilly Decl., Ex. 7, Dhillon

Depo. at 29:20-23, 39:5-10, 39:19-21.)

Company representatives gave the station operator instructions, including a manual, for

cleaning up gasoline releases.  (O'Reilly Decl., Ex. 7, Dhillon Depo. at 27:4-11.)  While the

station was branded Shell, company representatives from Shell would visit the station. (*Id.* at

149:4-15.) When Mr. Dhillon became a branded station, he was provided training by Shell on

the safe operation of a gasoline station. (O"Reilly Decl., Ex. 7, Dhillon Depo. at 25:14-26:13.)

Company representatives also gave Mr. Dhillon a manual ("book") on how to operate the station,

including instructions for cleaning up gasoline releases. (*Id.*, at 26:8-27:11, 62:5-63:2].) While

the station was branded Shell, company representatives from Shell would visit the station. ((*Id.*,

at 149:4-15].) The only spill clean up instructions Mr. Dhillon could recall was the use of kitty

litter to absorb spills.(*Id.*, at 27:12-24, 63:3-24].) Mr. Dhillon, moreover, had only heard that

MTBE was in gasoline, he did not recall any specific instructions provide by Shell for the

handling of MTBE gasoline. (*Id.*, at 92:18-94:25.)

Mr. Dhillon confirmed that upgrades to the UST system were not implemented until

actually required by governmental regulation. (*Id.*, at 54:3-19.) He also confirmed that the

station did not change from the long inadequate stick method of inventory reconciliation until the

time when the tanks were replaced. (*Id.*, at 56:1-57:7].) Once the tanks were replaced, Shell

began to monitor the gasoline levels in the tanks at the station.(*Id.*, at 57:8-15.)

Manuals provided by Shell to its warnings expert that were published in the relevant time

period when Mr. Dhillon was operating have little to no information concerning additional safety

and handling procedures for MTBE gasoline. (O'Reilly Decl., Ex. 40, Dealer Management

Development Program.) Shell's MSDSs during the relevant time period similarly lacked

information concerning additional safety and handling instructions for MTBE gasoline.

(O'Reilly Decl., Ex. 41, Shell MSDS, at Oct. 7, 1994.)

       12.    Admit.

13.     Admit.  The City contends, however, that this fact is irrelevant.  *See* Response to ¶ 11.

14.     Admit.

15.     Denied.  *See* Response to ¶ 11.

16.     Admit.  The City contends, however, that this fact is irrelevant.  *See* Response to ¶ 11.

17.     Admit.  The City contends, however, that this fact is irrelevant.  *See* Response to ¶ 11.

18.     The City admits that Mr. Dhillon provided instructions to his employees, but Shell also provided training and instruction to Mr. Dhillon, and provided manuals and MSDSs that would have referred to by his employees.  *See* Response to ¶ 11.

19.     The City admits that Mr. Dhillon had maintenance responsibilities at the station, but denies that Mr. Dhillon was provided adequate instructions and information with which to carry out those responsibilities.  The City further denies this fact on the grounds that Shell provided training and manuals on how to maintain the station and how to respond to leaks and spills.  *See* Response to ¶ 11.

**D.     "EXXON" SERVICE STATION –4594 E. TULARE**

20.     Valero's Separate Statement of Facts concedes that the property and business were turned over to Ultramar (referred to as "Beacon") in approximately 1985 (Defs' Fact No. 23), and that Ultramar leased and operated the station from 1985 to 1995 (Defs' Fact No. 24). Valero thus had direct control and ownership over the station during the relevant time period, and would be directly liable for nuisance.

7

21.    Denied.  More than a year after the close of fact discovery in this matter, however, Valero now contends they do not have nuisance liability because they are not successors to Ultramar.  Eight years ago Ultramar admitted in a disclosure to the Court that VMSC took over and continued Ultramar's duties and obligations relating to MTBE activities.  (O'Reilly Decl., Ex. 36, Defendant Ultramar, Inc.'s Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005 (Oct. 17, 2005) at Response to 2B.)

Valero admits that its history can be traced back to Beacon Oil Company, which was acquired by and merged into Ultramar Inc. in 1989.  (Def.'s SSUF at ¶ 50.)  Ultramar then merged with Diamond Shamrock, Inc. to form Ultramar Diamond Shamrock Inc. in 1996.  (*Id.*) Ultramar Diamond Shamrock Corp. then merged with and into Valero Energy Corp. on December 31, 2001.  (*Id.*)  With each merger, the successor company assumed the liabilities of the merging entities.  (*Ray v. Alad Corp.* (1977) 19 Cal.2d 22, 28.)

