UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | Master File No. 1:00–1898 |
| IN RE:  METHYL TERTIARY BUTYL | : | MDL 1358 (SAS) |
| ETHER ("MTBE") PRODUCTS | : | M 21-88 |
| LIABILITY LITIGATION | : | |
| | : | |
| | : | |
| This document relates to: | : | |
| | : | |
| *City of Fresno v. Chevron U.S.A., Inc.,* | : | |
| *et al.,* | | |
| Case No. 1:04-cv-04973 | : | |
| | : | |

DECLARATION OF MICHAEL D. AXLINE IN SUPPORT OF PLAINTIFF CITY OF
FRESNO'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
FOR LACK OF EVIDENCE PERTAINING TO CAUSATION
(EXHIBITS 12-16)

1

## DECLARATION OF MICHAEL D. AXLINE

I, Michael D. Axline, declare:

1.　　I am an attorney admitted to practice law in the State of California, and I am associated with the law firm of Miller, Axline & Sawyer, attorneys for plaintiff City of Fresno in this action.

2.　　All of the exhibits attached hereto are documents are drawn from the litigation files kept in the ordinary course of business at Miller, Axline & Sawyer, and were copied either by me or by someone working directly under my supervision.

3.　　Attached as Exhibit 1 is a true and correct duplicate copy of the First Amended Complaint in this Action, filed on November 18, 2004.

4.　　Attached as Exhibit 2 is a true and correct duplicate copy of the letter from Mike Axline and Evan Eickmeyer to Jeffrey Parker, dated February 8, 2012.

5.　　Attached as Exhibit 3 is a true and correct duplicate copy of the letter from Mike Axline and Evan Eickmeyer to Brian Ledger, dated March 6, 2013.

6.　　Attached as Exhibit 4 is a true and correct duplicate copy of Defendant Ultramar, Inc.'s Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005.

7.　　Attached as Exhibit 5 is a true and correct duplicate copy of excerpts from the transcript of the August 10, 2011 deposition of Gary Beacom.

8.　　Attached as Exhibit 6 is a true and correct duplicate copy of excerpts from the Valero Defendants' Objections and Responses to Plaintiff City of Fresno's First Set of

Interrogatories to Defendants.

9. Attached as Exhibit 7 is a true and correct duplicate copy of Chevron U.S.A. Inc.'s Supply Declaration of Frank G. Soler and exhibits thereto, dated April 18, 2011.

10. Attached as Exhibit 8 is a true and correct duplicate copy of Defendant Union Oil Company of California's Declaration of Grace N. Chan in Response to CMO #75, dated April 11, 2011.

11. Attached as Exhibit 9 is a true and correct duplicate copy of the Further Response of Defendant Chevron U.S.A Inc. To Plaintiffs' Preliminary Set of Interrogatories re: Defendant Identification, dated August 30, 2004.

12. Attached as Exhibit 10 is a true and correct duplicate copy of the Valero Defendants' Answers and Objections to Plaintiffs' Preliminary Set of Interrogatories re: Defendant Identification, dated August 30, 2004.

13. Attached as Exhibit 11 is a true and correct duplicate copy of excerpts from the transcript of the March 16, 2011 deposition of James Shehadey and Exhibit 5 attached thereto.

14. Attached as Exhibit 12 is a true and correct duplicate copy of excerpts from Marcel Moreau's Expert Report, dated November 2, 2011.

15. Attached as Exhibit 13 is a true and correct duplicate copy of an excerpt from the transcript of the June 4, 2012 deposition of Sam Williams.

16. Attached as Exhibit 14 is a true and correct duplicate copy of excerpts from the transcript of the February 16, 2011 deposition of Imtiaz Ahmad.

17. Attached as Exhibit 15 is a true and correct duplicate copy of Defendant Exxon Mobil Corporation's Responses and Objections to Plaintiffs' Preliminary Set of Interrogatories

Regarding Defendant Identification, dated August 30, 2004.

18.    Attached as Exhibit 16 is a true and correct duplicate copy of excerpts from the transcript of the January 11, 2013 Status Conference before Honorable Shira A. Scheindlin.

19.    Attached as Exhibit 17 is a true and correct duplicate copy of the transcript of the May 10, 2001 deposition of Dickman Lum in the *South Tahoe Public Utility District v. Atlantic Richfield Co.* case.

20.    Attached as Exhibit 18 is a true and correct duplicate copy of excerpts from the transcript of the June 8, 1999 deposition of Elwanda Kovich in the *South Tahoe Public Utility District v. Atlantic Richfield Co.* case.

21.    Attached as Exhibit 19 is a true and correct duplicate copy of excerpts from Marcel Moreau's Site Specific Report, dated November 2, 2011.

22.    Attached as Exhibit 20 is a true and correct duplicate copy of Union Oil Company of California's Amendment to Its Supply Declaration with Declaration attached, dated August 9, 2012.

23.    Attached as Exhibit 21 is a true and correct duplicate copy of Union Oil Company of California's Supplemental and Amended Response to Plaintiff City of Fresno's First Set of Interrogatories, dated August 12, 2011.

24.    Attached as Exhibit 22 is a true and correct duplicate copy of excerpts from the transcript of the March 18, 2011 deposition of Gail Blue.

25.    Attached as Exhibit 23 is a true and correct duplicate copy of excerpts from the transcript of the March 17, 2011 deposition of Glen R. Blue.

26.     Attached as Exhibit 24 is a true and correct duplicate copy of excerpts from the transcript of the March 16, 2011 deposition of Narinder Singh.

27.     Attached as Exhibit 25 is a true and correct duplicate copy of excerpts from Defendant Exxon Mobil Corporation's Responses to Plaintiff City of Fresno's First Set of Interrogatories.

28.     Attached as Exhibit 26 is a true and correct duplicate copy of excerpts from the transcript of the March 29, 2011 deposition of James Clements.

29.     Attached as Exhibit 27 is a true and correct duplicate copy of excerpts form the transcript of the April 4, 2011 deposition of Garabed Bedirian.

30.     Attached as Exhibit 28 is a true and correct duplicate copy of excerpts from the February 16, 2011 deposition of Shirley McMurphy Ahmad.

31.     Attached as Exhibit 29 is a true and correct duplicate copy of Exhibit B from the Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants.

32.     Attached as Exhibit 30 is a true and correct duplicate copy of excerpts from the transcript of the February 9, 2011 deposition of Joel Hohenshelt.

33.     Attached as Exhibit 31 is a true and correct duplicate copy of excerpts from the transcript of the August 11, 2011 deposition of Jatinder Paul Dhillon.

34.     Attached as Exhibit 32 is a true and correct duplicate copy of excerpts from the transcript of the August 17, 2011 deposition of Bryan Leonard Moe.

