Law Offices of

# MILLER, AXLINE & SAWYER

A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE
A. CURTIS SAWYER, JR.

TRACEY L. O'REILLY
EVAN EICKMEYER
DANIEL BOONE
JUSTIN MASSEY
BRIAN D. SHANNON
DONALD MOONEY, of Counsel

April 26, 2013

<u>VIA FEDERAL EXPRESS AND ELECTRONIC MAIL</u>

The Hon. Shira A. Scheindlin
United States District Court, Southern District of New York
500 Pearl Street, Room 1620
New York, New York  10007-1312

Re:   <u>Master File C.A. No. 1:00-1898 (SAS), M 21-88, MDL No. 1358</u>
This Document Relates to: *Orange County Water District v. Unocal Corp., et al.*,
04 Civ. 4968
**Plaintiff Orange County Water District's Objection to Pre-Trial Order #76**

Dear Judge Scheindlin:

Pursuant to Section 4 of the Order Appointing a Special Master, Plaintiff Orange County Water District (the "District") hereby submits its objection to Pre-Trial Order #76 ("PTO #76") on the grounds that it erroneously compels the District to produce a privileged spreadsheet prepared by Dr. Wheatcraft solely to assist counsel.  The order in PTO #76 is based on an erroneous finding that the spreadsheet is not subject to the attorney work product or attorney client privilege because Dr. Wheatcraft is a testifying expert and the District's privilege claims purportedly lack factual credibility.

PTO #76 was issued in response to this Court's ruling sustaining the District's objection objections to Pre-Trial Order #71 which compelled the District to produce a work product privileged spreadsheet prepared by Dr. Wheatcraft at the request of counsel for purposes of assisting counsel.  (Ex. 1, June 6, 2012, Memorandum Opinion and Order.)  PTO #76, like its predecessor, gives short shrift to the District's claims that the spreadsheet in question is subject to the attorney work product privilege, finding that the spreadsheet is not privileged and therefore must be produced.  This finding is not based on an analysis of the law of privilege, including prior rulings in this matter concerning privileges applicable to materials prepared by experts.

The Hon. Shira A. Scheindlin
Page 2
April 26, 2013

Instead, PTO #76 solely weighs the credibility of the District's factual statements and its privilege claims, and effectively concludes that the District's claim of privilege is not credible. This is not the appropriate analysis to determine whether or not a spreadsheet is subject to a work product or attorney client privilege.

Finally PTO #76 is contrary to prior pre-trial orders, and this Court's Case Management Order #73, all of which explicitly recognize that a party does not waive all privileges for communications between counsel and an expert simply because the expert testifies. These prior rulings set forth a detailed legal test for analyzing whether or not a spreadsheet is, in fact, subject to a privilege. As this Court noted, this analysis was absent from PTO #71, and is again absent from PTO #76. For these reasons, the District respectfully requests that the Court overrule the finding in PTO #76 that the spreadsheet in question is not subject to the attorney work product privilege.

The District also contends that defendants improperly sought to influence the outcome of PTO #76 by submitting an irrelevant order from another court concerning Dr. Wheatcraft's testimony. (Ex. 2, March 22, 2013, Letter from J. Anderson to Special Master Warner.) This supplemental submission was clearly improper.

I.   **The Facts Establish That the Spreadsheet Was Prepared at the Request of the District's Counsel to Assist the District's Counsel and Not as Part of Dr. Wheatcraft's Substantive Opinions in this Matter.**[1]

PTO #76 recognizes that "if the spreadsheet were protected by the work product privilege, . . . the Rule 612 balancing test would not require production of additional portions of the document beyond what plaintiff has already produced." (Ex. 3, PTO #76 at 2.) PTO #76, however, concludes that "the spreadsheet at issue is not protected by the work product privilege and therefore must be produced in its entirety." (*Ibid.*) The facts, however, clearly establish that the spreadsheet is subject to the attorney work product and/or attorney client privilege.

- There is no dispute that the District asserted a claim of attorney work product privilege as soon as it was discovered that the spreadsheet from which Dr. Wheatcraft was reading

---

[1] In order to avoid repetitive submissions, the District incorporates by reference the facts and background discussions from its prior submissions to Special Master Warner and this Court. These are as follows: (1) Feb. 7, 2012, Plaintiff Orange County Water District's Submission Regarding Conoco's Motion to Compel Document Concerning Dr. Wheatcraft's Deposition; (2) March 15, 2012, Plaintiff Orange County Water District's Objection to Pre-Trial Order #71; and (3) July 30, 2012, Plaintiff Orange County Water District's Opposition to Defendant ConocoPhillips Company's Supplemental Motion to Compel Privileged Document Concerning Dr. Wheatcraft's Deposition. These pleadings are being submitted under separate cover.

was, in fact, privileged. (Ex. 4, Wheatcraft Depo. (Jan. 17, 2012) at 348:22-349:25.)
Counsel for the District explicitly stated that the spreadsheet was "prepared for counsel"
by Dr. Wheatcraft at counsel's request. (*Ibid.*)

- There is no dispute that the spreadsheet was prepared by Dr. Wheatcraft to assist counsel
  as Dr. Wheatcraft testified that the spreadsheet was prepared at his direction, and that it
  was not prepared by counsel. (*Id.* at 352:5-12.) At no time did Dr. Wheatcraft testify that
  he asked his staff to prepare the spreadsheet in connection with his expert opinions or
  report in this matter. (*Id.* at 348:22-353:11.) More importantly, Dr. Wheatcraft did not
  testify that he was never given direction by counsel to prepare the spreadsheet. (*Ibid.*)
  The fact that Dr. Wheatcraft directed his staff to prepare the spreadsheet, and participated
  in its preparation, is not inconsistent with the District's assertion that Dr. Wheatcraft was
  asked to prepare this spreadsheet to assist its counsel.

- There is no dispute that after obtaining the quotation from Dr. Daus' expert report that he
  was unable to recall, Dr. Wheatcraft continued to testify on the issue of defense experts'
  compliance with discovery obligations without further reference to the spreadsheet.[2] (*Id.*
  at 334:7-348:20.) Substantive examination on this issue, in fact, went on for ten
  additional pages before any questions concerning the spreadsheet itself were raised.

- This is no dispute that Dr. Wheatcraft did not disclose any privileged information or
  communication from the spreadsheet. (*Id.* at 334:7-336:12.) Dr. Wheatcraft only read a
  direct quote from an expert report prepared by a defense expert. (*Ibid.*) Thus, there is no
  evidence that the District waived its attorney work product privilege with respect to the
  spreadsheet.

- There is no dispute that the opinions for which Dr. Wheatcraft was retained relate, in
  general, to the impacts of MTBE releases on the drinking water aquifers, and the
  modeling work he prepared. (Ex. 5, Expert Report of Stephen W. Wheatcraft, Ph.D.
  (June 23, 2011) at Summary of Opinions, pp. 7-9.) There is also no dispute that these are
  the opinions which the District intends to present at trial in this matter.

Defendants previously argued to this Court that "[t]he spreadsheet Dr. Wheatcraft reviewed is
not privileged. It is not a communication with counsel, and Dr. Wheatcraft confirmed that it is

---

[2] The District continues to contend that the spreadsheet itself does not directly relate to
the substance of Dr. Wheatcraft's opinions, and instead merely relates to a discovery dispute
between defendants and the District over the adequacy of spreadsheet productions by defendants'
experts. By using the term "opinion," the District does not concede that the spreadsheet or
testimony relates to any substantive opinions of Dr. Wheatcraft. (*See e.g.* Ex. 6, July 30, 2012,
Letter to Special Master Warner at Section A, pp. 5-6.)

The Hon. Shira A. Scheindlin
Page 4
April 26, 2013

not attorney work product, but rather something he and his staff created." (Ex. 7, March 22, 2012, Defendants' Response To Plaintiff Orange County Water District's Objection To Pre-Trial Order #71 at 8.)

Presumably in response to these arguments and submissions made by the parties, this Court's opinion and order concluded that the attorney work product privilege "includes not just documents prepared by an attorney but documents prepared by the attorney's agents and consultants." (Ex. 1, Opinion & Order (June 6, 2012) at 6.) This Court's order further concluded that "the proper approach is to conduct a 'balancing test to determine whether Rule 612 requires disclosure, notwithstanding the existence of a privilege.'" (*Id.* at 7.) Finally, this Court then explicitly remanded this matter "to determine whether, under the balancing test articulated above, Rule 612 mandates the production of the spreadsheet at issue." (*Id.* at 9.) The District contends that this record, and the facts catalogued above, unequivocally establish that the spreadsheet is subject to the attorney work product and/or attorney client privileges, and is, therefore protected from disclosure contrary to PTO #76.

## II.   The Spreadsheet is Subject to the Attorney Work Product Privilege and is Protected from Disclosure.

As the District has explained numerous times before, it is widely understood that parties often rely on their own experts for assistance in understanding and attacking the opinions of opposing experts. It is also widely accepted that such assistance falls within the scope of the attorney work product privilege since the expert is acting in their capacity as a consultant to counsel. (*See e.g.* Ex. 8, Case Management Order No. 73, Ex. 9, Pre-Trial Order #46, and Ex. 10, Pre-Trial Order #53.) It is axiomatic that any documents prepared by an expert in furtherance of this assistance would similarly be protected by the attorney work product privilege. *Seiffer v. Topsy's Intern., Inc.*, 69 F.R.D. 69, 72 (D. Kan. 1975); *In re Cendant Corp. Securities Litigation*, 343 F.3d 658, 662 (3d Cir. 2003) ("this protection extends beyond materials prepared by an attorney to include materials prepared by an attorney's agents and consultants."); *see also* PTO #46 and PTO #53. It is clear that the privileged nature of a document is established by the nature of its creation, and the role in which the expert prepared the document.

PTO #76 focused solely on the fact that Dr. Wheatcraft utilized the spreadsheet to refresh his recollection in response to a question posed at his deposition. (Ex. 3, at 3-4.) This is circular reasoning. The privileged nature of a document is not determined by whether or not an expert refers to it in a deposition, particularly where the use of the document was inadvertent, the privilege was promptly asserted, and no privileged material was disclosed. The only time PTO #76 discusses the appropriate facts, PTO #76 admits that "there is ambiguity as to which 'hat' Dr. Wheatcraft was wearing (testifying expert vs. consulting expert, or both) when he created the spreadsheet." (*Id.* at 4.) Despite this "ambiguity," PTO #76 nonetheless concludes the spreadsheet is not privileged.

The Hon. Shira A. Scheindlin
Page 5
April 26, 2013

Defendants failed to submit any evidence to refute the District's claim that the spreadsheet was created at the request of counsel to assist counsel with respect to defense experts. The testimony of Dr. Wheatcraft is clearly consistent with the District's claims. PTO #76, however, simply brushes these facts aside and appears to discredit the factual statements made by the District concerning the creation of the spreadsheet. This is clearly improper, particularly where these is no evidence to contradict the statements of the District's counsel. This line of reasoning, moreover, ignores the most important aspect of this dispute and that is the communication between counsel and Dr. Wheatcraft which led to the creation of the document. PTO #76 appears to assume that this communication did not occur, and never even considers whether the spreadsheet would be privileged if, in fact, it was created at the request of counsel as required by the standards set forth under prior orders in this matter.

As explained above, instead of analyzing the facts *as proven by the District* against the appropriate legal standards, PTO #76 starts with the assumption that there is no work product privilege for materials prepared by a testifying expert. (Ex. 3, at 3.) An assumption which is clearly contradictory to this Court's prior rulings, and the legal standards set forth in prior pre-trial orders. PTO #76, in fact, appears to start with the assumption that the spreadsheet was not even prepared by Dr. Wheatcraft at the request of counsel. An assumption which is not supported by the facts.

Finally, "[i]t is well-settled that, once properly invoked, the attorney-client privilege is not vitiated in the absence of an actual or implied waiver." *Suss v. MSX Intern. Engineering Services, Inc.*, 212 F.R.D. 159, 165 (S.D.N.Y. 2002). The District contended, and continues to contend, that merely reading into the record direct quotations from one of defendants' expert reports does not act as a waiver of any privilege or require the production of the entire document. *Granite Partners v. Bear, Sterns & Co., Inc.*, 184 F.R.D. 49, 54-55 (S.D.N.Y. 1999) (privileged materials are only put at issue where "a privileged document is used offensively" or "though some affirmative act intended to insure . . . that party's benefit, or where the party makes selective use of the privileged materials."). Notably, PTO #76 did not find that the District waived its privilege as to the spreadsheet, and only found that the spreadsheet was never privileged in the first place.

## III.  Conclusion.

The District respectfully requests that the Court overrule the finding in Pre-Trial Order #76 that the spreadsheet prepared by Dr. Wheatcraft is not privileged, and deny defendants request for production of the remained of the spreadsheet or a further deposition of Dr. Wheatcraft.

The Hon. Shira A. Scheindlin
Page 6
April 26, 2013

Respectfully submitted,

Tracey L. O'Reilly

cc: Jon D. Anderson, Esq. (via email)
    Stephen Schweizer (via email)
    All Counsel (via LNFS)

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------ X
   :
   :
**IN RE: METHYL TERTIARY BUTYL**   :
**ETHER ("MTBE") PRODUCTS**     :        **MEMORANDUM**
**LIABILITY LITIGATION**          :    **OPINION AND ORDER**
------------------------------------------------  :
   :    **Master File No. 1:00-1898**
**This document relates to:**     :    **MDL 1358 (SAS)**
   :    **M21-88**
*Orange County Water District v. Unocal*  :
*Corp., et al.*, 04 Civ. 4968       :
   :
------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

In this consolidated multi-district litigation ("MDL"), plaintiffs seek

relief from contamination — or threatened contamination — of groundwater from

various defendants' use of the gasoline additive methyl tertiary butyl ether

("MTBE") and/or tertiary butyl alcohol, a product formed by the natural

degradation of MTBE in water. The parties have engaged in extensive motion

practice and familiarity with the underlying facts is presumed. In this case,

plaintiff Orange County Water District ("the District") — which is responsible for

maintaining groundwater quality — alleges that defendants' use and handling of

MTBE has resulted in contamination and threatened future contamination of

1

groundwater within its geographic region. Currently before the court on letter briefs is the District's objection to Special Master Kenneth J. Warner's Pre-Trial Order ("PTO 71").[1] For the reasons stated below, the objection is sustained, and the matter is remanded to Special Master Warner.

## II.   BACKGROUND[2]

Defendants deposed Dr. Stephen Wheatcraft, one of the District's expert witnesses, on January 17, 2012. During that deposition, defense counsel asked Dr. Wheatcraft for an example of a defense expert that ran his "model with their own variations and where the information has not been provided to you." To answer the question, Dr. Wheatcraft looked at the 45-page spreadsheet that is the subject of this objection and proceeded to read into the record a quote from the report of a defense expert contained in that spreadsheet.

At a later point in the deposition, defense counsel asked Dr. Wheatcraft about the spreadsheet. Dr. Wheatcraft described it as "a document that contains information about each expert and the details of opinions they provide that relate to the issue we have been discussing." Defense counsel then asked if the document "summarize[d] the deficiencies that [existed] in connection with the

---

[1]      See Docket No. 293.

[2]      Unless otherwise stated, these facts are drawn from PTO 71.

2

defense experts' reports?" Counsel for the District objected, stating that Dr. Wheatcraft merely used the document "as a reference to refresh his recollection." When defense counsel continued to press Dr. Wheatcraft as to the nature of the spreadsheet, counsel for the District objected to any further questioning and specifically refused to produce the document on the grounds that it is protected by the attorney work-product doctrine.

On January 20, 2012, defendants filed a motion with Special Master Warner to compel production of the document. On January 27, 2012, when the District's opposition was due, Counsel for the District informed Special Master Warner and defense counsel that she would produce the materials "reviewed and relied upon" by Dr. Wheatcraft during his deposition by the close of business on January 30, 2012, thereby making the motion moot. Because the District only produced eight pages of the spreadsheet, however, defendants renewed their motion on February 6, 2012. Two weeks later, on February 20, 2012, Special Master Warner held a telephonic hearing.

Special Master Warner issued PTO 71 on February 29, 2012. He found that the entirety of the document at issue was related to the testimony Dr. Wheatcraft gave at his deposition and that Federal Rule of Evidence 612 therefore required its production. In order to assuage the District's concern that production

3

of the document would result in broader waiver of "privilege" with respect to all consulting work done by Dr. Wheatcraft on the District's behalf, Special Master Warner specifically limited his ruling "only to the document at issue," and stated that it did not "constitute a ruling that the attorney/client privilege has been waived as to any other document."[3]

## III.    APPLICABLE LAW

### A.    Review of Rulings by Special Master Warner

Special Master Warner's orders on non-dispositive motions are classified as rulings on procedural matters.  As such, they will only be overturned if clearly erroneous or contrary to law.[4]  "Discovery rulings, including those regarding privilege issues, are nondispositive matters subject to that standard of review."[5]

### B.    Production of Documents Relied Upon During a Deposition

When a witness uses a document to refresh his or her recollection while testifying, Rule 612 provides that:

---

[3]     PTO 71.

