UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

Master File No. 1:00–1898
MDL 1358 (SAS)
M 21-88

This document relates to:

*City of Merced Redevelopment Agency v. Exxon
Mobil Corp., et al.,* 08 Civ. 06306 (SAS)

DECLARATION OF DUANE C. MILLER IN SUPPORT OF
PLAINTIFF CITY OF MERCED REDEVELOPMENT AGENCY'S
OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
RE STATUTE OF LIMITATIONS

1

I, Duane C. Miller, hereby declare:

1.      I am one of the attorneys in this case for plaintiff City of Merced Redevelopment Agency.  I have been personally involved in much of the discovery and pretrial proceedings in this action.  This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of relevant portions of the Expert Report of Marcel Moreau dated April 11, 2011.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the November 3, 2011, Reporter's Transcript of Trial Proceedings in *City of Merced v. Chevron U.S.A., et al.,* Merced County Superior Court Case No. CU148451.

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the November 4, 2011, Reporter's Transcript of Trial Proceedings in *City of Merced v. Chevron U.S.A., et al.,* Merced County Superior Court Case No. CU148451.

5.      Attached hereto as Exhibit 4 is a true and correct copy of relevant portions of the lease between Costco and the RDA dated July 13, 1993.

6.      Attached hereto as Exhibit 5 is a true and correct copy of relevant portions of City of Merced Redevelopment Agency's First Amended Complaint filed on March 4, 2013.

7.      Attached hereto as Exhibit 6 is a true and correct copy of excerpts from the deposition of Frank Quintero taken on February 23, 2011, in this action.

8.      Attached hereto as Exhibit 7 is a true and correct copy of the Participation Agreement dated September 27, 1994, between the RDA and the Shackelfords.

9.      Attached hereto as Exhibit 8 is a true and correct copy of a letter from W. Gross to

2

the Shackelfords and A. Randhawa dated January 28, 2002.

      10.    Attached hereto as Exhibit 9 is a true and correct copy of an Order dated June 25, 2012, in *City of Merced v. Chevron, et al.*

      11.    Attached hereto as Exhibit 10 is a true and correct copy of Special Verdict Form dated February 9, 2012, in *City of Merced v. Chevron, et al.*

      12.    Attached hereto as Exhibit 11 is a true and correct copy of a letter from Warren Gross to Arvel and Virginia Shackelford, et al., dated August 6, 2002.

      13.    Attached hereto as Exhibit 12 is a true and correct copy of a letter from William Cahill to Warren Gross dated April 13, 2005.

      14.    Attached hereto as Exhibit 13 is a true and correct copy of a letter from Bert Van Voris to Bill Cahill, et al, dated May 2, 2006.

      15.    Attached hereto as Exhibit 14 is a true and correct copy of a letter from Bert Van Voris to Bill Cahill, et al., dated July 14, 2006.

      16.    Attached hereto as Exhibit 15 is a true and correct copy of a letter from RWQBC dated October 27, 2006, and attached CAO for R Street Station sites.

      17.    Attached hereto as Exhibit 16 is a true and correct copy of relevant portions of the July 17, 2008 MTBE Remediation Coordination Agreement.

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed this 29th day of April, 2013, at Sacramento, California.

                              DUANE C. MILLER

3

# EXHIBIT 1

LEXISNEXIS' FILE & SERVE
E-SERVICE
36978487
Apr 11 2011
8:27PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This Document Relates To:

*City of Merced Redevelopment Agency v. Exxon
Mobil Corp., et al.*, 08 Civ. 06306 (SAS)

# EXPERT REPORT OF MARCEL MOREAU

Marcel Moreau Associates
73 Bell Street
Portland, ME 04103

_____
Signature

April 11, 2011
_____
Date

# R Street Exxon

## 1415 R St, Merced

**NOTE:** For the purposes of investigation and remediation, the California Regional Water Quality Control Board (CRWQCB) attributed the groundwater pollution detected in the 1400 block of R Street as combined releases from the Pacific Pride Cardlock Station (Pacific Pride) at 1455 R Street and the adjacent R Street Exxon (Exxon) at 1415 R Street. The tank fields of these two facilities are approximately 50 feet apart. The R Street Exxon station is located to the south of the Pacific Pride station. Shallow groundwater flow direction is generally to the north.

## SITE OWNERSHIP HISTORY

| | |
|---|---|
| 1963 – 1980 | Mobil station |
| 1992 | R Street Exxon |
| 1999 | R Street Texaco |

a/k/a/ R Street Chevron, 1415 R Street, Facility ID: 1528, LOP# 24162

## MAJOR MILESTONES

| | |
|---|---|
| ~1963 | Service Station first operated at this site. |
| Dec 1991 | Unauthorized Release Report (URR) was filed for an estimated 20-gal release that occurred on 12/20/1990 during a tightness test. |
| 1992 | MtBE first added to gasoline produced by Exxon's Benecia refinery. |
| Oct 1995 | Start of quarterly groundwater monitoring. Floating product was observed in two monitoring wells, one on-site and one to the northeast. |
| March 1996 | Merced County Division of Environmental Health (MCDEH) directed the site to include MtBE as an analyte in the next groundwater sampling event. |

# EXHIBIT 2

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF MERCED

3    BEFORE THE HONORABLE CAROL K. ASH, JUDGE

4    ---oOo---

5

6  CITY OF MERCED,                    )
                                      )
7        Plaintiff,                   )
                                      )    Case No. CU148451
8  vs.                                )
                                      )
9  CHEVRON U.S.A., Inc., et           )
   al.,                               )
10                                    )
                                      )
11       Defendants.                  )
   _____   )

12

13    REPORTER'S TRANSCRIPT

14    TRIAL PROCEEDINGS

15    NOVEMBER 3, 2011, AFTERNOON SESSION

16

17

18

19

20

21

22

23

24
   Reported By:          Denisa L. Dunbar, CSR #12460, RPR
25                       Official Reporter

26

1    Q.   Okay.  In terms of this investigation by Krazan,

2  did you get to see some of the reports related to that as

3  part of negotiations with Costco?

4    A.   Yes.  The way that we approached this negotiation

5  as we try to do with all development is for a full sharing

6  of information between the developer, in this case,

7  Costco, and the city or the redevelopment agency so that

8  we have a common base of information to give us an

9  understanding.

10        When Costco hired Krazan & Associates from Fresno

11  to perform those first environmental tests, they gave us

12  copies of that information.

13    Q.   Okay.  And at the time, was some gasoline

14  contamination discovered, to your understanding?

15    A.   Yes.  The properties fronting 15th street, which

16  are two gas stations, were found through their sampling to

17  be contaminated, and they discovered that contamination

18  also extended a little bit northern -- or northerly of

19  those two gas stations, into the area, which is today,

20  appears to the public to be Costco's parking lot.

21    Q.   Does Costco actually own the entire parking lot?

22    A.   No.  As part of the negotiation of the project

23  with Costco, having discovered that there was a

24  contaminated area, Costco said they were not interested in

25  acquiring that part of the parking lot.  For a while we

26  thought that would stop the project and that we would not

1    have a Costco in Merced, but we then moved to the idea of

2    retaining that property -- part of the parking lot right

3    along 15th Street -- retaining that in redevelopment

4    agency ownership and leasing it to Costco.  So that's what

5    was eventually done.  That was, in fact, the key to the

6    whole project going forward.

7        Q.   Okay.  So the City of Merced Redevelopment Agency

8    bought the property and had to lease it to Costco instead

9    of the original plan of selling it to Costco; is that

10   correct?

11       A.   That's correct.

12       Q.   And at the time you left your position with the

13   city of Merced, did the redevelopment agency still own and

14   lease that parcel?

15       A.   Yes.

16       Q.   As a result of the contamination of fuel at these

17   two stations -- we're going to go into more detail about

18   them in a minute -- did the city lose an opportunity to

19   sell that property?

20       A.   Yes.  It would have been sold at that time to

21   Costco and even now when it gets cleaned up, may some day

22   be sold to them or to some other user.

23       Q.   Okay.  Now, you mentioned two stations.  Could you

24   give me the intersection?

25       A.   Yes.  The station on the south at the corner of

26   14th and R Street was owned by a gentleman named

UNCERTIFIED ROUGH DRAFT TRANSCRIPT                    1834

# EXHIBIT 3

1   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2     IN AND FOR THE COUNTY OF MERCED

3    Before the Honorable CAROL ASH, Judge

4       -oOo-

5 CITY OF MERCED,    )
           )
6     Plaintiff(s), )
           )
7 vs.        ) Case No. CU148451
           )
8 CHEVRON U.S.A., INC., SHELL )
 OIL COMPANY; EXXON MOBIL )
9 CORPORATION; EXXON   )
 CORPORATION; KINDER MORGAN )
10 ENERGY PARTNERS L.P.;  )
 EQUILON ENTERPRISES, LLC; )
11 SFPP, L.P., and DOES 1  )
 through 200, inclusive, )
12          )
     Defendant(s). )
13 _____)

14

15

16

17      REPORTER'S TRANSCRIPT

18   TRIAL PROCEEDINGS - AFTERNOON SESSION

19      November 4, 2011

20

21

22

23

24 Reported by:   RENEE L. TERRY, CSR #7321, RPR
         Official Reporter

25

26

1    question, it was that as of -- to you was was it your

2    understanding -- was it your understanding that in 1996, but

3    for testing for MTBE, the R Street site was approaching

4    closure?

5        A.   No.  I don't think so.

6        Q.   That's not a fair reading of this, is it?

7        A.   No.

8        Q.   Because the remediation had not even begun, had it?

9        A.   That's correct.

10        MR. MEADOWS:  All right.  Thank you, sir, very much.

11        That's all I have, Your Honor.

12        THE COURT:  Thank you, Mr. Meadows.

13        Did anyone other defense counsel --

14        MR. PARKER:  Yes, Your Honor.  Thank you.

15                     CROSS EXAMINATION

16   BY MR. PARKER:

17        Q.   Good afternoon, Mr. Cahill.  My name is Jeff Parker.

18   We met a couple of years ago.

19        A.   Yes.

20        MR. PARKER:  Good afternoon ladies and gentlemen.

21        Q.   I am going to follow up on some questions that

22   Mr. Meadows had and then a couple of areas that he didn't

23   necessarily go into.

24        First I just wanted to make clear:  You were involved

25   in the Costco investigation as of 1992; is that correct?

26        A.   Yes.  Well, let me make sure we understand that.

1        We were not running that investigation.  We received

2    the results of that investigation from Costco's consultant.

3        Q.   And that was the Krassan -- the Krassan firm from

4    Fresno?

5        A.   Yes.  Krassan & Associates.

6        Q.   Krassan.  Thank you.

7             Mr. Reed, can you put up the map, please.

8             MR. REED:  (Complies.)

9             MR. PARKER:  Q.  Mr. Cahill, this is a map just

10   generally to show the location of the 1415 and 1455 R Street

11   properties.  And the City Well 5.  Do you recognize that?

12       A.   Yes.  I see that.

13       Q.   That's generally consistent with your recollection of

14   where those stations are located or were located and where

15   the well is?

16       A.   Yes, they are.

17       Q.   Okay.  And then you see down in the lower right-hand

18   corner, there is the north arrow; is that right?

19       A.   Yes.

20       Q.   And that's consistent with your recollection that R

21   Street runs generally north/northeast?

22       A.   Yes.

23       Q.   Can you indicate on there roughly where the Costco

24   facility is?

25       A.   Yes.  It is to the west or left on this map of the

26   1455 and 1415 locations.

1        It would be right along that area.  The railroad
2   right of way is in here and continues to extend here.  This
3   maps show some irregularity in it.  (Indicating.)
4        MR. PARKER:  Q.  So about halfway between 15th and
5   16th Street; is that right?
6      A.  Correct.
7      Q.  Just roughly.  Thank you.
8        THE COURT:  If you wouldn't mind out -- you mentioned
9   the property that Costco leased.  Just point that out.
10        THE WITNESS:  Yes.  As I said, this part is Costco.
11   This area is owned by the Redevelopment Agency and is leased
12   to Costco.  And it was in this area that there were
13   discoveries of contamination early on in 1992, '93, as well
14   as at the gas stations.  So this area was segmented off or
15   was split from the other property, created its own parcel,
16   and then that parcel got leased from the agency to Costco.
17   (Indicating.)
18        THE COURT:  Okay.  Thank you.
19        MR. PARKER:  Thank you, Mr. Cahill, for that
20   explanation.
21      Q.  So you mentioned something about the contamination.
22   When the Costco project started, you were aware that there
23   was gasoline contamination off site from the two R Street
24   stations; isn't that right?
25      A.  That's correct.  As I just indicated, it extended a
26   bit northerly.

1    Q.   And it's dated January 28, 2002?

2    A.   Yes, it is.

3    Q.   Okay.  And if you could please look in the first

4    paragraph and particularly in the middle of it, read that to

5    yourself, and then let me know if that refreshes your

6    recollection as to whether it was January 2002 when the

7    Regional Board told you that.

8    A.   (Examines document.)  Yes.  The middle of that

9    paragraph -- and this is January -- says, "Your site is

10   considered a high priority site --"

11   Q.   Mr. Cahill, if you read it to yourself, my only

12   question is:  Does this refresh your recollection as to the

13   time that the Regional Board indicated to the Redevelopment

14   Agency that it concerned -- or that considered the MTBE plume

15   to be a potential threat to Well 5?

16   A.   It does not refer -- well, not the way your question

17   is phrased.  The letter refers to high concentrations of

18   petroleum hydrocarbons, not specifically to MTBE.  But it

19   does say that the site's considered a potential threat to

20   water supply wells.

21   Q.   But you understood at that time, January 2002, that

22   the investigation dealt in large part with MTBE; correct?

