UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898 MDL No 1358 (SAS) M21-88 |

This Document Relates To:

*City of Merced Redevelopment Agency v. Exxon Mobil Corp., et al.*, 08 Civ. 06306 (SAS)

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE NUISANCE AND TRESPASS

**Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Legal Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  Under California Law, A Manufacturer and Supplier of a Product Who Provides
Improper Storage and Handling Instructions That Fail To Prevent Contamination
May Be Liable For The Creation Of A Nuisance. . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  Defendants Assisted In The Creation of a Nuisance in Fresno By Failing To Provide
Proper Training Even When Inspecting Stations, and By Providing Improper
Handling And Storage Instructions That Contributed To Significant Groundwater
Contamination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  Before MTBE Was Added to Gasoline in California, Defendants Knew MTBE
    Gasoline Posed Different Environmental Risks Than Non-MTBE Gasoline
    And That Additional Storage and Handling Procedures Needed to Be
    Implemented to Avoid Releases Which Would Create Substantial
    Groundwater Contamination in Fresno. . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.  Handling and Storage Instructions Provided by Defendants to the Stations at
    Issue Did Not Disclose the Increased Risks Posed by MTBE and the
    Inadequacy of Their USTs to Handle This Risk, Nor Did Defendants Instruct
    Owners and Operators on Storage and Handling Procedures Which Would
    Have Addressed the Increased Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    C.  Defendants Concealed The Risks Of MTBE And Mislead Regulators
    Regarding MTBE's Risks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## **Table of Authorities**

**Cases**

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*City of Modesto Redevelopment Agency v. Superior Court*
    119 Cal.App.4th 28 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22, 23

*City of San Diego v. U.S. Gypsum Co.*
    30 Cal.App.4th 575, (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*County of Santa Clara v. Atlantic Richfield Co.*
    137 Cal.App.4th 292 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 10, 11

*Gallin v. Poulou*
    140 Cal.App.2d 638 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Gallo v. Prudential Residential Servs. Ltd. Partnership*
    22 F.3d 1219 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In Re Methyl Tertiary Butyl Ether Products Liability Litigation*
    175 F.Supp.2d 593 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*
    (S.D.N.Y. 2006) 457 F.Supp.2d 455 . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*
    676 F.Supp.2d 139 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Kessler v. Westchester County Dep't of Soc. Servs.*
    461 F.3d 199 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*McClellan v. Smith*
    439 F.3d 137 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Miner v. Clinton County, N.Y.*
    541 F.3d 464 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Newhall Land & Farming Co. v. Sup. Ct.*
    19 Cal.App.4th 334 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

*Pyke v. Cuomo*
    567 F.3d 74 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*SCR Joint Venture L.P. v. Warshawsky*
    559 F.3d 133 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Selma Pressure Treating Co. v. Osmose Wood Preserving Co.*
    221 Cal.App.3d 1601 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13

*Shurpin v. Elmhirst*
    (1983) 148 Cal.App.3d 94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State of California v. Campbell*
    138 F.3d 772 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State of New York v. Fermenta ASC Corp.*
    (N.Y. Sup. Ct. 1995) 630 N.Y.S.2d 884 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Diebold, Inc.*
    369 U.S. 654 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Statutes</u>

CERCLA § 309 (42 U.S.C. § 9658) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Civ. Code § 3479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Rules</u>

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Other Authorities</u>

13 Witkin, Summary of Cal. Law (10th ed. 2008) Equity . . . . . . . . . . . . . . . . . . . . . . 4

Rest.2d Torts, § 824 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rest.2d Torts, § 832 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## I.   Introduction

Defendants Exxon Mobil Corporation, Chevron U.S.A. Inc., Shell Oil Company, Equilon Enterprises LLC, Tesoro Corporation, and Tesoro Refining and Marketing Corporation (collectively "Defendants") seek partial summary judgment of the City of Merced Redevelopment Agency's and its successor Designated Local Authority's (collectively "RDA") causes of action for nuisance and trespass.[1]

Defendants assert that the RDA has sued them for public nuisance "because they merely supplied gasoline to the stations." (Defendant's Memo at p. 1.)   This is wrong.  The RDA's complaint alleges that the defendants' negligent, reckless, intentional and ultra-hazardous activity, including failure to warn of properties of MTBE and the need to take special precautions when handling MTBE, were a substantial factor in creating a nuisance." (Rule 56.1 St. ¶ 61)  As explained below and in the RDA's Rule 56.1 statement, these allegations are supported by substantial evidence, and there are at a minimum disputed issues of material fact with respect to the allegations.

The standard for nuisance liability advanced by defendants in their brief is not the standard for nuisance liability in California law.  Rather, under California case law, affirmative acts leading to the creation or maintenance of a nuisance can encompass a wide variety of activities.  The focus of the cases establishing the standard for nuisance liability is, as it should

---

[1] At the time this litigation was filed, the City of Merced RDA was authorized to sue and be sued as a separate entity.  RDAs in the State of California, however, were recently dissolved by statute, with provisions for designated local authorities to be appointed to handle matters previously handled by RDAs.   As alleged in the amended complaint in this case, a designated local authority has been appointed for the Merced RDA.  Because many of the facts referenced in this brief involved the RDA, however, this brief refers to plaintiff as the RDA.

be, on the connection between defendants' affirmative actions and the resulting nuisance.

The RDA's evidence, as set forth below, establishes that defendants took affirmative acts to assist in the creation of the nuisance. These acts include exercising control over the stations where their product was sold, and promoting and marketing MTBE while concealing from regulators, station operators and the public the dangers posed by MTBE. *See In Re Methyl Tertiary Butyl Ether Products Liability Litigation* (S.D.N.Y. 2001) 175 F.Supp.2d 593, 629 ("*In Re MTBE*") (evidence that defendants "marketed and promoted the use of MTBE by misrepresenting its chemical properties . . . and actively conspired to conceal the threat posed by MTBE . . . are sufficient to demonstrate defendant's participation and assistance in the creation of a nuisance.")

