UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898<br>MDL No 1358 (SAS)<br>M21-88 |
| This Document Relates To:<br><br>City of Merced Redevelopment Agency v. Exxon Mobil Corp., et al., 08 Civ. 06306 (SAS) | |

**PLAINTIFF'S REVISED OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT RE NUISANCE AND TRESPASS**

I.     **Introduction**

Defendants Exxon Mobil Corporation, Chevron U.S.A. Inc., Shell Oil Company, Equilon Enterprises LLC, Tesoro Corporation, and Tesoro Refining and Marketing Corporation (collectively "Defendants") seek partial summary judgment of the City of Merced Redevelopment Agency's and its successor Designated Local Authority's (collectively "RDA") causes of action for nuisance and trespass.

Defendants assert that the RDA has sued them for public nuisance "because they merely supplied gasoline to the stations." (Motion at p. 1.) This is wrong. The RDA's complaint alleges that the defendants' "negligent, reckless, intentional and ultra-hazardous activity, including failure to warn of properties of MTBE and the need to take special precautions when handling MTBE, were a substantial factor in creating a nuisance." (Rule 56.1 St. ¶ 61)

The standard for nuisance liability advanced by defendants is overly restrictive. Under California case law, affirmative acts leading to the creation or maintenance of a nuisance can encompass a wide variety of activities. The focus of the cases establishing the standard for nuisance liability is, as it should be, on the connection between defendants' affirmative actions and the resulting nuisance.

The RDA's evidence establishes that defendants took affirmative acts to assist in the creation of the nuisance, including exercising control over the stations where their product was sold and promoting and marketing gasoline containing MTBE while, at the same time, concealing from regulators, station operators and the public the dangers posed by MTBE. (*See In Re Methyl Tertiary Butyl Ether Products Liability Litigation* (S.D.N.Y. 2001) 175 F.Supp.2d 593, 629 ("*In Re MTBE*") (evidence that defendants "marketed and promoted the use of MTBE

1

by misrepresenting its chemical properties . . . and actively conspired to conceal the threat posed by MTBE . . . are sufficient to demonstrate defendants' participation and assistance in the creation of a nuisance.").)

## II. Under California Law, A Manufacturer and Supplier of a Product Who Provides Improper Storage and Handling Instructions That Fail To Prevent Contamination May Be Liable For The Creation Of A Nuisance.

Adopting the Restatement Second of Torts standard, California imposes nuisance liability on those who "negligently" cause a "third person" or a "thing" to enter plaintiff's property. (*Gallin v. Poulou* (1956) 140 Cal.App.2d 638, 642-646 (adopting Rest.2d Torts, § 165).) Thus, "not only is the party who maintains the nuisance liable but also the party or parties who *create or assist in its creation* are responsible for the ensuing damages." (*Shurpin v. Elmhirst* (1983) 148 Cal.App.3d 94, 101 [Emphasis added]; *State of California v. Campbell* (9th Cir. 1998) 138 F.3d 772, 778 (applying California law).

Applying these basic principles, California courts have found that a manufacturer of a product can be held liable under nuisance for groundwater contamination caused by the manufacturer's products when the manufacturer participates in the creation of the nuisance by providing instructions for use and handling of the product which make groundwater contamination inevitable, and by failing to provide warnings about environmental risks known to the manufacturer which could have mitigated or prevented the contamination. (*Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601 ("*Selma Pressure Treating*"); *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 (*City of Modesto*); and *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292 (*County of Santa Clara*).)

The court in *Selma Pressure Treating,* one of the first cases to consider application of nuisance liability to a manufacturing defendant, expressly found that it is the connection between the defendants' conduct and the creation of a nuisance which is the critical factor. (*Id.* at 1624.) Other courts have followed and applied similar reasoning in denying summary adjudication of nuisance claims such as those asserted by the RDA.

