UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In Re:  Methyl Tertiary Butyl Ether ("MTBE")          MDL 1358 (SAS)
Products Liability Litigation

---

This Document Relates To:
*City of Merced Redevelopment Agency v. Exxon*
*Mobil Corp., et al., 08 Civ. 06306 (SAS)*

---

**PLAINTIFF CITY OF MERCED REDEVELOPMENT AGENCY'S AMENDED
LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS SUBMITTED IN
OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
RE NUISANCE AND TRESPASS**

Pursuant to Local Rule 56.1, plaintiff City of Merced Redevelopment Agency (the "RDA") submits this statement of rebuttal and additional material facts for which the RDA contends there is a genuine issue to be tried in support of the RDA's opposition to Defendants' motion for partial summary judgment re nuisance and trespass.

**Facts Regarding 1415 R Street**

1.    The RDA admits that the Shackelfords operated the station as a branded Mobil station selling Mobil gasoline from 1978 to 1984. (Sawyer Decl., Exh. 3, A. Shackelford Depo., pp. 7:12-22; 12:6-19; 13:24-14:12.) The RDA also admits that the Shackelfords owned and operated the R Street Exxon Station at 1415 R Street, but denies that this fact is admissible or relevant.

2.    Denied. Mr. Shackelford testified that after he purchased the station from Mobil, the Shackelfords entered into an agreement to *buy* Exxon gasoline from Courtesy Oil. (Sawyer Decl., Exh. 3, A. Shackelford Depo. (5/18/09) at 17:3-10.) All of the signs and branding materials then changed to Exxon. (*Id*. at 17:11-16.) Once the station changed to Exxon branding, the Shackelfords sold only Exxon gasoline. (*Id*. at 17:3-10, 17:22-18:10, 18:22-24.) The testimony cited by defendants does not establish that Courtesy Oil branded the station as an Exxon station.

3.    The RDA admits that Courtesy Oil delivered gasoline to the station. The Shackelfords bought gasoline from Courtesy Oil in order to obtain Exxon gasoline. (*See* Response to Paragraph 2 *supra*.)

4.    The RDA admits that there was no contract, but denies that this fact is admissible or relevant in light of the fact that the Shackelfords entered into an agreement to exclusively buy

Exxon gasoline and branded the station as an Exxon station. *See* Response to Paragraph 2 *supra*.

5.      The RDA admits that the Shackelfords sold the station to J.P. Randhawa in 1994, but denies that this fact is admissible or relevant.

6.      The RDA admits that Mr. Randhawa purchased gasoline from Curtesy Oil. Mr. Randhawa purchased gasoline from Curtesy so that he could obtain Exxon branded gasoline and so that he could display the Exxon logo on "dispensers, price sign, freeway sign," and that he was "authorized through Curtesy Oil by Exxon" to display the logo. (Shannon Decl., Exh. 1, Randhawa Depo. (8/26/09) at 72:1-16.)

7.      The RDA admits that Mr. Randhawa changed the brand name on his station from Exxon to Texaco in or around 1999, and that once the station became a Texaco, the gasoline supplier became Dickey Petroleum. (Shannon Decl., Exh. 1, Randhawa Depo. (8/26/09) at 13:6-10.)

8.      The RDA admits that Mr. Randhawa owned and operated the R Street Exxon/Texaco Station at 1415 R Street, but denies that this fact is admissible or relevant.

9.      The RDA admits that there was no contract, but denies that this fact is admissible or relevant in light of the fact that the Shackelfords entered into an agreement to exclusively buy Exxon gasoline and brand the station as an Exxon station. (*See* Response to Paragraph 6 *supra*.)

10.     Disputed. The 1415 R Street station operated as a Texaco/Shell branded station from 1999 to at least 2003 when MTBE was removed from gasoline. Mr. Randhawa testified that Texaco offered him $79,000 to become a Texaco station which helped finance the tank upgrades. (Shannon Decl., Exh. 1, Randhawa Depo. (8/26/09) at 16:6-22.) This "was the main reason" he changed from Exxon to Texaco "because they offered - - Texaco offered, I believe it

was, $79,000." (*Id.* at 16:6-22.)  Mr. Randhawa confirmed that the Texaco's name was on the

station and the dispensers once he change from an Exxon to Texaco station.  (*Id.* at 14:9-12.)

