UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

Master File No. 1:00–1898
MDL 1358 (SAS)
M 21-88

---

**This document relates to:**

*City of Merced Redevelopment Agency v. Exxon
Mobil Corp., et al.,* 08 Civ. 06306 (SAS)

---

## DECLARATION OF A. CURTIS SAWYER IN SUPPORT OF PLAINTIFF CITY OF MERCED REDEVELOPMENT AGENCY'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE NUISANCE AND TRESPASS

1

I, A. Curtis Sawyer, hereby declare:

1.      I am one of the attorneys in this case for plaintiff City of Merced Redevelopment Agency.  I have been personally involved in much of the discovery and pretrial proceedings in this action.  This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a June 25, 1996, Letter from P. Pugnale, Shell Oil Company, to R. Ghirelli, California Regional Water Quality Control Board.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a letter dated September 29, 1997, from C.E. Flanikan, Ultramar, to California Environmental Protection Agency with attachment.

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the deposition of Arvel Shackelford taken May 18, 2009, in *City of Merced.*

5.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the deposition of Robert C. Donovan taken August 31, 2000, in *South Tahoe Public Utility District.*

6.      Attached hereto as Exhibit 5 is a true and correct copy of a letter dated October 17, 2005, from Diana Pfeffer Martin to Robin Greenwald.

7.      Attached hereto as Exhibit 6 is a true and correct copy of 1988 Health & Environmental Project Proposals.

8.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the deposition of Brian Pazin taken on August 25, 2009, in *City of Merced.*

9.      Attached hereto as Exhibit 8 is a true and correct copy of American Petroleum

2

Institute Memorandum dated February 16, 1988, from David Chen.

10.     Attached hereto as Exhibit 9 is a true and correct copy of relevant portions of the First Amended Complaint filed on March 4, 2013.

11.     Attached hereto as Exhibit 10 is a true and correct copy of Minutes for the Public Focus Meeting dated December 17, 1986.

12.     Attached hereto as Exhibit 11 is a true and correct copy of a Memorandum dated February 13, 1987, to O.B. Smith.

13.     Attached hereto as Exhibit 12 is a true and correct copy of a Memorandum dated January 8, 1987, to Bob Drew from Judy Shaw.

14.     Attached hereto as Exhibit 13 is a true and correct copy of a letter dated February 12, 1987, to Beth Anderson and a Jan 28, 1987 Letter from D. Chan to J. Lehr.

15.     Attached hereto as Exhibit 14 is a true and correct copy of a letter dated February 27, 1987, to Beth Anderson.

16.     Attached hereto as Exhibit 15 is a true and correct copy of a 1988 Health & Environmental Project Proposal.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of May, 2013, at Sacramento, California.

_____
A. CURTIS SAWYER

3

# EXHIBIT 1

**Shell Oil Products Company**    

P O Box 4848
Anaheim CA 92803

811 Wilshire Boulevard Street
Anaheim CA 92803

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

JUNE 25, 1996

Dr. Robert Ghirelli, Executive Officer
California Regional Water Quality Control Board
Los Angeles Region
101 Centre Plaza Drive
Monterey Park, CA 91754-2156

RE: Methyl Tertiary Butyl Ether (MTBE) Pollution Investigation - City of Santa Monica
Charnock Well Field (Your File NO. 96-042)

Dear Dr. Ghirelli:

The following information is furnished in response to your letter on this subject to Ms. Karen Haynes dated May 23, 1996. It responds to the specific information requested by Appendix A in your May 23 letter and provides it in the sequence that information is requested.

MTBE INFORMATION

Shell Oil Company SU2000E Gasoline, introduced in the first quarter of 1990, was the first Shell gasoline manufactured, transported or sold in California that contained MTBE. All Shell gasolines manufactured, transported and sold in California contained MTBE after October, 1992. Shell refineries located in Texas and Louisiana intermittently used MTBE to enhance gasoline octane levels beginning in early 1980. It is possible, but very unlikely, that these refineries supplied some tiny percentage of the gasoline Shell marketed in California in the 1980's. (Shell had three refineries located on the West Coast that supplied almost all of Shell's product throughout this period.) In addition, Shell occasionally purchased small amounts of gasoline on the open market to fulfill its needs. Since our purchase specifications did not reference MTBE during the 1980's and early 1990's, it is also possible that some of that purchased gasoline contained MTBE.

Enclosed as Attachment I are two documents authored by Mr. James M. Davidson of Alpine Environmental, Inc., Fort Collins, Colorado. These documents deal specifically with technical aspects associated with the issue of MTBE in ground water. Shell has no information about MTBE of any real significance to the issue of MTBE in ground water that is not adequately addressed in Mr. Davidson's work.

PIPELINE INFORMATION
(Shell Pipe Line Corporation)

The Shell Pipe Line Corporation owns and operates the Ventura Products Pipeline located in a right-of-way within Sawtelle Boulevard. This pipeline lies immediately to the east of the Charnock Field as depicted on the sketch that accompanied your May 23 letter. A map showing the location of the sections of the Ventura Products

00035

EXHIBIT 2

Pipeline within a two mile radius of the Charnock Field is enclosed as Attachment II. This pipeline has been exclusively owned by the Shell Pipeline Corporation since prior to January 1, 1980, and has transported only Shell gasolines from that date to the present time.

Shell Pipeline Corporation also owns and operates the Ventura Crude Pipeline a small segment of which is located within acre one and one-half miles of the Charnock Field. We have not included a map of this pipeline because it has never transported any substance that contains MTBE. The Ventura Crude Pipeline has been exclusively owned and operated by the Shell Pipeline Corporation since prior to January 1, 1980.

Copies of profile drawings for sections of the Ventura Products Pipeline located within two miles of the Charnock field are enclosed as Attachment III. These profile drawings show materials of construction, dates of installation and burial depth. The operational capacity of the segment of the line under discussion is approximately 725 barrels per hour.

No California Pipeline Safety Act hydrostatic tests have indicated that the line leaked. Copies of the tightness certification for tests performed in 1988 and 1993 are enclosed as Attachment IV. The Ventura Products Pipeline is continuously monitored whenever it is in operation. Pressure readings are compared via computer at intervals of less than 60 seconds. All recorded anomalies are investigated. None were found to be the result product releases.

Our records do not contain any indication of a product release within two miles of the Charnock field nor any indication of contaminated soil along the Ventura Products Pipeline right-of-way. Moreover, discussions with appropriate maintenance and operating personnel responsible for the Ventura Products Pipeline provided no indication of contamination.

Appendix A concludes with a request for a technical report that details an active program to evaluate the length of all petroleum pipelines within two miles of the Charnock Well Field. We believe it is inappropriate to perform any evaluation of the Ventura Crude Pipeline because it has never transported any substance that contains MTBE and because it's closest point is over mile and one-half from the Charnock Field. We will take immediate steps to evaluate the Ventura Products Pipeline. The next California Pipeline Safety Act hydrostatic test of this pipeline is scheduled for 1998. However, we will now make arrangements to perform a California Pipeline Safety Act test of the segment within approximately two miles of the Charnock field during the third quarter of 1996. We will provide you with the results of this test immediately thereafter. Should these test results indicate that further evaluation is warranted, we will then provide a detailed description of our proposed follow-up investigation.

UNDERGROUND GASOLINE STORAGE TANKS INFORMATION:
(Shell Oil Products Company)

There are three operating Shell stations in the list of sites located within the one-mile radius from th'  Charnock Wellfield. The three Shell stations are at the following locations:
1. 3500 Centinela, Los Angeles
2. 10815 National, Los Angeles
3. 3801 Sepulveda, Culver City

Attachment V contains the summary report addressing the items listed in Appendix A regarding underground gasoline storage tanks.

We believe that the foregoing provides all the information requested by Appendix A. Should you or your staff have any further questions, please contact our Carlton Jordan at (310) 816-2060 for matters related to the Ventura Products Pipeline or Karen Haynes at (714)-520-3395 for matters related to Shell service stations.

00036

Yours truly,

FOR SHELL PIPE LINE CORPORATION:

L. W. Alexander, Manager
Environmental and Technical

FOR SHELL OIL PRODUCTS COMPANY:

P. J. Pugnale, Manager
Engineering, Western Region

TFM
KGH

.00037

# EXHIBIT 2



**ULTRAMAR DIAMOND SHAMROCK**
C O R P O R A T I O N



Charles E. Flaniken,
Manager, Quality Control

September 29, 1997

California Environmental Protection Agency
San Francisco Bay Regional Water Quality Control Board
2101 Webster Street
Suite 500
Oakland, CA 94612

Gentlemen:

RE: Request for Information on Gasoline Additives, Letter dated July 29, 1997

As requested in your letter to Mr. Terry Fox of Ultramar Inc., here is a report detailing additives introduced into gasolines distributed in the San Francisco Bay Area by Ultramar Inc. and its predecessor companies during the period from 1978 - 1997.

We have attempted to provide all the information you requested. Kevin Graves of your staff was very helpful in clarifying the scope of your information gathering. If you have questions about the information included in the report, you may contact me directly at the telephone number listed on the letterhead below.

Respectfully,

C. E. Flaniken

C. E. Flaniken
Manager, Quality Control

cc: T. Fox, S. Epperson (no attachment)

P.O. Box 696000, San Antonio, Texas 78269- 6000 - (210) 530-8516 / Fax (210) 530-8856

# ULTRAMAR DIAMOND SHAMROCK
## GASOLINE ADDITIVES
## SAN FRANCISCO BAY AREA, 1978 - 1997
### October 1, 1997

Prepared for: San Francisco Bay Regional Water Quality Control Board
By: Charles E. Flaniken, Quality Control Manager

# Table of Contents

|  | Page No. |
|---|---|
| Scope | 1 |
| General Business Information | 1 |
| San Francisco Bay Area Business Activities | 1 |
| Brief History of Gasoline Additization in California | 2 |
| Ultramar Inc. Gasoline Additives, San Francisco Bay Area | 3 |
| Purchased/Exchanged Gasolines | 8 |
| Methodologies for Determining Additives in Soil and Water | 9 |
| Other Sources of Information | 10 |
| Further Information | 10 |

**Appendix**

| | |
|---|---|
| Ethanol, Fuel Grade | A-1 |
| DMA 67Y | A-23 |
| Tolad MFA-10 | A-31 |
| OGA 476PL | A-37 |
| Lubrizol 8195C | A-47 |
| OGA 477 PL | A-55 |
| Lubrizol 8192S | A-65 |
| Lubrizol 8247E | A-73 |
| MTBE | A-84 |

## Scope

This report is in response to your letter to Mr. Terry Fox of Ultramar Inc. dated July 29, 1997. In addition to the specific information requested about the identity, period of use, concentration, name of supplier, and available health & safety data for the various additives introduced into gasolines at the direction of Ultramar Inc. and its predecessor companies during the last 20 years, we will offer a brief overview of our business activities in the San Francisco Bay Area, discuss limitations to the data provided, and offer suggestions for other sources of information about other additives potentially included in the San Francisco Bay Area.

## General Business Information

Ultramar Diamond Shamrock is an independent oil company with headquarters in San Antonio, Texas. Through our subsidiary company, Ultramar Inc., and its predecessor companies, we have refined and marketed gasoline products in California for more than 65 years. We currently own and operate one refinery in California, located in Wilmington, CA. We operate more than 150 company owned service stations, identified with the Beacon or Ultramar brands, throughout the state and supply an additional 200 stations through Branded Contract agreements. Although we neither own nor operate any gasoline distribution terminals, we do supply product to the independent petroleum market through a number of third party terminals.

## San Francisco Bay Area Business Activities

Our business activities in the San Francisco Bay Area during the years 1978 – 1997 have been exclusively the additization, transportation, and marketing of petroleum products. We have never owned or operated a refinery or petroleum distribution terminal in the San Francisco Bay Area. We currently operate 47 company owned service stations in the greater San Francisco Bay Area distributed as follows:

1

| County | Number Company Owned Stations |
|---|---|
| Alameda | 6 |
| Contra Costa | 7 |
| Marin | 0 |
| Napa | 4 |
| San Francisco | 0 |
| San Mateo | 0 |
| Santa Clara | 9 |
| Santa Cruz | 9 |
| Solano | 5 |
| Sonoma | 7 |
| Total | 47 |

## Brief History of Gasoline Additization in California

Until 1992, gasoline additization was a matter of choice in California. No Federal or State regulations directly required the use of any type of gasoline additive. Use of additives was primarily dictated by (1) their effectiveness in achieving or maintaining compliance with general petroleum product specifications, such as ASTM specifications, (2) recommendations or requirements of OEMs, or (3) marketing considerations.

Over the years, additives have been injected into gasolines at a variety of points in the gasoline manufacturing and distribution system. Additives can be injected into gasoline blending components at the refinery (i.e. antioxidants), used as a blending component at the refinery (i. e. MTBE and other ethers), used as a blendstock at terminal transport truck loading racks (i.e. ethanol), and injected into finished gasolines at terminal transport truck loading facilities (i.e. fuel system detergent additives)

Although there were no direct requirements to use additives, beginning in the early 1970's provisions of the Federal Clean Air Act required additive manufacturers to register additives that were intended for use in transportation fuels with the Office of Fuel and Fuel Additive Registration.

The regulation also required fuel manufacturers to register all additives added to transportation fuels through their direct actions or under their direction and to report such use on a quarterly basis.

The use of detergent additives and oxygenates was mandated by Federal and State regulations beginning in 1992. Additive packages effective in controlling engine deposits were required in California by CARB regulation beginning in January, 1992. A part of the CARB detergent additive regulation required registration of all detergent additives intended for use by fuel suppliers and certification of all potential gasoline detergent additives by CARB staff.

Beginning in November, 1992, all California gasolines were required to have a minimum oxygen content of 1.8 wt% during the winter months to satisfy the requirements of both Federal and State Clean Air regulations. This necessitated the widespread use of oxygenates in California gasolines. Prior to this time, oxygenates were blended voluntarily for business purposes.

The use of detergent additives and oxygenates has been modified by subsequent regulations including Federal detergent additive regulations effective in January, 1994 and July, 1997, Federal RFG requirements effective in parts of California beginning in January, 1995, and CARB RFG regulations effective March, 1996.

## Ultramar Inc. Gasoline Additives, San Francisco Bay Area

Ultramar Inc. additization activities in the San Francisco Bay Area have been confined exclusively to additization of gasolines or non-oxygenated blendstocks at transport truck loading facilities located in third party terminals. Since we have not owned or operated these facilities, our role has always been an indirect one, selecting additives individually or jointly with other users of the system and monitoring and reporting use of the additives as required by good business practice and/or governmental regulation.

Since all of the gasoline sold by Ultramar Inc. and predecessor companies in the San Francisco Bay Area was refined and/or imported by other companies and was obtained by purchase from or exchange with another company, the

following list does not include additives that may have been added by others parties prior to our ownership of the gasolines or non-oxygenated blendstocks. A discussion of additives in purchased or exchanged gasolines is included in a later section, "Purchased/Exchanged Gasolines".

The following table lists the commercial or brand name of the additive, manufacturer, purpose for use, and approximate period of use in San Francisco Bay Area gasolines listed in chronological order. Additional notes on each additive follow the table and MSDS data for each additive are included as attachments.

Prior to 1981, no additives of any kind were added by Ultramar Inc. or its predecessor companies to gasolines sold in the San Francisco Bay Area. Nor did Ultramar Inc. or its predecessor companies direct others to inject additives specified by Ultramar Inc. into gasolines sold in the San Francisco Bay Area prior to 1981.

## Ultramar Inc. Gasoline Additives, 1981 - 1997

| Additive Name | Manufacturer | Purpose | Estimated Dosages | Period |
|---|---|---|---|---|
| Ethanol, Fuel Grade | Various | Octane Improver & Oxygenate | 0 - 10 vol% | 1981 - 1991 |
| DMA 67Y | E. I. Dupont | Detergent & Corrosion Inhibitor | 0 - 52 mg/l | 1986 - 1991 |
| Tolad MFA-10 | Petrolite | Detergent & Corrosion Inhibitor | 0 - 30 mg/l | 1991 |
| OGA 476PL | Chevron Chemical Co. | Detergent & Corrosion Inhibitor | 0 - 877 mg/l | 1991 - 1995 |
| Ethanol, Fuel Grade | Various | Octane Improver & Oxygenate | 0 - 6.2 vol% | 1992 - 1995, Oct. - Feb. |

4

## Ultramar Inc. Gasoline Additives, 1981 - 1997 (continued)

| Additive Name | Manufacturer | Purpose | Estimated Dosages | Period |
|---|---|---|---|---|
| 8195C | Lubrizol Corp. | Detergent & Corrosion Inhibitor | 0 - 528 mg/l | 1993 - 1995 |
| OGA 477PL | Chevron Chemical Co. | Detergent & Corrosion Inhibitor | 0 - 483 mg/l | 1995 - 1996 |
| 8192S | Lubrizol Corp. | Detergent & Corrosion Inhibitor | 0 - 321 mg/l | 1995 - 1997 |
| 8247E | Lubrizol Corp. | Detergent & Corrosion Inhibitor | 0 - 184 mg/l | 1997 - |

**Ethanol, Fuel Grade (MSDS included):**  Used as a gasoline extender and octane booster in a portion of the gasolines distributed by Ultramar Inc. during the period from 1981 - 1991.  The ethanol used was supplied by a variety of suppliers, primarily Archers Daniel Midlands (ADM).  Denatured fuel grade ethanol was blended into gasolines at 10 vol% at terminal transport truck loading racks during the years 1981 - 1991 and at 6.2 vol% from 1992 - 1995.  While ethanol blended gasoline was sold at most company operated Beacon and Ultramar branded stations, gasolines without ethanol were also available at the option of independent branded dealers and other wholesale customers.

