UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE:  METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

---

Master File No. 1:00–1898
MDL 1358 (SAS)
M 21-88

**This document relates to:**

City of Merced Redevelopment Agency v. Exxon
Mobil Corp., et al., 08 Civ. 06306 (SAS)

---

## DECLARATION OF DUANE C. MILLER IN SUPPORT OF PLAINTIFF CITY OF MERCED REDEVELOPMENT AGENCY'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE NUISANCE AND TRESPASS

I, Duane C. Miller, hereby declare:

1.     I am one of the attorneys in this case for plaintiff City of Merced Redevelopment Agency.  I have been personally involved in much of the discovery and pretrial proceedings in this action.  This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.     Attached hereto as Exhibit 1 is true and correct copy of the relevant portion of Expert Report of Marcel Moreau dated April 11, 2011, section III, pp. 16-23.

3.     Attached hereto as Exhibit 2 is a true and correct copy of Cracker Barrel Meeting Remarks dated January 1995.

4.     Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the deposition of Richard Pazin taken on August 24, 2009, in *City of Merced*.

5.     Attached hereto as Exhibit 4 is a true and correct copy of relevant portions of Supplement Response of ExxonMobil Corporation to Special Interrogatories Set Three dated September 15, 2010.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this ___ day of May, 2013, at Sacramento, California.

DUANE C. MILLER

2

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This Document Relates To:

*City of Merced Redevelopment Agency v. Exxon
Mobil Corp., et al.*, 08 Civ. 06306 (SAS)

---

# EXPERT REPORT OF MARCEL MOREAU

Marcel Moreau Associates
73 Bell Street
Portland, ME 04103

_____
Signature

April 11, 2011
_____
Date

The API considered the formation of a "Tank Leak Strike Force" that would provide immediate response to leak incidents.[107]  The purpose of the strike force was to respond to "...the growing number of underground tank leaks before things get out of hand."[108]  A recurring problem had been that when petroleum product appeared in sewers, basements, and water supplies no tank owner would assume responsibility for the incident.  This frequently led to adverse publicity for the oil marketing industry.  The committee charged with putting together this strike force included Gulf, Texaco, Union Oil, Amoco, Chevron, and Shell.  Chevron's marketing vice-president, Don Mulit, apparently "...urged the group to tackle the problem as quickly as possible, noting that his company was only one of a number of firms that had been clobbered in the courts and held responsible for underground leaks at hinterland service stations."[109]  Despite Chevron's pleas, the tank leak strike force was never created.

### February 1982 – Major Oil Companies Divest Themselves of Storage Systems

Texaco personnel wrote a document at about this time entitled "Proposal to Reduce Costs and Exposure to Underground Product Leaks."[110]  This document provides an example of a cost reduction strategy that was extensively used by major oil marketers from the mid-1970s to the mid-1980s.  This strategy was to "...divest ownership of underground storage systems at locations other than Investment Stations."[111]  The basic strategy was to reduce the costs and risks posed by UST leaks by transferring ownership of the storage systems to the facility owners or operators.

This document presents the numeric results of Texaco's divestment strategy.  In 1976, Texaco owned tanks at 11,254 service stations.  In 1980, Texaco owned tanks at 5,271 service stations.[112]  In four years, Texaco had sold off more than half of the UST systems it owned.

---

[107] "API Ponders Tank Leak Strike Force," *NPN*, January 1982.
[108] Ibid.
[109] Ibid.
[110] "Proposal to Reduce Costs and Exposure Due to Underground Product Leaks," February 9, 1982 (date approximate), Hitchcock deposition *In re: MtBE Products Liability Litigation*, May 2, 2007, Exhibit 4.
[111] Ibid., Bates # CITYNY 201123.
[112] Ibid., Bates# CITYNY 201116.

Prior to the 1980s, it was common practice for oil suppliers to own the UST systems at retail facilities, even at facilities where they did not own the property or directly operate the facility. By owning the storage systems, oil companies could control what product went into them and effectively prevent a facility from buying a different brand of product. For example, if Texaco owned the tanks, then it could prohibit the facility operator from buying lower-quality gasoline and selling it under the Texaco brand.

As the cost of leaks increased, however, this practice became unattractive to the oil companies. A facility that only sold a small amount of product might have a very expensive leak, so it was not worth accepting this large liability for only a small profit on the sale of gasoline. The small profits also did not justify the cost of replacing the storage system with a more leak-resistant one. The easy answer to this problem was to sell the storage system, often for a nominal sum, such as one dollar, to the facility owner or operator.[113] The new owner typically continued to operate the UST system, generally unaware of the risks he had just acquired.

## May, 1982 – Major Oil Companies Describe Tank-Upgrading Programs

The May 1982 edition of the *TulsaLetter* reported, "Most marketers, by this time, have had at least one costly experience with an underground oil spill. They have discovered that the expense of coping with liability claims and environmental requirements, growing out of tank leaks, can far exceed other routine marketing costs."[114] This issue of the *TulsaLetter* also summarized presentations given by three major oil companies (Texaco, Shell, and Exxon) at the spring meeting of the API marketing division concerning the nature and scope of their UST upgrading and replacement programs.

---

[113] Letter, with attachment, from Matt Troy, Executive Director of the Long Island Gasoline Retailers Association to Thomas J. Downey, Member of Congress, dated June 27, 1985.
[114] "Testing and replacement of underground tanks…" *TulsaLetter,* May 20, 1982.

