UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**Master File No. 1:00 - 1898**
**MDL 1358 (SAS)**
**M21-88**

Civil Action

**This Document Relates To:**

*Commonwealth of Puerto Rico, et al. v.*
*Shell Oil Co., et al.,* No. 07 Civ. 10470

**DECLARATION OF DANIEL BOONE IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO MOTION TO DISMISS BY DEFENDANT TOTAL, S.A.**

I, Daniel Boone, declare:

1.      I am one of the attorneys in this case for plaintiffs Commonwealth of Puerto Rico and Commonwealth of Puerto Rico through the Environmental Quality Board.   I have been involved in the discovery and pretrial proceedings in this action.   This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of relevant portions of the Third Amended Complaint filed in this action on December 3, 2012.

3.      Attached hereto as Exhibit 2 is a true and correct copy of information from the corporate website of TSA uploaded from the internet on May 8, 2013.

4.      Attached hereto as Exhibit 3 is a true and correct copy of relevant portions of the Total S.A. Notice of Combined General Meeting for May 2005.

5.      Attached hereto as Exhibit 4 is a true and correct copy of relevant portions of Total S.A. Form 6-K, Report of Foreign Private Issuer, For the Month of October 2004.

6.      Attached hereto as Exhibit 5 is a true and correct copy of relevant portions of Total S.A. Form 20-F, For the fiscal year ended December 31, 2011.

7.      Attached hereto as Exhibit 6 is a true and correct copy of relevant portions of the Report of Independent Auditors for Total Petroleum Puerto Rico Corp. dated June 9, 2006.

8.      Attached hereto as Exhibit 7 is a true and correct copy of relevant portions of Total Petroleum Puerto Rico Corp. Statement Attached To and Made Part of the 2004 Corporate Annual Report for the period ended December 31, 2004.

9.      Attached hereto as Exhibit 8 is a true and correct copy of relevant portions of the TPPRC Financial Statement for the years ended December 31, 2007 and 2006.

1

10.     Attached hereto as Exhibit 9 is a true and correct copy of relevant portions of the Report of Independent Auditors for Total Petroleum Puerto Rico Corp. dated September 9, 2009.

11.     Attached hereto as Exhibit 10 is a true and correct copy of documents Bate-stamped TPPRC.SUPPLY_000413, TPPRC.SUPPLY_000456-57; TPPRC.SUPPLY_000460; TPPRC.SUPPLY_000462-63; TPPRC.SUPPLY_000469; and TPPRC.SUPPLY_000480-81;

12.     Attached hereto as Exhibit 11 is a true and correct copy of documents Bate-stamped  TPPRC.SUPPLY_000420-23; and TPPRC.SUPPLY_000451-55.

13.     Attached hereto as Exhibit 12 is a true and correct copy of Total Petroleum Puerto Rico Corporation Corporate Disclosure Statement dated November 24, 2008.

14.     Attached hereto as Exhibit 13 is a true and correct copy of TPPRC Amended Corporate Disclosure Statement dated October 15, 2012.

15.     Attached hereto as Exhibit 14 is a true and correct copy of a letter dated April 17, 2013, from Michael Axline to Elliot Polebaum.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th  day of May, 2013, at Sacramento, California.

DANIEL BOONE

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation .

Master File No. 1:00–1898
MDL 1358 (SAS)
M21-88

---

COMMONWEALTH OF PUERTO
RICO and COMMONWEALTH OF
PUERTO RICO through the
ENVIRONMENTAL QUALITY
BOARD,

   Plaintiff,

v.

SHELL OIL COMPANY;
SHELL COMPANY PUERTO RICO LTD.;
SHELL CHEMICAL YABUCOA, INC.;
SHELL TRADING (US) COMPANY;
MOTIVA ENTREPRISES, LLC;
EQUILON ENTERPRISES, LLC;
CHEVRON CORPORATION;
CHEVRON, U.S.A., INC.;
CHEVRON PUERTO RICO, LLC;
TEXACO PUERTO RICO, INC.;
CHEVRON PHILLIPS;
CHEMICAL PUERTO RICO CORE, INC.;
TEXACO PETROLEUM, INC.;
CHEVRON INTERNATIONAL
OIL COMPANY, INC.;
TEXACO REFINING AND
MARKETING, INC.;
CHEVRON CARIBBEAN, INC.;
CHEVRON ESTRELLA PUERTO RICO, INC.;
ESSO STANDARD OIL COMPANY
(PUERTO RICO);
EXXONMOBIL CORPORATION;
HOVENSA L.L.C.;
HESS OIL VIRGIN ISLANDS
CORPORATION;
SUNOCO, INC.;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
).
)
)
)
)
)
)
)
)
)
)
)
)

THIRD AMENDED
COMPLAINT

Civil Action

Case No. 07 Civ. 10470 (SAS)

JURY TRIAL DEMANDED

1

9.     The Defendants in this action are all corporate members of the petroleum and chemical industries.  As described below, Defendants include refiners of gasoline containing MTBE; manufacturers and promoters of MTBE; suppliers of gasoline containing MTBE; and owners and operators of facilities that have released MTBE into the waters of the Commonwealth.

10.     In addition to producing and/or supplying MTBE or gasoline containing MTBE within the Commonwealth, Defendants knowingly and willfully promoted, marketed and sold MTBE and petroleum products containing MTBE, when they knew or reasonably should have known that MTBE would be released into the environment and pollute the waters of the Commonwealth, would interfere with the Commonwealth's interest in protecting and preserving the waters of the Commonwealth, and would threaten public health and welfare and the environment, as has occurred and is continuing to occur within the Commonwealth.

11.     In addition to seeking damages to fund the identification and treatment of MTBE contaminated waters used for public and private drinking water, the Commonwealth also seeks the costs of restoring MTBE contaminated waters of the Commonwealth to their original pre-discharge condition, and compensation for injuries to the waters of the Commonwealth, including compensation for the lost use, lost value, and lost existence value of such waters.  The Commonwealth further seeks an order compelling the Defendants to investigate their contamination, to abate the public nuisance the Defendants have caused with respect to the waters of the Commonwealth, and to prevent further releases from their leaking underground storage tanks, among other relief.

6

15.     The Commonwealth, through the Environmental Quality Board, has standing to enforce the Commonwealth's environmental regulations and statutes through The Public Policy Environmental Act, Title II, Act No. 9, 12 L.P.R.A. §1121 *et seq.*

16.     The Secretary of Justice may, when in his judgment the interests of the Commonwealth require it, institute and conduct proceedings against persons who intrude on the lands, rights, or property of the Commonwealth, or commit or erect any nuisance thereon.

## DEFENDANTS

17.     The Defendants in this action are all corporate members of the petroleum industry.  As described below, Defendants include refiners of gasoline containing MTBE that contaminates waters of the Commonwealth; manufacturers and promoters of MTBE; suppliers of gasoline containing MTBE that contaminates waters of the Commonwealth; and owners and/or operators of gasoline facilities that have released MTBE that contaminates waters of the Commonwealth.

18.     Any and all references to Defendant, Defendants, or a particular Defendant by name in this Complaint include all predecessors, successors, parents, subsidiaries, affiliates, divisions, and agents of the named Defendants.

19.     When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

20.     When reference in this complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

.8

## A. Refiner/Supplier Defendants

21.     Upon information and belief, the following Defendants, at all times relevant to this action, refined, marketed and/or otherwise supplied (directly or indirectly) gasoline and/or other products containing MTBE that each such Defendant knew or should have known would be delivered into the Commonwealth.  The following Defendants and Does 1 through 99 are collectively referred to as the "Refiner/Supplier Defendants."

22.     Chevron Corporation ("Chevron Corp.") is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California. Defendant Chevron Corp. is the successor-in-interest to ChevronTexaco Corporation and successor-in-interest to Texaco, Inc.  Upon information and belief, the Commonwealth further alleges that Chevron Corp. owns and/or controls defendant Chevron U.S.A., Inc.

23.     Chevron Puerto Rico LLC ("Chevron PR") is an affiliate of Chevron Global Energy, Inc., which is also known as Chevron Texaco Products Company, a Delaware limited liability company, with its principal place of business at 6001 Bollinger Canyon Rd., Room 5378, San Ramon, CA.  Chevron PR's principal place of business is located at the Texaco Plaza Building, Suite 400, Metro Office Park, Guaynabo, Puerto Rico.  Upon information and belief, the Commonwealth alleges that Chevron PR was formerly known as Texaco Puerto Rico LLC, which was formerly known as Texas Company (Puerto Rico) Inc.

24.     Texaco Puerto Rico, Inc. ("Texaco PR") is a Puerto Rico corporation with its principal place of business located at Texaco Plaza Metro Office Park, Street 1 #2, 4th Floor, Suite 400, Guaynabo, Puerto Rico.

9

51.     Total Petroleum Puerto Rico Corporation ("Total PR"), successor to Gasolinas de Puerto Rico Corporation, is a Puerto Rico corporation with its principal place of business at Mario Julia Industrial Park, A Street, Suite 11A, Guaynabo, Puerto Rico.  Upon information and belief, the Commonwealth alleges that Total PR is a wholly owned subsidiary of Total Outre Mer, S.A. of France.

52.     Total Outre Mer, S.A., is a French "société anonyme," similar to a U.S. corporation, with a principal place of business at 24 Cours Michelet 92800 Puteaux Tour Total, France.

53.     Total, S.A., is a French "société anonyme," similar to a U.S. corporation, with a principal place of business at 2, place de la Coupole, La Défense 6, 92400 Courbevoie, France.

54.     Shell Western Supply and Trading Limited, ("SWS&TL") is a business organization, similar to a U.S. corporation, with a principal place of business at Mahogany Court, Wildey Business Park, Wildey, Barbados.

55.     Shell International Petroleum Company Limited ("Shell International") is a business organization of unknown form with a principal place of business at Shell Centre SE1 7NA, London, United Kingdom.

56.     Shell Western Services is a business organization similar to a U.S. corporation with a principal place of business in Nassau, Bahamas.

57.     Peerless Oil and Chemicals, Inc. ("Peerless") is a Delaware corporation headquartered in Puerto Rico with a principal place of business at Road 127 KM 17.1, Punta Guayanilla, Penuelas, Puerto Rico 00624.

14

87.     Because of MTBE's propensity to contaminate vast quantities of water, to date, at least 25 States or Commonwealths have banned or enacted laws that have set a date certain banning the use of MTBE as an additive in gasoline.

**Defendants' Promotion of MTBE**

88.     The Refiner/Supplier and Manufacturer/Supplier Defendants, all of whom have promoted the use of gasoline containing MTBE for its purported environmental benefits, knew or should have known of the grave harm and threat to the public health and welfare represented by the proliferating use of this compound, including (among other things): widespread pollution of waters of the Commonwealth with MTBE, drinking water supplies rendered unfit and unusable for consumption, public health threatened, and increased costs to public water suppliers and their customers.

89.     Despite knowing that MTBE pollution was inevitable unless adequate precautions were taken, and despite the availability of reasonable alternatives (including but not limited to adequate warnings), Defendants chose not to warn customers, retailers, regulators or public officials, including the Commonwealth.  As production and sales of these compounds and gasoline containing them increased, Defendants failed to take any reasonable, appropriate, and special precautions to store gasoline containing MTBE safely, or to prevent, detect and clean-up spills and leaks of gasoline containing this product.  Despite knowing the risk of harm posed by MTBE, Defendants also failed to warn purchasers, the public, regulators, and/or the Commonwealth that without such precautions more and more MTBE would be released into the environment and cause, among other significant adverse effects, long term contamination of waters of the Commonwealth and threats to public health and safety.

