**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In Re: Methyl Tertiary Butyl Ether ("MTBE")** **Products Liability Litigation** **This document relates to:** *City of Merced Redevelopment Agency, et al. v. Exxon Mobil Corporation, et al.*, 1:08-cv-06306 | **Master File No. 1:00-1898** **MDL 1358 (SAS)** **M21-88** |

<u>**DEFENDANTS' *REPLY* RULE 56.1 STATEMENT IN SUPPORT OF MOTION FOR**</u>
<u>**PARTIAL SUMMARY JUDGMENT RE NUISANCE & TRESPASS**</u>

Defendants Exxon Mobil Corporation, Chevron U.S.A. Inc., Shell Oil Company, Equilon Enterprises LLC, Tesoro Corporation, and Tesoro Refining and Marketing Company (collectively, "Defendants") submit the following Local Rule 56.1 Reply Statement in support of their Motion for Partial Summary Judgment re Nuisance and Trespass:

## DEFENDANTS' FACTS

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| 1.  Virginia and Arvel Shackelford owned and operated the gasoline service station at 1415 R Street from 1984-1994.  (Roy Decl., Ex. 1 (V. Shackelford Depo), p. 103:10-16; Ex. 7 (1/6/12 Merced Trial Transcript Stipulation), p. 6794:23–6795:3.) | The RDA admits that the Shackelfords operated the station as a branded Mobil station selling Mobil gasoline from 1978 to 1984.  (Sawyer Decl., Exh. 3, A. Shackelford Depo., pp. 7:12-22; 12:6-19; 13:24-14:12.)  The RDA also admits that the Shackelfords owned and operated the R Street Exxon Station at 1415 R Street, but denies that this fact is admissible or relevant. | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.

Plaintiff's additional fact statements are immaterial and irrelevant. |
| 2.  During that time, the Shackelfords sought out their old friends at Curtesy Oil to supply gasoline to the station and Curtesy Oil, in turn, branded the station "Exxon." (Roy Decl., Ex. 2  (A. Shackelford Depo), p. 16:21–17:2, 17:8-10, 17:22–18:21.) | Denied.  Mr. Shackelford testified that after he purchased the station from Mobil, the Shackelfords entered into an agreement to buy Exxon gasoline from Courtesy Oil. (Sawyer Decl., Exh. 3, A. Shackelford Depo. (5/18/09) at 17:3-10.)  All of the signs and branding materials then changed to | Plaintiff's denial is illusory.  The cited evidence supports the fact.

Plaintiff's additional fact statements are immaterial and irrelevant. |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | Exxon. (Id. at 17:11-16.)  Once the station changed to Exxon branding, the Shackelfords sold only Exxon gasoline.  (Id. at 17:3-10, 17:22-18:10, 18:22-24.)  The testimony cited by defendants does not establish that Courtesy Oil branded the station as an Exxon station. | |
| 3.  The Shackelfords bought their gasoline from Curtesy Oil, not directly from any Defendant.  (Roy Decl., Ex. 7 (1/6/12 Merced Trial Stipulation), p. 6794:23–6795:3; Ex. 1 (V. Shackelford), pp. 37:9-15.) | The RDA admits that Courtesy Oil delivered gasoline to the station.  The Shackelfords bought gasoline from Courtesy Oil in order to obtain Exxon gasoline.  (See Response to Paragraph 2 supra.) | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.  Plaintiff's additional fact statements are immaterial and irrelevant, and misrepresent the evidence they cite.  The Shackelfords did not buy gasoline from Curtesy Oil "*in order to* obtain gasoline from Exxon".  Rather, the testimony indicated that they went to Curtesy Oil, which they knew for decades, and Curtesy Oil happened to be selling Exxon-branded |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | | gasoline. |
| 4.  There was no contract or agreement between the Shackelfords and Exxon.  Roy Decl., Ex. 1 (V. Shackelford, pp. 104:5-7). | The RDA admits that there was no contract, but denies that this fact is admissible or relevant in light of the fact that the Shackelfords entered into an agreement to exclusively buy Exxon gasoline and branded the station as an Exxon station. See Response to Paragraph 2 supra. | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.  Plaintiff has already admitted that the Shackelford's agreement was with Curtesy Oil, not Exxon, and Mr. Shackelford was not aware of signing any agreement or having an agreement requiring him to sell Exxon-branded gasoline.  (Roy Decl., Ex. 2  (A. Shackelford Depo), p. 18:6, 18:18-21.) |
| 5.  In 1994, the Shackelfords sold the station to JP Randhawa.  (Roy Decl., Ex. 1 (V. Shackelford Depo.), p. 74:6-7, 74:13, 75:1-13.) | The RDA admits that the Shackelfords sold the station to J.P. Randhawa in 1994, but denies that this fact is admissible or relevant. | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.  Plaintiff provides no legal authority or explanation of why the cited evidence is inadmissible.  As a result, the objection should be |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | | disregarded. |
| 6.  Mr. Randhawa operated the station under the Exxon brand through Curtesy Oil until 1998.  (Roy Decl., Ex. 5 (Merced Trial Transcript 10/28/2011 PM), pp. 1198:11–1200:8.) | The RDA admits that Mr. Randhawa purchased gasoline from Curtesy Oil.  Mr. Randhawa purchased gasoline from Curtesy so that he could obtain Exxon branded gasoline and so that he could display the Exxon logo on "dispensers, price sign, freeway sign," and that he was "authorized through Curtesy Oil by Exxon" to display the logo.  (Shannon Decl., Exh. 1, Randhawa Depo. (8/26/09) at 72:1-16.) | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.  Plaintiff's additional fact statements are immaterial and irrelevant, and they mischaracterize the cited evidence.  However, the RDA's cited evidence (Shannon Decl., Exh. 1, Randhawa Depo. (8/26/09) at 72:1-16 [CM/ECF Doc. No. 169, p. 12 of 98]) was stricken from the record.  Therefore, Plaintiff's additional statements are unsupported by the evidence and should be disregarded. |
| 7.  Mr. Randhawa closed his station in 1998 and reopened it in 1999 as a Texaco-branded station that purchased gasoline from a distributor, | The RDA admits that Mr. Randhawa changed the brand name on his station from Exxon to Texaco in or around 1999, and that once the station became a Texaco, | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted. |

