UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | : : : : : : | Master File No. 1:00–1898 MDL 1358 (SAS) M 21-88 |
| This document relates to: | : : | |
| *City of Fresno v. Chevron U.S.A., Inc., et al.,* Case No. 1:04-cv-04973 | : : : : | |

## DECLARATION OF MICHAEL AXLINE IN SUPPORT OF PLAINTIFF CITY OF FRESNO'S OPPOSITION TO CERTAIN DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S NUISANCE

I, Michael Axline, declare:

1.      I am one of the attorneys in this case for plaintiff City of Fresno.  I have been personally involved in much of the discovery and pretrial proceedings in this action.  This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of relevant portions of City of Fresno's First Amended Complaint filed on November 18, 2004,  a true and correct copy of an October 17, 2005, Letter from W. Hughes to R. Greenwald, a true and correct copy of an October 17, 2005, Letter from P. Condron to R. Greenwald, and a true and correct copy of a September 15, 2005, Letter from T. Renfroe to R. Greenwald.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the deposition of Garabed Bedirian taken on April 4, 2011, in this action, and a true and correct copy of excerpts from the deposition of James Clements, taken on March 29, 2011, in this action.

4.      Attached hereto as Exhibit 3 is a true and correct copy of relevant portions of the Chevron Dealer Supply Contract between Chevron U.S.A., Inc. and G.R. Clements dated August 15, 1985, and a true and correct copy of December 30, 1986, Memorandum re: MTBE.

5.      Attached hereto as Exhibit 4 is a true and correct copy of an Aug. 12, 1991, Memorandum, TIP Letter #237, MTBE Effects [CHEV 09564-09567], the Chevron Material Safety Data Sheet dated February 1993, and the Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants, Exhibit B, filed November 11, 2008.

6.      Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the deposition of Jatinder Dhillon taken on August 11, 2011, in this action, and a true and correct

2

copy of excerpts from the deposition of Joel Mascitelli taken on July 26, 2000, in this action.

7.      Attached hereto as Exhibit 6 is a true and correct copy of relevant portions of the Expert Report of Marcel Moreau dated Nov. 2, 2011, a true and correct copy of relevant portions of the Expert Rebuttal Report of Marcel Moreau dated March 5, 2012, a true and correct copy of a March 12, 1999,  Email from G. Marshall to C. Stanley, and a true and correct copy of January 20, 1999 email from Hugh Dickey to multiple recipients attaching "Solving Problems from MTBE Contamination - It's Not Just Regulating Underground Tanks."

8.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the deposition of Imtiaz Ahmad, taken on February 16, 2011, in this action, a true and correct copy of relevant portions of Valero Defendants' Responses to First Set of Interrogatories dated November 5, 2008, a true and correct copy of relevant portions of  Valero Corporate Representative Deposition, Early Knowledge and Taste & Odor Issues, and  a true and correct copy of Defendant Ultramar, Inc.'s Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005 (Oct. 17, 2005).

9.      Attached hereto as Exhibit 8 is a true and correct copy of the Declaration of Alexander Blagojevic dated May 4, 2000, and a true and correct copy of  excerpts from the May 6, 1999 deposition of Curt Stanley, taken in this action.

10.      Attached hereto as Exhibit 9 is a true and correct copy of a March 31, 1981, Internal Arco Memo from R.N. Roth to MTBE File, a true and correct copy of excerpts from the deposition of  Ben Thomas taken on November 15, 2000, in this case, a true and correct copy of a June 14, 1984, Arco Chemical Company Internal Correspondence from B. Hoover to S. Ridlon, and a true and correct copy of a March 26, 1991, Memorandum, Chemical Entry Review for

for MTBE.

11.     Attached hereto as Exhibit 10 is a true and correct copy of a May 13, 1998 Email from C. Stanley to C. Parkinson, a true and correct copy of a June 11, 1986, Memorandum, to O.T. Buffalow, San Francisco, CA, from D.W. Callahan, re Marketing Environmental Concerning Regarding the use of MTBE in MOGAS,  a true and correct copy of a July 14, 1993, Email from C. Stanley to D. McGill,  a true and correct copy of a May 14, 1998, Email from C. Stanley to K. Bell, et al., a true and correct copy of a November 3, 1998, Email from C. Stanley to J. Pedley, a true and correct copy of relevant portions of  MTBE Release Source Identification at Marketing Sites dated March 30, 1999, a true and correct copy of a February 2, 1999, Email from C. Stanley to F. Benton, and a true and correct copy of a May 29, 1998, Email from G. Marshall to C. Stanley..

12.     Attached hereto as Exhibit 11 is a true and correct copy of a June 18, 1984, Memo from S. Cragg, API, to MTBE Task Force, and a true and correct copy of relevant portions from Hydrocarbons and Organic Chemicals in Groundwater Water - Prevention, Detection and Restoration, dated November 12-14, 1986.

13.     Attached hereto as Exhibit 12 is a true and correct copy of a June 25, 1996, Letter from P. Pugnale, Shell Oil Company, to R. Ghirelli, California Regional Water Quality Control Board and a true and correct copy of a September 29, 1997, letter from C Flanikan, Ultramar, to California Environmental Protection Agency, with enclosure.

14.     Attached hereto as Exhibit 13 is a true and correct copy of a June 30, 1994 Ultramar Material Safety Data Sheet.

15.     Attached hereto as Exhibit 14 is a true and correct copy of Chevron U.S.A. Inc.'s

4

Supply Declaration dated April 18, 2011, and  a true and correct copy of relevant portions of

Dealer Management Development Program, Health, Safety & Environment Participation Guide

16.      Attached hereto as Exhibit 15 is a true and correct copy of April 27, 1995 MTBE

in Groundwater issues and a true and correct copy of Shell MSDS dated October 7, 1994.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15 th  day of May, 2013, at Sacramento, California.

MICHAEL AXLINE

# EXHIBIT 1



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------X

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

This Document Relates To:

CITY OF FRESNO

                    Plaintiff,

CHEVRON U.S.A. INC.; CHEVRON
ENVIRONMENTAL SERVICES COMPANY;
SHELL OIL COMPANY; EXXON CORPORATION;
TOSCO CORPORATION; UNOCAL
CORPORATION; UNION OIL COMPANY OF
CALIFORNIA; KERN OIL & REFINING
COMPANY; VALERO REFINING COMPANY-
CALIFORNIA; VALERO MARKETING AND
SUPPLY COMPANY; [DOE 1]; TESORO
PETROLEUM CORPORATION [DOE 2]; TESORO
REFINING AND MARKETING COMPANY, INC.
[DOE 3]; TEXACO REFINING AND MARKETING
INC.; ULTRAMAR INC.; ARCO
CHEMICAL COMPANY; LYONDELL
CHEMICAL COMPANY; COASTAL CHEM, INC.;
EXXON MOBIL CORPORATION;
CONOCOPHILLIPS CORPORATION; ATLANTIC
RICHFIELD COMPANY; EQUIVA
SERVICES LLC; TEXACO, INC.; EQUILON
ENTERPRISES LLC; CHEVRONTEXACO
CORPORATION; NEW WEST PETROLEUM;
DUKE ENERGY MERCHANTS, LLC; DUKE
ENERGY TRADING AND MARKETING, LLC;
PACIFIC SOUTHWEST TRADING; NORTHRIDGE
PETROLEUM MARKETING U.S., INC.; DUKE
ENERGY MERCHANTS CALIFORNIA, INC.; NEW
WEST PETROLEUM, LLC;
WESTPORT PETROLEUM INC.; NELLA
OIL COMPANY, LLC; CITGO PETROLEUM
CORPORATION [DOE 20]; AND DOES 4
THROUGH 200, 202 THROUGH 400, and
403 THROUGH 600, inclusive,

                    Defendants.

----------------------------------------X

Master File C.A. No. 1:00-Civ.-1898

MDL No 1358 (SAS)

Case No. 04 CV-04973 (SAS)

Transferred from:
United States District Court for
the Northern District of California
Case No. C 03-5378 JSW
(Honorable Jeffrey S. White)

Removed from:
Superior Court of California,
County of San Francisco,
Case No. CGG-03-425649

**FIRST AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

FEB-22-2005 16:11 From:Keating & Walker

13. Defendant Union Oil Company of California ("Union Oil") is a California corporation with its principle place of business in El Segundo, California.

14. Defendant Kern Oil & Refining Company ("Kern Oil") is a California corporation with its principal place of business located in Long Beach, California.

15. Defendant Valero Refining Company-California ("Valero Refining") is a Delaware corporation with its principle place of business in San Antonio, Texas, and doing business in California.

16. Defendant Valero Marketing and Supply Company ("Valero Marketing") is a Delaware corporation with its principal place of business in San Antonio, Texas, and doing business in California. Valero Marketing and Supply Company is named in place of DOE 1.

17. Defendant Tesoro Petroleum Corporation ("Tesoro") is a Delaware corporation with its principal place of business in San Antonio, Texas, and doing business in California. Tesoro is named in place of DOE 2.

18. Defendant Tesoro Refining and Marketing Company, Inc. ("Tesoro Refining"), a wholly owned subsidiary of Tesoro, is a Delaware corporation with its principal place of business in San Antonio, Texas, doing business in California. Tesoro Refining is named in place of DOE 3.

19. Defendant Texaco Refining and Marketing Inc. ("TRMI") is a Delaware corporation with its principal place of business in New York.

20. Defendant Ultramar, Inc. ("Ultramar") is a Nevada corporation with its principal place of business in San Antonio, Texas.

21. Defendant Exxon Mobil Corporation ("ExxonMobil") is a New Jersey corporation with its principal place of business located in Texas. Plaintiff is informed that Exxon Mobil was formed on or about November 30, 1999 as a result of a merger of Mobil Corporation and Exxon Corporation and is a successor in interest to Exxon Corporation and Mobil Corporation.

22. Defendant ConocoPhillips Corporation ("Conoco") is a Delaware Corporation doing business in California and is a successor in interest to Tosco Corporation.

23. Defendant ChevronTexaco Corporation ("ChevronTexaco") is a Delaware corporation with its headquarters in San Ramon California. Plaintiff is informed and believes that

4

ChevronTexaco Corporation is a successor in interest to certain Chevron-related and Texaco-related entities.

24. Defendant Equilon Enterprises LLC ("Equilon") is a Delaware Limited Liability Company. Plaintiff is informed and believes that Equilon Enterprises LLC is a successor in interest to certain Shell-related and Texaco-related entities.

25. Defendants Chevron USA, Shell, Exxon, Tosco, Unocal, Union Oil, Kern Oil, Valero Refining, Valero Marketing, Tesoro, Tesoro Refining, TRMI, Ultramar, ExxonMobil, Conoco, ChevronTexaco, Equilon and DOES 4 through 100, will be collectively referred to hereafter as the "Refiner Defendants." The Refiner Defendants, and each of them, owned and/or operated gasoline refineries that manufactured and supplied gasoline containing MTBE and/or TBA to locations in the vicinity of Fresno's water system, such that releases of such products to the subsurface contaminated and polluted the water system. Among other things, these defendants (1) designed, formulated, refined, manufactured, promoted, marketed, distributed, transported, packaged, exchanged and/or sold gasoline containing MTBE and/or TBA, which is contaminating, polluting and threatening Fresno's public water supplies; (2) owned, operated, and/or controlled gasoline delivery systems including, but not limited to, gasoline stations, gasoline storage, transfer, delivery, and dispensing systems (collectively herein "gasoline delivery systems") in areas affecting Fresno's water system; (3) were legally responsible for and committed each of the multiple tortious and ongoing wrongful acts alleged in this complaint; (4) participated in one or more enterprises to promote MTBE and/or TBA and/or gasoline containing MTBE and/or TBA; (5) negligently designed, constructed, installed, fabricated, owned, operated, controlled, inspected and/or repaired gasoline delivery systems from which MTBE and/or TBA is contaminating, polluting, and threatening the water system; (6) negligently and/or intentionally failed and refused to take appropriate remediation action to abate MTBE and/or TBA plumes when MTBE and/or TBA escaped from the gasoline delivery systems; and (7) in doing the tortious and wrongful acts alleged in this complaint, acted in the capacity of aider, abettor, joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the remaining DOE and named defendants.

5



 Wallace
King
Domike
Branson

WALLACE KING DOMIKE & BRANSON, PLLC
1050 THOMAS JEFFERSON STREET, N.W.
WASHINGTON, DC 20007

Phone 202.204.1000
Fax 202.204.1001

William F. Hughes
Direct Dial 202.204.3727
bhughes@wallaceking.com

October 17, 2005

*Via LexisNexis File & Serve*

Robin L. Greenwald
Weitz & Luxenburg, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038-4925

      **Re:**   *In re: MDL 1358 Products Liability Litigation*

Dear Ms. Greenwald:

On behalf of the Chevron Defendants, this letter provides information responsive to Judge Scheindlin's August 12, 2005 directive regarding disclosure of involvement in national and regional trade associations on issues related to oxygenates and/or underground storage tanks ("USTs"). Based upon their investigation thus far, the Chevron Defendants provide the following information:

**American Petroleum Institute**

Defendant Chevron Corporation[1] has been a member of the American Petroleum Institute ("API") since a date prior to the relevant time. On various occasions during the relevant time period, certain employees of Chevron Corporation and/or affiliated entities, including defendant Chevron U.S.A. Inc., participated in various API committees that may have addressed certain matters related to oxygenates and/or USTs. These committees include: (1) Ad Hoc MTBE Coordination Group; (2) Soil/Groundwater Technical Task Force; (3) MTBE Research Group; (4) RFG Certification Work Group; (5) Ad Hoc RFG Certification Protocol Subgroup; (6) Section 211(b) Research Group; (7) Ad Hoc Oxygenates Group; (8) Clean Air Act Ad Hoc Committee on PPC; (9) Toxicology Committee; (10) Petroleum Industry Workgroup on Methanol Research; (11)

---

[1] Chevron Corporation has operated under several names during the relevant time period: (1) Standard Oil Company of California (from a date prior to 1979 until July 1984), (2) Chevron Corporation (July 1984-Oct. 2001 and May 2005-present), and (3) ChevronTexaco Corporation (Oct. 2001-May 2005). These entities are referred to collectively herein as Chevron Corporation.


