# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
-oOo-

In re: Methyl Tertiary Butyl
Ether ("MTBE") Products
Liability Litigation

This Document Relates To:

City of Fresno
v. Chevron U.S.A. Inc., et al.,
Case No. 04 Civ. 4973

Master File No.
1:00-1898

Case No.
MDL 1358(SAS)



COPY

DEPOSITION OF JATINDER PAUL DHILLON

August 11, 2011 at 9:00 (9:05) a.m.

Before:  ERIC L. JOHNSON
RPR, CSR #9771

Taken at:
Fresno, California



Court Reporting Services
(800) 830.8885
www.depobook.com
Professional Reporting Services Nationwide!

1    Q.  I'm sorry.  Is that yes?

2    A.  Yes.

3    Q.  Just to get an answer out loud.  Thank you.

4    Do you recall what instructions you were given

5  by the area rep about how to respond to a gas leak or

6  spill at the station?  What did they tell you to do, in

7  other words?

8    A.  They -- they told us if spill happen what we

9  are supposed to do, how to clean up, and if it was more

10  than that we are to call the fire department, or

11  whatever.  Details and everything was in that book.

12    Q.  When you say how to clean up, do you remember

13  anything more specifically about how you were told to

14  clean up?

15    A.  Small spill or large spill?

16    Q.  Start with a small spill.

17    A.  Okay.  We put like a cat litter and we have a

18  drum there which is picked up by a -- some company who

19  used to take care of those -- what you call -- we

20  dispose them through one company.

21    Q.  When you say it was a cat litter, we have heard

22  some people talk about a product that was like kitty

23  litter.

24    A.  Like kitty litter, yes.

25    Q.  Do you remember the name of the product that

1  you were using?

2    A.  No.  No.

3    Q.  Were you the one responsible for buying that

4  cat litter-type product?

5    A.  We buy those, yes.

6    Q.  Do you recall if you were using that cat

7  litter-type product at 2619 South East Avenue?

8    A.  Yes.

9    Q.  Do you recall how large of a bag or container

10  that cat litter product came in?

11    A.  I think they come in 25 pounds, something like

12  that.

13    Q.  Do you recall how often that would need to be

14  replaced that you would have to buy some more product?

15    A.  When we finish it.

16    Q.  Do you recall how often that was on average?

17    A.  I have no answer for that.

18    Q.  I mean, did it happen every so many months or

19  years, or do you have --

20    A.  All depends upon the spill.  Sometimes it's a

21  spill we use it; sometimes months we don't have any

22  spill and we don't use it.

23    Q.  So you mentioned that after it was used you

24  said it was put in a drum that was picked up by a

25  company?

1    A.  Right.

2    Q.  So was that a container that was used just for

3  the purpose of that cat litter product?

4    A.  Yes.  Yes.

5    Q.  Do you have a recollection as to what company

6  was used to pick that up at --

7    A.  I don't --

8    Q.  -- 26 -- one second here.

9    A.  Sorry.

10    Q.  -- at 2619 South East Avenue?

11    A.  No.

12    Q.  Okay.  I am going to try to just make sure we

13  are clear what station we are talking about --

14    A.  Right.

15    Q.  -- since I think you have had five.  If you are

16  ever not clear, please let me know.  I mean, we are --

17  we are mostly going to be talking about the East Avenue

18  station, but if you are ever not clear, please indicate.

19    A.  Yes.

20    Q.  In fact, why don't we -- why don't I just

21  say if we refer to the station, we are referring to

22  2619 South East Avenue.  Is that fair?

23    A.  That's fair.

24    Q.  All right.  Now, you mentioned a moment ago, I

25  think you asked about a small spill versus a large

Deposition of Jatinder Paul Dhillon / August 11, 2011

```
 1      A.  No, I don't remember.
 2      Q.  When you bought the station was it branded
 3  Texaco at that point?
 4      A.  Yes.
 5      Q.  Did the branding on the station ever change
 6  over the years?
 7      A.  Yes.
 8      Q.  What did it first change to?
 9      A.  Because Shell and Texaco is bought by Shell, so
10  it was Shell, and it has been Shell after that.
11      Q.  Do you recall approximately what year it
12  changed to Shell?
13      A.  I don't remember.
14      Q.  Do you recall if that was in the '90s or 2000s?
15      A.  I -- I am not sure.  I don't know.
16      Q.  We may see some --
17      A.  Documents I can tell you about?  I don't
18  remember.
19      Q.  So was the station branded Shell at the time
20  you stopped operating it in 2009?
21      A.  Yes.
22      Q.  During the time the station was branded Texaco,
23  where were you obtaining gas deliveries from?
24      A.  In the beginning we used to buy from Texaco.
25      Q.  So when you first took over the station you
```

39

1 selling you Shell branded gas, or did you have an

2 understanding?

3    A. That's what contract says, yes.

4    Q. So is it correct, maybe if I can summarize it

5 this way, is it your understanding, then, you were

6 always buying company branded gas either from Texaco or

7 then Shell?

8    A. Yes.

9           (Deposition Exhibit 3 marked

10             for identification)

11    MR. EICKMEYER: Let me show you what I am

12 marking as Exhibit 3. Exhibit 2, you just put

13 aside in the pile if you'd like. Exhibit 3 is the

14 letterhead of Fresno County Health Services Agency,

15 date November 13, 1995, addressed to Mr. Dhillon.

16 Bates is FCDEH-FRESNO-050249 through 050252.

17    Q. Mr. Dhillon, do you recall having received this

18 letter?

19    A. My signature. Yes.

20    Q. And I was going to get to that, on the third

21 page of the packet, Bates ending in 251. Do you

22 recognize your signature where it says "Received By"?

23    A. Yes.

24    Q. And at the bottom of the last page in the

25 packet Bates ending in 252, would that be your signature

1 at the bottom left?

2    A. Yes.

3    Q. Now, on the -- going back to the front of the

4 packet, the Bates ending in 249, under your name I see

5 there's an address on Huntington Boulevard. Was that

6 your home address, or what was that?

7    A. That's the landlord's address.

8    Q. Oh, the Pricketts' address?

9    A. Pricketts' address.

10    Q. I want to ask you about some of the numbered

11 items on the first page. It says No. 1, Annual tank

12 test -- sorry. "Annual tank tightness tests have not

13 been performed. Tests must be performed annually," end

14 quote.

15        Do you recall being told this by the county

16 inspector, that there needed to be annual tank tightness

17 tests?

18    A. Yeah, that's what the letter says. Yes.

19    Q. Do you recall if you took any action in

20 response to this letter?

21    A. Yes.

22    Q. Whose responsibility was it during this 1995

23 time frame to conduct tank tightness tests?

24    A. Mine. I was responsible.

25    Q. Did that responsibility ever change during the

1 years you operated that station?

2    A. No.

3    Q. For item No. 2, it says, "Line leak detectors

4 have not been installed. Detectors must be installed,

5 maintained, and tested annually," end quote.

6        Do you recall taking any action in response to

7 that?

8    A. Yes.

9    Q. What did you do?

10    A. To get the things done what they want us to do.

11    Q. Do you recall if you hired a company or service

12 to --

13    A. Yes.

14    Q. -- install any detectors?

15    A. Yes.

16    Q. Do you recall if you had any conversations with

17 Kerry Oil, Mr. Kerry or the company, as to why there had

18 not been any line leak detectors installed before?

19    A. I think they were not required before that.

20    Q. No. 3 says, "A hazardous materials business

21 plan has not been updated. A current business plan must

22 be submitted to this office," end quote.

23        Do you recall if you took any response in

24 regard to that?

25    A. Yes.

1    Q. What did you do?

2    A. We submitted it.

3    Q. No. 4 says, "Annual tightness tests have not

4 been performed on pressurized product lines," end quote.

5 Do you recall if you took any response to that?

6    A. Yes.

7    Q. What was that?

8    A. If I remember right, this was delayed because

9 we were in process to -- landlord was in process to

10 change the new tanks and the new pipes and everything.

11 That's the reason they are in the permit -- time of

12 getting permits and everything. That's why it was not

13 done timely after that because we were putting in new

14 tanks and new pipes, and all kind of this.

15    Q. Do you recall if anyone from the county ever

16 indicated that Kerry Oil, the previous owners, had not

17 been submitting the information requested here?

18    A. No.

19    Q. Let me ask you, on the very back page of the

20 packet, there's a couple of checked lines. And I think

21 there's one that wasn't mentioned in the cover letter.

22 It is the third X down, about the middle of the page.

23 Says starting with "inventory." You see that line?

24    A. Mm-hmm.

25    Q. I will read that into the record. It says,

1  "Inventory reconciliation or tank gauging annual summary

2  reports are not being submitted.  Annual summary reports

3  must be submitted to this office," end quote.

4      Do you recall if you took any response to that

5  item?

6      A.  We gave them the copies.  We never knew that we

7  were supposed to, but at that time the law changed, we

8  give them all the copies, yes.

9      Q.  Now, when it mentions inventory reconciliation

10  or tank gauging, was there something being done at this

11  time frame, 1995, to check the amount of gas in the

12  underground storage tanks?

13      A.  Yes.

14      Q.  We have heard from other witnesses about taking

15  a stick measurement.  Were you doing that kind of

16  process?

17      A.  That time it was stick, yes.

18      Q.  Did that later change from stick measurement to

19  something else?

20      A.  Something else, yes.

21      Q.  Do you recall, did that change when the tanks

22  were replaced or when did that change?

23      A.  When the tanks were replaced.

24      Q.  What kind of system was used after the tanks

25  were replaced?  I am just asking generally, was it an

1  electronic system?

2      A.  Electronic system.

3      Q.  During the time the stick measurements were

4  being taken, how often were those taken?

5      A.  Every morning.

6      Q.  Who is responsible for the stick measurements?

7      A.  The employee who opens the store.

8      Q.  Was there some kind of reconciliation done to

9  try and determine if what was measured with the stick

10  matched what was expected to be in the tank?

11      A.  Yes.

12      Q.  Can you describe that process?

13      A.  Our bookkeeping system was like that to --

14  because they know how much gas we sold and how much gas

15  we missing from the tank, should match.

16      Q.  Was there a particular amount of gallons of

17  discrepancy that would cause reason for investigation if

18  what was measured in the tank didn't match what you

19  expected to be there?

20      A.  If it is difference between more than 20, 30

21  gallons, we do check it around there.

22      Q.  Do you recall how many times there was a

23  difference of more than 20 or 30 gallons found at the

24  station?

25      A.  Never.  I don't remember that happening.

1     (Break taken at 10:06 a.m.)

2         THE VIDEOGRAPHER:  This begins videotape No. 2

3   in the deposition of Paul Dhillon.  We are on the record

4   and the time is 10:11 a.m.

5         MR. EICKMEYER:  Q.  Mr. Dhillon, before we go

6   on to the next exhibit, I think you mentioned a moment

7   ago before the break that someone from the company would

8   come by on occasion and look at your purchase records to

9   see you were purchasing gas from the company?

10     A.  Yes.

11     Q.  When that person came by, was that called an

12   area rep, or what was their title?

13     A.  Area rep.

14     Q.  Did that area rep ever give you any training

15   about how to respond to a gasoline leak or spill at the

16   station?

17         MR. YBARRA:  Objection; asked and answered.

18         THE WITNESS:  I already answered this question.

19   They already trained me, they gave me the booklet to do

20   all those kind of things.

21         MR. EICKMEYER:  Well, okay.  Thank you.  I'm

22   sorry.  Let me -- let me try to ask it a little better.

23     Q.  Beside that initial training that you

24   mentioned, when they would come out to the station

25   periodically, did they ever give you any more training?

1     A.  They send us some videos to update those

2   things, yes, they do.

3     Q.  Did they ever give you any different

4   instructions other than using the kitty litter product

5   that you discussed earlier?

6     A.  For small spills or what?

7     Q.  Right.  Did they ever tell you any different

8   way that you should be cleaning up a small spill or leak

9   at the station?

10     A.  Yes, there are different ways, too.

11     Q.  What else did they tell you beside the kitty

12   litter product?

13     A.  Some other product come on the market, to buy

14   those if you want to, or use this products, or different

15   products are available.

16     Q.  Did they ever tell you that you should switch

17   from the kitty litter product --

18     A.  No.

19     Q.  -- to some other one?

20     A.  No.

21     Q.  Did you continue using the kitty litter product

22   during the entire time you operated the East Avenue

23   station?

24     A.  Yes.

25     Q.  Approximately how often would the area rep come

1   Q.  Now, the next sentence says, "Sampling of soils
2   in the vicinity of the former USTs indicated a
3   releases of" -- releases, plural -- "of petroleum
4   product.  Subsequent work showed that the leaking USTs
5   had caused extensive soil contamination.  We believe the
6   vertical extent of soil impacts have reached the water
7   table," end quote.
8       Do you recall when you received this letter
9   taking any action in response to this information?
10      A.  Yes.
11      Q.  What did you do?
12      A.  I gave it to Saboor, ASR Engineering to handle
13  this.
14      Q.  Had you heard before this letter that there
15  were releases of petroleum product that had been found
16  to cause soil contamination and reached the water table?
17      A.  Yes.
18      Q.  Now, the next sentence says, "In our review of
19  the case file, we found that petroleum hydrocarbons were
20  detected in soils at the site at concentrations as high
21  as 98,000 mg/kg as diesel, 43,000 mg/kg as TPH-G, 390
22  mg/kg as benzene and 10,000 mg/kg as methyl T-butyl
23  ether (MTBE)."
24      As far as the numbers that I just read here, do
25  you recall ever hearing those numbers before you

1   received this letter?
2       A.  Honestly, we don't really know -- understand
3   what this says over here because we give it to ASR
4   Engineering to handle the problem.
5       Q.  The MTBE that was listed here at the end of the
6   sentence, had you ever heard of MTBE before receiving
7   this letter?
8       A.  I just explain to you because this kind I have
9   no knowledge.  Above my head.  So we just gave it to
10  Saboor, ARS Engineering to handle this problem.
11      Q.  Well, I am asking a little different question
12  now, not as far as this specific number there.  But had
13  you ever heard of MTBE from anywhere before this letter?
14      A.  No.
15      Q.  Do you recall ever hearing or learning that
16  MTBE was used as an additive in gasoline?
17      A.  Yes, I heard that.
18      Q.  Do you recall when you heard that MTBE started
19  being used in gasoline?
20      A.  Started being used?
21      Q.  Right.  What year?  What time frame?
22      A.  I don't remember.
23      Q.  Do you recall ever hearing that MTBE was no
24  longer being added to gasoline?
25      A.  I remember that.

