# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00–1898 MDL 1358 (SAS) M21-88 |

| | |
|---|---|
| COMMONWEALTH OF PUERTO RICO and COMMONWEALTH OF PUERTO RICO through the ENVIRONMENTAL QUALITY BOARD,<br><br>                Plaintiff,<br><br>v.<br><br>SHELL OIL COMPANY; SHELL COMPANY PUERTO RICO LTD.; SHELL CHEMICAL YABUCOA, INC.; SHELL TRADING (US) COMPANY; MOTIVA ENTREPRISES, LLC; EQUILON ENTERPRISES, LLC; CHEVRON CORPORATION; CHEVRON, U.S.A., INC.; CHEVRON PUERTO RICO, LLC; TEXACO PUERTO RICO, INC.; CHEVRON PHILLIPS; CHEMICAL PUERTO RICO CORE, INC.; TEXACO PETROLEUM, INC.; CHEVRON INTERNATIONAL OIL COMPANY, INC.; TEXACO REFINING AND MARKETING, INC.; CHEVRON CARIBBEAN, INC.; CHEVRON ESTRELLA PUERTO RICO, INC.; ESSO STANDARD OIL COMPANY (PUERTO RICO); EXXONMOBIL CORPORATION; HOVENSA L.L.C.; HESS OIL VIRGIN ISLANDS CORPORATION; SUNOCO, INC.; | THIRD AMENDED COMPLAINT<br><br>Civil Action<br><br>Case No. 07 Civ. 10470 (SAS)<br><br>JURY TRIAL DEMANDED |

9.    The Defendants in this action are all corporate members of the petroleum and chemical industries.  As described below, Defendants include refiners of gasoline containing MTBE; manufacturers and promoters of MTBE; suppliers of gasoline containing MTBE; and owners and operators of facilities that have released MTBE into the waters of the Commonwealth.

10.    In addition to producing and/or supplying MTBE or gasoline containing MTBE within the Commonwealth, Defendants knowingly and willfully promoted, marketed and sold MTBE and petroleum products containing MTBE, when they knew or reasonably should have known that MTBE would be released into the environment and pollute the waters of the Commonwealth, would interfere with the Commonwealth's interest in protecting and preserving the waters of the Commonwealth, and would threaten public health and welfare and the environment, as has occurred and is continuing to occur within the Commonwealth.

11.    In addition to seeking damages to fund the identification and treatment of MTBE contaminated waters used for public and private drinking water, the Commonwealth also seeks the costs of restoring MTBE contaminated waters of the Commonwealth to their original pre-discharge condition, and compensation for injuries to the waters of the Commonwealth, including compensation for the lost use, lost value, and lost existence value of such waters.  The Commonwealth further seeks an order compelling the Defendants to investigate their contamination, to abate the public nuisance the Defendants have caused with respect to the waters of the Commonwealth, and to prevent further releases from their leaking underground storage tanks, among other relief.

15.    The Commonwealth, through the Environmental Quality Board, has standing to enforce the Commonwealth's environmental regulations and statutes through The Public Policy Environmental Act, Title II, Act No. 9, 12 L.P.R.A. §1121 *et seq.*

16.    The Secretary of Justice may, when in his judgment the interests of the Commonwealth require it, institute and conduct proceedings against persons who intrude on the lands, rights, or property of the Commonwealth, or commit or erect any nuisance thereon.

## DEFENDANTS

17.    The Defendants in this action are all corporate members of the petroleum industry. As described below, Defendants include refiners of gasoline containing MTBE that contaminates waters of the Commonwealth; manufacturers and promoters of MTBE; suppliers of gasoline containing MTBE that contaminates waters of the Commonwealth; and owners and/or operators of gasoline facilities that have released MTBE that contaminates waters of the Commonwealth.

18.    Any and all references to Defendant, Defendants, or a particular Defendant by name in this Complaint include all predecessors, successors, parents, subsidiaries, affiliates, divisions, and agents of the named Defendants.

19.    When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

20.    When reference in this complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## A.     Refiner/Supplier Defendants

21.    Upon information and belief, the following Defendants, at all times relevant to this action, refined, marketed and/or otherwise supplied (directly or indirectly) gasoline and/or other products containing MTBE that each such Defendant knew or should have known would be delivered into the Commonwealth. The following Defendants and Does 1 through 99 are collectively referred to as the "Refiner/Supplier Defendants."

22.    Chevron Corporation ("Chevron Corp.") is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California. Defendant Chevron Corp. is the successor-in-interest to ChevronTexaco Corporation and successor-in-interest to Texaco, Inc. Upon information and belief, the Commonwealth further alleges that Chevron Corp. owns and/or controls defendant Chevron U.S.A., Inc.

23.    Chevron Puerto Rico LLC ("Chevron PR") is an affiliate of Chevron Global Energy, Inc., which is also known as Chevron Texaco Products Company, a Delaware limited liability company, with its principal place of business at 6001 Bollinger Canyon Rd., Room 5378, San Ramon, CA. Chevron PR's principal place of business is located at the Texaco Plaza Building, Suite 400, Metro Office Park, Guaynabo, Puerto Rico. Upon information and belief, the Commonwealth alleges that Chevron PR was formerly known as Texaco Puerto Rico LLC, which was formerly known as Texas Company (Puerto Rico) Inc.

24.    Texaco Puerto Rico, Inc. ("Texaco PR") is a Puerto Rico corporation with its principal place of business located at Texaco Plaza Metro Office Park, Street 1 #2, 4th Floor, Suite 400, Guaynabo, Puerto Rico.

51.     Total Petroleum Puerto Rico Corporation ("Total PR"), successor to Gasolinas de Puerto Rico Corporation, is a Puerto Rico corporation with its principal place of business at Mario Julia Industrial Park, A Street, Suite 11A, Guaynabo, Puerto Rico.  Upon information and belief, the Commonwealth alleges that Total PR is a wholly owned subsidiary of Total Outre Mer, S.A. of France.

52.     Total Outre Mer, S.A., is a French "société anonyme," similar to a U.S. corporation, with a principal place of business at 24 Cours Michelet 92800 Puteaux Tour Total, France.

53.     Total, S.A., is a French "société anonyme," similar to a U.S. corporation, with a principal place of business at 2, place de la Coupole, La Défense 6, 92400 Courbevoie, France.

54.     Shell Western Supply and Trading Limited, ("SWS&TL") is a business organization, similar to a U.S. corporation, with a principal place of business at Mahogany Court, Wildey Business Park, Wildey, Barbados.

55.     Shell International Petroleum Company Limited ("Shell International") is a business organization of unknown form with a principal place of business at Shell Centre SE1 7NA, London, United Kingdom.

56.     Shell Western Services is a business organization similar to a U.S. corporation with a principal place of business in Nassau, Bahamas.

57.     Peerless Oil and Chemicals, Inc. ("Peerless") is a Delaware corporation headquartered in Puerto Rico with a principal place of business at Road 127 KM 17.1, Punta Guayanilla, Penuelas, Puerto Rico 00624.

87.   Because of MTBE's propensity to contaminate vast quantities of water, to date, at least 25 States or Commonwealths have banned or enacted laws that have set a date certain banning the use of MTBE as an additive in gasoline.

**Defendants' Promotion of MTBE**

88.   The Refiner/Supplier and Manufacturer/Supplier Defendants, all of whom have promoted the use of gasoline containing MTBE for its purported environmental benefits, knew or should have known of the grave harm and threat to the public health and welfare represented by the proliferating use of this compound, including (among other things): widespread pollution of waters of the Commonwealth with MTBE, drinking water supplies rendered unfit and unusable for consumption, public health threatened, and increased costs to public water suppliers and their customers.

89.   Despite knowing that MTBE pollution was inevitable unless adequate precautions were taken, and despite the availability of reasonable alternatives (including but not limited to adequate warnings), Defendants chose not to warn customers, retailers, regulators or public officials, including the Commonwealth.  As production and sales of these compounds and gasoline containing them increased, Defendants failed to take any reasonable, appropriate, and special precautions to store gasoline containing MTBE safely, or to prevent, detect and clean-up spills and leaks of gasoline containing this product.  Despite knowing the risk of harm posed by MTBE, Defendants also failed to warn purchasers, the public, regulators, and/or the Commonwealth that without such precautions more and more MTBE would be released into the environment and cause, among other significant adverse effects, long term contamination of waters of the Commonwealth and threats to public health and safety.

90.   The Refiner/Supplier Defendants further exacerbated the situation by continuing unreasonable and negligent acts, including providing gasoline containing

20

MTBE to gasoline stations without either providing appropriate warnings or taking other precautions adequate to prevent releases of MTBE to the subsurface, knowing that release to the environment of this compound would be inevitable because a substantial percentage of those gasoline stations would store such gasoline without taking reasonable, appropriate or special precautions, including placing the gasoline in inadequate and leaking gasoline delivery systems, and failing to take reasonable, appropriate, or special measures to monitor, detect, and respond to releases of MTBE to soil and/or groundwater, and without taking reasonable, appropriate or special precautions to investigate, contain and clean up releases of these compounds.

91.     The Refiner/Supplier and Manufacturer/Supplier Defendants took affirmative actions that led to the contamination of the waters of the Commonwealth with MTBE, including but not limited to, making representations to downstream users of MTBE and/or gasoline containing MTBE, as well as to the public and government agencies, that such products were environmentally sound and appropriate for widespread production, distribution, sale and use. Indeed, Defendants represented that gasoline containing MTBE could be handled the same as ordinary gasoline, and required no special measures to protect against or respond to suspected releases to the subsurface.

92.     The manufacturers, refiners, and suppliers of MTBE and gasoline containing MTBE had a duty (which they breached) to test MTBE thoroughly to determine its environmental fate and transport characteristics, and potential human health impacts before they sold MTBE and/or gasoline containing MTBE, and had a further duty (which they also breached) to take precautions necessary to assure that gasoline containing MTBE was properly stored and to institute all necessary measures to contain and promptly abate the inevitable spills and leaks. Nonetheless, the Defendants, and each of them, failed adequately to test, store, warn about, or control gasoline containing

MTBE, and, among other things, failed to abate contamination caused by MTBE, including contamination in and pollution of the waters of the Commonwealth.

93. The Refiner/Supplier and Manufacturer/Supplier Defendants, their agents and employees created, participated in, and/or facilitated the flow of MTBE and/or gasoline containing one or more such compounds into gasoline distribution, storage, and dispensing systems that they knew could not safely contain such products. The widespread problems of leaking gasoline delivery systems were well known to the Defendants prior to the introduction of MTBE. At least as early as the mid-1960's, these Defendants knew, or reasonably should have known, that gasoline delivery systems suffer significant and widespread leaks and failures, and release gasoline products into the environment, including into ground water.

94. Before introducing MTBE into gasoline delivery systems, the Refiner/Supplier and Manufacturer/Supplier Defendants knew, or reasonably should have known, among other things, that MTBE released into the environment would mix easily with ground water, move great distances, resist biodegradation and/or bioremediation, render drinking water unsafe and/or non-potable, cause significant expenses to remove from public drinking water supplies, and otherwise threaten the public health and welfare. The Defendants knew, or they reasonably should have known, that the gasoline distribution and retail system in the Commonwealth contained leaking gasoline delivery systems. They knew, or they reasonably should have known, that gasoline facilities, including those in the Commonwealth, commonly lacked adequate storage facilities for gasoline containing MTBE, and that the operators of these facilities were unaware of either the special hazards of MTBE or the steps necessary to eliminate or mitigate those hazards.

95. At all times relevant to this action:

22

(a)   The Manufacturer/Supplier Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided MTBE to the Refiner/Supplier Defendants, and each of them, sold, exchanged, supplied, distributed, delivered and/or otherwise provided gasoline containing MTBE to retail gasoline stations and/or other gasoline delivery systems in the Commonwealth. Upon information and belief, the Commonwealth alleges that such sales, exchanges, supplies, distributions, deliveries and/or other provisions of gasoline containing MTBE to such facilities occurred over time, up to and including the present;

(b)   Gasoline containing MTBE was released to the subsurface from retail gasoline facilities owned and/or operated by the Owner/Operator Defendants, and each of them, and from other facilities at dispersed locations in the Commonwealth. Such releases of gasoline containing MTBE have occurred over time, have been discovered or have become discoverable at various times, and are still occurring, all in varying amounts at different locations, impacting waters of the Commonwealth; and

(c)   MTBE takes time to migrate from release points to locations within the subsurface at which they have an appreciable impact on groundwater resources. MTBE has over time migrated in the subsurface from dispersed release points at or near the surface at retail gasoline facilities in the Commonwealth, causing pollution, contamination, and substantial damage to the waters of the Commonwealth, causing appreciable injury to the Commonwealth.

## COUNT I
### (Strict Products Liability for Defective Design and Failure to Warn Against All Defendants)

96.     The Commonwealth re-alleges paragraphs 1 through 77 above, and by this reference incorporates them as though set forth in full.

97.     The Refiner/Supplier Defendants, and each of them, designed, formulated, manufactured, compounded, refined, provided product information and/or instructions for use, packaged, labeled, promoted, marketed, distributed, transported, exchanged and/or sold gasoline containing MTBE.

98.     The Refiner/Supplier and Manufacturer/Supplier Defendants, and each of them, designed, formulated, manufactured, compounded, refined, provided product information and/or instructions for use, packaged, labeled, promoted, marketed, distributed, transported, exchanged and/or sold MTBE, which was intended by said Defendants, and each of them, to be used as a gasoline additive.

99.     The Owner/Operator Defendants took delivery of, stored and sold the gasoline containing MTBE which is contaminating and polluting waters of the Commonwealth.

100.    The Refiner/Supplier and Manufacturer/Supplier Defendants, and each of them, represented, asserted, claimed and warranted that gasoline containing MTBE could be used in the same manner as gasoline not containing these compounds, and/or that gasoline containing MTBE did not require any different or special handling or precautions.

101.    Defendants, and each of them, knew that said product(s) were to be purchased and used without inspection for defects.

102.    MTBE and gasoline containing MTBE are defective products because, among other things:

24

## COUNT II
### (Public Nuisance – 32 L.P.R.A. § 2761 Against All Defendants)

108.    The Commonwealth re-alleges paragraphs 1 through 89 above, and by this reference incorporates them as though set forth in full.

109.    The negligent, reckless, intentional and ultrahazardous activity of Defendants, and each of them, alleged herein has resulted in the contamination and pollution of the waters of the Commonwealth as alleged herein, and constitutes a public nuisance.   32 L.P.R.A. § 2761.   The Secretary of Justice is authorized to institute proceedings against those parties that intrude on the lands, rights, or property of the Commonwealth, or commit a nuisance thereon. 3 L.P.R.A. § 73.

110.    The public nuisance caused, contributed to, maintained, and/or participated in by Defendants, and each of them, has substantially and unreasonably interfered with, obstructed and/or threatened, among other things, the Commonwealth's significant property and quasi-sovereign interests in the waters of the Commonwealth, the Commonwealth's ability to protect, conserve and manage the waters of the Commonwealth, which are by law precious and invaluable public resources held by the Commonwealth in trust for the benefit of the public, as well as the rights of the people of the Commonwealth to enjoy a water supply free from unacceptable health risk, taste, odor, pollution, and contamination.

111.    Each Defendant has, at all times relevant to this action, caused, maintained, participated in and/or assisted in the creation of such public nuisance. Among other things, each Defendant is a substantial contributor to such public nuisance as follows:

27

disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the Commonwealth.

## COUNT III
### (Trespass - 31 L.P.R.A § 5141 Against All Defendants)

118.    The Commonwealth re-alleges paragraphs 1 through 99 above, and by this reference incorporates them as though set forth in full.

