MEUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X
                                                  :
IN RE: METHYL TERTIARY BUTYL           :
ETHER ("MTBE") PRODUCTS                 :            **OPINION AND ORDER**
LIABILITY LITIGATION                          :
-------------------------------------------------- :
                                                  :            **Master File No. 1:00-1898**
                                                  :            **MDL 1358 (SAS)**
**This document relates to:**                :            **M21-88**
                                                  :
*Commonwealth of Puerto Rico v. Shell Oil*   :
*Co. et al.*, 07 Civ. 10470                   :
                                                  :
                                                  :
-------------------------------------------------- X
SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

This is a consolidated multi-district litigation ("MDL") relating to

contamination — actual or threatened — of groundwater from various defendants'

use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary

butyl alcohol, a product formed by the breakdown of MTBE in water. In this case,

the Commonwealth of Puerto Rico ("the Commonwealth") alleges that defendants'

use and handling of MTBE has contaminated, or threatened to contaminate,

groundwater within its jurisdiction. Familiarity with the underlying facts is

presumed for the purposes of this Order.

Currently before the Court are four motions to dismiss brought by

Total, S.A. ("Total Umbrella"),[1] Total Outre-Mer, S.A. ("TOM"), Peerless Oil and

Chemicals, Inc. ("Peerless"), and Trammo Petroleum, Inc. ("Trammo Parent") and

Trammo Caribbean, Inc. ("Trammo Operating") (collectively, "Trammo

Defendants").  Four defendants — Total Umbrella, TOM, and the Trammo

Defendants — move to dismiss  for lack of personal jurisdiction and failure to state

a claim on various grounds. Peerless moves to dismiss for failure to state a claim

on the ground that the Commonwealth's claims are time-barred.  For the reasons

stated below all of these motions are GRANTED.

## II.     BACKGROUND

### A.     Facts Common to All Moving Defendants

On June 12, 2007, the Commonwealth filed its initial complaint

against gasoline suppliers for supplying or trading in gasoline products containing

MTBE.[2]  On October 31, 2007, the case was transferred to this Court as part of the

MTBE MDL.[3]  On December 3, 2012, the Commonwealth filed its Third Amended

Complaint ("TAC") that included several additional defendants,  naming Total

---

[1]      I use "Total Umbrella" to refer to Total, S.A. because it is the
corporate parent of hundreds of subsidiaries.

[2]      *See* Affirmation of Mark Katz, counsel for Trammo Petroleum, Inc.
and Trammo Caribbean, Inc., in Support of Trammo Petroleum, Inc. and Trammo
Caribbean, Inc.'s Motion to Dismiss ("Katz Aff.") ¶ 3.

[3]      *See id.* ¶ 4.

2

Umbrella, TOM, Peerless, and the Trammo Defendants as new "Refiner/Supplier Defendants."[4]  The TAC alleges that "[these defendants], at all times relevant to this action, refined, marketed and/or otherwise supplied (directly or indirectly) gasoline and/or other products containing MTBE that each such Defendant knew or should have known would be delivered into Commonwealth."[5]  Five counts of the TAC apply to these five defendants and allege violations of Puerto Rican law on the grounds of (1) strict products liability for defective design and failure to warn; (2) public nuisance; (3) trespass; (4) negligence; and (5) violation of Puerto Rico Public Policy Environmental Act, Water Pollution Control Act, and underground storage tank control regulations.[6]

### B.  Facts Regarding Total Umbrella

#### 1.  Undisputed Facts

Total Umbrella is a publicly held company organized under the laws of France as a *société anonyme*, similar to a U.S. corporation, with its corporate headquarters and principal place of business at 2, Place Jean Miller, La Défense 6,

---

[4]  *See id.* ¶¶ 4– 5.  *See* TAC ¶ 21.

[5]  TAC ¶ 21.

[6]  *See id.* ¶¶ 96–156.

92400 Courbevoie, France.[7]  Total Umbrella "has no offices in the United States or

its territories and is not registered to do business in any United States

jurisdiction."[8]  Total Umbrella is the "parent company of the [Total] Group" and

has over eight hundred subsidiary companies.[9]  Total Umbrella's divisions range

from "the upstream segment" — exploration, hydrocarbon production, gas,

electricity, and other forms of energy — to "the downstream segment" — refining,

petroleum product marketing and distribution, speciality products, and the trading

and shipping of crude oil and products — to "the chemical segment" — base

chemicals and polymers, intermediates and performance polymers and

specialties.[10]

> In 2004, TPPRC, a gasoline service station network incorporated and

operating in Puerto Rico,[11]  was purchased by TOM, a company in the Total

---

[7]    *See* 4/16/13 Declaration of Peter Herbel, Total Umbrella's counsel, in
Support of Total Umbrella's Motion to Dismiss the TAC ("Herbel Decl.") ¶ 3.

[8]    *Id.* ¶ 4.

[9]    2012 SEC Filing Form 20-F, Ex. A to 5/22/13 Reply Declaration of
Peter Herbel in Support of Total Umbrella's Motion to Dismiss ("Herbel Rep.
Decl."), at 81.

[10]    *See* 2011 SEC Filing Form 20-F, Ex. B at 10–11.  *See also* Notice of
Total Umbrella Shareholder Meeting ("Shareholder Notice"), Ex. G to Herbel
Decl., at 24.

[11]    *See* Herbel Decl. ¶¶ 14, 16; Shareholder Notice at 26.

Group.[12]  TPPRC is wholly owned by Total Raffinage Marketing, S.A. ("Raffinage

Marketing") in which Total Umbrella has a seventy-four percent stake.[13]

## 2.     Disputed Facts

### a.     Total Umbrella Is a Holding Company

The Commonwealth offers three documents in support of its

allegation that Total Umbrella is not a holding company but rather an "integrated

company."[14]  *First*, a 2011 SEC filing states:  "With operations in more than 130

countries, TOTAL has activities in every sector of the oil industry."[15]  The form

also states: "[Total Umbrella] is the fifth largest publicly traded integrated

international oil and gas company in the world."[16]  *Second,* a press release from

Paris attached to a 2004 SEC form announces that: "Total has finalized an

agreement to acquire one hundred service stations on the island of Puerto Rico . . .

---

[12]     TPPRC was previously named Gasolinas de Puerto Rico Corporation ("GPR") before acquisition by TOM.  *See* Herbel Decl. ¶¶ 16–17.  I use TPPRC to refer to both entities.

[13]     *See* Herbel Decl. ¶ 15.  The prior name of Raffinage Marketing was "Total France."  *See id.* ¶ 21(b).

[14]     Memorandum of Law in Opposition to Total Umbrella's Motion to Dismiss the TAC ("Opp. Mem. Total Umbrella") at 7.

[15]     2011 SEC Filing Form 20-F at 10.

[16]     *Id.*

they will be branded by the Total colours by the end of 2005 . . . This acquisition reinforce[s] Total's development strategy in the Caribbean."[17]  The press release goes on to say that "Total's activities cover the whole energy chain of the petroleum industry . . . [and] [t]he Group is a major player in chemicals."[18]  *Third*, pages from Total Umbrella's website establish that it performs operations.[19]

Total Umbrella denies that it is anything except a holding company. Total Umbrella's general counsel has testified that Total Umbrella is a holding company, not an operating company.[20]  Further, Total Umbrella's SEC filings state that "when we refer to the parent holding company alone, we use the term [Total Umbrella] or the Company."[21]

> **b.   Total Umbrella Was Involved in the Puerto Rico MTBE Market**

The Commonwealth alleges that Total Umbrella has sufficient

---

[17]   Press Announcement Affixed to 2004 SEC Filing Form 6-K, Ex. 4 to 5/8/13 Declaration of Daniel Boone, counsel for the Commonwealth, in Support of Commonwealth's Opposition to Total Umbrella ("Total Umbrella Boone Decl.").

[18]   2004 SEC Filing Form 6-K.  "The Group" is defined as Total Umbrella and its subsidiaries and affiliates. *See* 2011 Form 20-F at iv.

[19]   Total Umbrella Website (total.com), Ex. 2 to Total Umbrella Boone Decl.

[20]   Herbel Rep. Decl. ¶ 6.

[21]   2011 Form 20-F at iv.

contacts with Puerto Rico because it "participates in the Puerto Rico MTBE market."[22]  In support of this contention, the Commonwealth offers multiple documents, mostly relating to one of Total Umbrella's operating companies, TPPRC.

