# EXHIBIT 6

1

```
     D1BPMTBC
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
3    ETHER ("MTBE") PRODUCTS                Master File C.A.
4    LIABILITY LITIGATION                   No. 1:00-1898(SAS)
4                                                04CV4973 (SAS)
5    ------------------------------x
5
6                                           January 11, 2013
6                                           12:43 p.m.
7
7    Before:
8
8                      HON.  SHIRA A. SCHEINDLIN,
9
9                                           District Judge
10
10                       APPEARANCES
11
11   MILLER, AXLINE & SAWYER
12        Plaintiffs City of Fresno
12   BY:  TRACEY O'REILLY
13
13   McDERMOTT, WILL & EMERY
14        Attorneys for Defendants Exxon Mobil Corp.
14        and defendants' liaison counsel
15   BY:  JAMES PARDO
15        STEPHEN J. RICCARDULLI
16
16   SEDGWICK, LLP
17        Attorneys for Defendants Shell Oil Co.;
17        Texaco Refining and Marketing, Inc.;
18        Chevron U.S.A. Inc.; Motiva Enterprises;
18        Equilon Enterprises, LLC
19   BY:  PETER C. CONDRON
19
20   BRACEWELL & GIULIANI
20        Attorneys for Defendants Ultramar, Inc.;
21        Valero Marketing and Supply Company [DOE 1]
21   BY:  COY M. CONNELLY
22
22   SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
23        Attorneys Defendant for Exxon Mobil Corp.
23   BY:  JEFFREY J. PARKER
24
25
```

2

D1BPMTBC

1                          APPEARANCES CONTINUED
1
2    SIDLEY AUSTIN, LLP
2          Attorneys for Defendants Duke Energy Merchants, LLC;
3          Duke Energy Trading and marketing, LLC;
3          Northridge Petroleum Marketing U.S., Inc.;
4          Duke Energy Merchants California
4    BY:  JIM WEDEKING
5
5    KING & SPALDING
6          Attorney for Defendants Chevron
6    BY:  CHARLES C. CORRELL, JR.
7
7                          oOo
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
D1BPMTBC
 1              (In open court)
 2              (Case called)
 3              THE COURT:  Good afternoon, Miss O'Reilly.
 4              MS. O'REILLY:  Good afternoon, your Honor.
 5              THE COURT:  And Mr. Pardo.
 6              MR. PARDO:  Good afternoon, your Honor.
 7              THE COURT:  Mr. Riccardulli.
 8              MR. RICCARDULLI:  Good afternoon.
 9              THE COURT:  And Mr. Wedderling, is it?
10              MR. WEDEKING:  Wedeking, your Honor.
11              THE COURT:  Can you spell that?
12              MR. WEDEKING:  W-e-d-e-k-i-n-g.
13              THE COURT:  Wedeking.  Mr. Parker.
14              MR. PARKER:  Good afternoon, your Honor.
15              THE COURT:  Mr. Correll.
16              MR. CORRELL:  Good afternoon, Judge.
17              THE COURT:  Mr. Condron.
18              MR. CONDRON:  Good afternoon, your Honor.
19              THE COURT:  Mr. Connolly.
20              MR. CONNELLY:  Yes, your Honor.
21              THE COURT:  All right.  I think everything that we're
22    going to talk about today has to do with the City of Fresno
23    case, right?
24              MS. O'REILLY:  That's correct.
25              THE COURT:  It's a one-case conference.  That said, I
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

42

D1BPMTBC
1   prove that their product got to a particular station, like -- I
2   shouldn't use that, but --
3               MS. O'REILLY:  We --
4               THE COURT:  Well, no, I can't use that.
5               MS. O'REILLY:  We said to Van Ness, if you look on
6   Page --
7               THE COURT:  Van Ness?  I thought Van Ness was one of
8   the problem ones because Chevron had an exclusive supply
9   agreement, and so Duke's material couldn't have been there.
10              MS. O'REILLY:  It says Duke -- on Page 3 of our
11  letter, it says:  Duke Energy mixed several gas station sites,
12  received delivery, deliveries of MTBE gasoline from jobbers to
13  whom Duke Energy sold MTBE gasoline.
14              And what the evidence will show is that while there's
15  sometimes an exclusive agreement, also sometimes jobbers
16  supply, and they can do it when there's short supply or low
17  supply.  It's a product tracing issue, and we feel that we have
18  sufficient evidence, and we're happy to let them test that.
19              THE COURT:  It shouldn't be tested.  If you've got the
20  evidence that can show it to them, like the last topic, provide
21  the evidence of product tracing because they already know my
22  ruling after that.  If you can get it to the station, I at
23  least don't believe that they have to show it's their -- you to
24  show it's their molecule versus somebody else's molecule.  If
25  it's mixed and blended right there in the station and the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

43

D1BPMTBC
1   material is actually pumped and used and spilled, then that's
2   that.
3            So it really is a matter -- If she has evidence that
4   your product ended up at a particular station, there's no
5   summary judgment.
6            MR. WEDEKING:  We agree, your Honor.  We don't believe
7   they have any evidence showing that Duke's product actually
8   went to any of these particular stations.  They can show that
9   Duke sold to a jobber, jobbers bought from many suppliers,
10  delivered to many gas stations, a gas station bought from
11  several jobbers.
12           They have a theoretical possibility that Duke's
13  gasoline reached one of these stations, but a theoretical
14  possibility is not enough to defeat a summary judgment motion.
15  It would be very easy for Fresno to track Duke's product.  When
16  Duke sells gasoline at the rack, it creates a bill of lading
17  showing which jobber purchased Duke's gasoline.
18           THE COURT:  Yes, and she's got it to the jobber.  Then
19  the jobber goes to the station.
20           MR. WEDEKING:  We have not seen any of this evidence
21  from the City of Fresno.
22           THE COURT:  Then take it to the next step.
23           MR. WEDEKING:  That's correct.
24           THE COURT:  In other words, she has proof of what
25  jobber it was sold to, but then she doesn't have to deliver it.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

44

D1BPMTBC

```
 1               MR. WEDEKING:  That's correct, your Honor.
 2               THE COURT:  Do you have it or not?  Can you trace it
 3     to the station, Miss O'Reilly?
 4               MS. O'REILLY:  Your Honor, there are multiple methods,
 5     and what he's describing is a very discrete, direct,
 6     one-to-one-to-one paper trail.
 7               THE COURT:  No.  He's just saying -- well, yes, on the
 8     jobber's delivery, not of his material.  He's saying you get it
 9     to the jobber.  That's interesting.  Now, can you get that
10     jobber to make a delivery to any of these stations, without
11     worrying what's in that delivery, but did that jobber deliver?
12               MS. O'REILLY:  I don't know -- The evidence of product
13     delivery is voluminous; so I can't tell you off the top of my
14     head what exactly paper trail we have.  What we've done in
15     other cases, we don't always have every bill of lading for
16     every delivery to every station because sometimes those records
17     are destroyed, jobbers go out of business.
18               But we have evidence of testimony from gas station
19     owner.  What we did in Merced, for example, if a gas station
20     owner/operator says I bought from X jobber on these years,
21     multiple times in a week.  We have the jobber testifying, I
22     delivered to this station multiple times a week; I picked up my
23     gasoline at this terminal from this supplier.
24               THE COURT:  That sounds good to me.  It seems like,
25     Mr --
```

45

D1BPMTBC

 1              MR. WEDEKING:  Wedeking, your Honor.
 2              THE COURT:  -- Wedeking -- well, if you'd written it
 3    in the first place, I'd be able to say it -- doesn't really
 4    understand what your proof is until you lay it out to him.  But
 5    let's go to some of these, a couple of these specifics.
 6    Two-layer Exxon Beacon No. 3519 and Beacon No. 615.  They say
 7    that you only allege that Duke sold MTBE to these sites after
 8    they removed their tanks.
 9              MS. O'REILLY:  Your Honor, with respect to those
10    stations, we make the point -- and I think that claim of they
11    removed their tanks is disingenuous because in California many
12    stations removed their tanks and replaced them.
13              THE COURT:  Yeah, but they're saying one -- I thought
14    they said --
15              MS. O'REILLY:  There's one station, Cary Oil, where we
16    agree that they didn't replace their tanks.
17              THE COURT:  That's right.  I thought there was others
18    about after the replacement, there's no proof of delivery.
19              MS. O'REILLY:  If you look on Page 3 of our brief, we
20    ship to Exxon and several of the Beacons, that those
21    stations -- if you look right there, it says that the tanks
22    were removed and replaced.  And it says Duke's claims for these
23    three sites are based on the unsupported assumption that
24    releases only occurred before the date of tank removal.  Unlike
25    the Smith Tank Lines, Cary Oil sites, however, these three

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1BPMTBC

```
 1  sites had new tanks installed and then continued operating as
 2  gas stations.  That's on Page 3.
 3           THE COURT:  That's too much material.  I'm not going
 4  there.  Anyway, I'm looking at my summary notes.  One second.
 5           MS. O'REILLY:  Okay.
 6           THE COURT:  Okay.  Here's one.  In the reply letter of
 7  Duke, they talk about a case where you say there might have
 8  been MTB detection after the new tanks were installed.  If
 9  that's it, that's not good enough, that "there might have been
10  a detection after."  There either was or there wasn't after the
11  new tanks were installed.
12           And they say, to be more specific, that your expert,
13  Mr. Norman, never identified a release at these particular
14  stations after the 1998 and 1999 tanks were removed.
15           MS. O'REILLY:  Mr. Norman is not our release expert.
16  Mr. Marcel Moreau is our release expert.
17           THE COURT:  Did he identify a release at those
18  stations after the tank removals of '98 and '99?
19           MR. WEDEKING:  I will assert, your Honor, that he did
20  not.
21           THE COURT:  Okay.  If he did not, then it doesn't
22  matter what you have after the new tanks are installed because
23  you don't have a release.  So whether they were or not is kind
24  of irrelevant.  I am telling you that it may reach the point
25  where the years of patience runs out.
```

D1BPMTBC

```
 1              If you make me look at motions which you can't win,
 2    then I'm going to sanction somebody because the sanction is
 3    basically saying enough is enough.  My time is too valuable.
 4    If you know you don't have a case of a particular site against
 5    particular defendant, let the defendant out.  So I've given
 6    what guidance I can here on this Duke issue.  This one
 7    defendant.  It's been very specific, and I think we've
 8    discussed now, we've clarified the product tracing and the
 9    commingling.
10              I've agreed with you, Miss O'Reilly, to some extent.
11    If you can get it to the station and there's a release, he
12    doesn't have to prove whose molecule caused that.  Now, he
13    knows that, don't bother moving.  I'm telling you that.
14    They're saying they can't get my stuff to the station, where
15    there's a release, and if you can prove that, you win the
16    summary judgment.
17              So I'm going to ask you again to be on this slow
18    motion schedule that we just worked out for the nuisance issue.
19    Do the same thing for this with respect to Duke.  Figure out
20    what proof you have, meet and confer, and then you'll brief it.
21    All right?
22              MS. O'REILLY:  Thank you, your Honor.
23              THE COURT:  Now, I've put off until last the statute
24    of limitations because this is just a lot of work, too.  And
25    again, I sense no flexibility here, but let's start with the
```

# EXHIBIT 7

Marcel G. Moreau

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

***********************************

In Re:  Methyl Tertiary Butyl

Ether ("MTBE")            MDL NO. 1358 (SAS)

Products Liability Litigation

***********************************

This Document Relates To:

City of Fresno v. Chevron U.S.A., Inc., et al.,

Case No. 04 Civ 4973 (SAS)

***********************************

VIDEOTAPED DEPOSITION OF MARCEL G. MOREAU

VOLUME I

April 4, 2012

Deposition of Marcel G. Moreau,

Volume I, Plaintiff City of Fresno's designated

Expert Witness, on April 4, 2012, held at the

Marriott at Sable Oaks, 200 Sable Oaks Drive,

South Portland, Maine, beginning at 9:06 a.m.,

before Maryellen Coughlin, RPR/CRR.

