UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X

IN RE: METHYL TERTIARY BUTYL          :
ETHER ("MTBE") PRODUCTS               :
LIABILITY LITIGATION                  :
------------------------------------------------------ :
                                      :
This document relates to:             :
                                      :
*City of Fresno v. Chevron U.S.A., Inc. et al.,* :
04 Civ. 4973                          :
                                      :
------------------------------------------------------ X

**OPINION AND ORDER**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

I.    **INTRODUCTION**

        This multidistrict litigation ("MDL") arises from claims relating to the

environmental and health impact allegedly caused by MTBE,[1] a water-soluble

gasoline additive.[2]  MTBE is known to have a favorable air-emissions profile

compared to ethanol—a competing oxygenate—but its high solubility (and

reportedly terrible taste) allegedly make it a threat to groundwater.

        In this case within the MDL, the City of Fresno—which is charged

with ensuring that roughly half a million residents of Fresno County, California

---

        [1]     For purposes of this Opinion and Order, "MTBE" will refer to both
MTBE and its byproducts, such as tertiary butyl alcohol.

        [2]     Familiarity with the background of this MDL is presumed for
purposes of this Opinion and Order.

receive fresh drinking water—sues a number of defendants that have refined, manufactured, supplied, distributed, handled, and/or used MTBE within its territory, and thereby allegedly threatened Fresno's water supply.  Fresno asserts three claims: (1) strict liability; (2) negligence; and (3) nuisance.[3]

Presently before the Court are three motions for summary judgment brought by various defendants seeking the dismissal of one or more of Fresno's claims against them.  The grounds for these motions are, respectively: (1) the statute of limitations (or, alternatively, lack of harm) (the "Limitations Motion"); (2) lack of evidence pertaining to causation (the "Causation Motion"); and (3) lack of evidence pertaining to nuisance (the "Nuisance Motion").  The moving defendants and grounds for these motions are detailed with greater specificity below.  For the following reasons, the motions are granted.

## II.    PROCEDURAL POSTURE

Fresno commenced this action on October 22, 2003 by filing its Complaint in the Superior Court for the State of California, San Francisco County, alleging that Defendants were liable for contaminating the City of Fresno's public drinking water supplies with MTBE.  Fresno subsequently filed its First Amended Complaint ("FAC"), dated October 28, 2004.  The case was removed to federal

---

[3]    Fresno has stipulated to the dismissal of its fourth claim, for trespass, as detailed below.

court and transferred to this MDL, where pre-trial motions and discovery have been conducted.  Discovery is now complete, and after the resolution of the instant motions, the case will be returned to the trial court.

###### A.     The January 2, 2013 Stipulated Dismissal

All of Fresno's claims arise from its allegations that MTBE leaked from gasoline stations and contaminated the drinking water that it is charged with protecting.  There were originally sixty gasoline stations at issue in the case. Through a stipulation and order entered on January 2, 2013, Fresno narrowed the scope of its claims to the stations and defendants listed on the following table.

**Table 1:**     *Stations and Defendants at Issue*[4]

| Station Name And Address | Defendant(s) |
| --- | --- |
| M & S Texaco, 2619 S. East Ave. | Kern, Lyondell, Shell |
| Tosco #30587, 1610 N. Palm Ave. | Chevron, Coastal, ConocoPhillips, Kern, Lyondell |
| 7-Eleven #19198, 1596 N. Palm Ave. | Citgo |
| Valley Gas, 2139 S. Elm St. | Arco, Duke, Kern, Tesoro, Valero |
| Chevron #9-4374, 1160 Fresno St. | Chevron, Coastal, Kern, Lyondell |
| Shell (1212), 1212 Fresno St. | Kern, Lyondell, Shell |

---

[4]     Table 1 is drawn from Case Management Order No. ("CMO") 108, No. 00 Civ. 1898, Doc. No. 3594 at 2-3.  The defendants listed in this table are given short-form names for convenience.  The proper corporate names of the defendants at issue are listed below, insofar as they are relevant to this Opinion and Order.

| Station Name And Address | Defendant(s) |
| --- | --- |
| Unocal #6353, 1418 E. Shaw | Chevron, Coastal, ConocoPhillips, Kern, Lyondell |
| U&A Gas & Food Mart, 2929 N. Blackstone | Tesoro |
| Ratcliff Gas, 2145 Blackstone Ave. | Arco |
| Gilbert's Exxon, 4142 E. Church | Arco, Valero |
| Van Ness Auto, 2740 N. Van Ness | Chevron, Coastal, Duke, Kern, Lyondell |
| Smith Tank Lines (f/k/a Carey Oil), 30 E. Divisadero St. | Duke, Kern, Valero |
| Red Triangle, 2809 S. Chestnut Ave. | Coastal, Duke, Exxon, Kern, Lyondell, Nella, New West, Tesoro, Valero |
| Chevron #9-9093, 3996 N. Parkway Dr. | Chevron, Coastal, Kern, Lyondell |
| Tosco #39118, 1605 N. Cedar | Chevron, Coastal, ConocoPhillips, Kern, Lyondell |
| Beacon #3519, 4591 E. Belmont Ave. | Arco, Duke, Kern, Valero |
| Beacon-Arco, #615, 1625 Chestnut Ave. | Arco, Duke, Kern, Valero |
| Exxon Service Station, 4594 E. Tulare St. | Arco, Coastal, Duke, Exxon, Kern, Lyondell, Valero |
| 7-Eleven #13917, 3645 E. Olive Ave. | Citgo |

## B.   Additional Stipulations and Dismissals

A number of additional stipulated dismissals and settlements have

further narrowed the claims presently before the Court.  I will *first* detail the

settlements, and then the dismissals.

### 1.    Settlements

The following defendants have executed settlements with Fresno during the pendency of this motion, and, after permitting time for allegedly jointly-liable co-defendants to object, have been dismissed from the case: (1) the BP Defendants;[5] (2) the Lyondell Defendants;[6] and (3) the ConocoPhillips Defendants.[7]  Additionally, Fresno has executed a settlement with Valero;[8] however, because the time for Valero's co-defendants to object to this settlement has not yet lapsed, the settlement has not yet been entered.  Likewise, Coastal has stated that it has reached a settlement with Fresno, but this settlement has not yet

---

[5]      Comprising Atlantic Richfield Company, BP West Coast Products LLC, and BP Products North America Inc.  *See* 2/19/13 Stipulation and Order of Dismissal with Prejudice Under Fed. R. Civ. P. 41(a)(2), Doc. No. 152.

[6]      Lyondell Chemical Company, individually and as successor-in-interest to the Delaware corporation known as ARCO Chemical Company.  *See* 7/23/13 Order Granting Defendant Lyondell Chemical Company's Motion for Good Faith Settlement Determination, Doc. No. 226.

[7]      Defendant ConocoPhillips Company, individually and as successor-in-interest to Tosco Corporation and Phillips Petroleum Company, and including but not limited to Phillips 66.  *See* 3/20/13 Stipulation And Order of Dismissal with Prejudice Under Fed. R. Civ. P. 41(a)(2), Doc. No. 171.

[8]      Ultramar Inc., Valero Refining Company—California, and Valero Marketing and Supply Company.  *See* 8/16/13 Proposed Order Regarding Briefing on Ultramar Defendants' Motion for Good Faith Settlement Determination, Doc. No. 230.

been entered.

### 2.    Stipulated Dismissals

#### a.    Complete Dismissals

Fresno has voluntarily dismissed its claim for trespass against all defendants.[9]  Fresno has also voluntarily dismissed, with prejudice, all of its claims against Duke Energy Merchants California, Inc. and Duke Energy Trading and Marketing, LLC.[10]  Likewise, Fresno has voluntarily dismissed, with prejudice, all of its claims against Chevron Corporation, Chevron Environmental Management Company, and Unocal Corporation;[11] as well as all of its claims against Westport Petroleum, Inc.[12]

#### b.    Dismissals as to Certain Claims or Sites

_____

[9]      *See* 2/4/13 Stipulation and Order re: Summary Judgment on Plaintiff's Claim for Trespass, Doc. No. 150.  Fresno based this stipulated dismissal on my ruling in another California MTBE case that "'[a] trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it[,]'" as opposed to a usage right, such as Fresno's.  *In re MTBE Prods. Liab. Litig.*, 824 F. Supp. 2d 524, 545 (S.D.N.Y. 2011) (quoting *Wilson v. Interlake Steel Co.*, 185 Cal. Rptr. 280, 283 (1982) (emphasis removed)).  Fresno preserves its right to appeal this ruling.

[10]      *See* 4/3/13 Stipulated Dismissal of Duke Energy Merchants California, Inc. and Duke Energy Trading and Marketing, LLC, Doc. No. 177.

[11]      *See* 1/3/13 Order of Dismissal with Prejudice, Doc. No. 136.

[12]      *See* 12/27/12 Stipulation of Dismissal of All Claims Against Westport Petroleum, Inc., Doc. No. 133.

Fresno has dismissed, with prejudice, all of its claims against Exxon Mobil Corporation at the following two sites: (1) Gilbert's Exxon, 4142 E. Church; (2) Exxon Service Station, 4594 E. Tulare.[13]   Similarly, Fresno has dismissed, with prejudice, all of its claims against Duke Energy Merchants, LLC and Northridge Petroleum Marketing U.S., Inc. (collectively, "Duke") at the following five sites: (1) Smith Tank Lines, 30 E. Divisadero; (2) Tulare Exxon; (3) Beacon #3519; (4) Beacon #615; (5) Van Ness Auto.[14]   However, Fresno continues to assert claims against these entities at the following two sites: (1) Red Triangle, 2809 S. Chestnut Ave.; and (2) Valley Gas, 2139 S. Elm St.[15]

Finally, Fresno has stipulated to the dismissal with prejudice of its claim for nuisance as to the following defendants at the following sites:

---

[13]      See 3/29/13 Order of Dismissal with Prejudice, Doc. No. 175.

[14]      See 4/2/13 Stipulated Dismissal of Duke Energy Merchants, LLC and Northridge Petroleum Marketing U.S., Inc. at Certain Trial Sites, Doc. No. 178.

[15]      See id.

**Table 2:**  *Stipulated Dismissal of Nuisance Claims*[16]

| Station Name And Address | Defendant(s) Against Which Nuisance Claim Dismissed |
|---|---|
| M & S Texaco, 2619 S. East Ave. | Kern Oil & Refining Co. ("Kern"), Lyondell Chemical Company ("Lyondell") |
| Tosco #30587, 1610 N. Palm Ave. | Coastal Chem, Inc. ("Coastal"), Kern, Lyondell, Chevron U.S.A. Inc. ("CUSA") |
| 7-Eleven #19198, 1596 N. Palm Ave. | CITGO Petroleum Corporation ("CITGO") |
| Valley Gas, 2139 South Elm St. | Kern, Tesoro |
| Chevron #9-4374, 1160 Fresno St. | Union Oil Company of California ("Union"), Coastal, Kern, Lyondell |
| Shell (1212), 1212 Fresno St. | Kern, Lyondell |
| Unocal #6353, 1418 E. Shaw | Coastal, Kern, Lyondell, CUSA |
| U&A Gas & Food Mart, 2929 N. Blackstone | Tesoro |
| Gilbert's Exxon, 4142 E. Church | Coastal, Lyondell, Exxon Mobil Corporation ("Exxon") |
| Van Ness Auto, 2740 N. Van Ness | Union, Coastal, Kern, Lyondell |

---

[16]     This table is drawn from 4/2/13 Order of Dismissal with Prejudice, Doc. No. 176.  Some of the parties against whom Fresno's nuisance claim was dismissed pursuant to this Order subsequently settled all of Fresno's remaining claims, as reflected above.

| Station Name And Address | Defendant(s) Against Which Nuisance Claim Dismissed |
|---|---|
| Smith Tank Lines (f/k/a Carey Oil), 30 E. Divisadero St. | Kern, Valero Marketing and Supply Company, Valero Refining Company—California, and Ultramar Inc. (collectively with the Valero defendants, either "Valero" or the "Ultramar Defendants") |
| Red Triangle, 2809 S. Chestnut Ave. | Coastal, Kern, Lyondell, Nella Oil Company ("Nella"), Exxon, Tesoro, Valero |
| Chevron #9-9093, 3996 N. Parkway Dr. | Union, Coastal, Kern, Lyondell |
| Tosco #39118, 1605 N. Cedar | Coastal, Kern, Lyondell, CUSA |
| Beacon #3519, 4591 E. Belmont Ave. | Kern |
| Beacon-Arco, #615, 1625 Chestnut Ave. | Kern |
| Exxon Service Station, 4594 E. Tulare St. | Coastal, Kern, Lyondell |
| 7-Eleven #13917, 3645 E. Olive Ave. | CITGO |

### C.   Moving Defendants, Stations, and Grounds

This section sets forth with specificity the moving defendants, the grounds upon which they move, and the stations to which their motions are directed.

