# EXHIBIT 10

CATHY CURRIE

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Master File No. 1:00-1998

MDL 1358 (SAS)   M21-88

- - - - - - - - - - - - - - - - - - - - - - - -x

IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")

PRODUCTS LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - -x

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL

PROTECTION, et al.

    v.

ATLANTIC RICHFIELD CO., et al.,

Case No. 08-CIV-00312:(SAS)

- - - - - - - - - - - - - - - - - - - - - - - -x

    VIDEOTAPED RULE 30(b)(6) DEPOSITION OF

CUMBERLAND FARMS, INC., BY CATHY CURRIE,

DESIGNEE, a witness called on behalf of

Plaintiffs, taken pursuant to the Federal Rules

of Civil Procedure, before Daria L. Romano, RPR,

CRR and Notary Public in and for the

Commonwealth of Massachusetts, at Goodwin

Procter, LLP, 53 State Street, Boston,

Massachusetts, on October 19, 2012, commencing

at 9:38 a.m. to 11:19 a.m.

Page 14

1  Q. And --
2  A. Well, actually, I'm going to say I
3  have a supervisor. Eight report to him, and he
4  reports to me, but I oversee 11, to correct
5  that.
6  Q. Three report directly to you?
7  A. Correct.
8  Q. Okay. Is there -- of those 11, is
9  there one person that is in charge of New
10 Jersey, the supply and logistics for New Jersey?
11        MR. HIGGINS: Objection.
12        When I object, you can answer, unless
13 I tell you not to. So go ahead.
14        THE WITNESS: Okay.
15 A. No, there's not one specific person
16 assigned to New Jersey. Because of our
17 schedules and the hours that we work, everything
18 is each -- it's rotation.
19 Q. So of those 11, different people might
20 be on any given day handling New Jersey?
21 A. Correct.
22 Q. Is there people who are -- well, let's
23 talk -- I'll get back to that. Never mind.
24 Strike that.
25        Prior to 1997, did you have -- were

Page 15

1  you employed?
2  A. Yes.
3  Q. And what was your job prior to
4  beginning with CFI?
5  A. I worked for Pillsbury, and I worked
6  as a LAN administrator and an analyst. LAN,
7  local area network, I'm sorry.
8  Q. And how long did you have that
9  position?
10 A. Just shy of five years.
11 Q. And did you -- have you had any other
12 positions in the oil industry?
13 A. No.
14 Q. Okay. And prior to Pillsbury, where
15 were you?
16 A. I worked for Kennerson Associates,
17 which is a manufacturer's rep company.
18 Q. What's your educational background?
19 A. I went to Salem State College in
20 Salem, Massachusetts.
21 Q. And what year did you graduate?
22 A. 1983.
23 Q. And do you have a -- what's your
24 degree in?
25 A. I have a BS in geography.

Page 16

1  Q. And do you have any other degrees?
2  A. No.
3        MR. MOONEY: Let's do that as 1.
4        (Exhibit 1 marked
5        for identification)
6  BY MR. MOONEY:
7  Q. During the course of the day I'll be
8  handing some documents for the court reporter to
9  mark as exhibits, and the court reporter will
10 hand them to you, and I'll ask you some
11 questions about those documents.
12       You've been handed what's been marked
13 as Exhibit 1 entitled the Third Amended Notice
14 of Deposition of Cumberland Farms Incorporated
15 on Designated Issues With Production of
16 Documents and Videotaping Trial Site Number 7.
17       Have you seen this document before?
18 A. Yes.
19 Q. Okay. And is it your understanding
20 that you are here to testify today pursuant to
21 this document?
22 A. Yes.
23 Q. Is it also your understanding that
24 this is what's referred to as a 30(b)(6)
25 deposition, and that means you're testifying on

Page 17

1  behalf of Cumberland Farms?
2  A. Yes.
3  Q. And if you'll turn to page three,
4  you'll see under number five the term site, and
5  there's a reference to Trial Site Number 7,
6  current site name, Bakers Waldwick Service
7  Station Number 121359, 49 Franklin Turnpike,
8  Waldwick burro, Bergen.
9        Are you familiar with that site?
10 A. Yes.
11 Q. Have you ever visited that site?
12 A. No.
13 Q. Do you know if any of the 11 people
14 that work or that report to you directly or
15 indirectly, do you know if any of them have ever
16 visited that site?
17 A. I do not know.
18 Q. Okay. And if you -- on page three,
19 the bottom of page three there's the title
20 designated issues, and then it goes on to list
21 29 issues.
22       Can you tell me which designated
23 issues that you're prepared to testify to today?
24 A. One, two, three, four, five, six,
25 seven, eight, nine, 10, 26, 27, 28.

