**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION** | |
| **This document pertains to:** | **Master File No. 1:00 – 1898** **MDL 1358 (SAS)** **M21-88** |
| *New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al., No. 08 Civ. 312* | |

**MEMORANDUM OF LAW IN SUPPORT OF SHELL'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM**
**FOR PRIMARY RESTORATION AT THE RIDGEWOOD TRIAL SITE**

SEDGWICK LLP
2900 K Street, NW
Harbourside, Suite 500
Washington, DC 20007
(202) 204-1000

Attorneys for Defendants Shell Oil Company, Shell Oil
Products Company LLC, Shell Trading (US) Company,
Equilon Enterprises LLC, and Motiva Enterprises LLC

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.    UNDISPUTED FACTS ........................................................................................ 2

     A.    Shell Has Remediated the Ridgewood Site to the Satisfaction of NJDEP ................... 2

     B.    Plaintiffs' Expert Brown Opines that More "Investigation" May Be Needed.............. 6

III.   ARGUMENT ...................................................................................................... 8

     A.    Summary Judgment Standard ....................................................................... 9

     B.    Plaintiffs Cannot Prove Primary Restoration Damages at the Ridgewood Site ......... 10

     C.    Mr. Brown's Report Is Insufficient To Raise a Genuine Issue of Material Fact Showing a Need for Primary Restoration at the Ridgewood Trial Site ...................... 14

IV.   CONCLUSION.................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ....................................................... 9

*Barnes Group v. United States*, 872 F.2d 528 (2d Cir. 1989)..................................................... 10

*Caldwell v. Haynes*, 136 N.J. 422 (N.J. 1994)............................................................................ 10

*California v. Kinder Morgan Energy Partners*, No. 07-CV-1883-MMA (WVG),
  2013 U.S. Dist. LEXIS 10503 (S.D. Cal. 2013) ......................................................... 11

*Carroll v. Lytton Sys*., No. B-C-88-253, 1990 U.S. Dist LEXIS 16833 (W.D.N.C. 1990) ......... 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 9

*City of Fresno v. Chevron U.S.A., Inc.,* MDL 1358, 04 Civ. 4973,
  2013 WL 4830965 (S.D.N.Y. Sept. 10, 2013)....................................................... 11, 14

*Finn v. N.Y. State Office of Mental Health-Rockland Psychiatric Ctr.*,
  489 Fed. App'x 513 (2d Cir. 2012)............................................................................... 9

*Froom v. Perel,* 377 N.J. Super. 298 (N.J. App. Div.), *certif. denied*, 185 N.J. 267 (2005) ........ 11

*Gioia v. Forbes Media LLC*, 501 Fed. App'x 52 (2d Cir. 2012) ..................................................... 9

*In re Kimber Petroleum Corp.*, 110 N.J. 69 (N.J. 1988) ............................................................. 12

*Kelly v. Berlin,* 300 N.J. Super. 256 (N.J. App. Div. 1997)........................................................... 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..................................... 9

*New Jersey Tpk Auth. v. PPG Indus., Inc.*, 197 F.3d 96 (3rd Cir. 1999) ..................................... 11

*NJDEP v. Essex Chem. Corp.,* No. A-004478-10T2, 2012 WL 913042, *7
  (N.J.A.D. Mar. 20, 2012) .................................................................................... passim

*NJDEP v. Union Carbide Corp.*, Docket No. MID-L-5632-07
  (N.J. Super. Ct. Mar. 29, 2011.)............................................................................. 9, 13

*Point Productions, A.G. v. Sony Music Entertainment, Inc.*,
  215 F. Supp. 2d 336 (S.D.N.Y. 2002)........................................................................ 10

*Rivera v. Rochester Genesee Regional Transp. Auth.*, 702 F.3d 685 (2d Cir. 2012) ..................... 9

*Robinson v. Allstate Ins. Co.*, 508 Fed. App'x 7 (2d Cir. 2013)............................................. 10, 13

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998) ....................................................................... 10

*Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336 (2d Cir. 2010) ..................................... 9

Defendants Shell Oil Company, Shell Oil Products Company LLC, Shell Trading (US) Company, Equilon Enterprises LLC, and Motiva Enterprises LLC ("Shell"), submit this memorandum of law in support of their motion for partial summary judgment on Plaintiffs' claim for what they call "primary restoration" damages at the Ridgewood Trial Site.

