UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE METHYL TERTIARY BUTYL ETHER PRODUCTS LIABILITY LITIGATION | Master File No. 1:00 – 1898 MDL 1358 (SAS) M21-88 |
| This document pertains to: | DECLARATION OF JULIAN DAVIES, LSRP |
| *New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.* No. 08 Civ. 312 | |

JULIAN DAVIES, under penalty of perjury, declares as follows:

1.     I am a senior project manager and office manager with Sovereign Consulting Inc. ("Sovereign"), an environmental consulting firm, in Sovereign's Parsippany, New Jersey office. I am a Licensed Site Remediation Professional ("LSRP") in the State of New Jersey, having been issued a license by the Site Remediation Professional Licensing Board, which was established by the Site Remediation Reform Act ("SRRA") in 2009. I received a temporary license to act as an LSRP (No. 508604) in 2009, and a final license from the Site Remediation Professional Licensing Board (No. 574051) in July 2012. I was deposed in this matter by counsel for the Plaintiffs on March 22, 2012.

2.     I have been retained by Shell Oil Products US on behalf of Motiva Enterprises LLC as the LSRP-of-Record at a service station located at 657 Franklin Turnpike in the Village of Ridgewood, Bergen County, New Jersey (the "Ridgewood Site"). I have performed environmental consulting services at that site since 1999, first with Envirotrac, and later with Sovereign. I have been the LSRP-of-Record at the Ridgewood Site since 2010.

3.     The SRRA changed the way site remediations are conducted in New Jersey. Prior to enactment of the SRRA, the New Jersey Department of Environmental Protection's Site

1

Remediation Program ("SRP") provided oversight for the cleanup of contaminated sites, and needed to approve work plans, progress reports, and remedial actions before they could be implemented. With the passage of the SRRA, parties responsible for the cleanup of contaminated sites are required to hire an LSRP, and the LSRP is responsible for oversight of the investigation and remediation of the site, without direct supervision or prior approval of NJDEP's SRP. LSRPs have the authority under the SRRA to conduct investigations, approve remedial alternatives, and determine when remedial action is complete.

4.      As a document prepared by the NJDEP SRP in April 2011 puts it, "LSRPs will 'step into the shoes' of the Department of Environmental Protection (Department) to oversee the remediation of contaminated sites in most instances." NJDEP SRP, *Overview of the Licensed Site Remediation Professional (LSRP) Program,* April 2011 (attached as Exhibit 1 to this Declaration). An LSRP is required to oversee the remediation of contaminated sites in accordance with NJDEP's applicable standards, regulations and technical guidance for responsible parties. LSRPs are subject to a strict code of conduct established by statute and regulation and must ensure that remediations are protective of human health, safety and the environment. The conduct of LSRPs is overseen by the Site Remediation Professional Licensing Board.

5.      In performing my work as an LSRP, I am required to apply standards that are specifically spelled out in the SRRA (C.58:10C-14). Those standards include (a) health risk and environmental standards established pursuant to section 35 of P.L.1993, c.139 (C.58:10B-12); (b) remediation standards adopted by the department pursuant to section 35 of P.L.1993, c.139 (C.58:10B-12); (c) maximum contaminant levels for building interiors adopted by the

Department of Health and Senior Services pursuant to section 1 of P.L.2007, c.1 (C.52:27D-130.4) as applicable; and (d) any other applicable standards adopted pursuant to law.

6.     I am also required to apply NJDEP regulations when performing my work, including (a) technical standards for site remediation adopted by NJDEP pursuant to P.L.1993, c.139 (C.58:10B-1 et al.); (b) mandatory remediation timeframes and expedited site specific timeframes adopted by NJDEP pursuant to section 28 of P.L.2009, c.60 (C.58:10C-28); and (c) presumptive remedies adopted by NJDEP pursuant to section 35 of P.L.1993, c.139 (C.58:10B-12).  I am also required to apply any available and appropriate technical guidance concerning site remediation issued by NJDEP.  If no such standards or guidance exist, in my professional judgment, I may make decisions based on (a) relevant guidance from the federal Environmental Protection Agency or other states; and (b) other relevant, applicable, and appropriate methods and practices that ensure the protection of the public health and safety, and of the environment.

7.     In addition, an LSRP is bound by the code of ethics contained in the SRRA at C.58:10C-16.  Under that code, an LSRP's "highest priority in the performance of professional services shall be the protection of public health and safety and the environment."  Further, an LSRP is required to "exercise reasonable care and diligence, and shall apply the knowledge and skill ordinarily exercised by licensed site remediation professionals in good standing practicing in the State at the time the services are performed."  Likewise, an LSRP must "exercise independent professional judgment, … make a good faith and reasonable effort to identify and obtain the relevant and material facts, data, reports and other information evidencing conditions at a contaminated site for which he is responsible that is in possession of the owner of the property, or that is otherwise available, and identify and obtain whatever additional data and other information as the licensed site remediation professional deems necessary.  The licensed

3

site remediation professional shall disclose and explain in any document submitted to the department any facts, data, information, qualifications, or limitations known by the licensed site remediation professional that are not supportive of the conclusions reached in the document."

