UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00 - 1898
MDL 1358 (SAS)

---

This document refers to:

*New Jersey Dep't of Envtl. Prot., et al. v. Atlantic Richfield Co., et al.,* Case No. 08-CV-00312
(SAS)
*Town of Brewster, et al. v. Atlantic Richfield Co., et al.,* Case No. 13-CV-07247 (SAS)
*Town of Hinesburg v. Atlantic Richfield Co., et al.,* Case No. 13-CV-07271 (SAS)

---

## DEFENDANT HESS CORPORATION'S FOURTH AMENDED
## MASTER ANSWER AND AFFIRMATIVE DEFENSES

Pursuant to the Master Answer agreement among the parties, and various orders
and directives from this Court, Hess Corporation ("Hess") answers the complaints in MDL 1358
cases for which an answer is required, and in which it has been properly named and served, as
follows:

## I.   ADMISSIONS AND STATEMENTS REGARDING SELECT ALLEGATIONS

### A.   Basic Defendant Information

Hess is a publicly held corporation organized and existing under the laws of the
State of Delaware.  Hess has its corporate headquarters in New York, New York.

### B.   Sale or Distribution of Gasoline with MTBE or TBA

Hess admits that at various times it manufactured, refined, distributed, supplied,
sold and marketed gasoline containing MTBE.

C.    **Allegations Regarding Production of MTBE or TBA**

Hess, at one or more times during the relevant time period, has manufactured MTBE. Hess specifically denies that it "introduced" MTBE. Hess states that it did not produce MTBE until sometime in or after 1989.

D.    **Allegations Regarding Properties and Behavior of MTBE**

Hess admits that MTBE is a chemical compound. Hess admits that there are various methods for the production of MTBE and that one method of production is from methanol and isobutylene.

Hess states that solubility and mobility are relative properties and that while MTBE and other ethers may be more soluble and mobile in water than certain gasoline components, such as the benzene, toluene, ethyl benzene and xylene ("BTEX") compounds, they are less soluble and mobile in water than other components sometimes blended into gasoline, such as ethanol. Hess specifically denies that MTBE is "highly soluble" in water. Hess further states that MTBE's behavior in the environment -- and its behavior relative to BTEX -- is dependent on a variety of factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.

Hess states that while under certain conditions MTBE may biodegrade less readily than some other components of gasoline, MTBE has been found to naturally attenuate and biodegrade in numerous ways.

E.    **Allegations Regarding Motivation of Defendants to Add MTBE to Gasoline**

Hess admits only that MTBE was added to certain gasoline products in varying concentrations to comply with federal and state fuel volatility, air toxics and oxygenate requirements and/or, because MTBE is a low volatility, high octane component, which allowed Hess to meet the required octane ratings of its products without violating volatility standards.

Hess states that MTBE was the only feasible and viable option of achieving higher octane levels in gasoline. Hess further states that, at all times during the relevant time period, due to supply and transport issues, ethanol has not been available to satisfy the requirements of the RFG program, particularly on the East Coast of the United States, the area where Hess markets and distributes gasoline.

Hess denies that it produced or marketed MTBE "to make money off gasoline refining waste byproducts." Hess states that it began producing MTBE specifically to respond to federal and state laws and regulations. Similarly, Hess denies that it added MTBE to gasoline solely "to boost octane cheaply and increase [its] own profits." In fact, MTBE historically has been an expensive means of boosting octane. Hess denies that MTBE is a "waste byproduct" of the process of refining intermediate feedstocks into gasoline.

Hess admits that in 1990, with the amendments to the Clean Air Act (the "Amendments"), the federal government mandated an increase in the use of oxygenates (up to 2.7% oxygen content). The initial phase of the Amendments focused on meeting carbon monoxide ambient air standards during the wintertime in many cities (beginning in 1992). The reformulated gasoline ("RFG") program, as mandated by the Amendments, took effect on January 1, 1995 and required year-round use of 2.0% oxygen content in gasoline for severe and extreme ozone non-attainment areas in the United States or areas which "opted in" to the RFG program. Reformulated gasolines used since that time have sometimes contained between 10% and 15% MTBE, or up to 10% ethanol, to meet government mandates on oxygenate content. In March 2001, the EPA issued the Mobile Air Source Toxics Rule, which had the effect of requiring Hess to continue to use MTBE.

Hess denies that ethanol was available in sufficient supply to meet the demand for oxygenated gasoline in the RFG and oxy-fuel regions when the RFG regulation requiring 2% oxygen content in year-round gasoline in areas using RFG became effective. Hess denies that ethanol was a feasible alternative for Hess because of its adverse effects on volatility, air toxics emissions, noncompatability with ether-blended gasoline and a limited distribution in the areas in which Hess markets and distributes gasoline.

Hess admits that at all times when it owned refineries, refined intermediate feedstocks, and made gasoline, it complied with the legal requirements of the lead phase-out, the RFG Program, the Oxygenated Fuel Program and the Mobile Source Air Toxics Rule. Hess further states that several government agencies have concluded that MTBE has contributed substantially to reducing air pollution. EPA's model for air toxics emissions predicts that air emissions from MTBE-blended RFG are lower than for ethanol-blended RFG.

### F.   Allegations Regarding Contamination of Groundwater and Gasoline Containing MTBE

Hess states that solubility and mobility are relative properties and that while MTBE and other ethers may be more soluble and mobile in water than certain gasoline components, such as the BTEX compounds, they are less soluble and mobile in water than other components sometimes blended into gasoline, such as ethanol. Hess further states that MTBE's behavior in the environment -- and its behavior relative to BTEX -- is dependent on a variety of factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.

Hess is without sufficient knowledge or information as to the truth of the allegations concerning the nature, extent and persistence of leaks, spills, or releases of MTBE by any party other than Hess.

Hess acknowledges that MTBE in drinking water can result in taste and odor concerns, but only if MTBE is present above certain threshold amounts. Hess states that responsible federal and state regulatory agencies have considered and adopted MTBE standards for environmental media fully protective of water use. Such regulatory agencies, therefore, have determined that water meeting those standards is safe for use.

Other than as expressed in expert reports filed by defendants, including Hess, in the MDL cases to date, Hess is without sufficient knowledge or information as to the truth of the allegations concerning human health risks from consumption of drinking water containing MTBE. Hess states that responsible federal and state regulatory agencies have considered and adopted MTBE standards for environmental media fully protective of any alleged health concerns related to MTBE. Such regulatory agencies, therefore, have determined that water meeting those standards is safe for use.

