UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00 - 1898
MDL 1358 (SAS)
M21-88

**This Document Relates to:**

*New Jersey Department of Environmental
Protection, et al. v. Atlantic Richfield Co., et al.*
No. 1:08-cv-00312-SAS

## PLAINTIFFS' OPPOSITION TO CHEVRON U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING THE SKYLINE SERVICE CENTER TRIAL SITE

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      A Rational Jury Plausibly Could Infer that Chevron Supplied MTBE Gasoline
                That Was  Released at Skyline Between 1992 and 1994 . . . . . . . . . . . . . . . . . 3

                1.      Skyline Released MTBE Between 1992 and 1994 . . . . . . . . . . . . . . . 4

                2.      Star was Skyline's Sole Supplier of MTBE Gasoline Between 1992 and
                        1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                3.      Star Purchased MTBE Gasoline From Chevron Between 1992 and 1994
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                4.      The MTBE Gasoline Star Purchased from Chevron from 1992 to 1994
                        Would Have Been Delivered to the Skyline Station . . . . . . . . . . . . . . . 8

        B.      A Rational Jury Could Plausibly Infer that Chevron Did Not Produce Star's
                Delivery Tickets Because Those Records Would Have Been Adverse to
                Chevron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.      Chevron's Reliance on *City of Fresno* is Misplaced . . . . . . . . . . . . . . . . . . . 10

        D.      Chevron had Ample Notice of Plaintiffs' Skyline-Related Claims and Evidence
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        E.      Chevron is Not Prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

Plaintiffs' Opposition to Chevron U.S.A. Inc.'s Motion for Summary Judgment Regarding the
Skyline Service Center Trial Site

# TABLE OF AUTHORITIES

**CASES**                                                                                                      **PAGE**

*188 LLC v. Trinity Indus., Inc.*
    300 F.3d 730, 736 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*B-K Lighting, Inc. v. Vision3 Lighting*
    930 F.Supp.2d 1102, 11371138 (C.D.Cal. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Byrnie v. Town of Cromwell, Board of Education*
    (2nd Cir. 2001) 243 F.3d 93 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 10

*City of Fresno*
    2013 WL 4830965 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 10

*Eastman Kodak Co. v. Image Technical Services, Inc.*
    504 U.S. 451 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*Ebewo v. Martinez,*
    309 F.Supp.2d 600 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 14, 15

*Hoodoo v. Holder*
    558 F.3d 184 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kiln Underwriting Ltd. v. Jesuit High School of New Orleans*
    2008 WL 4724390 (E.D.La. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

*Kronisch v. United States*
    150 F.3d 112 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

*McElroy v. United Air Lines*
    21 F.R.D. 100 (W.D. Mo. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Group, PLC*
    2008 WL 4449412 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Moragelli v. Chemed Corporation*
    922 F.Supp.2d 278 (E.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

*Nilson v. Nationwide Mutual Ins. Co.*
    2009 WL 1285854 (S.D.Miss. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*State v. Dabas*
    215 N.J. 114 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*The Prince Group v. MTS Products and Kmart*
    1998 WL 273099 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Unigene Laboratories, Inc. v. Apotex, Inc.*
    2010 WL 273047 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ii

Plaintiffs' Opposition to Chevron U.S.A. Inc.'s Motion for Summary Judgment Regarding the
Skyline Service Center Trial Site

*United States v. GAF Corp., et al.*
      928 F.2d 1253, 1259 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

*United States v. Hussain*
      2008 WL 2561948 (S.D. Fla 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wechsler v. Hunt Health Systems, Ltd.*
      1999 WL 672902 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*
      395 F.3d 416 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## **STATUTES**

Fed. R. Civ. P. 15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 33, Advisory Comm. Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

Fed. R. Civ. P. 37(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## I.    **INTRODUCTION**

Chevron U.S.A. Inc.'s (**Chevron**) summary-judgment motion (**Motion**) with respect to the Skyline Service Center (**Skyline**) is without merit and should be denied.

Chevron argues that there is no evidence that Chevron's MTBE gasoline was released at Skyline. Motion at 1. This is not accurate. The undisputed evidence shows that Star Enterprises (**Star**) – the sole supplier of gasoline to Skyline during a time when MTBE releases occurred – purchased large volumes of MTBE gasoline from Chevron at four New Jersey terminals, two of which are just 40 miles away from Skyline. Chevron has submitted no evidence to suggest that Star purchased MTBE gasoline from anyone but Chevron, or that Star did not deliver Chevron's gasoline to Skyline. A rational fact finder could plausibly infer from these facts that at least some of the MTBE released at Skyline came from Chevron. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 478 (1992).

Although Star's records could have confirmed that Star delivered Chevron's MTBE gasoline to the Skyline station, Star went out of existence in 1998. Chevron, however, was a successor to Star and would have received any records of whose MTBE gasoline Star delivered to Skyline. Despite requests from Plaintiffs during discovery, Chevron failed to produce any such records. Under the rules of evidence, Chevron's failure to produce these records supports the inference that the records would have been adverse to Chevron. *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 93, 107 (2nd Cir. 2001).

