UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00 - 1898 MDL 1358 (SAS) M21-88 |

**This Document Relates to:**

*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*
No. 1:08-cv-00312-SAS

### DECLARATION OF MICHAEL AXLINE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO CHEVRON U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING THE SKYLINE SERVICE CENTER TRIAL SITE

I, Michael Axline, declare:

    1.     I am one of the attorneys in this case for Plaintiff New Jersey Department of Environmental Protection.   I have been involved in the discovery and pretrial proceedings in this action.  This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

    2.     Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the Aquilogic Revised Site Summary Report for Site ID # - 3256 Skyline Service Center, Ringwood Borough, Passaic County, New Jersey, dated January 2013.

    3.     Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the Expert Site Specific Report of Marcel Moreau, Volume 1, pertaining to Skyline - Ringwood, dated November 8, 2012.

    4.     Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the Draft Remedial Investigation Report for the Skyline Service Center, Ringwood, New Jersey, dated November 2009.

    5.     Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the deposition of Joseph Costello, taken in the above-referenced matter, on August 2, 2011.

    6.     Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the deposition of Michael Costello, taken in the above-referenced matter, on July 20, 2001.

    7.     Attached hereto as Exhibit 6 is a true and correct copy of excerpts of the Sales Agreement between Star Enterprise and Skyline Service Center, Inc, dated April 8, 1991.  (Bates No. SKYLINE001395-1402.)  This document was Exhibit 10 to the 8/02/2011 deposition of Joseph Costello.  Also, this document was bates-stamped as SH-NJ-XX-065093-65100 and

produced by Defendant Shell on November 15, 2010, in Document Group E, attached to "The Shell Defendants' Objections and Responses to Plaintiffs' Second Set of Interrogatories and Request for Production of Documents to All Defendants."

8.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the deposition of Anthony Brown, taken in the above-referenced matter, on May 28, 2013 and May 29, 2013.

9.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts from Defendant Chevron U.S.A. Inc. And ChevronTexaco Corporation's CMO 45 Responses, dated February 6, 2009.

10.     Attached hereto as Exhibit 9 is a true and correct copy of excerpts of Plaintiffs' Responses to Defendants' First Set of Contention Interrogatories, dated September 7, 2012.

11.     Attached hereto as Exhibit 10 is a true and correct copy of the Order for Preservation of Records entered on March 13, 2001.

12.     Attached hereto as Exhibit 11 is a true and correct copy of Case Management Order No. 107, entered December 27, 2012.

13.     Attached hereto as Exhibit 12 is a true and correct copy of excerpts from a December 5, 2012 hearing in *In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, before Hon. Shira A. Scheindlin.

14.     Attached hereto as Exhibit 13 is a true and correct copy of an email from Lisa Gerson to Stephen Schweizer dated  December 21, 2012.

15.     Attached hereto as Exhibit 14 is a true and correct copy of excerpts from Plaintiffs' Second Amended Complaint filed September 28, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of ~~November,~~ December 2013, at Sacramento, California.

MICHAEL AXLINE

3

# EXHIBIT 1





245 Fischer Avenue, Suite D
Costa Mesa, CA 9262
Tel. +1.714.770.804
Web: www.aquilogic.com

# REVISED SITE SUMMARY
## ID # - 2156 SKYLINE SERVICE CENTER
### Ringwood Borough, Passaic County, New Jersey

Prepared on behalf of:

New Jersey Department of Environmental Protection (NJDEP)

The Commissioner of the NJDEP

The Administrator of the New Jersey Spill Compensation Fund

For:

The Office of the Attorney General of New Jersey

and

Miller, Axline & Sawyer

The Law Office of John K. Dema

Berger & Montague

Cohn Lifland Pearlman Herrmann & Knopf

Project No.: 003-01

January 2013



 aquilogic

## 3.0   SITE SETTING

### 3.1   Site Description

The Site is an active gasoline service station and consists of a single, one-story building that contains two automotive repair bays and a main office (Figure 2a). The fueling system includes two fueling islands, each with three gasoline pumps, and two 10,000-gallon USTs that are used to store unleaded gasoline. In addition, the Site contains one above ground storage tank (AST) used to store motor oil (LBG, 2009; 007289).

### 3.2   Site Location

The Site is located at 236 Skyline Drive in the borough of Ringwood, Passaic County, New Jersey (LBG, 2009; 007289). The Site is situated along a steep slope, with the down-gradient angle trending toward a residential neighborhood and then Skyline Lakes, which is approximately 0.3-miles to the west of the Site. The Site is bordered to the northeast by an automatic carwash, and a mixture of residential and undeveloped properties to the south (LBG, 2009; 007289).

### 3.3   Surface Cover and Drainage

With the exception of two small landscaped areas and the service station building, the entire footprint of the front of the Site (southwestern side of the property) is paved. The back half of the Site (northeastern side of the property) is covered in grass. Two wide driveways connect the Site to Skyline Drive. Surface water is expected to drain off-site to the south or west toward Skyline Drive. One storm drain is located in each driveway, close to where they connect to Skyline Drive.

 aquilogic

## 4.0   SITE HISTORY

### 4.1   Operational History

Skyline Service Center was built and began service in the fall of 1984 as an automotive repair center and retail fuel vendor (LBG, 2009; 007289).  During construction, local bedrock was blasted and carved out to allow for the installation of the USTs used to store gasoline (NJDEP, 2006a; 000298).  The Site originally operated four USTs: two 10,000-gallon, single-wall, steel tanks for unleaded gasoline; one 8,000-gallon, single-wall, steel tank for leaded gasoline; and one 550-gallon, single-wall steel tank for waste oil (LBG, 2009; 007289).  The Site presently has one AST containing used motor oil and two 10,000-gallon USTs used to store unleaded gasoline.  The Site also contains two fueling islands, each with three gasoline pumps (LBG, 2009; 007289).

The waste oil UST was removed from the Site in October 1998 by ECO-Sense Environmental Consultants (ECO-Sense) (LBG, 2009: 007286).  On August 5, 2003, the three remaining USTs and associated piping at the Site were removed by the PTS under NJDEP case number 03-08-14-1153-51 (LBG, 2009; 007286).  The tanks were later replaced by two 10,000-gallon USTs and one 5,000-gallon AST (LBG, 2009; 007287).  The new system included three double walled fiberglass tanks and double walled fiberglass piping with leak detection system installed (automatic tank gages and interstitial monitoring) (NJDEP, 2006b; 003760).

### 4.2   Environmental Investigation and Remediation Chronology

The following is a chronology of investigation and remediation activities that have been conducted at the Site.  Monitoring wells locations are depicted on Figure 2.  Summaries of Site characterization and remedial actions are illustrated on Figure 3.  Well construction details are summarized on Table 1.

| Date/Period | Activity |
|---|---|
| Fall of 1984 | The Skyline Service Center, which included a gasoline service station and automotive repair center, was constructed in the Fall of 1984 (LBG, 2005; 003805). |
| Early 1998 | The Passaic County Department of Health (DOH) conducted a limited domestic well investigation at private residences in the vicinity of the Site. Eighteen wells were sampled, 16 showed low levels of MTBE, one well (63 Oakwood Drive) exceeded New Jersey safe drinking water standard for MTBE (LBG, 2009; 007308).  The DOH informed the NJDEP of possible groundwater contamination and requested their assistance in determining |



| Date/Period | Activity |
|---|---|
| | the source(s) (LBG, 2009; 007286). |
| May 1998 | Preliminary investigations conducted by the NJDEP in 1998 identified the likely source of the contamination to be the Site and directed the owner to perform a Site Investigation (SI) (LBG, 2009; 007286). |
| July 16, 1998 | A field investigation was conducted in the Oakwood Drive area and determined the Site to be the source of the contamination (LBG, 2009; 007308). |
| July 27, 1998 | Mr. Joseph Costello and Mr. Michael Costello, the owners of Skyline Service Center, received a letter from NJDEP, Bureau of Underground Storage Tanks (BUST) stating that the Site was to conduct a SI pursuant to N.J.A.C 7:26E that specifically included installing a bedrock monitoring well down-gradient of the tank field and pump islands (NJDEP, 1998; 001975). |
| October 1998 | One 550-gallon waste oil UST was removed by ECO-Sense. "Contamination was noted in the pea-gravel and an undetermined quantity of soil was removed; details of this removal are unknown. It is assumed that a closure report would have been submitted to the NJDEP by ECO-Sense...." (LBG, 2009; 007286).<br><br>**This was the first time that petroleum hydrocarbon impact to groundwater beneath the Site was noted.** |
| August 2003 | PTS removed the remaining three USTs and performed a subsurface evaluation at the Site in August 2003; the details of these activities are described in its report entitled "Remedial Investigation Report (RIR)," dated January 22, 2004 (PTS, 2004; 002221). As part of these activities, PTS removed three USTs (formerly used for storage of gasoline fuel of various grades) and the piping from the Site. During the removal of the USTs, it was determined that a fuel release had occurred. Fuel impacted soil was excavated from the former UST locations and the resultant excavation was approximately 858 square feet (22 feet wide by 39 feet long) and approximately 13 feet deep. A total of approximately 429 tons of fuel and petroleum impacted soil were removed from the excavation and transported off-site for disposal (PTS, 2004; 002221). Post-excavation samples were collected from the base of the walls and the bottom of excavation. Benzene, ethylbenzene, toluene and MTBE were detected in the collected soil samples at the following concentrations (PTS, 2004; |

11



| Date/Period | Activity |
| --- | --- |

002232):

- Benzene at 3.5 milligrams per kilogram (mg/kg) in one soil sample Pipe pump 4 (dispenser 4) at 2.5 to 3 feet bgs;
- Ethylbenzene at 0.31 mg/kg in a soil sample PE-9W (west wall of the UST excavation) at 12.5 to 13 feet bgs, 0.44 mg/kg in a soil sample PE-2E (northeast wall of the UST excavation) at 12.5 to 13 feet bgs, and 62 mg/kg in a soil sample Pipe pump 4 (dispenser 4) at 2.5 to 3 feet bgs;
- Toluene at 0.79 mg/kg in a soil sample PE-9W (west wall of the UST excavation) at 12.5 to 13 feet bgs, 1.2 mg/kg In a soil sample PE-2E (northeastern wall of the UST excavation) at 12.5 to 13 feet bgs, and 150 mg/kg in a soil sample Pipe pump 4 (dispenser 4) at 2.5 to 3 feet bgs;
- MTBE at 0.2 mg/kg in a soil sample Pipe pump 3 (dispenser 3) 2.5 to 3 feet bgs, 16 mg/kg in a soil sample Pipe 3 (below product pipe) at 3 to 3.5 feet bgs; and 49 mg/kg in a soil sample Pipe pump 4 (dispenser 4) at 2.5 to 3 feet bgs.

After the soils were removed, approximately 725-gallons of gasoline and water mixture (free product was floating on the groundwater that infiltrated the base of the excavation), was vacuumed from the excavation (LBG, 2009; 007286-007287).

The excavated USTs were later replaced by two 10,000-gallon USTs and one 5,000-gallon AST (LBG, 2009; 007287).

Based on the field observations and soil analytical results, PTS recommended to collect additional step-out soil samples in the vicinity of PE-1E (northeastern wall of the UST excavation at 12.5 to 13 feet bgs) and Pipe pump 4 (dispenser 4 at 2.5 to 3 feet bgs), and to evaluate impacts of the gasoline-fuel releases on the shallow aquifer/perched aquifer (PTS, 2004; 002233; see Appendix D for soil sample locations).

March 5, 2004

The NJDEP, BUST issued a letter to Michael Costello requiring a remedial investigation (RI), based on the review of the received RIR submitted by PTS on January 22, 2004 (NJDEP, 2004a; 001977). The RI requirements included the following (NJDEP, 2004a; 001977-001982):

- Conduct a receptor evaluation, including well search, and well



Revised Site Summary Report
ID # - 2156 Skyline Service Center
January 2013

| Date/Period | Activity |
|---|---|
| | sampling within the 1,000-foot radius of the contamination; |
| | • Conduct a groundwater investigation in the area of the excavation and 10 feet down-gradient of the area of concern (location of the former three gasoline tanks and Pipe pump 4); |
| | • Remediate the contaminated soil and conduct post-remedial sampling in the area of Pipe pump 4 and the area of PE-1E; |
| | • Fully delineate the horizontal and vertical extent of the soil contamination; |
| | • Conduct a baseline ecological evaluation; and |
| | • Submit a Remedial Action Selection Report. |
| March 22 and 23, 2004 | A survey of the residences surrounding the Site was conducted to collect an inventory of possible potable wells requiring sampling. Based on the survey results, approximately one hundred fifty potential residents were identified in the immediate area, including Oakwood Drive, Wildwood Terrace, Skyline Drive, James Court, Forsgate Drive, Beech Court, and High Mountain Road. The identified list of residences was reported to the NJDEP, and the list was reduced by the NJDEP to 23 potable wells to be sampled initially (PTS, 2005; 011045). |
| June and July 2004 | NJDEP and Ringwood Health Department sampled 44 four residential wells in the vicinity of the Site; specifically the area south and southwest of the Site including Oakwood Drive, Wildwood Terrace, and High Mountain Road (off-site). Results from the well sampling indicated that MTBE and TBA were present in 29 of the domestic well samples. Of those samples, four exhibited a concentration of TBA above the NJDEP Groundwater Quality Standard (GWQS) and USEPA's Safe Drinking Water Standards (17 Wildwood Terrace, 20 Wildwood Terrace, 24 Wildwood Terrace, and 28 Wildwood Terrace). In addition to the TBA exceedances, there were also three exceedances of the NJ MTBE standard (17 Wildwood Terrace, 20 Wildwood Terrace, & 28 Wildwood Terrace (LBG, 2009; 007287). |
| July 7, 2004 | Four groundwater monitoring wells, MW-1, MW-2, MW-3, and MW-4 were installed at the Site (PTS, 2005; 011046). Three wells were screened within the unconsolidated sediments at the following depth intervals: MW-1 was installed immediately down-gradient of the fuel islands and screened from 1.68 to 11.68 feet bgs; MW-2 was installed down-gradient of the former UST excavation and waste oil AST and screened from 4.93 to 14.93 feet bgs; and MW-3 was installed directly adjacent to the former UST excavation and screened from 1.1 to 11.1 feet bgs; One well, MW-4, was installed next to |

13



## 5.3    Bedrock

### 5.3.1    Depth/Elevation

Depth to groundwater within the fractured bedrock zone, as measured on September 10, 2009 in the on-site groundwater monitoring well MW-4, was 34.5 feet bgs, and the corresponding groundwater elevation was calculated at 369.5 feet AMSL. MW-4 is the only well installed within the bedrock zone at the Site. Three additional groundwater monitoring wells, SCC 01D, SCC-02D, and SCC-03D have been installed off-site within the bedrock zone to depths ranging from 113.15 to 130.95 feet bgs. Depth to groundwater as measured in these wells on September 10, 2009 ranged from 1.71 feet bgs (SCC-02D) to 11.6 feet bgs (SCC-03D), and groundwater elevations were between 346.21 feet AMSL (SCC-03D) and 347.55 feet AMSL (SCC 01D) (LBG, 2009; 007310).

### 5.3.2    Flow Direction and Gradient

Water in the fractured bedrock is documented to flow to the south, towards High Mountain Brook which discharges to Upper Skyline Lake (LBG, 2011; 012508). Groundwater flows to south at a lateral hydraulic gradient of 0.004 feet/foot, based on water level measurements collected by LBG from bedrock wells SCC-01D, SCC-02D, and SCC-03D in September 2009. Based on a comparison of groundwater elevations in the bedrock and the unconsolidated sediments, a downward vertical hydraulic gradient is present beneath the Site, and likely off-site to the south.

### 5.3.3    Hydraulic Properties

An estimated K value, based on slug testing at monitoring well SCC-01D, of 0.4 feet/day was calculated (LBG, 2011; 011375).

### 5.3.4    Velocity

Using 0.05 as a representative effective $n_e$ for fractured gneiss and the above gradient of 0.004 feet/foot and calculated K value of 0.4 feet/day, the linear V is approximately 0.032 feet/day (11.7 feet/year). However, the majority of water storage and flow in bedrock is anticipated to be within fractures and joints; therefore, the actual velocity is probably much higher.

 aquilogic

Revised Site Summary Report
ID # - 2156 Skyline Service Center
January 2013

### 6.3.2    Magnitude

No information regarding magnitude of LNAPL at the Site is available.

### 6.3.3    Extent

No information regarding extent of the LNAPL at the Site is available.

## 6.4    Groundwater Contamination

### 6.4.1    Nature

In May 1998, MTBE and TBA were detected in drinking water samples collected from private wells by the Passaic County DOH.  Based on the results of this investigation, the Site was identified by the NJDEP BUST as a potential source of contamination.  MTBE and TBA contamination likely occurred sometime between the Fall of 1984, when the fuel station was constructed, and 1998 when contamination was discovered in private wells (LBG, 2005; 003808).

Groundwater contamination was reported in August 2003 during removal of the three USTs and associated piping, when free product floating on top of groundwater was observed.  At that time, approximately 725-gallons of gasoline and water mixture was vacuumed from the excavation (LBG, 2009; 007286-007287).  No groundwater samples were collected for chemical analysis (PTS, 2004; 002232).

Groundwater quality data was collected at the Site for the first time in July 2004, after four shallow (less than 35 feet deep) groundwater monitoring wells (MW-1 through MW-4) were installed.  MW-1 through MW-3 were screened within the unconsolidated deposits, while MW-4 was screened within the bedrock formation.  Initial groundwater analytical results indicated the presence of MTBE and TBA at concentrations up to 320 µg/L and 1,500 µg/L, respectively, in Well MW-4.  Maximum MTBE and TBA concentrations detected in groundwater collected from wells in unconsolidated deposits (MW-1, MW-2, and MW-3) were 66 µg/L (MW-1) and 650 µg/L (MW-2), respectively (NJDEP, 2004b; 000277).

The most recent groundwater quality data, collected from the on-site wells in September 2009, indicated the presence of MTBE at concentrations ranging from non-detect (MW-1 and MW-3) to 15.7 µg/L (MW-4).  TBA was not detected in any of the on-site groundwater monitoring wells in September 2009 (LBG, 2009; 007318).  No deeper groundwater monitoring wells have been installed at the Site. The deepest well (bedrock monitoring well MW-4) is screened between 24.4 and 34.4 feet bgs and contained the highest MTBE concentrations detected at the Site.

