**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | **Master File No. 1:00 - 1898**<br>**MDL 1358 (SAS)**<br>**M21-88** |

**This Document Relates to:**

*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*
No. 1:08-cv-00312-SAS

**DECLARATION OF BRYAN BARNHART IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO CHEVRON U.S.A. INC.'S**
**MOTION FOR SUMMARY JUDGMENT REGARDING**
**THE SKYLINE SERVICE CENTER TRIAL SITE**

I, Bryan Barnhart, declare:

1.      I am an attorney at Miller, Axline & Sawyer, counsel for Plaintiff New Jersey Department of Environmental Protection.   I have been involved in the pretrial proceedings in this action.  This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a document with bates numbers NJ-MTBE-DEF-000000016-000000018.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the transcript from the deposition of Bruce Odiel Beyaert in the *In Re: Methyl Tertiary Butly Ether ("MTBE") Products Liability Litigation* case, dated June 19, 2007.

4.      I am informed and believe that Exhibit 3 hereto is a true and correct copy of a letter from James R. Deurbig to Joseph A. Costello and Michael Costello re: Skyline Service Center, Inc., dated July 24, 1998.

5.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the Expert Report of Bruce F. Burke, dated November 20, 2009.

6.      Attached hereto as Exhibit 5 is a true and correct copy of documents relating to the installation of the containment system at the Skyline Service Center, Inc., which was Exhibit 14 to the deposition transcript of Skyline's operator Joe Costello.

7.      Attached hereto as Exhibit 6 is a true and correct copy of excerpts from a transcript in *In Re: MTBE Litigation,* of a hearing held before Honorable Shira A. Scheindlin, on August 19, 2013.

8.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from

1

"Objections and Responses of Texaco Inc. to Plaintiffs First Set of Interrogatories to Defendants."

9.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts from, "The Chevron Defendants' Objections and Responses to Plaintiffs First Set of Request for Production of Documents"

10.      On November 22, 2013, I personally reviewed the public filings of Texaco and of ChevronTexaco on the sec.gov website.  Texaco's 1993 10-K states that Star was formed in 1988 as a joint venture between defendant Texaco and the Saudi Arabian Oil Company. ChevronTexaco's 2000 10-K states that, "[e]ffective July 1, 1998, Texaco, Shell and Saudi Refining Inc., a corporate affiliate of Saudi Aramco, formed Motiva, a Delaware limited liability company.  Motiva is a joint venture that combined the East and Gulf Coast U.S. refining and marketing businesses of Shell and Star Enterprise (Star). Star, in turn, was a joint venture owned 50 percent each by Texaco and Saudi Refining Inc."  ChevronTexaco's 2000 10-K also states that ChevronTexaco took over Texaco's ownership interest when Chevron and Texaco merged in 2000, and that ChevronTexaco sold its ownership interest in Motiva to Shell and Saudi Refining Inc. in October 2001.  Texaco's 1993 10-K shows that it and Star have been involved in groundwater-contamination litigation since at least 1993.  Texaco's 1998 10-K shows that it, Motiva, and Shell all have been defendants in MTBE cases since at least 1998.

11.      Attached hereto as Exhibit 9 is a true and correct copy of excerpts from "Defendant Chevron U.S.A. Inc.'s Objections and Responses to Plaintiff's Second Set of Interrogatories to Defendants."

12.      Attached hereto as Exhibit 10 is a true and correct copy of excerpts from Expert

2

Generic Report of Marcel Moreau.

      13.     Attached hereto as Exhibit 11 is a true and correct copy of excerpts from "Plaintiff's Amended Notice of Deposition of Michael Costello with Production of Documents and Videotaping."

      14.     Attached hereto as Exhibit 12 is a true and correct copy of the document identified as Exhibit 25 of the August 2, 2011 Deposition of Joseph Costello.

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed this 2nd day of December, 2013, at Sacramento, California.

BRYAN BARNHART

# EXHIBIT 1

LEXISNEXIS' FILE & SERVE
30511959
E-SERVICE
Apr 9 2010
6:18PM

UNITED STATES DISTRICT COURT                )
SOUTHERN DISTRICT OF NEW YORK    )
                                                 )
                                                 )    Master File C.A. No. 1:00-1898
                                                 )

In re Methyl Tertiary-Butyl Ether    )
("MTBE") Products Liability Litigation    )    **MDL 1358 (SAS)**
                                                 )    **No. M21-88**
                                                 )

**This document relates to:**    )
                                                 )
                                                 )    **CITGO PETROLEUM CORPORATION'S**
*New Jersey Department of Environmental*    )    **ANSWERS AND OBJECTIONS TO**
*Protection et al. v. Atlantic Richfield Co., et*    )    **PLAINTIFFS' FIRST SET OF**
*al.*    )    **INTERROGATORIES TO DEFENDANTS**
No. 08 Civ. 00312 (SAS)    )
                                                 )

       Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant CITGO

Petroleum Corporation ("CITGO") hereby responds to Plaintiffs' First Set of Interrogatories to

Defendants as follows:

## GENERAL OBJECTIONS

       1.     CITGO objects to the definitions set forth in the Interrogatories to the extent they

deviate from or purport to impose requirements other than or in addition to those required by the

Federal Rules of Civil Procedure, the Local Civil Rules or Orders of this Court.

       2.     CITGO objects to the Interrogatories on the grounds that they are overly broad,

unduly burdensome, and seek the disclosure of information that is not relevant to the claim or

defense of any party nor reasonably calculated to lead to the discovery of admissible evidence.

       3.     CITGO is a very large organization, and it would neither be possible nor practical

to search every location where records are retained or to interview each employee for responsive

information. CITGO has conducted, and is still conducting, a good faith search for documents

and information in the locations and from the individuals who are most likely to have the

responsive information. CITGO reserves the right to amend or supplement its responses as

entire State of New Jersey prior to completion of the ongoing Court-ordered process of site selection. CITGO also objects that the phrases and terms "routes along which you own ... or operate," "primary origin points," "secondary origin points" and "breakout terminals" are vague and ambiguous in the context of this Interrogatory. CITGO also objects to Plaintiffs' demand that it depict responsive information in graphic format on the basis that it is unduly burdensome to the extent that the responsive information does not already exist in such format. Subject to and without waiving its objections, CITGO states that it formerly owned an interest in Colonial Pipeline and that it currently owns a terminal in Linden, New Jersey. CITGO also owns a property in Pennsauken, New Jersey that formerly was used as a gasoline distribution terminal. CITGO produces herewith documents bearing Bates numbers CITGO-NJ-002938 through CITGO-NJ-002944, which depict Colonial Pipeline routes in New Jersey as well as the locations of breakout tankage and of the Linden and Pennsauken terminals.

12.   Identify all routes in the State of New Jersey along which you ship (or have shipped) gasoline through a common carrier pipeline, and indicate by city any and all primary and secondary origin points where you do input (or did input) gasoline, and any and all ending points, breakout terminals, and off-take points where you take out (or have taken out) gasoline. Depict this information in graphic format.

**ANSWER:**   In addition to its General Objections, CITGO objects to Interrogatory No. 12 on the basis that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information about the entire State of New Jersey prior to completion of the ongoing Court-ordered process of site selection. CITGO also objects that the phrases "primary and secondary origin points," "input," "off-take points" and "breakout terminals" are vague and ambiguous in the context of this Interrogatory. CITGO also objects to Plaintiffs' demand that it depict responsive information

8

for the purpose of responding to these Interrogatories.  Subject to and without waiving its

objections, CITGO states that CITGO employees Steve Fuller and Jack McCrossin were

consulted for these responses.

     19.    Identify each party on whose behalf you are responding to these requests.

    **ANSWER:**   CITGO Petroleum Corporation is responding to these requests on its own

behalf.

Dated: April 9, 2010                Respectfully submitted,

                                  CITGO PETROLEUM CORPORATION

                           By: *Pamela R Hanebutt*
                                 Nathan P. Eimer (neimer@eimerstahl.com)
                                  (New York Bar No. 1976067)
                                 Pamela R. Hanebutt
                                  (phanebutt@eimerstahl.com)
                                 Lisa S. Meyer (lmeyer@eimerstahl.com)
                                 EIMER STAHL KLEVORN & SOLBERG LLP
                                 224 South Michigan Avenue, Suite 1100
                                 Chicago, IL 60604
                                 Ph.  312-660-7600
                                 Fax  312-692-1718

# Colonial Pipeline Company



CITGO-NJ-002938

NJ-MTBE-DEF-000000016

# Colonial Pipeline Company



CITGO-NJ-002939

NJ-MTBE-DEF-000000017

# Colonial Pipeline Company

## LINDEN JUNCTION

The Linden Tank Farm represents the final destination location on the Colonial system. Colonial delivers product to 12 different locations, serving 48 shipper terminals, as well as three direct connections to other pipelines from this breakout tankage.

### LINDEN DELIVERY TANKAGE & SHIPPERS (LND)

Citgo (CIT)
Cumberland Farms (CNR)

Mobil (MOB)
Northville (NVI)

### PORT READING DELIVERY TANKAGE & SHIPPERS (PRD)

Hess (HSS)

### PORT MOBIL DELIVERY TANKAGE & SHIPPERS (PRD)

Mobil (MOB)

### SEWAREN DELIVERY TANKAGE & SHPPERS (SWD)

Chevron (CHV)

Motiva (MTV)
Stolt (STI)

### CARTERET DELIVERY TANK & SHIPPERS (CTD)

Amoco (AMO)

### STATEN ISLAND DELIVERY TANKAGE & SHPPERS (SID)

GATX (GX)
Shippers with leased tankage are made valid when appropriate

### TREMLEY POINT DELIVERY TANKAGE & SHPPERS (TPD)

Tosco (TRC)

Northville (NVI)

### BUCKEYE PIPE LINE TANKAGE & SHPPERS (BPL)

Buckeye Pipe Line (BPL)

CITGO-NJ-002940

NJ-MTBE-DEF-000000018

# EXHIBIT 2

1

1      UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF NEW YORK

3        --oOo--

4  ----------------------------X
  IN RE:        )
5  Methyl Tertiary    ) MDL No. 1358 (SAS)
  Butyl Ether      )
6  ("MTBE")       )
  Products Liability   )
7  Litigation       )
  _____X

8

9

10        VOLUME I

11     VIDEOTAPED DEPOSITION OF

12     BRUCE ODIEL BEYAERT

13    Tuesday, June 19, 2007

14    San Francisco, California

15

16

17

18

19

20

21

22

23  REPORTED BY:  KENNETH T. BRILL, RPR, CRR, CSR #12797

24

25

7

1    A P P E A R A N C E S:

2

            LAW OFFICES OF MATTHEW F. PAWA, P.C.
3           BY:  BENJAMIN A. KRASS, ESQUIRE
            1280 Centre Street, Suite 230
4           Newton Centre, MA 02459
            (617) 641-9550
5           bkrass@pawalaw.com
            Representing the Plaintiffs

6

7

8

            KING & SPALDING LLP
9           BY:  CHARLES C. CORRELL, JR., ESQUIRE
            1100 Louisianna, Suite 4000
10          Houston, TX 77002-5213
            (713) 276-7378
11          ccorrell@kslaw.com
            Representing the Defendant Chevron
12          U.S.A., Inc.

13

14

15          WALLACE KING DOMIKE & REISKIN, PLLC
            BY:  WILLIAM F. HUGHES, ESQUIRE
16          1050 Thomas Jefferson Street, N.W.
            Suite 500
17          Washington, DC 20007
            (202) 204-3727
18          bhughes@wallaceking.com
            Representing the Shell Defendants

19

20

21   via telephone:
            BLEAKLEY, PLATT & SCHMIDT, LLP
22          BY:  CLAUDIA NEARY, ESQUIRE
            One North Lexington Avenue
23          White Plains, New York  10601
            (914) 287-6192
24          cneary@bpslaw.com
            Representing Getty Petroleum
25          Marketing, Inc.

Beyaert, Bruce Odiel - Chevron - Decision to Use (06/19/2007)

1          MR. CORRELL:  Charles Correll, Jr. from

2    King & Spalding, LLP for defendant Chevron, U.S.A.

3          MR. HUGHES:  William Hughes, with Wallace

4    and King for Shell defendants.

5          THE VIDEOGRAPHER:  Would the court

6    reporter please swear in the witness.

7              BRUCE ODIEL BEYAERT, after having

8              been first duly sworn, was examined and

9              testified as follows:

10          THE VIDEOGRAPHER:  Please proceed.

11                    --oOo--

12                   EXAMINATION

13                    --oOo--

14    BY MR. KRASS:

15       Q.   Good morning.

16       A.   Good morning.

17       Q.   My name is Ben Krass and I'm an attorney

18    for plaintiffs in this case.  Would you please state

19    your full name and address for the record.

