UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

In Re: Methyl Tertiary Butyl Ether (MTBE)
Products Liability Litigation

**Master File No. 1:00 - 1898**
**MDL 1358 (SAS)**
**M21-88**

_____

Civil Action

**This Document Relates To:**

*New Jersey Dept. of Envtl. Prot., et al. v.*
*Atlantic Richfield Co., et al.*, No. 08 Civ. 312

_____

# PLAINTIFFS' RESPONSE TO THIRD PARTY
# MOTION FOR SUMMARY JUDGMENT

0

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................... ii

SUMMARY OF RESPONSE ..................................................... 1

I.   BACKGROUND FACTS AND PROCEDURAL HISTORY ..................... 3

III. ARGUMENT ............................................................... 5

     A.   Standard of Review ............................................. 5

     B.   There Is Extensive Evidence That MTBE Gasoline Delivered By Dhandi
          Was Released And Contaminated Groundwater At The HP Delta Site. ..... 6

     C.   There Is Extensive Evidence That The HP Delta Site Is The Source
          Of MTBE Detected in Nearby Domestic Wells. ........................ 7

     D.   The Fact That NJDEP Did Not Prosecute Dhandi For Releasing MTBE
          Gasoline At The HP Delta Site Does Not Support An Inference That Dhandi
          Did Not Release MTBE Gasoline At The Site ......................... 9

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby Inc.*,
   477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). ........................... 5

*Byrnie v. Town of Cromwell, Bd. of Educ.*
   243 F.3d 93 (2d Cir. 2001) ............................................. 5

*Mannington Mills v. Shinn*
   877 F. Supp. 921 (D.N.J.1995) ......................................... 12

*New Jersey Department of Environmental Protection v. Dimant*
   51 A.3d 816 (N.J. 2012). .................................. 1-3, 5-6, 10-11

*NJDEP v. ExxonMobil Corp.*
   923 A.2d 345 (App. Div. 2007) ........................................ 6

*NJDEP v Magic Disposal, Inc.*
   2009 WL 1930039 (N.J. Adm.) ....................................... 12

*Scott v. Harris*
   550 U.S. 372, 127 S. Ct. 1769, 167 L.Ed. 2d 686 (2007 ........................ 5

*Woodland Private Study Group v. New Jersey Dept. of Envt'al Protection*
   109 NJ 62, 533 A.2d 387 (N.J. 1987) .................................. 12

**Statutes**

N.J.S.A. 58:10-23.11g(c)(1) ................................................ 6

**Federal Rules**

Federal Rule of Civil Procedure 56(a). ....................................... 5

Plaintiffs the New Jersey Department of Environmental Protection, the Commissioner of the New Jersey Department of Environmental Protection, and the Administrator of the New Jersey Spill Compensation Fund (collectively, "Plaintiffs" or "NJDEP") files this Response to third party defendant Dhandi Transport's ("Dhandi's") motion for summary judgement with respect to contribution and indemnification claims alleged by defendant Getty Properties Corporation ("Getty"). Third party defendants Robert Melecci and HP Delta Inc., have joined in Dhandi's motion. Getty's third party complaint alleges that Dhandi, Melecci and HP Delta are responsible for MTBE contamination at the HP Delta trial site. Dhandi, Melecci and HP Delta allege that Getty is responsible for MTBE contamination at the site.

### SUMMARY OF RESPONSE

Although NJDEP has not sued Dhandi, NJDEP is filing this Response because Dhandi's moving papers contain erroneous assertions that could impact NJDEP's claims against other defendants at the HP Delta trial site. In particular, Dhandi's motion (without any expert declaration) erroneously asserts: (1) there is no evidence that MTBE delivered by Dhandi contaminated groundwater at the HP Delta site; (2) there is no evidence that the MTBE contaminating private domestic wells near the HP Delta site came from the HP Delta site; and (3) the fact that NJDEP did not prosecute Dhandi for discharges at the HP Delta site supports an inference that Dhandi did not release MTBE when it delivered gasoline to the site. Each of these assertions is incorrect, as explained below. At a minimum there are disputed issues of fact with respect to each assertion.

Dhandi's motion equates the facts of this case with the facts of *New Jersey Department of Environmental Protection v. Dimant*, 51 A.3d 816 (N.J. 2012). The facts of the two cases are not

1

alike, however, and to the extent the facts are similar they support NJDEP's claim.

