UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00 - 1898
MDL 1358 (SAS)
M21-88

This Document Relates to:

*New Jersey Department of Environmental
Protection, et al. v. Atlantic Richfield Co., et al.*
No. 1:08-cv-00312-SAS

# DECLARATION OF MICHAEL AXLINE IN SUPPORT PLAINTIFFS' OPPOSITION TO THE THIRD PARTIES' MOTION FOR SUMMARY JUDGMENT

I, Michael Axline, declare:

1.      I am one of the attorneys in this case for Plaintiff New Jersey Department of Environmental Protection.   I have been involved in the discovery and pretrial proceedings in this action.  This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the deposition transcript of Robert Melecci, taken in the above-referenced matter, dated September 12, 2012.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a letter from Anthony P. Ambrosio to Stuart J. Lieberman re: Gasoline Spill, dated January 22, 2007, and a letter in response from Dhandi Transport's attorney, Gary S. Pasricha, dated February 2, 2007.

4.      Attached hereto as Exhibit 3 is a true and correct copy of an email from Mark Herzberg to Valeri Morone re: HP Delta/Rob's Service Station, dated January 23, 2007.

5.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the Aquilogic, Inc. Revised Site Summary for HP Delta Service Station, dated January 2013.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a letter from Anthony P. Ambrosio to Gurmail Singh, of HP Delta, re: Gasoline Spill, dated August 28, 2006 and a letter in response from H.P. Delta's attorney, Shari M. Blecher, re: DEP Enforcement Action, dated September 5, 2006.

7.      Attached hereto as Exhibit 6 is a true and correct copy of excerpts from the deposition transcript of Gary S. Lipsius, regarding HP Delta, taken in the above-referenced matter, dated August 2, 2012.

1

8.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the deposition transcript of Akshay Parikh regarding HP Delta, taken in the above-referenced matter, dated September 11, 2012.

9.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts from the deposition transcript of Anthony Brown, taken in the above-referenced matter, dated May 28, 2013.

10.     Attached hereto as Exhibit 9 is a true and correct copy of a letter from Charles L. Maack to Robert Melecci and Harbans Singh re: Administrative Order and Notice of Civil Administrative Penalty Assessment, dated April 30, 2007.

11.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts from Defendant Getty Properties Corp.'s Answers and Objections to Plaintiffs' First Set of Requests for Admissions, dated October 15, 2012.

12.     Attached hereto as Exhibit 11 is a true and correct copy of excerpts from Triassic Technology Inc.'s Expert Report on the Source and Age of Subsurface Gasoline Contamination at the Delta Gas Service Station Site in Colonia, New Jersey, dated December 14, 2010.

13.     Attached hereto as Exhibit 12 is a true and correct copy of an Administrative Order from the State of New Jersey Depart of Environmental Protection in the Matter of Getty Petroleum Inc., dated December 15, 1987.

14.     Attached hereto as Exhibit 13 is a true and correct copy of excerpts from HCR's Annual Site Update Report re: HP Delta, dated March 2010.

15.     Attached hereto as Exhibit 14 is a true and correct copy of excerpts from the deposition transcript of Mehar Singh, taken in the above-referenced matter, dated August 1, 2012.

16.     Attached hereto as Exhibit 15 is a true and correct copy of a letter from Kevin F. Kratina to Harbans Singh re: Notice of Rejection of Site Investigation Report dated December 7, 2006 regarding HP Delta, Inc., dated February 28, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of January, 2014 at Sacramento, California.

MICHAEL AXLINE

3

# EXHIBIT 1

**ROBERT MELECCI**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 08 CIV 312 (SAS)
MDL 1358

----------------------------x

NEW JERSEY DEPARTMENT OF        :
ENVIRONMENTAL PROTECTION,
et al.                          :        Videotaped
                                         Deposition of:
                                :
        Plaintiffs,             :        ROBERT MELECCI
                                :
    against                     :
                                :
ATLANTIC RICHFIELD CO.,
et al.,                         :
                                :
        Defendants.             :

----------------------------x


    TRANSCRIPT of testimony as taken by and before

NANCY C. BENDISH, Certified Court Reporter, RMR, CRR

and Notary Public of the States of New Jersey and

New York, at the offices of LEARY, BRIDE, TINKER &

MORAN, 7 Ridgedale Avenue, Cedar Knolls, New Jersey

on Wednesday, September 12, 2012, commencing at

10:25 a.m.

ROBERT MELECCI

Page 18

1    A.    Yeah.
2    Q.    -- what did you -- was it just a car
3    repair -- was it a car repair place?
4    A.    Car repair and gas station.
5    Q.    And did you purchase it in 19 -- did
6    you purchase the parcel of property in 1983?
7    A.    Yes.
8    Q.    And who did you purchase it from?
9    A.    Lino Silva.
10   Q.    Lina?
11   A.    Lino.
12   Q.    Lino.  Silva?
13   A.    Yes.
14   Q.    When you operated -- and when you
15   purchased in 1983 was it already a gas station?
16   A.    Yes.
17   Q.    Do you know how long they were in
18   operation prior to your purchasing there?
19   A.    No.
20   Q.    Okay.  When you operated it from --
21   Rob's Service Center from 1983 to 2004, during that
22   whole time period did you operate it as a gas
23   station and an automotive repair?
24   A.    Yes.
25   Q.    And from 1983 to 2004 was it always

Page 19

1    referred to as Rob's Service Center?
2    A.    Yes.
3    Q.    Do you know the name of the gas
4    station prior to 1983?
5    A.    Getty.
6    Q.    And do you know how long it was named
7    Getty prior to 1983?
8    A.    No.
9    Q.    And then when you purchased it, was
10   there any -- when you purchased it in 1983, did you
11   sell -- from 1983 to 2004, did you sell gasoline?
12   A.    Yes.
13   Q.    And was there a -- was there a
14   particular brand of gasoline that you sold during
15   that time period?
16   A.    Sold Getty gas, sold Texaco gas, sold
17   BP gas, and CITGO.
18   Q.    Okay.  What years, do you recall what
19   years you sold Getty gas?
20   A.    Up to the beginning of '90 -- of '87.
21   Q.    So you sold Getty gas from 1983 --
22   A.    '83 to the beginning of '87.
23   Q.    Did you have a branding agreement
24   with Getty?
25   A.    I just took over the contract that it

Page 20

1    was when I bought the property.
2    Q.    And did it have the Getty sign
3    outside?
4    A.    Yes.
5    Q.    Okay.  But you called it Rob's
6    Service Center?
7    A.    Yes.
8    Q.    But it was referred to as a Getty
9    station or Rob's -- in terms of -- did you advertise
10   your station at all?
11   A.    As Rob's Service Center.
12   Q.    As Rob's Service Center?
13   A.    Yes.
14   Q.    But there was a Getty sign outside?
15   A.    Yes.
16   Q.    Was the operation of the gasoline,
17   the selling of the gasoline separate from the
18   automotive repair?
19   A.    Yes.
20   Q.    Was the automotive repair referred to
21   as Rob's Service Center?
22   A.    Yes.
23   Q.    And was the gasoline station referred
24   to as Getty?
25   A.    You want Getty gas, it's Getty gas.

Page 21

1    Q.    Well, did you have the Getty sign out
2    front?
3    A.    Yes.
4    Q.    And on the dispensers for gasoline,
5    did they say Getty?
6    A.    Yes.
7    Q.    And since you were selling gasoline
8    I'm assuming that there was some underground storage
9    tanks?
10   A.    Yes.
11   Q.    Did they exist when you purchased the
12   property?
13   A.    Yes.
14   Q.    And prior to purchasing the property,
15   did you have those underground storage tanks
16   inspected?
17   A.    No.
18   Q.    Did you ask for any documents with
19   regards to the underground storage tanks when you
20   purchased the property?
21   A.    Not that I remember.
22   Q.    So when you purchased the gas
23   station, did you also purchase the underground
24   storage tanks?
25   A.    Well, Getty owned the tanks at the

6 (Pages 18 to 21)

ROBERT MELECCI

Page 94

1    Q.    What other carriers; do you recall?

2    A.    Jersey Gasoline.

3    Q.    And do you recall the time frame,

4  about what year?

5    A.    No.

6    Q.    When you witnessed Dhandi Transport

7  deliver gasoline, did you ever witness spills of

8  gasoline?

9    A.    Yes.

10    Q.    Describe the spill; how would it

11  spill?

12        MR. BRIGHT:  Objection to form.

13        MR. SINKEVICH:  Join.

14    Q.    Can you describe to me what you

15  witnessed when you said you witnessed a spill?

16    A.    Just seen gas.

17    Q.    Well, I understand that, but --

18    A.    Spill.

19    Q.    Was it spilling out of the truck?

20    A.    No.

21    Q.    Was it spilling out of the hose from

22  the truck?

23    A.    Yes.

24    Q.    Was it -- the truck would hook up --

25  when the truck arrived it would hook up the hose to

Page 95

1  the truck and then to the underground storage tank?

2    A.    Yes.

3    Q.    And then it was during that process

4  that you, during that delivery of gasoline to the

5  underground storage tank, that you would see spills

6  of gasoline?

7    A.    Yes.

8        MR. BRIGHT:  Objection, form.

9    Q.    And what end of the hose would you

10  see spillage of gasoline?

11        MR. BRIGHT:  Objection to form.

12    Q.    Would you see the part that's

13  connected to the truck or the part that's connected

14  to the underground storage tank?

15        MR. BRIGHT:  Same objection.

16    A.    Ummm.

17    Q.    You don't know?

18    A.    Am I supposed to answer?

19    Q.    Yes.

20        MR. BRIDE:  If you can.

21    A.    To the tank.

22    Q.    The part that's to the tank?

23    A.    Yes.

24    Q.    And would it be at the beginning of

25  when they were starting to pump gasoline into the

Page 96

1  underground storage -- or deliver gasoline to the

2  underground storage tank or at the conclusion of it?

3        MR. BRIGHT:  Objection to form.

4    A.    I couldn't tell you.

5    Q.    On how many occasions did you witness

6  them spilling, Dhandi Transport gas spilling

7  gasoline?

8    A.    A few.

9    Q.    Do you recall the dates?

10    A.    No.

11    Q.    By a few do you mean three times over

12  the last -- since 2003, or more often?

13    A.    No, I'd say a few more.

14    Q.    A few more than a few?

15    A.    Yes.

16    Q.    So, would that be six, nine?

17    A.    Yes.

18    Q.    Six times?

19    A.    Yeah.

20    Q.    Is that six times a year or is that

21  six times total?

22    A.    Six total, I don't know.

23        MR. MOONEY:  Take a break.

24        THE VIDEOGRAPHER:  This is the end of

25  tape number 1, the time is 12:39 p.m. and we are

Page 97

1  going off the record.

2        (Recess taken.)

3        THE VIDEOGRAPHER:  This begins tape

4  number 2, the time is 12:43 p.m. and we are now back

5  on the record.

6  BY MR. MOONEY:

7    Q.    Mr. Melecci, you said that over the

8  course of time that Dhandi, that you witnessed them

9  maybe about six times spill gasoline; is that

10  correct?

11    A.    Yes.

12    Q.    Do you recall testifying in a

13  previous deposition when asked, did you ever -- of

14  spilling gas when they dispensed from the trailer to

15  the ground, there was a question:  Did you ever see,

16  in reference to Dhandi Transport, did you ever see

17  them spilling gas, you testified yes and they asked

18  the question of how often and you stated, every

19  time?

20        MR. BRIGHT:  Objection to form.

21    Q.    Do you recall that testimony?

22    A.    I don't know every time.  But yes.

23    Q.    You recall testifying that --

24    A.    Yes.

25    Q.    They spilled gas every time?

25 (Pages 94 to 97)

**ROBERT MELECCI**

Page 102

1 spills of gasoline?
2   A.   Yes.
3   Q.   What did you do?
4   A.   I let him know that he's got to take
5 care of it.
6   Q.   And so did they take care of it?
7   A.   He spoke to -- I guess he spoke to
8 the owner.
9   Q.   The owner being Gurmail Singh?
10  A.   I spoke to Gurmail.
11  Q.   You spoke to Gurmail?
12  A.   He took care of it from there.
13  Q.   And what -- to your knowledge what
14 did Mr. Singh do?
15  A.   I have no clue.
16  Q.   Did you ever follow up to make
17 sure he --
18  A.   No.
19  Q.   -- that he took care of it?
20  A.   No.
21  Q.   How many times did you talk to
22 Mr. Singh?
23  A.   I couldn't tell you.  Whenever I see
24 him I talk.  It's not necessarily on this; it's just
25 other things.

Page 103

1   Q.   Did you ever, when you saw the Dhandi
2 Transport spilling gasoline during their delivery,
3 did you -- do you have an estimate as to how much
4 gasoline was spilled?
5   A.   No.
6   Q.   Was it -- did it just run freely out
7 of the end pipe?
8       MR. BRIGHT:  Objection to form.
9   Q.   I mean, can you -- describe to me
10 what you --
11  A.   I just seen a stain on the ground.
12  Q.   Would you actually see liquid?
13  A.   Yes.
14  Q.   And the liquid was flowing out of the
15 pipe from the tanker truck?
16  A.   No.  I don't remember.
17  Q.   Were the --
18  A.   I seen a stain.
19  Q.   You seen a stain but you also saw
20 liquid?
21  A.   Yes.
22  Q.   So would the liquid be kind of by
23 where the underground storage tanks were?
24  A.   Yes.
25  Q.   What's the -- is it asphalt there or

Page 104

1 is it concrete?
2   A.   Both.
3   Q.   And where would the liquid run off
4 to?
5   A.   In dirt.
6   Q.   In dirt?
7   A.   Yeah.  Grass.
8   Q.   And where would the liquid, the
9 gasoline that you saw, this free product that you
10 saw, where would it run off to?
11      MR. BRIGHT:  Objection to form.
12  A.   On the concrete and the blacktop.
13  Q.   Would just be absorbed into it?
14  A.   Would go in the cracks, yeah.
15  Q.   There's cracks in the concrete?
16  A.   Between the blacktop and the
17 concrete.
18  Q.   Okay.  Is there cracks in the
19 concrete?
20  A.   No.
21  Q.   Is there cracks in the asphalt?
22  A.   No.
23  Q.   And how far away is the grass, would
24 you say?
25  A.   Ten feet.  Maybe.

Page 105

1   Q.   Would that product flow towards the
2 grass?
3       MR. BRIGHT:  Objection, form.
4   A.   Yes.
5   Q.   Did you ever witness it flow towards
6 the grass?
7   A.   No.  I said I seen the stain.
8   Q.   The stain in the grass?
9   A.   Stain on the blacktop.
10  Q.   On the blacktop?
11  A.   Yes.
12  Q.   What does the stain look like?
13  A.   A stain.  The way that you spilt the
14 soda on your shirt.
15  Q.   So it's this color?
16  A.   Same kind.
17  Q.   Was it a brownish color?
18  A.   Yes.
19  Q.   How, did the tanks have an overflow
20 bucket?
21  A.   Yes.
22  Q.   When Dhandi Transport would spill
23 gasoline would it go into the overflow bucket?
24  A.   Yes.
25  Q.   Do you recall testifying that when

27 (Pages 102 to 105)

**ROBERT MELECCI**

---

**Page 138**

1  State did in response to this access agreement?
2      A.    They took action, cleaning up my
3  property.
4          (Exhibit Melecci-21 marked for
5  identification.)
6      Q.    21 is MEL 0128 to 0137, a letter
7  dated December 22nd, 2006 from Lieberman & Blecher
8  to Anthony Ambrosio regarding 439 Lake Avenue,
9  Colonia, Rob's Service Center.
10         Do you ever recall seeing this letter
11  before?
12     A.    I would imagine, yes.
13     Q.    In this letter attorneys for H.P.
14  Delta are asserting that the source of the
15  contamination is the old well field and very high
16  levels of contamination exist and some levels exceed
17  NJDEP clean-up thresholds.
18         And then in the last sentence of the
19  third paragraph, says, "Since the contamination
20  occurred during your client's ownership of the
21  property, you are jointly and severally liable for
22  all costs and expenses relating to this
23  contamination."
24         Do you agree that the contamination
25  occurred during your ownership of the property?

---

**Page 139**

1      A.    I couldn't answer that.
2      Q.    Hum?
3      A.    I can't answer that.
4      Q.    Can't answer that. Do you still own
5  the property?
6      A.    Yes.
7      Q.    And do you own the property -- you
8  began owning it in 1983?
9      A.    Yes.
10     Q.    So do you know if the contamination
11  occurred during your ownership of the property?
12     A.    I couldn't tell you that. I bought
13  it used.
14     Q.    You bought the property used?
15     A.    Yes.
16     Q.    Did you inspect the property -- did
17  you have the property inspected before buying it?
18     A.    Not to my knowledge.
19     Q.    Did you ever contact any of the
20  previous owners of the property to --
21     A.    No one to ask. Deceased.
22     Q.    Okay. Did you contact their estate?
23     A.    No, I did not.
24     Q.    Did you ever contact Getty who
25  previously owned the storage tanks?

---

**Page 140**

1      A.    No.
2      Q.    Did you ever instruct your attorney
3  to contact Getty?
4      A.    I don't recall.
5      Q.    Do you know if your attorney ever
6  contacted Getty?
7      A.    I don't recall.
8          (Exhibit Melecci-22 marked for
9  identification.)
10     Q.    22 is MEL 0498 to 0499, and it is a
11  letter dated January 22nd, 2007 from Anthony
12  Ambrosio to Stuart Lieberman.
13         Have you seen this letter before?
14     A.    Yes, I did.
15     Q.    When did you see this letter?
16     A.    January 22nd.
17     Q.    Your attorney provided you a copy of
18  this letter?
19     A.    Yes, he did.
20     Q.    This letter states that -- says,
21  "This letter is to advise you that on Wednesday,
22  January 17th, 2007 my client, Robert Melecci, the
23  owner of Rob's Towing Service, observed a delivery
24  being made sometime in the afternoon by your
25  client's gasoline transportation service. During

---

**Page 141**

1  the delivery gasoline spilled on the ground and
2  pooled underneath the truck. Although the spill was
3  cleaned up, clearly some of the gasoline seeped into
4  the group." I'm assuming that should be ground; is
5  that correct?
6      A.    On the ground, yes.
7      Q.    "This spill appears to be a
8  recurrence of prior spills which may be the cause of
9  the contamination now being investigated by the New
10  Jersey Department of Environmental Protection."
11         Can you explain to me, describe to me
12  what you observed on January 17th, 2007?
13         MR. BRIGHT: Objection to the form.
14     A.    Stain of gas underneath the truck.
15     Q.    It says "by your client's gasoline
16  transportation delivery service." Do you know what
17  company that was?
18     A.    That was Dhandi.
19     Q.    Dhandi Transport?
20     A.    Yeah. Dhandi, Dhondi.
21     Q.    Is that spelled D-h-a-n-d-i?
22     A.    I don't even know. D-i.
23     Q.    Says, "although the spill was cleaned
24  up." Who cleaned up the spill?
25     A.    I guess it was the truck driver or

---

36 (Pages 138 to 141)

**ROBERT MELECCI**

**Page 198**

1    A.    They owned everything at the time.
2    It shows you right there but I didn't even -- they
3    never even said nothing about a waste oil tank.
4    Q.    So did you not know that was there
5    when you bought the property?
6    A.    No, it was there because we were
7    draining the oil in it, but never knowing that was
8    part of Getty.
9    Q.    Oh, I see. So you knew it was there
10   but you didn't know it was owned by Getty?
11   A.    Yeah, I just found out today that
12   that was in the contract.
13   Q.    Okay.
14   A.    But I don't know why they didn't take
15   it out then.
16   Q.    You testified earlier when you were
17   asked about when Getty removed the tanks, the dirt
18   that they took out of the ground...
19   A.    Um-hum.
20   Q.    I think you testified they stockpiled
21   it on the site; is that correct?
22   A.    Yes.
23   Q.    You were asked if the soil, if the
24   soil that had been removed, that pile had been
25   covered.

