**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
—————————————————————

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation
—————————————————————

This Document Relates To:
*Commonwealth of Puerto Rico, et al. v.*
*Shell Oil Company, et al.,*

**Case No. 07-CV-10470-SAS**
**Case No. 14-CV-1014-SAS**
—————————————————————

**MDL No. 1358**
**C.A. No. 1:00-1898 (SAS)**
**M21-88**

**MEMORANDUM OF LAW IN**
**SUPPORT OF DEFENDANT**
**TAUBER OIL COMPANY'S**
**MOTION TO DISMISS FOR LACK**
**OF PERSONAL JURISDICTION**

MICHAEL A. WALSH (2534)
NYS Bar No. 20132191
Strasburger & Price, LLP
901 Main Street, Suite 4300
Dallas, Texas 75202-3794
(214) 651-4459
(214) 651-4330 (Facsimile)
michael.walsh@strasburger.com

**ATTORNEYS FOR DEFENDANT**
**TAUBER OIL COMPANY**

## TABLE OF CONTENTS

I.      Preliminary Statement............................................................................................1

II.     Factual Background ................................................................................................1

III.    Procedural Background & Preservation of Jurisdictional Challenge ................................10

IV.     Legal Standards........................................................................................................10
        A.      Rule 12(b)(2) Personal Jurisdiction Standard of Proof........................................10

V.      The Puerto Rico Courts Lack Personal Jurisdiction over Tauber......................................11
        A.      Puerto Rico Courts do not have General Jurisdiction over Tauber .........................11
        B.      Puerto Rico lacks Specific Jurisdiction over Tauber .............................................12
                1.      Under Puerto Rico's long-arm statute, Puerto Rico lacks Personal
                        Jurisdiction over Tauber .........................................................................12
                2.      To Permit Puerto Rico to Exercise Specific Personal Jurisdiction
                        over Tauber would be a violation of the Due Process Clause ..................12
                        a.      Tauber Lacks Minimum Contacts with Puerto Rico to
                                Establish Specific Jurisdiction ......................................................13
                                (i)     Tauber Lacks Minimum Contacts to Subject it to
                                        Puerto Rico Courts under the Nicastro  Plurality's
                                        Opinion ..............................................................................17
                                (ii)    Tauber's Contacts do not Satisfy the Test for
                                        Minimum Contacts in the Nicastro Concurrence or
                                        Dissent...............................................................................20
                        b.      The Exercise of Specific Jurisdiction over Tauber is
                                Unreasonable................................................................................24

VI.     Conclusion ................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Distilling & Mfg. v. Amerada Hess Corp. (In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.),*
399 F. Supp. 2d 325 (S.D.N.Y. 2005).....................................................................12

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*
305 F3d 120 (2d Cir. 2002).....................................................................................14

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985).........................................................................................18, 24

*Carreras v. PMG Collins, LLC,*
660 F.3d 549 (1st Cir. 2011)..............................................................12, 17, 18, 19

*Cecarelli v. CSX Transportation, Inc.,*
No. 3:09cv1590 (MRK), 2012 U.S. Dist. LEXIS 122287
(D. Conn. Jan. 10, 2012).............................................................................15, 16, 20

*Commonwealth v. Shell Oil Co. (In re MTBE),*
No. 1:00-1898, MDL 1358 (SAS), 07-civ-10470, No. 2013 U.S. Dist. LEXIS 99288
(S.D.N.Y. July 12, 2013) .............................................................................10, 24

*Daimler AG v. Bauman,*
134 S.Ct. 746 (2014)...............................................................................................11

*Dejana v. Marine Tech. Inc.,*
No. 10-cv-4029 (JS)(WDW), 2011 U.S. Dist. LEXIS 1111080 (E.D.N.Y. Sept. 26,
2011) .....................................................................................................................14

*Doe v. Delaware State Police,*
No. 10 Civ. 3003, 2013 WL 1431526 (S.D.N.Y. Apr. 4, 2013)............................10

*Goodyear Dunlop Tires Opers S.A. v. Brown,*
131 S.Ct. 2846 (2011).......................................................................................11, 13

*Hanson v. Denckla,*
72 S. Ct. 1228 (1958).......................................................................................13, 15

*In re MTBE Prods. Liab. Litig.,*
725 F.3d 65 (2d Cir. 2013)......................................................................................14

*In re Stillwater Capital Partners Inc. Litig.,*
851 F. Supp. 2d 556 (S.D.N.Y. 2012).....................................................................11

*International Shoe Co. v. Washington*,
   66 S. Ct. 154 (1945) ................................................................................................ 13

*MacDermid, Inc. v. Dieter,*
   702 F.3d 725 (2d Cir. 2012) .................................................................................... 24

*McIntyre Machinery, Ltd. v. Nicastro*,
   131 S. Ct. 2780 (2011) ..................................................................................... *passim*

*Negron-Torres v. Verizon Commc'ns, Inc.*,
   479 F.3d 19 (1st Cir. 2007) ...................................................................................... 12

*SEC v. Compania*,
   No. 11-civ.-4904 (DLC), 2011 U.S. Dist. LEXIS 83424 (S.D.N.Y. July 29, 2011) ............... 14

*Walden v. Fiore*,
   No. 12-574, 2014 U.S. LEXIS 1635 (2014) ........................................................ 13, 14, 15

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U. S. (1980) .................................................................................................. 13, 21

## STATUTES

U.C.C. § 2-319 ............................................................................................................. 1

## RULES

Federal Rule of Civil Procedure 12(b)(2) ............................................................. *passim*

Federal Rule of Civil Procedure 30(b)(6) ....................................................................... 4

COMES NOW Defendant Tauber Oil, Company ("Tauber"), through undersigned attorneys and hereby submits this its Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Third Amended Complaint filed in Case No. 07-CV-10470-SAS and Plaintiff's First Amended Complaint filed in Case No. 14-CV-1014-SAS pursuant to Federal Rule of Civil Procedure 12(b)(2).

## I.      Preliminary Statement

Tauber engaged in "spot sales" [1] in Texas of MTBE with Phillips in Bartlesville, Oklahoma and nothing more.  There is no allegation nor is there any evidence of any conduct on the part of Tauber that connects Tauber to any claim in this case.  The Court lacks personal jurisdiction over Tauber, a Texas company, which had and has no involvement in the refining, marketing, and supplying of MTBE or gasoline containing MTBE in the Commonwealth of Puerto Rico (the "Commonwealth"). Tauber has and had no presence whatsoever in the Commonwealth and the facts set forth below demonstrate that Tauber has not availed itself of the protections of Puerto Rico law and is not subject to jurisdiction in this case.

