# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: METHYL TERTIARY | ) | MASTER FILE |
| BUTYL ETHER ("MTBE) | ) | NO. 1:00-1898 |
| LIABILITY LITIGATION | ) | M21-88 |
| PRODUCTS | ) | MDL  1358(SAS) |
| | ) | |
| _____ | ) | |
| | ) | |
| COMMONWEALTH OF PUERTO | ) | |
| RICO, ET AL. | ) | |
|   PLAINTIFF, | ) | CASE NO. 07-CIV-10470 |
| | ) | (SAS) |
| VS. | ) | |
| | ) | |
| SHELL OIL CO., ET AL., | ) | |
|   DEFENDANTS. | ) | |

DEPOSITION OF
TAUBER OIL THROUGH KEVIN WILSON
DECEMBER 16, 2013
VOLUME 1

    Called as a witness by counsel for the
Plaintiffs, taken before Dorothy A. Rull, CSR, CRR,
a Certified Shorthand Reporter and Notary Public in
and for the State of Texas, on the 16th day of
December, 2013, from 12:35 p.m. to 5:12 p.m., at the
law offices of Strasburger & Price, LLP, 909 Fannin
Street, Suite 2300, Houston, Texas 77010, pursuant
to Notice and the Federal Rules of Civil Procedure.

1  would be to their discretion what vessel they load
2  the contracted volume on to.
3       Q.    So in --
4       A.    Now, it would have to be ran by us
5  for -- for vessel particulars.  We would take that
6  information and pass it to our supplier.  If TPC
7  rejected the vessel due to vessel size, draft
8  limitations or any other -- it's what they call
9  vetting procedures.  If -- if the vessel hasn't had
10 its proper Coast Guard certification, and had the
11 type of documents that they want to see -- because
12 this is all public record stuff out there on all
13 these vessels -- then they could disapprove and
14 disallow the vessel to be loaded.
15             So the ultimate approval to load the
16 vessel comes from the terminal party, in this case,
17 TPC.  We're the pass-through party.
18      Q.    And the destination is completely and
19 wholly irrelevant?
20      A.    It's irrelevant to Tauber.  It's
21 irrelevant to TPC.
22      Q.    Okay.
23      A.    The only people that it would be
24 relevant to here is SGS.

Kevin Wilson

Page 73

1  operations of moving -- movement of the oil.
2  BY MR. SHORT:
3      Q.    So did Marilyn have a similarly situated
4  individual like Scott Podsednik?
5            MS. FARLEY:  Objection, form.
6      A.    I can't speak to that, other than I see
7  this contract is written between Mark Matthiesen and
8  Scott.  So Mark Matthiesen is the individual at
9  Phillips who purchased this product --
10 BY MR. SHORT:
11     Q.    Okay.
12     A.    -- according to this document.
13     Q.    Do you have any reason -- any
14 independent fact to believe that the MTBE that is
15 the subject of this file did not get discharged in
16 Puerto Rico?
17           MS. FARLEY:  Objection, form.
18           MR. WALSH:  I join in that
19 objection.
20     A.    I don't.  I don't know.  I don't have
21 discharge documentation here to know if that is, in
22 fact, where it went.  I can only presume that's the
23 case.
24 BY MR. SHORT:

1    Q.    Would it be common to have discharge
2    documents?
3    A.    No.  In fact, it's strictly forbidden,
4    generally speaking.
5    Q.    And why is it strictly forbidden?
6    A.    Because it's a FOB transaction, and it's
7    quite commonplace in this industry, and just in
8    general, that you're limited to your -- you know,
9    the knowledge is limited to what you transact to do
10   and that -- that's it.
11            The industry as a whole maintains
12   that because of proprietary information.  They don't
13   want -- if I were to purchase product from Dow and
14   sell it to Chevron, and that purchase from Dow was
15   made through an intermediary like Vitol, Vitol
16   purchased it from Dow and sells it to me and Vitol
17   knows where my customer takes it, why would Vitol
18   want us in the middle of that transaction?
19            People don't share this type of
20   information.  Not in this business.
21   Q.    And the type of information, much of it
22   relating to --
23   A.    Destination.
24   Q.    -- destination, and the identity of --

