UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | **Master File No. 1:00 - 1898**<br>**MDL 1358 (SAS)**<br>**M21-88**<br><br>Civil Action |

**This Document Relates To:**

*New Jersey Dep't of Envtl. Prot., et al. v. Atlantic Richfield Co., et al.,* No. MER-L-1622-07

**PLAINTIFFS' CONSOLIDATED REPLY TO DEFENDANTS' OPPOSITIONS TO PLAINTIFFS' MOTION FOR APPROVAL OF THE PROPOSED CITGO JUDICIAL CONSENT ORDER**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    PLAINTIFFS HAVE PROVIDED A SUFFICIENT RECORD FOR CONCLUDING
      THAT THE CITGO SETTLEMENT IS NOT ARBITRARY, CAPRICIOUS OR
      UNREASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    The Available Data Support the Settlment . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    Plaintiffs' Denominator of Total Damages Has a Rational Basis . . . . . 6

            2.    Plaintiffs Have Sufficiently Addressed the Various Categories of
                  Possible Damages to Arrive at a Reasonable Denominator . . . . . . . . . 8

            3.    Citgo is Paying Its Fair Share in Settlement as Reflected in the
                  Reasonably Calculated Numerator . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    The CERCLA Case Law Cited by BP and the Non-Settling Defendants Supports
            Approval of the Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      C.    Objectors Fail to Address the Legislative Purposes Behind the Spill Act's
            Settlement Credit Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE**

*Arizona v. Acme Laundry & Dry Cleaning Co.*
    2009 WL 5170176 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Commissioner v. Century Alumina Co.*
    2008 WL 4693550 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*GEI Int'l Corp. v. St. Paul Fire & Marine Ins. Co.*
    287 N.J. Super. 385 A.2d 171,175 (App. Div. 1996) . . . . . . . . . . . . 15

*In re Envtl. Ins. Declaratory Judgment Actions*
    149 N.J. 278 A.2d 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re MTBE Products Liability Litigation*
    578 F.Supp.2d 519 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . 2, 8

*In re Tutu Water Wells CERCLA Lit.*
    326 F.3d 201 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Kelley v. Wagner*
    930 F. Supp. 293 (E.D. Mich. 1996) . . . . . . . . . . . . . . . . . . . . . . . 14

*New Jersey Dept. of Envtl. Prot. v. Dimant*
    418 N.J. Super. 530 A.3d 780,786 (App. Div. 2011) . . . . . . . . . . . . 15

*New Jersey, Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs.*
    821 F. Supp. 999 (D.N.J. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*NJDEP v. Occidental Chem. Corp.*
    2012 WL 1392597 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Pitney Bowes, Inc. v. Baker Indus., Inc.*
    277 N.J. Super 484 (App.Div. 1994) . . . . . . . . . . . . . . . . . . . . . . . 16

*Seigel v. New Jersey Dept. of Envtl. Prot.*
    395 N.J. Super. 604 A.2d 461, 466 (App. Div. 2007) . . . . . . . . . . . . . 5

*Twp. of Voorhees v. New Jersey Dep't of Envtl. Prot.*
    149 N.J. 119, A.2d 97, 106-107 n.3 (1997) . . . . . . . . . . . . . . . . . . 15

*United States v. Allied Signal, Inc.*
    62 F.Supp.2d 713 (N.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . 13

*U.S. v. Cannons Engineering Corp.*
    899 F.2d 79 (1st Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . 14-15, 16

*United States v. Kramer*
    757 F. Supp. 2d 511 (D.N.J.2010) . . . . . . . . . . . . . . . . . . . . . . . . 15

*U.S. v. Montrose Chemical Corp of California*
    50 F.3d 741 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Plaintiffs respectfully submit this Consolidated Reply in response to the Non-Settling Defendants' Memorandum in Opposition to Plaintiffs' Motion for Approval of the Proposed Judicial Consent Order as to Citgo Petroleum Corporation (Doc. # 357) ("Non-Settling Defendants' Brief") and BP Defendants' Memorandum in Opposition to Plaintiffs' Motion for Approval of the Proposed Citgo Judicial Consent Order  (Doc. # 359) ("BP Brief").  The Non-Settling Defendants' and BP Defendants' (collectively, "Objectors'") Briefs In Opposition to Plaintiffs' settlement with Citgo are without merit.  The evidence submitted by Plaintiffs and by Citgo in support of the Citgo settlement provides a more-than-sufficient basis for the Court to conclude that the settlement is not arbitrary, capricious or unreasonable and should be approved.

Objectors complain that the information upon which the Citgo settlement is based is incomplete and this prevents the Court from accurately assessing the relative liability of Citgo and Objectors.  As Plaintiffs explain in their motion to approve the settlement, however, the statewide settlement with Citgo was necessarily based on available statewide data (which has been provided to Objectors) and the limited amount of site-specific data generated through discovery on the Phase I Trial Sites (which Objectors also have).   Site specific discovery with respect to the *more than 5,000* additional MTBE-contaminated sites in New Jersey would have been impractical and contrary to CMO # 65 (establishing a bellwether approach to Phase I discovery and trial).

