UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00 - 1898<br>MDL 1358 (SAS)<br>M21-88 |

**This Document Relates to:**

*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*
No. 1:08-cv-00312-SAS

# DECLARATION OF MICHAEL AXLINE IN SUPPORT OF PLAINTIFFS' CONSOLIDATED REPLY TO DEFENDANTS' OPPOSITIONS TO PLAINTIFFS' MOTION FOR APPROVAL OF THE PROPOSED CITGO JUDICIAL CONSENT ORDER

I, Michael Axline, declare:

1.  I am one of the attorneys in this case for plaintiff New Jersey Department of Environmental Protection. I have been involved in the discovery and pretrial proceedings in this action. This Declaration is based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.  Attached hereto as Exhibit A is a true and correct copy of excerpts from the deposition of Kevin Boyle, Ph.D., dated May 15, 2013.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of March, 2014, at Sacramento, California.

_____
MICHAEL AXLINE

# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl    :   Master File

Ether ("MTBE") Products         :   No. 1:00-1898 MDL 1358

Liability Litigation            :   (SAS): M21-88


This Document Relates To:

New Jersey Department of

Environmental Protection

v.

Atlantic Richfield Co., et al.

No. 08 Civ. 00312


VIDEOTAPED DEPOSITION OF KEVIN J. BOYLE, Ph.D.

Washington, D.C.

May 15, 2013

9:00 a.m.


Ref. No. 67828

Volume 1 of 3 Pages 1-345

Reported by:  Linda S. Kinkade, RDR, CRR, RMR, CSR

Video Specialist:  Michael Gay, CLVS

1 add the primary restoration result and the total
2 economic value result?
3          A.   No.
4          Q.   Okay.  So why not?
5          A.   Because the passive-use values that
6 I'm presenting in the New Jersey case are a loss
7 in value to the public in those communities.  The
8 primary restoration that Mr. Brown presents is
9 the cost of the primary restoration, and then the
10 resource equivalency that Mr. Unsworth presented
11 is to compensate for those injuries that are not
12 covered by the primary restoration interim
13 injuries.  And so those are the cost of bringing
14 the groundwater back to the condition prior to
15 the MTBE entering -- being entered into the
16 groundwater.
17          What I'm measuring is the loss to the
18 public.  And so you could look at them as in
19 terms of, you know, one is the total loss to the
20 public; the other two are the cost of programs to
21 restore the resource so that there will not be a
22 continuing injury in the future.
23          Q.   So just so that we're completely
24 clear, your testimony is that you would not take

Page 82

1 the total economic value result and add to it the
2 primary restoration number -- they are separate
3 things.
4      A.   I would not add those two together.
5      Q.   Okay.  In a case where there will be
6 primary restoration of the resource, are resource
7 equivalency analysis and a calculation of total
8 economic value alternative ways of measuring the
9 interim loss until primary restoration is
10 complete?
11          MR. KAUFF:  Objection, form.
12      You can answer.
13          THE WITNESS:  I'm sorry.  I got
14 distracted.  Could you repeat that back, please?
15 BY MR. GUTTMANN:
16      Q.   Sure.  I'll restate it.  In a case
17 where there is going to be primary restoration of
18 the resource, are resource equivalency analysis
19 and the total economic value analysis alternative
20 ways of measuring the interim loss?
21          MR. KAUFF:  Objection, form.
22          THE WITNESS:  No.
23 BY MR. GUTTMANN:
24      Q.   Okay.  You testified earlier, I

1 believe -- and correct me if I'm wrong -- that
2 once primary restoration is complete, going
3 forward from that point, the total economic loss
4 is no longer -- has been effectively neutralized;
5 is that correct?
6            MR. KAUFF:  Objection, form.  I'm
7 sorry.
8       Objection, form, misstates his prior
9 testimony.
10           You can answer.
11           THE WITNESS:  Sorry.  I need you to
12 repeat it again.
13 BY MR. GUTTMANN:
14      Q.  Okay.  We talked earlier about your
15 calculation of total economic loss, and I asked
16 you a question about what happens once primary
17 restoration is complete.  Do you recall that part
18 of our discussion?
19      A.  I recall we had that prior discussion.
20      Q.  Okay.  And after primary restoration
21 is complete, is the total economic loss that has
22 been calculated still in existence as a loss?
23           MR. KAUFF:  Objection, form,
24 hypothetical.

