UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————X
                                             :
IN RE: METHYL TERTIARY BUTYL                 :   Master File No. 1:00-1898
ETHER ("MTBE") PRODUCTS                       :   MDL 1358(SAS)
LIABILITY LITIGATION                          :
                                             :   No. M21-88
———————————————————          :
                                             :
This document relates to:                    :
                                             :
*New Jersey Department of*                    :
                                             :
*Environmental Protection et al.,*            :
*v. Altantic Richfield Co., et al.,*          :
08 Civ. 00312                                 :
———————————————————X

**SHIRA A. SCHEINDLIN, U.S.D.J.**

### DECLARATION OF LEONARD Z. KAUFMANN

LEONARD Z. KAUFMANN does hereby state, under penalty of perjury, that the following is true and correct to the best of my knowledge.

1.      I am a member of the bar of the State of New Jersey and am admitted to practice in the United States District Court for the Southern District of New York.

2.      I am a member of the firm of Cohn Lifland Pearlman Herrmann & Knopf which is Special Counsel to the Attorney General of New Jersey for this litigation. Thus, we are counsel for plaintiffs in this matter.

3.      I am also one of the attorneys serving as Special Counsel in the litigation encaptioned *New Jersey Department of Environmental Protection et al. v ExxonMobil Corporation et al.* venued in the Superior Court of New Jersey, Law Division Gloucester County, Docket No. L-1063-07. It is referred to hereinafter as the "ST Terminals Litigation."

4.      In the ST Terminals Litigation, plaintiffs sued defendants for, *inter alia*, natural resource damages.

5.      ExxonMobil owned and operated the facility until 1989. Defendant Kinder Morgan Liquid Terminals, LLC ("KMLT") owned and operated the facility from 1989 to 2000. Defendant Support Terminals Operating Partnership LP and its successors ("ST") owned and operated the facility after 2000.

6.      In 2011, plaintiffs reached a settlement agreement with KMLT and ST. Although ExxonMobil had participated in the settlement discussions, plaintiffs were unable to reach accord with ExxonMobil. The settlement required KMLT and ST to conduct cleanup operations to a specified level and to pay a certain amount in cash.

7.      The settlement also released ExxonMobil for all liability for post 1989 discharges. (The pertinent parts of the Consent Judgment are attached hereto as Exhibit "A").

8.      Despite receiving a complete release for liability for all discharges other than its own, ExxonMobil opposed the settlement. In opposing the settlement, it made essentially the same arguments it makes now in opposing the settlement in the matter at bar. It claimed that plaintiffs had not properly calculated the damages, and that ExxonMobil would be left with a disproportionate share of liability.  Excerpts from ExxonMobil's brief are attached hereto as Exhibit "B."

9.      As evidenced by Exhibit "A," the court did enter the Consent Judgment. Since that time, plaintiffs have served expert reports specifically delineating the pre-1989 damages.

10.      The ST Terminals Litigation remains active at this time.

11.     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

LEONARD Z. KAUFMANN

Dated: March 10, 2014

# EXHIBIT "A"

MARC PHILIP FERZAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
PO Box 093
Trenton, NJ 08625-0093
Attorney for Plaintiffs

By: Richard F. Engel
Deputy Attorney General
(609) 984-4863

Barry A. Knopf, Esq.
Leonard Z. Kaufmann, Esq.
Special Counsel to the Attorney General
Cohn, Lifland, Pearlman, Herrmann
& Knopf, L.L.P.
Park 80 Plaza West-One
Saddle Brook, NJ  07663
(201) 845-9600

Scott E. Kauff, Esq.
Special Counsel to the
  Attorney General
Law Offices of John K. Dema
11300 Rockville Pike, Suite 112
Rockville, Maryland 20852
(301) 881-5900

RECEIVED & FILED

SEP 2 8 2011

Anne McDonnell, P.J.Ch.

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, and THE ADMINISTRATOR O THE NEW JERSEY SPILL COMPENSATION FUND,<br><br>        Plaintiffs,<br><br>-vs-<br><br>EXXON MOBIL CORPORATION f/k/a EXXON CORPORATION and KINDER MORGAN LIQUIDS TERMINALS, L.L.C. f/k/a GATX TERMINALS CORPORATION,<br><br>        Defendants,<br><br>EXXON MOBIL CORPORATION f/k/a EXXON CORPORATION,<br><br>        Defendant/Third-Party Plaintiff,<br><br>-vs-<br><br>SUPPORT TERMINALS OPERATING PARTNERSHIP, L.P. and PACIFIC ATLANTIC TERMINALS, L.L.C.,<br><br>        Third-Party Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: GLOUCESTER COUNTY DOCKET NO.:  L-1063-07<br><br>CIVIL ACTION<br><br><br><br><br><br>**ORDER ENTERING CONSENT JUDGMENT** |

This matter having been brought before the Court by Marc Philip Ferzan, Acting Attorney General of New Jersey (Richard F. Engel, Esq. Deputy Attorney General appearing), and by Cohn Lifland Pearlman Herrmann & Knopf LLP, Special Counsel to the Attorney General of New Jersey (Leonard Z. Kaufmann, Esq. appearing), attorneys for plaintiffs in the within matter and on notice to David Edelstein, Esq. of Archer & Greiner, P.C. attorneys for Defendant, ExxonMobil Corporation; Ross A. Lewin, Esq. of Drinker Biddle & Reath, LLP attorneys for Kinder Morgan Liquids Terminals, LLC; and Edward F. McTiernan, Esq. of Gibbons, PC and Todd Mensing, Esq. (admitted *Pro Hac Vice*) attorneys for Support Terminals Operating Partnership, LP and Pacific Atlantic Terminals, LLC, for an order entering the Consent Judgment and the Court having read the papers submitted in support thereof and in opposition thereto, and the Court having heard oral argument, and good cause having been shown for the making and granting of the within order;

IT IS on this __28__ day of __Sept.__, 2011

ORDERED as follows:

1.    The Consent Judgment attached hereto shall be and herby is entered by the Court and effective as of this date.

ANNE McDONNELL, P.J.Ch.

