

Boston  Brussels  Chicago  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Peter John Sacripanti
Chairman
psacripanti@mwe.com
+1 212 547 5583

March 11, 2014

BY HAND DELIVERY AND ELECTRONIC MAIL

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York  10007-1312

      Re:    Master File C.A. No. 1:00-1898 (SAS), M21-88, MDL No. 1358
               *Defendants' Pre-Conference Letter for* March 19, 2014 *Conference*

Dear Judge Scheindlin:

Defendants respectfully submit this letter in advance of the March 19, 2014 conference.

**DEFENDANTS' AGENDA ITEMS**

**I.**     *Puerto Rico*: **Plaintiffs' Expert's Improper Inclusion of New Wells and Release Sites**

On January 24, 2014 Plaintiffs served the site-specific expert report of Anthony Brown. Shortly after, Defendants identified and communicated to Plaintiffs a number of serious concerns with the content of that report. *See C. Danley Ltr. to N. Short* (Feb. 10, 2014) (at Ex. A). Specifically, Defendants objected to: (1) inclusion of alleged damages for investigations at several non-Trial Site release sites in connection with opinions on the Club de Leones Well Trial Site; (2) reference to several non-Trial Site release sites in connection with opinions on the Manatí and Maysonet Trial Sites; and (3) inclusion of 173 new wells not subject to discovery.

      A.    Investigation Costs at Non-Trial Sites. As one of their Trial Sites, Defendants selected the Club de Leones well.[1] Mr. Brown improperly includes the following opinion

---

[1] Mr. Brown also impermissibly attempts to expand the scope of Defendants' selected Trial Site by stating that it consists of "two contaminated water supply wells." *Site-Specific Expert Report of A. Brown*, at 157 (hereinafter "Brown Rpt.") (at Ex. B). Contrary to Mr. Brown's current suggestion, the selected Trial Site always has consisted of **one** public supply well identified by the unique ID # S4C030W. *See S. Riccardulli Ltr. to M. Axline* (June 11, 2012) (at Ex. C). The second well to which Mr. Brown refers, the Ana Maria well, has its own unique ID. Further, Plaintiffs' discovery responses clearly have been limited to the single Club de Leones Well.

U.S. practice conducted through McDermott Will & Emery LLP.

**340 Madison Avenue New York New York 10173-1922  Telephone: +1 212 547 5400  Facsimile: +1 212 547 5444   www.mwe.com**

The Honorable Shira A. Scheindlin
March 11, 2014
Page 2

regarding the Site: "In an effort to determine the source of the MTBE contamination, eight service stations were identified by USEPA within a two-mile radius of the [] Club de Leones well. Investigations will be needed at each of these sites…. These investigations will include, at a minimum, installation of at least three groundwater monitoring wells at each site."[2] *Brown Rpt.* at 162. Mr. Brown attributes most of the alleged damages for the Trial Site to the installation and monitoring of these twenty-four proposed monitoring wells. In other words, through Mr. Brown, the Commonwealth seeks to recover for the cost of investigating eight service stations that were not the subject of discovery in this phase of the case. Indeed, of the eight stations, one was dismissed from the case pursuant to CMO 109, five were never identified by Plaintiffs as release sites (*i.e.*, never were in the case), and two are identified release sites that presumably will be the subject of a later phase of this litigation. It is inappropriate for Plaintiffs to attempt to recover damages to investigate these non-Trial Site service stations.[3]

B. <u>Reference to Non-Trial Site Service Stations</u>. At two of Defendants' selected Trial Sites – Manatí and Maysonet – Mr. Brown has identified four and eleven additional service stations, respectively, that he contends **may** have had releases that, in turn, **may** have commingled with releases from these Trial Sites. As with Club de Leones, the inclusion of other service stations that are not Trial Sites, and for which no discovery has been taken, is inappropriate and prejudicial. Although Mr. Brown's purpose in referencing these sites is not entirely clear, it appears that Mr. Brown may improperly seek to implicate those service stations or their owners/suppliers/operators. As Mr. Brown stated, "If it exists, groundwater contamination may have co-mingled with releases from nearby facilities." *Id.* at 173. It is improper to suggest that (possible) contamination at non-Trial Sites is at issue in this first trial.

