

Boston  Brussels  Chicago  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Peter John Sacripanti
Chairman
psacripanti@mwe.com
+1 212 547 5583

March 14, 2014

BY ELECTRONIC MAIL AND HAND DELIVERY

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York  10007-1312

Re:     Master File C.A. No. 1:00-1898 (SAS), M21-88, MDL No. 1358
        *Defendants' Pre-Conference Reply Letter for March 19, 2014 Conference*

Dear Judge Scheindlin:

        Defendants respectfully submit this reply letter ahead of the March 19, 2014 conference.[1]

## PLAINTIFFS' AGENDA ITEMS

### I.     *Puerto Rico:* **Plaintiffs' Motion to Compel Tauber & Tauber's Motion to Dismiss**

        To the extent Plaintiffs' agenda item No. 1 is not mooted by the Court's endorsed order setting a briefing schedule on Tauber's motion to dismiss, Tauber requests that the Court deny Plaintiffs' discovery motion and not refer the issue to the Special Master. Plaintiffs have not demonstrated a basis for asserting that additional documents exist, what those documents might say, or how they relate to the issue of jurisdiction or any material issue in this case.

### II.    *Puerto Rico***: Defendants' Designation of Rule 26(a)(2)(C) Experts**

        The Court has seen this before.  Plaintiffs throw out an inflamatory number, proclaim that it is too high, and seek to arbitrarily limit Defendants' efforts to defend the case.  Here, Plaintiffs allege that Defendants have "designated over seventy-five (75) experts, including … FRCP 26(a)(2)(C)" witnesses, and speculate that the total number could "easily exceed 100" when

---

[1] Defendants respectfully request a short extension of the three-page limit for reply letters.

The Honorable Shira A. Scheindlin
March 14, 2014
Page 2

Defendants designate their site-specific 26(a)(2)(C) witnesses.  *Pls. Ltr.* at 2. First, Defendants'
dispute the total number.[2]

Second, including Defendants' 26(a)(2)(C) witnesses in this "expert count" is misleading.
Most of these witnesses are, first and foremost, fact witnesses for the defendant companies.
They will testify about, *inter alia*, Defendants' knowledge of the properties of MTBE, the
efficacy of UST technology, and methods for groundwater remediation.  Many of these
witnesses authored documents on these topics that Plaintiffs will seek to use in trial.  Their
testimony necessarily includes opinions on scientific issues because the relevant issues and
documents are scientific in nature.  Therefore, under the Court's clear guidance, Defendants have
designated them as Rule 26(a)(2)(C) witnesses.  *See Dec. 11, 2008 Conf. Tr.*, at 16-17 (at Ex. A).

The Court provided additional guidance on designation of Rule 26(a)(2)(C) witnesses in
*New Jersey*.  There, Plaintiffs also alleged that Defendants' number of designated witnesses
was too high and the issue was addressed at the April 2013 conference.  Defendants are well aware of
the Court's guidance from that conference, and took it into account when making designations in
*Puerto Rico*.  *See Apr. 10, 2013 Conf. Tr.*, at 42:13-16 (at Ex. B) (discussing number of
designated witnesses per defendant: "THE COURT:  The 21 sounds too high.  The 17 sounds too
high.  Could you folks try to get down to the same ten as ConocoPhillips….").  In contrast to
*New Jersey*, in *Puerto Rico* fourteen defendants have designated a total of just thirty-five (35)
Rule 26(a)(2)(C) witnesses – on average, less than three per defendant.

Third, Plaintiffs complain that the number of witnesses is problematic because they will
not be able to complete depositions by the close of discovery.  First, this is a non-issue as to
many of the witnesses, who have already been deposed (some more than once and some even
cross examined in MTBE trials) on the very topics for which they have been designated.
Second, given the experience in *New Jersey* and the number of Defendants they sued here,
Plaintiffs should have anticipated (and apparently did)[3] the number of 26(a)(2)(C) witnesses that
could be involved (although the numbers here are very different than *New Jersey*).  Furthermore,

---

[2] Defendants have collectively designated 35 retained expert witnesses.  (Defendants do not take
Plaintiffs to be complaining about those witnesses – subject to the issues raised in agenda item
No. 3.)  That number includes both joint defense experts and experts for individual defendants. It
also, on certain topics, includes a second expert to address issues unique to Puerto Rico that are
not covered by our usual experts. Furthermore, Plaintiffs received our non-site-specific and site-
specific designations of retained witnesses on August 2, 2013 and January 8, 2014, respectively.
Having waited months to raise the issue, to now complain about numbers after Defendants have
spent time and money preparing expert reports, is prejudicial and Plaintiffs' should be estopped
from making this argument.

[3] *See Email from M. Axline to L. Gerson* (Nov. 13, 2013) (at Ex. C) (suggesting early April
deadline for disclosure "in light of the number of such witnesses that were disclosed by
defendants in the NJ case.").

The Honorable Shira A. Scheindlin
March 14, 2014
Page 3

Plaintiffs' concerns about the time left to depose these witnesses are unfounded, and to the extent there is an issue, it is a "problem" of their own creation.  When the parties were discussing the schedule for these designations, Defendants accepted Plaintiffs' proposal that, "based in part on our experience in New Jersey, … it would be more efficient to all concerned if we disclose such witnesses after receiving expert reports" issued by retained experts.  *Email from M. Axline to L. Gerson* (Aug. 19, 2013) (at Ex. D).  The delay caused by this request was then compounded by Plaintiffs' multiple requests for expert-related extensions.  Defendants have repeatedly expressed the concern that such extensions would unduly limit the time available for depositions, but granted the requests as a matter of professional courtesy.  Defendants should not now be prejudiced for extending those courtesies to Plaintiffs.

Finally, Defendants believe that we have provided more than adequate summaries based on the applicable rules and the precedent established by the parties in the *New Jersey* matter.  However, we have invited Plaintiffs to identify for us any witness disclosures they believe are not adequate.  *See Ltr. from L. Gerson to V. Cardenas* (Mar. 13, 2014), at 3 (at Ex. E).  At minimum, Plaintiffs' request for relief is premature until Plaintiffs specifically identify which witness disclosures are improper and discuss the same with the appropriate Defendant(s).

