E3j2mtbc1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In Re: METHYL TERTIARY BUTYL          00 MDL 1358 (SAS)
            ETHER ("MTBE") PRODUCTS        00 CV  1898 (SAS)
4           LIABILITY LITIGATION

5   ------------------------------x

6                                         New York, N.Y.
                                          March 19, 2014
7                                         3:30 p.m.

8   Before:

9           HON. SHIRA A. SCHEINDLIN

10                                        District Judge

11
            APPEARANCES
12
    MILLER AXLINE & SAWYER
13       Attorneys for Plaintiffs
    BY:  DUANE C. MILLER
14       MICHAEL AXLINE

15  WEITZ & LUXENBERG
         Attorneys for Plaintiffs
16  BY:  WILLIAM A. WALSH

17  LAW OFFICES OF JOHN K. DEMA
         Attorneys for Plaintiffs
18  BY:  JOHN K. DEMA

19  McDERMOTT WILL & EMERY LLP
         Attorneys for ExxonMobil
20  BY:  LISA GERSON
         STEPHEN J. RICCARDULLI
21
    SHEPPARD MULLIN RICHTER & HAMPTON
22       Attorneys for ExxonMobil
    BY:  WILLIAM STACK
23       WHITNEY JONES ROY

24  SEPULVADO & MALDONADO, PSC
         Attorneys for Total Petroleum Puerto Rico
25  BY:  ALBENIZ COURET-FUENTES

E3j2mtbc1

1                      APPEARANCES

2    SEDGWICK LAW
          Attorneys for Shell Oil Company
3    BY:  PETER CONDRON
          DAVID M. COVEY
4
5    McCONNELL VALDES LLC
          Attorneys for Sol Puerto Rico Limited
6    BY:  JUAN A. MARQUES-DIAZ

7    STRASBURGER, LLC
          Attorneys for Defendant Tauber Oil
8    BY:  MICHAEL A. WALSH

9    MANATT, PHELPS & PHILLIPS, LLP
          Attorneys for Defendant Tauber Oil
10   BY:  MICHAEL A. WALSH

11   LATHAM & WATKINS
          Attorneys for Defendant Conoco Phillips
12   BY:  MICHAEL A. WALSH

13   ARNOLD & PORTER, LLP
          Attorneys for Defendant Atlantic Richfield Co.
14   BY:  MICHAEL A. WALSH

15

16

17

18

19

20

21

22

23

24

25

E3j2mtbc1

1              (Case called; all parties present)

2              THE COURT:  We have received a number of letters, A

3       huge numbers of attachments things aren't going so well again.

4       But the years go by; some years are better years and some

5       years, worse years.  This one is bad.

6              The March 3 letter, which is the plaintiffs'

7       preconference letter had five attachments, some longer than

8       others.

9              The defendants' preconference letter of March 11 had I

10      think 13 attachments, and that really is a lot and kind of

11      defeats the purpose of a page limitation.  We have to talk

12      about that again.

13             The plaintiffs' reply letter is March 14.  It had two

14      attachments.

15             The defendant's reply letter of March 14 has eight.

16      So, all around, the defendants are up to 20 different

17      attachments.  We should have a little chat about how to do

18      that.

19             The plaintiffs have three agenda items, and the

20      defendants have six agenda items.  Of the plaintiffs' three

21      agenda items, the first one is moot.  That had to do with the

22      Tauber pending motion to dismiss.  The plaintiffs' opposition

23      was due and came in.  I saw it in today's mail.  So there is

24      nothing to discuss with respect to agenda item one, agreed?

25             MR. AXLINE:  Agreed, your Honor.

E3j2mtbc1

1          THE COURT:  So that takes us to plaintiffs' agenda

2     item two, which is what plaintiffs describe as defendants'

3     excessive and duplicative expert designations in the Puerto

4     Rico case.  I need to understand how many of the alleged 75

5     expert witnesses are in play here?  Is it really 75, if you

6     include 26(a)(2)(B) and 26(a)(2)(C)?  There were two different

7     groups totaling 75?

8          MR. MILLER:  Yes, your Honor.

9          THE COURT:  Mr. Miller, yes.  Because the defendants

10     come back and talk about having only 35, and I think that's

11     maybe Ms. Gerson is the one who is on the line for saying 35.

12     Were you limiting it yourself to (a)(2)(B) when you said there

13     were only 35.

14          MS. GERSON:  We were talking plaintiffs grouped

15     together retained experts and 26(a)(2)(C) experts, although

16     their letter only appeared to be complaining about (a)(2)(C)

17     witnesses.

18          THE COURT:  What is the number of each.

19          MS. GERSON:  It actually breaks down exactly 35 of

20     each.

21          THE COURT:  Oh, exactly 35 of each.

22          MS. GERSON:  So focusing on the (a)(2)(C) witnesses, I

23     think we point out in our letter --

24          THE COURT:  Let me understand what the plaintiffs'

25     complaint is.  I want to make sure I understood the numbers.

E3j2mtbc1

 1   It is 35 of one kind and 35 of another kind.  That happens to

 2   be 70, not -- is that what the complaint was, that there was

 3   75?  Already we seem to have gone down by five, which is good

 4   news.  Did we reduce it by five?  Because the complaint was 75.

 5   Now you are telling me there are 70, which sounds ridiculous

 6   anyway.  But are there 75 or 70.

 7          MR. MILLER:  I think your Honor is right that it is

 8   70.

 9          THE COURT:  So you are complaining about 70, not 75.

10   Small progress, but I assume you think 70 is still way out of

11   line.  Whether it is the retained kind or the inside kind, it

12   is still a problem.

13          MR. MILLER:  It is, your Honor.

14          THE COURT:  And you are complaining about both groups.

15          MR. MILLER:  Yes.  But we met and conferred, and I

16   think that we can make substantial progress in dealing with the

17   35 current and former employees testifying as experts through a

18   meet-and-confer process.  I told counsel what I thought my

19   solution was because part of what we are concerned with is

20   duplication.  Part of what we are concerned with is taking 35

21   additional depositions.

22          THE COURT:  Right.  No, it's horrible.

23          MR. MILLER:  And I think that we can probably at a

24   minimum cut the number of depositions of the 35 down

25   substantially.

E3j2mtbc1

1          THE COURT:  The (a)(2)(C) ones.

2          MR. MILLER:  That's correct.

3          THE COURT:  But the retained ones, (a)(2)(B) ones, I

4    don't know whether we are calling them retained or just

5    (a)(2)(B), whichever is clear for the record.  One second.

6    Give me a minute to have the rule in front of me, because

7    either way there has to be a submission.  And you also are

8    complaining about the inadequacy of the submissions, and we

9    will get to that in a minute, too.  It will be convenient to

10   have the rule open.

11         MR. MILLER:  My suggestion, your Honor --

12         THE COURT:  Wait, no; no suggestions until I get the

13   rule open is what I said.

14         Okay, so the (a)(2)(C)'s are the ones you think you

15   can negotiate about?

16         MR. MILLER:  Yes.

17         THE COURT:  You realize, of course, that they still

18   have to disclose the subject matter in which the witness is

19   expected to present evidence under rules of evidence 702(3) and

20   (5), and the summary of facts and opinions to which that

21   witness will testify.  So they are not just fact witnesses, as

22   I understand it, who happen to be on the payroll.  They are

23   being offered also as experts who do not have to provide a

24   report.

25         MR. MILLER:  That's correct.

E3j2mtbc1

1          THE COURT:  Then they have to do these other things.

2     Have they done these other two things?  Have they designated

3     the subject matter and summary and facts upon which they plan

4     to testify?

5          MR. MILLER:  They have written a paragraph and they

6     say things like the witness will cover industry practices,

7     without specifying them, which is a pretty broad category, in

8     my mind.

