E3j2mtbc1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  In Re: METHYL TERTIARY BUTYL            00 MDL 1358 (SAS)
              ETHER ("MTBE") PRODUCTS      00 CV  1898 (SAS)
4             LIABILITY LITIGATION

5  ------------------------------x

6                                          New York, N.Y.
                                           March 19, 2014
7                                          3:30 p.m.

8  Before:

9         HON. SHIRA A. SCHEINDLIN

10                                         District Judge

11
            APPEARANCES
12
   MILLER AXLINE & SAWYER
13       Attorneys for Plaintiffs
   BY:  DUANE C. MILLER
14       MICHAEL AXLINE

15  WEITZ & LUXENBERG
         Attorneys for Plaintiffs
16  BY:  WILLIAM A. WALSH

17  LAW OFFICES OF JOHN K. DEMA
         Attorneys for Plaintiffs
18  BY:  JOHN K. DEMA

19  McDERMOTT WILL & EMERY LLP
         Attorneys for ExxonMobil
20  BY:  LISA GERSON
         STEPHEN J. RICCARDULLI
21
   SHEPPARD MULLIN RICHTER & HAMPTON
22       Attorneys for ExxonMobil
   BY:  WILLIAM STACK
23       WHITNEY JONES ROY

24  SEPULVADO & MALDONADO, PSC
         Attorneys for Total Petroleum Puerto Rico
25  BY:  ALBENIZ COURET-FUENTES

E3j2mtbc1

1                   APPEARANCES

2    SEDGWICK LAW
          Attorneys for Shell Oil Company
3    BY:  PETER CONDRON
          DAVID M. COVEY
4
     McCONNELL VALDES LLC
5         Attorneys for Sol Puerto Rico Limited
     BY:  JUAN A. MARQUES-DIAZ
6
     STRASBURGER, LLC
7         Attorneys for Defendant Tauber Oil
     BY:  MICHAEL A. WALSH
8
     MANATT, PHELPS & PHILLIPS, LLP
9         Attorneys for Defendant USA Gasoline Corporation
          now known as Moller Investment Group, Inc.
10   BY:  SAMANTHA J. KATZE

11   LATHAM & WATKINS
          Attorneys for Defendant Conoco Phillips
12   BY:  JON D. ANDERSON

13   ARNOLD & PORTER, LLP
          Attorneys for Defendant Atlantic Richfield Co.
14   BY:  STEPHANIE WEIRICK

15

16

17

18

19

20

21

22

23

24

25

E3j2mtbc1

1              (Case called; all parties present)

2              THE COURT:  We have received a number of letters, A

3    huge numbers of attachments things aren't going so well again.

4    But the years go by; some years are better years and some

5    years, worse years.  This one is bad.

6              The March 3 letter, which is the plaintiffs'

7    preconference letter had five attachments, some longer than

8    others.

9              The defendants' preconference letter of March 11 had I

10   think 13 attachments, and that really is a lot and kind of

11   defeats the purpose of a page limitation.  We have to talk

12   about that again.

13             The plaintiffs' reply letter is March 14.  It had two

14   attachments.

15             The defendant's reply letter of March 14 has eight.

16   So, all around, the defendants are up to 20 different

17   attachments.  We should have a little chat about how to do

18   that.

19             The plaintiffs have three agenda items, and the

20   defendants have six agenda items.  Of the plaintiffs' three

21   agenda items, the first one is moot.  That had to do with the

22   Tauber pending motion to dismiss.  The plaintiffs' opposition

23   was due and came in.  I saw it in today's mail.  So there is

24   nothing to discuss with respect to agenda item one, agreed?

25             MR. AXLINE:  Agreed, your Honor.

1          THE COURT:  So that takes us to plaintiffs' agenda

2     item two, which is what plaintiffs describe as defendants'

3     excessive and duplicative expert designations in the Puerto

4     Rico case.  I need to understand how many of the alleged 75

5     expert witnesses are in play here?  Is it really 75, if you

6     include 26(a)(2)(B) and 26(a)(2)(C)?  There were two different

7     groups totaling 75?

