Law Offices of

# MILLER, AXLINE & SAWYER

A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE

TRACEY L. O'REILLY
DANIEL BOONE
JUSTIN MASSEY
BRYAN BARNHART
DAVE E. BLUM
MOLLY MCGINLEY HAN

April 9, 2014

VIA E-MAIL & FEDERAL EXPRESS

The Honorable Shira A. Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007-1312

Re:   *In Re MTBE Products Liability Litigation* MDL No. 1358, Master File No. 1:00-1898 (SAS)
      **Plaintiffs Submission Regarding Wells in Anthony Brown's Modeling**

Dear Judge Scheindlin:

Pursuant to the Court's request during the April 4, 2014, hearing, Plaintiffs Commonwealth of Puerto Rico and Commonwealth of Puerto Rico through the Environmental Quality Board (collectively the "Commonwealth") submit this supplemental briefing on defendants' request to exclude wells outside the delineated areas from Anthony Brown's expert report and modeling work.

Anthony Brown's Expert Report concludes that groundwater within the delineated areas of two trial sites (the Esso Ponce 364 trial site and the Total Hato Rey 1012 trial site) is impacted by the capture zone of several wells located outside the delineated areas for those sites. The delineations were prepared prior to expert reports and without the use of expert modeling, so at the time the delineations were prepared the impacts of wells outside the delineated areas on groundwater within those areas was not known. In *New Jersey*, the Court acknowledged that "the lawyers did the best they could to delineate the area of threat," but that it was "always expected that in the end this would be a question for experts." (Ex. 1, R.T. (Dec. 19, 2012) at 15:6-17.)

Mr. Brown fully explained his capture zone analysis in his Report, and provided to defendants all of the information he relied upon in his analysis. On March 31, 2014, however,

defendants contended that Mr. Brown must remove all references to wells outside delineated areas from his modeling work, even if the capture zones of those wells extend into the delineated areas, or produce six categories of well specific information. (Ex. 2, March 31, 2014, Email from L. Gerson to T. O'Reilly.)  Defendants complain that had they only known that Mr. Brown would be considering the capture zones of wells outside the delineated areas, they would have conducted discovery with respect to these wells.  Plaintiffs, however, produced information in its possession with regard to wells both inside and outside the delineated areas.  Although plaintiffs are now attempting to determine whether there is any additional responsive information (despite the fact that Mr. Brown did not rely on any such information), we note that defendants' complaints are disingenuous in several respects.

First, defendants did *not* limit their discovery with respect to wells that were only inside the delineated areas.  Instead, they conducted extensive discovery with respect to wells outside the delineated areas.  (*See* Ex. 3, Subpoena to Municipality of San Juan at Document Request No. 12 (asking for all information on wells "within a two mile radius" of Total Hato Rey 1012); and Ex. 4, Subpoena to Municipality of Cayey at Document Request Nos. 10, 12, and 13 (asking for all information on wells within municipality, which is where Esso 364 is located).

The subpoena to the Municipality of San Juan, in fact, asks for the exact same information on three wells which defendants now seek to exclude on the basis that they were not able to conduct discovery with respect to the wells.  (Ex. 3 at Document Request No. 12, Sorbona, Ham well 3, and Ham well 2.)  These wells were already well known to defendants. Defendants' claims that they would have conducted additional discovery, outside delineated areas, had they only known that Mr. Brown would consider the capture zones of wells outside the delineated areas ignores the fact that Defendants did in fact conduct such discovery.

Second, for many wells the information defendants now claim they need is simply not available, whether those wells are inside delineated areas or outside delineated areas because there is very limited information on "pumping rates" and "well construction" for most wells in Puerto Rico.  In this sense, even if defendants had not conducted discovery with respect to wells outside the delineated area (they did), they would be no more prejudiced as to wells outside the delineated area than they are for wells inside the delineated areas.  Information on wells, both inside and outside the delineated areas - is minimal.

Third, pumping data, and additional well construction data, including data for wells outside the delineated area, was produced in discovery for wells where it was available to Plaintiffs. (Ex. 5, April 3, 2014, Letter from T. O'Reilly to L. Gerson.)   This information was for the most part contained in a production Bates stamped PR-MTBE-TSWells_00etc. Plaintiffs, for example, produced pumping data for the University Wells. (*See* Ex. 5.)

Mr. Brown prepared the models in the Puerto Rico matter to graphically demonstrate impacts from MTBE on groundwater and wells in the vicinity of the Trial Sites.  Since all groundwater is effected by the pumping of wells, Mr. Brown exercised his professional judgement in selecting wells that likely impacted the flow of groundwater in the vicinity of the Trial Sites.  The Court previously recognized that Mr. Brown was doing what scientists

commonly do and that defendants would have a full opportunity to address Mr. Brown's opinions:

13      MS. GERSON:  The only difference, your Honor, is that
14   the first group of wells I mentioned, Mr. Brown specifically in
15   his report says that they will be impacted.  The remaining
16   wells we believe still need to come out of his model, because
17   although he doesn't draw that conclusion, they operate in his
18   model to affect groundwater flow and his ultimate conclusion
19   about what the model output will be.  By having them in his
20   model, they will be affecting his output that will be
21   projected.

22      THE COURT:  Why isn't that something you can handle by
23   cross-examining?  They are not claiming anything for those 25.
24   They are not calling them impacted and they are not calling
25   them threatened.  It is simply part of his methodology to
 1   explain his inputs and why he says he is adding them into his
 2   formula, so to speak, because of the direction of the ground-
 3   water flow, and that results in a conclusion.
 4      You can poke all the holes you want in that
 5   conclusion, but they are not trying to recover anything for
 6   those wells as either impacted or threatened.
12      I don't see how you're harmed.  He is not basing that
13   on actual impact or actual testing.  He is doing what
14   scientists do.  He is saying here are my inputs, here is my
15   conclusion, here is my outcome, here is why, here is my
16   formula, I'm putting it all out, and you can cross-examine me
17   until the cows come home.  I don't see the problem with that
18   group.

(Ex. 6, R.T. (April 1, 2014) at 4:13-5:18.)  Defendants acknowledge that Mr. Brown utilized his professional judgment to determine input parameters for the modeling and that he did not rely on any of the data defendants are now seeking.  (*Id.* at 7:14-8:3.)

Mr. Brown made the same reasonable assumptions for all wells, whether inside or outside delineated areas, based upon the category of well involved and what is known about wells in that category for which there *is* pumping rate or well construction information.  This is all explained in Mr. Brown's Report, and defendants have all of the information that Mr. Brown used for his analysis.  Accordingly, there is no need or basis for defendants to supplement their responses to Mr. Brown's Report, or to require Mr. Brown to alter his analysis of impacts to groundwater within delineated areas - including impacts caused by the capture zones of wells outside those areas.

