1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In Re: METHYL TERTIARY BUTYL
            ETHER ("MTBE") PRODUCTS        00 CV  1898 (SAS)
4           LIABILITY LITIGATION
                                           Conference
5   ------------------------------x

6                                          New York, N.Y.
                                           April 16, 2014
7                                          5:15 p.m.

8   Before:

9            HON. SHIRA A. SCHEINDLIN

10                                         District Judge

11
                 APPEARANCES
12

13  MILLER AXLINE & SAWYER
         Attorneys for Plaintiffs
14  BY:  MICHAEL AXLINE

15
    McDERMOTT WILL & EMERY LLP
16       Attorneys for ExxonMobil
    BY:  JAMES A. PARDO
17       STEPHEN J. RICCARDULLI

18
    SHEPPARD MULLIN RICHTER & HAMPTON
19       Attorneys for ExxonMobil
    BY:  WHITNEY ROY
20

21  KING & SPALDING
         Attorneys for Chevron USA
22  BY:  CHARLES C. CORRELL, JR.

23
    SEDGWICK LLP
24       Attorneys for Shell Oil Company and Equilon
         Enterprises LLC
25  BY:  PETER C. CONDRON

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1                    APPEARANCES

2

HUNTON & WILLIAMS LLP
3        Attorneys for Defendant Tesoro Petroleum
    BY:   COLLEEN P. DOYLE
4

5  BLANK ROME LLP
        Attorneys for Defendant Lyondell Chemical Company
6  BY:   JOHN J. DICHELLO, JR.

7

BRACEWELL & GIULIANI LLP
8        Attorneys for Defendant Valero Refining Company
    BY:   AMY PARKER
9

10 LATHAM & WATKINS LLP
        Attorneys for Defendant Conoco Phillips
11 BY:   JON D. ANDERSON

12

ARNOLD & PORTER LLP
13        Attorneys for Defendant Atlantic Richfield,
         BP WestCoast Products, and BP Products North America
14 BY:   STEPHANIE B. WEIRICK

15

MANATT, PHELPS & PHILLIPS LLP
16        Attorneys for Defendant USA Gasoline Corp.
    BY:   SAMANTHA J. KATZE
17

18 MCCONNELL VALDES LLC
        Attorneys for Defendant Sol Puerto Rico
19 BY:   ALEJANDRO CEPEDA

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  Is the only case on today the Orange

3    County audit history?

4          MR. AXLINE:  Yes, your Honor.

5          THE COURT:  Are you in that case, Mr. Cepeda?

6          MR. CEPEDA:  No, your Honor.  But by the time it was

7    confirmed, I was already on the plane, so I might as well show

8    up.

9          THE COURT:  Is there a particular issue that we could

10   get out of the way?

11         MR. CEPEDA:  No.  I'm fine just listening in.

12         THE COURT:  We are not going to do Puerto Rico today,

13   but thank you for coming.

14         The only issue I know about is the station matrix

15   problem, continuing problem with the station matrix.  In

16   particular, Tesoro and Lyondell have both written saying there

17   is no evidence they know of against their clients to which

18   plaintiffs say commingled product.

19         I didn't realize, and neither did the defendants, that

20   plaintiffs are intending to rely on the commingled product

21   theory.  I thought plaintiff has always said in this case that

22   it wasn't relying on an alternative theory of liability and

23   that it could do product identification, which is what the

24   station matrix was all about.  So we do have a couple of

25   topics.

1          Let's put aside Lyondell and Tesoro initially and see

2    what else we have to talk about.  For the rest of you who

3    aren't Lyondell or Tesoro, tell me what your problem is if you

4    are not with one of those companies.

5          MS. ROY:  Whitney Roy, representing ExxonMobil

6    Corporation.  We have been talking about a tentative

7    stipulation with plaintiff that would resolve a lot of the

8    issues that we were concerned about when we came to you last

9    time.

10          THE COURT:  Right.

11          MS. ROY:  There may be a deal breaker issue.  The

12    proposal we received from the plaintiff is that for each of the

13    stations, the defendant that owned or operated or is basically

14    the obvious anchor tenant of that station would stipulate to

15    their dates that they were on the property.  In return, for

16    other stations where they are just targeted based on some sort

17    of allegation of supply to the station, the plaintiff would

18    walk away from those claims and dismiss them.

19          If we were able to get through a stipulation that

20    works for everyone, that would resolve a lot of the issues we

21    were concerned about for summary judgment and would streamline

22    the motions substantially.

23          THE COURT:  That would mean that the plaintiffs would

24    decide not to go after suppliers unless the supplier is the

25    same company as the owner of the station.  But short of that,

 1    they would agree not to go after suppliers.

 2           MS. ROY:  There are some instance where the anchor

 3    tenant is only there because they are a supplier but they are

 4    the majority supplier or they are a much bigger share and

 5    direct supplier to the station.

 6           The deal breaker point, though, is that the defendants

 7    would want the dismissal of those other stations or claims on

 8    other stations to be with prejudice.  As you can imagine, that

 9    would be something we want.  Plaintiff is wrestling with that

10    issue.

11           We have not gotten firm confirmation from them of

12    that.  We are sending of them a draft of a stipulation by

13    Friday.  If we can reach a resolution on prejudice, the motions

14    will be streamlined and we will have accomplished some.  If the

15    with-prejudice agreement doesn't come through, then the

16    stipulation is going to be thrown out the door and we will have

17    to submit motions that are substantial.  That's where we stand

18    on that issue.

