UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
In re:  Methyl Tertiary Butyl Ether ("MTBE")   :    **Master File No. 1:00-1898**
Products Liability Litigation                              **MDL No. 1358 (SAS)**

                                          :

This Document Relates To:                              :    The Honorable Shira A. Scheindlin
*Orange County Water District v. Unocal
Corporation, et al.,* Case No. 04 Civ. 4968       :
(SAS)
                                          :

                                          :

------------------------------------- X


# BP AND SHELL DEFENDANTS' LOCAL RULE 56.1 STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BASED ON *RES JUDICATA*

Defendants Atlantic Richfield Company ("ARCO"), BP West Coast Products LLC, and BP Products North America Inc. (collectively, the "BP Defendants") and Shell Oil Company, Equilon Enterprises LLC, and Texaco Refining and Marketing Inc. (collectively, the "Shell Defendants") respectfully submit the following Local Rule 56.1 statement in support of their motion for summary judgment based on *res judicata*.

1.      In January 1999, the Orange County District Attorney ("OCDA") initiated two civil actions in Orange County Superior Court, each on behalf of "the People of the State of California": *People v. Atlantic Richfield Co., et al.* (Orange County Superior Court Case No. 80-40-30 ("*People v. ARCO*"), which named ARCO and Thrifty Oil Company ("Thrifty") as defendants; and *People v. Shell Oil Co., et al.* (Orange County Superior Court Case No. 80-40-31) ("*People v. Shell*"), which named Shell Oil Company as a defendant.  (Request for Judicial Notice ("RJN") (citing original ARCO DA Complaint as Ex. A and original Shell DA Complaint as Ex. B).  Both *People v. ARCO* and *People v. Shell*  were filed "in the public interest in the name of the People of the State of California and the County of Orange" and alleged that defendants were responsible for unauthorized releases of MTBE gasoline from underground storage tanks they owned, operated, and/or supplied throughout Orange County, resulting in contamination of Orange County soil and groundwater. (RJN Ex. A ¶¶ 1, 10-12 and Ex. B ¶¶ 1, 10-12.)

2.      In October 2000, the OCDA filed a First Amended Complaint ("BP DAFAC") in *People v. ARCO*, which added BP Amoco as a defendant and contained additional allegations regarding the health and environmental risks of releases of MTBE gasoline into Orange County groundwater.  (Declaration of Lawrence A. Cox In Support of BP's Motion for Summary Judgment ("Cox Decl.") ¶ 3 and Ex. B  (BP DAFAC) ¶¶ 49 ("MTBE poses unique risks  to

groundwater and especially to drinking water"); ¶¶ 56-76 (entitled "DEFENDANTS LEARN OF YET DENY THE RISKS POSED BY MTBE"); ¶¶ 87 -91 (entitled "MTBE DESTROYS STATE WATER SUPPLIES"); ¶ 101 ("the Orange County Water District ("OCWD") … conducts sampling and testing of groundwater in the Santa Ana River Basin" which shows MTBE concentrations): ¶¶ 3, 117 (defendants' release of MTBE gasoline "constitutes a continuing nuisance" in Orange County); ¶ 102 ("MTBE has migrated, and is migrating, from the sources of release -- underground storage tank systems and pipelines containing gasoline -- into deeper drinking water supplies in Orange County."); ¶ 104 (at "approximately sixty" of ARCO's "owned and previously owned sites in Orange County," unauthorized releases of gasoline had caused "groundwater contamination, including, but not limited to, MTBE."); ¶ 110 (defendants' "dilatory and ineffective response . . . in addressing MTBE contaminant plumes" had resulted in "the spread and migration of MTBE contamination  . . . into deeper soil and groundwater . . . placing drinking water supplies at risk.")).)

