**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Methyl *tertiary* Butyl Ether ("MtBE") Products Liability Litigation | Master File No. 1:00-1898 MDL No. 1358 (SAS) |

This Document Relates To:

*Orange County Water District v. Unocal Corporation, et al.,*
Case No. 04 Civ. 4968 (SAS)

## DECLARATION OF LAWRENCE A. COX IN SUPPORT OF BP DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON *RES JUDICATA*

I, Lawrence A. Cox, declare and state:

1.      I am an attorney duly admitted to practice law before this Court, and am a partner with Arnold & Porter LLP, attorneys of record for Defendants Atlantic Richfield Company; BP West Coast LLC; and BP Products North America Inc. (collectively "BP Defendants). I have personal knowledge of the facts hereinafter set forth and if called as a witness I could and would testify competently to the following.

2.      Attached hereto as Exhibit A is a true and correct copy of the Final Judgment Pursuant to Stipulation and Order Thereon filed on December 17, 2002 in *People of the State of California v. Atlantic Richfield Company, etc. et al.* (Orange County Superior Court Case No. 80-40-30) (the "BP Final Judgment").

3.      Attached hereto as Exhibit B is a true and correct copy of the First Amended Complaint in *People of the State of California v. Atlantic Richfield Company, etc. et al.* (Orange County Superior Court Case No. 80-40-30) filed by the Orange County District Attorney ("OCDA") on December 17, 2002.

4.      In the pending case, in April 2007, Orange County Water District ("OCWD") identified two hundred thirteen (213) service stations that it alleged had contributed MTBE to

one hundred twenty seven (127) "focus plumes." Sixty (60) of the service station locations identified by OCWD in April 2007 were owned and/or operated by the BP Defendants as "ARCO branded" locations, including "ARCO branded" locations that were leased from Thrifty Oil Company ("Thrifty"). OCWD subsequently dropped various stations and "focus plumes" from the case as "non-ripe" and identified some five "focus plumes" (numbers 1, 2, 3, 8 and 9) as the plumes it selected for a bellwether trial; however, this motion concerns all locations owned or operated by the BP Defendants that were identified in April 2007, including those which may have been subsequently dropped by OCWD as "non-ripe" for purposes of trial.

5.      Attached hereto as Exhibit C is a document prepared at my direction and under my supervision that lists all stations in the case owned or operated by the BP Defendants that allegedly contributed to MTBE to any of the 127 "focus plumes" identified by OCWD in April 2007, listed by focus plume, station number, and address. Exhibit C also contains a reference to the site number in the BP Final Judgment, as set forth on Exs. A and B thereto, and confirms that all the subject stations in the *OCWD* litigation for which the BP Defendants are allegedly responsible for MTBE contamination were subject to and released by the BP Final Judgment.

6.      Attached hereto as Exhibit D is a true and correct copy of a memorandum dated October 20, 2000 from John Kennedy of the OCWD to OCWD Producers attaching the OCDA's Press Release of October 19, 2000 and related press coverage of the First Amended Complaint against Atlantic Richfield Company filed by the OCDA, as produced by Plaintiff in this litigation as OCWD-MTBE-001-102466 through OCWD-MTBE-001-102473.

7.      Attached hereto as Exhibit E is a true and correct copy of OCWD correspondence dated July 14, 2000 to the Orange County Department of Environmental Health and the OCDA re MTBE contamination in the Irvine Area, as produced by Plaintiff in this litigation as OCWD-MTBE-001-080988 through OCWD-MTBE-001-080990.

8.      Attached hereto as Exhibit F is a true and correct copy of pages 216-217 of the reporter's official transcript of the deposition of Ron Wildermuth, which was taken in this matter on February 19, 2009. Also attached as part of Exhibit F to this Declaration is a true and correct

- 2 -

copy of Exhibit 24 to the Wildermuth Deposition, as produced by Plaintiff in this litigation as OCWD-MTBE-001-101342 through OCWD-MTBE-001-101343.

9.      Attached hereto as Exhibit G is a true and correct copy of an OC DA Press Release dated December 17, 2002 entitled "**Prosecution of Oil Company by Orange County District Attorney Sets Precedent** *ARCO Agrees to Clean-Up More Than One Hundred Contaminated Gas Station Sites*," as produced by Plaintiff in this litigation as OCWD-MTBE-001-100664 through OCWD-MTBE-001-100666.

10.      Attached hereto as Exhibit H is a true and correct copy of the Final Judgment Pursuant to Stipulation and Order Thereon dated February 11, 2003 as to Thrifty in *People of the State of California v. Atlantic Richfield, etc. et al.* (Orange County Sup. Ct. Case No. 80-40-30).

11.      Attached hereto as Exhibit I is a true and correct copy of the Minute Order dated January 5, 2005 in *People of the State of California v. Shell Oil Company, etc. et al.* (Orange County Superior Court Case No. 80-40-31).

12.      Attached hereto as Exhibit J is a true and correct copy of pages 1111-1112 of the transcript of the deposition of Anthony Brown, taken in this matter on February 1, 2012.

13.      Attached hereto as Exhibit K is a true and correct copy of Exhibit 38 to the deposition of Nira Yamachika, as produced by Plaintiff in this litigation as OCWD-MTBE-001-038689 through OCWD-MTBE-001-038690.

14.      Attached hereto as Exhibit L is a true and correct copy of a document entitled "Safe Drinking Water Subcommittee Meeting -- ACWA Fall Conference, Anaheim, CA" dated November 8, 2000, as produced by Plaintiff in this litigation as OCWD-MTBE-001-038623-24.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed June 4, 2014 at Los Angeles, California.

LAWRENCE A. COX

34727062_2

# Exhibit A

20 4

1   ORANGE COUNTY DISTRICT ATTORNEY
    Tony Rackauckas, District Attorney
2   Bill Feccia, Senior Assistant District Attorney
    Joe D'Agostino, Assistant District Attorney
3   Consumer and Environmental Protection Unit
    Aleta Bryant; Bar No. 125381, Deputy District Attorney
4   401 Civic Center Drive
    Santa Ana, CA 92701-4575
5   (714) 347-8720, FAX (714) 568-1250
        — In association with —
6   Mark P. Robinson, Jr., Esq.; Bar No. 054426
    Allan F. Davis, Esq.;  Bar No. 108269
7   ROBINSON, CALCAGNIE & ROBINSON
    620 Newport Center Drive, 7th Floor
8   Newport Beach, CA 92660
    (949) 720-1288, FAX (949) 720-1292
9       — and —
    Ramon Rossi Lopez, Esq.; Bar No. 86361
10  Thomas A. Schultz, Esq.; Bar No. 149578
    LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS
11  450 Newport Center Drive, 2nd Floor
    Newport Beach, CA 92660
12  (949) 640-8222, FAX (949) 640-8294

13
    Attorneys for Plaintiff
14  THE PEOPLE OF THE STATE OF CALIFORNIA

15
16          SUPERIOR COURT OF THE STATE OF CALIFORNIA

17          FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

18

19  THE PEOPLE OF THE STATE OF          )   Case No. 80-40-30
    CALIFORNIA                          )
20                                      )   Assigned for all purposes to:
            Plaintiff,                  )      Judge Raymond J. Ikola
21                                      )      Department CX105
        vs.                             )
22                                      )   Complaint filed 1/6/99
    ATLANTIC RICHFIELD COMPANY, a       )   1st Amended Complaint filed 10/5/00
23  Delaware corporation doing business as )
    ARCO; BP AMOCO CORPORATION;         )   [PROPOSED] FINAL JUDGMENT
24  ARCO CHEMICAL COMPANY; LYONDELL     )   PURSUANT TO STIPULATION AND
    CHEMICAL COMPANY; THRIFTY OIL       )   ORDER THEREON
25  COMPANY; and DOES 5 through 200,    )
    inclusive;                          )   Trial Date: January 21, 2003
26                                      )
            Defendants.                 )
27

28

    LA2:649652.2                            FINAL JUDGMENT PURSUANT TO
                                            STIPULATION AND ORDER THEREON

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 1 7 2002

ALAN SLATER, Clerk of the Court
Nora O'Bryan
BY  NORA O'BRYAN

RECEIVED
DEC - 9 2002
ALAN SLATER, Clerk of the Court
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

1    This Final Judgment Pursuant to Stipulation (this "Final Judgment") is made between the

2    Plaintiff, People of the State of California, by and through its attorney Tony Rackauckas, the

3    District Attorney of the County of Orange ("Plaintiff"), and defendants Atlantic Richfield

4    Company, BP Amoco Corporation, and ARCO Chemical Company ("Settling Defendants").

5

6                                              **RECITALS**

7        A.     In this action, Plaintiff filed a civil complaint ("First Amended Complaint") in

8    Orange County against Settling Defendants, Lyondell Chemical Company and Thrifty Oil

9    Company.

10       B.     Plaintiff and Settling Defendants have agreed to settle this action on the terms set

11   forth in this Final Judgment. Plaintiff believes that the resolution of the violations alleged in the

12   First Amended Complaint is fair and reasonable and fulfills the Plaintiff's enforcement objectives,

13   that no further action is warranted concerning the specific violations alleged in the First Amended

14   Complaint except as provided pursuant to the Final Judgment, and that this Final Judgment is in

15   the best interest of the general public. Notwithstanding the foregoing, Plaintiff may bring an

16   action or file a motion with the Court to enforce this Final Judgment pursuant to the terms and

17   conditions hereof.

18

19                                           **JURISDICTION**

20       1.     This Court has jurisdiction of the subject matter and the parties hereto.

21

22                              **SETTLEMENT OF DISPUTED CLAIMS**

23       2.     Settling Defendants expressly deny the allegations raised by the Plaintiff in the

24   First Amended Complaint and Plaintiff's discovery responses in the above-referenced matter.

25   This Final Judgment is not an admission by Settling Defendants of any issue of law or fact in the

26   above-captioned matter or any violation of any law. The parties enter into this Final Judgment

27   pursuant to a compromise and settlement of disputed claims set forth in the First Amended

28   Complaint and Plaintiff's discovery responses for the purpose of furthering the public interest.

LA2:649652.2                        - 1 -              FINAL JUDGMENT PURSUANT TO
                                                       STIPULATION AND ORDER THEREON

## COSTS OF INVESTIGATION AND LITIGATION

3.     Settling Defendants shall reimburse Plaintiff its cost of investigation, in the total amount of Five Million Dollars ($5,000,000).  Within fourteen business days after the entry of this Final Judgment, Settling Defendants will wire such amount to Plaintiff as follows:

| | |
|---|---|
| Bank Name: | Wells Fargo Bank |
| Company Name: | County of Orange |
| Routing Number: | 121000248 |

## PLUME DELINEATION PROGRAM

4.0     Settling Defendants shall implement the program described in Sections 4.0 through 4.10 (the "Plume Delineation Program") for a cost of up to Three Million Dollars ($3,000,000), of which up to Seven Hundred and Fifty Thousand Dollars ($750,000) shall be used exclusively for compensation of the CONSULTANT selected pursuant to Section 4.1 below.

4.1.     Plaintiff shall select an independent, third party environmental consultant to serve as "CONSULTANT."  The CONSULTANT selected by Plaintiff pursuant to this Final Judgment is Dennis England, a principal in England Geosystem, Inc.  The CONSULTANT will be reasonably compensated by Settling Defendants in an amount not to exceed a total of $750,000 for the term of this Final Judgment.  The CONSULTANT shall report in writing the CONSULTANT's findings and recommendations in regards to the presence of petroleum hydrocarbon compounds (including: TPHG, BTEX, and the oxygenates MTBE, TBA, DIPE, ETBE, and TAME) in the soil and groundwater (hereinafter: "PLUME") and the recommended corrective action to be undertaken by Settling Defendants with respect to the PLUME at the ARCO gas station sites in Orange County currently undergoing corrective action where Settling Defendants are the responsible party (the "Subject Sites"), pursuant to the procedure set forth in Sections 4.1 through 4.9.

FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

4.2    (a) CONSULTANT shall determine whether the corrective action at each of the Subject Sites is consistent with the standards set forth in the Corrective Action Guidelines. As used herein, the "Corrective Action Guidelines" means either: (i) the State Water Resources Control Board's "Final Draft Guidelines for Investigation and Cleanup of MTBE and other Ether-Based Oxygenates," dated March 27, 2000, prepared pursuant to Executive Order D-5-99 and Senate Bill 989, which provide guidelines and time frames for corrective action at sites impacted by releases of gasoline containing MTBE and other oxygenates, as supplemented by the final version of the " Supplemental Guidance for the Prioritization of Investigation and Cleanup of Underground Storage Tank Releases Containing MtBE" adopted by the Santa Ana Regional Water Quality Control Board on June 1, 2001; or (ii) a new or updated guidance document adopted at some future date by the State Water Resources Control Board that provides guidelines and time frames for corrective action at sites impacted by gasoline or petroleum releases, and any new or updated version of the " Supplemental Guidance for the Prioritization of Investigation and Cleanup of Underground Storage Tank Releases Containing MtBE" as adopted by the Santa Ana Regional Water Quality Control Board on June 1, 2001.

(b) Based on CONSULTANT's detailed review of the Plume Delineation Report and the results of any additional assessment work described in Section 4.6 below, CONSULTANT shall evaluate whether the corrective action at the Subject Sites is consistent with the standards of the Corrective Action Guidelines and shall recommend in writing additional actions that the CONSULTANT reasonably believes are necessary to meet such standards. The CONSULTANT may recommend in writing additional actions, including, but not limited to, the following tasks, where reasonably necessary to make the corrective action at the Subject Sites consistent with the Corrective Action Guidelines:

A.    The drilling and installation of new wells and/or borings to further analyze and delineate the PLUME at the Subject Sites pursuant to Sections 4.3 to 4.7, which may potentially include delineation in both the lateral and vertical direction that approximates the 5 ppb MTBE contour line in groundwater, if

FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

1 reasonably necessary to make the corrective action at the Subject Sites consistent
2 with the Corrective Action Guidelines;

3      B.    The additional collection of soil samples at the Subject Sites, and
4 the additional collection of groundwater samples on a quarterly basis, and testing
5 data as needed, from existing and any newly installed wells at the Subject Sites;

6      C.    The additional analysis of soil and groundwater samples for the
7 presence of petroleum hydrocarbon compounds, including but not limited to:
8 TPHG, BTEX, and the oxygenates MTBE, TBA, DIPE, ETBE, TAME, and other
9 gasoline derived compounds; [7].

10     (c) The CONSULTANT may submit written reports to Settling Defendants, as the
11 Consultant deems necessary, a copy of which shall also be submitted to the appropriate regulatory
12 agency having jurisdiction over the Subject Site, the Santa Ana Regional Water Quality Control
13 Board, and to the Plaintiff, which shall include the findings and recommendations of the
14 CONSULTANT concerning the delineation of the PLUME at the Subject Sites, pursuant to
15 Section 4.5, and the nature and scope of any corrective action which, in the opinion of the
16 CONSULTANT, is reasonably necessary to make the corrective action at the Subject Sites
17 consistent with the Corrective Action Guidelines.

18     (d) Settling Defendants shall perform all corrective action in regards to the PLUME that
19 are reasonably necessary to make the corrective action at the Subject Sites consistent with the
20 Corrective Action Guidelines, as recommended in writing by the CONSULTANT, in accordance
21 with: (i) a time table consistent with the Corrective Action Guidelines, and (ii) cleanup levels for
22 petroleum hydrocarbons, BTEX, and the oxygenates MTBE, TBA, DIPE, ETBE, TAME, or other
23 gasoline-derived compounds, determined pursuant to a corrective action procedure or guidance
24 document adopted or approved by the State Water Resources Control Board, Santa Ana Regional
25 Water Quality Control Board, federal Environmental Protection Agency, or ASTM.

26     (e) In the event, however, of a reasonable and bona fide dispute presented by any of the
27 parties to this agreement as to any written corrective action recommendations by the
28 CONSULTANT, including any time table consistent with the Corrective Action Guidelines

1  and/or cleanup levels determined pursuant to the procedure set forth above, the dispute shall be

2  resolved pursuant to the dispute resolution procedures of Section 5.7. Notwithstanding anything

3  to the contrary in this Final Judgment, if the regulatory agency with jurisdiction over a Subject

4  Site refuses to approve any work recommended by CONSULTANT, Settling Defendants shall

5  have no obligation under this Final Judgment to conduct such unapproved work.

6       4.3    Settling Defendants will prepare a comprehensive report providing a detailed

7  description of the extent of delineation of the PLUME at each of the Subject Sites (the "Plume

8  Delineation Report"). The Plume Delineation Report will be prepared by Settling Defendants'

9  consultants, with appropriate California certifications, who are currently retained by Settling

10  Defendants, and will be based on: (i) a thorough review of relevant prior assessments of the

11  Subject Sites; (ii) any additional assessment and investigation work that may be conducted by

12  Settling Defendants at their election, with the concurrence of the relevant regulatory agencies, to

13  further refine the data available to delineate the PLUME; and (iii) other relevant data identified by

14  Settling Defendants' consultants. All underlying reports and analytical data on which the

15  conclusions in the Plume Delineation Report are based will be made available to the

16  CONSULTANT upon request. Settling Defendants will submit the Plume Delineation Report to

17  the CONSULTANT no later than 150 days after the entry of this Final Judgment.

18       4.4.    The CONSULTANT will conduct a detailed review of the Plume Delineation

19  Report prepared by the consultants retained by the Settling Defendants, and will recommend or

20  request in writing further analysis, testing or assessment the CONSULTANT reasonably believes

21  is appropriate and consistent with the Corrective Action Guidelines in order to determine if the

22  delineation of the PLUME at each of the Subject Sites provides the information needed to identify

23  in writing corrective actions that are appropriate in light of any potential impacts the PLUME

24  may pose to human health, the groundwater resource, and the environment. This review and

25  determination will be based on appropriate scientific and technical reasoning and knowledge of

26  regulatory objectives. Ultimately the discretion for making this determination shall be in the

27  hands of the CONSULTANT subject to the approval of the court, provided that if Settling

28  Defendants object then any disputes will be resolved pursuant to the dispute resolution procedures

       - 5 -        FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

1  of Section 5.7. The CONSULTANT's determination as to the scope and extent of the study shall

2  not necessarily be binding on regulatory agencies in future plume delineation studies statewide.

3      4.5    If the CONSULTANT cannot conclude that the delineation of the PLUME, as set

4  forth in the Settling Defendant's Plume Delineation Report, at each of the Subject Sites provides

5  the information needed to identify corrective actions that are appropriate in light of any potential

6  impacts the PLUME may pose to human health, the groundwater resource, and the environment,

7  then the CONSULTANT will, in addition to the review described in Section 4.4 above, identify

8  the deficiencies or data gaps in the delineation work that has been completed at the relevant

9  Subject Site. The CONSULTANT will also identify and recommend in writing additional work

10  that could be conducted that would allow the CONSULTANT to reach the conclusion that the

11  delineation of the PLUME at the Subject Site is sufficient to identify the appropriate corrective

12  actions consistent with the Corrective Action Guidelines.

13      4.6    If the CONSULTANT recommends in writing additional assessment work at a

14  Subject Site that is consistent with the Corrective Action Guidelines, and the regulatory agency

15  with jurisdiction over the Subject Site approves such additional work, Settling Defendants will

16  conduct such work under the supervision of the relevant regulatory agency within a time limit

17  determined to be reasonable by the CONSULTANT. If either party disagrees with the time limit

18  determined by the CONSULTANT, the dispute shall be resolved pursuant to the dispute

19  resolution procedures of Section 5.7. Settling Defendants will submit copies of all reports that are

20  prepared in connection with completing such additional work to Plaintiff.

21      4.7    Notwithstanding the foregoing, if Settling Defendants conclude that the additional

22  work recommended in writing by the CONSULTANT is not reasonably necessary to identify the

23  corrective action that may be appropriate in light of any potential impacts the PLUME may pose

24  to human health and the environment, the dispute will be resolved pursuant to the dispute

25  resolution procedures of Section 5.7.

26      4.8    As necessary, face-to-face meetings between the CONSULTANT and Settling

27  Defendants' consultants may be scheduled to discuss issues raised by the Plume Delineation

28  Report or other written recommendation by CONSULTANT. No ex parte meetings or

1  communications will be conducted between Settling Defendants, or their consultants, and the

2  CONSULTANT, unless and until Settling Defendants provide the Plaintiff with seventy-two (72)

3  hours advance written notice of any meeting contemplated by Settling Defendants, so that a

4  representative or designee of Plaintiff can attend.  Settling Defendants shall provide or make

5  arrangements for access to the Subject Sites, as well as to off-site locations if such access can be

6  obtained on commercially reasonable terms, for the CONSULTANT, and the regulatory agency

7  with jurisdiction over each site, for the purpose of observing site conditions or observing

8  investigation or corrective action activities taking place on such Subject Site.  The

9  CONSULTANT (and any other designee or representative of Plaintiff) will comply with Settling

10  Defendant's health and safety requirements when observing the Subject Sites or such off-site

11  locations.

12       4.9    Settling Defendants shall maintain an accounting of all expenditures that Settling

13  Defendants incur pursuant to this Plume Delineation Program.  Settling Defendants shall provide

14  Plaintiff with semi-annual statements of such expenditures, including costs incurred by Settling

15  Defendant: (i) to prepare the Plume Delineation Report; (ii) to compensate CONSULTANT, (iii)

16  to review the CONSULTANT's written recommendations and to attend meetings with

17  CONSULTANT regarding such recommendations; (iv) to assist CONSULTANT, including by

18  providing information requested by CONSULTANT, responding to CONSULTANT'S requests,

19  accompanying CONSULTANT on site visits, and the like, and (iv) to perform tasks of the sort

20  that would reasonably be undertaken by third party environmental consultants in order to respond

21  to the CONSULTANT's written recommendations for further PLUME delineations and/or for

22  corrective action to be undertaken by Settling Defendants at the Subject Sites pursuant to this

23  Final Judgment, including without limitation preparing work plans, implementing such work

24  plans, and preparing any necessary reports.  If the parties have a bona fide dispute regarding

25  whether any of the costs reported in the Settling Defendants' statement of expenditures were

26  incurred pursuant to the Plume Delineation Program, the dispute shall be resolved pursuant to the

27  dispute resolution procedures of Section 5.7.  Attorneys' fees and costs incurred by Settling

28  Defendants, and costs associated with preparing for and participating in mediations pursuant to

- 7 -

1   Section 5.7, shall not be deemed to be expenditures incurred pursuant to this Plume Delineation
2   Program. Records of the accounting of these expenditures, including invoices, work orders, or
3   other documentation evidencing these expenditures, shall be maintained by Settling Defendants
4   and shall be subject to review by Plaintiff on an annual basis. These records shall remain
5   available for review by Plaintiff for a period of 12 months after the termination of Settling
6   Defendants' obligation under the Plume Delineation Program.

7       4.10    Notwithstanding anything to the contrary herein, Settling Defendants' obligations
8   under the Plume Delineation Program shall terminate the earlier of five years after the date of
9   entry of this Final Judgment or the date Settling Defendants have incurred costs of $3,000,000 in
10  implementation of the Plume Delineation Program, as demonstrated pursuant to Section 4.9. If
11  the parties have a bona fide dispute regarding whether Settling Defendants have incurred costs of
12  $3,000,000 in implementation of the Plume Delineation Program, the dispute shall be resolved
13  pursuant to the dispute resolution procedures of Section 5.7.

14

15                          **INJUNCTIVE RELIEF**

16      5.0     Pursuant to the provisions of Health and Safety Code Section 25299.01, Business
17  and Professions Code Section 17203, and the Court's equitable powers, Settling Defendants shall
18  take the following actions:

19      5.1     Settling Defendants shall accept and comply with the written findings and
20  recommendations of the CONSULTANT for further PLUME delineations and/or for corrective
21  action of the PLUME at the Subject Sites pursuant to the terms and conditions of the Plume
22  Delineation Program (including without limitation the termination of Settling Defendant's
23  obligations under the Plume Delineation Program pursuant to Section 4.10 above) that are
24  reasonably necessary to make the corrective action at the Subject Sites consistent with the
25  Corrective Action Guidelines; in the event, however, that Settling Defendants present a
26  reasonable and bona fide dispute as to any of the written findings or recommendations of the
27  CONSULTANT, the dispute will be resolved pursuant to the dispute resolution procedures of
28  Section 5.7.

1    5.2    Settling Defendants shall be required to promptly work with the appropriate
2    regulatory agencies to rectify any and all existing violations of the regulatory compliance
3    requirements found in Chapter 6.7 of Division 20 of the Health and Safety Code as indicated by
4    said agencies.

5    5.3    Effective upon entry of this Final Judgment, Settling Defendants, and each of their
6    subsidiaries, corporate parents and Affiliates, and all successors and assigns of the Settling
7    Defendants, are hereby permanently enjoined and restrained under California Health and Safety
8    Code Sections 25299.01 and 25299.04, in the County of Orange, from violating the following
9    requirements regulating underground storage tanks:

10    (1)    Engaging in any acts or practices which violate the corrective action
11    requirements of the Barry Keene Underground Storage Tank Cleanup Trust Fund Act of 1989, as
12    codified in Chapter 6.75 of Division 20 of the Health and Safety Code and the corrective action
13    requirements set forth in Title 23 of the California Code of Regulations, Division 3, Chapter 16,
14    Article, sections 2720 through 2727;

15    (2)    Failing to implement, comply with or respond, within the time required
16    by law, to any request, directive or demand of the Orange County Health Care Agency, or of any
17    other agency, board, department or entity charged by law with the implementation or enforcement
18    of such laws, regarding the ownership, operation, installation, maintenance, upgrade, repair,
19    permitting, closure, investigation, monitoring or testing of any underground storage tank or
20    related underground storage tank system owned or operated by Settling Defendants, or for which
21    Settling Defendants are otherwise the responsible party, or any recording, reporting or abatement
22    activities related to any such underground storage tanks or underground storage tank systems, in
23    each case to the extent required by applicable law.

