UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | **Master File No. 1:00 – 1898** <br> **MDL 1358 (SAS)** <br> **M21-88** |
| This Document Relates To: | The Honorable Shira A. Scheindlin |
| *Orange County Water District v. Unocal Corporation, et al.,* Case No. 04 Civ. 4968 (SAS) | |

**DECLARATION OF PETER C. CONDRON IN SUPPORT OF MEMORANDUM OF LAW OF DEFENDANTS ATLANTIC RICHFIELD COMPANY, BP WEST COAST PRODUCTS LLC, BP PRODUCTS NORTH AMERICA, INC., ARCO CHEMICAL COMPANY, LYONDELL CHEMICAL COMPANY, SHELL OIL COMPANY, EQUILON ENTERPRISES LLC, TEXACO REFINING AND MARKETING INC., TESORO CORPORATION, TESORO REFINING AND MARKETING COMPANY, UNION OIL COMPANY OF CALIFORNIA, VALERO MARKETING AND SUPPLY COMPANY, VALERO REFINING COMPANY—CALIFORNIA, AND ULTRAMAR INC. IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT DUE TO LACK OF INJURY AND DAMAGES AT CERTAIN TRIAL SITES**

PETER C. CONDRON, under penalty of perjury, declares as follows:

1.      I am an attorney with the law firm of Sedgwick LLP, counsel for defendants Shell Oil Company, Equilon Enterprises LLC, and Texaco Refining and Marketing Inc. in this matter. I make this declaration in support of certain defendants' motion for summary judgment on four of the designated focus trial sites:  the former Beacon Bay Auto Wash at 10035 Ellis Avenue, Fountain Valley ("Beacon Bay FV"); Unocal #5399, 9525 Warner Avenue, Huntington Beach ("Unocal #5399"); Unocal #5123, 14972 Springdale Street, Huntington Beach ("Unocal #5123"); and Thrifty 368, 6311 Westminster Boulevard, Westminster ("Thrifty 368").  I am familiar with the facts stated herein and would testify to them if called upon to do so.

2.      Attached hereto as Exhibit 1 is an excerpt from the expert report of Anthony Brown, submitted on behalf of plaintiff Orange County Water District ("OCWD") in this matter.

3.      Attached hereto as Exhibit 2 is a chart prepared by Mr. Brown and presented to

*DRAFT – 5.12.14*
*PRIVILEGED & CONFIDENTIAL*
*ATTORNEY WORK PRODUCT*

defendants at his deposition, at which the chart was marked as Exhibit 36.

4.      Attached hereto as Exhibit 3 are excerpts from the deposition of Anthony Brown in this matter, which was taken on December 29, 2011, December 30, 2011, January 2, 2012, January 3, 2012, February 1, 2012 and February 6, 2012.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at Washington, D.C., this 6th day of June, 2014.

Respectfully submitted,

_____

Peter C. Condron

# Exhibit 1



37880087

May 31 2011
7:06PM

# Expert Report of Anthony Brown and Robert Stollar

Prepared for

**Miller, Axline & Sawyer**

1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4272

May 28, 2011

United States District Court
Southern District of New York

In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability
Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This Document Relates To:

Orange County Water District v. Unocal Corp., et al.,
No. 04 Civ. 4968

## Expert Report of Anthony Brown

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4272

May 28, 2011

_____
Signature

MAY 28, 2011
_____
Date

1503 South Coast Drive, Suite 203
Costa Mesa, CA 92626

## Section 1:                                          Opinion of Anthony Brown

### 1.1 Introduction

This written report is submitted in compliance with the disclosure requirements set forth in FRCP 26(2)(B), subject to the right to supplement the report in accordance with FRCP 26(e)(2).  This report focuses on an evaluation of releases of methyl tertiary-butyl ether (MTBE) and tert-butyl alcohol (TBA) from twenty-six (26) gasoline service stations (facilities) within the Coastal Plain of Orange County, California.  These facilities have impacted the groundwater resources managed by the Orange County Water District (OCWD).

### 1.2 Qualifications

***Education***

I hold a B.A. Degree with Honors in Geography (1985) from King's College, University of London, a M.Sc. in Engineering Hydrology (1988) from the Imperial College of Science, Technology and Medicine (Imperial College), University of London, and a D.I.C. in Civil Engineering (1988) from Imperial College.

***Professional Experience***

I have 20+ years of experience as an environmental and water resources consultant. During this period, I have managed or directed an extensive number of contaminant investigations and remediation programs including facilities with multiple responsible parties, complex hydrogeology and fate and transport, multiple contaminants, and co-mingled plumes.  A substantial portion of my work has been performed on studies related to the assessment and remediation of water resources impacted by gasoline constituents, such as the fuel oxygenates MTBE and TBA.

My curriculum vitae, including a list of publications authored in the prior ten years and cases in which I served as an expert within the prior four years, is provided in Appendix A.   A schedule of my compensation regarding this matter is also included in Appendix A.

The exhibits that will be used to summarize or support the opinions expressed in this report are the exhibits which appear in, or are transmitted with, this report. The exhibits may subsequently be revised to allow for presentation in a manner appropriate to the proceeding where they are used. I reserve the right to update my opinion as new information becomes available➡

### 1.3 Opinions and Basis of Opinions

For the facilities subject to this phase of litigation, the available facility specific documents indicate the following:

1.  MTBE and/or TBA have been released at the facilities.

2.  MTBE and/or TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. At most facilities, MTBE that has migrated off-site has comingled with releases from nearby facilities.

6. To date, the responsible parties have failed to delineate MTBE and/or TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and/or off-site remediation of groundwater is required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at these facilities to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at all facilities.  At a minimum, however, the cost of additional investigation will be no less than $79,050 per facility.  Unit costs for subsequent investigation activities have also been developed.

11. At select facilities, the minimum scope and cost to implement the required remediation can be estimated based on currently available data.  For the facilities referred to as G&M Oil #4 and ARCO 1905, the cost to implement the minimum scope of investigation and remediation is $13,229,611 and $3,186,627, respectively

12. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at other facilities, once additional investigation has been performed at these facilities.

It has been assumed that the responsible parties will continue to perform periodic monitoring and sampling of existing groundwater monitoring wells.

Facility-specific opinions, and the basis for each opinion, are provided in Appendices B (parts B.1 through B.26).

Plumes of MTBE and TBA contaminated groundwater have, and continue to, migrate beyond the facility boundaries. This off-site contamination can be abated before it reaches drinking water wells.  While the cost to remediate the MTBE and TBA emanating from each facility will be significant, the cost to address the contamination once it reaches drinking water wells, including operational costs, would be far greater.

An approach to remediating  facilities has been developed based on G&M Oil #4 and ARCO 1905 (Feasibility Studies in Appendices C.1 and C.2 and Remedial Action Plans in Appendices D.1 and D.2) along with reasonable costs to implement the abatement (Appendices E.1 and E.2).  However, it should be noted that the full lateral and vertical extent of contamination at these facilities is not known.  Therefore, the costs to fully investigate the contamination at these facilities will likely be more than the costs presented to address the currently known extent of contamination. That is, the costs presented herein are conservative.

# Exhibit 2

It is more likely than not that:

| Facility | Address | City | 1. Releases of MTBE have occurred at the facility? | 2. Releases of TBA have occurred at the facility? | 3. MTBE has impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries? | 4. TBA has impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries? | 5. Groundwater contamination has migrated off-site and commingled with releases from nearby facilities (focus stations)? | 6. To date, investigations have failed to delineate historical MTBE contamination in groundwater laterally? | 7. Currently, investigations have failed to delineate on-site MTBE contamination in groundwater laterally? | 8. To date, investigations have failed to delineate MTBE in groundwater vertically? | 9. To date, investigations have failed to delineate historical TBA contamination in groundwater laterally? | 10. Currently, investigations have failed to delineate on-site TBA contamination in groundwater laterally? | 11. To date, investigations have failed to delineate TBA in groundwater vertically? | 12. MTBE contamination in groundwater exists beyond the current monitoring network? | 13. TBA contamination in groundwater exists beyond the current monitoring network? | 14. Remediation performed to date has failed to effectively address on-site groundwater contamination? | 15. Remediation performed to date has failed to effectively control the off-site migration of groundwater contamination? | 16. Remediation performed to date has failed to effectively remediate off-site groundwater contamination? | 17. Additional off-site investigation is required? | 18. Investigation of deeper groundwater zones is required? | 19. Additional on-site remediation of groundwater is required? | 20. Additional off-site remediation of groundwater is required? | 21. Releases pose a threat to deeper aquifers? | 22. Releases at the facility pose a threat to water supply wells? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Arco 1887 | 16742 Beach Blvd. | Huntington Beach | Y | Y | Y | Y | P (G&M Oil #4) | Y | N | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | P | Y |
| G&M Oil #4 | 16990 Beach Blvd. | Huntington Beach | Y | Y | Y | Y | | N | N | Y | P | N | P | Y | Y | N | Y | Y | Y | Y | Y | Y | N | Y |
| Texaco 8520 | 8520 Warner Ave. | Huntington Beach | Y | Y | Y | Y | P (Shell 204359403) | Y | N | N | Y | N | N | Y | Y | P | Y | Y | Y | Y | P | Y | Y | P |
| Shell 204359403 | 8471 Warner Ave. | Huntington Beach | Y | P | Y | Y | P (Texaco 8520) | Y | N | Y | P | N | P | Y | P | Y | Y | Y | Y | Y | N | Y | Y | P |
| Texaco 121681 | 9475 Warner Ave. | Huntington Beach | Y | Y | Y | Y | P (Unocal 5399) | N | N | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | P | Y | Y | P |
| Unocal 5399 | 9525 Warner Ave | Huntington Beach | Y | P[1] | Y | P[1] | P (Texaco 121681) | Y | P[2] | Y | P[1] | P[1] | P[1] | P | P[1] | N | Y | Y | Y | Y | N | P | P | N |
| ARCO 1912 | 18480 Brookhurst St. | Fountain Valley | Y | Y | Y | Y | Thrifty 383 / Beacon Bay Auto Wash FV | N | N | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y | Y | P | Y | P |
| ARCO 1905 | 18025 Magnolia St. | Fountain Valley | Y | Y | Y | Y | | N | N | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y | Y | P | Y | P |
| Thrifty 383 | 18520 Brookhurst St | Fountain Valley | Y | Y | Y | Y | ARCO 1912 / Beacon Bay Auto Wash FV | N | N | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y | Y | P | Y | P |
| Beacon Bay Auto Wash FV | 10035 Ellis Ave. | Fountain Valley | Y | Y | Y | Y | Thrifty 383 / ARCO 1912 | N | N | Y | Y | N | Y | P | P | P | Y | Y | Y | Y | Y | P | Y | P |
| G&M Oil #24 | 3301 S Bristol St. | Santa Ana | Y | Y | Y | Y | | N | N | N | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | N | Y | P |
| Beacon Bay Auto Wash SA | 1501 W MacArthur Blvd. | Santa Ana | Y | Y | Y | Y | | N | N | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y | Y | N | Y | P |
| Chevron 1921 | 3801 S. Bristol St. | Santa Ana | Y | Y | Y | Y | | N | | Y | Y | N | Y | Y | Y | N | Y | Y | Y | Y | Y | N | Y | P |
| ARCO 3085 | 3361 S Bristol St. | Santa Ana | Y | Y | Y | Y | | N | | | | | | | | | | | | | | | | |
| Chevron 9-5401 | 5992 Westminster Blvd. | Westminster | Y | Y | Y | Y | Westminster Shell | N | N | P | Y | N | P | Y | Y | Y | Y | Y | Y | Y | Y | Y | P | Y |
| Unocal 5123 | 14972 Springdale St | Huntington Beach | Y | Y | Y | Y | P (Huntington Beach Arco) | N | N | P[3] | Y[3] | N | Y[3] | P[3] | Y[3] | P[3] | Y | Y[3] | P[3] | Y[3] | N | P[3] | P[3] | P[3] |
| Shell 6502 | 6502 Bolsa Ave. | Huntington Beach | Y | Y | Y | Y | | N | N | Y | Y | N | Y | N | N | N | Y | N | N | Y | N | N | N | N |
| Thrifty 368 | 6311 Westminster Blvd. | Westminster | Y | Y | Y | Y | Unocal 5226 | N | N | Y | Y | N | Y | N | N | N | P | N | N | Y | N | N | P | N |
| Unocal 5226 | 6322 Westminster Ave | Westminster | Y | Y | Y | Y | Thrifty 368 | Y | N | Y | Y | N | Y | N | N | N | N | N | N | Y | N | N | P | N |
| Westminster Shell | 5981 Westminster Blvd | Westminster | Y | P | Y | Y | Chevron 9-5401 | N | N | Y | Y | N | Y | N | N | Y | P | Y | Y | Y | P | Y | Y | Y |
| Huntington Beach Arco | 6002 Bolsa Ave. | Huntington Beach | Y | Y | Y | Y | P (Unocal 5123) | N | N | Y | Y | N | Y | N | N | Y | Y | N | N | Y | N | N | Y | P |
| USA Gasoline 141 | 14600 Edwards St | Westminster | Y | Y | Y | Y | | N | N | N | Y | N | Y | N | N | Y | Y | P | P | Y | N | N | N | N |
| Conoco Phillips 5792 | 4002 Ball Rd | Cypress | Y | P | Y | P | | N | N | Y | Y | N | Y | N | N | Y | Y | P | P | Y | N | N | N | N |
| ARCO 6036 | 13142 Goldenwest St. | Westminster | Y | Y | Y | Y | | N | N | Y | Y | N | Y | N | N | Y | Y | N | N | Y | Y | Y | P | Y |
| Chevron 9-5568 | 12541 Seal Beach Blvd. | Seal Beach | Y | Y | Y | Y | | N | N | Y | Y | N | Y | N | N | Y | Y | N | N | Y | N | N | P | P |
| World Oil 39 | 3450 Ball Road | Anaheim | Y | P | Y | Y | | N | N | Y | Y | N | Y | N | N | Y | Y | N | N | Y | N | N | P | P |

**Notes**

| | |
|---|---|
| Y | Yes |
| N | No |
| P | Possible |
| P[1] | Possible (No analysis for TBA has been performed at this facility) |
| P[2] | No analysis for MTBE since 1997 |
| Y/P[3] | Deeper zones |
| MTBE | methyl tert-butyl ether |
| TBA | tert-butyl alcohol |



Exhibit 36
Date 1/2/12
Deponent Bruxur

# Exhibit 3

Anthony Brown

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION
MDL No. 1358 (SAS)


This Document Relates to:


      ORANGE COUNTY WATER DISTRICT
      v. UNOCAL CORPORATION, et al.,
      Case No. 04 CIV.4968 (SAS)
_____/


-- -- --

FRIDAY, DECEMBER 30, 2011

-- -- --

      Videotaped Deposition of ANTHONY BROWN,
Expert Witness, Volume II, held at the Law Offices of
Arnold & Porter, 777 S. Figueroa Street, Suite 4400,
Los Angeles, California, beginning at 9:10 a.m.,
before Sandra Bunch VanderPol, FAPR, RMR, CRR, CSR
#3032

