UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00 - 1898
MDL 1358 (SAS)
M21-88

This Document Relates to:

*New Jersey Department of Environmental
Protection, et al. v. Atlantic Richfield Co., et al.*
No. 1:08-cv-00312-SAS

### DECLARATION OF BRYAN BARNHART IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PROTECTIVE ORDERS' WAIVER AND DECLASSIFICATION PROVISIONS

I, Bryan Barnhart, declare:

1. I am attorney at Miller & Axline, A Professional Corporation, counsel of record for the plaintiffs in this action. All facts stated herein are true, and they are supported by evidence in my office's files that I will provide if requested. The exhibits attached to this Declaration are documents that are kept in the ordinary course of business in Miller & Axline's files. They were copied by me, or by someone working under my supervision.

2. On May 13, 2014, this Court granted Plaintiffs leave to file a motion to declassify documents covered by the Hamner and EPL protective orders. The transcript reflects that Court agreed with Plaintiffs' counsel when he "correctly said, . . . EPA doesn't know what it doesn't have."

3. Both protective orders impose pre-motion meet-and-confer requirements. Plaintiffs complied with those requirements. Plaintiffs filed this Motion two days after the parties meet-and-confer efforts failed. **Exhibit 1** to this Declaration is true and correct copies of the relevant pages from Plaintiffs' meet-and-confer efforts with Hamner's and EPL's attorneys counsel.

4. On April 22nd, I spoke with EPL's counsel Robert Cunningham about Plaintiffs' request that EPL declassify EPL's Hamner Data. I followed up with a letter. On April 29th, I followed up with Mr. Cunningham by email. Mr. Cunningham emailed me back, stating that he did "not anticipate a problem" with obtaining his client's consent to declassify EPL's Hamner Data, and that he'd have an answer for me that week. On the basis of this representation, Plaintiffs' pre-conference letter represented to the Court that Plaintiffs expected to resolve this issue with EPL by stipulation. I followed up with Mr. Cunningham again on May 9, 2014. Mr.

Cunningham wrote back to say that he was no longer handling this issue, and referred me to his colleague Andrew Golkow. On May 14, 2014, I followed up with Mr. Golkow. No response. On June 10, 2014, I followed up with Mr. Golkow again. Mr. Golkow had no answer for me. Instead, he referred me to his colleague Alison Mullins, and told me that she would respond to me by the following day. On June 11, 2014, I followed up with Ms. Mullins. She responded with an after-hours email saying that she'd get back to me the next day. On June 12, I sent another follow-up email to Ms. Mullins. In response, I received an out-of-office auto-reply. I immediately followed up with Ms. Mullins, Mr. Golkow, and Mr. Cunningham. The next day – almost two months after my initial query – Ms. Mullins emailed me to say that her client would not stipulate to declassify its Hamner Data. The only reason that she gave was that I was rushing her too much: "Since you are insisting on a response now, the answer is no, EPL does not agree to dissolve the Protective Order in place."

5.    **Exhibit 2** is true and correct copies of the relevant pages of the deposition of the May 9, 2014 deposition of Dr. Eric Stine.

6.    **Exhibit 3** is a true and correct copy of the relevant pages of EPL's Motion to Quash.

7.    **Exhibit 4** is a true and correct copy of the relevant pages from my correspondence with the court reporter who transcribed the depositions of Dr. Darol Dodd and Dr. Gabrielle Willson, establishing that no one followed the protective orders' procedures for making confidential deposition exhibits or testimony that reflects or discusses Hamner Data.

8.    EPL's website refers to its own Pathology Working Group services as "beneficial" and "quite valuable." See http://epl-inc.com/news/value-of-pathology-working-groups-pwg-

at-epl/

9.     **Exhibit 5** is a true and correct copy of Exhibit 19 to Dr. Dodd's July 30, 2012, deposition transcript. It is the December 7, 2010, cover letter that accompanied defendant Shell's filing of the draft Hamner Study with the EPA.

10.     The Disclosure of Rule 26(a)(2)(C) Non-Site Specific Witnesses that dfeendants Chevron Corporation, Chevron U.S.A. Inc., Chevron Puerto Rico, LLC, Chevron Estrella Puerto Rico Inc., Chevron Caribbean Inc., and Chevron International Oil Company, Inc. filed on February 21, 2014, in the Puerto Rico MTBE Case (No. 07 Civ. 10470 (SAS) included the following disclosure:

9.     Eric Stine

Dr. Stine may offer opinions about, among other things, the toxicological and health aspects of MTBE and the state and sufficiency of Defendants' knowledge about those issues during the relevant time period; Defendants' participation in studies related to MTBE; the current state of science concernign the toxicity of MTBE; and topics covered in his deposition previously taken in MDL 1358 dated June 1-2, 2011 and other MTBE cases; topics covered in his trial testimony in the *City of Merced* case, and issues related to the documents produced in relationship to those depositions . . .."

11.     My firm has checked its records and LNFS. We cannot find any record of anyone complying with the protective orders' notice requirements for designating testimony or exhibits confidential from the July, 2012, depositions of Dr. Dodd or Dr. Willson.

12.     Defendants May 8, 2011, pre-conference reply letter stated defendants' opposition to Plaintiffs' request to declassify the Hamner Data. Defendants' letter stated that, "to the extent Mr. Miller or another plaintiff believe that there are materials which no longer should be treated

# EXHIBIT 1

Law Offices of

# MILLER & AXLINE
A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE

TRACEY L. O'REILLY
DANIEL BOONE
JUSTIN MASSEY
BRYAN BARNHART
DAVE E. BLUM
MOLLY MCGINLEY HAN

June 17, 2014

**VIA LNF&S**

All Counsel

**VIA EMAIL**

Andrew B. Golkow
Robert J. Cunningham, Jr.
Alison R. Mullins
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182
Counsel to Experimental Pathology Laboratories, Inc.

William G. Pappas
Scott E. Bayzle
Wells Fargo Capitol Center
150 Fayetteville Street
Suite 1400
Raleigh, NC 27601
Counsel to The Hamner Institute for Health Sciences

RE:   *In re: Methyle Tertiary Butyl Ether ("MTBE") Products Liability Litigation*
      **Motion To Declassify & Challenge Confidentiality Of Documents**

Dear Counsel:

As you know, we intend to file a motion challenging the confidentiality of – and asking Judge Scheindlin to declassify – documents produced by the Hamner Institute ("**Hamner**"), and by Experimental Pathology Laboratories ("**EPL**"), pursuant to protective orders (collectively, "**Hamner Documents**"). Our Motion's primary goal will be to free up these documents, so we can share them with government regulators, including the EPA. Given Dr. Stine's recent testimony that the Hamner Study team would "welcome" review of the Hamner Documents by "EPA or any other governmental organization," however, it would seem that we should be able to resolve this issue without burdening the Court with a Motion.

June 17, 2014
Page 2

---

The Hamner Documents fall into two categories:

1)      Non-Confidential Deposition Exhibits: Under the terms of the protective orders, Hamner Documents used as deposition exhibits are not confidential unless so designated at or following the deposition. We have checked our records, and we cannot find any confidentiality designation by anyone relating to any Hamner Document that was made an exhibit to any deposition. It does not appear that anyone timely designated as confidential, for example, any testimony or exhibit from the depositions of Darol Dodd and Gabrielle Willson, which took place in Hamner's attorneys' offices, and which were attended by Hamner's and EPL's counsel. If we've missed something, please let us know within five business days of the date of this letter. Otherwise, we will turn these documents over to relevant regulators without further delay.

2)      Other Documents That Hamner And EPL Saved For Review By Regulatory Authorities: Eric Stine – defendant Chevron's expert regarding MTBE and the Hamner Institute's MTBE study, and a member of the Study's toxicology committee – recently testified that the Hamner Documents were preserved because good laboratory practices required them to be made available for review by third parties, such as regulators. Specifically, Mr. Stine testified:

> Again, under good laboratory practices, virtually all of the data and study records related to the study are stored. The plan is to store them for a minimum of ten years so any other scientist or academician or regulatory agency can come and review the data, come to their own conclusions. And in the case of a regulatory agency, they can make whatever appropriate conclusions they feel are appropriate relative to whether or not exposure to MTBE at very high doses in rodents causes cancer.

Plainly these Documents were never intended to be treated as confidential once the Hamner Study became final. Plaintiffs renew their request that Hamner and EPL stipulate to declassify the Hamner Documents so that "any other scientist or academician or regulatory agency can come and review the data, come to their own conclusions."

It does not make sense to burden the Court with a Motion seeking to permit the Hamner Documents to be put to the very purpose for which Hamner and EPL saved them. Accordingly, plaintiffs ask defendants to let us know within five business days of this letter whether defendants intend to object to Plaintiffs' production of Hamner Documents to regulators.

Very truly yours,

Bryan Barnhart

**Bryan Barnhart**

| | |
|---|---|
| **From:** | Pappas, William G. [billpappas@parkerpoe.com] |
| **Sent:** | Monday, June 30, 2014 9:48 AM |
| **To:** | 'Bryan Barnhart' |
| **Cc:** | 'Kathy Herron'; Amullins@reesbroome.com; AGolkow@reesbroome.com; dmiller@toxictorts.org; 'James A. Pardo'; 'Miller, Axline & Sawyer'; maxline@toxictorts.org; 'Tracey O'Reilly'; Bayzle, Scott E.; RCunningham@reesbroome.com |
| **Subject:** | RE: In re MTBE--Motion to Declassify |

Bryan, As you say, the documents were produced subject to the Protective Order (pursuant to Paragraph 3) and, thus, were and continue to be protected under that Order as they were used in the deposition. We disagree with your characterization of the effect of Section 6 (as it relates to the other provisions of the Order) and your contention that The Hamner has, in any way, waived its confidentiality rights. We stand by our previously stated position. Sincerely, Bill

---

**William Pappas**
Partner



Wells Fargo Capitol Center | 150 Fayetteville Street | Suite 1400 | Raleigh, NC 27601
Phone: 919.890.4164 | Fax: 919.834.4564 | www.parkerpoe.com | vcard | map

---

**From:** Bryan Barnhart [mailto:bbarnhart@toxictorts.org]
**Sent:** Friday, June 27, 2014 5:16 PM
**To:** Pappas, William G.
**Cc:** 'Kathy Herron'; Amullins@reesbroome.com; AGolkow@reesbroome.com; dmiller@toxictorts.org; 'James A. Pardo'; 'Miller, Axline & Sawyer'; maxline@toxictorts.org; 'Tracey O'Reilly'; Bayzle, Scott E.; RCunningham@reesbroome.com
**Subject:** RE: In re MTBE--Motion to Declassify

Good afternoon.

