UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | : Master File No. 1:00–1898 : MDL 1358 (SAS) : M21-88 |
| This document relates to: | : |
| Orange County Water District v. Unocal Corp., et al., No. 04 Civ. 4968 | : |

**DECLARATION OF TRACEY L. O'REILLY**
**SUBMITTED IN SUPPORT OF PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**DUE TO LACK OF INJURY AND DAMAGES AT CERTAIN TRIAL SITES**

I, Tracey L. O'Reilly, declare:

1. I am one of the attorneys of record in this case for plaintiff Orange County Water District. I make this declaration from personal knowledge.

2. Attached as Exhibit 1 is a true and correct copy of excerpts of the deposition of David P. Bolin, taken in this action on July 30, 2008.

3. Attached as Exhibit 2 is a true and correct copy of excerpts of the Expert Report of Anthony Brown and Robert Stollar, served May 28, 2011.

4. Attached as Exhibit 3 is a true and correct copy of excerpts of the deposition of Anthony Brown, taken in this action on December 29, 2011, January 2, 2012, January 3, 2012, January 25, 2012 and February 1, 2012.

5. Attached as Exhibit 4 is a true and correct copy of excerpts of the deposition of Stephen W. Wheatcraft, Ph.D., taken in this action on January 17, 2012.

6. Attached as Exhibit 5 is a true and correct copy of excerpts of the Expert Report of Stephen W. Wheatcraft, Ph.D., served June 23, 2011.

7. Attached as Exhibit 6 is a true and correct copy of excerpts of the deposition of Graham Fogg, taken in this action on January 21, 2012.

8. Attached as Exhibit 7 is a true and correct copy of excerpts of the deposition of Kateri Luka, taken in this action on March 27, 2009.

9. Attached as Exhibit 8 is a true and correct copy of excerpts of the deposition of Anthony Daus, taken in this action on February 2, 2012.

10. Attached as Exhibit 9 is a true and correct copy of excerpts of the deposition of John Connor, P.E., P.G., taken in this action on January 27, 2012.

11.  Attached as Exhibit 10 is a true and correct copy of excerpts of the deposition of John L. Wilson, Ph.D., taken in the *City of Fresno* on May 18, 2012.

12.  Attached as Exhibit 11 is a true and correct copy of excerpts of the deposition of Howard Johnson, taken in this action on August 24, 2010.

13.  Attached as Exhibit 12 is a true and correct copy of excerpts of the deposition of George Murdoch, taken in this action on May 13, 2010.

14.  Attached as Exhibit 13 is a true and correct copy of excerpts of the deposition of Kenneth Rudo, taken in this action on May 31, 2011.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 21st day of July, 2014, at Sacramento, California.

_____
TRACEY L. O'REILLY

# EXHIBIT 1

Confidential - Per 2004 MDL 1358 Order

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

| Methyl Tertiary Butyl | : | Master File No. 1:00-1898 |
| Ether ("MTBE") | : | MDL NO. 1358 (SAS) |
| Products Liability | : | M21-88 |
| Litigation | : | |

This Document Relates to:
    Orange County Water District
    v. Unocal Corporation, et al.,
    S.D.N.Y. No. 04 Civ. 4968 (SAS)
_____/

CONFIDENTIAL
(Per 2004 MDL 1358 Order)

------

July 30, 2008

------


     Videotaped Deposition of DAVID P. BOLIN,

OCWD'S 30(b)(6) DESIGNEE, held in the law offices of

Latham & Watkins, 650 Towne Center Drive, Suite 2000,

Costa Mesa,California beginning at 9:05 a.m., before

Sandra Bunch VanderPol, RPR, RMR, CRR, CSR #3032.



GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|917.591.5672 fax

deps@golkow.com

1c087168-c6b2-471b-8821-7a9aaca2380e

Confidential - Per 2004 MDL 1358 Order

Page 72

1       Q.      And in 9 we have four
2   Huntington Beach wells, right?
3       A.      Yes.
4       Q.      And there are seven stations
5   associated with it?
6       A.      I see that.
7       Q.      All right.  Are those wells and those
8   stations and the relationship they have to those
9   three plumes, are those familiar to you?
10      A.      Yes, they are.
11      Q.      All right.  This letter is dated
12  April of 2007.  Do you recall participating in a
13  review or a study of any kind of plumes, wells and
14  stations that you believed was part of the process of
15  coming up with this list that you have before you in
16  Exhibit 2?
17          MR. MILLER:  As asked -- and I believe he
18  can answer without getting into privileged matters,
19  but any attorney-client communications you had
20  shouldn't be considered in developing your answer or
21  disclosed.
22          THE WITNESS:  Some of these stations -- and
23  I can't be certain which ones.  Some of these
24  stations were reviewed, are part of our work that
25  Komex had provided services on.  They reviewed the

1c087168-c6b2-471b-8821-7a9aaca2380e

Confidential - Per 2004 MDL 1358 Order

Page 73

1    files, or they provided information to, or they

2    discussed those stations with me at the time they

3    were doing the work.   Some of those stations are on

4    this plume -- are on this list, associated with

5    plumes 2, 7 and 9.

6           The stations, if I understand correctly, are

7    grouped in this order because they are in proximity

8    to one another and in proximity to the wells that are

9    listed.   And that's how the plumes were identified,

10   because contamination, MTBE and TBA contamination

11   specifically, identified at these sites are believed

12   to have commingled or could commingle, subsequently

13   referred to as a plume, and consequently referred to

14   as the focus plumes for the purpose of this

15   discussion.

16   BY MR. ANDERSON:

17           Q.     And that's consistent with my

18   recollection, at least from my side of the table, how

19   this came together and what was represented to us by

20   Mr. Miller and his colleagues.

21           My question is -- and I appreciate

22   Mr. Miller's concern about -- I don't want to get

23   into conversations between you and Mr. Miller, or

24   other lawyers, but my foundational question is:  Did

25   you personally play any role in the review and

1c087168-c6b2-471b-8821-7a9aaca2380e

# EXHIBIT 2

**Expert Report of Anthony Brown
and Robert Stollar**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4272

May 28, 2011

**APPENDIX B.6**
**Facility Summary Report**

**Unocal 5399**
**9525 Warner Avenue**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Table of Contents

*List of Tables*........................................................................................................................................*ii*

*List of Figures*......................................................................................................................................*ii*

*List of Appendices*..............................................................................................................................*ii*

*List of Abbreviations and Acronyms*.................................................................................................*ii*

**Section 1:**     **Facility Summary** ..............................................................................................**1**
                1.1     Identification........................................................................................1
                1.2     Characterization and Remedial Action Chronology.........................1
                1.3     Hydrogeologic Issues .........................................................................4
                1.4     Contaminant Issues ............................................................................4

**Section 2:**     **Hydrogeologic Conditions** ..............................................................................**5**
                2.1     Regional Hydrogeology ......................................................................5
                2.2     Local Hydrogeology ...........................................................................5
                2.3     Local Groundwater Utilization ..........................................................5

**Section 3:**     **Contaminant Fate and Transport** ...................................................................**7**
                3.1     First Evidence of Release ...................................................................7
                3.2     Presence of Free Product in Groundwater ........................................7
                3.3     Maximum Concentrations in Groundwater ........................................7
                3.4     Lateral Delineation of Groundwater Contamination..........................7
                3.5     Vertical Delineation of Groundwater Contamination..........................8

**Section 4:**     **Remediation**......................................................................................................**9**

**Section 5:**     **Pathway and Receptor Summary** ...................................................................**10**

*The MTBE plume was not laterally delineated at the time. No follow-up was performed after this investigation even though the leading edge of the MTBE plume had already moved off-site.*

**May 1997**                          The last groundwater sampling event before closure of the facility was conducted (UOC 48274 to 48285). While BTEX was no longer detected in on-site wells, MTBE remains present above maximum contaminant levels (MCLs), up to 66 ug/l, in down-gradient well MW-6 (UOC 55539).

