**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | **Master File No. 1:00-1989**<br>**MDL 1358 (SAS)** |
| This Document Relates To: | The Honorable Shira A. Scheindlin |
| *Orange County Water District v. Unocal Corporation et al.,* Case No. 04 Civ. 4968 (SAS) | |

**PLAINTIFF ORANGE COUNTY WATER DISTRICT'S OPPOSITION TO
DEFENDANTS' OMNIBUS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................. iii

INTRODUCTION ..................................................... 1

I.   A Reasonable Jury Could Find That Defendants Created Or Assisted In The Creation Of A Public Nuisance ................................... 3

    A.   There Is No "Defective Product" Loophole In Public-Nuisance Law ....... 4

    B.   A Reasonable Jury Could Find That Defendants Did More Than Merely Place A Defective Product In The Stream Of Commerce ............... 5

II.  MTBE Contamination Is A Continuing Nuisance At Focus Plume Stations.. ....... 7

    A.   Defendants' Nuisances Are "Continuing" ......................... 9

    B.   Defendants Are Seeking An Advisory Opinion On Continuing Nuisance . 11

III. The Orange County Water District Act Does Not Simply Restate Nuisance Law . 11

IV.  The District May Recover Site Specific Remediation Costs Under The Orange County Water District Act. .......................................... 13

V.   A REASONABLE JURY COULD FIND THAT THE ISSUE 5 DEFENDANTS' MTBE WAS RELEASED AT ONE OR MORE STATIONS IN APPENDIX F ... 20

    A.   Lyondell ................................................. 21

    B.   Tesoro .................................................. 22

    C.   Valero .................................................. 23

    D.   Commingled Product ..................................... 23

        1. Impossibility ......................................... 23

        2. Disclosure of theory .................................. 27

        3. Make-Whole Defendants ............................... 27

VI.   Substantial Evidence Shows That MTBE From The Focus Plume Stations Has Impacted Or Will Impact Wells . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VII.   Evidence of Releases Subsequent To May 6, 2000, Precludes Summary Judgment Based On The Statute Of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VIII.   The District Did Not Fail To Disclose Information In Discovery . . . . . . . . . . . . . . 32

TABLE OF AUTHORITIES

<u>CASES</u>                                                                                        <u>PAGE</u>

*Aerojet-General Corp. v. Transport Indemnity Co.*
    17 Cal. 4th 38 (Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Atlantic Research Corp. v. United States*
    459 F.3d 827 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Baker v. Burbank-Glendale-Pasadena Airport Authority*
    39 Cal.3d 862  (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

*Cadillac Fairview v. Dow Chem. Co.*
    840 F.2d 691 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*California v. Kinder Morgan Energy Partners, L.P.*
    2013 WL 314825, *23 (S.D.Cal. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 8

*Capogeannis v. Sup. Ct.*
    12 Cal.App.4th 668 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*Castaic Lake Water Agency v. Whittaker Corp.*
    272 F.Supp.2d 1053 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*CEEED v. Cal. Coastal Zone Conserv. Commn.*
    43 Cal.App.3d 306 (Cal. App. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*City of Modesto Redevelopment Agency v. Sup. Ct.*
    119 Cal.App.4th 28 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6

*City of San Diego v. United States Gypsum Co.*
    30 Cal.App.4th 575 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Coal. of Concerned Communities, Inc. v. City of Los Angeles*
    34 Cal.4th 733 (Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Con. Edison of N.Y., Inc. v. Fyn Paint & Lacquer Co., Inc.*
    2008 WL 852067, p. *12 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . 19

*County of Santa Clara v. Atlantic Richfield Co.*
    137 Cal.App.4th 292 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*DTSC v. Neville Chemical Co.*
  358 F.3d 661 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ebewo v. Martinez*
  309 F.Supp.2d 600  (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*El Escorial Owners' Assoc. v. DLC Plastering, Inc.*
  154 Cal.App.4th 1337 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hoffman v. Constr. Protective Serv.*
  541 F.3d 1175 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ileto v. Glock*
  349 F.3d 1191 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In Re County of San Diego*
  Order No. WQ 96-2. Feb. 22, 1996, 1996 WL 101751 . . . . . . . . . . . . . . . . . . . . . 5

*In Re MTBE*
  379 F.Supp.2d 348 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*In Re MTBE*
  447 F.Supp.2d 289 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re MTBE*
  457 F. Supp. 2d 455 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4 - 7

In Re MTBE
  2007 WL 700819 * 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 19

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*
  591 F.Supp.2d 259  (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 20-22, 25, 26

*In Re MTBE*
  676 F. Supp.2d 139 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In Re MTBE*
  739 F. Supp.2d 576 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re MTBE*
  279 F.R.D. 131 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

-iv-

In Re MTBE
    824 F.Supp. 524 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 9, 10, 11, 14, 15

In Re MTBE
    725 F.3d 65 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In Re MTBE*
    2013 WL 4830965 at * 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re MTBE*
    2014 WL 494522 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Johnston v. Sonoma County Agric. Pres. & Open Space Dist.*
    100 Cal.App.4th 973(Cal. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kornoff v. Kingsburg Cotton Oil Co.*
    45 Cal.2d 265 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Leslie Salt Co. v. San Francisco Bay Conserv. Commn.*
    153 Cal.App.3d 605 (Cal. App. 1984)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Machado v. State Water Res. Control Bd.*
    90 Cal.App.4th 720 (Cal. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mangini v. Aerojet-General Corp.*
    230 Cal.App.3d 1125 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18, 19

*Mangini v. Aerojet-General Corp.*
    12 Cal.4th 1087 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*New York v. Shore Realty Corp.*
    759 F.2d 1032 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Newhall Land and Farming Co. v. Sup. Ct.*
    19 Cal.App.4th 334 (Cal. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*OCWD v. Arnold Engineering Co.*
    196 Cal.App.4th 1110 (Cal. App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Public Service Co. of Colo. v. Gates Rubber Co.*
    22 F. Supp.2d 1180, *** (D. Colo. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Purgess v. Sharrock*
  33 F.3d 134 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*San Diego Police Officers Assoc. v. City of San Diego Civil Serv. Comm.*
  104 Cal App.4th 275 (Cal. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Selma Pressure Treating Co. V. Osmose Wood Preserving Co.*
  221 Cal.App.3d 1601 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Shields v. Wondries*
  154 Cal.App. 2d 249 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Starrh and Starrh Cotton Growers v. Aera Energy LLC*
  153 Cal.App.4th 583 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Unigene Labs, Inc. v. Apotex, Inc.*
  2010 WL 2730471 (S.D.N.Y. July 7, 2010) . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Monsanto Co.*
  858 F.2d 160 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*U.S. ex rel. Schwartz v. TRW, Inc.*
  211 F.R.D. 388 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Walnut Creek Manor, LLC v. Mayhew Center, LLC*
  622 F. Supp. 2d 918 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Westfarm Assoc., LP v. Washington Suburban Sanitary Comm.*
  66 F.3d 669 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wilshire Westwood Assoc. v. Atlantic Richfield Co.*
  20 Cal.App.4th 732 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Zysman v Zanett, Inc.*
  2014 WL 1320805, at * 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## STATUTES

Cal. Civil Code § 3333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Cal. Civil Code § 3493 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Cal. Code Regs., tit. 23, § 2720 ................................................. 17

Cal. Health & Saf. Code § 25296.10(c)(1) ................................. 17

Cal. Health & Saf. Code § 25322(b) .......................................... 17

Cal. Health & Saf. Code § 25323 ............................................... 18

Cal. Health & Saf. Code § 33459(g) ........................................... 17

Cal. Water Code § 13304 ..................................................... 16, 17

Cal. Water Code  § 13304(a) ...................................................... 16

Cal. Water Code § 13304(b)-(c) ................................................. 16

Cal. Water Code Appen.  § 40-2(9) ............................................... 1

Cal. Water Code Appen. § 40-8 ................................ 12, 13, 16, 17

Cal. Water Code Appen.  § 40-8(a) ............................................. 15

Cal. Water Code Appen.  § 40-8(b) ........................................ 15, 16

Cal. Water Code Appen. § 40-8(c) ................... 11, 12, 15, 16, 17

Cal. Water Code Appen. § 40-75 ........................................ 12, 13, 15

42 U.S.C. § 9601(23) .............................................................. 17

42 U.S.C. § 9601(24) .............................................................. 18

42 U.S.C. § 9601(25) .............................................................. 18

<u>OTHER</u>

CACI § 430 ............................................................................... 5

CACI § 2020 ......................................................................... 5, 7

## INTRODUCTION

The Orange County Water District is statutorily authorized to "'prevent interference [with] . . . [or] diminution . . . [or] pollution or contamination of the water supply within its service area.'" *In Re MTBE*, 2007 WL 700819 * 5 (citing California Water Code Appendix 40-2(9)). The District filed this case to carry out the District's authority with respect to actual and threatened contamination of the District's water supply with methyl tertiary butyl ether (MTBE).

