UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1989<br>MDL 1358 (SAS) |
| This Document Relates To:<br><br>*Orange County Water District v. Unocal Corporation et al.,* Case No. 04 Civ. 4968 (SAS) | The Honorable Shira A. Scheindlin |

---

# PLAINTIFF'S SEPARATE RULE 56.1 STATEMENT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1(b) of the U.S. District Court for the Southern District of New York, plaintiff Orange County Water District submits the following separate statement of undisputed facts in opposition to Defendants' Motion for Summary Judgment.

## Plaintiff's Separate Rule 56.1 Statement

289. At each focus plume station, MTBE has been released, has impacted soil and groundwater beneath the facility and off-site beyond the facility boundary, has been present in groundwater for more than a decade, and continues to migrate beyond the facility boundary. (Axline Decl., Ex. 1 [May 28, 2011, Expert Report of Anthony Brown, pp. 1-2] [hereinafter "Axline Ex. _"].)

290. Each focus plume station is located within a pumping depression (capture zone) created by major production wells used to provide domestic water supplies to residents within the Orange County Water District's service area. (Herndon Decl., ¶¶ 1-3.) A single large-capacity production well pumping from the principal aquifer can create a capture zone of up to one-half mile or more, and pull groundwater (and MTBE) in a cross-gradient and even up-gradient direction. Pumping depressions created by multiple production wells can be several miles in diameter. (*Ibid.*)

291. MTBE from the focus plume stations, if not remediated, will impact water production wells in OCWD's service area. MTBE has already been detected in a number of wells. (Axline Ex. 2 [June 23, 2011, Expert Report of Stephen Wheatcraft, p. 8]; *see also* Wheatcraft Decl., ¶¶ 4, 7.)

292. MTBE originating from the focus plume stations will exceed 5 ppb at more than 100 production wells after 10 years. (Axline Ex. 2 [Expert Report of Stephen Wheatcraft, p. 8].)

293. Monitoring wells at focus plume stations are seldom screened below 50 feet below the surface and most are screened at no more than 30 to 40 feet below the surface. Monitoring wells are typically clustered on or close to the station property. These wells therefore provide a limited picture of the extent of MTBE contamination in groundwater at the focus plume stations. (Herndon Decl., ¶ 6.)

294. Groundwater within the District's service area is not stationary. Groundwater flow rates within the District's service area are highly variable and range from a low of 0.7 feet per day to as much as 25 feet per day. (Herndon Decl., ¶ 1.)

295. To advance the process of remediating the MTBE plumes migrating away from the focus plume stations, the District has committed considerable funds to drilling borings and collecting depth-specific groundwater samples (CPT and sonic drilling) independent of data provided by responsible parties and independent of the District's routine sampling and data gathering activities. (Herndon Decl., ¶ 7.) The District has also had to analyze site-specific data from focus plume stations and evaluate the best methods for remediating MTBE that has migrated off-site from those stations. (Herndon Decl., ¶¶ 7-10.)

296. Gathering information about the extent of MTBE contamination at each focus plume station, including the location, depth, and rate of MTBE contamination movement is an essential step in the process of remediation. Results from monitoring wells and the District's data have been used not only to better delineate the scope of contamination but also to determine the specifics of remedial action. (Herndon Decl., ¶ 10.)

297. Defendants Chevron USA., Inc., Union Oil Company of Californis, Texaco Refining and Marketing, Inc., Shell Oil Company, Equilon Enterprises LLC, ExxonMobil Corporation, ExxonMobil Oil Corporation, ConocoPhillips Company, and BP have all stipulated

to owning and supplying MTBE gasoline to focus plume stations. CMO 116, Ex. B. At each of these stations MTBE was released, impacted groundwater, and migrated off site. (Axline Ex. 1 [May 28, 2011, Expert Report of Anthony Brown, pp. 1-2].)

298.  MTBE releases occur from UST systems regardless of the sophistication of the owner or operator. State of the art storage system technology and the standard of care implemented by petroleum handlers and end users were not sufficient to adequately contain MTBE. (Han Ex. 5 [April 15, 2011, Expert Report of Marcel Moreau, p. IV-1-IV-2].) All UST's and dispensing systems leak over time, in multiple ways. (*Ibid.*) Leaks from UST systems were considered by petroleum marketers as inevitable. (Han Ex. 5 [Moreau Report at III-23].) The oil industry was well aware that comonly used storage system technology was not adequate to contain MtBE. (Han Ex. 5 [June 3, 2011, Expert Rebuttal Report of Marcel Moreau, p. 16]; *see also In re MTBE*, 739 F. Supp. 2d 576, 607, fn. 192 (S.D.N.Y. 2010).)

