# Exhibit 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation : MDL No. 1358 (SAS)

This document relates to the following case:

Orange County Water District v. Unocal Corp., et al., 04 CIV. 4968 (SAS) : Pages 1059-1283

- - - - -

FEBRUARY 1, 2012

- - - - -

Videotaped Deposition of ANTHONY BROWN, EXPERT WITNESS, VOLUME VI, held at Latham & Watkins, at 650 Town Center Drive, Suite 2000, Costa Mesa, California, commencing at 10:17 a.m., on the above date, before Kimberly S. Thrall, a Registered Professional Reporter and Certified Shorthand Reporter.

Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Giuliani for the Valero defendants.

MR. ORLACCHIO: Adam Orlacchio of Blank Rome, LLC for Lyondell Chemical and ARCO Chemical.

THE VIDEOGRAPHER: Is there anybody --

MR. ANDERSON: Okay.

THE VIDEOGRAPHER: -- else on the line? Counsel will be noted on the stenographic record.

The court reporter is Kim Thrall, and she will now reswear in the witness.

ANTHONY BROWN

having been first duly sworn, testified as follows:

EXAMINATION RESUMED

BY MR. ANDERSON:

Q. Good morning, Mr. Brown. How are you?

A. Good. How are you, Mr. Anderson?

Q. I'm doing well. So we meet again.

A. We do indeed.

Q. I am here to ask questions about three stations and probably some background questions that may apply to other aspects of your retention, but not station specific other than the Unocal 5226, the ConocoPhillips 5792, and the World Oil 39 as listed on what I believe is your summary chart that was previously

marked as Exhibit 36.

Do you have a copy of that summary chart with you?

A. I -- I do indeed.

Q. We'll probably refer to it from time to time. And I don't know if you have a copy with the exhibit stamp on it, but I have an exhibit sticker that is dated January 2nd of 2012. So that was probably your first date. I don't know.

A. The third day.

MS. O'REILLY: No. 29th was the --

MR. ANDERSON: Okay.

MS. O'REILLY: That was the third day.

BY MR. ANDERSON:

Q. And just for my background, so I understand, Exhibit 36 was something prepared by you, right?

A. Correct.

Q. And it was designed to summarize in tabular form using symbols that can be referenced in the lower left-hand corner, the basic opinions that you have formed, if you have formed them, with respect to each of the sites that are listed on this exhibit, right?

MS. O'REILLY: Objection. This was asked and answered. Misstates the purpose of chart.

Go ahead.

THE WITNESS: In general, yes. The -- there may be additional opinions contained within my expert reports. And in addition in response obviously to certain questions during the deposition, I may have to develop new opinions or perhaps revise existing opinions. And I've made the clarification that where an opinion that's presented on Exhibit 36 is perhaps in conflict with an opinion in the report, the opinion on Exhibit 36 takes precedence and essentially "trumps" -- I think the word was used -- any opinion within the reports.

BY MR. ANDERSON:

Q. Okay. So you consider 36 to be, at least as far as the final conclusions, superior to the text in the report if there's a conflict?

A. That is correct.

Q. Okay. And as I was saying, I'm going to ask you about three stations. But as a general matter, I understand you've been retained by Orange County Water District or its counsel or both to be a testifying expert in the case.

I wanted to know whether you have been approached by or had discussions with Orange County Water District about actually doing or supervising the completion of any of the work at any or all of the

stations that are mentioned in your report where you have expressed an opinion that work needs to be done?

MS. O'REILLY: And I'm going to object to the extent that -- and instruct the witness not to answer to the extent that goes into attorney-client privileged communication.

THE WITNESS: To determine whether it was an attorney-client privileged -- attorney-client privileged communication, that would require me to make a legal conclusion, so perhaps I can --

MR. ANDERSON: Didn't you want to add that objection?

MS. O'REILLY: Well, I'm just indicating that I -- it -- that if he's had any discussions with Orange County regarding performance of any work, those would be subject to attorney-client privileged communication at this point.

MR. ANDERSON: Yeah. And I -- I may disagree with the basis of the objection, but let's go ahead and get whatever answer you can give me, subject to Ms. O'Reilly's objection.

MS. O'REILLY: Are you indicating you can't -- you need to confirm with me before you can answer?

