UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898 (SAS) MDL 1358 |
| **This document relates to:** | The Honorable Shira A. Scheindlin |
| *Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*, Case No. 07-cv-10470 | |

**PLAINTIFF'S CONSOLIDATED RULE 56.1 STATEMENT IN OPPOSITION TO DEFENDANTS' FIRST AMENDED RULE 56.1 STATEMENT IN SUPPORT OF CERTAIN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON THE SOPHISTICATED PURCHASER DEFENSE**

## PLAINTIFF'S RULE 56.1 STATEMENT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Pursuant Rule 56.1 of this Court's Civil Rules, PLAINTIFF respectfully submits the following statement of undisputed facts in opposition to Defendants' Motion for Summary Judgment Based on the Sophisticated Purchaser Defense.

## I.    Procedural Background

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 1.      From the initial set of trial sites selected by the parties, five trial sites now remain at issue for the first trial of this action: (1) Shell #003042, (2) Esso CO-242, (3) Esso CO-364, (4) Total #1012, and (5) Texaco #800 (collectively, the "Trial Sites"). | **Undisputed.** |
| 2.      Plaintiffs have conceded that these Co-Defendant Trial Site owners were sophisticated purchasers of MTBE-containing gasoline to whom no duty to warn of the alleged hazardous properties of MTBE was owed. (*Dillard Dec.*, Ex. 18, Transcript of Status Conference (July 15, 2014)), at 64:17–65:1.) ,<br><br>THE COURT: "That's fine. But if the proof is that Conoco only sold to Exxon [sic] or Shell or Total or Texaco, whatever, big companies, then you concede they had no duty to warn them because you plead over and over that those people knew."<br><br>MR. MILLER: "The point is it's a matrix issue, so we would not make that contention."<br><br>THE COURT:  "Which contention?" | **Disputed.**  The quoted colloquy involves refiners, not co-defendant trial site owners. Plaintiff did not concede that any of the trial site owners were sophisticated. None of the trial sites are owned by moving defendants. Trial site Esso C0-242, for example, is not owned by Exxon Mobil Corporation, but by Esso Standard Oil Company (Puerto Rico). *See* PLAINTIFF'S additional fact No. 88, *infra*. Although the complaint alleges that do-defendant trial site owners were aware of the hazardous properties of MTBE, in discovery these co-defendants denied any such knowledge. |

| | |
|---|---|
| MR. MILLER: "I'm not going to stand up and tell the jury that Hess should have told Exxon and Exxon [sic] didn't know."<br><br>*Id.* | |

## II.   The Core Defendants' Statement of Facts

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 3.   The Core facility in Guayama, Puerto Rico (the "Core Facility") was operated by Phillips Puerto Rico Core Inc., later Chevron Phillips Chemical Puerto Rico Core ("CPCPRC"), during the relevant time period. (*Declaration of Stephen C. Dillard ("Dillard Dec.")*, Ex. 01 (Defendants ConocoPhillips Company and CPCPRC's Declaration Pursuant to Case Management Order #4 (hereafter "Marin Dec."), ¶ 3.) | **Undisputed.** |
| 4.   The Core Facility was a chemical manufacturing plant.   During a portion of the relevant years, a byproduct of the chemical manufacturing process was used to make gasoline, which was sold, in bulk quantities, to various <u>wholesale distributors</u> on and off the main island of Puerto Rico. (*Dillard Dec.*, Ex. 02 (Deposition of Juan Perez), at 27:3–29:24; *Dillard Dec.*, Ex. 01 (Marin Dec.), ¶ 4.) | **Disputed**. The evidence cited does not support the stated fact. "The Core facility in Guayama, Puerto Rico was a petrochemical facility. In addition to the chemical products made at the facility, gasoline was blended for sale at the wholesale level." *Dillard Dec.*, Ex. 01 (Marin Dec. ¶ 4.   Undisputed that gasoline was blended at the Core Facility. |
| 5.   All gasoline sales were F.O.B. at the truck loading rack or barge dock at the Core Facility.   (*Dillard Dec.*, Ex. 01 (Marin Dec.), ¶ 7.) | **Undisputed** but **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from the Core facility were sophisticated, and whether Phillips reasonably relied on purchasers to provide adequate warnings to end users. |
| 6.   From mid-1982 through early 2000, some, but not all, of the gasoline manufactured and sold from the Core Facility contained MTBE, which was blended to replace octane lost by the phase-out of lead. (*Dillard Dec.*, Ex. 01 (Marin Dec.), ¶ 5.) Customers were notified that the gasoline might contain MTBE. *See* ¶¶ 3–5 *infra*. | **Disputed**.   Virtually all of the gasoline sold from the Core Facility from 1982 through 1997 contained MTBE.   *See* Plaintiff's Rule 56.1 Statement Re Lack of Causation, ¶¶ 4-10.   In addition, the evidence cited does not support the stated fact and the fact misstates the cited testimony: "Some of the gasoline blended at the Core facility for sale in the Commonwealth |

| | |
|---|---|
| | of Puerto Rico contained MTBE from mid-1982- until March 2000. Phillips Puerto Rico Core Inc. may have blended TBA into some gasoline for sale in the Commonwealth of Puerto Rico for approximately a three month period in 1982." (Dillard Dec., Ex. 01 (Marin Dec.), ¶ 5.) The evidence cited does not address octane or lead. |
| 7.    Gasoline contracts between the Core Facility and customers during the relevant years specified that MTBE was permissible and might be present. (*See, e.g., Dillard Dec.*, Ex. 03 (1992 Esso Contract (Bates # XOM-PR-SUPP-716260-66), Attach. 1); *see also Dillard Dec.*, Ex. 04 (Deposition of Jan Carlos Rodriguez), at 73:20–74:10.) | **Disputed.**    The evidence cited does not support the stated fact and the fact misstates testimony. The lone 1992 Esso contract referenced allows MTBE up to 2.7% *Dillard Dec.*, Ex. 03 (1992 Esso Contract (Bates # XOM-PR-SUPP-716260-66), Attach. 1). This does not establish what was in other contracts. The cited testimony of Jan Carlos Rodriguez, on behalf of TPPRC, owner of Trial Site 9, Total 1012, is that its supply agreement with Core provided for the "possibility" that the gasoline might contain MTBE between 1992 and 1997. *Dillard Dec.*, Ex. 04 (Deposition of Jan Carlos Rodriguez), at 73:20–74:10.) This does not establish what was in contracts for other trial sites or what was in contracts for the Total site prior to 1992 or after 1997. <br><br> Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from the Core facility were sophisticated, and whether Phillips reasonably relied on purchasers to provide adequate warnings to end users |
| 8.    Material Safety Data Sheets ("MSDS") were supplied to customers when a new contract was signed. (*Dillard Dec.*, Ex. 05 (Deposition of Hector Marin), at 152:12–19, 154:7–10; *see also, e.g., Dillard Dec.*, Ex. 06 (1990 MSDS for Phillips Gasoline).) | **Disputed.** The evidence cited does not support the stated fact. The evidence cited indicates only that it was "the policy of the company [Core]," to provide customers with MSDS's. The deponent, Hector Marin, testified that he had no personal knowledge of whether MSDS's were actually given to customers and was not involved in providing MSDSs to customers. His testimony was only that "there was a committee back then" [responsible for approving and disseminating MSDSs]. **Dispute** any implication that providing customers with MSDSs gave adequate warnings on the hazards of MTBE or adequate instructions for its safe |

