# Exhibit 1

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL  *      Master File
ETHER ("MTBE") PRODUCTS               No. 1:00-1898
LIABILITY LITIGATION           *
-------------------------------       MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,    *      M21-88
et al.,
                                *
        Plaintiffs,
                                *
             vs.
                                *
     Defendants.
                                *
Case No. 07-CIV-10470 (SAS)
-------------------------------
The videotape deposition of:

                    YAMIRA RIVERA,

HSE Coordinator and a Non-Party Witness for Sol Puerto

Rico Limited herein, was held at the DEPARTMENT OF

JUSTICE FOR THE COMMONWEALTH OF PUERTO RICO, Ninth

Floor, Olimpo Street, San Juan, Puerto Rico  00907, on

Wednesday, August 14, 2013, at 9:09 a.m.

93

1   A.  Yes.
2   Q.  And this was written as of September 11,
3   2005.
4   Do you see that?
5   A.  I see that.
6   Q.  Would you agree that as of September 11,
7   2005, based on your experience, that MTBE was
8   considered a known groundwater contaminant?
9   MR. CONDRON:  Object to form.  Calls for
10   speculation, lack of foundation.
11   THE DEPONENT:  I wasn't aware at the time.
12   BY MS. O'REILLY:
13   Q.  Did you become aware at any time since
14   2005 that MTBE was considered a known groundwater
15   contaminant?
16   A.  While working with Chevron.
17   Q.  In approximately what year did you learn
18   that?
19   A.  2010.
20   Q.  And how did you learn, come to learn, that
21   MTBE is a known groundwater contaminant?  How did you
22   learn that?
23   A.  When the case started to-- when I was
24   doing the remediation projects with Chevron and then
25   they say that we needed to test for MTBE.

94

1   Q.  And that was in 2010 when they asked you
2   to you test for MTBE?
3   A.  No.  I think-- I was implementing the
4   program, so I was just going along with what was
5   already established.
6   Q.  Okay.
7   Well, let me make sure I understand your answer.
8   MS. O'REILLY:  (To the reporter) Can I
9   have you read back her prior answer.
10   THE REPORTER:  The last one?
11   MS. O'REILLY:  The one before.
12   THE REPORTER:  "ANSWER: When the case
13   started to-- when I was doing the remediation
14   projects with Chevron and then they say that we
15   needed to test for MTBE."
16   BY MS. O'REILLY:
17   Q.  What did you mean by "then they say we
18   need to do the test"--
19   A.  No, no.  It was-- it was-- I was
20   implementing that.  I didn't express myself well.  I
21   was just implementing-- when I got the cases in Puerto
22   Rico, I was just implementing what was going on, so I
23   just followed up on the work plan.
24   Q.  Oh, I see.  So when you came into Puerto
25   Rico, you were implementing a program and they were

95

1   sampling for MTBE at that time?
2   A.  At some point they-- when I became aware
3   it was because then they said to gather all the
4   information regarding MTBE on the sites.  So I just
5   hired a consultant and they gathered all the
6   information and that's my involvement in that.
7   Q.  "And that's" what?  I'm sorry.  I missed
8   the last part of your answer.
9   A.  That was my involvement with that.
10   Q.  And what consultant did you hire?
11   A.  ERTEC.
12   Q.  E-R-T-E-C?
13   A.  E-R-T-E-C.  Yes.
14   Q.  Okay.
15   And did you hire ERTEC to go out and conduct
16   MTBE sampling?
17   A.  Not that I recall.  I was gathering the
18   information--
19   Q.  Okay.
20   A.  --at the time and there was some sampling
21   on some projects.
22   Q.  Okay.
23   When you say gathering information-- when you
24   say they, actually, to gather information--
25   A.  I mean, we were gathering for the legal

96

1   department.
2   Q.  Oh.  Okay.
3   THE REPORTER:  I'm sorry.  "We were"?
4   THE DEPONENT:  It was for the legal
5   department, gathering information for the legal
6   department, for all the information preparing
7   for the case.
8   BY MS. O'REILLY:
9   Q.  Okay.  You mean this case.  When you refer
10   to "the case," you're referring to this case?
11   MR. CEPEDA:  Counsel, I've given you some
12   leeway, but you're asking her questions about
13   another defendant in the case and she's here to
14   talk about Sol.
15   MS. O'REILLY:  I understand she's here to
16   talk about Sol, but I'm also-- you put her up as
17   a witness and I'm also entitled to inquire about
18   her knowledge on the subjects on which you've
19   put her up as.
20   MR. CEPEDA:  Okay.  But I'm just reminding
21   you she's here--
22   MS. O'REILLY:  I understand that.
23   MR. CEPEDA:  --as a Sol representative on
24   Sol's time.
25

101

1      **A.  I cannot.  I will have to talk to the**
2  **expert on that to find out.**
3      Q.  And who's the--
4      **A.  I'm getting--how you call it?--familiar**
5  **with all these systems now.**
6      Q.  Okay.
7      **A.  I didn't used to work for service stations**
8  **the whole time.  Not even, you know, for-- over here.**
9  **It was mainly, like I said before, terminals and**
10  **compliance, but not-- kind of the service stations,**
11  **there were other people working with service stations.**
12      Q.  So it's a new area for you?
13      **A.  Huh?**
14      Q.  It's a new area for you?
15      **A.  Kind of.  Yes.**
16      Q.  Did you see any documents in preparing for
17  your deposition which indicated that Sol was taking
18  specific steps to address very, very small releases at
19  their service stations?
20      **A.  I don't know.**
21      Q.  Did you see any documents that discussed
22  that?
23      **A.  No.  I'm trying to get familiar with a lot**
24  **of documents now.**
25      Q.  Since 2001, have you seen-- did you see

102

1  any documents that-- at least since 2005 that--  where
2  Sol discusses taking additional steps at its service
3  stations with the tank system specifically to address
4  preventing releases of MTBE?
5      MR. CONDRON:  Objection.  Lacks
6      foundation.
7      THE DEPONENT:  I really don't know.  I
8      don't know.  Like specifically for MTBE, I don't
9      know.  I know for the rest of-- you know, for
10      everything-- for any release.  Yes.
11  BY MS. O'REILLY:
12      Q.  Okay.  Do you recall-- let me make sure I
13  have a clear picture.
14  Do you recall seeing any documents that you
15  reviewed to prepare for your deposition where it stated
16  Sol was taking additional precautions at the USTs at
17  its stations specifically to address MTBE?
18      MR. CEPEDA:  Asked and answered.
19      MR. CONDRON:  Same objection.
20      THE DEPONENT:  Well, when we're doing the
21      projects now, the environmental program that is
22      being taken care of-- implemented, we test for
23      MTBE.
24  BY MS. O'REILLY:
25      Q.  And I want to focus on the tanks.  We'll

103

1  get to the remediation--
2      **A.  Okay.**
3      Q.  --program, but I want to focus on the
4  tanks themselves.
5  Did you review any documents in preparation for
6  your deposition which indicated that Sol was taking
7  additional precautions with its tanks to address MTBE?
8      **A.  I don't recall.**
9      MR. CEPEDA:  Same objection.
10  BY MS. O'REILLY:
11      Q.  Okay.  You don't recall seeing anything.
12      **A.  I don't recall any.  Right.  I don't**
13  **recall.**
14      Q.  Okay.
15      **A.  I saw too many documents.**
16      Q.  Okay.
17  <u>When you started with Sol, did anybody talk to</u>
18  <u>you about MTBE as a groundwater contamination problem?</u>
19  <u>**A.  No.  They talked to me about the**</u>
20  <u>**environmental program that was going on, but not--**</u>
21  <u>**specifically going talking into MTBE, no.**</u>
22      Q.  Okay.
23      THE REPORTER:  This would be ten.
24      (A document is marked for purposes of
25      identification as Deposition Exhibit

104

1      No. 10.)
2      MR. CEPEDA:  Is it both one exhibit?
3      MS. O'REILLY:  Yes.  There's an English
4      translation in the back.
5      THE DEPONENT:  Thank you.  Excuse me.
6      MS. O'REILLY:  I only have Spanish
7      versions left.  But I have extra copies of the
8      Spanish.
9      And I'm sorry.  I--
10      THE DEPONENT:  Ten.
11      MS. O'REILLY:  Ten.
12      For the record, I've marked as Exhibit 10
13      a Spanish language document entitled "Shell
14      Company Puerto Rico Limited, Memorandum," dated
15      August 4th, 1988, and it's Bates stamped SOL
16      Focus Site Production 5/22/2012 - 6958 through
17      6966.  And I've also attached a translation of
18      the memorandum, not the attached laboratory
19      reports, and the English translation is also
20      Bates stamped SOL Focus Site Production
21      5/22/2012 - 6958 through 6960.
22  BY MS. O'REILLY:
23      Q.  And take your time and let me know when
24  you're done reviewing this.
25      **A.  Okay.**

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL  *       Master File
ETHER ("MTBE") PRODUCTS                No. 1:00-1898
LIABILITY LITIGATION           *
-------------------------------       MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,    *      M21-88
et al.,
                                *
        Plaintiffs,
                                *
            vs.
                                *
    Defendants.
                                *
Case No. 07-CIV-10470 (SAS)
-------------------------------
The videotape deposition of:

             DARIO ENRIQUE AMADEO-CEDO,

General Manager for Sol Puerto Rico Limited and a

Non-Party Witness herein, was held at the DEPARTMENT OF

JUSTICE FOR THE COMMONWEALTH OF PUERTO RICO, Ninth

Floor, Olimpo Street, San Juan, Puerto Rico  00907, on

Tuesday, August 13, 2013, at 9:03 a.m.

37

1      The time is 10:02.  Off the record.
2          (Off the record.)
3          THE VIDEOGRAPHER:  We're back on the
4      record.  The time is 10:17.  On the record.
5      Tape No. 2.
6  BY MR. CARDENAS:
7      Q.   Mr. Amadeo, before we took our break we
8  were talking about your last position that ran from
9  2006 through 2011 in which you were the Puerto Rico
10  retail manager.
11          Is that correct?
12      A.   Yes.  Correct.
13      Q.   Okay.
14          And I thought you mentioned that you had that
15  position through 2011.
16      A.   Yes.  Correct.
17      Q.   And what is the next position that you
18  held?
19      A.   I was-- I worked as country manager for
20  some six months, I believe it was, and post that I was
21  named general manager.
22      Q.   So sometime in 2011 you were appointed as
23  general manager?
24      A.   No.  I served as country manager for that
25  six-month period.  I don't remember exactly when my

38

1  nomination or assignment occurred as country manager,
2  but it was after 2011.
3      Q.   And you're currently in the same position,
4  as general manager, today?
5      A.   Correct.
6      Q.   Mr. Amadeo, let me go back to when you
7  transferred to the Dominican Republic.
8          Did any of your pension or your paychecks change
9  from when you went from Shell Company Puerto Rico
10  Limited to Shell Dominican Republic?
11          MR. MARQUES:  Objection.  Irrelevant.
12          THE DEPONENT:  When I worked with the
13      Dominican Republic, I was paid by the Dominican
14      Republic.
15  BY MR. CARDENAS:
16      Q.   Okay.  And any of your 401 or your
17  pensions, did they stay in the same place?
18          MR. MARQUES:  Same objection.
19          THE DEPONENT:  Well, I was not able to
20      contribute to it while I was not within Shell
21      Puerto Rico.
22  BY MR. CARDENAS:
23      Q.   Okay.  And what about when you were in
24  Costa Rica?
25          MR. MARQUES:  Same objection.

39

1          THE DEPONENT:  Identical to the Dominican
2      Republic case.
3  BY MR. CARDENAS:
4      Q.   Okay.
5          MR. CONDRON:  Counsel, sorry to interrupt.
6          Can we have an agreement that objection by
7      one counsel is sufficient for all in the room?
8          MR. CARDENAS:  That's fine.
9          MR. CONDRON:  Thank you.
10          THE REPORTER:  "Sufficient for all three"?
11          MR. CONDRON:  "For all in the room."
12          THE REPORTER:  "For all in the room."
13      Okay.
14          MR. CONDRON:  Or on the phone.
15  BY MR. CARDENAS:
16      Q.   Mr. Amadeo, in any one of these capacities
17  that we've discussed over your time frame with Shell
18  Company Puerto Rico Limited, and now with Sol, were you
19  ever responsible for overseeing safety programs for the
20  gas stations?
21      A.   In the capacity of my duties, yes.
22      Q.   Which ones?
23      A.   What duties?
24      Q.   Yes.  Let me back up.
25          During which time, which position did you hold,

40

1  that you were responsible for overseeing the safety
2  programs at the gas stations?
3      A.   During all my positions with Shell,
4  because all company officers must retain a focus on
5  safety at all times.
6      Q.   So just to make sure I understand, so even
7  from your time when you were a sales rep back in 1991,
8  you were responsible for overseeing safety programs
9  With the gas stations?
10      A.   That is one of the duties of a sales
11  representative.
12      Q.   Fair enough.
13          And would the same be for overseeing safety
14  programs for the delivery of gas at all of the stations
15  throughout your career?
16      A.   Not directly.  Only regarding to the gas
17  station's operations once the truck arrives at the
18  station.
19      Q.   So once the truck arrives at the station,
20  you were responsible for overseeing the safety and the
21  delivery of the gasoline at that point.
22          MR. MARQUES:  Objection.  Misstates
23      testimony.
24          MR. CONDRON:  Object.
25          MR. CARDENAS:  Let me rephrase.

10 (Pages 37 to 40)

125

1    Q.   Did you review some specific documents
2  that helped you prepare to address this topic?
3       A.   Those which were provided.
4       Q.   And when did Shell Company Puerto Rico
5  Limited first learn that it was purchasing gasoline
6  that contained MTBE?
7            MR. MARQUES:  Objection.  Assumes facts
8  not in evidence.
9  BY MR. CARDENAS:
10      Q.   You can answer.
11      A.   I don't know.  I have no knowledge as to
12  the date.
13      Q.   If I wanted to find out that information,
14  who would I need to talk to at Sol?
15      A.   If it's regarding Shell, I would imagine
16  with someone at Shell.  But I don't believe that anyone
17  at Sol is able to answer such questions.
18      Q.   Tell me what generally you understand as
19  to when Shell Company Puerto Rico Limited started using
20  MTBE in Puerto Rico.
21           MR. MARQUES:  Same objection.
22           THE DEPONENT:  I have no knowledge as to
23  when Shell.
24  BY MR. CARDENAS:
25      Q.   And when you're saying "Shell," you're

126

1  talking about Shell Company Puerto Rico Limited?
2       A.   Shell in general.  Yes.
3       Q.   During your time that you worked for Shell
4  Company Puerto Rico Limited, do you recall ever hearing
5  MTBE discussed?
6       A.   Not at the level I was at, no.
7       Q.   At what level was it discussed?
8       A.   Well, I have no knowledge of that, but not
9  the one I was in.
10      Q.   Do you ever recall ever hearing the term
11  "MTBE" while you were working for Shell Company Puerto
12  Rico Limited?
13      A.   No.
14      Q.   Do you recall ever seeing MTBE referenced
15  in any of the retail agreements or supply agreements at
16  the stations that you dealt with as a sales
17  representative?
18      A.   In the contracts with the stations?  No.
19      Q.   Do you ever recall ever seeing MTBE
20  mentioned on any of the supply agreements that dealt
21  with the terminals and different service stations?
22      A.   Having seen?  No, no, no.
23      Q.   Do you have any knowledge whether Sol
24  Puerto Rico Limited has purchased any gasoline that
25  contains MTBE?

127

1       A.   To my best understanding, no.
2       Q.   Do you have any knowledge regarding--as
3  the Sol corporate representative--whether Sol Puerto
4  Rico Limited has distributed any gasoline that contains
5  MTBE?
6       A.   I have none.  I don't have such knowledge.
7       Q.   As the corporate representative for Sol,
8  do you have any knowledge regarding whether Sol Puerto
9  Rico Limited marketed any gasoline that contained MTBE?
10      A.   No.  And Sol Puerto Rico is not a product
11  importer.
12      Q.   Okay.
13           As the corporate representative for Sol Puerto
14  Rico Limited, do you have any knowledge whether Sol
15  Puerto Rico stored any gasoline that contained MTBE?
16      A.   Sol Puerto Rico does not store gasoline in
17  Puerto Rico.
18      Q.   Where does Sol Puerto Rico house its
19  gasoline?
20      A.   It doesn't store it.  It just simply buys
21  its rack supply daily.
22           MR. CEPEDA:  (To the interpreter) I think
23  he said it daily purchases its product at the
24  rack.
25           THE INTERPRETER:  Okay. Thank you,

128

1       Counsel.  I appreciate it.
2  BY MR. CARDENAS:
3       Q.   And when you say at the rack, what are you
4  referring to?
5       A.   Where the trucks go and fill up, if I may.
6       Q.   Is there a specific location?
7       A.   For our trucks there is.  Yes.
8       Q.   And which locations are those?
9       A.   Yabucoa.
10      Q.   The Shell Yabucoa Chemical facility?
11           MR. CONDRON:  Object to form.
12           THE DEPONENT:  It no longer goes by that
13  name.
14  BY MR. CARDENAS:
15      Q.   What is it known as now?
16      A.   I know that it's Buckeye, but I don't have
17  much more information than that.
18      Q.   Okay.
19           And prior to that it used to pick up from Shell
20  Chemical at Yabucoa?
21      A.   Yes.
22      Q.   Okay.
23           Do you know how long that took place?
24      A.   Specifically, what occurred?
25      Q.   That Sol Puerto Rico Limited was lifting

joannedethomas@yahoo.com   -   787.501.3007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL   *          Master File
ETHER ("MTBE") PRODUCTS                    No. 1:00-1898
LIABILITY LITIGATION            *
--------------------------------           MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,     *         M21-88
et al.,
                                 *
       Plaintiffs,
                                 *
            vs.
                                 *
    Defendants.
                                 *
Case No. 07-CIV-10470 (SAS)
--------------------------------
The videotaped deposition of:

                   BRENDA TORANO,

former Shell Puerto Rico Limited (Sol Puerto Rico

Limited) employee, current Puma Energy employee, and a

non-party witness herein, was held at the law offices

of O'NEILL & BORGES, LLC, American International Plaza,

Suite 800, 250 Munoz Rivera Avenue, San Juan, Puerto

Rico  00918, on Thursday, September 26, 2013,

at 9:04 a.m.

33

1  that was available to me, yes.
2  Q.  Were you aware when you were with Shell
3  that MTBE had in fact been detected in groundwater at
4  some of the stations?
5  A.  MTBE detection, to my knowledge, came in
6  at the end of 2005, and it was part of an investigation
7  that was done in that market.
8  Q.  Okay.
9  And do you recall service stations that in fact
10  MTBE was found in groundwater at the stations?
11  A.  Yes, I remember that MTBE was found in
12  various of the stations.
13  Q.  Did anyone-- did you talk to anyone about
14  why that MTBE was there in groundwater at those
15  stations?
16  A.  Not that I recall.
17  Q.  Did anyone tell you that that MTBE needed
18  to be cleaned up out of groundwater at those stations?
19  A.  I don't remember in that specific context,
20  but part of the process after they did the test was to
21  notify the agencies and come up with a plan to clean it
22  up.
23  Q.  And was there a specific plan, a remedial
24  alternative or option, that was proposed for addressing
25  the MTBE in groundwater?

35

1  Q.  And what was-- was there any concern about
2  MTBE contamination in groundwater at service stations
3  in those discussions?
4  A.  At least what I remember, the concern was
5  raised, they raised the point, because these studies
6  had been done, but it was a study that Shell did
7  internally.  It was not a study that had been asked for
8  by the agency.
9  Q.  Do you know why this internal study was
10  done for Shell?
11  A.  Yes, because Shell was in the process of
12  evaluation for sale.
13  Q.  The sale of the Puerto Rico unit?
14  A.  Correct.
15  Q.  So it was like a due diligence process?
16  A.  Correct.  Shell commissioned a study to
17  investigate the conditions of each site in order to
18  continue with the sales process.
19  Q.  Do you recall if any time after those
20  studies were completed that Shell gave those studies to
21  EQB?
22  A.  If I recall correctly, yes, and a program
23  was presented that the agency approved for each site to
24  be able to do the remediation program.
25  Q.  Okay.

34

1  A.  Not that I recall.  No.  The agencies that
2  we were dealing with were concerned with benzene, TPH
3  and BTEX and MTBE, while later on that would've been
4  one of the items of concern.
5  Q.  Did you have any understanding of MTBE's
6  fate and transport characteristics once it got into
7  groundwater?
8  A.  What I have read in terms of information
9  and process and how it can move, yes.
10  Q.  And where did you read that information?
11  A.  Well, in the EPA documents or documents
12  about cleanup and remediation, and mostly articles that
13  appear on the EPA site on the internet.
14  Q.  Okay.
15  And when did you-- when approximately did you
16  learn about how MTBE moves in groundwater?
17  A.  I don't remember exactly, because I've
18  always liked to read a lot about my topic and it could
19  have been any time during when I was working for the
20  Environmental Quality Board or later.
21  Q.  Did-- was MTBE ever discussed amongst your
22  cluster group of Shell people, MTBE contamination?
23  A.  I remember that, yes, it was mentioned as
24  part of the process of the findings in the 2005 study
25  that was done for the portfolio.

36

1  And was there a generic remediation process,
2  like a generic work plan, that was applied to each
3  station, or did each station-- did you develop a
4  separate work plan for each station?
5  A.  No.  During the time that I worked for
6  Shell, and shortly afterward, the investigation in
7  2005, after that they developed a plan and it was
8  submitted to the agency.  They did talk about
9  investigating the condition of each station, but the
10  first one was just a snapshot, a baseline, and then
11  further investigation was initiated, but I'm not
12  familiar with that because I wasn't with the company at
13  that time.
14  Q.  Okay.
15  Was there ever a corrective action plan prepared
16  to address the contamination at the Shell stations
17  found after 2005 while you were with Shell?
18  A.  No, because what was being implemented in
19  my time was to amplify the investigation that was done,
20  the findings in 2006, to then remediate.
21  Q.  So like a Phase II?  You were working on a
22  Phase II investigation of certain stations, or all
23  stations?
24  A.  I'm not sure what you mean by "Phase II,"
25  but this was a more comprehensive investigation of the

57

1 make water taste good?
2     A.   There's still no MCL for MTBE, but I don't
3 understand that by experience, direct experience.  I
4 just know from the information that was given that they
5 were saying that there was a drinking water advisory
6 regarding MTBE.
7     Q.   And you're referring to an EPA drinking
8 water advisory?
9     A.   Correct.
10    Q.   And that's available on the EPA web site?
11    A.   Correct.
12    Q.   Did you receive any information internally
13 from Shell that-- about MTBE and its unpleasant taste
14 or odor in drinking water?
15    A.   Not that I remember.
16    Q.   At this time, in 2001, was it your
17 understanding that if MTBE was detected in groundwater
18 at a retail station that Shell might be required to
19 clean it up?
20    A.   For 2001 no sampling was done for MTBE, so
21 there was no process, because the agency didn't require
22 any sampling of MTBE.
23    Q.   Okay.
24         But my question is more when you were writing
25 this e-mail and you said "new parameters to remediate

58

1 in the future," were you thinking that if MTBE was
2 detected in groundwater if the sampling was done, that
3 Shell might be required to remediate it?
4     A.   Yes.  If the agency required it, then the
5 agency was going to establish criteria and was going to
6 require cleanup.
7     Q.   Okay.
8         The next paragraph says, "As soon the amendments
9 become official, I think that the best way to address
10 the issue is have a meeting with the industry," and
11 then you have "Texaco" in parentheses, "and analyze the
12 possible actions to challenge the position of the
13 government."
14        Do you see that?
15    A.   Yes.
16    Q.   What did you mean by "challenge"?
17    A.   The detail with the agency is that it
18 doesn't evaluate risk analysis to establish terms for
19 the cleanup, and it has been, and it's still, a
20 situation where it doesn't detail the risks to be able
21 to take the site to an acceptable level.
22        The terms for cleanup are arbitrary in terms
23 that they're not in the established regulations, and
24 even as recently as 2012 is when they have actually
25 established a guide that's not part of the regulations

59

1 and where they establish a list of cleaning
2 requirements that include now MTBE.
3     Q.   The-- because of MTBE's characteristics,
4 do you think it would have been okay to establish one
5 cleanup level, or were there other factors that should
6 be taken into consideration when establishing a cleanup
7 level for MTBE in groundwater?  Should it be station
8 specific, or should it-- or should it have been
9 general?
10        MR. MARQUES:  Objection.  Compound and
11 calls for an opinion.
12        MR. ALLEN:  Calls for a legal conclusion,
13 calls for speculation.
14        THE DEPONENT:  There should be an
15 evaluation of risk to determine the criteria for
16 cleanup for everything in general, all of the
17 parameters.
18 BY MS. O'REILLY:
19    Q.   Were you aware, or did you have an
20 understanding, that MTBE posed a different risk to
21 drinking water supplies than the BTEX compounds?
22    A.   From what I read, I understand that
23 benzene is a component of this and that has been
24 known-- has been found to be a known carcinogen, that
25 the benzene has been found to be a carcinogen.  There's

60

1 already a drinking water criteria that's established
2 for it, but there isn't such for MTBE, and that would
3 be part of the investigations or the determinations for
4 the effects that it could have.
5     Q.   Were you ever provided documents
6 internally from Shell indicating that at service
7 stations, for example, in the United States, MTBE was
8 more frequently detected in drinking water than benzene
9 at service stations?
10    A.   Not that I received any.  I do remember
11 seeing documents, but it was on the internet.
12    Q.   And that was something that you looked up
13 yourself?
14    A.   Yes.  Correct.
15    Q.   Do you recall asking anyone in your
16 cluster why there was a concern about MTBE in
17 groundwater at service stations?
18    A.   No, because the cluster, as I indicated
19 before, we didn't have any communication with Shell US.
20 Even when Puerto Rico was under US legislation, there
21 was still not that communication between them.
22    Q.   Okay.
23        But in your cluster, did anyone talk about "Why
24 are we sampling for MTBE?  Why are we being asked about
25 MTBE?"  When it first came up, did you talk about it in

# Transcript of the Testimony of Carlos Cuevas

Date: May 7, 2013
Volume:

Case: Commonwelath of PR v. Shell Oil Company.

Printed On: October 17, 2014

Joanne de Thomas
Phone:787.501.3007
Email:joannedethomas@yahoo.com

Cuevas

---

33

```
1    the maintenance person to repair, they would have to
2    approve the repair.
3        A.   Yes, because apparently it became more
4    expensive.  So apparently they had to give the order
5    for them to come and check.
6        Q.   And Shell paid for that.
7        A.   They were always responsible for that.
8        Q.   Okay.
9        When you had a leak underground, under the
10   ground, what did you do when you found that out?
11       A.   Immediately you had to not sell anymore
12   gasoline and call Shell for them to come and verify
13   from where that gasoline was coming from.
14       Q.   Where it went?
15       A.   Yes, where it went.  Because gasoline
16   runs.
17       Q.   And so Shell would come out and be
18   responsible for finding out where the gasoline went
19   that escaped the tank.
20       A.   And we were responsible for calling them
21   on time.
22       Q.   Do you know how to check where the
23   gasoline went if it escaped the tank?
24       A.   No, I didn't know how to check that.  But
25   gasoline always runs.  It runs the way water runs.
```

---

34

```
1        Q.   And who explained to you that gasoline
2    runs where water runs?
3        A.   In the course that Shell gave.
4        Q.   Did it say that the gasoline would go far,
5    a long way?
6        A.   Yes, because gasoline weighs less than
7    water.  The water goes below and the gasoline goes
8    above and it runs faster.
9        Q.   Does it-- when did you learn that?
10       A.   In the school.  They showed us that in the
11   Shell school.
12       Q.   Did they show you that when you-- in 1968?
13       A.   In 1968, and they would remind us of it
14   practically every year.
15       Q.   Okay.
16       And did you-- when you were operating the
17   station, were you told by Shell that they were putting
18   MTBE in the gasoline?
19       A.   At no time.
20       Q.   Do you know what MTBE is?
21       A.   I found out about some weeks or months
22   ago.
23       Q.   How did you find out?
24       A.   The press.  The press.  Radio, television.
25       Q.   And what did you find out about it from
```

---

35

```
1    the press?
2        THE INTERPRETER:  I'm sorry.  "What did
3    you find"?
4        MS. O'REILLY:  "What did you find out
5    about it from the press?"
6        (The interpreter addresses the deponent in
7    Spanish.)
8        THE DEPONENT:  I found out about that
9    component that the gasoline has and that it
10   caused harm to new automobiles, new ones, and
11   that has caused that Shell sells more.
12   BY MS. O'REILLY:
13       Q.   Did you learn in the press that MTBE gets
14   into water that people drink?
15       MR. BOLLAR:  Objection to form.
16       THE REPORTER:  Who objected?  I can't see.
17       (Mr. Bollar indicates.)
18       THE DEPONENT:  No, I haven't learned that.
19   No.
20   BY MS. O'REILLY:
21       Q.   Did you ever learn that--
22       (Ms. Lopez privately confers with
23   Ms. O'Reilly.)
24       MS. O'REILLY:  Oh.  Let's see if we can
25   clarify that.
```

---

36

```
1    BY MS. O'REILLY:
2        Q.   Let me clarify a word I'm using.
3    M-- methyl tertiary butyl ether, MTBE.
4        A.   "V," or "B" as in "boy"?
5        Q.   "B" as in "boy."
6        A.   Yes.
7        Q.   Was that the same thing that you heard
8    about in the press?
9        A.   No, it's not the same thing.
10       Q.   Okay.
11       Did you ever learn while you were operating the
12   station that the MTBE was in the gasoline?
13       A.   No, I never learned that.  I never had
14   that information.
15       Q.   Did you ever learn that the MTBE was a
16   component of gasoline?
17       A.   No, I did not know that.
18       Q.   Did you ever learn that MTBE can get into
19   water that you drink?
20       MR. BOLLAR:  Objection to form.
21       THE DEPONENT:  No, I never learned that.
22   BY MS. O'REILLY:
23       Q.   Did you learn that gasoline can get into
24   the water that you drink?
25       A.   Yes, it can get into it.  It can get into
```

---

Joanne de Thomas

787.501.3007                                joannedethomas@yahoo.com

GASOLINE SERVICE STATION
LEASE CONTRACT

Entered into on April 8, 1988 between The Shell Company (Puerto Rico) Limited (hereinafter referred to as the "Company") and Carlos Cuevas, in his capacity as the business operator (hereinafter referred to as the "Lessee").

This Contract includes Annex A, Lessee's Maintenance Obligations, incorporated herein by reference.

1.   DEFINITIONS:  The following definitions will be used in this Contract, in the singular as well as in the plural:

(a)   Alteration, refers to any change, addition, modification, improvement, removal or replacement of any building or equipment located at the Station;

(b)   Commercial entity, refers to any legal entity other than an individual person, including but not limited to, a company, corporation, cooperative, trust, succession or association;

(c)   Station, refers to the property occupied by the gasoline and/or diesel fuel dispatch station, as well as the buildings and improvements currently located or located in the future on the property, all of which will be incorporated into the Station, to be operated by the Lessee in the manner stipulated and for the use specified in Article 5;

(d)   Expiration, refers to the end of the term specified in Article 5 or any extension as described in Article 13 or agreed upon in writing by the Company and the Lessee;

(e)   "Shell" Trademarks, refers to the trademarks, registered trademarks, factory trademarks, names, insignias, symbols, logos, service emblems, and "Shell" color schemes, which the Company authorizes the Lessee to use at the Station;

(f)   Law, refers to any statute, constitution, ordinance, regulation, administrative order or any regulatory requirements issued by a federal or state agency or an agency or authority of the local government which, unless otherwise specified herein, is in effect on the signature date of this Contract or at any time during its term;

(g)   Maintenance, unless the context indicates otherwise, this term refers to maintenance, repairs, replacement, inspections, painting and cleaning;

(h)   Non-renewal, refers to non-continuation or non-extension of this Contract by the Company upon expiration of the term specified in Article 3, or of any extension allowed by Article 13 or agreed upon in writing by the Company and the Sub-Lessee;

(i)   Petroleum Products, refers to fuel for motor vehicles, including but not limited to gasoline, gas oil and/or diesel;

(j)   Termination, will refer to the termination of this Contract for any reason prior to its expiration date.

_Cuevas_

Deposition
Exhibit _____ #4
JAT _____ May 7, 2013

SOL Focus Site Prod. 5/22/2012_ 7071

<u>DEALER CONTRACT</u>

Entered into on April 8, 1988 between The Shell Company (Puerto Rico) Limited (hereinafter referred to as the "Company") and Carlos M. Cuevas (hereinafter referred to as the "Dealer").

    1.    <u>DEFINITIONS</u>: As used in this Contract in either the singular or plural form.

    (a)  <u>Change</u>, refers to any change, addition, modification, improvement, removal or replacement of any building or equipment located at the Station;

    (b)  <u>Commercial entity</u>, refers to any legal entity other than an individual, including but not limited to a company, corporation, cooperative, trust, succession or association;

    (c)  <u>Station</u>, refers to the property occupied by the gasoline and/or diesel service station, and the buildings and improvements located at the Station currently or in the future, to be operated by the Retailer in accordance with the stipulations and for the uses specified in Article 6;

    (d)  <u>Expiration</u>, refers to the end of the term specified in Article 4 or of any extension granted under the terms of Article 21, or any extension to which the Company and the Dealer agree in writing.

    (e)  <u>Shell Trademarks</u>, refers to the trademarks, factory trademarks, registered trademarks, names, logos and "Shell" color combinations, which the Company authorizes the Dealer to use at the Station;

    (f)  <u>Law</u>, refers to any statute, constitution, ordinance, regulation, administrative order or any requirement of any federal or state agency or a local government, which, unless otherwise specified herein, is in effect on the signature date of this Contract or at any time during its term;

    (g)  <u>Maintenance</u>; unless the context indicates otherwise, will refer to maintenance, repairs, replacement, inspections, painting and cleaning;

    (h)  <u>Nonrenewal</u>, refers to refusal by the Company to continue or extend this Contract at the end of the term specified in Article 4, or any extension described in Article 21 or to which the Company and the Dealer have agreed in writing;

    (i)  <u>Plant</u>, refers to the Company's distribution plant from which the deliveries of the "Shell" Petroleum Products will normally be made to the Dealer;

    (j)  <u>Petroleum Products</u>, refers to fuel for motor vehicles, including but not limited to gasoline, gas oil and/or diesel;

    (k)  <u>Termination</u>, refers to the termination of this Contract for any reason prior to its expiration date.

**SOL Focus Site Prod. 5/22/2012_7081**

-3-

6.    USE. The Station will be used exclusively for the operation of a station for the retail sale of Petroleum Products.

7.    PRODUCTS - QUANTITIES

7.1  The Company will sell and deliver to the Dealer the quantities of "Shell" brand Petroleum Products which the Dealer orders from time to time during the term of this Contract for delivery at the Station. The Petroleum Products will be of the class, grade, brand and quality generally sold by the Company at the time of delivery.  The volume of Petroleum Product sales will be subject to reductions or adjustments under the terms of any mandatory or voluntary federal or state allocation program in effect at any time; and even if no allocation program is in effect, deliveries may be subject to reductions, or products may be discontinued in accordance with Article 15.

7.2  The Company may at any time change the grade, specifications, characteristics, brands or any other identification of any "Shell" brand product, and the modified product will continue to be subject to the terms and conditions of this Contract.  The Company may discontinue the sale of any product at any time, in which case the Company and the Dealer will be released from any liability in that regard.

8.    PRICES - TERMS. The prices will be: (a) for gasoline and diesel, the Company's list prices for direct sale to dealers for the respective grades and brands delivered, in effect on the date of the delivery and for the delivery location; and (b) for lubricants or any other "Shell" brand product, the Company's list prices for direct sale to dealers for the respective grades, brands, containers and quantities delivered, in effect on the date of the delivery and for the delivery location, including any applicable price difference.  The list prices will be kept at the Company offices or at the Plant or at any other location specified by the Company. The Dealer will pay the Company for the products at the time of delivery, in cash or by means of a certified or manager's check, postal money order or any combination of the above, as specified by the Company with reasonable prior notice to the Dealer, or under the terms of any credit extended to the Dealer by the Company, which may be changed or revoked by the Company at any time, effective on the date when the Dealer is notified.

9.    DELIVERIES.   Deliveries will be made to the Station by any means of transportation and in the containers selected by the Company.  The Company will not be obligated to make deliveries outside of business hours.

10.   TRAINING. Prior to the initiation of the term of this Contract (or as soon as may be practicable), the Company may require that the Dealer satisfactorily pass an initial Company training course designed for the type of operations to be conducted at the Station.  At the Company's discretion, the Dealer will participate in additional training appropriate to the activities at the Station, which may include an "Advanced Business Management Seminar" offered by the Company or any equivalent training, which will not exceed two weeks in duration and which the

# Exhibit 2

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL  *        Master File
ETHER ("MTBE") PRODUCTS                 No. 1:00-1898
LIABILITY LITIGATION          *
-------------------------------         MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,   *        M21-88
et al.,
                               *
        Plaintiffs,
                               *
             vs.
                               *
    Defendants.
                               *
Case No. 07-CIV-10470 (SAS)
-------------------------------
The videotape deposition of:

            MIGUEL A.TORRES-HERNANDEZ,

a former Esso Service Station Operator, and a Non-Party

Witness herein, was held at the DEPARTMENT OF JUSTICE

FOR THE COMMONWEALTH OF PUERTO RICO, Ninth Floor,

Olimpo Street, San Juan, Puerto Rico  00907, on Monday,

July 8, 2013, at 9:33 a.m.