Ultramar had engaged in wholesale/bulk marketing and/or selling gas with MTBE in California from 1994 to 2002.  (O'Reilly Decl., Ex. 40, Defendant Ultramar, Inc.'s Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005 (Oct. 17, 2005) at Response to 2A.)  At the time when Ultramar Diamond Shamrock merged with and into Valero Energy Corp., VMSC then took over and continued Ultramar's MTBE activities.  (*Ibid.* at 2B)  In 2005, Ultramar disclosed to the Court:

> "Ultramar ceased the above-described wholesale/bulk and/or
> selling activity on or about July 1, 2002, when this activity was
> undertaken by Valero Marketing and Supply Company ("VMSC"),
> an indirectly held subsidiary."

(*Id.*)  Even if Ultramar became a subsidiary of Valero Energy, Valero treated Ultramar as an asset

by transferring its operations to various other Valero entities, such as VMSC. Ultramar, moreover, declined to fully disclose any transfer or shift in liability until specific stations were identified by plaintiffs. (O'Reilly Decl., Ex. 40, Defendant Ultramar, Inc.'s Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005 (Oct. 17, 2005) at Response to 2B.) Nonetheless, the City's First Amended Complaint asserts that all defendants, including Ultramar and Valero, acted as "successor[s]-in-interest" to each other. (O'Reilly Decl., Ex. 1, First Amended Complaint at ¶ 25.)

When Ultramar was making the decision to use MTBE as an oxygenate, no consideration was given to the underground storage tanks as retail facilities. (O'Reilly Decl., Ex. 8, Masticelli Depo. (July 26, 2000) at pp. 40:4-8, *South Tahoe*.) Furthermore, Ultramar had no program which required independent gasoline dealers which purchased gasoline from Ultramar to certify that their tanks were not leaking prior to a purchase of Ultramar gasoline. (*Id.* at pp. 46:2-7.) Ultramar made no effort to determine the environmental impacts of MTBE as an additive for gasoline. For example, Ultramar made no attempt to contact anybody at Shell to discuss its experience with the use of MTBE in gasoline. (*Id.* at p. 50:3-12.) Ultramar engaged in no independent research regarding the environmental fate of MTBE before it decided to use it as an oxygenate in gasoline. (*Id.* at pp. 50:18-25.) The Vice President of Ultramar recalled no discussions regarding the effects of MTBE in groundwater when Ultramar elected to use MTBE in gasoline. (*Id.* at p. 52:15-25, p. 53:1-10.)

22.   Denied. *See* Response to ¶ 21.

23.   Admit.

24.   Admit.

25.    Admit. The City contends, however, that this fact is irrelevant.

26.    Admit. The City contends, however, that this fact is irrelevant.

27.    Admit. The City contends, however, that this fact is irrelevant.

28.    Denied. *See* Response to ¶ 21.

**E.    VALLEY GAS – 2139 SOUTH ELM**

29.    Valero admits that Ultramar owned the station until October 29, 1991. (Defs'
Fact No. 29.) After the site was purchased from Ultramar, Beacon and Ultramar gasoline were
delivered to the station. (O'Reilly Decl., Ex. 10, Ahmad Depo., at 139:9-11.) Mr. Imtiaz Ahmad
testified there was a brand distribution marketing agreement between Petro Group II and Beacon
that prohibited him or Petro Group from buying gasoline from anyone other than Ultramar. (*Id.*
at 139:13-25, 140:7-8.) The brand name agreement ceased in 1995. (*Id.* at 140:7-15.)

Ultramar failed to upgrade the old single wall steel tank system before transferring the
station to the new owners in 1991. (*Id.* at 31:12-32:8.) Mr. Ahmad testified that he received
training from Ultramar on how to operate the station when he bought it from them. (*Id.* at 33:18-
34:14.) He was only told to utilize kitty litter to clean up spills, and then dump dirty litter and
rags into a drum. (*Id.* at 33:25-35:11.) Mr. Ahmad was aware that MTBE was being added to
gasoline, but was never told that it had to be stored or handled differently than gasoline without
MTBE. (*Id.* at 110:1-111:1.) The City further incorporates Response to ¶ 21.