35.     Attached as Exhibit 33 is a true and correct duplicate copy of excerpts from the transcript of the August 17, 2011 deposition of Thomas K. Baughs and exhibits attached thereto.

36.     Attached as Exhibit 34 is a true and correct duplicate copy of excerpts from the

transcript of the August 9, 2011 deposition of David Benjamin.

37.    Attached as Exhibit 35 is a true and correct duplicate copy of excerpts from the transcript of the August 11, 2011 deposition of Ellis (Ike) Pursell.

38.    Attached as Exhibit 36 is a true and correct duplicate copy of the Declaration of the Valero Defendants in Anticipation of 30(b)(6) Deposition, dated _.

39.    Attached as Exhibit 37 is a true and correct duplicate copy of excerpts from the transcript of the July 27, 2011 deposition of Baldev Singh Sandhu.

40.    Attached as Exhibit 38 is a true and correct duplicate copy of Defendant Exxon Mobil Corporation's Supplemental Response to Plaintiff City of Fresno's First Set of Interrogatories, dated August 30, 2011.

41.    Attached as Exhibit 39 is a true and correct duplicate copy of The Shell Defendants' Responses to Plaintiff's First Set of Interrogatories, dated August 30, 2004.

42.    Attached as Exhibit 40 is a true and correct duplicate copy of excerpts from the transcript of the July 29, 1999 deposition of Mary F. Morgan.

43.    Attached as Exhibit 41 is a true and correct duplicate copy of excerpts from the transcript of the July 1, 1999 deposition of Kelly J. Hammar.

44.    Attached as Exhibit 42 is a true and correct duplicate copy of excerpts from the transcript of the September 22, 2000 deposition of Thomas Hooks.

45.    Attached as Exhibit 43 is a true and correct duplicate copy of excerpts from the transcript of the July 22, 1999 deposition of Bob Simonson.

46.    Attached as Exhibit 44 is a true and correct duplicate copy of excerpts from the transcript of the January 12, 2001 deposition of Dixon B. Smith.

47.     Attached as Exhibit 45 is a true and correct duplicate copy of Valero Corporate

Representative Depositon - Early Knowledge and Taste & Odor.

48.     Attached as Exhibit 46 is a true and correct duplicate copy of selected Bills of

Lading and Highway Receipts provided by Red Triangle.


I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct.


                                        Respectfully submitted,

DATED: April 12, 2013                   **MILLER, AXLINE & SAWYER**
                                        A Professional Corporation

                                        By: *Michael Axline*
                                             MICHAEL D. AXLINE
                                             Attorneys for Plaintiff


                                        MILLER, AXLINE & SAWYER
                                        A Professional Corporation
                                        1050 Fulton Avenue, Suite 100
                                        Sacramento, CA 95825-4225
                                        Telephone: (916) 488-6688

# EXHIBIT 12

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

In Re: Methyl Tertiary Butyl Ether ("MTBE")        Master File No. 1:00-1898
Products Liability Litigation                       MDL 1358 (SAS)

                                                    M21-88

_____

**This Document Relates to:**

*City of Fresno v. Chevron U.S.A Inc.., et al.*
*No. 04 Civ. 04973 (SAS)*

_____

**Expert Report of Marcel Moreau**

Marcel Moreau Associates

Portland, Maine

_Marcel Moreau_                                     November 2, 2011

automobiles with onboard refueling vapor-recovery (ORVR) systems means that relatively fresh air rather than air saturated with gasoline vapors is returned to the storage tank when these vehicles are refueled. This relatively fresh air tends to increase in volume when it becomes saturated with gasoline vapors inside the storage tank. In conjunction with the pressure-vacuum vent valves that are typically installed on these systems, both of these factors contribute to the build-up of pressure inside the storage tank. This slight pressure inside the tank is sufficient to maintain a continuous flow of vapors out of any leaks in the vapor recovery piping, the vent piping, or any of the fittings along the top of the tank. Studies in California have shown that this type of "vapor" leak is common in UST systems, both single- and double-walled.[26] Observations in New Hampshire and Vermont indicate that vapor leaks are also common in New England.[27] When MtBE is present in the gasoline, even these small vapor leaks can release significant quantities of MtBE to the environment.[28]

## Summary

There are many mechanisms and many pathways by which fuel can be released into the environment from UST systems. Typical leak rates vary greatly among these mechanisms from gallons per minute for pressurized piping, to gallons per day for corrosion holes in tanks, to gallons per year for vapor leaks from Stage II vapor-recovery systems. Most of these mechanisms and pathways have been familiar to the petroleum marketing industry for many decades (see Section III). Because of MtBE's unique properties, leaks of any size, even relatively small vapor leaks, can result in significant contamination of the underground environment (see Section IV).

---

[26] *Underground Storage System Field-Based Research Project Report*, Thomas M. Young, Ph.D, Department of Civil & Environmental Engineering, University of California, Davis, May 31, 2002.
[27] "Tracking Troubling Vapor Releases in New Hampshire," Gary Lynn, *L.U.S.T.Line* Bulletin #47, June 2004.
[28] *Investigation of MtBE Occurrence Associated with Operating UST Systems*, Levine Fricke, July 1999.

system that was going to have problems is still going to have problems. Upgrades addressed inadvertent spills and releases, not root causes of tank or line leaks."[148]

**Summary**

Leaks from UST systems have long been recognized by petroleum marketers and were considered "inevitable."[149] In 1980, at the time when MtBE began to be blended into gasoline, the petroleum industry was acutely aware of the decrepit nature of the nation's population of UST systems. Any company that owned substantial numbers of underground petroleum storage systems in the latter part of the twentieth century knew or should have known that these storage systems were common sources of groundwater contamination.

Recognizing this problem, trade press and internal company documents show that major oil companies undertook expensive UST system upgrading programs in the 1980s. It was well known in the industry, however, that many other storage tank owners put off upgrading their storage systems until the late 1990s. Most of these station owners were not aware of the MtBE problem (see Section IV) and the hazards posed by even small gasoline releases from their storage systems. Thus, in the time frame when MtBE was prevalent in the nation's gasoline supply, the nation's UST population was poorly suited to contain it.

---

[148] "Draft Agenda; Roster; Info Items," internal Shell e-mail from G. Marshall to C. Stanley, March 12, 1999.
[149] "Tank Leaks: Like the Common Cold, Nobody's Found a Cure," *NPN*, January 1979.