[4]     *See* 6/18/04 Order Appointing Special Master Warner at 3-4.

[5]     *Eisai Ltd. v. Dr. Reddy's Labs., Inc.*, 406 F. Supp. 2d 341, 342 (S.D.N.Y. 2005).

4

**(a) Scope.** This rule gives an adverse party certain options when a witness uses a writing to refresh memory:

(1) while testifying; or

(2) before testifying, if the court decides that justice requires the party to have those options.

**(b) Adverse Party's Options; Deleting Unrelated Matter.** Unless 18 U.S.C. § 3500 provides otherwise in a criminal case, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony. If the producing party claims that the writing includes unrelated matter, the court must examine the writing in camera, delete any unrelated portion, and order that the rest be delivered to the adverse party. Any portion deleted over objection must be preserved for the record.[6]

Pursuant to Federal Rule of Civil Procedure 30(c), Rule 612 has been held applicable to deposition testimony.[7]

## C.   Attorney Work-Product Doctrine

The work-product doctrine, first articulated by the Supreme Court in *Hickman v. Taylor*[8] and later codified in the Federal Rules of Civil Procedure, protects from discovery all documents and materials prepared "in anticipation of

---

[6]      Fed. R. Evid. 612.

[7]      *See Sporck v. Peil*, 759 F.2d 312, 317 (3d Cir. 1985); *Al-Rowaishan Establishment Universal Trading & Agencies, Ltd. v. Beatrice Foods Co.*, 92 F.R.D. 779, 780 n.1 (S.D.N.Y. 1982).

[8]      329 U.S. 495 (1947).

litigation."[9]  This includes not just documents prepared by an attorney but documents prepared by the attorney's agents and consultants.[10]  However, this protection is not absolute and a party may be entitled to the documents containing the opposing attorney's work-product if it can show "that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."[11]

## IV.   DISCUSSION

When a witness uses attorney work-product to refresh his or her recollection, a tension is created between the protection afforded by the doctrine and Rule 612's provision that the "adverse party is entitled to have the writing produced at the hearing."  Although Rule 612 does not directly address this conflict, the Advisory Committee Note states that "nothing in the Rule be construed as barring the assertion of a privilege with respect to writings used by a witness to refresh his memory."[12]  Nonetheless, "courts have been grappling with

---

[9]     Fed. R. Civ. P. 26(b)(3).

[10]    *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003) ("[T]his protection extends beyond materials prepared by an attorney to include materials prepared by an attorney's agents and consultants.").

[11]    Fed. R. Civ. P. 26(b)(3)(A)(ii).

[12]    1974 Advisory Committee Note to Fed. R. Evid. 612(2).

the scope of Rule 612 with varying degrees of clarity."[13] Some courts have

distinguished between Rule 612(a)(1) and Rule 612(a)(2) — the latter applies to

writings used to refresh recollection *before* testifying and includes a clause giving

courts discretion to decide whether "justice requires" production of the writing; the

former applies to writings used to refresh recollection *during* testimony and

includes no such clause. Accordingly, some courts have held that "being phrased

in mandatory language, Rule 612(1) prevails when pitted against a claim of

privilege"[14] — and this is the approach that Special Master Warner took in

ordering the District to produce the entirety of the 45-page document.[15] However,

the proper approach is to conduct a "balancing test to determine whether Rule 612

requires disclosure, notwithstanding the existence of a privilege."[16] This balancing

approach should be used not just when Rule 612 conflicts with the attorney-client

---

[13]     *Suss v. MSX Int'l Eng'g Servs., Inc.*, 212 F.R.D. 159, 163 (S.D.N.Y.
2002).

[14]     *Magee v. Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 637 (E.D.N.Y.
1997).

[15]     PTO 71, Docket No. 293, at 5 (citing *Magee*, 172 F.R.D. at 637).

[16]     *Bank Hapoalim, B.M. v. American Home Assur. Co.*, No. 92 Civ.
3561, 1994 WL 119575, at *6 (S.D.N.Y. Apr. 6, 1994) (citing *Berkey Photo, Inc.
v. Eastman Kodak Co.*, 74 F.R.D. 613, 615 (S.D.N.Y. 1977)).

privilege, but also when it conflicts with the attorney work-product doctrine.[17]

Relevant factors include: (1) whether production is necessary for a fair cross-examination; (2) the extent to which reviewing the document impacted the witness's testimony; (3) whether the witness was himself the author of the document (and therefore whether the document represents a mere memorialization of the witness's knowledge); and (4) whether the party seeking production is engaging in a 'fishing expedition.'[18]  Thus, Special Master Warner's Order is contrary to law to the extent it concludes that, *whenever* a privileged document is used to refresh a witness's recollection while testifying, production of that document is mandatory.  Instead, the above factors must be weighed to determine whether or not Rule 612 mandates production.

---

[17]     Although *Bank Hapoalim* addressed a writing protected by the attorney-client privilege, *see id.* at *1, courts in this circuit have also withheld the production of attorney work-product that was used to refresh a witness's recollection.  *See Al-Rowaishan Establishment Universal Trading & Agencies, Ltd. v. Beatrice Foods Co.*, 92 F.R.D. 79 (S.D.N.Y. 1982); *Carter-Wallace, Inc. v. Hartz Mountain Indus., Inc.*, 553 F. Supp. 45, 52 (S.D.N.Y.1982) ("[W]here many of the documents C–W's attorneys have shown deponents to refresh their recollection fall within the work product doctrine, it would not be appropriate to order C–W to turn over the documents it has used to refresh their witnesses' recollection.").

[18]     *See In re Rivastigmine Patent Litig.*, 486 F. Supp. 2d 241, 243-44 (S.D.N.Y. 2007); *Bank Hapoalim*, 1994 WL 119575, at *6; In *re Joint Eastern & Southern Dist. Asbestos Litig.*, 119 F.R.D. 4, 6 (E.D. & S.D.N.Y. 1988); *Berkey Photo Inc.*, 74 F.R.D. at 617.

8

Even where Rule 612 does mandate the production of writings used to refresh a witness's recollection, it only does so with respect to portions of the document relating to the testimony that was based on the refreshed recollection.[19] However, because it must *first* be determined whether Rule 612 mandates the production of the work-product spreadsheet at issue, I need not determine at this stage whether Special Master Warner erred in his determination that the thirty-seven pages withheld by plaintiff are related to the portion of Dr. Wheatcraft's testimony that was based on his refreshed recollection.

## V.  CONCLUSION

Because the holding of PTO 71 is contrary to law, the District's objection to it is sustained.  I hereby remand this matter to Special Master Warner to determine whether, under the balancing test articulated above, Rule 612 mandates the production of the spreadsheet at issue.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 5, 2012

---

[19]      Fed. R. Evid. 612(b).

9

# EXHIBIT 2

Jon D. Anderson
Direct Dial: (714) 755-8217
jon.anderson@lw.com

650 Town Center Drive, 20th Floor
Costa Mesa, California  92626-1925
Tel: +1.714.540.1235  Fax: +1.714.755.8290
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Moscow |
| Barcelona | Munich |
| Beijing | New Jersey |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Doha | Riyadh |
| Dubai | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

File No. 036309-0044

March 22, 2013

## VIA EMAIL AND LNF&S

Kenneth E. Warner, Esq.
Special Master
Warner Partners
950 Third Avenue, 32nd Floor
New York, New York  10022

Re:    MDL No. 1358 Master File C.A. No. 1:00-1898 (SAS)
       *Orange County Water District v. Unocal Corp., et al.*, No. 04 Civ. 4968
       **Pending Motion To Compel Production of Document Improperly Withheld
       During Deposition of Dr. Wheatcraft**

Dear Special Master Warner:

       I write on behalf of Defendants in the above-referenced matter regarding Defendants'
fully briefed and currently pending Motion to Compel Production of Document Improperly
Withheld During Deposition of Dr. Wheatcraft (the "Motion").

       By way of background, and as you will recall, on January 20, 2012, Defendants moved to
compel Plaintiff Orange County Water District ("OCWD") to produce a document that was
expressly and openly relied upon by Dr. Wheatcraft to "refresh his recollection" during his
deposition (to quote counsel for OCWD).  After the parties fully briefed and argued the Motion,
and the document in question was submitted to you for *in camera* review, the Motion was
granted for the reasons set forth in PTO 71 (dated February 29, 2012).  OCWD objected to PTO
71 and, on June 6, 2012, Judge Scheindlin sustained the objection and remanded the Motion to
be re-evaluated by application of a "balancing test" set forth in Judge Scheindlin's opinion.  At
your request, the parties submitted supplemental briefing in July and August 2012, applying the
"balancing test" to the issues raised in the Motion.[1]  Accordingly, the Motion has been fully
briefed following remand and is ripe for decision.

---

[1] Defendants' supplemental brief was submitted on July 9, 2012.  OCWD responded on July 30,
2012, and the supplemental briefing closed with the submission of Defendants' reply on August
13, 2012.

LA\3101776.1

Special Master Warner
March 22, 2013
Page 2

**LATHAM&WATKINS**LLP

The purpose of this letter is to respectfully request a ruling on the remanded Motion and to respectfully indicate Defendants' willingness to participate in a telephonic hearing, submit additional briefing, or otherwise provide any information that would be useful.

While Defendants were hesitant to impose upon you with such a request, it is the peculiar importance of this Motion that ultimately led us to do so. Indeed, the relief requested in the Motion—*i.e.* the opportunity to obtain the full extent of discovery from Dr. Wheatcraft to which Defendants are entitled under the applicable Federal Rules—is of paramount importance to Defendants, as Dr. Wheatcraft's opinions will be vigorously contested in the pre-trial stage of this matter, as in other MTBE litigations. *See, e.g., Crescenta Valley Water District v. Exxon Mobil Corp. et al.* Case No. 07-CV-2630-JST (C.D. Cal.), Jan. 8, 2013 Order Granting Defendants' Motion in Limine #1 (excluding Dr. Wheatcraft's proposed expert testimony because it "d[id] not meet the standards required by Federal Rule of Evidence 702" including because Dr. Wheatcraft's "model was specifically created for the purpose of ensuring that necessary levels of MTBE would appear in Plaintiff's wells, and . . . was changed to further that goal rather than to reflect objective, verifiable, and scientifically based decisions").[2] It is, therefore, of the utmost importance to Defendants that Dr. Wheatcraft's opinions, and all bases therefor, be fully disclosed and explored sooner rather than later, in advance of the inevitable *Daubert* motion in this case.

Very truly yours,

Jon D. Anderson
of LATHAM & WATKINS LLP

cc:   Duane Miller, Esq.
      Tracey O'Reilly, Esq.
      All Counsel (via LNFS)

---

[2] A copy of the trial court's recent order excluding Dr. Wheatcraft in the *Crescenta Valley* case is attached.

LA\3101776.1

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 20 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 1 of 18   Page ID
#:11640

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

Present: **Honorable JOSEPHINE STATON TUCKER, UNITED STATES DISTRICT JUDGE**

　Ellen Matheson　                                        　N/A　
Deputy Clerk                                              Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:      ATTORNEYS PRESENT FOR DEFENDANT:

Not Present                                               Not Present

**PROCEEDINGS:  (IN CHAMBERS)  ORDER GRANTING DEFENDANTS'
MOTION IN LIMINE #1 (Doc. 107)**

　　　This action arises out of a dispute over the impact of the release of the gasoline additive
methyl tertiary butyl ether ("MTBE") on the water supply within the Crescenta Valley Water
District.  The Crescenta Valley Water District ("Plaintiff" or "District") claims that "Defendants'
gasoline stations . . . released an enormous amount of MTBE into the groundwater, and that
MTBE is now moving down through the wash with the flow of groundwater and contaminating
the District's wells."  (Joint Memorandum of Case at 11, Doc. 74.)  Defendants, on the other
hand, argue that any MTBE contamination has been, or is in the process of being, cleaned up,
such that "[t]oday, these wells now have only trace amounts of MTBE, if any." (*Id.* at 24.)
Defendants further argue that "the likelihood that MTBE will meaningfully impact [the
District's] wells has diminished to the point of non-existence since the case was filed." (*Id.*)
Hence, as to any future damages calculation, the key issue is the accurate prediction of future
concentrations of MTBE in the District's wells.  To that end, Plaintiff retained Stephen W.
Wheatcraft, Ph.D. ("Dr. Wheatcraft") to model future groundwater and contaminant flow in
order to predict the specific impact on the wells.

　　　Before the Court is Defendants' Motion in Limine to Exclude Testimony of Dr.
Wheatcraft ("Motion") pursuant to Federal Rule of Evidence 702. (Mot., Doc. 107.)  Plaintiff

---

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 21 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 2 of 18   Page ID
#:11641

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                           Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

filed its opposition, and Defendants replied.  (Opp'n, Doc. 181; Reply, Doc. 207.)  The Court
heard argument on the Motion on July 9, 2012, and held an evidentiary hearing on August 22,
2012 ("Hearing").  (Doc. 236; Doc. 239.)  Thereafter, the parties filed post-hearing briefs, and
that briefing was complete as of September 21, 2012.  (Pl. Br., Doc. 251; Def. Br., Doc. 252.)
Having reviewed the papers on file in this action and considered the testimony from the August
22, 2012, *Daubert* hearing, the Court GRANTS Defendants' Motion in Limine.  The Court
concludes that the inability of Dr. Wheatcraft's model to replicate real-world data—i.e., it's
failure to accurately capture past or present concentrations of MTBE in the District Wells – is a
result of critical failures in methodology.  In its role as gatekeeper, the Court must exclude Dr.
Wheatcraft's testimony.


I.      **Background**

        Plaintiff hired Dr. Wheatcraft to assess the source(s) of the MTBE in Crescenta Valley
and to predict the amounts of MTBE that would get into District wells.  (Tr. 31:5-8, Doc. 247.)
To do this, Dr. Wheatcraft modified existing models to create a model that spans 78 years and an
area of roughly seventeen square miles.  (Tr. 47:15-16.)  The model covers an historical period
from 1995 through 2009, and the model's predictive phase began in 2010.  (Tr. 52:1-2, 74:8-10.)
Dr. Wheatcraft conducted 8 runs of his model before he issued his first expert report ("Report")
dated July 2010.  (Tr. 118:8-14, 149:9-15.)  He then conducted three more runs and issued a
supplemental rebuttal report ("Supplemental Report") dated September 2011, which was based
on Run 11.  (Tr. 117:10-12.)
        To create his model, Dr. Wheatcraft started with existing, available computer models that
measure groundwater flow (known as a "groundwater flow model"), that determine
concentrations of the contaminant (known as a "transport model"), and that display the results

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 22 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 3 of 18   Page ID
#:11642

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

(known as "modeling software" or a "graphical user interface").  (Tr. 31-34.)  The resulting,
combined model works in three stages: (1) the groundwater flow model calculates the
groundwater velocity; (2) this calculated velocity is used as data input for the transport model,
which computes concentrations as the MTBE moves from the source; and (3) data from both the
groundwater flow and transport models are input into the modeling software and graphically
organized.  (Tr. 34:8-10, 38:24-39:3, 43:23-25.)

     Dr. Wheatcraft began with a groundwater flow model created by GeoMatrix, along with a
transport model and modeling software that are generally known in and used by the scientific
community.  (Tr. 33:7-14; 34:6-10,19-20, 36:17-18.)  The GeoMatrix model was created outside
of litigation for the Crescenta Valley Water District to manage its aquifers.  (Anderson Decl. Ex.
4 (Report), at 11, Doc. 107-3; Tr. 140:23-141:2.)  It covers the period from 1995 through roughly
2004-2005 and integrates actual field data.  (Tr. 34:19-25, 36:22-24, 52:6.)

     The reliability of the GeoMatrix model is not seriously disputed.  (*See* Reply at 12-13.)
Both Dr. Wheatcraft and Defendants' expert witness Dr. John L. Wilson ("Dr. Wilson") state
that the GeoMatrix model was properly calibrated. (Tr. 35:14-19, Tr. 206:5-17.)  Calibration is a
large component of reliability.  *See Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007,
1060 (E.D. Cal. 2011) ("it is indisputable that calibration is a 'critical' and 'valuable' step that
ensures that model simulation matches the field observation to a reasonable degree.")
Specifically, as part of the model's calibration process, GeoMatrix made 109 model runs,
documenting each run with its statistical parameters and explanations for the continuation or
termination of calibration.  (Tr. 148:13-15, 206:11-17.)  In 2006, the GeoMatrix model was
updated with information derived from a geophysical study of the area—which included a
gravity survey, a seismic survey, and resistivity survey—and was recalibrated.  (Report at 11-
12.)  This additional information was used to determine, *inter alia*, the depth of the bedrock and
models the permeability of the subsurface.  (Tr. 55:9-12, 144:15-21.)