23   A.   In part with MTBE.  But this is -- I refer to earlier

24   in the testimony to a continuing evolution of our

25   understanding of this problem.  Because since 1992, we had

26   been focused on gasoline, hydrocarbons, not on MTBE itself.

1  MTBE didn't really enter the picture until we were asked to

2  test for it in '96.  And a lot of our focus was still on

3  hydrocarbons and gasoline itself as opposed to MTBE.  But by

4  this time, there had been testing for it, and it was known to

5  be in the plume.

6      Q.  Okay.  So just to be clear, the threat that you

7  understood the Regional Board to be referring to in this

8  January letter was a threat that at least included MTBE and

9  may have included other constituents of gasoline; right?

10     A.  Well, we knew for sure that it included gasoline.  It

11 may have included MTBE if you read that into it by

12 implication.  But it may well have.  I'm just saying that the

13 emphasis at that time and prior to that time had usually been

14 on the gasoline.

15     Q.  Mr. Cahill, you knew by March of 2002 that the

16 contamination from the R Street stations had spread and was

17 spreading and that there could be a threat to Well 5 from the

18 contamination; right?

19     A.  Yes.  That's correct.

20     Q.  And clearly that was a concern at that point in time

21 to you; right?

22     A.  Yes.  We were concerned about the possibility.

23     Q.  Okay.  Now the free product that you discussed

24 yesterday, do you recall generally discussing in response to

25 Mr. Miller's questions?

26     A.  Yes.

# EXHIBIT 4

*After recording Return to:*
*Redevelopment Agency of the City of Merced*
*678 W 18th Street*
*Merced CA 95340*

## LEASE AGREEMENT WITH OPTION TO PURCHASE

THIS LEASE is executed at Merced, California, on ___July 13___,
1993 between the REDEVELOPMENT AGENCY OF THE CITY OF MERCED
("Lessor") and COSTCO WHOLESALE CORPORATION ("Lessee").

### W I T N E S S E T H

WHEREAS, the Lessor is the owner of an 82,000 square foot
(approximately) parcel immediately adjacent to the property
purchased by Lessee as part of the Merced Costco Disposition and
Development Agreement (DDA) as amended, hereby incorporated into
this Lease as if fully set forth within; and

WHEREAS, said property is adjacent to the Merced Costco Site;
and

WHEREAS, Lessee desires to use the parcel as parking for the
Merced Costco project;

NOW THEREFORE, the parties hereto, in consideration of the
mutual covenants, promises, and agreements herein contained, agree
as follows:

1. Lessor leases to Lessee and Lessee hires from Lessor a
portion of that property owned by the Lessor, located on the corner
of R and West 15th Streets, Merced, California, consisting of the
approximately 82,800 square feet shown in Exhibit 1 of the Amendment
to Disposition and Development Agreement between the Redevelopment
Agency of the City of Merced and Costco Wholesale Corporation,
referred to as the "Lease Parcel" or "the Property", on the terms
and conditions set forth in this Lease.

25452 RECORDED 0:
TRANSCOUNTY TITLE
JUL 13 1993 AT 8 00 AM
VOL 3127 PAGE 496
OFFL RECORDS OF
MERCED COUNTY
CALIFORNIA
JAMES L. BALL
Recorder
DH

VOL 3127 PAGE 496

MERCEDMTBE025491

10.  Lessee shall maintain the Property in a safe condition, and shall hold Lessor harmless and agrees to defend and indemnify Lessor from any claims or damages to person or property sustained either on the Property or as a result of its use, except to the extent such claims or damages are attributable to the active negligence or misconduct of Lessor or any entity acting on behalf of Lessor.  Lessee shall name Lessor and the City of Merced as additional insureds under policies of insurance required to be maintained by Lessee pursuant to Section 20 of this Lease.

11.  Lessor shall perform, at no cost to Lessee, any and all required remediation of environmental hazards on the Property to the extent such hazards were on the Property prior to Lessee's possession of the Property and to the extent such hazards may have entered the Property after Lessee's possession but from a source other than Lessee or any entity acting on behalf of Lessee.  Lessor shall use best efforts to implement the remediation so as to avoid wherever possible and otherwise minimize any interference with Lessee's use of the Property.  Lessor shall hold Lessee harmless and agrees to defend and indemnify Lessee against costs associated with any remediation by Lessor and against costs incurred by Lessee as a result of the failure of Lessor to perform Lessor's remediation obligations pursuant hereto.  Notwithstanding the above, Lessor shall not be responsible to Lessee for any consequential damages such as loss of use, profits, etc. attributable to the contamination or any remedial action.  If Lessor acts or omits to

10

{ VOL 3127 PAGE 505

MERCEDMTBE025500

square feet, rectangular in shape and must have a minimum of 125 feet of frontage on 15th street. If only a part of the Property is purchased, this Lease Agreement shall terminate as to all portions retained by the Lessor.

15. Lessee may exercise the above option to purchase all or part of the Property upon sixty (60) days written notice to the Lessor.

16. In the event that Lessee purchases part or all of the Property and re-sells all or a portion thereof within four (4) years of the close of escrow, Lessee shall pay to Lessor fifty percent (50%) of the net profits from that re-sale. For the purposes of this Lease Agreement, net profits shall mean the total sale price paid to Lessee reduced by the original purchase price paid by Lessee to Lessor for the property being resold, the costs of any improvements made by Lessee to the property being resold, including without limitation, all costs incurred in connection with planning, designing and constructing such improvements and the following expenses from Lessee's re-sale: real estate commissions, escrow fees, and related transaction costs. In the event that only a portion of the property purchased by Lessee is re-sold, the original purchase price shall be prorated on a square footage basis.

17. Lessee's failure to perform any term or obligation under this Lease Agreement, the DDA or any subsequent amendment thereto, shall constitute a default under this Lease.

13

MERCEDMTBE025503

Lessor, at any time after expiration of Lessee's time under this Lease to cure a default by Lessee can cure the default at Lessee's cost.  If Lessor, after the expiration of any such Lessee cure period, by reason of Lessee's default, pays any sum or does any act that requires the payment of any sum, the sum paid by Lessor shall be due immediately from Lessee to Lessor at the time the sum is paid, and shall bear interest at the rate of ten percent (10%) per annum from the date the sum is paid by Lessor until Lessor is reimbursed by Lessee.  The sum, together with interest on it, shall be additional rent.

Rent not received within ten (10) days after the due date shall bear interest at the rate of ten percent (10%) per annum from the date due until paid.

IN WITNESS WHEREOF, the Lessor and the Lessee have hereunto subscribed their names the day and year in this Lease first above written.

APPROVED AS TO FORM:

BY: _____
General Counsel

930680
FUNDS/ACCOUNTS VERIFIED

_____   7/12/93
Finance Office          Date

no funds required 7/12/93
pkd

REDEVELOPMENT AGENCY OF THE
CITY OF MERCED
A Public Corporation

BY: _____
Chairman

BY: _____
Secretary

LESSOR

COSTCO WHOLESALE CORPORATION

BY: _____
Richard J. Olin
Asst. V.P. / Asst. Secy.

22

VOL 3127 PAGE 517

MERCEDMTBE025512

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898 MDL 1358 (SAS) M21-88 |
| This Document Relates To: | Hon. Shira A. Scheindlin |
| *City of Merced Redevelopment Agency, et al. v. Exxon Mobil Corp., et al.*, 1:08-cv-06306 | Transferred from: United States District Court, Eastern District of California Case No. 1:08-cv-00714 |
| CITY OF MERCED REDEVELOPMENT AGENCY and MERCED DESIGNATED LOCAL AUTHORITY, AS SUCCESSOR AGENCY TO THE REDEVELOPMENT AGENCY OF THE CITY OF MERCED, | Removed from: Superior Court of California, County of Merced Case No. 151145 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF FOR:** |
| v. | |
| EXXON MOBIL CORPORATION; EXXON CORPORATION; CHEVRON U.S.A. INC.; SHELL OIL COMPANY; EQUILON ENTERPRISES LLC; TESORO CORPORATION; TESORO REFINING AND MARKETING COMPANY; and DOES 1 THROUGH 200, inclusive, | **(1) COST RECOVERY UNDER THE POLANCO REDEVELOPMENT ACT; (2) PRODUCTS LIABILITY; (3) NEGLIGENCE; (4) TRESPASS; AND (5) NUISANCE** |
| Defendants. | **JURY TRIAL DEMANDED** |

1

## FIRST CAUSE OF ACTION

### (Cost Recovery under the Polanco Redevelopment Act)

29. Plaintiffs refer to paragraphs 1 through 28 above, and by this reference incorporate them into this cause of action as though fully set forth herein.

30. Prior to the commencement of ths action Plaintiffs served all legally required notices under the Polanco Redevelopment Act (Health & Saf. Code, §§ 33459-33459.8) ("Polanco Act") on each of the Defendants.  None of the Defendants submitted a proposed remedial action plan or took any other action as required by the Polanco Act;  instead, some Defendants denied that they had any responsibility to remediate the project area.  At all times relevant herein, Defendants, and each of them, have failed and refused to remediate the gasoline and MTBE contamination described herein.

31. As a direct result of the Defendants' acts alleged in this Complaint, the project area, including soil, groundwater, and improvements, has been contaminated, and will continue to be contaminated with gasoline, hydrocarbons, MTBE, and TBA which create a public health hazard unless abated.  As a direct and proximate result thereof, Plaintiffs must initiate a remedial program to assess, evaluate, investigate, monitor, remove, clean up, correct, and abate such contamination in the project area and to restore the project area at significant expense, loss, and damage.  Costs incurred within the past three years of the filing of the Complaint, or that are to be incurred in the future, include:  loss of use of property, loss of tax revenues, property damage, restoration costs incurred within the past three years of the filing of the Complaint or that are to be incurred in the future, delay damages, property devaluation, interim and permanent remedial

measures to control releases and potential releases of gasoline, hydrocarbons, MTBE, and TBA,

cleanup costs, potential installation and maintenance of interceptor wells, and water treatment

facilities, all in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### (Products Liability)

32.  Plaintiffs refer to paragraphs 1 through 31 above, and by this reference incorporate

them into this cause of action as though fully set forth herein.

33.  Defendants formulated, manufactured, compounded, refined, provided product

information and/or instructions for use, promoted, marketed, distributed, transported, exchanged,

and/or sold gasoline containing MTBE.

34.  Defendants, and each of them, represented, asserted, claimed, and warranted that

gasoline containing MTBE could be used in the same manner as gasoline not containing these

compounds, and/or that gasoline containing MTBE did not require any different or special

handling or precautions.

35.  Defendants, and each of them, knew that said product(s) were to be purchased and

used without inspection for defects.

36.  MTBE, and gasoline containing MTBE, are defective products because, among other

things:

(a)     The design of these products was defective;

(b)     The benefits of using MTBE in gasoline, if any, are greatly outweighed by the

associated costs and negative impacts imposed on society, consumers, and the

11

63.  Plaintiffs have not consented to and do not consent to this nuisance.  Defendants, and each of them, knew, or should have known, that Plaintiffs would not consent to this nuisance.

64.  As a direct and proximate result of the nuisance, Plaintiffs have been damaged and are entitled to the compensatory and exemplary damages alleged herein, or to such other appropriate relief as Plaintiffs may elect at trial, including, but not limited to, equitable relief in the form of an order requiring the Defendants to abate the nuisance injuring Plaintiffs and the project area.

## PRAYER

WHEREFORE, Plaintiffs request judgment against Defendants, and each of them, for:

1.  Compensatory damages according to proof;

2.  Exemplary damages in an amount sufficient to punish defendants Chevron, Shell, Exxon Mobil, Exxon, Equilon, and DOES 1 through 50, inclusive, and to deter those defendants from ever committing the same or similar acts;

3.  An Order declaring that the Defendants have created a nuisance, and compelling Defendants to abate that nuisance;

4.  Pursuant to Civil Code section 1882.2, three times the amount of actual damages, plus the cost of the suit and reasonable attorneys' fees;

5.  Reasonable attorneys' fees, pursuant to Code of Civil Procedure section 1021.5 or otherwise, and costs incurred in prosecuting this action, and prejudgment interest to the full extent permitted by law;  and

6.  Such and other further relief as the court may deem just and proper.

First Amended Complaint for Damages and Other Relief

# EXHIBIT 6

FRANK QUINTERO, Volume 1                                    2/23/2011

1

```
1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF NEW YORK
3
4  IN RE:  METHYL TERTIARY BUTYL ETHER
   PRODUCTS LIABILITY LIGITATION
5
   This Document Relates To:
6
   City of Merced Redevelopment Agency v.
7  Exxon Mobil Corporation, et al.,
   Case No. 08 Civ. 06306 (SAS)            /
8
9
10             Videotape Deposition of
11                  FRANK QUINTERO
12        (Person Most Qualified re damages)
13            Wednesday, February 23, 2011
14
15
16
17
18
19  Reported by:
    SANDRA BUNCH VANDER POL, FAPR, RMR, CRR, CSR
20  License No. 3032
    Certified Realtime Reporter
21  Realtime Systems Administrator credentialed
    Job No. 27808LR
22
23
24
25
```

2

```
1                    APPEARANCES
2
3  For the Plaintiff:
4       MILLER, AXLINE & SAWYER
5       By:  DUANE C. MILLER, Esq.
6       dmiller@toxictorts.org
7       1050 Fulton avenue, Suite 100
8       Sacramento, California 95825-4272
9       (916) 488-6688
10
11  For the Defendant CHEVRON, U.S.A., INC.:
12       KING & SPALDING
13       By:  DAVID GRENARDO, Esq.
14       dgrenardo@kslaw.com
15       1100 Louisiana Street, Suite 4000
16       Houston, Texas 7002-5213
17       (713) 276 7329
18
19  For the Defendant CONNOCOPHILLIPS, INC.:
20       LATHAM & WATKINS
21       By:  JON ANDERSON, Esq.
22       jon.anderson@lw.com
23       650 Town Center Drive, Suite 2000
24       Costa Mesa, California 92626-1925
25       (714) 540-1235
```