## II.   Legal Standard for Summary Judgment.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994).

"An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability*

*Litigation*, 676 F.Supp.2d 139, 144 (S.D.N.Y. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ." *In re MTBE*, 676 F.Supp.2d at 144 (quoting *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)). "[A]ll that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *In re MTBE*, 676 F.Supp.2d at 144 (quoting *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)).

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences" in that party's favor. *In re MTBE*, 676 F.Supp.2d at 144 (quoting *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009)). However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *In re MTBE*, 676 F.Supp.2d at 144-45 (quoting *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006)). Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *In re MTBE*, 676 F.Supp.2d at 145 (quoting *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009)).

**III.   Under California Law, A Manufacturer and Supplier of a Product Who Provides Improper Storage and Handling Instructions That Fail To Prevent Contamination May Be Liable For The Creation Of A Nuisance.**

In California, "[a]nything which is injurious to health ... or an obstruction to the free use

3

of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance." (Cal. Civ. Code § 3479.) Those who pollute groundwater – and threaten a public water supply – unquestionably commit a nuisance. (See, e.g., 13 Witkin, Summary of Cal. Law (10th ed. 2008) Equity, § 138, p. 459 [citations omitted] ["[c]ases holding that the deposit of material or pollution on land is a nuisance are legion."]; Rest.2d Torts, § 832 ("nuisance includes an invasion of one's interest in the use and enjoyment of . . . water resulting from another's pollution of . . . ground waters"); *Newhall Land & Farming Co. v. Sup. Ct.* (1993) 19 Cal.App.4th 334, 341 ("Pollution of water constitutes a public nuisance . . . . "); *State of California v. Campbell* (9th Cir. 1998) 138 F.3d 772, 782 ("Under [California] laws, polluted water is a public nuisance, . . . and any person who creates or helps create or maintain a nuisance is liable for its abatement and damages").)

Adopting the Restatement Second of Torts standard, California imposes nuisance liability on those who "negligently" cause a "third person" or a "thing" to enter plaintiff's property. (*Gallin v. Poulou* (1956) 140 Cal.App.2d 638, 642-646 (adopting Rest.2d Torts, § 165) Thus, "not only is the party who maintains the nuisance liable but also the party or parties who *create or assist in its creation* are responsible for the ensuing damages." (*Shurpin v. Elmhirst* (1983) 148 Cal.App.3d 94, 101 [emphasis added]; *State of California v. Campbell, supra,* at 778 (applying California law); *Hardin v. Sinclair* (1896) 115 Cal. 460, 463; *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125.)

Applying these basic principles, California courts have found that a manufacturer of a product can be held liable under nuisance for groundwater contamination caused by the manufacturer's products when the manufacturer participates in the creation of the nuisance by

providing instructions for use and handling of the product which make groundwater contamination inevitable, and by failing to provide warnings about environmental risks known to the manufacturer which could have mitigated or prevented the contamination. (*Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601 ("*Selma Pressure Treating*"); *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 (*City of Modesto*); and *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292 (*County of Santa Clara*).)

The court in *Selma Pressure Treating,* one of the first cases to consider application of nuisance liability to a manufacturing defendant, expressly found that it is the connection between the defendants' conduct and the creation of a nuisance which is the critical factor:

> [I]f we *can say improper disposal or storage of the chemicals was the likely consequence of the chemical supplier's failure to warn*, . . . we find that, in failing to warn an unknowledgeable [customer] of the hazards to the environment which [the chemical manufacturers and distributors] knew could flow from the improper handling and disposal of the wood treating chemicals, *their failure could be found to be a substantial factor in the creation of the nuisance.*

(*Id.* at 1624 [emphasis added].) Other courts have followed and applied similar reasoning in denying summary adjudication of nuisance claims such as those asserted by the RDA.

In *City of Modesto*, for example, building on *Selma*, the Court found that "affirmative acts or instructions could support a finding that those defendants assisted in creating a nuisance . . ." (*Id.* at 41.) The *City of Modesto* court, in fact, specifically rejected the arguments advanced by Defendants in their motion, stating that "liability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the

nuisance." (*Id.* at 38, citing *Newhall Land & Farming Co., supra* at 343.) *City of Modesto* thus rejected the broad proposition that product manufactures are essentially automatically immune from nuisance claims, and affirmed the reasoning that nuisance liability turns on the "affirmative acts" of the product manufacturers, not on the manufacturer's position in the chain of distribution.

Based on California law, including *Selma Pressure Treating,* this Court in *In Re Methyl Tertiary Butyl Ether Products Liability Litigation* (S.D.N.Y. 2001) 175 F.Supp.2d 593 ("*In Re MTBE*") also rejected the contention that ownership, possession or control of the property is the deciding factor in determining a defendants' liability for nuisance:

> Although defendants argue that they cannot be held liable for public nuisance because they had no control over the product at the time it was 'released' onto plaintiff's property, '[o]ne is subject to liability for a nuisance caused by an activity, not only when [i]t carries on the activity, but also when [i]t participates to a substantial extent in carrying it on' . . . (citations omitted)
>
> . . .
>
> Here, plaintiffs allege that defendants have extensive knowledge of all phases of the petroleum business, from the extraction of crude oils, to the refining and/or distribution, marketing and retail sale of gasoline, including the design and manufacture of gasoline containing MTBE . . . defendants added MTBE to gasoline, marketed and distributed gasoline containing MTBE, all with the knowledge of the dangers MTBE poses to groundwater . . . in addition, plaintiffs allege that defendants failed to warn the downstream handlers, retailers, gasoline purchasers, government officials and well owners of the dangers associated with MTBE . . . according to the plaintiffs, defendants marketed and promoted the use of MTBE by misrepresenting its chemical properties . . . and actively conspired to conceal the threat posed by MTBE . . . *these allegations are sufficient to demonstrate defendant's participation and assistance in the creation of a nuisance.*

(*Id.* at 628-629, emphasis added.) The *In re MTBE* opinion also noted that "a key sentence from [*County of Santa Clara*] bears repeating": "'[L]iability is premised on defendants' promotion of lead paint for interior use with knowledge of the hazard that such use would create.'" *Id.* at 464.