In *City of Modesto*, for example, building on *Selma*, the Court found that "affirmative acts or instructions could support a finding that those defendants assisted in creating a nuisance . . ." (*Id.* at 41.) The *City of Modesto* court, in fact, specifically rejected the arguments advanced by Defendants in their motion, stating that "liability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance." (*Id.* at 38, citing *Newhall Land & Farming Co. v. Sup. Ct.* (1993) 19 Cal.App.4th 334, 343.) *City of Modesto* thus rejected the broad proposition that product manufacturers are essentially immune from nuisance claims, and affirmed the reasoning that nuisance liability turns on the "affirmative acts" of the product manufacturers, not on the manufacturer's position in the chain of distribution.

Based on California law, including *Selma Pressure Treating,* this Court in *In Re MTBE* also rejected the contention that ownership, possession or control of the property is the deciding factor in determining a defendants' liability for nuisance. (*Id.* at 628-629.) The *In re MTBE* opinion also noted that "a key sentence from [*County of Santa Clara*] bears repeating": "'[L]iability is premised on defendants' promotion of lead paint for interior use with knowledge of the hazard that such use would create.'" (*Id.* at 464.) The Court concluded: "If the allegations

3

made by OCWD are true, such allegations would be sufficient to sustain a nuisance claim against the defendants." (*Id.*)

Defendants assert that *City of Modesto* stands for the proposition that nuisance liability can only be imposed if a defendant (1) "manufactured equipment *designed* to result in unlawful discharges" or (2) "*specifically instructed* a user to dispose of waste *improperly*." (Motion at p. 6 [Emphasis added].) Defendants then argue that the RDA's lacks evidence that Defendants, or any of them, engaged in conduct that "falls within these two limited instances of affirmative conduct" is fatal to the RDA's nuisance claim. (Motion at p. 6.)

Defendants' reliance on *City of Modesto* to support an overly narrow scope of nuisance liability is misplaced. In fact, the *City of Modesto* court stated that "these *kinds* of affirmative acts or instructions could support a finding that those defendants assisted in creating a nuisance." (*City of Modesto, supra,* at 41 [Emphasis added].) They are thus *examples* of circumstances which would warrant imposition of nuisance liability on a manufacturer, not an exhaustive list.

### III.   Defendants Assisted In The Creation of a Nuisance.

Defendants were well aware of the characteristics of MTBE when gasoline with MTBE was first marketed in the 1980's. Defendants were also well aware that due to its chemical properties, releases of gasoline containing MTBE posed far greater risk of groundwater contamination than releases of regular gasoline. They also knew that gasoline with MTBE needed to be handled and stored in a different manner than regular gasoline, that the gasoline storage and handling systems in place at gasoline stations prior to the introduction of MTBE were inadequate to address the environmental risks posed by MTBE, and that installation of different equipment and implementation of safety precautions could greatly reduce the

environmental risks posed by MTBE. Despite this knowledge, Defendants failed to instruct as to proper handling (even during station inspections) or warn of the increased risks of environmental contamination as well as the need for different equipment and additional safety procedures.[1]

### A. Before MTBE Was Added to Gasoline in California, Defendants Knew MTBE Gasoline Posed Greater Environmental Risks Than Non-MTBE Gasoline.

*Selma Pressure Treating* specifically identified the failure to provide instructions on the proper handling and/or storage of a product as the type of "participation" which can support nuisance liability, particularly where the manufacturer knew that release of the product would "flow" from the lack of proper handling and storage. (*Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1624 ["If we can say *improper disposal or storage* of the chemicals was the likely consequence of the chemical supplier's failure to warn, . . . we find that, in failing to warn an unknowledgeable [customer] of the hazards to the environment which [the chemical manufacturers and distributors] knew could *flow from the improper handling and disposal* of the wood treating chemicals . . ."] (Emphasis added).) *City of Modesto* and *County of Santa Clara* similarly focused on the inadequacy of instructions which were necessary to addressed increased risks. *See County of Santa Clara, supra*, 137 Cal.App.4th at 309 (failure to give proper instructions that would avoid harm "is quite similar to instructing the purchaser to use the product in a hazardous manner.") The evidence offered in opposition to

---

[1] The RDA's separate opposition to Defendants' Rule 56.1 Statement provides highlights and key documents from the larger body of evidence adduced through discovery that, at a minimum, create disputed issues of material fact as to whether Defendants created or assisted in creating a nuisance. The RDA's expert concerning underground storage tanks, Marcel Moreau, has decades of experience concerning this issue, and provided a detailed history of Defendants' knowledge concerning the problems of storing and handling MTBE gasoline at service stations. (Rule 56. 1 St. at ¶ 24.)