Mr. Randhawa testified, furthermore, that he "was able to take Texaco and Shell credit card . . ."

(*Id.* at 109:3-109:19.)

      11.     Admit.

**Facts Regarding 1455 R Street**

      12.     The RDA admits that Mr. Pazin owned and operated the 1455 R Street Station,

but denies that this fact is admissible or relevant.

      13.     Disputed.  Mr. Pazin initially purchased gasoline from Pazin Oil Company before

later purchasing gasoline from Pazin & Meyers.  (*See* Roy Decl., Exh. 8, R. Pazin Depo. at p.

17:17-22.)

      14.     The RDA admits that Mr. Pazin did not have a franchise agreement with any

defendants or purchase gasoline directly from these defendants, but denies that this fact is

admissible or relevant.  Defendants admit that Pazin & Meyers delivered gasoline to the 1455 R

Street station from a number of defendants including Chevron and Tesoro.  (*See* Defendants'

Rule 56.1 Statement at ¶¶ 17, 22-23.)  Richard Pazin, owner of Pazin & Meyers, confirmed that

he bought gasoline for distribution to Merced stations during the relevant time period, including

the Cardlock, from Chevron and Tesoro.  (Miller Decl., Exh. 3, R. Pazin Depo. (8/24/09) at 57-

59.)  There is evidence that gasoline manufactured by Exxon was delivered to the station.  (*See*

Paragraph 15 below.)  Brian Pazin testified, nonetheless, that he never received any "special

training or instruction on MTBE and its potential to cause contamination . . . (Sawyer Decl., Exh.

7, B. Pazin Depo. (8/25/09) at 132:1-25.)  Brian Pazin, moreover, was familiar with Material

Safety Data Sheets from his work at Pazin & Meyers. (*Id*. at 174:17-176:14.)]

Material Safety Data Sheets ("MSDSs") for MTBE gasoline for the relevant time period do not contain any of the warnings or precautions called out in the above memorandum. In the 1993 MSDS, there is not one single mention of the need to implement "spill containment manholes" to prevent releases of MTBE gasoline during deliveries that could result in significant groundwater contamination. (Boone Decl., Exh. 4, Material Safety Data Sheet (created February 16, 1993; revised June 30, 1994) at section 6.)

15.     The RDA admits that Exxon did not supply gasoline directly to the Cardlock station, but Exxon gasoline was delivered to the station through a jobber named New West Petroleum. Exxon admitted that it sold gasoline to New West Petroleum ("New West") from 1995-2000 for delivery to Merced stations. (Miller Decl., Exh. 4, Supplemental Responses of Defendant ExxonMobil Corporation to Special Interrogatories Propounded by Plaintiff City of Merced (Set Three) (Sept. 15, 2010) at Interrogatory No. 23.) Richard Pazin testified that New West was one of four gasoline suppliers used by Pazin & Meyers to supply Merced stations during the relevant time period. (Miller Decl., Exh. 3, R. Pazin Depo. (8/24/09) at 57:9-59:1.)

16.     The RDA admits that Chevron never owned or operated the station, but denies that this fact is admissible or relevant. There is testimony that gasoline manufactured by Chevron was supplied to the station. (*See* Paragraph 14 *supra*.)

17.     The RDA admits that Chevron never owned or operated the station, but denies that this fact is relevant. The RDA further disputes that cited testimony establishes that Chevron was not aware of the sale by Pazin & Meyers of Chevron gasoline to the station at 1455 R Street.

18.     The RDA admits that Richard Pazin testified as reported, but denies that this fact

is relevant.

19.     The RDA admits that Tesoro never owned or operated the station, but denies that this fact is admissible or relevant.  Tesoro admits that it supplied gasoline directly to Pazin & Meyers and to the station.  Brian Pazin testified, nonetheless, that he never received any "special training or instruction on MTBE and its potential to cause contamination ...."  (Sawyer Decl., Exh. 7, B. Pazin Depo. (8/25/09) at 132:1-25.)