**DMA 67Y (MSDS included):**  Added by ethanol suppliers to ethanol used for blending into a portion of the gasolines distributed by Ultramar Inc.  in  the San Francisco Bay Area from 1986 - 1991.  DMA 67Y is a multifunctional additive manufactured by E. I. Dupont de Nemours, providing detergency and corrosion inhibition.  This additive was included in the ethanol blended into gasolines as described above.  Fuels blended with 10 vol% fuel grade ethanol

5

containing DMA 67Y yielded a concentration of about 51 mg/l of DMA 67Y in the finished blend. Not all gasolines distributed by Ultramar Inc. during the period contained DMA 67Y (See the discussion of fuel grade ethanol above.)

**Tolad MFA-10 (MSDS included):** Added to a portion of the gasolines distributed by Ultramar Inc. in the San Francisco Bay Area during 1991. Tolad MFA-10 is a multifunctional additive manufactured by Petrolite, providing detergency and corrosion inhibition. This additive was injected into gasolines by computer controlled systems at terminal transport truck loading racks at a dosage of about 30 mg/l. Tolad MFA-10 was not added to all gasoline sold in the San Francisco Bay Area in 1991. As additive injection systems were installed in third party terminals prior to CARB additive regulations taking effect in January, 1992, MFA-10 was introduced into gasolines distributed by Ultramar Inc. OGA 476PL was substituted for Tolad MFA-10 late in 1991.

**OGA 476PL (MSDS and Product Data sheet included):** Added to a portion of the gasolines distributed by Ultramar Inc. in the San Francisco Bay Area from 1991 - 1995. OGA 476PL is a multifunctional additive manufactured by Chevron Chemical Company, providing detergency and corrosion inhibition. This additive was injected into gasolines by computer controlled systems at terminal transport truck loading racks. OGA 476PL was not added to all gasoline sold in the San Francisco Bay Area from 1991 - 1995. OGA 476PL was replaced by Lubrizol 8195C in some gasolines supplied to the San Francisco Bay Area beginning in 1993 and replaced by OGA 477PL in other gasolines beginning in 1995. The maximum average dosage of OGA 476PL from a single supply terminal for a one month period between 1991 and 1995 was 877 mg/l.

**Lubrizol 8195C (MSDS and Product Data sheet included):** Added to a portion of the gasolines distributed by Ultramar Inc. in the San Francisco Bay Area from 1993 -1995. Lubrizol 8195C is a multifunctional additive manufactured by Lubrizol Corporation, providing detergency and corrosion inhibition. This additive was injected into gasolines by computer controlled systems at terminal transport truck loading racks. Lubrizol 8195C was not added to all

6

gasoline sold in the San Francisco Bay Area from 1993 - 1995.
Lubrizol 8195C replaced OGA 476PL in some gasolines supplied to
the San Francisco Bay Area beginning in 1993. Lubrizol 8195C was
replaced by Lubrizol 8192S in 1995. The maximum average dosage of
Lubrizol 8195C from a single supply terminal for a one month period
between 1993 and 1995 was 528 mg/l.

**OGA 477PL (MSDS and Product Data sheet included):** Added to a
portion of the gasolines distributed by Ultramar Inc. in the San
Francisco Bay Area from 1995 - 1996. OGA 477PL is a multifuntional
additive manufactured by Chevron Chemical Company, providing
detergency and corrosion inhibition. This additive was injected into
gasolines by computer controlled systems at terminal transport truck
loading racks. OGA 477PL was not added to all gasoline sold in the
San Francisco Bay Area from 1995 - 1996. OGA 477PL was
gradually replaced by Lubrizol 8192S in gasolines supplied to the San
Francisco Bay Area during 1995 and 1996. The maximum average
dosage of OGA 477PL from a single supply terminal for a one month
period between 1995 and 1996 was 483 mg/l.

**Lubrizol 8192S (MSDS included):** Added to a portion of the
gasolines distributed by Ultramar Inc. in the San Francisco Bay Area
from 1995 - 1997. Lubrizol 8192S is a multifuntional additive
manufactured by Lubrizol Corporation, providing detergency and
corrosion inhibition. This additive was injected into gasolines by
computer controlled systems at terminal transport truck loading racks.
Lubrizol 8192S was not added to all gasoline sold in the San
Francisco Bay Area from 1995 - 1997. Lubrizol 8192S replaced
Lubrizol 8195C in some gasolines supplied to the San Francisco Bay
Area beginning in  1995 and gradually replaced OGA 477PL in other
gasolines supplied to the San Francisco Bay Area during 1995 and
1996. Lubrizol 8192S was replaced by Lubrizol 8247E in 1997.
The maximum average dosage of Lubrizol 8192S from a single
supply terminal for a one month period between 1995 and 1997 was
321 mg/l.

**Lubrizol 8247E (MSDS and Product Data sheet included):** Added
to a portion of the gasolines distributed by Ultramar Inc. in the San

Francisco Bay Area during 1997. Lubrizol 8247E is a multifuntional additive manufactured by Lubrizol Corporation, providing detergency and corrosion inhibition. This additive is injected into gasolines by computer controlled systems at terminal transport truck loading racks. Lubrizol 8192S was not added to all gasoline sold in the San Francisco Bay Area during 1997. Lubrizol 8247E replaced Lubrizol 8195C in some gasolines supplied to the San Francisco Bay Area in 1997. The maximum average dosage of Lubrizol 8247E from a single supply terminal for a one month period through the second quarter of 1997 was 184 mg/l.

## Purchased/Exchanged Gasolines

In the oil industry, it is a common practice for companies to supply gasolines to end use customers that they do not manufacture in their own refineries in order to reduce logistic expenses. These gasolines may either be purchased from another company or procured through an "exchange". An exchange is a reciprocal agreement to supply equivalent volumes of similar quality products to each other in agreed upon locations. The specifications governing the products exchanged are agreed upon in advance and are usually based on industry standards and/or regulatory requirements.

Additives were not often addressed in the exchange agreements prior to 1992. Therefore, companies such as Ultramar Inc. have little specific information about individual additives included in gasolines received from other companies through purchases or exchanges prior to 1992. A good example of lack of specific information is the leaded gasoline supplied in the San Francisco Bay Area by Ultramar Inc. prior to the prohibition of leaded gasoline by CARB regulation in 1992. We know that leaded gasoline provided to us through purchases or exchanges had lead contents potentially ranging from about 0.1 grams/gallon Pb to a maximum of 4.23 grams/gallon Pb. We do not know exact organic lead compound used (tetraethyl lead, tetramethyl lead, or a mixture of both), the supplier, or the brand name of the additive used to produce the gasoline we received for distribution.

Another example is oxygenated compounds, such as MTBE. Prior to 1992, unless a gasoline was intended for blending with ethanol or unless specifically

addressed in the purchase or exchange agreement, gasoline manufacturers were not required to disclose the use of oxygenates. Even today, gasolines are typically exchanged on the basis of minimum oxygen content and in the San Francisco Bay Area may contain from 0 - 2.7 wt% oxygen from February to October and 1.8 to 2.7 wt% oxygen from November - January. The type and amount of the oxygenate is typically not disclosed. Although we cannot provide detailed information about other oxygenates that may have been used in gasolines we received through purchases or exchanges, we have included MSDS data for MTBE in the attachments.

We do have limited information from our suppliers about detergent additives included in purchased or exchanged gasolines. The following additives have been used in gasolines supplied to Ultramar Inc. for distribution in the San Francisco Bay Area:

## Exchange Gasoline Additives, 1992 - 1997

| Supplier | Additive Name |
|----------|---------------|
| Exxon | OGA 476TU, OGA 400EX |
| Shell | OGA 400DC, Lubrizol 8192S, Lubrizol 8247E |

Dosage rates of these additives would best be supplied by the companies themselves and will likely be included in their response to your current request for information.

## Methodologies for Determining Additives in Soil and Water

Ultramar Inc. has no unique proprietary methods for identfying or quantifying fuel additives in soil or water. As indicated in your letter, oxygenates can be readily measured at the ppb level in groundwater using Federally approved test methods. While manufacturers of detergent additives must submit to CARB methods for measuring the additive concentration in fuels as part of the certification process, questions about methods for measuring the detergent additives (typically high molecular weight poly-isobutene amines in a mineral

9

oil carrier fluid) would best be answered by the additive manufacturers. We will provide contacts with additive suppliers at your request.

## Other Sources of Information

If one purpose of this information gathering process is to define the universe of potential compounds that might be added to gasolines, the best source for such information might be the Office of Fuel and Fuel Additive Registration. The Office maintains lists of all additives approved for use in transportation fuels. The address is:

> U. S. EPA
> Office of Fuel and  Fuel Additive Registration
> 401 M Street, SW
> Mail Code 64-06J
> Washington, DC, 20460.

Lists of certified deposit control additives are maintained by the CARB staff administered through the Stationary Source Division, Fuels Section. The address is:

> California Environmental Protection Agency
> Air Resources Board
> Stationary Source Division
> Fuels Section
> 2020 L Street
> P.O. Box 2815
> Sacramento, CA 95814

## Further Information

The information included in this report is accurate and complete to the best of our knowledge.. We will provide further information or clarification of information included in this report at your request.

10

# EXHIBIT 3

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF MERCED

--oOo--

CITY OF MERCED,

    Plaintiff,

vs.

                                            No. 148451

CHEVRON U.S.A., INC.; SHELL
OIL COMPANY; EXXONMOBIL
CORPORATION; EXXON
CORPORATION; KINDER MORGAN
ENERGY PARTNERS L.P.; EQUILON
ENTERPRISES LLC; SFPP, L.P.
and DOES 1 THROUGH 200,
inclusive,

    Defendants.

---

VIDEOTAPED DEPOSITION OF

ARVEL SHACKELFORD

(VOLUME I - PAGES 1 - 80)

May 18, 2009

REPORTED BY: VALERIE NUNEMACHER, CSR, CCR, RPR

**COPY**



DEPOBOOK
reporting services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

Deposition of Arvel Shackelford / May 18, 2009

1   can read the question back to you so that you have it

2   clear in your mind before you answer.  Because this

3   testimony is under oath, so it's important that we be

4   accurate.  That's the important part.

5         A.   I understand.

6         Q.   Okay.  If you need time to read a document or

7   to do something else before you answer, just let us know

8   and we'll do our best to accommodate you today.  Each of

9   the attorneys will.  We're also going to try and make

10   good use of your time and get this over with.

11         A.   Okay.

12         Q.   Okay.  I'm going to be asking you questions

13   about a gasoline station that was located at 1415 R

14   Street in Merced.  Did you and your wife operate that

15   station for over a decade?

16         A.   Yes.

17         Q.   And did you start leasing that station in

18   approximately 1978?

19         A.   '78 is when it was.

20         Q.   And then did you later purchase the station

21   from Mobil Oil Corporation?

22         A.   From Mobil.

23         Q.   And did you operate the station for about a

24   decade after you purchased it?

25         A.   Yes, but it was under Exxon.

7

Deposition of Arvel Shackelford / May 18, 2009

1    and I still remember it.  Bias tire.

2         Q.   So they asked you a question about what a bias

3    tire was?

4         A.   They asked the two kinds of tires and I could

5    not think of bias.

6         Q.   Okay.  Once you started operating the station

7    under the lease, it was Mobil-branded station?

8         A.   Yes.

9         Q.   Was it your understanding you were selling

10   Mobil gasoline during that period you were leasing?

11        A.   Yes.

12             MR. PARKER:  Objection.  Lacks foundation.

13   Calls for speculation.  And also calls for a legal

14   conclusion.

15             MR. MILLER:  Q.  Well, actually the whole

16   station was labeled, "Mobil."  You had a big sign that

17   said, "Mobil"?  The dispensers were labeled, "Mobil"?

18   The gas was labeled, "Mobil," correct?

19        A.   Yes.

20             MR. PARKER:  Objection.  I'm sorry,

21   Mr. Shackelford, we're now getting into some questions

22   where I have an objection to the question that

23   Mr. Miller raised -- or that he asked.  So if you could

24   pause for just a second --

25             THE WITNESS:  Oh, okay.

                                                          12

Deposition of Arvel Shackelford / May 18, 2009

1      MR. PARKER: -- then I can get my objection on

2  the record.

3      THE WITNESS: Okay.

4      MR. PARKER: Thank you, very much.

5      THE WITNESS: No problem.

6      MR. PARKER: I object to that question in that

7  it is compound, leading, argumentative. States a legal

8  conclusion incorrectly. Assumes facts not in evidence.

9  And calls for speculation.

10      MR. MILLER: Here's the good part about what

11  he said. There's a ground rule you need to remember.

12  It helps the court reporter if we don't all talk at

13  once. She prefers only one voice. It makes it a lot

14  easier for her to do her job.

15      THE WITNESS: Sorry.

16      MR. MILLER: It's all right. We'll remind you

17  if need be, but I'm pretty sure you'll remember. Could

18  you reread the question please.

19      (Whereupon, the record was read as follows:

20      "Question: Was it your understanding you were

21      selling Mobil gasoline during that period you

22      were leasing?

23      "Answer: Yes.")

24      MR. MILLER: Q. And during the period that

25  you were leasing from Mobil, the sign on the station

13

DEPOBOOK REPORTING SERVICES (800) 830-8885

Deposition of Arvel Shackelford / May 18, 2009

1   said, "Mobil," the gasoline dispenser said, "Mobil,"

2   correct?

3          MR. PARKER: Objection. Compound. Leading.

4          MR. MILLER: Q. You can answer.

5   A.   Oh, yes. Yes.

6   Q.   And certainly if you had Mobil's name out

7   there on the dispenser, you knew the customers thought

8   they were buying Mobil gas and you thought you were

9   selling Mobil gas; is that correct?

10         MR. PARKER: Objection. Compound. Leading.

11   Calls for speculation. Calls for a legal conclusion.

12         THE WITNESS: Yes.

13         MR. MILLER: Q. During that period of time

14   that you were doing the lease, I would like you to

15   describe whether representatives of Mobil would come out

16   to the station and, if so, what they were doing.

17   A.   They came to the --

18         MR. PARKER: Again, I'm sorry. Objection.

19   Compound. Calls for a narrative.

20         MR. MILLER: Q. Go ahead, please.

21   A.   They came about once a month. When one guy

22   would come and he'd check and then take orders for oil

23   and stuff like that from Mobil.

24   Q.   From your communications with that

25   representative, were you doing what they wanted you to

14

Deposition of Arvel Shackelford / May 18, 2009

1    do?

2           MR. PARKER:  Objection.  Lacks foundation.

3    Calls for speculation.

4           THE WITNESS:  As far as I was -- know I was

5    all right, because I bought the station from them after

6    ten years.  So other than that they would have kicked me

7    out probably.

8           MR. MILLER:  Q.  Did they ever -- after an

9    inspection or visit by a Mobil representative, did they

10   ever tell you that they were unhappy with the way you

11   were handling the station?

12          MR. PARKER:  Objection.  Mischaracterizes the

13   testimony.  Assumes facts not in evidence.

14          THE WITNESS:  Never.

15          MR. MILLER:  Q.  Okay.  In 1984, I want to

16   focus on the purchase of the station from Mobil.

17       A.  Okay.

18       Q.  Was it your idea to buy the station or did

19   they bring up the subject to you?

20       A.  They said they were going to sell the station

21   and I said, Well, if you are, I want to buy it.

22       Q.  Okay.  And did they tell you why they wanted

23   to sell it?

24       A.  No.

25       Q.  When you discussed purchasing the station, do

15

Deposition of Arvel Shackelford / May 18, 2009

1   round pumps and they didn't want round pumps at an Exxon

2   station.  Because I switched over to Exxon.

3        Q.   Okay.  So after the purchase you entered into

4   an arrangement to buy Exxon gasoline, correct?

5        A.   Yes.

6             MR. PARKER:  Objection.  Lacks foundation.

7   Calls for a legal conclusion.

8             MR. MILLER:  Q.  Who did you buy your gasoline

9   from after you entered into the arrangement?

10        A.   Curtesy Oil.

11        Q.   And at the time that you switched to Curtesy

12   Oil, did you change the signage for the service station?

13        A.   Yes.

14        Q.   And how did you change it?  Used to be Mobil,

15   what did it change to?

16        A.   Exxon.

17        Q.   Were there ever any other types of signs on

18   the station as far as the brand of gasoline being sold

19   other than Mobil or Exxon during your entire period that

20   you owned or operated it?

21        A.   No.

22        Q.   From the time you entered into the agreement

23   with Curtesy, was it your understanding that you were

24   getting a particular brand of gasoline --

25             MR. PARKER:  Objection.

                                                        17

Deposition of Arvel Shackelford / May 18, 2009

1        MR. MILLER:  Q.  -- from Curtesy?

2        MR. PARKER:  Objection.  Lacks foundation.

3   Calls for an expert and a legal opinion.

4        THE WITNESS:  All I know it was Exxon and he

5   was Exxon for a long time and I knew him since 1943 or

6   '44.  I don't think we even signed an agreement.  I

7   think it was just verbal.

8        MR. MILLER:  Q.  Okay.  So you had known him

9   for quite a while?

10       A.   I knew him before his kids were born, yep.

11       Q.   Okay.  Did you think that he had a good

12   business reputation?

13       A.   He did.

14       Q.   And was he fair in his dealings with you?

15       A.   Yes.  Yes.  Well, now -- it wasn't he, it was

16   his sons because he's already 75 years old.  But his

17   sons -- I wouldn't have went with them if I didn't feel

18   good about them.  And I like -- I don't recall even

19   writing a piece of paper that I would sell nothing but

20   Exxon gas.  They said they'll bring it to me and that

21   was all.

22       Q.   Okay.  And on the bills, it showed that you

23   were buying Exxon gasoline from them?

24       A.   Yes.

25       MR. PARKER:  Objection.  Best evidence as to

                                                        18

1   STATE OF IDAHO              }
                                } ss.
2   COUNTY OF KOOTENAI          }

3

4       I, VALERIE NUNEMACHER, CSR, License No. 738, do

5   certify:

6       That ARVEL SHACKELFORD, the witness in the

7   foregoing deposition, was first duly sworn to testify to

8   the truth, the whole truth, and nothing but the truth in

9   the within-entitled cause;

10      That said deposition was reported by me at the time

11  and place therein stated by me, a Certified Shorthand

12  Reporter, and thereafter transcribed into typewriting;

13      I further certify that I am not interested in the

14  outcome of said action, nor connected with, nor related

15  to, any of the parties of said action or to their

16  respective counsel.