**July 1982 – *NPN* Describes the "Tank Leak Mess"**

In July 1982, *NPN* published a cover article entitled, "The Tank Leak Mess."[115] The article presented a comprehensive overview of the tank problem, how expensive it could be, and what some in the petroleum marketing industry were doing about it. An incident in Northglenn, Colorado, which reportedly cost Chevron over 10 million dollars, was described.[116]

**November 1982 – Rogers Estimates 50,000 Tanks are Leaking**

In November 1982, *Petroleum Marketer* magazine reported on Dr. Warren Rogers' methodology for predicting the life expectancy of USTs.[117] The magazine also reported that Chevron had requested that Dr. Rogers estimate how many tanks were leaking on a national basis. Based on his model and data provided by "a whole spectrum of oil companies," Dr. Rogers estimated that there were 50,000 leaking tanks at that time, and that the number would increase to 75,000 in about a year.[118]

**December 1983 – Oil Companies Compare Upgrading Programs**

Rival petroleum marketers were very interested in what their competitors were doing relative to their USTs. A December 12, 1983, Texaco memo from Marvin Dimond to P.D. McNaughton presented brief summaries of what ten different oil companies were doing with regard to tank replacement or upgrading.[119] Companies included in the survey were Exxon, Shell, Amoco, Chevron, Getty, Gulf, Mobil, Phillips, SOHIO, and Union. A similar survey conducted in about 1981, also included Marathon and ARCO.[120] A survey dated April 2, 1982, conducted by Mobil, also summarized the activities of competitive companies with regard to tanks as part of the justification for ramping up

---

[115] "The Tank Leak Mess," *NPN*, July 1982, pp. 36-40.
[116] Ibid. p. 38.
[117] "Rogers Finds Leaks By Using Statistics," *Petroleum Marketer*, November-December 1982
[118] Ibid.
[119] "Underground Leak Protection Ten Year Tank Replacement Program," internal Texaco memo from Marvin Dimond to P. D. McNaughton, December 12, 1983.
[120] Ibid., Bates #TEX 0036444.

Mobil's tank program.[121]  Mobil's survey included Exxon, Shell, Chevron, Amoco, Texaco, Gulf, ARCO, Union, Getty, SOHIO, Marathon, and Sun.[122]

These surveys documented that nearly all of the significant players in petroleum marketing in the 1980's were very much aware of the tank leak problem.

**May 1984 – Protecting Groundwater from Leaking Tanks Dominant Issue for API**

The *TulsaLetter* reported on the spring 1984 meeting of the API O & E Committee and stated that, "Issues connected with protecting groundwater from leaking underground tanks dominate the thinking of the marketing industry these days.  There is more concern about the ramifications of state and federal regulations, related to tank systems, than with vapor recovery, lead phasedown, alcohol fuels, or any of the other issues which have held center stage in the thinking of marketing operations people in recent years."[123]  At this point, federal legislation to regulate UST systems had been proposed and tank owners were very interested in the progress, content, and cost of the impending legislation.

**November 8, 1984 – National Tank Regulatory Program Established**

President Reagan signed into law Subtitle I of the Resource Conservation and Recovery Act (RCRA), establishing a national program to regulate UST systems.[124] The fact that this far reaching and expensive legislation was proposed in spring 1984 and signed into law that same fall (with little opposition from the petroleum marketing industry) indicates the industry had finally recognized the time had come to do something about the leaking UST system problem.

**May 7, 1985 – The End of the Bare Steel Tank Era**

---

[121] "Underground Service Station Product Tank Replacement," internal Mobil memo from R. L. Abbott to H. Hokamp, April 2, 1982.
[122] Ibid., Bates# XOM-UST-000021916
[123] "Underground Storage Systems," *TulsaLetter*, May 31, 1984.
[124] Solid Waste Disposal Act, Title II, Solid Waste Disposal, Subtitle I, Regulation of Underground Storage Tanks, November 8, 1984.

The authors of Subtitle I of RCRA recognized it would be some time before regulations implementing the provisions of this law could be promulgated. Because it was well understood that bare steel tanks were a significant component of the leaking UST system problem, Subtitle I included a measure known as "interim prohibition," designed to stop the use of bare steel tanks for regulated underground petroleum storage systems.[125] The interim prohibition specified that after May 7, 1985, all newly installed UST systems had to be protected against corrosion, structurally sound, and compatible with the contents. Interim prohibition officially ended the era of the bare steel tank. While this step was long overdue, the fact remained that millions of bare steel tanks were already in service, and many of these would remain in service for another decade or more.

### November 1988 – Suffolk County Completes Corrosion Study

The EPA Office of Underground Storage Tanks contracted with the Suffolk County, New York, Department of Health Services to conduct a tank autopsy study to determine the nature and extent of corrosion on USTs that were being removed.[126] A large number of tanks were being removed in Suffolk County because of a local regulation requiring all bare steel storage tanks to be removed from service by January 1, 1990. In the course of the study, detailed observations of the nature and extent of corrosion were made on 500 individual bare steel tanks located at 199 different facilities. Tank sizes ranged from 175 to 50,000 gallons, and tank ages ranged from 2 to 70 years, with 87 tanks of unknown age. Overall, 28.6 percent of the 500 tanks inspected had perforations, although only about 58 percent of perforated tanks showed signs of leakage.[127] Among the perforated

---

[125] Ibid., Section 9003(g).
[126] *Tank Corrosion Study*, EPA 510-K-92-802, November 1988.
[127] Ibid., p. 10.

tanks, the average number of perforations was seven.[128]   Consistent with the API study
(see February, 1981 ), 96 percent of the tank failures were due to corrosion.[129]

**December 22, 1988 – EPA Tank Rules Go into Effect**

On December 22, 1988, the regulations developed by the EPA pursuant to Subtitle I of
the 1984 RCRA Amendments went into effect.  The regulations established notification,
installation, leak detection, removal, corrective action, and financial responsibility
requirements for USTs.  All regulated storage systems installed after this date had to meet
the new requirements immediately.  The regulations included a five-year timetable for
instituting leak detection at all existing UST systems subject to the regulations, and a ten-
year timetable for upgrading existing storage systems to meet corrosion protection, spill
containment, and overfill prevention requirements.  In short, the regulations defined a
ten-year program for improving the nation's UST systems.

However, the regulations stopped short of mandating the replacement of all of the
nation's bare steel tanks.  Instead, bare steel tanks could meet the new requirements by
adding either a lining inside the tank or cathodic protection on the outside surface of the
tank.  These technologies had long been used in the petroleum marketing industry and
were generally considered to be temporary fixes rather than long-term solutions to the
leaking tank problem.   Thus, the petroleum marketing industry had reason to believe that
the EPA's approach would prove to be less than satisfactory in the long term.