90.     The Refiner/Supplier Defendants further exacerbated the situation by continuing unreasonable and negligent acts, including providing gasoline containing

20

MTBE to gasoline stations without either providing appropriate warnings or taking other precautions adequate to prevent releases of MTBE to the subsurface, knowing that release to the environment of this compound would be inevitable because a substantial percentage of those gasoline stations would store such gasoline without taking reasonable, appropriate or special precautions, including placing the gasoline in inadequate and leaking gasoline delivery systems, and failing to take reasonable, appropriate, or special measures to monitor, detect, and respond to releases of MTBE to soil and/or groundwater, and without taking reasonable, appropriate or special precautions to investigate, contain and clean up releases of these compounds.

91.    The Refiner/Supplier and Manufacturer/Supplier Defendants took affirmative actions that led to the contamination of the waters of the Commonwealth with MTBE, including but not limited to, making representations to downstream users of MTBE and/or gasoline containing MTBE, as well as to the public and government agencies, that such products were environmentally sound and appropriate for widespread production, distribution, sale and use.   Indeed, Defendants represented that gasoline containing MTBE could be handled the same as ordinary gasoline, and required no special measures to protect against or respond to suspected releases to the subsurface.

92.    The manufacturers, refiners, and suppliers of MTBE and gasoline containing MTBE had a duty (which they breached) to test MTBE thoroughly to determine its environmental fate and transport characteristics, and potential human health impacts before they sold MTBE and/or gasoline containing MTBE, and had a further duty (which they also breached) to take precautions necessary to assure that gasoline containing MTBE was properly stored and to institute all necessary measures to contain and promptly abate the inevitable spills and leaks.  Nonetheless, the Defendants, and each of them, failed adequately to test, store, warn about, or control gasoline containing

21

MTBE, and, among other things, failed to abate contamination caused by MTBE, including contamination in and pollution of the waters of the Commonwealth.

93. The Refiner/Supplier and Manufacturer/Supplier Defendants, their agents and employees created, participated in, and/or facilitated the flow of MTBE and/or gasoline containing one or more such compounds into gasoline distribution, storage, and dispensing systems that they knew could not safely contain such products. The widespread problems of leaking gasoline delivery systems were well known to the Defendants prior to the introduction of MTBE. At least as early as the mid-1960's, these Defendants knew, or reasonably should have known, that gasoline delivery systems suffer significant and widespread leaks and failures, and release gasoline products into the environment, including into ground water.

94. Before introducing MTBE into gasoline delivery systems, the Refiner/Supplier and Manufacturer/Supplier Defendants knew, or reasonably should have known, among other things, that MTBE released into the environment would mix easily with ground water, move great distances, resist biodegradation and/or bioremediation, render drinking water unsafe and/or non-potable, cause significant expenses to remove from public drinking water supplies, and otherwise threaten the public health and welfare. The Defendants knew, or they reasonably should have known, that the gasoline distribution and retail system in the Commonwealth contained leaking gasoline delivery systems. They knew, or they reasonably should have known, that gasoline facilities, including those in the Commonwealth, commonly lacked adequate storage facilities for gasoline containing MTBE, and that the operators of these facilities were unaware of either the special hazards of MTBE or the steps necessary to eliminate or mitigate those hazards.

95. At all times relevant to this action:

22

(a)     The Manufacturer/Supplier Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided MTBE to the Refiner/Supplier Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided gasoline containing MTBE to retail gasoline stations and/or other gasoline delivery systems in the Commonwealth. Upon information and belief, the Commonwealth alleges that such sales, exchanges, supplies, distributions, deliveries and/or other provisions of gasoline containing MTBE to such facilities occurred over time, up to and including the present;

(b)     Gasoline containing MTBE was released to the subsurface from retail gasoline facilities owned and/or operated by the Owner/Operator Defendants, and each of them, and from other facilities at dispersed locations in the Commonwealth. Such releases of gasoline containing MTBE have occurred over time, have been discovered or have become discoverable at various times, and are still occurring, all in varying amounts at different locations, impacting waters of the Commonwealth; and

(c)     MTBE takes time to migrate from release points to locations within the subsurface at which they have an appreciable impact on groundwater resources. MTBE has over time migrated in the subsurface from dispersed release points at or near the surface at retail gasoline facilities in the Commonwealth, causing pollution, contamination, and substantial damage to the waters of the Commonwealth, causing appreciable injury to the Commonwealth.

23

## COUNT I
### (Strict Products Liability for Defective Design and
### Failure to Warn Against All Defendants)

96.     The Commonwealth re-alleges paragraphs 1 through 77 above, and by this

reference incorporates them as though set forth in full.

97.     The Refiner/Supplier Defendants, and each of them, designed, formulated,

manufactured, compounded, refined, provided product information and/or instructions for

use, packaged, labeled, promoted, marketed, distributed, transported, exchanged and/or

sold gasoline containing MTBE.

98.     The Refiner/Supplier and Manufacturer/Supplier Defendants, and each of

them, designed, formulated, manufactured, compounded, refined, provided product

information and/or instructions for use, packaged, labeled, promoted, marketed,

distributed, transported, exchanged and/or sold MTBE, which was intended by said

Defendants, and each of them, to be used as a gasoline additive.

99.     The Owner/Operator Defendants took delivery of, stored and sold the

gasoline containing MTBE which is contaminating and polluting waters of the

Commonwealth.

100.     The Refiner/Supplier and Manufacturer/Supplier Defendants, and each of

them, represented, asserted, claimed and warranted that gasoline containing MTBE could

be used in the same manner as gasoline not containing these compounds, and/or that

gasoline containing MTBE did not require any different or special handling or

precautions.

101.     Defendants, and each of them, knew that said product(s) were to be

purchased and used without inspection for defects.

102.     MTBE and gasoline containing MTBE are defective products because,

among other things:

24

## COUNT II
### (Public Nuisance - 32 L.P.R.A. § 2761 Against All Defendants)

108.    The Commonwealth re-alleges paragraphs 1 through 89 above, and by this reference incorporates them as though set forth in full.

109.    The negligent, reckless, intentional and ultrahazardous activity of Defendants, and each of them, alleged herein has resulted in the contamination and pollution of the waters of the Commonwealth as alleged herein, and constitutes a public nuisance. 32 L.P.R.A. § 2761. The Secretary of Justice is authorized to institute proceedings against those parties that intrude on the lands, rights, or property of the Commonwealth, or commit a nuisance thereon. 3 L.P.R.A. § 73.

110.    The public nuisance caused, contributed to, maintained, and/or participated in by Defendants, and each of them, has substantially and unreasonably interfered with, obstructed and/or threatened, among other things, the Commonwealth's significant property and quasi-sovereign interests in the waters of the Commonwealth, the Commonwealth's ability to protect, conserve and manage the waters of the Commonwealth, which are by law precious and invaluable public resources held by the Commonwealth in trust for the benefit of the public, as well as the rights of the people of the Commonwealth to enjoy a water supply free from unacceptable health risk, taste, odor, pollution, and contamination.

111.    Each Defendant has, at all times relevant to this action, caused, maintained, participated in and/or assisted in the creation of such public nuisance. Among other things, each Defendant is a substantial contributor to such public nuisance as follows:

27

disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the Commonwealth.

## COUNT III
### (Trespass - 31 L.P.R.A § 5141 Against All Defendants)

118.   The Commonwealth re-alleges paragraphs 1 through 99 above, and by this reference incorporates them as though set forth in full.

119.   The Commonwealth is the owner and/or actual possessor of property rights and interests in the waters of the Commonwealth, as alleged herein, which the Commonwealth holds in trust for the benefit of the public. These property rights and interests include, but are not limited to, a quasi-sovereign interest in protecting the quality of such waters from contamination and pollution.

120.   Defendants, and each of them, intentionally manufactured, refined, marketed, and/or otherwise supplied MTBE and/or gasoline containing MTBE with the knowledge that contamination of the waters of the Commonwealth with MTBE was substantially certain to result.

121.   Among other things, Defendants, and each of them, intentionally caused MTBE to enter, invade, intrude upon and injure the waters of the Commonwealth as follows:

    a.   The Manufacturer/Supplier Defendants manufactured, promoted and supplied MTBE to refiners when they knew that it was substantially certain that: (i) the refiners would in turn blend the MTBE into gasoline; (ii) such gasoline containing MTBE would then be placed into leaking gasoline delivery systems, including those in the Commonwealth; (iii)

## COUNT IV
### (Negligence – 31 L.P.R.A § 5141 Against All Defendants)

129.    The Commonwealth re-alleges paragraphs 1 through 110 above, and by this reference incorporates them as though set forth in full.

130.    Defendants had a duty to the Commonwealth to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or gasoline containing MTBE.

131.    Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold and otherwise entrusted MTBE and gasoline containing MTBE that they breached their duties and directly and proximately caused MTBE to contaminate and threaten the waters of the Commonwealth, resulting in the damages alleged in this Complaint.

132.    Defendants, and each of them, failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of MTBE, and/or the likelihood that use of MTBE as a component of gasoline would pollute waters of the Commonwealth, render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

133.    The Manufacturer/Supplier Defendants, among other things, manufactured, promoted and/or otherwise supplied MTBE to refiners when they knew, or reasonably should have known, that: (a) the refiners would in turn blend the MTBE into gasoline; (b) such gasoline containing MTBE would then be placed into leaking gasoline delivery systems, including those in the Commonwealth; (c) MTBE would be released even more readily than the constituents of conventional gasoline from gasoline delivery

142.    The contamination of the waters of the Commonwealth with MTBE alleged herein has varied over time and has not yet ceased.  MTBE continues to threaten, migrate into and enter the waters of the Commonwealth.  Defendants continue to refrain from taking responsibility for this trespass and from taking action to remediate existing contamination and prevent future contamination of the waters of the Commonwealth.

143.    Defendants' conduct is reprehensible, despicable, and was performed to promote sales of MTBE and/or gasoline containing MTBE in conscious disregard of the known risks of injury to health and property.  Defendants acted with willful and conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the Commonwealth.

**COUNT V**
**(Puerto Rico Public Policy Environmental Act, Water Pollution Control Act, and Underground Storage Tank Control Regulations Against All Defendants)**

144.    The Commonwealth re-alleges paragraphs 1 through 125 above, and by this reference incorporates them as though set forth in full.

145.    The Defendants are each "person[s]" as defined by 24 L.P.R.A. § 591(d).

146.    The activities of Defendants, and each of them, alleged herein has resulted in the "pollution" of "waters" of the Commonwealth as defined by 24 L.P.R.A. § 591(i) and § 591(e), respectively.  For purposes of this Complaint, "waters" only includes waters of the Commonwealth, as defined in Paragraph 5 above.

147.    The MTBE and petroleum discharged to waters of the Commonwealth by the Defendants are "other" types of pollution as that term is defined by 24 L.P.R.A § 591(h).