| **Undisputed Material Facts And Supporting Evidence** | **Merced RDA's Response** | **Defendants' Reply** |
|---|---|---|
| Dickey Petroleum. (Roy Decl., Ex. 5 (Merced Trial Transcript 10/28/11 PM), p. 1255:4-19); Ex. 3 (Randhawa Depo.) pp. 13:6-10, 109:22–110:04; Ex. 4 (Dickey Depo), p. 18:2-20.) | the gasoline supplier became Dickey Petroleum. (Shannon Decl., Exh. 1, Randhawa Depo. (8/26/09) at 13:6- 10.) | Plaintiff's additional fact statements are immaterial and irrelevant and misrepresent the cited testimony, which identifies the date he ceased operating under the Exxon brand as November or December 1998. (Shannon Decl., Exh. 1, Randhawa Depo. (8/26/09) at 13:3-5.) |
| 8.  Mr. Randhawa has owned and operated the station since 1994. (Roy Decl., Ex. 3 (Randhawa Depo.) pp. 88:14–91:18.) | The RDA admits that Mr. Randhawa owned and operated the R Street Exxon/Texaco Station at 1415 R Street, but denies that this fact is admissible or relevant. | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.<br><br>Plaintiff provides no legal authority or explanation of why the cited evidence is inadmissible.  As a result, the objection should be disregarded. |
| 9.  Mr. Randhawa never had a contractual relationship or any contact with Exxon. (Roy Decl., Ex. 5 (Merced Trial Transcript 10/28/11 PM), p. | The RDA admits that there was no contract, but denies that this fact is admissible or relevant in light of the fact that the Shackelfords entered into an agreement to exclusively buy Exxon gasoline | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.<br><br>Plaintiff provides no legal |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| 1240:22–1242:12.) | and brand the station as an Exxon station.  (See Response to Paragraph 6 supra.) | authority or explanation of why the cited evidence is inadmissible.  As a result, the objection should be disregarded.<br><br>Plaintiff's reference to the Shackelfords is not relevant to Mr. Randhawa's lack of a relationship with Exxon.  Plaintiff's additional statements should therefore be disregarded.<br><br>Defendants incorporate their Reply to Fact No. 6. |
| 10.  Mr. Randhawa never had a contractual relationship with Shell or Equilon.  (Roy Decl., Ex. 3 (Randhawa Depo.),pp. 109:22-110:04.) | Disputed.  The 1415 R Street station operated as a Texaco/Shell branded station from 1999 to at least 2003 when MTBE was removed from gasoline. Mr. Randhawa testified that Texaco offered him $79,000 to become a Texaco station which helped finance the tank upgrades. (Shannon Decl., Exh. 1, Randhawa Depo. (8/26/09) at 16:6-22.)  This "was the main reason" he changed from Exxon to Texaco "because | Plaintiff's dispute is illusory.  Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.<br><br>Plaintiff's additional fact statements are immaterial and irrelevant.<br><br>The RDA's cited evidence is legally irrelevant.  Mr. |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | they offered - - Texaco offered, I believe it  was, $79,000." *(Id.* at 16:6-22.)  Mr. Randhawa confirmed that the Texaco's name was on the station and the dispensers once he change from an Exxon to Texaco station.  *(Id.* at 14:9-12.) Mr. Randhawa testified, furthermore, that he "was able to take Texaco and Shell credit card . . ." *(Id.* at 109:3-109:19.) | Randhawa testified that he received a $79,000 contract advance from Texaco that he used to finance UST replacement; he did not testify that Texaco lent him money for that purpose.  He further testified that Texaco did not install the tanks, did not hire or even suggest a contractor to install the tanks, did not tell him which tanks to install, and did not participate in the installation. (Shannon Dec., Ex. 1, p. 16; Second Roy Dec., Ex. 15, p. 17.) Second, even though Texaco had no role in selecting or installing them, the new tanks installed at 1415 R Street prior to the station's switch to Texaco gasoline were state-of-the-art, double-walled fiberglass tanks with leak detection |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | | devices. (Second Roy Dec., Ex. 15, pp. 52-55.) And finally, no one has ever told Mr. Randhawa that there has been a release of gasoline from the new tank system at his station, nor does the RDA provide any evidence of one. (*Id*. at 63-64.) |
| 11. The RDA is not asserting a claim against Chevron U.S.A. Inc. at 1415 R Street. (Roy Decl., Ex 13 (Station Matrix).) | Admit. | Admit. |
| 12. The gasoline station located at 1455 R Street was owned and operated by Brian Pazin through his company Cardgas, Incorporated, during the relevant time period. (Roy Decl., Ex. 8 (B. Pazin Depo.), pp. 7:20-23, 8:3-4.) | The RDA admits that Mr. Pazin owned and operated the 1455 R Street Station, but denies that this fact is admissible or relevant. | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.<br><br>Plaintiff provides no legal authority or explanation of why the cited evidence is inadmissible. As a result, the objection should be disregarded. |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| 13.  The station at 1455 R Street was branded as a Pacific Pride card-lock station pursuant to a franchise agreement with Pacific Pride and bought all of its gasoline from distributor Pazin & Myers.  (Roy Decl., Ex. 8  (B. Pazin Depo.), pp. 17:17-22, 144:17–145:9.) | Disputed.  Mr. Pazin initially purchased gasoline from Pazin Oil Company before later purchasing gasoline from Pazin & Meyers.  (See Roy Decl., Exh. 8, R. Pazin Depo. at p. 17:17-22.) | Plaintiff does not dispute that 1455 R Street has always been branded Pacific Pride card-lock station pursuant to a franchise agreement with Pacific Pride or that the station only purchased gasoline from a Pazin-related distributor. |
| 14.  1455 R Street never had a franchise agreement with any Defendant and never purchased gasoline directly from any defendant.  (Roy Decl., Ex. 8  (B. Pazin Depo.), pp. 145:10–146:8.) | The RDA admits that Mr. Pazin did not have a franchise agreement with any defendants or purchase gasoline directly from these defendants, but denies that this fact is admissible or relevant.  Defendants admit that Pazin & Meyers delivered gasoline to the 1455 R Street station from a number of defendants including Chevron and Tesoro.  (See Defendants' Rule 56.1 Statement at ¶¶ 17, 22-23.)  Richard Pazin, owner of Pazin & Meyers, confirmed that he bought gasoline for distribution to Merced stations during the relevant time period, including the Cardlock, from Chevron and Tesoro.  (Miller | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.

Plaintiff provides no legal authority or explanation of why Defendants' cited evidence is inadmissible.  As a result, the objection should be disregarded.

Plaintiff's additional fact statements are immaterial, unsupported, and irrelevant.  For example, contrary to Plaintiff's suggestion, the undisputed evidence shows that Chevron did not know that |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | Decl., Exh. 3, R. Pazin Depo. (8/24/09) at 57-59.)  There is evidence that gasoline manufactured by Exxon was delivered to the station.  *(See* Paragraph 15 below.)  Brian Pazin testified, nonetheless, that he never received any "special training or instruction on MTBE and its potential to cause contamination . . . (Sawyer Decl., Exh. 7, B. Pazin Depo. (8/25/09) at 132:1-25.)  Brian Pazin, moreover, was familiar with Material Safety Data Sheets from his work at Pazin & Meyers. *(Id.* at 174:17-176:14.)

Material Safety Data Sheets ("MSDSs") for MTBE gasoline for the relevant time period do not contain any of the warnings or precautions called out in the above memorandum. In the 1993 MSDS, there is not one single mention of the need to implement "spill containment manholes" to prevent releases of MTBE gasoline during deliveries that could result in significant groundwater contamination. (Boone Decl., | Pazin & Meyers was purchasing its gasoline for delivery to 1455 R Street. (Roy Decl., Ex. 6 (Merced Trial Transcript 11/30/11 PM), p. 3743:6-19.)

Similarly, the Court struck the Brian Pazin testimony cited by Plaintiff concerning his alleged training and his receipt of Material Safety Data Sheets.  Plaintiff has no evidence to support these two allegations.