Wallace
King
Roelke
Branson

Robin L. Greenwald
October 17, 2005
Page 2

Fuels Committee; (12) Fuels Task Force; (13) Water Subcommittee·Water Quality and Water Protection Task Force; and/or (14) Vehicle Emissions Task Force.[2]

## Western States Petroleum Association

Defendant Chevron Corporation and/or affiliated entities have belonged to the Western States Petroleum Association ("WSPA") since a date prior to the relevant time period.[3] On various occasions during the relevant time period, employees of Chevron Corporation and/or affiliated entities participated in the following WSPA committees that may have addressed certain matters related to oxygenates and/or USTs: (1) MTBE Task Force; (2) Ad Hoc MTBE Task Force; (3) Ad Hoc WSPA MTBE Treatability Task Force; (4) RFG Advocacy Task Force; (5) Fuels Subcommittee RFG Compatibility Issues Technical Task Force; (6) Ad Hoc RFG Group; (7) Remediation Task Force; (8) Toxic Air Contaminant Task Force; and/or (9) Ad Hoc Group on MTBE.

## Other Industry Organizations

On various occasions during the relevant time period, Chevron Corporation and/or affiliated entities (including defendant Chevron U.S.A. Inc.) were members of and/or participated in the following industry associations that may have addressed certain matters involving oxygenates and/or USTs: (1) Independent Petroleum Association of America; (2) Interstate Technology Resource Council; (3) National Petrochemical Refiners Association; (4) National Petroleum Council; (5) Petroleum Environmental Research Forum; (6) Reformulated Gasoline Survey Association; (7) Resource Environmental, LLC; (8) Society of Automotive Engineers; (9) Society of Independent Gasoline Marketing America; (10) Western Petroleum Marketers Association; and/or (11) certain divisions of U.S. Oil & Gas.

The Chevron Defendants provide this information to the best of their knowledge. The Chevron Defendants are continuing their investigation and reserve the right to amend and/or supplement this response should they discover additional information.

---

[2] Prior to 1984, defendant Chevron U.S.A. Inc. was known as Gulf Oil Corporation. From a date prior to the relevant time period until approximately 1984, Gulf Oil Corporation was a member of API. Defendant Texaco Inc. was a member of API from a date prior to the relevant time period until 2001.

[3] Prior to 1988, WSPA was known as the Western Oil and Gas Association.

**Wallace**
**King**
**Domike**
**Branson**

WALLACE KING DOMIKE & BRANSON, PLLC
1050 THOMAS JEFFERSON STREET, N.W.
WASHINGTON, DC 20007

Phone 202.204.1000
Fax 202.204.1001

PETER C. CONDRON
Direct Dial 202.204.3707
pcondron@wallaceking.com

October 17, 2005

**VIA LEXIS/NEXIS FILE AND SERVE**

Robin L. Greenwald, Esq.
Weitz & Luxenburg, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038-4925

Re:     *In re: MDL 1358 Products Liability Litigation*

Dear Ms. Greenwald:

On behalf of the Shell Defendants, this letter provides information responsive to Judge
Scheindlin's August 12, 2005 directive regarding disclosure of participation in national
and regional petroleum industry trade associations that focus on issues related to
oxygenates and/or underground storage tanks ("USTs"). Based upon their investigation
thus far, the Shell Defendants submit the following membership information:

**American Petroleum Institute (API)**

Shell Oil Company has been a member of API from 1950 though the present. During this
period, representatives of Shell Oil Company and/or its various affiliates and subsidiaries
may have participated in the following subcommittees and task forces: the 211(b)
Research Group, the Ad Hoc Committee on MTBE, the Ad Hoc MTBE Coordination
Group, the Fuels Committee, the Fuels Group Program, the Fuels Task Force, and the
Soil/Groundwater Technical Task Force.

**Louisiana Mid-Continent Oil & Gas Association (LMOGA)**

Shell Oil Company and members of its various affiliates and subsidiaries, including
Equiva Enterprises, Motiva Enterprises and Shell Oil Products US f/k/a Equilon
Enterprises, have been members of LMOGA since at least 1980. During this period,
representatives of Shell Oil Company and/or its various affiliates and subsidiaries may
have participated in the Subcommittee on Air that was originally formed to consider the
Clean Air Act Amendments of 1990.

Wallace
King
Domike
Branson

### Mid-Continent Oil and Gas Association

Shell Oil Company and/or its various affiliates and subsidiaries are current members of the Mid-Continent Oil and Gas Association.

### National Petrochemical and Refiners Association (NPRA)

Shell Oil Company has been a member of NPRA from 1999 through the present.

### National Petroleum Council (NPC)

Shell Oil Company and/or its various affiliates and subsidiaries have been members of NPC since 1946.

### Petroleum Environmental Research Forum (PERF)

Shell Oil Company and/or its various affiliates and subsidiaries are current members of PERF.

### Petroleum Marketers Association of America (PMAA)

Shell Oil Company has never been a member of PMAA. Shell Oil Company does support PMAA, though, through a corporate sponsorship.

### Reformulated Gasoline Survey Association

Shell Oil Company and/or its various affiliates and subsidiaries are current members of the Reformulated Gasoline Survey Association.

### Society of Independent Gasoline Marketers of America (SIGMA)

Shell Oil Company and/or its various affiliates and subsidiaries have been members of SIGMA since 1992 through the present.

### Western Petroleum Marketers Association (WPMA)

Shell Oil Company and/or its various affiliates and subsidiaries, excluding Motiva Enterprises and Equiva Enterprises, are current members of WPMA.

### Western States Petroleum Association (WSPA)

Shell Oil Company has been a member of WSPA since a date prior to the relevant time period. During this time, representatives of Shell Oil Company and/or its various affiliates and subsidiaries may have participated in the MTBE Task Force subcommittee.





Tracie J. Renfroe
Partner

711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Office  713.221.1404  800.887.1993
Fax  713.221.2123
tracie.renfroe@bracewellgiuliani.com

September 15, 2005

*Via LexisNexis File & Serve*

Robin L. Greenwald
Weitz & Luxenberg
180 Maiden Lane, 17th Floor
New York, New York 10038

      Re:    MDL 1358 – Valero and Ultramar Defendants' Trade Organization Information

Dear Ms. Greenwald:

In accordance with the Court's directive at the August 12, 2005 Status Conference and in your capacity as Plaintiffs' liaison counsel, this letter provides information on Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing Company, and Valero Refining Company-California's[1] ("Valero Defendants") and Ultramar Inc., Ultramar Energy, Inc., Ultramar Limited, TPI Petroleum, Inc., and Colorado Refining Company's ("Ultramar Defendants") membership in the American Petroleum Institute ("API"), Oxygenated Fuels Association ("OFA"), and OFA MTBE Committee.

## API

Valero Defendants have never been members of API. API records indicate that Hill Petroleum Company was a member of API from 1980-81, prior to this entity's affiliation with Valero Defendants beginning in 1997. Additionally, API records indicate that Ultramar Refining was a member of API from 1989-90; Ultramar Inc. was a member of API in 1991; and Ultramar Corporation was a member of API from 1992-93.

---

    [1] Plaintiffs' complaints filed in Connecticut, Iowa, and New York also name Valero Refining Company, a non-existent entity.



Robin L. Greenwald
September 15, 2005
Page 2

### OFA

Valero Energy Corporation was a member of OFA from 1993 until the organization's dissolution in 2004. Phibro Energy was apparently a member of OFA from 1994-95, prior to this entity's affiliation with the Valero Defendants in 1997. Ultramar Defendants have never been members of OFA.

### MTBE Committee

Valero Defendants and Ultramar Defendants have never been members of the MTBE Committee.

Valero Defendants and Ultramar Defendants reserve the right to amend or supplement this information in the future if necessary.

Very truly yours,

Bracewell & Giuliani LLP

Tracie J. Renfroe

TJR/tds

cc:     All counsel via LexisNexis File & Serve

# EXHIBIT 2

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3

 4  In re:  Methyl Tertiary Butyl )  Master File No.
    Ether ("MTBE") Products       )  1:00-1898
 5  Liability Litigation          )  MDL 1358 (SAS)
    _____)

 6

 7

    This Document Relates To:
 8

 9  CITY OF FRESNO,                )
                                   )
10          Plaintiff,             )
                                   )
11      vs.                        )        CASE NO.
                                   )  04 Civ. 4973 (SAS)
12  CHEVRON U.S.A., INC., et al.,  )
                                   )
13          Defendants.            )
    _____)

14

15

16

17    VIDEOTAPED DEPOSITION OF GARABED BEDIRIAN

18

19         Monday, April 4, 2011, at 9:41 a.m.

20

21         2800 North Green Valley Parkway

22                Henderson, Nevada

23

24

           REPORTED BY:  PEGGY S. ELIAS, RPR
25     Nevada CCR No. 274 - California CSR No. 8671
```

Deposition of Garabed Bedirian / April 4, 2011

1    Q.  Thank you.
2        (Exhibit No. 12 was marked for
3    identification.)
4    BY MR. STEEVES:
5        Q.  I'm handing you what's been marked as
6    Exhibit 12 (handing). It's an Underground Storage Tank
7    Testing Permit Application, looks like for the County
8    of Fresno, Bates number FCDEH-FRESNO-005977.
9        Have you seen this document before?
10   A.  Yeah, I remember. Those papers, they all
11   look alike. I used to have all this paperwork, but
12   then after ten years passed, I threw them away.
13   Q.  It looks like -- excuse me. It looks like,
14   on this document, both the underground storage tank and
15   the piping was tested using the Petro Type II method.
16       Does that comport your -- with your
17   recollection as to the method of testing that was used?
18       THE INTERPRETER:  What kind of method you
19   said? What kind of method was used?
20       MR. STEEVES:  Petro Type II.
21       THE WITNESS:  What kind of -- I don't
22   understand what kind of tube it is.
23   BY MR. STEEVES:
24   Q.  Under the tank tester information, a company
25   named -- listed Able Service Company.

Page 34

1    Do you recall that company?
2    A.  Yeah. I used to call them.
3    Q.  What did you use them for at the site?
4    A.  I don't know why we used, but they came to do
5    the test. I don't understand the system they do it.
6    Q.  Do you recall how often they came out to do
7    testing?
8    A.  My job was mechanic. I didn't understand
9    from a gas station -- it was all new stuff for me.
10   They used to come and do every year testing, and I used
11   to pay them. They used to give me copies.
12       They used to give me copies, and they used to
13   send a copy to the government, and I didn't know the
14   name of the companies, but I used to ask Jensen, and he
15   used to tell me who to call and gave me the names. It
16   should have been a satisfied company licensed in order
17   to do this kind of job.
18       (Exhibit No. 13 was marked for
19   identification.)
20   BY MR. STEEVES:
21   Q.  I'll hand you what I've marked as Exhibit 13
22   (handing). It's an Official Inspection Report from
23   Fresno County Health Services Agency, Bates numbers
24   FCDEH-FRESNO-006007 through 008.
25       On the -- on the first page, there's a number

Page 35

1    two circled. It says very minor weeping was seen on
2    dispensers.
3        Do you recall ever being alerted to weeping
4    on your -- on your dispensers at the station?
5        THE INTERPRETER:  Weeping is like hitting
6    something, weeping? What do you mean by "weeping"?
7        MR. DAVIS:  I'll object that the term
8    "weeping" is vague and ambiguous.
9        THE WITNESS:  I don't understand what it
10   means.
11   BY MR. STEEVES:
12   Q.  Okay. That's fine.
13       Do you know what MTBE is?
14   A.  No. If you explain, maybe I'll understand
15   it.
16   Q.  Well, MTBE refers to methyl tertiary butyl
17   ether. It's an additive some companies put in the
18   gasoline to comply with Clean Act -- Clean Air Act
19   requirements.
20       So if I refer to "MTBE," will you understand
21   what I'm referring to?
22   A.  Yeah. There was paper that I used to get for
23   air pollution, but I didn't know exactly what it was
24   for.
25   Q.  Do you recall if you ever sold gasoline

Page 36

1    containing MTBE at your station?
2    A.  I don't know.
3    Q.  Do you recall who delivered your gasoline to
4    the station at the time you owned it?
5    A.  From what -- first day till the last day, I
6    always bought it from Jensen. No one else.
7    Q.  Do you recall if you bought a particular
8    brand of gasoline?
9    A.  There were two kinds, the unleaded and the
10   super unleaded.
11   Q.  Do you recall if you purchased a particular
12   brand from a particular company, oil company?
13   A.  Jensen was Chevron, and I know that all my
14   signs were Chevron, and the trucks that came, they were
15   all Chevron trucks.
16   Q.  The trucks that delivered gasoline to your
17   station were Chevron trucks?
18   A.  Yes, they were. I have all the Chevron signs
19   on it.
20   Q.  Do you recall how often gasoline was
21   delivered to your station?
22   A.  Every time we felt that it was really low, we
23   used to call them, and the second day morning they were
24   there right away delivering.
25   Q.  Did you generally make the calls for ordering

Page 37

Deposition of Garabed Bedirian  /  April 4, 2011

1   gasoline?
2       A.  Yes.
3       Q.  Did you keep records of your orders?
4       A.  I used to, but I don't have them.  I threw
5   them away, all.
6       Q.  Do you know where Jensen picked up the
7   gasoline from to deliver it to your station?
8       A.  I don't know.  I don't know.
9           A couple of times I had to go to their
10  office, and I saw the big -- for -- to share problems,
11  accounting problems, and I saw it was a big place, and
12  they had big, big tanks, but I don't know where they
13  bought it from.
14      Q.  When you say "their office," you mean Jensen?
15      A.  Yes.  They have a big place, and they have
16  big tanks, and every tank was hundred meter.
17      Q.  You mentioned that you had Chevron signs at
18  the station.
19          Were you a branded station?
20      A.  Yes, when I bought it, there was signs of
21  Chevron everywhere, and I ordered couple of them, and
22  they brought couple of them more.  But when I got out
23  of it, they came and picked it up, the signs.
24      Q.  What types of signs did you have at your
25  station?  Were they just logo signs?  Did you have --

Page 38

1   well, strike that.
2           Did you have a logo -- Chevron logo, logo
3   sign, at your station?
4       A.  Yes.  There was one on a pole.  That was the
5   old one that was there for a long time on the pole.  It
6   was beginning of the Chevron, and I bought with the
7   lights, the ones that -- I ordered with the lights.
8       Q.  Did you have any Chevron logos on your
9   gasoline dispensers?
10      A.  Yes.
11          (Exhibit No. 14 was marked for
12  identification.)
13  BY MR. STEEVES:
14      Q.  I'll hand you what has been marked as
15  Exhibit 14 (handing).  This is a copy of a business
16  card you brought in today.
17          Is that the business card you used when you
18  owned the station?
19      A.  Yes.
20      Q.  And is that Chevron's logo in the upper right
21  corner?
22      A.  Yes.
23      Q.  Did Chevron ever provide you any training for
24  operating the station?
25      MR. DAVIS:  Objection, lacks foundation,

Page 39

1   assumes facts not in evidence.
2       THE WITNESS:  They didn't teach me any
3   classes or anything, but my experience wasn't on gas.
4   It was a mechanic.  You see the number 45 here?  I've
5   been 45 years in the business (indicating).
6   BY MR. STEEVES:
7       Q.  45 years in the business, do you mean 45
8   years as an auto mechanic?
9       A.  Yes, yes.
10      Q.  Did you operate any gas stations prior to
11  opening the Van Ness Auto Repair?
12      A.  No.  I had a garage, mechanic garage, body
13  shop.
14          (In English)  But no gas.  First time I work
15  in this place as a gas station and mechanic.
16          (Through interpreter)  Well, the first time I
17  work in this place, gas station and mechanic, it's --
18  it's a small place.  This is the smallest business I
19  did in my lifetime.  Before that -- because of my age,
20  but before that I have big businesses.
21      Q.  Did you ever work directly for an oil or gas
22  company?
23      A.  Yes, I have worked oil and gas companies, but
24  in order to take care of their cars but not gas part
25  specific.

Page 40

1       Q.  So you worked as an auto mechanic?
2       A.  Yes.
3       Q.  You testified that you ordered more signs
4   from Chevron.
5           Did someone from Chevron bring those signs to
6   you?
7       A.  Yes, they came and hooked it up, and then at
8   the end they came and picked it up.
9       Q.  Did anybody from Chevron ever inspect your
10  station?
11      MR. DAVIS:  Objection, lacks foundation,
12  assumes facts not in evidence.
13      THE WITNESS:  They used to come and check it
14  out every time for cleanliness, and even they gave me a
15  prize.  Because my place was an older place, the prize
16  that I got because it was the cleanliest [sic] place,
17  the cleanest place.
18  BY MR. STEEVES:
19      Q.  How often did they inspect your station?
20      MR. DAVIS:  Objection.  Hold on one second.
21      THE WITNESS:  Most of the time I never knew
22  that you could come and fill up a gas tank and go to
23  the bathroom, they asked for the key, and then they
24  checked everywhere, and then suddenly I used to get a
25  letter that they were there.

Page 41

11 (Pages 38 to 41)

Page 65