1   Q.  Do you recall when that occurred?
2   A.  No.
3   Q.  Do you recall if you were ever given any kind
4   of stickers mentioning MTBE to put on the gas
5   dispensers?
6   A.  I think they come -- they put stickers on my
7   pump, yes, long time ago.
8   Q.  Do you recall what those stickers said?
9   A.  I don't remember.
10  Q.  Do you recall where you received those stickers
11  from?
12  A.  I think the gas company did the -- put the
13  stickers there.
14  A.  Do you recall ever being told that gasoline
15  that contained MTBE needed to be handled differently
16  from gas that did not contain MTBE?
17      MR. YBARRA:  Objection; lacks foundation.
18      THE WITNESS:  No, I didn't.
19      MR. EICKMEYER:  Q.  Do you recall if you ever
20  received a Material Safety Data Sheet, or MSDS, for
21  gasoline?
22  A.  I don't understand.
23  Q.  Any document called an MSDS, do you remember
24  ever receiving one of those?
25  A.  I don't remember.

```
1        MR. EICKMEYER:  I have got a few follow up.  I
2   think I can ask from here, if everybody can hear me.
3                EXAMINATION BY MR. EICKMEYER
4        MR. EICKMEYER:  Q.  Let me just ask, sir, I'm
5   not sure if we clarified.  We talked before about, I
6   think you called them area reps that would come by on
7   occasion?
8        A.  Yes.
9        Q.  During the years it was a Texaco branded
10  station, were those area reps coming out from the Texaco
11  company?
12       A.  Yes.
13       Q.  During the years it was a Shell branded
14  station, were those area reps from the Shell Company?
15       A.  Yes.
16       MR. EICKMEYER:  Okay.  Nothing further.  Thank
17  you.
18       MR. YBARRA:  Nothing on mine.
19       MR. EICKMEYER:  Anybody else on the phone?
20       Hearing nothing, I guess we can conclude.
21       THE VIDEOGRAPHER:  One moment, please.  This
22  concludes today's proceedings in the deposition of Paul
23  Dhillon.  The number of videotapes used is a total of
24  three.  We are now going off the record, and the time is
25  12:06 p.m.
```

```
1        (Whereupon the deposition of JATINDER PAUL
             DHILLON concluded at 12:06 p.m.)
2
3                       -oOo-
4
   Please be advised I have read the foregoing deposition,
5
   pages_____ through_____, inclusive.  I hereby state
6
   there are:
7
   (Check one) ____ no corrections
8
               ____ corrections per attached
9
10 Executed this_____day of _____, 2011 at
11
   _____, California.
12
13
                    JATINDER PAUL DHILLON
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              DEPONENT'S CHANGES OR CORRECTIONS
   Note: If you are adding to your testimony, print the
2        exact words you want to add.  If you are deleting
         from your testimony, print the exact words you
3        want to delete.  Specify with "Add" or "Delete"
         and sign this form.
4
   Deposition of:       JATINDER PAUL DHILLON
5  Case Title:          FRESNO V CHEVRON
   Date of Deposition:  AUGUST 11, 2011
6
   I, _____, have the
7  following corrections to make to my deposition:
   Page Line  Change:        "Add"/"Delete"
8
9  ____ ____  _____
10 ____ ____  _____
11 ____ ____  _____
12 ____ ____  _____
13 ____ ____  _____
14 ____ ____  _____
15 ____ ____  _____
16 ____ ____  _____
17 ____ ____  _____
18 ____ ____  _____
19 ____ ____  _____
20 ____ ____  _____
21 ____ ____  _____
22 ____ ____  _____
23 ____ ____  _____
24 ____ ____  _____
25     (If you need more space, please use reverse side)
```

```
1  STATE OF CALIFORNIA    )
                          (    ss.
2  COUNTY OF STANISLAUS   )
3        I, ERIC L. JOHNSON, do hereby certify that I am a
4  licensed Certified Shorthand Reporter, duly qualified
5  and certified as such by the State of California;
6        That prior to being examined, the witness named in
7  the foregoing deposition was by me duly sworn to testify
8  to tell the truth, the whole truth, and nothing but the
9  truth;
10       That the said deposition was by me recorded
11 stenographically at the time and place herein mentioned;
12 and the foregoing pages constitute a full, true,
13 complete and correct record of the testimony given by
14 the said witness;
15       That I am a disinterested person, not being in any
16 way interested in the outcome of said action, or
17 connected with, nor related to any of the parties in
18 said action, or to their respective counsel, in any
19 manner whatsoever.
20
21       DATED:  August 29, 2011
22
23       _____
24                    Eric L. Johnson, CSR, RPR
25
```

1       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          IN AND FOR THE COUNTY OF SAN FRANCISCO

3                  --oOo--

4   SOUTH TAHOE PUBLIC UTILITY      )

     DISTRICT,                  )

5                           )

              Plaintiff,     )

6                           )

                vs          )  No.  999128

7                         )  THIS TRANSCRIPT

     ATLANTIC RICHFIELD COMPANY    )  CONTAINS

8   ("ARCO"); ARCO CHEMICAL COMPANY;)  CONFIDENTIAL

     SHELL OIL COMPANY; CHEVRON    )  MATERIALS

9   U.S.A., INC.; EXXON CORPORATION;)

     B.P. AMERICA, INC.; TOSCO      )

10  CORPORATION; ULTRAMAR, INC.;   )

     BEACON OIL CO.; USA GASOLINE   )

11  CORPORATION; SHELL OIL PRODUCTS )

     CO.; TERRIBLE HERBST, INC.;    )

12  ROTTEN ROBBIE; J.E. TVETEN     )

     CORP.; TAHOE TOM'S GAS STATION; )

13  THE SOUTHLAND CORP.; PARADISE   )

     CHEVRON; and DOES 1 through 600,)

14  inclusive,                 )

                            )

15             Defendants.    )

16

17                --oOo--

18         WEDNESDAY, JULY 26, 2000

               10:07 A.M.

19              --oOo--

             DEPOSITION OF

20         JOEL MASCITELLI

              --oOo--

21

22

23

24  CATHLEEN SLOCUM, CSR

     License No. 2822

25

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1  product specifications for the company.  So I'm sure
2  that he may have had some responsibility at that time.
3  Q    At the time you left the company, were these
4  three gentlemen still employed by Ultramar?
10:33:00 am 5  A    Yes, they were.
6  Q    As far as you know are they still employed by the
7  company?
8  A    I believe they, all three of them still are.
9  Q    Prior to 1996, and let's take the 1990 through
10  1996 time period, was Ultramar a member of the
11  American Petroleum Institute?
12  A    We were a member, and I don't remember the exact
13  year, up until sometime in -- it could have been, you
10:33:30 am 14  know, right after the IPO which was in '92.  '93, '94
15  we dropped our membership in the API.
16  Q    And was there a particular reason why the
17  membership was dropped?
18  A    Cost.
19  Q    Was the American Petroleum Institute a source of
20  information regarding other gasoline companies'
21  experiences with gasoline in terms of environmental
10:34:00 am 22  fate?
23  A    They were one of the sources, yes.
24  Q    And just so I'm clear, Ultramar stopped becoming
25  a member of American Petroleum Institute in

20

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1  approximately 1992 because of cost?
2  A    Yeah, '92, '93.  Cost and the fact that we felt
3  that we were getting similar type information from
4  other associations.
5  Q    All right.  And what other associations would
6  those be?
7  A    The main one was the NPRA, National Petroleum
10:34:30 am 8  Refiners Association, and then there was also a West
9  Coast association.  I believe it was WSPA, Western
10  States Petroleum Association.
11  Q    And when was Ultramar a member of the NPRA?
12  A    They were, they've been a member, you know, from
13  when I started with the company until when I left.
14  Q    Okay.  And how long has Ultramar been a member of
10:35:00 am 15  WSPA?
16  A    My recollection would be they probably were,
17  became a member after the acquisition of the
18  Wilmington refinery which was in '89.  I mean, excuse
19  me, prior to that they could have been an associate
20  member, but I don't remember that.
21  Q    And did the NPRA generate materials that it
10:35:30 am 22  shared with members regarding the environmental fate
23  of gasoline?
24  A    The NPRA shares materials on environmental
25  matters, gasoline and otherwise, yes.

21

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1  testified earlier that Ultramar was also involved in
2  the retail gasoline business at the time?
3  A    Yes.
4  Q    As part of the choice of oxygenates, was any
5  consideration given to the underground storage tanks
6  at the retail facilities in terms of the choice of
7  oxygenates?
11:01:30 am 8  A    No.
9  Q    Was there any, in conjunction with this
10  decision-making process on the choice of oxygenates,
11  was any program instituted regarding tank upgrades or
12  tank inspections of any sort?
13  A    Well, at that same period of time the company was
14  upgrading all of their underground storage tanks and
11:02:00 am 15  their retail stations to meet, you know, a deadline
16  when you were supposed to have these, you know, there
17  was a deadline.  I can't remember what it was.  It
18  could have been sometime in '98, '99.  But we were
19  upgrading, basically on a program to upgrade all of
20  the underground storage tanks to meet the new
21  regulations.
22  Q    And you think that this program culminated either
11:02:30 am 23  in 1998 or 1999?
24  A    I believe so.  And I think -- and, again, it's my
25  recollection that we were, you know, somewhere like 60

40

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1  to 70 percent done when I left the company in '97.
2  And I know that at that point in time we were
3  essentially ahead of the program as far as the number
4  of sites we needed to get done on a yearly basis.
5  Q    So when you left the company in 1977, taking the
11:03:00 am 6  converse of what you said, approximately 30 to 40
7  percent of the Ultramar retail stations had not yet
8  had their underground storage systems upgraded?
9  A    Yeah, they would be less than 30 percent.
10  Q    Less than 30 percent but more than 25 percent?
11  A    Well, again, it's somewhere in that range.
12  Q    All right.  And do you know what type of storage
11:03:30 am 13  tanks were being installed to meet the California
14  government regs which required upgraded storage tank
15  facilities at retail stations?
16  A    I'm pretty sure that in all sites that we were
17  working on we were going to double-walled tanks.
18  Q    Do you know if the upgraded -- well, did
11:04:00 am 19  Ultramar own a number of its own stations?
20  A    Yes, they did.
21  Q    When I say own, that means they own the site
22  where the gas station was located?
23  A    I believe in most of the cases they owned the
24  land where the station was located, yes.
25  Q    And that would also include obviously the

41

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

1    A    Yes.

2    Q    From 1996 until you retired from the company, are

3    you aware of any program by Ultramar that required

11:10:00 am    4    independent dealers that purchased gasoline from

5    Ultramar to certify that their tanks weren't leaking

6    to Ultramar prior to a purchase of gas from Ultramar?

7    A    I was not aware of that, no.

8    Q    Are you aware of any program at Ultramar to

9    determine if the non-branded stations receiving

10    Ultramar gas after 1996 in California -- strike that

11:10:30 am    11    question.

12         Do you know if Ultramar after 1996 in

13    California had any program to inspect unbranded

14    stations that received Ultramar gasoline in terms of

11:11:00 am    15    whether they had any leaks in their underground

16    storage tank systems?

17    A    No, I was not aware of any.

18    Q    Now, going back to the decision-making analysis

19    that was undertaken when Ultramar was determining

20    which oxygenate to select, do you know if any members

11:11:30 am    21    of Ultramar ever asked ARCO Chemical to discuss their

22    experiences with MTBE in terms of its environmental

23    fate?

24    A    I'm not aware of any, any requests, no.

25    Q    Do you recall as you sit here today ever seeing

46

11:16:30 am 1  an oxygenate in 1996?

2  A   No, I'm not.

3  Q   Did you attempt to contact anybody at Shell to

4  discuss their experience with the use of MTBE in

5  gasoline --

6  A   No.

7  Q   -- prior to 1996?

8  A   No, I did not.

9  Q   Do you know of anybody at Ultramar that attempted

10  to contact anybody at Shell regarding their experience

11:17:00 am 11  with MTBE in gasoline prior to 1996?

12  A   No.

13  Q   Are you aware of anybody at Ultramar that

14  attempted to contact anybody at ARCO regarding its

15  experience with MTBE in conjunction with the

16  decision-making process to use MTBE in 1996?

17  A   No, I'm not.

18  Q   Did Ultramar engage in any independent research

19  regarding the environmental fate of MTBE before it

11:17:30 am 20  decided to use it as an oxygenate in gasoline?

21     MS. MILNER:  Objection.  Asked and answered.

22     MR. SAWYER:  Go ahead, sir.

23     THE WITNESS:  Did we do independent research?

24     MR. SAWYER:  Q  Yes, sir, in-house research.

25  A   No, we did not.

50

1  Q   In conjunction with the Environmental Impact

11:18:00 am 2  Report with respect to the Wilmington refinery

3  modifications when you were going to go to MTBE, do

4  you know if Ultramar did any independent in-house

5  analysis of the environmental effects of MTBE as part

6  of the EIR process?

7     MS. MILNER:  Objection.  Misstates the

8  witness' prior testimony.  He testified that the

9  construction and the permitting was done for, not for

11:18:30 am 10  MTBE but for the CARB RFG requirements.

11     MR. SAWYER:  That's a point.

12  Q   Was any environmental impact analysis done with

13  respect to the use of or the introduction of MTBE at

14  the Wilmington refinery?

15  A   Not that I'm aware of unless -- I mean, here

16  again, it potentially could have been required under

17  the Environmental Impact Report but I wasn't aware of

18  an independent study.

19  Q   So you're not sure whether or not it was included

11:19:00 am 20  as part of the Environmental Impact Report?

21  A   No, I'm not.

22  Q   When MTBE was first introduced into gasoline and

23  Ultramar at its Wilmington refinery facility, was

24  there any analysis undertaken as to whether any

25  warning should accompany the sale of the gasoline?

51

11:19:30 am 1  A   Again, it would fall under the regulations as far

2  as any kind of product labeling requirements that were

3  required at that time.  And so if there, if there was

4  a requirement to have the products labeled

5  appropriately, I mean, you know, with the use of MTBE,

6  then I'm sure that we would have followed that.

7  Q   Just so I'm clear on your testimony then, if the

11:20:00 am 8  government required Ultramar to issue a warning, then

9  they'd issue a warning, but they weren't going to do

10  any warnings on their own; is that correct?

11  A   Correct.

12     MS. MILNER:  Objection.  Argumentative.

13     MR. SAWYER:  Did you get the answer,

14  "Correct"?  All right.  Thank you.

15  Q   In conjunction with the decision-making process

11:20:30 am 16  of selecting the oxygenate to use to meet CARB

17  requirements, were there any discussions regarding the

18  affects of MTBE on groundwater?

19     MS. MILNER:  I'm sorry, could I ask the

20  court reporter to repeat that.

21     MR. SAWYER:  Absolutely.

22     MS. MILNER:  Thanks.

23     (Thereupon the record was read back.)

24     THE WITNESS:  I don't remember any specific

11:21:00 am 25  discussions about that, no.

52

1     MR. SAWYER:  Q  Do you have any recollection

2  whatsoever regarding that particular subject matter

3  coming up during the decision-making process?

4  A   No, I don't.

5  Q   At some point after the decision was made to use

11:21:30 am 6  MTBE at the Wilmington refinery and to the point that

7  you retired from the company, do you recall any

8  discussions regarding the effects of MTBE on

9  groundwater?

10  A   No.

11  Q   From the point that Ultramar first used MTBE as

11:22:00 am 12  an oxygenate at the Wilmington refinery until the

13  point you retired, do you recall whether or not there

14  were any meetings at which the subject of MTBE

15  groundwater contamination was discussed?

16  A   I don't remember any.  No, I don't.

17  Q   Now, you indicated that Ultramar relied on what

11:22:30 am 18  you called its outside experts to, on the issue of

19  choice of oxygenates and its impact on the

20  environment.  Do you recall ever reviewing any

21  literature from any of the organizations that Ultramar

22  belonged to regarding the affects of MTBE on

23  groundwater?