119.    The Commonwealth is the owner and/or actual possessor of property rights and interests in the waters of the Commonwealth, as alleged herein, which the Commonwealth holds in trust for the benefit of the public. These property rights and interests include, but are not limited to, a quasi-sovereign interest in protecting the quality of such waters from contamination and pollution.

120.    Defendants, and each of them, intentionally manufactured, refined, marketed, and/or otherwise supplied MTBE and/or gasoline containing MTBE with the knowledge that contamination of the waters of the Commonwealth with MTBE was substantially certain to result.

121.    Among other things, Defendants, and each of them, intentionally caused MTBE to enter, invade, intrude upon and injure the waters of the Commonwealth as follows:

a.    The Manufacturer/Supplier Defendants manufactured, promoted and supplied MTBE to refiners when they knew that it was substantially certain that: (i) the refiners would in turn blend the MTBE into gasoline; (ii) such gasoline containing MTBE would then be placed into leaking gasoline delivery systems, including those in the Commonwealth; (iii)

31

## COUNT IV
### (Negligence – 31 L.P.R.A § 5141 Against All Defendants)

129.    The Commonwealth re-alleges paragraphs 1 through 110 above, and by this reference incorporates them as though set forth in full.

130.    Defendants had a duty to the Commonwealth to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or gasoline containing MTBE.

131.    Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold and otherwise entrusted MTBE and gasoline containing MTBE that they breached their duties and directly and proximately caused MTBE to contaminate and threaten the waters of the Commonwealth, resulting in the damages alleged in this Complaint.

132.    Defendants, and each of them, failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of MTBE, and/or the likelihood that use of MTBE as a component of gasoline would pollute waters of the Commonwealth, render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

133.    The Manufacturer/Supplier Defendants, among other things, manufactured, promoted and/or otherwise supplied MTBE to refiners when they knew, or reasonably should have known, that: (a) the refiners would in turn blend the MTBE into gasoline; (b) such gasoline containing MTBE would then be placed into leaking gasoline delivery systems, including those in the Commonwealth; (c) MTBE would be released even more readily than the constituents of conventional gasoline from gasoline delivery

142.    The contamination of the waters of the Commonwealth with MTBE alleged herein has varied over time and has not yet ceased. MTBE continues to threaten, migrate into and enter the waters of the Commonwealth. Defendants continue to refrain from taking responsibility for this trespass and from taking action to remediate existing contamination and prevent future contamination of the waters of the Commonwealth.

143.    Defendants' conduct is reprehensible, despicable, and was performed to promote sales of MTBE and/or gasoline containing MTBE in conscious disregard of the known risks of injury to health and property. Defendants acted with willful and conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the Commonwealth.

### COUNT V
**(Puerto Rico Public Policy Environmental Act, Water Pollution Control Act, and Underground Storage Tank Control Regulations Against All Defendants)**

144.    The Commonwealth re-alleges paragraphs 1 through 125 above, and by this reference incorporates them as though set forth in full.

145.    The Defendants are each "person[s]" as defined by 24 L.P.R.A. § 591(d).

146.    The activities of Defendants, and each of them, alleged herein has resulted in the "pollution" of "waters" of the Commonwealth as defined by 24 L.P.R.A. § 591(i) and § 591(e), respectively. For purposes of this Complaint, "waters" only includes waters of the Commonwealth, as defined in Paragraph 5 above.

147.    The MTBE and petroleum discharged to waters of the Commonwealth by the Defendants are "other" types of pollution as that term is defined by 24 L.P.R.A § 591(h).

# EXHIBIT 2

*Fraguada Bonilla v. Hosp. Auxilio Mutuo*,
186 D.P.R. 365 (P.R. 2012), 2012 WL 3655336

CERTIFIED TRANSLATION

<u>Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)</u>
2012 TSPR 126

186 D.P.R. 365, 2012 TSPR 126

Daniel FRAGUADA BONILLA et al, Respondents

v.

HOSPITAL AUXILIO MUTUO, Dr. Manuel Anguita, et al, Petitioners

In the Supreme Court of Puerto Rico
No. CC-2009-918
San Juan, Puerto Rico, August 13, 2012

Certiorari
Attorney for Petitioner: Ms. Maritza Lopez Camuy

Attorney for Respondent: Mr. Wilfredo Zayas Nieves, Ms. Zedided Ortiz Martinez, Mr. Jose A. Gonzalez Villamil

Matter: Torts- Art. 1802 Civil Code – Interruption of Statute of Limitations in claims when there are several co-tortfeasors; revocation of the *Arroyo v. Hospital La Concepcion* regarding interruption of the statute in these situations.

Opinion of the court issued by ASSOCIATE JUDGE ESTRELLA MARTINEZ

Today we have an opportunity to examine our rules regarding interruption of the statute of limitations in situations in which there are several tortfeasors for an extra-contractual tort. To do so, we must determine whether it is appropriate to distinguish between the effects of joint and several liability that has been agreed to or which is based on a pre-existing connection and joint and several liability that arises when there are several extra-contractual tortfeasors.

I

On May 2, 2002, the relatives of Ms. Hilda Perez filed a torts complaint against the Auxilio Mutuo Hospital and Dr. Manuel Anguita.[1]  John Doe and Richard Roe were also included as unknown defendants.  It was alleged that they were joint and severally liable in the event that it was determined that they incurred in negligence.[2]  Subsequently, the complaint was amended to include certain allegations.  Jointly, plaintiffs alleged that on January 14, 2000, Dr. Manuel Anguita operated on Ms. Perez and found that her intestine was obstructed.  After the operation, hospital personnel placed a nasogastric tube in the sixty-year old patient.  A nurse carried out a Turner study and injected a liquid through the aforementioned tube without allegedly verifying whether it had been placed in the stomach.  Plaintiffs alleged that at that moment Ms. Perez started to scream.

[1]  The following are plaintiff relatives: Mr. Daniel Fraguada Bonilla, Mr. Hector L. Fraguada Perez, Ms. Ana Hilda Fraguada Perez, Ms. Maria de los Angeles Fraguada Perez, Mr. Carlos Daniel Fraguada Perez and Mr. Angel G. Osorio Fraguada.

[2]  It is necessary to clarify that Rule 15.4 of Civil Procedure of 1979, 32 L.P.R.A. Ap. III r. 15.4 regarding unknown defendants is applicable in the present case.  As is well known, the mere fact of including mention in a complaint of a fictitious name for a defendant does not invoke an automatic application of Rule 15.4, supra.  This rule requires that a specific claim be established and the identity of the defendant known.

On examining the allegation included in the complaint we realized that it is extremely succinct; a specific claim was not established as required by Rule 15.4, supra.  We are dealing with a situation of an unknown defendant, and therefore the aforementioned rule is not applicable.  Even assuming that we are dealing with a case of an unknown defendant, plaintiffs did not comply with the requirements of Rule 15.4, supra, of promptly carrying out the corresponding amendment upon discovering the true name.

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)
2012 TSPR 126

Subsequently she developed difficulty breathing and had to be intubated. Months later, on July 1, 2000, the patient died. Bringing all of these allegations together, plaintiffs pointed out that Ms. Perez died due to the negligent acts of the Auxilio Mutuo Hospital and its personnel, by failing to provide adequate medical treatment.[3]

[3]  On May 18, 2006, a settlement agreement was reached.  Plaintiffs agreed to dismiss their claim as to Auxilio Mutuo Hospital and the latter agreed to pay them $70,000.  On October 25, 2006, the Court of First Instance issued a partial judgment through which it disposed of the matter according to the settlement agreement reached by the parties.

Six years after the litigation started, plaintiffs made a request to amend the complaint in order to include other presumed tortfeasors.  Specifically, they requested to bring in Dr. Noel Totti and Dr. Octavio Mestre to the case.[4]  After the court of First Instance granted the requested amendment, on May 21, 2008, plaintiffs amended the complaint.  It was then that Dr. Mestre Morera and Dr. Totti became aware that they as well as their community marital property regimes were codefendants in a litigation filed over more than half a decade ago.  The doctors, according to plaintiffs' allegations, placed the nasogastric tube on Ms. Perez negligently.

[4]  In this request, plaintiff alleged that discovery revealed information that the aforementioned doctors had been negligent in the medical treatment provided to Ms. Perez.
    The request made in 2008 to amend the complaint was not a substitution or an indication of names of unknown defendants, rather it was for purposes of bringing new defendants to the litigation.  Additionally, the amended complaint from 2008 kept the allegation of liability of defendants Jonh [sic] Doe and Richard Roe that was included in the initial complaint.

Doctor Mestre Morera filed his answer to the amended complaint.  Later, having been updated on the litigation, the doctor filed a summary judgment motion.  In it he argued that the statute of limitation had expired on the complaint because plaintiffs knew his identity beforehand and his participation in the event.[5]   Thus, the doctor highlighted the fact that although plaintiffs were in a position to exercise their claim it wasn't until six years after the original complaint had been filed that they filed an action against him.  He stated that this delay was a gross lack of diligence on plaintiffs' part in exercising their cause of action, and therefore the claim against him should be dismissed.

[5]  The allegation as to knowledge by plaintiffs of the identity of the doctors is based on a deposition taken of coplaintiff, Ms. Maria de los Angeles Fraguada Perez, on July 11, 2005, Appendix, p. 101. In it, Fraguada Perez- daughter of Ms. Perez- made a chronological and detailed description of what occurred according to her perception.  Specifically, she testified that the day of the alleged facts, Drs. Mestre Morera and Totti arrived at Ms. Perez's room after she asked a nurse to get a doctor, because her mother started to cough after they gave her a liquid through the nasogastric tube to carry out the exam.  Co-plaintiff maintained that she heard Drs. Mestre Morera and Totti alternatively order each other to remove the tube, because it was in the lungs and could cause an embolism.  Id.  Furthermore, Dr. Mestre Morera emphasized that in any event from January 12, 2005, plaintiffs had a report from their expert which alleged deviations in the placement of the nasogastric tube.  He argued that if the date of the deposition was taken as the moment of knowledge by plaintiffs regarding the elements to exercise their cause of action, three years would still have passed from that point in time until the claim was finally filed.

Plaintiffs filed their opposition to Dr. Mestre Morera's motion for summary judgment.  They did not justify the delay in claiming after six years, but they indicated that although his participation was lesser than that of the other doctors, from the moment they filed the original complaint, the statute of limitations was tolled against any doctor that was negligent in the treatment provided to Ms. Perez.[6]

[6]  In this opposition to summary judgment plaintiffs assure that the alleged discussion between doctors Mestre Morera and Totti was carried out *in the presence of the relatives*.

Having evaluated the positions of the parties, the Court of First Instance issued a decision in which it denied the motion for summary judgment.  Not satisfied with this decision, Dr. Mestre Morera filed a *certiorari* petition in

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

2

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

the Court of Appeals.  Subsequently, the intermediate appellate forum issued a decision in which it refused to issue the writ.  It based its decision on the rules stated in Arroyo v. Hospital La Concepcion, 130 D.P.R. 596 (1992).

Once again unsatisfied with this outcome, Dr. Mestre Morera appealed to us via certiorari request.  In relevant part, it indicated that the Court of Appeals erred when it concluded that the statute of limitations had not run out on the claim filed six years after the original complaint.  It argued that according to the cognitive tort theory the period to file a claim had expired, since plaintiffs knew his identity beforehand as well as the elements necessary in order to be able to exercise their cause of action.  The doctor questioned the fact that through a mere procedural formality without further measures, plaintiffs were released from their duty to act in a diligent and timely manner in claiming their rights.

Inevitably he calls upon us to revoke the rule described in Arroyo v. Hospital La Concepcion, 130 D.P.R. 596 (1992) as to the automatic and indefinite tolling of the statute of limitations against alleged co-tortfeasors who were not included in the original complaint.  In its place he proposes that we adopt the doctrine of the *in solidum* obligation.

On April 16, 2010, we granted plaintiffs a period of time to demonstrate why we should not issue the writ of certiorari and revoke the decision of the Court of Appeals.  They have appeared.  Having received the different arguments, we are in a position to decide.

II.
A.

The statute of limitations is an institution that extinguishes a right due to inertia of a party in exercising it within a given period of time.  We have repeatedly explained that expiration of the statute of limitations is substantive and not procedural, which is governed by the principles of our Civil Code.  Serrano Rivera v. Foot Locker Retail Inc., dec. August 15, 2011, 182 D.P.R. __ (2011); COSSEC et al v. Gonzalez Lopez et al, 179 D.P.R. 793, 805 (2010); Santos de Garcia v. Banco Popular, 172 D.P.R. 759, 766 (2007).  It applies as a question of law through the passage of time, unless one of the situations covered by our legal code occurs.  COSSEC et al v. Gonzalez Lopez et al, supra, pp. 805-806; Santos de Garcia v. Banco Popular, supra, p. 766.  To that end, Art. 1873 of the Civil Code, 31 L.P.R.A. sec. 5303 establishes that the expiration of the statute of limitations in actions is tolled by exercising them in court, by an extrajudicial claim by the creditor, and by any other act of acknowledgment of debt by the debtor.[7]

[7]  Articles 1094, 1868, and 1874 are also relevant as to expiration of statute of limitations (31 L.P.R.A. secs. 3105, 5298, and 5304).
Statutes of limitations seek to punish inertia and stimulate the quick exercise of actions.  COSSEC et al v. Gonzalez Lopez et al, supra, p. 806; Campos v. Cia. Fam. Ind., 153 D.P.R. 137, 143 (2001).  The purpose of these is to promote reliance in legal processes and stability in legal relations.  Id.  We have stated that the existence of statutes of limitations is based on a firmly-established policy for expedited decision of claims.  Campos v. Cia. Form. Ind. supra, p. 143.  This way we avoid surprises generated by the resuscitation of old claims, as well as the inevitable consequences of the passage of time, such as: loss of evidence, inaccurate memory, and difficulty finding witnesses.  Id, p. 144.  This mechanism is based on "the human experience that valid claims are filed immediately and not abandoned."  Culebra Enterprises Corp. v. E.L.A., 127 D.P.R. 943, 950 (1991).  As to this, the passage of the period of time established by law without any claim made by the right-holder leads to a legal presumption of abandonment.  See, Zambrana Maldonado v. E.L.A., 129 D.P.R. 740, 752 (1992).

As is well-known, obligations which arise from fault or negligence are governed by the provisions of Art. 1802 of the Civil Code, 31 L.P.R.A. sec. 5141, which establishes that he who "by action or omission causes harm to another, through fault or negligence is obligated to repair the harm caused."  The statute of limitations for these actions is one year as provided by Art. 1868 of the Civil Code, 31 L.P.R.A. sec. 5298.  The shortness of this period has to do with the inexistence of a prior legal relationship between plaintiff and defendant.  Culebra Enterprises Corp. v. E.L.A., supra, pp. 951-952.  Specifically, the aforementioned statute of limitations seeks to promote the timely filing of actions in order to ensure



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

3

CERTIFIED TRANSLATION

__Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)__
2012 TSPR 126

that the passage of time shall not confuse or erase the elucidation of the truth in its dimensions of liability and evaluation of amount. Campos v. Cia. Fom. Ind. supra, p. 143; Culebra Enterprises Corp v. E.L.A., supra, p. 950.

According to the cognitive theory of torts, this statute of limitations starts to run when the claimant knew or should have known that she had suffered an injury, who caused it and the elements necessary in order to be able to effectively exercise her cause of action. See, COSSEC et al v. Gonzalez Lopez et al, supra; Toledo Maldonado v. Cartagena Ortiz, 132 D.P.R. 249, 254-255 (1992); Colon Prieto v. Geigel, 115 D.P.R. 232, 247 (1984). However, we have repeatedly expressed that "if ignorance was due to lack of diligence, these considerations as to statute of limitations are not applicable." COSSEC et al v. Gonzalez Lopez et al, supra.

B.