### i.  E-mails

In support of its jurisdictional contention, the Commonwealth points to several emails that mention or involve Total Umbrella.  *First*, a Total Umbrella employee confirmed in an email that TPPRC is a subsidiary of the Total Group in response to a request by Peerless, a potential supplier to TPPRC, for confirmation that TPPRC is a subsidiary of the Total Group:

> Further to our conversation, please note that the shares of the company GPR . . . renamed (or to be renamed) [TPPRC] have recently been acquired by Total Outre Mer (a 100% subsidiary of the Total group) . . . [TPPRC] is engaged in the wholesale and retail distribution of petroleum products in Puerto Rico.  I understand that the company Peerless Oil & Chemicals, Inc. have [sic] been approached to be one of the suppliers of [TPPRC].  Peerless are [sic] seeking, on request of BNP Paribas in New York . . . confirmation that [TPPRC] . . . is a subsidiary of the Total Group.[23]

---

[22]    3/28/13 Letter from Michael Axline, Commonwealth's counsel, to the Court, Ex. A to Herbel Decl., at 2.

[23]    Email from Julien Maumont, a Total Umbrella employee, to "Florence" ("Maumont Email"), Ex. B to Herbel Decl.

The email concludes:

> For the avoidance of doubt, this e-mail may under no circumstances be construed as a commitment, liability, agreement, or guarantee on the part of Total SA (or any of its affiliates) in respect of any obligations of GPR/Total Petroleum Puerto Rico and neither Total SA nor any of its affiliates shall be obliged under this e-mail to make any payment in respect of any amounts that would become due by GPR/TPPR.[24]

*Second*, a contract between Peerless and TPPRC that references "Total" — as well as the above email and others — "reveal that [Total Umbrella] had a direct role in the [2004] acquisition of [TPPRC] and actively directed TPPRC to change station signage as quickly as possible to the Total brand."[25]  *Third*, an email in a negotiation between TPPRC and Peerless references "Total France."[26]

## ii.    Financial Statements

The Commonwealth has produced financial statements that allegedly support its argument.  *First*, a 2005 report from Total Umbrella's annual shareholder meeting stated:  "Total also acquired a service station network

---

[24]    *Id.*

[25]    Total Umbrella Opp. Mem at 9.  *See also* Peerless Contract, Ex. 11 to Boone Decl.  *See also* Maumont Email.

[26]    Philippe Corsaletti, copied on the emails, was never an employee of Total Umbrella.  *See* Herbel Decl. ¶ 21(b).

[TPPRC] in Puerto Rico that has about a six percent market share."[27]  Total

Umbrella contends that "Total" refers to the "Total Group" of companies, not

[Total Umbrella].[28]  *Second*, TPPRC's 2006-2007 financial statements show that

"Total France" charged TPPRC for services.[29]  *Third*, an audit report for TPPRC

shows that TPPRC was able to acquire certain Esso Standard Oil Company assets

in Puerto Rico in 2008 "with the direct support of [Total Umbrella] and [TOM]."[30]

*Fourth*, the Commonwealth notes that a TPPRC report identifying officers and

directors  proves that "[t]he officers and board of directors of TPPRC were

employees of [Total Umbrella] or its wholly owned subsidiaries."[31]

### iii.    Total Umbrella and TPPRC

---

[27]        Shareholder Notice, at 26.

[28]        *See* Total Umbrella Mem. at 9.

[29]        *See* Opp. Mem. Total Umbrella at 8–9.  "Total France" was the
previous name of "Total Raffinage Marketing, S.A.," which changed its name in
2008.  *See* Herbel Rep. Decl. ¶ 20.

[30]        Opp. Mem. Total Umbrella at 9. *See* Report of Independent Auditors
for TPPRC, Ex. 9 to Total Umbrella Boone Decl.  The Commonwealth offers
another audit report for TPPRC that references the "Parent Company" of TPPRC.
*See* 2006 Report of Independent Auditors, Ex. 6 to Boone Decl. The "Parent
Company" refers to TOM, not Total Umbrella. *See* Opp. Mem. Total Umbrella at 8
n.6.

[31]        Opp Mem. Total Umbrella at 8. *See* Excerpts from TPPRC's 2004
Corporate Annual Report, Ex. 7 to Total Umbrella Boone Decl. The document,
however, does not reference Total Umbrella or any employees of Total Umbrella.
*See* Herbel Rep. Decl. ¶ 19.

Total Umbrella denies that it has ever directly owned TPPRC.[32] Rather, Total Umbrella claims that it is two corporate layers away from TPPRC,[33] which is wholly owned by Raffinage Marketing.[34]   Total Umbrella was not a party to the 2004 transaction between TOM and TPPRC.[35]   Total Umbrella further asserts that it "does not control or direct any of the day-to-day activities of its subsidiaries," including TPPRC, and there is no overlap in the officers or directors of TPPRC and Total Umbrella.[36]   Total Umbrella denies that is has ever shared any bank accounts or commingled any funds with the funds of TPPRC.[37]

### c.      Total Umbrella's Other Contacts with Puerto Rico

In support of its motion, Total Umbrella maintains that it lacks sufficient contacts and presence in Puerto Rico for this Court to exercise personal jurisdiction over it.[38]   Total Umbrella denies that it has ever (1) owned any real or

---

[32]      *See* Herbel Decl. ¶¶ 14, 16.

[33]      *See id.* ¶ 14; Total Umbrella Mem. at 5.

[34]      *See* Herbel Decl. ¶ 15.

[35]      TOM changed the name of the Gasolinas de Puerto Rico Corporation to TPPRC. *See id.* ¶¶ 16–17.

[36]      *Id.* ¶¶ 18, 20.

[37]      *See id.* ¶ 18.

[38]      *See* Total Umbrella Mem. at 4–5.

personal property in Puerto Rico; (2) solicited business, advertised or marketed any

goods or services in Puerto Rico; (3) maintained offices or leased any real or

personal property in Puerto Rico; (4) had officers, directors, employees, or agents

acting on its behalf in Puerto Rico, including agents for service of process; (5) held

bank accounts, phone numbers, facsimile numbers, or corporate records in Puerto

Rico; or (6) initiated litigation in Puerto Rico courts.[39]  Total Umbrella denies that

it has any involvement in the Puerto Rico MTBE market because "it is a holding

company, not an operating company," and Total Umbrella "does not manufacture,

supply, or market any product containing MTBE."[40]

## C.    Facts Regarding TOM

### 1.    Undisputed Facts

Like Total Umbrella, TOM is a *société anonyme* and a distributor of

petroleum based fuels, with its principal place of business at 21 Cours Michelet

92800 Puteaux Tour Total, France.[41]  "TOM is a separate corporate entity, with its

own board of directors, officers and employees," and it is a "wholly owned

---

[39]    *See* Herbel Decl. ¶¶ 8–13.

[40]    *Id.* ¶ 6.

[41]    *See* 4/17/13 Declaration of Christophe Jacquet, formerly the General
Manager of TPPRC ("Jacquet Decl."), ¶ 5.

subsidiary of [Total Umbrella]."[42]

TPPRC is a corporation created under the laws of Puerto Rico actively doing business there, and it was a wholly owned subsidiary of TOM from October 2004 to June 2012.[43]  TPPRC is not a department of TOM and does not act on behalf of TOM.[44]  "All of the gasoline that [TPPRC] sells to its retailers is independently purchased [by TPPRC]."[45]

### 2.    Disputed Facts

#### a.    TOM Was Actively Involved in the Puerto Rico Gasoline Market

On October 21, 2004, TOM acquired TPPRC's stock through an agreement.[46]  The Commonwealth points to communications concerning the 2004 contract between TOM and Gasolinas de Puerto Rico ("GPR"), Caribe Gasoline Distributors ("Caribe"), and Sunshine Rentals Puerto Rico, Inc. ("Sunshine") to

---

[42]    *Id.* ¶¶ 7–8.

[43]    *See id.* ¶¶ 9–10.

[44]    *See id.* ¶ 13.

[45]    *Id.* ¶ 27.