Marcel G. Moreau

Page 2

```
 1    APPEARANCES:
 2
 3    FOR THE PLAINTIFF:
 4    BY:   TRACEY L. O'REILLY, ESQ.
 5          MILLER, AXLINE & SAWYER, P.C.
 6          1050 Fulton Avenue, Suite 100
 7          Sacramento, California 95825-4272
 8          (916)488-6688
 9          toreilly@toxictorts.org
10
11
12    FOR EXXON MOBIL CORPORATION:
13    BY:   WILLIAM STACK, Esq.
14          EXXON MOBIL CORPORATION
15          P.O. Box 2180
16          Houston, Texas 77252
17          (713) 656-2583
18          wstack@tmoblackberry.net
19          william.j.stack@exxonmobil.com
20          wroy@smrh.com
21
22
23
24
25
```

Page 4

```
 1    FURTHER APPEARANCES:
 2
 3    FOR CITGO PETROLEUM COMPANY (Via Phone):
 4    BY:   JOAN RADOVICH, ESQ.
 5          EIMER STAHL KLEVORN & SOLBERG, LLP
 6          224 South Michigan Avenue, Suite 1100
 7          Chicago, Illinois 60604-2516
 8          (312) 660-7678
 9          jradovich@eimerstahl.com
10
11    FOR VALERO ENERGY CORPORATION AND TOTAL
12    PETROCHEMICALS USA (Via phone):
13    BY:   EDUARDO PÉREZ, ESQ.
14          BRACEWELL & GIULIANI, LLP
15          711 Louisiana Street, Suite 2300
16          Pennzoil Place - South Tower
17          Houston, Texas 77002-2770
18          (713) 221-1312
19          ed.perez@bgllp.com
20
21
22
23
24
25
```

Page 3

```
 1    FURTHER APPEARANCES:
 2
 3    FOR CHEVRON U.S.A.:
 4    BY:   JEREMIAH J. ANDERSON, ESQ.
 5          KING & SPALDING
 6          1100 Louisiana, Suite 4000
 7          Houston, Texas  77002
 8          (713) 276-7417
 9          jjanderson@kslaw.com
10
11    FOR LYONDELL CHEMICAL COMPANY:
12    BY:   JOHN J. DiCHELLO, JR., ESQ.
13          BLANK ROME, LLP
14          One Logan Square
15          130 N. 18th Street
16          Philadelphia, Pennsylvania 19103-6998
17          (215) 569-5390
18          DiChello@BlankRome.com
19
20
21
22
23
24
25
```