#### 1.   Motion for Summary Judgment Dismissing Claims on Limitations Grounds, or Alternatively for Lack of Harm

The Limitations Defendants[17] move for summary judgment dismissing all of Fresno's remaining claims—for strict liability, negligence, and nuisance—on the ground that these claims are either barred by the relevant statute of limitations, or are either unripe or non-existent.  Specifically, the Limitations Defendants move for summary judgment dismissing Fresno's claims at the following stations.

**Table 3:**   *Stations at Issue in the Limitations Motion*

| Station Name | Station Address |
| --- | --- |
| Chevron #9-4374 | 1160 Fresno St. |
| Gilbert's Exxon | 4142 E. Church |
| Chevron #9-9093 | 3996 N. Parkway Drive |
| 7-Eleven #13917 | 3645 Olive Ave. |
| Tosco #39118 | 1605 N. Cedar |
| Tosco #30587 | 1610 N. Palm |
| Valley Gas | 2139 S. Elm St. |
| Beacon-Arco #615 | 1625 Chestnut Ave. |
| Unocal #6353 | 1418 E. Shaw |

---

[17]     Comprising CUSA; Union; Exxon; Shell Oil Company; Texaco Refining and Marketing Inc.; Equilon Enterprises LLC; Equiva Services LLC; CITGO; Kern; Nella; ConocoPhillips Company, individially and as successor-in-interest to defendants Tosco Corporation and Phillips Petroleum Company ("ConocoPhillips"); Lyondell (f/k/a/ Arco Chemical Company); Coastal; Tesoro; Valero.  *See* 2/1/13 Defendants' Notice of Motion and Motion for Summary Judgment Based on the Statute of Limitations or, Alternatively, for Lack of Injury, Doc. No. 146.

-10-

**2.      Motion for Summary Judgment Dismissing Claims for Lack of Evidence Pertaining to Causation**

The Causation Defendants[18] move for summary judgment dismissing Fresno's strict liability and negligence claims against them on the grounds that Fresno cannot prove that their product caused its alleged injuries.[19]  The Causation Defendants — or a subset thereof — move for summary judgment as to the following stations.

**Table 4:**   *Stations as to Which Causation Defendants Move for Summary Judgment[20]*

| Station Name And Address | Moving Defendant(s) |
| --- | --- |
| M & S Texaco, 2619 S. East Ave. | Kern |
| Tosco #30587, 1610 N. Palm Ave. | Coastal, Kern |
| Valley Gas, 2139 S. Elm St. | Duke, Kern, Tesoro, Valero |
| Chevron #9-4374, 1160 Fresno St. | Duke, Kern, Tesoro, Valero |
| Shell (1212), 1212 Fresno St. | Kern |
| Unocal #6353, 1418 E. Shaw | Coastal, Kern |
| U & A Gas & Food Mart, 2929 N. Blackstone | Tesoro |

---

[18]      Comprising Coastal; Duke; Tesoro; and Valero.  *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation ("Causation Mem.") at 1, 1 n.1.

[19]      *See id*.

[20]      *See id*. at 6-7.

| Station Name And Address | Moving Defendant(s) |
| --- | --- |
| Gilbert's Exxon, 4142 E. Church | Arco, Valero |
| Van Ness Auto, 2740 N. Van Ness | Coastal, Kern |
| Smith Tank Lines (f/k/a Carey Oil), 30 E. Divisadero St. | Duke, Kern, Valero |
| Red Triangle, 2809 S. Chestnut Ave. | Coastal, Duke, Kern, Tesoro, Valero |
| Chevron #9-9093, 3996 N. Parkway Dr. | Coastal, Kern |
| Tosco #39118, 1605 N. Cedar | Coastal, Kern |
| Beacon #3519, 4591 E. Belmont Ave. | Kern, Valero |
| Beacon-Arco, #615, 1625 Chestnut Ave. | Kern, Valero |
| Exxon Service Station, 4594 E. Tulare St. | Coastal, Kern, Valero |

### 3. Motion for Summary Judgment for Lack of Evidence Pertaining to Nuisance

Finally, the Nuisance Defendants[21] move for summary judgment

dismissing Fresno's claim for nuisance as reflected in the table below.

**Table 5:** *Stations as to Which Nuisance Defendants Move for Summary Judgment*

---

[21]   Comprising CUSA; Shell Oil Company; Texaco Refining and Marketing, Inc.; Equilon Enterprises LLC (collectively with Shell Oil Company and Texaco Refining and Marketing, Inc., the "Shell Defendants"); Valero. *See* 3/20/13 Certain Defendants' Notice of Motion and Motion for Partial Summary Judgment on Plaintiff's Nuisance Claims, No. 00 Civ. 1898, Doc. No. 3636.

| Station Name and Address | Moving Defendant(s) |
|---|---|
| Van Ness Auto, 2740 N. Van Ness | CUSA |
| M & S Texaco, 2619 S. E. Ave. | Shell Defendants |
| Exxon Service Station, 4594 E. Tulare St. | Valero |
| Valley Gas, 2139 S. Elm St. | Valero |
| Beacon #3519, 4591 E. Belmont Ave. | Valero |
| Beacon-Arco #615, 1625 Chestnut Ave. | Valero |

### D.     Claims at Issue for Purposes of These Motions

The following table lists the stations, defendants, and claims still at issue, for purposes of the present motions, following the settlements and stipulated dismissals detailed above.  The Limitations Defendants seek dismissal of all claims at the stations indicated; the Causation Defendants seek dismissal of Fresno's strict liability and negligence claims; and the Nuisance Defendants, Fresno's nuisance claims.

**Table 6:**    *Stations and Defendants at Issue for Purposes of These Motions Following Stipulated Dismissals and Settlements*

| Station Name And Address | Defendant(s) Allegedly Liable | Limitations Defendants | Causation Defendants | Nuisance Defendants |
|---|---|---|---|---|
| M & S Texaco, 2619 S. E. Ave. | Kern (ND),[22] Shell Defendants | | Kern | Shell Defendants |
| Tosco #3058-7, 1610 N. Palm Ave. | CUSA (ND), Kern (ND) | X | Kern | |
| Valley Gas, 2139 S. Elm St. | Duke, Kern, Tesoro | X | Duke, Kern, Tesoro | |
| Chevron #9-4374, 1160 Fresno St. | CUSA, Kern (ND) | X | Duke, Kern, Tesoro | |
| Shell (1212), 1212 Fresno St. | Kern (ND), Shell Defendants | | Kern | |
| Unocal #635-3, 1418 E. Shaw | CUSA (ND),Kern (ND) | X[23] | Kern | |
| U&A Gas & Food Mart, 2929 N. Blackstone | Tesoro (ND) | | Tesoro | |

---

[22]    ND indicates that Fresno has voluntarily dismissed its claim for nuisance as to the indicated defendant at the indicated station.

[23]    In the course of the briefing of the Limitations Motion, Fresno voluntarily dismissed its claims pertaining to this Station, at which there have been no recorded MTBE detections.

| Station Name And Address | Defendant(s) Allegedly Liable | Limitations Defendants | Causation Defendants | Nuisance Defendants |
|---|---|---|---|---|
| Van Ness Auto, 2740 N. Van Ness | CUSA,  Kern (ND) | | Kern | CUSA |
| Smith Tank Lines (f/k/a Carey Oil), 30 E. Divisadero St. | Kern (ND) | | Kern | |
| Red Triangle, 2809 S. Chestnut Ave. | Duke, Exxon (ND), Kern (ND),  Nella, New West, Tesoro (ND) | | Duke, Kern, Tesoro | |
| Chevron #9-9093, 3996 N. Parkway Dr. | CUSA, Kern (ND) | X | Kern | |
| Tosco #3911-8, 1605 N. Cedar | CUSA,  Kern (ND) | X | Kern | |
| Beacon #351-9, 4591 E. Belmont Ave. | Kern (ND) | | Kern | |
| Beacon-Arco, #615, 1625 Chestnut Ave. | Kern (ND) | X | Kern | |
| Exxon Service Station, 4594 E. Tulare St. | Kern (ND) | | Kern | |

| Station Name And Address | Defendant(s) Allegedly Liable | Limitations Defendants | Causation Defendants | Nuisance Defendants |
|---|---|---|---|---|
| 7-Eleven #13917, 3645 E. Olive Ave. | Citgo (ND) | X | | |

## III.   BACKGROUND[24]

### A.   The Limitations Motion

#### 1.   Summary of Limitations Defendants' Argument[25]

As reflected in Table 6, seven stations are at issue in the Limitations Motion.[26]  Of these seven, four allegedly had an MTBE detection of at least five parts per billion ("ppb") prior to the alleged limitations date: (1) Chevron #9-4374 (2) Chevron #9-9093 (3) Tosco #39118; and (4) 7-Eleven #13917 (collectively, the

---

[24]    The facts recited below—with the exception of the subsections summarizing the arguments of the parties—are taken from the pleadings, the parties' Local Civil Rule 56.1 Statements, the affidavits submitted in connection with the instant motions, and the exhibits attached thereto.  The facts are undisputed unless otherwise noted.  Where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

[25]    This section—which summarizes the argument of the Limitations Defendants—is drawn from the Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment Based on the Statute of Limitations or, Alternatively, for Lack of Injury ("SOL Mem.") at 1-4.

[26]    The Limitations Defendants' motion as to a ninth station—Gilbert's Exxon, 4142 E. Church—has been rendered moot by the dismissal of Arco and Valero from the action.

"Limitations Sites").  The remaining three stations at issue—Tosco #30587, Beacon-Arco #615, and Valley Gas (collectively, the "Soil Detection Sites")—had soil MTBE detections of above five ppb outside of the limitations period, but no detections in groundwater.

The Limitations Defendants argue that Fresno's claims at the Limitations Sites are time-barred, and that its claims at the Soil Detection sites must be dismissed because Fresno has not engaged a modeling expert, and therefore cannot meet its burden of proving that MTBE releases from the Soil Detection Sites have impacted or threatened groundwater.  In the alternative, the Limitations Defendants argue that if Fresno's claims accrued only upon actual or threatened injuries to its production wells, then its claims as to both the Soil Detection and Limitations Sites must be dismissed, because Fresno has not presented evidence from which a reasonable jury could infer that MTBE contamination at those sites poses a threat to Fresno's production wells.

**2.     The Basis for Fresno's Claims**

Fresno is "responsible for 'purveying clean, safe drinking water to approximately 450,000 people in the County of Fresno, California.'"[27]  In this capacity, it owns and operates a water system that serves the public, including two hundred and fifty wells.[28]  It seeks damages in order "'to remove MTBE and TBA pollution from drinking water supplies, to restore the reliability of Fresno's water system and drinking water supply, [and] to abate MTBE . . . plumes.'"[29]

Fresno has not identified any past or future costs associated with removing MTBE from its drinking water wells, and has incurred no such costs.[30]  Its remediation expert—David Norman—testified that he lacked sufficient information to recommend remediation at any of the sites at issue, and therefore could not state whether future remediation at any of these sites would be reasonable.[31]  However, he recommended that site-assessments be performed for

---

[27]     Defendants' Local Rule 56.1 Statement of Material Facts Submitted in Support of Defendants' Motion for Summary Judgment Based on the Statute of Limitations or, Alternatively, for Lack of Injury ("SOL 56.1") ¶ 10 (quoting FAC ¶1).

[28]     *See id*. ¶ 11 (citing FAC ¶ 4).

[29]     *Id*. ¶ 3 (quoting FAC ¶ 3).

[30]     *See id*. ¶ 6 (citations omitted).

[31]     *See id*. ¶ 7 (citations omitted).

the sites,[32] and opined that it would cost between $23,000 and $135,000 per site to conduct an initial assessment in order to determine whether remediation is reasonably required.[33]

### 3. Fresno Learns of the Threat MTBE Poses to Groundwater by the Late 1990s

By the late 1990s, through its officers and as reflected in its records, Fresno was aware of the properties and risks associated with MTBE upon which its present claims rest.[34] Additionally, Fresno's awareness of the general risks posed

---

[32]   *See* Fresno's Local Rule 56.1 Statement of Material Facts Submitted in Opposition to Defendants' Motion for Summary Judgment Based on the Statute of Limitations or, Alternatively, for Lack of Injury ("SOL Counter-56.1") ¶ 7 (citations omitted).  Norman further testified as to the average cost of remediation for sites involved in the California Underground Storage Tank ("UST") Clean-Up Fund program, but this fact has no bearing on the present motion.  *See id.*

[33]   *See* SOL 56.1 ¶ 7 (citations omitted).