CATHY CURRIE

**Page 22**

1  Q. How about Angela Pimental, how many
2  times did you talk to her?
3  A. I actually only E mailed with her, and
4  it was regarding dealer training.
5  Q. And what did you ask her about dealer
6  training?
7  A. If she had any copies of training
8  materials and what the training was for offsite
9  training for the dealers.
10 Q. And what did she tell you? Did she
11 have copies of -- did she have manuals?
12 A. She had copies of PowerPoint
13 presentations and attendance logs and provided a
14 recap of historical --
15 Q. And did she provide those copies or
16 those documents to you?
17 A. Yes.
18 Q. And did you provide those to counsel?
19 A. Yes. Somebody else delivered the
20 copies, actually. I don't recall. That's okay?
21 Okay.
22 Q. So anybody else that you -- did you
23 talk to anybody else other than I think the five
24 people you mentioned to me?
25 A. Not that I recall.

**Page 23**

1  Q. Did you ever have a conversation with
2  Raymond Leather about the deposition?
3  A. No.
4  Q. Do you know Mr. Leather?
5  A. Yes.
6     (Pause)
7     MR. MOONEY: I'm going to -- this
8  will be two.
9     (Exhibit 2 marked
10    for identification)
11 BY MR. MOONEY:
12 Q. Exhibit 2 is a deed. Have you seen
13 this document before?
14 A. Yes.
15 Q. Okay. Can you explain to me what this
16 document is?
17 A. This is a document aligning the
18 purchase of the site from Chevron.
19 Q. Okay. And when was the purchase done?
20 A. May 1, 1986.
21 Q. And it was purchased by Cumberland
22 Farms?
23 A. Correct.
24 Q. And Cumberland Farms still owns the
25 site?

**Page 24**

1  A. Yes.
2  Q. Do you know if when Cumberland Farms
3  purchased the site from Chevron in 1986, whether
4  or not Cumberland Farms had conducted any kind
5  of investigation of the site?
6  A. I do not know.
7  Q. And how is the site currently
8  operated?
9     MR. HIGGINS: Objection.
10 BY MR. MOONEY:
11 Q. Let me rephrase that.
12    Do you lease -- does Cumberland Farms
13 lease the site to anybody?
14 A. Yes.
15 Q. And who do you lease it to? When I
16 use the term you, please understand that I'm --
17 A. It's Cumberland Farms.
18    To an independent operator.
19 Q. And has that been the case since 1986?
20 A. Correct.
21 Q. And who owns the underground storage
22 tanks?
23 A. Cumberland Farms.
24 Q. And has that been the case since 1986?
25 A. Yes.

**Page 25**

1  Q. Who owned -- I used the term
2  underground storage tank, and sometimes that
3  term gets used as the whole system, gas delivery
4  system, but I'm actually going to break it down
5  a little bit.
6     Who owns the dispensers, like on the
7  island where the product comes out?
8  A. Cumberland Farms.
9  Q. Who owns the piping between the
10 underground storage tank and the dispensers?
11 A. Cumberland Farms.
12 Q. So is it fair to say that the entire
13 gasoline storage and delivery system is owned --
14 at the site is owned by Cumberland Farms?
15 A. Yes.
16 Q. And who's responsible for the
17 maintenance, the testing and the maintenance of
18 the underground storage tanks?
19 A. Cumberland Farms.
20 Q. And how about for the testing and
21 maintenance of the dispensers?
22 A. I would say that's split
23 responsibility. I was going to say inspection
24 or maintaining.
25 Q. Let me break it down then.

U.S. LEGAL SUPPORT
916-248-5608