I.      INTRODUCTION

Gasoline constituents, including MTBE, were first detected in the soil and groundwater at the Ridgewood Site in 1987.  Since then, Shell has worked at the direction of NJDEP to investigate and remediate the Site, including the station and surrounding areas.  Shell has performed all the work NJDEP has required, including active remediation for many years, and the installation of more than 80 monitoring and extraction wells.  In 2009, NJDEP approved shutdown of the active remediation systems and directed Shell to undertake Monitored Natural Attenuation ("MNA"), which involves testing samples from numerous existing monitoring wells at and around the Site and reporting the results periodically.  In late 2012, the active remediation equipment was removed.  Shell continues to monitor existing wells.  The remediation branch of NJDEP has not required more than that.

Now, based on a claim for what they call "primary restoration," Plaintiffs seek a judgment against Shell for the costs of additional investigation that an outside expert from California, Anthony Brown, recommended in this case, consisting of installing and sampling more monitoring wells, which Mr. Brown says would cost another $1.3 million.  To repeat, NJDEP has not directed Shell to perform this work.  To the contrary, this additional "investigation" is unnecessary under the NJDEP cleanup standards.  Yet Plaintiffs say Shell should have to pay $1.3 million in "damages" because that is what their expert says this investigation work would cost -- if it were ever done.

This claim is legally untenable for two main reasons:  *First*, Plaintiffs admit they cannot prove a need for "primary restoration" that would support a claim for damages.  Rather, the most Plaintiffs can allege is that the additional "investigation" which Mr. Brown recommends "may" uncover an injury (which is highly speculative at best, particularly since there is no indication Plaintiffs would even conduct the "investigation" if awarded the "damages" they seek, and in any event would not do so until after trial).  Even Mr. Brown acknowledges the investigation might be fruitless, as he candidly admits that the prior remediation and current monitoring "may" be sufficient and, at present, he cannot recommend any additional remediation.  *Second,* the claim cannot survive as a form of "primary restoration" damages because mere investigation would not "restore" anything.  New Jersey courts have made clear that damages for "primary restoration" may be recoverable if, but only if, NJDEP can show that additional restoration is necessary to protect flora, fauna or human health, safety or welfare.  Mere "investigation" cannot meet that standard.  Shell is therefore entitled to partial summary judgment on the claim for "primary restoration" damages at the Ridgewood Site.

II.    UNDISPUTED FACTS

A.  Shell Has Remediated the Ridgewood Site to the Satisfaction of NJDEP

In 1987, a release of gasoline including MTBE was detected at the Ridgewood Site. Additional releases were reported in the ensuing years, most recently in 1998.  MTBE from the Site allegedly impacted three wells owned by the Village of Ridgewood, and Shell settled claims of the Village in the 1990s by paying for treatment on those wells.  MTBE has not been detected in those wells above the State MCL since 1998, and has not been detected at any level whatsoever since 2008.  (*See Shell Defendants' Rule 56.1 Statement of Material Facts (the "R. 56.1 Statement") ¶¶* 7, 8.)

Shell accepted responsibility for discharges at the Site and has worked at the direction of NJDEP to remediate the Site and surrounding areas. The remediation, which has been extensive, is essentially complete. Shell installed and operated two active remediation systems, and installed more than 80 monitoring and extraction wells throughout the area. (*R. 56.1 Statement ¶¶ 9, 19,* Davies Exh. 2.) By 2009, NJDEP determined that Shell had achieved full control of the plume, that no further investigation or remediation was needed, and that ongoing monitoring of existing wells is all that is necessary.

At various points in the past, particularly in the 1990s, Shell and its consultants took issue with some of NJDEP's demands. In 2000, NJDEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment against Shell for the Ridgewood Site. In 2007, NJDEP and Shell entered into an Administrative Consent Order which settled NJDEP's claims for alleged violations or shortcomings in the remedial work at Ridgewood, as well as NJDEP's claims for its oversight costs and a penalty. (*R. 56.1 Statement ¶ 6,* Wallace Exh. 5.)