8.      LSRPs are subject to professional discipline if they breach their duties under the SRRA, and can have their licenses suspended or revoked by the Site Remediation Professional Licensing Board.

9.      In my role as LSRP-of-Record at the Ridgewood Site, I have been responsible for making professional judgments pertaining to the investigation and remediation of environmental contamination at the site.  In doing so, I have exercised independent professional judgment and reasonable care and diligence, and have been mindful of the SRRA's requirement that an LSRP's highest priority is the protection of public health and safety and the environment.

10.      At the time I began working on the Ridgewood Site in 1999, two active remediation systems, a soil vapor extraction ("SVE") system and a groundwater pump and treat system, were already in place.  My understanding, based on review of documents, is that the SVE system began operating in 1996, and that the groundwater pump and treat system began operating in 1990.

11.      The SVE system, which was connected to 18 wells on and around the Ridgewood Site, ceased operation in February 2009.  Based on a review of the data from the system, the SVE system had achieved its goal, because the influent concentrations had reached non-detect. The NJDEP SRP approved the shutdown of the system in 2009.  The system remained on the site, but inactive, until 2012.

12.      The groundwater pump and treat system also ceased operation in 2009 due to freezing weather conditions at the Ridgewood Site.  The system was not restarted, because it had

accomplished its objective of decreasing the concentrations of gasoline contaminants in groundwater. The NJDEP SRP approved the shutdown of the system. The system remained on the site, but inactive, until 2012.

13.     By letter dated September 12, 2012 (relevant portions of which are attached as Exhibit 2 to this Declaration), in my role as LSRP-of-Record, I approved the permanent shutdown and removal of the SVE and groundwater pump and treat equipment from the Ridgewood Site. Neither system had been operated since 2009. Levels of contaminants detected in groundwater monitoring wells on and around the Ridgewood Site did not show any significant "rebound" as a result of the shutdown of the systems. Both the SVE and pump and treat systems were removed from the Ridgewood Site in late 2012.

14.     Currently, the approved remedial strategy at the Ridgewood Site is monitored natural attenuation ("MNA"). In the exercise of my professional judgment, I have determined that MNA is the appropriate remedial strategy both on-site and off-site based on the data obtained from sampling the monitoring well network that exists at the Ridgewood Site.

15.     MNA was approved as the remedial action for off-site groundwater by the NJDEP's SRP prior to the time I became LSRP-of-Record for the Ridgewood Site. By letter dated March 28, 2006 (relevant portions of which are attached as Exhibit 3 to this Declaration), NJDEP's SRP approved an Off-Site Remedial Action Workplan ("RAW") that proposed a Natural Remediation Compliance Program – monitored natural attenuation – as the remedial action for off-site groundwater at Ridgewood. The approval letter specifically identified 36 wells that needed to be sampled, and the sampling frequency for those wells, as part of the Natural Remediation Compliance Program. NJDEP's SRP approved removing certain of the wells at the Ridgewood Site from the sampling schedule because it determined that sampling

them was no longer necessary.  NJDEP's SRP did not require the installation of any additional monitoring wells.

16.     By letter dated September 12, 2012 (relevant portions of which are attached as Exhibit 2 to this Declaration), in my role as LSRP-of-Record, I approved monitored natural attenuation as the remedial strategy for on-site groundwater at the Ridgewood Site.  After examining the historical sampling results from 30 on-site and off-site groundwater wells, I determined that annual sampling of 18 groundwater wells should continue as part of the MNA remedial strategy and that annual sampling of these wells was appropriate for purposes of protecting public health and safety and the environment, including flora and fauna in the vicinity of the Ridgewood Site.  I did not determine, in my role as LSRP-of-Record, that installation and/or sampling of any additional monitoring wells was necessary or appropriate.

17.     A total of approximately 50-60 monitoring wells are in place at the Ridgewood Site.  Based on a review of records, approximately 85 different wells have been in place at the Site at one time or another, some of which are located as far as 1,200 feet from the station itself. More than 2,000 groundwater samples from those wells have been collected and analyzed for up to 15 different chemical constituents during the course of the 25-year investigation and remediation of the Ridgewood Site.  Additional sampling data has been collected from the Village of Ridgewood Water Department supply wells in the vicinity of the Ridgewood Site. Not all of these wells are currently required to be sampled for the implementation of the MNA remedy.

18.     In my role as LSRP-of-Record at the Ridgewood Site, upon the exercise of reasonable care and diligence and by applying the knowledge and skill ordinarily exercised by licensed site remediation professionals in good standing practicing in the State at the time these

professional services are performed, I have determined that no additional active remediation is needed at Ridgewood and that the current program of monitored natural attenuation is appropriate for purposes of protecting public health and safety and the environment, including flora and fauna in the vicinity of the Ridgewood Site.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Parsippany, New Jersey, this 27 day of September, 2013.

Julian Davies, LSRP