G.    **Allegations Regarding the Unintended Gasoline Discharges & Allegations Regarding Whether Defendants Knew that the Addition of MTBE to Gasoline May Result in Groundwater Contamination**

Hess admits that gasoline is sometimes released into the environment from underground storage tank ("UST") systems, surface spills and other means. Hess states that it and, according to reports, other major oil companies, have spent hundreds of millions of dollars or more over the past 30 years to eliminate or reduce leaks, to improve leak detection and to remediate spills. Hess denies that it knew of "history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use."

Hess states that it is aware that most users and handlers of gasoline understand that gasoline should be handled carefully and should not be spilled. State and federal regulations also require proper care and maintenance with respect to gasoline. Hess denies that it is responsible for mishandling by others.

Other than as expressed in expert reports filed by defendants, including Hess, in the MDL cases to date, Hess is without sufficient knowledge or information as to the truth of the allegations concerning gasoline containing MTBE "exacerbat[ing] the threat to groundwater caused by leaking USTs;" or "additional quantities of MTBE reach[ing] the soil and groundwater in the form of rainfall".

Hess denies Plaintiffs' allegations regarding the existence of "widespread contamination" of groundwater by MTBE.  Hess states that Plaintiffs' allegation that "MTBE contamination of groundwater was and is . . . inevitable and foreseeable" is a legal conclusion which does not require a response by Hess.

**H.    Allegations Regarding Defendants' "Constructive Knowledge" of MTBE and "Threats Posed to Groundwater"**

Hess states that Plaintiffs' allegation that "Defendants were or should have been aware that MTBE contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, recalcitrance to biogradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses . . ." is a legal conclusion which does not require a response by Hess.

Hess states that in 1988 the Environmental Protection Agency ("EPA") issued final rules governing, among other things, the design, construction, upgrade, and release detection requirements of USTs.  The EPA intended these regulations to eliminate leaks from USTs which could impact ground water.  Many states implemented similar, but more stringent requirements.

Hess states that in advance of these mandates, it systematically upgraded the UST systems at its stations and designed and built new UST systems to eliminate the risk of the release of gasoline into the environment.  Hess continues to implement upgrades and

advancements in UST release-detection and release-prevention technology that meet or exceed federal and state requirements. Hess also trains employees in spill response and maintains specialists to respond to any spills that do occur. Hess states that while under certain conditions MTBE may biodegrade less readily than some other components of gasoline, MTBE has been found to naturally attenuate and biodegrade in numerous ways.

Hess is without sufficient knowledge or information as to the truth of the allegations concerning the American Petroleum Institute's ("API") Toxicology Committee. Hess was not a member of API's Toxicology Committee.

Hess denies that it had "early knowledge" of any "need to do low level, long term ingestion studies on the effects of MTBE." Hess is without sufficient knowledge or information as to the truth of the allegations concerning whether such studies had been conducted by other persons, entities or organizations.

Hess denies Plaintiffs' allegation that it "possess[es] and ha[s] always had knowledge, resources, experience and other advantages which are vastly superior to those of Plaintiffs" with respect to all aspects of gasoline and MTBE's behavior in, or the effect on, the environment. Hess states that many Plaintiffs are very large, publicly-traded water utilities, some of which are held by a large multi-national conglomerate, whose business interests have included coal and other natural resources.

Hess denies Plaintiffs' allegation that at all times relevant to this litigation it has "been in a position to know the threat which MTBE poses to groundwater." Hess denies that MTBE is a "threat" to groundwater.

Hess denies Plaintiffs' allegations that it failed to state the "truth about MTBE" and "act in accordance with the truth about MTBE." Furthermore, Hess states that Plaintiffs'

allegation that it had "a duty to disclose" information about MTBE is a legal conclusion which does not require a response by Hess.

Hess denies that it breached any duty to Plaintiffs, regulators, and the general public.

## I.      Allegations Regarding Defendants' "Early Knowledge" of Specific Instances of MTBE Contamination of Groundwater"

Hess denies that it knew as early as 1980 of the impact of MTBE and its contamination of water.

The complaints purport to describe various "publicly reported" incidents of MTBE contamination in New Jersey, New York and Maine in the 1980s. Hess is without sufficient knowledge or information as to the truth of the allegations concerning contamination events in Rockaway, New Jersey; Jacksonville, Maryland; Liberty, New York; and East Patchogue, New York. Hess admits that the events did not involve Hess. Hess denies knowing more about these events than was "publicly reported" at the time to the general public, other than as a result of reading the Plaintiffs' complaints.

## J.      Allegations Regarding Defendants' "Awareness of the 1986 Garrett Report"

Hess is without sufficient knowledge or information as to the truth of the allegations concerning the 1986 paper, written by Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection, entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" (the "Garrett Report"). Hess is without sufficient knowledge or information as to the truth of the allegations concerning the Groundwater Technical Task Force ("GTTF") and/or its communications with the National Well Association. Hess is without knowledge or information that any of its relevant employees knew of the Garrett Report or the GTTF at or prior to the time Hess decided to use, manufacture and/or produce MTBE.

**K.**   **Allegations Regarding Defendants' Internal Studies on MTBE and Contamination of Groundwater**

Hess states that it is without sufficient knowledge or information as to the truth of the allegations concerning Arco Chemical's statements to any entity named in the Complaints. Hess did not receive any internal studies from Arco Chemical.  Hess is without sufficient knowledge or information as to the truth of the allegations concerning the Groundwater Technical Task Force ("GTTF") and its communications with the oil industry.

Hess is without sufficient knowledge or information as to the truth of the allegations concerning certain documents produced by and/or certain communications of Arco Chemical, Mobil, ChevronTexaco, Chevron or Shell.  Hess denies that Arco Chemical, Mobil, ChevronTexaco, Chevron or Shell spoke on behalf of Hess.

Hess did not produce or use MTBE in 1986 and did not participate in comments to the EPA.  Hess denies that Arco Chemical made any representation to it regarding the Garrett Report.

Hess denies that it prepared or conducted any internal study regarding MTBE contamination of groundwater.

**L.**   **Allegations Regarding Defendants Knowledge Concerning the Existence of MTBE Toxicity Studies**

Hess is without sufficient knowledge or information as to the truth of the allegations concerning the existence or non-existence of long-term cancer studies on MTBE effects.