Chevron also argues that it should be granted summary judgment because Plaintiffs did not inform Chevron of Plaintiffs' contention that Chevron was potentially liable at the Skyline site. Motion at 1. This also is not accurate. Chevron concedes that Plaintiffs have pursued claims against Chevron at Skyline since this litigation began. Motion at 3. In December, 2012, Chevron stipulated to the entry of CMO 107, which specifies that Plaintiffs are (still) pursuing

1

claims against Chevron at Skyline. Chevron received copies of all of the documents that support Plaintiffs' case, and Chevron attended depositions upon which Plaintiffs rely. Indeed, most of the evidence against Chevron came from Chevron's own files. Chevron's "surprise" arguments are without merit. Even if those arguments had merit, though, any trial is at least a year away and the appropriate remedy would be for the Court to deny Chevron's Motion, and to grant Plaintiffs leave to amend responses to interrogatories to specify the contentions and evidence identified in this Opposition.

Plaintiffs' Skyline claim should be resolved on the merits by a finder of fact. Plaintiffs respectfully request that the Court deny Chevron's Motion.

## II.    <u>LEGAL STANDARD</u>

Chevron has the burden on summary judgment to prove there is no evidence from which a rational jury could plausibly infer that Chevron's MTBE gasoline was at Skyline at the time that MTBE releases occurred. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. at 478; *City of Fresno*, 2013 WL 4830965, *19 (S.D.N.Y. 2013). At the summary judgment stage, the Court's role "is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Ebewo v. Martinez*, 309 F.Supp.2d 600, 601 (S.D.N.Y. 2004) (cited by Chevron, Motion at 10); *see also* Declaration of Bryan Barnhart (**Barnhart Decl.**) Ex. 6 [8/19/13 Pre-Motion Hearing Transcript] at 91 ( "The Court: . . . But for summary judgment purposes [a plaintiff] doesn't have to meet the preponderance of the evidence test because then I would be weighing the evidence. That can't be the test on summary judgment.").

Where, as here, "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Byrnie v. Town of Cromwell*, 243 F.3d at 101 (courts "should resolve all ambiguities

2

and draw all inferences" in the non-movant's favor).   In addition, the "evidence of [Plaintiffs] is

to be believed," and the non-movant's "version of any disputed issue of fact is presumed

correct." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Where, as here, the non-

movant's evidence shows "that its version of the events is not wholly fanciful," summary

judgment should be denied. *Moragelli v. Chemed Corporation*, 922 F.Supp.2d 278, 289

(E.D.N.Y. 2013) (cited by Chevron at 14.)

## III.   ARGUMENT

To defeat Chevron's summary judgment motion, Plaintiffs need only point to evidence

from which a rational jury could infer that Chevron's MTBE gasoline was present at the station

at the time of the release.  *City of Fresno*, 2013 WL 4830965 at *19.  Plaintiffs' evidence –

especially when coupled with Chevron's concessions – easily meets this standard.

### A.   A Rational Jury Plausibly Could Infer That Chevron Supplied MTBE Gasoline That Was Released At Skyline Between 1992 And 1994.

As explained below, MTBE-gasoline releases occurred at Skyline between 1984 and

1998. (Part A-1, *infra*.)  From 1991 until 1997, Star was Skyline's sole supplier of gasoline.

(Part A-2, *infra*).  Between 1992 and 1994, Star purchased millions of gallons of MTBE gasoline

from Chevron.  That gasoline was delivered to Star at three locations, including 5,000,000

gallons at the Linden/Bayway terminal just 40 miles from Skyline.[1]  (Parts A-3 and A-4, *infra*).

In addition, Star's Newark facility – which is only 35 miles from the Skyline stations – was

connected to the Linden/Bayway terminal by pipeline.  Chevron's Motion does not cite any

evidence that Star purchased MTBE gasoline from anyone other than Chevron, or that Star did

not sell Chevron's MTBE gasoline to Skyline.

---

[1]  Chevron's records refer to Bayway and Linden as separate terminals.  Both terminals, however, are located at the same place on the map and are the same distance from the Skyline station.  Going forward, this Opposition refers to both terminals collectively as Linden/Bayway.