# EXHIBIT 2



Nov 09 2012
10:37AM

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether ("MTBE")

Products Liability Litigation

Master File No. 1:00-1898

MDL 1358 (SAS)

M21-88

---

**This Document Relates to:**

*New Jersey Department of Environmental Protection*
*v.*
*Atlantic Richfield Co., et al.,*
*No. 04 Civ. 04973 (SAS)*

---

**Expert Site Specific Report of Marcel Moreau**

**Volume I**

Marcel Moreau Associates
Portland, Maine

_Marcel Moreau_

November 8, 2012

# Skyline - Ringwood

# Skyline - Ringwood

### 236 Skyline Drive, Ringwood, NJ

## MAJOR MILESTONES

| | |
|---|---|
| August 1985 | Two 10,000 gallon, one 8,000 gallon, and one 550 gallon STI-P3 tanks were installed [9 9 2005].[1]  The piping was steel [8 27 1987]. |
| October 1985 | Skyline began selling Sunoco branded gasoline.[2] |
| 1988 | Stage II vapor recovery was added to the storage systems.[3] |
| October 1, 1991 | The facility changed from Sunoco branded gasoline to Texaco branded gasoline.[4] |
| Fall 1992 | The winter oxygenate program (2.7 percent oxygen requirement) went into effect in New Jersey.[5] |
| 1993 | A Red Jacket ST1401 tank gauge, submersible pump containment sumps, and spill containment manholes were added to the storage systems.[6] |
| January 1, 1995 | The reformulated fuel program (2 percent oxygen requirement) was implemented statewide in New Jersey.[7] |
| September 30, 1997 | The facility was no longer branded Texaco.[8] |
| October 1, 1997 – September 30, 2006 | The facility was supplied by Prestige Petroleum and branded Citgo.[9] |

---

[1] Deposition of Joseph Costello, In re: MtBE Products Liability Litigation, *New Jersey Department of Environmental Protection, et al., v. Atlantic Richfield Co., et al., Case No. 08-CIV-00312: (SAS)*, August 2, 2011, p. 34, and pp. 95-96.
[2] Ibid., p. 26.
[3] Ibid., p. 32.
[4] Ibid., pp. 51-54.
[5] *MTBE in New Jersey's Environment*, NJDEP Work Group, 2001, pp. 2-4.
[6] Deposition of Joseph Costello, In re: MtBE Products Liability Litigation, *New Jersey Department of Environmental Protection, et al., v. Atlantic Richfield Co., et al., Case No. 08-CIV-00312: (SAS)*, August 2, 2011, pp. 62-65.
[7] *MTBE in New Jersey's Environment*, NJDEP Work Group, 2001, pp. 2-5
[8] Deposition of Joseph Costello, In re: MtBE Products Liability Litigation, *New Jersey Department of Environmental Protection, et al., v. Atlantic Richfield Co., et al., Case No. 08-CIV-00312: (SAS)*, August 2, 2011, pp. 69-71.
[9] Ibid., p. 76.

| | |
|---|---|
| May 1998 | The health department found one potable well with MtBE above standard, sixteen other potable wells with low levels of MtBE [9 9 2005]. |
| July 24, 1998 | The NJDEP identified the Skyline Service Center as a potential source of contamination and directed Skyline to conduct a site investigation. |
| August 2003 | Steel storage systems were removed and replaced with double-wall fiberglass tanks and double-wall fiberglass piping with interstitial monitoring [1 28 2008]. |
| June – July 2004 | The NJDEP sampled 45 residential wells in the vicinity of the site.  Five wells had concentrations of MTBE or TBA above standards, 22 wells had detections below standards [9 9 2005]. |
| Spring 2006 | MtBE removed from the gasoline supply in the Northeast.[10] |

## SPILL/LEAK EVENT CHRONOLOGY

| | |
|---|---|
| 1985 – 1993 | According to the facility owner, fuel delivery drivers would spill fuel into the ground when they disconnected the delivery hose.[11]  He did not report this to the NJDEP.[12] |
| 1985 - 2007 | The facility owner acknowledged that small spills occurred when vehicles were fueled.[13] |

## SOIL/GROUNDWATER CONTAMINATION CHRONOLOGY

| | |
|---|---|
| October 1998 | The waste oil tank was removed and replaced with an aboveground tank.  Contamination was noted in the pea gravel surrounding the tank, and an unknown quantity of soil was removed.  The NJDEP was notified of a release [9 9 2005]. |
| August 2003 | During the removal of the gasoline storage systems, MtBE was found in two dispenser soil samples (2.5 to 3.0 ft below grade) at 49,000 ppb and 160 ppb.  Both of these samples were from the southerly |

[10] "Eliminating MTBE in Gasoline in 2006," Energy Information Administration, February 22, 2006.
[11] Deposition of Joseph Costello, In re: MtBE Products Liability Litigation, *New Jersey Department of Environmental Protection, et al., v. Atlantic Richfield Co., et al., Case No. 08-CIV-00312: (SAS),* August 2, 2011, pp. 42-48 and pp. 261-63.
[12] Ibid., p. 266.
[13] Ibid., pp. 88-90.

dispenser island. The dispenser soil samples were taken from between dispensers, not directly beneath the dispenser cabinets. MtBE was also detected in one piping sample (3.0 to 3.5 ft below grade) at 160 ppb. This piping sample was the closest to the dispenser islands. According to data tables in the removal report, high TPH (14,000,000 ppb) but no MtBE was detected in soil samples taken around the perimeter of the tank excavation. Other reports indicate that MtBE was detected in tank excavation samples [11 1 2009]. Soil samples were taken from the base of the excavation sidewalls, not the bottom of the tank excavation [2 3 2004].

July 2004        Four onsite monitor wells were installed. The highest concentration of MtBE detected in ground water was 320 ppb. The highest concentration of TBA detected was 1,500 ppb [11 1 2009].

April 3, 2006    Onsite monitor wells were sampled again. MtBE and TBA were detected in MW-1 (the well nearest to the dispenser islands) at 6.5 ppb and 15 ppb respectively. Toluene was present in all the monitor wells at less than 10 ppb.

June 2009        Sampling of the onsite monitor wells detected MtBE in MW-4 (near the tank field) at a concentration of 1.5 ppb. The three other onsite wells were non-detect (ND) for MtBE. Three offsite wells were also sampled, with well SCC01D (in the area where potable wells had previously been contaminated) showing MtBE at levels ranging from 154 to 180 ppb at depths ranging from 111 to 121 ft.

## IDENTIFICATION OF MTBE RELEASES

### Tank Area Releases

The facility operator observed fuel delivery personnel draining residual fuel from delivery hoses after deliveries. From the time these storage tanks went into service in 1985 until the installation of spill containment manholes in 1993, this fuel would have gone directly into the soil adjacent to the fill pipe. These releases were not reported to the NJDEP. The total volume that may have been released is not known.

According to the data tables in the tank removal report, a sample from the base of the tank excavation sidewall contained 14,000,000 ppb TPH. Other reports indicated that MtBE was detected in the tank excavation, but I was not able to locate the laboratory reports for these samples to confirm this. MtBE was likely present in the gasoline dispensed from this facility from the time when it first went into operation in 1985, so it is likely that MtBE was present in the gasoline detected in the soil near the tank excavation in August of 2003. No investigation was initiated to determine the origin, timing, or volume of the release by the responsible

parties.

<u>Piping and Dispenser Area Releases</u>
MtBE was detected in one soil sample from beneath the piping (160 ppb) and two soil samples from the southerly dispenser island (49,000 and 160 ppb) when the storage systems were replaced in August of 2003.  Dispenser soil samples were taken adjacent to rather than directly beneath the dispensers, so the levels detected may not have been the maximum levels present. No investigation was initiated to determine the origin, timing, or volume of the releases by the responsible parties.

<u>Fueling Spills</u>
Small spills are common during vehicle fueling activities and the facility operator confirmed that they occurred at this facility.  Fueling spills may have contributed to the contamination present in the dispenser area.

# EXHIBIT 3

**Draft Remedial Investigation Report**

# Skyline Service Center
## Ringwood, New Jersey

### RI/RASE Services
### Term Contract No. A-60243



Submitted to:



**STATE OF NEW JERSEY**
Department of
Environmental Protection
Site Remediation Program
Bureau of Investigation,
Design and Construction
401 East State Street,
Trenton, New Jersey 08625

Submitted by:



## The Louis Berger Group, Inc.
412 Mount Kemble Avenue
Morristown, New Jersey 07962

November 2009

NJDEP-SITE249-007281

## 2.0   BACKGROUND

Skyline Service Center was built and began service in the fall of 1984 as an automotive repair center and retail fuel vendor (Facility ID No. 109145). A Site Plan is included as Figure 2. During construction, local bedrock was blasted and carved out to allow for the installation of the Underground Storage Tanks (UST) used to store gasoline. The Site operated four USTs: two 10,000-gallon, single-wall steel, unleaded gasoline; one 8,000 gallon, single-wall, steel, leaded gasoline; and one 550 gallon, single-wall steel, waste oil UST. Table 1 presents a chronology of the Site history.

In early 1998, the Passaic County Department of Health (DOH) conducted a limited domestic well investigation at private residences in the vicinity of the Site. Results of the investigation showed concentrations of methyl-tertiary butyl ether (MTBE) and/or tertiary butyl-alcohol (TBA) in 16 of the 18 domestic wells sampled. The DOH informed the NJDEP of possible groundwater contamination and requested their assistance in determining the source(s). Preliminary investigations conducted by the NJDEP in 1998 identified the likely source of the contamination to be the Skyline Service Center Site and directed the owner to perform a Site Investigation (SI).

According to NJDEP facility questionnaires and correspondence, the 550 gallon waste oil tank was removed in October of 1998 by ECO-Sense Environmental Consultants (ECO-Sense). Contamination was noted in the pea-gravel and an undetermined quantity of soil was removed; details of this removal are unknown. It is assumed that a closure report would have been submitted to the NJDEP by ECO-Sense, however; the report is not contained within the files submitted to Berger for review. In addition, based on available well records and abandonment logs, it is apparent that a monitoring well was installed to 50 feet below ground surface (ft bgs) in 1998 and abandoned shortly after. Additional information regarding this well and investigation has not been located.

On August 5, 2003, the three remaining USTs and associated piping at the Site were removed by the Preferred Tank Group, LCC (PTG) under NJDEP case number 03-08-14-1153-51. In addition to the tank removals, 429 tons of impacted soil was removed by PTG over a period of 13 days in August 2003. Subsequent to excavation, 20 post-excavation samples were collected from the base of the excavation and from beneath the pump dispensers. One post excavation sample collected from the under the pump dispensers, exhibited concentrations of benzene, xylenes, and MTBE above the NJDEP's most stringent soil cleanup criteria (SCC). A second post excavation sample, collected from the base of the UST excavation exceeded criteria for MTBE and total petroleum hydrocarbons (TPH). Groundwater was observed flowing into the excavation from the bedrock sidewalls and free product was noted floating on the water within the excavation. Approximately 725 gallons of a gas

NJDEP-SITE249-007286

**Table 1**
*NJDEP - Skyline Service Center*
*Ringwood, New Jersey*
**Chronology of Events**

| DATE | EVENT |
|---|---|
| May-85 | Sediments and soil laden runoff is reported entering skyline lake as a result of construction activities, building the gas station at 256 Skyline Drive. Complaints are also filed due to truck traffic entering and leaving the site. |
| Dec-86 | Complaint is filed by Environmental commission stating that the Sunoco gas station has not conformed to construction plans and that the little measures taken to appease the community who protested the gas station have not been met. |
| May-98 | NJDEP (BUST) responds to Passaic county department of health which requested the departments assistance in determining the source(s) of gasoline related contamination in the vicinity of Oakwood Drive. 18 wells are sampled 16 show low levels of MTBE, 1 well 63 Oakwood drive exceeded NJ safe drinking water standard. |
| Jul-98 | BUST conducts field investigations and determines Skyline service station to be the source of the contamination |
| Aug-98 | Monitoring well installed on site |
| Sep-98 | Monitoring well installed on site |
| Oct-98 | Notification of release is made to the DEP by Frank Libby of Eco Sense in association with the removal of the waste oil tank. |
| Aug-03 | Three gasoline tanks were removed by The Preferred Tank Group as a result of closure and replacement plans. In their RI R they recommend that a groundwater investigation, and additional soil sampling be conducted. |
| June/July 04 | NJDEP and Ringwood Health Department sample 44 residential wells. |
| Mar - Oct 04 | POET systems are installed at 9 private residences. |
| 2005 | Water supply alternative analysis conducted and public water determine to be most effective solution; all associated residents on potable wells moved to public water by spring 2005. |
| Apr-06 | On Site groundwater monitoring wells sampled. |

1 of 1

NJDEP-SITE249-007308

# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK    Master File No.

------------------------------    1:00-1898

IN RE:  METHYL TERTIARY BUTYL    MDL 1358 (SAS)

ETHER ("MTBE") PRODUCTS    M21-88

LIABILITY LITIGATION

------------------------------

This document relates to:

New Jersey Department of

Environmental Protection, et al.

v.

Atlantic RIchfield Co., et al.,

Case No. 08-CIV-00312: (SAS)

------------------------------

          Pursuant to Notice, the video deposition of

JOSEPH COSTELLO, was taken on Tuesday, the 2nd day

of August, 2011, commencing at approximately 9:43

a.m., at the Courtyard Charlottesville, University

Medical Center, located at 1201 Main Street,

Charlottesville, Virginia, before Brian M. McDonald,

a Notary Public.

Page 2

```
 1        A P P E A R A N C E S :
 2   FOR THE PLAINTIFF:
 3     MICHAEL STEEVES, ESQUIRE
 4     Miller Axline & Sawyer
 5     1050 Fulton Avenue, Suite 100
 6     Sacramento, California 95825
 7     (916) 488-6688
 8     msteeves@toxictorts.org
 9   FOR DEENDANT CITGO PETORLEUM CORPORATION:
10     PAMELA R. HANEBUTT, ESQUIRE
11     and
12     SHELLY GEPPERT, ESQUIRE
13     Eimer Stahl Klevorn & Solberg, LLP
14     224 South Michigan Avenue, Suite 1100
15     Chicago, Illinois 60604
16     (312) 660-7625
17     phanebutt@eimerstahl.com
18   FOR THE DEENDANT SHELL OIL:
19     MIMI S. DENNIS, ESQUIRE
20     Wallace King Domike & Reiskin, PLLC
21     2900 K Street, N.W.
22     Harbourside, Suite 500
23     Washington, D.C. 20007
24     (202) 204-1000
25     mdennis@wallaceking.com
```

Page 4

```
 1        A P P E A R A N C E S (Continued)
 2   FOR THE DEFENDANT LYONDELL:
 3     LAURA M. BROWN, ESQUIRE (Appearing telephonically)
 4     Blank Rome LLP
 5     One Logan Square, 130 North 18th Street
 6     Philadelphia, Pennsylvania 19103
 7     (215) 569-5336
 8     Brown-L@BlankRome.com
 9   FOR DEFENDANT GETTY PETROLEUM MARKETING, INC.:
10     JOHN A. RISI, ESQUIRE
11     Bleakley Platt & Schmidt, LLP
12     One North Lexington Avenue
13     White Plaints, New York 10601
14     (914) 949-2700
15   FOR THE DEFENDANT GETTY PROPERTIES, INC.:
16     SUSAN DEAN, ESQUIRE
17     The Widener Building
18     16th Floor, 1339 Chestnut Street
19     One South Penn Square
20     Philadelphia, Pennsylvania 19107
21     (215) 575-4200
22   ALSO PRESENT:  MR. REN ANGLE, Videographer
23
24
25
```

Page 3

```
 1   FOR THE SUNOCO DEFENDANTS:
 2     PATRICK JACOBI, ESQUIRE
 3     1350 I Street, N.W., Suite 700
 4     Washington, D.C. 20005-3311
 5     (202) 789-6000
 6     pjacobi@bdlaw.com
 7   FOR THE CHEVRON DEFENDANT:
 8     HELEINA FORMOSO, ESQUIRE  (Telephonic)
 9     and
10     JAMIE M. MILLER, ESQUIRE (Telephonic)
11     King & Spalding
12     1100 Louisiana, Suite 4000
13     Houston, Texas 77002
14     (713) 276-7445
15     JAMiller@KSLAW.com
16     and hformoso@kslaw.com
17   FOR THE DEFENDANTS COASTAL EAGLE POINT OIL CO. and
18   EL PASO CORP.:  (Appearing Telephonically)
19     LESLEY LAWRENCE-HAMMER, ESQUIRE
20     Greenberg Traurig, LLP
21     2101 L Street, N.W., Suite 1000
22     Washington, D.C. 20037
23     (202) 331-3161
24     hammerl@gtlaw.com
25
```

Page 5

```
 1            I N D E X
 2   WITNESS: JOSEPH COSTELLO        PAGE NO.
 3     Direct Examination by Mr. Steeves........... 11
 4     Cross-Examination by Ms. Hanebutt.......... 102
 5     Cross-Examination by Mr. Jacobi............. 152
 6     Cross-Examination by Ms. Dennis............. 274
 7            EXHIBITS
 8   EXHIBIT NO.   DESCRIPTION          PAGE NO.
 9   No. 1  Plaintiff's Second Amended Notice of
10     Deposition of Joseph Costello with
11     Production of Documents and video-
12     taping................................. 10
13   No. 2  Letter to Thomas Rushforth from John
14     McCambley, Esq., dated August 12, 1985.... 26
15   No. 3  Document entitled "Testing costs___?"..... 29
16   No. 4  Dealer Supply Franchise Part A Cover
17     Provisions, dated October 3, 1988......... 30
18   No. 5  Sun Refining and Marketing Co., letter
19     dated June 6, 1988, to Skyline Service
20     Center, Inc............................... 31
21   No. 6  Fairfield Maintenance Inc. Proposal....... 33
22   No. 7  Sun Refining and Marketing Company
23     October 24, 1989 memo to dealer........... 35
24   No. 8  Handwritten letter to Jay from Joe
25     dated August 28, '04...................... 41
```

2  (Pages 2 to 5)

Page 38

1  before we went off the record that we marked as J.
2  Costello 7. What I'm going to do is take that back
3  and hand you a new exhibit marked J. Costello 7.
4  Will you take a look at that.
5      A.  Okay.
6      Q.  For the record, the exhibit, it's marked
7  Skyline001960. It's the cover letter with the Sun
8  logo dated October 24th, 1989. On the front of the
9  first page is a signature from the -- from the
10  second page, there's a signature. Is that your
11  signature?
12      A.  Doesn't look like it.
13      Q.  You don't recall seeing this document
14  before?
15      A.  For the record, it doesn't match my
16  signatures from all of the other documents, and I
17  don't think I changed my signature.
18      Q.  Does anybody else -- would anybody else...
19      A.  Nobody else has power of attorney...
20      Q.  Let me finish my question...
21      A.  I apologize.
22      Q.  ...for the record. Would anybody else at
23  your company have the authority to sign a document
24  for you?
25      A.  No.

Page 39

1      Q.  Do you recall ever giving anybody power of
2  attorney to sign the document for you?
3      A.  No.
4      Q.  So you don't recall ever receiving this
5  document from Sunoco?
6      A.  No.
7      Q.  Turn to the back of the third page, Bates
8  No. Skyline001965. Appears to be a chemical
9  inventory stored by chemical name for Sunoco service
10  stations. Have you seen this before, this document
11  before?
12      A.  Don't recall.
13      Q.  It's dated October 20th, 1989. If you
14  look down at the bottom, it looks like it lists the
15  types of gasoline sold at your station, correct?
16  Did you sell Sunoco economy unleaded gasoline at
17  your service station?
18      A.  Yes.
19      Q.  And did you sell Sunoco Ultra unleaded
20  gasoline at your service station?
21      A.  Yes.
22      Q.  Underneath Sunoco economy unleaded, it
23  lists a bunch of components, one of which is MTBE.
24  Outside of this document, did Sunoco ever tell you
25  that gasoline sold at your service station while it

Page 40

1  was branded Sunoco contained MTBE?
2      A.  No.
3      Q.  There's another component listed there for
4  both Sunoco economy and Ultra Tert Butyl Alcohol.
5  Do you know what Tert Butyl Alcohol is?
6      A.  No.
7      Q.  Did Sunoco ever inform you that gasoline
8  sold at your service station when it was branded
9  Sunoco contained Tert Butyl Alcohol?
10      A.  No.
11      Q.  It looks like this document was produced
12  by you, it has a Skyline Bates number. Is this a
13  type of document you would normally keep in your
14  files?
15      A.  Are we still talking about 1960?
16      Q.  Yeah, we're still on Exhibit 7.
17      A.  I'd say yes.
18      Q.  Who would be responsible for maintaining a
19  document like this?
20      A.  It would be me.
21      Q.  During the time period your station was
22  branded Sunoco, do you recall ever seeing a gasoline
23  spill during delivery of gasoline to the USTs?
24      A.  No.
25          (Whereupon, Deposition Exhibit

Page 41

1          No. 8 was marked for identification)
2  BY MR. STEEVES:
3      Q.  Let me hand you what is marked as J.
4  Costello 8.
5      A.  Okay.
6      Q.  Have you seen this document before?
7      A.  Yes.
8      Q.  For the record, it's Bates No.
9  Skyline004056. It's a handwritten letter dated
10  August 23rd, 2004. Is this your writing?
11      A.  Yes.
12      Q.  And there's a signature. It says Joe. Is
13  that you?
14      A.  That's me, yes.
15      Q.  So you wrote this letter?
16      A.  Yes.
17      Q.  The second sentence it says, "When Sunoco
18  would deliver gasoline it was a driver habit to
19  disconnect the hose at the fill port; therefore, any
20  gas still in the hose would be dumped into the
21  ground."
22      A.  Yes.
23      Q.  Do you recall seeing gasoline dumped on
24  the ground when the hose was disconnected?
25          MR. JACOBI: I'm going to object. Asked

Page 42

```
 1    and answered the question.
 2         THE WITNESS:  If I can put it in my own
 3    terms....
 4         Q.  Absolutely.
 5         A.  ...I've already said that I never saw them
 6    spill gasoline.  Now, if we take spill in context,
 7    you'd have to wide that for me, please.  However, I
 8    did see drivers on a number of different occasions,
 9    they would disconnect the hose at the fill port,
10    take it off because it was open at that time, and
11    just dump the effluent to the ground, instead of
12    walking it the way they have to do now.  And when I
13    say walking it the way they have to do now, it's
14    required that they disconnect at the truck and walk
15    it in to get every remaining drop into the ground,
16    all right.  Now, we also have spill buckets just in
17    case the thing would disconnect, they'd have the
18    gasoline in the spill bucket.  I hope that answers
19    your question the way you wanted it or the way you
20    posed it.
21         Q.  During the time you were a Sunoco branded
22    gasoline station, did you have spill buckets?
23         A.  I don't believe so.  I don't know exactly
24    when they came into play.  I'm not sure of the date,
25    all right.
```