20       A.   My name is Bruce ODiel Beyaert.  My

21    address is 73 Belvedere Avenue, Point Richmond,

22    California, 94801.

23       Q.   And who is your current employer?

24       A.   I'm retired.  I retired from Chevron

25    U.S.A. in 1992.

11

```
 1        Q.   Are you currently employed?

 2        A.   No.  Well, I'm Chevron's corporate

 3   representative today.

 4        Q.   Sure.  And have you ever been deposed

 5   before?

 6        A.   Yes.

 7        Q.   Approximately how many times?

 8        A.   One for sure in 2005.  And then 20 or 25

 9   years ago I have a vague recollection of being

10   deposed.  I don't recall what the subject was.

11        Q.   Are those the only two times that you can

12   recall being deposed previously?

13        A.   Yes.

14        Q.   And what did the case involve in 2005 for

15   which you were deposed?

16        A.   That was Coastal -- Coast Floral case

17   involving leakage of an underground storage tank

18   they had.

19        Q.   And what is your recollection as to which

20   matters you were deposed on in that case?

21        A.   They were matters concerning MTBE and

22   gasoline, some similarity to this case, so --

23        Q.   Let me just go over a couple of the ground

24   rules for a deposition, then, to refresh your

25   recollection.
```

Beyaert, Bruce Odiel - Chevron - Decision to Use (06/19/2007)

1    do here is to list all of the Chevron U.S.A.

2    organizations which would have been involved in

3    those decisions, and that would have been the

4    refinery manages -- managers and personnels at

5    Pascagoula and El Segundo.  They would have be

6    the -- have been the key people in figuring out how

7    to make premium unleaded gasoline at that time with

8    lead being phased out.

9            And then there were home office management

10   approvals, as I mentioned earlier, along the way,

11   and marketing and product engineering, supply

12   distribution, strategic planning, business

13   evaluation, environmental affairs, environmental

14   health scientists, all would have provided advice

15   and input.

16           So all those organizations that I have

17   listed here, the names of the key individuals who I

18   knew at that time and were involved based on a

19   review of the documents provided to me.

20   BY MR. KRASS:

21       Q.   For the record, what do S&D and SP and BE

22   refer to?

23       A.   SD is supply and distribution.  That would

24   be the organization that would go out and, in this

25   case, find an economic source for MTBE or the best

Beyaert, Bruce Odiel - Chevron - Decision to Use (06/19/2007)

59

1    source.

2          Strategic planning and business evaluation

3    was the Chevron U.S.A. Downstream organization for

4    which I worked.

5          Q.   Were you personally involved in Chevron's

6    decision to first add MTBE to its gasoline as an

7    octane enhancer?

8          A.   I don't believe so, not that I recall.

9          Q.   And --

10         A.   And the one -- one exception occurs to me

11   is that I did author a memo which D.B. Smith sent to

12   R.L. Arscott, again, touching bases in 1987,

13   following up on the 1983 and '85 memos we had from

14   our environmental health scientists to be sure there

15   weren't any environmental showstoppers.  So I did

16   author and review that February 13, 1987 memo, so I

17   was involved at that time.

18         It was -- relates to my background in

19   environmental planning to be sure that everything

20   was -- could proceed as planned.

21         Q.   And skipping to Point 16, it's Chevron's

22   understanding that the individuals listed in 14 were

23   those that were involved in making any

24   recommendations to the ultimate decision maker with

25   respect to Chevron's decision to first add MTBE to

299

1    ACKNOWLEDGMENT OF DEPONENT

2         I, _____, do hereby certify

3    that I have read the foregoing pages _____ to ____

4    and that the same is a correct transcription of the

5    answers given by me to the questions therein

6    propounded, except for the corrections or changes in

7    form or substance, if any, noted in the attached

8    Errata Sheet.

9

10   _____
     DATE         SIGNATURE
11

12

13

14        Subscribed and sworn to before me this

15        _____ day of _____,

16        200__.

17        My commission expires: _____

18

19

20        _____
          Notary Public
21

22

23

24

25

# EXHIBIT 3



**State of New Jersey**

Department of Environmental Protection

Christine Todd Whitman
*Governor*

Robert C. Shinn, Jr.
*Commissioner*

**Bureau of Underground Storage Tanks**
P.O. Box 433
401 East State Street
Trenton, NJ 08625
Fax: (609)633-1454

JUL 2 4 1998

Mr. Joseph A. Costello
Mr. Michael Costello
236 Skyline Drive
Ringwood, New Jersey 07456

Re:   *Skyline Servicecenter, Inc.*
       236 Skyline Drive
       Ringwood. Passaic County
       Case # N/A
       UST #0025391

RECEIVED

JUL 2 7 1998

RINGWOOD HEALTH DEPT

Dear Sirs:

The New Jersey Department of Environmental Protection (Department), specifically, the Bureau of Underground Storage Tanks (BUST) has responded to the Passaic County Department of Health which requested the Department's assistance in determining the source(s) of gasoline related contamination that has been detected in several potable wells located in the vicinity of Oakwood Drive, Ringwood. In May of 1998 the Department of Health sampled wells in the area and detected methyl-*tert* butyl ether (MTBE*)*, a gasoline additive, at a concentration that exceeds the Safe Drinking Water Standard in one potable well located at 63 Oakwood Drive. Of the eighteen wells sampled in the Oakwood Drive area, sixteen had low levels of MTBE present.

On July 16th, 1998, representatives from BUST conducted a field investigation in the Oakwood Drive area to identify the possible source(s) of the ground water contamination. Your facility is located within 1,000 feet of Oakwood Drive and is upgradient to the impacted wells. As per N.J.A.C. 7:14B-7.1(a)3, "The New Jersey UST State Regulations", a site investigation (SI) is required when "there is evidence of a hazardous substance or resulting vapors in the soil. in surface water, or in any underground structure <u>or well in the vicinity of the facility</u>". Therefore, Skyline Servicenter shall conduct an SI pursuant to N.J.A.C. 7:26E that specifically includes installing a bedrock monitoring well downgradient of the tank field and pump islands. Said well shall test the first encountered aquifer in <u>competent</u> bedrock. Analyses of ground water samples shall be per USEPA Method 624 (including MTBE and TBA).

During the above site inspection. you mentioned that you were anticipating the closure and excavation of the on-site waste oil tank. In an effort to reduce time and costs the Department encourages you to coordinate the tank closure and SI activities to minimize the extent of invasive activities.

The results of the ground water SI are to be submitted to the Department **within sixty (60) days of the**

*New Jersey is an Equal Opportunity Employer*
*Recycled Paper*

NJDEP-SITE249-001975

receipt of this letter.  The Department appreciates your cooperation in this matter.  Should you have any
questions, please contact Leonard Lipman, Case Manager, at (609) 777-0126

Sincerely,

James R. Duerbig, Acting Section Chief
Bureau of Underground Storage Tanks

c:      Passaic County Department of Health
        Health Department, Borough of Ringwood
        Clerk's Office, Borough of Ringwood
        Leonard Lipman, Case Manager, BUST

NJDEP-SITE249-001976

# EXHIBIT 4



28167654

Nov 20 2009
9:50PM

# UNITED STATES DISTRICT COURT
## SOUTHER DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether (MTBE")

Product Liability Litigation

MDL No. 1358 (SAS)

Master File C.A. No. 1:00-1898

---

This document relates to the following cases:

West Hempstead Water District v. AGIP, et al.

No. 03-CV 10052

---

# EXPERT REPORT OF BRUCE F. BURKE

**Nexant, Inc.**
**44 South Broadway**
**White Plains, New York  10601**

_____

**Signature**

November 20, 2009

**Date**

CPNJMTBESWNY00002958

91

| NY | Nassau | Location | Company | |
|---|---|---|---|---|
| NY | Nassau | 125 Apollo Street Brooklyn, NY 11222 | Amoco | Terminal is currently in use by BP Products (or its affiliates) |
| | | 760 Roosevelt Avenue Carteret, NJ 07008 | Amoco | Terminal is currently in use by BP Productions (or its affiliates) |
| | | Unknown Inwood, NY | Amoco | Terminal was in use by BP Products or its affiliates at least in 1988 |
| | | Unknown Mount Vernon, NY | Amoco | Terminal sold to Sprague Energy Corp. in 1999 |
| | | Unknown Oceanside, NY | BP | Terminal sold or closed |
| | | Unknown Port Jefferson, NY | Amoco | Terminal was in use by BP Products (or its affiliates) at least in 1988 |

- "BP Products currently leases space from Carbo Industries' terminal in Lawrence listed in Attachment A as owned by Carbo. Lawrence sells gasoline for distribution to Suffolk and Nassau Counties and parts of Westchester County. This terminal is supplied by Buckeye Pipeline and by barge from BP Products' Carteret, New Jersey terminal." [151]

- "BP Products' and/or its predecessor Amoco owned the terminal in Inwood, New York (listed in Attachment A as owned by Amoco) from prior to 1979 until it was sold in about 1993. This terminal supplied Suffolk and Nassau Counties and parts of Westchester County. The terminal was supplied by barge from BP Products' Carteret, New Jersey terminal and by the Buckeye Pipeline." [152]

- The Oceanside terminal previously owned by BP supplied Suffolk, Nassau and Queens counties. This terminal was supplied by barge from Tremley Point and by barges of imports from New York harbor." [153]

133. **Chevron U.S.A. Inc. ("Chevron") and ChevronTexaco Corporation (n/k/a Chevron Corporation) have indicated that they did ship MTBE gasoline into terminals**

---

[151] Defendant BP Products North America Inc.'s and BP Corporation North America Inc.'s Answers and Objections to City of New York's Revised Third Set of Interrogatories to All Defendants, Page 45
[152] Defendant BP Products North America Inc.'s and BP Corporation North America Inc.'s Answers and Objections to City of New York's Revised Third Set of Interrogatories to All Defendants, Page 46
[153] Defendant BP Products North America Inc.'s and BP Corporation North America Inc.'s Answers and Objections to City of New York's Revised Third Set of Interrogatories to All Defendants, Page 47

CPNJMTBESWNY00003050

92

along the gasoline supply system which served the RGA.  Specifically, Chevron and
ChevronTexaco have indicated the following:

- "..., Chevron refers to the chart attached as Exhibit 1, which depicts Chevron's deliveries
  of gasoline that Chevron can identify as containing MTBE to the New York and New
  Jersey terminals listed on Attachment A, based on Chevron's review of the electronic
  information available to it."[154]

Chevron identifies terminals and approximate barrels delivered to these terminals. The Amoco
Terminal at 760 Roosevelt Ave., Carteret, NJ (162,647 in 1993; 237,350 in 1994); the Bayway
Terminal at Linden, NJ(225,156 in 1993); the Chevron Terminal at Gulfport, NY(25,000 in
1993; 59,999 in 1994); and the CITGO Terminal at Linden, NJ (1,044,729 in 1992; 1,394,652 in
1993; 144,915 in 1994) were those identified by Chevron as terminals which they delivered
MTBE gasoline to [155]

- 

---

[154] Defendants Chevron U.S.A. Inc.'s and ChevronTexaco Corp.'s Response to City of New York's Revised Third
Set of Interrogatories to all Defendants, Page 24
[155] Defendants Chevron U.S.A. Inc.'s and ChevronTexaco Corp.'s Response to City of New York's Revised Third
Set of Interrogatories to all Defendants, Exhibit 1

**CPNJMTBESWNY00003051**

93



156

---

CPNJMTBESWNY00003052

94

Subject to and without waiving any of their objections, Chevron identifies the following terminals from which, on information and belief, they may have supplied gasoline to the localities that are the subject of these interrogatory responses. This is not to suggest that any or all of the gasoline had MTBE in it, and Chevron's records do not always reflect where gasoline was ultimately delivered.

| State | Name of Plaintiff | County | Terminal(s) | Dates Used* | Proprietary? |
|---|---|---|---|---|---|
| New Hampshire | City of Dover | Strafford | Chelsea, MA | 1979–1986 | Y |
| | | | South Portland, ME | 1979–1986 | Y |
| | City of Portsmouth | Rockingham | Chelsea, MA | 1979–1986 | Y |
| | | | South Portland, ME | 1979–1986 | Y |
| | State of New Hampshire | | Chelsea, MA | 1979–1986 | Y |
| | | | South Portland, ME | 1979–1986 | Y |
| New York | City of New York | Bronx County, Kings County, New York, Queens, Richmond | Albany, NY | 1979–1986 | N |
| | | | Buffalo, NY | 1979–1986 | N |
| | | | Greenpoint, NY | 1979–1986 | N |
| | | | Gulfport, NY | 1979–1986 | Y |
| | | | Johnson City, NY | 1979–1986 | Y |
| | | | Long Island, NY | 1979–1986 | N |
| | | | Oceanside, NY | 1979–1986 | Y |
| | | | Rensselaer, NY | 1979–1986 | Y |
| | | | Rochester, NY | 1979–1986 | Y |
| | | | So. Seatauket, NY | 1979–1986 | N |
| | | | Syracuse, NY | 1979–1986 | Y |
| | | | Utica, NY | 1979–1986 | Y |
| | | | Yonkers, NY | 1979–1986 | N |

*Chevron notes that after 1986, it is possible that some of the listed terminals were used by other companies to supply their own retail outlets in some of the relevant areas. Chevron had no retail outlets in the relevant areas after 1986.