*Dimant* involved several dry cleaning operations in an area where groundwater was contaminated with PCE.  One operation (Zaccardi's) used PCE extensively and plainly contaminated groundwater.  51 A.3d at 824.  Defendant's operation (Sue's) used small amounts of PCE sporadically, and the only evidence of a release at Sue's was a one time observation of a small amount of PCE fluid dripping from an exterior above ground pipe onto concrete at a shopping mall.  *Id*.

Here, the HP Delta site is the only identified source of MTBE contamination in groundwater at the site.  Axline Decl., Ex. 7 (9/11/12 A. Parikh Depo. at 34.)  Like the PCE used in Zaccardi's operations in *Dimant,* MTBE gasoline has been in continuous use at the HP Delta site for many years, and high levels of MTBE have been detected in soil and groundwater at the site and in nearby residential wells.[1]  In *Dimant* (which was decided *after* an evidentiary trial), no evidence was presented linking a one time observation of PCE dripping from a pipe where defendant sporadically used small amounts of PCE to groundwater contamination.  51 A.3d at 823-824, 835.  Here, NJDEP's experts have concluded that the high levels of MTBE contamination in the soils and groundwater beneath and adjacent to the HP Delta site came from releases at the HP Delta site (where millions of gallons of MTBE were handled annually).  Eyewitnesses testified to multiple releases that occurred during the three year period when Dhandi delivered MTBE gasoline to the site.

In *Dimant*, no evidence was presented to explain how a drip of PCE fluid observed on a

---

[1]  Unlike the Sue's defendant in *Dimant*, Dhandi does not deny that MTBE in the groundwater beneath the HP Delta site came from operations at the site.

2

single day from a dry cleaning operation that used PCE only sporadically could have migrated to residential wells in a nearby neighborhood. 51 A.3d at 835. Here, NJDEP's experts have explained that the high levels of MTBE in groundwater beneath the HP Delta site were pulled into nearby residential wells as those wells pumped water for domestic use. Dhandi quotes selectively from NJDEP's expert report regarding general groundwater flow direction, but ignores that same report's explanation that residential well pumping pulled MTBE from beneath the HP Delta site. Dhandi offers no expert testimony of its own.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

The HP Delta site has been owned by Robert Melecci since 1983. Between 1983 and 2003 Mr. Melecci operated a gas station (Rob's Service Center) at the site. Since 2003, Mr. Melecci has leased the site to HP Delta, and HP Delta has continued to operate the site as a gas station. Between 2003 and 2006 Dhandi supplied gasoline to the HP Delta site. Dhandi obtained this gasoline from several suppliers, including defendants BP and ConocoPhillips.

Defendant Getty owned the underground storage tanks (USTs) at the HP Delta site until 1987, when contaminated soil was discovered near the tanks and the tanks were removed.[2] Six holes were observed in one of the tanks at the time of removal. During the time that it owned the USTs at the site, Getty also supplied gasoline to the site. Following removal of the Getty USTs Mr. Melecci installed new USTs, which are still in use at the site. Although no testing for MTBE occurred at the time the Getty tanks were removed, MTBE was in widespread use as an octane

---

[2] According to Getty, Getty Properties had a contract dealer agreement to supply gasoline to Melecci from February 1, 1985 until June, 1987, when Getty's leaking tanks were removed.

enhancer in New Jersey at the time and would have been present in Getty's gasoline.[3]

In 2005, homeowners located near the HP Delta site complained to the State of odors in their water supplies. Testing revealed the presence of MTBE as high as 19,000 parts per billion (ppb) in those wells. NJDEP Rule 56.1 Statement of Facts, ¶ 59. The maximum contamination level for MTBE in groundwater in New Jersey is 70 ppb. Tests for MTBE were then conducted for the first time at the HP Delta site. MTBE was detected in groundwater beneath the site at levels as high as 242,000 ppb. In 2006, NJDEP cited the station for deficiencies in tank overfill protection and imposed a delivery ban on the station until remedial steps were taken.

In 2007, NJDEP filed suit against a number of defendants, including Getty, for contaminating waters of the State with MTBE. The HP Delta site was selected as one of several bellwether sites in the State for trial.