**Page 199**

1    A.    Yes.
2    Q.    I think you said it was, for the most
3    part?
4    A.    Yeah, because the sun I guess was
5    beating on the plastic, deteriorated, the weather.
6    And they could come and cover it back and forth.
7    Q.    So the sun would deteriorate the
8    cover they had on it?
9    A.    Yes. The weather, weather beating.
10   Q.    So there was a cover on it?
11   A.    Yes.
12   Q.    But the cover would periodically get
13   ruined from the weather and they'd replace it?
14   A.    Yes.
15   Q.    What type of cover was it?
16   A.    Plastic.
17   Q.    Was the whole entire pile covered?
18   A.    No. They couldn't cover the whole
19   pile.
20   Q.    What portion of it, roughly?
21   A.    Just the top. They gave it like a
22   yamaka.
23   Q.    Just the top?
24   A.    Just the top.
25   Q.    Like the top 10 percent?

**Page 200**

1    A.    I don't know.
2    Q.    How long did that soil sit --
3    A.    Over a year.
4    Q.    More than two years?
5    A.    Over a year.
6    Q.    So like a year and a few months?
7    A.    Yes. Because I couldn't put my tanks
8    in until they moved the dirt.
9    Q.    All right. Now, regarding your
10   testimony, which was a little bit confusing earlier,
11   about how many times you saw Dhandi Transport spill
12   fuel, I just want to -- I'm a little bit confused
13   because you mentioned I think some type of a spill
14   or maybe, I think you said six spills from when they
15   were actually filling the tank but then later you
16   referenced fuel coming out of a vent pipe.
17   A.    Yes.
18   Q.    Okay. So, am I correct in
19   understanding your testimony today is that you
20   witnessed approximately six times in which fuel was
21   spilled by Dhandi while filling the tanks and then
22   one additional time when you noticed it coming out
23   the vent pipe?
24   A.    No, I seen it coming out of the vent
25   pipe.

**Page 201**

1    Q.    Okay.
2    A.    Many times.
3    Q.    Is the first part of my statement
4    correct regarding the number of times that you --
5    A.    No, because, like I say, I'm an
6    absentee owner, in and out. But there's times I
7    come in, I knew they got gas because I would see the
8    spills. But there's times I was there and actually
9    physically watched it.
10   Q.    Okay. And your testimony is you
11   actually watched it six times; is that correct?
12   A.    Yeah, and told them -- well, not six
13   times, I mean, goes three, goes six, goes nine. You
14   give me a number, I give you a number.
15   Q.    Well, I understand it's approximate.
16   A.    Yeah, it's approximate.
17   Q.    But approximately six times; is that
18   correct?
19   A.    Yes.
20   Q.    Now, you're saying that you also
21   observed instances in which you believe that fuel
22   had been spilled because you noticed some type of
23   staining on the ground, but you didn't actually
24   witness the fuel being poured on the ground by
25   Dhandi, correct?

**51 (Pages 198 to 201)**

ROBERT MELECCI

Page 202

1     A.    Yes.
2     Q.    Okay. And your belief that a fuel
3  spill had occurred is based upon the fact that when
4  you arrived at the site, you noticed a stain on the
5  ground, correct?
6     A.    I asked the gas attendant and he told
7  me who was here. He said it was the gas truck, and
8  he said it was Dhandi.
9     Q.    So you noticed a stain on the ground,
10  correct?
11     A.    Um-hum.
12     Q.    You asked the gas station attendant,
13  right?
14     A.    Who was there, and I notified the
15  tenant and told him. He would have it corrected.
16     Q.    My question to you is, in those
17  instances in which you just observed the stain on
18  the ground, how do you know that was gasoline you
19  observed?
20     A.    It was.
21     Q.    How do you know that?
22     A.    Just the stain from where the fillers
23  are is only -- is gas. It's not antifreeze or
24  nothing like that, it's a gas stain. Because you go
25  over there and you could put your finger in the

Page 203

1  blacktop.
2     Q.    What do you mean put your finger in
3  the blacktop?
4     A.    It eats up the blacktop.
5     Q.    The gasoline --
6     A.    Yes.
7     Q.    -- eats up the blacktop?
8     A.    Yes, it does.
9     Q.    Okay. So, did you put your finger in
10  it every time you observed it?
11     A.    Yes. Yes, I did.
12     Q.    How many times was that?
13     A.    I don't remember.
14     Q.    Can you approximate it?
15     A.    I don't know.
16     Q.    Was it less than ten?
17     A.    Don't know.
18     Q.    Is there any other way that you -- is
19  there any method that you utilized to determine that
20  this was gasoline in question, not some other
21  substance?
22     A.    No.
23     Q.    Just by virtue of the fact that it
24  would somehow act upon the blacktop?
25     A.    Well, no, I would see it, I would

Page 204

1  find out if they had a gas drop, and the truck was
2  either just there or he was just leaving or
3  whatever, but I would catch it.
4     Q.    So you would see a stain?
5     A.    Yes.
6     Q.    And you would find out that the truck
7  had just been there?
8     A.    Yes.
9     Q.    And you would therefore assume that
10  that was gas on the ground because of that?
11     A.    I knew it was gas. You could smell
12  it.
13     Q.    Okay, you could smell it. How did
14  you go about smelling it?
15     A.    The Lord gave me a nose and I smelt
16  it.
17     Q.    I've got to believe that the whole
18  area smells somewhat like gasoline because it's a
19  gas station, right?
20     A.    Not necessarily.
21     Q.    There were approximately six
22  instances in which you observed Dhandi people
23  spilling gas while filling tanks, right?
24     A.    You're on that number six again, but
25  go ahead.

Page 205

1     Q.    Okay. How much fuel was spilt,
2  roughly?
3     A.    I have no clue.
4     Q.    Was it spilled in the area of the
5  spill buckets?
6     A.    Within the area, yes.
7     Q.    Okay.
8     A.    But it's still on the blacktop.
9     Q.    So it wasn't in the spill bucket?
10     A.    No.
11     Q.    And you can't estimate at all how
12  much?
13     A.    No.
14     Q.    Could you estimate a range in terms
15  of gallons?
16     A.    No. Gas spreads. Liquid spreads.
17  When you put it on the ground, it spreads.
18     Q.    But I'm talking about the instances
19  in which you actually saw the Dhandi people spill.
20  Not the instances of seeing the stain --
21     A.    I just --
22     Q.    You've got to let me finish the
23  question because we're not going to have an accurate
24  record.
25        Not the instances in which you

52  (Pages 202 to 205)

[Page 214]

1                    REPORTER'S CERTIFICATION

2

3              I, NANCY C. BENDISH, a Certified Court

4     Reporter and Notary Public of the States of New

5     Jersey and New York, do hereby certify that prior to

6     the commencement of the aforementioned examination,

7     ROBERT MELECCI was sworn by me to testify the truth,

8     the whole truth and nothing but the truth.

9              I DO FURTHER CERTIFY that the

10    foregoing is a true and accurate transcript of the

11    testimony as taken stenographically by and before me

12    at the time, place, and on the date hereinbefore set

13    forth.

14             I DO FURTHER CERTIFY that I am neither

15    a relative nor employee nor attorney nor counsel of

16    any party in this action and that I am neither a

17    relative nor employee of such attorney or counsel,

18    and that I am not financially interested in the

19    event nor outcome of this action.

20

21

22    _____
      Notary Public of the State of New Jersey
      Certificate No. XI00836

23

24

      Dated: September 24, 2012

25

# EXHIBIT 2



**Anthony P. Ambrosio**
**Attorney at Law**
**317 Belleville Avenue**
**Bloomfield, New Jersey 07003**
**E-Mail: apambrosio@yahoo.com**

**Telephone 973-748-7474**                                    **Facsimile 973-748-0765**

January 22, 2007

**VIA LAWYERS SERVICE**
Stuart J. Lieberman, Esq.
10 Jefferson Plaza
Suite 100
Princeton, New Jersey 08540

Re:   Rob's Towing Service/Robert Melecci
      439 Lake Avenue, Colonia, New Jersey

Dear Stuart:

      This letter is to advise you that on Wednesday, January 17, 2007 my client, Robert Melecci, the owner of Rob's Towing Service observed a delivery being made some time in the afternoon by your client's gasoline transportation delivery service. During the delivery gasoline spilled on the ground and pooled underneath the truck. Although the spill was cleaned up, clearly some of the gasoline seeped into the group. This spill appears to be a recurrence of prior spills which may be the cause of the contamination now being investigated by the New Jersey Department of Environmental Protection ("NJDEP").

      Clearly the method used to deliver the gasoline does not comply with the standard required for such deliveries. No gasoline should leak during the delivery and your by your client and the delivery company

HP282

**NJMTBE-HPDELTA-000622**

Stuart J. Lieberman, Esq.
January 22, 2007
Page 2

shall be held responsible for any adverse consequences for the negligent
manner in which the gasoline deliveries have been made.

Sincerely,

Anthony P. Ambrosio

APA/la
cc:   Robert W. Muilenburg, Esq. (via facsimile)
      Joy Ricigliano, Esq. (via facsimile)
      Mr. Robert Melecci (via facsimile)

HP283

NJMTBE-HPDELTA-000623



**PASRICHA**
**& PATEL, LLC**
ATTORNEYS AT LAW

1794 OAK TREE ROAD    EDISON, NEW JERSEY 08820    (732) 593-6200    FAX (732) 593-6201
E-MAIL: LAW@PASRICHA.COM    WWW.PASRICHA.COM

GARY S. PASRICHA*
SHEETAL A. PATEL
CLEMENT C. CHANG*

OF COUNSEL
SANDDEEP CHATHRATH⁴
JEREMY ESAKOFF*

*NJ AND NY
ANY AND NA

February 2, 2007

By Facsimile and Mail

Stuart J. Lieberman, Esq.
10 Jefferson Plaza, Suite 100
Princeton, New Jersey 08540

Re:   Dhandi Transport, Inc. with Rob's Towing Service

Dear Mr. Lieberman:

Please be advised that our firm represents Dhandi Transport, Inc. ("DTI"). I am compelled to respond to Mr. Ambrosio's letter to you dated January 22, 2007.

It is our understanding that Mr. Robert Melecci of Rob's Towing Service, the landlord of the property located at 439 Lake Avenue, Colonia, New Jersey, has alleged that our client negligently delivered gasoline products to your client HP Delta on January 17, 2007.

Our client vehemently denies any wrongful conduct. When DTI's driver handled the hose from the truck, a small amount of product, roughly half-liter, leaked onto the ground. Thereafter, the driver immediately soaked up the product with a rag. Therefore, Mr. Melecci's contention that the "gasoline spilled on the ground and pooled underneath the truck" is wrong. There was no pool. Moreover, Mr. Ambrosio's letter implies that there was significant spillage, which simply was not the case.

We therefore reject any claim of negligence asserted by your client or the landlord. We are confident that any environmental damage found on the property was not caused by or exacerbated by our client's conduct.

Please do not hesitate to contact me if you should have any questions or concerns.

Very truly yours,

Gary S. Pasricha

cc:   Dhandi Transport, Inc.

EXHIBIT
Dhandi
5 8/1/12

HP279

**NJMTBE-HPDELTA-000619**

# EXHIBIT 3

**To:**       Herzberg, Mark[Mark.Herzberg@dep.state.nj.us]
**From:**     valeri.morone@twp.woodbridge.nj.us
**Sent:**     Tue 1/23/2007 2:45:43 PM
**Subject:**  RE: Fwd: HP Delta/Rob's Service Station PI-001463

Hi Mark,

Do you want me to try to find some phone numbers for you?

---

**From:** Mark Herzberg [mailto:Mark.Herzberg@dep.state.nj.us]
**Sent:** Tuesday, January 23, 2007 8:42 AM
**To:** Morone,Valeri
**Subject:** Fwd: HP Delta/Rob's Service Station PI-001463

FYI.  I am going to be out on site Thursday morning to try to get a hold of/leave cards at homes where I have no phone number. Mark

>>> William Buchanan 1/22/2007 11:56:03 AM >>>
On Thursday January 18, 2007, I visited the HP Delta site with Dave Miele (BSCM). The station was operating and dispensing gasoline fuels.

Upon arrival I observed grading activity at the rear of the station. I questioned station owner Rob Meleci about this work. He explained that the recent rain had made the soil at the rear of the station very soft and that his tow trucks normally parked in this location were becomming stuck in this muddy area. He was grading, compacting and removing a minimal amount of soil followed by installation of about two inches of gravel to provide a more suitable parking area.

The NJDEP Emergency Response Services contract EP&S came to the site and removed from the observation wells in the station's tankfield floating product. A total of 2800 gallons of floating product and product contaminated water was removed. The product level ranged from 8 inches to one inch, in the tank wells initially. After four hours of removal and recharge, all wells had no measurable product. Reinspection is scheduled for Thursday January 25 for floating product in these wells. An additional removal action will be taken if appreciable product is observed.

It was noted that in the well closest to Lake Ave., the product was black in coloration but had a stong gasoline odor. The tank adjacent to this well had previously been a diesel fuel tank. The well at the opposite end of the tank field had a clear petroluem product which appeared to be fresh gasoline product with a strong odor.



# EXHIBIT 4



245 Fischer Avenue, Suite D
Costa Mesa, CA 92626, US
Tel. +1.714.770.8040
Web:  www.aquilogic.com



# REVISED SITE SUMMARY
## ID # - 41958 HP DELTA SERVICE STATION
### Woodbridge Township, Middlesex County, New Jersey

Prepared on behalf of:

New Jersey Department of Environmental Protection (NJDEP)

The Commissioner of the NJDEP

The Administrator of the New Jersey Spill Compensation Fund

For:

The Office of the Attorney General of New Jersey

and

Miller, Axline & Sawyer

The Law Office of John K. Dema

Berger & Montague

Cohn Lifland Pearlman Herrmann & Knopf

Project No.: 003-01

January 2013

 aquilogic

Revised Site Summary Report
ID # - 41958 HP Delta Service Station
January 2013

This report addresses items 1 through 7 above, and presents opinions related to that work. Supplemental documents (e.g. remediation feasibility studies [FS], restoration costs) address items 8 and 9.

## 1.2    History of MTBE Use in New Jersey

MTBE usage in New Jersey began in the late 1970s (NJDEP, 2001). It was used as an octane enhancer throughout the 1980s at low concentrations, primarily in high-octane grade gasoline (NJDEP, 2001). During this time, concentrations of MTBE in premium grade gasoline ranged from 2% to 8%; regular grade gasoline contained a lower percentage (NJDEP, 2001).

In 1990, Congress passed amendments to the Clean Air Act (CAA) that mandated the use of reformulated gasoline (RFG) and wintertime oxygenated fuel (WOF) in areas that had failed to reduce ambient air quality to the National Ambient Air Quality Standards (NAAQS) (NJDEP, 2001). Specifically, the use of WOF during winter months was mandated for 39 urban areas (including 2 areas comprising 21 counties in New Jersey) throughout the country to limit emissions of carbon monoxide (CO), and RFG was mandated for 9 urban areas (including all but 2 counties in New Jersey) to limit emissions of contaminants that lead to the formation of ozone (NJDEP, 2001). These fuels require the presence of oxygen at 2.7% by weight for WOF and 2% by weight for RFG (NJDEP, 2001). MTBE was the primary gasoline additive used to meet the mandated oxygen percentage (NJDEP, 2001). To meet the weight requirements, MTBE would need to account for 15% by volume of WOF (almost 2.5 cups per gallon) and 11% by volume of RFG (about 1.75 cups per gallon) (NJDEP, 2001).

The use of RFG was required beginning January 1, 1995. Although two counties were exempted from this requirement, New Jersey mandated its use statewide in order to streamline gasoline distribution (NJDEP, 2001).

The WOF program was established in the winter of 1992-1993 in both northern and southern New Jersey (NJDEP, 2001). In 1995, southern New Jersey attained the NAAQS for CO and discontinued the WOF program (NJDEP, 2001). In 1997, the NJDEP submitted requests to the United States Environmental Protection Agency (USEPA) to suspend the WOF program in northern New Jersey, citing findings of MTBE risk to water supplies and citizen concerns about the use of MTBE in gasoline (NJDEP, 2001). In 1999, the request was approved with the condition that RFG would be sold during all months throughout New Jersey (NJDEP, 2001).

Upon initiating the WOF program, the state of New Jersey received numerous complaints regarding MTBE (NJDEP, 2001). In 1995, citizens claimed that they felt sick when exposed to the

 aquilogic

Soils in the vicinity of the Site are classified as Haledone Urban Land Complex.  The Haledone is a coarse loamy basal till with a basalt parent material.  The soil is classified as Urban because surfaces in the vicinity are typically covered by pavement, concrete, buildings, and other structures, and the underlying soil is often disturbed (LBG, 2008; 007191).

## 2.2    Hydrogeology

There are two basic hydrogeologic units of importance at the Site - the Passaic Formation (part of the Brunswick Aquifer), and the unconsolidated glacial sediments known as the Rahway Till (Herman et al. 1998).  The Passaic Formation, part of the Brunswick Aquifer, is an important regional aquifer in central and northern New Jersey (Michalski, 1990; Herman, 1998).  Groundwater flow within the Passaic Formation is primarily within secondary porosity that occurs as partings along bedding, fractures, and near vertical joints (Michalski, 1990).  The Brunswick Aquifer has been described as a multi-unit leaky aquifer with several water-bearing units of varying transmissivities, which are separated by units that behave as aquitards or semi-confining units (Michalski, 1990).

The Rahway River is located approximately 2-miles to the northeast of the Site, with the Robinson Branch and Middlesex Reservoir approximately 1-mile to the north-northeast of the Site (USGS, 2011).  Under pre-development conditions, the Rahway River acts as a regional groundwater discharge feature, and groundwater in the Passaic Formation flowed northeast towards the river (LBG, 2008; 007192).  However, domestic supply wells in the area locally affect groundwater flow.  Because of this, bedrock groundwater monitoring wells in the vicinity of the Site between October of 2009 and March of 2010 show groundwater flow in the Passaic Formation to the south or the southeast (LBG, 2010; 006911, 006912).  Supply wells screened within the Passaic Formation have highly variable yields with an average yield of 19 gallons per minute (gpm) (LBG, 2008; 007192).

Based on local topography, groundwater in the unconsolidated sediments in the vicinity of the Site is interpreted to flow toward the Pumpkin Patch Brook, 0.3 miles to the southwest (LBG, 2008; 006906).  However, groundwater contour maps constructed from monitoring well elevation data between October 2009 and March 2010 show shallow local groundwater on-site flowing northwest (LBG, 2010).  Depth to water data collected on-site revealed shallow groundwater at depths ranging from 10 to 18 feet bgs (LBG, 2008; 007192).

 aquilogic

## 4.0    SITE HISTORY

### 4.1    Operational History

A UST Registration Questionnaire from May of 1986 suggests that the Site has operated as a gasoline station since at least 1966 when two steel 4,000-gallon gasoline USTs, two steel 3,000-gallon gasoline USTs, one steel 1,000-gallon waste oil UST, and associated galvanized piping were in use (NJDEP, 1986; 006615).  These USTs were believed to have operated at the Site until approximately 1988 (NJDEP, 1986; 006613 to 006615).  Prior to March 1989, the five USTs, associated piping and five dispensers were replaced.

Current USTs at the Site include three fiberglass-clad steel 6,000-gallon gasoline storage tanks, one fiberglass-clad steel 4,000-gallon gasoline storage tank, one fiberglass-clad steel 6,000-gallon diesel storage tank, and the associated steel product piping.  The questionnaire also indicates that the USTs and piping are not lined and are not equipped with secondary containment (NJDEP, 1989; 006634 to 006634).

The gasoline retail portion of the Site was apparently leased to HP Delta sometime in 1988 (LBG, 2007; 008312).