## II.      Factual Background

Tauber is a Texas based marketer of energy products that engaged in spot sales of MTBE with Phillips Petroleum Company ("PPC") and the following related divisions, Phillips 66 Co. ("Phillips 66") and Phillips Chemical Co. ("PCC"), all located in Bartlesville Oklahoma.  As detailed below, every sale was Free on Board (FOB)[2] outside of Puerto Rico.  Tauber never

---

[1] Spot and forward contracts are based on cargo-by-cargo transactions. Spot transactions mean those with schedules within fifteen days to one month (oil trading for delivery on the same day is rare). A spot sale is a term to distinguish the sale from other sales such as those under a supply agreement.  *See* Declaration of Kevin Wilson at fn.1.

[2] Free on Board describes the terms of a transaction where the seller agrees to make the product available within an agreed-upon time period at a given location. U.C.C. § 2-319.

contracted with any Puerto Rico entity for the sale or delivery of MTBE into Puerto Rico.[3]

The Declaration of Kevin Wilson, sworn to on February 26, 2014 (the "Wilson Declaration") establishes that Tauber has no contacts with the Commonwealth to establish either general or specific jurisdiction.  The Wilson Declaration establishes that:

- Tauber is a Texas company, incorporated and registered in Texas. *Id.* at ¶4.

- Tauber's principal place of business is in Texas. *Id.* at ¶5.

- Tauber has never manufactured, marketed, traded, stored, sold or otherwise handled finished gasoline, gasoline containing MTBE, or MTBE in Puerto Rico.  *Id.* at ¶ 6.

- Tauber, its distributors, and agents have never solicited, advertised or marketed the sale of gasoline or MTBE in Puerto Rico and have never taken any actions to create a market for gasoline or MTBE in Puerto Rico. *Id.* at ¶ 7.

- Tauber does not have a distribution agreement with any person, company, or agent to distribute gasoline containing MTBE, or MTBE in Puerto Rico. *Id.* at ¶ 8.

- Tauber has never entered into a distribution agreement with a person, company, or agent to solicit, advertise, market, or sell MTBE or gasoline containing MTBE in Puerto Rico. *Id.* at ¶ 9.

- Tauber never designed MTBE, gasoline containing MTBE, or any product to be specifically used in Puerto Rico. *Id.* at ¶ 10. Tauber has never had any of its officers, directors, employees or agents travel to Puerto Rico for any business-related purpose or activity. *Id.*

- Tauber has never filed, and is not required to file, any tax returns in Puerto Rico and has never paid taxes in Puerto Rico.  *Id.* at ¶ 11.

- Tauber owns no real or personal property located in Puerto Rico. *Id.* at ¶12.Tauber has never leased real or personal property in Puerto Rico. *Id.* at ¶ 13.

- Tauber has never maintained, controlled, leased, or operated storage tanks, pipelines, or service stations in Puerto Rico. *Id.* at ¶ 14.

- Tauber has never maintained a place of business or office in Puerto Rico and employs no agents or employees in Puerto Rico. *Id.* at ¶ 15.

---

[3] Tauber is not alleged to have sold gasoline containing MTBE that was delivered to Puerto Rico, nor is Tauber aware of any evidence from any party establishing or inferring that Tauber sold MTBE gasoline that was delivered to Puerto Rico.

- Tauber has never had any officers, directors, employees or agents acting on its behalf present in Puerto Rico, including any agent for service of process in Puerto Rico. *Id.* at ¶ 16.

- Tauber has never had a bank account, phone number, fax number, or any corporate records located in Puerto Rico. *Id.* at ¶ 17.

- Tauber has not initiated litigation in Puerto Rico. *Id.* at ¶ 18.

- Tauber has not engaged in any commercial activity to purposefully avail itself of the protections of the laws of Puerto Rico and has not engaged in conduct purposefully directed at Puerto Rico. *Id.* at ¶ 19.

- Tauber has not delivered its goods, including MTBE, in the stream of commerce with the expectation that they would be purchased by Puerto Rico users. *Id.* at ¶ 20.

- Tauber has not participated in any conventions, meetings or sales events in Puerto Rico or engaged in conduct "targeting" Puerto Rico for its products. *Id.* at ¶ 21.

- Tauber's website did not promote the sale of MTBE or gasoline containing MTBE in Puerto Rico.  Tauber's website is in English and is not translated to Spanish or otherwise targeted to customers in Puerto Rico. *Id.* at ¶ 23.

- Tauber has never refined and/or manufactured petroleum products, including, but not limited to, gasoline, gasoline containing MTBE, and MTBE. *Id.* at ¶ 24.

- Tauber has never sold or distributed MTBE or gasoline containing MTBE at any station, port, or any other location in the Commonwealth of Puerto Rico. *Id.* at ¶ 25.

- Tauber has never blended finished gasoline or added chemicals such as MTBE to gasoline for shipment or sale in Puerto Rico. *Id.* at ¶ 26.

- Tauber has not traded gasoline for sale in Puerto Rico. *Id.* at ¶ 27. Tauber has not traded gasoline containing MTBE for sale in Puerto Rico.  *Id.* at ¶ 28.

- Tauber has reviewed its records and hereby states that Tauber sold MTBE to Phillips Petroleum Company ("PPC") and the following related divisions, Phillips 66 Co. ("Phillips 66") and Phillips Chemical Co. ("PCC") in "spot sales." *Id.* at ¶ 30.

- Other than the listed Phillips entities, Tauber has located no records concerning any other party to Commonwealth's Third Amended Complaint in action 07-cv-10470 or the First Amended Complaint in action 14-cv-1014 indicating that such party purchased MTBE from Tauber and that such MTBE was shipped to Puerto Rico.  *Id.* at ¶ 31.

- Upon information and belief, no Phillips entity (PPC, PCC or Phillips 66) to which Tauber sold and delivered title to MTBE was or is located in Puerto Rico.  *Id.* at ¶ 32.

- Tauber is a trader of energy products and the total volume of spot sales by Tauber to PPC, Phillips 66 and PCC represent a negligible percentage by volume of petrochemicals sold by Tauber during the relevant time period. *Id.* at ¶ 35.

- Tauber had no involvement in any decision by any Phillips entity to use MTBE, including that it did not provide any economic analysis of MTBE versus any other oxygenate to substitute for lead. *Id.* at ¶ 36. Tauber has no distribution or agency agreement with any Phillips entity. *Id.* at ¶ 37.

- Tauber had no discussions with any Phillips entity concerning any purported economic "advantage" to using MTBE over any other alternative. *Id.* at ¶ 38.

- Tauber did not market or sell TBA to Phillips or any other party for delivery or use in Puerto Rico. *Id.* at ¶ 39.