Kevin Wilson

Page 75

1     A.    Of who's -- who's receiving it
2  ultimately.
3     Q.    -- the entities that are purchasing it?
4     A.    No.  The entities that are ultimately
5  consuming it or, in many cases, the entities who are
6  producing it.
7     Q.    So either upstream or downstream?
8     A.    Right.
9     Q.    Okay.
10              (Exhibit No. 6 marked.)
11              MR. WALSH:  Are you done with
12 Exhibit No. 5?
13              MR. SHORT:  Yes.
14 BY MR. SHORT:
15    Q.    And I'm handing you what is marked
16 Tauber 6.
17              MR. SHORT:  Copy for counsel.
18              MR. WALSH:  Thank you.
19              MR. SHORT:  Copy for counsel.
20              MS. FARLEY:  Thank you.
21 BY MR. SHORT:
22    Q.    And for the record, Exhibit 6 is Bates
23 numbered Tauber002277, and this document is a fax
24 from Marilyn Dugan to multiple recipients, including

1   it appear that there was 55,000 barrels of MTBE that
2   was loaded on the HMI ASTRACHEM at the TPC-Houston
3   terminal?
4         A.      Yes.
5         Q.      And to the last page --
6         A.      Yes.
7         Q.      -- next to the vessel, it says "HMI
8   ASTRACHEM/EX OMI STAR."  What does that mean?
9         A.      It means -- it likely means -- I can't
10  know for sure, but it likely means that the HMI
11  ASTRACHEM was renamed and used to be called the OMI
12  STAR.
13        Q.      And does the destination indicate Puerto
14  Rico?
15        A.      Yes.
16        Q.      Do you have any independent facts to
17  indicate that this shipment of MTBE was not
18  discharged in Puerto Rico?
19                MS. FARLEY:  Objection, form.
20        A.      I cannot tell where any of these
21  discharge, because, again, once they're -- the FOB
22  transactions occur and we pass title at the rail,
23  the receiver can take it wherever they want, as
24  often occurs.  On many transactions that I do, they

Kevin Wilson

Page 104

1  ultimately end up in Asia.  This happens to me all
2  the time.
3  BY MR. SHORT:
4       Q.     Can you give me an example of when a
5  purchaser has identified a destination and then you
6  later learned that it went to a different
7  destination?
8       A.     With MTBE?  No.
9       Q.     Well, refer to a current example that
10 you're aware of.
11      A.     Well, what happens -- happens frequently
12 in our business is they don't -- they don't label
13 it.  It's "one safe port to Far East."  It's not
14 labeled.  And they do that very specifically because
15 they don't want to expose where it's going.
16      Q.     And in a circumstance where a port is
17 labeled, do you have specific knowledge of that port
18 changing?
19      A.     Neither -- no.  I don't.
20      Q.     Do you have any independent facts that
21 leads you to believe that the particular shipment of
22 MTBE that's identified in Exhibit No. 10 was not
23 discharged in Puerto Rico?
24             MS. FARLEY:  Objection, form.

Page 105

1    A.    That's something you would have to go to
2  Phillips for.  I mean, in each case that I'm being
3  asked that, I have no way of knowing.
4             MR. SHORT:  Would you mind taking 10
5  minutes --
6             MR. WALSH:  Didn't we just take --
7             MR. SHORT:  Off the record.
8             THE VIDEOGRAPHER:  Okay.  We're off
9  the record 2:42 p.m.
10            (Recess.)
11            THE VIDEOGRAPHER:  We're back on the
12 record at 2:57 p.m.
13            (Exhibit No. 11 marked.)
14 BY MR. SHORT:
15    Q.    I'm handing you what's marked as Tauber
16 Exhibit No. 11.
17    A.    Tauber 11.
18            MR. SHORT:  A copy.
19            MR. GOOLSBY:  Thank you.
20            MS. FARLEY:  Thank you.
21 BY MR. SHORT:
22    Q.    And for the record, this document is
23 Bates stamped Tauber001246.  If you could turn to
24 Tauber001248.

1  appointment and the general nominal volume to be
2  loaded is understood, that's really all that people
3  care about.  They care about the quality, the
4  quantity, the location and the date.  And that would
5  apply to most every one of these transactions that
6  we've gone through --
7      Q.     And what --
8      A.     -- and that is what is in particular
9  importance to the commercial parties involved.
10 Other things may be important to the surveyors,
11 namely point of discharge, but not to the
12 transaction parties involved.
13     Q.     So with your communications with Marilyn
14 Dugan, you would never, under no uncertain
15 circumstances, discuss the destinations for
16 products?
17     A.     It's none of Tauber's business.
18            MS. FARLEY:  Objection, form.
19 BY MR. SHORT:
20     Q.     But you -- I understand you're saying
21 it's none of Tauber's business.  Did you ever
22 discuss the destination of product?
23     A.     No.  We did not discuss that.
24     Q.     Did you ever discuss the destination of