Detailed knowledge about Plaintiffs' MTBE damages and defendants' liability at every site is simply not available at this stage of the litigation.   Under the Objectors' approach, no settlements could be approved until the very end of the case.  The approach would impact not only the Citgo settlement but also the Valero, Hess and George E. Warren settlements that will soon be submitted for approval, as well as other settlements that are currently being discussed.

As this Court has previously stated, "the review of the settlement is based upon the evidence as it exists at the time of the settlement." *In re MTBE Products Liability Litigation*, 578 F.Supp.2d 519, 529 (S.D.N.Y. 2008).  Plaintiffs reasonably projected their damages and Citgo's responsibility for those damages using the relevant and reasonably available evidence.

Objectors incorrectly and selectively use data to attack the basis for the Citgo settlement. BP, for example, argues that the 700 parts per billion ("ppb") MTBE level used by Plaintiffs to determine that approximately 10% of contaminated sites in the State are similar to Plaintiffs' Trial Sites is unreliable because it is lower than the average MTBE levels at Plaintiffs' Trial Sites (which exceeds 9,000 ppb).  The 700 ppb used by Plaintiffs, however, is consistent with the *median* MTBE contamination level of 726 ppb at the Trial Sites.  It would have been wrong to use the *average* concentration BP advocates for the Trial Sites, because the concentration at one of those sites is an outlier that skews the average dramatically upward (approximately 62,000 ppb compared with less than 15,000 ppb at all of the other Plaintiff Trial Sites).  A median provides a better estimation than an average when considering central tendencies in data with outliers.[1]  *See* Declaration of Anthony Brown ("Brown Decl."), ¶ 11.

Similarly, Non-Settling Defendants' argument that the list of 128 Citgo-associated sites in Plaintiffs' databases is incomplete ignores the fact that Plaintiffs also factored into their assessment of Citgo's liability Energy Information Administration ("EIA") data on Citgo's market share for gasoline sold for local consumption in New Jersey.  This data reflects statewide sales by Citgo and accounts for both Citgo-associated stations and all other stations to which Citgo supplied gasoline – including Trial Sites with which Citgo is associated.

---

[1] In addition to being statistically incorrect, BP's argument is disingenuous.   BP would not argue in any context other than opposing the Citgo settlement that MTBE contamination levels are *higher* than estimated by Plaintiffs.

To gain what would be an unfair advantage in the remainder of this litigation and at trial, Objectors ask the Court to approve the Citgo settlement only if the Court also limits Plaintiffs' available damage claims and theories of recovery (*e.g.,* costs of testing private wells, treatment of drinking water). Objectors argue this is necessary because Plaintiffs did not base their total estimated damages (*i.e.,* denominator) on all of their possible damage claims and theories.

Objectors cite no authority for the proposition that a settlement evaluation must be based upon maximum potential recovery under all possible damage and liability theories. Such a requirement would contravene longstanding and widely accepted public policy that favors settlements over continued litigation. Plaintiffs' only obligation is to provide a *reasonable* denominator of their damages based on available evidence. Here, Plaintiffs developed a reasonable denominator based on damages developed for the Phase I Trial.

Plaintiffs' numerator is also reasonable. In determining an appropriate numerator, Plaintiffs properly considered a number of factors, including the limited number of Citgo-associated stations, Citgo's market share, Citgo's defenses and arguments (many of which are detailed in Citgo's Initial Brief and its Reply In Support of Plaintiffs' Motion for Approval of the Judicial Consent Order), the timing of the settlement, and the uncertainties of litigation. These are all garden-variety, well accepted factors properly considered both by settling parties and courts when evaluating the reasonableness of a settlement. Objectors inflate Citgo's numerator by ignoring the liability of other defendants at Citgo sites and assuming Citgo is solely liable at those sites. This is transparently wrong.

Finally, Objectors' arguments should be given even less weight in light of the following facts. Objectors do not argue that Citgo is paying too little. They do not offer their own denominator (despite the fact that they have the same information as Plaintiffs). They do not

dispute that it is their burden to allocate damages, yet they make no attempt to do so.[2]  Rather, Objectors say they need to know more and demand what is impractical to give before the end of the entire case: (1) additional information that could only be provided by discovery on and expert reports related to all 5,000+ sites; (2) an exact dollar amount of damages; (3) a specific determination as to percentage of liability for each defendant as to each site; and (4) a commitment by Plaintiffs to reveal trial strategy and forego alternative theories of damages.

In short, Objectors do not claim that the settlement is unreasonable or harmful to them based on what is currently known.  Rather, they argue that in the future information not currently available may show that the Citgo settlement adversely affected their interests.  This is not a basis for disapproving a settlement that is eminently fair based on the present facts and projections.  Objectors, of course, can always avoid the risk of adverse future impacts by settling today, as Citgo did.