Page 84

1        You can answer.

2             THE WITNESS: So I think there are
3 different parts of this. The primary restoration
4 costs and the resource equivalency are
5 alternatives to the passive use.
6 BY MR. GUTTMANN:
7        Q. Okay.
8        A. So I don't view that conditioning
9 point that you -- I also qualified that previous
10 answer by saying that the primary restoration had
11 returned the groundwater to baseline conditions,
12 and my understanding from Mr. Brown's report that
13 that will happen, depending on the sites, in
14 five, ten or 15 years, and so I was adding that
15 conditioning onto the end. You know, there can
16 be, I know there are cases where there is
17 groundwater contamination and it carries on for a
18 very long period of time, but Mr. Brown in this
19 case is assuming that those restoration periods
20 are going to occur in the, you know, next decade
21 plus or minus.
22        Q. Once that primary restoration is
23 complete, which Mr. Brown says is going to take
24 place in the time frames you're talking about,

1 starting my answer.

2        Q.   Oh, I apologize.

3        A.   I may have hesitated because I was
4 thinking.  In the model we have probability of
5 contamination, and so in the studies that we had
6 there were different probabilities of
7 contamination that allowed us to estimate the
8 effect.  And so we are estimating going from a
9 probability of 1 of contamination to a
10 probability of 0.  So we're removing the
11 probability of contamination.

12       Q.   Okay.  And at the ten trial sites
13 would you expect the public's willingness to pay
14 to remove contamination to be influenced by the
15 fact that there is remediation underway at a
16 site?

17       A.   Where -- what I'm measuring is the
18 value of removing that contamination, and so that
19 can be viewed in economic terms as a benefit that
20 can be compared to the cost of the programs,
21 which is the primary restoration plus the
22 compensatory damages.  And so it's a benefit that
23 gets compared against them.

24       Q.   Well, your meta-analysis, if I

Page 160

1 understand it, yields conclusions as to how much
2 the public would pay to remediate the
3 contamination at each of the ten sites, correct?
4          MR. KAUFF:  Objection, form.
5          THE WITNESS:  So my study estimates the
6 value that the public would pay to remove
7 contamination within the geopolitical boundary
8 where the contamination site is located.
9 BY MR. GUTTMANN:
10     Q.   Okay.  And how much the public -- are
11 you suggesting that how much the public in that
12 geopolitical boundary would be willing to pay is
13 not influenced by whether or not there is already
14 remediation underway at the site?
15     A.   No, because you're looking at -- I'm
16 not measuring a value from where, you know, a
17 program of where you are right now for additional
18 remediation.  I'm estimating a value to take it
19 from contaminated to uncontaminated, so that is
20 going back to the point of the initial start of
21 remediation.
22          So when you look at it, if you're not an
23 economist, one of the things that's typical to
24 confound is the cost on the value side, and

1                C E R T I F I C A T E

2

3           I, LINDA S. KINKADE, Registered

4  Diplomate Reporter, Certified Realtime Reporter,

5  Registered Merit Reporter, Certified Shorthand

6  Reporter, and Notary Public, do hereby certify

7  that prior to the commencement of examination the

8  deponent herein was duly sworn by me to testify

9  truthfully under penalty of perjury.

10          I FURTHER CERTIFY that the foregoing is a

11 true and accurate transcript of the proceedings as

12 reported by me stenographically to the best of my

13 ability.

14          I FURTHER CERTIFY that I am neither

15 counsel for nor related to nor employed by any of

16 the parties to this case and have no interest,

17 financial or otherwise, in its outcome.

18          IN WITNESS WHEREOF, I have hereunto set my

19 hand and affixed my notarial seal this 22nd day of

20 May 2013.

21          My commission expires:  July 31, 2017

22 _____

23

24