_____
Hon. Anne McDonnell, J.S.C.

__✓__ Opposed

____ Unopposed

*on record*

MARC-PHILIP FERZAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
PO Box 093
Trenton, NJ 08625-0093
Attorney for Plaintiffs
By: Richard F. Engel
Deputy Attorney General
(609) 984-4863

Gordon C. Rhea, Esq.                John K. Dema, Esq.
Special Counsel to the Attorney     Scott E. Kauff, Esq.
General                             Special Counsel to the Attorney
Richardson, Patrick, Westbrook      General
& Brickman, L.L.C.                  Law Offices of John K. Dema,
1037 Chuck Dawley Boulevard,        P.C.
Building A                          1236 Strand Street, Suite 103
Mt. Pleasant, SC 29464              Christiansted, St. Croix
(843) 727-6501                      U.S. Virgin Islands 00820-5008
                                    (340) 773-6142


Barry A. Knopf, Esq.
Leonard Z. Kaufmann, Esq.
Special Counsel to the Attorney General
Cohn, Lifland, Pearlman, Herrmann & Knopf, L.L.P.
Park 80 Plaza West-One
Saddle Brook, NJ 07663

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION; THE
COMMISSIONER OF THE NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL
PROTECTION; and THE
ADMINISTRATOR OF THE NEW JERSEY
SPILL COMPENSATION FUND,

               Plaintiffs,

v.

EXXON MOBIL CORPORATION f/k/a
EXXON CORPORATION; KINDER
MORGAN LIQUIDS TERMINALS, LLC
f/k/a GATX TERMINALS
CORPORATION; and SUPPORT
TERMINALS OPERATING PARTNERSHIP
L.P.; and PLAINS PRODUCTS
TERMINALS LLC a/k/a PACIFIC
ATLANTIC TERMINALS L.C.,

               Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
GLOUCESTER COUNTY
DOCKET NO. L-1063-07

Civil Action

CONSENT JUDGMENT

     This matter was opened to the Court by the Attorney General
of New Jersey, Richard F. Engel Esq., Deputy Attorney General
appearing, and Leonard Z. Kaufmann Esq., of Cohn Lifland
Pearlman Herrmann & Knopf and Scott E. Kauff, Esq., of the Law
Offices of John K. Dema, Special Counsel to the Attorney
General, appearing as attorneys for plaintiffs New Jersey
Department of Environmental Protection ("DEP"), the Commissioner
of the New Jersey Department of Environmental Protection
("Commissioner"), and the Administrator of the New Jersey Spill
Compensation Fund ("Administrator")(collectively, "the

Plaintiffs"), Ross A. Lewin, Esq., Drinker Biddle & Reath LLP, attorneys for defendant Kinder Morgan Liquids Terminal f/k/a GATX Terminals Corporation ("KMLT") and GATX Corporation, Todd W. Mensing Esq., Ahmad, Zavitsanos, & Anaipakos, P.C. and Edward F. McTiernan Esq., Gibbons P.C. attorneys for Support Terminals Operating Partnership L.P. ("ST") and Plains Products Terminals LLC f/k/a Pacific Atlantic Terminals L.L.C. ("PPT"); (collectively, KMLT and PPT shall be known hereafter as "the Performing Parties"); and the Parties ("Parties" being defined as Plaintiffs, the Performing Parties, ST, and GATX Corporation collectively) having amicably resolved their dispute before trial:

## I.   BACKGROUND

A.     The Plaintiffs initiated this action on June 25, 2007 by filing a complaint against ExxonMobil Corp. f/k/a/ Exxon Corp. ("ExxonMobil") and KMLT, pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24 ("the Spill Act"), and the common law. The complaint was amended on May 27, 2010 to add ST and PPT as defendants.

B.     ExxonMobil, KMLT, ST, and PPT, either directly or through predecessors, operated a terminal for the storage of petroleum and other products at Third Street and Billingsport

to paragraphs 6, 7, or 8 as determined pursuant to N.J.A.C. 7:26C-4.5, incurred after the effective date of this Consent Judgment, or as otherwise provided in Section VII, the activities required by Paragraphs 6, 7 and 8 above, shall constitute the sole and exclusive obligation(s) of the Performing Parties concerning cleanup, remediation or restoration of the Site. Without limiting the foregoing, nothing in this Consent Judgment shall require, and Plaintiffs shall not otherwise demand, that the Performing Parties establish or maintain hydraulic control of contamination at or emanating from the Terminal or any other off-site location impacted by discharges at the Site.

9.    Upon the sale of the Terminal or substantially all of the assets of the Terminal to a party which is not a related entity to PPT, the Performing Parties shall jointly and severally be responsible for providing financial assurance in the amount of One Million Five Hundred Thousand Dollars ($1,500,000) and in the form of assurances acceptable to DEP under the then-applicable regulations for remediation funding sources.