C. <u>Newly Identified Wells</u> – As occurred in the *New Jersey* matter, Mr. Brown has improperly injected new wells into the case after the close of fact discovery. Defendants identified 173 such wells, and provided a list to Plaintiffs on February 12. Initially, 132 of these wells are located outside of Plaintiffs' delineated areas. *See* Ex. E *(List #1)*.[4] The Court already has ruled against Plaintiffs on this issue with absolute clarity in both *New Jersey* and *Puerto*

---

[2] Mr. Brown misleadingly suggests that EPA identified these eight service stations as "potential sources of the MTBE contamination detected" in the Trial Site well. *Brown Rpt.* at 158, 162. EPA made no such determination. *See* PR-MTBE-BROWN-0003165 (at Ex. D).

[3] In addition, this Court recently granted partial summary judgment in the *New Jersey* matter where Mr. Brown had opined that, rather than active remediation, it was necessary to install and sample eighteen new monitoring wells. *Opinion and Order* (Feb. 18, 2014), at 6. The Court found that it "cannot allow plaintiffs to seek costs incidental to primary restoration where there is no evidence that restorative measures are necessary or will even be implemented." *Id.* at 11.

[4] The parties may have reached agreement on one sub-set of the 132 – wells that are (i) outside the delineations and (ii) appear only in figures and (iii) are categorized as "unused," "irrigation" or "stock." However, Plaintiffs have not yet identified the wells falling within this category.

*Rico*.  *See May 2, 2012 Status Conf. Tr.*, at 16:20-18:24 (at Ex. F) (discussing Puerto Rico delineations, "MR. AXLINE:  That's why we drew them generously.  COURT:  … So now you're bound to that.  You can draw the line narrower or make less of it, but you can't suddenly double it.  That would not be fair.  It would change entirely.  So I'm saying the delineations you drew are final on the outer limits.  You can always contract them … but you can't expand them."); *Jan. 18, 2013 Status Conf. Tr.*, at 23:14-24:13 (counsel for NJDEP agreeing that such wells cannot be identified to the jury) (at Ex. G).  In addition, none of these 132 wells was otherwise identified to Defendants during the course of discovery, whether through written discovery, in advance of 30(b)(6) depositions, or in negotiating declarations in lieu of certain 30(b)(6) depositions.

As to the remaining 41 wells, which appear to be located inside Plaintiffs' delineations, they should be excluded from Mr. Brown's report for the following reasons.  Eleven (11) of these wells are being identified by Mr. Brown for the first time as "receptors" or "potential receptors." *See* Ex. E (*List #2*).  As Your Honor will recall, the Court was clear that any wells not identified to Defendants by July 1, 2011 were out of the case.  *See Mar. 30, 2011 Status Conf. Tr.*, at 59:16-19 (at Ex. H) ("And if they want to have a case left at the end of it, they better do it by July 1.  In fact, putting it differently, any place there's not a pin on a map is out of the case.").  None of the 11 wells was identified on Plaintiffs' July 2011 list.  Therefore, Defendants believe the Court already has ruled that these wells are out of the case.[5]  Additionally, with two exceptions,[6] these 11 wells were not identified to Defendants through written discovery or in advance of depositions, and Defendants were prejudiced by the inability to pursue such discovery.  The remaining thirty (30) wells were newly identified by Mr. Brown, although not specifically as "receptors" or "potential receptors." Ex. E (*List #3*).  Of these, only one was identified on Plaintiffs July 2011 well list – the VROV well.  However, as with **all** 30 wells in this category, it was never identified through discovery.  Defendants have been prejudiced by the inability to pursue discovery on these wells, and they should also be stricken from the report.