### III.    *Puerto Rico*:  Defendants' Designation of Certain Retained Experts

As an initial matter, Defendants object to Plaintiffs' attempt to exclude expert witnesses through an informal process of pre-conference letter writing.  The Court should deny Plaintiffs' requested relief not only because their position lacks merit, but also because Plaintiffs have not followed the proper procedure to obtain the extraordinary relief of striking Defendants' experts.  If the Court is inclined to consider the merits of Plaintiffs' request, there should be full briefing.

Plaintiffs argue that three of Defendants' experts, Mr. Thomas Austin, Dr. S. Kent Hoekman and Mr. Richard Wilson, provide opinions on irrelevant topics.  As demonstrated below, Plaintiffs' arguments are based on a statement made by the Court during a telephonic hearing on a discrete issue; Plaintiffs' misunderstanding of Defendants' arguments; and, apparently selective memory as to the claims they have brought against Defendants – most notably, strict liability for defective design, negligent design, and negligent sale of gasoline containing MTBE.  *Third Am. Comp.* ¶¶ 96-107, 130-143.

First, the Court's very brief colloquy with counsel during the October, 22, 2013 telephonic hearing – convened to address Plaintiffs' service of 122 deposition notices on the eve of the close of fact discovery[4] – is misguided.  During that hearing, the Court ruled only that Defendants could not proceed with the Rule 30(b)(6) deposition **of the Commonwealth** on

---

[4] Plaintiffs' statement that the October telephonic hearing was held to address "Defendants' excessive deposition notices" is a clear example of revisionist history.  However, to streamline resolution of all deposition issues, the Court did also hear Plaintiffs' objections to certain Defendant-issued 30(b)(6) notices. The schedule for pre-hearing letters did not permit replies.

The Honorable Shira A. Scheindlin
March 14, 2014
Page 4

issues contained in the notice on Air Quality – nothing more.  *Oct. 22, 2013 Tel. Hrg. Tr.* at 14:21-15:8  (at Ex. F).  Further, the Court acknowledged that the issue had not been briefed by Defendants.  *Id.* at 13:15-19.  Plaintiffs' attempt to characterize that ruling as the equivalent of a successful motion *in limine* is incorrect.

Second, Plaintiffs misunderstand and mischaracterize these experts' opinions.  Plaintiffs suggest that a cost/benefit analysis of MTBE vs. lead is not relevant.  *Pls.' Ltr.* at 3.  Indeed, that is not the issue.  Defendants agree that the gasoline industry was required to remove lead by a certain date.[5]  Defendants do not offer an expert to say that a cost/benefit analysis of MTBE vs. lead concluded that MTBE was the better choice after lead was already phased out.  However, the reasons that necessitated the lead phase-out and led to the eventual use of MTBE as an octane enhancer are extremely relevant to explain to the jury **why** MTBE was added to gasoline in the first place – *i.e.,* prior to the promulgation of oxygenated and reformulated fuel regulations, MTBE was added to gasoline to replace octane levels lost from the phase-out of lead.  In a case where Plaintiffs are alleging that gasoline with MTBE was a defectively designed product (based on strict liability and negligence), Defendants are entitled to explain their decisions to add MTBE to gasoline in the first place.  Lead is part of that story, and Plaintiffs' expert Dr. Fogg apparently agrees.[6]  *See Pls.' Expert Dr. Fogg Rpt.*, at 43 (at Ex. G) ("MTBE usage as an octane booster grew in the early 1980's in response to the phasing out of lead from gasoline[.]")

As to the MTBE versus ethanol story, this is certainly an aspect of Defendants' defense to the strict liability and negligent design claims.  Plaintiffs' claim that ethanol is irrelevant because Puerto Rico was not an RFG area is a red herring.  Plaintiffs allege that Defendants were negligent in selling gasoline with MTBE in Puerto Rico (*Third Am. Compl.* ¶ 131), Defendants are entitled to explain why MTBE was in some of the gasoline supplied to the island. The RFG program and ethanol are part of that story.  Indeed, Plaintiffs' expert agrees.  *See M. Moreau Generic Rpt.*, at IV-1 (at Ex. H) ("In contrast, ethanol, another compound that can be used as a fuel oxygenate, biodegrades rapidly. For this reason, even though ethanol is completely miscible in water, it does not pose nearly as great a threat to groundwater quality as MtBE."); *see also id.* at IV-32, IV-41, IV-49.  Likewise, in a design defect case the Plaintiff must show that there was a safer, feasible alternative design.  Defendants are entitled to counter that argument by explaining why – given the market for gasoline and the federal regulations on gasoline – it was

---

[5] Plaintiffs state that the issue also is irrelevant because the lead phase-down began in 1986 and concluded in 1995; therefore, lead was not an issue during the "relevant time period."  *Pls.' Ltr.* at 3.  Plaintiffs have always insisted the relevant time period for MTBE litigation begins in 1979.

[6] Contrary to Plaintiffs' assertion, the Court did not rule that "lead is just not an issue in this case."  *Pls. Ltr.*, at 3.  Instead, the Court stated as an introduction and before hearing from Defendants: "I read the plaintiffs letter.  I don't know that I really have a response to it, so to speak, because you had so many issues to raise in the defense letter.  But **judging solely from the plaintiffs' letter** this issue about lead is just not an issue in this case."  Ex. F, at 13:15-19 (emphasis added).  Then, as now, Plaintiffs misunderstood the purpose for the evidence on lead.

The Honorable Shira A. Scheindlin
March 14, 2014
Page 5

not always feasible to supply non-oxygenated gasoline to Puerto Rico. The RFG program and issues with ethanol help explain why MTBE was used.