9          THE COURT:  I can help you out.  I don't find that

10    satisfactory.  The whole point of 26(a)(2)(C) was to relax the

11    written report requirement but to still require that if they

12    are going to give opinions, expert opinions under 702(3) or

13    (5), they have to do (ii), which is a summary of the facts and

14    opinions to which the witness is expected to testify.  That

15    broad sentence won't do it.  It would save time, it would help

16    me and everybody else figure out duplication.  It might avoid

17    depositions if that were done right.  So I think you should

18    make a separate two- or three-page submission for each of them

19    that complies with Rule 26(a)(2)(C).

20          MS. GERSON:  Your Honor --

21          MR. MILLER:  We do not have two or three pages --

22          THE COURT:  I know you don't.

23          MR. MILLER:  -- on anyone.

24          THE COURT:  I know you don't, and I think you should.

25    So whether you ask for it or not, Mr. Miller, I want it.  I

E3j2mtbc1

want a proper two- or three-page single-spaced summary for each

of these people, if they are going to give expert opinions.  If

they are just going to talk about the facts of their job or

something, then they are like any other fact witness and

nothing is required.  They are just going to be an everyday

percipient witness, like everybody else.  But if they are going

to give opinions, that's why the rule is written as it is

written.  You have a certain amount of time to produce a

statement from each them.  And one of the excuses for having so

many people is that there are 14 defendants.  So I am not

looking at you, Ms. Gerson, I don't think you have to write 35

of these, but there are 14 defendants.  Each defendant is going

to have to talk to their, whatever it is, two or three --

            MS. GERSON:  Your Honor --

            THE COURT:  -- people in house -- I don't know how

else to call them -- employees, and get them to write up the

opinions on which they plan to give expert testimony and the

facts of which they expect to testify, etc., the facts and

opinions, a real statement that might take care of depositions

if they knew what they were going to say and would also help

them make arguments about being duplicative.

            MS. GERSON:  Your Honor, I think we understand that.

I do think we have invited plaintiffs to point out --

            THE COURT:  They don't need to do it.  I'm not

satisfied with the description I heard in the one paragraph you

E3j2mtbc1

gave.  That's not explicit enough.  So if you want to test out

what is explicit enough and do one that's more detailed, send

it to Mr. Miller and the court, and see if there is an

objection, before you do 34 more of the same, that's fine.  So

maybe you want to do one in the next three days, send it over

and say, Will this be satisfactory to you, Mr. Miller and to

you, the judge.

          Mr. Riccardulli, you have been here long enough, if

you want to confer, the right way to do it is you say, your

Honor, may I have a moment?  Otherwise I consider it rude.

Once you say, May I have a moment, I say, Sure, and I stop

talking.

          MR. RICCARDULLI:  I apologize, your Honor.

          THE COURT:  Any time you want to confer with anybody,

you say, May I have a moment please, and then go ahead and

confer.  Given that, you do or don't?

          MR. RICCARDULLI:  I do, for five seconds.

          MS. GERSON:  Your Honor, we have a few examples I

think that defendants have done, some defendants have done more

than others.

          THE COURT:  This probably isn't the time.  If you have

one that you think really is fuller and complies with

(a)(2)(C), send that one over to Mr. Miller, copy to the court,

I think, and say, Will this satisfy everybody?  If it will,

then all the rest have to be brought up to that level.  And

E3j2mtbc1

```
1   then if Mr. Miller wants to make an argument that it is
2   duplicative, overlapping, and there are still too many in that
3   group, I will at least have paper to be able to figure that
4   out.  So let's not spend any more time on (a)(2)(C), because he
5   doesn't think it is worth it and I don't either.  Can you give
6   the next examples over in the next day, since you think you
7   have one.
8           MS. GERSON:  Yes, your Honor.
9           THE COURT:  When you get that, Mr. Miller, if that
10  example is satisfactory to you, then the other 34 should be
11  due, all of them, no later than two weeks from today.
12          MR. MILLER:  Yes, your Honor.
13          THE COURT:  Two weeks from today would be April 2, all
14  35.  But if that one isn't satisfactory and you can't resolve
15  it, since I will have a copy, we can get on the phone and I
16  will agree or disagree that it is satisfactory.
17          MR. MILLER:  Thank you.
18          THE COURT:  Because I'm going to ask Ms. Gerson to
19  copy me on what she sends you, so we can work it out if it is
20  not enough.
21          MR. MILLER:  Yes, your Honor.
22          THE COURT:  What about the other 35, the (a)(2)(B)
23  people?  Where are we up to?  Let me hear from Mr. Miller, see
24  what he is complaining about.  So what about the (a)(2)(B)
25  people?
```

E3j2mtbc1

1          MR. MILLER:  Your Honor, I would like to defer that as

2     well, because I view them, especially the duplication issue, as

3     overlapping.

4          THE COURT:  Overlapping with the (a)(2)(C)?

5          MR. MILLER:  Yes.  Both -- several people.

6          THE COURT:  Deferring is not something we really can

7     do.  The whole point is that the discovery of these experts, as

8     I understand it, is supposed to end May 30.  Is that the right

9     date?

10          MR. MILLER:  Yes.

11          THE COURT:  We can't defer.  Today is March 19.

12     That's why these are being raised in the letters.  You have

13     reports, real reports from each of the 35(a)(2)(B)'s?

14          MR. MILLER:  We do not have reports from the ones that

15     are rendering site-specific reports.  In most cases I think we

16     are owed more than 20 reports at this point.

17          THE COURT:  So how many (a)(2)(B) reports do you have?

18     15?

19          MR. MILLER:  They have served nine reports out of 35.

20     That, by my math, means we are owed 26.

21          THE COURT:  Of the nine you have got, are they

22     sufficient?

23          MR. MILLER:  Yes.

24          THE COURT:  So you are not challenging the quality of

25     the reports, you are challenging the duplicativeness, overlap,

E3j2mtbc1

1    etc.

2             MR. MILLER:  Not quality.  There are some items that

3    are the subject of item three in our agenda.

4             THE COURT:  Oh, irrelevant.  That's different.  But

5    the reports satisfy the rule.

6             MR. MILLER:  Yes.

7             THE COURT:  What you are left arguing about is whether

8    it is duplicative and whether it is irrelevant.

9             MR. MILLER:  That's correct.

10            THE COURT:  I got that.

11            Where are the other 26 reports, Ms. Gerson?

12            MS. GERSON:  Your Honor, based on -- they are not

13    late.  Based on the schedule, they are not due yet.

14            THE COURT:  Because all 26 are site specific?

15            MS. GERSON:  That's correct.

16            THE COURT:  When are they due?

17            MS. GERSON:  April 7.

18            THE COURT:  Oh, and then we are going to be able to

19    complete all those depositions by May 30?

20            MS. GERSON:  That's the plan, your Honor.

21            THE COURT:  I don't think they knew how many experts

22    you were going to do.  Why do you need nine non-site-specific

23    and 26 site-specific?  How many sites are we talking about?

24    And why do there have to be different experts for all of these

25    sites?  Even if there are 26 sites, why do there have to be 26

E3j2mtbc1

1    different people?

2              MS. GERSON:  Your Honor, the retained experts, first

3    of all, plaintiffs have not provided us with any detail about

4    who they are complaining about.  This issue was not in the

5    letter.  They have had our designations of retained experts

6    since August for non-site specific, December for site specific,

7    and they haven't raised this issue before today.

8              And in terms of the numbers, this is right in line

9    with the experts in New Jersey.

10             THE COURT:  Right in line with what?

11             MS. GERSON:  The number of retained experts by

12   defendants in New Jersey.  So the numbers are --

13             THE COURT:  I don't think activity in one case creates

14   a waiver in another case.  Either it is correct to have this

15   many or it isn't, period.

16             MS. GERSON:  And some --

17             THE COURT:  Why do you need 26 different site-specific

18   experts?  How many sites are we talking about.