8          MR. MILLER:  Yes, your Honor.

9          THE COURT:  Mr. Miller, yes.  Because the defendants

10    come back and talk about having only 35, and I think that's

11    maybe Ms. Gerson is the one who is on the line for saying 35.

12    Were you limiting it yourself to (a)(2)(B) when you said there

13    were only 35.

14         MS. GERSON:  We were talking plaintiffs grouped

15    together retained experts and 26(a)(2)(C) experts, although

16    their letter only appeared to be complaining about (a)(2)(C)

17    witnesses.

18         THE COURT:  What is the number of each.

19         MS. GERSON:  It actually breaks down exactly 35 of

20    each.

21         THE COURT:  Oh, exactly 35 of each.

22         MS. GERSON:  So focusing on the (a)(2)(C) witnesses, I

23    think we point out in our letter --

24         THE COURT:  Let me understand what the plaintiffs'

25    complaint is.  I want to make sure I understood the numbers.

E3j2mtbc1

1    It is 35 of one kind and 35 of another kind.  That happens to

2    be 70, not -- is that what the complaint was, that there was

3    75?  Already we seem to have gone down by five, which is good

4    news.  Did we reduce it by five?  Because the complaint was 75.

5    Now you are telling me there are 70, which sounds ridiculous

6    anyway.  But are there 75 or 70.

7              MR. MILLER:  I think your Honor is right that it is

8    70.

9              THE COURT:  So you are complaining about 70, not 75.

10   Small progress, but I assume you think 70 is still way out of

11   line.  Whether it is the retained kind or the inside kind, it

12   is still a problem.

13             MR. MILLER:  It is, your Honor.

14             THE COURT:  And you are complaining about both groups.

15             MR. MILLER:  Yes.  But we met and conferred, and I

16   think that we can make substantial progress in dealing with the

17   35 current and former employees testifying as experts through a

18   meet-and-confer process.  I told counsel what I thought my

19   solution was because part of what we are concerned with is

20   duplication.  Part of what we are concerned with is taking 35

21   additional depositions.

22             THE COURT:  Right.  No, it's horrible.

23             MR. MILLER:  And I think that we can probably at a

24   minimum cut the number of depositions of the 35 down

25   substantially.

E3j2mtbc1

1              THE COURT:  The (a)(2)(C) ones.

2              MR. MILLER:  That's correct.

3              THE COURT:  But the retained ones, (a)(2)(B) ones, I

4    don't know whether we are calling them retained or just

5    (a)(2)(B), whichever is clear for the record.  One second.

6    Give me a minute to have the rule in front of me, because

7    either way there has to be a submission.  And you also are

8    complaining about the inadequacy of the submissions, and we

9    will get to that in a minute, too.  It will be convenient to

10   have the rule open.

11             MR. MILLER:  My suggestion, your Honor --

12             THE COURT:  Wait, no; no suggestions until I get the

13   rule open is what I said.

14             Okay, so the (a)(2)(C)'s are the ones you think you

15   can negotiate about?

16             MR. MILLER:  Yes.

17             THE COURT:  You realize, of course, that they still

18   have to disclose the subject matter in which the witness is

19   expected to present evidence under rules of evidence 702(3) and

20   (5), and the summary of facts and opinions to which that

21   witness will testify.  So they are not just fact witnesses, as

22   I understand it, who happen to be on the payroll.  They are

23   being offered also as experts who do not have to provide a

24   report.

25             MR. MILLER:  That's correct.

1          THE COURT:  Then they have to do these other things.

2     Have they done these other two things?  Have they designated

3     the subject matter and summary and facts upon which they plan

4     to testify?

5          MR. MILLER:  They have written a paragraph and they

6     say things like the witness will cover industry practices,

7     without specifying them, which is a pretty broad category, in

8     my mind.