Respectfully Submitted,

Michael D. Axline
Attorneys for Commonwealth

cc: Lisa Gerson, Esq. (via email)
    All Counsel (via LNFS)

# EXHIBIT 1

1

```
CCJMMTBC
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
 3  ETHER ("MTBE") PRODUCTS                Master File C.A.
 4  LIABILITY LITIGATION                   No. 1:00-1898(SAS)
 4
 5  ------------------------------x
 5                                         New York, N.Y.
 6                                         December 19, 2012
 6                                         5:30 p.m.
 7
 7  Before:
 8
 8                  HON. SHIRA A. SCHEINDLIN
 9
 9                                         District Judge
10
10                      APPEARANCES
11
11
12  MILLER AXLINE & SAWYER
12       Attorneys for New Jersey, Puerto Rico Plaintiffs
13  BY:  MICHAEL AXLINE
13
14  LAW OFFICES OF JOHN K. DEMA, P.C.
14       Attorneys for New Jersey, Puerto Rico Plaintiffs
15  BY:  JOHN K. DEMA
15       NATHAN SHORT
16
16  COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
17       Attorneys for New Jersey Plaintiffs
17  BY:  LEONARD Z. KAUFMANN
18
18
19
20
21
22
23
24
25
```

15

CCJMMTBC
1    case.  They were drawn with an acknowledgement that plumes
2    move, as your Honor had noted.  So they encompass not only the
3    area of actual impact, which is a much smaller area that's now
4    been identified to us by Anthony Brown, but they identify the
5    extent of the threat.
6                THE COURT:  But wait a minute.  I am going to
7    interrupt because I don't think that's entirely fair.  These
8    were drawn in an early stage, before Brown's report.  I at
9    least always expected that in the end this would be a question
10   for experts.  So at that time the lawyers did the best they
11   could to delineate the area of threat.  The expert then writes
12   his reports and says the area of threat is even greater, but we
13   are not seeking any damages for it.  We are just saying,
14   because of that threat, we want to remediate in a different and
15   broader way than the New Jersey EDP or whatever now requires.
16   I don't see the unfairness in that it takes you beyond the
17   delineation.
18                Your argument of unfairness is, we would have to be
19   entitled to so much more discovery.  I can't imagine what.
20   Your discovery is your expert.  Your expert studies the Brown
21   report.  Your expert does whatever measurements or something he
22   wants to do of the current plume and where it is and where it's
23   traveled, where it was hit and how far it's moved from the hit,
24   and tells the jury whatever he wants to tell the jury -- or
25   she, hopefully.  Maybe there will be some she in this case --

CCJMMTBC

1          THE COURT:  Yeah, but.  I still say I don't see much
2    burden in him redoing the report so that if for any reason some
3    judge some day thinks the whole report should come in or the
4    parties agree to that or just to clarify to the rebuttal expert
5    what he is dealing with, it's not a bad idea that the report
6    conform to the ruling and to your letter.  I don't see the
7    downside.  I know it's a little more work, but not a lot in
8    today's world.  I thought the report would be about 50 pages.
9    I didn't know what you were going to answer.  I'm delighted
10   it's not 500.  I think he should conform, and Mr. Wallace said
11   it will go a long way and everybody can look at it and we can
12   reconvene.  I think he should get it done.  If you need a
13   ruling on that, then a revised report should be prepared in
14   accordance with your letter and what I've said in two different
15   transcripts now, December 5 and December 19, and then I will
16   still revisit this if the defendants want to take more of my
17   time to discuss it again when they see the revised report.
18         MR. AXLINE:  Your Honor, let me just preview some
19   problems I can anticipate from this approach.
20         One is that while the narrative is 50 some pages at
21   each site, there is supporting data which includes data from
22   outside the delineated area that's much more massive.
23         THE COURT:  I don't think the exhibits have to be
24   changed.  I think they are only beneficial to the defense
25   expert to see the basis for his conclusion in generalities that

CCJMMTBC

1    this thing could impact receptors outside of the delineated
2    area.  They might as well see those exhibits.  There is no
3    reason to change that.  It's the report I'm worried about
4    because the report states the opinions.  I'm not worried about
5    that.  You don't need to start fussing with 8,000 pages of
6    exhibits.
7         Go ahead.
8         MR. AXLINE:  The other issue is a little trickier.  We
9    tried to address it in our proposed language.  And that is,
10   what are the defendants going to be allowed to make of the fact
11   that Mr. Brown testifies that the plume may move beyond the
12   delineated boundaries?  If there is no clear understanding,
13   they could jump all over that at trial.  I think it would be
14   good to clarify what it is and it's not permissible
15   specifically about what Mr. Brown will be allowed to say if --
16        THE COURT:  He says my opinion is that without
17   extensive remediation or broad remediation, this plume could
18   move and threaten a receptor site outside the delineation that
19   counsel has prepared.  Then the lawyer gets up on
20   cross-examination and says, on what do you base that opinion,
21   right?  On what evidence do you base that opinion?  You would
22   think that Brown would have to say, I'm familiar with the
23   measurements of this plume, I've seen the distances of its
24   travel over time, which we have measured by test results over
25   the years, and I extrapolate from that math as to how far it

# EXHIBIT 2

**Tracey O'Reilly**

| | |
|---|---|
| **From:** | Gerson, Lisa [LGerson@mwe.com] |
| **Sent:** | Monday, March 31, 2014 5:13 PM |
| **To:** | Tracey O'Reilly; maxline@toxictorts.org |
| **Cc:** | john.kampman@sedgwicklaw.com; pschauwecker@bdlaw.com; 'Duane Miller'; 'Justin J. Arenas'; 'Scott Kauff'; 'Nathan Short'; 'Daniel Boone'; 'Kizel Urrutia'; 'Miller, Axline & Sawyer' |
| **Subject:** | RE: A. Brown Report |

Tracey,

There are two issues that remain, although they are related. First, it is our understanding that with the exception of the Hospital Auxilio Mutuo and UCAT 2 wells, Plaintiffs have agreed to remove reference to wells located outside of the delineated areas from the text of Mr. Brown's report. However, this does not go far enough because certain of those wells, listed below, may be discussed in the text of the Brown report but also are included as part of Mr. Brown's modeling. The list below is slightly different than the list attached to our March 26th letter because it represents a slightly different group of wells. The March 26th list responded to Mike's request for Defendants to identify the wells discussed in the text and located outside of the delineated areas. The below list identifies wells contained in Mr. Brown's modeling and located outside of the delineated areas. There is overlap, but not complete overlap. Furthermore, the below wells were previously identified to Plaintiffs as being located outside the delineated areas in our preconference letter, Ex. E (they represent a subset of the larger list of 132). Removing wells from the text alone does not rectify the problem of Plaintiffs having injected wells outside the delineated areas into the case after the close of fact discovery if those wells also are contained in Mr. Brown's modeling. If Plaintiffs do not agree to remove these wells from Mr. Brown's report and model, we will ask the Court to order that relief.