19           There are three independent stations.

20           THE COURT:  Why don't we pause there for a moment.

21    Mr. Axline, is your client leaning toward agreeing to with-

22    prejudice dismissal or have you rejected it out of hand and

23    there is no point until waiting until Friday?

24           MR. AXLINE:  No, we haven't rejected it out of hand,

25    your Honor.  Our objective here is to allow the defendants to

1    present their motions in the most efficient way possible given

2    your prior rulings.  But we also have to preserve our record in

3    that process.  I'll tell you, frankly, my concern with the

4    with-prejudice point is that if we can come up with language

5    that would preserve our ability to pursue the claims should

6    there be a reversal on appeal of the reasons that we are

7    stipulating, I think we are going to be able to get there.

8    That is our objective.

9            THE COURT:  I'm not quite sure I understand that to be

10   with prejudice.  What you are saying is you would agree to

11   dismiss with prejudice but reserve the right that if there was

12   an appeal of my ruling and it was reversed, that could vacate

13   the stipulation, essentially?

14           MR. AXLINE:  Yes, in substance.

15           THE COURT:  Are defendants going to be interested in

16   that idea?

17           MS. ROY:  Your Honor, the problem is that the rulings

18   that we are talking about are rulings from the City of Fresno

19   case.

20           THE COURT:  That's OK.  He is still saying that's only

21   a matter of lawyer drafting.  He is saying should the

22   underlying ruling that created the thought that it should be

23   with prejudice and -- what other parts of the ruling would you

24   be referring to, Mr. Axline?

25           MR. AXLINE:  That's it.

```
 1              THE COURT:  That's it.  There are a lot of things that

 2     can happen on the way.  The case could settle, it may never get

 3     appealed, you may not win the appeal.  A lot of things could

 4     happen.  But he is saying in the event that he actually pursues

 5     an appeal way down the road and is successful, that would

 6     vacate the stipulation.

 7              MS. ROY:  I understand.

 8              THE COURT:  The chances of all the steps happening may

 9     be somewhat slim.

10              MS. ROY:  One of the proposals I made was that perhaps

11     if they could identify specific opinions that they are wanting

12     to reserve and if we can get to language that everyone is

13     comfortable with, then we will have a stipulation.  We are just

14     not there yet.  We need a couple more days.

15              THE COURT:  So it is possible that the outlines of

16     what he just said could be acceptable?

17              MS. ROY:  It all comes down to language, once we see

18     in it writing.

19              THE COURT:  It is also concept.  The concept is to

20     preserve the plaintiff's right to appeal that ruling.  Yes, he

21     would identify the ruling, and yes, you would have to work out

22     the language.  But the concept is fairly simple to me.  You

23     will dismiss with prejudice but subject to the right to appeal

24     a ruling in a different case.  It is California.  Should it be

25     reversed, that would vacate the stipulation of dismissal with
```

 1   prejudice.

 2              MS. ROY:  Understood.  That is a plausible agreement.

 3   I can't speak for all the defendants on this point.  It was

 4   something that we just discussed out in the hallway.

 5              THE COURT:  I see.  Mr. Axline, can you identify the

 6   opinion that you are talking about, opinion or opinions?

 7              MR. AXLINE:  Yes.

 8              THE COURT:  Now?

 9              MR. AXLINE:  Yes.  There were rulings in the Fresno

10   case on commingled product.  There was a ruling on the statute

11   of limitations in the Orange County Water District case, an

12   earlier ruling in the Orange County Water District case that

13   the defendants are invoking and which we don't want to have

14   this Court have to visit again on additional stations.  Those

15   are the rulings that we are talking about.

16              THE COURT:  You could be more specific by date and

17   docket number at another time.

18              MR. AXLINE:  Yes.  I think that would go into the

19   stipulation.  I think that Ms. Roy's proposal makes sense.  I

20   just heard it in the hallway.

21              THE COURT:  That was her proposal about preserving the

22   right to appeal?  No.

23              MR. AXLINE:  It was her proposal to specify the

24   rulings.

25              THE COURT:  All right.

1          MS. ROY:  It is obviously something we will need to

2    discuss with our clients once we see the exact orders, but that

3    helps.

4          THE COURT:  Given that it is still in negotiations, I

5    realize you have all come here, but does it make sense to spend

6    any more time on the defendants other than Lyondell and Tesoro,

7    since you may be on the verge of an agreement?

8          MS. ROY:  Yes, your Honor, there is a remaining issue.

9    The stipulation does not address all of the stations.  There

10   are three independent stations and two Thrifty stations where

11   they would not be subject to the stipulation.  We have been

12   asking, as we have told you before, for plaintiff to provide us

13   with the evidence they are relying on to get our gas to those

14   stations.  We have still not received it.

15         THE COURT:  Mr. Axline, that is not right.  The whole

16   idea was to do it before everybody traveled here today.  What

17   evidence do you have AT those three independent stations and

18   two Thrifty stations that, for example, the Exxon gas was

19   there?  What do you have?  What theory is that?  Are you

20   talking about an alternative theory?  Are you talking about a

21   supplier situation?  What are you talking about?

22         MR. AXLINE:  We are talking about an alternative

23   theory at those stations, your Honor, the commingled products,

24   as we informed the defendants at the first session.