3.     The BP DAFAC alleged claims for equitable relief, damages and penalties under theories of public nuisance, as well as violations of California's Health & Safety Code, Fish & Game Code, and Business & Professions Code.  (Cox Decl. Ex. B (BP DAFAC ¶ 3 (seeking to (1) "enjoin defendants from ... further violations of the laws and regulations," (2) "compel defendants to cleanup and abate soil and groundwater contamination caused by unauthorized releases of gasoline and [MTBE]...," (3) recover damages from defendants where such contamination cannot be cleaned up or abated...," (4) "penalize defendants with ... civil penalties," and (5) require defendants to "disgorge the monetary profits [they had] obtained."); ¶¶ 116- 122 (public nuisance); ¶¶ 123-126, 130-168 (Health & Safety Code); ¶¶ 126-129 (Fish & Game Code); ¶¶ 169-170 (Bus. & Prof. Code); Prayer ¶ 1 (defendants "be ordered to effectively

and expeditiously cleanup and abate contaminant plumes" at the listed stations"); Prayer ¶ 2 (defendants "be ordered to pay damages ... where cleanup and abatement of contaminated groundwater cannot be achieved")).)

4.      In April 2001, the OCDA filed a First Amended Complaint ("Shell DAFAC") in *People v. Shell*, which contained additional allegations regarding releases of MTBE gasoline. (Condron Decl., Ex. A (Shell DAFAC ¶ 21 (at least 81 service stations owned, operated and/or supplied by the Shell Defendants had "soil and/or groundwater contamination caused by the unauthorized release or releases of gasoline and/or MTBE to the environment from . . . underground storage tank systems...."); ¶ 23 (releases "resulted in the spread and migration of MTBE contamination away from the original source zone (underneath and around underground storage tank systems) into deeper soil and groundwater, decreasing the feasibility and increasing the cost of cleanup and placing drinking water supplies at risk"); ¶ 12 (Shell "failed to take appropriate corrective action to remedy the impact" of the releases and "knowingly allowed the continued migration of such releases through and into soil, groundwater and sources or potential sources of drinking water of Orange County and the State of California.")).)

5.      In December 2001, the OCDA amended the complaint in *People v. Shell* to identify Equilon Enterprises LLC as one of the "Doe" defendants it had sued.  In October 2003, the OCDA added Texaco Refining and Marketing Inc. as another of the "Doe" defendants. (RJN, Ex. B.)

6.      The Shell DAFAC alleged claims for equitable relief, damages and penalties under theories of public nuisance, and violations of California's Health & Safety Code, Water Code, Fish & Game Code, and Business & Professions Code.  (Condron Decl. Ex. A (Shell DAFAC ¶¶ 28- 34 (public nuisance); ¶¶ 35-38, 43-76 (Health & Safety Code); ¶¶ 39-42 (Fish &

Game Code); ¶¶ 77-78 (Bus. & Prof. Code); Prayer ¶ 1 (defendants "be ordered to effectively

and expeditiously cleanup and abate contaminant plumes consisting of gasoline, its constituent

chemicals BTEX, and the chemical additive MTBE"); Prayer ¶ 2 (defendants "be ordered to pay

damages . . . where cleanup and abatement of contaminated groundwater cannot be achieved")).)

       7.      In both *People v. ARCO* and *People v. Shell*, the OCDA brought claims on behalf

of the public to protect the public's property interest in groundwater.  (Cox Decl. Ex. B (BP

DAFAC ¶ 1 (OCDA "brings this action on behalf of the People of the State of California" to:

"protect the public from health and safety hazards" and "prevent destruction of Orange County's

groundwater resources . . . ."); ¶ 6 ("Plaintiff, the People, is the public located within the County

of Orange, as represented by . . . the District Attorney."); ¶ 34 ("All water within the State,

including groundwater, is the property of the people of the State of California." (citing Cal.

Water Code §§ 102 & 104)); Condron Decl., Ex. A (Shell DAFAC ¶ 1 (DA "brings this action in

the public interest in the name of the People of the State of California and Orange County" to

"protect the public from health and safety hazards... and to protect the environment of Orange

County..."); ¶ 5 ("Plaintiff, the People, is the public located within the [sic] Orange County, as

represented by ... the District Attorney").