24    5.4    If Settling Defendants are deficient in the performance of the requirements in this
25    Final Judgment after any relevant dispute resolution procedure set forth in this Final Judgment,
26    and have failed to commence to cure such deficiency within sixty days after the Plaintiff has
27    notified Settling Defendants in writing of this deficiency pursuant to Section 6.2 below, such
28    deficiency shall constitute a violation of the injunction. If the Plaintiff sends such a notice, the

LA2:649652.2                                     -9-                FINAL JUDGMENT PURSUANT TO
                                                                   STIPULATION AND ORDER THEREON

1   Plaintiff and Settling Defendants shall meet and confer in good faith in an effort to resolve any

2   alleged violation of this Final Judgment. If a resolution cannot be achieved by the parties, the

3   matter will be mediated by Judge Daniel Weinstein (or another mediator approved by both

4   parties). The costs of said mediator in connection with the resolution of said matter shall be

5   borne by Settling Defendants; provided, however, that after three mediations hereunder, the

6   mediator can allocate the costs of mediation to Plaintiff if the mediator determines that such an

7   allocation is equitable considering the reasonableness or unreasonableness of the Plaintiff's

8   position on the matter that was the subject of the dispute. If the parties cannot reach resolution

9   through the mediator, Plaintiff may pursue any and all remedies Plaintiff may have against

10  Settling Defendants at law or in equity, including but not limited to filing a motion with the Court

11  to compel Settling Defendants to comply with the terms and conditions of this injunction.

12      5.5    Notwithstanding anything to the contrary herein, it will not be a breach of Settling

13  Defendants' obligations under this Final Judgment if Settling Defendants are unable to perform

14  (including, without limitation, by meeting a time limit set by the CONSULTANT hereunder) due

15  to a force majeure event, such as a physical condition of the site that makes work materially more

16  difficult than anticipated or makes it impossible to proceed with the planned work, inability to

17  obtain required surface entry rights and access necessary for the conduct of work, or inability to

18  obtain reasonable governmental permits or approval of work. Settling Defendants must use

19  reasonable efforts to anticipate, and avoid delay that may be caused by, a force majeure event.

20      5.6    Settling Defendants' obligations hereunder shall terminate five years after the date

21  of entry of this Final Judgment.

22

23                          **DISPUTE RESOLUTION**

24      5.7    Except as otherwise expressly stated herein, in the event of a reasonable and bona

25  fide dispute presented by any of the parties to this Final Judgment, the parties agree that the

26  dispute will be mediated by Judge Daniel Weinstein (or another mediator approved by both

27  parties). The costs of said mediator in connection with the resolution of said dispute shall be

28  borne by Settling Defendants, provided, however, that after three mediations hereunder, the

1 mediator can allocate the costs of mediation to Plaintiff if the mediator determines that such an

2 allocation is equitable considering the reasonableness or unreasonableness of the Plaintiff's (or

3 CONSULTANT'S) position on the matter that was the subject of the dispute.  If the parties

4 cannot reach resolution through the mediator, the dispute shall be submitted to Honorable

5 Raymond Ikola, or his court-appointed judicial successor for resolution.

## MATTERS COVERED BY THIS FINAL JUDGMENT

6.0    Except for the retained jurisdiction of the court as set forth in section 6.3 below,
this Final Judgment is a final and binding resolution and settlement of all claims, violations, or
causes of action that were alleged by the First Amended Complaint and Plaintiff's discovery
responses against Settling Defendants, or could have been asserted, based on the facts alleged in
the First Amended Complaint and Plaintiff's discovery responses, against:

(i) each of the Settling Defendants and each of their subsidiaries, corporate parents,
Affiliates (including, without limitation, BP West Coast Products LLC, BP Products North
America Inc., BP Company North America Inc., BP Corporation North America Inc., BP
America Inc., BP p.l.c., ARCO Pipeline Company, ARCO Oil and Gas Company, and ARCO Oil
Refining Company), successors, heirs, assigns, and their respective officers, directors, partners,
employees, representatives, and agents, dealers, franchisees, and facility operators of the stations
listed in Exhibit A ("Covered Defendant Parties"), or

(ii) Thrifty Oil Company, its Affiliates, and their respective officers, directors, partners,
employees, successors, assigns and Affiliates ("Thrifty Parties"), solely to the extent such claims,
violations or causes of actions arise from Settling Defendants' alleged violations of Operational
Compliance Requirements at  the stations listed in Exhibit B (which are stations owned by Thrifty
Oil Co. or its Affiliates and leased by Settling Defendants).  As used herein, "Operational
Compliance Requirements" means the legal obligations of Settling Defendants relating to the

day-to-day operation of underground storage tank equipment, as set forth in Sections 25284-25296 and 25298-25299 of the Health & Safety Code, and Sections 2630-2652 and 2660-2714 of title 23 of the California Code of Regulations. Operational Compliance Requirements do not include legal obligations relating to corrective action or remediation of releases from underground storage tanks.

Except as set forth in Section 6.0(ii) and Section 6.1(ii): (a) this Final Judgment shall not operate as a release, dismissal or retraxit as to any party not specifically identified as a "Settling Defendant" in this judgment; (b) Plaintiff's causes of action as against Defendants Thrifty Oil Company and Lyondell Chemical Company ("Non-Released Parties") as set forth in the First Amended Complaint, shall not be affected by this Final Judgment; (c) it is not the intent of Plaintiff to dismiss, release, discharge or diminish Plaintiff's claims and actions against the Non-Released Parties, including Thrifty Oil Company and Lyondell Chemical Company; (d) Plaintiff would not be entering into this stipulated judgment if Plaintiff knew or suspected that the affect of the judgment would be to release, dismiss or discharge Plaintiff's actions or claims as against the Non-Released Parties; and (e) Plaintiff does hereby expressly preserve the Plaintiff's actions and claims against the Non-Released Parties.

The provisions of this section 6.0 are expressly conditioned on the Settling Defendants' full payment of the amount specified in Section 3 above by the deadlines specified in the Section 3 above and their full satisfaction of the Plume Delineation Program; provided, however, that after full payment of such amount, the provisions of this section 6.0 will remain in full force and effect unless and until the Court makes a final determination that Settling Defendants have not fully satisfied Section 3.0 and the Plume Delineation Program.

As used herein, "Affiliate" means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person

LA2:649652.2

- 12 -

specified  This Final Judgment shall be binding upon and shall inure to the benefit of the parties,

including the parties listed in subclauses (i) and (ii) above.

6.1    This Final Judgment also constitutes a release from any known or unknown past or

present claims, violations, or causes of action that were or could have been asserted in the First

Amended Complaint against Covered Defendant Parties with regard to any and all existing or

potential demands, causes of action, equitable or legal claims, obligations, damages, losses, fines,

penalties and liabilities related to underground storage tank systems, the unauthorized release of

petroleum product, or additive or constituent of such petroleum product (including but not limited

to TPH, BTEX, MTBE and other fuel oxygenates); the use of MTBE and/or other fuel oxygenates

in gasoline, or any alleged failure to assess, remediate, or otherwise take corrective action in

response to any such unauthorized release, at the sites listed in Exhibit A, whether asserted or

unasserted or known or unknown, arising out of or connected with any act, cause, matter, or thing

stated, claimed, alleged, or that could have been alleged in any pleading, records, or other papers

filed in this lawsuit or that may be based upon, related to or connected with any of the matters

referred to in any such pleadings, records, or other papers.  This Final Judgment also constitutes a

release from any known or unknown past or present claims, violations, or causes of action that

were or could have been asserted in the First Amended Complaint against the Thrifty Parties

solely to the extent such known or unknown past or present claims, violations or causes of actions

arise from Settling Defendants' alleged violations of Operational Compliance Requirements at the

stations listed in Exhibit B.  Except as set forth in the preceding sentence, this Final Judgment

does not release any claims, violations, or causes of action against the Thrifty Parties.  The release

in this Section 6.1 does not include unknown future violations relating to the facilities listed on

Exhibit A.

- 13 -

## NOTICE

6.2    All submissions and notices required by this Consent Judgment shall be sent to:

For Plaintiff:

Tony Rackaukas, Esq.
District Attorney
Orange County District Attorney's Office
Consumer and Environmental Protection Unit
401 Civic Center Drive
Santa Ana, CA 92701-4575

and to:

Mark P. Robinson, Jr., Esq.
Robinson, Calcagnie & Robinson
620 Newport Center Drive, 7th Floor
Newport Beach, CA 92660

For Settling Defendants:

Deborah P. Felt, Esq.
BP Legal Western Region
333 South Hope Street, Room 2048
Los Angeles, California 90071

and to:

James R. Asperger, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071-2809

Any party may change the address for purpose of notices to that party by a notice specifying a new address, but no such change is effective until it is actually received by the party sought to be charged with its contents. All notices and other communications required or permitted under this Final Judgment which are addressed as provided in this Section 6.2 are effective upon delivery if delivered personally or by overnight mail, or are effective five (5) days following deposit in the United States mail, postage prepaid, if delivered by mail.

LA2:649652.2                                - 14 -                    FINAL JUDGMENT PURSUANT TO
                                                                     STIPULATION AND ORDER THEREON

## JURISDICTION RETAINED

6.3     Jurisdiction is retained for the purpose of enabling any party to this Final Judgment to apply to the Court at any time for such further orders and directions as may be deemed necessary or appropriate for the construction of or the carrying out of this Final Judgment.

6.4     This Final Judgment will go into effect immediately upon entry hereto. Entry is authorized immediately upon filing.

6.5     This Final Judgment may be executed by the parties in counterpart, and when a copy is signed by an authorized representative of each party, the stipulation shall be effective as if a single document were signed by all parties.

6.6     This Final Judgment shall not serve to bar, estop, alter, supersede, or interfere with, any investigation, action, order, request, demand or directive of any regulatory agency having jurisdiction over the underground storage tank systems at any of the Subject Sites, including any order, directive or demand by the Orange County Health Care Agency, the applicable Regional Water Quality Control Board, or the State Water Resources Control Board pursuant to any of the laws and regulations pertaining to underground storage tanks. This Final Judgment shall not alter or affect the obligations of Settling Defendants to comply with all laws and regulations pertaining to underground storage tanks, including, but not limited to (in each case to the extent applicable): Health and Safety Code, Chapters 6.7 and 6.75; Water Code sections 13285 and 13350; Fish and Game Code sections 5650 and 5650.1; California Code of Regulations, Title 23, Division 3, Chapter 16, the underground storage tank regulations, and any other applicable laws, statutes, and regulations, and any directive or order of a regulatory agency pursuant to such laws and regulations.

6.7     This Final Judgment supersedes all previous contracts and agreements and constitutes the entire Final Judgment between or among the parties, and no oral statement or prior written material not specifically incorporated herein shall be of any force or effect.

FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

OFFICE OF THE ORANGE COUNTY DISTRICT
ATTORNEY

By _____
       Tony Rackauckas
Attorneys for Plaintiff The People of
The State Of California

Approved as to Form:

ROBINSON, CALCAGNIE & ROBINSON

By _____
       Mark P. Robinson, Jr.
Attorneys for Plaintiff The People of
The State Of California

LOPEZ, HODES, RESTAINO, MILMAN &
SKIKOS

By _____
       Ramon Rossi Lopez
Attorneys for Plaintiff The People of
The State Of California

BP AMOCO CORPORATION

By:_____
Daniel B. Pinkert, Corporate Secretary,
BP Corporation North America Inc.

ATLANTIC RICHFIELD COMPANY

By _____
       John Wales
Its Executive Vice President and
       Chief Operating Officer

Approved as to Form:

O'MELVENY & MYERS LLP

By _____
       James R. Asperger
Attorneys for Settling Defendants

LA2:649652.2

- 16 -

OFFICE OF THE ORANGE COUNTY DISTRICT
ATTORNEY

By _____
   Tony Rackauckas
Attorneys for Plaintiff The People of
The State Of California

Approved as to Form:

ROBINSON, CALCAGNIE & ROBINSON

By _____
   Mark P. Robinson, Jr.
Attorneys for Plaintiff The People of
The State Of California

LOPEZ, HODES, RESTAINO, MILMAN &
SKIKOS

By _____
   Ramon Rossi Lopez
Attorneys for Plaintiff The People of
The State Of California

BP AMOCO CORPORATION

By: _____
Daniel B. Pinkert, Corporate Secretary,
BP Corporation North America Inc.

ATLANTIC RICHFIELD COMPANY

By _____

Its _____

Approved as to Form:

O'MELVENY & MYERS LLP

By _____
   James R. Asperger
Attorneys for Settling Defendants

L A2:649652.2                      - 16 -                FINAL JUDGMENT PURSUANT TO
                                                        STIPULATION AND ORDER THEREON

OFFICE OF THE ORANGE COUNTY DISTRICT
ATTORNEY

By _____
    Tony Rackauckas
Attorneys for Plaintiff The People of
The State Of California

Approved as to Form:

ROBINSON, CALCAGNIE & ROBINSON

By _____
    Mark P. Robinson, Jr.
Attorneys for Plaintiff The People of
The State Of California

LOPEZ, HODES, RESTAINO, MILMAN &
SKIKOS

By _____
    Ramon Rossi Lopez
Attorneys for Plaintiff The People of
The State Of California

BP AMOCO CORPORATION

By: _____
Daniel B. Pinkert, Corporate Secretary,
BP Corporation North America Inc.

ATLANTIC RICHFIELD COMPANY

By _____

Its _____

Approved as to Form:

O'MELVENY & MYERS LLP

By _____
    James R. Asperger
Attorneys for Settling Defendants

LA2:649652.2

- 16 -

FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

OFFICE OF THE ORANGE COUNTY DISTRICT
ATTORNEY

By _Tony Rackauckas_
Tony Rackauckas
Attorneys for Plaintiff The People of
The State Of California

Approved as to Form:

ROBINSON, CALCAGNIE & ROBINSON

By _____
Mark P. Robinson, Jr.
Attorneys for Plaintiff The People of
The State Of California

LOPEZ, HODES, RESTAINO, MILMAN &
SKIKOS

By _____
Ramon Rossi Lopez
Attorneys for Plaintiff The People of
The State Of California

BP AMOCO CORPORATION

By: _____
Daniel B. Pinkert, Corporate Secretary,
BP Corporation North America Inc.

ATLANTIC RICHFIELD COMPANY

By _____

Its _____

Approved as to Form:

O'MELVENY & MYERS LLP

By _____
James R. Asperger
Attorneys for Settling Defendants

LA2:649652.2

OFFICE OF THE ORANGE COUNTY DISTRICT
ATTORNEY

By _____
    Tony Rackauckas
Attorneys for Plaintiff The People of
The State Of California

Approved as to Form:

ROBINSON, CALCAGNIE & ROBINSON

By _____
    Mark P. Robinson, Jr.
Attorneys for Plaintiff The People of
The State Of California

LOPEZ, HODES, RESTAINO, MILMAN &
SKIKOS

By _____
    Ramon Rossi Lopez
Attorneys for Plaintiff The People of
The State Of California

BP AMOCO CORPORATION

By: _____
Daniel B. Pinkert, Corporate Secretary,
BP Corporation North America Inc.

ATLANTIC RICHFIELD COMPANY

By _____

Its _____

Approved as to Form:

O'MELVENY & MYERS LLP

By _____
    James R. Asperger
Attorneys for Settling Defendants

- 16 -

FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

## ORDER

It appearing to the Court that the Plaintiff and Settling Defendants have stipulated and consented to the entry of this Final Judgment, and the Court having considered the matter, the pleadings, and this stipulation, and **GOOD CAUSE APPEARING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT JUDGMENT BE ENTERED ACCORDINGLY. IT IS SO ORDERED.**

Dated: ___12-17-02___

The Honorable Raymond J. Ikola
Judge of the Superior Court

LA2:649652.2

– 17 –

FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON



 

## ORANGE COUNTY SITES
### EXHIBIT A

| ITEM | FAC # | FAC ADDRESS | CITY | STATE | COUNTY | | |
|------|-------|-------------|------|-------|--------|---|---|
| 1 | 00076 | 100 N TUSTIN AVE | ORANGE | CA | ORANGE | | |
| 2 | 00097 | 401 N PLACENTIA | FULLERTON | CA | ORANGE | | |
| 3 | 00192 | 2100 SE BRISTOL ST | NEWPORT BEACH | CA | ORANGE | | |
| 4 | 00203 | 1700 W LA PALMA AVE | ANAHEIM | CA | ORANGE | | |
| 5 | 00206 | 302 W FIRST ST | SANTA ANA | CA | ORANGE | | |
| 6 | 00447 | 34342 PACIFIC COAST HWY | DANA POINT | CA | ORANGE | | |
| 7 | 00629 | 13482 BROOKHURST ST | GARDEN GROVE | CA | ORANGE | | |
| 8 | 01023 | 1000 W VALENCIA DR | FULLERTON | CA | ORANGE | | |
| 9 | 01028 | 1201 S BROOKHURST ST | ANAHEIM | CA | ORANGE | | |
| 10 | 01047 | 2546 W FIRST STREET | SANTA ANA | CA | ORANGE | | |
| 11 | 01055 | 9001 GARDEN GROVE BLVD | GARDEN GROVE | CA | ORANGE | | |
| 12 | 01064 | 14511 BROOKHURST ST | WESTMINSTER | CA | ORANGE | | |
| 13 | 01072 | 1202 E ORANGETHORPE AVE | FULLERTON | CA | ORANGE | | |
| 14 | 01077 | 13742 RED HILL AVE | TUSTIN | CA | ORANGE | | |
| 15 | 01257 | 2090 BRISTOL STREET | COSTA MESA | CA | ORANGE | | |
| 16 | 01359 | 883 N. TUSTIN AVE | TUSTIN | CA | ORANGE | | |
| 17 | 01365 | 6370 MANCHESTER AVE | BUENA PARK | CA | ORANGE | | |
| 18 | 01583 | 7090 KNOTT AVE | BUENA PARK | CA | ORANGE | | |
| 19 | 01633 | 6082 WESTMINSTER BLVD | WESTMINSTER | CA | ORANGE | | |
| 20 | 01637 | 1000 N STATE COLLEGE BLVD | ANAHEIM | CA | ORANGE | | |
| 21 | 01667 | 5071 LINCOLN AVENUE | BUENA PARK | CA | ORANGE | | |
| 22 | 01706 | 26551 ORTEGA HWY | SAN JUAN CAPISTRANO | CA | ORANGE | | |
| 23 | 01736 | 5012 LINCOLN AVE | CYPRESS | CA | ORANGE | | |
| 24 | 01795 | 301 S EUCLID AVE | ANAHEIM | CA | ORANGE | | |
| 25 | 01812 | 16502 BOLSA CHICA ST | HUNTINGTON BEACH | CA | ORANGE | | |
| 26 | 01831 | 16751 YORBA LINDA | YORBA LINDA | CA | ORANGE | | |
| 27 | 01865 | 14244 NEWPORT AVE | TUSTIN | CA | ORANGE | | |
| 28 | 01887 | 16742 BEACH BLVD | HUNTINGTON BEACH | CA | ORANGE | | |
| 29 | 01888 | 16501 GOLDENWEST ST | HUNTINGTON BEACH | CA | ORANGE | | |
| 30 | 01905 | 18025 MAGNOLIA ST | FOUNTAIN VALLEY | CA | ORANGE | | |



# ORANGE COUNTY SITES
### EXHIBIT A

| ITEM | FAC. | FAC ADDRESS | CITY | STATE | COUNTY | | |
|------|------|-------------|------|-------|--------|---|---|
| 31 | 01912 | 18480 BROOKHURST ST | FOUNTAIN VALLEY | CA | ORANGE | | |
| 32 | 01956 | 26001 LA PAZ ROAD | MISSION VIEJO | CA | ORANGE | | |
| 33 | 01969 | 7760 CRESCENT AVE | BUENA PARK | CA | ORANGE | | |
| 34 | 01973 | 4988 BALL ROAD | CYPRESS | CA | ORANGE | | |
| 35 | 01977 | 2302 N GRAND AVE | SANTA ANA | CA | ORANGE | | |
| 36 | 01994 | 700 S STATE COLLEGE BLVD | ANAHEIM | CA | ORANGE | | |
| 37 | 03013 | 23742 EL TORO RD | EL TORO | CA | ORANGE | | |
| 38 | 03016 | 12422 VALLEY VIEW STREET | GARDEN GROVE | CA | ORANGE | | |
| 39 | 03023 | 801 S. MAGNOLIA AVE | ANAHEIM | CA | ORANGE | | |
| 40 | 03042 | 13331 EUCLID AVE | GARDEN GROVE | CA | ORANGE | | |
| 41 | 03045 | 14231 RED HILL AVE | TUSTIN | CA | ORANGE | | |
| 42 | 03048 | 27682 CROWN VALLEY PKWY | MISSION VIEJO | CA | ORANGE | | |
| 43 | 03053 | 6981 WARNER AVE | HUNTINGTON BEACH | CA | ORANGE | | |
| 44 | 03076 | 1935 E KATELLA AVE | ORANGE | CA | ORANGE | | |
| 45 | 03080 | 2840 E IMPERIAL HWY | FULLERTON | CA | ORANGE | | |
| 46 | 03083 | 3470 FAIRVIEW | COSTA MESA | CA | ORANGE | | |
| 47 | 03085 | 3361 S. BRISTOL | SANTA ANA | CA | ORANGE | | |
| 48 | 03086 | 5700 E LA PALMA | ANAHEIM | CA | ORANGE | | |
| 49 | 03091 | 14493 CULVER DRIVE | IRVINE | CA | ORANGE | | |
| 50 | 03094 | 530 N BROOKHURST ST | ANAHEIM | CA | ORANGE | | |
| 51 | 03101 | 25122 MARGUERITE PKWY | MISSION VIEJO | CA | ORANGE | | |
| 52 | 03102 | 23921 ALICIA PRKWY | MISSION VIEJO | CA | ORANGE | | |
| 53 | 05038 | 1620 N BROADWAY | SANTA ANA | CA | ORANGE | | |
| 54 | 05084 | 490 EAST SEVENTEETH STREET | COSTA MESA | CA | ORANGE | | |
| 55 | 05111 | 2749 N EL CAMINO REAL | SAN CLEMENTE | CA | ORANGE | | |
| 56 | 05139 | 2401 LINCOLN AVE | ANAHEIM | CA | ORANGE | | |
| 57 | 05147 | 2245 S MAIN ST | SANTA ANA | CA | ORANGE | | |
| 58 | 05185 | 1450 BAKER STREET | COSTA MESA | CA | ORANGE | | |
| 59 | 05202 | 12502 HARBOR BLVD | GARDEN GROVE | CA | ORANGE | | |
| 60 | 05831 | 24181 MOULTON PKWY | LAGUNA HILLS | CA | ORANGE | | |

 

## ORANGE COUNTY SITES
### EXHIBIT A

| ITEM | FAC | FAC ADDRESS | FAC CITY | STATE | COUNTY | | |
|---|---|---|---|---|---|---|---|
| 61 | 05881 | 9511 VALLEY VIEW ST | CYPRESS | CA | ORANGE | | |
| 62 | 05907 | 27491 LA PAZ RD | LAGUNA NIGUEL | CA | ORANGE | | |
| 63 | 05912/01898 | 5472 ORANGETHORPE AVE | LA PALMA | CA | ORANGE | | |
| 64 | 05994 | 300 BRISTOL ST | COSTA MESA | CA | ORANGE | | |
| 65 | 05909 | 1801 S STATE COLLEGE BLVD | ANAHEIM | CA | ORANGE | | |
| 66 | 06030 | 13142 GOLDENWEST ST | WESTMINSTER | CA | ORANGE | | |
| 67 | 06060 | 21452 BROOKHURST ST | HUNTINGTON BEACH | CA | ORANGE | | |
| 68 | 06068 | 490 PACIFIC COAST HWY | SEAL BEACH | CA | ORANGE | | |
| 69 | 06071 | 3414 S MAIN ST | SANTA ANA | CA | ORANGE | | |
| 70 | 06079 | 3901 E RIVERDALE AVE | ANAHEIM | CA | ORANGE | | |
| 71 | 06085 | 1222 E FIRST ST | SANTA ANA | CA | ORANGE | | |
| 72 | 06110 | 1201 E IMPERIAL HWY | PLACENTIA | CA | ORANGE | | |
| 73 | 06118 | 17520 BROOKHURST ST | FOUNTAIN VALLEY | CA | ORANGE | | |
| 74 | 06131 | 3201 HARBOR BLVD | COSTA MESA | CA | ORANGE | | |
| 75 | 06132 | 2445 E BALL RD | ANAHEIM | CA | ORANGE | | |
| 76 | 06160 | 13361 HARBOR BLVD | GARDEN GROVE | CA | ORANGE | | |
| 77 | 06191 | 17502 GOLDENWEST ST | HUNTINGTON BEACH | CA | ORANGE | | |
| 78 | 06226 | 102 E YORBA LINDA BLVD | PLACENTIA | CA | ORANGE | | |
| 79 | 09511 | 120 E IMPERIAL | BREA | CA | ORANGE | | |
| 80 | 09512 | 2016 W 17TH ST | SANTA ANA | CA | ORANGE | | |
| 81 | 09539 | 2937 E CHAPMAN AVE | ORANGE | CA | ORANGE | | |
| 82 | 09549 | 14121 NEWPORT AVE | TUSTIN | CA | ORANGE | | |
| 83 | 09550 | 291 S TUSTIN ST | ORANGE | CA | ORANGE | | |
| 84 | 09555 | 304 S MAGNOLIA AVE | ANAHEIM | CA | ORANGE | | |
| 85 | 09556 | 17475 BROOKHURST | FOUNTAIN VALLEY | CA | ORANGE | | |
| 86 | 09589 | 799 W 19TH ST | COSTA MESA | CA | ORANGE | | |
| 87 | 09593 | 1639 S STANDARD AVE | SANTA ANA | CA | ORANGE | | |
| 88 | 09594 | 751 BAKER ST | COSTA MESA | CA | ORANGE | | |
| 89 | 09604 | 7510 ORANGETHORPE AVE | BUENA PARK | CA | ORANGE | | |
| 90 | 09675 | 101 E WHITTIER BLVD | LA HABRA | CA | ORANGE | | |