-- -- --


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
Deps@golkow.com

Anthony Brown

Page 214

1  BY MR. DUCHESNEAU:
2     Q.   How could you determine whether or
3  not there -- strike that.
4        How could you determine the -- why there is
5  a discrepancy between Exhibit 21 and Exhibit 18?
6     A.   I could make a quick phone call to
7  Mr. Eisen, who compiled this Summary Table.
8     Q.   Okay.  Maybe we will do that at a --
9  at a break at some point in time.
10    A.   Sure.
11    Q.   And if you -- this might be affected
12 by the significance of the gradient, I would imagine,
13 of the number used in Item No. 30 -- strike that.
14       Let me ask you this:  Go down to now Item 33
15 in your chart.
16    A.   Yes.
17    Q.   And you have your -- what you
18 indicated as what is the estimated advective solute
19 transport velocity in the first aquifer.
20       What is advective solute transport velocity?
21    A.   Essentially, it's the unretarded
22 velocity of groundwater moving through the aquifer
23 materials.
24    Q.   So in kind of layman's terms, it's
25 how fast the groundwater would move underneath the

Page 215

1  site at that depth?
2     A.   Correct.  And realistically, it's the
3  fastest rate at which the groundwater would move.
4     Q.   Okay.  And that rate, it takes into
5  account the hydraulic gradient in its calculation,
6  right?
7     A.   Correct.
8     Q.   All right.  So we might have to go
9  back and revisit, depending on what your response is
10 when you make your phone call.
11    A.   Certainly, yes.  I can confirm
12 whether these numbers are, in fact, still correct or
13 whether they need to be adjusted.
14    Q.   Okay.  That aside, in terms of the
15 particular value right now for the gradient or the
16 velocity, have you attempted to prepare any estimates
17 as to how long it may have taken contamination at the
18 site to migrate from one location to the other?
19    A.   No.
20    MS. O'REILLY:  Vague and ambiguous.
21    Go ahead.
22    THE WITNESS:  No.
23 BY MR. DUCHESNEAU:
24    Q.   Okay.  And has anybody on your staff
25 attempted to do any calculations or estimates as to

Page 216

1  how long contamination may have taken to migrate from
2  one location to another at the facility -- at the
3  site?
4     A.   Other than the calculations we have
5  discussed, not that I'm aware of.
6     Q.   Okay.  So just only calculating the
7  values for the gradient and the velocities, correct?
8     A.   Correct.
9     Q.   Now, also as part of Exhibit 21, you
10 have a diagram which I believe you referred to it as
11 a rose diagram concerning flow direction.
12       If you can take that out.  And I see you do
13 have that in front of you.
14    A.   Yes.
15    Q.   And in looking at this diagram
16 concerning the station, maybe you could explain to me
17 what it represents.
18    A.   Certainly, yes.
19       We could imagine that this rose diagram
20 would resemble a compass, where around the outside of
21 the rose diagram it has the directions.  So north
22 through east, south, west, and increments between
23 those directions.
24       And then the axis from the center out to the
25 edge of the circle is the number of times the flow

Page 217

1  direction was reported in that particular compass
2  direction.
3        So, for example, if we consider the
4  southerly direction, we can see that a southerly flow
5  direction was reported 20 times in the documents
6  reviewed for the USA Gasoline Service Station 141;
7  whereas, for a southwesterly direction, it was
8  reported 15 times, and even for a northerly direction
9  just once.
10    Q.   So the -- the data that goes into
11 this rose diagram comes out of the site documents for
12 the investigation of the station?
13    A.   That is correct.  Taken directly from
14 the documents prepared by consultants for USA
15 Gasoline.
16    Q.   And have you formulated your own
17 opinion with regard to the flow direction of
18 groundwater in the vicinity of the station?
19    A.   My opinion is based on the reported
20 information from the consultants' reports.  And that
21 the groundwater flow would be between southerly and
22 west-southwesterly.  On an average, it appears that
23 it would probably be in a generally southwesterly
24 direction.  And then I believe we reported in my
25 expert report on page 11, under Section 2.2, "Local

9  (Pages 214 to 217)

Anthony Brown

Page 218

1    Hydrogeology."
2         Q.    All right.  Let me turn your
3    attention to page 8 of your initial report that's
4    Exhibit 18.
5         Now, at the bottom of page 8 you write under
6    the header "Present," and in parentheses "May 2011,"
7    you write, "Based on review and evaluation of
8    investigation and remedial activities performed at
9    the facility to date, the following opinions are
10   presented."
11        And then you have 1 through 10 which follows
12   on to page 9 of your report.  Are you following me
13   there?
14        A.    Yes.
15        Q.    And is that a summary of your overall
16   opinions concerning the station?
17        A.    For this station, yes.  And then what
18   I have attempted to perhaps -- I wouldn't say expand
19   on, clarify my opinions, as I drafted what we have
20   referred to as Exhibit 5, I believe, which presents
21   22 separate opinions and addresses those opinions for
22   each of the sites.
23        To date, I have completed that for the 12
24   sites that appear on Exhibit 5.  And I should have
25   that complete for all sites by next Monday.

Page 219

1         Q.    And for the station we're discussing
2    this morning, it is the last one you have listed on
3    Exhibit 5, right?
4         A.    Correct.  Yes.
5         Q.    Okay.  So with regard to your
6    opinions concerning the station, we could work off of
7    Exhibit 5 rather than working off of page 8 and 9 of
8    those opinions?
9         A.    Correct.  I have prepared Exhibit 5
10   for the purpose of hopefully expediting the
11   deposition process, and that we could go through
12   ideally, if need be, one or all of the opinions as
13   they relate to each station.
14        Q.    All right.  Then we will attempt to
15   do it that way, inasmuch as possible.
16        So if you look at Exhibit 5, the last row
17   there, again, you write "USA Gasoline 141," so at
18   14600 Edwards Street, Westminster.  And that is,
19   again, the station that we have been discussing this
20   morning, correct?
21        A.    That is correct, yes.
22        Q.    All right.  And so your first column
23   indicates "Releases of MTBE have occurred at the
24   facility?"  And you have a "Y" for "yes."  We have
25   already had some testimony on that as well, which I

Page 220

1    won't go over, other than let me ask you the -- what
2    is the general basis for your opinion there?
3         A.    It would be the detection of MTBE in
4    soil and groundwater beneath the facility.
5         Q.    Okay.  And, again, unless you have
6    something to add, I won't retread some ground we
7    already covered.  But with regard to the basis for
8    your opinion that TBA has been released at the
9    facility, what is the basis?
10        A.    It would be the detection of TBA in
11   groundwater at the facility and the additional
12   information we discussed as part of an earlier
13   question.
14        Q.    So we have already discussed the --
15   to the extent that you have an opinion as to when
16   those releases may have occurred, correct?
17        A.    Correct.
18        Q.    All right.  Your next column,
19   Mr. Brown, indicates, "MTBE has impacted soil and
20   groundwater beneath the facility and off-site beyond
21   the facility boundaries?"
22        There's a lot there, so I just want to get
23   an understanding as to what is meant by this column.
24        For -- for this column, you've indicated
25   MTBE has impacted soil and groundwater beneath the

Page 221

1    facility, correct?
2         A.    Correct.
3         Q.    And then you also indicate "and off
4    site beyond the facility boundaries."
5         So you have, in some sense in your mind, two
6    locations there --
7         A.    Correct.
8         Q.    -- is that right?  Okay.
9         And what do you mean by "off site beyond the
10   facility boundaries"?
11        A.    That would be that MTBE is present in
12   neither soil or groundwater and beyond the boundaries
13   of the station itself.
14        Q.    Okay.  And you had prepared a few
15   figures for the station that was part of -- part of
16   your initial report, and I think you reproduced them
17   as part of Exhibit 21, right?
18        A.    Correct.
19        Q.    All right.  Now, the figures in
20   Exhibit 21 were the same thing as your figures in 18?
21   Or were they changed in any way?
22        A.    In Figure 21 -- sorry.  In
23   Exhibit 21, the figures that we produced, for
24   example, what we refer to as Figure 6 and Figure 7,
25   would be similar to those that were produced as part

10  (Pages 218 to 221)

Anthony Brown

---

Page 254

1  additional activities, in your opinion, that need to
2  be done with regard to the Station 141?)
3       THE WITNESS:  The only one that I can think
4  of would be the ongoing periodic sampling that's
5  being performed at the site by the consultants for
6  USA Gasoline.
7  BY MR. DUCHESNEAU:
8       Q.    Mr. Brown, have you developed a cost
9  estimate for the additional vertical investigation
10 that you testified to today?
11      A.    Yes, we have.
12      Q.    All right.  And could you refer that
13 to me?  Well, strike that.
14      Do you have that in writing?
15      A.    Yes, we do.
16      Q.    All right.  And where is that in
17 writing?
18      A.    First of all, on page 9 of my expert
19 report, which is referred to as Exhibit 18.
20      Q.    Okay.
21      A.    Under Opinion No. 9 it indicates that
22 the cost of additional investigation will be no less
23 than $79,050.  And we gave a break-out of those
24 costs, I believe, as part of my expert report.
25      Do you want -- I have a copy, I know, in my

---

Page 255

1  file, if you want me to get that.
2       Q.    Before we get to that, maybe we
3  can -- we will do it at a break, just to try to keep
4  things rolling here.  We are going at a decent pace,
5  at least.
6       A.    Good.
7       Q.    And maybe what we will do, if we take
8  the next break, if I could remind you just to make
9  that telephone call to your staff so we can resolve
10 that gradient question.
11      Okay.  So you're referring to Opinion 9 on
12 page 9 of your initial report.  This -- if you
13 know -- and if you need to, you just tell me, and you
14 can pull out your -- your other documents.
15      But, if you know, would the $79,000 be the
16 approximate cost for the three wells you discussed or
17 the three groundwater samples you discussed earlier
18 today?
19      A.    Actually, the standard costs we
20 developed for additional investigation would be for
21 CPTs and associated hydropunch samples.  And there is
22 actually a standard cost based on five locations.
23      So for the USA Gasoline Station, I believe
24 only three locations would be required at this stage;
25 therefore, the costs would be somewhat less.

---

Page 256

1       Q.    Okay.  And if you go to your next
2  opinion on page 9, Opinion No. 10, which indicated,
3  "The scope and costs developed for investigation and
4  remediation activities at G & M Oil No. 04 and ARCO
5  1905 can be used as a basis to reasonably estimate
6  the scope and costs for the additional remediation
7  required at this facility, once additional
8  investigation has been performed."
9       I had already asked you this question, and
10 that was if this additional investigation that you've
11 opined on came up nondetect, then your opinion is
12 nothing more would need to be done, right?
13      A.    That is correct.
14      Q.    And then in that case, Opinion 10
15 would not apply, correct?
16      A.    That is correct.
17      MR. DUCHESNEAU:  Let me suggest this.  Why
18 don't we go off the record to give Mr. Brown a moment
19 to call his staff.  I'm coming close, but I'd like to
20 you to have the opportunity to talk to your staff in
21 case I have more examination based on whatever comes
22 out of it.  I can check my notes then, and we can
23 determine --
24      THE WITNESS:  Okay.  Sounds good.
25      MR. DUCHESNEAU:  -- how much more I need

---

Page 257

1  before we finish up.  If it's okay with everybody,
2  let's go off the record.
3       THE VIDEOGRAPHER:  With the approval of
4  counsel, we are going off the record.  The time is
5  approximately 11:07 a.m.
6       (Recess taken.)
7       THE VIDEOGRAPHER:  With the approval of
8  counsel, we are back on the record.  The time is
9  approximately 11:18 a.m.  This is the beginning of
10 Disc No. 2.
11 BY MR. DUCHESNEAU:
12      Q.    Okay.  Mr. Brown, any success in
13 getting through to your staff?
14      A.    No.  I left a voice mail and sent an
15 e-mail, but I have not heard back.
16      Q.    Well, let me ask you it this way,
17 maybe.  With regard to the question we had about the
18 difference in the gradient value in your chart
19 produced yesterday and in your initial report,
20 regardless of how that discrepancy comes out, it's
21 not going to affect your opinion that you've
22 expressed in Exhibit 5 and expressed today, is it?
23      A.    I don't believe so, no.
24      Q.    Okay.  And to the extent that there
25 is any inconsistency between Exhibit 5 and your

19 (Pages 254 to 257)

Anthony Brown

Page 258

1  written opinions that would be from Exhibit 1818
2  through, I believe it's 20, would it be fair to say
3  that what you testified to today, and as depicted in
4  Exhibit 5, would be your most current opinion?
5      A.   That is correct.
6      Q.   So if there's any discrepancy -- and
7  I'm not sure if there is or not -- but if there's any
8  discrepancy, we should refer to Exhibit 5 in your
9  testimony today, correct?
10     A.   That is correct.  I believe Exhibit 5
11 would not only be the most current, but we developed
12 Exhibit 5 to try to clarify some of the opinions
13 which could be construed as somewhat uncertain in the
14 expert reports.
15     Q.   Okay.  Now, going back to those CPT
16 borings and groundwater samples that you believed
17 should be done, in your opinion, for additional
18 vertical characterization at the -- all right, strike
19 that.  Technical difficulties.  We will go back.
20 All right, strike that.
21     So with regard to your opinion as to the
22 additional three CPT borings that should be done and
23 groundwater samples for additional information on
24 vertical characterization at the site, do you have an
25 opinion as to the depths at which samples should be

Page 259

1  taken?
2      A.   Yes.
3      Q.   And what are -- what is your opinion?
4      A.   I believe that groundwater samples
5  should be taken at depths consistent with the
6  existing sampling depths from the most recent CPTs
7  advanced on behalf of Orange County Water District,
8  that is, CPT U-141A, U-141B and U-141D.
9      The specific depth in the sample would be
10 determined in the field based on the CPT log.  So it
11 may vary by a few feet compared to the samples taken
12 at the existing CPT locations.
13     Q.   Okay.
14     A.   And they would extend down to a depth
15 of plus or minus 90 feet.
16     Q.   Now, you had mentioned that with
17 regard to the cost estimates, you had an opinion that
18 was developed, I believe it was for an ARCO Station
19 and a G & M Oil station, correct?
20     A.   Correct.
21     MR. DUCHESNEAU:  And, Counsel, what I would
22 propose doing, if it's okay with you, to facilitate
23 things, I -- I think I have a very few questions on
24 that, and it may be more efficient to allow counsel
25 for G & M and ARCO to dive into those documents to

Page 260

1  the extent they want.
2      And if it's okay with you, if I have any
3  follow-up on that, I could do it then, but I really
4  don't think I would have much.  It would just be more
5  efficient for us all.  Is that okay with you?
6      MS. O'REILLY:  Yes.
7      MR. DUCHESNEAU:  Okay.
8      Q.   All right.  Mr. Brown, have we
9  covered the gamut of your opinions today as to the
10 station?
11     A.   I believe so.
12     Q.   There's nothing burning on your mind
13 that we haven't covered with regard to the station?
14     A.   I cannot think of anything, no.
15     MR. DUCHESNEAU:  Okay.  Well, then if that's
16 the case, I do appreciate your time today.  Good to
17 see you.
18     And at this point in time I have no further
19 questions other than, as I said, subject to the --
20 what I said as to the cost estimates.
21     THE WITNESS:  Thanks -- thank you,
22 Mr. Duchesneau.
23     MR. DUCHESNEAU:  All right.  Thank you.
24 All right.  Why don't we go off the record.
25     THE VIDEOGRAPHER:  With the approval of