Thank you for your prompt response, but we're still talking past each other. Your earlier correspondence does not answer my question.

I understand that the Hamner documents were marked confidential before the deposition. Those confidentiality designations were made pursuant to section 3 of the protective order.

I'm talking about **section 6**. That section requires Hamner to comply with additional procedures to maintain the confidentiality of deposition testimony and exhibits.

Here is the language from the protective order to which I'm referring, reproduced in full:

6.   **Documents at Depositions.**

(a)      A deponent who is a current employee of The Hamner may, during deposition, be shown and examined about the Documents.

1

(b)      A deponent who is not a current employee of The Hamner may, during depositions, be shown and examined about the Documents if the provisions of Paragraph 4 and 5 are complied with. Deponents shall not retain or copy portions of the transcript of their depositions that certain confidential information not provided by them or the entities they represent unless they sign the Confidentiality Agreement and applicable Affidavit.

(c)      Parties and deponents may, within (thirty) 30 days after receiving a deposition transcript, designate pages of the transcript, and exhibits thereto which pertain specifically to the discussion and/or disclosure of the subject Documents, as confidential. Confidential information within the deposition transcript may be designated by underlining the portions of the pages that are confidential and stamping such pages: "HAMNER-CONFIDENTIAL."  Until expiration of the thirty (30) day period, the entire deposition will be treated as subject to protection against disclosure under this Order.  Parties and deponents, through their respective counsel, shall notify in writing all opposing counsel of the pages and exhibits which they have designated confidential information.  If no party or deponent timely designates confidential information in a deposition, then none of the transcript or its exhibits will be treated as confidential.  If a timely designation is made, the stamped pages and exhibits shall be treated like a Confidential Document under this Order.  If there is uncertainty or a dispute about whether the pages and/or exhibits have been property designated as confidential information, any party may seek a ruling from this Court.

Did Hamner follow the above-quoted procedures?

Our records show that Hamner did not.

The court reporter's records show that Hamner did not.

All I need from you is confirmation that our records are accurate, or evidence that our records are wrong.

You have not answered that question.  And I don't know how to ask it any more clearly.

Did Hamner comply with section 6?

Let's do it this way:

If Hamner complied with section 6's procedures, then please:

   1.  Say "Yes, Hamner complied with section 6's procedures;" and

   2.  Email me proof of Hamner's compliance.

Otherwise, our Motion will assume that Hamner did not comply with section 6's procedures, and that Dr. Dodd's deposition testimony and exhibits were automatically declassified under the plain language of the protective order that Hamner seeks to enforce.

Thank you.

Bryan

---

**From:** Pappas, William G. [mailto:billpappas@parkerpoe.com]
**Sent:** Friday, June 27, 2014 1:58 PM
**To:** 'Bryan Barnhart'

**Cc:** 'Kathy Herron'; Amullins@reesbroome.com; AGolkow@reesbroome.com; RCunninghamjr@reesbroom.com; dmiller@toxictorts.org; 'James A. Pardo'; 'Miller, Axline & Sawyer'; maxline@toxictorts.org; 'Tracey O'Reilly'; Bayzle, Scott E.
**Subject:** RE: In re MTBE--Motion to Declassify

Mr. Barnhart, In Scott's absence, I wanted to respond to your email. As we indicate in our past responses, some (but not all) the exhibits used in Dr. Dodd's deposition were marked "HAMNER-CONFIDENTIAL" in advance of his deposition and therefore already subject to the Order when used in his deposition. The Hamner has not waived the confidential treatment of any of those exhibits. The marking of these documents was the subject of correspondence between your office and ours at the time of the production in 2012. We do not know what exhibits were marked as confidential in the depositions of other MTBE litigation deponents, in other pending cases, but certainly the Hamner has not waived its position as to matters it has not been involved in and is unaware of.
Sincerely, Bill


_____

**William Pappas**
Partner



Wells Fargo Capitol Center | 150 Fayetteville Street | Suite 1400 | Raleigh, NC 27601
Phone: 919.890.4164 | Fax: 919.834.4564 | www.parkerpoe.com | vcard | map

_____

**From:** Bryan Barnhart [mailto:bbarnhart@toxictorts.org]
**Sent:** Friday, June 27, 2014 3:21 PM
**To:** Bayzle, Scott E.
**Cc:** 'Kathy Herron'; Amullins@reesbroome.com; AGolkow@reesbroome.com; RCunninghamjr@reesbroom.com; Pappas, William G.; dmiller@toxictorts.org; 'James A. Pardo'; 'Miller, Axline & Sawyer'; maxline@toxictorts.org; 'Tracey O'Reilly'
**Subject:** RE: In re MTBE--Motion to Declassify

Good afternoon.

Please read section 6 of the protective order, entitled "Documents at Depositions."

Has any Hamner representative ever complied with section 6's requirements for maintaining the confidentiality of any exhibit or testimony?

Please begin your answer with "yes" or "no."

And please respond today. We want our Motion to provide the Court with the most accurate and fact-checked information possible.

Thank you.

Bryan

**From:** Bayzle, Scott E. [mailto:scottbayzle@parkerpoe.com]
**Sent:** Friday, June 27, 2014 10:04 AM
**To:** 'Bryan Barnhart'
**Cc:** 'Kathy Herron'; Amullins@reesbroome.com; AGolkow@reesbroome.com; RCunninghamjr@reesbroom.com; Pappas, William G.; dmiller@toxictorts.org; 'James A. Pardo'; Miller, Axline & Sawyer
**Subject:** RE: In re MTBE--Motion to Declassify

Mr. Barnhart,

Our letter of June 23, 2014 and various emails with you beginning in late April are fully responsive to the issues you have raised below and your prior correspondence, and I refer you to them. We have repeated The Hamner's position to you from the outset: the Hamner cannot agree to a blanket dissolution of the Protective Order, but is certainly willing to consider legitimate requests regarding specific documents that you contend are no longer confidential under the Order – an Order that the plaintiffs readily agreed to years ago.

The Hamner has not waived any of its rights with regard to the Order, including but not limited to deposition exhibits. Some (but not all) of the deposition exhibits used in connection with Dr. Dodd's deposition were clearly marked/stamped "HAMNER-CONFIDENTIAL" under the terms of the Protective Order. The deposition exhibits marked accordingly are subject to the Protective Order.

The Hamner is not a party to the MTBE litigation. We were not served with any motion, order or notice that made our participation in the hearing you refer to below appropriate. We copied both Mr. Miller and Mr. Pardo on our reply to your demands because we understand that they are designated as "liaison counsel" for the plaintiffs and defendants, respectively. Section 8(a) of the Protective Order provides that they must be copied on such correspondence.

We stand by our responses and urge you and your clients to comply with the Order and not waste the Court and the litigants' time.

Sincerely,
Scott

_____
**Scott Bayzle**
Partner



Wells Fargo Capitol Center | 150 Fayetteville Street | Suite 1400 | Raleigh, NC 27601
Phone: 919.835.4627 | Fax: 919.834.4564 | www.parkerpoe.com | vcard | map

**From:** Bryan Barnhart [mailto:bbarnhart@toxictorts.org]
**Sent:** Thursday, June 26, 2014 12:50 PM
**To:** Bayzle, Scott E.
**Cc:** 'Kathy Herron'; Amullins@reesbroome.com; AGolkow@reesbroome.com; RCunninghamjr@reesbroom.com; Pappas, William G.; dmiller@toxictorts.org; 'James A. Pardo'; Miller, Axline & Sawyer
**Subject:** RE: In re MTBE--Motion to Declassify

Good morning.

Your letter does not identify any deposition exhibits that Hamner marked as confidential pursuant to the protective order.  Hamner has waived all rights, therefore, to keep these documents confidential.

Most of the questions that your letter raises were discussed and answered at the pre-motion hearing on plaintiffs motion to declassify Hamner's documents.  We notified Hamner of that hearing.  You did not attend.  Instead, Exxon's attorney Mr. Pardo – who you also copied on your response to me (see below) – appeared to argue your case.  I'm sure that he can answer any questions about what transpired.

Plaintiffs cannot narrow their declassification request.  Plaintiffs make this request so that they can provide the documents to the EPA.  Plaintiffs do not presume to know precisely which documents the EPA will find relevant to its inquiry.

By close of business tomorrow, please agree to declassify all of the documents that Hamner produced pursuant to the protective order.  Otherwise, plaintiffs will move to declassify all documents that remain subject to the protective order.

Thank you.

Bryan

---

**From:** Bayzle, Scott E. [mailto:scottbayzle@parkerpoe.com]
**Sent:** Monday, June 23, 2014 12:07 PM
**To:** bbarnhart@toxictorts.org
**Cc:** 'Kathy Herron'; Amullins@reesbroome.com; AGolkow@reesbroome.com; RCunninghamjr@reesbroom.com; Pappas, William G.; 'dmiller@toxictorts.org'; James A. Pardo (jpardo@mwe.com)
**Subject:** RE: In re MTBE--Motion to Declassify

Counsel,

Attached please find a letter in response to Bryan Barnhart's email dated June 13, 2014 and his letter dated June 17, 2014.