*The MTBE plume has never been laterally delineated, in particular in the down-gradient direction. Vertical delineation was never attempted.*

**September 1997**                          The facility was granted closure based on Santa Ana "low risk" criteria policy adopted in January 1996 (CHEVMDL 1358 00000541340 to 1358 00000541346). No TBA testing was performed.

**Present (May 2011)**                          Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and probably TBA have been released at the facility.

2. MTBE and probably TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. To date, the responsible party has failed to delineate MTBE contamination in groundwater laterally or vertically, and additional investigation is required

4. Remediation performed to date has failed to effectively address on-site and off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

5. Additional on-site and off-site remediation may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

6. The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD

7. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed

8. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

**APPENDIX B.10**
**Facility Summary Report**

**Beacon Bay Car Wash FV**
**10035 Ellis Avenue**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement

5. MTBE that has migrated off-site has comingled with releases from nearby facilities.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation would be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M-04 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for any additional remediation required at this facility, once additional investigation has been performed at this facility and nearby facilities.

## 1.3    Hydrogeologic Issues

- First groundwater is encountered in the upper semi-perched zone within five feet of ground surface. Flow is generally to the southwest.

- Although not evaluated at Beacon Bay, investigations at neighboring facilities (i.e. ARCO #1912 and Thrifty #383), indicate that a steep downward vertical gradient generally prevails between the upper semi-perched zone and the Talbert Aquifer.

- Several wells have been identified within a quarter of a mile of the facility that could provide vertical contaminant migration pathways to deeper aquifers (i.e Talbert, Alpha, Lambda). These include wells used for agriculture and irrigation, both active and abandoned, and a regional monitoring well.

- GKAW-FV2 is the nearest potentially vulnerable production well. It is a domestic well and is located approximately 1,090 feet northwest of the facility. It is screened from 120 to 125 feet bgs down to or near the Alpha Aquifer.

**APPENDIX B.16**
**Facility Summary Report**

**Unocal 5123**
**14972 Springdale Street**
**Huntington Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

***Present (May 2011)***                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from Huntington Beach Arco.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3      Hydrogeologic Issues

- Four discrete groundwater-bearing sandy zones have been identified:

    o  Upper A zone: 10–15 feet bgs

    o  Lower A zone: 18-23 feet bgs

    o  B zone: 30-40 feet bgs

    o  C zone: 40-50 feet bgs

**APPENDIX B.18**
**Facility Summary Report**

**Thrifty Oil #368**
**6311 Westminster Avenue**
**Westminster, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

8. Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3    Hydrogeologic Issues

- Groundwater beneath the facility occurs in a Semi-Perched Aquifer zone, with historical groundwater levels between depths of about 6.5 and 10 feet bgs. Six discrete zones have been defined in the Semi-Perched Aquifer based on Thrifty Station 368, Unocal Station 5226 (located just across Westminster Ave. to south) and Hargis CPT investigations (to bottom of CPT at 122 feet bgs):

  ☐ Semi-perched zone-A (8–20 feet bgs)

  ☐ Semi-perched zone-B (40-44 feet bgs)

  ☐ Semi-perched zone-C (47-58 feet bgs)

  ☐ Semi-perched zone-D (61-63 feet bgs)

  ☐ Semi-perched zone-E (86-114 feet bgs)

  ☐ Semi-perched zone-F (118-122 feet bgs)

  All but two groundwater monitoring wells at Thrifty Station 368 and Unocal Station 5226 were screened across zone-A. Unocal wells MW-13s and MW-13d were screened across zones B and D, respectively. In 2010, Hargis collected Hydropunch groundwater samples in zones A, B, C and E at a location off-site adjacent to service station Unocal 5226.

- The historical prevailing groundwater gradient beneath the facility, when not affected by soil/groundwater remediation system operation, has been towards the south-southwest at an approximate gradient of 0.007. Including groundwater level data from Unocal Station 5226, the groundwater surface since 2003 has formed a westward directed trough whose axis bisects In-and-Out Burger, with groundwater flowing southward into the trough from Thrifty Station 368 and westward into the trough from Unocal Station 5226.

- Based on historical water levels from Unocal Station 5226 wells MW-9, MW-13s and MW-13d since October 2000 (first records for MW-13s and MW-13d), the direction of vertical gradients were:

# EXHIBIT 3

Anthony Brown

1              MS. O'REILLY:  Vague and ambiguous.

2      Overbroad.  Incomplete hypothetical.

3              THE WITNESS:  As part of my work, I have not

4      offered opinions as to whether the threat to water

5      supply wells is specific to an individual well.

6      BY MR. COX:

7              Q.      Specific to an individual location?

8              A.      Correct.  Such that, for example, let

9      us say, I have not given the opinion that a release

10     at station "X" poses a threat to water supply well

11     "B."

12              I would be -- or I have offered the opinion

13     that release at station "X" would pose a threat to

14     water supply wells but have not specified the well in

15     that opinion.

16              Q.      All right.  Well, I'm looking at --

17              A.      And if I could just continue.  And

18     this may help you somewhat.

19              Q.      Okay.  Go ahead.

20              A.      One additional item, which I failed

21     to mention before, which we have generated and are

22     still in the process of creating is a summary table

23     that essentially summarizes my opinions as they

24     relate to each specific site.

25              And this table, along the top of each

Anthony Brown

Page 441

1    Overbroad.

2         THE WITNESS:   And in particular you're

3    referencing this one opinion, the threat to water

4    supply wells?

5    BY MR. COX:

6         Q.    Yes.   The threat to water supply

7    wells that we've been spending a lot of time on.

8         A.    In evaluating each of the specific

9    service stations, I would obviously look at the

10   historical and current contaminant concentration

11   data, groundwater flow direction, the remediation

12   activities that have occurred at the site.  And based

13   upon that and potential data gaps that exist, I would

14   attempt to reach a conclusion that it is more likely

15   than not that the contaminants do pose a threat to

16   water supply wells.  And that would be indicated by a

17   "Y" in the column for that particular question --

18        Q.    Right.

19        A.    -- or it's more likely than not they

20   don't.  In which case that would be indicated by an

21   "N," that I have reached that conclusion that it's

22   more likely than not that they don't.

23        However, for most of them I could not reach

24   a conclusion either way, and it's simply possible

25   that they do.  And, conversely, possible that they

Anthony Brown

Page 442

1    don't.

2          Q.    So if you looked at a site, let's say

3    ARCO 6036 since we're there, and concluded it was

4    unlikely that the site posed a threat to a drinking

5    water supply, you would still give that site -- in

6    this case ARCO 6036 -- a "P," correct?

7          A.    If I could not conclude that it was

8    more likely than not, I would give it a "P."

9    Assuming, again, that I could not conclude that it

10   was not more likely than not.  We're getting too many

11   negatives.

12         Q.    A lot of negatives here.  Let's

13   assume that you concluded that it was unlikely that

14   ARCO 6036 was a threat to drinking water supply, you

15   would still give ARCO 3036 a "P," correct?

16         MS. O'REILLY:  Vague and ambiguous.

17         Go ahead.

18         THE WITNESS:  It actually could get a "P" or

19   an "N."  We're talking generically across all of the

20   potential sites.