During the nearly three decades that MTBE was in gasoline in California, MTBE was released at hundreds of gas stations throughout the District. These releases have formed MTBE plumes that are moving towards (or have reached) public drinking water supply wells. At the Court's direction, the parties selected several MTBE plumes for a bellwether trial. These plumes originated at one or more gas stations defendants owned, operated, and/or supplied with MTBE gasoline. CMO 116; Exh. B; 56.1 ¶ 297.

Each focus plume station is located within the capture zone of one or more public drinking water supply wells. Herndon Decl., ¶ 3. Unless remediated, these MTBE plumes will be pulled into public drinking water supply wells. *Id.* The District's expert Dr. Wheatcraft has concluded that MTBE releases from the focus plume stations alone will cause more than 100 domestic production wells in the District to exceed 5 ppb MTBE after 10 years. Wheatcraft Decl., ¶ 7. The District has spent millions of dollars responding to MTBE contamination from the focus plume stations. Herndon Decl., ¶ 7.

Defendants do not deny they caused these MTBE plumes (as well as virtually all of the MTBE contamination in the District). They nevertheless seek summary judgment through multiple motions that, if granted, would absolve them of any liability for the MTBE plumes they

1

created.  If defendants succeed, residents of Orange County  will pay to clean up defendants'
MTBE plumes.

The District's expert, Dr. Wheatcraft, was the only expert in the case to prepare a model
showing when each plume will impact production wells, and at what levels.  To perform this
analysis, Dr. Wheatcraft reviewed monitoring well data from each focus plume station.
Wheatcraft Decl., ¶ 4.  Although defendants argue that because Dr. Wheatcraft modeled all
stations, rather than each station separately, he cannot tell when MTBE from individual stations
will arrive at a production well (Motion at 20) defendants do not challenge Dr. Wheatcraft's
opinions regarding when MTBE will impact public water supply wells, and at what levels.[1]

MTBE has been detected in groundwater at each focus plume station at extremely high
levels.  The average time between MTBE detection and the start of remediation at these stations
is 11 years.  56.1, ¶ 291 .  This means that MTBE traveled off site for an average of 11 years (and
in most cases much longer) before on-site remediation even started.  *Id.*

Responsible parties and regulatory agencies have made few efforts to remediate off-site
MTBE from focus plume stations.  As this Court noted in In Re MTBE, 824 F.Supp. 524, 531
(S.D.N.Y. 2011): "Both the Regional Board and OCHCA have been active in remediation of
MTBE at spill sites . . . but neither agency has undertaken MTBE remediation efforts beyond
those spill sites."  As the Court also noted in a separate opinion:  "OCWD is first and foremost a
state environmental agency that may well have the best knowledge of what efforts are most likely
to remediate MTBE plumes in the service area."  2007 WL 700819 * 4.

Several overarching principles are relevant to defendants' motion.  First, cases involving

---

[1]  This is defendants' only mention of Dr. Wheatcraft.

MTBE contamination of public water supply systems implicate "an unusually compelling public interest." In Re MTBE, 725 F.3d 65, 112 (2d Cir. 2013). Second, the unavoidable delay between detecting MTBE and initiating remediation allows defendants to argue that plaintiffs are both too early (because remediation is not complete) and too late (because they knew of contamination). *See, e.g.* In Re MTBE, supra, 725 F.3d at 110-112 (discussing simultaneous ripeness/lack of injury and statute of limitations defenses).[2] Third, although MTBE can be remediated in nearly all cases, finding the best options for a particular site occurs only through the remedial process itself.

## I.  A Reasonable Jury Could Find That Defendants Created Or Assisted In The Creation Of A Public Nuisance.

Certain defendants argue they cannot be liable for nuisance at sites listed in their Appendix B because California law does not permit nuisance claims based on the manufacture of an allegedly defective product. Motion at 2. Alternatively, these defendants argue that the District does not have evidence they assisted in the creation of nuisances at the listed sites. *Id.*[3] Defendants, however, are not shielded from nuisance liability by their status as manufacturers. And there is extensive evidence from which a jury could find that defendants' "affirmative conduct" was "more than a remote or trivial factor" in causing MTBE contamination at Appendix B sites. Nuisance claims are fact intensive and not subject to "any fixed general rule." *Shields v. Wondries*, 154 Cal.App. 2d 249, 255 (1957).

---

[2] Delays are not always caused entirely by responsible party foot dragging. They are also caused by the difficulty of determining underground conditions, finding precise MTBE locations, evaluating remedial options and obtaining regulatory approval.

[3] The Issue 1 defendants do not argue that the MTBE contamination of groundwater at these sites is not a nuisance. They argue only that they cannot be held responsible.

3

## A.   There Is No "Defective Product" Loophole In Public-Nuisance Law.

Defendants argue: "California Law Does Not Permit Nuisance Claims Based On The Manufacture Or Supply Of An Allegedly Defective Product." Motion at 2. This Court, however, has already held:  "California courts have allowed nuisance claims to proceed where the manufacturer's or distributor's actions have 'created or assisted in the creation of the nuisance.'" *In re MTBE*, 457 F. Supp. 2d 455, 463 (S.D.N.Y. 2006) (citing *City of Modesto Redevelopment Agency v. Sup. Ct.*, 119 Cal.App.4th 28 (2004)).

The cases cited by defendants - including *City of Modesto* - do not hold that California law bars nuisance claims based on the manufacture or supply of a defective product.[4] To the contrary, the cases recognize that manufacturers and distributors are subject to the same nuisance-liability standard as everyone else. The cases maintain the distinction between nuisance law's "acting or failing to act" causation standard and products-liability law's strict-liability standard, but California courts have taken nuisance claims away from a jury only where the plaintiff sought to recover strict-liability damages under a strict-liability causation theory.  See City of San Diego v. United States Gypsum Co., 30 Cal.App.4th 575, 584-585 (1994) (plaintiff could not recover product-nuisance damages where its only causation argument was that "'[t]he stream of commerce can carry pollutants every bit as effectively as a stream of water'");[5] *see*

---

[4]   Primary California cases involving nuisance and product liability are: *Selma Pressure Treating Co. V. Osmose Wood Preserving Co.*, 221 Cal.App.3d 1601 (1990); City of San Diego v. United States Gypsum Co., 30 Cal.App.4th 575 (1994); Ileto v. Glock, 349 F.3d 1191 (9th Cir. 2003); *City of Modesto Redevelopment Agency v. Sup. Ct.*, 119 Cal.App.4th 28 (2004); and *County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal.App.4th 292 (2006).

[5]   In *Santa Clara*, the Court explained that a nuisance action that "seek[s] *abatement* of a hazard" cannot be "'essentially' a products liability action" because the two actions seek fundamentally different types of relief.  137 Cal.App.4th at 309-310.

4

*also El Escorial Owners' Assoc. v. DLC Plastering, Inc.*, 154 Cal.App.4th 1337, 1349 (2007) ("nuisance cause of action . . . was merely a clone of [products-liability]").   The District's public-nuisance claim does <u>not</u> seek to impose strict product liability.

### B.   <u>A Reasonable Jury Could Find That Defendants Did More Than Merely Place A Defective Product In The Stream Of Commerce.</u>

Under California's public-nuisance law, each defendant is liable if its "act[] or fail[ure] to act . . . was a substantial factor in causing [the District's] harm." CACI § 2020 ("Public Nuisance – Essential Factual Elements").   "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.   It must be more than a remote or trivial factor.   It does not have to be the only cause of the harm." CACI § 430 ("Causation: Substantial Factor").   "'[E]ven a minor contribution to a discharge may support a finding of responsibility.'" *City of Modesto, supra*, 119 Cal.App.4th at 41 (citing *In Re County of San Diego*, Order No. WQ 96-2. Feb. 22, 1996, 1996 WL 101751 at p. 5 (Cal.St.Wat.Res.Bd)).

In *Selma, supra*, the court held that a chemical manufacturer could be liable in nuisance for selling a product <u>directly</u> to the end user without warning of known groundwater hazards the chemicals posed.[6]   In *City of Modesto* the court held that chemical manufacturers could be  liable in nuisance for providing improper disposal instructions, even when they sold their chemicals through third-party distributors.   And of course this Court, in *In Re MTBE, supra*, held that defendants could be liable for nuisance if they represented that MTBE gasoline could be handled in the same manner as regular gasoline, or promoted and marketed MTBE gasoline knowing of

---

[6] The *San Diego* Court endorsed *Selma* without qualification, stating that *Selma* did <u>not</u> concern "a products liability action in the guise of a nuisance action." To date *Selma* remains the <u>only</u> case that has addressed this issue directly and the holding binds California's trial courts.

the hazard it would create.  457 F.Supp.2d at 464.

Here, the evidence establishes that Issue 1 defendants "assisted in the creation of a nuisance" at one or more Appendix B stations in a variety of ways.  At some stations the moving defendant had an interest in the station that was not disclosed in defendants' 56.1 statement.  *See* 56.1 ¶¶ 6-8 (Chevron USA)); 9-10 (Union Oil)  An ownership interest in, and/or control of, a focus station or equipment creates a genuine issue of material fact and can support summary judgment against defendants.  *See In re MTBE, supra*, 824 F.Supp.2d at 543.