299.  Defendants knew at the time they began marketing MTBE gasoline in Orange County that MTBE would create a public health and environmental hazard. In 1981, the BP Defendants circulated an internal memorandum reporting that Ben Thomas of Shell had sent a message to an industry MTBE conference that "Shell has been involved in the contamination of a township's drinking water with . . . 100 ppb MTBE" and that, according to Shell, "approximately 20% of all underground storage tanks leak." (Axline Ex. 4.) In 1983, Shell's T.G. Kirkpatrick responded to a survey by the American Petroleum Institute ("API") on MTBE, stating: "In our spill situation the MTBE was detectable (by drinking) in 7 to 15 parts per billion so even if it were not a factor to health, it still had to be removed to below the detectable amount in order to use the water. Also, our mobile product didn't indicate movement offsite even though the water-soluble fractions were in water wells 1500 feet away." (*Ibid.*) In 1984, ARCO Chemical

circulated an internal memorandum on a meeting of the "API Ad Hoc Committee on MTBE," reporting that "MTBE is a possible contaminant of groundwater, especially in association with leaking gasoline storage tanks." (*Ibid.*) In 1984, the API's "MTBE Task Force" (of oil industry representatives) discussed "the emerging issue of MTBE in groundwater." (*Ibid.*) In 1986, an internal Chevron memorandum titled "Marketing Environmental Concerns Regarding the Use of MTBE in MOGAS" reported on the "disturbing" chemical properties of MTBE and its likelihood of increasing gasoline station cleanup costs in light of Chevron's experience in "the cleanup of an aquifer in Maryland contaminated by several different company's leaking underground storage tanks." (*Ibid.*) In 1987, an "industry-wide [MTBE] committee" was formed. (*Ibid.*) Valero's Vice President of Health, Safety and Environment Norman Renfro prepared a memo indicating that "a few Valero employees became aware in approximately 1987 of allegations that MTBE had been detected in groundwater in Maine." (*Ibid.*) In 1991, an internal Chevron memorandum warned that, while non-MTBE gasoline plumes are "relatively easy" to address, "MTBE on the other hand is a different situation" because "[w]hen MTBE gets into the water then the trouble really starts" due to the fact that MTBE causes "larger" plumes of contamination that "will migrate" faster. (*Ibid.*) The memorandum indicated that "the removal of MTBE is very difficult at best" and "has the potnetial to be 2-3 times as expensive as our present groundwater cleanups." (*Ibid.*) In 1993, Shell's Curtis Stanley wrote a colleage – in response to an MTBE problem at a Shell station in Huntington Beach – that: "We need to convince management to implement dual containment NOW!" (*Ibid.*) In 1998, Shell's Curtis Stanley informed Shell management that: "My professional opinion is that MTBE and similar oxygenates should not be used at all in areas where groundwater is a potential drinking water supply." (*Ibid.*) In 1996, Union Oil sampled 209 of its stations in California – *and found MTBE contamination in groundwater at 167 of*

*them.* (*Ibid.*) In 1999, Exxon was commissioned a study that reported that: "Small leaks of gasoline (1 teaspoon) can translate into MTBE groundwater concentrations above the taste and odor detectable threshold levels. A standard Underground Storage Tank (UST) leak detection threshold of 0.01 gallons per hour converst into 7.5 teaspoons/hour." (*Ibid.*)

300. Defendants represented and warranted to their affiliates and customers that MTBE gasoline could be handled just like regular gasoline. On July 13, 1989, ARCO Chemical (now Lyondell), one of the largest suppliers of MTBE in the world, circulated a document titled "MTBE Octane Enhancer: Technical Guidance and Recommended Practices for Storage & Handling." (Axline Ex. 5.) That document provided that: "Gasoline containing MTBE is handled in the same manner as hydrocarbon-only gasoline. There are no extraordinary handling or safety precautions above those customary to gasoline." (*Ibid.*) Defendants have no evidence that any defendant gave contrary instructions; indeed, the evidence is to the opposite effect – station operators in this case (and every other case in the MDL) uniformly testified that defendants never told them MTBE was in the gasoline, let alone that it should be handled with special caution. (See, e.g., Massey Ex. 3 [Shea Depo., July 30, 2010, pp. 54:14-18, 60:10-61:16, 103:15-18]; Han Ex. 15 [Masri Depo., Aug. 26, 2010, p. 107:5-25 (Arco #1905)]; *Ibid.* [Sassounian Depo., Aug. 17, 2010, pp. 83:11-18, 83:25-84:5 (Exxon #4283)].)