THE WITNESS: I should just check --

MR. ANDERSON: Let's take a short break.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation : MDL No. 1358 (SAS)

This document relates to the following case:

Orange County Water District v. Unocal Corp., et al., 04 CIV. 4968 (SAS) : Pages 1284-1420

- - - - -

FEBRUARY 6, 2012

- - - - -

Videotaped Deposition of ANTHONY BROWN, EXPERT WITNESS, VOLUME VII, held at Latham & Watkins, at 650 Town Center Drive, Suite 2000, Costa Mesa, California, commencing at 1:59 p.m., on the above date, before Kimberly S. Thrall, a Registered Professional Reporter and Certified Shorthand Reporter.

Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

THE WITNESS: Unfortunately, I've not had an opportunity to review the scope of the excavation nor any of the analytical results that have been generated as part of that activity.
BY MR. ANDERSON:
Q. Okay. Have you or your staff communicated with Orange County Health Care Agency regarding your conclusions with respect to Chevron 9-5568?
MS. O'REILLY: Vague. Ambiguous. Overbroad.
THE WITNESS: Not that I'm aware of.
BY MR. ANDERSON:
Q. Have you or your staff communicated with the Regional Water Quality Control Board regarding your conclusions concerning Chevron 9-5568?
A. Again --
MS. O'REILLY: Same objections.
THE WITNESS: -- not that I'm aware of.
BY MR. ANDERSON:
Q. Do you have any information that OCWD or its agents have communicated with these regulators regarding your conclusions concerning Chevron 9-5568?
MS. O'REILLY: And object to the extent it calls for attorney-client privileged communication.
Go ahead.
THE WITNESS: Again, not that I'm aware of.

BY MR. ANDERSON:
Q. Have you or your staff communicated with Chevron outside of this litigation regarding your conclusions with respect to this station?
MS. O'REILLY: Vague. Ambiguous. Overbroad.
THE WITNESS: Not that I'm aware of.
BY MR. ANDERSON:
Q. Have you or your staff communicated with the environmental consultants overseeing the remediation at Chevron 9-5568 regarding your opinions concerning this site?
MS. O'REILLY: Asked and answered. Vague and ambiguous.
THE WITNESS: Again, not that I'm aware of.
BY MR. ANDERSON:
Q. Do you have any information that OCWD or its agents have communicated with Chevron outside of this litigation regarding your opinions concerning Chevron 9-5568?
MS. O'REILLY: Object to the extent it calls for attorney-client privilege. Vague and ambiguous.
Go ahead.
THE WITNESS: Again, not that I'm aware.
BY MR. ANDERSON:
Q. And do you have any information that OCWD or

its agents have communicated with the environmental consultants who have worked at Chevron 9-5568 regarding your opinions concerning this site?
MS. O'REILLY: Same objections.
THE WITNESS: Same answer. Again, not that I'm aware of.
BY MR. ANDERSON:
Q. Have you contacted the water purveyors in the area surrounding Chevron 9-5568 about your opinions concerning this site?
MS. O'REILLY: Same objections.
THE WITNESS: I have not, no.
BY MR. ANDERSON:
Q. Do you think any warning should be issued to the public concerning the alleged contamination at Chevron 9-5568?
MS. O'REILLY: Outside the scope of his designation. Calls for speculation. Assumes facts. Lacks foundation. Incomplete hypothetical. Vague. Ambiguous. Overbroad.
THE WITNESS: That's not something I was asked to evaluate as part of my retention in this matter.
BY MR. ANDERSON:
Q. And is that true for all of the sites that you looked at, you don't have an opinion as to whether or

not additional -- excuse me -- you don't have an opinion as to whether warnings need to be issued to the public about the alleged contamination concerning any of the sites you looked at?
MS. O'REILLY: Misstates testimony. Outside the scope of his designation. Argumentative. Assume facts. Lacks foundation.
Go ahead.
THE WITNESS: I believe the answer would be the same, that it's not something that I was asked to offer an opinion on.
BY MR. ANDERSON:
Q. Do you have an opinion, though, today on that issue?
MS. O'REILLY: Same objection. Exceeds the scope of his designation. It's vague, ambiguous, overbroad as to "warning." Assumes facts. Lacks foundation.
Go ahead if you can.
THE WITNESS: As I sit here, I would not want to come up with an instantaneous opinion on that. That is something that would require me to consider more in -- more deeply.
BY MR. ANDERSON:
Q. Do you have any opinions concerning

Chevron 9-5568 that we have not discussed or that are not in Exhibit 36, your expert report, Appendix B25, or your rebuttal report?