3

| | |
|---|---|
| | handling. |
| 9.      The MSDS identified MTBE as one of the ingredients potentially present in all grades of gasoline sold under the Phillips brand worldwide.   (*Dillard Dec.*, Ex. 06 (1990 MSDS for Phillips Gasoline), at 1, 6.) | **Undisputed** that the 1990 MSDS for Phillips Gasoline indicated the potential presence of MTBE in all grades of gasoline. **Dispute** any implication that the MSDS contained adequate warnings about the hazards of MTBE gasoline, or that adequate instructions were provided for safe handling. |
| 10.      The Core Defendants provided laboratory analyses to customers who transported the purchased gasoline from Core's marine docks.  Laboratory analyses referenced whether or not the gasoline contained MTBE. (*See, e.g., Dillard Dec.*, Ex. 07 (Laboratory Analyses of Core Gasoline).) | **Disputed**.  The evidence cited does not support the stated fact. The two excerpts of analyses are from January 29, 1996, and December 13, 1996 only. Each states that MTBE is present in the batch analyzed but gives no percentage. There is no evidence as to other batches.<br><br>Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from the Core facility were sophisticated, and whether Phillips reasonably relied on purchasers to provide adequate warnings to end users. |
| 11.      The Core Defendants never sold gasoline at retail or owned or operated gasoline service stations in Puerto Rico. (*Dillard Dec.*), Ex. 01 (Marin Dec.), ¶ 4.) | **Undisputed.** |
| 12.      The Core Facility was not the exclusive supplier to Esso, Total, Sol, or their predecessors during any period.   (*See, e.g., Dillard Dec.*, Ex. 08 (Deposition of Ivan Cintron), at 58:19–23; *Dillard Dec.*, Ex. 04 (Deposition of Jan Carlos Rodriguez), at 57:8–59:23; *Dillard Dec.*, Ex. 09 (Deposition of Margaret King), at 19:16–20:4, 36:2–15; *Dillard Dec.*, Ex. 10 (Sol PR Ltd. Dec. in Lieu of Deposition), ¶¶ 6–7.) | **Undisputed** that Core was not the exclusive supplier of *gasoline* to any of the Trial Site owners during the entire time period relevant to this case, i.e., 1979 – 2012.   However, CORE was the supplier of *MTBE gasoline* to certain of the Trial Sites during the time when certain releases occurred. *See* Plaintiff's Rule 56.1 Statement Re Lack of Causation, ¶¶ 23-38, 39-44.<br><br>Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from the Core facility were sophisticated, and whether Phillips reasonably relied on purchasers to provide adequate warnings to end users. |
| 13.      Moreover, the Core Defendants had no knowledge of where gasoline was delivered after it left Core's premises. (*Dillard Dec.*, Ex. 05 (Deposition of Hector Marin), at 301:23–302:21.) | **Disputed**.  Core Defendants knew that MTBE gasoline sold to co-defendant trial site owners would be resold in the Commonwealth to the retail operators at the trial sites.  Since 1998 Puerto Rico law has prohibited co-defendants |

| | from operating their retail locations, including the trial sites. 23 L.P.R.A. §1104a. CORE knew that the vast majority of all gasoline manufactured and sold by CORE was through "Local Sales," that is, on-island sales to CORE's customers, including Co-Defendant Trial Site owners. *See* Plaintiff's Rule 56.1 Statement Re Lack of Causation, ¶¶ 18, 19, 20.<br><br>**Dispute** any implication that Core Defendants did not know that co-defendant trial site owners were not the end users of the gasoline. |
| --- | --- |

### III.    Hess Oil Virgin Islands Corp. and HOVENSA L.L.C.'s Statement of Facts

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND EVIDENCE |
| --- | --- |
| 14.    The St. Croix refinery was owned and operated by Hess Oil Virgin Islands Corp. ("HOVIC") from 1966 to October 30, 1998. (*Leifer Dec.*, Ex. 01 (HOVIC CMO 4 Dec.), ¶ 4.) The St. Croix refinery was owned and operated by HOVENSA L.L.C. ("HOVENSA") starting on October 31, 1998. (*Leifer Dec.*, Ex. 02 (HOVENSA CMO 4 Dec.), ¶ 4.) | **Undisputed.** |
| 15.    All sales of gasoline by HOVIC and HOVENSA were F.O.B. at the docks of the St. Croix refinery where the title passed to the purchaser. (*Leifer Dec.*, Ex. 01 (HOVIC CMO 4 Dec.), ¶ 5; *Leifer Dec.*, Ex. 02 (HOVENSA CMO 4 Dec.), ¶ 5.) | **Undisputed** that title passed to purchaser at the docks in St. Croix. **Dispute** any implication that HOVIC and HOVENSA did not know that gasoline sold to co-defendant trial site owners would be resold in the Commonwealth to retail operators. Puerto Rico law, since 1998, has prohibited co-defendant trial site owners from operating retail stations. (23 L.P.R.A. § 1104a). **Dispute** any implication that HOVIC and HOVENSA did not know that co-defendant trial site owners were not the end users of the gasoline sold by HOVIC and HOVENSA.<br><br>Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from HOVIC or HOVENSA were sophisticated, and whether HOVIC or HOVENSA reasonably relied on purchasers to |

| | |
|---|---|
| | provide adequate warnings to end users. |
| 16.    Not    all    of    the    gasoline manufactured and sold from the St. Croix refinery and then taken to Puerto Rico by third parties contained MTBE. (*Leifer Dec.*, Ex. 03 (Wood Dep.), at 193:12–15.) | **Undisputed** that not all gasoline contained MTBE. **Dispute** any implication that HOVIC and HOVENSA had no duty to warn purchasers and end users of MTBE gasoline that **was** sold by HOVIC and HOVENSA of its hazards. |
| 17.    HOVIC's    and    HOVENSA's customers would know when a gasoline batch that they bought contained MTBE. (*Leifer Dec.*, Ex. 03 (Wood Dep.), at 144:1–4.) | **Undisputed** but **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from HOVIC or HOVENSA were sophisticated, and whether HOVIC or HOVENSA reasonably relied on purchasers to provide adequate warnings to end users. |
| 18.    HOVIC and HOVENSA did not have retail supply contracts or any other business relationship with the Trial Sites. (*Leifer Dec.*, Ex. 04 (HOVIC and HOVENSA Interrogatory Responses).) | **Undisputed** that HOVIC and HOVENSA did not have direct retail supply contracts with trial site retail operators. **Disputed** that HOVIC and HOVENSA did not have "any other business relationship" with the trial sites. HOVIC and HOVENSA sold gasoline to co-defendant trial site owners Shell Company Puerto Rico, Ltd, n/k/a Sol (Sol),    Esso Standard Oil Co. PR (Esso) and Chevron Puerto Rico, LLC, f/k/a Texaco Puerto Rico Inc. (Texaco). (*Leifer Dec.*, Ex. 01 (HOVIC CMO 4 Dec.), ¶ 1; *Leifer Dec.*, Ex. 02 (HOVENSA CMO 4 Dec.), ¶ 1.) Under Puerto Rico law, these co-defendant trial site owners could not themselves sell the gasoline they purchased but needed to re-sell to the trial site retail operators at Commonwealth retail gasoline stations. L.P.R.A. § 1104a.<br><br>Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from HOVIC or HOVENSA were sophisticated, and whether HOVIC or HOVENSA reasonably relied on purchasers to provide adequate warnings to end users. |
| 19.    Relative to the Trial Sites, HOVIC and HOVENSA supplied gasoline bound for Puerto Rico only to major oil companies, such as Shell, Texaco, and Exxon, or their affiliates.    (*Leifer Dec.*, Ex. 01 (HOVIC CMO 4 Dec.), ¶ 1; *Leifer Dec.*, Ex. 02 (HOVENSA CMO 4 Dec.), ¶ 1.) | **Undisputed** that HOVIC and HOVENSA supplied gasoline to the major oil company defendants and their affiliate defendants. |

| 20.    HOVIC and HOVENSA did not know the ultimate destination in Puerto Rico where the gasoline they manufactured was taken.   (*Leifer Dec.*, Ex. 04 (HOVIC and HOVENSA Interrogatory Responses).) | **Disputed**.  HOVIC and HOVENSA knew that gasoline sold to co-defendant trial site owners (Sol, Esso and Texaco) would be resold in Puerto Rico to retail operators at gas stations owned by the co-defendant trial site owners. Puerto Rico law, since 1998, has prohibited co-defendants from operating their retail locations. **Dispute** any implication that Core Defendants did not know that co-defendant trial site owners were not the end users of the gasoline. By law, the gasoline had to be re-sold before retail sale. 23 L.P.R.A. § 1104a.<br><br>Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from HOVIC or HOVENSA were sophisticated, and whether HOVIC or HOVENSA reasonably relied on purchasers to provide adequate warnings to end users. |