9

1      understand that your testimony today is being
2      taken by a court reporter as if you are under
3      oath.
4          Do you understand?
5          THE DEPONENT:  Yes.
6          MS. O'REILLY:  And you will tell the truth
7      and attempt to be truthful in your answers
8      today?
9          THE DEPONENT:  Yes.
10         MS. O'REILLY:  Okay.  Thank you for your
11     time.  I apologize for all of the delay in
12     getting started and we will try to proceed as
13     quickly as possible.
14         THE DEPONENT:  Okay.  Thank you.
15 Whereupon,
16         MIGUEL A. TORRES-HERNANDEZ,
17 is examined and, through the interpreter, deposes as
18 follows:
19             EXAMINATION
20 BY MS. O'REILLY:
21     Q.   Can you, for the record, state your name.
22     A.   **Miguel A. Torres-Hernandez.**
23     Q.   And what's your address?
24     A.   **Coral Street, Box 1044, Salinas, Puerto**
25 **Rico.**

10

1      Q.   Okay.
2          And did you work at a gasoline station that was
3  owned by your father?
4      A.   **(In English) Yes.**
5      Q.   And what gasoline station did you work at
6  that was owned by your father?
7      A.   **Esso Standard Oil Company.**
8      Q.   And what was the address of the gasoline
9  station where you worked?
10     A.   **(Through the interpreter) That was Antonio**
11 **R. Barcelo Avenue No. 1, corner of De Diego.**
12     Q.   Okay.
13         And how long did you work at that gas station?
14     A.   **(In English) 20 years.**
15     Q.   And what did-- did you go to the gas
16 station every day?
17     A.   **Yes.**
18     Q.   And what were your duties at the gas
19 station?
20     A.   **Everything.**
21     Q.   And when you say "everything," what do you
22 mean?
23     A.   **(Through the interpreter) Attend to the**
24 **customers, attend to the shop, because there was an oil**
25 **change shop.  Everything.**

11

1      Q.   Did you-- before working at your father's
2  gas station, had you worked at a gas station before?
3      A.   **No.**
4      Q.   And did you receive any training on how to
5  operate the gas station?
6      A.   **I don't think so.  No.  No.**
7      Q.   Did you-- when your father first bought
8  the gas station, did you meet with anyone from Esso?
9      A.   **No, no.  My father was the one who would**
10 **meet with them.  Not me.**
11     Q.   Okay.
12         To your understanding, when your father bought
13 the station, did he own the property?
14     A.   **No.**
15     Q.   Did he own the underground storage tanks,
16 the gasoline system?
17     A.   **No.**
18     Q.   Who owned, to your understanding, the
19 property where the gasoline station was?
20     A.   **The property?  Esso Standard Oil Company.**
21     Q.   And the tanks, the gasoline system, who
22 owned that, to your understanding?
23     A.   **Esso Standard Oil Company.**
24     Q.   Did anyone from Esso come to the station
25 while you were there to inspect the tanks or the

12

1  dispensers?
2      A.   **They may have.**
3      Q.   Did you see anyone opening the dispensers
4  and looking inside to inspect them while you were at
5  the station?
6      A.   **Well, throughout the 20 years?  The whole**
7  **time, or in the beginning?**
8      Q.   The whole time.
9      A.   **Well, yes.**
10     Q.   Did they come on a regular basis?
11     A.   **No.**
12     Q.   How often did they come to inspect the
13 tanks and the dispensers?
14     A.   **I don't recall.**
15         MR. BOLLAR:  (To the interpreter) Would
16     you mind translating the questions too, because
17     I think some of the questions-- I just want to
18     be certain that they're-- he's understanding the
19     full question.  I apologize.
20         THE DEPONENT:  Yes, yes.
21 BY MS. O'REILLY:
22     Q.   Let me show you something.
23         MS. O'REILLY:  Oh, Joanne, I'm sorry.  Can
24     you mark that.
25         MR. BOLLAR:  Thank you.  These are

3 (Pages 9 to 12)

## 33

```
1         MR. BOLLAR:  Objection to form.
2         THE DEPONENT:  Well, I would.
3    BY MS. O'REILLY:
4         Q.   And did you have a-- when you got the
5    measurement from the Veder-Root, did you have something
6    to compare it to?
7         A.   Well, what I explained earlier.  The sales
8    for the day, the day's sales, had to be compared with
9    the measurement.
10        Q.   Okay.
11        And how did you-- how did you calculate the
12   day's sales?
13        A.   With the console.  The console.  When you
14   put the amount of gasoline, there was a button which
15   was for the tally, and then the console would say how
16   much had been sold supposedly.
17        Q.   And who installed the console?
18        A.   Esso.
19        Q.   Did the Esso representative check the
20   console when they came?
21        A.   I don't recall.
22        Q.   Did you have any-- convert the numbers to
23   allow for temperature change in the gasoline?
24        MR. BOLLAR:  Objection to form.
25        THE DEPONENT:  I don't know.  I mean, at
```

## 34

```
1    least I didn't know anything about that.
2    BY MS. O'REILLY:
3         Q.   Did you hear your father talk about the
4    change in the amount of gasoline to vapor because of
5    changes in temperature in the tanks?
6         A.   It may have been.
7         Q.   Do you recall what he said?
8         A.   No.
9         Q.   Do you recall if your father ever
10   disagreed with the amount of gasoline that they said
11   they delivered to him?
12        MR. BOLLAR:  Objection to form.
13        THE DEPONENT:  No, I don't recall.
14   BY MS. O'REILLY:
15        Q.   Did you ever see any customers spill
16   gasoline at the station?
17        A.   No, I don't recall.
18        Q.   Did any of the customers drive away with
19   the nozzle in their car?
20        A.   Yes, I think once.  But since the top of
21   the hose of the dispensers had a-- it had something
22   that if the hose broke off, it was like a shutoff.
23        Q.   Automatic shutoff?
24        A.   I think so.  Yes.
25        Q.   Did any gasoline spill on the ground when
```

## 35

```
1    the customer drove away with it?
2         A.   I don't think so, because he had already
3    finished.
4         Q.   Do you remember how many times you used
5    the sand, or the special sand, on the ground to clean
6    up small spills?
7         A.   I don't recall.
8         Q.   Once a month maybe, once a year?
9         A.   Maybe once a year.
10        Q.   The concrete, was it concrete or asphalt
11   around the dispensers where the customers would fill
12   their cars?
13        A.   First it was asphalt and once it was
14   remodeled it was concrete.
15        Q.   Were there cracks or seams in the concrete
16   where the people filled up their cars?
17        A.   I don't recall.  I don't think so.
18        Q.   And do you recall if they put a special
19   seal on the concrete to ensure that spills didn't get
20   into the concrete?
21        A.   I don't think so.  I mean, I don't recall.
22        Q.   Did you wash down the concrete, clean the
23   concrete?
24        A.   Yes.  Yes.
25        Q.   How often?
```

## 36

```
1         A.   Sometimes it was about every four months.
2         Q.   And did you see a sheen on the water, a
3    color in the water, when you washed it down, showing
4    that there was maybe some gasoline there?
5         A.   I don't think so.
6         Q.   And where did the water go when you washed
7    it down?
8         A.   To the sewer.
9         Q.   When you washed it down, did you smell
10   gasoline?
11        A.   No.
12        Q.   Did you ever hear that there was
13   contamination of the water, the ground water under the
14   station, from a leak at the station?
15        A.   No.
16        Q.   Okay.
17        Did you ever hear that there was MTBE in the
18   gasoline?
19        A.   No.
20        Q.   And did you ever hear that the-- when you
21   were selling the gasoline, did they ever say that the
22   gasoline was good for the air?
23        A.   No.
24        Q.   Did they ever say-- did you ever have
25   marketing or advertising saying that the gasoline was
```

# Transcript of the Testimony of Miguel Torres

Date: May 8, 2013
Volume:

Case: Commonwelath of PR v. Shell Oil Company.

Printed On: October 17, 2014

Joanne de Thomas
Phone:787.501.3007
Email:joannedethomas@yahoo.com

**37**

```
1        Tape No. 2.
2   BY MS. O'REILLY:
3        Q.  Did Esso provide you with instructions on
4   what to do when there was a spill of gasoline?
5        A.  Yes.  First you would call Mike Pizarro,
6   the sales representative, or the company itself.
7        Q.  And what were you-- after you called them,
8   what did you do if you had a spill or a leak of
9   gasoline?
10       A.  No, because-- how could I put it?  There
11  was one that was small like that.  There were no big
12  leaks.
13       Q.  What did Esso instruct you to do after you
14  called Mike Pizarro?  Did they provide with you any
15  other instructions on what to do if there was a
16  gasoline spill or leak?
17            MR. BOLLAR:  Objection to form.
18            THE DEPONENT:  Well, more or less what you
19       would do is you didn't sell more gasoline.
20  BY MS. O'REILLY:
21       Q.  Okay.  And did Esso give you any
22  instructions about where to look for leaks?
23       A.  What do you mean "leaks"?
24       Q.  Well, did Esso--
25       A.  Oh.  Okay.  Continue.  Continue.
```

**38**

```
1        Q.  Did Esso provide you any instructions on
2   how you were supposed to look for any leaks or spills
3   of gasoline?
4            MR. BOLLAR:  Objection to form.
5            THE DEPONENT:  It was virtually the sales
6       representative who did that.
7   BY MS. O'REILLY:
8        Q.  Oh, he would look for the-- the sales
9   representative would look for leaks or spills of
10  gasoline at the station?
11       A.  Well, he was the one who instructed you
12  more or less on the things you had to do.
13       Q.  What instructions did he give you?
14       A.  Well, let's say that there's a spill.
15  Call him, call Esso, or call Mike Pizarro.
16       Q.  And that was it?
17       A.  Well, first you called Mike Pizarro for
18  him to send his brigade to check and see what happened.
19       Q.  Okay.
20       Did you try to follow the instructions that Esso
21  gave you on operating the station safely?
22       A.  Yes.
23       Q.  And if Esso gave you different
24  instructions, would you follow those?
25            MR. BOLLAR:  Objection to form.
```

**39**

```
1            THE DEPONENT:  Well, the thing is that the
2       instructions there practically always came from
3       the sales representative.  He was the one who
4       gave the orders.
5   BY MS. O'REILLY:
6        Q.  So if the sales representative told you to
7   do something, you would follow his instructions?
8            MR. BOLLAR:  Objection to form.
9            THE DEPONENT:  Well, he was the one who
10      knew.
11  BY MS. O'REILLY:
12       Q.  Okay.  Did you ever have any customers
13  drive off with the gasoline nozzle?
14            MR. BOLLAR:  Still in the tank?
15            MS. O'REILLY:  (To the interpreter) Ask
16      him.
17            (The interpreter complies.)
18            THE DEPONENT:  No.
19  BY MS. O'REILLY:
20       Q.  Okay.  Did you receive information in the
21  mail from Esso, notices, instructions?
22       A.  What about?
23       Q.  About operation of the station.
24       A.  Well, whenever they changed a regulation
25  or something, they would notify it.
```

**40**

```
1        Q.  Would they explain the regulation to you?
2        A.  Well, they would send a letter and when
3   the sales representative came, if you didn't
4   understand, then you would ask him.
5        Q.  Okay.
6        Did Esso tell you that the gasoline they were
7   providing you had MTBE in it?
8        A.  They did say that, yes, but it was also
9   the sales representative who did that.
10       Q.  And what did they tell you about MTBE?
11       A.  I don't know how to pronounce it.  Imagine
12  if I can remember what they said about it.
13       Q.  Did they tell you anything about MTBE and
14  contamination of drinking water?
15            MR. BOLLAR:  Objection to form.
16            THE DEPONENT:  No.  Not that I recall.
17  BY MS. O'REILLY:
18       Q.  Did they tell you that gasoline with MTBE
19  had to be handled more carefully than gasoline without
20  MTBE?
21            MR. BOLLAR:  Objection to form.
22            THE DEPONENT:  But which of the two
23      gasolines had that?  Both of them?
24  BY MS. O'REILLY:
25       Q.  Let me ask it this way.  Was gasoline with
```

10 (Pages 37 to 40)

Torres

### 41

1  MTBE handled special?
2  MR. BOLLAR: Objection to form.
3  THE DEPONENT: But what-- I mean, I don't
4  understand what you mean by that.
5  BY MS. O'REILLY:
6  Q.  If gasoline with-- the gasoline with MTBE,
7  did you handle it differently at the gas station, use
8  it differently?
9  MR. BOLLAR: Objection to form.
10  THE DEPONENT: But my understanding is
11  that there is no different way to handle
12  gasolines, because gasoline is premium and
13  regular.
14  BY MS. O'REILLY:
15  Q.  What did Esso tell you about the dangers
16  of gasoline for you to operate your station?
17  MR. BOLLAR: Objection to form.
18  THE DEPONENT: Well, in one of the
19  meetings they explained what lead did.
20  BY MS. O'REILLY:
21  Q.  What about safety in handling gasoline?
22  What dangers did they explain to you?
23  MR. BOLLAR: Objection to form.
24  THE DEPONENT: Well, that would be
25  touching it and smelling it. What other danger?

### 42

1  BY MS. O'REILLY:
2  Q.  Did they explain to you any other dangers
3  from gasoline other than handling or smelling it?
4  MR. BOLLAR: Objection.
5  THE DEPONENT: Well, how could I put it?
6  When I started there was hardly no leaded
7  gasoline anymore. When there was leaded
8  gasoline you had to do blood tests to see if you
9  had any lead in your blood.
10  BY MS. O'REILLY:
11  Q.  Okay. Did you receive-- when the gasoline
12  was delivered to your station, did you receive some
13  paperwork telling you about the gasoline?
14  A.  Paperwork telling me about the gasoline?
15  Q.  Yes.
16  A.  No.
17  Q.  Okay.
18  MS. O'REILLY: (To the interpreter) Oh.
19  Sorry. I'm used to having the court reporter
20  here.
21  THE REPORTER: This will be one.
22  (A document is marked for purposes of
23  identification as Deposition Exhibit
24  No. 1.)
25  THE REPORTER: Shall I hand it to him?

### 43

1  MS. O'REILLY: Yes.
2  MR. BOLLAR: This is double-sided?
3  MS. O'REILLY: Yes.
4  MS. FRAU: Excuse me. Is there any
5  exhibits for the rest of the counsel?
6  MS. O'REILLY: We didn't have time
7  yesterday to make copies because some of this
8  stuff arrived late. So I didn't have time to
9  make copies. I did bring one for counsel for
10  Exxon.
11  For the record, I've marked as Exhibit 1
12  an Esso Standard Oil Company Puerto Rico
13  "Material Safety Data Sheet" dated April 18,
14  1994, Bates stamped XOM-PR-FILES-SUPP-472478.
15  BY MS. O'REILLY:
16  Q.  Have you had a chance to read that?
17  A.  No.
18  Q.  Do you recognize that document?
19  A.  I don't remember ever having seen that
20  until now.
21  Q.  Okay. That's okay. Let me try another
22  one.
23  MR. BOLLAR: Thank you.
24  THE REPORTER: This would be two.
25  (A document is marked for purposes of

### 44

1  identification as Deposition Exhibit
2  No. 2.)
3  MS. O'REILLY: For the record, I've marked
4  as Exhibit 2 a January 1995 "Material Safety
5  Data Sheet" for Esso Standard Oil Company Puerto
6  Rico Bates stamped XOM-PR-FILES-0153706 through
7  0153712.
8  BY MS. O'REILLY:
9  Q.  Do you recognize that document?
10  (The deponent shakes his head.)
11  BY MS. O'REILLY:
12  Q.  Oh, I apologize.
13  A.  No.
14  Q.  You have you to say "no," "yes."
15  A.  Yes, yes.
16  Q.  Thank you.
17  You don't recall if you ever received one of
18  these?
19  A.  Honestly, as far as recalling is
20  concerned, I don't recall.
21  Q.  Okay. Let me try a couple of more.
22  THE REPORTER: This is three.
23  (A document is marked for purposes of
24  identification as Deposition Exhibit
25  No. 3.)

## DEALER INFORMATION

| | |
|---|---|
| Dealer | MIGUEL A. TORRES SIERRA |
| Address | ANTONIO R. BARCELO, NUMERO 1, CAYEY |
| Moso | CO-242 |

## CONTRACT INFORMATION

| | | |
|---|---|---|
| Contract Name | CONTRATO DE ARRENDAMIENTO | @ |
| Sales Organization | 2034 | @ |
| Relation ID (Ship To / Vendor) | 131094 | @ |
| Station ID (PBL) | 114710 | @ |
| Contract Start | 4/1/06 | @ |
| Contract End | 4/1/09 | @ |

Remarks

RENTA:
ABRIL 1, 2006 A ABRIL 1, 2009:
1,622 .00 DOLARES

262-313-4242
Pag., cover

#8
May 8, 2013

XOM-PR-FILES-0086447



**certified**translate
A LANGUAGE FISH LLC COMPANY



info@certifiedtranslate.com   604 Arizona Avenue   usa  1-888-856-2228
www.certifiedtranslate.com   Santa Monica, CA 90401 USA   intl  +1-310-684-3153
                                                           fax  +1-310-566-1944

## CERTIFIED TRANSLATION

A member of the American
Translators Association
ATA Member Number: 248719

Documents Translated For:

| Name: | John Dema, Esq. | Street Address: 1236 Strand Street |
|---|---|---|
| Firm: | Law Offices of John K. Dema | City/State/Zip:  Christiansted / Virgin Islands / 00820 |

Description of Document(s):

| EXCERPTS FROM CONTRACT (14 pages) |
|---|
| XOM-PR-FILES- |
| 0086455 – 0086460; 0086468 – 0086469; 0086471; 0086500 - 0086504 |

| Source Language:  **SPANISH** | Target Language:  **ENGLISH** |
|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

By:    Sean Kirschenstein, Director                    Date:    May 6, 2013

A copy of the translated version(s) is attached to this statement of certification.

State of California
County of Los Angeles

On _May 6, 2013_ before me,_____Desa Philadelphia_____, Notary Public, appeared ___Sean Kirschenstein__, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

DESA PHILADELPHIA
Commission # 1890751
Notary Public - California
Los Angeles County
My Comm. Expires May 23, 2014

certifiedtranslate                                                                                    www.certifiedtranslate.com

CO-242

4.2.12 ESSO has the right to designate a specific area as the minimum area for entering and exiting required in order to make deliveries of Products to the Station in a safe manner. If the trucker decides, upon attempting to make a delivery, that the area provided for access and exit would not permit the delivery of the Products in a safe manner, ESSO will have no obligation whatsoever to continue or to reschedule the delivery until LESSEE can demonstrate that the access and exit area will permit the safe delivery of the Products.

4.2.13 ESSO may refuse to make deliveries if it suspects that the system of underground tanks at the Station, including but not limited to, dispensing pumps, lines, leak detection systems, containment systems, overfill prevention systems, remediation systems or those related to environmental or safety issues, or monitoring, detection and testing equipment (collectively "Tank System") does not comply with federal, state or local laws, ordinances, rules, regulations, permits, zoning restrictions, authorizations, building codes and other requirements set by federal, state, municipal and local authorities and/or administrative bodies (collectively "Laws"), or if ESSO suspects that the Tank System cannot be used for the storage and handling of Products in a safe manner.

4.2.14 LESSEE agrees to pay ESSO for the products it acquires at the Retail Price ("Dealer Tank Wagon Price") established by ESSO at the time and place of delivery for the Product(s) in question. LESSEE agrees to pay for all merchandise delivered to LESSEE by ESSO under the terms of this Contract using a cashier's check, money order or other means approved by ESSO, including direct debit.

If, due to the application of some or any order, ordinance, rule, decree, legislation, judgment or measure of any type enacted or issued by a government authority, in the opinion of ESSO, prevents ESSO partially or wholly, temporarily or permanently, from collecting, realizing or obtaining an adequate profit or yield on the sale, delivery and distribution of the fuel subject to this contract, ESSO will be entitled, at its option, to suspend all its deliveries and obligations under this and all contracts with LESSEE, with no liability whatsoever on the part of ESSO toward LESSEE. ESSO is to provide LESSEE with adequate notice informing him of its decision and its effective date.

4.2.15 The quantity and quality of the products sold under this Contract will be understood conclusively to be, for all purposes, in the quantity and of the quality set forth in the ESSO delivery document, or of the quality and in the quantity requested, unless LESSEE provides ESSO with written notice of any claim regarding a lesser quantity or deviation from quality within 24 hours following the time of delivery. Time is of the essence for compliance with this provision.

4.2.16 ESSO, at the request of LESSEE, has placed or installed on the premises of the station the equipment identified in Appendix B. LESSEE acknowledges that said equipment is the property of ESSO.



XOM-PR-FILES-0086457

# Transcript of the Testimony of Hector E. Berrios

Date: May 9, 2013
Volume:

Case: Commonwelath of PR v. Shell Oil Company.

Printed On: October 17, 2014

Joanne de Thomas
Phone:787.501.3007
Email:joannedethomas@yahoo.com

Berrios

13

1    MR. BOLLAR: That is at the discretion of
2  Counsel and the witness, I believe.
3    MS. O'REILLY: Well--
4    MR. BOLLAR: If we want to make sure that
5  we get everything exactly right, given that we
6  have-- this is a pretty significant litigation,
7  I think we should do this in the language that
8  the witness feels most comfortable.
9    MS. O'REILLY: Counsel, would it be okay
10  with you?
11    MS. RAMOS: Sure.
12  BY MS. O'REILLY:
13    Q. Yeah. We're going to go ahead and have
14  her translate--
15    A. All right.
16    Q. --just so we get used to it.
17    MS. O'REILLY: Go ahead and translate.
18    (The interpreter complies.)
19    THE DEPONENT: (Through the interpreter)
20  Yes.
21  BY MS. O'REILLY:
22    Q. Okay. Can you tell me first what was your
23  relationship to the Esso station in Ponce.
24    A. In 1998 my father acquired a group of Esso
25  stations which were named "Esso Serve-A-Car" and within

14

1  that group was Ponce Villa.
2    Q. And what did you-- what was your
3  relationship to the station? What did you do in
4  relation to the Ponce Villa station?
5    A. We were the administrators.
6    Q. Did you visit the stations?
7    A. Yes, I visited.
8    Q. How often?
9    A. Ponce Villa, since it was the furthest
10  away, I visited there about once or twice a week.
11    Q. Did you have an employee who managed the
12  day-to-day operations of the station?
13    A. Yes. Each station had its manager.
14    Q. Okay.
15  You have to let her translate me too.
16    A. Okay. Sorry.
17    Q. Thank you though.
18  You said your father purchased. From whom did
19  he purchase the stations?
20    A. Straight from Esso.
21    Q. Did you purchase the property from Esso?
22    A. No.
23    Q. Did you purchase the tanks and gasoline
24  equipment from Esso?
25    A. The equipment was theirs. We merely

15

1  rented the property.
2    Q. Is it fair to say that at all times for
3  the Ponce Villa station Esso owned the gasoline tanks
4  and equipment?
5    A. Yes.
6    Q. Did you or your father, or anyone else on
7  your behalf, inspect the tank equipment before you
8  purchased the station, the Ponce Villa station, from
9  Esso?
10    A. Not that I recall.
11    Q. Did you rely on Esso to maintain and
12  provide you with safe operating gasoline tanks at the
13  Ponce Villa station?
14    MR. BOLLAR: Objection to form.
15    THE DEPONENT: Yes. Yes.
16  BY MS. O'REILLY:
17    Q. Does your family still own the Ponce Villa
18  station?
19    A. No. Not since 2000. They were sold in
20  2000.
21    Q. Who were they sold to in 2000?
22    A. I don't remember the name of the person
23  who bought Ponce Villa. What I remember is that a
24  couple of months later, the person died in a traffic
25  accident.

16

1    Q. Did you find-- your-- you or your family
2  find the buyer for the Ponce Villa station, or did Esso
3  find you a buyer?
4    A. No. It was Esso. Esso.
5    Q. Why did your family sell the Ponce Villa
6  station?
7    A. My father acquired the stations in 1998
8  because he had a furniture business which he sold. And
9  then in 2000 he bought the furniture company again, so
10  we sold all of the stations to get back into the
11  furniture business.
12    Q. When your family bought the stations,
13  including the Ponce Villa station from Esso, did you
14  receive training on how to operate the station?
15    A. I received a basic training on the
16  operation of the store.
17    Q. What do you mean by "basic"?
18    A. It was merchandising the products, how the
19  store should be organized. Things like that.
20    Q. Did you or your father, or any of your
21  family members, have experience in operating a gasoline
22  station before you purchased the station or the Ponce
23  Villa station?
24    A. My brother used to have a garage in
25  Caguas.

4 (Pages 13 to 16)

Berrios

25

```
1    Basically, those were the numbers on it.
2        Q.   What was-- whose responsibility to your
3    understanding was it to clean up any gasoline that had
4    spilled or leaked at the Esso stations, including Ponce
5    Villa?
6            MR. BOLLAR:  Objection to form.  Calls for
7    a legal conclusion.
8            THE DEPONENT:  I understand that it was
9    Esso's.
10   BY MS. O'REILLY:
11       Q.   So is it fair to say that your
12   responsibility, your family's responsibility, was to
13   shut down the tanks, put-- if necessary, put down sand,
14   and then call somebody, and then you had completed your
15   responsibility to respond to a spill or a leak?
16           MR. BOLLAR:  Objection to form.
17           THE DEPONENT:  Yes, that's my
18   understanding.
19   BY MS. O'REILLY:
20       Q.   Did you ever see any deliveries of
21   gasoline to the station?
22           MR. BOLLAR:  We're talking about Ponce,
23   Counselor, or just generally?
24           MS. O'REILLY:  (To the interpreter) Does
25   he understand my question?
```

26

```
1            (The interpreter addresses the deponent in
2    Spanish.)
3            THE DEPONENT:  Yes, I understood.
4            I was never at Ponce to receive a gasoline
5    delivery or be there while they were delivering.
6    I was, though, at other stations.
7    BY MS. O'REILLY:
8        Q.   And what did you observe when you saw
9    gasoline deliveries occur at the station, at one of
10   your stations?
11           THE INTERPRETER:  I'm sorry.  Could you
12   start again.
13           MS. O'REILLY:  Sure.
14   BY MS. O'REILLY:
15       Q.   What did you observe or see when you
16   watched a delivery of gasoline to one of your stations?
17       A.   Well, it was the normal procedure.  No car
18   could dispense gasoline.  The truck would arrive, the
19   truck area would be closed, and then the truck driver
20   would discharge.  First the gasoline would be measured
21   and then the truck driver would dispense.
22       Q.   When gasoline was delivered to one of the
23   stations, did you or your managers have any
24   responsibility to assist the driver in delivering the
25   gasoline?
```

27

```
1            MR. BOLLAR:  Objection to form.
2            THE DEPONENT:  No.  In terms of dispensing
3    the gasoline, the only person who could do that
4    was the driver.
5    BY MS. O'REILLY:
6        Q.   And who, to your understanding, hired the
7    driver to deliver the gasoline to your stations,
8    including Ponce Villa?
9            MR. BOLLAR:  Objection to form.
10           THE DEPONENT:  Esso.
11   BY MS. O'REILLY:
12       Q.   And were you required for the Esso
13   stations, including Ponce Villa, to buy all your
14   gasoline from Esso?
15       A.   Yes.  In terms of their brand, the only
16   thing that we could have was Esso.
17       Q.   Do you recall if someone from Esso would
18   come out to your stations, including Ponce Villa, and
19   test the gasoline to make sure it was Esso gasoline?
20       A.   I wasn't there at the Ponce station, but I
21   was at the other stations when a van would arrive and
22   they would take samples of the gasoline to also test
23   and make sure that the premium gasoline was premium and
24   the regular gasoline was regular and that they wouldn't
25   be mixed.
```

28

```
1        Q.   Okay.
2            Did your company, your family, put together any
3    kind of a manual or written instructions for your
4    employees on how to operate the stations?
5        A.   No.
6        Q.   If an employee, like a manager, had a
7    question about how to operate the station or a question
8    about safety, how would your family handle that?
9        A.   I understand that when they had a question
10   on safety or something like that they would call
11   Carlos, because they had a direct relationship with him
12   because Carlos was their supervisor when the station
13   was operated by Esso.
14       Q.   So you relied on Carlos to provide safety
15   information to your employees for operation of the
16   stations, including the Ponce Villa station.
17           MR. BOLLAR:  Objection to form.
18           THE DEPONENT:  Yes.
19   BY MS. O'REILLY:
20       Q.   When you owned the stations, did you or
21   your employees take inventory of the gasoline in the
22   tanks?
23       A.   Yes.
24       Q.   And how was that done?  Do you know?
25       A.   It was done on a daily basis.  The report
```

7 (Pages 25 to 28)

Joanne de Thomas

787.501.3007                        joannedethomas@yahoo.com

Berrios

45

1      Did Esso, anyone from Esso, tell you that a
2  release of gasoline at your station could get into
3  ground water that people drink?
4         MR. BOLLAR:  Objection to form.
5         THE DEPONENT:  I don't recall.
6  BY MS. O'REILLY:
7      Q.   Did anyone tell you how much gasoline had
8  to be released to cause contamination of the water?
9         THE INTERPRETER:  "Did anyone in Esso tell
10 you"?
11        MS. O'REILLY:  Yes.
12        THE DEPONENT:  I don't recall.  I don't
13 recall.
14 BY MS. O'REILLY:
15     Q.   Do you know if your employees were given
16 instructions, other than inventory, how to check for
17 leaks of gasoline at the Esso stations, including Ponce
18 Villa?
19        MR. BOLLAR:  Objection to form.
20        THE DEPONENT:  I don't recall.
21 BY MS. O'REILLY:
22     Q.   Okay.  Did you ever learn about MTBE being
23 in the gasoline that was provided to your stations by
24 Esso?
25     A.   No.

46

1      Q.   Were you ever told by Esso that even very
2  small releases of gasoline with MTBE could contaminate
3  the water that people drink?
4         MR. BOLLAR:  Objection to form.
5         THE DEPONENT:  No.
6  BY MS. O'REILLY:
7      Q.   Were you ever told that MTBE gasoline had
8  to be handled differently and more carefully than
9  gasoline without MTBE to prevent contamination?
10        MR. BOLLAR:  Objection to form.
11        THE DEPONENT:  No.
12 BY MS. O'REILLY:
13     Q.   Okay.  Do you recall if Esso took any soil
14 samples or environmental samples from the Ponce Villa
15 station during the time that your family owned or
16 operated it?
17     A.   I don't recall.
18     Q.   Were you or anyone in your family provided
19 with copies of environmental samples, soil or water,
20 from the Ponce Villa station by Esso?
21        MR. BOLLAR:  Objection to form.
22        THE DEPONENT:  I don't recall.
23 BY MS. O'REILLY:
24     Q.   Was there anyone in your family that was
25 responsible for keeping an eye on the-- any

47

1  contamination at the stations?
2         MR. BOLLAR:  Objection to form.
3         THE DEPONENT:  Well, it was everyone's
4  responsibility to keep an eye on contamination
5  if anything happened.
6  BY MS. O'REILLY:
7      Q.   Did you ever have any conversations with
8  Carlos about contamination, soil contamination or
9  ground water contamination, at the Ponce Villa station?
10     A.   No.
11     Q.   Okay.
12     When your family sold the stations, were you
13 required to do any cleanup of the stations, clean them
14 up or change anything at them before you sold them?
15     A.   No.
16     Q.   Okay.
17     When in 1998 did your family acquire the Ponce
18 Villa station?  Do you recall?
19     A.   I don't remember the exact date, but I
20 understand that it was between April, May, June.
21 Around that time.
22     Q.   Okay.
23        MR. BOLLAR:  Thank you.
24        THE REPORTER:  This would be two.
25        (A document is marked for purposes of

48

1  identification as Deposition Exhibit
2  No. 2.)
3         MS. O'REILLY:  For the record, I've marked
4  as Exhibit--
5         MS. TRELLES:  For the record, same
6  objection to Exhibit 2 and all questions
7  regarding it.
8         MS. O'REILLY:  And for the record, I've
9  only marked two documents.  On the next break
10 Counsel can certainly take the exhibits and
11 review them.  I'll give them plenty of time to
12 do that.
13     For the record, I've marked as Exhibit 2
14 an October 9th, 1998, letter from Esso to Edwin
15 Ortiz, Environmental Quality Board, regarding a
16 gasoline spill at Esso service station calle
17 Villa, Ponce.  It's Bates stamped
18 XOM-PR-00170268 through 0271, and I've given a
19 certified translation in English, as well as the
20 original Spanish version of the document.
21 BY MS. O'REILLY:
22     Q.   And I'll just direct your attention when
23 you're ready.
24     Have you had a chance to review the document?
25 "Yes"?

Joanne de Thomas
787.501.3007                              joannedethomas@yahoo.com

**Exhibit 3**

Carlos Figueroa-Lebron

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

In Re:  Methyl Tertiary  *
Butyl Ether ("MTBE")     * Master File No.
Products Liability       * 1:00 - 1898
Litigation,              * MDL 1358 (SAS): M21-88
_____*


This Document Relates to:

Commonwealth of Puerto
Rico, et al.

            v.

Shell Oil Co., et al.
_____

The videotaped deposition of:

           CARLOS FIGUEROA-LEBRÓN,

was held at O'Neill & Borges, 250 Muñoz Rivera

Avenue, Suite 800, San Juan, Puerto Rico, on


Thursday, December 5, 2013, at 9:13 a.m.




Reported By:  Derek L. Hoagland

             California CSR No. 13445

Carlos Figueroa-Lebron

Page 10

1    represent the Commonwealth of Puerto Rico and the
2    Environmental Quality Board.  I am going to be
3    asking you some questions today.
4         And if at any time you would like to take a
5    break, just let me know.  My practice has been to
6    take a break about every 60 minutes, and we will
7    need to do that anyway to change the videotape.
8    So -- and we will also break for lunch, but if at
9    any time between those breaks you would like to
10   take a break, just let me know and we can.
11        Is that okay?
12        A    Yeah.  Thank you.
13        Q    The only caveat to that that I would
14   ask is that if I have asked you a question and it
15   is still pending, I'd ask that you answer my
16   question before we take a break.
17        Is that okay?
18        A    Yeah.
19        Q    Where do you live, Mr. Figueroa?
20        A    I live in Manatí, Puerto Rico.
21        Q    Is that your only residence?
22        A    Yes.
23        Q    Have you ever been deposed before,
24   sir?

Page 11

1         A    Yes, sir, I have.
2         Q    How many times?
3         A    How many times?  Probably about three
4    times.
5         Q    Do you recall what type of litigation
6    was involved in those depositions?
7         A    Work-related, all those cases, and
8    basically related to a project that I was
9    handling, or -- or a case related to -- to work.
10        Q    When you say, "work," was it primarily
11   environmental-related litigation?
12        A    Not all the cases.  One case was
13   related to a construction project, and the other
14   two cases were related to environmental-related
15   work.
16        Q    So hopefully this process is not that
17   foreign to you.
18        A    Uh-huh, no.
19        Q    Did either one of the environmental
20   cases involve groundwater contamination?
21        A    Yes.
22        Q    What were the principal contaminants
23   of concern in that litigation, if you recall?
24        A    I don't recall the specifics, but

Page 12

1    basically for groundwater is the BTEX, the
2    benzine -- mostly the benzine has been the main
3    issue addressed in those cases.
4         Q    In either one of those cases, was MTBE
5    an issue?
6         A    I don't recall that MTBE has been
7    brought into those cases.
8         Q    And we're going to refer a fair bit
9    today to MTBE.  Do you -- are you aware of what
10   MTBE is?
11        A    Not completely.  I have a general
12   knowledge, but I am not an expert in chemist, so I
13   don't --
14        Q    What is your understanding of MTBE?
15        A    My understanding of MTBE is that it
16   was a product that was added to gasoline at a
17   certain point in history, and then it was
18   discontinued later on.
19        Q    Do you have an understanding of why it
20   was added to gasoline?
21        A    I have a general knowledge that after
22   they discontinued of the lead in gasoline, MTBE
23   came as a replacement, but I don't know the
24   chemists behind or the rationale behind.

Page 13

1         Q    In addition to being used as a lead
2    replacement, are you also aware that it was used
3    as an oxygenate in gasoline?
4         A    I am not that familiar with that term.
5         Q    And for the record, you're aware MTBE
6    stands for methyl tertiary butyl ether?  Are you
7    aware of that, the full name?
8         A    No.  No.
9         Q    When did you first learn about MTBE?
10        A    It was probably around 2000, or after
11   the year 2000.
12        Q    And why does that year stick in your
13   mind?
14        A    That was right after the merger of
15   Exxon and Mobil, and there was a new employee in
16   the group that came from the States and did have
17   previous experience dealing with a remediation
18   case with MTBE.
19        Q    Do you remember the name of that
20   employee?
21        A    Yes.
22        Q    What was the name?
23        A    Meena Nainan.
24        Q    Last name?

4 (Pages 10 to 13)

Carlos Figueroa-Lebron

Page 18

1    A   I held that position probably 1998,
2  '97, only two years, a year and a half, something
3  around that time frame.
4    Q   '97 to '98 time frame?
5    A   For -- for the environmental group,
6  yes.
7    Q   And who did you replace, sir?
8    A   I replaced Ms. Ana Gloria Ramos.
9    Q   And she was the environmental
10 supervisor up until approximately 1997?
11   A   Around that time frame, yes.
12   Q   You mentioned that you first learned
13 of about MTBE from Ms. Nainan.  How did you learn
14 about it?
15   A   Just regular exchange of information.
16   Q   Was it part of a presentation?
17   A   It was more of a exchange of
18 information regarding previous experiences,
19 previous projects.  She -- she came from
20 California, where she had a remediation case
21 dealing with MTBE, among other aspects.
22   Q   It was more conversational between two
23 colleagues?
24   A   Yes.

Page 19

1    Q   I know you have been deposed before,
2  Mr. Figueroa.  I just want to back up and make
3  sure that you and I are on the same page regarding
4  a couple of things so that this goes as smoothly
5  and as quickly as possible today for us.
6    A   Okay.
7    Q   First, as we have been doing, I am
8  going to ask you questions, and if you would
9  answer my questions verbally so that the court
10 reporter can take them down and have a complete
11 record --
12   A   Okay.  Yes.
13   Q   -- I would appreciate it.  We have a
14 tendency to anticipate what each other is going to
15 say and will oftentimes start to answer before my
16 question is finished, or similar sort of speaking
17 over one another, and if we could -- if you would
18 make an effort not to do that to me, I will make
19 an effort not to do that to you.
20     Is that okay?
21   A   That's okay.
22   Q   Because if we do speak over each
23 other, it is going to be very difficult for the
24 court reporter to take down a complete transcript.