30.    Denied. *See* Response to ¶ 21.

**F.    BEACON #3519 – 4951 E. BELMONT AVE.**

31.    Valero concedes that the station was leased by Beacon/Ultramar from March 1,
1971, until October 20, 1999. (Defs' Fact No. 31.) After October 20, 1999, Ultramar assigned

10

its rights in the lease to another party, but retained a remediation agreement. (Defs' Fact No. 31.) Valero had a retail supply contract with this site, identified as Beacon #4984, from October 20, 1999, to the date of the responses. (O'Reilly Decl., Ex. 11, Responses to First Set of Interrogatories, at Response to Interrogatory No. 4.) Valero thus had direct control and ownership over the station during a significant portion of the relevant time period, and would be directly liable for nuisance, and also had a supply relationship with the station for the rest of the relevant time period. The City contends, as outlined in ¶ 21 above, that Valero would still have nuisance liability during the time period when Valero had a supply agreement with this station.

32.    Admit. The City contends, however, that this fact is irrelevant because Valero continued to have a relationship with the station that continued after the sale.

33.    Denied. *See* Response to ¶ 21.

**G.    BEACON-ARCO #615, 1625 CHESTNUT AVE.**

34.    Valero's Separate Statement of Facts admits that on November 29, 1984, well before the introduction of MTBE into California gasoline, Martinoil, which owned the station franchise, sold and assigned its right, obligations, and interests under the Franchise Agreement to Beacon. (Defs' Fact No. 34.) Valero thus had direct control and ownership over the station during a significant portion of the relevant time period, and would be directly liable for nuisance.

35.    Denied. *See* Response to ¶ 21.

<u>**ADDITIONAL FACTS**</u>

36.    The City's expert concerning underground storage tanks, Marcel Moreau, has decades of experience concerning this issue, and provided a detailed history of defendants' knowledge concerning the problems of storing and handling MTBE gasoline at service stations.

11

(O'Reilly Decl., Ex. 9, Expert Report of Marcel Moreau (Nov. 2, 2011) at pp. 1-4 and pp. III-11 to III-25.)

37.     California refiners, particularly Chevron's Northern California refinery, started adding MTBE to gasoline in 1986, and continued to utilize MTBE until the early 2000s when it was banned.  (O'Reilly Decl., Ex. 12, May 4, 2000, Blagojevic Decl., *South Tahoe*.)

38.     After supervising remediation of MTBE releases at Shell gasoline stations across the country for nearly twenty years, Curtis Stanley, an engineer and hydrogeologist at Shell, described MTBE as the "biggest environmental" issue facing United States oil companies. (O'Reilly Decl., Ex. 13, May 13, 1998, Email from C. Stanley to C. Parkinson; Ex. 14,Stanley Depo. (May 6, 1999) at 5:16-7:5.)

39.     In 1981, Ben Thomas of Shell reported to an American Petroleum Institute ("API") committee that "approximately 20 percent of all underground storage tanks leak, leading to the possibility of groundwater contamination.  (O'Reilly Decl., Ex. 15, March 31, 1981, Internal Arco Memo from R.N. Roth to MTBE File; Ex. 16, Thomas Depo. (Nov. 15, 2000) at 89:17-90:9, *South Tahoe*].)

40.     Chevron and Shell were long standing members of API.  (O'Reilly Decl., Ex. 17, Oct. 17, 2005, Letter from W. Hughes to R. Greenwald at 1; Ex. 18, Oct. 17, 2005, Letter from P. Condron to R. Greenwald at 1.)  Ultramar, Valero's wholly owned subsidiary, was a member of API from approximately 1989 to 1993.  (O'Reilly Decl., Ex. 19, Sept. 15, 2005, Letter from T. Renfroe to R. Greenwald.)

41.     Just a few years later, in 1984, API had already formed an Methyl-tertiary-Butyl Ether Task Force ("MTBE Task Force") which held meetings concerning "emerging issue[s] of

MtBE in ground water." (O'Reilly Decl., Ex. 20, June 18, 1984, Memo from S. Cragg, API, to

MTBE Task Force.) The minutes of a June 1984 meeting state:

> "Some of the task force members indicated that MTBE had been found in ground
> water near leaking underground storage tanks from their service stations . . . It
> appears that the oxygenate components of gasoline, such as MTBE, migrate most
> rapidly underground . . ."

(*Ibid.*)

42.     Another memo reporting on the June 1984 API meeting also confirmed that

gasoline manufacturers were aware that "MTBE is a possible contaminant of groundwater,

especially in association with leaking gasoline storage tanks." (O'Reilly Decl., Ex. 21, June 14,

1984, Arco Chemical Company Internal Correspondence from B. Hoover to S. Ridlon at 1.)