# SUMMARY

## Summary Listing of Opinions Contained in this Report

- The petroleum industry was very well aware that large numbers of UST systems were leaking or at risk of leaking when they introduced MtBE as an gasoline octane enhancer in 1979 and as an oxygenate in the 1990s.   Throughout the 1980s and 1990s, a time when the quantity of MtBE produced placed it among the top organic chemicals in the country, UST systems continued to leak huge quantities of gasoline blended with MtBE into the ground.  Despite this knowledge, oil refiners chose to make MtBE a major constituent of their gasoline.

- The health of the nation's UST systems improved gradually in the 1980s and 1990s, but a significant percentage of tank owners put off making the required improvements to their storage systems until the eve of the December 1998 regulatory deadline.  This procrastination was common knowledge within the petroleum marketing industry, yet the industry issued no warnings to tank owners concerning the increased potential for gasoline blended with MtBE that was being delivered into storage systems that lacked corrosion protection, spill containment, and overfill prevention to cause groundwater contamination.

- MtBE leaks continued to plague the industry, even from "state-of-the-art" storage systems.  Because of the very small quantities of MtBE required to cause measurable and persistent contamination, even secondarily contained storage systems were frequently unable to adequately contain MtBE gasoline.  In addition, routine spills during operation and maintenance of UST systems contributed to MtBE releases to the environment.

- Commonly used leak detection technologies such as inventory control and automatic tank gauging were woefully inadequate in detecting MtBE releases. Even the most accurate leak detection technologies could only detect leaks of a

few gallons per day at best, while MtBE required leak detection accuracy on the order of a few gallons per year.

- The solubility, slow biodegradation rate, and low odor and taste thresholds of MtBE distinguished this chemical from the hundreds of other constituents of gasoline.   This uniqueness is evident in contamination plumes where MtBE is virtually the only chemical present or in plumes where there is an MtBE-only halo around the main body of the plume. Despite knowledge of these unique properties and the unique hazards they posed to groundwater quality, MtBE producers and distributors took no steps to warn the petroleum distributors, marketers, and users of their products of the special handling required for fuels containing MtBE.

- MtBE releases occurred from UST systems regardless of the sophistication of the owner or operator.  This is because the "state-of-the-art" in storage system technology and the "standard-of-care" implemented by petroleum handlers and end-users were not sufficient to adequately contain MtBE.   The lax standard-of-care was prevalent from decades of storing and handling gasoline without MtBE. No attempt was made to improve this standard-of-care because the industry contended that MtBE gasoline could be handled just like any other gasoline.

- A number of steps could have been taken that would have greatly lessened the number and magnitude of MtBE release incidents, including acknowledging the increased threat to groundwater posed by MtBE, promoting better handling procedures for gasoline, installing better UST systems, and using leak detection methods specifically aimed at the early detection of MtBE releases.  The key step would have been to acknowledge that MtBE posed a threat to groundwater. Instead of providing warnings, however, the industry chose to whitewash the issue.

# EXHIBIT 13

Page 1

1               UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
2                          -oOo-
3       _____
4       In re: Methyl Tertiary Butyl
        Ether ("MTBE") Products
5       Liability Litigation
                                          Master File No.
6       _____ 1:00-1898

        This Document Relates To:
7                                         Case No.
        City of Fresno                    MDL 1358(SAS)
8       v. Chevron U.S.A. Inc., et al.,
        Case No. 04 Civ. 4973
9       _____
10
11             DEPOSITION OF SAM WILLIAMS, PG
               VOLUME I
12
               June 4, 2012 at 9:00 (9:14) a.m.
13
               Before:   ERIC L. JOHNSON
14                       RPR, CSR #9771
15             Taken at:
               Los Angeles, California
16
17
18
19
20
21
22
23
24
25

1          MS. O'REILLY:   Q.   Okay.   Were any groundwater

2     samples taken off the station property?

3          A.   Not that I recall.

4          Q.   Were any soil samples taken off the station

5     property?

6          A.   No.

7          Q.   Were -- once the on-site wells went dry, were

8     any of those wells replaced?

9          A.   No, because they were essentially nondetect

10    when they had gone dry.

11         Q.   With respect to the release, when the UST

12    system was removed in '99, was there a leak point noted

13    in the system when it was removed?

14         A.   Not that I recall.

15         Q.   So was there any evidence that removing the

16    USTs had stopped the leak?

17         A.   Well, when contamination is observed around a

18    UST, there are several things that can result in that.

19    But if the UST system, which is the component that

20    stores and transfers gasoline is removed, one would

21    assume that once that system is removed, then the leak

22    has been removed.

23         Q.   So removal of the system stopped the -- any

24    release that was going on at Van Ness Auto?

25         MR. CORRELL:   Objection; assumes facts not in

# EXHIBIT 14

Page 1

1

2                     UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF NEW YORK

4

5      CITY OF FRESNO,                    )
                                          )
6                   Plaintiff,            )
                                          )
7      vs.                                )     No. 04 CIV. 4973
                                          )     (SAS)MDL 1358
8      CHEVRON U.S.A. INC., et al.,       )
                                          )
9                   Defendants.           )
       _____)

10

11

12                       DEPOSITION OF

13                       IMTIAZ AHMAD

14                    FREMONT, CALIFORNIA

15              WEDNESDAY, FEBRUARY 16, 2011

16

17

18               DEPOBOOK REPORTING SERVICES

19              Certified Shorthand Reporters

20                1600 G Street, Suite 101

21               Modesto, California 95354

22                    800-830-8885

23

24     REPORTER:    DENISE WHEELER, CSR NO. 8254

25

Page 25

1   Fresno terminal.  So I don't know whose gas was it.  That I

2   would not know.

3           MR. EICKMEYER:   Q.   How about when the Elm station

4   was branded Valley Gas, who was supplying the gasoline at

5   that time?

6       A.  Total Energy and Sabek Oil.

7       Q.  When Total and Sabek were providing gas to the Elm

8   station, do you know who the refiner was of that gas?

9       A.  No, I don't.

10      Q.  Let me ask the same question for the Olive station.

11  Do you know who the refiner was of gas provided to the Olive

12  station by Total or Sabek?

13      A.  No, I would not.

14                      (Exhibit No. 2 was marked for

15                       identification.)

16          MR. EICKMEYER:   Q.   I'm handing you Exhibit 2.

17  This is County of Fresno Environmental Health Application,

18  Bates FCDEH hyphen Fresno hyphen 003657 titled Business Name

19  Beacon Service Station and Ultramar address 2139 South Elm.

20  Do you recall ever seeing this form before?

21      A.  Yes.

22      Q.  Now, I understand we have your wife's deposition

23  coming later today.  Do you recognize the name about halfway

24  down, signature, it looks like Shirley McMurphy?

25      A.  Yes.

Page 139

1   actual scheduling reasons for it, but I apologize for it

2   being somewhat awkward.