---

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 23 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 4 of 18   Page ID
#:11643

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                              Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

Although Dr. Wheatcraft's reports state that "[t]he model was used as calibrated by
GeoMatrix from 1981 to present (through 2009)," (Report at 12; Anderson Decl. Ex. 10 (Suppl.
Report), at 9, Doc. 107-7), he later acknowledged that he did not, in fact, use the GeoMatrix flow
model "as-is."  Dr. Wheatcraft testified that he made several changes to the GeoMatrix model,
which in turn affects the transport model and the graphics created by the modeling software
because the GeoMatrix model data serves as input for the other two models.  For example, he
modified the pumping[1] and recharge[2] data for the GeoMatrix model.  (Tr. 36:3-6.)  Prior to the
Supplemental Report, he also made changes to the depth of bedrock in certain areas.  (Tr. 37:1-2,
145:7-11, 146:13-21, 147:5-10.)  In short, Dr. Wheatcraft altered what otherwise appears to have
been a valid, calibrated, non-litigation model.  He further admits to errors in input data, such as
continuing to add constant MTBE levels into the model though MTBE has not been used in
gasoline since 2003.  (*See* Supplemental Report at 309; Mot. at 19.)  The question before the
Court is whether those alterations and errors undermine the reliability of the model.

**II.      Legal Standard**

Federal Rule of Evidence 702 controls the admissibility of expert testimony.  A proposed
expert witness must be "qualified as an expert by knowledge, skill, experience, training, or
education."  Fed. R. Evid. 702.  Once qualified, the expert may testify if: "(a) the expert's
scientific, technical, or other specialized knowledge will help the trier of fact to understand the
evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

---

[1] Around a well that is being pumped, groundwater velocity increases and the water level lowers.  (Tr.
39:12-24.)  Conversely, if a well is turned off, the water level will rise and the water will not move toward
the well but return to the ambient groundwater flow direction.  (Tr. 40:9-16.)
[2] Recharge is the amount of rainfall that reaches groundwater.  (Tr. 57:24-58:2.)

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 24 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 5 of 18   Page ID
#:11644

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                                   Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

the testimony is a product of reliable principles and methods; and (d) the expert has reliably
applied the principles and methods to the facts of the case." *Id.*

Rule 702 imposes a "gatekeeping" obligation on the district court. *See Kumho Tire Co. v.
Carmichael*, 526 U.S. 137, 147 (1999); *see also Barabin v. AstenJohnson, Inc.*, 700 F.3d 428,
432 (9th Cir. 2012) ("The potentially significant influence of expert testimony underscores the
importance of assiduous 'gatekeeping' by trial judges."). The district court must determine
whether the proposed testimony "rests on a reliable foundation and is relevant to the task at
hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) ("*Daubert I*"); *see also
Barabin*, 700 F.3d at 433 (reversing trial court that failed to "assess the proffered expert
testimony for relevance and reliability"). In order to assess the reliability of expert testimony,
the court may consider "(1) whether the 'scientific knowledge ... can be (and has been) tested';
(2) whether 'the theory or technique has been subjected to peer review and publication'; (3) 'the
known or potential rate of error'; and (4) 'general acceptance.'" *Obrey v. Johnson*, 400 F.3d
691, 696 (9th Cir. 2005) (quoting *Daubert I*, 509 U.S. at 593-94). These factors, however, "do
*not* constitute a definitive checklist or test," *Kumho Tire*, 526 U.S. at 150 (emphasis in original)
(internal quotation marks omitted), and courts also look at whether research is conducted for
litigation purposes. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)
("*Daubert II*"). Research conducted independent of litigation "carries its own indicia of
reliability" since it provides "important, objective proof that the research comports with the
dictates of good science." *Id.* But because "experts whose findings flow from existing research
are less likely to have been biased toward a particular conclusion," parties who proffer expert
testimony based on research that is an outgrowth of litigation must "come forward with other
objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Id.*
at 1317-18.

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 25 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 6 of 18   Page ID
#:11645

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

### III.      Discussion

As required by Federal Rule of Evidence 702, the Court must first assess the qualification
of Dr. Wheatcraft "as an expert by knowledge, skill, experience, training, or education." Fed. R.
Evid. 702.  Plaintiff states that "defendants do not (and cannot) challenge Dr. Wheatcraft's
expertise," (Opp'n at 6)—and in fact, Defendants have never disputed the qualifications of Dr.
Wheatcraft, (Reply at 2)—yet Plaintiff goes on at length to enumerate his accomplishments.
(Opp'n at 6-7).  The Court finds that Dr. Wheatcraft is qualified as an expert, but that does not
end the inquiry, as the Court must also determine whether his proposed expert testimony "rests
on a reliable foundation" as required by the Supreme Court.  *See Daubert I*, 509 U.S. at 597.

Although a *Daubert* analysis does not typically focus on an expert's conclusions,
"conclusions and methodology are not entirely distinct from one another" and a court "may
conclude that there is simply too great an analytical gap between the data and the opinion
proffered." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997).  Here, it is particularly true that
conclusions cannot be divorced from the validity of the methodology.  The purpose of
Dr. Wheatcraft's model is to replicate the future flow of MTBE into the District's wells.  If the
data reflects that the model has, thus far, failed to do that, then the Court must give greater
scrutiny to the methodology.  "Nothing in either *Daubert* or the Federal Rules of Evidence
requires a district court to admit opinion evidence that is connected to existing data only by the
*ipse dixit* of the expert." *Id.*  Moreover, it is particularly important for the Court to keep in mind
its role as gatekeeper where, as here, an expert uses modeling software that "can be made to
appear extremely realistic, especially when coupled with computer graphics." *Cf.* Channing R.
Robertson, John E. Moalli, & David L. Black, *Reference Guide on Engineering*, *in* REFERENCE

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 26 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 7 of 18   Page ID
#:11646

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                         Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

MANUAL ON SCIENTIFIC EVIDENCE 897, 937 (3d ed. 2011) ("Reference Manual") (discussing
computer models that use finite element methods ("FEMs")).  Bearing this in mind, the Court
examines below Dr. Wheatcraft's methodology, beginning with the reliability of the model's
predictions thus far, followed by his method of calibration, and then finally the sufficiency of the
model's data.

### A.      Reliability of Model Predictions

Defendants allege that Dr. Wheatcraft's model does not correlate with real-world results.
(Mot. at 8.)  Indeed, two years have passed since the issuance of Dr. Wheatcraft's initial Report,
and we can look to that two-year period of real-world results to determine if the results validate
his predictions.  In that two-year period, the model predicts increasing MTBE concentrations in
eleven wells—reaching above 15 parts per billion ("ppb") in one well (#2), 10 ppb in four wells
(#6, 10, 14, 15), and 1 ppb in six wells (#1, 5, 7, 8, 9, 11)[3], (Report at 54-55),—yet observed data
shows a relatively stable trend, and that during this period no well had MTBE concentrations at
or above 0.5 ppb, with the exception of well 8.  (Hearing Ex. 41.)

Dr. Wheatcraft argues that this real-world comparison is inappropriate "because the
model itself had not been updated with all the appropriate data from the same time period."  (Tr.
76:12-14.)  The argument raises a significant concern.  Dr. Wheatcraft's model is helpful only if
it is predictive; if it cannot be predictive until after it has been updated with real-world results,
then it fails in its purpose.  Moreover, Dr. Wheatcraft agreed that the early years of the model
would be the most accurate, (Tr. 132:19-23), and Dr. Wilson testified that if the model's
predictions were off in the first few years, future predictions would become even less accurate.

---

[3] The model also predicts a negative amount in well 12 from October 2010 – May 2011.  (Report at 55,
Tr. 158:1-10 (discussing conversion of date estimates in Report).)

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 27 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 8 of 18   Page ID
#:11647

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                          Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

(Tr. 211:16-20.)  Even accepting Dr. Wheatcraft's argument that the model cannot be expected
to predict accurately without updating, the model also fails to comport with the historical
period—i.e., prior to 2010—for which real-world data *was* available when Dr. Wheatcraft issued
his Report.  (*See* Hearing Exs. 53-54, 57-61.)  Exhibits 53 and 54, introduced at the *Daubert*
hearing, show disparities between simulated and observed water levels in monitoring wells, with
some wells differing by 60 feet or more.  (*See, e.g.*, Hearing Exs. 53-3, 53-4, 53-5, 54-1, 54-2.)
Exhibits 57-61 highlight disparities between simulated and observed MTBE concentrations in
wells 2, 3, 5, 6, and 7 prior to the Report's release date.  (Hearing Exs. 57-61.)  Dr. Wheatcraft
himself stresses that his model also underpredicts observed data, pointing out that, among other
examples of underpredictions, well 7 underestimated MTBE by a factor of 335.6 for September
or October of 2006.  (Wheatcraft Decl. ¶ 47 Table 1, Doc. 181-1; Tr. 158:1-10.)

   At the July 9, 2012 hearing, Plaintiff suggested that the model is not mapping onto
real-life data because of an unanticipated, massive drought in 2011.  This relatively new
premise—a drought year was only briefly referenced by Dr. Wheatcraft in opposition to the
instant Motion (Wheatcraft Decl. ¶ 45) [4]—became Plaintiff's central explanation for the model's
inaccuracies, and the Court highlighted this argument as a reason to hold an evidentiary hearing.
(July 9 Tr. 31-33.)  Having now conducted the hearing, the Court concludes that Plaintiff's
drought argument is unavailing.  In short, the evidence does not reflect a drought in California in
2011.  Moreover, District Engineer Gould testified that "[s]ince '04, '05, the general basin has
been declining its water levels.  We've watched most of our wells lose capacity as well levels
decline: therefore, we can't get enough water out of the ground."  (Tr. 15:4-7.)  This decline
existed through the 2009, (Tr. 18:21-19:1), or possibly the 2010 water year, (Tr. 20:18-24), until
above-average rainfall followed.  (*See also* Hearing Exs. 21, 75.)  Mr. Gould provided Dr.

---

[4] "Rainfall records indicate that 2011 was a drought year.  My model uses an average rainfall amount . . . .
and the actual rainfall that took place in 2011—a drought year—could result in delay of MTBE reaching
CVWD production wells."  (*Id.*)

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 28 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 9 of 18   Page ID
#:11648

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                      Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

Wheatcraft with this data, (Tr. 20:18-24), and the data was included in Dr. Wheatcraft's
modifications to the GeoMatrix model.  (Tr. 36:21-37:4.)  Assuming Dr. Wheatcraft accurately
used this data, the recharge decrease would have been accounted for in his model.  Further, the
downward trend of water levels is just the sort of real-world data Dr. Wheatcraft would have
been comparing with the model's prediction in order to properly calibrate the model.  So while
the Court accepts Plaintiff's proffered field standard that models cannot exactly predict the first
arrivals of MTBE in the wells, Plaintiff has not adequately provided an explanation for why the
model has not accounted for the decrease in recharge and pumping that supposedly *was included*
in the model.

        Where "an expert purports to apply principles and methods in accordance with
professional standards," and yet reaches conclusions that are contrary to real life data before the
Court, "the trial court may fairly suspect that the principles and methods have not been faithfully
applied."  *See* Fed. R. Evid. 702 advisory committee's notes (citing *Lust v. Merrell Dow Pharm.,
Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("the district court can exclude [an expert] opinion if the
expert fails to identify and defend the reasons that his conclusions are anomalous.")).  Here, the
Court finds that the failure of Dr. Wheatcraft's data to align with real-world data—both for
historical periods and predictive periods—gives the Court reason to question Dr. Wheatcraft's
methodology and his application of such methodology.

        **B.  Scientifically Accepted Method of Calibration**

        Calibration "involves adjusting model parameters to best achieve a match between
measured and modeled (calculated) groundwater elevations."  Dr. David Huntley, *Use and
Misuse of Groundwater Models in Expert Testimony*, (2009) (Anderson Decl. Ex. 1, at 4.); *see
also* (Tr. at 205:21-206:4).  The key to a model's reliability is in large part based on its

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 29 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 10 of 18   Page ID
#:11649

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013

Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

documented calibration. *See Abarca*, 761 F. Supp. 2d at 1060 ("it is undisputable that calibration
is a 'critical' and 'valuable' step that ensures that model simulation matches the field observation
to a reasonable degree."); *see also Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977,
982 (9th Cir. 1993) (affirming defendant agency's approval of a timber sale in a national forest
and noting that Defendant had "conducted extensive field investigations to calibrate and verify
its models"). A well-calibrated model is one that can replicate real-world conditions. *See
Abcara*, 761 F. Supp. 2d at 1056 ("an expert must test or 'calibrate' a model to align the model
predictions with field observations"); *see also Upper Blackstone Water Pollution Abatement
Dist. v. U.S. Envtl. Prot. Agency*, 690 F.3d 9, 23 (1st Cir. 2012) (noting that with more data,
models are "further calibrated to match real-world conditions"). A model that is not calibrated or
is "partially-calibrated [] may not be scientifically sound." *Abcara*, 761 F. Supp. 2d at 1072 ("A
half-calibrated model is, by definition, inadequately calibrated and excluded under Daubert.").

Plaintiff claims that Dr. Wheatcraft calibrated his model by comparing "predicted
concentrations of MTBE in District wells to MTBE concentrations found historically in samples
taken from District wells" and following American Society for Testing and Materials Guidelines.
(Opp'n at 12, 15.) Dr. Wheatcraft testified that he made a total of only 12 runs, but not all of
these were calibration runs. (Tr. 149:22-25.) The first four runs were based entirely on the
GeoMatrix model: (1) run 1 was flow-only of the GeoMatrix model; (2) run 2 was flow-only
with the stress period increased to 340 and porosity in layers 1 and 2 increased from .01 to .02;
(3) run 3 was identical to run 2; and (4) run 4 was flow-only with stream flow off and the supply
well pumping scheme altered. (Tr. 152:7-25.) The next four runs included both flow and
transport models: (5) run 5 was the first run to include transport with the GeoMatrix flow model;
(6) run 6 increased the stress periods to 440 and altered the layer thickness in layer 1 and 2; (7)
run 7 was identical to run 6 with the addition of observation wells in layer 2 only, (Tr. 153:10-
154:25); and (8) run 8 appears to have increased layer 1 thickness by approximately 100 feet

**CIVIL MINUTES – GENERAL**

Case 1:00-cv-01898-VSB-VF  Document 3693  Filed 04/26/13  Page 30 of 100
Case 2:07-cv-02630-JST-AN  Document 273  Filed 01/08/13  Page 11 of 18  Page ID
#:11650

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

around two gas stations, essentially lowering the bedrock to make the area more permeable and
allowing water to flow more easily.  (171:20-174:14.)  Dr. Wheatcraft testified that the run 8
changes were based, in part, on problems Dr. Wheatcraft experienced with getting water to flow
through that area in the model.  (Tr. 167:11-19, 193:8-17.)  Dr. Wheatcraft's report is based on
run 8.  (Tr. 157:19-25.)  His Supplemental Report is based on run 11.  (Suppl. Report; Tr. 117:6-
12.)  The Supplemental Report was not updated to incorporate any of the field measurements that
had been collected during the 2010-2012 period.  (Tr. 122:1-8.)

Defendants allege that Dr. Wheatcraft did not calibrate his model after revising the
GeoMatrix model for layer thickness and inputs related to well pumping and groundwater
recharge.  (Mot. at 7.)  Dr. Wheatcraft agrees with this assertion, stating that "we checked the
calibration, and it didn't need to be recalibrated," (Tr. 166: 5-7), but then also states that
increasing the permeability was part of the calibration procedure, distinguishing the seemingly
contrary positions with a nod to semantics.  (Tr. 173:20-21.)  Additionally, the documentation on
the runs amounts to a small "read me" file attached to each run.  (Tr. 151:22-152:4, 227:18-21
("Q: He gave you read-me files which are explicitly for the purpose of describing a run; is that
correct? A: Yes. He provided read-me files typically consisting of less than six words.").)  As a
result, the purpose and findings of each run is not readily apparent, nor can the Court ascertain
from any documentation when or whether calibration in fact took place.

Plaintiff complains that Defendants want it both ways—they want Dr. Wheatcraft to have
modified the GeoMatrix model with regard to cell size, but then criticize the changes that he did
make.  (Opp'n at 2.)  The Court does not take issue with the need to adapt an existing model to
reflect the purpose of the new model or to improve accuracy with validated data; however, such
changes must be acknowledged and measured.  The new model cannot simply point to the
reliability and accuracy of the original model and rest on its laurels.  The Report states that the
"[GeoMatrix] model was used *as calibrated by GeoMatrix*" when in fact it was not.  (Tr. 162:18-

**CIVIL MINUTES – GENERAL**

11

Case 1:00-cv-01898-VSB-VF  Document 3693  Filed 04/26/13  Page 31 of 100
Case 2:07-cv-02630-JST-AN  Document 273  Filed 01/08/13  Page 12 of 18  Page ID
#:11651

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                          Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

20 (emphasis added).)  Dr. Wheatcraft downplays this discrepancy: "[t]he statement that the
model was used as calibrated was -- I mean, we didn't make any changes to any of the essential
information of the model." (Tr. 163: 6-9.)  The Court disagrees.  Minimizing layer thickness
specifically for the purpose of increasing groundwater flow near MTBE source sites is a change
that likely has critical consequences for the model's conclusion.  Plaintiff contends that the
reduction in source contribution and changes to the layer thickness in the GeoMatrix model do
not change Dr. Wheatcraft's model's results, (Opp'n at 3, 13); the Court cannot establish the
veracity of this claim because Plaintiff did not provide a run which isolated either of these
changes.