3

```
1  APPEARANCES (Continued)
2
3  For the Defendant SHELL OIL CO.:
4       MUNGER, TOLLES & OLSON LLP
5       By:  JOSEPH YBARRA, Esq.
6       joseph.ybarra@mto.com
7       355 South Grand Avenue, 35th Floor
8       Los Angeles, California 90071-1560
9       (213) 683-9296
10
11  For the Defendant EXXONMOBIL CORP.:
12       SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
13       By:  WHITNEY JONES ROY, Esq.
14       wroy@sheppardmullin.com
15       333 South Hope Street, 48th Floor
16       Los Angeles, California 90071-1448
17       (213) 620-1780
18
19  For the Defendant KINDER MORGAN, L.P., SFPP, L.P.:
20       REED SMITH CROSBY HEAFEY
21       By:  ROSE L. STANDIFER, Esq: (Telephonically)
22       rstandifer@reedsmith.com
23       101 Second Street, Suite 2200
24       San Francisco, California 94105
25       (415) 543-8700
```

4

```
1              APPEARANCES (Continued)
2
3  For the Defendant Tesoro (in the RDA Case):
4       BINGHAM MC CUTCHEN LLP
5       By:  BERG K. PARSEGHIAN, Esq.
6       Berj.parseghian@bingham.com
7       355 South Grand Avenue, Suite 4400
8       Los Angeles, California 90071-3106
9       (213) 680-6815
10
11  Videographer:  JORDAN CALLA
12       PHILLIPS LEGAL SERVICES
13       350 University Avenue, Suite 270
14       Sacramento, California 95825
15       (916) 927-3600
16
17               --oOo--
18
19
20
21
22
23
24
25
```

FRANK QUINTERO, Volume 1                                          2/23/2011

25

1   A.       That is correct.
2   Q.       Are there any other positions at the RDA,
3   other than city manager and development manager,
4   which would have authority to approve professional
5   services contracts under $25,000?
6   A.       No, sir.
7   Q.       All right.
8   A.       Excuse me.
9   Q.       I'd like you to look on page 4 of your
10  declaration, under designated issues 10 through 11,
11  14, 15 and 18 and 26.
12       The text there references a spreadsheet
13  attached as Exhibit 6.  Do you see that?
14  A.       Yes, I do.  Not the exhibit, but I see --
15  Q.       You see the reference to it.
16       Can you turn to, in your document, the
17  Exhibit 6.  Actually, it's probably --
18  A.       Oh.  Thank you.
19  Q.       Yep.
20       Have you seen this document that's Exhibit 6
21  to your declaration, prior to today?
22  A.       Yes.
23  Q.       Did you see this prior to signing the
24  declaration?
25  A.       No.

26

1   Q.       When is the first time you saw it?
2   A.       Yesterday.
3   Q.       What, if anything, did you do prior to
4   signing this declaration to satisfy yourself that the
5   cost that the RDA had incurred as a result of the
6   presence of MTBE in the project area would be
7   accurately set forth in your declaration?
8   A.       Would you repeat the question, please.
9   Q.       Sure.
10       Did you do anything, prior to signing this
11  declaration, to satisfy yourself that the declaration
12  would attach an accurate summary of the costs that
13  the RDA has incurred as a result of MTBE in the
14  project area?
15  A.       No, sir, because I rely upon staff to work
16  with the consultants, evaluate their work.
17  Q.       What staff person were you relying on with
18  respect to coming up with an accurate summary of the
19  costs?
20  A.       Joe Angulo.
21  Q.       Did he create this Exhibit 6, to your
22  knowledge?
23  A.       I'm not aware, sir.
24  Q.       Before you signed the declaration, did you
25  discuss with Mr. Angulo the list of costs that he was

27

1   going to prepare and attach to your declaration?
2   A.       No, sir, I did not.
3   Q.       Did you assume that the list that would be
4   attached to your declaration would be true and
5   correct?
6   A.       Yes, I did.
7   Q.       Looking at Exhibit 6, it sets forth a total
8   cost of $3,385,969.06.  Do you see that?
9   A.       Yes, I see it.
10  Q.       Since the time of your declaration, which I
11  think is December 2010, has that amount increased in
12  any way, to your knowledge?
13  A.       I'm not aware of that, sir.
14  Q.       To your knowledge, sitting here today, are
15  the numbers set forth on Exhibit 6 the entirety of
16  the costs that the RDA has incurred related to MTBE
17  or TBA in the project area?
18       MR. MILLER:  Is this incurred, in the sense
19  of paid?  Or are you talking about contractual
20  obligations that extend off into the future, which
21  would make it more difficult to answer as a separate
22  question.
23       MR. YBARRA:  I will separate it out.  I will
24  separate it out.
25  Q.       To your knowledge, sitting here today, are

28

1   the numbers set forth on Exhibit 6 the entirety of
2   the costs that the RDA has paid related to the
3   presence of MTBE or TBA in the RDA project area?
4   A.       That answer would have to come best from our
5   Finance Department.
6   Q.       Are you saying you don't know one way or the
7   other?
8   A.       One way or the other?
9   Q.       Whether this is the entirety of the costs
10  that the RDA has paid as a result of MTBE and/or TBA
11  in the project area?
12  A.       Based on our contractual obligations, we
13  have a set price for expenditures.  So if these are
14  related to those expenditures then, yes, they have
15  been paid by the Redevelopment Agency.
16  Q.       What I'm trying to get a sense of is whether
17  there's anything else that has been paid by Merced
18  RDA related to MTBE or TBA in the project area that's
19  not set forth on Exhibit 6?
20  A.       In the project area as a whole or for this
21  project specific?
22  Q.       Well, let me -- let me ask you that.
23       When you say "this project specific," what
24  are you referring to?
25  A.       I'm referring to the reason why I'm here.

77

1          REPORTER'S CERTIFICATE
2          I, SANDRA BUNCH VANDER POL, Certified
3    Shorthand No. 3032 for the State of California do
4    hereby certify:
5          That prior to being examined, the witness
6    named in the foregoing deposition was duly sworn to
7    testify to the truth, the whole truth, and nothing
8    but the truth.
9          That said deposition was taken down by me
10   stenographically at the time and place therein named,
11   and thereafter reduced by me into typewritten form,
12   and that the same is a true, correct and complete
13   transcript of said proceedings.
14         Before completion of the deposition, review of
15   the transcript was requested.  Any changes made by
16   the deponent (and if provided to the reporter) during
17   the period allowed are appended hereto.
18         I further certify that I am not interested in
19   the outcome of the litigation.
20         Witness my hand this 25th day of February,
21   2011.
22
23         SANDRA BUNCH VANDER POL
24         Certified Shorthand Reporter
25         Certificate No. 3032

*Digitally signed by Sandra Bunch VanderPol*
*Date: 2011.02.28 22:15:08 -08:00*
*Reason: Certification of transcript*
*Location: Sacramento, CA*

---

78

1          PHILLIPS LEGAL SERVICES
2          350 University Avenue, Suite 270
3          Sacramento, California 95825
4          (916) 927-3600
5    FRANK QUINTERO
6    c/o MILLER, AXLINE & SAWYER
     Attn: DUANE C. MILLER, Esq.
7    1050 Fulton avenue, Suite 100
     Sacramento, California 95825-4272
8    Re: MERCED RDA VS. EXXON MOBIL, ET AL
     Date Taken: FEBRUARY 23, 2011
9
10   Dear Mr. Quintero:
11   Your deposition is now ready for you to read, correct
     and sign.  The original will be held in our office
12   for 35 days from the date of this letter.
13   If you are represented by counsel, you may wish to
     discuss with him/her the reading and signing of your
14   deposition.  If your attorney has purchased a copy of
     your deposition, you may review that copy.  If you
15   choose to read your attorney's copy, please fill out,
     sign and submit to our office the DEPONENT'S CHANGE
16   SHEET located in the back of your deposition.
17   If you choose to read your deposition at our office,
     it will be available between 9:00 a.m. and 4:00 p.m.
18   Please bring this letter as a reference.
19   If you do not wish to read your deposition, please
     sign here and return within 30 days of the date of
20   this letter.
21   FRANK QUINTERO            DATE
22   Sincerely,
23
24   SANDRA BUNCH VANDER POL, CMR, CRR, CSR No. 3032
     PHILLIPS LEGAL SERVICES
     Job No. 27808LR
25   cc:  ALL COUNSEL

---

79

1          PHILLIPS LEGAL SERVICES
2          350 University Avenue, Suite 270
3          Sacramento, California 95825
4          (916) 927-3600
5
6    MUNGER, TOLLES & OLSON LLP
7    Attn:  JOSEPH YBARRA, Esq.
     355 South Grand Avenue, 35th Floor
8    Los Angeles, California 90071-1560
9    Re:  MERCED RDA vs. EXXON MOBIL, ET AL
     Deposition of:  FRANK QUINTERO, PMQ
10   Date Taken:  FEBRUARY 23, 2011
11   Dear Mr. Ybarra:
12   We wish to inform you of the disposition of this original
     transcript.  The following procedure is being taken by
13   our office:
14   _____   The witness has read and signed the
              deposition.  (See attached.)
15   _____   The witness has waived signature.
16   _____   The time for reading and signing has
              expired.
17
18   _____   The sealed original deposition is being
              forwarded to your office.
19
20           Other:
21   Sincerely,
22
23   Phillips Legal Services
24   Ref No. 27808LR
25

# EXHIBIT 7

When recorded return to:

CITY CLERK'S OFFICE
CITY OF MERCED
678 W. 18th STREET
MERCED, CA 95340

## PARTICIPATION AGREEMENT

THIS AGREEMENT is made and entered into this 6th day of September, 1994 by and between the REDEVELOPMENT AGENCY OF THE CITY OF MERCED (hereinafter referred to as the "Agency") and Arvel and Virginia Shackelford (hereinafter referred to as the "Participant").  The Agency and the Participant agree as follows:

I.   SUBJECT OF AGREEMENT

A. Purpose of this Agreement

The purpose of this Agreement is to effectuate the Redevelopment Plan (the "Redevelopment Plan") for the Merced Redevelopment Project No. 2 (the "Project") by providing for the costs of testing and cleanup of certain real property (the "Site") included within the boundaries of the Project.  The testing and cleanup of the Site pursuant to this Agreement, and the fulfillment generally of this Agreement are in the vital and best interests of the City of Merced (the "City") and the health, safety, morals and welfare of its residents, and in accordance with the public purposes and provisions of applicable federal, state and local laws and requirements.  Implementation of this Agreement will further the objective of the Redevelopment Plan to strengthen commercial functions in downtown Merced by improving the overall environmental character of the downtown area.

The Agreement is further being made to carry out the intent of the Petroleum Underground Storage Cleanup Act (Health and Safety Code Section 25299.10 through 25299.81), and is undertaken in accordance with Health and Safety Code Section 33459.2 which states in part that an agency may take any action which the agency determines is necessary to remedy or remove hazardous waste from property within its project areas.

B.   The Redevelopment Plan

This Agreement is subject to the provisions of the Redevelopment Plan which was approved and adopted on August 5, 1974, by the City Council of the City of Merced by Ordinance No. 1118, as amended on September 6, 1977, by Ordinance No. 1200, and further amended on February 6, 1978, by Ordinance No. 1210.  The Redevelopment Plan, as it now exists or as it may be subsequently amended pursuant, is incorporated herein by reference and made a part hereof as though fully set forth herein.

C.   Approval by Regulatory Agencies

This Agreement is made subject to approval by the California Department of Toxic Substances Control in accordance with Health and Safety Code 33459.2 and the State Water Resources Control Board

ym 3290 page 809

MCDEH-MTBE-027454

in accordance with the Petroleum Underground Storage Tank Cleanup Act. In the event that these agencies and any other required agency or agencies does not approve the terms of this Agreement, then this Agreement shall be null and void and no longer binding on either party hereto.

**D.  The Site**

The "Site" is that portion of the Project Area shown on the "Site Map" which is incorporated herein and attached to this Agreement as Attachment No. 1, and as more particularly described in the "Legal Description of the Site" incorporated herein and attached hereto at Attachment No. 2. The Site is composed of real property presently owned by the Participant.

**E.  Parties to the Agreement**

**1.  Agency**

The Agency is a public body, corporate and politic, exercising governmental functions and powers, and organized and existing under the Community Redevelopment Law of the State of California (Health and Safety Code Sections 33000 et seq.) and Part 1.7 of Division 24 of the Health and Safety Code.

The principal office of the Agency is located at 678 West 18th Street, Merced, California 95340.

"Agency," as used in this Agreement, includes the Redevelopment Agency of the City of Merced, California, and any assignee of or successor to its rights, powers and responsibilities.

**2.  Participant**

The Participant is Arvel and Virginia Shackelford.

The principal address of Participant is 2776 Branco, Merced, CA 95340.

Whenever the term "Participant" is used herein, such term shall include any permitted nominee, assignee, or successor in interest as herein provided.

The Participant qualifies as an Owner and Operator as those terms are used in Section 25299.20 and Section 25299.21 of the Health and Safety Code, and as an Eligible Claimant as that term is used in Section 2810.1 of Title 23, California Code of Regulations.