The Court concluded: "If the allegations made by OCWD are true, such allegations would be sufficient to sustain a nuisance claim against the defendants." *Id.* The Court's identification of this key factor, namely promotion of use with knowing of the inherent hazards posed by such use, is consistent with California law, and demonstrates that defendants' overly narrow definition of "affirmative acts" is inconsistent with the law recognized by this Court and California Courts.

New York courts have adopted a similar approach to nuisance. In *State of New York v. Fermenta ASC Corp.* (N.Y. Sup. Ct. 1995) 630 N.Y.S.2d 884, the court held that manufacturers and distributors of a chemical product which contaminated water wells were liable for participating in the creation of a trespass where "the defendants advised consumers that it be applied to the soil . . . ." (*Id.* at p. 894.) In affirming this decision, the New York Appellate Division held:

> For purposes of the trespass claim, it is enough that the defendants' actions in directing customers *to apply* [the chemical product] *to the soil* was substantially certain to result in the entry of [the contaminant] into [plaintiff's] wells. [Citation.] . . . [T]he trial court correctly upheld the trespass claim of [plaintiff].

(*State of New York v. Fermenta ASC Corp.* (N.Y. App. Div. 1997) 656 N.Y.S.2d 342, 346, emphases added.)[2]

In their motion, Defendants selectively quote from and distort the holdings of several California cases to suggest that these cases support Defendants' overly narrow definition of the

---

[2] The law of New York and California are similar on nuisance. (*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, supra*, 175 F.Supp.2d at pp. 627-628.) The holdings of *Selma Pressure Treating* and *State of New York* that chemical manufacturers are liable for participating in the creation of a nuisance and trespass respectively are remarkably similar. In each, manufacturers and distributors of products were found liable because they instructed customers to deposit the toxic product on the ground where it contaminated plaintiffs' water wells.

type of "affirmative conduct" necessary to support a nuisance claim.  For example, Defendants'

motion asserts that *City of Modesto* stands for the proposition that nuisance liability can <u>only</u> be

imposed if a defendant (1) "manufactured equipment *designed* to result in unlawful discharges"

or (2) "*specifically instructed* a user to dispose of waste *improperly*."  (Mot. at 6 [Emphasis

added].)  Defendants then argue that the RDA's lacks evidence that Defendants, or any of them,

engaged in conduct that "falls within these two limited instances of affirmative conduct" is fatal

to the RDA's nuisance claim.  (Motion at 6.)

Defendants' reliance on *City of Modesto* to support their tightly drawn circle of nuisance

liability is misplaced.  In fact, the *City of Modesto* court states that the type of affirmative acts it

listed are merely *examples* of circumstances which would warrant imposition of nuisance

liability.  Specifically, the *City of Modesto* court concluded "that these *kinds* of affirmative acts

or instructions could support a finding that those defendants assisted in creating a nuisance."

*City of Modesto, supra,* at 41.  As evidenced by the use of "kinds" in this context, the *City of

Modesto* court clearly did not intend to provide an exhaustive list of the affirmative acts that

could give rise to nuisance liability.  Rather, manufacturing equipment designed to unlawfully

discharge waste or providing instructions for its improper disposal are but two examples of the

multitude of ways in which a manufacturer could be found to have taken "affirmative steps"

assisting in the creation of a nuisance thereby incurring nuisance liability.

Defendants also cite to *City of San Diego v. U.S. Gypsum Co.*, 30 Cal.App.4th 575,

(1994), as supporting a narrow scope of nuisance liability arising from defective products.

Defendants' even quote the *City of San Diego* court in its colorful description of the systemic

danger of allowing the scope of nuisance liability to "become a monster that would devour in one

8

gulp the entire law of tort." (Motion at 6.) The facts underlying plaintiff's nuisance claim in *City of San Diego*, however, are materially distinct from those upon which the RDA bases its nuisance claim. As such, *City of San Diego* is distinguishable.

In *City of San Diego*, plaintiff City pled a private nuisance cause of action against manufacturers and distributors of asbestos-containing materials which had been installed in, and were then deteriorating in, city-owned and city-leased buildings. The City, which did not allege special injury, sought damages for past and future abatement. The *City of San Diego* court dismissed the City's private nuisance cause of action because it was "a products liability action in the guise of a nuisance action." (*Id.* at p. 587.) The court's holding was based on the fact that the City's allegations were not "land-connected," and did not concern the "use or condition of property." (*Id.* at pp. 584 ["nuisance, generally a land-connected tort"] and 586 ["nuisance cases 'universally' concern the use or condition of property, not products."].) (*Id.* at p. 586.) *City of San Diego* quoted and relied on Prosser & Keeton, Law of Torts (5th ed. 1984) section 86, page 618 (fns. omitted): "If 'nuisance' is to have any meaning at all, it is necessary to dismiss a considerable number of cases which have applied the term to matter not connected either with land or with any public right, as mere aberration . . . ." (*Id.* at p. 586.) Significantly, *City of San Diego* favorably cited, and distinguished, *Selma Pressure Treating* on this basis. (*Id.* at p. 586 ("California law has permitted recovery in nuisance . . . where a defendant has created a nuisance on another's property. . .") The holding in *City of San Diego* is also limited to nuisance actions based on defective asbestos-containing building materials.

In contrast, the conduct of Defendants here are classic examples of affirmative conduct giving rise to nuisance liability. The RDA alleges (and has evidence to prove) that defendants

9

delivered MTBE gasoline to stations in the City of Merced, and that as a result of defendants'

handling instructions, directions, and failure to warn station owners and operators about

significant risks posed by MTBE, defendants' MTBE gasoline was released from these stations

and has contaminated groundwater in the City of Merced.  More ominously, the DRA alleges

(and has evidence to prove) that Defendants, intentionally and in concert, actively sought to

suppress information regarding the particular hazards of MTBE and purposely withheld such

information from its customers, owners and operator, and regulatory agencies.