5

the instant motion shows that the moving Defendants engaged in the very type of acts described in all of these cases as sufficient to support a nuisance claim.

After supervising remediation of MTBE releases at Shell gasoline stations across the country for nearly twenty years, for example, Curtis Stanley, an engineer and hydrogeologist at Shell, described MTBE as the "biggest environmental" issue facing United States oil companies. (Rule 56.1 St. at ¶ 26.) Mr. Stanley's statement is a prophetic commentary on the fallacy of the oil industry's decision to continue to utilize MTBE in the face of known environmental risks.[2]

The California regulatory authorities responsible for oversight of releases from underground storage tanks were not advised by the oil industry, including Defendants, until the late 1990s that MTBE poses a serious threat to groundwater and drinking water in the State of California. (Rule 56.1 St. at ¶ 51.)

### B. Handling and Storage Instructions Provided by Defendants to the Stations at Issue Did Not Disclose the Increased Risks Posed by MTBE.

Oil industry defendants upgraded their gasoline storage systems ("USTs"), including upgrading from bare steel USTs to fiberglass, at their own gasoline stations in an effort to address the increased risks posed by MTBE. (Rule 56.1 St. at ¶ 52.) Defendants were aware of numerous upgrades to USTs, safety devices, warning systems, and alternative and improved

---

[2] California refiners, particularly Chevron's Northern California refinery, started adding MTBE to gasoline in 1986, and continued to utilize MTBE until the early 2000s when it was banned. (Rule 56.1 St. at ¶ 25.) The evidence described below and in the RDA's Rule 56.1 Statement shows that the refiners knew about the increased environmental risks of MTBE gasoline *before* they started adding MTBE in large quantities to gasoline in California. The evidence also demonstrates that while Defendants developed improved underground storage tank systems and instructions for their own wholly owned operations, they failed to provide this same information to service stations operated by others or to jobbers who delivered their gasoline to these stations. (See Plaintiff's Rule 56.1.)

6

instructions to service station owners and operators as well as jobbers who delivered gasoline, that were necessary to prevent releases of MTBE gasoline which would contaminate groundwater in Merced. (Rule 56.1 St. at ¶ 49.)

The R Street stations at issue in this motion, unaware of the need for fiberglass tanks or other upgrades, continued to utilize inadequate bare steel UST systems well past the time when MtBE was prevalent in California gasoline. (Rule 56.1 St. at ¶ 50.) Many, if not all, of the station owners and operators associated with stations at issue were unsophisticated, and relied upon others, including defendants, to instruct them on how to safely and properly operate and maintain their USTs and gasoline. (*Ibid.*) Defendants also continued to deliver MTBE gasoline to these stations even though they knew that the gasoline storage and handling systems were inadequate to prevent releases of MTBE which would cause significant groundwater contamination.

### 1.     1415 R Street - Exxon

The 1415 R Street station was operated as a branded Mobil station selling Mobil gasoline from 1978 to 1984, and was then operated as a branded Exxon station selling only Exxon gasoline from 1984 to 1999. (Rule 56.1 St. ¶ 1.) The station therefore was operating as a Mobil station at the time that MTBE was introduced into gasoline California (Mobil subsequently merged with Exxon to form ExxonMobil) and continued to operate as an Exxon station after Exxon began putting MTBE into its gasoline. (Rule 56.1 St. ¶¶ 1 and 2.) Mr. Randhawa purchased the 1415 R Street station in 1994 from Arvel Shackelford. (Rule 56.1 St. ¶¶ 5 and 7.)

The station was operating as an Exxon station at the time Mr. Randhawa purchased it from Mr. Shackelford, and he continued operating it as an Exxon station until 1999. (Rule 56.1

7

St. ¶¶ 2 and 5.) Mr. Randhawa confirmed that the Exxon logo was displayed at the station on "dispensers, price sign, freeway sign," and that he was "authorized through Curtesy Oil by Exxon" to display the logo. (Rule 56.1 St. ¶ 6.) Exxon plainly promoted its products, including MTBE gasoline, through use of its brand at this station, in addition to supplying MTBE gasoline without proper instructions for handling and without proper instructions for preventing or responding to releases.