20.     The RDA disputes this fact on the grounds that Defendants are relying upon testimony which was not disclosed during discovery in this matter.  Richard Pazin, owner of Pazin & Meyers and supplier to 1455 R Street, testified that he received gasoline MSDs from his suppliers, and provided them to his gasoline station customers.  (Miller Decl., Exh. 3, R. Pazin (8/24/09) at 34:23-35:2.)

21.     Disputed.  Richard Pazin, owner of Pazin & Meyers, testified that he bought gasoline for distribution to Merced stations during the relevant time period, including the Cardlock, from Tesoro.  (Miller Decl., Exh. 3, R. Pazin Depo. (8/24/09) at 57-59.)

22.     The RDA admits that Tesoro sold gasoline to Pazin & Meyers.  The RDA denies any implication that this fact suggests Tesoro gasoline was not delivered to the 1455 R. Street Station.  Pazin & Meyers sold gasoline to 1455 R Street.

23.     Admit.

**ADDITIONAL FACTS**

24.     The RDA's expert concerning underground storage tanks, Marcel Moreau, has decades of experience with storage and dispensing systems at gas stations, and provided a detailed history of defendants' knowledge concerning the problems of storing and handling

MTBE gasoline at service stations. (Shannon Decl., Exh. 2, Expert Report of Marcel Moreau (April 11, 2011), 1415 "R" Street section, pp. 1-8 and Shannon Decl., Exh. 3, 1455 "R" Street section pp. 1-10.)

25      California refiners, particularly Chevron's Northern California refinery, started adding MTBE to gasoline in 1986, and continued to utilize MTBE until the early 2000s when it was banned. (Shannon Decl., Exh. 4, May 4, 2000, Blagojevic Decl., *South Tahoe*.)

26      After supervising remediation of MTBE releases at Shell gasoline stations across the country for nearly twenty years, Curtis Stanley, an engineer and hydrogeologist at Shell, described MTBE as the "biggest environmental" issue facing United States oil companies. (Shannon Decl., Exh. 5, May 13, 1998, E-mail from C. Stanley to C. Parkinson; Exh. 6, Stanley Depo. (5/6/99) at 5:16-7:5.)

27      In 1981, Ben Thomas of Shell reported to an American Petroleum Institute ("API') committee that "approximately 20 percent of all underground storage tanks leak, leading to the possibility of groundwater contamination." (Shannon Decl., Exh. 7, March 31, 1981, Internal Arco Memo from R.N. Roth to MTBE File; Exh. 8, Thomas Depo. (11/15/00) at 89:17-90:9, *South Tahoe*].)

28.      Chevron and Shell were long standing members of API. (Shannon Decl., Exh. 9, Oct. 17, 2005, Letter from W. Hughes to R. Greenwald at 1; Exh. 10, Oct. 17, 2005, Letter from P. Condron to R. Greenwald at 1.) Ultramar, Valero's wholly owned subsidiary, was a member of API from approximately 1989 to 1993. (Shannon Decl., Exh. 11, Sept. 15, 2005, Letter from T. Renfroe to R. Greenwald.)

29.      Just a few years later, in 1984, API had already formed an Methyl-tertiary-Butyl

Ether Task Force ("MTBE Task Force") which held meetings concerning "emerging issue[s] of

MtBE in ground water." (Shannon Decl., Exh. 12, June 18, 1984, Memo from S. Cragg, API, to

MTBE Task Force.) The minutes of a June 1984 meeting state:

> "Some of the task force members indicated that MTBE had been found in ground
> water near leaking underground storage tanks from their service stations . . . It
> appears that the oxygenate components of gasoline, such as MTBE, migrate most
> rapidly underground . . ."

(*Ibid.*)

30.     Another memo reporting on the June 1984 API meeting also confirmed that

gasoline manufacturers were aware that "MTBE is a possible contaminant of groundwater,

especially in association with leaking gasoline storage tanks." (Shannon Decl., Exh. 13, June 14,

1984, Arco Chemical Company Internal Correspondence from B. Hoover to S. Ridlon at 1.)