17      IN WITNESS WHEREOF, I have hereunto set my hand

18  this __1st__ day of __June_____, 2009.

19

20

21

22  _Valerie Nunemacher_

23  VALERIE NUNEMACHER, ID CSR No. 738

24

25

                            80

# EXHIBIT 4

## Page 1

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

SOUTH TAHOE PUBLIC UTILITY
DISTRICT,                           )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )   No. 999128
                                    )
ATLANTIC RICHFIELD COMPANY          )
("ARCO"); ARCO CHEMICAL COMPANY;    )
SHELL OIL COMPANY; CHEVRON U.S.A.,  )
INC.; EXXON CORPORATION; B.P.       )
AMERICA, INC.; TOSCO CORPORATION;   )
et al.,                             )
                                    )
                Defendants.         )

VIDEOTAPED DEPOSITION OF ROBERT C. DONOVAN

August 31, 2000
Sea-Tac, Washington

BYERS & ANDERSON, INC.

COURT REPORTING & VIDEO

2208 North 30th Street          One Union Square
      Suite 202                 600 University Street
Tacoma, Washington 98403        Suite 2300
     253.627.6401               Seattle, WA  98101-4112
   Fax: 253.383.4884            206.340.1316

1.800.649.2034

www.byersanderson.com

1

## Page 32

1   A   In the fall of 1995, perhaps the summer of 1995, in

2       various conversations with various environmental

3       consultants in my employ -- "my" being Tesoro's employ,

4       -- on the West Coast, discussions of MTBE became more

5       common.

6   Q   And why was that?

7           MS. MARTIN:  Objection; calls for

8       speculation, lacks foundation.

9   A   The consultants brought it up.  I don't know why.  I

10      don't know what their -- their background was to start

11      feeling that they should raise this issue with me.

12  Q   (By Mr. Sher)  Which consultants do you have in mind

13      when you refer to "consultants"?

14  A   I remember specifically a conversation I had with the

15      consulting company named Orion Environmental.  And

16      they're located in Long Beach, California.

17  Q   Can you recall the circumstances of that conversation?

18  A   I believe it was in the fall of 1995.  And one of the

19      staff scientists attended a conference on MTBE, or

20      perhaps a conference that mentioned MTBE.

21  Q   Do you recall who this staff scientist was?

22  A   Her name was Mardi.  And that is -- I'll spell that, if

23      I may.

24  Q   Yes, please.

25  A   M-A-R-D-I.  And her last name is -- was Read.  And that

32

*Robert C. Donovan, 8/31/00 - by Mr. Sher*

## Page 33

1       is spelled R-E-E-D -- I'm sorry, that is spelled

2       R-E-A-D.  Correction.

3   Q   And Ms. Read was a staff scientist with Orion

4       Environmental?

5   A   That's correct.

6   Q   And she was the one that you said had attended a

7       conference at which MTBE was discussed?

8   A   To the best of my recollection.

9   Q   To your knowledge, had MTBE been discovered at that

10      point at any Tesoro sites?

11  A   No.

12  Q   What can you recall about the gist of the conversation

13      that you had with Ms. Read?

14  A   There was a discussion with regards to MTBE as an

15      additive in its fait and transport to the environment.

16      Ms. Read brought up the point -- and I must stress this

17      as recollection of almost five years ago -- that there

18      was a large body of toxicity data for MTBE.  Apparently

19      it had been used for medicinal purposes at some point.

20      This sparked me to learn more about MTBE.

21  Q   What sort of investigation did you undertake at that

22      point?

23  A   I went to a conference.  I believe that conference was

24      in May of 1996 -- I'm sorry -- February 1996.  I want to

25      stress I believe that's when the conference was.

33

*Robert C. Donovan, 8/31/00 - by Mr. Sher*

## Page 34

1   Q   Can you recall the title of the conference?

2   A   No, I can't.

3   Q   Can you recall where it was?

4   A   It was in the LA area, but not LA proper.

5   Q   Was MTBE the only topic of this conference?

6   A   No, it wasn't.

7   Q   Was it a topic at the conference?

8   A   I'm not sure if it was on the agenda, but it was

9       discussed.

10  Q   Did you attend the conference for reasons other than

11      MTBE?

12  A   Yes, I did.

13  Q   What were those other reasons?

14  A   This was a conference where various members of two

15      regional water quality control boards in the greater LA

16      area were present.  And I recall there was a panel

17      discussion.  And the main focus of the conference was

18      RBCA; Risk Based Corrective Action.  It's an acronym for

19      Risk Based Corrective Action.  And some of the -- the

20      strategic fallout from recent reports out of Lawrence

21      Livermore Laboratories on the fait and transport of

22      gasoline plumes.

23  Q   When you refer to fait and transport, are you referring

24      to MTBE's persistence in movement in soil and

25      groundwater?

34

*Robert C. Donovan, 8/31/00 - by Mr. Sher*

1        (Break taken at 10:06 a.m.)

2      THE VIDEOGRAPHER:  This begins videotape No. 2

3  in the deposition of Paul Dhillon.  We are on the record

4  and the time is 10:11 a.m.

5      MR. EICKMEYER:  Q.  Mr. Dhillon, before we go

6  on to the next exhibit, I think you mentioned a moment

7  ago before the break that someone from the company would

8  come by on occasion and look at your purchase records to

9  see you were purchasing gas from the company?

10    A.  Yes.

11    Q.  When that person came by, was that called an

12  area rep, or what was their title?

13    A.  Area rep.

14    Q.  Did that area rep ever give you any training

15  about how to respond to a gasoline leak or spill at the

16  station?

17      MR. YBARRA:  Objection; asked and answered.

18      THE WITNESS:  I already answered this question.

19  They already trained me, they gave me the booklet to do

20  all those kind of things.

21      MR. EICKMEYER:  Well, okay.  Thank you.  I'm

22  sorry.  Let me -- let me try to ask it a little better.

23    Q.  Beside that initial training that you

24  mentioned, when they would come out to the station

25  periodically, did they ever give you any more training?

---

1    A.  They send us some videos to update those

2  things, yes, they do.

3    Q.  Did they ever give you any different

4  instructions other than using the kitty litter product

5  that you discussed earlier?

6    A.  For small spills or what?

7    Q.  Right.  Did they ever tell you any different

8  way that you should be cleaning up a small spill or leak

9  at the station?

10    A.  Yes, there are different ways, too.

11    Q.  What else did they tell you beside the kitty

12  litter product?

13    A.  Some other product come on the market, to buy

14  those if you want to, or use this products, or different

15  products are available.

16    Q.  Did they ever tell you that you should switch

17  from the kitty litter product --

18    A.  No.

19    Q.  -- to some other one?

20    A.  No.

21    Q.  Did you continue using the kitty litter product

22  during the entire time you operated the East Avenue

23  station?

24    A.  Yes.

25    Q.  Approximately how often would the area rep come

1    And we have agreed that rather than going through
2    those document by document in the deposition, much of
3    which would require us to specifically designate the
4    transcript as confidential, that counsel will work
5    together to authenticate these documents as appropriate
6    for other purposes in the litigation.
7         Is that fair?
8              MS. MARTIN:  We agree.
9              MR. SHER:  Is that correct?
10             MS. MARTIN:  That's correct.
11   Q   (By Mr. Sher)  Let me just ask you, there's a fourth
12   site that I wanted to ask you if you recall, in
13   La Mirada, California; a former Lucky Store property at
14   which there's an MTBE plume.  Is that --
15   A   Yes.
16   Q   And is that in addition to the three sites that you
17   identified previously?
18   A   Yes, it is.
19   Q   And are there any other sites in California that you're
20   aware of at which there are -- in which there is MTBE
21   present?
22             MS. MARTIN:  Objection; calls for
23   speculation.  And it's outside of the scope of the
24   designated issues or the document demands.  So --
25             MR. SHER:  Well, what I'm trying to

---

1              MR. SHER:  I have read the
2    correspondence.
3              MS. MARTIN:  Okay, go ahead.
4              MR. SHER:  And I'm entitled to have
5    a witness, who is under oath, tell me whether certain
6    representations about the existence or lack of existence
7    of documents are accurate to his understanding.
8              MS. MARTIN:  Okay.
9    A   I know of no such documents.
10   Q   (By Mr. Sher)  Is there any other department at Tesoro,
11   that you know of, that would be responsible for
12   practices, procedures, or precautions which would be
13   followed in cleaning up or remediating a spill of
14   gasoline containing MTBE?
15   A   No, there's not.
16   Q   Now, Counsel earlier told us that there was one document
17   produced in response to Question No. 23, which asks for,
18   any practices, procedures, or precautions which should
19   be followed in cleaning up or remediating a spill of
20   gasoline since 1992.
21        And I don't want to -- other than the document
22   that has been produced to us, the one document which is
23   dated 1991, are you aware of any other responsive
24   documents?
25             MS. MARTIN:  Again, I believe we

---

1    should just clarify, during meet and confer, we
2    explained that we were not producing any documents that
3    would be spill response plans related to refinery
4    activities.
5    Q   (By Mr. Sher)  Okay.  Setting aside spill responses at
6    refineries.
7    A   There are no other documents that I am aware of.
8    Q   In your capacities at Tesoro in environmental
9    management, has your company ever, to your knowledge,
10   prepared any risk assessment to evaluate the likelihood
11   that gasoline containing MTBE would be released into the
12   environment?
13   A   No, we have not.
14   Q   Has your department at Tesoro ever performed any
15   analysis of whether upgraded gasoline storage tanks
16   reduced the incidence of gasoline releases into the
17   environment?
18   A   No, we have not.
19   Q   Has your company ever estimated the cost of remediating
20   MTBE releases into the environment --
21             MS. MARTIN:  Objection --
22   Q   (By Mr. Sher)  -- from retail gasoline stations?
23             MS. MARTIN:  Objection; vague and
24   ambiguous, calls for speculation, and lacks foundation.
25   A   Could you repeat the question, please?

---

1              MR. SHER:  Let's have it read back.
2              (Question on Page 113, Lines 19
3              through 20, and 22, read by the
4              reporter.)
5
6    A   Tesoro estimates probable expenditures for all releases
7    that we are responsible for.
8    Q   (By Mr. Sher)  And in performing those kinds of
9    estimates, have you ever distinguished between releases
10   including MTBE and releases that do not include MTBE?
11   A   No, we have not.
12   Q   To your knowledge, has anybody in your department
13   at Tesoro performed any economic analysis of the
14   environmental impacts of using MTBE in your gasoline?
15             MS. MARTIN:  Objection; vague and
16   ambiguous, lacks foundation, calls for speculation.
17        And further, we have responded to these exact
18   written discovery requests twice.  Mr. Donovan already
19   verified these responses under oath.  He -- these are
20   duplicative of Discovery Request No. 124 that we
21   responded to and he verified.
22             MR. SHER:  We will get through this
23   very quickly if you would just allow the witness to
24   answer.
25   A   Would you repeat the question?

Byers & Anderson, Inc.

```
 1   Q   (By Mr. Sher)  Sure.
 2              MR. SHER:  Read it back
 3              (Question on Page 114, Lines 12
 4          through 14, read by the
 5          reporter.)
 6
 7              MS. MARTIN:  Same objections.
 8   A   No, they have not.
 9              MR. SHER:  Let's go off the record
10      for a minute.
11              THE VIDEOGRAPHER:  We are now going
12      off the record.  The time is 2:20.
13              (Discussion off the record.)
14
15              THE VIDEOGRAPHER:  We are now back
16      on the record.  The time is 2:21.
02:21 PM 17   Q   (By Mr. Sher)  Mr. Donovan, will you briefly summarize
18      your educational background since high school?
19   A   I have a bachelor's of science degree in geology from
20      the University of Nebraska at Lincoln.
02:21 PM 21   Q   When did you get that?
22   A   I graduated in 1982.
23              That was followed by a master's of science degree
24      in geology from the University of Wyoming.  And that was
25      obtained in 1986.
```

115

Robert C. Donovan, 8/31/00 - by Mr. Sher

---

Byers & Anderson, Inc.

```
 1   STATE OF WASHINGTON )      I, KARMEN M. KNUDSON,
                        ) ss. CCR #KN-UD-SK-M310KT, a
 2   County of Pierce   )      duly authorized Notary
                               Public in and for the
 3                             State of Washington
                               residing at Tacoma,
 4                             do hereby certify:
 5
 6
 7              That the foregoing deposition of ROBERT C.
     DONOVAN was taken before me and completed on August 31,
 8   2000, and thereafter was transcribed under my direction;
     that the deposition is a full, true and complete
 9   transcript of the testimony of said witness, including
     all questions, answers, objections, motions and
10   exceptions;
11              That the witness, before examination, was by
     me duly sworn to testify the truth, the whole truth, and
12   nothing but the truth, and that the witness reserved the
     right of signature;.
13              That I am not a relative, employee, attorney
     or counsel of any party to this action or relative or
14   employee of any such attorney or counsel and that I am
     not financially interested in the said action or the
15   outcome thereof;
16              That I am herewith securely sealing the said
     deposition and promptly delivering the same to Attorney
17   Victor M. Sher.
18              IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my official seal this      day of
19              , 2000.
20
21
22              KARMEN M. KNUDSON, CSR, RPR, CRR,
                Notary Public in and for the State
23              of Washington, residing at Tacoma.
24
25
```

121

Certificate

FROM:API-HESD WASH DC          TO:    VIA XPEDITE   MAR 31. 1995  4:04PM  #840  P.02

_Meyers_

cc: *Leeth Finau, Bill ngi*
*Chuck Welmany, Dan*
*Terry Lavek, Parca*
*Jeff Baker, Lalo-ba*
*Ron Gantz, Perca "*
*Bill Broddie, Harold*
*RT circulation*
*Copy*

American Petroleum Institute
1220 L Street, Northwest
Washington, D.C. 20005
202 682-8345
202/682-8270 (Fax)

Bruce J. Bauman, Ph.D.
Health & Environmental Sciences Department

March 31, 1995

TO: Soil/Groundwater Technical Task Force

FROM: Bruce Bauman

RE: USGS VOC / MTBE in Groundwater Study

Here is the fact sheet the USGS has compiled that summarizes the report they will release next week. Also attached are a couple of pages we extracted from the USGS home page on the Internet's World Wide Web:

<http://wwwrvares.er.usgs.gov/nawqa/nawqa_home.html>

The fact sheet is also available at that location. The last page of the USGS release also notes other contacts for further information. We will learn more from them during the briefing they will give us here at API next Tuesday, April 4 at 3:30 PM. Enjoy!

cc:   H. Hopkins
      R. Claff
      J. Shaw
      S/GTTF file



EXHIBIT
1
Donovan

An equal opportunity employer

03/31/95 16:13:27  VIA FAX          →        713 293 3305 meyers, jeff          Page 003

FROM:API-HESD WASH DC          TO:          VIA XFEDITE          MAR 31, 1995  4:04PM  #840  P.03

United States Geological Survey
National Water-Quality Assessment Program


# Occurrence of the Gasoline Additive MTBE in Shallow Ground Water in Urban and Agricultural Areas

Methyl tert-butyl ether (MTBE) is a volatile organic compound (VOC) derived from natural gas that is added to gasoline either seasonally or year round in many parts of the United States to increase the octane level and to reduce carbon monoxide and ozone levels in the air. In 1993, production of MTBE ranked second among all organic chemicals manufactured in the United States. Currently, the U.S. Environmental Protection Agency (EPA) tentatively classifies MTBE as a possible human carcinogen. Health complaints related to MTBE in the air were first reported in Fairbanks, Alaska in November 1992 when about 200 residents reported problems such as headaches, dizziness, eye irritation, burning of the nose and throat, disorientation, and nausea. Similar health complaints have been registered in Anchorage, Alaska; Missoula, Montana; Milwaukee, Wisconsin; and New Jersey.

As part of the U.S. Geological Survey's National Water-Quality Assessment (NAWQA) Program, concentrations of 60 VOCs were measured in samples from 211 shallow wells in 8 urban areas and 524 shallow wells in 20 agricultural areas. Chloroform and MTBE were the two most frequently detected VOCs. Chloroform and MTBE were detected in 27 percent of the urban wells and 1.3 percent of the agricultural wells. Concentrations ranged from less than the detection level of 0.2 µg/L (micrograms per liter) to as high as 23,000 µg/L. When detected, the median concentration of MTBE was 0.6 µg/L. MTBE was most frequently detected in shallow ground water in Denver, Colorado and urban areas in New England. In Denver, 79 percent of the samples from shallow urban wells had detectable concentrations of MTBE and in New England, 37 percent of the samples from urban wells had detectable concentrations. Only 3 percent of the wells sampled in urban areas had concentrations of MTBE that exceeded 20 µg/L, which is the estimated lower limit of the EPA draft drinking water health advisory level. Contaminant concentrations below the health advisory are not expected to cause any adverse effects over a lifetime of exposure. MTBE is on the EPA's Drinking Water Priority List, which means it is a possible candidate for future regulation.

## What is MTBE and why is it used?

The Clean Air Act Amendments of 1990 mandate that compounds that add oxygen (oxygenates) be added either seasonally or year round to gasoline in specific parts of the country where concentrations of ozone in the summer or carbon monoxide in the winter exceed established air-quality standards. Oxygenates are added to increase the octane of gasoline and to improve air quality in urban areas. Oxygenates are added to more than 30 percent of the gasoline in the United States, and by the end of this decade, the Oxygenated Fuels Association has estimated that oxygenates will be added to 70 percent of the gasoline. MTBE is a commonly used oxygenate because of its low cost, ease of production, and favorable transfer and blending characteristics. It is

made from methanol, which is derived primarily from natural gas. Gasoline can contain up to 15 percent MTBE by volume. In 1993, 24 billion pounds of MTBE worth about 53 billion was produced in the United States. Domestic production of MTBE and its use in the United States decreases the need for foreign oil.