**August 31, 1994 – National Tank-Upgrading Program Goes Slowly**

In August 1994, Robert Renkes, executive director of the Petroleum Equipment Institute,
published an estimate in the *TulsaLetter* that only 400,000 out of the 1,300,000 regulated

---

[128] Ibid., p. 32.
[129] Ibid., p. 37.

UST systems met the corrosion protection, spill containment, and overfill prevention requirements of the federal regulations that were required to be in place by December 1998.[130] He estimated that the rate of upgrading would continue at about 100,000 tanks per year until 1998. This meant that "…we will enter 1998 with 600,000 USTs not yet in compliance with the federal tank upgrade requirements."[131]

In November 1996, the API cited an EPA estimate that only 40 percent of active tanks met the 1998 requirements at that time. The API briefing paper also indicated that 80 percent of API member UST systems met the 1998 upgrade requirements.[132]

API member companies were well ahead of smaller tank owners in upgrading the tanks they owned, but API member companies also knew that bare steel tanks still represented a very large portion of the UST systems receiving gasoline with MtBE. The petroleum marketing industry was well aware that many tank owners would be waiting until the last minute to upgrade their storage systems, and that many old and substandard bare steel UST systems would be storing gasoline containing MtBE for many years before they were upgraded.

## December 22, 1998 – The Federal Tank-Upgrading Deadline

EPA regulations that went into effect on December 22, 1988, established a ten-year timeline for upgrading the nation's UST systems with corrosion protection, spill containment, and overfill prevention. The deadline for adding these three components to UST systems already in service in 1988 was December 22, 1998.[133]

As predicted in the *TulsaLetter* in 1994,[134] a great many tank owners opted to wait until the last minute to upgrade their storage systems. California authorities estimated

---

[130] "Let's take a brief look at the prospects…" TulsaLetter, August 31, 1994, p. 1.
[131] Ibid.
[132] "Attachment B, MtBE Status/Strategy," API briefing paper, November 27, 1996.
[133] 40 CFR 280.21
[134] "Let's take a brief look at the prospects…" TulsaLetter, August 31, 1994, p. 1.

that only 52 percent of approximately 60,000 active UST facilities in California had been upgraded by July 1998.[135]  This meant that for most of the 1990s, when MtBE was in widespread use, it was being stored in a great many storage systems still subject to corrosion failure and delivery spills.

Annual MtBE consumption in the United States in 1998 was estimated at 4 billion gallons, with California consuming almost one-third of this amount.[136]

**Summary**

Leaks from UST systems have long been recognized by petroleum marketers and were considered "inevitable."[137]  In 1980, at the time when MtBE began to be blended into gasoline, the petroleum industry was acutely aware of the decrepit nature of the nation's population of UST systems.  Any company that owned substantial numbers of underground petroleum storage systems in the latter part of the twentieth century knew or should have known that these storage systems were common sources of groundwater contamination.

Recognizing this problem, trade press and internal company documents show that major oil companies undertook expensive UST system upgrading programs in the 1980s. It was well known in the industry, however, that many other storage tank owners put off upgrading their storage systems until the late 1990s.  Most of these station owners were not aware of the MtBE problem (see Section IV) and the hazards posed by even small gasoline releases from their storage systems.  Thus, in the time frame when MtBE was prevalent in the nation's gasoline supply, the nation's UST population was poorly suited to contain it.

---

[135] "MtBE Project Fact Sheet," Los Angeles Regional Water Quality Control Board and US Environmental Protection Agency, July 1998, p. 4
[136] "Status and Impact of State MtBE Bans," Energy Information Administration, March 27, 2003
[137] "Tank Leaks: Like the Common Cold, Nobody's Found a Cure," *NPN*, January 1979.

# EXHIBIT 2

_JAN. 1995_

## CLEANER-BURNING FORMULASHELL GASOLINES

## CRACKER-BARREL MEETING REMARKS

### GASOLINE INTRODUCTION

- I'D LIKE TO TELL YOU ABOUT A MAJOR NEW PRODUCT THAT SHELL WILL INTRODUCE THIS SPRING.

- SHELL HAS DEVELOPED A NEW GASOLINE CALLED CLEANER-BURNING FORMULASHELL THAT'S DESIGNED TO FIGHT AIR POLLUTION.

- WE'RE MAKING THIS GASOLINE EXCLUSIVELY FOR CALIFORNIA -- IT WILL REPLACE ALL THE GASOLINE WE CURRENTLY SELL THROUGHOUT THE STATE.

- TO COMPLY WITH THE FEDERAL CLEAN AIR ACT, THE CALIFORNIA AIR RESOURCES BOARD IS REQUIRING ALL GASOLINE MANUFACTURERS TO PRODUCE CLEANER-BURNING FUELS.

- THE NEW GASOLINE IS REQUIRED AT THE PUMP ON JUNE FIRST.  HOWEVER, DELIVERIES OF CLEANER-BURNING FORMULASHELL TO SOME STATIONS WILL BEGIN IN EARLY MARCH.

### ENVIRONMENTAL BENEFITS

- THE NEW GASOLINE WILL HAVE SIGNIFICANT ENVIRONMENTAL BENEFITS.

- BEGINNING THE FIRST DAY THEY'RE REQUIRED AT THE PUMP, CLEANER-BURNING GASOLINES LIKE FORMULASHELL WILL REDUCE VEHICLE EMISSIONS BY THREE MILLION POUNDS PER DAY.

- THAT'S EQUAL TO TAKING THREE AND A HALF MILLION CARS OFF THE ROAD.

- THE NEW GASOLINES WILL HELP ELIMINATE MORE THAN ONE BILLION POUNDS OF POLLUTION BY THE END OF THE FIRST YEAR.

- THAT AMOUNTS TO THE SINGLE LARGEST EMISSIONS REDUCTION OF THE DECADE.

## STATE REQUIREMENTS

- AS YOU KNOW, WE CURRENTLY SELL REFORMULATED GASOLINE IN THE CALIFORNIA CITIES WITH THE WORST AIR QUALITY.