38

# EXHIBIT 2

Case 1:00-cv-01898-VSB-VF   Document 3716   Filed 05/08/13   Page 20 of 78



**TOTAL**

# Our Businesses

You are here:   <u>Home</u>   <u>About Total</u>   Our Businesses

Total is leveraging its **integrated business model** to take advantage of synergies among its various activities worldwide. These activities are divided into **three businesses**.

Our **Upstream** business encompasses oil exploration and production, together with activities related to natural gas.

Our **Refining & Chemicals** includes refining, petrochemicals, speciality chemicals, crude oil trading and shipping.

Our **Marketing & Services** business is focused on the supply and sale of petroleum products, together with activities related to renewable energy.





## Upstream

The Upstream business has two branches: Exploration & Production and  Gas & Power. These teams engage in oil and gas exploration, development and production in more than 40 countries.

- ○ <u>Total's Upstream business</u>



# Refining & Chemicals

Total's Refining & Chemicals business is the Company's major industrial component, encompassing refining, petrochemicals, fertilizers and speciality chemicals. It also includes crude oil trading and shipping activities.

- ○ Learn more about this business



# Marketing & Services

This business involves supplying and marketing petroleum products (service station activities for light vehicles and trucks; general trade in automotive fuels, fuel oil, lubricants, LPG, asphalt, etc.). They are also developing solar energy and biomass.

- ○ Our Group's Marketing & Services business

# EXHIBIT 3



# Notice of Meeting
Combined General Meeting
(Ordinary and Extraordinary)

of Tuesday 17th May 2005
to be held at the Palais des Congrès,
2, place de la Porte Maillot – 75017 Paris at 10 a.m.

## How to take part in the General Meeting?    4


## Combined General Meeting    8

Agenda    8
Resolutions Summary    9
Proposed resolutions    13


## Board of Directors    20

Members of the Board of Directors    20


## Total in 2004    22

Summary presentation    22
Five-year financial summary and income allocation of TOTAL S.A.    28


## Request for copies of documents and information    29

**TOTAL S.A.**
Société anonyme with capital of 6,350,151,080 euros
Registered Office: 2, place de la Coupole
La Défense - 92400 Courbevoie (Hauts-de-Seine), France
542 051 180 Companies Register of Nanterre


Documents covered by Article 133 of Decree no. 67-236 of March 23, 1967.

## Total S.A. parent company accounts
### accounts and proposed dividend

The parent company, Total S.A., reported net earnings of 3,443 M€ in 2004 compared to 3,272 M€ in 2003. The Board of Directors, after closing the accounts, decided to propose at the May 17, 2005 Annual General Meeting a dividend of 5.40 euros per share for 2004, a 15% increase compared to 2003.

The pay-out ratio for Total in 2004, based on adjusted net income [4], would be 37%, above the average of the majors [3].

Taking into account the interim dividend payment of 2.40 euros per share made on November 24, 2004, the remaining dividend payable of 3 euros per action will be paid on May 24, 2005.



*Euros per share*

+ 64 %

| 2000 | 2001 | 2002 | 2003 | 2004 |
|------|------|------|------|------|
| 3,30 | 3,80 | 4,10 | 4,70 | 5,40 |

## Overview of Total's fiscal year



### The Group's three business segments are:

- **THE UPSTREAM SEGMENT,** which includes exploration, hydrocarbon production, gas, electricity, and other forms of energy;

- **THE DOWNSTREAM SEGMENT,** which includes refining, petroleum product marketing and distribution, specialty products, and the trading and shipping of crude oil and products;

- **THE CHEMICALS SEGMENT,** which includes Base chemicals & Polymers, Intermediates & Performance Polymers and Specialties.

The 2004 market environment has been favorable for the oil industry. The combination of very high oil prices, a sharp increase in refining margins and a rebound in petrochemical margins during the second half of the year allowed the Group to reach a new record level of earnings, 9.04 billion euros for adjusted net income [4], or an increase of 23% compared to 2003, despite the decline in the dollar.

Thanks to the commitment of our teams, we enjoyed solid operational performance by the business segments, particularly the continued growth of Upstream production, as well as ongoing productivity programs, which made significant contributions to the results.

Adjusted earnings per share [4] increased by 27% to 14.68 euros. Expressed in dollars [5], the increase was 40%.

Total pursued a large investment program of more than 8.7 billion euros, while offering, through a combination of dividends and buybacks, the best return to shareholders among the major oil companies.

Total is confident that it can extend its long-term profitable growth largely through exploration successes and through giant projects currently being negotiated.

| Medium-term oil market environnement | 2004 | 2003 | % |
|---|---|---|---|
| Euro/dollar | 1.24 | 1.13 | -9%* |
| Brent price (dollar per barel) | 38.3 | 28.8 | +33% |
| European refining margins (dollar per ton) | 32.8 | 20.9 | +57% |

*\* Change in the dollar versus the euro*

(3) ExxonMobil, BP, RD/Shell, ChevronTexaco, Total.

(4) Adjusted net income = net income (Group share) adjusted for special items and excluding Total's equity share of amortization of goodwill and intangible assets related to the Sanofi-Aventis merger (153 M€ for the full year 2004).

(5) Dollar amounts represent euro accounts converted at the average €/$ exchange rate for the period (1.2439 for the full year 2004, and 1.1312 for the full year 2003).

## Downstream

### Results

Net operating income from the Downstream segment adjusted for special items rose to 2,302 M€ in 2004 from 1,460 M€ in 2003, an increase of 58%.

### Profitability

Downstream return on average capital employed (ROACE) was 25% in 2004 compared to 15% in 2003.

### Refined product sales

For the full year 2004, refinery throughput increased by 1% to 2,496 kb/d compared to 2,481 kb/d in 2003. The utilization rate rose to 93% in 2004 from 92% in 2003.

Refined product sales increased by 3% to 3,771 kb/d in 2004.

### Highlights

In refining, the main highlights for 2004 concerned the launch of the construction of a distillates hydrocracker at the Normandy refinery in France. This project, including the hydrogen supply unit, represents a total investment of approximately 500 M€. It will enable the refinery to reduce substantially its heavy oil production and enhance its supply flexibility for diesel, jet fuel and heating oil. The unit will also produce high quality bases for lubricants and specialty fluids. The start-up is scheduled for 2006.

In marketing, Total announced the signing of a joint venture with Sinochem for the creation of a network of 200 service stations in northern China, where the two companies are already working together at the Dalian refinery. Total also acquired a service station network in Puerto Rico that has about a 6% market share. In France, the Group has implemented its brand strategy, including the deployment of the Elan brand mainly aimed at rural areas.



## Chemicals

### Results

Chemicals sales increased by 16% to 20,042 M€ in 2004 from 17,260 M€ in 2003.

Net operating income from the Chemicals segment adjusted for special items rose to 656 M€ from 254 M€ in 2003.

This recovery was due mainly to a higher contribution from base chemicals, reflecting the rebound in petrochemical margins in Europe and the US in the second half of 2004. The improvement in the utilization rate of the steam-crackers compared to 2003 allowed the Group to benefit fully from the favorable market conditions.

In 2004, margins for the Intermediates improved, particularly at the end of the year, despite the weakness of the dollar and an increase in raw material costs.

Specialties continued to perform well in terms of results and cash flow.

### Profitability

Chemicals return on average capital employed (ROACE) increased to 8.5% from 3.5% in 2003.

### Highlights

In 2004, Total announced a project to restructure its Chemicals segment aiming at a lighter functional organization as well as the creation of a decentralized entity, separate from the petrochemicals and the specialties, that would be comprised of the chlorochemicals, intermediates and performance polymers. This new entity has been named Arkema on October 1, 2004. Arkema is comprised of three activities: Vinyl Products, Industrial Chemicals and Performance Polymers. Its management team was put in place in June 2004 and is building an organization that will allow Arkema to be spun-off as an independent entity in 2006 [12].

In January 2005, Arkema announced a plan to restructure its vinyl products business in France, to improve the performance of its chlorochemicals chain.

*(12) Subject to market conditions and after informing/consulting with labor representatives.*

# EXHIBIT 4

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington D.C.

# FORM 6-K

REPORT OF FOREIGN PRIVATE ISSUER
PURSUANT TO RULE 13-a16 OR 15-d16 OF
THE SECURITIES EXCHANGE ACT OF 1934

For the month of

October 2004

# TOTAL S.A.

(Translation of registrant's name into English)

2, place de la Coupole
92078 Paris La Défense Cedex
France
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports
under cover Form 20-F or Form 40-F.

Form 20-F þ          Form 40-F o

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also
thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b)
under the Securities Exchange Act of 1934.

Yes o          No þ

(If "Yes" is marked, indicate below the file number assigned to the registrant
in connection with Rule 12g3-2(b): 82-_____.)

EX-99.4 5 y00961exv99w4.htm EX-99.4: SERVICE STATIONS IN PUERTO RICO

EX-99.4

http://www.sec.gov/Archives/edgar/data/879764/0000950123040138...

**Exhibit 99.4**



# TOTAL

2, place de la Coupole
La Défense 6
92 400 Courbevoie France
Fax: 33 (1) 47 44 68 21

**FOR IMMEDIATE RELEASE**

Catherine ENCK
Tel.: 33 (1) 47 44 37 76

Patricia MARIE
Tel.: 33 (1) 47 44 45 90

Paul FLOREN
Tel.: 33 (1) 47 44 45 91

Christine de CHAMPEAUX
Tel.: 33 (1) 47 44 47 49

Bertille ARON
Tel.: 33 (1) 47 44 67 12

Mary DWYER
Tel.: 33 (1) 47 44 21 19

Isabelle CABROL
Tel.: 33 (1) 47 44 64 24

Charles-Edouard ANFRAY
Tel.: 33 (1) 47 44 65 55

Franklin BOITIER
Tel.: 33 (1) 47 44 59 81

Philippe GATEAU
Tel.: 33 (1) 47 44 47 05

## Total acquires a hundred service stations in Puerto Rico

**Paris, November 2, 2004** — Total has finalized an agreement to acquire one hundred service stations on the island of Puerto Rico. The GPR- and CITGO-branded retail outlets are spread widely across this island and they will be branded in the Total colours by the end of 2005. With this agreement Total has acquired 6% of the retail market.

This acquisition reinforce Total's development strategy in the Caribbean, an area of rapidly growing consumption. In spring 2004, Total set up a distribution network in Jamaica, an addition to its presence in the French Caribbean islands.

\* \* \* \* \*

Total is the fourth largest oil and gas company in the world with operations in more than 130 countries. Total's activities cover the whole energy chain of the petroleum industry: exploration, oil and gas production, refining and marketing, trading and power generation. The Group is also a major player in chemicals. Total has more than 110,000 employees worldwide. More information can be found on the company's website: www.total.com



TOTAL S.A.
Capital 6 525 530 660 euros
542 051 180 R.C.S. Nanterre

www.total.com

5/8/2013 11:57 AM

# EXHIBIT 5

20-F 1 d278816d20f.htm FORM 20-F

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

## Form 20-F

**(Mark One)**

- REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

þ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

### For the fiscal year ended December 31, 2011

OR

- TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from_____to_____

OR

- SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report

Commission file number: 1-10888

# TOTAL S.A.

(Exact Name of Registrant as Specified in its Charter)

**Republic of France**

(Jurisdiction of Incorporation or Organization)

2, place Jean Millier
La Défense 6
92400 Courbevoie
France

(Address of Principal Executive Offices)

Patrick de La Chevardière
Chief Financial Officer
TOTAL S.A.
2, place Jean Millier
La Défense 6
92400 Courbevoie
France
Tel: +33 (0)1 47 44 45 46
Fax: +33 (0)1 47 44 49 44

(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Name of each exchange on which registered |
|---|---|
| Shares | New York Stock Exchange* |
| American Depositary Shares | New York Stock Exchange |

\* Not for trading, but only in connection with the registration of American Depositary Shares, pursuant to the requirements of the Securities and Exchange Commission.