The cited pages from Sawyer Dec., Ex. 7, B. Pazin Depo. (8/25/09) at 132:1-25 [CM/ECF Doc. No. 171, pg. 58 of 107] and Miller Dec., Ex. 3, R. Pazin Depo. (8/24/09) at 57-59 [CM/ECF Doc. No. 172, pg. 28-30 of 39] were stricken from the record. Therefore, Plaintiff's |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | Exh. 4, Material Safety Data Sheet (created February 16, 1993; revised June 30, 1994) at section 6.) | additional statements are unsupported by the evidence and should be disregarded.<br><br>Additionally, the cited MSDS is from Ultramar who is not a party to this lawsuit.  There is no evidence in the record of the content of MSDSs that Mr. Pazin received or who provided the MSDSs to him.  There is also no causation evidence in the record suggesting that 1455 did not have spill containment manholes in 1993 or that the lack of those manholes was the actual cause of any release of gasoline that caused injury.  Furthermore, Plaintiff has not identified any improper disposal instructions within the MSDS.  Accordingly, the reference to Ultramar's MSDS is irrelevant and |

| **Undisputed Material Facts And Supporting Evidence** | **Merced RDA's Response** | **Defendants' Reply** |
|---|---|---|
| | | should be disregarded. |
| 15. Exxon also has no connection 1455 R Street. Richard Pazin, owner of Pazin & Myers (the sole supplier of gasoline to 1455 R Street), testified that although he supplied various types of gasoline to the station, he did not supply Exxon gasoline because he did not have a position at the terminal to lift Exxon gasoline. (Roy Decl., Ex. 6 (Merced Trial Transcript 11/30/11 AM), p. 3701:17-25.) | The RDA admits that Exxon did not supply gasoline directly to the Cardlock station, but Exxon gasoline was delivered to the station through a jobber named New West Petroleum. Exxon admitted that it sold gasoline to New West Petroleum ("New West") from 1995-2000 for delivery to Merced stations. (Miller Decl., Exh. 4, Supplemental Responses of Defendant ExxonMobil Corporation to Special Interrogatories Propounded by Plaintiff City of Merced (Set Three) (Sept. 15, 2010) at Interrogatory No. 23.) Richard Pazin testified that New West was one of four gasoline suppliers used by Pazin & Meyers to supply Merced stations during the relevant time period. (Miller Decl., Exh. 3, R. Pazin Depo. (8/24/09) at 57:9-59:1.) | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted. All of Plaintiff's cited evidence was stricken— i.e., Miller Decl., Exh. 3, R. Pazin Depo. (8/24/09) at 57:9-59:1 [CM/ECF Doc. No. 172, pg. 28-30 of 39] and Miller Decl., Exh. 4, Supplemental Interrogatory Responses at Interrogatory No. 23 [CM/ECF Doc. No. 172, pg. 37 of 39].). Therefore, Plaintiff's additional statements are unsupported by the evidence and should be disregarded. In addition, the RDA's Response to Fact No. 15 mischaracterizes the cited evidence, and there is no evidence in the record that Exxon-refined gasoline |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | | was ever delivered to 1455 R Street. |
| 16.  Chevron never owned or operated the service station at 1455 R Street.  (Roy Decl., Ex. 9, (F. Soler Declaration), ¶ 3.) | The RDA admits that Chevron never owned or operated the station, but denies that this fact is admissible or relevant.  There is testimony that gasoline manufactured by Chevron was supplied to the station.  (See Paragraph 14 supra.) | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.<br><br>Plaintiff provides no legal authority or explanation of why the cited evidence is inadmissible.  As a result, the objection should be disregarded. |
| 17.  While Pazin & Meyers (a Chevron jobber) sold gasoline manufactured by Chevron to 1455 R Street on rare occasions, Chevron did not know about these sales.  (Roy Decl., Ex. 9 (F. Soler Decl.), ¶ 3; Ex. 6  (Merced Trial Transcript 11/30/11 PM), p. 3743:6-19.) | The RDA admits that Chevron never owned or operated the station, but denies that this fact is relevant.  The RDA further disputes that cited testimony establishes that Chevron was not aware of the sale by Pazin & Meyers of Chevron gasoline to the station at 1455 R Street. | Plaintiff does not deny that Richard Pazin testified that Chevron did not know about Pazin & Meyers deliveries to 1455 R Street, and fails to cite any evidence suggesting otherwise. |
| 18.  Richard Pazin testified that Chevron-refined gasoline accounted for *at most* five percent of his total deliveries to 1455 R Street.  (Roy Decl., Ex. 6  (Merced Trial | The RDA admits that Richard Pazin testified as reported, but denies that this fact is relevant. | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted. |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| Transcript 11/30/11 PM), p. 3737:8-22).) | | |
| 19.  Tesoro never owned nor operated the service station at 1455 R Street.  (Roy Decl., Ex. 10, (R. Mills Declaration), ¶ 3.) | The RDA admits that Tesoro never owned or operated the station, but denies that this fact is admissible or relevant.  Tesoro admits that it supplied gasoline directly to Pazin & Meyers and to the station. Brian Pazin testified, nonetheless, that he never received any "special training or instruction on MTBE and its potential to cause contamination ...." (Sawyer Decl., Exh. 7, B Pazin Depo. (8/25/09) at 132:1-25.) | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted Plaintiff provides no legal authority or explanation of why the cited evidence is inadmissible.  As a result, the objection should be disregarded.  Plaintiff's additional fact statements are unsupported by evidence, immaterial and irrelevant. Tesoro did not admit that it supplied gasoline to the station located at 1455 R Street. This statement is not followed by a citation to evidence, admissible or otherwise, in accordance with Local Rule 56.1(d). Therefore, Plaintiff's statements are unsupported by the evidence and should be |

SMRH:408450013.1

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | | disregarded. |
| 20.  Tesoro did not have any control over the station, nor did it provide the station's owners and operators with any instructions or guidance related to the station's operations, including their handling of gasoline, or their choice, maintenance, and operation of station equipment.  (Roy Decl., Ex. 10, (R. Mills Declaration), ¶ 5.) | The RDA disputes this fact on the grounds that Defendants are relying upon testimony which was not disclosed during discovery in this matter.  Richard Pazin, owner of Pazin & Meyers and supplier to 1455 R Street, testified that he received gasoline MSDS from his suppliers, and provided them to his gasoline station customers. (Miller Decl., Exh. 3, R. Pazin (8/24/09) at 34:23-35:2.) | Plaintiff's statement should be deemed admitted.  Plaintiff's objection to Tesoro's use of a declaration is contrary to Federal Rule of Civil Procedure 56(c)(4), permitting an "affidavit or declaration used to support or oppose a motion" so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated."