```
1   BY MR. STEEVES:
2       Q.   Did Chevron ever give you any warnings
3   regarding environmental contamination from gasoline
4   containing MTBE?
5            MR. DAVIS:  Same objections.
6            THE WITNESS:  I don't remember.  I don't
7   remember getting anything, whatever it contains, the
8   gas, or anything like that.  I know that there's two
9   kinds of gas, and that's all I know.
10  BY MR. STEEVES:
11      Q.   Did Chevron ever give you any material safety
12  data sheets for their gasoline?
13           MR. DAVIS:  Objection, lacks foundation.
14           THE WITNESS:  Yes, they send me safety
15  instructions; like if you spill on the floor, what you
16  have to do, what -- who you have to call, but I never
17  had a problem, so I didn't have to.
18  BY MR. STEEVES:
19      Q.   Do you still have that document?
20      A.   I don't think so.
21           If I was a person that was continuing the
22  business, even though if I sold the place without --
23  had a place, another place that I was continuing, I
24  would have kept all those paperwork, but I got out,
25  completely out of it, so I didn't want to keep anything
```

Page 66

```
1   anymore.
2       Q.   Do you recall what protocol was described in
3   the material safety data sheets for gasoline spills,
4   for cleaning up gasoline spills?
5       A.   All I remember, there was a number to call in
6   case that happened.  That's all I remember, but I don't
7   remember anything else.
8       Q.   Did you ever have to call that number
9   regarding the gasoline spill?
10      A.   No, no.  No, I never needed...  I'm very
11  clean.  When it comes -- I'm very disciplined and very
12  clean in the business.
13      Q.   You testified that your gasoline was
14  delivered by truck.
15           Do you recall ever seeing gasoline spilled
16  when the underground storage tanks were filled?
17      A.   No.  No, it never happened that way.  In the
18  past there were some trucks, the old trucks, and they
19  had only one pipe, and they told me that it used to
20  leak, but when they came to me, they had the new
21  trucks, and they had the double piping, and we never
22  had any accident, no.  No, nothing like that happened
23  to us.
24      Q.   Do you recall ever seeing any drips or spills
25  when customers filled up their gas -- or their cars
```

Page 84

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF NEVADA  )
                       )    ss:
 3    COUNTY OF CLARK  )

 4         I, Peggy S. Elias, a Certified Court Reporter

 5    licensed by the State of Nevada, do hereby certify:

 6    That I reported the deposition of GARABED BEDIRIAN, on

 7    Monday, April 4, 2011, at 9:41 a.m.

 8         That prior to being deposed, the witness was

 9    duly sworn by me to testify to the truth.  That I

10    thereafter transcribed my said stenographic notes via

11    computer-aided transcription into written form, and

12    that the typewritten transcript is a complete, true and

13    accurate transcription of my said stenographic notes.

14    That review of the transcript was requested.

15         I further certify that I am not a relative,

16    employee or independent contractor of counsel or of any

17    of the parties involved in the proceeding; nor a person

18    financially interested in the proceeding; nor do I have

19    any other relationship that may reasonably cause my

20    impartiality to be questioned.

21         IN WITNESS WHEREOF, I have set my hand in my

22    office in the County of Clark, State of Nevada, this

23    17th day of April, 2011.

24

25         _____
             PEGGY S. ELIAS, RPR, CCR NO. 274
```

Page 1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2                      -oOo-

3    _____

4    In re: Methyl Tertiary Butyl
     Ether ("MTBE") Products
5    Liability Litigation
                                    Master File No.
6    _____   1:00-1898

7    This Document Relates To:
                                    Case No.
     City of Fresno                 MDL 1358(SAS)
8    v. Chevron U.S.A. Inc., et al.,
     Case No. 04 Civ. 4973
9    _____

10

11          DEPOSITION OF JAMES CLEMENTS

12          March 29, 2011 at 9:00 (10:03) a.m.

13          Before:   ERIC L. JOHNSON
                      RPR, CSR #9771
14
            Taken at:
15          Fresno, California

16

17

18

19

20

21

22

23

24

25

Page 25

1  think the 1,000 gallon tank was the premium tank and
2  that was the one closest to the office.
3      Q.  Okay.  So you think the tank identified as
4  Tank 1 on this precision test would be the tank south of
5  the store on --
6      A.  That is correct.
7      Q.  Okay.  Under brand supplier, it says Chevron.
8          Do you recall if Chevron supplied the gas for
9  this station?
10     A.  You have to -- no, I didn't buy any gasoline
11  from Chevron when I owned the station.  My dad did from
12  1926 -- or 1928, I should say, until 1986, he dealt
13  directly with Chevron.  When my dad passed away, within
14  a couple of days after his death Chevron cancelled the
15  contract with me, with the station, per se, and I had to
16  go to R.V. Jensen & Company, which is a jobber, a local
17  distributor here in town, and they handled Chevron
18  products.  So I didn't buy anything direct from Chevron.
19  It was through R.V. Jensen & Company here in town.  They
20  were a jobber or a distributor or whatever you want to
21  call it.
22     Q.  And you said R.V. Jensen & Company used Chevron
23  products?
24     A.  They were --
25         MR. DAVIS:  Objection.  One second.  Objection;

Page 26

1  overbroad, vague as to time period and location.
2          THE WITNESS:  What?
3          MR. DAVIS:  I said -- you can read my
4  objections back if you want to.
5          (Record read)
6          MR. STEEVES:  Q.  I think the question pending
7  is you just stated that R.V. Jensen & Company used
8  Chevron products.  Correct?
9      A.  They were a Chevron distributor and I bought
10  from them.
11     Q.  Do you recall the contact person with R.V.
12  Jensen?
13     A.  No.  There were a couple out there, I don't
14  remember who they were.
15     Q.  Do you know if R.V. Jensen & Company used any
16  other suppliers?
17     A.  No, sir, I don't.
18     Q.  Do you recall the date that your contract --
19  your father's contract with Chevron was cancelled?
20     A.  No.
21     Q.  You said it was sometime in 1986; is that
22  correct?
23     A.  Yeah, it was in 1986.
24     Q.  Who is responsible for -- who at the station
25  was responsible for ordering gasoline?

Page 27

1      A.  Terry Kraft.
2      Q.  Do you know where Mr. Kraft is today?
3      A.  I have no idea.  I haven't seen him since '91.
4      Q.  Do you recall how gasoline was delivered to
5  your site by R.V. Jensen?
6      A.  In a truck.  Tanker truck.
7      Q.  Do you know where that gas was picked up from
8  before it was delivered to you?
9      A.  I assume out of their facility, which was south
10  of town there.  They had a -- R.V. Jensen was a
11  distributor for Chevron, and they had a plant out south
12  of town.  I assumed that's where they got it, because it
13  was always in an R.V. Jensen truck, so I --
14     Q.  You stated that you sold the station in 1991;
15  is that correct?
16     A.  Yes.
17     Q.  Do you recall the approximate date?
18     A.  I wish I could tell you, but I don't want to be
19  quoted as to the approximate -- 1991.  I don't remember
20  the month.
21     Q.  Do you recall who you sold the station to?
22     A.  A fellow by the name of Garabed Bedirian.
23         MR. STEEVES:  I will hand you what's been
24  marked as Exhibit 6.
25         / / / /

Page 45

1   I can do it from over here.  I'd just like to mark next
2   in order, this is Exhibit No. 7.
3          (Deposition Exhibit 7 marked
4          for identification)
5   FURTHER EXAMINATION BY MR. DAVIS
6       MR. DAVIS:  Unfortunately, for the record, I --
7   for the record, we have got a Bates labeling error here.
8   I do not believe these are going to be the correct Bates
9   numbers for the case, but in any event, this is the copy
10  that I have, so I will just refer to this as Exhibit
11  No. 7.  This is a Chevron dealer supply contract dated
12  August 15th, 1985.
13      Q.  Mr. Clements, if you will look at the last
14  page --
15      A.  Okay.
16      Q.  -- it appears to me that your father -- is that
17  J.R. Clements on the last page -- G.R.?
18      Q.  G.R.  I am sorry.  G.R. Clements?
19      A.  That is correct.
20      Q.  And is that his signature?
21      A.  Yes, sir.
22      Q.  Do you know if you have ever seen this document
23  before?
24      A.  I have never seen it.  This is the first time I
25  have seen this.  I have never ever seen it.

Page 46

1       Q.  So when Chevron -- I believe earlier you
2   testified that Chevron cancelled their supply contract
3   with your father around the time --
4       A.  No, with me.
5       Q.  With you.  Would this be the contract you think
6   they cancelled?
7       A.  Had to be, if this is all you have.
8       Q.  You never saw this before?
9       A.  No, sir.
10      Q.  If you look at eight pages in, I think it is
11  marked page eight at the -- in the bottom, in the center
12  of the page.  There is a section called Unleaded
13  Gasoline.
14      A.  On eight you say, sir?
15      Q.  Yes.
16      A.  What are we looking for now?
17      Q.  There is a section that's titled Unleaded
18  Gasoline, paragraph 12A.
19      A.  Okay.  Right.
20      Q.  Could you take a moment to read that --
21      A.  Sure.
22      Q.  -- paragraph for me?
23      A.  Do you want me to read it?
24      Q.  You can read it to yourself.  It begins with
25  "The motor fuels covered by this contract include

Page 47

1   unleaded gasoline."
2       A.  Okay.
3       Q.  Just let me know when you have finished reading
4   it.
5       A.  Okay.
6       Q.  I have shown you this document hoping that it
7   will refresh your recollection of that time period.
8           Does this remind you that as early as 1985,
9   Chevron was providing warnings about the need to handle
10  gasoline with care?
11      MR. STEEVES:  Objection; lack of foundation,
12  calls for speculation.
13      THE WITNESS:  Well, this would indicate they
14  are, but I never had any -- if you are asking me, I
15  never had any direct contact with anybody from Chevron
16  regarding this.
17      MR. DAVIS:  Q.  .Based on conversations you had
18  with your father, did you ever find out from him that it
19  was important to Chevron that gasoline was handled with
20  care?
21      A.  No, sir.
22      Q.  You just knew that from your -- from being in
23  business with your father?
24      A.  That's right.
25      Q.  You don't know what the source of -- you

Page 48

1   understood for the entire time you operated the station
2   that you needed to handle with care -- gasoline with
3   care?
4       A.  Yes.
5       Q.  You don't know one way or the other if Chevron
6   was the source of where you learned that information?
7       A.  Correct.
8       Q.  Is that your father's signature on the last
9   page?
10      A.  Yes, it is.
11      Q.  Based on what you have seen here, is it your
12  understanding that Chevron did then inform your father
13  of the importance of handling gasoline with care?
14      MR. STEEVES:  Objection; lack of foundation,
15  calls for speculation.
16      THE WITNESS:  I would suggest, based upon this
17  contract, if he read it he was certainly apprised of the
18  situation.
19      MR. DAVIS:  Was it your father's policy --
20  objection -- strike that.  I will pass the witness.
21      MR. STEEVES:  I have nothing else.
22      MR. DAVIS:  No further questions.
23      MR. STEEVES:  Anybody on the phone?
24      MR. ORLACCHIO:  None for me.
25      MS. WINTTERLE:  No questions.

Deposition of James Clements / March 29, 2011

Page 51

```
 1    STATE OF CALIFORNIA      )
                               (      ss.
 2    COUNTY OF STANISLAUS     )

 3         I, ERIC L. JOHNSON, do hereby certify that I am a

 4    licensed Certified Shorthand Reporter, duly qualified

 5    and certified as such by the State of California;

 6         That prior to being examined, the witness named in

 7    the foregoing deposition was by me duly sworn to testify

 8    to tell the truth, the whole truth, and nothing but the

 9    truth;

10         That the said deposition was by me recorded

11    stenographically at the time and place herein mentioned;

12    and the foregoing pages constitute a full, true,

13    complete and correct record of the testimony given by

14    the said witness;

15         That I am a disinterested person, not being in any

16    way interested in the outcome of said action, or

17    connected with, nor related to any of the parties in

18    said action, or to their respective counsel, in any

19    manner whatsoever.

20

21         DATED:  April 18, 2011

22

23                              _____

24                              Eric L. Johnson, CSR, RPR

25
```

# EXHIBIT 3

Dealer Employer Identification No. (EIN)   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          S.S. No. C019-1328

## CHEVRON DEALER SUPPLY CONTRACT
(Owner Dealer)

Dated: August 15, 1985

PREMISES AND TERM

    1.    Chevron U.S.A. Inc. ("Company") agrees to sell to **G. R. Clements** ("Dealer") and Dealer agrees to purchase from Company such quantities of the Chevron brand gasolines ----- ("Chevron motor fuels") sold by Company generally to service stations in Dealer's locality as are necessary to serve customer demand for Chevron motor fuels at Dealer's premises at **2740 Van Ness Blvd., Fresno, CA 93704** (the "premises") for a term commencing on the 1st day of January, 1986, and ending on the 31st day of December, 1988.