24  A   I don't remember any, receiving anything on

11:23:00 am 25  that.

53

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, CATHLEEN S. SLOCUM, a Certified Shorthand Reporter, in and for the State of California, duly appointed and commissioned to administer oaths, do hereby certify:

That I am a disinterested person herein; that the witness, JOEL MASCITELLI, named in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition was reported in shorthand by me, Cathleen S. Slocum, a Certified Shorthand Reporter of the State of California, and thereafter transcribed into typewriting.

IN WITNESS WHEREOF, I have hereunto set my hand as a Certified Shorthand Reporter on this 31 of July, 2000.

Cathleen Slocum
Certified Shorthand Reporter
License Number 2822

--oOo--

116

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")     Master File No. 1:00-1898
Products Liability Litigation                   MDL 1358 (SAS)

                                                M21-88

## This Document Relates to:

*City of Fresno v. Chevron U.S.A Inc.., et al.*

*No. 04 Civ. 04973 (SAS)*

## Expert Report of Marcel Moreau

Marcel Moreau Associates

Portland, Maine

November 2, 2011

# INTRODUCTION

### Qualifications

I am a nationally recognized expert in underground petroleum storage systems. Since 1983 I have worked exclusively in the petroleum storage field, chiefly in the areas of regulation, storage system design, leak detection technology, and regulatory compliance assessment.

I have served as consultant to many private and governmental clients, including the U.S. Environmental Protection Agency (EPA), the Chesapeake Division of the U.S. Navy, the Petroleum Equipment Institute, the American Petroleum Institute (API), and the California State Water Resources Control Board.

I have provided technical training concerning underground storage tank systems to state regulatory personnel in Alabama, Alaska, Arizona, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, New Hampshire, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

I have authored a chapter discussing the federal underground tank regulatory program in the *Handbook of Storage Tank Systems,* a textbook sponsored by the Steel Tank Institute. I am a regular columnist for *L.U.S.T.Line,* a U.S. EPA-funded bulletin that covers issues associated with underground storage tank systems.

I have co-authored a paper entitled "MTBE as a Ground Water Contaminant," published in the 1986 *Proceedings of the Petroleum Hydrocarbons and Organic Chemicals in Ground Water – Prevention, Detection and Restoration – A Conference and Exposition* co-sponsored by the API and the National Water Well Association (NWWA).

As a consultant to the Petroleum Equipment Institute (PEI), I have worked with PEI committees to produce eight industry recommended practices, including:

- *Recommended Practices for Installation of Underground Liquid Storage Systems* (1997, 2000, and 2005 editions)

- *Recommended Practices for Installation of Aboveground Storage Systems for Motor Vehicle Fueling* (1999 and 2003 editions)

- *Recommended Practices for Installation and Testing of Vapor-Recovery Systems at Vehicle-Fueling Sites* (2004 edition)

- *Recommended Procedure for Testing Electrical Continuity of Fuel-Dispensing Hanging Hardware* (2002 edition)

- *Recommended Practices for Inspection and Maintenance of Motor Fuel Dispensing Equipment* (2005 edition)

- *Recommended Practices for Overfill Prevention for Shop-Fabricated Aboveground Tanks* (2007 edition)

- *Recommended Practices for the Inspection and Maintenance of UST Systems* (2008 edition)

- *Recommended Practices for the Design and Maintenance of Fluid-Distribution Systems at Vehicle Maintenance Facilities* (2009 edition)

- *Recommended Practices for the Installation of Marina Fueling Systems* (2009 edition)

I have discussed storage tank issues with editors from the trade publications *National Petroleum News* (NPN) and *Convenience Store News* and reporters from the television news magazine *60 Minutes.*

Since 1991, I have been the president of Marcel Moreau Associates in Portland, Maine, a consulting firm providing information and educational services related to petroleum storage tank systems for government, industry trade organizations, and private sector clients.

A significant facet of my professional career is the analysis of underground storage tank system failure.

I have testified as an expert witness regarding the sources and potential effects of MtBE releases from underground gasoline storage tanks in several prior MtBE litigations, including:

- *City of New York v. Amerada Hess et al.,* United States District Court, Southern District of New York, MDL No. 1358, Master File C.A. No. 1:00-1898 (SAS)

- *South Tahoe Public Utility District v. Atlantic Richfield Co., et al.* San Francisco Superior Court Case No. 999128

- *Communities for a Better Environment v. Unocal Corp., et al.,* San Francisco Superior Court Case No. 997013

- *Dunne, et al. v. Shell Oil Company*, Index #96-13856T, Supreme Court of the State of New York, County of Westchester

**Disclosures**

A listing of my publications and the cases for which I have provided deposition and trial testimony is contained in my curriculum vitae which is attached to this report as Appendix A.

I am being compensated for my time at the rate of $275 per hour. No portion of my compensation is contingent upon the outcome of this litigation.

It is my understanding that discovery in this case is ongoing. I reserve the right to supplement this report and modify any opinions presented herein based on any additional documents or information that I may review or that may be produced in conjunction with this case.

**Overview**

At the request of plaintiffs, I have been asked to review industry documents and draw on my knowledge and experience in underground storage tank systems, which I will refer to as "UST systems" throughout this document, to render opinions concerning the following six topics:

   I.  What are the components of UST systems and how do petroleum releases typically occur from these systems?

  II.  What is the efficacy of leak detection methods in detecting leaks from underground petroleum storage systems, especially if the petroleum leaking from the storage system contains MtBE?

 III.  What information was available to the petroleum marketing industry concerning the integrity of UST systems during the time when gasoline/MtBE mixtures were stored in UST systems?

 IV.  What is the MtBE problem, what did the oil industry know during the 1980s and 1990s about the MtBE problem, what steps did they take to address the problem, and what warnings did they provide in response to the problem?

V.  What does the widespread occurrence of MtBE in groundwater tell us about
    the standard-of-care required to store and handle gasoline that contains
    MtBE?

ground at U.S. service stations and that as many as 77 percent of them would begin leaking over the next five to ten years.[105] Dr. Rogers had been retained by the API to determine a formula to be used in predicting when UST would begin leaking.

### June 14, 1981 – Jury Returns $200,000,000 Verdict Against Chevron

In June of 1981, a jury found Chevron guilty of negligence, trespass, nuisance, and posing an "ultra-hazard" in connection with a gasoline leak in Northglenn, Colorado that entered sewer lines and caused several explosions. News reports indicated the jury verdict could cost Chevron up to $200 million dollars, although Chevron later denied that the leak was this costly (see July 1982, *The Tank Leak Mess*, in Section III of this report).

### March – July 1981 – NFPA Describes the Leaking UST System Problem

A series of three articles written by Martin Henry, the flammable liquids specialist for the NFPA, appeared in the *NFPA Fire Journal* in 1981. The first article presented an overview of the leaking UST system problem and noted that, "In one eastern state, in a two-and-half year period, 115 homes had to be temporarily vacated; 8 homes were destroyed; 3 explosions occurred; 17 persons were injured; 14 public water supplies, which affected 800,000 users, were threatened; and the water quality of 104 wells was seriously damaged."[106] These numbers make clear the emerging magnitude of the leaking UST system problem and the potential liability posed by the many tens of thousands of storage systems owned by major oil companies. The article also noted that, "…it is widely acknowledged that most leaks are never reported. Most states require that the individuals responsible for the leak make official notification to the proper authorities. Yet, almost every reported case of leakage results from a third-party complaint involving pollution or fire hazard."[107] Despite the rising awareness and the increasing numbers of reported incidents, it was clear that the true magnitude of the problem was still unknown.

---

[105] Ibid.
[106] "Underground Leakage of Hydrocarbons – An Overview of a Potential Fire Problem," Martin F. Henry, *NFPA Fire Journal*, March 1981.
[107] Ibid.

system that was going to have problems is still going to have problems. Upgrades addressed inadvertent spills and releases, not root causes of tank or line leaks."[148]

**Summary**

Leaks from UST systems have long been recognized by petroleum marketers and were considered "inevitable."[149] In 1980, at the time when MtBE began to be blended into gasoline, the petroleum industry was acutely aware of the decrepit nature of the nation's population of UST systems. Any company that owned substantial numbers of underground petroleum storage systems in the latter part of the twentieth century knew or should have known that these storage systems were common sources of groundwater contamination.

Recognizing this problem, trade press and internal company documents show that major oil companies undertook expensive UST system upgrading programs in the 1980s. It was well known in the industry, however, that many other storage tank owners put off upgrading their storage systems until the late 1990s. Most of these station owners were not aware of the MtBE problem (see Section IV) and the hazards posed by even small gasoline releases from their storage systems. Thus, in the time frame when MtBE was prevalent in the nation's gasoline supply, the nation's UST population was poorly suited to contain it.

---

[148] "Draft Agenda; Roster; Info Items," internal Shell e-mail from G. Marshall to C. Stanley, March 12, 1999.
[149] "Tank Leaks: Like the Common Cold, Nobody's Found a Cure," *NPN*, January 1979.

# SUMMARY

## Summary Listing of Opinions Contained in this Report

- The petroleum industry was very well aware that large numbers of UST systems were leaking or at risk of leaking when they introduced MtBE as an gasoline octane enhancer in 1979 and as an oxygenate in the 1990s. Throughout the 1980s and 1990s, a time when the quantity of MtBE produced placed it among the top organic chemicals in the country, UST systems continued to leak huge quantities of gasoline blended with MtBE into the ground. Despite this knowledge, oil refiners chose to make MtBE a major constituent of their gasoline.

- The health of the nation's UST systems improved gradually in the 1980s and 1990s, but a significant percentage of tank owners put off making the required improvements to their storage systems until the eve of the December 1998 regulatory deadline. This procrastination was common knowledge within the petroleum marketing industry, yet the industry issued no warnings to tank owners concerning the increased potential for gasoline blended with MtBE that was being delivered into storage systems that lacked corrosion protection, spill containment, and overfill prevention to cause groundwater contamination.

- MtBE leaks continued to plague the industry, even from "state-of-the-art" storage systems. Because of the very small quantities of MtBE required to cause measurable and persistent contamination, even secondarily contained storage systems were frequently unable to adequately contain MtBE gasoline. In addition, routine spills during operation and maintenance of UST systems contributed to MtBE releases to the environment.

- Commonly used leak detection technologies such as inventory control and automatic tank gauging were woefully inadequate in detecting MtBE releases. Even the most accurate leak detection technologies could only detect leaks of a

few gallons per day at best, while MtBE required leak detection accuracy on the order of a few gallons per year.

- The solubility, slow biodegradation rate, and low odor and taste thresholds of MtBE distinguished this chemical from the hundreds of other constituents of gasoline.   This uniqueness is evident in contamination plumes where MtBE is virtually the only chemical present or in plumes where there is an MtBE-only halo around the main body of the plume. Despite knowledge of these unique properties and the unique hazards they posed to groundwater quality, MtBE producers and distributors took no steps to warn the petroleum distributors, marketers, and users of their products of the special handling required for fuels containing MtBE.

- MtBE releases occurred from UST systems regardless of the sophistication of the owner or operator.  This is because the "state-of-the-art" in storage system technology and the "standard-of-care" implemented by petroleum handlers and end-users were not sufficient to adequately contain MtBE.   The lax standard-of-care was prevalent from decades of storing and handling gasoline without MtBE. No attempt was made to improve this standard-of-care because the industry contended that MtBE gasoline could be handled just like any other gasoline.

- A number of steps could have been taken that would have greatly lessened the number and magnitude of MtBE release incidents, including acknowledging the increased threat to groundwater posed by MtBE, promoting better handling procedures for gasoline, installing better UST systems, and using leak detection methods specifically aimed at the early detection of MtBE releases.  The key step would have been to acknowledge that MtBE posed a threat to groundwater. Instead of providing warnings, however, the industry chose to whitewash the issue.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This Document Relates To:

*City of Fresno v. Chevron U.S.A. Inc., et al.*, No. 04
Civ. 04973 (SAS)

### EXPERT REBUTTAL REPORT OF MARCEL MOREAU

Marcel Moreau Associates
73 Bell Street
Portland, ME 04103

_Marcel Moreau_
Signature

March 5, 2012
Date

contamination is due to inadequate storage system technology, inadequate monitoring for releases, and the lack of pre-installed remediation technology.

## Defendants Recognized that Commonly Used Storage System Technology Was Inadequate to Contain MtBE Gasoline

The field evidence conclusively points to widespread inability of underground storage systems to be operated for any substantial length of time without experiencing substantial releases of gasoline. Having owned tens of thousands these storage systems over many decades, most of the defendants were well aware that this was the case.[34] Most of the defendants had replaced their leak prone bare-steel storage systems with fiberglass tanks and piping in the 1980s. Many of the defendants upgraded their facilities beyond California's regulatory requirements in the 1990s[35] in order to better contain gasoline.

But many of the Fresno facilities continued to operate with bare-steel storage system well past the time when MtBE was prevalent in California gasoline.[36] Defendants recognized that these storage systems were not adequate for the storage of gasoline, let alone gasoline with MtBE. Many of the Fresno facilities were owned or operated by people who knew very little about underground storage systems.[37] Other than the fact that gasoline is dangerous, these people knew very little about the properties of gasoline.[38] They had no way of knowing the dramatically increased security required of their storage systems to protect the environment from MtBE contamination. They needed to know this information before MtBE was introduced into gasoline.

---

[34] Expert Report of Marcel Moreau, *City of Fresno v. Chevron U.S.A., Inc., et al.,* November 2, 2011, Section III.
[35] E.g., Amoco, "Spill Prevention at Service Stations," approximately 1995, Bates 1206003119-121; Amoco, "MTBE: Recommendations for Environmental Liability Management, June 3, 1997; Shell, "An Environmental Symposium on MtBE," presentation by Glen Marshall, August 1996; Chevron, "Underground Storage Tank System Environmental Performance, Chevron Products Company, May 2003.
[36] E.g., 7-Eleven #19198, 1596 North Palm St; Beacon #3519, 4591 E. Belmont Ave.; Beacon Arco #3615, 1625 Chestnut Ave.; Exxon, 4594 East Tulare Ave.; Fresno Valley Gas, 2139 S. Elm St.; Gas 4 Less, 3706 E. Gettysburg Ave.; M & S Texaco, 2619 S. East Ave.; Ratcliffe Gas, 2145 N. Blackstone; Tosco #30857, 1610 N. Palm Ave.; U & A Gas, 2929 N. Blackstone Blvd.; Van Ness Auto, 2740 West Van Ness.
[37] E.g., depositions of Garabed Bedirian, 4/4/11 p. 30, 32; Gary Beacom, 8/10/11, p. 54; Joe Rebella, 3/15/11, p. 32; Babak Lakestani, 8/9/11, p. 50.
[38] E. g., depositions of Bryan Leonard Moe, 8/17/11, p. 68; David Benjamin, 8/9/11, p. 167; Ravi Stephen, 9/5/11, p. 101; Babak Lakestani, 8/9/11, p. 37.