Obligations can be classified according to the individuals that make up the relationship. Thus, there are joint obligations and joint and several obligations. With joint obligations, the debt can be divided and each debtor has to satisfy his portion independently. J. Castan Tobeñas, Derecho Civil Español, 10th Ed., Madrid, Ed. Reus, 1967, V. III, p. 107. In joint and several obligations each creditor has the right to ask and each debtor has the duty to fully satisfy the performance owed. Id.

The rule that governs in the subject of civil law is that joint and several liability is not assumed. Art. 1090 of the Civil Code, 31 L.P.R.A. sec. 3101 establishes that the concurrence of two or more debtors in one sole obligation does not imply that each one of them should fully satisfy performance thereof. This article establishes a joint obligation as the rule and joint and several liability as the exception, with the latter only occurring when the obligation expressly determines it.

In the subject of extra-contractual liability, in Cruz v. Frau, 31 D.P.R. 92, 100 (1922), we established that when a tort is caused due to the concurrent negligence of several persons, their neglect is the proximate cause of the accident and all of them are liable to repair the harm caused. Then, in Cubano v. Jimenez et al, 32 D.P.R. 167, 170 (1923), this Court expressed that "the tendency in jurisprudence was to declare the liability of various defendants *in solidum*."

Despite our statements above, faced with the question of the existence of the right to contribution in our legal system, in Garcia v. Gobierno de la Capital, 72 D.P.R. 138, 148-149 (1951), we jurisprudentially extended the application of Arts. 1094, 1098 and 1874 of the Civil Code, 31 L.P.R.A. secs. 3105, 3109, 5304 referring to the effects of joint and several liability to torts cases. As a prior step to said conclusion, we stated, perhaps in the outer edge of clarity, that those who cause a tort are jointly and severally liable to the injured party for a judgment which at some future point in time is issued in favor of him. Garcia v. Gobierno de la Capital, supra, pp. 146-147.

Subsequently we had the opportunity to clarify our statements as to the doctrine of joint and several liability. In Arroyo v. Hospital La Concepcion, supra, we reiterated that "what is provided in Art. 1090 of the Civil Code, 31 L.P.R.A. sec. 3101, as to the non-presumption of joint and several liability does not apply in the subject of extra-contractual liability." Id., p. 605. But more importantly, moved mainly by Spanish doctrine of the time – 1992- in that case we preferred not to make a distinction between the different types of joint and several liability – perfect and imperfect – and we held jurisprudentially that joint and several liability in our legal system had a homogenous nature, wherefore both primary and secondary effects applied to it. Consequently, we decided that timely filing of a complaint by an injured party against a joint and several co-tortfeasor automatically tolls the statute of limitations against all of the other co-tortfeasors. We stated that the alleged joint and several co-tortfeasors can be incorporated into the litigation through an amendment to the complaint or a third-party complaint, and that claimant merely must allege well and sufficiently that the new defendant is jointly and severally liable for the harm. With that, in that case we allowed several co-defendants to be brought to the case four years after the initial complaint had been filed.

Subsequently, we decided in Garcia Perez v. Corp. Serv. Mujer, 174 D.P.R. 138, 155 (2008), which had the particularity that the plaintiff knew beforehand the identity and elements necessary to exercise his cause of action against a presumptive joint and several co-tortfeasor, but he did not include her in the original complaint.[8] It wasn't until three years later that the injured party

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

4

CERTIFIED TRANSLATION

<u>Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)</u>
2012 TSPR 126

amended the complaint to include her as joint and several co-tortfeasor.[9]  On that occasion we repeated the rule of Arroyo v. Hospital La Concepcion, supra, and decided that since the amended complaint alleged that the new co-defendant was jointly and severally liable for all harm caused, the statute of limitations was tolled due to the initial filing of the complaint. Id, p. 159.

[8]  The Commonwealth of Puerto Rico was also not included as alleged jointly and severally liable party.

[9]  On that occasion it also incorporated the Commonwealth of Puerto Rico as codefendant.

As we mentioned, in Arroyo v. Hospital la Concepcion, supra, we adopted the interpretation of then-current Spanish jurisprudence and doctrine.  Time has passed and there have been many changes that have taken place since then.  The interpretation admitted in the afore-mentioned case has been abandoned in Spain for several years now and in its place the French doctrine was adopted which distinguishes between two types of joint and several liability: perfect and imperfect.

III

We must decide whether the rule established regarding statute of limitations in torts should remain in effect.  Specifically, whether filing a complaint for extra-contractual civil liability against an alleged joint and several co-tortfeasor tolls the statute of limitations against the rest of the presumptive co-tortfeasors.  To do so, we analyze whether we should integrate a distinction between cases of joint and several liability that has been agreed to or is based on a pre-existing connection - known as proper or perfect joint and several liability – and cases where there are several parties liable for an extra-contractual tort – known as improper or imperfect joint and several liability.  If this distinction is admitted, the tolling effect of Art. 1874 of the Civil Code, 31 L.P.R.A. sec. 5304 would apply in cases of proper joint and several liability, but would not extend to the scope of extra-contractual civil liability when there are several co-tortfeasors who are found by the court to be liable.[10]

[10]  Art. 1874 of our Civil Code provides, in relevant part, that "[t]olling of the statute of limitations in actions with joint and several liability benefits or is prejudicial to all creditors or debtors." 31 L.P.R.A. sec. 5304.

Careful study of the obligations derived from liability for extra-contractual torts requires a historic analysis of its nature and scope.

A.

The word solidarity (joint and several liability) comes from Latin *in solidum*, which is defined as the totality of a sum.  A. Blanquez Fraile, Diccionario Latino-Español, Español-Latino, Barcelona, Ed. Ramon, S.A., 1985, V. II, p. 1460.  The institution of the *in solidum* obligation comes in turn from Roman Law.  The latter acknowledged in all of its scope the division between joint obligations and joint and several obligations according to how the distribution of liability was apportioned among the parties.  J. R. Leon Alonso, La Categoria de la Obligacion in Solidum, Publicaciones de la Universidad de Sevilla, 1978, p. 51.  Obligations with several subjects were considered joint and several as long as there was no agreement between the parties.  C. Gomez Liguerre, Solidaridad y Derecho de daños.  Los limites de la responsabilidad colectiva, (s.l.), Thomson, Civitas, 2007, p. 79.  Roman joint and several liability allowed the creditor to require full performance of the obligation from any of the debtors.

From 286 bc through Lex Aquilia, Romans provided a regimen for situations in which there were several tortfeasors.  Gomez Liguerre, op. cit., p. 81.  According to it, the victim could claim all of the compensation from any of those declared liable.  Id.

Obligations in Roman Law were assumed to be joint and several.  [Merely] joint obligations were the exception and it was applied when it was agreed by the parties or when the obligation was divisible.  Subsequently this reasoning was inverted by Justinian Law (527-565 ac) which changed the presumption: it imposed the division of the obligation as the rule and established joint and several liability only when it had been agreed to.  Gomez Liguerre, op. cit., p. 80.  It was an inescapable requirement for the claim to be made against all debtors at once. Id., p. 81.

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

From its creation, joint and several liability has been divided according to the source from which it arises. Roman law proposed the idea of distinguishing between two types of plural obligations: correal obligations and *in solidum* obligations. See: E. Petit, Tratado Elemental de Derecho Romano (J.M. Rizzi, trad), Mexico, Ed. Editora Nacional, 1966, pp. 348-355/ Although apparently similar, these obligations were different as to source or origin. J. Cubides Camacho, Obligaciones, 5ᵗʰ Ed., Bogota, D.C., 2007, p. 68. Id. *In solidum* obligations arose from natural causes, such as those derived from common crime or fault of debtors, and correal obligations arose from voluntary causer. E. Petit, op. cit., p. 353-354. Similarly, *in solidum* obligations could only exist between debtors, while correal obligations could be established both among debtors and among creditors. Id.

The rule of non-presumption of joint and several liability in Roman law had a significant influence in the creation of the French and Spanish civil codes. However, these codes do not expressly establish how liability shall be apportioned among extra-contractual co-tortfeasors, and therefore both countries have supplemented this absence through jurisprudence. In this aspect, our Civil Code is similar to that of France and Spain.

B.

In France, Art. 1202 of their Civil Code provides that joint and several liability is not assumed, rather it has to be expressly agreed upon. As we suggested, the aforementioned civil code is silent as to the obligation that should exist when there are several tortfeasors.

In the subject of general liability, French doctrine distinguishes between two types of effect of joint and several liability: primary effects and secondary effects. Primary effects include sharing the debt and a variety of connections. Secondary effects are tolling of the statute of limitations, interruption of default, and the promise of performance by all joint and several debtors. Gomez Liguerre, op cit., p. 127. This distinction is crucial in this doctrine, since the secondary effects of joint and several liability are not applicable to extra-contractual liability.

Since joint and several liability can arise from the law or the will of the parties, in France a distinction is made between cases of perfect joint and several liability and imperfect joint and several liability. Liability is perfect when it is "among several persons that are united by a common interest, who have frequent contact with each other or know each other." J. R. Leon Alonso, op. cit., p. 32. On the other hand, it is imperfect when it is established by law "between persons who do not know each other, who are accidental codebtors or when their contact is sporadic." Id., pp. 32-33.

When joint and several liability is imperfect, there is an *in solidum* obligation.[11] According to this, in cases where there are several tortfeasors each one of them is liable for the whole amount, but his liability is autonomous from that of the others. A. Cristobal Montes, Mancomunidad o solidaridad, 1985 ed. Bosch, Casa Editorial, S.A., Barcelona, p. 36. This is due to the fact that the link that gives rise to the obligation of each co-tortfeasor is independent. Id. Because of this, the French doctrine does not deem said obligation to be a regular joint and several obligation, rather an *in solidum* obligation. Even though each of the co-tortfeasors are liable to pay everything, the secondary effects of traditional joint and several liability- among them, tolling of the statute of limitations- do not apply. This means that in extra-contractual tort actions, the injured party should individually toll the statute of limitations as to each joint and several tortfeasor. Id, p. 38. That is, timely filing of a complaint against a joint and several extra-contractual co-tortfeasor does not toll the statute of limitations against the rest of the alleged tortfeasors.

[11] Some legal theorists have attributed the creation of the *in solidum* obligation to French doctrine. J.R. Leon Alonso, op. cit., p. 32. With regards to tolling of the statute of limitations, Art. 1206 of the French Civil Code- similar to Art. 1874 of our Civil Code, supra- establishes that "actions exercised against one joint and several debtor interrupts the statute of limitations as to all of them." French Civil Code (A. Nunez Iglesias, trad.), Madrid, Marcial Mons Ed., 2005, p. 552. However, French doctrine does not apply said article to the extra-contractual realm. This is mainly due to the fact that classic joint and several liability is explained in France as an idea of mutual representation, which requires all parties to be motivated by a common intention. See Gomez Liguerre, op. cit., p. 99. This does not occur in cases of *in solidum* liability. In these cases, since

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

there is no mutual representation due to the absence of intention of the coparties to jointly bind themselves, the obligation that arises among the co-tortfeasors is not considered to be fully on the same level as a proper joint and several obligation.

The exclusion of secondary effects of joint and several liability of several extra-contractual tortfeasors is justified based on the absence of common interests between the co-parties. J. Lopez Richart, Responsabilidad Personal e Individualizada, Madrid, Ed. Dikinson, 2003, p. 40. There is no common interest or mutual representation because the *in solidum* obligation does not arise out of a previous pact or agreement, rather from a unconventional event. I. Sierra Gil de la Cuesta, Tratado de Responsabilidad Civil, Spain, Ed. Bosch, 2008, V. II, p. 669.

In sum, in the extra-contractual realm, French doctrine holds that when there are several extra-contractual tortfeasors, an *in solidum* obligation arises in which the secondary effects of joint and several liability are not produced. In order for the injured party to preserve its action against the alleged co-tortfeasors, it must toll the statute of limitations against each of them. A. Cristobal Montes, op. cit. p. 38.

C.

The Civil Code of Spain follows the model of the French Civil Code and does not expressly contemplate the obligational assumption that governs in cases of extra-contractual liability with several tortfeasors. A. Cristobal Montes, op. cit., p. 29. Art. 1902 of the Spanish Civil Code, similar to our Civil Code, supra, covers the concept of extra-contractual fault. For its part, Art. 1137 of the Civil Code of Spain establishes that joint and several liability is not assumed.[12]  However, extra-contractual co-tortfeasors are jointly and severally liable based on judicial interpretation.

[12]  Art. 1137 of the Spanish civil code – which is identical to our Art. 1091 sec. 3102 – establishes the following:
    The fact that there are two or more creditors with two or more debtors for one obligation does not imply that each of the former has a right to request, nor do each of the latter have to fully provide, the items that are the subject thereof. This shall only occur if the obligation expressly indicates it, being established as a joint and several obligation.

In the period in which we decided Arroyo v. Hospital La Concepcion, supra, the rule that was in effect in Spain contemplated homogenous joint and several liability which admitted that the timely filing of a complaint by an injured party against a joint and several co-tortfeasor would toll the statute of limitations against those who subsequently were found to be jointly and severally liable. This was so because there was no distinction between joint and several liability arising out of an agreement and joint and several liability which is the product of an injury caused by several tortfeasors. As we stated, this rule was abandoned in Spain. In its place, the dominant French interpretation which admits a distinction between proper and improper joint and several liability was incorporated. According to the modern rule in Spain, joint and several liability is proper when its nature arises from a legal rule or conventional agreement, and is improper when it arises from a judgment. See S. June 7, 2010, No. 521/2010.

The concept of improper joint and several liability provided "the solution to one of the problems that arise from joint and several liability: tolling of the statute of limitations." Gomez Liguerre, op. cit., p. 129. This is due to the fact that improper joint and several liability is an exception to the rule of tolling of the statute of limitations. The Spanish concept is very similar to the consolidated French doctrine of *in solidum*, in effect since the 19th Century. C. Gomez Liguerre, op. cit. p. 125. It was specifically in the judgment from March 14, 2003, D. from March 14, 2003, No. 3645/2003, that Spanish jurisprudence incorporated this distinction. The factual background of that judgment is as follows. A construction worker filed an action in torts against the company for which he worked, the promoter of the project and the architect in charge. A judgment released the latter from liability and ordered the two former parties to compensate the injured party. Said party could not receive compensation due to the insolvency of defendants, and proceeded to sue the technical architect and its insurance companies. The lower courts decided that the statute of limitations for the action had expired because Art. 1974 of the Spanish Civil Code did not apply to this extra-contractual cause of action. The Supreme Court of Spain affirmed the decision after consulting the General Assembly of Judges of the First Court of the Supreme Court, which adopted the following accord by a clear majority of votes:
    The first paragraph of Article 1974 of the Civil Code solely contemplates a tolling effect in the situation where there are joint and several obligations in the proper sense when said nature arises from a legal rule

*pep*

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

7

CERTIFIED TRANSLATION

<u>Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)</u>
2012 TSPR 126

> or a conventional agreement, *and this may not be extended to the field of extra-contractual liability when liability is found by the court for several parties*. D. from March 14, 2003, No. 3645/2003 (emphasis added).

As can be observed, currently Spanish jurisprudence, as well as French doctrine, considers that the tolling effect on statute of limitations established by Art. 1974 applies only to cases of proper joint and several liability. See: Judgment from March 14, 2003; No. 3645/2003; Judgment from June 4, 2007, No. 662/2007. That is, in the case of Spain, when said nature arises from an agreement or law. Id. Nevertheless, tolling does not extend to improper joint and several liability since it does not exist until the moment it arises from a judgment. Id. This joint and several liability does not arise out of a pre-existing connection, rather from the illicit act that causes the injury, which becomes acknowledged through the judgment declared as such. Id. Therefore, tolling acts operate independently. "[I]f joint and several liability arises from a judgment, which is the so-called improper joint and several liability, tolling of the statute of limitations as to one of the debtors shall not extend to the other, since he was not a joint and several debtor and it was only the judgment which declared him as such, not before." D. from June 4, 2007, No. 3645/2007; D. from March 14, 2003, No. 3612/2003.