[46]    *See id.* ¶ 11. At the time of the purchase TPPRC was known as Gasolinas de Puerto Rico Corporation. *See id.* ¶ 12.

show that TOM was "actively involved in the Puerto Rico gas market."[47]  The

Commonwealth contends that the 2004 purchase and sale agreement ("PSA")

shows that TOM purposely availed itself of the benefits and protection of the laws

of Puerto Rico.[48]  The PSA cover page names "Total Outre Mer S.A. as purchaser"

and "Maximo Alvarez and Sunshine Rentals Puerto Rico, Inc. as sellers."[49]  The

preamble of the PSA sets forth the details of the two-part transaction.[50]  The parties

simultaneously executed a "Stock Purchase Agreement" ("SPA") and an "Asset

Purchase Agreement" ("APA").[51]  Through the SPA, TOM acquired TPPRC shares

from Alvarez;[52] through the APA, TPPRC acquired real property and operating

equipment from Sunshine.[53]  In order for TPPRC to acquire these assets, TOM

issued a short-term advance to TPPRC and later converted the advance to an

---

[47]     Commonwealth's Opposition to TOM's Motion to Dismiss ("Opp. Mem. TOM") at 6.  *See also* 9/14/04 Letter from Maximo Alvaraez to Christian Chammas, Ex. 2 to 5/10/13 Declaration of Daniel Boone in Support of the Commonwealth's Opposition to TOM's Motion to Dismiss ("TOM Boone Decl.").

[48]     *See* Opp. Mem. TOM at 7–8.

[49]     PSA Cover Page, Ex. 3 to TOM Boone Decl.

[50]     *See* PSA at 1.

[51]     *See id.*

[52]     *See id.*  TPPRC replaced GPR, which was used in the PSA.

[53]     *See id.*

interest-bearing loan.[54]

The PSA specifically notes that, "[n]otwithstanding anything in this Agreement that could be construed to the contrary, [TOM] shall never take title to the Assets (as defined herein) to be conveyed to [TPPRC] by [Sunshine]."[55]  The effective date of the PSA, which was executed in New York, was October 21, 2004.[56]  The PSA also contains a provision specifying that the laws of Puerto Rico govern the agreement.[57]

TOM, in turn, claims that it "conducts no business in Puerto Rico . . . and that TOM's only alleged 'contact' with Puerto Rico is that [TOM] was involved in pre-acquisition due diligence activities and was the parent of a local corporation [TPPRC]."[58]  TOM notes that in the execution of the PSA, the service stations never passed to TOM; rather, TPPRC acquired title to the service stations

---

[54]     *See* Notes to Audited Financial Statements, Ex. 13 to TOM Boone Decl., at 5.

[55]     PSA at 1.

[56]     *See id.* at 3.  TOM claims the place of "execution" was Paris.  *See* Memorandum of Law in Support of TOM's Motion to Dismiss ("TOM Mem.") at 2.

[57]     *See* PSA at 57.

[58]     TOM Mem. at 6.

-14-

once TOM had acquired all the stock of TPPRC.[59]

### b.     TOM and TPPRC Share Employees

The Commonwealth claims that TOM and TPPRC share employees. Specifically, it asserts that four members — Christian Chammas, Alain Champeaux, Francois De Lingniville, and Pierre Fart — of TPPRC's board of directors were also employees of TOM.[60]  In support of this contention, the Commonwealth cites two document attached to a 2004 TPPRC financial statement.[61]  The first document is a letter from April 27, 2005 that lists four members of TPPRC's board of directors and their addresses.[62]  The address of Christian Chammas, the President of TPPRC, is listed as "Total Outre-Mer Paris, France."[63]  The second document lists three members of TOM's board of directors with their address as "Total Outre-Mer, 24 cours Michelet-La Défense 10, 92069 Paris La Défense Cedex, [France]."[64]

---

[59]      *See id.* at 6–7.  *See also* PSA at 1.

[60]      *See* Opp. Mem. TOM at 12.

[61]      *See* Statement attached to TPPRC's 2004 Corporate Annual Report ("2004 Statement"), Ex. 12 to Boone Decl.

[62]      *See id.*

[63]      *Id.*

[64]      *Id.*

TOM notes that the Commonwealth has not provided "evidence to support its assertion that these individuals were TOM employees."[65]  TOM argues that the two documents relied on by the Commonwealth list members of "two separate boards of directors and there were no common directors on the boards of TOM and TPPRC."[66]

### c.   TOM's Other Contacts

In support of its motion, TOM maintains that it lacks sufficient contacts and presence in Puerto Rico for this Court to exercise personal jurisdiction over it.[67]  TOM denies that it has ever (1) refined oil into gasoline in any US jurisdiction; (2) operated refining facilities in Puerto Rico; (3) owned gasoline retail stations or underground storage tanks in Puerto Rico; (4) contracted regarding the sale of gasoline in Puerto Rico or the franchising of retailers that operate gasoline retail stations in Puerto Rico; (5) been licensed to do business or requested a license to do business in Puerto Rico; (6) maintained offices in the United States or its territories; (7) been registered to do business in any US jurisdiction; (8) owned, leased, managed, or maintained any real property in Puerto

---

[65]     TOM's Memorandum of Law in Reply to Commonwealth's Opposition to TOM's Motion to Dismiss at 8.

[66]     *Id.*

[67]     *See* Total Umbrella Mem. at 4–5.

Rico; (9) solicited business, advertised, or marketed any goods or services in Puerto Rico; (10) had bank accounts, phone numbers, fax numbers, or corporate records in Puerto Rico; (11) had officers or employees in Puerto Rico; (12) conducted business in Puerto Rico; or (13) litigated in Puerto Rico.[68]

### D.  Facts Regarding Peerless Oil and Chemical, Inc.

#### 1.  Undisputed Facts

On November 15, 2012, the Commonwealth notified Peerless of its intention to file an action against it for alleged damage caused by MTBE.[69]  On December 3, 2012, the Commonwealth filed the action.[70]

Peerless is a "Delaware corporation headquartered in Puerto Rico with a principal place of business at Road 127 KM 17.1, Punta Guayanilla, Penuelas, Puerto Rico 00624."[71]  In 1996, Peerless received a permit from the Commonwealth of Puerto Rico/Office of the Governor and the Environmental Quality Board to operate a Hydrocarbon Processing, Bulk Storage Terminal, Tank

---

[68]      *See* Jacquet Decl. ¶¶ 14–26.

[69]      *See* Peerless' Memorandum of Law in Support of Motion to Dismiss ("Peerless Mem.") at 2.

[70]      *See id.*

[71]      TAC ¶ 57. *See also* Certificates of Incorporation, Exs. 1–2 to Declaration of Luiz R. Vázquez, General Manager of Peerless, in Support of Peerless' Motion to Dismiss ("Vázquez Decl.").

Truck and Marine Vessel Loading Facility.[72]  In 2003, Peerless obtained a license

from the Commonwealth of Puerto Rico to operate as a gasoline wholesaler.[73]

Peerless has been "openly engaged" in the business of supplying and storing

gasoline in Puerto Rico since obtaining its license, and has "even sold fuel to the

Commonwealth of Puerto Rico and its agencies."[74]

### E.       Facts Regarding Trammo Operating and Trammo Parent

#### 1.       Undisputed Facts

##### a.       Trammo Operating

The Trammo Defendants were added to this action five and a half

years after it commenced.[75]  On April 1, 2002, Trammo Operating was

incorporated in Delaware.[76]  Trammo Operating "was in the business of supplying

---

[72]      *See* Permit Letter, Ex. 3 to Vázquez Decl. Peerless also applied for a
similar permit in 1999. *See* Permit Letter, Ex. 4 to Vázquez Decl.

[73]      *See* License, Ex. 5 to Vázquez Decl.

[74]      Vázquez Decl. ¶ 9.

[75]      *See* Memorandum of Law in Support of Trammo Petroleum, Inc. and
Trammo Caribbean, Inc.'s Motion to Dismiss ("Trammo Mem.") at 1.

[76]      *See* 4/12/13 Declaration of William E. Markstein, Vice President and
Assistant Secretary of Trammo Operating from 2003-2007 and Assistant Secretary
of Trammo Parent from 2003, in Support of  Trammo Petroleum, Inc. and Trammo
Caribbean, Inc.'s Motion to Dismiss ("Markstein Decl.") ¶ 6; Certificate of
Incorporation, Ex. 2 to Markstein Decl.

petroleum-fuel products,"[77] and on June 5, 2002, the Commonwealth authorized it to "buy, sell and store petroleum" products within Puerto Rico.[78]

Trammo Operating had a contractual relationship with Peerless in Puerto Rico for the storage and sale of gasoline.  On January 31, 2005, that contract was assigned to Colonial Caribbean, Inc. ("Colonial").[79]  On January 24, 2006, "Trammo Operating filed a withdrawal of its registration to do business in Puerto Rico, which was granted by the Department of State of Puerto Rico on February 3, 2006."[80]  "On August 9, 2007, the board of directors of Trammo Operating decided to dissolve Trammo Operating. On August 13, 2007 a certificate of dissolution was filed, in accordance with Delaware law . . . effecting a valid dissolution of Trammo Operating."[81]  Upon dissolution, no assets were transferred to its parent company or any other entity, shareholder or person, and Trammo Operating had a negative net worth.[82]  In 2008, the Municipality of Peñuelas in

---

[77]   Trammo Mem. at 3.