Page 5

```
 1    FURTHER APPEARANCES:
 2
 3    FOR KERN OIL (Via phone):
 4    BY:   BRIAN M. LEDGER, ESQ.
 5          GORDON & REES, LLP
 6          101 West Broadway, Suite 2000
 7          San Diego, California 92101
 8          (616) 696-6700
 9          bledger@gordonrees.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Marcel G. Moreau

Page 6

I N D E X

WITNESS:    MARCEL G. MOREAU

EXAMINATION:                    Page
BY MR. STACK                      8

EXHIBITS FOR IDENTIFICATION:
No.      Description           Page
  1  Curriculum Vitae of            26
     Marcel G. Moreau
     (PEXP-FRESNO-MOREAU-000008 - 24)
  2  Site plan for Chevron          30
     Station 9-4374
  3  Summary pages 18 and 19 of 43 for   32
     Exxon, 4594 East Tulare, Fresno
  4  Expert of Marcel Moreau City of     66
     Fresno vs. Chevron U.S.A Inc.,
     Et al
  5  Expert Rebuttal Report of Marcel    66
     Moreau City of Fresno vs. Chevron
     U.S.A. Inc., et al
  6  Expert Site Specific Report of     163
     Marcel Moreau

Page 7

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on
the record.  My name is Wesley Hicks.  I'm a
videographer for Golkow Technologies.  Today's
date is April 4th, 2012, and the time is 9:06
a.m.

This video deposition is being held
in Portland, Maine in the matter -- in re: MTBE
Products Liability Litigation in the matter of
City of Fresno versus Chevron U.S.A., Inc.,
et al., Case No. 04 CIV 4973 (SAS) for the United
States District Court, Southern District of New
York.  The deponent is Marcel G. Moreau.  Counsel
please voice identify yourselves.

MS. O'REILLY:  Tracey O'Reilly,
Miller Axline & Sawyer for plaintiff City of
Fresno and the witness.

MR. ANDERSON:  Jeremiah Anderson
for the Chevron and Unocal defendants.

MR. DiCHELLO:  John DiChello of
Blank Rome for Lydonell Chemical Company.

MR. STACK:  William Stack for Exxon
Mobil.

THE VIDEOGRAPHER:  On the phone?

Page 8

MR. PEREZ:  Ed Perez with Bracewell
& Giuliani for the Valero defendants.

MS. RADOVICH:  Joan Radovich with
Eimer Stahl, LLC for Citgo Petroleum Corporation.

THE VIDEOGRAPHER:  Anyone else on
the phone?

The court reporter is Maryellen
Coughlin and will now swear in the witness.

MARCEL G. MOREAU,
having been first duly sworn, was examined
and testified as follows:

EXAMINATION
BY MR. STACK:
Q.    Please state your name for the
record?
A.    Marcel Gilbert Moreau.
Q.    And what is your business address
for purposes of this litigation?
A.    73 Bell Street in Portland, Maine
04103.
Q.    With regard to the work that you
performed in this case, did you perform it
through a business entity like a corporation or

Page 9

other business form?  Do you have a company?
A.    Yes, I do.
Q.    What is the company?
A.    Marcel Moreau Associates.
Q.    And with regard to that company,
how many employees do you currently have?
A.    Counting myself, there's two of us.
Q.    And with respect to the work that
you performed in this case, did you at any time
retain the services of a subcontractor to assist
you in performing your work?
A.    I believe we did.
Q.    And with regard to your
subcontractor, who was the subcontractor that you
retained?
A.    Christina Ferland.
Q.    And this individual worked for you
performing what tasks?
A.    As best I can recall, she was
involved in some cases in the initial review of
documents that were produced, and in a number of
instances, she produced a draft of the -- I guess
the facilities summary is what we've called it
historically for the individual facilities in
this case.

3  (Pages 6 to 9)

Marcel G. Moreau

Page 186

1    A.    I don't have any record specific to
2  a spill bucket, and I don't see any permit
3  applications.  A permit would have been required
4  if the work was done.  I don't know exactly when
5  that would have started.  Sometime in the early
6  '90s, if not sooner.  So the available evidence
7  indicates or doesn't indicate that a spill bucket
8  was added to this facility in the 1990 time frame
9  or any time in the 1990's.
10    Q.    So there is soil contamination in
11  the vicinity of the tank area, and the precise
12  cause of that contamination cannot be identified
13  because of the lack of documentation in the
14  records as they exist today?
15    MS. O'REILLY:  Vague and ambiguous.
16  Go ahead.
17    A.    As far as the records that I have
18  reviewed, there are no records that point to
19  specific releases associated with what I would
20  call the tank area.  There is contaminated soil,
21  so something happened in the area.  The records
22  of what those events might be are not present in
23  the record.
24    Q.    With regard to the piping and
25  dispenser area releases, there is a reference to

Page 187

1  an inspection in August of 2000 where evidence of
2  fuel releases were found in the dispenser
3  containment sumps with an active leak in one
4  dispenser.
5    Are the dispenser containment sumps
6  referred to on Page 5 of 6 of your report for the
7  Red Triangle facility under pan -- pardon me --
8  under dispenser pans which contain leaks from the
9  dispensers and prevent them from entering the
10  environment?
11    MS. O'REILLY:  Assumes facts, lacks
12  foundation.  Go ahead.
13    A.    The purpose of a dispenser pan is
14  to capture releases from the -- any of the
15  dispenser components above the dispenser pan.
16  It's not uncommon for dispenser pans to not be
17  liquid tight, even though that's what they're
18  suppose to do.  In cases such as this, I would
19  look for testing records that would establish the
20  integrity of the dispenser pan.  In this
21  particular case, we were not able to find or we
22  did not have any testing records for the
23  containment sump, so we don't know whether that
24  sump was liquid tight or not.
25    Q.    With regard to the opinions you've

Page 188

1  formed in this case, is it your opinion that a
2  leak into the environment occurred after 1998
3  from the containment sumps in the vicinity of the
4  dispenser area?
5    A.    We don't have any post '98 soil
6  sampling results from underneath the dispensers.
7  So we have identified some instances when there
8  were releases from within the dispenser cabinet.
9  I'm not able to establish whether those releases
10  were successfully contained or whether they made
11  it into the environment.
12    Q.    For the period prior to 1998, do
13  you have any maintenance records indicating that
14  maintenance was performed and leaks were observed
15  at the dispensers at the Red Triangle facility?
16    MS. O'REILLY:  Asked and answered.
17    A.    This was leaks in dispensers and
18  piping?
19    Q.    It's for the period 19 -- prior to
20  1998, do you have any records indicating that
21  maintenance was performed and leaks were observed
22  at the dispensers at the Red Triangle facility?
23    A.    Yes.
24    Q.    And what records do you have?
25    A.    If we look at the document listing,

Page 189

1  Page 11 of 22, the bottom entry.
2    Q.    I'm with you.
3    A.    There's an indication that there
4  was a leak in a union at a sump found as well as
5  the plug above the impact valve, the bottom
6  language.
7    Q.    And this is in August of 1998?
8    A.    I have it as June of '98.
9    Q.    Okay.
10    A.    Wait a minute.  Wait a minute.
11  Yeah, the general entry is June of '98, but the
12  specific reference appears to be an August '98
13  event.
14    Q.    And the August '98 event that's
15  described is for a release of diesel product; am
16  I correct?
17    A.    That specific incident was for
18  diesel, that's correct.
19    Q.    Are there any records of
20  maintenance having occurred at the facility prior
21  to 19 -- in or prior to 1998 which indicated that
22  leaks were observed in the dispensers with
23  gasoline being the product released?
24    MS. O'REILLY:  Asked and answered.
25    A.    For the period 1998 and before,

48 (Pages 186 to 189)

Marcel G. Moreau

Page 198

1      Q.     Is there any evidence to indicate
2  that the tanks at the Red Triangle facility prior
3  to 1998 failed a integrity test?
4      A.     All the test records that we
5  reviewed from the 1990's had a passing test
6  result.
7      Q.     With respect to the tanks installed
8  in '98, were there any tests indicating that the
9  post '98 tank field experience, or post '98 tanks
10 experienced any failures of integrity tests?
11         MS. O'REILLY: Vague and ambiguous.
12     A.     I believe the only test results we
13 have were the installation testing of the tanks,
14 and it appears the tanks passed the tests in
15 September of '98.
16     Q.     Prior to 1998, are there any
17 documents indicating that any of the product
18 lines or associated equipment failed an integrity
19 test?
20     A.     Prior to 1998, there's no
21 indication of a failed tightness test on the
22 lines.  That test would not have included, most
23 likely would not have included the STPs or the
24 dispensers, however.
25     Q.     With regard to the period after

Page 199

1  1998 and the new tanks were installed, were there
2  any tests indicating that the product lines
3  failed an integrity test after 1998?
4      A.     It appears they may have had some
5  issues passing the original tightness test in
6  September of '98, but I don't believe we have any
7  tightness test results after that date.
8      Q.     Based on your review of the records
9  in this case, is it your opinion that there was a
10 release from the new tank system with secondary
11 containment installed after 1998?
12         MS. O'REILLY: Vague and ambiguous,
13 overbroad.
14     A.     I don't believe we have any soil
15 information, soil contaminant, or let me see.  We
16 don't have any soil samples taken after 1998 from
17 relevant areas that would reveal whether there
18 were post-1998 releases, so I can't say whether
19 or not we have evidence of that.
20     Q.     Is it your opinion, though, that
21 there were releases from the 1998 installed tank
22 system?
23         MS. O'REILLY: Asked and answered.
24 Go ahead.
25     A.     I would say given the lack of

Page 200

1  evidence, I don't think I have -- I don't have an
2  opinion as to whether or not there were releases
3  from the post-'98 storage system.
4      Q.     Was there any evidence that you
5  reviewed in this case that prior to 1998 there
6  was documentation indicating there were repairs
7  or replacement of a leaking STP at the Red
8  Triangle station?
9          MS. O'REILLY: Same objections,
10 vague and ambiguous.
11     A.     There were few, if any, what I
12 would call maintenance or repair records present
13 in the file for the pre-1998 period, so I don't
14 have any specific repair records, but releases
15 from STPs are fairly common occurrences.
16     Q.     Did you see any URR reporting that
17 there had been a release from any STP prior to
18 1998 at the Red Triangle facility?
19         MS. O'REILLY: Assumes facts.  Go
20 ahead.
21     A.     I believe I've already indicated
22 that we don't have any URRs for the Red Triangle
23 facility, at least not in the documents that we
24 reviewed.  That doesn't mean that releases didn't
25 occur, just that they weren't reported.

Page 201

1      Q.     With regard to the STPs prior to
2  1998, when the tank system was replaced, was
3  there any documentation of the removal of
4  contaminated or saturated soils in the vicinity
5  of the STPs at this facility?
6          MS. O'REILLY: Vague and ambiguous.
7      A.     We have a statement that some
8  petroleum hydrocarbon odors were noted from the
9  tank pit at the west end of the pit under the
10 gasoline tanks, and this is for the December 28th
11 UST removal report, so this is the tank that was
12 removed in December of '98.  What I don't have
13 is, or at least I'm not recalling whether I have
14 a diagram that indicates which end of the tanks
15 the STPs for that particular tank field were
16 located.  So we have indications of contamination
17 at one end of the tanks.  I would need do some
18 research to determine whether that was the STP --
19 whether that was the end of the tanks where the
20 STPs were located.
21     Q.     And looking at your report, there
22 are some 1998 graphics for the Red Triangle
23 facility, and specifically we are referring to
24 RWQCB-FRESNO-009928 and 009936.
25         Are those the only graphics that

Marcel G. Moreau

Page 202

1  you have from Parker Environmental or any other
2  consultant or agency illustrating the location of
3  the tanks at the Red Triangle facility that were
4  removed in December 1998?
5       MS. O'REILLY: Vague and ambiguous,
6  overbroad. Go ahead.
7       A.   I would say those are probably not
8  the only graphics. Having gone through this
9  exercise in other cases, I determined that it
10  would be helpful to have some diagrams when we
11  were going through our deposition, and so as I
12  was reviewing documents, I would select out
13  graphics, primarily ones that showed soil sample
14  locations. So these are just not quite random,
15  but they're selections of the graphics that were
16  available.
17       If I were trying to identify the
18  location of an STP, I would first start with some
19  of the tank test records that we have, 'cause
20  those often times include a diagram of the site
21  and would indicate where the STPs might be
22  located.
23       Q.   And do you have any of those in
24  your collection of documents that reflect the
25  location of the submerged turbine pumps on this

Page 203

1  particular tank field?
2       MS. O'REILLY: Asked and answered.
3  Go head.
4       A.   They may be present in my hard
5  drive, but I would need to go look them up.
6       Q.   And with respect to the reference
7  to this particular facility and tank field, are
8  you talking about the UST removal at 2808 South
9  Chestnut or are you referring to the removal at
10  the adjacent facility?  'Cause there were two,
11  correct?
12       MS. O'REILLY: Okay. There are
13  two, Bill, but I think they're at the same
14  address. Why don't you have him explain his
15  report.
16       Q.   More importantly, it's just when
17  you made reference to this notation, do you know
18  which tank field they were talking about, was it
19  the one just with the gasoline tanks or is it the
20  location where they had a combination of kerosene
21  and diesel and gasoline?
22       A.   If you look just a couple pages
23  ahead.
24       Q.   Okay.
25       A.   There's a diagram right -- the very

Page 204

1  first diagram.
2       Q.   Okay. I got it.
3       A.   You got it?
4       Q.   That would be RWQCB-FRESNO-010508?
5       A.   Correct. So my understanding of
6  this facility is that in the lower left corner of
7  that diagram there was essentially a retail fuel
8  facility that contained some storage tanks and
9  dispensers, and then sort of in the middle of
10  that diagram there's a dotted line that says
11  "Former UST Locations," and those would be the
12  ones that contained gasoline, diesel, and I think
13  weed oil in one of those tanks. I believe the
14  releases from the tanks that I was describing
15  earlier are the ones from the non-retail side of
16  the facility, the ones that would be in the
17  middle of that diagram. So in my mind, they were
18  distinguished as retail and non-retail.
19       Q.   And the non-retail were used for
20  fueling a fleet of vehicles?
21       A.   It was never clear to me what they
22  were used for. They didn't particularly appear
23  to be associated with dispensers. I couldn't
24  quite determine what exactly those tanks were
25  used for, whether this was a bulk plant of some

Page 205

1  kind or a repackaging facility of some kind or
2  what was going on.
3       Q.   With regard to the Red Triangle
4  facility, did you have any information by which
5  you could estimate the volume of gasoline sold at
6  this facility prior to 1998 on an annual basis?
7       A.   From the retail or non-retail or
8  either?
9       Q.   Either.
10       A.   Based on my recent review of the
11  document listing, it doesn't appear that -- oh,
12  wait a minute.
13       We had some inventory quarterly,
14  the quarterly inventory reconciliation documents
15  that were submitted in the early '90s for this
16  facility. I would go there first to see if they
17  had some through-put information, but I don't
18  have any on the top of my head.
19       Q.   With respect to the work that you
20  did in this case, did you determine what the
21  allowable stock loss tolerance would be for the
22  tanks that were in use at the facility prior to
23  1998, either retail or non-retail?
24       A.   What the inventory tolerance might
25  be?

52 (Pages 202 to 205)

Marcel G. Moreau

|  |  |
| --- | --- |
| Page 238 | Page 240 |

**Page 238**

INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8      After doing so, please sign the errata
9  sheet and date it.  It will be attached to your
10  deposition.
11      It is imperative that you return the
12  original errata sheet to the deposing attorney
13  within thirty (30) days of receipt of the
14  deposition transcript by you.  If you fail to do
15  so, the deposition transcript may be deemed to