[34]   *See id.* ¶ 12 (presenting testimony from Fresno's Water Production Supervisor and its Water Systems Manager that Fresno believed that MTBE could threaten its groundwater by the late 1990s, and that Fresno began monitoring and/or sampling for MTBE as early as 1997) (citations omitted); *id.* ¶ 14 (presenting April 15, 1997 advisory from California Department of Health Services to Fresno's Water Systems Manager documenting general risk of MTBE seepage through soil); *id.* ¶¶ 16-17 (documenting that Fresno's Water Systems Manager participated in the Association of California Water Agencies' MTBE Work Group as early as 1998, and that in June of that year, the city participated in the Southwest Ground Water Conference, which focused on the threat MTBE posed to groundwater) (citations omitted).  *See id.* ¶ 18 (submitting laboratory report submitted to the California State Water Resources Control Board, entitled "An Evaluation of MTBE Impacts to California Groundwater Resources," a copy of which was produced from Fresno's files, and which documents the threat that

-19-

by MTBE may be inferred from California's political response to MTBE in the late

1990s.  On March 25, 1999, Governor Gray Davis issued an executive order

phasing out MTBE in gasoline in California, stating that "while MTBE has

provided California with clean air benefits, because of leaking underground fuel

storage tanks, [it] poses an environmental threat to groundwater and drinking

water."[35]  That same year, all gasoline stations selling gasoline containing MTBE

were required to put a notice on their pumps stating that, "[t]he State of California

has determined that the use of this chemical presents a significant risk to the

_____

MTBE posed to groundwater resources in the State of California) (citations
omitted).  Because Fresno either admits, or has failed to specifically controvert, the
above facts, they are deemed admitted.  *See* SOL Counter-56.1 ¶¶ 12, 14, 16-18
(citations omitted).  Based on the testimony of Robert Little, its 30(b)(6) designee
as to damages and remedies, Fresno claims that "it had no MTBE detections in its
drinking water supply wells at that time, and Fresno first detected MTBE in a
monitoring well (Monitoring Well 318) on November 27, 2001." *Id*. ¶ 12
(citations omitted).  But Little testifies only that there was a detection at that well
on November 27, 2001, and that "up until 2008[,]" Fresno was "pretty much" not
detecting MTBE; he does not specifically controvert the testimony of Fresno's
Water Production Supervisor and Water Systems Manager presented by the
Limitations Defendants.  1/19/11 Deposition of Robert Little ("Little Dep."), Ex.
10 to Declaration of Jeremiah J. Anderson (counsel for Limitations Defendants) in
Support of Defendants' Motion for Summary Judgment Based on the Statute of
Limitations or, Alternatively, for Lack of Injury ("Anderson Decl."), at 443:16-24;
3/31/11 Little Dep., Ex. 5 to Declaration of Evan Eickmeyer  (counsel for Fresno)
in Support of Fresno's Opposition to Defendants' Motion for Partial Summary
Judgment Based on the Statute of Limitations or, Alternatively, for Lack of Injury
("Eickmeyer Decl."), at 160:22-161:6.

[35]     SOL 56.1 ¶ 25 (quotation marks and citations omitted).

environment."[36]  Additionally, the California Department of Health Services set the

Secondary Maximum Contaminant Level ("MCL") for MTBE at five ppb, which it

denoted as the maximum "Consumer Acceptance Contaminant Level[]. . . .."[37]

### 4.    Fresno Learns of  MTBE Detections at the Sites at Issue

Fresno was also aware that MTBE had been detected at all of the sites

at issue in this motion prior to October 2000.  This knowledge was derived from

many sources.  Fresno had actual knowledge of detections at the Limitations Sites

via quarterly reports issued by the Central Valley Regional Water Quality Control

Board (the "Regional Board").  As early as October 1998, pursuant to a California

statute, the Regional Board began sending quarterly reports listing reported MTBE

releases from leaking USTs in the Central Valley region to Fresno, as well as other

water system operators within its jurisdiction.[38]  As of July 2000, these quarterly

reports had specifically identified that each of the Limitations Sites had reported

MTBE releases that impacted groundwater at levels above five ppb.[39]

---

[36]    CAL. CODE REGS. tit. 13, § 2273 (1999).

[37]    *Id*. tit. 22 § 64449 (1999); SOL Counter-56.1 ¶ 27.

[38]    *See* SOL 56.1 ¶¶ 19-20 (citing CAL. WATER CODE § 13272.1)
(establishing the Regional Board's duty to report MTBE releases)  (further
citations omitted).

[39]    *See id*. ¶ 21.

In addition to receiving notice of releases at the Limitations Sites through the Regional Board, Fresno—by virtue of its involvement in the installation, destruction, and use of monitoring wells—was on notice of MTBE detections at the following sites for which monitoring wells were installed prior to October 2000: (1) Chevron #9-4374; (2) Chevron #9-9093; (3) Tosco #39118; and (4) 7-Eleven #13917.[40]  Since at least 1994, Fresno has regulated the installation, use, and destruction of all groundwater monitoring wells within its jurisdiction by a permitting process, and its policy required it to assess the 'analytical results' at each site that had at least one groundwater monitoring well and make a determination with respect to the environmental impact at the well's location.[41]

Finally, Fresno was on inquiry notice that there had been MTBE detections at *all* of the sites at issue for purposes of the Limitations Motion as of July 12, 2000.[42]  Under California law, records of detections are maintained by

---

[40]     *See id*. ¶ 22 (citations omitted).

[41]     *See id*. ¶¶ 28-29 (citing Engineering Services Division, City of Fresno Public Works Department, Standard Procedures for Monitoring Well Permit Process §§ 5, 8-9 (July 1, 1994, revised July 1, 2003), Ex. 14 to Anderson Decl.)).

[42]     *See id*. ¶¶ 32, 42, 45, 51, 55, 62, 67, 69 (presenting documentary evidence of detections on or prior to July 12, 2000 for all sites at issue in the Limitations Motion save for Unocal, the non-detect site) (citations omitted). Fresno "[d]en[ies] the implication that [it] was provided with the reports."  SOL Counter-56.1 ¶ 42.  However, it does not deny that the reports were accessible to it.

California agencies charged by law with making them publicly available, and Fresno has submitted reports generated pursuant to this obligation showing detections of above five ppb, outside the limitations period, in the Limitations Sites (detection in groundwater) and the Soil Detection Sites (detection in soil).[43]

### 5. The September 3, 2013 Hearing Confirms that Fresno Is Claiming Injury Only to Its Production Wells

In its opposition to the Limitations Motion, Fresno argues that its injuries are entirely to its production wells, and that it merely seeks to abate and/or remediate contamination at the Limitations Sites and Soil Detection Sites as a remedy for this injury.[44]  Specifically, Fresno's position is that it had no cause of action until MTBE was detected in Monitoring Well 318—a monitoring well fifty feet from one of Fresno's drinking water production wells—on November 27,

---

[43]     *See* Counter-56.1 ¶¶ 22-24 (citations omitted); CAL. GOV'T CODE §§ 6250-6276.48, 6252(a), (d), (f), 6253, 6253.4.

[44]     *See* Fresno's Opposition to Defendants' Motion for Partial Summary Judgment Based on the Statute of Limitations or, Alternatively, for Lack of Injury ("SOL Opp. Mem.") at 15 ("Defendants have submitted no evidence to demonstrate why the mere presence of MTBE in a shallow aquifer at a station site —at any level—constitutes appreciable harm to Fresno's water system prior to the limitations period.") (citations omitted)  *See also id.* at 21 ("The MTBE detected in the soil and shallow aquifer at gas station sites . . . did not impair Fresno's use of its wells or the water supplied by the wells before the limitations period.  In other words, before the limitations period, Fresno did not suffer physical property damage. . . [or any] appreciable harm until its wells were actually contaminated with MTBE.") (citations omitted).

2001, within the limitations period.[45]

Fresno's representation that its claims arise solely from injuries—or threatened injuries—to its water production wells considerably narrows the scope of the Limitations Motion.  It is well-established that "[a] court can appropriately treat statements in briefs as binding judicial admissions of fact."[46]  However, to ensure that Fresno had not mistakenly abandoned any claim that it was directly injured by MTBE contamination at the Limitation Sites and Soil Detection Sites, I held a telephonic hearing on September 3, 2013 (the "September 3 Hearing").  At that Hearing, counsel for Fresno confirmed that Fresno does not claim it has been injured at the Limitations Sites and Soil Detection Sites, but that it suffered appreciable injury only to the extent that contamination to the stations at issue threatened the deeper aquifers from which its production wells draw water.[47]

## 6.    Evidence Pertaining to Fresno's Threatened Well Theory

Fresno's judicial admission that its claims arise solely from threats to its production wells limits the scope of the Limitations Motion to a consideration

---

[45]    *See id*. at 16.

[46]    *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) (citations omitted).

[47]    *See* 9/3/13 Telephone Hearing Transcript ("9/13 Tr.") at 5:1-3 ("[Fresno] was appreciably harmed for the first time [] when MTBE [was detected] in its production wells.")

-24-

of whether the deeper aquifers that serve Fresno's production wells are threatened by the groundwater or soil contamination at the seven stations at issue.  In support of its contention that its production wells are threatened by contamination at the seven stations at issue, Fresno offers the testimony of its experts Graham Fogg, Richard Haberman, and David Norman.  Fresno also offers the opinion of defense expert John Wilson.

### a.    Graham Fogg

In its Local Rule 56.1 Counterstatement, Fresno "[a]dmit[s] that [it] did not designate an expert to construct and run [fate and transport] models[,]" but asserts that it "designated expert Dr. Graham Fogg to discuss the fate and transport of MTBE in groundwater and his expert report discusses models constructed and run by others."[48]  Fresno did not submit Fogg's report or testimony into the record; instead, it relied upon an attorney declaration containing the statement quoted above.[49]

The Limitations Defendants respond in their Reply 56.1 Statement that:

> Fogg's expert report and deposition testimony contain general opinions relating to the fate and transport of MTBE in

---

[48]    SOL Counter-56.1 ¶ 4 (citing Eickmeyer Decl. ¶ 9).

[49]    *See* Eickmeyer Decl. ¶ 9.

groundwater; however, Dr. Fogg has not created a model predicting the fate and transport of the MTBE allegedly released from the Sites that are the subjects of Defendants' Motion. Nor did Dr. Fogg discuss any "models constructed and run by others" that concern the Sites or even the City of Fresno.[50]

At the September 3 Hearing, over the Limitation Defendants' objection, I permitted Fresno to supplement the record with Appendix B of Fogg's expert report, which counsel for Fresno maintained would supply the "missing link" proving a causal connection between the seven stations at issue and Fresno's production wells.[51] I also permitted the Limitation Defendants to submit portions of Fogg's deposition that they represented would show that Fogg could not draw a causal link between contamination at the stations at issue and Fresno's water production wells.[52]

### i.    Appendix B to Fogg's Report

Fresno submitted Appendix B to Fogg's report, accompanied by a

---

[50]    Defendants' Reply to Fresno's Local Rule 56.1 Statement of Material Facts Submitted in Opposition to Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("SOL Reply 56.1") ¶ 4.

[51]    *See* 9/13 Tr. at 28:17-25.

[52]    *See id*.; *see also id*. at 27:11-16.

dated and signed signature page.  Appendix B

> presents the results of an analysis to determine wells threatened by
> MTBE contamination from 28 focus sites.  The analysis was
> performed by selecting wells within a 1/2 mile radius ±90 degrees
> of the approximate groundwater flow direction and within a 1/4
> mile radius ±90 degrees from the direction opposite to the
> approximate groundwater flow direction.  Also selected are wells
> within a one mile radius ±90 degrees of the approximate
> groundwater flow direction.[53]

In short, Fogg's methodology consisted of drawing three semicircles around sites with MTBE detections: two larger semicircles—one with a half-mile radius, and one with a mile radius—in the approximate direction of groundwater flow, and one smaller semicircle—with a quarter-mile radius—in the opposite direction.  The production wells falling within these semi-circles are, in Fogg's opinion, threatened by MTBE.

The remainder of Appendix B contains a table listing focus sites and the wells that fall within one of the semicircles.  For example, the table shows that the Chevron #9-9093 Station is within the half-mile down-gradient semicircle of Fresno's production well 320 (about which no other facts are in the record).[54]

### ii.    Fogg's Deposition

---

[53]    12/5/11 Expert Report of Graham Fogg (filed concurrently with this Order) at 169.

[54]    *See id*. at 171.

Accepting my invitation at the September 3 Hearing, the Limitations Defendants submitted Fogg's deposition transcript to the Court, along with a sworn declaration of counsel attesting to its accuracy.[55]  As Defendants had represented at the September 3 Hearing, Fogg testified at his deposition that he had not "formed an opinion as to whether MTBE from any particular station in this case has already gotten to any well[,]" and that he could not "identify any station . . . that [he] believe[d] w[ould], more likely than not, contaminate a drinking water well. . . ."[56]

Fogg further testified that Appendix B listed sites that "could potentially affect at least one drinking water well[,]" but not sites that constituted a "present threat. . . ."[57]  Finally, Fogg testified that he had not "quantified that potential for any of" the stations listed in Appendix B.[58]

---

[55]    *See* Excerpts from 4/13/12 and 6/15/12 Depositions of Graham Fogg ("Fogg Deps. Tr."), Ex. 1 to 9/6/13 Declaration of Charles C. Correll, Jr. in Support of Defendants' Motion for Summary Judgment Based on the Statute of Limitations or, Alternatively, for Lack of Injury.