The former NJDEP case manager assigned to the Ridgewood Site, Donna Plummer, testified in this case about Shell's remediation. She stated that her goal at this and other sites is to "protect municipal wells and clean up contaminated sites as quickly as possible." (*R. 56.1 Statement ¶ 40,* Wallace Exh. 6, *Mar. 14, 2012 Deposition of Donna Plummer,* at 439:18-23.) She had directed the remediation of the Ridgewood Site from 1988 to 2006. (*R. 56.1 Statement ¶ 441,* Wallace Exh. 6, at 69:6-17.) In 2006, NJDEP approved a final Remedial Action Workplan for the Site. ((*R. 56.1 Statement ¶ 41,* Wallace Exh. 6, at 70-71.) She testified that Shell had installed enough wells to delineate contamination, and had achieved the goals of controlling the plume and reducing the levels of contamination, all by 2006 when NJDEP approved the final Remedial Action Workplan. (*R. 56.1 Statement ¶ 43,* Wallace Exh. 6, at 70-

72, 126, 193-94, 205-06.)  Ms. Plummer also testified that Shell was "very responsive" to

NJDEP's requests to conduct investigation and remediation. (*R. 56.1 Statement ¶* 44, Wallace

Exh. 6, at  126.)

In the final plan, NJDEP approved the program of Monitored Natural Attenuation or

MNA off-site, directing that the program include background monitoring points, source area

monitoring points, compliance monitoring points, and sentinel wells.  The NJDEP specified

which of the existing wells to include in the monitoring program.  The NJDEP did not request

any further investigation or the installation of additional wells.  (*R. 56.1 Statement ¶¶* 32, 33, 36,

Davies Exh. 2.)  Active remediation systems continued to operate on-site at the station property

until 2009, at which point NJDEP also approved shutdown of those systems.  (*Id.* ¶¶ 10, 20-23.)

Coincidentally, in 2009, New Jersey enacted the Site Remediation Reform Act

("SRRA"), which changed the way NJDEP directs remediation projects.  Previously, NJDEP's

Site Remediation Program ("SRP") provided direct oversight of the cleanup of contaminated

sites, and needed to approve work plans, progress reports, and remedial actions before they could

be implemented.  With the passage of the SRRA, NJDEP effectively privatized much of this

function.  Under SRRA, the party responsible for the cleanup of a contaminated site must hire

and pay for an independent Licensed Site Remediation Professional or "LSRP," and that LSRP is

responsible for applying the NJDEP standards for directing the investigation and remediation of

the site.  LSRPs have the authority under the SRRA to conduct investigations, approve remedial

alternatives, and determine when remedial action is complete.  (*Id.* ¶ 13, Declaration of Julian

Davies ¶ 3.)  As NJDEP put it, the LSRPs "'step into the shoes' of the Department … to oversee

the remediation of contaminated sites in most instances."  (*R. 56.1 Statement ¶* 14, Davies Exh.

1, NJDEP SRP, *Overview of the LSRP Program,* April 2011.).

Julian Davies is the LSRP for the Ridgewood Site, and has been since 2010.  In a declaration submitted with this motion, Mr. Davies describes in detail the responsibilities of a LSRP and the standards that LSRPs must apply.  In brief, they are subject to a strict code of ethics and very specific standards that are set forth in the SRRA and NJDEP regulations, all aimed at assuring they protect human health and the environment.  (*R. 56.1 Statement ¶¶* 15-18, Davies Declaration ¶¶ 4-9.)

By the time Mr. Davies was assigned to be the LSRP for the Ridgewood Site in 2010, the NJDEP SRP had already approved of the final Workplan in 2006 which required only monitoring and no further active remediation off-site, and had approved shutdown of the on-site active remediation systems in 2009, and reiterated that approval in 2010.  (*R. 56.1 Statement ¶¶* 22, 23, 27, Davies Exh. 2.)  In 2012, in his role as LSRP, Mr. Davies approved the permanent shutdown and removal of the active remediation equipment on-site.  (*R. 56.1 Statement ¶* 26, Davies Declaration *¶* 13, Davies Exh. 2.)  Mr. Davies determined that annual sampling of 18 groundwater wells should continue as part of the MNA program and that annual sampling of these wells was appropriate for purposes of protecting flora, fauna, public health, safety and the environment in the vicinity of the Ridgewood Site.  Mr. Davies did not determine, in his role as LSRP, that any additional investigation or new monitoring wells were necessary or appropriate. (*R. 56.1 Statement ¶* 33, Davies Declaration ¶ 16.)