Hess is without sufficient knowledge or information as to the truth of the allegations concerning the effect of MTBE on animals, and any "common knowledge within the scientific community" regarding when toxicological tests must be performed.  Hess admits that it did not perform any toxicological tests on MTBE.  However, Hess states that other companies

provided to it copies of studies and material safety data sheets ("MSDSs") regarding the environmental and health impacts of MTBE.  The purpose of an MSDS is to ensure that hazards of the chemical product covered by the MSDS is evaluated and transmitted to employers, employees and customers who handle and/or receive the product.  Based upon standard industry practice, as well as under Occupational Safety and Health Administration rules, Hess reasonably relied upon the information provided to it.

Hess denies that it attempted to convince the EPA that health testing of MTBE was not needed.

**M.**     **Allegations Regarding Representations to the EPA and the Public About MTBE and Contamination of Groundwater**

Hess denies that it had any agreement with another Defendant to withhold from any Plaintiff, government regulator or the public information concerning MTBE.  Specifically, Hess denies that in the early 1980's it formed or was a part of any formal or informal task-forces or committees created for the "purpose of concealing the actual threat of MTBE, facilitating the . . . use of MTBE without regard to its impact on Plaintiff(s) and convincing the public and regulators that increasing concentrations of MTBE in gasoline was desirable."  Hess further denies that it intentionally failed to disclose to downstream handlers, the public, or government officials information concerning MTBE.

Hess admits it was at one or more times during the relevant time period a member of the American Petroleum Institute ("API").  Hess denies that it was at any relevant time period a member of the Oxygenated Fuels Association ("OFA").

Hess denies that its membership in API constituted "conspir[ing] to conceal the risk of MTBE contamination of groundwater" and Hess further denies that its membership in API constituted "placing corporate profits" above harm to the environment and Plaintiffs.  Hess

further answers that its decision to produce and use MTBE was substantially motivated by the air benefits from the use of MTBE in gasoline.  Hess denies that any industry group or any other Defendant named in the MTBE lawsuits made any representations to the public or government officials on behalf of Hess.

Hess denies that it manufactured and distributed MTBE with actual knowledge of MTBE's defects and with actual knowledge that MTBE would cause harm in groundwater and production wells.  Hess further denies that it took affirmative steps to conceal those effects.

**N.    Allegations Regarding Representations to EPA About Testing Under the Toxic Substances Control Act (TSCA) in the Late 1980's**

Hess is without sufficient knowledge or information as to the truth of the allegations concerning representations by or communications of ARCO to the Interagency Testing Committee ("ITC") concerning MTBE.  Hess is without sufficient knowledge or information as to the truth of the allegations concerning the reliance of ITC on any representations or communications of ARCO.

Hess denies that it was involved in any effort to "convince the EPA that additional testing of MTBE was not needed."  Hess denies that ARCO spoke on its behalf or with its explicit or implicit approval when making any representation to ITC.

Hess is without sufficient knowledge or information as to the truth of the allegations concerning representations by ARCO and Exxon to the EPA at the EPA's December 17, 1986 Public Focus Meeting.

Hess is without sufficient knowledge or information as to the truth of the allegations concerning the formation of the MTBE Committee or the actions and/pronouncements of such Committee members.  Hess denies that it was at any relevant time a member of the MTBE Committee or MTBE Technical Subcommittee.

Hess further denies that it made any representations regarding MTBE testing to ITC, to the EPA during its Public Focus Meeting, or to the EPA by way of MTBE Committee communications. Hess denies that any industry group or any other Defendant named in the MTBE lawsuits made any representations to the public or government officials on behalf of Hess.

Hess is without sufficient knowledge or information as to the truth of the allegations concerning some gasoline manufacturers and distributors entering a January 21, 1988 Testing Consent Order with EPA, and any representations made by gasoline manufacturers and distributors to EP A with respect to the Order. Hess did not manufacture or use MTBE on or around January 21, 1988, and thus did not sign or participate in any purported "Testing Consent Order" or make any representations to the EPA.

Hess further denies that representations or communications of other Defendants or committees are evidence of any improper act, omission or breach of any duty on the part of Hess.

**O.**   **Allegations Regarding Representations to Congress About the Reformulated Gasoline Program**

Hess states that beginning in the late 1970s, following the U.S. EPA's mandate to reduce lead in gasoline, some U.S. refiners began evaluating oxygenates and octane enhancers such as ethanol and MTBE. However, upon information and belief, Hess began considering the use of MTBE, which was a high cost yet low volatility and high octane component, only after volatility standards made the use of MTBE feasible.

In 1990, with the amendments to the Clean Air Act, the federal government mandated an increase in the use of oxygenates (up to 2.7% oxygen content) to meet ambient carbon monoxide air requirements in winter gasoline in many cities (beginning in 1992). In

1995, various oxygenates were extended by regulation to year-round use for severe, non-attainment ozone areas in the United States.

Hess states that although the 1990 Clean Air Act Amendments ("CAAA") did not mandate MTBE as the only oxygenate, in practical terms the CAAA certainly did compel MTBE's use, particularly in Hess's East Coast market area, where there is little, if any, ethanol production. EPA and Congress knew that the oxygen requirements of the Act could not and would not be met without MTBE's use. Reformulated gasolines used since that time have sometimes contained between 10% and 15% MTBE, or up to 10% ethanol, to meet government mandates on oxygenate content.

In response to Plaintiffs' allegation that Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act "[a]s a result of tremendous lobbying efforts by the industry, including Defendants," Hess states that it did not participate in any lobbying efforts regarding the RFG program in the 1990 Amendments to the Clean Air Act. Hess denies that it lobbied Congress to adopt the RFG program or to list MTBE as one of the required oxygenates.

Hess further denies that ethanol was available in sufficient supply to meet the demand for oxygenated gasoline in the RFG and oxy-fuel regions when the Amendments requiring 2% oxygen content in year-round gasoline in areas using RFG became effective, particularly in Hess's East Coast market area, where there is little, if any, ethanol production.

Hess further denies that MTBE was its "oxygenate of choice" based solely on cost considerations and/or profitability.

Hess states that at all times when it owned refineries, refined intermediate feedstocks, and made gasoline, it complied with the legal requirements of the lead phase-out, the RFG Program, the Oxygenated Fuel Program and the Mobile Source Air Toxics Rule.

Hess further states that several government agencies have concluded that MTBE has contributed substantially to reducing air pollution.  Hess is without sufficient knowledge or information as to the truth of the allegations concerning whether "safe, more environmentally sound alternatives were available."

P.   **Allegations Regarding Representations to Plaintiffs and the Public, Including Downstream Gasoline Handlers, About Gasoline with MTBE**

Hess denies that it "misrepresented the properties of MTBE" to Plaintiffs or the public, or "withheld information" about "the dangers of MTBE." Hess is without sufficient knowledge or information as to the truth of the allegations concerning when the "public started to become aware of the dangers of MTBE."