At the same time that Star was buying millions of gallons of MTBE gasoline from Chevron at the nearby Linden/Bayway terminal (as well as other terminals), Star was selling approximately 3,000,000 gallons of MTBE gasoline to the Skyline station. Certainly, a rational jury could plausibly infer that some of the 5,000,000 gallons of Chevron gasoline that Star pumped into its trucks at Newark and/or at the Linden/Bayview terminal were among the 3,000,000 gallons of gasoline that Star pumped out of its trucks at Skyline, just 35 to 40 miles away. The jury also could reasonably infer that Skyline received some of the Chevron gasoline that Star purchased at the Carteret and Perth Amboy terminals, both of which supplied Chevron gasoline to Star between 1992 and 1994. Motion at 8.[2]

### 1.    Skyline Released MTBE Between 1992 And 1994.

In May 1998, MTBE contamination was discovered in 17 potable wells around the Skyline station. Declaration of Michael Axline (**Axline Decl.**) Ex. 1 at 10 [Aquilogic Revised Site Summary Report], Ex. 2 at 98 [Excerpts of New Jersey Site-Specific Report of M. Moreau]; and Ex. 3 at 2-1 [Draft Remediation Investigation Report by The Louis Berger Group Inc]. A New Jersey Department of Environmental Protection investigation determined that Skyline was the source of MTBE contamination in the private wells. Axline Decl. Ex. 1 at 11, 25, and Ex. 3 at Table 1.

Plaintiffs' expert Anthony Brown opined that "contamination likely occurred sometime between the Fall of 1984, when the fuel station was constructed, and 1998 when contamination was discovered in private wells." Axline Decl. Ex. 1 at 25. No other known MTBE releases

---

[2] Although Chevron concedes in its Motion that Chevron also supplied MTBE gasoline to Star at the Carteret and Perth Amboy terminals between 1992 and 1994, the records that Chevron produced during discovery only reflect sales to Star at the Linden/Bayway terminal, and it is not clear whether even these records are complete. As with Chevron's failure to produce Star's delivery records, Chevron's failure to produce its own complete sales records supports an inference that such records would be adverse to Chevron. *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d at 107.

occurred in Skyline's vicinity "between the Fall of 1984 . . . and 1998 when contamination was discovered in private wells." Axline Decl. Ex. 1 at 25; Axline Decl. Ex. 3 at 2-1 and Table 1; Axline Decl. Ex. 7 at 77-78; Axline Decl. Ex. 9 at 9.

Skyline's MTBE-gasoline releases occurred both above and below ground, and on an ongoing basis. Skyline did not use spill buckets while filling its tanks until late 1993 at the earliest, and it was "common practice" for the tanker-truck drivers to spill gasoline onto the ground where it was absorbed. Axline Decl. at Ex. 4 at 42-44, 258-66, 293-94 [Depo. of J. Costello]; Ex. 5 at 51:4, 54, 106:8 [Depo. of M. Costello]. Skyline's operator also testified that customers often spilled gasoline while filling up. Axline Decl. Ex. 4 at 88 [8/2/2011 Depo. of J. Costello]; *see also* Ex. 2 at 100 [M. Moreau Site-Specific Report]. "Anyone familiar with gas station operations [is] aware that small gasoline spills—of cups to quarts—are relatively frequent events." Barnhart Decl. Ex. 10 at V-10. These small spills add up. Studies by the American Petroleum Institute "documented that miniscule customer spills on the order of drops of gasoline would total over 50 gallons spilled for every million gallons dispensed." Barnhart Decl. Ex. 10 at V-10. Skyline dispensed about 1,000,000 gallons of gasoline per year, so its annual surface releases likely exceeded 50 gallons. Axline Decl. Ex. 4 at 55; *see also* Barnhart Decl. Ex. 12 at SKYLINE001919. And every drop released at Skyline's surface had a straight shot to the station's groundwater, which is as little as 1.7 feet below ground surface. Axline Decl. Ex. 1 at 21.

A rational jury also could infer that Skyline released MTBE from its underground-storage-tank system directly to groundwater between 1992 and 1994. As documented in the November 2, 2011 report from Plaintiffs' expert Marcel Moreau, "[l]eaks from UST systems have long been recognized by petroleum marketers and were considered 'inevitable.'" Barnhart Decl., Ex. 10 at III-25. In fact, Shell's storage system engineer noted in 1996 that Shell's own

investigation found that – in addition to leaks from tanks themselves – "each tank fill connection, submerged turbine, and under every single island pump or dispenser was a leak source that required containment." *Id.* at I-9.

At Skyline, strong evidence of ongoing releases was discovered when its underground storage tanks were removed in August 2003. MTBE was found in soil samples at 49,000 ppb and 160 ppb. Axline Decl. Ex 2 at 98-100 [Report of M. Moreau]. "[F]ree product was floating on the groundwater." Axline Decl. Ex. 1 at 12, 25 [Aquilogic Revised Site Summary Report]. "Fuel impacted soil was excavated from the former UST locations and the resultant excavation was approximately 858 square feet (22 feet wide by 39 feet long) and approximately 13 feet deep." Axline Decl. Ex. 1 at 11. Four-hundred-and-twenty-nine tons of petroleum- and fuel-impacted soil were transported off-site for disposal. Axline Decl. Ex. 1 at 11. "After the soils were removed, approximately 725 gallons of gasoline and water mixture . . . was vacuumed from the extraction." Axline Decl. Ex. 1 at 12 [Revised Aquilogic Site Summary Report]. Plainly, MTBE releases had been occurring at the site over an extended period of time.