Page 43

```
 1         Q.  Did Sunoco ever require you to install
 2    spill buckets?
 3         A.  If that came under the stage two vapor
 4    recover, the answer is yes.  If it was done
 5    subsequent to that, then the answer is no.
 6         Q.  The third sentence says "At the time you
 7    were not required to have overspill containment
 8    sumps.  Is an overspill containment sump the same as
 9    a spill bucket?
10         A.  That's correct, yes.
11         Q.  Towards the bottom of your letter, I can't
12    really quantify the amount of loss but a fair guess
13    would be about ten gallons for each delivery.  Do
14    you recall why ten gallons was a fair guess as to
15    the loss of gasoline for each delivery?
16         A.  I think I took the size of the hose and
17    figured if there was a gallon or two, two or three
18    gallons in each hose, we delivered with three hoses,
19    so I just did some math on my own.  I could not
20    swear to it.  This is just a guesstimate.  But
21    notwithstanding, if I had a full hose, then there
22    could be about eight or nine gallons in that one
23    hose.  A lot of our deliveries were at night so I
24    couldn't tell you exactly what happened.  The only
25    thing I can tell is what I had seen them do from
```

Page 44

```
 1    time to time when I had daytime deliveries.  It was
 2    just common practice, that's all.
 3         Q.  It says in the days before the spill
 4    bucket we averaged about 11 deliveries a month.
 5         A.  That's correct, yes.
 6         Q.  And those deliveries at the time that were
 7    branded Sunoco were made mostly by a Sunoco truck?
 8         A.  To the best of my knowledge, yes.
 9         Q.  Did you have any sort of containment
10    system on the ground like a bumper or a curb to
11    prevent gasoline from running off the concrete pad
12    or the UST's?
13         A.  No.
14         Q.  What would you do if you saw gasoline
15    spilled or released from the driver hose?
16         A.  It would be on the ground; we'd probably
17    assist in trying to mop it up a little bit so it
18    wouldn't spread all over the place.  But if he was
19    dumping it into the ground, there would be no way of
20    doing anything about it, it just disappears into the
21    dirt.
22         Q.  So you saw -- did you see spills of
23    gasoline or release of the gasoline from the driver
24    hose...
25         A.  Oh, sure, yes.
```

Page 45

```
 1         Q.  I'm sorry, let me just finish my question.
 2         A.  I'm sorry.
 3         Q.  ...to the ground beyond the concrete pad,
 4    around the UST's?
 5         A.  No, not beyond the concrete pad, no.  It
 6    would be quickly contained, all right, if they did
 7    have some sort of a mishap.  There was a situation,
 8    and I believe it was with Sunoco, and I wish I could
 9    document this, but we had gotten deliveries every
10    Friday for a time period for about a month or so,
11    and it was just one of those weird things, it was
12    constantly raining.  And the driver who was
13    delivering, was the same driver in all cases.  All
14    right.  And he started -- he just took -- I know he
15    got annoyed because he was the guy getting soaking
16    wet.  All right.  And again, I wish I could document
17    this completely.  But I received a phone call, my
18    inventory didn't check out one day for about three
19    hundred gallons of gasoline.  I was short.  So I
20    called the terminal and the terminal would not --
21    you know, wouldn't confirm what I was saying at that
22    particular time, but I did have some friends, some
23    drivers were friends because, you know, they'd come
24    up to the building, we kept somewhat of a rapport
25    because that was important.  And one driver said,
```

Page 46

1 call the terminal and check to see what happened
2 last night or the night -- the other night. So I
3 said what happened. He said, well, they have it on
4 record that the guy didn't deliver all of your
5 gasoline, and when he went back to the terminal,
6 he's filling the next load, he overfilled and it was
7 on film, on camera. They subsequently reimbursed me
8 for the shortage of gasoline that I had claimed that
9 I never received. Notwithstanding that, this guy, I
10 would, you know, I'd always come up short on his
11 deliveries, particularly with that intense rain. It
12 was just one of those time periods. I can remember
13 that. And it sticks out, you know, prevalently -- a
14 lot. Anyway, and this guy just had an attitude and
15 that was all there was to it. I think he was
16 subsequently fired.
17     Q. You said you called the terminal. Do you
18 remember what terminal you called?
19     A. I believe they delivered from Newark.
20     Q. Do you recall who you spoke with?
21     A. No, not at all, no.
22     Q. During the time your station was branded
23 Sunoco, do you recall any other examples of
24 instances of gasoline being spilled at your station?
25     A. No, you just had situations where you

Page 47

1 might get into a hassle with some of the drivers
2 because they didn't like the way we had to deliver
3 and they would take a little bit of an attitude
4 because they had to work a little harder. So if
5 during the day I could always control what was
6 happening; at night I had no controls, none
7 whatsoever. i had no security cameras or anything of
8 that nature.
9     Q. When gasoline was released out of the fill
10 port where the hose from the delivery truck, who
11 typically cleaned up that gasoline?
12     MR. JACOBI: I'm going to object to the
13 form.
14     MS. HANEBUTT: And time frame.
15     Q. When it was a Sunoco branded station, who
16 typically would clean up the spills of gasoline at
17 your station?
18     A. I guess we would because the drivers
19 didn't have any material to clean with at that
20 particular time the way they have now. And when you
21 talk about spilling the gasoline, generally speaking
22 not come out to the ground but it would be dumped
23 into the hole which was opened and there was dirt
24 there, just, you know. So a spill onto the ground
25 would be almost non-existent at that particular

Page 48

1 time. All right.
2     Q. So you're saying typically the spills form
3 the hose would be underground, below the concrete
4 pad?
5     MS. HANEBUTT: Objection to form.
6     Q. Correct me if I'm wrong, is that what
7 you're saying?
8     A. Yes, exactly, you have a four inch pipe in
9 a 12 inch hole or a 14 inch hole, you have space. A
10 significant amount of space between the receiving
11 port and the concrete pad. If the man disconnected
12 the hose and there was still gasoline in the hose,
13 he didn't bother to bring it over here, he would
14 just let it sit here, drain out into the ground,
15 shake it, rattle it, whatever he would do, and then
16 he'd put it back on to the truck, all right. So the
17 chances of it getting on the concrete or on the
18 apron was not so great, but it did go into the hole
19 that was open. If I could show you a diagram but I
20 can't because it's, you know, you have to accept
21 what I'm trying to picture for you. I'm right
22 brain, not left brain, I can't give you a good
23 picture. Sorry.
24     Q. Is a spill bucket designed to capture that
25 sort of spill of gasoline?

Page 49

1     A. Yes. That would be one of the main
2 reasons why they went into spill buckets because
3 they knew that the gasoline was being dumped into
4 the ground. And I know if I had a situation where
5 somebody was contaminating my area, I'd want to stop
6 it. And that's how I would do it. By containment.
7 That's what we subsequently did. We meaning the
8 USA.
9     Q. Do you recall ever being made aware of any
10 leaks from the underground storage tanks at your
11 station during the time it was branded Sunoco?
12     A. No, no.
13     Q. Do you recall being made aware of any
14 leaks from the pipes connecting the underground
15 storage tanks to the dispensers during the time your
16 station was branded Sunoco?
17     A. No.
18     Q. Did Sunoco ever give you any training
19 regarding safeguards against leaks of gasoline
20 containing MTBE while you were branded Sunoco?
21     A. No.
22     Q. Did Sunoco ever give you any warnings
23 regarding environmental contamination from gasoline
24 containing MTBE when you were branded Sunoco?
25     A. No.

13 (Pages 46 to 49)

Page 54

1    A.  Yes.
2    Q.  What brand of gasoline?
3    A.  Texaco gasoline.
4    Q.  On the back of the eighth page is Bates
5    No. SH-NJ-XX-065160. Did you find that page?
6    A.  560, okay, yeah.
7    Q.  It says "Star Enterprise Retailer Credit
8    Card Agreements." And on the second page of this
9    document is a signature line. Is that your
10   signature?
11   A.  Yes.
12   Q.  If you look at the paragraph one on the
13   first page. It says "Star grants to retailer and/or
14   retail outlets Retailer operates or serves the
15   privilege of honoring valid Texaco credit cards."
16   Do you recall if you accepted Texaco credit cards at
17   the station at the time of this...
18   A.  Yes.
19   Q.  Okay. If you turn two more pages. It's
20   the page Bates labeled SH-NJ-XX-065162. It says
21   Exhibit on the top. Dated October 1st, 1991. Is
22   that your signature at the bottom?
23   A.  Yes.
24   Q.  It says, "I hereby authorize you to have
25   your representative make motor fuel deliveries to my

Page 55

1    retail facility at any time." Do you recall, first
2    of all, who delivered your gasoline when it was
3    branded Texaco?
4    A.  Again, for the most part Texaco Refining
5    brought the gasoline, their own trucks.
6    Q.  And were you present when the deliveries
7    were made?
8    A.  Sometimes.
9    Q.  How often was gasoline delivered when it
10   was a Texaco branded station?
11   A.  We were then also doing about a million
12   gallons a year so that would be ten or eleven
13   deliveries a month.
14   Q.  Do you recall if during the time you were
15   a branded Texaco station you sold gasoline
16   containing MTBE?
17   A.  No.
18   Q.  No, you don't recall?
19   A.  I do not recall. The only thing I can
20   remember is the first indication that we had MTBE
21   was the dating was when we received those stick-on
22   information from the -- they were stick-ons to the
23   dispensers. And we got that from the New Jersey
24   Gasoline Retailers Association; otherwise I have no
25   knowledge of MTBE at all.

Page 56

1            (Whereupon, Deposition Exhibit
2            No. 11 was marked for
3            identification.)
4    Q.  Handing you what's been marked as J.
5    Costello 11. If you'd take a look at that. Go
6    ahead and mark these as exhibits as well.
7            (Whereupon, Deposition Exhibit
8            No. 12 was marked for
9            identification.)
10           (Whereupon, Deposition Exhibit
11           No. 13 was marked for
12           identification.)
13   Q.  Handing you what's been marked as J.
14   Costello 12 and J. Costello 13. Have you seen these
15   documents before?
16   A.  I have to say probably so. I can't answer
17   yes or no because it's an MSDS and I used to save
18   the MSDS's that I received.
19   Q.  So Exhibit 11 says Texaco Material Safety
20   Data Sheets, dated issued 1997-07-01, Bates No.
21   Skyline004345. Exhibit 12 has the same
22   identifications. It appears to be a Material Safety
23   Data Sheet for unleaded premium gasoline. The Bates
24   No. is Skyline 004357. And Exhibit 13, the same
25   identification, appears to be a Material Safety Data

Page 57

1    Sheet for unleaded mid-grade. Skyline Bates No.
2    004369. Now, you testified that you maintained
3    MSDS's in a filing system; is that correct?
4    A.  Yes.
5    Q.  And it appears that these documents were
6    provided by your company, correct?
7    A.  Yes. May I -- Island Transportation were
8    the other delivery carriers. It just came to me,
9    I'm sorry.
10   Q.  That's okay.
11   A.  The mind is -- it's wasted sometimes. All
12   right. They were the biggest outside carrier at the
13   time, Island Transportation. That's why I said they
14   came out of Long Island.
15   Q.  And that was one from Long Island?
16   A.  That's correct, yes.
17   Q.  And to the best of you recollection they
18   delivered Sunoco branded gasoline to your station?
19   A.  And/or Texaco. They were a universal
20   carrier for oil products, okay.
21   Q.  Did they ever deliver CITGO brand gasoline
22   to your station?
23   A.  No. CITGO's an altogether different
24   story.
25   Q.  We'll get to that in a little while.

Deposition of Joseph Costello  /  August 2, 2011

Page 86

1    A.  No.
2    Q.  Were you ever made aware of any leaks from
3  the underground storage tanks during the time your
4  station was branded CITGO?
5    MR. JACOBI:  Object to the form.
6    A.  No.
7        (Whereupon, Deposition Exhibit
8        No. 22 was marked for
9        identification.)
10   Q.  I'm handing you what's been marked as J.
11  Costello 22.  Have you seen this document before?
12   MR. JACOBI:  Sorry, can we go off the
13  record.
14   MR. STEEVES:  Sure.
15   THE VIDEOGRAPHER:  The time I have is
16  approximately 12:15 p.m. and we are going off
17  the record.
18       (Whereupon, a recess
19       was taken.)
20   THE VIDEOGRAPHER:  The time I have is
21  approximately 12:21 p.m. and we are back on the
22  record.
23  BY MR. STEEVES:
24   Q.  Mr. Costello, before we went off the
25  record I handed you what was marked as Exhibit J.

Page 87

1  Costello 22.  Off the record we had a discussion
2  regarding potential privilege issues associated with
3  this document.  Can you just confirm for the record
4  that you intended to produce a document and you're
5  waiving any privilege that may be associated with
6  it?
7    A.  Yes.
8    Q.  I'll identify the document for the record.
9  It's Bates labeled Skyline 003829, and it has
10  Skyline Service Center letterhead at the top of the
11  document.  Mr. Costello, have you seen this document
12  before?
13   A.  Yes.
14   Q.  It looks like -- well, at the bottom it
15  says "Very truly yours, Michael J. Costello."
16  Michael Costello is your son, correct?
17   A.  Yes.
18   Q.  Did Michael draw up this document?
19   A.  No, I drew the document.  He's just
20  signing it.
21   Q.  Who is Preferred Tank Group?
22   A.  They handled the 2003 changeover to
23  secondary containment from the steel to the
24  fiberglass tanks, including all of the new
25  containment sumps and the setup on double wall

Page 88

1  container piping from the tanks to the dispensers.
2    Q.  And you have a list of it looks like five
3  items you were requesting action on by Preferred
4  Tank Group; is that correct?
5    A.  Yes.
6    Q.  No. 1 is, "All holes you drilled in the
7  property should be filled, particularly the holes at
8  the pump island."  What holes were you referencing
9  there?
10   A.  They never did a proper pouring of the
11  cement so water would accumulate and just sit there,
12  and they wanted to drill holes in the thing so that
13  the water would run through into the ground.  We
14  objected to that because at the islands you have
15  gasoline spills, even if they're only slight spills,
16  they were spills.  And the gasoline would float on
17  the water and then when you pull the water down
18  you're going to pull down the gasoline too.  I did
19  not want that in the ground, no way.
20   Q.  When were those holes originally drilled?
21   A.  Subsequent to the installation.  All
22  right.  They collected it since then, I believe.
23  They re-did the apron to a degree.  They put some
24  superficial covering.
25   Q.  You said subsequent to the installation,

Page 89

1  subsequent to the installation of the new
2  underground storage tanks; is that correct?
3    A.  We're talking not about the tanks but
4  we're talking about the piping.  The piping from the
5  tanks to the dispensers.  That's the area that we're
6  talking about.
7    Q.  And that was the piping that was replaced
8  in 1993?
9    A.  No, no, no.  No.  This piping came -- the
10  piping in 1993, okay, there was no piping done in
11  '93.  '93 we had the containment sumps put in and
12  you had the spill buckets put in.  And was that --
13  no.  Let me get my dates straight again, all right.
14  '88, '89, that was stage II.  '93, okay, '93 were
15  the spill buckets and the containment sumps.  All
16  right.  That was all done theoretically above
17  ground.  All right.  Except for the containment
18  sumps, which would be put in about four or five feet
19  below ground, six feet below ground to hold the --
20  to hold the piping, to keep it dry.  All right.
21  Because there were electronic probes to it.  Here we
22  changed over the complete system in 2003; we went
23  from single wall containment to double wall
24  containment, which included the tanks, the sumps,
25  new buckets and double wall piping to the

Deposition of Joseph Costello  /  August 2, 2011

Page 98

1  Q. It's dated July 16, 1998. And under the
2  description of violations, it says, Failure to
3  verify ATG for release of detection monitoring.
4  What is ATG?
5  A. I'm not sure.
6  Q. And it says...
7  A. Red Jacket in parenthesis, that's my
8  handwriting, so obviously it has to do with the
9  automatic something or other, and that refers to the
10  piece of equipment that we had on the wall. That's
11  why I have it in parenthesis, Red Jacket.
12  Q. And it says failure to perform RDM for
13  product lines. What's RDM?
14  MS. HANEBUTT: Objection; lack of
15  foundation.
16  A. I'm not sure. Okay. I could guess at
17  what it is, is that it doesn't have line leak
18  detectors, all right. Excuse me.
19  Q. Well, do you recall if Skyline Service
20  Station ever addressed the issues identified in the
21  description violations?
22  A. Guaranteed we did, guaranteed, because we
23  received no fines or anything like that, so I know
24  we corrected whatever there was. I think I remember
25  this. We didn't have some documentation posted on

Page 99

1  the wall that we were supposed to have in case of a
2  release, who to respond to, who to call, of the
3  people that were supposed to be notified if there
4  was a release of any sort. And I didn't have that
5  posted, and I just had to make one up. That's all
6  that was.
7  (Whereupon, Deposition Exhibit
8  No. 25 was marked for
9  identification.)
10  Q. Going out of order here, but I just wanted
11  to, if you could look at this document quickly, it
12  says, that I've marked as J. Costello 25. Appears
13  to be handwritten notes, Bates labeled
14  Skyline001918. Have you seen these documents
15  before?
16  A. Yes.
17  Q. Were they prepared by you?
18  A. Yes.
19  Q. Were they produced from your files?
20  A. Yes.
21  Q. Were the entries on these documents
22  maintained in the ordinary course of Skyline's
23  business?
24  A. Yes.
25  Q. That's all I have on that.

Page 100

1  (Whereupon, Deposition Exhibit
2  No. 26 was marked for
3  identification.)
4  Q. Handing you what is marked as Exhibit 26.
5  And I think I only have one copy of this as well,
6  but this is exhibits from the previous Costello
7  deposition. It's the correspondence...
8  MS. HANEBUTT: I have it.
9  Q. ...from Zurich, dated December 14, 2005.
10  Bates No. Skyline 002645. Have you seen this
11  document before?
12  A. Yes.
13  Q. Did you apply for insurance to cover the
14  contamination at the Skyline Service Station?
15  A. Yes.
16  Q. Did you receive coverage?
17  A. Yes.
18  Q. Has that policy paid out at all?
19  A. No.
20  Q. Do you know how much your coverage was
21  for?
22  A. I believe it was the standard coverage
23  that was mandated by law, one million dollars worth
24  of on-site remediation and one million dollars
25  off-site, so with the deductible of I believe it was

Page 101

1  ten thousand dollars.
2  Q. Was this coverage provided by Zurich?
3  A. Yes.
4  Q. If you look at the bottom of the first
5  page, "According to our investigation and
6  information provided, there have been two reported
7  releases." And then it details a release in October
8  of '98.
9  A. That's one, yes.
10  Q. And then a second release, which is on the
11  second page, reported on August 5th, 2003.
12  A. That's sort of a misnomer. There was
13  never a release. That's why they denied the claim.
14  Typical insurance company.
15  Q. So the claim was paid out or was not paid
16  out?
17  A. Was not paid out.
18  MR. STEEVES: Okay. I don't have any
19  other questions.
20  MS. HANEBUTT: Okay.
21  THE WITNESS: Excuse me, should I give
22  these back?
23  MR. STEEVES: Should hold onto those.
24  THE WITNESS: Okay.
25  MS. HANEBUTT: But don't take them home

26 (Pages 98 to 101)

DEPOBOOK REPORTING SERVICES, LLC  (800) 830-8885

Page 258

1    Q.   Earlier you stated that if there was a
2   spill or release of gasoline at your station,
3   regardless of whether there's MTBE in it, you would
4   clean it up, correct?
5    A.   Yes.  Can I give you an answer there, a
6   reason for it?
7    Q.   Sure.
8    A.   If it gets into the blacktop, it's ruining
9   my blacktop so it would be to my benefit to clean it
10  immediately.  If it's on the concrete, it's going to
11  rot the concrete.  I don't want things like that
12  hanging around.  Now, this is a very, very drawn
13  out, stretched out answer.  The question that's
14  trying to narrow me down, all right.  Yes, of course
15  I would clean it up.  You know.  I'd clean up oil
16  for fear somebody would walk on it and slip and
17  break a leg.  I'm responsible in a lawsuit.  All
18  right.  Same thing applies.  Somebody comes in, they
19  throw a cigarette into a puddle of gasoline, it
20  ignites, the car goes, who's responsible?  I am.
21  Not the guy who threw the cigarette, so therefore I
22  would take every diligent effort to keep things in a
23  safe and operative manner.  Does that answer your
24  question, sir?
25   Q.   Absolutely.  With regard to your earlier

Page 259

1   testimony related to the shaking off of the hose
2   when Sunoco or Texaco was filling the USTs, and
3   some of the product going into the soil around the
4   top of the UST, do you recall that testimony?
5    A.   I certainly do.
6    Q.   Have I restate it okay for you?
7    A.   Yeah, that's fine, yes.
8    Q.   How many times did you actually see that
9   occur?
10   A.   I can't qualify an answer to that.  It
11  might have been twenty times; it might have been two
12  times; it might have been thirty times.  And again,
13  I go back to the evening deliveries.  I don't know
14  what happened then.  And if they did it during the
15  day when I saw it, and let's say -- let's
16  hypothetically say I was getting 11 or 12 deliveries
17  a month, and let's say it only had two during the
18  day, and of the two only one I saw the guy actually
19  dumping gasoline in, that would mean with the
20  remaining ten, that there was a possibility of five
21  dumpings.  That's just simple math, sir.
22   Q.   Let's try to put a number on this.  Did
23  you see this happen less than 25 times?
24   A.   I can't answer the question.
25   Q.   Less than 30?