There may be additional terminals that were formerly and/or currently owned or used by Chevron (including its predecessor Gulf). Chevron will supplement its response to this interrogatory to the extent such additional terminals are identified.

157

134.   **CITGO Petroleum Corporation ("CITGO") and CITGO Refining and Chemicals Company L.P. ("CRCC") (collectively, the "CITGO Defendants")** have indicated that they did ship MTBE gasoline into terminals along the gasoline supply system which served the RGA.   Further they state that they blended MTBE into gasoline at the terminals. Specifically, the   CITGO Defendants have indicated the following:

- "During the years 1995 through March 2000, CITGO shipped RFG via a branch of the Buckeye Pipeline East system that runs from Linden, New Jersey to the Shell/Motiva terminal located at 25 Paidge Avenue in Brooklyn, New York."[158]

[157] Chevron U.S.A. Inc.'s Responses to City of New York's First Set of Interrogatories, Page 11
[158] Citgo Petroleum Corporation's and Citgo Refining and Chemicals Company L.P.'s Answers and Objections to City of New York's Revised Third Set of Interrogatories to all Defendants, Page 8

CPNJMTBESWNY00003053

# EXHIBIT 5

*StarEnterprise*



Mr. Bruce Bodami                                    October 26, 1993
Lombardo Equiptment Co.
Bushes Lane
PO Box 62
Elmwood Park, NJ   07407

     Re:  Skyline S/C
          Ringwood, NJ

Dear Mr. Bodami,

We have been advised by Mr. Joseph Costello, proprietor of subject
location that your company has entered into contract with him on
June 9, 1993 for tank upgrading.  The work has not commenced as of
this date.  We at Star Enterprise have completed all our tank
upgrading at those locations we own and we expect all other
customers to be in compliance with state regulations.

Since we are rapidly approaching the deadline date, when can we
expect Mr. Costello's location to be in compliance?


Very Truly Yours,

Sam A. Trunzo
Marketing Supervisor

EXHIBIT
J. Costello

796-3390
796-3391
796-3392

*[handwritten: Site Plan Figure of 10/93 for asbestos]*

*[handwritten: Sumps Equipment Containment]*

# LOMBARDO EQUIPMENT CO.
### *Service Station Installation and Maintenance*

BUSHES LANE, P. O. BOX 62      ELMWOOD PARK, N. J. 07407

JUNE 7, 1993

SKYLINE TEXACO
SKYLINE DRIVE
RINGWOOD NJ  07456

ATT:  JOE COSTELLO

SIR:

WE ARE PLEASED TO SUBMIT OUR COMPLIED QUOTATION TO PERFORM THE FOLLOWING
IN THE AMOUNT OF $28,500.00 (TAX NOT INCLUDED).

SUPPLY AND INSTALL ONE (1) ST1401 CONSOLE AND PRINTER, THREE (3) SENSORS
(INVENTORY TYPE), AND TWO (2) VAPOR SENSORS.

EXCAVATE TO TANK AND INSTALL THREE (3) CONTAINMENT SUMPS, THREE (3)
CONTAINMENT COVERS, AND FOUR (4) 15 GALLON SPILL.

OVERFILL WILL BE ELCTRONIC AND INCORPORATED IN THE ST1401.

*[handwritten: NEED only Three (3) containment covers - Ed Change ONE In Telephone modem to Home Phone - 8:15 am 6/4/93]*

*[handwritten: Phone Conversation w/ Bruce Rossini]*

REPLACE ALL DISTURBED CONCRETE AND ASPHALT.

OBTAIN SUBSTANCIAL MODIFICATION PERMIT AND LOCAL PERMIT.

ASSUMPTIONS
IT IS ASSUMED THAT;
          THE TANKS TO BE UPGRADED ARE REGISTERED WITH THE STATE.
          THE AREA TO BE EXCAVATED WILL BE FREE OF ANY OBSTRUCTIONS SUCH
              AS CARS, TRUCKS, OR OTHER MISCELLANEOUS DEBRIS.

THERE WILL BE AN ADDITIONAL CHARGE SHOULD IT BE NECESSARY TO REMOVE AND
DISPOSE OF CONTAMINATED WATER OR ANY SUB SURFACE SOIL WHICH SHOULD BE
DETERMINED HAZARDOUS BY LOCAL OFFICIAL, EPA, DEP, OR OUTSIDE TESTING
LABS.

ANY ADDITIONAL BACK FILL REQUIRED TO REPLACE CONTAMINATED SOIL WILL BE
CERTIFIED CLEAN FILL AND WILL BE SUPPLIED AT $25.00 PER TON.

ANY UNFORSEEN OBSTACLES SUCH AS BUT NOT LIMITED TO ROCK, HIGH WATER IN
EXCAVATION OR UNDERGROUND UTILITY LINES WILL CONSTITUTE AN EXTRA TO THIS
CONTRACT.

SKYLINE002159

WE THANK YOU FOR THE OPPORTUNITY OF QUOTING ON THIS PROPOSED IMPROVEMENT
AND LOOK FORWARD TO DOING BUSINESS WITH YOU.

*#1OP3 PO A 2000⁰⁰ 6/9/93*
*Bl 26500⁰⁰*

TERMS OF THIS CONTRACT:
      6% SALES TAX WILL BE ADDED TO THE ABOVE PRICE
      $2,000.00 TO START PAPER WORK AND OBTAIN PERMITS
      $12,000.00 AT COMMENCEMENT OF WORK
      BALANCE UPON COMPLETION OF CONTRACT.

I HEREBY AGREE AND ACCEPT THE TERMS OF THIS CONTRACT_____

                                        SINCERELY,

                                        *Bruce Badami* (signature)

                                        BRUCE BADAMI
                                        LOMBARDO EQUIPMENT CO., INC.

BB/ml

NOTE: THERE WILL BE AN ADDITIONAL CHARGE SHOULD IT BE
      NECESSARY TO REMOVE AND DISPOSE OF CONTAMINATED
      WATER OR ANY EXCAVATED SUB SURFACE SOILS WHICH
      SHOULD BE DETERMINED HAZARDOUS BY THE LOCAL
      OFFICIALS, EPA, DEP OR OUTSIDE TESTING LAB.

*Balance*
*# 26.500*

*DATE*
*11/1/93 Received (Bruce Badami) $5000.00 Cash*
*11/19/93 Received (V. Lombardo) $10,000.00 Cash*
*12/15/93 a Bruce Badami 11,500.00 Cash*

SKYLINE002160

# EXHIBIT 6

```
                                                                    1
     D8JMMTB1
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    IN RE:  MTBE LITIGATION
3
4                                        00 MDL 1358 (SAS)
4
5    ------------------------------x
5                                        New York, N.Y.
6                                        August 19, 2013
6                                        4:40 p.m.
7
7    Before:
8
8                    HON. SHIRA A. SCHEINDLIN,
9
9                                        District Judge
10
10                       APPEARANCES
11
11   MILLER AXLINE & SAWYER
12        Attorneys for Plaintiffs NJ, PR, et al.
12   BY:  MICHAEL AXLINE
13        -and-
13   BERGER & MONTAGUE
14   BY:  TYLER E. WREN
14
15   GWEN FARLEY
15   YIN ZHOU
16        Attorneys for New Jersey Plaintiffs
16
17   McDERMOTT WILL & EMERY LLP
17        Attorneys for Defendant ExxonMobil, Defense Liaison
18   BY:  JAMES A. PARDO
18
19   ARCHER & GREINER, P.C.
19        Attorneys for Defendants
20   BY:  DAVID EDELSTEIN
20
21   KING & SPALDING LLP
21        Attorneys for Defendant Chevron
22   BY:  CHARLES C. CORRELL, JR.
22        ROBERT MEADOWS
23
23   SEDGWICK LLP
24        Attorneys for Defendant Shell
24   BY:  PETER C. CONDRON
25        RICHARD E. WALLACE, JR.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

D8JMMTB3

1   interrogatories, where it's supposed to give us your facts --
2           THE COURT:  They put you on notice that Chevron was at
3   those sites.
4           MR. CORRELL:  Yes, your Honor.  But not the facts
5   supporting their claim.
6           THE COURT:  I don't think they were supposed to lay
7   out all of the evidence of every defendant at every site.
8           MR. CORRELL:  In the contention interrogatory, yes,
9   your Honor.  What Axline didn't tell you is, they make this
10  general statement and they go down the contention
11  interrogatories, and let's just turn to the Getty site.  They
12  list Texaco, now Chevron, owned this site, supplied it with
13  MTBE gasoline.  Then they talk about Getty properties and the
14  facts related to Getty properties.  They never mention any
15  facts related to Chevron USA, Inc.  And if you look at each one
16  of these sites, they go into detail in their contention
17  interrogatory answers and listing the different entities
18  involved, and they never list Chevron USA.  They never talk
19  about any Chevron supply arrangements.  They list the Texaco
20  supply agreements, they list the Getty supply agreements, but
21  they never give one fact about Chevron USA.  In their response
22  letter, when they mention the Philadelphia refinery, that was
23  the first time they have mentioned that.  And we issued an
24  expert report --
25          THE COURT:  That dates back for a long, long time

D8JMMTB3