After NJDEP filed its complaint, Getty filed a third party complaint against Dhandi, Melecci and HP Delta for contribution and indemnification at the HP Delta site. Getty and the third party defendants, Dhandi, Mr. Melecci and HP Delta (collectively referred to herein as "third party defendants") filed lawsuits against and among each other in state court. The state litigation is currently stayed pending resolution of this federal litigation.

On July 26, 2013, Getty filed a pre-motion letter with the Court seeking permission to file

---

[3] MTBE was used as an octane enhancer in New Jersey throughout the 1980s. Axline Decl., Ex. 4 (Aquilogic Report at 3). As third party defendant HP Delta's expert states: "MTBE is an additive used in gasoline since about 1980 and was present in leaded gasoline in the mid-1980s." Axline Decl., Ex. 11 (HP Delta Expert Report by Triassic Technology, at 6). When given the opportunity, Getty did not deny that the gasoline it supplied to Melecci's gas station between 1985 and 1987 contained MTBE. Axline Decl., Ex. 10 (Defendant Getty Properties Corp.'s Answers and Objections to Plaintiffs' First Set of Requests for Admissions at p.5, Response to Admission No. 3).

a motion for summary judgment with respect to the HP Delta site. Dhandi filed a pre-motion letter the same day, also seeking permission to file a summary judgment motion. Melecci and HP Delta subsequently filed pre-motion letters seeking to join in Dhandi's motion. The Court held a hearing on multiple pre-motion letters, including Getty's and Dhandi's on August 13, 2013. Following the Court's comments at that hearing and a subsequent exchange of letters with NJDEP's counsel, Getty elected not to seek summary judgment. On December 6, 2013, however, Dhandi filed a Motion for Summary Judgment. Melecci and HP Delta filed a letter the same day joining in Dhandi's motion.

## II. ARGUMENT

### A. Standard of Review

The standard for deciding a motion for summary judgment is well established. The moving party is entitled to judgment as a matter of law only if there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). The Court is required to review the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *See Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 1774, 167 L.Ed. 2d 686 (2007). "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001). Accordingly, if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party, Dhandi and the other third party defendants are not entitled to summary judgment. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986).

*Dimant*, *supra*, does not support summary judgment. *Dimant* was not decided on summary judgment, but rather after the presentation of evidence at trial. The New Jersey Supreme Court in *Dimant* emphasized that the Spill Act provides liability for parties who are "'in any way responsible for any hazardous substance.'" *Dimant* at 829 (quoting N.J.S.A. 58:10-23.11g(c)(1).) *See also NJDEP v. ExxonMobil Corp.*, 923 A.2d 345, 353 (App. Div. 2007) (rejecting a constricted interpretation of the Spill Act in favor of "lending the Act an expansive reading....")

In *Dimant* the court explained that there is to be "some connection" or "nexus" linking "the discharger to the discharge that is alleged to be the, or a, culprit in the environmental contamination in issue." *Dimant* at 830. The Court further stated that, "[a] nexus also must be determined to exist between the discharge for which one is responsible – *in any way* – and the contaminated site for which cleanup and other related authorized costs are incurred." *Dimant* at 830-31(emphasis added). The evidence plainly establishes that nexus at the HP Delta site.

**B.   There Is Extensive Evidence That MTBE Gasoline Delivered By Dhandi Was Released And Contaminated Groundwater At The HP Delta Site.**

Contrary to Dhandi's contention, there is extensive evidence that Dhandi spilled and released MTBE gasoline that contaminated groundwater at the HP Delta site. The site owner, Melecci testified that he observed Dhandi Transport spilling and releasing gasoline at the site on a number of occasions. Axline Decl., Ex. 1 (9/12/12 Melecci Depo. at 94-97, 200-202). In addition, the attendant reported to Melecci that Dhandi spilled and released gasoline on a number of occasions. Mr. Melecci testified that he observed gasoline on the ground on many occasions as a result of spills from Dhandi and blow-back from the vent pipe located by the tank field. Axline Decl., Ex. 1 (9/12/12 Melecci Depo. at 200-202).