### 4.2    Environmental Investigation and Remediation Chronology

The following is a chronology of investigation and remediation activities that have been conducted at the Site:

| Date/Period | Activity |
| --- | --- |
| December 7, 2004 | The earliest record of regulatory involvement with the Site (spill incident #04-12-07-1319-21).  It was reported when a turbine spill containment sump on the UST containing regular gasoline was found to be filled with product (LBG, 2007; 008312). |
| May 11, 2005 | A groundwater sample collected from the domestic well located at 31 Morningside Road indicated the presence of benzene at 45 µg/L (APE, 2007; 011243) and MTBE at 12,000 µg/L (APE, 2007; 011243). |
| June 2, 2005 | The domestic supply well located at 31 Morningside Road was re-sampled.  Benzene at 130 µg/L (APE, 2007; 011243) and MTBE at 19,000 µg/L were detected (APE, 2007; 011243). |



Revised Site Summary Report
ID # - 41958 HP Delta Service Station
January 2013

| Date/Period | Activity |
|---|---|
| December 5, 2005 | The domestic supply well located at 49 Morningside Road was sampled and MTBE at 1,600 µg/L was detected (APE, 2007; 011243). |
| January 5, 2006 | The domestic supply well located at 49 Morningside Road was re-sampled and MTBE was detected at 120 µg/L was detected (APE, 2007; 011243). |
| March 13 and 14, 2006 | The domestic supply well (open borehole from 20 feet to 72 feet [NJDEP, 2007c, 015328]) located at 62 Lancaster Road was sampled on March 13, 2006 and MTBE at 0.95 µg/L was detected (EMSL, 2006a; 015337). |
| | The domestic supply well located at 164 Jordan was sampled on March 14, 2006 and MTBE at 220 µg/L was detected (EMSL, 2006b; 006666). |
| April 13, 2006 | The domestic supply well located at 164 Jordan Road was re-sampled and MTBE at 220 µg/L was detected (EMSL, 2006c; 006658). |
| May 2006 | The domestic supply well (open borehole from 31 feet to 79 feet [NJDEP, 2010a, 015010]) located at 100 Lancaster Road was sampled on May 11, 2006 and MTBE at 6.2 µg/L was detected (EMSL, 2006d; 015039). |
| | The domestic supply well (open borehole from 20 feet to 81 feet [NJDEP, 2006l; 014696]) located at 85 Lancaster Road was sampled May 18, 2006 and MTBE at 110 µg/L was detected (EMSL, 2006e; 015337). |
| | The domestic supply well (open borehole from 27 feet to 70 feet [NJDEP, 2006k; 014836]) located at 86 Lancaster Road was sampled on May 18, 2006 and MTBE at 720 µg/L was detected (EMSL, 2006f; 006653). |
| | The domestic supply well located at 99 Lancaster Road was sampled on May 18, 2006 and MTBE at 210 µg/L was detected (EMSL, 2006g; 006686). |
| | The domestic supply well (open borehole from 25 feet to 79 feet [NJDEP, 2006k; 014865]) located at 95 Lancaster Road was sampled on May 25, 2006 and MTBE at 420 µg/L was detected (EMSL, 2006h; 014885). |
| | The domestic supply well located at 94 Lancaster Road was sampled May 25, 2006 and MTBE at 70 µg/L (Woodbridge, 2006; 008711) was detected. The screen interval for this well is unknown. |
| June 15, 2006 | The domestic supply well (open borehole from 27 feet to 70 feet [NJDEP, 2006k; 014836]) located at 86 Lancaster was sampled and MTBE at 610 µg/L |



Revised Site Summary Report
ID # - 41958 HP Delta Service Station
January 2013

| Date/Period | Activity |
| --- | --- |
| | was detected (EMSL, 2006i; 006648). |
| | The domestic supply well located at 99 Lancaster was re-sampled and MTBE at 150 µg/L was detected (EMSL, 2006j; 006643). |
| July 6, 2006 | The domestic supply well located at 95 Lancaster was re-sampled and MTBE at 310 µg/L was detected (EMSL, 2006k; 14891). |
| August 2006 | The domestic supply well (open borehole from 20 feet to 81 feet [NJDEP, 2006l; 014696]) located at 85 Lancaster was re-sampled on August 2, 2006 and MTBE at 240 µg/L was detected (EMSL, 2006l; 015337). |

A compliance inspection of the UST system located at the Site was conducted August 5, 2006.  The inspection revealed gross soil contamination and floating product in observation wells (secondary leak detection system located within the UST basin) at the Site among other violations (NJDEP, 2006a; 009123).

An August 7, 2006 email on a 2004 incident states that, *"The incident in NJEMs reports a Line failure and the regular UST taken out-of-service for repairs.  The case status is listed as "Awaiting Report" with Initial Notice."* (NJDEP, 2006b; 009141).

An August 7, 2006 email correspondence from Akshay Parikh of the NJDEP recognized that additional sampling would be necessary to delineate the extent of contamination and to evaluate the homes for intrusion of gasoline vapors into indoor air (NJDEP, 2006c; 009143).

**It does not appear that indoor air sampling was ever conducted.**

During an inspection on August 8, 2006, a UST Field Notice of Violation 06-08-08-1117-02 was issued to HP Delta.  The violation noted deficiencies in tank overfill protection.  A delivery ban was imposed and an order given to cease use of the USTs.  It was noted that free-product was observed in all tank field wells (secondary leak detection system located within the UST basin).  Corrective action included emptying of USTs within 48-hours (NJDEP, 2006d; 008563).

On August 10, 2006, MIG Environmental (MIG) collected groundwater samples from one of the existing tank field monitoring wells (APE, 2007; 011231).  This water sample indicated the presence of benzene, MTBE and

12

 aquilogic

| Date/Period | Activity |
|---|---|
| | TBA at 14,200 µg/L, 41,900 µg/L, and 5,820 µg/L, respectively (APE, 2007; 011283). |

Prior to any documented soil and groundwater investigations at the Site, the UST basin was equipped with wells that are believed to serve as a secondary release detection system. For the purposes of this report, this well will be referred to as Tank Field Well MW-4 throughout remainder of the report.

The Bureau of USTs requested that Bureau of Risk Management Issue a Directive to the Site on August 11, 2006 (NJDEP, 2006a; 009123).

On August 16, 2006 the NJDEP filed a "Directive and Notice to Insurers" (Directive) naming H.P. Delta Inc., Rob's Service Center and Robert Melecci as respondents. The Directive cited that "*several potable wells had exceedances of MTBE and/or benzene*" (NJDEP, 2006e; 014541) and that "*gross soil contamination and floating product was observed during an August 2006 compliance inspection*" (NJDEP, 2006e; 014544).

The Directive stated that "*The Department has determined that it is necessary for the Respondents to conduct departmentally approved investigative and remedial activities at the contaminated Site in order to fully determine the nature and extent of the problem presented by the discharges. Upon completion of the remedial investigation, it will be necessary to implement a remedial action to address the discharges at the Site.*" (NJDEP, 2006e; 014544).

Respondents were directed to take corrective action that included a receptor evaluation (NJDEP, 2006e; 014545), immediate removal of separate phase hydrocarbons observed during the August 5, 2006 compliance inspection, a remedial investigation of the groundwater contamination, a remedial investigation of the soil contamination, an inspection of the tank system and make any needed repairs, and a vapor intrusion investigation of the Site structure and surrounding structures (NJDEP, 2006e; 014546).

The domestic supply well located at 170 Jordan Road was sampled on August 17, 2006 and MTBE at 990 µg/L (EMSL, 2006m; 014852) was detected.

H.P. Delta, Inc.'s Legal representative, Lieberman & Blecher, responded to



| Date/Period | Activity |
|---|---|
| | the August 16, 2006 Directive in a letter dated August 23, 2006.  The response requested that H.P. Delta business re-open immediately (USTs had been mandatorily taken out of service after August 8, 2006 compliance inspection).  Letter argued that there was no reason to believe that operations related to the H.P. Delta station were related to the release that was detected.  Letter also transmits results of tank system testing performed on August 10, 2006 (LB, 2006a; 009091). |
| | An email on August 24, 2006 from Bradi Montozzi of NJDEP and Valeri Morone of NJDEP documents that two of the respondents, Robert Melecci and H.P. Delta had not yet committed to complying with the Directive.  Email suggests that both respondents are blaming each other (Montozzi, 2006; 009069). |
| | Legal representatives for the property owner, Robert Melecci, sent a letter on August 28, 2006 to HP Delta suggesting that the problems relating to the gasoline spill were due to the negligence of Dandi Transport, Inc. (AA, 2006, 008528).  The letter argued that the spill occurred when the employees of the transporter (Dandi Transport) were in the process of delivering fuel oil at the premises (AA, 2006; 008528). |
| September 2006 | Domestic supply well located at the Site was sampled on September 1, 2006.  Benzene at 1.26 µg/L and MTBE at 1,440 µg/L were detected.  (LBG, 2007; 011285). |
| | On September 5, 2006, an attorney for HP Delta responded to the August 28, 2006 letter.  The letter refutes any claim of a discharge or spill to the environment (LBG, 2006; 008472). |
| | NJDEP issued a draft Administrative Consent Order (ACO) on September 6, 2006 (NJDEP, 2006f; 008454). |
| | NJDEP issued a letter to HP Delta indicating that documentation of functional overfill protection had not been received.  This request for documentation comes approximately one month after the original violation was observed during the field compliance visit on August 8, 2006 (NJDEP, 2006g; 006544). |
| | On September 13, 2006, HP Delta's legal representatives sent a letter to NJDEP indicating the HP Delta is not prepared to sign the ACO (LB, 2006d; |

 aquilogic

| Date/Period | Activity |
|---|---|
| | 008426). |
| October 2006 | The domestic supply well located at 170 Jordan Road was re-sampled on October 5, 2006 and MTBE at 1,472 µg/L was detected (GSLI, 2006; 014854). |
| | Property owner Robert Melecci signed an access agreement with NJDEP on October 6, 2006 (NJDEP, 2006h; 008080). |
| | Analytical results for temporary well TWP-3 located immediately north of existing UST indicate benzene, MTBE and TBA as high as 15,900 µg/L, 242,000 µg/L and 35,400 µg/L, respectively (MIG, 2007; 008380). |
| December 2006 | On December 1, 2006, MTBE was detected at 2,690 µg/L and TBA at 993 µg/L in a temporary well (TWP-6) installed at the Site during investigation activities by MIG (Table 3, 2006; 008410). |
| | MIG submitted a Site Investigation Report (SIR) to the NJDEP on December 7, 2006 (LBG, 2007; 008118). |
| January 31, 2007 | The domestic supply well located at 35 Morningside Road was sampled. Benzene at 3.6 µg/L and MTBE at 8,000 µg/L were detected (NJDEP, 2007a; 014666). |
| February 2007 | The domestic supply well located at 35 Morningside Road was sampled February 11, 2007.  MTBE at 791 µg/L was detected (Woodbridge, 2007a; 014675). |

On February 28, 2007, NJDEP responded to the MIG SIR with a Notice of Rejection.  The correspondence stated that *"The Department has determined that this document does not meet the minimum standards required for review and does not present sufficient sampling conducted at the site to qualify as a complete Site Investigation (SI) report."* (NJDEP, 2007b; 008208)

NJDEP went on to state that *"the report primarily focused on the attempt by HP Delta, Inc. to prove that the primary source of the free phase product and ground water contamination which is presently observed at the existing tank field wells and in the Site's potable well is a result of discharges to the subsurface from the former tank field which previously existed at the site until approximately 1987 (and not the existing tank field.)"* (NJDEP, 2007b;



Revised Site Summary Report
ID # - 41958 HP Delta Service Station
January 2013

| Date/Period | Activity |
|---|---|
| | reportedly encountered in boring TF-4 beginning at a depth of approximately 12 feet bgs (APE, 2007; 011305). This boring was drilled at or near the location of the USTs that were removed prior to the installation of the existing USTs. |
| July 2007 | On July 11, 2007, monitoring wells MW-1 through MW-12 were sampled. Benzene, MTBE and TBA were detected at concentrations as high as 20,400 µg/L, 253,000 µg/L, and 14,400 µg/L, respectively in MW-8 (HCR, 2006; 007121 through HCR, 2006; 007123). |
| | Analytical results of the second reported groundwater sample collected from the on-site domestic supply well indicated 1.1 µg/L of benzene, 2,490 µg/L of MTBE, and 43.9 µg/L of TBA (Accutest, 2007b; 000682-000684). |
| | On July 17, 2007, NJDEP responded to the June 12, 2007 SIR. NJDEP stated that *"Since the successful completion of an appropriate site investigation still has not been performed and the addressed party has refused to enter into an Administrative Consent Order (ACO) pursuant to the Spill Compensation and Control Act to perform the appropriate site investigation/remedial investigation, the Department will continue to utilize public funds to conduct the proper site investigation, remedial investigation and remediation of the site"*. (NJDEP, 2007c; 008287). |
| | The domestic supply well (open borehole from 31 feet to 79 feet [NJDEP, 2010a, 015010]) located at 100 Road Lancaster was re-sampled on July 30, 2007, and MTBE at 26.1 µg/L was detected (GSLI, 2007a; 015033). |
| | Beginning in July of 2007, unconsolidated sediment zone off-site groundwater monitoring wells OMW-1 through OMW-9 and OMW-11 were installed with screened intervals ranging from 2 to 25 feet bgs (Table 1). The wells were installed to terminate within the unconsolidated sediments that overlie the local bedrock. Field activities continued into September of 2007. |
| | Planned off-site well OMW-10 was not installed during these investigation activities. |
| August 20, 2007 | Unconsolidated sediment zone off-site groundwater monitoring wells OMW-1 through OMW-9 and OMW-11 were sampled. MTBE was detected in three of the wells at concentrations as high as 3.90 µg/L (HCR, 2010; |

 **aquilogic**

Revised Site Summary Report
ID # - 41958 HP Delta Service Station
January 2013

### 5.3.2    Flow Direction and Gradient

Groundwater flow in the bedrock aquifer zone (i.e., fractured bedrock wells completed from 50 to 64 feet bgs), as monitored by wells MW-01, MW-02 and MW-03, has been reported to be to the south and southeast (LBG, 2010; 006945, 006947 and 006949). Estimated gradients in the bedrock were approximately 0.01 feet/foot in October 2009 and March 2010 (LBG, 2010; 006945 and 006949). In December 2009, the gradient was estimated at 0.006 to the southeast (LBG, 2010; 006947). The rose diagram shown on Figure 7aii depicts an overall regional flow direction of south-southeasterly in the bedrock zone in the vicinity of the Site using recent data from MW-01 through MW-03. Figure 7bii is a map showing recent groundwater elevation results for wells completed in bedrock.

Groundwater elevations in the bedrock zone are generally lower than elevations measured in the unconsolidated sediment zone, indicating a downward vertical gradient between the two zones. For example, a comparison of March 2010 groundwater elevations between unconsolidated zone wells and nearby bedrock wells OMW-2/MW-03, OMW-3/MW-01 and OMW-9/MW-02 indicates that groundwater elevations in the bedrock aquifer are lower than in the unconsolidated zone (by as much as about 15 feet in some wells), indicating a strong downward vertical gradient between the two zones. The downward vertical gradient likely exists naturally, but pumping from the bedrock zone has further increased the head differential between the two aquifer zones.

Under natural conditions, the regional groundwater within the underlying bedrock of the Passaic Formation (Brunswick Formation) would be expected to flow northeast, toward the Rahway River, as this is a regional groundwater discharge feature. However, the pumping of groundwater supply wells in the area has locally affected the groundwater flow patterns.

It is likely that gradients in the bedrock in the vicinity of the Site were influenced by pumping at domestic supply wells. Given the distribution of these wells, groundwater in the bedrock likely flowed to the west-southwest when the supply wells were actively pumping.

### 5.3.3    Hydraulic Properties

No data regarding the hydraulic properties (e.g., K, T) of the bedrock were collected as part of Site investigations. The bedrock of the Passaic Formation is generally considered non-porous; however, the bedrock is typically fractured along bedding planes and contains variably-spaced joints, which tend to produce a relatively high secondary permeability. These structural elements tend to create anisotropic flow conditions when influenced by well pumping (LBG, 2010; 006706).



The unconsolidated sediments beneath the Site are underlain by bedrock (fractured shale) of the Passaic Formation.  Depth to groundwater in the bedrock has been measured from approximately 15 feet bgs to approximately 28 feet bgs.  Groundwater flow within the bedrock aquifer is primarily within secondary porosity that occurs as partings along bedding, fractures, and near vertical joints.  Currently, groundwater flows southeasterly in the bedrock aquifer at gradients ranging from approximately 0.007 to 0.0125.  Historically, the flow of groundwater (and COCs dissolved therein) was likely "controlled" by the pumping at domestic WSWs to the west-southwest of the Site.  The K of the bedrock aquifer is expected to be greater than that of the overlying unconsolidated sediments based on testing done in other areas.  The horizontal K in the bedrock aquifer has been measured at a mean value of approximately 5.01 feet/day.  Although data for hydraulic properties of the bedrock beneath the Site have not been collected, it is expected that groundwater velocities in the bedrock are substantially higher than that those of the unconsolidated sediments (reasonable estimates are in excess of 100 feet/year).

### 8.5.2    Releases

Releases of gasoline were reported to have occurred at the Site in 2004 (turbine sump) and 2006 (tank field monitoring wells).  Based on the dates of the release discoveries, MTBE would have been present in the gasoline released in 2004 and likely present in the gasoline measured in the tank field wells in 2006; although, in 2006 most gasoline refiners switched to using ethanol.

### 8.5.3    Investigation and Remediation

Between 2006 through 2009, a total of 34 wells were installed as part of investigations at the Site (wells MW-1 through MW-24, OWM-1 through OMW-9, and OMW-11).  Beginning in 2005, the contamination of groundwater off-site in the bedrock aquifer has been assessed largely through the sampling of numerous domestic supply wells located west-southwest of the Site and three bedrock monitoring wells (MW-01 through MW-03).  However, many domestic supply wells that were found to contain MTBE (or other contaminants) at concentrations in excess of water quality standards have been destroyed.  Overall, there have been few off-site monitoring wells installed during the course of investigation activities at the site.

In August 2006, interim remediation was implemented to remove LNAPL and groundwater containing high-dissolved phase concentrations from locations in and around the USTs.  In May of 2008, a full scale dual-phase remediation system was started up to treat the soil and groundwater of the unconsolidated sediments beneath the Site.  A review of available documentation suggests that the SVE portion of the remediation system has not operated since January of 2010, and the groundwater extraction portion of the system is focused on wells



movement down into the bedrock aquifer. Due to the combined effect of recharge and local pumping, the contaminated groundwater of the unconsolidated sediments migrated downward to the bedrock aquifer. Once in bedrock, groundwater migrated rapidly westward, in the secondary porosity of the fractured bedrock, to the domestic supply wells.

The current extent the COC plume in the bedrock aquifer is not known since many of the domestic supply wells found to be contaminated were subsequently destroyed. The plume of contaminated groundwater is likely similar to the extent and distribution observed in 2006. However, the plume may now be migrating to the south-southeast.

Contamination released at the Site will continue to migrate with groundwater and, without remediation, the contamination may migrate beyond the delineation boundaries. Therefore, additional investigation is needed to the west-southwest of the Site. Remediation of the bedrock aquifer is also needed to restore the water resource to its pre-impacted condition.



## 10.0   KEY OPINIONS

1. Releases of gasoline containing MTBE have occurred at the Site.  Gasoline releases have been reported at the Site in December 2004 and August 2006.  See Section 8.2.

2. MTBE has impacted soil and groundwater beneath the Site.  MTBE contamination was first detected in soil beneath the Site in October 2006.  See Section 6.2.  MTBE contamination was first detected in groundwater beneath the Site in August 2006.  See Section 6.4.

3. TBA has impacted soil and groundwater beneath the Site.  TBA contamination was first detected in soil beneath the Site in October 2006.  See Section 6.2.  TBA contamination was first detected in groundwater beneath the Site in August 2006.  See Section 6.4.