- PPC, PCC and Phillips 66 took delivery at locations outside of Puerto Rico in each of the sales of MTBE by Tauber. *Id.* at ¶ 41. No sale was ever made by Tauber to Phillips Puerto Rico Core, Inc. or any entity in Puerto Rico. *Id.* at ¶ 44. All sales were between Tauber and PPC, PCC or Phillips 66, all located in Bartlesville, Oklahoma, and title transferred in all FOB outside of Puerto Rico. *Id.*

At the deposition of Tauber's FRCP 30(b)(6) witness Kevin Wilson, Tauber was questioned at length concerning Plaintiffs' sole jurisdictional allegation that Tauber knew that "Phillips" was shipping MTBE to Puerto Rico and that knowledge somehow confers jurisdiction. But Tauber's testimony established that (1) the Phillips entities with which Tauber transacted sales were all located in Oklahoma and (2) the ultimate destination of the MTBE, or any petrochemical product, was not a term of the sale and is not information that Tauber customarily receives. Tauber testified as follows:

Q.    And the destination is completely and wholly irrelevant?
A.    It's irrelevant to Tauber.  It's irrelevant to TPC.[4]
Q.    Okay.
A.    The only people that it would be relevant to here is SGS [others involved in aspects of the shipment such as the inspection company].

*See* Deposition Testimony of Kevin Wilson 69:8-24 (Exhibit A attached to Declaration of Michael A. Walsh).

---

[4] TPC is Tauber Petroleum Corporation.  Mr. Wilson was offered as a witness to testify on behalf of defendant Tauber Oil.  Tauber Petrochemical Corp. is not a party to this case.

When questioned on whether Tauber even has knowledge of where the product it had sold was going or if it had any way to testify as to where the product it sold was actually delivered, Tauber testified that cargo destination is commercially sensitive information that is customarily not provided to Tauber.  Tauber testified as follows:

> Q.      Do you have any reason -- any independent fact to believe that the MTBE that is the subject of this file did not get discharged in Puerto Rico?
> A.      I don't.  I don't know.  I don't have discharge documentation here to know if that is, in fact, where it went.  I can only presume that's the case.
> Q.      Would it be common to have discharge documents?
> A.      No.  In fact, it's strictly forbidden, generally speaking.
> Q.      And why is it strictly forbidden?
> A.      Because it's a FOB transaction, and it's quite commonplace in this industry, and just in general, that you're limited to your -- you know, the knowledge is limited to what you transact to do and that -- that's it.  The industry as a whole maintains that because of proprietary information.  They don't want -- if I were to purchase product from Dow and sell it to Chevron, and that purchase from Dow was made through an intermediary like Vitol, Vitol purchased it from Dow and sells it to me and Vitol knows where my customer takes it, why would Vitol want us in the middle of that transaction?
> People don't share this type of information.  Not in this business.
> Q.      And the type of information, much of it relating to --
> A.      Destination.
> Q.      -- destination, and the identity of --
> A.      Of who's -- who's receiving it ultimately.
> Q.      -- the entities that are purchasing it?
> A.      No.  The entities that are ultimately consuming it or, in many cases, the entities who are producing it.

*Id.* at 73:13-75:6. Plaintiffs' counsel was relentless, repeatedly attempting to frame his question in a manner to suggest a fact that Tauber simply is not capable of establishing; that is, that any MTBE it sold to PPC, PCC or Phillips 66 was used in Puerto Rico.  In this regard, Tauber testified as follows:

> Q.      Do you have any independent facts to indicate that this shipment of MTBE was not discharged in Puerto Rico?
> A.      I cannot tell where any of these discharge, because, again, once they're -- the FOB transactions occur and we pass title at the rail, the receiver can take it wherever they want, as often occurs.  On many transactions that I do, they ultimately end up in Asia.  This happens to me all the time.

*Id.* at 103:16-104:2.

> Q.   And in a circumstance where a port is labeled, do you have specific knowledge of that port changing?
>
> A.   …no. I don't.
>
> Q.   Do you have any independent facts that leads you to believe that the particular shipment of MTBE that's identified in Exhibit No. 10 was not discharged in Puerto Rico?
>
> A.   That's something you would have to go to Phillips for. I mean, in each case that I'm being asked that, I have no way of knowing.

*Id.* at 104:16-105:3.

> Q.   So with your communications with Marilyn Dugan [PPC], you would never, under no uncertain circumstances, discuss the destinations for products?
>
> A.   It's none of Tauber's business.
>
> Q.   But you -- I understand you're saying it's none of Tauber's business. Did you ever discuss the destination of product?
>
> A.   No. We did not discuss that.

*Id.* at 133:13-23.

> We have no involvement. It's a free on board contract. It passed at the rail to the ship. We do not have title on the vessel. We do not have any ownership interest whatsoever. We have no loss exposure of the cargo. We do not participate in the inspection at point of discharge. We are done. That [destination information] is there to communicate, and it's there -- and it's quite odd that it's there, because, of all the files that we could go back and we could look at, with many other products over long periods of time, you wouldn't see that information there. Because it's just what Marilyn did. She conveyed it in that way.

*Id.* at 135:7-19.

Testimony establishes that Tauber had no knowledge or control over the destination and the destination was not information that factored into Tauber's transacting spot sales of MTBE to PPC, PCC and Phillips 66. Tauber's deposition testimony further confirmed that Phillips did not inform Tauber of the destination:

> Q.   Did you ever instruct Phillips not to inform you of the intended destination of MTBE you sold to them?
>
> A.   It would be irrelevant. There would be no cause to ask them to inform or not inform.

*Id.* at 200:23-201:4.

While Plaintiffs may suggest that the Court infer that MTBE PPC, PCC and Phillips 66 purchased from Tauber may have been and resold and shipped to Phillips Core Puerto Rico, what is clear from the deposition testimony is that Tauber had no interest, power, control or knowledge concerning where the MTBE it sold was ultimately delivered.  In discovery responses, Phillips admits that PCC supplied MTBE to the Core facility stating: "Phillips Petroleum Company arranged for the supply of MTBE to the Core facility." *See* Exhibit B at page 7 attached to Declaration of Michael A. Walsh.  Despite the Commonwealth attempting to implicate Tauber, the discovery establishes that it was a Phillips related entity (PPC, PCC or Phillips 66) that sold or "arranged" for the MTBE it obtained to be shipped to the Commonwealth.  In this regard, Phillips Core Puerto Rico witness testified as follows:

> Q.   So the purchase of MTBE from whatever source, was that a function of anybody at the Core facility?
> A.   Not that I recall.
> Q.   So, again, that would be Bartlesville?
> A.   I think Bartlesville had more to do with purchasing.

*See* Exhibit C attached to Declaration of Michael A. Walsh, Dep. of Don Sitton 26:15-21.

> Q.   So the Phillips companies, in terms of the materials that were shipped to the plant, essentially bought them?
> A.   They were -- there was interaction between the plant and the folks in Bartlesville on purchasing the feedstock, but yes.
> Q.   And then Bartlesville arranged to ship them?
> A.   Correct.

*Id.* at 40:8-16.