Kevin Wilson

Page 135

1  understand what this means.  You know, it's
2  conveying that for purposes so the surveyor can
3  communicate his loading information to the relevant
4  point of discharge, which is Puerto Rico, obviously
5  in this case.  I have no information to suggest that
6  it did not go there, but that is why that is there.
7            We have no involvement.  It's a free
8  on board contract.  It passed at the rail to the
9  ship.  We do not have title on the vessel.  We do
10 not have any ownership interest whatsoever.  We have
11 no loss exposure of the cargo.  We do not
12 participate in the inspection at point of discharge.
13 We are done.  That is there to communicate, and it's
14 there -- and it's quite odd that it's there,
15 because, of all the files that we could go back and
16 we could look at, with many other products over long
17 periods of time, you wouldn't see that information
18 there.  Because it's just what Marilyn did.  She
19 conveyed it in that way.
20 BY MR. SHORT:
21     Q.    So this is -- you're saying this is very
22 odd?
23     A.    It is odd.
24            MR. WALSH:  Let me just make sure --

Kevin Wilson

Page 168

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: METHYL TERTIARY ) | MASTER FILE |
| BUTYL ETHER ("MTBE) ) | NO. 1:00-1898 |
| LIABILITY LITIGATION ) | M21-88 |
| PRODUCTS ) | MDL  1358(SAS) |
| ) | |
| _____ ) | |
| ) | |
| COMMONWEALTH OF PUERTO ) | |
| RICO, ET AL. ) | |
|   PLAINTIFF, ) | CASE NO. 07-CIV-10470 |
| ) | (SAS) |
| VS. ) | |
| ) | |
| SHELL OIL CO., ET AL., ) | |
|   DEFENDANTS. ) | |

CONTINUED DEPOSITION OF
TABER OIL THROUGH KEVIN WILSON
DECEMBER 17, 2013
VOLUME 2

Called as a witness by counsel for the Plaintiffs, taken before Dorothy A. Rull, CSR, CRR, a Certified Shorthand Reporter and Notary Public in and for the State of Texas, on the 17th day of December, 2013, from 10:07 a.m. to 11:03 a.m., at the law offices of Strasburger & Price, LLP, 909 Fannin Street, Suite 2300, Houston, Texas 77010, pursuant to Notice and the Federal Rules of Civil Procedure.

Golkow Technologies, Inc. - 1.877.370.DEPS

1   of documents on nominations that show the
2   destination.
3       Q.      If we could then turn to Exhibit 5.  And
4   I'll direct you to Tauber002350.
5       A.      50.
6       Q.      And this is a fax; correct?
7       A.      Yes.
8       Q.      Is this similar to other faxes that we
9   discussed yesterday?
10      A.      Yes.
11      Q.      And it is from a Marilyn Dugan to a
12  number of recipients, including Tauber Houston,
13  attention Kevin Wilson?
14      A.      Yes.
15      Q.      And next to the line that says
16  "destination," is Puerto Rico indicated?
17      A.      Yes.
18              MR. WALSH:  Nathan, I'm sorry.  What
19  was that page number?
20              MR. SHORT:  It's Tauber002350.
21              MR. WALSH:  Okay.
22  BY MR. SHORT:
23      Q.      Did you ever instruct Phillips not to
24  inform you of the intended destination of MTBE you

Kevin Wilson

Page 201

1  sold to them?
2              MS. FARLEY:  Objection, form.
3       A.     It would not be relevant.  There would
4  be no cause to ask them to inform or not inform.
5  BY MR. SHORT:
6       Q.     But did you?
7       A.     Not that I recall.
8       Q.     Okay.  Did knowing of Phillips' intended
9  destination as -- as identified in this document
10 change the way that you did business with them?
11             MS. FARLEY:  Objection, form.
12             MR. WALSH:  Yeah.  Objection to the
13 form.  That's a loaded question.
14      A.     Again, there's no cause.  This is --
15 this is an FOB transaction, if I recall this one.
16             You know, the concern that any
17 operations person would have with a relative
18 movement would end with the certification of
19 quantity and quality at the title transfer point.
20 BY MR. SHORT:
21      Q.     So it wouldn't -- it wouldn't affect --
22      A.     It wouldn't affect anything.
23      Q.     -- what you did on a day-to-day basis?
24      A.     -- in any manner.