As a "solution" to the false problems they create, Objectors propose stripping the Spill Act of its mechanism for crediting settlement proceeds on a dollar for dollar basis.  Objector's Brief at 4; BP Brief at 2.  The Spill Act, however, *deliberately* shifts to non-settling defendants the risk of others settling based on necessarily imperfect information by limiting non-settler offsets to the dollar amount of a settlement, rather than a pro rata reduction of liability.  This encourages settlements, and especially early settlements such as Citgo's settlement here.  The New Jersey Legislature *intentionally* adopted a statutory scheme that allocates settlement risk

---

[2] The exception is BP's argument that Citgo is responsible for some 90% of MTBE at the 5 Points BP site.  *See* BP Brief at 4 and accompanying Declaration of Dr. Robert Powell.  As noted by Plaintiffs' expert Marcel Moreau, however, Dr. Powell's theory that all of the MTBE contamination at the 5 Points Site can be accounted for by a loose manway bolt at the top of the fuel tank when the site was a Citgo-branded station is contrary to inventory records for the station and to industry delivery standards.  Declaration of Marcel Moreau, dated Mar. 10, 2014 ("Moreau Decl."), ¶ 2.  Dr. Powell does not address at all the MTBE in soils along the pipes and near the dispenser island that were in use while the station was a BP station.  Moreau Decl. ¶ 8.

differently than other statutory or common law schemes.  Objectors ask the Court to ignore the Spill Act approach for the very reason the Legislature adopted it – it shifts risk to non-settling defendants.

Plaintiffs and Citgo have provided the Court with a detailed explanation of the basis for their settlement.  The settlement is not arbitrary, capricious or unreasonable, but rather is rational and fully justified.  The settlement should be approved and the way cleared for further settlements that could bring this litigation to an end in our lifetimes.

I.    **PLAINTIFFS HAVE PROVIDED A SUFFICIENT RECORD FOR CONCLUDING THAT THE CITGO SETTLEMENT IS NOT ARBITRARY, CAPRICIOUS OR UNREASONABLE.**

Objectors do not challenge the general principles governing settlement approvals cited by Plaintiffs.  These principles include deference to the administrative agency that entered into the settlement, a preference for encouraging settlements, acceptance of the fact that late or non-settlers may pay a disproportionate share, and settlements are to be approved unless demonstrated to be arbitrary, capricious or unreasonable.  *See Seigel v. New Jersey Dept. of Envtl. Prot.*, 395 N.J. Super. 604, 613, 930 A.2d 461, 466 (App. Div. 2007).  Objectors' arguments, when distilled to their essence, are that Plaintiffs used imperfect information to estimate damages and Citgo's reasonable share of liability for those damages.  As this Court has previously determined, however, this is not a basis for disapproving a settlement.

A.    **The Available Data Support the Settlement.**

With one exception, Objectors do not dispute the data upon which Plaintiffs base the Citgo settlement.[3]  Rather, they claim there are inconsistencies in Plaintiffs' use of the data to

---

[3] BP argues that the number of sites in the HazSites database with most recent MTBE detections that exceed 700 ppb is 401, rather than the 498 noted in Plaintiffs' Motion.  BP Brief at 21.  Plaintiffs do not know how BP queried the database, but note two things.  First, Plaintiffs

develop the total damages (the "denominator") and Citgo's approximate share of such damages (the "numerator").  A close examination of these arguments, however, reveals that Plaintiffs' analysis of the data is not inconsistent at all, but rather is rational, fully justified and consistent with the statewide approach to settlement that Plaintiffs have taken with Citgo and others.

> **1.**    **Plaintiffs' Denominator of Total Damages Has a Rational Basis.**

As explained in Plaintiffs' opening brief, Plaintiffs reasonably considered the calculated damages at the Plaintiffs' 10 Trial Sites to be representative of damages at approximately 10% (498 sites) of sites where the latest data point in NJDEP's databases for MTBE groundwater contamination was equal to or greater than 700 ppb.

BP argues that Plaintiffs' use of 700 ppb was arbitrary because the *average* maximum MTBE concentration at the Plaintiffs' 10 Trial Sites was 9,238 ppb, or over 13 times the 700 ppb used by Plaintiffs.  (BP Brief at 20).  BP's analysis, however, ignores a basic tenet of statistics – the median, and not the average (mean), is a better measure of central tendency when a data set includes outliers that skew the distribution and have a disproportionate effect on the average (mean).  (*See* Brown Decl. ¶ 11.).

MTBE concentrations at the 10 Trial Sites have such an outlier, with one value being greater than 62,300 ppb and all others being less than 15,000 ppb.  (BP Brief, Exhibit G, Powell Declaration, Attachment F; Brown Decl. ¶ 11.).  This results in the average of the concentrations being skewed upward to a number that is not representative of the central tendency of the data.  (*Id.*).  While the average is 9,238 ppb, the median (*i.e.,* middle number) is 726 ppb.  Plaintiffs' use of 700 ppb was consistent with the statistically more representative median, rather than a

---

provided BP and other defendants with the same databases used by Plaintiffs.  Second, the discrepancy between 401 and 498 is so small as to not be relevant when evaluating damages for settlement purposes in a case of this magnitude.

misleading average. This approach was correct and it was certainly not arbitrary, capricious or unreasonable. (*Id*).