## VI.  PLAINTIFFS' COVENANTS & RELEASE

10.    In consideration of the actions set forth in Section V above, and subject to the completion of all such obligations,

and except as otherwise provided in Section VII below, the Plaintiffs covenant not to sue, or to take judicial, administrative or other action for reimbursement of Past Cleanup and Removal Costs, including Post 1989 Cleanup and Removal Costs, and Future Cleanup and Removal Costs the Plaintiffs have for the Site against the Released Parties or to otherwise compel remediation pursuant to the Spill Act or otherwise.

11.     In further consideration of the performance of the obligations of Section V above, and subject to the fulfillment of said obligations, and except as otherwise provided in Section VII below, the Plaintiffs fully and forever release, covenant not to sue, and agree not to otherwise take judicial, administrative or other action for any and all of the Plaintiffs' causes of actions for Natural Resource Damages against the Released Parties.

12.     a. In consideration of the actions set forth in Section V above, the Plaintiffs fully and forever covenant not to sue, and agree not to otherwise take judicial, administrative, or other action against ExxonMobil for reimbursement of Post 1989 Cleanup and Removal Costs or to otherwise compel remediation of the Site pursuant to the Spill Act or otherwise, but the foregoing covenant not to sue and agreement shall be limited to any matters arising out of discharges at the Site occurring after November 29, 1989 only

and shall not apply whatsoever to any matter of any sort arising
out of discharges at the Site prior to November 29, 1989.

      b.   In consideration of the actions set forth in
Section V above, the Plaintiffs fully and forever
release, covenant not to sue, and agree not to
otherwise take judicial, administrative, or other
action against ExxonMobil for Natural Resource
Damages, but the foregoing release, covenant not to
sue, and agreement shall be limited to any matters
arising out of discharges at the Site occurring after
November 29, 1989 only and shall not apply whatsoever
to any matter of any sort arising out of discharges at
the Site prior to November 29, 1989.

      c.  The purpose of the foregoing provisions is to
protect ExxonMobil from any liabilities arising out of
post-November 29, 1989 discharges and to preserve in
their entirety and without prejudice any and all
liabilities of ExxonMobil to any Party attributable to
discharges at the Site of any contaminants prior to
November 29, 1989. Accordingly, the foregoing
releases, covenants and agreements shall not apply to
any claims against, or any liabilities of, ExxonMobil
related to discharges at the Site prior to November
29, 1989.

13.     Within five (5) days after entry of this Consent Judgment, Plaintiffs shall file a stipulation dismissing, with prejudice and without costs, all claims in the Complaint and Amended Complaint against defendants KMLT, ST, and PPT and dismissing, with prejudice and without costs, all claims in the Complaint and Amended Complaint against defendant ExxonMobil based on discharges at the Site from and after November 29, 1989.

## VII. PLAINTIFFS' RESERVATIONS

14.     The Performing Parties agree that the settlement terms reflected in this Consent Judgment are premised on compliance with all lawfully imposed requirements for remediation as set forth in the Spill Act, ISRA or otherwise for discharges at the Property after the effective date of this Consent Judgment as well as Performing Parties' obligation to remediate MTBE at the Site in accordance with this Consent Judgment. A material failure to implement the activities required by Paragraphs 6, 7, and 8 above may give rise to additional liability for Natural Resource Damages to the extent that such failure increases the scope or duration of injuries to natural resources, and the Department expressly reserves its right to pursue the Performing Parties for such increased scope or duration of injuries to natural resources to the extent that the Department can satisfy

# EXHIBIT "B"

MARC A. ROLLO, ESQ
DAVID F. EDELSTEIN, ESQ.
ARCHER & GREINER
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968
(856) 795-2121
Attorneys for Defendant/Third-Party Plaintiff,
 Exxon Mobil Corporation

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION GLOUCESTER COUNTY DOCKET NO.: L-1063-07 |
| Plaintiffs, | |
| v. | |
| EXXON MOBIL CORPORATION f/k/a EXXON CORPORATION, and KINDER MORGAN LIQUIDS TERMINALS, L.L.C. f/k/a GATX TERMINALS CORPORATION, | |
| Defendants. | |
| EXXON MOBIL CORPORATION, | |
| Defendant /Third-Party Plaintiff, | |
| v. | |
| SUPPORT TERMINALS OPERATING PARTNERSHIP, L.P. and PACIFIC ATLANTIC TERMINALS, L.L.C. | |
| Third-Party Defendants. | |

---

**BRIEF IN OPPOSITION TO MOTIONS TO APPROVE CONSENT JUDGMENT**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

PROCEDURAL AND FACTUAL HISTORY ............................................................ 6

        A.    THE TERMINAL .......................................................................... 6

        B.    ENVIRONMENTAL CONDITIONS AT THE TERMINAL................. 6

        C.    EXXONMOBIL'S CONTRIBUTION ACTION ............................ 7

        D.    NJDEP'S NRD CLAIMS .......................................................... 8

        E.    THE PROPOSED CONSENT JUDGMENT ........................... 8

ARGUMENT ............................................................................................................. 9

    I.    STANDARD OF REVIEW ............................................................ 9

    II.    THE CONSENT JUDGMENT DOES NOT REPRESENT A FAIR
          APPORTIONMENT OF NRD LIABILITY ..................................... 10

    III.    THE PROPOSED CONSENT JUDGMENT DOES NOT REPRESENT A
          FAIR APPORTIONMENT OF LIABILITY FOR REMEDIATION OF
          SOIL AND GROUNDWATER.................................................... 13

        A.    EXXONMOBIL IS NOT RESPONSIBLE FOR MTBE
             CONTAMINATION IN THE EASTERN TANKFIELD ...................... 14