## II.      *Puerto Rico*:  Defendants' Request for an Order on Authentication of Documents

In November 2013, Defendants Esso and ExxonMobil sent Plaintiffs a draft stipulation regarding the authenticity of documents.  Plaintiffs never responded to the draft, but instead raised the issue of authentication with the Court at the November 18, 2013 status conference, and requested a deadline for all Defendants to submit declarations on this topic.  The Court disagreed

---

[5] Although discussion at the May 30, 2011 conference focused on PRASA, Plaintiffs' July 1 well list was more inclusive, likely as a result of the Court's admonition, and Defendants relied on it.

[6] The Sprague and Reparada wells were identified to Defendants prior to the Ponce Site 30(b)(6).  However, Plaintiffs' witness specifically testified that these wells were identified solely for inclusiveness and to answer "more generic questions that … don't mention threats of impact." *B. Green Nov. 20, 2013 Dep. Tr.* at 55:20-56:7 (at Ex. I).  Therefore, Mr. Brown's identification of these wells now as "receptors" or "potential receptors" is inappropriate and prejudicial.

and placed the burden on Plaintiffs to move the process forward.  CMO 113 required Plaintiffs to "promptly" inform all Defendants whether the Esso proposed stipulation was acceptable. If not, Plaintiffs were to "immediately notify Defendants of the deficiencies and attempt to resolve the dispute[.]"  CMO 113 ¶ 2.D.  The Court also required Plaintiffs to submit a declaration on authenticity.  Plaintiffs never complied with CMO 113.

Therefore, on January 2 and February 7, 2014, counsel for Esso attempted to further engage Plaintiffs on this topic.  *See, e.g.*, *L. Gerson Ltr. to D. Miller* (Feb. 7, 2014) (at Ex. J). We notified Plaintiffs that, absent response, we intended to submit our own attached proposal to the Court at the upcoming conference. Plaintiffs did not respond.  On March 5, Defendants confirmed that we would present our proposal to the Court and clarified one change in that proposal.  *See L. Gerson Email to D. Miller* (Mar. 5, 2014) (at Ex. K).  Last night we received Plaintiffs' first response – a counter-proposal.  Defendants believe that the counter-proposal expands the stipulation too far by, *inter alia*, attempting to cover trade groups of which not all defendants were members and for which there has previously been dispute as to membership. However, we will confer with Plaintiffs regarding their proposal.  In the event that resolution is not possible, and as this issue has now dragged on for months with Plaintiffs largely unresponsive to Defendants' overtures, we will present a proposal to the Court in our reply letter.

### III.     *Puerto Rico*: Plaintiffs Failure to Identify Theories of Liability at the Trial Sites

Since at least September 2013, Defendants have been pressing Plaintiffs to tell us the theory of liability under which they will pursue their claims at the Trial Sites, and until as recently as late February it still was unclear whether Plaintiffs intended to rely on the commingled product theory.  *See Pls.' Second Supp. Resp. to Contention Interrogs.*, No. 23 (Plaintiffs "**may** rely on a comingled product theory of liability at trial." (emphasis added)) (at Ex. L).  Not until five days after Defendants attempted to raise this issue with the Court via a telephonic hearing, and on the eve of our deadline to submit a letter to the Court, did we finally received an answer – Plaintiffs do intend to rely on the commingled product theory. However, as Defendants articulated in a response the following day, we still need to know: (1) which Defendants are allegedly implicated at each Trial Site; and (2) for each such Defendant, under what theory(ies) – *i.e.*, traditional or commingled.  Defendants understood that Plaintiffs were willing to provide this information.  However, more than a week later, no additional information has been provided, and Defendants' expert reports (the content of which may turn on Plaintiffs' responses) are due in less than one month.  Therefore, Defendants request an Order requiring Plaintiffs to produce this information in a clear and concise pleading by Thursday, March 20, 2014 at the latest (just two weeks prior to Defendants' expert report deadline).