Finally, Plaintiffs contend that air quality benefits of MTBE are irrelevant.  But as explained above, the reasons why some Defendants added MTBE to gasoline are relevant, and those reasons include MTBE's air quality benefits.  It does not matter that some Defendants did not make an individual decision to include MTBE in gasoline sold to Puerto Rico (some did, and have the right to explain why).  These are national and international companies.  They make decisions about formulating their products and then they sell those products to hundreds of markets.  When the product arrives in Puerto Rico we cannot suddenly ignore the design and decision-making process that occurred elsewhere.  In addition, the jury is entitled to hear the opinions of the Defendants' experts as to whether the MTBE gasoline that was sold in Puerto Rico provided an air quality benefit to the people of Puerto Rico.

## DEFENDANTS' AGENDA ITEMS

## II.    *Puerto Rico*:  Defendants' Request for an Order on Authentication of Documents

Defendants have provided comments to Plaintiffs on their latest proposal, and the parties will continue to meet-and-confer next week in the hopes of submitting a joint stipulation.

***

As always, we appreciate your Honor's attention this matter and ask that this letter be docketed by the Clerk's Office so that it is part of the Court's file.

Sincerely,

*Peter John Sacripanti*

Peter John Sacripanti

cc:  All Counsel of Record by LNFS, Service on Plaintiffs' Liaison Counsel

# EXHIBIT A

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
      ETHER ("MTBE") PRODUCTS                Master File C.A.
 4    LIABILITY LITIGATION                   No. 1:00-1898(SAS)

 5    ------------------------------x
                                             New York, N.Y.
 6                                           December 11, 2008
                                             2:20 p.m.
 7
      Before:
 8
                         HON. SHIRA A. SCHEINDLIN
 9
                                             District Judge
10
                              APPEARANCES
11

12    WEITZ & LUXENBERG, P.C.
           Plaintiffs' Liaison Counsel
13    ROBERT J. GORDON

14    MILLER AXLINE & SAWYER
           Attorneys for Plaintiff Quick v. Shell
15    BY:  MICHAEL AXLINE

16    NAPOLI BERN RIPKA, L.L.P.
           Attorneys for Plaintiffs
17    BY:  MARC JAY BERN
           WILLIAM J. DUBANEVICH
18
      SHER LEFF LLP
19         Attorneys for City of New York
      VICTOR M. SHER
20
      MICHAEL A. CARDOZO
21         Corporation Counsel of the
           City of New York
22         Attorney for City plaintiffs
      SCOTT PASTERNACK
23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1             Putting all that aside, you are saying they are still

2     experts.  Why shouldn't they be named when experts are named?

3             MR. PARDO:  26(a)(2) -- I don't want a report --

4     requires us to be told who they are.

5             THE COURT:  Now, Mr. Pasternack that makes sense.

6             MR. PASTERNACK:  The key issue here is whether or not

7     they are experts.  They have couched this as though they were

8     experts.

9             THE COURT:  You decide.  I will make it very simple.

10    If they are going to say "in my opinion," they are experts.  So

11    if they are going to say "in my opinion," then I advise you to

12    disclose them on the expert schedule -- don't worry about

13    reports, no reports because they are employees who are not

14    specially retained under Rule 26.  But if they are going to say

15    "in my opinion" then you should disclose them on the expert

16    schedule.  And if you wait until 30 days before trial on the

17    ordinary witness list, then they can be fact witnesses or

18    whatever the in word is these days, but they are not going to

19    say the words "in my opinion."

20            MR. PASTERNACK:  I guess the issue is between 701 and

21    702.  And the fact that we are also looking at actually making

22    our witness list known two and a half months before as opposed

23    to a month before, why that is not sufficient time --

24            THE COURT:  Because the experts have a schedule, and

25     if they are going to give expert testimony -- which they are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

8CBUMTBC

1     welcome to do -- your present or in fact former employees, for

2     that matter, may have expertise.

3          Your present or former employees, Mr. Pardo, may have

4     expertise.  There is nothing wrong with their being an expert.

5          I realize that the rules on the report may be

6     different, but they should be disclosed during the time period

7     that experts are disclosed because experts are subject to

8     Daubert motions and all of the rest of the qualifications.  So

9     I don't see the big problem.  You are preparing to go to trial.

10    Think about it.  If you want to call a present or former

11    employee -- former employee is probably going to be retained

12    expert -- but a present employee, just put that person in your

13    mind in the expert bag even if you don't do a report.

14         MR. PASTERNACK:  There is an issue later regarding

15    whether some testimony offered was offered by the City as 701

16    testimony as opposed to 702.  We have to address that when we

17    get to that.

18         THE COURT:  I guess so.  I would err on the side of

19    disclosing the person as an expert and not play games and risk

20    being precluded.  Rather than risk being precluded, I would

21    play it safe.

22         MR. PASTERNACK:  Thank you, your Honor.

# **EXHIBIT B**

```
                                                              1
         D4A8MTB1
1        UNITED STATES DISTRICT COURT
1        SOUTHERN DISTRICT OF NEW YORK
2
2        -----------------------------x
3
3        IN RE:  METHYL TERTIARY BUTYL        00 MDL 1358
4        ETHER ("MTBE") PRODUCTS              Master File C.A.
4        LIABILITY LITIGATION                 No. 1:00-1898(SAS)
5
5        -----------------------------x
6
7                                             April 10, 2013
7                                             4:55 p.m.
8
8        Before:
9
9                        HON. SHIRA A. SCHEINDLIN,
10
10                                            District Judge
11
11                            APPEARANCES
12
12
13       WEITZ & LUXENBERG, P.C.
13            Plaintiffs' Liaison Counsel
14       BY:  WILLIAM A. WALSH
14
15       MILLER, AXLINE & SAWYER P.C.
15            Attorneys for Puerto Rico
16            and New Jersey Plaintiffs
16       BY:  MICHAEL AXLINE
17
17       LAW OFFICES OF JOHN K. DEMA, P.C.
18            Attorneys for New Jersey, Puerto Rico Plaintiffs
18       BY:  NATHAN SHORT
19
19       COHN LIFLAND PEARLMAN HERRMANN & KNOPF, LLP
20            Attorneys for New Jersey Plaintiffs
20       BY:  LEONARD Z. KAUFMANN
21
21       McDERMOTT, WILL & EMERY LLP
22            Attorneys for Defendants ExxonMobil Corp.
22            and defendants' liaison counsel
23       BY:  JAMES A. PARDO
23            STEPHEN J. RICCARDULLI
24            LISA A. GERSON
25
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

42

D4a9mtb2