19             MS. GERSON:  There are ten sites, and not all of these

20   are hydrogeologists.  There are site-specific issues in terms

21   of supply, and one thing that we, like in New Jersey, are

22   facing here are different defendants have different supply

23   experts to explain their stories that we believe is a

24   significant portion of the numbers.

25             As we mentioned in our letter, we do have a couple of

E3j2mtbc1

1    experts that we retained for Puerto Rico that we may not have

2    used in other cases, because they are dealing with a very

3    different region, and we believe they have specific Puerto Rico

4    knowledge that we can't get out of our traditional experts.

5            THE COURT:  What I can say is neither the plaintiffs'

6    attorneys nor the court can opine without seeing the reports.

7    It may that be there is overlap and you should not be using 26

8    different people, or it may be that because it is defendant

9    specific, with different supplies, as you said, stories, etc.,

10   maybe there is a need.  But nobody can challenge it without

11   seeing it.

12           So I guess until April 7, when they are due, I guess

13   you would agree, Mr. Miller, there is nothing more I can say

14   about the 26 who you haven't seen.

15           MR. MILLER:  I agree, your Honor.  That's the problem

16   at the moment and potential duplication, which I can't really

17   address until I see the reports.

18           THE COURT:  Right, but there really isn't a lot of

19   time between April 7 and May 30, especially if you knew these

20   numbers back in either August or December respectively.  She

21   said you knew some in August and some in December, and here we

22   are in March.  Why didn't you say there were 70 a long time

23   ago?

24           MR. MILLER:  Because we had 35 that were not known and

25   expected in employees.  So it is the combination of the two

E3j2mtbc1

1    that makes it more difficult.

2              THE COURT:  So what you got notice of were the

3    (a)(2)(B)'s.

4              MR. MILLER:  We got notice of retained experts.

5              THE COURT:  Was that December or August?  You

6    mentioned both dates, Ms. Gerson, I forgot which group is

7    which.

8              MS. GERSON:  The retained experts the non-site

9    specific were disclosed last August.  The retained site

10   specific experts were disclosed in December.

11             THE COURT:  By December you knew there were 35

12   retained ones.

13             MR. MILLER:  Yes.

14             THE COURT:  And you didn't think that was too many.

15             MR. MILLER:  No.  We could get it done within the

16   schedule.  But now the number is doubled.

17             THE COURT:  I realize.

18             MR. MILLER:  I am hopeful we will not need to take a

19   deposition in most of the current and former employees for

20   various reasons; but, until I see and talk to counsel, I won't

21   know for sure.

22             THE COURT:  Right.

23             Well, I think we need to get a date on the calendar

24   very shortly after the 7th to handle this issue of the number

25   of experts.  It really does sound very high.  So I am going to

E3j2mtbc1

1   stop -- it is unusual -- and look at the calendar now, for how

2   soon after the 7th we can be ready to talk about this issue.

3   If the issue goes away, fine, you can cancel, but at least you

4   will be on the calendar.

5          Wednesday, April 16, at 4:30 or Thursday, April 17, at

6   4:30.  It is the earliest date I can give you, because I figure

7   you need a week to review the reports.  But early in the week

8   is the holiday, and I don't have any idea when Good Friday is.

9   So, anyhow, 16th or 17th at 4:30.

10          MR. MILLER:  Either is acceptable to plaintiffs.

11          MR. RICCARDULLI:  Same for defendants, your Honor.

12          THE COURT:  Earlier the better, then.

13          (Pause)

14          THE COURT:  So we will do it April 16 at 4:30.  It

15   will be a special conference just to address expert issues in

16   the Puerto Rico case.  It has to be at 4:30.  I expect to be on

17   trial.  That's done.

18          So we will go on with the agenda, which is the

19   arguments about relevant experts.  The plaintiffs say there are

20   three issues on which there is no need for experts at all.

21   Those issues involve the question of the benefits of using MTBE

22   versus lead.  The use of lead as an octane enhancer is one of

23   them, and the other is the benefits of using MTBE versus

24   ethanol, and the third has to do with the overall air quality

25   benefits of MTBE.  There is one expert on each of these issues,

E3j2mtbc1

Mr. Austin, Mr. Hoekman, and Mr. Wilson.

Plaintiffs, as I say, said that all of these are irrelevant.  The defendants disagree as to all three categories, so we should start with the question of lead and I will go with the defendants' argument.  Defendants say that the reasons for the lead phased out in the introduction of MTBE as an octane enhancer is relevant as to why MTBE was used in the first place.  Defendants argue they are entitled to explain why they decided to use MTBE at all.

I should preface this and say also defendants say that this is a serious issue that shouldn't be raised through letter submissions, and it should be done as a full motion *in limine* on the eve of trial.  I understood Mr. Riccardulli to address that point.  But the reason why it is timely now and should not be done as a motion *in limine* in either trial is because of the issue of depositions.  There are so many depositions to schedule, that if I were to agree with the plaintiffs' argument on any one of these three, that is one less deposition.  I would rather not leave it out until later in the game because all the work has to get done now when time is precious.

So I actually thought we could discuss each of the three, and it is the lead one that I thought was the easiest.  It is not a subject for expert testimony.  If you want to explain why you decided to use MTBE, call a fact witness.  Call somebody in the company.  You don't hire an expert when there

E3j2mtbc1

1    is no issue to be decided by the jury.  You are saying

2    essentially this is background information that you think a

3    jury should know.  You think you should have a right to explain

4    to the jury why you decided to use MTBE, fine.  But to hire an

5    expert?  One expert breeds a competing expert, as if the jury

6    is going to be asked a question, and they are not.  This is

7    background information that you say they should know and have a

8    right to know.  So there are a lot of fact witnesses who know

9    that answer.  I don't see why this is a matter for expert

10   testimony.

11           MR. RICCARDULLI:  Yes, your Honor.  Just two points,

12   one on the timing of the -- sort of the -- that this be briefed

13   more fully.  If it is a question of timing, we are certainly

14   happy to do that now if that's what the court would want.  But

15   we do think that if the court's considering striking one of

16   these experts, that this should be done on a fuller record.

17           THE COURT:  Nobody needs extra work.  This one seemed

18   easiest of the three.  The other two may take me more time.  I

19   may allow short submissions, but I thought the first one was

20   really obvious.  You don't hire experts when it is matter of

21   fact in the company.  Anybody from the company knows the

22   answer.

23           MR. RICCARDULLI:  Yes, your Honor.  The expert is

24   going to say and explain that when lead was phased out, the

25   industry was faced with having to replace lead and gasoline.

E3j2mtbc1

1    The expert was not retained to address that one piece.  They do

2    go on to talk about the other benefits or the feasibility of

3    MTBE versus --

4          THE COURT:  That may be overlapping with somebody

5    else.  That's the problem with overlap.  You may have an expert

6    already about, whatever you call it, the feasibility.

7          MR. RICCARDULLI:  We don't, your Honor.  One of the

8    experts was in -- you referenced them before, and you will

9    remember at least Mr. Austin who testified as to the air

10   quality benefits of MTBE in gasoline, he testified in the New

11   York City case, and you will remember -- you may recall that he

12   testified in the case.

13         THE COURT:  The good luck for me is that I don't

14   remember hardly anything about it.

15         MR. RICCARDULLI:  Mr. Wilson also was involved in that

16   prior case, your Honor, resumed on sort of the scope of his

17   testimony that deals with more of the regulatory framework

18   generally with gasoline, not as to just the phaseout of lead or

19   the benefits of lead versus MTBE.  We are not arguing that lead

20   was a viable alternative.

21         THE COURT:  That's my point.  It is not an expert

22   issue.