9          THE COURT:  I can help you out.  I don't find that

10    satisfactory.  The whole point of 26(a)(2)(C) was to relax the

11    written report requirement but to still require that if they

12    are going to give opinions, expert opinions under 702(3) or

13    (5), they have to do (ii), which is a summary of the facts and

14    opinions to which the witness is expected to testify.  That

15    broad sentence won't do it.  It would save time, it would help

16    me and everybody else figure out duplication.  It might avoid

17    depositions if that were done right.  So I think you should

18    make a separate two- or three-page submission for each of them

19    that complies with Rule 26(a)(2)(C).

20          MS. GERSON:  Your Honor --

21          MR. MILLER:  We do not have two or three pages --

22          THE COURT:  I know you don't.

23          MR. MILLER:  -- on anyone.

24          THE COURT:  I know you don't, and I think you should.

25    So whether you ask for it or not, Mr. Miller, I want it.  I

want a proper two- or three-page single-spaced summary for each

of these people, if they are going to give expert opinions.  If

they are just going to talk about the facts of their job or

something, then they are like any other fact witness and

nothing is required.  They are just going to be an everyday

percipient witness, like everybody else.  But if they are going

to give opinions, that's why the rule is written as it is

written.  You have a certain amount of time to produce a

statement from each them.  And one of the excuses for having so

many people is that there are 14 defendants.  So I am not

looking at you, Ms. Gerson, I don't think you have to write 35

of these, but there are 14 defendants.  Each defendant is going

to have to talk to their, whatever it is, two or three --

          MS. GERSON:  Your Honor --

          THE COURT:  -- people in house -- I don't know how

else to call them -- employees, and get them to write up the

opinions on which they plan to give expert testimony and the

facts of which they expect to testify, etc., the facts and

opinions, a real statement that might take care of depositions

if they knew what they were going to say and would also help

them make arguments about being duplicative.

          MS. GERSON:  Your Honor, I think we understand that.

I do think we have invited plaintiffs to point out --

          THE COURT:  They don't need to do it.  I'm not

satisfied with the description I heard in the one paragraph you

E3j2mtbc1

1    gave.  That's not explicit enough.  So if you want to test out

2    what is explicit enough and do one that's more detailed, send

3    it to Mr. Miller and the court, and see if there is an

4    objection, before you do 34 more of the same, that's fine.  So

5    maybe you want to do one in the next three days, send it over

6    and say, Will this be satisfactory to you, Mr. Miller and to

7    you, the judge.

8            Mr. Riccardulli, you have been here long enough, if

9    you want to confer, the right way to do it is you say, your

10   Honor, may I have a moment?  Otherwise I consider it rude.

11   Once you say, May I have a moment, I say, Sure, and I stop

12   talking.

13           MR. RICCARDULLI:  I apologize, your Honor.

14           THE COURT:  Any time you want to confer with anybody,

15   you say, May I have a moment please, and then go ahead and

16   confer.  Given that, you do or don't?

17           MR. RICCARDULLI:  I do, for five seconds.

18           MS. GERSON:  Your Honor, we have a few examples I

19   think that defendants have done, some defendants have done more

20   than others.

21           THE COURT:  This probably isn't the time.  If you have

22   one that you think really is fuller and complies with

23   (a)(2)(C), send that one over to Mr. Miller, copy to the court,

24   I think, and say, Will this satisfy everybody?  If it will,

25   then all the rest have to be brought up to that level.  And

E3j2mtbc1

1    then if Mr. Miller wants to make an argument that it is

2    duplicative, overlapping, and there are still too many in that

3    group, I will at least have paper to be able to figure that

4    out.  So let's not spend any more time on (a)(2)(C), because he

5    doesn't think it is worth it and I don't either.  Can you give

6    the next examples over in the next day, since you think you

7    have one.

8              MS. GERSON:  Yes, your Honor.

9              THE COURT:  When you get that, Mr. Miller, if that

10   example is satisfactory to you, then the other 34 should be

11   due, all of them, no later than two weeks from today.