As to the Hospital Auxilio Mutuo and UCAT 2 wells, although Plaintiffs admit that they are outside of the delineated area, we understand your position to be that they should remain in the case because Mr. Brown has modeled a capture zone for these wells that reaches inside the delineated areas. We disagree with this position, as stated in our March 26th letter, and will request that Court order these wells removed from Mr. Brown's report and modeling.

| |
|---|
| VILLA DEL REY |
| CASERIO 1 WELL |
| MUNOZ RIVERA WELL |
| POLVORIN 2 WELL |
| UCAT 1 Well |
| UCAT 2 Well |
| Giron 1 Well |
| PC 1 Well |
| PC 5 Well |
| PC 6 Well |
| PRCEM 2 Well |
| Santiago 1 Well |
| Western P-1 Well |
| ALHAMBRA East Well |
| Buena Vista Well |
| CAF 3 Well |
| CAF 4 Well |
| California Well |

| |
|---|
| Can Well |
| Cuatro Calles 1 Well |
| Flores Well |
| Rovira 1 Well |
| Valle Verde Well |
| Sauri 1 North Well |
| Hacienda la Margarita* |
| CABO ROJO 1 WELL* |
| CABO ROJO 2 WELL |
| CABO ROJO 3 WELL* |
| HOSPITAL AUXILIO MUTUO |
| GABRIELA MISTRAL |
| SORBONA |
| HAM 2 WELL |
| HAM 3 WELL |

*Wells marked with an asterisk are not contained on Ex. E.  However, these wells all relate to the Pozo Club de Leones site, which the parties have agreed to remove from the first trial of this action, so there may no longer be a dispute.

Lisa A. Gerson
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
Tel:  212-547-5769
Fax: 646-224-8675

**From:** Tracey O'Reilly [mailto:toreilly@toxictorts.org]
**Sent:** Monday, March 31, 2014 4:24 PM
**To:** Gerson, Lisa; maxline@toxictorts.org
**Cc:** john.kampman@sedgwicklaw.com; pschauwecker@bdlaw.com; 'Duane Miller'; 'Justin J. Arenas'; 'Scott Kauff'; 'Nathan Short'; 'Daniel Boone'; 'Kizel Urrutia'; 'Miller, Axline & Sawyer'
**Subject:** RE: A. Brown Report

Lisa,

I have some notes from Mike which I will try to use to put together what I understand to be our position.  Since I am playing catch-up, I might not be able to get the letter out until tomorrow morning.  Our office is actually closed today because it is a California holiday (Cesar Chavez Day).

Can you please identify which wells defendants' contend are part of Mr. Brown's modeling, but are located outside the delineated areas?  I had understood that defendants had previously identified all wells that the contend are outside the delineated area.  (*See* March 26, 2014, Letter from L. Gerson to M. Axline.)  Are you now identifying additional wells?

Sincerely,

Tracey L. O'Reilly
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, California  95825

# EXHIBIT 3



E-SERVICE
49233022
Jan 31 2013
04:54PM
File & ServeXpress

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE")PRODUCTS LIABILITY LITIGATION** | Master File No. 1:00-1898 MDL 1358 (SAS) M21-88 |

**This document relates to:**

*Commonwealth of Puerto Rico, et. al.*
*vs. Shell Oil Company, et. als.*; 07-CV-10470

## NOTICE OF SUBPOENA

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant Total Petroleum Puerto Rico Corp. is causing a subpoena attached hereto to be served upon the Municipality of San Juan, Chardón Ave. 160, San Juan, Puerto Rico 00918.

Dated:   January 31, 2013
San Juan, Puerto Rico

Respectfully submitted,

By:   Elaine Maldonado-Matías
Sepulvado & Maldonado, PSC
252 Ponce De León Ave.
Suite 1900
San Juan, P.R. 00918
Phone 787.765.5656
Fax 787.294.0073

*Counsel for Defendant Total Petroleum*
*Puerto Rico Corp.*

To:   All counsel via LexisNexis File and Serve

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the District of Puerto Rico

| | |
|---|---|
| In re:  Methyl Tertiary Butyl  Ether | )   Case Number:   MLD 1358 |
| ("MTBE") Products Liability Litigation | )   Docket No. M21-88 |
| | )   Master File C.A. No. |
| This documents applies to: | )   1:00-1898 (SAS) |
| | ) |
| ***Commonwealth of Puerto Rico, et al. v. Shell*** | )   Pending in the Southern District of New York |
| ***Oil Co., et al.,***  Case No. 07- CV- 10470 | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Municipality of San Juan
      Ave. Chardón 160
      Hato Rey PR 00918

    ☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:  See  Attachment "A"

        Documents are requested by February 20, 2013.  If you have any questions, please contact Elaine Maldonado-Matías or Deliris Ortíz (787-765-4949)

| Place: | Date and Time: |
|---|---|
| Sepulvado & Maldonado, PSC | February 20, 2013 |
| 252 Ave. Ponce De León, Suite 1900 | |
| San Juan, Puerto Rico  00918 | |

    ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   January 31, 2013

        *CLERK OF COURT*

                                      OR _____

      _____                  
        *Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
    Total Petroleum Puerto Rico Corp. _____ , who issues or requests this subpoena, are:
Elaine Maldonado, Esq. (emaldonado@smlawpr.com), 252 Ave. Ponce De León, Suite 1900, San Juan, PR 00918; Phone: (787) 765-4949; (787) 765-5656; Fax: (787) 294-0073.

# ATTACHMENT A

**I.   INSTRUCTIONS**

1.   The time frame for these requests is January 1, 1979 to the present.

2.   All DOCUMENTS are to be produced in their entirety.

3.   In the event the DOCUMENTS requested in this subpoena were formerly in the possession, custody or control of the subpoenaed party and have been lost and/or destroyed, those documents are to be identified in writing, including the identification of the DOCUMENT'S author(s), recipient(s), date of preparation, date of transmittal, subject matter, number of pages, attachments, date of loss and/or destruction, the manner of destruction, the reason for destruction, and person authorizing destruction.