25         THE COURT:  I'm sorry, I missed that.

```
 1              MR. AXLINE:  As we informed the defendants at the

 2    meeting, the first session.

 3              THE COURT:  What was the meeting first session?

 4              MR. AXLINE:  On April 8th.

 5              THE COURT:  It wasn't until April 8, 2014, that you

 6    first raised commingled product in this case?

 7              MR. AXLINE:  No, your Honor.

 8              THE COURT:  This is an '04 case.  It sounds like it's

 9    ten years old.  Go ahead.

10              MR. AXLINE:  Unlike the Fresno case, the defendants

11    didn't submit contention interrogatories to the district in

12    this case.  The meet-and-confer session was the first

13    opportunity to discuss with the defendants the evidence upon

14    which we were going to base our claims with respect to

15    commingled product.  It was the first time we had discussed

16    their summary judgment motions.  It is not like they asked us

17    are you going to invoke the commingled product theory and we

18    said no.  They did not do that.

19              THE COURT:  And you never represented you weren't

20    going to use it?

21              MR. AXLINE:  It never came up specifically.

22              THE COURT:  I'm asking you.  You never made a

23    representation that you weren't going to use it in this case?

24              MR. AXLINE:  No, we did not.

25              THE COURT:  Ms. Roy, your question seems to be
```

 1   answered that with respect to the three independent stations

 2   and the two Thrifty stations, the theory is not one of product

 3   tracing, the theory is one of commingled product.  As long as

 4   there is going to be some evidence that your material was in a

 5   refinery or was commingled with other product which eventually

 6   made its way to the station even though one can't identify

 7   everybody's product within the combined product, that's the

 8   theory.

 9        MS. ROY:  Your Honor, this is actually a different

10   story from the one that we received last Wednesday during our

11   meet-and-confer, particularly with respect to the three

12   independent stations and the Thrifty.  I'm at a loss for what

13   to tell you.  They seem to be constantly moving around.

14        I would also like to correct the record.  We did ask a

15   lot of interrogatories, as you can imagine, specifically.

16        THE COURT:  Mr. Correll has a specific one to read.

17        MR. CORRELL:  Interrogatory number 5 to the second set

18   of interrogatories states clearly "whether you invoke or rely

19   on any theory of alternative liability in the alternative to

20   the theory of traditional causation reflected in," and it gives

21   the cite's statute, "including without limitation theories of

22   market share liability or commingled product liability."

23        THE COURT:  The answer?

24        MR. CORRELL:  They objected.  They said it was

25   contrary to rule 33(a)(2).

```
 1              MR. AXLINE:  This was a very early interrogatory.

 2              THE COURT:  I realize it is.  It is probably contrary

 3   to our local rule.

 4              MR. CORRELL:  The answers were May 14, 2010.  That's

 5   six years after the case was filed.

 6              THE COURT:  True.  I'm saying it probably does violate

 7   our local rule, but nobody came to me and moved to compel an

 8   answer.  Or, if you had an objection and they didn't answer

 9   you, you should have come in and said they are objecting under

10   this rule as an improper interrogatory, will you overrule the

11   objection and compel them to answer.

12              So they never denied, they just objected.  It seems to

13   me that under our rule, which is very limited on

14   interrogatories, it was probably an appropriate objection.

15   Unless you had asked me to overrule it, and then I would have

16   said while it is an appropriate objection in this case, it

17   would be wise to know, you have to answer.  But that never

18   happened.

19              Given that you had an objection, not a denial, I don't

20   think I can say that Mr. Axline misled you.  All he did was

21   object to your question.  He didn't deny that he was going to

22   use it.

23              MR. CORRELL:  He just told the Court that the reason

24   for the first time he disclosed was on April 8th was that we

25   had never asked.
```

```
 1              THE COURT:  That was a mistake.  You asked, they
 2     objected.  They did ask.  There is no point going over that.
 3     He objected, he didn't deny, so there is no contradiction.  I
 4     still say once you got that objection, you should have come to
 5     me.
 6              MS. DOYLE:  On behalf of Tesoro, to clarify, your
 7     Honor, if anything, we were misled.  There are a number of
 8     occasions where it is obvious that they were not pursuing the
 9     commingled product theory.  We cite in the footnote in our
10     letter to you there is a 2006 letter where Tracy O'Reilly for
11     the plaintiffs' counsel is saying that basically we have done
12     this before in the South Tahoe case and we can do it again, we
13     can trace gas.  That's one thing.
14              THE COURT:  I don't know if it is helpful now to tell
15     me, basically.  If you want to quote something she said from a
16     letter, quote it.  You are accusing her of misleading you,
17     therefore the Court.  I would have to hear the exact words.
18              MS. DOYLE:  This is in a footnote to our letter.  I'll
19     read it to you.  It is to Special Master Warner.  There is a
20     question about operator information and jobber information that
21     the parties are trying to obtain for purposes, frankly, of
22     product tracing.
23              She says, "First, the majority of the defendants in
24     the district's case owned and operated refineries that supplied
25     gasoline to the district service area over a long period of
```

 1    time.  South Tahoe's counsel, defense counsel in this matter,

 2    was able to connect every refiner defendant to each and every

 3    gasoline station in addition."  That's 2006.

 4              In 2010 --

 5              THE COURT:  Wait.  I didn't hear any misleading there.

 6              MS. DOYLE:  She is responding to Special Master

 7    Warner's question about how they were going to do it in terms

 8    of the jobber, how they were going to basically connect the

 9    dots of the refiners and other defendants to the stations.

10              THE COURT:  Maybe I'm too generous, but the way I hear

11    that is we were able to do it in another case, so the inference

12    is we'll do our best to do it here.  I didn't hear misleading.

13    I guess they are saying where they can do it, they are going to

14    do it.

15              MS. DOYLE:  Your Honor, the next point is, from Mr.

16    Axline to us, to Tesoro, in a June 24, 2010 letter, he says

17    that it was a letter to Tesoro in which plaintiff identifies

18    the largest distributors and the relevant geographic area, and

19    at a telephonic conference before the special master after the

20    close of fact discovery, the Special Master Warner asked,

21    "Except, you know, the relief requested that an order

22    compelling all CWV to confirm the identities of the jobbers to

23    whom they issued subpoenas.  So that's not difficult, right?