       8.      Both the OCDA and OCWD are agencies of the State of California.

       9.      The OCDA acts as an officer of Orange County and the State of California in

exercising the powers for which he was elected.  (*See Pitchess v. Superior Court,* 2 Cal.App.3d

653, 656-57 (1969), citing Cal. Govt. Code §§ 24000(a); 26500 - 26505).

       10.     OCWD is special district within Orange County that acts as an agency of the State

of California.  (*See In re MTBE*, 522 F.Supp.2d 557, 559 n.9 (S.D.N.Y. 2007); *In re MTBE*, 522

F.Supp.2d 569, 574 (S.D.N.Y. 2007), citing Cal. Govt. Code § 16271[d]).

11.     OCWD circulated a copy of the BP DAFAC, a press release from the OCDA, and newspaper articles about the lawsuit to its Water Producers and Board of Directors.  (Cox Decl. Ex. ¶ 6, Ex. D (Oct. 20, 2000 Memorandum from J. Kennedy of OCWD to OCWD Water Producers (attaching (1) Oct. 19, 2000 OCDA Press Release ("alleg[ing] contamination at 116 gas stations countywide," that "[p]ollution of this nature caused by ARCO ... could cause Orange County to lose a substantial portion of its water supply," and that remediation at the sites cited in the lawsuit "could take years to complete"); (2) Stuart Pfeifer, County Seeks Millions From Oil Firms, L.A. Times, Oct. 20, 2000, at B1 (defendants "blamed for contaminating groundwater underneath more than 100 gas stations across the county."); (3) Pat Brennan, Prosecutors Allege MTBE Conspiracy, Orange County Register, Oct. 20, 2000, at Local News p. 1 (OCDA contends ARCO "has negligently allowed [MTBE] into Orange County's groundwater"); and (4) Pat Brennan, ARCO Sued Over Gas Additive Leak, Orange County Register, Oct. 20, 2000, at Local News p. 6 ("the contamination represents a potentially enormous impact on public funds if it seeps from shallow ground water into deeper aquifers."))).)

12.     OCWD, including many of its senior staff, were familiar with and actively monitored the OCDA's lawsuit against BP, and provided "technical assistance" to the District Attorney "to help in the enforcement of cleanup of MTBE and other petroleum contaminants from leaking gasoline storage tanks in Orange County."  (Cox Decl. Ex. E (July 14, 2000 Ltr. From W. Mills to J. Miller noting that the OCDA "is involved in litigation against oil companies in an effort to address the MTBE problem."); Cox Decl. Ex. F (Wildermuth Dep. 216:24-217:17 ("And at the same time, this DA was ... doing the case on MTBE") & Ex. 24 (Oct. 10, 2001 email from R. Herndon to R. Wildermuth and J. Glasser discussing the District Attorney's lawsuit)); Cox Decl. Ex F; Cox Decl. Ex. J (A. Brown Dep., 1111:11-1112:12 ("I believe there

may have been a meeting or maybe more than one meeting where the Orange County Water District was present, and they were involved as the agency responsible for managing and protecting the ... groundwater resources of the coastal plain of Orange County. And the service stations that were the subject of the Orange County District Attorney's case ... most, if not all, were located within the limits of the Orange County Water District.")); Cox Decl. Ex. K (Yamachika Dep. Ex. 38 ("Last month the OCDA ... received the go-ahead from the judge to proceed with his lawsuit against ARCO for contamination from numerous LUFT sites.... OCWD supports the efforts of the DA to expedite cleanup by the responsible parties.")); Cox Decl. Ex. L (OCWD-MTBE-001-038623-24 (Safe Drinking Water Subcommittee Meeting ACWA Fall Conference) (same quote as Yamachika Dep. Ex. 38)).)