 

# ORANGE COUNTY SITES
### EXHIBIT A

| ITEM | FAC | FAC ADDRESS | CITY | STATE | COUNTY | | |
|------|-----|-------------|------|-------|--------|---|---|
| 91 | 09876 | 719 S BREA BLVD | BREA | CA | ORANGE | | |
| 92 | 09677 | 2351 E ORANGETHORPE | FULLERTON | CA | ORANGE | | |
| 93 | 09725 | 2811 W LINCOLN AVE | ANAHEIM | CA | ORANGE | | |
| 94 | 09726 | 300 S BROOKHURST ST | ANAHEIM | CA | ORANGE | | |
| 95 | 09727 | 2101 S HARBOR BLVD | ANAHEIM | CA | ORANGE | | |
| 96 | 09728 | 2800 W BALL ROAD | ANAHEIM | CA | ORANGE | | |
| 97 | 09729 | 11500 BEACH BLVD | STANTON | CA | ORANGE | | |
| 98 | 09730 | 727 S EAST ST | ANAHEIM | CA | ORANGE | | |
| 99 | 09731 | 3101 E LA PALMA | ANAHEIM | CA | ORANGE | | |
| 100 | 09732 | 2493 N TUSTIN | ORANGE | CA | ORANGE | | |
| 101 | 09733 | 825 W KATELLA AVE | ORANGE | CA | ORANGE | | |
| 102 | 09734 | 6311 WESTMINSTER AVE | WESTMINSTER | CA | ORANGE | | |
| 103 | 09735 | 13501 MAGNOLIA ST | GARDEN GROVE | CA | ORANGE | | |
| 104 | 09736 | 13511 EUCLID ST | GARDEN GROVE | CA | ORANGE | | |
| 105 | 09738 | 2730 W MCFADDEN AVE | SANTA ANA | CA | ORANGE | | |
| 106 | 09739 | 2940 N BRISTOL ST | SANTA ANA | CA | ORANGE | | |
| 107 | 09740 | 801 N BRISTOL ST | SANTA ANA | CA | ORANGE | | |
| 108 | 09741 | 324 S GRAND AVE | SANTA ANA | CA | ORANGE | | |
| 109 | 09742 | 15501 EDWARDS STREET | HUNTINGTON BEACH | CA | ORANGE | | |
| 110 | 09743 | 18520 BROOKHURST | FOUNTAIN VALLEY | CA | ORANGE | | |
| 111 | 09744 | 18975 MAGNOLIA | FOUNTAIN VALLEY | CA | ORANGE | | |
| 112 | 09745 | 19971 BEACH BLVD | HUNTINGTON BEACH | CA | ORANGE | | |
| 113 | 09746 | 2021 NEWPORT BLVD | COSTA MESA | CA | ORANGE | | |
| 114 | 09747 | 590 S PACIFIC COAST HWY | LAGUNA BEACH | CA | ORANGE | | |
| 115 | 09748 | 590 CAMINO DE ESTRELLA | SAN CLEMENTE | CA | ORANGE | | |
| 116 | 70328 | 890 N. BATAVIA STREET | ORANGE | CA | ORANGE | | |
| 117 | 70342 | 13871 RED HILL AVE | TUSTIN | CA | ORANGE | | |
| 118 | 70483 | 1490 S HARBOR BLVD | LA HABRA | CA | ORANGE | | |
| 119 | 71051 | 2604 W LA PALMA | ANAHEIM | CA | ORANGE | | |
| 120 | 81205 | 480 N GLASSELL ST | ORANGE | CA | ORANGE | | |

 

# ORANGE COUNTY SITES
### EXHIBIT A

| ITEM | TRACT | FAC ADDRESS | CITY | STATE | COUNTY | | |
|------|-------|-------------|------|-------|--------|---|---|
| 121 | 81258 | 2721 W EDINGER AVE | SANTA ANA | CA | ORANGE | | |
| 122 | 81426 | 2045 COMMONWEALTH | FULLERTON | CA | ORANGE | | |
| 123 | 81451 | 8002 BOLSA AVE | HUNTINGTON BEACH | CA | ORANGE | | |
| 124 | 81652 | 2731 E LINCOLN AVE | ANAHEIM | CA | ORANGE | | |
| 125 | 81675 | 519 S HARBOR BLVD | FULLERTON | CA | ORANGE | | |
| 126 | 81712 | 3003 NEWPORT BLVD | COSTA MESA | CA | ORANGE | | |
| 127 | 81759 | 2490 FAIRVIEW RD | COSTA MESA | CA | ORANGE | | |
| 128 | 81762 | 422 DE LA ESTRELLA | SAN CLEMENTE | CA | ORANGE | | |
| 129 | 81782 | 11171 LOS ALAMITOS BLVD | LOS ALAMITOS | CA | ORANGE | | |
| 130 | 81849 | 23611 LA PALMA AVE | YORBA LINDA | CA | ORANGE | | |
| 131 | 81850 | 301 S ANAHEIM BLVD | ANAHEIM | CA | ORANGE | | |
| 132 | 81883 | 1131 S MAIN ST | SANTA ANA | CA | ORANGE | | |
| 133 | 81887/01579 | 1124 E CHAPMAN AVE | FULLERTON | CA | ORANGE | | |
| 134 | 81904 | 10975 EDINGER AVE | FOUNTAIN VALLEY | CA | ORANGE | | |
| 135 | 81955 | 9472 KATELLA AVE | ANAHEIM | CA | ORANGE | | |
| 136 | 81991 | 20572 LAKE FOREST DR | LAKE FOREST | CA | ORANGE | | |
| 137 | 81994 | 12931 GARDEN GROVE BLVD | GARDEN GROVE | CA | ORANGE | | |
| 138 | 82008 | 18972 BEACH BLVD | HUNTINGTON BEACH | CA | ORANGE | | |
| 139 | 82048 | 1037 W BALL RD | ANAHEIM | CA | ORANGE | | |
| 140 | 82051 | 2602 NEWPORT BLVD | COSTA MESA | CA | ORANGE | | |
| 141 | 82075 | 29850 SANTA MARGARITA PKY | SANTA MARGARITA | CA | ORANGE | | |
| 142 | 82097 | 8032 GARDEN GROVE BLVD | GARDEN GROVE | CA | ORANGE | | |
| 143 | 82215 | 1401 E LAMBERT ROAD | LA HABRA | CA | ORANGE | | |



Exhibit B

## THRIFTY SITES LEASED BY ARCO IN ORANGE COUNTY
### EXHIBIT B

| ORANGE # | FAC # | FAC ADDRESS | REGION | STATE | COUNTY |
|---|---|---|---|---|---|
| 1 | 09506 | 704 N BRISTOL | SANTA ANA | CA | ORANGE |
| 2 | 09511 | 120 E IMPERIAL | BREA | CA | ORANGE |
| 3 | 09512 | 2016 W 17TH ST | SANTA ANA | CA | ORANGE |
| 4 | 09539 | 2937 C CHAPMAN AVE | ORANGE | CA | ORANGE |
| 5 | 09549 | 14121 NEWPORT AVE | TUSTIN | CA | ORANGE |
| 6 | 09550 | 291 S TUSTIN ST | ORANGE | CA | ORANGE |
| 7 | 09555 | 304 S MAGNOLIA AVE | ANAHEIM | CA | ORANGE |
| 8 | 09556 | 17475 BROOKHURST | FOUNTAIN VALLEY | CA | ORANGE |
| 9 | 09585 | 1881 W BALL | ANAHEIM | CA | ORANGE |
| 10 | 09589 | 799 W 19TH ST | COSTA MESA | CA | ORANGE |
| 11 | 09593 | 1509 S STANDARD AVE | SANTA ANA | CA | ORANGE |
| 12 | 09594 | 761 BAKER ST | COSTA MESA | CA | ORANGE |
| 13 | 09904 | 7510 ORANGETHORPE AVE | BUENA PARK | CA | ORANGE |
| 14 | 09875 | 101 E WHITTIER BLVD | LA HABRA | CA | ORANGE |
| 15 | 09876 | 718 S BREA BLVD | BREA | CA | ORANGE |
| 16 | 09877 | 2351 E ORANGETHORPE | FULLERTON | CA | ORANGE |
| 17 | 09725 | 2811 W LINCOLN AVE | ANAHEIM | CA | ORANGE |
| 18 | 09726 | 300 S BROOKHURST ST | ANAHEIM | CA | ORANGE |
| 19 | 09727 | 2101 S HARBOR BLVD | ANAHEIM | CA | ORANGE |
| 20 | 09728 | 2800 W BALL ROAD | ANAHEIM | CA | ORANGE |
| 21 | 09729 | 11590 BEACH BLVD | STANTON | CA | ORANGE |
| 22 | 09730 | 727 S EAST ST | ANAHEIM | CA | ORANGE |
| 23 | 09731 | 3101 E LA PALMA | ANAHEIM | CA | ORANGE |
| 24 | 09732 | 2493 N TUSTIN | ORANGE | CA | ORANGE |
| 25 | 09733 | 825 W KATELLA AVE | ORANGE | CA | ORANGE |
| 26 | 09734 | 6311 WESTMINSTER AVE | WESTMINSTER | CA | ORANGE |
| 27 | 09735 | 13501 MAGNOLIA ST | GARDEN GROVE | CA | ORANGE |
| 28 | 09736 | 13511 EUCLID ST | GARDEN GROVE | CA | ORANGE |
| 29 | 09737 | 14472 BROOKHURST | GARDEN GROVE | CA | ORANGE |
| 30 | 09738 | 2730 W MCFADDEN AVE | SANTA ANA | CA | ORANGE |
| 31 | 09739 | 2940 N BRISTOL ST | SANTA ANA | CA | ORANGE |

## THRIFTY SITES LEASED BY ARCO IN ORANGE COUNTY
### EXHIBIT B

| ORANGE# | PAC | PAC ADDRESS | CITY | STATE | COUNTY |
|---|---|---|---|---|---|
| 32 | 09740 | 801 N BRISTOL ST | SANTA ANA | CA | ORANGE |
| 33 | 09741 | 324 S GRAND AVE | SANTA ANA | CA | ORANGE |
| 34 | 09742 | 16501 EDWARDS STREET | HUNTINGTON BEACH | CA | ORANGE |
| 35 | 09743 | 18520 BROOKHURST | FOUNTAIN VALLEY | CA | ORANGE |
| 36 | 09744 | 18975 MAGNOLIA | FOUNTAIN VALLEY | CA | ORANGE |
| 37 | 09745 | 19971 BEACH BLVD | HUNTINGTON BEACH | CA | ORANGE |
| 38 | 09746 | 2021 NEWPORT BLVD | COSTA MESA | CA | ORANGE |
| 39 | 09747 | 590 S PACIFIC COAST HWY | LAGUNA BEACH | CA | ORANGE |
| 40 | 09748 | 590 CAMINO DE ESTRELLA | SAN CLEMENTE | CA | ORANGE |

I hereby certify the foregoing instrument consisting of **3** page(s) is a true and correct copy of the original on file in this court.

ATTEST: (DATE) **JAN 0 8 2003**
ALAN SLATER, EXECUTIVE OFFICER AND CLERK OF THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

BY _____ DEPUTY

Derick Raybalid

Exhibit B

TONY RACKAUCKAS, District Attorney
County of Orange, State of California
JAN C. STURLA, Senior Assistant District Attorney
ROBERT C. GANNON, JR., Assistant District Attorney
Consumer and Environmental Protection Unit
BY:   MICHELLE M. LYMAN (Bar No. 121780)
Deputy District Attorney
401 Civic Center Drive West, 5th Floor
Santa Ana, California 92701-4575
Telephone:   (714) 347-8706
Facsimile:   (714) 796-0476

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA

**FILED**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

OCT 05 2000

ALAN SLATER, Clerk of the Court

BY:   N. ABURTO   DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE-CENTRAL JUSTICE CENTER

THE PEOPLE OF THE STATE OF CALIFORNIA,  ) **CASE NO. 80-40-30**
                                        ) **ASSIGNED FOR ALL PURPOSES TO:**
                             Plaintiff, ) **JUDGE JOHN C. WOOLLEY**
                                        ) **DEPARTMENT C6**
                  vs.                   )
                                        )
ATLANTIC RICHFIELD COMPANY, a Delaware  ) **FIRST AMENDED COMPLAINT**
corporation doing business as ARCO; BP AMOCO ) **FOR INJUNCTION, COMPLIANCE**
CORPORATION; ARCO CHEMICAL COMPANY; ) **ORDER, CIVIL PENALTIES**
LYONDELL CHEMICAL COMPANY; THRIFTY  ) **AND OTHER RELIEF**
OIL COMPANY; DOES 5 through 200, inclusive, )
                                        )
_____Defendant._____ )

Plaintiff, the People of the State of California, by and through Tony Rackauckas, District

Attorney for the County of Orange, alleges:

**VENUE AND JURISDICTION**

1.     Tony Rackauckas, the District Attorney of the County of Orange ("District

Attorney") brings this action on behalf of the People of the State of California ("the People") to:

(1) protect the public from health and safety hazards, (2) prevent destruction of Orange County's

groundwater resources and otherwise protect the environment, and (3) protect the People from

unfair, unlawful and fraudulent business practices.

2.     The District Attorney brings this action pursuant to Code of Civil Procedure

section 731, Civil Code sections 3479 and 3480, Health and Safety Code sections 25299,

25299.01, 25299.37, 25299.76, 25249.5, 25249.7, 25189.2(c), Water Code sections 13285 and

FIRST AMENDED COMPLAINT FOR INJUNCTION, COMPLIANCE
ORDER, CIVIL PENALTIES AND OTHER RELIEF

OCWD-MTBE-001-102473

13350, Fish and Game Code sections 5650 and 5650.1, Business and Professions Code sections 17200, 17203, 17204, and 17206 and California Code of Regulations, Title 23, Division 3, Chapter 16 and other applicable laws, statutes, and regulations.

3.    The District Attorney seeks to: (1) enjoin defendants from engaging in further violations of the laws and regulations alleged herein, (2) compel defendants to cleanup and abate soil and groundwater contamination caused by unauthorized releases of gasoline and Methyl Tertiary-Butyl Ether ("MTBE") which contamination constitutes a continuing nuisance, (3) recover damages from defendants where such contamination cannot be cleaned up or abated and has resulted in the creation of a permanent nuisance, (4) penalize defendants with the imposition of civil penalties for violations of the laws and regulations alleged herein, (5) disgorge the monetary profits obtained by defendants as a result of their acts in violation of the laws and regulations alleged herein, and (6) obtain such other relief as the Court deems appropriate to ensure the health and safety of the People, protect the environment and to prevent the destruction of groundwater resources by defendants.

4.    Defendants, and each of them, conduct business in Orange County and elsewhere in California.

5.    The violations of law alleged herein were committed in Orange County and elsewhere within the State of California.

**PLAINTIFF**

6.    Plaintiff, the People, is the public located within the County of Orange, as represented by Tony Rackauckas, the District Attorney. Plaintiff does not include, and the District Attorney does not represent, any water district or other municipality; the Orange County Health Care Agency; the Santa Ana Regional Water Quality Control Board; the State Water Resources Control Board; any city; any public or private well owner; or any other individual, regulatory agency, corporation or other entity with an interest in or pertaining to groundwater or production wells located within the County of Orange.

//

## DEFENDANT ATLANTIC RICHFIELD COMPANY

7.     Defendant Atlantic Richfield Company ("ARCO") was and is a corporation organized under the laws of the state of Delaware with its principal place of business in Los Angeles, California.

8.     ARCO is, and at times relevant herein was, engaged in the business of exploration, development, production and refining of crude oil and the marketing and sale of petroleum products, including gasoline sold as motor vehicle fuel on the West Coast of the United States. In 1999, ARCO had total revenues of more than $12 billion dollars. In the first quarter of 1999, ARCO's net income was $165 million dollars. In the first quarter of 2000, ARCO's net income rose to $617 million dollars.

9.     ARCO markets gasoline and other refined petroleum products to both consumers and retailers. Gasoline is marketed under the ARCO trademark directly to motorists at ARCO branded retail outlets and through independent dealers and distributors in California and elsewhere.

10.     ARCO owns and/or operates, and at all times relevant herein has owned and/or operated, numerous underground storage tank systems in Orange County which are used for the storage of gasoline offered for sale by ARCO to the general public.

11.     ARCO owns, and at times relevant herein has owned, approximately ninety (90) parcels of real property ("sites") in Orange County on which underground storage tank systems are located and which are used for the storage of gasoline offered for sale to the general public. ARCO previously owned additional sites upon which it operated underground storage tank systems at times relevant herein.

12.     Since approximately mid-1997, ARCO has leased from defendant Thrifty Oil Co. ("Thrifty") approximately forty-two (42) gas station sites on which it operates underground storage tank systems used for the storage of gasoline offered for sale by ARCO to the general public.

13.     ARCO owns and operates two petroleum refineries on the West Coast. At all times relevant herein, ARCO added the chemical Methyl Tertiary-Butyl Ether (MTBE) to its

OCWD-MTBE-001-102475

gasoline at its West Coast refineries prior to sale to the general public.

14.    The MTBE ARCO added to its gasoline was either manufactured by ARCO, or obtained from defendants ARCO Chemical Company ("ARCO Chemical"), Lyondell Chemical Company ("Lyondell"), or others unknown to Plaintiff.

## DEFENDANT BP AMOCO CORPORATION

15.    Defendant BP Amoco Corporation ("BP") is a United Kingdom corporation with its headquarters in London, England. BP is incorporated under the laws of the state of Indiana with its principal place of business located in Chicago, Illinois.

16.    BP is the world's third largest oil company with worldwide revenues of more than $91 billion dollars in 1999. BP is engaged in the exploration, development, production and refining of crude oil and the marketing of gasoline for use as motor vehicle on a worldwide basis.

17.    Plaintiff is informed and believes and on that basis alleges that, on or about April 18, 2000, BP acquired all of the assets and liabilities of ARCO through a merger transaction and that ARCO is now a wholly-owned subsidiary of BP.

18.    Plaintiff is informed and believes and on that basis alleges that BP acquired ARCO to, among other things, "give BP Amoco entry to the key West Coast retail markets of the US where ARCO has the leading market share in five states and owns two of the most efficient refineries in the region. With the prime refining and retail network BP Amoco already has east of the Rockies, this makes it a coast-to-coast marketer in the US." [BP Amoco April 1, 1999 Press Release entitled "BP Amoco and ARCO in $26.8 Billion Deal Agreed by Boards of Both Companies".]

19.    There exists, and since at least April 18, 2000, has existed a unity of interest and ownership between defendant BP and defendant ARCO, such that any individuality and separateness between BP and ARCO have ceased to exist, in that BP completely controls, dominates, manages and operates ARCO to suit its own convenience and for its own purposes. ARCO is a mere shell, instrumentality and conduit through which BP conducts its own petroleum related business on the West Coast with the ARCO brand name and adherence to the fiction of the separate existence of ARCO as an entity distinct from BP would permit abuse of

OCWD-MTBE-001-102476

the corporate privilege.

## DEFENDANT ARCO CHEMICAL COMPANY

20.    Defendant ARCO Chemical is a corporation with its headquarters in Newtown Square, Pennsylvania.

21.    ARCO Chemical was a wholly-owned subsidiary of ARCO until 1987. In 1987, ARCO Chemical became a public company listed on the New York Stock Exchange, when ARCO sold 20% of the company to the public and retained 80% ownership of ARCO Chemical. In July 1998, Lyondell acquired all of ARCO's interest in ARCO Chemical.

22.    ARCO Chemical is, and at times relevant herein was, engaged in the business of manufacturing, producing and distributing MTBE to gasoline refiners and suppliers and others, including but not limited to ARCO and Thrifty.

## DEFENDANT LYONDELL CHEMICAL COMPANY

23.    Defendant Lyondell is a corporation with its headquarters in Houston, Texas.

24.    Lyondell was formed by ARCO as a wholly-owned subsidiary in 1985 with selected chemical and refining assets. In 1989, ARCO spun-off Lyondell into a public company listed on the New York Stock Exchange.

25.    In 1998, Lyondell acquired ARCO Chemical.

26.    Lyondell is, and at all times relevant herein was, engaged in the business of manufacturing, producing and distributing MTBE to gasoline refiners and suppliers and others, including but not limited to ARCO, BP, and Thrifty. Lyondell owns and operates the worlds largest MTBE production facility at its Channelview, Texas plant.

## DEFENDANT THRIFTY OIL COMPANY

27.    Defendant Thrifty is a privately held California corporation with its headquarters in Santa Fe Springs, California.

28.    Thrifty is, and at times relevant herein was, engaged in the business of the production and refining of crude oil and the marketing and sale of petroleum products, including gasoline used as motor vehicle fuel on the West Coast of the United States.

29.    At all times relevant herein, Thrifty added MTBE to its gasoline prior to sale to

OCWD-MTBE-001-102477

the general public.

30.     Thrifty owns, and at times relevant herein has owned, approximately forty-two (42) parcels of real property ("sites") in Orange County on which underground storage tank systems are located and which were used by Thrifty until mid-1997 for the storage of gasoline offered for sale to the general public.  Thrifty owned and operated the underground storage tank systems at these 42 location until mid-1997.

31.     In mid-1997, Thrifty leased all 260 of its retail gas stations in California to ARCO, including the 42 Orange County locations.  ARCO assumed operational responsibility for the underground storage tank systems located at all 42 Orange County locations, and thereafter used these systems for the storage of gasoline offered for sale to the general public. Plaintiff is informed and believes and on that basis alleges that ARCO assumed ownership of the underground storage tank systems at these 42 locations in accordance with the terms of its lease arrangement with Thrifty.

### ALL DEFENDANTS

32.     The names and capacities, whether individual, corporate or otherwise, of Defendants named herein as DOES 5 through 200, are unknown to plaintiff, who, therefore, sues these defendants by such fictitious names.  Plaintiff will amend this complaint to show their true names and capacities if and when they have been ascertained.  Plaintiff is informed and believes, and on such information and belief alleges, that each of the defendants named as a Doe is responsible in some manner for the events and occurrences about which this complaint is filed and is liable for the relief sought herein.

33.     At times relevant herein, each of the defendants acted in concert with or conspired with one or more of the remaining defendants in committing the violations of law alleged herein.  Each of the defendants was the agent, employee or principal of each of the remaining defendants and was acting within the course and scope of his or her agency and/or employment.

//

OCWD-MTBE-001-102478

## WATERS OF THE STATE OF CALIFORNIA

34.    All water within the State, including groundwater, is the property of the people of the State of California. *Cal. Water Code sections 102 and 104.*

35.    As to all water, the Legislature of the State of California ("the Legislature") has determined that **"the people of the State have a primary interest in the conservation, control and utilization of the water resources of the state, and that the quality of all waters of the State shall be protected for use and enjoyment of the people of the state."** *Cal. Water Code section 13000.*

36.    The Legislature has expressly recognized the critical importance of California's groundwater given the state's reliance on it as a primary water supply: **"[T]he greater portion of the water used in this State is stored, regulated, distributed and furnished by its ground water basins, and that such basins are subject to critical conditions of . . . degraded water quality causing great detriment to the peace, health, safety and welfare of the people of the State."** *Cal. Water Code section 12922.1.* **"[T]he people of the State have a primary interest in the correction and prevention of irreparable damage to, or impaired use of, the ground water basins of this State caused by . . . degraded water quality."** *Cal. Water Code section 12922.39.*

37.    The Legislature has designated the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Boards ("Regional Boards") as the principal state agencies with responsibility for the coordination and control of water quality in California. *Cal. Water Code section 13001.* The State Board adopts water quality control policies for the state and the Regional Boards implement them. In Resolution No. 68-16, the State Board established a policy that the high quality of waters in the state shall be maintained. To that end, the Regional Boards and other authorized local agencies are charged with the responsibility of overseeing the cleanup of sites in California where soil and groundwater are polluted or contaminated.

//

OCWD-MTBE-001-102479

## ORANGE COUNTY'S GROUNDWATER BASIN

38.     The Santa Ana River Basin is a vast groundwater basin located primarily within the County of Orange. It provides approximately seventy-five (75) percent of the annual water supply for more than two million (2,000,000) people in Orange County. All water in the Santa Ana River Basin has the highest possible designated beneficial use -- municipal and domestic supply. There are thousands of active and inactive production wells located in Orange County which are used or can potentially be used to supply water to the public. Each year more production wells are installed in order to meet the increasing water supply needs of the County's growing population. Discharges of pollutants to groundwater within the Santa Ana River Basin are a threat to existing production wells and to the potential future use of the basin as a water supply.

## GASOLINE AND ITS CHEMICAL CONSTITUENTS AND ADDITIVES

39.     As purchased at the pump, gasoline contains a number of constituents and additives each of which separately, as well as in combination, present a significant risk to human health, safety and to the environment.

40.     The gasoline marketed by ARCO, BP and Thrifty, at all times relevant herein, contains the chemicals Benzene, Toluene, Ethylbenzene and Xylene ("BTEX"), petroleum hydrocarbons and the chemical additive Methyl Tertiary-Butyl Ether ("MTBE").