Page 261

1  counsel, we are going off the record.  The time is
2  approximately 11:23 a.m.
3      (Off the record.)
4      THE VIDEOGRAPHER:  With the approval of
5  counsel, we are back on the record.  The time is
6  approximately 11:28 a.m.
7      EXAMINATION RESUMED
8  BY MR. COX:
9      Q.   Good morning again, Mr. Brown.
10     A.   Good morning.
11     Q.   Yesterday I was questioning you about
12 Mr. Daus's expert report that we marked as Exhibit 3,
13 and there were some figures to that.  Do you happen
14 to have that in front of you?
15     A.   Mr. Daus's figures?
16     Q.   Mr. Daus's figures.  Only because
17 they are the ones I happen to have brought back with
18 me.
19     A.   Do you recall the exhibit number?
20     Q.   3.
21     A.   It should be in that stack there.
22     Q.   2.  Exhibit 2.  Figure 3.
23     THE REPORTER:  These should be in order.
24     MR. COX:  Yes.  I will help you.
25     Q.   Placing Exhibit 2, Figure 3, before

Anthony Brown

Page 367

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION
MDL No. 1358 (SAS)


This Document Relates to:

        ORANGE COUNTY WATER DISTRICT
        v. UNOCAL CORPORATION, et al.,
        Case No. 04 CIV.4968 (SAS)
_____/



            -- -- --

        MONDAY, JANUARY 2, 2012

            -- -- --


        Videotaped Deposition of ANTHONY BROWN,
Expert Witness, Volume III, held at the Law Offices
of Arnold & Porter, 777 South Figueroa Street,
Suite 4400, Los Angeles, California, beginning at
9:12 a.m., before Sandra Bunch VanderPol, FAPR, RMR,
CRR, CSR #3032

            -- -- --




_____

        GOLKOW TECHNOLOGIES, INC.
    877.370.3377 ph|917.591.5672 fax
        Deps@golkow.com

Anthony Brown

Page 440

1    counsel, we are back on the record.  The time is
2    approximately 11:15 a.m.  This is the beginning of
3    Disc No. 2.
4        MR. COX:  If you need to go back off, just
5    let me know.
6        Q.    We are about to move to Thrifty 368,
7    but before we leave we ARCO 6036, Mr. Brown, I just
8    want to make sure that under column 22 for ARCO 6036,
9    "Releases at the facility pose a threat to water
10   supply wells," it's your opinion more likely than not
11   that releases at the ARCO 6036 location don't pose a
12   threat to water supply wells, correct?
13       A.    While it is possible that the
14   releases at ARCO 6036 pose a threat to water supply
15   wells, I have not been able to reach that conclusion
16   that it is more likely than not.
17       Q.    And we probably covered this before,
18   but let me take a slightly different tack.
19       I know you can't quantify what you mean by
20   "possible," but can you describe it with any more
21   specificity than -- there's a lot of range of
22   possibilities.  If so, I'd be interested in
23   additional definition around your use of the word
24   "possible."
25       MS. O'REILLY:  Vague.  Ambiguous.

Page 441

1    Overbroad.
2        THE WITNESS:  And in particular you're
3    referencing this one opinion, the threat to water
4    supply wells?
5    BY MR. COX:
6        Q.    Yes.  The threat to water supply
7    wells that we've been spending a lot of time on.
8        A.    In evaluating each of the specific
9    service stations, I would obviously look at the
10   historical and current contaminant concentration
11   data, groundwater flow direction, the remediation
12   activities that have occurred at the site.  And based
13   upon that and potential data gaps that exist, I would
14   attempt to reach a conclusion that it is more likely
15   than not that the contaminants do pose a threat to
16   water supply wells.  And that would be indicated by a
17   "Y" in the column for that particular question --
18       Q.    Right.
19       A.    -- or it's more likely than not they
20   don't.  In which case that would be indicated by an
21   "N," that I have reached that conclusion that it's
22   more likely than not that they don't.
23       However, for most of them I could not reach
24   a conclusion either way, and it's simply possible
25   that they do.  And, conversely, possible that they

Page 442

1    don't.
2        Q.    So if you looked at a site, let's say
3    ARCO 6036 since we're there, and concluded it was
4    unlikely that the site posed a threat to a drinking
5    water supply, you would still give that site -- in
6    this case ARCO 6036 -- a "P," correct?
7        A.    If I could not conclude that it was
8    more likely than not, I would give it a "P."
9    Assuming, again, that I could not conclude that it
10   was not more likely than not.  We're getting too many
11   negatives.
12       Q.    A lot of negatives here.  Let's
13   assume that you concluded that it was unlikely that
14   ARCO 6036 was a threat to drinking water supply, you
15   would still give ARCO 3036 a "P," correct?
16       MS. O'REILLY:  Vague and ambiguous.
17       Go ahead.
18       THE WITNESS:  It actually could get a "P" or
19   an "N."  We're talking generically across all of the
20   potential sites.
21       MR. COX:  Okay.
22       THE WITNESS:  If I was confident enough to
23   feel that it was more likely than not that it doesn't
24   represent a threat, then it would get an "N."
25   ///

Page 443

1    BY MR. COX:
2        Q.    But if it was unlikely but you
3    couldn't conclude it was more likely than not, it
4    would get a "P"?
5        A.    Correct.
6        MR. COX:  All right.  I think I'm beginning
7    to understand your grading scale better.  Thank you.
8        Moving on to Thrifty 368.  I'd like to mark
9    your expert report for Thrifty 368 as next in order.
10   Can I do that?
11       MS. WELCHANS:  Yes.
12       MR. COX:  Okay.
13       THE REPORTER:  Exhibit 42.
14           (Exhibit No. 42 was marked.)
15   BY MR. COX:
16       Q.    And, Mr. Brown, under the "Pathway
17   and Receptor Summary" section of Exhibit 42, at
18   page 12, the very first sentence states, quote,
19   "Gasoline containing MTBE was released at the
20   facility prior to February 1996, and MTBE can be
21   traced from the source area to groundwater beneath
22   the facility."  Do you see that?
23       A.    Yes.
24       Q.    Can you tell me what pre-February
25   1996 releases you're referring to there?

20  (Pages 440 to 443)

Anthony Brown

Page 472

1  BY MR. COX:
2      Q.   And did you make any assumptions
3  about the mass of the plume that extends off-site
4  beyond Unocal 5226?
5      A.   Not the mass, no.  As I indicated, we
6  did not perform those calculations.
7      Q.   Why?
8      MS. O'REILLY:  Vague and ambiguous.
9  Go ahead.
10     THE WITNESS:  It was not something we were
11 asked to do as part of our retention in this matter.
12 BY MR. COX:
13     Q.   Okay.  Back to your conceptual model
14 on getting MTBE from Thrifty 368 and/or Unocal 5226
15 up to WM-RES2.  Can you provide some more detail to
16 me, because at this point it looks like the primary
17 groundwater flow direction from those sites is to
18 the -- the south, away from WM-RES2.
19     A.   That's correct.  It is predominantly
20 to the south.  And the plume extends to the south and
21 does not appear to extend in any other direction.
22 That's within the shallow semi-perched zone.
23     Q.   All right.  And you testified that
24 WM-RES2 is maybe in the Beta, Lambda and Omicron zone
25 aquifers?

Page 473

1      A.   It's in the -- that's correct.
2      Q.   Okay.  Conceptually how is it that
3  MTBE from these two locations migrate to the
4  northwest and, in your opinion, possibly threaten
5  WM-RES2?
6      MS. O'REILLY:  Vague.  Ambiguous.
7  Overbroad.
8      THE WITNESS:  I believe I've not indicated
9  that the release at these stations poses a threat to
10 that specific well.
11 BY MR. COX:
12     Q.   Oh, okay.
13     A.   You asked me earlier what are the
14 wells in the vicinity of this site.
15     Q.   Good point.
16     A.   My view, which perhaps I can
17 articulate and clarify.
18     Q.   Yes, please -- please do.  Because I
19 was lost there for a little bit.
20     A.   Is that for the Thrifty 368 site, the
21 release poses a possible threat to water supply wells
22 in the vicinity.  Realistically those water supply
23 wells, in my view, would be those located to the
24 south of the station.  And as I indicated, I cannot
25 conclude that it is more likely than not that the

Page 474

1  contamination poses a threat.
2      Q.   Got it.  But sticking with WM-RES2,
3  it's your conclusion that more likely than not
4  Thrifty 368 is not a threat to that well, correct?
5      MS. O'REILLY:  Vague and ambiguous.
6  Go ahead.
7      THE WITNESS:  I would agree with that
8  conclusion, yes.
9  BY MR. COX:
10     Q.   Okay.  And that has to do with
11 groundwater flow direction, correct?
12     MS. O'REILLY:  Misstates the testimony.
13 Go ahead.
14     THE WITNESS:  It actually has several
15 things.
16     MR. COX:  All right.
17     THE WITNESS:  Firstly, the groundwater flow
18 direction in the semi-perched aquifer is almost due
19 south.  It is likely that the groundwater flow
20 direction in underlying aquifers would be in a
21 generally southerly direction, perhaps in some cases
22 southwest, southeast, but most definitely it would
23 not be to the north.
24     The pumping of Well WM-RES2 would create a
25 capture zone that extends to the south, but I do not

Page 475

1  believe it would extend as far as Thrifty 368.  So
2  even if contaminants from site 338 migrated
3  vertically and entered aquifers that were within the
4  capture zone of well WM -- sorry, entered aquifers
5  from which WM-RES2 withdrew water, I do not believe
6  that the contaminants, or I think it unlikely that
7  the contaminants would be within the capture zone of
8  that well.
9  BY MR. COX:
10     Q.   All right.  So the well that -- or
11 wells that Thrifty 368 possibly threatens are what is
12 reflected on Exhibit 43, SHAF-WM?
13     A.   Correct.
14     Q.   Is it your opinion that Thrifty 368
15 threatens HB-4, HB-13, or HB-7?
16     MS. O'REILLY:  Vague.  Ambiguous.
17 Overbroad.  Compound.
18     THE WITNESS:  Based upon the data I've
19 reviewed and the analysis that I have performed, I do
20 not believe that it is likely that the release at
21 Thrifty 368 poses a threat to Wells HB-4, HB-7 and
22 HB-13.
23 BY MR. COX:
24     Q.   Do you believe it is more likely than
25 not that Thrifty 368 poses a threat to those wells?

28 (Pages 472 to 475)

Anthony Brown

Page 476

1     MS. O'REILLY: Same objection. Compound.
2     THE WITNESS: I think I just answered that
3  by saying, no, I don't think it does.
4     MR. COX: Okay. Thank you. I think you
5  might have answered likely as opposed to more likely
6  than not.
7     THE WITNESS: Okay.
8     MR. COX: Okay. All right. Let's take a
9  minute or two, maybe go off the record and clean up
10  the table as we move to Huntington Beach ARCO.
11     THE VIDEOGRAPHER: With the approval of
12  counsel, we are going off the record. The time is
13  approximately 1:19 p.m.
14     (Off the record.)
15     THE VIDEOGRAPHER: With the approval of
16  counsel, we are back on the record. The time is
17  approximately 1:22 p.m.
18     MR. COX: Okay. I'd like to mark as
19  exhibit next in order Figure 6 to Mr. Brown's expert
20  report for the Huntington Beach ARCO.
21     THE REPORTER: Exhibit 51.
22     (Exhibit No. 51` was marked.)
23     MR. COX: And, let's see, what else do we
24  have here?
25     I'd like to mark as Exhibit 52 Figure 8, the

Page 477

1  Receptor Location Map, to Mr. Brown's expert report
2  for the Huntington Beach ARCO.
3     (Exhibit No. 52 was marked.)
4     MR. COX: I would like to mark as Exhibit 53
5  the rose chart groundwater flow direction information
6  for the Huntington Beach ARCO.
7     (Exhibit No. 53 was marked.)
8     MR. COX: And I'd like to mark as Exhibit 54
9  the rose groundwater flow information for the Unocal
10  5123.
11     (Exhibit No. 54 was marked.)
12     MR. COX: That's actually 55?
13     THE REPORTER: 54.
14  BY MR. COX:
15     Q.   Mr. Brown, I'm assuming that your
16  conclusion with respect to question 20 and the
17  Huntington Beach ARCO is that it's possible that
18  releases at the facility more likely than not pose a
19  threat to water supply wells, correct?
20     A.   That is correct. And I believe it's
21  question 22.
22     Q.   22, thank you. You would think I
23  could get that right.
24     So I don't make the same mistake I made last
25  time, which water supply wells, in your opinion, are

Page 478

1  threatened more likely than not by the
2  Huntington Beach ARCO?
3     A.   It would be Well HB-1.
4     Q.   Okay. And I believe the analytical
5  result summary for Well HB-1 reflects that it has
6  never had an MTBE detection, correct?
7     A.   Correct. Could you just bear with me
8  one second --
9     Q.   Sure.
10     A.   -- with regard to the previous
11  question.
12     I have completed my answer to that question.
13     Q.   Okay. So, in your opinion, more
14  likely than not the Huntington Beach ARCO is not a
15  threat to water supply Well HB-7, correct?
16     MS. O'REILLY: Vague and ambiguous.
17     THE WITNESS: That's not what I concluded.
18  BY MR. COX:
19     Q.   Okay. Tell me what you have
20  concluded.
21     A.   As I indicated in response to a
22  previous question, if I believe the release at a
23  particular site is more likely a threat to nearby
24  water wells, I have indicated that is a "Yes" in
25  response to question 22.

Page 479

1     Q.   Correct.
2     A.   If, based on the information I have
3  reviewed and the analysis I have performed to date, I
4  believe that the release at a particular station is
5  more likely not a threat to a particular well, I have
6  indicated an "N" to that question.
7     If I've been unable to determine either of
8  those situations, then I have indicated it's a
9  "Possible." So it is possibly a threat and,
10  conversely, it is possibly not a threat.
11     But based on the review and the analysis I
12  have performed to date, I haven't been able to reach
13  the "yes" and "no" answers.
14     Q.   Okay. Well, then let me try
15  answering it this way: Have you concluded with
16  respect to Well HB-7, that the Huntington Beach ARCO
17  is not a possible threat?
18     MS. O'REILLY: Vague and ambiguous.
19  Go ahead.
20     THE WITNESS: Yes.
21  BY MR. COX:
22     Q.   And have you concluded with respect
23  to Well HB-13, that the Huntington Beach ARCO is not
24  a possible threat to that well?
25     MS. O'REILLY: Same objection.