Many thanks,
Scott

_____
**Scott Bayzle**
Partner



Wells Fargo Capitol Center | 150 Fayetteville Street | Suite 1400 | Raleigh, NC 27601
Phone: 919.835.4627 | Fax: 919.834.4564 | www.parkerpoe.com | vcard | map



**Parker Poe**

**Scott E. Bayzle**
*Partner*
Telephone: 919.835.4627
Direct Fax: 919.834.4564
scottbayzle@parkerpoe.com

Charleston, SC
Charlotte, NC
Columbia, SC
Raleigh, NC
Spartanburg, SC

June 23, 2014

**U.S. MAIL & E-MAIL**
Bryan Barnhart
MILLER & AXLINE, P.C.
1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4225
E-mail: bbarnhart@toxictorts.org

Re:  *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation;*
     **Master File No. 1:00-1898 MDL 1358**

Dear Mr. Barnhart:

As you know, this firm represents The Hamner Institutes ("The Hamner") and Dr. Darol Dodd ("Dr. Dodd"). I am writing in response to your e-mail dated June 13, 2014 and your letter dated June 17, 2014 requesting, pursuant to Section 8 of the *Stipulation and Protective Order* (the "Protective Order"), the declassification of all documents produced under that Protective Order. The Hamner does not consent to your request for declassification as set forth in your correspondence and objects to the use of its confidential information in any manner contrary to the Protective Order.

The Hamner and Dr. Dodd, as subpoenaed non-parties, produced documents in the above-captioned action in both 2010 and 2012. Some, but not all, of those documents were marked subject to the Protective Order, an Order to which Mr. Miller, on behalf of the plaintiffs, agreed and stipulated. Your office has had many of these documents for nearly four years (the 2010 production) and all of the documents since at least July of 2012 (the 2012 production). If any party disagreed with The Hamner's classification of a document, that party had an ample opportunity to object (*via* Section 8 of the Order) at that time. Yet, in the years following those productions, neither your office, nor counsel for any other party, made any such objections.

Notwithstanding, we would like to resolve any legitimate disagreements concerning the classification of specific documents without burdening the Court. As mentioned in our previous e-mail to you, The Hamner cannot agree simply to dissolve the Protective Order in its entirety. The Hamner disclosed an enormous amount of information in accordance with the Protective Order and certainly believes that much of this information continues to need protection. We cannot expend further time and expense reviewing the entire prior document productions because of your blanket request. If you have a legitimate reason to contend that there are certain documents that should no longer be subject to the Protective Order, we ask that you identify those documents by bates-number and inform us as to why

PPAB 2479077v1

Parker Poe Adams & Bernstein LLP   Attorneys and Counselors at Law   Wells Fargo Capitol Ctr   150 Fayetteville St   Ste 1400   Raleigh, NC 27601   PO Box 389   Raleigh, NC 27602-0389
t 919.828.0564   f 919.834.4564   www.parkerpoe.com

Bryan Barnhart
June 23, 2014
Page 2

you contend those specific documents should be declassified. This will afford The Hamner with a reasonable opportunity to consider your request.

You raise several contentions in your recent correspondence with which The Hamner disagrees. You contend that certain of The Hamner's documents (although, again, you fail to identify the specific documents to which you refer) should be declassified because the EPA "need[s] the information in these documents to understand and evaluate the contents of The Hamner's MTBE report." This is inaccurate. There are procedures in place for the EPA to request certain information and documentation from a study sponsor or laboratory related to a GLP-certified study, and there are specific mechanisms with regard to the manner in which such information is reviewed by the EPA.[1] Furthermore, the Protective Order, at Paragraph 9, contemplates this very type of process. The EPA has not requested any such information or documentation from The Hamner related to the MTBE Study and The Hamner is not aware of any such request to a party in this litigation. If the EPA needs certain information from The Hamner, then it would certainly be able to obtain such information in a manner consistent with the approach outlined under federal regulations. Consequently, we do not understand why or how this is a matter that must be addressed by the plaintiffs.

Also, your contention that the Protective Order was intended to extend confidentiality protection only until the "release" date of the MTBE study is wholly without basis. By its express terms, the Order extends until and after the MDL litigation is concluded; such protection was clearly not intended to end at the study release date. *See* Section 14 ("The provisions of this Order shall not terminate at the conclusion of this action. ...."). In fact, the vast majority of the documents disclosed under the Protective Order were produced long after the release of the MTBE Study in December of 2010. Most of these documents were produced on July 12, 2012, nearly two years after the release of the Study. As you know, there was much correspondence between my office and your office regarding this 2012 production and the applicability of the Protective Order to that production. Both parties, of course, agreed and understood that the Protective Order extended beyond the release date of the MTBE Study and your statement that "The Hamner did not reasonably rely [on] any term of the order ... extend[ing] confidentiality beyond the Report's release date" is completely unfounded.

Your correspondence also misconstrues The Hamner's initial filings in this matter in 2010. While The Hamner did initially seek to quash all discovery against it in 2010 because of the preliminary nature of the MTBE Study, The Hamner has never taken the position that its documents and information needed protection *only* for that reason and *only* until the conclusion of the MTBE Study. Indeed, as previously noted, most of the documents at issue were in fact produced after the Study was concluded. The Hamner produced confidential documents and information only after the Protective Order was stipulated to by the parties and entered by Judge Scheindlin, and it expects those agreed-upon protections to apply until and after the MDL litigation has concluded.

---

[1] Presumably it is to this that Dr. Stine, who is referenced in your letter, may have been referring. We note, however, that: (i) Dr. Stine is not affiliated with The Hamner, (ii) neither The Hamner nor Dr. Dodd were present at his deposition, and (iii) neither The Hamner nor Dr. Dodd know the content of his purported testimony.

Bryan Barnhart
June 23, 2014
Page 3

You also allege that The Hamner "has waived all confidentiality protections" because certain documents "have been relied upon by testifying experts" and certain documents "have been filed in courts." We do not know the documents or filings to which you refer. Please provide a copy of these documents or filings to afford The Hamner with a reasonable opportunity to review this issue. In any event, neither The Hamner nor Dr. Dodd is a party to this litigation so neither of them receives copies of court filings or otherwise participates in expert discovery in this litigation. Accordingly, no credible argument can be made that either the Hamner or Dr. Dodd have waived provisions of the Protective Order. To the contrary, they have always relied upon its continuing application.

You further allege that no exhibits to Dr. Dodd's deposition were marked as subject to the Protective Order. I have reviewed the deposition exhibits and I do not understand your contention. Some (but not all) of the deposition exhibits are clearly marked as "HAMNER-CONFIDENTIAL" and are thus subject to the Protective Order. Those documents were produced pursuant to the 2012 deposition subpoena and were clearly stamped as "HAMNER-CONFIDENTIAL" (the marking set forth in Paragraph 3 of the Protective Order).

Should you have any questions or wish to discuss this matter further, I hope that you will not hesitate to contact me.

Sincerely,

Scott E. Bayzle

cc:   *Via email*
      William G. Pappas
      Andrew B. Golkow
      Robert J. Cunningham, Jr.
      Alison R. Mullins
      Duane Miller (designated Plaintiffs' Liaison Counsel)
      James Pardo (designated Defendants' Liaison Counsel)

## Bryan Barnhart

**From:** Bryan Barnhart [bbarnhart@toxictorts.org]
**Sent:** Thursday, June 26, 2014 5:08 PM
**To:** 'Andrew B. Golkow'
**Cc:** billpappas@parkerpoe.com; scottbayzle@parkerpoe.com; dmiller@toxictorts.org; 'James A. Pardo'; maxline@toxictorts.org; 'Tracey O'Reilly'; 'Miller, Axline & Sawyer'; 'Robert J. Cunningham Jr.'; 'Alison R. Mullins'
**Subject:** RE: Letter to Bryan Barnhart

Good evening.

Thank you for writing back.  It appears that we're talking past each other.

Please read Paragraph H.b.

Our records — and the Court Reporter's records — show that EPL did not maintain the confidentiality of any deposition exhibit pursuant to H.b.'s required procedures.  Do your records show differently?  Please focus special attention on the exhibits to the deposition of Gabrielle Willson.

Thank you.

Bryan

---

**From:** Andrew B. Golkow [mailto:AGolkow@reesbroome.com]
**Sent:** Thursday, June 26, 2014 4:26 PM
**To:** 'Bryan Barnhart'
**Cc:** billpappas@parkerpoe.com; scottbayzle@parkerpoe.com; dmiller@toxictorts.org; 'James A. Pardo'; maxline@toxictorts.org; 'Tracey O'Reilly'; Miller, Axline & Sawyer; Robert J. Cunningham Jr.; Alison R. Mullins
**Subject:** RE: Letter to Bryan Barnhart

Good evening,

Thank you for your email from earlier this afternoon.  Please be advised that EPL has not waived anything, nor does it agree to the blanket declassification that you have requested.

Paragraph K, on page 8 of the Protective Order, states, in relevant part  "Any party hereto may challenge the claim of confidentiality of any materials by notifying counsel for the party claiming confidentiality of the basis of their challenge to the claim.  Counsel for the party claiming confidentiality will respond in writing within ten (10) Days, and the parties will meet and confer to resolve the dispute.  If the parties cannot resolve the dispute, the matter will be brought before the Court for resolution.  Until the Court issues a ruling on the dispute, and until any and all proceedings and interlocutory appeals challenging such decision have been concluded, the Confidential Documents shall continue to be deemed  'CONFIDENTIAL' under the terms of this Order." [Capitalization in original]  I did not see any mention of "waiver" in the Protective Order, and all that is necessary under the terms of the Order is a response.  We object to this attempt to read into the Order what is not there.  Nevertheless, our response of June 24, 2014, and Mr. Bayzle's response of June 23, 2014, were detailed and certainly waived nothing.