21         MR. COX:  Okay.

22         THE WITNESS:  If I was confident enough to

23   feel that it was more likely than not that it doesn't

24   represent a threat, then it would get an "N."

25   ///

Golkow Technologies, Inc. - 1.877.370.DEPS

Anthony Brown

Page 451

1          MS. O'REILLY:  Okay.

2  BY MR. COX:

3          Q.    I believe you indicated, upon further

4  reflection on my part, that you've concluded that

5  Thrifty 368 possibly poses a threat to drinking water

6  supply wells, correct?

7          A.    Correct.

8          Q.    All right.  And which drinking water

9  supply wells are you referring to?

10          A.    Those would be indicated on Figure 8.

11          Q.    All right.  So let me see if I can do

12  this.  HELL-WM-3, is that one?

13          A.    Actually, that's not a supply well.

14  That's a monitoring well.

15          Q.    Okay.  WM-RES2, is that the supply

16  well up there?

17          A.    That is a supply well in the

18  immediate vicinity of Thrifty 368.

19          Q.    Okay.

20          A.    There is also a supply well

21  immediately to the south, SHAF-WM.

22          Q.    Okay.

23          A.    And a series of supply wells to the

24  southwest, HB-4, HB-7 and HB-13.

25          Q.    Okay.  And have any of those supply

Anthony Brown

Page 452

1    wells had MTBE detected in them?

2           A.      No, they have not.

3           Q.      Well, let's take WM-RES2. Can you

4    describe in general terms what conceptual model you

5    used to reach the conclusion that it's possible that

6    Thrifty 368 is a threat to that water supply well?

7           A.      With respect to this particular

8    service station?

9           Q.      Right.

10          A.      While releases of MTBE and TBA have

11   occurred, the lateral extent of the contaminants both

12   historically and currently is delineated, in my

13   opinion; however, there has been no investigation of

14   the potential vertical migration of contaminants.

15          Therefore, given the absence of that

16   information, it is possible that the release at this

17   facility may have migrated vertically and could,

18   thus, pose a possible risk to water supply wells in

19   the immediate vicinity.  But I have not been able to

20   conclude that it is more likely than not that the

21   releases at this facility pose a threat to these

22   water supply wells.

23          Q.      I was looking for the historical well

24   data that might have identified the depth at which

25   WM-RES2 is screened.  Is that part of your expert

Anthony Brown

Page 638

1          Go ahead.

2          THE WITNESS:  In the context of this work,

3    the term "threat" would be defined as the

4    contamination that has resulted from a release at a

5    particular facility could potentially either impact

6    aquifers that would be used for or potentially used

7    for drinking water supply, and that's reflected in

8    question or opinion 21 on my summary table.

9    BY MR. CONDRON:

10         Q.      And that's Exhibit 36?

11         A.      Correct.

12         Q.      Okay.

13         A.      And also presents a threat to water

14   supply wells; that is, the contamination could

15   potentially impact the water supply well.

16         Q.      In your report you also use the term

17   "potential threat."  Do you distinguish between

18   "potential threat" and "threat"?

19         MS. O'REILLY:  Vague and ambiguous.

20         THE WITNESS:  We define threat in one of

21   three ways.  And those would be "yes," "no" and

22   "possible."  And that's the "P," for the possible.

23   And obviously "Y" and "N" for the "yes" and "no" on

24   the table.

25         As I have discussed in response to earlier

a625ef7f-218b-4124-b608-12a58d312040

Anthony Brown

Page 639

1   questions, if we believe that it was more likely than
2   not the contamination posed a threat, then in
3   response to question No. 22, the answer would be
4   "Yes."
5           If we believe that the contamination did not
6   pose a threat, then the answer would be "No."
7           If we could not determine that it was more
8   likely than not that the contamination posed a
9   threat, but also not determine that it was more
10  likely than not that it did not pose a threat, then
11  it was left as a "Possible."
12  BY MR. CONDRON:
13          Q.    Okay.  That's helpful.  But in your
14  report you actually use the term in several places
15  "potential threat."  And I'm wondering if that's the
16  same thing as "threat," different than "threat,"
17  something else?
18          A.    I do not recall the specific
19  language.  As I indicated yesterday, Exhibit 36 would
20  be the opinions that I will be offering at trial.
21          Q.    So this is the latest and greatest --
22          A.    Correct.
23          Q.    -- Exhibit 36?
24          A.    Yes.
25          Q.    Okay.  Let me just make sure I

a625ef7f-218b-4124-b608-12a58d312040

Anthony Brown

Page 919

1    it is more likely than not that the historical MTBE

2    plume has not been laterally delineated, correct?

3         A.      That is correct, yes.

4         Q.      And which directions do you think

5    additional lateral delineation is needed?

6         A.      It would be to the southwest of the

7    station.

8         Q.      What's the flow of groundwater on

9    this site?

10        A.      If you refer to the rose diagram that

11   we prepared for Unocal 5399, it would indicate that

12   the groundwater flow direction at this facility is

13   almost exclusively to the southwest.

14        MR. JEREMIAH ANDERSON:  And I just have one

15   copy of this, but can you mark that, Sandy.

16        THE REPORTER:  It's 118.

17             (Exhibit No. 118 was marked.)

18        MR. JEREMIAH ANDERSON:  And can you hand it

19   to the witness, please.

20        Q.      Does that appear to be the rose

21   diagram you guys created for this site?

22        A.      Yes.

23        Q.      In your question 7 you think it's

24   possible that the investigation has failed to

25   delineate on-site MTBE contamination, but you can't

31a940b7-2d5e-48e8-9964-6dc2d8f8c747

Anthony Brown

Page 920

1    say whether or not it's more likely than not,

2    correct?

3              A.      That's correct.

4              MS. O'REILLY:   Vague.   Ambiguous.

5    Overbroad.

6              THE WITNESS:   If you refer to footnote P-2,

7    there has actually been no analysis for MTBE at this

8    site since 1997.

9    BY MR. JEREMIAH ANDERSON:

10             Q.      Right.   And in 1997 is when this site

11   received closure?

12             A.      I believe so, yes.   Or shortly

13   thereafter.

14             Q.      And, similarly, with question 12, you

15   think it's possible that MTBE exists beyond the

16   current monitoring well network, but you don't know

17   if that's more likely than not the case, correct?

18             A.      That is correct.

19             Q.      Now, you do think that the current

20   remediation has effectively addressed the on-site

21   MTBE contamination, correct?   And that's question 14.

22             A.      Yes.   And, as indicated, the only

23   remediation activities was an excavation performed at

24   this facility back in late 1994.

25             Q.      It's your opinion that no more

31a940b7-2d5e-48e8-9964-6dc2d8f8c747

Anthony Brown

Page 924

1    question 21.  Again, you think it's possible that
2    contamination from Unocal 5399 is a threat to the
3    deep aquifers, but you can't say whether or not it's
4    more likely than not that's the case, correct?
5            A.      That's correct.
6            Q.      And if I look at column 21, going
7    down all the sites, I see that it's your opinion at
8    each site that either contamination from that
9    particular site is a threat to the deep aquifers or
10   it's possible; is that fair?
11           A.      Yes.
12           Q.      What would it take for you to say
13   that an MTBE site is not a threat to the deeper
14   aquifers?
15           MS. O'REILLY:  Vague.  Ambiguous.
16   Overbroad.  Incomplete hypothetical.
17           THE WITNESS:  Vertical delineation, which is
18   absent at almost every site.  In fact, it may be
19   absent at every site.
20   BY MR. JEREMIAH ANDERSON:
21           Q.      So if I understand your answer
22   correctly, you think that an MTBE plume has to be
23   vertically delineated for you to determine that a
24   plume is not a threat to the deeper aquifer?
25           MS. O'REILLY:  Vague.  Ambiguous.