At other stations, moving defendants not only sold but delivered MTBE gasoline for extended periods. 56.1 ¶¶ 6-8 (Chevron USA); 9-10 (Union Oil); 18, 24, 32 (Shell defendants); 55 (BP).  Gasoline deliveries are a frequent source of spills.  *Id.*  Defendants are liable if they participate in activities known to cause MTBE contamination.  *City of Modesto, supra,* 119 Cal.App.4th at 38-43;  *In re MTBE*, 457 F.Supp.2d at 463-464 (S.D.N.Y. 2006). Pltfs.' 56.1 ¶ 11. Defendants also had contracts at the Appendix B stations that gave them control over operations at the stations.  *E.g.* 56.1 ¶¶ 6 - 10; 18, 24, 32.

Defendants also provided their customers with MTBE handling instructions they knew were inadequate, affirmatively promoted their MTBE products with full knowledge that MTBE was hazardous and likely to be released and cause contamination, and chose to hide what they knew about MTBE's risks from the public and those who handled their MTBE.  56.1 ¶¶ 299-301.  Defendants do not deny or provide evidence to refute these allegations.  As this Court held in *In re MTBE*, 457 F.Supp.2d 455, 464 (S.D.N.Y. 2006):

> OCWD argues that defendants did more than merely manufacture or distribute gasoline containing MTBE without warning of the danger posed.  OCWD contends that defendants "represented, asserted, claimed and warranted" that

> gasoline containing MTBE "could be used in the same manner as gasoline
> [without MTBE]" and that it "did not require any different or special handling
> instructions." . . . Further, OCWD states that defendants "marketed and promoted
> MTBE knowing that underground storage tanks ... could not safely contain
> MTBE." . . . At the same time . . . defendants knew that such claims were false
> that that MTBE posed "unique dangers" to groundwater. . . . If the allegations
> made by OCWD are true, such allegations would be sufficient to sustain a
> nuisance claim against the defendants.

Defendants' motion provides no evidence to refute these allegations, other than to argue

(contrary to the Court's opinion) that they cannot support a nuisance claim.

The allegations are supported by extensive evidence. Lyondell, for example, instructed its

customers: "Gasoline containing MTBE is handled in the same manner as hydrocarbon only

gasoline." 56.1 ¶ 300. Shell's Curtis Stanley informed management in 1998: "My professional

opinion is that MTBE and similar oxygenates should not be used at all in areas where

groundwater is a potential drinking water supply." 56.1 ¶ 299. ExxonMobil, Chevron, Union

Oil, the Shell Defendants, and the BP Defendants contractually agreed to promote the use of their

MTBE gasoline. 56.1 ¶ 301.[7]

The District's public-nuisance evidence is plainly sufficient to create triable issues of fact.

While each defendant played a different role in "creating, or assisting in creating" a nuisance at

the Issue B stations, all defendants committed some act or omission that went beyond passively

dropping a product into the stream of commerce, and were "more than a remote or trivial factor"

in causing the District's harm. CACI section 2020.

## II.   MTBE Contamination Is A Continuing Nuisance At Focus Plume Stations.

Defendants argue that to prove a continuing nuisance, the District must establish MTBE

---

[7] Defendants present no evidence to rebut these allegations. Summary judgment should
be denied for this reason alone.

contamination is "reasonably abatable." Motion at 4-5. Defendants then assert that the District

has "no evidence of reasonable abatability" at Appendix C stations. *Id*. Defendants, however,

"do not contend that MTBE impacts cannot reasonably be abated." *Id*. fn. 4.[8] In addition to

being inconsistent, defendants' arguments rest on two false premises.

First, defendants incorrectly assume that proof of "reasonabl[e] abatab[ility]" is the only

way to establish a nuisance is "continuing." As explained in the *California v. Kinder Morgan

Energy Partners, L.P.*, 2013 WL 314825 case relied upon by defendants, there are "three main

tests" to determine whether a nuisance is continuing. 2013 WL 314825 at *23 (emphasis added).

These are: (1) "Whether the offens[ive] activity is currently continuing, which indicates that the

nuisance is continuing; (2) "[W]hether the impact of the condition will vary over time,"

indicating a continuing nuisance, or (3) whether the nuisance is "reasonably abatable." *Id*, 2013

WL 314825, *23. *See also Starrh and Starrh Cotton Growers v. Aera Energy LLC*, 153

Cal.App.4th 583, 592 (2007) ("continuing nuisance" tests are alternative tests).[9] Evidence that

---

[8] This is a judicial admission. *Purgess v. Sharrock*, 33 F.3d 134, 144 (2nd Cir. 1994) ("A Court can appropriately treat statements in briefs as binding judicial admissions.").

[9] California has a "clearly stated preference for continuing nuisance," and generally permits plaintiffs to chose "whether to treat a particular nuisance as permanent or continuing." *Wilshire Westwood Assoc. v. Atlantic Richfield Co.* (1994) 20 Cal.App.4th 732, 744 (1994); *Kornoff v. Kingsburg Cotton Oil Co.*, 45 Cal.2d 265, 271 (1955) ("In doubtful cases the plaintiff should have an election to treat the nuisance as either permanent or not."). This preference is particularly strong in groundwater-contamination cases. *Mangini v. Aerojet-General Corp.*, 230 Cal.App.3d 1125, 1148 (1991); *Capogeannis v. Sup. Ct.* (1993) 12 Cal.App.4th 668, 682 (1993). As the *Capogeannis* Court observed, "there is simply no legitimate interest to be served by permitting [groundwater] contamination to persist. . . . the well-documented tendency of such contamination to migrate . . . strongly supports a conclusion that the contamination should be cleaned up as promptly and as thoroughly as possible." *Capogeannis*, 12 Cal.App.4th at 682. Polluters have "little or no incentive to make remedial efforts," "once the nuisance is classified as permanent." *Mangini, supra*, 230 Cal.App.3d at 1148; *Baker v. Burbank-Glendale-Pasadena Airport Authority*, 39 Cal.3d 862, 872 (1985).

meets any one of these tests is sufficient to establish that a nuisance is "continuing." *Id.*[10] The District's evidence easily satisfies each of these tests.[11]

Second, defendants assume the District must establish that a nuisance is "continuing" as part of the District's case. Defendants cite no authority for this proposition and it is incorrect. In California the continuing-nuisance doctrine is used for the limited purposes of resolving statute-of-limitations disputes and determining the appropriate measure of damages. It is <u>not</u> an element of a nuisance claim. Defendants do not challenge the District's nuisance claim on statute-of-limitations or damages grounds, and are merely seeking an (improper) advisory opinion.

## A.   Defendants' Nuisances Are "Continuing"

The District's evidence clearly establishes that "[p]lumes of MTBE and TBA contaminated groundwater have, and continue to, migrate beyond [each station's] boundaries." 56.1, ¶ 248, 289-290 . These plumes are threatening public water supply wells. 56.1 ¶ 248, 291; Wheatcraft Decl. ¶ 7. After ten (10) years they will cause more than 100 wells to exceed California's secondary contaminant level for MTBE of 5 ppb. *Id.* Defendants offer <u>no</u> evidence that the MTBE plumes are stationary or not migrating.

---

[10] "'Whether contamination . . . is a permanent or continuing injury is ordinarily a question of fact turning on the nature and extent of the contamination.'" *In Re MTBE*, 824 F.Supp.2d at 544 (citations omitted).

[11] Prior to the close of fact and expert discovery the District sought summary judgment that defendants' nuisances were continuing based on the "reasonably abatable" test and defendants' admissions. *In re MTBE*, 824 F.Supp.2d 524, 544-45. The Court declined to grant summary judgment. 824 F.Supp.2d at 545. Although the District's evidence was not sufficient to grant summary judgment to the District, it was (and is) sufficient to deny <u>defendants</u> summary judgment on abatability. In addition the District has now developed evidence and expert reports addressing facts relevant to the alternative "continuing nuisance" tests of the ongoing migration of contaminants and reasonableness of abatement. 56.1 ¶¶ 110-115.

9

The evidence also establishes that the contamination is "reasonably abatable." The "reasonably abatable" test asks a jury to "compar[e] the benefits and detriments to be gained by abatement." *Kinder Morgan, supra,* 2013 WL 314825, *23. In making this determination "the fact that an abatement 'may take considerable time and may never be wholly successful' does not dictate a finding that it is not abatable." *In Re MTBE*, 824 F.Supp.2d at 544 (citations omitted). The relevant "comparison" is not between the cost of abating defendants' MTBE and <u>not</u> abating that contamination. After10 years, the focus plumes alone will cause MTBE levels to exceed 5 ppb in more than 100 production wells. 56.1 ¶ 248, 292; Wheatcraft Decl. ¶ 7. That MTBE must be removed before the water is served to the public. The relevant "comparison" is between "the benefits and detriments" of abating defendants' MTBE <u>before</u> it spreads and abating that MTBE <u>after</u> it spreads. The District's expert Anthony Brown and defense expert Richard Sloan both agree that remediating MTBE contamination sooner is more cost-effective than doing it later.