301. Defendants undertook to promote MTBE gasoline to the public via promotional campaigns and conspicuous advertising at the stations that carried their gas and otherwise (e.g., television, radio, etc.). (*See, e.g.,* Massey Ex. 3 [Shea Depo., July 30, 2010, Ex. 10 (Tosco committing to conduct "advertising and sales promotions" to foster "acceptance of TOSCO's Union 76 products")].) Exxon promoted the sale of MTBE gasoline to the public. (*See* Massey Ex. 4 [Rekhlau Depo., Sept. 10, 2010, Ex. 2 & 4 (§§ 11-13) (requiring dealer to pay Exxon a per

gallon "advertising fee")].) Chevron promoted the sale of MTBE gasoline to the public. (Massey Ex. 2 [Gray Depo., Aug. 6, 2010, Ex. 11, 20, 30 (§ 2(a))].) The Shell Defendants promotes MTBE gasoline to the public. (Massey Ex. 6.a.-6.b., 7.a.-7.b. (§ 10(a)), 6.c.-7.c. (§§ 7-8), 8 [SHELL416314-416324 (§ 6), 9.a. (§ 6).) The BP Defendants promoted MTBE gasoline to the public. (Massey Ex. 9.b.-9.c. (§ 7) [AROCWD003348-003356, AROCWD003357-003365], Ex. 9.d. (§ 14.2) [AROCWD003375-003399].)

302. The Court has held that "[r]emediation at any point might include drilling of monitoring wells to observe the underground movement of contaminants." *In re MTBE*, 2007 WL 700819, *5, fn. 30 (S.D.N.Y. 2007). Defendants' preferred remedy is <u>monitored</u> natural attenuation ("MNA"), in which the only remedial action is monitoring. (Axline Ex. 5 [Expert Report of John Wilson].) According to the U.S. EPA, the only remedial action involved in MNA is monitoring. (Axline Ex. 6 [U.S. EPA Citizens Guide to Monitored Natural Attenuation].)

303. The District designated *plumes* rather than individual stations. The District defined a *plume* as "[a] body of contaminated groundwater flowing from one or more sources." (Axline Ex. 9 [Plaintiff's Supp. Resp. Conoco 2nd Rogs, p. 3 ("Resp. to Conoco 2nd Rogs")].) The District designated multiple stations within "plumes" because "they are in proximity to one another and in proximity to the wells that are listed" and "because contamination, MTBE and TBA contamination . . . identified at these sits are believed to have commingled or could commingle . . . and consequently referred to as the focus plumes." (Axline Ex. 10 [Bolin Depo., July 30, 2008, pp. 72:11-73:15].) The District advised defendants that MTBE releases from all stations in multiple station plumes has "resulted in a commingled plume." (Axline Ex. 9 [Resp. to Conoco 2nd Rogs, pp. 3-4].) Dr. Wheatcraft's model shows that as MTBE migrates off-site from a station, that MTBE mixes with MTBE from other nearby stations to form MTBE plumes.

(Axline Ex. 11 [Wheatcraft Depo., Jan 17, 2012, pp. 374:13-375:2].)  Dr. Fogg concluded that "significant MTBE mass [is present] beyond the monitoring well networks . . ." of the stations, and that the only way to prevent this MTBE from reaching public drinking water wells is to clean up the [MTBE] contamination before it gets to supply wells."  (Axline Ex. 12 [Fogg Depo., Jan. 21, 2012, pp. 110:9-24].)

DATED: July 21, 2014

Respectfully submitted

_/s/ Michael Axline_
Michael Axline
MILLER & AXLINE
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825-4225
Telephone: (916) 488-6688
Counsel for Plaintiff Orange County Water District