MS. O'REILLY: Vague. Ambiguous. Overbroad.

THE WITNESS: Not that I'm aware of. And, again, the only caveat I would provide is if there are any conflicts between the opinions I've provided in Exhibit 36, and anything that can be construed as an opinion in my summary report, the Exhibit 36 opinions, would be the most current and would take precedence over any conflicting opinions presented in the summary report.

BY MR. ANDERSON:

Q. Okay. Do you have any of the maps where you have drawn the contours of the plumes here?

A. Yes. For this station, Chevron 5568, on Figures 4 and Figure 5 from my expert report, I did contour both MTBE and TBA concentration at various time steps. I'll provide that to you. Excuse me.

Q. What I would like to do is do the same thing we did last time, which is a Post-It, and then get these back to you. Is that all right?

A. That's correct.

MR. ANDERSON: Is that fine with you, Tracey?

MS. O'REILLY: That's fine. And just for the

record, we have produced these documents to defendants.

MR. ANDERSON: Unfortunately, as I'm sure you can appreciate, some of us have been living out of suitcases for a while, so we can't get copies of everything. But it's 137.

(Brown Exhibit 137 was marked.)

THE WITNESS: Could we just note that I've not received my previous originals back yet?

MR. ANDERSON: Okay.

MS. O'REILLY: Sandy went on vacation.

THE WITNESS: Oh, okay.

MS. O'REILLY: I told her that it was okay to send them to you when she got back.

BY MR. ANDERSON:

Q. In these plumes -- and I think this is true for the other sites -- you draw the 10 and 100 isoconcentration range, correct?

A. Correct.

Q. Is there any reason you didn't go to 5 parts per billion for the isoconcentration range?

MS. O'REILLY: Assumes facts. Lacks foundation.

THE WITNESS: I tried to use just order of magnitude concentrations, so the 10, the 100, the 1,000. At some of the stations, I could have drawn a 1 contour,

but the majority of the stations there was often cases where data was only present down to a 5-part-per-billion level, the -- because the 5 part per billion was the detection limit that was used by the laboratory.

So I -- for most of the figures, I kept it to a 10, a 100, 1,000 contour. There were some -- some cases, and I think particularly ARCO 1912, where I actually did use a 1 contour. And there may have been some other instances, but for the majority I believe I just used the 10, 100, and 1,000.

MR. ANDERSON: I'm ready to move on to Beacon Bay. We haven't been going an hour, but I know it may take a second for you to get this stuff out. Do you want to take five minutes?

THE WITNESS: That would be good.

MS. O'REILLY: Yeah.

THE WITNESS: Yeah, and I can pull the right reports out.

MR. ANDERSON: Okay. So the time it looks to me like -- well, they're all different. Every clock is different. Let's try to keep five minutes. I think we only have a couple more sites left.

MS. O'REILLY: That's fine.

THE VIDEOGRAPHER: With the approval of counsel, we're going off the record. The time is

approximately 2:59 p.m.

(Recess.)

THE VIDEOGRAPHER: With the approval of counsel, we are back on the record. The time is approximately 3:07 p.m.

(Brown Exhibit 138 was marked.)

BY MR. ANDERSON:

Q. And I wanted to mark 138 for you. And this is still dealing with 9-5568. I just had a couple of quick questions for you about it. This is a December 1st, 2011, SAIC report regarding the site excavation final report for Chevron 9-5568. For the record, I think that this is an extract of the entire document that was prepared.

Have you reviewed this before?

A. No, I've not.

Q. If we turn to page 7 of 10, under the "Conclusions," five lines down, it begins the sentence "The objective." "The objective of the excavation (to remove the majority of residual source mass of petroleum hydrocarbons in soil to substantially reduce continued leaching into groundwater) has been achieved based on a comparison of preexcavation to postexcavation soil sample results."

Do you see that?