## IV.    Exxon Mobil Corporation Statement of Facts

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 21.    Exxon Mobil Corporation ("ExxonMobil") has never owned, operated, or had any legal interest in any gasoline service station in Puerto Rico, including the Trial Sites.   (*Bollar Dec.*, Ex. 01 (ExxonMobil's March 26, 2013 Supp. Resp. to Pls.' 2008 First Set of Interrog.), at No. 1.) | **Disputed.**  The stated fact is not supported by admissible evidence.  Moving party's own discovery responses are not admissible on summary judgment evidence. (*Lobel v. American Airlines*, 192 F.2d 217, 221 (2d Cir. 1951) (allowing party to read its own interrogatory responses into evidence at trial was error).<br><br>Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from ExxonMobil were sophisticated, and whether ExxonMobil reasonably relied on purchasers to provide adequate warnings to end users. |
| 22.    ExxonMobil has never owned, operated, or had any interest in any refinery, terminal, gasoline pipeline, common carrier pipeline system, breakout terminal, or other distribution facility located in Puerto Rico. (*Bollar Dec.*, Ex. 02 (CMO 4 Dec. of Paul | **Undisputed** but **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from ExxonMobil were sophisticated, and whether ExxonMobil reasonably relied on purchasers to provide adequate warnings to end users. |

| | |
|---|---|
| Goldberg on Behalf of Exxon Mobil Corporation), §§ III(B)(2)(a)(ix)(2) – (3).) | |
| 23. ExxonMobil has never utilized any common carrier pipeline system, breakout terminal, or waterway route within Puerto Rico. (*Id.* §§ III(B)(2)(a)(ix)(4) – (6).) | **Undisputed** but **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from ExxonMobil were sophisticated, and whether ExxonMobil reasonably relied on purchasers to provide adequate warnings to end users. |
| 24. ExxonMobil has never transported or delivered gasoline to any service stations within the Commonwealth of Puerto Rico, including the Trial Sites. (*Id.* § III(B)(2)(a)(ix)(7).) | **Undisputed** but **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from ExxonMobil were sophisticated, and whether ExxonMobil reasonably relied on purchasers to provide adequate warnings to end users. |
| 25. ExxonMobil has never contracted with distributors for the supply of gasoline to any gasoline service stations in Puerto Rico, including the Trial Sites. (*Id.* at § III(B)(2)(i).) | **Disputed**. Exxon Company, U.S.A. (now known as ExxonMobil Corporation) entered into a long term contract to supply gasoline to its Puerto Rico subsidiary. The contract commenced in June 1982 and continued indefinitely until one of the parties gave six months' notice to terminate  The contract explicitly states: "EUSA ("Exxon Company, U.S.A.") agrees to sell motor gasoline to Essorico ("Esso Standard Oil Company (Puerto Rico)") under the following terms and conditions." In other words, the exchange agreement was a purchase by ExxonMobil of CORE's MTBE gasoline on the account of Esso.<br><br>To comply with its contract with Esso, ExxonMobil entered into an exchange agreement with Phillips Petroleum Company (n/k/a ConocoPhillips Company ("COP"), whereby COP provided CORE MTBE gasoline to Esso in Puerto Rico and, in exchange, ExxonMobil provided its gasoline to COP in the mainland United States.<br><br>*See* Response to Rule 56.1 Statement Re Lack of Causation, ¶¶ 27, 28. |
| 26. Exxon Chemical International Supply, S.A. ("ECIS") sold limited amounts of neat MTBE to Phillips Puerto Rico Core, Inc. | **Undisputed** but **irrelevant**. |

| | |
|---|---|
| ("PPRC") which was then shipped by PPRC to the Core facility from mid-1982 until the second quarter of 1985. (*See Bollar Dec.*, Ex. 03 (CPCPR-051767 to CPCPR-051768; CPCPR-032100 to CPCPR-032119; CPCPR-051771 to CPCPR-051782; XOM-PR-FILES-SUPP-966191).) ECIS did not sell neat MTBE to Core during any other time period. *See id.* | |
| 27.    ECIS was an independent Panamanian corporation which was dissolved effective December 23, 1986. (*Bollar Dec.*, Ex. 04 (10/17/13 Dep. of Ricardo Casas, Ex. 4).) | **Undisputed** but **irrelevant**. |
| 28.    In the thirty-five year period since 1979, only thirteen shipments of gasoline were supplied by ExxonMobil to Puerto Rico. Ten of these shipments were received by co-defendant Esso Standard Oil Company (Puerto Rico) ("Esso") and three of these shipments were received by co-defendant Shell Chemical Yabucoa Inc. (*Bollar Dec.*, Ex. 05 (Second Am. Expert Report of D. Millican, Ex. 1).) | **Disputed.** *See* Response to Fact No. 25.<br><br>Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from ExxonMobil were sophisticated, and whether ExxonMobil reasonably relied on purchasers to provide adequate warnings to end users. |
| 29.    The presence of MTBE was confirmed in only one shipment of gasoline supplied by ExxonMobil to Esso over the thirty-five year period since 1979. (*See id.*; *Bollar Dec.*, Ex. 02 (CMO 4 Dec. of Paul Goldberg on Behalf of Exxon Mobil Corporation), §§ III(B)(2)(i), III(B)(2)(a)(vii).) | Denied. *See* Response to Fact No. 25.<br><br>Also **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from ExxonMobil were sophisticated, and whether ExxonMobil reasonably relied on purchasers to provide adequate warnings to end users. |
| 30.    This April 22, 1995 shipment of 18,603 barrels of premium gasoline containing 6% MTBE by volume was shipped from Baton Rouge, LA to Esso at the Cataño terminal in Puerto Rico. (*Bollar Dec.*, Ex. 05 (Second Am. Expert Report of D. Millican, Ex. 1).) | **Undisputed.** |
| 31.    In addition to the April 22, 1995 shipment of gasoline from ExxonMobil to Esso, there was a July 1992 shipment of gasoline from ExxonMobil to Esso at the Cataño terminal that contained an unidentified oxygenate. (*Id.*; *Bollar Dec.*, Ex. 02 (CMO 4 Dec. of Paul Goldberg on Behalf of Exxon Mobil Corporation), § III(B)(2)(a)(vii).) | **Undisputed.** |

## V.   The Trial Sites

### 1. Shell #3042

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 32.     Sol Puerto Rico Limited ("Sol") has owned the Shell #3042 service stations, including all underground storage tanks ("USTs") and dispensing equipment, since prior to 1979. (*See Dillard Dec.*, Ex. 10 (Sol PR Ltd. Dec. in Lieu of Deposition), ¶ 2.) | **Undisputed.** |
| 33.     Sol contracted out operation of the station but at all times retained ownership, control, and the responsibility to maintain the USTs and dispensing equipment at the station. (*See Dillard Dec.*, Ex. 11 (Deposition of Carlos Cuevas), at 13:11–17; 30:14–31:25, 57:18–58:6.) | **Undisputed** but **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 34.     Sol instructed the operators on how to identify releases of gasoline at Shell #3042. (*Id.* at 17:2–10, 24:10-22, 60:13–21.) | **Undisputed** that Sol gave some instructions. **Dispute** any implication that such instructions included instructions on how to handle MTBE gasoline properly. **Dispute** any implication that Sol itself was sophisticated as to MTBE's hazards. See Facts No. 53-55 and 72, *infra*. |
| 35.     Sol, not the Trial Site operator, was responsible for cleaning up any spills of gasoline at Shell #3042. (*Id.* at 17:11–19:2, 33:9-21, 75:3–76:1.) | **Undisputed** but **irrelevant.** The operator, not Sol, received, dispensed, and oversaw day –to-day operations at the Trial Sites. *See* PCS Facts Nos. 72 and 85, *infra*. |
| 36.     Sol provided the Trial Site operator with a manual on how to operate Shell #3042. (*Id.* at 57:2–13.) | **Undisputed** that Sol provided a manual. **Dispute** any implication that it contained any instruction to the operator as to the proper handling or hazards of MTBE gasoline. |