Page 20

1    A   Understood.
2    Q   If you do not understand any question
3  that I ask, please just tell me so, and I will
4  either reask it or rephrase it.
5    A   Okay.
6    Q   If at any time you want to revise one
7  of your answers, please just let me know, and I'll
8  give you that opportunity.
9    A   Okay.
10   Q   I am going to show you some documents
11 today.  If at any time you think of a document
12 that may help you to remember or testify regarding
13 an issue, please let me know, because I may have
14 it and I may be able to show it to you.
15   A   Okay.
16   Q   If at any time you want to speak with
17 your attorney, you may.  Just I would ask that we
18 have the same understanding as we do regarding a
19 break, which is if I have a question pending, I
20 would ask that you answer my question first before
21 speaking with him.
22     Is that okay?
23   A   Okay.
24   Q   Are you taking any medication today

Page 21

1  that might prevent you from being able to fully
2  testify?
3    A   No.
4    Q   Have you had anything alcoholic to
5  drink in the last eight hours?
6    A   No.
7    Q   Are you suffering from any illness
8  that would prevent you from testifying today?
9    A   I am diabetic, but I am taking my
10 medication.  I should be okay, as long as we take
11 the breaks needed.
12   Q   And as we talked about earlier, if at
13 any time you need to take a break for any reason,
14 just let me know and we can do so.
15   A   Okay.
16   Q   Is there any reason that you can think
17 of that you can't testify fully and completely
18 today?
19   A   No.
20   Q   I am going to show you, sir, what I
21 just marked as Figueroa Exhibit 1.  And I have
22 copies for counsel.
23     (Exhibit No. 1 marked for
24     identification.)

Carlos Figueroa-Lebron

Page 38

1   October 2008 -- actually, the way that I want to
2   clarify this is I was more like a project
3   engineer, I was managing projects.
4        So when I took the role of supervisor in
5   2006, I continued with my project manager roles; I
6   just got the additional assignment to be the
7   supervisor of the group, and I was supervisor
8   until -- basically for the local group, until
9   October 2008.  That's when the company was sold to
10  Total.
11       I stayed with the company until I left in
12  2011, but I mean, there was no longer a group, so
13  I was not supervising anybody.  I was more
14  managing.  I just continued my role as a project
15  manager until 2000 -- from 2008 through 2011.
16       Q   Then what types of projects were you
17  managing after the sale to Total in October of
18  2008?
19       A   Basically, it was environmental
20  projects or remediation projects or what we used
21  to call retained liabilities project sites that
22  were no longer Esso's property, but they were
23  divested or disengaged, and Esso retained the
24  responsibility to address the environmental

Page 39

1   condition of the site.
2        Q   During the time frame from October
3   2008 to November of 2011, were you still an
4   employee of Esso Puerto Rico?
5        A   I was an employee until September
6   2011.
7        Q   And I am just trying to clarify --
8        A   Right.
9        Q   -- whether you were acting as an
10  independent contractor.
11       A   No.
12       Q   What happened in September 2011?
13       A   In September 2000 -- well, it was in
14  August 2011, I presented my resignation letter,
15  and I went to work for another petroleum company
16  in October 2011.
17       Q   What caused you to retire from -- or
18  to resign, rather, from Esso Puerto Rico?
19       A   Well, Esso Puerto Rico was a company
20  that sold all its assets in 2008, and my main task
21  was to complete and close projects, so I
22  understood that there was going to be a very short
23  time frame with the company, because after that,
24  most likely I would be without a job.

Page 40

1        So an opportunity presented, and I
2   evaluated and took the decision to leave the
3   company to pursue personal interests on -- on the
4   behalf of the best interest for me and for my
5   family.
6        Q   Is it fair to say that, if I
7   understand you, Esso Puerto Rico was -- was
8   wrapping up the projects that you managed, and
9   there was a -- there was a visible backstop to
10  when those projects would end?
11           MR. CONLEY:  Objection to form.
12  Mischaracterizes.
13           THE DEPONENT:  Can you clarify?
14  Because I didn't understood the
15  last statement.
16  BY MR. GILMOUR:
17       Q   Yes, sir, I am just trying to
18  understand.  You -- it is my understanding that
19  Esso Puerto Rico divested its retail -- the
20  majority of its retail service stations in 2008;
21  is that correct?
22       A   Esso Puerto Rico divested all its
23  operations, retail, industrial, aviation
24  terminals, all the operations were divested in

Page 41

1   2008.
2        Q   So it is my understanding that Esso
3   Puerto Rico didn't have ongoing operations after
4   that date; is that correct?
5        A   That's correct.
6        Q   And so you had -- but you still had
7   ongoing projects that you were managing, the --
8   the retained liability projects?
9        A   That's correct.
10       Q   At some point, those projects were all
11  going to be complete, correct?
12       A   That's the intention, correct.
13       Q   And so you foresaw that that was --
14  your projects were going to end, and so you sought
15  alternative employment; is that correct?
16       A   That's correct.
17       Q   And, again, I am just trying to make
18  sure that you and I aren't talking past one
19  another and I understand everything that you're
20  saying.
21       We spent some time discussing your work
22  history, and I want to make sure that we have
23  covered all of the positions that you held while
24  you were at Esso Puerto Rico from, my

11  (Pages 38 to 41)

Carlos Figueroa-Lebron

Page 42

1  understanding is February of 1996 until October
2  2011; is that correct?
3      A   Yeah, that was -- September 2011.
4      Q   Sorry, September 2011.
5      A   Yes.
6      Q   Another housekeeping matter,
7  Mr. Figueroa.  Some of the documents I am going to
8  show you today are in English and some of the
9  documents I am going to show you today are in
10  Spanish.  It is my understanding that you are
11  fluent in Spanish; is that correct?
12      A   Yes.
13      Q   It is also my understanding that you
14  are fluent in English; is that correct?
15      A   Yes.
16      Q   And so you won't have any difficulty
17  reading a Spanish document if I give it to you?
18      A   No.
19      Q   And the same for if I give you a
20  document in English, you will be able to read and
21  understand it?
22      A   Yes, and if I have a question, I will
23  ask a question, so...
24      Q   Perfect.  We're going to be talking

Page 43

1  today about two particular sites, and I want to
2  make sure that you and I are on the same page when
3  we're referring to them.  One is referred to in
4  the documentation I have seen as CO-242 in Cayey.
5      Are you familiar with that site, sir?
6      A   Yes.
7      Q   And the other site is CO-364, which is
8  in Ponce.  Are you familiar with that site, sir?
9      A   Yes.
10      Q   So if I refer to either of those, you
11  will understand which site we are talking about?
12      A   Yes.
13      Q   It's my understanding that both of
14  those stations were former Esso Puerto Rico retail
15  gas stations; is that correct?
16      A   That's correct.
17      Q   Would those two sites have fallen
18  within the scope of your work in the 1997 and '98
19  time frame, when you were working to complete
20  compliance with EPA regulations?
21      A   The compliance of EPA regulation,
22  basically we look at the whole network.  Being the
23  supervisor, I didn't really manage any specific
24  project, but I oversee the whole program, so if

Page 44

1  there was any activity, I most likely coordinated
2  or assisted the engineers that were coordinating
3  that work.
4      Some of those sites may have their work
5  completed prior to that time, and some of them may
6  have a portion of the work to be completed during
7  that time frame.  But I don't recall specifically
8  working on those two cases doing the compliance.
9      I mean, again, being the supervisor, I
10  didn't manage the specific project, but more the
11  overall program in terms of logistics, budget,
12  resources, communications with the agency.
13      Q   Did you have individuals that worked
14  for you that would have been responsible for
15  implementation of the work necessary to comply
16  with the regs?
17      A   Yes.
18      Q   Okay.
19      A   There was a group of about -- I think
20  I -- I was counting it was about ten people when
21  you added the retail, engineering and the
22  environmental.  It was about ten people that
23  day -- but basically in order to get the
24  compliance in place, it was like a team of one

Page 45

1  engineer for retail and one for environmental.  So
2  it was a team effort for almost every project.
3      So it was not only getting the physical
4  piece done, but also getting the environmental
5  related work that -- that -- for example, a tank
6  replacement project also required tank excavation
7  assessment, and it would require soil disposal.
8      So it was a team effort.  One engineer will
9  handle the civil work, and the other will handle
10  the consulting -- environmental consultant and
11  waste disposal, so it was a team effort.  Also
12  there were two different contractors in most
13  cases.
14      Q   Do you recall who those contractors
15  were?
16      A   Back then in the 1997-'98, probably
17  there were several contractors.
18      Q   And do you remember the names of any
19  of them?
20      A   Yes, in the engineering side, there
21  were contractors such as Mike Pizarro, Roque
22  Schmidt.  Those were the two main maintenance
23  contractors, but they also conducted tank work.  I
24  mean, installations, removals, installation of

Carlos Figueroa-Lebron

Page 62

1   normally are not from that region, and you take
2   advantage and provide the course right there.
3       Q   And you had previously mentioned The
4   Woodlands, Texas.  Were some of these courses
5   taken in The Woodlands, Texas?
6       A   The one at The Woodlands was with
7   Exxon, and that was just the UST installation
8   course.
9       Q   That was the only course that you have
10  taken in The Woodlands?
11      A   That's the only course I can remember
12  in The Woodlands.  I think I visited The Woodlands
13  area because that's where there are some Exxon
14  offices, but for courses, that's the one that I
15  recall in that area.
16      Q   Do you recall any other of these
17  training courses that we have been talking about
18  that were offered by Exxon or ExxonMobil?
19          MR. CONLEY:  Objection to form.
20  Vague.
21          THE DEPONENT:  Yeah, it's a --
22      there were several.  I don't recall
23      the exact number.  Like I
24      mentioned, there were some that,

Page 63

1           for example, the resource will
2       visit Esso Puerto Rico and offer
3       the course to the local group, and
4       others in which we will go to a
5       meeting, a regional meeting, or a
6       meeting where we will have --
7       probably attending for another
8       function, but we will take
9       advantage that we are nearby an
10      office, and we will take a one-day
11      session or half-day session on a
12      specific topic.
13          And there were several.  I
14      mean, we have meetings every year.
15      Every year, they will have, like, a
16      regional meeting that we all will
17      go.  Not always at the same
18      location.  I mean, they may change
19      location depending on the --
20      purpose of the meeting and who was
21      offering the meeting.
22          But there were several, like I
23      mentioned, natural attenuation or
24      the Remediation 101.  There were

Page 64

1   others also related to safety
2   aspects to this work environment.
3   We have quite a few on that -- on
4   that section.
5       So safety was a big part of
6   ExxonMobil and Esso Puerto Rico's
7   role, so -- so that was also
8   another big item.
9       But on remediation, I don't
10  recall the -- the exact number or
11  the exact title.  I know that there
12  were several during the -- how much
13  was it?  Ten years, eleven years
14  that I was with that group.  We
15  have several.
16      That was not something that I
17  keep a record of it, so I
18  couldn't -- that's something that I
19  didn't went back and check, so
20  sorry, I can't give you the exact
21  number or titles.
22  BY MR. GILMOUR:
23      Q   That's okay.  All I am trying to do is
24  ask whether you recall any locations in the United

Page 65

1   States that you went to at an Exxon or ExxonMobil
2   facility, other than The Woodlands, Texas.
3       A   The location, I remember going to the
4   Fairfax office for ExxonMobil.
5       Q   And that's Fairfax, Virginia?
6       A   Fairfax, Virginia, yeah.  There may
7   have been others at Coral Gables, Miami, Florida.
8   I remember being in Huntington Beach, California.
9   And I think one of the very last ones was in the
10  New York area.
11      Q   Was there ever a time that you
12  received training related to MTBE while at --
13  while employed by Esso Puerto Rico?
14      A   While employed by Esso Puerto Rico, if
15  I ever received training on MTBE?
16      Q   Better way for me to ask --
17      A   Yeah.
18      Q   -- the question.
19      Prior to September 2011, did you receive
20  any training related to MTBE?
21          MR. CONLEY:  Objection.  Vague.
22          THE DEPONENT:  I don't recall a
23      training on that specific matter,
24      no.

17 (Pages 62 to 65)

Carlos Figueroa-Lebron

Page 66

BY MR. GILMOUR:
    Q   Do you recall MTBE being addressed in
any of the training that you attended prior to
September 2011?
    A   It most likely, or probably, could
have been mentioned at some of these remediation
courses, but just the same way as benzine is
mentioned or other components of gasoline or
diesel are also mentioned, but not specific on
that aspect.  But it usually doesn't point out
from -- on the general training sessions.
    Q   I would like to show you a document.
It's attached to a -- as an exhibit to a
deposition exhibit, or it's attached to a -- it's
attached as an exhibit to a deposition notice,
rather, and the notice does not apply to you.  I
am marking this as Figueroa 3.
        (Exhibit No. 3 marked for
         identification.)
BY MR. GILMOUR:
    Q   It has also been previously marked as
Muñoz Exhibit 2.  I am going to turn to the
page -- first page of Exhibit A to the document.
        Copy for counsel so you can see.  And

Page 67

Exhibit A attached to Figueroa Exhibit 3 is a
relatively lengthy document and I don't need you
to read it all.  I just want to -- it is entitled
"MTBE Release Source Identification at Marketing
Sites, a Study Conducted for EUSA ESD by Exxon
Research and Engineering Company," dated
March 30th, 1999.
        Have you ever seen this document before,
sir?
    A   March 1999, I was with the company.  I
don't recall the document.
    Q   You don't recall ever reviewing this
document?
    A   Reviewing the document, no.  We had
a -- like a library at the office, and there were
several documents on different branding and
standards, but I don't -- I don't recall seeing
this one specifically.
    Q   So you don't remember ever reading
this document?
    A   I don't remember.
    Q   Was the existence of this document
ever brought to your attention that you can
recall?

Page 68

    A   I'm sorry, I just answered that I
don't remember the document, so the assistance
(sic) of the document.
    Q   I was making a distinction.  I heard
you say that you had not read the document.  I
just wanted to --
    A   Right.
    Q   I was asking if you were aware that it
existed.
        MR. CONLEY:  Objection to the
    extent it calls for a privileged
    communication, so don't answer to
    the extent it's outside work
    communications.
        THE DEPONENT:  Okay.
BY MR. GILMOUR:
    Q   And to be clear, I am not asking about
anything done specifically in preparation for your
deposition here today.  I am talking about your
time prior to September 2011.
    A   Right.  So in order to address the
question, no, I haven't.  I don't remember seeing
that document before.
    Q   In your work prior to -- and if we

Page 69

could have an understanding, all of the questions
that I am asking you apply to your time at Esso
Puerto Rico prior to September 2011, unless I
otherwise tell you.
        Can we have that understanding so that we
don't get into the situations where you may have
spoken to counsel about issues in preparation for
today?
    A   Okay.  Understood.
    Q   During your time at Esso Puerto Rico,
was there ever a time that MTBE became a focus of
your work?
        MR. CONLEY:  Objection.  Vague.
        THE DEPONENT:  Can you clarify
    or -- focus of my work?
BY MR. GILMOUR:
    Q   We have been talking today about your
understanding of MTBE.  And it started, as I
understand it, in a conversational nature between
colleagues back in 2000.
        And so what I am trying to get at, sir, was
there a time that MTBE specifically became part of
your work?
        MR. CONLEY:  Objection.  Vague.

18 (Pages 66 to 69)

Carlos Figueroa-Lebron

Page 70

1      THE DEPONENT: Not that I
2   recall, no.
3   BY MR. GILMOUR:
4      Q   When you were the retail environmental
5   supervisor, do you recall having instances where
6   you were supervising work related to MTBE?
7          MR. CONLEY: Objection. Vague.
8          THE DEPONENT: No.
9   BY MR. GILMOUR:
10      Q   And, again, I am going to get the
11   supervisory titles mixed up, but during your time
12   at Esso Puerto Rico, was there a time that you
13   oversaw work being done -- let's start
14   specifically to identify MTBE contamination?
15          MR. CONLEY: Objection. Vague.
16          THE DEPONENT: During my time
17      at Esso Puerto Rico, I don't
18      remember that MTBE was a parameter
19      that was requested to be sampled.
20          Esso did work on the setup tank
21      guidelines, basically, with EQB.
22      We have a generic sampling plan,
23      and MTBE was not part of that plan.
24      That plan was approved by the

Page 71

1      Environmental Quality Board, and
2      basically covers the requirements
3      of the UST regulation, so we follow
4      basically that. And MTBE was not
5      included.
6          So to answer your question, no,
7      we did not -- although there may
8      have been instances in which the
9      agency has requested to do MTBE
10      sampling, I don't recall a case in
11      which I personally handled, or I
12      don't recall the company did have
13      cases in which MTBE was
14      specifically requested by the
15      agency.
16   BY MR. GILMOUR:
17      Q   You mentioned that Esso Puerto Rico
18   had a generic sampling plan, and it's my
19   understanding that you said it was developed based
20   upon the EPA regs; is that correct?
21          MR. CONLEY: Objection.
22      Mischaracterizes.
23          THE DEPONENT: It was really
24      developed to address the local UST

Page 72

1   regulation.
2   BY MR. GILMOUR:
3      Q   And which agency was responsible for
4   the local UST regulation?
5      A   The Puerto Rico Environmental Quality
6   Board.
7      Q   So the generic sampling plan was
8   developed based upon the existing UST regulations?
9      A   That's correct.
10      Q   Do you know when the generic sampling
11   plan was developed?
12      A   The document was developed around 1996
13   and submitted to the agency for approval. My
14   recollection is that it was endorsed or approved
15   by EQB in 1997.
16          So during my time at Esso, that was, like,
17   the document that we used as a guiding document
18   because it was the endorsed document by EQB.
19          So the answer to your question would be
20   1997, that's when we got the endorsement from the
21   agency.
22      Q   Has that generic sampling plan -- or
23   was that generic sampling plan amended during your
24   time at Esso Puerto Rico?

Page 73

1      A   Around 2007, during regular business
2   meetings with EQB personnel, we got a verbal
3   request to update it, because it has already been
4   ten years. So the document was revised and
5   resubmitted to the agency around 2007.
6          I do not recall receiving it back from the
7   agency, either with comments or approvals, so we
8   still -- during my time with the company, I still
9   continue working under the 1997 document.
10      Q   And if I understand you, then, the
11   sampling during your time at Esso Puerto Rico was
12   for substances that were identified in the local
13   regulation -- UST regulations applicable in 1996;
14   is that correct?
15          MR. CONLEY: Objection.
16      Mischaracterizes.
17          THE DEPONENT: The local UST
18      regulation, my understanding, is
19      dated 1990, and as far as I am
20      concerned, they still -- they -- is
21      still the active one or the
22      applicable one.
23          I do remember an effort at one
24      point to have that revised, but as

Golkow Technologies, Inc. - 1.877.370.DEPS

Ricardo L. Casas-Lomba

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------x
IN RE:  METHYL TERTIARY          MASTER FILE
BUTYL ETHER ("MTBE")            NO. 1:00-1898
LIABILITY LITIGATION            M21-88
PRODUCTS                        MDL 1358 (SAS)
---------------------------x
COMMONWEALTH OF PUERTO
RICO, ET AL.,
              Plaintiffs,

       vs.                      CASE NO.
                                07-CIV-10470
SHELL OIL CO., ET AL.,,         (SAS)

              Defendants.
---------------------------x


   The video deposition of:


            RICARDO L. CASAS-LOMBA,


   Was held at the law offices of O'Neill & Borges,
   250 Muñoz Rivera Avenue, 800 American International
   Plaza, San Juan, Puerto Rico, on Tuesday,  May 6,
   2014, at 10:07 a.m.




   Reported by:  Marty E. McArver, CA-CSR, GA-CCR, FPR


            GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph|917.591.5672 fax
              deps@golkow.com

Ricardo L. Casas-Lomba

Page 34

1    Esso in Puerto Rico, you had no personal knowledge
2    as to whether or not that gasoline contained MTBE?
3    Correct?
4         A.  I don't recall any instances where I was
5    informed or not that it did or did not have MTBE.
6         Q.  When you say MTBE was not a consideration,
7    can you explain what you mean by that?
8         A.  What I mean is that normally a company
9    has a standard for, for example, 93-octane gasoline or
10   87-octane gasoline.  And that has several items that
11   our product experts say, hey, this is -- you know, these
12   are the different tests that need to be performed on
13   that fuel to be able to be sold and branded under the
14   Esso flag.
15        So those tests are -- you know, have various
16   levels, you know, color or density or octane and others,
17   and so it's -- As long as the product was meeting those
18   specs, I was not, you know, informed that there was an
19   issue with the product.  I mean, it just meets the spec
20   and it's marketed.
21        Q.  Okay.  So nobody was looking at the MTBE
22   content or lack of MTBE content in gasoline at that
23   time?
24            MR. BOLLAR:  Objection to form.

Page 35

1    Mischaracterizes testimony.
2            THE DEPONENT:  I was personally not
3    informed.  We had, you know, technical
4    people that were reviewing the product
5    being purchased.
6    BY MS. O'REILLY:
7         Q.  Do you know if they were reviewing the
8    product for content of MTBE?
9         A.  I don't know.
10        Q.  Were there any reports that you saw
11   during the time period when you were working for
12   Esso that discussed whether or not MTBE was present
13   in the gasoline distributed by Esso in Puerto Rico?
14        A.  I don't recall any reports, no.
15        Q.  Were there any summaries prepared, while you
16   were involved with Esso, concerning the amount of MTBE
17   present in gasoline distributed by Esso Puerto Rico?
18        A.  I don't recall any summaries.
19        Q.  Was that a statistic, to your understanding,
20   that Esso Puerto Rico tracked for gasoline it
21   distributed in Puerto Rico?
22        A.  I'm sorry.  Are you asking whether Esso was
23   tracking what --
24        Q.  MTBE content of its gasoline.

Page 36

1         A.  Well, as I have learned more recently, it
2    was part of the certificate of analysis.  Whether it
3    was tracked or not, I don't know.  It may be on the
4    certificate.
5         Q.  In preparation for your deposition today,
6    did you have conversations with any of the technical
7    people that you referred to who were responsible for
8    reviewing the quality of gasoline that Esso Puerto
9    Rico distributed?
10        A.  No, I did not.
11        Q.  Do you recall the names of those
12   individuals?
13        A.  At that time, it was -- must have been
14   Francisco Guerra.
15        Q.  Rivera?
16        A.  Guerra.
17        Q.  Guerra.
18        A.  Guerra.
19        Q.  Anyone else?
20        A.  No.  That was about it.
21        Q.  I assume he's a man.  Did you have any
22   conversations with Mr. Guerra about MTBE?
23        A.  No.
24        Q.  Prior to testifying in this case, when did

Page 37

1    you first become aware that MTBE may have been present
2    in gasoline distributed by Esso Puerto Rico?
3         A.  I mean, I was -- I've been made aware,
4    through this matter, of MTBE.
5         Before that, I wasn't really involved in that.
6         Q.  Prior to any of your other depositions,
7    have you ever talked to Mr. Guerra about MTBE content
8    of gasoline Esso distributed in Puerto Rico?
9         A.  No.
10        Q.  Is there anyone other than Mr. Guerra that
11   you believe would potentially have known about the
12   content of MTBE gasoline being distributed by Esso
13   at the time Esso was selling gasoline in Puerto Rico?
14        A.  I don't recall anybody else that would
15   have been in that situation.
16        Q.  Going back to Exhibit 2 --
17        A.  Yes.
18        Q.  -- paragraph 5, so have we now covered all
19   of the documents or bases on which you are basing your
20   testimony concerning the presence or absence of MTBE
21   gasoline distributed by Esso Puerto Rico?
22            MR. BOLLAR:  Objection.  Form.
23            THE DEPONENT:  Have we covered --
24            Sorry.  Can you repeat the

10  (Pages 34 to 37)

Ricardo L. Casas-Lomba

Page 46

1   But after CORCO, we had -- we were supplied by
2   Phillips Puerto Rico Core and we were supplied by Hess
3   Oil in the Virgin Islands.
4       Q.  And Phillips Puerto Rico Core was on island,
5   correct?
6       A.  That was on island.  (Deponent moves head
7   up and down.)
8       Q.  And Hess HOVENSA was off island, correct?
9       A.  That's correct, coming from St. Croix.
10      Q.  Any other suppliers, regular suppliers,
11  that you recall after CORCO besides Phillips PR Core
12  and Hess?
13      A.  Not primary suppliers.  We might have, you
14  know, for some periods bought shipments from others;
15  but I guess you're -- What I'm thinking you want is
16  like primary suppliers.  Those are --
17      Q.  And do you have an opinion about the
18  presence or absence of MTBE in gasoline supplied to
19  Esso Puerto Rico by Phillips Core?
20      A.  My understanding is the product produced by
21  Phillips may have had MTBE some of the time and may not
22  have had MTBE at other points in time.
23      Q.  And what is that opinion based on?
24      A.  For my prior depositions, we looked at

Page 47

1   some -- I think some certificates of analysis from
2   Phillips.
3       Q.  Any other documents that you're relying
4   upon for that opinion?
5       A.  No.  I mean, those are the principal
6   documents that --
7       Q.  At the time you worked for Esso Puerto Rico,
8   did you ever meet with anyone from Phillips Core?
9       A.  I mean, we might have met occasionally with
10  folks from Phillips Core.
11      Q.  Did you discuss MTBE with them?
12      A.  No, I did not.
13      Q.  At the time you were working for Esso Puerto
14  Rico, were you aware that Phillips Core was supplying
15  gasoline that contained MTBE to Esso?
16      MR. THOMPSON:  Objection.  Form.
17      THE REPORTER:  And who made that
18      objection?
19      MS. BURNS:  Objection.
20      MR. THOMPSON:  Blayne Thompson.
21      THE DEPONENT:  I'm not aware.
22  BY MS. O'REILLY:
23      Q.  Well, I'm asking, were you aware at the
24  time?

Page 48

1       A.  Can you repeat the question, please?
2       Q.  Sure, sure.
3       My question is:  At the time you were working
4   for Esso Puerto Rico, were you aware that Phillips
5   Core provided gasoline containing MTBE to Esso?
6       MR. THOMPSON:  Same objection.
7       THE DEPONENT:  I was not aware
8       then.
9   BY MS. O'REILLY:
10      Q.  And in what time periods did the gasoline
11  provided by Phillips Core to Esso Puerto Rico contain
12  MTBE, to your understanding?
13      A.  I don't, you know, have specific knowledge
14  of the dates when and when MTBE might have been present
15  or not.
16      Q.  You said specific dates.  Was MTBE --
17      What was your understanding of when MTBE was
18  present from Phillips Core?
19      A.  At that time I was not involved in looking
20  at whether MTBE was or was not present.  So I just have
21  no basis to -- you know, from that time period.
22      Q.  Okay.  And for purposes of your testimony
23  today, do you have an opinion on when, what time
24  periods, MTBE was present in gasoline that was provided

Page 49

1   by Phillips Core to Esso Puerto Rico?
2       A.  From the information I've seen and
3   documents, it would appear that in the time period
4   that Esso was being supplied by Phillips, there was --
5   there were at least some certificates that showed some
6   presence.  How much or how long that period was, I
7   cannot ascertain that.
8       Q.  Okay.  Did you see certificates from
9   Phillips Core for gasoline provided to Esso that did
10  not contain MTBE?
11      A.  I seem to recall we had some that did not
12  have MTBE.
13      Q.  Were those for a different time period?
14      A.  No, the same time period.  It was just --
15  I just think it was different dates, but I have to go
16  back and look at the certificates.
17      Q.  Okay.  And what time periods did Phillips
18  Core overall, to your understanding, provide gasoline
19  to Esso Puerto Rico?
20      A.  My recollection is that Phillips was
21  supplying some of our gasoline between the 1982 and
22  1992 time period.
23      Q.  Was that for both north and south or
24  primarily for south?

13  (Pages 46 to 49)

Ricardo L. Casas-Lomba

Page 54

1  moves head up and down.)
2    Q.  Did Hess supply both 87 and 93 octane to
3  Esso Puerto Rico?
4    A.  I think over time they supplied both, both
5  grades, 87 and 93.
6    Q.  Do you recall at the time you were with Esso
7  Puerto Rico whether or not you were aware that gasoline
8  supplied by Hess had de minimis amounts of MTBE?
9    A.  At that time I don't recall that
10  information.
11    Q.  Okay.  And is it your understanding that
12  Hess was able to manufacture a 93-octane gasoline
13  without or with only de minimis amounts of MTBE?
14    A.  Sorry.  Can you repeat the question?
15    Q.  Sure.
16    Is it your understanding that Hess was able to
17  supply Esso Puerto Rico with 93-octane gasoline that
18  either only had de minimis or no MTBE in it?
19    A.  My understanding at the time was that Hess
20  could supply 93-octane gasoline.
21    More recently from the records I reviewed, it
22  shows that it had none or de minimis amounts of MTBE,
23  for the most part.
24    Q.  Do you have an understanding of what Hess

Page 55

1  used to achieve a 93 octane, instead of MTBE?
2    A.  I don't know exactly how they do it; but,
3  I mean, Hess was certainly at that time probably the
4  largest refinery in the Caribbean basin, so -- And it
5  was producing 93 octane to be marketed in the northeast
6  U.S., principally New York and those markets.  So they
7  were already producing that grade.
8    Q.  We've covered CORCO, Phillips Core, and Hess
9  HOVENSA.  Was there any other supplier on which you have
10  an opinion concerning the amount of MTBE present in the
11  gasoline supplied to Esso Puerto Rico?
12    A.  I looked at information that we had,
13  whatever we had from -- You know, as I mentioned, we
14  would -- we might have had spot purchases from others
15  that were on record.  And looked at the percentages
16  that were there, and were fairly small.  And those --
17  You know, those suppliers were various suppliers.
18  They're shown on the tables.
19    Sorry to refer back to that, but I just -- I
20  mean, that's where the facts are.
21    Q.  Okay.  When you say spot purchases, what
22  do you mean by a spot purchase?
23    A.  It means, as an example, when we were
24  transitioning from 91 to 93, that perhaps in that

Page 56

1  time period while Hess was getting ready or we were
2  getting -- we might have purchased a shipment from
3  somebody that we might not have purchased again ever
4  or -- That's what I mean by a spot purchase.
5    Q.  Okay.  And do you know who the spot
6  purchases came from that Esso Puerto Rico purchased
7  over the years?
8    A.  I mean, as I think I responded, the trader
9  would be the one to secure that supply.  So, I mean,
10  I'm sure Goldberg can tell you.
11    And obviously if we look at the table, it shows
12  the supplier.  I just don't really have those memorized.
13    Q.  And do you have an opinion as to the
14  presence or absence of MTBE in gasoline supplied through
15  spot purchases?
16    A.  What I recall is that some of them didn't
17  show any presence.  I'm not sure if they were -- you
18  know, why, but they didn't show any.
19    And some would show small percentages.  That's
20  what I recall from looking at that data.
21    Q.  Do you recall which ones showed no MTBE,
22  to your recollection?
23    A.  No, I don't recall which ones.
24    Q.  If we go back to paragraph 5, third sentence

Page 57

1  in that paragraph:  "Mr. Casas is expected to testify
2  regarding Esso's purchase of gasoline relative to its
3  needs at Esso branded stations."
4    Do you see that?
5    A.  You're saying paragraph 5?
6    Q.  I'm sorry.  Paragraph 4.
7    A.  Oh.  Sorry.
8    Q.  Sorry.  No, that's my fault.
9    MR. BOLLAR:  Which sentence,
10  Counselor?  I'm sorry.
11    MS. O'REILLY:  Third sentence.
12  BY MS. O'REILLY:
13    Q.  "Mr. Casas is expected to testify regarding
14  Esso's purchase of gasoline relative to its needs at
15  Esso branded stations."
16    Do you see that?
17    A.  Yes.
18    Q.  Have I covered all of the opinions that you
19  intend to give at trial in this matter on that subject?
20    A.  No, we haven't really covered all of them.
21    Q.  What other opinions do you have on that
22  subject that we haven't covered?
23    A.  I mean, I'm of the opinion that we can very
24  effectively trace the products that we were purchasing

15 (Pages 54 to 57)

Ricardo L. Casas-Lomba

Page 86

1    THE DEPONENT: Can you be more
2  specific what you mean by Exxon or --
3    MS. O'REILLY: Exxon U.S.A., any
4  Exxon U.S.A. affiliate, entity.
5    MR. BOLLAR: Objection. Compound.
6    THE DEPONENT: I mean, throughout
7  my career I received training in various
8  affiliates throughout the organization.
9  You know, some of this training, you
10  know, would have been in Puerto Rico.
11  Sometimes it may be in the U.S. or
12  elsewhere. So it's not, you know,
13  something that, you know, it's just like
14  a one time or anything of that nature.
15 BY MS. O'REILLY:
16    Q. Well, in your deposition, your previous
17  deposition, you talked about you were working in the
18  solvents area initially. Correct?
19    A. Yes, that's correct.
20    Q. When you transitioned to gasoline, did you
21  receive training on the safe handling of gasoline and
22  how to communicate safety procedures to dealers?
23    MR. BOLLAR: Objection. Compound.
24    THE DEPONENT: We -- I mean, the

Page 87

1  difference between handling gasoline or
2  handling chemicals, it's -- you know,
3  they're both handled very, very safely
4  by the company.
5    So it's not like we moved from
6  something that was nonflammable to
7  something flammable, because we were
8  handling, you know, solvents such as
9  toluene, which are part of gasoline.
10  So I already had training based on my
11  prior experience in handling these sort
12  of products.
13    And, you know, we did attend --
14  or I did attend marketing technical
15  services training, specifically when I
16  joined the fuel side of the business,
17  to become more familiar and -- with
18  these various fuels and lubricants that
19  were part of my new responsibilities.
20 BY MS. O'REILLY:
21    Q. Okay. And part of your opinions that you're
22  being offered for here today, in the second part of your
23  designation, discusses interactions between Esso and
24  Esso dealers, including dealer and operator training,

Page 88

1  in paragraph 6. Correct?
2    A. Yes.
3    Q. What training did you receive in order to
4  train dealers, in particular, on handling of gasoline
5  at service stations?
6    MR. BOLLAR: Objection. Form.
7    You can answer.
8    THE DEPONENT: I mean, as I said
9  earlier, I attended training provided
10  by the marketing technical services
11  department.
12    In addition, I had -- by the time
13  I had started in the gasoline business,
14  I had been in the solvents and chemical
15  side of the business for eight years.
16  So I had plenty of experience with
17  solvents and training that I've had
18  throughout that time period, you know,
19  based on the different projects I was
20  working throughout that time.
21    MS. O'REILLY: Did --
22    THE DEPONENT: And --
23    MS. O'REILLY: Go ahead.
24  I'm sorry.

Page 89

1    THE DEPONENT: No.
2 BY MS. O'REILLY:
3    Q. Did you receive any training on MTBE
4 in gasoline?
5    A. No, I did not.
6    Q. Did you receive any training on leak
7 detection methods specific to MTBE?
8    A. The training was on leak detection and
9 prevention, of gasoline in general. It had nothing
10 particularly different because MTBE would have been,
11 or not, a component.
12    Q. Were you ever told in your training and
13 preparing to train and work with dealers that a teaspoon
14 of MTBE could contaminate a football-size field of
15 groundwater?
16    MR. BOLLAR: Objection to form.
17    THE DEPONENT: I was not told that.
18 BY MS. O'REILLY:
19    Q. Were you ever told that customer spills
20 and drips and leaks could release sufficient MTBE to
21 contaminate a groundwater aquifer?
22    MR. BOLLAR: Objection to form.
23    THE DEPONENT: We were not told
24 that.

23 (Pages 86 to 89)

Augustos Munoz

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE: METHYL TERTIARY    :   MASTER FILE
BUTYL ETHER ("MTBE")      :   NO. 1:00-1898
LIABILITY LITIGATION      :   M21-88
PRODUCTS                  :   MDL 1358(SAS)
------------------------:
COMMONWEALTH OF PUERTO    :
RICO, ET AL.,             :
          Plaintiff,      :
                          :   CASE NO.
          vs.             :   07-CIV-10470
                          :   (SAS)
SHELL OIL CO., ET AL.,    :
          Defendants.     :


    The videotaped deposition of:


              AUGUSTOS MUÑOZ,

was held at the law offices of O'Neill & Borges,

250 Muñoz Rivera Avenue, 800 American

International Plaza, San Juan, Puerto Rico, on

Wednesday, May 7, 2014, at 9:52 a.m.




    Reported by:  Shawn D. Weber, RPR

Augustos Munoz

Page 42

1      You can answer.
2          THE DEPONENT:  No.  I understand
3      that the environmental group kept
4      looking at each case up until the tank
5      was upgraded.
6  BY MS. O'REILLY:
7      Q.  Was it your understanding that environmental
8  would continue to look at it until they identified the
9  actual source or mechanism of the release?
10     A.  Yes.
11     Q.  Were you ever asked as part of this upgrade
12 program, yourself personally, to go out and investigate
13 a tank to determine how a leak may have occurred?
14     A.  Yes.
15     Q.  How many times?
16     A.  Many times.
17     Q.  And what would you do when you went out to a
18 station where there was a suspected release, what steps
19 would you take to respond to that?
20     A.  Well, initially, I did a visual inspection
21 of each equipment installed, conditions, soil, any soil
22 change, color or damaged grass or something like that,
23 because that will give us a hint, you know, what
24 happened, then proceed with the test.

Page 43

1      Q.  So for engineering department, your response
2  would be to do a visual inspection of the system and
3  look at the soil that you could see and the area and
4  then test the tanks.  Any other responses that your
5  department would take in response to a suspected leak?
6      A.  If it had a -- what do you call -- the wells
7  installed, we got information from the contractor that
8  was handling the soil test report, the wells report.
9      Q.  And you had a contractor go out to each
10 station every month and do a vapor test of the wells?
11     A.  Yeah, they verify for free product, as well
12 as vapor.
13     Q.  What was done with respect to the dispensers
14 to check for and response to a suspected leak?
15     A.  Well, the dispenser is a mechanical
16 equipment.  It has filters, it had gaskets.  In some
17 cases, you know, it might have got loose, so it would
18 start dripping.
19     I, for example, had an experience that at an
20 outlet which we had already replaced the sump or
21 installed the sump under the dispenser, one of the
22 filters exploded, but then nothing happened, thank God.
23 But we cleaned it up and set it up again and nothing
24 happened there.  But these other things we know that

Page 44

1  could happen, not many times, you know.  That was the
2  only one time I saw damage with a filter like that.
3      Q.  Did dealers change the dispenser filters, or
4  did Esso's maintenance department change dispenser
5  filters?
6      A.  Esso did it.
7      Q.  Esso did it?
8      A.  Yes.
9      Q.  If the pump was slowing down, was the dealer
10 supposed to call Esso, and then they would come out and
11 look at the filters?
12     A.  Yes.
13     Q.  With respect to opinion 5(a), we've talked
14 about the Veeder-Root, inventory reconciliation,
15 monitoring wells.  Was there any other part of Esso's
16 underground storage tank program that was focused on
17 detection, any other part of the program?
18     A.  I can't recall at this time.  No.  I think
19 it was everything within the tank replacement program,
20 as stated since the beginning.  It included everything,
21 because we included external assistance from
22 contractors, environmental contractors that help us put
23 together the program, as well as the environmental
24 manager and our experience.