43.     In 1986, Dr. Peter Garrett, Marcel Moreau, and Jerry B. Lowry of the Maine

Department of Environmental Protection drafted a paper entitled "Methyl tertiary Butyl Ether as

a Ground Water Contaminant" (the "Maine Paper") which was intended to be presented at an

API sponsored conference. (O'Reilly Decl., Ex. 22, at Cover and Table of Contents.) The Maine

Paper detailed multiple problems with releases of MTBE gasoline from service stations,

including:

(1) MTBE is more soluble in water and thus "spreads both further and faster than the

gasoline"

(2) "Groundwater contaminated with MTBE is difficult to remediate;"

(3) MTBE will migrate out beyond gasoline and appear as a "halo" around the gasoline

groundwater plume;

(4) relatively small spills of MTBE gasoline ("a small driveway spill") can result in

"large" plumes of MTBE only groundwater contamination.

(*Ibid..)* The authors of the Maine Paper recommended that either MTBE be removed from gasoline or that several changes be made to USTs before MTBE gasoline is stored in them.  (*Id.,* at 236-237.)

44.     Valero admitted that its employees were aware of the Maine Paper at the time of its publication.  (O'Reilly Decl., Ex. 23, Valero Corporate Representative Deposition, Early Knowledge and Taste & Odor at Early Knowledge Issues, ¶ 3(a).) ) Joel Masticelli, a member of Ultramar's upper management, testified that Ultramar received information on the environmental fate of MTBE gasoline from the API, the WSPA, and NPRA. (O'Reilly Decl., Ex. 8, Masticelli Depo. (July 26, 2000) at pp. 20-21, *South Tahoe.*)

45.     In June 1986, in a memo entitled "Marketing Environmental Concerns Regarding the the Use of MTBE in MOGAS, D.W. Callahan, a Chevron employee, also noted that MTBE had "several disturbing properties."  (O'Reilly Decl., Ex. 24, June 11, 1986, Memorandum, from O.T. Buffalow, San Francisco, CA, to D.W. Callahan, re Marketing Environmental Concerning Regarding the use of MTBE in MOGAS at 1.) These "disturbing" properties included the high solubility and mobility of MTBE as compared to the regular components of gasoline.  (*Ibid.*) Mr. Callahan specifically warned that "MTBE utilization could increase the costs to clean up leaks at service stations . . .(*Ibid.*)

46.     In December 1986, Chevron personnel circulated an article published in a oil industry trade publication reporting on significant MTBE groundwater contamination problems, highlighting, in particular, the Maine Paper and its call for changes to USTs at gasoline stations. (O'Reilly Decl., Ex. 33, Dec. 30, 1986, Memorandum re MTBE].)

47.     At the time Ultramar commenced distributing MTBE gasoline to its service

stations in California , approximately 30-40 percent of its underground storage tanks had not yet

been upgraded.  (O'Reilly Decl., Ex. 8, Masticelli Depo.  (July 26, 2000) at pp. 40:9-25, 41:1-23,

*South Tahoe.*)

48.     Ultramar's June 30, 1994 Material Safety Data Sheet ("MSDS") regarding MTBE

gasoline, for example, states as follows:

(1) under release measures, it contains no warnings regarding the unique capabilities of

MTBE to contaminate a far greater amount than non-MTBE gasoline,

(2) it recommends using water to be sprayed on spills to reduce vapors which would

cause the MTBE gasoline residue to be washed into the ground or adjacent sewers,

(3) for larger spills it merely recommends diking the spill "for later disposal",

(4) contains no requirements for special handling of MTBE gasoline (section 7),

(5) under physical and chemical properties, it states that the odor threshold is .25 parts per

million, when in fact odors associated with MTBE in drinking water have been detected as low

as 4 to 5 parts per <u>billion</u>.  Additionally, Ultramar's Material Safety Data Sheets state that there is

"no data available" regarding the "degradability" of MTBE.  In fact, there is substantial evidence

that MTBE is very resistant to biodegradation.  (O'Reilly Decl., Ex. 39, June 30, 1994 Ultramar

Material Safety Data Sheet.)

49.     When Ultramar first introduced MTBE into gasoline in California, it made no

effort to provide a warning with the gasoline unless it was ordered to do so by the Government.

(O'Reilly Decl., Ex. 8, Masticelli Depo. (July 26, 2000) at pp. 51:22-25, 52:1-11, *South Tahoe*].)