3          Can you hear me?

4      A.   I can hear you pretty good at this point.

5      Q.   As I said in the beginning, I represent the Valero

6   defendants in this case, and I just wanted to clarify a few

7   things you discussed with Mr. Eickmeyer if that's okay?

8      A.   That's okay with me.

9      Q.   I know that you said that after Petro Group II

10  purchased the Elm Street station from Ultramar, that it was

11  Beacon and Ultramar gasoline that was delivered to the

12  station; is that correct?

13     A.   That is correct.

14     Q.   And do you recall if there was a specific agreement

15  between Petro Group II and Ultramar that allowed for that

16  delivery of gasoline?

17     A.   I believe we signed the -- what do you guys call in

18  this business branded versus not branded gasoline, so that

19  particular place was branded as Beacon, so we signed a

20  contract with them.

21     Q.   Like a brand distribution marketing agreement,

22  something like that?

23     A.   Yes.

24     Q.   Okay.  And do you recall if there was a specific

25  number of years that that was set for?

Page 140

1      A.  That I don't know.  I think it was three-year

2   agreement or five-year agreement.

3      Q.  Okay.  And do you recall if there was any other

4   specific terms in that agreement, whether there were

5   specific amounts of gasoline specified or whether it set out

6   other requirements for either party?

7      A.  I believe we couldn't buy from anybody else other

8   than Ultramar during -- during the product term.

9      Q.  Okay.  And I believe that you just told my

10  associate -- my colleague that you ceased the brand name

11  agreement in 1995; is that correct?

12     A.  That is correct.

13     Q.  And at that time you stopped accepting Beacon or

14  Ultramar gasoline at the station; is that correct?

15     A.  That's right.

16     Q.  And did you have Beacon or Ultramar signs at the

17  station, do you recall?

18     A.  After we stopped buying from Beacon?

19     Q.  When you were buying from Beacon?

20     A.  Yeah, every time -- yeah, so -- so while we were

21  buying from Beacon, what we were called in the market is

22  called branded location -- so as such we were branded

23  Beacon.  So every location had a sign called Ultramar Beacon

24  sign.  And this particular location had an Arco sign.

25     Q.  Okay.  And do you recall if you needed new gasoline

# EXHIBIT 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In Re:  Methyl Tertiary Butyl Ether ("MTBE")          Master File C.A. No.
Products Liability Litigation                         1:00-1898 (SAS)
                                                      MDL No. 1358

-----------------------------------------------------------X
This Document Relates to:

California-American Water Company v. Atlantic Richfield Co., et al.
City of Fresno, et al. v. Chevron U.S.A., Inc., et al.
City of Riverside v. Atlantic Richfield Co., et al.
City of Roseville v. Atlanta Richfield, et al.
Martin Silver, et al. v. Alon USA Energy, Inc., et al.
Orange County Water District v. Unocal, et al.
People of the State of California, et al. v. Atlantic Richfield Co., et al.
Quincy Community Services District v. Atlantic Richfield Co., et al.

-----------------------------------------------------------X

## DEFENDANT EXXON MOBIL CORPORATION'S RESPONSES
## AND OBJECTIONS TO PLAINTIFFS' PRELIMINARY
## SET OF INTERROGATORIES
## REGARDING DEFENDANT IDENTIFICATION

Defendant Exxon Mobil Corporation ("ExxonMobil"), by and through its attorneys,

McDermott Will & Emery, LLP, makes the following Responses and Objections to Plaintiffs

Preliminary Set of Interrogatories Regarding Defendant Identification, dated August 30, 2004,

pursuant to the Federal Rules of Civil Procedure and the Local Rules of the Southern District of

New York.

## PRELIMINARY STATEMENT AND DISCLOSURES

Plaintiffs' counsel has stated and the Court has acknowledged that, at this time, the

purpose of these Interrogatories is to identify additional Defendants.  Furthermore, Plaintiffs'

counsel has made clear their interest in fully complying with Rule 11 by emphasizing the need to

have reliable and accurate information concerning the identity of non-parties whose products

were delivered into geographic areas at issue in the lawsuits.

## RESPONSES TO INTERROGATORIES

ExxonMobil responds to the following three Interrogatories as provided below for each identified geographic area, subject to and without waiving the General Objections, the Preliminary Statement and Disclosures and the specific objections which follow immediately below each restated question.

INTERROGTORY NO. 1 – Please identify the name and address of each entity (including You, if applicable) that supplied You with MTBE Products for ultimate delivery into the *identified geographical region* at any time since the date of first MTBE use in the *identified geographical region*; the dates or date ranges when each such entity supplied You with MTBE Products, and the name and address of each Refinery from which such MTBE Products were supplied.

OBJECTION:

ExxonMobil objects to this Interrogatory as seeking information outside the restricted scope of discovery permissible under Rule 33.3 of the Local Civil Rules of this Court. ExxonMobil further objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Further, ExxonMobil objects that the request for "dates or dates ranges" is specifically overbroad, unduly burdensome, and oppressive. ExxonMobil also objects to this Interrogatory on the grounds that the term "supplied," as used herein, is undefined, vague and without any precise meaning. Additionally, ExxonMobil objects to the extent that this Interrogatory calls for ExxonMobil to speculate as to the presence of MTBE in gasoline and the identity of the refinery providing the MTBE Product when the MTBE Product is not refined by Exxon, Mobil or ExxonMobil, but only later sold in the identified geographic region by Exxon, Mobil or ExxonMobil. Moreover, ExxonMobil objects to the extent that this Interrogatory calls for ExxonMobil to speculate as to which of its refining entities provides MTBE Product for delivery into the identified geographical region because ExxonMobil does not track the ultimate destination of product manufactured by ExxonMobil. Lastly, ExxonMobil does not, in the

7

ordinary course of business, prepare or maintain data in a form that readily permits it to answer this Interrogatory as asked.

RESPONSE:

In addition to the attached "**EXXONMOBIL'S SPECIFIC GEOGRAPHIC RESPONSES**," ExxonMobil also provides a listing of relevant refinery addresses in Attachment A to these Responses. The responses in the attached "**EXXONMOBIL'S SPECIFIC GEOGRAPHIC RESPONSES**" are specifically limited to gasoline refined by Exxon, Mobil and ExxonMobil, except where specifically provided for therein.

INTERROGATORY NO. 2 – Please identify the name and address of each entity from which You obtained neat MTBE for use at any Refinery owned or operated by You that supplied gasoline for ultimate delivery into the *identified geographical region*; the date or date ranges when MTBE was acquired from each supplier, and the name and address of Your refinery(ies).