    Aside from generalizations about checking the model against real life data, Dr.
Wheatcraft does not identify any specific, scientifically-grounded methods he undertook for
calibration.  This is dissimilar to the expert testimony that was allowed in *Abarca*.  761 F. Supp.
2d 1007.  In *Abarca*, the plaintiff's air model expert chose a particle size within generally
accepted standards and then "did the sensitivity analysis and the probability distribution and an
uncertainty analysis" to validate her particle size selection.  *Id.* at 1037.  Additionally, the
*Abarca* court deferred to the groundwater expert's choice not to calibrate his data against field
data that he concluded was unreliable, stating that the reliability of the field data was a "scientific
factual dispute" which must be weighed by the trier of fact.  *Id.* at 1071.  Here, Dr. Wheatcraft
has not provided a scientifically based reason for not calibrating and has not provided enough
detail about his methodology to even create a "scientific factual dispute."  The Court has serious
reservation whether the Report was based on "the same level of intellectual rigor" that Dr.
Wheatcraft would use outside his litigation consulting.  *See Kumho*, 526 U.S. at 152; *see also*
*Cooper v. Brown*, 510 F.3d 870, 943 (9th Cir. 2007).

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 32 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 13 of 18   Page ID
#:11652

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

### C. Sufficiency of Data

This Court also has serious questions about the sufficiency of the data used by Dr.
Wheatcraft, particularly the MTBE source term and the layer thickness.

### 1.    MTBE Source Term

Defendants contend that the model erroneously adds MTBE values to groundwater.
(Mot. at 1.)  Dr. Wheatcraft's run 8 model used constant release concentration values to continue
to inject MTBE into the groundwater through 2059.  (Mot. at 8; Wheatcraft Decl. ¶ 30.)
Additionally, Dr. Wheatcraft's model was "given an initial condition that there was MTBE found
in 2001" in the Wortmann station, (Tr. 112:19-24), although MTBE was not detected in that
station until five years later.  (Tr. 102: 21-23.)  Dr. Wheatcraft holds that the early appearance of
MTBE, alternatively called "a typo" or "erroneous belief," (Tr. 112:16-19), was removed prior to
run 11 on which the Supplemental Report was issued, (Suppl. Report at 10), though Dr. Wilson
contends that the error remains.  (Tr. 225:3-11.)  As the Reference Manual on Scientific
Evidence states "[n]o matter how sophisticated the [model] software, or how realistic the output
seems, if the *data* fed to the program are inaccurate, the results will be poor and thus can be
misleading."  Reference Manual, *supra*, at 937.  This Court has serious questions about the
reliability of Dr. Wheatcraft's methodology in calculating future MTBE levels where the MTBE
source term is wildly inaccurate.

Moreover, though the Supplemental Report now reduces MTBE source contribution over
time,  Defendants argue that the continuous, if reduced, introduction of MTBE is contrary to Dr.
Wheatcraft's testimony that he did not add MTBE to the model after July 2, 2010, (Mot. at 7),

**CIVIL MINUTES – GENERAL**

13

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 33 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 14 of 18   Page ID
#:11653

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

and is inaccurate because the model adds MTBE in substantial quantities to groundwater for 56 years after MTBE was no longer in gasoline.  (Mot. at 1, 8.)  Plaintiff states that the change results in no significant difference from the original projections.  (Opp'n at 3.)  The continuous addition of MTBE is necessary, according to Plaintiff, because "[a]lthough soil remediation can reduce MTBE loading into groundwater, such remediation seldom eliminates MTBE loading to groundwater.  Transport modeling must account in some manner for ongoing contributions of contaminants to groundwater."  (Opp'n at 12.)

An expert "may demonstrate the scientific validity of a theory or technique by showing that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.  Alternatively, testifying experts may also show the validity of their theory by explaining  precisely how [the experts] went about reaching their conclusions."  *Domingo ex rel. Domingo  v. T.K.*, 289 F.3d 600, 605-06 (9th Cir. 2002) (internal quotation marks omitted).  An expert may extrapolate from existing data as long as there is an analytical connection between the known data and the opinion.  *See Joiner*, 522 U.S. at 146.  While the Court agrees with Plaintiff that MTBE would not have magically disappeared from the soil and groundwater once MTBE was banned in California, (*see* Opp'n at 3, 13), Plaintiff has not made clear on what evidence Dr. Wheatcraft based his MTBE release concentration value—the analytical connection has not been made.  Additionally, it is unclear how reducing the source contribution over time could bring about the same results as maintaining a continuous stream of source contribution, especially given Dr. Wheatcraft's testimony that "the mass that reaches the well is primarily a function of the amount of mass that's input as the source term."  (Tr. 67: 21-23.)  In upholding its duty as gatekeeper, the Court cannot rely solely on Dr. Wheatcraft's word to verify his methodology.  *Joiner*, 522 U.S. at 136-37.

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 34 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 15 of 18   Page ID
#:11654

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013

Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

 

2.    <u>Selective Changes to Layer Thickness</u>

Defendants contend that the changes made to the subsurface geology are arbitrary and
results-driven, "based purely on the *ipse dixit* of Dr. Wheatcraft." (Mot. at 16.) Relying on data
from monitoring wells that post-dated the GeoMatrix model and visual surface inspections made
during a site visit, Dr. Wheatcraft modified the GeoMatrix model prior to the original Report and
again prior to the Supplemental Report. (Tr. 145:7-11, 147:4-18, 192:5-7.)[5] Defendants argue
that observed water levels did not match the modeled water levels, so Dr. Wheatcraft changed
layer thickness without looking to other causes of the discrepancy. (Reply at 15.)  While
Plaintiff argues that the localized nature of the changes increased the accuracy of the model,
(Opp'n at 3, 12), Defendants claim that the alteration of cells located only near MTBE release
sites substantially increased the velocity of the groundwater flow in the affected cell by adding
water to cells that would otherwise be dry. (Mot. at 15-16; Reply at 16.)

Rather than scientifically justify the changes made to the GeoMatrix model's layer
thickness, Plaintiff argues that Dr. Wheatcraft's modifications  are insignificant because he
altered the layer thickness of only 2.1% of the model cells. (Opp'n at 12; Tr. 166:12-16.)
However, the key location of affected cells trumps the quantity of unaffected cells.  Indeed, the
testimony of Dr. Wheatcraft suggests a focus on results:

Q: Now, you were having trouble getting the model to get water to flow through the
Unocal station in your model, right?

A: That's right.

---

[5] Specifically, Dr. Wheatcraft testified that he modified the "depth to bedrock" which "effectively
increased the permeability." (Tr. 145:3-11, 173:13-21.)

---

**CIVIL MINUTES – GENERAL**

15

Case 1:00-cv-01898-VSB-VF Document 3693 Filed 04/26/13 Page 35 of 100
Case 2:07-cv-02630-JST-AN Document 273 Filed 01/08/13 Page 16 of 18 Page ID
#:11655

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. CV 07-2630-JST (ANx)　　　　　　　　Date: January 8, 2013
Title: Crescenta Valley Water District v. Exxon Mobile Corp., et al.

---

Q: So what you did to correct for that problem or to solve that dilemma was to push the
bedrock down lower than GeoMatrix actually found it to be, right?

A: Lower than what it was predicted based on the geophysical results, yes.

(Tr. 171:23-172:6.)

It also appears that Dr. Wheatcraft changed layer thickness as early as Run 6. (Tr. 153:24-
154:4.) While he is unsure whether the thickness was increased or decreased, he testified that
"there was something that we did between [increasing stress periods to 400 and altering layer
thickness] that would have improved both [flow and transport]." (Tr. 154:12-14.)

Dr. Wheatcraft testified that "[a]ll models are approximations of reality. We don't
actually know each and every value of the permeability of the porosity and varieties of other
parameters within the subsurface. And so, we use very well-known, scientifically tested methods
to provide inputs to the model." (Tr. 56:23-57:2.) Plaintiff, however, relies on increased water
levels in test wells and a visual inspection of above-ground bedrock to justify increasing
permeability in areas surrounding source sites, in effect lowering the bedrock one hundred feet
from the depth that GeoMatrix's geophysical test had indicated. (Tr. 172:16-19.)

Again, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district
court to admit opinion evidence that is connected to existing data" on the expert's word alone.
*Joiner*, 522 U.S. at 146. Plaintiff has provided the Court no "well-known or scientifically tested
methods" to explain why water levels and above-ground inspection provide data superior to
geophysical test results, or why "dropping" the bedrock one hundred feet was the necessary
adjustment. In other words, these changes fail *Daubert*'s requirement that "in order to qualify as
'scientific knowledge,' an inference or assertion must be derived by the scientific method."
*Daubert*, 509 U.S. at 590.

**IV.　Conclusion**

---

**CIVIL MINUTES – GENERAL**

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 36 of 100
Case 2:07-cv-02630-JST-AN   Document 273   Filed 01/08/13   Page 17 of 18   Page ID
#:11656

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                    Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

---

Despite the *Daubert* requirement that "[p]roposed testimony must be supported by appropriate validation," Plaintiff has not provided such evidence. *See Daubert I*, 509 U.S. at 590.  Plaintiff instead relies solely on Dr. Wheatcraft's word that the model can accurately predict MTBE levels despite its historical failure to comport with real-world data.  Moreover, though the GeoMatrix model was created for nonlitigation purposes, Dr. Wheatcraft's modified model and his Report were created solely for litigation purposes.  Plaintiff is therefore "required to come forward with other objective, verifiable evidence that the testimony is based on scientifically valid principles." *Cano v. Cont'l Airlines*, 193 F. App'x 664, 666 (9th Cir. 2006) (quoting *Daubert I*, 509 U.S. at 597) (internal quotation marks omitted) (finding district court did not abuse discretion in excluding expert testimony where "[a]ppellants made no real effort to show how [expert] went about reaching his conclusions").  Instead Dr. Wheatcraft appears to have made certain assumptions about the source term and bedrock thickness without also providing "objective, verifiable evidence" about why those assumptions were made.  Further, the model runs lack comprehensive descriptions that would easily enable third-party verification of the principles on which the runs were based.  Finally, while modeling may not be an exact science, the lack of accuracy in Dr. Wheatcraft's calculations as compared to historical and current data, coupled with a lack of calibration or adjustment, raises serious concerns about the reliability of Dr. Wheatcraft's research. *Accord Abcara*, 761 F. Supp. 2d at 1074.

In short, the Court is left with the impression that the model was specifically created for the purpose of ensuring that necessary levels of MTBE would appear in Plaintiff's wells, and the model was changed to further that goal rather than to reflect objective, verifiable, and scientifically based decisions.

"Any step that renders the analysis unreliable renders the expert's testimony inadmissible." *AG of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009) (affirming

---

**CIVIL MINUTES – GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  CV 07-2630-JST (ANx)                                    Date: January 8, 2013
Title:  Crescenta Valley Water District v. Exxon Mobile Corp., et al.

district court finding that expert testimony was unreliable where expert work had not been peer
reviewed or validated by someone outside litigation); *see also Abcara*, 761 F. Supp. 2d at 1055
(quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)).  Thus, the Court does not
need to consider the others issues raised by Defendants, as any one of the above issues renders
the testimony inadmissible.  The Court finds that Dr. Wheatcraft's expert testimony does not
meet the standards required by Federal Rule of Evidence 702 and explicated in *Daubert*.

Accordingly, the Court GRANTS Defendants' Motion in Limine to Exclude the
Testimony of Stephen W. Wheatcraft.  While Dr. Wheatcraft may testify as to past and current
measured MTBE concentrations in the District's wells, and may opine as to which stations/sites
caused the contamination, he may not testify or offer opinions regarding future MTBE
concentrations.

Initials of Preparer:  <u>enm</u>

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*Orange County Water Dist. v. Unocal Corp., et al.,* 04 Civ. 4968 (SAS) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Master File No. 1:00-1898<br>    MDL 1358 (SAS)<br>    M21-88 |

**KENNETH E. WARNER, SPECIAL MASTER:**

### PRE-TRIAL ORDER # 76
### (Motion of ConocoPhillips Company to Compel Production
### of Balance of Document Withheld During Deposition of Dr. Wheatcraft)

Defendants (*per* ConocoPhillips Company) moved for an order "compelling Plaintiff

Orange County Water District ('OCWD' or 'the District') to produce a document" defendant

alleges was "improperly withheld from production by Dr. Wheatcraft and his counsel after Dr.

Wheatcraft expressly referred to the document to 'refresh his recollection' while testifying

during deposition." Defendants also ask that they be allowed to further depose Dr. Wheatcraft

"if necessary." I granted defendants' motion in PTO 71, which plaintiff appealed to Judge

Scheindlin. The motion is before me again on remand from Judge Scheindlin, who ruled that – if

the spreadsheet is otherwise protected by the attorney work product privilege -- I must

"determine whether [nonetheless], under the balancing test articulated in [the Court's June 6,

2012 opinion], Rule 612 mandates . . . production."

In PTO 71, I did not decide the privilege issue, based on my determination that, whether

or not the spreadsheet was privileged, the circumstances called for production. Likewise, as I

read Judge Scheindlin's opinion, she too assumed without deciding that the spreadsheet was

privileged and addressed the applicable balancing test -- *i.e.,* "whenever a privileged document is

used to refresh a witness's recollection . . . [certain] factors must be weighed to determine

whether or not Rule 612 mandates production" (June 6, 2012 Opinion & Order at p. 8).

In this PTO I decide the privilege issue – which defendants have continued to press – and

also address the balancing test in accordance with the guidance provided by Judge Scheindlin.

For the reasons set forth below, I find that the spreadsheet at issue is not protected by the work

product privilege and therefore must be produced in its entirety.  However, if the spreadsheet

were protected by the work product privilege, I find that the Rule 612 balancing test would not

require production of additional portions of the document beyond what plaintiff has already

produced.

## The Work Product Privilege

The party asserting the work product privilege bears the burden of establishing it.  *See*

*Gill v. Bausch & Lomb Supplemental Ret. Income Plan I*, 09-CV-6043 (CJS), 2012 U.S. Dist.

LEXIS 81446, at *29 (W.D.N.Y. June 12, 2012); *EEOC v. Johnson & Higgins, Inc.*, 93 Civ.

5481 (LBS)(AJP), 1998 U.S. Dist. LEXIS 17612, at *12 n.4 (S.D.N.Y. Nov. 6, 1998).  During

his deposition, Dr. Wheatcraft testified that the spreadsheet "was prepared at [his] desk by [his

colleague] Ms. Benton, actually the two of us together, along with some others," and not by

counsel.  (Jan. 17, 2012 Wheatcraft Dep. (Rough) 350:13-23.)  At Dr. Wheatcraft's deposition,

plaintiff's counsel objected to further questioning regarding, and production of, the spreadsheet,

"to the extent that document was prepared for counsel".  (*Id.* at 347:25-348:9.)

During the telephonic hearing I conducted on this motion, plaintiff's counsel asserted that

the spreadsheet is privileged because it "was prepared at [counsel's] request, and it was prepared

to assist" counsel in analyzing defendants' expert reports.  More specifically, plaintiff's counsel

argued that the spreadsheet was protected by the work product privilege because, although it was

prepared by a person who is plaintiff's testifying expert (*i.e.,* Dr. Wheatcraft), he was acting *in a different capacity* when he prepared the spreadsheet at counsel's request, namely as a non-testifying consulting expert.  Plaintiff's opposition to this motion states:

> Dr. Wheatcraft did not review, consider, or rely on this document for his opinions in this matter, nor was any privileged portion of the document reviewed or relied upon by Dr. Wheatcraft in responding to Mr. Anderson's questions.  Obviously, counsel is entitled to consult with its experts concerning matters outside the scope of their expert opinions, including seeking assistance with opinions espoused by the other party's expert...*In re Cendant Corp. Securities Litigation,* 343 F.3d 658, 662 (3d Cir. 2003) ["this protection extends beyond materials prepared by an attorney to include materials prepared by an attorney's agents and consultants."]

(Plaintiff Orange County Water District's Submission Regarding Conoco's Motion to Compel Document Concerning Dr. Wheatcraft's Deposition, Feb. 7, 2012, at 2.)

As a general rule, "the work product rule does not apply to experts who are expected to testify." *Beverage Market v. Ogilvy & Mather,* 563 F. Supp. 1013, 1014 (S.D.N.Y. 1983). While it "is conceivable that an expert could be retained to testify and in addition to advise counsel outside of the subject of his testimony," the rule is that "documents having no relation to the expert's role as an expert need not be produced but that any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of the party seeking discovery." *B.C.F. Oil Ref. v. Consolidated Edison Co.,* 171 F.R.D. 57, 61-62 (S.D.N.Y. 1997) (ordering production of documents where it was "not clear whether the expert reviewed them solely as a consultant or whether they informed his expert opinion as well"). *See also Beverage Market,* 563 F. Supp. at 1015 (ordering production where defendant had refused to produce expert report and rejecting defendant's argument that it was meant only as an analysis of plaintiff's expert report and did not relate directly to the expert testimony of defendant).