2

MCDEH-MTBE-027456

## II. TESTING AND CLEANUP OF THE SITE

### A. Participant to Obtain Cleanup Funds

Subject to the terms of this Participation Agreement, Participant agrees and covenants to take corrective action to clean up the environmental damage on the Site and to apply for reimbursement of said costs from the Petroleum Underground Storage Tank Cleanup Fund (the "Cleanup Fund"). In connection therewith, Participant shall take all action necessary to obtain cleanup funds and shall designate Agency as co-payee for payments from the Fund in accordance with Section 2812 of Title 23 of the California Code of Regulations. Participant further agrees to assign all of said payments to the Agency.

### B. Agency Testing and Cleanup

Agency agrees to act as Participant's Agent in the testing and cleanup of the Site. Agency further agrees to advance to Participant the $10,000 financial requirement contained in Health and Safety Code Section 25299.30, et seq. Repayment of the $10,000 by Participant to Agency shall be made upon sale of the Property or the business thereon by Participant, unless such sale occurs prior to December 31, 1994, in which case $1,000 is due upon sale, and the remainder paid at $300 per month over a period of thirty (30) months at no interest. The repayment obligation shall be evidenced by a Promissory Note executed by Participant

Agency shall undertake the corrective work required to clean up the Site in accordance with state and federal laws and regulations. This corrective work shall be in compliance with Title 23, Division 3, Chapter 18 of the California Code of Regulations and with Health and Safety Code Section 25299.10, et seq. In so doing, Agency shall act as Agent for Participant in soliciting proposals, reviewing proposals, contracting for testing and studies and for the actual cleanup of the environmental hazards, and preparing all reimbursement requests and other grant formalities required by the laws and regulations.

### C. Costs of Testing and Cleanup

Participant shall remain responsible for the costs of testing and cleanup of the Site. The Agency activities and costs described above in B. (with the exception of the $10,000) shall remain the responsibility of the Participant, and Agency shall be reimbursed as amounts are reimbursed to Participant through the Cleanup Fund. Participant shall continue as the recipient of said funds, and shall cooperate fully in obtaining said funds and assigning them to Agency.

3

VM 3290 PAGE 811

MCDEH-MTBE-027455

**D.**   Schedule of Performance

The Agency shall begin the cleanup and testing, construction and other related activities on the Site within the time specified in the Schedule of Performance (Attachment 3) or such reasonable extension of said dates as may be necessary. The Schedule of Performance is subject to revision from time to time to reflect funding and reimbursement from the Cleanup Fund.

**E.**   Applicable Laws

The Participant and Agency shall carry out the testing and cleanup to the Site in conformance with all applicable state and federal laws.

III.   NONDISCRIMINATION

**A.**   Obligation to Refrain From Discrimination

The Agency and Participant covenant and agree for themselves, their successors, assigns and every successor and interest to the Site or any part thereof that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry, disability or natural origin in the sale, lease, sublease, transfer of use, occupancy, tenure or enjoyment of the Site nor shall the Participant himself or any person claiming under or through him, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sub-tenants, sub-lessees or vendees of the Site. The foregoing covenant shall run with the land and shall remain in effect in perpetuity.

**B.**   Form of Nondiscrimination and Nondiscrimination

Clause

The Participant shall refrain from restricting the rental, sale, or lease of the Site on the basis of race, color, creed, religion, sex, marital status, ancestry, disability or national origin of any person. All such deeds, leases or contracts shall contain or be subject to substantially the following nondiscrimination or nonsegregation clauses:

1.   Deeds: "The grantee hereby covenants by and for himself, his heirs, executors, administrators and assigns and all persons claiming under or through them that there

4

MCDEH-MTBE-027457

shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry, disability or national origin in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the land herein conveyed nor shall the grantee himself or any person claiming under or through him, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number or use or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the land herein conveyed.  The foregoing covenants shall remain with the land."

2.  Leases:  "Lessee herein covenants by and for himself, his heirs, executors, administrators and assigns and all persons claiming under or through him and this Lease is made and subject to the following conditions:  That there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry, disability, or national origin, when leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the land herein leased nor shall the Lessee himself, or any person claiming under or through him, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants, or vendees in the land herein leased."

3.  In contracts:  "There shall be no discrimination against or segregation of any persons, or group of persons on account of race, color, creed, religion, sex, marital status, ancestry, disability or national origin in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the land, nor shall the transferee himself or any person claiming under or through him, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, sublessees or vendees of the land."

IV.  GENERAL PROVISIONS

A.  Rights of Access

For the purposes of assuring compliance and carrying out the terms of this Participation Agreement, representatives of the Agency and the City of Merced shall have the reasonable right of

5

VOL 3290 PAGE 813

MCDEH-MTBE-027458

access to the Site without charges or fees, at normal construction hours during the period of testing and cleanup for the purposes of this Agreement, including but not limited to the inspection of the work being performed.

B.  **Effect and Duration of Covenants**

The covenants against discrimination contained in this Agreement shall remain in effect in perpetuity.  The covenants established in this Agreement shall, without regard to technical classification and designation, be binding on the part of the Participant and any successor and assigns to the Site or any part thereof, and the tenants, lessees, sublessees and occupants of the Site, for the benefit of and in favor of the Agency, its successors and assigns, the City and any successor in interest thereto.

C.  **Defaults**

Subject to the extensions of time, failure or delay by either party to perform any term or provision of this Agreement constitutes a default under this Agreement.  The party who so fails or delays must immediately commence to cure, correct, or remedy such failure or delay, and shall complete such cure, correction or remedy with reasonable diligence.

D.  **Legal Actions**

In addition to any other rights or remedies, either party may institute legal action to cure, correct, or remedy any default, to recover damages for any default, or to obtain any other remedy consistent with the purposes of this Agreement.  Such legal actions must be instituted in the Superior Court of the County of Merced, State of California, in any other appropriate court in that county, or in the Federal District Court in the Eastern District of California.

E.  **Applicable Law**

The laws of the State of California shall govern the interpretation and enforcement of this Agreement.

F.  **Conflicts of Interest**

No member, official or employee of the Agency shall have any personal interest, direct or indirect, in this Agreement nor shall any such member, official or employee participate in any decision relating to this Agreement which affects his personnel interests or the interests of any corporation, partnership or association in which he is, directly or indirectly, interested.

6

VOL

MCDEH-MTBE-027459

The Participant warrants that it has not paid or given, and will not pay or give, any third party any money or other consideration for obtaining this Agreement.

G. **Nonliability of Agency Officials and Employees**

No member, official or employee of the Agency shall be personally liable to the Participant in the event of any default or breach by the Agency or for any amount which may become due to the Participant or on any obligations under the terms of this Agreement.

H. **Enforced Delay:  Extensions of Times of Performance**

In addition to the specific provisions of this Agreement, performance by either party hereunder shall not be deemed to be in default where delays or defaults are due to war; insurrection; strikes; lockouts; riots; floods; earthquakes; fires; casualties; acts of God; acts of the public enemy; epidemics; quarantine restrictions; freight embargoes; lack of transportation; governmental restriction or priority; litigation; unusually severe weather; inability to secure necessary labor, materials or tools; delays of any contractor, subcontractor or supplier; acts of the other party; acts or failure to act of the City or any other public or governmental agency or entity or any other causes beyond the control or without the fault of the party claiming an extension of time to perform.  An extension of time for any such cause shall be for the period of enforced delay and shall continue to run from the time of the commencement of the cause, if notice by the party claiming such extension is sent to the other party within thirty (30) days of the commencement of the cause.  Times of performance under this Agreement may also be extended in writing by the Agency and the Participant.

V.  **GRANT AVAILABILITY**

This Agreement assumes that Participant is eligible for reimbursement from the Cleanup Fund and has or will receive a Letter of Commitment pursuant thereto in an amount sufficient to cover the cost of the corrective action work.  In the event that a Letter of Commitment is not obtained or is not in an amount sufficient to cover the anticipated corrective action work, then this Agreement shall be null and void.  During the course of testing and cleanup, should it become apparent that the cost there of will exceed the amount of reimbursement from the Cleanup Fund, Agency may terminate this Agreement upon written notice to

7

MCDEH-MTBE-027460

Participant.  Upon termination, Agency shall be entitled to reimbursement from the Cleanup Fund for all work undertaken through the effective date of the termination.

VI.  ENTIRE AGREEMENT, WAIVERS AND AMENDMENTS, RECORDATION

This Agreement, is executed in four (4) duplicate originals each of which is deemed to be an original.  This Agreement comprises pages __1__ through __8__, inclusive, and Attachments numbers one through __3__ which constitute the entire understanding and agreement of the parties.

This Agreement integrates all of the terms and conditions mentioned herein or incidental hereto, and supersedes all negotiations or previous agreements between the parties with respect to all or any part of the subject matter hereof.

All waivers of the provisions of this Agreement must be in writing and signed by the appropriate authorities of the Agency and the Participant, and all amendments hereto must be in writing and signed by the appropriate authorities of the Agency and the Participant.

This Agreement may be recorded by the Agency or Participant.

IN WITNESS WHEREOF the parties have hereto executed this Participation Agreement as of the date first above written.

_____, 1994

REDEVELOPMENT AGENCY OF THE CITY OF MERCED

BY: _____
          Chairman

BY: _____
          Secretary

                              "AGENCY"

ARVEL SHACKELFORD

BY _____

                              "PARTICIPANT"

_____, 1994

PARTSHKFRD

_____
City Attorney

8

VIRGINIA SHACKELFORD

BY _____

                              "PARTICIPANT"

MCDEH-MTBE-027461

# EXHIBIT 8



# California Regional Water Quality Control Board

## Central Valley Region

### Robert Schneider, Chair



Winston H. Hickox
*Secretary for
Environmental
Protection*

Gray Davis
*Governor*

**Fresno Branch Office**
Internet Address: http://www.swrcb.ca.gov/rwqcb5
3614 East Ashlan Avenue, Fresno, California 93726
Phone (559) 445-5116 • FAX (559) 445-5910

28 January 2002

5T24000349

Mr. Arvel Shackelford
c/o Ms. Laura Russell
City of Merced Redevelopment Agency
678 W. 18th Street
Merced, CA 93540

Mr. Amrik Randhawa
dba: R Street Texaco
1107 5th Street
Livingston, CA 95334-1227



Exhibit No. __22__
Date: __11-2-09__
Witness: __Cahill__
Sandra Bunch, CSR 2002

*UNDERGROUND STORAGE TANK LEAK, R STREET TEXACO, 1415 R STREET, MERCED,
MERCED COUNTY*

Thank you for your submittal of the documents we requested in our 7 December 2001 letter. Your
submittal also included Groundwater Monitoring Reports for 4th quarter 2000 and 1st quarter 2001. The
most recent data regarding operation of the soil vapor extraction system is from June 2000. No
information from the installation early last year of two additional soil vapor extraction wells and four
additional groundwater monitoring wells has been received. Your site is considered a high-priority site
because of the extremely high concentrations of petroleum hydrocarbons which have been measured in
water samples from groundwater monitoring wells on and near the site. The site is considered a
potential threat to water supply wells and to public health and safety. Therefore, it is extremely
important that updated information be provided to this office as soon as possible so that we may properly
evaluate the risks posed by the site and develop an appropriate regulatory response. Specifically, we
require the following information be submitted **no later than 28 February 2002**:

- A report of groundwater monitoring for the 2nd through 4th quarters of 2001.

- A report of the status of soil vapor extraction and air sparging at the site since June 2000, the
  end of the last reporting period. The report should include the operational status of the system at
  the time of your submittal and your projections for the immediate future of system operation.

- A report of the installation of SVE-5, SVE-6, MW-F(S), MW-G(S), MW-K(S), and MW-5,
  including the results of soil and groundwater sample analyses and any observations of floating
  hydrocarbon to date.

### *California Environmental Protection Agency*

 *Recycled Paper*

The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption.
For a list of simple ways you can reduce demand and cut your energy costs, see our Web-site at http://www.swrcb.ca.gov/rwqcb5

Mssrs. Arvel Shackelford & Amrik Randhawa      - 2 -                    28 January 2002

In the future, groundwater monitoring reports are due quarterly and remedial system progress reports are due each six months, within 45 days of the end of the monitoring period. The remedial system should be operated without interruption until the Regional Board approves termination or interruption of operation.

I spoke by telephone with Laura Russell on 23 January 2002 and learned that the City is still in the process of securing site access for two additional shallow groundwater monitoring wells which were approved by the Merced County Environmental Health Department (MCEHD) by their letter dated 1 September 2000. In addition, two deep monitoring wells that were to be completed on the basis of the additional shallow monitoring wells have yet to be sited and completed. While I acknowledge that site access arrangements can be difficult and time-consuming, further delays will unnecessarily compromise the needs of the site assessment and potentially threaten water supply wells and public health and safety. Unless site access for the proposed parcels is obtained by 28 February 2002, then you should propose alternate well locations in accessible areas, such as City Streets or other accessible parcels. **By 22 April 2002**, submit a report of the installation and initial sampling of the two additional shallow groundwater monitoring wells. Include a recommendation for locations for the two previously-approved deep monitoring wells and a schedule for their completion and sampling.

Please contact me at 559 445-5128 if you have any questions.