Defendants also rely upon *County of Santa Clara v. Atlantic Richfield Co.*, 137

Cal.App.4th 292 (2006), a recent case implementing *City of Modesto*, in support of their

argument that the RDA's "generalized statements about the [petroleum] industry" are insufficient

to support a nuisance claim.  (Motion at 6.)  In *County of Santa Clara*, plaintiffs were pursuing a

representative public nuisance cause of action seeking cost of abatement of a hazard created by

affirmative and knowing promotion of a product for a hazardous use.  In its analysis, the court

noted that only a public nuisance cause of action, as opposed to a product liability cause of

action, would allowed a plaintiff to obtain relief *before* the hazard caused any physical injury or

property damage.  Moreover, as the court observed, a products liability action does not provide

an avenue to prevent future harm and does not allow a public entity to act on behalf of the

community that has been subjected to a wide spread health hazard.

Based on these considerations, the *County of Santa Clara* court upheld the public

nuisance claim against the manufacturers of lead paint, finding that liability "premised on

defendants' *promotion of lead paint for interior use* with knowledge of the hazard that such use

would create . . . is distinct from and far more egregious than simply producing a defective

10

product or failing to warn of a defective product." (*Id.* at p. 309 [emphasis in original].)  The court specifically concluded that knowingly concealing environmental risks that will create a nuisance "is quite similar to instructing the purchaser to use the product in a hazardous manager, which *Modesto* found *could* create nuisance liability." (*Id.* at p. 309 [emphasis in original].)  Contrary to defendants' arguments, *County of Santa Clara* actually *supports* the imposition of nuisance liability in this case where Defendants knew that the presence of MTBE in their gasoline mandated different storage and handling procedures from non-MTBE gasoline and that if released, MTBE would inevitably contaminate groundwater thereby subjecting the community to a wide spread health hazard.  Defendants also knew that the storage and handling procedures being utilized by gasoline station owners and operators were inadequate to prevent this groundwater contamination, and that failure to disclose these risks to the station owners and operators, regulators, and the public or to provide adequate instructions on appropriate storage and handling procedures would lead to the contamination of which the RDA complains.

*County of Santa Clara*, *Selma Pressure Treating*, and *City of Modesto* are all consistent with the Restatement of Torts' general principles concerning the types of conduct which create nuisance liability.  (Rest.2d Torts, § 824.)  Specifically, that under certain circumstances, the "failure to act" to prevent or abate a nuisance can be the basis for nuisance liability.  (*Ibid.*)  The court in *County of Santa Clara* articulated this concept in finding the paint manufacturers liable in nuisance for promoting a product which the manufacturers knew would create a nuisance and then actively concealing the nuisance hazards of that product which made the creation of the nuisance inevitable.

11

**IV.   Defendants Assisted In The Creation of a Nuisance in Fresno By Failing To Provide Proper Training Even When Inspecting Stations, and By Providing Improper Handling And Storage Instructions That Contributed To Significant Groundwater Contamination.**

The moving Defendants were well aware of the characteristics of MTBE when gasoline with MTBE was first marketed in 1992.  Defendants were also well aware that due to its chemical properties, releases of gasoline containing MTBE posed far greater risk of groundwater contamination risks than releases of regular gasoline.  They also knew that gasoline with MTBE needed to be handled and stored in a different manner than regular gasoline, that the gasoline storage and handling systems in place at gasoline stations prior to the introduction of MTBE were inadequate to address the environmental risks posed by MTBE, and that installation of different equipment and implementation of safety precautions could greatly reduce the environmental risks posed by MTBE.  Despite this knowledge, Defendants failed to instruct as to proper handling (even during station inspections) or warn of the increased risks of environmental contamination as well as the need for additional equipment and safety procedures.

Below and in the RDA's separate opposition to Defendants' Rule 56.1 Statement are highlights and key documents from the larger body of evidence adduced through discovery that, at a minimum, create disputed issues of material fact as to whether Defendants created, or assisted in creating, a nuisance.  The RDA's expert concerning underground storage tanks, Marcel Moreau, has decades of experience concerning this issue, and provided a detailed history of defendants' knowledge concerning the problems of storing and handling MTBE gasoline at service stations.  (Rule 56. 1 St. at ¶ 24.)

12

**A.      Before MTBE Was Added to Gasoline in California, Defendants Knew MTBE Gasoline Posed Different Environmental Risks Than Non-MTBE Gasoline And That Additional Storage and Handling Procedures Needed to Be Implemented to Avoid Releases Which Would Create Substantial Groundwater Contamination in Fresno.**

*Selma Pressure Treating* specifically identified the failure to provide instructions on the proper handling and/or storage of a product as the type of "participation" which can support nuisance liability, particularly where the manufacturer knew that release of the product would "flow" from the lack of proper handling and storage.  (*Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1624 ["If we can say *improper disposal or storage* of the chemicals was the likely consequence of the chemical supplier's failure to warn, . . . we find that, in failing to warn an unknowledgeable [customer] of the hazards to the environment which [the chemical manufacturers and distributors] knew could *flow from the improper handling and disposal* of the wood treating chemicals . . ."] (emphasis added).)   *City of Modesto* and *County of Santa Clara* [failure to give proper instructions that would avoid harm. . . "is quite similar to instructing the purchaser to use the product in a hazardous manner."] similarly focused on the inadequacy of instructions which were necessary to addressed the increased risks. The evidence shows that the moving defendants engaged in the very type of acts described as sufficient to support a nuisance claim in all of these cases.

After supervising remediation of MTBE releases at Shell gasoline stations across the country for nearly twenty years, Curtis Stanley, an engineer and hydrogeologist at Shell, described MTBE as the "biggest environmental" issue facing United States oil companies.  (Rule 56.1 St. at ¶ 26.)  Mr. Stanley's statement is a prophetic commentary on the fallacy of the oil industry's decision to continue to utilize MTBE in the face of known environmental risks.