### 2. 1415 R Street - Shell

The 1415 R Street station became a Shell station (using the Texaco brand) in approximately 1999.[3] (Rule 56.1 St. ¶ 10.) As an incentive to the station operators to switch from Exxon, Shell provided $79,000 for the purchase and installation of new underground storage tanks. (Id.) Having assisted the owner with obtaining new tanks, Shell then became the exclusive supplier of MTBE gasoline to this station. (Rule 56.1 St. ¶ 10.) Shell also controlled the branding rights to the station, through its acquisition of Texaco's marketing and retail assets. (Ibid.)

Shell's attempts to portray its relationship with the R Street Texaco station as merely supplying MTBE gasoline after 1999 through an independent jobber ignore the fact that Shell financed the USTs at the station, controlled the brand under which products were promoted at the station, and exclusively supplied MTBE gasoline to the stations from 1999 until MTBE gasoline

---

[3] Texaco Refining and Marketing Inc. (TRMI) obtained Texaco's refining and marketing assets (including gas station related assets) in 1984. TRMI then sold those assets in 1998 to Equilon Enterprises, Inc., a Shell joint partnership. As of 1998, then, Shell owned former Texaco station related assets, including those in Merced. Shell retained the Texaco brand for marketing purposes.

8

was banned in California in 2003. (Rule 56.1 St. ¶ 10.) Shell plainly promoted its products, including MTBE gasoline, through use of its brand at this station, in addition to supplying MTBE gasoline without proper instructions for handling and without proper instructions for preventing or responding to releases. At a minimum there are disputed facts as to whether Shell's affirmative acts "created or assisted in the creation" of a nuisance at the 1415 R Street site. (City of Modesto, supra, 119 Cal.App.4th at p. 38; In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, supra, 457 F.Supp.2d at p. 464, fn. 43.)

### 3. 1455 R Street - Chevron and Tesoro

Chevron admits that it supplied MTBE gasoline to the jobber serving the 1455 R Street station. (Motion at 8.) Tesoro also admits that it supplied MTBE gasoline to the jobber serving the 1455 R Street station. (Motion at 9.) In fact Pazin and Meyers, the jobber used by both Chevron and Tesoro, was the exclusive supplier of gasoline to this station, which was owned and operated by Brian Pazin, Mr. Pazin's brother. Although each defendant attempts to minimize the amount of MTBE gasoline it supplied to this station, and their involvement with the station, neither defendant argues that it supplied instructions to the station as to the proper handling of MTBE gasoline or steps to take to prevent, minimize and control releases of MTBE gasoline. Brian Pazin testified that he never received any "special training or instruction on MTBE and its potential to cause contamination . . . ." (Rule 56.1 Statement, ¶ 14.)

At a minimum there are disputed issues of material fact as to whether Shell, ExxonMobil, Chevron and Tesoro created, or assisted in the creation, of a nuisance at the R Street stations.

In short, Defendants were not only not forthcoming with what they knew about the risks of MTBE, they actively worked, within their own research departments and within their

9

associations, to downplay those risks and to develop information to counter what regulators had begun to learn about MTBE. This conduct by Defendants was a substantial factor contributing to the creation of the continuing nuisance and trespass at the R Street stations.[4]

## IV. Conclusion

For the foregoing reasons, Defendants' motion for partial summary judgment re nuisance and trespass should be denied.

Respectfully submitted,

Dated: May 7, 2013

**MILLER, AXLINE & SAWYER**
A Professional Corporation

By: _____
DUANE MILLER, Esq.
Attorney for plaintiff City of Merced Redevelopment Agency

---

[4] The discussion of nuisance in this opposition applies equally to the RDA's trespass claims. As defendants themselves acknowledge in their motion for partial summary judgement on the statute of limitations, the RDA, unlike the water districts involved in most MTBE cases, owns property that has been contaminated with MTBE. (See Defendants' Rule 56.1 Statement In Support of Motion For Partial Summary Judgement Re Statute of Limitations, ¶ 22.)