31.     In 1986, Dr. Peter Garrett, Marcel Moreau, and Jerry B. Lowry of the Maine

Department of Environmental Protection drafted a paper entitled "Methyl tertiary Butyl Ether as

a Ground Water Contaminant" (the "Maine Paper") which was intended to be presented at an

API sponsored conference. (Shannon Decl., Exh. 14, at Cover and Table of Contents.) The

Maine Paper detailed multiple problems with releases of MTBE gasoline from service stations,

including:

(1) MTBE is more soluble in water and thus "spreads both further and faster than the

gasoline"

(2) "Groundwater contaminated with MTBE is difficult to remediate;"

(3) MTBE will migrate out beyond gasoline and appear as a "halo" around the gasoline

groundwater plume;

(4) relatively small spills of MTBE gasoline ("a small driveway spill") can result in "large" plumes of MTBE only groundwater contamination.

(*Ibid.*) The authors of the Maine Paper recommended that either MTBE be removed from gasoline or that several changes be made to USTs before MTBE gasoline is stored in them. (*Id.* at 236-237.)

32.      Valero admitted that its employees were aware of the Maine Paper at the time of its publication. (Shannon Decl., Exh. 15, Valero Corporate Representative Depostion, Early Knowledge and Taste & Odor at Early Knowledge Issues, ¶ 3(a).) Joel Masticelli, a member of Ultramar's upper management, testified that Ultramar received information on the environmental fate of MTBE gasoline from the API, the WSPA, and NPRA. (Boone Decl., Exh. 1, Masticelli Depo. (7/26/00) at 20-21, *South Tahoe*.)

33.      In June 1986, in a memo entitled "Marketing Environmental Concerns Regarding the Use of MTBE in MOGAS, D.W. Callahan, a Chevron employee, also noted that MTBE had "several disturbing properties." (Boone Decl., Exh. 2, June 11, 1986, Memorandum, from O.T. Buffalow, San Francisco, CA, to D.W. Callahan, re Marketing Environmental Concerning Regarding the use of MTBE in MOGAS at 1.) These "disturbing" properties included the high solubility and mobility of MTBE as compared to the regular components of gasoline. (*Ibid.*) Mr. Callahan specifically warned that "MTBE utilization could increase the costs to clean up leaks at service stations . . .(*Ibid.*)

34.      In December 1986, Chevron personnel circulated an article published in a oil industry trade publication reporting on significant MTBE groundwater contamination problems, highlighting, in particular, the Maine Paper and its call for changes to USTs at gasoline stations.

(Boone Decl., Exh. 3, Dec. 30, 1986, Memorandum re MTBE].)

35.     At the time Ultramar commenced distributing MTBE gasoline to its service stations in California , approximately 30-40 percent of its underground storage tanks had not yet been upgraded.  (Boone Decl., Exh. 1, Masticelli Depo.  (7/26/00) at 40:9-25, 41:1-23, *South Tahoe.*)

36.     Material Safety Data Sheet ("MSDS") regarding MTBE gasoline, for example, states as follows:

(1) under Accidental Release Measures, it contains no warnings regarding the unique capabilities of MTBE to contaminate a far greater amount than non-MTBE gasoline,

(2) it recommends using water to be sprayed on spills to reduce vapors which would cause the MTBE gasoline residue to be washed into the ground or adjacent sewers,

(3) for larger spills it merely recommends diking the spill "for later disposal",

(4) contains no requirements for special handling of MTBE gasoline (section 7),

(5) under physical and chemical properties, it states that the odor threshold is .25 parts per million, when in fact odors associated with MTBE in drinking water have been detected as low as 4 to 5 parts per billion.  Additionally, Material Safety Data Sheets state that there is "no data available" regarding the "degradability" of MTBE.  In fact, there is substantial evidence that MTBE is very resistant to biodegradation.  (Boone Decl., Exh. 4, June 30, 1994 Ultramar Material Safety Data Sheet.)

37.     When Ultramar first introduced MTBE into gasoline in California, it made no effort to provide a warning with the gasoline unless it was ordered to do so by the Government. (Boone Decl., Exh. 1, Masticelli Depo. (7/26/00) at 51:22-25, 52:1-11, *South Tahoe*].)