## Why is MTBE of interest?

About 109 million Americans live in counties where MTBE is believed to be used (fig.1). Health complaints related to MTBE in the air were first reported in Fairbanks, Alaska in November 1992 when about 200 residents reported headaches, dizziness, irritated eyes, burning of the nose and throat, coughing, disorientation, and nausea after MTBE had been added to gasoline. Health complaints also have been registered in Anchorage, Alaska; Missoula, Montana; Milwaukee, Wisconsin; and New Jersey. Studies done by the Centers for Disease Control and Prevention in Fairbanks, Alaska; Albany, New York; and Stamford, Connecticut have shown that the concentration of MTBE in the blood is related to the concentration of MTBE in the air. People with the greatest exposure, such as gasoline service station attendants and automobile mechanics, had the largest concentrations of MTBE in their blood (ranging from less than 0.05 to 37 µg/L); however, even commuters had measurable concentrations of MTBE in their blood (ranging from less than 0.05 µg/L to 2.6 µg/L). Furthermore, the study in Fairbanks showed that among commuters there was a significant increase in the concentration of MTBE in their blood as a result of exposure to MTBE while driving. Detectable concentrations of MTBE were found in the blood of all those tested 2 months after the use of MTBE was suspended in Alaska.

## What are the sources of MTBE?

All sources of MTBE released to the environment are not well documented. The release of MTBE in 1992 from industry in the United States accounted for only 0.03 percent of the MTBE that was produced. According to EPA's Toxic Release Inventory for 1992, about 94 percent of the MTBE released from industry was released to the air, 3.5 percent was discharged to surface water, and 2.5 percent was injected into wells. Releases of MTBE in addition to those from industry have not been quantified. For example, the amount of MTBE released during refueling at service stations and from mobile sources such as vehicles is unknown, but may be an important source of MTBE in the environment. Leaking underground storage tanks and spills at the land surface are also sources of MTBE in the environment.

## What are the chemical properties of MTBE and its fate in the environment?

MTBE is an ether. It is a volatile, flammable, colorless liquid at room temperature, and it smells like turpentine.

TS1 003541

83/31/95 16:14:46  VIA FAX          ->          713 293 3385 meyers, jeff          Page 884

FROM:API-HESD WASH DC          TO:          VIA XPEDITE     MAR 31, 1995   4:25PM  #840  P.04



EXPLANATION

■  NAWOA Urban Land-Use Studies
●  NAWOA Agricultural Land-Use Studies
+  MTBE Release Locations
▨  Counties with potential use of MTBE

MTBE release locations from U.S. Environmental Protection Agency Toxic Release Inventory for 1992
MTBE use areas from reformulated/oxygenated fuel program areas, U.S. Environmental Protection Agency.

Figure 1. Location of urban and agricultural areas studied, and locations where MTBE may be released and used.

MTBE mixes with gasoline and is soluble in water, alcohol, and other ethers. Because of its chemical characteristics, MTBE would be expected to be found primarily in the atmosphere and in water. Results of a computer model used by Environment Canada for southern Ontario showed that 56 percent of MTBE in the environment should be found in the air, 43 percent in surface water and only about 0.5 percent in soil or streambed sediment. This model predicts where MTBE may be found in the environment but needs to be verified by environmental sampling. Although MTBE will volatilize from soils, it is also highly mobile in soil and can move into ground water. Once in ground water, MTBE resists decay when compared to other gasoline components like benzene. In surface water, MTBE is not expected to bio-accumulate in aquatic organisms.

It is hypothesized that MTBE moves with water in the hydrologic cycle (fig. 2), but more data are needed to determine the extent of the movement. MTBE is released to the air from sources such as industry and vehicles. Once in the air, MTBE can mix with precipitation that may eventually carry MTBE to the ground water or to streams. The MTBE detected in snow samples collected in Denver, Colorado by U.S. Geological Survey scientists supports this hypothesis. Alternatively, gasoline spills may directly contribute to MTBE contamination of ground water and surface water.

## Where, how frequently, and at what concentrations is MTBE found in shallow ground water?

The concentrations of MTBE and 59 other VOCs were measured in samples of shallow ground water from 211 urban wells and 524 agricultural wells in 1993-94. These monitoring wells are located in 8 urban and 20 agricultural areas. These urban areas were located where MTBE was released to the environment by industry or is potentially used in gasoline. Some of the wells were constructed for the NAWQA studies, whereas others were existing wells. Wells for these studies were randomly located within specific land-use areas to allow comparison of shallow ground-water quality with land use. Urban wells were located in industrial, commercial, residential, and recreational areas, while agricultural wells were located in various crop areas.

Water-quality data from urban and agricultural areas show that MTBE occurs predominantly in shallow ground water underlying urban areas. MTBE was detected in 27 percent of urban wells, and in 1.3 percent of agricultural wells distributed across the United States, with concentrations ranging from less than the detection level of 0.2 µg/L to 23,000 µg/L. The concentrations of MTBE in ground water from eight urban areas are shown in figure 3. When detected, the median concentration of MTBE was 0.6 µg/L.

MTBE was detected in shallow ground water in all eight urban land-use studies but was detected in ground water from only 3 of 20 agricultural areas studied. For the urban areas, MTBE was most frequently detected in Denver, Colorado, and in urban areas in New England (fig. 4). In Denver, 79 percent of the shallow urban wells (23 of 29 wells) had detectable concentrations of MTBE, and in New England (specifically urban areas within Connecticut, Massachusetts, and Vermont), 37 percent of the wells (13 of 35 wells) had detectable concentrations of MTBE. Other urban areas where MTBE was detected included Reno, Nevada; Albany, New York; Dallas/Fort Worth, Texas; Las Vegas, Nevada; Atlanta, Georgia; and Albuquerque, New Mexico. Within agricultural land-use areas, MTBE was detected in southern Colorado, New England, and eastern Pennsylvania.

MTBE was the second most commonly detected VOC in water from urban wells. Of the 211 urban wells tested, 28 percent had chloroform; 27 percent had MTBE; 18 percent had tetrachloroethene; 10 percent had trichloroethene; 7 percent had cis-1,2 dichloroethene; 5 percent had 1,1-dichloroethane; and 5 percent had benzene. There are many potential sources for these other chemicals; however, 1,1-dichloroethane and benzene are used in gasoline, and chloroform has been identified in automobile exhaust.

TS1 003542



Figure 2. The movement of MTBE in the environment.

## Do the concentrations of MTBE in ground water pose a threat to human health?

The EPA draft drinking water lifetime health advisory for MTBE is estimated to fall within the range of 20-200 μg/L. The health advisory is the maximum concentration in drinking water that is not expected to cause any adverse effects over a lifetime of exposure, with a margin of safety. EPA expects to issue the final health advisory in the fall of 1995. EPA tentatively classifies MTBE as a possible human carcinogen. MTBE is also on the EPA's Drinking Water Priority List which means it is a possible candidate for future regulation. There are no current Federal regulations that require municipalities to test for MTBE in drinking water.

The water sampled by U.S. Geological Survey scientists was located near the top of the water table and is the ground water most likely to show contamination from sources at the land surface. In seven of the eight urban areas studied, the sampled ground water is the uppermost part of an aquifer used for drinking water or is possibly connected to an underlying aquifer, which is used as a municipal water supply.

None of the urban wells sampled were being used as a source of drinking water. In general, public water supplies draw water from deeper parts of the ground water system



Figure 3. The concentrations of MTBE in each of the eight urban study areas.

TS1 003543



Figure 4. The frequency of detection of MTBE for each urban study area.

and there are few data showing concentrations of MTBE at these deeper depths. Of the urban monitoring wells tested, about 24 percent had concentrations of MTBE ranging from 0.2 to 20.0 µg/L, and 3 percent had concentrations exceeding 20.0 µg/L.

## What are the implications of this study?

NAWQA data show that MTBE is found predominantly in shallow ground water in urban areas; however, many questions need to be answered. For example:

(1) Can MTBE in shallow ground water be traced to non-point mobile sources, such as vehicle emissions? Alternatively, how much MTBE in shallow ground water is due to point-source spills or leaking underground storage tanks?

(2) Do other fuel oxygenates occur in shallow ground water in urban areas?

(3) What is the fate of MTBE and other possible oxygenates in shallow ground water; will these oxygenates degrade over time due to natural processes, or will they accumulate in ground water?

(4) What are the concentrations of MTBE and other oxygenates in the air, in precipitation, and in surface water in urban areas? Is MTBE transported to ground water by infiltration of precipitation?

The U. S. Geological Survey will be working on these questions in cooperation with city and state organizations, and other Federal agencies.

## Suggestions for further reading

Leahy, P.P., and Thompson, T.H., 1994, U. S. Geological Survey National Water-Quality Assessment Program: U. S. Geological Survey Open-File Report 94-70, 4 p.

Mormile, M.R., Liu, Shi, and Suflita, J.M., 1994, Anaerobic biodegradation of gasoline oxygenates—extrapolation of information to multiple sites and redox conditions: Environmental Science and Technology, v. 28, no. 9, p. 1727–1732.

March, 1995

Reichhardt, Tony, 1995, A new formula for fighting urban ozone: Environmental Science and Technology, v. 29, no. 1, p. 36A–41A.

Government of Canada, 1992, Canadian Environmental Protection Act. Priority substances list, assessment report no. 5, methyl tertiary-butyl ether: Ottawa, Canada, 19 p.

Moolenaar, R.L., Hefflin, B.J., Ashley, D.L., Middaugh, J.P., and Etzel, R.A, 1994, Methyl tertiary butyl ether in human blood after exposure to oxygenated fuel in Fairbanks, Alaska: Archives of Environmental Health, v. 49, no. 5, p. 402–409.

U.S. Environmental Protection Agency, 1994, Health Risk Perspectives on Fuel Oxygenates. Office of Research and Development; EPA report no. EPA/600/R-94/217, Washington, D.C.

U.S. Environmental Protection Agency, 1993, Assessment of Potential Health Risks of Gasoline Oxygenated with Methyl Tertiary Butyl Ether (MTBE), Office of Research and Development; EPA report no. EPA/600/R-93/206, Washington, D.C.

—Paul J. Squillace, Daryll A. Pope, and Curtis V. Price

Information on technical reports and hydrologic data related to NAWQA can be obtained from:
NAWQA VOC National Synthesis
U.S. Geological Survey, WRD
1608 Mt. View Rd.
Rapid City, SD 57702

Additional information on NAWQA and other U.S. Geological Survey programs can be found by accessing the NAWQA "home page" on the World Wide Web at "http://wwwrvares.er.usgs.gov/nawqa/nawqa_home.html."

Additional information on health effects of MTBE and drinking water regulations can be obtained by calling EPA's Safe Drinking Water Hotline 1-800-426-4791.

U.S. Geological Survey, Fact Sheet FS-114-95

TS1 003544

FROM:API-HESD WASH DC          TO:     VIA XPEDITE     MAR.31, 1995  4:07PM  #840  P.07

MTBE data from Agricultural Studies
MTBE data from 20 Agricultural Land-Use Studies     *MTBE DATA*

To see the MTBE data for a particular study click on the study name in the
table below.
Note: Latitude and Longitude coordinates are of variable accuracy.
For more information about these data, contact the individual
listed at the end of each group of concentration data.

| Study Name | Number of wells where MTBE was detected | Number of wells sampled | Percent of wells where MTBE was detected |
|---|---|---|---|
| Appalachicola Chattahoochee Basin | 0 | 32 | 0 |
| Albemarle-Pamlico | 0 | 20 | 0 |
| Central Columbia Plateau #1 | 0 | 45 | 0 |
| Central Columbia Plateau #2 | 0 | 21 | 0 |
| New England (CT-MA-VT) | 2 | 22 | 9 |
| Florida- Georgia | 0 | 23 | 0 |
| Lower Susquehanna River Basin | 4 | 30 | 13 |
| Potomac River Basin | 0 | 17 | 0 |
| Rio Grande River Basin #1 | 0 | 20 | 0 |
| Rio Grande River Basin #2 | 1 | 35 | 3 |
| San Joaquin-Tulare #1 | 0 | 20 | 0 |
| San Joaquin-Tulare #2 | 0 | 30 | 0 |
| South Platte | 0 | 31 | 0 |
| Upper Snake River Basin #1 | 0 | 28 | 0 |
| Upper Snake River Basin #2 | 0 | 30 | 0 |
| Upper Snake River Basin #3 | 0 | 15 | 0 |
| Willamette River Basin #1 | 0 | 26 | 0 |
| Willamette River Basin #2 | 0 | 28 | 0 |
| Western Lake Michigan #1 | 0 | 27 | 0 |
| Western Lake Michigan #2 | 0 | 30 | 0 |
| | 7 | 524 | 1.3 |

Appalachicola Chattahoochee Basin Agricultural Land-Use Study

| USGS station number | Latitude | Longitude | Date | MTBE concentration (micrograms per Liter) |
|---|---|---|---|---|
| 305641084542001 | 305641 | 845420 | 1993.08.26 | Appalachiola Chattoochee Basin NAWQA |

   David Wangsness, NAWQA Chief
   U.S. Geological Survey
   Georgia District
   (404) 903-9100
   Return to summary of MTBE data

- 1 -

TS1 003545

03/31/95 16:18:14  VIA FAX        →        713 293 3385 meyers, jeff        Page 008

FROM:API-HESD WASH DC        TO:        VIA XPEDITE   MAR 31, 1995  4:07PM #840  P.08

NAWQA VOC National Synthesis
Recommended Target VOC Analytes (3/16/95)   *ANALYTES IN USGS STUDY*

These VOCs have been chosen for study for FY 96-98. This list
is currently being reviewed for analytical feasiblity.

| Cas # | Compound | On (USGS Lab) Schedule 2090 |
|-------|----------|------------------------------|
| 56-23-5 | TETRACHLOROMETHANE (CARBON TETRACHLORIDE) | Yes |
| 67-66-3 | TRICHLOROMETHANE (CHLOROFORM) | Yes |
| 67-72-1 | HEXACHLOROETHANE | No |
| 74-83-9 | BROMOMETHANE | Yes |
| 74-87-3 | CHLOROMETHANE | Yes |
| 75-09-2 | DICHLOROMETHANE (METHYLENE CHLORIDE) | Yes |
| 75-25-2 | TRIBROMOMETHANE (BROMOFORM) | Yes |
| 75-27-4 | BROMODICHLOROMETHANE | Yes |
| 78-87-5 | 1,2-DICHLOROPROPANE | Yes |
| 79-00-5 | 1,1,2-TRICHLOROETHANE | Yes |
| 96-12-8 | 1,2-DIBROMO-3-CHLOROPROPANE (DBCP) | Yes |
| 96-18-4 | 1,2,3-TRICHLOROPROPANE | Yes |
| 106-93-4 | 1,2-DIBROMOETHANE (EDB) | Yes |
| 107-06-2 | 1,2-DICHLOROETHANE | Yes |
| 124-48-1 | DIBROMOCHLOROMETHANE | Yes |
| 75-01-4 | CHLOROETHENE (VINYL CHLORIDE) | Yes |
| 77-47-4 | 1,2,3,4,5,5-HEXACHLORO-1,3-CYCLOPENTADIENE | No |
| 79-01-6 | TRICHLOROETHENE | Yes |
| 87-68-3 | 1,1,2,3,4,4-HEXACHLORO-1,3-BUTADIENE | Yes |
| 50-00-0 | FORMALDEHYDE | No |
| 593-60-2 | BROMOETHENE | No |
| 10061-01-5 | CIS-1,3-DICHLORO-1-PROPENE | Yes |
| 10061-02-6 | TRANS-1,3-DICHLORO-1-PROPENE | Yes |
| 71-43-2 | BENZENE | Yes |
| 91-20-3 | NAPHTHALENE | Yes |
| 108-90-7 | CHLOROBENZENE | Yes |
| 120-82-1 | 1,2,4-TRICHLOROBENZENE | Yes |
| 608-93-5 | PENTACHLOROBENZENE | No |
| 107-02-8 | ACROLEIN | No |
| 107-30-2 | CHLOROMETHYL METHYL ETHER | No |
| 123-91-1 | 1,4-DIOXANE | No |
| 505-60-2 | BIS(2-CHLOROETHYL) SULFIDE | No |
| 111-44-4 | BIS(2-CHLOROETHYL) ETHER | No |
| 542-88-1 | BIS(CHLOROMETHYL) ETHER | No |
| 79-06-1 | ACRYLAMIDE | No |
| 107-13-1 | 2-PROPENENITRILE (ACRYLONITRILE) | No |
| 71-55-6 | 1,1,1-TRICHLOROETHANE | Yes |
| 75-34-3 | 1,1-DICHLOROETHANE | Yes |
| 75-35-4 | 1,1-DICHLOROETHENE | Yes |
| 75-69-4 | TRICHLOROFLUOROMETHANE (CFC 11) | Yes |
| 95-47-6 | 1,2-DIMETHYLBENZENE (O-XYLENE) | Yes |
| 95-50-1 | 1,2-DICHLOROBENZENE | Yes |
| 100-41-4 | ETHYLBENZENE | Yes |
| 106-42-3 | 1,4-DIMETHYLBENZENE (P-XYLENE) | Yes |
| 108-38-3 | 1,3-DIMETHYLBENZENE (M-XYLENE) | Yes |
| 108-88-3 | METHYLBENZENE (TOLUENE) | Yes |
| 98-82-8 | CUMENE (ISOPROPYLBENZENE) | Yes |

- 1 -

TS1 003546

03/31/95 16:19:07  VIA FAX          ->          713 293 3385 meyers, jeff          Page 009

FROM:API~HESD WASH DC          TO:          VIA XPEDITE    MAR 31, 1995  4:08PM #840  P.09

| | | |
|---|---|---|
| 103-65-1 | n-PROPYLBENZENE | Yes |
| 104-51-8 | n-BUTYLBENZENE | Yes |
| 127-18-4 | TETRACHLOROETHENE | Yes |
| 156-59-2 | CIS-1,2-DICHLOROETHENE | Yes |
| 156-60-5 | TRANS-1,2-DICHLOROETHENE | Yes |
| 75-00-3 | CHLOROETHANE | Yes |
| 75-71-8 | DICHLORODIFLUOROMETHANE (CFC 12) | Yes |
| 95-63-6 | 1,2,4-TRIMETHYLBENZENE | Yes |
| 100-42-5 | STYRENE (VINYL BENZENE) | Yes |
| 106-46-7 | 1,4-DICHLOROBENZENE | Yes |
| 1634-04-4 | METHYL TERT-BUTYL ETHER (MTBE) | Yes |
| 76-13-1 | 1,1,2-TRICHLORO-1,2,2-TRIFLUOROETHANE (CFC 113) | Yes |
| 87-61-6 | 1,2,3-TRICHLOROBENZENE | Yes |
| 541-73-1 | 1,3-DICHLOROBENZENE | Yes |
| 637-92-3 | ETHYL Tert-BUTYLETHER (ETBE) | No |
| 994-05-8 | tert-PENTYL METHYL ETHER (TAME) or (tert-AMYL METHYL ETHER) | No |

This page is maintained by Curtis Price &lt;cprice@usgs.gov&gt;

Last modified: Wed Mar 29 12:15:45 1995

The URL for this page is
&lt;http://sv02dsdhrn.cr.usgs.gov/nawqa/vocns/voc_targets.html&gt;.