- THAT'S HELPED THE POLLUTION PROBLEM, BUT MORE NEEDS TO BE DONE.

- MORE THAN NINETY PERCENT OF THE PEOPLE IN CALIFORNIA STILL LIVE IN AREAS THAT DO NOT MEET FEDERAL CLEAN AIR STANDARDS AT SOME POINT DURING THE YEAR.

- THE STATE IS TAKING STEPS TO REDUCE POLLUTION CAUSED BY CARS AND TRUCKS, ALONG WITH OTHER SOURCES, SUCH AS FACTORIES AND POWER PLANTS.

- SINCE CARS AND TRUCKS ARE RESPONSIBLE FOR ABOUT HALF OF AIR EMISSIONS, THE AIR RESOURCES BOARD HAS DETERMINED THAT CLEANER-BURNING GASOLINE IS ONE OF THE MOST EFFECTIVE WAYS TO REDUCE AIR POLLUTION.

- THE BOARD HAS DEFINED SPECIFICATIONS FOR THE NEW GASOLINE.   TO MEET THOSE, WE HAVE TO CHANGE OUR MANUFACTURING PROCESS TO REDUCE THE AMOUNT OF BENZENE, SULFUR AND AROMATIC HYDROCARBONS IN OUR PRODUCT.

## FORMULASHELL ADVANTAGES

- EVERYBODY HAS TO MEET THE SAME SPECS. BUT THAT DOESN'T MEAN THAT ALL CLEANER-BURNING GASOLINES WILL BE THE SAME.

- THERE WILL CONTINUE TO BE DIFFERENCES BETWEEN FORMULASHELL AND OTHER BRANDS, JUST AS THERE ARE TODAY.

- CLEANER-BURNING FORMULASHELL WILL BE OUR CLEANEST GASOLINE EVER.

- LIKE TODAY'S FORMULASHELL, IT HAS AN ADDITIVE PACKAGE THAT REDUCES INTAKE SYSTEM DEPOSITS THAT OTHER GASOLINES CAN LEAVE BEHIND.

- THAT MEANS BETTER PERFORMANCE AND BETTER EMISSIONS CONTROL THAN IF DEPOSITS WERE ALLOWED TO BUILD UP.

- CLEANER-BURNING FORMULASHELL WILL COME IN THREE OCTANE GRADES  -- REGULAR, PLUS AND PREMIUM.  THERE WILL BE NO CHANGE IN ANTI-KNOCK PERFORMANCE.

## GASOLINE PERFORMANCE

- THE NEW GASOLINES WILL WORK IN ALL CARS AND TRUCKS, AND SHOULD NOT AFFECT ERFORMANCE.

- AFTER EXTENSIVE TESTING, THE AIR RESOURCES BOARD CONCLUDED THAT, IN GENERAL, CARS PERFORM AS WELL ON CLEANER-BURNING FUEL AS THEY DO ON TODAY'S GASOLINE.

- DRIVERS MAY NOTICE A VERY SLIGHT DECREASE IN FUEL ECONOMY -- USUALLY  LESS THAN ONE MILE PER GALLON.

- CLEANER-BURNING FORMULASHELL CAN BE MIXED WITH CONVENTIONAL GASOLINE -- IT WON'T CAUSE ENGINE DAMAGE.   SO PEOPLE DRIVING BETWEEN STATES  SHOULD NOT HAVE PROBLEMS MIXING THE TWO FUELS.

- THE NEW GASOLINE WILL NOT AFFECT VEHICLE OR EMISSIONS-CONTROL SYSTEM WARRANTIES.

- IT ALSO CAN BE USED IN GASOLINE-POWERED EQUIPMENT, LIKE LAWNMOWERS AND BOAT ENGINES.  EXCEPT FOR THE SLIGHT LOSS OF FUEL ECONOMY, THERE SHOULD BE NO CHANGE IN PERFORMANCE.

## COST

- THE BIG QUESTION, OF COURSE, IS WHAT WILL CLEANER-BURNING FORMULASHELL COST?

- BECAUSE IT REQUIRES MORE EXPENSIVE PROCESSING TECHNIQUES AND COMPONENTS, CLEANER-BURNING FUEL COSTS MORE TO PRODUCE.

5

- AT THIS POINT, IT'S IMPOSSIBLE TO ACCURATELY PREDICT HOW THOSE INCREASED PRODUCTION COSTS WILL TRANSLATE INTO PUMP PRICES.

- IT'S SAFE TO SAY THAT PUMP PRICES WILL BE DETERMINED BY SUPPLY AND DEMAND FACTORS IN THE COMPETITIVE MARKETPLACE.

## QUESTIONS

- YOU PROBABLY HAVE SOME OTHER QUESTIONS ABOUT THE NEW GASOLINE. AND YOUR CUSTOMERS WILL, TOO.

- TO HELP YOU ANSWER THEIR QUESTIONS, WE'RE PROVIDING YOU WITH BROCHURES PRINTED IN ENGLISH AND SPANISH THAT CONTAIN MOST OF THE INFORMATION I'VE JUST GIVEN YOU. THESE BROCHURES AND RELATED PUMP TOPPERS WILL BE ARRIVING AT YOUR STATIONS AROUND MARCH 1.

- THE BROCHURES ALSO HAVE AN 800 NUMBER THAT CUSTOMERS CAN CALL TO FIND OUT MORE ABOUT CLEANER-BURNING GASOLINE.

## FORMULASHELL IN-SCHOOL PROGRAM

- TO ENHANCE OUR COMMUNICATION EFFORTS ABOUT THESE NEW CLEANER-BURNING GASOLINES, SHELL IS SPONSORING AN EDUCATIONAL PROGRAM IN CALIFORNIA TARGETED AT FOURTH AND FIFTH GRADE STUDENTS .