Securities registered or to be registered pursuant to Section 12(g) of the Act.

None

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

2,363,767,313 Shares, par value €2.50 each, as of December 31, 2011

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes þ   No ¨

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ¨   No þ

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes þ   No ¨

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).**

Yes ¨   No ¨

\*\* This requirement is not currently applicable to the registrant.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer þ             Accelerated filer ¨             Non-accelerated filer ¨

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ¨    International Financial Reporting Standards as issued by the International Accounting Standards Board þ    Other ¨

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.   Item 17 ¨   Item 18 ¨

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ¨   No þ

Table of Contents

and petroleum and petrochemical products by European persons and by entities constituted under the laws of an EU Member State. Prior to that date, TOTAL had ceased these now-prohibited activities.

TOTAL continues to closely monitor legislative and other developments in France, the EU and the United States in order to determine whether its limited activities in Iran, Syria and other sanctioned or potentially sanctioned jurisdictions could subject it to the application of sanctions. The Group cannot assure that current or future regulations or developments will not have a negative impact on its business or reputation.

With respect to Syria, the EU adopted measures in May 2011 with criminal and financial penalties that prohibit the supply of certain equipment to Syria, as well as certain financial and asset transactions with respect to a list of named individuals and entities. These measures apply to European persons and to entities constituted under the laws of an EU Member State. In September 2011, the EU adopted further measures, including, notably, a prohibition on the purchase, import or transportation from Syria of crude oil and petroleum products. Since early September 2011, the Group ceased to purchase hydrocarbons from Syria. On December 1, 2011, the EU extended sanctions against, among others, three state-owned Syrian oil firms, including General Petroleum Corporation, TOTAL's co-contracting partner in PSA 1988 (Deir Es Zor licence) and the Tabiyeh contract. TOTAL has ceased its activities that contribute to oil and gas production in Syria.

The U.S. Treasury Department's Office of Foreign Assets Control (referred to as "OFAC") administers and enforces broad and comprehensive economic sanctions programs, as well as sanctions that are based on the United Nations Security Council resolutions referred to above and that target individuals engaged in terrorism or weapons proliferation in Iran, using the blocking of assets and trade restrictions. The activities that are restricted depend on the sanctions program and targeted country or parties, and

civil and/or criminal penalties, imposed on a per transaction basis, can be substantial. These OFAC sanctions generally apply to U.S. persons and activities taking place in the United States or that are otherwise subject to U.S. jurisdiction. Sanctions administered by OFAC target, among others, Cuba, Iran, Myanmar (Burma), Sudan and Syria. TOTAL does not believe that these sanctions are applicable to any of its activities in the OFAC-targeted countries and, since the independence of the Republic of South Sudan on July 9, 2011, TOTAL is no longer present in Sudan.

On December 8, 2011, OFAC amended the Sudanese Sanctions Regulations with the publication of two general licenses that authorize all activities and transactions relating to the petroleum and petrochemical industries in the Republic of South Sudan and related financial transactions, and the transshipment of goods, technology and services through Sudan to or from the Republic of South Sudan and related financial transactions.

In addition, many U.S. states have adopted legislation requiring state pension funds to divest themselves of securities in any company with active business operations in Iran or Sudan, and state contracts not to be awarded to such companies. State insurance regulators have adopted similar initiatives relating to investments by insurance companies in companies doing business with the Iranian oil and gas, nuclear, and defense sectors. CISADA supports these state legislative initiatives. If TOTAL's operations in Iran were determined to fall within the prohibited scope of these laws, and TOTAL were not to qualify for any available exemptions, certain U.S. institutions holding interests in TOTAL may be required to sell their interests. If significant, sales of securities resulting from such laws and/or regulatory initiatives could have an adverse effect on the prices of TOTAL's securities.

For more information on TOTAL's presence in Cuba, Iran, Sudan and Syria, see "Item 4. Other Matters — Business Activities in Cuba, Iran, Sudan and Syria".

ITEM 4. INFORMATION ON THE COMPANY

# HISTORY AND DEVELOPMENT

TOTAL S.A., a French *société anonyme* (limited company) incorporated in France on March 28, 1924, together with its subsidiaries and affiliates, is the fifth largest publicly-traded integrated international oil and gas company in the world[1].

With operations in more than 130 countries, TOTAL has activities in every sector of the oil industry: in the upstream (oil and gas exploration, development and production, liquefied natural gas) and downstream (refining, petrochemicals, specialty chemicals, marketing and the



---

(1) Based on market capitalization (in dollars) as of December 31, 2011.

10

Form 20-F

Table of Contents




trading and shipping of crude oil and petroleum products). In addition, TOTAL has equity stakes in coal mines and operates in the power generation and renewable energy sectors. TOTAL began its Upstream operations in the Middle East in 1924. Since that time, the Company has grown and expanded its operations worldwide. In early 1999, the Company acquired control of PetroFina S.A. (hereafter referred to as "PetroFina" or "Fina") and in early 2000, the Company acquired control of Elf Aquitaine S.A. (hereafter referred to as "Elf Aquitaine" or "Elf").

The Company's corporate name is TOTAL S.A. Its registered office is 2, place Jean Millier, La Défense 6, 92400 Courbevoie, France. Its telephone number is +33 (0)1 47 44 45 46.

TOTAL S.A. is registered in France at the Nanterre Trade Register under the registration number 542 051 180. The length of the life of the Company is 99 years from March 22, 2000, unless it is dissolved or extended prior to such date.

# BUSINESS OVERVIEW

TOTAL's worldwide operations in 2011 were conducted through three business segments: Upstream, Downstream, and Chemicals. The table below gives

information on the geographic breakdown of TOTAL's activities and is taken from Note 5 to the Consolidated Financial Statements included elsewhere herein.

| (M€) | France | Rest of Europe | North America | Africa | Rest of world | Total |
|---|---|---|---|---|---|---|
| **2011** | | | | | | |
| Non-Group sales[a] | 42,626 | 81,453 | 15,917 | 15,077 | 29,620 | 184,693 |
| Property, plant and equipment, intangible assets, net | 5,637 | 15,576 | 14,518 | 23,546 | 17,593 | 76,870 |
| Capital expenditures | 1,530 | 3,802 | 5,245 | 5,264 | 8,700 | 24,541 |
| **2010** | | | | | | |
| Non-Group sales[a] | 36,820 | 72,636 | 12,432 | 12,561 | 24,820 | 159,269 |
| Property, plant and equipment, intangible assets, net | 5,666 | 14,568 | 9,584 | 20,166 | 13,897 | 63,881 |
| Capital expenditures | 1,062 | 2,629 | 3,626 | 4,855 | 4,101 | 16,273 |
| **2009** | | | | | | |
| Non-Group sales[a] | 32,437 | 60,140 | 9,515 | 9,808 | 19,427 | 131,327 |
| Property, plant and equipment, intangible assets, net | 6,973 | 15,218 | 8,112 | 17,312 | 11,489 | 59,104 |
| Capital expenditures | 1,189 | 2,502 | 1,739 | 4,651 | 3,268 | 13,349 |

*(a) Non-Group sales from continuing operations.*

# UPSTREAM

TOTAL's Upstream segment includes the Exploration & Production and Gas & Power divisions. The Group has exploration and production activities in more than forty countries and produces oil or gas in approximately thirty countries. The Group's Gas & Power division conducts

activities downstream from production related to natural gas, liquefied natural gas (LNG) and liquefied petroleum gas (LPG), as well as power generation and trading, and other activities.

# Exploration & Production

### Exploration and development

TOTAL's Upstream segment aims at continuing to combine long-term growth and profitability at the level of the best in the industry.

TOTAL evaluates exploration opportunities based on a variety of geological, technical, political and economic factors (including taxes and license terms), and on projected oil and gas prices. Discoveries and extensions of existing fields accounted for approximately 76% of the 2,037 Mboe added to the Upstream segment's proved reserves during the three-year period ended December 31,

2011 (before deducting production and sales of reserves in place and adding any acquisitions of reserves in place during this period). The remaining 24% comes from revisions of previous estimates. The level of revisions during this three year period was significantly impacted by the effect of successive increases of the reference oil price (from $36.55/b at the end of 2008 to $110.96/b in 2011 for Brent crude) which induced a substantial negative revision.

In 2011, the exploration investments of consolidated subsidiaries amounted to €1,629 million (including exploration bonuses included in the unproved property

11

# EXHIBIT 6



**ℲℲ ERNST & YOUNG**

■ Ernst & Young LLP
1000 Scotiabank Plaza
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico 00917-1989

■ Phone: (787) 759-8212
Fax:    (787) 753-0808
Fax:    (787) 753-0813
www.ey.com

DEPARTAMENTO DE ESTADO
NOV 2 1 2006
SECCION DE CORRESPONDENCIA

## Report of Independent Auditors

The Board of Directors and Shareholder
Total Petroleum Puerto Rico Corp.

We have audited the accompanying balance sheet of Total Petroleum Puerto Rico Corp. as of December 31, 2005. This balance sheet is the responsibility of the Company's management. Our responsibility is to express an opinion on this balance sheet based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the balance sheet is free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the balance sheet, assessing the accounting principles used and significant estimates made by management, and evaluating the overall balance sheet presentation. We believe that our audit of the balance sheet provides a reasonable basis for our opinion.

In our opinion, the balance sheet referred to above presents fairly, in all material respects, the financial position of Total Petroleum Puerto Rico Corp. at December 31, 2005, in conformity with accounting principles generally accepted in the United States.

As further discussed in Note 10, management restated its beginning of year accumulated deficit.

*Ernst & Young LLP*

June 9, 2006

Stamp No. 2183286
affixed to
original of
this report

By: _____
**Arturo I. Ondina, CPA**
Lic. No. 2567

# Total Petroleum Puerto Rico Corp.

## Notes to Balance Sheet

### December 31, 2005



## 1. Summary of Significant Accounting Policies

**Basis of Balance sheet**

Total Petroleum Puerto Rico Corp. (the Company) (formerly Gasolinas de Puerto Rico Corporation), is a corporation organized under the laws of the Commonwealth of Puerto Rico and is a wholly owned subsidiary of Total Outre Mer, S.A. of France (the Parent Company). The Company is engaged in the wholesale distribution of petroleum (mostly gasoline) products in Puerto Rico. Other revenue is mainly generated from leasing arrangements made with service stations' operators and the operations of food shops at certain stations.

**Accounts Receivable**

The accounts receivable arise in the normal course of business of selling petroleum products. Based on management's evaluation of uncollected accounts receivable, twenty five percent of the accounts receivable over 120 days was potentially uncollectible.

**Inventories**

Inventories are stated at the lower of cost or market. Costs are calculated by the first-in, first-out method.

**Property, Equipment and Rental Properties**

Property, equipment and rental properties are stated at cost. Depreciation is computed using the straight-line method over the estimated useful life of the assets.