Plaintiff's additional fact statements are immaterial and irrelevant. Plaintiff's statement that Pazin & Meyers received MSDS from suppliers and provided them to various stations does not |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | | specifically controvert this fact regarding *Tesoro's* lack of control *at this particular station*. Moreover, Plaintiff inaccurately portrays Mr. Pazin's testimony, who testified MSDS were kept on file at Pazin & Meyers' plant and were *not* routinely provided to stations, but were supplied upon request. (Transcript of R. Pazin, 34:2-35:8). |
| 21.  Tesoro did not sell or deliver gasoline containing MTBE to 1455 R Street or have any gasoline sales agreements with any jobbers related to this station.  (Roy Decl., Ex. 10, (R. Mills Declaration), ¶¶ 3, 4.) | Disputed.  Richard Pazin, owner of Pazin & Meyers, testified that he bought gasoline for distribution to Merced stations during the relevant time period, including the Cardlock, from Tesoro.  (Miller Decl., Exh. 3, R. Pazin Depo. (8/24/09) at 57-59.) | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.  Plaintiff's cited evidence from Miller Decl., Ex. 3, has been stricken from the record. Therefore, Plaintiff's additional statements are unsupported by the evidence and should be disregarded.  Moreover, Plaintiff's statement that |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| | | Pazin & Meyers bought gasoline from Tesoro for distribution to Merced stations, including Cardlock, does not specifically controvert this fact regarding *Tesoro's* lack of sales or deliveries to this station, or lack of sales agreements with jobbers regarding this station |
| 22.  Tesoro sold product to Pazin & Myers (not the 1455 R Street station) during 2003 only. (Roy Decl., Ex. 11 (Defendants Tesoro Corporation and Tesoro Refining and Marketing Company's Response to Plaintiff City of Merced Redevelopment Agency's First Set of Interrogatories to Defendants, Response to Interrogatory No. 5).) | The RDA admits that Tesoro sold gasoline to Pazin & Meyers.  The RDA denies any implication that this fact suggests Tesoro gasoline was not delivered to the 1455 R. Street Station.  Pazin & Meyers sold gasoline to 1455 R Street. | Plaintiff's statement does not deny the fact and it should therefore be deemed admitted.<br><br>Plaintiff's additional fact statements are immaterial and irrelevant. |
| 23.  As MTBE was phased out of gasoline sold in California | Admit. | Admit. |

| Undisputed Material Facts And Supporting Evidence | Merced RDA's Response | Defendants' Reply |
|---|---|---|
| during 2003, Tesoro sold gasoline containing MTBE to Pazin & Myers for one year (at most) during the relevant time period. (Roy Decl., Ex. 12  (3/14/02 Executive Order).) | | |

## PLAINTIFF'S ADDITIONAL FACTS

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| 24.  The RDA's expert concerning underground storage tanks, Marcel Moreau, has decades of experience with storage and dispensing systems at gas stations, and provided a detailed history of defendants' knowledge concerning the problems of storing and handling MTBE gasoline at service stations.  (Shannon Decl., Exh. 2, Expert Report of Marcel Moreau (April 11, 2011), 1415 "R" Street section, pp. 1-8 and Shannon Decl., Exh. 3, 1455 "R" Street section pp. 1-10.) | Deny.  Defendants deny that Mr. Moreau provided a detailed history of *Defendants'* knowledge concerning problems at the subject service stations. The RDA's cited evidence does not support the fact.  Exhibits 2 and 3 of the Shannon Declaration are Mr. Moreau's compilation of site histories for 1415 and 1455 R Street, respectively, based on document review.  Neither exhibit provides any evidence that Exxon, Chevron, Shell or Tesoro had any knowledge of the site conditions or activity at either station prior to the initiation of this lawsuit.  (*See generally*, Shannon Dec., Ex. 2 and 3.) Additionally, the cited evidence is |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| | hearsay and should be excluded. |
| 25.  California refiners, particularly Chevron's Northern California refinery, started adding MTBE to gasoline in 1986, and continued to utilize MTBE until the early 2000s when it was banned.  (Shannon Decl., Exh. 4, May 4, 2000, Blagojevic Decl., *South Tahoe*.) | Denied in part.  The evidence cited by Plaintiff does not suggest—much less establish—that Chevron added MTBE to its gasoline in Northern California in 1986.  To the contrary, Chevron did not begin adding MTBE to its gasoline at its Northern California Refinery (the Richmond Refinery) until 1990.  (Roy Decl. Ex. 9, [F. Solar 4/15/11 Decl.] at p. 3:28-4:1.)  The RDA has also already admitted as part of the statute of limitation briefing that Exxon did not add MTBE to gasoline in Northern California until 1992.  (See RDA's Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment re Statute of Limitations [CM/ECF Doc. No. 3695 (Master case); CM/ECF Doc. No. 158 (Merced RDA case)], ¶¶ 1, 35.)

Additionally, Plaintiff's statement is not supported by admissible evidence.  The declarant was not an employee of any California refinery and therefore lacks sufficient personal knowledge.  While he may have knowledge of sales of MTBE by Lyondell, he has no personal knowledge of what was done with that |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| | MTBE after the sale. |
| 26.  After supervising remediation of MTBE releases at Shell gasoline stations across the country for nearly twenty years, Curtis Stanley, an engineer and hydrogeologist at Shell, described MTBE as the "biggest environmental" issue facing United States oil companies.  (Shannon Decl., Exh. 5, May 13, 1998, E-mail from C. Stanley to C. Parkinson; Exh. 6, Stanley Depo. (5/6/99) at 5:16-7:5.) | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.

The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.

The statement is also inadmissible hearsay as to all Defendants except Shell. |
| 27.  In 1981, Ben Thomas of Shell reported to an American Petroleum Institute ("API") committee that "approximately 20 percent of all underground storage tanks leak, leading to the possibility of groundwater contamination."  (Shannon Decl., Exh. 7, March 31, 1981, Internal Arco Memo from R.N. Roth to MTBE File; Exh. 8, Thomas Depo. (11/15/00) at 89:17- 90:9, *South Tahoe*].) | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.

The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.

Evidence regarding ARCO is not relevant because it is not a party to this lawsuit. |

| **Plaintiff's Additional Facts** | **Defendants' Response** |
|---|---|
| | The statement is also inadmissible hearsay as to all Defendants except Shell. |
| 28.  Chevron and Shell were long standing members of API.  (Shannon Decl., Exh. 9, Oct. 17, 2005, Letter from W. Hughes to R. Greenwald at 1; Exh. 10, Oct. 17, 2005, Letter from P. Condron to R. Greenwald at 1.)  Ultramar, Valero's wholly owned subsidiary, was a member of API from approximately 1989 to 1993.  (Shannon Decl., Exh. 11, Sept. 15, 2005, Letter from T. Renfroe to R. Greenwald.) | Admit. The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>Evidence regarding Ultramar and Valero is not relevant because neither is party to this lawsuit. |
| 29.  Just a few years later, in 1984, API had already formed an Methyl-tertiary-Butyl  Ether Task Force ("MTBE Task Force") which held meetings concerning "emerging issue[s] of MTBE in ground water." (Shannon Decl., Exh. 12, June 18, 1984, Memo from S. Cragg, API, to MTBE Task Force.) The minutes of a June 1984 meeting state: <br><br> "Some of the task force members indicated that MTBE had been found in ground water near leaking underground storage tanks from their service stations . . . It appears that the oxygenate components of gasoline, such as MTBE, migrate most rapidly  underground . . ." <br><br>(*Ibid*.) | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.<br><br>The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants. |
| 30.     Another memo reporting on the June 1984 | Admit that the statement was made but |