USE OF PREMISES

    2.    (a)    Dealer acknowledges that there is a demand for Chevron motor fuels and Chevron brand motor oils (hereinafter sometimes collectively referred to as "Chevron products") at the premises, which is enhanced by Company's advertising and other promotions thereof, and agrees continuously to stock at the premises and to offer for sale such quantities of Chevron products as are necessary to serve customer demand therefor. Dealer acknowledges the financial benefit to Dealer of selling and prominently displaying Chevron products due to the high regard of the motoring public for service stations selling under the Chevron trademarks and trade names, and Dealer agrees at all times to give the dispensing equipment, displays and advertisements for Chevron products and brands as prominent and convenient positions as those for any other product offered for sale on the premises and not to disparage or diminish in any way by act or omission the good reputation of such trademarks, trade names, products or service stations.

    (b)    Dealer agrees to devote sufficient time to the personal management of the premises so as to provide for the continued proper operation thereof as a service station, to maintain and operate the premises in a clean, safe and healthful manner with an appearance that is inviting to the motoring public, to render professional driveway and automotive service to customers by providing trained, acceptably groomed and uniformed service station personnel in numbers adequate to handle available business, to operate and manage the premises and cause customers to be treated in such a manner as to eliminate customer complaints to the extent possible, to comply with all applicable Federal, state and local laws and regulations relevant to the use and operation of the premises or the resale of all products purchased by Dealer under this Contract, and to supply Company with all information which Company shall reasonably request to enable Company to comply with all applicable Federal, state and local laws and regulations. Company and its authorized representatives shall have the right at any time to enter upon the premises to confirm the performance by Dealer of Dealer's obligations under this Contract.



EXHIBIT

7

Clements 3-29-11

CONFIDENTIAL (per 2004 MDL 1358 Order)                                                 CHEVMDL1358_FRES_ 00000002419

## DELIVERIES--PRICES--TAXES

3.   (a)   Deliveries shall be made (except at Company's option) in full bulk transport quantities and on reasonable notice (preferably at least forty-eight (48) hours) at the premises in Company's customary manner using equipment selected by Company.

(b)   The prices Dealer shall pay Company for Chevron motor fuels hereunder shall be Company's prices to Dealer in effect at the time and place of delivery for the particular product, grade, quantity and type of delivery involved, as established by Company from time to time. Dealer shall, except at Company's option, pay Company net cash at the time of delivery for Chevron motor fuels and any other resale merchandise which Dealer may purchase from Company.

(c)   Any tax, duty, toll, fee, impost, charge or other exaction, or the amount equivalent thereto, and any increase thereof now or hereafter imposed, levied or assessed by any governmental authority upon, measured by, incident to or as a result of the transactions herein provided for (other than local, state and Federal net income taxes measured by the net income of Company from all sources), or the transportation, importation, production, manufacture, use or ownership of the goods the subject of this Contract shall, if collectible or payable by Company, be paid by Dealer on demand by Company.  Any such payment shall be in addition to the prices otherwise herein provided for.

## TRADEMARKS, TRADE NAMES AND COLOR SCHEMES

4.   (a)   The products purchased by Dealer under this Contract shall be sold by Dealer as the products of Company and only under the trademarks and trade names authorized for such products by Company.  Dealer shall not at any time offer for sale under such trademarks and trade names any product not authorized by Company to be sold thereunder.  Dealer shall conduct Dealer's business so as to eliminate any likelihood of confusion between Company's products and those of others and so as to eliminate any likelihood of substitution or commingling of the products of others as or with those of Company.  Dealer agrees to abide by such reasonable regulations to this end as Company may from time to time establish by written notice to Dealer.  Without limitation on the foregoing, Company shall have the right at any time to take samples of Chevron motor fuels from the premises for testing purposes, compensating Dealer (at Dealer's cost, which for this purpose shall be based on Company's prices to Dealer hereunder in effect at the time the product is taken, or, at Company's option, in kind) for any products so taken.

(b)   Dealer recognizes Company's right to use and authorize others to use all trademarks, service marks, trade names, color schemes and service station designs (collectively "insignia") utilized by Company to identify products and services, and Dealer agrees not to claim any right, title or interest therein.  Dealer acknowledges the need to control Dealer's use of such insignia in order to maintain the validity thereof and to assure the continued recognition of, acceptance by and high regard of the motoring public for products and services identified by such insignia.  Accordingly, Dealer agrees that Dealer shall use such insignia only in such manner as may be approved by Company and that Company may from time to time change such insignia and its promotional materials as it sees fit.  Dealer shall not use any such insignia in Dealer's corporate name if Dealer is a corporation, nor permit the use of any such insignia in the name of any corporation in which Dealer has an interest.  All signs advertising Company's products and all signs in the colors used by Company to identify its products or the places at which its products are sold and all rights therein are and shall continue to be the property of Company.  Dealer shall not use any such signs except in connection with products manufactured or handled by Company and only in such manner as may be approved by Company.  Company may, during the term of this Contract, and within a reasonable period thereafter, remove or obliterate such signs, and repaint so much of the premises as it elects, in a color or colors selected by it.  If Company removes or obliterates any signs or repaints any of the premises, Company need not restore any pre-existing signs on or paint schemes of the premises.

-2-

CONFIDENTIAL (per 2004 MDL 1358 Order)

Dealer may not use other signs to advertise products purchased from Company without Company's prior written consent. No other signs (except motor fuel price signs) shall be placed on a sign pole containing a sign advertising a product manufactured or handled by Company. Dealer shall not, during the term of this Contract or thereafter, simulate in any way any insignia identifying Company's products or the places or outlets where they are sold or marketed. Upon termination of this Contract, Dealer shall immediately return to Company all signs supplied to Dealer by Company and shall immediately discontinue any and all use of such insignia and shall obliterate such insignia from all real or personal property utilized by Dealer. Dealer likewise shall obliterate such insignia from any real or personal property of Dealer before selling any such property to a third party.

(c) Company shall have the right at any time during the term of this Contract to change, alter or amend any of the trademarks and trade names under which the motor fuels covered by this Contract are now or may hereafter be sold. If Company shall at any time during the term of this Contract discontinue the marketing in Dealer's locality of any or all of the motor fuels covered by this Contract, Company shall be relieved of all obligation to sell or deliver such discontinued product to Dealer and, if Company shall market any other product in lieu of the discontinued product, this Contract shall embrace the new product and all of the terms and conditions hereof previously applicable to the discontinued product shall apply to the new product.

CONDUCT OF DEALER'S BUSINESS

5.   (a)  Dealer is engaged in an independent business and nothing herein contained shall be construed as granting to Company any right to control Dealer's business or operations or the manner in which the same shall be conducted, Dealer's obligation to Company hereunder being the performance of the terms and conditions of this Contract. Company has no right to hire or fire any employees of Dealer or to exercise any control over any of Dealer's employees, all of whom are entirely under the control and direction of Dealer, who shall be responsible for their acts and omissions. Dealer accepts exclusive liability for all contributions and payroll taxes required under Federal Social Security laws and State Unemployment Compensation laws or other payments under any laws of similar character as to all persons employed by or working for Dealer.

(b)  Dealer shall indemnify, defend and hold harmless Company, Company's parent company, Chevron Corporation, the subsidiary and affiliated companies of each of them (collectively "Company and its affiliates"), and their respective directors, officers, agents and employees, from and against all expense (including attorneys' fees), liability and claims of whatsoever kind and nature, including but not limited to those for damage to property (including Dealer's property) or injury to or death of persons (including Dealer), directly or indirectly resulting, or alleged to result, from anything occurring from any cause on or about or in connection with the maintenance, upkeep, repair, replacement, operation or use of the premises, or anything located thereon.

PREVENTION OF PERFORMANCE--SHORTAGE OF SUPPLY

6.   (a)  There shall be no obligation to sell or deliver or to receive or use the petroleum products covered by this Contract when and while, and to the extent that, the receiving or using or manufacture or making deliveries in the customary manner are prevented or hindered by act of God, fire, riot, labor disturbances (whether involving employees of the party affected or of others and regardless of whether the disturbance could be settled by acceding to the demands of a labor group), accident, war or the acts of any government (whether foreign or domestic, Federal, state, county or municipal) or any causes beyond the reasonable control of the party affected, whether or not similar to any of the foregoing causes. In cases of partial or total interruption or loss or shortage of transportation facilities or supplies, or shortage of products deliverable hereunder, Company may allocate deliveries of available products among Dealer, Company's other customers, contract or

-3-

otherwise, including Company's affiliates, and Company for its own use, on any basis which in Company's sole judgment is fair and reasonable, allowing for such priorities as Company deems appropriate.

(b) Due to uncertainties in the supply/demand situation (which may include a decision by Company that the costs of some crude oil and petroleum products which might be available are unreasonable), Company may not have sufficient supplies of one or more of the petroleum products covered by this Contract to meet the full requirements of Dealer, of Company's other customers, contract or otherwise, including Company's affiliates, and of Company for its own use. Whenever that situation exists and Company's performance hereunder is not otherwise excused, Company may allocate deliveries of available products on any basis which in Company's sole judgment is fair and reasonable, allowing for such priorities as Company deems appropriate.

(c) Allocation is fair and reasonable even if it is based on a shortage in the then contemplated sources of supply or a general shortage in Company's system or on historical or planned deliveries. "Company's system" means the supply system of Company and its affiliates.

## TERMINATION

7.   (a) Dealer may terminate this Contract without cause at any time during the term hereof upon giving Company written notice of such termination.

(b) Company may, in addition to such other remedies as Company may have (including but not limited to the right to terminate this Contract as otherwise provided herein) and subject to any valid requirements of any applicable statute, terminate this Contract upon giving Dealer ninety (90) days' prior written notice of such termination or, if it would not be reasonable for Company to give ninety (90) days' prior written notice, at Company's election upon giving Dealer prior written notice for such lesser period as is reasonable in the circumstances, if any one of the following occurs:

(1)   Dealer by act or omission breaches or defaults on any covenant, condition or other provision of this Contract, which breach or default can be cured, and Dealer fails to cure such breach or default within ten (10) days after such written notice of termination from Company which shall specify such breach or default; or

(2)   Dealer by act or omission breaches or defaults on any covenant, condition or other provision of this Contract which breach or default cannot be cured, or in the event of any breach or default by Dealer after notice of two previous breaches or defaults of any kind has been given hereunder, regardless of Dealer's curing such previous breaches or defaults; or

(3)   Dealer fails to exert good faith efforts to carry out the provisions of this Contract following written notice to Dealer from Company of such failure and a reasonable opportunity to exert good faith efforts to carry out such provisions; or

(4)   Dealer fails to pay to Company in a timely manner when due all sums to which Company is legally entitled (whether or not such sums are owed to Company under this Contract); or

(5)   Dealer knowingly fails to comply with Federal, state or local laws or regulations relevant to the use or operation of the premises; or

(6)   Willful adulteration, commingling, mislabeling or misbranding of motor fuels or other violations by Dealer of trademarks utilized by Company; or

-4-

CONFIDENTIAL (per 2004 MDL 1358 Order)

CHEVMDL1358_FRES_00000002422

(7)   This Contract, or any interest therein, is assigned or otherwise transferred contrary to the provisions of section 9 hereof; or

(8)   Dealer vacates, abandons, transfers or is deprived of possession of the premises; or

(9)   Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Dealer relevant to the operation of the premises; or

(10)   Continuing severe physical or mental disability of Dealer of three (3) months' duration which renders Dealer unable to provide for the continued proper operation of the premises as a service station; or

(11)   Failure by Dealer to operate the premises as a service station for seven (7) consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time; or

(12)   Conviction of Dealer of any felony involving moral turpitude; or

(13)   Dealer's death.

Without limitation on the foregoing, it is agreed that upon the occurrence of any of the events specified in clauses (6) through (13) of this subsection (b) it would not be reasonable for Company to give ninety (90) days' prior written notice, that ten (10) days' notice would be reasonable in such circumstances, and that in any such circumstance Company may elect to terminate this Contract upon giving Dealer ten (10) instead of ninety (90) days' prior written notice of such termination.

(c)   If during the term hereof Company decides to withdraw from marketing motor fuels through retail outlets in the relevant geographic market area in which the premises are located, Company may terminate this Contract by giving Dealer one hundred eighty (180) days' prior written notice of such termination and otherwise complying with any applicable requirements of law, including the Federal Petroleum Marketing Practices Act.

(d)   Waiver by Company of one or more breaches or defaults hereunder shall not be deemed to be a waiver of any other or continuing breach or default hereunder. No modification of this Contract, and no waiver of any provision hereof, shall be binding on Company unless in writing and signed by Company.  Termination of this Contract shall not relieve Dealer of responsibility for obligations incurred prior to termination.  Upon termination of this Contract, subject to any valid requirements of any applicable statute, neither Company nor any incoming Dealer shall have any obligation to purchase from Dealer any of Dealer's inventory, tools, equipment or supplies.

(e)   If Company continues to accept orders from Dealer for motor fuels following expiration of the term of this Contract, such sales shall be upon all of the terms and conditions hereof; provided that such sales shall not be construed to evidence a renewal of this Contract by operation of law or otherwise, but shall imply only an agreement from day to day, which Company may (subject to any valid requirements of any applicable statute) terminate without cause at any time upon giving Dealer written notice of such termination.

-5-

CONFIDENTIAL (per 2004 MDL 1358 Order)

CHEVMDL1358_FRES_00000002423

## FACILITIES

8.    Company has delivered to or installed for (or shall deliver to or install for) Dealer the following facilities to be used by Dealer at the premises:

| | | | | Monthly Rent |
|---|---|---|---|---|
| Chevron I.D. Signs: | of Type | @ | $ /mo. | $ -0- |
| Chevron I.D. Signs: Pump Block | of Type | @ | $ /mo. | $ |
| Lighter Boxes: | No. of | @ | $ /mo. | $ -0- |
| | | TOTAL MONTHLY RENT | | $ -0- |

Dealer shall pay Company, in advance, each month for use of such facilities the total monthly rent specified above. In connection with the use by Dealer of such facilities, Dealer agrees to be responsible for loss of or damage to such facilities and agrees not to remove any of such facilities from the premises. Title to such facilities and all trademark and service mark rights Company may have in the same shall at all times remain in Company, and Company shall have the right at any time to remove any or all of such facilities on notice to Dealer thereof, refunding to Dealer any unearned, prepaid rental.

## ASSIGNMENT

9.    This Contract is personal to Dealer, and Dealer shall not, subject to any valid requirements of any applicable statute: assign this Contract, or any interest therein (either voluntarily or by operation of law) by assignment or other arrangements having similar effect; or become associated with any other person, directly or indirectly, as a partner or otherwise in regard to Dealer's interest or operations under this Contract.