## Legal Retention at MSXSOC

| From: | Marshall Glen R [Newcos] |
|---|---|
| Sent: | Friday, March 12, 1999 2:47 AM |
| To: | Stanley CC (Curtis)  at MSXWHWTC |
| Subject: | RE: Draft Agenda; Roster; Info Items |

Already discussed details with Mike Barsa twice. '98 upgrade work will have no affect on MTBE issues. Any system that was going to have problems is still going to have problems. Upgrades addressed inadvertent spills and releases, not root causes of tank or line leaks. Also, all R&D work I'm familiar with indicates that MTBE will have no affect on same.

## Glen R. Marshall, P.E.
Staff Coordinator
Technical Services - Engineering
## Equiva Services, L.L.C.
Shell + Texaco + Saudi Aramco

9/80 Schedule "A"
Office:      (281) 874-4857
Fax:        (281) 874-7979
Beeper:     (800) 342-4033
Alliance ELS.  Marshall GR (Glen)
Internet:    GRMarshall@Equiva.com

Address: Equiva Services, LL C
12700 Northborough Drive
Suite 300C12
Houston, TX   067

-----Original Message-----
| From: | Stanley CC (Curtis)  at MSXWHWTC [SMTP:CS193653@MSXWHWTC SHELL.COM] |
|---|---|
| Sent: | Thursday, March 11, 1999 3:35 AM |
| To: | Marshall Glen R [Newcos] |
| Subject: | RE: Draft Agenda; Roster; Info Items |

Glen,

This is just an fyi.  The new MTBE counsel (outside attorney) is interested in hearing your opinion on tank upgrades in relation to MTBE release prevention.  They will contact you in the near future.

Curt

-----Original Message-----
| From: | Marshall Glen R [Newcos] |
|---|---|
| Sent: | March 10, 1999 9:32 PM |
| To: | Stanley CC (Curtis)  at MSXWHWTC |
| Subject: | RE: Draft Agenda; Roster; Info Items |

Any specific support needs from me or my department?  I'm not officially on any of the attached committees to my knowledge, have out-of-state vendor coming in on 3-31, and will only be in office 3-29 thru 4-1.  Due to current travel commitments, will not be back in office on regular basis until roughly 4-8.

## Glen R. Marshall, P.E.
Staff Coordinator
Technical Services - Engineering
## Equiva Services, L.L.C.
Shell + Texaco + Saudi Aramco

9/80 Schedule "A"
Office:      (281) 874-4857
Fax:        (281) 874-7979
Beeper:     (800) 342-4033
Alliance ELS:  Marshall GR (Glen)
Internet:    GRMarshall@Equiva.com

Address: Equiva Services, LL C
12700 Northborough Drive
Suite 300C12
Houston, TX  77067

-----Original Message-----
| From: | Stanley CC (Curtis)  at MSXWHWTC [SMTP:CS193653@MSXWHWTC.SHELL.COM] |
|---|---|
| Sent: | Wednesday, March 10, 1999 12:48 PM |
| To: | Allan Register; Ariane Warden; Brad Boschetto; Bruce Krewinghaus; Chen Chiang; Chris Neaville; Christine White; Chuck Lieder; Cindy Delaney; Daniel Farrier; Ed Hsu; Edward Dink(eid; Erik Hansen; F Benton; Felicia Federico; George Dealey; George Devault; Gerard Spinxler; Glen Marshall; Gweneyatte Broussard; Ileana Rhodes; James Michalski; Jerry Ivie; Joe Salanitro; Jonathan Miller; Kathleen Gillmore; Ken Darmer; Ken Springer; Marjorie Hong; Michael Gallagher; Otto Meyers; Paul Sun; Pete Parker; Phil Daly; Phil Dorn; Richard Lewis; Rick Wolfe; Robert Dedoes; Robert Ettinger |
| Subject: | FW: Draft Agenda; Roster; Info Items |

FYI

Curt

SH 022667

Ber  D (DBEA)

| | |
|---|---|
| From: | Dickey, Hugh (JHDI) |
| Sent: | Wednesday, January 20, 1999 10:59 AM |
| To: | Hopkins, Mark (MHOP) |
| Cc: | Harrer, Bob (ROBO); Buscheck, Timothy (TIBU); Barber, Randy (RBBA); Sea, D (DBEA); Jessel, Al (AJJE); Gilson, Donald (DFGI); Hartwig, Jeff (JWHA); Freeberg, Clay (CRFR), Pierce, David (DWPI) |
| Subject: | RE: MtBE Fate in the Subsurface |

Mark - Here's the final MTBE-UST white paper.  I tried to be consistent with the spirit (if not the exact wording) of the comments I received from folks.  Thanks to all.  The only thing we need now is the Bill # from Feinstein's bill and it will be final.

　　　　　Hugh

**x̄**

MTBE-UST White
Paper (final d..

-----Original Message-----
From:        Dickey, Hugh (JHDI)
Sent:        Monday, January 18, 1999 8:05 AM
To:          Buscheck, Timothy (TIBU); Sea, D (DBEA); Barber, Randy (RBBA); Harrer, Bob (ROBD); Hopkins, Mark (MHOP); Jessel, Al (AJJE
             Gilson, Donald (DFGI); Hartwig, Jeff (JWHA)
Subject:     RE: MtBE Fate in the Subsurface

Here's the first draft of the white paper we would like to use in DC to help lobby the Feinstein/Bilbray bills to remove the federal oxygenate mandate.  This responds to the argument that OFA and other MTBE manufacturers make that it is "just a problem with the tanks".  Please review and get me any comments you have by COB tomorrow.  Thanks.
Hugh

<< File: MTBE-UST White Paper.doc >>

-----Original Message-----
From:        Buscheck, Timothy (TIBU)
Sent:        Tuesday, January 12, 1999 8:02 PM
To:          Dickey, Hugh (JHDI)
Subject:     MtBE Fate in the Subsurface

Hugh,

I've attached some material that should be suitable for your white paper.

Tim

<< File: MtBEtanks.doc >>

1

CH 001981

### Solving Problems from MTBE Contamination –

### It's Not Just Regulating Underground Tanks

Some have suggested that the problems observed with MTBE contamination of groundwater can be resolved by forcing gasoline manufacturers and retailers into more stringent underground storage tank requirements. They argue it's just the tanks – fix them from leaking, and the MTBE problem will go away. There are several reasons why this explanation over-simplifies the situation. While it is important to reduce the likelihood a release from underground tanks, the mandated use of oxygenates has had unintended consequences. The physical and chemical properties of MTBE (and thus its mobility and persistence in the environment differ markedly from other components of gasoline. These differences make MTBE (and other ethers and heavy alcohols) more likely to get into groundwater and problematic to contain and clean up when a release occurs. These differences include:

- MTBE is more volatile than many components in gasoline. This means it is more likely to evaporate into the atmosphere when a release occurs, which in turn can readily move into water vapor (and and subsequent rainfall) in the atmosphere.

- MTBE and other oxygenates are orders of magnitude more soluble in water than other gasoline components. Oxygenates make up one of largest single components in gasoline (10-15% by volume). They have a strong affinity for and dissolve easily in water (rainfall, surface waters, groundwater)

- Other gasoline components in comparison, bond more strongly to soil, should a release occur. This greatly reduces the volume of groundwater requiring clean-up, by limiting the area impacted.

- MTBE does not <u>biodegrade</u> as readily as other gasoline components, increasing the volume of groundwater impacted and making it more difficult to clean up.

Researchers at the University of California – Lawrence Livermore Laboratory[1] have concluded:

> <u>MTBE has the potential to impact regional groundwater resources and may present a cumulative contamination hazard. To date, impacts of MTBE to public water systems have been limited and were similar in frequency to those of benzene. Based on historical data, future impacts of aromatic hydrocarbons, such as benzene to water supplies is not expected to be common, due to retardation and relative ease of biodegradation. In contrast, MTBE contamination may be a progressive problem due to the chemical's apparent recalcitrance and mobility. With a compound that appears both ubiquitous and recalcitrant, water resource management on the regional scale will become increasingly relevant.</u>

---

[1] "An Evaluation of MTBE Impacts to California Groundwater Resources"; LLNL – June 11, 1998

CH 001982

These concerns on the mobility and persistence of MTBE in the environment are reinforced by a recent study by the state of Maine. The state found MTBE groundwater contamination from small spills of gasoline (e.g. a spill in a parking lot, or a car accident) – incidences that stood in contrast to the known historical causes of MTBE contamination e.g. point source discharges from leaking underground storage tanks.[2]

While MTBE and other oxygenates have been used for many years as gasoline blending components, it was only after the mandated use of oxygenates following the passage of the 1990 Clean Air Act Amendments, that oxygenates became as widely used as they are today. It is because of the differences in physical and chemical properties of MTBE that it is more likely to reach groundwater, as a result of incidental spills, overfills, and gasoline deliveries, *even without* underground storage tank leaks. Therefore, the detection of MTBE does not necessarily mean a tank is leaking. For example, MTBE has been found in low concentrations in lakes from rainfall runoff and recreational activities.

Congress passed requirements for owners and operators to upgrade their underground storage tanks, provide for leak detection, and provide for financial responsibility, should a release occur. These requirements became fully effective on January 1, 1999. As a company, Chevron began upgrading their tanks around the country in the early 1980's, years in advance of federal and state requirements. Over the years, Chevron has continued to go beyond federal requirements – for example, in the early 1990's Chevron decided to install double-walled tanks, even though they are not required, in all new and reconstructed service stations. In addition, last year Chevron began a nationwide program to further reduce the likelihood of releases of gasoline into the environment. This program includes evaluation and monitoring of the most sensitive sites where groundwater exists, checking lines and connections of pumps and tanks, and changing station operating procedures and housekeeping practices.

Even these steps, which go far beyond federal and state requirements, can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they do get in the environment. Further, additional control measures could take years to implement, without fully solving the problem. The solution is to allow refiners the flexibility to avoid putting MTBE into gasoline in the first place. California Cleaner Burning Gasoline, the cleanest burning gasoline in the world, can be produced with little or no oxygenates and still meet the state's strict air quality requirements. Congress should pass HR 11 and S ( ) which would allow California refiners this flexibility.

---

[2] "The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water"; October 13, 1998

CH 001983

# EXHIBIT 7

Page 1

1

2                      UNITED STATES DISTRICT COURT

3                     NORTHERN DISTRICT OF NEW YORK

4

5   CITY OF FRESNO,                    )
                                       )
6                    Plaintiff,        )
                                       )
7   vs.                                )      No. 04 CIV. 4973
                                       )      (SAS)MDL 1358
8   CHEVRON U.S.A. INC., et al.,       )
                                       )
9                    Defendants.       )
    _____)

10

11

12                        DEPOSITION OF

13                        IMTIAZ AHMAD

14                     FREMONT, CALIFORNIA

15                WEDNESDAY, FEBRUARY 16, 2011

16

17

18                DEPOBOOK REPORTING SERVICES

19                Certified Shorthand Reporters

20                   1600 G Street, Suite 101

21                  Modesto, California 95354

22                       800-830-8885

23

24   REPORTER:    DENISE WHEELER, CSR NO. 8254

25

1    Q.  There's an indication about four lines down that

2  says, "Date of business commencement 11, slash, 1, slash,

3  91." Do you see that?

4    A.  Yes, I do.

5    Q.  And does that match your approximate recollection

6  as to when Petro Group II started operating that station?

7    A.  Yes.

8    Q.  Now, in about the middle section here below the

9  heavy bar it looks like UST Annual Fees.  It says, "Three

10  non-upgraded tanks."  Do you see that?

11    A.  Yes.

12    Q.  Do you recall were -- were there three underground

13  storage tanks at the time that Petro Group II took over that

14  station on Elm?

15    A.  Yes.

16    Q.  Did you have any knowledge whether these tanks were

17  singled walled or double walled?

18    A.  They were single walled.

19    Q.  Do you have any knowledge as to what those tanks

20  were made out of?

21    A.  They were made out of steel.

22    Q.  Do you have any knowledge as to when those tanks

23  were first installed?

24    A.  First installed?  They were old tanks.  I would not

25  know exactly, no.

31

1    Q.  Is it correct the tanks were not changed out at the

2  time that Petro Group II took over the station?

3    A.  No, sir.

4    Q.  Do you know at the time the Petro Group II took

5  over was there any kind of leak detection system for those

6  underground storage tanks?

7    A.  No, other than manual inspection we do on a daily

8  basis.

9    Q.  Okay.  Set that aside.  Thanks.

10      (Exhibit No. 6 was marked for

11      identification.)

12    MR. EICKMEYER:  Q.   Handing you Exhibit 6, this is

13  Business Plan Registration Form Department of Health, Date

14  stamped at the bottom right RWQCB hyphen Fresno hyphen

15  001732.  Do you recognize having seen this form before?

16    A.  When you say recognize, the -- the answer would be,

17  no, I don't recognize.  All I know is, yes, we did these

18  things, and you had to file certain forms.  And I can see

19  just my wife's writing.  So the answer -- when you said

20  recognize, tell me what you're saying?

21    Q.  Well, if you remember having seen this page before.

22  You're saying you remember seeing similar forms?

23    A.  Yes.

24    Q.  You're not sure if you've seen this exact page

25  before?

32

1    A.  That's exactly what I'm saying.

2    Q.  Do you recognize your wife's signature down at the

3  very bottom?

4    A.  Yes, I do.

5    Q.  Now, in about the middle of the page under

6  emergency contacts has your name listed?

7    A.  Yes.

8    Q.  And below that it says title of manager?

9    A.  Uh-huh.

10    Q.  Is that yes?  I think you said uh-huh.

11    A.  Yes.  Yes.  I'm sorry.

12    Q.  Were you considered the manager of the station on

13  Elm?

14    A.  Yes.

15    Q.  Were you present there during the station

16  operations?

17    A.  Not every day but a good part of -- part of it.

18    Q.  When you or Petro Group took over that station,

19  were you given any training in what to do in the event of a

20  gasoline leak or spill?

21    A.  I believe we went through that process.

22    Q.  Who did you go through that process with?

23    A.  I believe Beacon did it or someone from Beacon came

24  in who did it.

25    Q.  Do you have any recollection of what you were told

33

1  to do in the event of a gasoline leak or spill?

2    A.  I believe we had what you guys called an

3  environmental kit.  Its a 55-gallon drum.

4    THE COURT REPORTER:  What, kit?

5    THE WITNESS:  Kit, K-I-T.  So it has a sack or two

6  sacks of chemical that wipes up the gasoline or oil.  That

7  it has some kind of bonds that are supposed to contain the

8  oil.  There was a bunch of stuff in there, some rags and

9  that kind of stuff in that tub.

10    MR. EICKMEYER:  Q.   I've heard different witnesses

11  describe a product that had the consistency of kitty litter.

12  Did you have something like that?

13    A.  Yeah, you can say that.  You can say that.  That's

14  the term they used, yes.

15    Q.  Do you recall how often you would have to use that

16  kitty litter type product to clean up a gasoline leak or

17  spill at the station?

18    A.  Not that very often.

19    Q.  Can you quantify how often that would be, weekly,

20  daily, monthly?

21    A.  I wouldn't be able to say how often, but I would

22  say probably about -- I would say probably at least once --

23  once a month or so you would end up using it.

24    Q.  After that kitty litter product was applied to the

25  ground was it then swept up or scooped up somehow?