This doctrine is already consolidated in Spain, D. from October 19, 2007, No. 1086/2007. And it has been uniformly applied since 2003. See: D. from July 18, 2011, No. 545/2011; D. from October 19, 2007, No. 1086/2007; D. from May 8, 2007, No. 466/2007; D. from June 5, 2003, No. 534/2003; D. from October 23, 2003, No. 979/2003.

IV.

We have carefully examined the rule of Arroyo v. Hospital La Concepcion, supra. In this case we faced the existence of two possible interpretations as to joint and several liability in our law. One of them reiterated the homogenous nature of joint and several liability, and consequently, its acknowledgment in all of its scope of its primary and secondary effects. The other admitted a distinction between proper and improper joint and several liability. According to the latter exegesis, the primary effects of joint and several liability remained intact-the fact that each codebtor was responsible for paying all of the debt- but the secondary effects of joint and several liability – in this case, the fact that a statute of limitations was tolled against an extra-contractual co-tortfeasor interrupting in turn, indefinitely, the statute of limitations against the rest of the co-tortfeasors - would not be recognized.

In light of this situation, in Arroyo v. Hospital La Concepcion, supra, we opted for the Spanish doctrine in effect at the time – and abandoned in that jurisdiction almost a decade ago- and we interpreted that according to Art. 1874 of our Civil Code, supra, the first paragraph of which provides that "[t]olling of the statute of limitations for actions in joint and several obligations benefits or is prejudicial to all creditors or debtors alike," timely filing of a torts action against a joint and several co-tortfeasor tolled the statute of limitations against anyone who was jointly and severally liable. It was not the first time that we supplemented a vacuum in legislation regarding extra-contractual civil liability, since joint and several liability of co-tortfeasors itself is not expressly included in the law, rather it comes from judicial interpretation of the provisions of our Civil Code. C.J. Irizarry Yunque, Responsabilidad Civil Extracontractual, 6th Ed., [sin. l.], author's ed, 2007, p. 343. Thus, in Arroyo v. Hospital La Concepcion, supra, we jurisprudentially interpreted that in our law there was only one joint and several liability and we refused to make a distinction between perfect and imperfect joint and several liability, and admitting in turn the effects that this implied as to interruption of the statute of limitations.

We did the above for the purpose of achieving a fair balance between the conflicting sides. We affirmed in Arroyo v. Hospital La Concepcion, supra, that the norm adopted therein "achiev[ed] the best balance between all of the interests." Id., p. 608. It was the declaration of a hypothesis that remained to be verified. Two decades later, the accumulation of experience forces us to conclude that the rule established therein did not reach the balance that was sought. In effect, after Arroyo v. Hospital La Concepcion, supra, we acknowledged that that rule really provides the greatest protection to plaintiff. See, for example, Garcia Perez v. Corp. Serv. Mujer, supra, p. 151. And this is supported by the different effects of the rule applied in practice.

Plaintiff may bring another party to the litigation as a codefendant even when he brings a claim outside of the statute of limitations. In fact, even if he knows the identify of the alleged co-tortfeasor he does not have to include him in the original complaint.

8

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)
2012 TSPR 126

See Garcia Perez v. Corp. Serv. Mujer, supra. The injured party does not even have to allege joint and several liability of tortfeasors in this complaint, since she can do so through an amendment to the complaint. Id. In that amendment she merely needs to allege that the new defendant is jointly and severally liable for injuries claimed from the original defendant, against whom the complaint was filed, within the statute of limitations provided by the law. In this way, although plaintiff is in a position to exercise her cause of action against the supposed joint and several co-tortfeasor, it has no limit in doing so. This is because the rule in Arroyo v. Hospital La Concepcion, supra, provided an automatic and indefinite tolling effect in prejudice of all those who could be jointly and severally liable for the injury.

For its part, the alleged jointly and severally liable co-tortfeasor brought to the litigation several years after the original complaint – six in this case – shall employ, in none too few occasions, copious effort to remember with any given certainty the specific events that motivated the claim filed against it. It must also take on a diligent search for documents conceived in that moment in time; a matter that is complicated when they are in the possession of third parties it has little or no relationship with, or in the possession of a third party who no longer exists. Similarly, the more time passes until it is finally incorporated as a codefendant, the higher the probability that it will face difficulties in finding witnesses. Similarly, the supposed joint and several co-tortfeasor shall incur in expenses associated with a litigation whose statute of limitations would otherwise be expired, due to the shortness of the term in our Civil Code for these claims.

As must be contemplated, far from achieving equilibrium between opposing interests, this rule tilts the balance in favor of claimant. As a consequence of the above, and despite the express and extensive acknowledgment of the substantive concept of expiration of the statute of limitations in Arts. 1840 to 1874 of our Civil Code, supra, the severity that characterizes statutes of limitations diminishes considerably. This is despite the fact that their existence is based on the search for stability in legal relationships and promoting diligence in the vindication of rights.

It should also be noted that the rules regarding joint and several liability in extra-contractual liability built on Arroyo v. Hospital La Concepcion, supra, is not expressly contained in our Civil Code. When it alludes to "joint and several obligations" it does not specify whether we are dealing with a situation with only one joint and several obligation or several, and in the latter case, how many and which ones specifically. In spite of said absence, jurisprudentially we gave preeminence to the rule adopted therein regarding the substantive concept of the expiration of the statute of limitations, which is expressly regulated in our Code. The problem of interpreting this rule was that it did not achieve a solution that was in harmony with the rest of the law. Its development has been an institution of undermined expiration by statute of limitation, since one party has the eternal right to file a torts claim against the other. Just as dangerous, said rule has the unfortunate effect of rewarding inertia in the vindication of a right and promoting the strategic use of inaction, given the fact that the plaintiff may select at will the moment which is most convenient to him to include a party in litigation.

Another problem faced by the automatic tolling and indefinite deferral of the cause of action is that the statute of limitations limited to a year for claims under Art. 1802 of the Civil Code, supra, is mainly due to the absence of a prior legal relationship between plaintiff and defendant. The obligation that shall cause extra-contractual harm does not arise from an agreement between the parties, therefore there is no opportunity to negotiate the terms of the obligation or freely consent, contrary to the contractual relationship. Thus the brief period provided by the legislator. In this way, a modicum of certainty was conferred upon a claim that had been deprived of it. This modicum of certainty somewhat compensates the absence of knowledge as to the scope of the obligation. It provides, thus, a miniscule safeguard that allows a fair equilibrium to be maintained between the parties. And it should not be set aside.

Based on all of the above, we adopt in our jurisdiction the *in solidum* obligation in the subject of the expiration of the statute of limitations for a cause of action due to extra-contractual civil liability when there is more than one tortfeasor.[13] Accordingly, the injured party may recover from each defendant co-tortfeasor all of the debt *that is appropriate*, because the primary effects of joint and several liability are maintained. But it will have to interrupt the expiration of the statute of limitations as to each co-tortfeasor separately, within a term of a year established by art. 1868 of the Civil Code, supra, if it wishes to preserve its cause of action against each of them. This does not entail a heavy burden for the injured party, since it must only exercise the same degree of diligence required when claiming against a tortfeasor. This way, timely filing of a complaint against a supposed co-tortfeasor does not toll the

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

9

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

statute of limitations against the rest of the alleged co-tortfeasors, since said secondary effect of joint and several liability does not operate in *in solidum* obligations. [14] Therefore, Art. 1874 of the Civil Code, supra, does not apply to torts actions under Art. 1802 of the Civil Code, supra.[15]

[13] Furthermore, we reiterate that what is provided in Art. 1090 of the Civil Code, 31 L.P.R.A. sec. 3101, as to the non-presumption of joint and several liability does not apply in the field of extra-contractual liability. Additionally, we emphasize that we do not adopt the rule of the *in solidum* obligation in all of its scope, but only as to the tolling of the statute of limitations when there are several co-tortfeasors under Art. 1802 of the Civil Code, supra.

[14] Improper joint and several liability does not give rise to automatic and indefinite tolling of the statute of limitations in prejudice to other co-tortfeasors, which, due to their own fault, have an obligation towards the injured party. The liability of each of them is autonomous from the rest, and therefore arises from a variety of independent links, which requires the statute of limitations against each debtor to be tolled individually. This is so because imperfect joint and several liability does not arise out of a pre-existing connection, but from the illicit act of the tortfeasor as acknowledged by the judgment that so declares.

[15] In Puerto Rico, as occurred in Spain, concerns have been raised as to the adoption of this rule. The concerns revolve mainly around the fact that there is a solid precedent and the possible effect that this change of rule may have on judicial reliability. Similarly, it has been stated that its adoption goes against the purpose of the application of joint and several liability in cases of extra-contractual liability. See, J.J. Alvarez Gonzalez, El Tribunal Supremo de Puerto Rico: Analysis Del Termino 2007-2008, 78 Rev. Jur. U.P.R. 457 (2009). We disagree with said interpretation. As we indicated, the fair balance that was sought to be achieved with the application of joint and several liability in extra-contractual tort actions in truth resulted in greater protection to plaintiff, indefinite deferrals of causes of action, among other effects that undermined judicial stability. The rule that we adopt today as to tolling of the statute of limitations when there are several co-tortfeasors under Art. 1802 of the Civil Code, supra, achieves a fair balance between the parties and harmonizes our law. It also does not represent a great burden for plaintiff, who must only exercise his cause of action diligently against all potential co-tortfeasors whose identity is known by him. That is to say, in total harmony with the cognitive theory of torts. Another one of the concerns expressed revolved around the fact that the rule that we adopt today was contrary to Rule 51.7 of the Civil Code of 1979, 32 L.P.R.. Ap. III. The above rule was eliminated from the body of the Rules of Civil Procedure of 2009 precisely because it was "contrary to the law, since it allow[ed] a judgment to be executed against a person who was not a party to the litigation and as to whom the court did not acquire jurisdiction." Tribunal Supremo de Puerto Rico, Secretariado de la Conferencia Judicial y Notarial, Informe de Reglas de Procedimiento Civil, March 2008, p. 583. Therefore, we believe the need for change of the rule outweighs the concerns stated.

However, it should be noted that the rule adopted today is in agreement with the cognitive tort theory; therefore, the statute of limitations starts running when the injured party learned or should have learned, by exercising some degree of diligence, of the existence of the injury and who caused it, as well as the necessary elements to be able to effectively exercise its cause of action. *CSMPR v. Carlo Marrero et al,* 182 D.P.R. 411, 425-426 (2011); *COSSEC et al. v. González López et al, supra;* Vera v. Dr. Bravo, 161 D.P.R. 308, 328 (2004); *Santiago v. Ríos Alonso,* 156 D.P.R. 181, 189 (2002). Consequently, if through discovery or other method the injured party learns of the existence of another co-tortfeasor and of the remaining elements that are necessary to file a claim against the same, the statute of limitations against said co-tortfeasor shall start running at that moment, since a statute of limitations whose effect is to require that the plaintiffs file a cause of action before having knowledge of its existence would violate due process of law. *COSSEC et al v. González López et al, supra,* pp. 821-822; *Vera v. Dr. Bravo, supra,* page 327; *Vega v. J. Pérez & Cía, Inc.,* 135 D.P.R. 746, 754 (1994).

By doing this, we harmonize the rules when there are several extra-contractual tortfeasors with the cognitive tort theory and the substantive concept of the statute of limitations, while also respecting the minimum certainty awarded by the legislator to this type of relationship. At the same time, by adopting an improper joint and several liability we settle the problem of uncertainty posed by the indefinite pendency of a cause of action for extra-contractual civil liability. The rule established herein allows us to avoid the dangerous frontier where seeking relief for injury does not require any diligence, in spite of the express mandate of the provisions of our Civil Code. Diligence in claiming a right is indispensable in the aggregate.

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.



10

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012TSPR126

We are conscious of the fact that the aforementioned doctrine is a consolidated doctrine, but this circumstance is not an impediment to harmonize our legal system and remedy an injustice. Even though the doctrine of stare decisis establishes that a court must follow its decisions in subsequent cases, it does not reach the extreme of declaring that the opinion of a court shall turn into a dogma that the Court must blindly follow. *Pueblo v. Díaz De León*, 176 D.P.R. 913, 921 (2009); *A Railroad Co. V. Comisión Industrial,* 61 D.P.R. 314, 326 (1943). Therefore, when the reasoning of a decision can no longer withstand a careful analysis we are not bound to follow it. *Arizona v. Gant,* 556 U.S. 332, 348 (2009). The foregoing allows for the consistent development of legal principles. *Pueblo v. Díaz De León, supra; Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (1996).

V

The complaint in the case at bar was filed on May 2, 2002. For six long years, the plaintiffs did not file their claim against Dr. Mestre Morera, who they finally brought to the lawsuit on May 21, 2008 through an amended complaint.

The plaintiffs' own statements reveal that they had knowledge of the identity and participation of Dr. Mestre Morera in the event. Coplaintiff Fraguada Pérez testified that she was in the room of Ms. Pérez paying close attention to the procedure being performed by the nurse. That is when she noticed that Ms. Pérez started coughing repeatedly. Due to this unforeseen situation, Dr. Mestre Morera and another physician quickly appeared at the room. The coplaintiff herself asked the doctors to do something, while she remained firm next to her mother. She witnessed the alleged discussion between Dr. Mestre Morera and the other physician with respect to the placement of the nasogastric tube in the lung of the patient and the warning that one of the latter gave to the other regarding the potential risk of embolism. The coplaintiff continued next to her mother and very close to the physicians, who—as she stated—would alternatively order each other to withdraw the tube from the patient. At that moment, given the look in the eyes and presence of the coplaintiff, the tube was withdrawn from Ms. Pérez's interior body.

The alleged incorrect placement of the nasogastric tube and the alleged discussion by Dr. Mestre Morera are precisely the only two reasons that the plaintiffs filed a claim against the physician in the amended complaint that they filed six years later. The testimony of the coplaintiff given during a deposition clearly reveals that the plaintiffs had knowledge, since the day of the event, of the identity of the physician and of his alleged participation in the cause of the alleged injury, which reached its critical moment months later with the demise of Ms. Pérez. In spite of having knowledge of the foregoing, the plaintiffs did not include Dr. Mestre Morera in their original complaint. More so, they decided to do so six years later, an act which shows their neglect and abandonment of said claim.[16] Therefore, under the rule adopted today, the plaintiffs should have filed an individual claim against Dr. Mestre Morera as the alleged joint and several co-tortfeasor within the statute of limitations of one year provided in Art. 1868 of our Civil Code, *supra,* which started running as soon as they learned of the injury, the identity of the tortfeasor, and the necessary elements to exercise the cause of action.

16      It should also be noted that since 2005 the plaintiffs had an expert witness report informing them of the deviations in the placement of the nasogastric tube. In spite of this, the party only filed a claim against Dr. Mestre Morera after three years of having the above-referenced report.