[78]   Markstein Decl. ¶ 7; Certificate of Authorization, Ex. 3 to Markstein Decl.

[79]   *See* Markstein Decl. ¶ 8.

[80]   *Id.* ¶ 9.

[81]   *Id.* ¶ 11. *See also* Certificate of Dissolution, Ex. 5 to Markstein Decl.

[82]   *See* Markstein Decl. ¶¶ 12–13.

Puerto Rico dismissed an action against Caribbean for back taxes "because [the municipality] had found that Trammo Operating has ceased doing business in Puerto Rico and upon liquidation and dissolution the parent company received no assets of the corporation."[83]

### b.    Trammo Parent

On January 24, 2002, Trammo Parent  was incorporated in Delaware.[84]  It was the parent corporation of Trammo Operating and did not direct any day-to-day operations at Trammo Operating.[85]  Trammo Parent "does not and did not conduct business or sell gasoline in Puerto Rico, either itself or through an intermediary, or have any agents in Puerto Rico. [Trammo Parent] has never been registered to do business in Puerto Rico."[86]  Trammo Parent is no longer an active corporation and has a negative net worth.[87]

## III.   LEGAL STANDARD

### A.    Rule 12(b)(2) Motion to Dismiss

---

[83]    *Id.* ¶ 14. *See also* Letter from Municipality, Ex. 6 to Markstein Decl.

[84]    *See* Markstein Decl. ¶ 2; Certification of Incorporation, Ex. 1 to Markstein Decl.

[85]    *See* Markstein Decl. ¶ 5.

[86]    *Id.* ¶ 3.

[87]    *See id.* ¶ 4.

### 1.    Standard of Proof

A plaintiff has the burden of proving personal jurisdiction by a preponderance of the evidence.[88]  When assessed on written submissions, "the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction" to survive a Rule 12(b)(2) motion.[89]  The plaintiff may make such a showing with "an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant."[90]  In this posture, the court must construe all allegations in the light most favorable to the plaintiff and resolve all doubts in the plaintiff's favor.[91]  However, "a plaintiff may not rely on conclusory non-fact-specific jurisdictional allegations to overcome a motion to dismiss."[92]  Further, when a "'defendant rebuts plaintiffs' unsupported allegations

---

[88]    *See Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865 (2d Cir. 1996).

[89]    *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, No. 12 Civ. 770, 2013 WL 3335784 (2d Cir. July 3, 2013) (alteration in original) (quotation marks and citations omitted).

[90]    *Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (quotation marks and citation omitted).

[91]    *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993).  *See also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (citation omitted).

[92]    *Doe v. Delaware State Police*, No. 10 Civ. 3003, 2013 WL 1431526, at *3 (S.D.N.Y. Apr. 4, 2013) (quotation marks omitted) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)).

with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction — and plaintiffs do not counter that evidence — the allegation may be deemed refuted.'"[93]

### 2.   Specific Jurisdiction Under Puerto Rico's Long Arm Statute

Puerto Rico's long-arm statute allows courts to exercise jurisdiction over a non-resident defendant if the action arises because that person:  (1) transacted business in Puerto Rico personally or through an agent; (2) participated in tortious acts within Puerto Rico personally or through his agent . . . or (5) owns, uses or possesses, personally or through his agent, real property in Puerto Rico.[94]  Puerto Rico's long arm statute "stretches up to the point allowed by the Constitution."[95]  Thus, the present inquiry is guided by "whether the exercise of personal jurisdiction [] would abide by constitutional guidelines" of Due Process.[96]

---

[93]      *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 567 (S.D.N.Y. 2012) (quoting *Schenker v. Assicurazioni Genereali S.p.A., Consol.*, No. 98 Civ. 9186, 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002)).

[94]      *See Negron-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 24 (1st Cir. 2007) (quoting L.P.R.A., Tit. 32, App. III, Rule 4.7(a)(1)).

[95]      *Id.* (quotation marks and citations omitted).  *Accord Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994) (citations omitted) (stating that Rule 4.7 "extends personal jurisdiction as far as the Federal Constitution permits").

[96]      *Gonzalez-Diaz v. Up Stage Inc.*, No. 11 Civ. 1689, 2012 WL 2579307, at *1 (D.P.R. July 3, 2012).

### 3.    Due Process

The Supreme Court set forth the requirements of Due Process in *International Shoe v. Washington*:  that a defendant "not present within the territory of the forum" have "certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[97]   This analysis requires both a "minimum-contacts" test and a "reasonableness" inquiry.

*First*, to satisfy minimum contacts for due process, the plaintiff must demonstrate that "the defendant purposely availed itself of the privilege of doing business in the forum and could foresee being haled into court there" and that "the claim arises out of, or relates to, the defendant's contacts with the forum."[98] *Second*, if the defendant's contacts with the forum state satisfy this test, the defendant may defeat jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[99]

> [Courts] consider five factors [in] determining whether an exercise of jurisdiction is reasonable: . . . "(1) the burden on

---

[97]     326 U.S. 310, 316 (1945) (quotation marks and citations omitted).

[98]     *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (quotation marks and citations omitted).

[99]     *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).  *Accord Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010).

the defendant, (2) the interests of the forum State, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, [and] (5) the shared interest of the several States in furthering fundamental substantive social policies."[100]

### a.   Jurisdictional Veil Piercing

In the First Circuit, the inquiry into piercing the veil separating two corporations in the liability context also informs the jurisdictional inquiry.[101]  In determining whether jurisdiction may be asserted over the parent corporation solely on the basis of its subsidiary's contacts with the forum state, the court presumes the institutional independence of a parent and a subsidiary.[102]  The "'mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary.'"[103]

---

[100]   *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987)).

[101]   *See United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992) (citation omitted).

[102]   *See Donatelli v. National Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990) (citations omitted).

[103]   *Negron-Torres*, 478 F.3d at 27 (quoting *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980) (citing *Blount v. Peerless Chemicals (P.R.) Inc.*, 316 F.2d 695 (2d Cir. 1963))).

-24-

Where courts in the First Circuit have exercised personal jurisdiction over the parent corporation, there is a "plus factor" beyond the "subsidary's mere presence within the bosom of the corporate family."[104]  Such plus factors include finding an agency relationship between the parent and the subsidary.[105]  Other plus factors include finding "strong and robust evidence" that "the parent in fact controls the activities of the subsidary," or that the subsidary is a mere shell for the parent's operations.[106]  In this way, asserting jurisdiction over a foreign parent is "'unfair to the extent that the independence of the local subsidiary is a reality.'"[107]  The parent's ownership of all of a subsidary's stock — such that the parent maintains control incident to stock ownership — does not justify ignoring corporate separateness,[108] nor does the fact that the parent and subsidiary have

---

[104]     *Donatelli*, 893 F.2d at 465–66.

[105]     *See id.* at 466 (citations omitted).

[106]     *Escude Cruz,* 619 F.2d at 905 (citations omitted). *Accord Donatelli*, 893 F.2d at 466 (quotation marks and citations omitted) (noting that "the exercise of control by the parent [must be] greater than that normally associated with common ownership and directorship," and not the level of control "innately inherent in the family relationship").

[107]     *Escude Cruz,* 619 F.2d at 905 (quoting *Blount*, 316 F.2d at 699).

[108]     *See de Walker v. Pueblo Int'l, Inc.*, 569 F.2d 1169, 1173 (1st Cir. 1978).

interlocking directorates.[109]

When a subsidiary enters the forum state as an agent of the parent, acts as a mere department of the parent, or is a shell for the parent company, "the parent has plainly made a choice to avail itself of the forum's benefices."[110]   Once minimum contacts can be attributed derivatively to the parent — through a plus factor of either agency, department, or shell theory — the parent "should, in all fairness, be within the state court's jurisdictional reach" because all of the relevant *Asahi* criteria are "easily attained . . . [to] corroborate the appropriateness of an exercise of jurisdiction."[111]

### B.   Failure to State a Claim

### 1.   Standard of Proof

When reviewing a Rule 12(b)(6) motion to dismiss, the court must "accept as true all of the factual allegations contained in the complaint"[112] and

---

[109]   *See Escude Cruz,* 619 F.2d at 905.

[110]   *Donatelli*, 893 F.2d at 466.