16  be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

**Page 240**

ACKNOWLEDGMENT OF DEPONENT

1
2
3      I, _____, do
hereby certify that I have read the foregoing
4  pages, and that the same is a correct
transcription of the answers given by me to the
5  questions therein propounded, except for the
corrections or changes in form or substance, if
6  any, noted in the attached Errata Sheet.
7
8  _____
MARCEL G. MOREAU          DATE
9
10
11
12
13
14
15  Subscribed and sworn
To before me this
16  _____ day of _____, 20_____.
17  My commission expires: _____
18
_____
19  Notary Public
20
21
22
23
24
25

**Page 239**

1      - - - - - -
        E R R A T A
2      - - - - - -
3  PAGE LINE CHANGE
4  ____ ____ _____
5      REASON: _____
6  ____ ____ _____
7      REASON: _____
8  ____ ____ _____
9      REASON: _____
10  ____ ____ _____
11      REASON: _____
12  ____ ____ _____
13      REASON: _____
14  ____ ____ _____
15      REASON: _____
16  ____ ____ _____
17      REASON: _____
18  ____ ____ _____
19      REASON: _____
20  ____ ____ _____
21      REASON: _____
22  ____ ____ _____
23      REASON: _____
24  ____ ____ _____
25

**Page 241**

1      LAWYER'S NOTES
2  PAGE LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25  ____ ____ _____

Golkow Technologies, Inc. - 1.877.370.DEPS

Marcel G. Moreau

Page 704

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL
ETHER ("MTBE")                    MDL No. 1358
Products Liability Litigation   (SAS)


This Document Relates to:

        CITY OF FRESNO V. CHEVRON, U.S.A.,
        INC., et al.,
        Case No. 04 Civ 4973 (SAS)
_____/


                    --  --  --

            WEDNESDAY, APRIL 11, 2012

                    --  --  --

        Videotaped Deposition of MARCEL G. MOREAU,
Expert Witness, Volume IV, held at the Law Offices of
Sheppard Mullin Richter & Hampton, Four Embarcadero,
17th Floor, San Francisco, California, beginning at
8:59 a.m., before Sandra Bunch VanderPol, FAPR, RMR,
CRR, CSR #3032

                    --  --  --

            GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph|917.591.5672 fax
                Deps@golkow.com

Marcel G. Moreau

## Page 705

1  APPEARANCES:
2
    MILLER, AXLINE & SAWYER, P.C.
3   By:  TRACEY O'REILLY, Esq.
    1050 Fulton avenue, Suite 100
4   Sacramento, California 95825-4272
    (916) 488-6688
5   toreilly@toxictorts.org
    Counsel for Plaintiff CITY OF FRESNO
6
7   ARNOLD & PORTER, LLP
    KELLY A. WELCHANS, Esq.
8   777 South Figueroa Street, 44th Floor
    Los Angeles, California 90017-5844
9   (213) 243-4125
    kelly.welchans@aporter.com
10  Counsel for BP OIL COMPANY
11
    BLANK ROME, LLP
12  JOHN J. DiCHELLO, Esq. (Telephonically)
    One Logan Square, 130 N 18th Street
13  Philadelphia, California 19103
    (215) 683-9266
14  dichello@blankrome.com
    Counsel for Defendant LYONDELL CHEMICAL COMPANY
15
16  KING & SPALDING, LLP
    CHARLES C. CORRELL, JR., Esq.
17  ccorrell@kslaw.com
    101 Second Street, Suite 2300
18  San Francisco, California 94105
    (415) 318-1250
19  Counsel for Defendants CHEVRON U.S.A. CORPORATION
20
    BRACEWELL & GIULIANI, LLP
21  M. COY CONNELLY, Esq.
    EDUARDO (ED) S. PÉREZ
22  711 Louisiana Street, Suite 2900
    Houston, Texas 77002-2781
23  (713) 221-1404
    coy.connelly@bgllp.com
24  ed.perez@bgllp.com
    Counsel for Defendants VALERO ENERGY CORPORATION
25  AND TOTAL PETROCHEMICALS USA

## Page 706

1   APPEARANCES (Continued)
2   SEDGWICK, LLP
    SCOTT D. MROZ, Esq.
3   333 Bush Street, 30th Floor
    San Francisco, California
4   (415) 781-7900
    scott.mroz@sedgwicklaw.com
5   Counsel for Defendant SHELL OIL COMPANY
6
    LeCLAIR RYAN
7   RACHEL WINTTERLE, Esq. (Telephonically)
    44 Montgomery Street, 18th Floor
8   San Francisco, California 94104
    (415) 913-4915
9   rachel.wintterle@leclairryan.com
    For Defendant NELLA OIL PRODUCTS
10
11  GORDON & REES, LLP
    By:  BRIAN LEDGER, Esq. (Telephonically)
12  bledger@gordonrees.com
    101 W. Broadway, Suite 2000
13  San Diego, California 92101
    (619) 696-6700
14  For Defendant KERN OIL & REFINING
15
    BINGHAM McCUTCHEN, LLP
16  NARGUES MOTAMED, Esq.
    Three Embarcadero Center
17  San Francisco, California 94111-4067
    (415) 393-2622
18  nargues.motamed@bingham.com
    For Defendant TESORO
19
20  EIMER STAHL, LLP
    JOAN RADOVICH, Esq.
21  224 South Michigan Avenue, Suite 1100
    Chicago, Illinois 60604
22  (312) 660 7600
    JRadovich@EimerSthal.com
23  For Defendant CITGO PETROLEUM CORPORATION
24  VIDEOGRAPHER:
25      FRANK CLARE

## Page 707

1              I N D E X
2   Examination by:              Page
3   Mr. Pérez                    710
    Ms. Welchans                 804
4   Ms. Radovich                 808
    Ms. Motamed                  909
5   Mr. Perez                    941
    Mr. Mroz                     941
6
7           --o0o--
8           EXHIBITS
    DEPOSITION OF MARCEL G. MOREAU
9       WEDNESDAY, APRIL 11, 2012
10  Exhibit #      Description      Page
11
        No exhibits marked
12
13          --o0o--
14
15
16
17
18
19
20
21
22
23
24
25

## Page 708

1       BE IT REMEMBERED that on Wednesday, the 11th day
2   of April, 2012, commencing at the hour of 8:59 a.m. in
3   the Law Offices of Sheppard Mullin Richter & Hampton,
4   Four Embarcadero, 17th Floor, San Francisco,
5   California, before me, Sandra Bunch VanderPol, a
6   Certified Shorthand Reporter in and for the State of
7   California, personally appeared
8           MARCEL G. MOREAU,
9   called as an expert witness herein, who, having been
10  duly sworn, was thereupon examined and interrogated as
11  hereinafter set forth.
12          --o0o--
13      THE VIDEOGRAPHER:  Today's date is
14  April 11th, 2012, and the time is 8:59 a.m.  This
15  video deposition is being held in San Francisco,
16  California in regards to MTBE, City of Fresno versus
17  Chevron USA, Incorporated, et al., for the United
18  States District Court, Southern District of New York.
19  The deponent is Marcel Moreau, Volume IV.
20      Counsel, will you please identify
21  yourselves.
22      MR. PÉREZ:  Ed Pérez, with Bracewell &
23  Giuliani, for the Valero defendants.
24      MR. CONNELLY:  Coy Connelly, Bracewell &
25  Giuliani for the Valero defendants.

2 (Pages 705 to 708)

Marcel G. Moreau

Page 773

1  California gasoline.
2       So June of '98 would be the last time or the
3  last event where evidence of a release was
4  discovered -- of gasoline that contained MTBE.
5  BY MR. PÉREZ:
6       Q.   And with respect to the January of
7  2009 and January 2010 releases that you just
8  mentioned, you state for both of those, quote, "This
9  release likely did not contribute to the MTBE
10  contamination at this facility," closed quote.
11  Correct?
12       A.   Well, the first part of that sentence
13  is, "MTBE should not have been present in California
14  motor fuel in 2010."  One of them should have said
15  209 (sic).
16       So this release likely did not contribute to
17  the MTBE contamination at this facility, that's
18  correct.
19       Q.   And this is a case where in the
20  "Customer Spill" section you do mention a specific
21  customer release occurring in August of 2005,
22  correct?
23       A.   That is correct.
24       Q.   And that was also after the time that
25  MTBE was no longer in use in California gasoline,

Page 774

1  right?
2       A.   It should not have been present in
3  the gasoline, that's correct.
4       Q.   For this site did you consider the
5  possibility that any off-site source could have
6  contributed to the presence of MTBE at the site?
7       A.   Again, the thrust of our
8  investigation was to determine whether releases had
9  occurred at the storage systems at this particular
10  site.
11       In this particular case, there was ample
12  evidence of soil contamination immediately adjacent
13  to the storage systems, well above the water table.
14  So I did not feel the need to investigate whether
15  off-site sources of contamination may have
16  contributed to the contamination at this site.
17       Q.   On page 4 of 5, with respect to the
18  June of 1998 release discussed in the last paragraph;
19  do you see that?
20       A.   I do.
21       Q.   You mention possible sources of that
22  release being delivery spills or leaks from the
23  submersible pump or adjacent piping.  Do you have any
24  opinion with respect to which of those two possible
25  sources that you mention is more likely than the

Page 775

1  other to have been the source of the release?
2       MS. O'REILLY:  Vague and ambiguous.
3  Overbroad.
4       THE WITNESS:  In general, I would say that
5  the submersible pump and adjacent piping is likely --
6  is more likely to be a significant source of release
7  or a more significant source than a delivery spill.
8       I need to go and look up the soil sample
9  results, if you wanted to get more specific than that
10  for this specific site.
11       MR. PÉREZ:  Not necessary.
12       Q.   For all -- for any of the releases
13  that you discussed in the "Identification of MTBE
14  Releases" section, were you able to calculate the
15  volume of the release?
16       A.   At this site?
17       Q.   Yes.
18       MS. O'REILLY:  Vague and ambiguous.
19       THE WITNESS:  Except for the customer spill
20  in August of 2005, the volume released was not able
21  to be determined for the other release incident or
22  for the evidence of releases that was discovered at
23  various times.
24  BY MR. PEREZ:
25       Q.   Were you able to determine the

Page 776

1  duration of any of the releases that you identified
2  for this site?
3       A.   For the active release discovered in
4  June of '94, the statement in the report is that,
5  "When the leak began is not known."  So we were not
6  able to establish a start point for that release.
7       And then for the other evidence of releases,
8  the statement is that the releases were likely
9  intermittent.
10       Q.   On page 3 of 5, September --
11  September 27th, 1998 entry you note that, "The Tank
12  Closure Report indicated that the tanks removed were
13  in good condition and there were no holes or pitting
14  observed in any of the USTs."  Do you see that?
15       A.   I see that, yes.
16       Q.   Does that indicate to you that there
17  was never a release from the tanks themselves at this
18  site?
19       MS. O'REILLY:  Vague and ambiguous.
20  Overbroad.
21       THE WITNESS:  As I've discussed before, the
22  type of observations that are made during tank
23  removal are typically very cursory.  So I take this
24  to be an indication that there was no obvious holes
25  in the tank from the outside.

19 (Pages 773 to 776)

Marcel G. Moreau

Page 777

1    I would point out that internal corrosion
2    holes are very difficult to spot.  So the indications
3    are that there were no holes observed when these
4    tanks were removed.  I wouldn't go so far as to say that
5    the tanks themselves never leaked.
6    BY MR. PÉREZ:
7        Q.    Let's go on to the next site, please,
8    which is Fresno Valley Gas.  If you could look at the
9    Site Specific Report you prepared for that site.
10   It's located at 2139 South Elm Street in Fresno.
11       A.    I have that.
12       Q.    Looking at the "Identification of
13   MTBE Releases" section, would you agree that among
14   the releases discussed here in both the "Tank Area
15   Releases" and the "Piping and Dispenser Area
16   Releases" section, for those releases prior to 1992,
17   none of those contributed to the presence of MTBE at
18   the site; is that correct?
19       MS. O'REILLY:  Misstates the document.
20   Vague and ambiguous.
21       THE WITNESS:  There's several actual release
22   incidents -- or active releases that were discovered
23   in the time period before 1992.  And the statement
24   associated with those in the report is that MTBE was
25   not commonly present in California gasoline in --

Page 778

1    insert the appropriate date -- but it would be before
2    the fall of 1992.  So it's unlikely that this release
3    contributed to the MTBE contamination at this
4    facility.
5        So without having specific information about
6    a gasoline supplier, sort of the default opinion is
7    that a release of MTBE was unlikely prior to the fall
8    of '92.
9    BY MR. PÉREZ:
10       Q.    For any of the releases discussed in
11   the "Identification of MTBE Releases" section for
12   this site, were you able to determine the volume of
13   the release?
14       MS. O'REILLY:  Asked and answered.  Vague
15   and ambiguous.
16       Go ahead.
17       THE WITNESS:  A specific volume for any of
18   the releases or any of the evidence of releases that
19   was discovered could not be determined with the
20   documentation that was provided.
21   BY MR. PÉREZ:
22       Q.    Were you able to determine the
23   duration of any of these releases?
24       MS. O'REILLY:  Same objections.
25       THE WITNESS:  With regard to the actual

Page 779

1    release incidents, I was not able to determine the
2    start of the release for any of those incidents that
3    were identified.
4        With regard to the evidence of a release
5    provided by soil contamination, the report states
6    that the releases were likely intermittent.
7    BY MR. PÉREZ:
8        Q.    And were you able to identify the
9    source for any of the releases you identified in this
10   section for this site?
11       A.    There were a number of sources
12   identified.  Do you want to go through the list?
13       Q.    Sure.
14       A.    In August of '89, the unleaded
15   turbine pump was observed to be leaking.  A fill
16   riser was found to be leaking in April of 1992.  The
17   specific tank is not identified.  Piping and
18   dispensers 4 and 6 were observed to be leaking in
19   August of '89.
20       A piping leak was identified in the Premium
21   dispenser in October of 1990.  A piping leak in a
22   dispenser riser, the particular dispenser is not
23   identified, was observed in April of 1992.  A leak in
24   the Unleaded piping was repaired in August of 1999.
25   A piping leak near the southern dispenser islands was

Page 780

1    repaired in November of '99.
2        I think that's it for the actual releases
3    that were identified.
4        Q.    Do you have any opinions regarding
5    the occurrence of a release at this site between the
6    fall of 1992 and August of 1999?
7        MS. O'REILLY:  Vague.  Ambiguous.
8    Overbroad.
9    BY MR. PÉREZ:
10       Q.    If you look on page 4 of 5, just to
11   help you answer the question.  Under the "Piping and
12   Dispenser Area Releases," the third paragraph talks
13   about a spill in April of 1992.  And you have stated
14   earlier that MTBE was not commonly present in
15   California gasoline beginning in the fall of 1992,
16   correct?
17       And the next paragraph talks about a release
18   or a line leak repair in August of '89.
19       So in between those two incidents, do you
20   have any opinion regarding the occurrence of any
21   release in that time frame?
22       MS. O'REILLY:  Vague.  Ambiguous.
23   Overbroad.  Asked and answered.
24       THE WITNESS:  The documented release
25   incidents are -- or there's a gap in the documented

20 (Pages 777 to 780)

Marcel G. Moreau

Page 797

1      MS. O'REILLY:  Vague and ambiguous.
2  BY MR. PÉREZ:
3      Q.   Also excluding the September 2003
4  fuel piping release that we discussed earlier.
5      MS. O'REILLY:  Same objections.
6      THE WITNESS:  Are we on the Gas 4 Less site?
7  MR. PÉREZ:  Yes.
8      THE WITNESS:  We talked about a September
9  2003 release already?
10 BY MR. PÉREZ:
11     Q.   We talked about that release of one
12 gallon --
13     A.   Oh.
14     Q.   -- that's in the last paragraph of
15 the piping and dispenser sentence?
16     A.   Sorry.  That is correct.
17     Q.   Obviously you've already discussed
18 the source of that one.
19     A.   Right.
20     Other than the September 2003 incident, the
21 evidence comes from -- what we have is evidence of a
22 release rather than description of actual release
23 events.  So the sources of the release in the tank
24 area would have been delivery spills, leaks from tank
25 top fittings, and leaks from submersible pumps and

Page 798

1  adjacent piping.  And releases from the piping and
2  dispenser area would be from dispenser components
3  and/or adjacent piping.
4      But I don't have a -- I can't be more
5  specific with it.
6      Q.   And for any of the releases described
7  in the "Identification of Releases" section, were you
8  able to determine the duration of the release?
9      MS. O'REILLY:  Misstates the document.
10 Vague and ambiguous.
11     THE WITNESS:  I was not able to determine a
12 specific duration of a release.  The opinion stated
13 is that the releases were likely intermittent.
14 BY MR. PÉREZ:
15     Q.   Let's briefly turn to the Exxon
16 Tulare site, and I just have a few brief questions on
17 that, following up on Mr. Stack's questioning.
18     In the "Identification of MTBE Releases"
19 section for the Exxon Tulare site, which is located
20 at 4594 East Tulare Avenue in Fresno, in the first