[56]    *Id*. at 2.  *See also id*. at 3 (Question: "Can you identify any specific station, gas station, in Fresno where you have formed the opinion that MTBE in any amount from that station will [more likely than not] eventually get to one or more wells?"  Answer: "Again, not for individual stations.").

[57]    *Id*. at 3.

[58]    *Id*.

### b.    Richard Haberman

Haberman was a Regional Engineer for the Fresno office of the California Department of Public Health from 2001 to 2009, and is employed by Fresno as a contamination and treatment expert.  Fresno relies upon two portions of Haberman's report.  The *first* states that:

> Methyl tertiary butyl ether (MTBE) contamination of a ground water basin can result in the need to curtail the use of drinking water wells located in the groundwater basin to prevent spreading the contamination. This can cause a municipality to seek potentially more expensive alternative sources of water.
>
> Identifying MTBE contamination in a ground water basin will result in increased monitoring costs for utilities that use the basin as a drinking water source.[59]

The *second* portion of Haberman's report relied upon by Fresno states:

> Even though an MTBE plume is not presently affecting drinking water supply wells, under certain circumstances, a utility may find it more cost effective to take mitigation measures to address the plume before it eventually spreads to water supply wells resulting in more expensive treatment costs to comply with MCLs and maintain consumer confidence.  Cleaning up a concentrated contaminant plume in shallower groundwater aquifers is less expensive than allowing a plume to spread out and treating smaller concentrations over a wider area.[60]

The Limitations Defendants object and move to strike these portions of

---

[59]    Expert Report of Richard L. Haberman, PE ("Haberman Report"), Ex. 1 to Eickmeyer Decl., at 5.

[60]    *Id*. at 10.

Haberman's report on the ground that they are inadmissible hearsay.  An expert's report may not be used as a conduit for the inadmissible hearsay of another, but an expert may rely on hearsay sources that she used in forming her opinion.[61] Haberman's report is not inadmissible hearsay, because it reflects his own opinions.

Fresno also relies upon Haberman's deposition, at which he testified as follows:

> Q.    Bullet No. 8 [referring to Haberman's expert report] says, "Identifying MTBE contamination in a groundwater basin will result in increased monitoring costs for – cost for utilities that use the basin as a drinking water source."  By "groundwater basin," do you mean the aquifer from which the particular well draws its water?
>
> A.    Correct.

### c.    David Norman

Fresno designated David Norman as its remediation and damages

---

[61]    *See, e.g., United States Info. Sys., Inc. v. International Broth. of Elec. Workers Local Union Number 3*, No. 00 Civ. 4763, 2006 WL 2136249, at *16 (S.D.N.Y. Aug. 1, 2006) ("Although the plaintiffs are correct that under Rule 703 of the Federal Rules of Evidence they may quote [an expert's] conclusions and opinions, even if he has relied on inadmissible evidence in reaching them, they may not use his report as a mere conduit for the hearsay of another.") (quotation marks and citations omitted).

testifying expert.[62]  In opposition to the Limitations Motion, Fresno offers the

deposition testimony of Norman that: "of the more than 7,000 open sites in the

California UST Clean-Up Fund, clean-up costs at 11% of the sites have been

reimbursed for over $800,000, averaging $1.1 million.  Conversely, 89% of the

sites have been reimbursed $800,000 or less."[63]  This testimony mirrors the opinion

offered by Norman in his expert report, which states that:

> Remedial costs vary widely [] depending on the depth of
> groundwater, concentration of MTBE (or other contaminants
> present), the costs of electric power or propane, the area available
> to house a treatment system and many other variables.  Without a
> completed assessment it is not possible to estimate the cost to
> remediate a site. The State of California's UST cleanup fund
> ("Fund") has set limits for assessment and cleanup for a single
> release at UST sites with gasoline and MTBE of $1,500,000. This
> upper limit is for State reimbursement and is not intended to make
> the responsible party whole. . . . In a recent conversation with
> Fund staff they indicated they are just now beginning to look at
> remedial technologies used at any given site for cost comparison.
> Of the more than 7,000 open sites in the Fund over 800 sites
> (11%) have been reimbursed over $800,000 dollars averaging
> $1,100,000.[64]

> Norman acknowledged at his deposition that "[f]or none of the []

---

[62]     *See* SOL Counter-56.1 ¶ 4 ("Admit that Fresno designated David
Norman as its remediation and damages testifying expert.").

[63]     *Id*. ¶ 7 (citing 4/18/12 Deposition of David Norman ("Norman Dep."),
Ex. 6 to Eickmeyer Decl., at 102:11-19; 102:20-24).

[64]     Expert Report of David Norman ("Norman Report"), Ex. 8 to
Anderson SOL Decl., at 5.

[sites] at issue [in this case] did he provide an estimate[] [] of the cost [of] remedi[ation]. . . ."[65]   Norman also acknowledged that he recommended "additional assessment activities"—*e.g.*, installing sampling wells in order to detect the existence and/or magnitude of MTBE contamination—but not "additional remediation action" at the sites at issue in this action.[66]   Norman opined that performing such assessments at the sites at issue in this motion would cost between $23,000 and $135,000 per site.[67]   Finally, Norman testified that he was not qualified to perform site-specific fate and transport analysis, and did not attempt to do so.[68]

In short, Norman provided no opinion or testimony supporting remediation damages on a site-specific basis, and he did not perform any fate and transport analysis connecting releases at specific stations to Fresno's production wells.   However, Norman recommended that assessments be conducted at the sites at issue in order to determine whether remediation is appropriate.[69]

---

[65]      *See* Norman Dep., Ex. 7 to Anderson Decl., at 101:3-6.

[66]      *Id*. at 33:2-11.

[67]      *See* Chart of Norman's Recommended Assessment Activities, Ex. 7 to Anderson Decl.

[68]      *See id*. at 61:8-64:2.

[69]      *See* SOL Reply-56.1 ¶ 7 ("It is undisputed that [] Norman opined that an initial site assessment is necessary at each of the Sites [in this action] in order

### d.   John Wilson

In its opposition to the Limitations Motion, Fresno submits a portion of the report of defense expert John Wilson, a qualified hydrogeologist (the "Wilson Report").[70]  Specifically, its Local Rule 56.1 Statement in opposition to the Limitations Motion, Fresno—citing the Wilson Report—alleges that "Defendants' expert Dr. John Wilson stated in his expert report that gasoline released at station sites stays in the shallower 'vadose' zone and does not represent an immediate threat to Fresno's deeper drinking water supply aquifer."[71]  By submitting the Wilson Report, Fresno has waived objections to its admissibility, at least for purposes of the Limitation Motion.

The Wilson Report "considers 31 gasoline service stations (Williams, 2012, see Table 1), including 28 identified as focus sites by plaintiff expert Dr. Graham Fogg (Appendix B, 2011), and City of Fresno drinking water supply wells that are allegedly threatened by gasoline hydrocarbon releases at these stations."[72]

---

for [] Norman to provide an opinion regarding what, if any, additional assessment or active remedial work may be needed at the Sites.").

[70]     *See* SOL Counter-56.1 ¶ 80 (citing 2/17/12 Expert Report of John Wilson ("Wilson Report"), Ex. 3 to Eickmeyer Decl., at 5-7).

[71]     SOL Counter-56.1 ¶ 7 (citation omitted).

[72]     Wilson Report at 4.

It concludes that "MTBE associated with hydrocarbon releases from service stations impacts the shallow aquifer, [but] not the deeper and protected semi-confined aquifer system."[73]  This is so because "a substantial percentage of liquid gasoline releases are confined to the vadose zone (*i.e.*, the unsaturated zone) beneath the station, without migrating to groundwater[,]" and this effect "is particularly likely for the City of Fresno, which has a thick vadose zone."[74]

In addition to the vadose zone—which is roughly one hundred feet thick in the City of Fresno[75]—acting as a barrier between MTBE contamination and the deeper aquifers serving Fresno's production wells, the Wilson Report identifies a number of other mechanisms which, in his opinion, make it unlikely that MTBE at the Limitations Sites and Soil Detection Sites pose a threat to Fresno's production wells.[76]  The report states that: "[t]he suite of barriers, attenuation mechanisms, and mixing in wells also ensures that if one or more attenuation mechanisms are weak or absent, *e.g.*, absorption or biodegradation,

---

[73]     *Id*. at 6.

[74]     *Id*.

[75]     *See id*. at 17 ("The vadose zone under Fresno has been roughly 100 feet thick or more for several decades, including the period of the 1990s when MTBE was used as a gasoline oxygenate.").

[76]     *See id*. at 4-7.

then the barriers, remaining mechanisms, and mixing in wells will continue to protect water supply wells from detectable MTBE impacts. . . ."[77]

Finally, regarding the report of Fresno's expert Fogg, the Wilsom Report states as follows:

> I reviewed Dr. Graham Fogg's December 5, 2011 expert report on MTBE in the environment, which he submitted in this case. Dr. Fogg mostly presents generic technical and scientific opinions, some of which are not relevant to the City of Fresno case, and some of which are misleading. His report is designed to develop a generic argument that claims MTBE impacts from hydrocarbon releases to the near subsurface will be widespread and long-lived and suggests that future impacts to City of Fresno wells will occur. Dr. Fogg fails to consider relevant peer reviewed studies, site-specific conditions, and the prevalence of MTBE biodegradation data that refute his theory for City of Fresno water supply wells.

In sum, the Wilson Report identifies a number of complementary mechanisms whereby groundwater contamination might not cause contamination to the deeper aquifers serving Fresno's production wells, and finds that Fogg's conclusion that the migration of MTBE to the deeper aquifer is inevitable has no scientific basis.

**B.     Factual Background of Causation Motion**

**1.     Stations at Issue Following Limitations Motion and Summary of Argument**

---

[77]     *Id*. at 7.

Following my disposition of the Limitations Motion,[78] the following stations are at issue for purposes of the Causation Motion.

**Table 7:**   *Stations and Defendants at Issue for Purposes of Causation Motion*

| Station Name And Address | Defendant(s) Allegedly Liable | Causation Defendants |
|---|---|---|
| M & S Texaco, 2619 S. East Ave. | Kern (ND),  Shell | Kern |
| Shell (1212), 1212 Fresno St. | Kern (ND),  Shell | Kern |
| U&A Gas & Food Mart, 2929 N. Blackstone | Tesoro (ND) | Tesoro |
| Van Ness Auto, 2740 N. Van Ness | CUSA, Kern (ND) | Kern |
| Smith Tank Lines (f/k/a Carey Oil), 30 E. Divisadero St. | Kern (ND) | Kern |
| Red Triangle, 2809 S. Chestnut Ave. | Duke, Exxon (ND), Kern (ND), Nella, New West, Tesoro (ND) | Duke, Kern, Tesoro |
| Beacon #3519, 4591 E. Belmont Ave. | Kern (ND) | Kern |
| Exxon Service Station, 4594 E. Tulare St. | Kern (ND) | Kern |

In sum, Kern, Tesoro, and Duke move for summary judgment dismissing Fresno's

---

[78]     *See infra* Section V.A.

claims for strict liability and negligence against them as to eight stations on the ground that there is no evidence that they caused MTBE to contaminate these stations.

### 2.     The Moving Defendants

#### a.     Kern

Freso alleges that Kern manufactured and supplied neat MTBE to Shell, CUSA, and Valero, and further alleges that this neat MTBE was blended into gasoline that was then distributed to fourteen stations within the City of Fresno.[79]  Fresno "is relying solely upon the commingled product theory to establish the required causal nexus[]" for Kern, and, lacking direct evidence that gasoline blended with MTBE from Kern was delivered to any station at issue, instead relies upon the interrogatory responses of Shell, CUSA, and Valero that Kern supplied them with neat MTBE and that they supplied gasoline to the stations at issue.[80]

#### b.     Tesoro

---

[79]     *See* Defendants' Statement of Material Facts in Support of Motion for Summary Judgment Pertaining to Causation ("Causation 56.1") ¶¶ 25-28; Fresno's Statement of Material Facts Submitted in Opposition to Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation ("Causation Counter-56.1") ¶¶ 25-28.

[80]     *See* Causation 56.1 ¶¶ 29-30; Causation Counter-56.1 ¶¶ 29-30.