More than 50 monitoring wells are still in place at and around the Ridgewood Site. Approximately 85 wells have been installed at and around the Site at one time or another, some of which are located as far as 1,200 feet from the station itself.  More than 2,000 groundwater samples from those wells have been collected and analyzed for up to 15 different chemical constituents during the course of the 25-year investigation and remediation.  Additional sampling

data have also been collected from the Village of Ridgewood Water Department supply wells.

(*R. 56.1 Statement ¶* 39, Davies Declaration ¶ 17.)  The investigation has been thorough, and

certainly sufficient to meet NJDEP standards.

### B.  Plaintiffs' Expert Brown Opines that More "Investigation" May Be Needed

One of Plaintiffs' experts, Anthony Brown, a California hydrogeologist, has opined that

additional investigation should be conducted to determine whether more remediation "may" be

needed.  He offers the following opinions, among others, about the Ridgewood Site:

13.   "Remediation performed to date **may have effectively addressed** on-site groundwater contamination."  …

18.   "Additional on-site remediation of groundwater **is possibly required.**"

19.   "Additional off-site remediation of groundwater **may be required**. …  The most recent contaminant concentrations detected off-site **would not warrant the implementation of an off-site groundwater remediation system**.  However, based upon the results of additional investigation, particularly in the transmissive Z4 bedrock unit, an off-site groundwater remediation system **may be required**."

(*R. 56.1 Statement ¶* 46, Wallace Exh. 8, Revised Site Summary, ID # 11346 Shell Service

Station #138490, Jan. 2013, §10, p. 56.) (emphasis added).

Despite some 25 years of investigation and remediation, and the contrary determinations

by the NJDEP case manager and the LSRP, and despite his own view that recent data "would not

warrant" any additional remediation, Mr. Brown opines that more investigation "may" indicate

that more remediation "may be required."  Notably, Mr. Brown recommends additional active

remediation at all but two of Plaintiffs' 10 Trial Sites, Ridgewood and one other.  *Revised Brown

Expert Report, Jan. 2013,* § 1.8, p. 15 (Wallace Exh. 7 at 15) ("Monitoring only is recommended

for two plaintiffs' trial sites (… Ridgewood; and … Manalapan…)").  Hence, the material facts

presented here, where Plaintiffs seek "primary restoration" damages for mere investigation, are

unique to the Ridgewood Site and possibly one other.

Mr. Brown opines that the further investigation he suggests should involve installing 18 new wells, and then monitoring those wells for five years, which he says would cost more than $1.3 million.  *Revised Cost Summary, ID # 11346 Shell Service Station #138490, Jan. 2013,* § A, pp. 1-4, Jan. 2013 (Wallace Exh. 8.)

Mr. Brown does not disagree with NJDEP's approval of the shutdown of the active remediation systems at the Ridgewood Site.  (*R. 56.1 Statement ¶ 53,* Wallace Exh. 11, *June 3,2013 Brown Depo.* 881:19-22.) Mr. Brown is not a LSRP.  *R. 56.1 Statement ¶ 54,* Wallace Exh. 11, *May 28, 2013 Brown Depo.* 68:25-69:2.)  No one indicated to Mr. Brown that the LSRP's work at the Ridgewood Site had been inadequate.  (*R. 56.1 Statement ¶ 55,* Wallace Exh. 11, 898:12-20.)  Mr. Brown never made any attempt to discuss the Ridgewood Site with the LSRP for the Site.  (*R. 56.1 Statement ¶ 56,* Wallace Exh. 11, *June 3, 2013 Brown Depo.* 880:22-25.)