Hess is without sufficient knowledge or information as to the truth of the allegations concerning representations made by George Dominguez of the MTBE Committee on April 1 and 2 of 1987.  Hess was not a member of the MTBE Committee.  Hess is without sufficient knowledge or information as to the truth of the allegations concerning a letter written in 1994 by "an official with the API" regarding the use of MTBE.  Hess is without sufficient knowledge or information as to the truth of the allegations concerning the publishing and distribution of a pamphlet on public health issues and MTBE in April 1996 by an OFA agent. Hess was not a member of the OFA.

Hess denies that it at any relevant time "green washed shameful facts," or "judged" MTBE contamination "too costly to clean up." Hess states that its policy consistently

has been to clean up promptly and effectively any gasoline spill for which it is responsible, regardless of its MTBE content.

Hess states that it is without sufficient knowledge or information as to the truth of the allegations concerning what alternatives Downstream Handlers and the general public would have sought or whether the Downstream Handlers and the public would have demanded MTBE-free gasoline.  Hess further denies that it breached any duty to warn or deprived Plaintiffs of any facts.

**Q.     Allegations Regarding Defendants Use of MTBE in Gasoline Post-Creation of the RFG Program**

Hess is without sufficient knowledge or information as to the truth of the allegations concerning historical or recent trends of MTBE use and content of MTBE in gasoline by the oil industry after the creation of the RFG program.

Hess admits only that MTBE was added to certain gasoline products in varying concentrations to comply with federal and state fuel volatility, air toxics and oxygenate requirements and/or, because MTBE is a low volatility, high octane component, which allows Hess to meet the required octane ratings of its products without violating volatility standards. Hess states that MTBE was the only feasible and viable option of achieving higher octane levels in gasoline.  Hess further states that, at all times during the relevant time period, due to supply and transport issues, ethanol has not been available to satisfy the requirements of the RFG program, particularly on the East Coast of the United States, the area where Hess markets and distributes gasoline.

**R.     Allegations Regarding MTBE's Degradation Product:  TBA**

Hess admits that TBA is the product of the hydrolysis of isobutylene.  Hess admits that TBA can be an intermediate product of MTBE biodegradation.  Hess is without

sufficient knowledge or information as to the truth of the remaining allegations concerning the use of TBA as an oxygenate in gasoline.

Hess states that solubility and mobility are relative properties and that TBA is more soluble and mobile in water than certain gasoline components, such as the BTEX compounds. Hess further states that TBA's behavior in the environment -- and its behavior relative to BTEX -- is dependent on a variety of factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.

Hess is without sufficient knowledge or information as to the truth of the remaining allegations concerning the properties, characteristics, persistence, and remediation of TBA in groundwater, or its presence in water supplies.

Hess is without sufficient knowledge or information as to the truth of the allegations concerning the health effects of TBA.

Hess denies that it breached any duty to Plaintiffs, regulators, and the general public.

S.   **Allegations Regarding MTBE's Effect Upon Groundwater and Groundwater Wells**

Hess is without sufficient knowledge or information as to the truth of the allegations concerning frequency and extent of MTBE contamination in groundwater.

The Complaints purport to quote from or summarize the EPA Blue Ribbon Panel findings. These written materials speak for themselves and are the best evidence of their contents. Hess therefore denies Plaintiffs' attempts to summarize or characterize the contents of these findings. Hess is without sufficient knowledge or information as to the truth of the allegations regarding whether any state has or lacks plans or a source of funds to conduct testing of groundwater for components of gasoline.

**T.**   **Allegations Regarding MTBE-Related Actions Taken By State or Federal Governmental Bodies**

Hess admits that in 2001, EPA provided advance notice of its intent to initiate a rulemaking pursuant to TSCA to eliminate or limit the use of MTBE as a fuel additive. No such rulemaking was ever initiated. Hess admits that certain state legislatures or regulatory bodies have passed laws or adopted regulations to limit or eliminate the use of MTBE in gasoline. The details of such laws are a matter of public record.

**U.**   **Allegations Regarding Plaintiffs' Claimed Inability to Identify Relevant Sources of Gasoline Leaks Or Spills Affecting a Given Site**

Gasoline leaks, whether containing MTBE or not, are almost always traceable to a specific source, limited to the immediate geographic area of the source, and remediable. In the vast majority of leak incidents, a responsible party can be and is identified.

Hess denies that gasoline can never be traced from a contamination site to its terminal or refinery source.

**V.**   **Allegations Purporting To Quote Or Summarize Documents**

Numerous paragraphs in each complaint purport to quote from or summarize documents, statutes and regulations. These written materials speak for themselves. The documents, statutes and regulations referenced by Plaintiffs, which are not attached to the complaints, are the best evidence of their content, and Hess therefore denies Plaintiffs' attempts to summarize or characterize the contents of these written materials.

**W.    Allegations Regarding Defendants Unrelated To Hess**

Hess is without knowledge or information sufficient to form a belief as to the truth of the matters averred in the complaints regarding the specific statements, acts or omissions of Defendants unrelated to Hess.

**X.    Allegations Regarding Particular Claims or Counts**

In response to the portions of the complaints purporting to state particular common law or statutory claims, Hess incorporates each paragraph of this Third Amended Master Answer as if fully restated herein.  Hess denies it is liable for any legal claim in any MDL 1358 complaint.

**Y.    Allegations Regarding Claimed Injuries or Damages**

Some complaints make claims about contamination to specific wells, and others do not.  Hess is without knowledge or information sufficient to form a belief as to the truth of the matters averred in the complaints regarding specific incidents of alleged contamination arising from the alleged activities of other Defendants.  Hess believes publicly available documents regarding Plaintiffs will demonstrate that many of the wells at issue have not been impacted by MTBE, or have been impacted only at levels well below state action standards for MTBE.

With regard to alleged damages, the allegations require no further answer.  To the extent that further answer is deemed necessary, Hess admits that Plaintiffs seek the relief mentioned in the complaints, but denies that Plaintiffs are entitled to any relief.

**Z.    Plaintiffs' Demands for Jury Trials**

Plaintiffs in all actions have demanded a trial by jury of all claims asserted in the complaints.  These jury demands state a legal conclusion which require no answer.

**AA.** **Plaintiffs' Allegations of Intentional, Willful, Deliberate, or Negligent Acts**

Hess denies that it intentionally, willfully, deliberately, or negligently committed any acts that caused or foreseeably could have caused harm to Plaintiffs or any other party.