In 2004, NJDEP-mandated testing found that Skyline's MTBE plume had spread to 29 residential potable wells. Axline Decl. Ex. 1 at 13 [Revised Aquilogic Site Summary Report]. Some of those wells could not be saved – eventually, their owners were forced to destroy them and connect to a municipal supply. Axline Decl. Ex. 7 at 349-350, [5/29/13 Depo. of A. Brown.]

## 2.    Star Was Skyline's Sole Supplier Of MTBE Gasoline Between 1992 and 1994.

From 1991 through 1997, Skyline's sole gasoline supplier was Star. *See* Axline Decl. Ex. 4 at 55, Ex. 6 [Sales Agreement]. Skyline bought about 1,000,000 gallons of gasoline per year from Star. Axline Decl. Ex. 4 at 55; *see also* Barnhart Decl. Ex. 12 at SKYLINE001919. Star delivered gasoline to Skyline ten to eleven times each month. Axline Decl. Ex. 6 [Sales

Agreement]; Ex. 4 at 55:11-13 [Depo. of J. Costello]. Spills frequently occurred during deliveries. Axline Decl. Ex. 4 at 44, 48-49, 54-55, 259-61, 293-94; Axline Decl. Ex. 2 at 100.

### 3.    Star Purchased MTBE Gasoline From Chevron Between 1992 and 1994.

It is undisputed that, "between 1992 and 1994, [Chevron] did deliver gasoline from [its] Philadelphia refinery to a number of New York Harbor terminals in New Jersey, including the Bayway, Linden, Carteret, Trembly Point, Sewaren, Bayonne and Perth Amboy terminals." Motion at 8. It also is undisputed that "one of the customers who purchased gasoline from [Chevron] during this time period was Star Enterprise, which purchased gasoline from [Chevron] at the Carteret, Perth Amboy, Linden and Bayway terminals." *Id.*

These concessions by Chevron are supported by Chevron's own records and discovery responses, which (while apparently incomplete) show that – from 1992 through 1994 –Chevron sold at least 9,000,000 barrels of MTBE gasoline into New Jersey through the New York Harbor's Carteret, Perth Amboy, and Linden/Bayway terminals. Axline Decl. Ex. 8 at 2 , Defendant Chevron U.S.A. Inc. and ChevronTexaco Corporation's CMO 45 Responses (2/06/09)]; Declaration of Alex Wallace (**Wallace Decl.**) Ex. 1-C [ChevMDL1358_NJDEP-C00000000119-120 [header and notations added]; Barnhart Ex. 2 at 58 [6/19/07 Deposition of Bruce Beyaert]; *see also* Chevron's Motion at 8.

Much of the MTBE gasoline Chevron sold into New Jersey went to Star, the Skyline station's sole supplier of MTBE gasoline. Motion, 8; Wallace Decl. Ex. 1-B [ChevMDL1358_ NJDEP-C00000000115]; Axline Decl. Ex. 4 at 55 [Depo. of J. Costello]. Chevron's customer information shows that Star Enterprises had eight separate accounts at four terminals, including accounts at the Linden/Bayway terminal. Wallace Decl. Ex. 1-B [ChevMDL1358_NJDEP-C00000000115-116 (with header and notations added]. Chevron's records also show that Star took delivery of at least 5,000,000 gallons of Chevron MTBE gasoline at the Linden/Bayway

terminal. Wallace Decl. Ex. 1-A [ChevMDL1358_NJDEP-C00000000469-471 (with header and notations added)]. Chevron's Motion cites no evidence that Star purchased MTBE gasoline from anyone other than Chevron during this time period.

**4.    The MTBE Gasoline Star Purchased From Chevron From 1992 to 1994 Would Have Been Delivered To The Skyline Station.**

The Linden/Bayway terminal where Star purchased Chevron's MTBE gasoline is a 40-mile drive from the Skyline station. Wallace Decl. Ex. 2. In addition, Star's Newark terminal, which is connected via pipeline to the Linden/Bayway terminal where Star received Chevron's MTBE gasoline, is only 35 miles from Skyline. Wallace Decl. Ex. 2. A reasonable jury could infer that at least some of the 3,000,000 gallons of MTBE gasoline that Star's trucks delivered to Skyline between 1992 and 1994 came from the 5,000,000 gallons of Chevron MTBE gasoline that Star's trucks picked up at the nearby Linden/Bayway terminal and/or at Newark. Of course, a jury also could reasonably infer that Skyline received Chevron gasoline Star purchased at Carteret and Perth Amboy as well. *See* Motion at 8.

**B.    A Rational Jury Could Plausibly Infer That Chevron Did Not Produce Star's Delivery Tickets Because Those Records Would Have Been Adverse To Chevron.**

Chevron – along with its co-defendants Shell and Motiva – are the successors-in-interest to Star's assets and operations, and should have produced Star's records. Between 1992 and 1994, Star was a joint venture that was owned and controlled by Texaco and Saudi Aramco. Barnhart Decl., ¶ 10. In 1998, the New Jersey operations and assets of Star were transferred to Motiva, a joint venture that was owned and controlled, Texaco, Saudi Aramco, and Shell. *Id.* Chevron took over Texaco's ownership interest in Motiva in 2000, and maintained that ownership interest until October of 2001. *Id.*

Motiva, Chevron, and Shell all are Defendants in this action. Their duty to preserve Star's Skyline-delivery records arose as soon as they were aware that those records might be

8

relevant in pending litigation. *See Kronisch v. United States*, 150 F3d 112, 126-127 (2nd Cir.