Page 260

1    A.   I still can't answer the question.
2    Q.   Less than 50?
3    A.   Let's go back.  Over a six-year period,
4   okay, getting 11 deliveries a month, if my math is
5   right, that's about 132 a year, and you're asking me
6   if about 50 percent of them, I noticed that they
7   were dumping after I had said that, 65 percent of
8   them came at night, I'd be lying, right.  So I can't
9   give -- I cannot give you a good answer as to how
10  many times I saw it.  I can only say I saw it.  And
11  I can say if it was being done during the day, it
12  would be done more at night because these guys want
13  to get the heck out of there and they want to get
14  home.  Counselor, you know, I've been in the
15  business a long time, all right.  So I can't answer
16  for what they may or may not have done.
17   Q.   You testified earlier that the truck was
18  parked within twenty feet of the tanks when they
19  refueled it at the time; is that correct?
20   A.   I did say that, yes.
21   Q.   Okay.  So that would mean at the most
22  there would be twenty feet or less of hose with gas
23  in it when it was shook out, correct?
24   A.   I don't know.  All of those hoses that
25  they delivered with are about 18 to 20 feet long,

Page 261

1   maybe 25.  I'm not sure.  Because they have them on
2   the side of the tankers, and they stretch almost the
3   length of the tanks and the tankers are 45 feet.  So
4   let's say they're thirty foot hoses, all right, or
5   35 foot hoses, again, now you're asking me something
6   that I'm not sure of, but I'm guessing.  They would
7   have to take the whole hose off to put it to the
8   spill port.  Correct?  Because they're going --
9   okay, then I'm going to be teaching you something.
10  They attach it to the truck, right, and then they're
11  opening the gravity feeds down, all right.  So now
12  you have 30, 35 feet of hose perhaps, whi0ch is
13  wound around, so now when they disconnect and if
14  they're only going to -- let's say they have only 18
15  feet of hose, now which would you think they'd most
16  likely do?  Disconnect at the truck and then walk
17  the whole thing, or would they disconnect and only
18  walk 12 or 15 feet?  You answer my question.  All
19  right.  It's logical, that's all I'm doing, is
20  presenting a logical situation to answer your
21  question.
22   Q.   When you witnessed the shaking out of the
23  hose during the years that Sunoco supplied gas to
24  236 Skyline Drive, what did you do about it?
25   A.   Absolutely nothing.  It was an accepted

Page 262

1  procedure. I didn't know that there was a
2  contamination problem with gasoline in the ground.
3  No way did I know that. To answer the question in
4  its entirety, people could dump their waste oil and
5  their gasoline in their back yard and get away with
6  it; nobody would say anything. You do it now you go
7  to jail. See, things change, all right, and they
8  change drastically. So when I'd see them dump the
9  gas, I'd say, okay, he's a buddy and he wants to get
10 out of here and he wants to go home to his wife,
11 because she's cooking a beautiful meal, I"m not
12 going to complain that he dropped 20 or 30 gallons
13 into the ground or ten or five gallons, whatever the
14 case may be, he's a friend. He's my delivering
15 driver. I know him. I break bread with him because
16 I like the guy. There was some jerks, I admit that,
17 but most of the guys were fairly nice guys and I
18 always treated them like human beings, you see.
19 That's an important thing, Patrick. I always
20 greeted them humanly. And I never looked down my
21 face at them. Okay. And that's why I used to get
22 good results form them. When they dump the gas do
23 you think they were doing it intentionally because
24 they were trying to hurt me? No, they just wanted
25 to get the hell home, that's all. I'm sorry I'm on

Page 263

1  my soapbox.
2      Q.  That's all right. When you saw this
3  occur, did you ever, for any of those instances, did
4  you ever investigate whether or not any product had
5  actually been put in the soil?
6      A.  Oh, if I saw the dropping, then of course,
7  I wouldn't have to investigate. I saw it. All
8  right. If I had a strong variation in any one day,
9  I would open my mouth to let them know I kept exact
10 inventory records. Now, the law said that
11 one-quarter of one percent was an acceptable
12 deviation, and they range in the warm months and
13 then in the cold months go differently. I'd always
14 keep my eye on it. If I was a hundred gallons
15 short, they knew about it. If I was ten gallons
16 short or five gallons short, I was within the
17 expansion-contraction thing, I'd not say anything.
18     Q.  In terms of the shaking off of the hose
19 into the soil that you mentioned, did you ever
20 attempt to quantify during any instances that you
21 witnessed how much product had been put in the soil?
22     A.  No, it wasn't important at the time. If I
23 saw it now I would. It would be different.
24     Q.  Did you ever attempt to clean it up in any
25 way?

Page 264

1      A.  No, it's in the ground. It disappears.
2  It's absorbed in the dirt and in the gravel. In the
3  letter from Zurich, they said there was overspill in
4  the gravel. Now, how did it get there? I didn't
5  put it there. And it had to be put there by
6  somebody other than me.
7      Q.  Did you report any -- when you witnessed
8  the product going in the soil, did you report it
9  Sunoco at all?
10     A.  No. Firstly, if there was something wrong
11 with that at the time, then I would never have let
12 the guy do it. See, I would have objected
13 immediately. And if the guy was doing it
14 intentionally, I'd report him immediately, and
15 particular if he was being flagrant about it. Like
16 the story I gave you with the guy who overloaded and
17 it was raining hard so he figured the heck with
18 them, and he went back with three hundred gallons of
19 my gasoline, which then overflowed at the terminal
20 and they told me about it because I did have
21 friends, as I just mentioned before. I was always
22 nice to these guys. They said, "Joe, look into it,"
23 so I did, okay. And we're going on a tangent, I'm
24 sorry.
25     Q.  Let's go there for a second. Three

Page 265

1  hundred gallons was actually returned...
2      A.  I don't remember if it was 300, I'm sorry.
3      Q.  Well, approximately 300.
4      A.  There was a substantial amount of gas
5  which they subsequently paid me for.
6      Q.  Because it was returned to the terminal?
7      A.  It was spilled over at the terminal,
8  Patrick. Okay. What happened was, when the driver
9  came back -- there were procedures we used to follow
10 on some deliveries. You're supposed to climb the
11 truck and make sure there's no product left and so
12 on and so forth. All right. This was at night and
13 this guy was annoyed because he was there about
14 three or four weeks in a row and it rained like the
15 dickens. And, I don't know, I guess the rain caused
16 him to slip, and he was a jerk, he shouldn't have
17 done what he did. He went back to the terminal with
18 my gasoline in his truck. Right. And then he was
19 filling that port again and it overflowed and they
20 had it on tape. I got my money back because of it.
21     Q.  What I'm trying to understand, is the
22 three hundred gallons was not released into the
23 ground?
24     A.  Oh, no, it was released at the terminal.
25 Okay.

Page 290

1    Q.  Okay, and to be clear they was DEP?
2    A.  I'm sorry?
3    Q.  To be clear, when you say this is what
4  they would do, you mean DEP?
5    A.  He did say the attorneys for the
6  Department of Environmental Protection.
7    Q.  Did he give you a time frame for when that
8  would happen?
9    A.  He did not, no.
10    Q.  Did he ask you any additional information
11  about your Zurich Insurance policy or contact points
12  at Zurich?
13    A.  No, I left him a copy of the letter and
14  they read it and they made their own interpretation,
15  and they decided what they were going to do, not
16  what I wanted them to do.
17    Q.  And so that we're clear, when you say
18  they, you're talking about DEP?
19    A.  I am talking about the people at that
20  meeting.
21    Q.  Do you know if that was ever done?
22    A.  No, I do not know.
23    Q.  Have you had any additional contact with
24  Mr. Farro or anyone else from DEP with regard to the
25  Zurich issue?

Page 291

1    A.  I was going to call Ms. Teresa Hartig, I
2  was going to call her after I had this meeting to
3  see if there would be any conflicts involving
4  because I'm not going to turn over any rocks and
5  find out that there's something wrong, so I've been
6  very quiet about anything.  I didn't tell them that
7  I had a deposition to go to or anything of that
8  nature.  Absolutely nothing.  They don't know where
9  I am and what I'm doing.
10    Q.  Now this may seem silly because we just
11  said that you didn't have any conversations with
12  them, but just so I'm clear, you haven't received
13  any correspondence from DEP with regard to the
14  Zurich issues since that meeting?
15    A.  Oh, not at all, no.
16    Q.  Turning your attention to Exhibit 35 in
17  the big stack, which is an article entitled "DEP
18  said they will pay for new water line."  If you look
19  at the very end of the article, there's a notation,
20  "Carol Fletcher's Email address is
21  Fletcher@northjersey.com."
22    A.  Uh-huh.
23    Q.  Does that refresh your recollection as to
24  the name of the publication which this article
25  appears?

Page 292

1    A.  No, it does not.  You know, it's a local
2  paper and I can't remember the name of it and it
3  escapes me.
4    Q.  Is North Jersey a paper?
5    A.  I don't believe so, no.  It has -- I
6  believe it's -- like the West Milford Local or
7  something like that.  I'm sorry, I can't be more
8  informative.
9    Q.  That's fine.
10    A.  I have a question though.  Miss Fletcher
11  interviewed me a second time at my request, to hear
12  my end of the story.  My question is, why isn't that
13  found anywhere?  I mean, somebody dug this up
14  somewhere, then why wouldn't would you dig up the
15  other half.
16    Q.  Well, I can't testify on the record.  I
17  can represent to you that these documents were
18  obtained from Mr. Steeves' office.
19    A.  Okay.
20    Q.  With the understanding that they had been
21  obtained from Skyline.
22    A.  Okay.
23    Q.  So if Skyline has them and have produced
24  them to Mr. Steeves, they would have come to us.
25    MR. JACOBI:  In terms of whether or not it

Page 293

1  was produced, I believe it was.  To the extent
2  that constitutes testimony, you can move to
3  strike it, but I believe it was produced.
4    THE WITNESS:  (Inaudible)  Thank you, I
5  was just curious, that's all.
6    MR. JACOBI:  We're fair and balanced.
7    Q.  Any overfills or spills into the ground
8  during deliveries by Texaco trucks, with regard to
9  those types of incidents, you never referred any of
10  that to Star Enterprises; is that accurate?  Let me
11  start over.  That's a terrible question.
12    A.  Kind of on the broad side, okay.
13    Q.  Well, there was testimony earlier today
14  that any overfills or delivery spills during the
15  Sunoco years were not report back to Sunoco because
16  you were friendly with the drivers and that's just
17  how things were and it wasn't a big deal to you.  Is
18  that accurate?
19    A.  That's accurate, yes.
20    Q.  Is the same true for the period of time
21  during which Skyline had a contract with Star
22  Enterprise?
23    A.  It would all depend on when we installed
24  the spill buckets.  I believe they were in 1998, all
25  right, or '95, '96.  So there was a possibility that

74  (Pages 290 to 293)

Page 294

1 the same thing applied to Texaco, all right, because
2 I believe I got the sumps and the spill buckets
3 during the reign of Texaco. If you don't mind my
4 using that expression.
5    Q.   Is it fair to say that no delivery
6 overfills were reported to Star Enterprise prior to
7 the installation of the spill bucket?
8    A.   Probably, that's good, that's -- yes,
9 okay. I would not have reported it. Yes, I would
10 have done the exact same thing unless some guy was
11 very flagrant and let's say he was standing there
12 for ten minutes dumping gasoline in a hole. So then
13 I know that he was shorting my delivery and
14 actually, you know, it wasn't a heck of a lot, and
15 like it's not the money that we have right now, but
16 it would still, you know, be a fair amount of money.
17 So if it was only a buck a gallon, and if I lost two
18 hundred gallons, that was $200, and the $200, if you
19 do an extrapolation, is worth about 8 or $900 now,
20 so that sort of answers your question.
21    Q.   That's a hypothetical, though, that never
22 actually happened?
23    A.   Not to my knowledge, no.
24    Q.   And do you have any recollection of ever
25 reporting any overfill or delivery spills to Star

Page 295

1 Enterprise after the installation of the spill
2 bucket?
3    A.   The only thing I can refer back again to
4 is the -- that situation where with the raining and
5 the guy over -- you know, driving off with a couple
6 of hundred gallons of my gasoline. You know, I say
7 three hundred but, you know, don't hold that as
8 Gospel, and that could have been done during the
9 time that we had the overfill protection, right, and
10 he spilled what he spilled and he took the rest back
11 because he didn't want to stay there any longer.
12 That, again, is a possibility and it's not fact.
13    Q.   So you never explicitly reported any
14 spills or delivery overfills to Star Enterprises
15 after...
16    A.   I did not. I'm sorry, here we go again.
17    Q.   You never explicitly reported any delivery
18 overfills or spills to Star Enteprise after the
19 installation of the spill buckets...
20    A.   Not to my knowledge, no.
21    Q.   Okay. Did you ever obtain any minutes of
22 any meetings of the Borough of Ringwood related to
23 Skyline?
24    A.   No, but, you know, if there was anything
25 in the newspapers I was privy to reading it, that's

Page 296

1 all. Under the advice of my attorney, it was stay
2 clear of all of the publicity.
3            (Whereupon, Deposition Exhibit
4            No. 41 was marked for
5            identification.)
6    Q.   Mr. Costello, I'm going to hand what you
7 what's been marked as J. Costello Exhibit 41,
8 Skyline 003864. It is a newspaper article entitled,
9 "Gasoline station denies pollution," and there's a
10 handwritten date of 12-7, I think it says '04. I'm
11 going to ask you about that and I only have one
12 copy. Let me know when you've had a few minutes to
13 familiarize yourself with that.
14    A.   Okay, I've read it.
15    Q.   Okay. Have you ever seen that document
16 before?
17    A.   Yes.
18    Q.   Did you see it when it originally ran in
19 the newspaper?
20    A.   Probably so, yes.
21    Q.   Is that your handwriting with the date on
22 the document?
23    A.   I don't believe it is.
24    Q.   Does it look like your son's handwriting?
25    A.   Definitely not.

Page 297

1    Q.   Okay. He's got bad handwriting?
2    A.   No comment.
3    Q.   Okay. Well, we know all about Michael
4 now. We know how his housekeeping is and his
5 handwriting is.
6    A.   I already said he was left-handed and
7 Pamela took an affront to -- she let me know I was
8 way out of line.
9    Q.   Okay. So in an effort to speed this along
10 and also because I don't have a copy of the document
11 in front of me, is it accurate to say that that
12 article discusses a proposed lawsuit or planned
13 litigation on your behalf against the New Jersey
14 DEP?
15    A.   I believe in a prior article there was no
16 mention of suing the DEP, but suing the Town of
17 Ringwood.
18    Q.   Okay. And what does this article talk
19 about?
20    A.   For $10 million -- I'm sorry. "The
21 Borough Council and its professionals not only were
22 the prosecutor, judge and jury but convicted my
23 client and executed them," so in my opinion he was
24 still talking about going after the Borough of
25 Ringwood but not the DEP.

Deposition of Joseph Costello  /  August 2, 2011

Page 305

1                  CERTIFICATION OF NOTARY

2    I, Brian M. McDonald, the officer before whom the

3    foregoing deposition was taken, do hereby certify

4    that the witness whose testimony appears in the

5    foregoing deposition was duly sworn by me; that the

6    testimony of said witness was taken by me; that the

7    testimony of said witness was taken by me

8    stenographically and thereafter reduced to

9    typewriting by me; that said deposition· is a true

10   record of the testimony given by said witness; that

11   I am neither counsel for, related to, or employed by

12   any·of the parties to the action in which this

13   deposition is taken and further, that I am not a

14   relative or employee of any attorney or counsel

15   employed by the parties thereto, nor financially or

16   otherwise interested in the outcome of this action.

17

18                 _____

19                      Brian M. McDonald

20        Notary Public - Commonwealth of Virginia

21         My Commission Expires: June 30, 2015

22

23

24

25

DEPOBOOK REPORTING SERVICES, LLC (800) 830-8885

# EXHIBIT 5

Deposition of Michael Costello  /  July 20, 2011

Page 1

1               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
2

3    NEW JERSEY DEPARTMENT        :   Case No.
     OF ENVIRONMENTAL                 08-CIV-00312 (SAS)
4    PROTECTION,                  :
          Plaintiff,
5                                 :
          vs.
6                                 :
     ATLANTIC RICHFIELD CO., et
7    al,                          :

8         Defendants             :

9

10

11                   - - - -

12

13   VIDEOTAPED DEPOSITION OF MICHAEL COSTELLO

14               New Jersey Gasoline-C Store

15               66 Morris Avenue

16               Springfield, New Jersey 07081

17               July 20, 2001

18               10:25 a.m.

19

20   Reported by:  Barbara DeVico, CRR

21

22

23

24

25

Page 51

```
 1    branded Texaco, did you ever see any gasoline
 2    released or spilled during a delivery of gasoline?
 3                  MS. DENNIS:   Object to the form.
 4        A.       Yes.
 5        Q.       Can you describe it?
 6        A.       I can remember on at least one
 7    occasion the delivery truck removing fill pipe
 8    from the -- from the tanker truck to my tank
 9    ground, and I remember there was gasoline was
10    spilled out on the ground.
11        Q.       Do you recall the date of that
12    spill?
13        A.       Absolutely not.
14        Q.       Do you recall if there were any
15    spills of gasoline during delivery during the time
16    your station was branded Sunoco?
17        A.       I'm going to say no, because I
18    was -- again, earlier in the infancy of the
19    business I was inside for the most part, not
20    outside.  In the bays working.  I'm going to I
21    have to say I can't remember.
22        Q.       I hand you what's been marked as
23    Costello-8.
24                  (Document marked Exhibit
25    Costello-8 for identification.)
```

Deposition of Michael Costello  /  July 20, 2011

Page 63

1    myself.  My name is Pam Hanebutt.  I'm with a law

2    firm in Chicago, Eimer Stahl.  We represent the

3    Citgo entities.  I have a few questions by way of

4    follow-up.

5                    We talked a little bit about

6    Deposition Exhibit No. 1, which was the deposition

7    notice and the request for documents that we've

8    appended.

9                    What role did you play in

10   gathering documents to give to plaintiff's

11   counsel?

12        A.        You mean I physically went through

13   cases upon cases of boxes in storage.

14        Q.        Okay.  And are you the only one

15   that did that, or did your father also assist in

16   that effort?

17        A.        He also assisted.

18        Q.        Did anybody else assist in that

19   effort?

20        A.        No.

21        Q.        And to your knowledge, have you

22   provided, with the exception of that one yellow

23   binder of MSDSs that you mentioned, to the best of

24   your knowledge have you produced all of the

25   documents that you were asked to produce?

Deposition of Michael Costello / July 20, 2011

Page 64

```
 1        A.        As much as I could find at this
 2   point in time, yes.
 3        Q.        There isn't anything that you've
 4   held back?
 5        A.        No.  I definitely have not held
 6   anything back.  At least not knowingly, anyway.
 7        Q.        Okay.  And where are the documents
 8   physically located?  At the station?
 9        A.        At the facility, we have a storage
10   facility, a storage shed, rather.
11        Q.        Okay.  And when did you provide
12   the documents to plaintiff's counsel?
13        A.        Approximately a week ago.
14        Q.        And prior to the deposition, did
15   you speak with Mr. Steeves?
16        A.        Mr. Steeves?
17        Q.        Correct.
18        A.        Yes.
19        Q.        Okay.  What was discussed?
20        A.        Just where we would be meeting,
21   who we're going to be talking to and so on.  He
22   said just introduced himself, that was it.
23        Q.        Okay.  Did he describe the
24   litigation for you?
25        A.        No.
```

Deposition of Michael Costello / July 20, 2011

Page 65

```
 1        Q.        Did he tell you what the
 2   litigation was about?
 3        A.        Mr. Axline told me what the
 4   litigation was.
 5        Q.        So you also had a conversation
 6   with Mr. Axline?
 7        A.        Yes.
 8        Q.        When did that occur?
 9        A.        Approximately a month ago, maybe
10   two months ago.
11        Q.        Okay.  What did you and Mr. Axline
12   discuss?
13        A.        The possibility of me giving him
14   some documentation as far as the, my bill of
15   lading records and so on and so forth for gasoline
16   deliveries and supplies for the last 15 years,
17   whatever it was.
18        Q.        And did he discuss your
19   anticipated testimony with you?
20        A.        At some point he did, yes.
21        Q.        Okay.  What did he say?
22        A.        He asked if I would be willing to,
23   you know, be disposed and testify for the State of
24   New Jersey on behalf of the DEP.
25        Q.        Okay.  And did he tell you what
```

Page 66

```
 1    sort of testimony he was looking for?

 2         A.      No.  Just as far as, he asked

 3    if -- he said that the testimony I was going to

 4    give would be just about my knowledge of the gas

 5    station and the gas and so on and so forth.

 6         Q.      Okay.  And did he tell you that --

 7    well, strike that.

 8                 Are you being compensated in any

 9    way other than that whopping 40-dollar subpoena

10    fee that you were given, mileage?

11         A.      No.

12         Q.      Be sure to turn that in, by the

13    way.

14         A.      I didn't, actually.

15         Q.      Any other conversations with

16    Mr. Axline, Mr. Steeves or anyone on behalf of New

17    Jersey DEP?

18         A.      I talked to a young lady, Nickie.

19    I don't know Nickie's last name.

20         Q.      Okay.  Do you know where Nickie

21    works?

22         A.      With that firm, as far as I know.

23         Q.      And what, how did -- what was --

24    what was your conversation with Nickie about?

25         A.      She just kept confirming to give
```

Page 67

1    her the paperwork to her, which I didn't do.