```
 1                THE COURT:  There is some evidence that can support a
 2      disputed issue of fact, I think you might be right on that.
 3      But for summary judgment purposes he doesn't have to meet the
 4      preponderance of the evidence test because then I would be
 5      weighing the evidence.  That can't be the test on summary
 6      judgment.  It has to be a record cite to something that will
 7      show that they will offer evidence at trial from which a
 8      reasonable juror could find.  That's the way it reads.  I
 9      wouldn't have to meet the preponderance of the evidence test.
10      Then I would be weighing.
11                MS. DEAN:  I understand, your Honor.  But the bottom
12      line is, plaintiffs don't even have an expert opinion to
13      connect MTBE that was found in 2006, 19 years after my client
14      pulled the USTs.
15                THE COURT:  He agrees with that.
16                MS. DEAN:  And the MTBE was located in a new tank
17      field.
18                THE COURT:  Which he says is right on top of the old
19      tank field.  He says it's right on top of the old tank field.
20                MS. DEAN:  In our motion, your Honor, we would present
21      evidence showing that that is not true.
22                THE COURT:  Then it will be a disputed issue of fact
23      and I can't decide it.  I'm trying to make a point as to when
24      these motions should be made and shouldn't be made.  If that's
25      disputed and if he relies on proof that virtually all the
```

D8JMMTB3

1  gasoline at that time had MTBE and Getty, who, as you said,
2  sought the waiver, that means they had to use MTBE because they
3  didn't get the waiver.  So they were using MTBE, like everybody
4  else.  So the discharge had to have contained MTBE.  That's his
5  point.
6          MS. DEAN:  My question is, your Honor, that's not a
7  fact.  That's not a fact in evidence.
8          THE COURT:  An inference is based on a series of
9  facts.  Fact, MTBE was used as an oxygenate in the '80s, right?
10 Fact, Getty supplied gasoline to this station at this time
11 during that period.  Fact, UST had six holes and there was a
12 leak from that tank.  If you put the three facts together, all
13 he's saying, it is a fair inference that the contamination in
14 the soil would have shown that it was only part MTBE.
15         MS. DEAN:  May I raise one other issue that I
16 neglected to raise earlier.
17         Also, we had sought to seek summary judgment on this
18 site, based on the state's own finding that the owner and the
19 operator were the responsible parties for the contamination
20 that was found in 2006.  And, in fact, during that process the
21 owner and operator presented evidence to the state to attempt
22 to prove that the contamination that was found in 2006 was a
23 result of Getty's tanks in 1987.
24         (Continued on next page)
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# EXHIBIT 7



LEXISNEXIS' FILE & SERVE
E-SERVICE
30509986
Apr 9 2010
5:21PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

IN RE METHYL TERTIARY BUTYL ETHER    :     Master File No. 1:00-1898
PRODUCTS LIABILITY LITIGATION        :     MDL 1358 (SAS)
                                     :     M 21-88
-------------------------------------------------------X
                                     :     OBJECTIONS AND RESPONSES
This document pertains to:           :     OF TEXACO INC. TO
                                     :     PLAINTIFFS' FIRST SET OF
*New Jersey Department of Environmental* :  INTERROGATORIES TO
*Protection, et al. v. Atlantic Richfield Co., et al.,* :  DEFENDANTS
*08 Civ. 00312*                      :
                                     :
-------------------------------------------------------X

        Texaco Inc., by and through its attorneys, makes the following objections and responses

to Plaintiffs' First Set of Interrogatories to Defendants pursuant to the Federal Rules of Civil

Procedure and the Local Rules of the Southern District of New York.[1]

## PRELIMINARY STATEMENT

        Texaco Inc. has not refined or marketed gasoline in the United States since December

1984, when its domestic operating assets were transferred to a subsidiary then known as Texaco

Refining and Marketing Inc. (n/k/a TRMI-H LLC).   TRMI-H LLC in turn exited the U.S.

gasoline market in December 1988 when its operating assets were acquired by Star Enterprise.

        In November 2005, Texaco Inc. entered into a settlement agreement with the New Jersey

Department of Environmental Protection (the "Settlement"), whereby NJDEP released Texaco

Inc. from any and all liability for groundwater natural resource damages—specifically including

the lost value of, injury to, or destruction of the State's groundwater resources and services

flowing from those resources, and the restoration, rehabilitation, or acquisition of the equivalent

---

[1] The Third Amended Complaint improperly identifies Texaco Inc. as a corporate predecessor to Chevron
Corporation (f/k/a ChevronTexaco Corporation).  Texaco Inc., however, is a separately incorporated entity that is
wholly independent from Chevron Corporation.

of injured groundwater resources and the services flowing from those resources—at all known and unknown sites in New Jersey that may have been owned, operated, leased or otherwise affiliated with Texaco Inc.

Texaco Inc. has already produced voluminous documents that contain information responsive to these Interrogatories in response to CMO #45 (CHEVMDL 1358_NJDEP-UTX 0000001 - CHEVMDL 1358_NJDEP-UTX 00000950).  *See also* CHEVMDL 1358_CNY 0000001 - CHEVMDL 1358_CNY 0001121 previously produced in *City of New York*.  Such documents include, but may not be limited to:  (1) EIA data identifying Texaco gasoline that was marketed or distributed in NJ during the period 1986-1989; (2) Texaco gasoline sales data for the period 1981-1989; (3) TRMI-Star Fixed Assets List dated Dec. 1988 (identifying former Texaco service stations and terminals in NJ); (4) Natural Resource Damages Settlement Agreement between Texaco Inc. and NJDEP dated Nov. 2005 (identifying former Texaco service stations and terminals in NJ); and (5) Colonial Pipeline data.  Pursuant to Federal Rule of Civil Procedure 33(d), Texaco Inc. refers Plaintiff to these documents for information responsive to these Interrogatories, as the burden of reviewing them is the same for Plaintiff as it is for Texaco Inc.

Much of the foregoing sales data do not distinguish between gasoline containing MTBE and gasoline without MTBE.  By making this production, Texaco Inc. does not concede that any of the gasoline represented by this data contained MTBE.

Texaco Inc.'s investigations regarding this matter are continuing.  Texaco Inc. reserves the right to supplement or modify these responses in the event additional documents or information becomes available.

counsel. *See also* Texaco Inc.'s response to Interrogatory No. 16 and the Texaco depositions identified therein.

**INTERROGATORY NO. 19:**       **Identify each party on whose behalf you are responding to these requests.**

**RESPONSE**: Texaco Inc. (improperly characterized in the Third Amended Complaint as the corporate predecessor to Chevron Corporation, f/k/a ChevronTexaco Corporation).

Dated:  April 9, 2010

                                   Respectfully submitted,


                                   *William F. Hughes*
                                   _____
                                   Richard E. Wallace, Jr.
                                   William F. Hughes
                                   WALLACE KING DOMIKE
                                   & REISKIN PLLC
                                   2900 K Street, N.W., Harbourside
                                   Washington, D.C.  20007
                                   Telephone: (202) 204-1000

                                   Robert E. Meadows
                                   Charles C. Correll, Jr.
                                   Russell D. Workman
                                   KING & SPALDING LLP
                                   1100 Louisiana, Suite 4000
                                   Houston, Texas 77002

                                   Attorneys for Texaco Inc.

20

# EXHIBIT 8



Nov 12 2010
4:20PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

IN RE METHYL TERTIARY BUTYL ETHER   :
PRODUCTS LIABILITY LITIGATION   :
  :
------------------------------------------------------------X

This document pertains to:   :
  :
  :
  :
*New Jersey Department of Environmental*   :
*Protection, et al. v. Atlantic Richfield Co., et al.,*   :
  :
  :
*08 Civ. 00312*   :
  :
------------------------------------------------------------X

Master File No. 1:00-1898
MDL 1358 (SAS)
M 21-88

CHEVRON DEFENDANTS'
OBJECTIONS AND RESPONSES
TO PLAINTIFFS' REQUESTS
FOR PRODUCTION
OF DOCUMENTS TO
DEFENDANTS

        Defendants Chevron U.S.A. Inc. ("Chevron") Chevron Corporation (f/k/a ChevronTexaco Corporation), Texaco Inc. ("Texaco"), Unocal Corporation ("Unocal"), and Kewanee Industries, Inc. ("Kewanee") (hereinafter collectively referred to as the "Chevron Defendants"), submit the following objections and responses to Plaintiffs' Requests for Production of Documents dated October 11, 2010.

<div align="center">

### PRELIMINARY STATEMENT

</div>

        Defendants Chevron Corporation, Unocal, and Kewanee did not refine, market, or distribute gasoline to any of the 18 locations Plaintiffs designated as "Focus Sites" in the above-captioned litigation, or anywhere else in New Jersey. Consequently, Chevron Corporation, Unocal, nor Kewanee has information responsive to these Requests.

        Chevron has not marketed any gasoline in the relevant geographic area for *New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.* (the "RGA") since 1986, when Chevron sold substantially all of its marketing facilities and assets in the

Northeast, including its legacy Chevron retail stations, and its legacy Gulf Oil Corporation ("Gulf") retail stations, to Cumberland Farms.

Texaco has not refined or marketed gasoline in the United States since December 1984, when its operating assets were acquired by a subsidiary then known as Texaco Refining and Marketing Inc., n/k/a TRMI-H LLC ("TRMI"). TMRI refined and marketed gasoline in the United States from 1985 until approximately December 1988, when its assets were acquired by Star Enterprise. Neither Texaco nor TRMI has refined, marketed or distributed gasoline in the State of New Jersey or other areas of the United States since December 1988.

In November 2005, Chevron and Texaco entered into a settlement with the New Jersey DEP (the "Settlement"), whereby the DEP received what it acknowledged was payment for 100% of groundwater natural resource damages—specifically including the lost value of, injury to, or destruction of the State's groundwater resources and services flowing from those resources, and the restoration, rehabilitation, or acquisition of the equivalent of injured groundwater resources and the services flowing from those resources—at all known and unknown sites in New Jersey that may have been owned, leased, affiliated with, and/or operated by Chevron (the "Chevron Sites"),[1] even if such sites were later transferred to a third party. In exchange, the DEP released Chevron and Texaco from all liability for such damages relating to all discharges of any hazardous substances—including petroleum hydrocarbons, oil, oil products and fractions thereof—at all Chevron Sites in New Jersey.

As part of the Settlement, Chevron and Texaco have already provided Plaintiffs with the records it has concerning retail and terminal locations in New Jersey. These documents were also submitted to Plaintiffs on February 9, 2009 as part of the above-referenced litigation (*see*

---

[1]  The Settlement also released Chevron and Texaco from liability for such damages at sites owned, leased, affiliated with, and/or operated by the other parties to the Settlement.

Bates Nos. CHEVMDL1358_NJDEP-C0000000001 through CHEVMDL1358_NJDEP-C0000000507). Further, in response to CMO #45, CMO #75, and Plaintiffs' First set of Interrogatories, Chevron and Texaco have provided documents (*see* Bates Nos. CHEVMDL1358_NJDEP-C0000000519 through CHEVMDL1358_NJDEP-C0000013451, and CHEVMDL1358_NJDEP-UTX 0000000001 through 0000000950) and answers regarding their relationship with, and deliveries of gasoline to, retail locations in New Jersey, which would necessarily include the locations now selected as focus sites for this litigation (the "Focus Sites"), if Chevron and/or Texaco had any relationship with them. In other words, answers to the discovery Plaintiffs now seek has already been provided multiple times, and Chevron and Texaco object to the unnecessary and harassing duplication of discovery that Plaintiffs have already conducted.

According to records available to Chevron and Texaco, neither party owned or leased property at any of the Focus Sites. Nevertheless, at least six of the Focus Sites are among those included under the Settlement:

1. Cumberland Farms, Inc. Gulf Service Station #2902 at Route 73 and Vanderveer Street; Site ID 10625;
2. Baker's Waldwick Gulf Service Station #121359 at 49 Franklin Turnpike; Site ID 11126;
3. Getty Service Station # 57207 at 360 Route 9; Site ID 12912;
4. Getty Service Station #56206 at 3710 Route 1; Site ID 6187;
5. Lukoil Service Station # 57715 at 590 Shrewsbury Avenue; Site ID 15204; and