6

Melecci also testified that free product spilled during Dhandi's deliveries ran off into the dirt and grass and stained the concrete at the same approximate location as the USTs. Axline Decl., Ex. 1 (9/12/12 Melecci Depo. at 103-04). These spills continued into 2007. Axline Decl., Ex. 1 (9/12/12 Melecci Depo. at 140-141); Axline Decl., Ex. 2 (1/22/07 Letter from A. Ambrosio to S. Lieberman & 2/02/07 Letter from G. Pasricha to S. Lieberman). In response to the 2007 release, 2800 gallons of free product were removed from the site. Axline Decl., Ex. 3 (1/23/07 Email correspondence from M. Herzberg to V. Morone.)

The HP Delta site was not tested for MTBE until October of 2006. MTBE contamination was detected in the groundwater and soil at the site during these first tests. Axline Decl., Ex. 4 (Aquilogic Report at 15.) A compliance inspection of the UST system at the site conducted on August 5, 2006, revealed "gross soil contamination and floating product in observation wells at the Site." *Id.* at 12.) The Report comments that "A delivery ban was imposed and an order given to cease use of the USTs. It was noted that free-product was observed in all tank field wells." *Id*.

After learning of this free product, the legal representatives for the owner, Melecci, sent a letter to HP Delta (the tenant) suggesting negligence on the part of Dhandi. Axline Decl., Ex. 4 (Aquilogic Report at 14); Axline Decl., Ex. 5 (8/28/06 Letter from A. Ambrosio to H.P. Delta & 9/5/06 Letter from S. Lieberman to A. Ambrosio.) MTBE migration from the HP Delta site has not been controlled and continues to persist. Axline Decl., Ex. 4 (Aquilogic Report at 47, ¶ 14.)

    **C.**    **There Is Extensive Evidence That The HP Delta Site Is The Source Of MTBE Detected in Nearby Domestic Wells.**

There is extensive evidence that MTBE detected in nearby domestic supply wells came from the HP Delta site. Axline Decl., Ex. 7 (9/11/12 Depo. of A. Parikh at 34.) Dhandi incorrectly states

(with no supporting expert declaration) that the direction of the groundwater flow indicates that HP Delta is not the source of contamination in residential wells. This assertion is wrong for several reasons. After an investigation in 2006-2007, the DEP determined that HP Delta is "the only source of groundwater contamination or private well contamination in this area." Axline Decl. Ex. 7 (9/11/12 Depo. of A. Parikh at 34.)

First, the levels of MTBE contamination at both the residential wells and at the HP Delta location are dramatic. Testing for MTBE first began in 2005 at off-site residential wells when residents reported strong odors in their drinking water. In 2005, the MTBE detections were as high as 19,000 and 12,000 ug/L(on Morningside Road) and in 2007, detections were still as high as 8000 ug/L. Axline Decl., Ex. 4 (Aquilogic Report at 15.)

At the site itself, MTBE was detected at levels as high as 242,000 ug/L (ppb) during the first testing for MTBE in October of 2006. Axline Decl., Ex. 4 (Aquilogic Report at 15.) The following year, a monitoring well on site had a detection level of 253,000 ug/L. *Id*. Contamination is on-going and additional remediation is needed both on-site and off-site . Axline Decl., Ex. 4 (Aquilogic Report at 46-47, ¶¶ 14, 18-19.)  In fact, "MTBE contamination in groundwater exists beyond the current monitoring network." *Id*. at 46 ¶ 11.)

Second, NJDEP's expert Anthony Brown determined that MTBE from the HP Delta site migrated off-site to the nearby residential wells. Axline Decl., Ex. 4 (Aquilogic Report at 46, ¶¶ 2, 4.)  Mr. Brown's Report explains that groundwater flow direction was impacted by the pumping of nearby residential wells. Axline Decl., Ex. 4 (Aquilogic Report at 6, 26, 41, 43.)  He states:

- "[D]omestic supply wells in the area locally affect groundwater flow." (*Id*. at 6.)
- "[T]he pumping of groundwater supply wells in the area has locally affected the groundwater flow patterns." (*Id*. at 26.)

- "Historically, the flow of groundwater (and COCs dissolved therein) was likely "controlled" by the pumping at domestic WSWs to the west-southwest of the Site." (*Id*. at 41.)

Brown explains that groundwater flow patterns in the area were altered and the groundwater flowed west-southwest towards the residential wells while the pumps were in operation. (*Id*. at 6, 26, 41.) The pumps are now shut down due to contamination, and the groundwater flow is currently in the southeast direction. (*Id*. at 41, 43.) Dhandi offers no expert or contrary opinion to contradict Mr. Brown.