4. MTBE has migrated off-site beyond the Site boundaries.  MTBE contamination in groundwater was first detected in May 2005 in the domestic supply well located at 31 Morningside Drive.  See Section 6.4.

5. TBA has migrated off-site beyond the Site boundaries.  TBA was detected in off-site well MW-01 on March 2010.  See Section 6.4.3.2.

6. Groundwater contamination has not co-mingled with releases from nearby facilities.  There is no indication that the plume of contaminated groundwater has co-mingled with gasoline-impacted groundwater associated with a release at another facility.

7. Investigations have failed to delineate the current extent of MTBE contamination in groundwater laterally.  MTBE is not delineated laterally in the bedrock zone.  See Section 6.4.3.2.

8. Investigations have failed to delineate MTBE in groundwater vertically.  MTBE is not delineated vertically in the bedrock zone.  See Section 6.4.3.2.

9. Investigations have delineated the current extent of TBA contamination in groundwater laterally.  The plume of TBA contaminated groundwater appears to be laterally delineated and extends 250 feet west of the Site.  See Section 6.4.3.3.

10. Investigations have failed to delineate TBA in groundwater vertically.  TBA was detected in the on-site domestic supply well in July 2007.  See Section 6.4.3.2.

11. MTBE contamination in groundwater exists beyond the current monitoring network.  MTBE in groundwater extends at least 1,350 feet to the west-southwest of the Site (MTBE detected in domestic supply wells at 164 Jordan Road and 170 Jordan Road) See Section 6.4.3.3.

12. TBA contamination in groundwater exists beyond the current monitoring network.  TBA was detected in off-site well MW-01 in March 2010 and also in the domestic supply well located on-site on July 11, 2007.  TBA has not been delineated vertically.  See Section 6.4.3.2.

 aquilogic

13. Remediation performed to date appears to be effectively addressing on-site groundwater contamination in unconsolidated sediments. Given the nature of the unconsolidated sediments (e.g. relatively low K), the selected remedy is working about as well as can be expected. Continued operation of the system is recommended. See Section 7.

14. Remediation performed to date has failed to effectively control the off-site migration of groundwater contamination. Off-site contamination continues to persist. On-site remedial efforts were implemented after off-site contamination was already present. See Section 6.

15. Remediation performed to date has failed to effectively remediate off-site groundwater contamination. Groundwater sample results from well MW-1 suggested that the contamination detected in several domestic supply wells to the west-southwest continues to be present in the bedrock zone. See Section 6.4.3.2.

16. Additional off-site investigation is required. The lateral and vertical extents of MTBE in the bedrock zone have not been delineated. See Section 6.4.3.2.

17. Investigation of deeper groundwater zones is required. Contamination was detected in the bedrock aquifer at depths up to 100 feet bgs. Monitoring wells screened deeper than 100 feet bgs have not been installed in the vicinity of Site. See Section 6.4.3.2.

18. Additional on-site remediation of groundwater is required. Based on available data, continued operation of the selected remedy is recommended.

19. Off-site remediation of groundwater is required. No remediation of off-site groundwater has been performed to date and the observed off-site groundwater contamination in bedrock warrants remediation. See Section 6.4.3.

20. Releases pose a threat to deeper aquifers. COCs have been detected in nearby WSWs completed into bedrock and also in bedrock-zone monitoring well MW-01. See Section 6.4.

21. Releases pose a threat to other receptors. At least 23 of the domestic supply wells have been contaminated with MTBE and other nearby domestic wells are threatened. It is likely that groundwater contamination extended to Pumpkin Patch Brook, and this surface water body is still threatened by contamination. Contaminant vapors pose a risk to occupants at nearby buildings. Even though continued operation of the on-site remediation system should mitigate these risks, a vapor intrusion assessment is warranted. See Section 8.4 and Table 3.

# EXHIBIT 5



# ANTHONY P. AMBROSIO
### Attorney at Law
317 Belleville Avenue
Bloomfield, New Jersey
E.mail: apambrosio@Yahoo.com

Telephone (973) 748-7474          Facsimlie (973) 748-0765

Aug 28, 2006

**Via Certified & U.S. Mail**
H.P. Delta, Inc.
Attn: Gurmail Singh
35 Farm Haven Avenue
Edison, NJ 08820

       Re: Gasoline Spill at 439 Lake Avenue, Colonia, New Jersey
       Date of Spill: August 8, 2006

Dear Mr. Singh:

      This letter is advise you that I have been retained by your landlord Robert Melecci to deal with the problems relating to the gasoline spill due to the negligence of Dandi Transport, Inc. Apparently, the spill occurred when the employees of the transporter were in the process of delivery fuel oil at the premise which Delta leases from Mr. Melecci. The New Jersey Department of Environmental Protection has assigned a UST Registration # 001463 and case # 04-12-07-1319-21 and issued an Underground Storage Tank Field Notice of Violation to Robert Melecci, Rob's Service Center, and H.P. Delta, Inc., on August 16, 2006. Immediate steps are required.

      Mr. Melecci has been served with notice of his responsibility to remedy the problem by the Health Department of the Township of Woodbridge as well as the New Jersey Department of Environmental Protection because he is the owner of the premises. Your lease provides that as the tenant you are responsible to the landlord for any damages "caused by the carelessness, negligence or improper conduct on the part of the Tenant or the Tenant's agents, employees, guests, licensees, invitees, subtenants, assignees or successors" and further that "the Tenant shall repair the said damage or replace of (sic – should read "or") restore any destroyed parts of the premises, as speedily as possible, at the Tenant's own cost and expense. See paragraph 4. of the lease, a copy of which is attached hereto.

      Mr. Melecci has notified the insurance carrier Zurick American Insurance Company and requested that it take immediate steps to remedy the pollution and to comply with the demands



MEL 0492

made by the NJDEP. Demand is hereby made of you as the Tenant pursuant to the said lease to do that which is necessity to satisfy any and all requirements of the local municipalities and the State of New Jersey in the remedying the damages caused by the fuel oil spill.

      If necessary to protect the interests of my client Robert Melecci I am prepared to resort to litigation to compel you and your Insurer Zurich to comply with any requirements of local and state laws to which my client may be subjected and to indemnify my client from any harm. You should contact me immediately, and at any time in the future, to inform me as to the status of the remedial efforts you have or will undertake in order that I may so advise the appropriate authorities.

              Very truly yours,

              Anthony P. Ambrosio

cc:  NJDEP
     Attn: Ronald T. Corcory
     Asst Director, Oversight Resources Allocation Element
     Central Bureau of Water Compliance & Enforcement
     Route 130 South, 300 Horizon Center
     Robbinsville, New Jersey 08625-0407

     Township of Woodbridge
     Attn: Dennis M. Green
     Health Officer/Director of Health
     One Main Street
     Woodbridge, New Jersey 07095

     Zurich American Insurance Company
     1400 American Lane
     Tower 1 Floor 13
     Schaumberg, Illinois 60196
     Attn: Environmental Claims Unit

     Robert Melecci
     Rob's Towing & Service Center
     439 Lake Avenue
     Colonia, New Jersey 07067

MEL 0493

# LIEBERMAN & BLECHER

A PROFESSIONAL CORPORATION

10 JEFFERSON PLAZA, SUITE 100
PRINCETON, NEW JERSEY 08540
TEL: (732) 355-1311
FAX: (732) 355-1310
WEBSITE: WWW.LIEBERMANBLECHER.COM



SHARI M. BLECHER
ATTORNEY AT LAW
SBLECHER@LIEBERMANBLECHER.COM

September 5, 2006

## VIA FACSIMILE & REGULAR MAIL

Anthony P. Ambrosio, Esq.
317 Belleville Avenue
Bloomfield, NJ
Fax: 973-748-0765

> Re:  *DEP Enforcement Action, 439 Lake Avenue, Colonia, New Jersey*

Dear Mr. Ambrosio:

    This firm represents H.P. Delta, the tenant in the referenced matter. In your letter of August 28, 2006 you refer to an alleged "spill" you claim took place on August 8, 2006 at the above referenced property. I have spoken with Dandi Transport, Inc. and I am aware of no such discharge or spill into the environment. If you have any evidence of this alleged spill, I would appreciate it if you would send it to me. But for now, my client and Dandi Transport are in the dark as to this issue.

    Of much greater significance, you indicated that the date of this occurrence was August 8, 2006. As you are aware, evidence that contamination was released from your client's property predates August 8, 2006 by many months. As a matter of fact, Dandi Transport was decommissioning the tanks because the NJ DEP was responding to the contamination that had been detected well before August 8, 2006. It is therefore illogical to suggest that something that would have occurred on August 8, 2006 is responsible for the substantial discharge that obviously occurred long before August 8, 2006.

    Not only does your position appear to be chronologically impossible but it also defies the substantial evidence that the tanks and piping have been tight ever since my clients began their operations. Please note that the enclosed tank tightness tests show that the tank systems had passed each test since H.P. Delta began operating the site in late 2003. I would note that you have not produced any document in proof that is inconsistent with the written test results reflecting the integrity of the system during my client's operations.

    Therefore, in light of the chronological problems expressed herein, and in light of the substantial evidence showing my client's compliant operation of the property that has thus far



# LIEBERMAN & BLECHER
### A PROFESSIONAL CORPORATION

been produced, I am at a loss as to how you blame my client or Dandi Transport for the contamination on your client's property which clearly predates the current lease. And it is frankly shocking that you would present these baseless accusations to Mr. Corcory, of the NJDEP and to Woodbridge Township.

It is clear that from all currently available information that this contamination predates the current lease. It is also a fact that my clients have been compelled to cease doing business at the property as a result of the discharge for which your client is legally liable. Accordingly, demand is hereby made that your client immediately undertake all remedial measures being demanded by the NJDEP in order to obtain a NFA at this time. Further, demand is hereby made that your client reimburses my client damages, costs, and fees necessitated by the disruption of business associated by the discharge for which your client has legal responsibility.

If you have any questions, please feel free to contact me.

Very truly yours,

SHARI M. BLECHER, ESQ.
Lieberman & Blecher, P.C.

Enclosure

cc:   H.P. Delta, Inc.
      Ronald Corcory, NJDEP
      Woodbridge Township

MEL 0496

# EXHIBIT 6

Gary S. Lipsius

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re:  Methyl Tertiary        Master File
Butyl Ether ("MTBE")           No. 1:00-1898
Products Liability             MDL 1358
Litigation                     (SAS): M21-88

This Document Relates To:

New Jersey Department of Environmental
Protection, et al., v. Atlantic Richfield
Co., et al.
No. 08 Civ. 00312

- - -

August 2, 2012

- - -

Oral Rule 30(b)(6)
deposition of Plaintiff New Jersey
Department of Environmental Protection,
through its representative GARY S.
LIPSIUS, REGARDING HP DELTA, taken
pursuant to notice, was held at the
offices of the STATE OF NEW JERSEY,
DEPARTMENT OF ENVIRONMENTAL PROTECTION,
401 East State Street, Trenton, New
Jersey, beginning at 9:56 a.m., on the
above date, before Kimberly A. Cahill, a
Federally Approved Registered Merit
Reporter and Notary Public for the State
of New Jersey.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

Page 30

```
 1   something that came in last week that
 2   hadn't yet been turned over.
 3       A.   Not to my knowledge.
 4       Q.   When is the last time that
 5   you made documents available to counsel?
 6           I understand that your
 7   working file and other files have been
 8   turned over.  Do you know approximately
 9   when that was?
10           MR. SHANNON:  The question
11       is overbroad, vague, and ambiguous
12       as phrased.
13           THE WITNESS:  Okay.  The --
14       may I answer?
15           MR. SHANNON:  Yes.
16           THE WITNESS:  The last
17       document that I provided to
18       counsel that I can specifically
19       remember was the classification
20       exception area proposal, which I
21       e-mailed to Leonard Kaufmann.
22           MS. HANEBUTT:  Okay.
23   BY MS. HANEBUTT:
24       Q.   Aside from that document,
```

Page 31

```
 1   have there been any other documents
 2   generated for this site in the last, say,
 3   six months or since your deposition in
 4   October of 2011?
 5           MR. SHANNON:  Calls for
 6       speculation.
 7           THE WITNESS:  Okay.  I can
 8       answer?
 9           MS. HANEBUTT:  You don't
10       have to ask him that every time.
11       He'll tell you --
12           THE WITNESS:  Actually,
13       Leonard would say -- he would say
14       something like that and say "you
15       may answer."
16           MR. SHANNON:  Yes, and one
17       important thing is, only one
18       person can speak at the same time,
19       because you can imagine how
20       difficult --
21           THE WITNESS:  Sorry.
22           MR. SHANNON:  -- you can
23       imagine how difficult --
24           MR. LIEBERMAN:  Excuse me.
```

Page 32

```
 1   Can I speak with the questioner
 2   when we have a chance --
 3           MS. HANEBUTT:  Yeah, we can,
 4   but there's a question pending, so
 5   I'd like to --
 6           THE WITNESS:  Repeat the
 7   question.  I'm sorry.
 8           - - -
 9       (The court reporter read the
10   pertinent part of the record.)
11           - - -
12           THE WITNESS:  Okay.  The
13   project currently is under O and
14   M.  I can clarify what that is.
15   That's operation and maintenance.
16       Jane TenEyck is the project
17   manager for the operation and
18   maintenance portion of the HP
19   Delta site.  She may have had
20   submissions since then from her
21   own contractor.
22       My portion of this case,
23   which was specifically with
24   respect to the remedial
```

Page 33

```
 1   investigation conducted by Louis
 2   Berger, the answer would be no;
 3   but for the case as a whole, I
 4   can't testify as to what she is
 5   doing with her contractor.
 6       Is that clear?
 7           MS. HANEBUTT:  Yes, it is.
 8   BY MS. HANEBUTT:
 9       Q.   Let me just ask a couple of
10   follow-up questions:  With respect to the
11   O and M work that's being done, which
12   contractor has been retained to do that
13   work?
14       A.   Based upon my review of the
15   file, it is EnviroTrac.
16       Q.   And you said before that you
17   did not speak to Miss TenEyck to prepare?
18       A.   I did not.
19       Q.   Okay.
20       A.   She's out in the field a
21   lot.
22       Sorry.
23           MR. SHANNON:  Yes, no
24   question.
```

Page 42

1   was being deposed for this HP Delta site
2   and that she had been -- that I mentioned
3   that I had seen her name listed on some
4   of the enforcement documents at the time
5   she worked for Mr. Corcory.
6        And I asked her what she
7   remembered about the -- the site,
8   enforcement-wise.
9        Q.   And what did she have to say
10  in that regard?
11       A.   She told me that she really
12  didn't remember much about it at all, and
13  it wasn't a very long discussion.  She
14  just said, you know, I barely remember
15  the case.  I remember there was some --
16  some potable wells that were
17  contaminated, but she said she didn't
18  really have much detail to give me.
19       Q.   Is it the DEP's contention
20  that releases from the HP Delta station
21  caused the MTBE impacts to the potable
22  wells along Lancaster Road?
23       MR. SHANNON:  Calls for
24  expert opinion.  It's beyond the

Page 43

1        scope for which this witness is
2        being produced.
3        THE WITNESS:  Could you
4        clarify the question, the NJDEP's
5        position?
6   BY MS. HANEBUTT:
7        Q.   Well, you're here today as a
8   representative of the DEP.
9        A.   Right.
10       Q.   And as such, you have an
11  obligation to answer questions based on
12  information known to or available to DEP,
13  and I'm just wondering if DEP has a
14  position that the HP Delta station is
15  responsible for the MTBE impacts in the
16  potable wells along Lancaster Road.
17       MR. SHANNON:  Calls for
18  expert opinion and it's beyond the
19  scope for which this witness is
20  being produced.
21       THE WITNESS:  I believe it
22  would be NJDEP's position that the
23  contamination -- the MTBE
24  contamination and TBA

Page 44

1        contamination found at the HP
2        Delta site is in some part
3        responsible for the potable well
4        contamination associated with the
5        Lancaster Road site.  And that
6        would be shown by the directive
7        and in the inclusion of a
8        Lancaster Road well issue in the
9        HP Delta directive.
10  BY MS. HANEBUTT:
11       Q.   And what is the basis for
12  concluding that the HP Delta site is in
13  some part responsible for the Lancaster
14  Road contamination?
15       MR. SHANNON:  Calls for
16  expert opinion.  It's beyond the
17  scope for which this witness is
18  being produced.  I think that
19  question is --
20       MS. HANEBUTT:  No coaching.
21  You can just state your objection
22  -- I'm just going to tell you, as
23  a matter of courtesy, because
24  you're new to the case and you

Page 45

1        have not met Her Honor, Judge
2        Scheindlin, but she does not take
3        very kindly to coaching witnesses
4        on the record.
5        All you're allowed to do is
6        state the basis for your
7        objection.  Anything else is
8        improper.
9        And if I have to, I'll get
10  Special Master Warner on the
11  phone.  He, in fact, has invited
12  as much, so --
13       MR. SHANNON:  That's what I
14  was in the process of doing,
15  counsel, and if I may finish, it's
16  beyond the scope for which this
17  witness is produced.
18       I think that question is
19  most appropriately addressed to
20  Mr. Akshay Parikh, who will be
21  produced later today regarding the
22  issues related to the Lancaster
23  Road wells.
24       MR. HANEBUTT:  Are you able

12 (Pages 42 to 45)

Gary S. Lipsius

Page 46

1    to answer the question?
2        THE WITNESS:  Could you
3    repeat the question?
4        MS. HANEBUTT:  Sure.  Could
5    you repeat it?
6            - - -
7        (The court reporter read the
8    pertinent part of the record.)
9            - - -
10       THE WITNESS:  Okay.  Well,
11   I'm going to have to ask you for
12   more clarification.
13       MS. HANEBUTT:  I'm just
14   responding to your answer, so --
15       THE WITNESS:  Right.  I
16   understand; but as time went on,
17   that may have changed, because new
18   data was generated.  So could you
19   give me a time frame at which --
20   BY MS. HANEBUTT:
21       Q.   Well, I'm most interested in
22   their position right now.
23       A.   Right now.
24       Q.   And I take it from your

Page 47

1    testimony that your answer is that DEP's
2    position is that the HP Delta station is
3    in some part responsible for the MTBE
4    impacts in the potable wells along
5    Lancaster Road; is that a correct
6    statement of the position today?
7        A.   Yes.
8        Q.   Okay.
9            And then the basis for that
10   opinion would be what?
11       MR. SHANNON:  Same
12   objections.
13       THE WITNESS:  Okay.  We --
14   if you refer to the remedial
15   investigation report, there were
16   two rounds of groundwater sampling
17   that were done.  All the wells
18   were sampled in the study area --
19   and the study area, I mean not
20   only at the gas station, but the
21   16 wells that had also -- when I
22   speak of wells, I am speaking of
23   --
24       MS. HANEBUTT:  Monitoring

Page 48

1    wells?
2        THE WITNESS:  Monitoring
3    wells, not potable wells.
4        MS. HANEBUTT:  Understand.
5        THE WITNESS:  -- those wells
6    had been sampled twice.  This was
7    done in approximately -- at 2010,
8    I believe.  The first round was
9    done when the system -- the
10   treatment system was operational.
11   And we --
12   BY MS. HANEBUTT:
13       Q.   And that's the SVE system?
14       A.   Correct -- we did not find
15   contaminants of concern above the
16   applicable standards in that first round.
17       Q.   The applicable standard
18   being 70 --
19       A.   The groundwater quality
20   standard for the contaminants at the
21   site, so 70 for TB -- MTBE -- you know,
22   whatever they were at the time.
23       Q.   Okay.
24       A.   Some of those standards may

Page 49

1    have changed.
2        Q.   Understood.
3        A.   The second round of
4    sampling, I instructed my contractor to
5    have the system shut down.  All of the
6    wells, except for one, had -- they again
7    came up without contamination associated
8    with the site.
9            However, there was a well --
10   it's MW-01.  It's a deeper monitor well.
11   It is right near the gas station -- right
12   on a private residence -- and that's
13   actually a dental office right on the
14   sidewalk there -- that came up with some
15   significant levels of contamination, and
16   that is in the direction of the potable
17   wells.
18           And that leads me to
19   believe, as the departmental
20   representative and the most knowledgeable
21   person on the case at this time, that it
22   would be -- you could assume that there
23   is some potential impact to the potable
24   wells from the gas station based upon the