A declaration provided by Phillips Puerto Rico Core Inc. further supports that it was Phillips, not Tauber, which supplied MTBE to the Core facility:

> COP [ConocoPhillips Company] and CPCPRC [Chevron Phillips Chemical Puerto Rico Core Inc.] have provided discovery in the above-referenced litigation indicating that various "Phillips" entities supplied, purchased, and/or shipped methyl tertiary butyl ether ("MTBE") that was delivered to the Plant.

*See* Exhibit D attached to Declaration of Michael A. Walsh.  Phillips Puerto Rico Core Inc.

Declaration of Daryl Vance, dated April 30, 2013 (the "Vance Declaration").  In response to

discovery concerning the supply of MTBE to the Phillips Chemical Puerto Rico Core facility,

Phillips responded as follows:

> Defendant [Phillips Petroleum Company] caused neat MTBE to be delivered by ship to Phillips Puerto Rico Core Inc. for gasoline blending at the Core facility.

*See* Exhibit E at page 7 attached to Declaration of Michael A. Walsh.

Phillips Puerto Rico Core further confirmed that MTBE was supplied by PPC:

> Phillips Puerto Rico Core Inc. never manufactured MTBE.  During the relevant time period, Phillips Petroleum Company arranged for the supply of MTBE to the Core facility.

> *See* Exhibit B at 4-5 attached to Declaration of Michael A. Walsh.   Even assuming

Plaintiffs can infer that MTBE sold by Tauber to PPC, PCC or Phillips 66 was resold and

shipped to the Phillips Core Puerto Rico facility, it is not clear that any such MTBE remained in

Puerto Rico.  On August 9, 2013 Phillips submitted a letter to the Court representing that

"[Phillips"] had sales both within and outside Puerto Rico."  *See* Exhibit F attached to

Declaration of Michael A. Walsh.  Core's records do not indicate if MTBE was in gasoline

"[t]his is true for gasoline sales both within Puerto Rico as well as off-island sale."  *See* Exhibit

G at ¶ 8 attached to Declaration of Michael A. Walsh.  "The Core facility sold gasoline to the

wholesale market in Puerto Rico and elsewhere".  *See* Exhibit B at page 12 attached to

Declaration of Michael A. Walsh.

Tauber served thirty one (31) interrogatories focused on the jurisdictional facts that the

Commonwealth should possess to support any claim of personal jurisdiction in this case.  The

Commonwealth "responded" to each Interrogatory with a boilerplate response stating that

"discovery is ongoing" "Tauber [is] in the best position" to answer its own interrogatories and

"Tauber held title to several hundreds of thousands of barrels of neat MTBE over a period of

fifteen years that was shipped to Puerto Rico."  *See* Exhibit H attached to Declaration of Michael

A. Walsh.[5]  Thus, Plaintiffs hinge personal jurisdiction on the conclusory statement that MTBE Tauber sold "was shipped to Puerto Rico" by Phillips coupled with the allegation in the complaints in these cases concluding: "Defendant knew or should have known [products containing MTBE] would be delivered into the Commonwealth."[6]

When Hector Marin, Phillips Core Puerto Rico's R 30(b)(6) witness, was questioned regarding Tauber's purported sales to Phillips Core, he testified as follows:

> Q.    Okay.  And are you aware generally of an agreement between -- any agreement -- supply  agreement between Phillips Puerto Rico Core and Tauber?
> A.    In the documents that I've reviewed, I don't have that information.
> Q.    Okay.  Between the years of 1990 and 2000… Are you aware of any transactions involving Tauber during that time period?
> A.    In that period of time, their name is not here.
> Q.    Okay.  That's not …exactly answering my question.  Are you aware of any transactions between Phillips and Tauber during that time period?
> A.    Yes.  I understood now.  No.  I don't have any knowledge of that.

I Exhibit I attached to Declaration of Michael A. Walsh. at  357:10-24; 358:1-12.

Evidence of Tauber's purposeful availment is wholly lacking and, at best, Plaintiffs promise an inference that Tauber knew the MTBE it sold to PPC, PCC and Phillips 66 was going to the Commonwealth.  As the case law cited below demonstrates, the facts simply fail the Commonwealth and the Court lacks person jurisdiction over Tauber in both cases.

Ultimately, for Plaintiffs to establish that any MTBE product sold by Tauber is even at issue in this case, Plaintiffs will pile inference upon inference on top of supposition; Plaintiffs must prove that MTBE purchased by PPC, PCC or Phillips 66 purchased from Tauber was (1)

---

[5] Prior to the close of discovery, Tauber wrote Plaintiffs requesting that they supplement discovery responses.  Plaintiffs wrote Tauber on January 8, 2014 adding to their jurisdictional claim stating "Tauber was informed" and Tauber had knowledge" that MTBE it sold to Phillips Bartlesville was "bound" for the Commonwealth.
[6] *See* Third Amended Complaint in case no. 07-CV-10470 (Dkt. 175) (TAC) at paragraphs 21 and 71 and First Amended Complaint in case no. 14-cv-01014 (Dkt. 1) (FAC) at paragraphs 25 and 90.

was shipped to Puerto Rico, (2) remained in Puerto Rico, (3) blended into gasoline in Puerto

Rico, (4) the MTBE gasoline remained on the island and was not shipped off the island, (5) was

sold for use in the relevant geographical area or at a focus site, (6) was released into the

environment, and (7) contaminated drinking water.  The absence of such evidence in these cases

renders the Commonwealth unable to establish that any MTBE product Tauber sold to PPC, PCC

or Phillips 66 is even at issue in these cases.

### III.      Procedural Background & Preservation of Jurisdictional Challenge

Tauber procedurally preserved its challenge to Puerto Rico's exercise of personal

jurisdiction over Tauber.  Tauber timely challenged Plaintiffs' assertion of personal jurisdiction

in its first responsive pleadings in cases 07-CV-10470-SAS and 14:-CV-1014-SAS.

To date, Tauber has participated limitedly in this case to obtain discovery from Plaintiff

to ascertain any evidence it (or any other party) has in support of the Commonwealth's allegation

that the Commonwealth has personal jurisdiction over Tauber.  *See* Declaration of Michael

A.Walsh at ¶ 11.

### IV.      Legal Standards

### A.      Rule 12(b)(2) Personal Jurisdiction Standard of Proof

A plaintiff has the burden of proving personal jurisdiction by a preponderance of the

evidence. While the Court construes all allegations in favor of the plaintiff, a "plaintiff may not

rely on conclusory non-fact-specific jurisdictional allegations to overcome a motion to dismiss."