BP further argues that Plaintiffs' data is stale and speculates that MTBE concentrations today might be lower due to cleanup and natural attenuation. (BP Brief at 21). BP also argues that the number of sites exceeding 700 ppb is 401, not 498.[4] (*Id*.) The Non-Settling Defendants similarly point out that one of the Defendants' Trial Sites is included in Plaintiffs' list of sites, with most recent MTBE detections of 700 ppb or higher, although Plaintiffs' experts determined damages at this site were negligible. (Non-Settling Defendants' Brief at 10). All of these arguments suggest that Objectors believe the denominator Plaintiffs calculated is too large and should be smaller. A smaller denominator, however, would mean that Citgo's settlement amount of $23.25 million constitutes an even higher percentage of the total liability, which benefits rather than prejudices Objectors.

Other Objector arguments suggest that Plaintiffs' denominator should be larger. BP, for example, argues that the HazSites database relied upon by Plaintiffs underreports sites, and that the true number of heavily contaminated MTBE sites is larger than the number used by Plaintiffs. (BP Brief at 21-22). HazSites data, however, are the most complete set of statewide contaminant data in the possession of the parties, and detailed discovery has not been conducted on the other 5,000+ sites in the State.[5] While the HazSites data may not be perfect, it represents the best statewide

---

[4] BP has not provided a copy of its list of 401 sites, so it is not possible to evaluate BP's assertion. However, due to the nature of the data, it is highly likely that BP's consultant simply queried the this data differently than Plaintiffs.

[5] Similarly, Non-Settling Defendants point out that many of the Plaintiffs' Trial Sites are not among the 498 contaminated sites in the HazSites database with 700 ppb or greater in the last data recorded in the database. (*See* Non-Settling Defendants' Brief at 10). As explained above, however, Plaintiffs must rely upon the best available statewide data. Defendants fail to mention that no HazSites for two of the Plaintiffs' Trial Sites. In addition, the latest MTBE concentrations data was entered into HazSites (as opposed to other sources, such as defendants'

information currently available on this topic. *See In Re MTBE, supra,* 578 F.Supp.2d at 529 ("the review of the settlement is based upon the evidence as it exists at the time of the settlement"). BP, of course, is unlikely to argue that the data understate the Plaintiffs' damages anywhere other than in its objections to the Citgo settlement.

Objectors also complain that Plaintiffs did not consider the passive-use damages calculated by Plaintiffs' expert Dr. Kevin Boyle, which are larger than those calculated by Plaintiffs' experts Anthony Brown and Robert Unsworth. (*See* Non-Settling Defendants' Brief at 15; BP Brief at 14-15). Dr. Boyle, however, testified that the passive-use damages he calculated are an alternative to those calculated by Anthony Brown and Robert Unsworth. (*See* Axline Decl., Ex. A (Depo. of Kevin J. Boyle, Ph.D., at 81:23-82:4; 83:20-84:5). He also stated that his damages were not limited to a single site, but provided evidence of how communities value water. (*See id.* at 159:24-160:8). He did not provide calculations of damages that Plaintiffs will actually seek from Defendants. Rather, Dr. Boyle's value estimates were provided to establish a context for the State's claims. Plaintiffs will not be seeking damages for the Phase 1 Trial Sites in the amount of the passive-use damages calculated by Dr. Boyle. Dr. Boyle's damage assessments therefore were properly not included in Plaintiffs' damage calculations for purposes of arriving at a fair value for a settlement with Citgo.

### 2. Plaintiffs Have Sufficiently Addressed the Various Categories of Possible Damages to Arrive at a Reasonable Denominator.

Non-Settling Defendants assert that Plaintiffs did not consider in calculating the denominator five categories of possible damages: (1) costs of past and future testing of water supplies; (2) costs of past and future treatment of drinking water supplies; (3) past and future

---

consultants) for the Ridgewood Shell and Exxon Livingston Trial Sites are 614.2 ppb and 514 ppb respectively, which is close to but not quite as high as the 700 ppb threshold used to calculate damages for settlement purposes.

monitoring costs; (4) past cleanup and removal costs; and (5) attorney's fees and costs. These categories are not distinct, however, and necessarily overlap with categories reasonably used by Plaintiffs to calculate their damages. The first four categories, for example, are complementary to Primary Restoration *(i.e.,* cleanup of the contaminated groundwater). If MTBE-contaminated groundwater is cleaned up and the groundwater is restored, the need, and therefore any projected costs, to test and treat drinking water in private and public wells is diminished. Similarly, the need and costs to monitor the State's groundwater is reduced if sites statewide are being restored.