        B.    NJDEP MISCHARACTERIZES THE RECORD CONCERNING
             THE WESTERN TANKFIELD ................................................. 16

             1.    EXXONMOBIL'S CONTRIBUTION TO PRESENT
                 CONDITIONS IN THE WESTERN TANKFIELD................. 17

             2.    GATX'S CONTRIBUTIONS TO CONDITIONS IN THE
                 WESTERN TANKFIELD ............................................ 17

        C.    NJDEP MISCHARACTERIZES THE RECORD CONCERNING
             THE PIPING ALLEY ........................................................... 19

        D.    NJDEP MISCHARACTERIZES THE RECORD CONCERNING
             THE LOADING RACK ........................................................ 20

        E.    SUMMARY ........................................................................ 22

    IV.    NJDEP DID NOT UNDERTAKE A MEANINGFUL ANALYSIS OF
          SETTLING DEFENDANTS' COMPARATIVE FAULT. ..................... 22

    V.    THE PROPOSED CONSENT JUDGMENT VIOLATES PROCEDURAL
          DUE PROCESS.................................................................... 24

CONCLUSION........................................................................................................ 25

i

**ARGUMENT**

## I.   STANDARD OF REVIEW

"In assessing a proposed consent decree, the Court must 'satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that [the applicable statute] is intended to serve." United States v. Alliedsignal, Inc., 62 F. Supp. 2d 713, 719 (N.D.N.Y. 1999). To be substantively fair, the settlement "must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [party] has done." Id.

The reviewing court "must eschew any rubber stamp approval in favor of an independent evaluation." Kelley v. Wagner, 930 F. Supp. 293, 297 (E.D. Mich. 1996). While the court may ultimately defer to the agency when the agency has carefully applied its technical expertise to evaluate the reasonableness of the settlement, the court must first "undertake an independent assessment of the Consent Decree." Dep't. of Planning and Natural Res. v. Century Alumina Co., 2008 WL 4693550 at *3 (D.V.I. Oct. 22, 2008).[1] In other words, "[d]eference . . . does not mean turning a blind eye to an empty record on a critical aspect of settlement evaluation." United States v. Montrose Chem. Corp., 50 F.3d 741, 748 (9th Cir. 1995).

Courts have repeatedly refused to approve consent decrees when the government could not demonstrate that the settlement represented a fair apportionment of fault between the settling and non-settling defendants. See, e.g., Montrose, 50 F.3d at 746-48 (reversing trial court's approval of consent decree because plaintiff had not produced evidence of its total damages and, therefore, there was no way to determine if the settlement constituted a reasonable

---

[1] Century Alumina is an unpublished opinion, a true and correct copy of which is attached to the Certification of David Edelstein as Ex. F.

apportionment); Alliedsignal, Inc., 62 F. Supp. 2d at 723 (refusing to approve consent decree because settlement did "not apportion liability according to rational estimates of how much harm each PRP has done"); Kelley, 930 F. Supp. at 298-299 (refusing to enter consent decree because settlement amount did not represent a fair allocation of settling defendant's fault); Arizona ex rel. Arizona Dep't of Envtl. Quality v. Acme Laundry & Dry Cleaning Co., 2009 WL 5170176 at *2 (D. Ariz. Dec. 21, 2009) (refusing to approve consent decree because plaintiff did not produce evidence indicating total amount of NRD);[2] Century Alumina Co., 2008 WL 4693550 at *3-7 (refusing to enter consent decree because the agency did not provide the court with an estimate of the projected response costs).

## II. THE CONSENT JUDGMENT DOES NOT REPRESENT A FAIR APPORTIONMENT OF NRD LIABILITY

In order to determine whether the Consent Judgment represents a fair apportionment of NRD, it is necessary to compare the costs and damages that will be required in the future against the costs and damages that Settling Defendants are assuming in the Consent Judgment. As the Ninth Circuit held in Montrose, "the proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlers with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified." Montrose, 50 F.3d at 746-47.

If the record is not clear about the total damages that plaintiffs are seeking, then a court cannot approve the settlement. Id. See also Acme Laundry, 2009 WL 5170176 at *2 ("[w]e cannot evaluate the fairness and reasonableness of the parties' proposed consent decree at this

---

[2] Acme Laundry is an unpublished opinion, a true and correct copy of which is attached to the Certification of David Edelstein as Ex. G.

time because they have not provided a preliminary estimate of the natural resource damages at issue"); Century Alumina, 2008 WL 4693550 at *3-7 (court could not evaluate fairness of settlement "without an estimation of the total response costs").

Montrose is closely analogous to the present case. There, the United States and the State of California sued several corporate defendants to recover NRD and cleanup costs under CERCLA. A mediator issued a twelve page report recommending a settlement with some of the defendants based in part upon the litigation risks and the benefits to the parties of an early settlement. Id. at 745. Significantly, the mediator's report did not include an estimate of the total NRD being sought by plaintiffs. Id. The trial court approved the consent decree anyway.

The Ninth Circuit reversed, finding that the trial court could not have "adequately determined that the settlement was substantively fair without having some benchmark with which to compare it." Id. at 746. The Ninth Circuit went on to clarify that "'fair' and 'reasonable' are, by their very nature comparative terms" and, therefore, in order to determine whether the settlement represented a fair apportionment of liability the trial court needed to compare the settlement amount against the total damages. Id. at 746-47. Because the total damages were not known, it was impossible for the trial court to determine whether the settlement represented a fair apportionment. Id. at 748.