### IV.     *Puerto* Rico: Plaintiffs' Failure to Produce Certain Expert Reliance Materials

Given the short turn-around times on expert reports, Defendants have lost valuable time going back to Plaintiffs with requests for missing expert reliance materials.  *See, e.g.*, *L. Gerson Ltr. to N. Short* (Mar. 5, 2014), at 1 n.1 (listing instances of such requests) (at Ex. M).  Some of

The Honorable Shira A. Scheindlin
March 11, 2014
Page 5

these requests have been filled and others remain outstanding. *Id.* Plaintiffs should be ordered to produce all expert reliance materials – not just those raised in Defendants' letters – as required by CMO 112. Defendants request all such production by March 20, 2014 at the latest.

### V. *OCWD*: Schedule for Summary Judgment Pre-Motion Letters and Hearing

Defendants are analyzing which remaining issues can be resolved on summary judgment or partial summary judgment before this matter is remanded to the Central District of California for trial. Defendants request that the Court set a schedule for the submittal of Pre-Motion letters and a Pre-Motion Hearing to discuss the possible motions.

### VI. *OCWD*:  Remaining Claims at Issue in the Case

In advance of summary judgment briefing, Defendants request the Court's assistance to clarify the Defendants at issue for each station. Addressing this issue now will significantly decrease the scope of such briefing and reduce the burden on the Court. Currently, OCWD asserts claims at 10 focus plumes consisting of 34 stations. In its May 2010 *Supplemental Responses to Certain Defendants' Second Set of Interrogatories*, and prior to the August 2010 close of fact discovery, Plaintiff identified the Defendants allegedly responsible at each of the 34 stations. Plaintiff issued revised responses for a few specific defendants in 2010 and early 2011.

In Spring 2013, anticipating motion practice, Defendants asked OCWD for a station matrix memorializing the information in Plaintiff's discovery responses as well as the remaining claims Plaintiff was pursuing against each defendant at each station. Defendants sought a matrix because such had been a useful tool for narrowing remaining claims and stations in *City of Fresno*. There, the matrix facilitated voluntary dismissal of certain claims and stations and allowed Defendants to prepare streamlined summary judgment motions. Regrettably, Plaintiff's draft station matrix in *OCWD* had quite the opposite impact. Rather than narrowing the claims to conform with discovery and the Court's prior summary judgment rulings, OCWD's matrix dramatically expanded the number of Defendants allegedly responsible at each station. OCWD's matrix is particularly problematic because OCWD never before disclosed that it was pursuing claims against so many Defendants at each station despite specific discovery requests. *Compare Pl.'s Suppl. Resp. to Certain Defs.' Second Set of Interrogs.*, with *OCWD's Apr. 17, 2013 Station Matrix* (exemplar excerpts for Plume 1 at Exs. N & O).

OCWD's effort to dramatically expand its claims far beyond those disclosed in discovery is fundamentally unfair to Defendants and violates the Federal Rules of Civil Procedure. Defendants relied on OCWD's 2010/early 2011 contention interrogatory responses in completing their discovery. This Court recently addressed a similar issue in the *New Jersey* matter, noting that "[c]ontention interrogatories are treated as judicial admissions which usually estop the responding party from later asserting positions not included in its answers." *Opinion and Order* (Feb. 6, 2014), at 8. Under Rule 37(c)(1), failure to comply with disclosure obligations under Rule 26(e) warrants preclusion of omitted information. *Id.* at 9. Defendants therefore request

that the Court issue an order limiting Plaintiff to pursuing claims only against Defendants at sites that were previously disclosed in their verified discovery responses. Defendants' summary judgment motions will be significantly longer and more complex if Defendants' concerns cannot be resolved in advance.

*\*\*\**

As always, we appreciate your Honor's attention this matter and ask that this letter be docketed by the Clerk's Office so that it is part of the Court's file.

Sincerely,

*Peter John Sacripanti*

Peter John Sacripanti

cc: All Counsel of Record by LNFS, Service on Plaintiffs' Liaison Counsel