```
 1              MR. CONDRON:  A lot of them are for people, as
 2    Mr. Riccardulli described, may be dealing with issues like the
 3    decision to use MTBE --
 4              THE COURT:  I don't need 17 of those.
 5              MR. CONDRON:  They're not all on that issue,
 6    necessarily, your Honor.
 7              THE COURT:  Seventeen sounds high.  Twenty-one sounds
 8    high.  Where did I leave off on the 21?
 9              MR. RICCARDULLI:  Well, five consultants --
10              THE COURT:  We got down to 21.  Why do we have 21?
11              MR. RICCARDULLI:  Again, your Honor, it's for three
12    different companies over the 30 years in this case.
13              THE COURT:  Still sounds too high.  The 21 sounds too
14    high.  The 17 sounds too high.
15              Could you folks try to get down to the same ten as
16    ConocoPhillips, and get rid of all the fat, get rid of all the
17    overlap, get down to ten each.  We may have solved this
18    problem, particularly with the ruling about consultants and
19    getting this down to ten, take a look at the ten and understand
20    it.  That's it.
21              MR. RICCARDULLI:  We can do that, your Honor.
22              MR. AXLINE:  Your Honor.
23              THE COURT:  Mr. Axline.
24              MR. AXLINE:  I'm sorry to interrupt, but I think I
25    have to surface an issue based on something that
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

# **EXHIBIT C**

## Chang, Haeji

| | |
|---|---|
| **From:** | Mike Axline <maxline@toxictorts.org> |
| **Sent:** | Wednesday, November 13, 2013 2:35 PM |
| **To:** | Gerson, Lisa |
| **Cc:** | Miller, Axline & Sawyer |
| **Subject:** | Proposed expert protocol for PR |

**Importance:**   High

Lisa

We have reviewed the proposed expert protocol for PR and we are OK with all provisions except those having to do with the provision in Section IV having to do with defendants' site specific Rule 26(a)(2)(C) witnesses.  Your proposed disclosure date of April 24 is too close to the expert discovery cutoff of May 5, particularly in light of the number of such witnesses that were disclosed by defendants in the NJ case  – if you can agree to move that date back to April 2 or 3 I think we can take the item off of the agenda for the next CMC.

Mike

Miller, Axline & Sawyer / phone (916) 488-6688 / fax (916) 488-4288 This private communication may be confidential or privileged. If you are not the intended recipient, any disclosure, distribution, or use of information herein or attached is prohibited.

# **EXHIBIT D**

## Chang, Haeji

| | |
|---|---|
| **From:** | Mike Axline <maxline@toxictorts.org> |
| **Sent:** | Monday, August 19, 2013 2:11 PM |
| **To:** | Gerson, Lisa; 'Scott Kauff' |
| **Cc:** | 'Will Petit'; MDL1358; Miller, Axline & Sawyer |
| **Subject:** | RE: PR: FRCP 26(a)(2)(C) Witness Disclosures |

Lisa

While we appreciate the idea of looking to New Jersey with respect to how to handle Rule 26(a)(2)(C) witnesses, we believe, based in part on our experience in New Jersey, that it would be more efficient to all concerned if we disclose such witnesses after receiving expert reports. We therefore propose that the CMO be amended to provide that Rule 26(a)(2)(C) witnesses, along with short summaries of their expected testimony, be designated and disclosed no later than 30 days after filing of expert reports addressing the topics on which the Rule 26(a)(2)(C) witness may testify.

Mike

Miller, Axline & Sawyer / phone (916) 488-6688 / fax (916) 488-4288 This private communication may be confidential or privileged. If you are not the intended recipient, any disclosure, distribution, or use of information herein or attached is prohibited.

**From:** Gerson, Lisa [mailto:LGerson@mwe.com]
**Sent:** Friday, August 16, 2013 8:46 AM
**To:** maxline@toxictorts.org; Scott Kauff (skauff@lojkd.com)
**Cc:** Will Petit (wpetit@jgdpc.com); MDL1358
**Subject:** RE: PR: FRCP 26(a)(2)(C) Witness Disclosures

Counselors,
We have not received a response regarding the below proposal. Please let us know Plaintiffs' position by Monday. Thank you,

Lisa A. Gerson
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
Tel: 212-547-5769
Fax: 646-224-8675

**From:** Gerson, Lisa
**Sent:** Tuesday, July 30, 2013 1:18 PM
**To:** maxline@toxictorts.org; Scott Kauff (skauff@lojkd.com)
**Cc:** Will Petit (wpetit@jgdpc.com); MDL1358
**Subject:** PR: FRCP 26(a)(2)(C) Witness Disclosures

Mike & Scott,
The current scheduling CMO, No. 110, does not include a date for the disclosure of witnesses who may present expert opinion testimony at trial but who are not required to prepare an expert report (hereinafter "FRCP 26(a)(2)(C) Witnesses"). We note that Plaintiffs did not designate any such witnesses on July 19—their date to designate non-site-specific experts. It is not clear to Defendants whether that is because Plaintiffs have no such witnesses to designate or because Plaintiffs are operating under the assumption that another deadline exists. To remedy that uncertainty,

1

Defendants propose a schedule similar to that which was adopted in the *New Jersey* matter (CMO 106). Specifically, Defendants propose the following: (1) the parties designate FRCP 26(a)(2)(C) Witnesses, with a brief description of the subject matter on which the witness is expected to present testimony, not later than 30 days after the deadlines set forth in CMO 110 for the designation of the corresponding experts (e.g. Plaintiffs'/Defendants' non-site-specific/site-specific experts); (2) the parties disclose a summary of the facts and opinions to which the FRCP 26(a)(2)(C) Witnesses are expected to testimony not later than 30 days after the deadlines set forth in CMO 110 for the service of reports from the corresponding experts; (3) the parties produce reliance materials reviewed by the FRCP 26(a)(2)(C) Witnesses who are disclosed pursuant to the schedule above no later than five business days after the summary of facts and opinions of such witness's testimony is disclosed.