23         MR. RICCARDULLI:  Your Honor, I can look at that.  I

24   would like to confer and go back and see if we can remove that

25   one piece, but these experts -- we don't have one expert

E3j2mtbc1

1    committed to that sole issue.  If that's really what's driving

2    it here, that the lead phaseout and how we can explain that,

3    and if that resolves this, then I can certainly confer with my

4    group and see if we are willing to move past that.

5           THE COURT:  Mr. Miller, do you want to be heard on

6    these three different subjects or do you think this is amenable

7    to further meeting and conferring?  Because I guess

8    Mr. Riccardulli is arguing that some portion of these experts

9    is background in a sense that you could see what they did at

10   the City of New York trial, whether it was really any different

11   here; and if it was limited to those subjects, you may not have

12   an objection particularly, if it doesn't overlap some other

13   expert.  And that's the point to read all nine of the non-site

14   specific expert reports that you have and be specific about

15   overlap.  There should not be two people saying the same thing.

16   That should be obvious, Mr. Riccardulli.  It's going to be a

17   long trial as it is.  You do not need two people to say the

18   same thing.  It's just confusing to the jury and annoying.

19          MR. MILLER:  There is literally no dispute that the

20   jury has to hear about with respect to lead.

21          THE COURT:  I covered that.  I think Mr. Riccardulli

22   gets the idea, and he said, I will look at the report, I will

23   talk to my team, I will try to take out any portion that does

24   not relate to a disputed issue.

25          MR. MILLER:  Frankly, your Honor, I think ethanol is

E3j2mtbc1

1    the same situation.  I think that the defendants can, through

2    fact witness, give any background information they need to give

3    about ethanol.

4              THE COURT:  Let's be specific about Hoekman.  What's

5    Hoekman saying that we need an expert witness when, again, it

6    is not a subject for decision?

7              MR. RICCARDULLI:  Yes, your Honor.  Maybe this helps

8    frame it.  Plaintiffs have a design defect claim in this case

9    that the defendants should not have used MTBE.  One of

10   plaintiffs' own experts, Mr. Moreau, in his report talks about

11   the feasibility and the benefits that ethanol has over MTBE.

12   So --

13             THE COURT:  Is Mr. Moreau going to give that testimony

14   at this trial.

15             MR. MILLER:  I will be happy to strike it, your Honor.

16   It is not an issue unless the defendants are able to bring it

17   up.  He would have nothing to say about ethanol unless it is in

18   response.

19             THE COURT:  This is actually helpful.  So if the

20   plaintiffs' expert is not going to say why ethanol was a

21   feasible alternative that should have been used in place of

22   MTBE, if that issue is not coming up, then let's get it out of

23   the case.

24             MR. RICCARDULLI:  Not just Moreau.  There are other

25   experts, like Mr. Fogg, one of plaintiffs' experts, who talks

E3j2mtbc1

1    about the environmental conditions versus the benefits of

2    ethanol over MTBE.

3              THE COURT:  If ethanol is coming out of the case on

4    both sides, that's an advantage.  It will make, God knows, a

5    four-month trial three months or something, which is good for

6    everybody.  So maybe this is amenable to some talking, meeting

7    and conferring between the sides.  I didn't know that you would

8    point out the plaintiffs are bringing up ethanol.  I didn't

9    know Mr. Miller would say, I will take it out if they will take

10   it out.  So if it is out of the case, it is out of the case.

11             MR. MILLER:  If feasible alternative is an issue, our

12   feasible alternative isn't going to be ethanol.  It is gasoline

13   without MTBE.

14             THE COURT:  That's a different case.

15             MR. MILLER:  I do not need to go into ethanol at all.

16             MR. RICCARDULLI:  Then we do need to meet and confer,

17   your Honor?  Because I don't think the expert reports reflect

18   that.

19             THE COURT:  They don't know.  That's the point.

20   That's why you called them irrelevant.  But you didn't know his

21   position.

22             MR. RICCARDULLI:  I did not.

23             THE COURT:  So this one may solve itself, given the

24   statements you have made on the record today, Mr. Miller, by

25   talking directly with Mr. Riccardulli and/or his team.

E3j2mtbc1

1          MR. MILLER:  I will.  Thank you.

2          THE COURT:  The third one is -- well, the third one is

3     what you just said.

4          MR. RICCARDULLI:  Yes, your Honor, and the experts are

5     sort of --

6          THE COURT:  Right.  You are saying they didn't need to

7     do MTBE at all.

8          MR. MILLER:  That's right.

9          THE COURT:  The alternative is not to do it at all,

10    not to have any oxygenate.  So that takes care of the third

11    topic of the relevancy, too.  So you do need to talk.

12         MR. RICCARDULLI:  We do need to talk.

13         THE COURT:  Okay.  Good.  So that finished that.

14         We are up to the defendant's agenda items, of which

15    there are a lot.

16         But the first one has to do with Mr. Brown's

17    site-specific expert report which was served on January 24 and

18    the defendants have several objections to Mr. Brown's report.

19         Defendants say that Mr. Brown improperly included

20    damages for investigations at several nontrial sites in

21    connection with his opinion about a particular site.  I don't

22    know how to say it, but Club de Leones, the defendants say that

23    the commonwealth should not be allowed to recover the cost of

24    investigating eight service stations that were not the subject

25    of discovery.  In fact, of the eight, one was dismissed and

E3j2mtbc1

1    five were never identified as release sites and two were

2    identified but would presumably come up in a later phase.

3           Defendants then say that Brown refers to several non-

4    trial sites in connection with his opinion on the Manati and

5    Maysonet trial sites.  Brown notes that 15 additional sites may

6    have had releases, and they weren't identified as trial sites.

7    There has been no discovery.

8           And finally defendants object to Brown's inclusion of

9    173 new wells that were not subject to discovery.  Of these,

10   132 are outside plaintiffs' delineated areas and, they point

11   out that the court has already said that plaintiffs cannot now

12   expand the delineations.  The remaining 41 are inside the

13   delineations, but defendants argued that they weren't

14   identified during discovery, and that the court had said that

15   if they weren't identified by, of all dates, July 1, 2011, only

16   two and a half years ago, then they would be excluded.  So, in

17   sum, the defendants say all of this material should be

18   excluded.

19          Of course, the plaintiffs have respond in some detail

20   with respect to the Club de Leones.  Well, they said they

21   designated that as a receptor trial site, but never disclosed

22   the sources, and that's what experts do, and Brown should be

23   entitled to analyze the eight stations that are the source of

24   the contamination into their receptor well, and that defendants

25   would have a chance to depose Brown about that.

1          With respect to the 173, the ones that were outside

2     the delineated areas, which is the 132, they apparently are

3     only mentioned in figures attached to the report and this

4     was -- we did something like this in New Jersey.  I ruled in

5     New Jersey that Brown could discuss the wells, but only if a

6     defendant opened the door to that.  Otherwise the figures could

7     not be shown to the jury unless the wells were removed.  But

8     there is still a disagreement about the 41 that are within the

9     delineated areas.

10         So my thought on this, again, the defendants first say

11    that this should be subject to a motion *in limine*.  And I

12    understand the point.  Again, I don't know whether it is one of

13    timing or one of full briefing as opposed to the letter

14    briefing, but I can give you a tentative ruling and then see if

15    you think you still need to fully brief.

16         So it seems that Brown should be allowed to talk about

17    the eight stations that are the source of contamination into

18    the receptor well that has been identified, and that can be

19    explored at depositions, but I think the New Jersey procedure

20    should apply to the wells outside the delineated areas.  But

21    with respect to the ones within the boundaries, I think those

22    should be fair game, but I don't know what we do about the fact

23    that they haven't been previously identified and what kind of

24    discovery that would entail now.  But presumptively that's

25    where I would be coming out.  I don't think the plaintiffs'

E3j2mtbc1

1    responded with respect to the Manati and Maysonet trial sites,

2    so I don't know whether those are still in dispute.  If they

3    are in dispute, is it the same argument as it is with Club de

4    Leones, that they are the source of contamination into a

5    receptor.  I don't know.  So I need to get a little more

6    information with respect to Manati and Maysonet because I don't

7    think the plaintiffs responded.