12             MR. MILLER:  Yes, your Honor.

13             THE COURT:  Two weeks from today would be April 2, all

14   35.  But if that one isn't satisfactory and you can't resolve

15   it, since I will have a copy, we can get on the phone and I

16   will agree or disagree that it is satisfactory.

17             MR. MILLER:  Thank you.

18             THE COURT:  Because I'm going to ask Ms. Gerson to

19   copy me on what she sends you, so we can work it out if it is

20   not enough.

21             MR. MILLER:  Yes, your Honor.

22             THE COURT:  What about the other 35, the (a)(2)(B)

23   people?  Where are we up to?  Let me hear from Mr. Miller, see

24   what he is complaining about.  So what about the (a)(2)(B)

25   people?

E3j2mtbc1

1           MR. MILLER:  Your Honor, I would like to defer that as

2    well, because I view them, especially the duplication issue, as

3    overlapping.

4           THE COURT:  Overlapping with the (a)(2)(C)?

5           MR. MILLER:  Yes.  Both -- several people.

6           THE COURT:  Deferring is not something we really can

7    do.  The whole point is that the discovery of these experts, as

8    I understand it, is supposed to end May 30.  Is that the right

9    date?

10          MR. MILLER:  Yes.

11          THE COURT:  We can't defer.  Today is March 19.

12   That's why these are being raised in the letters.  You have

13   reports, real reports from each of the 35(a)(2)(B)'s?

14          MR. MILLER:  We do not have reports from the ones that

15   are rendering site-specific reports.  In most cases I think we

16   are owed more than 20 reports at this point.

17          THE COURT:  So how many (a)(2)(B) reports do you have?

18   15?

19          MR. MILLER:  They have served nine reports out of 35.

20   That, by my math, means we are owed 26.

21          THE COURT:  Of the nine you have got, are they

22   sufficient?

23          MR. MILLER:  Yes.

24          THE COURT:  So you are not challenging the quality of

25   the reports, you are challenging the duplicativeness, overlap,

E3j2mtbc1

1    etc.

2              MR. MILLER:  Not quality.  There are some items that

3    are the subject of item three in our agenda.

4              THE COURT:  Oh, irrelevant.  That's different.  But

5    the reports satisfy the rule.

6              MR. MILLER:  Yes.

7              THE COURT:  What you are left arguing about is whether

8    it is duplicative and whether it is irrelevant.

9              MR. MILLER:  That's correct.

10             THE COURT:  I got that.

11             Where are the other 26 reports, Ms. Gerson?

12             MS. GERSON:  Your Honor, based on -- they are not

13   late.  Based on the schedule, they are not due yet.

14             THE COURT:  Because all 26 are site specific?

15             MS. GERSON:  That's correct.

16             THE COURT:  When are they due?

17             MS. GERSON:  April 7.

18             THE COURT:  Oh, and then we are going to be able to

19   complete all those depositions by May 30?

20             MS. GERSON:  That's the plan, your Honor.

21             THE COURT:  I don't think they knew how many experts

22   you were going to do.  Why do you need nine non-site-specific

23   and 26 site-specific?  How many sites are we talking about?

24   And why do there have to be different experts for all of these

25   sites?  Even if there are 26 sites, why do there have to be 26

E3j2mtbc1

1    different people?

2              MS. GERSON:  Your Honor, the retained experts, first

3    of all, plaintiffs have not provided us with any detail about

4    who they are complaining about.  This issue was not in the

5    letter.  They have had our designations of retained experts

6    since August for non-site specific, December for site specific,

7    and they haven't raised this issue before today.

8              And in terms of the numbers, this is right in line

9    with the experts in New Jersey.

10             THE COURT:  Right in line with what?

11             MS. GERSON:  The number of retained experts by

12   defendants in New Jersey.  So the numbers are --

13             THE COURT:  I don't think activity in one case creates

14   a waiver in another case.  Either it is correct to have this

15   many or it isn't, period.

16             MS. GERSON:  And some --

17             THE COURT:  Why do you need 26 different site-specific

18   experts?  How many sites are we talking about.