4.   As used herein, the singular shall include the plural and the plural shall include the singular whenever necessary to bring within the scope of this subpoena DOCUMENTS which might otherwise be outside its scope.

5.   In all cases, electronic data is preferred over hard copy data; electronic are acceptable if they are complete and address the specific requests listed below.

**II.  DEFINITIONS**

1.   All definitions included in Local Rule 26.3 of the United States District Court for the Southern District of New York ("Local Rules") are incorporated herein by reference.

2.   "COMMONWEALTH" shall mean the territory and waters comprising the Commonwealth of Puerto Rico.

3.   "COMMUNICATION" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

4.   "CONTAMINANT" shall mean any substance of chemical constituent regulated by any local, state or federal agency or subject to a Maximum Contaminant Level (MCL), surface water quality standard, ground water quality standard, soil remediation standard, or other concentration based environmental regulatory standard; or any other substance or material containing such a substance and shall include, but not be limited to, any hazardous substance as defined by the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

5.   "CONTAMINATION" shall mean the presence, in any detectable amount, of any CONTAMINANT and any release, leaks or spills of any CONTAMINANT into the surface water, ground water or soil.

6.  "DISCHARGE," "SPILL," or "RELEASE" means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, overfilling, or dumping of a CONTAMINANT into the waters or onto the lands within the COMMONWEALTH.

7.  "DOCUMENT" or "DOCUMENTS" is defined to by synonymous in meaning and equal in scope to the usage of the term 'documents or electronically stored information' in Fed. R. Civ. 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term. A DOCUMENT includes all documents appended thereto.

8.  "EQB" or "JCA" means the Environmental Quality Board or Junta de Calidad Ambiental and all of its divisions, departments, bureaus, agencies and personnel.

9.  "EPA" means the United States Environmental Protection Agency.

10. "GASOLINE" means any gasoline or component of gasoline, including but not limited to methyl tertiary butyl ether (MTBE), ethylbenzene, benzene, toluene, xylenes (BTEX), tert-butyl alcohol (TBA), and/or any other oxygenate.

11. "MTBE" means the compound methyl tertiary butyl ether.

12. "PLAINTIFFS" shall mean the Commonwealth of Puerto Rico, and all of its divisions, departments, bureaus, and agencies, and the Puerto Rico Environmental Quality Board and all of its divisions, departments, bureaus, agencies, and personnel.  PLAINTIFFS shall also refer to all predecessors to the Commonwealth of Puerto Rico and the Puerto Rico Environmental Quality Board, and their divisions or offices, as well as present and former representatives, attorneys, consultants and other PERSONS acting or purporting to act on PLAINTIFFS' behalf.

13. "PRASA" means the Puerto Rico Aqueduct and Sewer Authority, and all of its divisions, departments, offices, bureaus, or agencies; all predecessors of these divisions, departments, offices, bureaus, or agencies; and any other person acting or purporting to act on behalf of PRASA.

14. "SUPPLY WELL(S)" shall include, without limitation, any public or private drinking water well, including but not limited to, those wells owned or operated, in part or in whole, at any time by PRASA.

15. "TOTAL SITE" means the gasoline service station located at Avenida Jesús T. Piñeiro #263 Hato Rey, Puerto Rico.

16. "UST" means underground storage tank.

17. "YOU" or "YOUR" means the Municipality of San Juan, and all of its divisions, departments, bureaus or offices, including but not limited to, the Environmental Affairs Program (Programa de Asuntos Ambientales), Permits area (Permisos), Complaints and Investigations area (Querellas e Investigaciones), Inspections  area (Inspecciones),  the

Geographic Information Systems (Sistemas de Información Geográfica) and all of its officers, directors, agents, and employees, as well as present and former representatives, attorneys, consultants and other persons acting or purporting to act on its behalf.

## III.    DOCUMENTS TO BE PRODUCED

1.    All DOCUMENTS CONCERNING the TOTAL STATION, including but not limited to any COMMUNICATIONS CONCERNING: (a) UST installation, maintenance, testing, closure and/or removal; (b) testing of soil and/or groundwater; (c) testing for and/or detections of MTBE; and (d) investigation and/or remediation of CONTAMINATION.

2.    All DOCUMENTS CONCERNING any complaints, reports, or other notifications of CONTAMINATION at the TOTAL STATION.

3.    All COMMUNICATIONS between YOU and PLAINTIFFS, the EPA, the EQB, the Department of Natural and Environmental Resources, the Department of Health, PRAS, any environmental consultant, or any other person or entity CONCERNING the TOTAL STATION.

4.    All DOCUMENTS CONCERNING the gasoline additive known as MTBE.

5.    All DOCUMENTS CONCERNING the installation, maintenance, testing, closure and/or removal of any USTs within a 2-mile radius of the TOTAL STATION.

6.    All DOCUMENTS CONCERNING the testing of soil, groundwater and/or surface water, including but not limited to any testing and/or detections of MTBE in soil, groundwater or surface water, within a 2-mile radius of the TOTAL STATION.

7.    All DOCUMENTS CONCERNING any investigation and/or remediation of CONTAMINATION in soil, groundwater or surface water within a 2-mile radius of the TOTAL STATION.

8.    All DOCUMENTS CONCERNING any DISCHARGE, SPILL or RELEASE of GASOLINE or a CONTAMINANT within a 2-mile radius of the TOTAL STATION.

9.    All DOCUMENTS CONCERNING any complaints, reports, or other notifications of CONTAMINATION at any location within a 2-mile radius of the TOTAL STATION.

10.    All DOCUMENTS CONCERNING any complaints, reports, or other notifications relating to the taste or odor of drinking water in the Municipality of San Juan.

11.    All DOCUMENTS regarding any effort or attempt made by YOU or PLAINTIFFS to address complaints regarding the taste or odor of drinking water in the Municipality of San Juan.

12.    All DOCUMENTS CONCERNING any SUPPLY WELLS located within 2-mile radius of the TOTAL STATION, including but not limited to any DOCUMENTS

CONCERNING the installation, depth, closure or source of the SUPPLY WELLS, including but not limited to the following SUPPLY WELLS:

a.   Hiram Bithorn 1 – Site Id. M3M050W;

b.   Hiram Bithorn 2 – Site Id. M3M051W;

c.   Miguel Souch – Site Id.

d.   Sorbona – Site Id.

e.   Truman – Site Id.

f.   Ext. Roosevelt – Site Id.

g.   Ham well 3 – Site Id. 182440066030400

h.   Ham well 2 – Site Id. 182441066030200;

i.   Claro – Site Id. 182500066032300; and

j.   McKraken – Site Id. 182505066030900.