24    You can do that.  Mr. Axline says, we can do that."

25              That was specifically again because they wanted

 1    information from jobbers that we use to tie us to the stations

 2            THE COURT:  Again, that makes sense.  If you can do

 3    it, make every effort possible to do it.  The only fallback on

 4    the alternative theory is when you can't do it.  He said, we

 5    will try to do that, there were subpoenas out.  I understand he

 6    wanted to pursue it.

 7            It's an easier case.  If you can get the direct proof,

 8    obviously it is an easier case to try and less risky from a

 9    legal perspective.  But I don't hear a denial yet that would

10    say at the end of the day when they weren't able to do it, that

11    they are precluded from being able to apply the commingled

12    theory.

13            MS. DOYLE:  Your Honor, I don't know if we want to get

14    into this part of the argument at this point in time without

15    the Tesoro and commingled product theory --

16            THE COURT:  I guess so.

17            MS. DOYLE:  For them to raise commingled product

18    theory essentially at the eleventh hour is I think is a

19    disgrace.  You know why I think it is a disgrace?  For several

20    months prior to the close of fact discovery, plaintiffs'

21    counsel noticed 40-plus deposition notices for owners and

22    operators of stations at issue on the matrix, 34 stations.  Not

23    only that, they also had in excess I believe of 80 jobbers that

24    were identified by all the defendants sitting in this room, and

25    they never, ever pursued those jobbers on any of this stuff.

1   The information was there, it's that they just did not pursue

2   it in discovery.

3          It is to me a different thing.  They are obligated to

4   do their job.  When the evidence is out there, they can't fall

5   back on --

6          THE COURT:  You're saying it's not that they couldn't

7   do it, they didn't try.

8          MS. DOYLE:  Correct, your Honor.

9          THE COURT:  They didn't complete the effort to

10  identify directly, instead just fell back on the alternative

11  theory without completing the effort.

12         MS. DOYLE:  Correct, your Honor.

13         THE COURT:  The theory is supposed to be available

14  only when you can't identify.  You're saying we don't know if

15  they could or they couldn't, because they didn't finish the

16  process, they just stopped.

17         MS. DOYLE:  Correct, your Honor.  For us, Tesoro, they

18  have never connected the dots.  This was exactly the same

19  situation Tesoro was in in the City of Fresno case.  They have

20  never ever been able to show us the evidence that links Tesoro

21  gasoline to any of the 34 stations.

22         We are in a position, your Honor, when the time is

23  set, that we will file motions for summary judgment as to all

24  34 stations.  That is the position that we are put in and

25  that's what we will do.  It is unfortunate.  We had hoped that

 1    we would be able to narrow the number of stations, but we have

 2    not been able to.

 3            THE COURT:  Is Lyondell in the same position?

 4            MR DiCHELLO:  Your Honor, we are also in the same

 5    position as Ms. Doyle indicated.  Plaintiff essentially started

 6    the process of trying to trace with respect to Lyondell and

 7    just never finished it.  We would likely move on all sites as

 8    well.

 9            MS. DOYLE:  Your Honor, the last point I will make

10    about the commingled, based on your ruling in Fresno and some

11    other cases, if there is a defendant or defendants associated

12    with a station, if you have an anchor defendant like we were

13    just talking about in terms of like the stipulation, if you

14    have an anchor defendant or two or three, they should not be

15    able to pursue a commingled product theory.

16            THE COURT:  I don't know if that's right.  Just

17    because there are some defendants as to which you have direct

18    evidence that it was their product on the premises doesn't mean

19    that there weren't suppliers and the suppliers had a commingled

20    product and everybody who was part of that commingled product

21    has a share of the liability.

22            It is going back too many years, but I remember when

23    this whole commingled product started, you can also exculpate

24    yourself.  There is a burden shifting built in, if I recall my

25    own theory from years ago.  After they are allowed to use it,

```
 1    the defendant can offer proof that they could not have been

 2    part of any commingled product at that location if they can

 3    show why.

 4              MS. DOYLE:  Correct.  Your Honor, I think that based

 5    on your Fresno ruling, plaintiffs still have to get it to the

 6    station.  They still have to get the gas to the station before.

 7              THE COURT:  As a commingled product.  In other words,

 8    they are starting with a refinery or --

 9              MS. DOYLE:  A terminal.

10              THE COURT:  That's the word, "terminal."  They are

11    saying at that terminal they can trace Tesoro material or

12    Lyondell material.  Then it is mixed in a batch, put on a

13    truck, delivered to the station.

14              MS. DOYLE:  They are going to have to connect those

15    dots.  To date they haven't connected those dots.  If that is

16    the approach, they have to connect those dots, and they can't

17    connect those dots.

18              THE COURT:  Mr. Axline.

19              MR. AXLINE:  Your Honor, you will recall that the

20    Orange County Water District case is, unlike the Fresno case, a

21    plume case.

22              THE COURT:  OCWD is a plume case.

23              MR. AXLINE:  Yes, unlike Fresno.  Fresno is simply a

24    station case.  The districts interested in the groundwater are

25    significantly more responsive, I think, than the City of
```

1    Fresno's.  The southern California system for delivery of

2    gasoline is much more complex than was involved in the City of

3    Fresno.  In that sense it is much more akin to Suffolk County.

4    We believe Suffolk County was also a plume case.

5            We did make extensive efforts to conduct discovery

6    against jobbers or other methods of connecting terminals

7    directly to stations.