13. On December 17, 2002, the Orange County Superior Court entered a Final Judgment Pursuant to Stipulation and Order Thereon ("BP Final Judgment"), wherein the OCDA settled all claims against Atlantic Richfield Company, BP West Coast Products LLC, and BP Products North America Inc. (Cox Decl. Ex. A (BP Final Judgment p. 1 (defining "Settling Defendants" as "defendants Atlantic Richfield Company, BP Amoco Corporation, and ARCO Chemical Company"); ¶ 6.0(i) (BP Final Judgment "is a final and binding resolution and settlement of all claims ... that were alleged by the First Amended Complaint ... or could have been asserted, based on the facts alleged in the First Amended Complaint ... against:(i) each of the Settling Defendants and each of their subsidiaries, corporate parents, [and] Affiliates (including, without limitation, BP West Coast Products LLC, BP Products North America Inc....").)

14.     Pursuant to the terms of the BP Final Judgment, ARCO and BP Amoco agreed to pay $5 million to reimburse the OCDA's cost of investigation.  (Cox Decl. Ex. A (BP Final Judgment ¶ 3).)

15.     Pursuant to the terms of the BP Final Judgment, ARCO and BP Amoco agreed to pay $3 million to fund a "Plume Delineation Program," under which an "independent third party environmental consultant" selected by the OCDA would evaluate the investigation and corrective action conducted at the service stations covered by the BP Final Judgment and identify what further action should be taken to remediate the MTBE and gasoline releases found there. (Cox Decl. Ex. A (BP Final Judgment ¶¶ 4.0-4.10; ¶ 4.4 (OCDA's consultant was expressly called upon to "determine if the delineation of the PLUME at each of the Subject Sites provides the information needed to identify ... corrective actions that are appropriate in light of any potential impacts the PLUME may pose to human health, the groundwater resource, and the environment."); ¶ 4.2(b)(A) (consultant authorized to identify additional actions required if needed at the sites in question, "including, but not limited to," the "drilling and installation of new wells and/or boring to further analyze and delineate the PLUME at the Subject Sites, ... which may potentially include delineation in both the lateral and vertical direction that approximates the 5 ppb MTBE contour line in groundwater.")).)

16.     Pursuant to the terms of the BP Final Judgment, ARCO and BP Amoco become subject to significant injunctive relief which remained in effect for five years following entry of the BP Final Judgment.  (Cox Decl. Ex. A (BP Final Judgment ¶¶ 5.0-5.6).)

17.     The BP Final Judgment also incorporated a comprehensive release which applied to an attached list of 183 ARCO service station sites.  (Cox Decl. Ex. A (BP Final Judgment ¶ 6.1 ("This Final Judgment also constitutes a release from any known or unknown past or present

7

claims, violations, or causes of action that were or could have been asserted in the First Amended Complaint" with regard to any "unauthorized release of petroleum product ... or additive or constituent of such product ...; the use of MTBE and/or other fuel oxygenates in gasoline, or any alleged failure to assess, remediate, or otherwise take corrective action in response to any such authorized release at the sites listed in Exhibit A, whether asserted or unasserted or known or unknown ."); BP Final Judgment Exs. A & B (listing 183 ARCO Owned/Leased Sites)).)

18.     The BP DAFAC was the operative complaint when the BP Final Judgment was entered on December 17, 2002 (Cox Decl. ¶ 2 and Ex. A (BP Final Judgment, Recitals A & B).)

19.     The BP Final Judgment was approved and entered by the Court in December 2002 -- the same month in which BP stopped adding MTBE to gasoline produced in California. (Cox Decl. Ex. A (BP Final Judgment); Alson Decl. ¶ 3.)

20.     BP complied fully with its obligations under the BP Final Judgment. (Winsor Decl. ¶¶ 2, 3.) Neither the OCDA nor the OCWD have ever voiced any concerns about the terms of the settlement or BP's adherence to those terms, nor was the dispute resolution process identified in paragraph 5.7 of the BP Final Judgment ever invoked. (Winsor Decl. ¶ 4.)

21.     In *People v. ARCO,* following the BP Final Judgment (i.e., as to Thrifty), OCWD appeared as an "interested party," and unsuccessfully moved to stay or continue the hearing on final judgment. (Cox Decl. Ex. I (Jan. 5, 2005 Minute Order (denying OCWD's motion for stay or continuance and signing Thrifty Final Judgment Pursuant to Stipulation and Order Thereon)); Cox Decl. Ex. H (Feb. 11, 2003 Thrifty Final Judgment) (¶ 6.6 (no estoppel or interference with rights or action of listed regulatory agencies overseeing the Thrifty sites *including* OCWD)).)