41.     Benzene is a clear, colorless, highly reactive flammable liquid derived from petroleum and contained in gasoline. Benzene is a chemical known by the State of California to cause cancer in humans and has been listed as such pursuant to the State's Safe Drinking Water Initiative, Health and Safety Code sections 25249.5 *et. seq.* ("Proposition 65"). Because of the adverse health effects of benzene, the California Department of Health Services has set a primary maximum contaminant level ("MCL") of benzene in drinking water of 0.001 milligrams per liter (mg/L), or 1 part per billion (ppb). State law prohibits public water suppliers from providing drinking water that exceeds primary MCLs.

42.     Toluene is a colorless flammable liquid obtained from coal tar or petroleum and contained in motor vehicle fuels. Toluene is a chemical known by the State of California to cause reproductive toxicity in humans and has been listed as such pursuant to Proposition 65.

OCWD-MTBE-001-102480

Toluene also adversely affects the brain. Because of the adverse health effects of toluene. the California Department of Health Services has set a primary MCL for toluene of 0.15 mg/L.

43.     Ethylbenzene is a colorless liquid that smells like gasoline and occurs naturally in coal tar and petroleum and is contained in gasoline. Because of the adverse health effects of ethylbenzene. the California Department of Health Services has set a primary MCL for ethylbenzene of 0.7 mg/L.

44.     Xylene is a colorless sweet-smelling flammable liquid that occurs naturally in coal tar and petroleum and is contained in gasoline, paint, paint thinners and other products. Xylene adversely affects the brain. Because of the adverse health effects of xylene, the California Department of Health Services has set a primary MCL for xylene of 1.750 mg/L.

### The Additive Methyl Tertiary-Butyl Ether

45.     Methyl Tertiary-butyl Ether (MTBE) is a flammable liquid and has an unpleasant odor and turpentine-like taste. MTBE is made from the blending of chemicals such as isobutylene and methanol.

46.     MTBE (unlike benzene, toluene, ethylbenzene and xylene) is not a naturally occurring constituent or fraction of refined petroleum. Rather, MTBE is an oxygenate which is added to gasoline as an octane enhancer to improve vehicle performance and reduce emissions.

47.     MTBE is a known animal carcinogen. The United States Environmental Protection Agency ("US EPA") classifies MTBE as a possible human carcinogen. A November 1998 report entitled "HEALTH & ENVIRONMENTAL ASSESSMENT OF MTBE" ("UC Report") prepared by a panel of experts assembled by the University of California at Davis for the Governor and Legislature of the State of California concluded, among other things, that MTBE "is an animal carcinogen with the potential to cause cancer in humans."

48.     Because of the adverse health effects of MTBE, the California Department of Health Services has set a primary MCL for MTBE of 0.013 mg/L or 13 ppb. Based on the adverse taste and odor of MTBE, the State has set a secondary MCL for MTBE of 0.005 mg/L, or 5 ppb.

49.     MTBE poses unique risks to groundwater and especially to drinking water

OCWD-MTBE-001-102481

supplies. Given the volume by weight of MTBE in gasoline (approximately 11%), MTBE contaminant plumes typically are of greater volume and concentration (mass) than the plumes of other gasoline chemicals found in retail quality gasoline. And, once released to soil and groundwater, MTBE persists in the subsurface environment and does not easily or readily biodegrade. MTBE is extremely soluble in water, moves with the flow of groundwater and spreads much more rapidly and extensively than other gasoline contaminant plumes. MTBE migrates vertically as well as horizontally with the natural flow of groundwater. The migration of MTBE may also be influenced and hastened by the pumping of nearby production wells which act to draw MTBE contamination down into deeper groundwater zones. Tertiary Butyl Alcohol ("TBA") is a bi-product of MTBE and poses similar risks to groundwater and the environment as MTBE.

50.     MTBE renders water unfit for human consumption at extremely low concentrations (less than 10 ppb) due to its foul taste and odor. Even small spills of MTBE into groundwater may destroy the usefulness of an entire water supply or aquifer.

51.     It is extremely difficult and extremely expensive to remove MTBE from groundwater. However, remediation of MTBE contamination from soil and groundwater located at the source of contamination (typically a leaking underground storage tank site) is far easier and less expensive than remediation of MTBE from an aquifer or contaminated production well.

52.     The UC Report summarized the risks posed by MTBE to the water supplies and the economy of the State of California: "There are significant risks and costs associated with water contamination due to the use of MTBE. MTBE is highly soluble in water and will transfer readily to groundwater from gasoline leaking from underground storage tanks..it is clear we are placing our limited water resources at risk by using MTBE. MTBE has been detected in several water supply systems, which have shut down the contaminated sources, resorting to alternative supplies or treatment . . . . If MTBE continues to be used at current levels and more sources become contaminated, the potential for regional degradation of water resources, especially groundwater basins, will increase . . . . The cost of treatment of MTBE-contaminated drinking water sources in California could be enormous . . . . We believe the use of either non-oxygenated

OCWD-MTBE-001-102482

reformulated gasoline or ethanol as an oxygenate . . . would result in much lower risk to water supplies, [and] lower water treatment costs in the event of a spill."

53.    Based on the findings and recommendations of the UC Report , the Governor of the State of California, Gray Davis, issued Executive order D-55-99 on March 25, 1999 declaring "on balance, there is a significant risk to the environment from using Methyl Tertiary-Butyl Ether (MTBE) in gasoline in California" and calling for its removal from gasoline no later than December 31, 2002.

## THE INTRODUCTION OF MTBE INTO GASOLINE SUPPLIES

54.    In March 1979, US EPA granted ARCO's application to use MTBE as a blending component in unleaded gasoline at volumes up to seven (7) percent.  ARCO sought such approval because the MTBE would raise octane levels and compensate for the removal of lead from gasoline.  US EPA's registration of MTBE does not constitute either approval or endorsement of MTBE by US EPA.  It is merely a determination that MTBE in such concentrations would not cause or contribute to the failure of any emission control device or system.  In 1988, US EPA registered MTBE at volumes up to fifteen (15) percent.

55.    Significant production of MTBE began in April 1979.  During the 1980s, MTBE was added to gasoline primarily to boost octane as lead was phased out of gasoline.  By 1986, MTBE was one of the most prevalent chemicals in production and use in the United States (primarily as a gasoline additive).  ARCO, through its subsidiaries ARCO Chemical and Lyondell, was a major manufacturer of MTBE during the 1980s and 1990s.  ARCO Chemical and Lyondell are still major manufacturers of MTBE.  ARCO, ARCO Chemical, and Lyondell have all substantially profited from the manufacture, production, distribution and widespread use of MTBE in gasoline, as have BP, Thrifty and other gasoline refiners, distributors and retail businesses by the ready availability of MTBE a relatively inexpensive additive to compensate for lead removal and reduce emissions.

//

//

//

OCWD-MTBE-001-102483

## DEFENDANTS LEARN OF YET DENY THE RISKS POSED BY MTBE

56.   During the 1980s. defendants learned of the unique risks posed to groundwater and drinking water supplies from releases of MTBE laden gasoline.

57.   By 1980, defendants knew that many underground gasoline storage tank and delivery systems. including many owned by defendants ARCO, BP, and Thrifty. were leaking gasoline into the environment.

58.   Shortly after MTBE was first added to gasoline supplies it was found in drinking water supplies.  In October 1980. it was discovered that gasoline containing MTBE released from a Shell station contaminated public drinking water supplies in Rockaway, New Jersey. Approximately four thousand (4,000)  people there could taste MTBE or DIPE (another ether) in their water supplied from a municipal well.  By 1981, Shell Oil Company knew MTBE in its gasoline could. and did, contaminate public drinking water supplies, rendering them unusable due to foul taste and odor.

59. Shell shared the results of its investigation into MTBE contamination at Rockaway, New Jersey, directly or indirectly with defendants and others.

60.   In 1983, in response to a survey regarding pollution of groundwater conducted by the Groundwater Technical Task Force of the American Petroleum Institute ("API"). Shell stated: "In our spill situation [at Rockaway], the MTBE was detectable (by drinking) in 7 to 15 parts per billion so even if it were not a factor to health, it still had to be removed to below the detectable amount in order to use the water."

61.   During the 1980s. API's Groundwater Technical Task Force  included representatives from ARCO (and its subsidiaries ARCO Chemical and Lyondell), BP and other major oil and chemical companies.  API members became privy to information shared by Shell and other oil companies pertaining to the discovery and investigation of MTBE releases to groundwater.  Since the early 1980s, API's Groundwater Technical Task Force collected data pertaining to MTBE releases to groundwater from virtually every major oil company, as well as technical data and the results of scientific studies conducted by the expert chemists, scientists, and engineers employed by the major oil companies, including defendants.  API shared the

OCWD-MTBE-001-102484

information it collected with API members and non-members affiliated with the petroleum industry. Through API, Defendants were in a unique position to know of the special characteristics of MTBE and the risks it poses to groundwater including, but not limited to, its solubility, resistance to biodegradation, migration potential, low odor and taste threshold, and the difficulties associated with its removal from groundwater.

62.    In 1986. US EPA's Interagency Testing Committee ("ITC") proposed adding MTBE to the list of regulated compounds under the federal Toxic Substances Control Act (TSCA). A listing pursuant to TSCA constitutes a recommendation to the US EPA Administrator that the listed chemical is in need of testing or study as to ecological, environmental, and/or health effects.

63.    In July 1986, ARCO Chemical responded to US EPA's proposed TSCA listing of MTBE in a letter to the Chairman of the ITC making the following representations: *"MTBE is only slightly soluble in water,"* that *accidental releases of MTBE "should be regarded as a minimal possibility,"* and that *"MTBE losses would be extremely small"* from gasoline storage and distribution systems. These representations to US EPA were untrue and ARCO Chemical knew or should have known they were untrue at the time the representations were made given the knowledge ARCO Chemical had already gained through the manufacturing and marketing of MTBE, through ARCO, its parent corporation, a supplier and retailer of MTBE laden gasoline, and through information provided to it and ARCO through and by the API.

64.    In November 1986, the ITC recommended MTBE for "priority consideration" under TSCA. The ITC noted that MTBE production "has increased dramatically since 1979." The ITC further stated: "Persistence in ground water following spills is unknown, but it may persist for long periods if volatilization is prevented, since MTBE is not likely to be readily biodegraded or otherwise transformed in ground water." US EPA added MTBE to the TSCA list effective December 15, 1986. US EPA did not, however, conduct studies or testing of MTBE as a result of the 1986 listing. (Such studies and testing were not conducted by US EPA until the late 1990's. only after MTBE had been extensively released to groundwater throughout the entire United States. The State of California also only began studying MTBE in the late 1990s.)

OCWD-MTBE-001-102485

65.    Also in November 1986, officials from the State of Maine Department of Environmental Protection presented a paper (Garrett, Moreau & Lowry, "MTBE as a Ground Water Contaminant") to a joint conference of the National Water Works Association and the American Petroleum Institute. Representatives of Defendants attended the conference and presentation. The State of Maine reported that in 1984, state officials discovered MTBE in groundwater in North Berwick, Maine. By 1986, Maine officials identified about thirty (30) additional sites with MTBE contamination. The paper concluded that MTBE "is a more soluble and more rapidly spreading ground water contaminant than other components of gasoline," and that MTBE "is more difficult to remove from contaminated water than other components of gasoline." The authors urged the oil industry to (1) abandon MTBE as an additive to gasoline stored underground, (2) store gasoline containing MTBE only in double-contained facilities or those with sensitive and effective leak detection systems, and (3) acknowledge that all underground storage must be as secure as possible because of the risks posed to groundwater by MTBE.

66.    In December 1986, representatives of ARCO, ARCO Chemical, API, and others were present at a US EPA "public focus meeting" regarding MTBE. At the meeting, US EPA made clear its concerns about groundwater contamination with the following statement: "An additional concern brought out by [EPA] research was the contamination of ground water supplies by MTBE. There are over 700,000 underground storage tanks for petroleum products in the U.S. and about 30% of these tanks leak."

67.    Based on information in their possession at that time, ARCO and API knew or should have known by January 28, 1987 that the conclusions in the Maine Department of Environmental Protection paper "MTBE as a Ground Water Contaminant" were true: MTBE is more soluble, rapidly spreading and difficult to remove from groundwater than the BTEX components of gasoline and additional containment measures were needed to prevent and detect leaks of MTBE from underground storage tanks.

68.    But in January 1987, ARCO urged the API to attack the findings of the Maine Department of Environmental Protection. In a letter to the National Water Works Association

OCWD-MTBE-001-102486

dated January 28, 1987, the API stated in part: *"The authors' recommendations that MTBE be either banned as gasoline additives or required double-lined storage tanks is clearly a policy statement and not an objective, credible scientific conclusion. Furthermore, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted and counterproductive."*

69.     On February 12, 1987, ARCO Chemical told US EPA: *"Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydro-carbon only gasoline."*

70.     On February 27, 1987, the "MTBE Committee," formed by MTBE producers including ARCO, and its subsidiaries ARCO Chemical and Lyondell, and others, submitted this comment to US EPA in order to persuade US EPA not to conduct testing of MTBE: *"We believe that the information provided supports the conclusion that MTBE does not represent a drinking water hazard. . . .. The following discussion establishes that there is no evidence that MTBE poses any significant risk of harm to health or environment, that human exposure to MTBE and release of MTBE to the environment is negligible, **that sufficient data exist** to reasonably determine or predict that the manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data."*

71.     ARCO Chemical knew or should have known, that the representations made in the February 12, 1987 submission to the EPA were false, and ARCO, ARCO Chemical, and Lyondell knew or should have known that material portions of the February 27, 1987 statement submitted by the "MTBE Committee" were false. At the time of these statements, Defendants and other members of the petroleum industry, including API members and non-members alike, knew that drinking water supplies had been destroyed by MTBE, knew that a substantial number of underground storage tanks containing MTBE laden gasoline were leaking throughout the nation, knew that sufficient data did not exist to determine or predict that the manufacture, processing, distribution, use and disposal of MTBE would not have an adverse effect on health or

OCWD-MTBE-001-102487

1  the environment. and knew that additional testing and study of MTBE were in fact needed.

2  72.    On February 4, 1987, contrary to (1) the January 28, 1987 statement submitted by
3  API to the National Water Works Association, (2) the February 12, 1987 submission by ARCO
4  Chemical to the US EPA. and (3) the February 27, 1987 submission by the "MTBE Committee"
5  to the US EPA. ARCO Chemical admitted in a letter to another petroleum industry company,
6  Citgo. that with respect to the Maine Department of Environmental Protection paper: *We don't*
7  *have any data to refute comments made in the paper that MTBE may spread further in a*
8  *plume or may be more difficult to remove/clean up than other gasoline constituents. We will*
9  *be working to develop data in this area, either ourselves or through industry groups such as*
10 *API."*

11 73.    Towards that end, and beginning in January 1987, the API's Groundwater
12 Technical Task Force considered a series of research proposals from its members. including one
13 submitted by ARCO, in which it admitted: ". . . *If the research is not conducted, there will be*
14 *few credible data to support industry's contention that such octane enhancers do not constitute a*
15 *significant new groundwater contamination threat as constituents of gasoline."*

16 74.    On February 16, 1988, Chevron, another API member. submitted a research
17 proposal to API stating the need for industry to respond to claims that MTBE warrants special
18 handling: *"At present, industry has no scientific data to refute these claims."* The proposal
19 further stated that there is *"a downside risk that the results may show that oxygenates, to some*
20 *extent, increase groundwater contamination problems from gasoline leaks and spills."*

21 75.    Because the study and testing of MTBE by the government would invariably
22 reveal both the likelihood of MTBE releases to the environment from leaking underground
23 storage tanks and the risks posed by MTBE to groundwater and drinking water supplies,
24 Defendants ARCO, ARCO Chemical, Lyondell and the API did not want the government to test
25 or study MTBE and actively discouraged the government from doing so. Still, plaintiff is
26 informed and believes and on that basis alleges that during the 1980s and 1990s ARCO, ARCO
27 Chemical, Lyondell. BP, and other oil companies conducted internal studies and tests of MTBE
28 which revealed, among other things, that the additive is more soluble in water than the BTEX

OCWD-MTBE-001-102488

components of gasoline. that it ruins the taste and odor of drinking water at very low levels. that it persists in the environment. that a significant number of MTBE releases had occurred and were occurring from underground gasoline storage tank delivery systems. and that in many instances such releases of MTBE had reached groundwater.

76.     By 1990, ARCO knew that BP Australia was refusing to accept gasoline with MTBE due to the risks posed by it to the environment.

## DEFENDANTS PROMOTE MTBE DESPITE KNOWLEDGE OF ITS RISKS

77.     During the 1980's. defendants ARCO, BP, ARCO Chemical and Lyondell formed and operated a conspiracy which they continued to operate throughout the 1990's and presently operate.  Through the conduct of their business, their relationship with one another and their joint membership in API, said defendants learned of the harmful characteristics of MTBE including the likelihood of its release from leaking underground storage tank systems and its potential to destroy drinking water supplies.   Despite this knowledge, said defendants agreed to and did deny the harmful characteristics of MTBE and the likelihood of its release to water supplies while at the same time encouraging and promoting the approval and use of MTBE as a fuel additive beneficial to the environment.  Said defendants individually and through API lied to Congress, US EPA. regulators and the general public about MTBE.  Said defendants then proceeded to manufacture MTBE and distribute it in gasoline supplies without giving any special handling or containment instructions to gasoline retailers and without taking any additional measures to prevent underground storage tank systems from leaking MTBE into groundwater supplies.  Said defendants also did not timely or adequately identify and cleanup MTBE releases caused by them.  Said defendants individually and through the Oxygenated Fuels Association continue to promote the use of MTBE while denying its harmful characteristics and to manufacture and distribute MTBE in gasoline supplies without giving adequate handling and storage instructions to prevent its release to the environment.

78.     The 1990 Clean Air Act Amendments as originally drafted and considered by Congress included a number of provisions that would have led to the introduction of alternative (non-petroleum) fuels for automobiles in order to reduce air pollution.

OCWD-MTBE-001-102489

79.     ARCO and ARCO Chemical, and others in the petroleum refining and oxygenate industry, opposed the alternative fuel provisions and instead proposed the Reformulated Gasoline Program ("RFG Program") which would rely instead on the use of oxygenated gasoline to reduce air pollution.

80.     In their attempt to obtain approval of the RFG Program, ARCO and ARCO Chemical began an extensive national campaign promoting MTBE as the key ingredient for making low emission gasoline and extolling the purported environmental benefits of MTBE based reformulated gasoline.  ARCO and ARCO Chemical failed to advise the public, Congress or regulators of the risks to groundwater created by the below ground storage of MTBE laden gasoline, despite their knowledge of existing MTBE groundwater contamination and the widespread leakage from underground storage tank systems.

81.     Congress amended the Clean Air Act in 1990 by adopting the RFG Program proposed by ARCO and ARCO Chemical, with no provision for the introduction of alternative fuels.  The amendments required that gasoline meet certain minimum and maximum oxygen requirements during winter months beginning in 1992 to control carbon monoxide pollution and to meet such requirements all year round beginning in 1995 in certain areas to control ozone pollution.  The oxygen requirements of the 1990 Clean Air Act Amendments may be achieved through the addition of chemicals such as MTBE, ethanol, or other oxygenates.

82.     Neither the federal Clean Air Act, nor US EPA's implementing regulations, nor any state law or regulation requires the use of MTBE to fulfill gasoline oxygenate requirements.  Congress specifically declined to mandate one oxygenated fuel additive over another, allowing the use of any oxygenate to satisfy the oxygen requirement.

83.     At times relevant herein, ARCO, BP and Thrifty chose to add the oxygenate MTBE to their gasoline both before and after passage of the Clean Air Act amendments of 1990, despite knowing of the risks posed by MTBE to groundwater.  Since approximately 1992, MTBE has constituted approximately eleven (11) percent by weight of the total volume of gasoline sold by ARCO and Thrifty in California.  MTBE is and has been the most widely used oxygenate in gasoline sold in California.

OCWD-MTBE-001-102490

84.     During the 1990s Defendants ARCO, ARCO Chemical, Lyondell, BP, and Thrifty continued to receive information and data generated both internally and received from other sources, including other major oil companies and the API, that widespread releases of MTBE to the environment had occurred from leaking underground storage tank systems and that these releases threatened groundwater.  By early 1995, ARCO, ARCO Chemical, API, and other oil companies knew and acknowledged amongst themselves that MTBE posed a serious future remediation concern.

### THE LAWRENCE LIVERMORE REPORT

85.     In 1995, the Lawrence Livermore National Laboratory ("Lawrence Livermore") conducted a study on behalf of the State Board concerning the cleanup of BTEX chemicals from soil and groundwater.  The study concluded that certain "low risk" sites contaminated with BTEX chemicals could be closed without requiring active cleanup by the responsible party, instead relying upon natural attenuation of BTEX contamination at such sites.  Natural attenuation is a remedial option which relies upon biodegradation and dilution of contaminants in lieu of active cleanup measures.  The Lawrence Livermore report did not consider or address MTBE contamination or whether natural attenuation is an appropriate remedial option to cleanup MTBE contamination.  It merely addressed the remediation of BTEX constituents of gasoline which it concluded do not persist in the environment and are amenable to biodegradation.  In reliance on the Lawrence Livermore report, the State Board and Regional Boards closed hundreds of gasoline contaminated sites throughout California without requiring cleanup and without testing for the presence of MTBE.  The closure of these sites (entombing MTBE and other contaminants therein) has only served to aggravate the scope and extent of damage wrought by MTBE to the waters of the State of California.

86.     Since 1995, ARCO has repeatedly argued to regulatory agencies in California that many of its sites are "low risk" and that ARCO should not be required to actively cleanup these sites, but instead should be allowed to leave contamination in place and rely upon natural attenuation to dissipate contamination, in accordance with the conclusions of the Lawrence Livermore report.  Many of the sites where ARCO cited the Lawrence Livermore Report and

OCWD-MTBE-001-102491

argued in favor of natural attenuation and against active cleanup did not meet the "low risk" criteria identified by Lawrence Livermore necessary to justify natural attenuation. ARCO argued in favor of natural attenuation at many gasoline release sites knowing that MTBE was necessarily present (given the composition of ARCO gasoline) and that, unlike the BTEX components of gasoline, MTBE persists in the environment and is extremely resistant to biodegradation. ARCO has intentionally misused the Lawrence Livermore report in order to avoid the cleanup, and expense associated therewith, of gasoline release sites which were not "low risk" and which were contaminated with MTBE. By this conduct, ARCO avoided substantial expenses associated with the cleanup of MTBE and BTEX contamination caused by ARCO's intentional promotion and use of MTBE in gasoline and the failure of ARCO to properly contain its gasoline within underground storage tanks and to otherwise meet structural and operational requirements for the ownership and operation of its underground storage tanks.

### MTBE DESTROYS STATE WATER SUPPLIES

87.    In August 1995, the City of Santa Monica, California, discovered MTBE in drinking water supply wells located at its Charnock Wellfield. The Charnock Wellfield had five operating municipal supply wells within the Charnock Sub-Basin which provided approximately forty-five (45) percent of the drinking water for the city's 87,000 residents and approximately 200,000 daytime users. In 1996, levels of MTBE at the city's Charnock Wellfield rose to more than 600 ppb, and by June 13, 1996, all of the supply wells in the Charnock Wellfield were shut down due to persistent and increasing levels of MTBE contamination. In October 1996, the Southern California Water Company ("SCWC"), another water purveyor utilizing the Charnock Sub-Basin, shut down its wellfield in order to avoid drawing in the MTBE contamination. Prior to this shut down, the SCWC had operated two municipal supply groundwater wells that provided a portion of the drinking water for approximately 10,000 residences in Culver City, California. Replacement water has been and continues to be purchased by the City of Santa Monica and the SCWC from the Metropolitan Water District of Southern California (Colorado River and northern California supply) at a cost approximately three times greater than that of the groundwater being replaced.

OCWD-MTBE-001-102492

88.     An investigation ensued into the source(s) of MTBE contamination at the Charnock Wellfield. By April 1997, US EPA and the Los Angeles Regional Water Quality Control Board identified thirty (30) potential source facilities within an approximate one and one-quarter mile radius of the Charnock Wellfield. Two of the potential sources were gasoline product pipelines. The remaining twenty-eight (28) potential sources were underground storage tank systems where gasoline had been or was being stored for retail distribution.

89.     In September 1997, MTBE contamination of the public drinking water supply at South Lake Tahoe, California, was discovered. Since then, the South Lake Tahoe Public Utilities Department was forced to shut down many of its drinking water supply wells due to MTBE contamination or the threat of such contamination. Leaking underground storage tanks located at gas stations in the South Lake Tahoe area were identified as the source of MTBE groundwater contamination. As in the City of Santa Monica, the drinking water supply in South Lake Tahoe, and the wells from which the supply is tapped, remain unusable because of MTBE contamination.

90.     In April 2000, the City of Cambria, California was forced to shut down its drinking water supply wells due to the migration of a large MTBE contaminant plume in close proximity to the wells. Even when its groundwater supply system is operational, Cambria suffers acute drinking water supply shortages. The MTBE plume in Cambria was caused by the unauthorized release of gasoline from underground storage tanks located at a Chevron service station.

91.     Several other private and public water supplies in California have been damaged and lost due to MTBE contamination and many others are threatened by such contamination.

### CALIFORNIA IMPLEMENTS TESTING REQUIREMENTS FOR MTBE

92.     In 1996, in direct response to information obtained regarding the discovery and investigation of MTBE contamination at the Charnock Wellfield, the State Board, Regional Boards and other local agencies in California responsible for the oversight and direction of the cleanup of gasoline releases began to require those responsible for gasoline releases to test soil and groundwater for MTBE on a statewide basis. Defendants ARCO, BP and Thrifty only began

OCWD-MTBE-001-102493

1    to systematically test their gasoline contaminated sites for the presence of MTBE after being

2    required to do so by the relevant regulatory agencies.