29 (Pages 476 to 479)

Anthony Brown

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION
MDL No. 1358 (SAS)

This Document Relates to:

        ORANGE COUNTY WATER DISTRICT
        v. UNOCAL CORPORATION, et al.,
        Case No. 04 CIV.4968 (SAS)
_____/


            --  --  --

        TUESDAY, JANUARY 3, 2012

            --  --  --

        Videotaped Deposition of ANTHONY BROWN,
Expert Witness, Volume IV, held at the Law Offices of
Arnold & Porter, 777 South Figueroa Street, Suite
4400, Los Angeles, California, beginning at 9:08
a.m., before Sandra Bunch VanderPol, FAPR, RMR, CRR,
CSR #3032

            --  --  --

_____

        GOLKOW TECHNOLOGIES, INC.
    877.370.3377 ph|917.591.5672 fax
        Deps@golkow.com

Anthony Brown

Page 634

1    Not the subject of his expert opinions.
2          Go ahead.
3          THE WITNESS:  I could infer or perhaps
4    speculate that it was used in some way to select
5    bellwether sites.
6    BY MR. CONDRON:
7          Q.    Other than Mr. Herndon and Mr. Bolin,
8    anybody else from OCWD that you had discussions with
9    about MTBE?
10         MS. O'REILLY: Same instruction.
11         Go ahead.
12         THE WITNESS: The only other individual I
13   recall meeting with was a Mr. Miller, Craig Miller.
14   BY MR. CONDRON:
15         Q.    And who is Craig Miller?
16         A.    I believe he was Mr. Herndon's
17   supervisor.  He no longer works at the Orange County
18   Water District.
19         Q.    And what did you meet with him about?
20         A.    I believe he was present at the
21   kickoff meeting with Mr. Herndon and Mr. Bolin.
22         Q.    Okay.  With regard to your report,
23   you prepared Feasibility Studies and remediation
24   reports regarding ARCO 1905 and G & M No. 4, correct?
25         A.    Correct.

Page 635

1          Q.    Why did you select those two sites to
2    do the reports for?
3          MS. O'REILLY: Objection. Assumes facts.
4    Lacks foundation.
5          Go ahead.
6          THE WITNESS: Those two sites were the sites
7    where we believed there was sufficient off-site
8    contamination that warranted remediation.
9          For the other sites, the current data would
10   not allow me to conclude -- or not allow me to
11   develop a Feasibility Study or a Remedial Action Plan
12   at this time.  And for those sites we had recommended
13   additional information be gathered for the sites.
14   BY MR. CONDRON:
15         Q.    Did you have any discussions with
16   anybody from Hargis?
17         A.    I personally --
18         MS. O'REILLY: Vague and ambiguous.
19         Go ahead.
20         THE WITNESS: I personally did not, no.
21   BY MR. CONDRON:
22         Q.    Do you know how Hargis selected the
23   particular sites that they did CPT testing at?
24         MS. O'REILLY: Vague and ambiguous.  Assumes
25   facts.  Lacks foundation.

Page 636

1          Go ahead.
2          THE WITNESS:  I do not know.
3    BY MR. CONDRON:
4          Q.    There have been some terms we've been
5    using the last couple of days, and I just want to
6    make sure that I'm clear on what they mean to you,
7    make sure they mean the same thing to you that they
8    mean to me so that we are discussing the same thing.
9          The first is, "delineation."  What do you
10   mean by "delineation," when you use that term?
11         MS. O'REILLY: Asked and answered.  Vague.
12         Go ahead.
13         THE WITNESS: "Delineation" means that one
14   has selected sufficient samples to understand the
15   lateral and vertical location of the contamination
16   that has been released from a particular facility.
17   BY MR. CONDRON:
18         Q.    And when you talk about delineation,
19   to what level -- strike that.
20         What level of detection or nondetection are
21   you looking for in order to determine whether or not
22   delineation has taken place?
23         MS. O'REILLY: Assumes facts.  Lacks
24   foundation.
25         Go ahead.

Page 637

1          THE WITNESS: For the purpose of the
2    assessment that we have conducted, we have considered
3    a delineation level at the secondary MCL
4    concentration of 5 micrograms per liter.  In some
5    instances there may be existing data that has
6    delineated to a level somewhat higher than that, not
7    significantly higher, where we then have concluded
8    that that was a reasonable level of delineation and
9    additional investigation would not be warranted in
10   that particular direction.
11   BY MR. CONDRON:
12         Q.    And that's for MTBE, correct?
13         A.    Correct.
14         Q.    How about for TBA?
15         A.    For TBA we considered the
16   notification level of 12 micrograms per liter.
17         Q.    Another term that we have been using
18   in your deposition is the term "threat."  And another
19   term I've seen in your report is "potential threat."
20   And I want to make sure I understand what you mean by
21   that.
22         What do you mean when you say the word
23   "threat" or use the term "threat"?
24         MS. O'REILLY: Vague and ambiguous.  Asked
25   and answered.

13  (Pages 634 to 637)

Anthony Brown

Page 638

1    Go ahead.
2         THE WITNESS:  In the context of this work,
3    the term "threat" would be defined as the
4    contamination that has resulted from a release at a
5    particular facility could potentially either impact
6    aquifers that would be used for or potentially used
7    for drinking water supply, and that's reflected in
8    question or opinion 21 on my summary table.
9    BY MR. CONDRON:
10        Q.    And that's Exhibit 36?
11        A.    Correct.
12        Q.    Okay.
13        A.    And also presents a threat to water
14   supply wells; that is, the contamination could
15   potentially impact the water supply well.
16        Q.    In your report you also use the term
17   "potential threat."  Do you distinguish between
18   "potential threat" and "threat"?
19        MS. O'REILLY:  Vague and ambiguous.
20        THE WITNESS:  We define threat in one of
21   three ways.  And those would be "yes," "no" and
22   "possible."  And that's the "P," for the possible.
23   And obviously "Y" and "N" for the "yes" and "no" on
24   the table.
25        As I have discussed in response to earlier

Page 639

1    questions, if we believe that it was more likely than
2    not the contamination posed a threat, then in
3    response to question No. 22, the answer would be
4    "Yes."
5         If we believe that the contamination did not
6    pose a threat, then the answer would be "No."
7         If we could not determine that it was more
8    likely than not that the contamination posed a
9    threat, but also not determine that it was more
10   likely than not that it did not pose a threat, then
11   it was left as a "Possible."
12   BY MR. CONDRON:
13        Q.    Okay.  That's helpful.  But in your
14   report you actually use the term in several places
15   "potential threat."  And I'm wondering if that's the
16   same thing as "threat," different than "threat,"
17   something else?
18        A.    I do not recall the specific
19   language.  As I indicated yesterday, Exhibit 36 would
20   be the opinions that I will be offering at trial.
21        Q.    So this is the latest and greatest --
22        A.    Correct.
23        Q.    -- Exhibit 36?
24        A.    Yes.
25        Q.    Okay.  Let me just make sure I

Page 640

1    understand how you're using the term "threat."  When
2    you say that something is a threat, is it your
3    opinion that absent some sort of affirmative action
4    or work on the part of someone to clean up
5    contamination, that that contamination is going to
6    impact drinking water aquifers?
7         MS. O'REILLY:  Asked and answered.  Vague
8    and ambiguous.
9         Go ahead.
10        THE WITNESS:  That would not be the case.
11   We have not performed that level of analysis.  It
12   would simply be that in the absence of some form of
13   mitigation, that the contamination could impact the
14   well.
15   BY MR. CONDRON:
16        Q.    So when you use the term "threat,"
17   you haven't made a determination that the
18   contamination is going to impact either an aquifer or
19   a well; is that correct?
20        MS. O'REILLY:  Vague and ambiguous.
21   Misstates testimony.
22        Go ahead.
23        THE WITNESS:  As I've indicated in response
24   to previous questions, as part of my work in this
25   matter, I did not perform the level of analysis that

Page 641

1    would allow me to determine whether contamination
2    would, in fact, reach a well, at what time, and at
3    what concentration.
4    BY MR. CONDRON:
5         Q.    Are you aware of any damaged property
6    that OCWD owns?
7         MS. O'REILLY:  Vague.  Ambiguous.  Overbroad
8    incomplete hypothetical.  Potentially calls for a
9    legal conclusion concerning "property."
10        THE WITNESS:  The term "property," are you
11   referring to, like, real estate or equipment?
12   BY MR. CONDRON:
13        Q.    Anything.
14        MS. O'REILLY:  Same objection, Counsel.
15   He's not here to testify as to damage to real estate,
16   so you need to clarify your question within the
17   confines of his opinions.
18        THE WITNESS:  First of all, I do not know
19   the enter realm of property that the Orange County
20   Water District owns.  So I don't think I could
21   probably offer a specific opinion as to whether
22   property was damaged, as I do not know the entire
23   universe of that property.
24   BY MR. CONDRON:
25        Q.    In your report in several places, you

14  (Pages 638 to 641)

Anthony Brown

Page 666

1    west.
2         Q.    And just for my purposes, when I was
3    looking at this diagram, does this Figure 3 use
4    something called vertical exaggeration?
5         A.    Yes --
6         MS. O'REILLY:  Vague.  Ambiguous.
7    Overbroad.
8         THE WITNESS:  Yes.  It's very common in
9    cross-sections to have the vertical scale larger than
10   the horizontal scale.
11   BY MR. CONDRON:
12        Q.    Okay.  So on the vertical scale it
13   looks like an inch is equal to about 20 feet, and on
14   the horizontal scale it looks like an inch is equal
15   to about 500 feet?
16        A.    Correct.
17        Q.    Okay.  And the result of that is that
18   things depicted graphically on the horizontal scale
19   appear much closer to each other than things on the
20   vertical scale?
21        A.    Essentially, yes.  If one used the
22   same scale for both horizontal and vertical and, say,
23   from this example we used a 500-foot scale for the
24   horizontal but the same for the vertical, you would
25   not be able to see any of the information vertically

Page 667

1    as, for example, Well 48 is only about 50 feet down.
2    And at 500 to an inch, that means the entire well
3    would be one-tenth of an inch.  And very difficult
4    even with these glasses to discern the information.
5         Q.    Alternatively you have a very large
6    piece of data?
7         A.    Or would have an extended piece of
8    paper that would run along the length of the table
9    here.
10        Q.    Fair enough.  Looking at your
11   opinions on page 7 of your report, Mr. Brown.
12   Specifically I wanted to look at Opinion No. 6 where
13   it says, "Remediation performed to date has failed to
14   effectively address on-site and/or off-site
15   groundwater contamination and has failed to prevent
16   off-site migration of MTBE in groundwater."  Do you
17   see that?
18        A.    Yes.
19        Q.    Based on Exhibit 36, is it now your
20   opinion that remediation at 6502 Bolsa has
21   effectively addressed on-site contamination?
22        A.    And off-site.
23        Q.    And off-site?
24        A.    In fact, in a copy of my report, I've
25   actually put a red line from the word "effectively"

Page 668

1    through to "failed to."
2         Q.    Okay.  So Opinion 6, then, is -- in
3    your report of May 28th, 2011, is no longer your
4    opinion?
5         A.    The opinions as stated on Exhibit 36
6    are the current opinions.
7         Q.    Okay.
8         A.    And Opinion No. 6 would, in fact,
9    change.
10        Q.    Did something change your mind about
11   this particular opinion since May?
12        A.    In particular, there was additional
13   off-site investigation performed by the Orange County
14   Water District.
15        Q.    And that's the Hargis work?
16        A.    Correct.
17        Q.    And what about that changed your
18   opinion?
19        A.    Essentially it -- that work
20   delineated the extent of the contamination laterally.
21        Q.    But you had that work when you
22   prepared this report, didn't you?
23        A.    No.  There was additional data that
24   came in later.
25        Q.    Okay.  What data are you talking

Page 669

1    about?
2         A.    Subsequent to the preparation of my
3    report, additional CPTs were advanced on behalf of
4    the Orange County Water District.  And those would be
5    CPTs S-6502J, S-2502K and S-6502L.
6         Q.    And what are you looking at right
7    now?
8         A.    At the beginning of the deposition I
9    produced a Figure 6 for this site.
10        Q.    Oh, okay.  I did not get that, I
11   don't think.  Or if I did, I have it and it didn't
12   appreciate that it was different than what's in your
13   report.
14        A.    And this shows a couple of things.
15   It shows the maximum concentrations of MTBE in
16   groundwater as reported for each of the wells.  It
17   also color codes the wells to indicate the saturated
18   unit they are screened within.  And it also included
19   additional data collected subsequent to the
20   preparation of my expert report.
21        Q.    Okay.  Let me see if I have that.
22   I'm sorry.  You said they were -J, -K --
23        A.    They were -K, -K and -L.  Here is the
24   figure.  This was placed on the FTP site on the day
25   prior to my deposition, and I produced copies at the

21 (Pages 666 to 669)

Anthony Brown

Page 838

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION
MDL No. 1358 (SAS)

This Document Relates to:

ORANGE COUNTY WATER DISTRICT
v. UNOCAL CORPORATION, et al.,
Case No. 04 CIV.4968 (SAS)
_____/


-- -- --

WEDNESDAY, JANUARY 25, 2012

-- -- --

Videotaped Deposition of ANTHONY BROWN,
Expert Witness, Volume V, held at the Law
Offices of Miller, Axline & Sawyer, 1050 Fulton
Avenue, Suite 100, Sacramento, California, beginning
at 9:17 a.m., before Sandra Bunch VanderPol, FAPR,
RMR, CRR, CSR #3032

-- -- --

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph│917.591.5672 fax
Deps@golkow.com

Anthony Brown

Page 911

1   BY MR. JEREMIAH ANDERSON:
2       Q.   Have you ever recommended the use of
3   monitored natural attenuation at an MTBE site in
4   California?
5       A.   Yes.  And I think we're recommending
6   it for some of the sites here.
7       Q.   So monitored natural attenuation can
8   be appropriate at a site, given the various factors
9   that you evaluate?
10      MS. O'REILLY:  Vague.  Ambiguous.
11  Overbroad.  Incomplete hypothetical.  Assumes facts.
12  Lacks foundation.
13      THE WITNESS:  If implemented appropriately,
14  it can be used as a -- either a sole remedial measure
15  or as a component to a remedial program.
16  BY MR. JEREMIAH ANDERSON:
17      Q.   And what circumstances do you look
18  for to evaluate to determine that monitored natural
19  attenuation may be appropriate?
20      MS. O'REILLY:  Vague.  Ambiguous.
21  Overbroad.
22      THE WITNESS:  I think the key issues would
23  be, firstly, the contaminant is delineated, you know
24  where it is both laterally and vertically.
25  ///

Page 912

1   BY MR. JEREMIAH ANDERSON:
2       Q.   In all directions?
3       A.   Correct.  Secondarily, that the
4   concentrations are low enough that natural processes
5   should reduce those concentrations over a reasonable
6   period of time.
7       And, thirdly, that sufficient data has been
8   collected to support the position that monitored
9   natural attenuation would be effective, most notably,
10  parameters that would allow you to conclude that
11  biodegradation was, in fact, occurring.
12      Q.   On your second point for the
13  contaminant MTBE, what's the level of the contaminant
14  that you consider sufficiently low for natural
15  attenuation to be appropriate?
16      A.   I think that --
17      MS. O'REILLY:  Vague.  Ambiguous.
18  Overbroad.  Incomplete hypothetical.
19  Go ahead.
20      THE WITNESS:  I think that's something that
21  would have to be evaluated on a site-by-site basis.
22  BY MR. JEREMIAH ANDERSON:
23      Q.   Exhibit -- I'm going to turn now to
24  -5399.  And before I do that, just Exhibit 36, with
25  the 22 questions about the various sites you