Andrew Golkow


**Andrew B. Golkow**
Rees Broome, PC

1

1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182
Telephone:  (703) 790-1911
Fax:        (703) 848-2530
agolkow@reesbroome.com

---

**From:** Bryan Barnhart [mailto:bbarnhart@toxictorts.org]
**Sent:** Thursday, June 26, 2014 12:42 PM
**To:** Andrew B. Golkow
**Cc:** billpappas@parkerpoe.com; scottbayzle@parkerpoe.com; dmiller@toxictorts.org; 'James A. Pardo';
maxline@toxictorts.org; 'Tracey O'Reilly'; Miller, Axline & Sawyer
**Subject:** RE: Letter to Bryan Barnhart

Good morning.

Your letter does not identify any deposition exhibits that EPL marked as confidential pursuant to the protective order.
EPL has waived all rights, therefore, to keep these documents confidential.

Plaintiffs cannot narrow their declassification request because Plaintiffs cannot know which documents the EPA will find
relevant.

By close of business tomorrow, please agree to declassify all of the documents that EPL produced pursuant to the
protective order.  Otherwise, plaintiffs will move to declassify all documents that remain subject to the protective order.

Thank you.

Bryan

---

**From:** Andrew B. Golkow [mailto:AGolkow@reesbroome.com]
**Sent:** Tuesday, June 24, 2014 3:13 PM
**To:** 'Bryan Barnhart'
**Cc:** 'billpappas@parkerpoe.com'; 'scottbayzle@parkerpoe.com'; 'dmiller@toxictorts.org'; James A. Pardo
(jpardo@mwe.com)
**Subject:** Letter to Bryan Barnhart

Please find attached a letter in response to Bryan Barnhart's email of June 13,  2014, and his letter dated June 17, 2014.

**Andrew B. Golkow**
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182
Telephone:  (703) 790-1911
Fax:        (703) 848-2530
agolkow@reesbroome.com

# RB   REES BROOME, PC

———————————ATTORNEYS AT LAW

1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182
Phone (703) 790-1911
Fax (703) 848-2530
www.reesbroome.com

JOEL M. BIRKEN*
JONATHAN J. BROOME, JR.
JOHN F. BOLAND*
JUAN R. CARDENAS
BRUCE E. TITUS*+
PETER S. PHILBIN+
WILLIAM P. DALY, JR.+
ANDREW B. GOLKOW*
SUSAN RICHARDS SALEN*+
MARK P. GRAHAM
TODD A. SINKINS*
MARK A. MOORSTEIN*
ROBERT J. CUNNINGHAM, JR.+*
KIMBERLEY M. O'HALLORAN-PEREZ+*
DAVID J. CHARLES*
STEPHEN J. ANNINO*+
PATRICK M. VIA
JAMES M. LEWIS*
URSULA KOENIG BURGESS+
ANDREW N. FELICE*
STEPHEN D. CHARNOFF*+

JAMES M. REES (1941-1986)

*  ALSO ADMITTED IN DC
+  ALSO ADMITTED IN MARYLAND
■  ALSO ADMITTED IN WEST VIRGINIA
▲  ALSO ADMITTED TO PATENT BAR
●  NOT ADMITTED TO PRACTICE IN VIRGINIA;
     ADMITTED ONLY IN MD AND DC

COUNSEL
ROBERT W. WOOLDRIDGE, JR.
JOSEPH H. KASIMER*
DANIEL R. GROPPER*
RORY K. NUGENT
NICOLE A. WILLIAMS*

ASSOCIATES
M. JOSEPH PIERCE*+
DOUGLAS S. LEVY*+
COURTNEY B. HARDEN
ERIK W. FOX*
TIFFANY L. BURTON+
GINA L. SCHAECHER*
JORDY L. MURRAY
KELLY C. ZOOK
MAUREEN E. CARR*+
WINTA MENGISTEAB+*
KATHLEEN N. MACHADO*
HILLARY ANNE COLLINS+*
ALISON R. MULLINS*+
MARIAM W. TADROS*
JOSEPH J. SHANNON+
MARGUERITE L. SELTON+

June 24, 2014

**BY FEDERAL EXPRESS AND**
**ELECTONIC MAIL**

Bryan Barnhart, Esq.
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825-4225
Email: Bbarnhart@toxictorts.org

Re:   In re: MTBE Products Liability Litigation
       Denial of Request to Declassify & Challenge Confidentiality of
       Documents Produced by Experimental Pathology Laboratories, Inc.

Dear Mr. Barnhart:

This letter is in response to your June 16, 2014 email and June 17, 2014 letter challenging the confidentiality of the documents produced by Experimental Pathology Laboratories, Inc. ("EPL") in accordance with the October 27, 2011 consent Confidentiality Agreement and Protective Order entered in the *In re: MTBE Products Liability Litigation*, MDL No. 1358 ("Protective Order").

EPL continues to maintain that the documents identified in the 2011 production are confidential, and does not agree to declassify the documents as such or to dissolve the Protective Order.

EPL disputes the statements and/or allegations in you June 16, 2014 email and/or June 17, 2014 letter, and states as follows:

1.   EPL's confidentiality agreement has not expired.

2.   EPL did not and has not waived all confidentiality protections under the Protective Order. The Protective Order carves out specific circumstances under which the documents may be disclosed on a limited basis, while maintaining the documents classification as confidential.

---

# RB REES BROOME, PC

————————————ATTORNEYS AT LAW

Bryan Barnhart, Esq.
June 24, 2014
Page 2

3. If the EPA and other governmental regulators need the information in EPL's confidential documents to understand and evaluate the contents of the Hamner Institutes' MTBE report, the EPA and other governmental regulators having authority can access the documents for review through the proper regulatory channels. The Protective Order has no effect on the EPA and other governmental regulators' access to the documents for regulatory purposes.

4. The Protective Order was entered into by consent of the parties after the Hamner Institutes' MTBE report was released; therefore, the timing of the release of the Hamner Institutes' MTBE report does not affect the Protective Order. Further, at the time the study was done, EPL did not know that its work would be used in litigation.

5. EPL and the Hamner Institute are independent institutions, and the documents were properly classified as confidential.

6. If, as you state, "EPL documents either are or have been incorporated into many judicial documents, to which the public has the right of access" is true and the EPL documents classified as confidential have not been handled in accordance with the terms of the Protective Order, then EPL reserves its rights to pursue all actions it deems appropriate to protect its interests in this matter, to include institution of formal legal proceedings against the violating parties.

I further note that your letter of June 17, 2014, seeks to require us to notify you "within five business days of this letter . . ." that a document used at a deposition that was previously classified as confidential in accordance with the terms of the Protective Order is confidential. I direct your attention to Paragraph K, on page 8, of the Protective Order. The Protective Order states, in relevant part, "Counsel for the party claiming confidentiality will respond in writing within ten (10) Days, and the parties will meet and confer to resolve the dispute." We object to purporting to establish deadlines which are inconsistent with the Protective Order.

We also would like to resolve any legitimate disagreements concerning the classification of specific documents without burdening the court. A blanket request is not appropriate or called for. If you are requesting specific documents to be declassified, please provide us with the Bates number and/or copy of the document for which you are requesting declassification. Upon receipt of the same, we will review the request and provide a response specific to the identified document(s).

# RB   REES BROOME, PC

———————————————ATTORNEYS AT LAW———

Bryan Barnhart, Esq.
June 24, 2014
Page 3


If you have any questions, please feel free to contact me or Ms. Mullins.


Very truly yours,

REES BROOME, PC


By: _Andrew B Golkow_
       Andrew B. Golkow


ABG:spg
cc:    Scott E. Bayzle
       William G. Pappas
       Duane Miller
       James Pardo


K:\05\05007\00001\110906 MTBE Subpeona\CORR\140624 letter from A Golkow to B Barnhart.docx

# EXHIBIT 2

Eric R. Stine, Ph.D., DABT

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE: METHYL TERTIARY      :    MASTER FILE

BUTYL ETHER ("MTBE")        :    NO. 1:00-1898

LIABILITY LITIGATION        :    M21-88

PRODUCTS                    :    MDL 1358(SAS)

------------------------:

COMMONWEALTH OF PUERTO      :

RICO, ET AL.,               :

        Plaintiff,          :

                    :    CASE NO.

        vs.                 :    07-CIV-10470

                    :    (SAS)

SHELL OIL CO., ET AL.,      :

        Defendants.         :

FRIDAY, MAY 9, 2014

Videotaped Deposition of ERIC R. STINE,

Ph.D., DABT, expert witness, held at King & Spalding,

LLP, 101 Second Street, Suite 2300, San Francisco,

California, beginning at 10:20 a.m., before Sandra

Bunch VanderPol, FAPR, RMR, CRR, CSR #3032

-- -- --

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|917.591.5672 fax

Deps@golkow.com

Eric R. Stine, Ph.D., DABT

Page 9

1                        EXAMINATION

2    BY MR. MILLER:

3            Q.    Good morning.  Please state your name

4    for the record.

5            A.    My name is Dr. Eric Stine.

6            Q.    And who is your current employer?

7            A.    Chevron.

8            Q.    And how long have you worked for

9    them?

10           A.    Just over 26 years.

11                 (Exhibit No. 1 was marked.)

12   BY MR. MILLER:

13           Q.    Exhibit 1 is a copy of the notice of

14   this deposition.  Have you seen it before I handed it

15   to you?