Anthony Brown

Page 1192

1    opinions and the estimates and the list of things that

2    you believe still need to be done at these sites was

3    exactly the same as it would have been had you been

4    retained by the responsible parties to come up with

5    plans for their sites?

6            MS. O'REILLY:  Same objections.

7            Go ahead.

8            THE WITNESS:  I believe so, yes.

9    BY MR. ANDERSON:

10       Q.    Okay.  And you don't believe that knowing that

11   Orange County Water District wanted to maximize its

12   recovery in this case had any influence on you

13   whatsoever?

14           MS. O'REILLY:  Objection.  Misstates facts.

15   Argumentative.  Calls -- assumes facts as to Mr. Brown's

16   knowledge of Orange County Water District's legal

17   strategy.  Calls for attorney-client privilege.  Vague.

18   Ambiguous.  Overbroad.  Misstates his testimony.

19           Go ahead.

20           THE WITNESS:  I cannot state whether

21   Orange County was trying to maximize its recovery, but

22   that did not have any bearing on the work that I did.  I

23   just was asked to determine data gaps at the sites and

24   what work would be necessary to complete investigation

25   and remediation at these sites and determine the costs.

Golkow Technologies, Inc. - 1.877.370.DEPS

Anthony Brown

Page 1193

1    I did not try to consider whether they should be the

2    maximum costs that could be achievable.

3    BY MR. ANDERSON:

4        Q.    Okay.  So you believe you approached it the

5    same way you would if you were working for a group of

6    responsible parties who were responsible for the

7    cleanups at these stations?

8            MS. O'REILLY:  Asked and answered.

9    BY MR. ANDERSON:

10       Q.    Right?

11       A.    That's my understanding, yes.

12       Q.    Okay.  And do you believe that your opinions

13   have -- in terms of the list of things that need to be

14   done at various sites, do you think that was influenced

15   at all by the fact that you would hope to get some work

16   to help clean up these sites after this case is over?

17       A.    Oh, no, not at all.

18       Q.    Okay.  I asked you the definition of vertical

19   delineation before, and that's up and down, right?

20       A.    That's correct.

21       Q.    So if you go sideways, is that called lateral?

22       A.    Yes.

23       Q.    And do you have a definition for lateral

24   delineation?

25       A.    Again, it would be the absence of contamination

# EXHIBIT 4

Stephen W. Wheatcraft, Ph.D.

Page 228

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")
PRODUCTS LIABILITY LITIGATION
Master File C.A. No. 1:00-1898 MDL 1358

This Document Relates to:

          ORANGE COUNTY WATER DISTRICT
          v. UNOCAL CORPORATION, et al.,
          Case No. 04 CIV.4968 (SAS)
_____/


            --  --  --


      TUESDAY, JANUARY 17, 2012

            --  --  --


         Videotaped Deposition of STEPHEN W.
WHEATCRAFT, Ph.D., Expert Witness, Volume II, held at
the Law Offices of Latham & Watkins, 505 Montgomery
Street, Suite 2000, San Francisco California,
beginning at 9:03 a.m., before Sandra Bunch
VanderPol, FAPR, RMR, CRR, CSR #3032

            --  --  --


                GOLKOW TECHNOLOGIES, INC.
          877.370.3377 ph|917.591.5672 fax
                   Deps@golkow.com

9d8c445e-bb8a-42b0-bea7-c8b842f635e9

Stephen W. Wheatcraft, Ph.D.

Page 249

1          Q.      All right.

2          A.      And in this case it's my

3    understanding that there's going to be a different

4    procedure for other experts, and that -- that what

5    the District wants to do is rather than treat for

6    MTBE at the wellhead when it comes out, they want to

7    go in ahead of time and remediate the aquifer and get

8    the plume out before it ever reaches the wells.  I

9    think that has to do with their -- their -- their

10   mission as it's written.

11          And so what really matters is that

12   ultimately MTBE in significant quantities get to

13   these wells.  Whether it gets there a little sooner

14   or a little later, a little higher, a little lower,

15   is not so important as it was, because it doesn't

16   necessarily affect the cost estimates for experts

17   that are doing work -- the later dominoes in the

18   series, as I like to refer to them.

19          Q.      Are you saying, basically, that your

20   work is showing the potential consequences if action

21   is not taken to remediate to take care of the plumes,

22   and you understood that to be your primary purpose?

23          A.      Yes.  And, actually, that's exactly

24   correct.

25          Q.      Okay.  Have you talked to any Orange

Stephen W. Wheatcraft, Ph.D.

Page 250

1   County Water District personnel about that mission?

2         A.     I --

3         MS. O'REILLY:  Vague and ambiguous.

4         Go ahead.

5         THE WITNESS:  I have had some brief

6   conversations with Mr. Herndon, Mr. Bolin about what

7   they see their mission is and what they want to

8   accomplish.  And it reflects what I just said.

9   BY MR. JON ANDERSON:

10        Q.    And would it be fair to say that, in

11  general, your predicted results that you've presented

12  in your report, and some represented in your modeling

13  and document productions, illustrate a significant

14  need for action?

15        A.    I think that's a fair statement.

16        Q.    All right.  And did Mr. Herndon or

17  Mr. Bolin explain to you that they appreciate this

18  need for action, in so many words?

19        MS. O'REILLY:  Vague.  Ambiguous.

20  Overbroad.

21        THE WITNESS:  I don't know what you mean by

22  "appreciate."

23  BY MR. JON ANDERSON:

24        Q.    Well --

25        A.    They explained to me what they --

Stephen W. Wheatcraft, Ph.D.

Page 374

1   answered multiple times.  Vague.  Ambiguous.

2   Overbroad.

3           THE WITNESS:  I will just restate my answer.

4   I haven't done any analysis to look at whether --

5   which -- to isolate or identify MTBE from a

6   particular station and whether or not or when it gets

7   to production wells.

8   BY MR. JON ANDERSON:

9           Q.      What I'm trying to get at -- and you

10  acknowledge on any individual station you have no

11  specific opinion about that MTBE.  And now I've given

12  you 34 stations.

13          What is the basis for you to say that one or

14  more of the 34 stations released MTBE that has gotten

15  into one or more drinking water wells?

16          MS. O'REILLY:  Argumentative.  Asked and

17  answered.  Misstates testimony.

18          THE WITNESS:  The overall behavior of the

19  model, it is showing MTBE mass moving from these

20  stations towards -- towards the wells and, in some

21  cases, having reached the wells.  And there are wells

22  that have had detections.  Some of these detections

23  are in the vicinity of these stations and so-called

24  plumes.

25          So it seems certainly more likely than not

9d8c445e-bb8a-42b0-bea7-c8b842f635e9

Stephen W. Wheatcraft, Ph.D.