Brown's report opines "[w]hile the cost to remediate the MTBE and TBA emanating from each facility will be significant, the cost to address the contamination once it reaches drinking water wells, including operational costs, would be far greater." 56.1, ¶ 78. Mr. Sloan makes the same point, but in even stronger terms. According to Sloan, failures to "respond[] to known gasoline leaks/spills in a timely and appropriate manner" is the primary reason that MTBE "threat[ens] potable water wells in [the District's] service area." *Id.* Mr. Sloan also opined that "timely application of a site-specific remediation sequence" determines the "cost and difficulty of remediation." *Id.*

Defendants do not contradict Mr. Brown' and Mr. Sloan's testimony. In fact, defendants

expressly concede they "do not contend that MTBE impacts cannot be reasonably abated." Motion at 5 fn. 4.  A reasonable jury could find that defendants' MTBE contamination "can be abated" in a manner and at a cost that "is feasible by comparison of the benefits and detriments to be gained by abatement." *Kinder Morgan, supra*, 2013 WL 314825, *23.

    **B.**    **Defendants Essentially Seek An Advisory Opinion On Continuing Nuisance**

The "reasonably abatable" test is not an element of the District's nuisance claim.  Rather, that test and the other continuing nuisance tests apply *only* when: (i) a defendant challenges a continuing-nuisance claim on statute of limitations grounds, and (ii) the plaintiff seeks only damages. *Mangini v. Aerojet-General Corp.*, 12 Cal.4th 1087 (1996) at 1090 and 1104; *Walnut Creek*, 622 F. Supp. 2d 918 (2009) at 933 (the "reasonably abatable" test "does not apply outside of the statute of limitations context").  *See also In re MTBE*, 824 F. Supp. 2d 524, 544 (2011); *Capogeannis v. Sup. Ct.*, 12 Cal.App.4th 668, 676, 677 (1993).  The "holding of *Mangini* does not apply outside of the statute of limitations context," or to nuisance cases where the plaintiffs seek more than damages. *Walnut Creek, supra*, 622 F. Supp. 2d at 933;  *Mangini, supra,* 12 Cal.4th 1087, 1090 and 1104.

Here, defendants raise not statue of limitations or damage limitation defense.  Rather, defendants appear to be seeking an abstract advisory opinion on continuing nuisance.

**III.**    **The Orange County Water District Act Does Not Simply Restate Nuisance Law**

Defendants argue that causation under section 40-8(c) of the OCWD Act "must be construed in light of common law nuisance principles" and that "a defendant's actions must amount to more than simply manufacturing or distributing an allegedly defective product – a defendant must take other affirmative acts that contribute directly to the nuisance."  Motion at 6-

7.  Defendants claim the District has "failed to provide" evidence of such acts. *Id.* at 8.

Nuisance is a useful reference point for interpreting 40-8(c), but as explained in Issue 2, *supra,* nuisance causation is very different than the standard articulated by defendants.  Nuisance is also not the only – or best – reference or 40-8(c).  As defendants point out, other "[c]ontemporary environmental legislation" is useful in interpreting 40-8(c) to effectuate its protective purposes. Motion at 7 ("Contemporary environmental legislation represents an exercise by government of [the] traditional power to regulate activities in the nature of nuisances") (quoting *CEEED v. Cal. Coastal Zone Conserv. Commn.,* 43 Cal.App.3d 306, 318.

The Act itself is the best source of authority for interpreting the Act.  *See Cal. Water Code Appen.* § 40-75 (requiring that the Act be liberally construed to effectuate its purposes). This provision is the best indicator of legislative intent. *See Coal. of Concerned Communities, Inc. v. City of Los Angeles,* 34 Cal.4th 733, 737 (Cal. 2004) ("Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose."); *cf. Atlantic Research Corp. v. United States,* 459 F.3d 827, 837 (8th Cir. 2006) (refusing to bar cost recovery because it would be "contrary to CERCLA's purpose" of encouraging voluntary cleanups).

Defendants argue that "where 'such legislation does not expressly purport to depart from or alter the common law, it will be construed in light of common law principles." *Memo.,* p. 7 (quoting *Leslie Salt Co. v. San Francisco Bay Conserv. Commn.,* 153 Cal.App.3d 605, 618-619 (Cal. App. 1984)).  Section 40-75 of the Act does, in fact, "expressly purport to depart from or alter the common law" by requiring section 40-8 of the Act to be liberally construed.

Courts have uniformly interpreted CERCLA's language broadly to effectuate CERCLA's

12

remedial purposes. *See, e.g., Atlantic Research, supra* (rejecting challenge to cost recovery as "contrary to CERCLA's purpose"); *United States v. Monsanto Co.*, 858 F.2d 160, 170 (4th Cir. 1988). Consequently, CERCLA requires a plaintiff to prove only that a defendant possessed a chemical that <u>could have</u> reached plaintiff's property and caused it to incur cleanup costs. *See Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.Supp.2d 1053, 1065 (C.D. Cal. 2003) ("The plaintiff must prove only that contaminants which were once in the custody of the defendant could have traveled onto the plaintiff's land, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs.") (quoting *Westfarm Assoc., LP v. Washington Suburban Sanitary Comm.*, 66 F.3d 669, 681 (4th Cir. 1995). Defendants must disprove causation once those facts are established. *Id.*

Section 40-75 of the Act mandates the same approach to interpreting 40-8. Defendants' argument that nuisance law provides the <u>only</u> guidance for interpreting the Act ignores § 40-75 and cases interpreting similar statutes. As noted in Part I, *supra*, the evidence at a minimum creates disputed issues of fact as to whether defendants' were a substantial factor in creating, or assisting in the creation of, the MTBE focus plumes.

## IV.    The District May Recover Site Specific Remediation Costs Under The Orange County Water District Act.

Defendants note the Court "granted judgment in Defendants' favor on the OCWD Act at 14 sites, concluding that OCWD could not recover under the Act costs associated with testing production wells and commissioning consultant reports at 14 sites because such costs are not

related to remediation." Motion at 8 (citing *In re MTBE*, 279 F.R.D. 131, 138).[12]  Defendants

argue "the facts are the same at the remaining focus stations," that the District has failed to

"identify an item of cost that is anything other than investigatory," that "[a]ny attempt by OCWD

to oppose this Motion by arguing that costs incurred after the . . . close of fact discovery are

recoverable items under the OCWD Act would be improper," and that "OCWD simply has not

conducted remediation at the 34 focus stations." *Id.* at pp. 8-10.

  The District's costs to respond to MTBE contamination at each focus plume station do

not involve "testing production wells and commissioning consultant reports."  Rather, they are

site specific response costs routinely recovered under other hazardous waste statutes once

contamination has been detected, such as drilling to determine the extent of off-site MTBE,

assessing site specific conditions and existing remedial activities to determine the threat posed by

MTBE at each station and developing steps to address off-site MTBE coming from the focus

plume stations.  Herndon Decl. ¶¶ 7-10; 56.1 ¶¶ 110 - 115.  The District has incurred millions of

dollars of such costs.  Herndon Decl., ¶ 7.

  This Court's prior opinion addressed <u>only</u> testing of production wells and commissioning

<u>initial</u> consultant reports summarizing the work of other consultants, and not site specific MTBE

costs.  *See In Re MTBE, supra*, 279 F.R.D. at 138 ("This find, however, will not prejudice

OCWD's ability to seek future relief for other remedial costs.").  The District's MTBE costs at

specific stations do not include routine testing of production wells or initial reports, but rather the

costs of responding to known MTBE contamination at each station.

---

  [12]  Defendants fail to mention that the Court also granted partial summary judgment <u>for</u>
the District, finding that defendants were a "substantial factor" in causing a nuisance at fourteen
(14) stations.  *In Re MTBE*, 824 F.Supp.2d 524, 541 - 543.

Defendants' argument is premised entirely on the notion that the District has not conducted "remedial work" because the District has not physically removed MTBE from groundwater. This is simply wrong. Defendants provide no authority for the proposition. Such a conclusion is contrary to the plain language, purpose, and legislative history of the OCWD Act, as well as to every other relevant authority on what constitutes "remediation" – including defendants' own preferred remediation, monitored natural attenuation. 56.1 ¶ 302 .

Section 40-8(a) of the Act plainly authorizes the District to conduct "any investigation . . . . the district determines to be necessary and appropriate to determine *whether* [its] waters are contaminated or polluted." (Emphasis added.) Section 40-8(a) authorizes initial investigation to determine whether contamination is present or threatened in the first place – i.e., the routine costs of testing production wells and summarizing the work of consultants at the stations.

Section 40-8(b) addresses OCWD's authority if actual or threatened contamination is found through an investigation authorized by 40-8(a). In such an event, 40-8(b) provides:

> The district may expend available funds to perform any cleanup, abatement, or remedial work required under the circumstances which, in the determination of the board of directors, is required by the magnitude of the endeavor or the urgency of prompt action needed to prevent, abate, or contain any *threatened or existing* contamination of, or pollution to, the surface or groundwaters of the district.[13]

Section 40-8(c) of the Act, in turn, authorizes the District to recover all costs incurred under section 40-8(b) on cleanup, containment, abatement, "or in the case of threatened contamination or pollution, <u>other necessary remedial action</u>." (Emphasis added).