### 2. Total #1012

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 37.     Total #1012 was previously known as GPR 1012. (*See Dillard Dec.*, Ex. 12 (Dec. of Jan Carlos Rodriguez), ¶ 6; *see also Dillard Dec.*, Ex. 14 (Deposition of Enrique Veglio), at 123:1–10 (stating that GPR owned the land and equipment at the station).) | **Undisputed.** |

| | |
|---|---|
| Before changing its name to Total Petroleum Puerto Rico Corp. ("TPPRC") in 2004, TPPRC was named Gasolinas de Puerto Rico Corporation ("GPR"). (*See Dillard Dec.*, Ex. 12 (Dec. of Jan Carlos Rodriguez), ¶ 5.) | |
| 38.   Until 1998, the station did not have an independent retailer. (*Id* ¶ 7.) Then, the station was turned over for operation by a franchisee-retailer that operates it under TPPRC's brand. (*Id.*) | **Undisputed.** |
| 39.   When operation of the station was contracted-out in 1998, several former GPR employees continued to work at the station. (*See Dillard Dec.*, Ex. 12 (Dec. of Jan Carlos Rodriguez), ¶ 7; *Dillard Dec.*, Ex. 13 (Deposition of Antonio Pavia), at 21:18–22:5.) The operators continued to receive instructions from the owner regarding safe operation of the station. (*See Dillard Dec.*, Ex. 14 (Deposition of Enrique Veglio), at 134:1–11.) The operators did not have responsibility for obtaining permits for tanks. (*See Dillard Dec.*, Ex. 14 (Deposition of Enrique Veglio), at 133:8–11.) The operators took measurements to check for spills, but if a spill occurred (or "if something . . . big happened"), then that was the owner's responsibility. (*See Dillard Dec.*, Ex. 14 (Deposition of Enrique Veglio), at 133:12–24.) ("It wasn't me alone because I couldn't do anything.").) | **Undisputed** that several former GPR employees, "the cashiers and floor employees," continued to work at the station when it was contracted-out in 1998. **Dispute** any implication that either the station owner or former employees were "sophisticated" as to the hazards of MTBE gasoline.<br><br> **Undisputed** that the operators continued to receive instructions from the Trial Site owner regarding station operation. **Dispute** that these instructions contained any information on the dangers of MTBE gasoline or special handling procedures for such. .<br><br>**Undisputed** that the operators did not have responsibility for tank permits.  **Undisputed** that the trial site owner, GPR/TPPRC was responsible for spills. **Irrelevant**, however,  to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |

### 3.  Esso #364

| **DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE** | **PLAINTIFF'S RESPONSE AND EVIDENCE** |
|---|---|
| 40.   Esso Standard Oil Company (Puerto Rico) ("Esso") has owned the Esso #364 service station, including its USTs and dispensing systems, at all relevant times. (*Bollar Dec.*, Ex. 06 (Esso's May 29, 2012 | **Disputed.**  The cited evidence does not support the stated fact.  Esso #364 site was owned by Esso "from at least 1991 through October 2007 . . . ."  The relevant time period for this action is 1979 to present. |

| | |
|---|---|
| Resp. to Pls.' First Set of Interrog. Re. Pltf. Trial Sites), at Nos. 7, 9.) | **Irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 41.     Prior to 1998, Esso operated the service station directly. (*Dillard Dec.*, Ex. 15 (Deposition of Hector Berrios) at 52:12–15.) | **Undisputed** but **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 42.     Even after Esso entered into a franchise agreement with an independent contractor dealer beginning in 1998, former Esso employees remained at the service station as employees of the new dealer, including the former station manager. (*See id* at 17:4–11.) | **Undisputed** that some former Esso employees, including a former station manager, remained at the station to work for the independent operator in 1998. **Disputed** as to any implication that these former employees were "sophisticated" as to the dangers of MTBE, or that Esso, their former employer, was "sophisticated" as to the dangers of MTBE. *See* PCS Facts Nos. 66-68 and 74. |
| 43.     As part of the franchise agreement with the service station dealers, Esso has retained responsibility for maintaining the underground storage tanks and dispensing systems at Esso #364. (*See id.* at 19:14–17.) | **Undisputed** but **irrelevant** to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |

### 4. Esso #242

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 44.     Esso also owned the Esso #242 service station, including its USTs and dispensing systems, at all relevant times. (*Bollar Dec.*, Ex. 06 (Esso's May 29, 2012 Resp. to Pls.' First Set of Interrog. Re. Pltf. Trial Sites), at Nos. 7, 9.) | **Undisputed.** **Irrelevant** as to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 45.     As part of the franchise agreement with the service station dealers, Esso retained responsibility for maintaining the USTs and dispensing systems at the Esso #242 until operations ceases after the station was | **Undisputed** but **irrelevant** as to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide |

| | |
|---|---|
| sold to Total on October 31, 2008. (*See Dillard Dec.*, Ex. 16 (Deposition of Miguel Torres), at 19:16-25; *Dillard Dec.*, Ex. 17 (Dec. of Polauris Vazquez re CMO #75 (Aug. 6, 2012)), ¶ 5.) | adequate warnings to end users. |

### 5.  Texaco #800

| DEFENDANTS' UNDISPUTED MATERIAL FACTS AND ALLEGED SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND EVIDENCE |
|---|---|
| 46.   Chevron Puerto Rico, LLC (f/k/a Texaco Puerto Rico Inc.) (hereinafter "CPRLLC") owned the Texaco #800 Trial Site, including its underground storage tank and dispensing systems. (*See Leifer Dec.*, Ex. 05 (Rivera-Agostini Exhibit #6), ¶¶ 17, 36).) | **Undisputed.**<br><br>**Irrelevant** as to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 47.   Pursuant to certain agreements, CPRLLC leased the Texaco #800 Trial Site to operators. (*Id.* ¶ 1.) | **Undisputed.**<br><br>**Irrelevant** as to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 48.   Under the supply contract agreement, the Texaco Trial Site operators were prohibited from making changes or alterations to the underground storage tank or dispensing systems without CPRLLC's consent. (*Id.* ¶¶ 17, 36.) | **Undisputed.**<br><br>**Irrelevant** as to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 49.   Under the supply contract agreement, the Texaco Trial Site operators had no control over how the underground storage tank or dispensing systems were installed, repaired, or upgraded. (*Id.*) | **Undisputed.**<br><br>**Irrelevant** as to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 50.   Under the supply contract agreement, the Texaco Trial Site operators were required to conduct daily underground | **Undisputed.**<br><br>**Irrelevant** as to whether adequate warnings |

| | |
|---|---|
| storage tank measurements and pump checks to identify potential releases of gasoline. (*Id.*) | were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 51.   Under the supply contract agreement, the Texaco Trial Site operators were required to contact Chevron Puerto Rico, LLC any time there was a release or potential release of gasoline. (*Id.*) | **Undisputed.**<br><br>**Irrelevant** as to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |
| 52.   Under the supply contract agreement, Chevron Puerto Rico, LLC was responsible for the investigation and remediation of any gasoline release at the Texaco Trial Site. (*Id.*) | **Undisputed.**<br><br>**Irrelevant** as to whether adequate warnings were given, whether those purchasing gasoline from moving parties were sophisticated, and whether moving parties reasonably relied on purchasers to provide adequate warnings to end users. |

**PLAINTIFF'S 56.1 SEPARATE STATEMENT OF FACTS IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON THE SOPHISTICATED PURCHASER DEFENSE**

**Subsidiary Defendants Were Not Sophisticated As To The Hazards Of MTBE**

**SOL Puerto Rico Limited f/k/a Shell Puerto Rico**

53.    Yamira Rivera, a former employee of Sol, testified that Sol did not inform her that MTBE was a threat to groundwater.  (Axline Decl., Ex. 1, Rivera Depo. (08/14/2013) at 103:17-21.)  She was not aware that MTBE was a groundwater contaminant until 2012, while working for Chevron Puerto Rico, LLC (CPRLLC), f/k/a Texaco Puerto Rico, Inc. At the time, she was implementing a remediation program in Puerto Rico and was instructed by her employer, CPRLLC, to gather information regarding MTBE.  (*Id.* at 93:13-94:6 and 94:24-95:6.)

54.    Dario Amadeo-Cedo, employee of Sol since 1991, was responsible for overseeing Sol's safety programs.  (Axline Decl., Ex. 1, Amadeo Depo. (08/13/2013) at 40:3-11.)  At the time of his deposition, he had no knowledge of MTBE being in Sol's gasoline.  When asked who at Sol might have such information, he testified, "I don't believe that anyone at Sol is able to answer such questions." (*Id.* at 125:4-17.)  He never heard MTBE being discussed, or even the term "MTBE." (*Id.* at 125:4-17, 126:3-13.)