Page 45

1      Q.  Did anyone from Exxon review the program
2  that you put together?
3      A.  Dave Porush did.
4      Q.  Did he provide you any input on that
5  program?
6      A.  We discussed -- since we were the first ones
7  to develop the program for the CCA division, we were
8  ahead of everybody, because nobody had done that,
9  because we knew that the EPA was coming with new
10 regulations.  EQB here started doing theirs in '85 or
11 '86, probably '84, and so that was when we started our
12 program back in 1986, and then we put it up together in
13 '88 when the program came into law.
14     Q.  Did Mr. Porush or anyone else tell you that
15 your program that you developed should consider MTBE?
16     A.  No.
17     MS. O'REILLY:  We've been going for
18 about an hour, so why don't we take a
19 quick break.
20     THE DEPONENT:  Okay.
21     THE VIDEOGRAPHER:  We are off the
22 record.  The time is 10:58 a.m.
23     (Recess.)
24     THE VIDEOGRAPHER:  We are back on

12 (Pages 42 to 45)

Augustos Munoz

Page 50

1    You can answer.
2    THE DEPONENT:  No.
3    BY MS. O'REILLY:
4    Q.  Were you ever made aware that very small
5    releases of gasoline with MTBE could cause significant
6    contamination of groundwater around the station?
7    MR. FARINO:  Object to the
8    hypothetical and characterization.
9    You can answer.
10    THE DEPONENT:  Yes, I did.
11    BY MS. O'REILLY:
12    Q.  When?
13    A.  During the last deposition through our
14    counsel.
15    Q.  At the time that you were working in dealer
16    training, were you aware that even small releases, such
17    as from a vapor adapter, could cause MTBE groundwater
18    contamination?
19    MR. FARINO:  Same objections.
20    THE DEPONENT:  No.
21    BY MS. O'REILLY:
22    Q.  During the time you were working in the
23    Exxon UST program, were you aware that MTBE had been
24    found in drinking water wells in the United States?

Page 51

1    MR. FARINO:  Objection.
2    Mischaracterization of his testimony and
3    his position.
4    Also, it calls for speculation,
5    also, incomplete hypothetical.
6    You can answer.
7    MS. O'REILLY:  Speaking objection.
8    BY MS. O'REILLY:
9    Q.  Go ahead.
10    A.  No, I don't.
11    Q.  I believe during your last deposition, you
12    talked about a little bit about repairs at Esso stations
13    of the concrete in the entryway.  Do you recall that
14    testimony?
15    A.  Yes.
16    Q.  Do you know if part of your upgrade program
17    was to repair concrete around the tank pads or
18    dispensers at stations?
19    A.  No.  That was after I left Esso.  I did some
20    work on a couple of outlets, but it was primarily at
21    access or egress of the outlet, because that's normally
22    where the sidewalk or entrance ramps or asphalt inside
23    the tank get more affected, but not, at any time, pump
24    islands.

Page 52

1    Q.  Were you aware, at any time, when customers
2    fill their cars that drips happen from the hoses and the
3    dispensers as they take the dispensers in and out of
4    their car?
5    MR. FARINO:  Object to the
6    hypothetical.
7    You can answer.
8    THE DEPONENT:  Well, that happens
9    very often in the daily operation of a
10    service station.
11    BY MS. O'REILLY:
12    Q.  And were you aware that that spilled
13    gasoline could leak through cracks in the pavement and
14    reach the environment?
15    A.  It could.
16    Q.  Was anything done when you were at Esso to
17    address potential cracks in the pavement so as to avoid
18    those spills reaching the environment?
19    A.  I don't recall.
20    Q.  Other than EQB standards in your opinion
21    5(b) and we talked about PEI, were there any other
22    standards that you compared Esso's training to?
23    A.  No.
24    MS. O'REILLY:  Let me mark a

Page 53

1    document, and then I'll go on to (c) and
2    (d).
3    (Muñoz Exhibit No. 5 marked for
4    identification.)
5    MS. O'REILLY:  For the record, I've
6    marked as Exhibit 5 a document that was
7    previously marked at Mr. Muñoz' December
8    deposition as Exhibit 9.  It's an Esso
9    CCD environmental review dated April 17,
10    1989, presentation outline.
11    BY MS. O'REILLY:
12    Q.  And this was the outline for the upgrade
13    program that you prepared, correct?
14    A.  Yes.
15    MR. FARINO:  Objection to the
16    characterization.
17    BY MS. O'REILLY:
18    Q.  So I want to go -- I have just a couple of
19    very quick questions.
20    And it doesn't have a page number.  There's a
21    handwritten page number 7.
22    A.  Yes.
23    Q.  And as part of your opinions today, you
24    indicated the storage tank program focused on

14 (Pages 50 to 53)

Augustos Munoz

Page 74

1    not only that, you know, it's disposing of the property
2    of the corporation.
3         Q.  In the tank upgrade program, there were a
4    couple of different options.  You started out with
5    single wall fiberglass and moved to double wall.  Was
6    there any problems along the way that you encountered
7    with the equipment Esso was utilizing to upgrade and
8    replace tanks?
9         MR. FARINO:  Objection.  Vague.
10           You can answer.
11           THE DEPONENT:  Not until I left,
12       nothing, just the normal, routine work,
13       routine experiences.  But in terms of
14       the tanks in fiberglass, I don't have no
15       negative experience in that.
16    BY MS. O'REILLY:
17        Q.  Did Esso -- did you and your engineering
18    group actually install the new tanks, or did you have a
19    contractor?
20        A.  Contractors.
21        Q.  And what did you do for oversight of those
22    contractors to ensure that they were properly trained
23    and installed the tanks correctly?
24        A.  Well, they couldn't do anything until my

Page 75

1    engineer was there, and then the -- what do you call --
2    an environmental contractor has to be there in order to
3    verify that the soil around the tank pit bottom, as well
4    as on the walls, was clean in order to remove every
5    trace of impacted soil, put it on the side and then
6    install new material.
7         Q.  And did anyone from Esso oversee the
8    contractor while they were installing the tanks and
9    lines to ensure that it was done correctly?
10        A.  Yes.
11           MR. FARINO:  Objection.  Asked and
12       answered.
13           THE DEPONENT:  Sorry.
14           MR. FARINO:  No problem.
15    BY MS. O'REILLY:
16        Q.  Is that someone from your department?
17        A.  Yes, my engineer.  They have to sign the
18    document that has to be filed to the EQB.  That's one
19    thing.
20           Another one is that they had to sign up that the
21    unit, that the fiberglass tank was installed
22    accordingly, the tests were done properly and everything
23    was negative.
24        Q.  You mean the pressure tests?

Page 76

1         A.  Yes.
2         Q.  Were your engineers trained in installation
3    of underground storage tanks in order to implement the
4    program?
5         A.  Yeah.
6         Q.  Where did they receive their training?
7         A.  By myself.
8         Q.  And where did you receive your training?
9         A.  On the job.
10        Q.  And did you ever go to the US for training
11    on underground storage tank installation?
12        A.  No.  What I did was I used the documents
13    from different -- like PEI.  What else, the regulations
14    from API.  That was basically the main source of those,
15    because from site to site, you know, there are different
16    factors that may affect, as well as regulations.  But
17    here, I received information, you know, from all these
18    sources, and then by experience.
19        Q.  Do you believe that if there were extra
20    steps that could have been taken to prevent MTBE from
21    reaching drinking water wells that those steps should be
22    taken to prevent those releases?
23           MR. FARINO:  Objection to form.
24           You can answer.

Page 77

1           THE DEPONENT:  If I had knowledge,
2       which at that time, I didn't, possibly,
3       yes.
4           MS. O'REILLY:  I think I'm done.
5       Why don't you give me a couple of
6       minutes just to review my notes, and
7       then I think we can be done today.
8           THE DEPONENT:  Okay.
9           THE VIDEOGRAPHER:  We are off the
10      record.  The time is 11:59.
11          (Recess.)
12          THE VIDEOGRAPHER:  We are back on
13      the record.  The time is 12:03, media 2.
14          MR. FARINO:  We have no questions.
15      I don't believe anybody on the phone has
16      questions.  Correct me if I'm wrong.
17          MS. O'REILLY:  And I'm finished
18      with my questions for the day.  We can
19      close out the record.
20          THE DEPONENT:  Thank you.
21          THE VIDEOGRAPHER:  This is the end
22      of today's deposition.  The time is
23      12:03 p.m.  Off the record.
24

20  (Pages 74 to 77)

# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL  *       Master File
ETHER ("MTBE") PRODUCTS                No. 1:00-1898
LIABILITY LITIGATION           *
--------------------------------       MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,    *      M21-88
et al.,
                                *
        Plaintiffs,
                                *
             vs.
                                *
     Defendants.
                                *
Case No. 07-CIV-10470 (SAS)
--------------------------------
The videotape deposition of:

              ANGEL M. RIVERA-AGOSTINI,

a former Texaco Service Station Operator, and a

Non-Party Witness herein, was held at Street 1, H-7,

Jardines de Santo Domingo Urbanization, Juana Diaz,

Puerto Rico  00795, on Tuesday, June 11, 2013,

at 9:59 a.m.

77

```
 1        MR. MAHER:  Objection to form.
 2        THE DEPONENT:  It was crazy.  It was no
 3    way to live.
 4    BY MS. O'REILLY:
 5        Q.   Were you unhappy with the contract with
 6    Texaco and the way that they responded to you when you
 7    called to have problems fixed?
 8        MR. MAHER:  Objection to form, and
 9    leading.
10        THE DEPONENT:  To a certain extent.
11    BY MS. O'REILLY:
12        Q.   And after, did Texaco release you from
13    your contract?
14        MR. MAHER:  Objection to form.
15        THE DEPONENT:  Well, apparently, yes,
16    based on this document that they gave me to
17    sign.
18    BY MS. O'REILLY:
19        Q.   Okay.  Do you remember did you have a
20    dispute with Texaco about ending the contract?
21        MR. MAHER:  Objection to form, and
22    leading.
23        THE DEPONENT:  I don't recall.  There were
24    moments, but I don't know if they were related.
25
```

78

```
 1    BY MS. O'REILLY:
 2        Q.   Did you sell the station to someone, or
 3    did you just release your contract?
 4        MR. MAHER:  Objection to form.
 5        THE DEPONENT:  Yes, yes, yes.
 6        MR. MAHER:  Objection.  Non-responsive.
 7    BY MS. O'REILLY:
 8        Q.   Did you sell the station to someone?
 9        A.   Yes.
10        Q.   And how did you find someone to buy the
11    station?
12        A.   I don't recall.
13        Q.   Did you know the person who bought the
14    station from you before you sold it to them?
15        MR. MAHER:  Objection to form.
16        THE DEPONENT:  No.
17    BY MS. O'REILLY:
18        Q.   Did Texaco help you find someone to buy
19    the station?
20        MR. MAHER:  Objection to form.
21        THE DEPONENT:  I don't recall.
22    BY MS. O'REILLY:
23        Q.   Just a couple of more questions.
24        A.   Uh-huh.
25        Q.   Do you recall at any time your sales
```

79

```
 1    representative or anyone from Texaco telling you that
 2    the gasoline had MTBE in it?
 3        A.   No, I don't recall.
 4        Q.   Do you recall if anyone from Texaco told
 5    you that MTBE would-- in the gasoline, if released,
 6    would contaminate water that people used for drinking?
 7        MR. MAHER:  Objection to form, and
 8    leading.
 9        THE DEPONENT:  No.
10    BY MS. O'REILLY:
11        Q.   Would you be concerned if you found out
12    that the MTBE in the gasoline at your station could
13    contaminate water that people were drinking?
14        MR. MAHER:  Objection to form.
15        THE DEPONENT:  Of course.
16    BY MS. O'REILLY:
17        Q.   And would you-- if you were told that
18    there were extra steps you could take so that the MTBE
19    wouldn't contaminate the water that people drink, would
20    you do that?
21        MR. MAHER:  Objection to form.  Leading.
22        THE DEPONENT:  Of course.
23    BY MS. O'REILLY:
24        Q.   Did you feel when you ran the station that
25    you got enough support from Texaco to help you with the
```

80

```
 1    station?
 2        MR. MAHER:  Objection to form.
 3        THE DEPONENT:  No.
 4    BY MS. O'REILLY:
 5        Q.   Okay.  I think I do not have any more
 6    questions.  Why don't we take a break.  I'm assuming he
 7    will have some questions.  I don't know if anyone else
 8    here will have some questions.  Can we take a break for
 9    a minute?
10        A.   Okay.
11        Q.   Thank you.
12        THE VIDEOGRAPHER:  Going off the record.
13    The time is 12:47.
14        (Recess.)
15        THE VIDEOGRAPHER:  We're back on the
16    record.  The time is 1:02.  On the record.
17        EXAMINATION
18    BY MR. MAHER:
19        Q.   Mr. Rivera, I introduced myself earlier
20    this morning.  My name is Jim Maher.  I represent
21    Texaco in this lawsuit.
22        Earlier in the deposition you said that you
23    bought the keys to the Constancia station.
24        Do you remember that?
25        A.   Yes.
```

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY      )   MASTER FILE
BUTYL ETHER ("MTBE)         )   NO. 1:00-1898
PRODUCTS                    )   M21-88
LIABILITY LITIGATION        )   MDL  1358(SAS)
                            )
_____    )
                            )
COMMONWEALTH OF PUERTO      )
RICO, ET AL.                )
 PLAINTIFF,                 )   CASE NO. 07-CIV-10470
                            )   (SAS)
VS.                         )
                            )
SHELL OIL CO., ET AL.,      )
 DEFENDANTS.                )


                    DEPOSITION OF

                  JOSE DE LA ROSA

                 SEPTEMBER 12, 2013



        Called as a witness by counsel for the

Plaintiffs, taken before Dorothy A. Rull, CSR, CRR,

a Certified Shorthand Reporter and Notary Public in

and for the State of Texas, on the 12th day of

September, 2013, from 9:05 a.m. to 2:59 p.m., at the

law offices of Norton Rose Fulbright, 1301 McKinney,

Suite 5100, Houston, Texas 77010, pursuant to Notice

and the Federal Rules of Civil Procedure.

Jose De La Rosa

---

Page 6

EXHIBIT INDEX

1   First Amended Notice of Deposition of        08
    Defendant Chevron Puerto Rico Core, LLC
    on Designated Issues With Production of
    Documents & Videotaping

2   Chevron Puerto Rico, LLC's Declarations      08
    in Lieu of Deposition Testimony

3   Map of Puerto Rico                           52

4   February 28, 1985 Letter From Victor         71
    Santiago to Texaco P.R.
    (CHEVMDL1358_PR-00000085636)

5   February 3, 1986 Letter From the United      79
    States Department of the Interior to
    Chevron USA (CHEVMDL1358_PR-00000083590)

6   Generator Waste Profile Sheet                88
    (CHEVMDL1358_PR-00000086699)

7   Altol Environmental Services May 2008        90
    Report (CHEVMDL1358_PR-00000117388 - 410)

8   10 May 1999 Memorandum                       105
    (CHEVMDL1358_PR-00000077707 - 721)

9   November 30, 2010 Letter From ERTEC          126
    to Chevron Puerto Rico
    (CHEVMDL1358_PR-00000081601 - 605)

10  ERTEC Remedial Investigation                 129
    (CHEVMDL1358_PR-00000080552 - 602)

10b Tables (CHEVMDL1358_PR-00000080503 - 607)

11  ERTEC Baseline Groundwater Sampling          130
    Report (CHEVMDL1358_PR-00000117092 - 7129)

12  ERTEC Correction Action Plan                 145
    (PR-MTBE_412958 - 413057)

13  October 19, 1990 Letter From Mary Jane       156
    Van Allmen to Texaco
    (CHEVMDL1358_PR-00000122073 - 080)

---

Page 7

14  2 June 1997 Letter From Jose J.              169
    Betancourt to Roberto Ayala
    (PR-MTBE-TRUJ_094619 - 20)

15  Analysis of Local Sales                      171
    (CPCPR-053902 - 914)

16  10/14/99 Invoice                             195
    (CHEVMDL1358_PR-00000086259)

17  Certificate of Quality                       198
    (CHEVMDL1358_PR-00000057500)

18  Certificate of Quality                       202
    (CHEVMDL1358_PR-00000073002)

19  Certificate of Submitted Analysis           204
    (CHEVMDL1358_PR-00000077313)

* * *

---

Page 8

PROCEEDINGS

(Exhibit Nos. 1-2 marked.)

THE VIDEOGRAPHER:  We are now on the record.

My name is Brian Bobbitt.  I'm a videographer for Golkow Technologies.  Today's date is September 12, 2013, and the time is 9:15 a.m.

This is video deposition is being held in Houston, Texas, in the matter of MTBE Products Liability Litigation before the United States District Court, Southern District of New York.

The deponent is Jose De La Rosa.

Would counsel like to identify themselves for the record.

MR. MAHER:  Jim Maher, King & Spalding, for Chevron Puerto Rico, LLC.

MR. CORRELL:  Charles Correll, Jr., King & Spalding, for Chevron Puerto Rico, LLC.

MS. FARLEY:  Jessica Farley for Chevron Phillips Chemical Puerto Rico Core and ConocoPhillips Company.

MR. PETIT:  Will Petit for the Commonwealth of Puerto Rico.

---

Page 9

MR. AXLINE:  Mike Axline for the Commonwealth of Puerto Rico.

And we have the names of the folks on the phone.  I don't think we need to have them announce themselves.

But we do have a -- a statement that counsel for Texaco and I have agreed to before we went on the record.

So, Jim, would you do the honors.

MR. MAHER:  Yeah.

Mr. De La Rosa be -- is being presented in response to the Plaintiffs' notice to Chevron Puerto Rico, LLC.  That company was formerly known as Texaco Puerto Rico, Inc.

And what we are going to agree to today is that references -- we're going to use the word "Texaco" to refer to those companies generally.

But, if it's agreed, any references to "Chevron" or "Texaco" throughout the course of the day, unless otherwise stated, will reference Chevron Puerto Rico, LLC, formerly Texaco Puerto Rico.

MR. AXLINE:  Okay.  That's acceptable to me.

3 (Pages 6 to 9)

Jose De La Rosa

Page 14

```
 1    asking; is that correct?
 2       A.   Yes.  On behalf of Texaco Puerto Rico.
 3       Q.   Very good.
 4            MR. CORRELL:  You had -- he's not
 5    designated on all topics.
 6            MR. AXLINE:  I --
 7            MR. MAHER:  I don't think the
 8    question said anything about topics.
 9            MR. CORRELL:  I know.
10            MR. AXLINE:  Yeah.  We -- I don't
11    mind saying we have an agreement that for some of
12    these topics we'll either get a separate declaration
13    or do another witness.
14            MR. MAHER:  Right.
15            MR. AXLINE:  But I -- so I won't be
16    asking questions about some of the topics.  I just
17    wanted to make sure the witness had seen this and
18    looked at the list.
19    BY MR. AXLINE:
20       Q.   So, Mr. De La Rosa, I think you have
21    Exhibit No. 2 in front of you that was handed to you
22    before the deposition started.
23            And have you seen this document
24    before?
```

Page 15

```
 1       A.   Yes, I have.
 2       Q.   Okay.  And could you describe for me
 3    what this document is, your understanding.
 4       A.   Well, this is -- this is basically a
 5    recollection of the facts that are intended to
 6    address the designated issues that are contained in
 7    Exhibit 1.
 8       Q.   Uh-huh.
 9       A.   That's basically it.  We tried to
10    present it up front to you so that we can, for the
11    sake of this deposition, be as time efficient as
12    possible.
13       Q.   Excellent.
14            And at the very end of Exhibit 2,
15    there's a verification that you have signed.  Do you
16    see that?
17       A.   Yes.
18       Q.   And it refers to Exhibit A, which is a
19    list of bullet points that address various topics;
20    correct?
21       A.   Yes.  Yes.
22       Q.   And I just want to double-check with you
23    for the record that you have, in fact, reviewed
24    Exhibit A and that you agree with the statements in
```

Page 16

```
 1    Exhibit A on behalf of Texaco and that you're
 2    prepared to answer the few follow-up questions I'm
 3    going to have for you today.
 4       A.   Yes.  And then, yes, I am.
 5       Q.   Okay.  Terrific.  Great.
 6            So let me begin the substance of
 7    this by asking you to briefly describe your tenure
 8    with Texaco.
 9            When were you hired and what
10    positions have you had with -- with Texaco?
11       A.   Well, I was hired in 1991 as a
12    construction and maintenance engineer for Texaco
13    Puerto Rico, Inc.  I -- I spent around seven years
14    in that position.  Then I moved to health,
15    environment and safety coordinator position.
16            After that, around 1999, I spent
17    some time in the original offices in Coral Gables as
18    an operations business analyst.  Then I went back to
19    Puerto Rico around 1999, 2000, as an HES
20    coordinator.
21            I was assigned to HES coordination
22    responsibilities or duties or -- for the Bahamas
23    around 2001.  Then in -- that included some
24    responsibilities for Texaco Puerto Rico and that.
```

Page 17

```
 1            And, after that, I moved outside the
 2    company for about two years.  Do you need me to tell
 3    a little bit about that?
 4       Q.   Very briefly, if you would.
 5       A.   Yeah.  Well, I was just health,
 6    environmental safety district manager for the Home
 7    Depot in -- in Puerto Rico.
 8       Q.   And -- sorry.  I'm breaking my rule on
 9    interrupting you.
10            But what years were those?
11       A.   That was around 2002 to 2004,
12    approximately.  Then I returned to Texaco -- by --
13    by then, it was Chevron Puerto Rico -- as an
14    environmental project manager for Chevron
15    Environmental Management Company.  That was around
16    2006.
17            Let me correct something.  The --
18    the timing in Home Depot was between 2004 and 2006.
19       Q.   Okay.  Thank you.
20            And you -- you mentioned Chevron
21    Environmental Services Company?
22       A.   Chevron Environmental Management
23    Company.
24       Q.   Management Company.
```

Jose De La Rosa

Page 18

1    And what is that company's
2  relationship to Texaco, if you know?
3    A.    To Texaco Puerto Rico?
4    Q.    Yes.
5        MR. MAHER:  Objection.  Calls for
6  speculation.
7  BY MR. AXLINE:
8    Q.    You can answer.
9    A.    Okay.  It was -- Chevron Environmental
10  Management Company is an affiliate of Chevron that
11  provides services on environmental management
12  liabilities to other businesses in -- within
13  Chevron.
14    Q.    Uh-huh.
15        And could you then briefly describe
16  for me the educational background or training that
17  you have acquired that led you into the health and
18  environmental services part of Texaco.
19    A.    Well, I'm -- chemical engineering by
20  training and I've taken numerous trainings during
21  the course of my tenure in Texaco and Chevron.
22  I started with hazardous oper --
23  hazardous waste operations, hazardous materials
24  operations, environmental remediation, risk-based

Page 19

1  corrective actions, occupational safe -- health and
2  safety, project management, decision-making, all
3  sort of trainings related to my different positions.
4    Q.    And have your positions been mostly
5  supervisory or have they been more on the ground,
6  practical?  Can you describe that aspect of your
7  work.
8    A.    I had both.  In the first years, I was
9  more of the field type of work.  Most of the time, I
10  had responsibilities over contractors that actually
11  did the field work for the company.
12        In the coordination -- HES
13  coordination role, I was also in the field, have an
14  oversight responsibility for environment contractors
15  mostly.
16        I was -- I had some training role --
17  or training provider role for contractors --
18  construction contractors in the safety and
19  environmental management part, also.
20        In EMC, I started with direct
21  responsibilities for field work and, after that, I
22  was -- assumed the position of team lead.  So I --
23  there I was formally supervising other project
24  managers.

Page 20

1    And that was until I moved to the
2  next position in Chevron Project Resources Company,
3  which is the one that I hold today.
4    Q.    And -- and what's --
5    A.    And today -- and today I am an
6  environmental advisor -- or Health, Environmental
7  and Safety Advisor for Chevron Project Resources
8  Company, which is another affiliate of Chevron that
9  provides project management services to the
10  different organizations within Chevron.
11    Q.    And while you were working for Texaco
12  Puerto Rico, you supervised work at multiple Texaco
13  stations on the island?
14    A.    Yes.
15    Q.    Were you ever personally involved in
16  supervising the remediation occurring at the Trial
17  Site No. 10 that we're going to be talking about
18  today?
19    A.    Yes.
20    Q.    Okay.  Thank you for that summary.
21        Can I now ask you to describe for me
22  what you did to prepare for today's deposition.  Did
23  you look at documents?  Interview people?
24        Maybe if you could describe that for

Page 21

1  me generally and then I might have some specifics
2  questions for you.
3    A.    Sure.  Yeah.  I reviewed numerous
4  documents, all the documents that I could have
5  access to.
6        I had the opportunity to talk to
7  several people that were somehow related to this
8  site in different roles, most of them employees or
9  former employees of Texaco Puerto Rico.
10        Do you need names?
11    Q.    Yes.  If you can give those to me, I'd
12  appreciate it.
13    A.    Well, yeah.  I had the opportunity to
14  talk with Jose Luis Faure, who was the district
15  manager; Alma Rodriguez, who was also district
16  manager that covered this site.  She was the
17  business consultant for this site at some point.
18    Q.    I'm sorry.  Can I ask you to slow down a
19  little bit.
20    A.    Oh.
21    Q.    The court reporter is faster than me,
22  but....
23    A.    Sure.
24    Q.    So Jose Luis -- what was the first

Jose De La Rosa

Page 98

1      So there was an agreement.  I mean,
2  this is the protocol that EMC uses.  And, obviously,
3  there was some considerations on -- we knew that we
4  would be analyzing for a parameter that was not
5  regulated.
6      So we started monitoring for -- or
7  sampling for MTBE six years before the regulation
8  was actually implemented by the EQB.  Right?
9      So we had to decide on what -- where
10 we're going to do -- or why are we going to be
11 sampling for MTBE.  So it was part of a protocol for
12 EMC.
13     We wanted to establish a standard
14 way of operating.  That was my personal view, as an
15 EMC person that didn't want to establish my own
16 protocol or anything like that.  So I was following
17 the protocol that -- that EMC used everywhere.
18     And Texaco Puerto Rico agreed that
19 there was no -- there was no objection for -- for
20 sampling, using EMC protocol.
21     And, obviously, that implied that we
22 would be reporting the results to the EQB in -- in
23 the reports and that's what we do -- what we did
24 eventually.

Page 99

BY MR. AXLINE:
1  BY MR. AXLINE:
2      Q.    So were you aware that MTBE was in
3  gasoline being sold in Puerto Rico before you began
4  work for Chevron in the EMC?
5      A.    Frankly, I was under the impression that
6  MTBE was not being used before that -- I mean,
7  before getting prepared for this deposition because
8  that was the -- the premise.
9      We've seen documents in this
10 deposition -- in preparation for this deposition
11 that indicate the presence of MTBE in the gasoline.
12     Q.    Uh-huh.
13     A.    But for the same token, most of the
14 supplies to the island -- most of the supplies of
15 gasoline did not contain MTBE.
16     So we are -- today, I can tell you
17 that I am aware that the gasoline contained MTBE.
18 Most of the gasoline imported to the isl -- to the
19 island did not contain MTBE.
20     So to your question was I aware at
21 that point back in 2006 that MTBE would be expected
22 to be found in the stations, no.  I wasn't expecting
23 to find MTBE.  But that was part of a protocol and
24 we did it that way.

Page 100

1      MR. MAHER:  It was not -- just --
2  let me just object on the basis that it -- and,
3  again, I can't remember the question; so, I'm not
4  sure whether or not it was inside or outside the
5  scope.
6      But the question was answered in
7  sort of a personal knowledge sort of way.  So -- and
8  so I'll just lodge that objection --
9      MR. AXLINE:  All right.
10     MR. MAHER:  -- for the record.
11 BY MR. AXLINE:
12     Q.    I want to follow up on something you
13 said, though.
14     Because I -- I believe you stated
15 that most of the gasoline imported into Puerto Rico
16 did not contain MTBE.
17     Did I hear that right?
18     A.    I said it that way.  And that is based
19 on my knowledge of -- that MTBE was not required to
20 be added to the gasoline imported to -- to the
21 island.
22     Q.    But you're not suggesting that MTBE
23 wouldn't have been in gasoline unless it was
24 required to be in gasoline, are you?

Page 101

1      A.    Can you say that question again.
2  Because --
3      Q.    I'll have the court reporter read it
4  back.  That's a luxury we have at these things.
5      MR. AXLINE:  Can you read that back.
6      (The record was read as requested.)
7      A.    For the knowledge that I have now, I
8  cannot imply that.  Because, obviously, we received
9  gasoline with MTBE.
10     I'm -- I am saying that based on my
11 expectations that are based on the specifications
12 for conventional gasoline that do not require the
13 addition of MTBE or any other oxygenate.
14     So it's -- I guess it's the way your
15 question is -- is phrased.  That's -- that's my
16 knowledge.
17 BY MR. AXLINE:
18     Q.    I really want to explore the answer that
19 you gave a moment ago, though.
20     A.    Okay.
21     Q.    You stated, as a 30(b)(6) witness for
22 Texaco Puerto Rico, that MTBE was not in gasoline
23 that was imported into Puerto Rico.
24     MR. MAHER:  I'll just object.

26 (Pages 98 to 101)

# Exhibit 5



E-SERVICE
54620144
Nov 26 2013
03:51PM
File & ServeXpress

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *IN RE* METHYL TERTIARY BUTYL ETHER (MTBE) PRODUCTS LIABILITY LITIGATION | Master File No: 1:00-cv-1898 |
| This document relates to: | MDL 1358 (SAS) |
| Commonwealth of Puerto Rico v. Shell Oil Company, *et al.*, USDC-SDNY 07-10470 (SAS); USDC-PR 07-1505 (CCC) | |

### DECLARATION OF JAN CARLOS RODRÍGUEZ-MUÑOZ

I, Jan Carlos Rodríguez-Muñoz, of legal age, married, and a resident of Guaynabo, Puerto Rico, pursuant to 28 U.S.C. § 1746, hereby declare under the penalty of perjury that:

1.  I have read the following statements and, to the best of my knowledge and belief and/or pursuant to records and information in possession of Total Petroleum Puerto Rico Corp. ("TPPRC" or "Company"), the contents of this Declaration are true and correct as of the date hereof.

2.  This Declaration concerns information and records relevant to the supply of gasoline to the Company and to Trial Site No. 9 up to the year 2012. In 2012, with the enactment of Law No. 16 of January 11, 2012, the Puerto Rico Legislative Assembly banned the use of Methyl Tertiary Butyl Ether ("MTBE") as a gasoline additive in Puerto Rico.

3.   I have worked for the Company since September 15, 2008. I am currently the Company's Network Director.

4.   The Company is a nongovernmental for-profit corporation that, according to its records and public records kept by the Puerto Rico Department of State, was created in 1992.

5.   Before changing its name to TPPRC in 2004, the Company was named Gasolinas de Puerto Rico Corporation.

6.   I am familiar with the gasoline service station located at 263 Jesús T. Piñero Avenue in San Juan, Puerto Rico, and referred to as Trial Site No. 9 or Total 1012 for purposes of this litigation. Trial Site No. 9 was previously known as GPR 1012. The Puerto Rico Environmental Quality Board has assigned the Site Id. No. 02-91-0067 to Trial Site No. 9.

7.   Until 1998, Trial Site No. 9 did not have an independent retailer. After the Legislative Assembly enacted a complete detachment policy between wholesale and retail of gasoline in Puerto Rico, the station was turned over for operation by a franchisee-retailer that operates it under the Company's brand.

8.   The service station has been operated by the following retailers: Bartolo, Inc., from April 1998 to January 2003; Q&M Distributors, Inc., from February 2003 to February 2006; IBT

2

Investments Corporation, from March 2007 to May 2010; and General Administration Services, Inc., from May 2010 to this date.

9.  Since 1992 the Company has supplied the gasoline sold at Trial Site No. 9. Tank trucks pick up the gasoline at the corresponding terminal and deliver it to the service station.

10. According to records reviewed, the Company has never manufactured, blended, stored, or otherwise owned or handled neat of pure MTBE or TBA.

11. Company records indicate that the Company has always requested for purchase conventional regular and premium gasoline, but has never requested reformulated gasoline with MTBE or TBA, or gasoline with MTBE or TBA.

12. The Company has never refined oil into gasoline or manufactured gasoline or any petroleum products.

13. The Company has never owned, leased or otherwise operated a gasoline refinery within the Commonwealth.

14. The Company has never owned a terminal facility or a gasoline pipeline within the Commonwealth.

15. Prior to November 2008, the Company did not operate a terminal facility within the Commonwealth.

16. Since November 2008, the Company leases a portion of a property located in the municipality of Guaynabo.  The Puerto

3

Rico Land Administration (an instrumentality of the government of the Commonwealth of Puerto Rico) is the lessor and owner of the property. A portion of the Cataño Fuel Storage Facility leased to TPPRC includes a fuel storage terminal area.

17. Records and information available indicate that between 1992 and 1997 the Company's supply of gasoline was obtained from Idemitsu Apollo Corporation. Upon information and belief, Idemitsu Apollo Corporation bought gasoline imported and/or refined by others and that gasoline was sold to the Company for delivery to its gasoline stations. Under this scheme, the Company would lift and transport the fuel from the terminal or storage facility to the gasoline stations.

18. Records and information reviewed reflect that most of the gasoline purchased from Idemitsu Apollo Corporation was lifted from Phillips Puerto Rico Core, Inc.'s facility in Guayama ("Core Facility"). However, records indicate that some of the gasoline may have been purchased from Puerto Rico Sun Oil Company, Inc. and lifted from Peerless Oil & Chemicals, Inc.'s facility in Peñuelas.

19. Records reviewed also reflect that, at least since late-1997, in multiple instances the Company has entered into supply agreements with Caribbean Petroleum Corporation, and spot purchase agreements with Esso Standard Oil Co. (Puerto Rico),

4

Inc., Shell Chemical Yabucoa, Inc., Texaco Puerto Rico, Inc., Texaco International Trader, Inc., Peerless Oil & Chemicals, Inc., CITGO International Puerto Rico Company, and CITGO International Puerto Rico, Inc.

20. Records reviewed show that the gasoline supply for Company stations from August 2001 to October 2004 was purchased from CITGO International Puerto Rico Company. This gasoline was lifted from the Cataño Fuel Storage Facility, from the facility of the Commonwealth Oil Refining Company, located in the municipality of Guayanilla, and from the Core Facility in Guayama.

21. Company records reflect that between 2004 and 2008, the Company executed supply agreements with Shell Chemical Yabucoa, Inc.; Esso Standard Oil Co. (Puerto Rico), Inc.; Peerless Oil & Chemicals, Inc.; and Caribbean Petroleum Corporation. The Company has also entered into spot purchase agreements with Shell Chemical Yabucoa, Inc. and Peerless Oil & Chemicals, Inc.

22. From 2008 until 2012, the Company mostly received gasoline brought into the Commonwealth from Hovensa, LLC's refinery in St. Croix, U.S. Virgin Islands. Since 2010, the Company also has executed loan and borrow agreements with Puma Energy Puerto Rico, Inc. and Peerless Oil & Chemicals, Inc.

5



E-SERVICE
55271981
Apr 08 2014
10:55PM
File & ServeXpress

*COMMONWEALTH OF PUERTO RICO V. SHELL OIL COMPANY, ET AL.*

CASE NO. 07 CIV. 10470 (SAS)

# SUPPLIES OFGASOLINE TO TOTAL PETROLEUM PUERTO RICO CORP'S SERVICE STATION 1012 IN PUERTO RICO

## LEONARDO GIACCHINO, Ph.D.

## SOLUTIONS ECONOMICS, LLC

Prepared on behalf of

Sepulvado & Maldonado, PSC

## April 8, 2014

Supplies of Gasoline to Total Petroleum Puerto Rico Corp.'s Service Station 1012
Leonardo Giacchino, Ph.D.

## B. Consolidation and Expansion of TPPRC

(82)    There were two parts in the 2004 purchase transaction.  First, Total Outre-Mer, S.A., purchased GPR stock.  Second, the Company acquired in 2004 additional assets from Sunshine Rentals Puerto Rico Inc., consisting of 20 service stations and operating equipment.[38]

(83)    On November 1, 2008, TPPRC acquired Esso's operations in Puerto Rico.[39]  This acquisition took the form of the purchase of a list of Esso assets in Puerto Rico as well as transportation and leasing contracts held by Esso.  TPPRC acquired additional distribution to retailers on the island in addition to its wholesale business.  It also acquired the leases to the Cataño and Guayanilla (CORCO, or Commonwealth Oil Refining Company, Inc.) facilities, although it stopped operating the CORCO facilities six months later.

(84)    Since November 2008, TPPRC supplies retailers bearing its brand using fuel that it imports to its storage locations.

## C. Sources of Gasoline and Additive Content

(85)    Prior to the acquisition of Esso's assets in 2008, the geographic source of gasoline purchased by the Company and supplied to retailers is unknown, since the Company was not involved in the importation process.  The Company was forced to purchase from various importers, although its degree of reliance on specific suppliers shifted over time.

(86)    Prior to 2008, the Company did not own storage assets and it has never been involved in the "blending" of oxygenates into the gasoline that was sold to retailers.  As a result, the Company did not have information regarding the origin and the additive content of the gasoline purchased.

(87)    **Figure 5** shows a summary of the Company's suppliers of gasoline during the years it was an operator and a reseller.  The Figure uses six time periods to classify the suppliers.

---

[38]  Purchase and Sale Agreement for Stock and Assets by and between Máximo Álvarez and Sunshine Rentals Puerto Rico Inc., as Sellers, and Total Outre-Mer S.A. as Purchaser, September 16, 2004 (TPPRC.GENERAL_000677 – TPPRC.GENERAL_000735).

[39]  "Total to Acquire ExxonMobil Caribbean Assets," BNA Americas, March 11, 2008.

Supplies of Gasoline to Total Petroleum Puerto Rico Corp.'s Service Station 1012
Leonardo Giacchino, Ph.D.