50.     In 1991, Chevron recognized that the introduction of MTBE into gasoline in

California would substantially change the consequences of a gasoline spill or leak.  (O'Reilly Decl., Ex. 4, Aug. 12, 1991, Memorandum, TIP Letter #237, MTBE Effects.)  The internal memo warns that while non-MTBE gasoline plumes are "relatively easy" to address, "MTBE on the other hand is a different situation." (*Id.* at 1.) The memo warns that MTBE gasoline releases will result in "larger" plumes of contamination that "will migrate" faster.  (*Id.*)  Specifically, the memo warns Chevron management that "[w]hen MTBE gets into the water then the trouble really starts." (*Id.*)  The memo concludes that:

> "Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE.  The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run.  **As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent.**"

(*Id.* at 2.)

51.     Another 1991 Memorandum by Chevron notes multiple additional safety precautions and amended handling instructions need to be provided when MTBE gasoline is being stored and distributed, including at service stations.  The additional precautions and handling instructions identified by Chevron included: (1) "Spills or leaks of MTBE must be contained and prevented from contacting the ground or entering the waste water drainage system," (2) "Tanks containing MTBE should have double bottoms and leak detections systems," (3) "Provide proper facilities for shutdowns and tank cleaning to prevent any MTBE from being spilled or washing into the drainage system." (O'Reilly Decl., Ex. 34, March 26, 1991, Memorandum, Chemical Entry Review for MTBE.)

52.     In 1993, in discussing the increased problem of MTBE groundwater

contamination from service station releases, Curtis Stanley wrote to one of his colleagues: "We need to convince management to implement dual containment NOW!" (O'Reilly Decl., Ex. 25, July 14, 1993, Email from C. Stanley to D. McGill [emphasis in original].)

53.     In the mid-1990s, Chevron also acknowledged that MTBE was driving factor to implement upgrades to USTs and improve instructions on storage and handling practices at service stations:

> "The USGS report points out that gasoline blended with MTBE may pose a greater risk to drinking water than non-oxygenated gasoline . . . . These concerns are not new, as Marketing raised the same issue ten years ago in connection with the Tank Integrity Program. . . .
> Marketing believes that MTBE in groundwater issue is just one more additional justification for the large Marketing capital investments in avoid terminal and service station leaks and spills."

(O'Reilly Decl., Ex. 35, April 27, 1995, Memo re MTBE in Ground Water Issue.)

54.     In the late 1990s, Shell's environmental personnel were also looking at "MTBE Contamination" and "MTBE in Groundwater" issues.  Curtis Stanley, one of Shell's key environmental personnel, concluded that, based on "research . . . extremely small releases can cause groundwater problems." (O'Reilly Decl., Ex. 26, May 14, 1998, Email from C. Stanley to K. Bell, et al.)

55.     Stanley later advised that "[v]ery small releases of MTBE (even small overfills seeping into cracks in the pavement) have the potential to adversely impact groundwater." (O'Reilly Decl., Ex. 27, Nov. 3, 1998, Email from C. Stanley to J. Pedley.)  Mr. Stanley further stated that "[m]y professional opinion is that MTBE . . . should not be used at all in areas where groundwater is a potential drinking water supply." (*Id.*)

56.     In the late 1990s, Exxon undertook a "study" to identify sources of potential

releases from gasoline stations "because MTBE contamination is increasingly being found in surface and ground waters near gasoline stations, and has been identified as a potential threat to public drinking water supply systems." (O'Reilly Decl., Ex. 28, March 30, 1999, MTBE Release Source Identification at Marketing Sites, at 2].) The study noted that "[t]he presence of MTBE found in surface, ground and drinking waters has been increasing [and] . . . [t]here are several reasons why increased MTBE presence can be concern." (*Id* at 2.) Exxon's study specifically concluded that "[s]mall leaks of gasoline (**1 teaspoon**) can translate into MTBE ground water concentrations above the taste and odor detectable threshold levels." (*Id.* [emphasis added].) In fact, the Exxon study included a graphic representation of the potential impact of "small releases" of MTBE on groundwater. (*Id.* at Figure I-1: Impact of Small Releases.)

57.     Similarly, in the late 1990s, Curtis Stanley of Shell also pointed out that "[v]ery small releases of MTBE . . . have the potential to adversely impact groundwater." (O'Reilly Decl., Ex. 27, Nov. 3, 1998, Email from C. Stanley to J. Pedley at ¶ 1].) Mr. Stanley further candidly admitted that MTBE gasoline should not be sold on an indiscriminate basis to gasoline stations where there is inadequate protection from spills, leaks and releases:

> My professional is opinion is MTBE and similar oxygenate should not be used at all in areas where groundwater is a potential drinking water supply. If it is used, engineering design and site operations (including act of subsurface monitoring) should be carefully developed to minimize the potential for release.