OBJECTION:

ExxonMobil objects to this Interrogatory as seeking information outside the restricted scope of discovery permissible under Rule 33.3 of the Local Civil Rules of this Court. ExxonMobil further objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Further, ExxonMobil objects that the request for "dates or dates ranges" is specifically overbroad, unduly burdensome, and oppressive. Additionally, ExxonMobil objects to the extent that this Interrogatory calls for ExxonMobil to speculate as to which of its refining entities provides MTBE Product for delivery into the identified geographical region because ExxonMobil does not track the ultimate destination of product manufactured by ExxonMobil. Lastly, ExxonMobil does not, in the ordinary course of business, prepare or maintain data in a form that readily permits ExxonMobil to answer this Interrogatory as asked.

8

RESPONSE:

ExxonMobil provides a listing of relevant suppliers of neat MTBE in Attachment B to

these Responses.

INTERROGATORY NO. 3 – Please identify each Terminal You use or used to supply gasoline for ultimate delivery into the *identified geographical region*; at any time since the date of first MTBE use in the identified geographical region, and the dates or date ranges when You have used such Terminal.  For each Terminal You use or used, please also state whether You owned or operated such Terminal or were a Terminaling Partner at such Terminal.

**OBJECTION:**

ExxonMobil objects to this Interrogatory as seeking information outside the restricted

scope of discovery permissible under Rule 33.3 of the Local Civil Rules of this Court.

ExxonMobil further objects to this Interrogatory on the grounds that it is vague, ambiguous,

overbroad and unduly burdensome.  Further, ExxonMobil objects that the request for "dates or

dates ranges" is specifically overbroad, unduly burdensome, and oppressive.  Lastly,

ExxonMobil does not, in the ordinary course of business, prepare or maintain data in a form that

readily permits ExxonMobil to answer this Interrogatory as asked.

RESPONSE:

ExxonMobil provides a listing of relevant terminal addresses in Attachment C to these

Responses.

## EXXONMOBIL'S SPECIFIC GEOGRAPHIC RESPONSES

A.   Fresno County  (*City of Fresno, et al. v. Chevron U.S.A., Inc., et al.*)

With respect to Exxon, ExxonMobil is unaware of any Exxon proprietary terminal that would have routinely supplied Exxon locations in Fresno County with gasoline or with gasoline containing MTBE.  Exxon locations in Fresno County may have been supplied with gasoline or with gasoline containing MTBE from the now current Kinder Morgan Pacific terminal in Fresno.  On occasion, Exxon locations in Fresno County may have been supplied with gasoline or with gasoline containing MTBE from ST Services at its terminal in Stockton.

With respect to Mobil, ExxonMobil responds that it is unaware of any Mobil proprietary terminal that would have routinely supplied Fresno County with gasoline or with gasoline containing MTBE.  Mobil may have supplied gasoline or gasoline containing MTBE for ultimate distribution into Fresno County via a throughput terminal owned and operated by Kinder Morgan and located in Fresno.  Mobil purchased gasoline containing MTBE from Equiva, Exxon, Tosco, Tower Energy Resources, Equilon, Texaco and Ultramar for shipment to the Kinder Morgan Fresno terminal via the Kinder Morgan Pipeline.

With respect to ExxonMobil, it is unaware of any ExxonMobil proprietary terminal that would have routinely supplied Fresno County. ExxonMobil supplied gasoline containing MTBE for ultimate distribution into Fresno County via a throughput terminal owned and operated by Kinder Morgan Pacific and located in Fresno.  ExxonMobil purchased gasoline containing MTBE from Tower Energy Resources, Valero, New West Petroleum, Tesoro, and Equiva for shipment to the Kinder Morgan Fresno terminal via the Kinder Morgan pipeline.

Accordingly, ExxonMobil refers Plaintiffs to Attachment B for a listing of suppliers that may have provided neat MTBE to the above identified Exxon, Mobil and ExxonMobil refineries.  ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

B.   Monterey County *(California American Water Company v. Atlantic Richfield Co., et al.)*

With respect to Exxon, ExxonMobil is unaware of any Exxon proprietary terminal that would have routinely supplied Exxon locations in Monterey County with gasoline or with gasoline containing MTBE.  Exxon locations in Monterey County may have been supplied gasoline or gasoline containing MTBE from the now current Kinder Morgan terminal in San Jose.  On occasion, Exxon locations in Monterey County may have been supplied gasoline containing MTBE from the Kinder Morgan terminal in Fresno.

ExxonMobil is unaware of any Mobil or ExxonMobil proprietary or throughput terminal that supplied Monterey County with gasoline or with gasoline containing MTBE.  In addition, it is also unaware, at this time, of any exchange agreements whereby Mobil or ExxonMobil received gasoline or gasoline with containing MTBE for ultimate distribution to locations in Monterey County.

10

ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

C.   Orange County *(Orange County Water District v. Unocal, et al.)*

With respect to Exxon, ExxonMobil is unaware of any Exxon proprietary terminal that would have routinely supplied Exxon locations in Orange County with gasoline or with gasoline containing MTBE. Exxon locations in Orange County may have been supplied gasoline or gasoline containing MTBE via exchange agreement(s) with GATX and Shell at their terminals in Carson.

With respect to Mobil, Mobil would have routinely supplied Orange County with gasoline or with gasoline containing MTBE from its terminals at Atwood and Vernon, California. Mobil's Vernon and Atwood terminals were supplied from Mobil's Torrance refinery via pipeline. On occasion, Mobil would receive at its Atwood and Vernon terminals, sometimes via the Shell Carson terminal, gasoline containing MTBE on exchange or purchased from ARCO, Ultramar Diamond Shamrock, Equilon, C&N, Inc., Shell, Texaco, Mieco Inc., Equiva, Tower Energy Resources, Tosco, Ultramar, Shell, Chevron and TR Trading. Additionally, on occasion, Mobil received gasoline containing MTBE from Hess at its terminal in the Los Angeles Harbor for distribution to Mobil's Vernon and Atwood terminals.

With respect to ExxonMobil, ExxonMobil would have routinely supplied Orange County with gasoline or with gasoline containing MTBE from Mobil's terminals at Atwood and Vernon, California. Mobil's Vernon and Atwood terminals were supplied from Mobil's Torrance refinery via pipeline. On occasion, ExxonMobil would receive at its Atwood and Vernon terminals, sometimes via the Shell Carson terminal, gasoline containing MTBE on exchange or purchased from BP West Coast, Equiva, Ultramar Diamond Shamrock, Valero, Tower Energy Resources, ARCO, Mieco, Inc. and Shell. Additionally, on occasion, ExxonMobil received gasoline containing MTBE from Amerada Hess and Vitol S.A., Inc., at its terminal in the Los Angeles Harbor for distribution to Mobil's Vernon and Atwood terminals.