Dr. Wheatcraft relied upon the spreadsheet, at least in part, while being deposed as plaintiff's testifying expert, because the contents of the spreadsheet related directly to his expert

witness rebuttal testimony. Had the questioning by defendant's counsel continued along the same lines, it is evident that Dr. Wheatcraft would have similarly relied upon additional portions of the spreadsheet to respond. Dr. Wheatcraft's reliance on the spreadsheet was consistent with his job as plaintiff's testifying expert to rebut defendants' experts – a subject to which the spreadsheet directly relates, as it is comprised of organized excerpts from defendants' experts' reports.[1] Dr. Wheatcraft himself stated during his deposition that the spreadsheet "contains information about each expert and the details of opinions they provide that relate to the issue we have been discussing." (Dep. Tr. at 347:15-18.) Consequently, it is apparent from the record before me that the contents of the spreadsheet, and the process of organizing it in the spreadsheet, "informed his expert opinion." *See B.C.F. Oil Ref. supra.*

At a minimum, therefore, there is ambiguity as to which "hat" Dr. Wheatcraft was wearing (testifying expert vs. consulting expert, or both) when he created the spreadsheet. Accordingly, the spreadsheet is not protected by the work product privilege, and plaintiff must produce the document in its entirety. *See B.C.F. Oil Ref.* 171 F.R.D. at 61-62; *Beverage Market*, 563 F. Supp. at 1014-15.

## Rule 612

Although my determination that the spreadsheet is not protected by the work product privilege is dispositive of this motion, it is appropriate that I also address the Rule 612 analysis discussed by Judge Scheindlin in her remand opinion.

Where "a party uses attorney work product to refresh his memory, the potential for conflict exists between Rule 612, which favors disclosure of materials used to refresh a witness'

---

[1] For this reason plaintiff's counsel is incorrect in characterizing Dr. Wheatcraft's work analyzing the opposition expert reports as "outside the scope of [Dr. Wheatcraft's] expert opinion[]." The rebuttal of defendants' experts is certainly within the scope of Dr. Wheatcraft's work as plaintiff's testifying expert.

recollection, and the work product privilege." *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 119 F.R.D. 4, 5 (E.D. & S.D.N.Y. 1988). Therefore, even if the spreadsheet in this case were protected by the work product privilege, the application of a "balancing test to determine whether Rule 612 requires disclosure, notwithstanding the existence of" the privilege, would still be necessary, since Dr. Wheatcraft used it to refresh his recollection during his deposition. *Bank Hapoalim, B.M v. American Home Assur. Co.*, No. 92 Civ. 3561, 1994 WL 119575, at *6 (S.D.N.Y. Apr. 6, 1994) (citing *Berkey Photo, Inc.v. Eastman Kodak Co.*, 74 F.R.D. 613, 615 (S.D.N.Y. 1977)). Relevant factors to be considered include:

> (1) whether production is necessary for a fair cross-examination; (2) the extent to which reviewing the document impacted the witness's testimony; (3) whether the witness was himself the author of the document (and therefore whether the document represents a mere memorialization of the witness's knowledge); and (4) whether the party seeking production is engaging in a fishing expedition.

(June 6, 2012 Opinion & Order of Scheindlin, D.J. at 8 (citing *In re Rivastigmine Patent Litig.*, 486 F. Supp. 2d 241, 243-44 (S.D.N.Y. 2007); *Bank Hapoalim*, 1994 WL 119575, at *6; *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 119 F.R.D. at 6; *Berkey Photo Inc.*, 74 F.R.D. at 617)).

The issue of whether production is necessary for a fair cross-examination is largely moot in this case, because here plaintiff apparently agreed to (and did) produce those portions of the spreadsheet referred to by Dr. Wheatcraft to refresh his recollection when he was asked for specifics; Dr. Wheatcraft appears to have read from those portions as well during his deposition testimony (from my review of the deposition videotape, it appears that Dr. Wheatcraft reviewed only a limited portion of the spreadsheet to refresh his recollection during his deposition testimony). The only issue is whether production of the *entire* spreadsheet, including portions

not referred to by Dr. Wheatcraft and not used to refresh his recollection, is required, and I find under the balancing test that it is not.

Thus, when defense counsel asked Dr. Wheatcraft to "take the starkest, clearest example you can think of right now of a defense expert who you are certain ran the model with their own variations and where the information has not been provided to you," Dr. Wheatcraft used the spreadsheet to respond using direct quotes from defense expert Daus's report. (Dep. Tr. 332:25-334:19.) Defense counsel then proceeded to cross-examine Dr. Wheatcraft at length regarding that example. (Dep. Tr. 334:20-343:5.) I can see no reason – and defendants here give none – why defense counsel could not have continued a thorough cross-examination of Dr. Wheatcraft in this manner to elicit other similar information in the same way. This is particularly so here, where it appears that Dr. Wheatcraft used the spreadsheet only to identify and read direct quotes from defendants' own experts' reports and where, had he referred to other pages in the spreadsheet to refresh his recollection, he presumably would have done the same thing and plaintiff would presumably have produced them.

Where a witness "testifies on the basis of knowledge obtained for the first time from privileged documents reviewed in preparation for the deposition, enforcing the privilege may result in denial of any effective cross-examination." *Rivastigmine*, 486 F. Supp. 2d at 244. But here that did not happen, both because Dr. Wheatcraft, as in *Rivastigmine*, "was [him]self the author of" the spreadsheet, which is comprised of quotations from defendants' expert reports, and thus he "had the factual information about which [he] testified from the outset and was subject to cross-examination regarding [his] own knowledge" (*Id.*) and also because, as noted, plaintiff did produce the spreadsheet pages referred to by Wheatcraft. Moreover, "this is not a case in which the accuracy of Dr. [Wheatcraft's] memory is a central concern." *Id.* Dr.

Wheatcraft "is not a percipient witness whose recollection" was essential to his deposition testimony. *Id*. Rather, he is an expert for plaintiff whose testimony concerned the evaluation of defendants' own expert reports.

Therefore, addressing the specific elements of the balancing test, (1) production is not necessary for a fair cross-examination because to the extent of the questioning there was production both by Dr. Wheatcraft reading the portions he reviewed and by those portions being physically produced by plaintiff as well; (2) reviewing the document impacted the witness's testimony by refreshing his recollection, but it does not appear that it *informed* Dr. Wheatcraft's opinion so much as reflected his own views in a specifically organized manner; and (3) the witness was himself the author of the document, as least as the person under whose supervision the document was prepared (and therefore the document represents a mere memorialization of the witness's knowledge). Defendants are not "engaging in a fishing expedition" in seeking production of this spreadsheet, but that is not enough to tip the balancing test in their favor.

## Conclusion

For the foregoing reasons, I find that the spreadsheet is not protected by the work product privilege and therefore must be produced in its entirety. If the spreadsheet were protected by the work product privilege, however, application of the Rule 612 balancing test would not require production of additional portions of the document. Accordingly, that part of defendants' motion as seeks production of the entire document at issue is granted, and the document shall be produced to defendants by OCWD no later than 20 days from the date of this PTO. This ruling concerns only the document at issue, and does not constitute a ruling that the attorney/client or work product privilege has been waived by plaintiff as to any other document.

With respect to defendants' request to further depose Dr. Wheatcraft concerning the contents of the spreadsheet, it appears to me from the deposition testimony that Dr. Wheatcraft's testimony explains how the spreadsheet is constructed.  Consequently defendants should be able to figure out how to use the spreadsheet upon review without the need to further depose Dr. Wheatcraft.  However, if, after receipt and examination of the spreadsheet defendants believe that not to be the case, a conference call should be arranged with me to resolve this issue.   In any event, for the parties' guidance, if I were to permit Dr. Wheatcraft to be further deposed – and I am not ruling at this point that he can be – it would not be for more than two hours.

Dated:  April 8, 2013

**SO ORDERED:**

/s/ Kenneth E. Warner _____
Kenneth E. Warner, Special Master

**EXHIBIT 4**

Stephen W. Wheatcraft, Ph.D.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION
Master File C.A. No. 1:00-1898 MDL 1358

This Document Relates to:


          ORANGE COUNTY WATER DISTRICT
          v. UNOCAL CORPORATION, et al.,
          Case No. 04 CIV.4968 (SAS)
                                              /


              --   --  --
          TUESDAY, JANUARY 17, 2012
              --   --  --
          Videotaped Deposition of STEPHEN W.
WHEATCRAFT, Ph.D., Expert Witness, Volume II, held at
the Law Offices of Latham & Watkins, 505 Montgomery
Street, Suite 2000, San Francisco California,
beginning at 9:03 a.m., before Sandra Bunch
VanderPol, FAPR, RMR, CRR, CSR #3032


              --   --  --


          GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph|917.591.5672 fax
             Deps@golkow.com



Stephen W. Wheatcraft, Ph.D.

Page 334

1    report, yes.

2    BY MR. JON ANDERSON:

3            Q.      Well, I had one served on me.  So you

4    finished your rebuttal report?

5            A.      We finished as much as we -- as much

6    as we could, based upon incomplete information.

7            Q.      Okay.  So give me an example of

8    information which you felt was incomplete and which

9    you believe justifies doing additional work?

10           MS. O'REILLY:  Objection.  Argumentative.

11   Misstates testimony.

12           Go ahead.

13           THE WITNESS:  There were numerous opinions

14   provided by your experts that show that they have

15   ran, reran, perhaps modified our model, thereby

16   becoming their model -- their own model results in an

17   attempt to, you might say, reverse engineer.  Figure

18   out what it is they've done, we have started to run

19   model simulations to better understand that

20   information because we haven't been provided with all

21   the information that is necessary.

22   BY MR. JON ANDERSON:

23           Q.      And I'd like you to take the

24   starkest, clearest example you can think of right now

25   of a defense expert who you are certain ran the model

Stephen W. Wheatcraft, Ph.D.

Page 335

1    with their own variations and where the information

2    has not been provided to you.

3              A.    I need to get a spreadsheet from

4    Ms. Benton.  I think she probably has it right there.

5              It's very hard to read small print.

6              So an example would be from Mr. Daus's

7    expert report.  This is a direct quote from his

8    report.  It says, "Regarding plume 1, former SAADS/S,

9    the total mass of MTBE added at the source by the

10   Wheatcraft model was extracted from the source

11   loading input file, quote, '14L.SSM,' end quote, in

12   directory, quote, 'model, backslash, model

13   development, backslash, final runs, backslash, TMR

14   grid model, backslash, TMS grid FD final, end quote.'

15   For model notes that represented the former SAAD

16   source, total mass of MTBE was added" -- sorry, let

17   me start that sentence over.  "The total mass of MTBE

18   added at the source over the entire simulation period

19   is 8,918 kilograms of MTBE, or approximately 29,000

20   gallons of gasoline, parentheses, assuming MTBE was

21   present in gasoline at 11 percent volume and MTBE's

22   density is approximately 6.2 pounds per gallon.  This

23   is an unreasonable amount of gasoline to be released

24   from the USTs in less than two years given that

25   Southern California refiners generally started using

Stephen W. Wheatcraft, Ph.D.

Page 336

1    MTBE in Orange County in 1990 and the tanks were

2    removed in September 1992, paren, Moreau expert

3    report April 15th, 2011."

4            MR. COX:  I am sorry.  What page are you

5    reading from?

6            THE WITNESS:  Pages 10 and 11, last

7    paragraph.

8            MR. COX:  Okay.  Thank you.

9            THE WITNESS:  Okay.  Let me just find some

10   more.

11           This one comes from Mr. Daus's report,

12   page 14, third paragraph.

13   BY MR. JON ANDERSON:

14           Q.    This is a new -- a new entry?

15           A.    A new entry.

16           Q.    Could I just go back to the one you

17   read.  And will you tell me what aspect of that makes

18   you believe that he did anything other than extract

19   information from your model?

20           A.    He extracted information from the

21   model and, according to the stipulation, extracting

22   information triggers a requirement to produce that

23   information.

24   BY MR. JON ANDERSON:

25           Q.    So I'm not going to quibble with you

Stephen W. Wheatcraft, Ph.D.

Page 337

1   on what the stipulation says, but I want you to tell

2   me, please --

3          A.     I'm still responding to your first

4   question.

5          Q.     My first question was what -- what

6   information do you have that Mr. Daus changed your

7   model, reran your model with his own inputs, words to

8   that effect was my question.

9          And what I heard you report on was that he

10  extracted from your model, with no indication in any

11  of that text that he actually changed your model.

12         So tell me what about his entry that you

13  just read makes you believe that he changed your

14  model and ran it in a changed condition?

15         MS. O'REILLY:  Objection.  The witness

16  wasn't finished with his answer.  Argumentative.

17  Misstates his testimony.  Assumes facts.  Lacks

18  foundation.

19         Go ahead and finish your answer.

20         THE WITNESS:  Okay.  So I'm reading from

21  another entry, which is going to address the point

22  that you just raised.

23         MR. JON ANDERSON:  Okay.

24         THE WITNESS:  Page 14 from his report, third

25  paragraph -- I can either read this exactly or I can

Stephen W. Wheatcraft, Ph.D.

Page 338

1    summarize.

2    BY MR. JON ANDERSON:

3          Q.      Just summarize.  Just tell me what it

4    is that lead you to think --

5          A.      So he said --

6          Q.      Excuse me.  Let me make sure I ask

7    the question.

8          Tell me what it is from that entry, or any

9    other entry, that leads you to believe that Mr. Daus

10   changed your model and reran it?

11         MS. O'REILLY:  Objection.  Argumentative.

12   You're interrupting the witness and not allowing him

13   to finish his answer.  You're assuming facts.  Lacks

14   foundation.  Misrepresenting what he said.

15         Go ahead.

16         THE WITNESS:  Okay.  So he says that he

17   prepared chemographs -- by the way, we don't know

18   where this term comes from.  It's not a term that's

19   used by hydrogeologists.  We have to assume that they

20   are using that word chemograph to mean breakthrough

21   curve.  So that's when we -- we are making that

22   assumption, because I have no idea what it means.

23         Anyway, "Chemographs were prepared for

24   several monitoring wells and presented in an

25   appendix.  Chemographs were prepared using the output

Stephen W. Wheatcraft, Ph.D.

Page 339

1    file from the Wheatcraft model," a bunch of model

2    files are listed, "inputting those data into

3    Groundwater Vistas to interpolate the concentrations

4    at geographic locations and converting the grams per

5    cubic foot to micrograms per liter."

6              So he inputted data into the Groundwater

7    Vistas model file, thereby changing it.  And if there

8    are four -- once you have changed the Groundwater

9    Vistas model file, you have changed the model.  First

10   of all, we have to have the Groundwater Vistas file

11   in order to know and confirm that there have been no

12   other changes to the file.

13             You can take the Groundwater Vistas file,

14   change parameters in it to suit your own taste, and

15   run it and say you're getting a breakthrough curve

16   and it might not have even been the model that I ran.

17   So we have to have the Groundwater Vistas file in

18   order to confirm that no changes have been made other

19   than the ones that they list.

20             Secondly, once you input monitoring wells,

21   we have no way to confirm that the -- what he says

22   represents the concentrations, are those

23   concentrations, unless we have the Groundwater Vistas

24   modeling file.  We have to have the locations of

25   those monitoring wells, the coordinates, first -- and

Stephen W. Wheatcraft, Ph.D.

Page 340

1    once you input a monitoring well into the Groundwater

2    Vistas modeling file, you have to know which layer or

3    layers it has been finished in; that is, which layers

4    it's been completed in.

5            You can have a monitoring well exactly at

6    the same spot and get two different results.  If you

7    put monitoring well in layer 1 and you put the

8    monitoring well in exactly the same place in layer

9    14, you're going to get different results.

10            And then there's -- there's another -- let's

11   see.  How many did I give there?  Three?  I think

12   there's -- I want to summarize.

13            So we need the Groundwater Vistas monitoring

14   file to confirm that there's been no changes to other

15   parameters.  We need it to confirm and check the

16   locations of the spatial horizontal location of the

17   monitoring well or wells that they just input.  We

18   need it to confirm the -- the -- which layer or

19   layers that it has been put in.  And there's one

20   more.

21            Give me just a second.  Oh, yes.  And the

22   fourth reason is because there are two ways in which

23   you can have monitoring wells report their

24   concentrations, and it is decided by a checkbox as

25   you import the data.  And the checkbox either -- the

Stephen W. Wheatcraft, Ph.D.

Page 341

1    default value is that it interpolates the

2    concentrations to the location of the monitoring

3    well.   The checkbox is unchecked, it just uses the

4    concentrations from the grid cell itself.