Warren W. Gross
Associate Engineering Geologist
CEG 1528, CHG 681

c:      Robert Weichert, Merced County Environmental Health Department
        Judi Nash, UST Cleanup Fund
        John Kirk, BSK & Associates
        Patrick Riggs, City of Merced, 678 W. 18th Street, Merced, CA  95340
        James M. & Marlene S. Hagerman, 1785 E. N. Bear Creek Drive, Merced, CA  95340
        Jatinderpal Randhawa, 1415 R Street, Merced, CA  95340

# EXHIBIT 9

FILED
MERCED COUNTY

2012 JUN 25   PM 4: 27

CLERK OF THE SUPERIOR COURT

BY ~MELANIE MYERS~

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF MERCED

| | |
|---|---|
| CITY OF MERCED,<br><br>          Plaintiff,<br><br>     vs.<br><br>CHEVRON, et al<br><br>          Defendants | ) Case No: 148451<br>)<br>) RULING ON DEFENDANTS' MOTIONS<br>) FOR JUDGMENT NOT WITHSTANDING<br>) THE VERDICT, ALLOCATION OF<br>) SETTLEMENT PROCEEDS and<br>) DETERMINATION OF PREVAILING<br>) PARTY<br>)<br>) |

The grounds for granting a motion for JNOV is the same as for granting a motion for directed verdict or motion for nonsuit, the court must consider every legitimate inference that can reasonably be drawn in plaintiff's favor from the evidence or facts  This means the judge in a jury trial may not weigh the evidence or determine the credibility of witnesses.  As plaintiff noted, the party in whose favor the verdict was rendered is entitled to the benefit of every favorable inference which may reasonably be drawn from the evidence and to have all conflicts in the evidence resolved in his favor. Castro v. State of Calif. (1981) 114 Cal. App. 3d 503, 507. If there are conflicts in the evidence or various inferences may be drawn from the evidence, the judge must deny the motion for JNOV.  In order to grant the motion, I would have to determine there is no substantial evidence to support the verdict, viewing the evidence in the light most favorable to the Plaintiff.  But it is not just "any" evidence.  The evidence must be reasonable, credible and of solid value, and must actually be substantial proof of the essential elements of the cause of action.

EXXON'S MOTION FOR JNOV RE:  1415 R STREET.

Statute of Limitations:  Denied.  It was a jury determination as to when appreciable harm occurred to the City at each site, and the verdicts between 1415 R Street and Gas n Save are not inconsistent as each site had different characteristics.  Further Defendant had the burden by a preponderance of the evidence to show the City was injured and that it knew of its injury prior to April 2002 and they did not meet that burden.

Causation: Denied.  As far as the issue of causation, regarding whether Mr. Randhawa or the Shackelfords would have changed their behavior if appropriate warnings had been given and thus prevented the City's harm from occurring, I disagree with Defendants that *Huitt v. Southern California Gas Co*, (2010) 188 Cal. App.4[th] 1586, requires this Court to grant JNOV.

Unlike *Huitt*, the evidence in this case shows that both Mr. Randhawa and the Shackelfords were responsible station owners and followed the instructions that were given to them regarding the handling, clean-up and storage of gasoline.  The focus of the *Huitt* decision was how an appropriate warning could have reached the consumers and particularly the specific plaintiffs in that case who failed to read the installation manual that did contain some type of warning.  Conversely in this case the evidence was station owners did read material data safety streets and followed any instructions given to them on handling gas from the oil companies.  Also, in this case there was evidence warnings regarding gasoline products were provided in the Material Safety Data sheets providing a mechanism to warn.  And training was provided by the Defendants to  station owners/operators.

Neither Mr. Rhandawa nor the Shackelfords ever testified they would ignore warnings, if given.  Mr. Rhandawa testified it was important not to spill or leak gasoline and although he said the chemical make-up of the case wouldn't change that, the evidence showed he followed the regulations, conducted the required testing and generally was a responsible owner.   Thus, the

1  jury could draw a reasonable inference they would have followed any warnings or procedures

2  regarding the handling of gas containing MTBE in this case.

3          Further, the recommendations of Mr. Moreau were more than just "don't spill" or " have

4  double walled storage tanks".  Also included were:  remediation for spills using soil vapor

5  extraction; better operation and maintenance of the systems, for example monthly inspections of

6  dispensers; consideration of the location of public water supplies in relation to the gas station;

7  and education regarding small spills  So even if the Shacklefords would not have voluntarily

8  replaced their single wall tanks with double wall tanks, there are other measures that would have

9  been taken if proper warnings had been given.  Just the fact they testified they knew gas was

10 dangerous and would treat it the same no matter what its chemical composition, does not mean

11 additional warnings regarding the specific characteristics of MTBE, particularly its solubility and

12 non-degradation, would not have prevented the harms to the City's right to use groundwater.

13 *Selma Pressure Treating v. Osmose* (1990) 221 Cal. App. 3d 1601.

14              CHEVRON'S MOTION FOR JNOV AS TO ALL THREE SITES.

15          Causation: Denied.  As stated above, I disagree with Defendants interpretation of *Huitt* as

16 it applies to the facts of this case.  Further, even though both Mr. Jones and Mr. Bedi testified

17 they handled gasoline carefully whether or not it contained MTBE, there were other appropriate

18 measures that Mr. Moreau testified to that would need to be taken if proper warnings had been

19 given and there is no evidence either witness would have disregarded or not paid attention to

20 such warnings.  Rather the evidence is the just the opposite that both witnesses were careful to

21 follow the instructions they were given, thus it was a reasonable inference by the jury that

22 additional warnings would have prevented the harm.

23          Regarding Defendant's argument that only a small percentage of the gas delivered to Gas

24 N Save could have been Chevron gas, or that the actual source of the leak causing the

25 contamination at each site was unknown, and thus they were not a substantial factor in causing

1  the harm, the court rejects that argument.  As Plaintiff notes, a substantial factor includes any

2  conduct that played a role in causing the harm that is more than infinitesimal or theoretical.  In

3  this case evidence was presented Chevron gas was delivered to all sites, and even if in varying

4  amounts it was reasonable for the jury to conclude that it was more probable the contamination

5  was caused by Defendant's gas than that it was not.  *Espinosa v. Little Company of Mary*

6  *Hospital* (1995) 31 Cal. App. 4th 1304,1314.

7     Speculative Damages:  Denied. Defendants point out the damages awarded for Gas n

8  Save, Buggy Bath and Beacon were the exact same amount, arguing that shows a lack of

9  substantial evidence to support the jury's award as to each site.   However, the court sees it as a

10  correct interpretation of the evidence presented, in that the testimony of Mr. Norman was limited

11  to what generally would be required, and the City argued what would be a plausible figure based

12  upon that evidence.  The jury then reached a figure for each station that was reasonably

13  foreseeable based upon the evidence in front of them.  As noted in my ruling denying the nonsuit

14  motion on this ground:

15     "A reasonable jury could determine appropriate future work at each site based upon the

16     testimony of Mr. Norman and Mr. Angulo.  There is sufficient evidence that it should at

17     least be presented to the jury for their determination of whether or not it is too speculative

18     and what steps the City will reasonably take as far as assessment, a workplan or other

19     remediation measures."

20  The jury did just that in determining their damages award.

21     Lack of Harm:  Denied as to Buggy Bath and Cardlock.  As to the general argument

22  regarding lack of harm to Plaintiff's rights to use of the groundwater and lack of an imminent

23  threat to the City's wells, the Court will not restate what I have previously stated in my prior

24  rulings on this issue.  There was substantial evidence to support the jury's verdict that the MTBE

25  detected in the groundwater posed an imminent threat to the City's use of that water.  There is a

1  distinction between when the City suffered harm to its groundwater, and thus its usufructuary

2  rights,  and the actual damages that it may incur in the future to remediate that contamination.

3       As to Gas N Save the motion is also denied.   Defendant Chevron relies on the judicial

4  admission made by Plaintiff that the contamination from that site did not threaten well 5b.

5  However, in considering the evidence presented by Plaintiff, and drawing all reasonable

6  inferences in their favor, there is  substantial evidence to support the jury's verdict as to the Gas

7  N Save site.  The jury could reasonably conclude the City was injured by the presence of MTBE

8  in the groundwater and will incur damages in the future as the result of the migration of the

9  MTBE to various City wells, even if not Well 5b.  The testimony of Mr. Norman and Dr. Fogg is

10  sufficient to support such a conclusion based upon the mobility, solubility, and non-degradation

11  of MTBE.

12       <u>Statute of Limitations</u>:  Denied.  As stated above, it was a jury determination as to when

13  appreciable harm occurred to the City at each site, and Defendant had the burden by a

14  preponderance of the evidence to show the City was injured and that it knew of its injury prior to

15  April 2002.  The jury determined they did not meet that burden and that determination was

16  supported by substantial evidence.

17

18                SHELL'S MOTION FOR JNOV AS TO BEACON 3-505

19       The motion is denied.   The evidence presented at trial does support a reasonable

20  inference the City was harmed by MTBE contamination at the Beacon station.  Defendant Shell

21  argues the Plaintiff's evidence of possible migration off-site was directly contradicted by the

22  testimony of their expert, Thomas Johnson who opined that there was no evidence of off-side

23  MTBE migration at the Beacon site, and no further remediation was needed, relying on testing

24  results of off-site monitoring wells set forth in Exhibit 1963 and the fact no City wells were in

25  the direction of the groundwater flow at that site.  However under cross-examination by Mr.

1   Miller, the witness did testify to the high concentration of MTBE in the groundwater found on-

2   site at the Beacon station and that Geoprobe testing done offsite, in which no MTBE was

3   detected in the groundwater was done at a fairly shallow depth of 40 feet.  Mr. Miller brought

4   forth additional factors for the jury's consideration regarding the capture zone of a well that

5   could draw in MTBE from a plume, even if the plume was not directly heading for that well.

6   Given the conflicting testimony of Mr. Norman and Mr. Johnson regarding the movement of

7   MTBE in the groundwater and the cross-examination of Mr. Johnson, and drawing all reasonable

8   inferences in favor of Plaintiff, this court must deny the request for JNOV, as I find there is

9   substantial evidence to support the verdict as to Beacon 3-505, viewing the evidence in the light

10  most favorable to the Plaintiff.

11          As to the argument regarding causation and the applicability of *Huitt,* for the reasons

12  stated above, I find *Huitt* distinguishable from the facts in this case.

13                          ALLOCATION OF SETTLEMENT.

14          At issue is how the court is to apply the offset for the $625,000 settlement proceeds from

15  Conoco Phillips and the $50,000 paid by Kinder Morgan as to each remaining defendant's

16  liability under this case pursuant to §CCP 877(a).  Each defendant had their own theory of the

17  proper allocation as did Plaintiff.

18          It is not disputed the remaining non-settling defendants are entitled to an offset, the

19  question is the proportional amount due to each remaining defendant.  The Court agrees with

20  Exxon's argument that the issue of ConocoPhillip's or Kinder Morgan's actual liability is not

21  relevant in determining the allocation since at the time of each settlement, the defendants were

22  jointly and severally liable for the same act and injury.  Thus the court will not go into the issue

23  of what stations ConocoPhillips delivered gas to or any potential liability it may have had on a

24  site by site basis.

25

1  However, that does not mean each remaining defendant has an equal right to the

2  settlement proceeds as argued by Exxon and Shell.  Rather, under principles of equity, the fairest

3  allocation would be based upon each defendant's proportional share of liability under the verdict,

4  as Chevron proposed.  In doing so, the court interprets the jury verdict as finding separate

5  liability of $200,000 as to Chevron, Cardlock,  and $200,000 as to Exxon, 1415 R Street, so the

6  total verdict is $2,977,000. Taking the $675,000 for both settlements, the Court allocates those

7  proceeds as follows:

8       Chevron = $1, 918,000 – $434,700(64.4%) = $1,483,300

9       Shell = $859,000-$195,075 (28.9%)= $663,925

10       Exxon=$200,000-$45,225(6.7%)= $154,775

11  PREVAILING PARTY.–

12  Plaintiff is the prevailing party, even as to Exxon, since the verdicts exceeded the joint

13  CC §998 offer of $600,000 made by the defendants. *Persson v. Smart Inventions, Inc* (2005) 125

14  Cal. App.4[th] 1141. Accordingly, Exxon is not entitled to its costs under CC §998 even if its

15  liability was reduced to zero.

16  Plaintiff is to prepare the Order and Judgment in accordance with this ruling, including

17  the previous denial of Plaintiff's request Declaratory Relief as stated on the record at the May 11,

18  2012 hearing.

19  Dated:  June 25, 2012

20

21                        _____

22                        Carol K. Ash, Judge of the Superior Court

23

24

25

## PROOF OF SERVICE BY MAIL
### (1013a, 2015.5 C.C.P)

STATE OF CALIFORNIA　　　　　)
　　　　　　　　　　　　　　　　)
COUNTY OF MERCED　　　　　　)　　　　　　　Case No. CU148451

　　　　I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is Merced County Superior Court, 627 West 21st Street, Merced, California 95340.

　　　　On June 25, 2012, I served the within **RULING ON DEFENDANTS' MOTIONS FOR JUDGMENT NOT WITHSTANDING THE VERDICT, ALLOCATION OF SETTLEMENT PROCEEDS AND DETERMINATION OF PREVAILING PARTY** on the person(s) named below and then placing a true copy thereof in an envelope and then placing in the Merced County Superior Court/Clerk's outgoing mail addressed as follows:

| | |
|---|---|
| Duane C. Miller, Esq.<br>MILLER, AXLINE & SAWYER<br>1050 Fulton Avenue, Suite 100<br>Sacramento, CA 95825-4225 | Gregory G. Diaz, Esq.<br>City of Merced<br>678 W. 18th Street<br>Merced, CA 95340 |
| William J. Stack, Jr., Esq.<br>P.O. Box 2180<br>Houston, TX 77252 | Charles C. Correll, Jr., Esq.<br>KING & SPALDING LLP<br>1100 Louisiana Street, Suite 4000<br>Houston, TX 77002 |
| Patrick J. Cafferty, Jr., Esq.<br>MUNGER, TOLLES & OLSON LLP<br>560 Mission Street, 27th Floor<br>San Francisco, CA 94105-2907 | Jeffrey J. Parker, Esq.<br>SHEPPARD MULLIN RICHTER & HAMPTON LLP<br>333 South Hope Street, 48th Floor<br>Los Angeles, CA 90071-1448 |

　　　　and then placing a true copy thereof in an envelope and then placing in the Merced County Superior Court/Clerk's office for the following department(s) or person(s):

　　N/a

　　　　I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

　　　　Executed on **June 25, 2012**, at Merced, California.