13

California refiners, particularly Chevron's Northern California refinery, started adding MTBE to gasoline in 1986, and continued to utilize MTBE until the early 2000s when it was banned. (Rule 56.1 St. at ¶ 25.)   The evidence described below shows that the refiners knew about the increased environmental risks of MTBE gasoline *before* they started adding MTBE in large quantities to gasoline in California.   The evidence also demonstrates that while defendants developed improved underground storage tank systems and instructions for their own wholly owned operations, they failed to provide this same information to service stations operated by others or to jobbers who delivered their gasoline to these stations.

### The 1980s

In 1981, Ben Thomas of Shell reported to an American Petroleum Institute ("API") committee that "approximately 20 percent of all underground storage tanks leak, leading to the possibility of groundwater contamination.  (Rule 56.1 St. at ¶ 27.) Chevron and Shell were long standing members of API.  (Rule 56.1 St. at ¶ 28.)   Thus, even before the addition of MTBE, the oil industry was aware that USTs were inadequate to prevent releases of gasoline or the contamination of groundwater by constituents of gasoline.

Just a few years later, in 1984, API had already formed an Methyl-tertiary-Butyl Ether Task Force ("MTBE Task Force") to address "emerging issue[s] of MtBE in ground water." (Rule 56.1 St. at ¶ 29.)  The minutes of a June 1984 meeting state:

> "Some of the task force members indicated that MTBE had been found in ground water near leaking underground storage tanks from their service stations . . . It appears that the oxygenate components of gasoline, such as MTBE, migrate most rapidly underground . . ."

(*Ibid.*)

In 1986, Dr. Peter Garrett, Marcel Moreau, and Jerry B. Lowry of the Maine Department of Environmental Protection drafted a paper entitled "Methyl tertiary Butyl Ether as a Ground Water Contaminant" (the "Maine Paper") which was intended to be presented at an API sponsored conference. (Rule 56.1 St. at ¶ 31.) The Maine Paper detailed multiple problems with releases of MTBE gasoline from service stations, including: (1) MTBE is more soluble in water and thus "spreads both further and faster than the gasoline." (2) "Groundwater contaminated with MTBE is difficult to remediate;" (3) MTBE will migrate out beyond gasoline and appear as a "halo" around the gasoline groundwater plume; (4) relatively small spills of MTBE gasoline ("a small driveway spill") can result in "large" plumes of MTBE only groundwater contamination. (*Ibid.*) The Maine Paper recommended that either MTBE be removed from gasoline or that several changes be made to USTs before MTBE gasoline is stored in them. (*Ibid.*) These findings were consistent with defendants' experience at their own service stations, and clearly put defendants on notice that one of the key defenses against widespread MTBE groundwater contamination was the upgrading of USTs and handling practices for MTBE gasoline.

In June 1986, in a memo entitled "Marketing Environmental Concerns Regarding the Use of MTBE in MOGAS, D.W. Callahan, a Chevron employee, also noted that MTBE had "several disturbing properties." (Rule 56.1 St. at ¶ 33.) These "disturbing" properties included the high solubility and mobility of MTBE as compared to the regular components of gasoline. (*Ibid.*) Mr. Callahan specifically warned that "MTBE utilization could increase the costs to clean up leaks at service stations . . ." (*Ibid.*) In December 1986, Chevron personnel circulated an article published in a oil industry trade publication reporting on significant MTBE groundwater contamination problems, highlighting, in particular, the Maine Paper and its call for changes to

15

USTs at gasoline stations.  (Rule 56.1 St. at ¶ 34.)

There can be no doubt that by the 1990s the oil industry, including the defendants, was well of the increased environmental risks posed by MTBE, and the need to upgrade USTs and to provide improved handling and storage instructions to service station owners and operators to avoid MTBE groundwater contamination.

### The 1990s

In 1991, Chevron recognized that the introduction of MTBE to California gasoline would substantially change the consequences of a gasoline spill or leak.  (Rule 56.1 St. at ¶ 38.)  The memo warns that while non-MTBE gasoline plumes are "relatively easy" to address, "MTBE on the other hand is a different situation."  Specifically, the memo warns Chevron management that "[w]hen MTBE gets into the water then the trouble really starts."  (*Ibid.*)  The memo concludes that:

> "Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE.  The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run.  **As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent.**"

(*Id.* at 2.)

Another 1991 Memorandum by Chevron notes multiple additional safety precautions and amended handling instructions need to be provided when MTBE gasoline is being stored and distributed, including at service stations.  The additional precautions and handling instructions identified by Chevron included: (1) "Spills or leaks of MTBE must be contained and prevented from contacting the ground or entering the waste water drainage system," (2) "Tanks containing

16

MTBE should have double bottoms and leak detections systems," (3) "Provide proper facilities for shutdowns and tank cleaning to prevent any MTBE from being spilled or washing into the drainage system." (Rule 56.1 St. at ¶ 39.)  In the mid-1990s, Chevron also acknowledged that MTBE was driving factor to implement upgrades to USTs and improve instructions on storage and handling practices at service stations:

> "The USGS report points out that gasoline blended with MTBE may pose a greater risk to drinking water than non-oxygenated gasoline . . . . These concerns are not new, as Marketing raised the same issue <u>ten years ago</u> in connection with the Tank Integrity Program. . . .
>
> Marketing believes that MTBE in groundwater issue is just one more additional justification for the large Marketing capital investments in avoid terminal and service station leaks and spills."

(Rule 56.1 St. at ¶ 41.)