38.     In 1991, Chevron recognized that the introduction of MTBE into gasoline in California would substantially change the consequences of a gasoline spill or leak. (Boone Decl., Exh. 5, Aug. 12, 1991, Memorandum, TIP Letter #237, MTBE Effects.)  The internal memo warns that while non-MTBE gasoline plumes are "relatively easy" to address, "MTBE on the other hand is a different situation." (*Id*. at 1.)  The memo warns that MTBE gasoline releases will result in "larger" plumes of contamination that "will migrate" faster. (*Id*.)  Specifically, the memo warns Chevron management that "[w]hen MTBE gets into the water then the trouble really starts." (*Id*.)  The memo concludes that:

> "Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE.  The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run.  **As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent.**"

(*Id*. at 2.)

39.     Another 1991 Memorandum by Chevron notes multiple additional safety precautions and amended handling instructions need to be provided when MTBE gasoline is being stored and distributed, including at service stations.  The additional precautions and handling instructions identified by Chevron included: (1) "Spills or leaks of MTBE must be contained and prevented from contacting the ground or entering the waste water drainage system," (2) "Tanks containing MTBE should have double bottoms and leak detections systems," (3) "Provide proper facilities for shutdowns and tank cleaning to prevent any MTBE from being spilled or washing into the drainage system." (Boone Decl., Exh. 6, March 26, 1991, Memorandum, Chemical Entry Review for MTBE.)

11

40.     In 1993, in discussing the increased problem of MTBE groundwater contamination from service station releases, Curtis Stanley wrote to one of his colleagues: "We need to convince management to implement dual containment NOW!" (Boone Decl., Exh. 7, July 14, 1993, E-mail from C. Stanley to D. McGill [emphasis in original].)

41.     In the mid-1990s, Chevron also acknowledged that MTBE was driving factor to implement upgrades to USTs and improve instructions on storage and handling practices at service stations:

> "The USGS report points out that gasoline blended with MTBE may pose a greater risk to drinking water than non-oxygenated gasoline . . . . These concerns are not new, as Marketing raised the same issue <u>ten years ago</u> in connection with the Tank Integrity Program. . . .
> Marketing believes that MTBE in groundwater issue is just one more additional justification for the large Marketing capital investments in avoid terminal and service station leaks and spills."

(Boone Decl., Exh. 8, April 27, 1995, Memo re MTBE in Ground Water Issue.)

42.     In the late 1990s, Shell's environmental personnel were also looking at "MTBE Contamination" and "MTBE in Groundwater" issues.  Curtis Stanley, one of Shell's key environmental personnel, concluded that, based on "research . . . extremely small releases can cause groundwater problems." (Boone Decl., Exh. 9, May 14, 1998, E-mail from C. Stanley to K. Bell, et al.)

43     Stanley later advised that "**[v]ery small releases** of MTBE (even small overfills seeping into cracks in the pavement) have the potential to adversely impact groundwater." (Boone Decl., Exh. 10, Nov. 3, 1998, E-mail from C. Stanley to J. Pedley.)  Mr. Stanley further stated that "[m]y professional opinion is that MTBE . . . should not be used at all in areas where groundwater is a potential drinking water supply." (*Id.*)

12

44.     In the late 1990s, Exxon undertook a "study" to identify sources of potential

releases from gasoline stations "because MTBE contamination is increasingly being found in

surface and ground waters near gasoline stations, and has been identified as a potential threat to

public drinking water supply systems." (Boone Decl., Exh. 11, March 30, 1999, MTBE Release

Source Identification at Marketing Sites, at 2].)  The study noted that "[t]he presence of MTBE

found in surface, ground and drinking waters has been increasing [and] . . . [t]here are several

reasons why increased MTBE presence can be concern." (*Id* at 2.)  Exxon's study specifically

concluded that "[s]mall leaks of gasoline (**1 teaspoon**) can translate into MTBE ground water

concentrations above the taste and odor detectable threshold levels." (*Id.* [emphasis added].)  In

fact, the Exxon study included a graphic representation of the potential impact of "small

releases" of MTBE on groundwater. (*Id.* at Figure I-1: Impact of Small Releases.)

45.     Similarly, in the late 1990s, Curtis Stanley of Shell also pointed out that "[v]ery

small releases of MTBE . . . have the potential to adversely impact groundwater." (Boone Decl.,

Exh. 10, Nov. 3, 1998, E-mail from C. Stanley to J. Pedley at ¶ 1].)  Mr. Stanley further candidly

admitted that MTBE gasoline should not be sold on an indiscriminate basis to gasoline stations

where there is inadequate protection from spills, leaks and releases:

> My professional is opinion is MTBE and similar oxygenate should not be used at
> all in areas where groundwater is a potential drinking water supply.  If it is used,
> engineering design and site operations (including act of subsurface monitoring)
> should be carefully developed to minimize the potential for release.