- 2 -

TS1 003547

# EXHIBIT 5



BINGHAM McCUTC

Oct 17 2005
3:15PM

Diana Pfeffer Martin
Direct Phone:  (213) 680-6448
Direct Fax:     (213) 680-6499
diana.martin@bingham.com

October 17, 2005

**VIA U.S. MAIL AND LEXIS NEXIS FILE AND SERVE**

Robin L. Greenwald, Esq.
Weitz & Luxenberg
180 Maiden Lane, 17th Floor
New York, New York 10038

**Re: MDL 1358 -- Tesoro October 2005 Response to
Trade Organization Information**

Dear Ms. Greenwald:

Consistent with the Court's directive at the August 12, 2005 Status Conference,
and in your capacity as plaintiffs' liaison counsel, this letter provides information
on the Tesoro defendants' membership in major trade organizations that were
involved with MTBE, ethanol, underground storage tanks, the LUST program
and/or RFG issues.[1]  The Tesoro defendants have no records of participation in
any committees within these trade associations that were established specifically
to address any of these topics.

<u>Western States Petroleum Association ("WSPA")</u>:  Based on available records,
Tesoro has been a member of WSPA since 1998.

<u>National Petrochemical and Refiners Association ("NPRA")</u>:  Based on available
information, Tesoro has been a member of NPRA since 1971.

<u>Society of Independent Gasoline Marketers of America ("SIGMA")</u>:  Based on
available records, Tesoro has been a member of SIGMA since 1999.

---

[1] Tesoro's September 12, 2005 submittal addressed its involvement with API, OFA and
the MTBE Committee.  Upon further records review, it appears that Tesoro has been a
member of API since 1999.  Tesoro also has records that reflect interactions with API
between approximately 1993 and approximately 1997.  Based on the available records,
Tesoro cannot determine the nature of these interactions (*e.g.*, whether they are
memberships, payments for conferences or books, etc.).

Bingham McCutchen LLP
Suite 4400
355 South Grand Avenue
Los Angeles, CA
90071-3106

213 680 6400
213 680 6499 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

Robin L. Greenwald
October 17, 2005
Page 2

Additionally, based on historic records that do not differentiate expenses (*e.g.*, difference between membership and equipment purchase), Tesoro had involvement with SIGMA at some point between approximately 1992 and 1999.

National Petroleum Council ("NPC"):  Based on available records, Tesoro had NPC membership between 1999 and 2003.  Additionally, based on historic records that do not differentiate between expenses (*e.g.*, differences between membership and equipment purchases), Tesoro had involvement with NPC at some point between approximately 1992 and 1999.

Petroleum Equipment Suppliers Association ("PESA"):  Based on available records, Tesoro had PESA membership between 1999 and 2003.  Additionally, based on historic records that do not differentiate expense (*e.g.*, difference between membership and equipment purchase), Tesoro had involvement with PESA in 1993.

Petroleum Equipment Services, Inc. ("PES"):  Based on available records, Tesoro had a PES membership between approximately 2000 and 2004.  Additionally, based on historic records that do not differentiate between expenses (*e.g.*, differences between membership and equipment purchases), Tesoro had involvement with PES at some point between approximately 1992 and 1999.

Western Petroleum Marketers Association ("WPMA"):  Based on available records, Tesoro has been a member of WPMA since 2000.  Additionally, based on historic records that do not differentiate expenses (*e.g.*, differences between membership and equipment purchases), Tesoro had involvement with WPMA in approximately 1993.

National Association of Convenience Stores ("NACS"):  Based on available records, Tesoro had a NACS membership between approximately 2001 and 2004.  Additionally, based on historic records that do not differentiate between expenses (*e.g.*, differences between membership and equipment purchases), Tesoro had involvement with NACS at some point between approximately 1992 and 1999.

Miscellaneous:  Based on records that do not differentiate expenses (*e.g.*, difference between membership and equipment purchase), Tesoro had involvement with the following at some time between approximately 1992 and

Bingham McCutchen LLP
bingham.com

Robin L. Greenwald
October 17, 2005
Page 3

1999 (specific date is unknown):  American Institute of Chemical Engineers;
American Society for Testing and Materials; Society of Petroleum Engineers; and
Petroleum Equipment Suppliers.

Sincerely yours,

Diana Pfeffer Martin

Bingham McCutchen LLP
bingham.com

cc:      All counsel via Lexis Nexis File Serve

Robin L. Greenwald
October 17, 2005
· Page 4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of MDL 1358 -- Tesoro October 2005
Response to Trade Organization Information was served upon all parties of
record via LexisNexis File & Serve on October 17, 2005.

Bingham McCutchen LLP
bingham.com

Angie Rigor

# EXHIBIT 6

1988 HEALTH AND ENVIRONMENTAL PROJECT PROPOSALS

ISSUE/TITLE:   Motor Gasoline and Water Abatement
               (Groundwater)/Chemical Fate of Octane Enhancers in
               Groundwater

OBJECTIVE:  To determine the chemical characteristics and fate of
BTX and ether/Alcohol solutions under in-situ experimental
groundwater spill conditions.  Specifically, plume delineation,
octane enhancer "cosolubility" characteristics, and
biodegradation will be investigated.

DRIVING FORCES/IMPACT:  As a result of lead phase-down, octane
enhancers such a MTBE and various alcohols are increasingly being
used as substitutes for lead.  There has recently been a dramatic
increase in regulatory interest/concern over these
alcohols/ethers in groundwater.  Maine is considering banning the
use of MTBE.  Without field data to address the concerns of the
regulatory community, regulatory action can be expected (probably
within a 1-3 year time frame.)

DESCRIPTION:  This project would consist of groundwater field
studies, laboratory water quality analysis, a modest literature
review and report preparation.  Data generated would include
characterization of plumes under water table conditions, the
degree to which selected alcohols/ethers act as cosolvents for
BTX compounds, and the nature of in-situ biodegradation of these
solutions.

POSSIBLE OUTCOMES AND CONSEQUENCES:  The objectives of the
research can be accomplished, as has been well-demonstrated with
recent Task Force research on in-situ BTX plumes.  The industry
segments most likely to benefit from the research are
refining/marketing.  If the research is not conducted, there will
be few credible data to support industry's contention that such
octane enhancers do not constitute a significant new groundwater
contamination threat as constituents of gasoline.

ESTIMATED DURATION:  1-2 years      ESTIMATED BUDGET:  $125K

PRIOR COSTS:  None                  FUTURE COSTS:  $80K

SUBMITTED BY:  Gene Mancini (ARCO)

Ranked 1st

#9:catchI

EXHIBIT 30

EQ-SH156 0034

NJDEP-MTBE-CONTENTION-000107

1988 HEALTH AND ENVIRONMENTAL PROJECT PROPOSALS

ISSUE/TITLE:  Water Management/Fate, Transport, Impact of
Gasoline Containing Oxygenates in Groundwater

OBJECTIVE:  Determine the relative chemical and physical effects,
if any, of gasoline containing oxygenates versus non-oxygenated
gasoline.

DRIVING FORCES/IMPACT:  The groundwater impact of oxygenates in
gasoline is receiving ever increasing attention from regulators
at both the local and national levels.  The State of Maine
currently regulates MTBE at a maximum contaminant level of 50
ppb; and in a recent paper, recommended that MTBE be banned from
underground storage or be contained in double wall tanks.  The
impact of MTBE is also being addressed by one state agencies and
the EPA is considering studies on its chronic health effects.

DESCRIPTION:  Oxygenates are highly soluble and mobile in water
relative to BTX and difficult to treat using conventional
technology.  API is currently engaged in studies documenting the
occurrence and removal of gasoline containing MTBE and evaluating
the ability of air stripping and activated carbon to achieve low
ppb treatment levels.  Additional work is needed, initially at
the laboratory scale, to understand the relative impact of
oxygenates in the saturated and unsaturated zones.  In
particular, their relative impact on solubility and transport
phenomena on gasoline constituents should be investigated.

POSSIBLE OUTCOMES AND CONSEQUENCES:  Development of data
providing a better understanding of oxygenates in groundwater
which can be used to respond to regulatory agencies considering
the promulgation of more stringent environmental regulations
governing oxygenates i gasoline.

ESTIMATED DURATION:  1 year          ESTIMATED BUDGET:  $75K

PRIOR COSTS:  $130,000               FUTURE COSTS:  $50K

SUBMITTED BY:  W. A. Stone (Exxon)

#2:catchI

Ranked 1st

EXHIBIT 31

EQ-SH156 0035

NJDEP-MTBE-CONTENTION-000108

# EXHIBIT 7

IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF MERCED

-oOo-

CITY OF MERCED,

       Plaintiff,

vs.

CHEVRON U.S.A., INC.; SHELL OIL
COMPANY; EXXONMOBIL CORPORATION;
EXXON CORPORATION; KINDER MORGAN
ENERGY PARTNERS L.P.; EQUILON
ENTERPRISES LLC; SFPP, L.P. and
DOES 1 THROUGH 200, inclusive,

      Defendants.

Case No. 148451

**COPY**

DEPOSITION OF BRIAN PAZIN

August 25, 2009 at 9:00 (9:08) a.m.

Before:  ERIC L. JOHNSON

RPR, CSR #9771

Taken at:

Merced, California



DEPOBOOK
reporting services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

Deposition of Brian Pazin / August 25, 2009

1          MR. TEMKO:  Bill Temko from Munger, Tolles &

2     Olson, and I represent Shell.

3          MS. STANDIFER:  Rose Standiford from Reed Smith

4     and I represent defendants Kinder Morgan Energy Partners

5     and SFPP.

6          MS. VANDERLAAN-SMITH:  Nicole Vanderlaan-Smith

7     from Latham & Watkins and I represent defendant

8     ConocoPhillips Company.

9          THE VIDEOGRAPHER:  Will the court reporter

10    please swear in the witness.

11               BRIAN PAZIN,

12    the Witness herein, having been duly and regularly sworn

13    by the Certified Shorthand Reporter, deposed and

14    testified as follows:

15               EXAMINATION BY MR. MILLER

16         MR. MILLER:  Q.  For the record, could we have

17    your name and business address, please.

18    A.  Brian David Pazin, 129 West 15th Street,

19    Merced, California, 95340.

20    Q.  By whom are you employed?

21    A.  Cardgas, Incorporated.

22    Q.  And when did you first go to work for them?

23    A.  November of -- I believe of 1986.

24         MR. CORRELL:  I believe you said you had a

25    statement you wanted to put on the record.

                                                            7

Deposition of Brian Pazin / August 25, 2009

1          MR. MILLER:  I was going to get to that, don't

2     worry.

3          Q.  And are you currently employed by them?

4          A.  Yes, I am the owner.

5          Q.  Okay.  I understand that you are on some

6     medication; is that correct?

7          A.  Yes.  I take blood pressure medicine and

8     anxiety medicine.

9          Q.  I don't want to get into personal details, but

10    have you been taking your medicine for a number of

11    years?

12         A.  Approximately about two years.

13         Q.  Okay.  Do you believe that you can give us your

14    best testimony this morning, despite the medication?

15         A.  Yes.

16         Q.  If you are having a problem at any time, for

17    any reason, I would like you to let us know, because we

18    want to give you a break or do whatever else may help,

19    so that you don't have a problem that interferes with

20    your ability to give a good deposition.  Will you

21    promise to let us know?

22         A.  Yes.

23         Q.  Is there anything else that you needed to put

24    on the record before we get started this morning?

25         A.  No, sir.

8

1    it was in in 1986 when you started working there.

2              Are you generally familiar with the features of

3    the station at that time?

4         A.   I am sorry.  I don't understand that question.

5         Q.   All right.  Was the underground storage tanks

6    present in 1986 when you started working at Cardgas --

7    were they single walled steel tanks?

8              MS. VANDERLAAN-SMITH:  Lacks foundation.

9              THE WITNESS:  Yes.

10             MR. MILLER:  Q.  And when you started in 1986,

11   were you selling gasoline and diesel products?

12        A.   Yes.

13        Q.   Did you have more than one grade of gasoline?

14        A.   Yes.

15        Q.   Did you sell premium gasoline?

16        A.   Yes.

17        Q.   Throughout the entire time that you have been

18   either employed by or owned that Cardgas facility, have

19   they purchased all of their gasoline through Pazin Oil

20   Company in the beginning and then Pazin & Myers, Inc.,

21   when it was formed later?

22        A.   To my knowledge, yes.

23        Q.   Are you familiar with the concept of placing a

24   containment device under a dispenser so that if gasoline

25   is released from the plumbing or some other part, it can

                                                          17

Deposition of Brian Pazin / August 25, 2009

```
 1          Did anyone give you any special training or

 2     instruction on MTBE and its potential to cause

 3     contamination, prior to the time those tanks were

 4     removed?

 5          A.  No.

 6          Q.  Did anyone talk to you about how MTBE can

 7     contaminate water supplies in wells before that time?

 8          A.  No.

 9          Q.  Did anybody talk to you about the kinds of

10     problems that can be created if MTBE gets in a well?

11          A.  No.

12          Q.  Did anybody discuss with you the need to take

13     prompt action to clean up a release if MTBE is involved,

14     because if you don't it moves further and faster than

15     the rest of the gasoline?

16          A.  No.

17          MR. CORRELL:  Objection; assumes facts not in

18     evidence.

19          MR. MILLER:  Q.  Did anyone talk to you about

20     the need to seal every crack in the pavement near your

21     dispensers because if the customer spilled some fuel it

22     could cause contamination problems with MTBE?

23          MR. CORRELL:  Objection; assumes facts not in

24     evidence.

25          THE WITNESS:  No.
```

132

Deposition of Brian Pazin / August 25, 2009

1        Q.   To the best of your recollection, did you ever

2   observe any, you know, puddles or spills of gasoline?

3        A.   No.

4        Q.   Okay.  And if you had, would it -- based on

5   your operations at the business, would you have cleaned

6   that up?

7        A.   Yes.

8             MR. MILLER:  Speculation.

9             MS. VANDERLAAN-SMITH:  Q.   Is it your

10  understanding that if you had a leak of gasoline or

11  there were a gasoline spill, that that would have the

12  potential to affect the environment?

13       A.   Yes.

14       Q.   And that would be so, regardless of whether the

15  gasoline had MTBE in it or not?

16       A.   Correct.

17       Q.   Have you heard of a material safety data sheet?

18       A.   Yes.

19       Q.   Okay.  Those are sometimes referred to as

20  MSDS's?

21       A.   Mm-hmm.

22       Q.   Do you know, during the time that you have been

23  involved with the Cardgas station, have you ever

24  received MSDS's?

25       A.   No.

                                                      174

```
 1         Q.  How is it that you became familiar with that
 2   term?  How do you know what that is?
 3         A.  Because I also am employed by Pazin & Myers.
 4         Q.  Okay?
 5         A.  So we know about MSDS sheets through thinner or
 6   solvents, or if a customer needs an MSDS sheet for
 7   another product.
 8         Q.  And in conjunction with your work for Pazin &
 9   Myers, have you ever seen MSDS's?
10         A.  Yes.
11         Q.  Okay.  And in what context would you generally
12   receive those?
13         A.  I don't know -- can you repeat that?
14         Q.  I guess you had said that you seen the MSDS's?
15         A.  I have seen the sheets.
16         Q.  Just seen the sheets?
17         A.  Yeah.
18         Q.  Why would you come to see those?  Would someone
19   hand them to you or would you --
20         A.  Maybe the secretary would say, "Would you
21   deliver this to a customer?  They want this MSDS sheet."
22   I would take it to whatever customer.
23         Q.  Okay.  What was your role with Pazin & Myers?
24         A.  I can just basically, you know, drive a route
25   truck, or if somebody comes in and wants some oil, it is
```

                                                          175

Deposition of Brian Pazin / August 25, 2009

1   kind of a dual thing for me.  It is our name on the gate

2   so, I mean, I am, you know, employed there.  I have a

3   class B license, so in case I need to get on the truck

4   and deliver fuel, I can do that.

5        Q.  Okay.  And I guess -- do you know if -- let me

6   think about how to phrase this.

7            So on occasion the secretary would ask you to

8   deliver an MSDS to a customer.  Correct?

9        A.  Yeah.

10       Q.  And she never asked you to deliver one to

11  yourself as owner of the Cardgas?

12       A.  No.

13       Q.  Because that would be kind of silly, right?

14       A.  Right.

15           MS. VANDERLAAN-SMITH:  All right.  Those are

16  all the questions that I have.  Thank you.