6

- THROUGH THE USE OF AN INTERACTIVE MULTI-MEDIA TEACHING KIT, WHICH INCLUDES A VIDEO AND POSTER, STUDENTS WILL LEARN ABOUT THE THE CHEMISTRY OF REFORMULATED GASOLINE AND HOW IT CONTRIBUTES TO A CLEANER ENVIRONMENT FOR ALL OF US.

- COUPONS REDEEMABLE FOR ONE-DOLLAR-OFF GASOLINE PURCHASES AT SHELL SERVICE STATIONS WILL BE PROVIDED TO THE STUDENTS AS PART OF THEIR INVOLVEMENT IN THE PROGRAM.

- THE PROGRAM, WHICH WILL BEGIN ARRIVING AT ABOUT 7,000 SCHOOLS IN EARLY APRIL, WILL REACH APPROXIMATELY 1.89 MILLION STUDENTS IN CALIFORNIA. MORE INFORMATION ABOUT THE PROGRAM WILL BE COMMUNICATED TO YOU.

## VIDEO INTRO

- NOW, TO GIVE YOU MORE DETAILS ON THE NEW CLEANER BURNING GASOLINE, I'D LIKE TO SHOW YOU A VIDEO PRODUCED BY THE CALIFORNIA AIR RESOURCES BOARD.

- IF YOU HAVE ADDITIONAL QUESTIONS, I'LL BE HAPPY TO TRY TO ANSWER THEM AFTER THE VIDEO.

# EXHIBIT 3

IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF MERCED
-oOo-

CITY OF MERCED,
Plaintiff,
Vs
CHEVRON U.S.A., INC.; SHELL OIL
COMPANY; EXXONMOBIL CORPORATION;
EXXON CORPORATION; KINDER MORGAN
ENERGY PARTNERS L.P.; EQUILON
ENTERPRISES LLC; SFPP, L.P. and
DOES 1 THROUGH 200, inclusive,
Defendants.

Case No. 148451


COPY

DEPOSITION OF RICHARD PAZIN

August 24, 2009 at 11:00 a.m.

Before:  ERIC L. JOHNSON
RPR, CSR #9771
Taken at:
Merced, California



DEPOBOOK
reporting services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

Deposition of Richard Pazin / August 24, 2009

1        Q.   Okay.   When Pazin & Myers at their Merced

2    location is picking up gasoline products, what terminals

3    would they have used for that purpose?

4        A.   We used ST Services out of Stockton, Banta,

5    California --

6        Q.   Help me with that last one.

7        A.   Banta, B-a-n-t-a, California, which is the

8    Chevron terminal in Tracy, California.   Banta.   We call

9    it Banta.   It is out of Tracy, California.   Kinder

10   Morgan in Fresno, California.   Tesoro out of Stockton.

11   New West Petroleum out of Stockton.   And that's the best

12   of my recollection, those were the -- where we pick up

13   product.

14       Q.   Okay.   And in listing the terminals in

15   Stockton, Tracy, and Fresno that you just mentioned,

16   does that cover the time period from 1980 to present?

17       A.   Yes.

18       Q.   When the firm became Pazin & Myers, Inc. were

19   you still obtaining product from each of those terminals

20   or was it a subset?

21       A.   Rephrase that.

22       Q.   I am trying to find out, when you started in

23   about 1990 or '91 as Pazin & Myers, Inc., if you were

24   still picking up gasoline products at all of those

25   terminals or only some of them.

                                                          10

Deposition of Richard Pazin / August 24, 2009

1          A.  All of them.

2          Q.  Were there any terminals you stopped doing

3    business with after the firm of Pazin & Myers, Inc., was

4    formed, out of this list that you have given us?

5          A.  No.

6          Q.  Given the fact that you were a distributor of

7    Chevron products and you had their sign up on your bulk

8    facility, did you tend to purchase more product from

9    Chevron than any other single supplier?

10             MR. CORRELL:  Objection; vague; misstates

11   evidence.

12             THE WITNESS:  No, no, I wouldn't say so.

13             MR. MILLER:  Q.  Was price the factor that

14   determined which terminal you picked the product up at?

15         A.  More time -- yes, unless we were going to a

16   branded facility.  Which in there we would have to take

17   Chevron product to Chevron sites.

18         Q.  And you are familiar with the cardlock station

19   in Merced, at 1455 R Street?

20         A.  I am.

21         Q.  To your recollection, were they ever selling

22   branded product?

23         A.  Yes.

24         Q.  What brand of --

25             MR. CORRELL:  Object to the form of the

                                                              11

1      A.   Yes.

2      Q.   What was the general practice during the time

3  that you were distributor of Chevron branded products,

4  in terms of when you supply MSDS's concerning gasoline

5  products to your customers?  First of all, were you

6  supposed to supply it at least once a year?

7      A.   I don't remember any of -- it was as-needed.

8  There was no set program, I believe.

9      Q.   If they had a new MSDS that it was revised and

10  it replaced an earlier one during the time you were

11  selling Chevron branded products, if you got such a

12  document from Chevron, what would you do with it?

13     A.   Put it in my file at the plant.

14     Q.   Would you send a copy out to all of your

15  customers when you got a revised or new MSDS from

16  Chevron?

17     A.   No.

18     Q.   Other than customers who were buying Chevron

19  branded products, did you have the same practice and

20  policy in distributing MSDS's that you just described

21  for us throughout the time you were general manager?

22     A.   Rephrase that.

23     Q.   Yeah.  Throughout the time you were general

24  manager and you were receiving material safety data

25  sheets, did you supply them to gasoline stations upon

34

Deposition of Richard Pazin / August 24, 2009

1    request?

2         A.   Yes.

3         Q.   If you didn't receive a request, if they didn't

4    ask for it, did you ever supply material safety data

5    sheets for gasoline products that you were selling to

6    gasoline stations?

7         A.   No.   I don't know.   We might have.   I can't

8    remember.

9         Q.   Who sends paperwork on behalf your business to

10   your customers today?   That is, gasoline stations.

11        A.   I do.   If they ask for something I do.

12        Q.   And you are the one who answers the phone?

13        A.   The secretary answers the phone.

14        Q.   Does she help you do that?

15        A.   Yes.

16        Q.   Is there anyone else who helps the business

17   send out documents like material safety data sheets,

18   other than yourself or your secretary, during the time

19   you have been with the business?