**Use of Estimates**

The preparation of balance sheet in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the balance sheet and accompanying notes. Actual results may differ from those estimates and assumptions used.

Total Petroleum Puerto Rico Corp.

Notes to Balance Sheet (continued)



DEPARTAMENTO DE ESTADO

NOV 2 1 2006

SECCION DE CORRESPONDENCIA

## 2. Related Party Transactions

The Parent Company also owns many other subsidiaries around the world. This group of companies is mainly engaged in the exploration, production and distribution of petroleum products (gasoline, diesel and lubricants). The Company has transactions with its affiliates, which include the purchase of lubricants, and the purchase of materials and fixtures to change the image of the gas stations. The Company also shares certain administrative personnel with its affiliates.

On September 30, 2005, the Parent Company formalized an agreement with the Company in which the Parent Company accepted to convert $10,000,000 of $22,501,019 advances made to the Company during 2004 into new issues of capital and the reminder into a loan. The purpose of the loan is to finance the acquisition of assets by the Company. The agreement entered into force from the date of the last cash call (December 31, 2004) for a given period of twelve (12) months. The payment of the loan is in U.S. dollars. Also, the agreement shall be governed in accordance to French laws. All disagreements arising between the Puerto Rico and the French laws not solved amicable, the commercial court (Tribunal of Commerce), Nanterre, France, shall have the exclusive jurisdiction. The loan bears interest at a rate of three months LIBOR plus a margin of 0.2%. At December 31, 2005, interest accrued on this debt amounted to $446,838.

## 3. Concentration of Credit Risk

The Company maintains cash balances at various financial institutions. Accounts at each financial institution are insured by the Federal Deposit Insurance Corporation up to $100,000. Uninsured deposits totaled $1,043,686 at December 31, 2005.

5

# EXHIBIT 7

## TOTAL PETROLEUM PUERTO RICO CORP.

## A STATEMENT ATTACHED TO AND MADE PART OF
## THE 2004 CORPORATE ANNUAL REPORT

AN AUDIT OF THE FINANCIAL STATEMENTS OF THE COMPANY BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT FOR THE PERIOD ENDED DECEMBER 31, 2004 IS CURRENTLY IN PROCESS. UPON THE COMPLETION OF THE AUDIT, THE AUDITED FINANCIAL STATEMENTS AND ACCOUNTANT'S REPORT WILL BE SUBMITTED.



**TOTAL**

**TOTAL PETROLEUM PUERTO RICO CORP.**

27 de abril de 2005

A Quien Pueda Interesar:

A continuación los componentes de la Junta de Directores de Total Petroleum Puerto Rico Corp.

Oficiales:

| Nombre | | SS | Dirección |
|---|---|---|---|
| Mr. Christian Chammas | President | n/a | Total Outre-Mer Paris, Francia |
| Mr. Philippe Corsaletti | V-President | | Ind.M. Juliá 416 C/A San Juan,PR |
| Mr. Julien Flecheux | Secretary/Treasurer | | Ind.M. Juliá 416 C/A San Juan,PR |
| Mrs. Margaret King | Sub-Secre/Sub.Treasurer | | Ind.M.Juliá 416 C/A San Juan,PR |

Esperamos sea de su entera conformidad la información aquí suministrada.

Atentamente,

Julien Flecheux
Director Finanzas

/ld

Ind. M. Juliá, 416 Calle A, San Juan, PR 00920-2012
P.O. Box 362916, San Juan, PR 00936-2916
Tel: (787) 783-4625 / Fax (787) 783-0407




<u>TOTAL OUTRE-MER</u>             <u>Board of Directors</u>

Mr. Alain Champeux              Chairman of the Board
Mr. Francois De Ligniville      Director
Mr. Pierre Fart                 Director

<u>Address</u>

Total Outre-Mer
24 cours Michelet-La Défense 10
92069 París La Défense Cedex
FRANCIA

# EXHIBIT 8

AUDITED FINANCIAL STATEMENTS

Total Petroleum Puerto Rico Corp.
Years Ended December 31, 2007 and 2006
With Report of Independent Auditors

0807-0965782

Total Petroleum Puerto Rico Corp.

Notes to Financial Statements (continued)

**2. Related Party Transactions (continued)**

    c.  Expenses charged by the Parent Company during 2007 and 2006 amounted to $534,321 and $1,245,416, respectively.

    d.  Expenses charged by the Company during 2007 and 2006 to its affiliates amounted to $75,983 and $190,054, respectively.

    e.  On December 1, 2006, the Parent Company formalized an agreement with the Company in which the Parent Company accepted to contribute $13,077,019 of additional capital to the Company. The balance of the outstanding loan of $12,501,019 from the Parent Company, as registered in the loan agreement signed on September 30, 2005 by and between the Company and the Parent Company was converted to capital. In 2007, this agreement was completely fulfilled and the payment of $576,000 was received by the Company.

    f.  During the year 2007, Total France, the ultimate parent company of the Parent Company, charged the Company $188,395 mainly for services related with computer technology and telecommunications. In 2006, Total France, the ultimate parent company of the Parent Company, charged the Company $444,766 for the implementation of several information systems and $51,575 for other expenses.

**3. Concentration of Credit Risk**

The Company maintains cash balances at various financial institutions. Accounts at each financial institution are insured by the Federal Deposit Insurance Corporation up to $100,000. Uninsured deposits totaled $932,358 and $24,853 at December 31, 2007 and 2006, respectively.

**4. Long-Term Receivables**

Long-term receivables, including the current portion, as of December 31, 2007 and 2006, consist of the following:

|  | 2007 | 2006 |
|---|---|---|
| Notes receivable (with interest rates from 5.0% to 10%) | $ 373,859 | $ 530,078 |
| Note with interest at 1% over prime rate | 375,000 | 375,000 |
|  | 748,859 | 905,078 |
| Less allowance for bad debts | (135,959) | (252,516) |
|  | $ 612,900 | $ 652,562 |

# EXHIBIT 9



**Ernst & Young LLP**
1000 Scotiabank Plaza
273 Ponce de León Avenue
San Juan, PR 00917-1951

Main tel: +1 787 759 8212
Fax: +1 787 753 0808
www.ey.com

## Report of Independent Auditors

The Board of Directors and Shareholder
Total Petroleum Puerto Rico Corp.

We have audited the accompanying balance sheets of Total Petroleum Puerto Rico Corp. (the Company) as of December 31, 2008 and 2007. These balance sheets are the responsibility of the Company's management. Our responsibility is to express an opinion on these balance sheets based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the balance sheet is free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the balance sheet, assessing the accounting principles used and significant estimates made by management, and evaluating the overall balance sheet presentation. We believe that our audits of the balance sheets provide a reasonable basis for our opinion.

In our opinion, the balance sheets referred to above present fairly, in all material respects, the financial position of Total Petroleum Puerto Rico Corp. at December 31, 2008 and 2007, in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

September 9, 2009

By: _____
Arturo I. Ondina, CPA
Lic.No.2567

2464300

0903-1043034

A member firm of Ernst & Young Global Limited

1

Total Petroleum Puerto Rico Corp.

Notes to Notes to Balance Sheets (continued)

## 1. Organization and Summary of Significant Accounting Policies (continued)

**Asset Retirement Obligations**

SFAS No. 143, *Accounting for Asset Retirement Obligations* (SFAS No. 143), addresses financial accounting and reporting for obligations associated with the retirement of tangible long-lived assets and the associated asset retirement costs. The Company's asset retirement obligation (ARO) liabilities primarily consist of spending estimates related to the removal of underground petroleum storage tanks in gasoline stations of the Company's rental properties.

The Company estimates its ARO liabilities for tank removal using calculations of the amount and timing of the future cash spending for a third party to perform the required work. Spending estimates are adjusted for inflation and then discounted at the credit-adjusted risk-free rate (8.50% at January 1, 2008). The Company records an ARO asset associated with the discounted liability for tank removal. The obligation and corresponding asset are recognized in the period in which the liability is incurred. The ARO asset is amortized on a straight line method over its expected life and the ARO liability is accreted to the projected spending date. As changes in estimates occur (such as changes in estimated costs, or changes in timing of the performance of reclamation activities), the revisions to the obligation and asset are recognized at the appropriate credit-adjusted risk-free rate.

## 2. Acquisition of Certain Esso Standard Oil Company Assets

In order to expand existing operations, on November 1, 2008, the Company acquired certain assets of Esso Standard Oil Company in Puerto Rico and Esso Virgin Islands, Inc. in the United States Virgin Islands. Since that date, the statement of operations includes the results of operations of such asset acquisitions. 

# EXHIBIT 10

Page 1 of 1

*BNF-PARiS Bas*

**Philippe Corsaletti**

*NY —o PARiS,*

| | |
|---|---|
| **From:** | "Philippe CORSALETTI" <philippe.corsaletti@total.com> |
| **To:** | <corsaletti@gaspr.com> |
| **Sent:** | Monday, November 01, 2004 1:26 AM |
| **Subject:** | Tr :Porto Rico |

_____ En-tête de transfert _____  Objet :  Tr :Porto Rico Auteur : "Julien MAUMONT"<CN=Julien%20MAUMONT/OU=PAR/OU=HD/O=Corp> Date :  1 novembre 2004 10:25:32

Dear Florence,

Further to our conversation, please note that the shares of the company GPR (Gasolineas de Puerto Rico) renamed (or to be renamed) Total Petroleum Puerto Rico (TPPR) have recently been acquired by Total Outre Mer (a 100% subsidiary of the Total group). The Closing took place on october 22nd, 2004.

TPPR/GPR is engaged in the wholesale and retail distribution of petroleum products in Puerto Rico.

I understand that the company Peerless Oil & Chemicals, Inc. have been approched to be one of the suppliers of TPPR/GPR.

Peerless are seeking, on request of BNP Paribas in New York (Mr. Zali Win 212-840-2013) confirmation
that TPPR/GPR, represented by M. Philippe Corsaletti, is a subsidiary of the Total Group. I would therefore appreciate if you could pass on the information to your colleague in New York.

For the avoidance of doubt, this e-mail may under no circumstances be construed as a commitment, liability, agreement or guarantee on the part of Total SA (or any of its affiliates) in respect of any obligations of GPR/Total Petroleum Puerto Rico and neither Total SA nor any of its affiliates shall be obliged under this e-mail to make any payment in respect of any amounts that would become due by GPR/TPPR.

Best regards
Julien Maumont
Total
DF/OFL/P
Tel : (33) 1 47 44 40 15
Fax : (33) 1 47 44 47 92

11/1/2004

Irwin Flashman                                                      6/65/7

| | |
|---|---|
| From: | Luis Vázquez [luis.vazquez@peerlessoil.com] |
| Sent: | Tuesday, October 26, 2004 5:37 PM |
| To: | Irwin Flashman |
| Cc: | Philippe Corsaletti (E-mail); Azmat Assur |
| Subject: | Re: Guide to changes in Peerless Total Supply Contract 10232004 O&B V |

  

TOTAL CONTRACT Guide to changes in
OCT.26,2004.doc...:   Peerless T...
                      Philippe,

Please find attached the latest Draft version (Oct.26, 2004) with some of
the revised changes proposed by Total and accepted by Peerless.