| Plaintiff's Additional Facts | Defendants' Response |
| --- | --- |
| API meeting also confirmed that gasoline manufacturers were aware that "MTBE is a possible contaminant of groundwater, especially in association with leaking gasoline storage tanks."  (Shannon Decl., Exh. 13, June 14, 1984, Arco Chemical Company Internal Correspondence from B. Hoover to S. Ridlon at 1.) | dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.  The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.  Evidence regarding Arco is not relevant because it is not a party to this lawsuit.  The statement is also inadmissible hearsay as to all Defendants. |
| 31.     In 1986, Dr. Peter Garrett, Marcel Moreau, and Jerry B. Lowry of the Maine Department of Environmental Protection drafted a paper entitled "Methyl tertiary Butyl Ether as a Ground Water Contaminant" (the "Maine Paper") which was intended to be presented at an API sponsored conference.  (Shannon Decl., Exh. 14, at Cover and Table of Contents.)  The Maine Paper detailed multiple problems with releases of MTBE gasoline from service stations, including:  (1)     MTBE is more soluble in water and thus "spreads both further and faster than the gasoline"  (2)     "Groundwater contaminated with MTBE is difficult to remediate;"  (3)     MTBE will migrate out beyond gasoline and appear as a "halo" around the gasoline groundwater | Admit that the statements were made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.  The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites. |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| plume; <br><br> (4)      relatively small spills of MTBE gasoline ("a small driveway spill") can result in "large" plumes of MTBE only groundwater contamination. <br><br> (*Ibid*.)  The authors of the Maine Paper recommended that either MTBE be removed from gasoline or that several changes be made to USTs before MTBE gasoline is stored in them.  (*Id*. at 236-237.) | |
| 32.      Valero admitted that its employees were aware of the Maine Paper at the time of its publication.  (Shannon Decl., Exh. 15, Valero Corporate Representative Deposition, Early Knowledge and Taste & Odor at Early Knowledge Issues, ¶ 3(a).)  Joel Masticelli, a member of Ultramar's upper management, testified that Ultramar received information on the environmental fate of MTBE gasoline from the API, the WSPA, and NPRA.  (Boone Decl., Exh. 1, Masticelli Depo. (7/26/00) at 20-21, South Tahoe.) | Admit. <br> The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites. <br><br> Evidence regarding Ultramar and Valero is not relevant because neither is party to this lawsuit. <br><br> The statement is also inadmissible hearsay as to all Defendants. |
| 33.      In June 1986, in a memo entitled "Marketing Environmental Concerns Regarding the Use of MTBE in MOGAS, D.W. Callahan, a Chevron employee, also noted that MTBE had "several disturbing properties."  (Boone Decl., Exh. 2, June 11, 1986, Memorandum, from O.T. Buffalow, San Francisco, CA, to D.W. Callahan, re Marketing Environmental Concerning Regarding the use of MTBE in MOGAS at 1.)  These "disturbing" | Admit that the statements were made but dispute Plaintiff's argumentative characterization, which has taken the statements out of context. <br><br> The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| properties included the high solubility and mobility of MTBE as compared to the regular components of gasoline.  (*Ibid.*) Mr. Callahan specifically warned that "MTBE utilization could increase the costs to clean up leaks at service stations . . .(*Ibid.*) | sites. The statement is also inadmissible hearsay as to all Defendants except Chevron. |
| 34.  In December 1986, Chevron personnel circulated an article published in a oil industry trade publication reporting on significant MTBE groundwater contamination problems, highlighting, in particular, the Maine Paper and its call for changes to USTs at gasoline stations.   (Boone Decl., Exh. 3, Dec. 30, 1986, Memorandum re MTBE.) | Admit. The statement is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites. The statement is also inadmissible hearsay as to all Defendants except Chevron. |
| 35.      At the time Ultramar commenced distributing MTBE gasoline to its service stations in California , approximately 30-40 percent of its underground storage tanks had not yet been upgraded.  (Boone Decl., Exh. 1, Masticelli Depo. (7/26/00) at 40:9-25, 41:1-23, *South Tahoe*.) | Disputed.  Cited evidence does not support the fact. Evidence regarding Ultramar and Valero is not relevant because neither is party to this lawsuit. The statement is also inadmissible hearsay as to all Defendants. |
| 36.      Material Safety Data Sheet ("MSDS") regarding MTBE gasoline, for example, states as follows: (1)      under Accidental Release Measures, it | Admit in part, Deny in part.  Defendants admit that referenced MSDS contains generally the listed statements but dispute Plaintiff's argumentative characterization.  However, the |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| contains no warnings regarding the unique capabilities of MTBE to contaminate a far greater amount than non-MTBE gasoline,<br><br>(2)    it recommends using water to be sprayed on spills to reduce vapors which would cause the MTBE gasoline residue to be washed into the ground or adjacent sewers,<br><br>(3)    for larger spills it merely recommends diking the spill "for later disposal",<br><br>(4)    contains no requirements for special handling of MTBE gasoline (section 7),<br><br>(5)    under physical and chemical properties, it states that the odor threshold is .25 parts per million, when in fact odors associated with MTBE in drinking water have been detected as low as 4 to 5 parts per billion. Additionally, Material Safety Data Sheets state that there is "no data available" regarding the "degradability" of MTBE.  In fact, there is substantial evidence that MTBE is very resistant to biodegradation.  (Boone Decl., Exh. 4, June 30, 1994 Ultramar Material Safety Data Sheet.) | document is not relevant to the present motion.  The cited MSDS is a document from Ultramar, which is not a party to this litigation.  Plaintiff fails to cite to any evidence demonstrating the content of MSDSs prepared by any of the Defendants, that the MSDSs went to the owners of 1415 and 1455 R Street, or that the actual MSDSs provided contained instructions for improper disposal of gasoline with MTBE.  Accordingly, Fact No. 36 is not relevant.<br><br>The statement is also inadmissible hearsay as to all Defendants. |
| 37.    When Ultramar first introduced MTBE into gasoline in California, it made no effort to provide a warning with the gasoline unless it was ordered to do so by the Government.  (Boone Decl., Exh. 1, Masticelli Depo. (7/26/00) at 51:22-25, 52:1-11, *South Tahoe*].) | Disputed.  Cited evidence does not support the stated fact.<br><br>Evidence regarding Ultramar and Valero is not relevant because neither is party to this lawsuit. |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| 38.  In 1991, Chevron recognized that the introduction of MTBE into gasoline in California would substantially change the consequences of a gasoline spill or leak.  (Boone Decl., Exh. 5, Aug. 12, 1991, Memorandum, TIP Letter #237, MTBE Effects.)  The internal memo warns that while non-MTBE gasoline plumes are "relatively easy" to address, "MTBE on the other hand is a different situation."  *(Id.* at 1.)  The memo warns that MTBE gasoline releases will result in "larger" plumes of contamination that "will migrate" faster.  (*Id.*)  Specifically, the memo warns Chevron management that "[w]hen MTBE gets into the water then the trouble really starts."  (*Id.*)  The memo concludes that:<br><br>"Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE.  The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run.  **As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent."**<br><br>*(Id.* at 2.) | Disputed due to lack of evidence.  Plaintiff's cited evidence (Boone Dec., Ex. 5 [CM/ECF Doc. No. 170, pg. 40-41 of 69]) was stricken from the record.<br><br>The statement is also inadmissible hearsay as to all Defendants except Chevron. |