## INSURANCE

10.    (a)   Dealer shall maintain, at Dealer's own expense during the term hereof, insurance with respect to Dealer's business, the premises and all activities on or about or in connection with the premises of the types and in the minimum amounts described generally as follows:

(1)    Garage Liability Insurance or Comprehensive General Liability Insurance (bodily injury and property damage) of not less than $500,000 combined single limit per occurrence, including explosion hazard, personal injury, premises-operations, products and completed operations, blanket contractual and independent contractors liability coverages; and

(2)    Business Auto Liability Insurance (bodily injury and property damage) of not less than $500,000 combined single limit per occurrence on all nonowned automobiles, all tow trucks and service vehicles which are owned, hired or leased by Dealer, and all vehicles bearing the hallmark or other insignia used by Company, which are owned, hired or leased by Dealer ; and

(3)    Environmental Impairment Liability Insurance (bodily injury and property damage) of not less than $500,000 combined single limit of liability, including gradual seepage, pollution and cleanup costs; and

-6-

CONFIDENTIAL (per 2004 MDL 1358 Order)

(4)   Full Worker's Compensation and Employer's Liability Insurance covering all employees of Dealer; and

(5)   Any other insurance or surety bonding that may be required by applicable Federal, state and local laws and regulations; and

(6)   Excess liability insurance of not less than $1,000,000 per occurrence in excess of the insurance required under clauses (1), (2), (4) (except Worker's Compensation) and (5) above, affording not less than the same coverage and including personal injury and property damage coverage.

(b)   The insurance required under clauses (1), (2), (3), (5) and (6) of subsection (a) above shall include Company and its affiliates as additional insureds except with regard to occurrences that are the result of their sole negligence.

(c)   The insurance required under clauses (1), (2), (3), (5) and (6) of subsection (a) above shall provide that it is primary coverage with respect to Dealer, Company and all other additional insureds.

(d)   The insurance required above shall provide that no cancellation or material change in any policy shall become effective except upon thirty (30) days' prior written notice to Company.

(e)   The insurance companies shall have no recourse against Company, or any other additional insured, for payment of any premiums or assessments under any policy issued by a mutual insurance company.

(f)   Dealer shall furnish certificates satisfactory to Company as evidence that the insurance required under subsection (a) above is being maintained.

(g)   Dealer shall be responsible for all deductibles in all of Dealer's insurance policies.

(h)   Dealer's indemnity and other obligations shall not be limited by the foregoing insurance requirements.

## CORPORATE DEALER--OPERATOR

11.   (a)   The personal qualifications of each Company dealer are of material significance to Company, other retail service stations displaying Company's insignia, and the motoring public.  When Company accommodates an individual's desire to do business in corporate form by entering into this Contract with the corporation, this is done with the understanding that, although it is only the corporate Dealer that enjoys rights under this Contract, those rights are conditioned on the individual remaining actively involved with and responsible for the operation of the service station and retaining control of the corporation.  Accordingly, if Dealer is a corporation and subject to any valid requirements of any applicable statute, Dealer agrees that the references to "Dealer" in clauses (9), (10), (12) and (13) of subsection 7(b) hereof are amended hereby to read "Dealer or any Operator" and that Dealer's rights under this Contract are subject to the following conditions being met throughout the term of this Contract, which Dealer shall cause the following named individual N/A ("Operator") to meet:

(1)   Operator shall perform Dealer's obligations under subsection 2(b) hereof to devote sufficient time to the personal management of the premises so as to provide for the continued proper operation thereof as a service station; and

-7-

CONFIDENTIAL (per 2004 MDL 1358 Order)

(2)     Operator shall own all right, title and interest, legal and beneficial, in and to a majority of the voting stock and any other stock of Dealer (as well as a majority thereof after giving effect to the conversion of all securities convertible into stock of Dealer and taking into account the issuance of any additional stock or securities convertible into stock) and Operator shall not pledge or otherwise hypothecate any such stock or securities, or permit or suffer any lien or encumbrance to be placed thereon, or grant proxies or enter into stockholder or other agreements which limit in any manner Operator's control of Dealer, or otherwise create, permit or suffer legal, beneficial or other rights or interests to exist in others with regard to any such stock or securities; and

(3)     Operator shall guarantee the performance of all of Dealer's obligations under this Contract.

(b)     The occurrence of any event, whether voluntary, involuntary, direct or indirect, by operation of law, by merger or other corporate proceedings or otherwise caused, which results in Operator having less than a majority of the voting and other stock of Dealer as required by clause (2) of subsection (a) above or any action otherwise in breach of clause (2) of subsection (a) above shall be construed as an assignment of this Contract for the purposes of section 9 hereof.

## UNLEADED GASOLINES

12.     (a) The motor fuels covered by this Contract include unleaded gasolines, which products are subject to Federal air pollution laws and regulations on fuels and fuel additives. Those regulations impose directly on Dealer and Company specific legal obligations regarding the quality control, distribution, sale and dispensing of unleaded gasolines. Accordingly, Company has established certain programs and procedures for the handling of unleaded gasolines. Dealer recognizes the importance to Company and to Dealer of Dealer meeting fully all governmental requirements covering unleaded gasolines. Dealer agrees to comply with Company's programs and procedures for handling unleaded gasolines in their present or future form and promptly to contact Company if Dealer has any indication whatsoever that contamination of unleaded gasolines may occur or may have occurred in order that Company may, at its option, conduct a test of such product. Company's representatives shall have the right at any time to enter upon the premises where unleaded gasolines purchased hereunder are stored by or for Dealer and to take such quantities of unleaded gasolines as they deem necessary to check the quality of such products, compensating Dealer (at Dealer's cost, which for this purpose shall be based on Company's prices to Dealer hereunder in effect at the time the product is taken, or, at Company's option, in kind) for any products so taken. Dealer shall comply fully with all applicable Federal, state and local laws and regulations pertaining to unleaded gasolines, including but not limited to specific compliance with the regulatory provisions which:

(1)     Prohibit the sale, dispensing or offering for sale of gasoline represented to be unleaded gasoline unless it meets the requirements for unleaded gasoline defined in the Federal regulations; and

(2)     Prohibit introduction, or causing or allowing introduction of leaded gasoline into any motor vehicle which is labeled "unleaded gasoline only," or which is equipped with a gasoline tank filler inlet which is designed only for the introduction of unleaded gasoline; and

(3)     Require that all gasoline pumps, from which leaded gasoline is introduced into motor vehicles, be equipped with a nozzle spout having a terminal end with an outside diameter of not less than 0.930 inches (2.363 centimeters); and

-8-

CONFIDENTIAL (per 2004 MDL 1358 Order)

(4)     Require that all gasoline pumps, from which unleaded gasoline is introduced into motor vehicles, be equipped with a nozzle spout which meets the following specifications: (i) the outside diameter of the terminal end shall not be greater than 0.840 inches (2.134 centimeters); (ii) the terminal end shall have a straight section of at least 2.5 inches (6.34 centimeters) in length; (iii) the retaining spring shall terminate 3.0 inches (7.6 centimeters) from the terminal end; and

(5)     Require that the following notice be displayed in the immediate area of each pump island:

"Federal Law Prohibits the Introduction of Any Gasoline Containing Lead or Phosphorus Into Any Motor Vehicle Labeled 'UNLEADED GASOLINE ONLY' "; and

(6)     Require that unleaded gasoline pumps have affixed a label stating: "Unleaded Gasoline"; and

(7)     Require that leaded gasoline pumps have affixed a label stating: "Contains lead anti-knock compounds."

(b)     Dealer shall comply fully with all documents, manuals and other written communications pertaining to unleaded gasolines, which Company has distributed or may distribute at any time in the future to Dealer.

(c)     Dealer's indemnity obligation under subsection 5(b) of this Contract shall include, but not be limited to, any and all expense (including attorneys' fees), liability, claims, fines, civil penalties or demands which may arise or be assessed as a result of any act or omission of Dealer or Dealer's agents or employees in handling unleaded gasolines hereunder, or as a result of failure by any of them to follow Company's programs and procedures for handling unleaded gasolines.

(d)     If Dealer fails to comply with the requirements regarding unleaded gasolines as hereinabove set forth, then Company, in addition to such other remedies as Company may have, shall have the right to terminate delivery of unleaded gasolines to Dealer or to suspend such delivery until Company is satisfied that Dealer is again in compliance therewith.

PRIOR SUPPLY CONTRACTS

13.     This Contract shall not become effective if, prior to the commencement of the term hereof, Company notifies Dealer of Company's election to exercise any right Company may have to terminate any prior supply contract with Dealer covering the delivery of motor fuels to the premises. In such event this Contract shall be null and void.   Subject to the foregoing, effective as of the commencement of the term hereof, this Contract supersedes and terminates all prior supply contracts between Company and its affiliates and Dealer covering the delivery of motor fuels to the premises, provided that any outstanding breach by Dealer of any such prior supply contract shall be deemed to be a breach of this Contract and the occurrence of any event authorizing the termination of any such prior supply contract shall authorize the termination of this Contract.

NOTICE

14.     All notices to be given under this Contract shall be in writing and shall be posted by certified mail or personally delivered to Company at 2 Annabel Lane, Suite 200, San Ramon, CA 94583 and to Dealer at the premises or such other address as either party may designate by written notice to the other in the manner herein provided.

-9-

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

CHEVRON U.S.A. INC.

By _____

_____
G. R. Clements

Dealer

The undersigned Operator hereby agrees that Operator shall perform and comply with the provisions of section 11 of this Contract and hereby guarantees to Company the performance of all of Dealer's obligations under this Contract.

_____

Operator

MS-9266(7-85)

-10-

CONFIDENTIAL (per 2004 MDL 1358 Order)

CHEVMDL1358_FRES_ 00000002429

**Memorandum**                    San Francisco, CA
                                  December 30, 1986


<u>MTBE</u>


MR. R. L. ARSCOTT:

Chevron USA Downstream has used MTBE in gasoline for a number of years.
Future use as an octane enhancer is likely to increase; and government
actions may stimulate additional use to reduce CO emissions from motor
vehicles and/or to reduce the aromatics in gasoline. We are currently
evaluating the economics of building an MTBE plant.

Recently, we have learned of concerns about potential adverse health and
environmental effects of MTBE.  For example, the attachments indicate
that:

   * The U.S. Interagency Testing Committee has recommended chronic
     inhalation toxicity testing with monitoring of concentrations at
     terminals and service stations, and

   * The Maine Department of Environmental Protection has recommended
     either banning MTBE or imposing special storage requirements to
     protect groundwater.

Marketing has also heard of some concern in Europe that may spill over
to the U.S.

We would appreciate your assessment of available information concerning
health and environmental effects of MTBE and of the potential for
additional government limitations on the use of MTBE in gasoline.


                                  D. B. SMITH

BB:jsc                            Original Signed by
                                  DIXON B. SMITH        Original Signed by
cc: Mr. C. L. Blackwell                                 M.A. JAVINSKY
    Mr. O. T. Buffalow
    Mr. D. W. Callahan
    Mr. R. D. Cavalli
    Mr. H. S. Quillicy
    Mr. E. E. Spitler
    Mr. R. W. Yose


bcc: JPG
     MAJ
     WBK
     WHL
     DAB

                                                        CH 009137

# Alcohol Week

An exclusive report on alcohol fuels and feedstocks    Vol. 7  No. 47  December 8, 1986

## MAINE CALLS FOR DROPPING MTBE: CITES IT AS GROUNDWATER CONTAMINANT

A report detailing the hazards of methyl tertiary butyl ether (MTBE) as a groundwater contaminant has just been released by the Maine Dept. of Environmental Protection. According to the report, MTBE is not highly toxic but does spread through an aquifer more rapidly than other gasoline components, thereby concentrating in the residual gasoline while contaminating drinking wells beyond the radius where gasoline would normally reach. The report concludes that MTBE should either be banned from addition to gasoline or at least stored in extra-secure containers.

MTBE was found to be soluble in water at 4.3%, compared to the relative insolubility of benzene at 0.18%, toluene at 0.05% and xylene at 0.02%. Since benzene, toluene and xylene are more soluble in ethers than in water they, along with the larger hydrocarbon molecules of gasoline, tend to linger and concentrate while the MTBE rushes into fresh water supplies, the report says.

Although Maine has set a maximum contaminant level for MTBE at 50 parts per billion (ppb), concentrations of 690 ppb were discovered in a drinking well near a gasoline/MTBE blend spill. At that site,

(continued on page 7)

the concentration of other gasoline components was only 10 ppb. The well nearest the spill had concentrations of up to 126,000 ppb gasoline plus MTBE, the report states. At another site, total concentrations exceeded 600,000 ppb in contrast to usual maximum concentrations for gasoline components near spills of only 10-20,000 ppb. The point is that MTBE not only leads other hydrocarbons through the aquifer but, as it spreads away, concentrates the remaining hydrocarbons, one of the authors said.

"Groundwater contaminated with MTBE is difficult to remediate," the report states. Carbon filtration is not cost-effective for MTBE since a 2-cu-ft bed used to treat household water only lasts a month or less at MTBE concentrations of as low as 10 ppb.

The report states that MTBE, now one of the top 50 chemicals produced in the U.S., is a very popular oxygenate in lieu of tetra-ethyl lead. Some 30 plants now produce MTBE; Texas Petrochemicals and ARCO are the largest producers. An additional 20 plants are planned, the report states. Of the U.S. 60,000 barrels/day MTBE production, 95% originates in Texas. MTBE was first produced by ARCO in the 1960s when the company patented a process for removing branched olefins like isobutylene from hydrocarbons streams, the report states. The isobutylene is then combined with methanol. MTBE was not commercially produced until 1979 and production has increased by about 40% each year since 1980, the report states. It is currently used in about 10% of the U.S. gasoline supply but the proportion of gasoline blended with MTBE is expected to increase dramatically in coming years. Although the U.S. Environmental Protection Agency allows blending up to 11%, it is usually added at between 2% and 7% and mostly in unleaded premium gasolines.

Claims made about MTBE are that it has an octane blending value greater than that of toluene, reformate or alkylate; is compatible with all types of automobile materials; does not phase-separate as alcohols do; and that its use in gasoline reduces carbon monoxide and hydrocarbon emissions in most cars, the report states.

Not only does MTBE's greater solubility and lower ability to stick with soil and biological particles mean that its plume around a leak is greater than that of other gasoline components, but it also acts as a cosolvent for the gasoline components, thereby dragging them along behind, the report says. "The result is that the sum total of all dissolved gasoline components in groundwater is increased."