34

1    A.  Yes.

2    Q.  And then where would that used product be placed?

3    A.  That product was supposed to go back in that drum

4    basically.

5    Q.  So the product would be reused?

6    A.  Not reuse.  I think the -- the kitty litter would

7    be sitting in our -- in our storage room, and then you have

8    the plastic bags.  That's where the stuff is supposed to go

9    back once you sweep up the floor.  And then I think every so

10   often somebody came in or we took it someplace else I

11   believe.

12   Q.  So after the kitty litter product was swept up, it

13   would be put into a plastic bag?

14   A.  It was put in a plastic bag.

15   Q.  Were these kept inside the station building or a

16   storage shed?

17   A.  No, the outside building.  There was always a

18   storage somewhere there.  So, like, this particular location

19   you're talking about, there's a main building, and then

20   there's a side building.  A little bit of a -- you can call

21   a storage room where we keep the -- the tanks have a

22   measuring sticks in the old days.  So this was like a 10, 15

23   feet long stick that you put in the tank to measure how much

24   the gas is there on a daily basis.

25        And then also the chemical kit would be in that

35

1    Q.  Were you ever told at a particular time that MTBE
2  was being added to the gasoline?
3    A.  Yes.
4    Q.  Do you recall when you first heard that?
5    A.  When we took over the gas station back in '91.
6    Q.  Do you recall ever being told while Petro Group
7  operated the station that MTBE was no longer being added to
8  the gasoline?
9    A.  I think that came in effect after we sold the gas
10  stations.
11    Q.  Did you ever hear from any source why MTBE was
12  being added to the gasoline?
13    A.  I think I need to add something at this point.  As
14  a CPA I specialized in gasoline service station accounting.
15  So as such I have, let's say, more than 50 gas station owner
16  operator.  So on a daily basis I hear everything there is to
17  hear about the industry.
18    Q.  Do you recall hearing from any sources as to why
19  MTBE was added to gasoline?
20    A.  Why it was added to the -- I think Arco who came up
21  with this product to boost the oxygenation I believe.
22  That's what it was.
23    Q.  Do you recall ever hearing that gasoline with MTBE
24  in it needed to be treated differently than gasoline that
25  did not contain MTBE?

110

1    A.  I would not know at this point, no.
2    Q.  Do you recall when gasoline was being delivered to
3  the station, did you ever receive an MSDS or Materials
4  Safety Data Sheet for gasoline?
5    A.  The answer would be have no idea at this time.  But
6  I can tell you on every single pump we had notice about MTBE
7  so that buyers of the gasoline, the consumer of the
8  gasoline, would know that this product included MTBE.
9    Q.  Did you ever hear from any source why those labels
10  needed to be put on the pumps?
11    A.  I think it could have many, many reasons.  But the
12  biggest reason the customer wanted to know or let the
13  customer know it could affect their converter system in
14  their cars.
15    Q.  Were those labels that you mentioned on the pumps
16  the entire time you operated the station?
17    A.  I'm sorry, say it again.
18    Q.  You described I think it was a label on the pump?
19    A.  Yeah, these are called decals.
20    Q.  Decal.  Were these decals indicating there was MTBE
21  in the gasoline on the pumps during the entire time you
22  operated the station?
23    A.  That is correct, yes.  I believe MTBE was added on
24  during the cold season like starting October to February,
25  and then it would come off I believe.

111

Page 139

```
 1    actual scheduling reasons for it, but I apologize for it
 2    being somewhat awkward.
 3         Can you hear me?
 4    A.   I can hear you pretty good at this point.
 5    Q.   As I said in the beginning, I represent the Valero
 6    defendants in this case, and I just wanted to clarify a few
 7    things you discussed with Mr. Eickmeyer if that's okay?
 8    A.   That's okay with me.
 9    Q.   I know that you said that after Petro Group II
10    purchased the Elm Street station from Ultramar, that it was
11    Beacon and Ultramar gasoline that was delivered to the
12    station; is that correct?
13    A.   That is correct.
14    Q.   And do you recall if there was a specific agreement
15    between Petro Group II and Ultramar that allowed for that
16    delivery of gasoline?
17    A.   I believe we signed the -- what do you guys call in
18    this business branded versus not branded gasoline, so that
19    particular place was branded as Beacon, so we signed a
20    contract with them.
21    Q.   Like a brand distribution marketing agreement,
22    something like that?
23    A.   Yes.
24    Q.   Okay.  And do you recall if there was a specific
25    number of years that that was set for?
```

Page 140

```
 1    A.   That I don't know.  I think it was three-year
 2    agreement or five-year agreement.
 3    Q.   Okay.  And do you recall if there was any other
 4    specific terms in that agreement, whether there were
 5    specific amounts of gasoline specified or whether it set out
 6    other requirements for either party?
 7    A.   I believe we couldn't buy from anybody else other
 8    than Ultramar during -- during the product term.
 9    Q.   Okay.  And I believe that you just told my
10    associate -- my colleague that you ceased the brand name
11    agreement in 1995; is that correct?
12    A.   That is correct.
13    Q.   And at that time you stopped accepting Beacon or
14    Ultramar gasoline at the station; is that correct?
15    A.   That's right.
16    Q.   And did you have Beacon or Ultramar signs at the
17    station, do you recall?
18    A.   After we stopped buying from Beacon?
19    Q.   When you were buying from Beacon?
20    A.   Yeah, every time -- yeah, so -- so while we were
21    buying from Beacon, what we were called in the market is
22    called branded location -- so as such we were branded
23    Beacon.  So every location had a sign called Ultramar Beacon
24    sign.  And this particular location had an Arco sign.
25    Q.   Okay.  And do you recall if you needed new gasoline
```

Deposition of Imtiaz Ahmad / February 16, 2011

Page 146

1

2                    REPORTER'S CERTIFICATION

3

4       I, DENISE WHEELER, CSR No. 8254, Certified Shorthand

5   Reporter, certify:

6       That the foregoing proceedings were taken before me at

7   the time and place therein set forth, at which time the

8   witness was put under oath by me;

9       That the testimony of the witness, the questions

10  propounded, and all objections and statements made at the

11  time of the examination were recorded stenographically by me

12  and were thereafter transcribed;

13      That the foregoing is a true and correct transcript of

14  my shorthand notes so taken.

15      I further certify that I am not a relative or employee

16  of any attorney of the parties, nor financially interested

17  in the action.    I declare under penalty of perjury under

18  the laws of the California that the foregoing is true and

19  correct.

20      Dated this 28th day of February, 2011.

21

22

23      _____

        DENISE WHEELER, C.S.R. No. 8254

24

25



UNITED STATES DISTRICT COURT )
SOUTHERN DISTRICT OF NEW YORK )
                                   )
_____ )
                                     )
In re Methyl Tertiary Butyl Ether )
("MTBE") Products Liability Litigation )
                                     )
_____ )
                                     )
This document relates to: )
                                     )
*City of Fresno v. Chevron U.S.A., Inc., et* )
*al.*, No. 04 Civ. 4973 )
                                     )
_____ )

Master File No. 1:00-1898
MDL No. 1358 (SAS)
M21-88


VALERO DEFENDANTS'
OBJECTIONS AND RESPONSES
TO PLAINTIFF CITY OF
FRESNO'S FIRST SET OF
INTERROGATORIES TO
DEFENDANTS

Pursuant to Federal Rule of Civil Procedure 33 and Local Rule 26.3, Ultramar Inc.,

Valero Marketing and Supply Company, and Valero Refining Company–California (collectively

"Valero Defendants") answer and object to Plaintiff City of Fresno's ("Plaintiff" or "City of

Fresno") First Set of Interrogatories served on September 2, 2008 as follows.

       Dated: November 5, 2008.

                                       _____

                                       J. Clifford Gunter III
                                       M. Coy Connelly
                                       Amy E. Parker
                                       BRACEWELL & GIULIANI LLP
                                       711 Louisiana St., Suite 2300
                                       Houston, Texas 77002-2770
                                       Telephone: (713) 221-1335
                                       Telecopier: (713) 221-1212

                                       Attorneys for Defendants
                                       ULTRAMAR INC., VALERO MARKETING AND
                                       SUPPLY COMPANY, AND VALERO REFINING
                                       COMPANY-CALIFORNIA

2. Beacon #78: Belmont at 12th Street, Fresno CA (1935—Closure Date Unknown)
3. Beacon #80: Tulare & Chestnut, Fresno CA (Dates of Leasehold Unknown)
4. Beacon #496: 4809 E. Kings Canyon, Fresno CA (Dates of Leasehold Unknown)
5. Beacon #595: 3768 S. Highway 99, Fresno CA (09/01/83—03/27/96)
6. Beacon #620: 4594 E. Tulare, Fresno CA (01/22/85—08/28/95)
7. Beacon #658: 1334 N. First St., Fresno CA (Lease terminated 11/01/96)
8. Beacon #257: 9th & McKenzie, Fresno CA (Site leased 10/46, Lease Termination Date Unknown)
9. Beacon #432: 2950 E. Ventura, Fresno CA (Dates of Leasehold Unknown)
10. Beacon #433: 1372 N. First St., Fresno CA (Dates of Leasehold Unknown)
11. Beacon #437: 4652 Belmont, Fresno CA (Dates of Leasehold Unknown)
12. Beacon #438: 4005 E. Jensen, Fresno CA (Dates of Leasehold Unknown)
13. Beacon #460: 603 G. Street, Fresno CA (04/28/75—04/30/90)
14. Beacon #472: 2295 S. Elm Ave., Fresno CA (Dates of Leasehold Unknown)
15. Beacon #516: 2430 E. Olive St., Fresno CA (07/15/85—10/31/91)
16. Beacon #538: 2139 S. Elm, Fresno CA (Lease terminated 11/01/91)
17. Beacon #579: 5190 E. Olive, Fresno CA (Lease terminated 11/01/91)
18. Beacon #619: 3076 E. Gettysburg, Fresno CA (01/22/85—08/03/89)
19. Beacon #9-1: 6900 N. Motel Dr., Fresno CA (Dates of Leasehold Unknown)

## INTERROGATORY NO. 4:

IDENTIFY the address of all gasoline stations with which YOU have or have had a retail supply contract within the RELEVANT GEOGRAPHIC AREA since 1979.

    a.     State the retail supply contract dates for each station YOU identified.

## RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is specifically overbroad both with respect to time, as explained in General Objections Nos. 6 and 7, and to the extent it calls for the identification of all gasoline stations owned by Valero Defendants in the RGA without regard to whether any of those stations is in the vicinity of any drinking water production well or whether any of those stations has ever been identified as the source of a release of gasoline containing MTBE. Valero Defendants further object to the extent this Interrogatory seeks information outside of Valero Defendants' possession, custody and control. Valero Defendants are not in possession of information pertaining to the operation, maintenance or environmental remediation which may be associated with any of the following stations. Notwithstanding the foregoing or the General Objections set forth above, Valero Defendants respond as follows:

1. #2339: 1919 W. Clinton Ave., Fresno, CA 93705 (06/13/03—present)
2. #2365: 603 G. Street, Fresno, CA 93722 (05/01/93—present)
3. #2516: 2837 N. Parkway Drive, Fresno, CA 93722 (07/18/03—present)

4. #3165: 3076 E. Gettysburg Ave., Fresno, CA 93726 (Branded Beacon prior to 2003. Date of initial branding is unknown. Re-branded Valero 10/17/03—present)
5. #4984: 4591 E. Belmont Ave., Fresno, CA 93702 (10/20/99—present)
6. #21854: 1460 "P" Street, Fresno CA 93721 (1/22/85—10/22/04, 01/27/05—present)
7. #24087: 1785 W. Shaw Ave., Fresno, CA 93711 (12/10/01—09/26/03, 11/27/07—present)
8. #21788: 2414 N. Marks Ave., Fresno, CA 93705 (03/01/91—05/16/05, 11/27/07—present)
9. #23972: 388 E. Shaw, Fresno, CA 93710 (Dates of operation unknown, station closed prior to 2002).
10. #21753: 394 E. Olive Ave., Fresno, CA 93728 (09/21/95—04/12/00)
11. #24049: 1680 W. Olive Ave., Fresno, CA 93728. (Date of initial branding unknown. De-branded 07/17/01).
12. #23990: 525 S. Clovis Ave., Fresno, CA 93727. (10/20/99—01/09/02, 11/09/04—present)
13. #21894: 5687 E. Kings Canyon Rd, Fresno, CA 93722, (04/19/95—11/03/02, 01/27/05—present)

## INTERROGATORY NO. 5:

IDENTIFY all jobbers, franchisees and/or distributors to whom YOU supplied MTBE gasoline within the RELEVANT GEOGRAPHIC AREA since 1979.

    a.    State the dates that YOU supplied MTBE gasoline to each jobber, franchisee, and/or distributor that YOU identified.

## RESPONSE:

Valero Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Valero Defendants further object to this Interrogatory on the grounds that the term "franchisees" is vague, ambiguous, and undefined. Further, Valero Defendants object to this Interrogatory to the extent it seeks information regarding sales of gasoline containing MTBE made within the RGA. Valero Defendants do not keep such information in the regular course of business. Valero Defendants' sales records are kept by county. This response will therefore provide information regarding sales made to entities in Fresno County.

Valero Defendants further object on the grounds that this Interrogatory seeks information outside of Valero Defendants' possession, custody and control. For example, apart from deliveries made to Valero Defendants' aforementioned retail and branded stations, Valero Defendants are not in possession of information regarding the ultimate delivery point of any gasoline sold to third parties in Fresno County. Notwithstanding the foregoing, Valero Defendants respond as follows:

Valero Defendants refer Plaintiff to Exhibit A attached to these responses which provides information responsive to Interrogatory No. 5 and Subpart (a) for Fresno County.

<u>**VALERO CORPORATE REPRESENTATIVE DEPOSITION**</u>
<u>**EARLY KNOWLEDGE AND TASTE & ODOR**</u>

Norman Renfro
Vice President of Health, Safety and Environmental
Valero Services, Inc.

**Employment History**

| | |
|---|---|
| May 7, 1984 | Environmental Engineer |
| 1988 | Chief Environmental Engineer |
| 1992 | Environmental Manager |
| 1995 | Director of Safety and Environmental |
| 1997 | Vice President of Environmental and Safety Affairs |
| 2002 | Vice President of Health, Safety and Environmental |

**For purposes of this deposition, "Valero" includes the following entities:**

Valero Energy Corporation
Valero Marketing and Supply Company
Valero Refining Company
Valero Refining and Marketing Company
Valero Refining Company Louisiana
Valero Refining—Texas, L.P.
Valero Refining Company—New Jersey
Valero Refining Company—California

Norman Renfro testimony applicable to heritage Valero and Basis refineries (1997), Paulsboro (1998), and Benicia (May 2000).

1.  Whether any DOCUMENTS described in the Request to Produce Documents, which is a part of this notice, were destroyed.  If so, when were said documents destroyed and by whom?

    **Valero is not aware of any instance in which responsive documents were destroyed. Given the expansive time frame for which the request seeks documents, it is possible that potentially responsive documents were destroyed long before this litigation was initiated.**

2.  Authentication of all DOCUMENTS produced at the deposition.

3.  What efforts were made to locate the DOCUMENTS described in the request to produce documents that accompanies this deposition notice, who performed the search, and when and what was found.