Notwithstanding the above, upon evaluating the established criteria in order to declare the retroactive or prospective application of a court decision—trust deposited by the plaintiffs in the former rule; purpose sought by the new rule to determine whether its retroactivity furthers it, and the effect of the new rules on the administration of justice—we hereby decide that our decision should have a prospective effect. See: *Isla Verde Rental v. García,* 165 D.P.R. 499, 505 (2005); *Datiz v. Hospital Episcopal,* 163 D.P.R. 10, 18 (2004); *Gorbea Vallés v. Registrador,* 131 D.P.R. 10, 16 (1992); *Correa Vélez v. Carrasquillo,* 103 D.P.R. 912, 918 (1975). The foregoing is based on the fact that the rule is a new rule and so applying it to this case would have substantially unfair results for the respondents, who relied on the prior rule that has been set aside by the new rule that we are establishing today. Public policy and social considerations have made us decide that this rule shall have prospective effects, since the purpose sought is to award fair and equitable relief resulting in a better social coexistence. *López v. Porrata Doria,* 169 D.P.R. 135, 169 (2006); *Isla Verde Rental v. García, supra.*



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

Subsequently, all causes of action filed according to Art. 1802 of the Civil Code, *supra*, shall be adjudicated in accordance with the rules established herein.

VI

Wherefore, we hereby issue the writ of certiorari and revoke the rule in *Arroyo v. Hospital La Concepción, supra*, in relation to the tolling of the statute of limitations in claims under Art. 1802 of the Civil Code, *supra*, when there are several extra-contractual tortfeasors, as well as any other determination that is incompatible with this decision. Furthermore, we hereby issue the requested writ of certiorari, declare the prospective effect of the adopted rule and, consequently, affirm the decision issued by the Court of Appeals. The case is returned to the Court of First Instance for continuation of the proceedings.

Judgment will be issued accordingly.

Luis F. Estrella Martínez

Associate Judge

JUDGMENT

Based on the grounds stated in the preceding Opinion, which is made a part of this Judgment, we hereby issue the writ of certiorari and revoke the rule in *Arroyo v. Hospital La Concepción, supra*, in relation to the tolling of the statute of limitations in claims under Art. 1802 of the Civil Code, *supra*, when there are several extra-contractual tortfeasors, as well as any other determination that is incompatible with this decision. Furthermore, we hereby issue the requested writ of certiorari, declare the prospective effect of the adopted rule and, consequently, affirm the decision issued by the Court of Appeals. The case is returned to the Court of First Instance for continuation of the proceedings.

So declared, ordered by the Court and certified by the Clerk of the Supreme Court. Associate Judge Pabón Charneco dissents with a written opinion, joined by Associate Judges Rivera García and Feliberti Cintrón.

Associate Judge Fiol Matta states the following:

"Associate Judge Fiol Matta dissents with the decision of the Court revoking the rule established in *Arroyo v. Hospital la Concepción*, 130 D.P.R. 596 (1992). The Opinions in *Arroyo* and in *García Pérez v. Corp. Serv. Mujeres*, 174 D.P.R. 138 (2008), as well as the Dissenting Opinion in this case of Associate Judge Pabón Charneco and the article by José Julián Álvarez González *"Responsabilidad Civil Extracontractual,"* 78 U.P.R. Law Journal 457, 473 (2009), explain the reasons to not adopt in our jurisdiction the *in solidum* doctrine.

I agree with the Majority Opinion in relation to the difficulties posed by a potential co-defendant being brought to a lawsuit years after it is filed, as a joint and several co-tortfeasor of the alleged injury, since the original complaint tolled the statute of limitations for all co-tortfeasors. However, the rule adopted in *Arroyo* allowed for this issue to be adequately dealt with since it in no way prevented the consideration, under the doctrine of laches, of extraordinary circumstances, such as the ones in the case at bar, in which a plaintiff is inactive and not diligent in learning the identity of other possible co-tortfeasors or, in case the plaintiff had knowledge of them, in bringing them to the lawsuit. To do so, it was not necessary to use the *in solidum* doctrine and divide the extra-contractual joint and several liability into primary and secondary effects. What should have been done was to set aside the inflexible application of the *Arroyo* rule and adjust it in order to deal with situations such as the one in the case at bar without having to revoke twenty years of precedents and adopt a new interpretation of the Civil Code. Without a doubt, the result in this case would have been the dismissal of the complaint, not as a result of the application of the new doctrine, but because the plaintiffs committed laches by being inactive and failing to amend the complaint when they learned of the identity of the co-tortfeasors.

I am concerned that the new rule may cause more problems than it will settle and generate situations in which a victim may be unnecessarily harmed. I believe that the Opinion of the Court partially acknowledges this fact and, therefore, it has



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

12

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

had to establish many safeguards, thereby creating an unnecessarily confusing and complicated system. Under *Arroyo*, our system gave priority to remedying the harm suffered by the victim, while protecting defendants in cases of inactivity and lack of diligence by the plaintiffs. Now, in order to protect the potential co-defendants brought late to lawsuits, victims are deprived of one of the main tools to remedy their injuries: the simultaneous tolling of the statutes of limitations for all of the joint and several co-tortfeasors, subject, of course, to basic legal rules, including diligence. I am afraid that the inevitable consequence of this decision shall be the eventual adoption of a rule of joint liability for extra-contractual civil liability cases, setting aside almost a century of precedents of statutory interpretation that has not been altered by the Legislative Assembly.

I share many of the concerns of the Majority Opinion. Without a doubt, an inflexible application of the *Arroyo* rule could result in clearly unfair situations for some potential defendants that would be subject to the situation where some plaintiffs remain inactive relying on the fact that a complaint against a co-tortfeasor perpetually tolls the statutes of limitations against the others. But this can be dealt with without affecting the current rule. Based on the foregoing, I very respectfully dissent with the adopted solution."

Aida Ileana Oquendo Graulau

Clerk of the Supreme Court

Dissenting opinion issued by ASSOCIATE JUDGE PABÓN CHARNECO, joined by ASSOCIATE JUDGE RIVERA GARCÍA AND ASSOCIATE JUDGE FELIBERTI CINTRÓN.

I respectfully dissent with the Majority Opinion. It carries out a normative change of a regressive nature in the area of extra-contractual civil liability by *partially* adopting the *In Solidum* Obligations Doctrine. By doing this, the Opinion introduces a *tertium genus* between joint and joint and several obligations that our system does not recognize. Furthermore, it sets aside a consolidated case law with the purpose of limiting the statute of limitations for co-tortfeasors who were not brought to the lawsuit in the original Complaint.

17    The Majority Opinion adopts the *In Solidum* Obligations Doctrine "only with respect to the tolling of the statute of limitations when there are several co-tortfeasors under Art. 1802 of the Civil Code." Majority Opinion, pp. 26-27, note 11.

18    V. Múrtula Lafuente, La *Responsabilidad Civil por los Daños Cansados por un Miembro Indeterminado de un Grupo*, Madrid, Dykinson Ed., 2005, pp. 103-104; A. Cristobal Montes, *Mancomunidad o Solidaridad en la Responsabilidad Plural por Acto Ilícito Civil*, Barcelona, Bosch Ed., 1985, page 41.

Certainly, there are occasions in which an injured party fails to file suit against one of the co-tortfeasors for a long time—in spite of having knowledge of the identity of the same—and during the course of the lawsuit amends the Complaint in order to bring the latter. This situation, which initially adjusts to the letter of the law, may be deemed an abuse in the irregular exercise of the law when it affects the defense of said co-tortfeasors, as well as an effective court economy. There is no doubt that our legal system provides the tools to deal with the difficulties that this type of practice can entail without having to turn to a doctrine that is not compatible with our system.

Below is a brief summary of the events that resulted in this controversy.

I

On May 2, 2002, the respondents (composed of Mr. Daniel Fraguada Bonilla, Mr. Héctor L. Fraguada Pérez, Ms. Ana Hilda Fraguada Pérez, Ms. María de los Ángeles Fraguada Pérez, Mr. Carlos Daniel Fraguada Pérez and Mr. Ángel G. Osorio Fraguada) filed a Complaint for torts against the Auxilio Mutuo Hospital, Dr. Manuel Anguita Alvarado and two (2) other unknown physicians. In short, they alleged negligence in the medical treatment to Ms. Hilda Pérez, who died on July 1, 2000 [sic]. Furthermore, in the Complaint, they noted "that at the time of filing this

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

13

CERTIFIED TRANSLATION

**Fraguada Bonilla v Hosp Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

complaint, not all of the details related to the events are known and it is being filed in order to toll the statute of limitations."[19]

19    Exhibit to Request for *certiorari,* page 48.

On October 25, 2006, the trial court issued a Partial Judgment due to Amended Stipulation in which it approved the settlement and released the Auxilio Mutuo Hospital from the claim. Subsequently, in April of 2008, the respondents requested authorization to amend the Complaint and indicated that the actions taken by them during discovery revealed information regarding two (2) other physicians who were negligent in their treatment of Ms. Pérez. On April 14, 2008, the respondents amended the Complaint to bring Dr. Octavio Mestre Morera (hereinafter Dr. Mestre Morera or petitioner) and Dr. Noel Totti as codefendants.

20    Exhibit to Request for *certiorari,* page 64.

For his part, Dr. Mestre Morera filed in his answer to the Complaint the affirmative defense regarding the expiration of the statute of limitations on February 10, 2009. He specifically stated that:

> The statute of limitations for the cause of action to be exercised against the appearing party has expired. Our current system promotes diligence in exercising rights and penalizes laches. Filing the amended complaint in the case at bar in order to bring the appearing party six years after filing the original complaint shows a serious lack of diligence by the plaintiffs. (Emphasis in original). Exhibit to Request for *certiorari,* page 84.

On April 14, 2009, the petitioner filed a Motion Requesting Summary Judgment due to Expiration of the Statute of Limitations.[21] In it, he indicated that a deposition taken on June 11, 2005, of coplaintiff María de los Ángeles Fraguada, revealed that the respondents knew that Dr. Mestre Morera had intervened in the treatment of Ms. Pérez. He added that, as of that date, the respondents already had an expert witness report in this regard.[22] Therefore, he requested that the cause of action be dismissed based on the lack of diligence of the plaintiffs in exercising their action, since three (3) years had already passed since the plaintiffs had the necessary information. On the other hand, the respondents indicated that filing the original Complaint had tolled the statute of limitations in relation to the other joint and several co-tortfeasors and that the latter could be brought to the lawsuit by way of an Amended Complaint in accordance with current law. This request was DENIED on July 9, 2009.

21    Exhibit to Request for *certiorari,* pp. 85-94.

22    Exhibit to Request for *certiorari,* pp. 99-101.

After filing a timely Motion to Reconsider that was denied by the court of first instance, the petitioner filed a request for *certiorari* in the Court of Appeals. It was denied.

Unsatisfied, the petitioner turned to us stating the following error:

> The Court of Appeals erred by applying the joint and several liability doctrine between alleged joint and several co-tortfeasors without taking into consideration the laches argument made by the appearing party to support the fact that in this case the plaintiffs should not benefit from the liberal conditions in relation to the expiration of a statute of limitations, taking into account that the events for which the appearing party is being sued took place eight years before filing the amended complaint through which it was brought to the lawsuit and that according to the cognitive tort theory the plaintiffs had all of the necessary elements to file a claim against Dr. Mestre Morera three years before filing the amended complaint.

II



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

A.

Extra-contractual civil liability is essentially based on Art. 1802 of the Civil Code, 31 L.P.R. A. sec. 5141. Said article provides the following, where relevant: "a person who by action or omission causes harm to another person shall be bound to remedy the harm caused."

At the same time, Art. 1868 of the Civil Code, 31 L.P.R.A. sec. 5298, establishes a statute of limitations of one (1) year for these actions. It starts running when the injured party discovered or should have discovered the harm, the tortfeasor, as well as the necessary elements to effectively exercise its cause of action.[23] Art. 1869 of the Civil Code, 31 L.P.R.A. sec. 5299. Also see, *COSSEC et al. v. González López et al,* 179 D.P.R. 793, 806 (2010), *Ojeda v. El Vocero,* 137 D.P.R. 315, 325 (1994). The foregoing is based on the fact that the passing of time entails losing the exercise of the rights in order to avoid uncertainty in legal relationships and penalize the failure to exercise said rights. *García Pérez v. Corp. Serv. Mujer,* 174 D.P.R. 138, 147 (2008). Therefore, it should be tolled in conformity with Art. 1873 of the Civil Code, 31 L.P.R.A. sec. 5303.

23    "It is not necessary for the injured party to know at that moment the magnitude and extension of the harmful consequences of the bodily injuries since said detail may be established subsequently." *Vera v. Dr. Bravo,* 161 D.P.R. 308 (2004). However, since the expiration of a statute of limitations punishes the inactivity of the claimant, then the considerations regarding the expiration of the statute of limitations are not applicable if the lack of knowledge is the result of a lack of diligence by the claimant. *COSSEC et al. v. González López et al,* 179 D.P.R. 793, 806 (2010).

In spite of these rules, new issues constantly arise requiring a deeper analysis and interpretation of the latter in order to settle the new situations that are continuously arising in that area. A frequent situation is the plurality of possible tortfeasors whose legal situation is not specifically determined in the Civil Code. This, in turn, generates multiple substantive and procedural difficulties. We shall examine the manner in which we have dealt with situations involving multiple tortfeasors.

B.

In the presence of multiple tortfeasors by action or negligence, there is no doubt that each of them is bound to remedy the harm caused. *Cubano v. Jiménez et al,* 32 D.P.R. 167 (1923). However, one of the difficulties that we face due to the succinct provisions of the Civil Code, without constituting an insuperable obstacle, is whether the obligation to repair the injury between the co-tortfeasors is several or joint and several. Our Code—like the Spanish Code—does not specifically state this distinction, as done by most other foreign Civil Codes.[24]

24    For a brief explanation, see, J. Santos Briz, *La Responsabilidad por Hecho de Otro Derivada de Acto Ilícito No Penal,* in *Tratado de Responsabilidad Civil* (I. Sierra Gil de la Cuesta, cord.) Bosch, V. II, 2008, p. 670; J.J. Álvarez González, *Responsabilidad Civil Extracontractual,* 78 (No.2) U.P.R. Legal Journal 457, 478 (2009).

As is well settled, obligations with multiple subjects can be **several or joint and several**. In principle, Art. 1090 of the Civil Code, 31 L.P.R.A. sec. 3101, provides that given the existence of two (2) or more debtors or two (2) or more creditors, several liability is presumed, not joint and several liability. That is, the credit or debt is presumed to be divided in as many equal parts as the number of creditors or debtors that exist, considering that the credits or debts are different from each other when the text of the obligation does not state otherwise. Art. 1091 of the Civil Code, 31 L.P.R.A. sec. 3102. This is based on the fact that the joint and several liability of the debtors increases the burden represented by the debt since it makes it possible for one debtor to have to settle his debt and the rest of the debt in case of insolvency of the co-tortfeasors. *Arroyo v. Hospital La Concepción,* 130 D.P.R. 596, 602 (1992). As we shall explain below, we have already defined that Art. 1090 of the Civil Code only applies to contracts; an interpretation that the Majority Opinion also does not contradict.[25]

25    Majority Opinion, pp. 26-27, note 11.

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

15

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

On the other hand, a joint and several obligation is considered as

> an obligation including several creditors (joint and several active liability) or several debtors (joint and several passive liability), or several creditors and several debtors (joint and several mixed liability), and in which each creditor has the right to request, and each debtor has the obligation or duty to fully perform, the owed obligation. *Arroyo v. Hospital La Concepción,* supra, page 600.

In cases in which a joint and several debtor pays for the entire obligation, the obligation expires since the creditor only has the right to receive it once. However, the same may recover from the others the amount paid in excess of his share. Art. 1098 of the Civil Code, 31 L.P.R.A. sec. 3109. On the other hand, when the creditor is not able to collect the entire debt by way of the claim filed against one (1) or several of the debtors, the same may subsequently sue the other debtors. Art. 1097 of the Civil Code, 31 L.P.R.A. sec. 3108.

With the passing of time and after careful analysis, we have developed a consolidated case law stating that the legal concept that applies to cases with multiple tortfeasors and in which the injury is indivisible is the joint and several liability concept.[26] *Arroyo v. Hospital La Concepción,* supra, pp. 604-605; *García v. Gobierno de la Capital,* 72 D.P.R. 138, 145 (1951); *García Pérez v. Corp. Serv. Mujer,* supra.