[111]   *Id.* The *Asahi* factors are referred to as "*Gestalt* factors" in the First Circuit.

[112]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

"draw all reasonable inferences in the plaintiff's favor."[113]   However, the court

"need not accord [l]egal conclusions, deductions or opinions couched as factual

allegations . . . a presumption of truthfulness."[114]  In order to survive a Rule

12(b)(6) motion, the complaint's  allegations must meet a standard of

"plausibility."[115]  A claim is facially plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."[116]  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully.  Where a complaint pleads facts that are "merely

consistent with" a defendant's liability, it "stops short of the line between

possibility and plausibility of entitlement to relief."[117]

> **2.**   **Factual Record and Statute of Limitations Defense on a
> Rule 12(b)(6) Motion**

"The lapse of a limitations period is an affirmative defense that a

---

[113]   *Simms v. City of New York*, 480 Fed. App'x 627, 629 (2d Cir. 2012)
(citation omitted).

[114]   *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)
(quotation marks and citation omitted).

[115]   *Twombly*, 550 U.S. at 564.

[116]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

[117]   *Id.* (citations omitted).

defendant must plead and prove."[118]  "However, a defendant may raise an

affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on

the face of the complaint."[119]  For the purposes of a Rule 12(b)(6) motion, the court

"may consider the facts alleged in the complaint, documents attached to the

complaint as exhibits, and documents incorporated by reference in the

complaint."[120]  While "the general rule is that a district court may not look outside

the complaint and the documents attached thereto in ruling on a Rule 12(b) motion

to dismiss," the court may "consider matters of which judicial notice may be

taken."[121]  The court is also allowed to consider documents outside the pleading if

the documents are integral to the pleading.[122]

### 3.     Statute of Limitations for Tort Claims in Puerto Rico

In Puerto Rico, Article 1802 of the Civil Code, L.P.R.A.[123] section

---

[118]     *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (citing FED. R. CIV. P. 8(c)(1)).

[119]     *Id.*

[120]     *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citation omitted).

[121]     *Staehr*, 547 F.3d at 425 (quotation marks and citation omitted).

[122]     *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[123]     I use the L.P.R.A. because it is readily available in translation.

-28-

5141, governs obligations that "arise from fault or negligence."[124]  "The statute of limitations for these actions is one year as provided by Art. 1868 of the Civil Code, 31 L.P.R.A. sec[tion] 5298."[125]  In Puerto Rico, the limitations period runs from the time the aggrieved party has "notice of the injury, plus notice of the person who caused it."[126]  Tolling the limitations period "does not require actual knowledge; it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information."[127]  The one year statute of limitations for a continuous tort — like a nuisance claim — runs from defendant's "last act."[128]

### 4.    Judge-Made Tolling in Puerto Rico

---

[124]    *Fraguada Bonilla v. Hospital Auxilio Mutuo*, 186 D.P.R. 365, 2012 WL 3655336 (cert. translation by Juan E. Segarra, USCII/translator), Ex. 2 to 5/28/13 Declaration of Daniel Boone, attorney for the Commonwealth, in Support of the Commonwealth's Opposition, Doc. No. 277 ("Peerless Boone Decl."), at 3 n.7. The Commonwealth has supplied a stipulated certified translation of *Fraguada* that I cite as: "*Fraguada* at [page in certified translation]."

[125]    *Id.*

[126]    *Rodriguez-Suris v. Montesinos*, 123 F.3d 10, 13 (1st Cir. 1997) (quotation marks and citations omitted).

[127]    *Lopez-Flores v. Cruz-Santiago*, 526 F. Supp. 2d 188, 190 (D.P.R. 2007) (citing *Rodriguez-Suris,* 123 F.3d at 14–17) (citations omitted)).

[128]    *De Leon Otero v. Rubero*, 820 F.2d 18, 19–20 (1st Cir. 1987) (quotation marks and citation omitted).

In 1992, the Supreme Court of Puerto Rico held that plaintiffs could add jointly and severally liable defendants to a complaint that was timely filed.[129] In explaining the 1992 decision, the *Fraguada* court stated:

> [W]e decided [in *Arroyo*] that timely filing of a complaint by an injured party against a joint and several co-tortfeasor automatically tolls the statute of limitations against all of the other co-tortfeasors. We stated that the alleged joint and several co-tortfeasors can be incorporated into the litigation through an amendment to the complaint or a third-party complaint, and that claimant merely must allege well and sufficiently that the new defendant is jointly and severally liable for the harm.[130]

In 2008, the Supreme Court expanded the reach of the *Arroyo* rule, holding that it allowed a plaintiff to add a joint and severally liable defendant who would otherwise be barred by the statute of limitations even though the "plaintiff knew beforehand the identity and elements necessary to exercise his cause of action against [that defendant]."[131]

In 2012, the Supreme Court of Puerto Rico abrogated *Arroyo* and its progeny, holding that "timely filing of a complaint against a supposed co-tortfeasor

---

[129]   *See Fraguada* at 4 (citing *Arroyo v. Hospital La Concepcion*, 130 D.P.R. 596, 605 (1992)).

[130]   *Id.*

[131]   *Id.* at 4–5 (citing *Garcia Perez v. Corporation Service Mujer*, 174 D.P.R. 138, 155 (2008)).

does not toll the statute of limitations against the rest of the alleged co-tortfeasors."[132]  In considering the retroactivity of the new rule, the court decided that it should have prospective effect.[133]  The court reasoned:

> The foregoing [decision that *Fraguada* should have prospective effect] is based on the fact that the rule is a new rule and so applying it to this case would have substantially unfair results for the respondents, who relied on the prior rule that has been set aside by the new rule that we are establishing today.  Public policy and social considerations have made us decide that this rule shall have prospective effects, since the purpose sought is to award fair and equitable relief resulting in a better social coexistence.[134]

The court concluded by stating that, "[A]ll causes of action filed according to Art. 1802 of the Civil Code [] shall be adjudicated in accordance with the rules established herein."[135]

## IV.   DISCUSSION

### A.   Puerto Rico Lacks Personal Jurisdiction over Total Umbrella

Because Total Umbrella is a holding company that has never operated in Puerto Rico or participated directly in the MTBE market, Puerto Rico lacks

---

[132]    *Id.*

[133]    *See id.* at 11.

[134]    *Id.*

[135]    *Id.* at 12.

personal jurisdiction over it with respect to the claims alleged.

### 1.    Total Umbrella Is a Holding Company

The Commonwealth strains to contest that Total Umbrella is a holding company.  A 2011 SEC Form 20-F defines Total Umbrella as a holding company.[136]  The same form also describes Total Umbrella's company structure: "[Total Umbrella] is the *parent company* of the TOTAL Group."[137]  The description of Total Umbrella as an "integrated international oil and gas company"[138] does not stand for the proposition that Total Umbrella "participates directly in the business of its subsidiaries."[139]  Rather, it merely indicates that Total Umbrella has subsidiaries in every sector in the oil supply chain.[140]  Considering

---

[136]    *See* 2011 SEC Filing 20-F at iv (emphasis added) (stating that "[w]hen we refer to the *parent holding company* alone, we use the term [Total Umbrella]").  The Commonwealth's exhibit of the same 2011 SEC Filing Form 20-F conspicuously lacks the relevant term definition pages. *Compare* Ex. 5 to Total Umbrella Boone Decl., *with* Ex. B to Herbel Rep. Decl.

[137]    2011 SEC Filing Form 20-F at 81 (emphasis added).

[138]    *Id.* at 10. *See also* Total, S.A. Website, Ex. 2 to Total Umbrella Boone Decl.

[139]    Opp. Mem. Total Umbrella at 7.

[140]    *See* 2011 SEC Filing Form 20-F at 10–11. *Cf. Gallelli v. Crown Imports, LLC*, 701 F. Supp. 2d 263, 268 (E.D.N.Y. 2010) (emphasis added) (noting that the business of a holding company — comprised of companies "engaged in *all aspects* of the beer brewing and distribution businesses" —  is best described as the holding of stock in other companies, and it is therefore "not directly engaged in

Total Umbrella's entire 2012 SEC 20-F Filing,[141] there is little doubt that Total

Umbrella is a typical holding company: it diversifies risk in the volatile oil and gas

market by holding an ownership stake in companies operating in various sectors of

the global market.[142]

      The Commonwealth's use of the name "Total" — as well as the term

"corporate parent" — throughout its Opposition will not establish personal

jurisdiction.[143]  The SEC forms define "Total" and "the Group" as Total Umbrella

and its over eight hundred subsidiaries.[144]  The use of "Total" on its corporate

---

any aspect of the beer brewing or distribution businesses").