21 paragraph of that section, the second to the last
22 sentence reads, quote, "The timing of the releases is
23 not known, but the releases likely occurred between
24 the fall of 1992, when MTBE was required to be in
25 Fresno County gasoline, and the time when the tanks

Page 799

1  were removed in 1999."  Do you see that sentence?
2      A.   I see that sentence, yes.
3      Q.   Did I read it correctly?
4      A.   You did.
5      Q.   Do you have any opinion regarding
6  whether it's more likely that any releases during
7  that time frame occurred in the beginning of that
8  time period -- say between 1992 and 1995 -- as
9  opposed to the end of that time period between '96
10 and '99?
11     MS. O'REILLY:  Vague and ambiguous.
12 Overbroad.
13     THE WITNESS:  There was an investigation
14 conducted in, it looks to be October 1995.  There was
15 no analysis done for MTBE at that time.  There
16 appeared to have been some releases that occurred by
17 that time.
18     But without specific analysis for MTBE, I
19 couldn't have any opinion -- I can't offer any
20 opinion as to whether MTBE releases occurred more
21 likely that, you know, prior to '95 or after '95.
22 BY MR. PÉREZ:
23     Q.   And I take it your answer would be
24 the same for the releases discussed in the first
25 paragraph of the piping and dispenser area releases,

Page 800

1  which you mentioned likely occurred during that same
2  time period?
3      A.   With the information that I have
4  available and my expertise which is in storage
5  systems -- your hydrogeo people may have different
6  opinions, but from where I'm sitting, I can't offer
7  any opinions as to -- any more precise than what I've
8  offered right here as to the timing of those
9  releases.
10     Q.   So it's equally likely that it
11 occurred earlier or later in the time period, in your
12 opinion?
13     A.   The information I have, I can only
14 bracket the release between fall of '92 and when the
15 tanks were removed in '99.  And I can't -- I can't
16 differentiate that period any more than that.
17     Q.   Now that we have talked about all the
18 sites, I want to go back to one point that you made
19 early on.
20     You said that if you had considered supplier
21 information in connection with development of your
22 opinions for any of these sites, it would have been
23 noted in a footnote in your site summary, correct?
24     A.   I believe that's correct.
25     Q.   And I don't believe that any of the

25 (Pages 797 to 800)

Marcel G. Moreau

---

Page 953

1    ACKNOWLEDGMENT OF DEPONENT
2
3        I, _____, do
hereby certify that I have read the foregoing
4    pages, and that the same is a correct
transcription of the answers given by me to the
5    questions therein propounded, except for the
corrections or changes in form or substance, if
6    any, noted in the attached Errata Sheet.
7
8    _____
9    MARCEL G. MOREAU        DATE
10
11
12
13
14
15   Subscribed and sworn
     To before me this
16   _____ day of _____, 20_____.
17   My commission expires: _____
18
19   _____
     Notary Public
20
21
22
23
24
25

---

Page 954

1        - - - - - -
         E R R A T A
         - - - - - -
2
3    PAGE  LINE  CHANGE
4    ____ ____ _____
5        REASON: _____
6    ____ ____ _____
7        REASON: _____
8    ____ ____ _____
9        REASON: _____
10   ____ ____ _____
11       REASON: _____
12   ____ ____ _____
13       REASON: _____
14   ____ ____ _____
15       REASON: _____
16   ____ ____ _____
17       REASON: _____
18   ____ ____ _____
19       REASON: _____
20   ____ ____ _____
21       REASON: _____
22   ____ ____ _____
23       REASON: _____
24   ____ ____ _____
25

---

Page 955

1    CERTIFICATE OF REPORTER
2        I, SANDRA BUNCH VANDER POL, a Certified
3    Shorthand Reporter, hereby certify that the witness
4    in the foregoing deposition was by me duly sworn to
5    tell the truth, the whole truth and nothing but the
6    truth in the within-entitled cause;
7        That said deposition was taken down in
8    shorthand by me, a disinterested person, at the time
9    and place therein stated, and that the testimony of
10   the said witness was thereafter reduced to
11   typewriting, by computer, under my direction and
12   supervision;
13       That before completion of the deposition,
14   review of the transcript was requested.  If
15   requested, any changes made by the deponent (and
16   provided to the reporter) during the period allowed
17   are appended hereto.
18       I further certify that I am not of counsel or
19   attorney for either or any of the parties to the said
20   deposition, nor in any way interested in the event of
21   this cause, and that I am not related to any of the
22   parties thereto.
23   DATED:
24       _____
         SANDRA BUNCH VANDER POL, CSR #3032
25

---

64 (Pages 953 to 955)

# EXHIBIT 8

Beacon 3519

# Beacon #3519

### 4591 East Belmont Avenue, Fresno

**MAJOR MILESTONES**

| | |
|---|---|
| 1961 | Three 12,000-gallon USTs were installed [10/22/1998]. |
| Dec 10, 1998 | Three single-walled (SW) steel, 12,000-gallon USTs, piping, and dispensers were removed. |
| Jan 19, 1999 | A Permit to Operate was issued for two 15,000-gallon unleaded tanks with pressure piping.  The tanks were installed in the same excavation as the former USTs. |
| Feb 13, 2001 | MtBE was detected in groundwater samples.  Quarterly groundwater sampling commenced. |
| July 10, 2003 | Consultant concluded after two series of soil vapor extraction tests that SVE was not a feasible alternative for remediation of soil beneath the site.  On behalf of Ultramar, the consultant requested CRWQCB to grant a low-risk closure for the site. |
| March 15, 2004 | CRWQCB confirmed the completion of a site investigation and corrective action for the USTs formerly located at the facility. |

**SPILL/LEAK EVENT CHRONOLOGY**

| | |
|---|---|
| Dec 10, 1998 | UST Abandonment Inspection Report.  Three 12,000-gallon USTs were removed.  Soil samples were collected from the tank excavations and from beneath eight dispensers on two islands (only four dispenser samples were reported in the removal report).  Odors were observed in the samples from the east side of Tank 2 (T2): strong odor, gray soil in S5 (15 ft bgs) and medium odor, grayish soil in S6 (17 ft bgs).  All three tanks were in good condition, rusted, with no holes visible. [12/10/1998] |
| Dec 11, 1998 | An Unauthorized Release Report (URR) was filed by Fresno County for the release of an unknown quantity of gasoline, discovered during tank removals.  The source was checked as unknown. |

**SOIL/GROUNDWATER CONTAMINATION CHRONOLOGY**

Feb 18, 1999        Tank Removal / Closure Report.  On Dec 10-11, 1998, three SW steel, 12,000-gallon USTs, product piping, and two dispenser islands were removed from the site.  Soil samples were collected for analysis of TPHg, MtBE, and BTEX.  Additional sidewall samples were collected on 12/14/1998 from the Tank 3 excavation.

USTs:  The highest concentrations of TPHg (13,000,000 ppb) and MtBE (110,000 ppb) were in the samples collected from the east end (submersible end) of Tank 3 (15 and 18 ft bgs).  Lower concentrations of TPHg were detected in samples from T2 (1,900 to 9,700 ppb) but not T1.  MtBE was detected at all three tank locations (15 ppb to 110,000 ppb).

Product Line Trenches – No analytes were detected in the single sample collected (3 ft bgs).

Dispenser Samples:  TPHg (at 1,100 ppb) and MtBE (at 120 ppb) were detected in the sample near the south end of the eastern dispenser island (6 ft bgs).  No analytes were detected in the other three dispenser samples.  Note: the site diagram indicates samples were taken from beneath the piping adjacent to the dispensers, not directly beneath the dispensers.

Feb 7, 2000         Two soil borings (B-1 & B-2) were drilled to 75 ft bgs and soil samples were collected.  B-1 was on the east side of the UST excavation, and B-2 was on the south side.  TPHg was found only in B-1 samples, at a maximum concentration of 13,000 ppb (45 ft bgs).  MtBE was detected in samples from both borings, with a high of 38,000 ppb at B-1 (31 ft bgs) and 1,600 ppb at B-2 (31 ft bgs).  The borings were grouted to 30 and 41 ft bgs, and vapor extraction wells were installed (VW-1 & VW-2).  The consultant concluded that no gasoline constituents were present within 20 to 30 ft of the estimated groundwater level (90 ft bgs).  [6/15/2000]

Dec 27-29, 2000     Three monitoring wells were installed to a depth of 115 ft bgs.  MW-1 was located east of the UST excavation area, and MW-2 and MW-3 were located on the southern property boundary.  [4/6/2001]

Feb 13, 2001        Groundwater samples were collected and analyzed.  Quarterly groundwater sampling commenced.  [4/6/2001]

April 6, 2001          Results of Soil and Groundwater Investigation.  Groundwater was
                       measured in site wells at 99 ft bgs, and reportedly flowed to the west-
                       southwest.  No TPHg or BTEX compounds were detected in the Dec
                       2000 soil boring samples.   MtBE was detected in soil samples collected
                       from 10 to 85 ft bgs at the MW-1 boring, with a maximum
                       concentration of 16,000 ppb (40 ft bgs).  The 85 ft bgs sample from
                       MW-1 also contained 6.5 ppb MtBE.  The only MtBE detection at MW-
                       2 was 5.6 ppb at 100 ft bgs.  No MtBE was present in soil samples from
                       the MW-3 boring.  In groundwater, only MtBE was detected:  59 ppb in
                       MW-1 and 6.6 ppb in MW-2.  Other groundwater analytes that were
                       ND were TPHg, BTEX, DIPE, ETBE, TAME, TBA, DCA, DBA.

July 10, 2003          Soil Vapor Extraction Test Report and Request for No Further Action.
                       Consultant concluded after two series of soil vapor extraction tests
                       that SVE was not a feasible alternative for remediation of soil beneath
                       the site.  Also noted was that no TPHg or BTEX had ever been detected
                       in groundwater samples, and no MtBE concentrations above 1 ppb had
                       been reported in groundwater since Dec 2001.  A request was made
                       for low-risk closure and permission to abandon the vapor extraction
                       and monitoring wells.

March 15, 2004         Case Closure Summary.  Fifteen water supply wells were identified
                       within a 2,500-foot radius of the site.  The closest well was
                       approximately 600 ft west of the site and was identified as City of
                       Fresno municipal Well #30A.

                       Summary and conclusions: A former release of petroleum
                       hydrocarbons at the site resulted in the degradation of the underlying
                       soils and groundwater.  The extent of the impacted soils has been
                       adequately evaluated.  Remediating the impacted soils via SVE
                       technology was evaluated and determined to not be a viable cleanup
                       alternative.  Further investigation of the site does not appear
                       warranted.  The results of groundwater monitoring and sampling
                       events conducted between 2001 and 2003 revealed that the
                       contaminant plume had stabilized and decreased.  Groundwater
                       impacts diminished to nearly non-detectable levels as of March 2002.
                       The residual petroleum hydrocarbons in the underlying soils are likely
                       to naturally degrade and are not anticipated to pose a threat to the
                       beneficial use of groundwater in the area.

                       CRWQCB confirmed the completion of a site investigation and
                       corrective action for the USTs formerly located at the facility.
                       [RWQCB-FRESNO-016244]

May 11, 2004          Well Abandonment Report.  Three monitoring wells and two VE wells
                      were pressure-grouted.  [5/11/2004]


IDENTIFICATION OF MTBE RELEASES

Tank Area Releases

MtBE contaminated soil was discovered at the bottom of the tank excavation in December of
1998 when three storage tanks were removed.   The highest levels of MtBE contamination
(110,000 ppb) were associated with the submersible pump end of Tank 3, but all samples
except the sample from the fill end of Tank 1 were contaminated with MtBE at levels ranging
from 15 to 21,000 ppb.  Contamination detected at the fill ends of the tanks was likely the
results of delivery releases, while contamination detected at the submersible pump ends of the
tanks was likely the result of releases from the submersible pumps and adjacent piping.  The
releases were likely intermittent.  The volume released is not known.

Piping and Dispenser Area Releases

MtBE contaminated soil was discovered beneath piping adjacent to the dispensers in December
of 1998 when the piping and dispensers were removed.  Because of the proximity of the sample
to the dispensers, the releases that produced the contamination could have originated from the
piping or from the dispensers.  Dispensers and adjacent piping are frequent sources of releases
(see general report in this case).  The releases were likely intermittent.  The volume released is
not known.

Customer Spills

Small spills are common during vehicle fueling activities and no doubt occurred throughout the
time this facility was in operation.  Fueling spills may have contributed to the MtBE
contamination present in the dispenser area.

# EXHIBIT 9

Fresno Valley Gas

# Fresno Valley Gas

### 2139 South Elm St., Fresno

**Note:**  Station known as Beacon Station No. 528, Ultramar Station No. 538, and Arco/Ultramart.

**MAJOR MILESTONES**

| | |
|---|---|
| 1975 | Three 10,000-gallon steel tanks and piping were installed, with no overfill protection or spill containment [undated document]. |
| Nov 18, 1985 | A new convenience store building was reportedly completed, and one dispenser island was removed. |
| April 17, 1991 | Three soil borings were drilled to evaluate petroleum hydrocarbons in soil and groundwater at the site as part of a real estate transaction. Petroleum hydrocarbons were not found in soil samples; groundwater was not encountered. |
| April 17, 1992 | Several piping leaks were discovered via a helium test. |
| Dec 8, 1998 | New construction permit application included removal of the surface cover to the tanks, internal sandblasting and coating, installation of cathodic protection, installation of a Veeder Root tank monitor and line leak detection. |
| Oct 25, 1999 | A line leak was discovered by helium testing. |
| Nov 29, 1999 | A soil sample collected on the north side of the southern dispenser island, where a hole in a pipe was discovered and repaired, was found to contain 31,000,000 ppb TPHg and 920,000 ppb MtBE. |
| Mar 2004 | Bravo boxes were added beneath the dispensers.  Dispenser containment not present previously [6 26 2003]. |
| May 18, 2004 | Shallow soil beneath the dispensers was reportedly "significantly impacted by fuel hydrocarbons", with a maximum MtBE concentration of 164,000 ppb.  Additional investigation was recommended. |

| Jun 20, 2007 | Official Inspection Report notes: "Facility still under piping replacement and under red tag regulation. Business is still closed." No other references to red tag were reviewed. |
| --- | --- |
| Feb 28, 2008 | A final construction inspection report documented the presence of:<br>• Single-wall steel USTs, with lining and cathodic protection.<br>• Overspill and overfill prevention.<br>• DW FRP piping, with continuous monitoring. |

## SPILL/LEAK EVENT CHRONOLOGY

| Aug 14, 1989 | A tightness testing report noted a leak at dispenser #4 in the vapor line and a leak at dispenser #6. The unleaded turbine was also found to be leaking. |
| --- | --- |
| Aug 21, 1989 | An interoffice memo questioned the accuracy of some of the Aug 1989 test results. Further testing confirmed a leak in the premium NL line and the NL turbine, and both were repaired.  [8/25/1989] |
| Sept 8, 1989 | A letter to Fresno County stated that the super line failed PetroTite line testing on Aug 14, 1989. The line was uncovered and repaired and passed a line test on 8/15/1989. |
| Oct 5, 1990 | Tank test results indicated a loss of -0.403 on the premium unleaded. |
| Oct 25, 1990 | Inspection Report documented that the super NL product line was repaired; the overfill protection, fill pipe, and vent pipe were also replaced. |
| April 17, 1992 | Official Inspection Report: An assessment of the exposed piping indicated that the metal piping was rusted and corroding; several leaks in the piping were found via a helium test. One leak was reportedly detected at the dispenser riser and another at the fill box. |
| July 30, 1999 | Official Inspection Report: Inspector noted that gasoline was being dispensed at the NL pumps, in violation of an order not to dispense fuel until the dispenser had been repaired, tested, and approved. |
| Oct 25, 1999 | A line leak, discovered by helium testing, was reported on the south island in front of the canopy column. |