Fresno alleges that Tesoro is liable for marketing and supplying gasoline containing MTBE that ultimately contaminated Fresno's water system.[81] Tesoro sold gasoline containing MTBE to jobbers—*i.e.*, middlemen who buy gasoline from terminals or producers and sell it to users—at one of the gasoline sales terminals servicing the City of Fresno.[82]  At the point of sale, it relinquished ownership of the gasoline sold, and issued bills of lading to the purchasing jobbers that identified the source, type, and quantity of product delivered, but not to whom the jobbers would ultimately sell the gasoline.[83]

As reflected in Table 7 above, Tesoro moves for summary judgment dismissing Fresno's claims as to two stations: Red Triangle and U & A.  With respect to Red Triangle: Tesoro sold gasoline at the gasoline sales terminal to Inter-City Petroleum Marketers, Inc, a predecessor to Red Triangle Oil Company (as a jobber), from 1994-1996 and from 1999-2003, and to Red Triangle Oil Company, Inc. (as a jobber) in 2002 and 2003.[84]  Fresno, in an interrogatory response, identified "Red Triangle" as the only jobber that may have supplied

---

[81]     *See* Causation 56.1 ¶ 31 (citing FAC ¶¶ 7; 17-18).

[82]     *See id*. ¶ 34.

[83]     *See id*. ¶¶ 35-36.

[84]     *See id*. ¶ 37.

Tesoro gasoline containing MTBE to the Red Triangle station prior to 1998 (when the MTBE release occurred).[85]  In opposition to the Causation Motion, Fresno presents the deposition testimony of Gail Blue—the CEO of Red Triangle (the jobber) as of 2011—that she "recalled Tesoro gasoline being delivered."[86]  In reply, Tesoro submits additional deposition testimony from Blue, in which she states that she was not responsible for purchasing gasoline, and that she was unsure as to the destination of the gasoline purchased by Red Triangle (the jobber).[87]

Regarding the U & A station: in an interrogatory response, Fresno identified Southern Counties Oil Co., Ltd. (d/b/a Total Energy Products) ("Southern Counties") as the only jobber that may have delivered Tesoro gasoline to the U & A station.[88]  Southern Counties had authority to supply Tesoro branded fuels to stations in Fresno, and Total Energy supplied gasoline to the U & A station.[89]  There is evidence that Southern Counties supplied gasoline to the U & A

---

[85]     *See id.* ¶ 38.

[86]     Causation Counter-56.1 ¶ 38.

[87]     *See* Defendants' Reply to Fresno's Local Rule 56.1 Statement of Material Facts Submitted in Opposition to Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation ("Causation 56.1 Reply") ¶ 38.

[88]     *See* Causation 56.1 ¶ 40.

[89]     *See id.* ¶ 41.

station, but, because Southern Counties lacks historical records, there is no direct

evidence that Southern Counties supplied *Tesoro* gasoline to the U & A station.[90]

### c.    Duke

Of the four named Duke defendants, only two remain in the case:

Duke Energy Merchants, LLC ("DEM")  and Northridge Petroleum Marketing

U.S. ("Northridge").[91]  Fresno alleges that these are "'Distributor Defendants'"

liable for supplying MTBE gasoline to "'areas that affect Fresno's Water

system.'"[92]

Northridge was a commodities trading company headquartered in

California that began doing business in California in approximately 1996.  Among

other commodities, it traded gasoline containing MTBE.  It did not buy or sell neat

MTBE.[93]  Northridge leased tanks at the Kinder Morgan terminal in Fresno,

California beginning in approximately June 1996, and, like Tesoro, sold gasoline at

the terminal's loading rack, F.O.B., to jobbers.[94]

In February 2000, Northridge was purchased by DEM, which had

---

[90]     *See id*. ¶¶ 42-44.

[91]     *See id*. ¶¶ 15-16.

[92]     *Id*. ¶ 15 (quoting FAC ¶¶ 33; 37-38; 41-42).

[93]     *See id*. ¶ 17.

[94]     *See id*. ¶ 18.

previously not done any business in California.[95]  DEM ceased business operations

in California in July 2006.[96]  Northridge and DEM, collectively, sold MTBE-

containing gasoline to Intercity Petroleum Marketers and Southern Counties

between 1996 and 2003.[97]

### 3.    Commingled Products Evidence[98]

MTBE could have been sold in California for a seventeen-year period

from 1986 to December 31, 2003.[99]  Dickman Lum, the California Air Resources

Board employee charged with enforcing gasoline composition regulations, testified

that five refineries, all located in Northern California, supplied gasoline —

including MTBE gasoline — to the San Francisco Bay Area from 1996 to 2001.[100]

---

[95]    *See id*. ¶ 21.

[96]    *See id*. ¶ 22.

[97]    *See id*. ¶ 24.

[98]    The facts that follow are drawn from Fresno's Statement of Additional Material Facts and the Causation Defendants' Reply 56.1 Statement.  They are undisputed, unless otherwise noted.

[99]    *See* Causation 56.1 Reply ¶ 117.

[100]    *Compare* Causation 56.1 Reply ¶ 105 *with* Causation Counter-56.1 ¶ 105 (citations omitted); *see* 5/10/01 Deposition of Dickman Lum (taken in *South Tahoe Public Utility District v. Atlantic Richfield Co*., No. 99 Civ. 999128 (San Fran. Sup. Ct. Apr. 16, 1999)), Ex. 17 to 4/15/13 Declaration of Michael D. Axline (counsel for Fresno) in Support of Fresno's Opposition to Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation ("Axline Decl.") at 44:4-45:25.

Shell owned and operated two refineries, Martinez Refinery and Bakersfield Refinery, that supplied MTBE gasoline to the City of Fresno.[101]  The gasoline manufactured at the Martinez Refinery was either distributed in Martinez or shipped to the rest of Northern California via the Kinder Morgan pipeline system.[102]  Additionally, Shell owned two terminals, the Stockton Terminal and the Rosedale Highway Terminal, both of which served the City of Fresno.[103]

CUSA owned and/or operated two refineries, located in Richmond, California and El Segundo.[104]  It supplied gasoline products to various terminals to serve the City of Fresno.[105]  In 2000, Valero acquired an Exxon refinery located in Benecia, California, which, through the Kinder Morgan pipeline, supplied gasoline to much of Northern California.[106]  In short, Shell, CUSA, Valero, and/or Exxon utilized the Kinder Morgan system to distribute gasoline from their Bay Area Refineries to terminals, some of which ultimately supplied stations within Fresno's jurisdiction.

---

[101]    *See* Causation Counter-56.1 ¶ 106.

[102]    *See id.* ¶ 107.

[103]    *See id.* ¶ 108.

[104]    *See id.* ¶ 110.

[105]    *See id.* ¶ 111.

[106]    *See id.* ¶ 112.

### 4.    Moreau's Testimony and Expert Reports

At the September 3 Hearing, counsel for Fresno represented that he had evidence, through Moreau's reports and testimony, tying the Causation Defendants' products to contamination at the stations at issue.[107]  However, site specific reports by Moreau pertain to only three of the eight Causation sites in the record: Beacon 3519, Red Triangle, and Exxon, Tulare Ave.

Moreau's Site Specific Report at Beacon 3519 states that:

> On December 10, 1998 three underground storage tanks were removed from the site, and later replaced.  On December 11, 1998 Fresno County filed an Unauthorized Release Report for a gasoline release discovered during the previous day's tank removals.  Soil samples collected at that time revealed MTBE contamination at the site.[108]

Moreau did not identify any MTBE releases following the December 1998 removal of the USTs.[109]  However, Moreau's Expert Report states that, during the time MTBE-containing gasoline was in use at the station, releases of gas were "routine" due to both the ineffective USTs as well as vapor leaks that occur during fuel

---

[107]    *See* 9/13 Tr. at 32:15-17.

[108]    Expert Site Specific Report of Marcel Moreau at Beacon 3519 ("Moreau Report-Beacon 3519"), Ex. 12 to Declaration of M. Coy Connelly in Support of Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation ("Connelly Decl."), at 1; Transcript of Deposition of Marcel Moreau ("Moreau Dep."), Ex. 8 to the Connelly Decl., at 767:2-6.

[109]    *See* Moreau Dep. at 767:2-6.

deliveries, customer overfilling, and dripping during fueling.[110]

Moreau's Site Specific Report at Red Triangle attributes the MTBE contamination at the site to the December 1998 removal of the bulk plant's USTs.[111]  The report notes that an inspection uncovered discharges of gasoline at the retail stations dispensers, but states:

> [I]t is not known whether these releases were contained within the dispenser sumps or whether some of the releases may have escaped to the environment.  No soil sampling data associated with these dispensers was reviewed.[112]

Moreau's Red Triangle Report identifies MTBE contamination near the bulk plant, not the retail-station gas-dispensers.[113]  Thus, a conclusion that MTBE contamination emanated from the retail portion of the Red Triangle Station is purely speculative.

Moreau's Site Specific Report of Exxon, Tulare Ave. notes that soil sampling detected MTBE at the site after USTs were removed in December

---

[110]     *See* 11/2/11 Expert Report of Marcel Moreau, Ex. 12 to Axline Decl., §§ I, II, V.

[111]     Expert Site Specific Report of Marcel Moreau at Red Triangle ("Moreau Report-Red Triangle"), Ex. 9 to 3/16/13 Declaration of James R. Wedeking in Support of Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation ("Wedeking Decl."), at 5.

[112]     *Id.* at 6.

[113]     *See id.* at 5-6.

1998.[114]  In the report, Moreau opines that spills or leaks at the storage tanks caused the MTBE releases at the site between fall of 1992 and December 1998, when the tanks were removed.[115]

Finally, Moreau's Site Specific Report at Valley Gas states that "spills or leaks occurred on a regular basis."[116]  The Causation Defendants object and move to strike Moreau's statement on the ground that it is inadmissible hearsay.[117] Because there is an insufficient basis in the record to conclude that this opinion is merely the conduit for inadmissible hearsay, rather than Moreau's own opinion, I deny the motion to strike.

### C.    Factual Background of Nuisance Motion

In the Nuisance Motion, CUSA moves to dismiss Fresno's nuisance claim against it as to the Van Ness Auto site ("Van Ness"), and Shell moves to dismiss Fresno's nuisance claim against it as to the M & S site ("M & S").  The facts of record pertaining to these stations are summarized below.

---

[114]    *See* Expert Site Specific Report of Marcel Moreau at Exxon, Tulare Ave. ("Moreau Report-Exxon, Tulare"), Ex. 13 to Connelly Decl., at 1.

[115]    *See id.*

[116]    11/2/11 Expert Site Specific Report of Marcel Moreau at Valley Gas ("Moreau Report-Valley Gas"), Ex. 19 to Axline Decl., at 4.

[117]    *See* Causation 56.1 Reply ¶ 102.

### 1.    Van Ness

Van Ness has not had a contractual relationship with CUSA since 1986.[118]  CUSA did not add MTBE to the gasoline that it refined until 1990.[119]  From 1986 to 1999, CUSA supplied gasoline to a jobber—R.V. Jensen & Company—that may have supplied gasoline to Van Ness.[120]  The USTs at Van Ness were removed, and the gasoline station was closed, in 1998.[121]

CUSA's sole involvement with Van Ness, besides supplying it with gasoline up to 1986 and indirectly supplying it via R.V. Jensen thereafter, was to enter the premises to provide signage— *e.g.*, 'Chevron Gas sold here!' — and inspect for cleanliness.[122]  CUSA ceased this limited involvement with Van Ness following the expiration of its dealer-supply/branding contract with the station in 1986.[123]

---

[118]    *See* Nuisance 56.1 ¶ 6.  Fresno submits evidence that the station owner subsequently purchased gasoline from a jobber that may have purchased from CUSA, but does not submit evidence controverting the fact that CUSA terminated its contractual relationship with Van Ness in 1986.  *See* Nuisance Counter-56.1 ¶ 6.

[119]    *See* Nuisance 56.1 ¶ 6.

[120]    *See id.* ¶ 9

[121]    *See id.* ¶ 8.

[122]    *See id.* ¶ 10.

[123]    *See id.* ¶ 6.

2.    **M & S**

Despite Fresno's repeated references to "Shell," the M & S station was Texaco-branded during the entire relevant time period, as Fresno's own evidence demonstrates.[124]  Shell's sole involvement with M & S was supplying it with gasoline pursuant to a supply contract.[125]  Shell neither owned nor operated the station.[126]  M & S and its owner, Jatinder Dhillon, were solely responsible for operating the station, maintaining the equipment, conducting required testing on the tanks and systems, complying with relevant laws and regulations, and responding to spills.[127]

An MTBE release was detected at M & S in October 1997.[128]

Fresno's nuisance claim at M & S is based on post-1998 visits by Shell

---

[124]    *See* Shell Defendants' Responses to City of Fresno's First Set of Interrogatories to Defendants, Ex. 6 to 3/12/13 Declaration of Tracey L. O'Reilly in Support of Fresno's Opposition to Certain Defendants' Motion for Partial Summary Judgment Based on Plaintiff's Nuisance Claims ("O'Reilly Decl."), at 8 (identifying station at 2619 S. E. Ave. as "Texaco" until 2003).