Mr. Brown does not and cannot identify any cleanup or removal costs necessary to accomplish "primary restoration" at the Ridgewood Trial Site.  Instead, he merely states that "[t]he need for remediation would be reevaluated … as additional data are generated from the proposed site investigations." *Revised Brown Expert Report, Jan. 2013,* § 1.8, p. 15 (Wallace Exh. 7).  Neither Mr. Brown nor Plaintiffs identify when this "reevaluation" would take place. Given that Plaintiffs are seeking an award of damages for additional investigation in the initial focus trial, that "reevaluation" presumably would have to take place *after* the trial has concluded – that is *if* Plaintiffs conduct any investigation at all with the money they seek to recover. [1]

---

[1]   There is reason to doubt whether Plaintiffs would ever do the investigation Mr. Brown proposes.  NJDEP Deputy Commissioner Irene Kropp testified that NJDEP's Office of Natural Resource Recovery ("ONRR") has recovered money for natural resource damages in the past, but to her knowledge NJDEP has never used the money for remediation:  "I think primarily the money that ONRR, whatever you call it, received through natural resource damage claims was

Mr. Brown concedes that he does not have any evidence that the MNA program currently

in place at the Ridgewood Site is inappropriate or insufficient, or that anything more is required:

> [T]he current off-site contaminant concentrations in groundwater do not justify
> implementation of an active remediation system.  Additional investigation
> proposed at these sites may indicate that off-site remediation of groundwater
> contamination is required.  However, until such time, the MNA alternative is
> effective in the short-term, and may be effective in the long-term….

*Feasibility Study, Nov. 2012,* § 4.1.2, p. 19 (Wallace Exh. 9).  At three other trial sites in this

case, Plaintiffs performed "limited additional site investigations" during discovery to determine

whether remediation to achieve primary restoration was necessary.  The Ridgewood Site was not

among them.  *See Revised Brown Expert Report, Jan. 2013,* § 1.9, p. 16 (Wallace Exh. 7).  Thus,

Plaintiffs could have done more investigation themselves to determine if real "restoration" work

is required at Ridgewood, but they did not.  As Mr. Brown acknowledged in his report, current

evidence would not "warrant" or "justify" additional active remediation at Ridgewood.  In

essence, then, the "primary restoration" damages Plaintiffs seek from Shell would amount to a

fund for a post-trial fishing expedition to search for evidence of a natural resource injury that

they admit they cannot prove now.

### III.    ARGUMENT

Plaintiffs claim they are entitled to recover damages under the New Jersey Spill

Compensation and Control Act (the "Spill Act") for "primary restoration," which they define as

the "cost to restore all MTBE contaminated waters of the State to their pre-discharge condition."

(NJDEP 4th Am. Compl. ¶¶ 1, 6; Wallace Exh. 10 (Brown Rebuttal Rpt. Attachment D.)  They

also seek other damages at the Ridgewood Site, including some oversight costs (most of which

---

spent on projects and acquisitions.  I'm not aware of when we've gone back in and said to
somebody we're taking your NRD contribution and moving your site from cleanup standards to
predischarge, if that's your question."  *Deposition of Irene Kropp, June 6, 2013*, at 224:9-17
(Wallace Exh. 6).

Shell already paid) and damages for alleged "lost use" of water (despite Shell having paid for

treatment of the Ridgewood water supply already).  This motion challenges only the claim for

alleged "primary restoration" damages.

New Jersey law is clear that NJDEP bears the burden of proving the need for primary

restoration.  *NJDEP v. Essex Chem. Corp.,* No. A-004478-10T2, 2012 WL 913042, *7 (N.J.A.D.

Mar. 20, 2012); *NJDEP v. Union Carbide Corp.*, Docket No. MID-L-5632-07 (N.J. Super. Ct.

Mar. 29, 2011.)(Wallace Exh. 12.)  Plaintiffs cannot meet that burden.

### A.  Summary Judgment Standard

Summary judgment is appropriate where the moving party shows "that there is no

genuine dispute as to any material fact and [that the party is] entitled to judgment as a matter of

law."  *Rivera v. Rochester Genesee Regional Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012)

(quoting Fed. R. Civ. P. 56(c)).  "A genuine dispute exists if the evidence is such that a

reasonable [trier of fact] could return a verdict for the nonmoving party."  *Finn v. N.Y. State*

*Office of Mental Health-Rockland Psychiatric Ctr.*, 489 Fed. App'x 513, 514 (2d Cir. 2012)

(quotation marks omitted).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."  *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "The moving party bears the burden of

establishing the absence of any genuine issue of material fact."  *Zalaski v. City of Bridgeport*

*Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986)).  To defeat a motion for summary judgment, however, the non-moving party "'must

do more than simply show that there is some metaphysical doubt as to the material facts,'" *Gioia*

*v. Forbes Media LLC*, 501 Fed. App'x 52, 54 (2d Cir. 2012) (quoting *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "'may not rely on conclusory

allegations or unsubstantiated speculation.'"  *Robinson v. Allstate Ins. Co.*, 508 Fed. App'x 7, 9

(2d Cir. 2013) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  A motion such as this seeking to limit damages is properly "treated as a motion for partial summary judgment." *Point Productions, A.G. v. Sony Music Entertainment, Inc.*, 215 F. Supp. 2d 336, 340 (S.D.N.Y. 2002), citing *Barnes Group v. United States*, 872 F.2d 528, 532 (2d Cir. 1989).