**BB.** **Certain Plaintiffs' Allegations of Ownership of Groundwater Resources**

To the extent that Plaintiffs allege that they own or have the authority to protect groundwater, groundwater resources, water resources, water supplies, water rights, or drinking water wells, or any other right in and to water or groundwater, these are legal conclusions which require no answer.

**CC.** **Certain Plaintiffs' Allegations of Injury to Natural Resources**

Certain Plaintiffs' complaints contain allegations of damage to natural resources and seek compensation and other relief as the alleged trustee and/or owner of those natural resources. Hess admits that groundwater, surface waters, wetlands and other ecological resources exist within the States at issue in MDL 1358 ("MDL States"); admits that some of those resources are privately owned and some are not; and admits that some natural resources may and do provide commercial, industrial, recreational, and other services to the people of the MDL States and to the economies of the MDL States.

Hess further admits that the police power of certain Plaintiffs extends to the protection and conservation of certain natural resources which are not the private property of any person or entity; admits that by a longstanding legal fiction this proposition is sometimes inexactly expressed by saying that a State is the owner or trustee of natural resources for the benefit of its own people or citizens; and admits that certain governmental agencies have limited regulatory authority with respect to natural resources within an MDL State as provided by law.

**DD.** **Allegations Regarding Jurisdiction**

Hess states that the TSCA jurisdictional allegations do not apply to it because Hess is not named as TSCA Defendant. Hess is without sufficient knowledge or information as to the truth of the remaining allegations.

## II.   GENERAL DENIAL OF REMAINING ALLEGATIONS

Hess denies the remaining allegations in the complaints in MDL 1358 cases for which an answer is presently required, and in which it has been properly named and served.

## III.   RESERVATION OF RIGHT TO AMEND

Hess reserves the right to amend this Third Amended Master Answer.

## IV.   AFFIRMATIVE DEFENSES APPLICABLE TO ALL CASES

For its separate defenses to the complaints in MDL 1358 cases for which an answer is presently required, and in which it has been properly named and served, Hess states as follows:

1.   Plaintiffs' claims are barred in whole or in part by the doctrine of federal preemption.

2.   At all relevant times, Hess's actions and its products complied with and were undertaken pursuant to applicable federal, state, and local laws, rules, regulations and specifications.

3.   Plaintiffs' claims are barred in whole or in part because federal, state and/or local authorities and agencies have mandated, directed, approved and/or ratified the alleged actions or omissions of Hess.

4.   Plaintiffs suffered no losses or injuries that were proximately caused by Hess.

5.    Hess's conduct was not the cause in fact of any injuries alleged by Plaintiffs.

6.    Plaintiffs' claimed injuries were caused in whole or in part by others, whose actions were not controlled by or related to Hess. Such actions are the superseding, supervening and/or intervening cause of Plaintiffs' injuries and therefore Plaintiffs may not recover from Hess as a matter of law.

7.    At no time did Hess exercise control over the persons or entities responsible for actual or threatened releases of MTBE, if any, alleged in certain complaints. At all times, Hess acted with due care with respect to any petroleum or petroleum products it used and took reasonable precautions against foreseeable acts or omissions of any such third parties and any foreseeable consequences resulting there from.

8.    Hess did not own, control or release all the petroleum products that are alleged to have caused or threatened contamination of Plaintiffs' wells.

9.    The alleged injuries and damages, if any, suffered as a result of conduct legally attributable to Hess is *de minimis* and therefore any injunction would pose a disproportionate hardship on Hess, as well as on he public, in comparison to the injury and or damages allegedly suffered by Plaintiffs. Accordingly, Plaintiffs are not entitled to injunctive relief as to Hess as a matter of law.

10.    Plaintiffs' claim is barred because Hess's conduct caused no physical impact to Plaintiffs' property. Any injury, damage or loss sustained by the Plaintiffs was proximately caused by and/or contributed to by their own negligence, carelessness, and/or omissions.

11.    Plaintiffs' claims are barred pursuant to the learned intermediary doctrine.

12.     Hess is entitled to total or partial indemnity from those individuals or entities who are responsible for Plaintiffs' injuries or damages, if any, in an amount in direct proportion to their relative culpability.

13.     If any damages or injuries alleged in the complaints occurred because of leaks in the gasoline storage tanks and associated piping of Hess, then Hess is not liable for those damages and/or injuries because the gasoline storage tanks and associated piping, when manufactured and distributed, conformed to the then current state of scientific and industrial knowledge, and the tanks and associated piping were used for their intended purpose. Further, Hess is not liable for any quality issues befalling the gasoline storage tanks and associated piping of third parties.

14.     The injuries and damages, if any, alleged by Plaintiffs are caused in whole or in part to the presence of compounds other than MTBE (e.g., the BTEX compounds). Under Plaintiffs' own legal theories, Hess is not liable for damages caused by compounds other than MTBE. In the event liability is assessed against Hess, such liability must be reduced where, and to the extent that, other compounds - about which Plaintiffs do not complain - contributed to the alleged injury.

15.     Hess is not liable for contamination where chemical compounds other than MTBE exceed state actions levels or standards, requiring cleanup or regardless of the presence of MTBE (particularly, but not exclusively, where MTBE is present below state action levels or standards).

16.     There is a defect or misjoinder of parties, in that Plaintiffs have failed to join indispensable or necessary parties.

17.     Plaintiffs have failed to name the party or parties responsible for the alleged harm.

18.     All acts and conduct of Hess, as alleged in the complaints, conformed to and were pursuant to statutes, government regulations and industry standards, and were based upon the state of knowledge existing at all material times alleged in the complaints.

19.     The relief sought by Plaintiffs' complaints is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus this Court should decline to exercise jurisdiction over this matter pursuant to the doctrine of primary jurisdiction.

20.     Plaintiffs have failed to exhaust their administrative remedies.

21.     Plaintiffs have a plain, common, adequate and speedy remedy at law.  The equitable causes of action alleged in the complaints are thus barred

22.     Plaintiffs are barred from seeking strict liability for design defect as any attempt to reexamine the mandatory cost-benefit analysis delegated to and performed by the EPA pursuant to its obligations under the Clean Air Act (CAA) would be impermissible given that Congress, through Section 211 of the CAA, authorized the EP A, and not the courts, to perform the cost-benefit analysis.

23.     If it is determined that Plaintiffs or anyone on whose behalf Plaintiffs are allegedly suing, was injured, asset forth in the complaints, which Hess denies, Hess alleges that such hardship is outweighed by the convenience and public service rendered by Hess's actions.