1998) (the "obligation to preserve evidence arises when the party has notice that the evidence is

relevant to litigation [such] as for example when a party should have known that the evidence

may be relevant to future litigation"). Texaco, Motiva, and Shell have all been involved in

MTBE litigation since 1998. Barnhart Decl., ¶ 10. And Texaco and Star have been defendants

in groundwater-contamination cases since at least 1993. *Id.* In addition, on March 8, 2001, this

Court ordered all parties to preserve all documents in their "possession, custody or control . . .

generated after January 1, 1976, that are relevant to . . . any claim or defense at issue

consolidated under MDL 1358." Axline Decl. Ex. 10 at 1.

During discovery, Plaintiffs served interrogatories and document requests on Chevron,

Shell, and Motiva, seeking gasoline-delivery records for the Skyline site. Interrogatory No. 11 of

Plaintiffs' Second Set of Interrogatories and Request for Production of Documents to

Defendants, for example, said: "If your gasoline containing MTBE or TBA was delivered to any

SITE at any time during the time period January 1, 1979, to the present, identify each type of

document created for each step in the transportation and delivery of your gasoline to the SITE."

Barnhart Decl. Ex. 9 at 6.[3]  Plaintiffs' Requests for Production Numbers 34 and 35 sought "[a]ll

delivery orders, delivery agreements, truck dispatch records, delivery tickets or other

documentation relating to the ordering of product for delivery to the gasoline storage system at

each SITE," and "[a]ny and all documents, including but not limited to gasoline supply

agreements, which reflect or refer to the suppliers of gasoline which has been stored in

underground storage tanks at each SITE." Barnhart Decl. Ex. 8 at 15-16.

Neither Chevron nor its co-Defendants produced Star's delivery records. The Chevron

Defendants – which included Chevron U.S.A. Inc., Chevron Corporation (f/k/a ChevronTexaco

---

[3] The interrogatories specifically defined "You" as including predecessors and affiliates, and Skyline was included within Plaintiffs' definition of "SITE."

Corporation), Texaco Inc., Unocal Corporation, and Kewanee Industries, Inc. – all claimed that they did not have any documents responsive to Plaintiffs' requests.  Barnhart Decl. Ex. 8 at 16; Ex. 9 at 6[claiming not to have any "type of document created for each stop in the transportation and delivery of [Chevron] gasoline to the [Skyline] SITE"].

    A rational fact finder could infer that Chevron failed to preserve and produce Star's records because those records would tend to establish Chevron's liability.  *See Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d at 107.  In fact, the trial judge may instruct the jury to draw this inference at trial.  *See State v. Dabas*, 215 N.J. 114, 139-142 (2013); *see also Kronisch v. United States*, 150 F.3d at 126-127.  Certainly, Chevron should not benefit from its own failure to preserve and produce relevant records that Plaintiffs properly requested during discovery.

### C.    Chevron's Reliance On *City Of Fresno* Is Misplaced.

    Chevron's reliance on this Court's opinion in *City of Fresno* is misplaced.  In *City of Fresno*, the Court dismissed the City's "commingled product" claim because "no special obstacle prevented Fresno from tracing the Causation Defendants' products to" the time and place where the contamination occurred.  *City of Fresno*, 2013 WL 4830965 at * 20.

    Here, Plaintiffs <u>have</u> produced evidence tracing Chevron's gasoline to the time and place where the contamination occurred.  Most of that evidence is undisputed.  Star was Skyline's sole supplier of MTBE gasoline between 1992 and 1994.  Star's tanker trucks delivered millions of gallons of gasoline to Skyline during this time.  During this same time, Star took delivery of 5,000,000 gallons of Chevron gasoline just 35 to 40 miles away from the Skyline station.  The only inference that the jury will need to draw is that Star delivered to Skyline some of the 5,000,000 gallons of MTBE gasoline that Star's trucks picked up at its terminals that are closest to the Skyline station.  Because a rational jury plausibly could draw such an inference – and

because Chevron has not submitted any contrary evidence – Plaintiffs' evidence creates a material issue of fact that precludes summary judgment.

It is worth noting, furthermore, that no inference would be necessary at all if Chevron had not created a "special obstacle" by failing to preserve and produce Star's records of deliveries to Skyline.  Despite diligent efforts to obtain such records from the parties most likely to have them, Plaintiffs were unable to secure copies of records that reflect the supplier of the gasoline that Star delivered to Skyline between 1992 and 1994.  Plaintiffs could not subpoena these records from Star – Star ceased to exist in 1998.  Barnhart Decl., ¶ 10.  And Plaintiffs could not get them from Skyline, despite a subpoena, two depositions, and repeated follow-up calls.[4] Axline Decl. Ex. 4; Axline Decl. Ex. 5 at 63-67; Barnhart Decl. Ex. 11.  At deposition, Skyline's operator testified that he had produced all of the documents that Skyline had – Star's delivery records were not among them.  Axline Decl. Ex. 5 at 63.