2         Q.      Okay.  So she was sort of a whip

3    behind the documents?

4         A.      Exactly.  She was very nice, but

5    she would call me, "We really need that.  We

6    really need that."  I said, "I'm going to get to

7    it, I'm going to get to it."  I actually stayed

8    until like 4:00 in the morning and did it one

9    night.

10        Q.      Wow.

11        A.      Put it all together.

12        Q.      Definitely cash that subpoena

13   check.

14        A.      Okay.

15        Q.      Did Mr. -- prior to the

16   deposition, did Mr. Axline or Mr. Steeves or any

17   of the lawyers for New Jersey DEP send you any

18   documents to look at?

19        A.      Just this.

20        Q.      Just the deposition notice?

21        A.      Yes.

22        Q.      Did they suggest to you any

23   answers that you should give during the

24   deposition?

25        A.      No.

Deposition of Michael Costello / July 20, 2011

Page 106

```
 1    Texaco-cabbed truck.  So again, I didn't ask for
 2    registration, but I remember it was a black Texaco
 3    truck with a silver trailer with a Texaco emblem
 4    on the side of it.  So by that indication I would
 5    say it was probably a Texaco truck.
 6            Q.        Can you estimate for me the amount
 7    of fuel spilled in that incident?
 8            A.        Probably 15 gallons, maybe, 10, 15
 9    gallons, something like that.
10            Q.        And you cleaned it up immediately?
11            A.        Absolutely.
12            Q.        Are you aware of any other spills
13    involving a Texaco truck?
14            A.        As I said earlier, I can remember
15    a certain -- I wouldn't call them spills, but it
16    was hoses.  You would walk them out and they would
17    come out and the guy would -- because sometimes
18    you wouldn't turn the hose properly and you would
19    put the hose on the ground and it can drip out and
20    so on and so forth.
21            Do I remember that, yes, I do remember
22    that very vividly.  Small amounts, but enough that
23    you can see it.
24            Q.        We talked a little bit earlier
25    about trade associations.
```

Deposition of Michael Costello  /  July 20, 2011

Page 136

1                    C E R T I F I C A T E

2

3

4        I, BARBARA DE VICO,    a Certified Court

5    Reporter and Notary Public of the State of New

6    York, certify that the foregoing is a true and

7    accurate transcript of the deposition of MICHAEL

8    COSTELLO taken by and before me.

9        I further certify that I am neither attorney

10   or counsel for, or related to or employed by any

11   of the parties to the action in which the

12   deposition is taken, and further that I am not a

13   relative or employee of any attorney or counsel

14   employed in this case, nor am I financially

15   interested in the action.

16

17

18

19

20

21

22        _____

23        CERTIFIED COURT REPORTER
          NOTARY PUBLIC OF NEW JERSEY
24        CERTIFICATE NO. XI00764

25

# EXHIBIT 6

NORTHEASTERN REGION# 11
LOCATION# 13-005-614

Form S-207D (JV) (1-89)

# SALES AGREEMENT

Star Enterprise, a general partnership under the New York Uniform Partnership Act ("Seller") _____
  303 Fellowship Road, Moorestown, NJ 08057 _____ and
_____ Skyline Service Center, Inc. _____
(Purchaser), whose place of business is located at  236 Skyline Drive, Ringwood, NJ 07456 _____

enter into this SALES AGREEMENT.

**1. Sale.**

(a)   Seller agrees to sell and deliver or cause to be delivered, and Purchaser agrees to buy, receive and pay for motor fuel of the kind, grade, brand and quality generally sold by Seller at the time of delivery for resale by Purchaser;

(b)   Orders for motor fuels by Purchaser must be for quantities equivalent to a full truck transport load. Seller shall deliver motor fuels only in such amounts and at such times as it determines are available for delivery;

(c)   As to each motor fuel, for the term hereof, Purchaser agrees to purchase not less for each quarterly period than the minimum quantity set forth below and Seller shall not be obligated to sell more for any quarterly period than the maximum quantity set forth below (in thousands of gallons, unless otherwise indicated):

### Quarter January - March

| Product | | Min. | | Max. | |
|---|---|---|---|---|---|
| Texaco | Reg.Unleaded | 65,535 | gals. | 196,605 | gals. |
| Texaco | Unleaded Plus | 21,293 | gals. | 63,878 | gals. |
| Texaco | Super Unleaded | 40,673 | gals. | 122,018 | gals. |
| Texaco | _____ | _____ | gals. | _____ | gals. |
| Texaco | _____ | _____ | gals. | _____ | gals. |
| Texaco | _____ | _____ | gals. | _____ | gals. |
| Texaco | _____ | _____ | gals. | _____ | gals. |

INITIAL HERE

### Quarter April - June

| Product | | Min. | | Max. | |
|---|---|---|---|---|---|
| Texaco | Reg.Unleaded | 65,535 | gals. | 196,605 | gals. |
| Texaco | Unleaded Plus | 21,293 | gals. | 63,878 | gals. |
| Texaco | Super Unleaded | 40,673 | gals. | 122,018 | gals. |
| Texaco | _____ | _____ | gals. | _____ | gals. |
| Texaco | _____ | _____ | gals. | _____ | gals. |
| Texaco | _____ | _____ | gals. | _____ | gals. |
| Texaco | _____ | _____ | gals. | _____ | gals. |

INITIAL HERE

SKYLINE001395

Form S-2070 (JV) Page 2

| Quarter July - September | | |
|---|---|---|
| Product | Min. | Max. |
| Texaco Reg. Unleaded | 65,535 gals. | 196,605 gals. |
| Texaco Unleaded Plus | 21,293 gals. | 63,878 gals. |
| Texaco Super Unleaded | 40,673 gals. | 122,018 gals. |
| Texaco _____ | _____ gals. | _____ gals. |
| Texaco _____ | _____ gals. | _____ gals. |
| Texaco _____ | _____ gals. | _____ gals. |
| Texaco _____ | _____ gals. | _____ gals. |

INITIAL HERE

| Quarter October - December | | |
|---|---|---|
| Product | Min. | Max. |
| Texaco Reg. Unleaded | 65,535 gals. | 196,605 gals. |
| Texaco Unleaded Plus | 21,293 gals. | 63,878 gals. |
| Texaco Super Unleaded | 40,673 gals. | 122,018 gals. |
| Texaco _____ | _____ gals. | _____ gals. |
| Texaco _____ | _____ gals. | _____ gals. |
| Texaco _____ | _____ gals. | _____ gals. |
| Texaco _____ | _____ gals. | _____ gals. |

INITIAL HERE

Purchases permitted by Seller in excess of the quarterly maximum quantities shall not operate as a waiver of Seller's right to restrict purchases to such maximum quantities during any subsequent period. For any period less than a full calendar quarter, said quarterly minimums and maximums shall be reduced on a pro rata basis.

(d)   Purchaser agrees to maintain a sufficient inventory of each grade and brand of Texaco motor fuel offered to it by Seller so that it shall always have each grade and brand available for resale.

2.   **Point of Delivery.** Seller shall have the right to designate, by written notice to Purchaser, the point of delivery. Seller initially designates as such point 236 Skyline Drive, Ringwood, NJ 07456

3.   **Prices.** Prices for Texaco brand motor fuels sold hereunder, exclusive of all applicable taxes, shall be Seller's applicable retailer price for each such motor fuel in effect on the date and for the place and method of delivery. Such prices may be obtained at Seller's Sales Office. Seller reserves the right to change its prices without notice to Purchaser.  ✱ SEE ATTACHED RIDER LABELLED EXHIBIT 1.

4.   **Terms of Payment.** C.O.D.

INITIAL HERE

5.   **Duration of Agreement.** This Agreement shall remain in full force and effect from October 1, 1991   to   September 30, 1997   ; provided, however, that if this Agreement covers the sale of Texaco brand motor fuels for resale at premises leased by Seller to Purchaser, it shall automatically terminate upon termination, nonrenewal or expiration of such lease, and provided further, however, that upon the termination or expiration of the original term of this Agreement, Seller may consent to an extension of the term of this Agreement, subject to all the other terms and conditions of this Agreement, for an additional one-month period, at the end of which Seller may consent to further month-by-month extensions of the term of this Agreement in accordance with this paragraph. The parties agree that any extension pursuant to this Paragraph shall not be construed as a renewal of this Agreement under the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq.

6.   **Trademarks, Brands and Product Quality Maintenance.** Purchaser shall sell motor fuels purchased hereunder only under Texaco brand names and shall have the right to use the trademarks and brand names of Seller, but only for the purpose of properly identifying and advertising Texaco brand motor fuels handled by Purchaser, and in a manner and fashion satisfactory to Seller in Seller's sole judgment.

Purchaser will not allow or permit any Texaco brand motor fuels to be sold as Texaco brand motor fuels which are mislabeled, misbranded or contaminated by mixture or adulteration with each other or with any other material or motor fuel. Purchaser will not commingle any substance with a Texaco brand motor fuel and then sell it as a Texaco brand motor fuel. Purchaser will not allow or permit the sale of any product or motor fuel under a Texaco label or designation which is not a Texaco brand product or motor fuel, or is a grade of Texaco brand product or motor fuel other than described by the label or designation; nor will Purchaser use Seller's trademarks, trade names or brand names in a manner which deceives or cause a likelihood of confusion to the motoring public. Purchaser will allow Seller, its employes, agents or designees, to enter Purchaser's place of business at any time to obtain such samples, or conduct such tests or inspections as may, in Seller's judgment, be reasonably required to determine that Purchaser is complying with the aforesaid obligations. Purchaser shall cooperate with Seller in any investigation of any alleged violations of such allegations.



SKYLINE001396

Form S-207D (JV) Page 3

Purchaser agrees that Seller shall have the right to reasonably restrict the size and location of any signs displayed at the Purchaser's place of business.

7.   **Unleaded Product Integrity.**

(a)   Purchaser warrants and agrees that Purchaser (1) will not mix or allow unleaded Texaco brand motor fuels to be mixed with any motor fuels containing lead anti-knock agents and then sell it as unleaded Texaco brand motor fuel; and (2) will not store, transport or deliver unleaded Texaco brand motor fuels in or through any container, tank, pump, pipe or other element of its motor fuel storage or distribution system unless such facilities comply with all federal, state, and local government requirements;

(b)   Purchaser further warrants and agrees that Purchaser, its employes, agents or invitees, will not introduce, or cause or allow the introduction of leaded (containing unlawful amounts of lead or phosphorus) motor fuels into any motor vehicle which is labeled "UNLEADED GASOLINE ONLY" or which is equipped with a gasoline tank filler inlet which is designed for the introduction of unleaded motor fuel only;

(c)   Purchaser represents that it has received and read a copy of Seller's guidelines for the handling of unleaded motor fuels, or the current guidelines which may be substituted from time to time therefor, which are provided for Purchaser's information in order to make Purchaser aware of the proper handling procedures to assist it in complying with the warranties of the preceding Subparagraphs and the relevant Federal Environmental Protection Agency Regulations pertaining to unleaded motor fuels. These guidelines are attached hereto as Exhibit A and are made a part hereof. Purchaser warrants and agrees that Purchaser will implement the unleaded motor fuel handling procedures set forth in these guidelines, will apply those procedures to all unleaded Texaco brand motor fuels, and will otherwise comply with the terms and provisions of these guidelines;

(d)   Purchaser will allow Seller, its employes, agents or designees, to enter Purchaser's place of business at any time to obtain such samples, or conduct such tests or inspections as may, in Seller's sole judgment, be reasonably required to determine that Purchaser is complying with the aforesaid obligations. Purchaser shall cooperate with Seller in any investigation of any alleged violations of such obligations;

(e)   Purchaser agrees and warrants that Purchaser will sample and test the lead content of all tanks at its place of business containing unleaded Texaco brand motor fuels on a frequent and regular basis, to assure that said fuels are in compliance with relevant Federal Environmental Protection Agency Regulations pertaining to unleaded brand motor fuels. In the event that Purchaser sells unleaded Texaco brand motor fuels to any other person, firm or company for resale under Seller's trademark or brand name, Purchaser shall likewise sample and test on a regular and frequent basis the lead content of said buyer's unleaded Texaco brand motor fuels storage facilities. Puchaser shall keep accurate records of all such samples and tests, and said records shall be reasonably made available to Seller for inspection and copying upon demand. Purchaser shall immediately notify Seller if its tests indicate the presence of lead in excess of amounts allowed by law in any unleaded Texaco brand motor fuel storage facility, shall not sell or distribute said motor fuel as unleaded, and shall cause any such buyer to cease selling said motor fuel as unleaded;

(f)   Purchaser agrees that it will defend, indemnify and hold Seller harmless from and against all present and future claims, demands, suits, actions, proceedings, and litigation arising out of any alleged liability for Purchaser's storage, transportation or delivery of unleaded Texaco brand motor fuels in or through any container, tank, pump, pipe, or other element of its storage or distribution system or the introduction of leaded motor fuel into any motor vehicle tank or compartment which is labeled "UNLEADED GASOLINE ONLY." Purchaser further agrees that it will, on Seller's demand, promptly pay all losses, costs, damages, obligations, judgments, fines, penalties, expenses and fees suffered or incurred by Seller by reason of any such claims, demands, suits, actions, proceedings, or litigation, except those which are caused by the sole negligence of Seller or its employes;

(g)   Seller warrants that unleaded Texaco brand motor fuels purchased by Purchaser from Seller shall conform to Seller's specifications for same at the time of delivery. Purchaser shall notify Seller immediately of any claim for variance in quality, and Seller shall have an opportunity to inspect and investigate at any time thereafter. Failure of Purchaser to notify Seller or cooperate in any investigation shall operate as a waiver of any and all claims by the Purchaser hereunder.

8.   **Product Grades.** In the event Seller determines that it should make available to Purchaser a product or grade(s) of product different from those provided for herein, or should not make available to Purchaser a grade(s) of product provided for herein, Seller reserves the right at any time to discontinue supplying any such product covered by this Agreement and/or to substitute a different product or grade(s) of product therefor at any time during the term of this Agreement. In the event that any such substitution is made, any minimum and maximum quantities provided for the product substituted for shall apply to such replacement product or grade(s) of product and the price shall be Seller's applicable retailer price for such replacement product. Thereafter, Seller shall be relieved of any further liability or obligation to furnish the replaced and/or discontinued product or grade(s) of product.



Form S-207D (JV) Page 4

9.   **Market Withdrawal.** In the event Seller elects to withdraw from marketing of motor fuels in the area in which Purchaser's place of business is located, if applicable, in compliance with the provisions of the Petroleum Marketing Practices Act, 15 U.S.C., Section 2801, et seq. as may be amended from time to time, Seller may terminate this Agreement at any time without further liability on one hundred eighty (180) days written notice.

10.   **Deliveries.** Purchaser shall allow any shipments in transport trucks furnished by the Seller to be unloaded by Seller immediately upon arrival. Free time for unloading trucks of common or contract carriers will be that permitted in their tariffs and any time in excess of the free unloading time will be charged to Purchaser at the tariff rate. One hour free time will be allowed for unloading trucks owned or operated by Seller after which Purchaser will be charged six dollars ($6.00) per quarter hour or fraction thereof until the shipment is unloaded.

11.   **Force Majeure.** Unless otherwise expressly provided for in this Agreement, failure (in whole or in part) or delay on the part of either party in the performance of any of the obligations imposed upon such party hereunder shall be excused and such party shall not be liable for damages or otherwise on account thereof, when such failure or delay is the direct or indirect result of any of the following causes, whether or not existing at the date hereof, and whether or not reasonably within the contemplation of the parties at the date hereof, namely: Acts of God, earthquakes, fire, flood or the elements, malicious mischief, insurrection, riot, strikes, lockouts, boycotts, picketing, labor disturbances, public enemy, war (declared or undeclared), compliance with any federal, state or municipal law or with any regulation, order, rule, recommendation, request or suggestion (including, but not limited to, priority, rationing or allocation orders or regulations) of government agencies or authorities or representatives of any government (foreign or domestic) acting under claim or color of authority; total or partial failure or loss or shortage of all or any part of transportation facilities ordinarily available to and used by a party hereto in the performance of the obligations imposed by this Agreement, whether such facilities are such party's own or those of others; or, if failure or delay be that of Seller, total or partial loss or shortage of raw or component materials or products ordinarily required by Seller, the commandeering or requisitioning by civil or military authorities of any raw or component materials, products or facilities, including, but not limited to producing, manufacturing, transportation and delivery facilities; perils of navigation, even when occasioned by negligence, malfeasance, default, or errors in judgment of the pilot, master, mariners or other servants of the ship's owner; or any cause whatsoever beyond the control of either party, whether similar to or dissimilar from the causes enumerated.

·If by reason of any of said causes, Seller is unable to make deliveries to all of its customers (whether under contract or not), its failure in whole or in part to make deliveries to Purchaser, while delivering to others, shall not be a breach of this Agreement and in such event Seller may, but shall not be obligated to, prorate its available supply.

Upon cessation of the cause or causes for any such failure or delay, performance hereof shall be resumed, but such failure or delay shall not operate to extend the term of this Agreement nor obligate either party to make up deliveries or receipts, as the case may be.

Seller may suspend deliveries so long as its cost of performance is increased and the increased cost cannot be recovered by an equivalent increase in the price to be paid by Purchaser.

Nothing herein contained shall excuse Purchaser from paying Seller, when due, any amounts payable hereunder or pursuant hereto.

12.   **Practicality.**

(a)   In the event Seller's capacity to perform as to all or some of its customers, including Purchaser, becomes impractical in Seller's sole judgment for any reason whatsoever, Seller shall be relieved of its obligation to perform hereunder and shall not be obligated to Purchaser by reason of any delay in performance in whole or in part except to the extent of providing product to Purchaser on the same allocation formula (to be solely determined by Seller) as other purchasers in the same class of trade served from the same shipping point. Seller shall notify Purchaser in writing of its lack of capacity to perform hereunder. In such notice, Seller shall advise Purchaser the quantities, if any, Seller will be able to supply Purchaser in the foreseeable future. Within ten (10) days thereafter, Purchaser shall notify Seller whether it wishes to purchase such reduced quantities where Seller has advised that reduced quantities are available, otherwise this Agreement shall be suspended until Seller's capacity to perform, in Seller's judgment, is restored.

(b)   If Seller determines that it is unable to perform hereunder by reason of any federal, state, or local law or regulation, order, rule, recommendation, request or suggestion relating to priority, rationing or allocation of any product covered hereby, Seller may suspend this Agreement at any time on ten (10) days' notice to Purchaser until such time as Seller determines its ability to perform is restored. Nothing herein shall be construed to extend the contract period beyond the term of this Agreement or give rise to any cause of action by reason of any of the provisions of this Agreement. In the event the Agreement is suspended as herein provided, Seller shall not be obligated to make up shipments not made as a result of such suspension.



SKYLINE001398

Form S-2070 (JV) Page 5

13. **Disputes as to Amount Due.** If at any time during the term of this Agreement there shall arise between the parties hereto a dispute as to the amount payable by Purchaser to Seller for any of the products delivered or deliverable hereunder, Seller, at its option, may suspend all shipments hereunder until the dispute is settled to the satisfaction of Seller. Upon the written request of the Purchaser, Seller shall continue shipments at the prices which Seller has in effect on the date of shipment, and, as to shipments so made, such prices shall be final and conclusive, but shall not prejudice Purchaser's position regarding payment for any prior shipments. In the event shipments are suspended as herein provided, Seller shall not be obligated to make up shipments so suspended.