6. 5 Points BP Service Station at 109 Delsea Drive; Site ID 15442.

These Focus Sites were among those that were included in the Settlement because New Jersey DEP had possession of records allegedly implicating one or more of the settling parties with respect to those locations. Although neither Chevron, nor Texaco, nor Kewanee have admitted any connection or liability to these Focus Sites, they agreed in the Settlement to pay an

**REQUEST FOR PRODUCTION NO. 33:** Copies of product codes and product descriptions which identify gasoline products containing MTBE, TBA, ethanol, and/or other oxygenates delivered to and/or marketed at each SITE.

**RESPONSE:** The Chevron Defendants object to this Request to the extent it seeks documents not in the "possession, custody or control" of the Chevron Defendants, or otherwise purports to require the Chevron Defendants to do any act not required of them under the Federal Rules of Civil Procedure. The Chevron Defendants further object to the extent that this Request seeks information protected from disclosure by the attorney-client privilege, the joint defense privilege, the attorney work product doctrine, the consulting expert privilege, or any other applicable protection, privilege or exemption at law or pursuant to statute.

The Chevron Defendants incorporate their Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, the Chevron Defendants respond as follows:

None of the Chevron Defendants have documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 34:** All delivery orders, delivery agreements, truck dispatch records, delivery tickets or other documentation relating to the ordering of product for delivery to the gasoline storage system at each SITE.

**RESPONSE:** The Chevron Defendants object to this Request to the extent it seeks documents not in the "possession, custody or control" of the Chevron Defendants, or otherwise purports to require the Chevron Defendants to do any act not required of them under the Federal Rules of Civil Procedure. The Chevron Defendants object that this Request is overbroad in that it is not confined to the delivery of gasoline containing MTBE. The Chevron Defendants further object to the extent that this Request seeks information protected from disclosure by the attorney-client privilege, the joint defense privilege, the attorney work product doctrine, the consulting expert privilege, or any other applicable protection, privilege or exemption at law or pursuant to statute.

The Chevron Defendants incorporate their Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, the Chevron Defendants respond as follows:

None of the Chevron Defendants have documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 35:** Any and all documents, including but not limited to gasoline supply agreements, which reflect or refer to the suppliers of gasoline which has been stored in underground storage tanks at each SITE.

**RESPONSE:** The Chevron Defendants object to this Request to the extent it seeks documents not in the "possession, custody or control" of the Chevron Defendants, or otherwise purports to require the Chevron Defendants to do any act not required of them under the Federal Rules of Civil Procedure. The Chevron Defendants object that this Request is overbroad in that it is not confined to gasoline containing MTBE. The Chevron Defendants further object to the extent

that this Request seeks information protected from disclosure by the attorney-client privilege, the joint defense privilege, the attorney work product doctrine, the consulting expert privilege, or any other applicable protection, privilege or exemption at law or pursuant to statute.

The Chevron Defendants incorporate their Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, the Chevron Defendants respond as follows:

None of the Chevron Defendants have documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 36:** Any and all motor fuel gasoline tax records for the sale of gasoline or gasoline with MTBE and/or TBA at each SITE.

**RESPONSE:** The Chevron Defendants object to this Request to the extent it seeks documents not in the "possession, custody or control" of the Chevron Defendants, or otherwise purports to require the Chevron Defendants to do any act not required of them under the Federal Rules of Civil Procedure. The Chevron Defendants further object to the extent that this Request seeks information protected from disclosure by the attorney-client privilege, the joint defense privilege, the attorney work product doctrine, the consulting expert privilege, or any other applicable protection, privilege or exemption at law or pursuant to statute.

The Chevron Defendants incorporate their Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, the Chevron Defendants respond as follows:

None of the Chevron Defendants have documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 37:** Any and all certificates, licenses or permits relating to the storage tanks or dispensing equipment at each SITE.

**RESPONSE:** The Chevron Defendants object to this Request to the extent it seeks documents not in the "possession, custody or control" of the Chevron Defendants, or otherwise purports to require the Chevron Defendants to do any act not required of them under the Federal Rules of Civil Procedure. The Chevron Defendants object that this Request is overbroad in that it is not confined to the "storage tanks or dispensing equipment" of gasoline containing MTBE. The Chevron Defendants further object to the extent that this Request seeks information protected from disclosure by the attorney-client privilege, the joint defense privilege, the attorney work product doctrine, the consulting expert privilege, or any other applicable protection, privilege or exemption at law or pursuant to statute.

The Chevron Defendants incorporate their Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, the Chevron Defendants respond as follows:

None of the Chevron Defendants have documents responsive to this Request.

Respectfully submitted,

*Russell D. Workman* *By Permission DAB*

Robert E. Meadows
Charles C. Correll, Jr.
Russell D. Workman
KING & SPALDING LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

**Attorneys for the Chevron Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on *November 12th*, 2010, a true, correct, and exact copy of the foregoing document was served on all counsel via LexisNexis File & Serve.

*Russell D. Workman* *By Permission DAB*

Russell D. Workman

# EXHIBIT 9



Nov 11 2010
5:21PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

................................................................X

IN RE METHYL TERTIARY BUTYL ETHER     :
PRODUCTS LIABILITY LITIGATION          :
                                       :
................................................................X
                                       :
This document pertains to:             :
                                       :
                                       :
New Jersey Department of Environmental :
Protection, et al. v. Atlantic Richfield Co., et al., :
                                       :
08 Civ. 00312                          :
                                       :
................................................................X

Master File No.  1:00-1898
MDL 1358 (SAS)
M 21-88

DEFENDANT CHEVRON U.S.A.
INC.'S OBJECTIONS AND
RESPONSES TO PLAINTIFFS'
SECOND SET
OF INTERROGATORIES
TO DEFENDANTS

Defendant Chevron U.S.A. Inc. ("Chevron"), submits the following objections and responses to Plaintiffs' Second Set of Interrogatories dated October 11, 2010.

PRELIMINARY STATEMENT

Chevron has not marketed any gasoline in the relevant geographic area for *New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.* (the "RGA") since 1986, when Chevron sold substantially all of its marketing facilities and assets in the Northeast, including its legacy Chevron retail stations, and its legacy Gulf Oil Corporation ("Gulf") retail stations, to Cumberland Farms.  In November 2005, Chevron entered into a settlement with the New Jersey DEP (the "Settlement"), whereby the DEP received what it acknowledged was payment for 100% of groundwater natural resource damages—specifically including the lost value of, injury to, or destruction of the State's groundwater resources and services flowing from those resources, and the restoration, rehabilitation, or acquisition of the equivalent of injured groundwater resources and the services flowing from those resources—at all known and unknown sites in New Jersey that may have been owned, leased, affiliated with,

and/or operated by Chevron (the "Chevron Sites"),[1] even if such sites were later transferred to a third party. In exchange, the DEP released Chevron from all liability for such damages relating to all discharges of any hazardous substances—including petroleum hydrocarbons, oil, oil products and fractions thereof—at all Chevron Sites in New Jersey.

The only Chevron refinery that directly served the New Jersey market was its former facility in Philadelphia, Pennsylvania (the "Philadelphia Refinery"), and prior to the 1986 divestiture, Chevron did not blend any MTBE there. Chevron has no records indicating that any of the gasoline Chevron marketed in New Jersey prior to the 1986 divestiture contained MTBE. After that time, Chevron had no intent to market or distribute gasoline containing MTBE in New Jersey or anywhere else in the Northeast, other than the few specific shipments noted below.

Chevron did not blend MTBE into gasoline at the Philadelphia Refinery until late 1992, when Chevron was required to begin using MTBE as an oxygenate under the federal Wintertime Program. By that time, Chevron had already divested its marketing assets in the Northeast, and thus was itself no longer marketing any gasoline in New Jersey. Between 1992 and 1994, Chevron's records reflect the following sales of gasoline containing MTBE into New Jersey:

| | |
|---|---|
| 1992 | 1,953,275 bbls |
| 1993 | 5,955,947 bbls |
| 1994 | 2,546,976 bbls |

Chevron sold the Philadelphia Refinery in August 1994. Since then, Chevron has not manufactured gasoline containing MTBE in the Northeast, and has no information that it has sold any gasoline containing MTBE in New Jersey.

---

[1]    The Settlement also released Chevron from liability for such damages at sites owned, leased, affiliated with, and/or operated by the other parties to the Settlement: Kewanee Industries, Inc. ("Kewanee"), Texaco Downstream Properties, Inc., and Texaco Inc ("Texaco").

Chevron also blended MTBE at its Pascagoula, Mississippi refinery on various occasions between approximately 1986 and 2001, and at its Port Arthur, Texas refinery on various occasions between approximately 1981 and February 1995, when that refinery was sold.   To the best of Chevron's knowledge, however, neither the Pascagoula nor Port Arthur refineries directly served New Jersey.   Chevron has no knowledge or record of any transaction whereby gasoline containing MTBE blended at the Pascagoula or Port Arthur refineries was sold or distributed in New Jersey.   By February 1995, however, Chevron no longer owned the Port Arthur Refinery, and with the exception of six test batches totaling 362,623 barrels produced between November 3, 1994 and December 1, 1994—none of which Chevron has any record were transported to New Jersey—Chevron never produced reformulated gasoline ("RFG") at the Pascagoula Refinery. Because all 21 New Jersey counties were either mandatory or opt-in RFG-only areas, from early 1995 forward Chevron-produced gasoline containing MTBE could not have been sold or distributed in New Jersey.

As part of the Settlement, Chevron has already provided Plaintiffs with the records it has concerning retail and terminal locations in New Jersey.   These documents were also submitted to Plaintiffs on February 9, 2009 as part of the above-referenced litigation (*see* Bates Nos. CHEVMDL1358_NJDEP-C0000000001   through   CHEVMDL1358_NJDEP-C0000000507). Further, in response to CMO #45, CMO #75, and Plaintiffs' First set of Interrogatories, Chevron has provided documents (*see* Bates Nos. CHEVMDL1358_NJDEP-C0000000519 through CHEVMDL1358_NJDEP-C0000013451) and answers regarding its relationship with, and deliveries of gasoline to, retail locations in New Jersey, which would necessarily include the locations now selected as focus sites for this litigation (the "Focus Sites").   In other words, answers to the discovery Plaintiffs now seek has already been provided multiple times, and

**RESPONSE:**

Chevron objects to this Interrogatory to the extent it seeks information or DOCUMENTS not in Chevron's "possession, custody or control" or otherwise purports to require Chevron to do any act not required of it under the Federal Rules of Civil Procedure. Chevron objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous.

Chevron also incorporates its Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, Chevron responds as follows:

Chevron has no record of owning underground storage tanks at any of the Focus Sites during the relevant time period.