In addition to Mr. Brown's expert opinions, NJDEP employee Gary Lipsius testified that the groundwater flow appeared to be impacted by the operation of the treatment system. Axline Decl., Ex. 6 (Lipsius Depo. at 48, 52-53.)

Finally, Mr. Brown concluded that there were no other known potential sources for the MTBE contamination found in nearby domestic wells: "[g]roundwater contamination has not co-mingled with releases from nearby facilities. There is no indication that the plume of contaminated groundwater has co-mingled with gasoline-impacted groundwater associated with a release at another facility." Axline Decl., Ex. 4 (Aquilogic Report at 46, ¶ 6.) At his deposition, Brown affirmed that no other source of contamination was identified. Axline Ex. 8 (Brown Depo. at 78-79; see also Axline Decl. Ex. 7 (9/11/12 A. Parikh Depo. at 34.)

Neither Dhandi, nor any third party defendant, supplied evidence to contradict Mr. Brown's Report. Even if Dhandi had supplied opposing evidence, which it did not, the issue would be disputed and not appropriate for summary judgment.

D. **The Fact That NJDEP Did Not Prosecute Dhandi For Releasing MTBE Gasoline At The HP Delta Site Does Not Support An Inference That Dhandi Did Not Release MTBE Gasoline At The Site.**

9

Dhandi argues that in *Dimant*, *supra*, the New Jersey Supreme Court "took note" of the trial court's finding that NJDEP had not formally pursued the defendant in that case, and asks this Court to draw an inference that Dhandi did not contribute to MTBE contamination at the HP Delta site because NJDEP did not directly formally pursue Dhandi for releases at the site. Dhandi Motion at 13-14. The facts in this case, however, are significantly different than the facts in *Dimant*, and the New Jersey Supreme Court did not in any way endorse the inference Dhandi asks this Court to draw. Such an inference would be directly contrary to New Jersey law.

Dhandi is incorrect to suggest that NJDEP did not view Dhandi as a contributing party to the off-site groundwater contamination simply because NJDEP did not directly prosecute Dhandi. NJDEP pursued administrative action against the owner (Melecci) and operator (HP Delta, Inc.) at the HP Delta site. Axline Decl., Ex. 9 (4/20/87 Administrative Order, which specifically found that eyewitnesses had observed overfilling of USTs at the site during deliveries, and NJDEP ordered the owner and operator to install equipment to ensure overfilling of the USTs would not occur again. *Id*. at NJDEP-SITE233-006497.) This is directly related to Dhandi's improper and overfilling of the USTs at the HP Delta site.

The parties have been involved in an on-going dispute regarding the spills and resulting contamination since 2006. Counsel for HP Delta, Melecci and Dhandi Transport exchanged correspondence back in 2006 and 2007 regarding Dhandi's numerous delivery releases at the site. Axline Decl. Ex. 5 (8/28/06 Letter from A. Ambrosio to H.P. Delta & 9/5/06 Letter from S. Lieberman to A. Ambrosio); Axline Decl., Ex. 2 (1/22/07 Letter from A. Ambrosio to S. Lieberman & 2/02/07 Letter from G. Pasricha to S. Lieberman). In 2007, the third parties filed suit among and between each other. (See 56.1 Statement of Fact Nos. 24-29.)

Although Dhandi tries to compare itself to the defendant in *Dimant*, the facts are entirely different. In *Dimant*, the DEP had taken a sample of a dripping pipe, but no other action was taken for over a decade, and the defendant had not even operated at the site for many years. By contrast, here, DEP took immediate action against the owner and operator of the site due to the overfilling of the USTs (caused by Dhandi). Dhandi is not a bystander suddenly drawn into litigation by a miscellaneous drip from a decade ago. Eyewitnesses observed Dhandi spilling gasoline at the site and the NJDEP acted immediately against the owner and operator as a result of Dhandi's overfill of the tanks.