13  (Pages 46 to 49)

Gary S. Lipsius

Page 50

1  proximity and the contaminants.
2      Q.   What's the groundwater flow
3  direction at the site?
4      MR. SHANNON: Calls for
5      expert opinion.
6      THE WITNESS: Can you be a
7      little bit more specific as to
8      groundwater flow direction?
9  BY MS. HANEBUTT:
10     Q.   Yeah. Okay.
11     Is there shallow groundwater
12  flow?
13     A.   Yes, there is.
14     Q.   What's the direction of
15  shallow groundwater flow?
16     MR. SHANNON: It's vague and
17     ambiguous as to time.
18     THE WITNESS: The --
19     MR. SHANNON: Calls for
20     expert opinion.
21     THE WITNESS: Okay. The
22     classification exception area
23     documents and the remedial
24     investigation report for the

Page 51

1      shallow groundwater shows sort of
2      an anomalus-looking set of data,
3      but more or less it seems to be
4      going to the north-northeast,
5      towards the Rahway River.
6  BY MS. HANEBUTT:
7      Q.   And what is the direction of
8  the deep groundwater flow?
9      MR. SHANNON: Calls for
10     expert opinion. It's vague and
11     ambiguous as to time.
12     THE WITNESS: The deep
13     groundwater flow, again, as shown
14     in the case file and in the
15     remedial investigation report and
16     CEA proposal, shows that the deep
17     groundwater is going in a
18     southerly -- southeast general
19     direction.
20  BY MS. HANEBUTT:
21     Q.   And monitoring well 1, was
22  that installed in the deeper aquifer?
23     A.   Yes.
24     Q.   And is monitoring well 1

Page 52

1  between the station and the Lancaster
2  Road wells that have been impacted? Is
3  it within that -- is it consistent with
4  groundwater flow?
5      MR. SHANNON: Calls for
6      expert opinion. It's vague and
7      ambiguous as phrased.
8      THE WITNESS: It's not
9      really. I was surprised to see
10     that. But sometimes with
11     contaminant flow in fractured
12     geology, especially with the
13     contaminant levels that we've seen
14     at this site, you can see data
15     that doesn't -- especially in an
16     anisotropic and nonhomogenous
17     aquifer, you can see data that is
18     not always what you would expect
19     based upon regional groundwater
20     flow.
21     And also the fact that the
22     system, when on, we did not see
23     that contaminant in MW-01 and,
24     when we shut it off, you did,

Page 53

1      leads me to believe that it is
2      coming from that source, the gas
3      station, HP Delta.
4  BY MS. HANEBUTT:
5      Q.   Now, you said that it's the
6  DEP's position that the HP Delta site is
7  in some part responsible for the
8  Lancaster Road impacts.
9      Is it solely responsible?
10     MR. SHANNON: Calls for
11     expert opinion.
12     THE WITNESS: I really can't
13     make a judgment on that.
14  BY MS. HANEBUTT:
15     Q.   Are there other potential
16  sources in the area?
17     MR. SHANNON: Calls for
18     expert opinion, speculation.
19     THE WITNESS: Well, just
20     generically speaking, I'd have to
21     say, in North Jersey, a densely
22     populated area like that, there's
23     always other potential sources.
24  BY MS. HANEBUTT:

14  (Pages 50 to 53)

Page 58

1 those other sites vis-a-vis the HP Delta
2 site.
3     Q.   Right.  What are those other
4 sites?
5     A.   Well, I know there is an --
6 and I'm not sure if that's within the
7 scope of this, but if counsel --
8     Q.   It is.  Topics 5 and 33.
9     A.   Okay.
10     Q.   You can refer to the notice
11 if you'd like.
12     A.   Fine.  I'm not a lawyer.
13         MR. SHANNON: I'm just going
14 to object that it violates the
15 case management order.  It's
16 beyond the scope of the
17 deposition.
18         You can go ahead.
19         THE WITNESS: Okay.  All
20 right.  I know there is a site on
21 Inman Avenue.  I forget -- it was
22 some sort of -- I went with a
23 colleague of mine.  We did a joint
24 site visit.

Page 59

1 BY MS. HANEBUTT:
2     Q.   Did it have a reported
3 release?
4         MR. SHANNON: Same
5 objections.
6         THE WITNESS: I believe it
7 did.
8         MR. LIEBERMAN: Inman
9 Avenue, did you say?
10         THE WITNESS: Yeah.
11 BY MS. HANEBUTT:
12     Q.   And was there another one
13 you were going to mention?
14     A.   There was a -- I know that
15 there is -- there are several gas
16 stations in that vicinity.
17         Many years ago, I had a
18 discussion with a gentleman named
19 Jonathan Berg, who's in our tank
20 enforcement group.  This group actually
21 monitors operational facilities --
22     Q.   BUST?
23     A.   BUST, yes -- no, he's not in
24 BUST, actually.

Page 60

1     Q.   Oh, okay.
2     A.   It's the tank enforcement
3 group where they -- BUST deals more with
4 remedial issues.  This group deals with
5 tanks that -- you know, their secondary
6 containment, their -- you know, checking
7 to make sure that they're not leaking
8 product, et cetera, operational
9 facilities.
10         And he had mentioned to me
11 that there were some other -- just
12 vaguely, some other tanks out there that
13 they were looking at various gas
14 stations.  This is again to the south.
15         But I don't have any
16 specific information linking those sites
17 to the HP Delta site.
18     Q.   Now, you talked about there
19 were two groundwater sampling events, one
20 when the SVE system was operational and
21 one when it wasn't.
22         Have there been any more
23 recent groundwater sampling events?
24         MR. SHANNON: Vague and

Page 61

1 ambiguous as phrased.
2         THE WITNESS: No, not that
3 I'm aware of.
4         And both of -- the remedial
5 investigation report has that
6 information, which has been
7 provided to counsel.
8         MS. HANEBUTT: Right.
9 BY MS. HANEBUTT:
10     Q.   Other than the hit in
11 monitoring well number 1, is there any
12 other information upon which DEP relies
13 to conclude that the HP Delta site is a
14 source of the impacts to the wells along
15 Lancaster Road?
16         MR. SHANNON: Calls for
17 expert opinion.
18         THE WITNESS: Well, again,
19 this goes back to my prior
20 question to you as regards to
21 time, because -- and going back to
22 my trying to get a hold of Mr. Ron
23 Corcory.
24         If you were talking about

Gary S. Lipsius

| Page 62 | Page 64 |
|---|---|
| 1  2006, the answer to that question | 1  MR. SHANNON: It's vague and |
| 2  would be different than if you're | 2  ambiguous as phrased, calls for |
| 3  talking about 2010. | 3  expert opinion. |
| 4  MS. HANEBUTT: Yeah. I'm | 4  MS. HANEBUTT: You just said |
| 5  interested in the current | 5  potential, so I'm trying to |
| 6  position. | 6  explore that. |
| 7  THE WITNESS: The current | 7  MR. SHANNON: Same |
| 8  position. | 8  objections; beyond the scope of |
| 9  MR. SHANNON: Same | 9  the deposition -- or beyond the |
| 10  objections. | 10  scope for which this witness is |
| 11  THE WITNESS: Could you | 11  being produced. |
| 12  repeat the question? | 12  THE WITNESS: Again, I think |
| 13  MS. HANEBUTT: Sure. | 13  Mr. Parikh would have some good |
| 14  THE WITNESS: Sorry. | 14  insight into this question, but |
| 15  - - - | 15  I'd be happy to answer the |
| 16  (The court reporter read the | 16  question, if I may. |
| 17  pertinent part of the record.) | 17  MR. SHANNON: Go ahead. |
| 18  - - - | 18  THE WITNESS: Okay. |
| 19  THE WITNESS: Again, as I | 19  I would say it's -- looking |
| 20  mentioned in my prior answer, I | 20  at the total history of the case |
| 21  believe the two primary issues | 21  and the contaminants and the |
| 22  that the DEP was looking at and is | 22  proximity, that it's a -- the HP |
| 23  still currently looking at is the | 23  Delta site is a likely source. |
| 24  proximity, number one, and the | 24  So you asked me to define |

| Page 63 | Page 65 |
|---|---|
| 1  contaminants that were found in | 1  the probability, I would say |
| 2  the potable wells. | 2  likely. Likely doesn't mean for |
| 3  BY MS. HANEBUTT: | 3  certain, but it's reasonable to |
| 4  Q.  Anything else? | 4  assume that there has been a major |
| 5  MR. SHANNON: Same | 5  component coming from the HP Delta |
| 6  objection. | 6  site. |
| 7  THE WITNESS: As I mentioned | 7  BY MS. HANEBUTT: |
| 8  before, I think the fact that | 8  Q.  Aside from Mr. Corcory, is |
| 9  MW-01 contaminant levels found | 9  there anyone else that you would have |
| 10  when the system was shut off, | 10  liked to talk to to prepare for the |
| 11  which is in the direction of the | 11  deposition that you couldn't? |
| 12  potable wells, also would lend one | 12  A.  Well, I did speak with Bradi |
| 13  to think that -- you know, that | 13  -- |
| 14  the northwest direction of the | 14  Q.  Did you get any documents |
| 15  site, notwithstanding the | 15  from Bradi? |
| 16  groundwater -- deep groundwater | 16  A.  No -- but -- and Mr. Corcory |
| 17  flow levels, it still seemed to be | 17  probably would have -- since he was in |
| 18  a potential source of the potable | 18  charge at the time -- -- |
| 19  well contamination. | 19  MR. SHANNON: Don't |
| 20  BY MS. HANEBUTT: | 20  speculate. |
| 21  Q.  What degree of confidence do | 21  THE WITNESS: -- I would |
| 22  you attach to that conclusion that HP | 22  have wanted to speak with him. I |
| 23  Delta is a source of impacts to the | 23  don't think there's anyone else I |
| 24  Lancaster Road wells? | 24  would speak to. |

17 (Pages 62 to 65)

Gary S. Lipsius

Page 134

1     this e-mail, that -- I don't want
2 to·speculate, but an IEC condition
3 is either potable well
4 contamination, vapor intrusion
5 problem, or an explosive
6 situation, so --
7 BY MS. HANEBUTT:
8     Q.   Was there a vapor intrusion
9 problem associated with this site?
10     A.   Not to my knowledge. And,
11 again, that, I would like to add, would
12 be Mr. Parikh's purview.
13     Q.   Okay.
14     A.   And at some point, I could
15 --
16     Q.   I'll add it to my list.
17     A.   Okay. Because his group
18 dealt specifically at that time with
19 immediate environmental concern issues,
20 which I indicated earlier include vapor
21 intrusion issues or potable well
22 contamination; and my group, we deferred
23 that to his group internally.
24     Q.   Fair enough.

Page 135

1     A.   Yeah.
2     Q.   Michael Hollis is on this
3 e-mail. I don't think we've talked about
4 him before. Have you talked to him about
5 this site?
6     A.   I don't even recognize that
7 name.
8     Q.   Okay.
9     A.   Which is unusual.
10       MS. HANEBUTT: 18.
11       - - -
12       (Deposition Exhibit No. HP
13 Delta-18, 2/28/07 Report of
14 Inspection by Miele,
15 NJ-LBG-ELEC-0107467 through
16 NJ-LBG-ELEC-0107470, was marked
17 for identification.)
18       - - -
19 BY MS. HANEBUTT:
20     Q.   HP Delta-18 bears Bates
21 NJ-LBG-ELEC-0107467 and it is a
22 multiple-page document, so why don't you
23 take a minute to look it over and then
24 I'll direct you specifically.

Page 136

1     A.   Okay.
2       (Pause.)
3 BY MS. HANEBUTT:
4     Q.   The part I want to ask you
5 about is in section D.
6     A.   Okay.
7       (Pause.)
8       THE WITNESS: Okay.
9 BY MS. HANEBUTT:
10     Q.   Okay.
11     I think you testified
12 earlier that you visited the site with
13 Mr. Buchanan; correct?
14     A.   Yes.
15     Q.   Is this a description of the
16 site visit that you were referring to
17 earlier?
18     A.   Yes. I've been to the site
19 numerous times --
20     Q.   I see.
21     A.   -- so I'm not sure if --
22     Q.   Okay.
23     A.   Yeah.
24     Q.   From my reading of this

Page 137

1 document, it appears that two other
2 potential sources were being discussed in
3 this section; is that a correct reading?
4     A.   Yes.
5     Q.   Do you know with respect to
6 the second site --
7     A.   Gas Star site?
8     Q.   Correct -- it said that
9 additional information was necessary in
10 order to make a determination whether or
11 not it is a potential source.
12     Do you know whether the work
13 that is reflected in paragraph D, namely,
14 groundwater monitoring wells, were
15 installed?
16     A.   I do not. Actually, I'm not
17 familiar with this Gas Star facility.
18     Q.   So you don't know whether
19 that work was ever ultimately done?
20     A.   No.
21     Q.   Do you know whether any
22 conclusions were drawn as to whether or
23 not Gas Star could be a potential source?
24     A.   I don't.

35 (Pages 134 to 137)

Gary S. Lipsius

Page 138

1    Q.   What about the other site,
2  the Getty 56904 on Inman Avenue?
3    A.   Well, I believe I alluded to
4  that facility earlier --
5    Q.   Yes, you did.
6    A.   -- and I -- if I recall
7  correctly, I believe on that same day,
8  Mr. Miele and I took a drive over there.
9       But, again, as I also
10  indicated to you and in my previous
11  testimony, it's important to understand
12  how we look at projects.
13       We weren't performing an
14  unknown source investigation.  A remedial
15  investigation is specific to one site
16  which receives a directive.
17    Q.   Understood.
18    A.   Okay.
19           - - -
20       (Deposition Exhibit No. HP
21    Delta-19, 2/2/10 E-Mail from W.
22    Buchanan to O'Neill,
23    NJDEP-SS-EMAIL-100007964, was
24    marked for identification.)

Page 139

1           - - -
2  BY MS. HANEBUTT:
3    Q.   HP Delta-19 bears Bates
4  numbers NJDEP-SS-EMAIL-100007964, and it
5  is an e-mail from Mr. Buchanan to Mr.
6  O'Neill, dated February 2nd, 2010.
7       Have you seen this document
8  before?
9    A.   I don't believe I have.
10    Q.   The e-mail references a
11  meeting with Berger on February 2nd,
12  2010.  Do you know whether or not you
13  attended that meeting?
14    A.   I'm not sure.  I can't
15  assume that I was at the meeting, but I
16  can't definitively say I was.  Berger was
17  -- it was my contractor, so --
18    Q.   You would be surprised if
19  there was a meeting that you weren't at?
20    A.   That's correct.
21    Q.   Do you recall a meeting
22  where Berger explained that they could
23  discover no off-site migration of
24  contaminants and that a deep well

Page 140

1  intermediary between the site, meaning
2  the HP Delta site, and the contaminated
3  wells was clean?
4    A.   No, I don't remember that,
5  and that's not really what the RI report
6  shows.  We did have some contamination
7  migrate off the site when the system was
8  shut down.
9    Q.   So do you think this e-mail
10  preceded that second sampling event?
11    A.   Probably.  I know Mr.
12  Buchanan and he can jump to the gun
13  sometimes.
14    Q.   The next sentence says, "The
15  flow direction from the site to the
16  contaminated residential wells was also
17  about 90 degrees in the wrong direction."
18       Do you agree with that
19  statement?
20       MR. SHANNON:  Calls for
21    expert opinion.
22       THE WITNESS:  Well, again,
23    we discussed this earlier.  In an
24    anisotropic and nonhomogeneous

Page 141

1  aquifer system, as shown by the
2  monitor well 1 contamination,
3  which is, quote, unquote, in the
4  wrong direction, you have a very
5  developed site with utilities,
6  maybe extraneous pumping sources.
7       You cannot as a geologist
8  always say the groundwater flow
9  direction -- even though it's
10  counterintuitive to this say, it
11  doesn't always work out that way.
12       So although --
13  BY MS. HANEBUTT:
14    Q.   Was any further study done
15  to sort of explain this what looks to be
16  like an anomaly?
17    A.   No.
18    Q.   Do you agree with the last
19  sentence in the e-mail?
20       MR. SHANNON:  Calls for
21    expert opinion, lacks foundation.
22       THE WITNESS:  The last
23    sentence, which says, "They are
24    doing some final work but are

36 (Pages 138 to 141)

Page 310

1  -- you could look on Google Maps or
2  Zillow and get the address very easily.
3      Q.   Do you happen to know if
4  there's a name associated with that
5  convenience store?
6      A.   I believe, but I'm not
7  certain, it was Country Pride or -- I
8  think it had the word Country in it.
9      Q.   Okay.
10          And then regarding the other
11  gas station, which I think you testified
12  was on Inman Avenue, do you happen to
13  know the address of that gas station?
14     A.   I don't.
15     Q.   What about any type of a
16  name associated with it, what brand
17  gasoline it sells?
18     A.   I don't really have any
19  information on that.
20     Q.   And are those the only two
21  other sites that you -- when you were
22  testifying earlier, you testified that
23  there were other sort of potential
24  sources that could have contributed to

Page 311

1  the potable well contamination on --
2  what's the road --
3          MR. SHANNON:  Lake?
4          MR. BRIGHT:  I'm sorry, no,
5      the other one.
6          MS. HANEBUTT:  Lancaster?
7          MR. BRIGHT:  Yes.
8          THE WITNESS:  And
9      Morningside Drive?
10          MR. SHANNON:  Misstates
11      testimony.
12  BY MR. BRIGHT:
13     Q.   Are these the only two sites
14  that you were familiar with when you were
15  talking about other possible sources for
16  the contamination?
17          MR. SHANNON:  Same
18      objection.
19          THE WITNESS:  Those are the
20      two that I had preliminarily in
21      mind.  Actually, as a part of this
22      litigation, this other entity that
23      was mentioned in some of the
24      documents, the Sun Bright, I

Page 312

1  believe -- there's one other
2  entity that's mentioned as a part
3  of this litigation that I had
4  never heard of, so I guess that
5  would make a third, but I wasn't
6  aware of that in the past.
7          But those -- to answer your
8  question, prior to this
9  litigation, yes, it was the gas
10  station -- potential sources could
11  be that or the convenience store
12  right across the street.
13  BY MR. BRIGHT:
14     Q.   Sun Bright, is that a gas
15  station?
16     A.   I forget now where it came
17  up today in one of the documents that was
18  handed to me.  I don't know what it is
19  and I wasn't aware of it until very
20  recently.  It's in one of the exhibits,
21  but I'm -- I can't remember right now.
22          MR. BRIGHT:  That's all I
23      have.
24          MR. BRIDE:  I just have

Page 313

1      probably two questions.
2          - - -
3          EXAMINATION
4          - - -
5  BY MR. BRIDE:
6      Q.   Mr. Lipsius, I represent Mr.
7  Melecci and Rob's Towing.  I just want to
8  ask you a couple of questions again about
9  that convenience store.
10          You said that the owner of
11  the property and/or the -- whoever was
12  the tenant -- did not permit you people
13  to put a -- what you wanted to do was a
14  monitoring well; is that correct?
15     A.   Temporary well point.
16     Q.   And by temporary well point
17  would mean that that would just be in
18  there for a short period of time?
19     A.   Correct.
20     Q.   And NJDEP now and at that
21  time has the power to compel the -- to
22  compel a landlord or a property owner to
23  let you people on the property, don't
24  they?

Gary S. Lipsius

Page 317

1                    CERTIFICATE

2

3

              I HEREBY CERTIFY that the
4    witness was duly sworn by me and that the
     deposition is a true record of the
5    testimony given by the witness.
6              It was not requested before
     completion of the deposition that the
7    witness, GARY S. LIPSIUS, have the
     opportunity to read and sign the
8    deposition transcript.