*Commonwealth v. Shell Oil Co. (In re MTBE)*, No. 1:00-1898, MDL 1358 (SAS), 07-civ-10470,

No. 2013 U.S. Dist. LEXIS 99288 (S.D.N.Y. July 12, 2013) (citing *Doe v. Delaware State*

*Police*, No. 10 Civ. 3003, 2013 WL 1431526, at *3 (S.D.N.Y. Apr. 4, 2013) (quotation marks

omitted)). Further, when a "defendant rebuts plaintiffs' unsupported allegations with direct

highly specific, testimonial evidence regarding a fact essential to jurisdiction – and plaintiffs do

not counter that evidence – the allegation may be deemed refuted." *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 567 (S.D.N.Y. 2012).

## V.       The Puerto Rico Courts Lack Personal Jurisdiction over Tauber

This Court lacks both general and specific jurisdiction over Tauber. The TAC sets forth no plausible basis for the Court's exercise of jurisdiction over Tauber. Instead, the TAC identifies Tauber by name in only a single paragraph that recites:  "Tauber is a Delaware[7] corporation headquartered at 55 Waugh Drive, Suite 700 in Houston, Texas 77007." TAC ¶64; FAC ¶81. No allegation links Tauber to the refining, supplying, marketing, or addition of MTBE to gasoline destined for Puerto Rico. More significantly, no evidence links Tauber to any activities conducted in the Commonwealth that relate to plaintiff's claims sufficient to confer personal jurisdiction.

### A.       Puerto Rico Courts do not have General Jurisdiction over Tauber

To establish a court has general jurisdiction over a defendant, the plaintiff must prove that the defendant has engaged in "continuous and systematic" activities within Puerto Rico. *Goodyear Dunlop Tires Opers S.A. v. Brown*, 131 S.Ct. 2846, 2853 (2011); *see also Daimler AG v. Bauman,* 134 S.Ct. 746 (2014) ("Accordingly, the inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.").  Tauber has had no such contacts with Puerto Rico to render it "at home" and the Commonwealth does not and cannot allege that Tauber had such contacts.

---

[7] Tauber is a Texas corporation.  *See* Wilson Declaration at ¶ 4.

**B.** **Puerto Rico lacks Specific Jurisdiction over Tauber**

**1.** **Under Puerto Rico's long-arm statute, Puerto Rico lacks Personal Jurisdiction over Tauber**

Tauber did not have any contacts with Puerto Rico that would reasonably avail Tauber of specific jurisdiction.   Puerto Rico's long-arm statute allows courts:

> to exercise jurisdiction over a non-resident defendant if the action arises because that person: (1) transacted business in Puerto Rico personally or through an agent; (2) participated in tortious acts within Puerto Rico personally or through his agent . . . or (5) owns, uses or possesses, personally or through his agent, real property in Puerto Rico.

1:07-CV-10470, Doc. 309 at 22 (citing *Negron-Torres v. Verizon Commc'ns, Inc.*, 479 F.3d 19, 24 (1st Cir. 2007).  The jurisdictional inquiry is guided by the constitutional guidelines of Due Process, and a constitutional analysis of the jurisdictional question will satisfy the long-arm statute inquiry. *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 552 (1st Cir. 2011).

**2.** **To Permit Puerto Rico to Exercise Specific Personal Jurisdiction over Tauber would be a violation of the Due Process Clause**

"The Due Process Clause of the Fourteenth Amendment requires that the exercise of personal jurisdiction over a nonresident defendant comports with traditional notions of fair play and substantial justice. *Am. Distilling & Mfg. v. Amerada Hess Corp. (In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.),* 399 F. Supp. 2d 325, 331 (S.D.N.Y. 2005). "[A]t the most general level, the due process nexus analysis requires that the court ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him." *Id.* In the Second Circuit, "the due process analysis consists of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *Id.*

a.    **Tauber Lacks Minimum Contacts with Puerto Rico to Establish Specific Jurisdiction**

"Specific" or "case-linked" jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy'" (*i.e.*, an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation"). *Goodyear Dunlop Tires Operations*, 131 S.Ct. 2846 (slip op., at 2). This is in contrast to "general" or "all purpose" jurisdiction, which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (*e.g.,* domicile). *Walden v. Fiore*, No. 12-574, 2014 U.S. LEXIS 1635 at fn. 6 (2014).

A court must consider whether contacts "purposefully availed" the defendant to the forum state's jurisdiction. "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Hanson v. Denckla*, 72 S. Ct. 1228 (1958). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Amerada Hess Corp.*, 399 F. Supp. 2d at 331. Mostly recently, a Supreme Court addressed minimum contacts stating: As an initial matter, we reiterate that the "minimum contacts" inquiry principally protects the liberty of the nonresident defendant, not the interests of the plaintiff. *Walden*, 2014 U.S. LEXIS 1635 at fn. 9 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U. S., 286, 291–292 (1980)).

"A court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2787 (2011) (quoting *International Shoe Co. v. Washington*, 66 S. Ct. 154 (1945)). The defendant must "purposely avail" itself of the privilege of conducting activities within the forum

State and could foresee being haled into court there. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F3d 120, 127 (2d Cir. 2002) (quotation marks omitted).  Moreover, the claim must arise out of, or relate to, the defendant's contacts with the forum. *Id.*[8]  "The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *Nicastro*, 131 S.Ct. at 2788; *see also SEC v. Compania*, No. 11-civ.-4904 (DLC), 2011 U.S. Dist. LEXIS 83424, *14 (S.D.N.Y. July 29, 2011); *Dejana v. Marine Tech. Inc.*, No. 10-cv-4029 (JS)(WDW), 2011 U.S. Dist. LEXIS 1111080 (E.D.N.Y. Sept. 26, 2011) (applying the plurality rule).

In *Walden v. Fioree*, Nevada residents had cash confiscated in Atlanta and a DEA agent helped draft a probable cause affidavit to support a forfeiture action.  No forfeiture complaint was filed and the money was returned to the plaintiffs in Nevada.  The Plaintiffs claimed the affidavit was false and sought damages for violation of their Fourth Amendment rights.  The District Court ruled that knowledge of causing harm in Nevada did not confer jurisdiction.  The Ninth Circuit reversed the dismissal on the grounds the defendant "expressly aimed" his conduct at Nevada with knowledge it would cause harm in Nevada.  The Supreme Court rejected the Ninth Circuit's holding allowing a court in Nevada to exercise specific jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would cause harm to plaintiffs in Nevada.  In reversing the Ninth Circuit, the Supreme Court noted:

> whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation   For a State to exercise jurisdiction consistent with due process, the

---

[8] In affirming this court's verdict in the City of New York v Exxon, the Second Circuit stated that tort liability flows not "for the mere use of MTBE, but because [the defendant] engaged in additional tortious conduct, such as failing to exercise reasonable care in storing gasoline at service stations it owned or controlled." *In re MTBE Prods. Liab. Litig.,* 725 F.3d 65, 101, fn 22 (2d Cir. 2013).   Thus "something more" than a mere sale of MTBE is necessary for the claim to "arise out of or relate to" Tauber's conduct for jurisdictional purposes.

defendant's suit-related conduct must create a substantial connection with the forum State. Two related aspects of this necessary relationship are relevant in this case. . .  First, the relationship must arise out of contacts that the defendant himself creates with the forum State. Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant - not the convenience of plaintiffs or third parties.  We have consistently rejected attempts to satisfy the defendant-focused "minimum contacts" inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State. The unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.  We have thus rejected a plaintiff 's argument that a Florida court could exercise personal jurisdiction over a trustee in Delaware based solely on the contacts of the trust's settlor, who was domiciled in Florida and had executed powers of appointment there.  We have likewise held that Oklahoma courts could not exercise personal jurisdiction over an automobile distributor that supplies New York, New Jersey, and Connecticut dealers based only on an automobile purchaser's act of driving it on Oklahoma highways.   Put simply, however significant the plaintiff's [or third-party's] contacts with the forum may be, those contacts cannot be "decisive in determining whether the defendant's due process rights are violated… Second, our "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.