At this early bellwether stage in the litigation, Plaintiffs cannot be forced to select the final basis for a statewide damage claim. Plaintiffs attempted to avoid potentially duplicative claims when determining a denominator and therefore focused on Primary and Compensatory Restoration. If the parties are unable to settle the case, and Plaintiffs ultimately proceed to trial against a small number of remaining defendants with respect to statewide claims, Plaintiffs should have the flexibility to select the remedy which is most appropriate at the time. Plaintiffs may elect, for example, to select wellhead MTBE treatment as the most appropriate method of achieving groundwater restoration in later phases of the case. Objectors' argument that the Court treat damages estimated for the Trial Sites as a binding and permanent election of remedies for all phases of the case should be rejected.

More importantly, Objectors cite no authority (and there is no authority) for the proposition that a settling plaintiff must separately consider all potential theories of liability and damage claims when developing a denominator.

As to cleanup and removal costs, statewide databases do not provide information regarding historic reimbursement of such costs. Determining such costs with respect to more than 5,000 sites is not practical at this stage of the litigation. Those costs in any event, as with

attorneys' fees and costs, will be relatively modest as compared to the $1.14[6] to $3.32 billion in estimated total damages.

Plaintiffs took a reasoned and realistic approach to settlement, both in their own calculations and in negotiations with Citgo. The same approach has been, and will be, followed in negotiations with other defendants. Of course, there are a number of factors that affect each individual negotiation (such as timing, levels of liability, strength of the Plaintiffs' case against a particular defendant, a particular defendants' defenses and litigation risk). And, as is the case with most litigation, the approach taken during settlement need not be, and often is not, the one taken during trial. But the contention by Objectors that Plaintiffs are approaching damages one way for Citgo and a different way for other defendants is simply not true, and ignores the fact that Plaintiffs developed their bellwether trial case in the same way for all defendants.

Objectors' novel approach to the relationship between settlement and trial is simply an attempt to gain an unfair strategic advantage in the remaining portion of the litigation, and should be rejected.

### 3.   Citgo Is Paying Its Fair Share in Settlement as Reflected in the Reasonably Calculated Numerator.

Objectors argue that Citgo is associated with more than the 128 sites Plaintiffs assumed for purposes of determining a numerator for Citgo, and complain this means that the Plaintiffs' numerator for Citgo is too small. To illustrate this point, Objectors point out that some of the Trial

---

[6] The Non-Settling Defendants argue that the reference by Citgo to $1.14 billion in damages as the low range denominator understates the low range of the damages. (*See* Non-Settling Defendants' Brief at 9 n.4). In addition to using statewide databases and site specific information on Trial Sites in estimating statewide damages, however, Plaintiffs also compared damages in New Jersey to damages awarded in the New Hampshire verdict. Based upon that comparison, Plaintiffs estimated the New Jersey damages would be approximately $1.14 billion to $2.65 billion. *See* Memorandum of Law in Support of Plaintiffs' Motion to Approve the Judicial Consent Order as to Citgo Petroleum Corporation Only (Doc. #345) ("Plaintiffs' Motion") at 8.

Sites with which Citgo is associated are not included on the list of 128 Citgo-associated sites in the statewide databases. (*See* Objectors' Brief at 4, 17; BP Brief at 10-11).

NJDEP's primary case management database has data fields that identify responsible parties, including the site names, program interest names, site owners, underground storage tank owners, responsible entities, responsible entities organization, etc. Plaintiffs used the data from this database as *part* of their process for determining an appropriate numerator for a statewide settlement with Citgo, and the data identified only 128 sites associated with Citgo. If Citgo's name did not fall into one of these fields (*e.g.,* as an identified site owner), Citgo's name was not associated with a site in the database. Plaintiffs provided the data from the database to Defendants in discovery, and Defendants do not argue that the data contains more than 128 sites associated with Citgo.

Site-specific discovery, on the other hand, provided additional information, including information regarding gasoline supply, not tracked by Plaintiffs' databases. Gasoline supplied by Citgo (or any other defendant) could find its way to sites that had no recorded connection to Citgo in NJDEP's databases. To account for such information on a statewide basis and in the absence of site-specific discovery on the 5,000+ other sites, Plaintiffs considered not only the 128 Citgo sites, but also Citgo's market share for gasoline sold for local consumption in New Jersey.[7] This was a rational and reasonable alternative to the impracticality at this stage of the litigation of conducting discovery with respect to over 5,000 other sites. This approach was certainly not arbitrary, capricious or unreasonable.

---

[7] BP argues that market share data should not be used at all and that Plaintiffs need to establish a nexus to site-specific discharges at each of the 5,045 sites in order to establish Citgo's expected liability pursuant to the Spill Act. (BP Brief at 16). As noted, an approach that requires discovery at over 5,000 other sites is impractical at this stage of the litigation.