Similarly, NJDEP has not specifically articulated its alleged damages. While this case has been pending, the NJDEP lost two other groundwater NRD cases involving similar claims. In both of those cases, the trial court dismissed the NJDEP's NRD claims, finding that NRD were not appropriate because the sites were being actively remediated under SRP and there was no evidence that the public actually lost the use of any groundwater. See NJDEP v. Essex Chemical Corp., Docket No. MID-L-5685-07 (March 29, 2011) and NJDEP v. Union Carbide

11

Corp., Docket No. MID-L-5632-07 (July 23, 2010).[3]  In the wake of those decisions, NJDEP indicated that it is no longer seeking to implement the $81 million primary restoration plan called for by its experts in this case.  See Exs. J and K to Edelstein Cert.  But, NJDEP has not offered any new expert reports or explained how this modification affects, if at all, the damages it is seeking.  See Ex. L to Edelstein Cert.  Instead, NJDEP maintains that it is looking for ExxonMobil to complete the remediation and restoration of the Terminal *"whatever the scope of the future cleanup activities may be."*  See Ex. M to Edelstein Cert. (emphasis added).  ExxonMobil has repeatedly requested discovery as to any change in the relief sought by NJDEP, but NJDEP has refused, opting for a stay of discovery instead.  See Exs. N, O and P to Edelstein Cert.

Thus, it is not clear at this point whether NJDEP is still claiming $84.2 million in NRD or whether it seeks a lesser amount and, if so, what amount.  As the Ninth Circuit explained in Montrose, a court cannot "adequately determine[ ] that [a] settlement [is] substantively fair without some benchmark with which to compare."  Here, if the "benchmark" is still $84.2 million, apportioning only $1.1 million to Settling Defendants is unfair and unreasonable under any view.  If the "benchmark" is now something lower than $84.2 million, NJDEP must indicate what that new benchmark is.  Until it does so, there is simply no way to determine whether Settling Defendants payment of $1.1 million represents a fair apportionment of NRD liability.

---

[3] Essex Chemical and Union Carbide are unpublished opinions, true and correct copies of which are attached to the Certification of David Edelstein as Exs. H and I.

III.   **THE PROPOSED CONSENT JUDGMENT DOES NOT REPRESENT A FAIR APPORTIONMENT OF LIABILITY FOR REMEDIATION OF SOIL AND GROUNDWATER.**

Another fundamental problem with the proposed Consent Judgment is that it shifts the costs of remediating contamination caused by Settling Defendants to ExxonMobil.  NJDEP obscures this unfairness by claiming that ExxonMobil will be released for discharges that occurred after it sold the Terminal.  But, as a practical matter, NJDEP knows that is not true. SRP has already concluded that contamination in many portions of the Terminal is comingled, making it impossible to remediate only the contaminants still remaining from ExxonMobil's prior operations.  See Exs. B and C to Edelstein Cert.  So, unless ExxonMobil is released from responsibility for *all* comingled contamination, ExxonMobil will still be left remediating Settling Defendants' post-1989 contamination, along with its own, with no ability to recoup from Settling Defendants their fair share of the those remediation costs.

For example, under the Consent Judgment, Settling Defendants would be excused from their obligation to:

- Investigate and remediate the MTBE groundwater plume in the Eastern Tankfield, even though they are solely responsible for that plume;

- Maintain hydraulic control of the MTBE groundwater plume in the Eastern Tankfield;

- Investigate and remediate the soil contamination they caused in the Western Tankfield;

- Investigate and remediate the soil contamination they caused in the Loading Rack; and

- Investigate and remediate the soil contamination they caused in the Piping Alley.

In contrast, if the Consent Judgment is approved, SRP still will require ExxonMobil to:

- Continue pumping and treating contaminated groundwater throughout the Terminal, including the Settling Defendants' MTBE plume in the Eastern Tankfield;

13

- Continue maintaining hydraulic control of the Settling Defendants' MTBE plume in the Eastern Tankfield;

- Investigate and remediate the co-mingled soil contamination in the Western Tankfield;

- Investigate and remediate the co-mingled soil contamination in the Piping Alley; and

- Investigate and remediate the co-mingled soil contamination in the Loading Rack.

Due to the contribution protection provided to Settling Defendants in the Consent Judgment, ExxonMobil will be required to incur all of these costs without the ability to recover from Settling Defendants their fair share of the costs. This is true even though SRP's historical record confirms that Settling Defendants' discharges will substantially increase future remediation costs throughout the Terminal.

## A.   ExxonMobil is Not Responsible for MTBE Contamination in the Eastern Tankfield

NJDEP contends that it is fair to relieve Settling Defendants of their liability for cleanup costs in other portions of the Terminal because the Consent Judgment will relieve ExxonMobil of its obligation to remediate MTBE in the Eastern Tankfield.[4] This argument overlooks the undisputed record that ExxonMobil did not contribute to the MTBE in the Eastern Tankfield. Therefore, the Consent Judgment does not constitute a quid pro quo in which Settling Defendants are assuming ExxonMobil's responsibility for contamination in one portion of the Terminal, while ExxonMobil assumes their responsibility in another portion. Rather, this is a situation where NJDEP is allowing Settling Defendants to simply walk away from their remediation and restoration responsibilities outside of the Eastern Tankfield.

The only material that ExxonMobil ever stored in the Eastern Tankfield was heating oil. See Ex. Q to Edelstein Cert. Before ExxonMobil sold the Terminal to GATX, sampling results

---

[4]The Eastern Tankfield consists of an area with seven above ground tanks (Tank 174 and Tanks 176-181) located along the eastern boundary of the Terminal. See Ex. A to Edelstein Cert.