Please let us know if you would like to discuss.
Thank you,

Lisa A. Gerson
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
Tel:  212-547-5769
Fax: 646-224-8675

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IRS Circular 230 Disclosure: To comply with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained herein (including any attachments), unless specifically stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter herein.


This message is a PRIVILEGED AND CONFIDENTIAL communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please visit http://www.mwe.com/ for more information about our Firm.

# **EXHIBIT E**

# McDermott
# Will & Emery



Boston  Brussels  Chicago  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Lisa A. Gerson
Attorney at Law
lgerson@mwe.com
+1 212 547 5769

March 13, 2014

BY ELECTRONIC MAIL AND LNFS

Victor L. Cardenas, Esq.
Jackson Gilmour & Dobbs, PC
3900 Essex, Suite 700
Houston, Texas 77027

**Re:**   **Master File C.A. No. 1:00-1898 (SAS), M21-88, MDL No. 1358**
      *Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*, No. 07-CV-10470
      Plaintiffs' March 7, 2014 Letter Regarding Experts

Dear Victor:

I am writing in response to your March 7, 2014 letter. You state that Defendants have identified "over seventy-five experts,"[1] including FRCP 26(a)(2)(C) witnesses, and speculate that the total could be "well over 100" after designation of site-specific 26(a)(2)(C) witnesses. We do not agree that our designations are "clearly excessive" given the number of individual parties the Commonwealth has sued, the number of topics at issue in the litigation, and the time span implicated by Plaintiffs' claims. As you know, Plaintiffs have sued more than 30 defendants covering the full range of participants in the gasoline market (*i.e.*, refiners, wholesalers, retailers, traders). Understandably, there will be differences in their positions and arguments – and therefore, expert testimony. You request that Defendants address your concerns by de-designating some unspecified number of 26(a)(2)(C) witnesses. Defendants disagree with your contentions – including that our designated experts are improperly duplicative or excessive – and, therefore, cannot agree to de-designate any witnesses at this time. Our reasons are discussed in greater detail below.

Regarding Defendants' Rule 26(a)(2)(C) witnesses, you suggest that many appear "prophylactic." As you may know, the Court has instructed parties to MDL 1358 to err on the side of over-inclusiveness when designating such witnesses. At a Court conference held December 11, 2008, at which your co-counsel Mike Axline was present, the Court stated:

---

[1] We disagree with this number. From our records, it appears that the defendants have designated a total of 35 FRCP 26(a)(2)(C) witnesses and 35 retained expert witnesses.

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue New York New York 10173-1922 Telephone: +1 212 547 5400 Facsimile: +1 212 547 5444 www.mwe.com

Victor L. Cardenas, Esq.
March 13, 2014
Page 2

> I will make it very simple.  If they are going to say 'in my opinion'
> they are experts.  So if they are going to say 'in my opinion,' then I
> advise you to disclose them on the expert schedule – don't worry
> about reports, no reports because they are employees who are not
> specially retained under Rule 26.  But if they are going to say 'in
> my opinion' then you should disclose them on the expert schedule.
>                                   …
> I would err on the side of disclosing the person as an expert and not
> play games and risk being precluded.  Rather than risk being
> precluded, I would play it safe.

*Transcript of Dec. 11, 2008 Conf.*, at 17-18.  It is important to note that these witnesses are, first
and foremost, fact witnesses for the defendant companies.  Many of the witnesses will testify
about issues related to Defendants' alleged knowledge – over time – of the properties of MTBE.
They may also discuss the state of UST technology over time.  Indeed, many of these witnesses
authored documents that Plaintiffs seek to use in trial.  Their testimony necessarily includes
opinions on scientific issues because the relevant issues and documents are scientific in nature.
Therefore, under the Court's clear guidance, Defendants have designated them as Rule
26(a)(2)(C) witnesses.

Furthermore, your co-counsel, Mr. Axline addressed this issue with the Court last year in
the context of the *New Jersey* matter.  There, Plaintiffs also alleged that Defendants' designation
of Rule 26(a)(2)(C) witnesses was excessive and raised the issue with the Court at the April 2013
conference.[2]  Defendants are aware of the Court's guidance from the April 2013 conference, and
took it into account when making our designations in the *Puerto Rico* matter.  Although we do
not believe the Court issued an order setting a firm number of acceptable 26(a)(2)(C) witnesses,
we do recognize her guidance that ten witnesses per defendant sounded reasonable.  *Apr. 10,
2013 Status Conf. Tr.* at 42.

Plaintiffs, and particularly your co-counsel, should have anticipated (and apparently did[3])
the number of 26(a)(2)(C) witnesses that would be involved in this case given the experience in
the other Statewide MDL 1358 action and the number of Defendants sued.  Furthermore, Plaintiffs
concerns about the time left to depose these witnesses are unfounded, and to the extend
there is any issues, it is entirely a "problem"[4] of their own creation.  Defendants originally

---

[2] The number of such designated witnesses was significantly higher in *New Jersey* than it is here.
In *Puerto Rico*, fourteen (14) defendants have designated just 35 witnesses – on average, less
than three per defendant.

[3] *See Email from M. Axline to L. Gerson* (Nov. 13, 2013) (suggesting early April deadline for
disclosure "in light of the number of such witnesses that were disclosed by defendants in the NJ
case.").

[4] Defendants do not concede that Plaintiffs need to depose each of the designated witnesses.
Many have been previously deposed on the same topics for which their disclosure was made.