8              Who wrote the plaintiffs' response letter?

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3jzmtb2                    Conference

 1          MR. AXLINE:  I did, your Honor.

 2          THE COURT:  Did you mention the 15 wells that are in

 3  contention with respect to the Manati and Maysonet?

 4          MR. AXLINE:  We had an extensive meet and confer

 5  before today's session, your Honor, and I think we've resolved

 6  the issues with respect to those two wells.

 7          THE COURT:  Good.

 8          MR. AXLINE:  In fact, I think we've narrowed it down

 9  to, and Ms. Gerson can confirm or deny this, but I think we

10  narrowed it down to the 11 wells that are within the delineated

11  area that are identified by Mr. Brown in his expert report that

12  were not previously discussed.

13          THE COURT:  You are talking about Manati and Maysonet?

14          MR. AXLINE:  No, no.

15          THE COURT:  No.  Altogether?

16          MR. AXLINE:  Yes.

17          THE COURT:  The 41 has become 11?

18          MR. AXLINE:  Yes.

19          THE COURT:  Oh, okay.  So there won't be anything more

20  right at this stage of the case with respect to the 132 outside

21  the delineated area, unless defendants open the door.

22          MR. AXLINE:  Yes.  But there is a caveat.  We're, with

23  respect to the Club De Leones site --

24          THE COURT:  That's different.  I'm talking about

25  the -- of the 173 that are not Club De Leones and not Manati or

E3jzmtb2                        Conference

1    Maysonet, 132 of those are outside the delineated areas.  They

2    won't come up unless the defendants open the door.

3              MR. AXLINE:  Yes.  But there may be two wells that are

4    a little different.  We're still discussing.

5              THE COURT:  Okay.

6              MR. AXLINE:  But, so --

7              THE COURT:  But otherwise correct about 132.

8              MR. AXLINE:   Correct?

9              THE COURT:  Now with the 41 that are in the delineated

10   areas, the number in play has been reduced to 11.

11             MR. AXLINE:  Yes, it has.

12             THE COURT:  So the other 30 are not -- there is not

13   going to be evidence of that in this phase of the case.

14             MR. AXLINE:  Well, I think the defendants are

15   withdrawing their objections to those.

16             THE COURT:  The other way around, the 30 are going to

17   be in the --

18             MS. GERSON:  Your Honor, can I?  I want to like to

19   clarify.  In plaintiff's letter, just briefly going back to the

20   132, plaintiff's letter said it's only on the graphics.

21             THE COURT:  Yes.

22             MS. GERSON:  We discussed ahead of time, they're both

23   on the graphics and in the report, and we'll discuss the ones

24   amongst ourselves how to strike those.  We're in agreement.

25             THE COURT:  Right.

E3jzmtb2                    Conference

 1           MS. GERSON:  On the 41 that are inside, plaintiffs

 2      represented that 30 of those, Mr. Brown is not alleging are

 3      threatened or impacted.  He's only mentioning them to, so to

 4      speak, the lay of the land and we'll accept that

 5      representation.

 6           THE COURT:  Right, okay.

 7           MS. GERSON:  So that does leave 11 that he's now

 8      alleging for the first time are potentially impacted or

 9      threatened that were not disclosed to us in discovery.  And,

10      indeed, a couple of those, for example, my client took a

11      30(b)(6) of the Commonwealth regarding an Esso service station.

12      A couple of the wells of those 11 were identified in advance of

13      that deposition.  We said, well, this is new information.

14      Their 30(b)(6) witness specifically said on the record, I was

15      just giving those to you again a lay of the land disclosure.

16      These are not -- these were not disclosed as threatened or

17      impacted.  That was in November of their 30(b)(6) witness.

18           Now we have Mr. Brown coming back in January and

19      saying they are.  So these 11 wells we do feel that we've been

20      prejudiced not being able to pursue discovery on them, now they

21      have an expert saying that --

22           THE COURT:  What does the expert say about these 11?

23      Is he saying they're threatened or impacted, Mr. Axline?

24           MR. AXLINE:  Yes, yes.

25           THE COURT:  Isn't he two and a half years late in

E3jzmtb2                    Conference

1    saying that?

2            MR. AXLINE:  No.  He said that in his expert report.

3            And I need to correct something Mr. Gerson said, which

4    is that these wells were not disclosed in discovery.  They have

5    had the data that has these wells in it for years.  It just

6    hasn't been analyzed by an expert until Mr. Brown completed his

7    report, and --

8            THE COURT:  Well, what was it I required to be

9    identified by July 1st, 2011?

10           MR. AXLINE:  Those were PROSA(phonetic) wells, your

11   Honor, island wide where the defendants were complaining we

12   hadn't given them exact coordinates for the wells, and you

13   ordered us to do that by a date certain, and we did that.

14           But there was no discussion of, you know, other wells.

15   And there are lots of other types of wells that are within the

16   delineated areas.

17           We didn't have our consulting experts do anything more

18   than try to identify geographic limitations for the experts to

19   analyze when they prepared their reports.  And you said on the

20   record, and I think this was right, that anything within those

21   delineated areas is fair game for the experts.

22           Now, Mr. Brown has now done his analysis and he's

23   identified 11 other wells that are impacted or potentially

24   impacted by the releases that the defendants have known about,

25   and they've known about the wells.  They just didn't know that

E3jzmtb2                        Conference

1    Mr. Brown was going to include --

2              THE COURT:  One more question.  Besides those 11, how

3    many turn up at Manati Maysonet and how many turn up in Club De

4    Leones; in other words, what's the total number of wells that

5    they say they've had no discovery on, and are now going to be

6    in play?  So I just want to add the numbers.  So 11, and then

7    what about the Manati and Maysonet, how many is that?

8              MR. AXLINE:  Those 11 are not involved in Manati or

9    Maysonet.

10             THE COURT:  I figured it out.  So I want to know what

11   the total number of new wells are.

12             MS. GERSON:  Your Honor?

13             THE COURT:  How many?

14             MS. GERSON:  I think we're mixing up issues.  I think

15   we're mixing issues.  The 11 are wells.  The Manati and

16   Maysonet are dealing with service stations.  They're not --

17             THE COURT:  Oh, there's no wells in play there.

18             MS. GERSON:  That was not the issue with those.

19             THE COURT:  And Club De Leones?  That's eight wells,

20   isn't it?

21             MR. MILLER:  No, it's not, your Honor.  There's a

22   single well --

23             THE COURT:  There was a single receptor, I thought.

24             MR. MILLER:  They identified nearby release sites for

25   service stations.

E3jzmtb2                        Conference

1              THE COURT:  They're also service stations.

2              MR. MILLER:  Yes.

3              THE COURT:  Okay.  So wells that are so-called new are

4    11.

5              MR. AXLINE:  Yes.

6              MR. MILLER:  Yes.

7              THE COURT:  Okay.  But do we have a dispute or not a

8    dispute about the service stations then at Club De Leones,

9    Manati and Maysonet; is there a dispute?

10             MR. AXLINE:  I think we're going to be able to resolve

11   the Club De Leones issue the next several days.

12             THE COURT:  And how about the others?

13             MR. AXLINE:  And we have no dispute for any, at least

14   I don't think we do, with respect to Manati or Maysonet.

15             THE COURT:  So this whole --

16             MR. MILLER:  Your Honor, I just want to -- we -- I'm

17   sorry.  We met and conferred this morning about the Club De

18   Leones site.  We may reach agreement on a solution to that

19   problem.  And I guess we agreed we might know by Monday.  If

20   that doesn't resolve itself, though, if that site is -- if we

21   don't agree on how to treat that site, there will still be a

22   discovery dispute as to the eight service stations that are

23   linked to that site.  We think we may be able to avoid this,

24   but --

25             THE COURT:  Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3jzmtb2                          Conference

1              MR. MILLER:  -- if we can't reach agreement, then we

2      do have a dispute as to those eight sites.