19             MS. GERSON:  There are ten sites, and not all of these

20   are hydrogeologists.  There are site-specific issues in terms

21   of supply, and one thing that we, like in New Jersey, are

22   facing here are different defendants have different supply

23   experts to explain their stories that we believe is a

24   significant portion of the numbers.

25             As we mentioned in our letter, we do have a couple of

E3j2mtbc1

1    experts that we retained for Puerto Rico that we may not have

2    used in other cases, because they are dealing with a very

3    different region, and we believe they have specific Puerto Rico

4    knowledge that we can't get out of our traditional experts.

5           THE COURT:  What I can say is neither the plaintiffs'

6    attorneys nor the court can opine without seeing the reports.

7    It may that be there is overlap and you should not be using 26

8    different people, or it may be that because it is defendant

9    specific, with different supplies, as you said, stories, etc.,

10   maybe there is a need.  But nobody can challenge it without

11   seeing it.

12          So I guess until April 7, when they are due, I guess

13   you would agree, Mr. Miller, there is nothing more I can say

14   about the 26 who you haven't seen.

15          MR. MILLER:  I agree, your Honor.  That's the problem

16   at the moment and potential duplication, which I can't really

17   address until I see the reports.

18          THE COURT:  Right, but there really isn't a lot of

19   time between April 7 and May 30, especially if you knew these

20   numbers back in either August or December respectively.  She

21   said you knew some in August and some in December, and here we

22   are in March.  Why didn't you say there were 70 a long time

23   ago?

24          MR. MILLER:  Because we had 35 that were not known and

25   expected in employees.  So it is the combination of the two

E3j2mtbc1

1     that makes it more difficult.

2              THE COURT:  So what you got notice of were the

3     (a)(2)(B)'s.

4              MR. MILLER:  We got notice of retained experts.

5              THE COURT:  Was that December or August?  You

6     mentioned both dates, Ms. Gerson, I forgot which group is

7     which.

8              MS. GERSON:  The retained experts the non-site

9     specific were disclosed last August.  The retained site

10    specific experts were disclosed in December.

11             THE COURT:  By December you knew there were 35

12    retained ones.

13             MR. MILLER:  Yes.

14             THE COURT:  And you didn't think that was too many.

15             MR. MILLER:  No.  We could get it done within the

16    schedule.  But now the number is doubled.

17             THE COURT:  I realize.

18             MR. MILLER:  I am hopeful we will not need to take a

19    deposition in most of the current and former employees for

20    various reasons; but, until I see and talk to counsel, I won't

21    know for sure.

22             THE COURT:  Right.

23             Well, I think we need to get a date on the calendar

24    very shortly after the 7th to handle this issue of the number

25    of experts.  It really does sound very high.  So I am going to

E3j2mtbc1

1    stop -- it is unusual -- and look at the calendar now, for how

2    soon after the 7th we can be ready to talk about this issue.

3    If the issue goes away, fine, you can cancel, but at least you

4    will be on the calendar.

5           Wednesday, April 16, at 4:30 or Thursday, April 17, at

6    4:30.  It is the earliest date I can give you, because I figure

7    you need a week to review the reports.  But early in the week

8    is the holiday, and I don't have any idea when Good Friday is.

9    So, anyhow, 16th or 17th at 4:30.

10          MR. MILLER:  Either is acceptable to plaintiffs.

11          MR. RICCARDULLI:  Same for defendants, your Honor.

12          THE COURT:  Earlier the better, then.

13          (Pause)

14          THE COURT:  So we will do it April 16 at 4:30.  It

15   will be a special conference just to address expert issues in

16   the Puerto Rico case.  It has to be at 4:30.  I expect to be on

17   trial.  That's done.

18          So we will go on with the agenda, which is the

19   arguments about relevant experts.  The plaintiffs say there are

20   three issues on which there is no need for experts at all.