13.   All DOCUMENTS CONCERNING sampling results from and/or treatment systems installed at any SUPPLY WELLS located within a 2-mile radius of the TOTAL STATION or at any of the SUPPLY WELLS referenced in Document Request No. 12, above.

14.   All DOCUMENTS CONCERNING any effort by YOU or PLAINTIFFS to investigate, remediate, treat or otherwise address the presence or potential presence of contamination in any SUPPLY WELL within a 2-mile radius of the TOTAL STATION including but not limited to the SUPPLY WELLS referenced in Document Request No. 12, above.

15.   All DOCUMENTS CONCERNING any effort by YOU or PLAINTIFFS to investigate, remediate or otherwise address the presence or potential presence of contamination in any surface water body in the Municipality of San Juan, including but not limited to the Río Piedras river.

16.   All DOCUMENTS CONCERNING the quality of water in any surface water body in the Municipality of San Juan, including but not limited to, the Río Piedras.

17.   All DOCUMENTS CONCERNING YOUR use of any surface water body for drinking water, including without limitation, the Río Piedras river.

18.   All DOCUMENTS CONCERNING any effort by YOU or PLAINTIFFS to investigate, remediate or otherwise address the presence or potential presence of contamination in groundwater in the Municipality of San Juan.

19. All DOCUMENTS CONCERNING any monies spent or predicted to be spent for the investigation, treatment or remediation of any contamination in soil, groundwater or surface water in the Municipality of San Juan.

20. All DOCUMENTS CONCERNING warnings or other COMMUNICATIONS to the Municipality of San Juan residents CONCERNING the presence of contamination in any soil, groundwater, SUPPLY WELL, or surface water.

21. All DOCUMENTS or COMMUNICATION between YOU and the EPA or the EQB CONCERNING YOUR compliance with the Municipality of San Juan's National Pollutant Discharge Elimination System (NPDES) Small MS4 General Permit No. PRR040036.

22. All DOCUMENTS CONCERNING any civil, administrative or criminal action or proceeding instated against YOU and CONCERNING any CONTAMINATION in soil, groundwater or surface water within the Municipality of San Juan.

23. Any maps or diagrams from the Geographic Information Systems, or any of YOUR offices or departments, of the area surrounding the TOTAL STATION extending, at the least, a 2-mile radius from the TOTAL STATION and including any information CONCERNING, but not limited to, the location of other gasoline service stations within the area, the location of drinking water infrastructure, and the location of surface water bodies and groundwater bodies within the area.

24. Municipality of San Juan organization charts and employee directories for 1979 to present.

# EXHIBIT 4



Dec 10 2012
02:38PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00 – 1898
MDL 1358 (SAS): M21 – 88

This Document Relates To:

*Commonwealth of Puerto Rico, et al. v.
Shell Oil Co., et al., 07 Civ. 10470*

---

## NOTICE OF SUBPOENA

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant Exxon Mobil Corporation is causing the subpoena attached hereto to be served upon the Municipality of Cayey, Cayey City Hall, St. Nuñez Romeu and St. Muñoz Rivera, Cayey, Puerto Rico 0000737-1330.

Dated:   December 10, 2012
Haddonfield, NJ

Respectfully submitted,

By: _____
Matthew R. Conley (mconley@archerlaw.com)
Archer & Greiner,
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033
Ph. 856-795-2121
Fax 856-795-0574

*Counsel for Defendant Exxon Mobil Corporation*

To:     All Counsel via LexisNexis File and Serve

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

# UNITED STATES DISTRICT COURT
for the
## District of Puerto Rico

| | | |
|---|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | ) ) ) | Case Number: MDL No. 1358 Docket No. M21-88 |
| This document applies to: | ) ) | Master File C.A. No. 1:00-1898 (SAS) |
| Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al., 07 Civ. 10470 | ) ) ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES

TO:    Municipality of Cayey
       Cayey City Hall
       St. Nuñez Romeu and St.Muñoz Rivera
       Cayey, P.R. 0000737-1330

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:    See Attachment "A"
       Documents are requested by December 30, 2012.  If you have any questions, please contact Antonio L. Collazo Bennazar (787-764-8181) or Matt Conley (856-673-3901)

| PLACE: O'NEILL & BORGES LLC Attn: Carla García-Benítez American International Plaza 250 Muñoz Rivera Ave., Ste. 800 San Juan, P.R. 00918-1813 | Date and Time: December 30, 2012 |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE: | Date and Time |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:    December 10, 2012

CLERK OF COURT

                                                        OR    _____
_____                                        *Attorney's signature*
*Signature of Clerk or Deputy Clerk*

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

The name, address, e-mail, and telephone number of the attorney representing (*name of party*)   _Exxon Mobil Corporation_
_____, who issues or requests this subpoena, are:

Matthew Conley; One Centennial Square, Haddonfield, NJ 08033; mconley@archeralw.com; 856-673-3901

ATTACHMENT A

DEFINITIONS AND INSTRUCTIONS

1.      The time frame for these requests is January 1, 1979 to the present.

2.      All DOCUMENTS are to be produced in their entirety.

3.      All definitions in Local Rule 26.3 of the United States District Court for the Southern District of New York ("Local Rules") are incorporated herein by reference.

4.      In the event the DOCUMENTS requested in this subpoena were formerly in the possession, custody or control of the subpoenaed party and have been lost and/or destroyed, those documents are to be identified in writing, including the identification of the DOCUMENT'S author(s), recipient(s), date of preparation, date of transmittal, subject matter, number of pages, attachments, date of loss and/or destruction, the manner of destruction, the reason for destruction, and person authorizing destruction.

5.      As used herein, the singular shall include the plural and the plural shall include the singular whenever necessary to bring within the scope of this subpoena DOCUMENTS which might otherwise be outside its scope.

6.      In all cases, electronic data is preferred over hard copy data; electronic are acceptable if they are complete and address the specific requests listed below.

7.      "CAYEY STATION" means the Esso station located at Calle Antonio R. Barcelo #1, in Cayey, Puerto Rico.

8.      "COMMONWEALTH OF PUERTO RICO" or "COMMONWEALTH" means the government of the Commonwealth of Puerto Rico, including all public agencies, departments, boards or other governmental entities as well as all personnel, employees, and representatives thereof.

9.      "COMMUNICATION" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

10.     "CONCERNING" means constituting, respecting, regarding, pertaining to, referring to, stating, establishing, showing, supporting, describing, recording, noting, reflecting, embodying, memorializing, containing, mentioning or discussing, either directly or indirectly.