8            THE COURT:  Ms. Doyle just told me how you quit, had

9    40 subpoenas out or deposition notices or 80 of them, either 40

10   in one category, 80 of another, and then just didn't pursue

11   them.

12           MR. AXLINE:  We pursued a number of subpoenas.  In

13   fact, we got some records from subpoenas for the largest.

14           THE COURT:  What you did do is not of interest.  She

15   is pointing out what you didn't do.  I forget.  You used the

16   number 40 and 80.

17           MS. DOYLE:  40 owner/operator deposition notices, at

18   least 40, and then at least 80 jobbers.

19           THE COURT:  That is the group she said you didn't

20   pursue, the 40 owner/operator, 80 jobbers, you had notices out

21   and didn't pursue them.  There is no point in telling me what

22   you did do.  That's what you didn't do.

23           MR. AXLINE:  I think what we did do is relevant in

24   this sense.  The law does not permit you to do a useless act.

25   By the time Orange County Water District came up, the retention

1    of records by jobbers as compared to what the situation was in

2    Tahoe was significantly less.

3         The jobbers that we spent the time to pursue who were

4    the most obvious targets, had no records.  There was no reason

5    for them to keep those records.  The question of whether we

6    should have continued to pursue that in light of what we had

7    already learned I think is a legitimate question as to the

8    question of impossibility.

9         In addition to the question of impossibility, we have

10   asked these defendants repeatedly for those kinds of records,

11   and they have, without saying -- well, it's a mixed bag, so I

12   hate to generalize.  If you will take it as a generalization,

13   they haven't responded or they have said we don't have them.

14        I think we are going to be able to show impossibility.

15   We are going to be able to show much higher volume of product

16   by the commingled product defendants being sold into the

17   relevant geographic area, which makes it similar to Suffolk

18   County.  It was sold into the relevant geographic area for a

19   much longer period of time, more like Suffolk County again than

20   Fresno.

21        THE COURT:  What about that last argument that one of

22   the lawyers made, I don't remember which of the three, that if

23   you have an anchor defendant who is primarily liable or one or

24   two others at the station, that should be it?  Was that you,

25   Ms. Doyle, who said that?

1          MS. DOYLE:  Yes, your Honor.  I was actually citing

2    from the City of Fresno decision, your Honor' decision.

3          MR. AXLINE:  I have two responses.  One is that at

4    some of the stations we have an anchor defendant for a period

5    of time, but for another period of time when released occurred

6    we do not have an anchor defendant.

7          THE COURT:  Let's stop with when you do.  Is Ms. Doyle

8    right?  Apparently, she is quoting from a decision of mine in

9    City of Fresno.  If you do have an anchor defendant at a

10   particular station theoretically for the whole period of time

11   or at some station for a period of time, in that instance do

12   you not have the opportunity to try to go after suppliers on an

13   alternative theory of commingled product?  To you agree with

14   her at least to that extent?

15         MR. AXLINE:  At a number of those stations those

16   anchor defendants purchased copious amounts of either MTBE or

17   MTBE gasoline from the commingled product defendants.  What we

18   are being asked to do is to voluntarily dismiss as to these

19   defendants.  We are not willing to do that.

20         THE COURT:  You don't agree with her that even when

21   you do have an anchor defendant, so the hypothetical would be

22   you have one or more at a particular station for the entire

23   period of time, even there you would go after those who

24   supplied the commingled product?

25         MR. AXLINE:  Even there we are not willing to dismiss

 1    the claims against the suppliers.

 2            THE COURT:  Ms. Doyle disagrees with you even on the

 3    proposition that if he can't identify the anchor defendant or

 4    defendants, he still thinks he can pursue the suppliers.  I

 5    don't know what you are quoting from.  I have written so many

 6    opinions over so many years.  It may by getting close to, who

 7    knows, a hundred.  I don't know which decision in the City of

 8    Fresno you are referring to or what quote from it.

 9            MS. DOYLE:  Your Honor, this was on the causation

10    motion.

11            THE COURT:  That won't help me.  If you have it in

12    front of you.

13            MS. DOYLE:  I have the cite.

14            THE COURT:  Do you have a date?

15            MS. DOYLE:  I'm sorry, your Honor, I do not have the

16    date of the Fresno decision.  I apologize.

17            THE COURT:  That's OK.  What was the quote?

18            MS. DOYLE:  It says, "The commingled product theory is

19    a theory of liability that, quote, shifts the burden of proof

20    to the defendant only in circumstances where, quote, each

21    defendant acted purposely but which of the defendants caused

22    injury is uncertain.  In other words, it applies only when the

23    plaintiff can, quote, establish the other elements of a prima

24    facie case against a number of defendants, unquote, that

25    cannot, quote, identify the exact defendant who caused the

1     injury."

2          THE COURT:  I don't see any inconsistency between Mr.

3     Axline's position and that quote.

4          MS. DOYLE:  As I understood what you were saying, your

5     Honor, you have a defendant at the station already.

6          THE COURT:  Not at all.  That's not what it says.

7     Your interpretation seems erroneous to me, I must say.

8          MS. DOYLE:  You can still have burden shifting even

9     though you have defendants --

10         THE COURT:  There are different roles.  There are

11    suppliers, there are owners.  There are different roles in

12    this.  We have been down this road for years.  Every situation

13    has a combination of roles.

14         MS. DOYLE:  You can have multiple alternative theories

15    of liability.

16         THE COURT:  There can be more than one tort feasor,

17    obviously, at any location.

18         MS. DOYLE:  I understand.

19         THE COURT:  What he is saying is he is not willing to

20    walk away from suppliers, which is sort of where we started.