22.     OCWD filed its initial complaint in this action in 2003. OCWD alleges that it and the "water users it represents" were injured due to MTBE and/or TBA contamination and/or

threat of contamination in water supply wells and OCWD's groundwater resources, allegedly

caused by ARCO, BP, the Shell Defendants and others, and seeks to "protect the groundwater

resources of northern Orange County from oil industry pollution." (Condron Decl. Ex. B

(OCWD 3d Am. Compl. ¶¶ 1, 5, 79).)

     23.    The alleged factual underpinnings of the OCDA actions against BP and Shell, and

of this lawsuit, and the bases for recovery asserted in all three actions, are virtually identical.

| **BP and Shell DAFAC Allegations** | **OCWD Allegations (3d Am. Compl.)** |
|---|---|
| "ARCO added the chemical Methyl Tertiary-Butyl Ether (MTBE) to its gasoline at its West Coast refineries prior to sale to the general public." BP DAFAC, ¶ 13<br><br>"SHELL...added MTBE to its gasoline at its West Coast refineries prior to sale to the general public including the general public in Orange County." Shell DAFAC¶ 13 | "The defendants in this action are the ...refiners...., marketers, distributors, suppliers, and retailers of...gasoline containing MTBE that contaminates and pollutes groundwater resources managed by [OCWD]." ¶ 2<br><br>Defendants "owned and operated gasoline refineries in Southern California that have provided... gasoline containing MTBE and/or TBA to areas affecting the District's groundwater supplies." ¶¶ 10, 17-19 |
| "Of the ninety (90) or more ARCO owned and previously owned sites in Orange County, approximately sixty (60) have groundwater contamination including, but not limited to, MTBE and/or BTEX contamination, caused by the prior or continuing unauthorized release, or releases, of gasoline to the environment from and surrounding underground storage tank systems." BP DAFAC ¶ 104<br><br>"Plaintiff is informed...that there have been numerous unauthorized releases of gasoline to the soil and groundwater of Orange County from underground storage tanks currently or previously owned and/or operated and/or supplied by Shell...that have resulted in the contamination of County soil and groundwater with...MTBE [and] have knowingly allowed the continued migration of such releases through and into soil, groundwater and sources or potential sources of drinking water of | "There are over four hundred confirmed MTBE release sites in the District contaminating and threatening the water supplies of overlying owners and other water users within the District. The District and the water users it represents have suffered injury in fact as a result of MTBE and/or TBA contamination and threat of contamination in water supply wells in the District's groundwater resources." ¶ 5<br><br>Defendants "negligently...owned, operated, [and/or] controlled gasoline delivery systems...from which MTBE and/or TBA is contaminating or polluting groundwaters within the District...." ¶ 34 |