3        93.    Once the results of required soil and groundwater testing for MTBE were

4    submitted to regulators, the extent of damage was revealed. MTBE releases from underground

5    storage tanks have contaminated shallow groundwater throughout California and these releases

6    have migrated to and destroyed a number of public drinking water supplies and threaten

7    numerous others.

8        94.    The extent of MTBE groundwater contamination in California was and is the

9    foreseeable and inevitable consequence of industry's denial of the risks posed to groundwater by

10    MTBE stored in underground tanks and the affirmative promotion, encouragement and

11    widespread distribution of MTBE in gasoline supplies.

12        95.    In 1996, BP found that eighty-four (84) percent of its gas station sites with known

13    gasoline releases had MTBE contamination.

14        96.    In 1997, ARCO found that eighty-five (85) percent of its gas station sites in

15    California with known gasoline releases had MTBE contamination.

16                **GROUNDWATER CONTAMINATION IN ORANGE COUNTY**

17        97.    Groundwater in the Santa Ana River Basin has been extensively damaged,

18    degraded, impaired and is currently threatened by underground storage tank systems located at

19    gas stations and other facilities which have leaked gasoline and MTBE into the subsurface

20    environment. In most areas of the Santa Ana River Basin, the uppermost portions of the aquifers

21    are in hydrologic contact with deeper portions used to supply drinking water. For this reason,

22    discharges of pollutants (including gasoline and MTBE) to shallow groundwater are a threat to

23    deeper water supplies. The Santa Ana Regional Water Quality Control Board ("Santa Ana

24    Regional Board") generally requires the cleanup of contaminated groundwater to drinking water

25    standards. This means that all contaminants which exceed primary MCLs must be removed from

26    groundwater before it is deemed "clean".

27        98.    Leaking underground storage tanks and product pipelines and other spills and

28    releases associated with the day to day operation of gas stations are the primary source of

OCWD-MTBE-001-102494

gasoline and MTBE found in groundwater. There are approximately seven hundred and fifty (750) sites in Orange County where an unauthorized release or releases of gasoline have caused groundwater contamination subject to cleanup oversight by the Santa Ana Regional Board or the Orange County Health Care Agency ("OCHCA"). There are approximately seven hundred and fifty (750) additional sites which have only soil contamination. Some of these "soil only" sites may in fact have groundwater contamination which has not been identified or groundwater may become contaminated at these sites as contaminants migrate from soil into groundwater.

99.   In 1995, the SCWC discovered MTBE in water sampled from two inactive production wells, "Concerto #1" and "Ballad" wells, located in the City of Anaheim, Orange County, California. The SCWC ceased pumping at the Ballad and Concerto #1 wells in 1988 and 1995, respectively, when perchlorethylene (a chemical used in the process of dry cleaning) was discovered in test samples obtained from the wells. Although the Ballad and Concerto #1 wells have remained inactive as production wells, the SCWC periodically resumes pumping activities at the wells for the purpose of obtaining and testing samples. A water sample taken from the Concerto #1 well in 1995 was found to contain 48 ppb MTBE, more than three and one half times the state's primary MCL for MTBE in drinking water. The Ballad well contained 34 ppb MTBE in July, 1999. Test samples taken from Concerto #1 since 1995 have all contained MTBE, and the majority of those samples had concentrations above primary drinking water standards. The highest MTBE concentration found at Concerto #1 was 51 ppb, which came from a sample taken in 1999. Concerto #1, formerly an active large system production well used to supply the City of Yorba Linda and other areas of Orange County, may no longer be used solely because of the presence of MTBE regardless of the presence or absence of other contaminants.

100.   The SCWC also discovered MTBE in samples obtained from Concerto #2 an active large system production well located near Concerto #1. Concerto #2 pumps water from a much greater depth than Concerto #1 and currently provides drinking water to the City of Yorba Linda and other portions of unincorporated Orange County. MTBE was first discovered in a sample procured from Concerto #2 on November 15, 1995, at a concentration of 1.6 ppb.

Sampling and testing for MTBE at Concerto #2 has been conducted regularly since the initial discovery of MTBE. The highest concentration of MTBE found at Concerto #2 was 3.7 ppb on December 3, 1998. The most recent sampling of Concerto #2 was conducted on May 15, 2000 and revealed an MTBE concentration of 2 ppb.

101.   The Orange County Water District ("OCWD"), among other things, conducts sampling and testing of groundwater in the Santa Ana River Basin by obtaining samples from groundwater monitoring wells. Groundwater monitoring wells are used for the purpose of monitoring groundwater quality and not for the purpose of pumping or providing a water supply. AM 1, AM 2 and AM 3 are groundwater monitoring wells located near Concerto #1 and Concerto #2. The OCWD periodically samples water from AM 2 and AM 3. A sample taken from AM2 on April 1, 2000 had a concentration of 4.5 ppb MTBE. A sample taken from AM3 on October 21, 1999 had a concentration of 4.4 ppb MTBE.

102.   The sampling and testing of Concerto #1, Concerto #2, AM 2, and AM 3 establish that MTBE has migrated, and is migrating, from the sources of release -- underground storage tank systems and pipelines containing gasoline -- into deeper drinking water supplies in Orange County. Plaintiff is unaware of the identity of the responsible party or parties who caused the MTBE contamination described in paragraphs 99 through 101, but merely seeks to establish that drinking water supplies in Orange County have been damaged and are currently threatened by releases of MTBE to soil and groundwater.

## ARCO'S AND THRIFTY'S ORANGE COUNTY OPERATIONS
## CAUSE GROUNDWATER CONTAMINATION

103.   ARCO currently owns approximately ninety (90) or more parcels of real property in Orange County on which a gas station is located, including but not limited to the locations specified in Exhibit "A" attached hereto and incorporated by reference as though set forth fully and at length herein. Also included in Exhibit "A" are several sites previously owned by ARCO. Approximately *seventy-four (74) of the ninety (90) or more ARCO owned and previously owned sites in Orange County have soil and/or groundwater contamination caused by the unauthorized release or releases of gasoline to the environment from and*

OCWD-MTBE-001-102496

*surrounding underground storage tank systems owned and/or operated by ARCO.* Additional ARCO owned sites in Orange County may also be contaminated with gasoline and MTBE from undetected and/or undisclosed leaks and releases.

104. Of the ninety (90) or more ARCO owned and previously owned sites in Orange County, approximately sixty (60) have groundwater contamination including, but not limited to, MTBE and/or BTEX contamination, caused by the prior or continuing unauthorized release, or releases, of gasoline to the environment from and surrounding underground storage tank systems that are owned and/or operated by ARCO. The exact nature, extent and duration of the groundwater contamination varies at each of the sixty (60) sites.

105. Of the sixty (60) ARCO owned sites in Orange County with groundwater contamination, approximately twenty-six (26) have had MTBE concentrations in groundwater above 10,000 ppb, including nine (9) sites which have had MTBE concentrations above 100,000 ppb. At one site, ARCO Station #1905, located at 10825 Magnolia Street in Fountain Valley, California, a groundwater sample taken on July 20, 1998 had 3,400,000 ppb MTBE.

106. Approximately fourteen (14) of the ninety (90) or more ARCO owned and previously owned sites in Orange County have confirmed soil contamination, but not groundwater contamination. Some of the fourteen (14) "soil only" sites may eventually disclose groundwater contamination through the conduct of further site assessment or through the migration of contaminants from soil to groundwater.

107. In mid-1997, ARCO leased approximately forty-two (42) gas station sites in Orange County from Thrifty, including but not limited to the locations specified in Exhibit "B" attached hereto and incorporated by reference as though set forth fully and at length herein. Of these forty-two (42) sites, all of them have groundwater contamination including, but not limited to, MTBE and BTEX contamination caused by the unauthorized release, or releases, of gasoline to the environment from and surrounding underground storage tank systems. Many of the gasoline releases at the forty-two (42) sites occurred during Thrifty's ownership and operation of the underground storage tank systems located on those sites. Subsequent gasoline releases have also occurred at some of the forty-two (42) sites during ARCO's ownership and

OCWD-MTBE-001-102497

operation of the underground storage tank systems located thereon. The exact nature, extent and duration of groundwater contamination at the forty-two (42) ARCO leased and Thrifty owned sites varies on a site by site basis. ARCO exercises control over the forty-two sites it leases from Thrifty and therefore, by law, is a responsible party along with Thrifty for the cleanup of these sites.

108.    Records of the Regional Board and the OCHCA reveal numerous instances of ARCO and Thrifty, at times relevant herein, resisting, delaying and/or failing to follow agency directives calling for corrective action, including but not limited to investigation and cleanup, at gasoline and MTBE release sites. ARCO and Thrifty, at times relevant herein, have otherwise failed to investigate, cleanup or take corrective action in response to gasoline and MTBE releases with or without agency direction in violation of the law. As a result, the 102 release sites described herein where groundwater contamination has been confirmed (60 owned by ARCO and 42 owned by Thrifty and leased by ARCO) have not yet been cleaned up despite the existence of such groundwater contamination, and knowledge by ARCO and Thrifty of the existence of such contamination, for many years. ARCO and Thrifty have known about groundwater contamination at several of the release sites in excess of ten (10) years and still have not achieved cleanup.

109.    ARCO and Thrifty should have taken aggressive measures to investigate, contain and cleanup unauthorized releases of gasoline and MTBE, especially at those sites in Orange County situated above or in close proximity to drinking water supplies and production wells, as recommended in the UC Report: *"Where contamination of groundwater is known or suspected, evaluation of plume extent and potential threats to drinking water supply wells **should be carried out immediately**. Plume containment, remediation and other corrective actions should proceed as soon as possible to reduce risk and cost."* Instead, ARCO and Thrifty allowed MTBE laden gasoline to remain in the ground for lengthy periods of time without taking appropriate investigative, remedial or other corrective action measures.

110.    The dilatory and ineffective response of ARCO and Thrifty in addressing MTBE contaminant plumes has resulted in the spread and migration of MTBE contamination away from

OCWD-MTBE-001-102498

the original source zone (underneath and around underground storage tank systems) into deeper soil and groundwater, decreasing the feasibility and increasing the cost of cleanup and placing drinking water supplies at risk. ARCO and Thrifty responsiveness to agency directives requiring site assessment and cleanup of their MTBE and gasoline contaminated sites began to improve *only after* the District Attorney demanded their compliance with such directives and notified them of the District Attorney's intention to seek the imposition of civil penalties for their failure to do so.

111. Records of the OCHCA and other local agencies responsible for the permitting and inspection of gas station facilities and underground storage tank systems in Orange County also reveal numerous instances where ARCO and/or Thrifty violated the laws and regulations pertaining to the ownership and operation of underground storage tank systems. These violations include, but are not limited to, failing to obtain appropriate permits; failing to meet structural requirements for underground storage tanks, including structural "upgrades" required to be completed by December 22, 1998; failing to conduct leak detection monitoring; tampering with leak detection monitoring equipment; failing to conduct tank integrity tests or failing to submit the results of tank integrity tests to the local regulatory agency; failing to properly close underground storage tanks no longer in use; and failing to operate underground storage tank systems in a manner preventing unauthorized releases.

112. The failure of ARCO and Thrifty to meet minimum state and federal requirements pertaining to the ownership and operation of underground storage tanks increased the likelihood that gasoline releases would occur and/or go undetected, and such releases did in fact occur.

113. Current and former state and federal requirements pertaining to construction, maintenance, testing, leak detection monitoring and other operational requirements for underground storage tank systems are inadequate and have not been reliable in preventing, minimizing or detecting leaks from such systems. Defendants at all times relevant herein were in possession of information regarding extensive and widespread releases of gasoline to the environment from underground storage tank systems on a nationwide basis even when such

OCWD-MTBE-001-102499

systems were in apparent compliance with minimum structural and operational requirements. ARCO, ARCO Chemical, Lyondell, BP and Thrifty knew or should have known that compliance with minimum state and federal requirements pertaining to the construction and operation of underground storage tank systems could not be relied upon to prevent, minimize or detect widespread leaks from underground storage tank systems.

114.    Not only should ARCO and Thrifty have complied with minimum state and federal requirements pertaining to the ownership and operation of underground storage tanks in Orange County (which in numerous instances they did not do), they should have taken additional leak prevention and detection measures given the apparent unreliability of underground storage tank systems that actually are in compliance with minimum requirements in preventing and detecting leaks and given the risks posed by MTBE once released to groundwater. ARCO and Thrifty knew or should have known that many of the underground storage tank systems they owned and/or operated in Orange County were (and are) located directly above one of the largest below ground drinking water sources in California which should have prompted them to take additional containment, leak detection and cleanup measures.

115.    ARCO Chemical and Lyondell prior to the sale and distribution of MTBE should have recommended additional containment and leak detection measures be taken by gasoline suppliers and retailers given their knowledge of the widespread occurrence of gasoline releases to the environment from leaking underground storage tank systems and the risks posed by MTBE once released to groundwater.

## FIRST CAUSE OF ACTION

## VIOLATION OF CIVIL CODE SECTIONS 3479 AND 3480

### Public Nuisance Against All Defendants

116.    The People reallege and incorporate by reference paragraphs 1 through 115, inclusive, as though set forth fully and at length herein.

117.    The unauthorized release of gasoline and/or MTBE to groundwater, and to soil where such releases are likely to reach groundwater, constitutes a nuisance. Each such gasoline

OCWD-MTBE-001-102500

and/or MTBE release is a continuing nuisance unless and until the gasoline and/or MTBE has been removed from groundwater and soil. Gasoline and MTBE contamination may be abated at the source of release ("source zone"). Groundwater contaminated with gasoline and MTBE surrounding the source zone may also be captured ("capture zone") and treated at the release site (typically a gas station). As MTBE contamination migrates away from the source and capture zones into deeper aquifers. it becomes far more difficult if not impossible to abate, thereby changing the nuisance from continuing to permanent. Once MTBE contamination reaches a production well or the aquifer from which such wells draw, the damage to water is complete. Abatement measures at this stage are extremely difficult, costly and time consuming. As in Santa Monica. a treatment system may be utilized at the well head in an attempt to clean MTBE contaminated water. but replacement water must be obtained to make up for the lost water supply at a far greater expense (approximately three and one half times the cost).

118. At times relevant herein, ARCO, BP and Thrifty created and/or maintained a public nuisance at numerous gasoline release sites in Orange County where Benzene, Toluene, Ethylbenzene and Xylene and/or MTBE have contaminated, continue to contaminate and threaten to contaminate groundwater and soil in close proximity to groundwater in violation of Civil Code sections 3479 and 3480. There are approximately sixty (74) of these release sites owned and previously owned by ARCO and controlled by BP, and approximately forty-two (42) more owned by Thrifty which are leased to ARCO and controlled by BP.

119. At times relevant herein ARCO Chemical and Lyondell aided, abetted, assisted and acted in concert with ARCO. BP, and Thrifty in the creation and maintenance of the nuisances as described in paragraphs 117 and 118 herein .

120. Each site where MTBE and/or gasoline (including its constituents Benzene, Toluene, Ethylbenzene and Xylene) contaminates, or threatens to contaminate, groundwater or drinking water supplies constitutes a separate and continuing nuisance subject to abatement.

121. Any site where MTBE and/or gasoline (including its constituents Benzene, Toluene, Ethylbenzene and Xylene) contamination has migrated offsite to a location or locations where such contamination is not subject to abatement constitutes a permanent nuisance justifying

OCWD-MTBE-001-102501

1  an award of damages.

2      122.   In addition to the MTBE and gasoline contaminant plumes in groundwater

3  constituting a public nuisance, underground storage tank systems owned and/or operated by

4  defendants ARCO, BP and Thrifty which are not properly designed, constructed, installed,

5  maintained or operated so as to adequately prevent the release of gasoline and MTBE to the

6  environment constitute a continuing public nuisance.

7                              **SECOND CAUSE OF ACTION**

8              **VIOLATION OF HEALTH AND SAFETY CODE SECTION 25249.5**

9    **Proposition 65: Unlawful Discharge to Drinking Water Against ARCO, BP and Thrifty**

10     123.   The People reallege and incorporate by reference paragraphs 1 through 122,

11  inclusive, as though set forth fully and at length herein.

12     124.   At times relevant herein, ARCO, BP and Thrifty in the course of doing business

13  knowingly discharged or released Benzene, a chemical known by the state to cause cancer, and

14  Toluene, a chemical known by the state to cause reproductive toxicity, into water or onto land

15  where such chemicals have passed or probably will pass into a source of drinking water at

16  numerous gasoline release sites in Orange County.  There are approximately sixty (74) of these

17  discharge sites owned by ARCO and controlled by BP and forty-two (42) more of these

18  discharge sites owned by Thrifty which are leased to ARCO and controlled by BP.  However,

19  Plaintiff excludes from its SECOND CAUSE OF ACTION the ARCO owned sites identified in

20  Exhibit "C" and the Thrifty owned and ARCO operated sites identified in Exhibit "D" which

21  exhibits are attached hereto and incorporated by reference as though set forth fully and at length

22  herein.

23     125.   ARCO, BP and Thrifty knew that a substantial number of their underground

24  storage tank systems had leaked, were leaking and would continue to leak gasoline, including

25  benzene and toluene, into the groundwater of Orange County.  ARCO, BP and Thrifty failed to

26  take appropriate action to prevent the initial releases of benzene and toluene from underground

27  storage tank systems owned and/or operated by them, or to subsequently cleanup such releases.

28  The failure of ARCO, BP and Thrifty to timely cleanup known releases of benzene and toluene

OCWD-MTBE-001-102502

resulted in the migration of these chemicals to deeper groundwater supplies. ARCO, BP and Thrifty knowingly discharged benzene and toluene into water where such chemicals would probably pass into a source of drinking water not only by allowing the initial discharge of chemicals from their leaking underground storage tanks but also by failing to timely cleanup and allowing the migration and further discharge of these chemicals into sources of drinking water.

### THIRD CAUSE OF ACTION

### VIOLATION OF FISH AND GAME CODE SECTION 5650

### Deposit of Petroleum and Other Substances Deleterious to Fish, Plant or Bird Life into Waters of the State Against All Defendants

126. The People reallege and incorporate by reference paragraphs 1 through 122, inclusive, as though set forth fully and at length herein.

127. ARCO, BP and Thrifty at times relevant herein deposited in, and permitted to pass into, or placed where it can pass into the waters of this state petroleum and/or residuary products of petroleum, including gasoline and its constituents Benzene, Toluene, Ethylbenzene and Xylene, in violation of Fish and Game Code Section 5650(a)(1).

128. Each of the defendants at times relevant herein deposited in, and permitted to pass into, or placed where it can pass into the waters of this state MTBE, a substance deleterious to fish, plant life, or bird life in violation of Fish and Game Code Section 5650(a)(6).

129. ARCO, BP and Thrifty at times relevant herein deposited in, and permitted to pass into, or placed where it can pass into the waters of this state gasoline, including its constituents Benzene, Toluene, Ethylbenzene and Xylene, which are substances deleterious to fish, plant life, or bird life in violation of Fish and Game Code section 5650(a)(6).

### FOURTH CAUSE OF ACTION

### VIOLATION OF HEALTH AND SAFETY CODE SECTION 25189.2(c)

### Unlawful Disposal of Hazardous Waste Against All Defendants

130. The People reallege and incorporate by reference paragraphs 1 through 122, inclusive, as though set forth fully and at length herein.

131. ARCO, BP and Thrifty at times relevant herein violated section 25189.2(c) of the

OCWD-MTBE-001-102503

Health and Safety Code by disposing of, or causing the disposal of, the following hazardous wastes at a point not authorized by Chapter 6.5 of Division 20 of the Health and Safety Code: Benzene; Toluene; Ethylbenzene; Xylene; and gasoline. Each of these wastes is hazardous within the meaning of Health and Safety Code section 25117, whether disposed of alone or in combination with one or more of the others.

132.    Defendants, and each of them, at times relevant herein violated section 25189.2(c) of the Health and Safety Code by disposing of, or causing the disposal of, a hazardous waste, Methyl Tertiary-Butyl Ether (MTBE), at a point not authorized by Chapter 6.5 of Division 20 of the Health and Safety Code. MTBE waste is hazardous within the meaning of Health and Safety Code section 25117.

## FIFTH CAUSE OF ACTION

### VIOLATION OF HEALTH AND SAFETY CODE SECTION 25299.37 AND REGULATIONS ENACTED PURSUANT TO HEALTH AND SAFETY CODE SECTION 25299.7

**Failure to Take Corrective Action or Appropriate Corrective Action in Response to Unauthorized Releases Against Defendants ARCO, BP and Thrifty**

133.    The People reallege and incorporate by reference paragraphs 1 through 122, inclusive, as though set forth fully and at length herein.

134.    ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299.37(a) by failing to take corrective action in response to unauthorized releases of motor vehicle fuel from underground storage tank systems owned, operated or leased by them as required by Article 4 of Chapter 6.75 of Division 20 of the Health and Safety Code and the corrective action regulations adopted pursuant to Health and Safety Code section 25299.77

135.    ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299.37(b) by conducting corrective action which did not ensure protection of human health, safety, and the environment or which was not consistent with applicable waste discharge requirements, state policies for water quality control or water quality control plans.

136.    ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code

OCWD-MTBE-001-102504

section 25299.37(c)(1) by failing, upon oral or written order, direction, notification or approval of the local agency or regional board, to prepare corrective action work plans that detail the actions they will take at various sites to comply with Health and Safety Code sections 25299.37(a) and 25299.37(b) and the corrective action regulations adopted pursuant to Health and Safety Code section 25299.77.

137.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299.37(c)(2) by preparing work plans not in accordance with the corrective action regulations adopted pursuant to section 25299.77 or which did not include a schedule and timeline for corrective action.

138.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code Section 25299.37(c)(5) by failing to conduct corrective action at various sites in accordance with work plans approved by the local agency or regional board pursuant to Health and Safety Code Section 25299.37(c).

139.   ARCO BP and Thrifty at times relevant herein violated numerous sections of Title 23 of the California Code of Regulations, Division 3, Chapter 16, Articles 5 and 11, of the California Underground Storage Tank Regulations related to the assessment, mitigation and cleanup of leaking underground storage tank sites by responsible parties. All further references to these regulations shall be by title and section number only.

140.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2721(b) by failing to take corrective action in compliance with the requirements of Chapter 6.7 of Division 20 of the Health and Safety Code and the regulations promulgated thereto.

141.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2722(b) by failing to take interim remedial action to abate or correct the actual or potential effects of unauthorized releases of motor vehicle fuel from underground storage tank systems owned and/or operated by them or onto land owned, leased, or controlled by them.

142.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2722© by failing to submit to the relevant regulatory agencies work plans for proposed preliminary site assessment activities or as directed by such regulatory agencies.

OCWD-MTBE-001-102505

143.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2722(d) by failing to submit work plans that include proposed corrective action or a proposed schedule for corrective action, or by failing to modify work plans for corrective action as directed by the relevant regulatory agencies.

144.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2723(a) by failing in to conduct initial site investigation, initial abatement actions or initial site characterization in accordance with Title 23, sections 2652, 2653 and 2654, or interim remedial action in accordance with Title 23, section 2722(b).

145.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2724 by failing to conduct investigations of the unauthorized releases, the release sites or the surrounding areas possibly affected by unauthorized releases of motor vehicle fuel as required by Tile 23, section 2724.

146.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2725(a) by failing to collect and analyze data necessary to assess the nature and vertical and lateral extent of unauthorized releases of motor vehicle fuel from underground storage tank systems owned and/or operated by them or onto land owned, leased, or controlled by them or to determine a cost effective method of cleanup for such unauthorized releases.

147.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2725(b) by failing to propose corrective action plans using information obtained during the Soil and Water Investigation Phase.

148.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2725© by failing to submit corrective action plans to the regulatory agencies for review and concurrence or to modify such corrective action plans in response to regulatory agency directives.

149.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2725(d) by failing to include in corrective action plans all required items and information.

150.   ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2726(a) by failing to carry out the selected corrective action alternative for remediation or mitigation of the actual or potential adverse effects of unauthorized releases.

OCWD-MTBE-001-102506

151.    ARCO, BP and Thrifty at times relevant herein violated Tile 23, section 2726(b) by failing to implement corrective action plans upon approval by the regulatory agencies, or to implement them as directed by the regulatory agencies, or to monitor, evaluate, or report the results of implementation of corrective action to the regulatory agencies.

152.    ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2727(a) by failing to verify implementation of the corrective action plan or to evaluate the effectiveness of the site work.

153.    ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2727(b) by failing to verify completion of the corrective action plans or to evaluate the effectiveness of site work.

154.    ARCO, BP and Thrifty at times relevant herein violated Title 23, section 2727© by failing to submit monitoring data or an evaluation of monitoring results in writing on a schedule and for a duration agreed to by the regulatory agencies.

## SIXTH CAUSE OF ACTION

## VIOLATION OF HEALTH AND SAFETY CODE SECTION 25299

## AND REGULATIONS ENACTED PURSUANT THERETO

**Failure to Comply with Owner/Operator Requirements for Underground Tank Systems**

**Against Defendants ARCO, BP and Thrifty**

155.    The People reallege and incorporate by reference paragraphs 1 through 122, inclusive, as though set forth fully and at length herein.

156.    ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(a)(1) by operating underground tank systems which had not been issued permits.

157.    ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(a)(2) by failing to comply with all applicable permit requirements for the operation of underground tank systems.

158.    ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(a)(3) by failing to maintain records as required by Chapter 6.7 of Division 20 of the Health and Safety Code and/or the regulations adopted pursuant to Health and Safety Code

OCWD-MTBE-001-102507

section 25299.3.