Page 913

1   addressed, other than the correction you made with
2   Mr. Adams earlier this morning regarding the
3   commingled plume, is there anything -- any other
4   answers to these questions for any of these stations
5   that you need to update or change today?
6       A.   Not that I'm aware of.
7       MS. O'REILLY:  Vague.  Ambiguous.
8   Overbroad.
9       THE WITNESS:  Now, in response to certain
10  questions in evaluating, there may be some changes,
11  but I'm not aware of any such.
12  BY MR. JEREMIAH ANDERSON:
13      Q.   Mr. Brown, you're familiar with the
14  former Unocal 5399 site at 9525 Warner Avenue in
15  Fountain Valley, correct?
16      A.   Yes.
17      Q.   Have you ever talked with the
18  environmental consultants that worked about this site
19  about the remediation and investigation they did at
20  this site?
21      MS. O'REILLY:  Vague.  Ambiguous.
22  Overbroad.
23      THE WITNESS:  No, I did not.  And I do not
24  believe any active remediation has actually been
25  implemented at the site, other than some soil

Page 914

1   excavation.
2   BY MR. JEREMIAH ANDERSON:
3       Q.   Now, you do not have an opinion as to
4   when MTBE gasoline was released from Unocal 5399,
5   correct?
6       MS. O'REILLY:  Vague.  Ambiguous.
7   Overbroad.  It misstates testimony.
8       THE WITNESS:  The only opinion that I would
9   have, would be that it occurred sometime prior to the
10  first detection of MTBE in groundwater, which was in,
11  I believe, 1996.
12  BY MR. JEREMIAH ANDERSON:
13      Q.   And you do not have an opinion as to
14  the total mass of MTBE that was released from Unocal
15  5399, correct?
16      A.   No, I do not.
17      Q.   And you don't have an opinion as to
18  the total volume of MTBE gasoline that was released
19  from upgradient 5399, correct?
20      MS. O'REILLY:  Vague and ambiguous.
21      THE WITNESS:  That's correct.
22  BY MR. JEREMIAH ANDERSON:
23      Q.   You do not have an opinion that
24  Unocal 5399 is the source of alleged MTBE detections
25  in any drinking water wells in Orange County, do you?

20  (Pages 911 to 914)

Anthony Brown

Page 915

1    MS. O'REILLY: Same objections. Incomplete
2  hypothetical.
3    Go ahead.
4    THE WITNESS: I have not performed the level
5  of analysis that would allow me to reach that kind of
6  opinion.
7  BY MR. JEREMIAH ANDERSON:
8    Q.   And you do not think that the alleged
9  MTBE released from Unocal 5399 is a threat to any
10  specific drinking water wells in Orange County,
11  correct?
12    MS. O'REILLY: Same objections. Misstates
13  testimony. Misstates opinions. Misstates report.
14    THE WITNESS: If you refer to Exhibit 35 for
15  Unocal station 5399, question 22.
16    MR. JEREMIAH ANDERSON: I think you meant
17  36.
18    THE WITNESS: Sorry, yes. Excuse me, 36.
19    Question 22 states, "Releases at the
20  facility pose a threat to water supply wells?"
21    I have concluded that it is more likely than
22  not that they do not pose such a threat.
23  BY MR. JEREMIAH ANDERSON:
24    Q.   You have not created a feasibility
25  plan for Unocal 5399, correct?

Page 916

1    A.   That's correct.
2    Q.   You have not created a Remedial
3  Action Plan for Unocal 5399, correct?
4    A.   Correct.
5    Q.   Looking at Exhibit 36. And as other
6  counsel have done, I'm just going to have to walk
7  through some of the answers to these questions
8  because of the way they are worded.
9    Question No. 2, if I understand your chart
10  correctly, you think that it's possible that TBA was
11  released from this site, but you don't have an
12  opinion as to whether or not it's more likely than
13  not that it was released?
14    A.   That's correct. Because no analysis
15  of TBA has been performed at this site. That's
16  footnote P-1.
17    Q.   So you don't -- if I understand your
18  chart correctly, you don't really have any opinions
19  concerning the TBA that may or may not have been
20  released from this site; is that correct?
21    MS. O'REILLY: Objection. Misstates
22  opinion.
23    THE WITNESS: The only opinions I can have
24  is that there could be a possible release and
25  possible impact; however, in the absence of data, I

Page 917

1  could not conclude that it's more likely than not.
2  BY MR. JEREMIAH ANDERSON:
3    Q.   Okay. Looking at question 5. You
4  think it's possible that this plume commingled with
5  Texaco 121681, but you don't know if it's more likely
6  than not?
7    A.   That's correct.
8    Q.   Do you think that it's possible that
9  there's still a plume today coming from Unocal 5399
10  that is commingled with the alleged plume from Texaco
11  121681?
12    MS. O'REILLY: Vague and ambiguous.
13  Overbroad.
14    THE WITNESS: While it's possible, I would
15  think it unlikely.
16  BY MR. JEREMIAH ANDERSON:
17    Q.   Questions -- let me back up.
18    What were the maps you were just looking at
19  there?
20    A.   Certainly, yes. I have two sets.
21  The first are my sketches on Figures 4, for the
22  Unocal 5399 site. And these would be what's been
23  referred to as the isoconcentration contour that I
24  hand drew.
25    Q.   Okay.

Page 918

1    A.   And the second was a similar figure
2  showing isoconcentration contours drawn on Figure 4
3  from the Texaco 121681 site.
4    Q.   Okay.
5    A.   Would you like to have them marked?
6    MR. JEREMIAH ANDERSON: I do. I have got
7  them electronically over here. I just want to make
8  sure I'm looking at the same things.
9    But Sandy, what exhibit are we on?
10    THE REPORTER: It would be 115.
11      (Exhibit Nos. 115, 116, 117 were
12      marked.)
13    THE WITNESS: So the court reporter has
14  marked as Exhibit 115, Figure 4, "MTBE in
15  Groundwater" for Unocal Site 5399, with the hand
16  annotated isoconcentration contours.
17    And marked as Exhibit 116, Figure 4, "MTBE
18  in Groundwater" for Texaco 121681 with,
19  isoconcentration contours drawn by hand.
20    And for Exhibit 117, Figure 5, "TBA in
21  Groundwater" for Texaco 121681, again, with
22  isoconcentration contours drawn by hand.
23    MR. JEREMIAH ANDERSON: Thank you.
24    Q.   Going back to Exhibit 36. Question
25  6, if I understand your answer correctly, you think

21 (Pages 915 to 918)

Anthony Brown

Page 919

1  it is more likely than not that the historical MTBE
2  plume has not been laterally delineated, correct?
3      A.    That is correct, yes.
4      Q.    And which directions do you think
5  additional lateral delineation is needed?
6      A.    It would be to the southwest of the
7  station.
8      Q.    What's the flow of groundwater on
9  this site?
10      A.    If you refer to the rose diagram that
11  we prepared for Unocal 5399, it would indicate that
12  the groundwater flow direction at this facility is
13  almost exclusively to the southwest.
14      MR. JEREMIAH ANDERSON:  And I just have one
15  copy of this, but can you mark that, Sandy.
16      THE REPORTER:  It's 118.
17          (Exhibit No. 118 was marked.)
18      MR. JEREMIAH ANDERSON:  And can you hand it
19  to the witness, please.
20      Q.    Does that appear to be the rose
21  diagram you guys created for this site?
22      A.    Yes.
23      Q.    In your question 7 you think it's
24  possible that the investigation has failed to
25  delineate on-site MTBE contamination, but you can't

Page 920

1  say whether or not it's more likely than not,
2  correct?
3      A.    That's correct.
4      MS. O'REILLY:  Vague.  Ambiguous.
5  Overbroad.
6      THE WITNESS:  If you refer to footnote P-2,
7  there has actually been no analysis for MTBE at this
8  site since 1997.
9  BY MR. JEREMIAH ANDERSON:
10      Q.    Right.  And in 1997 is when this site
11  received closure?
12      A.    I believe so, yes.  Or shortly
13  thereafter.
14      Q.    And, similarly, with question 12, you
15  think it's possible that MTBE exists beyond the
16  current monitoring well network, but you don't know
17  if that's more likely than not the case, correct?
18      A.    That is correct.
19      Q.    Now, you do think that the current
20  remediation has effectively addressed the on-site
21  MTBE contamination, correct?  And that's question 14
22      A.    Yes.  And, as indicated, the only
23  remediation activities was an excavation performed at
24  this facility back in late 1994.
25      Q.    It's your opinion that no more

Page 921

1  on-site remediation is needed at this site, correct?
2      A.    That's correct.
3      Q.    And in terms of question 20, the
4  off-site remediation, again, it may need it, but you
5  can't say whether or not it's more likely than not
6  it's needed, correct?
7      A.    That's correct.
8      Q.    Do you think it's more likely than
9  not that there's a detached MTBE plume at this site?
10      MS. O'REILLY:  Vague.  Ambiguous.
11  Overbroad.
12      THE WITNESS:  While it is possible, I could
13  not conclude that it's more likely than not.
14  BY MR. JEREMIAH ANDERSON:
15      Q.    Under what conditions do MTBE plumes
16  detach from the source when there remains a mass of
17  MTBE still at the source site?
18      MS. O'REILLY:  Vague.  Ambiguous.
19  Overbroad.  Incomplete hypothetical.
20  BY MR. JEREMIAH ANDERSON:
21      Q.    Do you understand my question?
22      A.    I think so, yes.
23      MS. O'REILLY:  Incomplete hypothetical.
24  BY MR. JEREMIAH ANDERSON:
25      Q.    And this would be in the Orange

Page 922

1  County area.
2      A.    Where a mass of MTBE is still present
3  to date in the area of the release, the only
4  hypothetical scenario that I could envision where a
5  detached plume would exist would be where multiple
6  releases of MTBE had occurred such that initial
7  release of MTBE migrated off-site and essentially
8  became detached from the source itself, and then
9  there was a subsequent release of MTBE which still
10  indicated detections of the contaminant on-site in
11  the source area.
12      Q.    And if MTBE testing began at a site
13  in 1996 and it consistently showed that there were
14  MTBE detections on-site from 1996 to the present,
15  that would indicate that your hypothetical situation
16  wouldn't have occurred because the MTBE was always
17  on-site; is that a fair characterization?
18      MS. O'REILLY:  Objection.  Misstates the
19  testimony.
20      THE WITNESS:  Unfortunately, no, not quite.
21  For example, one could have a release, say, in the
22  very early 1990s, when MTBE became widely used in
23  gasoline, that generated a groundwater contaminant
24  plume that migrated off-site.  And then a subsequent
25  release, perhaps in the mid 1990s, could

22 (Pages 919 to 922)

Anthony Brown

Page 923

1   recontaminate the area of the source. And when
2   analysis of MTBE began in 1996, it would show that
3   MTBE was present on the site for the entire period of
4   the monitoring; however, we do not have any data
5   prior to 1996.
6   BY MR. JEREMIAH ANDERSON:
7       Q.   Okay. And so that's a fair point.
8       You couldn't have a detached plume that
9   started detaching after '96? In other words, maybe
10  something got away before you started testing. But
11  in terms of 1996 to the present, if there have
12  consistently been detections of MTBE at the site,
13  that indicates that a plume hasn't detached from 1996
14  to the present?
15      MS. O'REILLY: It's vague. Ambiguous.
16  Overbroad. Misstates testimony.
17      THE WITNESS: In general, yes. Now,
18  obviously, if we had just, perhaps, very low
19  concentrations of MTBE present at the site, then
20  there may be a detached plume. But if the
21  concentrations were relatively significant, then one
22  would expect the off-site contamination to still be
23  contiguous with the on-site contamination.
24  BY MR. JEREMIAH ANDERSON:
25      Q.   Moving back to Exhibit 36 and

Page 924

1   question 21. Again, you think it's possible that
2   contamination from Unocal 5399 is a threat to the
3   deep aquifers, but you can't say whether or not it's
4   more likely than not that's the case, correct?
5       A.   That's correct.
6       Q.   And if I look at column 21, going
7   down all the sites, I see that it's your opinion at
8   each site that either contamination from that
9   particular site is a threat to the deep aquifers or
10  it's possible; is that fair?
11      A.   Yes.
12      Q.   What would it take for you to say
13  that an MTBE site is not a threat to the deeper
14  aquifers?
15      MS. O'REILLY: Vague. Ambiguous.
16  Overbroad. Incomplete hypothetical.
17      THE WITNESS: Vertical delineation, which is
18  absent at almost every site. In fact, it may be
19  absent at every site.
20  BY MR. JEREMIAH ANDERSON:
21      Q.   So if I understand your answer
22  correctly, you think that an MTBE plume has to be
23  vertically delineated for you to determine that a
24  plume is not a threat to the deeper aquifer?
25      MS. O'REILLY: Vague. Ambiguous.

Page 925

1   Overbroad. Misstates the testimony.
2       Go ahead.
3       THE WITNESS: Not quite. I mean, as I
4   discussed earlier in response to questions relating
5   to the G & M sites, there may, in fact, be very low
6   concentrations of MTBE present historically in the
7   shallow portion of the semi-perched aquifer that are
8   such that it might only be possible that deeper
9   aquifers could be impacted.
10  BY MR. JEREMIAH ANDERSON:
11      Q.   But, in your opinion, that's not the
12  case at any of the sites you've looked at?
13      MS. O'REILLY: Misstates testimony.
14      THE WITNESS: No. For some we have said it
15  is possible, only possible. For some we have been
16  able to conclude that, yes, releases do, in fact,
17  pose a threat to deeper aquifers.
18      But at some sites we have only been able to
19  state that that's possible, but we have not been able
20  to conclude that it's more likely than not.
21  BY MR. JEREMIAH ANDERSON:
22      Q.   And I guess my question was: Absent
23  vertical delineation, complete vertical delineation,
24  you think that every MTBE site -- let me back up.
25      Every MTBE site that has not been completely

Page 926

1   vertically delineated poses a threat to the deeper
2   aquifer, in your opinion?
3       MS. O'REILLY: Misstates opinion. Vague.
4   Ambiguous. Overbroad.
5       Go ahead.
6       THE WITNESS: No, that's not my opinion.
7   BY MR. ADAMS:
8       Q.   And so you indicated on the follow-up
9   that if the contamination in the shallow aquifer is
10  so insignificant, you may be able to determine that
11  there's not a threat to the deeper aquifer, correct?
12      MS. O'REILLY: Misstates opinion.
13      THE WITNESS: If the contaminant
14  concentrations in the upper portion of the
15  semi-perched aquifer were relatively low over the
16  historical period of sampling, I may not be able to
17  conclude that it's more likely than not that deeper
18  aquifers are threatened. It is possible. And, in
19  fact, at most of the facilities I've recommended that
20  additional vertical delineation would -- is required.
21  BY MR. JEREMIAH ANDERSON:
22      Q.   Okay. Just so I can make sure we're
23  on the same page.
24      You are saying that in some situations the
25  contamination in the upper/shallow aquifer is of such

23 (Pages 923 to 926)

Anthony Brown

Page 1019

1    that are the subject of this litigation or this phase
2    of the litigation, I have not been asked to give an
3    opinion as to when specifically MTBE releases
4    occurred; however, I have been able to conclude
5    that they did occur prior to the first testing of
6    MTBE when MTBE was detected.
7        And I have also identified incidence between
8    1990 and 1996, the first analysis where releases may
9    have occurred, and those releases may have, in fact,
10   contained MTBE.
11   BY MR. JEREMIAH ANDERSON:
12       Q.   But you don't have an opinion that
13   it's more likely than not that the incidences you
14   identify between 1990 and 1996 resulted in a release
15   of gasoline containing MTBE from the site, do you?
16       MS. O'REILLY:   Vague.  Ambiguous.
17   Overbroad.
18       THE WITNESS:   The only opinion that I have
19   reached is that the release occurred sometime prior
20   to February of 1996.
21   BY MR. JEREMIAH ANDERSON:
22       Q.   And, Mr. Brown, you do not have an
23   opinion as to the mass of MTBE that was released from
24   Unocal 5123, do you?
25       MS. O'REILLY:   Same objections.