16           A.    Yes, I have.

17           Q.    And did you supply counsel with any

18   documents you may have that are described in the

19   request for production of documents?

20           A.    Yes.  To my knowledge, I had provided

21   all documents prior to this request.

22           Q.    So there haven't been any recent

23   e-mails or other communications relating to MTBE and

24   cancer; is that correct?

25           A.    Well, let me explain.  My position

Eric R. Stine, Ph.D., DABT

Page 10

1    has changed since approximately July of 2011.  I

2    changed positions within the company.  I no longer

3    monitor human health toxicity related to MTBE.

4            I'm currently the environmental -- or the

5    technical team leader for the Environmental Risk

6    Assessment Team, still within environmental

7    technology company -- excuse me, the Engineering

8    Technology Company, within Health Environment and

9    Safety Group, at -- at Chevron.  So I no longer -- I

10   have not recently been working in the area of MTBE.

11           The only -- relative to your question, the

12   only communications that I have had that had anything

13   to do with MTBE were with the other members of the

14   Toxicology Committee, and it relates to the long-term

15   storage of the study materials as required under good

16   laboratory practices.

17           Q.    What was your position at the time

18   you first became involved with any work relating to

19   MTBE?

20           A.    My position, I worked within what was

21   then called Toxicology and Health Risk Assessment

22   Team.  Later the name was changed to Health and

23   Product Stewardship.  My recollection is that at the

24   time that I first became involved with MTBE, I was a

25   Senior Toxicologist.

Eric R. Stine, Ph.D., DABT

Page 14

1    involved in anything related to the Memorandum of

2    Understanding.  This all took place without my

3    knowledge.

4              Q.     I see.  Were you provided a copy of

5    this document so that you would understand the scope

6    of work that you were supervising?

7              A.     No.  It was not considered -- I don't

8    think it was relevant.

9              Q.     Did you become a member of a group

10   that related to the study of MTBE in drinking water

11   administered to laboratory animals?

12             A.     Are you speaking with relation to

13   this Memorandum of Understanding?

14             Q.     With respect to the study on MTBE

15   performed by The Hamner Institute.

16             A.     Yes, I did.

17             Q.     And what was the name of the group?

18             A.     We were the Toxicology Committee.

19             Q.     Were you the chairman of the

20   committee?

21             A.     No, I was not.

22             Q.     Who was?

23             MR. CORRELL:  Objection.  Covered

24   extensively in his prior deposition.

25             THE WITNESS:  Dave -- Dr. Dave Steup, of

Golkow Technologies, Inc. - 1.877.370.DEPS

Eric R. Stine, Ph.D., DABT

Page 75

1          THE WITNESS:  I -- I don't recall.  I didn't

2     pay particular attention to the specific statistical

3     tests.

4          Again, as I mentioned numerous times before,

5     I relied on Dr. Haseman's expertise for the

6     appropriate statistical analyses.

7                    (Exhibit No. 12 was marked.)

8          MR. MILLER:  Let me show you Exhibit 12.

9          Q.    Were you aware that the results of

10    the MTBE study were supposed to be turned over to the

11    federal government?

12         A.     I wouldn't characterize it that way.

13    I -- I was aware it was our intent that Jack Moore --

14    Dr. Jack Moore, president -- or as chairman of the

15    expert panel would provide the -- the report to EPA.

16    There was -- there was no requirement that it be --

17    it be provided.  It was our intent all along that

18    those data be provided to the EPA, and that's why we

19    did the study, in part.

20         Q.     If you look at the second paragraph

21    of this letter, provided by Shell to the EPA, it

22    states, "The study was conducted by The Hamner

23    Institute.  The draft study report indicates a

24    statistically significant increase in astrocytomas,

25    brain tumors in parentheses, among high-dose male

Eric R. Stine, Ph.D., DABT

Page 79

1    studies in the expert panel.

2              Yeah, it's accurate.

3              Q.    It goes on to state, "It is the panel

4    scientists' belief that the results from this study

5    and other supporting studies can provide valuable

6    data to enhance the risk assessment process used by

7    the agency and others to assess the potential health

8    effects of human exposure to MTBE through drinking

9    water."

10             Correct?

11             A.    Correct.

12             Q.    You knew that the federal government,

13   through the IRIS -- I-R-I-S, all caps -- process was

14   considering MTBE data in its potential

15   carcinogenicity at the time this study was going on?

16             A.    Yes.  As I indicated either in prior

17   testimony today or in an earlier deposition, that was

18   a large part of the reason that we initiated the

19   testing program, was to provide those data to EPA to

20   help them in their assessment.

21             Q.    And you wanted them to consider and

22   rely on the results in doing their assessment; is

23   that correct?

24             A.    Absolutely.

25             Q.    You were actually concerned that IRIS

Eric R. Stine, Ph.D., DABT

Page 80

1    might complete the process before the study was

2    complete, that is, the MTBE study done by The Hamner

3    Institute, correct?

4            A.      We were concerned that they might

5    complete their assessment before our data were

6    available, yes.

7            Q.      And did you urge them to wait until

8    your data became available before they acted?

9            A.      I wouldn't characterize that we urged

10   them.  I personally didn't have any direct

11   communications with EPA related to our studies or the

12   progress of the IRIS assessment.

13           Q.      Were there any communications telling

14   them that the study would be forthcoming if they

15   waited?

16           MR. CORRELL:  Objection.  Calls for

17   speculation.

18           THE WITNESS:  I don't know.

19                   (Exhibit No. 13 was marked.)

20           MR. MILLER:  Exhibit 13.  This is an e-mail

21   from Gabrielle, the study pathologist, dated

22   June 25th, 2010, to Darol Dodd and copies to others.

23   Subject, "Dr. Hard's report."

24           THE WITNESS:  Actually, I see that as an

25   attachment to this e-mail.  But, yes, I see it.

Eric R. Stine, Ph.D., DABT

1   using that tool.

2           And I really feel that she's -- she's saying

3   that Dr. Hard's -- the difference of those

4   assessments should be -- should be reconciled

5   somewhere in the process.  And then she's proposing a

6   pathology working group as a mechanism to resolve

7   those differences, which I would characterize as

8   relatively minor.  Not disagreement.

9   BY MR. MILLER:

10          Q.    She's saying that the difference is

11  such that somebody should not be making, quote, any

12  changes -- let me start earlier in the sentence.

13          The second paragraph, "There needs to be

14  some acceptable and accountable process if any

15  changes are to be made to my data by myself or

16  others."  And then she suggests a pathology working

17  group.

18          A.    Right.  I think -- as I mentioned

19  before, I think what she's suggesting here is that a

20  pathology working group, which is an independent

21  group of pathologists that are assembled and that

22  collectively review -- and, it's my understanding

23  that they come to a consensus opinion related to

24  issues of pathology -- that that be -- that that was

25  one mechanism to document final resolution of the

Eric R. Stine, Ph.D., DABT

Page 87

1    minor -- what I would characterize as minor -- my

2    understanding, minor differences between the

3    interpretations.

4          And certainly a pathology working group is

5    something that we would welcome as -- as per the

6    history of a study, that we made every -- what we

7    thought was every possible attempt to document what

8    was done without our influence.  If we were to

9    request or institute a pathology working group, I'm

10   sure that some people might characterize that as

11   trying to influence the outcome.

12         So if EPA or NTP, or any other organization

13   decides that it's appropriate to have a pathology

14   working group review of our data, we would welcome

15   it.  And I firmly believe that it would simply

16   document and reinforce the findings that Dr. Hard and

17   the pathologist ultimately came to.

18         Q.    Would your group welcome the EPA's

19   opportunity to read these e-mails we have been going

20   over today?

21         A.    Certainly.

22         Q.    You don't know of any reason they

23   should be kept from the government?

24         MR. CORRELL:  Objection.  Calls for a legal

25   opinion.

Golkow Technologies, Inc. - 1.877.370.DEPS

Eric R. Stine, Ph.D., DABT

Page 88

1          THE WITNESS:  We have absolutely nothing to

2     hide.  We haven't done anything inappropriate or

3     improper.  Everything was done aboveboard.

4          Certainly the whole purpose of doing the

5     study by good laboratory practice was to preserve all

6     possible documents and records related to the study

7     for the very fact -- or for the very opportunity of

8     EPA, or any other governmental organization, to

9     review them.

10                         (Exhibit No. 14 was marked.)

11     BY MR. MILLER:

12          Q.     Let me show you Exhibit 14.  It's

13     only for the sake of the completeness of the record.

14     I'm not going to go into this in detail because I

15     have gone -- it's been gone into elsewhere.

16          Could you tell us what this is, please?

17          A.     It says it's a Contract Document

18     Description, Law Department Sheet.

19          Q.     And if you look at page 6 of 8.

20     About a third of the way down your name appears.

21          A.     Yes.

22          Q.     So, as I read this, Shell, Chevron

23     and Exxon representatives would each receive every

24     invoice from the companies doing this study, correct?

25          A.     I wouldn't characterize it that way.

Eric R. Stine, Ph.D., DABT

Page 93

1   opposite conclusion?

2           A.       Again, I would say that the document

3   you showed me today represented interim discussions

4   between Dr. Haseman, the expert panel, and likely The

5   Hamner Institute.   The scientific process is

6   rigorous, in part, because scientists are allowed to

7   discuss the data and discuss various methods of

8   evaluating data, and that was what -- what these

9   data -- what these e-mails that you showed me

10  reflect.

11          All I know is that at the end of the study,

12  after Dr. Haseman had completed his assessment, I

13  spoke with him personally on the phone, and he

14  indicated adamantly to me that it was his

15  professional opinion -- and I have no reason to

16  believe that Dr. Haseman would -- would challenge or

17  otherwise put his professional opinion at risk by

18  doing anything unethical or anything that they

19  didn't -- that he couldn't support professionally --

20  he indicated that it was his opinion that the

21  increase in astrocytomas in the high-dose rats was

22  not related to treatment with MTBE, and he thought it

23  was, in fact, a false positive.