Page 375

1    that some of these stations have, in fact, impacted
2    production wells already.
3    BY MR. JON ANDERSON:
4            Q.    Are you a hydrogeologist?
5            A.    Yes.
6            Q.    And have you used your expertise in
7    hydrogeology to formulate the opinion that one or
8    more of the 34 stations listed has, in fact, impacted
9    one or more drinking water wells with MTBE?
10           A.    Yes, I have.
11           Q.    Okay.  And which of these stations,
12   in your opinion, has both a release and a pathway,
13   and to which drinking water wells, where you have
14   that opinion?
15           MS. O'REILLY:  Asked and answered.
16   Argumentative.  Misstates testimony.
17           THE WITNESS:  I haven't identified -- the
18   MTBE that gets in the wells is not tagged, so I don't
19   know which station it comes from.  It comes from one
20   or more stations on this list because those are all
21   the sources that are there.
22   BY MR. JON ANDERSON:
23           Q.    But the 34 stations are not the
24   totality of sources in the area, right?
25           MS. O'REILLY:  Objection.  Asked and

9d8c445e-bb8a-42b0-bea7-c8b842f635e9

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**In re: Methyl Tertiary Butyl Ether ("MTBE")**
**Products Liability Litigation**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

---

**This Document Relates To:**

*Orange County Water District v. Unocal Corp., et al.,*
*No. 04 Civ. 4968*

---

**EXPERT REPORT OF STEPHEN W. WHEATCRAFT, Ph.D.**

Wheatcraft & Associates
Reno, Nevada

*[signature]*

June 23, 2011

---
Signature

---
Date

The purpose of this expert report is to explain the methodology employed in constructing and running groundwater flow and MTBE transport models, and to provide an opinion regarding the results of these models. I was asked to determine whether any releases of MTBE gasoline from 34 pre-selected stations had or would reach drinking water wells within Orange County Water District's service area. I was also asked to provide an opinion as to the mobility, fate and transport and persistence of any MTBE that was released within the Orange County Water District service area. My opinions are as follows:

1. A significant amount of MTBE has been released to groundwater within the Orange County Water District's service area.

2. MTBE was likely in groundwater for years before any sampling for MTBE occurred.

3. This MTBE, if not remediated, will impact water production wells in OCWD's service area. MTBE has already been detected in a number of wells.

4. Groundwater remediation at the focus plume stations I reviewed has not prevented off-site migration of MTBE.

5. At the stations I reviewed, MTBE was in groundwater for years before groundwater remediation was initiated. At most stations, MTBE was in groundwater for more than a decade before groundwater remediation began.

6. The average time from known release to the start of remediation is 11 years, and the longest time between known release and start of remediation is 22.5 years.

7. MTBE is highly mobile and persistent in groundwater and groundwater is continuously in motion. As a consequence, MTBE released at the focus plume stations would have begun migrating off site as soon as it entered groundwater.

8. The MTBE transport model predicts (details are in Appendices B and D):
    a. 190 district production wells exceed 0.2 ug/l MTBE after 10 years
    b. 19 additional district production wells exceed 0.2 ug/l MTBE after 20 years
    c. 28 additional district production wells exceed 0.2 ug/l MTBE after 30 years
    d. 19 additional district production wells exceed 0.2 ug/l MTBE after 40 years
    e. 108 district production wells exceed 5.0 ug/l MTBE after 10 years
    f. 26 additional district production wells exceed 5.0 ug/l MTBE after 20 years
    g. 10 additional district production wells exceed 5.0 ug/l MTBE after 30 years
    h. 11 additional district production wells exceed 5.0 ug/l MTBE after 40 years

9. Clay layers within the OCWD service area will not prevent MTBE from migrating vertically down to deeper aquifers. Clay layers slow, but to not stop downward migration. In addition, clay layers within OCWD's service area have been perforated by numerous wells that act as conduits to deeper aquifers.

# EXHIBIT 6

Graham E. Fogg, Ph.D.

Page 1

                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK

IN RE:   METHYL TERTIARY BUTYL ETHER ("MTBE")
         PRODUCTS LIABILITY LITIGATION
Master File C.A. No. 1:00-1898(SAS) MDL 1358
_____

This Document Relates to:

         ORANGE COUNTY WATER DISTRICT
         v. UNOCAL CORPORATION, et al.,
         Case No. 04 CIV.4968 (SAS)
_____


                  -- -- --

            SATURDAY, JANUARY 21, 2012

                  -- -- --


   Videotaped Deposition of GRAHAM E. FOGG, Ph.D.,
Expert Witness, held at the Law Offices of Latham &
Watkins, 505 Montgomery Street Street, Suite 1900,
San Francisco, California, beginning at 9:03, before
Sandra Bunch VanderPol, FAPR, RMR, CRR, CSR #3032

                  -- -- --

              GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph|917.591.5672 fax
                Deps@golkow.com

Graham E. Fogg, Ph.D.

Page 110

1    network, then -- then that would indicate that people

2    are -- the companies are already doing as much as

3    they can or as much as should be done to protect the

4    groundwater resources.

5    BY MR. JON ANDERSON:

6            Q.    My question is a little bit different

7    than that.  And I'm focusing on the 34 stations that

8    are part of this case.

9            Do you have an opinion that something more

10   than local site cleanup is needed with respect to all

11   or any of those stations?

12           MS. O'REILLY:  Objection.  Misstates

13   testimony.  Misstates reports.  Exceeds the scope of

14   designation.

15           THE WITNESS:  My opinion is not with respect

16   to specific stations.  But my opinion is that there

17   is significant MTBE mass beyond the monitoring well

18   networks, and what one chooses to do about that is

19   dependent on other factors that are not part of my

20   scope of work or my opinions.

21           So you either try and clean up the

22   contamination before it gets to supply wells or you

23   clean it up at the supply wells or you find another

24   source of water.  Right.

25           So, basically, there's three choices.  Those

# EXHIBIT 7

Deposition of Kateri Luka, Vol. II / March 27, 2009

Page 194

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF NEW YORK

2

3

4

5    IN RE:  METHYL TERTIARY BUTYL )Master File No. 1:00-1898
     ETHER ("MTBE") PRODUCTS       )  MDL          1358(SAS)
6    LIABILITY LITIGATION          )  M21-88
     _____)
7    This document relates to:     )
                                    )
8    Orange County Water District   )
                                    )
9        vs.                        )    Case No. 04 Civ. 4968
                                    )         VOLUME 2
10   Unocal Corporation, et al.,    )
     _____)

11

12

13

14

15           DEPOSITION of KATERI LUKA, taken on

16      behalf of the Defendants at 777 So. Figueroa

17      Street, Conference Room 45-A, Los Angeles,

18      California, commencing at 9:09 a.m., Friday,

19      March 27, 2009, before NANCI L. GRUBE, CSR No.

20      3446, pursuant to Notice.

21

22

23

24

25

Deposition of Kateri Luka, Vol. II / March 27, 2009

Page 281

```
 1    the wells were installed in the extent -- the vertical
 2    extent has been assessed.
 3         Q.   And were the samples taken from those wells
 4    non-detect?
 5         A.   There were a lot of non-detect results from
 6    those wells.
 7         Q.   And what wells were you referring to?
 8         A.   I am referring to well B-19, B-20, B-21 and
 9    B-26.
10         Q.   When was the last time ARCO sampled those
11    wells?
12         A.   Sampling activities have been conducted as
13    recent as December 22nd, 2008.  And give me a second to
14    make sure that's correct for all of those wells that I
15    just mentioned.
16              For well B-21, the last date that well was
17    sampled was March 25, 2008, and for well B-26 the last
18    sampling date was September 10 of 2008.
19         Q.   So is it your testimony that the completion of
20    those -- installation of those wells completed the
21    vertical assessment of the MTBE plume of Arco 1912?
22         A.   Yes.
23         Q.   And when did ARCO complete the horizontal
24    assessment of the MTBE plume at 1912?
25         A.   I don't have an exact -- I don't have a date
```

Page 282

1   for you on that.  This is a complex site in that we have

2   commingling of plumes.  We have another station across

3   -- there is another station across the street known as

4   Thrifty, and next door on the same side of the street to

5   us is the Beacon Bay station.  So there is commingling

6   that's going on.  A lot of assessment has been done,

7   and as you know or I have mentioned, that the site is

8   currently under remediation.  So it's a process that,

9   you know, the site has been under, and I don't have an

10  exact date for that.