The term "other necessary remedial action," like the rest of section 40-8(c), is to be

---

[13] The District made that determination on March 23, 2005. E.g., *In re MTBE*, 824 F.Supp.2d 524, 545, fn. 123.

liberally construed and given independent meaning. *Cal. Water Code Appen.* § 40-75; *see San Diego Police Officers Assoc. v. City of San Diego Civil Serv. Comm.*, 104 Cal App.4th 275, 284 (Cal. App. 2002) (courts shall strive to "give independent meaning and significance to each word, phrase, and sentence in a statute and to avoid an interpretation that makes any part of a statute meaningless"). The phrase is juxtaposed in 40-8(c) against "cleanup, containment or abatement," and thus plainly references costs that are *not* costs involving "cleanup, containment or abatement" or other physical removal of contamination[14]

Most aspects of remediation do not include "cleanup, containment or abatement" or other physical removal of contamination. The Legislature had no reason to – and did not – list each aspect of "remediation" (e.g.,, evaluation, assessment, monitoring) in section 40-8(c). The Legislature, for example, did not specify "prepare remedial options" or "design a treatment facility," for example, but these are obviously remedial actions.

The remedial and cost recovery provisions of 40-8(b)-(c) are identical in all material respects to California Water Code § 13304(b)-(c). The Legislature amended § 13304 in 1971 (18 years before it enacted section 40-8) to expressly authorize the Water Board to take "other necessary remedial action" and recover the costs thereof. Cal. Stats. 1971, ch. 1288, § 11. The Water Board, in asking for the amendment, made clear to the Legislature and Governor that "other necessary remedial action" is *not* physical removal of contamination because no one can "clean up" or "abate" threatened contamination:

Section 13304(a) is broadened to include threatened pollution or nuisance. It is

---

[14] Every provision of the Act "shall be liberally construed to promote the objects thereof, and to carry out its intents and purposes." (Water Code Appen., § 40-75). Defendants offer no alternative interpretation of 40-8(c).

not possible to "clean up such waste or abate the effects thereof", when the pollution is just threatened.  The amendments to subsections (a) and (c) therefore provide for "other necessary remedial action" when the pollution or nuisance is not yet actual, but is threatened.

Governor's Chaptered Bill File, *Enrolled Bill Report (AB 1315)*, State Water Resources Control Bd., ¶ 11.a.; *cf. Machado v. State Water Res. Control Bd.*, 90 Cal.App.4th 720, 727 (Cal. App. 2001) (under § 13304, "[t]he state need not wait until injury actually occurs; it may act to prevent or minimize the harm").

Section 3304 remains the law today in California. The substantively identical section 40-8(c) of the OCWD Act grants the District the same authority, and that authority effectuates the purpose of the Act.  *See Johnston v. Sonoma County Agric. Pres. & Open Space Dist.*, 100 Cal.App.4th 973, 986 (Cal. App. 2002) ("statutes which are in *pari materia* should be read together and harmonized if possible").

Section 40-8 should be interpreted, where possible, to be consistent with other like statutes.  In those statutes, "remedial action" or "remediation" uniformly includes all actions necessary to respond to actual or threatened contamination, including investigation, monitoring, evaluation, assessment, analysis, and remedial development.  *See, e.g., Cal. Health & Saf. Code* § 25322(b) (California Hazardous Substances Account Act ["HSAA"]: "remedial action" includes "actions that are necessary to *monitor, assess, and evaluate* a release or a threatened release") (emphasis added); *id.* at § 33459(g) (Cal. Polanco Redevelopment Act: "remedy" and "remove" include "any action to *assess, evaluate, investigate, monitor,* remove, clean up, or abate a release of a hazardous substance *or to develop plans for those actions*") (emphasis added); *id.* at § 25296.10(c)(1) (Cal. UST Law: "corrective action" includes "preliminary site assessment and

17

investigation"); Cal. Code Regs., tit. 23, § 2720 (Cal. UST Regulations: "corrective action" includes "any activity necessary to *investigate and analyze* the effects of an unauthorized release") (emphasis added); 42 U.S.C. § 9601(23) (CERCLA: "'removal' means . . . in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to *monitor, assess, and evaluate* the release or threat of release") (emphasis added); *Cal. Health & Saf. Code* § 25323 (HSAA adopts CERCLA "removal" definition); 42 U.S.C. § 9601(24) (CERCLA: "'remedy' or 'remedial action' . . . . includes, but is not limited to, . . . *monitoring* . . . .") (emphasis added); *id.* at § 9601(25) (CERCLA: "'respond' or 'response' means remove, removal, remedy, and remedial action"); *Cadillac Fairview v. Dow Chem. Co.,* 840 F.2d 691, 695 (9th Cir. 1988) (rejecting attempted "distinction between *investigatory costs* and on-site cleanup costs" under CERCLA) (emphasis added); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 (2d Cir. 1985) ("*assessing* the conditions of the site . . . squarely fall[s] within CERCLA's definition of response costs") (emphasis added); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir. 1989) ("security measures and *site investigation* are acceptable response costs within the meaning of CERCLA") (emphasis added); *DTSC v. Neville Chemical Co.,* 358 F.3d 661, 668, fn.4 (9th Cir. 2004) ( "[a]s soon as [plaintiff] expended its first dollar, it could have sued [defendant] for this dollar"); *Public Service Co. of Colo. v. Gates Rubber Co.,* 22 F. Supp.2d 1180, 1188 (D. Colo. 1997) (recoverable response costs include planning, assessment and even "security fencing," without regard to actual contaminant removal activities).

Likewise, common law and statutory provisions on the measure of damages authorize the recovery of all costs spent in responding to contamination, not just costs spent physically removing contamination. *See, e.g., Newhall Land and Farming Co. v. Sup. Ct.,* 19 Cal.App.4th

334, 341 (Cal. App. 1993) (nuisance damages include money spent *investigating* groundwater

contamination) (emphasis added); *Aerojet-Gen. Corp v. Transport Indem. Co.,* 17 Cal.4th 38, 65

("*site investigation* expenses by a third party – such as those included within 'response costs' by

the United States under CERCLA – may be indemnification costs") (emphasis added); *Mangini,*

*supra,* 230 Cal.App.3d at 1138 ("*testing costs* are sufficient to constitute 'special injury' to

plaintiffs under [Civil Code] section 3493 [remedies for public nuisance]") (emphasis added);

*Con. Edison of N.Y., Inc. v. Fyn Paint & Lacquer Co., Inc.,* 2008 WL 852067, p. *12 (E.D.N.Y.

2008) ("investigation work was part and parcel of the entire remediation process") (emphasis

added); *OCWD v. Arnold Engineering Co.,* 196 Cal.App.4th 1110, 1126 (Cal. App. 2011) (the

"Water Code and the Health and Safety Code authorize the Water District to bring an action in its

own name to recover *investigation* and remediation costs it incurred") (emph. added); *Cal. Civil*

*Code* § 3333 ("the measure of damages . . . is the amount which will compensate for all the

detriment proximately caused thereby").

    Defense experts agree the term "remediation" is not limited to physical removal of

contamination.  In fact, defense experts have testified that their preferred remedy is monitored

natural attenuation (MNA), in which monitoring is the sole remedial action.  As defendants'

expert John Wilson states in his report: "Coupled with monitoring to ensure effectiveness,

[MNA] is an important component of hydrocarbon release-zone control . . . ." 56.1 ¶ 302. This

Court has itself previously recognized that MNA is one form of remediation.  *In re MTBE,* 2007

WL 700819, *5, fn. 30 ("Remediation at any point might include drilling of monitoring wells to

observe the underground movement of contaminants.").

    The District's remedial costs were fully disclosed in discovery, including at the

19

deposition of the District's 30(b)(6) damages witness Roy Herndon. Defendants, who noticed the deposition before the discovery cut-off but did not take the deposition until later, questioned Mr. Herndon thoroughly about all District costs, using the District's own discovery responses. 56.1 ¶ 110-115. Those responses meticulously itemized the District's remedial costs, including the costs of drilling at focus sites. 56.1 ¶¶ 110 - 115.[15] Defendants did not move to bar the deposition they themselves noticed.

## V.   A REASONABLE JURY COULD FIND THAT THE ISSUE 5 DEFENDANTS' MTBE WAS RELEASED AT ONE OR MORE STATIONS IN APPENDIX F.

Defendants argue the District cannot recover against Lyondell, the Valero defendants and Tesoro because the District "cannot establish that gasoline or MTBE of any Issue No. 5 Defendant[] identified in Appendix F was delivered to the stations at issue." Motion at 12. Defendants also argue that the District has no evidence that Shell gasoline was delivered to G&M #24 or the Huntington Beach Arco, or that Chevron USA gasoline was delivered to Chevron #208554 or Exxon 4283. *Id.*[16] Defendants then argue the District cannot rely on the commingled

---

[15] The fact that the reports do double-duty for purposes of this litigation and the remediation does not diminish their value as remedial work. See *Aerojet-General Corp. v. Transport Indemnity Co.*, 17 Cal. 4th 38, 65-66 (Cal. 1997) ("[T]he insured's site investigation expenses for identifying the hazardous substance discharged may be 'response costs' [and] . . . defense costs . . . . Any assumption that site investigation expenses cannot do double duty is unsupported and hence must be rejected.").