55.    Brenda Torano, former employee of Sol, recalled that MTBE was mentioned in 2005 as part of an internal study by Shell. (Axline Decl., Ex. 1, Torano Depo. (09/26/2013) at 34:21-35:8.)  Ms. Torano never received documents regarding the frequency of MTBE's detection in drinking water.  Ms. Torano found this information, on her own, on the internet when running her own searches.  (*Id.* at 60:5-14.)

**Total Petroleum Puerto Rico Corp. f/k/a Gasolinas de Puerto Rico**

56.     Since 1992, Total Petroleum Puerto Rico Corp. f/k/a Gasolinas de Puerto Rico

(TPPRC/GPR) supplied the gasoline sold at the Total 1012 gasoline station site.  (Axline Decl.,

Ex. 5, Declaration of Jan Carlos Rodriguez Munoz (11/26/13) ¶ 9.)

57.     Between 1992 and 1997, TPPRC/GPR obtained its gasoline from Idemitsu Apollo

Corporation ("IAC").   (Axline Decl., Ex. 5, Decl. of Jan Carlos Rodriguez Munoz (11/26/13) ¶

17;  Axline Decl., Ex. 5, Expert Report of Leonardo Giacchino, Ph.D., (4/18/14) ¶ 91, sentence

1.)

58.     Most of the gasoline TPPRC/GPR obtained from Idemitsu Apollo Corporation (IAC)

from 1992-1997 was lifted from Phillips Puerto Rico Core, Inc.'s facility in Guayama ("Core

Facility").  (Axline Decl., Ex. 5, Declaration of Jan Carlos Rodriguez Munoz (11/26/13) ¶ 18;

Expert Report of Leonardo Giacchino, Ph.D., ¶ 91, sentence 2.)

59.     TPPRC's expert wrote in his report that during the 1992-1997 period, TPPRC/GPR was

not aware of the content of the gasoline lifted from the Phillips Puerto Rico Core Inc. facility and

delivered to TPPRC/GPR's service stations.  (Axline Decl., Ex. 5, Expert Report of Leonardo

Giacchino, Ph.D., ¶ 92, (sentence 2).)

60.     TPPRC's expert wrote in his report that prior to 2008, TPPRC/GPR did not have

information regarding the origin or the additive content of the gasoline it purchased. (Axline

Decl., Ex. 5, Expert Report of Leonardo Giacchino, Ph.D., ¶ 86.)

61.     TPPRC's expert wrote in his report that TPPRC/GPR, as a reseller, did not know the

composition of the gasoline it purchased.  (Axline Decl., Ex. 5, Expert Report of Leonardo

Giacchino, Ph.D., ¶ 89, sentences 1 and 2.)

62.     TPPRC's expert wrote in his report that TPPRC/GPR, as a reseller, was not aware of any MTBE content in the gasoline that would be supplied to its service stations.  (Axline Decl., Ex. 5, Expert Report of Leonardo Giacchino, Ph.D., ¶ 89, (last sentence).)

63.     TPPRC's expert wrote in his report that TPPRC/GPR, as a reseller, did not conduct sampling of the gasoline it purchased.  (Axline Decl., Ex. 5, Expert Report of Leonardo Giacchino, Ph.D., ¶ 89, sentence 5.)

64.     TPPRC's expert wrote in his report that TPPRC/GPR did not know the content of the gasoline it to supplied Trial Site No. 9, Total 1012.  (Axline Decl., Ex. 5, Expert Report of Leonardo Giacchino, Ph.D., ¶ 115, (sentence 2).)

65.     Margaret King, was an employee of TPPRC/GPR, from 1990s – 2010, worked as a controller and then as a corporate officer.  (Axline Decl., Ex. 6, King Depo. (10/24/2013) at 10:19-23 and 11:20-12:1.)  In 2004, when TPPRC acquired GPR,   she became an administrative director.  (*Id.* at 27:22-28:1 and 28:9-14.)  Ms. King first became aware of MTBE through legal documents delivered to TPPRC in 2009.  During her time in the gasoline business, from 1983 to 2009, she had never heard anything about MTBE.  She only learned of MTBE through the lawsuit.  (*Id.* at 110:24-111:24.)

**Esso Standard Oil Company (Puerto Rico)**

66.     Augusto Munoz, former employee of Esso Standard Oil Company (Puerto Rico) (Esso), testified that when he was implementing a storage tank upgrade program for Esso stations in Puerto Rico, he was never told to even consider MTBE.   (Axline Decl., Ex. 3, Munoz Depo. (05/07/2014) at 45:14-16.)  He only become aware that even small releases of MTBE gasoline could cause significant contamination at his deposition in this case as designee under Rule 30(b)(6).  (*Id.* at 50:4-20.)  He was not aware that MTBE had been detected in drinking water

wells in the United States. (*Id.* at 50:21-51:10.) When asked if there were extra steps he could have taken to prevent releases and thus to prevent MTBE from reaching water wells, he testified, "If I had knowledge, which at that time, I didn't, possibly, yes." (*Id.* at 76:19-77:3.)

67.     Ricardo Casas was an employee of Esso for about 20 years. He was not aware of MTBE until his involvement in this case. (Axline Decl., Ex. 3, Casas Depo. (05/06/2014) at 36:24-37:9.) He does not know if gasoline purchased from Phillips Core or Hess (HOVIC / HOVENSA) contained MTBE. (*Id.* at 48:3-8 and 54:6-10.) He did not receive any training on leak detection methods specific to MTBE gasoline. "The training was on leak detection and prevention, of gasoline in general." There was no special training for gasoline containing MTBE. He was never told during his training, or in connection with his preparations for training gasoline station operators, that a teaspoon of MTBE could contaminate a football-field-sized well of groundwater. He was never told that a customer's spills, drips, and leaks could release sufficient MTBE to contaminate an aquifer. (*Id.* at 89:2-24.)

68.     Carlos Figueroa was employed by Esso from 1996 to 2011. (Axline Decl., Ex. 3, Figueroa Depo. (12/05/2013) at 41:24-42:3.) Mr. Figueroa testified that he first learned about MTBE after 2000, when a new employee from California, Ms. Nainan, joined Esso. (*Id.* at 13:9-23.) In conversations with colleagues, including Mr. Figueroa, Ms. Nainan shared her experience with an MTBE remediation in California. (*Id.* at 18:12-24.) Mr. Figueroa does not recall receiving any training related to MTBE prior to 2011. (*Id.* at 65:19-66:11.) At no time during his time with Esso did he have to deal specifically with any MTBE issues. (*Id.* at 69:16-70:2.)

18

**Chevron Puerto Rico, LLC f/k/a Texaco Puerto Rico, Inc.**

69.    Jose de La Rosa was designated to testify pursuant to Rule 30(b)(6) on behalf of Chevron

Puerto Rico, LLC f/k/a Texaco Puerto Rico, Inc. (CPRLLC).  (Axline Decl., Ex. 4, De La Rosa

Depo. (09/12/2013) at 9:11-14.)  He is currently employed by Chevron Project Resources

Company, an affiliate of Chevron. (*Id.* at 20:1-8.)

70.    Mr. de La Rosa was an employee of CPRLLC from 1991 – 2004, returning in 2006. Later

he joined Chevron Environmental Management, an affiliate of Chevron.  (*Id.* at 16:9-11, 17:11-

18, 17:20-18:13.)

71.    Mr. de La Rosa testified that he was not aware of the components in CPRLLC's gasoline

sold in Puerto Rico: "[f]rankly, I was under the impression that MTBE was not being used . . ."

Only when preparing for deposition in this case, and during his deposition, did he become aware

that MTBE was in gasoline being sold in Puerto Rico.  "I wasn't expecting to find MTBE."

(Axline Decl., Ex. 4, De La Rosa Depo. (09/12/2013) at 99:1-24.)

<u>Lack of Sophistication of Trial Site Operators of MTBE Hazards</u>

**At Shell/Sol #3042, Trial Site No. 3**

72.    Carlos Cuevas Ortiz, station operator of Shell/Sol # 3042, testified that at no time was he

told by Trial Site owner, Sol/Shell Puerto Rico, that it was putting MTBE in the gasoline, that

MTBE was in the gasoline, or that it was a component of gasoline.  (Axline Dec., Ex. 1, Cuevas

Depo. (05/07/2013) at 34:15-19.)  He was never told that MTBE could get into drinking water.