**Figure 5:  Suppliers of Gasoline**

| MTBE Content | No knowledge of MTBE content in gasoline supplied | | | | No MTBE / Not Detected | |
|---|---|---|---|---|---|---|
| Suppliers | Phillips<br>Sun Oil<br>(via Idemitsu Apollo Corp.) | Texaco<br>CAPECO<br>ESSO<br>Peerless<br>Chevron Phillips | CITGO | Peerless<br>CAPECO<br>Shell Yabucoa<br>ESSO | Trader (supplies from HOVENSA) | MTBE ban in effect |
| Date | 3/20/1992 | 1/1/1997 | 8/13/2001 | October 2004 | 11/1/2008 | 6/11/2012 |

(88)    The rest of this Subsection presents a detailed analysis of the suppliers of gasoline to the Company.   This analysis is based primarily on my review of documentation which I received of sales contracts (contracts in which a seller agrees to sell a product at a certain price over a certain period of time and a buyer agrees to buy it at that price) signed between the Company and various suppliers. I also received and reviewed Bills of Lading which provide information on gasoline retrieved from the rack by the Company.

## 1. As an Operator and as a Reseller

(89)    While operating as a reseller, the Company did not have control of the composition of the gasoline that was bought from the importers.  Resellers do not know the composition of the gasoline delivered to them.  None of the documentation exchanged with suppliers for the purchase of gasoline indicated that the gasoline delivered contained MTBE.   One contract in the early years indicated that gasoline could contain MTBE.   The Company did not conduct sampling of the gasoline and could not refuse delivery of the supplies that it would deliver to the service stations.   For example, Esso, a wholesaler with storage capacity that had a larger market share than the Company until 2008, did not test gasoline before resellers picked up gasoline at the rack: "Gasoline ultimately supplied by Esso to jobbers was not tested after it was delivered to Esso terminals in Puerto Rico."[40] Therefore, the Company did not know and was not aware of any MTBE content in the gasoline that would be supplied to service stations.

(90)    The function of reseller in Puerto Rico as an independent distributor is known in the US as "jobber."[41]   Jobbers are intermediaries and, as explained in **Section III.**A.**2,** buy supplies at the lowest price possible.  As such, they do not sample the product because competition in the marketplace does not make it possible from an economic point of

---

[40]   Declaration of Ricardo Casas, Esso Standard Oil (Puerto Rico)'s CMO #4 Declaration November 25, 2013, Response to Subsection III(B)(2)(i). Mr. Casas does not list TPPRC as a jobber but does list GPR.  TPPRC had a contract with Esso in this period and the statement of no testing applies to all gasoline that was delivered to the Esso operated terminal.

[41]   Meyer, David; and Fischer, Jeffrey (2004): "The Economics of Price Zones and Territorial Restrictions in Gasoline Marketing," Federal Trade Commission, March, p. 2.

Supplies of Gasoline to Total Petroleum Puerto Rico Corp.'s Service Station 1012
Leonardo Giacchino, Ph.D.

view. Similarly to the food distributors analogy in **Section III.**A.2, resellers buy the product from wholesalers and distribute it to retailers, relying on documentation exchanged in the transactions and the supplier disclosures about gasoline content.

## a. GPR: The Early Years Up to 1997

(91) Between its entry in the marketplace on March 20, 1992 and November of 1997, when Law 157 came into effect, the Company received its supplies through Idemitsu Apollo Corporation ("Idemitsu"), the owner of the Company at that time. Idemitsu purchased gasoline from two suppliers, Phillips Puerto Rico Core Inc. ("Phillips") and Sun Oil, and sold to it the Company for distribution to GPR's service stations.[42, 43] A Product Supply Agreement for the sale of gasoline from Phillips to Idemitsu for eight months beginning on February 1, 1994 illustrates this arrangement.[44] Prior to 1997, the Bills of Lading received by the Company also indicate that its principalsuppliers were Phillips and Sun Oil.[45]

(92) The only case of a document referring to MTBE which I reviewed is the February 1, 1994 supply contract between Phillips and Idemitsu, which indicates that the presence of MTBE in the gasoline supplied was "permissible".[46] The documentation exchanged for the deliveries did not contain any specifics about the gasoline content, therefore, GPR was not aware of the content of the gasoline lifted from Phillips' facility and delivered to service stations.

---

[42] "Q. And during those years of 1992 to 1997, after Itemitsu [sic] Apollo Corporation purchased GPR and ISLA, was it buying or lifting that fuel from Phillips and Sun Oil and then selling it to GPR and ISLA? MR. COURET: Same objection. THE WITNESS: I can't recall exactly what the terms where, but I think we reviewed differently during – but, yes, most of the time it was that way." Deposition of Margaret King, October 24, 2013, p. 10, lines 6-14.

[43] "THE WITNESS: From 1992 to 1997 to try to narrow down the periods, we were supplied with the help of either Idemitsu Apollo Corporation, from the facilities in Sunoco, Sun Oil – Sun Oil or known as Sunoco, and ChevronPhillips Puerto Rico Core." Deposition of Jan Carlos Rodríguez-Muñoz, October 25, 2013, p. 59, lines 2-8.

[44] Product Supply Agreement between Idemitsu Apollo Corporation and Phillips Puerto Rico Core Inc., February 1, 1994 (TPPRC.SUPPLY_001111 - TPPRC.SUPPLY_001127).

[45] The Bills of Lading from January 1995 to December 1996 indicate liftings of gasoline from "Peerless Oil", referring to gasoline purchased from Sun Oil stored at a Peerless Oil facility: "Q. And was it [Idemitsu] also lifting or purchasing gasoline from Sun Oil at the Peerless Oil and Chemical Plant at Peñuelas? MR. COURET: Objection, form. It's a compound question. And I also object to the extent it requires a legal opinion. You may answer. THE WITNESS: Yes." Deposition of Margaret King, October 24, 2013, p. 19, line 21 – p. 20, line 4.

[46] Product Supply Agreement between Idemitsu Apollo Corporation and Phillips Puerto Rico Core Inc., February 1, 1994, Addendum A (TPPRC.SUPPLY_001127).

Supplies of Gasoline to Total Petroleum Puerto Rico Corp.'s Service Station 1012
Leonardo Giacchino, Ph.D.

(113)   On October 21, 2004, GPR purchased Service Station 1012 from Sunshine Rentals Puerto Rico, Inc., pursuant to the Purchase and Sale Agreement signed between Máximo Álvarez and Sunshine Rentals Puerto Rico, Inc. as sellers and Total Outre-Mer, S.A. and GPR as purchasers on September 16, 2004.[85]   As described in **Section IV.**C above, Law 157 prevents wholesalers of gasoline from operating service stations.[86]   As a result, Service Station 1012 has not been operated by TPPRC after 1998, but has been leased by separate entities that conduct the service station's retail operations.

(114)   Service Station 1012 was a company operated service station until 1998.  Service Station 1012 was operated by Bartolo, Inc. from April of 1998 to February of 2003.  From February of 2003 to March of 2007, Service Station 1012 was operated by Q&M Distributors, Inc.  It was operated by I.B.T. Investments Corp. from April of 2007 until May of 2010.  Gas Inc. began operating Service Station 1012 in June of 2010 until the present.[87]   The retailer operating the service station, who is permitted to use the "TOTAL" brand, purchases its supply of gasoline from TPPRC.  The amounts supplied to the service station are summarized in letters known as *"Cartas de Galonaje"*.

(115)   A review of the documentation received shows no indication as to the gasoline content of the deliveries or the existence of MTBE.  The Company supplied Service Station 1012 with gasoline for which the Company did not know its content.  Based on the competitiveness of the market, there was no economic incentive to test the content before or after delivery of the gasoline to service stations.

I reserve the right to amend these opinions if subsequent information becomes available in the future.  I solemnly declare upon my honor and conscience that my statement is in accordance with my sincere belief.

Leonardo R. Giacchino, Ph. D.

---

[85]   Deed of Purchase and Sale (Station 1012), October 21, 2004 (TPPRC.SS1012_001266 - TPPRC.SS1012_001272).  This is the same day that the shares of GPR were acquired by Total Outre-Mer S.A., so the name of the purchaser is Gasolinas de Puerto Rico Corporation, as the change of the company's name to TPPRC had not taken place yet.

[86]   Law 157/96, p. 2.

[87]   Letters from TPPRC to Q&M Distributors, Inc., I.B.T. Investments Corp., and Gas Inc. on annual gasoline purchases by Station 1012 between January 1, 2006 and June 30, 2013, dated 4/17/12, 5/11/12, 1/10/13, and 7/2/13 (TPPRC.SS.RETAIL_000789 - TPPRC.SS.RETAIL_001095); and summary by TPPRC for sales of gasoline to Station 1012 between May 30, 2008 and June 29, 2013.

# Exhibit 6

Confidential (Per 2004 MDL 1358 Order)

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-   -   -

| | |
|---|---|
| IN RE: METHYL TERTIARY BUTYL | : MASTER FILE NO. |
| ETHER ("MTBE") PRODUCTS | : 1:00-1898 |
| LIABILITY LITIGATION | : MDL 1358 (SAS): |
| | : No. M21-88 |
| | : |
| This Document Relates to: | : |
| | : |
| Commonwealth of Puerto | : |
| Rico, et al. | : Case No. |
|                   v. | : 07-CIV-10470(SAS) |
| Shell Oil Co., et al. | : |

-   -   -

CONFIDENTIAL (PER 2004 MDL 1358 ORDER)
THIS TRANSCRIPT CONTAINS CONFIDENTIAL DOCUMENT(S),

INFORMATION OR OTHER THINGS

The videotaped deposition of:

MARGARET KING,

was held at the law offices of Sepulvado & Maldonado,

252 Ponce De Leon Avenue, San Juan, Puerto Rico, on

Thursday, October 24, 2013, at 9:03 a.m.

Reported by:  Wendy Alcock, RPR
              Registered Professional Reporter

Confidential (Per 2004 MDL 1358 Order)

Page 10

REDACTED

```
19        Q.  When did you retire?
20        A.  In March of 2010.
21        Q.  When you retired in March of 2010 what
22   company were you working for that you retired from?
23        A.  Total Petroleum Puerto Rico Corp.
```

REDACTED

Page 11

REDACTED

```
20        A.  When I started with -- it was a group of
21   companies.  And when I started there in 1983, I was
22   under contract with ISLA Petroleum Corporation.
23   Sometime during the '90s it was merged with Gasolinas
24   de Puerto Rico and so I became a Gasolinas de Puerto
```

Page 12

```
 1        Rico employee.
```

REDACTED

Page 13

REDACTED

4 (Pages 10 to 13)

Confidential (Per 2004 MDL 1358 Order)

Page 26

REDACTED

Page 27

REDACTED

```
22        Q.  Did you take on any additional
23    responsibilities or positions other than controller
24    during that time frame of 1989 to 1990 until 2004?
```

Page 28

```
1         A.  I was an officer of the corporation.
```

REDACTED

```
9         Q.  And at the time of the 2004 acquisition by
10    Total, did you then get new duties or a new position
11    with Total?
12        A.  Yes.
13        Q.  And what was your new position with Total?
14        A.  I was administrative director.
```

REDACTED

Page 29

REDACTED

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential (Per 2004 MDL 1358 Order)

Page 110

REDACTED

24        Q.  Okay.  So if I understand what you've just

Page 111

1    told me, the first time that you heard about MTBE was
2    when some legal documents were delivered to the office
3    where you were at TPPRC; is that right?
4        A.  Yes.
5        Q.  And do you recall what year that was?
6        A.  2009 maybe.
7        Q.  Okay.
8        A.  I don't really remember.
9        Q.  So before 2009, in your years in the
10   gasoline business from 1983 to 2009, you had not heard
11   anything about MTBE?
12       A.  No, I had never heard anything about it.
13       Q.  Okay.  Since first hearing about it in 2009,
14   other than any discussions you may have had with any
15   lawyers, have you learned anything about MTBE?
16       A.  I'm sorry to say that, no.  I've read
17   articles in the newspaper every time there's somebody
18   added or subtracted from the lawsuit.  But, no.
19       Q.  Okay.  So it sounds like perhaps the only
20   exposure you've had to information about MTBE would be
21   related to the lawsuit that brings us here today, and
22   perhaps reading about it in the newspapers; is that
23   accurate?
24       A.  That's true.

Page 112

REDACTED

Page 113

REDACTED

Golkow Technologies, Inc. - 1.877.370.DEPS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL  *      Master File
ETHER ("MTBE") PRODUCTS               No. 1:00-1898
LIABILITY LITIGATION           *
--------------------------------      MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,    *     M21-88
et al.,
                                *
        Plaintiffs,
                                *
             vs.
                                *
    Defendants.
                                *
Case No. 07-CIV-10470 (SAS)
--------------------------------
The videotape deposition of:

              ENRIQUE A. VEGLIO-MATOS,

a former Total Service Station Operator, and a

Non-Party Witness herein, was held at the DEPARTMENT OF

JUSTICE FOR THE COMMONWEALTH OF PUERTO RICO, Ninth

Floor, Olimpo Street, San Juan, Puerto Rico  00907, on

Tuesday, July 9, 2013, at 9:19 a.m.

81

1          And after calling the company, did the
2     instruction sheet tell you anything else to do?
3          A.   Yeah.
4          MS. ORTIZ:  Objection to form.
5          THE DEPONENT:  Everything depends on what
6     is the problem.  You call the police, call the
7     Fire Department, call the emergencies ambulance,
8     whatever--
9     BY MS. O'REILLY:
10         Q.   Right.
11         A.   --in case of emergency, you know.  Yes, we
12    did have it.
13         Q.   What if it was like a customer, you know,
14    spilled gasoline on the ground?  Did it have
15    instructions what to do there?
16         MS. ORTIZ:  Objection to form.
17         THE DEPONENT:  Okay.  Okay.  Okay.  I
18    know.  I know what you want.
19         Yes, we had sand, a bag of special sand
20    bag.  You know--
21    BY MS. O'REILLY:
22         Q.   Okay.
23         A.   --not regular sand from any place, that
24    you had to buy it.  It used to cost me around $5 a pail
25    of-- a sack of sand, special sand, that we are going to

82

1     throw it over, and then call the company to come out
2     and clean.  And we had the Pampers, we have Pampers
3     too, that we used to throw the Pampers too to the spill
4     and after we did everything, Pampers, sand, call the
5     company, they company comes and finished the cleaning.
6          Q.   Okay.
7          A.   And it all depends on the amount of spill.
8     For example, in Country Club, a station there lost
9     about 300 gallons.  So they had to call the emergencies
10    of, you know, the federal government go over there,
11    clean everything.  The gasoline went into a river near
12    it.
13         In the Fernandez-- in the Eleanor Roosevelt
14    there was a disaster for the people of the Esso, okay?
15    They were changing a tank.  To prove it they filled it
16    up with gasoline, and to level it, to make it level,
17    they fill it up with gasoline instead of filling it
18    with water, like they were supposed to.
19         Q.   Right.
20         A.   And the-- a tractor came in and tried to
21    lift it to level it and it cracked in half.  So the
22    10,000 gallons of gasoline went down the street and
23    went down to El Matadero and behind El Matadero there
24    is a big river and they ended down there.  I don't know
25    how many millions of dollars it cost to the Esso.

83

1     There you have one and you didn't know it.
2          Q.   That's a big one.  Wow.
3          A.   You can check with the-- because you pass
4     through the Eleanor Roosevelt, through the Roosevelt to
5     the avenue, you see all of these guys in white.
6          Q.   Gasoline can--
7          A.   You see it in white.  Every time that
8     somebody takes that, that's $20.
9          Q.   When you had the Pineiro station when you
10    were with GPR, did they tell you that even five or ten
11    gallons of gasoline spilled could contaminate the water
12    underneath the station?
13         A.   Yes.
14         MS. ORTIZ:  Objection to form.
15         THE DEPONENT:  Yes.  Any spill.
16    BY MS. O'REILLY:
17         Q.   Did they tell you that even five to ten
18    gallons can contaminate the water that goes to people's
19    drinking?
20         MS. ORTIZ:  Objection to form.
21         THE DEPONENT:  As long as you are to any
22    (through the interpreter) body, body of water.
23    (In English) Yeah.
24    BY MS. O'REILLY:
25         Q.   Even the water underground?

84

1          A.   Even the water underground.
2          Q.   Do you recall if GPR told you about MTBE
3     in the gasoline?
4          MS. ORTIZ:  Objection to form.
5     BY MS. O'REILLY:
6          Q.   MTBE.
7          A.   No.  That's one of the formulas.  No, they
8     never teach us-- tell us anything about formulas.
9     That, any formula, we had to learn about it.
10         COUNSEL ON THE PHONE:  I apologize.  What
11    was that last response from the deponent?
12         THE REPORTER:  "That formula, we had to
13    learn about it."
14         THE DEPONENT:  The MTBE, I don't know what
15    is it.
16    BY MS. O'REILLY:
17         Q.   Okay.  And did you ever learn that even
18    drips and drops, little drips, you know, when a
19    customer takes the hose out there's sometimes a drip of
20    gasoline, have you seen that, like a drop?
21         A.   A drop in where?
22         Q.   Comes from the hose onto the grand when
23    you take the hose out of the car.
24         A.   Yeah, I've seen it.  You know, it's not
25    normal, but you see it.

21 (Pages 81 to 84)

85

1    Q.   Were you aware that even those small drops
2  could contaminate the water?
3         MS. ORTIZ:  Objection to form.
4         THE REPORTER:  I'm sorry.  Could you
5     repeat that question.
6  BY MS. O'REILLY:
7    Q.   Were you aware that even those small drops
8  could contaminate the water?
9         MS. ORTIZ:  Objection to form.
10        THE DEPONENT:  It depends on the amount of
11    water.  If I put a drop of gasoline here, it
12    would taste me bad.  But if I put a drop of
13    gasoline in a pool, I wouldn't notice.
14 BY MS. O'REILLY:
15   Q.   Well, were you told that if you put a drop
16 of MTBE in a pool all of the water would taste bad?
17        MS. ORTIZ:  Objection to form.
18        MR. LUTZ:  Objection to form.
19        THE DEPONENT:  What is that?
20 BY MS. O'REILLY:
21   Q.   MTBE was added to the gasoline.  Were you
22 told that?
23        MS. ORTIZ:  Objection to form.
24        MR. LUTZ:  Objection to form.
25        MS. CIPRIANO:  Objection to form.

86

1         THE DEPONENT:  That's an additive.
2  BY MS. O'REILLY:
3    Q.   Yes.
4    A.   Okay.  That's different.  I know that they
5  put additive to the gasoline.  Now, which kind of
6  additive they put in, that I don't know.
7    Q.   Okay.
8         So you wouldn't have been told that, for
9  example, only a drop of MTBE could make a whole pool of
10 water taste bad.  You were never told that.
11        MS. CIPRIANO:  Objection to form.
12        MS. ORTIZ:  Objection to form.
13        THE DEPONENT:  No.
14 BY MS. O'REILLY:
15   Q.   Would you want your neighbors to drink
16 water that had contamination from your gasoline station
17 in it?
18   A.   No.
19        MR. LUTZ:  Objection to form.
20        MS. ORTIZ:  Objection to form.
21 BY MS. O'REILLY:
22   Q.   And if there were special extra procedures
23 that you could take, extra precautions, extra safety
24 precautions that you could take so that your gasoline
25 and the MTBE didn't get into your neighbors' water,

87

1  would you do that?
2         MS. ORTIZ:  Objection to form.
3         MR. LUTZ:  Objection to form.
4         MS. CIPRIANO:  Objection to form.
5         THE DEPONENT:  I don't know.  I don't know
6     if I can-- I could, you know-- if I can prevent
7     it.  I would try to prevent it, but I don't know
8     if I could prevent it.
9  BY MS. O'REILLY:
10   Q.   Is that because gasoline tanks in your
11 experience, there's always a leak from the tanks or the
12 dispensers?
13        MS. ORTIZ:  Objection to form.
14        MR. LUTZ:  Objection to form.
15        THE DEPONENT:  Any question that refers,
16    you know, to that, to the technicism on that, I
17    can't answer that.
18 BY MS. O'REILLY:
19   Q.   Were there any-- were you ever told that
20 there were any even small leaks from the tanks or the
21 dispensers at the Pineiro station?
22        MS. ORTIZ:  Objection to form.
23        THE DEPONENT:  There were-- as far as I
24    know, and by the inventory that I used to take,
25    there were never leaks in Pineiro.

88

1  BY MS. O'REILLY:
2    Q.   After they replaced the tanks and the
3  pipes and the dispensers, did they do any other repairs
4  to the tanks in the system later on that you recall?
5    A.   After they changed it?
6    Q.   Yeah.
7    A.   No.
8    Q.   So no repairs or maintenance work?
9         MS. ORTIZ:  Objection to form.
10        THE DEPONENT:  Well, maintenance, but no--
11    I mean, no repairs.  No taking one and put
12    another one.
13 BY MS. O'REILLY:
14   Q.   Okay.
15   A.   Because they were new.  And I left about
16 one year after that, so...
17   Q.   Okay.
18        Before they-- but when you-- when Bartolo first
19 took over the Pineiro station--
20   A.   Uh-huh.
21   Q.   --did they-- in between that time and when
22 they replaced the tanks, did they come out and do
23 repairs or maintenance on the system?
24        MS. ORTIZ:  Objection to form.
25        THE DEPONENT:  Yes, they did.

22 (Pages 85 to 88)

# Exhibit 7

**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL  *   Master File
ETHER ("MTBE") PRODUCTS           No. 1:00-1898
LIABILITY LITIGATION            *
-------------------------------      MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,  *   M21-88
et al.,
                          *
        Plaintiffs,
                          *
        vs.
                          *
        Defendants.
                          *
Case No. 07-CIV-10470 (SAS)
-------------------------------
The videotape deposition of:
        ANTONIO R. PAVIA,
a former Total Service Station Operator, and a
Non-Party Witness herein, was held at the DEPARTMENT OF
JUSTICE FOR THE COMMONWEALTH OF PUERTO RICO, Ninth
Floor, Olimpo Street, San Juan, Puerto Rico  00907, on
Wednesday, June 12, 2013, at 2:07 p.m.

**2**

APPEARANCES
COUNSEL FOR THE PLAINTIFFS
MILLER, AXLINE & SAWYER
1050 Fulton Avenue, Suite 100
Sacramento, California  95825
BY:  TRACEY L. O'REILLY, ESQ.
     916.488.6688
     toreilly@toxictorts.org

        - and -

ORLANDO H. MARTINEZ-ECHEVARRIA, ESQ.
Centro de Seguros Building, Suite 413
701 Ponce de Leon Avenue
San Juan, Puerto Rico  00907
(Also acting as Notary Public)
     787.722.2378
     omartinez@martinezlaw.org

COUNSEL FOR CODEFENDANT CHEVRON
PHILLIPS PUERTO RICO CHEMICAL CORP.
PIETRANTONI, MENDEZ & ALVAREZ, LLC
Banco Popular Center, 19th Floor
208 Ponce de Leon Avenue
San Juan, Puerto Rico  00918
BY:  ISABEL C. FRAU-NICOLE, ESQ.
     787.773.6000
     ifrau@pmalaw.com
COUNSEL FOR CODEFENDANT TOTAL
PETROLEUM PUERTO RICO CORP.

SEPULVADO & MALDONADO, PSC
Citibank Tower, 19th Floor
252 Ponce de Leon Avenue
San Juan, Puerto Rico  00918
BY:  DELIRIS ORTIZ-TORRES, ESQ.
     787.765.5656
     dortiz@smlawpr.com

**3**

APPEARANCES (Continued)
COUNSEL FOR CODEFENDANT IDEMITSU
APOLLO CORPORATION

BOWMAN and BROOKE, LLP
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota  55402
BY:  DAVID N. LUTZ, ESQ.
     612.339.8682
     david.lutz@bowmanandbrooke.com
COUNSEL FOR CODEFENDANTS CITGO
EIMER STAHL, LLP
224 S. Michigan Avenue, Suite 1100
Chicago, Illinois  60604
BY:  SHELLY GEPPERT, ESQ.
     312.660.7629
     sgeppert@eimerstahl.com

COUNSEL FOR CODEFENDANT ESSO STANDARD
OIL PUERTO RICO and EXXON MOBILE CORPORATION
ARCHER & GREINER, PC
One Centennial Square
Haddonfield, New Jersey  08033
BY:  DANIEL R. FERINO, ESQ.
(Appearing telephonically)
     856.354.3073
     dferino@archerlaw.com
COUNSEL FOR CODEFENDANT PC PUERTO RICO, LLC
KING & SPALDING
1100 Louisiana, Suite 4000
Houston, Texas  77002
BY:  HELEINA L. FORMOSO, ESQ.
(Appearing telephonically)
     713.751.3200
     hformoso@kslaw.com

**4**

APPEARANCES (Continued)
COUNSEL FOR CODEFENDANT PETROBAS AMERICA, INC.

THOMPSON & KNIGHT, LLP
98 San Jacinto Boulevard, Suite 1900
Austin, Texas  78701
BY:  CHRISTOHPER D. SMITH, ESQ.
(Appearing telephonically)
     512.469.6108
     Chris.Smith@tklaw.com
VIDEOGRAPHER
MS. SANDRA SUAREZ
INTERPRETER
MS. EDIE NUNEZ
COURT REPORTER
JOANNE de THOMAS

1 (Pages 1 to 4)

joannedethomas@yahoo.com  -  787.501.3007

13

1      Let me go ahead and I'm going to mark this
2  notice of deposition.
3      THE REPORTER:  This would be one.
4      (The document is marked for purposes of
5      identification as Deposition Exhibit
6      No. 1.)
7  BY MS. O'REILLY:
8      Q.   And the deposition notice in the beginning
9  says, "Deponent is believed to be associated with
10 Total 1012 (formerly GPR) Central Avenue No. 26, San
11 Juan, Puerto Rico."
12      Do you see that?  It's on the very first right
13 front.  There (indicating).
14      A.   Yes.
15      Q.   And were you associated with that station
16 at one point in time?
17      A.   Yes.
18      Q.   And what time period were you associated
19 with that station?
20      A.   (Through the interpreter) From
21 approximately 1998 to 2006.
22      Q.   And what was your association with the
23 station during that time period?
24      A.   I was the operator.
25      Q.   Did you personally operate the station on

14

1  a day-to-day basis, or did you have employees?
2      A.   We had a manager and a supervisor.
3      Q.   Was the manager at the station every day?
4      A.   Yes.
5      Q.   And did you have more than one manager
6  from 1998 to 2006?
7      A.   Yes.
8      Q.   Who was the name of-- what was the name of
9  your first manager for the station?
10      A.   I don't recall.
11      Q.   Let me just let you know too it's okay-- I
12 know these events occurred a long time ago and
13 sometimes you won't remember, but if later today as
14 we're talking you remember in response to a different
15 question, or I show you a document, please let me know,
16 let the translator know, so that we can put that
17 information on the record, okay?
18      A.   (In English) Okay.  (Through the
19 interpreter) All right.
20      Q.   Well, do you recall the name of the second
21 manager that you had for that station during the time
22 period when you were the operator?
23      A.   No.
24      Q.   And do you recall the name of any manager
25 that you had for that station during the time period

15

1  when you were the operator?
2      A.   Jorge Ortiz.
3      Q.   Was he the last manager that you had for
4  the station, do you recall?
5      A.   I don't think so.
6      Q.   Does he still work for you?
7      A.   No.
8      Q.   When was the last time he was employed by
9  you?
10      A.   Around 2003, 2004.
11      Q.   Did he work at other stations as well as
12 the one on Central Avenue?
13      A.   No.  Originally, he was the store
14 supervisor and after that, when we eliminated the
15 position, we assigned him to that store as manager.
16      Q.   And what were his responsibilities as
17 manager of the station?
18      A.   He supervised the employees, he kept the
19 store up to date with products, he was in charge of the
20 cleaning, he bought merchandise, he ordered gasoline.
21      Q.   Anything else?
22      A.   I don't think so.
23      Q.   Did Mr. Ortiz, or any other manager, have
24 responsibility for maintenance of the gasoline system,
25 the tanks or the dispensers?

16

1      MS. ORTIZ:  Objection to form.
2      THE DEPONENT:  (To Ms. Ortiz) Did you say
3  you objected?
4      MS. ORTIZ:  Yes, but it's just for the
5  court reporter.
6  BY MS. O'REILLY:
7      Q.   Let me explain.  Any-- at times today when
8  maybe some other lawyers or I ask questions, people
9  will object.  That's just for the written record.  You
10 can answer the question.  You can go ahead and answer
11 my question or her question or anyone else's question.
12 it's just for the court reporter, okay?
13      A.   Yes.  Would you repeat the question.
14      Q.   Certainly.
15      My question was did Mr. Ortiz, or any of your
16 other managers, have responsibility for maintaining the
17 dispensers or the pipes or the tanks, the gasoline
18 system.
19      MS. ORTIZ:  Same objection.
20      THE DEPONENT:  Not mechanically.  In terms
21 of the-- cleaning the dispensers or changing the
22 hoses or the nozzles, yes.
23  BY MS. O'REILLY:
24      Q.   When you say "cleaning the dispensers,"
25 what did you mean?

17

```
1              MS. ORTIZ:  Objection to form.
2              THE DEPONENT:  Dust the pumps off.
3  BY MS. O'REILLY:
4       Q.   Did Mr. Ortiz, or any of your managers,
5  change the filters inside the dispensers?
6       A.   I don't think so.
7       Q.   If the filters inside the dispensers
8  needed to be changed, or if there was something broken,
9  what would your manager do?
10      A.   They would call the operations department
11 of Gasolinas de Puerto Rico.
12      Q.   And when they called the-- Gasolinas de
13 Puerto Rico, what would the company do?
14      A.   I imagine they would send-- they would
15 send a technician.
16      Q.   And the technician would perform the
17 maintenance on the system and make repairs?
18             MS. ORTIZ:  Objection to form.
19             THE DEPONENT:  Yes.
20 BY MS. O'REILLY:
21      Q.   Did they-- did Gasolinas de Puerto Rico
22 charge you for those repairs or maintenance?
23      A.   I don't recall.
24      Q.   When-- in 1998, did you buy the property
25 where the gasoline station was located?
```

18

```
1              MS. ORTIZ:  Objection to form.
2              THE DEPONENT:  No.  We bought the rights
3  to operate.
4  BY MS. O'REILLY:
5       Q.   So who owned the property to your
6  knowledge where the gasoline station was located?
7       A.   I think it was a sister company of
8  Gasolinas de Puerto Rico.
9       Q.   Do you remember the name?
10      A.   No, but if you go to the Registrar, the
11 name should appear there of who the owner was.
12      Q.   And who owned the buildings and the
13 gasoline system to your understanding at the station?
14      A.   I don't know whether it was GPR or the
15 sister company.
16      Q.   But it was the company.  Not you.
17             MS. ORTIZ:  Objection to form.
18             THE DEPONENT:  No, not me.
19 BY MS. O'REILLY:
20      Q.   How did you come to buy the operations of
21 the station on Central?
22             MS. ORTIZ:  Objection to form.
23             THE DEPONENT:  A law had been enacted that
24 in 1998 the wholesalers would not be able to
25 operate service stations as retailers.  So all
```

19

```
1  of the wholesale companies that operated service
2  stations as retailers sold the rights to
3  operate.
4        In our case, this particular station was
5  offered to us by the then president of Gasolinas
6  de Puerto Rico, Rafael Toro.
7              MS. GEPPERT:  Can I just ask.
8              (To the interpreter) Can you speak up a
9  little bit.  I'm having trouble.  Thank you.
10             THE INTERPRETER:  Sure.
11 BY MS. O'REILLY:
12      Q.   Did you know Mr. Toro?
13      A.   Yes.
14      Q.   How did you know him?
15      A.   Because in 1997 we acquired the rights to
16 operate an additional two stations, one in Levittown
17 and one in Guaynabo.  In that transaction, Mr. Toro
18 acted as the representative of the company that sold us
19 the right to operate.
20      Q.   Were those the first gasoline stations you
21 and your company had ever operated, the first two that
22 you bought?
23      A.   The first two that we bought.
24      Q.   How did you come to buy the first two?
25      A.   We paid for some rights to operate.
```

20

```
1       Q.   Did you have any experience in the
2  gasoline industry before you bought the stations?
3       A.   No, but we had a partner who was an
4  operator of Gasolinas de Puerto Rico whose name is
5  Enrique Veglio, V-E-G-L-I-O, second surname, "Matos."
6       Q.   Did he work for Gasolinas de Puerto Rico?
7              MS. ORTIZ:  Objection to form.
8              THE DEPONENT:  No.  He was the owner of a
9  property at the Mario Julia Industrial Ward
10 where there was a Gasolinas de Puerto Rico
11 station.
12 BY MS. O'REILLY:
13      Q.   And he operated that station?
14             MS. ORTIZ:  Objection to form.
15             THE DEPONENT:  Yes.
16 BY MS. O'REILLY:
17      Q.   When did he first operate that station?
18 Do you recall?
19             MS. ORTIZ:  Objection to form.
20             THE DEPONENT:  No.
21 BY MS. O'REILLY:
22      Q.   The name of your company is "Bartolo"?
23      A.   Yes.
24      Q.   What was the business of Bartolo before
25 you bought gasoline stations?
```

5 (Pages 17 to 20)

21

1   A.   None.  Bartolo was created to acquire
2   these two stations.
3   Q.   Did you have-- how many partners did you
4   have in Bartolo when you created it?
5   A.   Five.
6   Q.   And who were your partners?
7   A.   Veglio, Attorney Manuel Villalon, Alex
8   Rodriguez, Luis Rodriguez-Pagan and me.
9   Q.   Other than Mr. Veglio--
10  "Veglio"?
11  A.   Yes.
12  Q.   --did anyone else have experience in
13  operating a station?
14  A.   No.
15  Q.   How many stations total did Bartolo own or
16  operate for Gasolinas de Puerto Rico?
17  A.   Six.
18  Q.   When Gasolinas de Puerto Rico had the
19  stations, did they have employees running the station
20  to your understanding?
21  MS. ORTIZ:  Objection.  Form.
22  THE DEPONENT:  Yes.
23  BY MS. O'REILLY:
24  Q.   Did Bartolo hire those same employees to
25  continue to work with the stations?

22

1   A.   I think the cashiers and the floor
2   employees.
3   Q.   What about-- none of the managers?
4   MS. ORTIZ:  Objection to form.
5   THE DEPONENT:  I don't recall.
6   BY MS. O'REILLY:
7   Q.   Was-- I may have asked you.  I apologize.
8   Was Mr. Ortiz an employee of Gasolinas de Puerto
9   Rico?
10  A.   No, but he did have experience in gasoline
11  stations as an employee of a wholesaler.  I don't
12  remember the name of the wholesaler, but he had worked
13  for a wholesaler.
14  Q.   Did Bartolo have any other gasoline
15  operations other than operating the six Gasolinas de
16  Puerto Rico stations?
17  A.   No.
18  Q.   When Bartolo first took over the Central
19  station, when you took over the first two, did you
20  receive training?
21  MS. ORTIZ:  Objection.  Form.
22  THE DEPONENT:  No.
23  BY MS. O'REILLY:
24  Q.   Did your managers receive training?
25  A.   I don't think so.

23

1   Q.   Did you hire managers who already had
2   experience in operating gasoline stations?
3   A.   Yes.
4   Q.   Did Gasolinas de Puerto Rico have to
5   approve any of your managers before they could work at
6   the stations?
7   MS. ORTIZ:  Objection to form.
8   THE DEPONENT:  No.
9   BY MS. O'REILLY:
10  Q.   Did you make sure that for the Central
11  station that the managers that you hired there had
12  experience operating a station before you hired them?
13  A.   I think that the first manager that we had
14  for that station we transferred from Levittown to
15  Central Avenue.
16      I'm sorry.  If my memory serves me correctly, I
17  think the first manager's there name was Yun Rivera,
18  and after that the next one was, I think, Juan Carlos
19  Gonzalez, and both came from working for the company
20  from which we bought the two stations in 1997 in
21  Levittown and Guaynabo.
22  Q.   Would that be Gasolinas de Puerto Rico?
23  A.   No.
24  Q.   Who did you buy the first two stations
25  from?