(*Ibid.*)

58.     In 1999, Chevron's personnel put together a "White Paper" on MTBE intended to address questions about stricter regulation of underground storage tanks. (O'Reilly Decl., Ex. 43, Solving Problems from MTBE Contamination - It's Not Just Regulating Underground Tanks.)

Chevron's White Paper specifically observed that [i]t is because of the differences in physical and chemical properties of MTBE that it is more likely to reach groundwater [at service stations], as a result of incidental spills, overfills and gasoline deliveries, even without underground storage tank leaks." (*Id.* at 2 [emphasis in original].)  Chevron thus also recognized that even small "incidental" spills and releases, caused by individual handling gasoline at the station, had the capacity to reach and contaminate groundwater.  More importantly, these types of leaks are only preventable through appropriate education and instruction of the individuals handling the gasoline.

59.    In 1999, Curtis Stanley also observed that MTBE releases capable of causing groundwater contamination arose not from the USTs themselves, but from improper handling practices at gasoline stations by owners, operators, and jobbers:

> "You may, however, want to carefully consider what you say when the new tank upgrades are our first line of defense.  While this is very true and the size of leaks has decreased substantially over the years, we are still finding MTBE at sites that have been upgraded.  The presence of MTBE may not be due to a leak but could also be due to operational and construction factors."

(O'Reilly Decl., Ex. 29, Feb. 2, 1999, Email from C. Stanley to F. Benton].)

60.    Shell's engineering coordinator, Glen Marshall, echoed the caution that releases of MTBE gasoline at service stations was dependent on improved and alternative instructions as well as upgrades of the entire UST system.  In 1998, Mr. Marshall warned that the "'Achilles Heel'" of [UST] systems has always been the 'Bubba-factor' . . . the best intentions of hardware manufacturers and designers being ultimately defeated by poor installation and maintenance practices."  (O'Reilly Decl., Ex. 37, May 29, 1998, Email from G. Marshall to C. Stanley.)  The maintenance practices Mr. Marshall is referring to are clearly the maintenance practices of

19

service station owners and operators.  A year later, Mr. Marshall continued to advised that

"[u]pgrades addressed the inadvertent spills and releases, no root causes of tank or line leaks."

(O'Reilly Decl., Ex. 42, March 12, 1999, Email from G. Marshall to c. Stanley.)

61.     The City's expert on underground storage tanks ("USTs"), Marcel Moreau, noted

that defendants upgraded their gasoline storage systems, including upgrading from bare steel

USTs to fiberglass, at their own gasoline stations in an effort to address the increased risks posed

by MTBE.  (O'Reilly Decl., Ex. 30, Expert Rebuttal Report of Marcel Moreau (March 5, 2012)

at 11 and fn 35].)  Defendants were, in fact, aware of numerous upgrades to USTs, safety

devices, warning systems, and alternative and improved instructions to service station owners

and operators as well as jobbers who delivered gasoline, that were necessary to prevent releases

of MTBE gasoline which would contaminate groundwater in Fresno.  (*Ibid.*)

62.     The Fresno gasoline stations at issue in this motion, unaware of the need for

fiberglass tanks or other upgrades, continued to utilize inadequate bare steel UST systems "well

past the time when MtBE was prevalent in California gasoline."   (*Id.,* at 11, and fn 36].)  The

evidence shows that many, if not all, of the station owners and operators associated with stations

at issue were unsophisticated, and relied upon others, including defendants, to instruct them on

how to safely and properly operate and maintain their USTs and gasoline.  (*Ibid.*)

63.     The California regulatory authorities responsible for oversight of releases from

underground storage tanks were not advised by the oil industry until the late 1990s that MTBE

poses a serious threat to groundwater and drinking water in the State of California.  (O'Reilly

Decl., Ex. 31, June 25, 1996, Letter from P. Pugnale, Shell Oil Company, to R. Ghirelli,

California Regional Water Quality Control Board; and Ex. 32, Letter from C Flanikan, Ultramar

to California Environmental Protection Agency.)

Respectfully submitted,

Dated: April 12, 2013

**MILLER, AXLINE & SAWYER**
A Professional Corporation

By: _____

TRACEY L. O'REILLY
Attorneys for plaintiff City of Fresno
MILLER, AXLINE & SAWYER
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688