Accordingly, ExxonMobil refers Plaintiffs to Attachment B for a listing of suppliers that may have provided neat MTBE to the above identified Exxon, Mobil and ExxonMobil refineries. ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

D.   Placer County *(City of Roseville v. Atlantic Richfield, et al.)*

With respect to Exxon, ExxonMobil is unaware of any Exxon proprietary terminal that would have routinely supplied Exxon locations in Placer County with gasoline or with gasoline containing MTBE. Exxon locations in Placer County may have been supplied gasoline or gasoline containing MTBE from the now current Kinder Morgan terminal in Sacramento.

With respect to Mobil and ExxonMobil, ExxonMobil is unaware of any Mobil or ExxonMobil proprietary or throughput terminal that would have routinely supplied Placer County with gasoline or with gasoline containing MTBE. In addition, it is also unaware, at this time, of any exchange agreements whereby Mobil or ExxonMobil routinely received gasoline or gasoline containing MTBE for distribution to locations in Placer County.

ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

E.      Plumas County *(Quincy Community Services District v. Atlantic Richfield, et al.)*

With respect to Exxon, ExxonMobil is unaware of any Exxon proprietary terminal that would have routinely supplied Exxon locations in Plumas County with gasoline or with gasoline containing MTBE. Exxon locations in Plumas County may have been supplied gasoline or gasoline containing MTBE from the now current Kinder Morgan terminal in Chico.

With respect to Mobil and ExxonMobil, ExxonMobil is unaware of any Mobil or ExxonMobil proprietary or throughput terminal that would have routinely supplied Plumas County with gasoline or with gasoline containing MTBE. In addition, it is also unaware, at this time, of any exchange agreements whereby Mobil or ExxonMobil routinely received gasoline or gasoline containing MTBE for distribution to locations in Plumas County.

ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

F.      Riverside County *(City of Riverside v. Atlantic Richfield Co., et al.)*

With respect to Exxon, ExxonMobil is unaware of any Exxon proprietary terminal that would have routinely supplied Exxon locations in Riverside County with gasoline or with gasoline containing MTBE. Exxon locations in Riverside County may have been supplied gasoline or gasoline containing MTBE via exchange agreement(s) with GATX and/or Shell at their terminals in Carson.

With respect to Mobil, Mobil routinely supplied gasoline or gasoline containing MTBE for ultimate distribution in Riverside County from Mobil's terminal at Colton, California. After that terminal was sold to Kinder Morgan in 1998, Mobil continued to use this location as a throughput terminal to supply locations in this area. The Mobil Colton terminal, and later, the Kinder Morgan Colton terminal were supplied via the Kinder Morgan pipeline, through the Kinder Morgan Watson terminal. Mobil supplied gasoline containing MTBE from its Torrance refinery to the Colton terminal through the Kinder Morgan Watson terminal. In addition, Mobil received on exchange or purchased gasoline containing MTBE at the Colton terminal or at the Kinder Morgan Watson terminal, for potential delivery to the Colton terminal, from a number of different companies, including ARCO, Astra Oil Co., Inc., C&N, Inc., Center Oil Co., Chevron, Tesoro,

Equilon, Equiva, Exxon, Giant Refining, Kern Oil Refining, Tosco, Koch, Mieco, Inc., Northridge Petroleum, Petro-Diamond, Inc., Shell Trading United States Company, Tower Energy Resources, Westport Petroleum, River City Petroleum, Inc., Vitol S.A., Inc., GP Resources, Southern Counties Oil, Trafigura A.G., Ultramar Diamond Shamrock, Neste Oy, Coastal, TR Trading, Golden West Refining, Texaco, New West Petroleum and Ultramar.

With respect to ExxonMobil, ExxonMobil routinely supplied gasoline and gasoline containing MTBE for ultimate distribution in Riverside County from the Kinder Morgan terminal in Colton. The Kinder Morgan Colton terminal was supplied via the Kinder Morgan pipeline, through the Kinder Morgan Watson terminal. ExxonMobil supplied gasoline containing MTBE from its Torrance refinery to the Colton terminal through the Kinder Morgan Watson terminal. In addition, ExxonMobil received on exchange or purchased gasoline containing MTBE at the Colton terminal or at the Kinder Morgan Watson terminal, for potential delivery to the Colton terminal, from a number of different companies including BP North America, Equiva, Mieco, Inc., New West Petroleum, Astra Oil Co., Inc., Petro-Diamond, Inc., Tesoro, Tosco, Trafigura A.G., Ultramar Diamond Shamrock, BPARCO, C&N, Inc., Chevron, Duke Energy, Glencore Ltd., Nella Oil, Westport Petroleum, Northridge, ARCO and Tower Energy Resources.

Accordingly, ExxonMobil refers Plaintiffs to Attachment B for a listing of suppliers that may have provided neat MTBE to the above identified Exxon, Mobil and ExxonMobil refineries. ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

G.    San Bernardino County *(City of Riverside v. Atlantic Richfield Co., et al.)*

With respect to Exxon, ExxonMobil is unaware of any Exxon proprietary terminal that would have routinely supplied Exxon locations in San Bernardino County with gasoline or with gasoline containing MTBE. Exxon locations in San Bernardino may have been supplied gasoline or gasoline containing MTBE via exchange agreement(s) with GATX and/or Shell at their terminals in Carson.

With respect to Mobil, Mobil routinely supplied gasoline and gasoline containing MTBE for ultimate distribution in San Bernardino County from Mobil's terminal at Colton, California. After that terminal was sold to Kinder Morgan in 1998, Mobil continued to use this location as a throughput terminal to supply its stations in this area. The Mobil Colton terminal, and later, the Kinder Morgan Colton terminal were supplied via the Kinder Morgan pipeline, through the Kinder Morgan Watson terminal. Mobil supplied gasoline with MTBE from its Torrance refinery to the Colton terminal through the Kinder Morgan Watson terminal. In addition, Mobil received on exchange or purchased gasoline containing MTBE for delivery at the Colton terminal or at the Kinder Morgan Watson terminal, for potential delivery to the Colton terminal, from a number of different companies, including ARCO, Astra Oil Co. Inc., C&N, Inc., Center Oil Co., Chevron, Tesoro, Equilon, Equiva, Exxon, Giant, Kern Oil Refining, Tosco, Koch, Mieco, Inc., Northridge Petroleum, Petro-Diamond, Inc., Shell Trading United States Company, Tower Energy Resources, Westport Petroleum, River City Petroleum Inc., Vitol S.A., GP

13

Resources, Southern Counties Oil, Trafigura A.G., Ultramar Diamond Shamrock, Neste Oy, Coastal, TR Trading, Golden West Refining, Texaco, New West Petroleum and Ultramar.