5           So without the Groundwater Vistas file that

6    they changed, thereby creating their own model, we

7    have no way to check the work that you've done.   And

8    there's nothing further that can be said about it.

9    BY MR. JON ANDERSON:

10          Q.    So you don't know --

11          A.    And I can point to -- I can point to

12   lots of instances, which we have done, in which this

13   was done over and over again by, I think, all of your

14   experts that had had opinions, most of them for sure,

15   regarding my modeling.

16          Q.    So with respect to Mr. Daus, which

17   was the example you came up with when I asked you to

18   come up with a stark, clear example, what I'm hearing

19   you say is you don't know whether or not he made any

20   changes to your model?

21          A.    No, that is not what you're hearing.

22          MS. O'REILLY:   Objection.   Misstates his

23   testimony.

24   MR. JON ANDERSON:

25          Q.    Okay.   So --

Stephen W. Wheatcraft, Ph.D.

Page 342

1          MS. O'REILLY:   Argumentative.

2    BY MR. JON ANDERSON:

3          Q.      So you do know that he made changes

4    to your model?

5          A.      He says -- I read it to you.   He said

6    that he made changes.

7          Q.      I listened to you, and you said that

8    he had input using Groundwater Vistas.   Right?

9          A.      Groundwater Vistas is the model.

10         Q.      Is your model?

11         A.      Yes.

12         Q.      Groundwater Vistas --

13         A.      The Groundwater Vistas file contains

14   all of the model files.   I can take from my computer,

15   take one of these little drives, put a Groundwater

16   Vistas file on it, and that's all I put on it, and I

17   can hand it to you, I could say, "Mr. Anderson, put

18   this on your computer and push this button," and you

19   can then run the model.   That's all you need.

20         The Groundwater Vistas file all of the

21   modeling files put together.   And plus it's even more

22   than the modeling files because the monitoring wells

23   themselves provide concentrations that only

24   Groundwater Vistas calculates.   So it's part of what

25   the model results are.

Stephen W. Wheatcraft, Ph.D.

Page 343

1          Q.      And what change to Groundwater Vistas
2     do you think Mr. Daus made?
3          MS. O'REILLY:  Objection.  Asked --
4     BY MR. JON ANDERSON:
5          Q.      In your words?
6          MS. O'REILLY:  Asked and answered.
7          THE WITNESS:  I will use his words.
8          MS. O'REILLY:  Vague.
9          THE WITNESS:  "Chemographs were prepared for
10    these monitoring wells inputting those data into
11    Groundwater Vistas."
12          He input data into Groundwater Vistas,
13    thereby changing the model.
14    BY MR. JON ANDERSON:
15          Q.      Whose data did he input into
16    Groundwater Vistas?
17          A.      His own data about these monitoring
18    wells.
19          Q.      Do you know where that data came
20    from?
21          A.      No, I don't.  He hasn't provided that
22    information.
23          Q.      Do you know what a chemograph is?
24          A.      No, I don't.
25          MS. O'REILLY:  Objection.  Vague and

Stephen W. Wheatcraft, Ph.D.

Page 344

1    ambiguous.  Argumentative --

2             MR. JON ANDERSON:  Okay.

3             MS. O'REILLY:  -- in light of his prior

4    testimony.

5    BY MR. JON ANDERSON:

6             Q.    So you don't know what he did, right?

7             A.    I think it's a breakthrough curve.  I

8    have to interpret it as that.

9             Q.    Are you going to be present during

10   Mr. Daus's deposition?

11            MS. O'REILLY:  Objection.  Don't answer

12   that.  He doesn't need to answer that question.

13            MR. JON ANDERSON:  Don't?

14            MS. O'REILLY:  No.

15            MR. JON ANDERSON:  Okay.

16            MS. O'REILLY:  That's attorney-client

17   privileged.

18   BY MR. JON ANDERSON:

19            Q.    Is that typical of the examples that

20   you're going to give me on what makes you think that

21   defense experts changed your model, reran it, and did

22   not disclose to you what the changes were?

23            A.    That's correct.  That's typical.

24            Q.    Okay.  And are there any other types

25   of examples you can come up with that -- that are not

Stephen W. Wheatcraft, Ph.D.

Page 345

1    the typical one you just described?

2          MS. O'REILLY:  I'm going to object to the

3    extent it calls for a memory test.  We did submit to

4    you letters that outline the changes we believe were

5    made to the model in detail.  Those were detailed

6    letters.

7          MR. JON ANDERSON:  Oh, I've seen them.

8          Q.    Do you want the question reread?

9          A.    Yes.

10         MR. JON ANDERSON:  Please reread it.

11         (Record read as follows:  QUESTION:  And are

12   there any other types of examples you can come up

13   with that are not the typical one you just

14   described?)

15         MS. O'REILLY:  And you're not giving him a

16   copy of the letters or the materials in which we

17   described in detail those changes.

18         Go ahead.

19         THE WITNESS:  There are a lot of examples

20   that we used.  Most of them involve your experts

21   either clearly saying that they added monitoring

22   wells to the Groundwater Vistas files or, if they

23   didn't clearly say it, they produced chemographs or

24   breakthrough curves for wells that are not in my

25   model.

Stephen W. Wheatcraft, Ph.D.

Page 346

1          If they are not in my model, then there was

2     a change made; it's a new model.  It's a newer model.

3     BY MR. JON ANDERSON:

4          Q.    Do you know the concept of an

5     observation well using Groundwater Vistas?

6          A.    I certainly do.

7          MS. O'REILLY:  Objection.  Vague and

8     ambiguous.

9     BY MR. JON ANDERSON:

10         Q.    Do you consider an observation well

11    to be a change in the model?

12         A.    I do.

13         Q.    And what impact --

14         A.    Because -- let me finish my answer.

15         Q.    You said "I do."

16         A.    Because it changes the result.  If

17    you -- if you have -- if you put a monitoring well in

18    and you print out a breakthrough curve from that

19    monitoring well, this is a new result from the model.

20         Q.    Do you think the results achieved

21    from printing out a breakthrough curve, assuming

22    that's what happened, from your model is different

23    output than your model would have had, had you run

24    it?

25         MS. O'REILLY:  Objection.  Argumentative.

Stephen W. Wheatcraft, Ph.D.

Page 347

1    Misstates his testimony as to what was done.

2         THE WITNESS:  Yes, it's absolutely different

3    because it wasn't there.  It's not in my model.

4    BY MR. JON ANDERSON:

5         Q.    Do you think that the difference was

6    driven by changing the input parameters in your

7    model?

8         MS. O'REILLY:  Same objection.

9         THE WITNESS:  I have no way of knowing that

10   because I can't -- you haven't given me the

11   Groundwater Vistas files to check to see if there

12   were any input parameters that were changed.

13   BY MR. JON ANDERSON:

14        Q.    Okay.  I believe the Groundwater

15   Vistas files are part of what your counsel has asked

16   for to be produced in advance of the deposition.

17   Have you checked with counsel to see if she has those

18   yet?

19        MS. O'REILLY:  Objection.  I'm going to

20   instruct the witness not to answer on the basis of

21   privilege.

22   BY MR. JON ANDERSON:

23        Q.    As you sit here today, would it be

24   fair to say you have suspicions that changes may have

25   been made to the input parameters in your model but

Stephen W. Wheatcraft, Ph.D.

Page 348

1    you don't know for a fact that that happened?

2              MS. O'REILLY:  Objection.  Misstates

3    testimony.  Argumentative.

4              THE WITNESS:  I can't draw any conclusions

5    about suspicions.  I just have to be able to check

6    these things.

7              There could have been a mistake made.  It

8    may be nothing that's meant to be -- wasn't designed

9    to be a change.

10             But the only way to check that is to have

11   the files myself so that I can rerun the model and

12   make sure that the outputs of this form that they

13   give me match my model.

14   BY MR. JON ANDERSON:

15             Q.    And that -- that you haven't done yet

16   because you don't have the Groundwater Vistas files?

17             A.    That's --

18             MS. O'REILLY:  Objection.  Misstates

19   testimony.

20             THE WITNESS:  That's correct.

21   BY MR. JON ANDERSON:

22             Q.    Somebody asked you for a page number

23   on the document you are reading.  Will you describe

24   what that document is?

25             A.    It's Mr. Daus's expert report --

Stephen W. Wheatcraft, Ph.D.

Page 349

1   let's see.

2           Q.     I -- I actually mean to interrupt you

3   just to for clarification.   I'm looking at you

4   holding about 20 pages of spreadsheets.   What is that

5   document?

6           A.     This is a document that contains

7   information about each expert and the details of

8   opinions they provide that relate to the issue we

9   have been discussing.

10          Q.     And does that document summarize the

11  deficiencies that you believe exist in connection

12  with the defense experts' reports --

13          MS. O'REILLY:   And I'm going to --

14  BY MR. JON ANDERSON:

15          Q.     -- and document productions?

16          MS. O'REILLY:   I'm going to object to the

17  extent that document was prepared for counsel.   We

18  have disclosed the -- in our letters to you, we have

19  disclosed the quotations from the expert reports.   We

20  have not disclosed the underlying document.

21          And you asked Mr. -- Dr. Wheatcraft about

22  putting our letters in front of him, you asked him

23  for a memory test to point out an example, and he's

24  using this as a reference to refresh his

25  recollection.

Stephen W. Wheatcraft, Ph.D.

Page 350

1    BY MR. JON ANDERSON:

2        Q.    Dr. Wheatcraft --

3        MR. CONDRON:  Counsel, is your position --

4        MR. JON ANDERSON:  Excuse me.

5        MR. CONDRON:  I'm sorry.

6    BY MR. JON ANDERSON:

7        Q.    Dr. Wheatcraft, would it fair to say

8    that the document in front of you is something you

9    used to refresh your recollection to answer my

10   questions?

11       A.    Yes.

12       MR. JON ANDERSON:  Okay.  Please produce it.

13   And I will get copies of it made, and we will mark it

14   as an exhibit.

15       MS. O'REILLY:  I'm going to object to it

16   being produced.  You did not put in front of him the

17   materials that we provided to you.  You asked him a

18   specific question, and I made an objection.  And I

19   could have told him not to answer it without you

20   putting in front of him -- putting our letters in

21   front of him --

22       MR. JON ANDERSON:  Right.

23       MS. O'REILLY:  -- that contained those

24   summary.

25       MR. JON ANDERSON:  I did not --

Stephen W. Wheatcraft, Ph.D.

Page 351

1          MS. O'REILLY:  So I'm not going to agree to

2    produce it.

3          MR. JON ANDERSON:  I did not put your

4    letters in front of him, but you put in front of him

5    a document that he used to refresh his recollection

6    in answering my question.  And he said there were

7    numerous examples of this throughout that document.

8          He read from some of them because he did not

9    have an independent recollection of them.  You

10   yourself, in your objection, characterized this

11   document as being used to refresh his recollection,

12   and that makes it producible to me because it was

13   used by him in the deposition to answer questions.

14         And I'm asking that it be disclosed to me

15   now.  I will make copies of it, and we will make it

16   an exhibit.  I'm absolutely entitled to it based on

17   your objection, on his confirmation that he used it

18   to refresh his recollection to answer my question.

19         MS. O'REILLY:  No.

20         MR. JON ANDERSON:  You're refusing?

21         MS. O'REILLY:  That's right.

22         MR. JON ANDERSON:  Do you want to ask a

23   follow-up question?

24         MR. CONDRON:  No.  I think you covered it.

25   Thank you.

Stephen W. Wheatcraft, Ph.D.

Page 352

1          MR. JON ANDERSON:  Okay.

2          Q.     How many pages to that document,

3     please?

4          A.     45.

5          Q.     And who prepared it?

6          A.     It was prepared at my direction by

7     Ms. Benton, actually the two of us together, along

8     with some others prepared it.

9          Q.     You and Ms. Benton prepared that?

10         A.     Yes.

11         Q.     Did your counsel prepare it?

12         A.     No.

13         Q.     And on the front page are there some

14    columns on the top that describe what is in it?

15         MS. O'REILLY:  And I'm going to object to

16    any further questions with respect to the document.

17         He refreshed his recollection with -- you

18    have established who prepared it.  He's not going

19    into any further content of the document.  He's not

20    read you the column headings.  He's not read you

21    anything else in the document.

22         He read from the document the section of the

23    report that you asked him to provide you in response

24    to a question.

25         MR. JON ANDERSON:  You can't get the cow

Case 1:00-cv-01898-VSB-VF   Document 3693   Filed 04/26/13   Page 68 of 100
Stephen W. Wheatcraft, Ph.D.

Page 353

1    back into the barn, Ms. O'Reilly.

2           MS. O'REILLY:  He has told you --

3           MR. JON ANDERSON:  You have made your record

4    and --

5           MS. O'REILLY:  He's told you who prepared

6    it.

7           MR. COX:  What's the basis -- excuse me,

8    Counsel.  What's the basis for your objection,

9    attorney-client privilege?

10          MS. O'REILLY:  That's exactly right.  And

11   CMO-73.

12          MR. COX:  Which part of CMO-73?

13          MS. O'REILLY:  All of it.

14          MR. JON ANDERSON:  Okay.

15          MS. O'REILLY:  And the defendants themselves

16   have taken the position that with Special Master

17   Warner that questions relating to what was or was not

18   given an expert in -- during the deposition of

19   Ms. Moran are privileged.

20          MR. COX:  This wasn't given an expert.

21          MR. JEREMIAH ANDERSON:  And I would just

22   like to be clear --

23          MS. O'REILLY:  What was --

24          MR. JEREMIAH ANDERSON:  -- about this,

25   Tracey, that is not what she ruled.  So if you want

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

---

This Document Relates To:

*Orange County Water District v. Unocal Corp., et al.,*
*No. 04 Civ. 4968*

---

# EXPERT REPORT OF STEPHEN W. WHEATCRAFT, Ph.D.

Wheatcraft & Associates
Reno, Nevada

*Stephen W. Wheatcraft*

June 23, 2011

---
Signature

---
Date

career, I have had more than ten million dollars of sponsored research from the National Science Foundation, the U.S. Environmental Protection Agency and the U.S. Department of Energy, among others. From 2001 to present, I have been the President of Wheatcraft and Associates, Ltd., a consulting firm that specializes in litigation support for cases involving groundwater contamination. I have been involved on a consulting basis in litigation support for about 22 years. In 2009, I was invited to join the faculty as a Visiting Professor at the University of Pierre and Marie Curie (UPMC) in Paris, France. I accepted this position and spent the month of September, 2010 at the UPMC working on research in highly fractured groundwater systems. For a complete statement of qualifications and list of publications see also curriculum vitae of Stephen W. Wheatcraft, Ph.D. included as Attachment A to this report.

2. **List of Cases Expert Testimony was Provided During in Past Four Years**
Within the past four years, I have testified as an expert witness regarding contaminant flow in aquifers in the following litigations:

Crescenta Valley Water District v. Mobil Corporation, et al., MDL No. 1358, Master File No. 1:00-1898 Case No. 07 Civ, 9453;

Employers Insurance of Wausau, A Mutual Company v. California Water Service Company (a California corporation), Case No. C06-03002 RMW (PVT);

Tonneson, et al., v. Exxon Mobil Corporation, et al., MDL No. 1358, Master File No. 1:00-1898 Case No. 03 Civ. 8248;

Hawaii Water Service Company, Inc., v. The Dow Chemical Company, et al., Civil No. CV 04-1-0036(1);

City of Modesto Redevelopment Agency v. The Dow Chemical Company, et al., Case No. 999643;

D.J. Nelson, Trustee for the D.J. Nelson Trust dba Fruitridge Vista Water Company v. Atlantic Richfield Company, Case No. 02AS00535; and

City of Redlands v. Shell Oil Co., et al., Case No. SCVSS120627.

For a complete list of cases I have worked on see also curriculum vitae of Stephen W. Wheatcraft, Ph.D., included as Attachment A to this report.

3. **Statement of Compensation**
I receive $300 per hour compensation for my services for deposition and trial testimony in this action.

4. **Summary of Opinions**

7

The purpose of this expert report is to explain the methodology employed in constructing and running groundwater flow and MTBE transport models, and to provide an opinion regarding the results of these models. I was asked to determine whether any releases of MTBE gasoline from 34 pre-selected stations had or would reach drinking water wells within Orange County Water District's service area. I was also asked to provide an opinion as to the mobility, fate and transport and persistence of any MTBE that was released within the Orange County Water District service area. My opinions are as follows:

1. A significant amount of MTBE has been released to groundwater within the Orange County Water District's service area.

2. MTBE was likely in groundwater for years before any sampling for MTBE occurred.

3. This MTBE, if not remediated, will impact water production wells in OCWD's service area. MTBE has already been detected in a number of wells.

4. Groundwater remediation at the focus plume stations I reviewed has not prevented off-site migration of MTBE.

5. At the stations I reviewed, MTBE was in groundwater for years before groundwater remediation was initiated. At most stations, MTBE was in groundwater for more than a decade before groundwater remediation began.

6. The average time from known release to the start of remediation is 11 years, and the longest time between known release and start of remediation is 22.5 years.