　　　　　　　　　　　　　　　　　　　_Melanie Myers_

　　　　　　　　　　　　　　　　　Melanie Myers, Declarant

# EXHIBIT 10

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF MERCED

FILED 2/9/12
MERCED SUPERIOR COURT
By: _____
Deputy

| | |
|---|---|
| CITY OF MERCED, | Case No. 148451 |
| Plaintiff, | |
| v. | *Assigned to the Honorable Carol K. Ash* |
| CHEVRON U.S.A., INC., *et al.*, | |
| Defendants. | |

## SPECIAL VERDICT FORM

**DIRECTIONS:** *Answer all questions unless directed to skip them. Answer all questions for each defendant listed (some defendants are omitted from certain questions intentionally, and you need not answer questions for any defendant that is not listed). For each question that calls for a "Yes" or "No" answer, fill in the blanks with the number of jurors voting "Yes" and the number of jurors voting "No."*

*The following table lists the stations in this case and the pages of this form where questions regarding each station begin.*

| | | |
|---|---|---|
| 1. | Beacon 3-505 at 3006 G Street | *Page 2* |
| 2. | Buggy Bath at 2210 G Street | *Page 5* |
| 3. | Former Exxon at 1415 R Street | *Page 8* |
| 4. | Former Texaco at 1415 R Street | *Page 11* |
| 5. | Gas n Save at 963 West 16th Street | *Page 14* |
| 6. | Pacific Pride Cardlock at 1455 R Street | *Page 17* |
| 7. | Century Chevron at 1970 East Childs Avenue | *Page 20* |

We, the jury, answer the questions submitted to us as follows:

1

### SECTION C:  Former Exxon at 1415 R Street

23.   Has the City proven that gasoline containing MTBE refined, distributed or sold by Exxon was delivered to the Former Exxon station at 1415 R Street?

_____ 12 Yes   _____ 0 No

*If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

24.   Has the City proven that the gasoline containing MTBE identified in answering the prior question was spilled or leaked from that station?

_____ 12 Yes   _____ 0 No

*If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

25.   Has the City proven that the release or releases found in the answer to the prior question caused harm to the City's drinking water supply system?

_____ 10 Yes   _____ 2 No

*If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

26.   Did gasoline containing MTBE have potential risks that were known, or knowable through the use of scientific knowledge available at the time of manufacture, distribution or sale?

_____ 12 Yes   _____ 0 No

*If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

27. Has the City proven that Exxon failed to adequately warn or instruct the owner/operators of the Former Exxon station concerning the safe handling of the product?

_12_ Yes    _0_ No

*If 9 or more jurors answered "Yes," proceed to the next question.. If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

28. Has the City proven that Exxon knew or should reasonably have known that gasoline containing MTBE was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner?

_12_ Yes    _0_ No

29. Because of their particular position, training, experience, knowledge, or skill, did the owner/operators of the Former Exxon station know, or should they have known, of the risk, harm, or danger from gasoline containing MTBE?

_0_ Yes    _12_ No

*If 9 or more jurors answered "No," proceed to the next question. If 9 or more jurors answered "Yes," skip the other questions in this Section and move on to the next Section about the next station.*

30. Was the lack of sufficient instructions or warnings a substantial factor in causing harm to the City of Merced?

_10_ Yes    _2_ No

*If 9 or more jurors answered "Yes," proceed to the next question. If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

31. Would the City's same harm have occurred even if Exxon had provided specific warnings or instructions about MTBE?

_0_ Yes    _12_ No

*If 9 or more jurors answered "No," proceed to the next question. If 9 or more jurors answered "Yes," skip the other questions in this Section and move on to the next Section about the next station.*

9

32.  Has Exxon proven that before April 22, 2002, groundwater containing MTBE from Former Exxon threatened injury to the City's water system, which means when the groundwater contains MTBE and the City takes action, or should have taken some action, in response to that contamination to protect its right to use that groundwater.

___2___ Yes     ___10___ No

*If 9 or more jurors answered "No," proceed to the next question. If 9 or more jurors answered "Yes," skip the other questions in this Section and move on to the next Section about the next station.*

33.  What are the City's damages? (Former Exxon station)

A.  The reasonably certain and necessary costs of sampling Well 5B caused by gasoline containing MTBE:

$ ___200,000___

Do you agree with the amount stated in the answer to question 33-A?

___10___ Yes     ___2___ No

10

**SECTION F:  Pacific Pride Cardlock service station at 1455 R Street**

56.   Has the City proven that gasoline containing MTBE refined, distributed or sold by
Chevron was delivered to the Pacific Pride Cardlock station at 1455 R Street?

__12__ Yes   __0__ No

*If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors
answered "No," skip the other questions in this Section and move on to the next Section
about the next station.*

57.   Has the City proven that the gasoline containing MTBE identified in answering the prior
question was spilled or leaked from that station?

__12__ Yes   __0__ No

*If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors
answered "No," skip the other questions in this Section and move on to the next Section
about the next station.*

58.   Has the City proven that the release or releases found in the answer to the prior question
caused harm to the City's drinking water supply system?

__12__ Yes   __0__ No

*If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors
answered "No," skip the other questions in this Section and move on to the next Section
about the next station.*

59.   Did gasoline containing MTBE have potential risks that were known, or knowable
through the use of scientific knowledge available at the time of manufacture, distribution
or sale?

__12__ Yes   __0__ No

*If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors
answered "No," skip the other questions in this Section and move on to the next Section
about the next station.*

60. Has the City proven that Chevron failed to adequately warn or instruct the owner/operators of the Pacific Pride Cardlock station concerning the safe handling of the product?

         __12__ Yes  __0__ No

*If 9 or more jurors answered "Yes," proceed to the next question. If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

61. Has the City proven that Chevron knew or should reasonably have known that gasoline containing MTBE was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner?

         __12__ Yes  __0__ No

62. Because of their particular position, training, experience, knowledge, or skill, did the owner/operators of the Pacific Pride Cardlock station know, or should they have known, of the risk, harm, or danger from gasoline containing MTBE?

         __0__ Yes  __12__ No

*If 9 or more jurors answered "No," proceed to the next question. If 9 or more jurors answered "Yes," skip the other questions in this Section and move on to the next Section about the next station.*

63. Was the lack of sufficient instructions or warnings by Chevron a substantial factor in causing harm to the City of Merced?

         __12__ Yes  __0__ No

*If 9 or more jurors answered "Yes," proceed to the next question. If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

64. Would the City's same harm have occurred even if Chevron had provided specific warnings or instructions about MTBE?

         __0__ Yes  __12__ No

*If 9 or more jurors answered "No," proceed to the next question. If 9 or more jurors answered "Yes," skip the other questions in this Section and move on to the next Section about the next station.*

65.     Has Chevron proven that before April 22, 2002, groundwater containing MTBE from Pacific Pride Cardlock threatened injury to the City's water system, which means when the groundwater contains MTBE and the City takes action, or should have taken some action, in response to that contamination to protect its right to use that groundwater.

                                        ___0___ Yes     ___12___ No

*If 9 or more jurors answered "No," proceed to the next question.  If 9 or more jurors answered "Yes," skip the other questions in this Section and move on to the next Section about the next station.*

66.     What are the City's damages? (Pacific Pride Cardlock station at 1455 R Street)

        A.      The reasonably certain and necessary costs of sampling Well 5B caused by gasoline containing MTBE:

                                $ ___200,000___.

        Do you agree with the amount stated in the answer to question 66-A?

                                        ___12___ Yes     ___0___ No

19

# EXHIBIT 11



# California Regional Water Quality Control Board
## Central Valley Region
### Robert Schneider, Chair



Winston H. Hickox
*Secretary for
Environmental
Protection*

**Fresno Branch Office**
Internet Address: http://www.swrcb.ca.gov/rwqcb5
3614 East Ashlan Avenue, Fresno, California 93726
Phone (559) 445-5116 • FAX (559) 445-5910

Gray Davis
*Governor*

6 August 2002

5T24000349
5T24000533

**Certified Mail #**
**7000 1670 0012 5940 7878**
Arvel R. & Virginia D. Shackelford
c/o Mr. Bill Cahill
Redevelopment Agency of the City of Merced
678 W. 18th Street
Merced, CA 93540

**Certified Mail #**
**7000 1670 0012 5940 7861**
Mr. Bill Cahill
Redevelopment Agency of the City of Merced
678 W. 18th Street
Merced, CA 93540

**Certified Mail #**
**7000 1670 0012 5940 7854**
Mr. Jatinderpal Singh Randhawa
DBA R Street Texaco
1415 R Street
Merced, CA 95340

**Certified Mail #**
**7000 1670 0012 5940 7847**
Amrik Randhawa and Bhupinder Gill
1107 5th Street
Livingston, CA 95334-1227

**Certified Mail #**
**7000 1670 0012 5940 7830**
Mr. Paul Randhawa
c/o 1777 G St., Suite 3
Merced, CA 95340

**Certified Mail #**
**7000 1670 0012 5940 7823**
Mr. John S. Pazin
Cardgas Inc.
1455 R Street
Merced, CA 95340-5850

**Certified Mail #**
**7000 1670 0012 5940 7816**
James M. & Marlene S. Hagerman
1785 E. N. Bear Creek Drive
Merced, CA 95340



**EXHIBIT**
23
B. Pazin 8-25-09

*REQUEST FOR MEETING TO DISCUSS COMINGLED UNDERGROUND STORAGE TANK PLUME SITES, R STREET TEXACO (FORMER EXXON), 1415 R STREET, AND PACIFIC PRIDE CARDLOC, 1455 R STREET, MERCED, MERCED COUNTY*

Upon the recent determination that an unauthorized release of petroleum hydrocarbons impacting groundwater occurred from the Pacific Pride Cardgas facility referenced above, we concluded that the plume of polluted groundwater derived from the two adjacent subject facilities has commingled. A consistent hydraulic gradient has been observed from the monitoring of wells on and near the sites, averaging 0.003 in a direction north 20° east, placing 1455 R Street consistently directly downgradient of

*California Environmental Protection Agency*

 *Recycled Paper*

The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption.
For a list of simple ways you can reduce demand and cut your energy costs, see our Web-site at http://www.swrcb.ca.gov/rwqcb5

RWQCB-MER-018390

# EXHIBIT 12



# CITY OF MERCED
"Gateway to Yosemite"

*Redevelopment Agency  ◊ Telephone (209) 385-6827 ◊ Facsimile (209) 723-1780*

April 13, 2005

Mr. Warren W. Gross
CRWQCB - Central Valley Region
1685 E Street
Fresno, CA 93706-2020

RECEIVED
APR 14 2005
RWQCB
FRESNO

  RE: *UST Leak/R Street Texaco, 1415 R Street, Merced*

Dear Mr. Gross:

  Thank you for the comments in your letter of March 7, 2005 in response to the Fourth Quarter 2004 Groundwater Monitoring Report dated January 25, 2005 prepared by BSK Associates. The purpose of this letter is to address a request made in your comments for public notice of the groundwater contamination in areas covered by the underground plume.

  As you are aware, the Redevelopment Agency and the City of Merced are deeply concerned about the safety and welfare of the people in this community, especially with regard to our drinking water. Our main objective is to push for the implementation of an effective remediation measure as soon as possible so that the groundwater contamination caused by others can be remedied without delay. This is in the best interest of the public, which we believe is the Board's objective as well.

  Due to the fact that the public did not cause the groundwater contamination, the City and the Agency are especially vigilant in making sure that the public is protected from further harms they did not cause. The comments provided in your



RWQCB-MER-018176

*Warren W. Gross*
*Re: UST Leak/R Street Texaco, 1415 R Street, Merced*
*April 13, 2005*
*Page 2*

letter do not contain information that indicate the contamination has reached a critical level, as determined by generally accepted scientific principles, that warrant notice to the public at this time. We have not provided, or been required to provide, this kind of public notice in similar cases in the past.

Thus, while we support the public's right to stay informed of matters that concern them, premature, inaccurate, or erroneous notices create more harm than good. You have noted cited any statutory or regulatory basis that mandate such notice at this time, especially since the remediation measure has begun and is currently underway.

I hope this letter sufficiently addresses your inquiry. Please do not hesitate to contact me if you have any questions.

Sincerely,

WILLIAM D. CAHILL
Assistant Executive Director

WDC/mg

cc:   Redevelopment Agency
      Jatinderpal Singh Randhawa
      Gregory G. Diaz, Agency Counsel
      Arvel Shackelford

N:\SHARED\Attorney\General Correspondence\2005\RDA\CRWQCB 4.13.05.doc

RWQCB-MER-018177

# EXHIBIT 13



# California Regional Water Quality Control Board
## Central Valley Region
### Robert Schneider, Chair



Fresno Branch Office
1685 E Street, Fresno, California 93706
(559) 445-5116 • Fax (559) 445-5910
RECEIVED waterboards.ca.gov/centralvalley

29/62

Arnold
Schwarzenegger
Governor

an Skopec
cting Secretary

MAY - 4 2006

ENVIRONMENTAL HEALTH

2 May 2006                                  5T24000349 / 5T24000533 / 5T24000564

Bill Cahill                                   Arvel R. Shackleford
City of Merced Redevelopment Agency            c/o Lus C. Ramirez
678 W. 18th Street                            City of Merced Redevelopment Agency
Merced, CA  93540                             678 W. 18th Street
                                              Merced, CA  93540

Jatinderpal Singh Randhawa                     Amrik Randhawa and Bhupinder Gill
1415 R Street                                 1107 5th Street
Merced, CA  95340                             Livingston, CA  95334-1227

Paul Randhawa                                 Brian Pazin
c/o 1777 G St., Suite 3                        Cardgas Inc.
Merced, CA  95340                             1455 R Street
                                              Merced, CA  95340-5850

James M. & Marlene S. Hagerman                 James M. Hagerman
785 E. N. Bear Creek Drive                     Smith Van & Storage Co., Inc.
Merced, CA  95340                             1120 West 15th Street
                                              Merced, CA 9534

## Underground Storage Tank Leaks, R Street Texaco, 1415 R Street, and Cardgas Inc., 1455 R Street Merced, Merced County

Remediation of the commingled plume from these sites is not progressing satisfactorily. The plume threatens a municipal water supply well and may impact public health. A formal order to expedite effective remedial action is appropriate. A meeting to discuss responsibility for future work, plume remediation, and related matters is also appropriate. This letter proposes that the meeting take place in May.