In 1993, in discussing the increased problem of MTBE groundwater contamination from service station releases, Curtis Stanley wrote to one of his colleagues: "We need to convince management to implement dual containment NOW!"  (Rule 56.1 St. at ¶ 40.) Stanley later concluded that, based on "research . . . extremely small releases can cause groundwater problems." and that "**[v]ery small releases** of MTBE (even small overfills seeping into cracks in the pavement) have the potential to adversely impact groundwater." (Rule 56.1 St. at ¶¶ 42-43.) Mr. Stanley further stated that "[m]y professional opinion is that MTBE . . . should not be used at all in areas where groundwater is a potential drinking water supply." (*Id.*)

Tesoro was aware that MTBE was a groundwater contaminant as early as 1996.  (Rule 56.1 St. at ¶ 53.)  Tesoro was engaged in the 1990's in remediation of multiple stations with MTBE contamination.   (Rule 56.1 St. at ¶ 54.)  Tesoro received reports on and attended

17

conferences at which MTBE's characteristics were discussed. (Rule 56.1 St. at ¶ 55.) Tesoro has been a member of the API from at least 1999, and interacted with API prior to becoming a member. (Rule 56.1 St. at ¶ 56.)  These interactions included receiving information from API on MTBE and its impacts on groundwater. (Rule 56.1 St. at ¶ 56.) Tesoro has also been a member of the National Petrochemical Refiners Association since 1971. (Rule 56.1 St. at ¶ 57.) Tesoro, however, took no special measures to prevent MTBE contamination. (Rule 56.1 St. at ¶ 58.) In fact, Tesoro, despite its knowledge, elected to treat gasoline with MTBE no differently than gasoline without MTBE. *Id.*

In 1999, Chevron's "White Paper" addressing questions about stricter regulation of USTs. observed that [i]t is because of the differences in physical and chemical properties of MTBE that it is more likely to reach groundwater [at service stations], as a result of incidental spills, overfills and gasoline deliveries, even without underground storage tank leaks." (Rule 56.1 St. at ¶ 46.) Chevron also recognized that even small "incidental" spills and releases, caused by individual handling gasoline at the station, had the capacity to reach and contaminate groundwater.  More importantly, these types of leaks are only preventable through appropriate education and instruction of the individuals handling the gasoline.

In 1999, Curtis Stanley further observed that MTBE releases capable of causing groundwater contamination arose not only from the USTs themselves, but also from improper handling practices at gasoline stations by owners, operators, and jobbers delivering gasoline to the stations:

> You may, however, want to carefully consider what you say when the new tank
> upgrades are our first line of defense.  While this is very true and the size of leaks
> has decreased substantially over the years, we are still finding MTBE at sites that

have been upgraded.  The presence of MTBE may not be due to a leak but could also be due to operational and construction factors.

(Rule 56.1 St. at ¶ 47.)

Shell's engineering coordinator, Glen Marshall, echoed the caution that releases of MTBE gasoline at service stations was dependent on improved and alternative instructions as well as upgrades of the entire UST system.  In 1998, Mr. Marshall warned that the "'Achilles Heel'" of [UST] systems has always been the 'Bubba-factor' . . . the best intentions of hardware manufacturers and designers being ultimately defeated by poor installation and maintenance practices." (Rule 56.1 St. at ¶ 48.)  The maintenance practices Mr. Marshall is referring to are clearly the maintenance practices of service station owners and operators.  A year later, Mr. Marshall continued to advised that "[u]pgrades addressed the inadvertent spills and releases, no root causes of tank or line leaks." (*Ibid.*)

The California regulatory authorities responsible for oversight of releases from underground storage tanks were not advised by the oil industry, including defendants, until the late 1990s that MTBE poses a serious threat to groundwater and drinking water in the State of California.  (Rule 56.1 St. at ¶ 51.)

Overall, the evidence shows that, like the defendants in *Selma Pressure Treating*, *City of Modesto*, and *County of Santa Clara*, defendants here knew, at the time they added MTBE to gasoline in California, that without the provision of additional instructions and precautionary measures, MTBE gasoline would be released from gasoline stations and inevitably contaminate groundwater and public drinking water supplies causing a nuisance.

19

**B.     Handling and Storage Instructions Provided by Defendants to the Stations at Issue Did Not Disclose the Increased Risks Posed by MTBE and the Inadequacy of Their USTs to Handle This Risk, Nor Did Defendants Instruct Owners and Operators on Storage and Handling Procedures Which Would Have Addressed the Increased Risk.**

Oil industry defendants upgraded their gasoline storage systems ("USTs"), including upgrading from bare steel USTs to fiberglass, at their own gasoline stations in an effort to address the increased risks posed by MTBE. (Rule 56.1 St. at ¶ 52.) Defendants were aware of numerous upgrades to USTs, safety devices, warning systems, and alternative and improved instructions to service station owners and operators as well as jobbers who delivered gasoline, that were necessary to prevent releases of MTBE gasoline which would contaminate groundwater in Merced. (*Ibid.* at pp. 11-14, 17-29, 31-34].)

The R Street stations at issue in this motion, unaware of the need for fiberglass tanks or other upgrades, continued to utilize inadequate bare steel UST systems "well past the time when MtBE was prevalent in California gasoline." (*Ibid.* at 11, and fn 36.) Many, if not all, of the station owners and operators associated with stations at issue were unsophisticated, and relied upon others, including defendants, to instruct them on how to safely and properly operate and maintain their USTs and gasoline. (*Ibid.* at 11].) Defendants also continued to deliver MTBE gasoline to these stations even though they knew that the gasoline storage and handling systems were inadequate to prevent releases of MTBE which would cause significant groundwater contamination.

**1.     1415 R Street - Exxon**

The 1415 R Street station was operated as a branded Mobil station selling Mobil gasoline from 1978 to 1984, and was then operated as a branded Exxon station selling only Exxon

gasoline from 1984 to 1999. (Rule 56.1 St. ¶ 5.) The station therefore was operating as a Mobil

station at the time that MTBE was introduced into gasoline California (Mobil subsequently

merged with Exxon to form ExxonMobil) and continued to operate as an Exxon station after

Exxon began putting MTBE into its gasoline. (Rule 56.1 St. ¶¶ 2 and 23.)    Mr. Randhawa

purchased the 1415 R Street station in 1994 from Arvel Shackelford. (*Id.*)

The station was operating as an Exxon station at the time Mr. Randhawa purchased it

from Mr. Shackelford, and he continued operating it as an Exxon station until 1999. (*Id.*)  Mr.