(*Ibid.*)

46.     In 1999, Chevron's personnel put together a "White Paper" on MTBE intended to

address questions about stricter regulation of underground storage tanks. (Boone Decl., Exh. 12,

Solving Problems from MTBE Contamination - It's Not Just Regulating Underground Tanks.)

Chevron's White Paper specifically observed that [i]t is because of the differences in physical

and chemical properties of MTBE that it is more likely to reach groundwater [at service stations],

as a result of incidental spills, overfills and gasoline deliveries, even without underground storage

tank leaks." (*Id.* at 2 [emphasis in original].)  Chevron thus also recognized that even small

"incidental" spills and releases, caused by individual handling gasoline at the station, had the

capacity to reach and contaminate groundwater.  More importantly, these types of leaks are only

preventable through appropriate education and instruction of the individuals handling the

gasoline.

47.     In 1999, Curtis Stanley also observed that MTBE releases capable of causing

groundwater contamination arose not from the USTs themselves, but from improper handling

practices at gasoline stations by owners, operators, and jobbers:

> "You may, however, want to carefully consider what you say when the new tank
> upgrades are our first line of defense.  While this is very true and the size of leaks
> has decreased substantially over the years, we are still finding MTBE at sites that
> have been upgraded.  The presence of MTBE may not be due to a leak but could
> also be due to operational and construction factors."

(Boone Decl., Exh. 13, Feb. 2, 1999, E-mail from C. Stanley to F. Benton].)

48.     Shell's engineering coordinator, Glen Marshall, echoed the caution that releases

of MTBE gasoline at service stations was dependent on improved and alternative instructions as

well as upgrades of the entire UST system.  In 1998, Mr. Marshall warned that the "'Achilles

Heel'" of [UST] systems has always been the 'Bubba-factor' . . . the best intentions of hardware

manufacturers and designers being ultimately defeated by poor installation and maintenance

practices." (Boone Decl., Exh. 14, May 29, 1998, E-mail from G. Marshall to C. Stanley.)  The

maintenance practices Mr. Marshall is referring to are clearly the maintenance practices of service station owners and operators. A year later, Mr. Marshall continued to advised that "[u]pgrades addressed the inadvertent spills and releases, no root causes of tank or line leaks." (Boone Decl., Exh. 15, March 12, 1999, E-mail from G. Marshall to C. Stanley.)

49.     The RDA's expert on underground storage tanks ("USTs"), Marcel Moreau, noted that defendants upgraded their gasoline storage systems, including upgrading from bare steel USTs to fiberglass, at their own gasoline stations in an effort to address the increased risks posed by MTBE. (Miller Decl., Exh. 1, Expert Report of Marcel Moreau (April 11, 2011) at section III, pp. 16-23.) Defendants were, in fact, aware of numerous upgrades to USTs, safety devices, warning systems, and alternative and improved instructions to service station owners and operators as well as jobbers who delivered gasoline, that were necessary to prevent releases of MTBE gasoline which would contaminate groundwater in Merced. (*Ibid.*)

50.     The Merced gasoline stations at issue in this motion, unaware of the need for fiberglass tanks or other upgrades, continued to utilize inadequate bare steel UST systems well past the time when MtBE was prevalent in California gasoline. (*Id*) The evidence shows that many, if not all, of the station owners and operators associated with stations at issue were unsophisticated, and relied upon others, including defendants, to instruct them on how to safely and properly operate and maintain their USTs and gasoline. (*Ib.*)

51.     The California regulatory authorities responsible for oversight of releases from underground storage tanks were not advised by the oil industry until the late 1990s that MTBE poses a serious threat to groundwater and drinking water in the State of California. (Sawyer Decl., Exh. 1, June 25, 1996, Letter from P. Pugnale, Shell Oil Company, to R. Ghirelli,

California Regional Water Quality Control Board; and Sawyer Decl., Exh. 2, Letter from C

Flanikan, Ultramar to California Environmental Protection Agency.)