17           THE WITNESS:  Thank you.

18           MS. STANDIFER:  Do you have any?

19           MS. JONES-ROY:  I don't have any.

20              EXAMINATION BY MS. STANDIFER

21           MS. STANDIFER:  All right.

22       Q.  Good afternoon, Mr. Pazin.  Rose Standifer.  I

23  represent Kinder Morgan and SFPP.

24           So first, have you ever heard of Kinder Morgan?

25       A.  Yes.

                                                        176

DEPOBOOK REPORTING SERVICES (800) 830-8885

Deposition of Brian Pazin / August 25, 2009

1    STATE OF CALIFORNIA   )
                          (   ss.

2    COUNTY OF STANISLAUS   )

3         I, ERIC L. JOHNSON, do hereby certify that I am a

4    licensed Certified Shorthand Reporter, duly qualified

5    and certified as such by the State of California;

6         That prior to being examined, the witness named in

7    the foregoing deposition was by me duly sworn to testify

8    to tell the truth, the whole truth, and nothing but the

9    truth;

10        That the said deposition was by me recorded

11    stenographically at the time and place herein mentioned;

12    and the foregoing pages constitute a full, true,

13    complete and correct record of the testimony given by

14    the said witness;

15        That I am a disinterested person, not being in any

16    way interested in the outcome of said action, or

17    connected with, nor related to any of the parties in

18    said action, or to their respective counsel, in any

19    manner whatsoever.

20

21    DATED:  September 4, 2009

22

23                 Eric L. Johnson, CSR, RPR

24

25

                                                181

# EXHIBIT 8

American Petroleum Institute
1220 L Street, Northwest
Washington, D C 20005
202-682-8000

**ΛPI**

David H. Chen, Ph.D.
Sr. Environmental Scientist
(202) 682-8343

Date:   February 16, 1988

From:   David H. Chen

To:     GROUNDWATER TECHNICAL TASK FORCE (GWTTF)

Subj:   1989 Groundwater Research Proposals

Attached please find the six individual project writeups in
the rank order proposed for the 1989 research program following
our discussion at the January GWTTF meeting.  For clarity and
consistency, some modifications were made to each of the original
project writeups as submitted by the authors.  The present
versions are included in the 1989 Wastes Research Program to be
reviewed by the Environmental Technology Research Group this
week.

Because of the heavy demands placed on the 1989 research
funds, and the competitiveness of the individual submittals in
the wastes program overall, it will be difficult to predict how
each of the groundwater research projects will fare.  Needless to
say adjustments will have to be made to accommodate various needs
identified.

Attachments

cc:  J. Shaw    (memo only)
     D. Persons

An equal opportunity employer

EXHIBIT *17*        EQ-SH156 0510

**NJDEP-MTBE-CONTENTION-000071**

1988 HEALTH AND ENVIRONMENTAL PROJECT PROPOSALS

ISSUE/TITLE:   Waste Management/Impact of Gasoline-Containing
               Oxygenates On Groundwater Contamination

OBJECTIVE:  A two-year program to investigate the fate and
transport characteristics of gasoline-oxygenate blend in
groundwater.  The study will assess the validity of claims that
spills of these blends cause an increased solubility of BTEX
hydrocarbons in groundwater, resulting in their moving faster and
further than in the absence of oxygenates.  This is a 2nd-year
continuation of a 1988 project (GW-16).

DRIVING FORCES/IMPACT:  The impact of oxygenates (e.g., methyl
tertiary butyl ether (MTBE), ethanol, and methanol) on
gasoline/groundwater interactions is receiving increasing
regulatory attention at state and federal levels.  In a paper by
State of Maine officials which received nationwide publicity, the
officials called for either banning of oxygenated gasolines or
stricter requirements that they be stored in double-walled tanks.
The claims were that the oxygenates increase the dissolved
hydrocarbon plume (BTEX and oxygenate), and it travels much
faster than a plume without oxygenate.  At present, industry has
no scientific data to refute these claims.  With recent interest
in use of alcohol blends to reduce air pollution, it is even more
imperative that the fate and transport of oxygenate plumes be
legitimately documented.

DESCRIPTION:  The 1988 project includes complementary laboratory
and in-situ field studies designed to determine the impact of
gasoline-oxygenate blends to groundwater.  The effects of
oxygenates on the solubility of BTEX constituents in groundwater
will be measured in the laboratory (Phase I).  In mid-1988, field
injections of one or two gasoline-oxygenate blends (e.g., MTBE
and methanol) will be conducted to assess plume behavior and
mobility under water table conditions (Phase II).  An injection
of reference, non-oxygenated gasoline will also be done.  The
fate and transport of BTEX and oxygenates will be monitored
through the Fall of 1989.  In order to complete the 2nd year of
study monitoring the plumes and comparing the oxygenate plumes to
the reference plume, 1989 funds are requested.

POSSIBLE OUTCOME & CONSEQUENCES:  This study will provide
industry with timely information to respond to regulatory
initiatives (Phase I report due Jan. 89, Phase II report due Feb.
90).  There is a downside risk that the results may show that
oxygenates, to some extent, increase groundwater contamination
problems from gasoline leaks and spills.  In this event, industry
will be knowledgeable about the range of impacts to expect from
gasoline-oxygenate blends, better equipped to formulate
strategies for cleanup, and in a stronger proactive rather than
reactive postion.

ESTIMATED DURATION:  1 year          ESTIMATED BUDGET: $140,000

PRIOR COSTS:  $100,000               FUTURE COSTS:  Unknown

SUBMITTED BY:  Dorothy Keech
               Groundwater Technical Task Force

ANSWER: DC2/P-6

**EQ-SH156 0511**

**NJDEP-MTBE-CONTENTION-000072**

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898<br>MDL 1358 (SAS)<br>M21-88 |

---

This Document Relates To:

*City of Merced Redevelopment Agency, et al. v. Exxon Mobil Corp., et al.*, 1:08-cv-06306

---

CITY OF MERCED REDEVELOPMENT AGENCY and MERCED DESIGNATED LOCAL AUTHORITY, AS SUCCESSOR AGENCY TO THE REDEVELOPMENT AGENCY OF THE CITY OF MERCED,

       Plaintiffs,

       v.

EXXON MOBIL CORPORATION; EXXON CORPORATION; CHEVRON U.S.A. INC.; SHELL OIL COMPANY; EQUILON ENTERPRISES LLC; TESORO CORPORATION; TESORO REFINING AND MARKETING COMPANY; and DOES 1 THROUGH 200, inclusive,

       Defendants.

Hon. Shira A. Scheindlin

Transferred from:
United States District Court,
Eastern District of California
Case No. 1:08-cv-00714

Removed from:
Superior Court of California,
County of Merced
Case No. 151145

**FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF FOR:**

**(1) COST RECOVERY UNDER THE POLANCO REDEVELOPMENT ACT;**
**(2) PRODUCTS LIABILITY;**
**(3) NEGLIGENCE;**
**(4) TRESPASS; AND**
**(5) NUISANCE**

**JURY TRIAL DEMANDED**

---

1

public drinking water because of MTBE's threat to public health.

19. TBA also presents a significant threat to public health.  The State of California has set an action level for TBA of 12 ppb in water, based on an interim assessment performed by the California Office of Environmental Health Hazard Assessment.  The interim assessment concluded that exposure to TBA at levels above 12 ppb in water creates an unacceptable public health risk of cancer.

20. California Governor Gray Davis ordered state agencies to phase out MTBE use in motor fuel in California, and to achieve 100% removal no later than December 31, 2003. Eighteen states, including California, have either banned or are phasing out the use of MTBE in gasoline.

**C.      Defendants' Promotion of MTBE and TBA.**

21. The Defendants promoted the use of gasoline containing MTBE and/or TBA by claiming that it was environmentally beneficial and would improve air quality.  At the same time, Defendants concealed and/or failed to disclose that MTBE would contaminate groundwater and render it not potable.

22. The widespread problems of leaking gasoline delivery systems were well known to the Defendants prior to the introduction of MTBE and TBA.  At least as early as the mid-1960's these Defendants knew, or reasonably should have known, that gasoline delivery systems frequently leak and release gasoline into the environment, including into groundwater.

23. Despite knowing that a substantial percentage of Merced gasoline stations would utilize gasoline storage and distribution facilities which were inadequate and leaking, and

First Amended Complaint for Damages and Other Relief

without taking reasonable, appropriate, or special measures to monitor, detect, and respond to releases of MTBE and/or TBA to soil and/or groundwater, and without taking reasonable, appropriate, or special precautions to investigate, contain, and cleanup releases of these compounds, and despite the availability of reasonable alternatives (including adequate warnings), Defendants chose not to warn customers, retailers, environmental consultants, regulators, or public officials, including Plaintiffs. At all times, Defendants represented to purchasers of MTBE, TBA, and/or gasoline containing MTBE and/or TBA, as well as to the public and government agencies, that such products were environmentally sound and appropriate for distribution, sale, and use. Indeed, Defendants represented that gasoline containing MTBE could be handled the same as ordinary gasoline, and required no special measures to protect against or respond to suspected releases to the subsurface.

24. The Defendants further exacerbated the situation by, among other things, negligently, carelessly, recklessly, and/or intentionally failing to: (1) prevent leaks of MTBE and/or TBA through the use of appropriate technology; (2) install and maintain gasoline delivery systems that prevent leaks and facilitate prompt detection and containment of any leaks; (3) monitor and discover leaks as soon as possible; (4) warn those who may be injured as a result of the leak(s); and (5) clean up and abate MTBE and/or TBA spill(s) as thoroughly and as soon as reasonably possible and in a manner necessary to prevent harm and injury.

25. Plaintiffs are informed the Defendants exercised control over use of gasoline containing MTBE and/or TBA through a variety of means, including written agreements, inspection rights, prescribing certain procedures and operating practices, training, sale of branded

8

First Amended Complaint for Damages and Other Relief

goods, and agreements obligating the users of MTBE and/or TBA to acquire, store, and sell gasoline containing MTBE and/or TBA.  Therefore, the Defendants had actual control over leaking gasoline delivery systems and/or were vicariously liable for the acts, omissions, and conduct of the owners and operators of Merced gasoline stations and pipelines which released MTBE into the environment.

26.  The Defendants further advised consultants who conduct environmental investigations and cleanups that gasoline with MTBE could be remediated using the same practices and procedures used for conventional gasoline.

27.  Gasoline containing MTBE and/or TBA was released from gasoline delivery systems in Merced until at least 1997 from gasoline retail stations and, Plaintiffs are informed, a pipeline operated by Kinder Morgan and SFPP.  Over time, MTBE and TBA migrated down to groundwater and, after several years elapsed, traveled to the project area causing pollution, contamination, and interference with the Plaintiffs' project area.  This appreciable injury and damage occurred for the first time in July 2006, when the Regional Water Quality Control Board determined that the parties responsible for releases at 1415 "R" Street and 1455 "R" Street in Merced were not taking appropriate and timely action to abate the plume, and the Plaintiffs were asked to manage the project.

28.  The Plaintiffs seek compensatory damages needed to investigate, remediate, and remove gasoline, hydrocarbons, MTBE and/or TBA contamination, and for past, present, and future remediation, and/or investigation costs incurred in or after August 2006.

First Amended Complaint for Damages and Other Relief

52. For the reasons alleged herein, Plaintiffs are entitled to an award of exemplary damages against defendants Chevron, Shell, Exxon Mobil, Exxon, Equilon, and DOES 1 through 50. After the completion of additional investigation and discovery, Plaintiffs may seek leave of court to amend this complaint to allege a claim for exemplary damages against additional defendants if warranted by the facts.

## FOURTH CAUSE OF ACTION

### (Trespass Against All Defendants)

53. Plaintiffs refer to paragraphs 1 through 52 above, and by this reference incorporate them into this cause of action as though fully set forth herein.

54. Plaintiffs are the owner and/or actual possessor of property rights and interests. Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE and TBA and gasoline containing MTBE and/or TBA are extremely hazardous to groundwater and to public water systems, including the property and other rights of the Plaintiffs.

55. The Defendants so negligently, recklessly, and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use gasoline containing MTBE and/or TBA, and/or failed to clean up spills and leaks of gasoline containing MTBE and/or TBA, that they directly and proximately caused MTBE and/or TBA to contaminate Plaintiffs' project area as follows:

     (a)     The Defendants participated in the use, storage, and release of gasoline containing MTBE and/or TBA by owning, controlling, regulating, constructing, installing,

17

First Amended Complaint for Damages and Other Relief

operating, monitoring, inspecting, and testing, or by failing to do so, the gasoline

delivery systems and thereby proximately caused gasoline containing MTBE

and/or TBA to be released into the environment and groundwater.

(b)  The Defendants negligently provided instructions and/or warnings to their

customers and others concerning MTBE and/or TBA, knowing that there was a

substantial danger that if their instructions and/or warnings were followed that

gasoline containing MTBE and/or TBA dispensed into gasoline delivery systems

would escape into the environment and contaminate groundwater and would not

be appropriately remediated.

(c)  The Defendants negligently delivered (directly or indirectly) gasoline containing

MTBE and/or TBA into gasoline delivery systems which they knew, or should

have known, were inadequate, old, leaking, and/or defective, and thereby created a

substantial known danger that MTBE and TBA would be released into the

environment and contaminate groundwater; and negligently provided instructions

and/or warnings to their customers and others concerning MTBE and TBA,

knowing that there was a substantial danger that if their instructions and/or

warnings were followed that gasoline containing MTBE and/or TBA dispensed

into gasoline delivery systems would escape into the environment and

contaminate groundwater.

(d)  Defendants retained consultants and negligently controlled and/or directed their

cleanup and remediation activities (or the lack thereof) at gasoline station sites,

---

18

thereby causing and permitting MTBE and/or TBA to contaminate and threaten Plaintiffs' project area, and Defendants failed to warn the appropriate entities and individuals, including Plaintiffs, of known risks, spills, releases, and/or leaks, and/or failed to undertake reasonable, appropriate, or necessary action to reduce, remediate, or abate MTBE and/or TBA groundwater contamination.

(e)    Defendants and their agents negligently overfilled gasoline delivery systems with gasoline containing MTBE and/or TBA, and/or spilled or released it at gasoline facilities near Plaintiffs' project area.

(f)    When Defendants learned, or reasonably should have learned, that MTBE and/or TBA were persistent, significant, and/or widespread sources of groundwater contamination, or threatened to be so, Defendants failed to warn the appropriate entities and individuals, including Plaintiffs, of known risks, spills, releases, and/or leaks, and/or failed to undertake reasonable, appropriate, or necessary action to reduce, remediate, or abate MTBE and/or TBA groundwater contamination.

56.  Defendants had actual control over Merced gasoline stations through a variety of means, including, but not limited to, written agreements, inspection rights, prescribing certain procedures and operating practices, sale of branded goods, agreements obligating the respective owners and/or operators to acquire, store, and sell gasoline containing MTBE and/or TBA, and training.  Therefore, Defendants had actual control over the Merced gasoline stations with leaking gasoline delivery systems and/or were vicariously liable for the acts and conduct of the

19

First Amended Complaint for Damages and Other Relief

owners and operators of those stations.

57. The MTBE and TBA contamination of Plaintiffs' project area has varied and will vary over time and requires investigation, remediation, abatement, and/or treatment. The Plaintiffs have engaged, or will engage, in remediation, abatement, investigation, and/or treatment programs, and thereby have sustained, are sustaining, and will sustain, the damages alleged herein.

58. For the reasons alleged herein, Plaintiffs are entitled to an award of exemplary damages against defendants Chevron, Shell, Exxon Mobil, Exxon, Equilon, and DOES 1 through 50. After the completion of additional investigation and discovery, Plaintiffs may seek leave of court to amend this complaint to allege a claim for exemplary damages against additional defendants if warranted by the facts.

## FIFTH CAUSE OF ACTION

### (Nuisance Against All Defendants)

59. Plaintiffs refer to paragraphs 1 through 58 above, and by this reference incorporate them into this cause of action as though fully set forth herein.

60. The negligent, reckless, intentional, and ultrahazardous activity of Defendants, and each of them, as alleged herein, has resulted in the contamination and pollution of and threats to Plaintiffs' project area and thereby constitutes a nuisance. The contamination, pollution, and threats to Plaintiffs' project area from gasoline containing MTBE and/or TBA is a public nuisance as defined in Civil Code section 3479, Civil Code section 3480, Health and Safety Code section 5410, and Water Code section 13050, as it is injurious to health, indecent, and offensive

20

First Amended Complaint for Damages and Other Relief

to the senses and has substantially interfered with and obstructed Plaintiffs' project area and property rights.

61. The Defendants' negligent failure to warn that:

(a)     MTBE and TBA are more soluble, mobile, and persistent than other components of conventional gasoline and, therefore, have a unique and greater potential to contaminate groundwater and drinking water supplies;

(b)     special precautions should be taken to prevent, contain, limit, detect, and cleanup releases of gasoline containing MTBE and TBA;

(c)     gasoline delivery systems should be upgraded and improved to prevent releases of gasoline containing MTBE;

(d)     any release of MTBE and TBA must be detected and remediated as soon as possible to avoid contamination of wells and drinking water;

(e)     handling gasoline containing MTBE and TBA in the same manner as conventional gasoline can cause environmental contamination which is difficult and expensive to cleanup;  and

(f)     even small spills of gasoline containing MTBE (including a cup spilled on the pavement by the customer) can cause environmental contamination if it is not promptly cleaned up;

was a substantial factor in the creation of the nuisance.

62. Plaintiffs own and hold property rights and interests damaged by the nuisance. Plaintiffs' injury is separate and distinct from that of the public.

63.  Plaintiffs have not consented to and do not consent to this nuisance.  Defendants, and each of them, knew, or should have known, that Plaintiffs would not consent to this nuisance.