20        A.   No.

21        Q.   Are there any other employees of your business,

22   other than yourself or your secretary, over the years we

23   are discussing?

24        A.   That would do that?

25        Q.   No, at all.

                                                          35

Deposition of Richard Pazin / August 24, 2009

1    would be the shipper of record, to the Cardgas station

2    in Merced.  Correct?

3         A.  Yes.

4             MS. VANDERLAAN-SMITH:  The document is the best

5    evidence.

6             MR. MILLER:  Q.  If we talk about -- not about

7    your diesel products, but your gas products, were you

8    buying most of your gasoline in the 90's from either

9    Tosco or Chevron?

10            MR. CORRELL:  Object to the form; calls for

11   speculation.

12            THE WITNESS:  It was either branded or

13   unbranded.

14            MR. MILLER:  Okay.

15            THE WITNESS:  I can't -- wouldn't know.

16            MR. MILLER:  Q.  All right.  Let's take that a

17   step at a time.  During the time that you were a jobber

18   for Chevron and the firm was Pazin & Myers, Inc., when

19   you picked up gasoline from Chevron was it branded gas

20   or branded and unbranded?

21        A.  Pick up --

22            MR. CORRELL:  Object to the form of the

23   question.

24            THE WITNESS:  I picked unbranded from Chevron

25   and unbranded from other entities.

                                                        55

DEPOBOOK REPORTING SERVICES (800) 830-8885

1        MR. MILLER:  Q.  Okay.  And was Tosco refining

2   company one of the entities that you purchased unbranded

3   gasoline from?

4        A.  Yes.

5        Q.  Now, how did it work in terms of when Cardgas

6   was branded or not branded?  Did they tell you as a

7   service station they wanted a Chevron blended gas or

8   what?

9        A.  No, no, it was strictly price.

10        Q.  Okay.

11        MR. CORRELL:  I will object to the form of the

12   prior question.

13        MR. MILLER:  Q.  And you knew that from their

14   practice of discussing gasoline deliveries with them

15   directly?

16        A.  I run the company, so I knew what the price was

17   for each oil company, so I would make the calls to get

18   it from -- if at all possible, I would get the cheapest

19   gas.

20        Q.  Okay.  So were you under --

21        A.  The most inexpensive gas.

22        Q.  Right.  You had an understanding with the

23   cardlock gas station owners in Merced that they wanted

24   you to acquire the least expensive gas that was

25   available for delivery to their station at that time?

56

```
 1        A.  Yes.

 2        Q.  And they wouldn't call you up and tell you who

 3   to buy it from, you were making the decisions on what

 4   was the least costly supplier at the time?

 5        A.  Unfortunately, yes.

 6        Q.  Okay.  And you had to keep track of that all

 7   the time anyway, correct?

 8        A.  I am a busy man, yeah.

 9        Q.  Did you have accounts that permitted you to

10   purchase gasoline from shippers other than Chevron and

11   Tosco?  For example, did you have an account with New

12   West?

13        A.  Yes.

14        Q.  Did you have an account with Tesoro?

15        A.  Yes.

16        Q.  In addition to the four we have gone over,

17   Chevron, Tosco, Tesoro, and New West, did you have

18   accounts that allowed you to purchase gasoline products

19   from anyone else during the time that you have been

20   employed by your firm?

21        A.  Well, we stated earlier ConocoPhillips.

22        Q.  Okay.

23        A.  Mobil.  Back in the 80's.

24        Q.  Okay.

25        A.  British Petroleum in the 80's, and that's about
```

                                                          57

Deposition of Richard Pazin / August 24, 2009

```
 1    it.
 2          Q.   Okay.  And as best you can recall, you had the
 3    right to purchase gasoline from Mobil, as the shipper of
 4    record in the 80's, not the 90's and later, correct?
 5          A.   Correct.
 6          Q.   And is the same true for BP, 80's but not 90's
 7    and later?
 8          A.   Best of my recollection is right in that area.
 9          Q.   All right.  What about ConocoPhillips?  During
10    what time period did you have arrangements to purchase
11    gasoline from them?
12          A.   From the 80's until present.
13          Q.   And during what period of time did you have
14    arrangements to purchase gasoline from New West?
15          A.   Probably from the 90's on.
16          Q.   Are they still in business?
17          A.   Yes.
18          Q.   And do you still have an account with them?
19          A.   Yes.
20          Q.   When did you first have an arrangement to
21    purchase gasoline products from Tesoro?
22          A.   Early 90's.
23          Q.   And are you still buying from them?
24          A.   Yes.
25          Q.   And has that been continuous?
```

58

Deposition of Richard Pazin / August 24, 2009

1      A.   Yes.

2      Q.   You mentioned that you went to the Kinder

3   Morgan terminal in Fresno, California to pick up

4   product.  Was there more than one shipper of record who

5   you could pick up product from at Fresno, at that

6   terminal?

7      A.   Yes.

8      Q.   And whose products could you pick up at that

9   terminal that you historically picked up there?

10     A.   It was Chevron, ConocoPhillips, Tosco, and New

11   West.

12     Q.   The Banta terminal near Tracy, California, is

13   that a Chevron terminal?

14     A.   Yes.

15     Q.   Is it a proprietary terminal?  That is, you can

16   only get Chevron gasoline there, to your understanding?

17     A.   Yes.

18          MR. CORRELL:   Objection; calls for speculation.

19          MR. MILLER:   Q.   And has it always been a

20   Chevron terminal during your business relationship with

21   that particular facility?