There are some proposed changes from the attached guide (provided by Irwin
Flashman) that Peerless didn't modify. These are:

1) 5.1.1, 5.1.2, 5.1.3. Prices didn't change. Peerless will pass any
discount provided by Trammo as negotiated between Trammo and Total France;

2) 5.3.1 - Version presented by Peerless stays;

3) 5.3.3 - Some sentences modified

4) 14.2 - Pending for revision

5) 17.16.1 and 17.16.2 - Pending for revision

Please contact our banker at New York (BNP Paribas) to discuss the the
information requested by Paribas, for the Security (credit).

We are still waiting for the response of the trucking company.

Regards,

Luis R. Vázquez, P.E.
Manager
Peerless Oil & Chemicals, Inc.
787-836-1280, ext. 229
787-836-1283, fax
787-484-7963, mobile

----- Original Message -----
From: "Irwin Flashman" <Irwinf@oneillborges.com>
To: "Luis R. Vazquez. P. E. (E-mail)" <luis.vazquez@peerlessoil.com>
Cc: "Philippe Corsaletti (E-mail)" <philippe.corsaletti@total.com>
Sent: Monday, October 25, 2004 12:39 PM
Subject: Guide to changes in Peerless Total Supply Contract 10232004 O&B V

Luis,

Pursuant to our telephone conversation of a few minutes ago, attached
herewith is a copy of the listing of the changes from the last version of
the proposed contract which you supplied on October 22 and the version which
GPR offered to you last night.  It does not include the change in the
Section A of the Whereas clause, where the words, "in order to supply Buyer"
were eliminated, nor the reference to the proposed elimination of the
language dealing with liquidated damages, as none are specified in the

1

contract, in Section 15.5.

If you have any questions, please feel free to call me.

Regards,

Irwin H. Flashman
O'Neill & Borges
American International Plaza
250 Muñoz Rivera Avenue, Ste. 800
San Juan, Puerto Rico 00918-1813
Switchboard: 787-764-8181, Ext. 740
Direct line: 787-282-5710
Fax: 787-753-8944
E-Mail: irwinf@oneillborges.com

Privacy and Confidentiality Notice
The information in this electronic message (e-mail) is intended for the
named recipients only. It may contain privileged, confidential or otherwise
restricted information. If you have received this e-mail in error, please
notify me immediately by e-mail or collect telephone call to 787-764-8181
and delete the message. Do not copy or retain the contents of the message,
or disclose the contents of the message to anyone. Thank you for your
cooperation.

<<Guide to changes in Peerless Total Supply Contract 10232004 O&B V.doc>>

2

May 29, 2012

TPPRC.SUPPLY_000481

**Phillipe Corsaletti**

| | |
|---|---|
| **From:** | "Enrique Ruiz Ocampo" <enrique.ruizocampo@atlantictm.com> |
| **To:** | <corsaletti@gaspr.com> |
| **Sent:** | Tuesday, January 04, 2005 6:40 PM |
| **Subject:** | Cargo to Trammo |



Estimado Philippe,

As mentioned on our last telecons, I hereby confirm to you that
we sold a gasoline cargo to Trammo CIF into Puerto Rico (approx 35Kt)
loading ex-europe (port not confirmed yet). The price for this cargo was
Nymex - 1.25 cpg, CIF Puerto Rico and inside duty, and the deal was done
approx 2 weeks ago when the Nymex-USGC differential was almost 9 cpg!
(Nymex higher than USGC). We still do not have a fixed ship for this cargo.
We will keep you updated on this issue. As mentioned as well, I recommend
you approach Peerless in order to ask them to confirm their position of
accepting you purchasing from Tammo directly at the same price they buy for
themselves (may be with a certain thruput).

As well, as a separate matter, I suggest you approach Shell Chemical
Yabucoa (Fernando Mateos) in order to request them about their Electronic
Tender for the sale of products, after they declined on giving us a firm
offer directly as they had agreed.

Rgds
ERO

1/5/2005

**Phillipe Corsaletti**

| | |
|---|---|
| **From:** | "Phillipe Corsaletti" <corsaletti@gaspr.com> |
| **To:** | "Luis Vázquez" <luis.vazquez@peerlessoil.com> |
| **Sent:** | Friday, December 17, 2004 2:06 PM |
| **Subject:** | Revised Peerless Contract Amendment |

Dear Luis:

I have reviewed with our attorney the proposed Amendment to the Agreement for supply of Motor Gasoline and Low Sulfur Diesel by and Between Total Petroleum Puerto Rico Corp. and Peerless Oil and Chemicals, Inc. entered into on November 18, 2004. Attached is the revised version of the proposed Agreement Amendment with the changes suggested. We consider these changes to be very minor, more questions of language, than anything else. The changes made are as follow:

1. Page 1 of the Amendment, Section 1, line 1. Change the word "therefore" to the word "therefor".

2. Page 2 of the Amendment, Section 3, lines 2-3, as proposed read:

"...,unless Seller send the invoices later that following week,...."

We suggest the language be modified to read as follows:

"..., unless Seller sends the invoices later than Monday of the following week,...".

3. Page 2 of the Amendment, Section 4, first line.
Change the word "therefore" to the word "therefor".

Page 2 of the Amendment, Section 5. Delete the phrase at the end of the section: "and in full force and effect" and place a period after the word "unchanged".

These changes have been incorporated into the version of the Amendment attached to this e-mail.

I am ready to sign the Amendment to the Agreement as set out below. Please call me so that we can make the arrangements for the signing.

Best regards.

Philippe Corsaletti
General Manager
Total Petroleum Puerto Rico Corp.

12/17/2004

TPPRC.SUPPLY_000456

787-836-1283, fax
787-484-7963, mobile

----- Original Message -----
**From:** James Goughary
**To:** Luis Vazquez (luis.vazquez@peerlessoil.com)
**Sent:** Wednesday, December 15, 2004 5:48 PM
**Subject:** Gulf coast Platts

Luis,

Confirming our telephone conversations Gulf Coast Gasoline prices in Dec. have continued at well below all other gasoline markets (including Puerto Rico) due to a number of unprecedented factors listed below;

1. Colonial pipeline has allocated gasoline shipments in December.
2. There are no U.S. Flag ships available to load I December.
3. Majors have been selling for year end "LIFO accounting" even though the value of the gasoline is more than $.10 per gallon higher by 1st week January.
4. Most Texas counties have an "ad valorem" tax on year end inventory.

It has been mutually agreed between Trammo and Peerless to continue pricing at daily NYMEX settlement. The price will revert back to Platts Gulf coast basis on Dec. 27th.

This temporary change in price formula was necessary in December only for the above reasons. We appreciate your co-operation during these unusual circumstances and please be assured that the contract price will not change after Dec 27th under any circumstances.

Regarding the price formula for sales to Total, we can not continue to use only Platts 2 days prior to lifting unless the liftings are ratable and guaranteed. As you know Trammo hedges all inventory therefore we need to know the volume for each "pricing" day. With volumes unknown I must insist on pricing the day of lifting. If volumes are known and guaranteed I can price on any Platts pricing days that Total would like. This includes 2 days prior, weekly average or any number of days up to and including the day of lifting.

Lastly I apologize for the lack of 93 octane premium. As you know our contract is for 91 octane however I have agreed to make 93 available to accommodate Total. We have 100 octane blend stock arriving this weekend and another cargo mid January which will insure the availability of 93 octane Premium.



Regards,

Jim Goughary

12/16/2004

TPPRC.SUPPLY_000457

## Phillipe Corsaletti

| | |
|---|---|
| **From:** | "Phillipe Corsaletti" <corsaletti@gaspr.com> |
| **To:** | "Luis Vázquez" <luis.vazquez@peerlessoil.com> |
| **Cc:** | "Christian CHAMMAS" <christian.chammas@total.com> |
| **Sent:** | Thursday, December 16, 2004 6:00 PM |
| **Subject:** | Re: Gulf coast Platts |

Luis,
As you know, since December 6th TPPR has passed all of its volume through PEERLESS,
We can guarantee to you a minimum volume of regular & premium of : 3000 BBL per day at this time .
But on the other hand, we need to preserve the current pricing formula and not change it after December
18.  Further, we want to have security that we will be supplied regularly with premium, which has not
been the case.  The recent unavailability of premium has caused us significant damages with our stations
in term of sales.
Additionally, we had understood at the time of your last e-mail that Nymex quotation was not to be used
any more.  Now, we are surprised to learn today from your e-mail that you have agreed with Trammo to
use Nymex until almost the end of this year!!   This was done without consulting with us.  This will
have an important and negative impact on our prices and on our sales.   We kindly request that you to
bring yourself and your Supplier closer to our needs so that Total is not required to bear the full brunt of
the difficulties set out in the letter from the Supplier.

Best regards,

Philippe Corsaletti

----- Original Message -----
**From:** Luis Vázquez
**To:** Phillipe Corsaletti
**Cc:** Azmat Assur
**Sent:** Thursday, December 16, 2004 8:49 AM
**Subject:** Fw: Gulf coast Platts

Philippe,

Please see the below email sent by our Supplier.  We will have to continue pricing based on Nymex until
December 27, 2004.

Also, since your daily liftings have not been consistent, Trammo is not capable of hedging the
products correctly, and therefore they are unprotected from the fluctuations in the market.  We will have to
change the formula after December 18, 2004, unless there is a commitment from Total in buying minimum
amounts per day (Ex. 3000 bbls of Regular).

Last, we have Premium 92.5 available in the tanks.  DACO approved the liftings with this octane, therefore,
send your trucks any time.

Call me if you have any questions.

Regards,

Luis R. Vázquez, P.E.
Manager
Peerless Oil & Chemicals, Inc.
787-836-1280, ext. 229

12/16/2004

**Phillipe Corsaletti**

| | |
|---|---|
| **From:** | "Luis Vázquez" <luis.vazquez@peerlessoil.com> |
| **To:** | "Philippe Corsaletti" <corsaletti@gaspr.com> |
| **Cc:** | "Azmat Assur" <pocesco@msn.com> |
| **Sent:** | Thursday, December 16, 2004 8:49 AM |
| **Subject:** | Fw: Gulf coast Platts |

Philippe,

Please see the below email sent by our Supplier.  We will have to continue pricing <u>based on Nymex</u> until December 27, 2004.

Also, since your daily liftings have not been consistent, Trammo is not capable of hedging the products correctly, and therefore they are unprotected from the fluctuations in the market.  We will have to change the formula after December 18, 2004, unless there is a commitment from Total in buying minimum amounts per day (Ex. 3000 bbls of Regular). 

Last, we have Premium 92.5 available in the tanks.  DACO approved the liftings with this octane, therefore, send your trucks any time.

Call me if you have any questions.

Regards,

Luis R. Vázquez, P.E.
Manager
Peerless Oil & Chemicals, Inc.
787-836-1280, ext. 229
787-836-1283, fax
787-484-7963, mobile

----- Original Message -----
From: James Goughary
To: Luis Vazquez (luis.vazquez@peerlessoil.com)
Sent: Wednesday, December 15, 2004 5:48 PM
Subject: Gulf coast Platts

Luis,

Confirming our telephone conversations Gulf Coast Gasoline prices in Dec. have continued at well below all other gasoline markets (including Puerto Rico) due to a number of unprecedented factors listed below;

1. Colonial pipeline has allocated gasoline shipments in December.
2. There are no U.S. Flag ships available to load I December.
3. Majors have been selling for year end "LIFO accounting" even though the value of the gasoline is more than $.10 per gallon higher by 1st week January.
4. Most Texas counties have an "ad valorem" tax on year end inventory.