| 39.      Another 1991 Memorandum by Chevron notes multiple additional safety precautions and amended handling instructions need to be provided when MTBE gasoline is being stored and distributed, including at service stations.  The additional | Admit that the statements were made but dispute Plaintiff's argumentative characterization, which has taken the statements out of context. |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| precautions and handling instructions identified by Chevron included:  (1) "Spills or leaks of MTBE must be contained and prevented from contacting the ground or entering the waste water drainage system," (2) "Tanks containing MTBE should have double bottoms and leak detections systems," (3) "Provide proper facilities for shutdowns and tank cleaning to prevent any MTBE from being spilled or washing into the drainage system."  (Boone Decl., Exh. 6, March 26, 1991, Memorandum, Chemical Entry Review for MTBE.) | The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except Chevron. |
| 40.      In 1993, in discussing the increased problem of MTBE groundwater contamination from service station releases, Curtis Stanley wrote to one of his colleagues: "We need to convince management to implement dual containment NOW!"  (Boone Decl., Exh. 7, July 14, 1993, E-mail from C. Stanley to D. McGill [emphasis in original].) | Disputed based on lack of evidence. Plaintiff's cited evidence (Boone Dec., Ex. 7 [CM/ECF Doc. No. 170, pg. 46 of 69]) has been stricken from the record.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except Shell. |
| 41.  In the mid-1990s, Chevron also acknowledged that MTBE was driving factor to implement upgrades to USTs and improve instructions on storage and handling practices at service stations: | Admit that the quoted document contains the referenced statement but dispute Plaintiff's argumentative characterization. |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| "The USGS report points out that gasoline blended with MTBE may pose a greater risk to drinking water than non-oxygenated gasoline . . . . These concerns are not new, as Marketing raised the same issue <u>ten years ago</u> in connection with the Tank Integrity Program. . . . Marketing believes that MTBE in groundwater issue is just one more additional justification for the large Marketing capital investments in avoid terminal and service station leaks and spills." <br><br> (Boone Decl., Exh. 8, April 27, 1995, Memo re MTBE in Ground Water Issue.) | The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites. <br><br> The statement is also inadmissible hearsay as to all Defendants except Chevron. |
| 42.     In the late 1990s, Shell's environmental personnel were also looking at "MTBE Contamination" and "MTBE in Groundwater" issues. Curtis Stanley, one of Shell's key environmental personnel, concluded that, based on "research . . . extremely small releases can cause groundwater problems."  (Boone Decl., Exh. 9, May 14, 1998, E-mail from C. Stanley to K. Bell, et al.) | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context. <br><br> The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites. <br><br> The statement is also inadmissible hearsay as to all Defendants except Shell. |
| 43.     Stanley later advised that **"[v]ery small releases** of MTBE (even small overfills seeping into cracks in the pavement) have the potential to | Disputed based on lack of evidence. Plaintiff's cited evidence (Boone Dec., Ex. 10 [CM/ECF Doc. No. 170, pg. 53- |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| adversely impact groundwater." (Boone Decl., Exh. 10, No. 3, 1998, E-mail from C. Stanley to J. Pedley.) Mr. Stanley further stated that "[m]y professional opinion is that MTBE . . . should not be used at all in areas where groundwater is a potential drinking water supply." (*Id*.) | 54 of 69]) has been stricken from the record.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except Shell. |
| 44.  In the late 1990s, Exxon undertook a "study" to identify sources of potential releases from gasoline stations "because MTBE contamination is increasingly being found in surface and ground waters near gasoline stations, and has been identified as a potential threat to public drinking water supply systems." (Boone Decl., Exh. 11, March 30, 1999, MTBE Release Source Identification at Marketing Sites, at 2].)  The study noted that "[t]he presence of MTBE found in surface, ground and drinking waters has been increasing [and] . . . [t]here are several reasons why increased MTBE presence can be concern." (*Id* at 2.)  Exxon's study specifically concluded that "[s]mall leaks of gasoline **(1 teaspoon)** can translate into MTBE ground water concentrations above the taste and odor detectable threshold levels." (*Id.* [emphasis added].)  In fact, the Exxon study included a graphic representation of the | Disputed.  Plaintiff's description of Exxon's study is taken out of context and distorted.  Plaintiff's summary of the "study" is simply an orchestrated attempt to exploit an irrelevant, but highly inflammatory illustration by an Exxon employee who made a simple calculation of the volume of MTBE that would result in a given concentration in a body of water.  (Boone Dec., Ex. 11.) That illustration was a mathematical calculation, *not* a statement that MTBE released at any particular site would result in that concentration of MTBE in drinking water. (Second Roy Dec., Ex. 14 (Liguori Deposition Transcript), pp. 133:25-138:15.)<br><br>The fact is irrelevant for purposes of |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| potential impact of "small releases" of MTBE on groundwater. *(Id.* at Figure I-1: Impact of Small Releases.) | evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except Exxon. |
| 45. Similarly, in the late 1990s, Curtis Stanley of Shell also pointed out that "[v]ery small releases of MTBE . . . have the potential to adversely impact groundwater." (Boone Decl., Exh. 10, Nov. 3, 1998, E-mail from C. Stanley to J. Pedley at 1].)<br><br>Mr. Stanley further candidly admitted that MTBE gasoline should not be sold on an indiscriminate basis to gasoline stations where there is inadequate protection from spills, leaks and releases:<br><br>My professional is opinion is MTBE and similar oxygenate should not be used at all in areas where groundwater is a potential drinking water supply. If it is used, engineering design and site operations (including act of subsurface monitoring) should be carefully developed to minimize the potential for release.<br><br>*(Ibid.)* | Disputed based on lack of evidence. Plaintiff's cited evidence (Boone Dec., Ex. 10 [CM/ECF Doc. No. 170, pg. 53-54 of 69]) has been stricken from the record.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except Shell. |
| 46. In 1999, Chevron's personnel put together a "White Paper" on MTBE intended to address questions about stricter regulation of underground storage tanks. (Boone Decl., Exh. 12, Solving | Admit that the statements were made but dispute Plaintiff's argumentative characterization, which has taken the statements out of context. |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| Problems from MTBE Contamination - It's Not Just Regulating Underground Tanks.)  Chevron's White Paper specifically observed that [i]t is because of the differences in physical and chemical properties of MTBE that it is more likely to reach groundwater [at service stations], as a result of incidental spills, overfills and gasoline deliveries, even without underground storage tank leaks." *(Id.* at 2 [emphasis in original].)  Chevron thus also recognized that even small "incidental" spills and releases, caused by individual handling gasoline at the station, had the capacity to reach and contaminate groundwater. More importantly, these types of leaks are only preventable through appropriate education and instruction of the individuals handling the gasoline. | The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.