Although MTBE is not particularly toxic and is not carcinogenic, it has a "terpene-like" or "chemical" odor. "Our first contamination case, in 1964, was initially mistaken for one of hazardous waste leachate because of the unusual smell," it states. The odor can be detected at water concentrations as low as 20-50 ppb, the report states. Years after a spill, most of the plume will be only MTBE as the other gasoline components are biodegraded.

The report gives four reasons for concern over the toxicity of MTBE and its presence in domestic well waters: it is very mobile in groundwater so that its concentration in a well may vary radically from week to weeks; plumes of MTBE in groundwater are associated with plumes of gasoline with its more varied and toxic components; MTBE is an irritant; and MTBE is probably a nervous system depressant like other ethers, and benzene, toluene and xylene.

MTBE is not the only villain when it comes to gasoline spills, however, the report says. The report offers three approaches regarding the MTBE problem, some of which would indirectly indict other gasoline additives including ethanol and methanol. Firstly, the report states that there is reason enough to call for the abandonment of MTBE as an additive in gasoline stored underground. Similarly, other octane enhancers including ethanol, methanol, and tertiary butyl alcohol may be equally soluble and have similar environmental effects to MTBE. Secondly, if MTBE use must continue, it by itself and when blended in gasoline should be stored only in double-contained facilities.

CH009138

# EXHIBIT 4

MEMORANDUM

San Francisco, CA
August 12, 1991

TIP Letter # 237
MTBE Effects

**REGIONAL MANAGERS:**

As you all know Methyl-tertiary-butyl-ether (MTBE) is widely used in gasoline throughout our distribution network. The oxygenated fuel requirements in the recent reauthorization of the federal Clean Air Act will only increase the use of MTBE and its concentration in our gasolines. In light of this, we thought it prudent to pass on some facts concerning the potential effects, both environmental and budgetary, of a spill or leak of gasoline containing MTBE into the groundwater. This information may help you to prioritize sites due for UST upgrades (ie. spill containment, release detection, etc.).

Typically, benzene is the component that determines the extent of a dissolved hydrocarbon plume and is the component with the most stringent cleanup standards. While benzene concentrations in the groundwater are the driving force for most cleanups, benzene is relatively easy to remove by carbon adsorption or air stripping and it will naturally biodegrade in most subsurface environments.

MTBE on the other hand is a different situation. The solubility of benzene in water is 1,800 parts per million (ppm), while the solubility of MTBE in water is 43,000 ppm. The dissolved plume that results from a leak into groundwater is directly related to the solubility in water of the chemical. The higher the solubility the larger the plume and the faster it will migrate.

When MTBE gets into the water then the trouble really starts. Removal of a compound by air stripping is governed by the Henry's Law constant; the constant for MTBE is 1/7 that of benzene; the biodegradation of MTBE is 1/5 that of benzene; the carbon adsorption of MTBE is 1/5 that of benzene. MTBE has two additional characteristics that only exacerbate the problem. Dissolved benzene transport in water is retarded due to adsorption; MTBE transport is not significantly slowed since it does not adsorb to soil as well. Water containing over 1,500 ppm of MTBE is flammable and can lead to explosive vapors. Attached you will find a summary of MTBE properties provided by R.J. Hinds of CRTC.

CONFIDENTIAL: This document is subject to the
September 21, 1999 Stipulated Protective Order entered
San Francisco Superior Court, Case No. 999128.

CHEV 09564

As you can see, a groundwater cleanup where MTBE is present has the potential to be 2-3 times as expensive as our present groundwater cleanups. The resulting plume will be much larger and the removal of MTBE is very difficult at best.

Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE. The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run. As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent.


J.L. KOERBER

JLK


DJL/



cc. A.M. Caccamo
    D.N. Perkins
    J.L. Pease
    R.J. Hinds
    Compliance Specialists
    TIP Coordinators
    Env. Engineering Supervisors
    H.W. Riggs

CONFIDENTIAL: This document is subject to the
September 21, 1999 Stipulated Protective Order entered
in the San Francisco Superior Court, Case No. 999128.

CHEV 09566

MATERIAL SAFETY DATA SHEET
MATERIAL SAFETY DATA SHEET

CHEVRON
CHEVRON

CHEVRON UNLEADED GASOLINE W/MTBE

PAGE   1 OF 1

THIS MATERIAL SAFETY DATA SHEET CONTAINS ENVIRONMENTAL, HEALTH AND
TOXICOLOGY INFORMATION FOR YOUR EMPLOYEES.  PLEASE MAKE SURE THIS
INFORMATION IS GIVEN TO THEM.  IT ALSO CONTAINS INFORMATION TO HELP
YOU MEET COMMUNITY RIGHT-TO-KNOW/EMERGENCY RESPONSE REPORTING
REQUIREMENTS UNDER SARA TITLE III AND MANY OTHER LAWS.  IF YOU RESELL
THIS PRODUCT, THIS MSDS MUST BE GIVEN TO THE BUYER OR THE INFORMATION
INCORPORATED IN YOUR MSDS.  DISCARD ANY PREVIOUS EDITION OF THIS MSDS.

MSDS DISCONTINUED.  THIS MATERIAL SAFETY DATA SHEET WILL NO LONGER
BE UPDATED.  SEE MSDS #2655.

## 1. CHEMICAL PRODUCT AND COMPANY IDENTIFICATION

CHEVRON UNLEADED GASOLINE W/MTBE

COMPANY IDENTIFICATION

CHEVRON USA PRODUCTS COMPANY
ENVIRONMENTAL, SAFETY AND HEALTH
575 MARKET ST.
SAN FRANCISCO, CA  94105-2856

PRODUCT INFORMATION: (800)822-5823 MSDS REQUESTS
                     (510)242-5357 TECHNICAL

EMERGENCY TELEPHONE NUMBERS

CHEMTREC (24 HR):
(800)424-9300 OR (202)483-7616

REVISION NUMBER: 2      REVISION DATE: 02/23/93      MSDS NUMBER: 004276
         NDA - NO DATA AVAILABLE          NA - NOT APPLICABLE

PREPARED ACCORDING TO THE OSHA HAZARD COMMUNICATION
STANDARD (29 CFR 1910.1200) BY THE CHEVRON ENVIRONMENTAL

EXHIBIT 2

HEALTH CENTER, INC., P.O. BOX 4854, RICHMOND, CA 94804,
CHEVRON UNLEADED GASOLINE W/MTBE

PAGE   2 OF 1

## 2. COMPOSITION/INFORMATION ON INGREDIENTS

SPECIAL NOTES: ETHYL ALCOHOL IS ONLY ADDED IN LIMITED SPECIFIC
DISTRIBUTION AREAS.
COMPOSITION COMMENT.
ALL THE COMPONENTS OF THIS MATERIAL ARE ON THE TOXIC SUBSTANCES CONTROL
ACT CHEMICAL SUBSTANCES INVENTORY.

THE PROPORTION COMPOSITIONS ARE GIVEN TO ALLOW FOR THE VARIOUS RANGES
OF THE COMPONENTS PRESENT IN THE WHOLE PRODUCT AND MAY NOT EQUAL 100%.

100.0 %    CHEVRON UNLEADED GASOLINE W/MTBE

   CONTAINING

| COMPONENTS | AMOUNT | LIMIT/QTY | AGENCY/TYPE |
|---|---|---|---|
| GASOLINE (GENERIC) | | | |
| | 100.0% | 300PPM | ACGIH TWA |
| | | 500PPM | ACGIH STEL |
| | | 300PPM | OSHA TWA |
| | | 500PPM | OSHA STEL |

   INCLUDING

| | | | |
|---|---|---|---|
| BENZENE | | | |
| CHEMICAL NAME: BENZENE | | | |
| CAS71432 | < 4.4% | 10PPM | ACGIH TWA |
| | | 1PPM | OSHA TWA |
| | | 5PPM | OSHA STEL |
| | | 25 PPM | OSHA CEILING |
| | | 10 LBS | CERCLA 302.4 RQ |

REFER TO THE OSHA BENZENE STANDARD (29 CFR 1910.1028) FOR DETAILED
TRAINING, EXPOSURE MONITORING, RESPIRATORY PROTECTION AND MEDICAL
SURVEILLANCE REQUIREMENTS BEFORE USING THIS PRODUCT.

| | | | |
|---|---|---|---|
| ETHYL BENZENE | | | |
| CHEMICAL NAME: ETHYLBENZENE | | | |
| CAS100414 | < 1.4% | 100PPM | ACGIH TWA |
| | | 125PPM | ACGIH STEL |
| | | 100PPM | OSHA TWA |
| | | 125PPM | OSHA STEL |
| | | 1,000 LBS | CERCLA 302.4 RQ |
| XYLENE-P | | | |
| CHEMICAL NAME: XYLENE-P | | | |
| CAS106423 | < 9.9% | 150 PPM | ACGIH STEL |

1,000 LBS                    CERCLA 302.4 RQ

XYLENE-M

REVISION NUMBER: 2.         REVISION DATE: 02/03/93    MSDS NUMBER: 004278
              NDA - NO DATA AVAILABLE       NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE                              PAGE   3 OF 1

CHEMICAL NAME: XYLENE-M
CAS108383                    < 4.6%      100PPM              ACGIH TWA
                                         150PPM              ACGIH STEL
                                         100PPM              OSHA TWA
                                         150PPM              OSHA STEL
                                         1,000 LBS           CERCLA 302.4 RQ

XYLENE-O
CHEMICAL NAME: XYLENE-O
CAS95476                     < 2.2%      100PPM              ACGIH TWA
                                         150PPM              ACGIH STEL
                                         100PPM              OSHA TWA
                                         150PPM              OSHA STEL
                                         1,000 LBS           CERCLA 302.4 RQ

TOLUENE
CHEMICAL NAME: TOLUENE
CAS108883                    < 6.5%      100PPM              ACGIH TWA
                                         150PPM              ACGIH STEL
                                         100PPM              OSHA TWA
                                         150PPM              OSHA STEL
                                         300 PPM             OSHA CEILING
                                         1,000 LBS           CERCLA 302.4 RQ

HEXANE
CHEMICAL NAME: HEXANE
CAS110543                    < 3.0%      50PPM               ACGIH TWA
                                         1000 PPM            ACGIH STEL
                                         50PPM               OSHA TWA

CYCLOHEXANE
CHEMICAL NAME: CYCLOHEXANE
CAS110827                    < 2.4%      300PPM              ACGIH TWA
                                         300PPM              OSHA TWA
                                         1,000 LBS           CERCLA 302.4 RQ

    CAN CONTAIN

MTBE
CHEMICAL NAME: METHYL TERTIARY BUTYL ETHER
CAS1634044                   < 15.0%     1 LBS               CERCLA 302.4 RQ

    OR

ETHANOL
CHEMICAL NAME: ETHYL ALCOHOL

CAS64175              < 10.0%           1,000PPM              ACGIH TWA
                                        1000PPM               OSHA TWA

TLV  = THRESHOLD LIMIT VALUE      TWA = TIME WEIGHTED AVERAGE
STEL = SHORT-TERM EXPOSURE LIMIT  TPQ = THRESHOLD PLANNING QUANTITY
RQ   = REPORTABLE QUANTITY        CPS = CUSA PRODUCT CODE
CC   = CHEVRON CHEMICAL COMPANY   CAS = CHEMICAL ABSTRACT SERVICE NUMBER

REVISION NUMBER: 2        REVISION DATE: 02/03/93     MSDS NUMBER: 004276
           NDA = NO DATA AVAILABLE       NA = NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE                            PAGE   4 OF 1

---

3. HAZARDS IDENTIFICATION

---

*********************** EMERGENCY OVERVIEW ***************************

        - HARMFUL OR FATAL IF SWALLOWED - CAN ENTER LUNGS
          AND CAUSE DAMAGE
        - VAPOR HARMFUL
        - LONG-TERM EXPOSURE TO VAPOR HAS CAUSED CANCER IN
          LABORATORY ANIMALS
        - MAY CAUSE EYE AND SKIN IRRITATION
        - EXTREMELY FLAMMABLE
        - KEEP OUT OF REACH OF CHILDREN

    *****************************************************************

POTENTIAL HEALTH EFFECTS

EYE CONTACT:
THIS SUBSTANCE IS SLIGHTLY IRRITATING TO THE EYES AND COULD CAUSE
PROLONGED (DAYS) IMPAIRMENT OF YOUR VISION.  THE DEGREE OF THE INJURY WILL
DEPEND ON THE AMOUNT OF MATERIAL THAT GETS INTO THE EYE AND THE SPEED AND
THOROUGHNESS OF THE FIRST AID TREATMENT.  SIGNS AND SYMPTOMS MAY INCLUDE
PAIN, TEARS, SWELLING, REDNESS, AND BLURRED VISION.  EYE CONTACT WITH THE
VAPORS, FUMES, OR SPRAY MIST FROM THIS SUBSTANCE COULD ALSO CAUSE SIMILAR
SIGNS AND SYMPTOMS.
SKIN IRRITATION:
PROLONGED OR FREQUENTLY REPEATED CONTACT MAY CAUSE THE SKIN TO BECOME
CRACKED OR DRY FROM THE DEFATTING ACTION OF THIS MATERIAL.
DERMAL TOXICITY:
IF ABSORBED THROUGH THE SKIN, THIS SUBSTANCE IS CONSIDERED PRACTICALLY
NON-TOXIC TO INTERNAL ORGANS.
RESPIRATORY/INHALATION:
THIS SUBSTANCE IS SLIGHTLY TOXIC TO INTERNAL ORGANS IF INHALED.  THE
DEGREE OF INJURY WILL DEPEND ON THE AIRBORNE CONCENTRATION AND DURATION OF
EXPOSURE.   THE TARGET ORGAN(S) IS THE NERVOUS SYSTEM.  INHALATION OF
GASOLINE VAPOR AT AIRBORNE CONCENTRATIONS EXCEEDING 1000 PPM MAY CAUSE
SIGNS AND SYMPTOMS OF CENTRAL NERVOUS SYSTEM EFFECTS SUCH AS HEADACHE,
DIZZINESS, LOSS OF APPETITE, WEAKNESS AND LOSS OF COORDINATION.  VAPOR

CONCENTRATIONS IN EXCESS OF 5000 PPM MAY CAUSE LOSS OF CONSCIOUSNESS, COMA AND DEATH. BRIEF EXPOSURES TO HIGH VAPOR CONCENTRATIONS MAY ALSO CAUSE PULMONARY EDEMA AND BRONCHITIS. INTENTIONAL EXPOSURES TO EXCESSIVELY HIGH CONCENTRATIONS (E.G., WHEN USED AS A DRUG OF ABUSE) HAVE BEEN REPORTED TO RESULT IN CLINICAL MANIFESTATIONS THAT MAY INCLUDE CONVULSIONS, DELIRIUM, AND HALLUCINATIONS. THESE MANIFESTATIONS ARE NOT KNOWN TO OCCUR FOLLOWING ACCIDENTAL INHALATION OF GASOLINE VAPOR DURING NORMAL OPERATIONS.
INGESTION:
THIS SUBSTANCE IS SLIGHTLY TOXIC TO INTERNAL ORGANS IF SWALLOWED. THE DEGREE OF INJURY WILL DEPEND ON THE AMOUNT ABSORBED FROM THE GUT. THE TARGET ORGAN(S) IS THE NERVOUS SYSTEM. SIGNS AND SYMPTOMS OF CENTRAL NERVOUS SYSTEM EFFECTS MAY INCLUDE ONE OR MORE OF THE FOLLOWING:
HEADACHE, DIZZINESS, LOSS OF APPETITE, WEAKNESS AND LOSS OF COORDINATION.