EXHIBIT
Renfro
1 A
12/12/05

Valero's archive documents were searched and reviewed for purposes of production in previous MTBE litigation matters (MDL I) as well as this litigation (MDL 1358), and for purposes of this subpoena. The files of individual employees thought likely to have relevant information have been collected and reviewed for responsiveness, as have potentially responsive files located at relevant refineries.   Documents that were located and determined to be responsive to this subpoena have been produced to Plaintiffs.

The following people were interviewed for preparation for this deposition:

Joe Almarez
Curt Benefield
John Braeutigam
Bobby Broadway
John Cotterel
Gene Edwards
Peter Fasullo
Tim George
Bill Glasscock
Jim Greenwood
Chip Gross
TD Higginbotham
Cal Hodge
Jon Kiggans
George Kain
Baines Manning
Gino Panganucci
Sam Pinizzotto
Roger Rinas
Rick Roat
Les Rucker
Wayne Smithers
Reid Trekell
Geoff Willig
Marty Zanotti

## EARLY KNOWLEDGE ISSUES

3.     The Defendant's early knowledge and understanding of MTBE and/or TBA's characteristics and impact on the environment.

(a)    When Valero First Became Aware That MTBE Had Caused Water Contamination.

A few Valero employees became aware in approximately 1987 of allegations that MTBE had been detected in groundwater in Maine.  The information received was

-2-

limited and indicated that the release was a unique situation and not likely to recur. Some Valero employees became aware that MTBE had been detected in groundwater in Denver in early-mid 1995. In general, Valero employees became aware of MTBE detections in the City of Santa Monica drinking water wells in connection with news accounts in 1995 or 1996.

(b)    First Several Instances in Which Valero Dealt With MTBE Contamination At Refineries

In September 1998, Valero acquired the Paulsboro refinery from Mobil. Since approximately 1979, the refinery has been operating a system designed to contain hydrocarbon contamination underneath the refinery. MTBE was detected in some wells at the refinery in 1997, prior to Valero's acquisition. The operation of the system, however, has not been modified as result of the MTBE detection in 1997.

In May 2000, Valero acquired the Benicia refinery from ExxonMobil. Prior to Valero's acquisition, MTBE had been detected at the refinery and terminal. ExxonMobil retains liability for this contamination. Since mid-2000, however, Valero has operated and maintained the equipment, including quarterly sampling.

In 2001, Valero detected MTBE in groundwater wells at the Corpus Christi refinery. The Remedial Action Plan (pump and treat 7 wells) does not call for any specific/different treatment in light of the existence of MTBE. The refinery continues to monitor the wells semi-annually for MTBE and BTEX.

In 2002, MTBE was detected in groundwater at the Houston refinery. The existing system has not been modified as a result of the MTBE detection.

(c)    First Instances in Which Valero Dealt With MTBE Contamination at Retail Stations

In 2000, in connection with Valero's purchase of retail stations in California from ExxonMobil, Valero commissioned environmental assessments of 16 retail stations. MTBE contamination was discovered at 12 of these stations. ExxonMobil retained the responsibility for remediating contamination at the sites. Therefore, Valero did not "deal with" MTBE contamination at these sites.

In 2002, in connection with its merger with Ultramar Diamond Shamrock Corporation, Valero entities acquired 1421 retail stations. Valero acquired approximately 840 sites at which there were on-going remediation activities, some of which included remediation of MTBE. A detailed review of all of the remediation site files has not been performed for this deposition.

(d)    First Several Instances in Which Valero Was Provided Information From Others in the Industry About Their Early Experiences With MTBE.

Valero has not located any specific record indicating that it received information from another in the industry about their early experience with MTBE. Valero

acquired information about Mobil's experience with MTBE at the Paulsboro refinery in 1998, and about ExxonMobil's experience with MTBE at the Benicia refinery in 2000.   Valero became aware of Ultramar Diamond Shamrock's experiences with remediation of MTBE after its merger with Ultramar Diamond Shamrock on December 31, 2001.

(e)   When Valero First Became Aware of MTBE's Low Taste and Odor Threshold.

Valero does not contend that MTBE has a "low" taste and odor threshold.  Valero understands that the concentrations in water at which MTBE can be detected by taste or odor varies widely.  In 1995, Valero learned from an OFA Fact Sheet that MTBE's average odor detection threshold in water has been measured in the range of 45-95 ppb and its average taste threshold at 134 ppb.

(f)   When Valero First Became Aware of the Fact that MTBE Flows Further and Faster than BTEX, and is More Likely to Cause Contamination Than a Release of Conventional Gasoline.

Valero became aware of allegations that MTBE flows further and faster than BTEX in 1995.  Valero has not concluded that MTBE is more likely to cause contamination than a release of conventional gasoline.

(g)   When Valero First Became Aware of the Fact That MTBE is More Soluble in Water Than the BTEX Constituents.

As a chemical principle, Valero is aware that MTBE is more soluble in water than the BTEX constituents.   Valero is also aware that MTBE is less soluble in water than some other constituents of gasoline.

(h)   When Valero First Became Aware of MTBE's Resistance to Biodegradation, and the Fact That MTBE is More Difficult and Costly to Remediate.

Valero became aware of allegations that MTBE was resistant to biodegradation in 1995.  Valero agrees that in some specific circumstances, MTBE may be more costly to remove from groundwater than BTEX constituents.   Based on Valero's investigation, it appears that Valero first became aware of this in 1995.

## TASTE AND ODOR DEPOSITION ISSUES

4.    STUDIES done by you, done at your direction, or that you obtained or reviewed that are designed to determine the taste and odor threshold of MTBE and/or TBA in water.

> **Valero has not performed any such studies.  With regard to studies conducted by others, Valero has obtained the following documents that may relate to this issue.**

> **(a)    U.S. Environmental Protection Agency, November 1993, Assessment of Potential Health Risks of Gasoline Oxygenated with Methyl Tertiary Butyl Ether (MTBE): Washington, D.C., Office of Research and Development;**

> **(b)    Oxygenated Fuels Association, 1995, MTBE in Ground Water--Fact Sheet for Local Health and Water Authorities:  Oxygenated Fuels Association;**

> **(c)    U.S. Environmental Protection Agency, 1997, EPA Drinking Water Advisory:  Consumer Acceptability Advice and Health Effects Analysis on Methyl Tertiary-Butyl Ether (MTBE) and related Fact Sheet;**

5.    When, and under what circumstances, according to YOUR records, YOU first learned about MTBE's taste and odor threshold in water, and how that knowledge evolved over time.

> **Valero first learned of the controversy regarding MTBE's taste and odor threshold in water in 1995.  Valero has not formed an opinion as to MTBE's particular taste and odor threshold in water.  In December 1997, the EPA set a Drinking Water Advisory for MTBE at 20 to 40 ppb.**

6.    When, according to YOUR records, YOU first received a copy of the January 17, 2003, Product Safety Bulletin for Methyl Tertiary Butyl Ether published by Lyondell Chemical Company.

> **Valero has no record of ever receiving a copy of the January 17, 2003, Product Safety Bulletin for Methyl Tertiary Butyl Ether published by Lyondell Chemical Company.**

7.    When, according to YOUR records, YOU first received a copy of the 18 March 1993 Campden Food and Drink Research Association STUDY titled Flavor [sic] and Odour [sic] Thresholds of Methyl Tertiary Butyl Ether (MTBE) in Water.

> **Valero has no record of ever receiving this document.  Valero understands that it was produced to Ultramar Inc. in the South Lake Tahoe Litigation.**

7117823

Oct 17 2005
9:08PM

| | |
|---|---|
| UNITED STATES DISTRICT COURT | )    Master File C.A. No. 1:00-1898 |
| SOUTHERN DISTRICT OF NEW YORK | ) |
| ———————————————— | )    MDL 1358 (SAS) |
| | )    No. M21-88 |
| In re Methyl Tertiary-Butyl Ether | ) |
| ("MTBE") Products Liability Litigation | )    DEFENDANT ULTRAMAR, INC.'S |
| | )    DISCLOSURE PURSUANT TO JUNE |
| ———————————————— | )    9, 2005 DIRECTIVE AS AMENDED BY |
| This document relates to: | )    THE COURT ON AUGUST 12, 2005 . |
| | ) |
| All cases | ) |
| | ) |

Defendant Ultramar, Inc. ("Ultramar"), by and through its attorneys, and pursuant to the

Court's directive of June 9, 2005 as amended by the Court on August 12, 2005, hereby provides

its declaration to the Court's Amended Successor Liability Questionnaire as follows:

1.  For each year beginning with January 1, 1979 to date, identify whether Ultramar engaged in designing, manufacturing, refining, distributing or marketing MTBE, TBA, and/or gasoline containing MTBE or TBA ("MTBE Activities").

    **Response:**

    Ultramar manufactured gasoline containing MTBE for distribution in California at its Wilmington, California refinery from 1995 through 2003. Ultramar refined and/or manufactured MTBE and/or gasoline containing MTBE at a refinery in Avon, California from approximately September 1, 2000 through May 17, 2002.

    Ultramar engaged in the wholesale/bulk marketing and/or selling of gasoline containing MTBE in California from 1994 through July 1, 2002.

    From approximately 1995 through 2003, Ultramar owned and/or operated retail gasoline stations in California from which gasoline containing MTBE may have been sold.

2A. If Ultramar ceased its MTBE Activities at any time, identify which, if any, of Ultramar's operating entities and/or directly- or indirectly-held subsidiaries continued the MTBE Activities, and the start and end date of such Activities.

    **Response:**

    Ultramar ceased the above-described refining/manufacturing activities at the Avon refinery on May 17, 2002, when this refinery was sold to Tesoro Petroleum, Inc. Tesoro Petroleum, Inc. is not an operating entity or subsidiary of Ultramar. Ultramar ceased the above-described refining/manufacturing activities at the Wilmington refinery in

November 2003. The activities were not continued by any operating entity or subsidiary of Ultramar.

Ultramar ceased the above-described wholesale/bulk marketing and/or selling activity on or about July 1, 2002, when this activity was undertaken by Valero Marketing and Supply Company ("VMSC"), an indirectly-held subsidiary of Ultramar.

At various times, Ultramar has ceased the ownership and/or operation of certain retail gasoline stations in California from which Ultramar may have sold gasoline containing MTBE.

2B.   If any of plaintiffs' causes of action against Ultramar are proven at trial and Ultramar would claim that at some point in time liability for those causes of action shifted, identify whether there are any documents that explicitly refer to a shift in liability for past or future MTBE Activities. If the entity named does not dispute that it would be liable in place of Ultramar should any liability be found, then no documentation need be produced so long as both Ultramar and the named entity stipulate in writing that there is no dispute. If the entity named disputes that it would be liable, then Ultramar must produce documentation as to its claim that liability passed to that entity.

**Response:**

Ultramar is unable to determine with precision what causes of action or damages are alleged by plaintiffs against Ultramar. Ultramar contends as follows:

The refining and/or manufacturing activities at the Avon, California refinery described above were ceased by Ultramar on May 17, 2002, when this refinery was sold to Tesoro Petroleum, Inc. Tesoro Petroleum, Inc. assumed the liability, if any, associated with Ultramar's MTBE Activities at the Avon refinery pursuant to the Sale and Purchase Agreement of Golden Eagle Refining and Marketing Assets between Ultramar and Tesoro Petroleum, Inc. dated February 4, 2002. Ultramar has no authority from Tesoro Petroleum, Inc. to stipulate to the liability of Tesoro Petroleum, Inc.

Ultramar ceased the wholesale/bulk sale and/or marketing activity described above on July 1, 2002, when this activity was undertaken by VMSC. Ultramar refers Plaintiffs to Defendant Valero Marketing and Supply Company's Disclosure Pursuant to June 9, 2005 Directive as Amended by the Court on August 12, 2005. Ultramar objects to any requirement that it stipulate to the liability of VMSC.

In the unlikely event that any of the claims asserted by Plaintiffs against Ultramar are based on particular releases of gasoline from stations that may have been owned or operated by Ultramar, it is possible that Ultramar will contend that such liability was assumed by a subsequent purchaser or lessor. Until such stations are identified, it is impossible to determine whether any shifting of liability occurred.

3A.   If Ultramar ceased its MTBE Activities at any time, identify whether a successor-in-interest (e.g. purchaser or newly formed entity) continued the MTBE Activities, and the start and end date of such Activities.

**Response:**

See Response to Inquiry 2A.

3B.   If any of plaintiffs' causes of action against Ultramar are proven at trial and Ultramar would claim that at some point in time liability for those causes of action shifted, identify whether there are any documents that explicitly refer to a shift in liability for past or future MTBE Activities.  If the entity named does not dispute that it would be liable in place of Ultramar should any liability be found, then no documentation need be produced so long as both Ultramar and the named entity stipulate in writing that there is no dispute. If the entity named disputes that it would be liable, then Ultramar must produce documentation as to its claim that liability passed to that entity.

**Response:**

See Response to Inquiry 2B.

Dated:  October 17, 2005

J. Clifford Gunter III
Tracie J. Renfroe
M. Coy Connelly

BRACEWELL & GIULIANI LLP
711 Louisiana St., Suite 2300
Houston, Texas 77002-2770
Telephone:  (713) 221-1404
Telecopier:  (713) 221-2123

ATTORNEYS FOR DEFENDANT
ULTRAMAR, INC.

# EXHIBIT 8

## DECLARATION OF ALEXANDER BLAGOJEVIC



I, ALEXANDER BLAGOJEVIC, declare:

1.   I am employed by Lyondell Chemical Company as marketing manager for the Oxyfuels Business Group.  My duties specifically include the marketing and sales of MTBE to refining customers in the Americas.  Having previously been employed by Arco Chemical Company,  I have held my current position since November 1992. I believe I am the person most knowledgeable presently in the employ of Lyondell Chemical Company with regard to the history of sales of MTBE by Arco Chemical Company to customers on the U.S. West Coast.

2.   This Declaration is based upon both my personal knowledge and upon a review of certain sales records.

3.   Given the nature of our sales and transportation arrangements with various customers, the ultimate location and use of a parcel of MTBE was not always known to us.  Largely because our company's MTBE manufacturing units are located in Channelview, Texas, most of our sales contracts for MTBE have included the shipping term "FOB HOUSTON".  We did enter into contracts with some customers by which we agreed to arrange for shipment to terminals in California.  In many instances, however, the customer arranged shipment for itself and we delivered into the customer's rail cars, tankships, barges, storage tanks or pipelines at Houston. Although in those circumstances we had no way to be certain whether or not the

1

product was eventually delivered to the West Coast, our Customer Service employees made attempts to obtain and record that information.

4.   In answer to Questions 13 and 14 of the "Notice of Taking Deposition of Arco Chemical", dated March 10, 2000, the first sales and deliveries of MTBE in and to California were made on a spot basis to Oxbow Resources (April 1986), Union Chemical (April 1986), Chevron Research (July 1986) and Kern Oil (October 1986).