26    Said case law is also supported by the prevailing doctrine. M. Martín-Casals y J. Solé, *Multiple Tortfeasors under Spanish Law* in: W.V.H. Rogers, *Unification of Tort Law: Multiple Tortfeasors,* The Hague, Ed. Kluwer Law International, 2004, page 189.

In spite of the prior statements in *Cubano v. Jiménez et al,* supra, and *García v. Gobierno de la Capital,* supra, it was in *Arroyo v. Hospital La Concepción,* supra, that we clarified that the no-joint-and-several-liability presumption of Art. 1090 does not apply to the area of extra-contractual liability, since the reasoning regarding the applicability of Art. 1090 in the area of contracts is different. In this regard, we indicated that "the will of the parties is not what creates the obligation; instead, it emerges unilaterally by virtue of an act freely performed by a person in relation to another person; and the law gives efficacy and sanctions the natural obligation to remedy the invoked harm." (Emphasis in original omitted). *Arroyo v. Hospital La Concepción,* supra, page 602, citing A. Borell Macía, *Responsabilidades Derivadas de Culpa Extracontractual Civil,* 2nd ed., Barcelona, Bosch Ed., 1958, page 319. Furthermore, in these cases, the obligation arises from Art. 1802, which requires that the tortfeasor repair the harm caused.[27] This is the reason that we adopted the interpretation of the majority doctrine, and, at that time, in Spanish case law, to the effect that there is legal joint and several liability under Art. 1802 when two (2) or more persons cause one indivisible harm. See, H.M. Brau, *El término Prescriptivo y su Interrupción en Acciones en Daños por Responsabilidad Extracontractual Solidaria en el Derecho Puertorriqueño,* 44 (No.2) P.R. Bar Assn Law Journal 203, 204-205 (1983). This way, the guarantee of the injured party is increased and the same is protected more effectively so that he may receive a complete remedy in case of insolvency of any of the tortfeasors.[28]

27    "The legal rules governing joint and several liability must logically be submitted to interpretation." Luis Díez Picazo, *Fundamentos del Derecho Civil Patrimonial,* Madrid, Thompson Ed., V. II, 2008, page 2000.

28    In this regard, we have recognized the doctrinal debate. *Arroyo v. Hospital La Concepción,* 130 D.P.R. 596(1992).

Pursuant to these principles, we have also established that said "legal joint and several liability" has the same consequences that it has in the area of contracts. When adopting a joint and several liability among co-tortfeasors, it must include all of its effects, since our Civil Code does not support different types of joint and several liability. *Arroyo v. Hospital La Concepción,* supra, page 606. See, J.J. Álvarez González, *Responsabilidad Civil Extracontractual,* 78 (No.2) U.P.R. Law Journal 457, 504-505 (2009); L.F. Reglero Campos, *La Prescripción de la Acción de Reclamación de Daños,* in *Tratado de Responsabilidad Civil,* Volume I, Aranzadi Ed., 2008, T.I, page 1280; M. Albaladejo García, *Interrupción o No de la Prescripción Frente a Todos los Deudores Solidarios por Reclamación a Uno Solo: Comentario a la Sentencia del Tribunal Supremo de 14 de Marzo de 2003,* Rev. Der. Priv. 553 (2003); A. Cristobal Montes, *Mancomunidad o Solidaridad en la Responsabilidad Plural por Acto Ilícito Civil,* Barcelona, Bosch Ed., 1985, page 42. As part of these effects, the tolling of the statute of limitations against one affects the

16

*I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.*

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

others in accordance with Art. 1874 of the Civil Code, 31 L.P.R.A. sec. 5304. *Rivera Otero v. Casco Sales Co.,* 115 D.P.R. 662 (1984). Specifically, we decided that[29]

29    Upon examining the French, German, Italian and Spanish doctrines regarding the expiration of statutes of limitations in these cases.

the joint and several liability doctrine *[established in García v. Gobierno de la Capital,* supra,*] allows bringing, to a case filed on time, a joint and several [co-tortfeasor] who was not originally brought to the lawsuit ... through a third party complaint by the original defendant or through an amendment to the complaint by the plaintiff.... The only thing that is required is to duly and sufficiently allege in the complaint—the fact that the defendant or third party defendant, as applicable, is jointly and severally liable for the harm claimed against the original defendant, against whom the complaint was filed within the term of the statute of limitations provided by law....* (Emphasis in original). *Arroyo v. Hospital La Concepción,* supra, pp. 607-608, citing H.M. Brau, *op. cit.,* page 243. Also see, *García Pérez v. Corp. Serv. Mujer,* supra, page 155.

In this regard, the Majority Opinion reiterates that the "no-joint-and-several-liability presumption" does not apply to extra-contractual liability.[30] However, it eliminates the homogeneous treatment given to joint and several liability in accordance with the provisions of the Civil Code, or at least partially by adopting said doctrine only in relation to the expiration of statutes of limitations. By doing this, it creates some effects that up to that point were unknown to our legal system and that should only be adopted by the Legislative Assembly. To do so, it embraces the *In Solidum* Obligations Doctrine in order to "harmonize the rules when there are several extra-contractual tortfeasors with the cognitive tort theory and the substantive concept of the statute of limitations, while also respecting the minimum certainty awarded by the legislator to this type of relationship."[31] Therefore, we shall examine what is supported by this doctrine.

30    Majority Opinion, pp. 26-27, note 11.

31    Majority Opinion, page 28.

Given the general rule to the effect that joint and several liability is not presumed, the French doctrine has conveniently developed the *In Solidum* Obligations Doctrine. Said doctrine is used to justify the obligation of each of the liable parties to pay the entire amount of the debt without some of its effects, including: the expiration of the statute of limitations, the enforceability of res judicata against other debtors, and the appeal, among others.[32] To do so, it distinguishes between two (2) types of joint and several liabilities under passive joint and several liability: perfect and imperfect joint and several liability; distinctions not contained in our Civil Code.[33]

32    J.J. Álvarez González, *supra,* pp. 478 and 504 note 206.

33    As acknowledged by one of the proponents of the *In Solidum* Obligations Doctrine, José Ricardo León Alonso:

"In our Law, ... the *in solidum* obligation does not have a doctrinal basis on which to rest, or specific rules from which to begin; therefore, it shall be convenient to continuously study the possible incorporation of the *in solidum* obligation in the articles or spirit of our C.c., the definition of terms for particularly compatible concepts and, of course, the journey through the dark doctrinal situation." J.R. León Alonso, *La Categoría de la Obligación In Solidum,* Sevilla, Pub.de la Universidad de Sevilla, 1978, page 27.

In order to explain this distinction, the Majority Opinion used the *in solidum* obligations definition offered by José Ricardo León Alonso. "A joint and several liability is perfect when it exists between several persons who are joined by a common interest, have frequent contact, or know each other," and it is "imperfect when the Law establishes it between persons who do not know each other, are only accidental co-tortfeasors, or whose contact is sporadic." See, J.R. León Alonso, *La Categoría de la Obligación In Solidum,* Sevilla, Pub. de la Universidad de Sevilla, 1978, pp. 32-33, citing Mourlon, *Repetitions Écrites Sur le Code Civil,* Paris, V.III, 1896, no 1.260.

34    Majority Opinion, page 15.

I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

17

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

As clearly summarized by Prof. Virginia Múrtula Lafuente, the *In Solidum* Obligations Doctrine:

> ... is based on the fact that in certain cases with multiple debtors, even when one of them is completely liable, his liability is separate from the liability of the others, since the link from which it derives is an independent link that has emerged on its own (it stems from the cause equivalence principle— everyone who has participated in a harmful act must be considered a co-tortfeasor—). Different from joint and several obligations, where each debtor owes the same obligation, in *in solidum* obligations the owed obligations are identical. The purpose of this is to try to avoid certain consequences inherent to passive joint and several liability. This way, in order for the injured party to be able to keep its action against each of the co-tortfeasors, it must toll the statute of limitations in relation to each of them; the judgment obtained against one of them will not be enforceable against the others; and the appeal filed by one of them against a common judgment will not benefit the others. However, common effects are recognized in relation to the joint and several obligation: the creditor may claim the complete obligation against any of the debtors and the payment made by one of the latter releases all other debtors. V. Múrtula Lafuente, *La Responsabilidad Civil por los Daños Causados por un Miembro Indeterminado de un Grupo*, Madrid, Dykinson Ed., 2005, pp. 103-104.

This doctrine was accepted by Spanish case law. Through a Judgment dated March 14, 2003, the Spanish Supreme Court examined the motion filed. In that case, the plaintiff suffered a serious work accident while working in construction. He filed a Complaint requesting compensation for the injury against the company for which he worked, the promoter of the building work and the architect. However, after the Judgment had been issued, and due to the insolvency of the defendants, he filed a new Complaint against the technical architect and two (2) insurance companies. The Complaint was dismissed due to the expiration of the statute of limitations. The Judgment indicated that:

> the doctrine has recognized, along with 'proper joint and several liability'... another form of joint and several liability called 'improper' or 'in solidum' obligations which emerge from the nature of the illicit act and the plurality of subjects who committed it, and which arises when it is not possible to individualize the respective obligations. Not all of the rules provided for proper joint and several liability apply to the latter type of joint and several liability and, especially, the first paragraph of art. 1.974 of the Civil Code cannot be taken into consideration ...

> [When making reference to the judgment dated October 21, 2002, it adds that the source of the joint and several liability ... is the judgment, and that it does not exist prior to the same.[35] J. dated March 14, 2003, No. 223/2003.

35      In this regard, the Majority Opinion affirms that the "imperfect joint and several liability does not emerge from a preexisting link, but from the illicit act that caused the harm as recognized by the judgment declaring it so." Majority Opinion, page 27, note 12. This position is highly criticized. See, M. Albaladejo García, *Interrupción o No de la Prescripción Frente a Todos los Deudores Solidarios por Reclamación a Uno Solo: Comentario a la Sentencia del Tribunal Supremo de 14 de marzo de 2003*, Rev. Der. Priv. 543, 554 (2003).

However, the doctrine continues setting aside the *in solidum* obligations since the Legal System divides the obligations with multiple subjects into several obligations and joint and several obligations and, based on this, it establishes the legal rules. See, V. Múrtula Lafuente, *op. cit*, page 104, M. Martín-Casals and J. Solé, *Multiple Tortfeasors under Spanish Law* in: W.V.H. Rgers, *Unification of Tort Law: Multiple Tortfeasors*, The Hague, Ed. Kluwer Law International, 2004, page 193.

III

The fact that the *in solidum* obligations doctrine was adopted in Spain does not discredit the fact that our system only recognizes one type of joint and several liability. In light of this, the reasons based on which we interpret that the obligations arising from a harm caused by multiple tortfeasors are joint and several, with all of the effects that a joint and several liability entails, are valid and correct. In essence, no distinctions which are not supported by the Civil Code are introduced, the guarantee of the injured party is increased to receive a complete remedy for its injury, and an effective court economy is promoted. Likewise, by bringing, through an Amended Complaint, a co-tortfeasor who had not been originally brought to the lawsuit, the position of the joint and several co-tortfeasor, whose defense could be affected by the passing of time, would be improved.

18



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

However, this does not eliminate a very important concern: ¿is there no maximum term for the creditor to bring, through an Amended Complaint, a co-tortfeasor of which the same knows the identity, as well as all of the necessary elements to effectively exercise the cause of action?

Certainly, it is a prerogative of the creditor to file a Complaint against one or all of the co-tortfeasors whether under our current laws or under the proposed *In Solidum* Obligations Doctrine. Art. 1097 of the Civil Code, 31 L.P.R.A. sec. 3108, states that:

> the creditor may file a claim against any of the joint and several debtors or against all of them simultaneously. The claims filed against one of them will not constitute an obstacle for the claims subsequently filed against the other ones, as long as the debt has not been collected in full.

The article states the options for the creditor to file his claim, whether (1) against all of the co-debtors, (2) against some of them, (3) against one of them, or (4) against one of them and subsequently against the others until he collects the debt in full, since only the payment of the debt in full releases all of the co-debtors. Art. 1098 of the Civil Code, supra. Furthermore, we have recognized that the Joint and Several Liability Doctrine allows bringing, to a claim filed on time, a co-tortfeasor, who was not originally brought to the lawsuit, through an amendment to the Complaint. *Arroyo v. Hospital La Concepción,* supra, pp. 607-608. However, this right is not absolute or unlimited.

In this regard, Luis Puig y Ferriol has stated the following:

> One would think that in the system of the Code successive legal claims are possible insofar as the interest of the creditor has not been fully satisfied, without requiring that the creditor notify to the co-debtors the different proceedings that it may initiate, which could constitute a sound measure, with the purpose of avoiding unnecessary expenses. **Some of these inconveniences should be invoked in all cases conjugating this *ius variandi* of the creditor ex article 1.144 C. c. with the principle of good faith** (cfr. Arts. 7-1 and 1.258 C. c.) **and with the sanctioning of the abuse of rights** (art. 7-2 C. c),[36] **as would maybe be the case in successive lawsuits filed by the creditor with the sole purpose of accruing court expenses or future imposition of costs.** (Emphasis added). L. Puig y Ferriol, *Régimen Jurídico de la Solidaridad de Deudores,* in *Libro-Homenaje a Ramón M.a Roca Sastre,* Madrid, Gráficas Cóndor, V.1,1976, page 457.

[36]   Following doctrinal consideration and application of case law, the Spanish legislator incorporated the abuse of a right to the Civil Code through a reform of the preliminary title from 1973-74. Paragraph 2 of Art. 7 of the Spanish Civil Code indicates that:
1. Rights must be exercised in accordance with the requirements of good faith.
2. The law does not protect the abuse or antisocial treatment of rights. All acts or omissions which due to the intention of the one who carries them out, due to their subject, or due to the circumstances under which they are carried out, clearly exceed the regular limits of the exercise of a right, causing harm to a third party, shall result in the corresponding compensation and in the administrative or court measures preventing that the abuse be continued. Art. 7 of the Civil Code, Madrid, Ed. Civitas, 1984, page 54.
In Puerto Rico, we do not have an identical provision in the Civil Code.

Likewise, in Puerto Rico we have recognized the principle stating that rights must be exercised in accordance with the requirements of good faith. *Soriano Tavárez v. Rivera Anaya,* 108 D.P.R. 663, 670 (1979). Furthermore, we have indicated that the law does not protect the abuse or antisocial treatment of rights. *Id.* That is, the exercise of all rights must be reasonable without entailing the rupture of orderly social coexistence, whether subjectively (by exercising a right with the intention of causing harm, or without real interest) or objectively (when the holder of the right clearly exceeds the limits imposed by good faith or by the social or economic end of that right). *Id.,* pp. 670-671. See also, J. Roca, *Art.* 7.2 in *Comentarios a las Reformas del Código Civil: El Nuevo Titulo Preliminar y la Ley de 2 de mayo de 1975,* V. I, Madrid, Tecnos Ed., page 375. Also, behavior in accordance with good faith is a general principle encompassing all legal activities and extending to the entire legal system. *Velilla v. Pueblo Supermarkets, Inc.,* 111 D.P.R. 585 (1981). Therefore, our system provides ways to sanction diligence and avoid excessive conducts. One them is the principle regarding abuse of the law.[37]



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

19

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

37    Likewise, we have also recognized the Laches Doctrine to dismiss actions involving inactivity or negligence in claiming a right. For this, the mere passing of time is not enough; other circumstances must be evaluated, among them the reason for the delay, the harm that it entails, and the effect on the relevant interests. See, *Rivera v. Depto. de Servicios Sociales*, 132 D.P.R. 240 (1992); *Aponte v. Srio. De Hacienda, E.L.A.*, 125 D.P.R. 610 (1990).
      However, we consider that the protection provided by the abuse of rights principle, and that is included in the civil tradition, is enough.