     [141]    I take judicial notice of the portions of the filing not included as exhibits.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (quotation marks and citation omitted) (holding that a district court may take judicial notice of the contents of public disclosure documents filed with the SEC as facts whose accuracy cannot reasonably be questioned, satisfying FRE 201(b)(2)).

     [142]    *See* Total, S.A., Annual and Transition Report of Foreign Private Issuers (Form 20-F) at 3–14, 81–83 (Mar. 28, 2013).  *See Gurvey v. Cowan, Liebowitz & Latman, PC*, No. 06 Civ. 1202, 2009 WL 691056, at *4 (S.D.N.Y. Mar. 17, 2009) (quotation marks and citations omitted) (stating that when a holding company is an investment mechanism for diversifying risk through corporate acquisitions, the subsidiaries conduct business as investments, not agents).

     [143]    *See Negron-Torres*, 478 F.3d at 26 (quotation marks omitted) (noting that a shared name between a parent and a subsidary cannot serve as jurisdictional shortcut for parties who "play fast and loose" with the name).

     [144]    *See* 2011 SEC Form 20-F at iii.

-33-

website[145] is consistent with this terminology and does not establish that Total

Umbrella is an operating company.[146]

### 2. Total Umbrella's Contacts with Puerto Rico Are Insufficient to Support the Exercise of Personal Jurisdiction

Because the Commonwealth has not established a prima facie case

that Total Umbrella was "directly involved in the Puerto Rico MTBE market,"

there are no contacts with the forum sufficient for exercising personal

jurisdiction.[147]  The Commonwealth cites several documents in support of its

contention that Total Umbrella had direct business contacts with Puerto Rico: (1)

an audit report from 2007 mentions "Total France" as a company that charged

---

[145]    *See* Total Umbrella Website (total.com), Ex. 2 to Total Umbrella Boone Decl.

[146]    *See Special Indus. Inc. v. Zamil Grp. Holding Co.*, No. 11 Civ. 3207, 2013 WL 1345612, at *5 (S.D. Tex. Mar. 29, 2013) (noting that a holding company's references to its "group" of companies in the first person plural on its website and promotional materials was unremarkable for purposes of determining jurisdiction over the holding company).

[147]    The Commonwealth does not argue that the contacts of Total Umbrella's subsidiaries should be imputed to the parent holding company.  Even if such an argument was presented, there is no reason to disregard the separate corporate forms of Total Umbrella and its subsidiaries because there are no exhibits that establish a First Circuit "plus factor," such as agency, extraordinary control, or shell.  *See Donatelli*, 893 F.2d at 465–66 (citations omitted).

TPPRC $200,000 for communication services;[148] (2) various emails concerning 2004 contract negotiations between Peerless and TPPRC that mention "Total";[149] (3) other documents relating to the above 2004 negotiations that mention "Total" and direct all newly acquired service stations to change their signage to "Total" colors.[150]  None help the Commonwealth.  *First,* "Total France" does not refer to Total Umbrella. Prior to October 5, 2008, "Total Raffinage Marketing," a subsidiary holding company of Total Umbrella, was named "Total France" and currently is the parent holding company of Total Outre Mer.[151]  *Second*, neither sets of the 2004 negotiations mention Total Umbrella, and no documents indicate that Total Umbrella directed any negotiations.[152]  Furthermore, a directive to change

---

[148]     *See* 2006/2007 Audit Report of TTPRC, Ex. 8 to Total Umbrella Boone Decl.  *See also* 2007/2008 Audit Report of TPPRC, Ex. 9 to Total Umbrella Boone Decl.

[149]     *See* 2004 Emails between Peerless and TPPRC, Ex. 10 to Total Umbrella Boone Decl.

[150]     *See* 2004 Negotiation Documents, Ex. 11 to Total Umbrella Boone Decl.  *See also* Press Announcement Affixed to SEC Filing Form 6-K, Ex. 4 to Total Umbrella Boone Decl.

[151]     *See* Minutes from Total France Shareholders Meeting, Ex. C to Herbel Rep. Decl.

[152]      *Cf. Eon Corp. v. AT & T Mobility, LLC*, 879 F. Supp. 2d 194, 213 (D.P.R. 2012) (quotation marks and citations omitted) (noting that merger negotiations can constitute actions directed towards a forum state for the purposes of personal jurisdiction, especially where the merger agreement affected the forum

TPPRC's signage to Total's trademarked logo and colors[153] neither rises to the

level of control "greater than that normally associated with common ownership and

directorship"[154] nor are they sufficient to establishing specific jurisdiction as to the

claims alleged.[155]

On the basis of a document that does not mention Total Umbrella, the

Commonwealth assumes that subsidary TPPRC and Total Umbrella shared officers

and employees.[156] Even accepting this questionable assumption,[157] Total

Umbrella's sharing officers with TPPRC is within the bounds of normal corporate

---

state).

[153]   TOTAL PETROCHEMICALS, Registration No. 85528831.

[154]   *Donatelli*, 893 F.2d at 466.  *See also Special Indus. Inc.*, 2013 WL
1345612, at *5 (applying the "greater than normal control" standard adopted in the
First Circuit, and finding that a holding company's "complete control over the
entire production process" failed to evince more than a normal corporate familial
relationship).

[155]   *Cf. González v. Walgreens Co.,* 878 F.2d 560, 561–62 (1st Cir. 1989)
(noting that use of the name "Walgreens" was insufficient to obtain jurisdiction
over the out-of-state franchisor in an action against the franchisee).

[156]   *See* 2004 Audit Report of TTPRC, Ex. 7 to Total Umbrella Boone
Decl.

[157]   *See Vitin Garment Mfg. Corp. v. Schreck Wholesale, Inc.*, 827 F.
Supp. 847, 850 (D.P.R. 1993) (citation omitted) (noting that asserting jurisdiction
over a parent company must be supported by more than assumption and suspicion).

structure and is not dispositive of whether the contacts of TPPRC may be imputed to its parent for jurisdictional purposes.[158]

The Maumont email,[159] in which a Total Umbrella employee confirmed that TPPRC was a subsidiary of the Total Group, does not demonstrate that Total Umbrella was involved in contract negotiation with Peerless.  Again, references to "Total France" are to the holding company of TPPRC, not Total Umbrella.[160]  Nothing in the email rises to a level that would indicate that Total Umbrella was directing the activities of a subsidiary,[161] particularly in light of the

---

[158]    *See Escude Cruz*, 619 F.2d at 905 (noting that allegations of interlocking directorates will not suffice to show that the activities of the subsidiary should be attributed to the parent); *In re Lupron Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d 280, 292 (D. Mass. 2003) (holding that customary incidents of a parent-subsidiary relationship — ownership, common personnel, profits, and managerial oversight — are not suspect and are insufficient for vicarious jurisdiction).

[159]    *See* Maumont Email, Ex. B to Herbel Decl. Because Total Group employees receive "total.com" email addresses, the fact that the Maumont email was forwarded from a "total.com" email address is irrelevant. *See* Herbel Rep. Decl. ¶ 26.

[160]    *See supra* note 151.

[161]    *See Negron-Torres*, 478 F.3d at 27 (holding that the court would not pierce the corporate veil of a subsidiary to find jurisdiction over the parent, reasoning that plaintiff's evidence merely supported the conclusion that the parent had indirect ownership in a subsidiary and did not direct its activities).

fact that TPPRC is two corporate layers removed from Total Umbrella.[162]  In sum, given Total Umbrella's lack of any direct contacts with Puerto Rico, there are no grounds for exercising personal jurisdiction over it.[163]

### B.    Puerto Rico Lacks Personal Jurisdiction over TOM

#### 1.    The 2004 PSA Does Not Confer Jurisdiction over TOM[164]

The Commonwealth argues that the 2004 PSA that TOM entered into with local oil companies evidences TOM's direct jurisdictional contacts with Puerto Rico.[165]  However, this agreement does not support personal jurisdiction for the following three reasons.  *First,* TOM has never owned any real property in

---

[162]    *See Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 135-36 (1st Cir. 2006) (finding that a holding company that exercised only limited control over a fourth-tier subsidiary could not be subjected to personal jurisdiction in the subsidiary's forum).

[163]    *See Rivera v. Bank One*, 145 F.R.D. 614, 619 (D.P.R. 1993) (finding a holding company organized under Ohio law that never had offices, employees, representatives or agents in Puerto Rico, nor owned, used, leased, by itself or through an agent, any movable or immovable property in Puerto Rico, nor had any directors or officers in Puerto Rico, and holding that [the holding company] had not engaged in any conduct that could qualify under 4.7(a)(1) of the Puerto Rico long arm statute).