| Nov 5, 1999 | UST Installation Inspection Record: Because of a leak (see Oct 25, 1999), the 87 NL piping was replaced between the southern dispenser |

island and the market.  A soil sample was collected for TPHg, BTEX and
MtBE analysis, and strong odors were noted.


**SOIL/GROUNDWATER CONTAMINATION CHRONOLOGY**

April 17, 1991          Subsurface Environmental Investigation Report:  Three soil borings (B1
                        to B3) were drilled to 35 to 50 ft bgs (max depth) to evaluate
                        petroleum hydrocarbons in soil and groundwater at the site as part of
                        a real estate transaction.  Soil samples were analyzed for TPHg and
                        BTEX, and the results were ND for the most part (two toluene hits at
                        15 ft bgs).  Groundwater was not encountered.   [5/8/1991]

Nov 29, 1999            Soil sample S-1 was collected at 5 ft bgs on 11/5/1999 on the north
                        side of the southern dispenser island, where a hole in a pipe was
                        discovered and repaired.  The sample was found to contain 31,000,000
                        ppb TPHg and 920,000 ppb MtBE.

May 18, 2004           Soil samples were collected from beneath the six dispensers at the site
                        on March 19 and 30, 2004, and tested for TPHg, BTEX, MtBE, and other
                        oxygenates.  The soil beneath the dispensers was reportedly
                        "significantly impacted by fuel hydrocarbons."  Four of six samples had
                        TPHg levels greater than 1,000,000 ppb.  The highest concentrations
                        were in samples taken at the southern dispenser island at 4 ft bgs; the
                        maximum TPHg concentration was 6,022,000 ppb and the maximum
                        MtBE concentration was 164,000 ppb.  Another sample from the
                        southern dispenser island had 38,000 ppb MtBE.  One sample from the
                        northern dispenser island had 5,000 ppb of MtBE.  Additional
                        investigation was recommended.

April 9, 2007          Results of Soil Sampling Report:  Soil samples were collected during the
                        removal of the dispenser system in Dec 2006, but the results were
                        never reported.  Nine samples were collected with hand augers in
                        February of 2007.  MtBE was detected in two samples from the
                        southern dispenser island, at 24 ppb and 27,000 ppb.


**IDENTIFICATION OF MTBE RELEASES**

<u>Tank Area Releases</u>

The unleaded turbine pump was observed to be leaking in August of 1989 and repaired shortly
thereafter.  When this release began is not known.  The volume released is not known.  MtBE
was not commonly present in California gasoline in 1989, so it is unlikely that this release

contributed to the MtBE contamination at this facility.

A leak in a fill riser was detected and repaired in April of 1992.  When this release began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in the spring of 1992, so it is unlikely that this release contributed to the MtBE contamination at this facility.

Piping and Dispenser Area Releases

Releases were observed in the piping associated with dispensers #4 and #6 in August of 1989 and repaired shortly thereafter.  Releases from dispensers are common (see general report in this case).  When these releases began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in 1989, so it is unlikely that these releases contributed to the MtBE contamination at this facility.

A piping leak in a premium dispenser was detected and repaired in October of 1990.  Releases from dispensers are common (see general report in this case).  When this release began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in 1990, so it is unlikely that this release contributed to the MtBE contamination at this facility.

A piping leak in a dispenser riser was detected and repaired in April of 1992.  Releases from dispensers and adjacent piping are common (see general report in this case).  When this release began is not known.  The volume released is not known.  MtBE was not commonly present in California gasoline in the spring of 1992, so it is unlikely that this release contributed to the MtBE contamination at this facility.

A leak in the unleaded line was repaired in August of 1999.  Unleaded fuel was apparently being dispensed despite the leak.  The exact location of the leak is not known.  When this release began is not known.  The volume released is not known.  MtBE was commonly present in California gasoline in 1999, so it is likely that this release contributed to the MtBE contamination at this facility.

A piping leak near the southern dispenser islands was repaired in November of 1999, and MtBE contaminated soil was detected.  When the leak began is not known.  The volume of the release is not known.

MtBE was detected in three of six soil samples collected in March of 2004 from beneath the dispensers at the site.  When these releases occurred is not known, but they likely occurred intermittently between the fall of 1992 when MtBE was first required to be present in Fresno County gasoline,[1] and 2003 when MtBE was removed from California gasoline.  The exact

---

[1] "Areas Participating in the Oxygenated Gasoline Program," Energy Information Administration, Department of Energy,  http://www.eia.gov/steo/special/oxy2.html#Original,  accessed on 9/15/2011.

dispenser components that leaked are not known, but dispensers and adjacent piping are frequent sources of releases (see general report in this case).  The amount released is not known.

MtBE was detected in two of nine soil samples collected in February of 2007 from beneath the dispensers at the site.  When these releases occurred is not known, but they likely occurred intermittently between the fall of 1992 when MtBE was first required to be present in Fresno County gasoline,[2] and 2003 when MtBE was removed from California gasoline.  The exact components that leaked are not known, but dispensers and adjacent piping are frequent sources of releases (see general report in this case).  The amount released is not known.

<u>Customer Spills</u>

Small spills are common during vehicle fueling activities and no doubt occurred throughout the time this facility was in operation.  Fueling spills may have contributed to the MtBE contamination detected in the dispenser area at this facility.

---

[2] Ibid.

# EXHIBIT 10

Deposition of Shirley McMurphy Ahmad  /  February 16, 2011

---

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CITY OF FRESNO,           )
                          )
        Plaintiff,        )
                          )
vs.                       )   No. 04 CIV. 4973
                          )   (SAS)MDL 1358
CHEVRON U.S.A. INC., et al.,   )
                          )
        Defendants.       )
_____)

DEPOSITION OF
SHIRLEY McMURPHY AHMAD
FREMONT, CALIFORNIA
WEDNESDAY, FEBRUARY 16, 2011

DEPOBOOK REPORTING SERVICES
Certified Shorthand Reporters
1600 G Street, Suite 101
Modesto, California 95354
800-830-8885

REPORTER:   DENISE WHEELER, CSR NO. 8254

---

Page 2

A P P E A R A N C E S:
FOR THE PLAINTIFF:
EVAN EICKMEYER, Attorney at Law
MILLER, AXLINE, SAWYER
1050 Fulton Avenue, Suite 100
Sacramento, California  95825-4225
916.488.6688
916.488.4288 FAX
eeickmeyer@toxictorts.org
FOR THE DEFENDANT TESORO:
NARGUES MOTAMED, Attorney at Law
BINGHAM MCCUTCHEN, LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California  90071-3106
213.680.6868
213.830.8768 FAX
nargues.motamed@bingham.com
FOR THE DEFENDANT CHEVRON U.S.A. INC.:
SAMUEL DAVIS, Attorney at Law
KING & SPALDING
1100 Louisiana Street, Suite 4000
Houston, Texas  77002-5213
713.276.7335
713.751.3290 FAX
sdavis@kslaw.com
FOR THE DEFENDANT LYONDELL:
BENJAMIN WANGER, Attorney at Law
BLANK ROME, LLP
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania  19103-6998
215.569.5559
215.832.5559 FAX
wanger@blankrome.com

---

Page 3

A P P E A R A N C E S (Cont'd):
FOR THE DEFENDANT KERN OIL AND REFINING:
CYNTHIA TSAI, Attorney at Law
GORDON & REES, LLP
101 W. Broadway, Suite 2000
San Diego, California  92101
619.696.6700
619.696.7124 FAX
ctsai@gordonrees.com
FOR THE DEFENDANT VALERO:
BEN PATTON, Attorney at Law
BRACEWELL & GIULIANI, LLP
711 Louisiana Street, Suite 2300
Houston, Texas  77002-2770
713.221.1344
713.221.1212 FAX
ben.patton@bgllp.com

---

Page 4

I N D E X

WITNESS:  SHIRLEY McMURPHY AHMAD

| EXAMINATION | PAGE |
| --- | --- |
| By MR. EICKMEYER | 7 |
| By MS. MOTOMED | 35 |
| By MR. PATTON | 39 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Plaintiff City of Fresno's Second Amended Notice of Deposition of Shirley McMurphy Ahmad With Videotaping | 11 |
| 2 | City of Fresno Environmental Health Application Bates FCDEH-FRESNO-003657 | 17 |
| 3 | Business Plan Registration Form Bates RWQCB-FRESNO-001732 | 19 |
| 4 | Department of Health Environmental Health Application Bates FCDEH-FRESNO-003889 | 23 |
| 5 | Certification of Financial Responsibility for Underground Storage Tanks Containing Petroleum Bates RWQCB-FRESNO-001520 to 001521 | 24 |
| 6 | May 31, 1994, letter from Shirley McMurphy to Fresno County Environmental Health Bates RWQCB-FRESNO-001509 | 26 |

---

1 (Pages 1 to 4)

Deposition of Shirley McMurphy Ahmad  /  February 16, 2011

Page 5

E X H I B I T S (Cont'd)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Single Form of Agreement for Purchase and Sale of Commericial Property Bates RWQCB-FRESNO-001448 to 001449 | 28 |
| 8 | Note Modification Agreement Bates BD000878 to 000880 | 39 |
| 9 | Purchase Agreement and Escrow Instructions BB002759 to 002777 | 41 |
| 10 | May 8, 1991, letter from Randall K. Stephenson to Fresno County Environmental Health Department Bates RWQCB-FRESNO-001265 to 001313 | 45 |

Page 6

1    THE VIDEOGRAPHER:  Good afternoon.
2       This begins videotape number 1, Volume I, in the
3    deposition of Shirley McMurphy Ahmad in the matter of the
4    City of Fresno versus Chevron USA, et al. in the United
5    States District Court for the Southern District of New York.
6    The master file number of which is 100-1898.
7       Today's date is February 16th, 2011, and the time
8    on the video monitor is 3:30 p.m.
9       The deposition is being taken at the Courtyard
10   Marriott in Fremont, California, and was made at the request
11   of the plaintiff.
12      The court reporter producing the official
13   transcript of today's testimony is Denise Wheeler of
14   Depobook Reporting Services, 1600 G Street, Suite 101,
15   Modesto, California, 95354.  The videographer is Cutler
16   Andrus of Legal Advantage Video, 25 Stillman Street, Suite
17   106, San Francisco, California 94107.
18      Will counsel please identify yourselves and state
19   whom you represent?
20      MR. EICKMEYER:  Good afternoon.  Evan Eickmeyer of
21   Miller Axline & Sawyer for plaintiff City of Fresno.
22      MS. MOTAMED:  Nargues Motamed of Bingham McCutchen
23   on behalf of the Tesoro defendants.
24      MR. EICKMEYER:  On the phone?
25      MR. WANGER:  This is Ben Wanger from Blank Rome for

Page 7

1    Lyondell.
2       MS. TSAI:  This is Cynthia Tsai with Gordon & Rees
3    on behalf of Kern Oil.
4       MR. PATTON:  This is Ben Patton with Bracewell &
5    Giuliani on behalf of the Valero defendants.
6       MR. DAVIS:  Samuel Davis with King & Spalding on
7    behalf of the Chevron defendants.
8       THE VIDEOGRAPHER:  Will the court reporter please
9    swear in the witness.
10         SHIRLEY MCMURPHY AHMAD,
11         having been duly sworn, was
12      examined and testified as follows:
13         EXAMINATION BY:
14      MR. EICKMEYER:  Q.  Good afternoon, Ms. Ahmad.  My
15   name is Evan Eickmeyer, as I introduced myself.
16      I will start out the questioning this afternoon and
17   ask most of the questions, and then the people on the phone
18   and here in the room will have a chance to ask questions as
19   well.
20      I think we covered a lot of questions with your
21   husband already.  You'll be happy to hear it will make
22   things faster for you.
23      If you ever can't hear me or I'm not speaking
24   clearly or loudly, please let me know, and I'll try and do
25   better.

Page 8

1       Have you ever had your deposition taken before?
2    A.  Yes.
3    Q.  Has it been in regard to any gasoline stations?
4    A.  It had to do with the partners --
5    Q.  And that was --
6    A.  -- in this group.
7    Q.  I'm sorry, were you done?
8    A.  In this group of partners we had on the gas
9    station.
10   Q.  It had to do with the Petro Group?
11   A.  Yes.
12   Q.  Did any of the topics of your deposition have
13   anything to do with any environmental contamination or
14   cleanup?
15   A.  No.
16   Q.  I'm going to go over for a minute some of the
17   ground rules of the deposition process just to make sure
18   they're fresh in your mind and make sure you don't have any
19   questions for us.
20      The oath that the reporter gave you is the same
21   oath to tell the truth as if we were in court today in front
22   of a judge, and you have the same obligation to be truthful
23   as if we were in court here today.  Do you understand that?
24   A.  Yes.
25   Q.  Because the transcript is being typed up, it's

Deposition of Shirley McMurphy Ahmad  /  February 16, 2011

---

Page 13

1  wrong, please let us know.  But I think what your husband
2  described there were two partnerships called Petro Group I
3  and Petro Group II?
4      A.  That's correct.
5      Q.  Is it correct that -- let's see if I have my notes
6  correct.  I think it was Petro Group II acquired the station
7  on Elm?
8      A.  Yes.
9      Q.  During the time that the Petro Group operated the
10  station on Elm, do you know where the gasoline was supplied
11  from?
12      A.  We -- we bought the location from Beacon, and we
13  would buy the gas from Beacon.  And then I guess they became
14  Ultramar or something.  And then -- so that's where we would
15  get the gas I think.
16      Q.  Did you have an understanding as to who the refiner
17  of the gasoline was during the time you mentioned first that
18  it was branded Beacon or Ultramar?
19      MR. PATTON:  This is Ben Patton.  I'd like to
20  object to the extent that calls for speculation.
21      MR. DAVIS:  This is Samuel Davis.  I'll object that
22  it's been asked and answered.
23      THE COURT REPORTER:  I'm sorry, you'll object that
24  it's what?
25      MR. EICKMEYER:  He said asked and answered.

---

Page 14

1      Q.  Go ahead.
2      A.  I really don't know who the refinery was.
3      Q.  Do you recall ever seeing tanker trucks delivering
4  gasoline to the station?
5      A.  Oh, I'm sure they -- they came.  See, I lived in
6  Fremont, and so I very seldom was at Fresno.  And I paid all
7  the bills.  I did all the bookkeeping.  Every day they would
8  have, you know, the sales report.  Then I would put it in
9  the computer.  So I had the five gas stations to take care
10  of.  Then we had our own business and our personal, and then
11  I had a little one at the time, and so I was pretty busy
12  just taking care of that part.  So I really wasn't in Fresno
13  that often.  And because of that particular location wasn't
14  the best area, I just didn't go there that often.
15      So I don't know if I remember seeing a tanker truck
16  at that location.  I know I did at other locations.  We were
17  at other locations more often than that one.
18      Q.  When you mentioned -- I think you described
19  handling the paperwork for the station, did you ever see any
20  paperwork indicating what company or companies were
21  delivering gasoline to that station?
22      A.  I really don't remember.
23      Q.  You mentioned the station was initially branded
24  Beacon I think you said?
25      A.  That's correct.

---

Page 15

1      Q.  Was it your understanding that the station was
2  purchased from Beacon?
3      A.  That's right.
4      Q.  And then I think you said -- I'm sorry -- I'm
5  trying to remember between your testimony and your
6  husband's -- that there was a change in the brand after a
7  few years?
8      A.  I think Beacon was taken over, or Ultramar bought
9  Beacon.  It became Ultramar later.
10      Q.  So the station changed at some point from the
11  Beacon brand to the Ultramar brand?
12      A.  I think that's what happened.
13      Q.  This is the one on Elm Street -- or, I'm sorry,
14  2139 South Elm?
15      A.  If it happened to one, it would have happened to
16  all of them.  So I think they all changed.  You know, I
17  mean, I think Beacon -- didn't Ultramar buy out Beacon.
18  That's what I'm -- that's what I -- I mean, I just am trying
19  to remember, and I'm thinking that's what happened.
20      Q.  Well, let me back up a little bit because we're
21  just trying to find out what your knowledge is.  So when you
22  first bought the station at 2139 South Elm --
23      A.  I know we bought them from Beacon.
24      Q.  Okay.
25      A.  Because all the Beacon people were there, and they

---

Page 16

1  were, you know, going through the whole thing and