[125]    *See* Nuisance 56.1 ¶ 15.

[126]    *See id.* ¶ 16.

[127]    *See* Nuisance 56.1 ¶¶ 11, 17-19.

[128]    *See* Nuisance 56.1 Reply ¶ 11 (citing Central Valley Regional Water Quality Control Board, M & S Texaco Case Closure Summary, Mar. 2012, at 1.).

representatives to the station.[129]  Dhillon also allegedly received "training by Shell on the safe operation of a gasoline station."[130]  Specifically, Shell representatives gave Dhillon a manual on how to operate the station, including instructions for cleaning up gasoline releases.[131]  Dhillon testified at his deposition that he did not recall receiving specific instructions from Shell as to how to properly handle and dispose of MTBE-containing gasoline.[132]

## IV.   LEGAL STANDARD

### A.   Summary Judgment Standard

Summary judgment is appropriate only if the moving party shows "that there is no genuine dispute as to any material fact and [that the party is] entitled to judgment as a matter of law."[133]  "A genuine dispute exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[129]    *See* Nuisance Counter-56.1 ¶ 11 (citing 8/11/11 Deposition of Jatinder Dhillon ("Dhillon Dep."), Ex. 7 to O'Reilly Decl., at 149:4-15).

[130]    *Id.* (citing Dhillon Dep. at 25:14-26:13).

[131]    *Id.* (citing Dhillon Dep. at 26:8-27:11, 62:5-63:2).

[132]    *Id.* (citing Dhillon Dep. at 92:18-94:25).

[133]    *Rivera v. Rochester Genesee Regional Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (quoting FED. R. CIV. P. 56(c)) (further quotation marks omitted).

party.  A fact is material if it might affect the outcome of the suit."[134]

The moving party bears the burden of establishing the absence of any genuine issue of material fact."[135]  To defeat a motion for summary judgment, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[136] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[137]

A court deciding a motion for summary judgment must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."[138]  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of

---

[134]   *Finn v. N.Y. State Office of Mental Health-Rockland Psychiatric Ctr.*, 489 Fed. App'x 513, 514 (2d Cir. 2012) (quotation marks omitted).

[135]   *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[136]   *Gioia v. Forbes Media LLC*, 501 Fed. App'x 52, 54 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

[137]   *Robinson v. Allstate Ins. Co.*, 508 Fed. App'x 7, 9 (2d Cir. 2013) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

[138]   *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (quotations omitted).

legitimate inferences from the facts are jury functions, not those of a judge.'"[139]

"The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[140]

### B.    The Limitations Period for Fresno's Claims Under California Law

Under Section 338 of California's Civil Code of Procedure, a three-year statute of limitations applies to all of Fresno's claims.[141]  Like most jurisdictions, California applies the common law "last element accrual rule: ordinarily, the statute of limitations runs from the occurrence of the last element essential to the cause of action."[142]  For claims predicated upon tortious injury to property, such as Fresno's, the element of harm is met upon "harm to the property

---

[139]    *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[140]    *Cuff ex rel. B.C. v. Valley Cent. School Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[141]    *See* California Code Civ. Pro. § 338(a) (claims "created by statute" must be commenced within three years); *id.* § 338(b) (claims for "trespass or injury to real property").  I reject Fresno's argument that CERCLA § 309 preempts California's statute of limitations in this case for the same reasons that I rejected the identical argument in *In re MTBE Prods. Liab. Litig.*, No. 04 Civ. 4968, 2009 WL 4496736, at *2 (S.D.N.Y. Dec. 2, 2009), which Fresno fails to cite in its lengthy discussion of the subject.  *See* SOL Opp. Mem. at 6-8.  A deliberate strategy to ignore this contrary authority would constitute sanctionable conduct under Rule 11.  I hope this was not Fresno's intent.

[142]    *Aryeh v. Canon Bus. Solutions, Inc.* 55 Cal. 4th 1185, 1191-92 (2013).

itself[,]" as opposed to harm to its owner.[143]

As the Supreme Court of California has observed,

Application of the accrual rule becomes rather complex
when . . . a plaintiff is aware of both an injury and its wrongful
cause but is uncertain as to how serious the resulting damages
will be or whether additional injuries will later become
manifest.  Generally, . . . even when the extent of damages
remains speculative[,] . . . we have held that "the infliction of
appreciable and actual harm, however uncertain in amount, will
commence the statutory period."[144]

California courts recognize a number of exceptions to the last element

accrual rule, the "most important" of which is "the discovery rule. . . . [which]

postpones accrual of a cause of action until the plaintiff discovers, or has reason to

discover, the cause of action."[145]  In determining whether a plaintiff has or should

have discovered its injury, California courts consider both the plaintiff's "actual

knowledge as well as knowledge that could reasonably be discovered through the

---

[143]    *Beck Dev. Co. v. Southern Pac. Transp. Co.*, 44 Cal. App. 4th 1160,
52 Cal. Rptr. 2d 518, 556 (1996).  *Accord Starrh and Starrh Cotton Growers v.
Aera Energy LLC*, 153 Cal. App. 4th 583, 63 Cal. Rptr. 3d 165, 170 (2007)
(holding that, for claims of permanent trespass, "[t]he cause of action accrues and
the statute of limitations begins to run at the time of entry").

[144]    *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 797 (2011)
(quoting *Davies v. Krasna*, 14 Cal. 3d 502, 514 (1975)).

[145]    *Aryeh*, 55 Cal. 4th at 1192 (quoting *Norgart v. Upjohn Co.*, 21 Cal.
4th 383, 397 (1999)).

investigation of sources open to [the plaintiff]."[146]  Generally, a plaintiff "need not

be aware of the specific facts necessary to establish the claim[;]"[147] rather, once it

"has a suspicion of wrongdoing[,]" it will be charged with knowledge of its

injury.[148]

      The law of the case establishes that a claim for MTBE contamination

accrues under California law when:  (1) MTBE is present in the groundwater and

"results in a *contamination* of the groundwater[;]" or, (2) "the presence of MTBE

in the groundwater caused or should have caused [a water district] to take some

action."[149]  Further, in the *Orange County Water District* ("OCWD") case—one of

the four focus cases in this MDL, and the only California focus case—I determined

that, as a matter of law, a detection of MTBE at or above a five ppb level was

sufficient to trigger the OCWD's statutory duty to remediate, and, thus, for the

limitations period to begin to run.[150]

---

[146]    *City of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292,
40 Cal. Rptr. 3d 313, 334 (2006) (citing *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103,
245 Cal. Rptr. 658, 751 P.2d 923, 928 (1988)).

[147]    *Jolly*, 751 P.2d at 928.

[148]    *Id.*

[149]    *In re MTBE Prods. Liab. Litig.*, 475 F. Supp. 2d 286, 293 (S.D.N.Y.
2006).

[150]    *See In re MTBE Prods. Liab. Litig.* ("*OCWD*"), 676 F. Supp. 2d 139,
149 (S.D.N.Y. 2009).

## C.    The Commingled Product Theory

In order to protect the interests of plaintiffs in this MDL while fairly apportioning liability, I have developed the commingled product theory of proof, which Fresno relies upon in opposition to the present motions.  Under this theory, when a plaintiff can prove that certain gaseous or liquid products (*e.g.*, gasoline, liquid propane, alcohol) of many refiners and manufacturers were present in a completely commingled or blended state at the time and place that the harm or risk of harm occurred, and the commingled product caused plaintiff's injury, each refiner or manufacturer is deemed to have caused the harm.  Each defendant is then given the opportunity to exculpate itself by proving that its product was not present at the relevant time or in the relevant place, and therefore could not be part of the commingled or blended product.

Before the rebuttable presumption undergirding this theory is activated, a plaintiff must prove by a preponderance of the evidence that the defendant contributed-in-fact to the injury by showing that each defendant's product was part of the commingled mass that injured the plaintiff.  The theory thus requires the plaintiff to prove that each defendant's gasoline was part of the commingled product, but relieves the plaintiff of the duty to prove that each individual defendant's contribution to that product, in and of itself, was sufficient

to have caused an injury.  "Rather, to establish liability against a particular

defendant with respect to an individual well, [the plaintiff] must show that (a) the

defendant's MTBE was present in a commingled product and (b) that the

commingled product [rather than defendant's product alone] caused plaintiff's

injury."[151]  The commingled product theory has not been reviewed on appeal.[152]

### D.    Nuisance Claims Against Suppliers/Manufacturers

In an opinion issued in the OCWD case, I summarized California law

pertaining to nuisance claims against product manufacturers as follows:

> [T]he law of nuisance is not intended to serve as a surrogate for
> ordinary products liability, [but] California courts have allowed
> nuisance claims to proceed where the manufacturer's or
> distributor's actions have created or assisted in the creation of
> the nuisance.  Such actions, however, must amount to more
> than simply the manufacture or distribution of the defective
> product—rather, a defendant must take other affirmative acts
> that contribute directly to the nuisance.  Importantly, a failure
> to warn regarding the dangers of a product, without more
> activity directly connected to the creation of the nuisance, is an
> insufficient basis for nuisance liability.  But where a defendant
> engages in more substantial conduct contributing to the

---

[151]    *In re MTBE Prods. Liab. Litig.*, 739 F. Supp. 2d 576, 598 (S.D.N.Y. 2010) (quotation marks and citations omitted).

[152]    *See In re MTBE Prods. Liab. Litig.* ("*New York City*"), Nos. 10 Civ. 4135, 10 Civ. 4329, 2013 WL 3863890, at *49 n.39 (2d Cir. July 26, 2013) ("Because the jury never rendered a verdict on the commingled product theory, it is not at issue here.").

nuisance, liability may well be appropriate.[153]

## V.    DISCUSSION

### A.    The Limitations Motion

For the following reasons, the Limitations Motion is granted, on the ground that Fresno has presented no evidence from which a reasonable jury could infer that MTBE contamination at the Soil Detection and Limitations Sites have caused appreciable injury to its water production wells.[154]

#### 1.    Fresno's Judicial Admission Narrows the Scope of the Limitations Motion to a Consideration of Injury

As set forth in OCWD, Fresno "incurs appreciable harm"—and its claims accrue—"when groundwater within its territory [is] sufficiently contaminated with MTBE that a [reasonable] government agency charged with protecting the quality of that water [] [would] have responded to that

---

[153]    *In re MTBE Prods. Liab. Litig.* ("*OCWD II*"), 457 F. Supp. 2d 455, 463-64 (S.D.N.Y. 2006) (quotation marks and citations omitted).

[154]    My holding that Fresno has failed to produce evidence from which a reasonable jury could conclude that contamination at the sites at issue in the Limitations Motion has impacted or threatened to impact the production wells moots the parties' arguments pertaining to the continuing nuisance doctrine.  The continuing nuisance doctrine permits a plaintiff to seek damages for a nuisance that is reasonably abatable and that persists within the limitations period, even if its initial claim accrued outside of the limitations period.  Given that Fresno has no evidence of appreciable injury to its production wells from the sites at issue in this motion, the continuing nuisance doctrine does not apply.

contamination."[155]   The Limitations Defendants have set forth uncontroverted

evidence showing that Fresno was aware of the risks of MTBE that form the basis

of its present claims by the late 1990s, and that five ppb was set as the MCL for

potability at that time.   Thus, it was reasonable for a government agency charged

with protecting groundwater to respond upon a detection of five ppb or higher in

groundwater.   Moreover, the uncontested material facts show that Fresno was

aware of the detections at the Soil Detection and Limitations Sites outside of the

limitations period.   Thus, if Fresno were asserting claims for injury to groundwater

and/or soil in its territory, these claims would be time-barred at the Soil Detection

and Limitation Sites.

　　　　　But Fresno has explicitly disclaimed any interest in protecting

groundwater—as opposed to the deeper aquifers from which its production wells

draw drinking water.[156]   Further, the protection of groundwater and soil does not

---

[155]　　*OCWD*, 676 F. Supp. 2d at 147-48 (citations omitted).

[156]　　*See* 9/13 Tr. at 10:4-11 ("THE COURT: Just to be clear, detections at
the stations were not an injury for which you could have sought redress by way of
a lawsuit. You're saying you didn't have an interest that would give you legal
standing to bring a lawsuit 8 until there was an actual contamination or detected
contamination at the production well or a threat of such contamination at a
production well.  Is that right?  MR. AXLINE (counsel for Fresno): That's right,
your Honor.").

appear to be within Fresno's statutory mandate.[157]  Fresno instead maintains that its

claims are based upon damage to the deeper drinking water supply aquifer, not the

shallow aquifers adjoining the stations at issue, and that they therefore did not

accrue until November 27, 2001, when MTBE was first detected in Well 318, a

drinking water production well within its jurisdiction.[158]  In sum, Fresno seeks

damages from the Limitations Defendants to perform site-assessments at the

Limitations Sites and Soil Detection Sites in order to determine whether they must

be remediated in order to protect its water production wells.