### B.  Plaintiffs Cannot Prove Primary Restoration Damages at the Ridgewood Site

Plaintiffs offer nothing but unsubstantiated speculation that the Ridgewood Site "may" someday require some unspecified form of remediation based on future test results from new monitoring wells that Mr. Brown recommends, and they seek the estimated costs to drill and test such wells.  The wells and testing that Mr. Brown recommends would do nothing to restore any natural resource or to protect flora, fauna or human health, safety or welfare.  Mr. Brown's report fails to establish the need for "primary restoration" and fails to identify any restoration work beyond mere investigation.  Plaintiffs' failure to support their primary restoration claim with admissible evidence entitles Shell to summary judgment on that claim.

NJDEP's ability to sue for so-called Natural Resource Damages or "NRD" such as "primary restoration" is not without limits.[2]  When the State brings a civil action, including an action under the Spill Act, it bears the burden of proving every element of its claim, particularly the alleged damages.  *NJDEP v. Essex Chem. Corp.,* 2012 WL 913042 at *7 ("plaintiffs' role as trustees of the State's resources and their responsibilities under the Spill Act did not relieve them of their burden of proof on the issues of damages") (*citing Caldwell v. Haynes*, 136 N.J. 422, 436 (N.J. 1994), which held that "[g]enerally, plaintiffs have the burden of proving damages").  *Cf.*

---

[2]   The term "primary restoration" does not appear at all in the Spill Act.  Several times Mr. Brown quotes an NJDEP regulation (N.J.A.C. 7:26C-6.5) that uses the term "primary and compensatory restoration damages" and misleadingly attributes the quotation to the Spill Act. *See, e.g., Brown Rebuttal Rpt.* Attachment A, at 4 (Wallace Exh. 10).  Even the cited regulation does not define the term, and that regulation does not concern recoverable damages, but rather addresses the scope of final remediation documents and covenants not to sue.

*New Jersey Tpk Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 106 (3rd Cir. 1999) (rejecting state

authority's attempt to relieve its burden to prove causation under the Spill Act).

Summary judgment is appropriate where a plaintiff fails to meet its burden to prove an

element of its claim. *E.g., New Jersey Tpk. Auth.*, 197 F.3d at 112.  Expert testimony is required

on any issue which is beyond the "common knowledge of lay persons." *Froom v. Perel,* 377

N.J. Super. 298, 318 (N.J. App. Div.), *certif. denied*, 185 N.J. 267 (2005); *Kelly v. Berlin,* 300

N.J. Super. 256, 268 (N.J. App. Div. 1997) (expert evidence required on the issue of damages

where "laypersons do not have the knowledge, from their common experience, to evaluate and

determine damages in a case of this kind").  In particular, a matter that involves a "complex

scientific issue such as the migration of chemicals through land" requires expert evidence if the

plaintiff is to meet its burden.  *California v. Kinder Morgan Energy Partners*, No. 07-CV-1883-

MMA (WVG), 2013 U.S. Dist. LEXIS 10503, at *28 (S.D. Cal. 2013); *Carroll v. Lytton Sys*.,

No. B-C-88-253, 1990 U.S. Dist LEXIS 16833, *132 (W.D.N.C. 1990).  *Cf. City of Fresno v.

Chevron U.S.A., Inc.,* MDL 1358, 04 Civ. 4973, 2013 WL 4830965, *9, *18 (S.D.N.Y. Sept. 10,

2013) (granting summary judgment on some of plaintiff's claims partly because plaintiff failed

to designate an expert on the fate and transport of chemicals and hence could not prove

causation).