24.     Each purported cause of action asserted in the complaints is barred under the doctrine of primary assumption of risk in that the general public, by and through its elected representatives and their appointees, knew and understood the alleged risks of harm presented by

the use of MTBE, if any, and elected nevertheless to proceed to require the use of gasoline oxygenates and to specifically permit the use of MTBE as a gasoline oxygenate.

25.    To the extent that Plaintiffs have received or may receive the requested relief from a governmental agency, Hess asserts its entitlement to an appropriate set-off or reduction of any judgment against it.

26.    The appropriate forum for Plaintiffs' claims is an administrative agency, and therefore all proceedings before this Court should be stayed pending administrative resolution of the issues.

27.    The claims set forth in the complaints fail, in whole or in part, based on the doctrine of election of remedies.

28.    Each purported cause of action of the complaints as applied to Hess is barred because the relief sought therein would pose unreasonable barriers and substantial burdens on interstate and/or international commerce in violation of the Commerce Clause of the United States Constitution and/or the North American Free Trade Agreement.

29.    The complaints fail to state a claim upon which relief may be granted and should, therefore, be dismissed pursuant Fed. R. Civ. P. 12(b)(6).

30.    Because one or more Plaintiffs have not suffered any cognizable harm and have not incurred any present damages, there is no current case or controversy and thus, those Plaintiffs' claims are not ripe for adjudication.

31.    Plaintiffs have failed to state a cause of action for nuisance because they have neither alleged nor suffered any particularized injury.

32.    Plaintiffs do not have a legally cognizable injury unless or until the alleged MTBE contamination exceeds state action levels.

33. Plaintiffs may not seek attorneys' fees as an element of relief.

34. Plaintiffs have failed to properly present any claim for attorneys' fees.

35. Because Plaintiffs have sued multiple parties, under multiple causes of action, with divisible damages, the claim for attorneys' fees must be apportioned between same.

36. The claims set forth in the complaints are barred, in whole or in part, by the mootness doctrine.

37. The complaints and each purported cause of action are barred, in whole or in part, by the defense of laches. Plaintiffs' unreasonable and inexcusable delay in filing these actions caused substantial prejudice to Hess.

38. The complaints and each purported cause of action are barred by the applicable provisions of the pertinent statutes of limitation.

39. The complaints and each purported cause of action are barred by the applicable provisions of the pertinent statutes of repose.

40. Plaintiffs are estopped by their conduct from asserting any of the purported claims alleged against Hess in the complaints.

41. Plaintiffs have not adequately investigated the cause of the alleged harm or attempted to identify the actual responsible party or parties.

42. Plaintiffs cannot establish the required predicates for their theories of collective liability, and therefore their Defendant-identification burden remains. In the event that the Defendant-identification burden is shifted in the future, Hess denies that it contributed to the contamination at issue.

43. Plaintiffs' claims are barred in whole or in part by the doctrine of waiver.

44.    Plaintiffs assumed the risk of all acts, injuries, and damages that Plaintiffs now assert against Hess.

45.    Plaintiffs lack the capacity to sue.

46.    Plaintiffs lack standing to sue.

47.    The claims set forth in the complaints fail, in whole or in part, because of the failure to identify which Defendant, if any, proximately caused the harms alleged by Plaintiffs.

48.    Plaintiffs may not maintain theories of collective or alternative liability given the facts alleged in the complaints.

49.    Any Hess gasoline product sold or distributed for resale was properly designed, formulated, prepared and otherwise not defective in any respect.

50.    To the extent required, Hess provided proper warnings, information, and instructions relating to its products pursuant to generally recognized and prevailing standards in existence at the time.

51.    Plaintiffs have failed to allege that Hess's alleged failure to provide an adequate warning proximately caused their injuries.

52.    Any gasoline product containing MTBE manufactured, sold, or distributed for resale by Hess was not unreasonably dangerous when made.

53.    The Plaintiffs' claims against Hess are barred by the bulk supplier doctrine.

54.    Hess sold its products to knowledgeable and sophisticated purchasers, and any injury alleged by Plaintiffs was caused by such purchasers' failure to observe known standards of care.

55.     Plaintiffs' public nuisance claims should be dismissed because there were no acts or omissions by or on behalf of any of the Defendants constituting an intentional, unreasonable interference with the Plaintiffs' interest in the use and enjoyment of their property.

56.     Plaintiffs' public nuisance claims must be dismissed because Plaintiff has failed to allege "special damages," an absolute prerequisite to the assertion of a public nuisance claim.

57.     Hess alleges that it owed no duty of care to Plaintiffs in connection with the matters alleged in the complaints.

58.     The complaints fail to plead the elements of negligence claims with sufficient clarity, specificity, and particularity.

59.     Plaintiffs' claims are barred to the extent the conduct complained of is protected by the First Amendment to the United States Constitution.

60.     Certain causes of action are barred based on Hess's valid exercise of the right of petition to the federal government, state government(s), and/or their respective deliberative bodies and agencies.

61.     Plaintiffs' claims are barred, in whole or in part, based on Plaintiffs' actual or constructive notice of reported spills or releases, if any, from publicly available records.

62.     There is no legal relationship upon which any duty could possibly be owed by Hess to Plaintiffs, and therefore, Plaintiffs' causes of action fail as a matter of law.

63.     Any injury, damage or loss sustained by the Plaintiffs in connection with the subject matter of this action was not reasonably foreseeable.

64.     If it is determined that Plaintiffs or anyone on whose behalf Plaintiffs are allegedly suing, was injured, as set forth in the complaints, which Hess denies, Hess alleges that

any award of damages shall be reduced in proportion to the percentage of fault attributable to the Plaintiffs.

65.     If it is determined that Plaintiffs or anyone on whose behalf Plaintiffs are allegedly suing, was injured, as set forth in the complaints, which Hess denies, Hess alleges that any award of damages shall be reduced in proportion to the percentage of fault attributable to third parties (including but not limited to persons or entities responsible for gasoline leaks or spills).

66.     The injuries alleged in the complaints, if any, may be reasonably apportioned among the Defendants, as each Defendant's alleged acts and omissions, including Hess', is divisible and distinct.   Therefore, no Defendant is jointly and severally liable to Plaintiffs for any claim alleged in the complaints.

67.     Plaintiff has unreasonably failed to mitigate its damages, if any.

68.     To the extent that any party has settled or may settle in the future with Plaintiffs, Hess asserts its entitlement to an appropriate credit or reduction of any judgment(s) against it.

69.     Plaintiffs' claims for punitive damages violate the provisions of the U.S. Constitution, including but not limited to those provisions requiring due process of law and prohibiting excessive fines.