Star's delivery records should have been preserved, however, by Chevron and its co-defendants Shell and Motiva.  *See Kronisch v. United States*, 150 F3d at 126-127.  Yet none of these defendants produced any records of deliveries by Star in response to Plaintiffs' unambiguous discovery requests.  Chevron should not be heard to complain about a gap in the record for which Chevron is partially responsible, especially where, as here, that gap is so easily bridged by reasonable inferences from undisputed facts.

D.    **Chevron Had Ample Notice Of Plaintiffs' Skyline-Related Claims And Evidence.**

Plaintiffs have been pursuing claims against Chevron at Skyline since this lawsuit began.  As Chevron's Motion concedes, "Plaintiffs originally asserted claims against Chevron Corporation and Chevron regarding four trial sites identified in CMO 107 [including] The

---

[4] Skyline's operator did produce his own handwritten ledger of the amounts of gasoline that Star delivered from 1992 through 1994.  *See* Barnhart Decl. Ex. 12.  But neither that ledger nor any other document that Skyline or Chevron produced reflects Star's supplier.

Skyline Service Center, Site ID 2156 ('Skyline' or 'Skyline Service Center')." Motion at 3. During discovery, Plaintiffs used interrogatories, document requests, and depositions to establish Chevron's link to the Skyline station's MTBE releases. *See, e.g.*, Barnhart Decl. Exs. 7, 8, 9. As demonstrated above, Chevron's discovery responses are the source of most of Plaintiffs' evidence against it.

In their draft CMO 107, Plaintiffs expressly reconfirmed that Chevron is a Skyline defendant. Axline Decl. Ex. 11. In December 2012 – three months <u>after</u> Plaintiffs served the interrogatory responses about which Chevron complains here – Chevron's counsel conceded in open court that Chevron had read and understood Plaintiffs' draft of CMO 107. Axline Decl. Ex. 11 [CMO 107], and Ex. 12 at [12/05/12 Trans. of Status Conference]. Then, Chevron's counsel affirmatively requested that the Court enter CMO 107 as it was drafted by Plaintiffs. Axline Decl. Ex. 11 [CMO 107], and Ex. 12 at [12/05/12 Trans. of Status Conference]. Chevron confirmed its agreement to CMO 107 in correspondence to the Court on December 21, 2012. Axline Decl. Ex. 13 [12/21/12 E-mail from L. Gerson to S. Schweizer].

Chevron's December 2012 stipulation to the entry of CMO 107 binds Chevron here. *See Hoodoo v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (stipulations by counsel are judicial admissions that bind the client); *see also The Prince Group v. MTS Products and Kmart*, 1998 WL 273099, *3 (S.D.N.Y. 1998) (unpublished opinion cited by Chevron at 11; same). And CMO 107's joint stipulations by Chevron and Plaintiffs moot any dispute about the completeness of Plaintiffs' prior interrogatory responses. *See United States v. GAF Corp., et al.*, 928 F.2d 1253, 1259 (2d Cir. 1991) (later judicial admissions supersede earlier ones); *see also 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) (same); *see also Kiln Underwriting Ltd. v. Jesuit High School of New Orleans*, 2008 WL 4724390, *12 (E.D.La. 2008) (later judicial admission moots dispute about preclusive effect of earlier admissions).

12

The record does not support Chevron's argument that it did not understand that it fell within CMO 107's definition of "Chevron." Both Chevron and Plaintiffs <u>always</u> have used "Chevron" to refer to Chevron U.S.A. Chevron U.S.A. refers to itself as "Chevron" in its individual discovery responses. Barnhart Decl. Ex. 9 at 1[Defendant Chevron U.S.A. Inc.'s Objections and Responses To Plaintiffs' Second Set of Interrogatories To Defendants; *see also* Barnhart Decl. Ex. 8 at 1 [Chevron Defendants' Objections and Responses to Plaintiffs' Requests for Production of Documents to Defendants]. Both Plaintiffs' Complaint and Chevron's Master Answer includes Chevron U.S.A. – along with Chevron Corporation – within its definition of "Chevron." Axline Decl. Ex. 14; Docket No. 2561. When Chevron Corporation and Chevron U.S.A. served collective responses, their definition of "Chevron" included Chevron U.S.A. Decl. Ex. 8 [CMO 45]; Barnhart Decl. Ex. 8 [The Chevron Defendants' Objections and Responses to Plaintiffs First Set of Request for Production of Documents]. Given this history, Chevron's attorneys – who represent both Chevron Corporation and Chevron U.S.A. – should be estopped from arguing that Chevron is not bound by CMO 107.