14. **Claims.** Any claims for defect or variance in quality or shortage in quantity shall be made, and Seller shall be notified and given an opportunity to inspect, within two (2) days after the product or goods are delivered, except that if delivery is made in equipment furnished by Seller such notice and opportunity shall be given before the product or goods are unloaded, and if delivery is made in equipment furnished by Purchaser, such notice and opportunity shall be given before the product or goods move from point of shipment. If equipment furnished by the Seller is in bad order or leaking, Purchaser shall notify Seller and secure examination by the authorized agent of seller as to the condition of the shipment before the same is unloaded. Failure of Purchaser to comply with these requirements shall operate as a waiver of any and all claims by Purchaser.

15. **Taxes.** Purchaser assumes responsibility for the payment of all federal, state and local taxes, licenses, fees and/or duties, including but not limited to: gross receipts taxes, occupation taxes, motor fuel taxes, sales and use taxes, franchise taxes, income taxes, ad valorem taxes, property taxes, inspection fees, license fees, and all other taxes, fees and licenses arising from the purchase, sale, transfer or disposition, holding for sale, transfer or disposition, transportation of or use of the goods covered by this Agreement. Should any government authority require Seller to pay taxes, penalties, or interest which under this Agreement are the responsibility of Purchaser, Purchaser agrees to reimburse Seller for all amounts so paid by Seller.

If any federal, state or local law authorizes Purchaser to purchase the goods covered by this Agreement without the payment of federal, state or local taxes, Purchaser agrees to furnish Seller evidence satisfactory to Seller of such authority. Until Purchaser presents Seller with acceptable evidence of such authority, Seller shall be entitled to bill Purchaser for all applicable taxes.

16. **Customer Complaints.** Purchaser will respond to any customer inquiries or complaints received by Purchaser or Seller, in connection with any customer served by Purchaser, and take reasonable action to correct or satisfactorily resolve each such inquiry or complaint.



INITIAL HERE

17. **Hours of Operation.** Purchaser agrees to remain open for the sale of Texaco brand motor fuels to the motoring public at least from (a) 6:00 a.m. to 10:00 p.m. on Monday through Friday, (b) 6:00 a.m. to 10:00 p.m. on Saturdays, and (c) 8:00 a.m. to 10:00 p.m. on Sundays and holidays, each and every week of the calendar year. Purchaser agrees to maintain these hours of operation during the term hereof.

INITIAL HERE

18. **Assignability.** It is understood and agreed that this Agreement is personal to Purchaser, and that Purchaser shall not sell, assign, give, grant, devise or otherwise dispose of Purchaser's interest in this Agreement in whole or in part, directly or indirectly, by operation of law or otherwise to any other person or entity. In the event Purchaser is a corporation, partnership or other business entity, this clause shall be deemed to apply to the sale, assignment or other disposition of the ownership of any share or interest in such corporation, partnership or business entity.   (Except as provided in 56:10-6 N.J.S.A.).

19. **Independent Status of Purchaser.** This Agreement shall not be deemed to reserve, give or grant to Seller any right to manage or control the day-to-day business of Purchaser and/or the retail outlet it operates, and neither Purchaser nor its employes or agents shall be agents or employes of Seller for any reason or for any purpose whatsoever. Purchaser is and shall at all times be an independent business entity that is free to select its customers, purchase and sell products from sources other than Seller, set its own selling prices and terms of sale, and generally conduct its business as it determines. Purchaser has the sole right to hire, control, supervise and discharge its employes and agents, and Purchaser shall have the sole right to control the performance of and the sole responsibility for any maintenance or automotive repair work performed at Purchaser's place of business.

20. **Indemnification.** Purchaser convenants and agrees to fully defend, protect, indemnify and hold harmless Seller, its employes and agents, from and against each and every claim, demand or cause of action and any liability, cost, expense (including, but not limited to, reasonable attorneys' fees and expenses incurred in defense of Seller) damage or loss in connection therewith, which may be made or asserted by Purchaser, Purchaser's employes or agents, or any third parties (including, but not limited to, Seller's agents, servants or employes) on account of personal injury or death or property damage caused by, arising out of, or in any way incidental to, or in connection with the performance hereunder, excluding such as may result solely from the Seller's negligence. Purchaser also agrees to make this indemnity for all costs, expenses (including, but not limited to, reasonable attorneys fees and expenses incurred in defense of Seller) and damages resulting from Purchaser's handling, storing, dispensing, or selling of non-Texaco brand motor fuels without regard to Seller's negligence.

⑤

SKYLINE001399

Form S-207D (JV) Page 5

21.   **Credit Cards.** By separate agreement, hereinafter referred to as the Credit Card Agreement, Seller has authorized Purchaser to accept Texaco Credit Cards. If Purchaser chooses to accept Texaco Credit Cards, Purchaser shall accept Texaco Credit Cards only in compliance with and for sales authorized by the Texaco Credit Card Agreement, Form S-452A, between Seller and Purchaser.

Purchaser acknowledges that Seller imposes a service charge and/or processing charge for the privilege of honoring Texaco Credit Cards or other credit cards authorized by Seller, if any, and Purchaser acknowledges that Seller reserves the right to discontinue the extension of credit (including the acceptance of Texaco Credit Cards) or to change the terms of such service charge and/or processing charge upon giving Purchaser at least thirty (30) days written notice.

22.   **Termination by Seller.** In addition to any other rights of termination which Seller may have, upon the occurrence of any of the following events, which events the parties agree are both reasonable and of material significance to the relationship hereunder, or upon such other grounds as are allowed under the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq., as amended from time to time, Seller may terminate this Agreement:

(a)   If Purchaser fails to observe Seller's rules, regulations, and requirements in effect at the delivery point at which delivery is made;

(b)   Upon default in the payment of any sum when due. In the event payment is not made when due, Seller may also at its option suspend making all further deliveries of all products until Purchaser's indebtedness is paid in full. The right to suspend deliveries does not operate as a waiver of Seller's right of termination for Purchaser's failure to pay for product when due and the obligation to pay for products delivered shall not be subject to offset for any claims against Seller except for nondelivery of products billed to Purchaser;

(c)   If Purchaser, its employes, agents or invitees, violate the covenants of or fail to comply with any of the provisions of Paragraph 7, Unleaded Product Integrity;

(d)   If Seller elects to withdraw from marketing of motor fuels in the area supplied by Purchaser as set forth in Paragraph 9, Market Withdrawal;

(e)   If Purchaser violates or fails to comply with the minimum standards as required by the provisions of Paragraph 23, Minimum Standards;

(f)   If Purchaser sells non-Texaco brand products or any mixture or adulteration of Texaco brand products with each other or with any other product or material under the trademarks or brand names of Seller, if Purchaser sells Texaco brand products under brand names or trademarks other than those of Seller, or if Purchaser uses Seller's identifications in a manner which deceives or causes a likelihood of confusion to the motoring public;

(g)   If Purchaser fails to take reasonable action to satisfy customer complaints as set forth in Paragraph 16, Customer Complaints;

(h)   If Purchaser violates the covenants of or fails to comply with any of the provisions of Paragraph 21, Credit Cards, or any provisions of the Credit Card Agreement;

(i)   If Purchaser fails to comply with any applicable laws, ordinances, regulations, judicial or administrative orders, or other legal requirements of all governmental authorities, federal, state, municipal or other authority, pertaining to this Agreement and the loading, unloading, storage, transportation and sale of petroleum products;

(j)   If Purchaser fails to maintain the quality integrity of Texaco brand motor fuels as set forth in Paragraph 6, Trademarks, Brands and Product Quality Maintenance;

(k)   If Purchaser attempts to sell, assign, give, grant, devise or otherwise dispose of Purchaser's interests in this Agreement;

(l)   If bankruptcy or insolvency proceedings are begun by or against Purchaser under the Bankruptcy Code or if Purchaser becomes insolvent;

(m)   Upon any breach of any of the terms, covenants, warranties, agreements or conditions of this Agreement or any other agreement that may be in effect between the parties;

(n)   If Purchaser makes or furnishes any false or misleading statement, or if Purchaser fails to disclose information to Seller, its agents or employes, concerning any material fact for the purpose of inducing Seller to make any payment, to deliver product, to extend or continue to extend or increase credit or to issue any credit memorandum to Purchaser or to any other party acting in concert with Purchaser;



Form S-207D (JV) Page 7

(o)   If Purchaser fails to comply with the provisions of Paragraph 1, Sale;

(p)   If Purchaser fails to comply with the provisions of Paragraph 17, Hours of Operation;

(q)   If the premises are vacant, unattended or not operated for the retail sale of motor fuels for seven (7) consecutive days or such lesser period which, under the fact and circumstances, constitutes an unreasonable period of time;

(r)   If the Purchaser fails to comply with the provisions of Paragraph 27, Health and Safety Information; or,

(s)   If Purchaser dies or becomes severely physically or mentally disabled.   (Except as provided in 56:10-6 N.J.S.A.).

INITIAL
HERE

Purchaser shall not suffer, permit or allow the occurrence of any of the events enumerated in Subparagraphs (a) through (r) above. The occurrence of any of the events enumerated in Subparagraphs (a) through (s) above of this Termination by Seller Paragraph shall constitute a failure by Purchaser to comply with a provision of this Agreement which is both reasonable and of material significance to the relationship between Seller and Purchaser, and shall constitute good cause to cancel or terminate this Agreement as the term "good cause" or any similar term is or may be used in any federal or state statute affecting the rights of the parties to terminate this Agreement. Seller's rights of termination for good cause as defined above shall not in any way be affected by any previous waiver, forbearance or course of dealing.

23.  Minimum Standards. Purchaser recognizes that it is in the interest of the parties to this Agreement for Purchaser to affirmatively conduct its business to reflect favorably on the said parties and to further promote public acceptance of Seller's brand name, trademarks and motor fuels. In recognition of such objectives, Purchaser agrees to conduct its operations in accordance with the minimum standards set forth below:

(a)   Purchaser's Place of Business

Purchaser's Place of Business, including building, restrooms, driveways, grass or planting areas, and storage areas shall be maintained inside and out in a clean and orderly appearance in accordance with the requirements of Seller's Standard of Appearance Manual, receipt of which is hereby acknowledged by Purchaser and made a part hereof;

(b)   Equipment

Retail outlets will be equipped to provide services comparable with competitive outlets of similar types, age, and style. All equipment will be kept neat and clean, and in good repair. Pumps and dispensers which dispense Seller's branded motor fuels shall be properly identified with Seller's product decals and other decals which may be required by applicable laws, rules and regulations. Seller's trademark signs, logos, and other identification will be kept clean, in good repair and painted where required according to Seller's specifications;

(c)   Personnel and Services

Purchaser and Purchaser's employes will at all times present a good personal appearance, observe clean, neat and safe working habits; render prompt, courteous and honest service to customers; and will take reasonable action to promote Seller's trade names and trademarks and the Texaco brand products they sell.

24.  Deidentification. If Purchaser's place of business is abandoned, unoccupied or not operated by Purchaser for a period of seven (7) consecutive days, Seller may, at its discretion, give Purchaser a written notice to remove all Texaco identification, including identifying Texaco colors, from Purchaser's place of business within five (5) days of said notice. Should Purchaser fail to comply with said notice, Seller is hereby authorized to enter upon Purchaser's place of business for the express purpose of removing all Texaco identification, including painting over all Texaco identifying colors.

25.  Insurance Requirements. Purchaser shall maintain, at its sole cost at all times during the term of this Agreement, the insurance coverage set forth below with companies satisfactory to Seller with policy limits not less than as stated:

(a)   Comprehensive General Liability Insurance including Products Liability with a limit of liability of not less than $500,000.00 per occurrence, Bodily Injury and Property Damage combined, or such limit as may be prescribed by Seller from time to time. This policy shall cover, among other risks, the contractual liability assumed under the indemnification provision set forth in this Agreement;

(b)   Automobile Liability for owned, hired, and non-owned automotive equipment with a limit of liability of not less than $500,000.00 per occurrence, Bodily Injury and Property Damage combined, or such limit as may be prescribed by the Seller from time to time;

(c)   Garagekeeper's Liability Insurance with a limit of not less than $25,000.00 per occurrence.



Form S-207D (JV) Page 8

Seller shall be named as a co-insured on said insurance coverages. A certificate naming Seller as co-insured, evidencing said insurance coverages, and specifically quoting the indemnification provision set forth in this Agreement, shall be delivered to Seller prior to the commencement of the Agreement. Such certificate shall provide that any change restricting or reducing coverage or the cancellation of any policies under which certificates are issued shall not be valid as respects Seller's interest therein until Seller has received a thirty (30) days notice in writing of such change or cancellation.

26. Governmental Price Control. If Seller's right to charge or receive any price payable pursuant hereto, or to revise any such price as herein provided, is restricted or prohibited by law, regulation or order of any governmental authority, Seller may, from time to time and upon thirty (30) days prior written notice to Purchaser, terminate the provisions of this Agreement insofar as they apply to the product(s)(s), the price(s) for which are so restricted or prohibited. Upon the expiration of the thirty (30) days, it is understood that any such products(s) shall be deemed deleted from this Agreement, but that this Agreement shall otherwise continue to remain in full force and effect.

27. Health and Safety Information. Purchaser shall cooperate with Seller to facilitate the dissemination of any health and safety information from Seller concerning the products sold hereunder. In that regard, upon request of Seller, Purchaser shall promptly provide to Seller an accurate listing of the types of uses made of products sold hereunder by Purchaser, and to provide accurate information in response to such requests Purchaser shall make reasonable efforts to determine the uses of products sold hereunder by Purchaser's customers. Purchaser shall also disseminate, to all persons who Purchaser can reasonably foresee may be exposed to possible hazards from the products sold hereunder, any health and safety information from Seller promptly after such information is furnished to Purchaser by Seller and in the manner prescribed by Seller, including but not limited to dispenser decals, portable container labels, fueling area signs, and information leaflets.

28. Notice. Notices from Seller to Purchaser shall be considered as properly given if personally delivered in writing to Purchaser or its place of business stated herein, or if placed in the United States mail, postage prepaid, addressed to Purchaser's place of business stated herein. Notices from Purchaser to Seller shall be considered properly given if placed in the United States mail, postage prepaid, addressed to Seller's place of business stated herein. The postmark date shall be the date of any notice sent by United States mail.

29. Waiver. The right of either party to require strict performance by the other of any and/or all obligations imposed upon the other by this Agreement shall not in any way be affected by any previous waiver, forbearance or course of dealing.

30. Severability. If for any reason any provision(s) contained in this Agreement is held to be invalid, illegal, or otherwise void by a court of competent jurisdiction, the remaining provisions of this Agreement shall not be affected and shall continue in full force and effect; provided, however, that in the event Seller loses the right to grant the use of the Texaco trademark, this Agreement shall terminate upon written notice.

31. Approval and Signing by Seller. This Agreement shall not be binding on Seller until approved and signed on its behalf by a duly authorized officer or employe. Commencement of performance hereunder prior to such approval and signing shall in no case be construed as a waiver by Seller of the foregoing requirements.

32. Entirety of Agreement. This Agreement is intended by the parties to be the final, complete and exclusive embodiment of their agreement about the matters covered herein. This Agreement may be altered, amended, or changed in any way only by a written instrument executed by both parties.

IN WITNESS WHEREOF Seller and Purchaser have hereunto subscribed their names.

WITNESS:

_S. A. Grace_
S.A. GRACE

WITNESS:

_S.A. Trunzo_
S.A. TRUNZO

Star Enterprise
(Seller)

By: _W. H. Trautmann_
D.H. TRAUTMANN — MARKETING MANAGER
Date Signed:_____

SKYLINE SERVICE CENTER, INC.

By: _Joseph A Costello_
JOSEPH A. (Purchaser) COSTELLO
President
Date Signed:____4/8/91____

SKYLINE001402

# EXHIBIT 7

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL          Master File
ETHER ("MTBE")                         No. 1:00-1898
                                       MDL 1358
This Document Relates to:              (SAS): M21-88
New Jersey Department of
Environmental Protection,
et al., v. Atlantic Richfield
Co., et al.
No. 08 Civ. 00312
_____/


-- -- --

TUESDAY, MAY 28, 2013
-- -- --


        Videotaped Deposition of ANTHONY BROWN,
Expert Witness, Volume I, held at the Law Offices of
Latham & Watkins LLP, 650 Town Center Drive,
Twenty-First Floor, Costa Mesa, California, beginning
at 9:10 a.m., before Sandra Bunch VanderPol, FAPR,
RMR, CRR, CSR #3032

-- -- --

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
Deps@golkow.com

1 videographer to change out the tape, kill two birds

2 with one stone.

3          THE WITNESS:  Sounds good.

4          THE VIDEOGRAPHER:  We are going off the

5 record.  This is the end of Unit media No. 1, and the

6 time is 11:23.

7          (Recess taken.)

8          THE VIDEOGRAPHER:  We are going back on the

9 record, and the time is 11:36 a.m.

10 BY MR. STACK:

11          Q.     Prior to your work on this case, had

12 you ever performed a site investigation at a gasoline

13 release site in New Jersey?

14          A.     Not, I had not.  Did you want to go

15 ask -- have me address the question you asked just

16 before the break?

17          Q.     If you can -- is it Appendix E or --

18          A.     Appendix E were the plume maps

19 generated as part of our estimation of the plume

20 volume.

21          Q.     Yes.

22          A.     And you asked if, in doing the plume

23 maps, we identified any other potential sources of

24 the contamination.

25          Q.     And the answer is?

Page 78

1          A.      For Skyline, no.  For Bakers Waldwick

2 for the MTBE, no.  For Shell Ridgewood, we did

3 identify other sources of MTBE contamination.

4          Q.      And those would be the NJDOT

5 maintenance yard and the two service stations?

6          A.      Yes.  The former Sunoco Service

7 Station, the Gulf Service Station, and also, I

8 believe, there was a documented release at the Joseph

9 Fergueson & Sons facility.

10         Q.      Okay.

11         A.      While we do not believe these

12 facilities contributed to the plume of MTBE to the

13 south of the Shell station, they are potential

14 contributing sources of MTBE.

15         Q.      Sunoco --

16         A.      Excuse me.

17         Q.      -- Bloomfield?

18         A.      To the Twinney Well.

19         Q.      To the Twinney Well?

20         A.      Yes.

21         Q.      Okay.

22         A.      For the Sunoco Station, no, we did

23 not identify any other potential sources.

24         For the Exxon Livingston Station, no, we did

25 not identify any other contaminant sources for the

Page 222

1                 CERTIFICATE OF REPORTER

2         I, SANDRA BUNCH VANDER POL, a Certified

3   Shorthand Reporter, hereby certify that the witness

4   in the foregoing deposition was by me duly sworn to

5   tell the truth, the whole truth and nothing but the

6   truth in the within-entitled cause;

7         That said deposition was taken down in

8   shorthand by me, a disinterested person, at the time

9   and place therein stated, and that the testimony of

10  the said witness was thereafter reduced to

11  typewriting, by computer, under my direction and

12  supervision;

13        That before completion of the deposition,

14  review of the transcript was requested.  If

15  requested, any changes made by the deponent (and

16  provided to the reporter) during the period allowed

17  are appended hereto.

18        I further certify that I am not of counsel or

19  attorney for either or any of the parties to the said

20  deposition, nor in any way interested in the event of

21  this cause, and that I am not related to any of the

22  parties thereto.

23  DATED:   JUNE 10, 2013

24        _____

              SANDRA BUNCH VANDER POL, CSR #3032

25

Page 223

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL          Master File
ETHER ("MTBE")                          No. 1:00-1898
                                        MDL 1358
This Document Relates to:               (SAS): M21-88
New Jersey Department of
Environmental Protection,
et al., v. Atlantic Richfield
Co., et al.
No. 08 Civ. 00312
_____/


-- -- --

WEDNESDAY, MAY 29, 2013
-- -- --


        Videotaped Deposition of ANTHONY BROWN,
Expert Witness, Volume II, held at the Law Offices of
Latham & Watkins LLP, 650 Town Center Drive,
Twenty-First Floor, Costa Mesa, California, beginning
at 9:07 a.m., before Sandra Bunch VanderPol, FAPR,
RMR, CRR, CSR #3032

-- -- --


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
Deps@golkow.com

Page 349

1              MR. MILLER:  Again, it's compound and

2 potentially requires a detailed review of each

3 report.  So it amounts to a memory test.

4              THE WITNESS:  I think the third one would

5 apply to many of them, in that many of the sites,

6 when releases were identified, particularly during

7 station upgrade or tank removal or programs, that

8 excavation activity would be conducted.  However,

9 clearly it was ineffective in preventing the

10 groundwater contamination.

11 BY MR. KRAUS:

12              Q.     Okay.  And that was years ago in the

13 case of each of the sites, correct?

14              A.     For most of the sites, it was years

15 ago, yes.  Some there were some more recent

16 excavations, also.

17              Q.     Okay.

18              A.     With respect to the first two

19 instances, there were expedited steps taken to

20 mitigate the threat to public health at certain

21 sites.  In some cases it was not remediation per se

22 in terms of the installation of a treatment system.