**INTERROGATORY NO. 4:**   Identify each SITE where you ever entered into an agreement to supply gasoline to that SITE during the time period January 1, 1979, to the present.

**RESPONSE:**

Chevron objects to this Interrogatory to the extent it seeks information or DOCUMENTS not in Chevron's "possession, custody or control" or otherwise purports to require Chevron to do any act not required of it under the Federal Rules of Civil Procedure. Chevron objects to this Interrogatory to the extent it seeks information that is neither relevant to the subject matter of the above-referenced action nor reasonably calculated to lead to the discovery of admissible evidence. Chevron objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Chevron objects that this Interrogatory is overbroad in that it is not confined to gasoline containing MTBE. Chevron objects that this request is duplicative in that it seeks information already supplied by Chevron or otherwise in Plaintiffs' possession. Chevron further objects that this interrogatory is duplicative of Interrogatory Nos. 1 and 3 of Plaintiffs' First Set of Interrogatories to Defendants and is duplicative of information already provided pursuant to CMO 45 (category 2).

Chevron also incorporates its Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, Chevron responds as follows:

Chevron has no record of entering into any agreement to supply gasoline at any of the Focus Sites during the relevant time period.

**INTERROGATORY NO. 5:**  Identify each SITE that ever sold your brand of gasoline during the time period January 1, 1979, to the present, and the inclusive dates of such sales.

**RESPONSE:**

Chevron objects to this Interrogatory to the extent it seeks information or DOCUMENTS not in Chevron's "possession, custody or control" or otherwise purports to require Chevron to do any

act not required of it under the Federal Rules of Civil Procedure. Chevron objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Chevron objects to this Interrogatory to the extent it seeks information that is neither relevant to the subject matter of the above-referenced action nor reasonably calculated to lead to the discovery of admissible evidence. Chevron objects that this Interrogatory is overbroad in that it is not confined to gasoline containing MTBE. Chevron objects that this interrogatory is duplicative of Interrogatory Nos. 1 and 3 of Plaintiffs' First Set of Interrogatories to Defendants and is duplicative of information already provided pursuant to CMO 45 (category 2).

Chevron also incorporates its Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, Chevron responds as follows:

Chevron has no record of Chevron-branded gasoline being sold at any of the Focus Sites during the relevant time period.

**INTERROGATORY NO. 6:** For each SITE, state whether your brand of gasoline was sold at the SITE with your knowledge and permission.

**RESPONSE:**

Chevron objects to this Interrogatory to the extent it seeks information or DOCUMENTS not in Chevron's "possession, custody or control" or otherwise purports to require Chevron to do any act not required of it under the Federal Rules of Civil Procedure. Chevron objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Chevron objects to this Interrogatory to the extent it seeks information that is neither relevant to the subject matter of the above-referenced action nor reasonably calculated to lead to the discovery of admissible evidence. Chevron objects that this Interrogatory is overbroad in that it is not confined to gasoline containing MTBE. Chevron objects that this interrogatory is duplicative of Interrogatory Nos. 1 and 3 of Plaintiffs' First Set of Interrogatories to Defendants and is duplicative of information already provided pursuant to CMO 45 (category 2).

Chevron also incorporates its Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, Chevron refers to its response to Interrogatory No. 5.

**INTERROGATORY NO. 7:** Identify the person(s) you employed who are the most knowledgeable concerning the SITE during the time period January 1, 1979, to the present.

**RESPONSE:**

Chevron objects to this Interrogatory to the extent it seeks information or DOCUMENTS not in Chevron's "possession, custody or control" or otherwise purports to require Chevron to do any act not required of it under the Federal Rules of Civil Procedure. Chevron objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Chevron further objects to the extent that this interrogatory seeks information protected from disclosure

**INTERROGATORY NO. 10:**   If your branded gasoline containing MTBE or TBA was delivered to any SITE, at any time between January 1, 1979, to the present, describe fully and completely the movement of gasoline from the refinery to each SITE, including but not limited to a full and complete description of each transportation step.

**RESPONSE:**

Chevron objects to this Interrogatory to the extent it seeks information or DOCUMENTS not in Chevron's "possession, custody or control" or otherwise purports to require Chevron to do any act not required of it under the Federal Rules of Civil Procedure. Chevron objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Chevron further objects that this Interrogatory is vague and/or overbroad in that it does not identify whose deliveries are in question, and Chevron will respond to this Interrogatory as though it refers to deliveries by Chevron.

Chevron incorporates its Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, Chevron refers to its responses to Interrogatory Nos. 5 and 6.

**INTERROGATORY NO. 11:**   If your gasoline containing MTBE or TBA was delivered to any SITE at any time during the time period January 1, 1979, to the present, identify each type of document created for each step in the transportation and delivery of your gasoline to the SITE.

**RESPONSE:**

Chevron objects to this Interrogatory to the extent it seeks information or DOCUMENTS not in Chevron's "possession, custody or control" or otherwise purports to require Chevron to do any act not required of it under the Federal Rules of Civil Procedure. Chevron objects to the definition of the terms "YOU" and "YOUR" as overbroad, vague and ambiguous. Chevron further objects that this Interrogatory is vague and/or overbroad in that it does not identify whose deliveries are in question, and Chevron will respond to this Interrogatory as though it refers to deliveries by Chevron.

Chevron incorporates its Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, Chevron refers to its responses to Interrogatory Nos. 5 and 6.

**INTERROGATORY NO. 12:**   For each SITE that sold your gasoline:

     a.     Identify the date(s) MTBE and/or TBA gasoline was released;

     b.     Please provide your best estimate of the amount(s) of MTBE and/or TBA gasoline released;

further objects that this Interrogatory assumes facts that are not in evidence, namely that Chevron installed any storage tanks, containment systems, spill buckets, and/or leak detection equipment at any of the Focus Sites.

Chevron also incorporates its Preliminary Statement and General Objections, above, by reference. Subject to and without waiving the foregoing objections, Chevron responds as follows:

Chevron refers to its responses to Interrogatory Nos. 1 through 3. Because Chevron did not own or lease any of the Focus Sites, nor own any USTs at any of the Focus Sites, nor have any sales relationship with any of the Focus Sites, Chevron would not have been in any position to install any storage tanks, containment systems, spill buckets, or leak detection equipment, nor would Chevron have had any responsibility for doing so.

Respectfully submitted,

Robert E. Meadows
Charles C. Correll, Jr.
Russell D. Workman
KING & SPALDING LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

**Attorneys for Chevron U.S.A. Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on November _ll_, 2010, a true, correct, and exact copy of the foregoing document was served on all counsel via LexisNexis File & Serve.

Russell D. Workman

## VERIFICATION

I, Frank G. Soler, declare and state:

That I am Assistant Secretary of Chevron U.S.A. Inc. ("Chevron"), and I am authorized to make this verification for and on the behalf of Chevron, and I make this verification for that reason.

I have read the foregoing Responses of Chevron to Plaintiffs' Second of Interrogatories to Defendants in *New Jersey Department of Environmental Protection, et al., v. Atlantic Richfield Co., et al., 08 Civ. 00312.* I am informed and believe that the matters stated therein are true and on that ground allege that the matters stated therein are true. I do not believe that any one person employed by Chevron knows all of the matters stated therein, and therefore these responses were prepared with the assistance and advice of representatives of, and counsel for, said Chevron upon whose assistance and advice I have relied. These responses are limited by the records and information still in existence, presently recollected and thus far discovered in the course of preparation of these responses. Chevron reserves the right to change or supplement said responses, or to apply for relief to permit insertion of unintentionally omitted matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at San Ramon, California, this 1 day of November, 2010.

Frank G. Soler, Assistant Secretary

EXHIBIT 10

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

**This Document Relates to:**

*New Jersey Department of Environmental Protection*

*v.*

*Atlantic Richfield Co., et al.,*

*No. 04 Civ. 04973 (SAS)*

**Expert Generic Report of Marcel Moreau**

Marcel Moreau Associates

Portland, Maine

*Marcel Moreau*

September 13, 2012

Leaks from suction pumping systems are often self-limiting. If the piping is not tight, the problem is generally noticed because air is drawn into the piping, and the pump functions erratically. The advent of the submersible pump, however, changed this picture dramatically. With the pump inside the tank instead of inside the dispenser, and the piping operating under positive rather than negative pressure, even large leaks in the piping do not affect the operation of the dispensing system. To this day, leaks in pressurized pumping systems account for the great majority of substantial subsurface product releases.

Whether the fuel is moved via suction or pressure, dispensers contain numerous fuel handling components such as meters, filters, strainers, solenoid valves, and unions that include mating surfaces sealed by various gaskets and seals and held together with bolts and screws. These components are frequent sources of leaks, and contamination beneath dispensers is commonplace. As Glen Marshall, Shell's storage system engineer noted at a symposium in 1996, "We found that each tank fill connection, submerged turbine, and under every single island pump or dispenser was a leak source that required containment."[20]

## Maintenance

In addition to leaks from piping-system components, maintenance activities such as replacing fuel filters or repairing pumps can release product into the environment, especially in the absence of secondary containment. Though the volumes spilled are generally small, ranging from quarts to a few gallons, these volumes can be sufficient to produce soil and groundwater contamination if MtBE is present in the gasoline (see Section IV). Because even small releases of gasoline containing MtBE can have big consequences, maintenance personnel must be aware of the different handling characteristics of gasoline containing MtBE and be much more fastidious when servicing equipment in order to prevent releases and protect the environment.

---

[20] *Spill and Leak Prevention Practices at Retail Sites,*" presentation by Glen Marshall of Shell at "An Environmental Symposium on MtBE," August 31, 1996.

portions of storage systems, vacuum-assisted Stage II vapor recovery systems that
pressurized tanks (leading to increased vapor leaks from leaky vapor piping and tank top
fittings), and poor maintenance practices (especially when combined with single-wall
storage systems).[146]

### May 1998 – Shell Employee States the "Bubba Factor" is the Achilles Heel of Storage Systems

In 1998, Curtis Stanley was notified by API of a study being initiated by the Santa Clara
Valley Water Authority.[147]  One aspect of the Santa Clara study was to investigate the
occurrence of MtBE at facilities that met the 1998 upgrade requirements.  In an e-mail to
Glen Marshall, Stanley indicated that he had urged API to "…evaluate existing [storage
tank] systems and new system design, installation and operations.  I already have a good
idea of what Santa Clara is going to find and if the industry isn't ready with an adequate
response/solution, we are all going to look bad."[148]   In response to Stanley's e-mail, Glen
Marshall stated that the "'Achilles Heel' of [storage tank] systems has always been the
'Bubba factor' …the best intentions of hardware manufacturers and designers being
ultimately defeated by poor installation and maintenance practices."[149]

### December 22, 1998 – The Federal Tank-Upgrading Deadline

EPA regulations that went into effect on December 22, 1988, established a ten-year
timeline for upgrading the nation's UST systems with corrosion protection, spill
containment, and overfill prevention.  The deadline for adding these three components to
UST systems already in service in 1988 was December 22, 1998.[150]

As predicted in the *TulsaLetter* in 1994,[151] a great many tank owners opted to wait
until the last minute to upgrade their storage systems.  California authorities estimated
that only 52 percent of approximately 60,000 active UST facilities in California had been

---

[146] Ibid.
[147] Untitled e-mail chain involving Judy Shaw (API), C. Stanley and G. Marshall, May 29, 1998.