Dhandi's request that the Court draw an inference that Dhandi is innocent based on the fact that NJDEP did not formally prosecute Dhandi for releases at the HP Delta site is contrary to New Jersey law. Dhandi cites the trial court's finding in *Dimant* that NJDEP's inaction after observing a drip coming from defendant's pipe was circumstantial evidence that NJDEP did not consider the drip to be significant. Dhandi Motion at 13-14. The *Dimant* trial court, however, cited no authority for such an inference, and the New Jersey Supreme Court certainly did not endorse such an inference on appeal. To the contrary, the *Dimant* opinion emphasized:

> [O]ur review of the [Spill] Act's language and legislative history leads us to conclude that there is no basis for importing a proximate cause analysis into the calculus when assessing the bases for relief. Imposing that proof requirement for damages as a precondition to the various forms of relief meant to be available under the Act would thwart the salutary public purpose underlying this comprehensive and groundbreaking statutory program.

51 A.3d at 833. Drawing the inference sought by Dhandi also would be contrary to the law in New Jersey regarding prosecutorial discretion.

The New Jersey Supreme Court has recognized that, "[g]iven limited resources, an agency

11

must make important choices regarding which actions of the regulated public it should monitor or prosecute." *Woodland Private Study Group v. New Jersey Dept. of Envt'al Protection*, 109 NJ 62, 74, 533 A.2d 387, 393 (N.J. 1987).

In *Mannington Mills v. Shinn,* 877 F. Supp. 921, 932 (D.N.J.1995), a responsible party challenged the NJDEP's decision to pursue an action based on the apparent ability of the party to pay for the cleanup, and argued that NJDEP was "selectively prosecuting" that party rather than others more responsible for the contamination. The Court rejected this argument, stating:

> [T]he legitimate interest at issue is the protection of the environment. We find that the consideration of wealth in prioritizing hazardous waste sites could be rationally related to this interest. Targeting sites for priority remediation serves in part to encourage site-owners to undertake voluntary remediation. If the government instead prioritized sites where the alleged polluters could not afford to undertake remediation, either the government would bear the cost of remediation or no remediation would occur. Thus, the government has some legitimate interest in targeting sites owned by those able to afford remediation.

877 F.Supp. at 932. Although claims of selective prosecution often arise in the criminal context, the analysis of such claims is equally applicable in the civil and administrative fields. *See, e.g., NJDEP v Magic Disposal, Inc*., 2009 WL 1930039 (N.J. Adm.) ("Although many of the cases addressing selective prosecution have arisen in the criminal context, their elaboration of the limits of a claim of 'selective prosecution' is just as applicable in the civil and administrative fields.")

As the court recognized in *NJDEP v Magic Disposal, Inc*., 2009 WL 1930039 (N.J. Adm.):

> In the end, the fact, if true, that others also have violated the environmental or other laws, even habitually done so, provides no shield for these respondents against the consequences of their own conduct, even if such consequences are, in the regulatory context, as severe as to bar them from the industry. That others may be as "bad", or indeed "worse" actors than these respondents is no assist to [the

responding party's] defense against the DEP.

(Footnote omitted.)

NJDEP has <u>never</u> made a determination that Dhandi was <u>not</u> a responsible party, and in fact, NJDEP found that overfills of the USTs at the site had occurred during Dhandi's deliveries. Axline Decl. Ex. 9 (4/30/07 Administrative Order).

Dhandi's requested inference that Dhandi is innocent because the State did not prosecute it would have far reaching negative implications for every state agency. The Court should reject Dhandi's request.

Dated this 10th day of January, 2014.    Respectfully submitted,

／s／
MICHAEL AXLINE, State Bar #229840
Attorneys for Plaintiffs
MILLER, AXLINE & SAWYER
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688
Facsimile:  (916) 488-4288
*Special Counsel to the Attorney General*

John J. Hoffman, Esq.
Acting Attorney General

／s／
GWEN  FARLEY
Deputy Attorney General
25 Market Street
P.O. Box 093
Trenton, NJ 08625-0093
Telephone:  (609) 984-2845

**PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE**

*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*
United States District Court, Southern District of New York, Case No. 08 Civ. 00312 (SAS)

I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action. My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA 95825-4225.

On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

(1) **PLAINTIFFS' RESPONSE TO THIRD PARTY MOTION FOR SUMMARY JUDGMENT; and**

(2) **DECLARATION OF MICHAEL AXLINE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE THIRD PARTIES' MOTION FOR SUMMARY JUDGMENT**

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on January 10, 2014, at Sacramento, California.

_____
KATHY HERRON