9

10

11

12        KIMBERLY A. CAHILL, a
          Federally Approved Registered
13        Merit Reporter and Notary Public
          Dated:  August 20, 2012

14

15

16

17

18

19              (The foregoing certification
20   of this transcript does not apply to any
21   reproduction of the same by any means,
22   unless under the direct control and/or
23   supervision of the certifying reporter.)

24

# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


IN RE:  Methyl Tertiary Butyl       Master File
Ether ("MTBE")                      No. 1:00-1898
Products Liability Litigation       MDL 1358
                                    (SAS): M21-88


This Document Relates To:

New Jersey Department of Environmental
Protection, et al. v. Atlantic Richfield
Co., et al.
No. 08 Civ. 00312


                    — — —

              September 11, 2012
                    — — —

        Oral Rule 30(b)(6) videotape deposition

of Plaintiff New Jersey Department of Environmental

Protection, through its representative, AKSHAY R.

PARIKH, REGARDING HP DELTA, taken pursuant to notice,

was held at the offices of the STATE OF NEW JERSEY,

DEPARTMENT OF ENVIRONMENTAL PROTECTION, 401 East State

Street, Trenton, New Jersey, beginning at 10:22 a.m.,

on the above date, before Margaret M. Reihl, RPR, CCR,

CRR, CLR and Notary Public for the State of New

Jersey.


                GOLKOW TECHNOLOGIES, INC.
            877.370.3377 ph|917.591.5672 fax
                    deps@golkow.com

## Page 34

1  environmental concern?
2  A.   Right, yeah.
3  Q.   So then it's important then for the DEP to
4  determine the source of the contamination, correct?
5  A.   That's right, yeah.
6  Q.   And has that been done here?
7      MR. SHANNON:  Calls for expert opinion.
8      THE WITNESS:  That what I mention in my
9  just like previous answer -- question that when I got
10  the case in 2006, the first thing I referred this case
11  to our enforcement people as well as the underground
12  storage tank people.  They did their investigation,
13  and our enforcement people at that time determine HP
14  Delta the source of contamination for private wells in
15  this area.
16  Q.   Do you know whether DEP determined that the HP
17  Delta station was the sole source of impacts on
18  Lancaster Road?
19      MR. SHANNON:  Object to the extent it
20  calls for expert opinion.
21      THE WITNESS:  Based on the information
22  available at that time, they determined that they are
23  the only source of groundwater contamination or
24  private well contamination in this area.
25  BY MS. HANEBUTT:

## Page 35

1  Q.   And when you just said "at that time," what
2  did you mean?
3  A.   I'm talking about between 2000 -- in July of
4  2006 and August of 2006, when they should have
5  contacted HP Delta for the contamination in this area.
6  Q.   And do you know whether that view changed over
7  time -- let me rephrase that question.
8      As we sit here today, does DEP consider HP
9  Delta the sole source of contamination at Lancaster
10  Road?
11      MR. SHANNON:  Object to the extent it
12  calls for expert opinion.
13      THE WITNESS:  Basically, since we
14  identified HP Delta as a source of contamination, my
15  understanding is or I am not aware of that the DEP is
16  doing any additional investigation to identify
17  additional sources of contamination in this area.
18  BY MS. HANEBUTT:
19  Q.   They're not doing any additional source
20  investigation.  Are you aware of any information to
21  suggest that there are potential other sources of
22  impacts to Lancaster Road?
23      MR. SHANNON:  Same objection.
24      THE WITNESS:  Just like during my
25  discussion with Gary Lipsius and Bill Buchanan, they

## Page 36

1  were talking about there are some other, like, gas
2  stations in this area, but I am not sure about they
3  are the source of contamination for this particular
4  private wells in this area.
5  BY MS. HANEBUTT:
6  Q.   In the course of your responsibilities at DEP,
7  have you ever talked to anyone who questioned whether
8  HP Delta was the source of the impacts at Lancaster
9  Road?
10      MR. SHANNON:  Vague and ambiguous as
11  phrased.
12      THE WITNESS:  I did not discuss with
13  anybody about the source of contamination because that
14  was not my expertise.  That was just like --
15  enforcement people were doing about that one.
16      My responsibility was only to provide
17  alternate water supply to the people affected by
18  groundwater contamination.
19  BY MS. HANEBUTT:
20  Q.   I understand it wasn't your job to talk about
21  source, but were you involved in meetings at which
22  others expressed skepticism about whether HP Delta was
23  the sole source of impacts to Lancaster Road?
24  A.   No, no.
25  Q.   Do you know why then when I deposed

## Page 37

1  Mr. Lipsius, he suggested that I ask you whether an
2  unknown source investigation would be appropriate for
3  this site?
4      MR. SHANNON:  Lacks foundation.
5      THE WITNESS:  Unknown source
6  investigation, that group is also working in our
7  bureau.  I am working in the Bureau of Environmental
8  Measurement and Site Assessment.  The site assessment
9  group is the -- are the people who are doing the
10  unknown source investigation.
11  BY MS. HANEBUTT:
12  Q.   So that's not your area?
13  A.   That's in our bureau, but that's not my area.
14  Q.   Whose area is it?
15  A.   We are under same bureau chief and that --
16  Q.   Who would have that responsibility?
17  A.   You're talking about the responsibility --
18  Q.   For unknown source investigations.
19  A.   When -- I think what happens, whenever there
20  is a groundwater contamination, like private well
21  contamination at that time, if that is unknown source
22  or if they could not identify the source of
23  contamination, automatically we are referring all
24  those files to unknown source investigation group, and
25  they are doing the source investigation for this --

Page 70

1       THE WITNESS: As I told you before, I
2  was not involved in source determination for
3  groundwater contamination on Lancaster Road, so I did
4  not review any of that information.
5  BY MS. HANEBUTT:
6  Q.    If the HP Delta site was not the source of the
7  impacts at Lancaster Road, would it be appropriate for
8  DEP to pursue those involved with the HP Delta site
9  for those costs?
10      MR. SHANNON: Calls for expert opinion,
11 lacks foundation, beyond the scope for which this
12 witness was prepared, calls for legal conclusion.
13      THE WITNESS: Basically, if there are
14 any costs involved, we are asking the responsible
15 party to pay for that one, but if HP Delta was
16 determined that they're not source of contamination,
17 probably, yes, the department would not have asked
18 them to reimburse the cost.
19      But in this particular case, my
20 understanding is the department has not yet -- they
21 did not do any further investigation to identify other
22 sources of contamination for private wells in this
23 area.
24 BY MS. HANEBUTT:
25 Q.    Have they conclusively determined that HP

Page 71

1  Delta is the source of impacts to the Lancaster Road
2  site?
3       MR. SHANNON: It's beyond the scope,
4  calls for expert opinion.
5       THE WITNESS: In 2006 that's what the
6  department determined, that HP Delta is the source of
7  contamination for.
8  BY MS. HANEBUTT:
9  Q.    And is that a final decision?
10      MR. SHANNON: Vague and ambiguous as
11 phrased, asked and answered, calls for expert opinion.
12      THE WITNESS: I believe so.
13 BY MS. HANEBUTT:
14 Q.    If new information becomes available to the
15 department to suggest that its original information
16 was incorrect, would the department revisit that
17 decision?
18      MR. SHANNON: Incomplete hypothetical,
19 lacks foundation, object to the extent it calls for
20 expert opinion.
21      THE WITNESS: Yes.
22 BY MS. HANEBUTT:
23 Q.    And have you ever seen the DEP revise its
24 original determination of who the responsible party
25 is?

Page 72

1  A.    I did not understand the question.
2  Q.    In your -- I mean, have you ever seen a
3  situation where the DEP has revised its original
4  determination as to responsible party status?
5  A.    Not to my knowledge.
6       MR. SHANNON: Beyond the scope.
7       THE WITNESS: Not to my knowledge.
8  BY MS. HANEBUTT:
9  Q.    This memo was written in 2010. Between 2006
10 and 2010, are you aware of any documents that would
11 suggest that HP Delta is not the source of impacts to
12 Lancaster Road?
13      MR. SHANNON: Object to the extent it
14 calls for expert opinion.
15      THE WITNESS: I did not get any
16 documents suggesting that HP Delta is not responsible
17 for the contamination for this site.
18 BY MS. HANEBUTT:
19 Q.    Do you know what the basis is for the
20 department's conclusion that HP Delta is responsible
21 for the Lancaster Road contamination?
22      MR. SHANNON: Same objections.
23      THE WITNESS: Can you repeat that
24 question.
25      MS. HANEBUTT: Yeah. Go ahead.

Page 73

1       (The court reporter read back the
2       record as requested.)
3       THE WITNESS: Yeah, basically, when we
4  determine HP Delta is responsible for the
5  contamination in 2006, there were two main things,
6  proximity of the site, HP Delta site, with respect to
7  the private wells in that area. And the second thing
8  is the type of contamination we found at HP Delta
9  because the production room at HP Delta was
10 contaminated with like 3,000 parts per billion of
11 MTBE.
12      So we found the same contamination in
13 private wells at HP Delta and the same contamination
14 we found at private wells in this area. The soil was
15 grossly contaminated. There was free product in many
16 of the observation wells on the site, so that's the
17 reason -- and, also, I think the compliance visit
18 conducted by Jonathan Berg's group, they found that
19 there was violation history, just like spill or
20 discharge at this location in the past, and there was
21 no remedial actions taken at the site. So based on
22 that one, I think the department or enforcement
23 decided, determined that the HP Delta was the source
24 of contamination of private wells in this area.
25 Q.    Is the HP Delta station the only retail

Akshay R. Parikh

Page 120

1           C E R T I F I C A T I O N

2                    I, MARGARET M. REIHL, a Registered

3      Professional Reporter, Certified Realtime Reporter,

4      Certified Shorthand Reporter, Certified LiveNote

5      Reporter and Notary Public, do hereby certify that the

6      foregoing is a true and accurate transcript of the

7      testimony as taken stenographically by and before me

8      at the time, place, and on the date hereinbefore set

9      forth.

10                   I DO FURTHER CERTIFY that I am

11     neither a relative nor employee nor attorney nor

12     counsel of any of the parties to this action, and that

13     I am neither a relative nor employee of such attorney

14     or counsel, and that I am not financially interested

15     in the action.

16

17                    *Margaret M. Reihl*

18     ----------------------------------------

       Margaret M. Reihl, RPR, CRR, CLR

19     CSR #XI01497  Notary Public

20

21

22

23

24

25

# EXHIBIT 8

Anthony Brown

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL      Master File
ETHER ("MTBE")                     No. 1:00-1898
                                   MDL 1358
This Document Relates to:          (SAS): M21-88

New Jersey Department of
Environmental Protection,
et al., v. Atlantic Richfield
Co., et al.
No. 08 Civ. 00312
_____/


-- -- --
TUESDAY, MAY 28, 2013
-- -- --


          Videotaped Deposition of ANTHONY BROWN,
Expert Witness, Volume I, held at the Law Offices of
Latham & Watkins LLP, 650 Town Center Drive,
Twenty-First Floor, Costa Mesa, California, beginning
at 9:10 a.m., before Sandra Bunch VanderPol, FAPR,
RMR, CRR, CSR #3032

          -- -- --


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
Deps@golkow.com

Anthony Brown

## Page 78

1      A.   For Skyline, no.  For Bakers Waldwick
2   for the MTBE, no.  For Shell Ridgewood, we did
3   identify other sources of MTBE contamination.
4      Q.   And those would be the NJDOT
5   maintenance yard and the two service stations?
6      A.   Yes.  The former Sunoco Service
7   Station, the Gulf Service Station, and also, I
8   believe, there was a documented release at the Joseph
9   Fergueson & Sons facility.
10      Q.   Okay.
11      A.   While we do not believe these
12   facilities contributed to the plume of MTBE to the
13   south of the Shell station, they are potential
14   contributing sources of MTBE.
15      Q.   Sunoco --
16      A.   Excuse me.
17      Q.   -- Bloomfield?
18      A.   To the Twinney Well.
19      Q.   To the Twinney Well?
20      A.   Yes.
21      Q.   Okay.
22      A.   For the Sunoco Station, no, we did
23   not identify any other potential sources.
24      For the Exxon Livingston Station, no, we did
25   not identify any other contaminant sources for the

## Page 79

1   interpreted contaminant plume.
2      For HB Delta, we did not identified any --
3   excuse me, identify any other sources.
4      For the Valero APCO Manalapan, we did not
5   identify any other sources of the observed
6   contamination.
7      For the Getty West Windsor Service Station,
8   we did identify two nearby service stations, a former
9   Exxon Mobil Service Station and a Gulf Service
10   Station.  But we did not believe they contributed to
11   the observed contamination within the groundwater
12   plume as we interpreted it.
13      Q.   In looking at the Getty Service
14   Station plume, in the area where MW-13 and MW-16 is
15   located, did you have any information to indicate
16   that there was a service station on that corner of
17   what was known as the Princeton Circle?
18      A.   Not that I recall.
19      Q.   Okay.
20      A.   At the Maple Shade Citgo Station, we
21   did identify a service station immediately to the
22   southeast.  The Citgo Station, I believe, is an
23   Exxon-branded station.  We do not believe that that
24   site was the source of the observed contamination to
25   the southwest of the Maple Shade Citgo Station.

## Page 80

1      For the Five Points BP Deptford, we did
2   identify an Exxon Station immediately to the east of
3   the Five Points BP Station, but we did not believe
4   that station contributed to the observed
5   contamination beneath the Five Points BP and off-site
6   to the northwest.
7      Q.   Okay.  In your professional
8   experience, have you observed any tank removals at
9   service station facilities in New Jersey?
10      A.   During my second visit to the
11   plaintiff-selected trial sites in March of 2013, I
12   did observe what appeared to be station upgrade
13   activities at the Exxon Livingston Station, where the
14   tanks had been exposed, the dispensers had been
15   removed, but I could not state for certain, based on
16   the field observations, where the new tanks were
17   being installed or whether it was simply upgrades to
18   the existing tanks.
19      Q.   Were you provided with any soil or
20   groundwater sampling data taken in March of 2013 as a
21   result of activities at the Exxon Station?
22      MR. MILLER:  Counsel, is this the material
23   that was produced last Thursday?
24      MR. STACK:  In part.
25      MR. MILLER:  I don't think it's appropriate

## Page 81

1   to ask this witness about the material produced that
2   late until they have had a chance to review it.  And
3   I would suggest that you defer questioning about that
4   accordingly.
5      MR. STACK:  I will --
6      MR. MILLER:  Because of the time in which it
7   was produced, on a holiday, and certain downloading
8   problems I won't bore you with now, the production
9   was not entirely timely.
10      MR. STACK:  Well, I guess the feeling is
11   mutual, then.  But we will proceed and -- I won't ask
12   questions of that right now.  I will -- I will make
13   those documents, and we will talk about them likely
14   later today.
15      MR. MILLER:  Do you have a copy set for me?
16      MR. STACK:  Of course we have a courtesy set
17   for counsel.
18      MR. MILLER:  That would be appreciated.
19      MR. STACK:  By all means.  Absolutely.
20      So the record is clear, there were materials
21   produced to the defense counsel in response to
22   subpoena and -- pardon me, in response to deposition
23   notice and outstanding requests, and we are still
24   printing that material, which was produced to us late
25   last week, and on Friday, over the holiday weekend.

21 (Pages 78 to 81)

CERTIFICATE OF REPORTER

I, SANDRA BUNCH VANDER POL, a Certified
Shorthand Reporter, hereby certify that the witness
in the foregoing deposition was by me duly sworn to
tell the truth, the whole truth and nothing but the
truth in the within-entitled cause;

That said deposition was taken down in
shorthand by me, a disinterested person, at the time
and place therein stated, and that the testimony of
the said witness was thereafter reduced to
typewriting, by computer, under my direction and
supervision;

That before completion of the deposition,
review of the transcript was requested.  If
requested, any changes made by the deponent (and
provided to the reporter) during the period allowed
are appended hereto.

I further certify that I am not of counsel or
attorney for either or any of the parties to the said
deposition, nor in any way interested in the event of
this cause, and that I am not related to any of the
parties thereto.

DATED:   JUNE 10, 2013

*Sandra Bunch VanderPol*

SANDRA BUNCH VANDER POL, CSR #3032

# EXHIBIT 9



**State of New Jersey**
DEPARTMENT OF ENVIRONMENTAL PROTECTION
Water Compliance and Enforcement Element
Central Bureau of Water Compliance and Enforcement
PO BOX 407
Trenton, New Jersey 08625-0407
609-584-4200
Fax: 609-584-4220

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

April 30, 2007

**0CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

**Robert Melleci, Owner**
Rob's Service Center
439 Lake Ave.
Colonia, NJ 07067

**Harbans Singh, Operator   7003 3110 0003 5034 3621**
HP Delta
439 Lake Ave.
Colonia, NJ 07067

Re:  Administrative Order and
     Notice of Civil Administrative Penalty Assessment
     HP Delta
     UST Registration # 001463
     Woodbridge Township, Middlesex County

Dear Sirs:

There is enclosed for service upon you an Administrative Order and Notice of Civil Administrative Penalty Assessment issued by the Department pursuant to the provisions of the Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 et seq. and the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq.

Notice is hereby given that HP Delta is entitled to request an administrative hearing. Any hearing request must include a copy of the cover letter and enforcement document for which a hearing is being requested, a complete Administrative Hearing Request Checklist and Tracking Form for Enforcement Documents (Tracking Form), with documentation and all information specified and must be delivered within twenty (20) calendar days after receipt by the Respondents of this Administrative Order and Notice of Civil Administrative Penalty Assessment to:

*New Jersey Is An Equal Opportunity Employer  •  Printed on Recycled Paper and Recyclable*



### State of New Jersey
DEPARTMENT OF ENVIRONMENTAL PROTECTION
Water Compliance and Enforcement Element
Central Bureau of Water Compliance and Enforcement
PO BOX 407
Trenton, New Jersey 08625-0407
609-584-4200
Fax: 609-584-4220

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

| | | |
|---|---|---|
| IN THE MATTER OF | : | **ADMINISTRATIVE ORDER** |
| | : | **AND** |
| **HP DELTA** | : | **NOTICE OF CIVIL ADMINISTRATIVE** |
| **WOODBRIDGE TOWNSHIP** | : | **PENALTY ASSESSMENT** |

This Administrative Order and Notice of Civil Administrative Penalty Assessment is issued pursuant to the authority vested in the Commissioner of the New Jersey Department of Environmental Protection ("the Department") by N.J.S.A. 13:1D-1 et seq., the Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 et seq., the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., and duly delegated to the Bureau Chief of Central Water Compliance and Enforcement pursuant to N.J.S.A. 13:1B-4.

### FINDINGS

1. Robert Melecci owns a commercial gasoline station (Rob's Service Center, operating as HP Delta) located at 439 Lake Ave. in Colonia, NJ 07067.

2. Harbans Singh operates the commercial gasoline station (HP Delta) located at 439 Lake Ave. in Colonia, NJ 07067.

3. HP Delta maintains on-site, four-6,000 gallon unleaded and one-4,000 gallon unleaded gasoline underground storage tanks ("USTs") at the facility for dispensing and sale of gasoline. The tanks and their associated ancillary equipment are collectively defined as an "underground storage tank system" as defined by N.J.A.C. 7:14B-1.6.

4. Pursuant to N.J.A.C. 7:14B-1.6, gasoline is defined as a "Hazardous substance."

5. On August 8, 2006, Department representatives inspected HP Delta to determine compliance with the Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 et seq. The inspection revealed the following:

a. The Owner or Operator shall provide overfill prevention equipment that shall:

   1) Automatically shut off flow into the tank when the tank is no more than 95 percent full;

   2) Alert the transfer operator when the tank is no more than 90 percent full by restricting the flow into the tank or triggering a high-level alarm; or

*New Jersey Is An Equal Opportunity Employer ● Printed on Recycled Paper and Recyclable*

Page 2 of 7
HP DELTA
ROB'S SERVICE CENTER

3) Restrict flow 30 minutes prior to overfilling, alert the operator with a high level alarm one minute before overfilling, or automatically shut off flow into the tank so that none of the fittings located on top of the tank are exposed to product due to overfilling.