*Walden*, No. No. 12-574, 2014 U.S. LEXIS 1635 at *11-*14 (internal citations and quotations omitted).  Citing *Hanson*, the Court held "'unilateral activity' of a third-party….cannot satisfy the requirement of contact with the forum State."  *Id.* at *24.  "[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum State.  *Id.* at *24-25.  Here, Plaintiffs should not be permitted to establish specific jurisdiction over Tauber because of PPC's strong forum connections; the inquiry is whether Tauber itself had those connections and whether those connections relate to the claims at issue.  Neither exist in this case.

In *Cecarelli v. CSX Transportation, Inc.*, No. 3:09cv1590 (MRK), 2012 U.S. Dist. LEXIS 122287 (D. Conn. Jan. 10, 2012), the plaintiff was injured in Connecticut when a door fell off a railroad boxcar.  Plaintiff sought to add Albany & Eastern Railroad Co. (AERC), an Oregon rail carrier. *Id.* at *2.  AERC's involvement was to move railcars along approximately 67 miles of track on its line to an interchange point, where it would hand off the railcars to another

railroad. *Id.* *7-10.  Discovery in the case revealed nearly 200 bills of lading showing Connecticut as the destination for railcars moved by AERC.  *Id.*  at *8.

The District of Connecticut held that the fact that AERC could foresee that a defective boxcar was destined for Connecticut was not determinative of the personal jurisdiction question. *Id.* at *9.  Instead, the court found "[I]t is the totality of the defendant's conduct and connection with this state' that must be considered when determining personal jurisdiction, not merely conduct specifically connected to the plaintiff's cause of action." *Id*  at *9.   The District of Connecticut applied the *Denckla* rule that the unilateral activity of those who claim relationship with the defendant cannot satisfy the contact with the forum state rule. *Id* at *9

In *Nicastro*, the Supreme Court explained that purposeful availment in a products liability case requires a showing that the defendant "seek to serve" that forum's market. *Id.* "The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.*

The Supreme Court rejected the New Jersey Supreme Court's holding that New Jersey courts could exercise personal jurisdiction over a foreign manufacturer of a product so long as the manufacturer knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." *Id.* at 2785 (internal citations omitted). The New Jersey Supreme Court premised its decision on the fact that the manufacturer had a distributor agreement with a domestic company to sell that company's machines in the United States; the manufacturer's attendance at trade shows in several states, and the fact that up to four of the manufacturer's machines ended up in New Jersey. *Id.*

The Supreme Court rejected the New Jersey Supreme Court's decision and application of personal jurisdiction.  Writing for the plurality, Justice Kennedy emphasized that the true test is one of lawful authority to excise jurisdiction over a defendant where the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.*  New Jersey did not have jurisdiction over the manufacturer because its contacts did not demonstrate a purposeful availment of the protections under New Jersey law. The Supreme Court highlighted that the manufacturer had "no office in New Jersey; it neither paid taxes nor owned property there; and it neither advertised in, nor sent any employees to, the State." *Id.*  The defendant did not have a single contact with the forum state short of the product ending up in the forum state. *Id.* While there was intent to serve the U.S. market, this intent did not rise to the level of a purposeful contact that would avail the defendant to the jurisdiction of the courts of New Jersey. *Id.* As such, despite the manufacturer's intent to reach all U.S. markets and the fact that its products did indeed reach New Jersey, the Supreme Court held that the manufacturer had not purposely availed itself to the jurisdiction of the forum State's courts.

Under *Nicastro*, a defendant's participation in the national market for MTBE alone would not constitute a basis for specific jurisdiction as to any forum State not specifically targeted. While Tauber did sell MTBE in Texas, the facts are simply lacking to provide support that Tauber had sufficient contacts or presence in the Commonwealth for this Court to exercise personal jurisdiction.

> **(i)     Tauber Lacks Minimum Contacts to Subject it to Puerto Rico Courts under the *Nicastro*  Plurality's Opinion**

Puerto Rico courts have adopted the purposeful availment standard articulated by the *Nicastro* plurality. *Carreras*, 660 F.3d at 555. In *Carreras*, the First Circuit held that

"[p]urposeful availment represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior." *Id.* (quoting *Nicastro*,131 S.Ct. at  2787-88). Puerto Rico focuses on "the defendant's intentions" in its purposeful availment analysis, refusing to find jurisdiction exists based on "random, fortuitous, or attenuated contacts." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

*Carreras* involved a 2008 housing crisis deal gone bad, where two Puerto Rico citizens provided two Florida based companies down payments on two separate condominiums in Miami. *Id.* at 551. The Puerto Rico plaintiffs sued the companies in Puerto Rico to recover the down payments when the financing fell through as part of the 2008 housing crisis. *Id.* After the conclusion of jurisdictional discovery, the Puerto Rico court concluded that neither defendant had contacts with Puerto Rico sufficient to permit the exercise of jurisdiction.  *Id.* at 552. The plaintiffs appealed to the First Circuit.  *Id.*

The key jurisdictional facts are as follows, the Florida based defendant, an ISG employee, telephoned Puerto Rico plaintiffs in Puerto Rico and offered to sell each plaintiff a condominium located in Miami. *Id.* at 553. The plaintiffs were referred to ISG by a Puerto Rico real estate agent. *Id.*  For five years prior to the failed condo deal, the ISG employee had kept in touch with the Puerto Rico real estate agent by periodically sending her ISG listings via e-mail.  *Id.* In return for the referrals of plaintiff to ISG, ISG paid the local Puerto Rico real estate agent a finder's fee. *Id.*   The initial phone calls between the ISG employee and plaintiffs identified the price of the condominiums, the terms of sale, and the plaintiffs agreed in principle to purchase the condominiums.  *Id.* Again, the ISG employee contacted the plaintiffs in Puerto Rico and requested they tender the earnest money. *Id.* at 554. The payments were then sent from Puerto