Non-Settling Defendants also argue that Citgo is liable for $21 to $32 million at the four Citgo trial sites alone. (Non-Settling Defendants' Brief at 8). BP similarly argues that Citgo could be liable for as much as $75.7 to $126.1 million at the 128 Citgo sites plus the Trial Sites. (BP Brief at 12-13). Objectors completely ignore the fact that these Sites involve other defendants in addition to Citgo. The Skyline Site, for example, involves four defendants (including Citgo) and the HP Delta Site involves six defendants (including Citgo). At the Five Points BP Site, BP supplied MTBE gasoline for many years using the same the pipes and dispenser islands in place during Citgo's tenure – equipment that plainly released MTBE. Moreau Decl., ¶¶ 4-6. At a minimum there are disputed issues of material fact with respect to how liability at that Site should be allocated. Objectors' assumption that 100% of the liability at these sites would go to Citgo, and their failure to mention or account for other defendants who are liable at these sites, in order to argue that the numerator for Citgo is too small, is not only wrong but disingenuous.[8]

Plaintiffs of course evaluate each settlement based not only upon available data but also upon evaluations of trial risk, defenses unique to particular defendants (including those summarized by Citgo in its briefs in support of Plaintiffs' Motion for Approval of the Judicial Consent Order), timing of settlement and other factors. Objectors do not address these factors, much less explain why they should not have been considered in evaluating the Citgo settlement.

**B.    The CERCLA Case Law Cited by BP and the Non-Settling Defendants Supports Approval of the Settlement.**

As noted in Plaintiffs' opening brief, analogous case law under CERCLA supports approval of the Citgo settlement. Objectors cite several CERCLA cases in their objections to the

---

[8] As noted in Plaintiffs' Motion, it is Non-Settling Defendants' burden to allocate, and such allocation occurs only after liability is determined. Non-Settling Defendants do not dispute this – they simply ignore it and assume that Citgo is 100% liable at every Citgo-associated site.

Citgo settlement, but those cases involved very different facts, and the standards applied in those cases actually support the Citgo settlement.

One of the primary cases cited by Objectors is *U.S. v. Montrose Chemical Corp of California*, 50 F.3d 741 (9th Cir. 1995). In *Montrose*, the District Court relied entirely on the recommendation and report of the Special Master. That report did not provide any estimates – preliminary or otherwise – of the potential amount of natural resource damages. 50 F.3d at 744. The judge had not seen, much less independently evaluated, the record.

The Ninth Circuit in *Montrose* recognized that requiring precise information about the total damages and relative culpability of the various defendants "would contravene CERCLA's primary goal of encouraging early settlements." *Id.* at 745. The court also acknowledged that CERCLA's policy of encouraging early settlements is strengthened when a government agency charged with protecting the public interest "has pulled the laboring oar in constructing the proposed settlement." *Id.* at 746. The court found, however, that because in that case the District Court itself had seen no evidence at all, the process was flawed and the settlement could not stand. In contrast, here both Plaintiffs and Citgo have relied on extensive evidence, both from statewide databases and from discovery regarding Trial Sites, all of which was also in the possession of the Non-Settling Defendants, from which the Court may conclude that the proposed Citgo settlement is not arbitrary, capricious or unreasonable.

In *United States v. Allied Signal, Inc.*, 62 F.Supp.2d 713 (N.D.N.Y. 1999), the court rejected a settlement because the settling defendant had a majority of the liability but paid a smaller portion of the total damages – which occurred only at a single site and which were capable of precise measurement. Here, of course, Plaintiffs are State agencies and the claims involve more than 5,000 sites statewide. Objectors have not argued, and certainly have

presented no evidence, that Citgo has a significant share of liability as compared to all of the remaining defendants. Nor have they provided any evidence of what they consider to be the actual damages that should be used in evaluating the settlement.

In *Kelley v. Wagner*, 930 F. Supp. 293 (E.D. Mich. 1996), the court rejected a proposed settlement of $35,000 where a preliminary estimate of the settling defendant's total liability was $646,000. No reasons were offered as to why the settlement was so low. The court held that settlement was not roughly correlated to an acceptable measure of comparative fault and did not apportion liability according to rational estimates of fault. These are not the facts in the present case. Citgo's settlement payment at this stage of the litigation is substantial and reasonably related to its potential liability.

In *Arizona v. Acme Laundry & Dry Cleaning Co.*, 2009 WL 5170176, at *2 (D. Ariz. Dec. 21, 2009), the proposed settlement of $34,844 was rejected where the court held it could not evaluate the fairness and reasonableness of the settlement because, unlike the instant case, there was *no* preliminary estimate presented of the natural resource damages at issue.

In *Commissioner v. Century Alumina Co.*, 2008 WL 4693550 (D.V.I. Oct. 22, 2008), the settlement was rejected because "the movants provided the Court with neither a calculated apportionment of liability, nor any other substantive qualitative methodology, that it used in determining the amount that [the settling defendant] would pay in exchange for its discharge from liability." *Id.* at *6. Again, this is not the case here. Plaintiffs have presented ample information as to the facts and methodology by which Citgo's potential liability was reasonably determined.