14

confirmed that there was no MTBE contamination in the Eastern Tankfield. Id.; see also

Renzulli Aff. at ¶ 11. After GATX began storing pure MTBE in the Eastern Tankfield in 1992,

groundwater sampling revealed steadily increasing trends of MTBE contamination. For

example, MTBE concentrations in one well, P-5A, jumped from non-detect in 1988 to 3,610

parts per billion ("ppb") in July 1994. See Renzulli Aff. at ¶ 14. In May 2000, MTBE was

detected in another well at a concentration of 6,400,000 ppb, and it climbed to 8,030,000 ppb by

November 2000. Id. at ¶ 16 These extraordinarily high concentrations of MTBE can only be

attributed to a discharge of pure MTBE occurring after ExxonMobil sold the Terminal. Id. at ¶

17.

Notably, SRP agrees that ExxonMobil is not responsible for MTBE contamination in the

Eastern Tankfield. SRP has explained:

> The 1988 sample results were nondetect for MTBE. Also, Exxon's 1987 storage
> records show that MTBE was not stored in these tanks. *Based on this data the*
> *NJDEP agrees with Exxon that the MTBE contamination downgradient of tanks*
> *178-181 is GATX's responsibility.*

See Ex. Q to Edelstein Cert. (emphasis added). See also Ex. R to Edelstein Cert. ("the NJDEP

considers that based upon the soil and ground water investigations performed to date, *the MTBE*

*contamination in the area of Tanks 176-181 to have occurred subsequent to Exxon's*

*occupation*") (emphasis added); Ex. D. at 257:12-260:6.

Even Settling Defendant ST's environmental consultant concluded that "it was GATX's

MTBE in the soils and groundwater." See Ex. S to Edelstein Cert. at 42:10-14. Similarly,

Settling Defendant Plains' head of remediation concluded that the contamination in the Eastern

Tankfield was from discharges of pure MTBE that post-dated ExxonMobil's operations. See Ex.
T to Edelstein Cert. at 100:12-17; 106:14-17; 110:24-111; 238:5-8.[5]

Thus, it is universally recognized that ExxonMobil is *not* responsible for MTBE in the
Eastern Tankfield. Accordingly, NJDEP's rationale for approving the Consent Judgment—that
it is fair and reasonable to release Settling Defendants from their remediation obligations in the
rest of the Terminal because ExxonMobil is obtaining a release for MTBE in the Eastern
Tankfield—is fundamentally flawed.

**B.      NJDEP Mischaracterizes the Record Concerning the Western Tankfield**

The Western Tankfield is an area in the central portion of the Terminal, generally
consisting of Tanks 164-170, 172, 173, 175 and 182, where each of the defendants stored
gasoline and other petroleum products during their respective operations. See Ex A. Unlike the
pure MTBE contamination in the Eastern Tankfield, the contamination in the Western Tankfield
primarily consists of dissolved petroleum constituents, including benzene, toluene, ethylbenzene,
and xylene (collectively "BTEX"), as well as naphthalene and MTBE. See Ex. V to Edelstein
Cert. at 2.

SRP has acknowledged that Settling Defendants are responsible for some of the
contamination in the Western Tankfield. See Ex. W to Edelstein Cert. at 10. According to SRP,
the contamination in the Western Tankfield is "a co-mingled plume" and, therefore, "it is not
possible to determine which operators are responsible for contamination in deeper soils and
ground water due to co-mingling." See Ex. C at 2. Yet, the Consent Judgment relieves Settling
Defendants of their responsibility to remediate soil and groundwater contamination in the

---

[5]Despite the numerous inspection reports revealing problems with its tanks in the Eastern Tankfield, see Ex. U to
Edelstein Cert., GATX repeatedly advised NJDEP throughout the 1990's that there was no evidence of any
problems with the tanks and refused to accept responsibility for cleaning up the steadily increasing MTBE
contamination.

Western Tankfield and provides them with contribution protection against claims by ExxonMobil for future remediation costs in the Western Tankfield.

### 1.    ExxonMobil's Contribution to Present Conditions in the Western Tankfield

ExxonMobil's pre-sale sampling revealed a large plume of petroleum in the soils, elevated levels of dissolved petroleum constituents (BTEX) in the groundwater, and several pits that had been historically used by ExxonMobil's predecessors to dispose of residue from tank-cleaning.

In the early 1990's, ExxonMobil began to actively remediate this contamination. ExxonMobil installed a system of recovery wells that have removed virtually all of the free product.  See Ex. X to Edelstein Cert. at 5; see also Renzulli Aff. at ¶ 8.  In addition, ExxonMobil has actively remediated the dissolved BTEX groundwater plume through the pump and treat system at the Valero Property.  As a result of these efforts, the dissolved BTEX plume demonstrated steadily decreasing trends through the early 1990's, which prompted the SRP to approve a modified remedial approach that was based upon natural attenuation of the contamination.  See Renzulli Aff. at ¶ 9.  ExxonMobil also excavated the majority of the tank bottom pits, and the SRP has not required any further remediation of those areas.  Id. at ¶ 8.

### 2.    GATX's Contributions to Conditions in the Western Tankfield

GATX is responsible for several significant spills in the Western Tankfield in the 1990's, which caused contaminant concentrations to significantly increase and substantially exacerbated past and future cleanup efforts in this area.