Victor L. Cardenas, Esq.
March 13, 2014
Page 3

proposed that Rule 26(a)(2)(C) designations should be made "not later than 30 days after the deadlines set forth in CMO 110 for the designation of the corresponding experts." *Email from L. Gerson to M. Axline, S. Kauff & W. Petit* (July 30, 2013). Had that proposal been accepted, Plaintiffs would have received Defendants' designations last year. Instead, Mr. Axline responded that Plaintiffs "believe, based in part on our experience in New Jersey, that it would be more efficient to all concerned if we disclose such witnesses after receiving expert reports" and "therefore propose[d] that the CMO be amended to provide that Rule 26(a)(2)(C) witnesses, along with short summaries of their expected testimony, be designated and disclosed no later than 30 days after filing of expert reports addressing the topics on which the Rule 26(a)(2)(C) witness may testify." *Email from M. Axline to L. Gerson, S. Kauff & W. Petit* (Aug. 19, 2013). The delay caused by this request was then compounded by Plaintiffs' multiple requests for expert-related extensions. Defendants cannot be prejudiced in our ability to defend this case because Plaintiffs desire an arbitrary limit on the number of witnesses Defendants may designate and waited until the last three months of expert discovery to raise the issue.

You also state that several defendants have "failed to adequately disclose or produce" the subject matter and reliance materials for our designated Rule 26(a)(2)(C). As indicated above, the parties did discuss the content and scope of such designations last summer. *See Email from L. Gerson to M. Axline, S. Kauff & W. Petit* (July 30, 2013); *Email from M. Axline to L. Gerson, S. Kauff & W. Petit* (Aug. 19, 2013). Mr. Axline suggested that the parties exchange "short summaries of … expected testimony." *Id.* Defendants believe they have provided more than adequate summaries based on the applicable rules, as well as the above mentioned exchange and the precedent established by the parties in the *New Jersey* matter. However, to the extent Plaintiffs still believe that they have not received a proper disclosure for any Rule 26(a)(2)(C) witness, please provide us with a list of those witnesses.

Finally, Defendants would appreciate a response to my February 11, 2014 letter to Nathan Short, in which Defendants seek confirmation on the deadline for the parties' designation of site-specific Rule 26(a)(2)(C) designations. *See Ltr. from L. Gerson to N. Short* (Feb. 11, 2014), at 2 n.1.

Based on the above explanations, Defendants do not believe this issue should be raised with the Court. We look forward to your response.

Thank you,

*Lisa A. Gerson*

Lisa A. Gerson

cc:   All counsel of record by LNFS
      Nathan P. Short, Esq.

# **EXHIBIT F**

DM_US 35481469-1.T13305.0010

1

```
       Damrmtbc
1     UNITED STATES DISTRICT COURT
1     SOUTHERN DISTRICT OF NEW YORK
2     ------------------------------x
2
3     In Re: METHYL TERTIARY BUTYL        00 MDL 1358 (SAS)
3           ETHER ("MTBE") PRODUCTS       00 CV  1898 (SAS)
4           LIABILITY LITIGATION
4                                         Telephone Conference
5     ------------------------------x
5
6                                         New York, N.Y.
6                                         October 22, 2013
7                                         2:30 p.m.
7
8     Before:
8
9               HON. SHIRA A. SCHEINDLIN
9
10                                        District Judge
10
11
11
12              APPEARANCES
12
13
13    MILLER AXLINE & SAWYER
14         Attorneys for Plaintiffs
14    BY:  DUANE C. MILLER
15         MICHAEL AXLINE
15         TRACEY L. O'REILLY
16
16    JACKSON, GILMOUR & DOBBS
17         Attorneys for Plaintiffs
17    BY:  JOHN D.S. GILMOUR
18         NATHAN SHORT
18
19    McDERMOTT WILL & EMERY LLP
19         Attorneys for ExxonMobil
20    BY:  LISA GERSON
20         STEPHEN J. RICCARDULLI
21
21    SHEPPARD MULLIN RICHTER & HAMPTON
22         Attorneys for ExxonMobil
22    BY:  WILLIAM STACK
23
23    SEPULVADO & MALDONADO, PSC
24         Attorneys for Total Petroleum Puerto Rico
24    BY:  ELAINE M. MALDONADO-MATIAS
25         ALBENIZ COURET-FUENTES
25
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

Damrmtbc

1   that if defendants continue to maintain that the depositions of
2   these two individuals are necessary, they are available on the
3   following dates.  That is actually next week.  We confirmed
4   that we will be taking them next week.  So we were surprised to
5   see those being objected to at this point.
6            THE COURT:  And the remaining five?
7            MS. GERSON:  The remaining five are each of the
8   regional coordinators for an area where there is a trial phase.
9            THE COURT:  They are going to give you a declaration
10  saying they have no knowledge regarding MTBE or the trial
11  sites.  That is their testimony.  To cut to the chase, you can
12  have the two, you can't have the five.  You can have the one
13  tomorrow, and the two missing are missing.  I'm going right on
14  to the air quality issue.
15           I read the plaintiffs letter.  I don't know that I
16  really have a response to it, so to speak, because you had so
17  many issues to raise in the defense letter.  But judging solely
18  from the plaintiffs' letter this issue about lead is just not
19  an issue in this case.  Why are the defendants wasting time on
20  an issue that is not an issue in this case?
21           MR. STACK:  Your Honor, William Stack for ExxonMobil.
22  There are two aspects of this.  First and foremost, Puerto Rico
23  is not an RFGC.
24           THE COURT:  Correct.
25           MR. STACK:  We know that they are supplied with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Damrmtbc

1   conventional gasoline.  As your Honor knows from prior cases
2   that you have been involved in, and discovery, conventional
3   gasoline did have some MTBE in it to replace lead and to
4   maintain octane levels.  We are seeking basic information
5   concerning knowledge of the commonwealth concerning air quality
6   effects on reducing lead in gasoline.
7            THE COURT:  Why do you need that?  This letter
8   convinces me that it is not an issue in this case.
9            MR. STACK:  It is an issue in this respect, your
10  Honor, in that we are at some point going to have to address
11  what benefits they have accrued from the use of MTBE in
12  gasoline, whose only use was to maintain octane and which has
13  been regulated.  We have spent some time here today that there
14  are limitations on the percentage of MTBE that can be in
15  gasoline in Puerto Rico because there are limits for vapor
16  controls and gasoline journals and gasoline shipping
17  operations.  So it is germane because they were controlling
18  vapor emissions from these large terminals and from these truck
19  loading facilities.
20           THE COURT:  That's fine.  That's got nothing to do
21  with what this paragraph seems to be about.  They think you're
22  trying to show that MTBE was a better, safer octane enhancer
23  than leaded gasoline.  But then they go on to say it wasn't
24  available anyway, lead wasn't available as an octane enhancer
25  during the trial period so lead was not a legally available

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

15