3              THE COURT:  Okay.  So --

4              MR. MILLER:  I just want to be clear.

5              THE COURT:  -- with respect to those eight sites, if

6      you don't reach a resolution, I'm going to refer that directly

7      to the special master, given I'm starting a ten week trial or

8      something horrible like that.  So go straight to him.  If you

9      have that discovery dispute, take it there and see if you can

10     work it out there.

11             MR. MILLER:  Understood.

12             THE COURT:  Okay.

13             Now, with respect to the 11 wells within the

14     delineated area, my instinct is to allow that in on the theory

15     of what Mr. Axline argued, but I was there before he said it;

16     namely, that you knew, you know -- you knew about the existence

17     of these wells, there is no way you could know the expert's

18     opinion until he did his expert work.  So it was always going

19     to be anticipated some of the wells were identified might in

20     fact, once examined by an expert, turn out to be either

21     impacted or threatened.

22             What discovery would this open up for these 11

23     locations if I left them in?

24             MS. GERSON:  Well, your Honor --

25             THE COURT:  In other words, if Brown was allowed to

E3jzmtb2                    Conference

1  testify about it and they're part of the case, what would you

2  say happens then?

3       MS. GERSON:  Yeah, I think first of all in terms

4  whether we knew about them, we asked very specific discovery

5  requests, very specific, what are the wells allegedly

6  threatened or impacted, and these were not disclosed.  It was,

7  not never supplemented later on.  Secondly --

8       THE COURT:  It was always anticipated when the experts

9  did the analyses, you would learn who through the expert

10  analysis, it's sort of the final parameters of the opinion.  If

11  it's only 11 within the delineated area, that's good news.

12      The dispute started out with 173.  We're down to 11.

13  So my question to you is what would you have to do to not be

14  prejudiced in terms of discovery with respect to these 11

15  sites?  Is it just a matter of -- not sites, but wells -- is it

16  just a matter of receiving reports of testing that was done at

17  those 11 places, any history of testing about what was found,

18  what would you need to discover?

19      MS. GERSON:  Your Honor, we can certainly confer with

20  our experts.  Off the top of my head I think that certainly

21  testing data, basically documents in their possession, but

22  testing data, we don't have the well depth.  So, for example, I

23  don't know if it's drawing water from shallow or deep.

24      THE COURT:  But they could get that to you very fast I

25  think or they better be able to get it very fast, or they can't

1    do this, but go ahead.

2           MS. GERSON:  Well, depth screen, screen level, pumping

3    rates, historic pumping rates.  I think we'd have to confer

4    with our experts, but -- and if I could confer with Mr.

5    Riccardulli?

6           Your Honor, one of the issues goes back to what I

7    mentioned, which was when we took the 30(b)(6) deposition,

8    these were -- a couple of these we were told they're not

9    threatened, and now we're being told that they are.  I think we

10   need at least a deposition of a 30(b)(6) to explain to us the

11   EQB --

12          THE COURT:  The what?

13          MS. GERSON:  I'm sorry, the Environmental Quality

14   board's position as to why they did not investigate these

15   wells, require action at these wells, but for leaving it to

16   there expert to now raise an opinion.

17          THE COURT:  I'd like to know Mr. Axline's answer to

18   that now somewhat.  Why?

19          MR. AXLINE:  First, let me say, your Honor, that when

20   we responded to the discovery request from the defendants,

21   every one of those had a caveat that this is subject to expert

22   reports which are going to be coming.  So it's not like -- the

23   reason you have an expert is to address things that the EQB

24   doesn't have the time or the resources to address on its own.

25   So the EQB has the information that it has, it did what it

E3jzmtb2                      Conference

1  could with that information, and now retained an expert for the

2  case to do what experts do, which is look at it closely.

3        And I don't think there's anything that the defendants

4  don't have that Mr. Brown had.  I don't think Mr. Brown has

5  anything the defendants don't have.  We produced all the

6  information that he relied on to reach his opinion.

7        THE COURT:  Well, do you have any testing data?  They

8  say they don't know the depth of the wells, they don't know the

9  screen, they don't know --

10        MS. GERSON:  Pumping.

11        THE COURT:  Yes.

12        MR. AXLINE:  If there is information that Mr. Brown

13  has that hasn't been given to them, they're welcome to ask

14  specific questions, what about this --

15        THE COURT:  Let's not wait for that.  Why don't you

16  ask him what data he has with respect to each of the 11, put it

17  together in packets and send it off.

18        MR. AXLINE:  I think we've already provided that, but

19  I'll double check that.  And they're going to be able to depose

20  Mr. Brown.

21        THE COURT:  I know, but -- that's very nice, but it's

22  good to be ready to depose people by having information in

23  front of you.  So if you have testing data, as I said, the

24  other topics she mentioned, it should be produced immediately.

25        MR. AXLINE:  I'll make sure that they have every piece

E3jzmtb2                    Conference

1  of information Mr. Brown has with respect to those wells, as

2  well as everything else in his report.

3           MS. GERSON:  Your Honor?

4           THE COURT:  Well, by when, by a week from today?

5           MR. AXLINE:  By a week from today, yes.

6           THE COURT:  By a week from today.

7           MS. GERSON:  Your Honor, I think it would be --

8           THE COURT:  Which would be March 26.

9           Yes.

10          MS. GERSON:  It would the -- it would be everything --

11 I mean, we would also want what the plaintiffs have on these

12 wells.

13          THE COURT:  Fair enough.  And then we can revisit

14 after you get that, after you've had a chance to consult with

15 your expert.  Because you did say that a couple of times in

16 your -- last times you spoke, you said we need to talk to our

17 experts and see what they would need.  So you'll have a chance

18 to do that.  And we can talk about this also again very

19 promptly.  If you receive this data, we know we're down to 11,

20 and if you consult with your experts, you can come back.  We

21 would do a shorter time frame than the other issue we just set

22 a date for.  We can I think hear you about this in ten days, if

23 need be.

24          So you're going, Mr. Axline is going to make sure you

25 have all data that he has by the 26th of March.  You need to

E3jzmtb2                    Conference

1   talk to your experts.  So I'm thinking April 1st or 2nd if I

2   have to talk about this issue.  Give me one minute to just

3   check the calendar on this trial.  I could see you the

4   afternoon of April 1st, say 3:00 o'clock, if we have to talk

5   about this issue further.  Shall I calendar that just in case?

6          MS. GERSON:  Thank you, your Honor.

7          THE COURT:  It doesn't hurt.  We can always take it

8   off.  It's just a computer entry.  So 3:00 o'clock.

9          MS. GERSON:  By telephone, your Honor, or in person?

10          THE COURT:  Well, they have to come from California so

11   I guess telephone.  So please get the issue down so this would

12   be the -- I'll call it delineation new 11 wells.  That's a

13   pretty good description.  3:00 p.m. if needed.  I'll note

14   telephone.

15          But by then there are two things that have to happen

16   Mr. Axline.  One week from today make sure they have all the

17   data you have, and then, Ms. Gerson, be sure you've had a

18   conversation with your experts as to what they would need.  All

19   right.

20          Now, we can move on.  Yes, that finishes that agenda

21   item.

22          Okay, the next agenda item is defendants' request for

23   an order on authentication of documents.

24          MR. RICCARDULLI:  Your Honor?

25          THE COURT:  You resolved it?

1          MR. RICCARDULLI:  Almost, but I think we're going to

2     resolve it.  We met and conferred this morning.  We went

3     through a red line draft.  I think we'll be able to present you

4     with a joint submission later this week.