21   Those issues involve the question of the benefits of using MTBE

22   versus lead.  The use of lead as an octane enhancer is one of

23   them, and the other is the benefits of using MTBE versus

24   ethanol, and the third has to do with the overall air quality

25   benefits of MTBE.  There is one expert on each of these issues,

E3j2mtbc1

Mr. Austin, Mr. Hoekman, and Mr. Wilson.

Plaintiffs, as I say, said that all of these are irrelevant.  The defendants disagree as to all three categories, so we should start with the question of lead and I will go with the defendants' argument.  Defendants say that the reasons for the lead phased out in the introduction of MTBE as an octane enhancer is relevant as to why MTBE was used in the first place.  Defendants argue they are entitled to explain why they decided to use MTBE at all.

I should preface this and say also defendants say that this is a serious issue that shouldn't be raised through letter submissions, and it should be done as a full motion *in limine* on the eve of trial.  I understood Mr. Riccardulli to address that point.  But the reason why it is timely now and should not be done as a motion *in limine* in either trial is because of the issue of depositions.  There are so many depositions to schedule, that if I were to agree with the plaintiffs' argument on any one of these three, that is one less deposition.  I would rather not leave it out until later in the game because all the work has to get done now when time is precious.

So I actually thought we could discuss each of the three, and it is the lead one that I thought was the easiest. It is not a subject for expert testimony.  If you want to explain why you decided to use MTBE, call a fact witness.  Call somebody in the company.  You don't hire an expert when there

E3j2mtbc1

is no issue to be decided by the jury.  You are saying

essentially this is background information that you think a

jury should know.  You think you should have a right to explain

to the jury why you decided to use MTBE, fine.  But to hire an

expert?  One expert breeds a competing expert, as if the jury

is going to be asked a question, and they are not.  This is

background information that you say they should know and have a

right to know.  So there are a lot of fact witnesses who know

that answer.  I don't see why this is a matter for expert

testimony.

MR. RICCARDULLI:  Yes, your Honor.  Just two points,

one on the timing of the -- sort of the -- that this be briefed

more fully.  If it is a question of timing, we are certainly

happy to do that now if that's what the court would want.  But

we do think that if the court's considering striking one of

these experts, that this should be done on a fuller record.

THE COURT:  Nobody needs extra work.  This one seemed

easiest of the three.  The other two may take me more time.  I

may allow short submissions, but I thought the first one was

really obvious.  You don't hire experts when it is matter of

fact in the company.  Anybody from the company knows the

answer.

MR. RICCARDULLI:  Yes, your Honor.  The expert is

going to say and explain that when lead was phased out, the

industry was faced with having to replace lead and gasoline.

E3j2mtbc1

1      The expert was not retained to address that one piece.  They do

2      go on to talk about the other benefits or the feasibility of

3      MTBE versus --

4                THE COURT:  That may be overlapping with somebody

5      else.  That's the problem with overlap.  You may have an expert

6      already about, whatever you call it, the feasibility.

7                MR. RICCARDULLI:  We don't, your Honor.  One of the

8      experts was in -- you referenced them before, and you will

9      remember at least Mr. Austin who testified as to the air

10     quality benefits of MTBE in gasoline, he testified in the New

11     York City case, and you will remember -- you may recall that he

12     testified in the case.

13               THE COURT:  The good luck for me is that I don't

14     remember hardly anything about it.

15               MR. RICCARDULLI:  Mr. Wilson also was involved in that

16     prior case, your Honor, resumed on sort of the scope of his

17     testimony that deals with more of the regulatory framework

18     generally with gasoline, not as to just the phaseout of lead or

19     the benefits of lead versus MTBE.  We are not arguing that lead

20     was a viable alternative.

21               THE COURT:  That's my point.  It is not an expert

22     issue.

23               MR. RICCARDULLI:  Your Honor, I can look at that.  I

24     would like to confer and go back and see if we can remove that

25     one piece, but these experts -- we don't have one expert

E3j2mtbc1

1    committed to that sole issue.  If that's really what's driving

2    it here, that the lead phaseout and how we can explain that,

3    and if that resolves this, then I can certainly confer with my

4    group and see if we are willing to move past that.