11.     "DISCHARGE," "SPILL," or "RELEASE" means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, overfilling, or dumping of hazardous substances into the waters or onto the lands within the COMMONWEALTH.

12.     "DOCUMENT(S)" is defined in the Local Rules is synonymous in meaning and

equal in scope to the usage of this term in Fed. R. Civ. P. 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term. A document includes all documents appended thereto.

13. "MTBE" means the compound methyl tertiary butyl ether.

14. "PLAINTIFFS" means the COMMONWEALTH OF PUERTO RICO; the Environmental Quality Board, the Department of Natural and Environmental Resources, the Department of Health, PRASA, and all of their divisions, departments, bureaus, agencies, or offices; all predecessors to these divisions, departments, bureaus, agencies, or offices; and water authorities within the COMMONWEALTH.

15. "PRASA" means the Puerto Rico Aqueduct and Sewer Authority, and all of its divisions, departments, bureaus, agencies, or offices; all predecessors to these divisions, departments, bureaus, agencies, or offices; and any other persons acting or purporting to act on behalf of PRASA.

16. "SUPPLY WELL" or "SUPPLY WELLS" shall include, without limitation, any public or private drinking water well, including, but not limited to, those wells owned or operated, in part or in whole, at any time, by PRASA.

17. "UST" means underground storage tank.

18. "YOU" or "YOUR" means the Municipality of Cayey, and all of its divisions, departments, bureaus, agencies or offices, including but not limited to the Department of Public Works and the Office of Environmental Control, and all of its officers, directors agents and employees as well as present and former representatives, attorneys, consultants and other persons acting or purporting to act on its behalf.

## DOCUMENTS TO BE PRODUCED

1. All DOCUMENTS CONCERNING the CAYEY STATION, including but not limited to any COMMUNICATIONS CONCERNING: (a) UST installation, maintenance, testing, closure and/or removal; (b) testing of soil and/or groundwater; (c) testing for and/or detections of MTBE; and (d) investigation and/or remediation of contamination.

2. All DOCUMENTS CONCERNING any complaints, reports, or other notifications of contamination at the CAYEY STATION.

3. All COMMUNICATIONS between YOU and PLAINTIFFS, the United States Environmental Protection Agency, any environmental consultant, or any other person or entity CONCERNING the CAYEY STATION.

4. All DOCUMENTS CONCERNING the gasoline additive known as MTBE.

5.      All DOCUMENTS CONCERNING the installation, maintenance, testing, closure and/or removal of any USTs within a 2-mile radius of the CAYEY STATION.

6.      All DOCUMENTS CONCERNING the testing of soil, groundwater and/or surface water, including but not limited to any testing and/or detections of MTBE in soil, groundwater or surface water, within a 2-mile radius of the CAYEY STATION.

7.      All DOCUMENTS CONCERNING any investigation and/or remediation of contamination in soil, groundwater or surface water within a 2-mile radius of the CAYEY STATION.

8.      All DOCUMENTS CONCERNING any DISCHARGE, SPILL or RELEASE of a hazardous substance within a 2-mile radius of the CAYEY STATION.

9.      All DOCUMENTS CONCERNING any complaints, reports, or other notifications of contamination at any location within a 2-mile radius of the CAYEY STATION.

10.     All DOCUMENTS CONCERNING any complaints, reports, or other notifications relating to the taste or odor of drinking water in the Municipality of Cayey.

11.     All DOCUMENTS regarding any effort or attempt by the Municipality of Cayey or the COMMONWEALTH to address complaints regarding the taste or odor of drinking water in the Municipality of Cayey.

12.     All DOCUMENTS CONCERNING any SUPPLY WELLS located in the Municipality of Cayey, including but not limited to any DOCUMENTS CONCERNING the installation, depth, closure or source of the SUPPLY WELLS.

13.     All DOCUMENTS CONCERNING sampling results from and/or treatment systems installed at any SUPPLY WELLS located in the Municipality of Cayey.

14.     All DOCUMENTS CONCERNING any effort by the Municipality of Cayey or the COMMONWEALTH to investigate, remediate, treat or otherwise address the presence or potential presence of contamination in any SUPPLY WELL.

15.     All DOCUMENTS CONCERNING any effort by the Municipality of Cayey or the COMMONWEALTH to investigate, remediate or otherwise address the presence or potential presence of contamination in any surface water body in the Municipality of Cayey.

16.     All DOCUMENTS CONCERNING the quality of water in any surface water body in the Municipality of Cayey, including without limitation, the De La Plata River.

17.     All DOCUMENTS CONCERNING the Municipality of Cayey's use of any surface water body for drinking water, including without limitation, the De La Plata River.

18.   All DOCUMENTS CONCERNING any effort by the Municipality of Cayey or the COMMONWEALTH to investigate, remediate or otherwise address the presence or potential presence of contamination in groundwater in the Municipality of Cayey.

19.   All DOCUMENTS CONCERNING any monies spent or predicted to be spent for the investigation, treatment or remediation of any contamination in soil, groundwater or surface water in the Municipality of Cayey.

20.   All DOCUMENTS CONCERNING warnings or other COMMUNICATIONS to Municipality of Cayey residents CONCERNING the presence of contamination in any soil, groundwater, SUPPLY WELL, or surface water.

21.   Municipality of Cayey organization charts and employee directories for 1979 to present.

9121689v1

# EXHIBIT 5

Law Offices of

# MILLER, AXLINE & SAWYER

A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE

TRACEY L. O'REILLY
DANIEL BOONE
JUSTIN MASSEY
BRYAN BARNHART
DAVE E. BLUM
MOLLY MCGINLEY HAN

April 2, 2014

VIA U.S. MAIL AND LNFS

Lisa A. Gerson, Esq.
McDermott, Will & Emery
340 Madison Avenue
New York, New York 10173-1922

Re:   *Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*
      **Expert Report of Anthony Brown**

Dear Ms. Gerson:

I am writing on behalf of plaintiffs Commonwealth of Puerto Rico and Commonwealth of Puerto Rico through the Environmental Quality Board (collectively the "Commonwealth") to follow-up on the hearing with Judge Scheindlin yesterday concerning defendants' request to exclude wells outside the delineated areas from Mr. Brown's expert report.

Status of Meet and Confer

I have reviewed prior correspondence and emails concerning this issue and have been unable to locate any prior mention of excluding wells from the modeling work performed by Mr. Brown.[1] I have also reviewed the transcript for the March 19, 2014, MDL Status Conference, and there is no mention of Mr. Brown's modeling work or wells associated with his modeling work.