21         MR. CORRELL:  Your Honor, there is one other issue.

22    In these interrogatories also ask in interrogatory number 3 for

23    each defendant that you claim caused damage to any plume, give

24    us the facts.  They gave us the tracing facts:  For Chevron,

25    you branded this station, you supplied this station.  But any

```
 1    fact upon which Mr. Axline now contends that the commingled

 2    product should be used, i.e., you just delivered this terminal

 3    and it got put on this jobber's truck that went wherever, those

 4    aren't disclosed.

 5            We are now at the summary judgment stage and we are

 6    really shadow boxing.  For example, for Chevron he alleges that

 7    we are liable at the Thrifty station.  We have no records of

 8    our gasoline going to Thrifty.  I don't understand the facts

 9    which I need to write a letter, the pre-motion letter.

10            THE COURT:  I think we have had the pre-motion just

11    now.  I think what he is saying is he can't specifically move

12    the Chevron product to the station or he wouldn't need the

13    alternative theory.  What he is saying is there is a geographic

14    location, there is a terminal, the terminal supplies that

15    entire geographic area, and your product is in the terminal and

16    it's mixed and it's sent out and that's the best he can do.

17    That's what the theory is.

18            I agree that you make a very good point, sort of the

19    better point I have heard, about interrogatory number 3.  When

20    was he supposed to tell you that?

21            MR. CORRELL:  He should have told me the terminal he

22    is talking about.  There are several terminals.

23            THE COURT:  I understand that argument.  It is a good

24    argument.

25            MR. CORRELL:  You also have exculpation.  They haven't
```

1   pled the commingled product theory.  They objected to the

2   interrogatory, and they didn't put these facts in response.  I

3   don't have an expert like I have used in other cases to

4   exculpate myself, because we learned about theory in a meet-

5   and-confer a week ago.

6           MR. ANDERSON:  Jon Anderson for Conoco Phillips.

7   There is another aspect of this, and that is this revised

8   matrix that added a lot of stations to various defendants based

9   on what we now hear as a commingled theory happened in March of

10  2013.  I've written at least five or six letters to Mr.

11  Axline's firm asking for the factual basis.

12          THE COURT:  Yes.

13          MR. ANDERSON:  They have never breathed a word about

14  commingled product.

15          THE COURT:  When you wrote the five or six letters,

16  how did they respondent?

17          MR. ANDERSON:  They didn't respond to most of them.

18  Some they said we will respond soon, and we didn't get a

19  response until last week.  No substantive response until last

20  week.  That's when we first heard about commingled product.

21  Maybe this will get resolved with the stipulation.

22          THE COURT:  I don't know, but that sounds like a good

23  argument, too.  When you argue, Mr. Anderson, when you argue,

24  Mr. Correll, I expect to see it in your opposition briefs if it

25  has to go that way.

1          Those are good arguments, Mr. Axline.  I know your

2     firm is very busy, maybe overwhelmed, but you can't come up

3     with these ideas at the last minute when people did ask you

4     specific questions about the facts.  The first time you

5     mentioned this commingled thing is a week ago.  That is

6     troubling.

7          You didn't plead it.  They didn't take the discovery

8     that might exculpate.  You haven't laid out the information as

9     to your proof with respect to the geographic areas that you are

10    now telling me about for the first time.  So there is a lot of

11    last-minute stuff happening ten years later.

12          MR. AXLINE:  We just have a disagreement about the

13    level of detail that we did provide in response to those

14    interrogatories, your Honor.  We will point to the responses if

15    it comes to that.

16          THE COURT:  There is no dispute.  They are in black

17    and white.  Whatever the responses are are in black and white.

18          MR. AXLINE:  Yes.

19          THE COURT:  They are filed documents.  That is going

20    to be the easiest part of the briefing.  You responded what you

21    responded and not more.  If somebody sends you five letters in

22    the course of one year and you never give them the information

23    they ask for for a year, I don't think that looks too good for

24    raising this a week ago at a meet-and-confer.

25          I think it would be wasting time to have another pre-

 1   motion conference with letters.  I think it's got to be briefed

 2   if it can't be worked out and that's the end of it.  I have to

 3   study this record.  It's a big decision in the OCWD case, which

 4   of course has to end, at least from here, and go back to

 5   California.

 6              MR. AXLINE:  Your Honor, the plaintiffs would be OK

 7   with that.  I don't know how the defendants feel about it.  As

 8   the schedule is currently established there is a very shortened

 9   schedule that was been established.

10              THE COURT:  I'll skip it.  I think I have heard what

11   it is to hear.

12              MS. PARKER:  Amy Parker on behalf of the Valero

13   defendants.  We are currently without information from the

14   plaintiffs to know which camp we fall in.

15              THE COURT:  Which camp you fall in?

16              MS. PARKER:  We participated in the April 8th in-

17   person meet-and-confer.  We issued a letter to the plaintiffs

18   on March 28th.

19              THE COURT:  Maybe we can pause and find out, Mr.

20   Axline, where does Valero stand?

21              MR. AXLINE:  It has a leg in both camps, your Honor.

22   At some stations we have direct evidence of supply.

23              THE COURT:  Have you put that in the matrix?  Does she

24   know which stations have direct evidence for Valero?

25              MR. AXLINE:  We owe her a letter as to which stations

 1    are which.

 2              THE COURT:  For the remainder you want to rely on the

 3    commingled product?

 4              MR. AXLINE:  Yes.

 5              THE COURT:  He answered your question.  He owes you a

 6    letter.  When will you have the letter?  By Monday?