| | |
|---|---|
| Orange County and the State of California." Shell DAFAC ¶ 12<br><br>"Approximately 81…sites currently have soil and/or groundwater contamination caused by the unauthorized release or releases of gasoline and/or MTBE to the environment from and surrounding underground storage tank systems owned, operated and/or supplied by SHELL…." Shell DAFAC ¶ 21 | |
| "The dilatory and ineffective response of ARCO… has resulted in the spread and migration of MTBE contamination away from the original source zone (underneath and around underground storage tank systems) into deeper soil and groundwater, decreasing the feasibility and increasing the cost of cleanup and placing drinking water supplies at risk." BP DAFAC¶ 110<br><br>"The dilatory and ineffective response of SHELL…in addressing MTBE contamination plumes has resulted in the spread and migration of MTBE contamination away from the original source zone…into deeper soil and groundwater, decreasing the feasibility and increasing the cost of cleanup and placing drinking water supplies at risk." Shell DAFAC ¶ 23 | Defendants "negligently and/or intentionally failed and refused to take appropriate remediation action to abate MTBE and/or TBA plumes formed after MTBE and/or TBA escaped from their gasoline delivery systems…." ¶ 34<br><br>"If MTBE and/or TBA are released into the environment in sufficient quantities, MTBE and/or TBA have the capacity to migrate through soil, the groundwater, penetrate deeper within the aquifer, and cause persistent contamination…." ¶ 49<br><br>"MTBE and TBA have over time migrated in the subsurface from the dispersed release points at or near the surface at retail gasoline facilities within or near the District's boundaries, causing pollution, contamination and substantial damage to the District's groundwater resources…." ¶63<br><br>Defendants "failed to… clean up and abate MTBE and/or TBA spills as thoroughly and as soon as reasonably possible…." ¶ 79 |
| "Defendants at all times relevant herein were in possession of information regarding exten-sive and widespread releases of gasoline to the environment from underground storage tank systems on a nationwide basis even when such systems were in apparent compliance with minimum structural and operational require-ments. ARCO [and] BP… knew or should have known that compliance with minimum state and federal requirements pertaining to the construction and operation of underground storage tank systems could not be relied upon to prevent, minimize or detect widespread leaks from underground storage tank systems." | Defendants "created, participated in, and/or facilitated the flow of MTBE, TBA and/or gasoline containing one or more such compounds into gasoline distribution, storage and dispensing systems that they knew could not safely contain such products. The widespread problems of leaking gasoline delivery systems were well known to the defendants prior to the introduction of MTBE and TBA." ¶ 61 |

| | |
|---|---|
| BP DAFAC ¶ 113<br><br>"SHELL…w[as] in possession of information regarding extensive and widespread release of gasoline to the environment from underground storage tank systems on a nationwide basis even when such systems were in apparent compliance with minimum structural and operational requirements.  SHELL…knew or should have known that compliance with minimum former state and federal requirements pertaining to the construction and operation of underground storage tank systems could not be relied upon to prevent, minimize or detect widespread leaks from underground storage tank systems."  Shell DAFAC ¶ 26 | |
| "Defendants were in a unique position to know of the special characteristics of MTBE and the risks it poses to groundwater including, but not limited to, insolubility, resistance to biodegradation, migration potential, low odor and taste threshold, and the difficulties associated with its removal from groundwater." BP DAFAC ¶ 61.<br><br>"As MTBE contamination migrates away from the source and capture zones into deeper aquifers, it becomes far more difficult if not impossible to abate…. Abatement measures at this stage are extremely difficult, costly and time consuming."  Shell DAFAC ¶ 29 | "If MTBE and/or TBA are released into the environment in sufficient quantities, MTBE and/or TBA have the capacity to migrate through the soil, the groundwater, penetrate deeper within the aquifer, and cause persistent contamination that can threaten the potability of drinking water wells."  ¶ 49<br><br>"MTBE and/or TBA spread farther and faster than other components of gasoline, resist biodegradation, and are difficult and costly to remove from groundwater and drinking water supplies."  ¶ 50 |
| "The unauthorized release of gasoline and/or MTBE to groundwater, and to soil where such releases are likely to reach groundwater constitutes a nuisance." BP DAFAC ¶ 117<br><br>"The unauthorized release of gasoline and/or MTBE to groundwater and to soil where such releases are likely to reach groundwater, constitutes a nuisance."  Shell DAFAC ¶ 29 | "The contamination and pollution of such groundwaters with gasoline and MTBE and/or TBA is a public nuisance…."  ¶ 94 |

24.     Because of the alleged injuries to groundwater in Orange County, OCWD says that it seeks to recover "all necessary funds to investigate, monitor, prevent, abate, or contain any contamination of, or pollution to, groundwaters within the District from MTBE and TBA; to

11

protect the quality of the common water supplies of the District; to prevent pollution or contamination of that water supply; and to assure that the responsible parties – and not the District nor the public – bear the expense." (Condron Decl. Ex. B (OCWD 3d Am. Compl.¶ 3).)