159.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(a)(4) by failing to report unauthorized releases from their underground storage tank systems.

160.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(a)(5) by failing to properly close underground tank systems as required by Health and Safety Code Section 25298.

161.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(a)(6) by violating applicable requirements of Chapter 6.7 of Division 20 of the Health and Safety Code and/or the regulations adopted pursuant to Health and Safety Code Section 25299.3.

162.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25292.1(a) by failing to operate underground tank systems to prevent unauthorized releases of motor vehicle fuel.

163.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(b)(1) by failing to obtain permits as required by law.

164.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(b)(2) by failing to repair or upgrade underground tank systems as required by law.

165.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(b)(3) by abandoning or improperly closing underground tank systems.

166.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(b)(4) by their knowing failure to take reasonable and necessary steps to assure compliance with applicable laws and regulations by the operators of an underground storage tank systems.

167.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code section 25299(b)(5) by failing to comply with all applicable requirements of the permit issued for the operation of an underground tank system.

168.   ARCO, BP and Thrifty at times relevant herein violated Health and Safety Code

OCWD-MTBE-001-102508

section 25299(b)(6) by failing to comply with applicable requirements of Chapter 6.7 of Division 20 of the Health and Safety Code and/or the regulations adopted pursuant to Health and Safety Code Section 25299.3.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200

### Acts of Unlawful, Unfair and Fraudulent Business Practice Against All Defendants

169.    The People reallege and incorporate by reference paragraphs 1 through 168, inclusive, as though set forth fully and at length herein.

170.    Defendants, and each of them, at times relevant herein committed business acts and practices which are unlawful, unfair or fraudulent in violation of Business and Professions Code section 17200. These acts and practices include, but are not limited to, the following:

A.    All of the acts, practices and violations of law as alleged in paragraphs 116 through 168 of the First through Sixth Causes of Action, inclusive, which the People reallege and incorporate by reference as though set forth fully and at length herein.

B.    Defendants, and each of them, at times relevant herein have not cleaned up discharges of Methyl Tertiary-Butyl Ether (MTBE) which pose a threat to drinking water, or to groundwater that may reasonably be used for drinking water, as required by Section 13285 of the Water Code.

C.    Defendants, and each of them, at times relevant herein and in violation of a prohibition issued by the regional board or state board intentionally or negligently discharged MTBE waste, or caused or permitted MTBE waste to be deposited where it discharged, into the waters of the state and created a condition of pollution or nuisance in violation of Section 13350(a)(2) of the Water Code.

D.    ARCO, BP and Thrifty at times relevant herein and in violation of a prohibition issued by the regional board or state board intentionally or negligently discharged BTEX and gasoline waste, or caused or permitted BTEX and gasoline waste to be deposited where it discharged, into the waters of the state and created a condition of pollution or nuisance in violation of Section 13350(a)(2) of the Water Code.

OCWD-MTBE-001-102509

E.   ARCO, BP and Thrifty at times relevant herein caused or permitted residuary products of petroleum to be deposited in or on waters of the state in violation of Section 13350(a)(3) of the Water Code.

F.   Defendants, and each of them, at times relevant herein caused or permitted a hazardous substance (MTBE) to be discharged in or on waters of the state where it created a condition of pollution or nuisance in violation of Section 13350(b)(1) of the Water Code.

G.   ARCO, BP and Thrifty at times relevant herein caused or permitted hazardous substances (Benzene, Toluene, Ethylbenzene, Xylene and gasoline) to be discharged in or on waters of the state where they created a condition of pollution or nuisance in violation of Section 13550(b)(1) of the Water Code.

H.   Defendants, and each of them, at times relevant herein caused the degradation of groundwater quality in the Santa Ana River Basin to the detriment of the peace, health, safety and welfare of the people of the state of California and the County of Orange in contravention of the express intent of the legislature to prevent such degradation and protect the waters of the state as declared in Sections 102, 104, 12922, 12922.1, 13000 and other sections of the Water Code.

I.   Defendants, and each of them, at times relevant herein violated the State Board antidegradation policy established for waters of the state in Resolution No. 68-16 "Statement of Policy with Respect to Maintaining High Quality Waters of California".

J.   ARCO, BP and Thrifty at times relevant herein violated the State Board policy established for the investigation and cleanup of releases from underground storage tanks in Resolution No. 92-49 "Policies and Procedures for Investigation and Cleanup and Abatement of Discharges".

K.   Defendants, and each of them, at times relevant herein violated the Regional Board policy contained in the 1995 Water Quality Control Plan for the Santa Ana River Basin which establishes that groundwaters of the region shall not contain, as a result of controllable water quality factors, taste or odor-producing substances at concentrations which cause a nuisance or adversely affect beneficial uses.

OCWD-MTBE-001-102510

L.    Defendants, and each of them, at times relevant herein violated the Regional Board policy contained in the 1995 Water Quality Control Plan for the Santa Ana River Basin which establishes that all waters of the region shall be maintained free of substances in concentrations which are toxic, or that produce detrimental physiological responses in human, plant or aquatic life.

M.    Defendants, and each of them, at times relevant herein conspired to commit an act or acts injurious to the public health in violation of Section 182(a)(5) of the Penal Code.

N.    ARCO, BP and Thrifty at times relevant herein should have but did not begin cleanup of soil and water after submitting a corrective action plan but before such plan had been approved by the regulatory agency as authorized by Section 25299.37(c)(5) of the Health and Safety Code in the interest of minimizing environmental contamination and promoting prompt cleanup.

**WHEREFORE PLAINTIFF PRAYS THAT:**

1.    Pursuant to Civil Code sections 3479 and 3480, Code of Civil Procedure section 731, Business and Professions Code section 17203, Health and Safety Code sections 25299.01 and 25249.7 and Fish and Game Code section 5650.1, defendants, and each of them, be ordered to effectively and expeditiously cleanup and abate contaminant plumes consisting of gasoline, its constituent chemicals Benzene, Toluene, Ethylbenzene and Xylene, and the chemical additive MTBE declared by the court to constitute a public nuisance or which were otherwise caused by their violation of the laws, statutes and policies set forth in the First through Seventh Causes of Action herein.

2.    Pursuant to Code of Civil Procedure section 731, defendants, and each of them, be ordered to pay damages according to proof where cleanup and abatement of contaminated groundwater cannot be achieved and has resulted in the creation of a permanent nuisance.

3.    Pursuant to Code of Civil Procedure section 731, Business and Professions Code section 17203, Health and Safety Code sections 25299.01 and 25249.7 and Fish and Game Code section 5650.1, defendants, and each of them be temporarily, preliminarily, and thereafter

OCWD-MTBE-001-102511

1  permanently restrained and enjoined from engaging in the acts alleged in this complaint which

2  violate the laws, regulations and policies as set forth herein.

3      4.    Pursuant to Health and Safety Code sections 25299, 25299.76, 25249.7 and

4  25189.2, Business and Professions Code section 17206 and Fish and Game Code section 5650.1,

5  defendants, and each of them, be assessed and plaintiff recover civil penalties for each violation

6  of law proved at trial.

7      5.    Pursuant to Business and Professions Code section 17203 and the inherent

8  equitable powers of the Court, the Court order defendants, and each of them, to disgorge profits

9  obtained as a result of their unlawful, unfair and fraudulent business practices.

10      6.    The Court order such other and further relief as the Court deems proper to fully

11  and successfully dissipate the adverse effects of defendants unlawful acts and to prevent

12  defendants from committing such unlawful acts in the future.

13

14  TONY RACKAUCKAS, DISTRICT ATTORNEY
    COUNTY OF ORANGE, STATE OF CALIFORNIA

15  DATED: _____

16  BY: _____
    MICHELLE M. LYMAN
    DEPUTY DISTRICT ATTORNEY

17

18

19

20

21

22

23

24

25

26

27

28

OCWD-MTBE-001-102512

EXHIBIT A

OCWD-MTBE-001-102513

## EXHIBIT A

301 S. Anaheim Blvd.
Anaheim, CA

301 S. Euclid Ave.
Anaheim, CA

530 N. Brookhurst St.
Anaheim, CA

700 S. State College
Anaheim, CA

1000 N. State College
Anaheim, CA

1037 W. Ball Road
Anaheim, CA

1201 S. Brookhurst St.
Anaheim, CA

1700 W. La Palma Ave.
Anaheim, CA

1801 S. State College
Anaheim, CA

2101 S. Harbor Blvd.
Anaheim, CA

2401 Lincoln Ave.
Anaheim, CA

2445 E. Ball Rd.
Anaheim, CA

2791 E. Lincoln Ave.
Anaheim, CA

3901 Riverdale Ave.
Anaheim, CA

5700 E. La Palma Ave.
Anaheim, CA

7760 Crescent Ave.
Buena Park, CA

7990 Knott Ave.
Buena Park, CA

300 Bristol
Costa Mesa, CA

1450 Baker St.
Costa Mesa, CA

2490 Fairview
Costa Mesa, CA

3003 Newport Blvd.
Costa Mesa, CA

3201 Harbor Blvd.
Costa Mesa, CA

4988 Ball Rd.
Cypress, CA

5012 Lincoln Ave.
Cypress, CA

34342 Coast Hwy.
Dana Point, CA

20572 Lake Forest
El Toro, CA

23742 El Toro Rd.
El Toro, CA

10975 Edinger Ave.
Fountain Valley, CA

17520 Brookhurst St.
Fountain Valley, CA

18025 Magnolia Ave.
Fountain Valley, CA

18480 Brookhurst St.
Fountain Valley, CA

18520 Brookhurst St.
Fountain Valley, CA

401 N. Placentia
Fullerton

519 Harbor Blvd.
Fullerton, CA

1000 W. Valencia Dr.
Fullerton, CA

1124 E. Chapman Ave.
Fullerton, CA

1202 E. Orangethorpe Ave.
Fullerton, CA

2045 Commonwealth
Fullerton, CA

2840 E. Imperial Hwy.
Fullerton, CA

9001 Garden Grove Blvd.
Garden Grove, CA

12502 Harbor Blvd.
Garden Grove, CA

13331 Euclid Ave.
Garden Grove, CA

13361 Harbor Blvd.
Garden Grove, CA

13482 Brookhurst St.
Garden Grove, CA

5981 Warner Ave.
Huntington Beach, CA

## EXHIBIT A (p. 2)

| | | |
|---|---|---|
| 6002 Bolsa Ave.<br>Huntington Beach, CA | 16501 Goldenwest Ave.<br>Huntington Beach, CA | 16502 Bolsa Ave.<br>Huntington Beach, CA |
| 16742 Beach Blvd.<br>Huntington Beach, CA | 17502 Goldenwest Ave.<br>Huntington Beach, CA | 18972 Beach Blvd.<br>Huntington Beach, CA |
| 21452 Brookhurst<br>Huntington Beach, CA | 1490 S. Harbor Blvd.<br>La Habra, CA | 5472 Orangethorpe<br>La Palma, CA |
| 24181 Moulton Parkway<br>Laguna Hills, CA | 27491 La Paz Rd.<br>Laguna Nigel, CA | 11171 Los Alamitos<br>Los Alamitos, CA |
| 23921 Alicia Parkway<br>Mission Viejo, CA | 25122 Marguerite Parkway<br>Mission Viejo, CA | 26001 La Paz Rd.<br>Mission Viejo, CA |
| 27682 Crown Valley Pkwy.<br>Mission Viejo, CA | 2100 S.E. Bristol Rd.<br>Newport Beach, CA | 100 N. Tustin Ave.<br>Orange, CA |
| 480 N. Glassell<br>Orange, CA | 883 N. Tustin Ave.<br>Orange, CA | 890 N. Batavia St.<br>Orange, CA |
| 1935 E. Katella Ave.<br>Orange, CA | 2937 E. Chapman<br>Orange, CA | 102 E. Yorba Linda Blvd.<br>Placentia, CA |
| 1201 E. Imperial Hwy.<br>Placentia, CA | 422 De La Estrella<br>San Clemente, CA | 2749 N. El Camino Real<br>San Clemente, CA |
| 302 W. First St.<br>Santa Ana, CA | 324 S. Grand Ave.<br>Santa Ana, CA | 1222 E. First St.<br>Santa Ana, CA |
| 1620 N. Broadway<br>Santa Ana, CA | 2245 S. Main St.<br>Santa Ana, CA | 2646 W. First St.<br>Santa Ana, CA |
| 2721 W. Edinger Ave.<br>Santa Ana, CA | 3414 S. Main St.<br>Santa Ana, CA | 490 Pacific Coast Hwy.<br>Seal Beach, CA |
| 13742 Red Hill Ave.<br>Tustin, CA | 13871 Red Hill Ave.<br>Tustin, CA | 14231 Red Hill Ave.<br>Tustin, CA |
| 14244 Newport Ave.<br>Tustin, CA | 6982 Westminster Ave.<br>Westminster, CA | 13142 Goldenwest<br>Westminster, CA |
| 14511 Brookhurst Ave.<br>Westminster, CA | 2361 La Palma Ave.<br>Yorba Linda, CA | 14493 Culver Drive<br>Irvine, CA |

**EXHIBIT A (p. 3)**

| | | |
|---|---|---|
| 2990 Bristol Street<br>Costa Mesa, CA | 5971 Lincoln Avenue<br>Buena Park, CA | 16751 Yorba Linda Blvd.<br>Yorba Linda, CA |
| 601 S. Magnolia Ave.<br>Anaheim, CA | 12422 Valley View Street<br>Garden Grove, CA | 3470 Fairview<br>Costa Mesa, CA |
| 2604 W. La Palma<br>Anaheim, CA | 3361 S. Bristol St.<br>Santa Ana, CA | 6370 Manchester Blvd.<br>Buena Park, CA |
| 2302 N. Grand Ave.<br>Santa Ana, CA | 490 East 17th Street<br>Costa Mesa, CA | |

OCWD-MTBE-001-102516

EXHIBIT B

OCWD-MTBE-001-102517

## EXHIBIT B

704 N. Bristol St.
Santa Ana, CA

120 E. Imperial Hwy.
Brea, CA

2016 W. 17th St.
Santa Ana. CA

2937 E. Chapman Ave.
Orange, CA

14121 Newport Ave.
Tustin, CA

291 S. Tustin St.
Orange, CA

304 S. Magnolia Ave.
Anaheim, CA

17475 Brookhurst St.
Fountain Valley, CA

1881 W. Ball Rd.
Anaheim, CA

799 W. 19th St.
Costa Mesa, CA

1539 Standard Ave.
Santa Ana, CA

751 Baker St.
Costa mesa, CA

7510 Orangethorpe Ave.
Buena Park, CA

101 E. Whittier Blvd.
La Habra, CA

718 S. Brea Blvd.
Brea, CA

2351 Orangethorpe Ave.
Fullerton, CA

9511 Valley View St.
Cypress, CA

2811 W. Lincoln Ave.
Anaheim, CA

300 S. Brookhurst St.
Anaheim, CA

2102 S. Harbor Blvd.
Anaheim, CA

2800 W. Ball Rd.
Anaheim, CA

11500 Beach Blvd.
Stanton, CA

727 S. East St.
Anaheim, CA

3101 E. La Palma Ave.
Anaheim, CA

2493 N. Tustin St.
Orange, CA

825 E. Katella Ave.
Orange, CA

6311 Westminster Blvd.
Westminster, CA

13501 Magnolia St.
Garden Grove, CA

13511 Euclid St.
Garden Grove, CA

14472 Brookhurst St.
Garden Grove, CA

2730 W. McFadden Ave.
Santa Ana, CA

2940 N. Bristol St.
Santa Ana, CA

801 N. Bristol St.
Santa Ana, CA

324 S. Grand Ave.
Santa Ana, CA

101 N. Tustin Ave.
Tustin, CA

15501 Edwards St.
Huntington Beach, CA

18520 Brookhurst St.
Fountain Valley, CA

18975 Magnolia St.
Fountain Valley, CA

19971 Beach Blvd.
Huntington Beach, CA

2021 Newport Blvd.
Costa Mesa, CA

590 S. Pacific Coast Hwy.
Laguna Beach, CA

590 Camino de Estrella
San Clemente, CA

114 S. Bristol St.
Santa Ana, CA

OCWD-MTBE-001-102518

EXHIBIT C

OCWD-MTBE-001-102519

# EXHIBIT C

1201 S. Brookhurst St.
Anaheim, CA

1450 Baker St.
Costa Mesa, CA

3201 Harbor Blvd.
Costa Mesa, CA

1202 E. Orangethorpe Ave.
Fullerton, CA

13482 Brookhurst St.
Garden Grove, CA

530 N. Brookhurst St.
Anaheim, CA

23742 El Toro Rd.
Lake Forest, CA

2840 E. Imperial Hwy.
Fullerton, CA

5981 Warner Ave.
Huntington Beach, CA

21452 Brookhurst
Huntington Beach, CA

17502 goldenwest Ave
Huntington Beach, CA

2245 S. Main St.
Santa Ana, CA

2646 W. First St.
Santa Ana, CA

OCWD-MTBE-001-102520

EXHIBIT **D**

OCWD-MTBE-001-102521

## EXHIBIT D

704 N. Bristol St.
Santa Ana, CA

799 W. 19th St.
Costa Mesa, CA

7510 Orangethorpe Ave.
Buena Park, CA

13501 Magnolia St.
Garden Grove, CA

2730 W. McFadden Ave.
Santa Ana, CA

324 S. Grand Ave.
Santa Ana, CA

2021 Newport Blvd.
Csota Mesa, CA

17475 Brookhurst St.
Fountain Valley, CA

1539 Standard Ave.
Santa Ana, CA

9511 Valley View St.
Cypress, CA

13511 Euclid St.
Garden Grove, CA

2016 W. 17th St.
Santa Ana, CA

1881 W. Ball Rd.
Anaheim, CA

751 Baker St.
Costa Mesa, CA

718 S. Brea Blvd.
Brea, CA

2800 W. Ball Rd.
Anaheim, CA

801 N. Bristol St.
Santa Ana, CA

19971 Beach Blvd.
Huntington Beach, Ca

OCWD-MTBE-001-102522

1                   PROOF OF PERSONAL SERVICE

2        I, Matthew I. Kaplan, declare:

3        I am employed in the County of Orange, California; I am

4   over the age of eighteen years of age and not a party to the

5   within action; my business address is Orange County District

6   Attorney's Office, 401 Civic Center Drive West, Santa Ana,

7   California 92701.

8        On September 14, 2000, I served the attached **THE PEOPLE'S**

9   **NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A FIRST AMENDED**

10  **COMPLAINT; MEMORANDUM OF POINTS OF AUTHORITIES; DECLARATION OF**

11  **MICHELLE M. LYMAN** on the interested parties in this action by

12  delivering a true and correct copy of the original by hand to

13  the following address:

14               Joseph Butler
                 Beth Dorris
15               McKenna & Cuneo, LLP
                 444 South Flower Street
16               8th Floor
                 Los Angeles, California 90017
17
         I declare under penalty of perjury under the laws of the
18
     State of California and the United States of America that the
19
     foregoing is true and correct.
20
         Executed on September 14, 2000, in Santa Ana, California.
21

22
                              Signature:    _____
23
                              Printed Name:  _____
24

25

26

27

28
                              - 6 -
     People's Notice of Motion and Motion for Leave to File Amended Complaint

Exhibit C

**BP Locations Subject To OCWD Claims**

**As Of April 2007***

| Focus Plumes | Stations | Address | City | OCDA Judgment and Release Site |
|---|---|---|---|---|
| 1 | Arco #1887 | 16742 Beach Blvd. | Huntington Beach | 28 |
| 2 | Arco #6131 | 3201 Harbor Blvd. | Costa Mesa | 74 |
| 3 | Arco #1912 | 18480 Brookhurst St. | Fountain Valley | 31 |
| 3 | Thrifty #383 | 18520 Brookhurst St. | Fountain Valley | 110 |
| 3 | Arco #1905 | 18025 Magnolia St. | Fountain Valley | 30 |
| 8 | Arco #3085 | 3361 S. Bristol St. | Santa Ana | 47 |
| 9 | Thrifty #368 | 6311 Westminster Blvd. | Westminster | 102 |
| 9 | Huntington Beach Arco | 6002 Bolsa Ave. | Huntington Beach | 123 |
| D2 (63) | Arco #6036 | 13142 Goldenwest St. | Westminster | 66 |

| Dropped Focus Plumes/Dismissed Sites | Stations | Address | City | OCDA Judgment and Release Site |
|---|---|---|---|---|
| 2 | Arco #3083 | 3470 Fairview Rd. | Costa Mesa | 46 |
| 4 | Thrifty #376 | 801 N. Bristol St. | Santa Ana | 107 |
| 4 | Thrifty #008 | 704 N. Bristol St. | Santa Ana | 1** |
| 6 | Thrifty #085 | 17475 Brookhurst | Fountain Valley | 85 |
| 6 | Arco #6116 | 17520 Brookhurst | Fountain Valley | 73 |
| 7 | Arco #1994 | 700 S. State College Blvd. | Anaheim | 36 |
| 11 | Arco Master Auto Repair | 2604 W. La Palma Ave. | Anaheim | 119 |

| Non-Focus Plumes | Stations | Address | City | OCDA Judgment and Release Site |
|---|---|---|---|---|
| 13 | Thrifty #150 | 1539 Standard Avenue | Santa Ana | 87 |
| 14 | Arco #1055 | 9001 Garden Grove Blvd. | Garden Grove | 11 |
| 23 | Arco #6071 | 3414 S. Main St. | Santa Ana | 69 |
| 24 | Thrifty #075 | 14121 Newport Blvd. | Tustin | 82 |
| 24 | Arco #1077 | 13742 Red Hill Ave. | Tustin | 14 |
| 24 | Arco #3045 | 14231 Red Hill Ave. | Tustin | 41 |
| 25 | Arco #5185 | 1450 Baker St. | Costa Mesa | 58 |
| 26 | Thrifty #385 | 19971 Beach Blvd. | Huntington Beach | 112 |
| 29 | Arco #1998 | 5472 Orangethorpe Ave. | La Palma | 63 |
| 33 | Thrifty #014 | 120 E. Imperial Hwy. | Brea | 79 |
| 33 | Thrifty #302 | 718 S. Brea Blvd. | Brea | 91 |
| 34 | Arco #3080 | 2840 E. Imperial Hwy. | Fullerton | 45 |
| 37 | Arco #0629 | 13482 Brookhurst St. | Garden Grove | 7 |
| 38 | Arco #3042 | 13331 Euclid St. | Garden Grove | 40 |
| 38 | Thrifty #371 | 13511 Euclid Street | Garden Grove | 104 |
| 39 | Arco #0192 | 2100 SE. Bristol St. | Santa Ana | 3 |
| 42 | Arco #3053 | 5981 Warner Ave. | Huntington Beach | 43 |
| 44 | Thrifty #182 | 7510 Orangethorpe Ave. | Buena Park | 89 |
| 47 | Arco #6060 | 21452 Brookhurst St. | Huntington Beach | 67 |
| 48 | Thrifty #386 | 2021 Newport Ave. | Costa Mesa | 113 |
| 53 | Arco #1047 | 2646 W. 1st St. | Santa Ana | 10 |
| 54 | Arco #1064 | 14511 Brookhurst St. | Westminster | 12 |
| 55 | Arco #1583 | 7990 Knott Avenue | Buena Park | 18 |
| 56 | Arco #1812 | 16502 Bolsa Chica St. | Huntington Beach | 25 |
| 57 | Arco #1888 | 16501 Goldenwest St. | Huntington Beach | 29 |
| 58 | Arco #3016 | 12422 Valley View Street | Garden Grove | 38 |
| 60 | Arco #3094 | 530 N. Brookhurst Avenue | Anaheim | 50 |
| 61 | Arco #5084 | 490 E. 17th St. | Costa Mesa | 54 |
| 62 | Arco #5202 | 12502 Harbor Blvd. | Garden Grove | 59 |
| 64 | Arco #6160 | 13361 Harbor Blvd | Garden Grove | 76 |
| 65 | Arco #6191 | 17502 Golden West St. | Huntington Beach | 77 |
| 66 | Arco #6226 | 102 E. Yorba Linda Blvd. | Placentia | 78 |

**BP Locations Subject To OCWD Claims**
**As Of April 2007***

| Non-Focus Plumes | Stations | Address | City | OCDA Judgment and Release Site |
|---|---|---|---|---|
| 99 | Arco #6079 | 3901 Riverdale Ave. | Anaheim | 70 |
| 100 | Thrifty #015 | 2016 W. Seventeenth Street | Santa Ana | 80 |
| 101 | Thrifty #139 | 799 W. 19th Street | Costa Mesa | 86 |
| 102 | Thrifty #151 | 751 Baker St. | Costa Mesa | 88 |
| 103 | Thrifty #356 | 9511 Valley View St. | Cypress | 61 |
| 104 | Thrifty #360 | 2800 W. Ball Road | Anaheim | 96 |
| 105 | Thrifty #361 | 11500 Beach Boulevard | Stanton | 97 |
| 106 | Thrifty #370 | 13501 Magnolia Ave. | Garden Grove | 103 |
| 107 | Thrifty #374 | 2730 McFadden Ave. | Santa Ana | 105 |
| 108 | Thrifty #380 | 15501 Edwards Street | Huntington Beach | 109 |
| 109 | Thrifty #384 | 18795 Magnolia Blvd. | Fountain Valley | 111 |
| 110 | Arco #1072 | 1202 E. Orangethorpe Ave. | Fullerton | 13 |

*Includes Locations Subject To Claims Identified As "Nonripe" By OCWD In February 2009
**Site appears on Exhibit B to Judgment.  All others appear on Exhibit A.