Page 1020

1        THE WITNESS:   The only opinion I would have
2    is that more than 33,000 pounds of gasoline has been
3    released at this facility, as that is the amount of
4    hydrocarbons that have been recovered as part of the
5    remediation program.
6    BY MR. JEREMIAH ANDERSON:
7        Q.   And is that your opinion or is that
8    just what you understand by reading the documents
9    that you reviewed?
10       MS. O'REILLY:   Vague.  Ambiguous.
11   Overbroad.
12       THE WITNESS:   My understanding is that is
13   data that's been generated by the consultants working
14   at this facility.
15   BY MR. JEREMIAH ANDERSON:
16       Q.   But your opinion is just coming from
17   the documents you reviewed from the consultants
18   working at the facility; is that correct?
19       MS. O'REILLY:   Vague.  Ambiguous.
20   Overbroad.
21       THE WITNESS:   That is correct.  I haven't
22   performed any separate analysis beyond the quantities
23   reported by the consultants working at the facility.
24   BY MR. JEREMIAH ANDERSON:
25       Q.   Have you performed any analysis to

Page 1021

1    determine the total volume of gasoline containing
2    MTBE that was allegedly released from Unocal 5123?
3        A.   Beyond what I have just described,
4    no.
5        Q.   Mr. Brown, you do not have an opinion
6    that Unocal 5123 is the source of any alleged MTBE
7    detections in drinking water wells in Orange County,
8    do you?
9        MS. O'REILLY:   Vague.  Ambiguous.
10   Overbroad.  Misstates opinions.
11       Go ahead.
12       THE WITNESS:   I have not performed such an
13   analysis.
14   BY MR. JEREMIAH ANDERSON:
15       Q.   Mr. Brown, you do not have an opinion
16   that alleged MTBE from Unocal 5123 is a threat to any
17   specific drinking water wells in Orange County, do
18   you?
19       MS. O'REILLY:   Same objections.
20       THE WITNESS:   I have only been able to
21   conclude that it poses a possible threat.  I have not
22   been able to conclude that that threat is more likely
23   than not.
24   BY MR. JEREMIAH ANDERSON:
25       Q.   Mr. Brown, you have not created a

Page 1022

1    Feasibility Study -- or excuse me -- you have not
2    created a Feasibility Plan for Unocal 5123, have you?
3        A.   That is correct.
4        Q.   And you have not created a Remedial
5    Action Plan for 5123, have you?
6        A.   That is correct.
7        Q.   Looking at your expert report, B-16
8    under the technology area.  In August 1996, which is
9    on page -- top of page 4, in the italicized
10   portion -- and, again, if I understand your prior
11   testimony correct, the italicized portion is your
12   comments, correct?
13       A.   That is correct.
14       Q.   The second to the last sentence
15   states, "The analytical results indicate that
16   cross-screening and groundwater pumping from these
17   wells facilitated downward migration of MTBE."
18       Do you see that?
19       A.   Yes.
20       Q.   Can you explain to me what you meant
21   by that?
22       A.   Yes.  The monitoring wells initially
23   installed as part of the investigation at Unocal
24   5123, as well as groundwater extraction wells, were
25   screened across the upper and lower saturated portion

47 (Pages 1019 to 1022)

Anthony Brown

Page 1031

1    MS. O'REILLY:  Vague and --
2  BY MR. JEREMIAH ANDERSON:
3      Q.    -- are your opinions -- do your
4  opinions remain the same?
5          To be clear, do your opinions remain the
6  same as they are listed in your expert report?
7      A.    It would require additional
8  delineation to the west and southwest.  And, once
9  again, while we do not have data for TBA
10  contamination in the B zone beneath Bolsa Avenue, the
11  investigation data from the Huntington Beach ARCO
12  site would provide delineation directly to the south.
13  And while additional delineation to the -- to the
14  east-southeast would be of value, I don't think I
15  could conclude that it is more likely than not
16  required.
17      Q.    And the answer you just gave would be
18  for both the B and the C zones; is that correct?
19      A.    Yes, I think that's reasonable to say
20  that.
21      Q.    Do you think that it's more likely
22  than not that there's a detached MTBE plume from
23  Unocal 5123?
24      MS. O'REILLY:  Vague.  Ambiguous.
25  Overbroad.

Page 1032

1  BY MR. JEREMIAH ANDERSON:
2      Q.    And if I said could you think, I
3  meant to say do you think that it's more likely than
4  not that there's a detached MTBE plume from Unocal
5  5123.
6      A.    While it is possible, based upon the
7  information I have reviewed, at this time I could not
8  conclude that it's more likely than not.
9      Q.    And do you think it's more likely
10  than not that there's a detached TBA plume at Unocal
11  5123?
12      MS. O'REILLY:  Vague.  Ambiguous.
13  Overbroad.
14      THE WITNESS:  Again, while it is possible,
15  based on the data I have reviewed, I cannot conclude
16  that it's more likely than not.
17      MR. JEREMIAH ANDERSON:  When you have been
18  reviewing the isoconcentration maps you've created
19  for this site, pretty extensively over the four
20  questions I've asked.  Let's go ahead and mark those.
21      I'm not sure what the next number is, but we
22  will do it --
23      THE REPORTER:  129.
24      MR. JEREMIAH ANDERSON:  129.  We can do it
25  with a sticky.

Page 1033

1      THE WITNESS:  So I actually have four
2  figures, because I have MTBE and TBA for time series
3  at Unocal 5123.
4      MR. JEREMIAH ANDERSON:  Okay.
5      THE WITNESS:  And I have different time
6  steps for the MTBE and TBA at Huntington Beach ARCO.
7      So I've been referring to both sets because
8  it gives a more complete time series data.  So we
9  will need to mark four exhibits.
10      MR. JEREMIAH ANDERSON:  Okay.  Let's do
11  that.
12      THE WITNESS:  And I apologize for the delay,
13  but, as you know, there are a lot of wells and some
14  are ABC, some are ULs.
15      MR. JEREMIAH ANDERSON:  Absolutely no need
16  to apologize.  We want to make sure we get your
17  correct opinions.
18          (Exhibit Nos. 129, 130, 131 and
19          132 were marked.)
20  BY MR. JEREMIAH ANDERSON:
21      Q.    Going back to Exhibit 36.  Column 6
22  and 7 you indicate that you think the current
23  investigation has effectively delineated the on-site
24  MTBE and TBA at this site, correct?
25      A.    That is correct.  Additional on-site

Page 1034

1  investigation of MTBE and TBA is not required.
2      Q.    And you think it is possible that
3  additional on-site remediation of groundwater is
4  required at this site, but you do not have an opinion
5  that it's more likely than not that additional
6  on-site remediation will be required at this site,
7  correct?
8      MS. O'REILLY:  Vague.  Ambiguous.
9  Overbroad.
10      THE WITNESS:  Based upon the information I
11  have reviewed to date, I cannot conclude that it's
12  more likely than not that additional on-site
13  remediation of groundwater will be required.  It is
14  possible, but additional investigation of the deeper
15  zones will be required prior to making such a
16  determination that it's more likely than not.
17  BY MR. JEREMIAH ANDERSON:
18      Q.    Where at this site would you drill
19  the additional CPT investigation wells we have
20  suggested?
21      MS. O'REILLY:  Objection.  Vague and
22  ambiguous.  Object to the extent it calls for a
23  instant expert opinion.
24      Go ahead.
25      THE WITNESS:  I have not determined the

50  (Pages 1031 to 1034)

Anthony Brown

Page 1035

1  exact locations; however, in general, they would be
2  to the west and southwest of Unocal station 5123 as
3  well as on-site to provide additional vertical
4  delineation in the area of the release.
5  BY MR. JEREMIAH ANDERSON:
6      Q.   Question 12, you do not have an
7  opinion that it is more likely than not that
8  additional off-site remediation is necessary at this
9  site, correct?
10     MS. O'REILLY:  Vague.  Ambiguous.
11 Overbroad.
12     THE WITNESS:  Sorry.  You're referring to
13 question 12, and then you refer to off-site
14 remediation?
15 BY MR. JEREMIAH ANDERSON:
16     Q.   You know, I meant to -- that was
17 question 20.
18     Question 12, you do not have an opinion that
19 MTBE exists beyond the current monitoring well
20 network, correct?
21     MS. O'REILLY:  Misstates testimony.  Vague
22 and ambiguous.
23     THE WITNESS:  I cannot conclude that it is
24 more likely than not, only that it is possible the
25 MTBE contamination exists beyond the current

Page 1036

1  monitoring network.
2  BY MR. JEREMIAH ANDERSON:
3      Q.   I will now ask the question I asked
4  previously which relates to column 20.  You do not
5  have an opinion that it is more likely than not that
6  additional off-site remediation is necessary at
7  Unocal 5123, correct?
8      A.   Yes, based on the current
9  information, I cannot conclude that it's more likely
10 than not that additional off-site remediation of
11 groundwater will be required, only that it is
12 possible, and only after additional investigation
13 could one determine whether additional such
14 remediation is -- would be required.
15     Q.   And with respect to column 21, you do
16 not have an opinion that it is more likely than not
17 that MTBE poses a threat to the deeper aquifers,
18 correct?
19     MS. O'REILLY:  Objection.  Misstates the
20 document and opinions.
21     Go ahead.
22     THE WITNESS:  Yes.  Once again, I cannot
23 conclude that the releases more than likely than not
24 pose a threat to deeper aquifers, only that they
25 possibly pose such a threat.

Page 1037

1  BY MR. JEREMIAH ANDERSON:
2      Q.   And, similarly, with column 22, you
3  do not think it is more likely than not that MTBE
4  from upgradient 5123 poses a threat to water supply
5  wells, correct?
6      MS. O'REILLY:  Vague.  Ambiguous.
7  Overbroad.
8      THE WITNESS:  Yes, I'm of the same opinion,
9  that I could not conclude that it's more likely than
10 not that the releases pose a threat to water supply
11 wells, only that they pose a possible threat.
12 BY MR. JEREMIAH ANDERSON:
13     Q.   And you have not concluded that it is
14 more likely than not that additional remediation is
15 necessary at this site, correct?
16     MS. O'REILLY:  Same objections.
17     THE WITNESS:  That is correct.  Only that
18 additional remediation may possibly be required.
19 BY MR. JEREMIAH ANDERSON:
20     Q.   With respect to column 22, which
21 production wells are potentially threatened by the
22 MTBE release allegedly from Unocal 5123?
23     A.   It would be Well HB-1, which, if you
24 refer to Figure 8, is located approximately 700 feet
25 to the east-southeast of Unocal 5123.

Page 1038

1      Q.   Any others?
2      A.   While it is possible the release
3  poses a threat to the HB wells -4 -7, and -13, I
4  think it is unlikely.
5      Q.   The groundwater flow at this site has
6  most often been toward the south, southwest and
7  southeast, correct?
8      MS. O'REILLY:  Vague.  Ambiguous.
9  Overbroad.
10     THE WITNESS:  In the A zone, it has
11 generally ranged between southwest and east with the
12 predominant direction to the southeast.
13     In the B zone it's ranged between south and
14 east, with the predominant direction to the south.
15     And in the C zone it's ranged between
16 southwest and southeast.
17     And those are indicated in the rose diagram
18 that we prepared for Unocal station 5123.
19 BY MR. JEREMIAH ANDERSON:
20     Q.   Huntington Beach well 1 is,
21 therefore, not downgradient from Unocal 5123,
22 correct?
23     MS. O'REILLY:  Misstates testimony.  Vague
24 and ambiguous.
25     THE WITNESS:  The flow directions reported

51 (Pages 1035 to 1038)

Page 1284

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

In Re:  Methyl Tertiary Butyl Ether    :
("MTBE")                               :
Products Liability Litigation          :
                                       :   MDL No. 1358 (SAS)
_____:
                                       :
This document relates to the           :
following case:                        :
                                       :
Orange County Water District v.        :
Unocal Corp., et al., 04 CIV. 4968     :
(SAS)                                  :   Pages 1284-1420
_____:


- - - - -

FEBRUARY 6, 2012

- - - - -


Videotaped Deposition of ANTHONY BROWN,

EXPERT WITNESS, VOLUME VII, held at Latham & Watkins, at

650 Town Center Drive, Suite 2000, Costa Mesa,

California, commencing at 1:59 p.m., on the above date,

before Kimberly S. Thrall, a Registered Professional

Reporter and Certified Shorthand Reporter.


Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Anthony Brown

Page 1329

1    A.  Yes, I do.
2    Q.  You have not done the evaluation necessary as
3    of today to determine whether or not you agree or
4    disagree with that statement, correct?
5        MS. O'REILLY: Vague. Ambiguous. Overbroad.
6        Go ahead.
7        THE WITNESS:  That is correct.  As I indicated
8    earlier, I have not had an opportunity to review either
9    the closure report or any of the analytical testing data
10   that was collected as part of the excavation process.
11   BY MR. ANDERSON:
12       Q.  Before issuing your rebuttal report on
13   December 15th, 2011, did you look on GeoTracker to see
14   what reports had recently been updated -- or uploaded
15   for the sites you reviewed?
16       MS. O'REILLY: Vague. Ambiguous. Overbroad.
17       THE WITNESS:  We did review briefly the
18   GeoTracker information, but we were unable to review
19   the -- any additional reports given the time frame in
20   which we had to prepare our rebuttal report.
21   BY MR. ANDERSON:
22       Q.  And in preparing for this deposition, did you
23   review the reports that were available on GeoTracker for
24   the sites that you analyzed?
25       MS. O'REILLY: Same objection.  Assumes facts.