24          And I guess the last thing I would add is

25  that the fact that the study authors and the expert

Eric R. Stine, Ph.D., DABT

Page 94

1   panel came to the conclusions they did, certainly

2   does not preclude other -- other organizations or

3   agencies who might review the data from coming to

4   their own conclusions.

5            Again, under good laboratory practices,

6   virtually all of the data and study records related

7   to the study are stored.  The plan is to store them

8   for a minimum of ten years so any other scientist or

9   academician or regulatory agency can come and review

10  the data, come to their own conclusions.  And in the

11  case of a regulatory agency, they can make whatever

12  appropriate conclusions they feel are appropriate

13  relative to whether or not exposure to MTBE at very

14  high doses in rodents causes cancer.

15           Q.      And although the study pathologist,

16  Dr. Gabrielle Wilson, and a peer-review pathologist,

17  Dr. Talmage Brown, came to the opinion that the data

18  show no evidence that MTBE caused chronic progressive

19  neuropathy --

20           A.      Excuse me.  It's nephropathy.

21           Q.      Thank you.

22           -- the published result says that the -- the

23  opposite?

24           MR. CORRELL:  Objection.  Assumes facts not

25  in evidence.  Misstates the --

Eric R. Stine, Ph.D., DABT

Page 95

1    BY MR. MILLER:

2         Q.      Relying on Dr. Hard's work?

3         MR. CORRELL:  Same objection.

4         THE WITNESS:  Again -- again, their analysis

5    was done without the benefit of Dr. Hard's assessment

6    methodology, which adds increased rigor to the

7    evaluation and allows for a more statistically

8    robust, as I understand it, evaluation of the data.

9         So the fact that they did not see, in their

10   minds at the time, an increase in chronic -- in the

11   severity of chronic progressive nephropathy related

12   to increased doses with MTBE, without the benefit of

13   Dr. Hard's tool or Dr. Hard's expertise, I do not

14   believe represents them changing their mind or any

15   other potential -- what? -- potential reason for the

16   conclusion representing a slightly different

17   interpretation.

18        And, again, we would welcome any kind of

19   pathology review that others would like to perform,

20   provided that it's done in an ethical and unbiased

21   manner.

22   BY MR. MILLER:

23        Q.      And when Dr. Gabrielle Wilson

24   requested that instead of changing her opinion by

25   inserting Dr. Hard's and leaving hers out, that a

Eric R. Stine, Ph.D., DABT

Page 96

1   pathology working group resolve the difference, did

2   Chevron, Shell and Exxon pay to have a pathology

3   group do that work?

4          A.      Again, as I stated earlier, I -- we

5   don't -- we would welcome a pathology working group.

6   It's my personal and professional opinion that that

7   pathology working group should be assembled and

8   requested by the appropriate regulatory authority.

9          If the companies were to fund or otherwise

10  pursue a pathology working group, my concern is that,

11  you know, similar to the results of the study today

12  and the nature of your questions, others would view

13  that as us trying to influence the results of the

14  study or the results of the interpretation.

15         We would welcome a pathology working group.

16  And I'm convinced, through my interactions with the

17  expert panel and the people who did the study at The

18  Hamner, that it would validate the conclusions that

19  they came to.

20         Q.      Why didn't somebody respond to

21  Dr. Wilson's request for a pathology working group in

22  writing?

23         MR. CORRELL:  Objection.  Assumes facts not

24  in evidence.

25         THE WITNESS:  I don't know.  Again, at the

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

(Pending in the Southern District of New York)

| | |
|---|---|
| New Jersey Dept. of Environmental Protection, et al. | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| Atlantic Richfield Co., et al. | ) ) ) |
| Defendants. | ) ) |

Civil Action No.: *1:11mc49*

08 Civ. 00312(SAS); MDL 1358

(Pending in the Southern District of New York)

**FILED SEP 16 2011 IN THIS OFFICE Clerk U. S. District Court Greensboro, N. C. By \_\_\_\_**

## BRIEF IN SUPPORT OF
## EXPERIMENTAL PATHOLOGY LABORATORIES, INC.'S
## MOTION TO QUASH, OBJECTIONS TO SUBPOENA,
## AND ALTERNATIVE MOTION FOR PROTECTIVE ORDER

Experimental Pathology Laboratories, Inc. ("EPL"), through counsel and pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, hereby submits to the Court this Brief in Support of its Motion to Quash, Objections, and Alternative Motion for a Protective Order to the Subpoena *duces tecum* ("Subpoena")[1] issued by New Jersey Department of Environmental Protection ("Plaintiff") in the above-captioned matter.

## I.    Statement of the Nature of the Matter Before the Court

EPL submits this brief and corresponding motions asking that this Court: (1) quash the Subpoena, or (2) in the alternative, grant EPL's motion for a protective order. EPL is not a party to the litigation in which the Subpoena was served. EPL has not been involved in the underlying litigation and therefore is not in a position to fully address the

1

*Id.* (internal citations omitted). The court ruled that the hardship to the subpoenaed party and the negative consequences that would flow from allowing the subpoena outweighed the plaintiffs' need for discovery. *Id.* at *40.

Similarly, in this case, the Subpoena seeks "preliminary data," "draft" narratives, and communications "referring to, or transmitting the draft . . . narrative and/or preliminary data." Applying the logic of *Fosamax*, the Subpoena must be quashed to avoid the chilling effect that allowing such discovery would have on the scientific community.

Further, EPL had a written agreement ("Agreement") with The Hamner Institutes ("Hamner") related to the project at issue in the above-referenced litigation.[3] The Agreement contains a confidentiality provision at paragraph 7, which states that "EPL and [Hamner] will hold all matters relating to this Agreement in the strictest confidence during and for five (5) years after the expiration of this Agreement." The Agreement was effective from July 1, 2007, and continued through December 31, 2007, making the confidentiality provision applicable through December 31, 2012. Upon information and belief, the Subpoena requests disclosure of material protected by the Agreement's confidentiality provision. Since Plaintiff is seeking information that requires disclosure of protected matter under the Agreement, EPL's Motion to Quash should be granted.

---

[3] A true and correct copy of the Agreement is attached hereto as **Exhibit C.**

4

**AGREEMENT**

This agreement is made and entered into this __1st__ day of __July____, 2007 by and between Experimental Pathology Laboratories, Inc. ("EPL"), P.O. Box 169, Sterling, VA, 20167 and The Hamner Institutes ("Client").

WHEREAS, Client desires to use the services of EPL for pathology services, microscopic evaluation and pathology report preparation, peer review, and other services as described in (1) below;

NOW, THEREFORE, in consideration of the mutual covenants between the parties, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

1.    Description of Services

1.1    EPL shall place a pathologist on-site at Client to perform all customary duties of an on-site pathologist.  The duties will include, but are not necessarily limited to, pathology consultation for new study necropsy plans, lesion identification in laser capture projects, fixation issues, stain method development and image analysis method development, review of unscheduled animal gross lesions, scheduled necropsy gross pathology, histopathology slide reading for research studies and illustrative photomicrography related to poster and manuscript preparation, SOP mandated tissue checkout for some studies, histopathology staff continuing education including one histotechnologist candidate and one candidate for special immuno-certification, and technical SOP review and assistance with pathology glossary refinement for the Provantis System.

It is anticipated the pathologist will be on-site 16 hours per week, 4 hours per day, 4 days per week, to include mornings on scheduled necropsy days.  The specific schedule will be determined prior to each week.

1.2    EPL shall provide the Client with Attending Veterinary Services.  Some of this support will be provided on-site while other duties can be provided via e-mail and faxes. The duties will include, but are not necessarily limited to, attending all CIIT IACUC quarterly meetings and any special meetings requested by the CIIT IACUC Chairperson (3-4 hours/quarter); reviewing all IACUC Statements (protocols) and amendments within 10 working days of submission by the Secretary (1-3 hours per month); providing training to CIIT employees concerning Federal regulations; update staff on IACUC functions and responsibilities; technical training on rodent anesthesia/euthanasia procedures (4 hours per year--does not include preparation time); consulting with the Animal Care Unit (ACU) Manager about veterinary issues (1-2 hours per month); interacting with the CIIT Health & Safety Manager concerning issues as they relate to staff working with laboratory animals (0-6 hours per year); providing lab animal medicine support and technical advice related to the ACU; interacting with the Facility Veterinarian and Manager of Animal Care to update methods and procedures as needed (0-2 hours/month); and assisting in developing materials for the next AAALAC (international site visit in 2007, recertification every 3 years).

The times listed above are estimates.  It is anticipated that increased support and interactions with the Attending Veterinarian will be needed as Client projects increase.

2.　　Period of Agreement

This Agreement shall be effective on ___July___1, 2007___ and shall continue in full force and effect through _December 31, 2007_, unless earlier terminated by either party consistent with other provisions of this Agreement.

3.　　Payment

As full payment for EPL's proper performance of on-site pathology services under this Agreement, Client agrees to pay EPL $13,433 per month ($193.90 per hour).  The monthly billing will be based on the actual hours provided.

As full payment for EPL's proper performance of attending veterinarian services under this Agreement, Client agrees to pay EPL $132.70 per hour.

Client shall pay EPL for services provided pursuant to this Agreement within thirty (30) days after receipt by Client of a properly prepared and correct invoice.