11      Q.   Has -- to your understanding, has horizontal

12  delineation of the MTBE plume at ARCO 1912 been

13  completed as of today?

14      A.   With the work that has been going on

15  especially at the direction of the Orange County Health

16  Care Agency, I would say that it is -- that no

17  additional work has been required off -- to install more

18  wells and that the wells that are currently there are

19  being monitored through remediation, so there is not an

20  actual date of completion.

21      MS. WEIRICK:  Tracey could be the court reporter,

22  too.  You could save yourselves some money.

23          Is that it for 1912?

24      MS. O'REILLY:  Yes.  Sorry.

25      Q.   And one other pending question was whether you

# EXHIBIT 8

Deposition of Anthony Daus, Vol. II  /  February 2, 2012

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL     : Master File No.
                                       1:00-1898

ETHER ("MTBE") PRODUCTS          : MDL 1358 (SAS)

LIABILITY LITIGATION             : M21-88

ORANGE COUNTY WATER DISTRICT

v.

UNOCAL CORP., et al.                 VOLUME II

Case No. 04 Civ. 4968 (SAS)          Pages 249 - 476

VIDEOTAPED DEPOSITION OF ANTHONY DAUS

Thursday, February 2, 2012  9:19 a.m.

LOCATION:     355 S. Grand Avenue, Suite 3H

              Los Angeles, California  90071-1560

REPORTED BY: Debra Kottke, C.S.R. #7422

              Registered Professional Reporter

Deposition of Anthony Daus, Vol. II / February 2, 2012

Page 395

1     MR. COX:  Vague.

2     MR. JEREMIAH ANDERSON:  Are you talking about in

3  1998 did he do this analysis?

4     THE WITNESS:  I didn't do any analysis.

5  BY MS. O'REILLY:

6     Q.  So, in terms of your opinion that the air

7  sparging system promoted biodegradation of MTBE,

8  you're relying on your general knowledge of MTBE

9  biodegradation?

10     A.  Yes, and that, you know, we did find TBA at

11  concentrations, elevated concentrations, but the data

12  record isn't complete enough to assess concentrations

13  prior to the sparge system.

14     Q.  Did the sparge system provide hydraulic

15  control of the MTBE being detected in the areas of

16  MW-6 and MW-7?

17     A.  Hydraulic control, a sparge system wouldn't

18  do that, hydraulic control.

19     Q.  Would that contamination continue to migrate

20  with groundwater off the Beacon Bay Santa Ana

21  property?

22     MR. COX:  Vague.

23     THE WITNESS:  Some MTBE that's not broken down

24  would continue to migrate.

25  \\\\

DEPOBOOK REPORTING SERVICES, LLC (800) 830-8885

Page 396

1    BY MS. O'REILLY:

2         Q.   Do you know how far it would have migrated?

3         A.   No.

4         MR. COX:  Vague, ambiguous, incomplete

5    hypothetical.  Go ahead.

6    BY MS. O'REILLY:

7         Q.  Do you know what concentration would have

8    migrated?

9         MR. COX:  Same objections.

10        THE WITNESS:  MW-8 is downgradient of southwest

11   and downgradient of -- I think underground fuel

12   tanks.

13   BY MS. O'REILLY:

14        Q.  Okay.

15        A.  And MTBE was detected at relatively low

16   concentrations in MW-8 up to 26, 28, looks like the

17   highest is 28 parts per billion.

18        Q.  Are you talking about MW-8?

19        A.  Yes.

20        VIDEO OPERATOR:  Five minutes left on the disk.

21        MS. O'REILLY:  Okay.

22   BY MS. O'REILLY:

23        Q.  Are you saying that the concentrations --

24   let me make sure I understand your testimony because

25   my question was, do you know what concentrations

Page 397

1    migrated off-site of the Beacon Bay Fountain Valley

2    that were being detected in 6 and 7?

3         A.  Oh, it was in reference to 6 and 7?

4         Q.  Yes, sorry.

5         A.  I'm sorry, I thought it was more about the

6    air sparge system.  The MW-7, I don't believe there's

7    a well downgradient of MW-7 and MW-6.  MW-11 hadn't

8    been installed yet and MW-3 had very limited

9    sampling.

10        Q.  So, you can't tell what concentration

11   migrated off-site from that area?

12        MR. COX:  Vaque.

13        THE WITNESS:  I can't -- well, I can't tell what

14   migrated off-site, how much or --

15   BY MS. O'REILLY:

16        Q.  How far?

17        A.  Or how far.

18        Q.  With respect to, very quick because I might

19   almost be done with this.  With respect to MW-8 it

20   had a concentration of 2,270 parts per billion in

21   August 1996, correct, high concentrations?

22        A.  Yes, when it was first installed it had a

23   very high concentration that was a one-time

24   detection.  It wasn't a repeated detection.

25   Concentrations prior to that were 64 parts per

# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-oOo-

In re: Methyl Tertiary Butyl
Ether ("MTBE") Products
Liability Litigation

Master File No.
1:00-1898

This Document Relates To:

Case No.
Orange County Water District          MDL 1358(SAS)
v. Unocal Corporation, et al.,
Case No. 04 Civ. 4968

DEPOSITION OF JOHN CONNOR, P.E., P.G.
January 27, 2012 at 9:00 (9:07) a.m.

Before:   ERIC L. JOHNSON
          RPR, CSR #9771
Taken at:
San Francisco, California

Page 41

1    semi-perched zone.  And at the -- the last paragraph in

2    that section, you -- yeah.

3            It says, "Due to the poor natural quality of

4    the water contained in this zone, e.g., elevated total

5    dissolved solids, TDS, the groundwater is not used for

6    drinking water supply."  And you cite DWI 1967.

7            Do you see that?

8       A.   Yes.

9       Q.   Is it your opinion that the groundwater on the

10   semi-perched zone is -- is non-beneficial use?

11              MR. ANDERSON:  Objection; vague.

12              THE WITNESS:  It depends on which beneficial

13   use you are referring to.

14              MS. O'REILLY:  Q.  Do you understand the term

15   "beneficial use" as it is used by the Regional Water

16   Quality Control Board and the State Water Resources

17   Control Board?

18       A.   Yes.

19              MR. ANDERSON:  Objection; calls for

20   speculation.

21              MS. O'REILLY:  Q.  Is the shallow aquifer in

22   Orange County designated for non-beneficial use, in your

23   opinion?

24              MR. ANDERSON:  Objection; vague.

25              THE WITNESS:  That's a different question.

Page 42

1        The -- the groundwater in the semi-perched unit

2    is subject to the groundwater protection regulations

3    that are implemented by the state water -- the State

4    Water Resources Quality Control Board and so the water

5    is subject to remediation.  The standards that they

6    apply to that, under water quality objectives, are more

7    stringent than drinking water standards.

8        The statement that's made by the Department of

9    Water Resources in 1967, and has been affirmed in many

10   publications since that time, is that the water is not

11   used.  In fact, the study that was done, published in

12   1967 for that, state there is a -- there is an internal

13   memorandum that indicates that the last well that drew

14   water from that unit had been removed by that time and

15   it is not -- it is not used out there.