[16] Defendants, citing *In Re MTBE*, 591 F.Supp.2d 259, 266-67 (*Fresno*), argue that the District must provide evidence establishing that it is "reasonably probable" that a particular defendants' MTBE or MTBE gasoline was delivered to a particular station during a time that a release was documented, and assert that the District has no such evidence. *Id.* The District's case, however, unlike *Fresno*, involves focus plumes. The case is therefore more analogous to *In Re MTBE*, 591 F. Supp.2d 259 (*Suffolk County*) which also focused on plumes of contamination. The District in discovery has gone far beyond the *Suffolk County* plaintiffs, who apparently were not able to identify sources of the MTBE in plumes. Here, the District has for the most part identified sources and linked them through discovery to particular defendants. As the Court

product theory at the Appendix F stations. Motion at 13-19.

Defendants are wrong. The District has extensive evidence showing it is "reasonably probable" that defendants' MTBE or MTBE gasoline was delivered to one or more focus plume stations. Direct evidence of deliveries is not required. In *In Re MTBE*, 739 F. Supp.2d 576, the Court found that the jury could rely on market share information alone to determine that, more likely than not, ExxonMobil's MTBE gasoline had contaminated wells. 739 F. Supp.2d at 607. Here, the District has both market share information and extensive station specific evidence. 56.1, ¶¶ 120 (market share); 116-238 (station specific). At a minimum, the District's evidence establishes disputed issues of fact as to whether the Issue 5 defendants were "more than a minor" factor in causing the focus plumes.

### A.  Lyondell

The District's evidence that Lyondell contributed MTBE to the focus plumes is set forth in 56.1 ¶¶ 117-139. Here we simply note that in 1987 Lyondell provided approximately one half of the entire neat MTBE market in the United States. 56.1 ¶ 119 (Health Effects Task Force). Lyondell (then known as Arco Chemical) was the *sole* supplier of neat MTBE to Chevron's El Segundo Refinery from 1987 through 1997 (with one small exception in 1995). 56.1 ¶ 121. Lyondell sold hundreds of millions of gallons of neat MTBE to the El Segundo refinery during this period. 56.1 ¶ 134. At the same time, Chevron's El Segundo refinery supplied all of the

---

noted in *Suffolk County*, however: "many of the spills and leaks of gasoline that may have caused contamination of plaintiff's well water occurred long ago and beneath the ground . . . [i]n many cases it is difficult for plaintiffs to identify the gasoline releases from which the MTBE contamination originated (i.e., the leaking UST at a particular retailer)." 591 F. Supp.2d at 263-64.

MTBE gasoline delivered to Chevron stations in Orange County. *Id.* 134. All MTBE gasoline supplied to Chevron stations in Orange County between 1987 and 199 contained Lyondell's MTBE. There is similar evidence with respect to the other major refiner defendants. As the Court held in *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 591 F.Supp.2d 259, 28 (S.D.N.Y. 2008) (*County of Suffolk*): "A reasonable jury could conclude . . . that because refiners blended Lyondell . . . MTBE into gasoline that was placed in the Colonial Pipeline or shipped to the New York Harbor, some of Lyondell['s] . . . MTBE was likely found in groundwater within the capture zones of various focus wells in Suffolk County. For this reason, under the commingled product theory Lyondell . . . can be held liable for the contamination in the wells, unless they are able to prove that their MTBE was not in the relevant place at the relevant time." *Id.*

### B.   Tesoro

The District's evidence that Tesoro contributed MTBE to the focus plumes is set forth in 56.1 ¶¶ 140-196. Tesoro posed particular problems because Tesoro's 2009 discovery responses stated: "Between 1986 and 2003, Tesoro did not . . . deliver gasoline . . . in the Orange County Water District service area . . ." 56.1 ¶ 141. Tesoro therefore produced <u>no</u> sales records -  until Tesoro's expert, George Schink, was deposed on July 20, 2011, <u>after</u> the discovery cut-off. Mr. Schink then produced, for the first time, 21 pages of detailed sales records, including location of sales, volumes and product codes. 56 ¶ 141-144 . These records show that between 1986 and 2003, Tesoro sold more than 845 <u>million</u> gallons of MTBE gasoline to customers and terminals that served Orange County. Tesoro's customers included most of the major defendants in this

22

case.[17]

### C.     <u>Valero</u>

The District's evidence that Valero contributed MTBE to the focus plumes is set forth in 56.1 ¶¶ 197-206.  Here we simply highlight that when Exxon and Mobil merged in 2000, Valero took over all of Exxon's retail operations in the State.   The Valero Defendants sold enormous volumes of both neat MTBE and MTBE gasoline into Orange County, both before and after this merger.  *Id.* 197-206.

### D.     <u>Commingled Product</u>

Defendants devote 5 pages of their 25 page brief to arguing that the District cannot rely on the commingled product theory.  Motion at 13-19.  As noted above, the District does not need to rely on the commingled product theory with respect to most of the stations and most of the defendants.  The District, however, <u>has</u> established the predicates for use of the theory against <u>some</u> defendants for <u>some</u> periods of time.  And since defendants make a number of highly misleading (and even flatly untrue) assertions regarding the District's discovery efforts, the District responds as follows.

#### 1.  <u>Impossibility</u>

Defendants argue that it was not "impossible" to trace MTBE and MTBE gasoline from Lyondell, Tesoro and Valero to specific stations, and the co-mingled product theory therefore

---

[17]  When the District deposed Petro-Diamond, however, Petro-Diamond testified that it had a contract with Tesoro to blend MTBE into Tesoro gasoline at Petro-Diamond's Long Beach, California, facility, and Tesoro then sold that MTBE gasoline to jobbers at the Long Beach terminal and rack adjacent to the Petro-Diamond facility.  56.1 ¶ 141.  Although Long Beach is technically in Southern Los Angeles County, it is on the Orange County border and Tesoro's failure to voluntarily disclose these sales in discovery responses was, at a minimum, disingenuous.

does not apply.  Motion at 14.  Lyondell, however, asserted (and still asserts) that it has "no way of knowing" where its neat MTBE went after it was sold. 56. 1 12, 122 .  Tesoro asserted during discovery that it had no records of deliveries into the Orange County Water District Service Area 56.1 ¶ 141 .

At the same time defendants assert <u>they</u> cannot tell where their MTBE gasoline went, defendants assert the <u>District</u> could have determined where it went, but for the District's "lackadasical" discovery.  Motion at 5.  Defendants quote this Court's statement in *Fresno, supra,* that: "'Alternate theories of proof are justified not when evidence is lacking, but when gathering evidence is, for practical purposes, impossible.'" Motion at 16 (quoting *In Re MTBE,* 2013 WL 4830965 at * 20).  Defendants suggest that, had the District simply deposed more station operators and jobbers, it could have determined, for all time periods and at all locations, whose MTBE was in the District's water.  Motion at 14.  The District has several responses.

First, the District *did* pursue product tracing extensively where it was possible to do so. In fact, the District was able to "trace" MTBE gasoline from most of the defendants to most of the stations, and defendants thus stipulated that their MTBE gasoline was delivered to stations during specified time periods.  *See* CMO 116, Ex. B.[18]

Second, product tracing was *not* possible as a practical matter for all defendants and for all time frames.  Twenty-one station operators testified they had "no records."  56.1 ¶ 230. Defendants argue the District should have taken more "jobber" depositions, but omit the fact that

---

[18] Defendants did not provide the admissions in this stipulation out of the goodness of their hearts.  The District traced the MTBE gasoline of these defendants to these stations in discovery and was prepared to establish the stipulated facts at trial if necessary.  Furthermore, defendants continue to be less than forthcoming–despite CMO No. 75 and other orders and discovery requiring disclosure–on their relationship to the stations. E.g., 56.1 ¶ 6-10, 55.

(as defendants knew) the vast majority of the jobbers had <u>already</u> indicated, in other MTBE

cases, that they had "no records." 56.1 ¶ 213, 226-227.  Defendants cite the deposition testimony

of Southern Counties' general counsel, and argue that although Southern Counties was one of the

largest jobbers in Southern California, provided services to many of the defendants, made its

records available to the District, and even provided a draft declaration, counsel for the District

failed to follow up with Southern Counties.  Motion at 15.

      Defendants conveniently omit the draft declaration Mr. Bollar provided, which stated:

> 6.  At the request of Plaintiff's counsel I have reviewed Plaintiff's Notice of
> Taking Deposition of Southern Counties Oil Co., Inc. And conducted an
> investigation to respond the designated issues and document requests contained
> therein.  I provide the following information in response to said Notice.
> 7.  Neither Southern Counties Oil Co., Inc. nor the LP delivered, sold or shipped
> gasoline to any focus plume station from 1986 to 2003.
> 8.  Neither Southern Counties Oil Co., Inc. nor the LP had any agreement to
> supply gasoline to any focus plume station at any time between 1986 and 2003.
> 9.  The LP itself is a "jobber."  The LP, during the relevant time period, may have
> supplied minor amounts of petroleum on a rush basis to other jobbers.  Records
> reflecting Southern Counties Oil Co. Inc.'s sales to other jobbers have been
> destroyed.