(*Id.* at 36:11-21.)

**At Esso #242, Trial Site No. 6**

73.    Miguel A. Torres-Hernandez was an operator of Esso CO-242 and testified that he was

not aware that MTBE was in the gasoline sold at the station.  (Axline Dec. Ex. 2, Torres-

Hernandez Depo. (07/08/2013) at 36:16-19.) Esso told another operator of Esso CO-242, Miguel

Torres-Sierra, that the gasoline it was supplying had MTBE, but does not recall being told

anything about MTBE contaminating drinking water. (Axline Dec., Ex. 2, Torres-Sierra Depo.

(05/08/2013) at 40:6-9, 13-16.) His understanding was that gasoline with MTBE did not need to

be handled differently. (*Id.* at 41:6-13.)

**At Esso #364, Trial Site No. No. 5**

74.      Hector Emilio Berrios, administrator/operator of Esso CO-364, testified that he had not

been told by Esso that any amount of releases of gasoline with MTBE could contaminate

drinking water. He further testified that he was never told that MTBE gasoline had to be handled

differently or more carefully than gasoline without MTBE. (Axline Decl., Ex. 2 Berrios Depo.

(05/09/2013) at 46:1-11.)

**At Texaco #800, Trial Site No. 10**

75.      Angel M. Rivera-Agostini, operator of Texaco 800, did not recall any representative of

the Trial Site owner, CPRLLC, ever telling him that the gasoline he bought had MTBE. No one

from CPRLLC told him that MTBE, if released, would contaminate drinking water. He would

have been concerned if he had found out that MTBE in the gasoline at his station could

contaminate drinking water. Had he been told that there were extra steps he could have taken so

that MTBE wouldn't contaminate drinking water, he would have taken those steps. (Axline

Decl., Ex. 4, Rivera-Agostini Depo. (06/11/2013) at 78:25-79:22.)

**At Total 1012, Trial Site No. 9**

76.      Antonio R. Pavia, operator of Total 1012 (a/k/a Gasolinas de Puerto Rico (GPR) Central

Station), testified that he was never told by the Trial Site owner, Total Petroleum Puerto Rico

Corp. f/k/a Gasolinas de Puerto Rico (TPPRC) that MTBE was in the gasoline being sold at the

station. (Axline Decl., Ex. 7, Deposition of Antonio R. Pavia (6/12/13) (hereafter "Pavia depo

Vol. 1") at 70:17-20.) During the time Mr. Pavia operated the Total 1012, he was not aware that

MTBE could contaminate drinking water. (*Id.* at 71:9-20.)

77.     Mr. Pavia was concerned about any such contamination and states he would have done

everything he could to prevent MTBE from contaminating drinking water. (Decl., Ex. 7,

Deposition of Pavia depo Vol. 1, at 71:21-72:12, and 73:11-19.)

78.     Starting in 1998, the Total 1012 station was operated by the Bartolo Company. It had

five partners, only one of whom had any experience operating a gas station. (Axline Decl., Ex. 7,

Deposition of Pavia depo Vol. 1, at pp. 13:8-24, 20:1-5, 20:22-21:14.)

79.     Bartolo operated the Total 1012 station from April 30, 1998, until February 20, 2003.

(Axline Decl., Ex. 7, Deposition of Antonio R. Pavia (7/11/13) (hereafter "Pavia depo Vol. 2"),

at pp.12:12-18.)

80.     During that time, Bartolo purchased gasoline for the station by contacting the Trial Site

owner (TPPRC/GPR) which arranged for delivery of gasoline to that station. (Axline Decl., Ex.

7, Pavia Depo Vol. 1, at p. 32:2-12.)

81.     All gasoline Bartolo purchased for Total 1012, from 1998 to 2003, was supplied by

TPPRC/GPR. (Axline Decl., Ex. 7, Pavia depo Vol. 2, at pp. 40:25-41:15.)

82.     TPPRC/GPR never told Bartolo that MTBE was in the gasoline sold at Total 1012.

(Axline Decl., Ex. 7, Pavia Depo Vol. 1, at p. 70:17-20; 76:23-77:3.)

83.     No one from TPPRC/GPR ever informed Bartolo about MTBE or its ability to

contaminate drinking water (Axline Decl., Ex. 7, Pavia Depo Vol. 1, at p. 76:17-21.)

84.     Enrique A. Veglio-Matos, another operator of Total 1012, testified that the Trial Site

owner, TPPRC/GPR did not tell him about MTBE being in the gasoline sold at the station.

(Axline Decl., Ex. 6, Veglio-Matos Depo. (07/09/2013) at 84:2-7.)  He was never told that a drop of MTBE could cause water to taste bad.  (*Id.* at 86:7-13.)  He stated that if there were extra precautions he could have taken so MTBE would not get into his neighbor's water, he would have tried to prevent MTBE from getting into his neighbors' water.  (*Id.* at 86:22-87:8.)

### Subsidiary Defendants Were Not the End Users as They Re-Sold Gasoline Supplied by Refiner Defendants to the Operators of the Trial Site Gas Stations

**Shell #3042**

85.     Carlos Cuevas and Trial Site owner of Shell #3042, Sol/Shell Puerto Rico, entered into an agreement under which "[t]he Company [Shell Puerto Rico] will sell and deliver to the Dealer [Carlos Cuevas] the quantities of 'Shell' brand Petroleum Products which the Dealer orders from time to time during the term of this Contract for delivery to the Station." (Axline Decl., Ex. 1, Cuevas Depo. (05/7/2013) Exhibit 1, attached thereto at p. 3, § 7.1.)

**Total #1012**

86.     Antonio R. Pavia/Bartolo Inc., and Trial Site owner of Total #1012, TPPRC/GPR entered into an agreement under which the operator purchased all gasoline to be sold at that station from TPPRC/GPR "[d]uring the term of this contract, SUPPLIER [TPPRC/GPR agrees to sell and BUYER [Bartolo Inc.] agrees to buy and pay for the products . . . ." (Axline Decl., Ex. 7, Pavia Depo. (06/12/2013) Exhibit 4 thereto at p. 4-5.)

**Esso #364**

87.     Hector Berrios, whose family operated a group of Esso gas stations since 1998, including Esso #364, was required to purchase all gasoline for the station from Esso. "In terms of their brand, the only thing we could have was Esso." (Axline Decl., Ex. 2, Berrios Depo. (05/09/2013) at 13:22-14:5; 27:12-16.)

**Esso #242**

88.     Miguel A. Torres-Hernandez worked at the Esso CO-242 for twenty years. (Axline Decl., Ex. 2 Torres Depo. (07/08/2013), at 12:03-09). Esso owned the property, the underground storage tanks and gasoline dispensing systems. (*Id.*, at 11:18-23). The operators of the station were required to buy the gasoline from Esso.

89.     Miguel A. Torres Sierra and operator of Esso #242 entered into an agreement under which the operator/lessee purchased all gasoline to be sold at the station from Esso. "Lessee agrees to pay Esso for the products it acquired at the Retail Price ('Dealer Tank Wagon Price") established by Esso at time and place of delivery for the Product(s) in questions. Lessee agrees to pay for all merchandise delivered to Lessee by Esso under the terms of this Contract using a cashier's check, money order or other means approved by Esso, including direct debit." (Axline Decl., Ex. 2, Torres Depo. (05/08/2013) Exhibit 8 attached thereto at p. 2 § 4.2.14.)

**Texaco #800**

90.     Chevron Puerto Rico, LLC f/k/a Texaco Puerto Rico Inc., owner of Trial Site 10, re-sold the gasoline it purchased from moving refiner defendants to third party retail operators, including to the operators of Trial Site 10, Texaco # 800. *See Leifer Dec.* in Support of Defs.' Motion, Ex. 05 (Rivera-Agostini Exhibit #6, paragraphs 2, 3, 17).

### **Refiners/Suppliers, Knew of MTBE Hazards**

**Chevron Phillips Chemical Puerto Rico Core LLC**

91.     The Material Safety Data Sheet (MSDS) provided by moving Core Defendants contains no special warnings as to MTBE hazards and no special handling procedures for MTBE gasoline. *See* Moving Defendants' Rule 56.1 Statement, Facts #s 8,9,12; (*Dillard Dec.*, Ex. 06 (1990 MSDS for Phillips Gasoline)).