24

1   A.   I've been trying to remember that for a
2   while.
3   Q.   Okay.  Well, you're doing great.  Great.
4   You remembered the names.  That's great.
5      Did you or your partners participate at all in
6   day-to-day operations of the Central Avenue station?
7   MS. ORTIZ:  Objection.  Form.
8   THE DEPONENT:  Yes.
9   BY MS. O'REILLY:
10  Q.   And how did you participate?
11  MS. ORTIZ:  Objection.  Form.
12  THE DEPONENT:  The manager would call us
13  on a daily basis, he would tell us what the
14  sales were, any problems that existed.  We
15  visited the stores.  Typical supervision.
16  BY MS. O'REILLY:
17  Q.   And did-- when you bought the Central
18  store, did Gasolinas de Puerto Rico offer training for
19  you and your partners or any of your employees?
20  MS. ORTIZ:  Objection.  Form.
21  THE DEPONENT:  No.
22  BY MS. O'REILLY:
23  Q.   How did you or your managers keep track of
24  the gasoline inventory, how much you received and how
25  much you sold?

joannedethomas@yahoo.com   -   787.501.3007

29

```
1    BY MS. O'REILLY:
2         Q.  Did any of the stations have a machine
3    that would print out a piece of paper every day that
4    would tell you how much gasoline was in the system?
5              MS. ORTIZ:  Objection.  Form.
6              THE DEPONENT:  How much was in the tanks?
7    BY MS. O'REILLY:
8         Q.  Yes.
9         A.  No.
10        Q.  Did any-- did the system at Central, did
11   the tanks at Central, have an alarm system that was
12   supposed to alarm if there was a leak from the gasoline
13   system?
14        A.  I don't recall.
15        Q.  Do you recall if Gasolinas de Puerto Rico
16   told you to put any covering on the pavement by the
17   dispensers, a coating or a sealant on the pavement by
18   the dispensers, to prevent leaks or drips of gasoline
19   from getting into the ground?
20             MS. ORTIZ:  Objection.  Form.
21             THE DEPONENT:  Are you referring in the
22        event of a leakage?
23   BY MS. O'REILLY:
24        Q.  Yes.
25        A.  There was no leakage.
```

30

```
1         Q.  But on the pavement by the dispensers, did
2    they tell you to put something on, like a seal or a
3    type of paint or something, to keep the gasoline if it
4    dripped from going into the ground?
5              MS. ORTIZ:  Objection to form.  Asked and
6         answered.
7              THE DEPONENT:  But it was a cement floor.
8         It wouldn't go in.
9    BY MS. O'REILLY:
10        Q.  Other than measuring the tanks every day,
11   did Gasolinas de Puerto Rico tell you about any other
12   steps that you should take to check for leaks?
13             MS. ORTIZ:  Objection to form.
14             THE DEPONENT:  In the event of?
15   BY MS. O'REILLY:
16        Q.  Just to look for leaks.
17             MS. ORTIZ:  Same objection.
18             THE DEPONENT:  I really don't recall.
19   BY MS. O'REILLY:
20        Q.  Did Gasolinas de Puerto Rico provide you
21   with information about safety of operating the tanks?
22             MS. ORTIZ:  Objection.  Form.
23             THE DEPONENT:  I don't recall.
24             (To the interpreter) I think it would be
25        important to mention to her that out of us the
```

31

```
1         person who was in charge of the supervision of
2    the stores was Veglio.  More than anything, I
3    was part of the finances.
4    BY MS. O'REILLY:
5         Q.  Okay.  Do you know where Mr. Veglio is?
6         A.  He's either at his house or at a bar.
7         Q.  Well, how about the house, the address of
8    the house?  I won't ask about the bar on the record.
9         A.  Oh, Jesus.  I don't recall.
10        Q.  Just let us know if you do remember any
11   time a little bit later.
12        A.  Yes.
13        Q.  Would you like some water?
14        A.  No, no.  I'm fine.
15        Q.  Okay.
16        A.  Thank you.
17        Q.  And we'll go a few more minutes and then
18   we'll take a break.  We'll try to take a break every
19   hour just for a few minutes to stretch our legs.
20             When you acquired the Central station, were you
21   provided with manuals, booklets, on the operations of
22   the station, do you remember?
23             MS. ORTIZ:  Objection.  Form.
24             THE DEPONENT:  I don't think so.
25
```

32

```
1    BY MS. O'REILLY:
2         Q.  Who was called, or who did you or the
3    manager call, when you wanted to order gasoline for the
4    Central station?
5         A.  Dispatch.
6         Q.  A dispatcher where?
7         A.  At Gasolinas de Puerto Rico.
8         Q.  And did Gasolinas de Puerto Rico arrange
9    for the delivery of the gasoline to the Central
10   station?
11             MS. ORTIZ:  Objection.  Form.
12             THE DEPONENT:  Yes.
13   BY MS. O'REILLY:
14        Q.  They hired the drivers to your knowledge?
15        A.  Yes.
16        Q.  Do you know where the gasoline that was
17   supplied to the Central station, where it was picked
18   up?
19             MS. ORTIZ:  Objection.  Form.
20             THE DEPONENT:  Gasolinas de Puerto Rico
21        bought gasoline from all of the wholesalers.  So
22        they may have acquired the gasoline either from
23        Exxon as well as Shell.  They didn't have a
24        tank.
25
```

8 (Pages 29 to 32)

37

1    pipelines or the dispensers, was any of that equipment
2    changed or replaced or upgraded?
3         MS. ORTIZ: Objection. Form.
4         THE DEPONENT: I don't recall.
5    BY MS. O'REILLY:
6         Q.   I think you told me--let me make
7    sure--when Bartolo took over the Central station you
8    took it over directly from Gasolinas de Puerto Rico,
9    correct?
10        **A.   Correct.**
11        Q.   Okay.
12        Do you recall at any time being at the Central
13   station and seeing the ground dug up, the soil exposed?
14        MS. ORTIZ: Objection. Form.
15        THE DEPONENT: No.
16   BY MS. O'REILLY:
17        Q.   Do you know if there were any leaks or
18   releases before Bartolo took over the Central station?
19        MS. ORTIZ: Objection. Form.
20        THE DEPONENT: I don't know.
21   BY MS. O'REILLY:
22        Q.   Did you see or did Gasolineras de Puerto
23   Rico tell you they were testing the soil or testing the
24   water at the station at any time?
25        MS. ORTIZ: Objection to form.

38

1         THE DEPONENT: I don't recall.
2    BY MS. O'REILLY:
3         Q.   Did you receive any documents when you
4    took over operations of the Central station, when
5    Bartolo took them over, about the environmental status
6    of the station, any documents about an investigation or
7    contamination?
8         **A.   No.**
9         MS. ORTIZ: Objection to form.
10   BY MS. O'REILLY:
11        Q.   If you recall, how long after-- how long
12   would it take for Gasolinas de Puerto Rico to send
13   someone out to fix a problem with the tanks or the
14   dispensers after your manager called?
15        **A.   It depends, because if we would call**
16   **sometimes for them to come and fix something if there**
17   **was a problem, they might send someone the same day or**
18   **the next day. It depends on the problem.**
19        Q.   Was it someone, to your understanding, the
20   technician that they sent out, was that technician
21   employed by Gasolinas de Puerto Rico, or was it a
22   contractor?
23        MS. ORTIZ: Objection to form.
24        THE DEPONENT: They were contractors
25   sometimes.

39

1    BY MS. O'REILLY:
2         Q.   Do you remember the name of the companies,
3    the contract companies?
4         **A.   No.**
5         Q.   Did they leave paperwork with you if they
6    made a repair?
7         **A.   I think so.**
8         Q.   And who paid for those repairs?
9         **A.   I think they paid in the majority of**
10   **cases.**
11        Q.   Were there some times when Bartolo paid?
12        **A.   I think so.**
13        Q.   And in what instances do you recall where
14   Bartolo might have paid?
15        **A.   I don't recall.**
16        Q.   Did Gasolinas de Puerto Rico, the sales
17   representative, or anyone from Gasolinas de Puerto
18   Rico, come out and inspect the station on a regular
19   basis?
20        MS. ORTIZ: Objection to form.
21        THE DEPONENT: Yes.
22   BY MS. O'REILLY:
23        Q.   Was it the sales manager that came out?
24        **A.   No. The representative in charge of the**
25   **store.**

40

1         Q.   When you say "the representative in charge
2    of the store," what was their position with Gasolinas
3    de Puerto Rico to your understanding?
4         **A.   It was the liaison between us and the**
5    **Gasolinas de Puerto Rico management.**
6         Q.   Do you recall what the name of that person
7    was?
8         **A.   There were several.**
9         Q.   Do you remember any of the names?
10        **A.   No.**
11        Q.   Okay. And--
12        MS. O'REILLY: (To the interpreter) I'm
13   sorry?
14        THE INTERPRETER: "No."
15   BY MS. O'REILLY:
16        Q.   Did you-- were you present when they did
17   any-- when they did an inspection?
18        **A.   Freddie. I believe there was one whose**
19   **name was Freddie Castaner. The rest I don't remember.**
20        Q.   Okay.
21        Did you ever go watch an inspection of the
22   station? Were you present when the Gasolinas de Puerto
23   Rico liaison inspected the station?
24        **A.   Yes.**
25        Q.   Can you generally describe what they did

10 (Pages 37 to 40)

69

1    A.  Yeah.
2    Q.  Okay.
3    Do you recognize this document?
4       A.  I don't remember it, but I recognize my
5    signature.
6    Q.  Okay.
7    And do you know what this document represents?
8       A.  Yes.
9    Q.  And what is it for?
10      A.  The cancellation of the four contracts for
11   the operation-- I'm guessing it's for the operation of
12   Avenida Central.
13      Q.  Did you have any other stations with
14   Gasolinas de Puerto Rico that started on April 30,
15   1998, other than the Central?
16      A.  Santurce.
17      Q.  And did that contract get canceled as
18   well?
19      A.  No.
20      Q.  So given the fact that the Santurce
21   gasoline station was not cancelled, but the Central was
22   cancelled, does this likely relate to the Central
23   station?
24      A.  This refers to the cancellation so that
25   they can then rent the station to Veglio.

70

1    Q.  Okay.
2    And that's the Central, correct?
3       A.  Yes.
4    Q.  Did you-- when the contract was canceled,
5    had you worked out all the problems with Gasolinas de
6    Puerto Rico, or did you continue to have correspondence
7    with them about the Central station?
8       MS. ORTIZ:  Objection.  Form.
9       THE DEPONENT:  I don't recall.
10   BY MS. O'REILLY:
11      Q.  Did you learn at any time that there had
12   been contamination of the soil or ground water
13   associated with the Central station?
14      MS. ORTIZ:  Objection to form.
15      THE DEPONENT:  I don't recall.
16   BY MS. O'REILLY:
17      Q.  Did Gasolinas de Puerto Rico ever tell you
18   that MTBE was in the gasoline being sold at the Central
19   station?
20      A.  No.
21      MS. ORTIZ:  Objection to form.
22   BY MS. O'REILLY:
23      Q.  Did Bartolo and your managers try to be
24   careful in operating the Central station to make sure
25   that gasoline didn't spill?

71

1    A.  Yes.
2    Q.  And if there were extra steps or extra
3    procedures that should have been in place so that MTBE
4    didn't contaminate water, would you and your managers
5    have implemented those procedures?
6       MS. ORTIZ:  Objection.  Form.
7       MS. GEPPERT:  Objection.
8       THE DEPONENT:  I imagine.
9    BY MS. O'REILLY:
10      Q.  Were you aware that MTBE can, when
11   released from a gas station, contaminate the water that
12   people drink?
13      MS. ORTIZ:  Objection.  Form.
14      THE DEPONENT:  Now I am.
15   BY MS. O'REILLY:
16      Q.  And when you saw "now," today, or did you
17   learn after-- sometime before today?
18      A.  No, because it's been published in the
19   press lately.  But in those days I didn't even know
20   that MTBE existed.
21      Q.  Does it concern you that MTBE can
22   contaminate water that people drink?
23      MR. LUTZ:  Objection to form.
24      MS. ORTIZ:  Objection.  Form.
25      THE DEPONENT:  Yes.

72

1    BY MS. O'REILLY:
2       Q.  Would you have wanted to do everything
3    that you could, and your managers to do everything they
4    could, to prevent MTBE from contaminating the water
5    people drink?
6       MS. ORTIZ:  Objection.  Form.
7       MS. GEPPERT:  Objection.  Vague.
8       MS. ORTIZ:  Asked and answered.
9       THE REPORTER:  (To Ms. Geppert) Did you
10   say "Objection.  Vague"?
11      MS. GEPPERT:  Yes.
12      THE DEPONENT:  Personally, yes.
13   BY MS. O'REILLY:
14      Q.  And your managers too?
15      MS. ORTIZ:  Same objection.
16      THE DEPONENT:  I can't speak for them.
17   BY MS. O'REILLY:
18      Q.  But Bartolo, would you implement a policy
19   to-- if there were special procedures that could
20   prevent MTBE from getting to the water?
21      MS. ORTIZ:  Objection.  Form.
22      THE DEPONENT:  Basically, what we would
23   have limited ourselves to if there had been a
24   gasoline spill would be to remedy the situation
25   by putting sand over it in the area where the

joannedethomas@yahoo.com   -   787.501.3007

73

1    gasoline spill is, and then we would have
2    proceeded to call the Fire Department and GPR.
3    BY MS. O'REILLY:
4    Q.  Okay.
5    **A.  But I repeat like I did before.  I'm**
6    **answering because I am a concerned citizen, but in the**
7    **case of Avenida Central, if there ever had been a**
8    **spill, it would have been on top of cement, on top of**
9    **the cement floor, unless there was some kind of a spill**
10   **in the tanks or in the lines.**
11   Q.  Okay.
12   And if you and your managers could take special
13   precautions to prevent MTBE from reaching the water
14   people drink, would you do it?
15   MS. ORTIZ:  Objection.  Form.
16   MR. LUTZ:  Objection to form.
17   THE DEPONENT:  Well, I would have to speak
18   for now, about my station, and the answer would
19   be yes.
20   BY MS. O'REILLY:
21   Q.  Okay.  I need to take a moment to look at
22   my notes.  Why don't we take a quick break and I'll
23   look at my notes.  I may be done with my questions, and
24   I will turn you over to other counsel.
25   **A.  Thank you.**

74

1    THE VIDEOGRAPHER:  We're off the record.
2    The time is 4:26 p.m.
3    (Recess.)
4    THE VIDEOGRAPHER:  We're back on the
5    record.  The time is 4:36 p.m.
6    BY MS. O'REILLY:
7    Q.  I just have a couple of more questions and
8    there is one more document I'm going to ask you about.
9    MS. O'REILLY:  But before we go into my
10   questions, we had a discussion off the record
11   with the witness.  Counsel for plaintiffs is--
12   we're going to stay until I finish my
13   cross-examination-- my direct examination today.
14   Then we will reconvene for up to two, no more
15   than two, additional hours at a point in time in
16   July convenient to the witness.  We're initially
17   going to look at the week of July 8th, but if
18   that doesn't work, then we will work with him on
19   another time, and he's agreed to come back.
20   Is that correct?
21   THE DEPONENT:  Yes, that is.
22   MS. O'REILLY:  And for counsel for
23   defendants to conduct their examination and for
24   any follow-up questions.
25   Is that correct?

75

1    THE DEPONENT:  Right.
2    MS. ORTIZ:  I just want to clear up that
3    we needed-- we suggested two hours for our part,
4    but if you have some follow up--
5    MS. O'REILLY:  It probably won't take over
6    two.  Okay.
7    BY MS. O'REILLY:
8    Q.  A couple of quick follow-up questions.
9    Let me do this first.  Let me mark one more
10   document.
11   THE REPORTER:  This would be 12.
12   (A document is marked for purposes of
13   identification as Deposition Exhibit
14   No. 12.)
15   MS. O'REILLY:  For the record, I've marked
16   as Exhibit 12 a March 12, 2002, letter directed
17   to Jorge Pavia of PR Petroleum Products from
18   Gasolinas de Puerto Rico and it's Bates stamped
19   TPPRC.SUPPLY-001738 through 1739.
20   BY MS. O'REILLY:
21   Q.  Do you know Jorge Pavia?
22   **A.  Yes.**
23   Q.  And who is he?
24   **A.  He's my nephew.**
25   Q.  And did he have a contract with Gasolinas

76

1    de Puerto Rico for gasoline supply?
2    **A.  I understand that he had a contract with**
3    **Total for transportation of petroleum products.**
4    Q.  Okay.
5    And is your nephew still in Puerto Rico?
6    **A.  Yes.**
7    Q.  Okay.
8    And do you know where he lives now?
9    **A.  He was divorced last year.  I know he**
10   **lives in Miramar, but I don't know where.**
11   Q.  Okay.
12   Did his company ever deliver the petroleum to
13   your Central station?
14   MS. ORTIZ:  Objection to form.
15   THE DEPONENT:  No.
16   BY MS. O'REILLY:
17   Q.  Okay.  Do you recall if anyone from
18   Gasolinas de Puerto Rico told you about MTBE and its
19   ability to contaminate water people drink?
20   MS. ORTIZ:  Objection.  Form.
21   THE DEPONENT:  No.
22   BY MS. O'REILLY:
23   Q.  Did they tell you MTBE was in the gasoline
24   that you were selling at the Central station?
25   MR. LUTZ:  Objection to form.

19 (Pages 73 to 76)

[Certified Translation]

5/31/13

*Daniel Tomlinson*

DANIEL TOMLINSON
CERTIFIED TRANSLATOR
ADMINISTRATIVE OFFICE OF
THE UNITED STATES COURTS

[From page No. TPPRC.SSRETAIL_000854-57]

## GRATUITOUS BAILMENT AGREEMENT

– AS PARTY OF THE FIRST PART: GASOLINAS DE PUERTO RICO CORPORATION, a corporation established and existing under the laws of the Commonwealth of Puerto Rico, ... hereinafter referred to as G.P.R., and

– AS PARTY OF THE SECOND PART: BARTOLO, INC., a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, duly authorized to do business in Puerto Rico, with offices at Calle "C", Block E, dash, fifty-four (E-54), Reparto Industrial Doctor Mario A. Julia, Puerto Nuevo, Puerto Rico, and represented in this proceeding by its President, Mr. ANTONIO PAVIA BIBILONI, with Social Security number 583-08-[redacted], of legal age, married and a resident of San Juan, Puerto Rico, hereinafter referred to as GRATUITOUS BAILEE, who will engage in the sales business of petroleum products at the gasoline station located at *Avenida Jesus T. Piñero, #263, Hato Rey, Puerto Rico*—

– FIRST: THE GRATUITOUS BAILEE has signed a contract with G.P.R. for the purchase of G.P.R.'s gasoline and diesel, greases and lubricants to be sold at the service station that he operates at the gasoline station located at *Avenida Jesus T. Piñero, #263, Hato Rey, Puerto Rico*—

– THIRD: By means of this contract G.P.R. will deliver personal property it owns to the GRATUITOUS BAILEE, and G.P.R. and the GRATUITOUS BAILEE agree that said equipment mentioned in the SECOND number or those that may be substituted or that have already been installed or that may be installed in the future, shall be used solely to store, dispense, use and sell petroleum products distributed by G.P.R., with the G.P.R. trademarks and emblems, excluding any others, remaining subject to this Gratuitous Bailment Agreement, as an express waiver of any other proviso or pact included in any other agreement. G.P.R. reserves absolute ownership of the property that is the subject of this Gratuitous Bailment Agreement and grants to GRATUITOUS BAILEE the user's right in accordance with what is agreed to in this

1

Deposition
Exhibit ___ PAVIA
Jeff ____ #4
6/12/13

able to enter said establishment and pick up said property in the agreed-upon manner, in which case GRATUITOUS BAILEE shall also pay the legal and out-of-court expenses and costs that G.P.R. incurs in the removal and extracting and transportation of said property to G.P.R.'s warehouse.

– SIXTEENTH: G.P.R. and GRATUITOUS BAILEE make it clear that all the equipment or personal property belonging to G.P.R. and that G.P.R. has delivered or put in the service station by way of notarized or verbal contracts, or being part of other contracts or whether or not its delivery is justified through a "Receipt of Equipment and Materials," shall be governed by this GRATUITOUS BAILMENT AGREEMENT.

[From page No. TPPRC.SSRETAIL_000860]

Gratuitous Bailment Agreement Attachment
Bartolo, Inc. & GPR
S/S 2012

[From page No. TPPRC.SSRETAIL_000861]

Gratuitous Bailment Agreement Attachment
Bartolo, Inc. & GPR
S/S 2012
Page No. 2

[From page No. TPPRC.SSRETAIL_000867]

SALES AND SUPPLY CONTRACT
(2012)

COME NOW
– AS PARTY OF THE FIRST PART: GASOLINAS DE PUERTO RICO CORPORATION, ...

hereinafter referred to as the "SUPPLIER."

– AS PART OF THE SECOND PART: BARTOLO, INC., ...

hereinafter referred to as the "BUYER."

4

– SECOND: That BUYER is interested in obtaining from SUPPLIER, by means of purchase, the petroleum products with the G.P.R. trademark and/or with any other brand name distributed by SUPPLIER.

[From page No. TPPRC.SSRETAIL_000868]

CLAUSES AND CONDITIONS

– First: TERM OF THE CONTRACT
The term of this contract shall be for a period of three years, beginning on the ~~thirtieth (30) day~~ of ~~April~~ [Handwritten with initials in margin: first (1) of May] of nineteen ninety-eight (1998) and ending on the ~~twenty-ninth (29)~~ [Handwritten with initials: thirtieth (30)] of April of two thousand one (2001).

– Second: MINIMUM PURCHASES
During the term of this contract, SUPPLIER agrees to sell and BUYER agrees to buy and pay for the products indicated in the SECOND recital, above, in a minimum monthly amount according to what is listed below:

|  |  |  |
|---|---|---|
| Regular unleaded gasoline | 140,000___ | gallons |
| Premium unleaded gasoline | 85,000___ | gallons |
| Monthly fuel minimum | 225,000___ | gallons |
| Oils and Lubricants | 160___ | gallons |

[Initials]

[From page No. TPPRC.SSRETAIL_000871]

– Ninth: REGULAR DELIVERIES
SUPPLIER shall deliver to BUYER each and every one of the products in amounts that it considers to be wholesale sales and taking into consideration the cost of transportation, handling and delivery. The gasoline and gas oil shall be ordered by BUYER to be delivered in bulk by SUPPLIER in a tank truck, on each occasion, with a minimum of eight thousand (8,000) gallons of a single product or combined. However, SUPPLIER retains the power to modify the amount and manner of deliveries in consideration of its particular operational circumstances, at its sole discretion, and for this purpose latter is released by BUYER from any claim that may originate from exercising said power.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL  *      Master File
ETHER ("MTBE") PRODUCTS               No. 1:00-1898
LIABILITY LITIGATION           *
-------------------------------       MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,    *     M21-88
et al.,
                               *

        Plaintiffs,
                               *

               vs.             *

    Defendants.                *

Case No. 07-CIV-10470 (SAS)
-------------------------------
The continued videotape deposition of:

                ANTONIO R. PAVIA,

a former Total Service Station Operator, and a

Non-Party Witness herein, was held at the DEPARTMENT OF

JUSTICE FOR THE COMMONWEALTH OF PUERTO RICO, Ninth

Floor, Olimpo Street, San Juan, Puerto Rico  00907, on

Thursday, July 11, 2013, at 10:17 a.m.


                - VOLUME II OF II -

ead56f97-ba61-4cd9-b8a3-e744728ce428

Page 10

1  follows:
2                    EXAMINATION
3  BY MS. ORTIZ:
4       Q.   Good morning, Mr. Pavia, and thank you for
5  being here today.  Once again, my name is Deliris Ortiz
6  and I'm here on behalf of Total Petroleum Puerto Rico
7  Corp. I'm going to be asking you some questions geared
8  toward clarification of your prior testimony back in
9  June 12th.
10      Before, you testified that you had five partners
11  in Bartolo and you mentioned that they were Veglio,
12  Manuel Villalon, Alex Rodriguez, Luis Rodriguez, and
13  you.
14      Is that correct?
15      A.   Yes.
16      Q.   Were all of them shareholders of Bartolo,
17  Inc.?
18      A.   Yes.
19      Q.   Did they all have the same participation
20  of shares?
21      A.   Yes.
22      Q.   Does Bartolo have a board of directors?
23      A.   Yes.
24      Q.   And who are the members of the board of
25  directors?

Page 11

1       A.   Luis Rodriguez-Pagan and I.
2       Q.   And what position is-- Luis Rodriguez
3  holds in the board of directors?
4       A.   Director.
5       Q.   And your position?
6       A.   Director.
7       Q.   Were each of you assigned a particular
8  responsibility?
9       A.   When?
10      Q.   During two thousand-- since-- I'm sorry.
11  Since you incorporated Bartolo, Inc.
12      A.   Yes.
13      Q.   And what were those responsibilities and
14  the persons having the responsibilities?
15      A.   Veglio ran the operation, I supervised it,
16  Villalon handled the finances, and the other two were
17  nonparticipating partners in the administration.
18      Q.   Thank you.
19      And I want to clarify the dates of operation of
20  the Total 1012 station of Bartolo, Inc.
21      Before you had mentioned that you were-- when
22  asked about your association with the station, that you
23  were associated with the station from 1998 until 2006.
24      Do you remember that?
25      A.   To the best of my recollection, we

Page 12

1  operated the Central Street station from 1998 until
2  2006, in which I participated.
3       Q.   But Bartolo operated the Total station
4  from April of 1998 until 2003 when Q & M began the
5  operation of the station.
6       Is that correct?  Do you recall?
7       A.   No, that is not correct, because I don't
8  remember Total being in Puerto Rico in 2006 when we had
9  the operations.
10      Q.   How about GPR?
11      A.   GPR, yes.
12      Q.   I'm going to refer you to Exhibit 11.
13  Just let me know when you're done.
14      A.   Yeah.
15      Q.   Will that refresh your memory that Bartolo
16  operated the station from April 30, 1998, until
17  February 20th of 2003?
18      A.   Yes.
19      Q.   You were not a member of Q & M
20  Distributors, Inc., right?
21      A.   No.
22      Q.   Okay.  You can put that aside.  May I have
23  it back.
24          (The deponent complies.)
25

Page 13

1  BY MS. ORTIZ:
2       Q.   Thank you.
3       Also, before, back on June 12, when Counsel
4  asked you if you personally operated the station on a
5  day-to-day basis you responded that you had managers
6  and supervisors.
7       Do you remember that?
8       A.   Yes.
9       Q.   And were you in charge of supervising the
10  managers and the supervisors at the station?
11      A.   Veglio and I.
12      Q.   And how was that divided?
13          MS. O'REILLY:  Vague.
14          THE DEPONENT:  Veglio did the part of the
15      operations. But since this is a small business,
16      we both participated in visiting the stations
17      and there was no formal division of the duties.
18  BY MS. ORTIZ:
19      Q.   Do you remember how often you would visit
20  the Total 1012 station?
21      A.   No.
22      Q.   Once a month perhaps?  Less than that?
23      A.   No.  More than that.
24      Q.   So if GPR sales representatives or GPR
25  subcontractors would come and visit the station, either

Page 38

1              EXAMINATION
2   BY MR. LUTZ:
3        Q.   Mr. Pavia, my name is David Lutz.  I
4   represent Idemitsu Apollo Corporation and I have maybe
5   15 minutes of questions for you.
6        If I talk from here, can you hear me okay?
7        A.   Yes.
8        MR. LUTZ:  And equally important, those of
9   you on the phone, can you hear me from here?
10        MR. FERRINO:  Yes.
11        MR. LUTZ:  Great.
12        THE REPORTER:  Who spoke just now?
13        MR. FARINO:  Dan Farino from Archer &
14   Greiner.
15        THE REPORTER:  Thank you.
16   BY MR. LUTZ:
17        Q.   Mr. Pavia, you testified a little while
18   ago that you visited the station at least once a month.
19        Do you think it was as often as once a week
20   even?
21        MS. O'REILLY:  Asked and answered multiple
22   times.
23        THE DEPONENT:  Not necessarily.
24   BY MR. LUTZ:
25        Q.   Now, during the years that Bartolo

Page 39

1   operated Station 1012, was Bartolo your primary
2   business venture?
3        A.   Throughout all of the years?
4        Q.   From 1998 until 2003, was Bartolo your
5   primary business venture?
6        A.   I think that for part of that time it was
7   not.
8        Q.   During the majority of those five years,
9   was Bartolo your primary business venture?
10        A.   I'd have to check.
11        Q.   What other business were you involved in?
12        A.   In a finance consulting office.
13        Q.   Would it be fair to say that of the five
14   partners in Bartolo that you had the primary
15   supervision?
16        MS. O'REILLY:  Asked and answered multiple
17   times.
18        THE DEPONENT:  No.
19   BY MR. LUTZ:
20        Q.   But you supervised Mr. Veglio?
21        MS. O'REILLY:  Asked and answered.
22        THE DEPONENT:  Yes.
23   BY MR. LUTZ:
24        Q.   And Mr. Veglio supervised the general
25   manager at the station?

Page 40

1        MS. O'REILLY:  Asked and answered.
2        THE DEPONENT:  He supervised the
3   operations, the employees.
4   BY MR. LUTZ:
5        Q.   So there would be certain things that
6   might happen on a daily basis that were not important
7   enough to bring to your attention, right?
8        MS. O'REILLY:  Calls for speculation,
9   asked and answered, vague and ambiguous.
10        THE DEPONENT:  I imagine that Veglio
11   wouldn't tell me everything that happened at the
12   station on a day-to-day basis.
13   BY MR. LUTZ:
14        Q.   But then there were certain things that if
15   they happened that were important enough to the
16   existence or the success of the station, things like
17   that would be brought to your attention, right?
18        MS. O'REILLY:  Calls for speculation,
19   argumentative, vague, ambiguous, over broad.
20        THE DEPONENT:  He was supposed to do so.
21   BY MR. LUTZ:
22        Q.   And obviously the purpose of the station
23   was a business venture to make money, right?
24        A.   Yes.
25        Q.   And the station would buy the gasoline

Page 41

1   from someone else, right?
2        MS. O'REILLY:  Vague and ambiguous.
3   BY MR. LUTZ:
4        Q.   Do you understand what I'm asking?
5        A.   We only had one supplier, which was
6   Gasolinas de Puerto Rico.
7        Q.   Okay.
8        And so would the station buy the gasoline from
9   GPR?
10        MS. O'REILLY:  Asked and answered.
11        THE DEPONENT:  Yes.
12   BY MR. LUTZ:
13        Q.   And then the station would in turn sell
14   that gasoline to retail customers, right?
15        A.   Yes.
16        Q.   Can you give me a sense of what the markup
17   might be or the margin on the gasoline, how much more
18   you would sell it for to retail customers than you
19   would buy it for from GPR?
20        MS. O'REILLY:  Vague.  Vague, ambiguous,
21   over broad, assumes facts.
22        (To the interpreter) Go ahead.
23        THE DEPONENT:  The thing is that depends
24   on many factors.
25

11 (Pages 38 to 41)

ead56f97-ba61-4cd9-b8a3-e744728ce428

Page 46

```
 1        contamination, we would have done whatever had
 2        to be done to avoid the contamination.
 3   BY MR. LUTZ:
 4        Q.   If you could not sell gasoline that you
 5   had bought and paid for because it was leaking into the
 6   ground, that would have been a big problem for the
 7   finances of the station also, right?
 8        MS. O'REILLY:  Vague, ambiguous, over
 9        broad, incomplete hypothetical, argumentative,
10        assumes facts, lacks foundation, asked and
11        answered,
12        THE DEPONENT:  Well, the thing is that I
13        find that question to be speculative because I
14        don't remember that there was ever any leak.
15   BY MR. LUTZ:
16        Q.   And I understand there wasn't a leak that
17   you know of.  But if there was a leak and gasoline was
18   leaking into the ground so that the station couldn't
19   sell it, that would have been an important enough event
20   that you would have been told about it, right?
21        MS. O'REILLY:  Assumes facts, calls for
22        speculation, lacks foundation, incomplete
23        hypothetical, asked and answered, argumentative.
24        The witness has answered the question.
25        THE DEPONENT:  I'm assuming,
```

Page 47

```
 1   speculatively, that what we're talking about is
 2   if there's any problem in a tank that has a
 3   gasoline leak and we find out about the
 4   situation, the logical thing was to call GPR for
 5   GPR to come and check whether there actually was
 6   a leak, and I imagine that GPR may have shut off
 7   or closed down that tank, but the other two
 8   tanks could continue to operate.
 9   BY MR. LUTZ:
10        Q.   And there never was a spill or leak like
11   that, was there?
12        MS. O'REILLY:  Argumentative, asked and
13        answered multiple times.
14        THE DEPONENT:  I don't recall.
15   BY MR. LUTZ:
16        Q.   Now, to your knowledge, the tanks complied
17   with Puerto Rican law and regulation, right?
18        MS. O'REILLY:  Vague and ambiguous, over
19        broad.
20        THE DEPONENT:  Yes.  And the tanks were
21        GPR's.  They weren't ours.
22   BY MR. LUTZ:
23        Q.   And your station was never cited by the
24   government of Puerto Rico for any violation that
25   related to the tanks or the gasoline or spills or
```

Page 48

```
 1   contamination.
 2        MS. O'REILLY:  Vague, ambiguous, over
 3        broad, incomplete, assumes facts, lacks
 4        foundation, calls for speculation.
 5        (To the interpreter) Go ahead.
 6        THE DEPONENT:  I don't remember that
 7        happening.
 8   BY MR. LUTZ:
 9        Q.   Do you know who the gasoline that found
10   its way to your station through GPR, who ultimately it
11   came from?
12        MS. O'REILLY:  Asked and answered.  That
13        was covered in his prior deposition, Counsel.
14        THE DEPONENT:  What refinery it came from?
15   BY MR. LUTZ:
16        Q.   Yes.
17        A.   No.
18        Q.   If we wanted to know what specific
19   features the tanks had, is that something you knew, or
20   is that something Mr. Veglio would know more about?
21        MS. O'REILLY:  Calls for speculation,
22        assumes facts.
23        THE DEPONENT:  With respect to the
24        capacity of the tank?
25
```

Page 49

```
 1   BY MR. LUTZ:
 2        Q.   Well, with respect to whether they had
 3   leak detection, or spill control, overfill protection,
 4   corrosion protection, cathodic protection, things like
 5   that.
 6        Are those questions for you, or are those things
 7   that Mr. Veglio would know more about than you?
 8        MS. O'REILLY:  Assumes facts, lacks
 9        foundation, calls for speculation.
10        (To the interpreter) Go ahead.
11        THE DEPONENT:  Well, I think Veglio knew
12        more about it than I did, but even more than
13        Veglio, I think GPR would have more knowledge.
14        They're the owners of the tanks.
15   BY MR. LUTZ:
16        Q.   You're not aware of any evidence during
17   the time that Bartolo operated the station that there
18   were any malfunctions or damage to the tank, pipes or
19   other parts of the system?
20        MS. O'REILLY:  Asked and answered multiple
21        times, vague and ambiguous.
22        (To the interpreter)  Go ahead.
23        Compound.
24        THE DEPONENT:  I think I already answered
25        that I don't recall there ever being any problem
```

13 (Pages 46 to 49)

ead56f97-ba61-4cd9-b8a3-e744728ce428

# Exhibit 8

MEMORANDUM

San Francisco, CA
August 12, 1991

TIP Letter # 237
MTBE Effects

REGIONAL MANAGERS:

As you all know Methyl-tertiary-butyl-ether (MTBE) is widely used in gasoline throughout our distribution network. The oxygenated fuel requirements in the recent reauthorization of the federal Clean Air Act will only increase the use of MTBE and its concentration in our gasolines. In light of this, we thought it prudent to pass on some facts concerning the potential effects, both environmental and budgetary, of a spill or leak of gasoline containing MTBE into the groundwater. This information may help you to prioritize sites due for UST upgrades (ie. spill containment, release detection, etc.).

Typically, benzene is the component that determines the extent of a dissolved hydrocarbon plume and is the component with the most stringent cleanup standards. While benzene concentrations in the groundwater are the driving force for most cleanups, benzene is relatively easy to remove by carbon adsorption or air stripping and it will naturally biodegrade in most subsurface environments.

MTBE on the other hand is a different situation. The solubility of benzene in water is 1,800 parts per million (ppm), while the solubility of MTBE in water is 43,000 ppm! The dissolved plume that results from a leak into groundwater is directly related to the solubility in water of the chemical. The higher the solubility the larger the plume and the faster it will migrate.

When MTBE gets into the water then the trouble really starts. Removal of a compound by air stripping is governed by the Henry's Law constant; the constant for MTBE is 1/7 that of benzene; the biodegredation of MTBE is 1/5 that of benzene; the carbon adsorption of MTBE is 1/5 that of benzene. MTBE has two additional characteristics that only exacerbate the problem. Dissolved benzene transport in water is retarded due to adsorption; MTBE transport is not significantly slowed since it does not adsorb to soil as well. Water containing over 1,500 ppm of MTBE is flammable and can lead to explosive vapors. Attached you will find a summary of MTBE properties provided by R.J. Hinds of CRTC.



EXHIBIT
107
999128

CONFIDENTIAL: This document is subject to the September 21, 1999 Stipulated Protective Order entered in the San Francisco Superior Court, Case No. 999128.

CHEV 09564

As you can see, a groundwater cleanup where MTBE is present has the potential to be 2-3 times as expensive as our present groundwater cleanups. The resulting plume will be much larger and the removal of MTBE is very difficult at best.

Our highest degree of concern right now is with service stations without spill containment manholes that are, or will be, served by racks that are blending MTBE. The combination of MTBE gasoline being delivered, the lack of spill containment manholes, and shallow groundwater could be tremendously expensive for us in the long run. As they say, an ounce of prevention is worth a pound of cure, and in this case prevention is certainly prudent.

J.L. KOERBER

JLK

DJL/

cc. A.M. Caccamo
    D.N. Perkins
    J.L. Pease
    R.J. Hinds
    Compliance Specialists
    TIP Coordinators
    Env. Engineering Supervisors
    H.W. Riggs

CONFIDENTIAL: This document is subject to the September 21, 1999 Stipulated Protective Order entered the San Francisco Superior Court, Case No. 999128.

CHEV 09565

MTBE

$$CH_3-O-\underset{\underset{CH_3}{|}}{\overset{\overset{CH_3}{|}}{C}}-CH_3$$

# SOLUBILITY, PPM AT 68 °F

MTBE IN WATER = 43,000    (BENZENE IN WATER = 1,800)

WATER IN MTBE = 14,000

# FLAMMABILITY, MOL % IN AIR

LOWER EXPLOSIVE LIMIT = 1.6

UPPER EXPLOSIVE LIMIT = 10.5

# AIR STRIPPING

HENRY'S LAW CONSTANT = 30 ATM/MOL FRACTION

(1/7 THAT OF BENZENE)

# BIODEGREDATION IN WATER = POOR

(ABOUT 1/5 THAT OF BENZENE)

# CARBON ADSORPTION = POOR

(ABOUT 1/5 THAT OF BENZENE)

RJH
6/5/91

CONFIDENTIAL: This document is subject to the
September 21, 1999 Stipulated Protective Order entered
by the San Francisco Superior Court, Case No. 999128.

CHEV 09566

MTBE

$$CH_3-O-\overset{\displaystyle CH_3}{\underset{\displaystyle CH_3}{\overset{|}{\underset{|}{C}}}}-CH_3$$

## UNUSUAL CHARACTERISTICS

### HIGH GROUNDWATER TRANSPORT RATE

(DISSOLVED BENZENE TRANSPORT IN WATER IS RETARDED DUE TO ADSORPTION;
MTBE TRANSPORT IS NOT SIGNIFICANTLY SLOWED SINCE IT DOESN'T ADSORB AS WELL)

### UNEXPECTED FLAMMABILITY (>1,500 PPM IN WATER)

(WATER CONTAINING OVER 1500 PPM OF MTBE IS FLAMMABLE AND CAN LEAD
TO EXPLOSIVE VAPORS)

### SALT SOLUBILITY

(WET MTBE CAN DISSOLVE 20 TO 50 PPM OF SALT)

CONFIDENTIAL: This document is subject to the
September 21, 1999 Stipulated Protective Order entered
by the San Francisco Superior Court, Case No. 999128.

RJH
6/5/91

CHEV 09567

Memorandum



San Francisco, CA
June 11, 1986

MARKETING ENVIRONMENTAL
CONCERNS REGARDING
THE USE OF MTBE IN MOGAS

MR. O. T. BUFFALOW:

We are currently involved in the cleanup of an aquifer in Maryland contaminated by several different company's leaking underground storage tanks. The companies involved, including Gulf, were utilizing MTBE (Methyl Tertiary Butyl Ether), a motor gasoline octane improver. The EPA has shown great interest in the removal of MTBE from this contaminated aquifer. A literature study by the API has shown that MTBE, and the related octane enhancer IPE (Isopropyl Ether), have several disturbing properties. Both MTBE and IPE:

o    have relatively high solubilities in water - an order of magnitude higher than BTX (Benzene, Toluene, Xylene)

o    have relatively high mobility in the subsurface - will move to the leading edge of a contamination plume

o    have low odor and taste thresholds in water

o    are relatively stable with respect to biodegradation

o    are expensive to remove from water - air stripping is required with follow-up treatment probably necessary to attain the extremely low discharge concentrations likely to be mandated by a governmental agency

We understand that Chevron currently utilizes MTBE at Port Arthur extensively and to a lessor extent in Pascagoula. We further understand that MTBE is anticipated to be used at some other Chevron refineries as the EPA mandated lead-phasedown continues to impact octane requirements. This projected increase in MTBE utilization concerns Marketing for two major reasons:

o    MTBE utilization could increase the cost to clean up leaks at service stations and terminals; and

o    MTBE could become a significant constituent of mogas storage water-draws and attact regulatory attention to Marketing terminal effluent. Marketing terminals generally route effluent through a simple API separator and have no facilities to treat or reduce dissolved component contamination.