With respect to ExxonMobil, ExxonMobil routinely supplied gasoline and gasoline containing MTBE for ultimate distribution in San Bernardino County from the Kinder Morgan terminal in Colton. The Kinder Morgan Colton terminal was supplied via the Kinder Morgan pipeline, through the Kinder Morgan Watson terminal. ExxonMobil supplied gasoline with MTBE from its Torrance refinery to the Colton terminal through the Kinder Morgan Watson terminal. In addition, ExxonMobil received on exchange or purchased gasoline containing MTBE at the Colton terminal or at the Kinder Morgan Watson terminal, for potential delivery to the Colton terminal, from a number of different companies, including BP North America, Equiva, Mieco, Inc., New West Petroleum, Astra Oil Co., Inc., Petro-Diamond, Inc., Tesoro, Tosco, Trafigura, A.G., Ultramar Diamond Shamrock, BPARCO, C&N, Inc., Chevron, Duke Energy, Glencore Ltd., Nella Oil, Westport Petroleum, Northridge Petroleum, ARCO and Tower Energy Resources.

Accordingly, ExxonMobil refers Plaintiffs to Attachment B for a listing of suppliers that may have provided neat MTBE to the above identified Exxon, Mobil and ExxonMobil refineries. ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

H.   San Diego County *(Martin Silver, et al. v. Alon USA Energy, et al.)*

With respect to Exxon, ExxonMobil is unaware of any Exxon proprietary terminal that would have routinely supplied Exxon locations in San Diego County with gasoline or with gasoline containing MTBE. Exxon locations in San Diego County may have been supplied gasoline or gasoline containing MTBE via exchange agreement(s) with GATX and/or Shell at their terminals in Carson.

With respect to Mobil, Mobil routinely supplied gasoline and gasoline containing MTBE for ultimate distribution in San Diego County from Mobil's terminal at Mission Valley, California. The Mobil Mission Valley terminal was supplied via the Kinder Morgan pipeline, through the Kinder Morgan Watson terminal. Mobil supplied gasoline with MTBE from its Torrance refinery to the Mission Valley terminal through the Kinder Morgan Watson terminal. In addition, Mobil received on exchange or purchased gasoline containing MTBE at the Mission Valley terminal or at the Kinder Morgan Watson terminal, for potential delivery to the Mission Valley terminal, from a number of different companies, including ARCO, Astra Oil Co., C&N, Inc., Center Oil Co., Chevron, Tesoro, Equilon, Equiva, Exxon, Giant Refining, Kern Oil Refining, Tosco, Koch, Mieco, Inc., Northridge Petroleum, Petro-Diamond, Inc., Shell Trading United States Company, Tower Energy Resources, Westport Petroleum, River City Petroleum, Inc., Vitol S.A., Inc., GP Resources, Southern Counties Oil, Trafigura A.G., Ultramar Diamond Shamrock, Neste Oy, Coastal, TR Trading, Golden West Refining, Texaco, New West Petroleum and Ultramar.

14

With respect to ExxonMobil, ExxonMobil routinely supplied gasoline and gasoline containing MTBE for ultimate distribution in San Diego County from the Kinder Morgan terminal in Mission Valley, California. The Mobil Mission Valley terminal was supplied via the Kinder Morgan pipeline, through the Kinder Morgan Watson terminal. ExxonMobil supplied gasoline with MTBE from the Torrance refinery to the Mission Valley terminal through the Kinder Morgan Watson terminal. In addition, ExxonMobil received on exchange or purchased gasoline containing MTBE at the Mission Valley terminal or at the Kinder Morgan Watson terminal, for potential delivery to the Mission Valley terminal, from a number of different companies, including BPNA, Equiva, Mieco, Inc., New West Petroleum, Astra Oil Co., Inc., Petro-Diamond, Inc., Tesoro, Tosco, Trafigura A.G., Ultramar Diamond Shamrock, BPARCO, C&N, Inc., Chevron, Duke Energy, Glencore Ltd., Nella Oil, Westport Petroleum, Northridge Petroleum, ARCO and Tower Energy Resources.

Accordingly, ExxonMobil refers Plaintiffs to Attachment B for a listing of suppliers that may have provided neat MTBE to the above identified Exxon, Mobil and ExxonMobil refineries. ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

I.   Sacramento County (*People of the State of California, et al. v. Atlantic Richfield, Co., et al.*)

With respect to Exxon, ExxonMobil responds that Exxon locations in Sacramento County may have been supplied gasoline or gasoline containing MTBE from the Kinder Morgan terminal in Sacramento. Exxon locations in Sacramento may have also been supplied gasoline containing MTBE from Exxon's proprietary terminal in Benicia or from ST Services at its terminal in Stockton. Gasoline containing MTBE obtained from Exxon's Benicia terminal may have been supplied from Exxon's Benicia refinery. (See Attachment A for refinery addresses). As required by the U.S. Federal Trade Commission's Consent Agreement dated November 30, 1999, and the consent decree entered with the State of California, Exxon sold its Benicia refinery and fuels terminal to Valero Energy Corporation in or about May of 2000.

With respect to Mobil and ExxonMobil, ExxonMobil is unaware of any Mobil or ExxonMobil proprietary or throughput terminal that would have routinely supplied Sacramento County with gasoline or with gasoline containing MTBE. In addition, it is also unaware, at this time, of any exchange agreements whereby Mobil routinely received gasoline or gasoline with containing MTBE for distribution to locations in Sacramento County.

Accordingly, ExxonMobil refers Plaintiffs to Attachment B for a listing of suppliers that may have provided neat MTBE to the above identified Exxon, Mobil and ExxonMobil refineries. ExxonMobil is unaware of the identity of suppliers of neat MTBE blended into gasoline refined by others and/or identity of the refiners of gasoline containing MTBE obtained from others.