7. MTBE is highly mobile and persistent in groundwater and groundwater is continuously in motion. As a consequence, MTBE released at the focus plume stations would have begun migrating off site as soon as it entered groundwater.

8. The MTBE transport model predicts (details are in Appendices B and D):
   a. 190 district production wells exceed 0.2 ug/l MTBE after 10 years
   b. 19 additional district production wells exceed 0.2 ug/l MTBE after 20 years
   c. 28 additional district production wells exceed 0.2 ug/l MTBE after 30 years
   d. 19 additional district production wells exceed 0.2 ug/l MTBE after 40 years
   e. 108 district production wells exceed 5.0 ug/l MTBE after 10 years
   f. 26 additional district production wells exceed 5.0 ug/l MTBE after 20 years
   g. 10 additional district production wells exceed 5.0 ug/l MTBE after 30 years
   h. 11 additional district production wells exceed 5.0 ug/l MTBE after 40 years

9. Clay layers within the OCWD service area will not prevent MTBE from migrating vertically down to deeper aquifers. Clay layers slow, but to not stop downward migration. In addition, clay layers within OCWD's service area have been perforated by numerous wells that act as conduits to deeper aquifers.

10. Differences between actual concentrations of MTBE in wells compared to the predicted concentrations of MTBE by the model are caused by two main factors: (1) there is a very high degree of small scale heterogeneity in the aquifer that causes the MTBE concentrations to be highly variable on a small scale; (2) the model averages MTBE concentrations over a grid block, which is 100 feet by 100 feet in area, and anywhere from 10 to 100 feet thick. By contrast, a sample collected from a well is usually less than 1 liter in size. As a result, the model predictions of MTBE concentrations tend to be fairly "smooth", and the actual MTBE sample data will tend to cluster around the model predictions. This is illustrated in Figure 1.

11. The actual amount of MTBE mass in OCWD aquifers is greatly underestimated for several reasons:

    a. For the purposes of this report, I was initially asked to consider 40 plaintiff gas stations and 10 defense gas stations in Orange County. This list was narrowed down to 5 plaintiff focus plumes, with 29 gas stations, and 5 defense focus plumes with 5 gas stations, for a total of 34 gas stations. There are many more known gas stations within the OCWD and so the total amount of MTBE mass in the aquifer will therefore be underestimated by our models.

    b. As stated above in opinion #6, the average time between known release and start of remediation is 11 years. Because MTBE is highly mobile, it is highly likely that large amounts of the releases from these sites have moved off-site. In 11 years, at an average groundwater velocity of 3 feet/day (typical of OCWD aquifers), an MTBE plume could move approximately 2 miles.

    c. Because there are many more gas stations that actually contribute MTBE mass to the OCWD aquifers than the model uses, the model will, on average, underpredict the amount of MTBE that will contaminate district production wells.

Figure 1



9

# EXHIBIT 6

Law Offices of
# MILLER, AXLINE & SAWYER
A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE
A. CURTIS SAWYER, JR.

TRACEY L. O'REILLY
EVAN EICKMEYER
DANIEL BOONE
JUSTIN MASSEY
BRIAN D. SHANNON
DONALD MOONEY, of Counsel

July 30, 2012

VIA EMAIL AND FEDERAL EXPRESS

Special Master Kenneth E. Warner, Esq.
Warner Partners
950 Third Avenue, 32nd Floor
New York, New York 10022

Re:   MDL No. 1358 Master File C.A. No. 1:00-1898 (SAS)
This Document Relates to: *Orange County Water District v. Unocal Corp., et al.*, 04
Civ. 4968
**Plaintiff Orange County Water District's Opposition to Defendant
ConocoPhillips Company's Supplemental Motion to Compel Privileged
Document Concerning Dr. Wheatcraft's Deposition**

Dear Mr. Warner:

Plaintiff Orange County Water District (the "District") submits this response to defendant
ConocoPhillips Company's ("Conoco's") July 9, 2012, supplemental motion to compel
production of a privileged document related to Dr. Stephen Wheatcraft's deposition.

As a preliminary matter, Conoco's attempt to challenge the privileged nature of the
spreadsheet should be rejected on the grounds that this issue has already been resolved. Judge
Scheindlin's opinion and order implicitly concluded that the document was subject to the
attorney work product privilege, and explicitly remanded this matter "to determine whether,
under the balancing test articulated above, Rule 612 mandates the production of the spreadsheet
at issue." (Opinion & Order (June 6, 2012) at 9.)

In the June 6, 2012, opinion, Judge Scheindlin ruled that "*whenever* a privileged document is
used to refresh a witness's recollection . . . [certain] factors must be weighed to determine
whether or not Rule 612 mandates production." (Opinion & Order (June 6, 2012) at 8 [emphasis
in original].) The factors enumerated in Judge Scheindlin's order are as follows:

Special Master Kenneth E. Warner, Esq.
Page 5
July 30, 2012

**A. Since the Document at Issue Does Not Relate to Dr. Wheatcraft's Opinions in This Matter and Defendants Fully Examined Dr. Wheatcraft Concerning Those Opinions as Well as His Conclusions Concerning the Modeling Work Done by Defendants' Experts, Production of the Document at Issue is Not Necessary for a Fair Cross-Examination.**

The record above establishes that defendants not only cross-examined Dr. Wheatcraft concerning his conclusions about the modeling work done by defendants' experts, including the quotation he read from the document, but, more importantly, defendants had a full and fair opportunity to cross-examine Dr. Wheatcraft concerning his opinions that will be offered at trial in this matter. Dr. Wheatcraft's expert report and opinions in this matter relate, in general, to the impacts of MTBE releases on the drinking water aquifers, including, but not limited to the following:

1. A significant amount of MTBE has been released to groundwater within the Orange County Water District's service area.

2. MTBE was likely in groundwater for years before any sampling for MTBE occurred.

3. This MTBE, if not remediated, will impact water production wells in OCWD's service area. MTBE has already been detected in a number of wells.

4. Groundwater remediation at the focus plume stations I reviewed has not prevented off-site migration of MTBE.

5. At the stations I reviewed, MTBE was in groundwater for years before groundwater remediation was initiated. At most stations, MTBE was in groundwater for more than a decade before groundwater remediation began.

6. The average time from known release to the start of remediation is 11 years, and the longest time between known release and start of remediation is 22.5 years.

7. MTBE is highly mobile and persistent in groundwater and groundwater is continuously in motion. As a consequence, MTBE released at the focus plume stations would have begun migrating off-site as soon as it entered groundwater.

8. The MTBE transport model predicts (details are in Appendices B and D):

   a. 190 district production wells exceed 0.2 ug/l MTBE after 10 years
   b. 19 additional district production wells exceed 0.2 ug/l MTBE after 20 years
   c. 28 additional district production wells exceed 0.2 ug/l MTBE after 30 years
   d. 19 additional district production wells exceed 0.2 ug/l MTBE after 40 years

Special Master Kenneth E. Warner, Esq.
Page 6
July 30, 2012

      e.  108 district production wells exceed 5.0 ug/l MTBE after 10 years
      f.   26 additional district production wells exceed 5.0 ug/l MTBE after 20 years
      g.  10 additional district production wells exceed 5.0 ug/l MTBE after 30 years
      h.  11 additional district production wells exceed 5.0 ug/l MTBE after 40 years

9.  Clay layers within the OCWD service area will not prevent MTBE from migrating vertically down to deeper aquifers. Clay layers slow, but do not stop, downward migration. In addition, clay layers within OCWD's service area have been perforated by numerous wells that act as conduits to deeper aquifers.

(Ex. 3, Expert Report of Stephen W. Wheatcraft, Ph.D. (June 23, 2011) at Summary of Opinions, pp. 7-9.) These are the opinions that Dr. Wheatcraft has been asked to prepare, and which will be the basis of any testimony Dr. Wheatcraft provides at trial. Defendants deposed Dr. Wheatcraft for three days concerning these opinions and his expert report, and thus had a fair cross-examination of Dr. Wheatcraft on the opinions he will be providing at trial.

The document at issue, on the other hand, relates solely to a discovery dispute, i.e. whether defendants' experts conducted modeling work within the meaning of the Modeling Stipulation, and whether they failed to comply with the Modeling Stipulation by not producing their modeling work. (See e.g., Dec. 20, 2011, Plaintiff Orange County Water District's Motion to Strike the Modeling Opinions of Defendants' Experts John Wilson and Anthony Daus and Other Defendant Specific Experts.) Defendants, in fact, already admitted in their submission to Judge Scheindlin that this issue relates solely to an expert discovery dispute between the parties. (See March 22, 2012, Defendants' Response To Plaintiff Orange County Water District's Objection To Pre-Trial Order #71 at 3 ["Dr. Wheatcraft claims that defense experts reran his model but failed to produce the corresponding documentation."].) This is, therefore, plainly an issue which will not be the subject of Dr. Wheatcraft's anticipated testimony at trial. Dr. Wheatcraft, furthermore, did not testify that he reviewed, considered, or relied upon this document for his opinions in this matter.

Under these facts, production of the document is not "necessary for a fair cross-examination" of Dr. Wheatcraft.

**B.** **Dr. Wheatcraft's Use of the Document Was Limited to Locating an Example of Modeling Work Performed by Defendants' Experts, and Nothing in the Document Impacted Dr. Wheatcraft's Opinions in This Matter or Even His Conclusions Concerning Modeling Work Performed by Defendants' Experts.**

The relevant transcript demonstrates that Dr. Wheatcraft's use of the document was solely to respond to a very specific question posed by Conoco's counsel:

      Q. So give me an example of

# EXHIBIT 7

Jon D. Anderson
Direct Dial: (714) 755-8217
jon.anderson@lw.com

650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Tel: +1.714.540.1235  Fax: +1.714.755.8290
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Moscow |
| Barcelona | Munich |
| Beijing | New Jersey |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Doha | Riyadh |
| Dubai | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

File No. 036309-0044

March 22, 2012

**VIA FEDEX AND EMAIL**

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1312

Re:   MDL No. 1358 Master File C.A. No. 1:00-1898 (SAS)
      *Orange County Water District v. Unocal Corp., et al.*, No. 04 Civ. 4968
      **Defendants' Response To Plaintiff Orange County Water District's
      Objection To Pre-Trial Order #71**

Dear Judge Scheindlin:

Pursuant to Sections II.A and VIII of Case Management Order No. 12, ConocoPhillips

Company ("ConocoPhillips"), on behalf of itself and certain Defendants, respectfully submits

this Opposition to Plaintiff's Objection to Pre-Trial Order #71 concerning the production of a

document withheld during the deposition of Plaintiff's expert Dr. Wheatcraft.

## I.   PRELIMINARY STATEMENT

During his January 17, 2012, deposition, Plaintiff Orange County Water District's

("OCWD" or the "District") expert Dr. Wheatcraft repeatedly referred to, read from, and

summarized a 45-page spreadsheet. Both Dr. Wheatcraft and Plaintiff's counsel, Tracey

O'Reilly, stated that the spreadsheet was used "to refresh [Dr. Wheatcraft's] recollection" while

testifying. In responding to deposition questions, Dr. Wheatcraft quoted excerpts from defense

LATHAM&WATKINSᴸᴸᴾ

Importantly, OCWD has not shown (and, as set forth more fully below, cannot show) that PTO #71 is "clearly erroneous or contrary to law."

To the extent OCWD claims it raises new arguments before the Court, its Objection also fails. In reviewing pre-trial orders on discovery matters, courts ignore evidence or arguments submitted by the objecting party that could have been but were not presented to the special master. (*See United States v. USA Remediation Servs., Inc.,* 2005 U.S. Dist. LEXIS 32901 at 4).

The spreadsheet Dr. Wheatcraft reviewed is not privileged. It is not a communication with counsel, and Dr. Wheatcraft confirmed that it is not attorney work product, but rather something he and his staff created. (Ex. 1, Wheatcraft Tr. at 352:1-12). However, even if the document at issue *were* privileged, Plaintiff waived any claim of privilege when Dr. Wheatcraft used the spreadsheet to refresh his recollection and provide opinions at his deposition.

Plaintiff claims that Dr. Wheatcraft used the document only to read direct quotations from an expert report into the record. This is incorrect. Both Dr. Wheatcraft and Ms. O'Reilly unambiguously stated that the spreadsheet was used "to refresh [Dr. Wheatcraft's] recollection" while testifying during the deposition. (*Id.* at 349:16-25, 350:7-11) (Ms. O'Reilly stated during the deposition, "You asked Dr. Wheatcraft for a memory test to point out an example, and he's using this as a reference to refresh his recollection."). Plaintiff's claim that Dr. Wheatcraft did not review, consider, or rely on this document for his opinions in this matter therefore also is incorrect. Dr. Wheatcraft used the document not only to quote portions of expert reports, but also to put those excerpts into context and opine on them. (*See, e.g., id.* at 338:8-341:15).

Dr. Wheatcraft reviewed and considered the entire 45-page spreadsheet in order to respond to questions from counsel, even if he only read certain portions of the document directly into the record. Indeed, the entire spreadsheet relates to Dr. Wheatcraft's contention that

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | : | Master File No. 1:00-1898 MDL 1358 (SAS) |
| **This Document Relates To:** | : | |

*Crescenta Valley Water District v. Mobil Corporation, et al.,* 07 Civ. 9453

*Orange County Water District v. Unocal Corp.,* CA-CV-03-1742

*City of Fresno v. Chevron U.S.A. Inc., et. al.,* CA-C-03-5378

*City of Merced Redevelopment Agency v. Exxon Mobil Corp.,* 1:08-CV-6306

*New Jersey Department of Environmental Protection v. Atlantic Richfield Co., et al.* 08 Civ. 00312

*Commonwealth of Puerto Rico v. Shell Oil Co., et al.,* 07-CV-10470



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/14/10

## <u>CASE MANAGEMENT ORDER NO. 73</u>

The parties in the above referenced matters have agreed that the revised Rules

26(b)(4)(B) & (C), which go into effect in December, will apply to expert discovery in this case.

These rules provide:

(B) Trial Preparation Protection for Draft Reports or Disclosures. Rules

26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule

26(a)(2), regardless of the form of the draft.

(C) Trial Preparation Protection for Communications Between Party's Attorney

and Expert Witnesses. Rules 26(b)(3)(A) and (B) protect communications

between the party's attorney and any witness required to provide a report under

Rule 26(a)(2)(B), regardless of the form of the communications, except to the

extent that the communications:

    (i)     Relate to compensation for the expert's study or testimony;

    (ii)    Identify facts or data that the party's attorney provided and that the

                expert considered in forming the opinions to be expressed, or

    (iii)   Identify assumptions that the party's attorney provided and that the

                expert relied upon in forming the opinions to be expressed.

The Court therefore Orders that the revised Rules 26(b)(4)(B) & (C) will apply to expert

discovery in the above referenced matters even before they go into effect.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York

June _____//_____, 2010

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X
                               :

IN RE: METHYL TERTIARY BUTYL   :    Master File No. 1:00-1898
ETHER ("MTBE") PRODUCTS        :    MDL 1358 (SAS)
LIABILITY LITIGATION            :

------------------------------------------------- :    No. M21-88
                               :

This document relates to:           :

*Orange County Water Dist. v. Unocal Corp., et*  :
*al.*, 04 Civ. 4968                  :
                               :
------------------------------------------------- X

KENNETH E. WARNER, SPECIAL MASTER:

## PRE-TRIAL ORDER # 46
### (Motion of Defendant Conoco for Nonparty Document Production by Komex)

Defendant ConocoPhillips Company ("Conoco") has moved for an order

compelling WorleyParsons Komex ("Komex"), a non-testifying consultant hired by

plaintiff, Orange County Water District ("OCWD"), to produce certain documents.[1] For

---

[1] I raised with the parties *sua sponte* the issue of whether this motion was properly brought in this MDL court, as opposed to the District Court in the Central District of California. I conclude that I have jurisdiction to decide this motion and that it was properly brought in this Court. Under 28 U.S.C. § 1407(b), an MDL judge has the same power to enforce the Komex subpoena as a judge in the Central District of California. While in a non-MDL case FRCP 45 normally requires that service and enforcement of a subpoena issued to a non-party like Komex be done in the District in which the party is located, an MDL court has broad enough powers to by-pass that requirement. *See* cases cited in support by Conoco. *See also United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 238 F.Supp.2d 270, 274-75 (D.D.C. 2002); *In re Asbestos Products Liability Litigation*, – F.R.D. –, 2009 WL 466381, at *2 (E.D. Pa. Feb. 25, 2009) ("To hold that a court presiding over an MDL case could not enforce a motion to compel would hamper the ability of an MDL court to coordinate and consolidate pretrial proceedings."). Moreover, in this case Conoco's subpoena was issued from the Southern District of New York, which is an additional reason why this Court may properly enforce it.

the reasons below, Conoco's motion is denied.