Assessment of the extent of soil contamination and groundwater pollution within the plume and cleanup of petroleum hydrocarbons in soil above the water table on the two properties are essentially complete. However, corrective action below the water table and beyond the property boundaries, primarily as it pertains to additional remedial actions and evaluation of the hydraulic gradient and assessment of the threat to city water supply wells, remains.

R:\Reg\UGT\Projects\WWG files\Merced County\R Street Texaco\L27 - request for mtg.doc



Exhibit No. 25
Date: 11-2-09
Witness: Cahill
Sandra Bunch, CSR 3032

*California Environmental Protection Agency*

♻ *Recycled Paper*

MCDEH-MTBE-030773

Several staff letters to active responsible parties in these cases requested additional actions and reports remain largely unsatisfied in these respects.[1]

Recent Regional Water Board staff correspondence has focused on the down-gradient portion of the commingled plume, that portion north of 15th Street.  In addition to the general water quality impact in this area, the plume has potential to impact groundwater extracted by City of Merced water supply well 5b and to impact human health from exposure to petroleum hydrocarbons.  Such exposure could result from, among other pathways, the volatilization of petroleum hydrocarbons from the plume to indoor air.  This potential for exposure prompted the 7 March 2005 letter concerning public notification of corrective action activities at both sites and the 29 June 2005 letter requesting sampling and analysis for tetraethyl lead.  The letters yielded only limited results from tetraethyl lead sampling for 1415 R Street, dated 24 January 2006.  Regional Water Board staff subsequently effected public notification by distributing a public notice on 25 April 2005.  Additional public notifications and indoor air quality assessment tasks will be necessary.

The magnitude of the plume and its associated impact and threats to water quality and human health dictate a formal order pursuant to California Code of Regulations Section 13304 for the subject cases.  A Cleanup and Abatement Order will be issued  in the near future. Responsible parties are jointly and severally liable for required assessment and cleanup activities.  Enforcement actions typically name all known potentially responsible parties and make no attempt to determine degree of responsibility.  At this time, the following potentially responsible parties have been identified for the subject sites:

Arvel R. Shackleford – UST owner/operator and property owner at the time of identification of the unauthorized release, 1415 R Street
Virginia D. Shackleford – as above
Virginia Shackleford – as above (may be same as Virginia D. )
Parbhjit Randhawa – property owner after identification of the unauthorized release, 1415 R Street
Amarjit Gill – property owner after identification of the unauthorized release, 1415 R Street
Paul Randhawa – property owner after identification of the unauthorized release, 1415 R Street
Bhupinder Gill – property owner after identification of the unauthorized release, 1415 R Street
Amrik Randhawa – property owner after identification of the unauthorized release, 1415 R Street
Jatinderpal Randhawa – property owner after identification of the unauthorized release, 1415 R Street  (may be same as Jatinderpal Singh, below)
Jatinderpal Singh Randhawa – current UST owner/operator and current property owner, 1415 R Street
Cardgas, Inc., UST owner/operator at time of identification of unauthorized release, 1455 R Street
James M. & Marlene S. Hagerman, property owners, 1455 R Street

---

[1] Refer to our letters regarding 1455 R Street dated 13 December 2004 (L29), 7 March 2005 (L30), 11 April 2005 (L31), and 22 September 2005 (L33), and our letters regarding 1415 R Street dated 7 March 2005 (L19), 11 April 2005 (L20), 29 June 2005 (L22), 6 July 2005 (L23) and 23 September 2005 (L25).

MCDEH-MTBE-030774

Bill Cahill et al.                            - 3 -                          2 May 2006

Smith Van & Storage Co., Inc., UST owner/operator at time of unauthorized release, 1120 W. 15th St.
James M. & Marlene S. Hagerman, property owners, 1120 W. 15th St.

The above list includes responsible parties for a third leaking underground storage tank site, Smith Van & Storage Co, Inc. (Smith) at 1120 W. 15th Street, immediately west of the Cardgas site. According to a report in our case files for the subject sites[2], a 1,000-gallon regular leaded gasoline tank was removed from the Smith site in 1986. While the Smith property was not identified as a leaking UST site at the time of UST removal, reports of soil contamination and groundwater pollution subsequently identified in the footnoted report and in site assessment reports for the subject sites, most recently the 31 August 2005 Groundwater monitoring report for the subject sites[3], indicate a release of petroleum hydrocarbons occurred in association with the former Smith UST. Further, the hydrocarbons appear to have commingled with the plume from the 1415 and 1455 R Street sites. Pending site investigation at the Smith property may demonstrate that the release from the Smith UST and related fueling facilities was insignificant, or significant but not commingled with the plume from the R Street sites.

Additional responsible parties may yet be identified and included. If you have information regarding other potentially responsible parties, please contact our office with this information. Owners of land overlying impacted groundwater without responsibility for a release are interested parties, but not potentially responsible unless found at some point to be unreasonably impeding the responsible parties from performing necessary investigation and remediation of the plume.

A meeting to discuss the above issues and related matters and to establish a timeline for the completion of corrective actions is appropriate. Please contact Warren Gross at (559) 445-5128 by **8 May 2006** as to your availability and he will arrange a meeting that will take place in the Regional Water Board's Fresno office no later than **29 May 2006**. Please contact John Noonan at (559) 445-5550 if you have any questions.

BERT E. VAN VORIS
Supervising Engineer


See attached distribution list

---

[2] Krazan & Associates, Inc., *Limited Site characterization, Proposed Costco, West 14th and West 15th Streets, Between "R" and "U" Streets, Merced, California,* Report prepared for City of Merced Redevelopment Agency, 15 October 1992.
[3] BSK & Associates, *Groundwater Monitoring Report, Second Quarter 2005, Former Exxon Station UST Site, 1415 R Street, Merced, California,* Report prepared for City of Merced Redevelopment Agency, 31 August 2005.

MCDEH-MTBE-030775

Bill Cahill et al.  - 2 -  2 May 2006

Distribution:

    Jeff Palsgaard, Merced County Environmental Health Department
    Barbara Rempel, UST Cleanup Fund
    Amer Hussein, BSK, Fresno
    John Raggio, City of Merced Public Works
    Greg Diaz, City Attorney, Merced
    Lus Ramirez, City of Merced Redevelopment Agency
    Joann Solga, Merced
    Rich Leonard & Patricia Louise, Merced
    Joseph Melehan & Larry Blackwell Co., Merced
    Omer Bradley, Merced
    Anna Lopez, Fremont
    Madeleine Rose, San Jose
    Crown Road Partners, Merced
    Glen Benson, Merced
    Janice Dutt, Savemart Real Estate, Modesto
    Savemart Supermarkets, Modesto

File: UST/Merced/R St. Texaco/ 5T24000349
    UST/Merced/Cardgas Inc/5T24000533
    UST/Merced/Smith Van & Storage/5T24000564

R:\Reg\UGT\Projects\WWG files\Merced County\R Street Texaco\L27 - request for mtg.doc

MCDEH-MTBE-030776

# EXHIBIT 14



# California Regional Water Quality Control Board
## Central Valley Region
### Robert Schneider, Chair



Linda S. Adams
*Secretary for
Environmental
Protection*

**Fresno Branch Office**
1685 E Street, Fresno, California 93706
(559) 445-5116 • Fax (559) 445-5910
http://www.waterboards.ca.gov/centralvalley

Arnold
Schwarzenegger
*Governor*

14 July 2006

5T24000349 / 5T24000533

Bill Cahill
City of Merced Redevelopment Agency
678 W. 18th Street
Merced, CA 93540

Arvel R. Shackleford
c/o Lus C. Ramirez
City of Merced Redevelopment Agency
678 W. 18th Street
Merced, CA 93540

Jatinderpal Singh Randhawa
1415 R Street
Merced, CA 95340

Amrik Randhawa and Bhupinder Gill
1107 5th Street
Livingston, CA 95334-1227

Paul Randhawa
c/o 1777 G St., Suite 3
Merced, CA 95340

Brian Pazin
Cardgas Inc.
1455 R Street
Merced, CA 95340-5850

## MEETING FOLLOWUP, UNDERGROUND STORAGE TANK LEAKS, R STREET TEXACO, 1415 R STREET, AND CARDGAS INC., 1455 R STREET MERCED, MERCED COUNTY

City and Redevelopment Agency officials met with Regional Water Board staff and management on 10 July to describe their concerns with the progress and effectiveness of current cleanup actions, and to propose a commitment and timeframe for identifying a more aggressive and effective cleanup strategy. Regional Water Board staff previously informed the affected responsible parties and the Redevelopment Agency that formal enforcement would be forthcoming due to slow progress and the diminishing effectiveness of current remediation activity. City officials subsequently expressed the above concerns, especially the imminent threat to a City water supply well, and developed a proposal, on behalf of the RPs and in its own interest, to circulate a request for proposals (RFP) seeking alternate technical strategies for cleanup of the commingled plume. As neither the City nor the Redevelopment Agency is a RP, and the RFP proposal potentially conflicts with enforcement directed at the RPs, John Raggio, Director of Public Works, requested a meeting with Regional Water Board management to seek delay in formal enforcement pending completion of the RFP process.

R:\Reg\UGT\Projects\WWG files\Merced County\R Street Texaco\L31 - mtg follow up r.doc



*California Environmental Protection Agency*

♻ *Recycled Paper*



Exhibit No. 36
Date: 11-11-09
Witness: Ramirez

RWQCB-MER-009275

For reasons given at the meeting, formal enforcement will not be delayed to accommodate the RFP process. However, as Pamela Creedon, Regional Water Board Executive Officer indicated, a cleanup and abatement order (CAO) will include a schedule that allows for the RFP process. This accommodation, however, is only relevant if the affected RPs commit to the approach outlined by City and Redevelopment Agency officials, including commitment to the Redevelopment Agency as the lead in coordinated remediation of the commingled plume. It will take staff at least a month before it circulates a draft CAO for comment. Prior to that, it is essential that we receive written documentation of the commitment of the City and Redevelopment Agency and of RPs, to the Redevelopment Agency as lead and to the strategy behind the RFP. Therefore, **by 14 August 2006**, please submit a copy of the agreement(s) formalizing these commitments.

Management indicated that staff would advise as to technical issues concerning the RFP. Staff comments on the RFP follow:

Cover page:
Subject: Refer to UST "remediation" or "cleanup" (rather than "leaks"). This will help get the RFP in the right hands without delay.

Page 2
Better characterize dissolved plume: consists of gasoline constituents including BTEX, MTBE, TBA, EDB, and 1,2-DCA (not just benzene and MTBE).

BSK's proposal was for ozone/hydrogen peroxide injection, not just ozone.

Under method of compensation, acknowledge that many costs will not be hourly (equipment, lab analysis, etc) and address method of compensation.

When will the agency make file information available? Any time a consultant requests following receipt of RFP or only to the successful bidder?

Page 3
Clarify that risk assessment is not required up front. It may be required near the end of remediation to characterize risk of constituents that may be technically or economically infeasible to remediate.

Page 6
E: Ask consultants to propose appropriate groundwater cleanup levels or to tell how they will determine such levels.

Page 7
The meaning of the paragraph following "f." is unclear

Attachment 1, Page 1
Objective 2 is too open-ended. Assess health risk of what? The plume as it exists today? The remediation project? The plume after remediation? All of the above? The Regional Water Board is looking for assessment of risks associated with soil vapor migration up front, but if no soil vapor concentrations above established thresholds of concern are detected in shallow soils, no formal risk assessment would be required at

that time.  The formal risk assessment would be performed near the end of remediation to characterize risk of constituents that may be technically or economically infeasible to remediate.

Replace ozone with ozone/hydrogen peroxide

State limitations as to discharge of extracted groundwater from the site.  Sanitary sewer is not available (according to stated City concerns) and discharge to the storm sewer has city-specific limitations also.  These issues will be critical to the proposals.

Attachment 1, Page 1
The following rewrite of the project objectives is suggested:

**Objective:**
Develop and implement a remedial action plan for the remediation of the commingled plume within an established timeframe, that protects the water supply and public health, and in a manner that leads to case closure by the Regional Water Board.  To this end, include the following:
  1.  Additional plume characterization as necessary to support the selected remedial alternative(s);
  2.  Assessment of vapor migration as necessary to insure protection of public health during and following remediation.

Attachment 1, Page 2
Evaluation Report:  Clarify where in the process this is to be provided (following completion of most of the remediation) and its purpose (identify further actions necessary after the completion of technically and economically feasible remediation has been completed).

The latest 1455 SVE status report, the aquifer test report (7 February 2005), and the ozone/hydrogen peroxide injection pilot test report (11 February 2005) should be included as part of the RFP package.  As alternatives, only critical excerpts from the reports (data tables, figures, conclusions, etc.) or a reference to their existence (such as the 7 March 2005 Regional Water Board letter) could be included and serve to alert interested parties to seek out the reports.