Randhawa confirmed that the Exxon logo was displayed at the station on "dispensers, price sign,

freeway sign," and that he was "authorized through Curtesy Oil by Exxon" to display the logo.

(*Id.*)  Exxon plainly promoted its products, including MTBE gasoline, through use of its brand at

this station, in addition to supplying MTBE gasoline without proper instructions for handling and

without proper instructions for preventing or responding to releases.

### 2.    1415 R Street - Shell

The 1415 R Street station became a Texaco station in approximately 1999 and Shell

acquired the marketing and retail assets of Texaco Refining and Marketing, Inc. (Texaco).[3]  (*Id.*)

As an incentive to the station operators to switch from Exxon to Texaco, Texaco (Shell) provided

$79,000 for the purchase and installation of new underground storage tanks.  (*Id.*)  Having

assisted the owner with obtaining new tanks, Shell then became the exclusive supplier of MTBE

---

[3]  Texaco Refining and Marketing Inc. (TRMI) obtained Texaco's refining and marketing
assets (including gas station related assets) in 1984.  TRMI then sold those assets in 1998 to
Equilon Enterprises, Inc., a Shell joint partnership.  As of 1998, then, Shell owned former
Texaco station related assets, including those in Merced.  Shell retained the Texaco brand for
marketing purposes.

gasoline to this station. (Rule 56.1 St. ¶¶ 2, 3, 23 and 24.) Shell also controlled the branding

rights to the station, through its acquisition of Texaco's marketing and retail assets. (Rule 56.1

St. ¶¶ 2 and 23.)

Shell attempts to portray its relationship with the R Street Texaco station as merely

supplying MTBE gasoline after 1999 through an independent jobber. Shell, however, acquired

Texaco's retail operations, including Texaco's branding and supply agreement with the R Street

Station, in 1999. (Rule 56.1 St. ¶¶ 2 and 23.) Shell subsequently supplied MTBE gasoline to the

station until MTBE was banned in 2003. (Rule 56.1 St. ¶¶ 3 and 24.) Shell plainly promoted its

products, including MTBE gasoline, through use of its brand at this station, in addition to

supplying MTBE gasoline without proper instructions for handling and without proper

instructions for preventing or responding to releases.

Shell's (Texaco's) participation in the financing of the UST at the R Street station,

together with its ownership of the Texaco brand and supply of the MTBE gasoline to the station,

create, at a minimum, a disputed issue of fact as to whether Shell "assisted in the creation

"created or assisted in the creation" of a nuisance at the 1415 R Street site. (*City of Modesto*,

*supra*, 119 Cal.App.4th at p. 38; *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability

Litigation*, *supra*, 457 F.Supp.2d at p. 464, fn. 43.)

### 3. 1455 R Street - Chevron and Tesoro

Chevron admits that it supplied MTBE gasoline to the jobber serving the 1455 R Street

station. Defendants' Motion at 8. Tesoro also admits that it supplied MTBE gasoline to the

jobber serving the 1455 R Street station. Defendants' Motion at 9. In fact Pazin and Meyers,

the jobber used by both Chevron and Tesoro, was the exclusive supplier of gasoline to this

station, which was owned and operated by Mr. Pazin's brother.  Although each defendant

attempts to minimize the amount of MTBE gasoline it supplied to this station, and their

involvement with the station, neither defendant argues that it supplied instructions to the station

as to the proper handling of MTBE gasoline or steps to take to prevent, minimize and control

releases of MTBE gasoline.

In *City of Modesto*, *supra*, 119 Cal.App.4th 28, the court held that non-landowners may

be liable for contamination of groundwater if they "created or assisted in the creation of the

nuisance."  (*Id.* at p. 38.)  In *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability

Litigation* (S.D.N.Y. 2006) 457 F.Supp.2d 455, Judge Scheindlin applied *City of Modesto* to find

that even *non*-property owning manufacturers of a polluting chemical could be liable for

nuisance if they "installed systems [i.e., UST's] that resulted in improper discharge of

contaminated wastewater."  (457 F.Supp.2d at p. 464, fn. 43.)

At a minimum there are disputed issues of material fact as to whether Shell, Exxonmobil,

Chevron and Tesoro created, or assisted in the creation, of a nuisance at the R Street stations.

### C.    Defendants Concealed The Risks Of MTBE And Mislead Regulators Regarding MTBE's Risks.

Defendants and other members of the petroleum industry actively promoted the use of

oxygenates (with MTBE as the oxygenate of choice).  As the EPA put it, the concept of using

oxygenated gasoline to address air pollution:

> [W]as originally generated, developed, and promoted by industry,
> not the [EPA] or other parts of the federal government.... The
> Clean Air Act legislation President Bush sent to Congress in 1990
> included a number of provisions that would have led to the
> introduction of alternative (non-petroleum) fuels. The petroleum
> and oxygenate industries responded to these provisions by offering

23

the [Reformulated Gasoline] program as a substitute for most of
the alternative fuel provisions.

(April 1999, EPA Office of Mobile Sources, Technical Overview "Origin of the

Reformulated Gasoline Program".)

On **December 17, 1986**, EPA held a "public focus meeting" for MTBE.  This meeting

was attended by representatives of ARCO Chemical Co., Exxon, Texaco, API, and others.  The

minutes of that meeting make clear that EPA brought to the group's attention the agency's

concern about groundwater contamination:

> An additional concern brought out by [EPA]
> research was the contamination of ground water
> supplies by MTBE.  There are over 700,000
> underground storage tanks for petroleum products in
> the US and about 30% of these tanks leak.

> (Rule 56.1 St. ¶ 61.)

Defendants' response to growing concern about MTBE contamination of

groundwater was to stonewall.  An internal Chevron memo summarized the situation as follows:

> Because of the perceived health effects, local and state regulatory
> agencies are concerned with the clean-up of ground water
> containing MTBE . . . Two considerations impact MTBE.  One is
> the potential health risk, and the second is the increased solubility
> over [BTEX compounds]. . .  MTBE is significantly more soluble
> in water than BTEX.  Consequently, the dissolved 'halo' from a
> leak containing MTBE can be expected to extend farther and
> spread faster than a gasoline leak that does not include MTBE as
> one of the constituents. . . . Further compounding the problem . . .
> MTBE is more difficult to remove from ground water using current
> technology . . .  Cleanup of a gasoline leak/spill containing MTBE
> can be expected to initially cost more in capital and O&M than a
> conventional gasoline leak/spill.