52.     Oil industry defendants upgraded their gasoline storage systems ("USTs"),

including upgrading from bare steel USTs to fiberglass, at their own gasoline stations in an effort

to address the increased risks posed by MTBE.  (Miller Decl., Exh. 1, Expert Report of Marcel

Moreau (April 11, 2011) at section III, pp. 16-23.)

53.     Tesoro was aware that MTBE was a groundwater contaminant as early as 1996.

(Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C. Donovan at 32:1-34:9, and

Deposition Exhibit 7 (March 31, 1995 letter from Bruce Bauman).

54.     Tesoro was engaged in the 1990's in remediation of multiple stations with MTBE

contamination. (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C. Donovan at

103:11-18.)

55.     Tesoro received reports on and attended conferences at which MTBE's

characteristics were discussed.  (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C.

Donovan at 32:1-34:9.)

56.     Tesoro has been a member of the API from at least 1999, and interacted with API

prior to becoming a member.  These interactions included receiving information from API on

MTBE and its impacts on groundwater.  (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of

Robert C. Donovan at 32:1-34:9, and Deposition Exhibit 7 (March 31, 1995 letter from Bruce

Bauman.)

57.     Tesoro has also been a member of the National Petrochemical Refiners

Association since 1971. (Sawyer Decl. Exh. 34, 10/17/05 Letter from D. Martin to R.

Greenwald, Tesoro Trade Organization Information Disclosure.)

58.    Tesoro, however, took no special measures to prevent MTBE contamination.  In fact, Tesoro, despite its knowledge, elected to treat gasoline with MTBE no differently than gasoline without MTBE.  (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C. Donovan at 112:9-115:8.)

59.    An API research proposal, sponsored by an Exxon representative, would have studied the "Fate, Transport, [and] Impact of Gasoline Containing Oxygenates in Groundwater" in order to "respond to regulatory agencies considering the promulgation of more stringent environmental regulations governing oxygenates in gasoline." (Sawyer Decl., Exh. 6, 1988 Health & Environmental Project Proposals.)

60.    A year later yet another API research proposal reiterated the need for industry to respond to the claims that MTBE gasoline warranted special handling, stating bluntly:  "At present, industry has no scientific data to refute these claims."  The proposal conceded that there was "a downside risk that the results may show that oxygenates, to some extent, increase groundwater contamination problems from gasoline leaks and spills."  (Sawyer Decl., Exh. 8, API Memo dated February 16, 1988.)

61.    The RDA's complaint alleges that the defendants' "negligent, reckless, intentional and ultra-hazardous activity, including failure to warn of properties of MTBE and the need to take special precautions when handling MTBE, were a substantial factor in creating a nuisance." (Sawyer Decl., Exh. 9, excerpts from First Amended Complaint.)

62.    On December 17, 1986, EPA held a "public focus meeting" for MTBE.  This meeting was attended by representatives of ARCO Chemical Co., Exxon, Texaco, API, and

others.  The minutes of that meeting make clear that EPA brought to the group's attention the

agency's concern about groundwater contamination:

> An additional concern brought out by [EPA] research was the
> contamination of ground water supplies by MTBE.  There are over
> 700,000 underground storage tanks for petroleum products in the
> US and about 30% of these tanks leak.

(Sawyer Decl., Exh. 10, Minutes for the Public Focus Meeting (NJDEP-MTBE-CONTENTION-

000100-000105)).

    63.    Defendants' response to growing concern about MTBE contamination of

groundwater was to stonewall.  An internal Chevron memo summarized the situation as follows:

> Because of the perceived health effects, local and state regulatory agencies are
> concerned with the clean-up of ground water containing MTBE . . . Two
> considerations impact MTBE.  One is the potential health risk, and the second is
> the increased solubility over [BTEX compounds]. . . MTBE is significantly more
> soluble in water than BTEX.  Consequently, the dissolved 'halo' from a leak
> containing MTBE can be expected to extend farther and spread faster than a
> gasoline leak that does not include MTBE as one of the constituents. . . . Further
> compounding the problem . . . MTBE is more difficult to remove from ground
> water using current technology . . .  Cleanup of a gasoline leak/spill containing
> MTBE can be expected to initially cost more in capital and O&M than a
> conventional gasoline leak/spill.
>
> Industry representatives from Arco, Exxon . . . and Texaco met with EPA in
> December, 1986 at a 'focus meeting' to discuss MTBE.  ARCO's representative
> felt the EPA's major concern was the potential for ground water contamination . .
> . Manufacturers of MTBE are attempting to establish an industry group to
> 'negotiate' the test rule with EPA . . . Chevron has experience in three states
> involving clean-up of ground water containing MTBE (Florida, Maryland and
> Texas). . . . The possible move to restrict the use of MTBE in Maine appears to
> be an isolated action and not a trend.  However, this could change if other states
> perceive the threat to ground water to be great or if Maine becomes exceptionally
> vocal .

(Sawyer Decl., Exh. 11, Memorandum dated February 13, 1987 (NJDEP-MTBE-

CONTENTION-000055-000057)).

64.    At ARCO's initial request (NJDEP-MTBE-CONTENTION-000106), the API's

Groundwater Technical Task Force (whose members included representatives of ARCO, Exxon,

Shell, Chevron, Texaco, and BP, among others), attacked the Maine Department of

Environmental Protection article even though they knew based on their own experiences that the

authors were correct:

> The authors' "recommendations" that MTBE... be either banned as gasoline
> additives or required double-lined storage tanks is clearly a policy statement and
> not an objective, credible scientific conclusion. Furthermore, data presented in
> this paper as well as those generated by ongoing API research indicate that such a
> policy is reactionary, unwarranted and counterproductive.

(Sawyer Decl., Exh. 12, Memorandum dated January 8, 1987 (NJDEP-MTBE-

CONTENTION-000106) and API letter dated January 28, 1987 (NJDEP-MTBE-

CONTENTION-000050-000051) .)

65.    Slightly over a month later, in its comments on EPA's listing of MTBE under

TSCA, Arco Chemical Company again simply denied there was any problem, insisting to EPA

that

> Where gasoline containing MTBE is stored at refineries, terminals, or service
> stations, there is little information on MTBE in groundwater. We feel that there
> are no unique handling problems when gasoline containing MTBE is compared to
> hydrocarbon-only gasoline.

(Sawyer Decl., Exh. 13, ARCO Chemical Company letter dated February 12, 1987 (NJDEP-

MTBE-CONTENTION-000052-000054) and Miller Decl., Exh. 2 (Cracker-Barrel Meeting

Remarks.)

66.    The MTBE producers -- including ARCO, Exxon and Texaco -- formed an

"MTBE Committee" to deal with potential regulatory concerns about MTBE. In contrast to their

19

internal concerns about MTBE, the Committee submitted formal comments to EPA insisting that

MTBE posed _no_ environmental problems and arguing that environmental testing would be

unnecessary and counter-productive in view of MTBE's lack of environmental risks:

> We believe that the information provided supports the conclusion that MTBE does not represent a drinking water hazard...

> The following discussion establishes that there is no evidence that MTBE poses any significant risk of harm to health or environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exist to reasonably determine or predict that the manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data.

> (Sawyer Decl., Exh. 14 at NJDEP-MTBE-CONTENTION-000058-000066).)

67.     Starting in January 1987 the API's Groundwater Technical Task Force considered

a series of research proposals regarding MTBE.  One such proposal, initially submitted by an

ARCO representative on the Task Force, noted

> There has recently been a dramatic increase in regulatory interest/concern over these alcohols/ethers in groundwater.  Maine is considering banning the use of MTBE.  Without field data to address the concerns of the regulatory community, regulatory action can be expected (probably within a 1-3 year time frame.)....  If the research is not conducted, there will be few credible data to support industry's contention that such octane enhancers do not constitute a significant new groundwater contamination threat as constituents of gasoline.

> (Sawyer Decl., Exh. 15 at NJDEP-MTBE-CONTENTION-000107.)


                                        Respectfully submitted,

Dated: May 7, 2013                      **MILLER, AXLINE & SAWYER**
                                        A Professional Corporation


                          By:   _____

                                    20

DUANE MILLER, Esq.
Attorney  for plaintiff City of Merced
Redevelopment Agency
MILLER, AXLINE & SAWYER
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688