64.  As a direct and proximate result of the nuisance, Plaintiffs have been damaged and are entitled to the compensatory and exemplary damages alleged herein, or to such other appropriate relief as Plaintiffs may elect at trial, including, but not limited to, equitable relief in the form of an order requiring the Defendants to abate the nuisance injuring Plaintiffs and the project area.

## PRAYER

**WHEREFORE**, Plaintiffs request judgment against Defendants, and each of them, for:

1.  Compensatory damages according to proof;

2.  Exemplary damages in an amount sufficient to punish defendants Chevron, Shell, Exxon Mobil, Exxon, Equilon, and DOES 1 through 50, inclusive, and to deter those defendants from ever committing the same or similar acts;

3.  An Order declaring that the Defendants have created a nuisance, and compelling Defendants to abate that nuisance;

4.  Pursuant to Civil Code section 1882.2, three times the amount of actual damages, plus the cost of the suit and reasonable attorneys' fees;

5.  Reasonable attorneys' fees, pursuant to Code of Civil Procedure section 1021.5 or otherwise, and costs incurred in prosecuting this action, and prejudgment interest to the full extent permitted by law;  and

6.  Such and other further relief as the court may deem just and proper.

---

First Amended Complaint for Damages and Other Relief

# EXHIBIT 10

40-86/30-23

Dit(1)

Minutes for the Public Focus Meeting

For Methyl tert-Butyl Ether (MTBE)

December 17, 1986

The meeting opened with comments from Rich Troast, Section Chief in the Test Rules Development Branch. Beth Anderson, project manager for MTBE, presented the handout information (attached) which outlined the concerns and testing recommended by the Interagency Testing Committee (ITC) Report 51 FR 41417 (November 14, 1986). She indicated the data gaps in: health effects, exposure, and production data and requested industry submission of this information. An additional concern brought out by TRDB research was the contamination of ground water supplies by MTBE. There are over 700,000 underground storage tanks for petroleum products in the US and about 30% of these tanks leak.

Vinay Kumar, Chemical Engineering Branch, submitted a list of questions and requested industry response. Ed Coe, Economics Branch, presented a list of questions for industry response. He estimated the ITC testing costs ($500,000 to $800,000) and the annualized test cost per pound as a percentage of product price per pound: 0.009% to 0.018%.

William Kilmartin, from ARCO Chemical Company, presented data to answer the ITC's concerns with two major points: 1) Monitoring of exposure to MTBE from gasoline vapors is needed. The worse case exposures can be calculated from existing data. 2) Testing for chronic inhalation health effects is not necessary because worse case exposures to MTBE are well below the no observable adverse effect level.

Arthur Lington, EXXON Corproation, presented a summary of health effects testing of MTBE already conducted. His review of MTBE data concluded that there was no need to conduct a chronic study to assess oncogenic, hematologic or neurotoxic effects based on data from experiments with MTBE, other aliphatic ethers and tert-butyl alcohol. The presentation concluded by suggesting that TLV of 100 ppm MTBE would allow a margin of safety of 100 or greater because exposure to MTBE vapor is generally <1 ppm.

The industry representatives were encouraged to submit supplemental information and the mandatory 8(a) and 8(d) information for the Agency's course setting process. Rich Troast indicated that a public course setting meeting would be held in April. Then the meeting was ajourned.

Attachments

EXHIBIT 28

*Schedule*

| Week 1/ | Event |
|---------|-------|
| 0 | Receive ITC report recommendation |
| 2 | Publish ITC report, 3(a) & 8(d) notices, and invitation for public participation in negotiations |
| 3-6 | Comment period on ITC report |
| 6 | Public focus meeting |
| 7-14 | 3(a) and 8(d) reporting period |
| 18-20 | Course-setting |
| 22 | Public meeting on course-setting decision and deadline for requests to participate in negotiations |
| 22-30 | Negotiations |
| 32 | EPA decision point:  consent agreement or test rule |

| Week | Consent Agreement | Week | Test Rule |
|------|-------------------|------|-----------|
| 32-36 | Prepare consent agreement; circulate to parties | 32-60 | Rule preparation, agency review and sign-off |
| 36-40 | Comments due on consent agreement | 62 | Publish proposed rule in FEDERAL REGISTER3/ |
| 42 | Comment resolution meeting if necessary | 70-106 | Agency reviews comments; preparation of final rule or no-test decision, agency review and sign-off2/ |
| 42-44 | Prepare final consent agreement and FEDERAL REGISTER notice | | |
| 44-48 | Sign-off consent agreement and FEDERAL REGISTER notice | 108 | Publish final rule or no-test decision in FEDERAL REGISTER2/ |
| 50 | Publish FEDERAL REGISTER notice | | |

METHYL TERT-BUTYL ETHER FOCUS MEETING
DECEMBER 17, 1986      10 A.M.

Name _____ ART LINNTON _____
Company Affiliation _____ EXXON CORPORATION _____
Address _____ P.O. BOX 235   E. MILLSTONE   NJ   08977 _____
Phone Number _____ 201-873-6055 _____

Name _____ JAMES DEJOVINE _____
Company Affiliation _____ ARCO (chemical) _____
Address _____ 1500 MARKET ST   Philadelphia   Pa   19102 _____
Phone Number _____ 215-557-2604 _____

Name _____ C. S. Ferguson _____
Company Affiliation _____ EPA _____
Address _____ 1330 G. AVE   WASH DC   20056 _____
Phone Number _____ 202-695-0050 _____

Name _____ Ken Sternberg / Lori Wainright _____
Company Affiliation _____ Alcohol Week _____
Address _____ 1234 . Jeff Davis Highway, Arlington, Va _____
Phone Number _____ 872-3516 _____

Name _____ George Vegas _____
Company Affiliation _____ Vegas Chemical _____
Address _____ 1500 market st.   Phila Pa   19101 _____
Phone Number _____ (215)557-2255 _____

Name _____ Vinov Kumar _____
Company Affiliation _____ EPA _____
Address _____ WASHINGTON D. C.   20460 _____
Phone Number _____ 202-382-3741 _____

Name _____ John DeiAm _____
Company Affiliation _____ Texaco Inc _____
Address _____ PO Box 509   Beacon NY   10418 _____
Phone Number _____ 914-831-3400 x6311 _____

NJDEP-MTBE-CONTENTION-000102

Name   WILLIAM  J  KILMARTIN
Company Affiliation   ARCO  CHEMICAL Co
Address   1500  MARKET   ST     PHILA  PA  19102
Phone Number   215-557-3560

Name   S.A. LIDDON
Company Affiliation   ARCO  Chem. Co.
Address   3801 West Chester Pk.   Newtown Square  Pa.  19073
Phone Number   (215) 359-2000

Name   Joanne  Kla
Company Affiliation   TRDB
Address   441  M  St GW
Phone Number   475-8120

Name   Ed  Coe
Company Affiliation   EPA   OTS/ETD/RIR
Address   TS-779
Phone Number   382-3214

Name   Michael  Semine
Company Affiliation   EPA   OTS/HERD/TEB
Address   TS-706
Phone Number   382-3481

Name   DANIEL  TALSMA
Company Affiliation   AMOCO  CORP
Address   200  E.  RANDOLPH  CHICAGO  IL  60601
Phone Number   212-856-5792

Name   D A. GRAY
Company Affiliation   SYRACUSE  RESEARCH  CORP
Address   SYRACUSE  NY 13210
Phone Number   315-426-7017

Name _____ Ric Con_ _n _____
Company Affiliation _____ PTC N _____
Address _____
Phone Number _____ 544-1650 _____

Name __ LYNNE AKERSON __
Company Affiliation __ APT __
Address __ 1220 L ST NW __
Phone Number __ 682-8479 __

Name __ Phil M. H: Howard __
Company Affiliation __ Syracuse Res Cor __
Address __ Merrill Lane Syracuse N413217 __
Phone Number __ 315-4355100 __

Name __ Michael Noal __
Company Affiliation __ Syracuse research Grp __
Address __ Morrill / Land 560 __
Phone Number __ 315-425-5100 __

Name __ JACK McCARTHY __
Company Affiliation __ EPA / TAD __
Address __ Wa, Me_ __
Phone Number __ 382-2777 __

Name _____ Bob Drink _____
Company Affiliation _____ EPA ITC _____
Address _____ 45 TS793 _____
Phone Number _____ 382-3820 _____

Name _____ W.J Sauer _____
Company Affiliation _____ Chevron Res Corp _____
Address _____ 2301 M ST NW Wash TX 20037 __
Phone Number _____ 702 887-1164 __

Name _L. L. Scurlock_
Company Affiliation _CMA_
Address _25? M St NW_          _UDC ~0072_
Phone Number _202-782-1182_

Name _Dave Kortum_
Company Affiliation _EPA - OAR - OMS - FOCA - Full_
Address _FAIRCHILD    EN-347F_
Phone Number _475-9841_

Name _Robert Fensterheim_
Company Affiliation _API_
Address _1201 L ST NW    Wash DC 25007_
Phone Number _682-8478_

Name _Seth Anderson_
Company Affiliation _EPA - OTS - ECAD - TRDB_
Address _401 M Street SW_
Phone Number _475 8158_

Name _Rick Troast_
Company Affiliation _EPA_
Address _401 M Street S_
Phone Number

Name
Company Affiliation
Address
Phone Number

Name
Company Affiliation
Address
Phone Number

# EXHIBIT 11

*JOB FILE 3700i*

Memorandum

San Francisco
February 13, 1987

MTBE

| OPERATIONS & BUSINESS PLANNING | | | | | | | |
|---|---|---|---|---|---|---|---|
| FEB 18 '87 | | | | | | | |

MR. D. B. SMITH:

As per your request, we have reviewed the available health data, environmental consequence and likely regulatory action relative to MTBE (tert-Butyl methyl ether) and offer the following assessment.

## Toxicology

In November, the Interagency Testing Committee (ITC) listed MTBE in their 19th annual report to the EPA. Prior to that action, CRCS, Inc. had prepared an information review document which served as the basis for the ITC decision. A copy of the report is enclosed.

Most of the toxicology testing on MTBE has been sponsored by the American Petroleum Institute. In inhalation teratology and reproduction studies in rats and mice, no exposure-related adverse effects were observed. In a 90-day inhalation exposure to rats, the no-effect-level was 250 ppm. The principal pharmacotoxic sign was a dose-related anesthetic effect on the central nervous system. Other studies showed MTBE to be a slight skin and eye irritant and have low acute dermal and oral toxicity. We believe the acute toxicity data and 90-day inhalation study are sufficient to prepare safe handling procedures and exposure levels for workers. *Toxic effect of mtbe*

The mutagenicity data on MTBE was equivocal. While the Ames test was negative, other short-term genotoxicity assays were positive under certain conditions. A lifetime cancer bioassay has not been done with MTBE. Because the ITC concluded the exposure potential to MTBE was high, any test rule is likely to require additional testing in these areas. *DNA (gene) alteration of bacterium other cells*

## Occupational Health

Occupational health concerns do not impose a problem to the manufacturing of MTBE over normal refinery operations.

TLVs exist for methanol but not for isobutylene (a second reactant) and MTBE. While monitoring of employee exposure can be accomplished, the Chevron Exposure Standards Committee would have to establish standards for isobutylene and MTBE. Detailed studies may be required before it is possible to accurately measure employee exposure on a routine basis, and the methods will require validation.

In the event of fire, all the materials, feed stock, intermediates, and process chemicals degrade to carbon monoxide, carbon dioxide and water and are not reported to form toxic combustion products. The control of occupational exposures in normal and emergency situations is similar to what is being done now in refinery operations.

**EXHIBIT** *13*

NJDEP-MTBE-CONTENTION-000055

Mr. C. B. Smith                    - 2 -                    February 12, 1987

## Environmental

Because of the perceived health effects, local and state regulatory agencies are concerned with the clean-up of ground water containing MTBE. Clean-up levels vary from state to state, and in some cases, between localities within a state.

Two considerations impact MTBE. One is the potential health risk, and the second is the increased solubility over normally regulated constituents of interest, i.e., benzene, toluene and xylene (BTX).

MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of the constituents.

Further compounding the problem of increased solubility, MTBE is more difficult to remove from ground water using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double the air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

Clean-up of a gasoline leak/spill containing MTBE can be expected to initially cost more in capital and O&M than a conventional gasoline leak/spill. There are insufficient data available to determine the time required to clean up dissolved MTBE from ground water. Logically one could conclude the MTBE would not be as tightly bound to soil particles, thus could be more easily leached from the subsurface soil particles. However, due to the increased solubility, the MTBE will be dissolved into a much larger portion of the aquifer, thus offsetting a possible reduced vadose zone contamination.

*unsaturated portion of subsurface above water table*

## Regulatory

The Environmental Protection Agency (EPA) has until April, 1987, to propose a test rule for MTBE under Section 4 of TSCA. While EPA does not have to issue a test rule if they determine that current information is sufficient, this is not expected to happen. In April, the EPA is expected to outline their major concerns about MTBE and issue the required testing and monitoring needed to address those concerns.

Industry representatives from Arco, Exxon, Sun Oil and Texaco met with EPA in December, 1986 at a "focus meeting" to discuss MTBE. Arco's representative felt the EPA's major concern was the potential for ground water contamination. Their secondary concerns were the lack of animal lifetime bioassay data and consumer exposure data. Manufacturers of MTBE are attempting to establish an industry group to "negotiate" the test rule with EPA. This will probably be done through the Specialty Organic Chemicals Manufacturers Association (SOCMA).

Chevron has experience in three states involving clean-up of ground water containing MTBE (Florida, Maryland and Texas). While all states were concerned about the MTBE, none showed any increased concern due to mobility, solubility, toxicity, or difficulty of clean-up. The possible move to restrict the use of MTBE

Mr. D. E. Smith                        - 3 -                    February 13, 1987

in Maine appears to be an isolated action and not a trend. However, this could change if other states perceive the threat to ground water to be great or if Maine becomes exceptionally vocal (see Enclosure 2). Considering solubility, toxicity, difficulty of detection (taste) and degree of treatment, methanol as an additive should be of greater concern than MTBE. However, several states apparently do not share those concerns about methanol.

Overseas, the European-Economic Community (EEC) is concerned about all oxygenated fuel additives (i.e., methanol, ethanol, MTBE) and is considering a data call-in on these materials. Manufacturers and users would have to develop and submit the required data. We have asked Chevron Central Laboratories to monitor their actions and inform us of new developments.

If you have any additional questions please contact either Mr. Russ White (CTN 666-6027) or Mr. Jack Fraim (CTN 894-6735).

For: R. L. ABSCOTT

JWF:jdr
Enclosures

cc w/o encl: Mr. C. L. Blackwell          Mr. H. S. Quilliy
            Mr. O. T. Buffalaw           Mr. E. E. Spitler
            Mr. O. W. Callahan           Mr. R. W. Vose
            Mr. R. D. Cavalli            Mr. S. L. Dryden
            Mr. W. J. Mulligan

NJDEP-MTBE-CONTENTION-000057

# EXHIBIT 12

TO:   Bob Drew

FROM: Judy Shaw

DATE: Jan. 8, 1987

RE: Potential Issue for API--Methyl Tertiary Butyl Ether in Gasoline

During the API/NWWA Groundwater Conference held Nov. 12-14 in Houston, a paper was presented by personnel from the Maine Dept. of Environmental Protection discussing groundwater contamination problems resulting from MTBE in gasoline leaks and spills.  Of most concern is the paper's conclusion that 1) MTBE be banned from gasoline stored underground or 2) gasoline containing MTBE be stored in double contained facilities.  This paper received considerable publicity at the conference and was picked up and reported in the Dec. 8 issue of Alcohol Week.  In addition, it was sent out to the UST Work Group of the New England Interstate Water Pollution Control Commission which also includes EPA personnel.

Recently, representatives of ARCO Chemical (Bill Kilmartin, George Yogis ) contacted Dave Ruhala and Joe Pattok of API expressing their concern and requesting API rebuttal.  As a result Dave R. Joe and Rudy White met with Dave Chen to discuss the issue.  Subsequently, Dave sent a copy of the paper to selected members of the Groundwater task force for review.  (NWWA will publish the proceedings of the conference and we have an oppurtunity to comment and request changes in the paper.)  A draft of the API comment on the paper is attached along with the original paper and the Alcohol  Week review.  The API comments were prepared by Gene Mancini of ARCO, subsequent to a conference call with task force members. (Gene is a member of the task force but not involved with ARCO Chemical.)  The draft is now being circulated to the task force members for comment.  When final, it will be sent to Jay Lahr, the president of NWWA and the person responsible for preparing the proceedings.

In addition, Dave Chen tells me that Walter Retzsch has been asked by Ron Jones to develop information on the current production of MTBE and its extent of use in gasoline. Lastly, Bob Fensterheim states in his Dec. 30 memo that EPA is considering TSCA reporting requirements for MTBE.

Since a number of API folks seem to now be involved in the issue, I suggest you bring it to Bill's attention.  Perhaps a meeting should be scheduled to decide what should be API's role (if any) on this issue and who should be the players.  Our only other involvement with MTBE here in HESD at the moment is a research project which has just got underway to look at treatment technology efficiency and optimization for removing MTBE from contaminated groundwater.

EXHIBIT, 29

EQ 038173

NJDEP-MTBE-CONTENTION-000106

American Petroleum Institute
1220 L Street. Northwest
Washington. D.C. 20005
202-682-8000

David H. Chen, Ph.D.
Sr. Environmental Scientist
(202) 682-8343

January 28, 1987

Dr. Jay Lehr
National Water Well Association
6375 Riverside Drive
Dublin, OH  43017

Dear Dr. Lehr:

This letter has been written in order to provide comments to the National Water Well Association regarding a manuscript submitted for proceedings publication entitled "Methyl tertiary Butyl Ether as a Ground Water Contaminant" written by Garrett, Moreau and Lowry.  The comments presented here represent the consensus opinions of members of the Groundwater Technical Task Force of the American Petroleum Institute.