22     A.   Yes.

23     Q.   Besides Fresno and the Banta terminal in Tracy,

24   were there other locations where you could pick up

25   Chevron gas?

                                                    59

Deposition of Richard Pazin / August 24, 2009

```
 1       A.  No.

 2       Q.  And the ST Services terminal in Stockton, whose

 3  gasoline could you pick up there and did pick up there?

 4       A.  Tosco, Tesoro, New West.

 5            MR. CORRELL:  I am sorry.  What terminal was

 6  that again?

 7            THE WITNESS:  The Stockton terminal.

 8            MR. CORRELL:  Okay.

 9            MR. MILLER:  Q.  Was there any location where

10  you could pick up New West products, besides the Fresno

11  and Stockton terminals?

12       A.  No.

13       Q.  Was there any location where you could pick up

14  Tesoro product, other than the Stockton terminal?

15       A.  No.

16       Q.  When BP came into the picture, where were you

17  getting their gasoline from?  What terminal?

18       A.  I believe that was Rough and Ready Island out

19  of Stockton.

20       Q.  Okay.  Let's finish Exhibit 6, please.  I think

21  we made it to page 6.  Is page 7 of Exhibit 6 an

22  electronic funds transfer notice that you would have

23  received from Tosco refining company by fax?

24       A.  Yes.

25       Q.  And this relates to a shipment from the
```

60

Deposition of Richard Pazin  /  August 24, 2009

```
 1    contacted you?
 2         A.   To state the fact that something doesn't look
 3    right in the spill bucket.  You might want to take a
 4    look at it.  But that's where --
 5         Q.   Okay.  And if they noticed a problem with a
 6    spill bucket and you were contacted, what did you do
 7    with that information?
 8         A.   I went out and checked it and had it repaired.
 9         Q.   Now, you had gasoline stations as customers
10    other than the Cardgas station in Merced?
11         A.   Yes.
12         Q.   Could you estimate roughly how many?  I realize
13    it varies with time, but I am just trying to get a sense
14    of the order of magnitude that we are talking about.
15         A.   Over the years, 8 to 10.
16         Q.   And were some of those gas stations, in
17    addition to the Cardgas station, affiliated with your
18    family?
19         A.   No.
20         Q.   Were they independents, as opposed to branded
21    stations?
22              MR. CORRELL:  Objection.
23              THE WITNESS:  They were all different.  We had
24    both.
25              MR. MILLER:  Q.  Were some of them Chevron
```

64

1    stations?

2        A.  Yes.

3            MR. CORRELL:  Objection to form.

4            MR. MILLER:  Q.  And when I say Chevron

5    stations, I mean Chevron branded stations.

6        A.  Yes.

7        Q.  Okay.  Were you in a position to repair a spill

8    bucket at a station you didn't own and your family

9    didn't own?

10       A.  No.

11       Q.  Were you in a position to repair or replace a

12   spill bucket at the Cardgas station in Merced, if there

13   was a problem with it?

14       A.  Yes.

15       Q.  Explain, please.

16       A.  It was our site, so I would take care of it.  I

17   would just call some company to fix it if there was an

18   issue.

19       Q.  And do you recall what company or companies

20   were available to you to assist with a task like that?

21   That is, repairing and replacing a spill bucket,

22   inspecting it, whatever was required?

23       A.  Shaw Maintenance out of Turlock.

24       Q.  And how long have you had an account or

25   relationship with that firm?  I need an estimate, I am

65

Deposition of Richard Pazin / August 24, 2009

```
 1    STATE OF CALIFORNIA    )
                             (       ss.
 2    COUNTY OF STANISLAUS   )

 3        I, ERIC L. JOHNSON, do hereby certify that I am a

 4    licensed Certified Shorthand Reporter, duly qualified

 5    and certified as such by the State of California;

 6        That prior to being examined, the witness named in

 7    the foregoing deposition was by me duly sworn to testify

 8    to tell the truth, the whole truth, and nothing but the

 9    truth;

10        That the said deposition was by me recorded

11    stenographically at the time and place herein mentioned;

12    and the foregoing pages constitute a full, true,

13    complete and correct record of the testimony given by

14    the said witness;

15        That I am a disinterested person, not being in any

16    way interested in the outcome of said action, or

17    connected with, nor related to any of the parties in

18    said action, or to their respective counsel, in any

19    manner whatsoever.

20

21    DATED:  September 1, 2009

22

23                      _____
                        Eric L. Johnson, CSR, RPR
24

25
                                                        121
```

# EXHIBIT 4



1  SHEPPARD MULLIN RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   JEFFREY J. PARKER, Cal. Bar No. 155377
3  WHITNEY JONES ROY, Cal. Bar No. 211541
   ALISON N. KLEAVER, Cal. Bar No. 251410
4  333 South Hope Street, 48th Floor
   Los Angeles, California  90071-1448
5  Telephone:   213-620-1780
   Facsimile:   213-620-1398
6
7  Attorneys for Defendant
   EXXON MOBIL CORPORATION
8
9           SUPERIOR COURT OF THE STATE OF CALIFORNIA
10                  FOR THE COUNTY OF MERCED
11

12  CITY OF MERCED,                      Case No. 148451

13              Plaintiff,               *Assigned to the Honorable Carol K. Ash,
                                         Department 3*
14        v.
                                         **SUPPLEMENTAL RESPONSES OF**
15  CHEVRON U.S.A., INC., SHELL OIL      **DEFENDANT EXXON MOBIL**
    COMPANY; EXXONMOBIL                  **CORPORATION TO SPECIAL**
16  CORPORATION; EXXON                   **INTERROGATORIES PROPOUNDED**
    CORPORATION; KINDER MORGAN           **BY PLAINTIFF CITY OF MERCED**
17  ENERGY PARTNERS L.P.; EQUILON        **(SET THREE)**
    ENTERPRISES LLC; SFPP, L.P. and
18  DOES 1 through 200, inclusive,       Complaint Filed:   April 22, 2005

19              Defendants.

20

21  PROPOUNDING PARTY: PLAINTIFF CITY OF MERCED

22  RESPONDING PARTY:   DEFENDANT EXXON MOBIL CORPORATION

23  SET NO.:            THREE

24

25

26

27

28

---

W02-WEST:1ANK1\402710562.1          EXXONMOBIL'S SUPPLEMENTAL RESPONSES TO
                                    PLAINTIFF'S SPECIAL INTERROGATORIES (SET 3)

1   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 23:**

2        Subject to and without waiver of the foregoing objections and in addition to the

3   information previously provided in response to this special interrogatory, ExxonMobil

4   responds as follows:  ExxonMobil understands the term "jobber" to refer to third party

5   distributors supplied by Exxon, Mobil or ExxonMobil who then supplied retail stations

6   pursuant to agreements with those retail stations.