It has been mutually agreed between Trammo and Peerless to continue pricing at daily NYMEX settlement. The price will revert back to Platts Gulf coast basis on Dec. 27th.

This temporary change in price formula was necessary in December only for the above reasons. We appreciate your co-operation during these unusual circumstances and please be assured that the contract price will not

12/16/2004

change after Dec 27th under any circumstances.

Regarding the price formula for sales to Total, we can not continue to use only Platts 2 days prior to lifting unless the liftings are ratable and guaranteed. As you know Trammo hedges all inventory therefore we need to know the volume for each "pricing" day. With volumes unknown I must insist on pricing the day of lifting. If volumes are known and guaranteed I can price on any Platts pricing days that Total would like. This includes 2 days prior, weekly average or any number of days up to and including the day of lifting.

Lastly I apologize for the lack of 93 octane premium. As you know our contract is for 91 octane however I have agreed to make 93 available to accommodate Total. We have 100 octane blend stock arriving this weekend and another cargo mid January which will insure the availability of 93 octane Premium.

Regards,

Jim Goughary

12/16/2004

TPPRC.SUPPLY_000463

# EXHIBIT 11

**Peerless :**

Storage capacity : 1,4 Million bbl.
Wharf with 38 feet draft no other restriction. Only a few vessels per month while the wharf is private and PEERLESS dedicated.

Place : Guayanilla (inside a foreign trade area so taxes have to be paid only when product come out of the installation)

Peerless sale to over 450 independents (either thru the distributor independent network or to independent not attach to on distributor)
Peerless is supply thru TRAMMO (Ex ENRON who save peerless when Shell and Texaco leave the place) and buy in fact in truck. Trammo is covering the stock, the base line and the pricing risk.

Problem for Peerless : They Don't want to help a potential competitor and also they don't want to put in danger their actual supply scheme with TRAMMO.

Problem for us : location far away from San Juan where 50 % of our new network is located.

We come to the following agreement to be confirm quickly with figures :

**TOM sell CIF to TPR on aPlatt's formula with pricing 5 days around B/L**

**TPR sell DES to TRAMMO on a similar formula (to see between us the amount of margin for TPR at least to cover the sea loses)**

**TRAMMO will do the cover and the base line declaration.**

**TRAMMO will sell IN TRUCK to PEERLESS on USGCWM + a price differential based on quotation published the day of the lifting.**
**Today the pricing will be :**
**For 87 USGCWM + 3,75 c/gl**
**For 91 USGCWM + 4,50 c/gl**
**For LSD USGCWM+ 4,75 c/gl**

**PEERLESS sell IN TRUCK to TPR basis TRAMMO price plus a price diff.**

Action :

TOM Supply: Discussion with TRAMMO to fix the price formula for beginning of January 2005.

TPPRC.SUPPLY_000420

During this period of time 3 month Peerless will supply Total PR, the two parties agreed to sign a supply agreement for this trasitory period.

**Peerless Proposal:**

> **Peerless will sell in tank truks to Total PR based on : Platt's Oilgram Price Report, Product Price Assessments, U.S. Gulf Coast, Waterborne, arithmetic mean of the high and low quotations, plus US ...Gal FOB inside U.S. customs (DUS status) at the Truck Rack Delivery Point or the Terminal Delivery Point (Gross)**

**Today the price proposal (Sale gross)\* is:[ price is effective the day of lifting]**

**For 87 USGCWM+ 6 c/gl**
**For 93 USGCWM + 6,50 c/gl**
**For LSD USGCWM + 7 c/gl**

At this stage the proposal of Peerless is not acceptable since they will not transfer the Temperature Adjustment to TPR.

Sale on gross : Product lifted on ambient temperature not adjusted to 60 degrees farh. Section 1105 [a] of law # 3 requires that all distributors / wholesalers are obligued to transfer any temperature adjustment received in its origin. Peerless is in fact a distributor/wholesaler and according to the law they must comply and transfer the temp. Adj. to TPR.

CITGO Contract :

Amended Contrat June & August 2003 :

Modification of Prices:

- For 87: Based on the Platts US Gulf Coast Waterbone Mean price for such product  + 6,5 c/gl for Unbranded product / 7,5 c/gl for branded product

- For 93: Based on Platts USGCWM Price for for such product + 6.5 for the unbranded and 7.5 for the branded. However, the price shall be equal to the higher of: the base price for 87 oct. gasoline at the applicable terminal plus $0.105 or the base price set for herein, plus the price differential.

All the Prices of CITGO are Net: The temperature adjustment is transfered to GPR and GPR to the dealers.

(At this stage the prices of CITGO is cheaper than the prices of Peerless : 2ct/gl for each products due to Temperature adjustment)

*21st of October 2004, acquisition of GPR by Total and at the same time Termination of the Light Oils Marketer Agreement between CITGO and GPR.

What Total PR propose to CITGO ( J.Toledo) during the re-branded phase: 90 days

- For 87: Base on the Platts USG Gulf Coast Waterbone Mean price for such product  + 5,5 c/gl for Unbranded product / 6,5 c/gl for branded product

- For 93 Base on plats + 6,50 c/gl for Unbranded product / 7,5 c/gl for branded product

- For Low Sulfur Diesel Base on plats + 7 c/gl for Unbranded product / 7,5 c/gl for branded product

These prices will remain in effect until (90) days after one of the parties provides a prior written notice to the other of its desire to terminate this short term pricing and supply agreement, or until a long term pricing and supply agreement is agreed upon between the parties.

Branded and Unbranded stations branded as CITGO Stations will purchase products at the prices set out above for CITGO Branded Stations. GPR  branded stations whose CITGO signage has been covered or removed and stations converted to the Total brand will purchase products at the prices as you have required by the termination of trademark use authorizations, TPR will proceed to rebrand all of the CITGO Branded Stations in the shortest possible time.


Despite the different discussion with J.Toledo, the situation in Puerto Rico is still the same or worse that we have before the 21st October, it's seem that CITGO Puerto Rico want to squeeze Total, and with the price they gave us during last week we were out of the market and we will be out for a couple of weeks if we don't find a solution as soon as possible.

Prices of CITGO today to Total PR:

- For 87: Based on the Platts US Gulf Coast Waterbone Mean price for such product  + 7,5 c/gl for branded  and 12.5 cpg. for the unbranded product.

- For 93: Based on Price for 87 octane Gasoline + $0.105 ( $6,5ct + $4dt)  and  12.5 cpg. for the unbranded product.

May 29, 2012

- For diesel fuel the price differential today is 17.5 cpg over Platts.

Taking into consideration the competitive market in P.R. we need to work with a price differential within a range between the 3.5 to 4.0cpg. temperature adjusted for all products.

TPPRC.SUPPLY_000423

**Peerless :**

Storage capacity : 1,4 Million bbl.
Wharf with 38 feet draft, no other restriction. Only a few vessels per month while the wharf is private and PEERLESS dedicated.

Place : Guayanilla (inside a foreign trade area, so taxes have to be paid only when product comes out of the installation)

Peerless sale to over 450 independents (either thru the distributor independent network or to independent not attached to one distributor)
Peerless is supplied thru TRAMMO (Ex ENRON who saved Peerless when Shell and Texaco left the place) and buy in fact in truck. Trammo is covering the stock, the base line and the pricing risk.

Problem for Peerless : They don't want to help a potential competitor and also they don't want to put in danger their actual supply scheme with TRAMMO.

Problem for us : location far away from San Juan where 50 % of our new network is located.

We come to the following agreement to be confirm quickly with figures :

**TOM sell CIF to TPR on a Platt's formula with pricing 5 days around B/L**

**TPR sell DES to TRAMMO on a similar formula (to see between us the amount of margin for TPR at least to cover the sea loses)**

**TRAMMO will do the cover and the base line declaration.**

**TRAMMO will sell IN TRUCK to PEERLESS on USGCWM + a price differential based on quotation published the day of the lifting.**
**Today the pricing will be :**
**For 87 USGCWM + 3,75 c/gl**
**For 91 USGCWM + 4,50 c/gl**
**For LSD USGCWM + 4,75 c/gl**

**PEERLESS sell IN TRUCK to TPR basis TRAMMO price plus a price diff.**

Action :

TOM Supply: Discussion with TRAMMO to fix the price formula for beginning of January 2005.

TPPRC.SUPPLY_000451

**Peerless :**

Storage capacity : 1,4 Million bbl.
Wharf with 38 feet draft, no other restriction. Only a few vessels per month while the wharf is private and PEERLESS dedicated.

Place : Guayanilla (inside a foreign trade area, so taxes have to be paid only when product comes out of the installation)

Peerless sale to over 450 independents (either thru the distributor independent network or to independent not attached to one distributor)
Peerless is supplied thru TRAMMO (Ex ENRON who saved Peerless when Shell and Texaco left the place) and buy in fact in truck. Trammo is covering the stock, the base line and the pricing risk.

Problem for Peerless : They don't want to help a potential competitor and also they don't want to put in danger their actual supply scheme with TRAMMO.

Problem for us : location far away from San Juan where 50 % of our new network is located.

We come to the following agreement to be confirm quickly with figures :

**TOM sell CIF to TPR on a Platt's formula with pricing 5 days around B/L**

**TPR sell DES to TRAMMO on a similar formula (to see between us the amount of margin for TPR at least to cover the sea loses)**

**TRAMMO will do the cover and the base line declaration.**

**TRAMMO will sell IN TRUCK to PEERLESS on USGCWM + a price differential based on quotation published the day of the lifting.**
**Today the pricing will be :**
For 87 USGCWM + 3,75 c/gl
For 91 USGCWM + 4,50 c/gl
For LSD USGCWM + 4,75 c/gl

**PEERLESS sell IN TRUCK to TPR basis TRA**

Action :

TOM Supply: Discussion with TRAMMO to fix th
January 2005.

*(handwritten notes at lower right:)*
(2%) 70 s/s – Oct
Actual Volume (20%) 867,000 (26%)
Network Sales = 3.314,000
Total Rental Adjustment = +42.900,00
Cost Per Gallon = [4.9 cts]
Volumen sin Ajuste = 412.000 →

During this period of time, 3 months, Peerless will supply Total PR, the two parties agreed to sign a supply agreement for this transitory period.

**Peerless Proposal:**

> **Peerless will sell in tank trucks to Total PR based on :** Platt's Oilgram Price Report, Product Price Assessments, U.S. Gulf Coast, Waterborne, arithmetic mean of the high and low quotations, plus US ...Gal FOB inside U.S. customs (DUS status) at the Truck Rack Delivery Point or the Terminal Delivery Point (Gross)

**Today the price proposal (Sale gross)\* is:[ price is effective the day of lifting]**

**For 87 USGCWM+ 6 c/gl**
**For 93 USGCWM + 6,50 c/gl**
**For LSD USGCWM + 7 c/gl**

At this stage the proposal of Peerless is not acceptable since they will not transfer the Temperature Adjustment to TPR.

Sale on gross : Product lifted on ambient temperature not adjusted to 60 degrees farh. Section 1105 [a] of law # 3 requires that all distributors / wholesalers are obliged to transfer any temperature adjustment received in its origin. Peerless is in fact a distributor/wholesaler and according to the law they must comply and transfer the temp. Adj. to TPR.