The statement is also inadmissible hearsay as to all Defendants except Chevron. |
| 47.  In 1999, Curtis Stanley also observed that MTBE releases capable of causing groundwater contamination arose not from the USTs themselves, but from improper handling practices at gasoline stations by owners, operators, and jobbers:

> "You may, however, want to carefully consider what you say when the new tank upgrades are our first line of defense. While this is very true and the size of leaks has decreased substantially over the years, we are still finding MTBE at sites that have been upgraded. The presence of MTBE may not be due to a leak but could also be due to operational and construction factors."

(Boone Decl., Exh. 13, Feb. 2, 1999, E-mail from C. | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.

The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.

The statement is also inadmissible hearsay as to all Defendants except Shell. |

| **Plaintiff's Additional Facts** | **Defendants' Response** |
|---|---|
| Stanley to F. Benton].) | |
| 48.  Shell's engineering coordinator, Glen Marshall, echoed the caution that releases of MTBE gasoline at service stations was dependent on improved and alternative instructions as well as upgrades of the entire UST system.  In 1998, Mr. Marshall warned that the "'Achilles Heel'" of [UST] systems has always been the 'Bubba-factor' . . . the best intentions of hardware manufacturers and designers being ultimately defeated by poor installation and maintenance practices."  (Boone Decl., Exh. 14, May 29, 1998, E-mail from G. Marshall to C. Stanley.)  The maintenance practices Mr. Marshall is referring to are clearly the maintenance practices of service station owners and operators.  A year later, Mr. Marshall continued to advised that "[u]pgrades addressed the inadvertent spills and releases, no root causes of tank or line leaks."  (Boone Decl., Exh. 15, March 12, 1999, E-mail from G. Marshall to C. Stanley.) | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.

The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.

The statement is also inadmissible hearsay as to all Defendants except Shell. |
| 49.  The RDA's expert on underground storage tanks ("USTs"), Marcel Moreau, noted that defendants upgraded their gasoline storage systems, including upgrading from bare steel USTs to fiberglass, at their own gasoline stations in an effort to address the increased risks posed by MTBE.  (Miller Decl., Exh. 1, Expert Report of Marcel Moreau (April 11, 2011) at section III, pp. 16-23.)  Defendants were, in fact, aware of numerous upgrades to USTs, safety | Disputed based on lack of evidence. Plaintiff's cited evidence (Miller Dec., Ex. 1 [CM/ECF Doc. No. 172, pg. 5-12 of 39]) has been stricken from the record.  Plaintiff lacks any evidence that Defendants had any knowledge of the conditions at 1415 and 1455 R Street or what was "necessary" at either site to |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| devices, warning systems, and alternative and improved instructions to service station owners and operators as well as jobbers who delivered gasoline, that were necessary to prevent releases of MTBE gasoline which would contaminate groundwater in Merced. *(Ibid.)* | prevent a release. |
| 50.  The Merced gasoline stations at issue in this motion, unaware of the need for fiberglass tanks or other upgrades, continued to utilize inadequate bare steel UST systems well past the time when MTBE was prevalent in California gasoline. *(Id)*  The evidence shows that many, if not all, of the station owners and operators associated with stations at issue were unsophisticated, and relied upon others, including defendants, to instruct them on how to safely and properly operate and maintain their USTs and gasoline. *(Id.)* | Disputed based on lack of evidence. Plaintiff's cited evidence (Miller Dec., Ex. 1 [CM/ECF Doc. No. 172, pg. 5-12 of 39]) has been stricken from the record.  Plaintiff has no evidence of the sophistication of the owners of the sites or that the owners actually relied on any Defendant to provide instructions regarding how to operate and maintain their stations. |
| 51.  The California regulatory authorities responsible for oversight of releases from underground storage tanks were not advised by the oil industry until the late 1990s that MTBE poses a serious threat to groundwater and drinking water in the State of California.  (Sawyer Decl., Exh. 1, June 25, 1996, Letter from P. Pugnale, Shell Oil Company, to R. Ghirelli, California Regional Water Quality Control Board; and Sawyer Decl., Exh. 2, Letter from C Flanikan, Ultramar to California Environmental Protection Agency.) | Disputed.  Cited evidence does not support that factual statement.  The statement is also irrelevant to the issue of nuisance and trespass.<br><br>The statement is also inadmissible hearsay as to all Defendants except Shell. |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| 52.  Oil industry defendants upgraded their gasoline storage systems ("USTs"), including upgrading from bare steel USTs to fiberglass, at their own gasoline stations in an effort to address the increased risks posed by MTBE.  (Miller Decl., Exh. 1, Expert Report of Marcel Moreau (April 11, 2011) at section III, pp. 16-23.) | Disputed based on lack of evidence.  Plaintiff's cited evidence (Miller Dec., Ex. 1 [CM/ECF Doc. No. 172, pg. 5-12 of 39]) has been stricken from the record. |
| 53.  Tesoro was aware that MTBE was a groundwater contaminant as early as 1996.  (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C. Donovan at 32:1-34:9, and Deposition Exhibit 7 (March 31, 1995 letter from Bruce Bauman). | Admit.  The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.  The statement is also inadmissible hearsay as to all Defendants except Tesoro. |
| 54.  Tesoro was engaged in the 1990's in remediation of multiple stations with MTBE contamination.  (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C. Donovan at 103:11-18.) | Admit.  The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.  The statement is also inadmissible hearsay as to all Defendants except Tesoro. |
| 55.  Tesoro received reports on and attended conferences at which MTBE's characteristics were | Deny.  Plaintiff mischaracterizes Mr. Donovan's testimony.  At one |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| discussed.  (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C. Donovan at 32:1-34:9.) | conference personally attended by Mr. Donovan, MTBE "was raised…as an unknown" (Transcript of Robert C. Donovan at 36:25-37:8); at another, Mr. Donovan received a report from a consultant and was unclear as to what extent MTBE was discussed (*Id.* at 32:6-8) (testifying that a consultant "attended a conference on MTBE, or perhaps a conference that mentioned MTBE"). Mr. Donovan did not testify that MTBE's characteristics were discussed at either conference.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except Tesoro. |
| 56.  Tesoro has been a member of the API from at least 1999, and interacted with API prior to becoming a member.  These interactions included receiving information from API on MTBE and its impacts on groundwater.  (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C. Donovan at 32:1-34:9, and Deposition Exhibit 7 (March 31, 1995 letter from | Admit that Tesoro has been a member of API, but deny that Tesoro was a member from 1999 to the present.  Deny that Tesoro interacted with API prior to becoming a member, including receiving information from API on MTBE and its groundwater impacts.  Plaintiff's |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| Bruce Bauman.) | statements are not supported by the cited evidence.  Mr. Donovan's only testimony regarding the American Petroleum Institute concerns Exhibit 7; Mr. Donovan testified that he had never seen Exhibit 7 and believes the document came to Tesoro with Jeff Baker, who was hired by Tesoro in late summer/early fall of 1998 and brought his files with him at that time. (*Id.* at 96:21-97:2; 97:9-98:9).  This is insufficient to show Tesoro's membership in API or interactions with API.

The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.