REVISION NUMBER: 2      REVISION DATE: 02/03/93      MSDS NUMBER: 004278
        NDA - NO DATA AVAILABLE        NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE                       PAGE   5 OF 1

BECAUSE OF THE LOW VISCOSITY OF THIS SUBSTANCE, IT CAN DIRECTLY ENTER THE LUNGS IF IT IS SWALLOWED (THIS IS CALLED ASPIRATION). THIS CAN OCCUR DURING THE ACT OF SWALLOWING OR WHEN VOMITING THE SUBSTANCE. ONCE IN THE LUNGS, THE SUBSTANCE IS VERY DIFFICULT TO REMOVE AND CAN CAUSE SEVERE INJURY TO THE LUNGS AND DEATH.

4: FIRST AID MEASURES

EYE CONTACT:
FLUSH EYES IMMEDIATELY WITH FRESH WATER FOR AT LEAST 15 MINUTES WHILE HOLDING THE EYELIDS OPEN. REMOVE CONTACT LENSES IF WORN. NO ADDITIONAL FIRST AID SHOULD BE NECESSARY. HOWEVER, IF IRRITATION PERSISTS, SEE A DOCTOR.
SKIN CONTACT:
NO FIRST AID PROCEDURES ARE REQUIRED. AS A PRECAUTION, WASH SKIN THOROUGHLY WITH SOAP AND WATER. REMOVE AND WASH CONTAMINATED CLOTHING.
INHALATION:
IF RESPIRATORY IRRITATION OR ANY SIGNS OR SYMPTOMS AS DESCRIBED IN THIS DOCUMENT OCCUR, MOVE THE PERSON TO FRESH AIR. IF ANY OF THESE EFFECTS CONTINUE, SEE A DOCTOR.
INGESTION:
IF SWALLOWED, GIVE WATER OR MILK TO DRINK AND TELEPHONE FOR MEDICAL ADVICE. DO NOT MAKE PERSON VOMIT UNLESS DIRECTED TO DO SO BY MEDICAL PERSONNEL. IF MEDICAL ADVICE CANNOT BE OBTAINED, THEN TAKE THE PERSON AND PRODUCT CONTAINER TO THE NEAREST MEDICAL EMERGENCY TREATMENT CENTER OR HOSPITAL. NOTE TO PHYSICIAN: INGESTION OF THIS PRODUCT OR SUBSEQUENT VOMITING CAN RESULT IN ASPIRATION OF LIGHT HYDROCARBON LIQUID WHICH CAN CAUSE PNEUMONITIS.

5: FIRE FIGHTING MEASURES

FLASH POINT (P-M) < -40F  (-40C)

AUTOIGNITION: NDA
FLAMMABILITY LIMITS (% BY VOLUME IN AIR):   LOWER: 1.4  UPPER: 7.6
EXTINGUISHING MEDIA:
    FIRE FIGHTING FOAM: ALCOHOL RESISTANT TYPE (AR)
    AFFF, CO2, DRY CHEMICAL.
FIRE FIGHTING PROCEDURES:
THIS PRODUCT PRESENTS AN EXTREME FIRE HAZARD. LIQUID VERY QUICKLY
EVAPORATES, EVEN AT LOW TEMPERATURES, AND FORMS VAPOR (FUMES) WHICH CAN
CATCH FIRE AND BURN WITH EXPLOSIVE VIOLENCE. INVISIBLE VAPOR SPREADS
EASILY AND CAN BE SET ON FIRE BY MANY SOURCES SUCH AS PILOT LIGHTS,
WELDING EQUIPMENT, AND ELECTRICAL MOTORS AND SWITCHES.

FOR FIRES INVOLVING THIS MATERIAL, DO NOT ENTER ANY ENCLOSED OR CONFINED
FIRE SPACE WITHOUT PROPER PROTECTIVE EQUIPMENT. THIS MAY INCLUDE
SELF-CONTAINED BREATHING APPARATUS TO PROTECT AGAINST THE HAZARDOUS
EFFECTS OF NORMAL PRODUCTS OF COMBUSTION OR OXYGEN DEFICIENCY.  READ THE
ENTIRE DOCUMENT.
COMBUSTION PRODUCTS:

REVISION NUMBER: 2            REVISION DATE: 02/23/93        MSDS NUMBER: 004276
            NDA - NO DATA AVAILABLE        NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE
                                                            PAGE  6 OF 1

NORMAL COMBUSTION FORMS CARBON DIOXIDE AND WATER VAPOR. INCOMPLETE
COMBUSTION CAN PRODUCE CARBON MONOXIDE.
NFPA RATINGS: HEALTH 1; FLAMMABILITY 3; REACTIVITY 0; SPECIAL NDA;
LEAST-0, SLIGHT-1, MODERATE-2, HIGH-3, EXTREME-4). THESE VALUES ARE
OBTAINED USING THE GUIDELINES OR PUBLISHED EVALUATIONS PREPARED BY THE
NATIONAL FIRE PROTECTION ASSOCIATION (NFPA) OR THE NATIONAL PAINT AND
COATING ASSOCIATION.

6 ENVIRONMENTAL CONCERNS, SPILL RESPONSE AND DISPOSAL

CHEMTREC EMERGENCY NUMBER (24 HR): (800) 424-9300 OR (202) 483-7616
SPILL OR LEAK PROCEDURES:
ELIMINATE ALL SOURCES OF IGNITION IN VICINITY OF SPILL OR RELEASED VAPOR.

CLEAN UP PERSONNEL MAY REQUIRE PROTECTION FROM INHALATION OR RESPIRATORY
PROTECTIVE EQUIPMENT
SECTION: THIS MATERIAL IS CONSIDERED TO BE A HAZARDOUS POLLUTANT...

NATIONAL RESPONSE CENTER IS (800) 424-8802

DISPOSAL METHODS:
CLEAN UP SMALL SPILLS USING APPROPRIATE TECHNIQUES SUCH AS SORBENT
MATERIALS OR PUMPING. WHERE FEASIBLE AND APPROPRIATE REMOVE CONTAMINATED
SOIL.  FOLLOW PRESCRIBED PROCEDURES FOR REPORTING AND RESPONDING TO LARGER
RELEASES.   PLACE CONTAMINATED MATERIALS IN DISPOSABLE CONTAINERS AND
DISPOSE OF IN A MANNER CONSISTENT WITH APPLICABLE REGULATIONS. CONTACT

LOCAL ENVIRONMENTAL OR HEALTH AUTHORITIES FOR APPROVED DISPOSAL OF THIS
MATERIAL.

## 7. STORAGE, HANDLING, AND REACTIVITY

HAZARDOUS DECOMPOSITION PRODUCTS:
NDA.
STABILITY:
STABLE.
HAZARDOUS POLYMERIZATION:
POLYMERIZATION WILL NOT OCCUR.
INCOMPATIBILITY:
MAY REACT WITH STRONG OXIDIZING AGENTS, SUCH AS CHLORATES, NITRATES,
PEROXIDES, ETC.
SPECIAL PRECAUTIONS:
NEVER SIPHON GASOLINE BY MOUTH.  READ AND OBSERVE ALL PRECAUTIONS ON
PRODUCT LABEL.  USE ONLY AS A MOTOR FUEL.  DO NOT USE FOR CLEANING,
PRESSURE APPLIANCE FUEL, OR ANY OTHER SUCH USE.  DO NOT USE OR STORE NEAR
FLAME, SPARKS OR HOT SURFACES.  USE ONLY IN WELL VENTILATED AREA.  KEEP
CONTAINER CLOSED.  DO NOT TRANSFER LIQUID TO AN UNLABELED CONTAINER.  DO

REVISION NUMBER: 2          REVISION DATE: 02/23/93        MSDS NUMBER: 004276
                    NDA - NO DATA AVAILABLE          NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINES                                          PAGE  7 OF 1

NOT WELD, HEAT OR DRILL CONTAINER.  REPLACE CAP OR BUNG. EMPTIED CONTAINER
STILL CONTAINS HAZARDOUS OR EXPLOSIVE VAPOR OR LIQUID.

## 8. PROTECTIVE EQUIPMENT

EYE PROTECTION:
DO NOT GET THIS MATERIAL IN YOUR EYES.  EYE CONTACT CAN BE AVOIDED BY
WEARING CHEMICAL GOGGLES.
SKIN PROTECTION:
NO SPECIAL SKIN PROTECTION IS USUALLY NECESSARY.  AVOID PROLONGED OR
FREQUENTLY REPEATED SKIN CONTACT WITH THIS MATERIAL.  SKIN CONTACT CAN BE
MINIMIZED BY WEARING PROTECTIVE CLOTHING.
RESPIRATORY PROTECTION:
NO SPECIAL RESPIRATORY PROTECTION IS NORMALLY REQUIRED.  HOWEVER, IF
OPERATING CONDITIONS CREATE AIRBORNE CONCENTRATIONS WHICH EXCEED THE
RECOMMENDED EXPOSURE STANDARDS, THE USE OF AN APPROVED RESPIRATOR IS
REQUIRED.  REFER TO THE OSHA BENZENE STANDARD TO DETERMINE WHAT TYPE OF
RESPIRATOR IS REQUIRED BASED ON EXPOSURE LEVELS.
VENTILATION:
USE THIS MATERIAL ONLY IN WELL VENTILATED AREAS.

## 9. PHYSICAL AND CHEMICAL PROPERTIES

```
APPEARANCE:            ORANGE TO BRONZE LIQUID.
ODOR:                  NDA
PHYSICAL STATE:        NDA
PH:                    NDA
VAPOR PRESSURE:        5 - 15 PSI   (MAX.) @ 100F (VARIABLE)
VAPOR DENSITY
  (AIR=1):             3-4
BOILING POINT:         25 - 225C  (VARIABLE)
FREEZING POINT:        NDA
MELTING POINT:         NA
SOLUBILITY:            SOLUBLE IN HYDROCARBONS INSOLUBLE IN WATER
SPECIFIC GRAVITY:      0.7 - 0.8
DENSITY:               NDA
EVAPORATION RATE:      NDA
PERCENT VOLATILE
  (VOL):               99+%
```

11. TOXICOLOGICAL INFORMATION

EYE IRRITATION:
THE DRAIZE EYE IRRITATION SCORE (RANGE, 0-110) IN RABBITS IS 0.
SKIN IRRITATION:
THE DRAIZE SKIN PRIMARY IRRITATION SCORE (RANGE, 0-8) FOR A 4-HOUR
EXPOSURE (RABBITS) IS 0.00.  THIS MATERIAL WAS NOT A SKIN SENSITIZER IN

REVISION NUMBER: 2              REVISION DATE: 02/03/93        MSDS NUMBER: 00-4276
        NDA - NO DATA AVAILABLE     NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE                                  PAGE   8 OF 1

THE MODIFIED BUEHLER GUINEA PIG SENSITIZATION TEST.
DERMAL TOXICITY:
THE DERMAL LD50 IN RABBITS IS > 5 ML/KG.
RESPIRATORY/INHALATION:
NO PRODUCT TOXICOLOGY DATA AVAILABLE.
INGESTION:
THE ORAL LD50 IN RATS IS > 5 ML/KG.
ADDITIONAL TOXICOLOGY DATA:
LIFETIME INHALATION OF WHOLE GASOLINE VAPOR HAS CAUSED INCREASED LIVER
TUMORS IN FEMALE MICE.  THE MECHANISM OF THIS RESPONSE IS STILL BEING
INVESTIGATED BUT IT IS THOUGHT TO BE AN EPIGENETIC PROCESS UNIQUE TO THE
FEMALE MOUSE.  INHALATION EXPOSURE TO WHOLE GASOLINE VAPOR ALSO CAUSED
KIDNEY DAMAGE AND EVENTUALLY KIDNEY CANCER IN MALE RATS.  NO OTHER ANIMAL
MODEL STUDIED HAS SHOWN THESE ADVERSE KIDNEY EFFECTS AND THERE IS NO
PHYSIOLOGICAL REASON TO BELIEVE THAT THEY WOULD OCCUR IN MAN.

THE DATA ABOVE IS OBTAINED FROM STUDIES SPONSORED BY THE AMERICAN
PETROLEUM INSTITUTE (API).

11. TRANSPORT INFORMATION

THE DESCRIPTION SHOWN MAY NOT APPLY TO ALL SHIPPING SITUATIONS.
CONSULT 49CFR, OR APPROPRIATE DANGEROUS GOODS REGULATIONS, FOR
ADDITIONAL DESCRIPTION REQUIREMENTS (E.G., TECHNICAL NAME) AND
MODE-SPECIFIC OR QUANTITY-SPECIFIC SHIPPING REQUIREMENTS.

DOT SHIPPING NAME: NDA
DOT HAZARD CLASS: NDA
DOT IDENTIFICATION NUMBER: NDA
DOT PACKING GROUP: NDA

12. REGULATORY INFORMATION

SARA 311 CATEGORIES:        1.  IMMEDIATE (ACUTE) HEALTH EFFECTS:   YES
                            2.  DELAYED (CHRONIC) HEALTH EFFECTS:   YES
                            3.  FIRE HAZARD:                        YES
                            4.  SUDDEN RELEASE OF PRESSURE HAZARD:  NO
                            5.  REACTIVITY HAZARD:                  NO

REGULATORY LISTS SEARCHED:

01=SARA 313          11=RI RTK              21=TSCA SECT 4(E)
02=MASS RTK          12=CERCLA 302.4        22=TSCA SECT 5(A)(E)(F)
03=NTP CARCINOGEN    13=NH RTK              23=TSCA SECT 6
04=CA PROP 65-CARCIN 14=ACGIH TWA           24=TSCA SECT 12(B)
05=CA PROP 65-REPRO TOX 15=ACGIH STEL       25=TSCA SECT 8(A)
06=IARC GROUP 1      16=ACGIH CALC TLV      26=TSCA SECT 8(D)
07=IARC GROUP 2A     17=OSHA TWA            28=CANADIAN WHMIS
08=IARC GROUP 2B     18=OSHA STEL           29=OSHA CEILING

REVISION NUMBER: 2       REVISION DATE: 02/03/93       MSDS NUMBER: 09427S
            NDA — NO DATA AVAILABLE     NA — NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE                                 PAGE   9 OF 1

09=SARA 302/304         19=CHEVRON TWA           30=CHEVRON STEL
10=PA RTK              20=EPA CARCINOGEN

THE FOLLOWING COMPONENTS OF THIS MATERIAL ARE FOUND ON THE REGULATORY
LISTS INDICATED.