5.   Question 20 attached to the Notice asked whether or not Arco Chemical Company had sold MTBE, directly or indirectly, to certain companies.  The answer to that question is "yes" as to the following companies (or their affiliates):  Shell Oil Company; Shell Oil Products Company; Equilon Enterprises, LLC; Exxon Corporation; Tosco Corporation (both directly and as the assignee of certain sales contracts originally negotiated with Unocal Corporation); Chevron U.S.A. Inc.; Atlantic Richfield Co.; Texaco Inc.; BP America Inc.; BP Exploration & Oil Inc.; Ultramar, Inc.; Ultramar Diamond Shamrock Corporation; Unocal Corporation and Wickland Oil Company.  I have no recollection and have found no record indicating that Arco Chemical Company ever made sales of MTBE to "Pacific Refining". However, the sales records do show a sale in 1992 of less than 500 gallons to a company in Los Angeles referred to as "PRC".

6.   I attach a spreadsheet derived from our sales records showing MTBE sales by Arco Chemical Company to certain customers at destinations within

2

California between 1986 and 1999, inclusive. See Exhibit "A". The destinations identified on our sales records are in most cases either the port or place of delivery by Arco Chemical or the port or place to which the customer had indicated an intention to ship the product. As shown by the spreadsheet, the answer to Question 15 of the Notice is "yes".

7.     The answers to Questions 16 and 17 of the Notice are "yes", as indicated above.

8.     The types of documents which were generally created by Arco Chemical Company pertaining to the sale, transport, delivery, supply and/or exchange of MTBE to or with any of the defendants in the South Tahoe Public Utility District ("STPUD") case and any Northern California refineries were:

> Invoices to customers;
>
> Product Purchase Agreements;
>
> MTBE Sales Contracts;
>
> Exchange Agreements;
>
> Telexes or Letters confirming spot orders;
>
> Shipping Contracts with customers;
>
> Shipping bills of lading;
>
> Charter Parties or other contracts with transport providers; and
>
> Invoices from transport providers.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is made this 4th day of May, 2000 at Houston, Texas.

Alexander Blagojevic

EXHIBIT "A"

## SALES OF MTBE BY ARCO CHEMICAL COMPANY TO SPECIFIED CALIFORNIA CUSTOMERS BY DESTINATIONS, 1986-1999

(Volume in Gallons rounded to nearest thousand)[1]

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARCO PRODUCTS CO. | | | | | | | | | | | | | | |
| EL SEGUNDO | | | | | | | | | 6604 | | | | | |
| MARTINEZ | | | | | | | | 2098 | | | | | | |
| ANAHEIM | | | | | | | 0 | | | | | | | |
| CARSON | | | | | | | | 2068 | | | | | | |
| CROCKETT | | | | | | | 3576 | 12252 | | | | | | |
| LONG BEACH | | | | | | 34137 | 35631 | 111551 | 79469 | 9441 | 11150 | 47928 | 59934 | 52126 |
| LOS ANGELES | | | | | | 1259 | 6347 | 18685 | 1051 | 2100 | | 47 | | |
| SAN PEDRO | | | | | | 2077 | 11456 | 10868 | | | | | | |
| ATLANTIC RICHFIELD | | | | | | | | | | | | | | |
| LOS ANGELES | | | 2985 | 15207 | 2966 | | | | | | | | | |
| LONG BEACH | | | | | 14478 | | | | | | | | | |

[1]Blank box indicates no sales in given year; "0" indicates sales of at least 1 gallon but less than 500 gallons.

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHEVRON, USA (INCLUDING CHEVRON RESEARCH) | | | | | | | | | | | | | | |
| CROCKETT | | | | | | | | | | | | | | |
| EL SEGUNDO | | 3578 | 8320 | 5472 | 25763 | 36502 | | 8586 | | 3318 | 5460 | | | |
| RICHMOND | | | 1252 | | 6448 | 8073 | 0 | 2031 | 11130 | 0 | 16580 | 22499 | | |
| LONGBEACH | | | | | | | | | | 3732 | | | | |
| WALNUT CREEK | | | | | | 3024 | | | | | 2350 | | | |
| LOS ANGELES | | | | | | | | | | | | 2700 | | |
| EQUILON ENTERPRISES | | | | | | | | | | | | | | |
| MOTIVA? | | | | | | | | | | | | | | 38605 |
| BAKERSFIELD | | | | | | | | | | | | | | 392 |
| EQUIVA TRADING CO. | | | | | | | | | | | | | | |
| MOPECO | | | | | | | | | | | | | 35022 | |
| LONGBEACH | | | | | | | | | | | | | 3780 | |
| EXXON CO. USA | | | | | | | | | | | | | | |
| BENICIA | | | | | | | 3053 | | | | | | | |
| CARSON | | | | | | | 3282 | | | | | | | |
| CROCKETT | | | | | | | 39362 | | 15457 | | 35239 | | | |
| HERCULES | | | | | | | 506 | | | | | | | |

2

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EXXON CO. USA(CONT.) | | | | | | | | | | | | | | |
| LONG BEACH | | | | 8169 | 6182 | 1010 | 3248 | | | | | | | |
| SIGNAL HILL | | | | | 3150 | | 125 | | | | | | | |
| EXXON SUPPLY CO. | | | | | | | | | | | | | | |
| CROCKETT | | | | | | | | 34000 | | | | | | |
| EL SEGUNDO | | | | | | | | 9783 | | | | | | |
| LONG BEACH | | | | | | | | 755 | | | | | | |
| KERN | | | | | | | | | | | | | | |
| BAKERSFIELD | 49 | 76 | 383 | | | | | | | | | | | |
| LONG BEACH | | 2049 | 5680 | 6262 | | | | | | | | | | |
| EL SEGUNDO | | | | 174 | | | | | | | | | | |
| PRC | | | | | | | | | | | | | | |
| LOS ANGELES | | | | | | | 0 | | | | | | | |
| SHELL OIL CO. | | | | | | | | | | | | | | |
| SEBASTOPOL | | | | | | | | | | | 5072 | | | |
| CARSON | | | | | | | 2847 | 1760 | | | | 2280 | | |
| MARTINEZ | | | | | | | | 2432 | | | | | | |
| SELBY | | | | | 1673 | | | | | | | | | |
| WILMINGTON | | | | 1034 | 26583 | 8996 | | | | | | | | |
| LONG BEACH | | | | | 3871 | | | | | | | | | |

3

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TEXACO REFINING & MARKETING | | | | | | | | | | | | | | |
| BAKERSFIELD | | | | | | | 318 | | | | | | | |
| EL SEGUNDO | | | | | | 3822 | | | | | | | | |
| SIGNAL HILL | | | | 7768 | 9822 | 5327 | | | | | | | | |
| SAN FRANCISCO | | | | 1966 | | | | | | | | | | |
| WILMINGTON | | 669 | | | | 1531 | | | | | | | | |
| CROCKETT | | | | | | | 2112 | | | | 10219 | | | |
| LONG BEACH | | | | 11207 | 9054 | 17140 | 11790 | 5411 | 12241 | 12453 | 14776 | 8968 | | |
| LOS ANGELES | | | | | | | | 672 | | | | | | |
| MOPECO | | | | | | | 10742 | 14830 | 12212 | 14682 | 33620 | 41520 | | |
| RICHMOND | | | | | | 2721 | 2076 | | | | | | | |
| SAN PEDRO | | | | | 11182 | 2940 | 1655 | 3937 | 2662 | | 15217 | 7654 | | |
| SIGNAL HILL | | | | | | | 8668 | 14906 | 6300 | | | | | |
| UNIVERSITY CITY | | | | | | | 1483 | 9008 | | 3310 | | | | |
| TOSCO REFINING CO. | | | | | | | | | | | | | | |
| MARTINEZ | | | | | | | | | | 0 | | | | |
| CROCKETT | | | | | | | | | | | | 3088 | | |
| LOS ANGELES | | | | | | | | | | | | 47132 | 68319 | |
| SAN FRANCISCO | | | | | | | | | | | | 3212 | | |
| LONG BEACH | | | | | | | | | | | | | 2062 | |

4

| CUSTOMER | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ULTRAMAR, INC. | | | | | | | | | | | | | | |
| WILMINGTON | | | | | | | | | | | 1680 | 5852 | | |
| LONG BRANCH | | | | | | | | | | | | 2108 | | |
| ULTRAMAR DIAMOND SHAMROCK | | | | | | | | | | | | | | |
| WILMINGTON | | | | | | | | | | | | 2100 | | |
| UNION CHEMICALS | | | | | | | | | | | | | | |
| LOS ANGELES | 7131 | | | | | | | | | | | | | |
| LONG BEACH | 790 | | | | | | | | | | | | | |
| SAN FRANCISCO | 1307 | | | | | | | | | | | | | |
| UNOCAL (CHEMICAL or REFINING) | | | | | | | | | | | | | | |
| LOS ANGELES | 6276 | 25660 | 34114 | 20772 | 14059 | 30669 | 27616 | 42653 | 14423 | 101951 | 83949 | 23201 | | |
| LONG BEACH | | | | | | | | | | 2315 | | | | |
| BREA | | | | | 0 | 1 | 1 | | | | | | | |
| SAN FRANCISCO | | 2242 | 8971 | 9 | 1687 | 5148 | | | | | 7324 | 6276 | | |
| WICKLAND OIL CO | | | | | | | | | | | | | | |
| SELBY | | | | | 453 | | | | | | | | | |

1       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF SAN FRANCISCO

3               --oOo--

4   SOUTH TAHOE PUBLIC UTILITY     )
    DISTRICT,                 )

5                       )
              Plaintiff,     )

6                       )
              vs           )   No.  999128

7                       )   VOLUME I
   ATLANTIC RICHFIELD COMPANY     )

8   ("ARCO"); ARCO CHEMICAL COMPANY;)
   SHELL OIL COMPANY; CHEVRON     )

9   U.S.A., INC.; EXXON CORPORATION;)
   B.P. AMERICA, INC.; TOSCO      )

10  CORPORATION; ULTRAMAR, INC.;   )
   BEACON OIL CO.; USA GASOLINE    )

11  CORPORATION; SHELL OIL PRODUCTS )
   CO.; TERRIBLE HERBST, INC.;    )

12  ROTTEN ROBBIE; J.E. TVETEN     )
   CORP.; TAHOE TOM'S GAS STATION; )

13  THE SOUTHLAND CORP.; PARADISE   )
   CHEVRON; and DOES 1 through 600,)

14  inclusive,               )
                       )

15             Defendants.    )

16

17                --oOo--

18       THURSDAY, MAY 6, 1999
           10:03 A.M.

19            --oOo--
        DEPOSITION OF

20        CURTIS STANLEY
           --oOo--

21

22

23

24  CATHLEEN SLOCUM, CSR
   License No. 2822

25



EXAMINATION

By DUANE C. MILLER, Esq., counsel on behalf of the plaintiff:

Q   Can we have your name and business address, please?

A   Sure. My name is Curtis Stanley. My business address is the Equilon Westhollow Technology Center in Houston, Texas. Is that enough?

Q   That's sufficient.

THE VIDEOGRAPHER: Excuse me. We need to swear in the witness.

MR. MILLER: Correct.

(Witness sworn.)

MS. DOYLE: So now really tell him your true address.

THE WITNESS: The same.

MR. MILLER: Q Mr. Stanley, I'd like you to briefly relate your educational background starting with college for us, please.

A   I have a bachelor of science in geology from North Carolina State University with a specialization in engineering. That is my formal education and then other education that I've received was on-the-job training while at Shell and now Equilon.

Q   And basically you were employed by the Shell Oil Company since you graduated from North Carolina State

5

---

University?

A   That's correct.

Q   And you are currently responsible for hydrogeological evaluation of Shell's facilities nationwide and on the West Coast immediately prior to Equilon becoming involved; is that correct?

A   In my career I've had responsibility for evaluating facilities. Currently my primary responsibility is in regard to development and implementation of risk-based corrective action.

Q   When you were employed by Shell you had responsibility to evaluate retail gasoline stations; is that correct?

A   Yes.

Q   And you had that responsibility for the West Coast for a period of time for manufacturing facilities; is that correct?

A   That's correct.

Q   And you also had that responsibility nationwide for Shell for gasoline stations at one time; is that correct?

A   That's correct.

Q   And what period of time are we talking about when you had that responsibility?

A   For retail?

Q   Yes.

A   As I recall probably starting in 1980 extending into

6

---

the mid-eighties.

Q   And when you had those responsibilities, were you responsible among other things for investigating leaks of gasoline?

A   Yes.

Q   And in that respect did you go to Rockaway, New Jersey in approximately 1980?

A   Yes.

Q   What was the problem in Rockaway, New Jersey?

A   MTBE and diisopropyl ether had been found in the municipal water supply for Rockaway, New Jersey.

Q   And why as a Shell Oil Company employee were you interested in that?

A   There was an indication that that, the concentrations of those oxygenates, those oxygenates in the water supply, were potentially from one of our service stations located upgradient of the site.

Q   Didn't you confirm that Shell was the source of that problem?

A   We confirmed that we were part of that problem.

Q   In 1980?

A   1980, 1981.

Q   Okay. And during that investigation were you in charge of that investigation on behalf of Shell?

A   Yes.

7

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, CATHLEEN S. SLOCUM, a Certified Shorthand Reporter, in and for the State of California, duly appointed and commissioned to administer oaths, do hereby certify:

That I am a disinterested person herein; that the witness, CURTIS STANLEY, named in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition was reported in shorthand by me, Cathleen S. Slocum, a Certified Shorthand Reporter of the State of California, and thereafter transcribed into typewriting.

IN WITNESS WHEREOF, I have hereunto set my hand as Certified Shorthand Reporter on this *15* of May, 1999.

Cathleen Slocum
Certified Shorthand Reporter
License Number 2822

--o0o--

181

PETERS SHORTHAND REPORTING CORPORATION (916) 362-2345

# EXHIBIT 9

Atlantic Richfield Company                    Internal Correspondence    MAT-9

Date:        March 31, 1981

Subject:     Pre Study Conference

From/Location:  R. N. Roth, AP-479

To/Location:    File, MTBE

On March 27, 1981, I attended a conference of the MTBE study
group.  The purposes of this meeting were to review the status
of the pre-study work for Phase I of the MTBE toxicity studies;
review the studies with the third party auditor Tracor-Jitco
and to review any protocol changes made to the planned teratol-
ogy and reproduction studies.

Highlights of the discussion are given below:

General

1.  ARCO has sent technical material to the laboratory for use
    in the inhalation studies.  Analytical information on the
    material is available and will be sent out by API.

2.  Although not present, Ben Thomas of Shell sent a message
    that Shell has been involved in the contamination of a
    township's drinking water with DIPE (disopropyl ether) and
    100 ppb MTBE.   According to Ben, approximately 20% of
    all underground gasoline storage tanks leak, leading to the
    possibility of ground water contamination.
    This ground water contamination may have to be considered
    when long term testing is considered.  It might also make
    the NTRP rat study of TBA in the drinking water more appli-
    cable.
    To date, Shell and ARCO are the only ones with MTBE in
    gasoline.

Reproduction - Teratology Studies

A question arose over what supplier to obtain rats from.
Bio/dynamics has a history of SDA virus.  Charles River's
Kingston facility, the original supplier, is supposedly SDA
free.  If animals were ordered from Kingston, they were likely
to develop SDA symptoms after arrival.  The group considered
ordering animals from CR's Portage facility, where animals
would already have been exposed to SDA.