The social and economic end of authorizing amendments to a Complaint is to provide more guarantees so that the affected person may obtain a remedy for the entire harm caused, as well as to promote an efficient court economy. However, the victim must exercise it in a reasonable and fair, not unconcerned, manner. Therefore, if a judge finds an abuse of a right, the same should be allowed to adopt legal measures such as dismissing the Complaint in relation to said co-debtor.[38] In those cases, the excess translates into affecting the balance between all interests, particularly the defense of the defendants, as well as procedural economy; reasons based on which we have concluded that the joint and several liability legal concept applies with all of its effects to this type of case. Therefore, the "eternal right" to which the Majority Opinion makes reference does not exist. More so, we may consider it abusive that, after the Complaint has been filed, it be amended by the creditor in order to bring a co-tortfeasor after an unreasonable term has passed since the same learned of his identity and other necessary elements, unless the delay is caused by actions or omissions that may be attributed to the co-tortfeasor. In this regard, the Legislative Assembly has already determined the term of one year as the reasonable term. However, the co-tortfeasor is the one who must allege said abuse of the right and state the facts showing so.

38    However, we have stated that the ethical nature of each act must be examined under its particular circumstances. *Velilla v. Pueblo Supermarkets, Inc.*, 111 D.P.R. 585 (1981). Also see, C. Lasarte Álvarez, *Principios de Derecho Civil*, Madrid, Trivium Ed., 1992, page 171.

In agreement with the above, the fact that a doctrine has been consolidated does not eliminate the fact that it may be improved or that it deals more efficiently with the challenges of a changing society. Our legal system provides the clarity and certainty that are necessary to deal with the consequences of an obligation resulting from a harm caused by multiple tortfeasors. Therefore, we do not have to turn to the doctrines developed in other jurisdictions. Making distinctions that are not provided by the Civil Code, such as recognizing the existence of two (2) types of joint and several obligations—perfect and imperfect—in order to be able to choose certain effects and set others aside, in no way contributes to the legal certainty of the parties. Therefore, we cannot rely on the idea that the legal system is harmonized by the partial introduction of a concept that is not recognized in the same.

IV

In the case at bar, the respondents tolled the statute of limitations of one (1) year by filing a legal claim. They also stated that at that time they did not have knowledge of all of the details related to the events. Due to this, they also filed a complaint against two (2) unknown physicians. However, during the course of the proceedings they learned of the names of the other physicians who intervened with Ms. Hilda Pérez, among them Dr. Mestre Morera, and of an expert witness report which stated errors in the diagnosis and treatment that they offered. However, more than three (3) years passed since the moment that the respondents learned all of the elements and brought Dr. Mestre Morera to the lawsuit. On the other hand, the petitioner alleged and supported in the trial court the excess incurred by the respondents. In accordance with the above, the delay of the respondents is excessive and not in harmony with the purpose of allowing amendments to a Complaint. Furthermore, said delay cannot be attributed to the acts or omissions of the petitioner.

V

Based on the foregoing, I dissent with the Majority Opinion. On the other hand, I would urge the victims of harm to file their actions against tortfeasors in a timely manner upon learning their identity, if they are interested in acquiring more guarantees to obtain a full compensation. Otherwise, they run the risk of their omission being considered abusive in relation to the same.



I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012)**
2012 TSPR 126

Mildred G. Pabón Charneco

Associate Judge


I, Juan E. Segarra, USCCI/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

21

# EXHIBIT 3

[Certified Translation]

5-27-13

*Daniel Tomlinson*

DANIEL TOMLINSON
CERTIFIED TRANSLATOR
ADMINISTRATIVE OFFICE OF
THE UNITED STATES COURTS

Westlaw
88 D.P.R. 355

H

Otto R. Seda et al., Maria Isabel Negroni de Velez
et al., Tartak Brother, Inc., plaintiffs, appellees
and the latter also an appellant
v.
Miranda Hnos. & Co., S. en C., defendant
and appellant
Numbers: 12642 12867 AP-62-25

Decided: May 13, 1963

MAY 13, 1963

In the Supreme Court of Puerto Rico.

Judgment by P.J. Santiago Lavandero, J. (San Juan) granting several complaints for damages and losses. Modified.

L.E. Dubon, Luis E. Dubon, Jr., A. Torres Braschi and R. Ruiz Sanchez, attorneys for appellant; Hector Gonzalez Blanes, attorney for some of the appellees and Tartak Brothers, Inc.; Hector Ramos Mimoso and Benjamin Rodriguez Ramon, attorneys for some of the appellees.

**1 Court composed of Associate Justice, Mr. Perez Pimentel as Presiding Justice in the Court Room and Associate Justices, Mr. Rigau and Mr. Davila.

PER CURIAM: Miranda Hnos. & Co., S. en C., operates a factory located in a building located on Avenida Ponce de Leon. The factory requires the use of a boiler. The smoke and gases coming from the fuel used in the operation of the boiler are expelled through a chimney. Next to the Miranda Hnos. building there is another taller building that belongs to Tartak Brothers, Inc. Tartak had leased the sixth and seventh floor of the building to the Division of Public Welfare of

1

the Department of Health.

On March 11, 1955, Tartak Brothers, Inc., filed a complaint against Miranda Hnos. to recover damages that had been caused by the smoke, soot and gases expelled from the chimney. It alleged that it had sustained damages in the amount of $60,000.00. Subsequently, on May 22, the complaint was amended to claim an additional amount of $15,180.00 corresponding to the monthly rents that were not received because the sixth and seventh floors had been vacated, because the vacating was due to the chimney emissions. It is relevant to set down that Tartak, on October 5, 1954, had requested ´a permanent writ of injunction prohibiting defendant from continuing to use the chimney that it had placed on top of the building it owned located at Avenida Ponce de *357 Leon 1256, and to cease to expel the smoke, soot and gases that said chimney was releasing.´ The hearing in this case was held on the days of November 15, 18, and 29 of 1954. On October 22, 1958, we affirmed the judgment issued granting the injunction Tartak Brothers v. Miranda Hnos. & Co., 80 D.P.R. 781 (1958).

On March 14, 1955 a group of 33 employees of the Division of Public Welfare initiated an action claiming damages sustained for having inhaled and been exposed to the smoke, soot and corrosive and poisonous gases emitted by the chimney. They claimed $165,000 in damages.

On April 1, 1955 another group of 14 employees of said Division filed another complaint. They alleged that ´the gases generated by defendant´s chimney contaminated the atmosphere to such an extent that since about November of 1952, the date on which the offices where plaintiffs were working were moved to [defendant´s] building, they have caused and are causing the defendants damages and losses consisting of poisoning, a decline in health, conjunctive irritation and irritation of the respiratory airways, stomach disorders, nausea, vomiting, diarrhea and other illnesses that are the result of poisoning by inhalation of the gases.´ This group claimed $84,000.00.

The three complaints were consolidated to be heard jointly in the trial court. The complaint filed by Tartak was granted, awarding it $27,613.00 in indemnity plus $3,000 in fees. One of the amounts for damages claimed, the one referring to damages sustained by the furniture and merchandise, was dismissed. The other two complaints were granted but compensation was denied for five of the plaintiffs. The first group was awarded an indemnity of $7,900 plus $6,000 for attorney fees. The second group $11,600 plus $3,000 in fees. Before us, the defendant appealed the judgments that were issued against *358 it. Tartak as to the part that denied it the right to claim an amount for damages. In this opinion we will consider all of the petitions filed.

**2 Defendant points out four errors: (1) It sustains that the trial court committed an error in evaluating the evidence; (2) It alleges that one of the amounts for damages awarded to Tartak is improper, because in the prior injunction suit it did not claim them. It invokes our opinion in Cruz v. Ortiz, 82 D.P.R. 834 (1961); (3) It maintains, in regard to the Tartak claim for rents that were not received, that said claim is beyond the statute of limitations and, if not, what was awarded was more than what was established by the evidence; (4) Finally, it points out that the

2

attorney fees awarded are excessive; (5) In the petition filed by Tartak it is pointed out that the trial court judge's decision was erroneous by denying compensation for damages caused to the furniture and merchandise in stock in the store.

1. Let us consider the first error pointed out. The evidence presented undoubtedly establishes that the employees of Public Welfare, plaintiffs in this action, sustained the damages they claim. That said, defendant, having established scientifically as well as through an expert in toxicology, sustains that for the poisonous gas expelled by the chimney that was identified as sulfuric anhydride or sulfur dioxide to cause the disorders that claimants alleged they suffered from, there had to be a concentration of 10 p.p.m.[FN1] in the atmosphere, and because from the tests conducted, the highest concentration emitted was 5.4 p.p.m., it was inevitable to conclude that the damages sustained were not caused by the gases expelled from the chimney.

The trial court judge in considering this same assertion decided that 'however respectable and creditworthy that the testimony of the honorable doctors Machle, Colon, Ramirez Torres and defendant's other experts *359 seemed to us, they are not sufficient to defeat the reality of the physical damages and pain and suffering sustained and suffered by plaintiffs...' And it is true that, as in all things in this issue of organic disorders that can be caused by poisonous gas concentrations in the atmosphere, inflexible measurements, consistent rules cannot be established. In Volume 69, Number 8 of August 1954 of the Public Health Reports, admitted into evidence, there is an interesting article written by Dr. Mary O. Amdur. It discusses the experience in different places in the world with concentrations of sulfuric anhydride or sulfur dioxide gas in the atmosphere. From that article we cite the following:

'We have more information about the very severe effects, thanks to studies done about the Meuse Valley tragedy of 1930, that resulted in 60 deaths; the 1948 mist in Donora, Pa., that killed 20 people and caused acute symptoms of varied intensity on 40 per cent of the population; and the mist of December of 1952 in London that caused the death of a large number of persons. One fact remains clear. The deaths and illnesses that occurred during these incidents were due to chemical impurities in the atmosphere and not to other causes.

**3 '.......

'The concentration measurements of the sulfur dioxide and smoke taken in London during the mist, as well as the calculations made after the incidents of Meuse Valley and Donora reveal that the concentration of impurities was not excessively high. They were, it is clear, higher than what is normally found in the atmosphere, but they did not fall in any way within the level commonly considered to be lethal or harmful. The concentrations did not even approach the so-called maximum allowable concentrations – the levels that hygienists consider safe for industrial workers subject to an exposure of 8 hours per day.

'The maximum allowable concentration for sulfur dioxide is 10 p.p.m. The concentration in the Meuse Valley was calculated at 8 p.p.m. and in Donora at 0.5 p.p.m. By measurement, the

3

average of sulfur dioxide during the most critical day of the mist in London turned out to be 1.3 p.p.m. This *360 concentration is almost 10 times what normally exists in London, but on the other hand, it is only one tenth of the maximum allowable concentration.

'How can it be that atmospheric impurities produce so much disease and death in concentrations that are normally considered not harmful? At first glance, it seems surprising that it can be that way. For some people, it is tempting to conclude that this or that impurity could not have conceivably contributed to the situation in general, because industrial workers have been submitted to even greater concentrations without sustaining any damage during a certain number of years.

'But, is the industrial worker comparable to the person who sustains damages during the mist? For several reasons I believe that the answer is no.

'These maximum allowable concentrations serve as a guide as far as exposure levels for individuals whose health allows them to work in the factory in the first place. Persons with a cardiac or respiratory history of any severity are not found, as a general rule, in jobs where respiratory irritants are commonly found. Therefore, the maximum allowable levels are prepared to protect the average individual, not someone who is highly susceptible. However, it is with this type of individual that we should be dealing with when mists occur.'

Having seen the foregoing, it is thus clear that the error alleged was not committed.

2. In Cruz v. Ortiz, *supra*, we decided that in an action for an injunction to prevent or prohibit the continuation of acts and activities that generate damages, plaintiff can claim the damages that were existing and were caused by these acts or activities up until the time of the hearing on the petition for injunction. If they are not claimed then the rule of partition of causes of action prevents it from claiming such damages in a subsequent suit.

**4 The judgment awarded plaintiff Tartak $10,360, the cost of installing new windows because the existing ones had been deteriorated by the corrosive action of the gases expelled by the chimney. Defendant alleges that *361 plaintiff could have recovered these damages in the injunction suit which we alluded to previously. The hearing of said suit was conducted during the days of November 15, 18 and 29 of 1954. The testimony of Mr. Pablo Tartak in said suit shows that by that date the cost of replacing the windows was already known and a contract had been executed to carry it out. It is evident thus that it was not proper to grant any amount in this action for replacing the windows.

 3. Defendant, to support its point that the amount awarded for the loss of rent was time barred, points out that the complaint was amended to establish the claim after one year had passed from when the two floors had been vacated. In Capella v. Carreras, 57 D.P.R. 258 (1940), that we affirmed in Arcelay v. Sanchez, 77 D.P.R. 824 (1955), we adopted the rule to the effect that the damages caused by continuing to maintain a nuisance or disturbance can be recovered throughout 

4

the entire duration of the nuisance.

The trial court awarded an amount of $17,253 for this item. Having examined the evidence presented, the correct amount to be awarded is $14,148.41. The sixth and seventh floors were vacated between April 15, 1955 and May 22, 1956, the date on which the complaint was amended, in other words 13 months and one week. The monthly rental rate for both floors was $1,166. Which makes a total of $15,449.66.[FN2] From this amount, you have to deduct $105 per month during the three months and one week that transpired between October 14, 1955 and January 23, 1956, the period during which an office was rented out amounting to a total of $341.25 and in addition $960 corresponding to the period between January 23, 1956 and May of that same year for a monthly rent of $240. The two figures amount to a total of $1,301.25 that when subtracted from $15,499.66 gives a result of $14,148.41.4. Let us go on *362 to consider the challenge of the fees awarded. Clearly they are disproportionate. Considering defendant's attitude, and the work performed, an order for fees of $3,500 in case AP 62-25, of $2,000 in civil case 12867 and of $1,500 in civil case 12642 is reasonable.

5. In relation to the appeal filed by Tartak Brothers, Inc., on that part of the judgment that denies it the right to receive compensation for damages to the furniture, the alleged error was not committed.

Tartak's position is that defendant is liable to it for the amount it did not earn (lost profits – "lucro cesante") because they were obligated to sell the damaged furniture at a price that was lower than what they regularly sold it for. Lost profits have been acknowledged as meriting compensation. Cintron v. Insular etc. y Balbaño, 58 D.P.R. 821 (1941); Aviles v. Hijos de Rafael Toro. S. en C. et al., 27 D.P.R, 671 (1919) ; Muriente v. Terrasa et al., 22 D.P.R. 738 (1915). But for them to be awarded, it is necessary to prove their amount with certainty and accuracy. See: Muriente v. Terrasa, *supra*.

**5 The evidence presented by Tartak consisted of the statement given by Mr. Eduardo Tartak and in the answer that he gave to an interrogatory that defendant served him with. From said evidence it can be seen that Mr. Tartak 'calculated' the 'depreciation' sustained by each item of furniture and that he subtracted that amount as depreciation from the price at which the furniture would normally be sold.

However, he did not offer evidence about the price at which the damaged items of furniture were sold, because they were not identified. Even in the few invoices presented, Mr. Tartak stated that it was impossible to maintain that the furniture described therein corresponded to the damaged furniture. Nor was the court given evidence as to the cost of said items of furniture.

The basis used by appellant is certainly very imprecise. Had *363 he presented evidence of the price at which each item of damaged furniture was sold, as well as the price at which said furniture is usually sold when it is in good condition, the court would have been in a better position to determine the damages accurately.

5

The error was not committed.