[164]    Nothing before the Court indicates that TPPRC was entirely controlled by TOM such as to warrant ignoring corporate separateness. *See In re Lupron*, 245 F. Supp. 2d at 293 (noting that jurisdiction has been found over two parent holding companies that were mere umbrella corporations that carried out the entirety of their business through "captive subsidiaries").

[165]    *See* TOM Opp. Mem. at 6–11.

-38-

Puerto Rico,[166] and the terms of the PSA[167] establish that TOM never took possession of the Puerto Rico service stations.[168]  Instead, TOM acquired a majority stock interest in TPPRC.[169]  *Second*, mere ownership of a subsidiary is insufficient to justify asserting personal jurisdiction over the parent wherever the subsidary is present.[170]  The Commonwealth argues that TOM's *taking* an ownership stake in a Puerto Rico operating company should confer jurisdiction over the parent.  But this position is contrary to law, as it would subject a foreign holding company to personal jurisdiction wherever it acquired new investments.[171]

---

[166]     *See* Jacquet Decl. ¶ 20.

[167]     *See* PSA at 1 ("[n]otwithstanding anything in this Agreement that could be construed to the contrary, [TOM] shall never take title to the Assets (as defined herein) to be conveyed to [TPPRC] by [Sunshine]").

[168]     *See Santini Rivera v. Santon*, 118 F. Supp. 2d 159, 164–65 (D.P.R. 2000) (holding that the court lacked personal jurisdiction over a co-defendant corporation that had never owned, leased, used or possessed, personally or through an agent, real property in Puerto Rico).

[169]     *See* PSA at 1.  *Accord TTPRC v. Colon*, Ex. 9 to TOM Boone. Decl., at 11 ("On November 18, 2004, Total sent a notice to all retailers . . . announcing that all of [TPPRC's] stock had been acquired by [TOM], a wholly owned subsidary of Total Group").

[170]     *See Donatelli,* 893 F.2d at 465–66.  *Accord Jazini*, 148 F.3d at 184 (citation omitted) (stating "the presence of the subsidiary alone does not establish the parent's presence in the state").

[171]     *Cf. In re Lupron*, 245 F. Supp. 2d at 292 (noting policy concerns over asserting jurisdiction liberally over foreign parents of United States subsidiaries

TOM has no contacts with Puerto Rico and has not satisfied the Due Process

requirements of purposeful availment and relatedness by acquiring and maintaining

a majority stock ownership interest in TPPRC.[172]  *Finally*, TOM's short-term

capital advance to TPPRC to execute the asset purchase agreement within the PSA

establishes neither the holding company's dominance, nor its contacts with Puerto

Rico; instead, because TOM immediately converted the advance into an interest-

bearing loan, it shows only that TOM observed corporate formalities and treated

the members of its corporate family as distinct entities.[173]

### 2. TOM's Sharing an Officer with TPPRC Does Not Support the Exercise of Personal Jurisdiction

---

because of "the probability of claims of reciprocal jurisdiction by countries in which American corporations do business through subsidiaries of their own").

[172]    *See Tom's of Maine v. Acme-Hardesty Co.*, 565 F. Supp. 2d 171, 179 (D. Me. 2008) (citation omitted).  There, employing a corporate structure similar to the Total Group, Akzo Nobel NV was the parent company of Akzo Nobel Chemicals, a holding company that owned subsidiary operating companies.  *See id.* Because the *only* relation of the holding companies to the action was limited to the fact that its subsidiaries manufactured and sold the goods in the product liability action, the court did not exercise jurisdiction over either the parent or mid-level holding companies as such contact was too attenuated and indirect and did not satisfy the relatedness and purposeful availment requirements for specific personal jurisdiction.  *See id.*

[173]    *See Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 219 (5th Cir. 2000) (citation omitted) (noting that the existence of interest-bearing intercorporate loans does not prove the dominance of the parent over the subsidiary but rather supports finding corporate separateness).

Because sharing employees is within the bounds of normal corporate structure, the fact that TOM and TPPRC share an officer is insufficient to confer personal jurisdiction over TOM.  While the Commonwealth contends that TOM shares four officers with its operating company,[174] its exhibits indicate that only one officer, Christian Chammas, was employed by both TOM and TPPRC.[175]  One shared officer, even a president, is not unusual in the organization of holding and operating companies and does not establish the parent's total control of the subsidiary.[176]

### C.   The Commonwealth's Claims Against Peerless Are Barred by the Statute of Limitations

Puerto Rico's one year statute of limitations bars the Commonwealth's action because:  (1) judicial notice can be taken of Peerless' permits and licenses in order to establish that the Commonwealth had constructive knowledge of Peerless' operations; (2) the Commonwealth added Peerless to this

---

[174]     *See* Opp. Mem. TOM at 12.

[175]     Chammas is the President of TPPRC and his address is listed as "Total Outre-Mer Paris, France."  *See* 2004 Statement.

[176]     *See supra* note 158.  *See also J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) (stating that "overlapping officers and directors are intrinsic to the parent-subsidiary relationship").

-41-

action after the Supreme Court of Puerto Rico changed its tolling rule for jointly and severally liable defendants in *Fraguada*, which eliminated the Commonwealth's ability to add Peerless as a defendant; and (3) the Commonwealth has not properly alleged a continuous tort that could trigger a new claim.

### 1.    There Is No Need to Convert the Rule 12(b)(6) Motion to One Under Rule 56

The Court may take judicial notice of Peerless' permits and license issued by the government of Puerto Rico, without converting this motion into one for summary judgment.  The Federal Rules of Evidence allow the court to "take judicial notice on its own" of "a fact that is not subject to reasonable dispute because it . . . [] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[177] The following three documents attached to Peerless' Motion to Dismiss may be noticed under this rule:[178]  (1) a

---

[177]    FED. R. EVID. 201(b)(2), (c)(1).

[178]    I consider only Peerless' exhibits, which were not included or incorporated in the TAC.  *See Sandy Hollow Assocs. LLC v. Incorporated Vill. Port Washington North*, No. 09 Civ. 2629, 2012 WL 273143, at *7 (E.D.N.Y. Jan. 30, 2012) (quotation marks and citations omitted) (finding unpersuasive plaintiff's objection that twenty-one documents defendant submitted with its Rule 12(b)(6) motion "were not attached to the complaint as exhibits or incorporated by reference therein," and taking judicial notice of the exhibits that were "matters of public record," but not taking judicial notice of affidavits, which would be error on a

1993 permit from the Commonwealth of Puerto Rico/Office of the Governor and

the Environmental Quality Board for the operation of a Hydrocarbon Processing,

Bulk Storage Terminal, Tank Truck and Marine Vessel Loading Facility;[179] (2) a

similar permit application from 1999;[180] and (3) a 2003 license to operate as a

gasoline wholesaler.[181]  All three documents bear a government seal or signature,

and their accuracy is beyond "reasonable dispute."[182]

        These documents establish that Peerless operated as a refiner/supplier

_____

12(b)(6) motion).

[179]    *See* Permit Letter, Ex. 3 to Vázquez Decl.

[180]    *See* Permit Application, Ex. 4 to Vázquez Decl.

[181]    *See* License, Ex. 5 to Vázquez Decl.

[182]    *See Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 472
(1st Cir. 2005) (taking judicial notice of a letter not in the official district court
record, reasoning that the "copy supplied to us bears a date, the stamped signature
of a retained file copy [,] . . . and an obscured file stamp"); *V.E.C. Corp. of
Delaware v. Hilliard*, No. 10 Civ. 2542, 2011 WL 7101236, at *7 (S.D.N.Y. Dec.
13, 2011) (taking judicial notice of a corporation's certificate of renewal filed with
the state secretary in considering the statute of limitations on a Rule 12(b)(6)
motion); *American Cas. Co. of Reading, PA v. Lee Brands, Inc.*, No. 05 Civ. 6701,
2010 WL 743839, at *4 (S.D.N.Y. Mar. 3, 2010) (taking judicial notice of business
documents that "show evidence of having been filed with the California Secretary
of State"); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F. Supp. 2d
1224, 1234 (E.D. Cal. 2003) (citations omitted) (taking judicial notice of water
permit applications and decisions of the State Water Resources Control Board).

in Puerto Rico from 1993 onward.[183]  Knowledge of these operations is imputed to
the Commonwealth because reasonable investigation would have revealed these
permits and license.[184]  Because the Commonwealth had knowledge of the injury
that MTBE has allegedly caused since 2007 and constructive knowledge of the
identity of the alleged tortfeasor,[185] the applicable one year statute of limitations
bars the Commonwealth from maintaining its action against Peerless five years
after the original filing of the complaint.