2  inventories and all that.  So I know we bought them from
3  Beacon.
4      Q.  Do you remember who you dealt with at Beacon as
5  part of that purchase process?
6      A.  I don't.  I didn't really deal with them.  My
7  husband did.
8      Q.  Is it your understanding that the gasoline then was
9  initially supplied by Beacon, and then their name switched
10  to Ultramar at some point.
11      A.  That's what I'm thinking, yes.
12      Q.  At some point did the brand of the station change
13  to Valley Gasoline?
14      A.  Yes, that happened later.
15      Q.  Do you have a knowledge as to who supplied gasoline
16  during the time the station was called Valley Gasoline?
17      A.  I'm not sure.  My husband would know.  I don't
18  know.
19      Q.  Your husband mentioned some companies call Total
20  Energy and Sabek Oil?
21      A.  Okay.  Yes.
22      Q.  Those are familiar?
23      A.  Yes.
24      Q.  Do you recall any other companies besides those two
25  that might have supplied gasoline to the station when it was

---

DEPOBOOK REPORTING SERVICES  (800) 830-8885

Page 25

1      A. Yes.
2      Q. Can you tell from the writing if you were the
3  person that completed this form?
4      A. No, I did not.
5      Q. As far as the information that's listed here, is
6  this information correct, to your knowledge, as of the date
7  shown here 12/31/93?
8      A. Yes.
9      Q. If you could turn to the second page Bates ending
10  in 1521, is that your signature at the bottom of the page?
11      A. Yes.
12      Q. And if you could take a look at this page -- and if
13  I didn't mention already, if there's any document you need a
14  moment to read, we'll be happy to take the time to do that.
15  I don't have too many documents to show you here.
16         If you could take a look at this page, and my
17  question is whether the information shown here was accurate
18  to the best of your knowledge as of the date indicated
19  12/31/93? So my question was just if the information shown
20  here on this page was accurate to the best of your knowledge
21  on the date indicated 12/31/93?
22      A. Yes.
23      Q. On the top line of this page it says, "I am the
24  chief financial officer for Petro Group II." Do you see
25  that?

Page 26

1      A. Yes.
2      Q. Was that an official title that you had, or is that
3  just indicating that you were responsible for taking care of
4  the financial business?
5      A. I think just that we were responsible for taking
6  care of the financial.
7      Q. Within the partnership of Petro Group II, did
8  anyone have any particular titles or designations as to what
9  they were responsible for?
10      A. No.
11      Q. Were the partners in Petro Group II equal partners?
12      A. No.
13      Q. Can you describe?
14      A. It was depending on how much they had invested.
15      Q. Who was considered, if anyone, then to be the lead
16  partner, have the biggest share?
17      A. It would have been myself.
18      Q. I think you mentioned when you were talking about
19  the stations and having a child at home, you said you and
20  your husband I think also had another business. Was that
21  right?
22      A. Accounting business. Bookkeeping, accounting
23  business.
24         (Exhibit No. 6 was marked for
25             identification.)

Page 27

1         MR. EICKMEYER: Q. I'm handing you what I've
2  marked as Exhibit 6. This was not used for your husband's
3  deposition. This is -- has your name at the top Shirley
4  McMurphy, EA, dated May 31, 1994, Bates RWQCB hyphen Fresno
5  hyphen 001509. Do you recognize your signature at the
6  bottom of this page?
7         I'm sorry, I didn't hear you if you answered. I
8  asked you do you recognize your signature at the bottom of
9  this page.
10      A. Yes. Yes.
11      Q. And does this letter appear to be in your writing?
12      A. Yes.
13      Q. And would this indicate changing stations from
14  Beacon Service Stations to Valley Gas, indicate that the
15  change of names would have happened at approximately the
16  date of this letter, May 31st, 1994?
17      A. Yes.
18      Q. So from the -- I see the designation at the -- at
19  the top of this page shows EA, that you're enrolled to
20  represent taxpayers before the IRS?
21      A. That's correct.
22      Q. So is that also -- I think your husband described
23  you as a CPA. So you were also in the accounting business
24  before the gas stations were acquired?
25      A. That's right.

Page 28

1      Q. Let me ask you -- if you want, we can look back at
2  Exhibit 1. Your husband had mentioned doing accounting work
3  for different gas stations. And I was just going to ask
4  looking at that list of stations in No. 1, did you ever do
5  any accounting work for any stations in Fresno shown
6  there --
7      A. No.
8      Q. -- besides your own station?
9      A. No.
10         (Exhibit No. 7 was marked for
11             identification.)
12         MR. EICKMEYER: Q. I'm going to hand you what
13  I've marked as Exhibit 7. I believe this was Exhibit 9 to
14  your husband's deposition. This is titled Single Form of
15  Agreement for Purchase and Sale of Commercial Property,
16  Bates RWQCB hyphen Fresno hyphen 001448 through 1449. Do
17  you recognize -- at the bottom of the second page do you
18  recognize your signature there?
19      A. Yes.
20      Q. Do you know whose handwriting this document is in?
21      A. This is my husband's.
22      Q. Can you tell us what's indicated by this document,
23  what the purpose was?
24      A. He was selling the station to these other people.
25      Q. Was it the Petro Group II was selling their

Page 45

1      THE WITNESS:  Is it in here?
2      MR. EICKMEYER:  She'll give you a new one.  We're
3  using different numbers than your husband's exhibits.
4      21, I've got it, thanks.
5      MS. MOTAMED:  And I'm marking this as Exhibit 10.
6          (Exhibit No. 10 was marked for
7          identification.)
8          (Pause in proceedings.)
9      MR. PATTON:  Q.  I'm sorry, do you have the
10 document, Ms. Ahmad?
11     A.  Oh, yes.
12     Q.  Do you recognize this as one of the reports that
13 was referred to in Section 4.2 that we were just looking at?
14     A.  Well, now I'm reading on this page here.  This says
15 600 East Elm Avenue in Fresno.  And we had a 600 in
16 Coalinga -- South Elm in Coalinga.  That was the address of
17 Coalinga.
18     Q.  I'm sorry, are we looking at different documents?
19 Are you looking at a document with Ultramar at the heading?
20 I may have got the wrong exhibit number, and that's my
21 fault.
22     MR. EICKMEYER:  I think, counsel, she's pointing
23 out on Bates 1267 the address in the top paragraph is 600
24 East Elm Avenue, Fresno.  That's what she was pointing to
25 here in the room.

Page 46

1      MR. PATTON:  Okay.  Thank you for clarifying that.
2  That does seem to be the wrong address.
3      Q.  But on the front it has the correct address; is
4  that right; on the first page?
5      A.  Right.
6      Q.  Was it your understanding after these reports were
7  done that they came back with the conclusion that there was
8  no contamination at the 2139 Elm station?
9      MR. EICKMEYER:  Object.  Misstates the evidence.
10     THE WITNESS:  As far as I know everything would
11 have been just right -- would have been okay.
12     MR. PATTON:  Q.  Okay.  Thank you very much,
13 Ms. Ahmad.
14     I have no further questions.
15     MR. EICKMEYER:  Anyone else on the phone?
16     UNKNOWN SPEAKER:  No questions here.
17     THE COURT REPORTER:  Who was that?
18     MR. WANGER:  Mr. Wanger.
19     MR. EICKMEYER:  Anyone else still with us?  Last
20 chance.
21     Anything else?
22     MS. MOTAMED:  No.
23     MR. EICKMEYER:  All right.  Thank you, Ms. Ahmad.
24 We conclude.
25     THE VIDEOGRAPHER:  This concludes the deposition.

Page 47

1  We are now going off the record.  The number of videotapes
2  used is two.  The time is 4:35.
3          (Deposition concluded at 4:35 p.m.)

Page 48

1
2              REPORTER'S CERTIFICATION
3
4      I, DENISE WHEELER, CSR No. 8254, Certified Shorthand
5  Reporter, certify:
6      That the foregoing proceedings were taken before me at
7  the time and place therein set forth, at which time the
8  witness was put under oath by me;
9      That the testimony of the witness, the questions
10 propounded, and all objections and statements made at the
11 time of the examination were recorded stenographically by me
12 and were thereafter transcribed;
13     That the foregoing is a true and correct transcript of
14 my shorthand notes so taken.
15     I further certify that I am not a relative or employee
16 of any attorney of the parties, nor financially interested
17 in the action.    I declare under penalty of perjury under
18 the laws of the California that the foregoing is true and
19 correct.
20     Dated this 28th day of February, 2011.
21
22
23     _____
       DENISE WHEELER, C.S.R. No. 8254
24
25

# EXHIBIT 11



40995205

Nov 21 2011
2:29PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – –

This Document Applies to:

*City of Fresno (Plaintiff)*                    Case No. 04 CV-04973 (SAS)

            *v.*

 *Chevron U.S.A. Inc., et al (Defendants)*

– – – – – – – – – – – – – – – – – – – – – – – – – – –

**AMENDED EXPERT REPORT OF JOHN B. O'BRIEN**

Date:  November 21, 2011

that implemented compromises reached as a result of the negotiations.[65]

64.   To clarify the terminology associated with the 1990 CAAA gasoline regulations, and as used in this Report, gasoline made to meet the requirements of the OFP is referred to as "oxygenated" gasoline, while gasoline made to meet the requirements of the RFG program is referred to as "reformulated" gasoline, or simply RFG.  Both of these grades of gasoline were required to contain minimum levels of oxygen through the addition of oxygenates, as described above.[66]  Gasoline sold in areas not covered by either the OFP or RFG programs was not required to contain oxygenates and is referred to as "conventional" gasoline.  However, conventional gasoline may, and often does, contain oxygenates depending on logistics, octane requirements, and processing economics.  Also, so-called "anti-dumping" regulations preclude refiners from simply blending ("dumping") all of their most highly polluting components into conventional gasoline.  Following the January 1995 introduction of RFG, there was a period of regulatory overlap between the OFP and RFG programs when RFG was required to contain 2.7 Wt.% oxygen (instead of 2 Wt.%) during the winter months in OFP areas.  This was done to avoid having two conflicting fuel regulations in areas covered by both OFP and RFG.

**CARB Reformulated Gasoline Regulations**

65.   CARB was formed by the California legislature in 1968 to find solutions to California's air pollution problems.  Since its establishment, CARB has often been in the forefront of the development of automobile emission controls.  In 1971, CARB adopted the nation's first automobile emissions standards for oxides of nitrogen.  In 1975, exhaust catalytic

---

[65] Michael Weisskopf, "Rare Pact Reached to Fight Smog; Environmentalists, Oil Firms Agree on Gasoline Standards," *The Washington Post*, August 16, 1991, p. 1.

[66] The requirement that RFG contain a minimum oxygen content was lifted in May 2006, after Congress passed the RFS mandating that the domestic gasoline supply contain certain minimum volumes of blendstocks made from renewable sources.

converters were required on all new cars sold in California under CARB's Motor Vehicle
Emission Control program.  In 1988, CARB adopted regulations requiring all new cars sold in
the state to have onboard computer-controlled emission monitoring systems.

66.    However, CARB's most significant statewide gasoline regulations occurred when
Phase I of the California Reformulated Gasoline (CaRFG1) program became effective on
January 1, 1992.  CaRFG1 totally eliminated the use of lead additives, mandated the use of
deposit control additives, and in some areas of the state, extended the new federal RVP limits for
longer time periods.

67.    For federal OFP-designated areas, California obtained an EPA waiver to use
gasoline containing between 1.8 and 2.2 Wt.% oxygen, instead of the standard federal level of
2.7 Wt.% for wintertime OFP gasolines.[67]  Also, when the federal OFP program commenced in
November 1992, CARB required the entire state to comply with the wintertime oxygenate
program because approximately 80% of the state's gasolines were marketed in areas that were
non-attainment for CO according to federal regulations.[68]  This statewide wintertime oxygenate
requirement started in November 1992 and terminated in February 1998.  However, CARB
required certain selected counties and areas of the state to continue their wintertime oxygenate
use even though they were CO-compliant.  For example, the counties of Fresno, Madera, and the
Lake Tahoe Air Basin were required to continue wintertime oxygenate use through January
2000, even though they had achieved CO-compliance in June 1998.[69]  The CARB wintertime
oxygenate target of 2.0 Wt.% oxygen was equivalent to 11.0 Vol.% MTBE or 5.7 Vol.% ethanol.

---

[67] The waiver was requested as part of California's State Implementation Plan (SIP).  Data showed that oxygen
levels above 2.2 Wt.% increased nitrogen oxide emissions and added to ozone and particulate matter pollution.
[68] James D. Boyd, CARB, Letter to Daniel W. McGovern, EPA, October 30,1992, regarding revisions to
California's SIP for compliance with the federal OFP program.
[69] See 63 FR 15305 and year 2000 version of Title 13, California Code of Regulations, Section 2262.5 (13 CCR
2262.5).

In his report in this matter, Plaintiff's expert Mr. Reynolds incorrectly states that CARB's wintertime oxygenate requirements only applied to Greater Los Angeles and Imperial County.[70] In fact, they applied throughout the state for several years.

68.    CARB Phase II (CaRFG2) gasoline regulations were promulgated in October 1991 and became effective on March 1, 1996, 15 months after the federal RFG regulations were implemented.  The CaRFG2 regulations were more stringent than those for federal Phase I RFG and substantially lowered the sulfur dioxide, nitrogen oxides, and VOC emissions compared to Phase I RFG.  The emissions behavior of CaRFG2 gasoline was estimated based on CARB's own "predictive model" and measured the emissions compliance of each gasoline blend based on its RVP, aromatics, olefins, sulfur, benzene, oxygen, and distillation.  CaRFG2 gasoline sulfur content was limited to 30 parts per million (ppm) using the averaging method of compliance versus an average level of 130 ppm for federal RFG.  In order to meet the tougher emission requirements, the average level of aromatics and olefins in CaRFG2 gasoline also had to be lower than typical federal RFG.

69.    Because CaRFG2 was more restrictive than federal RFG, it was allowed to supersede federal requirements.  Most CaRFG2 gasoline was targeted to contain 2.0 Wt.% oxygen year-round, with an allowable compliance range of between 1.8 and 2.2 Wt.%.[71] Although CaRFG2 was required statewide, some areas of the state were subject to the requirements of the federal OFP and RFG programs as well.  Exhibit H shows the counties in California that were subject to the federal OFP or RFG programs, or both, at any time during the

---

[70] Reynolds Fresno Report, May 2, 2011, Section 4.2, p. 7.
[71] If gasoline suppliers complied with the CARB emissions requirements under the predictive model, they were permitted to produce gasoline without oxygenates if they so chose (except in RFG-designated areas.)  The oxygenate requirement only applied to suppliers complying under the so-called "flat limits" of 1.8 to 2.2 Wt.%.  See 13 CCR 2262.  Although small amounts of non-oxygenated CaRFG2 were produced between 1996 to 2003, high refining costs precluded any significant volumes.  CaRFG2 also allowed 10 Vol.% ethanol blends with a maximum of 3.7 Wt.% oxygen.

period from 1995 to 2003.  In December 2001, the counties in the San Joaquin Valley Air Basin[72]

were designated by the federal government as ozone non-attainment areas and, effective

December 2002, these counties were required to meet federal RFG requirements.[73]

70.    CaRFG2 specifications proved very difficult for refiners to meet and required

numerous modifications to refinery facilities.  Difficulties in obtaining the necessary construction

permits in the highly regulated California environment added time and cost to the necessary

refinery modification projects.  CARB-compliant gasoline became the most expensive in the

nation and its availability from sources outside the state was very limited.

71.    CARB Phase III (CaRFG3) gasoline regulations became effective December 31,

2003, the same time that the state's MTBE phaseout was complete.  Because CaRFG3 gasoline

used in federal RFG areas was still required to contain 2.0 Wt.% oxygen, completion of the

MTBE phaseout was effectively a mandate for the use of 5.7 Vol.% ethanol (the only CARB-

approved source of oxygen) in those gasolines.[74]  CaRFG3 also lowered the levels of sulfur and

benzene permitted in gasoline and slightly adjusted distillation temperature limits.