> **2.     Fresno Has Failed to Present Evidence from Which a
> Reasonable Jury Could Find a Connection Between
> Contamination at the Soil Detection and Limitations Sites
> and Its Alleged Injury at Its Production Wells**

The difficulty with Fresno's position is that it has presented no

evidence tying the contaminants detected at the Soil Detection and Limitations

Sites to any of its production wells.  At the September 3 Hearing, counsel for

Fresno placed heavy reliance on the Second Circuit's recent decision in the *New*

---

[157]     *See* Defendants' Additional Material Facts ¶¶ 86-90 (citing, *e.g.*
California Historical Statutes, Water Code §§ 10610.4, 10631 (b), (c), (g))
(detailing Fresno's duty to protect the water supply within its jurisdiction, and
presenting testimony that Fresno's "calling is to protect and preserve the water
supply").

[158]     *See* SOL Opp. Mem. at 14-15.

*York* MTBE case.[159]  But the cases are readily distinguishable.  The plaintiffs in

*New York* engaged a hydrogeological expert—David Terry—who constructed site-

specific models, and used them to "make numerical projections about how high of

a concentration of MTBE will occur at [the site at issue] in the future, and how

long it will last[,]" and to "determine how long MTBE contamination at [the sites

at issue] would last. . . ."[160]  The Second Circuit affirmed the jury's verdict in favor

of plaintiff because, among other things, "the jury's peak-MTBE finding fell

within the range of possible outcomes predicted by Terry's analyses."[161]

    In this case, by contrast, Fresno "[a]dmit[s] that [it] did not designate

an expert to construct and run models. . . ."[162]  Further, it is undisputed that MTBE

has not been detected in Fresno's production wells since February 2011, and that

MTBE has not been detected at those wells above trace levels for over a decade.[163]

Lacking direct evidence of MTBE contamination in its production wells, and

having failed to engage a fate and transport expert, there is no basis for a

reasonable jury to infer that contamination at the Soil Detection Sites and

---

[159]    *See* 9/13 Tr. at 4:12-16; 13:13-16.

[160]    *New York City*, 2013 WL 3863890, at *8.

[161]    *Id*. at *35.

[162]    SOL Counter-56.1 ¶ 4.

[163]    *See* SOL 56.1 ¶ 8 (citations omitted).

Limitations Sites constitute an appreciable injury to Fresno.[164]

At the September 3 Hearing, counsel for Fresno represented that a jury could infer that contaminations at the Soil Detection Sites and Limitations Sites threaten its production wells based on the opinions and testimony of its experts Norman, Haberman, and Fogg.  However, none of these experts presents evidence from which a reasonable jury could conclude that the contaminations at issue in this motion threaten Fresno's production wells.

Norman testified that he was unqualified to, and did not, perform fate and transport modeling tying detections at the stations at issue to Fresno's production wells, and further testified that he had no basis to recommend remediation at the stations at issue.[165]  Thus, his testimony does not evidence a connection between contamination at the Soil Detection/Limitation Sites and

---

[164]     I note that this holding is not contrary to the discussion of ripeness, injury and standing in the *New York City* case.  The defendants in that case argued on appeal that, because the plaintiff was not presently using the water sources at issue, its claims were not prudentially ripe.  The Second Circuit rejected this argument, holding that: "[plaintiff's] claims are prudentially ripe.  It brought suit only after testing showed the presence of MTBE in the Station Six Wells. . . ." *New York*, 2013 WL 3863890 at *31.  Here, by contrast, Fresno has admitted that it has no standing to bring claims arising from groundwater or soil contamination *per se*, and it has failed to show a causal connection between groundwater or soil contamination at the sites at issue in this motion and MTBE detection in its production wells.

[165]     *See supra* Part III.A.6.c.

Fresno's production wells.

Haberman offers an opinion that "[e]ven though an MTBE plume is not presently affecting drinking water supply wells, under *certain circumstances*, a utility may find it more cost effective to take mitigation measures to address the plume before it eventually spreads to water supply wells. . . ."[166]  However, Haberman is silent on the question of whether the plumes under discussion are likely to spread to Fresno's water supply wells in the first instance.  His testimony therefore cannot support Fresno's claim that it has been appreciably injured by detections at the Soil Detection/Limitation Sites.

Finally, the excerpts from Fogg's Expert Report do not provide a sufficient basis for a reasonable jury to conclude that Fresno's production wells are threatened by contamination at the Soil Detection and Limitations Sites.  The portions of Fogg's Report that are in the record consist of semicircles drawn around MTBE-detection sites.[167]  If having a production well within one of those semicircles were sufficient to show that Fresno's production wells were threatened, then its claims as to the stations at issue would be time-barred: armed with a compass and a map, any member of Fresno's staff could have generated a table of

---

[166]    Haberman Report at 10 (emphasis added).

[167]    *See supra* Part III.A.6.a.

"threatened wells" identical to that presented in Fogg's Report, and determined that
its wells were threatened as the detections at these stations arose.

Because Fresno has disclaimed that its claims arose under such a
theory, its claims must arise, if at all, from specific evidence tying a release at a
station to the threat of harm to its production wells.  Fogg's Report does not
contain such evidence, and, at his depositions, Fogg admitted that he could not
opine that any particular well was more likely than not threatened by MTBE
contamination at the Soil Detection Sites and Limitations Sites.[168]  Further, the
report of defense expert Wilson—which was submitted by Fresno in opposition to
the Limitations Motion—identifies a number of ways in which the groundwater
and/or soil contamination at the sites at issue may prove not to be a threat to
Fresno's production wells; for example, the water may be trapped in Fresno's
hundred-foot vadose zone, and never permeate the deeper aquifers serving
Fresno's production wells.[169]

In sum, Fresno's position that "it is not the mere presence of chemical
molecules within the city boundaries that is significant for purposes of determining
appreciable harm, it is whether the MTBE caused appreciable harm to Fresno's

---

[168]     *See* Fogg Deps. Tr. at 2-3.

[169]     *See supra* Part III.A.6.d.

water system[]" ultimately dooms its claims as to the Limitations Sites and Soil Detection Sites.[170]  Fresno has presented no evidence from which a reasonable jury could find that the groundwater and soil contamination at the sites at issue in this motion threaten its production wells.  For this reason, the Limitations Motion is granted.

### B.      The Causation Motion

The Causation Motion is granted in its entirety.  Fresno principally relies upon the commingled product theory of proof, as it has no record evidence tying the Causation Defendants' product to the stations at issue.  But this theory of proof is not applicable to this case, because traditional proof of causation is not impossible, and there is no evidence that the Causation Defendants' products were likely delivered to the stations at issue in an undifferentiated mass.  Accordingly, Fresno's negligence and strict liability claims are dismissed against the Causation Defendants as to the stations at issue in the Causation Motion.

### 1.      The Commingled Product Theory of Proof

Fresno is not entitled to invoke the commingled product theory against the Causation Defendants in order to escape the burden of directly proving—by product tracing or otherwise—that the Causation Defendants'

---

[170]      SOL Opp. Mem. at 15.

gasoline and/or neat MTBE were present in the station tanks that allegedly caused its injuries.  At a pre-motion Conference, Fresno represented that it did not intend to rely on the commingled product theory in opposition to these motions.[171] However, Fresno now resists summary judgment largely on the basis of this theory.[172]

I last discussed the commingled products theory of proof in depth in the context of ruling on defendants' summary judgment motions in the *County of Suffolk* case.  There, the evidence "demonstrate[d] that during certain years each refiner defendant contributed to the commingled gasoline distributed in Suffolk County[;] [but] . . . even drawing all inferences in plaintiffs' favor, no reasonable jury could find, by a preponderance of the evidence, that *each* defendant's gasoline

---

[171]    *See* January 2013 Transcript ("1/13 Tr."), Ex. 1 to Wedeking Reply Decl., at 41:12-15 ([Counsel for Fresno:] "We're not going with commingled in the pipeline.  We're going with direct evidence … what we think is sufficient evidence to show that their [referring to either Duke, or the Causation Defendants as a whole] gasoline was delivered to a station.").  Shortly after making this statement, counsel for Fresno stated that Fresno possessed "voluminous" product delivery evidence that it would use to oppose the Causation Motion.  *Id*. at 44:13.

[172]    *See* Fresno's Opposition to Defendants' Motion for Summary Judgment Pertaining to Causation ("Causation Opp. Mem.") at 2-9 (revealing that Fresno principally relies on the commingled product theory in opposition to the Causation Motion).

[substantially] caused the contamination of each well."[173]  Finding it contrary to New York's law and public policy that the defendants would be able to escape *all* liability by the expedient of contaminating New York's environment in an undifferentiated mass, I held that "[t]he evidence can, however, support an inference that each defendant's gasoline containing MTBE was, at least during certain years, delivered to Suffolk County gas stations in a commingled state."[174]

In the *Suffolk* decision, I carefully limited the reach of the commingled products theory.  I emphasized that, as an alternative liability theory, it shifts the burden of proof to the defendant only in circumstances where "each defendant acted tortiously, but . . . which of the defendants caused [] injury[] [is uncertain][]."[175]  In other words, it applies only when the plaintiff "can establish the other elements of a prima facie case against a number of defendants[]" but cannot "identify the exact defendant who caused the injury. . . ."[176]

At a pre-motion Conference in this case, I explained that "[i]f [Fresno] can get [the MTBE] to the station, . . . they [don't] have to show [that] it's [a

---

[173]    *In re MTBE Prods. Liab. Litig.* ("*Suffolk*"), 591 F. Supp. 2d 259, 273 (S.D.N.Y. 2008) (quotation marks and citations omitted).

[174]    *Id*. at 274.

[175]    *Id*. at 267 n.31 (citation omitted)

[176]    *Id*. at 267.

particular defendant's] . . .  molecule versus somebody else's molecule. . . ."[177]
However, the commingled product theory does not relieve Fresno of the burden to
show that the defendants' products were at the stations at issue when the releases
occurred.  In sum, to invoke the commingled product theory, Fresno must show
"that [the MTBE or MTBE-containing gasoline] of many refiners and
manufacturers [was] present in a completely commingled or blended state at the
time and place that the harm or risk of harm occurred" at the sites at issue.[178]

A reasonable jury could not find that Fresno has met this burden here,
even drawing all inferences in its favor.  This case is distinct from *Suffolk* in that
the sources of the contamination are known.  In CMO 108, Fresno identified "the
sites at which [it] will pursue claims at trial and the Defendants against which it
will assert those claims for each site. . . ."[179]  Moreover, unlike *Suffolk*—in which
the alleged harm was to wells' capture zones, and the evidence showed that each
defendant's MTBE could have impacted those capture zones—Fresno's claims
relate to contamination—actual or threatened—at a limited number of production

---

[177]     1/13 Tr. at 42:22-43:5.

[178]     *Suffolk*, 591 F. Supp. 2d at 274.

[179]     CMO 108 at 1.

wells—the source of which were the stations at issue.[180]  There is no basis to

invoke an alternate theory of proof when no special obstacle prevented Fresno

from tracing the Causation Defendants' products to those stations.

Even standing alone, Fresno's failure to pursue possible discovery

forecloses an attempt to rely on the commingled product theory.  Alternate theories

of proof are justified not when evidence is lacking, but when gathering evidence is,

for practical purposes, impossible.  In *Suffolk*, it would have been impossible to

determine which defendant's gasoline contributed to an undifferentiated spill;

releases from multiple stations, supplied by multiple defendants, could have

contributed to the contamination of any given well's capture zone.  Here, by

contrast, Fresno could have gathered evidence *directly* connecting the Causation

Defendants' product to the limited number of stations at issue for purposes of this

motion.[181]   To approve of the use of the commingled product theory of proof in

---

[180]     *See Suffolk*, 591 F. Supp. 2d at 275 (justifying application of the
commingled product theory on the ground that "the place the harm or risk of harm
occurred is the capture zone of each well, where the MTBE now contaminating the
well must have first contaminated the groundwater.  A reasonable jury could
conclude that each defendant's gasoline was present within the well's capture zone
even if the jury concludes that it cannot identify the source of the spill that caused
the well's contamination.").

[181]     Fresno asserts—without citation—that "as the Court's commingled
product opinion makes clear, it is impossible to trace neat MTBE to individual
release sites. . . ."  Causation Opp. Mem. at 10.  This distorts the *Suffolk* ruling,
which states that "because of the blended nature of the gasoline, it is impossible to

this case, then, would be the practical equivalent of holding that direct proof is *never* required in MTBE cases: plaintiffs would have little incentive to prove direct causation if they could proceed under a commingled product theory.