Natural resource damages for primary restoration are not recoverable solely because a

release has taken place at a site.  Rather, if NJDEP can recover "primary restoration" damages at

all, it must show that existing contamination at a site poses a risk to flora, fauna, or to human

health, safety or welfare. *Essex Chem. Corp.,* 2012 WL 913042, at *7.  Likewise, NJDEP would

have to establish that a proposed "primary restoration" plan is justified and necessary.  *Id.*;

*accord In re Kimber Petroleum Corp.*, 110 N.J. 69, 85-86 (N.J. 1988) (DEP directive to a responsible party to pay for cleanup and removal costs must be reasonable).

The *Essex Chemical* case is particularly instructive.  In that case, NJDEP unsuccessfully sought to recover primary restoration damages for a site where, like here, the defendant acknowledged responsibility for contamination and had been remediating the site for years at the direction of NJDEP's Site Remediation Program or SRP.  There, Essex Chemical had implemented a remediation program with SRP's oversight and approval for more than two decades.  2012 WL 913042, at *7.  Nevertheless, NJDEP's Office of Natural Resource Restoration or ONRR sued claiming the remediation was insufficient and particularly that it was taking too long.  NJDEP, as in this case, hired an outside expert to identify additional, more aggressive remediation measures and to estimate the costs of those measures.  It sued to recover those costs as "primary restoration" damages.  *Id.*  NJDEP failed to show that the additional, costly measures its expert specified were necessary to protect flora, fauna or public health, safety or welfare; that the benefits of the additional measures would justify the costs; or that it would be harmful to permit Essex to continue with the remedial plan that the SRP had agreed was sufficient.  *Id.* at *8.  The Appellate Division held:

> The trial court recognized the State's unique role under the Spill Act and plaintiffs' right to seek natural resource damages for contamination resulting from the discharge of hazardous substances.  The trial court correctly determined, however, that plaintiffs' role as trustees of the State's resources and their responsibilities under the Spill Act did not relieve them of their burden of proof on the issue of damages.
>
> Thus, plaintiffs were required to establish by a preponderance of the credible evidence that their expedited remediation plan should be implemented rather than Essex's plan.  As the trial court found, plaintiffs failed to do so.  Plaintiffs did not show that there was a need to restore the properties to pre-discharge conditions within ten years, particularly when there was no evidence showing that the hazardous substances remaining on the properties were causing harm to any of the flora and fauna or posed any threat to the public health, safety or welfare.

*Id*. at \*7 (citations omitted); *see also NJDEP v. Union Carbide Corp.*, Docket No. MID-L-5632-07 (N.J. Super. Ct. Mar. 29, 2011) (Wallace Exh. 12) (NJDEP must show why it should be entitled to faster, more thorough cleanup or more stringent cleanup standards than those endorsed by the SRP).

Here, Plaintiffs' claim for "primary restoration" damages is even more meritless, since they seek costs not for additional or alternative remediation, but for mere investigation. They admit that additional remediation is not "warranted" or "justified" based on existing data (which are extensive, to say the least). Almost by definition, a claim for mere investigation cannot satisfy the requirement of proof that the relief sought must be necessary to protect flora, fauna or public health, safety or welfare.

Like Essex Chemical, Shell has worked closely with the SRP and LSRP for the Ridgewood Site to develop and implement remedial plans for more than 20 years. Unlike in the *Essex* case, active remediation has been completed at the Ridgewood Site and, with the permission of NJDEP, all active remediation equipment has already been removed from the Site. Plaintiffs offer no evidence that low levels of MTBE that remain at the Ridgewood Site pose any threat to flora, fauna, or public health, safety or welfare, much less that active remediation is necessary to avert such a threat. Moreover, unlike in the *Essex* case, NJDEP does not even have an alternative restoration plan here. The additional investigation Mr. Brown proposes would not result in any restoration whatsoever. What is more, as Mr. Brown effectively concedes, the additional investigation might not uncover any future need for additional remediation, and so may be pointless. At most, the recommendation for additional investigation is based on mere speculation that it "may" reveal a need for more remediation in the future. Speculation cannot defeat summary judgment. *Robinson v. Allstate Ins. Co.*, 508 Fed. App'x 7, 9 (2d Cir. 2013).