70.     Plaintiffs are public entities and/or authorities seeking compensation for damages to natural resources under their jurisdiction or purview.   These public entity/authority Plaintiffs have improperly delegated the power to prosecute these cases to private attorneys on a contingent fee basis.   Such delegation is against public policy.

71.    Plaintiffs' claims for punitive damages violate the provisions of the United States and State Constitutions, including but not limited to those provisions requiring due process of law and prohibiting excessive fines.

72.    Plaintiffs' claims for natural resource damages are barred, in whole or in part, because Plaintiffs do not own or have a trusteeship interest in the property and/or natural resources allegedly impacted.

73.    Plaintiffs have not incurred "clean-up and removal" costs or "response costs" as those terms are defined in the applicable statutes.

74.    Hess incorporates by reference any affirmative defense, whether general or specific to a specific State, alleged by other Defendants in MDL 1358.

75.    The pleading of the defenses described above shall not be construed as an undertaking by Hess of any burden that would otherwise be the responsibility of Plaintiffs.

## V.    AFFIRMATIVE DEFENSES APPLICABLE TO PARTICULAR STATES

For its separate defenses to the complaints in MDL 1358 cases from particular states (for which an answer is presently required, and in which Hess has been properly named and served), Hess states as follows:

## MASSACHUSETTS

1.    The Complaint and each purported cause of action are barred by the applicable provisions of the pertinent statutes of limitations, including but not limited to Mass. Gen. Laws Ann. Ch. 260 § 2A.

2.    Plaintiffs' claims are barred because their negligence is greater than the alleged negligence of Hess.  Mass. Gen. Laws Ann. Ch. 231 § 85.

3.    Hess is not liable for damages because any contamination resulted from the acts or omissions of third parties and Hess exercised due care with regard to its products and

took reasonable precautions against foreseeable acts or omissions of third parties and the consequences that could foreseeably result from such acts or omissions. Mass. Gen. Laws Ann. Ch. 21E § 5(c)(3).

4.    Plaintiffs are not entitled to injunctive relief because they failed to provide written notice to the Massachusetts Attorney General and Hess as required by statute. Mass. Gen. Laws Ann. Ch. 214 § 7A.

5.    Plaintiffs' efforts to impose liability on Hess without proof of causation violate the Due Process and other clauses of the Massachusetts and the federal constitutions.

## NEW JERSEY

1.    The Complaints and each purported cause of action are barred by the applicable provisions of the pertinent statutes of limitations, including but not limited to, N.J. Stat. Ann. § 2A:14 2 and N.J. Stat. Ann § 58:10B-17.1(a), which requires the State to commence any civil action concerning the remediation of a contaminated site within three years after the accrual of the cause of action.

2.    Hess's conduct did not meet the minimum requirements of culpability with respect to each material element of the alleged offenses of civil conspiracy, public nuisance. and negligence, according to the applicable provision of N.J. Stat. Ann. § 2C:2-2, and, therefore, Plaintiffs' claims on these counts should be dismissed.

3.    Plaintiffs were contributorily and comparatively negligent, and therefore their claims are barred or diminished by such negligence under the Comparative Negligence Act and New Jersey common law.

4.    Plaintiffs' claims are barred by the defenses available to Hess under the New Jersey Product Liability Act, N.J. Stat. Ann. § 2A:58C-1 *et seq.*

5.     To the extent that the cause of action seeks damages for which payment was received or may be received from collateral sources, such damages are barred by the Collateral Source Rule and the provisions of N.J. Stat. Ann. § 2A:15-97.

6.     The alleged injuries and damages set forth in Plaintiffs' complaint were caused by and arose out of risks of which Plaintiffs had full knowledge and which Plaintiffs assumed.

7.     Plaintiffs' claims are barred by reason of the fact that Hess owed and owes no duty to Plaintiffs.

8.     Plaintiffs' claims are barred by reason of the fact that all actions of Hess were performed in keeping with the state of the art, all technology utilized by Hess was state of the art, and/or the product at issue in this case was state of the art technology.

9.     Plaintiffs' claims are barred because a component part manufacturer who supplies its product in bulk owes no duty to warn ultimate users of risk attendant to the use of its product.

10.     Plaintiffs' claims are barred by the New Jersey entire controversy doctrine, the doctrine of *res judicata*, and/or other similar doctrines, and because of Plaintiffs'' failure to comply with New Jersey Court Rule 4:5-1 in prior litigations.

11.     Plaintiffs' claims are barred by the doctrine of primary jurisdiction insofar as the New Jersey Department of Environmental Protection ("NJDEP") is responsible for directing and allocating responsibility for investigation and remediation of the environmental condition alleged in the Complaint.

12.     Plaintiffs' claims are barred because Hess has complied with, and satisfied, all applicable laws, regulations, rules, orders, directives and/or other requirements of

the NJDEP and/or other state or federal agencies regarding the environmental condition alleged in the Complaint.

13.     Plaintiffs' effort to impose liability on Hess without proof of causation violates the Due Process and other clauses of the United States and New Jersey constitutions.

14.     Plaintiffs' claims under the New Jersey Compensation and Control Act ("Spill Act") are barred by one or more of the statutory defenses to liability provided in the Spill Act or the New Jersey Water Pollution Control Act, N.J. Stat. Ann. § 58:10A-6(a) *et seq.*("WPCA").

15.     Hess did not "discharge" any hazardous substance within the meaning of the Spill Act.

16.     Hess is not "in any way responsible" for any discharges of hazardous substance within the meaning of the Spill Act.

17.     The costs and damages sought by Plaintiffs do not constitute "cleanup and removal costs" under the Spill Act, or they are not otherwise recoverable under the Spill Act.

18.     Plaintiffs' claims under the Spill Act are barred to the extent Plaintiffs seek relief for conduct occurring or damages incurred prior to the effective date of the Spill Act or the WPCA.

19.     Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to comply with the prerequisites to liability under the Spill Act, including without limitation Plaintiffs' incurring of costs not authorized by the Spill Act and Plaintiffs' failure to direct clean up and remediation operations in accordance with the National Contingency Plan to the greatest extent possible.

20.    Plaintiffs' claims under the Spill Act are not ripe, since clean up and remediation have not been completed.

21.    Plaintiffs' claims under the Spill Act are barred, in whole or in part, because the claims asserted are preempted by federal law, including, without limitation the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*

22.    Plaintiffs' claims for natural resource damages are barred because the State's method of assessing natural resource damages was not adopted in a manner consistent with the Administrative Procedures Act, N.J. Stat. Ann. § 52.14B-2(e).