### E.   <u>Chevron Is Not Prejudiced.</u>

Chevron does not – and cannot – submit any evidence that Plaintiffs' interrogatory responses caused Chevron to suffer any prejudice. Even if Chevron's stipulation to CMO 107 had not mooted any dispute about the adequacy of Plaintiffs' interrogatory responses – which it did – Chevron's inability to prove prejudice still would defeat its Motion. It is settled that courts should not exclude evidence because of harmless errors in interrogatory responses. *Ebewo v. Martinez*, 309 F.Supp.2d at 607 ("Courts in [the Second] Circuit recognize that preclusion of evidence pursuant to Rule 37(c) is a drastic remedy and should be exercised with discretion and caution."); *see also McElroy v. United Air Lines*, 21 F.R.D. 100, 102 (W.D. Mo. 1957) ("Answers to interrogatories, as adjuncts to the pleadings, do limit the issues and define the

13

contentions of the parties, but under ordinary circumstances it is not their function to limit a party's proof in the way that pleadings do."); Fed. R. Civ. P. 37(c)(1) (harmless error in interrogatory responses do not justify exclusion of evidence).

The drafters of the 1970 amendments to Rule 33 of the Federal Rules of Civil Procedure – the amendments that first authorized contention interrogatories – made it clear that contention interrogatories are intended to facilitate the resolution of disputes on their merits, not to "reintroduce undesirable aspects of the prior pleading practice, whereby parties were chained to misconceived contentions or theories, and ultimate determination on the merits was frustrated." Fed. R. Civ. P. 33, Advisory Comm. Notes. For that reason, the drafters reaffirmed that the "general rule governing the use of answers to interrogatories is that under ordinary circumstances they do not limit proof." Fed. R. Civ. P. 33, Advisory Comm. Notes.

"Although in exceptional circumstances reliance on an answer may cause such prejudice that the court will hold the answering party bound to his answer . . . the interrogating party will ordinarily not be entitled to rely on the unchanging character of the answers he receives and cannot base prejudice on such reliance." Fed. R. Civ. P. 33, Advisory Comm. Notes. This rule limiting preclusion to "exceptional circumstances" is consistent with the Federal Rules' overarching policy to prevent technicalities from frustrating the resolution of disputes on their merits. *See, e.g.*, Fed. R. Civ. P. 15(b) (allowing pleadings to be amended to conform to proof, even after trial); *see also McElroy v. United Air Lines*, 21 F.R.D. at 102 ("The discovery rules are not to be employed as a stratagem to maneuver an adverse party into an unfavorable position."). In fact – as noted in a case upon which Chevron relies – many Second Circuit Courts have held that exclusion is improper unless the complaining party proves both prejudice and bad faith. *See Ebewo v. Martinez*, 309 F.Supp.2d at 607, n.2 (cited by Chevron at 10).

Chevron does cite dicta from one unpublished District Court opinion that contradicts the prevailing rule requiring proof of prejudice. *Wechsler v. Hunt Health Systems, Ltd.*, 1999 WL 672902, \*3 (S.D.N.Y. 1999) (asserting that "proof of unfair prejudice by defendants is not a prerequisite to preclusion"). But Chevron does not identify a single case in which a court actually excluded evidence because of an interrogatory error that did not prejudice the complaining party.[1] *See Ebewo v. Martinez*, 309 F.Supp.2d at 607 (cited by Chevron's Motion at 10; exclusion justified because of "flagrant bad faith and callous disregard for the rules [that] prejudiced defendant"); *see also Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Group, PLC*, 2008 WL 4449412, \*11 (S.D.N.Y. 2008) (unpublished opinion; cited by Chevron at 11; refusing to exclude evidence on the basis of erroneous contention-interrogatory response); *see also Moragelli v. Chemed Corporation*, 922 F.Supp.2d at 311-312 (decertifying class where plaintiffs did not even offer to perform calculations that would support continued certification until after decertification-motion hearing); *see also Unigene Laboratories, Inc. v. Apotex, Inc.*, 2010 WL 273047, \*6 (unpublished opinion; exclusion justified because of "substantial prejudice to Plaintiffs"); *see also Nilson v. Nationwide Mutual Ins. Co.*, 2009 WL 1285854, \*2 (S.D.Miss. 2009) (unpublished opinion cited by Chevron at 14; refusing to exclude late-produced evidence where defendant did not show clear prejudice); *see also B-K Lighting, Inc. v. Vision3 Lighting*, 930 F.Supp.2d 1102, 11371138 (C.D.Cal. 2013) (cited by Chevron at 14; requiring clear showing of prejudice to justify exclusion). Indeed, even the *Wechsler* Court justified its

---

[1] Chevron does cite two short opinions that do not detail the conduct that led to the exclusion of evidence. *See United States v. Hussain*, 2008 WL 2561948, \*1 (S.D. Fla 2008) (unpublished order cited by Chevron at pg. 14); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005). Both opinions make it clear, however, that the exclusion was imposed as a sanction. And the *Hussain* Court warned that it was considering imposing further sanctions. *Hussain*, 2008 WL 2561948 at \*1. It fairly may be assumed, therefore, that the conduct that led to the exclusionary order was fairly egregious.

evidentiary exclusion by "find[ing] that defendants would likely be unfairly prejudiced" if the evidence was admitted. *Wechsler v. Hunt Health Systems, Ltd.*, 1999 WL 672902 at *3.