23              An example of this would be at the Skyline

24 Service Station where, upon a realization that there

25 were private water supply wells that had elevated

1 concentrations of the contaminants, initially

2 point-of-entry treatment systems were placed on those

3 wells and eventually the wells were, in fact,

4 destroyed and the individual properties connected to

5 municipal water.

6        So that -- those were actions taken to

7 address not only an imminent threat but an actual

8 threat to human health.

9        Q.      Excluding those actions which were

10 taken and completed, can you think of any examples

11 among the 11 trial sites where there was a human

12 health or ecological concern that would justify

13 expedited restoration?

14        MR. MILLER:  That's compound.  It calls for

15 an opinion on the health sciences.  Exceeds scope.

16        Go ahead.

17        THE WITNESS:  And you -- by excluding the

18 type of program at Skyline, you would also want me to

19 exclude the HP Delta similar program?

20 BY MR. KRAUS:

21        Q.      Yes.  And any instance where

22 contaminated wells were replaced by either a

23 treatment or an alternate water supply.

24        A.      I would have to go through each of

25 the Site Summary Reports to address that question

Page 429

1                    CERTIFICATE OF REPORTER

2          I, SANDRA BUNCH VANDER POL, a Certified

3   Shorthand Reporter, hereby certify that the witness

4   in the foregoing deposition was by me duly sworn to

5   tell the truth, the whole truth and nothing but the

6   truth in the within-entitled cause;

7          That said deposition was taken down in

8   shorthand by me, a disinterested person, at the time

9   and place therein stated, and that the testimony of

10  the said witness was thereafter reduced to

11  typewriting, by computer, under my direction and

12  supervision;

13         That before completion of the deposition,

14  review of the transcript was requested.  If

15  requested, any changes made by the deponent (and

16  provided to the reporter) during the period allowed

17  are appended hereto.

18         I further certify that I am not of counsel or

19  attorney for either or any of the parties to the said

20  deposition, nor in any way interested in the event of

21  this cause, and that I am not related to any of the

22  parties thereto.

23  DATED:  JUNE 10, 2013

24             _____

                SANDRA BUNCH VANDER POL, CSR #3032

25

# EXHIBIT 8



LEXISNEXIS® FILE & SERVE
23663820
E-SERVICE
Feb 6 2009
3:50PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

.............................................................X

IN RE METHYL TERTIARY BUTYL ETHER    :     Master File No. 1:00-1898
PRODUCTS LIABILITY LITIGATION        :     MDL 1358 (SAS)
                                     :     M 21-88
.............................................................X
                                     :
                                     :     DEFENDANT CHEVRON U.S.A.
This document pertains to:           :     INC. AND CHEVRONTEXACO
                                     :     CORPORATION'S CMO 45
*New Jersey Department of Environmental*  :     RESPONSES
*Protection, et al. v. Atlantic Richfield Co., et al.,*  :
*08 Civ. 00312*                      :
                                     :
.............................................................X

Defendants Chevron U.S.A. Inc. and ChevronTexaco Corporation (n/k/a Chevron

Corporation) (collectively "Chevron" or "Defendant"),[1] by and through their attorneys, provide

the following objections and responses pursuant to Case Management Order No. 45.

<u>PRELIMINARY STATEMENT</u>

Chevron has not marketed any gasoline in the relevant geographic area for *New Jersey*

*Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.* (the "RGA")

since 1986, when Chevron sold substantially all of its marketing facilities and assets in the

Northeast, including its legacy Chevron U.S.A. Inc. retail stations, and its legacy Gulf Oil

Corporation ("Gulf") retail stations, to Cumberland Farms. In November 2005, Chevron entered

into a settlement with the New Jersey DEP (the "Settlement"), whereby the DEP received what it

acknowledged was payment for 100% of groundwater natural resource damages—specifically

including the lost value of, injury to, or destruction of the State's groundwater resources and

services flowing from those resources, and the restoration, rehabilitation, or acquisition of the

---

[1]    ChevronTexaco Corporation is not an operating company, and does not have any responsive
information.

equivalent of injured groundwater resources and the services flowing from those resources—at all known and unknown sites in New Jersey that may have been owned, leased, affiliated with, and/or operated by Chevron (the "Chevron Sites"),[2] even if such sites were later transferred to a third party. In exchange, the DEP released Chevron from all liability for such damages relating to all discharges of any hazardous substances—including petroleum hydrocarbons, oil, oil products and fractions thereof—at all Chevron Sites in New Jersey.

The only Chevron refinery that directly served the New Jersey market was its former facility in Philadelphia, Pennsylvania (the "Philadelphia Refinery"), and prior to the 1986 divestiture, Chevron did not blend any MTBE there. Chevron has no records indicating that any of the gasoline Chevron marketed in New Jersey prior to the 1986 divestiture contained MTBE. After that time, Chevron had no intent to market or distribute gasoline containing MTBE in New Jersey or anywhere else in the Northeast, other than the few specific shipments noted below.

Chevron did not blend MTBE into gasoline at the Philadelphia Refinery until late 1992, when Chevron was required to begin using MTBE as an oxygenate under the federal Wintertime Program. By that time, Chevron had already divested its marketing assets in the Northeast, and thus was itself no longer marketing any gasoline in New Jersey. Between 1992 and 1994, Chevron's records reflect the following sales of gasoline containing MTBE into New Jersey:

| | |
|---|---|
| 1992 | 1,953,275 bbls |
| 1993 | 5,955,947 bbls |
| 1994 | 2,546,976 bbls |

---

[2]    The Settlement also released Chevron from liability for such damages at sites owned, leased, affiliated with, and/or operated by the other parties to the Settlement: Kewanee Industries, Inc., Texaco Downstream Properties, Inc., and Texaco Inc.

Chevron sold the Philadelphia Refinery in August 1994. Since then, Chevron has not manufactured gasoline containing MTBE in the Northeast, and has no information that it has sold any gasoline containing MTBE in New Jersey.

Chevron also blended MTBE at its Pascagoula, Mississippi refinery on various occasions between approximately 1986 and 2001, and at its Port Arthur, Texas refinery on various occasions between approximately 1981 and February 1995, when that refinery was sold. To the best of Chevron's knowledge, however, neither the Pascagoula nor Port Arthur refineries directly served New Jersey. Chevron has no knowledge or record of any transaction whereby gasoline containing MTBE blended at the Pascagoula or Port Arthur refineries was sold or distributed in New Jersey. By February 1995, however, Chevron no longer owned the Port Arthur Refinery, and with the exception of six test batches totalling 362,623 barrels produced between November 3, 1994 and December 1, 1994—none of which Chevron has any record were transported to New Jersey—Chevron never produced reformulated gasoline ("RFG") at the Pascagoula Refinery. Because all 21 New Jersey counties were either mandatory or opt-in RFG-only areas, from early 1995 forward Chevron-produced gasoline containing MTBE could not have been sold or distributed in New Jersey.

## CATAGORIES OF DATA

Chevron responds as follows regarding the specific categories of data listed in CMO 45:

1.   **Locations and ownership interests in stations, USTs, terminals, refineries, pipelines, or delivery systems (including but not limited to, tankers, tank trucks, railcars) in which any defendant has or has had an interest, and that is located in, or that serves, New Jersey.**

Chevron objects that the Settlement has rendered its interest in potential spill sites in New Jersey irrelevant and/or moot. Any liability Chevron has based on MTBE discharges from assets in New Jersey was released in the Settlement.

Subject to the foregoing objection, Chevron responds that information readily available to it regarding this topic was already provided to the State as part of the Settlement. Information still available to Chevron about the retailers and terminals in which Chevron may have had some interest as of the 1986 divestitures is included in the attached Appendices 1-A and 1-B, respectively. Any USTs in New Jersey in which Chevron owned an interest would be covered by the lists of retailers and terminals in those Appendices; however, additional data readily available to Chevron regarding USTs in which Chevron may have owned an interest as of the 1986 divestitures is included in the attached Appendix 1-C. Chevron also refers to its Preliminary Statement above.

Chevron has not held any interest in a refinery in New Jersey. As noted in the Preliminary Statement above, the only Chevron refinery that directly served the New Jersey market was the Philadelphia Refinery prior to its divestiture in August 1994.

Chevron has not held any interest in a pipeline in or serving the New Jersey market. Chevron has no information about an ownership interest in other delivery systems (*i.e.*, tankers, tank trucks, or railcars) in New Jersey.

2.   **Identities, contact information, and locations of parties with whom Defendants have or have had supply contracts to deliver gasoline containing MTBE or neat MTBE to New Jersey, including exclusive supply contracts, and contracts with delivery services, franchisees, lessees, lessors, jobbers, common carriers (including, but not limited to, pipelines), distributors, terminals, other refiners, or any other entities.**

Chevron objects that the Settlement released it from all liability for damages relating to discharges of MTBE or other hazardous substances in New Jersey, including any liabilities or damages arising out of the sale of gasoline containing MTBE to franchisees, lessees, lessors, jobbers, common carriers, distributors, terminals, other refiners and/or other entities in New

4

Jersey. The Settlement therefore has rendered the information requested by this section irrelevant and/or moot. Subject to this objection, Chevron responds that information readily available to it regarding this topic was already provided to the State as part of the Settlement. Information still available to Chevron about the retailers with which Chevron may have had supply contracts as of the 1986 divestitures is provided in the attached Appendix 2.

3.    **Names, grades of products, product codes, blend information, and other identifying information for gasoline with MTBE or neat MTBE that was or continues to be distributed in or intended for New Jersey.**

Chevron objects that the Settlement released it from all liability for damages relating to discharges of MTBE or other hazardous substances in the State of New Jersey. The Settlement therefore has rendered the information requested by this section irrelevant and/or moot. Subject to this objection, Chevron responds as follows:

Chevron refers to its Preliminary Statement above. Prior to 1992, Chevron has no record of any gasoline sold or intended for distribution in New Jersey that it can identify as having contained MTBE. Product delivered to New Jersey between 1992 and 1994 that Chevron can determine included MTBE was identified by the following product codes and names:

| | |
|---|---|
| 201088 | PUL CGAS W/ETHER |
| 201188 | UL CGAS W/ETHER |

After 1994, only RFG could be sold or delivered in New Jersey. With the exception of six test batches produced at the Pascagoula Refinery between November 3, 1994 and December 1, 1994—none of which was intended for, nor does Chevron have any record was delivered to, New Jersey—Chevron did not produce any RFG, and therefore none of Chevron's gasoline containing MTBE from early 1995 forward could have been delivered or sold into New Jersey.

5

Dated: Houston, Texas
February 6, 2009

Respectfully submitted,

Robert E. Meadows
Charles C. Correll, Jr.
Russell D. Workman
KING & SPALDING LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

Richard E. Wallace, Jr.
William F. Hughes
WALLACE KING DOMIKE & BRANSON PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone:  (202) 204-1000
Facsimile:  (202) 204-10001

**Attorneys for Defendants ChevronTexaco**
**Corporation (now known as Chevron**
**Corporation), Chevron U.S.A. Inc., TRMI**
**Holdings Inc., Texaco Inc., and Chevron**
**Environmental Services Company**

7

# EXHIBIT 9



46335628
Sep 07 2012
08:45PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          MDL No. 1358 (SAS)

**In Re: Methyl Tertiary Butyl Ether**          **PLAINTIFFS' RESPONSES TO**
**("MTBE") Products Liability Litigation**       **DEFENDANTS' FIRST SET OF**
                                                 **CONTENTION**
**This Document Relates To:**                    **INTERROGATORIES**

*New Jersey Dep't of Envtl. Prot., et al. v.*
*Atlantic Richfield Co., et al., No. 08 Civ. 312*

Plaintiffs, the New Jersey Department of Environmental Protection

("NJDEP"), the Commissioner of the New Jersey Department of Environmental

Protection, and the Administrator of the New Jersey Spill Compensation Fund

("Plaintiffs"), by and through their attorneys, respond to Defendants' First Set of

Contention Interrogatories (the "Contention Interrogatories") as follows:

## GENERAL OBJECTIONS

1.      Plaintiffs object to the Contention Interrogatories to the extent they

seek information or documents outside the scope of discovery permissible under the

Federal Rules of Civil Procedure.

2.      Plaintiffs object to the Contention Interrogatories to the extent they

seek information covered by the Attorney-Client Privilege, the Work Product

Doctrine, or any other applicable privilege or immunity, including but not limited to

the Deliberative Process Privilege or Executive Privilege.  Plaintiffs' responses are not

intended as, nor should they be construed as, a waiver or relinquishment of any part of

1

the protections afforded by the above-referenced, or any other privileges or immunities.   Plaintiffs reserve the right to withdraw and recover documents or information covered by such privileges or immunities if Plaintiffs inadvertently or mistakenly produce such documents or information in response to the Contention Interrogatories.

3.     Plaintiffs object to the Contention Interrogatories to the extent that they contain vague or ambiguous terms, or are overly broad, unduly burdensome and oppressive, or are not reasonably calculated to lead to the discovery of admissible evidence.  Interrogatories demanding identification of "all facts and documents" are duplicative of other discovery and inconsistent with the federal discovery rules. Reasonable assumptions will be made, where possible, as to the intended meanings. Nothing herein shall constitute an admission regarding the admissibility, truth, accuracy or relevance of any information and Plaintiffs reserve the right to raise any further objections.

4.     Plaintiffs reserve the right to further supplement or amend Plaintiffs' responses to the Contention Interrogatories to include newly-found, responsive information or documents, as provided in Rule 26 of the Federal Rules of Civil Procedure.  In particular, defendants are still responding to discovery requests propounded by Plaintiffs, and Plaintiffs reserve the right to supplement these responses with additional information as that information is made available to Plaintiffs.

5.     Plaintiffs object to the Contention Interrogatories to the extent that they

prematurely seek information and documents relating to the subject matter and opinions of expert witnesses, whose disclosure is governed by Rule 26 of the Federal Rules of Civil Procedure and the Court's Case Management Orders.

6.      Plaintiffs object to the Contention Interrogatories to the extent they seek to impose obligations upon Plaintiffs beyond those authorized by the Federal Rules of Civil Procedure, the Local Civil Rules of the Court, the Case Management Orders or Pre-Trial Orders of this Court, or any other orders or pronouncements of this Court or of the Special Master.

7.      Plaintiffs object to the instructions and definitions set forth in the Contention Interrogatories to the extent they deviate from or purport to impose requirements other than or in addition to those required by the Federal Rules of Civil Procedure, the Local Civil Rules of this Court, the Case Management Orders or Pre-Trial Orders of this Court, or any other orders or pronouncements of this Court or of the Special Master.  Consistent with the Federal Rules of Civil Procedure, Plaintiffs assume that the term "YOU" does not include Plaintiffs' counsel in this matter, or any investigators, consultants, or other agents of Plaintiffs' counsel.

8.      Plaintiffs provide these responses to the Contention Interrogatories solely for the purposes of this action.  All responses are subject to appropriate confidentiality agreements negotiated, or to be negotiated, between the parties, or as may be imposed by the Court.  Plaintiffs' decision to provide information in response to the Contention Interrogatories, notwithstanding the objectionable nature of any the Contention Interrogatories, shall not be construed as an admission that the information is relevant.

Such information is subject to all objections regarding relevance, authenticity, materiality, propriety, admissibility and any other objections that would require exclusion of the information is such information were offered as evidence at trial, all of which objections are hereby expressly reserved and may be interposed at the time of trial.

9.      Plaintiffs object to the Contention Interrogatories to the extent they seek information that is confidential, sensitive, proprietary or subject to privacy restrictions. Plaintiffs respond on the condition that the inadvertent production of information or documents that are confidential, sensitive or private information does not waive Plaintiffs' right to protect this information and to seek recovery of any such information or documents that are inadvertently produced.

10.     Plaintiffs' General Objections apply to each of the Contention Interrogatories as though restated in full therein.

## RESPONSES TO CONTENTION INTERROGATORIES

## INTERROGATORY NO. 1:

Identify the Defendants YOU contend caused the alleged DAMAGES at each of the DELINEATED TRIAL SITE AREAS at issue in this action.

## RESPONSE TO INTERROGATORY NO. 1:

Subject to and without waiving its objections, Plaintiffs respond as follows:

## Plaintiffs' Trial Sites

1.      **Skyline Service Center: Site ID No. 2156.**

Sunoco; Texaco; Shell; Citgo.

4

9.   **NJ State Prison Bayside: Site ID No. NJ0609001.**

Coastal

See also Response to Interrogatory No. 2 re NJ State Prison Bayside.

**INTERROGATORY NO. 2:**

For each Defendant IDENTIFIED in YOUR response to Interrogatory No. 1, above, IDENTIFY all facts and all DOCUMENTS that YOU contend prove, establish, show or demonstrate that the particular Defendant caused the alleged DAMAGES at each DELINEATED TRIAL SITE AREA.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiffs assert the general objections.  Plaintiffs also object that this interrogatory calls for expert opinion, and expert reports are not yet due. Notwithstanding and without waiving these objection, plaintiffs respond as follows.

As to all trial sites, the defendants associated with those sites were a substantial factor in causing contamination at the sites by supplying MTBE gasoline to the sites without proper warnings or instructions, and with knowledge that MTBE gasoline would escape from the UST's and dispenser systems and contaminate soil and groundwater.  In addition, defendants maintained control over the supply and inventory of MTBE gasoline at the trial sites through branding and supply agreements, as well as through on-site inspections and control of amounts and methods of delivery.   At some trial sites, as described below, defendants also owned or leased the property,  underground storage tanks and dispensing equipment, and are managing on-site remediation.  In addition,

7

plaintiffs refer to and incorporate Plaintiffs' Response to Interrogatory No. 3, *infra*. As to each trial site, Plaintiffs respond as follows:

1.      **Skyline Service Center: Site ID No. 2156.**

Sunoco supplied MTBE to Skyline from November of 1985 to September 1991 pursuant to a branding agreement. (Sunoco Resp 2nd Rogs, nos. 5, 10; Deposition of Joseph Costello ("Costello Depo") at 26:20-28:15 and Exhs. 2, 9.). *See also* Sunoco Response to CMO 45. Station owner Joe Costello testified that prior to the requirement of over-fill containment sumps, Sunoco commonly spilled approximately 10 gallons of gasoline each time it delivered gasoline to the station. (Costello Depo. at 41:3-42:20 and Exh. 8.) Mr. Costello testified that the amount of product spilled by Sunoco came to approximately 1,300 gallons over time. (*Id.*)

Texaco supplied MTBE gasoline to Skyline from October 1991 to September 1997 pursuant to a branding agreement. (SKYLINE 003560; Costello Depo. at 52:5-54:3; 68:19-69:17; and Exhs. 10, 16.)

CITGO, through its agent, supplied MTBE gasoline to Skyline from November, 1997 to June, 2008, including from CITGO's Linden Terminal. (CITGO Supplemental Response to Plaintiffs' Second Interrogatories, No. 5; Costello Depo. at 76:10-24; CITGO-NJ-003331.) Citgo also conducted on-site, in-tank testing of its MTBE gasoline products at this site during this time period. (*Id.*)

MTBE was detected during the first tests for MTBE at Skyline, on May 13, 1998 at concentrations of 207 ppb. (SKYLINE002375-002376.) MTBE and TBA were detected in 16 of 18 domestic wells during a limited investigation conducted by the

8

Passaic County Department of Health in 1998.  (NJ-LBG-07788-07789; NJDEP-SITE249-007146-007279.)  Preliminary investigations identified Skyline as the likely source of the contamination.  (*Id.*)

On or about August 5, 2003, three USTs and associated piping were removed at the Skyline station. (*Id.*)  In addition to the discovery of contaminated soil, approximately 725 gallons of free product was observed floating on top of groundwater, and contaminated groundwater was observed flowing into the excavation from bedrock sidewalls.  (NJDEP-SITE249-002219-002245; Costello Depo. at 95:6-97:11.)   A broken containment sump was found at the time of removal.  (*Id.*)

MTBE has continued to be detected at the Skyline station.  MTBE was detected at the site at concentrations as high as 175 ppb in 2009.  (NJDEP-SITE249-007146-007280.)   MTBE was detected in potable wells near the Skyline station at levels as high as 360 ppb on June 18, 2004.  (NJDEP-SITE249-002432-002433.)  There are 95 potable wells within 1,000 feet of the impacted potable well.  (*Id.*)

2.     **Valero/APCO:  Site ID No. 4476.**

Mobil had a branding agreement with this station from at least 1984 to 2004. (NJDEP-SITE620-000042; Deposition of Amar Singh Gill ("Gill Depo") at 20:13-22; 34:10-35:11.)  Mobil supplied MTBE gasoline to this station during this same time period.  (*Id.*)

Valero had a branding agreement with this station from 2004 to the present. (VLO-NJ-00000005-40; Gill Depo. at 22:18-23:16; 30:25-32:13 and Exh. 4.)  Valero supplied gasoline containing MTBE to the station during this time period.  (*Id.*)

9

## RESPONSE TO DOCUMENT REQUEST NO. 3:

Plaintiffs have already produced responsive documents and are including an additional production with these responses.  In addition, plaintiffs are awaiting responses from defendants to outstanding requests that may include additional documents responsive to these interrogatories.  Plaintiffs will supplement their responses if additional responsive documents are received from defendants.  In addition, defendants recently provided plaintiffs with summaries of prior productions by defendants that were sent to other plaintiffs in the MDL proceedings and that may contain documents responsive to this set of contention interrogatories.  Plaintiffs are in the process of gathering these productions from the other plaintiffs to whom the productions were sent, and plaintiffs will supplement their production in this case if additional responsive documents are located in the documents gathered from other plaintiffs.