[148] Ibid.
[149] Ibid.
[150] 40 CFR 280.21
[151] "Let's take a brief look at the prospects…" TulsaLetter, August 31, 1994, p. 1.

spills and releases on a monthly basis.[500]  By the end of August 1994, the data showed that only 5.1 gallons of gasoline had been spilled per million gallons of gasoline dispensed.[501]  A review of the data, however, indicates that the smallest spill recorded was 25 gallons.  API studies documented that miniscule customer spills on the order of drops of gasoline would total over 50 gallons spilled for every million gallons dispensed.[502]  Anyone familiar with gas station operations would also be aware that small gasoline spills—of cups to quarts—are relatively frequent events.  It is evident that the intent of this program was to track significant spills and the program did not consider the much more frequent, though much smaller spills, that are common occurrences at typical gas stations.

Personnel within Amoco who were more familiar with actual gas station practices were able to assess the situation more accurately:

> Why is it that we find most of our [contamination] problems only after we go looking for them (monitor wells, etc.)?  It is because those that are closest to the site may not be reporting spills, releases,…etc.  Why do we have contamination around the fill ports?  From what I hear the drivers didn't do it...they never spill a drop.  Well, if not them, then who?  I think with everyone afraid of having the finger pointed at them, we will be hard pressed to find many examples of negligence on the part of the dealer, engineer, or contractor.  What we have are results.  And the results show that most of our sites have contamination that was found only after we installed monitor wells as part of a divestiture.[503]

Another Amoco document cited an internal study that estimated 70 percent of new service stations less than 5 years old had groundwater contamination.[504]  Clearly the traditional admonition not to spill "any" fuel was not having the desired effect.

---

[500] "Monthly Spill and Release Status," internal BP memo to Site Managers and ProCare Managers, September 6, 1994.
[501] Ibid.
[502] *A Survey and Analysis of Liquid Gasoline Released to the Environment During Vehicle Refueling at Service Stations,* API Publication No. 4498, June 1989.  Assuming conventional, non-Stage II nozzles.
[503] Internal Amoco e-mail to Bill Hall from J. T. Schaeffer, August 23, 1996, in response to a request for examples of negligent behavior leading to remediation expense.
[504] "MTBE cost draft letter for your review and comment," internal Amoco facsimile correspondence to Ron Stahl from Minoo Javanmardian, July 30, 1993, p. 4.

# EXHIBIT 11



Jun 23 2011
4:37PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | Master File No.   1:00–1898 MDL            1358 (SAS) M21-88 |
| This document relates to: *New Jersey Department of Environmental Protection, et al.* v. *Atlantic Richfield Co., et al.,* Case No. 08-CIV-00312  : (SAS) | PLAINTIFFS' AMENDED NOTICE OF DEPOSITION OF MICHAEL COSTELLO WITH PRODUCTION OF DOCUMENTS AND VIDEOTAPING |

TO ALL PARTIES AND THEIR ATTORNEY(S) OF RECORD:

   **PLEASE TAKE NOTICE** that plaintiffs will take the oral deposition of Michael

Costello on July 20, 2011, beginning at 9:30 a.m. at the New Jersey Gasoline-C-Store

Automotive Association, 66 Morris Ave., Springfield, NJ 07081.  Deponent is believed to be

associated with Skyline Service Center, 236 Skyline Drive, Ringwood Borough, New Jersey

07456.  The deposition will continue from day to day, weekends and holidays excepted, until

completed.

   The deposition will be recorded stenographically and on videotape.  This deposition may

be used as evidence at trial.

   The deponent is not a party to this action.  So far as known to the deposing party, the

deponent's address and telephone number are as follows: Michael Costello- 236 Skyline Drive,

Ringwood Borough, New Jersey 07456, (973) 962-4667.  Said deponent is being served with a

-1-



EXHIBIT

deposition subpoena.  Copies of the deposition subpoena are attached hereto and served herewith.

Date:   June 23, 2011          By _____

                                    Michael Steeves
                                    Miller, Axline & Sawyer
                                    1050 Fulton Avenue, Suite 100
                                    Sacramento, CA 95825
                                    Telephone (916) 488-6688
                                    Attorneys for Plaintiff

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | | |
|---|---|---|
| New Jersey Dept. of Environmental Protection, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    08 Civ. 00312 (SAS); MDL 1358 |
| Atlantic Richfield Co., et al. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Southern District of New York        ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Michael Costello
     236 Skyline Drive, Ringwood Borough, New Jersey 07456

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Attachment

| Place: New Jersey Gasoline-C-Store Automotive Association<br>66 Morris Ave.<br>Springfield, NJ 07081 | Date and Time:<br><br>07/20/2011 9:30 am |
|---|---|

The deposition will be recorded by this method:   stenographically and by videotape

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

See Attachment

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  06/23/2011

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   New Jersey Department of Environmental Protection                            , who issues or requests this subpoena, are:

Michael Steeves, MILLER, AXLINE & SAWYER, 1050 Fulton Avenue, Suite 100, Sacramento, CA 95825 (916-488-6688); msteeves@toxictorts.org

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# ATTACHMENT

## DEFINITIONS

1.      "DOCUMENT" or "DOCUMENTS" are defined to include any and all manner of electronic, written, typed, printed, reproduced, filmed or recorded material, and all photographs, pictures, plans, drawings, or other representations of any kind of anything pertaining, describing, or concerning, directly or indirectly, in whole or in part, the subject matter of each designated issue and request, and document(s) includes, without limitation,

    a.      papers, books, journals, handbooks, manuals, ledgers, statements, memoranda, reports, invoices, worksheets, spreadsheets, work papers, notes, transcription of notes, letters, correspondence, abstracts, diagrams, plans, blueprints, specifications, pictures, drawings, films, photographs, graphic representations, diaries, calendars, desk calendars, lists, logs, publications, advertisements, instructions, minutes, orders, messages, résumés, summaries, agreements, contracts, telegrams, telexes, cables, recordings, electronic mail, audio tapes, transcriptions of tapes or recordings, or any other writings or tangible things in which any forms of communication are recorded or reproduced, as well as all notations on the foregoing; and

    b.      original and all other copies not absolutely identical; and

    c.      all drafts and notes (whether typed or handwritten or otherwise) made or prepared in connection with each such document, whether used or not.

2.      "JOBBER" means any company who delivered gasoline to your STATION.

3.      "RELEVANT TIME PERIOD" means the period from January 1, 1979 to January

1, 2009.

4.   "STATION" means Skyline Service Center, 236 Skyline Drive, Ringwood

Borough, New Jersey 07456.

## Request for Production of Documents

1.   All invoices for any shipments, deliveries, or receipts of gasoline to the STATION

during the RELEVANT TIME PERIOD.

2.   All Bills of Lading for any shipments, deliveries, or receipts of gasoline to the

STATION during the RELEVANT TIME PERIOD.

3.   All Highway Transportation Receipts which mention, concern, or refer to any

delivery of gasoline to the STATION during the RELEVANT TIME PERIOD.

4.   All Freight Bills or Shipping Orders which mention, concern, or refer to any

delivery of gasoline to the STATION during the RELEVANT TIME PERIOD.

5.   All DOCUMENTS which mention, concern, or refer to the supplier of gasoline

which was delivered to the STATION during the RELEVANT TIME PERIOD.

6.   All DOCUMENTS which mention, concern, or refer to any agreement to supply

gasoline to the STATION during the RELEVANT TIME PERIOD.

7.   All DOCUMENTS which mention, concern, or refer to the refiner of gasoline

which was delivered to the STATION during the RELEVANT TIME PERIOD.

8.   All DOCUMENTS which mention, concern, or refer to access to terminals from

which gasoline was lifted to supply the STATION at any time during the RELEVANT TIME

PERIOD.

9.   All license agreements for the property and/or buildings located at the STATION

during the RELEVANT TIME PERIOD.

10.    All lease agreements for the property and/or buildings located at the STATION during the RELEVANT TIME PERIOD.

11.    All DOCUMENTS which mention, concern, or refer to prior owners of the STATION or prior owners of the real property on which the STATION is located.

12.    All gasoline sales tax receipts for gasoline sold from, delivered to, shipped to, or received at the STATION during the RELEVANT TIME PERIOD.

13.    All correspondence or other DOCUMENTS from any petroleum refiner, manufacturer, supplier, distributor, or marketer during the RELEVANT TIME PERIOD.

14.    All DOCUMENTS, including, without limitation, correspondence from or agreements with any JOBBER regarding the STATION during the RELEVANT TIME PERIOD.

15.    All DOCUMENTS which mention, concern, or refer to any and all records from any leak detector, leak sensor, vapor sensor, or electronic alarm system, including but not limited to printouts, logs, electronic records, or reports indicating the alarm or sensor was activated or actuated at the STATION during the RELEVANT TIME PERIOD.

16.    All DOCUMENTS which mention, concern, or refer to any and all gasoline inventory reconciliation, analysis, or automatic tank gauging performed by any employees, personnel, or contractors for the STATION during the RELEVANT TIME PERIOD.

17.    All DOCUMENTS, including, without limitation, any reports or notices sent to or received from any regulatory agency disclosing that gasoline has been released at the STATION during the RELEVANT TIME PERIOD.

18.    All DOCUMENTS which mention, concern, or refer to specifications for underground tanks, product piping, pumps, valves, unions, meters, flex joints, swing joints, drop fills, overfill prevention devices, overspill containment, or any secondary containment equipment

used or installed at the STATION during the RELEVANT TIME PERIOD.

19. All DOCUMENTS which mention, concern, or refer to the purchase, acquisition, delivery, and installation of underground tanks, product piping, pumps, valves, unions, meters, flex joints, swing joints, drop fills, overfill prevention devices, overspill containment, or any secondary containment equipment used or installed at the STATION during the RELEVANT TIME PERIOD.

20. All DOCUMENTS which mention, concern, or refer to installation certifications for any equipment installed at the STATION during the RELEVANT TIME PERIOD including, without limitation, underground storage tanks, product piping, pumps, valves, unions, drop fills, overfill prevention devices, or overspill containment equipment.

21. All DOCUMENTS which mention, concern, or refer to post-installation inspection reports or integrity test results for any and all equipment for storing, transporting, transferring, or dispensing gasoline or other motor fuels at the STATION during the RELEVANT TIME PERIOD .

22. All DOCUMENTS which mention, concern, or refer to "as built" drawings for the STATION during the RELEVANT TIME PERIOD, including, without limitation, drawings of the location, design, or installation of any equipment or appurtenances at the STATION such as bay drains, dry wells, oil-water separators, "jensen boxes," underground sand filtration galleries, sand filters, cesspools, septic tanks, perimeter drains, canopy drains, tanks, product lines, pumps, dispensers, or any onsite storm water control facility.

23. All DOCUMENTS which mention, concern, or refer to evaluations, training, or reprimands for employees operating the STATION during the RELEVANT TIME PERIOD.

24. All DOCUMENTS which mention, concern, or refer to notices, warnings, product

information, bulletins, newspapers, magazines, newsletters or any other publications distributed to employees at the STATION during the RELEVANT TIME PERIOD that related to leaks, spills, or other releases of motor fuel or gasoline.

25.     All DOCUMENTS which mention, concern, or refer to standards, guidelines, procedures, protocols, or recommended practices issued to any employee at the STATION during the RELEVANT TIME PERIOD regarding the procedure(s) for notification of any person or entity, including government agencies, in connection with leaks, spills, or other releases of motor fuel or gasoline at the STATION.

26.     All DOCUMENTS which mention, concern, or refer to standards, guidelines, procedures, protocols, or recommended practices issued to any employee at the STATION relating to actions to be taken to contain, absorb, clean up, or remediate leaks, spills, or other releases of motor fuel or gasoline at the STATION during the RELEVANT TIME PERIOD.