No method of overfill protection was provided for any of the tanks, in violation of N.J.A.C. 7:14B-4.1(a)3ii. Overfill, High Product, and Max Product alarms were recently noted in the alarm history of the Veeder Root automatic tank gauging system. Furthermore, the property owner, Robert Melecci, disclosed to Department representatives that he had witnessed the USTs being overfilled to the point where product would be ejected out the vent pipes. Staining of the pavement and dead grass around the vent pipes was observed during the inspection.

6.    Based on the findings of the inspection a field Notice of Violation was issued to HP Delta. A Delivery Ban was implemented pursuant to N.J.A.C. 7:14B-1.8(a) which states that: No person or business firm shall introduce hazardous substances into an underground storage tank system which is known to be or suspected to be leaking or discharging hazardous substances except in accordance with N.J.A.C. 7:14B-8.1(a)2ii.

The Field Notice of Violation required HP Delta to empty the USTs within 48 hours as a result of obvious gross soil and groundwater contamination and possible off-site potable well contamination. Install and document functional overfill protection, and perform hydrostatic testing of all containment as soon as possible. Perform and submit a site investigation to determine the source of the release.

7.    By August 9, 2006, all violations with exception of the site investigation returned to compliance.

8.    On December 18, 2006, the Department received a site investigation from HP Delta The Delivery Ban was then lifted on December 22, 2006. Subsequently, the Bureau of Underground Storage Tanks, citing numerous deficiencies in the site investigation report has issued a Notice of Rejection letter to HP Delta.

9.    Based on the facts set forth in these FINDINGS, the Department has determined that HP Delta has violated the Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 et seq., and the regulations promulgated pursuant thereto, N.J.A.C. 7:14B-1 et seq.

## ORDER

10.    HP Delta shall immediately comply with the provisions of the Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 et seq., and the regulations promulgated pursuant thereto, N.J.A.C. 7:14B-1 et seq.

11.    Obligations and penalties of this Administrative Order and Notice of Civil Administrative Penalty Assessment are imposed pursuant to the police powers of the State of New Jersey for the enforcement of law and the protection of the public health, safety and welfare and are not intended to constitute debt or debts which may be limited or discharged in a bankruptcy proceeding.

NJDEP-SITE233-006497

Page 3 of 7
HP DELTA
ROB'S SERVICE CENTER

12.    This Order shall be effective upon receipt.

### NOTICE OF CIVIL ADMINISTRATIVE PENALTY ASSESSMENT

13.    Pursuant to N.J.S.A. 58:10A-32, N.J.S.A. 58:10A-10 and N.J.A.C. 7:14-8.1 et seq., and
       based upon the above FINDINGS, the Department has determined that a civil
       administrative penalty should be assessed against HP Delta in the amount of $20,000.00.
       The Department's rationale for this civil administrative penalty is set forth in Appendix A,
       which is attached hereto and incorporated herein.

14.    Payment of the penalty is due when a final order is issued by the Commissioner subsequent
       to a hearing if any, or when this Notice of Civil Administrative Penalty Assessment
       becomes a final order (see following paragraph). Payment shall be made by certified or
       cashier's check payable to "Treasurer, State of New Jersey" and shall be submitted along
       with the bottom portion of the attached enforcement invoice to:

                            Division of Revenue
                    New Jersey Department of Treasury
                            P. O. Box - 417
                        Trenton, New Jersey 08625-0417

15.    If no request for a hearing is received within twenty (20) calendar days after receipt of this
       Notice of Civil Administrative Penalty Assessment by HP Delta, it shall become a final
       order upon the twenty-first calendar day following its receipt by HP Delta, and the penalty
       shall be due and payable.

16.    Notice is given that pursuant to N.J.S.A. 58:10A-32 and N.J.S.A. 58:10A-10 and N.J.A.C.
       7:14-8.13, the Department may, in addition to any civil administrative penalty assessed,
       amend such penalty assessment to include a civil administrative penalty for the economic
       benefit (in dollars) which a violator has realized as a result of not complying, or by
       delaying compliance, with this Act.

### NOTICE OF RIGHT TO A HEARING

17.    HP Delta is entitled to request an administrative hearing. HP Delta shall, pursuant to
       N.J.A.C. 7:14-8.4(a) in its request for a hearing, furnish the Department with all of the
       information specified in the enclosed Administrative Hearing request Checklist and
       Tracking Form. This information must be delivered to the office of legal Affairs at the
       address referenced in the cover letter to this document within (20) calendar days from
       receipt of this Administrative Order and Notice of Civil Administrative Penalty
       Assessment. A copy of the hearing request shall be filed at the same time to the address
       referenced in paragraph 19 below.

Page 5 of 7
HP DELTA
ROB'S SERVICE CENTER

23.     Notice is further given that pursuant to N.J.S.A. 58:10A-10f, any person who purposely,
        knowingly or recklessly violates N.J.S.A. 58:10A-1 et seq., including making a false
        statement, representation, or certification in any application, record, or other document
        filed or required to be maintained under this act, or by falsifying, tampering with, or
        rendering inaccurate any monitoring device or method required to be maintained pursuant
        to this act, or by failing to submit a monitoring report, or any portion thereof, required
        pursuant to this act, shall, upon conviction, be guilty of a crime of the third degree, and
        shall, notwithstanding the provisions of subsection b. of N.J.S.A. 2C:43-3, be subject to a
        fine of not less than $5,000 nor more than $75,000 per day of violation, or by
        imprisonment, or by both.  Any person who negligently violates N.J.S.A. 58:10A-1 et seq.,
        including making a false statement, representation, or certification in any application,
        record, or other document filed or required to be maintained under this act, or by falsifying,
        tampering with, or rendering inaccurate any monitoring device or method required to be
        maintained pursuant to this act, or by failing to submit a discharge monitoring report, or
        any portion thereof, shall, upon conviction, be guilty of a crime of the fourth degree, and
        shall, notwithstanding the provisions of subsection b. of N.J.S.A. 2C:43-3, be subject to a
        fine of not less than $5,000 nor more than $50,000 per day of violation, or by
        imprisonment, or by both.

DATE: _April 30, 2007_                      _Charles L. Maack_
                                       Charles L. Maack, Bureau Chief
                                    Central Bureau of Water Compliance and
                                             Enforcement

NJDEP-SITE233-006500

# EXHIBIT 10



46989466

Oct 15 2012
06:20PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

IN RE: METHYL TERTIARY BUTYL ETHER
PRODUCTS LIABILITY LITIGATION

------------------------------------------------------------------

**This document pertains to:**

*New Jersey Dep't of Envtl. Prot., et al. v.*
*Atlantic Richfield Co., et al.,* No. 08 Civ. 312

------------------------------------------------------------------ x

)
)
)
)
)
)
)
)
)
)
)
)

Master File No. 1:00-1898
MDL No. 1358 (SAS)

### DEFENDANT GETTY PROPERTIES CORP.'S ANSWERS AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS

Defendant, Getty Properties Corp., by and through its attorneys, Rawle & Henderson, LLP, and pursuant to the Federal Rules of Civil Procedure and Local Rules of the Southern District of New York, hereby Objects and Responds to Plaintiffs' First Set of Requests for Admissions as follows:

### PRELIMINARY STATEMENT

Prior to February 1, 1997, Getty Properties Corp. ("Getty Properties") was known as Getty Petroleum Corp. and before July 1985 known as Power Test Corp. Getty Properties has never refined crude oil, owned refineries or manufactured gasoline. Getty Properties has never manufactured pure or neat MTBE.

In 1997, Getty Properties spun-off its petroleum marketing distribution business, and transferred (among other assets) all business and financial records pertaining thereto, to Defendant Getty Petroleum Marketing Inc. ("GPMI"). GPMI is independent of and not affiliated with Getty Properties. GPMI, and not Getty Properties, is the owner of and has legal possession of all records, to the extent they exist, pertaining to the ownership, operation, leasing and/or supply of petroleum product for certain properties. Further, as a result of the spin-off

5852166-1

3.     **Admit that YOU, through one or more distributors, supplied gasoline product containing MTBE to Rob's Service Station (now known as HP Delta), located at 439 Lake Avenue, Woodbridge, New Jersey, from between 1983 to 1987.**

RESPONSE:   Denied as to the time period 1983 to 1985.  Power Test Corp. (n/k/a Getty Properties) acquired certain "Getty" northeast petroleum marketing assets and the "Getty" trademark from Texaco Refining and Marketing Inc. in February 1985.  A contract dealer agreement with owner Robert Melecci was included in that acquisition.   Therefore, Getty Properties had a contract dealer agreement with Mr. Melecci from February 1, 1985 until June 1987.  As to that time period, Getty Properties can neither admit nor deny this Request as after reasonable inquiry the information known or readily available is insufficient to enable Getty Properties to admit or deny this Request.

4.     **Admit that YOU, through one or more distributors, supplied gasoline product containing MTBE to the Station (now known as HP Delta) located at 439 Lake Avenue, Woodbridge, New Jersey, from between 1979 to 1983.**

RESPONSE:   Denied.   Getty Properties did not have any connection to or business relationship with the referenced station from 1979 to 1985.

5.     **Admit that YOU had a branding agreement with Robert Melecci, owner of Rob's Service Station, located at 439 Lake Avenue, Woodbridge, New Jersey, from 1983 to 1987.**

RESPONSE:   Objection.   Getty Properties incorporates its General Objections and Limitations by reference and further denies this request as it objects to the term "branding

broad. Without waiving said objections, admitted. Getty Properties did not have any connection to or business relationship with the referenced property from 1979 to 1985.

13.    Admit that YOU owned the underground storage tanks that were removed in 1987 from Rob's Service Station (now known as HP Delta), located at 439 Lake Avenue, Woodbridge, New Jersey.

RESPONSE:  Getty Properties admits that it owned the underground storage tanks at the referenced property from February 1, 1985 until their removal in June 1987.

14.    Admit that a concentration of 41,900 ppb MTBE was detected at the HP Delta Station, located at 439 Lake Avenue; Woodbridge, New Jersey, on August 10, 2006.

RESPONSE:  Denied.  Getty Properties did not have any connection to or business relationship with the referenced property in 2006.

15.    Admit that YOU have never provided any written warnings to any New Jersey station operators that gasoline products containing MTBE pose a greater risk of groundwater contamination than conventional gasoline that did not contain MTBE.

RESPONSE: Objection.  Getty Properties incorporates its General Objections and Limitations by reference and further objects to this Request as it assumes facts not in evidence, assumes facts in dispute, assumes or implies a legal duty owned by Getty Properties, the statement "greater risk of groundwater contamination" is overly broad, vague and ambiguous. Further, the Request is overly broad in that it is not limited by a defined period of time.  Without

waiving said objections, Getty Properties cannot respond to this Request in the form that it is written and therefore it is denied.

**RAWLE & HENDERSON** LLP

By: _____

John C. McMeekin II, Esquire (JM8956)
Susan M. Dean, Esquire
The Widener Building
One South Penn Square
Philadelphia, PA  19107
Phone: 215-575-4324 (Phone)
Fax: 215-563-2583 (Fax)

Attorneys for Defendant,
Getty Properties Corp.

Date: 10/15/2012

## CERTIFICATE OF SERVICE

I, Susan M. Dean, hereby certify that on this date, a true and correct copy of Defendant Getty Properties Corp.'s Answers and Objections to Plaintiffs' First Set of Requests for Admissions were served via LexisNexis File & Serve upon all counsel of record.

RAWLE & HENDERSON LLP

By:
John C. McMeekin II, Esquire (JM8965)
Susan M. Dean, Esquire
The Widener Building
One South Penn Square
Philadelphia, PA 19107
Phone: 215-575-4324 (Phone)
Fax: 215-563-2583 (Fax)

Attorneys for Defendant,
Getty Properties Corp.

Dated: 10 | 15 | 2012

5852166-1

# EXHIBIT 11

# EXPERT REPORT ON THE SOURCE AND AGE OF SUBSURFACE GASOLINE CONTAMINATION AT THE DELTA GAS SERVICE STATION SITE IN COLONIA, NEW JERSEY

## H. P. DELTA, INC. v. ROBERT MELECCI and GETTY PROPERTIES CORPORATION v. DHANDI TRANSPORT DOCKET NO.  MID-L-7781-07

prepared for:

Stuart J. Lieberman, Esq.
Lieberman & Blecher
10 Jefferson Plaza
Princeton, New Jersey 08540

prepared by:

Gil Oudijk
Triassic Technology, Inc.
57 Hamilton Avenue
Hopewell, New Jersey 08525

December 14, 2010

review of reconciliation records from between January 2 and July 26, 2006 did not reveal leakage.

Numerous residences exist to the south and east of the Delta Gas site. Until recently, many relied on potable wells for their water supply. Ground-water samples collected from 40 wells, in as early as May 2005, revealed methyl *tert*-butyl ether (MTBE) and benzene concentrations in excess of the State's ground-water quality standards[3]. MTBE is an additive used in gasoline since about 1980 and was present in leaded gasoline in the mid-1980s[4]. The furthest impacted well is about 1,300 feet to the southwest.

In 2008, the NJDEP installed a ground-water remediation system at the site. The system includes nine pumping wells, a filtration/treatment system and discharge into the sanitary-sewer system. Use of the system is on-going as of November 2010. The most recent sampling event showed that contaminant concentrations in ground water were significantly reduced and cleanup was close to complete.

*Analysis of Chemical Data for 2006 NAPL Sample*

The laboratory data sheets are in Attachment II and summarized on Tables 1 and 2. Neither lead alkyls nor MMT were detected in MIG's gasoline NAPL sample. Therefore, the gasoline in this sample was unleaded and most probably manufactured in or after the 1970s. Unleaded gasoline was not available prior to 1970, except for stations supplied by Standard Oil of Indiana (Amoco), who always sold an unleaded grade[5]. Because Amoco did not supply this station, the gasoline in this sample was discharged after 1970.

Getty introduced a regular-grade unleaded gasoline in 1974. Because Getty supplied the station, the gasoline in MIG's sample was probably released in or after 1974. Getty phased out their sales of leaded gasoline (both regular and premium grades) in 1984[5].

*1. Octane Rating of the Gasoline*

Knowledge of the octane rating (such as regular versus premium) is helpful in assessing the age of gasoline. To assess the octane rating, an understanding of the magnitude of degradation or "weathering" is also needed.

*Weathering through dissolution/water washing*: To assess the magnitude of weathering and, predominantly dissolution, the ratio of the aromatics: benzene,

---

[3] The May 2005 sampling event at 31 Morningside Drive revealed MTBE and benzene concentrations of 12,000 micrograms per litre (µg/l) and 45 µg/l, respectively. The magnitude of the concentrations indicates that contamination was on-going prior to May 2005 for a considerable time period.

[4] Kramer, W. H. & Hayes, T. J. 1987. Water soluble phase of gasoline: Results of a laboratory mixing experiment. New Jersey Geological Survey Technical Memorandum 87-5.

[5] Oudijk, G. 2010. The rise and fall of organometallic additives in automotive gasoline. *Environ. Forensics* 11 (1/2): 17-49.



# EXHIBIT 12



**State of New Jersey**
## DEPARTMENT OF ENVIRONMENTAL PROTECTION
### DIVISION OF HAZARDOUS WASTE MANAGEMENT
John J. Trela, Ph.D., Acting Director
401 East State St.
CN 028
Trenton, N.J. 08825
609 - 633 - 1408

WC 005-87

| | | |
|---|---|---|
| IN THE MATTER OF | : | |
| GETTY PETROLEUM CORPORATION | : | **ADMINISTRATIVE ORDER** |
| 125 JERICHO TURNPIKE | : | |
| JERICHO, NEW YORK 11753 | : | |
| ATTENTION:  LEGAL DEPARTMENT | : | |

This Administrative Order is issued pursuant to the authority vested in the Commissioner of the New Jersey Department of Environmental Protection (hereinafter "NJDEP" or the "Department") by N.J.S.A. 13:1D-1 et seq. and the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., and duly delegated to the Assistant Director for Enforcement of the Division of Hazardous Waste Management pursuant to N.J.S.A. 13:1B-4.

### FINDINGS

1)  The Department has determined that Rob's Towing and Gas Center, hereinafter "Rob's Towing", is located at Lot 3, Block 506, 439 Lake Avenue, Woodbridge Township, Middlesex County, State of New Jersey.

2)  On April 26, 1987, the Department received a complaint of a discharge of a hazardous pollutant (petroleum hydrocarbon) into the waters and/or onto the land of the State at Rob's Towing due to leaking underground storage tanks.

3)  During an investigation conducted by Departmental personnel on July 2, 1987, it was determined that Getty Petroleum Corporation, hereinafter "Getty", is the owner of three underground storage tanks which were removed during this investigation. One tank which had been in use as late as the week of June 22, 1987, was observed to have at least six (6) holes and a strong odor of gasoline was noted in the excavated soil. Thereby confirming a discharge of a pollutant into the waters and/or onto the land of the State.

*New Jersey Is An Equal Opportunity Employer*

Getty Petroleum
Page 2

4) On July 7, 1987, a Notice of Violation was issued to Getty for the discharge noted in paragraphs two (2) and three (3) herein. Remedial action to correct the violation was to be initiated immediately and completed by July 14, 1987.

5) Excavation of contaminated soil due to the leak in the tank began on July 2, 1987. However, on July 21, 1987, excavation was terminated for safety reasons. Prior to backfilling, soil samples were taken of the contaminated soil and of the sides and bottom of the excavation.

6) The above mentioned excavated soil was placed on top of plastic and then completely covered with plastic to preclude any further discharges of said pollutants into the waters or onto the lands of the State, while awaiting sample analysis and final disposal of the contaminated soil. The plastic covering is used as a temporary measure to store contaminated soil awaiting proper waste classification and proper and permanent disposal. Routine maintenance is necessary to insure that the cover remains in place.

7) In August 1987 it was observed that the plastic covering over the pile of contaminated soil had come off, therefore, leaving the contaminated soil uncovered. The potential then existed for pollutants to be discharged to the environment by means of rain water runoff to the waters and lands of the State and possible release of vapors to the environment. Based upon routine inspections it was determined that the contaminated soil was again properly covered on November 27, 1987 by the station owner, due to numerous public complaints.

8) By a letter dated September 16, 1987, the Department issued written instruction to Getty for proper and permanent disposal of the contaminated soil.

9) As of the date of this Order, Getty has not made any effort to remove and properly dispose of any contaminated soil or to forward all soil sampling results to the Department, verifying complete cleanup of the discharge.

10) Based on the facts set forth in these FINDINGS, the Department has determined that Getty has violated the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., specifically N.J.S.A. 58:10A-6, and the regulations promulgated pursuant thereto, N.J.A.C. 7:14A-1 et seq., specifically N.J.A.C. 7:14A-1.2.

ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED THAT GETTY SHALL:

11) Within five (5) calendar days from receipt of this Administrative Order, submit to the Department all sampling results. This submittal shall be made to the following address:

'Getty Petroleum
Page 5

23) Except as provided above in the Notice of a Right to a Hearing section, this Administrative Order shall be effective upon receipt.