Rico to Florida. *Id.* at 553. The purchase agreements were mailed to plaintiffs in Puerto Rico and each plaintiff signed the purchase agreement in Puerto Rico. *Id.*  In addition, the ISG employee visited Puerto Rico and met with one of the plaintiffs to provide details on the construction of the condominium. *Id.* The same ISG employee tried to sell a condominium in the same complex to plaintiff Carreras's brother. *Id.* None of these contacts were found to confer specific jurisdiction over the Florida based companies. *Id.*

ISG advertised the condominium complex in magazines circulated in Puerto Rico and available on flights to Puerto Rico. *Id.* ISG made sales to other residents of Puerto Rico, ISG representatives periodically called the plaintiffs and other Puerto Rico residents in an effort to market other properties, and an ISG employee made a presentation after the signing of the purchasing agreement regarding the condominium complex at issue and other ISG properties in Panama and New Orleans. *Id.*  These contacts were not found to confer jurisdiction over defendants.  *Id.*

The First Circuit found that almost all of the contacts were insufficient to support the exercise of personal jurisdiction over the Florida defendants.  The First Circuit, however, did remand the case to determine the extent of the relationship between ISG and the Puerto Rico real estate agent and to consider the listings directed to Puerto Rico.  *Id.* at 556-57. All of the other contacts were found to be irrelevant or insufficient to permit the exercise of specific jurisdiction over the defendants. *Id.* at 554.

Tauber's contacts do not rise to the level of the contacts in *Carreras*, which were found not establish personal jurisdiction.  There is no evidence that Tauber, or any distributor or agent purporting to act on its behalf, ever solicited, advertised or marketed the sale of gasoline or MTBE in Puerto Rico, nor has it ever taken any actions to create a market for gasoline or MTBE

in Puerto Rico. *See* Declaration of Kevin Wilson at ¶ 7. Tauber lacks the minimum contacts to

avail itself to the jurisdiction of Puerto Rico courts.

### (ii) Tauber's Contacts do not Satisfy the Test for Minimum Contacts in the *Nicastro* Concurrence or Dissent

If this Court applies the narrower rule articulated in the concurrence in *Nicastro*, Tauber

lacks minimum contacts to avail itself to Puerto Rico's jurisdiction. Justice Breyer wrote for the

concurrence in *Nicastro* and concluded there was no specific jurisdiction over the British

manufacturer. *Nicastro*, 131 S.Ct at 2791. Specifically, the American Distributor on one

occasion sold and shipped one machine to New Jersey, the British Manufacturer expressed a

willingness to the American Distributor to sell the machines to anyone in America that wanted

one, and the representatives of the British Manufacturer attended a trade show in Las Vegas. *Id.*

There was no effort by the British Manufacturer to advertise, advise or market in New Jersey. *Id.*

Further there was no list of potential customers in New Jersey that the British manufacturer met

with or targeted. *Id.* at 2792. As such, the Court required "something more" than these contacts

to find specific jurisdiction over the British Manufacturer.

Tauber's contacts with Puerto Rico, however, do not even meet the narrower test put

forth by Justice Breyer. Like the company in *Cecarelli* that stored and moved boxcars from

shippers to Union Pacific train lines, Tauber did not enter into any contracts in Puerto Rico, did

not solicit business in Puerto Rico, and did not conduct a course of business in Puerto Rico.

Tauber did not have a distributor agreement with a Puerto Rico company. *See Cecarelli*, No.

3:09cv1590 (MRK), 2012 U.S. Dist. LEXIS 122287 at *8-*11.

Tauber made no sales in Puerto Rico. Declaration of Wilson at ¶¶ 31-34. It has only brokered sales in Oklahoma, which were delivered in Texas. *Id.* at ¶44.[9] Tauber does not have distribution relationship with a company to distribute MTBE in or to Puerto Rico.  Tauber has no agent that solicited business in Puerto Rico to sell MTBE or gasoline containing MTBE. *Id.* at ¶¶ 7, 9. Tauber was paid the same for its brokerage of the MTBE sale regardless of the ultimate destination of the product. *Id.* at ¶ 42. There was never "something more" as is discussed in the *Nicastro* concurrence. There was no special Puerto Rico related design, advertising, advice, marketing or anything else.  *See Nicastro*, 131 S.Ct. at 2791-92.

Even if the Commonwealth could establish that Tauber "knew" its products were being shipped to Puerto Rico, mere knowledge that a product might or may be shipped to the forum state does not constitute purposeful availment as the Supreme Court of the United States confirmed.  *World-Wide Volkswagen*, 444 U.S. at 295. Tauber was without any and all rights to information, as well as all power to direct or control the MTBE shipment itself once PPC, PCC or Phillips 66 took title to the MTBE. As Tauber's witness confirmed, Tauber understood that once title transferred, PPC, PCC or Phillips 66 was free to ship the MTBE to any location, resell it, or dispose of it in any way at any destination without Tauber's consent, control or knowledge. In this regard, Kevin Wilson testified as follows:

> Q.    Do you have any independent facts to indicate that this shipment of MTBE was not discharged in Puerto Rico?
> A.    I cannot tell where any of these discharge, because, again, once they're -- the FOB transactions occur and we pass title at the rail, the receiver can take it wherever they want, as often occurs.  On many transactions that I do, they ultimately end up in Asia.  This happens to me all the time.

---

[9] One transaction between Tauber and PCC was made where title transferred to PCC in Venezuela.  Under the terms of this transaction, Tauber acquired MTBE from Ecofuel which it simultaneously sold PCC.  PCC directed the MTBE to be delivered to Puerto Rico and PCC held title during transport to Puerto Rico.  Ecofuel was responsible for insurance in transit to Puerto Rico.

Dep. of Wilson 103:16-104:2. *See* Exhibit A attached to Declaration of Michael A. Walsh)

Q.      And in a circumstance where a port is labeled, do you have specific knowledge of that port changing?

A.      …no.  I don't.

Q.      Do you have any independent facts that leads you to believe that the particular shipment of MTBE that's identified in Exhibit No. 10 was not discharged in Puerto Rico?

A.      That's something you would have to go to Phillips for.  I mean, in each case that I'm being asked that, I have no way of knowing.

*Id.* at 104:16-105:3.

Tauber further testified that the destination of the petrochemical products it sold never

factored in to the negotiations for the sale of the products.   Tauber testified as follow regarding

its discussions with PPC, PCC or Phillips 66 for the sale of MTBE:

Q.      So with your communications with Marilyn Dugan [PPC], you would never, under no uncertain circumstances, discuss the destinations for products?

A.      It's none of Tauber's business.

Q.      But you -- I understand you're saying it's none of Tauber's business.  Did you ever discuss the destination of product?

A.      No.  We did not discuss that.

*Id.* at 133:13-23.