The handful of rulings cited by the Non-Settling Defendants involved vague facts. In contrast, the typical approach and outcome to CERCLA settlements is summarized in *U.S. v.*

*Cannons Engineering Corp.*, 899 F.2d 79 (1st Cir.1990), in which the First Circuit affirmed the District Court's approval of the settlements, stating that plaintiffs are entitled to leeway in determining comparative fault and damages related to a settlement at an early stage of the litigation. *See id.* at 87-88.

The need to "encourage (and suitably reward) early, cost effective settlements…and to account *inter alia* for anticipated savings in transaction costs inuring from celeritous settlement can affect the construct." *Id.* Just as Congress under CERCLA intended the U.S. Environmental Protection Agency to have "considerable flexibility in negotiating and structuring settlements," the New Jersey Legislature intended that Plaintiffs have broad discretion to "depart from rigid adherence to formulae whenever the agency proffers a reasonable good faith justification for departure."[9] *See id.*

### C. Objectors Fail to Recognize the Legislative Purposes Behind the Spill Act's Settlement Credit Provisions.

The New Jersey Legislature adopted a liability allocation in the Spill Act similar to CERCLA and different than the common law precisely to encourage settlement, to penalize late settlers and to impose a maximum burden on those who do not settle and are found liable at trial. *See, e.g., U.S. v. Cannons Engineering Corp.*, 899 F.2d 79, 87-88 (1st Cir. 1990); *United States v. Kramer*, 757 F.Supp.2d 511, 518 (D.N.J. 2010) ("'[T]he statutory scheme contemplates that those who are slow to settle ought to bear the risk of paying more.'") (quoting *In re Tutu Water*

---

[9] CERCLA has been called "the federal analogue to the Spill Act," *New Jersey Dept. of Envtl. Prot. v. Dimant*, 418 N.J. Super. 530, 542, 14 A.3d 780,786 (App. Div. 2011), and the Spill Act has been described as "the State's analogue to CERCLA." *Twp. of Voorhees v. New Jersey Dep't of Envtl. Prot.*, 149 N.J. 119, 137, 693 A.2d 97, 106-107 n.3 (1997) (O'Hern, J., dissenting); *see also GEI Int'l Corp. v. St. Paul Fire & Marine Ins. Co.*, 287 N.J. Super. 385, 393, 671 A.2d 171,175 (App. Div. 1996), *aff'd sub nom In re Envtl. Ins. Declaratory Judgment Actions*, 149 N.J. 278, 693 A.2d 844 (1997). Analyses pursuant to CERCLA are often applied by the courts in analyzing the Spill Act. *See New Jersey, Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs.*, 821 F. Supp. 999, 1009 (D.N.J. 1993).

*Wells CERCLA Lit.*, 326 F.3d 201, 208 (3d Cir. 2003)).[10]  Objectors nevertheless argue that the

Citgo settlement should be rejected because as non-settlors, Objectors may ultimately bear a

heavier portion of the damages.  This argument was rejected by the First Circuit in *Cannons*

*Engineering, supra*.  The court there held that rewarding those who settle sooner rather than later

is "completely consonant with CERCLA's makeup."  899 F.2d at 89.  "That the cost of

purchasing peace may rise for a laglast is consistent with the method of the statute...." *Id.*

The Citgo settlement, which provides some discount to Citgo for early settlement, is fully

consistent with the purposes of the Spill Act.  In fact, the Citgo settlement appears to have

spurred other defendants to settle as well.  As noted in Plaintiffs' initial brief, substantial

settlements have been reached with Defendants Valero and George E. Warren.  Submission of

those settlements to the Court awaits the approval of this motion.  Subsequent to the filing of the

initial brief, Plaintiffs also reached a settlement in principle with Defendant Hess Corporation for

$35.5 million, which will soon proceed to the Notice and Comment process.

Objectors' awareness of these other settlements is apparently driving Objectors'

opposition to the Citgo settlement.  They wish to derail the settlement trend out of fear that the

Spill Act will place disproportionate liability on those that do not settle.

If the Court were to grant Objector's request and decline to apply the dollar-for-dollar

credit provision of the Spill Act, defendants like Citgo, who have already settled their Spill Act

liability, would be treated unfairly.  Those defendants chose to settle based in part upon the risks

posed by the dollar-for-dollar credits provisions in the Spill Act.  To remove this threat would

---

[10] In amending the Spill Act in 1991, the Legislature intended "'to encourage prompt and
effective remediation by any responsible party who might otherwise be disinclined to do so
because of the risk and burden of bearing the entire cost despite the responsibility of others for
the creation and continuation of the problem.'"  *NJDEP v. Occidental Chem. Corp.*, 2012 WL
1392597, *15 (N.J. Super.A.D. Apr. 24, 2012) (quoting *Pitney Bowes, Inc. v. Baker Indus., Inc.*
277 N.J.Super. 484, 487 (App.Div. 1994); L.1991, c. 372, § 14).

punish the very parties the Legislature intended to reward – the parties that chose to resolve their potential Spill Act liability earlier than others – and would reward those parties the Act is designed to penalize – those parties that choose not to settle.