First, a leak from Tank 164 resulted in a discharge of 420 gallons of gasoline in 1993. See Ex. Y to Edelstein Cert.  One year later, the same tank leaked again, discharging at least 500

more gallons.[6]  See Ex. Z to Edelstein Cert.  Groundwater sampling demonstrated that these

discharges had a significant impact on soil and groundwater conditions.  Before the Terminal

was sold to GATX, the monitoring well adjacent to Tank 164 showed average concentrations of

benzene at 50 ppb, toluene at 191 ppb, and xylene at 336 ppb.  See Renzulli Aff. at ¶ 26.  In

1995, after the sale and the Tank 164 discharges, benzene levels increased dramatically to 2,920

ppb, toluene levels increased to 475 ppb, and xylene levels increased to 1,390 ppb.  Id.  BTEX

concentrations continued to increase for several years, peaking in 1997 at 6,900 ppb.[7]  Id. at ¶ 27.

In seeking approval of the Consent Judgment, NJDEP overlooks these discharge even though ST

and Plains acknowledge that the releases from Tank 164 impacted soil and groundwater in the

Western Tankfield.  See Ex. AA to Edelstein Cert. at 8, 10, 19, 20, 21; Ex. S at 174:3-175:2; Ex.

T at 123:13-126:2.

Second, Tank 164 was not the only leaking tank in the Western Tankfield during

GATX's operations.  In 1995, holes were discovered in Tanks 165 and 167.  See Ex. BB to

Edelstein Cert.  Groundwater sampling near those tanks demonstrated that benzene levels had

increased from pre-sale levels of 110 ppb to 3,600 ppb in 1996.  See Renzulli Aff. at ¶ 31.  By

1997, those levels had increased to 31,000 ppb.  Id.  Again, NJDEP does not discuss the effects

of these leaking tanks in its moving papers.

Third, MTBE levels also substantially increased in the Western Tankfield during

GATX's operations.  The only detection of MTBE in the Western Tankfield during

ExxonMobil's operations occurred in 1988, when MTBE was detected in well W-5 at a

concentration of 170 ppb.  See Renzulli Aff. at ¶ 37.  By 1992, ExxonMobil had successfully

---

[6]GATX's consultant originally estimated that 5,000 gallons of gasoline were discharged.  See Ex. Z to Edelstein
Cert.

[7]Sampling from the wells downgradient of Tank 164 similarly demonstrated increasing trends of BTEX
contamination after the discharges.

remediated this MTBE to a non-detect level. Id. Yet, two years later, during GATX's

operations, MTBE was detected in W-5 at a concentration of 59,400 ppb. Id. at ¶ 38. Again,

NJDEP does not consider this data.

**C.     NJDEP Mischaracterizes the Record Concerning the Piping Alley**

The Piping Alley consists of an extensive set of above-ground pipes that connect a

marine dock on the Delaware River to the tanks in the central portion of the Terminal. See Ex.

A. Free product was detected in this area before ExxonMobil sold the Terminal to GATX and,

as part of its ongoing remediation efforts, ExxonMobil has been pumping and treating impacted

groundwater beneath the Piping Alley.

This ongoing remediation has been hindered by several significant spills that occurred

after ExxonMobil sold the Terminal. SRP records demonstrate that Settling Defendants are

responsible for considerable contamination in this area.

In 1996, an estimated 93 gallons of MTBE were spilled when a truck driver left a valve

open during loading. See Ex. CC. The spill occurred in an area lacking adequate containment,

for which NJDEP had previously cited GATX. See Ex. DD. The well down-gradient of this

area, which had been non-detect for MTBE before the spill, thereafter showed consistent

concentrations of MTBE. See Renzulli Aff. at ¶ 43.

In 1997, GATX discharged 15,000 gallons of ethanol when a gasket failed. See Ex. EE.

NJDEP dismisses this spill on the grounds that it has not been the subject of discovery, but

ExxonMobil's efforts to take discovery about this spill have been blocked by the request of

NJDEP and the Settling Defendants for a stay of discovery. See Pl. Br. at 7, n.6.

In 1999, oil was found "seeping up through the ground" from a break in an underground

pipeline. See Ex. FF. Thereafter, free product began appearing regularly in a down- gradient

well.  See Renzulli Aff. at ¶ 47.  GATX made no effort to recover the free product or remediate the groundwater.

In 2003, a leaking valve sprayed 50 gallons of pure MTBE across soil in the Piping Alley.  See Ex. GG.  ST excavated the impacted surface soils, but it did not conduct any groundwater remediation.  MTBE is now present in groundwater down-gradient from this area. See Renzulli Aff. at ¶ 50.

In 2009, Plains reported a loss of 500 gallons of ethanol from a tank adjacent to the Piping Alley.  See Ex. HH.  Plains has not investigated the impacts from this discharge.

In its haste to obtain approval of the Consent Judgment, NJDEP overlooks all of these discharges by Settling Defendants.  Despite SRP's acknowledgment that Settling Defendants are responsible for soil and groundwater contamination in the Piping Alley, the Consent Judgment relieves Settling Defendants of their remediation responsibilities in this area and provides them with contribution protection against claims by ExxonMobil for future remediation costs.

**D.      NJDEP Mischaracterizes the Record Concerning the Loading Rack**

The Loading Rack is located in the northern corner of the Terminal.  It consists of several truck bays and overhead pipes where tanker trucks load and unload product.  See Ex. A. Contamination in this area primarily consists of BTEX and MTBE.  In 1985, ExxonMobil discovered a 120,000 gallon underground leak of heating oil and installed a remediation system that recovered 110,000 gallons by 1987.  See Renzulli Aff. at ¶ 8.  Since 1987, ExxonMobil has continued to remove smaller amounts of product through passive bailing.  Id.  *There is no free product left in the Loading Rack.*  Id.  NJDEP emphasizes the volume of the 1985 release in its moving papers, but it fails to mention that ExxonMobil has already removed all of the free product.