```
        Damrmtbc
 1   substitute.  Maybe that is not your point.  They think that is
 2   your point, that you want to show that there was a choice here.
 3   But they are saying there was no such thing, there was no
 4   possibility of lead being a legally available substitute at the
 5   relevant time period.
 6             MR. STACK:  That is correct.
 7             THE COURT:  Then I really don't understand the
 8   argument of why this is relevant.  To cut to the chase, no.
 9             Let's move on to 30(b)(6) regarding natural resources.
10   The plaintiffs' letter says this is just plain overbroad.  You
11   are seeking information regarding all natural resources in the
12   commonwealth.  You are not even limiting it to trial size, not
13   limiting to it fresh water, which are the only natural
14   resources involved here.  This seems to be an overbreadth
15   question.
16             Then they say that they already produced the sole
17   estimate of groundwater natural resources damages that was
18   previously prepared.
19             MR. STACK:  We have had discussions with plaintiffs'
20   counsel.  We have learned from them that they are apparently
21   limiting their claims in this case to groundwater, perhaps some
22   surface water.  As a consequence, we were willing to talk to
23   them about the establishment of base lines as well as the
24   extent of natural resource damages in and around the trial
25   site.
```

# **EXHIBIT G**



E-SERVICE
54854512
Jan 15 2014
11:15PM
File & ServeXpress

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Master File No. CA 1:00-1898(SAS)
MDL No. 1358

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

_____

This Document Relates To: Commonwealth of Puerto Rico v. Shell Oil Co. et al., Case
No. 07 Civ. 10470 (SAS)

_____

_____

EXPERT REPORT OF GRAHAM E. FOGG, Ph.D.

_____

Graham E. Fogg, Ph.D.
Carmichael, CA
January 15, 2014

# 5    Use of MTBE and Sources of Contamination

The following information on the use of MTBE and other common oxygenates [ethyl tertiary butyl ether (ETBE), tertiary amyl methyl ether (TAME) and ethanol] as gasoline fuel additives in the United States comes from information available through the U.S. Energy Information Administration (EIA)[14]:

> Oxygenates were first required in 39 areas of the country with the 1992 wintertime oxygenated gasoline program, arising from the Clean Air Act and designed to reduce emissions of carbon monoxide. This program required oxygen at a minimum level of 2.7 percent by weight (which by volume is equivalent to 15.0 percent MTBE or 7.4 percent ethanol). California obtained a waiver from this minimum 2.7 percent oxygen level because of concerns it would increase automotive emissions of oxides of nitrogen ($NO_x$). California's requirement was amended to require between 1.8 and 2.2 percent by weight oxygen. The reformulated gasoline program, aimed at reducing emissions of ozone-forming VOCs, nitrogen oxides, and other air pollutants, was implemented year round in certain areas of the United States, and during the summer months in other parts, beginning in December 1994. The program required a minimum of 2.1 percent oxygen by weight (which by volume is equivalent to approximately 11.7 percent MTBE or 5.8 percent ethanol).

> MTBE usage as an octane booster grew in the early 1980's in response to the phasing out of lead from gasoline, and an increase in demand for gasoline. The petroleum industry responded to the oxygenated and reformulated gasoline programs by amending gasoline with various oxygenates, principally MTBE and ethanol (Table 5.1). The use of MTBE increased significantly from about 83,000 in 1990 to about 161,000 barrels per day in 1994. MTBE use in gasoline increased to an estimated 256,000 barrels per day by 1997, following the reformulated gasoline program in December 1994 (Table 5.1).

While Puerto Rico did not opt into the reformulated or oxygenated gasoline programs,

---

[14] http://www.eia.doe.gov/emeu/steo/pub/special/mtbe.html#Who%20gets%20gasoline%20with%20oxygenates last accessed 2/15/07

43

# **EXHIBIT H**



E-SERVICE
54670090
Dec 06 2013
07:30PM
File & ServeXpress

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether ("MTBE")   Master File No. 1:00-1898
Products Liability Litigation                                MDL 1358 (SAS)

M21-88

---

## This Document Relates to:

*Commonwealth of Puerto Rico, et al.*

*v.*

*Shell Oil Co., et al.,*

*No. 07 Civ. 10470 (SAS)*

---

## Expert Generic Report of Marcel Moreau

Marcel Moreau Associates

Portland, Maine

Marcel Moreau                                    December 6, 2013

## IV.  What is the MtBE problem, what did oil refiners know during the 1980s and 1990s about the MtBE problem, what steps did the oil marketing industry take to address the problem, and what warnings did the oil marketing industry provide in response to the problem?

### The MtBE Problem

MtBE has chemical properties that are significantly different from the constituents of traditional gasoline.  It is much more soluble in water, is resistant to biodegradation, and has very low odor and taste thresholds.  This means that when gasoline containing MtBE is released into the environment, it will dissolve into and flow with the groundwater (because of its high solubility), will migrate long distances from the source (because soil bacteria will not easily degrade it), and will be readily detected in water supplies by consumers (because of the low odor and taste thresholds).  MtBE's high solubility and mobility combined with its low odor and taste thresholds means that even a very small quantity of product that enters the environment from an UST system has the potential to cause significant problems with nearby water supplies.

In contrast, ethanol, another compound that can be used as a fuel oxygenate, biodegrades rapidly.  For this reason, even though ethanol is completely miscible in water, it does not pose nearly as great a threat to groundwater quality as MtBE.  This is because it will be removed from the environment through biodegradation before it can migrate very far from the source of the release.

For most of the twentieth century, the petroleum marketing industry had adopted a rather cavalier attitude towards small-volume gasoline leaks and spills.  Small leaks from storage systems and spills associated with delivery activities, equipment maintenance, and vehicle fueling were very common and caused little concern.[173] Because the components of traditional gasoline were relatively insoluble and biodegraded fairly readily, these types of leaks and spills only rarely caused significant contamination incidents.