5          THE COURT:  Okay.

6          MR. MILLER:  I agree, your Honor.

7          THE COURT:  Okay.  I'm happy to skip that one and move

8     to the third topic, which we had called plaintiff's failure to

9     produce certain expert reliance material.

10          MS. GERSON:  Your Honor, I think that's Mr. Axline --

11     sorry.

12          MR. RICCARDULLI:  I think you skipped number three,

13     your Honor, on the agenda.

14          THE COURT:  I thought that was number three.

15          MR. RICCARDULLI:  We have it as four.  There is one --

16          THE COURT:  Okay, just a minute.  Let me look back and

17     see.  Oh, plaintiff's failure to identify theories of

18     liability, is that what you want to do?

19          MR. RICCARDULLI:  Yes, your Honor.  And again I just

20     want -- we met and conferred this morning.  I think we've

21     reached an agreement and this was sort of the conversation we

22     have to have for the Club De Leones site, the one site we

23     talked about earlier.  Plaintiffs have now confirmed for us

24     that they are not going to rely on the commingled product

25     theory of liability.

1              THE COURT:  At all?

2              MR. RICCARDULLI:  At any of the trial sites, except

3     for the De Leones site, and we're talking about how to handle

4     that one site now that it has a different causation theory, but

5     otherwise I think that that resolves this issue.

6              MR. MILLER:  Your Honor, that is correct, except we

7     reserve the right, if there is a later trial state-wide claim,

8     that we may have different theories.  But with respect to these

9     cases, these focus sites, that is the case.

10             THE COURT:  Okay.  So that takes us to plaintiff's

11    failure, alleged failure to produce certain expert reliance

12    materials.

13             MS. GERSON:  And, your Honor, I think we're in good

14    shape on that.  Mr. Axline -- there was a couple of additional

15    items he has committed to get us by Friday.

16             We did just want to -- we raised it initially because

17    if we do have further issues, we didn't want it to be the first

18    time you're hearing about, but for today I think we're good.

19             THE COURT:  Okay.  That takes us to a schedule for

20    summary judgment, premotion letters and/or hearing.

21             What summary judgment motions are being considered and

22    by whom?  You are Ms. Roy?

23             MS. ROY:  Yes, your Honor.  I've been coordinating for

24    the joint defense group on this.

25             There are about five motions that would be relevant to

1    all the defendants, and then a handful of defendants' specific

2    motions.

3              But, your Honor, I actually think that the station

4    matrix issue for the remaining claims at issue in the case is

5    something that we should address first.  That really governs

6    how many motions there are going to be.  If we can resolve some

7    of the issues related to which defendants are being targeted

8    and which stations, it hopefully will make some of the motions

9    go away or at least be substantially shorter.

10             THE COURT:  So you're just saying go to issue six

11   before five.

12             MS. ROY:  Yes, your Honor.

13             THE COURT:  All right.  Issue six, the defendants ask

14   the plaintiffs to clarify which defendants are at issue for

15   each station, and this is of course OCW -- whoops.  We switched

16   to OCDWD when we talked about summary judgment.  I should have

17   said that.  We're not in Puerto Rico any more.  We're in Orange

18   County, okay.  So let's go back to Orange County with respect

19   to which defendants are at issue of each station.  Currently

20   Orange County has claims at 34 stations, is that right; is that

21   you, Mr. Miller?

22             MR. MILLER:  Yes, your Honor.

23             THE COURT:  And in the spring of 2013, plaintiffs did

24   provide defendants with a station matrix identifying the claims

25   that plaintiffs were pursuing against each defendant and each

E3jzmtb2                    Conference

station.  But defendants say that the matrix dramatically

expanded the number of defendants allegedly responsible at each

station.  So they want an order limiting plaintiffs to pursuing

claims only against the defendants at the sites previously

disclosed.

          So I don't think I understand.  Ms. Roy, is this your

issue?

          MS. ROY:  Yes, your Honor.

          THE COURT:  So are you saying that in the spring of

2013 when the matrix came and with the dramatic expansion, you

want me to go back before the spring of 2013, even though

you're not raising this till the spring of 2014?

          MS. ROY:  Well, in terms of that delay I'll address

that part first.

          Defendants have been sending meet and confer letters

for the last year to Mr. Miller's office trying to get some

resolution and narrowing the station matrix down to the

stations that should be targeted, or at least to the ones that

were disclosed during discovery.  We have not been able to make

progress.

          THE COURT:  But it's been a year.  Spring, they tell

me, you never know from the weather, but they tell me it starts

Saturday.  So it's a year that you've had this matrix that,

quote, dramatically expanded.  Why haven't I heard about this

for a year?

E3jzmtb2                    Conference

1          MS. ROY:  Your Honor, I can understand.  We've been

2     frustrated too.  We've been trying to work with them.  We

3     continually get told we're going to get back to you, we're

4     about to send you letters with information.

5          We, of course, were wrapping up the Fresno and RDA

6     matters which those opinions are actually quite helpful in

7     terms of focusing the issues for Orange County.  So it did not

8     make sense to really report the issue in front of you until

9     now.  But our hope is that -- I had conversations with

10    Mr. Axline and Mr. Miller in the hallway that they are working

11    to try to narrow that list, and I'm hopeful that we can get to

12    a place where we know that the actual defendants that are

13    targeted at each station.

14         THE COURT:  Well, so you asked me to turn to six

15    before I turn to five, but then you're telling me you're not

16    ready for me to turn to six because you're hoping to talk to

17    each other.

18         MS. ROY:  Well, frankly, your Honor, I'll take an

19    order from you or agreement from them to narrow the station

20    matrix, whichever way --

21         THE COURT:  Well, an order for me that says you're

22    directed to narrow is not a very meaningful order.  It could be

23    dropping one defendant at one site and then saying, okay, you

24    told me to narrow, I cut it back by one.  That's not a helpful

25    order.  It has to be specific.  And that's what you're

E3jzmtb2                    Conference

1   negotiating.  I couldn't do anything more than that today,

2   because, A, you're still negotiating after a whole year, and,

3   B, it's a meaningless order to say narrow because, as I said,

4   34 to 33 isn't narrowing, but doesn't do much.  So I don't know

5   what I can do today, but I hate to put this one off.  And yet

6   everything on the agenda you say we're meeting in the hall, we

7   met this morning.  Good thing I have these conferences because

8   apparently it gets you talking.  But I can't do anything with

9   the time.

10              MS. ROY:  Your Honor, I think there is a proposal that

11   should hopefully move this forward.  Mr. Axline volunteered to

12   have an in person meet and confer with the defendants in the

13   next two weeks to narrow down the, hopefully narrow down the

14   list with the --

15              THE COURT:  So when should I schedule the follow up on

16   this one?

17              MS. ROY:  Your Honor, if I could make a proposed

18   schedule.  What we would do is within the next two weeks we

19   have in person meet and confer.  Within two weeks of that date

20   plaintiffs would be directed to submit a revised station

21   matrix.

22              THE COURT:  Directed by whom?

23              MS. ROY:  By you, or by agreement, however they want

24   to work it out.

25              THE COURT:  Go ahead.

E3jzmtb2                    Conference

1         MS. ROY:  And then after that, we can set a

2    preconference hearing or premotion hearing for perhaps mid to

3    late May for the first round of summary judgments, and we can

4    work out a briefing schedule.

5         THE COURT:  I would never really work on the matrix

6    issue so-called, I would just talk about summary judgment.

7         MS. ROY:  Well, there is one conceivable instance

8    where we would need your involvement.  If we reach a station

9    matrix that in defendant's view is still overblown and exceeds

10   what was disclosed during discovery, then we would be back in

11   front of you with a motion that would be to specifically limit

12   the matrix to only that which was discovered or disclosed in a

13   timely fashion.  So that's the only instance where I think we

14   would need to involve you.

15        THE COURT:  What's the date I set earlier in this

16   conference for the in person?