5           THE COURT:  Mr. Miller, do you want to be heard on

6    these three different subjects or do you think this is amenable

7    to further meeting and conferring?  Because I guess

8    Mr. Riccardulli is arguing that some portion of these experts

9    is background in a sense that you could see what they did at

10   the City of New York trial, whether it was really any different

11   here; and if it was limited to those subjects, you may not have

12   an objection particularly, if it doesn't overlap some other

13   expert.  And that's the point to read all nine of the non-site

14   specific expert reports that you have and be specific about

15   overlap.  There should not be two people saying the same thing.

16   That should be obvious, Mr. Riccardulli.  It's going to be a

17   long trial as it is.  You do not need two people to say the

18   same thing.  It's just confusing to the jury and annoying.

19          MR. MILLER:  There is literally no dispute that the

20   jury has to hear about with respect to lead.

21          THE COURT:  I covered that.  I think Mr. Riccardulli

22   gets the idea, and he said, I will look at the report, I will

23   talk to my team, I will try to take out any portion that does

24   not relate to a disputed issue.

25          MR. MILLER:  Frankly, your Honor, I think ethanol is

E3j2mtbc1

1    the same situation.  I think that the defendants can, through

2    fact witness, give any background information they need to give

3    about ethanol.

4            THE COURT:  Let's be specific about Hoekman.  What's

5    Hoekman saying that we need an expert witness when, again, it

6    is not a subject for decision?

7            MR. RICCARDULLI:  Yes, your Honor.  Maybe this helps

8    frame it.  Plaintiffs have a design defect claim in this case

9    that the defendants should not have used MTBE.  One of

10   plaintiffs' own experts, Mr. Moreau, in his report talks about

11   the feasibility and the benefits that ethanol has over MTBE.

12   So --

13           THE COURT:  Is Mr. Moreau going to give that testimony

14   at this trial.

15           MR. MILLER:  I will be happy to strike it, your Honor.

16   It is not an issue unless the defendants are able to bring it

17   up.  He would have nothing to say about ethanol unless it is in

18   response.

19           THE COURT:  This is actually helpful.  So if the

20   plaintiffs' expert is not going to say why ethanol was a

21   feasible alternative that should have been used in place of

22   MTBE, if that issue is not coming up, then let's get it out of

23   the case.

24           MR. RICCARDULLI:  Not just Moreau.  There are other

25   experts, like Mr. Fogg, one of plaintiffs' experts, who talks

E3j2mtbc1

1      about the environmental conditions versus the benefits of

2      ethanol over MTBE.

3              THE COURT:  If ethanol is coming out of the case on

4      both sides, that's an advantage.  It will make, God knows, a

5      four-month trial three months or something, which is good for

6      everybody.  So maybe this is amenable to some talking, meeting

7      and conferring between the sides.  I didn't know that you would

8      point out the plaintiffs are bringing up ethanol.  I didn't

9      know Mr. Miller would say, I will take it out if they will take

10     it out.  So if it is out of the case, it is out of the case.

11             MR. MILLER:  If feasible alternative is an issue, our

12     feasible alternative isn't going to be ethanol.  It is gasoline

13     without MTBE.

14             THE COURT:  That's a different case.

15             MR. MILLER:  I do not need to go into ethanol at all.

16             MR. RICCARDULLI:  Then we do need to meet and confer,

17     your Honor?  Because I don't think the expert reports reflect

18     that.

19             THE COURT:  They don't know.  That's the point.

20     That's why you called them irrelevant.  But you didn't know his

21     position.

22             MR. RICCARDULLI:  I did not.

23             THE COURT:  So this one may solve itself, given the

24     statements you have made on the record today, Mr. Miller, by

25     talking directly with Mr. Riccardulli and/or his team.

E3j2mtbc1

1          MR. MILLER:  I will.  Thank you.

2          THE COURT:  The third one is -- well, the third one is

3     what you just said.