Moreover, unless I am mistaken, defendants have not previously raised the need to have pumping and wells construction data for these wells in order to cross-examine Mr. Brown

---

[1] *See* Feb. 10, 2014, Letter from C. Danley to N. Short; March 5, 2014, Letter from L. Gerson to N. Short; March 11, 2014, Letter from P. Sacripanti to Judge Scheindlin; March 19, 2014, Letter from E. Maldonado-Matias to N. Short; and March 26, 2014, Letter from L. Gerson to M. Axline.

Lisa A. Gerson, Esq.
Page 2
April 2, 2014

concerning his input data. As far as I can tell you March 31, 2014, email to myself and Mr. Axline was the first time that defendants have raised the issue of data for wells "included as part of Mr. Brown's modeling," or even the need to exclude these wells from Mr. Brown's modeling work.

The Commonwealth, therefore, believes that this issue was improperly raised for the first time during the conference yesterday with Judge Scheindlin, and intends to so inform the Court.

Information Requested

We disagree that defendants need to conduct additional discovery concerning the wells included in Mr. Brown's modeling work, and with certain representations made during the conference yesterday. You, for example, suggested that Mr. Brown's modeling work improperly changed or impacted the direction of groundwater flow at the trial sites from the "natural" flow direction. This is incorrect. As you will recall, in the *New Jersey* matter Mr. Brown (and other experts for both plaintiffs and defendants) testified at length about the impacts of pumping wells (private, industrial & municipal) on the orientation of MTBE contamination plumes and the movement of groundwater. Mr. Brown's modeling work in this matter is simply a tool to graphically depict the same facts and information. There is thus nothing substantially new or different from the information which is already available to defendants.

Additionally, we note that there is a substantial volume of information already produced to defendants which contains some of the requested information. The Commonwealth, for example, produced the May 26, 2011, U.S. Geological Survey (USGS) (2011) Groundwater Site Inventory Database and identified other reliance material containing data on the status and pumping of numerous wells, including these wells, in Puerto Rico.[2] Additionally, substantive information concerning pumping rates, construction and usage relating to the UCAT wells was also previously produced to defendants. (*See* Attachment 1.) Finally, as stated during the conference, the pumping rates utilized by Mr. Brown in his modeling work were based on professional judgment.

Despite defendants' failure to properly meet and confer on this issue, the Commonwealth is nonetheless willing to work with defendants to obtain, to the extent possible, the requested data. Based on your representations to Judge Scheindlin yesterday, it is our understanding that defendants have requested the following information for the wells included in Mr. Brown's modeling work which are outside the delineated areas:

1.      Status of the wells;
2.      Well construction diagrams (depicting whether the well is cased and the screen interval);
3.      Well drilling logs;

_____

    [2] *See e.g.* March 21, 2014, Letter from M. Axline to E. Maldonado-Matias.

Lisa A. Gerson, Esq.
Page 3
April 2, 2014

    4.      Pumping rate, or pumping records;

    5.      Water level records;

    6.      Any pumping test performed on the wells; and

    7.      For the Hospital Auxilio Mutuo, confirmation or clarification on the number of wells and their designations as Hospital Auxilio Muto Well, HAM1, HAM2, and HAM 3.

(March 31, 2014, Email from L. Gerson to M. Axline, Follow up re 11 wells.)  We will assume that this is the outstanding request unless we hear otherwise.

<u>Wells at Issue</u>

Defendants have circulated a number of different lists concerning wells identified in Mr. Brown's expert report.  (*See e.g.* March 11, 2014, Letter from P. Sacripanti to Judge Scheindlin at Exhibit E. Well List #1, Well List #2, and Well List #3; *see also* March 19, 2014, Letter from E. Maldonado-Matias to N. Short.)  On March 31, 2014, you then circulated what appears to be a different list of wells in response to my email.  (*See* March 31, 2014, Email from L. Gerson to T. O'Reilly, A. Brown Report.)  As we understand it, and unless we hear otherwise by close of business tomorrow, the list of wells outside the delineated areas that are now at issue and for which defendants are now requesting additional information are the following wells:

| |
|---|
| VILLA DEL REY |
| CASERIO 1 WELL |
| MUNOZ RIVERA WELL |
| POLVORIN 2 WELL |
| UCAT 1 Well |
| UCAT 2 Well |
| Giron 1 Well |
| PC 1 Well |
| PC 5 Well |
| PC 6 Well |
| PRCEM 2 Well |
| Santiago 1 Well |
| Western P-1 Well |
| ALHAMBRA East Well |
| Buena Vista Well |
| CAF 3 Well |
| CAF 4 Well |
| California Well |
| Can Well |
| Cuatro Calles 1 Well |
| Flores Well |

Lisa A. Gerson, Esq.
Page 4
April 2, 2014

| Rovira 1 Well |
| --- |
| Valle Verde Well |
| Sauri 1 North Well |
| Hacienda la Margarita* |
| CABO ROJO 1 WELL* |
| CABO ROJO 2 WELL |
| CABO ROJO 3 WELL* |
| HOSPITAL AUXILIO MUTUO |
| GABRIELA MISTRAL |
| SORBONA |
| HAM 2 WELL |
| HAM 3 WELL |

Please confirm that wells marked with an asterisk are no longer at issue since they were associated with the Pozo Clube de Leones site.

Damages

Finally, I would like to clarify that the Commonwealth is not seeking damages for the Hospital Auxilio Mutuo and UCAT wells. The Commonwealth, instead, insists that they remain in Mr. Brown's report and opinions because the capture zones of these wells extend *into* the delineated areas. It cannot be said, therefore, that these wells are actually *outside* the delineated areas.