 7              MR. AXLINE:  By Monday.

 8              MS. PARKER:  It is still unclear to us whether the

 9    stipulation that is being offered to the other defendants is

10    being offered as to our clients.

11              THE COURT:  I don't know that.  You will have to work

12    that out.  But he is going to give you a letter that identifies

13    which stations have direct evidence, and the rest he is relying

14    on the alternative theory.  As for the stipulation, I can't get

15    involved with that.  You are working directly with Mr. Axline

16    on that.  He is going to have to make some decisions promptly.

17              Now the motions.  To put all these defendants to

18    needless motion practice and the Court to needless motion

19    practice would not be a good thing when it sounds like the

20    stipulation being discussed might resolve the scope of the

21    motions and in some instances the moving defendant entirely.

22    How much longer is the negotiation on the proposed stipulation

23    going to last?

24              MS. ROY:  Your Honor, the real issue is the prejudice

25    part of it.  We will send them our language by Friday.  They

 1    should be able to make a decision on that fairly quickly.

 2            THE COURT:  You know what he wants, preserving the

 3    right to appeal.  He has to identify for you the exact

 4    opinions.  He did by substance today, not by date and docket

 5    number, but he can.  He will send you that right away.  I think

 6    you had better take until Monday so he can send you the case

 7    law.

 8            He can send not the case law but the cases that he

 9    wants to preserve the right to appeal.  You can send him your

10    proposed language Monday.  He needs to look at it for a couple

11    of days.  I would say if there is not a stipulation by April

12    25th, a week from Friday, then you know what you have to do on

13    the motion practice, period.

14            That's it, Mr. Axline.  You either stipulate or you

15    don't, enough to limit the motion practice and in some

16    instances eliminate it.  Some defendants may not be here for

17    the stipulation, others might be.

18            Starting with April 25th, when are the defendants

19    prepared to make their motions?  And I don't want to get ten

20    motions or eight motions.  I'm very careful about briefing to

21    make sure people cooperate on the legal issues.

22            If you are going to all say it's too late to invoke

23    the alternative liability theory of commingled product, we had

24    no discovery, we asked for interrogatories, that is one brief.

25    I am looking at coordinating counsel now, looking at Mr.

1   Riccardulli and Mr. Pardo for that.  That has to be

2   coordinated.

3        When you have fact-specific motions, OK, I can take

4   some fact specific ones.  But I won't have ten people making

5   the same argument about why they should be commingled.  You are

6   going to have to meet as a group and figure out who is making

7   the generic motion.  Do you understand, Mr. Pardo?

8        MR.PARDO:  Understood, your Honor.

9        THE COURT:  Good.  There has to be a group meeting,

10  figure that out, one brief on common issues, then short,

11  targeted briefs on defendant-specific issues.  But don't repeat

12  the legal argument over and over.

13       For goodness' sake, don't tell me the summary judgment

14  standard in the Second Circuit.  Don't waste your pages on

15  that.  If you feel you must, you can do it once in the general

16  brief, but don't waste pages on that.  Get to the heart of the

17  specifics of what you want to say.

18       MS. ROY:  Understood, your Honor.  We will absolutely

19  coordinate.

20       THE COURT:  Let's talk about a schedule.

21       MS. ROY:  I'm sorry to interrupt.  I just have one

22  thing that may affect you in terms of scheduling.  We focused

23  here on really sort of the causation nuisance issues.  There

24  are other intended issues to be raised on summary judgment that

25  we have not had your procedure of letter briefing beforehand.

```
1              THE COURT:  Such as?

2              MS. ROY:  There is likely going to be a motion on the

3    OCWD Act and one with respect to lack of damages at certain

4    stations.  There are also, depending on how --

5              THE COURT:  I don't take motions by issue.  It's got

6    to all be combined in one brief.  Again, those would be

7    general.  The scope of the OCWD Act damages on the legal side

8    of it, one big long brief.  Case-specific, if there are

9    specific facts, and I don't know why there would be on the OCWD

10   Act.  It's a matter of law what it covers or doesn't cover.  As

11   far as no damages, maybe that is specific per station.  What

12   else?

13             MS. ROY:  I understand that, your Honor.  My only

14   point to you was just that we haven't engaged in your letter

15   briefing on this issue.

16             THE COURT:  I know.

17             MS. ROY:  We are fine going straight to the motion, if

18   that's what you refer.

19             THE COURT:  I don't usually, but we have been down

20   this road so often.  In this MDL I don't know that the delay is

21   worth it.  But I do want to coordinate the briefing.  That I

22   feel most strongly about.  If I get flooded with ten 25-page

23   briefs, I will reject them all and start over again; it will be

24   a total waste of time.  I'm not reading 250 pages.

25             The common issues, even including the ones you just
```

1    raised, like the scope of OCWDA, has to be one common brief.

2    It is all part of the same 25 pages as the other issue as to

3    why there can't be commingled product theory.  We have to have

4    page limits.  We don't make separate motions on issues.  It is

5    called point 1 and point 2 and point 3 in the same brief, all

6    one motion.

7          That said, let's talk about when the briefs can come

8    in.  Don't start counting until April 25th in the hope of

9    narrowing the issues by stipulation.  Starting then, can

10   defendants make all motions by May 23rd, which is four weeks?

11   That gives time for coordination.  Then we will talk again

12   specifically about page limits.

13         MS. DOYLE:  Your Honor, I am concerned about the time

14   line a bit.  In our situation we are going to have to be move

15   on 34 stations.  We have prepared, the group has, and is

16   working jointly on the joint motion, the practice that you want

17   us to do, but we still have a lot of additional work to do

18   because only recently did we learn that we need to go to expand

19   to all 34 stations.