25.   OCWD seeks "an order declaring that defendants are liable for the full cost of all remedial and other actions necessary to abate and remove MTBE and/or TBA which is contaminating and threatening the District's property, and for such orders as may be necessary to provide full relief to the plaintiff." (Condron Decl. Ex. B (OCWD 3d Am. Compl., Prayer ¶ 3).)

26.   On January 5, 2005, the Orange County Superior Court entered a Final Judgment Pursuant to Stipulation and Order Thereon (the "Shell Final Judgment"), which represented a settlement, between the People of the State of California and the Shell Defendants, of the claims asserted in *People v. Shell*. (Condron Decl. Ex. C (Shell Final Judgment).)

27.   The terms of the Shell Final Judgment were substantially similar to those of the BP Final Judgment. Pursuant to the terms of the Shell Final Judgment, the Shell Defendants agreed to pay $3.5 million to the OCDA's "Prosecution Trust Fund." (Condron Decl. Ex. C (Shell Final Judgment ¶¶ 7.0-7.4).)

28.   Pursuant to the terms of the Shell Final Judgment, the Shell Defendants agreed to pay up to $10.5 million to fund a "Plume Delineation Program," under which an "independent third party environmental consultant" selected by the OCDA would evaluate the investigation and corrective action conducted at the service stations covered by the Shell Final Judgment and identify what further action should be taken to remediate the MTBE and gasoline releases found there. (Condron Decl. Ex. C (Shell Final Judgment ¶¶ 3.0-3.10; ¶ 3.5; ¶ 3.3(b) (consultant authorized to identify additional actions required if needed at the sites in question, "including, but not limited to," the "drilling and installation of new wells and/or borings to further analyze

and delineate the PLUME at the Subject Sites, ... which may potentially include delineation in both the lateral and vertical direction that approximates the 5 ppb MTBE contour line in groundwater.").))

29.     Pursuant to the terms of the Shell Final Judgment, the Shell Defendants became subject to significant injunctive relief which remained in effect for five years following entry of the Final Judgment.  (Condron Decl. Ex. C (Shell Final Judgment ¶¶ 5.0-5.8).)

30.     The OCDA described this portion of the relief as a "blank check" for cleanup. (Condron Decl. Ex. D (OCDA 1/6/05 Press Release) (available at www.orangecountyda.com); Condron Decl. Ex. E (2007 Biennial Report of the Office of the Orange County District Attorney (the "Biennial Report"), p. 25).)

31.     The Shell Final Judgment specified that it was a "release from any known or unknown, past or present claims, violations, or causes of action that were or could have been asserted in the First Amended Complaint against the [Shell Defendants] with regard to: ... underground storage tank systems, the unauthorized release of petroleum product, additive or constituent of such petroleum product (including but not limited to TPH, BTEX, MTBE and other fuel oxygenates), the use of MTBE and/or other fuel oxygenates in gasoline...." (Condron Decl. Ex. C (Shell Final Judgment § 9.1).)

32.     The Final Judgment was "a final and binding judgment, release, resolution and settlement of all claims, violations, or causes of action that were alleged in the First Amended Complaint against Settling Defendants, or could have been asserted based on the facts alleged in the First Amended Complaint...." (Condron Decl. Ex. C (Shell Final Judgment § 9.0).)

33.     The Shell Final Judgment contained a provision stating that "the parties understand that the Plaintiff does not intend for [the Shell] Final Judgment to serve to legally bar,

estop, release, alter or supersede" actions by others, including OCWD.  However, the Shell Defendants did not agree to carve out or exempt any such actions from the broad release provided to the Shell Defendants by the Shell Final Judgment and there is no such provision in the Final Judgment or elsewhere.  (Condron Decl. Ex. C (Shell Final Judgment ¶ 9.6 ).)

34.    Prior to entry of the Shell Final Judgment, OCWD's counsel appeared in the Orange County Superior Court to oppose its entry, stating: "We have an action that is pending over MTBE contamination against the Shell defendants as well." (Condron Decl. Ex. F (Transcript at 4).)