Exhibit D



# ORANGE COUNTY WATER DISTRICT

# Memo

**To:** Orange County Water District Producers

**From:** John Kennedy

**CC:** Orange County Water District Board Members, Bill Mills

**Date:** October 20, 2000

**Re:** Copy of Orange County District Attorney's Complaint Against ARCO et al

---

Attached Orange County District Attorney's Complaint Against ARCO is provided for your information, also included are a related press release and news clippings.

OCWD-MTBE-001-102465



# Orange County District Attorney
## *Press Release*

TONY RACKAUCKAS, District Attorney
401 Civic Center Drive West
Santa Ana, CA 92701

**FOR IMMEDIATE RELEASE**
Oct. 19, 2000

Contact:    DDA Michelle Lyman
(714) 347-8720

# ARCO and Thrifty Oil Prosecuted for Polluting Groundwater

SANTA ANA --- The Orange County District Attorney's Office has filed a major lawsuit against two oil companies who have been accused of polluting the soil and/or groundwater at stations in 25 cities.

Defendants Atlantic Richfield Co., Thrifty Oil Co., BP Amoco Corp., ARCO Chemical Corp. and Lyondell Chemical Co. have known since the 1980s that their national network of underground storage tanks leak gasoline into the environment, but did not stop it, according to the complaint. Locally, ARCO and Thrifty have known for more than 10 years about groundwater contamination caused by some of their tanks.

The original complaint, which names only Atlantic Richfield (ARCO), was filed on Jan. 6, 1999. It was amended on Oct. 5, 2000 to include the additional defendants, allege contamination at 116 gas stations countywide, and allege operational violations. Pollution of this nature caused by ARCO, Thrifty and other gas stations could cause Orange County to lose a substantial portion of its water supply.

For example, in one area of North Orange County, groundwater pollution is so bad that two wells cannot be used to provide drinking water to the city of Yorba Linda. The source of this pollution has not been determined.

Since the filing of the original complaint, prosecutors have negotiated with ARCO to start performing required cleanup at their gas stations. Prosecutors have also tried to settle this case since the original filing and renewed their efforts over the past two weeks but unfortunately could not reach an agreement.

Contaminants that have been released into the groundwater include benzene, which may cause cancer; toluene, which adversely affects the brain; and MTBE, which causes drinking water to taste like turpentine and is a suspected carcinogen.

more

OCWD-MTBE-001-102466

According to the complaint, 102 sites have groundwater contamination – 60 involving ARCO and 42 involving Thrifty. Fourteen additional ARCO sites have soil contamination only. Cleanup of all sites is underway, but could take years to complete.

The complaint also alleges hundreds of underground storage tank operational violations such as tampering with leak-detection equipment, failing to perform proper maintenance on their tanks, and operating faulty equipment.

These violations came to the attention of the District Attorney's Office at the end of 1998 when an environmental watchdog group took steps to file a lawsuit. Under the Safe Drinking Water and Toxic Enforcement Act of 1986, district attorneys are notified of any citizen attempt to file a lawsuit and are given the option of taking over the prosecution. This is what happened in this case.

No other district attorney's office in the state is known to have tackled a case involving so many gas stations. The last oil company prosecution in Orange County was very successful, leading to a change in state law. In 1998, Mobil Oil settled a lawsuit for $1 million for tampering with tank monitoring equipment. As a result, a new law was created that allows prosecutors to file such violations as a criminal case rather than a civil matter.

Fines for operational violations range from $500 to $5,000 a day. Penalties for violating cleanup requirements on each gas station can reach $10,000 per day.

###

RW

*Los Angeles Times – Orange County Edition*
Friday, October 20, 2000
Page B1



An ARCO gas station with soil or ground-water contamination at Brookhurst Street and Ellis Avenue in Fountain Valley.

ROBERT LACHMAN
Los Angeles Times

# Pollution Lawsuit

Prosecutors accuse two oil companies of polluting the ground water with fuel leaking from more than 100 gas stations across the county, saying that the pollution is a threat to the drinking water supply. How pollution affects the supply:

## Cross-section of aquifer along Santa Ana River



| Early wells: | Current wells: | Future wells: | Clay layers help filter | Arrows show |
|---|---|---|---|---|
| About 300' deep. | About 1,000' deep | May go deeper into aquifer | water, keep pollutants from directly migrating to wells | ground-water movement |

Anaheim

Huntington Beach

Orange County Water District boundaries

**SHALLOW AQUIFER** less than 500' deep When county was mostly rural, wells were shallower.

**PRIMARY AQUIFER** 500' to 2,000' deep Salt from fertilizers affected quality of water. Deeper wells are dug.

**DEEP AQUIFER** more than 2,000' If primary layer becomes more polluted, deeper wells may have to be dug.

NOTE: Orange County gets more than 50% of its water from its underground aquifer, which is replenished when water trapped in reservoirs percolates into the ground.

Source: Orange County Water District, Orange County district attorney's office

## Polluted stations,* by city:

\* With soil and/ or ground-water contamination

| City | Stations |
|---|---|
| Anaheim | 25 |
| Buena Park | 5 |
| Brea | 2 |
| Costa Mesa | 11 |
| Cypress | 3 |
| Dana Point | 1 |
| Fountain Valley | 7 |
| Fullerton | 8 |
| Garden Grove | 9 |
| Huntington Beach | 10 |
| Irvine | 1 |
| Laguna Beach | 1 |
| Laguna Niguel | 1 |
| Laguna Woods | 0 |
| La Habra | 1 |
| Lake Forest | 2 |
| Los Alamitos | 1 |
| Mission Viejo | 4 |
| Newport Beach | 1 |

| City | Stations |
|---|---|
| Orange | 9 |
| Placentia | 2 |
| R. Santa Margarita | 0 |
| San Clemente | 3 |
| San Juan Capistrano | 0 |
| Santa Ana | 18 |
| Seal Beach | 1 |
| Stanton | 1 |
| Tustin | 6 |
| Villa Park | 0 |
| Westminster | 4 |
| Yorba Linda | 2 |

**Number of Stations**
- 1-5
- 6-9
- 10-19
- 20 or more

OCWD-MTBE-001-102468

*Los Angeles Times – Orange County Edition*
**Friday, October 20, 2000**
**Page B1**

# County Seeks Millions From Oil Firms

■ Lawsuit alleges the region's ground water was contaminated by leaky storage tanks at more than 100 gas stations owned by ARCO and Thrifty Oil. Talks are stalled.

By STUART PFEIFER
TIMES STAFF WRITER

Orange County prosecutors disclosed Thursday that they are seeking millions of dollars in civil penalties from two oil companies blamed for contaminating ground water underneath more than 100 gas stations across the county.

Prosecutors are seeking the fines as part of a 1999 lawsuit against Atlantic Richfield Co. and Thrifty Oil, which are trying to clean up their leaking underground gas storage tanks, said Deputy Dist. Atty. Michelle Lyman.

Ground-water purity has been a longtime concern in Orange County, where service stations and about 1,000 wells sit practically side by side. More than 50% of the county's drinking water comes from local wells.

Dist. Atty. Tony Rackauckas said he hopes to collect "at least a few million dollars" in penalties from the two oil companies. That money—and any fines collected in similar suits against other oil companies—would be put into a fund that the county's water districts could tap for cleanup efforts.

The groundwater contamination has not reached the deep aquifers that provide the county's drinking water, Lyman said.

But water officials closed two wells last year after tests detected trace amounts of a contaminant linked to gasoline; no contaminated water was reported to have reached taps. Officials also are monitoring a well in east Anaheim, where trace amounts of the contaminant MTBE were found.

Experts said extensive testing will keep contaminants from making it to Orange County taps. But if the ground-water supply is contaminated, the county would have to buy more expensive water from other places.

Lyman said it is important for prosecutors to act now, before the hidden ocean beneath the county is tainted.

"This is a preemptive strike," Lyman said. "We don't want to sit here twiddling our thumbs while this stuff is approaching our water."

**Please see WATER, B12**

OCWD-MTBE-001-102469

*Los Angeles Times – Orange County Edition*
Friday, October 20, 2000
Page B1

➤ ORANGE COUNTY I FRIDAY ◄

# WATER: Oil Firms Blamed

**Continued from B1**

And although it could take a decade or longer for contaminants to percolate through gravel and sand into drinking water reserves, prosecutors are aware of drinking water disasters in Santa Monica, Cambria and Lake Tahoe in recent years. In those communities, wells became contaminated and agencies had to turn elsewhere for drinking water.

The ground-water contamination sites that prosecutors allege are the responsibility of ARCO and Thrifty Oil are among about 750 ground-water cleanup cases in Orange County, Lyman said. ARCO is believed to be the largest polluter of the county's ground water, Lyman said.

An ARCO spokeswoman said Thursday that she does not understand why officials called a news conference to discuss the suit, which was filed in January 1999 and updated earlier this month.

"We want to work with them," said spokeswoman Cheryl Burnett. "We just need to know specifically what their issues are."

The main issue appears to be money, Lyman said prosecutors and the oil companies have reached an impasse over the appropriate civil penalty. Negotiations are also underway with other oil companies.

*Correspondent Leslie Berg contributed to this report.*

# Newport Bay Dredging Bill Advances

A federal bill that would establish a 20-year, $21-million endowment for the dredging and ecological improvement of Upper Newport Bay cleared the last major hurdle Thursday on its path to becoming law, legislators said.

"It looks as if my pie-in-the-sky dream . . . has made it," said Rep. Christopher Cox [R-Newport Beach], who has been pushing for the legislation since 1995.

A House of Representatives version of the measure, contained in the Water Resources Development Act, passed overwhelmingly Thursday. Earlier, the Senate had passed a version of the bill by 85 to 1. After approving uniform versions of the bill, probably next week, the two houses of Congress will send it to President Clinton for signing, sources at Cox's office said.

Under the bill, the federal money, along with about $11 million in state and local matching funds, will provide about $1 million a year for the work. For years, Congress has authorized funds for the removal of sediment from Upper Newport Bay, but the money had frequently been delayed by political wrangling.

—DAVID HALDANE

OCWD-MTBE-001-102470

*Orange County Register*
Friday, October 20, 2000
Local News, Page 6

# Prosecutors allege MTBE conspiracy

**ENVIRONMENT:** Reports showed problems, but oil distributors allegedly looked the other way. Arco denies allegations.

**By PAT BRENNAN**
The Orange County Register

As early as 1983, prosecutors allege, the American Petroleum Institute learned that the fuel additive MTBE gave off a noticeable odor and taste in tiny quantities – a few parts per billion.

Throughout the 1980s, reports from scientists began to suggest that MTBE was highly soluble and could potentially contaminate ground water, according to a lawsuit filed by the Orange County District Attorney's Office against Arco and Thrifty Oil Co.

But, while Arco and other distributors had access to this information, they continued to tell regulators, and the public, that there was little or no risk from the use of MTBE, the prosecutors allege.

Arco spokesman Paul Langland said Thursday that those allegations do not match up with the facts as he knows them. Thrifty officials could not be reached Thursday.

If the case goes to trial – a possibility, say prosecutors frustrated by their inability to settle with Arco – the alleged conspiracy will be at the heart of their case.

Both Arco and prosecutors said the oil company is now taking steps to clean up more than 100 contaminated sites named in the lawsuit. An impasse in settlement negotiations is solely related to the size of the penalty Arco would pay.

Neither side would discuss potential amounts.

If the case goes to trial, penalties could rise into the hundreds of millions of dollars, said Deputy District Attorney Michelle Lyman.

**ON PAGE 1**
The Orange County district attorney has filed suit against Arco for aquifer contamination from MTBE leaking from underground fuel storage tanks . Story on News 1

Prosecutors say the contamination – including not only MTBE but benzene and toluene, which can also cause health problems – has little chance of reaching the taps of Orange County residents. Monitoring of drinking water wells would catch the contamination and cause the wells to be shut down before contaminated water could reach consumers.

Instead, the contamination represents a potentially enormous impact on public funds if it seeps from shallow ground water into deeper aquifers. The county draws about 75 percent of its drinking water from these deep, natural reservoirs.

"We're starting to find evidence that MTBE is getting down there," Lyman said.

Removing MTBE once it reaches these aquifers is a difficult, expensive process, Lyman said.

MTBE, or methyl tertiary butyl ether, was until recently thought to be an important tool for fighting pollution.

Oil companies began adding the chemical to gasoline in 1979, and its use spread until the late 1990s. It is one of a class of oxygenates that cause the fuel to burn more cleanly, reducing air pollution; such chemicals were mandated by the state in 1996.

But the chemical, which leaks from underground fuel storage tanks and moves through water quickly, had already begun to contaminate some drinking water. It was first detected in wells used to monitor water quality in Anaheim, though no drinking water was then affected. The chemical shut down wells in Santa Monica, South Lake Tahoe and Cambria.

OCWD-MTBE-001-102471

*Orange County Register*
Friday, October 20, 2000
Local News, Page 6

# Arco sued over gas additive leak

**ENVIRONMENT:** O.C. district attorney says ground water tainted by possible carcinogen.

By PAT BRENNAN
The Orange County Register

Arco has negligently allowed a foul-tasting fuel additive that may cause cancer to leak into Orange County's ground water, the result of a "conspiracy" among oil distributors that reaches back to the 1980s, the District Attorney's Office contends in a lawsuit seeking millions of dollars in damages.

Prosecutors say Arco and Thrifty Oil Co. are responsible for ground-water contamina-

tion at 102 Orange County gas stations. Fourteen more Arco sites have contaminated and, the suit alleges. There is no immediate health threat.

In a news conference Thursday, District Attorney Tony Rackauckas called the lawsuit, filed in January and expanded this month, the largest of its kind in state history.

The prosecutors decided to call the case to the public's attention after settlement negotiations with Arco broke down.

"We need to protect the envi-

ronment. We need to make sure the leaks are stopped and that the pollution is cleaned up," Rackauckas said. "The defendants must be held accountable for their conduct."

Arco spokesman Paul Langland said that, while negotiations have reached an impasse, it is largely because the District Attorney's Office has been unclear about the level of fine it wishes to impose or the nature of the violations it

| MORE INSIDE |

▶ **LAWSUIT:** Oil companies are accused of a conspiracy. News 6

would be based on.

He also rejected the allegations that Arco had taken part in a conspiracy — having learned, along with other distributors, of potential problems with the fuel additive MTBE as early as 1983 but covering up these problems until the mid to late 1990s.

"I think it's more of a legal tactic than anything else," Langland said of the conspiracy allegations in the lawsuit.

Regulators consider MTBE a possible carcinogen. But people can taste and smell the chemical at far lower levels than those that trigger health concerns.

OCWD-MTBE-001-102472

TONY RACKAUCKAS, District Attorney
County of Orange, State of California
JAN C. STURLA, Senior Assistant District Attorney
ROBERT C. GANNON, JR., Assistant District Attorney
Consumer and Environmental Protection Unit
BY:   MICHELLE M. LYMAN (Bar No. 121780)
Deputy District Attorney
401 Civic Center Drive West, 5th Floor
Santa Ana, California 92701-4575
Telephone:   (714) 347-8706
Facsimile:   (714) 796-0476

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

OCT 05 2000

ALAN SLATER, Clerk of the Court

BY:   N. ABURTO   DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE-CENTRAL JUSTICE CENTER

THE PEOPLE OF THE STATE OF CALIFORNIA,   ) CASE NO. 80-40-30
                                          ) ASSIGNED FOR ALL PURPOSES TO:
                          Plaintiff,      ) JUDGE JOHN C. WOOLLEY
                                          ) DEPARTMENT C6
                                          )
              vs.                         )
                                          )
ATLANTIC RICHFIELD COMPANY, a Delaware    ) FIRST AMENDED COMPLAINT
corporation doing business as ARCO; BP AMOCO ) FOR INJUNCTION, COMPLIANCE
CORPORATION; ARCO CHEMICAL COMPANY; ) ORDER, CIVIL PENALTIES
LYONDELL CHEMICAL COMPANY; THRIFTY   ) AND OTHER RELIEF
OIL COMPANY; DOES 5 through 200, inclusive, )
                                          )
                          Defendant.      )

    Plaintiff, the People of the State of California, by and through Tony Rackauckas, District

Attorney for the County of Orange, alleges:

                        **VENUE AND JURISDICTION**

    1.    Tony Rackauckas, the District Attorney of the County of Orange ("District

Attorney") brings this action on behalf of the People of the State of California ("the People") to:

(1) protect the public from health and safety hazards, (2) prevent destruction of Orange County's

groundwater resources and otherwise protect the environment, and (3) protect the People from

unfair, unlawful and fraudulent business practices.

    2.    The District Attorney brings this action pursuant to Code of Civil Procedure

section 731, Civil Code sections 3479 and 3480, Health and Safety Code sections 25299,

25299.01, 25299.37, 25299.76, 25249.5, 25249.7, 25189.2(c), Water Code sections 13285 and

OCWD-MTBE-001-102473

# Exhibit E

Working Copy



## ORANGE
## COUNTY
## WATER
## DISTRICT

July 14, 2000

Mr. Jack Miller
Director of Environmental Health
County of Orange
2009 East Edinger
Santa Ana, CA 92705

WILLIAM R. MILLS JR.
GENERAL MANAGER

Re:   MTBE Contamination in the Irvine Area

Dear Mr. Miller:

We have a particular problem which we would like to have your agency and the District Attorney help us to solve with respect to a project in the Irvine area. The Orange County Water District (OCWD) and the Irvine Ranch Water District (IRWD), in cooperation with the United States Navy, are in the process of designing and building water treatment facilities in the vicinity of the former El Toro Marine Corps Air Station to remove nitrates, dissolved solids, and VOCs from the groundwater so that it may be available for municipal uses.

MTBE contamination has been detected at several gas stations in the Irvine area that could interfere with the above-described treatment facilities, referred to as the Irvine Desalter Project (IDP). MTBE, as you know, is a difficult chemical to treat once it reaches the deep aquifers and becomes dispersed. It is therefore extremely important that contamination at these stations be immediately characterized and remediated before they further threaten the groundwater. We are therefore requesting, with the utmost urgency, that you require the involved oil companies to immediately take steps to contain and extract the contaminated groundwater arising from the leaking tanks on these sites so that we will not have to deal with these contaminants later on on a larger scale and at greater expense.

MAILING ADDRESS:
P.O. BOX 8300
FOUNTAIN VALLEY
CA 92728-8300

10500 ELLIS AVENUE
FOUNTAIN VALLEY
CA 92708

TELEPHONE (714) 378-3200
FAX (714) 378-3373
wmills@ocwd.com

OCWD-MTBE-001-080988

Mr. Jack Miller
July 14, 2000
Page Two

Roy Herndon and Richard Bell from OCWD and IRWD, respectively, met with Joyce Krall and Jim Strozier of your staff on June 13, 2000 regarding MTBE contamination of groundwater below several gasoline stations in the vicinity of the Irvine Desalter Project (see attached map).  Our staff was advised of MTBE groundwater contamination at the following stations:

| | | |
|---|---|---|
| Unocal | Sand Canyon @ I-5 | |
| Unocal | Irvine Blvd. near Yale | 85UT45 |
| Unocal | Jeffrey @ Walnut | 98UT52 |
| Shell | Trabuco near Culver | 98UT15 |
| Chevron | Culver near Walnut | 99UT7 |
| Mobil (former ARCO) | Culver near Walnut | |

These stations are located very close to planned IDP production wells. An immediate concern is the spreading of the MTBE plume and unknown vertical extent of the plume below each of these sites.  We anticipate construction of the IDP production wells by July 2002.  It is critical that the MTBE plumes be substantially remediated and fully contained from the influence of the IDP production wells prior to their start up.

The Orange County Water District has appreciated the opportunity to provide technical assistance to your department and to the Orange County District Attorney to help in the enforcement of cleanup of MTBE and other petroleum contaminants from leaking gasoline storage tanks in Orange County.  The vigorous enforcement of the underground storage tank law by your agencies is acknowledged and commended.

I am sending a copy of this letter to the District Attorney because it is my understanding that he is involved in litigation against oil companies in an effort to address the MTBE problem with a greater sense of urgency.

OCWD-MTBE-001-080989

Mr. Jack Miller
July 14, 2000
Page Three

We appreciate your assistance in this matter.

Very truly yours,

William R. Mills Jr.
General Manager

cc:    Anthony Rackauckas, District Attorney - County of Orange
       Robert Gannon, Assistant District Attorney - County of Orange
       Michelle Lyman, Deputy District Attorney - County of Orange
       Paul D. Jones II, General Manager - Irvine Ranch Water District
       Rex Callaway - Department of Navy
       David Thompson - Department of Justice
       Gerard Thibeault - Regional Water Quality Control Board

c:\document\MTBE\O.C. Health Agency

Exhibit F

Page 1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    _____X

 3    In re:   Methyl Tertiary Butyl Ether
      ("MTBE") Products Liability Litigation
 4    Master File No. 1:00-1898
      MDL No. 1358 (SAS)
 5    M21-88
      _____X
 6
      This Document Relates To:
 7    Orange County Water District v. Unocal
      Corporation, et al.,
 8    Case No. 04 Civ. 4968 (SAS)
      _____X
 9

10

11

12              VIDEOTAPED DEPOSITION OF

13                RONALD E. WILDERMUTH

14                 February 19, 2009

15

16              Taken at the Courtyard by

17    Marriott Hotel, 5865 Katella Avenue,

18    Cypress, California, before Harry A. Palter,

19    California Certified Shorthand Reporter No.

20    7708, Certified LiveNote Reporter.