Page 1330

1    Lacks foundation.
2        THE WITNESS:  Not subsequent to the preparation
3    of my report.
4    BY MR. ANDERSON:
5        Q.  Okay.  Turning to Beacon Bay Auto Wash,
6    Fountain Valley, you're familiar with the former
7    Beacon Bay Car Wash, Fountain Valley site at 10035 Ellis
8    Avenue in Fountain Valley, correct?
9        A.  I am, yes.
10       Q.  And I believe this is B10 to your expert report
11   of the appendix.  Excuse me.
12       Have you ever spoken with the environmental
13   consultants that oversaw the remediation at this site
14   about your conclusions with respect to this site?
15       MS. O'REILLY: Vague and ambiguous.
16       THE WITNESS:  No, I did not.
17   BY MR. ANDERSON:
18       Q.  Do you have an opinion as to when MTBE was
19   released from the Beacon Bay, Fountain Valley site?
20       MS. O'REILLY: Vague and ambiguous.
21       THE WITNESS:  My opinions would be contained
22   within Section 3.1 on page 8 of my expert report.  Would
23   you like me to elaborate or just leave it on the record
24   as just the information in Section 3.1?
25   ///

Page 1331

1    BY MR. ANDERSON:
2        Q.  Well, let me just -- it appears that your
3    opinion would be that MTBE was released from this site
4    sometime before April 1996 when MTBE was first detected
5    in groundwater.  Is that a fair statement?
6        A.  That's correct.  That would be the earliest
7    information we would have about MTBE contamination at
8    this site.
9        Q.  But is it fair to say you can't sit and
10   pinpoint a particular date before April 1996 when the
11   MTBE was first released; is that correct?
12       MS. O'REILLY: Vague and ambiguous.
13       Go ahead.
14       THE WITNESS:  Not an exact date, no.
15   BY MR. ANDERSON:
16       Q.  Do you have an opinion as to the total mass of
17   MTBE that was released from Beacon Bay, Fountain Valley?
18       A.  I've not performed that analysis.
19       Q.  And do you have an opinion as to the total
20   volume of gasoline containing MTBE that was released
21   from Beacon Bay, Fountain Valley?
22       MS. O'REILLY: Vague and ambiguous.
23       Go ahead.
24       THE WITNESS:  Again, I've not performed those
25   calculations.

Page 1332

1    BY MR. ANDERSON:
2        Q.  And do you have an opinion as to the remaining
3    mass of MTBE -- let me reask it.
4        Do you have an opinion as to the mass of MTBE
5    that is remaining in the subsurface in the area
6    immediately surrounding the Beacon Bay, Fountain Valley
7    site?
8        MS. O'REILLY: Vague and ambiguous as to
9    "surrounding."
10       THE WITNESS:  I'm going to ask for that
11   clarification because there are two other service
12   stations in the immediate vicinity of this Beacon Bay
13   Car Wash facility.
14   BY MR. ANDERSON:
15       Q.  Do you have an opinion as to the mass of MTBE
16   that remains in the ground that came from Beacon Bay,
17   Fountain Valley?
18       MS. O'REILLY: Vague and ambiguous as to
19   "ground."  Soil? groundwater?
20       THE WITNESS:  I've not -- excuse me.  I've not
21   performed that level of analysis.
22   BY MR. ANDERSON:
23       Q.  Do you have an opinion that Beacon Bay is the
24   source of any alleged MTBE or TBA detections in drinking
25   water wells in Orange County?

13  (Pages 1329 to 1332)

Anthony Brown

Page 1333

1      MS. O'REILLY: Vague. Ambiguous. Overbroad.
2      THE WITNESS: As I indicated, as part of my
3  retention in this matter, I was not asked to determine
4  the specific source of any MTBE detected in water supply
5  wells.
6  BY MR. ANDERSON:
7      Q. Do you have an opinion that the alleged MTBE or
8  TBA from Beacon Bay, Fountain Valley is a threat to any
9  specific drinking water walls in Orange County?
10      MS. O'REILLY: Vague. Ambiguous. Overbroad.
11      THE WITNESS: I've only been able to conclude
12  that the release at Beacon Bay Auto Wash, Fountain
13  Valley is a possible threat to water supply wells, but
14  I've been able to -- unable to conclude that it's more
15  likely than not that the release poses a threat to a
16  water supply.
17  BY MR. ANDERSON:
18      Q. Have you created a feasibility plan for
19  Beacon Bay, Fountain Valley?
20      A. No, I have not.
21      Q. And have you created a remedial action plan for
22  Beacon Bay, Fountain Valley?
23      A. No, I have not.
24      Q. Do you have any opinions as to the manufacturer
25  of the gasoline that was allegedly released at

Page 1334

1  Beacon Bay, Fountain Valley?
2      MS. O'REILLY: Vague. Ambiguous. Overbroad.
3      THE WITNESS: That's not something I was asked
4  to evaluate as part of my retention in this matter.
5  BY MR. ANDERSON:
6      Q. And you have no independent opinions on that
7  sitting here today?
8      A. I don't believe so.
9      Q. And I think we had double negatives there.
10  Let's just -- you don't think that you have any
11  independent opinions as to the manufacturer of the
12  gasoline that was allegedly released from Beacon Bay,
13  Fountain Valley, correct?
14      MS. O'REILLY: Vague. Ambiguous. Overbroad.
15      THE WITNESS: That is correct.
16  BY MR. ANDERSON:
17      Q. Okay. Looking at Exhibit 36, the table, you
18  indicate that you think it's more likely than not that
19  the plume associated with Beacon Bay, Fountain Valley
20  has commingled with Thrifty 383 and ARCO 1912; is that
21  correct?
22      A. Yes, that's correct.
23      Q. All right. And what are you basing that on?
24      A. It would be based upon the contaminant
25  detections in monitoring wells installed at and in the

Page 1335

1  immediate vicinity of the Beacon Bay Auto Wash, Fountain
2  Valley, and the groundwater flow direction as reported
3  at the Beacon Bay, Fountain Valley car wash. And that's
4  the flow direction in the first saturated unit.
5      Q. Which way does it flow in the first saturated
6  unit?
7      A. If you refer to the rose diagram, it's
8  predominantly to the southwest.
9      (Brown Exhibit 139 was marked.)
10  BY MR. ANDERSON:
11      Q. Let me just mark that. I'm marking as 139, the
12  rose diagram for Beacon Bay, Fountain Valley groundwater
13  flow direction.
14      Is that the rose diagram that you or your
15  office created for the Beacon Bay, Fountain Valley?
16      A. Yes, it is.
17      Q. Is that still your opinion, that that's the
18  flow of the groundwater?
19      A. Yes, it is.
20      Q. You indicated that you looked at the monitoring
21  wells to help you determine whether or not there was a
22  commingled plume. It's one of the things you
23  investigated, correct?
24      A. Correct, yes.
25      Q. Is there a certain time period where you think

Page 1336

1  the plumes were commingled?
2      MS. O'REILLY: Vague. Ambiguous. Overbroad.
3  BY MR. ANDERSON:
4      Q. And just so I'm clarifying my question, I'm
5  talking about the MTBE plume.
6      A. Based upon my interpretation of the data, it is
7  my opinion that when MTBE was first analyzed in
8  groundwater beneath the Beacon Bay, Fountain Valley car
9  wash, the MTBE had already commingled with MTBE released
10  at ARCO Station 1912.
11      And by the year 2000, the MTBE released at the
12  Beacon Bay Auto Wash had commingled with releases from
13  the Thrifty Station 383.
14      The data from November 2010 would suggest that
15  MTBE released at the Beacon Bay Car Wash is still
16  commingled with MTBE released from ARCO Station 1912,
17  specifically beneath Ellis Avenue, but the MTBE that had
18  commingled with Thrifty Station 383 had been
19  predominantly remediated by the activities at Thrifty
20  Station 383 such that only very low levels of MTBE had
21  been detected in the area where the two plumes from
22  Beacon Bay and Thrifty 383 had commingled. And I was
23  making reference to some of my annotated figures --
24      Q. Right.
25      A. -- that assisted me in that evaluation.

14  (Pages 1333 to 1336)

Anthony Brown

Page 1357

1     (Recess.)
2         THE VIDEOGRAPHER:  With the approval of
3     counsel, we are back on the record.  The time is
4     approximately 4:08 p.m.  This marks the beginning of
5     Disk No. 2.
6         MS. O'REILLY:  I've had a discussion with the
7     witness off the record, and we are withdrawing 141.  And
8     due to a miscommunication between Mr. Brown and myself,
9     I understood these maps to be maps that were drawn in
10    response to questions about CPT locations asked in his
11    deposition, and that is not the case.  So we are
12    asserting a privilege for these two maps that have been
13    marked as 141.
14        MR. ANDERSON:  I -- you know, we can talk about
15    that later in terms of whether or not that's proper or
16    not, Tracey.  I would ask that if you are going to do
17    that, that you respond to the letters that we have sent
18    you about the inadvertent attorney-client -- well, we
19    can talk about that off the record.
20        But we will, of course, reserve our right to
21    take this up with this -- with Special Master Warner
22    and, you know, continue with this deposition later.  We
23    disagree with your position about the privileged nature
24    of these apparent new opinions and can address them with
25    him.

Page 1358

1         MS. O'REILLY:  And, again, Mr. Anderson, do not
2     misstate my statements or Mr. Brown's.  These are not
3     new opinions.  This is draft covered by CMO 73.  And
4     I -- as I have said for the fourth time, if Mr. Brown is
5     given work which he intends to rely upon and testify to
6     at trial, we will notify you.  And, in fact, previously,
7     not less than 20 minutes ago, or even less than that,
8     you asked Mr. Brown about 141 and whether he intended to
9     rely on these locations in his testimony at trial, and
10    he said no.  So anything that is outside the scope of
11    what he is being presented for deposition today is
12    privileged.
13 BY MR. ANDERSON:
14    Q.  Mr. Brown, sitting here today, do you have an
15    opinion as to where you would put additional CPT testing
16    with respect to Thrifty 383?
17        MS. O'REILLY:  And I'm going to instruct the
18    witness that he may answer if he has an opinion outside
19    the scope of any attorney-client privileged
20    communication.  Otherwise, he's not to answer.
21        THE WITNESS:  As part of my retention in this
22    matter and in the preparation of my expert reports
23    and -- and in responding to questions during this
24    deposition, I have indicated and reached the opinion
25    that additional investigation is warranted at Thrifty

Page 1359

1     Station 383, ARCO Station 1912, and the Beacon Bay Auto
2     Wash.  I have not identified the specific locations for
3     those specif- -- for those investigations.  I was not
4     planning to offer testimony with respect to the specific
5     locations.
6         Subsequent to the last day of my deposition, I
7     have performed some additional work, but to disclose any
8     of the details of that work would require me to disclose
9     information that I believe to be covered by the
10    attorney-client privileged rulings we have been
11    discussing.
12 BY MR. ANDERSON:
13    Q.  Turning back to Exhibit 36, which is your
14    chart, Question 7, you think it's more likely than not
15    that on-site MTBE was fully delineated at Beacon Bay,
16    Fountain Valley, correct?
17    A.  Sorry.  Is it question 7 you're referring to
18    there?
19    Q.  Yes.
20    A.  Yes, that's correct.
21    Q.  And Question 19, it's your opinion that it's
22    more likely than not that no additional on-site
23    delineation is needed -- excuse me -- no additional
24    on-site remediation of groundwater is needed, correct?
25    A.  That is correct.

Page 1360

1     Q.  It's your opinion that on-site remediation has
2     effectively controlled the contamination, correct?
3         MS. O'REILLY:  Misstates report and testimony.
4  BY MR. ANDERSON:
5     Q.  And I'm looking at Question 14.
6     A.  Correct.  Question 14 would indicate that the
7     remediation performed has effectively addressed the
8     on-site groundwater contamination.
9     Q.  For Questions 12 and 13, you think it's
10    possible that MTBE and TBA from this site exists beyond
11    the current network, but you don't know whether it's
12    more likely than not; is that correct?
13        MS. O'REILLY:  Vague and ambiguous.
14        THE WITNESS:  That is correct.
15 BY MR. ANDERSON:
16    Q.  As we have discussed, there's been significant
17    CPT testing around these sites, correct?
18    A.  Correct.
19    Q.  The highest MTBE detection in any of the CPT
20    tests -- or in any of the CPT borings around this site,
21    do you know what it was?
22    A.  For the CPT investigations performed on behalf
23    of the Orange County Water District, the highest
24    detected MTBE concentration in the vicinity of the three
25    service stations we have been discussing would be 2.3

20  (Pages 1357 to 1360)

Anthony Brown

Page 1361

1  micrograms per liter at a depth of 35 feet at sample
2  location A1912M.
3      Q.  Okay.  And -- can I see one of those maps
4  again, please?  For the record, you're looking at former
5  Exhibit 141 when you were answering that question; is
6  that correct?
7      A.  That is correct.
8      Q.  Do you know whether or not --
9          MS. O'REILLY:  Don't use that.
10 BY MR. ANDERSON:
11     Q.  -- the results from the CPT tests from A1912M
12 have been produced in this matter?
13         MS. O'REILLY:  Can you give him a copy?  I
14 don't want him to use 141.
15         Assumes facts.  Lacks foundation.  Calls for
16 speculation.
17         THE WITNESS:  The -- I do not know as I sit
18 here whether specific laboratory reports for the
19 sampling at A1912M have been reduced to date.  I do know
20 that the results have been produced.  As I indicated,
21 the figures that we've previously had marked as
22 Exhibit 141 were provided earlier in this deposition
23 without the green annotations that have been the subject
24 of the last hour's discussion or so.
25 ///

Page 1362

1  BY MR. ANDERSON:
2      Q.  Okay.
3      A.  And those figures would have had the data
4  for -- all the data results from A1912M.
5      Q.  To what isoconcentration do you intend to
6  delineate any of the MTBE plumes surrounding any of the
7  sites that you look at -- let me back up.
8          To what isoconcentration do you think the sites
9  that you look at -- looked at need to be delineated to?
10         MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
11         THE WITNESS:  That is probably something that
12 would have have to be addressed on a site-specific
13 basis.  However, in general, for those sites that have
14 extensive MTBE plumes that have migrated some distance
15 off-site, for the distal end of the plume, that's the
16 downgradient leading edge of the plume, I would
17 recommend delineation down to a detection limit of
18 .5 micrograms per liter.  That is a delineation to a
19 nondetect level.
20         In areas more approximate to the release
21 location, in cross-gradient and upgradient directions, I
22 believe delineation could be considered achieved at a
23 concentration above that level if the contaminant trend
24 data in that direction would indicate that a nondetect
25 concentration would be likely some short distance beyond