4.　　Indemnification

EPL shall, to the extent permitted by law, indemnify, defend, and hold harmless Client against all claims, liabilities, damages, losses or expenses to the extent arising out of any negligence, willful misconduct, breach of contract or violations of law by EPL, or EPL's employees, agents, subcontractors or assigns in the performance of this Agreement or while on, entering or leaving Client property.  This indemnity will not apply where the sole cause of the claim, liability, damage, loss or expense is a result of the willful misconduct or negligence of Client.

5.　　Notices

EPL shall submit notices, information and documents in writing to Client at:

    CIIT Centers for Health Research
    P.O. Box 12137
    Research Triangle Park, NC 27709
    Attention: Elizabeth Gross Bermudez
    Phone: 919-558-1309
    Fax: 919-558-1300

Client shall submit notices, information and documents in writing to EPL as follows:

    Experimental Pathology Laboratories, Inc.
    P.O. Box 169
    Sterling, VA  20167
    Attention:  Joseph V. Deninger, CFO
    Telephone: 703/471-7060
    Fax: 703/471-8447

6.    Independent Agency

      EPL agrees that it is acting under this Agreement as an independent contractor. EPL retains sole responsibility to establish and pay all wages and fringe benefits to its employees, to hire, fire and take all disciplinary actions of any kind with respect thereto. EPL shall likewise be responsible for payment of and for all taxes, Workers' Compensation insurance and other charges associated with the employment of the individuals performing services under this Agreement, and for any record keeping requirements associated with such employment.

      Neither EPL nor its employees, representatives or agents shall be considered employees or authorized agents of Client and neither party shall be liable or accountable for any obligations incurred by the other party, except as specified herein, it being specifically understood that the respective businesses of the parties are operated separately and apart from each other. EPL shall be free to exercise its discretion as to the means and methods of performing the services that are the subject of this Agreement.

7.    Confidentiality

      EPL and Client will hold all matters relating to this Agreement in strictest confidence during and for five (5) years after expiration of this Agreement.

      EPL may use Client's name for advertising and promotional purposes only upon prior written agreement from Client.  Client may use EPL's name for advertising and promotional purposes only upon prior written agreement from EPL.

8.    Termination

      Either party may terminate this Agreement at any time with thirty (30) days written notice to the other party.  Such termination, which shall be accomplished without penalty, shall not relieve or release either party from any rights, liabilities or obligations that may have accrued under the law or terms of the Agreement prior to the date of such termination.

9.    Miscellaneous

      9.1  Waiver of Breach.  Any waiver by any party hereto of a breach of any of the provisions of this Agreement by any other party shall not operate or be construed as a waiver by the other parties of any of the rights and privileges of said parties hereunder or of any subsequent breach.

      9.2  Controlling Law and Forum.  This Agreement shall be interpreted, construed and administered according to the laws of the Commonwealth of Virginia.  Any claim or cause of action arising under or connected with this Agreement shall be adjudicated in a forum in the Commonwealth of Virginia.

      9.3  Construction.  The language in all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against either party.

      9.4  No Partnership.  The parties hereto are not and will not hold themselves out as partners, agents, representatives, or joint venturers of each other.  This Agreement creates no relationship of joint venture, partnership, agency, or limited partnership between the parties, and

# EXHIBIT 4

**Bryan Barnhart**

| | |
|---|---|
| **From:** | Courtney Tarsa [CTarsa@golkow.com] |
| **Sent:** | Wednesday, June 18, 2014 1:50 PM |
| **To:** | Bryan Barnhart |
| **Cc:** | Linda Golkow; Miller, Axline & Sawyer |
| **Subject:** | RE: MTBE (NJDEP) |
| **Attachments:** | R&S - Thornton.docx; R&S - Cunningham.docx |

No problem Bryan, and absolutely no trouble or bother at all. I'm always here to help!

I'm attaching both witness review letters that were sent to the attorney's appearing for the witnesses. The copies were ordered and sent to plaintiff's (Kuafmann) and Defense Exxon. Hope that helps to clarify further.

**Courtney Tarsa**
**Case Manager**
**Golkow Technologies Inc.**
1650 Market Street, Suite 5150 | Philadelphia, Pennsylvania 19103
215.586.4224 direct | 877.370.3377 office
CTarsa@golkow.com

**From:** Bryan Barnhart [mailto:bbarnhart@toxictorts.org]
**Sent:** Wednesday, June 18, 2014 4:23 PM
**To:** Courtney Tarsa
**Cc:** Linda Golkow; Miller, Axline & Sawyer
**Subject:** FW: MTBE (NJDEP)

Good afternoon.

This is perfect.

Except one thing (sorry!): For the Willson errata sheets, who did you send the transcripts to? Willson's attorneys? Directly to Willson?

May I please have copies of your cover letters to whomever you send the Willson transcripts for review?

I need to connect all of the dots here....

Thank you again.

Bryan

**From:** Courtney Tarsa [mailto:CTarsa@golkow.com]
**Sent:** Wednesday, June 18, 2014 1:00 PM
**To:** Bryan Barnhart; Linda Golkow; Scheduling; Case Management
**Cc:** 'Miller, Axline & Sawyer'
**Subject:** RE: MTBE (NJDEP)

Hi Bryan,
I'm glad my analysis was helpful!
Attached are the Errata's and they were completed by the witnesses.

**Courtney Tarsa**
**Case Manager**
Golkow Technologies Inc.
1650 Market Street, Suite 5150 | Philadelphia, Pennsylvania 19103
215.586.4224 direct | 877.370.3377 office
CTarsa@golkow.com

**From:** Bryan Barnhart [mailto:bbarnhart@toxictorts.org]
**Sent:** Wednesday, June 18, 2014 3:46 PM
**To:** Linda Golkow; Courtney Tarsa; Scheduling; Case Management
**Cc:** 'Miller, Axline & Sawyer'
**Subject:** RE: MTBE (NJDEP)

Good afternoon.

This is very good. Thank you.

Please do send the errata pages (I don't think that they're attached to Ms. Tarsa's follow-up email).

<u>One More Question:</u> From whom did you get the errata pages? It looks like Willson, Dodd, and their attorneys did not get copies. It seems unlikely that they would have come from Plaintiffs or their attorneys. Did Exxon's counsel send them in?

Thank you.

Bryan

**From:** Linda Golkow [mailto:LGolkow@golkow.com]
**Sent:** Wednesday, June 18, 2014 11:39 AM
**To:** Bryan Barnhart; Courtney Tarsa; Scheduling; Case Management
**Cc:** Miller, Axline & Sawyer
**Subject:** RE: MTBE (NJDEP)

Bryan,

It was great to speak with you this morning.

1.   Darol Dodd, Ph.D. was taken on 7.27.12 & 7.30.12 ONLY in the NJDEP matter. There are errata pages. Courtney, please reply all and attach errata pages. There are no confidential designations. The only defendant that ordered copies was ExxonMobil (McDermott Will & Emery)
2.   Garbrielle Wilson was taken on 7.26.12 & 7.27.12 ONLY in the NJDEP matter. There are errata pages. Courtney, please reply all and attach the errata pages.
     There are no confidential designations. The only defendant that ordered copies was ExxonMobil (McDermott Will & Emery)

     Courtney, Bryan needs this info for these four witnesses: Ken Rudo, Barbara Beck, James Swenberg, Eric Stine.
     1.   If taken in any other matters other than NJDEP
     2.   Errata sheets
     3.   Confidential designations
     4.   Who received transcripts from the defense.

     Can you please respond to him ASAP. Bryan, please let us know if there is anything else you may need. Thanks.

2



August 7, 2012

Robert T. Cunningham, Jr., Esquire
REES BROOME, P.C.
8133 Leesberg Pike, Ninth Floor
Vienna, VA 22182

      Re:    MTBE(NJDEP v. Atlantic Richfield Co., et al.,)
              Deposition of Gabrielle A. Willson, BVMS (Volume I) – July 26, 2012

Dear Mr. Cunningham,

Enclosed please find a copy of the deposition transcript in the above-referenced matter. Kindly have the witness review the copy, note any corrections on the errata sheet provided within the transcript, and sign the acknowledgment page.

Please forward the transcript, errata sheet and the acknowledgement page within 30 days from receipt of this letter directly to:

              Brian D. Shannon, Esquire
              MILLER, AXLINE & SAWYER, P.C.
              1050 Fulton Avenue, Suite 100
              Sacramento, CA 95825

Please also provide a copy of the signed acknowledgment page and errata sheet to our attention for our records.

If you should have any questions, please do not hesitate to contact us.

Sincerely,

Production Department
production@golkow.com

cc:    Brian D. Shannon, Esquire
       Ms. Haeji Chang

www.golkow.com | 877.370.DEPS (3377)

OFFICES: Philadelphia (Headquarters) | New York City | Boston | Chicago | San Francisco | Los Angeles
Houston | Miami | New Orleans | Wilmington | Washington, DC | Baltimore



Experimental Pathology Laboratories, Inc.  PO Box 12766, Research Triangle Park, NC  27709
Tel: (919)998-9407   Fax: (919)998-9607   Website:  www.epl-inc.com

**VIA FEDERAL EXPRESS**

August 20, 2012

Golkow Technologies
Production Headquarters
1628 JFK Blvd., Suite 1200
Philadelphia, PA  19103

Re:  MTBE (NJDEP v. Atlantic Richfield Co., et al)
      Deposition of Gabrielle A. Willson, BVMS (Volume II) – July 27, 20212

Dear Sir/Madam:

Enclosed please find a copy of the signed acknowledgement pages and errata sheets in
connection with the above deposition.