16       MS. O'REILLY:  Q.  Is that aquifer designated

17   for non-beneficial use, in your opinion?

18       MR. ANDERSON:  Objection; vague.

19       THE WITNESS:  I guess I am unclear on your

20   question.  I think I have answered that.

21       It is not -- it is not -- it is -- it is

22   subject to the protection for the future potential

23   beneficial uses, subject to protection and remediation

24   as if it were a drinking water aquifer.  My statement

25   here is that it is not used as a drinking water aquifer.

Deposition of John Connor, P.E., P.G. / January 27, 2012

Page 43

1          MS. O'REILLY:  Q.  So is it fair --

2      A.  That's been affirmed by the Department of Water

3  Resources and many others.

4      Q.  So it is fair to say --

5      A.  It is not used as drinking water.

6      Q.  So the State Water Resources Control Board

7  still treats the semi-perched aquifer in Orange County,

8  within the pressure area, as a beneficial use aquifer

9  for potential for drinking water, correct?

10     A.  They apply the same standards as they apply to

11 waters that are amenable to use as a drinking water.

12 That is not to say that they recognize it as a local

13 water resource that's being used by the people or could

14 reasonably be used.  In the 1967 publication by the

15 Department of Water Resources, they note that

16 it had -- that the water is a poor quality for salinity.

17 But the principal limitation on using water from that

18 unit is it is low yield.  There's -- you can't get any

19 water out of it.  So that's why it is -- that's why it

20 is not feasible, you know, there were some old windmills

21 in there in the past in some of the early ranches --

22     Q.  What's your --

23     A.  -- but it is not used.

24     Q.  What's your basis for saying it is low yield?

25     A.  It is the nature of the sediments that are in

DEPOBOOK REPORTING SERVICES, LLC (800) 830-8885

1          So I have marked as Exhibit 6 a State of

2   California Resources Agency Department of Water

3   Resources Southern District progress report on

4   groundwater geology of the coastal plain of Orange

5   County dated July 1967.

6          Q.   And that is one of the documents that you

7   relied on in forming your opinions concerning the

8   usability of the semi-perched zone as a drinking water

9   aquifer in Orange County?

10         A.   You said that I used it for characterization --

11         Q.   Is it one -- is it one of the documents that

12   you relied on -- well, let me -- let me first ask it

13   this way:  That you relied on in order to form your

14   opinions concerning the geology and hydrogeology of the

15   semi-perched zone in Orange County.

16         A.   It is one of the documents that I relied upon,

17   yes.

18         Q.   And if I understand your testimony, you relied

19   on that document to form the opinion that the water in

20   the semi-perched zone is not appropriate for use as

21   drinking water?

22              MR. ANDERSON:   Misstates his opinions.

23              THE WITNESS:   No, that's not what I said.  What

24   I said is simply that this document says that the water

25   in the semi-perched zone is of high TDS and -- which is

Deposition of John Connor, P.E., P.G.  /  January 27, 2012

Page 46

1    a low quality of water, and there are many other

2    documents that I have said that identify that the

3    semi-perched zone is principally clays or silts.  I

4    don't think that's subject to argument.  And they are

5    low yield.  And I have explained to you that that's

6    another reason -- likely reason it is not used.  It is

7    not to say that it is not looked upon as a potential

8    water that's protected, subject to the board.  The board

9    does protect this unit.  It treats it as if it were

10   drinking water, even though it is not, under a very

11   conservative policy that they have.

12            MS. O'REILLY:  Q.  So it is fair to say that

13   the State of California -- the State Water Resources

14   Control Board still designates a semi-perched aquifer as

15   a beneficial use aquifer, correct?

16            MR. ANDERSON:  Objection; vague; overbroad.

17            THE WITNESS:  I'm not sure that that -- I am

18   not sure that that is -- that they have designated it as

19   a beneficial use aquifer.

20            What I am saying is that they -- subject to

21   their criteria, this -- the salinity in this unit isn't

22   high enough for it to be excluded.  There is a 1989

23   document, Aquifer Classification Guide, issued by

24   U.S. EPA, which was a guidance to the states, which a

25   number of the states have adopted, that identifies the

DEPOBOOK REPORTING SERVICES, LLC (800) 830-8885

# EXHIBIT 10

Deposition of John Wilson, Ph.D.  /  May 18, 2012

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-oOo-

In re: Methyl Tertiary Butyl
Ether ("MTBE") Products
Liability Litigation

Master File No.
1:00-1898

This Document Relates To:

Case No.

City of Fresno
v. Chevron U.S.A. Inc., et al.,
Case No. 04 Civ. 4973

MDL 1358(SAS)

DEPOSITION OF JOHN WILSON, Ph.D
May 18, 2012 at 9:00 (9:08) a.m.
Before:   ERIC L. JOHNSON
          RPR, CSR #9771


Taken at:
Los Angeles, California

Page 38

1    relationship between the detections of MTBE reported by

2    Friedman & Bruya and the maximum contaminant levels for

3    MTBE.

4           Is it your opinion that because those

5    detections were orders of magnitude below the MCL that

6    MTBE wasn't present in those wells?

7           MR. ANDERSON:  Objection; vague.

8           THE WITNESS:  I never used words to that

9    effect.  I reported the numbers that had been reported

10   by the people doing the analysis and related it to the

11   MCL.

12          MS. O'REILLY:  Q.  Did you determine the MTBE

13   detected in City of Fresno wells came from some source

14   other than gasoline?

15      A.  Well, if MTBE is present in the wells, as those

16   samples seem to indicate, then it is much more likely

17   than not they came from gasoline.

18      Q.  In your report, you talk about a drop in the

19   water levels in the City of Fresno during the last 20

20   years.

21          Is it fair to say that drop is somewhere

22   between 20 to 40 feet across the City of Fresno?

23          MR. ANDERSON:  Objection; vague.

24          THE WITNESS:  I don't recall.  The maximum may

25   be somewhat more than 40 feet, but not much more.  And I

Page 198

1      Q.   Would you consider it fair to say that all

2   groundwater is vulnerable to contamination?

3           MR. PARKER:   Objection; vague, ambiguous,

4   incomplete hypothetical.

5           THE WITNESS:   There is groundwater which has

6   ages that are quite old, that is not involved with a

7   mixture of young and old, that are not vulnerable to

8   contamination.   I worked in the Nubian sandstone of

9   Egypt, that water is 26- to 30,000 to 100,000 years old,

10  depending on the measurement.   It is not vulnerable to

11  contamination.

12          MS. O'REILLY:   That's all the questions that I

13  have.

14          MR. ANDERSON:   Thank you.

15          THE VIDEOGRAPHER:   This concludes today's

16  proceeding in the deposition of John Wilson.   The number

17  of videotapes used is three.   We are now going off the

18  record.   The time is 3:36 p.m.

19              (Whereupon the deposition of JOHN WILSON,

                    Ph.D concluded at 3:36 p.m.)