56.1 ¶ 226, 227.  This draft declaration, which Southern Counties was required to provide under

CMO No. 75, directly contradicts defendants' assertion that if the District had just "followed up"

with Southern Counties it would have discovered where all the MTBE gas went.  This draft

declaration, like the responses of other jobbers and operators, made it clear that it was impossible

and impractical to pursue Southern Counties records (or to name Southern Counties as a

defendant at any focus plume stations).  Defendants' failure to provide this declaration, and

inaccurate characterization of the District's efforts to obtain those records, is misleading in the

extreme.

Where it was impossible as a practical matter to gather evidence to trace a defendants' product to a particular plume, the District is entitled to rely on the Court's co-mingled product theory. In *Suffolk County, supra,* the case where the Court first applied the co-mingled product theory, there is no evidence that plaintiffs attempted any tracing discovery whatsoever. Yet the Court allowed the *Suffolk County* plaintiffs to pursue the co-mingled product theory based on two types of evidentiary difficulties. First, "many of the spills and leaks of gasoline that may have cause contamination of plaintiffs' well water occurred long ago and beneath the ground . . . In many cases it is difficult for plaintiffs to identify the gasoline releases from which the MTBE contamination originated (i.e., the leaking UST at a particular retailer)." 591 F.Supp.2d at 263-64. Second, "the gasoline distribution system in the United States requires manufacturers to mix their products together in a common pipeline. Because gasoline is commingled, it is impossible to identify with certainty the refiners of the gasoline released from a leaking UST." *Id.* at 264.

Here, the District has overcome the first obstacle that the *Suffolk County* plaintiffs were apparently not able to overcome. Through discovery and expert analysis, the District has been able to identify the specific stations from which releases occurred. The District also has been largely able to overcome the second obstacle that the *Suffolk County* plaintiffs were not able to overcome. Again, through hard work in discovery, the District has been able to show at many of the focus plume stations the specific defendants who supplied MTBE gasoline to those stations. For Tesoro, Valero and Lyondell, however, the options for obtaining evidence to trace their product to particular stations were limited. The absence of jobbers and station operator records made it not "practical" to trace defendants' MTBE or MTBE gasoline to a particular station in some case.

The MTBE and MTBE gasoline admittedly sold by these defendants into the relevant geographic area over a period of many years, however, unquestionably contributed to MTBE contamination of the District's water.  In Orange County, as in *Suffolk County* (and unlike *Fresno*), MTBE has been detected in more than one hundred wells, many of which are very deep, pump enormous amounts of water, and have capture zones several miles in diameter above which numerous gas stations are located.  In addition, in Orange County, as in *Suffolk County* (and unlike *Fresno*) Lyondell, Tesoro and Valero sold enormous quantities of MTBE into the District over a span of many years, and plumes of MTBE were created many years ago by releases from multiple stations.

Accordingly, defendants' motion for partial summary judgment barring the District from invoking the commingled product theory at trial should be denied.

### 2.    Disclosure of theory

Defendants argue, both here and in Issue 8, that they were prejudiced because the District did not disclose in discovery that it might invoke the commingled product theory at trial.  Motion at 16-17.  As with defendants' characterization of the District's product tracing discovery efforts, defendants mis-characterize the District's response and omit key documents.  The District responds more fully to this argument in its response to Issue 8, *infra*, and hereby incorporates that response by reference.

### 3.    Make-Whole Defendants.

Finally, defendants argue the District should not be allowed to assert the commingled product theory at sites where a make-whole defendant is located because "alternative theories were 'created for the purpose of providing a remedy to plaintiffs who cannot identify a

27

responsible party.'" Motion at 18 (citing *In Re MTBE*, 447 F.Supp.2d 289, 295).   Defendants

also cite this Court for the proposition that where the District is proceeding against a station

based on "'individualized proof of product identification,' it [the District] needs to 'dismiss the

remaining defendants.'" Motion at 18-19 (citing *In Re MTBE*, 379 F.Supp.2d at 371).

What the Court actually said at the cited page, however, is: "If plaintiffs are able to

discover which defendants caused their injuries, they will not be permitted to proceed on a theory

of collective liability, but must pursue the actual wrongdoers and dismiss the remaining

defendants.   Accordingly, plaintiffs are not precluded from proving their case through

individualized proof of product identification if they eventually discover whose product caused

their harm." 379 F. Supp.2d at 371.  This in no way means that if the District is able to establish

that one of several tortfeasors sold MTBE gasoline to a site all others who may also have

contributed either neat MTBE or MTBE gasoline from the site are absolved from liability - under

the commingled product theory or any other theory.  Defendants omit from their brief what this

Court more recently told them at the pre-motion hearing in this case.  In response to a statement

by Tesoro's counsel that: "if you have an anchor defendant or two or three, [the District] should

not be able to pursue a commingled product theory" (56.1 ¶ 242) the Court stated: "I don't know

if that's right.  Just because there are some defendants as to which you have direct evidence that

it was their product on the premises doesn't mean that there weren't suppliers and the suppliers

had a commingled product and everybody who was part of that commingled product has a share

of the liability." *Id.*   (April 16, 2014, Tr. at 17:12-21).

## VI.   Substantial Evidence Shows That MTBE From The Focus Plume Stations Has Impacted Or Will Impact Wells

Defendants argue: "[A]s part of its case-in-chief, OCWD must establish that specific drinking water supplies have been impacted by or are threatened by a particular defendant's gasoline. Motion at 20. Defendants cite to CMO 60, which provides:

> The issue is whether each release site identified as part of a focus plume contributed to contamination of the wells associated with that plume. If OCWD provides no proof that a particular release site contributed to such contamination, and OCWD will not drop the release site from that focus plume, then defendants may file a motion for partial summary judgment on that site.

CMO 60, ¶ 4.B. Defendants acknowledge the District's fate and transport expert Dr. Wheatcraft, but omit any reference to the conclusions in his report finding that MTBE from each focus plume station has contributed to an MTBE plume, and that the MTBE in these plumes has impacted, and will continue to impact, domestic water production wells. In fact, as discussed elsewhere in this brief, Dr. Wheatcraft has concluded that MTBE from the focus plume stations alone will cause more than 100 production wells in the District to exceed 5 ppb after just 10 years. Wheatcraft Decl. ¶ 7; 56.1 ¶ 292.

Defendants cite Dr. Wheatcraft's testimony that: "We haven't done any models in which we isolated a particular source and ran only that source" (56.1 ¶ 248) and argue that this statement proves the District did not comply with CMO 60. Motion at 59. But CMO 60 did not purported to dictate how the District should show that MTBE from each station would impact wells. Rather, CMO 60 simply stated that the District must show that MTBE from each station will "contribute" to contamination of a well. Dr. Wheatcraft did that for every focus plume station. As he explained in his report, his deposition, and the declaration that accompanies this opposition: "A separate MTBE source term for each of the focus plume stations was added to the model at the location of the station. The source term for each focus plume station was calculated

29

using actual data from MTBE detections in monitoring wells at or associated with each individual focus plume station." Wheatcraft Decl. ¶ 4. *See also* 56.1 ¶ 248. As Dr. Wheatcraft explains, the model shows when MTBE will reach specific wells associated with focus plumes (and at what concentration) as well as the overall number of wells that will be impacted, and at what concentrations. Wheatcraft Decl., ¶¶ 7-8.

Defendants do not challenge Dr. Wheatcraft's conclusions, only his methodolgy. They provide no countervailing testimony or evidence - they simply rely on counsel's argument. *See* Motion at 19-20 (citing only Wheatcraft testimony and 56.1 ¶ 248).

## VII.   Evidence of Releases Subsequent To May 6, 2000, Precludes Summary Judgment Based On The Statute Of Limitations

Issue 7 defendants contend this Court's opinion in *In Re MTBE*, 676 F. Supp.2d 139, at 149-50 and nn. 57-58, bars the District's negligence, products liability, and permanent nuisance claims at  World Oil #39, Chevron #9-5568, and Mobil #18-HEP.[19]  Motion at 21-22.  At the World Oil #39 and Chevron #5568 sites, however, the evidence establishes that more likely than not there were MTBE releases subsequent to the May 6, 2000, trigger date for the statute. Summary judgment is therefore improper with respect to defendants who supplied MTBE gasoline to these stations subsequent to May 6, 2000.[20]

---

[19]   Issue 7 defendants do not challenge the District's claims for continuing nuisance, OCWD Act and Declaratory Relief.