**Chevron U.S.A. Inc.**

92.     In 1991, Chevron recognized that the introduction of MTBE into gasoline in California

would substantially change the consequences of a gasoline spill or leak.  (Axline Decl., Ex. 8,

Aug. 12, 1991, Memorandum, TIP Letter #237, MTBE Effects [CHEV 09564-09565].)  The

internal memo warns that while non-MTBE gasoline plumes are "relatively easy" to address,

"MTBE on the other hand is a different situation."  (*Id.,* at 1.)  The memo warns that MTBE

gasoline releases will result in "larger" plumes of contamination that "will migrate" faster.

(*Ibid.*)  Specifically, the memo warns Chevron management that "[w]hen MTBE gets into the

water then the trouble really starts."  (*Ibid.)*  The memo concludes that:

> "Our highest degree of concern right now is with service stations without
> spill containment manholes that are, or will be, served by racks that are
> blending MTBE.  The combination of MTBE gasoline being delivered, the
> lack of spill containment manholes, and shallow groundwater could be
> tremendously expensive for us in the long run.  **As they say, an ounce of
> prevention is worth a pound of cure, and in this case prevention is
> certainly prudent**."

(*Id.,* at 1.)

93.     In June 1986, in a memo entitled "Marketing Environmental Concerns Regarding the Use

of MTBE in MOGAS, D.W. Callahan, a Chevron employee, also noted that MTBE had "several

disturbing properties."  (Axline Decl., Ex. 8, June 11, 1986, Memorandum, from O.T. Buffalow,

San Francisco, CA, to D.W. Callahan, re Marketing Environmental Concerning Regarding the

use of MTBE in MOGAS at 1.)  These "disturbing" properties included the high solubility and

mobility of MTBE as compared to the regular components of gasoline.  (*Ibid.*)  Mr. Callahan

specifically warned that "MTBE utilization could increase the costs to clean up leaks at service

stations . . .(*Ibid.*)

94.     In December 1986, Chevron personnel circulated an article published in an oil industry

trade publication reporting on significant MTBE groundwater contamination problems,

highlighting, in particular, the Maine Paper and its call for changes to USTs at gasoline stations. (Axline Decl., Ex. 8, Dec. 30, 1986, Memorandum re MTBE.)

95.     Another 1991 Memorandum by Chevron notes multiple additional safety precautions and amended handling instructions need to be provided when MTBE gasoline is being stored and distributed, including at service stations.  The additional precautions and handling instructions identified by Chevron included: (1) "Spills or leaks of MTBE must be contained and prevented from contacting the ground or entering the waste water drainage system," (2) "Tanks containing MTBE should have double bottoms and leak detections systems," (3) "Provide proper facilities for shutdowns and tank cleaning to prevent any MTBE from being spilled or washing into the drainage system." (Axline Decl., Ex. 8, March 26, 1991, Memorandum, Chemical Entry Review for MTBE.)

96.     In 1999, Chevron's personnel put together a "White Paper" on MTBE intended to address questions about stricter regulation of underground storage tanks.  (Axline Decl., Ex. 8, Solving Problems from MTBE Contamination - It's Not Just Regulating Underground Tanks.) Chevron's White Paper specifically observed that "[i]t is because of the differences in physical and chemical properties of MTBE that it is more likely to reach groundwater [at service stations], as a result of incidental spills, overfills and gasoline deliveries, *even without* underground storage tank leaks." (*Id.* at 2 [emphasis in original].)  Chevron thus also recognized that even small "incidental" spills and releases, caused by individual handling gasoline at the station, had the capacity to reach and contaminate groundwater.  More importantly, these types of leaks are only preventable through appropriate education and instruction of the individuals handling the gasoline.

97.     In the mid-1990s, Chevron also acknowledged that MTBE was driving factor to

implement upgrades to USTs and improve instructions on storage and handling practices at

service stations:

> "The USGS report points out that gasoline blended with MTBE may pose
> a greater risk to drinking water than non-oxygenated gasoline . . . . These
> concerns are not new as Marketing raised the same issue <u>ten years ago</u> in
> connection with the Tank Integrity Program. . . .
> Marketing believes that MTBE in groundwater issue is just one more
> additional justification for the large Marketing capital investments in
> avoid terminal and service station leaks and spills."

(Axline Decl., Ex. 8, April 27, 1995, Memo re MTBE in Ground Water Issue.)

98.     Chevron has been a long standing member of API.  (Axline Decl., Ex. 8, Oct. 17, 2005,

Letter from W. Hughes to R. Greenwald at 1.)


**Shell Oil Company**

99.     After supervising remediation of MTBE releases at Shell gasoline stations across the

country for nearly twenty years, Curtis Stanley, an engineer and hydrogeologist at Shell,

described MTBE as the "biggest environmental" issue facing United States oil companies.

(Axline Decl., Ex. 9, May 13, 1998, Email from C. Stanley to C. Parkinson; Axline Decl., Ex. 9,

Stanley Depo. *South Tahoe* (May 6, 1999) at 126:10-127:24.)

100.    Stanley later advised that "**[v]ery small releases** of MTBE (even small overfills seeping

into cracks in the pavement) have the potential to adversely impact groundwater."  (Axline Decl.,

Ex. 9, Nov. 3, 1998, Email from C. Stanley to J. Pedley.)  Mr. Stanley further stated that "[m]y

professional opinion is that MTBE . . . should not be used at all in areas where groundwater is a

potential drinking water supply."  (*Id.*)

101.    In 1993, in discussing the increased problem of MTBE groundwater contamination from

service station releases, Curtis Stanley wrote to one of his colleagues: "We need to convince

management to implement dual containment NOW!" (Axline Decl., Ex. 9, July 14, 1993, Email from C. Stanley to D. McGill [emphasis in original].)

102.    In the late 1990s, Shell's environmental personnel were also looking at "MTBE Contamination" and "MTBE in Groundwater" issues.  Curtis Stanley, one of Shell's key environmental personnel, concluded that, based on "research . . . extremely small releases can cause groundwater problems." (Axline Decl., Ex. 9, May 14, 1998, Email from C. Stanley to K. Bell, et al.)

103.    In 1999, Curtis Stanley also observed that MTBE releases capable of causing groundwater contamination arose not from the USTs themselves, but from improper handling practices at gasoline stations by owners, operators, and jobbers:

> "You may, however, want to carefully consider what you say when the new tank upgrades are our first line of defense.  While this is very true and the size of leaks has decreased substantially over the years, we are still finding MTBE at sites that have been upgraded.  The presence of MTBE may not be due to a leak but could also be due to operational and construction factors."

(Axline Decl., Ex. 9, Feb. 2, 1999, Email from C. Stanley to F. Benton.)

104.    Shell has been a long standing member of API.  (Axline Decl., Ex. 9, Oct. 17, 2005, Letter from P. Condron to R. Greenwald at 1.)

105.    Mr. Conaway of Texaco testified that TRMI was aware from 1977 until 1984 that underground storage tanks leaked.  (Axline Decl., Ex. 9, Conaway Depo. (Nov. 17, 2000) at 5:23-25; 59:12-15.)

106.    As of 1993, TRMI was aware that the remediation cost for MTBE as opposed to routine BTEX cleanups is 30%-300% higher.  (Axline Decl., Ex. 9, Tomlinson Depo. (June 29, 2000) at pp. 68:13-15, 69:13-17.)

**Shell International Petroleum and Shell Western Supply and Trading**

107.    Ian Charman testified on behalf of Shell International Petroleum and Shell Western

Supply and Trading.  (Axline Decl., Ex. 9, Charman Depo. (11/21/2013) at 13:12-18.)  He

worked with various Shell entities from 1970 to 2010.  (Axline Decl., Ex. 9, Charman Depo.

(11/21/2013) at Ex. 2 attached thereto.)   Mr. Charman testified that he "was aware of the

concerns regarding groundwater contamination and MTBE, but only at a very general level."

(*Id.* at 55:19-21.)  He testified that these concerns were not discussed with Shell Puerto Rico or

Shell Yabuccoa.  (*Id.* at 56:2-7.)