CONFIDENTIAL: This document is subject to the September 21, 1999 Stipulated Protective Order entered by the San Francisco Superior Court, Case No. 999128.

CHEV 14902

MR. O. T. BUFFALOW                    - 2 -                    June 11, 1986

Please let us know what refineries are currently using MTBE or IPE. Although we expect usage varies with operating necessities at the refineries, please let us know which blends generally utilize MTBE/IPE and at what average concentrations. Please let us know what your future plans are with respect to these additives.

Thank you for your cooperation.

                                        —
                                    D. W. CALLAHAN

JK:J-2

cc:   Mr. R. W. Kreutzen    -    Please let us know if you are aware of any Chevron
                                 NPDES permits with MTBE limits, or expect future
                                 regulatory activity in this area.

      Circulating File - 2500

CONFIDENTIAL: This document is subject to the September
21, 1999 Stipulated Protective Order entered by the San
Francisco Superior Court, Case No. 999128.

CHEV 14903

**Memorandum**                                 San Francisco, CA
                                               December 30, 1986


                                    MTBE


MR. R. L. ARSCOTT:

Chevron USA Downstream has used MTBE in gasoline for a number of years.
Future use as an octane enhancer is likely to increase; and government
actions may stimulate additional use to reduce CO emissions from motor
vehicles and/or to reduce the aromatics in gasoline.  We are currently
evaluating the economics of building an MTBE plant.

Recently, we have learned of concerns about potential adverse health and
environmental effects of MTBE.  For example, the attachments indicate
that:

   • The U.S. Interagency Testing Committee has recommended chronic
     inhalation toxicity testing with monitoring of concentrations at
     terminals and service stations, and

   • The Maine Department of Environmental Protection has recommended
     either banning MTBE or imposing special storage requirements to
     protect groundwater.

Marketing has also heard of some concern in Europe that may spill over
to the U.S.

We would appreciate your assessment of available information concerning
health and environmental effects of MTBE and of the potential for
additional government limitations on the use of MTBE in gasoline.


                                    D. B. SMITH

BB:jsc                              Original Signed by        Original Signed by
                                    DIXON B. SMITH            M.A. JAVINSKY
cc:  Mr. C. L. Blackwell
     Mr. O. T. Buffalow
     Mr. D. W. Callahan
     Mr. R. D. Cavalli
     Mr. H. S. Quillicy
     Mr. E. E. Spitler
     Mr. R. W. Yose


bcc:  JPG
      MAJ
      XBK
      WHL
      DAB ✓



EXHIBIT
tables⁹  29
        799728

                                                           CH 009137

# Alcohol Week

CHEVRON CORPORATION

An exclusive report on a global fuels and feedstocks
LIBRARY   Vol. 7 No. 47 December 8, 1986

inside
Washington
Publication

## MAINE CALLS FOR DROPPING MTBE: CITES IT AS GROUNDWATER CONTAMINANT

A report detailing the hazards of methyl tertiary butyl ether (MTBE) as a groundwater contaminant has just been released by the Maine Dept. of Environmental Protection. According to the report, MTBE is not highly toxic but does spread through an aquifer more rapidly than other gasoline components, thereby concentrating the residual gasoline while contaminating drinking wells beyond the radius where gasoline would normally reach. The report concludes that MTBE should either be banned from addition to gasoline or at least stored in extra-secure containers.

MTBE was found to be soluble in water at 4.3%, compared to the relative insolubility of benzene at 0.18%, toluene at 0.05% and xylene at 0.02%. Since benzene, toluene and xylene are more soluble in ethers than in water they, along with the larger hydrocarbon molecules of gasoline, tend to linger and concentrate while the MTBE rushes into fresh water supplies, the report says.

Although Maine has set a maximum contaminant level for MTBE at 50 parts per billion (ppb), concentrations of 690 ppb were discovered in a drinking well near a gasoline/MTBE blend spill. At that site,

(continued on page 7)

the concentration of other gasoline components was only 10 ppb. The well nearest the spill had concentrations of up to 126,000 ppb gasoline plus MTBE, the report states. At another site, total concentrations exceeded 600,000 ppb in contrast to usual maximum concentrations for gasoline components near spills of only 10-20,000 ppb. The point is that MTBE not only leads other hydrocarbons through the aquifer but, as it spreads away, concentrates the remaining hydrocarbons, one of the authors said.

"Groundwater contaminated with MTBE is difficult to remediate," the report states. Carbon filtration is not cost-effective for MTBE since a 2-cu-ft bed used to treat household water only lasts a month or less at MTBE concentrations of as low as 10 ppb.

The report states that MTBE, now one of the top 50 chemicals produced in the U.S., is a very popular oxygenate in lieu of tetra-ethyl lead. Some 30 plants now produce MTBE; Texas Petrochemicals and ARCO are the largest producers. An additional 20 plants are planned, the report states. Of the U.S.' 60,000 barrels/day MTBE production, 95% originates in Texas. MTBE was first produced by ARCO in the 1960s when the company patented a process for removing branched olefins like isobutylene from hydrocarbon streams, the report states. The isobutylene is then combined with methanol. MTBE was not commercially produced until 1979 and production has increased by about 40% each year since 1980, the report states. It is currently used in about 10% of the U.S. gasoline supply but the proportion of gasolines blended with MTBE is expected to increase dramatically in coming years. Although the U.S. Environmental Protection Agency allows blending up to 11%, it is usually added at between 2% and 7% and mostly in unleaded premium gasolines.

Claims made about MTBE are that it has an octane blending value greater than that of toluene, reformate or alkylate; is compatible with all types of automobile materials; does not phase-separate as alcohols do; and that its use in gasoline reduces carbon monoxide and hydrocarbon emissions in most cars, the report states.

Not only does MTBE's greater solubility and lower ability to stick with soil and biological particles mean that its plume around a leak is greater than that of other gasoline components, but it also acts as a cosolvent for the gasoline components, thereby dragging them along behind, the report says. "The result is that the sum total of all dissolved gasoline components in groundwater is increased."

Although MTBE is not particularly toxic and is not carcinogenic, it has a "terpene-like" or "chemical" odor. "Our first contamination case, in 1984, was initially mistaken for one of hazardous waste leachate because of the unusual smell," it states. The odor can be detected at water concentrations as low as 20-50 ppb, the report states. Years after a spill, most of the plume will be only MTBE as the other gasoline components are biodegraded.

The report gives four reasons for concern over the toxicity of MTBE and its presence in domestic well water: it is very mobile in groundwater so that its concentration in a well may vary radically from week to week; plumes of MTBE in groundwater are associated with plumes of gasoline with its more varied and toxic components; MTBE is an irritant; and MTBE is probably a nervous system depressant like other ethers, and benzene, toluene and xylene.

MTBE is not the only villain when it comes to gasoline spills, however, the source said. The report offers three approaches regarding the MTBE problem, some of which would indirectly indict other gasoline additives including ethanol and methanol. Firstly, the report states that there is reason enough to call for the abandonment of MTBE as an additive in gasoline stored underground. Similarly, other octane enhancers including ethanol, methanol, and tertiary butyl alcohol may be equally soluble and have similar environmental effects to MTBE. Secondly, if MTBE use must continue, it by itself and when blended in gasoline should be stored only in double-contained facilities.

CH 009138

Mr E. Bay___ F 9/02/ MDN

Mr L. Y. Long

Mr C. R. Karr (Southwest Region Marketing) #7エ

**MEMORANDUM**

You may be interested in these documents, which Furman Foster (Northwest Region Gas. Mgr.) acquired

March 26, 1991

CHEMICAL ENTRY REVIEW
FOR MTBE

A. L. Perkins: From Salt Lake Refinery. 2 File items 4-12-91

I have completed the environmental group's portion of the chemical entry review for MTBE. Bill Davis has previously completed his Safety Review. I will include a copy of this memo with the chemical review materials that still must be reviewed by Earl Shirts before they are returned to Bill Davis and then to you.

We understand that you are preparing for possible entry of MTBE into the refinery (or marketing) and simply wanted to develop our concerns for using this material. Whether the facilities are installed by marketing or the refinery, our concerns listed below are the same, especially since we currently treat marketing's waste water and have some responsibilities for fighting fires at the marketing terminal.

Bill Davis and I have signed the chemical entry review sheet allowing MTBE entry into the refinery subject to the following conditions:

1. Meet Bill Davis' safety concerns (attached).

2. Meet the following environmental concerns.

   A. Spills or leaks of MTBE must be contained and prevented from contacting the ground or entering the waste water drainage system. This requirement includes above-ground impoundments at the unloading area to prevent hose disconnection spills. Sample stations also need to be engineered to prevent spills. Impoundments should be sealed like our hazardous waste pad.

   B. Contaminated soil or water that has contacted MTBE or other oxygenates will likely be a hazardous waste because of the low flash points. Proper disposal procedures should be established and published.

   C. Tanks containing MTBE should have double bottoms and leak detection systems.

   D. Provide proper facilities for shutdowns and tank cleaning to prevent any MTBE from being spilled or washing into the drainage system.

   E. Complete a HAZOP study on the planned facilities

EXHIBIT

tabbies 166

999/28

CH 007163

during the design phase of the project. Safety and
environmental concerns should be included in this
study.

The attached memo from the El Segundo environmental group
discusses the environmental effects of MTBE and MetHanol.
These chemicals are different than any other stocks that we
have handled in the refinery before and consideration needs
to be given towards mitigation of extreme environmental risks.

I will pass this information on to Earl Shirts for his review.
Please see me if you have any questions.

Jeff Johns

Attachments

cc: RER, MGE, MDM, TJF, JWJ, SLR, MRB, WRD, MLP

CH 00716

## Solving Problems from MTBE Contamination –

### It's Not Just Regulating Underground Tanks

Some have suggested that the problems observed with MTBE contamination of groundwater can be resolved by forcing gasoline manufacturers and retailers into more stringent underground storage tank requirements. They argue it's just the tanks – fix them from leaking, and the MTBE problem will go away. There are several reasons why this explanation over-simplifies the situation. While it is important to reduce the likelihood a release from underground tanks, the mandated use of oxygenates has had unintended consequences. The physical and chemical properties of MTBE (and thus its mobility and persistence in the environment differ markedly from other components of gasoline. These differences make MTBE (and other ethers and heavy alcohols) more likely to get into groundwater and problematic to contain and clean up when a release occurs. These differences include:

- MTBE is more volatile than many components in gasoline. This means it is more likely to evaporate into the atmosphere when a release occurs, which in turn can readily move into water vapor (and and subsequent rainfall) in the atmosphere.

- MTBE and other oxygenates are orders of magnitude more soluble in water than other gasoline components. Oxygenates make up one of largest single components in gasoline (10-15% by volume). They have a strong affinity for and dissolve easily in water (rainfall, surface waters, groundwater)

- Other gasoline components in comparison, bond more strongly to soil, should a release occur. This greatly reduces the volume of groundwater requiring clean-up, by limiting the area impacted.

- MTBE does not biodegrade as readily as other gasoline components, increasing the volume of groundwater impacted and making it more difficult to clean up.

Researchers at the University of California – Lawrence Livermore Laboratory[1] have concluded:

> MTBE has the potential to impact regional groundwater resources and may present a cumulative contamination hazard. To date, impacts of MTBE to public water systems have been limited and were similar in frequency to those of benzene. Based on historical data, future impacts of aromatic hydrocarbons, such as benzene to water supplies is not expected to be common, due to retardation and relative ease of biodegradation. In contrast, MTBE contamination may be a progressive problem due to the chemical's apparent recalcitrance and mobility. With a compound that appears both ubiquitous and recalcitrant, water resource management on the regional scale will become increasingly relevant.

---

[1] "An Evaluation of MTBE Impacts to California Groundwater Resources"; LLNL – June 11, 1998



EXHIBIT
221
999/28

These concerns on the mobility and persistence of MTBE in the environment are reinforced by a recent study by the state of Maine. The state found MTBE groundwater contamination from small spills of gasoline (e.g. a spill in a parking lot, or a car accident) – incidences that stood in contrast to the known historical causes of MTBE contamination e.g. point source discharges from leaking underground storage tanks.[1]

While MTBE and other oxygenates have been used for many years as gasoline blending components, it was only after the mandated use of oxygenates following the passage of the 1990 Clean Air Act Amendments, that oxygenates became as widely used as they are today. It is because of the differences in physical and chemical properties of MTBE that it is more likely to reach groundwater, as a result of incidental spills, overfills, and gasoline deliveries, *even without* underground storage tank leaks. Therefore, the detection of MTBE does not necessarily mean a tank is leaking. For example, MTBE has been found in low concentrations in lakes from rainfall runoff and recreational activities.

Congress passed requirements for owners and operators to upgrade their underground storage tanks, provide for leak detection, and provide for financial responsibility, should a release occur. These requirements became fully effective on January 1, 1999. As a company, Chevron began upgrading their tanks around the country in the early 1980's, years in advance of federal and state requirements. Over the years, Chevron has continued to go beyond federal requirements – for example, in the early 1990's Chevron decided to install double-walled tanks, even though they are not required, in all new and reconstructed service stations. In addition, last year Chevron began a nationwide program to reduce the likelihood of releases of gasoline into the environment. This program includes evaluation and monitoring of the most sensitive sites where groundwater exists, checking lines and connections of pumps and tanks, and changing station operating procedures and housekeeping practices.

Even these steps, which go far beyond federal and state requirements, can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they do get in the environment. Further, additional control measures could take years to implement, without fully solving the problem. The solution is to allow refiners the flexibility to avoid putting MTBE into gasoline in the first place. California Cleaner Burning Gasoline, the cleanest burning gasoline in the world, can be produced with little or no oxygenates and still meet the state's strict air quality requirements. Congress should pass HR 11 and S ( ) which would allow California refiners this flexibility.

---

[1] "The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water" ; October 13, 1998

CH 001983

*Jim Stambolis: This is marketing's*
*response to DSD. I'll discuss with*
*you later this week*
*Thanks.*
*Mack*
*5/2/95*

San Francisco, CA
April 27, 1995

**☰ Chevron**

Product Engineering

L....  1 RECD
MDK
JCK

CONFIDENTIAL

*EXHIBIT*
*109*
*999128*

MTBE IN GROUND WATER ISSUE

MR. D.J. O'REILLY:

This memo is in response to a note you wrote on a recent memo sent to you
(plus Mr. K.T. Derr and Mr. J.N. Sullivan) from Mr. R.L. Hartung regarding Methyl
Tert Butyl Ether (MTBE) contamination of ground water. You asked Mr. B.D.
Frolich and me if we were concerned and if any action was needed (memo
attached for your convenience). This response was developed by Product
Engineering in consultation with the Marketing Environmental, Health, and
Safety team, the Alternative Fuels group, Public Affairs, and Chevron Research
and Technology Company (CRTC).

Mr. Hartung's memo included a report by the United States Geological Survey
(USGS) that summarized MTBE properties, sources, fate in the environment,
and the discovery of MTBE in shallow ground water (mostly in urban areas).
The USGS report did not include data regarding MTBE contamination in the
deeper ground water used for drinking water, but stated that, ". . . there are few
data showing concentrations of MTBE at these deeper depths." It is not clear
what risk exists for MTBE transport from shallow groundwater to deeper ground
water used as drinking water. The American Petroleum Institute (API)
developed a response-only document in connection with the USGS report
(attached). The API document quotes a regional EPA administrator as saying,
"The concentrations (of MTBE) you find are substantially below anything that we
would remotely consider a human health risk."

The USGS report points out that gasoline blended with MTBE may pose a
greater risk to drinking water than non-oxygenated gasoline, because MTBE is
soluble in water, plus it resists soil filtration and decay compared to other
gasoline components. These concerns are not new, as Marketing raised the
same issues ten years ago in connection with the Tank Integrity Program.
Marketing does not believe that the urban shallow-ground-water MTBE
contamination described in the USGS report is an urgent or significant threat to
public health.

FIDENTIAL: This document is subject to the September
1999 Stipulated Protective Order entered by the San
cisco Superior Court, Case No. 999128.

CHEV 05693

Mr. D.J. O'Reilly
4/27/95
Page 2

It is not yet clear what impact the MTBE-in-groundwater issue will have on the ongoing efforts of some to restrict the use of MTBE in gasoline. Although the early media interest in the USGS report has been light, connecting a potential water pollution problem to MTBE in addition to the alleged health problems may make it even more difficult for environmentalists to support MTBE.

==Marketing believes that the MTBE in groundwater issue is just one more additional justification for the large Marketing capital investment in avoiding terminal and service station leaks and spills.== While the USGS report will be used by anti-MTBE organizations, we do not currently expect the report to generate substantial additional interest in regulating or restricting MTBE use in gasoline in the short term.

In Mr. Hartung's memo, he mentions that ARCO announced that it is embarking on their own MTBE/groundwater test program, and that ARCO encouraged others to do independent testing on their own areas of concern. We do not recommend that Chevron begin a groundwater testing program for MTBE. The Alternative Fuels group and CRTC will take the lead roles monitoring the MTBE-in-groundwater issue, and inform you of significant future developments.

Please contact me if you have any questions.

D.C. SMITH

Attachments

cc:     B.D. Frolich          J.B. Krider
        R.E. Zalesky          F. Sam
        R.M. Wilkenfeld       C.L. Blackwell
        L.S. Shushan

CONFIDENTIAL: This document is subject to the September 1999 Stipulated Protective Order entered by the San Francisco Superior Court, Case No. 999128.

CHEV 05694



7717840

Oct 17 2005
9:03PM

Wallace
King
Domike
Branson

WALLACE KING DOMIKE & BRANSON, PLLC
1050 THOMAS JEFFERSON STREET, N.W.
WASHINGTON, DC 20007

Phone 202.204.1000
Fax 202.204.1001

William F. Hughes
Direct Dial 202.204.3727
bhughes@wallaceking.com

October 17, 2005

*Via LexisNexis File & Serve*

Robin L. Greenwald
Weitz & Luxenburg, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038-4925

    Re:    *In re: MDL 1358 Products Liability Litigation*

Dear Ms. Greenwald:

        On behalf of the Chevron Defendants, this letter provides information responsive
to Judge Scheindlin's August 12, 2005 directive regarding disclosure of involvement in
national and regional trade associations on issues related to oxygenates and/or
underground storage tanks ("USTs"). Based upon their investigation thus far, the
Chevron Defendants provide the following information:

**American Petroleum Institute**

        Defendant Chevron Corporation[1] has been a member of the American Petroleum
Institute ("API") since a date prior to the relevant time. On various occasions during the
relevant time period, certain employees of Chevron Corporation and/or affiliated entities,
including defendant Chevron U.S.A. Inc., participated in various API committees that
may have addressed certain matters related to oxygenates and/or USTs. These
committees include: (1) Ad Hoc MTBE Coordination Group; (2) Soil/Groundwater
Technical Task Force; (3) MTBE Research Group; (4) RFG Certification Work Group;
(5) Ad Hoc RFG Certification Protocol Subgroup; (6) Section 211(b) Research Group;
(7) Ad Hoc Oxygenates Group; (8) Clean Air Act Ad Hoc Committee on PPC; (9)
Toxicology Committee; (10) Petroleum Industry Workgroup on Methanol Research; (11)

---

[1] Chevron Corporation has operated under several names during the relevant time period: (1) Standard Oil
Company of California (from a date prior to 1979 until July 1984), (2) Chevron Corporation (July 1984-
Oct. 2001 and May 2005-present), and (3) ChevronTexaco Corporation (Oct. 2001-May 2005). These
entities are referred to collectively herein as Chevron Corporation.



Wallace
King
Domike
Branson

Robin L. Greenwald
October 17, 2005
Page 2

Fuels Committee; (12) Fuels Task Force; (13) Water Subcommittee Water Quality and
Water Protection Task Force; and/or (14) Vehicle Emissions Task Force.[2]

## Western States Petroleum Association

Defendant Chevron Corporation and/or affiliated entities have belonged to the
Western States Petroleum Association ("WSPA") since a date prior to the relevant time
period.[3] On various occasions during the relevant time period, employees of Chevron
Corporation and/or affiliated entities participated in the following WSPA committees that
may have addressed certain matters related to oxygenates and/or USTs: (1) MTBE Task
Force; (2) Ad Hoc MTBE Task Force; (3) Ad Hoc WSPA MTBE Treatability Task
Force; (4) RFG Advocacy Task Force; (5) Fuels Subcommittee RFG Compatibility
Issues Technical Task Force; (6) Ad Hoc RFG Group; (7) Remediation Task Force; (8)
Toxic Air Contaminant Task Force; and/or (9) Ad Hoc Group on MTBE.

## Other Industry Organizations

On various occasions during the relevant time period, Chevron Corporation
and/or affiliated entities (including defendant Chevron U.S.A. Inc.) were members of
and/or participated in the following industry associations that may have addressed certain
matters involving oxygenates and/or USTs: (1) Independent Petroleum Association of
America; (2) Interstate Technology Resource Council; (3) National Petrochemical
Refiners Association; (4) National Petroleum Council; (5) Petroleum Environmental
Research Forum; (6) Reformulated Gasoline Survey Association; (7) Resource
Environmental, LLC; (8) Society of Automotive Engineers; (9) Society of Independent
Gasoline Marketing America; (10) Western Petroleum Marketers Association; and/or
(11) certain divisions of U.S. Oil & Gas.

The Chevron Defendants provide this information to the best of their knowledge.
The Chevron Defendants are continuing their investigation and reserve the right to amend
and/or supplement this response should they discover additional information.

---

[2] Prior to 1984, defendant Chevron U.S.A. Inc. was known as Gulf Oil Corporation. From a date prior to
the relevant time period until approximately 1984, Gulf Oil Corporation was a member of API. Defendant
Texaco Inc. was a member of API from a date prior to the relevant time period until 2001.

[3] Prior to 1988, WSPA was known as the Western Oil and Gas Association.

 Wallace
King
Domike
Branson

Robin L. Greenwald
October 17, 2005
Page 3

Sincerely,

William F. Hughes

cc:   All Counsel (via LNFS)

# Exhibit 9

## Legal Retention at MSXSOC

| | |
|---|---|
| From: | Stanley CC (Curtis)  at MSXWHWTC |
| Sent: | Wednesday, May 13, 1998 11:49 PM |
| To: | Parkinson CD (Chris)  at OPC |
| Cc: | Gustafson JB  at SHELL RESEARCH THORNTON; Sykes RM  at SIEP |
| Subject: | MTBE issues |

Chris,

I'm sorry that it has taken me awhile to get back to you on MTBE issues.  I know that you are beginning to feel the heat (it will get much hotter).  As you are aware, MTBE is one of the biggest environmental issues that US oil companies are facing due to 1) MTBE's wide occurrence in groundwater, 2) MTBE's high migration potential, 3) MTBE's impact on several high visibility municipal well systems, 4) MTBE's very low odor and taste thresholds, and 5) the difficulty and high cost associated with treating MTBE in water.  My first association with MTBE was in 1980 at Rockaway, NJ where 4,000 people were tasting ether (MTBE and DIPE) in their water supplied from a municipal well.  The problem in the US in now much worse.  I hope that the following information will help put the issue in perspective for you.  As you are reviewing this information and have any questions, please feel free to call me.

Cal EPA Brfg 3 98.doc

a very well written and balanced paper from a state perspective

MTBE research table 4-98.doc

This is MTBE research conducted by API's Soil/Groundwater Technical Task Force which I chair

EPA MTBE Proj. list

state activities

FW California MTBE Advisory P...

California activities mandated by the legislature

MTBE editorial.doc

This is an editorial that the National Ground Water Association requested that I write for the Association of Ground Water Scientists and Engineers (May/June issue 1998)

mbsfas.doc

This is an API fact sheet from my Task Force

MTBE National Perspective 2.pp...

This is a presentation that I have made to Shell Mgmt

EXHIBIT

tablels

1

999128

EQ 028732



This is a table that I modified from some of John's work for my editorial



This is an MTBE remediation presentation that I made to Shell's remediation managers

In addition to the above references, I am in the process of writing two papers on MTBE considerations for RBCA. These papers will be presented 1) next week at the Battelle Conf on Recalcitrant Compounds, and 2) at the NGWA conf on MTBE in LA in June. We are also conducting work with decision analysis tools to help guide our remediation efforts for MTBE.

I'm sure this is much more than you bargained for, but like I said, if you have any questions, I'm only a call away.

Best Regards,

## Curtis C. Stanley

Environmental Technology Directorate - Soil and Groundwater
Westhollow Technology Center
(phone-⊗2) 281-544-7675   (fax-⊗) ) 281-544-8727
e-mail: ccstanley@rhellus.com
(This communication per applicable agreements between our respective companies.)

2

EQ 028733

Legal Retention at MSXSOC

| From: | Stanley CC (Curtis)  at MSXWHWTC |
|---|---|
| Sent: | Tuesday, November 03, 1998 12:21 AM |
| To: | Pedley JF (Joanna)  at MSXWHWTC; Benton F R [Newcos] |
| Cc: | Mcarragher S (Steve)  at OPC |
| Subject: | RE: MTBE IN GROUNDWATER - ISSUES BRIEF |

I am out of the office and will return on Thursday.  Based on a quick review of the attached material, there are several points that need to be made.

1) Very small releases of MTBE (even small overfills seeping into cracks in the pavement) have the potential to adversely impact groundwater

2) Based on engineering reliability studies, it is likely that a high percentage of sites using MTBE, have a soil and/or groundwater problem.  This problem is not just the result of leaking tanks, lines, fills, and dispensers, but is also a result of certain operations.

3) Due to MTBE's high solubility and low attenuation rates, it has the potential to migrate large distances relative to benzene (see attached paper)

4) Those sites which are located over potable groundwater are potentially very high risk sites.

5) Odor and taste will drive the cleanup goals rather than risk.  We are currently looking at cleanup goals between 5-15ppb.

6) Once in groundwater, MTBE is extremely difficult to remediate.  It's Henry's Law coefficient is very low which means that MTBE prefers to stay in the aqueous phase rather than being sorbed or stripped out of water.  Air sparging will be relatively ineffective.  We are currently evaluating biological and oxidation remediation techniques.

7) A simple risk assessment for all sites (like we are in the process of developing) will greatly help focus future resources.

My professional opinion is that MTBE and similar oxygenates should not be used at all in areas where groundwater is a potential drinking water supply.  If it is used, engineering design and site operations (including active subsurface monitoring) should be carefully developed to minimize the potential for a release.

Curt



ngwa MTBE2
5-3-98.ppt



EXHIBIT

labbles'

2
749/28

——Original Message——
| From: | Pedley JF (Joanna)  at MSXWHWTC |
|---|---|
| Sent: | Monday, November 02, 1998 6:24 PM |
| To: | Benton F R [Newcos] |
| Cc: | Stanley CC (Curtis)  at MSXWHWTC; Mcarragher S (Steve)  at OPC |
| Subject: | FW: MTBE IN GROUNDWATER - ISSUES BRIEF |

Ron -
As discussed earlier today, grateful for your comments (US perspective additions ?) on the attached.  Also by copy to Curtis - please could you review also.

nb: Steve had some sections highlighted in red in his original.  I have made a few first pass suggested mods which are in blue with strikeouts of the original in black.  Please feel free to change my mods.

From: Joanna Pedley
Equilon Enterprises LLC

Manager Fuels Technology
Westhollow Technology Center - M2603
Tel: 281 544 7795
Fax: 281 544 8585
email: jfpedley@shellus.com
        jfpedley@equilon.com

THIS COMMUNICATION PER APPLICABLE AGREEMENTS BETWEEN OUR RESPECTIVE COMPANIES

| From: | McArragher, Steve SIPC-OBMF/51 |
|---|---|
| Sent: | Tuesday, October 27, 1998 8:30 AM |
| To: | Pedley, Joanna SHLOIL—; Lee, Rob  SHLOIL— |
| Cc: | Wynn-Williams, William SIPC-OBX |
| Subject: | MTBE IN GROUNDWATER - ISSUES BRIEF |

Joanna, Rob, as discussed with Rob last week, we are starting to worry about the MTBE contamination issue outside

1

EQ 033388

êMSG FROM: WH889CCS--VM19      TO: MK59MDM·--VM01          07/15/93 07:28:39
To: MK59MDM --VM01

*** Reply to note of 07/14/93 19:23
Curtis C. Stanley
Staff Hydrogeologist - Environmental RD&T
Subject: Bolsa Chica @ Edinger, Huntington Beach

Sounds like you guys are covering the bases as best as you can.  We need to
convince management to implement dual containment NOW!

Curtis C. Stanley
Staff Hydrogeologist - Environmental RD&T
Profs Nickname: HYDRO1_____  Location: WRC ET-102
Bell: 493-7675   SSN: 433-7675
ÿÿ□□□□Bolsa Chica @ Edinger, Huntington Beach                          R□□
êMSG FROM: MK59MDM --VM01      TO: WH889CCS--VM19          07/14/93 19:23:54
To: WH889CCS--VM19

*** Reply to note of 07/14/93 08:32
From: DAN MCGILL, MDM1
Subject: Bolsa Chica @ Edinger, Huntington Beach
The tanks were single wall with single wall lines (two of the lines were also
leaking under the dispensers). We need some help out here... this stuff is
going to greatly increase the cost of our clean-ups. The one good note is that
MTBE is acting as a tracer for leaks - this is the second time that our lab
data has indicated that we we having an on going release. Our lab "screens"
all of our groundwater samples for MTBE and gives me a call if MTBE shows up
some where we have not seen it before.

cc: MK40PJP --VM01      P J PUGNALE

M. DANIEL McGILL
ENVIRONMENTAL ENGINEER
ANAHEIM, CALIFORNIA
SSN 520-3370
ÿÿ□□□ÅBolsa Chica @ Edinger, Huntington Beach                          R□□
êMSG FROM: WH889CCS--VM19      TO: WH889ALO--VM19          07/15/93 11:22:36
To: WH889ALO--VM19      A L OTERMAT

Curtis C. Stanley
Staff Hydrogeologist - Environmental RD&T
Subject: Tech. Assurance Paragraph for Waste Site Manager's Meeting

Per Environmental RD&T's technical assurance role in Product's, a draft paper
describing componenets for achieving technical assurance at waste sites
was presented. Copies of this document will be distributed to all waste site
managers for comments. A key component for technical assurance is based around
waste site technical teams on higher priority sites.  These teams will function
in much the same way that groundwater teams work at manufacturing locations.
Comments will be reviewed at the next Waste Sites Team Meeting and a final
document will then be prepared.

Curtis C. Stanley
Staff Hydrogeologist - Environmental RD&T
Profs Nickname: HYDRO1_____  Location: WRC ET-102
Bell: 493-7675   SSN: 433-7675



| | |
|---|---|
| From: | Stanley CC (Curtis)  at MSXWHWTC |
| Sent: | Thursday, May 14, 1998 10:25 AM |
| To: | Bell, Kathy; Boschetto, Brad; Broussard, Gweneyette; Chiang, Chen, Chou, Chi-su; Daly, Phil; Darmer, Ken; Dedoes, Robert; Deeley, George; Devaull, George; Dinkfeld, Edward; Dorn, Phil; Dove, John; Ettinger, Robert; Farrier, Daniel; Franceschini, Timothy; Gallagher, Michael; Gilimore, Kathleen; Green, Tom; Hansen, Erik; Hastings, Robert; Hong, Marjorie; Hsu, Ed; Ivie, Jerry; Jacobs, Joe; Krewinghaus, Bruce; Lewis, Richard; Lieder, Chuck; Lyons, Karen; Marshall, Glen; Miller, Jim; Miller, Jonathan; Neaville, Chris; Otermat, Art; Pugnale, Pete; Register, Allen; Rhodes, Ileana; Salanitro, Joe; Schroder, Richard; Sepesi, John; SHELTON, CHARLES; Spinelle, John; Spinnler, Gerard; Springer, Ken; Stearns, Steve; Sun, Paul; White, Christine |
| Cc: | Gustafson JB  at SHELL RESEARCH THORNTON; Parkinson CD (Chris)  at OPC |
| Subject: | FW: MTBE CONTAMINATION |

This article highlights the issue around leak detection and backs up our research that extremely small releases can cause groundwater problems. ) I think that this issue may cause us to reevaluate how we do leak detection in environmentally sensitive areas

## *Curtis C. Stanley*

Environmental Technology Directorate - Soil and Groundwater

Westhollow Technology Center

(phone-☺2)  281-544-7675  (fax-☺) )  281-544-8727

e-mail:  ccstanley@shellus.com

(This communication per applicable agreements between our respective companies.)

-----Original Message-----

| | |
|---|---|
| From: | Judy Shaw [SMTP:shaw@api.org] <mailto:[SMTP:shaw@api.org]> |
| Sent: | Thursday, May 14, 1998 7:55 AM |
| To: | Al Jessel; Brian Hamey; Carol Fairbrother; Curt Stanley; Dave Peirce; David Smith; Don Gilson; Eric Vogt; Gene Mancini; Georgia Callahan; Gerry Raabe; Gweneyette Broussard; James Rocco; Jeff Sickenger; Jim Ford; Jim Stevenson; John Taunton; Lee Hoffman; Mark Saperstein; Mary Kate Kell; Mike Wang; Ned Seppi; Ron Benton; Tim Buscheck; William Doyle |
| Cc: | Alexis Steen; Bill Bush; Bill Frick; Bob Greco; bruce bauman; Carol Henry; Chuck Krambuhl; David Deal; David Lax; Debi Tulou; Dee Gavora; Eldon Rucker; Howard Feldman; Jim Williams (MDM); Karen Inman; Kim Ashton; Larry Magni; Marc Meteyer; Martha Jordan; Molly Sinclair; Rick Brown; Robert Barter; Ron Chittim; Theresa Pugh; Tom Lareau; Valerie Ughetta |
| Subject: | FW: MTBE CONTAMINATION |

FYI, more info on Maine. Judy

> ---------
> From:    Bruce Bauman
> Sent: Wednesday, May 13, 1998 3:21 PM
> To:    Kim Ashton; Judy Shaw; Robert Barter; Molly Sinclair
> Cc:    Creg Smith; Larry Magni; Denise McCourt
> Subject:   RE: MTBE CONTAMINATION
>
> Here are links to the Monday and Tuesday articles if you want any gory
> details.  Look like they will have fun with this one.
> The Monday article notes that this is a new gas station that just
> opened in July 1997, so this incident, if tied to this facility, will
> likely raise questions (again) about the adequacy of fully upgraded
> USTs and their leak detection systems to prevent releases and to
> detect them properly.  It seems this release was only detected through
> some on-site wells drilled for a proposed property transfer. . . .
>
>
> http://www.portland.com/monews/story3.htm
>
> http://www.portland.com/tunews/story5.htm
>



EXHIBIT
tabbies®
985
999128



1

SH 032805

## Legal Retention at MSXSOC

| | |
|---|---|
| **From:** | Stanley CC (Curtis)  at MSXWHWTC |
| **Sent:** | Tuesday, February 02, 1999 6:28 PM |
| **To:** | Benton F R [Newcos] |
| **Subject:** | RE: Draft WSPA Q&A on MTBE |

Ron,

The paper looks fine.  You may, however, want to carefully consider what you say when the new tank upgrades are our first line of defense.  While this is very true and the size of leaks has decreased substantially over the years, we are still finding MTBE at sites that have been upgraded.  The presence of MTBE may not be due to  a leak but could also be due to operational and construction factors.

Curt

| | |
|---|---|
| ——Original Message—— | |
| **From:** | Benton F R [Newcos] |
| **Sent:** | February 02, 1999 7:48 AM |
| **To:** | Kulakowski James M [Texaco]; Olejnik Larry J [Newcos]; Hancock Steve R [Newcos]; Molina Bert  [Newcos]; Meeuwsen Mike J [Newcos]; Stanley CC (Curtis)  at MSXWHWTC |
| **Subject:** | Draft WSPA Q&A on MTBE |

Please let me know if you have any input/concerns.

| | |
|---|---|
| ——Original Message—— | |
| **From:** | DMFog@aol.com [SMTP:DMFog@aol.com] |
| **Sent:** | Friday, January 29, 1999 7:34 PM |
| **To:** | frbenton@equiva.com |
| **Subject:** | Oops! |

Ron:
I'm a cyber-dummy. Accidentally pushed the delete instead of the print button
on your email comment on the MTBE Q&A.  Please resend.  Attached is the latest
draft which reflects all other comments.