15

Dated:   August 30, 2004
        New York, New York

Respectfully submitted,

By: _____
Peter John Sacripanti
James A. Pardo
McDERMOTT WILL & EMERY LLP
50 Rockefeller Plaza
New York, New York 10020
212-547-5400

*Attorneys for Defendants*
*Exxon Mobil Corporation*

16

Attachment A

| Proposed Refinery Addresses |
| --- |
| Torrance Refinery<br>3700 West 190th Street<br>Torrance, California |
| Benicia Refinery<br>3400 East Second Street<br>Benicia, California |

Attachment B

| MTBE Suppliers (Tomato, Reported) | |
|---|---|
| ARCO Chemical | 1994, 1995, 1996, 1998, 1999 |
| Neste Canada | 1994, 1995, 1996, 1997 |
| SABIC Marketing Americas | 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2002, 2003 |
| Enron Clean Fuels Co. | 1997, 1998, 1999, 2001, 2002, 2003 |
| EcoFuel, S.P.A. | 1995 |

| MTBE Supplier (not Exported, California) | Years |
|---|---|
| ARCO Products Company | 1995 |
| Chevron Products Company | 1996 - 1998 |
| Coastal Chemical, Inc. | 1994, 1997 - 1998 |
| EcoFuel, S.P.A. | 1996-1999 |
| Enron Clean Fuels Company | 1999 |
| Lyondell Chemical Worldwide, Inc. | 1989, 1990-1994, 1996, 1998 |
| Noble Americas Corp. | 1998 |
| Neste Canada, Inc. | 1994 - 1999 |
| SABIC Americas, Inc. | 1994 - 1999 |
| Shell Oil Company | 1997 |
| Trammochem | 1996 |
| Vitol S.A., Inc. | 1999 |

Attachment C

| Property Terminal Address |
|---|
| Atwood Terminal<br>1477 Jefferson Street<br>Anaheim, California |
| Mission Valley Terminal<br>9950 San Diego Mission Road<br>San Diego, California |
| Vernon Terminal<br>2709 East 37th Street<br>Vernon, California |
| Torrance Refinery Rack<br>3700 West 190th Street<br>Torrance, California |
| Benicia Terminal<br>3410 East Second Street<br>Benicia, California |

14015v1

# EXHIBIT 16

1

```
D1BPMTBC
```
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   -----------------------------x
 2
 3   IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
 3   ETHER ("MTBE") PRODUCTS               Master File C.A.
 4   LIABILITY LITIGATION                  No. 1:00-1898(SAS)
 4                                              04CV4973 (SAS)
 5   -----------------------------x
 5
 6                                         January 11, 2013
 6                                         12:43 p.m.
 7
 7   Before:
 8
 8                   HON. SHIRA A. SCHEINDLIN,
 9
 9                                         District Judge
10
10                        APPEARANCES
11
11   MILLER, AXLINE & SAWYER
12        Plaintiffs City of Fresno
12   BY:  TRACEY O'REILLY
13
13   McDERMOTT, WILL & EMERY
14        Attorneys for Defendants Exxon Mobil Corp.
14        and defendants' liaison counsel
15   BY:  JAMES PARDO
15        STEPHEN J. RICCARDULLI
16
16   SEDGWICK, LLP
17        Attorneys for Defendants Shell Oil Co.;
17        Texaco Refining and Marketing, Inc.;
18        Chevron U.S.A. Inc.; Motiva Enterprises;
18        Equilon Enterprises, LLC
19   BY:  PETER C. CONDRON
19
20   BRACEWELL & GIULIANI
20        Attorneys for Defendants Ultramar, Inc.;
21        Valero Marketing and Supply Company [DOE 1]
21   BY:  COY M. CONNELLY
22
22   SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
23        Attorneys Defendant for Exxon Mobil Corp.
23   BY:  JEFFREY J. PARKER
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
D1BPMTBC
```

1    THE COURT:  Oh, this had to do with the commingled
2  product problem.
3    MS. O'REILLY:  Well, and the City also -- In a sense,
4  it's not just commingled because the commingled product issue
5  deals with commingled in pipeline, but it also deals with an
6  issue of causation about whether or not the City has to prove
7  that a particular molecule, a particular defendant's gasoline
8  was actually released, and that's an issue that I think --
9    THE COURT:  I think not.  I think I already ruled --
10    MS. O'REILLY:  Correct.
11    THE COURT:  -- and the answer is no, but until it gets
12  to some Appellate Court, or more than one Appellate Court
13  someday, somehow, we really don't have a different court
14  weighing in on that.  But there's no point in doing it again
15  before me.  I said what I had to say about that theory, and
16  it's old news.
17    So the issue is that, in the letter writing that the
18  defendant seems to think that it's too late to go with the
19  commingled product theory, and if you did that, you ought to
20  amend and all that.  I don't see that.  I just think it's a
21  method of proof.
22    MS. O'REILLY:  Correct.
23    THE COURT:  That's all I see it as.
24    MS. O'REILLY:  We agree, your Honor.
25    THE COURT:  I'm sure you do agree because that one is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1BPMTBC

1  good for you and bad for them, but I just see it as a method of
2  proof.  I don't see it requiring an amendment or it's too late
3  or it's prejudicial or any of that.
4          Can you also do it with direct product, Tracey, or do
5  you have to rely on the blended, you know, total product and
6  the markets?  Because I know in the defense letter it says, but
7  if we're going with that and we didn't know it, then we need
8  more discovery.  We'd have to figure out what share we had and
9  when we were part of the market, when we weren't, and we'd have
10  to get into pipelines and tracing.  We did all that stuff in
11  the county.  It was very difficult and time consuming.
12          MS. O'REILLY:  We're not going with commingled in the
13  pipeline.  We're going with direct evidence, is what we
14  explained, what we think is sufficient evidence to show that
15  their gasoline was delivered to a station --
16          THE COURT:  Okay.
17          MS. O'REILLY:  -- and then -- and from there, what
18  they are -- they're conflating commingled --
19          THE COURT:  I see.
20          MS. O'REILLY:  -- in the station tank with commingled
21  in the refinery pipeline.
22          THE COURT:  Right, the transportation distribution
23  system.
24          MS. O'REILLY:  Correct.
25          THE COURT:  And you're not doing that.  You say we can

42

D1BPMTBC
1  prove that their product got to a particular station, like -- I
2  shouldn't use that, but --
3            MS. O'REILLY:  We --
4            THE COURT:  Well, no, I can't use that.
5            MS. O'REILLY:  We said to Van Ness, if you look on
6  Page --
7            THE COURT:  Van Ness?  I thought Van Ness was one of
8  the problem ones because Chevron had an exclusive supply
9  agreement, and so Duke's material couldn't have been there.
10           MS. O'REILLY:  It says Duke -- on Page 3 of our
11  letter, it says:  Duke Energy mixed several gas station sites,
12  received delivery, deliveries of MTBE gasoline from jobbers to
13  whom Duke Energy sold MTBE gasoline.
14           And what the evidence will show is that while there's
15  sometimes an exclusive agreement, also sometimes jobbers
16  supply, and they can do it when there's short supply or low
17  supply.  It's a product tracing issue, and we feel that we have
18  sufficient evidence, and we're happy to let them test that.
19           THE COURT:  It shouldn't be tested.  If you've got the
20  evidence that can show it to them, like the last topic, provide
21  the evidence of product tracing because they already know my
22  ruling after that.  If you can get it to the station, I at
23  least don't believe that they have to show it's their -- you to
24  show it's their molecule versus somebody else's molecule.  If
25  it's mixed and blended right there in the station and the