## I.      BACKGROUND

OCWD filed its complaint in the Superior Court of California, Orange County, on May 6, 2003. Two years later, Komex sent a proposal to OCWD "to provide environmental consulting services in support of your litigation related to [MTBE] contamination." According to Conoco, "OCWD retained Komex on May 18, 2005, and again on January 16, 2008, to provide OCWD with consulting services." Conoco's Motion to Compel at 2.

On August 25, 2008, Conoco served a subpoena on Komex that requested the following:

> **REQUEST FOR PRODUCTION NO. 1:**
>
> All contracts, agreements, scopes of work, instructions, or other DOCUMENTS between YOU and OCWD. (Note: This request, and all requests, seek documents related to work related to MTBE, VOCs, or other contaminants).
>
> **REQUEST FOR PRODUCTION NO. 2:**
>
> All DOCUMENTS, including without limitation, emails, COMMUNICATIONS, CORRESPONDENCE, notes, reports, agendas, and PowerPoint presentations, RELATING TO YOUR work for OCWD, and any work proposed or considered for OCWD which was not performed.
>
> **REQUEST FOR PRODUCTION NO. 3:**
>
> The working files, including the electronic working files, of those persons who perfomed work for OCWD, including without limitation, Anthony Brown, Mark Ausburn, Lee Paprocki, and Christian

Zarn.

**REQUEST FOR PRODUCTION NO. 4:**

All electronic databaes created or maintained by YOU RELATING to YOUR work for OCWD (such databases to be produced in their native format).

**REQUEST FOR PRODUCTION NO. 5:**

All DOCUMENTS and COMMUNICATIONS between YOU and any person associated with the law firms Miller Axline & Sawyers, Miller Sher & Sawyer, or Sher Leff concerning YOUR work for OCWD.

According to Komex, it has produced over 270,000 documents in response to these requests. *See* Komex's Opposition to Conoco's Motion to Compel at 5-6. The documents that it has produced appear to be those documents that Komex has also provided to various public agencies. However, Komex asserts that the other responsive documents is has are privileged under Rule 26.

## II.   ANALYSIS

Rule 26 states:

Ordinarily, a party may not discover documents and tangible things that are prepared **in anticipation of litigation** or for trial by or for another party or its representative (including the other party's attorney, **consultant**, surety, indemnitor, insurer, or agent).

Fed. R. Civ. P. 26(b)(3)(A) (emphasis added).

Komex is a non-testifying "consultant" hired by OCWD and it prepared a number of "documents and tangible things . . . in anticipation of litigation" that fall under Rule

-3-

26(b)(3).[2]   Under the plain language of Rule 26, the documents that Komex has created

for OCWD may not ordinarily be discovered.[3]

"It may be surprising to long-time practitioners that 'a lawyer need not be involved

at all for the work product protection to take effect.'" *Goff v. Harrah's Operating Co.,*

*Inc.*, 240 F.R.D. 659 (D. Nev. 2007) (quoting *Roger Park et al., Hornbook on Evidence*

*Law* § 8.09 (West 2d ed. 2004)).  Although often referred to as "attorney work product

privilege," this title is a misnomer.  Indeed, prior to 1970 "[t]he courts [were] divided as

to whether the work-product doctrine extends to the preparatory work only of lawyers,"

and thus Rule 26(b)(3) was specifically adopted to extend privilege "to materials prepared

in anticipation of litigation or preparation for trial by or for a party or any representative

acting on his behalf." Fed. R. Civ. P. 26(b)(3) advisory committee's note (1970).  *See*

*also* Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice &*

*Procedure: Civil 2d* § 2024 (1994) (describing the history of the Rule 26(b)(3) and

explaining that work product privilege no longer applies only to attorney's work product

as it "expressly extends protection to documents prepared by or for a representative of a

party, including his agent").

---

[2]   *See United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998) ("Where a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within Rule 26(b)(3).").

[3]   "The conditional protections afforded by the work-product rule prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486, 1494 (9th 1989).

"It is true that courts have often emphasized the involvement of an attorney in cases where the work product rule was invoked." *Goff*, 240 F.R.D. at 661.  However, "it appears that courts have emphasized attorney involvement because such involvement clearly indicates that the documents were 'prepared in anticipation of litigation.'" *Id.* (quoting Fed. Rule Civ. P. 26(b)(3)).  In short, counsel for a party need not be the one who hires a non-party for Rule 26(b)(3) to apply. .

For example, in *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D. N.Y. 2001), plaintiffs Viacom Inc. and Emerson Electric Company sued defendant Sumitomo Corporation of America. *See id.* at 215.  Plaintiffs moved to compel the production of documents listed on the privilege log produced by non-party Robinson Lerer & Montgomery ("RLM"), a public relations firm.  "Sumitomo hired RLM because it had no prior experience in dealing with issues relating to publicity arising from high profile litigation, and because Sumitomo lacked experience in dealing with the Western media."  The requested documents related "to RLM's public relations consulting work for Sumitomo." *Id.*

As the court explained, plaintiffs argued that work product privilege should not apply because

> . . . communications to and from RLM are not protected by work-product immunity because RLM was hired by Sumitomo as a public relations consultant and was not hired to assist Paul Weiss in providing legal advice. Plaintiffs argue that the materials that RLM

claims are protected by work-product immunity were generated in the ordinary course of RLM's public relations services provided in connection with the copper trading scandal. In addition, plaintiffs argue that communications between Paul Weiss and Sumitomo which were disclosed to RLM are not protected by work-product immunity because any such immunity was waived upon disclosure to RLM.

*Id.* at 220.

The court rejected these arguments and held that the documents were protected from discovery, noting that the "[a]nalysis of work-product immunity begins with Federal Rules of Civil Procedure 26(b)(3)." *Id.* The Court went on to state that "[i]t is firmly established . . . that a document that assists in a business decision is protected by work-product immunity if the document was created because of the prospect of litigation. In addition, contrary to Plaintiffs' assertions, documents prepared in anticipation of litigation need not be created at the request of an attorney." (citations omitted).

The Court also held that:

> RLM specializes in litigation-related crisis management. Mather Aff., ¶ 3. The firm was hired shortly after Hamanaka's confession, when it was apparent that the CFTC might commence an enforcement action against Sumitomo. Mather Aff., ¶ 7. Elizabeth Mather, RLM's principal representative for the Sumitomo engagement, states that "[f]rom the outset, RLM knew its representation was litigation-related." Mather Aff., ¶ 8. Further, it is clear that Sumitomo retained RLM to make sure that its public statements would not result in further exposure in the litigation which grew out of the copper trading scandal. Mather Aff., ¶¶ 23-24, 29-30; Katsuno Decl., ¶ 10. In light of these uncontroverted facts, the Court finds that the materials listed on the Privilege Log were prepared by RLM or delivered to RLM in anticipation of litigation and that such documents are protected by work-product immunity. For the same reasons, listed documents prepared by Sumitomo or its counsel also are protected by work-product immunity.

*Id.* at 221.

In this case, Conoco argues that "Komex cannot claim a privilege for any communication with Miller Axline & Sawyer concerning Komex's work for OCWD . . . ." Reply at 1-2.  Indeed, Conoco also puts the following emphasis on Document Request No. 5:

> All DOCUMENTS and COMMUNICATIONS between YOU and any person associated with the law firms Miller Axline & Sawyers, Miller Sher & Sawyer, or Sher Leff concerning YOUR work *for OCWD*.

Conoco's Reply in Support of Its Motion to Compel at 2 (quoting Document Request No. 2).  The argument that Conoco seems to be making is that these documents were not produced "for OCWD's attorney" and therefore they do not fall under the "attorney" work product doctrine.

However, the plain language, as well as the history of the adoption of the rule and subsequent case law, shows that Rule 26 extends to consultants and nothing requires that those consultants be hired by a party's attorney.  Komex's documents were prepared in "anticipation of litigation" and then merely shared with Komex's lawyer (*i.e.*, Miller Axline & Sawyer), which would be acting as the party's "representative." Fed. R. Civ. P. 26(b)(3)(A).[4]

Conoco also argues that Komex is required to provide a privilege log but has failed

---

[4]   Similarly, Conoco's argument that the Komex documents are not attorney-client communications (*see* Reply 3-6) is inapposite in light of the applicability of Rule 26.

to do so, in violation of Rule 45 which states *inter alia*:

> When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

Fed. R. Civ. P. 45(d)(2).  Conoco therefore properly asks for a privilege log and Komex must prepare and submit one detailing each document withheld with detail "sufficient to enable [Conoco] to contest the claim" of privilege under Rule 26.

## III.   CONCLUSION

Conoco's motion for an order to compel Komex to produce documents is denied.

Komex must prepare and serve a privilege log on Conoco by no later than May 22, 2009.

Dated: April 18, 2009

Kenneth E. Warner, Special Master

# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
:
IN RE: METHYL TERTIARY BUTYL        :    Master File No. 1:00-1898
ETHER ("MTBE") PRODUCTS             :    MDL 1358 (SAS)
LIABILITY LITIGATION                :
------------------------------------------------------- :    No. M21-88
:
This document relates to:           :
:
*Orange County Water Dist. v. Unocal Corp., et* :
*al.,* 04 Civ. 4968                 :
:
------------------------------------------------------- X
KENNETH E. WARNER, SPECIAL MASTER:

PRE-TRIAL ORDER # 53
(Motion of Defendant Lyondell Chemical to Compel
30(b)(6) Deposition of OCWD Regarding Friedman & Bruya)

Defendant Lyondell Chemical Company, on behalf of itself and other defendants,

moves  (a) to compel a 30(b)(6) deposition of plaintiff, Orange County Water District, on

the 19 Designated Issues set forth in Lyondell's deposition notice dated June 19, 2009

(Mot., Exhibit H, the "Notice"), and   (b) for an order requiring the District to produce a

privilege log of all documents demanded in the Notice that have been withheld by the

District based on any claim of  privilege.  The motion is granted in part with respect to the

Designated Issues and granted with respect to the request for a privilege log.

Friedman & Bruya is an environmental laboratory and consulting firm that has

analyzed water samples on behalf of the District for the presence of MTBE.  It was

retained by the Miller, Axline firm and by the District as a consultant and to do water

-1-

testing for MTBE, and its test results were thereafter submitted to the Court and cited in discovery responses.  Its role in this litigation is discussed in PTO #49, in which I found that the work product privilege was waived with respect to communications between Friedman & Bruya and the Miller, Axline firm (attorneys for the District) to the extent such communications were considered by Friedman & Bruya and relevant to its disclosed test results.[1]  It follows from my analysis in PTO #49 that, in addition to the Miller, Axline firm, the District too has waived any work product or Rule 26 privilege against disclosure regarding Friedman & Bruya to the extent  (a) considered and relevant to Friedman & Bruya's disclosed test results and the evaluation thereof, and   (b) relevant to the District's use and assessment of test results that the District retained Friedman & Bruya to conduct as part of the District's business.  Defendants are not entitled to discovery of the District's litigation strategy, but in light of the multiple hats being worn by Friedman & Bruya – as consultant for litigation, as disclosed expert whose test results have been submitted to the Court, and as consultant/contractor to test water for MTBE in connection with the business of the District – ambiguities must be resolved in favor of disclosure (*see* PTO #49 and *City of New York v.  Amerada Hess Corp., et al.,* Memorandum Opinion and Order, 6/30/09, 00 MDL 1898, 04 Civ. 3417 (SAS), cited therein).

---

[1]   My ruling in this PTO #53 presumes familiarity with PTO #49 and #49-A (the latter PTO having ruled, based on an *in camera* review, on the discoverability of communications between Friedman & Bruya and the Miller, Axline firm that were withheld by the District on the basis of privilege).

Defendants are interested in pursuing the validity of Friedman & Bruya's test results because of the purported ability of that laboratory to detect extremely low levels of MTBE in water, and because of criticism of Friedman & Bruya's testing by experts in other MTBE cases (Mot., ltr of Mr. DiChello dated 8/4/09 at 2-3).   According to Lyondell, Friedman & Bruya purports to be able to detect MTBE in water even at 20 parts per trillion which, says Lyondell, "is several orders of magnitude below the California reportable detection limit for MTBE of 3 parts per billion, and well below the capabilities of typical qualified laboratories, including the District's own" (*Id.*).

**The Designated Issues**

As set forth below, and based on the analysis in PTO #49, I rule as follows with respect to the propriety of the Designated Issues:

**Nos. 1 and 2:**   These Issues concern possible destruction of documents and efforts to locate them and are proper.

**No. 3:**   This Issue concerns the "history and present and future status of OCWD's relationship with Friedman & Bruya" and is overbroad, covers the litigation strategy of the District and is improper, except to the extent of the dates of retention of Friedman & Bruya and any contracts memorializing the terms of such retention.  The parties may meet and confer with a view toward refinement of this Issue, although it may be that permissible information that would be gained as a result is covered in other Issues in the Notice that I find to be proper.

-3-

**No. 4:**  This issue concerns communications between the District and Friedman & Bruya regarding testing, sampling, etc. and is proper.  It does not require the District to prepare or formulate any expert opinions, as argued by the District.

**No. 5:**  This Issue concerns "any investigation, inspection, or audit undertaken by or on behalf of OCWD of Friedman & Bruya" and is proper.  It does not require the District to prepare or formulate any expert opinions or audits about the work of Friedman & Bruya; instead it simply seeks anything of that type *that the District has already done.* The fact that Mr. Fitzsimmons, testifying only with respect to his laboratory, testified that the laboratory did not audit or review Friedman & Bruya's testing does not preclude 30(b)(6) inquiry regarding the *District's* audit or review, if any, apart from the laboratory.

**Nos. 6 & 7:**  These Issues concern "OCWD's involvement, participation, or role in the sampling of water for testing by Friedman & Bruya" and the "status of any data, results, reports, or opinions received by OCWD from Friedman & Bruya" and is proper. There is no basis to limit them only to the Friedman & Bruya test results from Fall 2008, as the District seeks.

**No. 8:**  This Issue concerns "OCWD's evaluation, interpretation, analysis, or assessment of Friedman & Bruya testing data, results, reports, or opinions" and is proper. Like Issue No. 5, it does not call upon the District to formulate an expert opinion, as argued by the District, but rather only to identify any evaluations already conducted.

**No. 9:**  This Issue concerns "limitations, qualifications, or uncertainties with respect to the reliability of Friedman & Bruya testing results" and, as worded, is

-4-

overbroad and improper.  It is not necessary to refine this Issue because the extent to which it could be made proper is already covered in Issue No. 8.

No. 10:   This Issue concerns "all discussions and internal deliberations with OCWD concerning testing by Friedman & Bruya" and, as written, is overbroad, encompasses privileged communications and is improper.  The parties may meet and confer with a view toward refinement of this Issue, although it may be that permissible information that would be gained as a result is covered in other Issues in the Notice that I find to be proper.

No. 11:   This Issue concerns "all actions taken by OCWD " in response to Friedman & Bruya testing.  As written this Issue is susceptible to an extreme interpretation, but the common sense reading thereof is that "actions" refer to substantive responses, such as reports to regulatory agencies, water associations, customers, etc., changes of policy and the like. The parties may meet and confer with a view toward refinement of this Issue, although it may be that permissible information that would be gained as a result is covered in other Issues in the Notice that I find to be proper.

No. 12:   This Issue concerns "OCWD's reporting, officially or unofficially, of Friedman & Bruya's testing results" to government agencies, and is proper.

Nos. 13, 14 & 15:   These Issues concern all communications between OCWD and government regulators, water users and water associations regarding Friedman & Bruya testing, and are proper.

-5-

No. 16:   This Issue concerns all communications between OCWD and its "consultants and contractors" concerning Friedman & Bruya testing, and is overbroad. It should be read to exclude undisclosed litigation consultants and contractors other than those concerned with MTBE levels.

No. 17:   This Issue concerns all communications "between OCWD and its Board of Directors" concerning Friedman & Bruya testing, and is overbroad, encompasses discussions of litigation strategy and is improper. The parties may meet and confer with a view toward refinement of this Issue, although it may be that permissible information that would be gained as a result is covered in other Issues in the Notice that I find to be proper.

No. 18:   This Issue concerns all communications between "OCWD and any scientific research organization" concerning Friedman & Bruya testing, and is proper.

No. 19:   This catch-all Issue concerns every other communication besides those covered by Issues Nos. 13-18 between OCWD and "any entity or person" concerning Friedman & Bruya testing, and is overbroad, encompasses litigation strategy and is improper.

The meet and confer sessions referred to in this Order are permissive, not mandatory. However, if they do not take place, or if they are ineffective, but if either party believes that as a result arguments will ensue at the deposition(s) and cause disruption and delay, then the parties should contact me promptly to bring any issues to my attention for resolution.

-6-

**Privilege Log**

For the reasons set forth in PTO #49, defendants are entitled to a privilege log from the District listing any documents being withheld on the ground of privilege.

**Compliance Schedule**

In the first instance I am not setting a schedule for compliance with this Order and instead leave it to the parties to confer and agree upon a prompt effectuation. If that does not occur, the parties should contact me forthwith and I will arrange a teleconference to set a schedule for all open matters.

Dated: December 28, 2009

Kenneth E. Warner, Special Master