If you have any questions, please contact Warren Gross at (559) 445-5128.

Original signed by:

BERT E. VAN VORIS
Supervising Engineer

See attached distribution list

_____

R:\Reg\UGT\Projects\WWG files\Merced County\R Street Texaco\L31 - mtg follow up r.doc

RWQCB-MER-009277

Bill Cahill, et al.                          - 4 -                                14 July 2006

Distribution:

      Jeff Palsgaard, Merced County Environmental Health Department
      Barbara Rempel, UST Cleanup Fund
      Amer Hussein, BSK, Fresno
      John Raggio, City of Merced Public Works
      Greg Diaz, City Attorney, Merced
      Lus Ramirez, City of Merced Redevelopment Agency
      Joann Solga, Merced
      Rich Leonard & Patricia Louise, Merced
      Joseph Melehan & Larry Blackwell Co., Merced
      Omer Bradley, Merced
      Anna Lopez, Fremont
      Madeleine Rose, San Jose
      Crown Road Partners, Merced
      Glen Benson, Merced
      Janice Dutt, Savemart Real Estate, Modesto
      Savemart Supermarkets, Modesto
      James M. & Marlene S. Hagerman, Merced
      Smith Van & Storage Co., Inc., Merced

File: UST/Merced/R St. Texaco/ 5T24000349
      UST/Merced/Cardgas Inc/5T24000533

RWQCB-MER-009278

# EXHIBIT 15





P367.1


**ADMITTED AS TO SHELL**

California Regional Water Quality Control Board
~ Central Valley Region
Robert Schneider, Chair

Linda S. Adams
*Secretary for
Environmental
Protection*

Fresno Branch Office
1685 E Street, Fresno, California 93706
(559) 445-5116 • Fax (559) 445-5910
http://www.waterboards.ca.gov/centralvalley

Arnold
Schwarzenegger
*Governor*

27 October 2006                          5T24000349 / 5T24000533

Bill Cahill
City of Merced Redevelopment Agency
678 W. 18th Street
Merced, CA 93540

Arvel R. Shackleford
c/o Lus C. Ramirez
City of Merced Redevelopment Agency
678 W. 18th Street
Merced, CA 93540

Jatinderpal Singh Randhawa
1415 R Street
Merced, CA 95340

Amrik Randhawa and Bhupinder Gill
1107 5th Street
Livingston, CA 95334-1227

Paul Randhawa
c/o 1777 G St., Suite 3
Merced, CA 95340

Brian Pazin
Cardgas Inc.
1455 R Street
Merced, CA 95340-5850

James M. & Marlene S. Hagerman
785 E. N. Bear Creek Drive
Merced, CA 95340

**CALIFORNIA WATER CODE SECTIONS 13304 AND 13267 ORDER, UNDERGROUND STORAGE TANK RELEASE, R STREET TEXACO AND PACIFIC PRIDE CARDLOCK STATIONS, MERCED COUNTY**

Enclosed is an Order issued pursuant to California Water Code Sections 13267 and 13304 for the completion of site assessment, public participation activities, a feasibility study, site remediation, quarterly monitoring, and submittal of technical and monitoring reports with respect to these activities at the site.

Additional responsible parties may yet be identified and added to the Order. If you have information regarding other potentially responsible parties, please contact our office with this information. Owners of land overlying impacted groundwater without responsibility for a release are interested parties, but not potentially responsible unless found at some point to be unreasonably impeding the responsible parties from performing necessary investigation and remediation of the plume.

*California Environmental Protection Agency*

♻ *Recycled Paper*

RWQCB-MER-018827

P367.2

Bill Genin, et al.                    - 2 -                    27 October 2006

If you have any questions, please contact Warren Gross at (559) 445-5128.  In addition,
Please contact Warren Gross at least 72 hours in advance of all significant field work to
facilitate regulatory oversight.

*Pamela C. Creedon*

Pamela C. Creedon
Executive Officer

Enclosure: Order No. R5-2006-0724 with 3 attachments

Cc:   Jeff Palsgaard, Merced County Environmental Health Department
       Barbara Rempel, UST Cleanup Fund
       Amer Hussein, BSK, Fresno
       John Raggio, City of Merced Public Works
       Greg Diaz, City Attorney, Merced
       Lus Ramirez, City of Merced Redevelopment Agency
       Joann Sologa, Merced
       Rich Leonard & Patricia Louise, Merced
       Joseph Melehan & Larry Blackwell Co., Merced
       Omer Bradley, Merced
       Anna Lopez, Fremont
       Madeleine Rose, San Jose
       Crown Road Partners, Merced
       Glen Bensen, Merced
       Janice Dutt, Savemart Real Estate, Modesto
       Savemart Supermarkets, Modesto
       James M. & Marlene S. Hagerman, Merced
       Smith Van & Storage Co., Inc., Merced

R:\Reg\UST\Projects\WWG files\Merced County\R Street sites (Comingled Plume File)\CAO\R St fnl CAO cvr.doc

RWQCB-MER-018828

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

CLEANUP AND ABATEMENT ORDER NO. R5-2006-0724
FOR
ARVEL R. & VIRGINIA D. SHACKELFORD, AMRIK RANDHAWA, PAUL RANDHAWA,
BHUPINDER GILL, JATINDERPAL SINGH RANDHAWA, CARDGAS, INC., AND JAMES M. &
MARLENE S. HAGERMAN
R STREET TEXACO AND PACIFIC PRIDE CARDLOCK STATIONS
MERCED COUNTY

This Order is issued to Arvel R. & Virginia D. Shackelford, Amrik Randhawa, Paul Randhawa, Bhupinder Gill, Jatinderpal Singh Randhawa, Cardgas, Inc., and James M. & Marlene S. Hagerman, hereafter collectively referred to as Dischargers, based on provisions of California Water Code (CWC) Section 13304, which authorizes the Regional Water Quality Control Board, Central Valley Region (Regional Water Board) to issue a Cleanup and Abatement Order (Order), and Water Code section 13267, which authorizes the Regional Water Board to require preparation and submittal of technical and monitoring reports.

The Executive Officer finds that with respect to the Discharger's acts, or failure to act, the following:

## PROPERTY OWNERSHIP AND OPERATIONS

1. R Street Texaco (now under the Chevron brand) is an automotive fueling station and a convenience store at 1415 R Street, Merced, Merced County, otherwise known as Merced County Assessor's Parcel Number 031-201-002. According to Merced County Assessor and Merced County Environmental Health Department (MCDEH) records, Mr. Jatinderpal Singh Randhawa is the property owner and underground storage tank (UST) operator. For various periods from 20 December 1990 to 12 May 1998, according to Merced County Assessor's Department records, ownership was held in part or in whole by Mr. & Mrs. Arvel R. & Virginia D. Shackelford, Mr. Amrik Randhawa, Mr. Paul Randhawa, Mr. Bhupinder Gill, and Mr. Jatinderpal Singh Randhawa.

RWQCB-MER-018829

P367.4

CLEANUP AND ABATEMENT ORDER NO. R5-2006-0724                    -2-
ARVIL R. SHACKLEFORD, ET AL.
R STREET STATIONS
MERCED COUNTY

5.    The above-named dischargers are responsible parties because they owned the 1415 R
      Street or 1455 R Street property and/or operated The R Street Texaco or Pacific Pride
      Cardlock Station UST systems at the time of or after the UST system released
      petroleum hydrocarbons.  They are subject to this Order because, due to the release,
      they have, as established herein in Findings 8-11 and 21-28, caused or permitted waste
      to be discharged or deposited where it discharged to waters of the State and creates or
      threatens to create a condition of pollution or nuisance.

RWQCB-MER-018830

# EXHIBIT 16

## MTBE REMEDIATION COORDINATION AGREEMENT

THIS MTBE REMEDIATION COORDINATION AGREEMENT ("Agreement"), made and entered into ___July 7___, 2008, between the REDEVELOPMENT AGENCY OF THE CITY OF MERCED, a Body Corporate and Politic of the State of California ("Agency"), the CITY OF MERCED, a California Charter Municipal Corporation ("City"), and the following Responsible Parties identified by the California Regional Water Quality Control Board, Central Valley Region ("RWQCB"): Cardgas Inc., a California Corporation, Arvel R. Shackleford, Jatinderpal Singh Randhawa, Paul Randhawa, Amrik Randhawa and Bhupinder Gill (collectively referred to as "Responsible Parties"), relates to the coordinated remediation of MTBE contamination caused by leaking underground storage tanks located at R Street Texaco (1415 R Street) and Cardgas Inc. (1455 R Street), as required by the RWQCB.

### RECITALS

A.   The Responsible Parties are jointly and severally responsible for the commingled underground MTBE plume from known storage tank releases at 1415 R Street and 1455 R Street in Merced.

B.   The Agency, acting as an agent for one of the Responsible Parties, has been monitoring the work associated with the MTBE contamination from these sites.

C.   Following the direction of underground water flow, the commingled MTBE plume is migrating towards City Well No. 5.

D.   The RWQCB is concerned about the potential impact of commingled plume on City Well No. 5 and intends to issue a Cleanup and Abatement Order for the MTBE remediation.

E.   In its letter dated July 14, 2006, the RWQCB requested that a written document between the Agency, the City, and the Responsible Parties be submitted to RWQCB by August 14, 2006 that evidences commitment of the City, the Agency, and Responsible Parties to the Agency as the lead in the coordinated MTBE remediation effort, as well as the remediation strategy proposed by the Agency.

1

MERCEDMTBE 000815

Based on the foregoing recitals, and in consideration of the mutual covenants, promises, and agreements herein contained, the parties hereto mutually agree as follows:

## 1.   INCORPORATION OF RECITALS

The RECITALS above are true and correct and constitute an enforceable provision of this Agreement.

## 2.   REMEDIATION COORDINATION

The Agency, City, and the Responsible Parties agree that while neither the Agency nor the City is a Responsible Party for the storage tank releases at 1415 R Street and 1455 R Street in Merced, the Agency shall be the lead in the overall underground MTBE contamination remediation efforts with an immediate focus on preventing MTBE contamination and protecting water quality in and around City Well No. 5.

## 3.   REMEDIATION STRATEGY

The Agency, City, and the Responsible Parties are committed to the MTBE remediation strategy proposed by the Agency, which may be amended and revised from time to time as necessary to accomplish the required cleanup and/or as directed or required by the RWQCB.

## 4.   COST SHARING ARRANGEMENT

The Responsible Parties agree that each Responsible Party shall be responsible for, jointly and severally, all costs associated with the remediation of underground MTBE contamination as directed by the RWQCB. Since neither the Agency nor the City is a Responsible Party for the storage tank releases, neither the Agency nor the City will be responsible for any costs but may advance costs on behalf of the Responsible Parties subject to lien and/or reimbursement from the Responsible Parties. The Agency shall use all available funds from the Underground Storage Tank Fund earmarked for 1415 R Street and 1455 R Street before private funds from Responsible Parties are used in the remediation efforts.

MERCEDMTBE 000816

## 5.    INDEMNIFICATION

The Responsible Parties, and each of them, relieves the Agency and the City of any and all liability in connection with any action under this Agreement and/or the MTBE remediation efforts and shall jointly and severally indemnify, protect, defend, save and hold Agency and the City, their respective officers, employees, and agents, harmless from any and all claims or causes of action arising out of this Agreement and/or the MTBE remediation efforts. It is understood that the duty of the Responsible Parties to indemnify and hold harmless includes the duty to defend as set forth in Section 2778 of the California Civil Code. This indemnification and hold harmless clause shall survive the termination of this Agreement and shall apply to any damages or claims for damages whether or not such insurance policies shall have been determined to apply.   By execution of this Agreement, the Responsible Parties acknowledge and agree to the provisions of this Section and that it is a material element of consideration.

## 6.    SUCCESSORS AND ASSIGNS

This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the respective parties hereto.

## 7.    WAIVER

In the event that either the Agency, the City, or the Responsible Parties shall at any time or times waive any breach of this Agreement by the other, such waiver shall not constitute a waiver of any other or succeeding breach of this Agreement, whether of the same or any other covenant, condition or obligation. Waiver shall not be deemed effective until and unless signed by the waiving party.

## 8.    VENUE

This Agreement and all matters relating to it shall be governed by the laws of the State of California and any action brought relating to this Agreement shall be held exclusively in a state court in the County of Merced.

N:\SHARED\Attorney\Agreements\Planning\2006\MTBE Remediation Coordination Agreement 8.2.06.doc

MERCEDMTBE 000817

9.    **AMENDMENT**

This Agreement shall not be amended, modified, or otherwise changed unless in writing and signed by both parties hereto.

10.    **INTEGRATION**

This Agreement constitutes the entire understanding and agreement of the parties and supersedes all previous and/or contemporaneous understanding or agreement between the parties with respect to all or any part of the subject matter hereof.

11.    **AUTHORITY TO EXECUTE**

The person or persons executing this Agreement on behalf of the parties hereto warrants and represents that he/she/they has/have the authority to execute this Agreement on behalf of their entity and has/have the authority to bind their party to the performance of its obligations hereunder.

12.    **COUNTERPARTS**

This Agreement may be executed in one or more counterparts with each counterpart being deemed an original. No counterpart shall be deemed to be an original or presumed delivered unless and until the counterparts executed by the other parties hereto are in the physical possession of the party or parties seeking enforcement thereof.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed on the date first above written.

THE REDEVELOPMENT AGENCY
OF THE CITY OF MERCED
A body corporate and politic of the State
of California

BY:  _____
Executive Director

4

N:\SHARED\Attorney\Agreements\Planning\2006\MTBE Remediation Coordination Agreement 8.2.06.doc

MERCEDMTBE 000818