> Industry representatives from Arco, Exxon . . . and Texaco met

24

with EPA in December, 1986 at a 'focus meeting' to discuss
MTBE. ARCO's representative felt the EPA's major concern was
the potential for ground water contamination . . . Manufacturers of
MTBE are attempting to establish an industry group to 'negotiate'
the test rule with EPA . . . Chevron has experience in three states
involving clean-up of ground water containing MTBE (Florida,
Maryland and Texas). . . . The possible move to restrict the use of
MTBE in Maine appears to be an isolated action and not a trend.
However, this could change if other states perceive the threat to
ground water to be great or if Maine becomes exceptionally vocal .
. .

(Rule 56.1 St. ¶ 62.)

At ARCO's initial request (NJDEP-MTBE-CONTENTION-000106), the API's

Groundwater Technical Task Force (whose members included representatives of ARCO, Exxon,

Shell, Chevron, Texaco, and BP, among others), attacked the Maine Department of

Environmental Protection article even though they knew based on their own experiences that the

authors were correct:

The authors' "recommendations" that MTBE... be either banned as
gasoline additives or required double-lined storage tanks is clearly
a policy statement and not an objective, credible scientific
conclusion. Furthermore, data presented in this paper as well as
those generated by ongoing API research indicate that such a policy
is reactionary, unwarranted and counterproductive.

(Rule 56.1 St. ¶ 63.)

Slightly over a month later, in its comments on EPA's listing of MTBE under

TSCA, Arco Chemical Company again simply denied there was any problem, insisting to EPA

that

Where gasoline containing MTBE is stored at refineries, terminals,
or service stations, there is little information on MTBE in
groundwater. We feel that there are no unique handling problems
when gasoline containing MTBE is compared to hydrocarbon-only

25

gasoline.

(Rule 56.1 St. ¶ 64.)

The MTBE producers -- including ARCO, Exxon and Texaco -- formed an

"MTBE Committee" to deal with potential regulatory concerns about MTBE.  In contrast to their

internal concerns about MTBE, the Committee submitted formal comments to EPA insisting that

MTBE posed _no_ environmental problems and arguing that environmental testing would be

unnecessary and counter-productive in view of MTBE's lack of environmental risks:

> We believe that the information provided supports the conclusion
> that MTBE does not represent a drinking water hazard...
>
> The following discussion establishes that there is no evidence that
> MTBE poses any significant risk of harm to health or environment,
> that human exposure to MTBE and release of MTBE to the
> environment is negligible, that sufficient data exist to reasonably
> determine or predict that the manufacture, processing, distribution,
> use and disposal of MTBE will not have an adverse effect on
> health or the environment, and that testing is therefore not needed
> to develop such data.

(Rule 56.1 St. ¶ 65.)

Internal industry documents at the time reflected a very different picture.

As defendants were presenting a picture of safety to regulators, among themselves they

were acknowledging the growing problems posed by MTBE.  Indeed, the industry began

scrambling to find evidence to support its position.

Starting in January **1987** the API's Groundwater Technical Task Force considered

a series of research proposals regarding MTBE.  One such proposal, initially submitted by an

ARCO representative on the Task Force, noted

There has recently been a dramatic increase in regulatory

26

> interest/concern over these alcohols/ethers in groundwater.  Maine
> is considering banning the use of MTBE.  Without field data to
> address the concerns of the regulatory community, regulatory
> action can be expected (probably within a 1-3 year time frame.)....
> If the research is not conducted, there will be few credible data to
> support industry's contention that such octane enhancers do not
> constitute a significant new groundwater contamination threat as
> constituents of gasoline.

(Rule 56.1 St. ¶ 66.)

Another research proposal, sponsored by an Exxon representative, would have studied the "Fate, Transport, [and] Impact of Gasoline Containing Oxygenates in Groundwater" in order to "respond to regulatory agencies considering the promulgation of more stringent environmental regulations governing oxygenates in gasoline." (Rule 56.1 St. at ¶ 59.)  A year later yet another API research proposal reiterated the need for industry to respond to the claims that MTBE gasoline warranted special handling, stating bluntly:  "At present, industry has no scientific data to refute these claims."  The proposal conceded that there was "a downside risk that the results may show that oxygenates, to some extent, increase groundwater contamination problems from gasoline leaks and spills." (Rule 56.1 St. at ¶ 60.)

In short, defendants were not only not forthcoming with what they knew about the risks of MTBE, they actively worked, within their own research departments and within their associations, to downplay those risks and to develop information to counter what regulators had begun to learn about MTBE.  This conduct by defendants was a substantial factor contributing to the creation of the continuing nuisance and trespass at the R Street stations.[4]

---

[4] The discussion of nuisance in this opposition applies equally to the RDA's trespass claims.  As defendants themselves acknowledge in their motion for partial summary judgement on the statute of limitations, the RDA, unlike the water districts involved in most MTBE cases,

## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment re nuisance and trespass should be denied.

Respectfully submitted,

Dated:  April 29, 2013

**MILLER, AXLINE & SAWYER**
A Professional Corporation

By:

DUANE C. MILLER
MICHAEL AXLINE
Attorneys for plaintiff City of Fresno
MILLER, AXLINE & SAWYER
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688

---

owns property that has been contaminated with MTBE.  *See* Defendants' Rule 56.1 Statement In Support of Motion For Partial Summary Judgement Re Statute of Limitations, ¶ 22 ("there can be no doubt that the RDA was well aware of the fact that contamination from the R Street stations migrated to the property owned by the RDA.").  Of course, the RDA disputes that the harm caused by this property contamination is barred by the statute of limitations.

28