While specific and individual comments are indicated on a copy of the manuscript enclosed with this letter, several generalized but major comments and concerns are provided below for your consideration in reviewing the paper:

"The tone and presentation of the paper detracts from what should be an objective and dispassionate discussion of the technical data provided by the authors.  Phraseology such as "name of the game" and "chalk it up as" is unusual, and other familiar, almost conversational sentence structure, confers an informality which is unwarranted in a technical publication.

"The authors have reviewed publicly available toxicological data as well as industry monitoring data and have concluded that MTBE is "not very toxic" but seems to be an irritant at high doses. Nevertheless, they imply in other sections of the paper that MTBE is highly toxic in contradiction to their own cursory analysis of the available area.

"Both in the Abstract and in the body of the text the authors introduce and promote the hypothesis that MTBE acts as a cosolvent.  The somewhat confusing discussions imply that increased concentrations of BTX compounds will be found in both MTBE plumes and contaminated groundwater.  Such cosolubility theories were once proposed for benzene as a plume consolvent for ethylbenzene, toluene and other aromatics, but were subsequently demonstrated to be incorrect.  The authors provide no substantive data to support such a cosolubility theory.

An equal opportunity employer



EXHIBIT
56-99a1

EQ 038177

*The authors conclude the MTBE-contaminated groundwater is difficult to treat yet, in an unnecessarily commercial reference to Lowry Engineering, they conclude that this point-of-use technology is cost-effective. While reference to the technology may be appropriate, the rather strong commercial message is not.

*The authors' "recommendations" that MTBE, and several other octane enhancers developed to replace lead, be either banned as gasoline additives or required double-lined storage tanks is clearly a policy statement and not an objective, credible scientific conclusion. Furthermore, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted and counterproductive.

Please do not hesitate to contact me if you have any questions regarding these comments.

Sincerely,

D. H. Chen

Enclosure

cc:  J. Shaw
     B. Graves

EQ 038178

NJDEP-MTBE-CONTENTION-000051

# EXHIBIT 13

ARCO Chemical Company

HO— E 113008



February 12, 1987

Ms. Beth Anderson                          VIA FEDERAL EXPRESS
TS-7718, Room 100, NE Mall
Test Rules Development Branch
Environmental Protection Agency
401 M Street, S.W.
Washington, DC  20460

Dear Ms. Anderson:

In response to your questions on "Data Gaps" (Attach-
ment 1) that were presented at the December 17, 1986
Focus Meeting on Methyl- Tertiary Butyl Ether (MTBE),
ARCO Chemical Company submits the following comments:

Item A - Additional studies relevant to health effects
of MTBE will be addressed in our Section 8(a), 8(d)
submittal.

Item B - The number of workers exposed to MTBE will be
included in our Section 8(a) submittal.  We have no in-
formation on number of consumers exposed.  However, as
we have indicated in our submittal to the ITC, MTBE is
estimated to be in about 10% of the overall gasoline
production.  The number of consumers would then be ap-
portioned to approximately 10% of the gasoline distrib-
uted at self service stations. -

Item C was addressed in our formal comments to the En-
vironmental Protection Agency (EPA) on the 19th ITC Re-
port on MTBE.  A copy of those comments is included
(Attachment 2).  The conclusions are summarized here:

o  Gasoline vapor and subsequent MTBE in gasoline
   vapor exposures have been documented and studied.
   For the case with gasoline containing 10 Volume %
   MTBE, worker and consumer exposures would be
   approximately .06 ppm MTBE on an 8-hour TWA.
   Considering that fuels containing MTBE are
   typically blended at 2-8 Volume %, worker exposures
   would be even less than the .06 ppm value.

04/21/1999

TSCA Docket/EPA            EXHIBIT 12

NJDEP-MTBE-CONTENTION-000052

Ms. Beth Anderson          - 2 -          February 11, 1987

Item D requests more information on the presence and
persistance of MTBE in groundwater. We are not aware
of any incidents where MTBE contaminated groundwater at
manufacturing facilities. Where gasoline containing
MTBE is stored at refineries, terminals, or service
stations, there is little information on MTBE in
groundwater. We feel that there are no unique handling
problems when gasoline containing MTBE is compared to
hydrocarbon-only gasoline. We are aware of problems
reported in the State of Maine with groundwater con-
taining MTBE. Attachment 3 is a paper titled "MTBE as
a Groundwater Contaminant". We disagree with the con-
clusion in the paper's abstract that ..."the BTX com-
pounds are more soluble in ether than they are in
water. Thus, when gasoline plus MTBE leaks to
groundwater, the MTBE spreads both further and faster
than the gasoline, and the concentration of gasoline
dissolved in groundwater increases." ARCO Chemical has
conducted additional testing which supports our posi-
tion that MTBE will NOT act as a cosolvent and increase
the BTX or other gasoline components in the
groundwater. Attachment 4 summarizes this report.

Item E - Attachment 5 is an updated list of MTBE man-
ufacturers and the the plant locations.

If you have additional questions or require other
supplmental information, please contact me at
215-557-3560.

Very truly yours,

*W. J. Kilmartin*

W. J. Kilmartin
Manager, Technical Service

WJK/hlp

ATTACHMENT

04/21/1994          TSCA Docket/EPA

NJDEP-MTBE-CONTENTION-000053

-6-                    Attachment 1

## III. Data gaps

A. EPA is unaware of any additional studies relevant to the
   health effects of MTBE inhalation and ingestion.

   1) We have received copies of Bio/dynamics Inc.
      report to API of the following studies: 9-day
      inhalation toxicity study of MTBE in rats; an
      inhalation teratology study in rats with MTBE;
      an inhalation teratology study in mice with
      MTBE; a single generation inhalation
      reproduction/fertility study in rats with MTBE;
      and the metabolic fate of MTBE following acute
      intraperitoneal injection.

B. TRDB needs more current information on the number of
   workers and consumers exposed to MTBE.

C. TRDB needs more information on the concentration of MTBE
   in the "breathing zone" of workers and consumers
   transferring MTBE-containing gasoline.

D. TPDB needs more information on the presence and
   persistance of MTBE in ground water.

E. Is this list of manufacturers/distributors complete?

   American Petrofina Inc., Big Spring, TX
   Amoco Oil Co., Whiting, IN
   Arco Chemical Co., Newton Square, PA
   Champlin Petroleum Co., Humbolt, TX
   Diamond Shamrock, Sunray, TX
   Exxon, Houston, TX
   Hill Petroleum Co., Houston, TX
   Phillips Petroleum, Barttesville, OK
   Texaco Inc., Beacon., NY
   Texas Petroleum Corp., HOuston, TX
   Valero Refining Co., Coprus Christi, TX

NJDEP-MTBE-CONTENTION-000054

# EXHIBIT 14

40-8713012

MTBE COMMITTEE
1330 Connecticut Avenue, NW, Suite 300
Washington, DC 20036, Ph. 202-659-0060
Executive Director: George S. Dominguez

February 27, 1987

Dr. Beth Anderson
TS-778 Room 100 EX Mall
Test Rules Development Branch
Environmental Protection Agency
401 M Street, S.W.
Washington, D.C. 20460

Re:  MTBE Committee Statement on MTBE (OPTS - 41022)

Dear Dr. Anderson:

As you know from our earlier conversations, the MTBE Committee has
recently been formed and I am pleased to submit the attached statement on
behalf of the Committee relative to the Federal Register announcement of the
ITC's intention to designate MTBE for priority testing consideration under the
Toxic Substances Control Act (51 Federal Register 41417, Nov. 14, 1986). The
submission is also intended to be responsive to discussions held at the
December 16th Focus meeting.

In addition to providing you with this written statement, we would also
like to confirm that we will be making a verbal presentation to you and your
staff on March 5th at a meeting already scheduled for 10:00 a.m. on that day.

Sincerely,

George S. Dominguez
Executive Director

GSD/vlz

attachments

Affiliated with the Oxygenated Fuels Association

**EXHIBIT** 14

COMMENTS OF THE MTBE COMMITTEE

ON THE INTERAGENCY TESTING COMMITTEE'S

RECOMMENDATIONS CONCERNING

METHYL TERTIARY BUTYL ETHER

FEBRUARY 27TH, 1987

NJDEP-MTBE-CONTENTION-000059

## INTRODUCTION

The MTBE Committee was recently organized to provide a forum in which to address the environmental, health, safety, legislative and regulatory issues concerning methyl tertiary butyl ether (MTBE) of importance to the public and the producers and users of MTBE. The Committee is dedicated to working cooperatively with the government and the public and to be a source of information to MTBE producers, users, the government and the public. In specific the Committee will:

- Address environmental issues relating to MTBE by (i) collecting data from member companies and other sources and (ii) sponsoring programs to develop data unavailable from other sources.

- Address federal and state regulatory issues relating to MTBE by (i) providing technical data to appropriate regulatory agencies and legislative bodies (ii) meeting with appropriate governmental officials to develop acceptable solutions.

- Make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuel.

- Provide a forum for the exchange of appropriate information between producers and users of MTBE.

### Organization of The Statement

This statement consists of three sections:

Section I - Health Effects Review Summary
Section II - Occupational and Environmental Exposure
Section III - Remedial Impact of MTBE Utilization

In preparing this statement, extensive efforts were undertaken by the MTBE Committee and its members to obtain all available published and unpublished health effects studies. In this regard, we would specifically like to call the Agency's attention to the fact that we have been able to locate several unpublished toxicology studies that were apparently unavailable to the IRC in its review of MTBE toxicology data. A summary of these studies is provided in Section I. The full text of the studies is provided as an appendix to this section. It is important to note that these studies did not indicate any evidence that MTBE poses an unreasonable risk to human health. These studies as well as those which were reviewed by the IRC are in our opinion, sufficient to demonstrate or permit EPA to predict that MTBE does not represent such a risk. Even repeated exposures of rodents or monkeys to levels of 2,000 ppm or greater did not induce any neurological, neural tissue, or other organ effects which indicated a chemical induced toxicity. These conclusions are fully supported in the health effects review section of this paper.

1

NJDEP-MTBE-CONTENTION-000060

The information contained in Section II on Occupational and Environmental Exposure supports the conclusion that gasoline vapor emissions at service stations and terminals have been measured and the MTBE concentration in these vapors is well below levels which would produce any adverse health effects.

In addition, Section II provides information on the positive effects on air quality of using MTBE as a fuel component, as well as an analysis of the level at which MTBE would be detected as a ground water contaminant in the event of an accidental spill or leakage. We believe that the information provided supports the conclusion that MTBE does not represent a drinking water hazard.

Section III provides information on the societal impact of the use of MTBE as a high octane component for gasoline. The use of MTBE in motor fuels has a number of advantages relative to air quality improvement, all of which are summarized in Section III. If a test rule is issued requiring chronic testing that will take 3 - 4 years to complete, great uncertainty will be created as to whether MTBE is a safe fuel additive. As a result demand for MTBE and expansion of productive capacity is not likely to grow significantly. Refiners will be likely to commit capital to more costly alternative methods of octane enhancement such as isomerization and reformate plants that do not have the environmental benefits of MTBE. Thus, requiring long term testing of MTBE will have a significant adverse environmental and economic impact.

### Statutory Criteria

To issue a Section 4 test rule for MTBE EPA must make all of the following findings:

(1)(A)  MTBE may pose an "unreasonable risk" of harm to health or the environment; or

(B)  MTBE is produced in "substantial quantity" and may reasonably be anticipated to result in "substantial environmental release" or "significant or substantial human exposure"; and

(2)  insufficient data exists about the health or environmental effects of MTBE to reasonably determine or predict the impact on health or the environment of manufacturing, processing, distribution, use and disposal, and

(3)  testing is needed to develop such data.

In addition, to making the above findings, EPA must consider the economic impact of the tests required under the rule.

2



NJDEP-MTBE-CONTENTION-000061

TABLE OF CONTENTS

SECTION I - HEALTH EFFECTS REVIEW OF METHYL TERTIARY BUTYL ETHER (MTBE)

    I. Properties
    II. Presence in Water
    III. Acute Toxicity
        1. Oral
        2. Dermal
    IV. Subchronic Studies
        1. Rats
        2. Monkeys
        3. Anesthetic and Lethal Dose Levels - Monkeys
        4. Summary
    V. Metabolic Studies
        1. In Vivo Studies - Rat
        2. Summary
    VI. Neurotoxicity
    VII. Inhalation
        1. Animal Data
        2. Human Data
        3. Summary
    VIII. Genetic Toxicology of MTBE
    IX. References

SECTION II - OCCUPATIONAL AND ENVIRONMENTAL EXPOSURE

    I. Vapor Emissions
        1. Plants
            a. Exposure Measure
            b. Exposure Measurement Methodology
            c. Fugitive Emissions
            d. Examples of Plant Incidents
        2. Transportation Systems
        3. Service Stations
            a. MTBE as a Percentage of Total Hydrocarbon Vapor
            b. MTBE Effects on Air Quality
    II. Liquid Emissions/Ground Water Effects
        1. Concentration Levels
            a. Noticeable Levels
            b. MTBE in Ground Water
        2. Cosolvent Effects
        3. Biodegradation/Persistance

SECTION III - SOCIETAL IMPACT OF MTBE UTILIZATION

    I. Summary
    II. Introduction
    III. Refinery Options
        1. Introduction
        2. Options
            a. Toluene
            b. Ethanol/Methanol
            c. Refinery Processing
    IV. Conclusion

NJDEP-MTBE-CONTENTION-000062

in achieving . . .

alternative fuel . . .

II.   Information . . .

   1.   Concentration Levels

      a.  Noticeable Levels

Data presented in the MTBE Focus Meeting held by EPA on December 17, 1986, referenced a paper by P. Garrett et al (Exhibit X-7) which mentioned that "...People can detect the odor of MTBE in their water at concentrations as low as 20-50 parts per billion...."

As a result of this surprisingly low detectable level mentioned, a data search was conducted for data which would corroborate or question the same detectability levels. Data from Shell Oil Co. USA was obtained (Attachment I-11). The Shell data show significantly higher levels for the threshold of detectability of MTBE in water i.e. about 700 ppb.

The Shell data was based on studies employing a panel of people. The use of a panel is a widely accepted industry technique. This does not preclude the possibility that certain individuals may have much lower thresholds of noticeability for certain odors or tastes.

The question of detectability levels in water is significant. The lower the detectability level of MTBE in water . . .

NJDEP-MTBE-CONTENTION-000063

... ... ...

Hence, whether one considers the 700 ppb detectability
levels as determined by Shell or the much lower 20-50 ppb
level as presented in reference I-7, it does not appear
that harmful levels of MTBE from ground water containing
MTBE will be ingested before people are aware by taste
and smell that MTBE is present in the water.

b.  MTBE in Groundwater

The results of a number of acute and subchronic health
effect studies are presented in the Health Effects Review
summary section of this report.  These data suggest that
the odor detection level of 700 ppb (approximately
0.7mg/l) is such that the organoleptic properties of MTBE
are sufficient to protect against human ingestion of
toxic quantities of MTBE.

2.   Cosolvent Effects

Claims have been made by Garrett, et al (Exhibit I-7)
that MTBE in groundwater will increase the concentration
of other less soluble gasoline components, particularly
aromatics, dispersed from the leak to the ground water.

12:

NJDEP-MTBE-CONTENTION-000064



... demonstrate that there is substantial
in of the extraction of aromatics from gasoline by
at the concentration levels anticipated for MTBE
on to gasoline i.e.  the test were run at 10 volume.
concentration MTBE.

of Exhibit I-7 by Prof. Paul Roberts at Stanford
Y (Exhibit I-9) indicates that the situation was
've based on what he had seen from Exhibit I-7.
ibe sent Dr. Robert Arco's own data and asked
-uation and review. This evaluation and review
orthcoming within the next few weeks. This
...l be transmitted to EPA for consideration
ion of MTBE cosolvency effect on aromatics.

existence

'Y of MTBE is an important consideration:

solubility is a well known phenomenon
enced both in the air and in opera-

raisability is a less well known

II

NJDEP-MTBE-CONTENTION-000065



NJDEP-MTBE-CONTENTION-000066

# EXHIBIT 15

1988 HEALTH AND ENVIRONMENTAL PROJECT PROPOSALS

ISSUE/TITLE:   Motor Gasoline and Water Management
(Groundwater)/Chemical Fate of Octane Enhancers in
Groundwater

OBJECTIVE:  To determine the chemical characteristics and fate of
BTX and ether/Alcohol solutions under in-situ experimental
groundwater spill conditions.  Specifically, plume delineation,
octane enhancer "cosolubility" characteristics, and
biodegradation will be investigated.

DRIVING FORCES/IMPACT:  As a result of lead phase-down, octane
enhancers such a MTBE and various alcohols are increasingly being
used as substitutes for lead.  There has recently been a dramatic
increase in regulatory interest/concern over these
alcohols/ethers in groundwater.  Maine is considering banning the
use of MTBE.  Without field data to address the concerns of the
regulatory community, regulatory action can be expected (probably
within a 1-3 year time frame.)

DESCRIPTION:  This project would consist of groundwater field
studies, laboratory water quality analysis, a modest literature
review and report preparation.  Data generated would include
characterization of plumes under water table conditions, the
degree to which selected alcohols/ethers act as cosolvents for
BTX compounds, and the nature of in-situ biodegradation of these
solutions.

POSSIBLE OUTCOMES AND CONSEQUENCES:  The objectives of the
research can be accomplished, as has been well-demonstrated with
recent Task Force research on in-situ BTX plumes.  The industry
segments most likely to benefit from the research are
refining/marketing.  If the research is not conducted, there will
be few credible data to support industry's contention that such
octane enhancers do not constitute a significant new groundwater
contamination threat as constituents of gasoline.

ESTIMATED DURATION:  1-2 years      ESTIMATED BUDGET:  $125K

PRIOR COSTS:  None                  FUTURE COSTS:  $80K

SUBMITTED BY:  Gene Mancini (ARCO)

Ranked 1st

#9:catchI

EXHIBIT 30

EQ-SH156 0034

NJDEP-MTBE-CONTENTION-000107