7        Pre-merger Exxon supplied the following jobbers, whose contracts with Exxon

8   were transferred to Valero effective May 15, 2000, with gasoline that may have contained

9   MTBE at the terminals identified in ExxonMobil's responses and supplemental responses

10   to Special Interrogatory Nos. 24 and 25: Big Oil & Tire Co. Inc. (1997, 1999); C P Phelps

11   Inc. (1992-1999); Curtesy Oil Co. (1993-1999); Dwelle Bros. (1992, 1996); E.R. Vine &

12   Sons Inc. (1992-2000); El Monte Gas Inc. (1993-2000); Inter-City Petr. Marketers Inc.

13   (1992-2000); Jack Griggs Inc. (1992-1999); Jaco Oil Co. Inc. (1992-2000); Jeffries Bros.

14   Inc. (1994); Nella Oil (1992-2000); New West Petroleum (1995-2000); Olympian Oil Co.

15   (1992, 1994-1999); Petroleum Sales Inc. (1994-2000); Redding Oil Company (1993);

16   River City Petroleum Inc. (1996-2000); Robert V. Jensen, Inc. (1999); Selby Petroleum,

17   Inc. (1996-2000); Silveira Petroleum Inc. (1993-2000); Stockton Petroleum Co. (1992-

18   1999); Sturdy Oil Co. (1993-2000); Time Oil Co. (1993-2000); Tower Energy Group

19   (1992-2000); Van De Pol Enterprises, Inc. (1998-2000); and W P Davies Oil Co. (1992-

20   1998).  Additionally, pre-merger Exxon supplied Redwood Oil Co. (1996, 1998) at one or

21   more terminals identified in ExxonMobil's responses and supplemental responses to

22   Special Interrogatory Nos. 24 and 25.  ExxonMobil is unable to identify any other jobbers,

23   if they exist, from the database records.

24        Pre-merger Mobil supplied the following jobbers (listed by billing name) during the

25   listed dates from terminals identified in ExxonMobil's response and supplemental response

26   to Interrogatory No. 25: Golden Gate Petro (1987-1989); Rose and Ramos, Inc. (1987-

27   1989); John S. Pazin (1987-1989); Redwood Oil Co. (1986-1989); Gary V. Burrows Inc.

28   (1986-1987); California Fuels (1986-1989); C M Codorniz & T Conway (1986-1989);

-7-

1      (a)     Vague and ambiguous, particularly with respect to the term "MERCED

2               STATIONS," which is capitalized but not defined.

3      (b)     Vague and ambiguous, particularly with respect to interrogatory's failure to

4               identify the terminals that are the subject of the interrogatory.

5      Subject to and without waiving the foregoing objections, ExxonMobil responds as

6 follows:  Pre-merger Exxon ceased blending MTBE into gasoline at the Benicia refinery

7 on or about May 15, 2000.  ExxonMobil is unable to provide a further response to this

8 interrogatory because the interrogatory fails to define the "MERCED STATIONS" or

9 terminals about which Plaintiff seeks information.  ExxonMobil is also unable to provide a

10 further response to this interrogatory because it calls for improper and unduly burdensome

11 "top down" discovery that imposes an undue burden on ExxonMobil to search for

12 information that is unlikely to yield relevant or admissible evidence given the nature of the

13 request.

14 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 35:**

15      Subject to and without waiver of the foregoing objections and in addition to the

16 information previously provided in response to this special interrogatory, ExxonMobil

17 responds as follows:  Understanding the term "MERCED STATIONS" to refer to the

18 defined term "SITE," ExxonMobil responds that Exxon did not have any direct supply

19 agreements with any MERCED STATION during the relevant time period, but did have a

20 supply agreement with Curtesy Oil, who supplied the station at 1720 R Street.  The

21 delivery records in Exhibit 2-B indicate that Exxon last supplied gasoline containing

22 MTBE to Curtesy Oil on June 1, 1999.  Exxon ceased blending MTBE into gasoline at the

23 Benicia refinery on or about May 15, 2000.

24 Dated:  September 15, 2010

25                      SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

26                      By         */s/ Alison N. Kleaver*

27                           ALISON N. KLEAVER

28                           Attorneys for Defendant
                                    EXXON MOBIL CORPORATION

-16-

EXXONMOBIL'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S SPECIAL INTERROGATORIES (SET 3)

## PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE

*City of Merced v. Chevron U.S.A., Inc., et al.*

Superior Court – County of Merced Case No. 148451

I, Jennifer B. Rodriguez, the undersigned, hereby declare:

1. I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and am not a party to the within action. I am employed by Sheppard, Mullin, Richter & Hampton LLP in the City of Los Angeles, State of California. My business address is 333 South Hope Street, 48th Floor, Los Angeles, California 90071.

2. On September 15, 2010, I served a copy of the attached document titled: **SUPPLEMENTAL RESPONSES OF DEFENDANT EXXON MOBIL CORPORATION TO SPECIAL INTERROGATORIES PROPOUNDED BY PLAINTIFF CITY OF MERCED (SET THREE)** on all parties hereto by:

a. __X__   Posting it directly to the LexisNexis File & Serve website, www.lexisnexis.com/fileandserve, at approximately 3:15 p.m. Pacific Time

b. _____   Sending it via facsimile transmission to LexisNexis File & Serve at approximately _____ a.m./p.m. Pacific Time

c. _____   Placing it in an addressed, sealed envelope clearly labeled to LexisNexis File & Serve and causing it to be deposited with an overnight mail or courier service for delivery the next business day.

I declare under penalty under the laws of the State of California that the foregoing is true and correct. Executed on September 15, 2010.

Jennifer B. Rodriguez

W02-WEST:1JBR1\402305222.1