CITGO Contract :

Amended Contract June & August 2003 :

Modification of Prices:

- For 87: Based on the Platts US Gulf Coast Waterbone Mean price for such product  + 6,5 c/gl for Unbranded product / 7,5 c/gl for branded product

- For 93: Based on Platts USGCWM Price for such product + 6.5 for the unbranded and 7.5 for the branded. However, the price shall be equal to the higher of: the base price for 87 oct. gasoline at the applicable terminal plus $0.105 or the base price set for herein, plus the price differential.

TPPRC.SUPPLY_000453

All the Prices of CITGO are Net: The temperature adjustment is transferred to GPR and GPR to the dealers.

(At this stage the prices of CITGO are cheaper than the prices of Peerless : 2ct/gl for each product due to Temperature Adjustment)

*21st of October 2004, acquisition of GPR by Total and at the same time Termination of the Light Oils Marketer Agreement between CITGO and GPR.

What Total PR proposes to CITGO ( J. Toledo) during the re-branded phase: 90 days

- For 87: Base on the Platts USG Gulf Coast Waterbone Mean price for such product + 5,5 c/gl for Unbranded product / 6,5 c/gl for branded product

- For 93 Base on plats + 6,50 c/gl for Unbranded product / 7,5 c/gl for branded product

- For Low Sulfur Diesel Base on plats + 7 c/gl for Unbranded product / 7,5 c/gl for branded product

These prices will remain in effect until (90) days after one of the parties provides a prior written notice to the other of its desire to terminate this short term pricing and supply agreement, or until a long term pricing and supply agreement is agreed upon between the parties.

Branded and Unbranded stations branded as CITGO Stations will purchase products at the prices set out above for CITGO Branded Stations. GPR branded stations, stations whose CITGO signage has been covered or removed and stations converted to the Total brand will purchase products at the prices for unbranded stations. As required by the CITGO termination of trademark use authorizations, TPR will proceed to rebrand all of the CITGO Branded Stations in the shortest possible time.

Despite the different discussion with J. Toledo, the situation in Puerto Rico is still the same or worse that we have before the 21st October, it seems that CITGO Puerto Rico wants to squeeze Total, and with the price they gave us last week, we were out of the market and we will be out for a couple of weeks if we don't find a solution as soon as possible.

Prices of CITGO today to Total PR:

- For 87: Based on the Platts US Gulf Coast Waterbone Mean price for such product + 7,5 c/gl for branded and 12:5 cpg. for the unbranded product.

- For 93: Based on Price for 87 octane Gasoline + $0.105 ( $6,5ct + $4dt) and 12.5 cpg. for the unbranded product.

- For diesel fuel the price differential today is 17.5 cpg over Platts.

Taking into consideration the competitive market in P.R., we need to work with a price differential within a range between the 3.5 to 4.0cpg. temperature adjusted for all products.

TPPRC.SUPPLY_000455

# EXHIBIT 12

ATTACHM



Apr 9 2010
6:17PM

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL ETHER (MTBE)
PRODUCTS LIABILITY LITIGATION

This document relates to:

Commonwealth of Puerto Rico, et. al.
v. Shell Oil Company, et. al.; USDC-SDNY 07-10470
(SAS); USDC-PR 07-1505 (CCC)

Master File No: 1:00CV1898
MDL 1358 (SAS)

## TOTAL PETROLEUM PUERTO RICO CORPORATION
## CORPORATE DISCLOSURE STATEMENT

**TO THE HONORABLE COURT:**

Pursuant to Fed.R.Civ.P. 7.2, Defendant Total Petroleum Puerto Rico Corporation ("TPPRC") provides its Corporate Disclosure Statement in MDL 1358, which is presently required, as follows:

1.    On October 2, 2008, TPPRC filed its "Answer to the Second Amended Complaint and Affirmative Defenses".

2.    TPPRC respectfully states that it is a corporation duly organized under the laws of corporations of the Commonwealth of Puerto Rico and has its principal place of business at Galería San Patricio, Calle Tabonuco, B-5 Suite 202, Guaynabo, Puerto Rico 00936 and it's a wholly owned subsidiary of Total Outre Mer, SA which in turn is a direct wholly owned subsidiary of Total, SA and that no publicly held corporation owns 10% of its stock.



RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 24th day of November, 2008.

**SEPULVADO & MALDONADO, PSC**
Attorneys for
Total Petroleum Puerto Rico Corp.
Citibank Tower
Suite 1202
252 Ponce de Leon Avenue
San Juan, P.R. 00918
Phone 787.765.5656
Fax 787.294.0073

s/**Elaine M. Maldonado-Matias**
Elaine M. Maldonado-Matías
*Pro Hac Vice*
emaldonado@slawpr.com

2

# EXHIBIT 13

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation<br><br>This document relates to:<br><br>*Commonwealth of Puerto Rico, et. al. v. Shell Oil Company, et. al.;* USDC-SDNY 07-10470 (SAS) | Master File No.: 1:00-1898<br>MDL 1358 (SAS)<br>MD21-88 |

## TOTAL PETROLEUM PUERTO RICO CORP.'S
## AMENDED CORPORATE DISCLOSURE STATEMENT

**TO THE HONORABLE COURT:**

Pursuant to Fed. R. Civ. P. 7.1, Defendant Total Petroleum Puerto Rico Corp. ("TPPRC") provides an amended Corporate Disclosure Statement in the MDL 1358 case, as follows:

1.    TPPRC first filed its Corporate Disclosure Statement on November 26, 2008. *See* Docket Entry No. 41.

2.    Since then, TPPRC has changed the address of its principal place of business and is no longer wholly owned by Total Outre Mer.

3.    The current address of TPPRC's principal place of business is Santander Tower, Suite 1518, B-7 Tabonuco St., Guaynabo, Puerto Rico 00968.

4.    Further, TPPRC is now a wholly owned subsidiary of Total Raffinage Marketing; and no publicly held corporation owns 10% of TPPRC's stocks.



Respectfully Submitted.

In San Juan, Puerto Rico, this 15th day of October, 2012.

Elaine Maldonado-Matías
emaldonado@smlawpr.com

**SEPULVADO & MALDONADO, PSC**
Counsels for
Total Petroleum Puerto Rico Corp.
Citibank Tower, Suite 1900
252 Ponce de León Avenue
San Juan, P.R. 00918
Phone 787.765.5656
Fax 787.294.0073

# EXHIBIT 14

Law Offices of

# MILLER, AXLINE & SAWYER

A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE
A. CURTIS SAWYER, JR.

TRACEY L. O'REILLY
DANIEL BOONE
JUSTIN MASSEY
BRIAN D. SHANNON
DONALD MOONEY, of Counsel

April 17, 2013

**VIA LNFS & ELECTRONIC CORRESPONDENCE**

Elliot E. Polebaum, Esq.
Fried, Frank, Harris, Shriver & Jacobson, LLP
801 17th Street, NW
Washington, DC 20006

**RE:   Commonwealth of Puerto Rico, et al., v. Shell Oil Co., et al., 07-civ-10470 (SAS)**
*Pre-Motion Exchange of Letters Pursuant to Judge Scheindlin's Individual Rule IV(B)*

Dear Mr. Polebaum:

This letter responds to your letter, dated April 10, 2013, and written on behalf of
defendant Total, S.A. ("TSA"). In that letter you indicate that you will be filing a motion to
dismiss the Third Amended Complaint (TAC) for lack of personal jurisdiction and for failure to
state a claim and/or for a more definite statement. You request that plaintiffs agree to voluntarily
dismiss the complaint against TSA. Plaintiffs decline your request for several reasons.

First, you make a number of statements, including: "there is no basis for naming Total as
a defendant," TSA "does not refine, market, or supply gasoline or otherwise manufacture
MTBE," and "Total has no offices, employees or property in Puerto Rico and does not transact
business in Puerto Rico." Based on TSA's prior public statements, some of which are described
in my March 28, 2013, letter to the Court, as well as TSA's submissions to the U.S. Securities
and Exchange Commission (USS&EC), we disagree with your statements.

Specifically, your client made statements that directly contradict the assertions you put
forth in your April 10, 2013, letter. For example, TSA issued a document on November 2, 2004,
and filed it with the USS&EC on November 18, 2004. This document describes Total as
having:

Elliot E. Polebaum
April 17, 2013
Page 2

. . . finalized an agreement to acquire one hundred service stations on the island of Puerto Rico . . . spread widely across this island and they will be branded in the Total colours by the end of 2005. With this agreement Total has acquired 6% of the retail market . . . This acquisition reinforce Total's development strategy in the Caribbean, an area of rapidly growing consumption . . . Total is the fourth largest oil and gas company in the world with operations in more than 130 countries. Total's activities cover the whole energy chain of the petroleum industry: exploration, oil and gas production, refining and marketing, trading and power generation . . . Total has more than 110,000 employees worldwide. (Exhibit 99.4. Accepted 2004-11-18. SEC Accession #0000950123-04-013853).

In addition, public documents submitted by Gasolinas de Puerto Rico (GPR) and Total Petroleum Puerto Rico Co. (TPPRC) to the Puerto Rico Secretary of State identify "related-party transactions" implicating Total, S.A. in the sale of petroleum products to Puerto Rico companies and the purchase of gas stations and GPR assets in Puerto Rico. These documents indicate that TSA supplied petroleum products to GPR and its parent Caribe Gasoline Distributors, Inc., as well as to Idemitsu Apollo Corporation.

TSA's direct conduct in Puerto Rico provides more than an adequate basis for the MDL Court to exercise personal jurisdiction over TSA.

Second, your assertion that the TAC fails to allege any claim that is supported by facts against TSA, including TSA's liability by refining, supplying, or marketing gasoline with MTBE, is without merit. Pursuant to FRCP 8, relevant case law and Judge Scheindlin's Status Conference statements on the topics of pleading and motions to dismiss, plaintiffs have more than met the plausibility standard announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and its progeny. We note that, as an owner and supplier of stations in Puerto Rico, TSA's conduct giving rise to liability is described in the complaint in the same manner as a number of other defendants – none of whom have even challenged the sufficiency of the complaint, at least with respect to allegations involving their conduct.

Last, you indicate that TSA is a "holding" company, although TSA public documents do not describe the company as such and rather describe TSA as a "limited company" incorporated in France. Although a parent or holding company is typically not liable for the acts of subsidiaries, it appears that TSA closely controls its subsidiaries. Public documents submitted to the Puerto Rico Secretary of State and TSA's own submissions to the USS&EC, including consolidated financial statements, demonstrate that TSA controls its subsidiaries, such as TPPRC and Total Outre Mer, S.A. Although plaintiffs have named TSA as a defendant based on TSA's own direct activities in Puerto Rico, the documents received to date warrant further discovery as to the extent of control exercised by TSA over the activities of other Total entities with activity in Puerto Rico.

Elliot E. Polebaum
April 17, 2013
Page 3

Please call if you have questions about the above.

Sincerely,

Michael Axline
Counsel for Plaintiffs


cc:    All Counsel via LNFS
       Elliot Polebaum, Esq. via email (Elliot.Polebaum@friedfrank.com)
       Defendants' Liaison Counsel via email (MDL1358@mwe.com)
       Plaintiffs' Liaison Counsel via email (MDL1358@weitzlux.com)