The statement is also inadmissible hearsay as to all Defendants except Tesoro. |
| 57.  Tesoro has also been a member of the National Petrochemical Refiners Association since 1971. (Sawyer Decl. Exh. 34, 10/17/05 Letter from D. Martin to R. Greenwald, Tesoro Trade Organization Information Disclosure.) | Admit.
The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| | sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except Tesoro. |
| 58.  Tesoro, however, took no special measures to prevent MTBE contamination. In fact, Tesoro, despite its knowledge, elected to treat gasoline with MTBE no differently than gasoline without MTBE. (Sawyer Decl., Exh. 4, August 31, 2000, Deposition of Robert C. Donovan at 112:9-115:8.) | Deny.  Plaintiff's statement mischaracterizes Mr. Donovan's testimony. Mr. Donovan was never questioned about whether Tesoro elected to treat gasoline with MTBE differently than gasoline without MTBE.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except Tesoro. |
| 59.  An API research proposal, sponsored by an Exxon representative, would have studied the "Fate, Transport, [and] Impact of Gasoline Containing Oxygenates in Groundwater" in order to "respond to regulatory agencies considering the promulgation of more stringent environmental regulations governing oxygenates in gasoline." (Sawyer Decl., Exh. 6, 1988 Health & Environmental Project Proposals.) | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject |

| **Plaintiff's Additional Facts** | **Defendants' Response** |
|---|---|
| | sites.<br><br>The statement is also inadmissible hearsay as to all Defendants. |
| 60.  A year later yet another API research proposal reiterated the need for industry to respond to the claims that MTBE gasoline warranted special handling, stating bluntly:  "At present, industry has no scientific data to refute these claims."  The proposal conceded that there was "a downside risk that the results may show that oxygenates, to some extent, increase groundwater contamination problems from gasoline leaks and spills." (Sawyer Decl., Exh. 8, API Memo dated February 16, 1988.) | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants. |
| 61.  The RDA's complaint alleges that the defendants' "negligent, reckless, intentional and ultra-hazardous activity, including failure to warn of properties of MTBE and the need to take special precautions when handling MTBE, were a substantial factor in creating a nuisance." (Sawyer Decl., Exh. 9, excerpts from First Amended Complaint.) | Admit. |

| **Plaintiff's Additional Facts** | **Defendants' Response** |
|---|---|
| 62.  On December 17, 1986, EPA held a "public focus meeting" for MTBE.  This meeting was attended by representatives of ARCO Chemical Co., Exxon, Texaco, API, and others. The minutes of that meeting make clear that EPA brought to the group's attention the agency's concern about groundwater contamination:<br><br>    An additional concern brought out by [EPA] research was the contamination of ground water supplies by MTBE. There are over 700,000 underground storage tanks for petroleum products in the US and about 30% of these tanks leak.<br><br>(Sawyer Decl., Exh. 10, Minutes for the Public Focus Meeting (NJDEP-MTBE-CONTENTION- 000100-000105)) | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants. |
| 63.  Defendants' response to growing concern about MTBE contamination of groundwater was to stonewall.  An internal Chevron memo summarized the situation as follows:<br><br>    Because of the perceived health effects, local and state regulatory agencies are concerned with the clean-up of ground water containing MTBE . . . Two considerations impact MTBE. One is the potential health risk, and the second is the increased solubility over [BTEX compounds]. .. MTBE is significantly more soluble in water than BTEX. Consequently, the dissolved 'halo' from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants except |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| MTBE as one of the constituents. . . . Further compounding the problem . . . MTBE is more difficult to remove from ground water using current technology . . . Cleanup of a gasoline leak/spill containing MTBE can be expected to initially cost more in capital and O&M than a conventional gasoline leak/spill.<br><br>Industry representatives from Arco, Exxon . . . and Texaco met with EPA in December, 1986 at a 'focus meeting' to discuss MTBE. ARCO's representative felt the EPA's major concern was the potential for ground water contamination .. . Manufacturers of MTBE are attempting to establish an industry group to `negotiate' the test rule with EPA . . . Chevron has experience in three states involving clean-up of ground water containing MTBE (Florida, Maryland and Texas). . . . The possible move to restrict the use of MTBE in Maine appears to be an isolated action and not a trend. However, this could change if other states perceive the threat to ground water to be great or if Maine becomes exceptionally vocal .<br><br>(Sawyer Decl., Exh. 11, Memorandum dated February 13, 1987 (NJDEP-MTBECONTENTION-000055-000057).) | Chevron. |
| 64.  At ARCO's initial request (NJDEP-MTBE-CONTENTION-000106), the API's Groundwater Technical Task Force (whose members included representatives of ARCO, Exxon, Shell, Chevron, Texaco, and BP, among others), attacked the Maine Department of Environmental Protection article even | Admit that the statement was made but dispute Plaintiff's argumentative characterization of that fact, which has taken the statement out of context.<br><br>The statement is irrelevant for purposes |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| though they knew based on their own experiences that the authors were correct:<br><br>    The authors' "recommendations" that MTBE... be either banned as gasoline additives or required double-lined storage tanks is clearly a policy statement and not an objective, credible scientific conclusion. Furthermore, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted and counterproductive.<br><br>(Sawyer Decl., Exh. 12, Memorandum dated January 8, 1987 (NJDEP-MTBECONTENTION-000106) and API letter dated January 28, 1987 (NJDEP-MTBE CONTENTION-000050-000051).) | of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants. |
| 66.  The MTBE producers -- including ARCO, Exxon and Texaco -- formed an "MTBE Committee" to deal with potential regulatory concerns about MTBE. In contrast to their internal concerns about MTBE, the Committee submitted formal comments to EPA insisting that MTBE posed _no_ environmental problems and arguing that environmental testing would be unnecessary and counter-productive in view of MTBE's lack of environmental risks:<br><br>    We believe that the information provided supports the conclusion that MTBE does not represent a drinking water hazard...<br><br>    The following discussion establishes that there is no evidence that MTBE poses any | Disputed based on lack of evidence. Plaintiff's cited evidence (Sawyer Dec., Ex. 14 [CM/ECF Doc. No. 171, pg. 99-100, 102-105 of 107]) has been stricken from the record.<br><br>The fact is irrelevant for purposes of evaluating nuisance and trespass because it does not evidence affirmative conduct with a direct link to the subject sites.<br><br>The statement is also inadmissible hearsay as to all Defendants. |

| Plaintiff's Additional Facts | Defendants' Response |
|---|---|
| significant risk of harm to health or environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exist to reasonably determine or predict that the manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data.<br><br>(Sawyer Decl., Exh. 14 at NJDEP-MTBE-CONTENTION-000058-000066).) | |

Respectfully submitted,

Dated:  May 15, 2013

By _____

JEFFREY J. PARKER
WHITNEY JONES ROY
Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California  90071
Telephone:    (213) 620-1780
Facsimile:    (213) 620-1398
Attorneys for Defendant
EXXON MOBIL CORPORATION and signed with permission on behalf of defendants Chevron U.S.A. Inc., Shell Oil Company, Equilon Enterprises LLC, Tesoro Corporation, and Tesoro Refining and Marketing Company

_____

## PROOF OF SERVICE VIA FILE AND SERVE XPRESS

*City of Merced Redevelopment Agency v. Exxon Mobil Corp., et al.*

I, Laverna A. Henry, the undersigned, hereby declare:

1.  I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and am not a party to the within action.  I am employed by Sheppard, Mullin, Richter & Hampton LLP in the City of Los Angeles, State of California.  My business address is 333 South Hope Street, 48th Floor, Los Angeles, California 90071.

2.  On **May 15, 2013**, I served a copy of the attached document titled **DEFENDANTS' RULE 56.1 REPLY STATEMENT IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT RE NUISANCE AND TRESPASS** on all parties hereto by:

a.  _X_        Posting it directly to the File & Serve Xpress website,

               www.lexisnexis.com/fileandserve

b._____        Sending it via facsimile transmission to LexisNexis File & Serve at approximately

               _____. Pacific Time

c._____        Placing it in an addressed, sealed envelope clearly labeled to LexisNexis File &

               Serve and causing it to be deposited with an overnight mail or courier service for

               delivery the next business day.

I declare under penalty under the laws of the State of California that the foregoing is true and correct.  Executed this **15th** day of **May, 2013**.

_____
Laverna A. Henry