ETHYLBENZENE
    IS FOUND ON LISTS:  01,02,10,11,12,13,14,15,17,18,28,29,
XYLENE-P
    IS FOUND ON LISTS:  01,02,10,11,12,15,28,29,
XYLENE-M
    IS FOUND ON LISTS:  01,02,10,11,12,14,15,17,18,28,29,
TOLUENE
    IS FOUND ON LISTS:  01,02,04,10,11,12,13,14,15,17,18,28,29,
HEXANE
    IS FOUND ON LISTS:  02,10,11,13,14,15,17,28,

CYCLOHEXANE
    IS FOUND ON LISTS:  B1,B2,10,11,12,13,14,17,26,28,
METHYL TERT BUTYL ETHER
    IS FOUND ON LISTS:  B4,10,11,21,24,28,
ETHYL ALCOHOL
    IS FOUND ON LISTS:  B2,10,11,13,14,17,28,
BENZENE
    IS FOUND ON LISTS:  B1,B2,B3,B4,B6,10,11,12,13,14,17,18,20,28,29,
XYLENE-O
    IS FOUND ON LISTS:  B1,B2,10,11,12,14,15,17,18,26,28,
GASOLINE (GENERIC)
    IS FOUND ON LISTS:  B4,B6,14,15,17,18,28,

13. ADDITIONAL HEALTH DATA

ADDITIONAL HEALTH DATA COMMENT:
THIS PRODUCT CONTAINS BENZENE.  THE OSHA BENZENE STANDARD (29 CFR
1910.1028) CONTAINS DETAILED REQUIREMENTS FOR TRAINING, EXPOSURE
MONITORING, RESPIRATORY PROTECTION AND MEDICAL SURVEILLANCE TRIGGERED BY
THE EXPOSURE LEVEL.  REFER TO THE OSHA STANDARD BEFORE USING THIS PRODUCT.
REPEATED OR PROLONGED BREATHING OF BENZENE VAPORS HAS BEEN ASSOCIATED WITH
THE DEVELOPMENT OF CHROMOSOMAL DAMAGE IN EXPERIMENTAL ANIMALS AND VARIOUS
BLOOD DISEASES IN HUMANS RANGING FROM APLASTIC ANEMIA TO LEUKEMIA (A FORM
OF CANCER).  ALL OF THESE DISEASES CAN BE FATAL.  NO BIRTH DEFECTS HAVE
BEEN SHOWN TO OCCUR IN PREGNANT LABORATORY ANIMALS EXPOSED TO DOSES NOT
TOXIC TO THE MOTHER.  HOWEVER, SOME EVIDENCE OF FETAL TOXICITY SUCH AS
DELAYED PHYSICAL DEVELOPMENT HAS BEEN SEEN AT SUCH LEVELS.  THE AVAILABLE
INFORMATION ON THE EFFECTS OF BENZENE ON HUMAN PREGNANCIES IS INADEQUATE
BUT IT HAS BEEN ESTABLISHED THAT BENZENE CAN CROSS THE HUMAN PLACENTA.

THIS PRODUCT CONTAINS N-HEXANE.  PROLONGED OR REPEATED SKIN CONTACT OR
BREATHING OF VAPORS MAY CAUSE NERVE DAMAGE CHARACTERIZED BY PROGRESSIVE
WEAKNESS AND NUMBNESS IN THE ARMS AND LEGS.  RECOVERY RANGES FROM NO
RECOVERY TO COMPLETE RECOVERY DEPENDING UPON THE SEVERITY OF THE NERVE
DAMAGE.

REVISION NUMBER: 2            REVISION DATE: 02/03/89       MSDS NUMBER: 004278
         NDA - NO DATA AVAILABLE        NA - NOT APPLICABLE
CHEVRON UNLEADED GASOLINE W/MTBE
                                                              PAGE: 10 OF 1

THIS PRODUCT CONTAINS TOLUENE.  TOLUENE HAS BEEN REPORTED TO DECREASE
IMMUNOLOGICAL RESPONSES IN TEST ANIMALS.  IT HAS ALSO BEEN REPORTED THAT
WHEN YOUNG RATS WERE EXPOSED TO 1000 PPM TOLUENE FOR 14 HOURS DAILY FOR
TWO WEEKS, IRREVERSIBLE HEARING LOSS WAS DETECTED.  THE SAME DAILY EXPOSURE
TO 700 PPM FOR AS LONG AS 16 WEEKS WAS WITHOUT EFFECT.  SINCE THE LEVEL
NECESSARY TO PRODUCE HEARING LOSS IS GREATER THAN 7 TIMES THE ACGIH
TLV-TWA FOR TOLUENE, WORKER EXPOSURES AT OR BELOW 100 PPM IS NOT EXPECTED
TO CAUSE ANY ADVERSE EFFECTS.  THERE ARE ALSO REPORTS THAT CHRONIC SOLVENT
ABUSERS (GLUE SNIFFERS, SOLVENT HUFFERS) WHO DELIBERATELY INHALE HIGH
CONCENTRATIONS (SEVERAL THOUSAND PPM) OF TOLUENE FOR PROLONGED PERIODS (UP
TO TEN HOURS/DAY) HAVE SUFFERED LIVER, KIDNEY AND BRAIN DAMAGE.  TOLUENE

MAY ALSO CAUSE MENTAL AND/OR GROWTH RETARDATION IN THE CHILDREN OF FEMALE
SOLVENT ABUSERS WHO DIRECTLY INHALE TOLUENE WHEN THEY ARE PREGNANT.
TOLUENE CAUSED GROWTH RETARDATION IN RATS WHEN ADMINISTERED AT DOSES THAT
DID NOT CAUSE BIRTH DEFECTS. THERE WERE NO EFFECTS IN THE OFFSPRING AT
DOSES THAT DID NOT INTOXICATE THE PREGNANT RATS. THE EXPOSURE LEVEL AT
WHICH NO EFFECTS WERE SEEN (NO OBSERVED EFFECT LEVEL, NOEL) IS 750 PPM. WE
RECOMMEND THAT THE PRECAUTIONS OUTLINED IN THIS MSDS BE FOLLOWED TO KEEP
TOLUENE CONCENTRATIONS BELOW THE RECOMMENDED EXPOSURE STANDARDS.

THIS PRODUCT CONTAINS XYLENE, A CHEMICAL THAT HAS BEEN REPORTED TO CAUSE
DEVELOPMENTAL TOXICITY IN RATS AND MICE EXPOSED BY INHALATION DURING
PREGNANCY. THE EFFECTS NOTED CONSISTED OF DELAYED DEVELOPMENT AND MINOR
SKELETAL VARIATIONS, ADDITIONALLY, WHEN PREGNANT MICE WERE EXPOSED BY
INGESTION TO A LEVEL THAT KILLED NEARLY ONE-THIRD OF THE TEST GROUP,
LETHALITY (RESORPTIONS) AND MALFORMATIONS (PRIMARILY CLEFT PALATE)
OCCURRED. MALFORMATIONS HAVE NOT BEEN REPORTED FOLLOWING INHALATION
EXPOSURE. BECAUSE OF THE VERY HIGH LEVELS OF EXPOSURE USED IN THESE
STUDIES, WE DO NOT BELIEVE THAT THEIR RESULTS IMPLY AN INCREASED RISK OF
REPRODUCTIVE TOXICITY TO WORKERS EXPOSED TO XYLENE LEVELS AT OR BELOW THE
EXPOSURE STANDARD.

XYLENE HAS GIVEN NEGATIVE RESULTS IN SEVERAL MUTAGEN TESTING ASSAYS
INCLUDING THE AMES ASSAY. IN A CANCER STUDY SPONSORED BY THE NATIONAL
TOXICOLOGY PROGRAM (NTP), TECHNICAL GRADE XYLENE GAVE NO EVIDENCE OF
CARCINOGENICITY IN RATS OR MICE DOSED DAILY FOR TWO YEARS.

THIS PRODUCT CAN CONTAIN METHYL TERT BUTYL ETHER (MTBE). MOST
MUTAGENICITY DATA ON MTBE, EXCEPT FOR THE IN VITRO MOUSE LYMPHOMA TEST,
INDICATE THAT IT IS NOT MUTAGENIC. MTBE CAUSED BIRTH DEFECTS IN MICE
EXPOSED TO 8,000 PPM THROUGHOUT PREGNANCY. NO BIRTH DEFECTS WERE OBSERVED
IN MICE AT 1,000 PPM OR IN RATS OR RABBITS AT ANY DOSE OF MTBE. THESE
RESULTS SUGGEST THAT THE RISK OF BIRTH DEFECTS IN HUMANS FROM MTBE IS
NEGLIGIBLE AT THE ANTICIPATED EXPOSURE CONCENTRATIONS.

WHOLE GASOLINE EXHAUST WAS REVIEWED BY THE INTERNATIONAL AGENCY FOR
RESEARCH ON CANCER (IARC) IN THEIR MONOGRAPH VOLUME 45 (1989). EVIDENCE
FOR CAUSING CANCER WAS CONSIDERED INADEQUATE IN ANIMALS AND INADEQUATE IN
HUMANS. IARC PLACED WHOLE GASOLINE EXHAUST IN CATEGORY 2B, CONSIDERING IT
POSSIBLY CARCINOGENIC TO HUMANS.

---

REVISION NUMBER: 2
        NDA - NO DATA AVAILABLE        REVISION DATE: 02/03/93        MSDS NUMBER: 004275
CHEVRON UNLEADED GASOLINE W/MTBE                    NA - NOT APPLICABLE
                                                                     PAGE  11 OF 1

***************************************************************************

---

THE ABOVE INFORMATION IS BASED ON THE DATA OF WHICH WE ARE AWARE AND IS
BELIEVED TO BE CORRECT AS OF THE DATE HEREOF. SINCE THIS INFORMATION MAY
BE APPLIED UNDER CONDITIONS BEYOND OUR CONTROL AND WITH WHICH WE MAY BE

UNFAMILIAR AND SINCE DATA MADE AVAILABLE SUBSEQUENT TO THE DATE HEREOF MAY
SUGGEST MODIFICATION OF THE INFORMATION, WE DO NOT ASSUME ANY RESPONSIBIL-
ITY FOR THE RESULTS OF ITS USE.   THIS INFORMATION IS FURNISHED UPON
CONDITION THAT THE PERSON RECEIVING IT SHALL MAKE HIS OWN DETERMINATION
OF THE SUITABILITY OF THE MATERIAL FOR HIS PARTICULAR PURPOSE.

REVISION NUMBER: 2          REVISION DATE: 02/03/93          MSDS NUMBER: 224275
          NDA - NO DATA AVAILABLE          NA - NOT APPLICABLE

TOTAL P.13

Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants
Exhibit B

| | A LOCATION NO | B VALID FROM DATE | C VALID TO DATE | D LOCATION BRAND NAME | E STREET ADDRESS | F CITY | G STATE | H ZIP CODE | I COUNTY | J PRIMARY BUSINESS OPER DESC | K PRIMARY BUSINESS STATUS DESC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 317 | 121746 | 2001 | 2001 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 318 | 121746 | 2001 | 2002 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 319 | 121746 | 2002 | 2002 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 320 | 121746 | 2003 | 2003 | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 321 | 121746 | 2003 | | TEXACO | 1016 WEST SHAW AVENUE | FRESNO | CA | 93704 | FRESNO | CORO | OPEN FOR BUSINESS |
| 322 | 121776 | 1998 | 1998 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | CORO | OPEN FOR BUSINESS |
| 323 | 121776 | 1998 | 1998 | | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 324 | 121776 | 1999 | 1999 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 325 | 121776 | 1999 | 1999 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 326 | 121776 | 2000 | 2000 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 327 | 121776 | 2000 | 2000 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 328 | 121776 | 2001 | 2001 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 329 | 121776 | 2001 | 2001 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 330 | 121776 | 2002 | 2002 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 331 | 121776 | 2002 | 2002 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 332 | 121776 | 2003 | 2003 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 333 | 121776 | 2003 | 2003 | TEXACO | 2819 SOUTH EAST AVENUE | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 334 | 121793 | 1998 | 1998 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93706 | FRESNO | OPEN DEALER | ARCHIVED |
| 335 | 121793 | 1998 | 1998 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 336 | 121793 | 1998 | 1998 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 337 | 121793 | 1999 | 1999 | TEXACO | 4090 S. CHESTNUT | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | OPEN FOR BUSINESS |
| 338 | 121793 | 1999 | 1999 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 339 | 121793 | 2000 | 2000 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 340 | 121793 | 2001 | 2001 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 341 | 121793 | 2002 | 2002 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 342 | 121793 | 2003 | 2003 | TEXACO | 4090 SOUTH CHESTNUT AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 343 | 121794 | 1998 | 1998 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 344 | 121794 | 1998 | 1998 | | 4149 N CLOVIS AVE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 345 | 121794 | 1998 | 1998 | | 4149 N CLOVIS AVE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 346 | 121794 | 1998 | 1998 | | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | |
| 347 | 121794 | 1999 | 1999 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 348 | 121794 | 1999 | 1999 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 349 | 121794 | 2000 | 2000 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 350 | 121794 | 2001 | 2001 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 351 | 121794 | 2002 | 2002 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 352 | 121794 | 2003 | 2003 | TEXACO | 4149 NORTH CLOVIS AVENUE | FRESNO | CA | 93727 | FRESNO | OPEN DEALER | ARCHIVED |
| 353 | 121794 | 1998 | 1998 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 354 | 121853 | 1998 | 1998 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 355 | 121853 | 1999 | 1999 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 356 | 121853 | 2000 | 2000 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 357 | 121853 | 2001 | 2001 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 358 | 121853 | 2002 | 2002 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93706 | FRESNO | LESSEE | ARCHIVED |
| 359 | 121853 | 2003 | 2003 | TEXACO | 1410 W VENTURA | FRESNO | CA | 93708 | FRESNO | LESSEE | ARCHIVED |
| 360 | 124005 | 1998 | 1998 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |
| 361 | 124005 | 1998 | 1998 | TEXACO | 1506 VAN NESS AVE | FRESNO | CA | 93721 | FRESNO | BRANDED WHOLESALE | OPEN FOR BUSINESS |

Wallace King Document No. 90414v3