The decision was made to stay with Kingston since Bio/dynamics
has been getting animals from there for the last nine months
and has not experienced any problems.  To insure the animals
will be SDA-free when the exposure begins, animals will be
acclimated for three weeks.

ARC 035844                          A.R.CO.-1-A
                                    (6-79)

File, MTBE
March 31, 1981
Page 2

The concentrations of MTBE given in the justification document which were said to produce narcosis were questioned by C. Conoway. I said I would check them.

Details of the study monitoring by Tracor-Jitco will be sent to members by API.

The dates of the reproductive studies depend on when the nine-day probe study is completed.

At my suggestion, a complete water analysis will be done in the middle of the teratology study. This is required by GLP's.

Metabolism Studies

The methods development segment of the metabolism studies is completed. It has been found that the majority of MTBE is eliminated via the lungs within an hour after dosing in the aqueous soluble phase.

Since problems were encountered with hemolysis when MTBE was given I.V., future studies will use the I.P. method of dosing.

Nine-Day Inhalation Study

Prestudy work with the chambers and analytical methods has been completed. The material is being atomized without heating, to consistently generate levels of 100, 300, 1000 and 3000 ppm.

Chamber concentrations will be analyzed using I.R. For future studies, an online GC analysis will be available. Analysis will be done automatically every 15 minutes for 100, 300, and 1000 ppm and manually every ½ hour for 3000 ppm.

Bio/dynamics recommends eliminating the charcoal grab samples of chamber concentration. This was accepted by the group since the accuracy of these samples is questionable.

Tracor-Jitco will monitor the study once during early exposures and the day of necropsy. C. Kerwin, of Phillips Oil will also monitor the study during the necropsies.

Mr. Van Dyke of Bio/dynamics raised a point which deserves further consideration. The metabolic studies which have shown most of the MTBE blown off in the first hour have been done in an unsaturated atmosphere. However, all the toxicity studies will be done in atmospheres in which MTBE concentration is quite high, preventing MTBE from being eliminated so rapidly or completely. This may change the pharmacokinetic profile of

ARC 035845

File, MTBE
March 31, 1981
Page 3


MTBE and result in the metabolic studies not giving an accurate
profile of MTBE's fate in the rat. Mr. Van Dyke felt the group
may want to do future metabolic work in an MTBE saturated
atmosphere. However, the group felt the planned metabolic
studies should be completed before considering Mr. Van Dyke's
suggestion.

It would appear that the unsaturated atmosphere in the metabolic
studies more closely approximates the atmosphere workers will be
exposed to.

Overall, I think the planned MTBE studies are moving along
very well. If we could be assured of receiving accurate and
regular progress reports from Dr. S. Ridlon, I do not think
our presence would be necessary at the group meetings since
ARCO seems adequately represented by Dr. Ridlon.


cc: J. A. Budny
RNR:mp


ARC 035846

1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN FRANCISCO

SOUTH TAHOE PUBLIC UTILITY      *
DISTRICT,                       *
            Plaintiff           *
                                *
VS.                             *      NO. 999128
                                *
ATLANTIC RICHFIELD COMPANY ("ARCO"); *
ARCO CHEMICAL COMPANY; SHELL OIL     *
COMPANY; CHEVRON U.S.A., INC.;       *
EXXON  CORPORATION; B.P. AMERICA,    *
INC.; TOSCO CORPORATION; ULTRAMAR,   *
INC.; BEACON OIL CO.; USA            *
GASOLINE CORPORATION; et al.,        *
            Defendants          *



* * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF

BEN THOMAS, Ph.D.

November 15, 2000

* * * * * * * * * * * * * * * * * * * * * * * * *

Portions of this transcript contain confidential
documents, information or other things.


    VIDEOTAPED DEPOSITION OF BEN THOMAS, Ph.D., produced
as a witness at the instance of the plaintiff, was taken
in the above styled and numbered cause on November 15,
2000, from 10:15 a.m. to 4:50 p.m., before Kay Howell,
Certified Shorthand Reporter in and for the State of
Texas, reported by machine shorthand, at Doubletree
Hotel, 400 Dallas, Houston, Texas.

| | | |
|---|---|---|
| 14:10:33 | 1 | A.  Only in detail.  I'm afraid I don't remember him. |
| :10:39 | 2 | Q.  Were you a member of the Toxicology Committee |
| 14:10:42 | 3 | until you left Shell in 1990? |
| 14:10:45 | 4 | A.  I was. |
| | 5 | (Marked Thomas Exhibit No. 5.) |
| 14:11:15 | 6 | Q.  (BY MR. SHER)  I'm handing you a copy of what |
| 14:11:17 | 7 | I've marked as Exhibit 5 to your deposition.  This is on |
| 14:11:24 | 8 | Atlantic Richfield Company letterhead.  It's internal |
| 14:11:29 | 9 | correspondence dated March 31, 1981, from R. N. Roth to |
| 14:11:34 | 10 | file, MTBE, and it's Bates stamped ARC 035844 through 46. |
| 14:11:40 | 11 | Let's go off the record so you can have a chance to look |
| 14:11:43 | 12 | this over. |
| 14:11:44 | 13 | THE VIDEOGRAPHER:  The time is 2:11 p.m. |
| | 14 | (Discussion off the record.) |
| 14:14:52 | 15 | THE VIDEOGRAPHER:  Back on the record at |
| 14:14:53 | 16 | 2:14 p.m. |
| 14:14:54 | 17 | Q.  (BY MR. SHER)  Have you had a chance to look over |
| 14:14:57 | 18 | Exhibit 5 while we were off the record? |
| 14:14:59 | 19 | A.  I have. |
| 14:14:59 | 20 | Q.  Do you have any recollection in the first part of |
| 14:15:03 | 21 | 1981 being involved with a group known as the MTBE Study |
| 14:15:09 | 22 | Group? |
| 14:15:09 | 23 | A.  This memorandum refreshes my memory, yes. |
| 14:15:12 | 24 | Q.  What is your recollection about that? |
| :15:14 | 25 | A.  This was some early studies.  As I recall, they |

DEPOSITION OF BEN THOMAS, Ph.D.                    90

14:15:19   1   were -- it was a program ongoing when I joined the

:15:22    2   committee, or at least under discussion when I joined the

14:15:26   3   Toxicology Committee.  You know, I apparently have sent

14:15:32   4   information over to Randy Roth of Arco saying that we are

14:15:36   5   involved with a contamination of a township's drinking

14:15:42   6   water with disopropyl ether and MTBE at 100 part per

14:15:45   7   billion.  And I reflect the information that I had, that

14:15:48   8   20 percent of all underground storage tanks leak, leading

14:15:53   9   to the possibility of groundwater contamination.

14:15:53  10       Q.  In the middle of the page there is a reference

14:15:55  11   that says to date Shell and Arco are the only ones with

14:15:59  12   MTBE in gasoline.  Do you see that?

14:16:00  13       A.  I do.

14:16:01  14       Q.  Do you have a recollection of a time when Shell

14:16:03  15   and Arco were the only companies with MTBE in their

14:16:07  16   gasoline?

14:16:09  17       A.  I know Shell was a user of MTBE, but I don't know

14:16:13  18   what other companies used it.

14:16:16  19       Q.  Are you aware that over the course of the 80's

14:16:19  20   other companies also started using MTBE?

14:16:23  21       A.  Yes.

14:16:23  22       Q.  Can you recall when the additional companies

14:16:30  23   started using MTBE in rough terms?

14:16:33  24       A.  No, but I would assume it was in the mid-1980's,

:16:37   25   mid to late 1980's.

1   STATE OF TEXAS       )
    COUNTY OF HARRIS     )
2

3                   REPORTER'S CERTIFICATION

4          TO THE DEPOSITION OF BEN THOMAS, Ph.D.

5                 Taken on November 15, 2000

6
    I, KAY HOWELL, Certified Shorthand Reporter in and for
7   the State of Texas, hereby certify that this deposition
    transcript is a true record of the testimony given by the
8   witness named herein, after said witness was duly sworn
    by me.
9
    I further certify that I am neither attorney nor counsel
10  for, related to, nor employed by any of the parties to
    the action in which this testimony was taken.  Further, I
11  do not have any existing or past financial, business,
    professional, family, or social relationships with any of
12  the parties or their attorneys which to some might
    reasonably create an appearance of partiality.
13
    Upon conclusion of the deposition, the deponent
14  requested the opportunity to review the transcript and
    make changes in form or substance.
15

16  Subscribed and sworn to on this the 27th day of November,
    2000.
17

18

19                            _____
                              KAY HOWELL, CSR, RPR, FAPR
20                            Supreme Court of Texas
                              Certification No. 501
21                            Expiration:  12-31-02

    Dickman Davenport, Inc.
22  3000 Carlisle, Suite 113
    Dallas, Texas 75204
23  214-855-5100

24

25

MAT-9

**ARCO Chemical Company**                    Internal Correspondence

Date:              June 14, 1984

Subject:           API MTBE Meeting Highlights



From/Location:     B. K. Hoover

To/Location:       S. A. Ridlon

A meeting of the API Ad Hoc Committee on MTBE was held in Washington on June 12, 1984. Those in attendance included: F. B. Thomas (Shell), C. C. Conaway (Texaco), S. T. Grage (API), E. Seibert (Huls), C. Kirwin (Phillips), R. C. Anderson (API), S. C. Lovre (ARCO), S. A. Ridlon (ARCO Chemical), and B. K. Hoover (ARCO Chemical).

The status of the composite final report of the API studies was discussed. Although the report was generally good, some committee members had minor comments that they would like to have the laboratory address. It was decided that these remaining comments would be sent to API staff for submission to the laboratory. The report was given provisional approval providing that the laboratory address these comments either by letter or by changes in the report.

Dr. Conaway expressed a desire to submit these studies for publication to the Journal of Environmental Health and Toxicology. Authorship on the various papers was determined. Dr. Conaway stated that he had asked Larry Andrews of ARCO to review the metabolism study and prepare a draft for publication. ARCO is currently reviewing this request since problems noted in that study may make it less suitable for publication. Dr. Conaway also asked Dr. Ridlon of ARCO to review the possibility of publishing the acute studies that it submitted to the committee as background for the API work.

The future plans of the group were considered. It was decided that no attempt would be made to pursue plans to perform any new metabolism study. The cost of future work as well and the qualitative data obtained in the earlier metabolic study were cited as reasons for this decision.

MTBE is a possible contaminant of groundwater, especially in association with leaking gasoline storage tanks. Dr. Conaway expressed a desire to obtain taste and odor threshold data for MTBE. Dr. Thomas explained that he is chairman of the API task force on groundwater contamination. Their plans are presently only tentative due to a need for greater direction from API management committees. He stated that oxygenates such as MTBE were considered proprietary and not sufficiently generic to the industry to be considered in an API project at the present time. He further indicated that the Environmental Biology and Community

S. A. Ridlon
June 14, 1984
Page 2

Health Committee of API is considering taste and odor problems associated with the soluble components of gasoline. They may be willing to consider MTBE, as well as other oxygenates, on their list of contaminates for study. The Ad Hoc Committee decided to make their remaining funds available to that group providing that they specifically study MTBE and that they are allowed to review and comment on the proposal prior to the initiation of work. If this is not possible, they instructed API to distribute the remainder of the money back to each member company serving on the MTBE committee.

On other matters, the committee decided to dispose of the radio-labelled tissues from the metabolism study pending appropriate file documentation. They decided to ask API to make arrangements to store data and specimens from all MTBE studies at Experimental Pathology Laboratories in Herndon, Virginia. A request was made to API to revisit Bio/dynamics to quality assure the portions of the studies that were rejected during previous audits. If API needs assistance in this area, ARCO agreed to send B. K. Hoover to aid in this effort. ARCO staff reported on the latest informa-tion on a possible TLV for MTBE which is being considered by ACGIH. A draft document has been prepared along with a recom-mended TLV for consideration by the full committee of ACGIH at their next meeting. This TLV is expected to be in the range of 300-500 ppm which is consistent with other ethers and above cur-rent workplace exposures.

It was decided that it would not be necessary for the Ad Hoc Committee to meet again since it had completed its mission. The meeting was adjourned at noon.

BKH:mrr

[API/MTBE/MTG]

ARC 035449

**MEMORANDUM**

Mr B. Baugh F 9/02/ MDN
Mr L. V. Long
Mr C. R. Kerr (Southwest Region Marketing) #FYI

You may be interested                    March 26, 1991
in these documents, attach       CHEMICAL ENTRY REVIEW
Furman Foster (Southwest          FOR MTBE
Region Gas. Mgr.) required

A. L. Perkins: from Salt Lake Refinery.

I have completed the environmental group's portion of the chemical entry review for MTBE. Bill Davis has previously completed his Safety Review. I will include a copy of this memo with the chemical review materials that still must be reviewed by Earl Shirts before they are returned to Bill Davis and then to you.

We understand that you are preparing for possible entry of MTBE into the refinery (or marketing) and simply wanted to develop our concerns for using this material. Whether the facilities are installed by marketing or the refinery, our concerns listed below are the same, especially since we currently treat marketing's waste water and have some responsibilities for fighting fires at the marketing terminal.

Bill Davis and I have signed the chemical entry review sheet allowing MTBE entry into the refinery subject to the following conditions:

1. Meet Bill Davis' safety concerns (attached).

2. Meet the following environmental concerns.

   A. Spills or leaks of MTBE must be contained and prevented from contacting the ground or entering the waste water drainage system. This requirement includes above-ground impoundments at the unloading area to prevent hose disconnection spills. Sample stations also need to be engineered to prevent spills. Impoundments should be sealed like our hazardous waste pad.

   B. Contaminated soil or water that has contacted MTBE or other oxygenates will likely be a hazardous waste because of the low flash points. Proper disposal procedures should be established and published.

   C. Tanks containing MTBE should have double bottoms and leak detection systems.

   D. Provide proper facilities for shutdowns and tank cleaning to prevent any MTBE from being spilled or washing into the drainage system.

   E. Complete a HAZOP study on the planned facilities

CH 007163

during the design phase of the project. Safety and
environmental concerns should be included in this
study.

The attached memo from the El Segundo environmental group
discusses the environmental effects of MTBE and Methanol.
These chemicals are different than any other stocks that we
have handled in the refinery before and consideration needs
to be given towards mitigation of extreme environmental risks.

I will pass this information on to Earl Shirts for his review.
Please see me if you have any questions.

Jeff Johns

Attachments

CC: RER, MGE, MDM, TJF, JWJ, SLR, MRB, WRD, MLP

CH 00716

**PROOF OF SERVICE VIA LEXISNEXIS FILE AND SERVE**

I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action.  My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

On the date below, I served the following document on all counsel in *City of Fresno v. Chevron U.S.A., Inc., et al.*, Case No. 04 Civ 4973 (SAS), electronically through LexisNexis File & Serve:

> **DECLARATION OF MICHAEL AXLINE IN SUPPORT OF PLAINTIFF CITY OF FRESNO'S OPPOSITION TO CERTAIN DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S NUISANCE**

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on May 15, 2013, at Sacramento, California.

_____
KATHY HERRON