Due to everything that has been stated, it is proper to modify the judgment issued by the Superior Court, San Juan Division, dated January 16, 1958, insofar as reducing the indemnity awarded to Tartak Brothers, Inc., to the amount of $14,148.41 and reducing the awarding of attorney fees in the manner stated above. The judgment so modified will be affirmed.

    FN1: P.P.M. is equivalent to 'parts per million.'

    FN2: Defendant erroneously states that the total is $13,217.

Otto R. Seda et al., Maria Isabel Negroni de Velez et al., Tartak Brother, Inc., plaintiffs, appellees and the latter also as appellant v. Miranda Hnos. & Co., S. en C., defendant and appellant.

88 D.P.R. 355, 1963 WL 14893 (P.R.)

END OF DOCUMENT

6

Westlaw.

H

Otto R. Seda et al., María Isabel Negroni de Vélez et al., Tartak Brother, Inc., demandantes, recurridos y la última también recurrente

v.

Miranda Hnos. & Co., S. en C., demandada y recurrente.

Números: 12642 12867 AP-62-25

Resueltos: 13 de mayo de 1963

MAY 13, 1963

En El Tribunal Supremo De Puerto Rico.

Sentencia de P. J. Santiago Lavandero, J. (San Juan) declarando con lugar varias demandas en daños y perjuicios. Modificada.

L. E. Dubón, Luis E. Dubón, Jr., A. Torres Braschi y R. Ruiz Sánchez, abogados de la recurrente; Héctor González Blanes, abogado de algunos de los recurridos y de Tartak Brothers, Inc.; Héctor Ramos Mimoso y Benjamín Rodríguez Ramón, abogados de algunos de los recurridos.

**1 Sala integrada por el Juez Asociado el Señor Pérez Pimentel como Presidente de Sala y Jueces Asociados Señores Rigau y Dávila.

PER CURIAM: Miranda Hnos. & Co., S. en C., opera una fábrica localizada en un edificio sito en la Avenida Ponce de León. La fábrica requiere el uso de una caldera. El humo y los gases provenientes del combustible usado en el funcionamiento de la caldera son expelidos por una chimenea. Al lado del edificio de Miranda Hnos. está localizado uno de mayor altura perteneciente a Tartak Brothers, Inc. Tartak tenía

arrendados a la División de Bienestar Público del Departamento de Salud, los pisos sexto y séptimo del edificio.

El 11 de marzo de 1955 Tartak Brothers, Inc., instó una demanda contra Miranda Hnos. para recobrar los daños que le ocasionaron el humo, el hollín y los gases que expele la chimenea. Alegó haber sufrido daños ·por la cantidad de $60,000.00. Posteriormente, con fecha 22 de mayo, la demanda fue enmendad para reclamar la cantidad de $15,180.00 adicionales correspondientes a las rentas mensuales dejadas de recibir por haberse desalojado el sexto y séptimo piso por mor de los haberse desalojado que expele la chimenea. Es pertinente consignar que Tartak con fecha 5 de octubre de 1954 había solicitado 'un auto permanente de injunction prohibiendo a la demandada que continué usando la chimenea que tiene colocada sobre el edificio de su propiedad situado en la Avenida Ponce de *357 León 1256, y cese de arrojar el humo, hollín y gases que por dicha chimenea arroja'. La vista de este caso se celebró durante los días 15, 18 y 29 de noviembre de 1954. En 22 de octubre de 1958 confirmamos la sentencia dictada concediendo el injunction.Tartak Brothers v. Miranda Hnos. & Co., 80 D.P.R. 781 (1958).

El 14 de marzo de 1955 un grupo de treinta y tres empleados de la División de Bienestar Público inició una acción reclamando los daños sufridos por haber aspirado y estado expuestos al humo, hollín y gases corrosivos y venenosos lanzados por la chimenea. Reclamaron $165,000 de daños.

El 1ro. de abril de 1955 otro grupo de catorce empleados de la referida División instó otra demanda. Alegaron que 'los gases generados por la chimenea de la demandada contaminaron la atmósfera en forma tal que desde allá para noviembre de 1952 fecha en que las oficinas donde trabajaban los demandantes

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

quedaron instaladas en el edificio [de la demandada], han causado y están causando a los demandantes daños y perjuicios consistentes en envenenamiento, decaimiento de la salud, irritación conjuntival y de las vías respiratorias, trastornos estomacales, naúseas, vómitos, diarreas y otros males productos de intoxicación por inhalación de gases'. Este grupo reclamó $84,000.00.

Las tres demandas fueron consolidadas para verse conjuntamente en el tribunal de instancia. Se declaró con lugar la demanda instada por Tartak, concediéndosele $27,613.00 de indemnización más $3,000 de honorarios. Se desestimó una de las partidas de daños reclamadas, la referente a los daños sufridos por los muebles y mercancías. Las otras dos demandas fueron declaradas con lugar pero le fue negada compensación a cinco de los demandantes. Al primer grupo se le concedió una indemnización de $7,900 más $6,000 de honorarios de abogado. Al segundo grupo $11,600 más $3,000 de honorarios. La demandada recurrió ante nos de las sentencias dictadas en su *358 contra Tartak de aquella parte que le negó derecho a reclamar una partida de daños. Consideraremos todos los recursos interpuestos en esta opinión.

**2 La demandada apunta cuatro errores: (1) Sostiene que el tribunal de instancia incurrió en error al apreciar la prueba; (2) Alega que una de las partidas de daños concedidas a Tartak es improcedente, pues en el pleito de injunction anterior no los reclamó. Invoca nuestra opinión en Cruz v. Ortiz, 82 D.P.R. 834 (1961); (3) Mantiene, en relación con la reclamación de Tartak por rentas dejadas de percibir que la misma está prescrita y que de no estarlo, se concedió más que lo establecido por la prueba; (4) Por último, apunta que los honorarios de abogado concedidos son excesivos; (5) En el recurso interpuesto por Tartak se apunta que fue errónea la determinación del juez de instancia al negar compensación por los daños ocasionados a los muebles y mercancías existentes en la tienda.

1. Consideremos el primer error apuntado. La prueba presentada indubitablemente establece que los empleados de Bienestar Público, demandantes en esta acción, sufrieron los daños que reclaman. Ahora bien, la demandada sostiene que habiéndose establecido científicamente, así como por un perito en toxicología, que para que el gas venenoso que expelía la chimenea, identificado como anhídrido sulfuroso o bióxido de azufre, cause los trastornos que alegaron padecer los reclamantes, tenía que existir una concentración en la atmósfera de más 10 p.p.m.[FN1] y que como de las pruebas realizadas, la más alta arrojó una concentración de 5.4 p.p.m., era ineludible concluir que los daños sufridos no fueron ocasionados por los gases expelidos por la chimenea.

El juez de instancia al considerar este mismo planteamiento resolvió que '[p]or más respetables y dignos de crédito que nos parezcan los testimonios de los dignos doctores Machle, Colón, Ramírez Torres y otros peritos de la *359 demandada, los mismos no son suficientes para derrotar la realidad de los sufrimientos físicos y morales sufridos y padecidos por los demandantes...'. Y es que, como en todas las cosas en esto de los trastornos orgánicos que puedan ocasionar la concentración de gases venenosos en la atmósfera no puedan establecerse medidas inflexibles, reglas constantes. En el volúmen 69, número 8 de agosto de 1954 del Public Health Reports, admitido en evidencia, aparece un interesante artículo escrito por la Dra. Mary O. Amdur. Refiere la experiencia en distintos sitios del mundo con la concentración del gas anhídrido sulfuroso o bióxido de azufre en la atmósfera. Del artículo citamos lo siguiente:

'Tenemos más información sobre efectos muy severos, gracias a estudios hechos sobre la tragedia del valle Meuse en 1930, que resultó en 60 muertes; la neblina de 1948 en Donora, Pa., que mató a 20 personas y causó síntomas agudos de variada intensidad al 40 por ciento de la población; y la neblina de diciembre de 1952 en Londres, que causó la muerte de un gran número de personas. Un hecho resulta claro. Las muertes y enfermedades ocurridas durante estos in-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

cidentes se debieron a impurezas químicas en la atmósfera y no a otras causas.

**3 '........

'Las medidas de la concentración de bióxido de azufre y humo hechas en Londres durante la neblina así como los cálculos hechos luego de los incidentes del valle Meuse y de Donora revelan que la concentración de impurezas no era excesivamente alta. Eran, claro está, más altas que las que normalmente se encuentran en la atmósfera, pero no caían en forma alguna dentro del nivel corrientemente considerado como letal o dañino. Las concentraciones ni siquiera se aproximaban a las llamadas concentraciones máximas permisibles--los niveles que los higienistas consideran seguros para los trabajadores industriales sujetos a una exposición de 8 horas diarias.

'La concentración máxima permisible para bióxido de azufre es de 10 p.p.m. La concentración en el valle Meuse fue calculada en 8 p.p.m. y la de Donora en 0.5 p.p.m. El promedio, por medida, de bióxido de azufre durante el día más crítico de la neblina en Londres resultó ser 1.3 p.p.m. Esta *360 concentración es casi 10 veces la que normalmente existe en Londres, pero por el otro lado, es solo una décima parte de la concentración máxima permisible.

'¿Cómo puede ser que las impurezas atmosféricas produzcan tanta enfermedad y muerte en concentraciones normalmente consideradas no perjudiciales? A primera vista parece sorprendente que así sea. Para algunos resulta tentador concluir que ésta o aquella impureza no pudo concebiblemente haber contribuido a la situación en general ya que trabajadores industriales han estado sometidos a concentraciones aún mayores sin haber sufrido daño alguno durante cierto número de años.

'Pero, ¿son comparables el trabajador industrial y la persona que sufre daños durante la neblina? Por varias

razones creo que la contestación es que no.

'Estas concentraciones máximas permisibles sirven a manera de guía en cuanto a los niveles de exposición para individuos cuya salud les permitiría trabajar en la fábrica en primer lugar. Las personas con historial cardíaco o respiratorio de alguna severidad no se encuentran, como regla general, en trabajos donde los irritantes respiratorios se encuentran comúnmente. Por lo tanto, los niveles de concentración máxima permisible están preparados para proteger al individuo promedio, no al altamente susceptible. Sin embargo, es con este tipo de individuo con quien debemos tratar cuando ocurren las neblinas.'

Visto lo anterior, es claro pues, que no se cometió el error imputado.

2. En Cruz v. Ortiz, supra, resolvimos que en una acción de injunction para impedir o prohibir la continuación de actos y actividades generadoras de daños, el demandante puede reclamar los daños que existían y se causaron con estos actos o actividades hasta el momento de la vista del recurso de injunction. De no reclamarlos entonces la regla de fraccionamiento de las causas de acción le impide reclamar en un pleito posterior tales daños.

**4 La sentencia le concedió al demandante Tartak $10,360, costo de instalar ventanas nuevas por haberse deteriorado las existentes por la acción corrosiva de los gases que expelía la chimenea. La demandada alega que *361 estos daños los pudo recobrar la demandante en el pleito de injunction a que anteriormente hicimos alusión. La vista del referido pleito se llevó a cabo durante los días 15, 18 y 29 de noviembre de 1954. El testimonio del Sr. Pablo Tartak en el referido pleito demuestra que para esa fecha ya se conocía el costo del cambio de las ventanas y se había celebrado un contrato para llevarlo a cabo. Es evidente pues, que no procedía conceder en esta acción partida alguna por el cambio de las ventanas.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

3. La demandada, para sostener su punto de que la partida concedida por pérdida de rentas estaba prescrita, apunta que la demanda fue enmendada para establecer la reclamación luego de haber pasado un año de haber sido desocupados los dos pisos. En Capella v. Carreras, 57 D.P.R. 258 (1940), que ratificamos en Arcelay v. Sánchez, 77 D.P.R. 824 (1955), adoptamos la regla al efecto de que los daños y perjuicios causados por el continuado mantenimiento de un estorbo o perturbación, pueden recobrarse por todo el tiempo de la duración del estorbo.

El tribunal de instancia concedió por este concepto una partida de $17,253. Examinada la prueba presentada, la cantidad correcta a concederse es $14,148.41. Los pisos sexto y séptimo estuvieron desocupados entre abril 15, 1955, y mayo 22 de 1956, fecha en que se enmendó la demanda, o sea 13 meses y una semana. El canon mensual por el alquiler de ambos pisos era de $1,166. Lo que hace un total de $15,449.66.[FN2] De esta suma hay que deducir $105 mensuales durante los tres meses y una semana transcurridos entre el 14 de octubre de 1955 y el 23 de enero de 1956, período durante el cual estuvo alquilada una oficina montante en total a $341.25 y además $960 correspondientes al período entre el 23 de enero de 1956 y mayo de ese mismo año por un canon de $240 mensuales. Las dos cifras hacen un total de $1,301.25 que restados de $15,499.66, resultan ser $14,148.41.4. Pasemos *362 a considerar la impugnación a los honorarios concedidos. Claramente resultan desproporcionados. Considerada la actitud de la demandada y el trabajo realizado, una condena de honorarios de $3,500 en el caso AP 62-25, de $2,000 en el caso civil 12867 y de $1,500 en el caso civil 12642 es razonable.

5. En relación con la apelación interpuesta por Tartak Brothers, Inc., sobre aquella parte de la sentencia que le niega derecho a recibir compensación por los daños a los muebles, el error alegado no fue cometido.

La posición de Tartak es que la demandada le responde de aquella cantidad que dejó de ganar (lucro cesante) por verse obligada a vender los muebles dañados a un precio inferior al que regularmente se vendían. Se ha reconocido el lucro cesante como daño compensable.Cintrón v. Insular etc. y Balbaño, 58 D.P.R. 821 (1941); Avilés v. Hijos de Rafael Toro, S. en C., et al., 27 D.P.R. 671 (1919); Muriente v. Terrasa et al., 22 D.P.R. 738 (1915). Pero para que éstos sean otorgados es necesario que se pruebe su cuantía con certeza y precisión. Ver: Muriente v. Terrasa, supra.

**5 La prueba presentada por Tartak consistió en la declaración prestada por el Sr. Eduardo Tartak y en la contestación que éste prestó a un interrogatorio que le notificó la demandada. De dicha prueba se desprende que el Sr. Tartak 'calculó' la 'depreciación' sufrida por cada mueble y que restó esa cantidad por concepto de depreciación del precio al que se vendía el mueble normalmente.

Sin embargo, no ofreció prueba sobre el precio a que fueron vendidos los muebles dañados ya que éstos no fueron identificados. Aun en las escasas facturas presentadas el Sr. Tartak manifestó su imposibilidad de afirmar que los muebles allí descritos correspondían a los dañados. Tampoco se le presentó al tribunal prueba sobre el costo de dicho muebles.

La base utilizada por la apelante es ciertamente una muy imprecisa. De *363 haber presentado prueba del precio a que vendió cada mueble dañado así como del precio al que usualmente vendía dichos muebles cuando estaban en buenas condiciones, el tribunal hubiera estado en mejor posición para determinar los daños con precisión.

No se cometió el error.

Procede por todo lo expuesto modificar la sentencia dictada por el Tribunal Superior, Sala de San Juan, con

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

fecha 16 de enero de 1958 en el sentido de reducir la indemnización concedida a Tartak Brothers, Inc., a la suma de $14,148.41 y reducir la concesión de honorarios de abogado en la forma antes expresada. Así modificada la sentencia, será confirmada.

FN1. P.P.M. equivale a 'partes por millón'.

FN2. La demandada erróneamente expresa que el total es $13,217.

Otto R. Seda et al., María Isabel Negroni de Vélez et al., Tartak Brother, Inc., demandantes, recurridos y la última también recurrente v. Miranda Hnos. & Co., S. en C., demandada y recurrente.

88 D.P.R. 355, 1963 WL 14893 (P.R.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.