### 2.     The *Fraguada* Decision Bars the Commonwealth's Use of Its 2007 Filing Date Against Peerless

The new tolling rule announced by the Supreme Court of Puerto Rico
in *Fraguada* mandates that the Commonwealth's claims against Peerless be
dismissed as untimely.  The rule of *Fraguada* applies prospectively "to all causes

---

[183]     The Commonwealth does not contest this finding, which was initially
raised in Peerless' Memorandum in Support. *See* Peerless Mem. at 14–15.

[184]     *See St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 191–92
(E.D.N.Y. 2010) (citations omitted) (citing *Wanless v. General Elec. Co.*, 148 F.3d
1334, 1338–39 (Fed. Cir. 1998) (citations omitted) (stating that "[t]he Supreme
Court has consistently imputed to parties who failed to examine readily available
information the knowledge contained in it and the results of inquiries that the
knowledge would have motivated a reasonable man to conduct," and summarizing
and collecting Supreme Court cases on imputed knowledge)).

[185]     Because the Commonwealth had constructive knowledge of Peerless'
operations, I need not decide whether the Commonwealth arguably had *actual*
knowledge because it issued the permit and license itself.

-44-

of action filed according to Art[icle] 1802 of the Civil Code."[186]  The action against Peerless, a jointly and severally liable defendant, is governed by Article 1802, and it was filed on December 3, 2012 — after the August 13, 2012 *Fraguada* ruling. Thus, *Fraguada* bars the Commonwealth's use of the 2007 filing date to toll the statute of limitations.

### 3.    Continuous Harmful Effect Does Not Justify Tolling

Because Puerto Rico's continuous tort doctrine requires showing ongoing unlawful conduct, not ongoing harm, the Commonwealth's assertion that MTBE allegedly continues to damage the waters of Puerto Rico cannot save its claim.  In Puerto Rico, a defendant's last act is used for the purposes of the statute of limitations.[187]  Moreover, "a continuous tort [] is ongoing unlawful *conduct*, not a continuing harmful effect."[188]  The Commonwealth has alleged that:

MTBE continues to threaten, migrate into and enter the

---

[186]    *Fraguada* at 11–12.

[187]    *See Bonilla v. Trebol Motors Corp.*, 913 F. Supp. 655, 659–60 (D.P.R. 1995) (citation omitted) (holding that the defendants seeking to assert an untimely counterclaim could not use the continuous tort doctrine because the plaintiff's "last allegedly unlawful act" that could support a claim of malicious prosecution was outside the one year statute of limitations).

[188]    *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F. Supp. 2d 226, 240 (D.P.R. 1998) (emphasis added) (citing *Arcelay*, 77 D.P.R. at 838 (quotation marks omitted)).

-45-

> waters of the Commonwealth. Until the nuisance is abated
> and the waters of the Commonwealth are returned to their
> pre-injury quality, the Defendants are liable for the creation
> and continued maintenance of a public nuisance in
> contravention of the public's right to clean water and an
> unspoiled environment.[189]

There is no allegation that Peerless has engaged in continuous tortious conduct.[190]

Thus, the Commonwealth cannot avail itself of the continuous tort doctrine to toll

its claims against Peerless.[191]

---

[189]   TAC ¶ 113.

[190]   *See Torres v. Hospital San Cristobal*, 831 F. Supp. 2d 540, 544 (D.P.R. 2011) (citations omitted) (finding that plaintiffs could not avail themselves of the continuous tort doctrine to circumvent the one year statute of limitations for their untimely filed medical malpractice suit because they did not set forth any allegations in their complaint that constituted the elements of a continuous tort); *M.R. (Vega Alta)*, 31 F. Supp. 2d at 240 (finding that defendants were not continuously acting when pollutants entered land without any further impetus on the part of defendants, and noting that "pollutants themselves are not [d]efendants [and] their constant action (reentry) is not a continuous action on the part of the [d]efendants"); *De Leon Otero v. Rubero*, 820 F.2d 18, 19–20 (1st Cir. 1987) (quotation marks and citation omitted) (noting that "continuing consequences" cannot be equated with "continuing acts" for the purposes of establishing a continuous tort).

[191]   This action has been pending for over five years, and there is no indication that permitting a fourth amendment would be anything but futile. Accordingly, I deny further leave to amend. *See Okoi v. El Al Israel Airlines*, 378 Fed. App'x 9, 12 (2d Cir. 2010) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). *See also Schoenberg v. Shapolsky Publishers, Inc.*, 916 F. Supp. 333, 336 (S.D.N.Y. 1996) (citations omitted) (denying leave to amend because plaintiff sought to include a new claim in an action that "has lingered in the courts already for more than five years, partly because of bitter discovery disputes").

-46-

**D.** **The Commonwealth's Claims Against the Trammo Defendants Are Barred by the Statute of Limitations[192]**

In support of their motion to dismiss, the Trammo Defendants offer two documents issued by the Puerto Rico Department of State:[193] (1) a 2002 certificate authorizing Trammo Operating to do business in Puerto Rico,[194] and (2) a 2006 certificate of withdrawal of Trammo Operating from doing business in Puerto Rico.[195] The Commonwealth does not contest that Trammo Operating conducted business in Puerto Rico until 2006.[196] Because a reasonable investigation would have revealed these certificates and the Commonwealth issued them, knowledge of Trammo Operating's business is imputed to the Commonwealth.[197] Likewise, a reasonable search would have uncovered Trammo

---

[192] As with Peerless, there is no need to convert this motion into one for summary judgment. *See supra* notes 177–178, 182. Because the statute of limitations bars this action, I do not reach the issue of whether personal jurisdiction may be asserted over the Trammo Defendants.

[193] I take judicial notice of these documents. *See supra* notes 177–178, 182.

[194] *See* Certificate of Authorization, Ex. 3 to Markstein Decl.

[195] *See* Certificate of Withdrawal, Ex. 4 to Markstein Decl.

[196] *See id.*

[197] *See supra* notes 184–185.

-47-

Parent's identity as the corporate owner of Trammo Operating.[198]  In sum, like its claims against Peerless, the Commonwealth's claims against the Trammo Defendants are barred by the one year statute of limitations because the Commonwealth had knowledge of both the alleged injury and the identity of the alleged tortfeasors as of 2007 .

## V.    CONCLUSION

For the foregoing reasons all of these motions are GRANTED:  (1) Total Umbrella's motion is GRANTED; (2) TOM's motion is GRANTED; (3) Peerless' motion is GRANTED; and (4) the Trammo Defendants' motions are GRANTED.  The Clerk of the Court is directed to close these motions (Doc. Nos. 207, 215, 224, 231).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 16, 2013

------------------------------------

[198]    *Id.*

-48-

**- Appearances -**

**Counsel for Commonwealth**:

Michael Axline, Esq.
Miller, Axline, & Sawyer
1050 Fulton Avenue, Suite 10
Sacramento, CA 95825
Tel: (916) 488-6688
Fax: (916) 488-4288

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Counsel for Total S.A.:**

Elliot E. Polebaum, Esq.
Eugene N. Hansen (*pro hac vice* forthcoming)
Fried, Frank, Harris, Shriver, & Jacobsen LLP
801 17th Street, NW
Washington, DC 20006
Tel: (202) 639-7000
Fax: (202) 639-7003

**Counsel for Trammo Petroleum, Inc. and Trammo Caribbean, Inc.:**

Mark S. Katz, Esq.
Mound Cotton Wollan & Greengrass
One Battery Park Plaza
New York, NY 10004

Tel: (212) 804-4200
Fax: (212) 344-8066

**Counsel for Total Outre-Mer, S.A.**

Elaine M. Maldonado-Matias, Esq.
Sepulvado & Maldonado, PSC
Citibank Tower, Suite 1900
252 Ponce de Leon Ave.
San Juan, P.R. 00918
Tel: (787) 765-5656
Fax: (787) 294-0073

**Counsel for Peerless Oil and Chemical, Inc.:**

Adrian Sanchez-Pagan, Esq.
Sife & Munoz-Noya, PSC
P.O. Box 364428
San Juan, Puerto Rico, 00936
Tel: (787) 756-7880
Fax: (787) 753-6580

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York 10020
Tel: (212) 547-5583
Fax: (212) 547-5444