72.    Despite recent federal mandates to increase the blending of ethanol into all

domestic gasoline supplies, the 5.7 Vol.% ethanol level was retained in all California gasolines

until January 1, 2010, when the state's Low Carbon Fuel Standard (LCFS) was passed into law.[75]

Although the LCFS did not specifically mandate an increase in ethanol blending, increasing the

ethanol content from 5.7 to 10 Vol.% became, along with other adjustments in fuel quality, an

---

[72] The San Joaquin Valley Air Basin comprises the counties of San Joaquin, Stanislaus, Merced, Madera, Fresno, Kings, Tulane, and western Kern County.
[73] See 66 FR 56476-484.
[74] See 13 CCR 2262.6.
[75] California's LCFS is aimed at reducing greenhouse gases from all of the state's energy sources.

integral part of California refiners' strategy to comply with the new law.

**The Federal Renewable Fuel Standard ("RFS")**

73.    In August 2005, the federal government passed the Energy Policy Act of 2005, which included the first RFS.  Commencing in May 2006, the first RFS required certain minimum volumes of ethanol to be used annually in the nation's fuel supply, at the same time eliminating any requirement for oxygenates in RFG.   The intended purpose of the first RFS was to reduce dependence on foreign oil through increased use of domestic renewable fuels, reduce greenhouse gas emissions, and support new domestic economic activity in renewable fuels production.  In December 2007, the federal government passed the Energy Independence and Security Act of 2007 (EISA), which substantially expanded the RFS requirements for the nationwide blending of fuels from renewable sources.[76]  As of the time of this Report, minimum oxygen requirements remain only in certain OFP regulated areas.[77]  However, all such oxygen is currently provided through ethanol blending.

## V.    GASOLINE SUPPLY CHAIN OVERVIEW

74.    The gasoline "supply chain" is the entire set of interdependent activities that are carried out to bring gasoline to the end user.  The supply chain is very complex, highly regulated, intensely competitive, and involves a large number of business relationships.  The business relationships exist throughout the entire supply chain—from the refiner, blender, or importer to the retail service station operator.  Exhibit I is a diagram showing the complexity of the

---

[76] EISA increased the annual volume of renewable fuels (including ethanol) required in the U.S. motor fuel supply to 36 billion gallons by the year 2022, or approximately 2,350,000 barrels per day (B/D).  Of that total, only a maximum of 15 billion gallons per year (BGY), or approximately 978,500 B/D of corn-based ethanol can be used to meet RFS requirements.

[77] See 13 CCR 2262.5(a).  The remaining OFP areas are the South Coast Area (Los Angeles and Orange Counties, as well as parts of Riverside and San Bernardino Counties) and Imperial County.

out" of the gasoline pool in California is to export them or burn them as refinery fuel—providing a low economic value.  The net result is a loss in total gasoline volume.

193.  Third, and finally, the energy content of ethanol is less than that of either hydrocarbon gasoline or MTBE.  It is approximately one-third less than hydrocarbon gasoline and about 20% less than MTBE.  Since a fuel's volumetric energy content is directly related to the mileage that can be achieved in an internal combustion engine, substitution of hydrocarbon gasoline or MTBE with ethanol requires that more fuel volume be burned for the same miles driven.  The net effect is the same as for the removal of light ends from gasoline—the incremental gasoline volume must be made up by refiners processing more crude oil or through gasoline imports.

194.  If refiners must process more crude oil to produce the same volume of gasoline, the cost of producing gasoline increases.  Increased imports of gasoline not only increase the cost of the gasoline supplies, but also raise important issues regarding long-term security of supply.  Although the impact of ethanol on gasoline supply may vary, both on a refiner to refiner and on a temporal basis, it would have been clear to most refiners considering alternative oxygenate materials in the early 1990s that ethanol would negatively impact their overall gasoline production and make them less competitive from a pricing standpoint.

### Summary of MTBE versus Ethanol Considerations

195.  Each gasoline refiner was faced with the decision of how and where to source the large volumes of oxygenates that were projected to be required in RFG and OFP designated areas.  As has been explained in this Report, there were many factors to be considered in making this decision.  Although there were a number of different types of ethers and alcohols that could be used, the fundamental choice was between MTBE and ethanol.  For many of the reasons

discussed above, most refiners generally opted for MTBE.  The following paragraphs summarize the key issues that directed that decision.

196.   **Ethanol Availability** – Most ethanol plants were small, inefficient, highly leveraged, and concentrated in the Midwest corn producing states, far removed from the areas of largest future RFG/OFP demand.  There were few ethanol plants being planned or under construction because the economics did not justify it.  Ethanol imports were limited by a tariff and by the "cap" on CBI nation volumes.  In contrast, capacity for MTBE was growing rapidly, both at refineries and through merchant plant construction.  The latter relied on low-cost butanes, the very materials that were rapidly being displaced from the gasoline pool due to restrictive RVP regulations.

197.   **Ethanol Distribution and Blending** – Ethanol's water miscibility precluded it from being blended at the refinery and transported by pipeline.  Reliance on ethanol as the source of oxygenate in major East Coast and West Coast RFG markets would have resulted in substantial rail transportation costs, as well as major new investments in segregated rail off-loading facilities, terminal storage tanks, and truck rack loading and blending systems.  Ethanol's high blending RVP required refiners to produce a special low RVP RBOB (or CARBOB in California), complicating the refining process, adding additional expense, and reducing gasoline volume.  The latter could only be made up by processing more crude oil or importing high-cost gasoline from foreign sources.  When the EPA denied requests to provide ethanol-blended RFG gasoline with an RVP "waiver" (which it gave for conventional gasoline), any plans for new ethanol capacity essentially came to an end.[171]  In denying the waiver, the EPA was concerned that the expanded use of ethanol in RFG gasolines would increase emissions in those areas that

---

[171] "Ethanol Producers Battle EPA Proposal on Clean Air," *The Wall Street Journal*, May 1, 1992, p. 84.

already had the "dirtiest" air.  When asked about this fact at trial in the City of New York Case, Mr. Reynolds confirmed, "*I believe that's why they* [the EPA] *said they would not grant it* [the waiver] *for all their RFG areas, yes.*"[172]  In comparison, both inside and outside of the refinery, MTBE behaved like any other refinery gasoline blendstock and did not suffer from any excessive RVP, blending, transportation, or distribution problems.

198.  **Ethanol Economics** – Even with the help of generous federal subsidies, the cost of producing ethanol in the early 1990s made it only marginally competitive with other oxygenate sources, such as MTBE.  Additional state subsidies or incentives were needed to encourage expanded production.  Ethanol's fundamental economics, with a high dependency on corn prices, raised uncertainty about the long-term viability of the ethanol industry.  In 1994, the U.S. General Accountability Office (GAO), the audit arm of the U.S. Congress, reported that despite a federal law requiring large federal agencies to use renewable fuels, the agencies had substantially failed to comply.[173]  The high price of ethanol was cited as a key reason.  MTBE, in contrast, was not only much cheaper to produce, but also offered economic synergies with other refinery processes such as alkylation.  Also, MTBE production costs were directly related to other energy costs, not based on the price of a totally unrelated farm crop and agricultural by-products the way ethanol was.

199.  **Supply Reliability and Quality Control** – If a refiner chose ethanol as its oxygenate source, it often had to enter into a contract with a relatively small supplier with an unknown "track record."  A refiner did not want to be dependent on oxygenate sourced from potentially unreliable suppliers operating in an economically challenged, subsidized industry.

---

[172] Reynolds Trial Testimony, City of New York Case, p. 4715, lines 12-13.
[173] *Advanced Technology Program - Federal Agencies' use of Gasohol Limited by High Prices and Other Factors*, U.S. GAO, Report to the Honorable Byron L. Dorgan, U.S. Senate, December 1994.

The refiner was essentially taking on the risk of default in supply, the cost of which could be substantial.  However, refiners themselves had no interest in owning or operating ethanol plants, which represented an entirely different line of business.  The choice of ethanol also introduced issues of product quality control.  RFG regulations required that gasoline meet all specifications at the point of retail delivery to the consumer.  By choosing ethanol as the oxygenate source, refiners were, in effect, transferring part of the gasoline manufacturing process—the need to blend the correct volume of ethanol just prior to delivery—to entities over which they had little or no control.  Unlike ethanol, MTBE could be reliably manufactured and blended at the refinery and the final blend certified at the time of production, in accordance with strict quality control procedures.  Absent some unusual pipeline or terminal operating problem, the refiner knew that the product delivered to the retail station met the RFG regulations.  The use of MTBE offered more product quality assurance and less risk of violation of those regulations.

200.  **Consumer Acceptance** – Because ethanol had been linked to various fuel quality and vehicle performance issues when initially used, a perception had arisen that ethanol-blended fuels were inferior and to be avoided.  MTBE bore no such consumer acceptance problems.  Indeed, by 1990, MTBE had been proven to be an economic, easily used, high-octane, and reliable gasoline blendstock that could be blended, transported, and delivered like any other gasoline blendstock.

## VII.  COMPARISON OF ETHANOL CIRCUMSTANCES TODAY VS. THE 1990s

201.  It has often been asserted that the fact that ethanol is in such widespread use in the U.S. today is ample proof that all U.S. refiners and marketers could have, if they had chosen to, met the oxygenate requirements of the 1990 CAAA using ethanol alone.  I do not agree with this

assertion.  The technical and commercial circumstances 15-20 years ago were very much

different than they were in the early to mid-2000s when U.S. refiners started to transition from

MTBE to ethanol.  Of course, no one can know for certain what could have been accomplished

15-20 years ago.  However, given that ethanol producers and refiners would at that time have

had, at best, only three to four years to build a large number of new ethanol plants, as well as

substantially modify both refineries and distribution systems to accommodate ethanol on a

nationwide basis, I find it unreasonable to assume that such a rapid expansion of the ethanol

industry could have been achieved.  Ethanol blending confronted gasoline suppliers with a

multiplicity of risks, uncertainties, and added costs in the early 1990s.  To assume that suppliers

would have simply ignored such factors is, in my opinion, unrealistic.

202.  Instead, I am of the opinion that individual refiners did exactly what can be

anticipated from any competitive business enterprise.  They kept their options open until they

knew what the actual regulations would be and then made the most prudent investments and/or

operational changes needed to ensure that they remained competitive in their markets.  Since

MTBE held so many technical and economic advantages over ethanol, and entailed much lower

supply risk, it is not surprising that it became the oxygenate of choice outside the Midwest

ethanol production areas.  It is unreasonable to assume that refiners would have made large

investments to expand RBOB production, or potential ethanol suppliers would have invested in

large new production facilities, when neither knew the role that ethanol would eventually play in

meeting the 1990 CAAA.  Gasoline marketing is highly competitive.  Each refiner was faced

with an individual decision as to which federally approved oxygenate to use.  As discussed in

more detail in this section, an individual refiner facing such a choice would also be aware that its

competitors were facing a similar choice.  It would be reasonable for a refiner to assume that its

**Conclusion**

229.  In my opinion, it is totally improper to consider what has been achieved in the ethanol and the refining industries over the last 15-20 years and conclude that the same could have been achieved during the implementation of the 1990 CAAA.  Conditions were simply too different across many dimensions.  The dynamics of the entire industry were vastly different during the two periods, and there was simply too much uncertainty in the earlier periods to encourage the level of change and investment needed.  When individual refiners considered their choice between ethanol and MTBE, it was typically made on the basis of competition, overall economics, and security of oxygenate supply.  Since MTBE was generally favored in all categories, it is not surprising that most refiners chose it over ethanol.  MTBE phaseouts and ethanol mandates were key drivers in the transition from MTBE to ethanol in the mid-2000s.  No such issues were foreseen in the earlier time frames.

## VIII.   DIMINISHING PUBLIC AND POLITICAL SUPPORT FOR ETHANOL

230.  Over the last few years, both public and political support for the expanded use of corn to produce additional fuel ethanol has waned considerably.   This has come about as a greater proportion of the population has come to understand the additional costs and unintended consequences of the large-scale use of ethanol in motor fuel.  Even former Vice President Al Gore, who was once one of the most ardent advocates of fuel ethanol, has come out against expanded corn ethanol production.  He now admits that the benefits of ethanol are *trivial*."[210] Asked to explain his previous support for ethanol, the former Vice President said, "*One of the reasons I made that mistake* [i.e., supporting corn ethanol] *is that I paid particular attention to*

---

[210]"Al Gore's Ethanol Epiphany," *The Wall Street Journal*, November 27, 2010.

December 31, 2011.  Elimination of the VEETC would not reduce the quantity of ethanol blended into gasoline since this is mandated by law.  However, discontinuance of the VEETC has the potential to significantly alter the economics of ethanol producers.

I reserve the right to amend these opinions if subsequent information becomes available which would materially alter my findings.

_____

JOHN B. O'BRIEN

Date:  November 21, 2011

# EXHIBIT 12



40970676

Nov 18 2011
3:26PM

**City of Fresno v Chevron U.S.A. Inc., et al.**
Report of Christine T. Wood, Ph.D.

Christine T. Wood, Ph.D.

Exponent Failure Analysis Associates, Inc.
149 Commonwealth Drive
Menlo Park, CA 94025

November 18, 2011

© Exponent, Inc.

1107243 A0T0 1111 RPT1

stations.[55]  It is this existence of laws and regulations, and the enforcement thereof, that increases compliance with warnings that are disseminated about the safe handling of gasoline.

## Summary and Conclusions

In summary, I offer the following opinions with a reasonable degree of scientific certainty:

The safety messages contained in warnings and other information about gasoline releases provided by defendants available to their customers are reasonable, adequate and sufficient to communicate the proper precautions for storing and handling gasoline, whether it contains MTBE or not.

The inclusion of additional or alternative information, such as that proposed by plaintiff, would not change the safety practices among service station operators.

The inclusion of additional warnings would dilute the message of a simple warning not to permit spills or leaks of gasoline, reducing its effectiveness.

---

[55] Deposition of Gary Beacom, 08/10/2011, pp. 22, 24, 72; Deposition of Garabed Bedirian, 04/04/2011, pp. 41-42; Deposition of David Benjamin, 08/09/2011, p. 33; Deposition of David D'Alessandro, 04/01/2011, pp. 66-67; Deposition of Jatinder Paul Dhillon, 08/11/2011, pp. 26-27, 59, 62-64; Deposition of Babak Lakestani, 08/09/2011, p. 36; Deposition of Bryan Leonard Moe, 08/17/2011, p. 43; Deposition of Joe Rebella, 03/15/2011, p. 40 (fire department); Deposition of Judy Rogers, 03/08/2011, pp. 35-37; Deposition of Jeetander Sethi, 07/13/2011, pp. 26, 47-48, 90-91