Of course, to the extent that a reasonable jury, drawing all inferences in Fresno's favor, could find that the Causation Defendants' product was in the tanks at the time a release occurred, Fresno would be entitled to assert a commingled product theory in apportioning liability.  However, as the following discussion shows, Fresno has produced no evidence from which a reasonable juror could conclude that the Causation Defendants' molecules were in the relevant stations at the relevant times in the first instance.  *First*, I will discuss Duke's motion as to the Red Triangle station; *second*, Tesoro's motion as to the Red Triangle and U & A stations; and *finally*, Kern's motion.

### 2.    Duke

Fresno admits that it "does not have direct evidence of delivery to particular stations[]" with respect to Duke.[182]  Instead, Fresno argues that a jury

<hr />

determine whose product was in any particular *spill*."  591 F. Supp. 2d at 269 (emphasis added).  This statement relates to apportioning liability when a spill could have emanated from multiple sources; it does not, as Fresno contends, relieve plaintiffs of the burden of tracing a defendant's product to a station that could have caused contamination in the first instance.

[182]    Causation Opp. Mem. at 13.

could infer that Duke gasoline ended up at the Red Triangle station based on two facts: (1) Duke sold neat MTBE to Valero, which supplied gasoline to Red Triangle from 1997 to 2003; and (2) Duke sold MTBE gasoline to Red Triangle (the jobber) some 290 times between 2000 and 2002, and Red Triangle made deliveries to the Red Triangle station, as well as numerous other stations within the Fresno area.[183]   However: (1) Fresno admits that Duke did not supply neat MTBE to Valero until 2000, after the gasoline discharge at Red Triangle was detected — following the removal of a UST at the site — on December 1998;[184] and (2) likewise, Fresno admits that Duke began selling neat MTBE to Red Triangle (the jobber) after the discharge at Red Triangle.  Further, it is undisputed that Red Triangle (the jobber) supplied seven other Red Triangle stations, as well as an undisclosed number of Exxon-branded stations, during the time that Duke sold to it.  Thus, there is no basis to infer that Duke MTBE-containing gasoline made its way to the Red Triangle station at the time of a release.

It is within the realm of possibility that there was a second release at Red Triangle, after Duke began supplying Red Triangle (the jobber) and/or Valero with MTBE-containing gasoline or neat MTBE, that further contaminated the

---

[183]     *See id*. at 15-16 (citations omitted).

[184]     *See id*. at 14 ("Duke sold neat MTBE to Valero from 2000 through 2003.") (citation omitted).

groundwater at that station.  However, there is no evidence of any such release.

Nor is there any evidence that neat MTBE sold by Duke made its way to the tank at

Red Triangle at the time of, or before, any release.  For these reasons, there is no

basis to hold Duke liable, and its portion of the Causation Motion is granted.

### 3.    Tesoro

Fresno has presented no evidence in opposition to the Causation

Motion from which a reasonable factfinder could conclude that Tesoro's gasoline

contributed to the releases at the Red Triangle or U & A sites.  The only evidence

submitted by Fresno that Tesoro gasoline was delivered to the Red Triangle station

consists of bills of lading dated 2003, years after the only release identified at the

station.[185]  This is insufficient to show that Tesoro's gasoline was delivered to the

station *prior* to the release.

Similarly, the testimony of Gail Blue that Tesoro was a supplier for

the Red Triangle station cannot defeat summary judgment because, as discussed

above, Blue acknowledged in her deposition that she had no personal knowledge of

who supplied gasoline during the relevant time-frame, and was only speculating.

Finally, Fresno argues, without citation to evidence or a supporting affidavit, that

"[s]ince 100% of the gasoline supplied to the Red Triangle station came from the

---

[185]      *See* Causation Opp. Mem. at 20; Causation 56.1 ¶¶ 39, 91.

Fresno terminal, and Tesoro was a *major* supplier at the terminal, even without

jobber and operator testimony a reasonable jury could conclude that Tesoro

gasoline was delivered to [] Red Triangle [] during the relevant time period."[186]

But unsupported argument is not evidence, and cannot defeat summary judgment.

Among other things, there is no evidence to define what a "major supplier" is, or to

support the notion that Red Triangle bought gas solely from the Fresno Terminal.

In short, because Fresno has adduced no evidence from which a reasonable finder

of fact could conclude that Tesoro gasoline caused or contributed to the release at

the Red Triangle station, Fresno's claims against Tesoro at that station are

dismissed.

Likewise, Fresno has adduced no evidence that Tesoro gasoline made

its way to the U & A station; instead, it relies on the fact that Tesoro sold gasoline

to a jobber that sold gasoline to U & A.[187]  Because Fresno has produced no

evidence that Tesoro's gasoline made its way to the U & A station at or before the

time a release occurred, its claims against Tesoro at the U & A station are also

dismissed.

---

[186]     Causation Counter-56.1 ¶ 38 (emphasis added).

[187]     *See id*. ¶ 40; Causation Opp. Mem. at 19 ("With respect to the U & A
station, Southern Counties . . . a jobber used by Tesoro for many years, supplied
gasoline to the station.").

### 4.   Kern

Fresno's claims against Kern at the Kern Stations[188] are based on an analogy to my holding as to Lyondell in the *Suffolk* case.  There, because the evidence showed that Lyondell had supplied MTBE to nearly *all* of the refiners supplying gasoline to Suffolk county for roughly twenty-four years, I held that plaintiffs could avail themselves of the commingled products theory in proving Lyondell's liability.[189]  Here, Fresno submits evidence that Kern supplied three refiners for a far shorter period of time: CUSA from August-October 1989; Valero from 2000-2003; and Shell for some period of time on or following 1996.[190]  This evidence does not support a colorable inference that, by a preponderance of the evidence, *all* of the gasoline supplied by CUSA, Valero, and Shell to the Fresno area during the relevant time periods contained MTBE from Kern.

Indeed, Fresno has presented no evidence at all connecting Kern's MTBE to the Fresno area, much less to the Kern Stations.  Fresno instead presents evidence that: (1) Kern supplied MTBE to Shell, which supplied to the Fresno area, but no evidence that Shell supplied gasoline containing Kern's MTBE to the

---

188      Comprising M & S Texaco; Shell (1212); Van Ness Auto; Smith Tank Lines; Red Triangle; Beacon #3519; and Exxon Service Station.

189      *See Suffolk*, 591 F. Supp. 2d at 277.

190      *See* Causation 56.1 ¶¶ 25-27.

Fresno area; (2) that Kern supplied CUSA during a three-month period, but none that, during this period, CUSA supplied gasoline containing Kern's product to the Fresno area (as opposed to its other refinery in California); and (3) that Kern supplied MTBE to Valero, but none that Valero supplied gasoline containing Kern's product to the Fresno area.  In short, because Fresno's theory tying Kern's MTBE to releases at the Kern Stations is grounded solely on speculation, its claims against Kern at those stations are dismissed.

### 5.   Moreau's Reports and Testimony Are Too Speculative to Defeat Summary Judgment

Fresno argues that, despite its lack of evidence tying the products of the Causation Defendants to any of the stations at issue before a recorded release, a jury could infer that the Causation Defendants' products contributed to the plumes at the stations based on Moreau's opinion that "spills or leaks occurred on a regular basis."[191]  However, this opinion is purely speculative.  At most, Moreau's opinion implies that dribs and drabs of the Causation Defendants' products *could have* contributed to the plume caused by documented releases.  Without more, and because the commingled product does not apply, this is insufficient for a finding that the Causation Defendants contributed to the contamination at the stations at issue here.  Accordingly, the Causation Motion is granted.

---

[191]   Moreau Report-Valley Gas at 4.

### C.    The Nuisance Motion

Fresno opposes CUSA's motion for summary judgment dismissing nuisance claims against it at the Van Ness site solely on the grounds that CUSA knew the risks of MTBE, yet failed to warn the operators of Van Ness.[192]  Even accepting Fresno's allegations as true, summary judgment in CUSA's favor is warranted on the Nuisance Motion, because, by failing to allege affirmative acts CUSA took that created a nuisance, Fresno has "essentially [described] a products liability action[—in particular, failure to warn—][]not a nuisance action."[193]  "Any other result would allow nuisance to become a monster that would devour in one gulp the entire law of tort. . . ."[194]  Likewise, because Fresno's nuisance claim against Shell at the M & S site is unsupported by evidence of "affirmative acts" by Shell that contributed "directly to the nuisance[,]" it, too, is dismissed.[195]

---

[192]     *See* Fresno's Opposition to Certain Defendants' Motion for Partial Summary Judgment on Plaintiff's Nuisance Claims at 18-19 (concluding "[CUSA] . . . did not provide instructions that would have prevented or reduced the MTBE releases CUSA knew were likely to occur.").

[193]     *City of San Diego v. United States Gypsum Co.*, 30 Cal. App. 4th 575, 584-87 (2d Dist. Cal. 1994) (affirming dismissal on the pleadings of nuisance claims against manufacturers and distributors of asbestos products).

[194]     *El Escorial Owners' Ass'n v. DLC Plastering, Inc.*, 154 Cal. App. 4th 1337, 1348 (2d Dist. Cal. 2007).

[195]     *OCWD II*, 457 F. Supp. 2d at 463-64 (quotation marks and citations omitted).

## VI.    CONCLUSION

For the foregoing reasons, the Limitations Motion is granted, the

Causation Motion is granted to the extent not mooted by the Limitations Motion,

and the Nuisance Motion is granted to the extent not mooted by the former two

motions.  The Clerk of the Court is directed to close these motions (Doc. Nos. 146,

157, and 214 filed in Case No. 04 Civ. 4973, and Doc. No. 3636 filed in Doc. No.

00 Civ. 1898).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September 10, 2013

-74-

## - Appearances -

*Liaison Counsel:*

| *For Plaintiffs* | *For Defendants* |
| --- | --- |
| Robin Greenwald, Esq. | Peter John Sacripanti, Esq. |
| Robert Gordon, Esq. | James A. Pardo, Esq. |
| Weitz & Luxenberg, P.C. | McDermott Will & Emery LLP |
| 180 Maiden Lane | 50 Rockefeller Plaza, 11th Floor |
| New York, New York 10038 | New York, New York 10020 |
| Tel: (212) 558-5500 | Tel: (212) 547-5583 |
| Fax: (212) 344-5461 | Fax: (212) 547-5444 |

*For Fresno:*

Michael Axline, Esq.
Tracey L. O'Reilly, Esq.
Evan Eickmeyer, Esq.
Miller, Axline, & Sawyer
1050 Fulton Avenue, Suite 10
Sacramento, CA 95825
Tel: (916) 488-6688
Fax: (916) 488-4288

*For moving defendants:*

| *Limitations Defendants* | *Causation Defendants* | *Nuisance Defendants* |
|---|---|---|

Robert E. Meadows, Esq.
Jeremiah J. Anderson,
Esq.
King & Spalding LLP
1100 Louisiana, Suite
4000
Houston, TX 77002
Tel: (713) 751-3200
Fax: (713) 751-3290

Charles C. Correll Jr.,
Esq.
King & Spalding LLP
101 Second St., Suite
2300
San Francisco, CA 94105
Tel: (415) 318-1200
Fax: (415) 318-1300

James R. Wedeking, Esq.
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
Counsel for Duke

Brian M. Ledger, Esq.
Gordon & Rees LLP
101 W. Broadway, Suite
2000
San Diego, CA 92101
Tel: (619) 696-6700
Fax: (619) 696-7124
Counsel for Kern

Colleen P. Doyle, Esq.
Diana Pfeffer Martin,
Esq.
Suedy Torabi, Esq.
Hunton & Williams
550 S. Hope St., Suite
2000
Los Angeles, CA 90071
Tel: (213) 532-2000
Fax: (213) 532-2020
Counsel for Tesoro

Robert E. Meadows, Esq.
Jeremiah J. Anderson,
Esq.
King & Spalding LLP
1100 Louisiana, Suite
4000
Houston, TX 77002
Tel: (713) 751-3200
Fax: (713) 751-3290

Charles C. Correll Jr.,
Esq.
King & Spalding LLP
101 Second St., Suite
2300
San Francisco, CA 94105
Tel: (415) 318-1200
Fax: (415) 318-1300

M. Coy Connelly, Esq.
Amy E. Parker, Esq.
Bracewell & Giuliani
711 Louisiana St., Suite
2300
Pennzoil Place —
S. Tower
Houston, TX
77002-2770
Tel: (713) 223-2300
Fax: (713) 221-1212
Counsel for Valero

Brent H. Allen, Esq.
James Layman, Esq.
Greenberg Traurig, LLP
2101 L Street, N.W.,
Suite 1000
Washington, DC 20037
Tel: (202) 331-3100
Fax: (202) 331-3101
Counsel for Coastal