### C. Mr. Brown's Report Is Insufficient To Raise a Genuine Issue of Material Fact Showing a Need for Primary Restoration at the Ridgewood Trial Site

Plaintiffs' evidence, in the form of Mr. Brown's opinion about the need for further investigation, is insufficient to establish the existence of any injury, as would be necessary for Plaintiffs to maintain the claim for investigation costs. This Court recently rejected a similar claim in the *City of Fresno* case. There, Fresno's expert, David Norman, like Mr. Brown here, opined that additional assessment activities like those Mr. Brown recommends were required to determine if there was any injury that may require remediation. This Court summarized Mr. Norman's opinion in that case in words that aptly describe Mr. Brown's opinion here:

> [Fresno's] remediation expert—David Norman—testified that he lacked sufficient information to recommend remediation at any of the sites at issue, and therefore could not state whether future remediation at any of these sites would be reasonable. However, he recommended that site-assessments be performed for the sites, and opined that it would cost between $23,000 and $135,000 per site to conduct an initial assessment in order to determine whether remediation is reasonably required.

*City of Fresno v. Chevron U.S.A., Inc.,* MDL 1358, 04 Civ. 4973, 2013 WL 4830965, *5 (S.D.N.Y. Sept. 10, 2013). The Court also summarized Fresno's claim in terms that apply equally to NJDEP's claim for additional investigation at the Ridgewood Site: "Fresno seeks damages … to perform site-assessments at the [defendants'] … Sites in order to determine whether they must be remediated in order to protect its water production wells." *Id.* at*17. The Court held that, despite Mr. Norman's opinion about the need for investigation to search for proof of injury, "Fresno has presented no evidence from which a reasonable jury could infer that MTBE contamination at the [defendants'] … Sites have caused appreciable injury to its water production wells." *Id.* at *16.

Mr. Brown's opinion that past remediation and ongoing monitoring may be effective but that additional remediation "may be required" amounts to a tacit admission that, although he tried, he could not identify any "primary restoration" actually necessary at the Ridgewood Trial

Site.  Plaintiffs cannot skip the threshold requirement of proving recoverable damages by offering an expert opinion that more information is needed before that expert can decide whether active remediation, or real "restoration" damages are "justified" or "warranted."  *See* Transcript of MDL 1358 Hearing, August 19, 2013, p.45:18-23 (THE COURT: "You have to have some damage.  Nobody is going to order them to pay for damage that you can't prove").

Mr. Brown's recommended investigation is impractical, as well as legally untenable.  As noted, he recommends installing 18 new monitoring wells and sampling them for five years (or more precisely that the State recover $1.3 million representing his estimate of what this investigation would cost if it were performed).  If his plan were implemented, it would be undertaken after trial and would continue for five years, all to determine whether there is evidence that would "warrant" or "justify" additional remediation.  In effect, Mr. Brown acknowledges that Plaintiffs cannot prove a need for "primary restoration" damages, and proposes a plan to investigate whether there is such a need over the course of five years after trial, all based on his opinion that there "may" be a need for restoration or remediation after that time.  The Court should not allow the claim for "primary restoration" damages to proceed to trial based on Mr. Brown's mere speculation.

IV.      **CONCLUSION**

For the foregoing reasons, Shell's motion for partial summary judgment on Plaintiffs' claim for primary restoration damages at the Ridgewood Trial Site should be granted.

Dated: October 1, 2013                    Respectfully submitted,


                                        /s Richard E. Wallace, Jr.
                                    Richard E. Wallace, Jr.
                                    Michael L. Williams
                                    Marie S. Dennis
                                    SEDGWICK LLP
                                    2900 K Street, NW
                                    Harbourside, Suite 500
                                    Washington, DC 20007
                                    (202) 204-1000

                                    Attorneys for Defendants Shell Oil Company, Shell Oil
                                    Products Company LLC, Shell Trading (US) Company,
                                    Equilon Enterprises LLC, and Motiva Enterprises LLC

## <u>PROOF OF SERVICE VIA LEXIS/NEXIS FILE & SERVE AND E-MAIL</u>

I, Kristin McCormick, hereby declare under penalty of perjury under the laws of the United

States of America that a true and accurate copy of the foregoing was served via Lexis/Nexis File

& Serve and ECF on all parties on this 1st day of October 2013.


 

 

 

 

                                            _____/s/ Kristin McCormick_____
                                            Kristin McCormick