23.    Any injury or damages suffered by Plaintiffs have been increased by Plaintiffs' failure to mitigate their damages, in that (1) the policies and activities of the State of New Jersey and its agencies during the period of time for which Plaintiffs seek damages have caused damage to natural resources greater than that would otherwise have occurred; and (2) the State and its agencies have failed to take reasonable measures available to them to reduce damages.

24.    Plaintiffs' claims against Hess are barred, in whole or in part, by the prior settlement with certain MDL parties in New Jersey.

25.    Plaintiffs have failed to join parties needed for the just adjudication of the Plaintiffs' claims, in whose absence complete relief cannot be afforded the existing parties pursuant to *N.J. Ct. R.* 4:28-1.

26.    The Complaint and each purported cause of action is barred to the extent that such claims have been satisfied by payments or provisions of alternate water supplies by Hess, Defendants, or third parties.

27.   Plaintiffs' claims for natural resource damages are in excess of any sovereign rights transmitted to New Jersey by the British Crown at independence, and if upheld would be unconstitutional violations of the Equal Footing Doctrine.

28.   Plaintiffs' purported assessment of natural resource damages in an *ultra vires* act, contravenes protections afforded Defendants under the Constitutions of the State of New Jersey and the United States, and is not recoverable.

29.   Plaintiffs have failed to state a cause of action for any natural resource damages.

30.   Plaintiffs' claims under the Spill Act fail to the extent that any Defendant who has previously been found responsible for a discharge of a hazardous substance, has resolved its liability to the State for damages. N.J. Stat. Ann. § 58:10-23.11f-a(2)(b).

31.   Plaintiffs' strict liability claims are barred in whole or in part by N.J. Stat. Ann §58:10-23.11i, if they relate to any discharge or contamination eligible for funding from the Spill Act.

32.   Plaintiffs' allegations of strict products liability fail under New Jersey common law.

33.   Plaintiffs' product liability claims are barred because the characteristics of the product were known to Plaintiffs and the harm, if any, caused by an allegedly unsafe aspect of the product is an inherent characteristic of the product, recognized by Plaintiffs as ordinary persons who used or consumed the product with the ordinary knowledge common to the class of persons for whom the product was intended. N.J. Stat. Ann. § 2A:58C-3(a)(2).

34.   Plaintiffs' trespass and public nuisance claims are barred to the extent Plaintiffs are seeking damages for property or wells not actually owned by the State.

35.     Plaintiffs' trespass claim fails in whole or in part to the extent Plaintiffs are seeking damages to the ground and/or surface water of the State of New Jersey because the State of New Jersey does not have an exclusive possessory interest in such waters.

36.     Plaintiffs' trespass claim fails in whole or in part to the extent that Plaintiffs are not in possession of, or maintain a sufficient ownership interest in, the lands upon which it is claimed Defendants trespassed.

37.     Plaintiffs' public nuisance claim fails in whole or in part because such claim does not provide for the recovery of monetary damages.

38.     Plaintiffs have no claim under the WPCA because Hess is not a discharger and/or responsible person within the meaning of the WPCA.

39.     Plaintiffs' claims are barred to the extent that Plaintiffs did not comply with the requirements of the WPCA.

40.     The Complaint and each purported cause of action is barred to the extent that federal or New Jersey state agencies have exonerated Hess and/or determined that any Hess facility did not contribute to the presence of MTBE in the relevant ground and/or surface water for which Plaintiffs are asserting damages.

41.     Plaintiffs' claims for natural resource damages under either the New Jersey Spill Compensation and Control Act ("Spill Act") or the Water Pollution Control Act ("WPCA") are specifically barred by the applicable provisions of N.J. Stat. Ann. 58:10B-17.1(b), which requires the State to commence any action "concerning the payment of compensation for damage to, or loss of, natural resources due to the discharge of a hazardous substance . . . within five years and six months next after the cause of action shall have accrued."

42.     Plaintiffs' claim for relief under the Spill Act is barred to the extent Plaintiff has already received "compensation for damages or cleanup costs pursuant to any other State or Federal Law." N.J. Stat. Ann. § 58:10-23.11v. (2008).

43.     Plaintiffs' claims for natural resource damages under either the New Jersey Spill Compensation and Control Act or the Water Pollution Control Act are barred in whole or in part to the extent the New Jersey Department of Environmental Protection has already recovered damages from or otherwise released the responsible parties.

44.     If Plaintiffs have stated a claim for strict products liability under the New Jersey Products Liability Act, N.J.S.A. § 2A:58C-1, et seq., then Hess is entitled to the absolute defenses and rebuttable presumptions of non-liability established in N.J.S.A. §2A-58C-3a(1)-(3), as well as other statutes, regulations and case law.

45.     Plaintiffs' punitive damages claims must be dismissed because Hess's purported acts or omissions were not actuated by actual malice or accompanied by wanton and willful conduct.  N.J. Stat. Ann. § 2A:15-5.9 et seq.

## VERMONT

1.     The complaints and each purported cause of action are barred by the applicable provisions of the pertinent statutes of limitations, including but not limited to, 12 Vermont Stat. Ann. §§ 511, 512(4), 512(5).

2.     Plaintiffs' recovery is barred by their contributory fault, which is greater than the total causal negligence of the defendants.  12 Vermont Stat. Ann. § 1036.

3.     Recovery is barred or must be reduced, in whole or in part, based on the doctrine of comparative negligence. 12 Vermont Stat. Ann. § 1036.

4.     Plaintiffs' efforts to impose liability on Hess without proof of causation violate the Due Process and other clauses of the federal and state constitutions.

\*     \*     \*

For each State described above, Hess incorporates by reference any affirmative defense, whether general or specific to another State, alleged herein or by other Defendants in MDL 1358.

The pleading of the defenses described above shall not be construed as an undertaking by Hess of any burden which would otherwise be the responsibility of Plaintiffs.

**WHEREFORE**, Hess requests entry of judgment dismissing the complaints with prejudice, and awarding Hess its costs and attorneys' fees, and such other relief as the Court may deem just and proper.

Dated:  November 11, 2013.

Respectfully submitted,

Steven L. Leifer
BAKER BOTTS, L.L.P.
The Warner Building
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
(202) 639-7723
sleifer@bakerbotts.com

*Attorneys for Defendant Hess
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2013, a true and correct copy of DEFENDANT HESS CORPORATION'S FOURTH AMENDED MASTER ANSWER AND AFFIRMATIVE DEFENSES was electronically served on counsel of record for Plaintiffs and Defendants in MDL No. 1358 via LexisNexis File & Serve.

Christopher Danley