Here, Chevron does not cite any evidence of bad faith or prejudice that would justify excluding Plaintiffs' Skyline-claim evidence. True, Chevron *alleges* that it has "been extremely prejudiced," and that it "would have conducted [additional] discovery" if Plaintiffs had served different interrogatory responses. Motion at 13. But Chevron does not submit any *evidence* to support these allegations – not even a declaration from its own counsel. It does not identify any specific additional discovery that it would have conducted. Nor does it point to any information that it needs that it does not already have, or that it cannot obtain from its sister companies or from public sources.

Chevron also *alleges* that its expert Dr. Keeley relied on Plaintiffs' interrogatory responses when he mistakenly asserted in his report that there "is no allegation that Chevron supplied gasoline to [Skyline]." Motion, Ex. A-4 at 11. But this mistaken assertion in Dr. Keeley's report does not cite Plaintiffs' responses – in fact, it doesn't cite any evidence at all. (*Id.* at 10-11.) And his report lists CMO 107 – which expressly identified Chevron as one of the defendants against which Plaintiffs continue to pursue Skyline-related claims – among the documents that he considered when he formed his opinions. *Id.* at 10. While Chevron and Dr. Keeley *allege* that Dr. Keeley "would have addressed [Plaintiff's Skyline] allegation" if he had not missed it during his review of CMO 107, neither Chevron nor Dr. Keeley allege or provide evidence that Dr. Keeley cannot analyze Plaintiff's claims now with the information that he and Chevron either already have or can readily obtain. The fact that Chevron's expert may have to revise an unsupported error that was contradicted by a Court order of which the expert admits that he was aware does not constitute the kind of "prejudice" that would warrant excluding Plaintiffs' evidence.

Because Chevron has not carried its burden to prove prejudice, this Court should deny Chevron's Motion. If this Court finds that Plaintiffs' interrogatory responses were inadequate, then the appropriate remedy would be for the Court to grant Plaintiffs leave to amend those responses to include the contentions and evidence identified in this Opposition. The Court clearly has the power to permit such an amendment. Fed. R. Civ. P. 33, Advisory Comm. Notes (the Court has the "power . . . to permit withdrawal or amendment of answers to interrogatories"). Like the parties' stipulations in CMO 107, amended interrogatory responses from Plaintiffs would moot Chevron's Motion here. *See United States v. GAF Corp., et al.*, 928 F.2d at 1259; *see also 188 LLC v. Trinity Indus., Inc.*, 300 F.3d at 736; *see also Kiln Underwriting Ltd. V. Jesuit High School of New Orleans*, 2008 WL 4724390 at *12.

## IV.   **CONCLUSION**

For the reasons that are set forth above, Chevron's Motion should be denied.

Dated this 2nd day of December, 2013.

Respectfully submitted,

MICHAEL AXLINE, State Bar #229840
Attorneys for Plaintiffs
MILLER, AXLINE & SAWYER
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688
Facsimile:  (916) 488-4288

*Special Counsel to the Attorney General*

JOHN J. HOFFMAN
Acting Attorney General

_____/S/_____
GWEN FARLEY
Acting Attorney General
25 Market Street
P.O. Box 093
Trenton, NJ 08625-0093
Telephone:  (609) 984-2845

18

**PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE**
*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*
United States District Court, Southern District of New York, Case No. 08 Civ. 00312 (SAS)

I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action. My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA 95825-4225.

On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

**(1)   PLAINTIFFS' OPPOSITION TO CHEVRON U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING THE SKYLINE SERVICE CENTER TRIAL SITE**

**(2)   PLAINTIFFS' CONSOLIDATED OPPOSITION TO CHEVRON U.S.A. INC.'S RULE 56.1 MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT REGARDING THE SKYLINE SERVICE CENTER SITE
AND
PLAINTIFF'S RULE 56.1 MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO CHEVRON U.S.A. INC.'S RULE 56.1 STATEMENT OF MATERIAL FACTS**

**(3)   DECLARATION OF MICHAEL AXLINE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO CHEVRON U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING THE SKYLINE SERVICE CENTER TRIAL SITE**

**(4)   DECLARATION OF BRYAN BARNHART IN SUPPORT OF PLAINTIFFS' OPPOSITION TO CHEVRON U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING THE SKYLINE SERVICE CENTER TRIAL SITE**

**(5)   DECLARATION OF ALEX WALLACE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO CHEVRON U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING THE SKYLINE SERVICE CENTER TRIAL SITE**

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on December 2, 2013, at Sacramento, California.

TONYA L. ZIMMERMAN