Dated:  September 7, 2012

MICHAEL AXLINE
Attorneys for Plaintiff
Miller, Axline & Sawyer
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688
Facsimile:  (916) 488-4288

# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK




-------------------------------------X

In re: Methyl Tertiary Butyl Ether          :     M21-88.
("MTBE") Products Liability Litigation       :     MDL No. 1358
                                             :
                                             :     Master File
This Document Relates To: All Cases          :     C.A. No. 1:00-1898(SAS)
                                             :
-------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.;

ORDER FOR PRESERVATION OF RECORDS

IT IS HEREBY ORDERED:

   A.   Definitions

        "Document" is defined to be synonymous in meaning and

equal in scope to the usage of this term in Federal Rule of Civil

Procedure 34(a), as construed by the caselaw in this Circuit,

including, without limitation, electronic or computerized data.

A nonidentical copy is a separate document within the meaning of

this term.

   B.   Scope

        1.   This Order pertains only to documents in the

possession, custody or control of a party, generated after

January 1, 1976, that are relevant to class certification, or any

claim or defense at issue in any case consolidated under MDL

1358.  Relevant documents need not be admissible at trial if the

document appears reasonably calculated to lead to the discovery

of admissible evidence.  Any document described or referred to in

1

any discovery request or response made during this litigation shall, from the time of the request or response, be treated for purposes of this Order as containing such information unless and until the Court rules such information to be irrelevant.

2.  The persons subject to this Order shall be all parties and attorneys in any action consolidated herein, as well as their respective officers, agents, and employees, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise ("Subject Persons").

3.  However, this Order shall not cover employees who are not in the possession, custody or control of relevant documents other than as recipients of duplicate copies of relevant documents.  A party shall designate such excluded employees by location and title within twenty (20) days of this Order.  Such designation can be done by category grouping, e.g., "all employees in the accounting department in Houston, Texas." This designation list shall be promptly served on all other parties.  Any other party may dispute such designations within twenty (20) days of receipt of the designation list.

C.  Preservation

1.  During the pendency of this litigation and for thirty (30) days after entry of a final order closing all cases, all Subject Persons are restrained and enjoined from altering,

2

destroying or permitting the destruction of any document within the scope of this Order that is in the possession, custody or control of a party, wherever the document is located.

2.    The injunction set forth in section C.1 hereof shall not preclude the movement or change of location of any document within the scope of this Order, <u>provided</u>, that such document or an identical copy thereof remains in the possession, custody or control of a party and can be produced in response to a proper discovery request in this litigation.

3.    Counsel are directed to confer to resolve questions as to what documents are outside the scope of this order or otherwise need not be preserved and as to an earlier date for permissible destruction of particular categories of documents.  If counsel are unable to agree, any party may apply to the Court for clarification or relief from this Order upon reasonable notice.  A party which, within forty-five (45) days after receiving written notice from another party that specified documents will be destroyed, lost, or otherwise altered pursuant to routine policies and programs, fails to indicate in writing its objection shall be deemed to have agreed to such destruction.

D.    <u>Exemptions</u>

1.    Multiple identical copies of a document, including photocopies and electronically-stored data, are not covered by this order so long as (i) the original document or an identical

3

copy thereof remains in the possession, custody or control of a party; and (ii) a record is kept identifying all locations in which the document has been found.

      2.   Notwithstanding any other provision of this Order, Subject Persons may generate documents in the future without preserving dictation, drafts, interim versions, or other temporary compilations of information that would not be preserved in the ordinary course of business.  Nothing herein prohibits the continued routine operation of each party's computer systems, including systematic erasures and write-overs.  However, all hard-copy drafts, interim versions, or other temporary compilations, of relevant documents existing as of the date of this Order must be preserved.  If such material exists only in electronic format, it must also be preserved.

      3.   Computer-stored documents within the scope of this Order, including e-mail, other than those that also exist in hard-copy, must not be destroyed if, as of the date of this Order, such documents are retrievable.

      4.   All defendants must maintain their electronic "site specific" materials, whether or not a hard copy file exists, without regard to the state or states in which a defendant is now sued.

      5.   This Order shall not cover briefs, motions, legal or factual memoranda, notes or other similar materials created in

anticipation of or during the course of any litigation concerning MTBE contamination by any attorney, law firm or corporate legal department representing any party to any case in this proceeding. Scientific or medical studies, whether conducted in anticipation of litigation or not, shall not be subject to the exemption of this paragraph.

      E.   <u>Implementation</u>

        1.  Liaison counsel shall deliver a copy of this Order to counsel for all parties of record.  Thereupon, counsel for each plaintiff or defendant shall provide written notice of this Order to each corporate or individual client whom counsel now or hereafter represents in any case which becomes part of these proceedings.  Such notice shall include a copy of this Order.

        2.  Each party will, within ten (10) days after receiving this Order, designate an individual who shall be responsible for ensuring that the party carries out the requirements of this Order.

      F.  <u>Discoverability and Admissibility</u>

      Nothing in this Order shall be construed to affect the discoverability or admissibility of any document within the scope of this Order.

DATED this ___8___ day of _____March___, 2001

SHIRA A. SCHEINDLIN
U.S.D.J.

6

# EXHIBIT 11

IN THE UNITED STATERS DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION<br><br>**This document relates to:**<br><br>*New Jersey Department of Environmental Protection v. Atlantic Richfield Co., et al.*<br>No. 08 Civ. 00312 | Master File No. 1-00-1898<br>MDL 1358 (SAS)<br>M21-88 |

SHIRA A. SCHEINDLIN, U.S.D.J.

[Pls' Proposed] **CASE MANAGEMENT ORDER NO. _____**

After conference with the parties, it is hereby ORDERED that Plaintiffs' claims

with respect to the nineteen Trial Sites are limited to only the defendant or defendants identified

below for each Site:



| Trial Site Name (Site ID #) | Identified Defendants |
|---|---|
| Skyline Service Center (# 2156) | Sunoco; Texaco; CITGO; Chevron |
| Valero/APCO (# 4476) | Valero; Mobil; ExxonMobil |
| West Windsor Getty (# 6187) | Chevron; Texaco; Getty Properties Corp.; Getty Petroleum Marketing, Inc. |
| Livingston Exxon (# 8857) | ExxonMobil |
| Bloomfield Sunoco (# 9224) | Sunoco |
| Maple Shade CITGO (# 10792) | Hess; CITGO |
| Baker's Waldwick Gulf (# 11126) | Gulf Oil Ltd. Partnership; Cumberland Farms; Chevron |
| Shell Ridgewood (# 11346) | Shell |
| 5 Points BP (# 15442) | CITGO; BP |
| HP Delta (# 41958) | Getty Properties Corp.; Texaco; BP; CITGO; ConocoPhillips; Chevron |
| Tinton Falls Boro DPW Facility (# 4215) | NONE |
| Leonardo State Marina (# 4318) | CITGO; Coastal |
| Colts Neck DPW Garage (# 4729) | NONE |
| NJDOT W. Orange Maintenance Yard (# 8076) | Gulf |

| | |
|---|---|
| Camp Pedricktown W WTP (# 13363) | NONE |
| RC Cape May Holdings Corp. (# 15814) | NONE |
| Scarborough Office Tank (# 42523) | NONE |
| Tamcrest Country Club (# 59237) | NONE |
| NJ State Prison Bayside (# NJ0609001) | Coastal |

SO ORDERED:

_____

DATED:  New York, New York          Shira A. Scheindlin
    December _____, 2012  U.S.D.J.

2

# EXHIBIT 12

1

```
CC58MTB1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
ETHER ("MTBE") PRODUCTS                Master File C.A.
LIABILITY LITIGATION                   No. 1:00-1898(SAS)

------------------------------x
                                       New York, N.Y.
                                       December 5, 2012
                                       12:15 p.m.

Before:

                    HON. SHIRA A. SCHEINDLIN

                                       District Judge

                         APPEARANCES


WEITZ & LUXENBERG, P.C.
     Plaintiffs' Liaison Counsel
BY:  WILLIAM WALSH

MILLER AXLINE & SAWYER
     Attorneys for New Jersey, Puerto Rico Plaintiffs
BY:  MICHAEL AXLINE

LAW OFFICES OF JOHN K. DEMA, P.C.
     Attorneys for New Jersey, Puerto Rico Plaintiffs
BY:  JOHN K. DEMA
     NATHAN SHORT

COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
     Attorneys for New Jersey Plaintiffs
BY:  LEONARD Z. KAUFMANN

RAWLE & HENDERSON LLP
     Attorneys for Third Party Plaintiff Getty Properties
BY:  SUSAN M. DEAN
```

58

CC5AMTB2ps

1    pick --
2            MR. DEMA:  Sol.  So there's Sol to respond.
3            THE COURT:  Whoever is smaller.  They may only have
4    had three or four people over those years who had any
5    information about gasoline or gasoline containing MTBE.  It's
6    still somewhat limited -- I don't think we're talking about
7    hundreds or thousands of people -- in Puerto Rico.
8            MR. RICCARDULLI:  It makes it difficult to identify
9    them and it's a concern when it's sort of all issues relevant.
10           THE COURT:  It's still MTBE and gasoline.  So I
11   suggest I hear complaints on a case-specific basis.  If people
12   investigate this, if they find out it's true with hundreds of
13   custodians and the burden would be so terrible to identify
14   them, I'm happy to hear about it.  People may look into it and
15   find out it's actually a reasonable number of custodians and a
16   reasonable number of locations.
17           MR. RICCARDULLI:  Understood.
18           THE COURT:  So that's what I'm saying for today.
19   Should be done.  Subject to my hearing burden complaints when
20   people try to do it.
21           MR. DEMA:  Thank you.
22           MR. RICCARDULLI:  Your Honor, unfortunately I have one
23   more issue that I wanted to go back to.  And frankly I received
24   a comment from some our folks here.  With respect to the matrix
25   in the New Jersey case, in their reply letter, plaintiffs

                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

59

CC5AMTB2ps
1    actually put in a proposed revised matrix.  I think it was
2    attachment A to the reply letter.
3                THE COURT:  Yes.
4                MR. RICCARDULLI:  I'm sorry.  Exhibit C to the reply
5    letter.  And defendants are actually OK with the version that
6    was submitted by plaintiffs.
7                THE COURT:  Exhibit C to the reply letter.
8                MR. RICCARDULLI:  Yes.  And frankly we are in favor of
9    that being entered as a site matrix.
10               THE COURT:  OK.  Done.
11               MR. RICCARDULLI:  Thank you, your Honor.
12          Sorry.  One more note, your Honor.  With respect to
13   the dismissal, the CMO that will dismiss the non-test site, or
14   non-tech site in Puerto Rico that we've now reached agreement
15   on, just one sort of housekeeping note:  In the list of sites
16   that we received from plaintiffs was included one of the sites
17   that defendant had selected as a trial site.  So obviously that
18   site is going to be dismissed from the case.  We've met and
19   conferred and the plaintiffs have sort of agreed to drop one of
20   their trial sites from the mix.  It's an Esso service station.
21   I don't have the site number on me handy here, but it's one of
22   the sites.  So there are going to be two fewer trial sites now
23   that will be worked up for trial.
24               THE COURT:  That's good.  Do I have that proposed
25   order already sitting up here?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

# EXHIBIT 13

## Susan Tamayo

| | |
|---|---|
| **From:** | Haney, Nicole <NHaney@weitzlux.com> |
| **Sent:** | Friday, December 21, 2012 8:51 AM |
| **To:** | Ben Krass (Law Office of Matthew Pawa); Bill Plache (City of NY Law Department); Calvin Bonner; Christopher Reo (City of NY Law Department); Marshall, Curt; Duane C. Miller (Miller Axline Sawyer); F Galvez (City of NY Law Department); Gordon Rhea (Richardson, Patrick, Westbrook & Brickland); Jeffrey Osbun (Sher Leff LLP); John Dema (John Dema Law Office); Julia Cremin Wyman (Ury & Moskow LLC); L. Thomas (Law Office of John Dema); Leonard Z. Kaufmann (Cohn Lifland Pearlman Herrman & Knopf LLP); M. Poposh (Miller Axline Sawyer); Michael Stennis; Mike Axline (Miller Axline Sawyer); Miller, Axline & Sawyer (Miller Axline Sawyer); Nathan Short; neal moskow (Ury & Moskow, LLC); Haney, Nicole; Greenwald, Robin; Russ Henkin (Berger & Montague, PC); S Amron (City of NY Law Department); Scott Kauff (Law Office of John Dema); Scott Summy (Baron & Budd); Seth M. Tuman (Sher Leff); Sharon Desperak; Sielas Dixon (Berger & Montague, PC); Stuart Lieberman (Lieberman & Blechner); Todd Robins (Sher Leff); Tracey O'Reilly (Miller Axline Sawyer); Tyler Wren (Berger & Montague, PC); Victor Sher (Sher Leff); Walsh, William |
| **Cc:** | Amelia Wilson; Carla Burke; Cary McDougal; Celeste Evangelisti; Cristina Sanchez; Erin McIntosh; Gonzalez, Leiry; Gordon, Robert; Sandra Pierce; Sarah Baird; Shelly Sharbach; Staci Bednarski; Stephen Johnston |
| **Subject:** | FW: MDL 1358: Joint Proposed New Jersey Site Matrix |
| **Attachments:** | Joint Proposed NJ Matrix.pdf |

---

**From:** Gerson, Lisa [mailto:LGerson@mwe.com]
**Sent:** Friday, December 21, 2012 11:49 AM
**To:** Stephen_Schweizer@nysd.uscourts.gov
**Cc:** MDL1358; MDL1358; MDL_MTBE@nysd.uscourts.gov; Leonard Z. Kaufmann
**Subject:** MDL 1358: Joint Proposed New Jersey Site Matrix

Mr. Schweizer,
In advance of the December 5, 2012 conference, the parties submitted competing proposed orders related to claims in the New Jersey case. However, at the conference, Defendants indicated that we are in agreement with Plaintiffs' proposal. Therefore, we respectfully request that the proposed order be entered by the Court. A copy is attached for the Court's convenience.

Thank you and happy holidays,
Lisa

Lisa A. Gerson
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
Tel: 212-547-5769
Fax: 646-224-8675

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IRS Circular 230 Disclosure: To comply with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained herein (including any attachments), unless specifically stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter herein.

This message is a PRIVILEGED AND CONFIDENTIAL communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please visit http://www.mwe.com/ for more information about our Firm.

Please visit us at http://www.weitzlux.com

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The information contained in this message may be privileged and confidential and protected from disclosure.  If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone or by replying to the message and deleting it and all of its attachments from your computer.  Thank you.  Weitz & Luxenberg, P.C.

Every effort is made to keep our network free from viruses.  You should, however, review this e-mail message, as well as any attachment thereto, for viruses.  We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

All e-mails sent to Weitz & Luxenberg, P.C. or any individuals at Weitz & Luxenberg, P.C. are carefully scanned for viruses and content.  The sender should have no expectation of privacy in said transmission.

In the course of scanning all incoming e-mails to W & L, virus scanning software may block the e-mail and prevent it from being delivered.  Neither the intended recipient nor the sender will receive notice that their transmission has been blocked.

All e-mail to W & L or any individuals at W & L should be followed up by hard copy including attachment(s), as specific file types may be blocked at any time without notice being provided to sender or recipient.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# EXHIBIT 14

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
PO Box 093
Trenton, NJ 08625-0093
Attorney for Plaintiffs

By:     Brendan Ruane
        Deputy Attorney General
        (609) 984-5016

Gordon C. Rhea, Esq.
Special Counsel to the Attorney General
Richardson, Patrick, Westbrook & Brickman,
L.L.C.
1037 Chuck Dawley Boulevard, Building A
Mt. Pleasant, SC 29464
(843) 727-6500

John K. Dema, Esq.
Special Counsel to the Attorney General
Law Offices of John K. Dema, P.C.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5008
(340) 773-6142

Barry A. Knopf, Esq.
Special Counsel to the Attorney General
Cohn, Lifland, Pearlman, Herrmann
& Knopf, L.L.P.
Park 80 Plaza West-One
Saddle Brook, NJ  07663

Duane C. Miller, Esq.
Special Counsel to the Attorney General
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

                                   SUPERIOR COURT OF NEW JERSEY
                                   LAW DIVISION - MERCER COUNTY
                                   DOCKET NO. MER-L-1622-07

NEW    JERSEY    DEPARTMENT    OF       :
ENVIRONMENTAL PROTECTION; THE           :          Civil Action
COMMISSIONER OF THE NEW JERSEY          :
DEPARTMENT OF ENVIRONMENTAL             :        Second Amended
PROTECTION;    and      THE             :          Complaint
ADMINISTRATOR    OF    THE    NEW       :
JERSEY SPILL COMPENSATION FUND,         :

              Plaintiffs,               :

         v.                             :

ATLANTIC RICHFIELD COMPANY;             :
BP AMERICA, INC.;                       :
BP AMOCO CHEMICAL COMPANY;              :



23.    Chevron Corporation ("Chevron Corp.") is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California. Defendant Chevron Corp. is the successor-in-interest to ChevronTexaco Corporation, and successor-in-interest to Texaco, Inc. ("Texaco, Inc.").

24.    Chevron U.S.A., Inc. ("Chevron U.S.A.") is a Pennsylvania corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California.  The term "Chevron" as used in this Complaint refers to Chevron Corp. and Chevron U.S.A.

25.    Citgo Petroleum Corporation ("Citgo") is a Delaware Corporation with its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma.

26.    Coastal Eagle Point Oil Company ("Coastal Eagle") is a Delaware corporation with its principal place of business at Routes 130 and I-295, Westville, New Jersey.  Defendant Sunoco, Inc. acquired defendant Coastal Eagle in 2003.

27.    ConocoPhillips Company ("ConocoPhillips") is a Delaware corporation with its principal place of business at 600 North Dairy Ashford, Houston, Texas.  ConocoPhillips was formed as a result of a merger in 2002 of Conoco, Inc. and Phillips Petroleum Company, and is the successor to Conoco, Inc. and Phillips Petroleum Company.  Defendant ConocoPhillips is also the successor, to Tosco Corporation, including its subsidiary Tosco Refining, LP, which was acquired by Phillips Petroleum Company in 2001.

28.    Crown Central Petroleum Corporation ("Crown Central") is a Maryland corporation with its principal place of business at 1 North Charles Street, Baltimore, Maryland.

29.    Duke Energy Merchants, LLC ("Duke Energy Merchants") is a Delaware limited liability company with its principal place of business at 5400 Westheimer Court, Houston, Texas, doing business in New Jersey.

9

CERTIFICATION REGARDING OTHER PROCEEDINGS AND PARTIES

Undersigned counsel hereby certifies, in accordance with R. 4:5-1(b)(2), that the matters in controversy in this action are not the subject of any other pending or contemplated action in any court or arbitration proceeding known to the Plaintiff at this time, with the exception of In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, Master File No. 1:00-1898, MDL1358 (SAS), M21-98, (S.D.N.Y.), nor is any non-party known to the Plaintiff at this time who should be joined in this action pursuant to R. 4:28, or who is subject to joinder pursuant to R. 4:29-1. If, however, any such non-party later becomes known to the Plaintiff, an amended certification shall be filed and served on all other parties and with this Court in accordance with R. 4:5-1(b)(2).

COHN, LIFLAND, PEARLMAN, HERMANN
& KNOPF, L.L.P.
Attorneys for Plaintiffs
Special Counsel to the Attorney

By: _____
    Barry A. Knopf, Esq.
    Special Counsel to the
    Attorney General

Dated:  9-26-07

RICHARDSON, PATRICK, WESTBROOK &
BRICKMAN, L.L.C.
Attorneys for Plaintiffs
Special Counsel to the
Attorney General

MILLER, AXLINE & SAWYER
Attorneys for Plaintiffs
Special Counsel to the
Attorney General

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
    Brendan Ruane
    Deputy Attorney General

Dated:  9-28-07

LAW OFFICES OF JOHN K. DEMA, P.C.
Attorneys for Plaintiffs
Special Counsel to the
Attorney General