27.     All DOCUMENTS which mention, concern, or refer to standards, guidelines, procedures, protocols, or recommended practices issued to any employee at the STATION relating to the procedure(s) for inventory measurement, inventory record keeping, or inventory reconciliation to detect potential leaks, spills, or releases from the underground storage tank system at the STATION during the RELEVANT TIME PERIOD.

28.     All DOCUMENTS which mention, concern, or refer to standards, guidelines, procedures, protocols, or recommended practices issued to any employee at the STATION during the RELEVANT TIME PERIOD concerning notification to any person or entity, including government agencies, of gasoline inventory discrepancies, inventory variations, or any other indication of a potential leak, spill, or release from the gasoline storage and dispensing system at the STATION.

# EXHIBIT 12

1997

| | | 1 | 2 | | | 5 | 6 |
|---|---|---|---|---|---|---|---|
| | | | 1997 | Purchases | | | |
| Jan | | <9308> | 79211 | 438122 | | | 1 |
| Feb | | <8868> | 32311 | 438122 | | | 2 |
| Mar | | <14019> | 85014 | 446137 | | | 3 |
| Apr | | <18377> | 87361 | 334698 | | | 4 |
| May | | <36433> | 78198 | 413896 | | | 5 |
| June | | <27379> | 97344 | 510945 | | | 6 |
| July | | <45191> | 79202 | 590142 | | | 7 |
| Aug | | <36257> | 88019 | 678161 | | | 8 |
| Sept | | <43420> | 79202 | 757363 | | | 9 |
| October 1- 1997 : Transfer - $ 61,750 | | | | | | | 10 |
| | | | | | | | 11 |
| Oct | | | | 131502 | | | 12 |
| Nov | | | | 119300 | | | 13 |
| Dec | | | | 127019 | | | 14 |
| Jan | | | | 114264 | | | 15 |
| Feb | | | | | | | 16 |
| Mar | | | | | | | 17 |
| Apr | | | | | | | 18 |
| May | | | | | | | 19 |
| June | | | | | | | 20 |
| July | | | | | | | 21 |
| | | | | | | | 22 |

SKYLINE001918

EXHIBIT

National 35-606

Texico Purchases — Stadt Enter Prize — Motiva

| | Prepared By | Initials | Date |
| | Approved By | | |

Contract 10/90 to 10/97 — Purchases —

| | | | 1 | 2 | 3 | 4 | 5 | 6 | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 1991 | | | 1992 | | |
| 1 | Jan | | 6 | 61,600 | | 7 | 61,600 | | 1 |
| 2 | Feb | | 8 | 68,000 | 129,000 | 8 | 44,000 | 105,600 | 2 |
| 3 | Mar | | 9 | 76,500 | 196,500 | 8 (72,00) | 70,600 | 176,200 | 3 |
| 4 | Apr | | 8 | 68,000 | 263,500 | 8 (72,00) | 70,400 | 246,600 | 4 |
| 5 | May | | 9 | 76,500 | 340,000 | 7 (60,00) | 61,800 | 308,400 | 5 |
| 6 | June | | 9 | 76,500 | 416,500 | 7 | 61,600 | 370,000 | 6 |
| 7 | July | | 8 | 68,000 | 484,500 | 8 (64,00) | 70,400 | 440,400 | 7 |
| 8 | Aug | | 9 | 76,500 | 561,000 | 8 | 70,500 | 510,900 | 8 |
| 9 | Sept | | 6 | 61,000 | 617,000 | 7 (72,00) | 61,600 | 572,500 | 9 |
| 10 | Oct | | 6 | 52,800 | 669,800 | 7 (54,700) | 61,600 | 634,100 | 10 |
| 11 | Nov | | 8 | 70,400 | 735,200 | 7 (53,300) | 61,600 | 695,700 | 11 |
| 12 | Dec | 8 + transf | 73,400 | 808,600 | 8 | 70,700 | 766,400 | 12 |
| 13 | | | | | | | | | 13 |
| 14 | | | | | | | | | 14 |
| 15 | | | | 1993 | | | 1994 | | 15 |
| 16 | Jan | | 7 | 61,700 | | 1 | 17,200 | 9 | 789,000 | 16 |
| 17 | Feb | 26,600 | 8 | 69,300 | 131,000 2 | 27,200 9 | 79,300 | 1,588,200 | 17 |
| 18 | Mar | 14,300 | 7 | 61,500 | 192,500 3 | 62,500 9 | 96,800 | 2,255,000 | 18 |
| 19 | Apr | 14,300 | 8 | 70,400 | 262,900 4 | 80,200 9 | 88,100 | 2,343,100 | 19 |
| 20 | May | 33,700 | 9 | 79,200 | 342,100 5 | 97,700 10 | 96,700 | 439,800 | 20 |
| 21 | June | 60,000 | 10 | 87,600 | 430,000 6 | 115,600 10 | 105,600 | 545,400 | 21 |
| 22 | July | 76,600 | 10 | 87,600 | 517,600 7 | 116,600 11 | 88,200 | 633,600 | 22 |
| 23 | Aug | 78,700 | 8 | 70,600 | 587,600 8 | 147,700 9 | 943,400 | 730,300 | 23 |
| 24 | Sept | 103,100 | 10 | 88,000 | 675,600 9 | 141,100 10 | 86,900 | 817,200 | 24 |
| 25 | Oct | 120,700 | 9 | 78,200 | 754,800 10 | 59,200 10 | 96,800 | 914,000 | 25 |
| 26 | Nov | 149,100 | 10 | 88,000 | 842,800 11 | 156,600 10 | 55,700 | 969,700 | 26 |
| 27 | Dec | 149,200 | 10 | 87,800 | 930,600 12 | 148,700 11 | 100,800 | 1,100,500 | 27 |
| 28 | | | | | | | | | 28 |
| 29 | Gas + Oil + 44,000 (4 loads) | | | 1995 | | | 1996 | | 29 |
| 30 | Jan | 1 | 91,100 | 88,000 | | 61,9 | 88,419 | | 30 |
| 31 | Feb | 1 | 178,800 | 88,000 | 176,000 | <84,410> | 79,071 | 167,550 | 31 |
| 32 | Mar | 1 | 79,000 | 88,000 | 264,000 | <82,640> | 92,116 | 260,756 | 32 |
| 33 | Apr | 1 | 127,60 | 97,000 | 360,260 | <86,857> | 92,419 | 353,675 | 33 |
| 34 | May | 1 | 21,780 | 101,320 | 461,580 | <112,183> | 96,820 | 450,395 | 34 |
| 35 | June | 1 | 20,360 | 105,210 | 566,790 | <282,711> | 95,024 | 538,419 | 35 |
| 36 | July | 1 | 21,560 | 88,400 | 655,190 | <19,947> | 96,824 | 635,243 | 36 |
| 37 | Aug | 1 | 30,490 | 105,600 | 760,790 | <46,332> | 79,213 | 714,456 | 37 |
| 38 | Sept | 3.7% | 31,890 | 88,000 | 848,790 | <46,007> | 88,325 | 802,781 | 38 |
| 39 | Oct | 1 | 29,570 | 97,600 | 946,390 | <55,670> | 85,117 | 887,898 | 39 |
| 40 | Nov | + .35% | 34,870 | 88,000 | 1,034,390 | <55,000> | 86,128 | 974,026 | 40 |
| 41 | Dec | + 5.1% | 26,070 | 88,000 | | <60,386> | 87,366 | 886,392 | 41 |

SKYLINE001919

Daily Sales

1997

| | | Jan | Feb | Mar | Apr | May | Jun |

SKYLINE001920

National      35-C06

Daily Sales

1997

| | | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|
| | | (2713) | (2670) | (2770) | (2672) | (3012) | (2831) |



SKYLINE001921

Monthly Gas Reconciliation 1992

| | Initials | Date |
|---|---|---|
| Approved by | | |
| Prepared by | | |

| | 1 JAN | 2 FEB | 3 MAR | 4 APR | 5 MAY | 6 JUN |
|---|---|---|---|---|---|---|
| 1 Beginning Inventory | 42703 | 7160 | 11561 | 14796 | 16479 | 7834 |
| 2 Additions | 79421 | 79411 | 86014 | 86141 | 79198 | 93044 |
| 3 Available | 61614 | 86671 | 99575 | 102937 | 95677 | 100878 |
| 4 Ending Stock Inventory | 7160 | 11561 | 14796 | 16479 | 7834 | 14050 |
| 5 Stock Sales | 84764 | 74110 | 84779 | 86668 | 87643 | 90808 |
| 6 Meter Sales | 84810 | 75006 | 84750 | 86141 | 87984 | 90180 |
| 7 Variation Pos (Neg) | 56 | <104> | <297> | <537> | <349> | <340> |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | JUL | AUG | SEP | OCT | NOV | DEC |
| 11 Beg. Inventory | 14050 | 14630 | 8379 | Two | 6164 | 4379 |
| 12 Additions | 79262 | 86801 | 69611 | Months | 268357 | 129618 |
| 13 Available | 93252 | 91337 | 78018 | | 264522 | 133997 |
| 14 Ending Stock | 14630 | 8379 | 6156 | | 4379 | 12228 |
| 15 Stock Sales | 88822 | 82454 | 71853 | | 260143 | 121302 |
| 16 Meter Sales | 88180 | 83811 | 72263 | | 259917 | 120177 |
| 17 Variations | <642> | 867 | 410 | | <226> | <1125> |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 Monthly Variation | Meter | Cumulative | | | | |
| 21 Jan | 56 | | | | | |
| 22 Feb | <104> | <48> | | | | |
| 23 Mar | <297> | <77> | | | | |
| 24 Apr | <537> | <614> | | | | |
| 25 May | <349> | <963> | | | | |
| 26 Jun | <340> | <151> | | | | |
| 27 Jul | <642> | <2153> | | | | |
| 28 Aug | 867 | <1296> | | | | |
| 29 Sep | 410 | <886> | | | | |
| 30 Oct | <226> | <1112> | | | | |
| 31 Nov | | | | | | |
| 32 Dec | <1195> | <2307> | | | | |
| 33 | | | | | | |
| 34 | | | | | | |
| 35 | | | | | | |
| 36 | | | | | | |
| 37 | | | | | | |
| 38 | | | | | | |
| 39 | | | | | | |
| 40 | | | | | | |

QUILL CORPORATION-GENERAL OFFICES LINCOLNSHIRE IL 60069-3621  NO. 7-45106   PRINTED IN USA

SKYLINE001922

National 35-506

1998

Gallon Totals Daily

1998

| | | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|---|
| 1 | | 1353 | 2860 | 2030 | 2945 | | 3580 |
| 2 | | 3130 | 2687 | 3060 | 3133 | | 3590 |
| 3 | | 10578 | 3134 | 2524 | | 1577 | 3663 |
| 4 | | (7338) | 3704 | 3422 | 19290 | 2565 | 2677 |
| 5 | | 3307 | 2670 | 2716 | (3037) | 2855 | |
| 6 | | 3440 | (3643) | | 2758 | 3254 | (3552) |
| 7 | | 4371 | | 7262 | 3634 | 3721 | |
| 8 | | 3385 | 24345 | (3801) | 3030 | | 3657 |
| 9 | | | 3151 | 3118 | 2909 | 3256 | 2090 |
| 10 | | 10244 | 3153 | 2753 | | (2803) | 3303 |
| 11 | | (3374) | 3643 | 4048 | 3206 | 2656 | 2814 |
| 12 | | | 2946 | 2846 | (3010) | 3136 | |
| 13 | | 2664 | | (2855) | 2639 | 3130 | 3488 |
| 14 | | 4854 | 3047 | 3156 | 2261 | 2957 | (3402) |
| 15 | | 2951 | (3050) | | 3496 | | 2736 |
| 16 | | 3084 | | 2518 | 2662 | 3400 | 2647 |
| 17 | | 7814 | 2748 | 3086 | | (3508) | 3118 |
| 18 | | (3287) | 3297 | 35228 | 3345 | 3139 | 3271 |
| 19 | | 3158 | 2813 | 2856 | 3503 | 3245 | |
| 20 | | 3202 | | | 2973 | 3939 | 9288 |
| 21 | | 4415 | 3871 | 3847 | 2617 | 2981 | (3140) |
| 22 | | 4306 | (3050) | (3737) | 3609 | | 2660 |
| 23 | | | 2919 | 2793 | | | 2895 |
| 24 | | 3857 | 2620 | 2900 | 3355 | 2856 | 3411 |
| 25 | | | 3245 | 3285 | | (2553) H | 2993 |
| 26 | | 2946 | 4266 | 2483 | 3492 | 2771 | 3556 |
| 27 | | 3437 | | | 3057 | 3522 | |
| 28 | | 3611 | 7080 | 3962 | 2815 | 2517 | (3974) |
| 29 | | 3367 | | 3653 | | | 3726 |
| 30 | | 4444 | | 3304 | 2747 | 9055 | 2782 |
| 31 | | 2273 | | 2720 | | | |
| 32 | | (3317) | 3643 | 2860 | (3132) | 2435 | |
| 33 | Month 1998 | 103813 | 85443 | 82644 | 81945 | 80934 | 82901 |
| 34 | YTD | | 188855 | 272499 | 354413 | 455847 | 547688 |
| 35 | Month 1997 | 64810 | 76000 | 84760 | 80121 | 87244 | 90260 |
| 36 | YTD | | 149816 | 244566 | 330687 | 417981 | 508261 |

SKYLINE001923

National 35-606

| | Initials | Date |
|---|---|---|
| Prepared By | | |
| Approved By | | |

1998

| | | 1 July | 2 Aug | 3 Sept | 4 Oct | 5 Nov | 6 Dec |
|---|---|---|---|---|---|---|---|
| 1 | | 3940 | | 2529 | 2561 | 2157 | 2852 |
| 2 | | 3100 | 4932 | 2977 | | 2697 | 3847 |
| 3 | | | 2888 | 2687 | 8940 | 2723 | 2920 |
| 4 | | 7448 | 2788 | | (2875) | 3393 | |
| 5 | | (2848) | 3706 | 7506 | 11501<br>2931 | 2746 | 8989 |
| 6 | | 14488<br>2704 | 2718 | (2617) | 2732 | | (13161) |
| 7 | | 2925 | | 15699<br>1545 | 3120 | 8428 | 18658<br>3362 |
| 8 | | 3576 | 8814 | 2777 | 2998 | (12725) | 3143 |
| 9 | | 3029 | (12871) | 2970 | | 22194<br>2294 | 3934 |
| 10 | | | 73846<br>3036 | 2445 | 8052 | 2828 | 3557 |
| 11 | | 8591 | 2890 | | (2849) | 3267 | |
| 12 | | (2943) | 3768 | 8437 | 31334<br>2666 | 3040 | 9237 |
| 13 | | 35313 | 2504 | (12605) | 2359 | | (13219) |
| 14 | | 5311 | | 33873<br>2910 | 3611 | 8434 | 41841<br>3492 |
| 15 | | 3695 | 8664 | 2649 | | (12804) | 3236 |
| 16 | | 2882 | (2919) | | 9045 | 42057<br>2914 | 3411 |
| 17 | | | 46710<br>2718 | 6429 | (2883) | 2381 | 3767 |
| 18 | | 8956 | 2587 | | 49015<br>2782 | 3506 | |
| 19 | | (2956) | 3023 | 8327 | 2429 | 3192 | 8904 |
| 20 | | 15617<br>2805 | 2810 | (12709) | 3495 | | (13233) |
| 21 | | 2505 | | 54128<br>2858 | 2768 | 9298 | 64631<br>3023 |
| 22 | | 3510 | 7770 | 2619 | | (12801) | 3309 |
| 23 | | 3003 | (12854) | 3785 | 8854 | 63848<br>3120 | 4630 |
| 24 | | | 65675<br>2436 | 2996 | (2859) | 3060 | Closed Holiday |
| 25 | | 8515 | 2397 | | 69343<br>2685 | | |
| 26 | | (2942) | 3342 | 8415 | 2488 | 5394 | (8251) |
| 27 | | 76499<br>2592 | 2502 | (12773) | 3366 | | 8924 |
| 28 | | 2435 | | 74861<br>2753 | 3053 | 8660 | 84537<br>3177 |
| 29 | | 3442 | 7718 | 2759 | 2402 | (12883) | 2969 |
| 30 | | 2599 | | 3325 | | 83582<br>2850 | 2945 |
| 31 | | 3593 | 2664 | | 6693 | | 4738 |
| 32 | | (12941) | (12798) | (12792) | (12404) | (12881) | (13173) |
| 33 | Month 1998 | 91160 | 86724 | 83758 | 90030 | 86432 | 98366 |
| 34 | YTD | 635848 | 722572 | 806330 | 896360 | 982792 | 1,081,158 |
| 35 | Month 1997 | 88180 | 83811 | 72263 | 137917 | 122000 | 120,177 |
| 36 | YTD | 596441 | 680252 | 752515 | 890432 | 1,012,432 | 1,132,609 |

SKYLINE001924

National Brand  45-606  Eye-Ease®  45-306  2-Pack  Made in USA

PURCHASES  1998  Vs  1997

Prepared By

Approved By

| | | JAN | FEB | MAR | APR | MAY | JUNE |
|---|---|---|---|---|---|---|---|

SKYLINE001925

| | | Initials | Date |
|---|---|---|---|
| Approved by | | | |
| Prepared by | | | |

Monthly Gas Reconciliation 1998

| | | 1 Jan | 2 Feb | 3 Mar | 4 Apr | 5 May | 6 Jun |
|---|---|---|---|---|---|---|---|
| 1 | Beg Inventory | 10325 | 12896 | 7645 | 4334 | 10244 | 4461 |
| 2 | Additions | 109383 | 80041 | 84996 | 90042 | 85010 | 92997 |
| 3 | Available | 116608 | 92935 | 92655 | 94376 | 95256 | 97462 |
| 4 | Ending Stick | 12936 | 7645 | 4334 | 10244 | 4461 | 93260 |
| 5 | Stick Sales | 103672 | 85332 | 88321 | 185132 | 90788 | 88101 |
| 6 | Meter Sales | 109512 | 85463 | 88649 | 80969 | 90984 | 88791 |
| 7 | Variations | <810> | 343 | 328 | <1163> | 195 | 689 |
| 8 | | | | | | | |
| 9 | | | | | | | |
| | | Jul | Aug | Sep | Oct | Nov | Dec |
| 10 | | | | | | | |
| 11 | Beg Inventory | 93260 | 9462 | 7247 | 10380 | 9689 | 12935 |
| 12 | Additions | 84168 | 90198 | 87144 | 88046 | 89519 | 90039 |
| 13 | Available | 93529 | 92660 | 94391 | 98426 | 99108 | 102953 |
| 14 | Ending Stick | 3662 | 7247 | 10380 | 9689 | 12939 | 4576 |
| 15 | Stick Sales | 90046 | 86413 | 84011 | 88867 | 86168 | 98389 |
| 16 | Meter Sales | 91160 | 86724 | 83758 | 90030 | 86432 | 98366 |
| 17 | Variations | 1094 | 347 | <253> | 1143 | 263 | <18> |
| 18 | | | | | | | |
| 19 | | | | | | | |
| 20 | Monthly Variations | Month | Cumulative | | | | |
| 21 | Jan | <81.0> | | | | | |
| 22 | Feb | 242 | <568> | | | | |
| 23 | Mar | 328 | <240> | | | | |
| 24 | Apr | <1163> | <1403> | | | | |
| 25 | May | 195 | <208> | | | | |
| 26 | Jun | 689 | 481 | | | | |
| 27 | Jul | 1094 | 1575 | | | | |
| 28 | Aug | 311 | 1886 | | | | |
| 29 | Sep | <253> | 1633 | | | | |
| 30 | Oct | 1143 | 2776 | | | | |
| 31 | Nov | 263 | 3039 | | | | |
| 32 | Dec | <18> | 3021 | | | | |
| 33 | | | | | | | |
| 34 | | | | | | | |
| 35 | | | | | | | |
| 36 | | | | | | | |
| 37 | | | | | | | |
| 38 | | | | | | | |
| 39 | | | | | | | |
| 40 | | | | | | | |

QUILL CORPORATION-GENERAL OFFICES, LINCOLNSHIRE IL 60069-3621   NO 7-45106   PRINTED IN USA

SKYLINE001926