Date: _10-15-87_          _Ronald T. Corcory_

Ronald T. Corcory
Assistant Director — Enforcement
Hazardous Waste Management

df

GPC- HPDELTA -0018

# EXHIBIT 13





# ANNUAL SITE UPDATE REPORT

**HP Delta**
**439 Lake Avenue**
**Colonia, Middlesex County**
**New Jersey**
**ISRA Case No.: 86492**

**March 2010**

Prepared for:

New Jersey Department of Environmental Protection
Bureau of Operation, Maintenance and Monitoring
PO Box 413
Trenton, NJ 08625

Attention: Jane Ten Eyck

Prepared by:

Vincent S. Barra
Senior Hydrogeologist
NJDEP License No. 423339

Reviewed by:

Greg F. Reuter
Senior Project Manager
NJDEP License No. 0012365

24 Abeel Road | Monroe, New Jersey 08831 | P: 609-409-6999 | F: 609-409-7453 | www.hcr-llc.com

NJDEP-SITE233-005296



NJDEP-SITE233-005316

# EXHIBIT 14

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------
NEW JERSEY DEPARTMENT OF            )
ENVIRONMENTAL PROTECTION, ET AL.,   )
          Plaintiffs,               )
                                    )
          vs.                       )No. 08CIV.00312
                                    )
ATLANTIC RICHFIELD, CO., ET AL.,    )(SAS);MDL1358
          Defendants.               )
-------------------------------------------------

 Marshall, Dennehey, Warner, Coleman & Goggin
        200 Lake Drive East, Suite 300
            Cherry Hill, New Jersey


              _ _ _ _ _ _


          Tuesday, August 1, 2012
               10:10 a.m.


              _ _ _ _ _ _
```

        Videotape deposition before trial

of MEHAR SINGH, taken on behalf of the

Plaintiff Parties on the above date and time,

by and before Carol J. Angiolillo, Registered

Professional Reporter-Notary Public and

Certified LiveNote Reporter.

1    fuel into the ground.

2    _ _ _ _ _ _

3    BY MR. MOONEY:

4        Q.   Okay.  Describe for me the process

5    of pumping the gas going from the tanker truck

6    into the underground storage tanks.  What

7    would you do to make that happen?

8        A.   We stick the tank first, hook up

9    the vapor into ground tank to the tanker, hook

10   up -- grab, like, the fitting to the ground

11   tank.

12       Q.   The fitting?

13       A.   The fitting, yes.

14       Q.   Okay.

15       A.   The special fitting we keep in the

16   truck.  We hook up with the ground tank.  Then

17   we have plastic hose, like gasoline hose, 4

18   inch.  We hook up the ground tank into our

19   tank and start dropping.

20       Q.   Would you hook up the -- which

21   would you hook up first, the fitting to the --

22   to the underground storage tank?

23       A.   Yes.

24       Q.   Okay.  And then you would hook that

25   up to the tanker truck?

1        A.   Yeah.

2        Q.   So, in all of these deliveries here

3    that are reflected on Dhandi Transport 2,

4    which are essentially 10 pages of deliveries,

5    there was never -- no gasoline was ever

6    spilled during that delivery?

7        A.   Not with me.

8        Q.   Not with you?

9        A.   No.

10       Q.   Okay.  How about with any of your

11   other employees at Dhandi Transport?

12       A.   Yes, one time.

13       Q.   One time they spilled gasoline?

14       A.   Yes.

15       Q.   And do you know when that was?

16       A.   No, I don't remember.

17       Q.   And do you know how much gasoline

18   was spilled?

19       A.   No, I don't remember.

20       Q.   Do you know how it was spilled?

21       Do you know what went wrong in the

22   process?

23       A.   No.  Actually, I don't -- nothing,

24   I don't remember anything of this.

25       Q.   Okay.  And what was that -- and who

1        A.   Yes.

2        Q.   Would you ever do it the other way

3    around, hook it up to the tanker truck first?

4        A.   It doesn't matter.  We hook up both

5    sides and start dropping.

6        Q.   Okay.  When you started Dhandi

7    Transport delivering fuel -- well, actually,

8    let me get back -- I'll get back to that.

9    Strike that.

10       So, at the H.P. Delta station, when

11   you delivered this fuel, did any fuel ever

12   spill during your delivery?

13       A.   No.

14       Q.   So, in approximately 36 months --

15   well, how often would you deliver fuel to H.P.

16   Delta -- well, actually, it's reflected here,

17   right, on this custom report?

18       A.   Yes.

19       Q.   So, it looks like maybe every --

20       A.   Every week I think.

21       Q.   About every -- about once a week?

22       A.   Yeah.

23       Q.   Sometimes --

24       A.   Sometimes two times, three.

25       Q.   Sometimes two times a week?

1    was the -- who was the delivery person on that

2    day?  Do you know who it was?

3        A.   I don't remember.

4        Q.   Was it one of your partners?

5        A.   I don't remember.

6        Q.   Did they come back and report to

7    you that they had spilled gasoline?

8        A.   I don't remember.  They might

9    remember.  I don't remember what it was --

10   what happened was, nothing, I don't remember.

11       Q.   Well, how did you find -- you said

12   there was at least -- there was one occasion

13   where gasoline was spilled.

14       How do you -- how do you know that?

15       A.   Maybe somebody told me -- you know,

16   tell me, and that's why, you know.  But I

17   don't remember, you know, who it was; how much

18   it was.

19       Q.   And what type of -- did you -- when

20   you bought Dhandi Transport and began

21   delivering gas in 1996, did you take any --

22   get any training on the -- on the

23   transportation and delivery of gasoline?

24       A.   Yes.

25       Q.   And where did you get that

Page 74

1    Q.   In the letter that I showed you
2 just on Dhandi 5, it refers to a delivery on
3 January 17th, 2007 that your attorney at the
4 time acknowledged.
5         Where's the delivery report for
6 that -- for the deliveries in 2007?
7    A.   P & J have maybe everything.
8    Q.   Well, here it says that you
9 maintained the -- I mean, you certified with
10 your signature on page 16, this answer. And
11 it states that this delivery report was kept
12 by Dhandi Transport in the normal course of
13 business.
14        So, in 2008, you had the -- you had
15 documents regarding the spill -- regarding
16 deliveries at H.P. Delta.
17   A.   I may ask P & J to give me that
18 report, a printer report from their computer.
19 But I don't remember. Maybe that's --
20   Q.   But it doesn't say that. It says
21 that it was a report that you kept in the
22 normal course of business.
23   A.   I don't remember, sir.
24   Q.   Did you sell -- did you sell Dhandi
25 Transport, Incorporated?

Page 76

1 closed Dhandi Transport and then started a new
2 company?
3    A.   Yes.
4    Q.   And then did that new company buy
5 Dhandi Transport?
6    A.   What do you mean "buy"?
7    Q.   Did they purchase?
8    A.   We just transfer, you know, old
9 trucks into the Jersey Gasoline. The same
10 owner, me and my partner, Jorawar, we change
11 the company name to Jersey Gasoline.
12   Q.   Okay. So, why did you change the
13 company to Jersey Gasoline?
14   A.   The insurance things.
15   Q.   Because of insurance?
16   A.   Yes.
17   Q.   Why because of insurance?
18   A.   More expensive, and Dhandi
19 Transport have claims. And the -- we open the
20 new company and got the cheap insurance.
21   Q.   So, you changed -- so, you
22 closed -- I just want to make sure I
23 understand this. Because you had insurance
24 claims against Dhandi Transport --
25   A.   Right.

Page 75

1    A.   No.
2    Q.   You did not sell it?
3    A.   No.
4    Q.   Who owns Dhandi Transport,
5 Incorporated right now?
6    A.   Dhandi is closed.
7    Q.   Can you turn to page 9 of that
8 document? It states in response to answer 8:
9 "Mr. Singh was the owner of Dhandi Transport,
10 Incorporated from 1996 to March 2007 when he
11 sold the company." And that's your certified
12 response.
13        So, can you please tell me who you
14 sold the company to in 2007?
15   A.   Jersey Gasoline.
16        THE COURT REPORTER: I'm
17 sorry?
18        THE WITNESS: Jersey -- we
19 merged like -- Jersey Gasoline
20 Corporation. We merged to -- Dhandi
21 Transport closed and we, you know, opened
22 Jersey Gasoline Company.
23        _____
24 BY MR. MOONEY:
25   Q.   So, Jersey Gasoline Company -- you

Page 77

1    Q.   -- you closed Dhandi Transport and
2 opened a new company?
3    A.   Yes.
4    Q.   In order to avoid higher insurance
5 payments?
6    A.   Yes.
7    Q.   And what were those insurance
8 claims against Dhandi Transport?
9    A.   I remember accidents, a couple of
10 accidents. I don't know how many accidents
11 with cars, and insurance high.
12   Q.   Were those accidents with the
13 trucks?
14   A.   Yes.
15   Q.   Where the trucks were in accidents?
16   A.   The truck accidents, just claims.
17   Q.   Were any of those insurance
18 companies have to do with the spill of
19 gasoline?
20   A.   Pardon me?
21   Q.   Did any of those insurance claims
22 have to do with Dhandi Transport spilling
23 gasoline during its deliveries?
24   A.   That, I don't remember.
25   Q.   You -- you -- you dissolved the

Page 198

1 independent contractors?
2    A.   No.
3    Q.   Well, how did they dispense their
4 product?  How did P & J make deliveries to
5 other stations?
6    A.   They'd use only one company to
7 deliver their product.
8    Q.   They used a company to make
9 deliveries?
10   A.   Yes.
11   Q.   And then the owners of P & J Fuel,
12 are they also from India?
13   A.   Yes.
14   Q.   When you and your partner decided
15 to go into business, did P & J Fuel stop using
16 any other delivery company?
17   A.   No.
18   Q.   Well, didn't you tell us that P --
19 that your company, Dhandi Transport, was the
20 only company used by P & J Fuel for
21 deliveries?
22   A.   Right.
23   Q.   So, were others then dropped by
24 P & J Fuel so you could have the entire
25 business?

Page 199

1    A.   No.  They didn't have -- don't tell
2 us don't do work for Bellomo Fuel.  They never
3 told us stop work for Bellomo.  We start with
4 Bellomo Fuel.
5         Then they cut back our work, the
6 Bellomo Fuel.  You know, that's the way it is.
7 Give us couple load, then one load.  Sometimes
8 a week it's one load.  Then they start give us
9 work.
10   Q.   So, you first started working for
11 Bellomo Fuels?
12   A.   Yes.
13   Q.   And then began working for Dhandi?
14   A.   Yes.
15   Q.   I'm sorry.  Then began working for
16 P & J; is that right?
17   A.   Yes.
18   Q.   And you soon became the only
19 delivery company for P & J; is that right?
20   A.   Yes.
21        MR. BRIDE:  That's all I've
22 got.
23        THE VIDEOGRAPHER:  This
24 concludes our video deposition.  The time
25 is 2:49.  We're off the record.

Page 200

1         _ _ _ _ _ _
2         (Video Deposition was
3 concluded at 2:49 p.m.)
4         _ _ _ _ _ _
5         MS. LAWRENCE-HAMMER:  I'm
6 going to want a transcript.  This is
7 Lesley Lawrence-Hammer.
8         THE COURT REPORTER:  Okay.
9 You said you do want a transcript?
10        MS. LAWRENCE-HAMMER:  Yes, I
11 do.  And I would prefer to get an
12 electronic copy if that's possible?
13        THE COURT REPORTER:  It's
14 definitely possible.  Anyone else?
15        MS. WATSON:  Yes.  This is
16 Susan Watson.  I would like an electronic
17 version as well.
18
19
20
21
22
23
24
25

Page 201

1
2         C E R T I F I C A T I O N
3         I HEREBY CERTIFY that the
4 proceedings and evidence are contained
5 fully and accurately in the stenographic
6 notes taken by me upon the foregoing
7 matter on Wednesday, August 1, 2012, and
8 this is a correct transcript of same.
9
10        NOTARIAL SEAL
11        Carol J. Angiolillo, Notary Public
12        Upper Southampton Twp., Bucks County
13        My commission expires February 19, 2013
14
15
16
17
18
19        _____
19        CAROL J. ANGIOLILLO
20
21        NOTE: (The foregoing certification
22 of this transcript does not apply to any
23 reproduction of the same by any means unless
24 under the direct control and/or supervision of
25 the certifying reporter.)

# EXHIBIT 15



**State of New Jersey**
DEPARTMENT OF ENVIRONMENTAL PROTECTION

JON S. CORZINE
*Governor*

LISA P. JACKSON
*Commissioner*

Bureau of Underground Storage Tanks
401 East State Street
P.O. Box 433
Trenton, NJ 08625
Fax (609) 633-1454

FEB 2 8 2007

Mr. Harbans Singh
HP Delta, Inc.
439 Lake Avenue
Colonia, NJ 07067

Re:    Notice of Rejection of Site Investigation Report dated December 7, 2006
       HP DELTA, INC.
       439 LAKE AVE
       COLONIA, WOODBRIDGE TWP, MIDDLESEX COUNTY
       PI # 001463 - AAR050001
       Case # 04-12-07-1319-21

Dear Mr. Singh:

On December 18, 2006, the Department received the above-referenced document from MIG Environmental, on behalf of HP Delta Inc., for review. The Department has determined that this document does not meet the minimum standards required for review and does not present sufficient sampling conducted at the site to qualify as a complete Site Investigation (SI) report. Please refer to the minimum standards set forth in the Technical Requirements for Site Remediation, N.J.A.C. 7:26E, in the event that HP Delta, Inc. intends to submit a document that complies with those minimum standards. This letter does not represent an extension of any applicable schedules or deadlines. If HP Delta, Inc. intends to perform additional sampling in order to submit a revised Site Investigation / Remedial Investigation report, HP Delta, Inc. shall notify the Department within thirty (30) days after receipt of this correspondence.

The above report primarily focused on the attempt by HP Delta, Inc. to prove that the primary source of the free phase product and ground water contamination which is presently observed at the existing tank field wells and in the site potable well is a result of discharges to the subsurface from the former tank field which previously existed at the site until approximately 1987 (and not the existing tank field.) The site investigation work performed also in part addresses a 2004 incident (#04-12-07-1319-21) whereby a report was due to the Department to investigate whether a discharge had occurred from the turbine spill containment sump located at the 'Regular' gasoline tank which was found to be filled with gasoline product on December 7, 2004.

This is a short summary of the latest site conditions based upon the data included in the above listed report. Eight (8) boring locations were advanced throughout the site during

*New Jersey Is An Equal Opportunity Employer   ●   Printed on Recycled Paper and Recyclable*

NJ-LBG-10862

two different events, and notably few samples were taken at consistent depths or with a specific explanation as to why each location or depth was chosen. Methyl tertiary butyl ether (MTBE) was reported at 7.39 parts per million (ppm) in a shallow soil sample at 6.0 to 6.5 feet below grade surface (SB-1A) to the southeast of the new tank field, while benzene was reported at 24.9 ppm, total xylenes at 336.6 ppm and MTBE at 23.7 ppm at a sample SB-6B to the east of the existing potable well.

Additionally, a total of three (3) grab ground water samples were obtained on site, also during different events, listed with the labeling as TWP (Temporary Well Point). One point was located to south of the building (TWP-2), one to the south east of the building and in the vicinity of the potable well (TWP-6) and to the south east of the tank field (TWP-3). One ground water sample was also taken at a Tank Field Monitoring Well, although which well was not reported. The depth to ground water was also not reported for any of the three grab ground water samples. Note that the depth to ground water within the shallow tank field wells ranged from 6.42 feet to 7.125 feet below grade surface based upon the Department's gauging at the tank field wells during interim remedial activities at the site. The analytical results from the ground water samples collected on October 6, 2006 and indicated that benzene, toluene, ethyl-benzene and total xylenes (Total BTEX), MTBE and tertiary butyl alcohol (TBA) contaminants were discovered above the Ground Water Quality Standards (GWQS). At TWP-3, MTBE was reported at 242,000 parts per billion (ppb) and TBA was reported at 35,400 ppb. At one of the five tank field wells sampled on August 10, 2006 (labeled as Tank Field Well MW-4 whose location was not provided in the report), Total BTEX were discovered above the GWQS, along with MTBE at 41,900 ppb, TBA at 5,820 ppb and naphthalene at 696 ppb. In conclusion, these contaminant concentrations are consistent with a more recent discharge, such as a discharge due to the documented overfilling of the tanks and discharges from spill buckets and/or turbine spill containment sumps whose integrity was proven compromised.

Please note that the deficiencies in the site investigation performed to date are numerous and include, but are not limited to, the following primary items: 1) soil sampling and ground water sampling was not performed such that sample locations were biased to the area of greatest suspected contamination which HP Delta Inc. has suggested is the previous tank field. Please note that based upon research of the various maps of the site, and concurrence from the property owner, the previous tank field extended much further to the south, west and east well beyond the location of SB-6/TWP-6 and almost to and/or incorporating part of the existing tank field, which were areas where there were no samples reported obtained; 2) logs were not submitted as were required to be prepared for all soil samples to document subsurface conditions pursuant to N.J.A.C. 7:26E-3.6(a)c(2I); 3) sufficient soil samples were not collected to evaluate the existing tank field as outlined in N.J.A.C. 7:26E-3.9(a)3(I); 4) sufficient soil samples were not collected to evaluate the below grade product piping as outlined in N.J.A.C. 7:26E-3.9(a)4; 5) sufficient ground

water samples were not collected to evaluate the pump islands which are located further than 25 feet from the existing tank field area of concern as outlined in N.J.A.C. 7:26E-3.7(d)3; 6) the location of Tank Field Well MW-4 was not provided as outlined in N.J.A.C. 7:26E-3.13(c)8 which requires the inclusion in the site investigation report of any other data obtained pursuant to N.J.A.C. 7:26E-3.3 through 3.12; 7) the analytical data was not submitted as an electronic deliverable using the database format outlined in detail in the current HAZSITE application or appropriate spreadsheet format specified in the Department's Electronic Data Interchange Handbook in effect as of the date the report is prepared and 8) the appropriate certification for the report was not submitted pursuant to N.J.A.C. 7:26E-1.5(a).

Based upon a review of the data provided from the site investigation completed on behalf of HP Delta, Inc. in combination with fact that overfill protection was recently added to the tank field, field verification of the recent installation of new spill buckets and turbine spill containment sumps, and the fact that the site investigation into the area of the former tank field was totally inadequate, the Site Investigation Report, dated December 7, 2006, was inconclusive and insufficient for the Department to agree that the free phase product and ground water contamination found on site at this time was a result of discharges to the subsurface by the former tank field. In fact, and to the contrary, the current soil and ground water data seems to support that the existing tank field is most likely the source of the soil contamination, the free phase product within the tank field wells and the groundwater contamination in the subsurface at the points sampled. When evaluating the reports of overfilling events which have been observed at the vent pipes whose result is suspected discharges to the soil surrounding the tank field the vent pipes, the fact that the soil and ground water samples from a majority of the alternative sampling points surrounding the existing tank field were contaminated, and the nature of the actual free phase product being recovered on an interim basis from the tank field wells, it is quite clear that the existing tank field has most likely contributed to the contamination at this site. The Department also notes that a substantial soil and ground water sampling program is necessary to assess the full impact of the suspected discharges to the subsurface at this facility.

Since the successful completion of an appropriate site investigation has not been performed by the above addressed party and the addressed party has refused to enter into an Administrative Consent Order (ACO) pursuant to the Spill Compensation and Control Act authorities noted in N.J.A.C. 7:26C to perform the appropriate site investigation / remedial investigation, the Department will utilize public funds to conduct the proper site investigation, remedial investigation and remediation of the site at this time under the lead of the Bureau of Design & Construction.

NJ-LBG-10864

If you require copies of Departmental Guidance Documents or applications, many of these are available on the internet at www.state.nj.us/dep/srp.  If you have any questions regarding this review, please contact David N. Miele, Case Manager/Inspector at (609) 777-0900.

Sincerely,

Kevin F. Kratina, Chief
Bureau of Underground Storage Tanks

c:  Middlesex County Department of Health
    Municipal Clerk, Twp. of Woodbridge
    Vincent Pucciarello, MIG Environmental
    Robert M. Mellecia, Rob's Service Center
    David N. Miele, NJDEP-BUST
    Kevin Kratina, NJDEP - BUST
    Michael Hollis, NJDEP-Compliance & Enforcement - Central Field Office
    Jonathan Berg, NJDEP - Compliance & Enforcement
    Akshay Parikh, NJDEP - Office of Wellfield Remediation
    William Buchanan, NJDEP - Bureau of Design & Construction
    Gary Lipsius, NJDEP - Bureau of Case Management

NJ-LBG-10865