We have no involvement.  It's a free on board contract.  It passed at the rail to the ship.  We do not have title on the vessel.  We do not have any ownership interest whatsoever.  We have no loss exposure of the cargo. We do not participate in the inspection at point of discharge.  We are done. That [destination information] is there to communicate, and it's there -- and it's quite odd that it's there, because, of all the files that we could go back and we could look at, with many other products over long periods of time, you wouldn't see that information there.  Because it's just what Marilyn did.  She conveyed it in that way.

*Id.* at 135:7-19.

In its complaints, the Commonwealth only alleges that "Defendants" "knew or should

have known" that gasoline or products containing MTBE would be delivered to the

Commonwealth. The Commonwealth alleges no other jurisdictional facts and failed to identify

any jurisdictional facts in response to Tauber's jurisdictional discovery.  *See* Exhibit H attached

to Declaration of Michael A. Walsh.  Even under the dissenting opinion in *Nicastro*, Tauber

lacks the contacts with the Commonwealth sufficient to conclude that it availed itself of the

jurisdiction of the courts in the Commonwealth and Plaintiff has failed to establish personal

jurisdiction over Tauber in this case.

The *Nicastro* plurality and dissent agreed that to confer specific jurisdiction "something

more" than merely having a product in the stream of commerce was necessary.  For the dissent

there was "something more" in *Nicastro.*  What the dissent found persuasive for jurisdictional

purposes was:

> In a November 23, 1999 letter to McIntyre America, McIntyre UK's president
> spoke plainly about the manufacturer's objective in authorizing the exclusive
> distributorship: "All we wish to do is sell our products in the [United] States--and
> get paid!" . . . the product was built and designed by McIntyre Machinery in the
> UK and the buck  stops here--if there's something wrong with the machine. . . .
> the manufacturer engaged McIntyre America to attract customers "from anywhere
> in the United States. . . . In sum, McIntyre UK's regular attendance and
> exhibitions at ISRI conventions was surely a purposeful step to reach customers
> for its products "anywhere in the United States. . . Adjudicatory authority is
> appropriately exercised where "actions by the defendant *himself*" give rise to the
> affiliation with the forum.

*Nicastro*, 131 S.Ct. at 2797.

Moreover, the dissent, citing *Asahi*, a case involving a component part manufacturer,

stated:

> The Japanese valve-assembly manufacturer was not reasonably brought into the
> California courts to litigate a dispute with another foreign party over a transaction
> that took place outside the United States. . . In any event, *Asahi*, unlike McIntyre
> UK, did not itself seek out customers in the United States, it engaged no
> distributor to promote its wares here, it appeared at no tradeshows in the United
> States, and, of course, it had no Web site advertising its products to the world. . .
> Moreover, *Asahi* was a component-part manufacturer with "little control over the
> final destination of its products once they were delivered into the stream of
> commerce." It was important to the Court in *Asahi* that "those who use Asahi
> components in their final products, and sell those products in California, [would
> be] subject to the application of California tort law. To hold that *Asahi* controls
> this case would, to put it bluntly, be dead wrong.

*Id.* at 2803 (emphasis added) (internal citations omitted).

What is clear from *Nicastro* is that the Supreme Court has rejected the notion that a "stream of commerce" doctrine can displace the requirement that the plaintiffs demonstrate Tauber's purposeful availment to satisfy the constitution's requirement of "fair play and substantial justice."   Here, all that can be said of Tauber is that it freely availed itself of its telephone in Houston to transact business with an Oklahoma company for a spot sale of MTBE. One thing no Court has permitted is a defendant such as Phillips, through its own separate jurisdictional facts to somehow confer personal jurisdiction over a defendant such as Tauber.

> **b.    The Exercise of Specific Jurisdiction over Tauber is Unreasonable**

This Court's exercise of jurisdiction over Tauber would be unreasonable. Even if the defendant's contacts with Puerto Rico satisfied the test that it has purposely availed itself to the jurisdiction of the forum state, the Tauber may defeat jurisdiction by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.,* 471 U.S. at 477.

This Court has considered five factors in determining the reasonableness of an exercise of jurisdiction:

> (1) the burden on the defendant, (2) the interests of the forum State, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, [and] (5) the shared interest of the several States in furthering fundamental substantive social policies.

*In re MTBE*, No. 1:00-1898, MDL 1358 (SAS), 07-civ-10470, 2013 U.S. Dist. LEXIS 99288 at *25-*26 (citing *MacDermid, Inc. v. Dieter,* 702 F.3d 725, 730 (2d Cir. 2012)).

Here, the burden to litigate this case in Puerto Rico would be significant.  Tauber is a Texas based company that has no operations, agents, or personnel located in Puerto Rico. Wilson Declaration at ¶¶ 4-17. No Tauber employee or agent has even traveled to Puerto Rico for business. *Id.* at ¶ 10. The Commonwealth delayed over five years in adding Tauber as a

defendant only adding the burden that Tauber would have to endure if required to defend this case in Puerto Rico. As such, in addition to having no contacts with Puerto Rico that allow this Court the exercise of jurisdiction over Tauber, it would be unreasonable to exercise jurisdiction over Tauber.

In this action, dozens of the vertical and horizontal participants in the petroleum market – parties who manufactured, labeled, marketed, branded, blended, distributed and allegedly released MTBE gasoline are parties.  Beyond the lack of jurisdiction over Tauber and burden on Tauber to litigate in Puerto Rico, Tauber's participation in the case will neither increase nor decrease any potential recovery in this case.  Indeed, any potential recovery against Tauber in this case would be a portion of any recovery attributable to its customer Phillips.

## VI.    Conclusion

Where, as here, there is no evidence supporting specific jurisdiction in the Commonwealth over Tauber, nothing less than the Fourteenth Amendment to the United States Constitution demands that this Court dismiss Plaintiffs' claims for lack of personal jurisdiction.

WHEREFORE, PREMISES CONSIDERED, Defendant Tauber Company respectfully requests that this Court dismiss Plaintiffs' Third Amended Complaint filed in Case No. 07-CV-10470-SAS and Plaintiffs' First Amended Complaint filed in Case No. 14-CV-1014-SAS pursuant to Federal Rule of Civil Procedure 12(b)(2).

Respectfully submitted,

_____
MICHAEL A. WALSH
NYS Bar No. 20132191
Strasburger & Price, LLP
901 Main Street, Suite 4300
Dallas, Texas 75202-3794
(214) 651-4459
(214) 651-4330 (Facsimile)
michael.walsh@strasburger.com

**ATTORNEYS FOR DEFENDANT**
**TAUBER OIL COMPANY**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on March 3, 2014, a true and correct copy of this Memorandum of Law in

Support of its Motion to Dismiss by Tauber Company was electronically served on counsel of

record via LexisNexis File & Serve.

_____
MICHAEL A. WALSH