Non-Settling Defendants cite to the settlement Plaintiffs reached in the matter of *NJDEP v. ExxonMobil* (hereinafter the "*ST Terminal Litigation*") for the proposition that Plaintiffs have, in the past, voluntarily agreed to waive the Spill Act's *pro tanto* liability in order to achieve a settlement. The *ST Terminal Litigation*, however, is not at all like the instant case. In the *ST Terminal Litigation*, ExxonMobil owned and operated a site until 1989; the two settling defendants owned it in succession after ExxonMobil. Following completion of discovery, Plaintiffs settled with the non-ExxonMobil defendants, and as part of the settlement released ExxonMobil for all post 1989 liability. Declaration of Leonard Z. Kaufmann ("Kaufmann Decl."), Ex. A (excerpt from Consent Judgment). In the *ST Terminal Litigation*, the demarcation of liability was easily discernable and plaintiffs were able to submit expert reports as to the specific amount of pre-1989 liability.

In the instant case, without statewide fact and expert discovery on thousands of sites, it is simply not practical to achieve the level of detail used for settlement purposes in the *ST Terminal Litigation*. Moreover, the *ST Terminal Litigation* was but one of scores of natural resource damage settlements reached by the Plaintiffs; the fact that the NJDEP voluntarily agreed to waive joint and several liability and the credit provision of the Spill Act in a single case involving a single site does not provide a legal basis for the Objectors to force the Plaintiffs to waive the right to hold those Settling Defendants to a dollar-for-dollar credit in this case involving thousands of contaminated sites throughout the State.

17

Although ExxonMobil as a Non-Settling Defendant here now cites the *ST Terminal Litigation* settlement with approval, ExxonMobil aggressively opposed that settlement at the time, in part by arguing that Plaintiffs did not accurately calculate the denominator. Kaufmann Decl., Ex. B (ExxonMobil Brief In Opposition To Consent Judgment). Despite ExxonMobil's protestations, the Superior Court approved that settlement. Kaufmann Decl., Ex. A.

The Objector's arguments against the Citgo settlement are not based on sound legal principles, but rather on the very concerns that courts and legislators have said should *not* stand as obstacles to settlement. The objections only serve to delay this litigation and do not provide a valid basis for not approving the Citgo settlement.

## II.   CONCLUSION

Marathon, Valero, Hess, George E. Warren and others have settled with Plaintiffs based upon the same data used to determine the settlement values used by Plaintiffs to reach a settlement with Citgo. Plaintiffs' approach is consistent with the Spill Act and the information available to the parties at the time of settlement. Plaintiffs have provided more-than-sufficient evidence for the Court to find that Plaintiffs' settlement with Citgo is not arbitrary, capricious or unreasonable. Objectors have not met their burden to prove otherwise. Plaintiffs respectfully request that the Court approve the proposed settlement and enter the Judicial Consent Order.

Dated this 10th day of March, 2014.

                                              Respectfully submitted,


                                              JOHN J. HOFFMAN
                                              Acting Attorney General


                                              _____/s/_____.
                                              GWEN FARLEY
                                              Deputy Attorney General

                                              25 Market Street
                                              P.O. Box 093
                                              Trenton, NJ 08625-0093
                                              Telephone:  (609) 984-5189


                                              _____/s/_____.

                                              MICHAEL AXLINE, State Bar #229840
                                              Attorneys for Plaintiffs
                                              MILLER, AXLINE & SAWYER
                                              A Professional Corporation
                                              1050 Fulton Avenue, Suite 100
                                              Sacramento, CA  95825-4225
                                              Telephone:  (916) 488-6688
                                              Facsimile:  (916) 488-4288

                                              *Special Counsel to the Attorney General*

**PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE**

*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*
United States District Court, Southern District of New York, Case No. 08 Civ. 00312 (SAS)

I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action.  My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

(1)   **PLAINTIFFS' CONSOLIDATED REPLY TO DEFENDANTS' OPPOSITIONS TO PLAINTIFFS' MOTION FOR APPROVAL OF THE PROPOSED CITGO JUDICIAL CONSENT ORDER**

(2)   **DECLARATION OF MICHAEL AXLINE IN SUPPORT OF PLAINTIFFS' CONSOLIDATED REPLY TO DEFENDANTS' OPPOSITIONS TO PLAINTIFFS' MOTION FOR APPROVAL OF THE PROPOSED CITGO JUDICIAL CONSENT ORDER**

(3)   **DECLARATION OF LEONARD Z. KAUFMANN**

(4)   **DECLARATION OF ANTHONY BROWN IN SUPPORT OF PLAINTIFFS' CONSOLIDATED REPLY TO DEFENDANTS' OPPOSITIONS TO PLAINTIFFS' MOTION FOR APPROVAL OF THE PROPOSED CITGO JUDICIAL CONSENT ORDER**

(5)   **DECLARATION OF MARCEL MOREAU**

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on March 10, 2014, at Sacramento, California.

*Tonya L. Zimmerman*

TONYA L. ZIMMERMAN