NJDEP also ignores SRP records indicating that Settling Defendants are responsible for some of the contamination currently present in the Loading Rack.  For example, SRP has explained:

> Given the length of time since [the 1985 heating oil spill] occurred, as well as, the compounds detected in shallow soils (BTEX, lead and MTBE), the NJDEP considers this contamination to be NOT solely from a historic fuel oil discharge and that an expanded investigation is warranted.
>
> Given the volatile organic compounds (VOC) detected in the shallow soils and the relatively high rate of vertical migration of these VOC, *the NJDEP considers the VOC contamination detected in 2002 to be the result of a much more recent discharge of gasoline, likely during either GATX's or ST Services' tenancy* . . ..

See Ex. II at 2 (emphasis added). See also Ex. R at 4 (the agency "continues to consider that the existence of lead, MTBE and BTEX compounds in the soils of this area are the likely result of gasoline discharges occurring at this location over a long period of time during Exxon's, GATX's and ST Services' tenancy").

Even Settling Defendants have admitted that subsequent spills during their respective operations contributed to the current conditions in the Loading Rack.  Internal GATX notes describe "new sources" of contamination in the area after 1998.  See Ex. JJ.  Likewise, the consultant for ST and Plains testified that the contamination profile in the shallow soils in the Loading Rack is most likely the result of incidental spills that post-date ExxonMobil's operations.  See Ex. S at 271:14-272:17; 276:19-25; 280:21-281:18.

Despite this record, the proposed Consent Judgment relieves Settling Defendants of their responsibility to remediate soil and groundwater contamination in the Loading Rack and provides them contribution protection against claims by ExxonMobil for future remediation costs.

E.      **Summary**

SRP's records confirm that Settling Defendants are responsible for soil and groundwater conditions throughout the Terminal.  Those records also make clear that ExxonMobil is *not* responsible for the MTBE contamination in the Eastern Tankfield.  While advocating for approval of the Consent Judgment, ONRR has ignored this record.  Given the significant impacts that Settling Defendants' discharges have had throughout the Terminal, it is unfair and unreasonable for the Consent Judgment to limit Settling Defendants' cleanup obligations to the MTBE in the soils of the Eastern Tankfield, while providing Settling Defendants with contribution protection for all other future remediation costs.   It follows that the Court should not approve the Consent Judgment.


IV.     **NJDEP DID NOT UNDERTAKE A MEANINGFUL ANALYSIS OF SETTLING DEFENDANTS' COMPARATIVE FAULT.**

As evidenced by NJDEP's mischaracterizations about the sources of contamination currently present at the Terminal, the Consent Judgment is not based upon a careful evaluation of the record, but rather broad generalizations about the parties' comparative fault that have little technical support.  In fact, the NJDEP's experts, Michael Rafferty and Harvey Cohen, testified that they did *not* undertake any comparative fault analysis.  Rafferty testified that he did not review where the contamination originated or how concentrations changed over time.  See Ex. KK at 132:18-133:8.  Similarly, Cohen testified that he "did not try to link specific contamination in groundwater to specific sources on the site."  See Ex. LL at 116:19-20; 130:14-131:8; 179:12-14; 256:3-5; 435:13-15.  Consequently, neither Rafferty nor Cohen were able to offer an opinion as to how NRD or future remediation costs should be apportioned to each of the

defendants. See Ex. KK at 132:18-133:8; Ex. LL at 118:23-119:12; 130:14-131:8; 196:10-197:6; 253:14-20; 254:21-255:1; 391:19-396:13; 432:19-435:15.

In addition, nobody within NJDEP with knowledge of Settling Defendants' discharges, or their potential impacts, evaluated the proposed Consent Judgment. NJDEP asserts that John Kosher and Maurice Migliarino reviewed the proposed Consent Judgment. See Pl. Br. at 28. Kosher is ExxonMobil's case manager working within the Bureau of Industrial Site Remediation which oversees ISRA cleanups. GATX is not subject to ISRA and, therefore, Kosher has not overseen any of GATX's actions. Kosher repeatedly testified that he lacked information about GATX's discharges. See Ex. D at 233:6-234:16; 236:11-240:19. Migliarino, Kosher's supervisor, has even less knowledge about GATX's discharges, being only peripherally involved in the day-to-day oversight of the Terminal. Thus, the two "most knowledgeable" people who participated in the negotiations had no knowledge about the liability of Settling Defendants.

The only other NJDEP employees who reviewed the proposed Consent Judgment were John Sacco and Elizabeth Fernandez, both of whom work in ONRR. But, according to Sacco, ONRR has never undertaken any effort to evaluate the comparative fault of the defendants and, consequently, does not know whose discharges are currently impacting particular areas of the Terminal. See Ex. E at 71:6-12; 69:10-70:2; 186:6-14.[8]

As this testimony demonstrates, NJDEP did not undertake a meaningful evaluation of Settling Defendants' relative fault. Consequently, it could not have reasonably determined that the proposed Consent Judgment represents a fair apportionment of NRD between Settling Defendants and ExxonMobil.

---

[8]ExxonMobil sought to depose NJDEP personnel who oversaw the investigation of GATX's spills and was told that they no longer work at the agency and could not be located. ExxonMobil thereafter issued a deposition notice to NJDEP pursuant to Rule 4:14-2(c) to take the deposition of the individual within the agency most knowledgeable about the impacts from GATX's spills. NJDEP objected to the notice and obtained a stay of discovery before the deposition could occur.