---

[173] "Underground Monitoring," letter to T. M. Harvey of Gilbarco from Glen Marshall of Shell, with attachments, April 25, 1989.

Specific topics for review included toxicity, the effect on vehicle emissions, and the effects of oxygenates on groundwater. The formation of this broad-based committee within API is indicative of widespread concern among API members regarding the benefits and hazards posed by MtBE use.

## July 30, 1987 – Exxon Briefing Paper States Tank Leaks Pose Special Problems with MtBE

In July 1987, Exxon produced a briefing paper that was intended to be used to inform legislators, news reporters, and others on the issues surrounding the different oxygenated fuels.[294] The briefing paper described numerous issues associated with ethanol, methanol, and MtBE, covering topics such as growth as a motor fuel, environmental claims, energy security, problems as a vehicular fuel, consumer reaction, supply/distribution, and mandated use.

Comparing the various oxygenates, the briefing paper made it clear that MtBE had fewer issues with regard to use as a vehicular fuel, consumer reaction, and supply/distribution than ethanol or methanol. The briefing paper did note that, "Underground storage tank leaks pose special problems because MTBE is highly miscible and would spread rapidly if it encountered water in the soil…MTBE is detectible (sic) to smell and taste at very low levels."[295] The briefing paper also noted that, "EPA is currently studying the problem."[296]

In deposition testimony, Sully Curran noted that the briefing paper was intended to provide background for Exxon employees who might speak with regulators or any other outside personnel regarding oxygenated fuel issues.[297] Mr. Curran did not recall ever distributing the actual document, but he stated that he used the information in the briefing paper, "…orally on many meetings that I was involved with with regulators and

---

[294] "Briefing Material – Oxygenated Fuels," internal Exxon memo from Carl B. Raglin to R. P. Larkins, July 30, 1987, with attachment.
[295] Ibid., p. 10
[296] Ibid.
[297] *De Bene Esse Deposition* of Sullivan Curran, In re MTBE Products Liability Litigation, State of New Hampshire v. Hess Corporation, et al., Volume 1, March 8, 2011, p. 220.

**November 15, 1990 – Clean Air Act Amendments are Passed**

The 1990 Clean Air Act Amendments recognized that fuel composition needed to be addressed in order to provide further improvements to air quality.[328] Two programs were established:

- A winter oxygenate program (to go into effect November 1, 1992) designed to curb carbon monoxide emissions by adding oxygen molecules to the fuel to improve combustion
- A reformulated fuels program (to go into effect on January 1, 1995) designed to curb ozone levels in urban areas

An EPA document entitled, *Origin of the Reformulated Gasoline Program*, provides background on how MtBE came to be so widely used in gasoline.[329] In the late 1980's, agencies responsible for air quality were investigating the potential for non-petroleum fuels such as methanol to reduce automobile emissions and improve air quality. One issue with these fuels was that they were not compatible with the existing fuel storage and dispensing infrastructure or the existing automobile fleet.

In 1989, ARCO, a major manufacturer of MtBE, had begun to market a gasoline blended with MtBE as a replacement for leaded gasoline that would also improve automobile emissions. During discussions of the Clean Air Act Amendments in 1990, the petroleum and oxygenate industries proposed that MtBE could be used to improve air quality.[330] One advantage of MtBE was that it could be used with the existing fueling infrastructure and automobile fleet, so the air quality benefits could be realized much more quickly. The final Clean Air Act legislation set emission requirements for gasoline and also included a mandate for gasoline to contain a minimum amount of oxygen. The two most viable oxygenate compounds for use in fuels were ethanol and MtBE. MtBE became the oxygenate of choice among the major oil refiners for most of the country.

---

[328] *Vehicle Fuels and the 1990 Clean Air Act*, EPA 400-F-92-015, Fact Sheet OMS-13., August, 1994.
[329] *Origin of the Reformulated Fuels Program*, EPA 420-F-95-001, April 1995., April 31, 1995.
[330] Ibid.

used in reformulated gasoline come from renewable sources.[356]  This provision essentially would have forced the petroleum industry into blending ethanol into gasoline because MtBE did not come from renewable sources.  Not satisfied with being able to use MtBE for 70 percent of the oxygenate required by the Clean Air Act Amendments, the API and the National Petroleum Refiners Association (NPRA) filed suit against the EPA on the grounds that the EPA lacked the authority to require that a percentage of the oxygenate be "renewable."[357]  The oil industry eventually won this suit.  Thus, industry claims that the EPA "required" the use of MtBE are disingenuous.  In fact, the oil industry fought for the right to use MtBE, and only MtBE, to meet the oxygenate requirements of the 1990 Clean Air Act Amendments.

### March 1994 – MtBE Groundwater Contamination Has Occurred and Will Occur in the Future

On March 10, 1994, Ken Darmer, a Shell toxicologist in Shell's Product Safety and Compliance department, wrote a memo summarizing a meeting of the "MTBE Task Force" an industry group which had been charged with overseeing the health effects testing of MtBE.  Among the Task Force recommendations was the formation of an "MTBE Product Stewardship Task Force" to provide "ongoing support of MTBE…in light of the many unresolved issues."[358]  The memorandum also stated, "Groundwater contamination by gasoline containing MtBE has occurred and likely will happen in the future."[359]

---

[356] "Regulation of Fuels and Fuel Additives: Renewable Oxygenate Requirement for Reformulated Gasoline," 40 CFR Part 80, August 2, 1994.
[357] Decision document for American Petroleum Institute and National Petroleum Refiners Association v. United States Environmental Protection Agency and Carol M. Browner, Administrator, United States Environmental Protection Agency, United States Court of Appeals for the District of Columbia Circuit, No. 94-1502, April 28, 1995.
[358] *Summary of 8 March 94 MtBE Task Force Meeting,* internal Shell memo from K.L. Darmer to J.C. Willett, March 10, 1994.
[359] Ibid .