17        MS. ROY:  April 16.

18        THE COURT:  Yes.  Did I say 16th?

19        MS. ROY:  That's what I wrote down.

20        THE COURT:  That's four weeks, I mean that's the right

21   date.  So we'll have to add this to that agenda.  What was the

22   issue I thought I was going to do on the 16th?  I think I wrote

23   it down.  Let's see.  April 16th, I wrote down expert issues in

24   Puerto Rico MTBE case.  I will have to add, just to state now I

25   put down slash matrix issue in OCWD case, and that would be in

1    person.  They're monthly flight, they must be doing well on

2    their miles, but we'll do it the same night.  We'll start at

3    4:30.  If we don't finish till 10:30, that's that.  All right.

4    So that has been added.  If you can't resolve the matrix issue

5    so-called, that's the date.  But also happy to jump on the

6    phone earlier if after two weeks you see there is no progress

7    and you want an order maybe that they need to gave revised

8    matrix by X date.  If you can't get that far in your own talks,

9    just ask for telephone conference by calling my clerk on this

10   case.  You know who that is, right?

11            MS. ROY:  Your Honor, would it be also possible to

12   schedule a further date out for the motion?

13            THE COURT:  For the premotion conference.

14            MS. ROY:  Sure.

15            THE COURT:  No, I realize that.  So that should be two

16   weeks after that.  So two weeks from then would be April 30th

17   which is not a good day, but April 29th and May 1st are both

18   good dates.  So Tuesday or Thursday of that week, April 29th or

19   May 1st, which do you like?

20            MR. AXLINE:  Either is fine with the plaintiffs, your

21   Honor.

22            MS. ROY:  Your Honor, would it be possible to push to

23   the following week?

24            THE COURT:  No, I got to get done, that's why.

25   April 29th or May 1st, Tuesday or Thursday.

E3jzmtb2                    Conference

1              MS. ROY:  We'll take May 1st.

2              THE COURT:   Okay.  Now, to do that properly, you know,

3      I need premotion letters explain the outline, the motions you

4      intend to make, why there has to be five different motions.

5      That's not my style.  That's called burying the Judge with

6      motion practice so she can never decide the case and the case

7      could never go to trial.  I don't like that.  I like one motion

8      with several issues with page limits, we work it out.  I don't

9      really don't want five separate motions.  There have to be some

10     specific or defendants specific, that may be, I understand that

11     that's different, but I don't know the issues are yet.  So try

12     to outline it.  Obviously the three page single space limit in

13     most cases doesn't make sense here for outlining the issues.

14     So I would say ten double spaced pages is the maximum for the

15     premotion letter that describes all the motions the defense

16     wants to make, and a response letter of the same length.  And

17     that should be enough letter writing.  So ten double spaced,

18     ten double spaced.  But you got to get it done in time for me

19     to read, which means it has to come in by Tuesday, the 29th, so

20     I'm ready to talk to you on Thursday, the 1st.  If they're not

21     in, I can't read it, I can't have an intelligent conference.

22     And that's back to 4:30, because that endless trial if it's for

23     real, really going to be still on trial.  So, again, it's a

24     4:30 on May 1st in person.  I'll call that OCWD summary

25     judgment premotion conference.

E3jzmtb2                      Conference

1          MS. ROY:  Your Honor, if I can clarify?

2          THE COURT:  Yes.

3          MS. ROY:  The April 29th deadline, is that for both

4      the original --

5          THE COURT:  No, that would be -- the second letter has

6      to be in by then.  So the first letter has to be in I think

7      five business days before that.  Response letter by then, so I

8      have both letters in hand 48 hours before.  Obviously the first

9      letter I will have had five more days to read, so you have a

10     small advantage that way.  Okay.

11         So now we've covered for this purpose agenda item five

12     and six -- whoops -- six, and that's that.  That's the whole

13     agenda, yes?

14         MR. WALSH:  Your Honor, William Walsh.  Just one item

15     that didn't make the agenda.  I've discussed with

16     Mr. Riccardulli in advance.  In the new MTBE cases,

17     specifically in the Brewster case, you had given a deadline

18     earlier this month for amendments to the complaint.  Probably

19     literally hours after that one of the plaintiff's specifically

20     in the Brewster case advised us that it was dividing its

21     corporation and would have a name change.  We'd like the

22     opportunity to yet again amend that complaint to reflect the

23     change in the plaintiff.  And I've raised with defendants that.

24         THE COURT:  That's no big deal.  You don't object to

25     that, do you?

E3jzmtb2                    Conference

1          MR. RICCARDULLI:  I don't think so, your Honor.  I

2     normally just don't agree on behalf of the group without

3     letting them know, but I don't foresee a problem with that.

4     And I could certainly get Mr. Walsh a note by tomorrow that

5     let's him know.

6          THE COURT:  Sure.

7          MR. WALSH:  And I would expect we can do this within a

8     week or ten days once they finalize the new corporate name and

9     have everything in place.

10          THE COURT:  Okay, good.  No problem.

11          Anything else?

12          MR. WALSH:  Thank you, your Honor.

13          THE COURT:  Do we need an initial conference on -- how

14     many new cases are there, just one; is there more than one?

15          MR. CONDRON:  Your Honor, Peter Condron.  It's four

16     new cases with 11 plaintiffs.

17          THE COURT:  Okay.  Can they all be handled at one

18     conference together maybe to set a schedule?

19          MR. CONDRON:  I think they probably could.  It may be

20     a little bit premature right now to schedule a conference on

21     them.

22          THE COURT:  Why?

23          MR. CONDRON:  We're still having some preliminary

24     conversations with plaintiffs about a number of issues, and I

25     just want to go through some of those.  We might be able to

E3jzmtb2                    Conference

1   obviate the need for a conference.

2               THE COURT:  You can never obviate the need for a Rule

3   16 conference.  I mean that's essentially what it is, it's an

4   initial scheduling conference with the Court where the Court

5   sets a schedule for discovery in the case.  We do that in every

6   one of our 10,000 cases per year.

7               MR. CONDRON:  We're having settlement discussions with

8   them.

9               THE COURT:  Oh.  All four may go away?

10              MR. CONDRON:  Conceivably.

11              MR. RICCARDULLI:  Yes, your Honor.  And you did set a

12  CMO on those cases earlier this year I think that does layout

13  some discovery.  We actually asked for a quick delay to that

14  schedule so we could have these conversations, and we're in

15  that phase right now.  But there is a discovery schedule in

16  place.  Certain requests have already been served.  I think

17  we've gotten responses, so.

18              THE COURT:  Well, it's our practice, I think, to set

19  an all case conference about once a month.  Maybe we could skip

20  April because we have so many conferences scheduled now, I

21  don't know if it's two or three, but we did several, I think

22  three.  I think I just set three different dates in April.  So

23  I could jump to May, but then I want to have that conference,

24  Mr. Condron, wherever you're up to.

25              MR. CONDRON:  Understood, your Honor.  Thank you.

E3jzmtb2                        Conference

```
 1                THE COURT:  Yes.  All case conference for May.  Again,
 2      if nobody wants it, I'm sure it won't hurt my feelings.  I'll
 3      be willing to cancel.  So I'll pick a date in May.
 4                How about May 13th at 4:30?  That's a Tuesday.  Does
 5      that sound okay?
 6                MR. RICCARDULLI:  That's fine, your Honor.
 7                MR. WALSH:  Fine, your Honor.
 8                THE COURT:  Okay, so that would be the equivalent of
 9      the monthly all MTBE conference.  4:30, May 13th.
10                Okay, is there anything else?
11                MR. AXLINE:  Not from plaintiffs.
12                THE COURT:  All right, thank you.
13                MR. AXLINE:  Thank you, your Honor.
14                (Adjourned)
15
16
17
18
19
20
21
22
23
24
25
```