4          MR. RICCARDULLI:  Yes, your Honor, and the experts are

5     sort of --

6          THE COURT:  Right.  You are saying they didn't need to

7     do MTBE at all.

8          MR. MILLER:  That's right.

9          THE COURT:  The alternative is not to do it at all,

10    not to have any oxygenate.  So that takes care of the third

11    topic of the relevancy, too.  So you do need to talk.

12         MR. RICCARDULLI:  We do need to talk.

13         THE COURT:  Okay.  Good.  So that finished that.

14         We are up to the defendant's agenda items, of which

15    there are a lot.

16         But the first one has to do with Mr. Brown's

17    site-specific expert report which was served on January 24 and

18    the defendants have several objections to Mr. Brown's report.

19         Defendants say that Mr. Brown improperly included

20    damages for investigations at several nontrial sites in

21    connection with his opinion about a particular site.  I don't

22    know how to say it, but Club de Leones, the defendants say that

23    the commonwealth should not be allowed to recover the cost of

24    investigating eight service stations that were not the subject

25    of discovery.  In fact, of the eight, one was dismissed and

E3j2mtbc1

1    five were never identified as release sites and two were

2    identified but would presumably come up in a later phase.

3           Defendants then say that Brown refers to several non-

4    trial sites in connection with his opinion on the Manati and

5    Maysonet trial sites.  Brown notes that 15 additional sites may

6    have had releases, and they weren't identified as trial sites.

7    There has been no discovery.

8           And finally defendants object to Brown's inclusion of

9    173 new wells that were not subject to discovery.  Of these,

10   132 are outside plaintiffs' delineated areas and, they point

11   out that the court has already said that plaintiffs cannot now

12   expand the delineations.  The remaining 41 are inside the

13   delineations, but defendants argued that they weren't

14   identified during discovery, and that the court had said that

15   if they weren't identified by, of all dates, July 1, 2011, only

16   two and a half years ago, then they would be excluded.  So, in

17   sum, the defendants say all of this material should be

18   excluded.

19          Of course, the plaintiffs have respond in some detail

20   with respect to the Club de Leones.  Well, they said they

21   designated that as a receptor trial site, but never disclosed

22   the sources, and that's what experts do, and Brown should be

23   entitled to analyze the eight stations that are the source of

24   the contamination into their receptor well, and that defendants

25   would have a chance to depose Brown about that.

E3j2mtbc1

1          With respect to the 173, the ones that were outside

2     the delineated areas, which is the 132, they apparently are

3     only mentioned in figures attached to the report and this

4     was -- we did something like this in New Jersey.  I ruled in

5     New Jersey that Brown could discuss the wells, but only if a

6     defendant opened the door to that.  Otherwise the figures could

7     not be shown to the jury unless the wells were removed.  But

8     there is still a disagreement about the 41 that are within the

9     delineated areas.

10         So my thought on this, again, the defendants first say

11    that this should be subject to a motion *in limine*.  And I

12    understand the point.  Again, I don't know whether it is one of

13    timing or one of full briefing as opposed to the letter

14    briefing, but I can give you a tentative ruling and then see if

15    you think you still need to fully brief.

16         So it seems that Brown should be allowed to talk about

17    the eight stations that are the source of contamination into

18    the receptor well that has been identified, and that can be

19    explored at depositions, but I think the New Jersey procedure

20    should apply to the wells outside the delineated areas.  But

21    with respect to the ones within the boundaries, I think those

22    should be fair game, but I don't know what we do about the fact

23    that they haven't been previously identified and what kind of

24    discovery that would entail now.  But presumptively that's

25    where I would be coming out.  I don't think the plaintiffs'

E3j2mtbc1

responded with respect to the Manati and Maysonet trial sites,

so I don't know whether those are still in dispute.  If they

are in dispute, is it the same argument as it is with Club de

Leones, that they are the source of contamination into a

receptor.  I don't know.  So I need to get a little more

information with respect to Manati and Maysonet because I don't

think the plaintiffs responded.

Who wrote the plaintiffs' response letter?

(Continued on next page)