Sincerely,

Tracey L. O'Reilly

cc: All Counsel (via LNFS)

Lisa A. Gerson, Esq.
Attachment 1
April 2, 2014

*Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*
**Plaintiff's Expert Anthony Brown**
**Supplemental List of Previously Produced Materials**
**UCAT Well Data**

| Bates Range | | | Number of Pages |
|---|---|---|---|
| PR-MTBE-TSWells_000978 | to | 000979 | 2 |
| PR-MTBE-TSWells_001000 | to | 001014 | 14 |
| PR-MTBE-TSWells_001015 | to | 001021 | 6 |
| PR-MTBE-TSWells_001032 | to | 001035 | 3 |
| PR-MTBE-TSWells_001078 | to | 001084 | 6 |
| PR-MTBE-TSWells_001115 | to | 001118 | 3 |
| PR-MTBE-TSWells_001119 | to | 001122 | 3 |
| PR-MTBE-TSWells_001128 | to | 001136 | 8 |
| PR-MTBE-TSWells_001137 | to | 001145 | 8 |

# EXHIBIT 6

1

```
        E41rmtbc
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   In Re: METHYL TERTIARY BUTYL
 3         ETHER ("MTBE") PRODUCTS
 4         LIABILITY LITIGATION
 4
 5   ------------------------------x
 5
 6   COMMONWEALTH OF PUERTO RICO,
 6   et al.,
 7
 7                    Plaintiffs,
 8
 8          v.                          07 Civ. 10470 (SAS)
 9
 9   SHELL OIL CO., et al.,
10                                      Telephone Conference
10                   Defendants.
11
11   ------------------------------x
12                                      New York, N.Y.
12                                      April 1, 2014
13                                      3:30 p.m.
13
14   Before:
14
15            HON. SHIRA A. SCHEINDLIN
15
16                                      District Judge
16
17
17            APPEARANCES
18
18
19   MILLER AXLINE & SAWYER P.C.
19        Attorneys for Plaintiff
20   BY:  TRACEY O'REILLY
20
21   MCDERMOTT WILL & EMERY LLP
21        Attorneys for Defendant ExxonMobil Corporation
22   BY:  LISA GERSON
22        JAMES A. PARDO
23
23   SEPULVADO & ASSOCIATES
24        Attorneys for Defendant Total Petroleum
24   BY:  ELAINE MALDONADO
25        DELIRIS ORTIZ
25   EXAM
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4

E41rmtbc
1    off.  It is around 30.
2         THE COURT:  OK.
3         MS. GERSON:  These are wells that are outside the
4    delineation.  They are in Mr. Brown's model.  In other words,
5    he has them operating in his model.  He has wells both inside
6    and outside.
7         THE COURT:  I'm sorry.  You lost me.  You said a
8    minute ago there are two groups of wells which totaled to 5,
9    and that's where he did the modeling and the inputs changing
10   the groundwater flow and all that, and then concluding they
11   will be impacted.  Then I said, what about the remaining 25,
12   and you gave the same answer about in his model.
13        MS. GERSON:  The only difference, your Honor, is that
14   the first group of wells I mentioned, Mr. Brown specifically in
15   his report says that they will be impacted.  The remaining
16   wells we believe still need to come out of his model, because
17   although he doesn't draw that conclusion, they operate in his
18   model to affect groundwater flow and his ultimate conclusion
19   about what the model output will be.  By having them in his
20   model, they will be affecting his output that will be
21   projected.
22        THE COURT:  Why isn't that something you can handle by
23   cross-examining?  They are not claiming anything for those 25.
24   They are not calling them impacted and they are not calling
25   them threatened.  It is simply part of his methodology to

5

E41rmtbc
1  explain his inputs and why he says he is adding them into his
2  formula, so to speak, because of the direction of the ground-
3  water flow, and that results in a conclusion.
4          You can poke all the holes you want in that
5  conclusion, but they are not trying to recover anything for
6  those wells as either impacted or threatened.  That is the 25.
7  To me that is the easier group than the 5.  The 5, they are
8  actually trying to sort of sue on now as threatened wells.  I
9  have a view on that which, subject to hearing from the
10  plaintiffs, I will share with you.  But the other 25, they are
11  not doing anything except saying it's part of the calculus.
12          I don't see how you're harmed.  He is not basing that
13  on actual impact or actual testing.  He is doing what
14  scientists do.  He is saying here are my inputs, here is my
15  conclusion, here is my outcome, here is why, here is my
16  formula, I'm putting it all out, and you can cross-examine me
17  until the cows come home.  I don't see the problem with that
18  group.
19          It is 5 that I'm more troubled by.  They would
20  actually at the end of the day seek damages, I gather, or
21  relief for the 5 threatened wells.  They are not seeking
22  damages or relief, and Ms. O'Reilly can firm confirm this, for
23  the 25, using round numbers.  For the 25 they are not seek
24  relief.
25          Ms. O'Reilly, you heard Ms. Gerson break this down
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

7

E41rmtbc
1   get involved and exercise their judgment --
2           Mr. Brown identified these wells.  Unlike the 25, when
3   the modeling work was done by him -- and that's something that
4   had to actually physically be done, it is not something on file
5   anywhere that anyone could pull, it had to physically be
6   done -- it turned out that the capture zones for these wells
7   leached into the delineation areas.  That was the first time
8   that we knew about that.
9           THE COURT:  Ms. Gerson, I don't know if you so clearly
10  understood the distinction in remedies between the 5 and the
11  25.  The 25, in essence, are not in the suit other than as part
12  of sort of the mathematics of the expert's conclusions.  In
13  that sense I don't really understand what the dispute is.
14          MS. GERSON:  Your Honor, we appreciate the
15  clarification now between the 5 and the 25.  The underlying
16  issue is the same for both in that Mr. Brown, whether we are
17  talking about the 5 and this model of a capture zone he has
18  created or we are talking about the 25 and how they affect the
19  overall model, the issue is that he is making assumptions.  I
20  understand you can bring that out on cross.  What we don't have
21  here is the actual factual data that we would have gotten in
22  discovery to contradict his assumptions.
23          THE COURT:  But neither do they.  They are not
24  working, as I understand it, with actual factual data.  He's
25  done models where he has assumptions as inputs.  These are

8

E41rmtbc
1   assumptions that he is making without data.  Your expert can do
2   the same.  I don't think there is anything that says these with
3   based on actual test results, at least for the 25.
4          Now, for the 5 it must be more specific.  If they know
5   the capture zones fall within the delineated area, it may be
6   that that he actually did groundwater testing that showed that.
7   There is a difference between the two groups.  I need to
8   confirm that with Ms. O'Reilly.
9          Mr. O'Reilly, with respect to the 25, again I know we
10  are using shorthand, is there any actual testing or
11  measurements that he used, or was he using a hypothesis?
12         MS. O'REILLY:  It was a hypothesis, your Honor.  The
13  next question with the 5, it was also a hypothesis.  All of his
14  assumptions that he used to construct his model, including the
15  5, are listed and included in his report.
16         THE COURT:  None of them are based on what you might
17  call actual data?
18         MS. O'REILLY:  That's correct.
19         THE COURT:  Is that a clarification, Ms. Gerson?
20         MS. GERSON:  We knew that, your Honor.  That is a good
21  confirm for us.  We now have allegedly threatened wells outside
22  the delineation.  Of course, we did not serve a subpoena, for
23  example, on that well to find out, if Mr. Brown is assuming
24  this pumping rate, that actually, if we were to do discovery,
25  we would find out that the pumping rate is X or these wells are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300