20         THE COURT:  I don't understand expand.  What does that

21   mean, expand to 34 stations?  You're not filing 34 briefs.  I

22   don't even know what you are talking about.  He owes you a

23   letter, he said so already, or the lady next to you.  Fine.

24   Where he has direct evidence at specific stations, you will

25   know it.  He says he will update the final matrix on that.

 1        Everything else is the alternative theory.  There is

 2   nothing specific about it.  It's a matter of the terminals and

 3   the transportation system, and he's got the burden of proof

 4   initially and then it would switch to you to exculpate.  You

 5   can say there is no proof.  Basically, your work is going to be

 6   on the reply brief, as far as I can tell on that.

 7        But let's go back to my schedule.  I do think you

 8   should be able to move by May 23rd.  As you said, you have been

 9   prepping up already.  That's a ways off.

10        Then the response, Mr. Axline?  I realize you are

11   responding to a number of different briefs.  That is

12   significant.  If you get the briefs May 23rd, I would give you

13   until July 7th because you are going to be responding to a lot

14   of material.

15        MR. AXLINE:  Thank you.

16        THE COURT:  Then reply briefs would be July 28th.  It

17   is going to be a long schedule, but hopefully you will resolve

18   all the open issues.

19        With respect to these briefs, the joint brief will be

20   the usual 25-25-10 on common legal issues.  With respect to

21   defendant-specific issues, I'd like to limit that to 15-15-7.

22   You have to be specific with specific facts about your station.

23   There are many of you.  I'm going to get flooded as it is.

24        I don't see any point in having another conference.

25   Is there anything more that we should be discussing?  I have

1  set a lengthy schedule so you have time to respond to

2  everybody.  But the more work you can do up front to limit

3  these motions, Mr. Axline, the better off we will all be.

4           MR. AXLINE:  Yes, your Honor.

5           MS. ROY:  Your Honor, may I ask for one thing?

6  Because there are so many issues, would it be possible to

7  extend the number of pages for exhibits so we can give you

8  enough evidence?

9           THE COURT:  Yes, that is possible.  To what?  I have

10 already allowed 225 pages.  Everybody points that out to me.

11 They always say, you said five affidavits with X number of

12 pages.  Everybody then aggregates and says, well, it's a total

13 of 225 pages, do you care how it is distributed.  I have been

14 getting that for years.  It is a lot of pages.  You have to

15 think about his on the receiving end.

16          MS. ROY:  I understand that, your Honor.  It's just

17 with 34 stations it is a challenge.

18          THE COURT:  It is not individual evidence.  That is

19 your entire point.  It may be that at some stations there is

20 direct evidence.  The remainder is this theory.  There isn't

21 direct evidence to rebut.  I don't think you are fighting 34

22 individual cases on summary judgment.

23          The answer to that is there will be fact issues to be

24 tried.  If it was here is his evidence and here is my

25 evidence -- this is not a trial on paper.  This is for legal

1    issues.  It is for undisputed facts.  Lawyers have a very poor

2    understanding of the summary judgment process, in my opinion.

3    It is not hard.  If you are dumping that much paper, I'm going

4    to say there must be an issue of fact, they put in 500 pages

5    each.  It's crazy.  It's not called a trial on paper.  That is

6    not what summary judgment is.  Please remember what it is.

7             There is a strong legal issue here, as you know, on

8    whether he can fall back on this alternative theory at all,

9    whether there is an anchor defendant, are others liable, etc.

10   That's fine.  When I said there might be specific station

11   issues, it may be that although he says he has evidence that

12   I'm there, he hasn't shown any, there's none.  That's when he

13   is not using the alternative theory but claims he has evidence.

14   You show it as none, fine.  If you're going to start disputing

15   facts, I'm not trying cases on paper.  That's not my job.

16             MR. CONDRON:  Two quick questions.  There are a couple

17   of issues that are a little bit discreet.  Ms. Weirick's client

18   and mine have a specific issue with respect to res judicata

19   based on an earlier suit brought against us by the Orange

20   County distributor to your Honor.

21             THE COURT:  Can you combine?

22             MR. CONDRON:  Yes, absolutely, we will do that.

23             THE COURT:  That one can be a separate 15-15-7.

24             MR. CONDRON:  Thank you, your Honor.

25             THE COURT:  The other quick question, since it's 6

1    o'clock?

2         MR. CONDRON:  Yes.  Not all of the issues necessarily

3    are based on this type of causation.  We have one at a

4    particular station where the plaintiffs' expert basically

5    said -- you may recall the Anthony Brown issue in the New

6    Jersey case where he said I need to do more investigation

7    because I can't find anything I need to do right now, I don't

8    see any threat that this poses to a water well and I don't see

9    any threat or I can't identify any specific threat.

10        THE COURT:  It sounds like this is no case.

11        MR. CONDRON:  Exactly.

12        THE COURT:  Talk to Mr. Axline.  If you can't, that is

13   amenable to a motion.  It shouldn't have to be made.  If there

14   is no evidence, there is no evidence.  If that's what the

15   expert said, it is laughable, he doesn't have a case right now

16   at that station.

17        MR. CONDRON:  Thank you, your Honor.

18        THE COURT:  Thank you.

19        MS. ROY:  Your Honor, I'm sorry, one issue.  Just a

20   housekeeping matter.  We had a May 1st hearing on calendar in

21   this matter.

22        THE COURT:  To do the pre-motions in this very

23   instance?  I just said no.  Thank you.  I'll take it off May

24   1st.

25        (Adjourned)