35.    OCWD's counsel requested time to brief a petition to intervene, which the Orange County Superior Court denied, stating, "I make no findings about the effect of this settlement on any other action.  I'll let an appropriate court at an appropriate time make those determinations." (Condron Decl. Ex. F (Transcript at 28).)

36.    The Shell Defendants have fulfilled their obligations under the Shell Final Judgment.  (Declaration of Karen Lyons in Support of the Shell Defendants Motion for Partial Summary Judgment ("Lyons Decl.") ¶¶ 3-6.)

37.    The OCDA has never invoked the dispute resolution clause of the Shell Final Judgment, nor has it ever informed the Shell Defendants that they have not complied with the requirements of the Shell Final Judgment.  (Lyons Decl. ¶ 6.)

38.    In April 2007, OCWD identified a list of 127 service stations giving rise to its claims, at which MTBE releases allegedly threatened groundwater supplies.  Of these listed stations, a total of 60 were owned and/or operated by the BP defendants as "ARCO branded" locations.  (Cox Decl. ¶ 4.)

39.     In subsequent proceedings, OCWD further limited its claims by dismissing certain of the listed stations at which its claims allegedly were not ripe. (Cox Decl. ¶ 4.)

40.     All of the subject stations identified in the pending OCWD litigation for which the BP Defendants are allegedly responsible for MTBE contamination were subject to, and released by, the OCDA BP Final Judgment. (Cox Decl. ¶ 5, Ex. C (identifying each BP station in OCWD's lawsuit by station number, address, city, and reference in the BP Final Judgment); Cox Decl. Ex. A (BP Final Judgment Exs. A & B).)

41.     After settling with the Shell Defendants, the OCDA issued a press release describing the litigation, stating in part:

> **Threat to Supply of Drinking Water Discovered**
> District Attorney Rackauckas made the decision to file this environmental protection lawsuit based upon reports filed by the Orange County Health Care Agency and investigations by the Anaheim, Fullerton, Orange and Santa Ana Fire Departments… The necessity of this decision was shown in reports that indicated that gasoline leaking from improperly maintained storage tanks had contaminated surrounding soil and groundwater. The presence of the gasoline additive called MTBE (methyl tertiary-butyl ether) in the leaking fuel added to this problem. MTBE is more soluble and moves further and faster through groundwater than other components of gasoline. Because MTBE can be detected in very small amounts, even a small amount of MTBE can contaminate and render undrinkable large volumes of water. It makes the contaminated water taste and smell like turpentine. More over [sic], MTBE is extremely difficult and expensive to remove from water once contaminated. (Condron Decl. Ex. D (1/6/05 OCDA Press Release).)

42.     The OCDA subsequently described its lawsuits as follows:

> As a result of People v. Arco, Shell and Thrifty et al., clean-up work and remediation of numerous polluted underground storage tank sites are being funded by the major oil companies…. The oil companies were required to write a blank check to cover the cost of cleaning up the environment until the ground water is free of dangerous chemicals…. As a result, many of the polluted underground storage sites have been cleaned up and are free of a dangerous chemical compound called MTBE. (Condron Decl. Ex. E (OCDA 2007 Biennial Report at 25).)

Dated: June 6, 2014

Respectfully submitted,

_____
Richard E. Wallace, Jr.
Peter C. Condron
Amanda Gilbert
SEDGWICK LLP
2900 K Street, N.W.
Harbourside – Suite 500
Washington, D.C. 20007
Telephone:  (202) 204-1000
Facsimile:  (202) 204-1001

Attorneys for Defendants
Shell Oil Company, Equilon Enterprises LLC, and
Texaco Refining and Marketing Inc.

Matthew T. Heartney
Lawrence A. Cox
Stephanie B. Weirick
ARNOLD & PORTER LLP
777 South Figueroa Street
Los Angeles, California  90017
Telephone:  (213) 243-4150
Facsimile:  (213) 243-4199

Attorneys for Defendants
Atlantic Richfield Company, BP Products North
America Inc., and BP West Coast Products LLC