21

22
                  GOLKOW TECHNOLOGIES, INC.
23           877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
24
```

1    his stature.

2         Q.    What's that?

3         A.    I'm kidding.

4         Q.    Did Ken Williams have a problem

5    with something that had gone on with Regional

6    Board data?

7               MS. O'REILLY:  I'm going

8         to -- calls for speculation.

9               Lacks foundation.

10              Assumes facts not in

11        evidence.

12              THE WITNESS:  I don't know.

13   BY MR. JEREMIAH ANDERSON:

14        Q.    Did you understand Roy --

15   excuse me -- Mr. Herndon's e-mail when he

16   sent it to you?

17        A.    I don't know if I understand it

18   today.

19        (Brief pause)

20              Okay.

21              Yeah.

22              I think I know what he's

23   saying.

24        Q.    I just want to walk through

1    here.

2                    The end of the first paragraph,

3    "We've tip-toed through the MTBE mine field

4    so many times that the only way I can keep my

5    story straight is to say what I know, or

6    don't know," exclamation point.

7                    What did you understand

8    Mr. Herndon to mean by that sentence?

9          A.     Well, there was -- Regional

10   Board and Orange County Health had the

11   requirement to monitor and cleanup the

12   groundwater basin even before OCWD.

13                    And at the same time, this DA

14   was, you know, doing the case on MTBE.

15                    And I think Roy was venting

16   frustration, as you can see in this paragraph

17   about -- oh, let's see -- this wait and see.

18         Q.     This gives both the oil

19   companies and the regulators a reason to take

20   a wait-and-see stance?

21         A.     Yes.

22         Q.     Did you ever, as public

23   information officer, send any letters to the

24   Regional Board or to the healthcare agency

## Wildermuth, Ron

| | |
|---|---|
| **From:** | Herndon, Roy |
| **Sent:** | Wednesday, October 10, 2001 9:16 AM |
| **To:** | Wildermuth, Ron; Glasser, Jenny |
| **Cc:** | Yamachika, Nira |
| **Subject:** | RE: MTBE Query |

*Wildermuth* *Exhibit No.:*
*19 February 2009* 24
*Harry A. Palter, California CSR No. 7708*

Ron and Jenny,

I will give you my response based on my knowledge, and you can decide if you think it should be forwarded/edited. We've tiptoed through the MTBE minefield so many times that the only way I can keep my story straight is to say what I know or don't know!

#1 -- My understanding of the status of MTBE cleanups in O.C. is that there seems to be a general policy by the oil companies to proceed with soil cleanup, by excavation or soil vapor extraction (vacuum), but I rarely see any indication of groundwater cleanups that demonstrate containment of the MTBE plumes. The soil cleanups are important because they remove a large amount of MTBE near the spill that could otherwise leach into the groundwater. However, this does not address the need to cleanup the MTBE that has already reached the groundwater and in many cases has traveled off site. Why? Because groundwater cleanups are often long-term propositions, very costly, and often remove relatively small amounts of MTBE relative to the volumes of water pumped (because we're dealing with ppb-level concentrations); and the regulatory agencies (RWQCB, OCHCA) do not have the political will or ability to enforce effective (and expensive) cleanups. Another part of the reason is that, thus far, there have been no MTBE impacts on drinking water wells, except for 2 in the Yorba Linda area (neither of which exceeded the secondary MCL). This gives both the oil companies and the regulators a reason to take a wait-and-see stance. The risks of such an approach are that the local water agencies may ultimately pay the price for MTBE that eventually reaches production wells -- long after it can be traced back to a particular gas station.

#2 -- My understanding of the DA's case is that they are in the process of retaining outside legal counsel, specializing in environmental litigation, to assist them with their case. Once the outside counsel is on board, I understand activities such as information gathering (e.g., document requests, depositions) will begin in earnest. Because it is a legal matter, the DA's office is not at liberty to provide many details.

Hope this helps, Roy

-----Original Message-----
**From:** Wildermuth, Ron
**Sent:** Tuesday, October 09, 2001 6:55 PM
**To:** Glasser, Jenny; Herndon, Roy; Yamachika, Nira
**Subject:** RE: MTBE Query

Roy, remember problem in FV and also this is producer sensitive subject.
Nire and Roy, Should we send her to Reg Bd for occurrence data? remembering Ken Williams bent?
Or should we provide? ron

-----Original Message-----
**From:** Glasser, Jenny
**Sent:** Tuesday, October 09, 2001 6:17 PM
**To:** Herndon, Roy; Yamachika, Nira
**Cc:** Wildermuth, Ron
**Subject:** MTBE Query

Hi,

10/10/2001

Seema Mehta, reporter at LA Times is reviewing a local study (by Komex) on MTBE cleanup costs.  She said the study states the cost of cleaning up the water could cost $30 billion.  Some questions I need help on:

*Reg. Bd - OCHCA*

1. What is the status of MTBE cleanup?
   -what is being done to clean up the MTBE?
2. What's happening right now with the DA? *DA*

I need to respond to Seema by the end of the day on Wednesday, if possible.

*Jenny Glasser*
Public Affairs Specialist
Orange County Water District
10500 Ellis Avenue
Fountain Valley, CA 92708
(714) 378-3228
(714) 963-0291 fax
jglasser@ocwd.com
visit us at www.ocwd.com

10/10/2001

OCWD-MTBE-001-101343

# Exhibit G



# Orange County District Attorney
## *Press Release*

TONY RACKAUCKAS, District Attorney
401 Civic Center Drive West
Santa Ana, CA 92701

**FOR IMMEDIATE RELEASE**

**Contact:** Michelle Emard
Media Relations Director
(714) 347-8405 office
(714) 323-4486 cell
(714) 359-2239 pager

**DATE:** December 17, 2002

## Prosecution of Oil Company by Orange County District Attorney Sets Precedent
*ARCO Agrees to Clean-Up More Than One Hundred Contaminated Gas Station Sites*

### The People of Orange County vs. ARCO Settlement

SANTA ANA – December 17, 2002 -- Today Orange County District Attorney (OCDA) Tony Rackauckas announced the settlement of a multi-million dollar environmental protection lawsuit against the Atlantic Richfield Company (ARCO) on behalf of the People of Orange County. This is a case of unprecedented magnitude. It represents the largest civil litigation of its kind ever prosecuted in the United States by a district attorney on behalf of an entire county.

The case took nearly four (4) years to fully investigate, mediate and settle. During this time, the Office of the Orange County District Attorney and the County of Orange committed a record number of internal and external resources to bringing this complex lawsuit to a successful conclusion. This substantial expenditure of staff, money and time on this case was made for one very important reason: **To protect the drinking water for the citizens of Orange County.**

### Threat to Supply of Drinking Water Discovered

District Attorney Rackauckas personally made the decision to file this environmental protection lawsuit based upon reports filed by local and state regulatory agencies and an environmental watchdog group called Communities for a Better Environment. These reports provided evidence that numerous state statutes and regulations related to the installation, maintenance, monitoring, permitting, testing and overall operation of underground gasoline storage tanks (UST) were being violated on an ongoing basis in Orange County.

Tests show the supply of drinking water in Orange County is currently free of contamination. However, these reports proved that there had been a failure to adequately assess and cleanup the resulting contamination of the aquifer, groundwater and soil caused by the leaking USTs. The presence of a gasoline additive called MTBE (methyl tertiary-butyl ether) in the leaking fuel added to the problem. It is more soluble and moves further and faster through groundwater than other

OCWD-MTBE-001-100664

components of gasoline. MTBE can be detected in very small amounts because it makes the contaminated water taste and smell like turpentine, but it is extremely difficult and expensive to remove.

A majority of those living in Orange County get their drinking water from local sources. Seventy percent of the nearly three million people who live in Orange County rely upon the Santa Ana River Basin for 70% of their water supply. There are thousands of production wells that currently tap into this critical source of water and more will likely need to be drilled to meet the future water needs of Orange County. However, if the aquifer system becomes contaminated at any point, a portion of it will have to be shutdown and costly imported water will have to be purchased to make-up the shortfall in supply.

## Orange County District Attorney Takes Immediate Action

Collectively, these findings indicated that a significant threat to the supply of drinking water in Orange County clearly existed and would grow worse if immediate action was not taken. District Attorney Rackauckas moved quickly to file the lawsuit, stating: **"My goal was to compel the defendants to bring all identified sites into compliance and cleanup any contamination caused by leaking underground storage tanks and retail gas station operations."**

**"After being served with the lawsuit, ARCO began to take corrective action to bring all of its retail gas stations into compliance,"** District Attorney Rackauckas said. **"The company started making the necessary repairs to the underground storage tanks and launched a variety of remediation programs to clean-up contaminated sites. ARCO has indicated a desire to work with my office to ensure violations do not occur again so we can keep Orange County's drinking water safe today and into the future."**

## OCDA Case Against ARCO Sets Precedent

This case is unique because it represents the first time a district attorney has prosecuted a major oil company to force the compliance and clean-up of every single violation at each gas station location for the entire history of the statute of limitations. A case of this magnitude is very expensive and quite lengthy to litigate. However, although the costs associated with trying this type of case can be prohibitive, District Attorney Rackauckas decided that the potential threat to the drinking water supply in Orange County justified the action. He summarized his position in saying, **"Safe drinking water is a truly priceless commodity and Orange County's supply deserves to be protected."**

The Office of the OCDA committed a record number of attorneys to this litigation, particularly from the Environmental Protection. All were required to develop expertise in both the area of civil litigation and in the highly complex legal area of underground storage tank compliance and clean-up laws. The Orange County Board of Supervisors also approved the hiring of two outside law firms to assist with the litigation of this complex civil case, Robinson, Calcagnie & Robinson, and Lopez, Hodes, Restaino, Milman & Skikos.

In addition, the following local, regional and state departments, boards and agencies played an integral role in the resolution of this lawsuit:

Orange County Health Care Agency; Anaheim, Fullerton, Orange and Santa Ana Fire Departments; South Orange County Water Authority; Santa Ana Regional Water Quality Control Board; San Diego Regional Water Quality Control Board; and State Water Resources Control Board.

2

The members of the Orange County Hazmat Strike Force Team, a multi-agency task force which meets regularly under the direction of the Orange County District Attorney's Environmental Protection Unit, also worked to assist in the investigation and prosecution of this case.

## Settlement Achieves Full Recovery of Costs, Clean-Up and Compliance

The settlement for this case is summarized as follows:

- ARCO must pay $5 million dollars to reimburse the Office of the Orange County District Attorney and County of Orange for all litigation costs
- ARCO must pay $3 million dollar for a fund controlled by OCDA to pay for an independent consultant (hydrogeologist) to monitor the clean-up of all identified sites in Orange County
- ARCO is bound to pay for clean-up of all sites regardless of the cost
- ARCO must bring all gas station sites into full compliance

The original civil complaint was filed on January 6, 1999 and named only ARCO as a defendant. The civil complaint was later amended on October 5, 2000 to include additional defendants. Also named in the lawsuit were ARCO Chemical Company, BP Amoco Corporation (also owned by ARCO), Lyondell Chemical Company and Thrifty Oil Company. The lawsuit against ARCO involves 143 active gas station sites in Orange County. The cases against Lyondell Chemical Company and Thrifty Oil remain pending. A separate lawsuit against Shell Oil Company is set to resume in court on March 14th, 2003.

# # # # # #

## DO NOT RELEASE INFORMATION UNTIL 1:00 P.M. PST 12/17/02

3

Exhibit H

1   ORANGE COUNTY DISTRICT ATTORNEY
    Tony Rackauckas, District Attorney
2   Bill Feccia, Senior Assistant District Attorney
    Joe D'Agostino, Assistant District Attorney
3   Consumer and Environmental Protection Unit
    **Aleta Bryant; Bar No. 125381,** Deputy District Attorney
4   401 Civic Center Drive
    Santa Ana, CA 92701-4575
5   (714) 347-8720, FAX (714) 568-1250
        — *In association with* —
6   **Mark P. Robinson, Jr., Esq.; Bar No. 054426**
    **Allan F. Davis, Esq.;   Bar No. 108269**
7   ROBINSON, CALCAGNIE & ROBINSON
    620 Newport Center Drive, 7th Floor
8   Newport Beach, CA 92660
    (949) 720-1288, FAX (949) 720-1292
9       — *and* —
    **Ramon Rossi Lopez, Esq.; Bar No. 86361**
10  **Thomas A. Schultz, Esq.; Bar No. 149578**
    LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS
11  450 Newport Center Drive, 2nd Floor
    Newport Beach, CA 92660
12  (949) 640-8222, FAX (949) 640-8294

13

    Attorneys for Plaintiff
14  THE PEOPLE OF THE STATE OF CALIFORNIA

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16          FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

17

18

19  THE PEOPLE OF THE STATE OF              Case No.  80-40-30
    CALIFORNIA
20                                          Assigned for all purposes to:
                                            Judge Jonathan H. Cannon
        Plaintiff,                          Department CX102
21
        vs.
22                                          [~~PROPOSED~~] FINAL JUDGMENT
    ATLANTIC RICHFIELD COMPANY, a           PURSUANT TO STIPULATION AND
23  Delaware corporation doing business as  ORDER THEREON
    ARCO; BP AMOCO CORPORATION;
24  ARCO CHEMICAL COMPANY; LYONDELL
    CHEMICAL COMPANY; THRIFTY OIL
25  COMPANY; and DOES 5 through 200,
    inclusive;
26
        Defendants.
27

28

                        FINAL JUDGMENT PURSUANT TO
                    STIPULATION AND ORDER THEREON

FILED
ORANGE COUNTY SUPERIOR COURT

FEB 1 1 2003

Clerk of the Court

BY  C. HERNANDEZ

1    This Final Judgment Pursuant to Stipulation (this "Final Judgment") is made between the

2    Plaintiff, People of the State of California, by and through its attorney Tony Rackauckas, the

3    District Attorney of the County of Orange ("Plaintiff"), and defendant Thrifty Oil Co. ("Settling

4    Defendant").

5

6                                              **RECITALS**

7        A.        In this action, Plaintiff filed a civil complaint ("First Amended Complaint") in

8    Orange County against Settling Defendant, Lyondell Chemical Company, Atlantic Richfield

9    Company, BP Amoco Corporation and ARCO Chemical Company.

10       B.        Plaintiff and Settling Defendant have agreed to settle this action on the terms set

11   forth in this Final Judgment. Plaintiff believes that the resolution of the violations alleged in the

12   First Amended Complaint is fair and reasonable and fulfills the Plaintiff's enforcement objectives,

13   that no further action is warranted concerning the specific violations alleged in the First Amended

14   Complaint except as provided pursuant to the Final Judgment, and that this Final Judgment is in

15   the best interest of the general public. Notwithstanding the foregoing, Plaintiff may bring an

16   action or file a motion with the Court to enforce this Final Judgment pursuant to the terms and

17   conditions hereof.

18

19                                            **JURISDICTION**

20       1.        This Court has jurisdiction of the subject matter and the parties hereto.

21

22                              **SETTLEMENT OF DISPUTED CLAIMS**

23       2.        Settling Defendant expressly denies the allegations raised by the Plaintiff in the

24   First Amended Complaint and Plaintiff's discovery responses in the above-referenced matter.

25   This Final Judgment is not an admission by Settling Defendant of any issue of law or fact in the

26   above-captioned matter or any violation of any law. The parties enter into this Final Judgment

27   pursuant to a compromise and settlement of disputed claims set forth in the First Amended

28   Complaint and Plaintiff's discovery responses for the purpose of furthering the public interest.

- 1 -                FINAL JUDGMENT PURSUANT TO
                      STIPULATION AND ORDER THEREON

1 **JURISDICTION RETAINED**

2    6.3    Jurisdiction is retained for the purpose of enabling any party to this Final Judgment
3 to apply to the Court at any time for such further orders and directions as may be deemed
4 necessary or appropriate for the construction of or the carrying out of this Final Judgment.

5    6.4    This Final Judgment will go into effect immediately upon entry hereto. Entry is
6 authorized immediately upon filing.

7    6.5    This Final Judgment may be executed by the parties in counterpart, and when an
8 authorized representative of each party signs a copy, the stipulation shall be effective as if a single
9 document were signed by all parties.

10    6.6    This Final Judgment shall not serve to bar, estop, alter, supersede, or interfere
11 with, any investigation, action, order, request, demand or directive of any regulatory agency,
12 person or entity having jurisdiction over the underground storage tank systems at any of the
13 Subject Sites or the groundwater or production wells within the County of Orange, including any
14 investigation, action, order, request, demand or directive of the Orange County Health Care
15 Agency, the applicable Regional Water Quality Control Board, the State Water Resources
16 Control Board or the Orange County Water District pursuant to any of the laws and regulations
17 pertaining to underground storage tanks or water. Plaintiff does not include, and the Orange
18 County District Attorney does not represent, any water district or other municipality; the Orange
19 County Health Care Agency; the Santa Ana Regional Water Quality Control Board; the State
20 Water Resources Control Board; any city; any public or private well owner; or any other
21 individual, regulatory agency, corporation or other entity with an interest in or pertaining to
22 groundwater or production wells located within the County of Orange. This Final Judgment shall
23 not alter or affect the obligations of Settling Defendant to comply with all laws and regulations
24 pertaining to underground storage tanks, including, but not limited to (in each case to the extent
25 applicable): Health and Safety Code, Chapters 6.7 and 6.75; Water Code sections 13285 and
26 13350; Fish and Game Code sections 5650 and 5650.1; California Code of Regulations, Title 23,
27 Division 3, Chapter 16, the

28

- 15 -

1   underground storage tank regulations, and any other applicable laws, statutes, and regulations,

2   and any directive or order of a regulatory agency pursuant to such laws and regulations.

3       6.7     This Final Judgment supersedes all previous negotiations and agreements and

4   constitutes the entire Final Judgment between or among the parties, and no oral statement or prior

5   written material not specifically incorporated herein shall be of any force or effect.

6

7                                           OFFICE OF THE ORANGE COUNTY DISTRICT
                                            ATTORNEY

8                                           By _____
                                               Tony Rackauckas

9                                           Attorneys for Plaintiff The People of
                                            The State Of California

10

11

12                                          Approved as to Form:

13                                          ROBINSON, CALCAGNIE & ROBINSON

                                            By _____
14                                             Mark P. Robinson, Jr.

                                            Attorneys for Plaintiff The People of
15                                          The State Of California

16

17                                          LOPEZ, HODES, RESTAINO, MILMAN &
                                            SKIKOS
18
                                            By _____
19                                             Ramon Ross Lopez

                                            Attorneys for Plaintiff The People of
20                                          The State Of California

21                                          THRIFTY OIL CO.

22                                          By _____
                                               Barry W. Berkett
23                                          Executive Vice President

24

25                                          Approved as to Form:

26                                          LAW OFFICES OF MARK B. GILMARTIN

27                                          By _____
                                               Mark B. Gilmartin
28                                          Attorneys for Settling Defendant

                                            - 16 -        FINAL JUDGMENT PURSUANT TO
                                                          STIPULATION AND ORDER THEREON

# Exhibit I

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF ORANGE**
**MINUTE ORDER**
05-JAN-2005

| | | | | | |
|---|---|---|---|---|---|
| **Dept:** | CX104 | CIVIL COMPLEX CENTER | | **Convened at:** | 9:00:00 |

| | | | |
|---|---|---|---|
| **Judge/Comm:** | DAVID C. VELASQUEZ | **Clerk:** | C. CARR |
| **Bailiff:** | K. SAMRA | **Reporter:** | CHARLOTTE FREEMAN, #3084 |

**Court Type:** COMPLEX LITIGATION

**Court Category:** TOXIC WASTE

**Case Number:** 804031

**Case Title:** PEOPLE-STATE OF CALIF VS SHELL OIL CO

**Doct Seq No:** 163

**Event:** 510 STATUS CONFERENCE

**Filing Party:** 998/COURT

**Appearances:**

| | |
|---|---|
| PLAINTIFF ATTORNEY | DISTRICT ATTORNEY-SANTA ANA by Joe D'Agostino, Deputy District Attorney |
| DEFENDANT ATTORNEY | MUNGER TOLLES & OLSON by William Temko |
| WATER DISTRICT-INTERESTED PARTY | MILLER, SAWYER & AXLIN by Duane Miller special appearance |

The Court heard argument on the Water District's oral motion for a stay or continuance of this

hearing. The Court denied the motion. The Court signed the Final Judgment Pursuant to

Stipulation and Order Thereon this date. ENTERED:1-5-05

**ORIGINAL / FILE**

Exhibit J

Anthony Brown

Page 1059

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

In Re:  Methyl Tertiary Butyl Ether   :
4  ("MTBE")                             :
   Products Liability Litigation        :
5                                       :   MDL No. 1358 (SAS)
                                        :
6  _____ :

   This document relates to the         :
7  following case:                      :
                                        :
8  Orange County Water District v.      :
   Unocal Corp., et al., 04 CIV. 4968   :
9  (SAS)                                :   Pages 1059-1283
   _____ :

10

11

                    - - - - -
12
                  FEBRUARY 1, 2012
13
                    - - - - -
14

15        Videotaped Deposition of ANTHONY BROWN,

16  EXPERT WITNESS, VOLUME VI, held at Latham & Watkins, at

17  650 Town Center Drive, Suite 2000, Costa Mesa,

18  California, commencing at 10:17 a.m., on the above date,

19  before Kimberly S. Thrall, a Registered Professional

20  Reporter and Certified Shorthand Reporter.

21

22

23            Golkow Technologies, Inc.
          877.370.3377 ph | 917.591.5672 fax
24                deps@golkow.com

25

Anthony Brown

1          MS. O'REILLY:  Same objection.

2          Go ahead.

3          THE WITNESS:  The only other ones that I could

4     recall would be related to the assignment we had working

5     for the Orange County District Attorney's Office.

6     BY MR. ANDERSON:

7          Q.   Back when the district attorney filed some kind

8     of proceedings against -- as I recall, ARCO was involved

9     and/or Shell and/or Thrifty?

10         A.   That is correct.

11         Q.   Okay.  In that regard, what did you perceive to

12    be Orange County Water District's role that you're

13    thinking of now?

14         A.   As best as I can recall, I believe there may

15    have been a meeting or maybe more than one meeting where

16    the Orange County Water District was present, and they

17    were involved as the agency responsible for managing and

18    protecting the res- -- groundwater resources of the

19    coastal plain of Orange County.

20              And the service stations that were the subject

21    of the Orange County District attorney's case --

22         Q.   Okay.

23         A.   -- at most, if not all, were located within the

24    limits of the Orange County Water District and had

25    releases of contaminants into groundwater.

Anthony Brown

Page 1112

1     Q.   So you perceived Orange County Water District

2   being present because they had a very strong interest in

3   what was happening in that situation --

4          MS. O'REILLY:   Vague.

5   BY MR. ANDERSON:

6     Q.   -- as opposed to them driving the investigation

7   or the -- or the proceedings?

8          MS. O'REILLY:   Misstates testimony.   Vague.

9   Ambiguous.   Overbroad.   Assumes facts.   Lacks

10  foundation.

11         THE WITNESS:   I think that's a reasonable

12  statement, yes.

13  BY MR. ANDERSON:

14    Q.   Okay.   Now, I told you before we started that

15  I'm here and I'm interested in three specific sites, one

16  being Unocal 5226, one being ConocoPhillips 5792, and

17  the third being World Oil 39.

18         Are those all sites that you're personally

19  familiar with?

20    A.   Could you restate them again?   Unocal 5226, was

21  it?

22    Q.   Yeah.   Unocal 5226, ConocoPhillips 5792, and

23  World Oil 39.   And they're all among the last eight or

24  nine listed on the first page of Exhibit 36.

25    A.   Yes.

Exhibit K

**Yamachika, Nira**

| | |
|---|---|
| **From:** | Herndon, Roy |
| **Sent:** | Tuesday, November 07, 2000 9:28 AM |
| **To:** | Yamachika, Nira |
| **Subject:** | RE: MTBE Update |

Nira,

Here is a hit list on recent MTBE issues:

1. OCDA Lawsuit against ARCO

Last month the OCDA, Tony Rackauckas, received the go-ahead from the judge to proceed with his lawsuit against ARCO for contamination from numerous LUFT sites. ARCO was identified as the worst of the oil companies in terms of numbers of sites impacted and inadequate response, although other oil companies could be brought in for similar actions in the future. The OCDA is seeking monetary penalties from ARCO for its inaction over the years and a commitment to investigate and cleanup its sites. The suit could settle soon or go on for 2-3 years, according to my contacts at the DA's office. OCWD supports the efforts of the DA to expedite cleanup actions by responsible parties.

2. Report of MTBE reaching "deep" aquifer:

The week following the DA's press conference on Item #1, a news story broke in the OC Register that MTBE had reached the "deep" aquifer in Fountain Valley. The story apparently originated at the DA's office and was based on the finding of MTBE at approx. 940 ug/L at a depth of 60 feet in the Talbert aquifer at the ARCO station at Brookhurst Ave. and Ellis Ave. OCWD was contacted to confirm this finding, and we were fortunate to have been aware of this finding for several months. We had some discussion as to what defined "deep", and concluded that it was subjective, but that the finding of MTBE below the semi-perched (shallowmost) aquifer shows that the downward migration of MTBE is a threat to our potable supplies and demonstrates the need for cleanup of MTBE-impacted sites.

3. RWQCB Draft MTBE Guidance Document

Ken Williams has drafted a local guidance document for the Santa Ana RWQCB that was intended to be more stringent than the state-wide document adopted by the SWRCB. The impetus for the Santa Ana RWQCB to prepare a more stringent document stems from the OCDA's request for a document that more realistically treats the importance of the groundwater resources and hydrogeology of Orange County and other groundwater basins within the SARWQCB's area. I have not read the document, so I cannot comment as to how much more stringent the document is compared to the SWRCB's version. The document was to be presented at the Nov. 17 RWQCB meeting as an informational item, but I just heard that the item had been deferred to an unknown later date.

4. Concerto MTBE Investigation

Ken Williams required the 3 oil companies to construct an initial set of 5 monit. wells as part of its initial phase of investigation to characterize the nature and extent of MTBE that has impacted the Concerto #1 and #2 and Ballad wells in the east Anaheim area. The oil companies have committed to undertake this investigation, which will also include a groundwater flow model.

-----Original Message-----
**From:** Yamachika, Nira
**Sent:** Thursday, November 02, 2000 10:12 AM
**To:** Herndon, Roy

11/07/2000

Yamachika

EXHIBIT NO. 38
9.2470
Kim Thrall, CSR, RPR

OCWD-MTBE-001-038689

**Subject:** MTBE Update

Roy:

I need to provide the WQ committee at ACWA next week with an update on recent MTBE activities. Could you send me an email highlighting the meetings and MTBE issues that have occurred in the past 2 weeks that I was on vacation? This would include the regulatory issues and involvement with the DA with ARCO and pending enforcement action. Thanks.

11/07/2000

OCWD-MTBE-001-038690

Exhibit L

Safe Drinking Water Subcommittee Meeting
ACWA Fall Conference, Anaheim CA
November 8, 2000, 2:45 pm – 4:25 pm

Other Informational Items

## Chromium

- 77% OCWD wells are < 1 ppb total chromium; DLR = 1ppb; October DLR = 0.2 ppb
- 23% total Cr > 1ppb < 7 ppb (1993-2000 data)
- Coming on-line in early 2001 to test Cr(VI) at low levels (i.e. 0.5 ppb)

## MTBE

- EOCWD, Richard Barrett wrote letter to Senator Feinstein requesting her assistance to help CA obtain a waiver from EPA on the oxygenate content in gasoline. Senator Feinstein replied (10/5/2000) that she asked EPA for a wairver of the 2%percent requirement for CA and has met several times with EPA officials and spoke (and written) with Administrator Carol Browner. EPA has not granted the waiver. Barrett replied asking Senator Feinstein **why** Carol Browner has not granted the waiver.

- OCDA Lawsuit against ARCO

Last month the OCDA, Tony Rackauckas, received the go-ahead from the judge to proceed with his lawsuit against ARCO for contamination from numerous LUFT sites. ARCO was identified as the worst of the oil companies in terms of numbers of sites impacted and inadequate response, although other oil companies could be brought in for similar actions in the future. The OCDA is seeking monetary penalties from ARCO for its inaction over the years and a commitment to investigate and cleanup its sites. The suit could settle soon or go on for 2-3 years (per DA's office staff). OCWD supports the efforts of the DA to expedite cleanup actions by responsible parties.

- Report of MTBE reaching "deep" aquifer:

The week following the DA's press conference on Item #1, a news story broke in the OC Register that MTBE had reached the "deep" aquifer in Fountain Valley. The story apparently originated at the DA's office and was based on the finding of MTBE at approx. 940 ug/L at a depth of 60 feet in the Talbert aquifer at the ARCO station at Brookhurst Ave. and Ellis Ave. We had some discussion as to what defined "deep", and concluded that it was subjective, but that the finding of MTBE below the semi-perched (shallowmost) aquifer shows that the downward migration of MTBE is

a threat to our potable supplies and demonstrates the need for cleanup of MTBE-impacted sites.

- RWQCB Draft MTBE Guidance Document

Ken Williams has drafted a local guidance document for the Santa Ana RWQCB that was intended to be more stringent than the state-wide document adopted by the SWRCB. The impetus for the Santa Ana RWQCB to prepare a more stringent document stems from the OCDA's request for a document that more realistically treats the importance of the groundwater resources and hydrogeology of Orange County and other groundwater basins within the SARWQCB's area. The document was to be presented at the Nov. 17 RWQCB meeting as an informational item, but I just heard that the item had been deferred to an unknown later date.

## NDMA

- The 4-month running average for WF21 ~19.8 ppt with our regulatory limit of <20 ppt. Deep well water is being used as the primary source of injection water. OCSD is continuing with their source investigation program to reduce the amount of NDMA coming into the treatment plant.

- OCWD initiated a quarterly NDMA monitoring program of all nearby production wells to monitor and track NDMA movement. No additional wells have been found to contain NDMA from the initial screening conducted in May-June, 2000.