Page 1363

1  the current data.
2  BY MR. ANDERSON:
3      Q.  And so in the upgradient and cross-gradient
4  directions, it's basically a site-by-site evaluation, is
5  what you need -- would need to look at to determine what
6  you think the isoconcentration level needs to be to have
7  it delineated in that direction?
8      A.  For all of the sites in all of the directions.
9  It still would be site specific.  But I think
10 particularly in the upgradient and cross-gradient
11 directions, a site-specific analysis might allow one to
12 complete delineation at a concentration above the
13 detection limit.
14     Q.  You indicate that this Question 8 and 11, you
15 do not think that this site has been vertically
16 delineated, correct?  We're talking about Beacon Bay,
17 Fountain Valley.
18     A.  That is correct.
19     Q.  Doesn't the CPT testing vertically delineate
20 it?
21         MS. O'REILLY:  Vague and ambiguous as to "CPT
22 testing."  ARCO did CPT testing.  Are you talking about
23 Hargis or ARCO?
24 BY MR. ANDERSON:
25     Q.  Yeah.  Let me -- the CPT testing in the area

Page 1364

1  surrounding the Beacon Bay site.
2      A.  In the area surrounding the Beacon Bay site,
3  that is correct.  The CPT data collected on behalf of
4  the Orange County Water District does delineate vertical
5  contamination in the area surrounding Beacon Bay.
6  However, I still believe there's value in collecting
7  some additional CPT data at depth in the immediate
8  vicinity of the release.
9      Q.  So I'm clear, you think that there needs to be
10 CPT testing on site to delineate it vertically
11 completely; is that right?
12     A.  Or very close to the site.
13     Q.  Okay.  Question 20, you think it's possible
14 that off-site remediation will be needed at this site,
15 but you don't know whether it's more likely than not.
16 Is that right -- fair?
17     A.  That is correct.
18     Q.  And the depictions in Exhibit 140 are --
19 contain your opinions about how far off-site the MTBE
20 and TBA plumes allegedly extend from this site.  Is that
21 fair?
22     A.  No.  That's not what these figures depict on
23 Exhibit 140.
24     Q.  Okay.  Do you have an opinion as to how far
25 off-site the MTBE plume extends from Beacon Bay,

21 (Pages 1361 to 1364)

Anthony Brown

Page 1365

1  Fountain Valley?
2      A.  The current extent of MTBE in groundwater
3  related to a release at the Beacon Bay Auto Wash in my
4  opinion would extend no more than 150 feet off-site.
5      Q.  In which direction?
6      A.  In a predominantly southwesterly direction.
7      Q.  Do you have an opinion as to how far off-site
8  the TBA plume allegedly extends from Beacon Bay,
9  Fountain Valley?
10     A.  About the same distance.
11     Q.  Again, in the southwest direction?
12     A.  Correct.
13     Q.  And looking at your chart again, you think it's
14 possible that contamination from this site poses a
15 threat to deeper aquifers, but you don't have an opinion
16 as to whether it's more likely than not?
17     A.  That is correct.
18     Q.  In your opinion, which drinking water
19 production wells are possibly threatened by a release
20 from Beacon Bay, Fountain Valley?
21         MS. O'REILLY:  Vague and ambiguous.
22         THE WITNESS:  The only water supply wells that
23 could possibly be threatened by a release at the
24 Beacon Bay Car Wash are those indicated on page 7 of my
25 expert report, and in particular Well A1-HB.

Page 1366

1  BY MR. ANDERSON:
2      Q.  So looking at page 4 of your report, the last
3  bullet point where you identify GKAW-FV2 as the nearest
4  potentially vulnerable production well, that's no longer
5  your opinion today?
6      A.  No.  It should include that well.  I apologize.
7  It's very difficult to see the green symbols on
8  Figure 8.  They sort of blend in with the background.
9      Q.  Okay.  All right.  Well, we'll start with
10 GKAW-FV2 is not in the direction of groundwater,
11 correct, from Beacon Bay, Fountain Valley?
12     A.  In the first saturated unit beneath the
13 Beacon Bay, Fountain Valley site, groundwater flow is
14 predominantly in a southwesterly section.  Well GKAW-FV2
15 is located to the northwest of the Beacon Bay Car Wash.
16     Q.  Do you know if there's ever been any detections
17 of MTBE or TBA in GKAW-FV2?
18     A.  Not that I'm aware of.
19     Q.  Looking at the wells that you identify on
20 page 7, which are A1-HB, OCWD-D1, OCWD-D3, OCWD-D4, are
21 any of those wells in the direction of groundwater flow
22 from Beacon Bay, Fountain Valley?
23     A.  Those wells would not be downgradient of
24 Beacon Bay, Fountain Valley in the first saturated unit,
25 which is the only unit for which we have groundwater

Page 1367

1  flow data.  We do not have groundwater flow information
2  for deeper saturated units.
3      Q.  Have any of those four wells I just mentioned
4  had detections of MTBE or TBA?
5      A.  Not that I'm aware of.
6      Q.  Are OCWD-D1, OCWD-D3 and OCWD-D4 production
7  wells, to your -- drinking water production wells, to
8  your knowledge?
9          MS. O'REILLY:  Vague and ambiguous.
10         THE WITNESS:  I believe they are, yes.
11 BY MR. ANDERSON:
12     Q.  Do you know which water purveyor they're
13 associated with?
14         MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
15         THE WITNESS:  I do not know the purveyor for
16 Well A1-HB.  While I do not know specifically the
17 purveyor for the other three wells you referenced --
18 OCWD-D1, OCWD-D3 or OCWD-D4 -- the acronym would
19 coincide with the District's acronym, Orange County
20 Water District.
21 BY MR. ANDERSON:
22     Q.  Okay.
23     A.  And production at these wells has ranged from
24 as little as 9 acre-feet per month at Well A1-HB to as
25 much as 113 acre-feet per month at OCWD-D3.

Page 1368

1      Q.  But Orange County Water District is not a water
2  provider, is it?
3          MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
4          THE WITNESS:  That's my understanding.  They
5  may simply be referenced as that because they are on or
6  close to the Orange County Water District facility.
7  BY MR. ANDERSON:
8      Q.  Okay.
9      A.  As I indicated, I do not know specifically who
10 owns those wells.
11     Q.  Have you performed any analysis to determine
12 how long a release from Beacon Bay, Fountain View [sic]
13 would take to get to any of the wells that you have
14 identified as possibly threatened?
15         MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
16         THE WITNESS:  That's not an analysis I was
17 asked to perform as part of my retention in this matter.
18 BY MR. ANDERSON:
19     Q.  And are you able to quantify when an release --
20 when an alleged release from Beacon Bay, Fountain Valley
21 might impact any of the water wells you've identified as
22 being possibly threatened by release from the site?
23     A.  Again --
24         MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
25         THE WITNESS:  Again, such an analysis was not

22  (Pages 1365 to 1368)

Anthony Brown

| Page 1373 |
|---|

1    Go ahead.
2        THE WITNESS:  Not that I'm aware.
3    BY MR. ANDERSON:
4        Q.   A few more lines down, it says, "Are drinking
5    water wells affected?"
6        Do you see that?
7        A.   Yes, I do.
8        Q.   Have you ever told -- and the answer is "No."
9        Do you see that?
10       A.   Correct.
11       Q.   Have you ever told the Orange County Health
12   Care Agency you disagree with that conclusion?
13       MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
14   Calls for speculation.
15   BY MR. ANDERSON:
16       Q.   And let me just back up.  You don't know --
17   well, you don't have an opinion that it's more likely
18   than not that any drinking water wells are affected,
19   correct?
20       MS. O'REILLY:  Vague.  Ambiguous.
21       THE WITNESS:  I'm not aware of any drinking
22   water wells in the immediate vicinity of the Beacon Bay
23   fountain Valley car wash where MTBE has been detected to
24   date.
25   ///

| Page 1374 |
|---|

1    BY MR. ANDERSON:
2        Q.   So you agree with that conclusion, correct?
3        MS. O'REILLY:  Misstates testimony.
4    Argumentative.
5        THE WITNESS:  If one interprets "affected" to
6    mean impacted, then I would agree with it, yes.
7    BY MR. ANDERSON:
8        Q.   Do you have an opinion as to whether or not
9    surface water was affected by a release from Beacon Bay,
10   Fountain Valley?
11       MS. O'REILLY:  Did you say "surface water"?
12       MR. ANDERSON:  Yes.  The next question on
13   there.
14       MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
15   Exceeds the scope of his designation.
16       THE WITNESS:  I've not evaluated that as part
17   of my retention in this matter.
18   BY MR. ANDERSON:
19       Q.   On the following page, towards the bottom, the
20   last paragraph before the bullet point begins,
21   "Monitoring has shown the contaminated groundwater plume
22   to be stable and attenuating."
23       Do you see that?
24       A.   Yes.
25       Q.   Do you disagree with that conclusion?

| Page 1375 |
|---|

1        MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
2    Assumes facts.  Lacks foundation.
3        THE WITNESS:  With respect to this station, no.
4    BY MR. ANDERSON:
5        Q.   And the following sentence, "The reduced level
6    of contamination that remains at this site does not
7    present a threat to human health and the environment."
8        Do you disagree with that statement?
9        MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
10   Calls for speculation.  Exceeds the scope of his
11   designation.
12       Go ahead.
13       As to agree or disagree with Orange County
14   Health Care Agency.
15       THE WITNESS:  As part of my retention in this
16   matter, I did not evaluate the threat to human health.
17   With respect to water supply wells, I could only
18   conclude that the release poses a possible threat to
19   those wells.  I could not conclude that it was more
20   likely than not.
21   BY MR. ANDERSON:
22       Q.   So if I understand your opinion with respect to
23   this sentence, you can't comment on the threat to human
24   health, but as to the threat to the environment, it's more
25   haven't been able enough to conclude that it's more

| Page 1376 |
|---|

1    likely than not that this conclusion from OCHCA is
2    incorrect?  Is that a fair statement?
3        MS. O'REILLY:  Argumentative.  Compound.
4    Unintelligible.  Vague.  Ambiguous.  Overbroad.
5    Incomplete hypothetical.
6        THE WITNESS:  As part of my retention in this
7    matter, I was not asked to evaluate the overall threat
8    to the environment as a whole.  I've offered opinions as
9    to the threat the contamination poses to water supply
10   wells.  And for this particular station, I could only
11   conclude that there is a possible threat, but I would
12   not conclude that it's more likely than not.
13   BY MR. ANDERSON:
14       Q.   On the following page, the last bullet point up
15   at the top says, "Natural attenuation will continue to
16   address the remaining concentration levels with time."
17       Do you see that?
18       A.   Yes.
19       Q.   Do you disagree with that conclusion?
20       MS. O'REILLY:  Vague.  Ambiguous.  Overbroad.
21   Exceeds the scope of his designation to the extent he
22   was not asked to agree or disagree with Orange County
23   Health Care Agency.
24       THE WITNESS:  With respect to MTBE in
25   groundwater that was sourced from a release at the

24  (Pages 1373 to 1376)

Anthony Brown

---

Page 1377

1  Beacon Bay, Fountain Valley car wash, I would agree with
2  that statement.
3  BY MR. ANDERSON:
4      Q.  Turning to the second page up at the top, it's
5  got the before-and-after chart with what the MTBE
6  detections in water were before, and then it's got the
7  after detections.  It lists 6.77 parts per million, not
8  billion, as the before concentration, and less than
9  0.005 parts per million after.
10     Do you see that?
11     A.  Yes, I do.
12     Q.  That's a significant decrease in the MTBE
13  detections at this site, correct?
14         MS. O'REILLY:  Incomplete hypothetical.
15  Overbroad -- only one detection.  Vague.  Ambiguous.
16  Lacks foundation.
17         THE WITNESS:  The data you've been referring to
18  may, in fact, be incorrect as to the highest MTBE
19  concentration before and after.  However, in general,
20  significant reductions in MTBE concentrations have been
21  observed at monitoring wells at the Beacon Bay, Fountain
22  valley car wash.
23  BY MR. ANDERSON:
24     Q.  This case closure summary was signed by Joyce
25  Krau at the OCHCA.

---

Page 1378

1      Are you familiar with Ms. Krau?
2      A.  Yes.
3      Q.  Do you think her to be a competent regulator?
4         MS. O'REILLY:  Calls for speculation.  Assumes
5  facts.  Lack foundation.  Exceeds the scope of his
6  designation in this matter.
7         THE WITNESS:  Yes.
8  BY MR. ANDERSON:
9      Q.  And do you know Ken Williams?
10     A.  Yes.
11     Q.  And you think him to be a competent regulator
12  as well, correct?
13     A.  Yes.
14         MS. O'REILLY:  Calls for -- hold on.  Calls for
15  speculation.  Assumes facts.  Lacks foundation.  Exceeds
16  the scope of his designated testimony in this matter.
17         (Brown Exhibit 143 was marked.)
18  BY MR. ANDERSON:
19     Q.  Let me hand you -- I'm out of those things.
20  Oh, no, I'm not.  I have got 143 here.  Let me hand you
21  Exhibit 143.  Exhibit 143 is an April 19, 2006 letter
22  from Steven Wong at OCHCA to Patrick Shea of Beacon Bay
23  Enterprises.  The subject is:  "Remedial Action
24  Completion Certification."
25         The second sentence in the first paragraph,

---

Page 1379

1  "Thank you for your cooperation throughout this
2  investigation."
3      Do you see that?
4      A.  Yes.
5      Q.  Do you have any information that would indicate
6  that the responsible party did not act cooperatively
7  with OCHCA in this site investigation?
8         MS. O'REILLY:  Calls for speculation.
9  Overbroad.  Vague.  Ambiguous.  Lacks foundation.
10  Assumes facts.  Exceeds the scope of this witness's
11  designation, particularly with respect to whether or not
12  regulatory compliance was achieved.
13         THE WITNESS:  I cannot recall of such.
14  BY MR. ANDERSON:
15     Q.  The following sentence says, "Your willingness
16  and promptness in responding to our inquiries concerning
17  the former underground storage tanks are greatly
18  appreciated."
19     Do you see that?
20     A.  Yes, I do.
21     Q.  And do you have any information that would
22  indicate to you that the responsible party was unwilling
23  or tardy in responding to OCHCA's inquiries concerning
24  the former underground storage tanks at this site?
25         MS. O'REILLY:  Overbroad given you've only

---

Page 1380

1  shown him one document, one -- one excerpt.  He's got
2  pages and pages of notes.
3         MR. ANDERSON:  I don't need a speaking -- we
4  don't need speaking objections.
5         MS. O'REILLY:  Vague.  Ambiguous.  Calls for
6  speculation.  Lacks foundation.  Assumes facts.  And
7  exceeds the scope of his designation as he was not
8  retained to opine on the parties' compliance with
9  Orange County Health Care Agency requests or
10  regulations.
11         THE WITNESS:  As part of my retention in this
12  matter, I've not identified such instances.
13  BY MR. ANDERSON:
14     Q.  You understand this lawsuit was filed in 2003,
15  correct?
16         MS. O'REILLY:  Vague and ambiguous.
17         THE WITNESS:  I do not recall the specific
18  date, but that sounds reasonable.
19  BY MR. ANDERSON:
20     Q.  Do you know whether or not OCWD objected to the
21  closure of this site in April 2006?
22         MS. O'REILLY:  Objection.  Vague.  Ambiguous.
23  Overbroad.  Assumes facts.  Exceeds the scope of his
24  designation.
25         THE WITNESS:  I don't know.

25 (Pages 1377 to 1380)