Sincerely,

Gabrielle A. Willson, BVMS

GAW/dt
Enclosure

cc:  Robert J. Cunningham, Jr., Esquire
      Alison R. Mullins, Esquire

Gabrielle A. Willson, BVMS

Page 374

17 August 2012

1

2          E R R A T A

3

4      PAGE     LINE          CHANGE

5      11        20           Delete diploma in toxicology

6      REASON:        Misspoke

7      14         2           Omit "A"

8      REASON:        Incorrect

9      14         3           Change "Q" to "A"

10     REASON:        Incorrect

11     17         7           Say "change answer"

12     REASON:        Incorrect

13     56         1           Change "15" to "50"

14     REASON:        Incorrect

15     72        19           Change "diligent" to "diligence"

16     REASON:        Incorrect

17     114       13           "Neuropathy" is incorrect. It is "nephropathy"

18     REASON:        Counsel misspoke

19     114       10           "Neuropathy" is incorrect. It is "nephropathy"

20     REASON:        Counsel misspoke

21     119        7           Delete "and the result"

22     REASON:        Make grammatically correct

23     133       16           "Fiber adenoma" should be "fibroadenoma"

24     REASON:        Spelling correction

25

Gabrielle A. Willson, BVMS

Page 372

1           ACKNOWLEDGMENT OF DEPONENT

2

3               I, GABRIELLE A. WILLSON, BVMS, Volume 2, do

4       hereby certify that I have read the foregoing pages

5       and that the same is a correct transcription of the

6       answers given by me to the questions therein

7       propounded, except for the corrections or changes in

8       form or substance, if any, noted in the attached

9       Errata Sheet.

10

11

12       _____   17 Aug 2012
         GABRIELLE A. WILLSON, BVMS      Date

13

14

15     Durham Co, NC.

16           Subscribed and sworn to before me this 17th

         day of _____August_____, 2012.

17

18

                     _____

19                   Notary Public

20       My Commission Expires: July 21, 2013

21

22

23

24

25

Gabrielle A. Willson, BVMS

Page 156

1                ACKNOWLEDGMENT OF DEPONENT

2

3          I, GABRIELLE A. WILLSON, BVMS, Volume 1, do

4    hereby certify that I have read the foregoing pages

5    and that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    Errata Sheet.

10

11

12    _____ 17 Aug 2012

        GABRIELLE A. WILLSON, BVMS        Date

13

14

15    *Durham Co, NC.*

16          Subscribed and sworn to before me this 17th

      day of *August*                    , 2012.

17

18

        _____

19              Notary Public

20    My Commission Expires: *July 21, 2013*

21

22

23

24

25



August 14, 2012

James Thornton, Esquire
PARKER, POE, ADAMS & BERNSTEIN, LLP
Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, North Carolina 27601

   Re: MTBE(NJDEP v. Atlantic Richfield Co., et al.,)
      Deposition of Darol E. Dodd, Ph.D. (Volume II) – July 30, 2012

Dear Mr. Thornton,

Enclosed please find a copy of the deposition transcript in the above-referenced matter. Kindly have the witness review the copy, note any corrections on the errata sheet provided within the transcript, and sign the acknowledgment page.

Please forward the transcript, errata sheet and the acknowledgement page within 30 days from receipt of this letter directly to:

    Duane C. Miller, Esquire
    MILLER, AXLINE & SAWYER, P.C.
    1050 Fulton Avenue, Suite 100
    Sacramento, CA 95825

Please also provide a copy of the signed acknowledgment page and errata sheet to our attention for our records.

If you should have any questions, please do not hesitate to contact us.

Sincerely,

Production Department
production@golkow.com

cc: Duane C. Miller, Esquire
  Ms. Haeji Chang

www.golkow.com | 877.370.DEPS (3377)

OFFICES: Philadelphia (Headquarters) | New York City | Boston | Chicago | San Francisco | Los Angeles
Houston | Miami | New Orleans | Wilmington | Washington, DC | Baltimore



# Parker Poe

**Scott E. Bayzle**
Telephone: 919.835.4627
Direct Fax: 919.834.4564
scottbayzle@parkerpoe.com

Charleston, SC
Charlotte, NC
Columbia, SC
Myrtle Beach, SC
Raleigh, NC
Spartanburg, SC

September 6, 2012

Duane C. Miller
MILLER, AXLINE & SAWYER, P.C.
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825

John J. McDermott
ARCHER & GREINER, P.C.
One Centennial Square
33 East Euclid Avenue
Haddonfield, NJ  08033

> **Re:** **In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation**
> **Master File No. 1:00-1898 MDL 1358**

Dear Mr. Miller and Mr. McDermott:

Enclosed herein please find the completed *errata* sheet and executed *Acknowledgement of Deponent* for the deposition of Dr. Darol E. Dodd, Ph.D. (July 27 & 30, 2012) in the above-referenced matter.

Sincerely,

Scott E. Bayzle

cc:   Golkow Technologies – Global Deposition Services
      James Thornton, Parker Poe

PPAB 1999521v1

Parker Poe Adams & Bernstein LLP   Attorneys and Counselors at Law   Wachovia Capitol Ctr   150 Fayetteville St   Ste 1400   Raleigh, NC 27601   PO Box 389   Raleigh, NC 27602-0389
t 919.828.0564   f 919.834.4564   www.parkerpoe.com

Darol E. Dodd, Ph.D.

Page 410

1                            - - - - -

                             E R R A T A

2                            - - - - -

3       PAGE   LINE   CHANGE

4       169    13     replace "DMSO" with "DMES"

5       REASON:       Correction / transcription error

6       175    8      replace "vitro" with "vivo"

7       REASON:       Correction / transcription error

8       176    22     replace "communities" with "committees"

9       REASON:       Correction / transcription error

10      252    7      replace "substrate" with "substrain"

11      REASON:       correction / transcription error

12      334    17     replace "450 versus 150" with "4/50 versus 1/50"

13      REASON:       Correction / transcription error

14      342    16     replace "AE" with "8e"

15      REASON:       Correction / transcription error

16      385    8      replace "paralyzed" with "pair-wise"

17      REASON:       Correction / transcription error

18      _____  ____   _____

19      REASON:       _____

20      _____  ____   _____

21      REASON:       _____

22      _____  ____   _____

23      REASON:       _____

24

Darol E. Dodd, Ph.D.

Page 411

1        ACKNOWLEDGMENT OF DEPONENT

2

         I, _DAROL E. DODD_, do

3    hereby certify that I have read the

     foregoing pages, and that the same

4    is a correct transcription of the answers

     given by me to the questions therein

5    propounded, except for the corrections or

     changes in form or substance, if any,

6    noted in the attached Errata Sheet.

7         _Darol E. Dodd_         9/5/12

8    DAROL E. DODD, PH.D.              DATE

9

10

11

12

13

14

     Subscribed and sworn

15   to before me this

     _5th_ day of _September_, 20_12_.

16

     My commission expires: _July 18, 2014_

17

18   _Edna A. Mangum_

     Notary Public

19

20

21

22

23

24

# EXHIBIT 5



*J. Gingrich*

Shell Downstream Inc
One Shell Plaza
910 Louisiana
Houston, Texas 77002

Date: December 7, 2010

<u>CERTIFIED MAIL – RETURN RECEIPT REQUESTED</u>

Document Processing Center (7407M)
Office of Pollution Prevention and Toxics
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460-0001
Attn: 8(e) Coordinator

SUBJECT: Methyl tertiary-Butyl Ether (MTBE): Two-Year Combined Chronic Toxicity/Carcinogenicity Drinking Water Study in Wistar Rats

Shell Companies[1], as part of an adhoc group with ExxonMobil and Chevron, sponsored a two-year combined chronic toxicity/carcinogenicity drinking water study in Wistar rats. Shell is submitting the following information under TSCA 8(e).

The study was conducted by the Hamner Institute. The draft study report indicates a statistically significant increase in astrocytomas (brain tumors) among high-dose male rats consuming 7.5 mg/ml MTBE for two years. The reported incidence of actrocytoma is 4/50 compared to 1/50 in control animals. The report's authors state that this result "was not considered biologically significant" based on historical incidence of astrocytomas in the Wistar rat strain and failure of any past chronic studies of MTBE in rats or mice to identify the brain as a target organ.

This report is filed to provide information EPA may find useful. In no way is it intended as a waiver of any rights or privileges belonging to Shell as the reporting corporation, its agents or employees. The reporting corporation, its agents and employees, reserve the right to object to this report's use or admissibility in any subsequent judicial or administrative proceeding against the corporation, its agents or employees.

This report has been compiled based on information available as of the date of filing. The company, its agents and employees reserve the right to supplement the data contained in this report, and to revise and amend any conclusions drawn there from, as necessary.

This report contains no Confidential Business Information.

The following person should be contacted if you have questions or a need for discussion:
    Laurel Gingrich
    Product Regulatory Support
    Shell Downstream Inc, U.S.
    910 Louisiana St.
    Houston, TX 77002
    Telephone No. 713-241-6030; Facsimile 713-241-1596
    Email: laurel.gingrich@shell.com

Sincerely yours,

*P. J. Snyder*

P. J. Snyder
Global Manager Product Stewardship
Shell Downstream



EXHIBIT 19
WIT: Dodd
DATE: 7-30-12
Kinkade RDR CRR CSR

1.  Shell Companies include Shell companies and Shell affiliated companies, including Shell Oil Products Company LLC, Shell Trading (US) Company, Motiva Enterprises LLC and the Deer Park Refining Limited Partnership.

cc: V. Solis (SHR-355-10-05)
    L. Gingrich
    K. Kiibler
    D. Steup
    Carol Drury (Shell Canada)

XOM-HEALTH-SUPP-0007972

## PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE

*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*
United States District Court, Southern District of New York, Case No. 08 Civ. 00312 (SAS)

I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action.  My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

## DECLARATION OF BRYAN BARNHART IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PROTECTIVE ORDERS' WAIVER AND DECLASSIFICATION PROVISIONS

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on July 2,  2014, at Sacramento, California.

KATHY HERRON