20

                        -oOo-

21

22

23

24  / / / /

25  / / / /

EXHIBIT 11

Confidential - Per 2004 MDL 1358 Order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:
Methyl Tertiary Butyl:  MDL NO. 1358 (SAS)
Ether ("MTBE")       :  M21-88
Products Liability   :
Litigation           :
_____

This Document Relates to:
    Orange County Water District
    V. Unocal Corporation, et al.,
    S.D.N.Y. No. 04CIV.4968 (SAS)
_____/


CONFIDENTIAL - (PER 2004 MDL 1358 ORDER)


TUESDAY, AUGUST 24, 2010

------

        Videotaped Deposition of HOWARD JOHNSON, City of
Huntington Beach's 30(b)(6) designee, held in the Law
Offices of Latham & Watkins, 650 Town Center Drive,
Suite 2000, Costa Mesa, California, beginning at 9:01 a.m.
                    ------

Reported by:
Sandra Bunch VanderPol, CSR #3032
Certified Realtime Reporter
Registered Merit Reporter
Realtime Systems Administrator credentialed
Fellow, Academy of Professional Reporters

_____

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Confidential - Per 2004 MDL 1358 Order

Page 120

1    BY MR. ANDERSON:

2         Q.    Has Huntington Beach ever installed

3    any treatment facilities to treat for 1,4-dioxane in

4    the groundwater?

5         A.    No.

6         Q.    And so Huntington Beach is -- or was

7    still serving water to the public even though it had

8    these 1,4-dioxane detections in it that we saw in

9    Exhibit 20?

10        A.    Yes.

11        Q.    Has Huntington Beach sought any money

12   from OCWD as a result of the 1,4-dioxane detections

13   in its wells?

14        A.    No.

15        Q.    At what depth did the Huntington

16   Beach wells generally draw from?

17             MS. O'REILLY:  Vague.  Ambiguous.

18   Overbroad.

19             THE WITNESS:  They are different but

20   somewhat the same.  We usually perforate our wells

21   from the upper zone to the lower zone.  So we --

22   BY MR. ANDERSON:

23        Q.    How -- I'm sorry.  Go ahead.

24        A.    We do have some smaller wells that

25   only go to approximately two, 300 feet.  So those are

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Per 2004 MDL 1358 Order

Page 121

1    obviously the upper zone.  But the majority of our

2    wells are between five and seven, five and 800 feet.

3              Q.      Do any of your wells draw water from

4    the shallow aquifer?

5              A.      Yes.

6              Q.      Which wells are those?

7              A.      Well No. 1.

8              Q.      And at what level -- or what depth

9    does it draw from?

10             A.      180.  So it's probably perforated

11   from 100 to -- it's a very small well.  100 to 180.

12             Q.      And do you know how many consumers

13   Well No. 1 serves?

14             A.      Well, mathematically I could do that

15   for you.  It's about -- there's about 350 gallons a

16   minute, and we have 2.63 persons per household that

17   use an average of 106 gallons per person per day.

18             So I would say that it would just take care

19   of the tract in the immediate area.

20             Q.      Has Huntington Beach ever used

21   packers at -- are you familiar with the term

22   "packers"?

23             A.      Yes, I am.

24             Q.      Can you tell me what you understand

25   that to mean?

EXHIBIT 12

Confidential - Per 2004 MDL 1358 Order

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re:  Methyl Tertiary Butyl :
Ether ("MTBE")                :   Master File C.A. No. 1:00-1898
Products Liability            :   MDL NO. 1358 (SAS)
Litigation                    :
_____:
                              :
This document relates to the  :
following case:               :
                              :
Orange County Water District  :
v. Unocal Corp., et al,       :
04 Civ. 4968 (SAS)            :
_____:

CONFIDENTIAL - PER 2004 MDL 1358 ORDER

- - - - -

MAY 13, 2010

- - - -

Videotaped Deposition of GEORGE MURDOCH,
Corporate Representative for the City of Newport Beach,
held at 650 Town Center Drive, 20th Floor, Costa Mesa,
California, commencing at 10:13 a.m., on the above date,
before Kimberly S. Thrall, a Registered Professional
Reporter and Certified Shorthand Reporter.

Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Per 2004 MDL 1358 Order

Page 161

1   them.

2       Q.    Right.   And according to the presentation made

3   by OCWD, the injection wells from the Talbert Barrier

4   send water down and influence the Beta and the Lambda

5   Aquifer, correct?

6       A.    According to this presentation, yes.

7       Q.    Do you know the aquifers from which the TAMD

8   and TAMS wells produce from?

9       A.    No, I don't recall them as a name.   We call

10  them deep and shallow aquifers.   So, no, I am not -- I

11  have not referenced our aquifers that we draw our water

12  from by these names.

13      Q.    And if you look on page 4, there's a map.   It

14  says, "Modeling indicated that the inactive wells, when

15  operating, capture the majority of the injection water

16  in the Beta, Lambda Aquifers."

17            Do you see that?

18      A.    Yes.

19      Q.    Were you aware that OCWD had done some modeling

20  to determine the aquifers from which Newport Beach's

21  wells draw?

22      A.    No.   As a matter of fact, I don't know what the

23  word "modeling," whether it's computer or if it's

24  hydraulic modeling.   There's no reference in this

25  document that states what type of modeling that is.

# EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

---

This Document Relates To:

*Orange County Water District v. Unocal Corp., et al.,*
*No. 04 Civ. 4968*

---

## EXPERT REPORT OF KENNETH RUDO

Chapel Hill, North Carolina


_____          May 31, 2011
Signature                                _____
                                         Date

from May, 2010, on which I have only done a preliminary review, as well as additional formaldehyde data I am currently reviewing. My curriculum vitae is attached at the end of this report.

## II.   Key Opinions

A.   Based on the information in the scientific literature, MTBE is a genotoxic carcinogen and as such, has no safe level of exposure, especially in drinking water. Any exposure can result in an increased long-term risk of cancer for humans.

B.   MTBE is metabolized to formaldehyde, a known human carcinogen and a known human leukemogen, as well as a genotoxic carcinogen. MTBE causes lymphomas and leukemias in animal studies and formaldehyde causes leukemias in animal studies. The link between MTBE and formaldehyde described above indicates that because MTBE is metabolized to formaldehyde, which is a known human carcinogen, then MTBE from a toxicological standpoint may be considered a chemical that can cause cancer in humans in the absence of human epidemiological studies for MTBE. This information further supports the opinion that MTBE is a genotoxic carcinogen and as such has no safe level of exposure.

C.   MTBE poses an increased human health risk due to the potential for exposure in drinking water. Throughout the United States there are numerous public and private drinking water wells contaminated with MTBE, and from 1979 to the present, there were leaking underground storage tanks (USTs) that allowed MTBE and other gasoline compounds to get into groundwater aquifers and from there to contaminate public and private drinking water wells.

D.   At this point in time, every MTBE animal cancer study I have reviewed in its entirety or from a preliminary standpoint has found statistically significant levels of cancer from MTBE exposure. There are no negative studies.

E.   MTBE in drinking water poses an increased human health risk due to the avenues of exposure when a drinking water supply is contaminated. There is significant exposure from ingestion, bathing, showering, and whole house exposure due to the volatility of MTBE.

F.   For over 22 years as the North Carolina State Toxicologist I have evaluated thousands of private well water and public drinking water supplies contaminated by MTBE in North Carolina. Based on these investigations, I have observed that human exposure to MTBE contaminated drinking water can result in non-cancer adverse effects as well as cases where MTBE may have been linked to cancer in people exosed to MTBE contaminated drinking water.

## III.   Supporting Opinions

A.   The use of bright line drinking water standards for MTBE required by states and for chemicals in general by the federal government is necessary from a regulatory standpoint but still results in increased long-term health risks to humans based on the scientific literature. The only completely protective MTBE standard for public health based on the scientific literature is zero. Information will be presented in this report supporting this opinion.

B.   MTBE should not have been used in gasoline starting in 1979 and should not have had an increased use in oxygenated fuel programs in the late 1980s and the 1990s due to the knowledge possessed by the petroleum industry of the potential health risks associated with exposure to

3