[20]   With respect to the Mobil 18-HEP site, which closed in May, 2000, and defendants who only supplied MTBE gasoline to either site prior to May, 2000, the District acknowledges that *In Re MTBE*, *supra*, would bar the District's product liability, negligence, and permanent nuisance claims.  The relevant defendants and sites are: (1) at Chevron 9-5568, Tesoro and Lyondell each of whom sold or supplied MTBE and/or MTBE gasoline to Chevron prior to May 6, 2000;  (2) at World Oil # 39, Lyondell and BP, each of whom sold or supplied MTBE gasoline to World Oil #39 prior to May 6, 2000.  Plaintiff has never identified Tesoro with this station and

*In Re MTBE, supra,* was issued prior to the completion of discovery and expert reports in this case. Chevron now admits that Chevron #9-5568 was an active station throughout the relevant time period, and that Chevron owned the station and USTs, and supplied MTBE gasoline to the station during the entire relevant time period. CMO 116, App. B; 56.1 ¶ 257. The District's expert Marcel Moreau report, prepared subsequent to the *In Re MTBE* opinion, establishes that MTBE releases occurred at Chevron 9-5568 for as long as it was an active station and was selling MTBE gasoline. 56.1 ¶ 257.[21] Defendants' own internal documents confirm that releases and spills are a regular and expected occurrence at stations such as Chevron 9-5568. 56.1 ¶ 257. Although there were certainly releases of MTBE at this station prior to May 6, 2009, there is more than enough evidence from which a jury could conclude that there were releases of MTBE at this station subsequent to May 6, 2009. Valero sales included sales to Chevron in the relevant geographic area in 2001. 56.1 ¶ 197-206.

The same is true at the World Oil site. World Oil #39, like Chevron #9-5568, was an active station during the entire relevant time period. The District's evidence establishes, at a minimum, that there are disputed issues of material fact as to whether releases of MTBE occurred at this station subsequent to May 6, 2000. 56.1 ¶ 256. Valero supplied this station

---

therefore its' motion should be denied as moot. 56.1 ¶ 256. The District does not, by acknowledging these fact, waive its objections to or right to appeal that opinion. The District also incorporates by reference all arguments made by the District in opposing that opinion.

[21] Defendants argue that omission of Chevron 9-5568 from the Court's statute of limitations opinion was an "oversight." Motion at 22. Defendants had five years to raise the issue and never informed the Court of the District of this "oversight."

with MTBE gasoline for an extended period subsequent to May 6, 2000.  56.1 ¶ 256.[22]

## VIII.    The District Did Not Fail To Disclose Information In Discovery.

Issue 8 defendants contend they were "ambushed" because the District did not inform

them during discovery that the District considered them to be liable at stations listed in

Defendants' Appendix I.  Motion at 22.  The District did not "ambush" defendants.  It provided

comprehensive responses to defendants' discovery requests.[23]

Defendants's motion cites two interrogatory requests.  Interrogatory No. 1 from

defendants' Second Set of Interrogatories asked the District: "Separately, for each FOCUS

PLUME, identify which Defendant(s) YOU contend caused alleged DAMAGES arising from

such FOCUS PLUME."  Defendants state that the District answered this interrogatory

"generally."  Motion at 23, 56.1 ¶ 259.  This is not accurate.  The District answered this

interrogatory specifically, and specifically identified each Issue 8 defendant identified with each

focus plume, including Lyondell, Tesoro, Valero, and ExxonMobil.  56.1 ¶ 259-264.  Defendants

do not disclose this fact to the Court, or provide the Court with even one page of the District's

response specifically identifying these defendants.  This is misleading in the extreme.

---

[22] In the mid-1990s, Ultramar was a source of gasoline for World Oil, and in 1996, the USTs were removed, and the highest level of MTBE detection in groundwater occurred.  56.1 ¶ 256.  In the interim, between 1997 and May, 2000, ExxonMobil supplied this station with MTBE gasoline, but then Valero stepped in and supplied this station starting in May 15, 2000 until beyond the end of the relevant time period at the end of 2003.  56.1 ¶ 256.  Reports of free product at the site were detected as late as November 2000 – six months after Valero began supplying MTBE gasoline to the site.  *Id.*

[23] It is unclear why Southern Counties is a party to this motion at all.  Southern Counties previously informed the District that it has no records of ever delivering gasoline to any of the focus plume stations, and the District has not identified Southern Counties at any of the focus plume stations.  56.1 ¶ 226-227.

Defendants next assert: "in response to a targeted contention interrogatory, OCWD failed to disclose its theories of liability as to certain Defendants at certain sites." Motion at 24. Again, this is misleading in the extreme.   In response to multiple interrogatories the District fully laid out its theories of liability against each defendant and described why each defendant, including Lyondell, Tesoro, Valero and ExxonMobil, were liable.  56.1, ¶¶ 259-264.  Defendants again fail to provide the Court with these responses, or with even one page of the District's individual discovery responses to Tesoro and Valero (Lyondell did not submit separate interrogatories).[24] The District's responses detailed how defendants participation in the gasoline distribution system and their supply of neat MTBE and MTBE gasoline to other defendants who supplied MTBE gasoline to the focus plume stations made them liable for releases from those stations.  56.1 ¶¶ 259-264.  Issue 8 defendants omit all of this information from their summary judgment motion.[25]

In 2013, the District circulated, at defendants' request and the Court's direction, a matrix which put in table form the information previously disclosed in the District's discovery responses.  56.1 ¶275.  Defendants assert that this matrix expanded the number of stations with

---

[24] Although the District did not use the term "commingled product" in its responses, the responses explained in detail the evidence and conduct by defendants upon which the District intended to hold defendants liable.  Local Rule page limits prevent the District from submitting the entire February 26, 2010, response (or the discovery that was incorporated therein, such as the responses to individual defendant's requests).  The District is providing representative pages and will provide the complete responses if permitted to do so.

[25] World Oil #39 was first disclosed by defendants in mid-January, 2010, when defendants added focus plume 127 (a/k/a defendants' plume 5) and World Oil.  56.1 ¶ 256. ExxonMobil itself disclosed a "distributor relationship" with World Oil, and subsequently stipulated that "between July 1,1997 and ending May 14, 2000, all gasoline delivered to World Oil #39 contained MTBE and was supplied by Exxon."  56.1 ¶ 256.  Counsel for Valero (and Ultramar) was present at the deposition of World Oil Operator Pete Rehklau when he testified that World Oil bought gasoline from Ultramar between 1994 and 1997.  56.1 ¶ 256.

which the Issue 8 defendants were associated, and when they sought an explanation they were met with silence. This is simply untrue. As noted above, the District fully disclosed the stations and plumes the Issue 8 defendants were associated with. And the District was not "silent" in response to defendants' inquiries, but rather provided an 8-page, single-spaced letter specifically refuting defendants' complaint that the matrix expanded the number of defendants at each site. 56.1 ¶ 262 . Defendants do not mention this letter in their brief.

Defendants argue "courts routinely exclude evidence that was not disclosed in discovery" (Motion at 23) but never identify any evidence that was not disclosed or that they seek to exclude. The cases relied upon by defendants concern new evidence not previously disclosed.[26] The District fully disclosed all evidence upon which its claims are based. In any event, as this Court recognizes, a party is not required to "lay out all of the evidence of every defendant at every site" in response to a contention interrogatory. See 56.1 ¶¶ 260-264. *See also Zysman v Zanett, Inc.*, 2014 WL 1320805, at * 4 ("contention interrogatories asking for each and *every* fact ... that supports particular allegations in an opposing pleading may be held overly broad and unduly burdensome." *Id.* at *4 (citation omitted; emphasis in original). This is particularly true where, as here, the evidence was largely supplied by, and shared among, defendants themselves.

Defendants themselves failed to produce, until long after discovery closed, evidence that would have allowed the District to respond in more detail until long after fact discovery closed.

---

[26] *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y. 2004) (precluding plaintiff from using affidavit to oppose summary judgment of treating physician who was never disclosed as either treating physician or expert witness); *U.S. ex rel. Schwartz v. TRW, Inc.*, 211 F.R.D. 388 (giving the government an opportunity to supply declarations regarding the "state secrets privilege"); *Hoffman v. Constr. Protective Serv.*, 541 F.3d 1175 (9th Cir. 2008) (affirming district court's preclusion of undisclosed evidence of damages).

Tesoro, for example, asserted during fact discovery that it did not have responsive documents

regarding supplies of MTBE gasoline into the relevant geographic.  56.1 ¶ 141.  After the close

of fact discovery, and during expert discovery (in the summer of 2011), Tesoro expert George

Schink produced for the first time voluminous records of Tesoro MTBE gasoline delivered into

the relevant geographic area.  56.1 ¶ 141-144.

Defendants reliance on *Unigene Labs, Inc. v. Apotex, Inc.*, 2010 WL 2730471 (S.D.N.Y.

July 7, 2010) is also misplaced.  In *Unigene*, the defendant was not advised of the contours of the

claims until after the filing of dispositive motions.  In contrast, the District detailed it's theories

in the complaint, throughout discovery and in subsequent correspondence.  Defendants also cite

to *In re MTBE*, 2014 WL 494522, but that decision is also readily distinguishable.  There,

plaintiffs did not disclose in discovery responses that they associated a particular defendant with

a particular station, or why they had concluded that the defendant was liable.  In contrast, here,

the District disclosed the stations at which the Issue 8 defendants were associated and the basis

for their liability.  56.1 ¶ 259-264.

For the foregoing reasons, defendants' summary motion judgment should be denied.

DATED: July 21, 2014                    Respectfully submitted

Michael Axline
MILLER & AXLINE
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825-4225
Telephone: (916) 488-6688
Counsel for Plaintiff Orange County Water District