**Exxon Mobil Corporation**

108.    In the late 1990s, Exxon undertook a "study" to identify sources of potential releases

from gasoline stations "because MTBE contamination is increasingly being found in surface and

ground waters near gasoline stations, and has been identified as a potential threat to public

drinking water supply systems."  (Axline Decl., Ex. 10, March 30, 1999, MTBE Release Source

Identification at Marketing Sites, at 2].)  The study noted that "[t]he presence of MTBE found in

surface, ground and drinking waters has been increasing [and] . . . [t]here are several reasons

why increased MTBE presence can be concern."  (*Id* at 2.)  Exxon's study specifically concluded

that "[s]mall leaks of gasoline **(1 teaspoon)** can translate into MTBE ground water

concentrations above the taste and odor detectable threshold levels."  (*Id.* [emphasis added].)  In

fact, the Exxon study included a graphic representation of the potential impact of "small

releases" of MTBE on groundwater.  (*Id.* at Figure I-1: Impact of Small Releases.)

109.    Between 1980 and 1991, there were at least 100 Exxon stations that had MTBE detected

in groundwater in New Jersey alone.  Exxon produced 40 boxes of documents containing

consultants' reports on MTBE from contamination of Exxon gasoline stations between 1980 and

1990.  Exxon knew by at least 1980 that MTBE from Exxon station was contaminating wells.

(Axline Decl., Ex. 10, Anderson Depo., *South Tahoe* (Aug. 4, 2000) at 36:1-16, 46:5-12, 146:7-14, Ex. 6a attached thereto.)

110.    Mr. Spell recommended to Exxon Mobil's management that the potential impacts of MTBE should be evaluated before a decision was made to blend MTBE into Exxon gasoline. (Axline Decl., Ex. 11, Spell Depo., *South Tahoe* (April 13, 2000) at 6:3-25, 7:1-18, 8:14-23,17:5-18:4)

111.    Mr. Spell testified that the time when he wrote the memo in 1984 he was fully aware that: 1) MTBE was different than the other components of gasoline and that it was much more soluble, 2) MTBE had an odor to it that people found objectionable, and 3) if a leak were to occur from an underground storage tank MTBE could find its way into someone's drinking water well. (Axline Decl., Ex. 11, Spell Depo., *South Tahoe* (April 13, 2000) at 15:7-25, 16:1-2, 17:4-18:4.)

112.    Mr. Spell had discussed the issue with Sully Curran, another Exxon employee, and Mr. Spell felt that he should pass that information to Mr. Dick, as he was his manager and "we wanted him to be fully informed about developments in the consideration to use MTBE in gasoline." (Axline Decl., Ex. 11, Spell Depo., *South Tahoe* (April 13, 2000) at 23:5-14, 26:2-27:13, 29:9-13, and Ex. 4 thereto.)

113.    Ms. Mickelson warned management that the addition of MTBE to Exxon's gasoline would significantly increase number of contamination incidents and would increase the cost of remediation.  Her letter concluded: "In summary, there appear to be three reasons MTBE could add to groundwater incident costs and adverse public exposure," referring to MTBE's migration potential, its low odor and taste threshold and its difficulty to be remediated.  (Axline Decl., Ex. 12, Mickelson Depo., *South Tahoe* (January 13, 2000) at 41:6-15, 44:15-24, and Ex. 5 attached

thereto.)  This recommendation was rejected by an Exxon vice-president who was in charge of marketing MTBE and other products.  (Axline Decl., Ex. 12, Mickelson Depo., *South Tahoe* (Jan. 13, 2000) at 66:17-67:1, 67:6-17, 68:9-19, 69:9-70:1-25, 72:10-16, and Ex. 8 attached thereto.)

114.    Exxon management has specifically addressed the fact that if MTBE was added to gasoline and a release of gasoline occurred, then the expense and difficulty of cleaning up that contamination would be significantly greater if MTBE were in the gasoline as opposed to gasoline without MTBE.  (Axline Decl., Ex. 13, Eizember Depo., *South Tahoe* (Aug. 1, 2000) at pp. 11:17-12:1-16, 17:9-18:1-22, 19:5-20:1-7, 26:1-27:15, 94:12-95:22.)

115.    Ms. Mickelson of Exxon testified in her deposition that there was general knowledge in the 1980's that underground storage tanks were leaking, that steel tanks corrode, that Exxon was having problems with leaking tanks, and that Exxon knew its product could go into the groundwater.  (Axline Decl., Ex. 12, Mickelson Depo., *South Tahoe* (Jan. 1, 2000) at pp.27:17:-29:3, 29:10-16, 30:18-33:12, 104:20-106:24.)

116.    Mr. Anderson of Exxon testified that he was aware that there could be releases from underground storage tank systems that are small and continuous and that are not caught until later in time.  (Axline Decl., Ex. 10, Anderson Depo., *South Tahoe* (Aug. 4, 2000*)* at pp.146:7-14.)

**HOVIC/HOVENSA**

117.    Hess, which owns 100 % of HOVIC's stock, was aware of MTBE's potential to contaminate groundwater, "fate and transport issues," at latest by the mid-1990's.  (Axline Decl., Ex. 14, Noel Vance Wood Depo., *In  Re: MTBE (MDL No. 1358)* (06/28/2006) at 593:1-17; Corporate Disclosure Statement for Hess Oil Virgin Islands Corp. ("HOVIC") (05/07/2009).)

118.    The Material Safety Data Sheets provided by HOVIC (1994) and Hovensa (1999) do not adequately disclose the hazards of MTBE. (Axline Decl., Ex. 15, at HESS 236660-236667 and HOVENSA 090037-090043.)

**Refiners/Suppliers, Despite Extensive Information to the Contrary , Expressly or Impliedly Represented that Gasoline with MTBE Was No More Hazardous Than Gasoline Without, And That No Special Handling  Was Needed**

119.    ConocoPhillips designated Wayne Wilson as their corporate representative to testify regarding warnings provided regarding MTBE.  Plaintiff's Separate 56.1 Statement in Support of Opposition to Motion for Summary Judgment re Count I and IV (Strict Products Liability) (hereafter "Rule 56.1 Opp. Strict Products") at ¶¶ 119.  Mr. Wilson testified that "[b]ased on my investigation, the approach was that both types of gasoline, as I've explained, should be handled the same in the way that I've described it, securely contained, spills taken care of quickly, that kind of thing."   Rule 56.1 Opp. Strict Products at ¶ 119.  Chevron employee Kenneth Warren Anderson, testified that Chevron instructed its jobbers and dealers to treat all gasoline, conventional and MTBE gasoline, the same, "because it really doesn't matter to us… it really doesn't matter what's in the project - - or product." Rule 56.1 Opp. Strict Products at ¶ 119. ExxonMobil designated Michael Roman as their corporate representative to testify regarding warnings. Rule 56.1 Opp. Strict Products at ¶ 119.  Mr. Roman testified that ExxonMobil never ever warned or notified stations, service stations, or customers that gasoline containing MBTE should be handled differently than gasoline without MTBE, or that MTBE is more difficult and more expensive to clean up or remediate then conventional gasoline.  Rule 56.1 Opp. Strict Products at ¶ 119.  ExxonMobil did not in its Material Safety Data Sheets, advise customers to test for MTBE in the event of a spill or contamination: "quite frankly, they don't test…"  Rule 56.1 Opp. Strict Products at ¶ 119.

31

Dated: November 7, 2014

Respectfully submitted,

Michael Axline
Miller & Axline
1050 Fulton Avenue, Suite 100
Sacramento, California  95825

1

## PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE

2

*Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*, United States District Court, Southern District of New York Case No. No. 07 Civ. 10470 (SAS)

3

4

     I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action.  My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

5

6

     On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

7

**PLAINTIFF'S CONSOLIDATED RULE 56.1 STATEMENT IN OPPOSITION TO DEFENDANTS' FIRST AMENDED RULE 56.1 STATEMENT IN SUPPORT OF CERTAIN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON THE SOPHISTICATED PURCHASER DEFENSE**

8

9

10

     I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

11

12

     Executed on November 7, 2014, at Sacramento, California.

13

14

                         KATHY HERRON

15

16

17

18

19

20

21

22

23

24

25

26

27

28