Dave << File: Q&A.DOC >>

**EXHIBIT**
tables*
50
999128

1

EQ 035436

Page 1

```
 1         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2            IN AND FOR THE COUNTY OF SAN FRANCISCO
 3                         --o0o--
 4   SOUTH TAHOE PUBLIC UTILITY    )
     DISTRICT,                     )
 5                                 )
              Plaintiff,           )
 6                                 )
           vs            )   No.  999128
 7                       )      VOLUME I
     ATLANTIC RICHFIELD COMPANY    )
 8   ("ARCO'); ARCO CHEMICAL COMPANY;)
     SHELL OIL COMPANY; CHEVRON    )
 9   U.S.A., INC.; EXXON CORPORATION;)
     B.P. AMERICA, INC.; TOSCO     )
10   CORPORATION; ULTRAMAR, INC.;  )
     BEACON OIL CO.; USA GASOLINE  )
11   CORPORATION; SHELL OIL PRODUCTS )
     CO.; TERRIBLE HERBST, INC.;   )
12   ROTTEN ROBBIE; J.E. TVETEN    )
     CORP.; TAHOE TOM'S GAS STATION; )
13   THE SOUTHLAND CORP.; PARADISE  )
     CHEVRON; and DOES 1 through 600,)
14   inclusive,                    )
                                   )
15            Defendants.   )
     _____)
16
17                  --o0o--
                THURSDAY, MAY 6, 1999
18                  10:03 A.M.
                    --o0o--
19              DEPOSITION OF
                CURTIS STANLEY
20                  --o0o--
21
22
23
24   CATHLEEN SLOCUM, CSR
     License No. 2822
25
```

Page 2

```
 1                        ii
 2                     COUNSEL
 3
     For the Plaintiff:
 4
         MILLER, SHER & SAWYER
 5       BY:  DUANE C. MILLER, ESQ.
         7 Park Center Drive, Suite 1
 6       Sacramento, California 95825-5407
 7   For the Defendants Shell Oil Company, Shell Products
     Company, Equilon Enterprises, LLC, Exxon Corporation,
 8   Texaco, Inc., and Tesoro Petroleum Corporation:
 9       McCUTCHEN, DOYLE, BROWN & ENERSEN, LLP
         BY:  COLLEEN P. DOYLE, ESQ.
10       355 South Grand Avenue, Suite 4400
         Los Angeles, California 90071
11
     For the Defendant Chevron USA:
12
         LANDELS, RIPLEY & DIAMOND, LLP
13       BY:  RICHARD C. COFFIN, ESQ.
         350 The Embarcadero
14       San Francisco, California 94105-1250
15   For the Defendant Atlantic Richfield Company:
16       ARNOLD & PORTER
         BY:  HILARY L. ADEL, ESQ.
17       777 South Figueroa Street, 44th Floor
         Los Angeles, California 90017-5844
18
     For the Defendant Terrible Herbst, Inc.:
19
         PRICE, POSTEL & PARMA
20       BY:  CRAIG A. PARTON, ESQ.
         200 East Carrillo Street
21       Santa Barbara, California 93101
22   For the Defendant ARCO Chemical Company:
23       STEPTOE & JOHNSON, LLP
         BY:  KEVIN C. MAYER, ESQ.
24       633 West Fifth Street, Suite 700
         Los Angeles, California 90071
25
```

Page 3

```
 1                       iii
                       COUNSEL
 2
 3   For the Defendant BP Exploration and Oil, Inc.:
 4       BROBECK, PHLEGER & HARRISON, LLP
         BY:  WILLIAM K. DIAL, ESQ.
 5       555 South Hope Street
         Los Angeles, California 90071
 6
 7   For the Cross-Defendant Keith A. Tallia, Inc.:
 8       HEWITT & PROUT
         BY:  MICHAEL J. LeVANGIE, ESQ.
 9       980 Ninth Street, Suite 1700
         Sacramento, California 95814
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                       iv
 2                  I N D E X
 3   EXAMINATION                    Page
 4   By Mr. Miller                    5
 5   Certified Questions             vi
 6   Reporter's Certificate         181
 7                  --o0o--
 8            E X H I B I T S
 9   Plaintiff's                    Page
10   1   MTBE White Paper            9
11   2   Memo from CC Stanley to PL Cuneo   17
12   3   Page 6 of Presentation to the   25
         OEL Committee dtd July 18, 1986
13
14   4   Memo to Groundwater Technical Task   39
         Force from David H. Chen dtd
15       February 2, 1987 with attachments
16   5   Letter to Dr. Jay Lehr from     57
         D.H. Chen dtd January 28, 1987
17   6   Paper on Methyl Tertiary Butyl   51
         Ether as a Ground Water Contaminant
18       by Peter Garrett, Marcel Moreau
19   6a   Better copy of Exhibit 6    64
20   7   Inside EPA - February 13, 1987   67
21   8   Memo to Groundwater Technical   79
         Task Force from David H. Chen
22       dtd July 11, 1986
23   8a   Memo to Groundwater Technical   80
         Task Force from David H. Chen
24       dtd January 14, 1987 with
         attachment
25
```

Page 125

1     Okay.  I'll identify it.  It's dated Wednesday,
2   May 13, 1998.  And you appear to be the author.  It says
3   from CC Stanley.  Is this your document?
4   A   It appears to be.
5   Q   It was sent to Mr. Parkinson.  Who is he?
6   A   I believe he is a person that works in The Hague.
7   Q   And it says Mr. Parkinson is at OPC.  What does that
8   refer to?
9   A   I'm not sure exactly what that means.
10  Q   Okay.  Is this a communication you would have sent to
11  him in May of 1998, sir?
12  A   It appears so.
13  Q   And, of course, at the time you would have been a Shell
14  employee?  If you're writing to The Hague, I don't know,
15  but --
16  A   I still do.
17  Q   Oh.
18       MS. DOYLE:  Say you don't know.
19       THE WITNESS:  I was either Shell or Equilon.
20       MR. MILLER:  Q   Does July sound familiar, is that
21  D-day when they switched to Equilon?
22  A   I thought it was the beginning of the year, but I'm not
23  sure.
24  Q   All right.  Whatever.  We'll figure that out later.
25  A   Okay.

Page 126

1   Q   Mr. Parkinson's first name apparently is Chris?
2   A   Yes.
3   Q   So the letter begins, "Chris, I'm sorry that it has
4   taken ... awhile to get back to you on MTBE issues.  I know
5   that you are beginning to feel the heat (it will get much
6   hotter)."  By the way, were you referring to the temperature
7   or something else?
8   A   I don't remember what I was referring to.  I'd have to
9   see the note he sent to me.
10  Q   Well, let's continue with the next sentence.  That
11  might help us.  "As you are aware, MTBE is one of the
12  biggest environmental issues that US oil companies are
13  facing..."
14  A   Yes, I see that.
15  Q   That was your statement at the time?
16  A   Yes.
17  Q   And when you write to The Hague, I mean, that's where
18  the head of the company is, right?
19  A   Among other --
20  Q   Royal Dutch Shell?
21  A   Partly.
22  Q   So you tried to be accurate in writing this; is that
23  correct?
24  A   I always try to be accurate.
25  Q   Okay.  All right.  So you go on to state why MTBE is

Page 127

1   one of the biggest environmental issues that US oil
2   companies are facing today, you give five reasons, correct?
3   A   Yes.
4   Q   The first is, "MTBE's wide occurrence in groundwater"?
5   A   Yes.
6   Q   The second is, "MTBE's high migration potential"?
7   A   Relative to benzene, yes.
8   Q   The third is, "MTBE's impact on several high visibility
9   municipal well systems," correct?
10  A   Yes.
11  Q   What high visibility municipal well systems were you
12  talking about?
13  A   I may have been referring to sites like Rockaway or
14  even Santa Monica.
15  Q   Okay.  Four, the fourth reason you give, "MTBE's very
16  low odor and taste thresholds," correct?
17  A   That's what I say.
18  Q   And five, "The difficulty and high cost associated with
19  treating MTBE in water"?
20  A   Relative to benzene, yes.
21  Q   The quote is, "The difficulty and high cost associated
22  with treating MTBE in water," end quote?
23  A   That's true, but my intent to him was other than
24  benzene.
25  Q   Okay.  I have some questions about this.

Page 128

1   A   Okay.
2   Q   Why were you writing to someone in The Hague
3   identifying the significance of the MTBE problem for US oil
4   companies?
5   A   I don't recall specifically without seeing his note
6   that I was responding to.
7   Q   When you talk about MTBE having a high migration
8   potential, what you're saying is that it's very mobile in
9   groundwater, correct?
10  A   Relative to BTEX.
11  Q   And when you say it has a very low odor and taste
12  threshold, you're saying it can make the taste of water
13  unpleasant, correct?
14  A   At some concentration that would be true.
15  Q   And it would have a bad odor as well?
16  A   At some concentration.
17  Q   Okay.  And you're not an expert at what that
18  concentration would be, that's not your field?
19  A   That's right.
20  Q   But you've heard complaints from people that have drank
21  water containing MTBE firsthand, haven't you?
22  A   Yes.
23  Q   Some of them were upset?
24       MS. DOYLE:  Objection.  Calls for speculation.
25       THE WITNESS:  I don't recall.

Wallace
King
Domike
Branson

WALLACE KING DOMIKE & BRANSON, PLLC
1050 THOMAS JEFFERSON STREET, N.W.
WASHINGTON, DC 20007

Phone 202.204.1000
Fax 202.204.1001

PETER C. CONDRON
Direct Dial 202.204.3707
pcondron@wallaceking.com

October 17, 2005

**VIA LEXIS/NEXIS FILE AND SERVE**

Robin L. Greenwald, Esq.
Weitz & Luxenburg, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038-4925

Re:     *In re: MDL 1358 Products Liability Litigation*

Dear Ms. Greenwald:

On behalf of the Shell Defendants, this letter provides information responsive to Judge
Scheindlin's August 12, 2005 directive regarding disclosure of participation in national
and regional petroleum industry trade associations that focus on issues related to
oxygenates and/or underground storage tanks ("USTs"). Based upon their investigation
thus far, the Shell Defendants submit the following membership information:

**American Petroleum Institute (API)**

Shell Oil Company has been a member of API from 1950 though the present. During this
period, representatives of Shell Oil Company and/or its various affiliates and subsidiaries
may have participated in the following subcommittees and task forces: the 211(b)
Research Group, the Ad Hoc Committee on MTBE, the Ad Hoc MTBE Coordination
Group, the Fuels Committee, the Fuels Group Program, the Fuels Task Force, and the
Soil/Groundwater Technical Task Force.

**Louisiana Mid-Continent Oil & Gas Association (LMOGA)**

Shell Oil Company and members of its various affiliates and subsidiaries, including
Equiva Enterprises, Motiva Enterprises and Shell Oil Products US f/k/a Equilon
Enterprises, have been members of LMOGA since at least 1980. During this period,
representatives of Shell Oil Company and/or its various affiliates and subsidiaries may
have participated in the Subcommittee on Air that was originally formed to consider the
Clean Air Act Amendments of 1990.

Wallace
King
Domike
Branson

Robin L. Greenwald
October 17, 2005
Page 2

## Mid-Continent Oil and Gas Association

Shell Oil Company and/or its various affiliates and subsidiaries are current members of the Mid-Continent Oil and Gas Association.

## National Petrochemical and Refiners Association (NPRA)

Shell Oil Company has been a member of NPRA from 1999 through the present.

## National Petroleum Council (NPC)

Shell Oil Company and/or its various affiliates and subsidiaries have been members of NPC since 1946.

## Petroleum Environmental Research Forum (PERF)

Shell Oil Company and/or its various affiliates and subsidiaries are current members of PERF.

## Petroleum Marketers Association of America (PMAA)

Shell Oil Company has never been a member of PMAA. Shell Oil Company does support PMAA, though, through a corporate sponsorship.

## Reformulated Gasoline Survey Association

Shell Oil Company and/or its various affiliates and subsidiaries are current members of the Reformulated Gasoline Survey Association.

## Society of Independent Gasoline Marketers of America (SIGMA)

Shell Oil Company and/or its various affiliates and subsidiaries have been members of SIGMA since 1992 through the present.

## Western Petroleum Marketers Association (WPMA)

Shell Oil Company and/or its various affiliates and subsidiaries, excluding Motiva Enterprises and Equiva Enterprises, are current members of WPMA.

## Western States Petroleum Association (WSPA)

Shell Oil Company has been a member of WSPA since a date prior to the relevant time period. During this time, representatives of Shell Oil Company and/or its various affiliates and subsidiaries may have participated in the MTBE Task Force subcommittee.

Wallace
King
Domike
Branson

Robin L. Greenwald
October 17, 2005
Page 3

The Shell defendants have provided this information, including dates of membership, to
the best of their knowledge. The Shell defendants are continuing their investigation and
reserve the right to supplement this response should they discover additional information.

Very truly yours,

Peter C. Condron

cc:   Counsel of Record (via LexisNexis File and Serve)

Page 1

```
 1                            1
 2                  DEPOSITION
                       OF
 3              CARSON C. CONAWAY
              (A Non-Party Witness)
 4
 5
   DATED:  November 17, 2000
 6       White Plains, New York
         10:00 a.m.
 7
          Patrick M. DeGiorgio, Reporter
 8
 9
10
11  SUPERIOR COURT OF THE STATE OF CALIFORNIA
    IN AND FOR THE COUNTY OF SAN FRANCISCO
12  - - - - - - - - - - - - - - - - - X
    SOUTH TAHOE PUBLIC UTILITY DISTRICT,
13
            Plaintiff,
14
         against,        Civil No. 999128
15
    ATLANTIC RICHFIELD COMPANY ("ARCO"); ARCO
16  CHEMICAL COMPANY; SHELL OIL COMPANY;
    CHEVRON U.S.A., INC,; EXXON CORPORATION;
17  B.P. AMERICA, INC.; TOSCO CORPORATION;
    et al.,
18
            Defendants.
19  - - - - - - - - - - - - - - - - - X
20
21
22
23
24      Mary T. Babiarz Court Reporting Service
        11 Market St., Poughkeepsie, N.Y. 12601
25             (845) 471-2511
```

Page 2

```
 1                            2
 2
 3   SUPERIOR COURT OF THE STATE OF CALIFORNIA
 4
 5   IN AND FOR THE COUNTY OF SAN FRANCISCO
 6   - - - - - - - - - - - - - - - - - X
 7
 8   COMMUNITIES FOR A BETTER ENVIRONMENT,
 9   a California Non-Profit Corporation,
10   on behalf of the General Public,
11
12            Plaintiff,
13
14         against,        Civil No. 997013
15
16   UNOCAL CORPORATION, a Delaware
17   corporation et al.,
18
19            Defendants.
20
21   - - - - - - - - - - - - - - - - - X
22
23
24
25
```

Page 3

```
 1                            3
 2  APPEARANCES:
 3
 4    MILLER, SHER & SAWYER, P.C.
         Attorneys for Plaintiff, SOUTH TAHOE
 5       PUBLIC UTILITY DISTRICT
         100 Howe Avenue
 6       Suite S-120
         Sacramento, California 95825
 7    BY:  DUANE C. MILLER, ESQ.
 8
 9    SEDGWICK, DETERT, MORAN & ARNOLD
         Attorneys for Defendants, SHELL OIL
10       COMPANY, SHELL OIL PRODUCTS COMPANY,
         EQUILON ENTERPRISES, L.L.C., TEXACO,
11       INC.
         One Embarcadero Center
12       16th Floor
         San Francisco, California 94111-3628
13    BY:  STEPHEN W. JONES, ESQ.,
         of Counsel
14
15
16
17
18  Also Present:
    John Schoenberger, Videotape Operator
19  Legal Video Services
20
21
22
23
24
25
```

Page 4

```
 1                            4
 2   THE VIDEOTAPE OPERATOR:
 3        My name is John Schoenberger,
 4   videotape operator.  I'm employed by Legal
 5   Video Services of Goshen, New York.  We are
 6   retained by the firm of Miller, Sher &
 7   Sawyer of Sacramento, California to
 8   videotape the sworn testimony of Dr. Carson
 9   Conaway in the matter of South Tahoe Public
10   Utility District, plaintiff, against
11   Atlantic Richfield Company, et al,
12   defendants.
13        This proceeding is being conducted on
14   behalf of the plaintiff.  We are located at
15   80 Red Oaks Lane, White Plains, New York.
16   Today is November 17, 2000.  The time is
17   10:03 a.m.
18        Counsel will now introduce themselves.
19   MR. MILLER:
20        Good morning, Dr. Conaway.  My name is
21   Duane Miller.  I represent the plaintiff and
22   I'm going to be taking your deposition this
23   morning.
24   MR. JONES:
25        My name is Steve Jones and I'm
```

**Page 5**

1
2    attorney for Texaco, Equilon and Shell and
3    for purposes of this deposition, Dr.
4    Conaway.
5    THE VIDEOTAPE OPERATOR:
6        Will the court reporter please swear
7    in the witness
8                oOo
9    CARSON C. CONAWAY,        a non-party
10   witness herein, after having been first duly
11   sworn by Patrick M. DeGiorgio, a Notary
12   Public of the State of New York, was
13   examined and testified as follows:
14               oOo
15   EXAMINATION BY MR. MILLER:
16   Q.    Please state your name and business address.
17   A.    My name is Carson Clifford Conaway.  I go by
18   Cliff.  My business address is the American
19   Health Foundation, the region of molecular
20   carcinogenisus and molecular epidemiology
21   genealogy located at 1 Dana Road, Valhalla,
22   New York 10595.
23   Q.    Were you previously employed by Texaco?
24   A.    I was employed by Texaco during the period
25   of May 1st, 1997 through June 30th, 1984.

**Page 6**

1                CONAWAY            6
2    MR. JONES:
3        You said '97, Dr. Conaway.
4    A.    '77, excuse me.
5    MR. MILLER:
6    Q.    And what is your field of expertise, Dr.
7    Conaway?
8    A.    Well, during the period which I was employed
9    by Texaco it was petroleum toxicology.
10   Q.    Could you describe your educational
11   background for us, starting with college?
12   A.    I graduated 1960 from Southwestern College
13   in Kansas with a BA in chemistry and minors
14   in biology and mathematics.  I attended Yale
15   University School of Medicine for a year and
16   a half studying preclinical medicine and
17   received the MS degree in entomology, in
18   particular insecticide toxicology in 1969
19   from the University of Missouri.  I received
20   a Ph.D. degree from the University of
21   Wisconsin, Madison in 1974 in entomology
22   with research in insecticide and minor in
23   biochemistry.  I did a post-doctorate at the
24   University of Colorado Medical Center in the
25   Department of Pharmacology from 1974 through

**Page 7**

1                CONAWAY            7
2    1977 at which time I was hired by Texaco.
3    Q.    How many years of experience do you have in
4    the field of toxicology and pharmacology?
5    A.    Well, not counting my formal training, it's
6    about twenty-three years.
7
8        (NOTICE OF DEPOSITION WAS RECEIVED AND
9    MARKED AS PLAINTIFF'S EXHIBIT 1 FOR
10   IDENTIFICATION)
11
12       (INTEROFFICE CORRESPONDENCE DATED
13   NOVEMBER 5TH, 1979 WAS RECEIVED AND
14   MARKED AS PLAINTIFF'S EXHIBIT 2 FOR
15   IDENTIFICATION)
16
17   Q.    I've marked as Exhibit 1 a notice of this
18   deposition.  Exhibit 2 is a document dated
19   November 5th, 1979.  It's entitled
20   interoffice correspondence and it reports
21   that there was a meeting on October 9th,
22   1979, a semiannual meeting of the Medicine
23   and Biological Sciences Department of the
24   American Petroleum Institute and it lists
25   you in attendance.  Did you participate in

**Page 8**

1                CONAWAY            8
2    that group at the time?
3    A.    Evidently I did.
4    Q.    About midway in the documents it states,
5    "C.C. Conaway of Texaco was appointed
6    chairman by consensus of a group that was
7    interested in studying of toxicology in
8    MTBE."  Do you recall your participation in
9    that group?
10   A.    To some extent, yes, I do.
11   Q.    Is it true you were appointed chairman of
12   the group at the time?
13   A.    Yes.
14   Q.    Now, the document indicates that a number of
15   individuals were present.  In addition to
16   yourself, including representatives of Exxon
17   and Mr. Ridlon of Arco Chemical Company.  Do
18   you recall participating with other
19   companies in making decisions about doing
20   scientific studies on MTBE back in 1979?
21   A.    First I don't recall the time, but I've had
22   a chance to look at the document and I don't
23   have anything to add beyond what's basically
24   in the document.
25   Q.    As a Texaco employee, did you participate in

Page 57

CONAWAY                    57

2  A.    That's the Medicine and Biological Sciences
3        Division of API.
4  Q.    It goes onto state, "From this request a
5        multi-disciplinary group was formed which is
6        evaluating the saluibilities at different
7        temperatures of these chemicals likely to be
8        present. Company records reveal Benzene,
9        toluene, xylenes, methyl tertiary-butyl
10       ether, which would be MTBE, tertiary butyl
11       alcohol and ethyltoluene are present at
12       concentrations and in proportions which
13       depend upon their water solubility. The
14       distance from the contamination in a variety
15       of other factors. Dr. Thomas added that
16       MBSD is currently acting in an advisory
17       capacity that may become more active later
18       if testing is needed. TRC has been
19       contacted to conduct a literature survey of
20       potential health effects of contaminated
21       groundwater and may perform experiments to
22       model the plume of a gasoline spill." Do
23       you see those entries concerning the meeting
24       that you attended?
25 A.    I do.

Page 58

CONAWAY                    58

2  Q.    Does that refresh your memory that MTBE was
3        specifically brought up as a groundwater
4        contaminant?
5  A.    I'm sorry, sir, I do not recall this
6        meeting -- the discussions. I remember
7        going to the hotel, but I don't remember the
8        details of this meeting.
9  Q.    Thank you. I have no way of knowing if you
10       happen to recall without asking. I do
11       understand that you've explained on a number
12       of occasions that time has gone by. But I
13       need to ask, that's the only way I have of
14       finding out if you happen to remember. If
15       you could turn to the next page of the same
16       minutes. Reports that the American
17       Petroleum Institute, this is under TSCA,
18       Toxic Substance Control Act section,
19       "American Petroleum Institute has performed
20       a group in response to the EPA's new program
21       leaking underground storage tanks, LUST,
22       which is attempting to evaluate the extent
23       of underground storage tank leaks and
24       associated problems, R.N. Roth reported.
25       EPA is presently evaluating the ability of

Page 59

CONAWAY                    59

2        industry to comply with the range of
3        standards which it is considering." Were
4        you aware of the fact that there were
5        concerns by the EPA that underground storage
6        tanks were leaking gasoline into the
7        environment by this date which is 1984?
8        MR. JONES:
9              Objection to the form of the question.
10       It's vague and ambiguous. Assumes facts not
11       in evidence.
12 A.    I do recall that there was concern at Texaco
13       during the period of my employ regarding
14       underground leaks from storage tanks and
15       water contamination. I do not recall that
16       EPA was evaluating the ability of industry
17       to comply with standards.
18 MR. MILLER:
19 Q.    Is it fair to say that you personally didn't
20       have much interaction with the EPA or did
21       you at the time you were employed by Texaco?
22 A.    I had no interaction with EPA.
23 Q.    So you weren't providing them with the
24       information?
25 A.    No, I was not.

Page 60

CONAWAY                    60

2  Q.    There's a reference to a report you gave on
3        the next page under subsection F. Do you
4        see that?
5  A.    Yes.
6  Q.    It says you presented a written summary,
7        which is attachment 1, and if we go to
8        attachment 1 the next page says program
9        status on MTBE. Does this appear to be the
10       summary that you would have provided at the
11       time?
12 A.    Okay.
13 Q.    Does this appear to be a summary that you
14       would have prepared at the time and provided
15       to the committee?
16 A.    Yes.
17 Q.    If you look at the last paragraph, it
18       states, "A final report of all work
19       performed at Biodynamics is anticipated by
20       March 1, 1984. No additional testing or
21       research is planned at this time." Do you
22       see that entry?
23 A.    Uh-huh.
24 Q.    Can I have a yes or no, please?
25 A.    Yes.

Page 1

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
             IN AND FOR THE COUNTY OF SAN FRANCISCO
 2
 3   SOUTH TAHOE PUBLIC UTILITY       *
     DISTRICT,                        *
          Plaintiff                   *
 4                                    *
     VS.              NO. 999128      *
 5                                    *
     ATLANTIC RICHFIELD COMPANY ("ARCO"); *
 6   ARCO CHEMICAL COMPANY; SHELL OIL  *
     COMPANY; CHEVRON U.S.A., INC.;    *
 7   EXXON  CORPORATION; B.P. AMERICA, *
     INC.; TOSCO CORPORATION; ULTRAMAR, *
 8   INC.; BEACON OIL CO.; USA        *
     GASOLINE CORPORATION; et al.,    *
 9        Defendants                  *
10        SUPERIOR COURT OF THE STATE OF CALIFORNIA
             IN AND FOR THE COUNTY OF SAN FRANCISCO
11
     COMMUNITIES FOR A BETTER         *
12   ENVIRONMENT, a California        *
     Non-Profit Corporation, on behalf *
13   of the General Public,           *
                                      *
14        Plaintiff                   *
                                      *
15   VS.                * CIVIL NO. 997013
                                      *
16   UNOCAL CORPORATION,              *
17   a Delaware Corporation, et al    *
18                                    *
19        Defendants                  *
20
21   * * * * * * * * * * * * * * * * * *
22        VIDEOTAPE DEPOSITION OF
23        PATRICK TOMLINSON
24        June 29, 2000
25   * * * * * * * * * * * * * * * * * *
```

Page 2

```
 1      VIDEOTAPE DEPOSITION OF PATRICK TOMLINSON, produced
 2   as a witness at the instance of the plaintiff, was taken
 3   in the above styled and numbered cause on June 29, 2000,
 4   from 10:04 a.m. to 1:34 p.m., before Kay Howell,
 5   Certified Shorthand Reporter in and for the State of
 6   Texas, reported by machine shorthand, at Doubletree
 7   Hotel, 400 Dallas Street, Houston, Texas 77002.
 8   A P P E A R A N C E S :
 9   FOR PLAINTIFF TAHOE PUBLIC UTILITY DISTRICT:
       Mr. Duane C. Miller
10     Miller, Sher & Sawyer
       100 Howe Avenue, Suite S120
11     Sacramento, California 95825-8218
12
     FOR PLAINTIFF COMMUNITIES FOR A BETTER ENVIRONMENT:
13     Mr. Gabriel Reed
       Cooper & Scully
14     900 Jackson Street, Suite 100
       Dallas, Texas  75202
15
16   FOR DEFENDANTS SHELL OIL CO., SHELL OIL PRODUCTS CO.,
     TEXACO, INC., EQUILON ENTERPRISES LLC, EXXON CORP. AND
17   TESORO PETROLEUM CORP. IN THE SOUTH TAHOE LAWSUIT:
18   FOR DEFENDANTS SHELL OIL CO., EXXON CORP., TEXACO
     REFINING & MARKETING, INC. AND CHERON USA, INC. IN THE
19   CBE LAWSUIT:
       Ms. Jill F. Cooper
20     McCutchen, Doyle, Brown & Enersen, L.L.P.
       355 S. Grand Avenue, Suite 4400
21     Los Angeles, California 90071
22
     ALSO PRESENT:
23     Mr. John W. Kampman
       Wallace King Marraro & Branson, PLLC
24     1050 Thomas Jefferson Street, N.W.
       Washington, D.C.  20007
25
```

Page 3

```
 1   VIDEOGRAPHER:
       Ms. Suzy Price (for Dickman Davenport)
 2     P.O. Box 1433
       Alvin, Texas  77512-1433
 3     713-977-9402
 4   REPORTER:
       Ms. Kay Howell (for Dickman Davenport)
 5     3801 Kirby, Suite 246
       Houston, Texas
 6     713-521-1117
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            I N D E X
 2                       Page/Line
     Examination by Mr. Miller ...................... 7   15
 3
     Beginning of telephone conversation ............ 44   10
 4
     Conclusion of telephone conversation .......... 50   7
 5
     Changes and Witness Signature Page ............ 101   1
 6
     Reporter's Certification ...................... 103   1
 7
 8
 9
10            EXHIBITS
11   No.  Description              Page/Line
12   1  Amended notice of deposition .............. 11   2
13   1A Notice of deposition ...................... 11   2
14   2  Letter dated January 24, 1996, from  ...... 12   11
       Patrick W. Tomlinson to Dr. Bruce J.
15     Bauman of API with second page of
       letter missing and with attachments
16
     3  Letter dated January 24, 1996, from  ...... 13   22
17     Patrick W. Tomlinson to Dr. Bruce J.
       Bauman of API
18
     4  Letter dated May 4, 1990, to dear  ........ 28   1
19     customer from F. E. Bentley
20   5  Memo dated May 16, 1991, from Dr. R. B.  .. 30   19
       Borey to G. A. Weiss re special
21     procedures, MTBE and TANE
22   6  Memo dated 11/19/93 from Jack Hinton re .. 56   8
       MTBE update
23
     7A Memo dated January 20, 1997, from D. G.  .. 63   3
24     Yetter/Michael Redemer re
       MTBE/Oxygenate issue update
25
```

1 budget allocations.
2    Q.  For things like research?
3    A.  Yes, and other API activities.
4    Q.  Have you been involved in any previous MTBE
5 committees prior to joining that group in the mid-1998
6 time frame?
7    A.  No.
8       MS. COOPER:  With respect to API?
9    Q.  (BY MR. MILLER)  Have you been involved in any
10 other industry committees of any kind concerning MTBE
11 other than the one you mentioned that you started on in
12 1998?
13   A.  No, sir.
14   Q.  Is it a part of your duties as an Equiva employee
15 to be a part of that committee?
16      MS. COOPER:  Objection, vague.
17   A.  I wouldn't say it's part of my duties, but that's
18 why I'm a member of that committee.
19   Q.  (BY MR. MILLER)  All right.  I would like to turn
20 to a page concerning MTBE in this group.  If you could
21 go -- if you look at the Bates numbers which are the
22 numbers at the bottom, look at page 1439 in the series,
23 please.
24   A.  Okay.
25   Q.  This apparently is some type of power point or

1 slide presentation, and the top section is entitled Water
2 Issues, Cleanup Issues.  Do you see that?
3    A.  Yes, sir.
4    Q.  This API document states in three bullet points
5 "MTBE slow to biodegrade."  Do you see that first point?
6    A.  Yes, sir.
7    Q.  Have you seen any communications to indicate that
8 that statement is incorrect as part of your current API
9 work?
10      MS. COOPER:  Objection, vague, lacks
11 foundation, assumes facts not in evidence.
12   A.  I can't recall seeing anything on this.
13   Q.  (BY MR. MILLER)  And have you seen any
14 communication as an employee of Equiva that says that
15 that comment by the American Petroleum Institute is
16 incorrect?
17      MS. COOPER:  Same objections.
18   A.  I can't recall seeing anything like that.
19   Q.  (BY MR. MILLER)  The next bullet is -- I'm going
20 to translate the abbreviation.  Risk base corrective
21 action strategies and cost savings endangered.  Do you
22 see that statement?
23   A.  Yes, I do.
24   Q.  Could you explain what risk base corrective
25 action strategies are, please?

1    A.  Those are, to the best of my knowledge, and again
2 I'm not an expert in this area.  The people that work for
3 me would be better served on this.  But that is making
4 use of understanding hydrogeology and the way that
5 products and water and the land interact with each other
6 and the associated risk with that.
7    Q.  Is it your understanding that risk base
8 corrective action is basically developed by the industry?
9       MS. COOPER:  Objection, calls for
10 speculation, lacks foundation, assumes facts not in
11 evidence.
12   A.  No.
13   Q.  (BY MR. MILLER)  Do you have an understanding of
14 what is referred to here concerning MTBE water issues and
15 cleanup issue when they say risk base corrective action
16 strategies and cost savings endangered?
17      MS. COOPER:  Objection, calls for
18 speculation.
19   A.  I could only guess that --
20      MS. COOPER:  You can't only guess.
21   A.  I can't?  Then I don't know.  I don't know
22 specifically what is meant by this comment for this
23 presentation.
24   Q.  (BY MR. MILLER)  I understand that.  I'm trying
25 to find out if you have an understanding of the subject

1 matter that is mentioned here from your many years of
2 work in the oil industry and as a person who supervises
3 people who deal with cleanup activities.  If you could
4 explain it from that perspective for us, please.
5       MS. COOPER:  The witness has already
6 testified he has not seen this document.  He wasn't a
7 member of API at this time.  So to the extent -- I object
8 to the extent he would have to speculate in order to
9 interpret or answer your question.
10   A.  I can say that what I'm -- what I know is that we
11 don't have enough data about MTBE and how it moves and is
12 affected in groundwater once it's released in order to
13 determine a risk based strategy.  And these studies would
14 be in order to gather such data so that you could
15 determine what the actual risk would be, if any.
16   Q.  (BY MR. MILLER)  So how does that endanger cost
17 savings?  Could you explain?
18      MS. COOPER:  Objection, asked and answered,
19 calls for speculation, lacks foundation.
20   A.  There is risk base corrective action strategies
21 for hydrocarbons, and those are the strategies that I
22 believe are being referred to in common now.
23   Q.  (BY MR. MILLER)  I'm just trying to understand
24 why the cost savings associated with risk base corrective
25 action would be endangered if MTBE becomes a chemical

Page 69

1 that needs to be cleaned up in groundwater.
2        MS. COOPER:  Objection, asked and answered.
3 Again, it calls for speculation.  This witness did not
4 prepare this document, has not seen this document before.
5 You're asking him to interpret something written by
6 someone else, an organization he was not a member of at
7 the time.  He's doing his best to answer questions that
8 really are getting into speculation here.
9     A.  I'm not an expert in the regulations around risk
10 base corrective actions, and I don't know the specifics
11 of why it's endangered.  I only know what I just told you
12 generically.
13     Q.  (BY MR. MILLER)  All right.  The next bullet
14 concerning MTBE water issues and cleanup issues is
15 remediation costs 30 percent to 300 percent higher than
16 for routine BTEX cleanups.  Do you see that entry?
17     A.  Yes, I do.
18     Q.  And BTEX is kind of an abbreviation for some
19 chemicals that are found in gasoline that sometimes need
20 to be cleaned up.  Is that correct?
21     A.  Yes.
22     Q.  Is it your understanding that it is recognized
23 that the costs of cleaning up MTBE in groundwater are
24 significantly higher than the costs of cleaning up BTEX?
25        MS. COOPER:  Objection, vague and ambiguous

Page 70

1 as to significantly higher, lacks foundation, assumes
2 facts not in evidence.
3     Q.  (BY MR. MILLER)  The range here is 30 to 300
4 percent.  I think anything in that range is significantly
5 higher.  So with that in mind, can you answer the
6 question?
7     A.  No, that's not my understanding.
8     Q.  Could you explain what your understanding is,
9 please?
10     A.  That we haven't determined yet all the strategies
11 and the science that we're going to be able to use to
12 clean up MTBE.
13     Q.  How long has Texaco been putting MTBE in its
14 gasoline?
15        MS. COOPER:  Objection, calls for
16 speculation.
17     A.  I don't know.
18     Q.  (BY MR. MILLER)  Is Texaco sponsoring any
19 research right now to get the answer to that question?
20        MS. COOPER:  Objection, calls for
21 speculation, what question, vague.
22        MR. MILLER:  I'll rephrase.
23     Q.  (BY MR. MILLER)  Is Texaco or your current
24 employer doing anything to obtain information or data on
25 how to clean up MTBE effectively once it's in

Page 71

1 groundwater?
2        MS. COOPER:  Objection, calls for
3 speculation.
4     A.  The API studies that we have been referencing
5 have that as one of their purposes.
6     Q.  (BY MR. MILLER)  And today you're involved in
7 making decisions on doing new research concerning this
8 subject, is that correct?
9        MS. COOPER:  Objection, vague as to you.
10        MR. MILLER:  I mean him.
11        MS. COOPER:  Personally?
12        MR. MILLER:  Yes, as a member of the
13 committee.
14     A.  Not directly.
15     Q.  (BY MR. MILLER)  Don't you attend the meetings
16 personally?
17     A.  I've only attended about two or three of those
18 meetings.
19     Q.  Sometimes do you send a representative on your
20 behalf?
21     A.  Sometimes, yes.  But that committee doesn't make
22 those decisions.  They make recommendations, and then it
23 goes to another committee.
24     Q.  I see.
25     A.  And I don't understand all the committees in API.

Page 72

1     Q.  I know.  You're trying to get track of the flow
2 chart in the alliance.
3     A.  That I understand.
4     Q.  All right.  When you're involved in making
5 recommendations to fund research, I assume an effort is
6 made to identify what research hasn't been done and needs
7 to be done as contrasted with something that doesn't fit
8 those criteria?
9        MS. COOPER:  Objection, assumes facts not
10 in evidence, vague.
11     A.  The meetings that I have been in, all we are
12 deciding is on the proposals that have been put in front
13 of us as to funding of those programs and the allocation
14 of a given set of amount of money, about which programs
15 we are recommending should be funded, and to what levels.
16     Q.  All right.  Have you ever been asked whether or
17 not a study should be conducted as a part of the process
18 you described to evaluate whether or not MTBE, when taken
19 in orally, causes cancer?
20     A.  Not that I can recall.
21     Q.  Do you know of any API effort to undertake that
22 study at this point?
23     A.  I have no idea.
24     Q.  Do you know of current research efforts to
25 determine if there is a bug out there that will

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------§
IN RE:  METHYL TERTIARY BUTYL    §
ETHER ("MTBE") PRODUCTS          §
LIABILITY LITIGATION,            §  Master File No.
                                 §  1:00-1898
                                 §
                                 §  MDL 1358(SAS)
                                 §  M21-88
This document relates to:        §
                                 §
COMMONWEALTH OF PUERTO RICO,      §
et al.,                          §  Case No.
                                 §  07-civ-10470 (SAS)
      Plaintiff,                 §
vs.                              §
                                 §
SHELL OIL COMPANY, et al.,        §
                                 §
      Defendants.                §
-------------------------------
```

- - -

NOVEMBER 21, 2013

CONFIDENTIAL - FOR OUTSIDE COUNSEL ONLY

- - -

Videotaped deposition of IAN CHARMAN, as
30(b)(6) REPRESENTATIVE OF SHELL CHEMICAL YABUCOA,
INC., SHELL OIL COMPANY, SHELL TRADING (US) COMPANY;
SHELL WESTERN SUPPLY AND TRADING, AND SHELL
INTERNATIONAL PETROLEUM COMPANY, held at Sedgwick,
LLC, Fitzwilliam House, 10 St. Mary Axe, London,
EC3A 8BF, England, commencing at 9:12 a.m., on the
above date, before Joan L. Pitt, Registered Merit
Reporter, Certified Realtime Reporter, and
Professional Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - For Outside Counsel Only

| Page 10 | Page 12 |
|---|---|
| REDACTED | REDACTED |

| Page 11 | Page 13 |
|---|---|
| REDACTED | REDACTED |

12    Q.  Okay.  And, to your understanding, what
13    entities are you here today testifying on behalf of?
14        A.  Shell Western Supply and Trading and Shell
15    International Petroleum Company.
16        Q.  Okay.  Were you employed by either of those
17    entities at any point in time?
18        A.  Yes, both of them.

REDACTED

Confidential - For Outside Counsel Only

Page 54

REDACTED

Page 56

REDACTED

2      Q.  Were those concerns -- when you came back to
3      Shell West, were those concerns ever discussed in
4      meetings with Shell Puerto Rico or Shell Yabucoa?
5        A.  Not in that fashion, no.  Not in the fashion of
6      talking about concerns about groundwater contamination
7      or anything.  Not at all.

REDACTED

Page 55

REDACTED

19      A.  I was aware of the concerns regarding
20     groundwater contamination and MTBE, but only at a very,
21     very general level.

REDACTED

Page 57

REDACTED

15 (Pages 54 to 57)

REDACTED

Joined Group service – 7th September 1970

REDACTED

31st July 2010 – last day in Group Service.

REDACTED

