**Exhibit 7**



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

In Re: Methyl Tertiary-Butyl Ether
("MTBE") Products Liability Litigation
_____

This Document Relates To:

*Commonwealth of Puerto Rico, et al. v Shell*
*Oil Co., et al.*
No. 07 Civ. 10470 (SAS)

_____

)   **Master File C.A. No. 1:00-1898**
)
)   **MDL 1358 (SAS): No. M21-88**
)
)
)
)
)
)
)
)
)
)

## NON-SITE-SPECIFIC DESIGNATION AND DISCLOSURE OF VIC DUGAN FORMER EMPLOYEE OF EXXON MOBIL CORPORATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(C)

1.       Defense counsel cannot anticipate all evidence Plaintiffs may offer at trial and, consequently, cannot identify with certainty every opinion that may be elicited from this witness at trial.

2.       In compliance with F.R.C.P. 26(a)(2)(C) and Judge Scheindlin's prior statements advising the parties to designate each individual that may provide opinion testimony, we have identified herein areas in which Mr. Dugan is currently expected to offer opinion testimony. Defendant ExxonMobil does not waive the right to elicit other opinions not described herein in response to unanticipated proofs offered at trial by Plaintiffs.

3.       Mr. Dugan was previously deposed in the *South Tahoe* litigation on August 1, 2000 and in MDL 1358 on May 21, 2007.  Mr. Dugan also provided trial testimony on certain of the below topics in the *City of New York* litigation on September 21, 2009 and September 23, 2009, in *Allison, et al. v. Exxon Mobil Corp, et al.*, 03-C-07-3809 (Circuit Court, Baltimore, MD) on June 7, 2011, and in the *New Hampshire* litigation on March 5, 2013, and March 6, 2013.  To the extent that Mr. Dugan provides opinion testimony as described below, he is expected to rely on facts contained in his depositions and trial testimony as well as documents produced by ExxonMobil, Esso, and other parties, discovery responses by ExxonMobil, Esso, and other parties.  Documents previously produced that Mr. Dugan may rely upon include MDL1358DUGAN-000001 to 014480; MDL1358-XOM-DTU-0000001 to 0026250; XOM-DTU-00000001 to 00062849; and XOM-MDL1358hExxonDTU-0000001 to 0094395.

4.       Mr. Dugan is expected to testify regarding the refining and distribution of gasoline.  Mr. Dugan will offer the opinion that Exxon's decision to use MTBE was reasonable

at the time to replace lead in gasoline.  Mr. Dugan will offer the opinion that Exxon's use of MTBE to replace lead in gasoline was reasonable and necessary to address gasoline demand and to meet octane requirements.

5.      Mr. Dugan will offer opinions about Exxon's evaluation of MTBE prior to deciding to blend it into Exxon product.  Mr. Dugan will offer opinions concerning Exxon's assessment of the feasibility of alternatives to MTBE including availability, cost and impact on product quality, drivability, consumer prices and the environment.  Mr. Dugan will offer the opinion that alternatives to MTBE to replace lead in gasoline were not viable and/or not viable as the sole additive to replace lead in gasoline  Mr. Dugan will offer opinions about the scope and extent of the process used by Exxon to make the decision to use MTBE.

6.      Mr. Dugan's opinions in these areas are based, in part, on (1) ExxonMobil produced documents discussing MTBE and alternatives; (2) his personal experiences with Exxon, ExxonMobil and their current or former affiliates in these areas; and (3) Mr. Dugan's conversations with current or former employees of Exxon, ExxonMobil and their current or former affiliates regarding these topics.

7.      Mr. Dugan has not reviewed any documents specific to Puerto Rico and is not expected to offer any opinions specific to Puerto Rico.

# FILED UNDER SEAL



E-SERVICE

55254420
Apr 06 2014
12:44PM

File & ServeXpress

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ ) | **Master File C.A. No. 1:00-1898** |
| **In Re: Methyl Tertiary-Butyl Ether** ) | |
| **("MTBE") Products Liability Litigation** ) | **MDL 1358 (SAS): No. M21-88** |
| _____ ) | |
| ) | |
| **This Document Relates To:** ) | |
| ) | |
| *Commonwealth of Puerto Rico, et al. v Shell* ) | |
| *Oil Co., et al.* ) | |
| No. 07 Civ. 10470 (SAS) ) | |
| ) | |
| _____ ) | |

**NON-SITE-SPECIFIC DESIGNATION AND DISCLOSURE OF THOMAS EIZEMBER**
**FORMER EMPLOYEE OF EXXON MOBIL CORPORATION**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(C)**

1.        Defense counsel cannot anticipate all evidence Plaintiffs may offer at trial and, consequently, cannot identify with certainty every opinion that may be elicited from this witness at trial.

2.        In compliance with F.R.C.P. 26(a)(2)(C) and Judge Scheindlin's prior statements advising the parties to designate each individual that may provide opinion testimony, we have identified herein areas in which Mr. Eizember is currently expected to offer opinion testimony. Defendant ExxonMobil does not waive the right to elicit other opinions not described herein in response to unanticipated proofs offered at trial by Plaintiffs.

3.        Mr. Eizember was previously deposed in the *South Tahoe* litigation on August 1, 2000 and in MDL 1358 on May 21, 2007.  Mr. Eizember also provided trial testimony on certain of the below topics in the *City of New York* litigation on September 21, 2009 and September 23, 2009, and in the *New Hampshire* litigation on March 6, 2013, and March 7, 2013.  To the extent that Mr. Eizember provides opinion testimony as described below, he is expected to rely on facts contained in his depositions and trial testimony as well as documents produced by ExxonMobil Esso, and other parties, discovery responses by ExxonMobil, Esso, and other parties.  Documents previously produced that Mr. Eizember may rely upon include MDL1358DUGAN-000001 to 014480; MDL1358-XOM-DTU-0000001 to 0026250; XOM-DTU-00000001 to 00062849; and XOM-MDL1358hExxonDTU-0000001 to 0094395.

4.        Mr. Eizember is expected to testify regarding the refining and distribution of gasoline. <u>Mr. Eizember will offer the opinion that ExxonMobil's decision to use MTBE was reasonable at the time considering the feasibility of alternatives to replace lead.  Mr. Eizember</u>

will offer opinions concerning the assessment of alternatives to MTBE including consideration of their feasibility, cost and/or impact on consumer prices.  Mr. Eizember will also offer opinions concerning the potential for supply disruptions using MTBE or other additives to replace lead. Mr. Eizember will offer the opinion that MTBE was the most cost effective, secure means to replace lead, maintain octane, enhance oxygenation and meet environmental goals and objectives.  Mr. Eizember will offer opinions concerning the feasibility of producing conventional gasoline without MTBE and the impact on product quality requirements.  Mr. Eizember is also expected to offer opinions concerning the documents and spreadsheets used internally to track the importation, sale and distribution of petroleum product.

5.      Mr. Eizember is expected to testify regarding the technical specifications for gasoline, including those set by the federal government and state governments, and Mr. Eizember is expected to opine as to the necessity to make changes to ExxonMobil's refineries in response to changes to laws on gasoline specifications, including but not limited to the Clean Air Act Amendments.

6.      Mr. Eizember is expected to testify regarding the distribution of gasoline from Exxon's refineries, including the modes of distribution, and Mr. Eizember is expected to opine as to the necessity to make changes to ExxonMobil's gasoline distribution in response to changes to laws, including but not limited to the Clean Air Act Amendments.

7.      Mr. Eizember is expected to testify that ExxonMobil was required to begin planning for compliance with the Clean Air Act Amendments, including planned changes to its refineries, by the late 1980s and early 1990s.

8.      Mr. Eizember is expected to testify regarding ExxonMobil's opposition to the oxygenate mandate, and is expected to opine that ExxonMobil could have met government specifications without following a set formulation.

9.      Mr. Eizember is expected to opine that there was insufficient domestic supply of oxygenates to meet the requirements of the Clean Air Act Amendments, including the oxyfuel and reformulated gasoline requirements.

10.     Mr. Eizember's opinions in these areas are based, in part, on (1) ExxonMobil produced documents discussing MTBE and alternatives; (2) his personal experiences with Exxon, ExxonMobil and their current or former affiliates in these areas; (3) his personal experience working at the Benicia and Baton Rouge refineries; and (4) his conversations with current or former employees of Exxon, ExxonMobil and their current or former affiliates regarding these topics.

11.     Mr. Eizember has not reviewed any documents specific to Puerto Rico and is not expected to offer any opinions specific to Puerto Rico.

# FILED UNDER SEAL

Kenneth Stern

Page 170

1    mixed xylenes from time to time as such, then they
2    certainly would have been available as a blend stock
3    as well; true?
4         A.    Would have been available, but that
5    doesn't mean that they were available as a viable
6    blending option for their gasoline.
7         Q.    Why not?
8         A.    You remember that Core had a restriction
9    on the volume of aromatics it could put into its
10   gasoline because of the antidumping legislation.
11        Q.    Which was after 1995; correct?
12        A.    Correct.  This was the 1990 antidumping
13   rules, came into effect January '95.  So that
14   restricted Core to 41 percent aromatics, I think, on
15   average.
16             And -- and, remember, the average
17   for the refining industry in the United States
18   compared to Core's 41 percent was 28 percent.  So
19   Core was already very, very high in aromatics
20   compared to the average U.S. refiner.
21             That doesn't mean 41 versus 28 was
22   necessarily a bad thing.  I'm simply pointing out to
23   you it was different.  So they were very high in
24   aromatics.  The suggestion that perhaps they could

Page 171

1    have just used more aromatics in their gasoline
2    because it was available is not a good suggestion.
3         Q.    Well, certainly, before 1995 had MTBE
4    not been available as a blend stock, then Core had
5    available and could have used either toluene or
6    mixed xylenes?
7         A.    Yes, they could have.  And --
8         Q.    And did?
9         A.    -- to return to a familiar theme, there
10   would have been environmental implications for doing
11   that.
12        Q.    I'm going to show you what's been
13   previously marked as Scharre Exhibit 8.  But in
14   connection with having mixed xylenes and toluene not
15   only available internally, they also had it
16   available through the market as a purchased product.
17   I want you to take a look at this -- this exhibit.
18        A.    Okay.
19        Q.    You see here in 1982, you'll see
20   purchases of MTBE and TBA.  But you'll also see
21   relatively significant purchases of mixed xylene;
22   correct?
23        A.    It's hard for me to comment on
24   "relatively significant," except in the context of

Page 172

1    it's larger than TBA and MTBE.
2         Q.    And you also see private purchases for
3    toluene?
4         A.    Yes.
5         Q.    And if you'll just flip the pages with
6    me, but you will see, relatively consistent
7    purchases of mixed xylenes.  And I say "consistent,"
8    consistent with their purchases of MTBE throughout
9    the time period, right?
10        A.    I'm not quite sure what you want me to
11   look at.  I do see purchases of mixed xylenes, and I
12   see that they are, at least in the years I'm looking
13   at or these months -- years, they are larger than
14   their purchases in -- what did you say?  MTBE,
15   right?
16        Q.    MTBE.
17        A.    Yeah.  So here in 1983, 339 versus 310,
18   and in 1984, it looks like 535 versus 441.  So,
19   yeah, I mean based on this sample, yeah, it looks
20   like they were buying substantial amounts of mixed
21   xylenes and more mixed xylenes than MTBE, at least
22   for these years.
23        Q.    You're not opining or testifying that
24   mixed xylenes or toluene weren't available on the

Page 173

1    market to use as an octane-increasing blend stock
2    for gasoline, are you?
3         A.    Oh, I'm not suggesting that, no.  I
4    would suggest to you, as you already know in the
5    context of Core, that there are potentially
6    higher-value uses for mixed xylenes and even toluene
7    than gasoline is.  All right?
8             So, again, let's just return to the
9    first page for simplicity.  I see purchases of
10   191,000 barrels of mixed xylenes, but I don't know
11   if that was destined for gasoline blend stock.
12        Q.    Oh, exactly.  And the only thing I'm
13   suggesting is that they were -- throughout the
14   course of your report, you're suggesting that Core
15   wouldn't have wanted to divert aromatics from
16   production of higher-value products --
17             MR. DILLARD:  Object to the form.
18        Q.    (BY MR. PETIT)  -- to use -- to use in
19   place of MTBE and finished gasoline?  And what I'm
20   suggesting, sir, is that they wouldn't have had to
21   divert anything if it was available on the market to
22   purchase?
23             MR. DILLARD:  Object to the -- to
24   the form and misstatement implicit in the question.

44 (Pages 170 to 173)

# Exhibit 8

## COMMONWEALTH OF PUERTO RICO

CHAMBER OF REPRESENTATIVES

**13th Legislative
Assembly**

**7th** [handwritten:] *Extra* **Ordinary
Session**

REPORT
CHAMBER RESOLUTION 7008
~~October~~ [handwritten:] *November 29,* 2000

TO THE CHAMBER OF REPRESENTATIVES:

Your Commissions of Socioeconomic Development, Planning and Natural Resources and Environmental Quality of the Chamber of Representatives of Puerto Rico present to this Honorable Body the report on Chamber Resolution 7008 containing their findings, conclusions and recommendations.

### SCOPE OF THE MEASURE

The purpose of Chamber Resolution 7008 is to order the Commissions of Socioeconomic Development, Planning and Natural Resources and Environmental Quality of the Chamber of Representatives of Puerto Rico to carry out a study to find out the presence of methyl tertiary butyl ether (MTBE), in the preparation of gasoline in Puerto Rico, as well as that imported; to know its risks and proper handling; and study alternatives to replace said chemical.

### REPORT

This measure arises from the concerns of reports issued in various states of the United States related to the detection of MTBE in underground water, in concentrations found to be up to 50 parts per billion (ppb), such as occurred in the aquifer under an industrial plant in South Brunswick Township in New Jersey.

In discharging this legislative mandate, your Socioeconomic Development Commission requested presentations from the Environmental Quality Board, Gasoline Retailers Association of Puerto Rico, the gasoline distributing companies Esso, Shell, Gulf and Texaco to know their opinions on the measure.

To understand what MTBE is and its use as additive in gasoline, we must first establish the definitions of the elements that must be mentioned for the understanding of the matter in discussion.

**Gasoline** — is a mixture of light liquid hydrocarbons used as fuel in internal combustion engines. It is produced by fractional distillation of petroleum; by condensation or absorption of natural gas; by thermal or catalytic decomposition of petroleum or its fractions; or by polymerization of hydrocarbons with less molecular weight. It is a colorless, light brown or pink liquid, and it is extremely flammable. In most stations where gasoline is sold, it is offered in three different grades of unleaded gasoline. They are regular-87 octane, mid-grade-89 octane and premium-93 octane. The refinery product is generally regular 87 octane gasoline. The octane rating is increased by addition of oxidants to regular gasoline. Presently, the most widely used is Methyl tertiary-butyl ether (MTBE) which replaced lead, already discontinued many years ago due to its harmful characteristics.

**Octane** — is a measure of the ability of gasoline to resist acute metallic sounds in the engine (pistons) as a result of the premature igniting of the mixture of gasoline and air in one or several cylinders. These metallic sounds may damage the engine if they are not corrected in time. In most automobiles, there is no benefit obtained with the use of higher octane rating gasoline. The octane rating required by vehicles is mainly determined in the basic design. Variations in engines due to tolerances in the manufacturing process may cause the vehicles of the same model to require different octane gasoline. The best way of knowing what gasoline to use is by referring to the vehicle manual which indicates the type of gasoline to be used. However, as a new car is driven, its octane requirement may change due to the accumulation of

2

deposits in the combustion chamber. This action continues until it reaches a stable condition, which typically occurs at 15,000 miles of driving.

**Reformulated Gasoline -** Reformulated gasoline has the purpose of reducing the degree of contaminants in the environment through the gas expulsion system. This gasoline is also obtained by addition of additives, mostly oxygenates, based on ethanol, which may occur at the level of the refinery or distributor. This gasoline is required in the states whose atmosphere is highly saturated with volatile organic compounds (VOCs) and nitrogen oxides (NOx). **This is not the case in Puerto Rico.**

**MTBE** – Is a colorless liquid used to increase the octane rating in the gasoline, in order to reduce or eliminate the acute metallic sound of the pistons in internal combustion engines with ignition of the mix by spark. Molecular Formula $C_5H_{12}O$. It has great morbidity in earth, so that it can easily reach underground water. To reach the earth, there must be a gasoline spill, in which it is an additive. The Environmental Protection Agency (EPA) has tentatively classified MTBE as a carcinogen in human beings, since it has been demonstrated that this chemical had carcinogenic effects on laboratory animals. In 1981, EPA approved the use of MTBE with a concentration of 10% per value, which was increased to 15% by volume in 1988.

In 1996, the use of reformulated gasoline started in California. The refineries in California selected MTBE as oxidant to reduce emissions in automobiles. From that moment, MTBE started being detected in underground waters, probably caused by leaks in the tanks. After a study of the University of California on the health and environment related to MTBE, the Governor of the State of California decreed an Executive Order on March 25, 1999, excluding MTBE from the gasoline to be provided as of December 31, 2002. The truth is that there is still no reliable scientific evidence to demonstrate that MTBE produces cancer in humans.

From the hearings held, it appeared that most gasoline used in P.R. does not contain MTBE, because the island is not one of the states that requires reformulated gasoline. However, some of this gasoline does come to the

3

PR-LEG-0000046

market, so that it will depend on the producer or refinery that manufacture it. Even so, none of the local distributors has exceeded so far the parameters established by EPA.

## CONCLUSION AND RECOMMENDATIONS

The huge majority of vehicles in Puerto Rico require regular gasoline by design. The premium gasoline sold in Puerto Rico is mostly the product of sales advertising.

The new federal and local requirements related to the storage of gasoline, where underground tanks are practically encapsulated, reduce the possibility of contamination by MTBE, so that we understand that it is not necessary to take additional measures for now, except continue with periodic legislative monitoring.

Due to all of the above, the Socioeconomic Development Commission of the Chamber of Representatives submit the Report of Chamber Resolution 7008, as required by this Honorable Body.

[signature]                                    [signature]
**Antonio Silva Delgado**                      **Jorge Acevedo Méndez**
**President**                                  **President**
**Commission for Socioeconomic Development**   **Commission for Natural Resources**
**Planning**

4

PR-LEG-0000047

**CERTIFICATION OF DOCUMENTS FOUND IN THE FILE:**

In the capacity of custodian of the files of the Legislative Assembly of Puerto Rico, I certify that we have diligently reviewed the file of the Chamber Resolution 7008, (hereinafter Chamber Resolution 7008) found in our archives and we delivered a true and exact copy of all documents that are part of the file to Atty. Jorge A. Sagardía, including:

1) Copy of the Text of Final Approval of Chamber Resolution 7008 dated June 30, 2000. (2 pages)
2) Report on Chamber Resolution 7008 by the Internal Affairs Commission of the Chamber dated June 29, 2000, signed by Augusto Sánchez Fuentes (Interim President — Internal Affairs Commission). (2 pages)
3) Report on Chamber Resolution 7008 by the Socioeconomic Development, Planning and Natural Resources Commission of the Chamber dated November 29, 2000, signed by Antonio Silva Delgado (President —Socioeconomic Development and Planning Commission) and Jorge Acevedo Méndez (President — Natural Resources Commission). (4 pages)
4) Presentation of The Shell Company (Puerto Rico) Limited dated August 15, 2000, signed by Juan I. Vásquez (Country Chairman). (3 pages)
5) Presentation of Caribbean Petroleum Limited Partnership dated August 15, 2000, signed by Eric Guzmán (Marketing Manager). (3 pages)
6) Presentation of the Gasoline Retailers Association of Puerto Rico, Inc. dated August 17, 2000. (5 pages)
7) Presentation of the Department of Health dated September 11, 2000, signed by Carmen Feliciano de Melecio, M.D. (Secretary of Health). (2 pages)
8) Presentation of the Department of Consumer Affairs dated September 14, 2000, signed by Jose M. Cintrón (Undersecretary). (2 pages)
9) Presentation of Esso Standard Oil Co. (Puerto Rico) dated September 20, 2000, signed by Jorge Concha (President). (3 pages)
10) Presentation of Texaco Puerto Rico Inc. dated September 20, 2000, signed by Cándido Rivera (Marketing Manager). (3 pages)
11) Presentation of the Environmental Quality Board signed by Atty. Héctor Russe Martínez (President). (4 pages)

The file consists of various documents – with a combined total number of 33 pages.

ISSUED today, October _, 2010, in San Juan, Puerto Rico.

[stamp:]
OCT. 13, 2010 9:15 AM
[stamp:]
OFFICE OF LEGISLATIVE SERVICES
ARCHIVE [illegible]

[signature]

# The Shell Company (Puerto Rico) Limited
[ logo]

August 15, 2000

Honorable Antonio Silva Delgado
President
Socioeconomic Development and Planning Commission
Government of Puerto Rico
Chamber of Representatives
Capitol, P.O. Box 2228
San Juan, Puerto Rico 00901

RE: Chamber Resolution 7008

Honorable Commission:

The Shell Company (Puerto Rico) Limited respectfully submits its presentation concerning Chamber Resolution 7008. First of all, it is important to indicate that the situation related to the use of MTBE in gasoline requires a constructive dialog among the parties involved, to determine which alternative, if any, is necessary to implement, taking into account the concrete studies and findings on the real impact of MTBE on the underground water of our Country. Any intervention would be premature without evaluating whether this impact exists. Let's look at the core of this situation and the realities faced by the oil industry and all the parties involved.

Due to the serious air quality problems existing in several states of the United States, the Federal Environmental Protection Agency (better known by its initials, EPA) required the oil industry to introduce the use of a gasoline that would reduce the emissions of carbon monoxide (CO) for certain specific states. This gasoline, known as reformulated gasoline, was required in the amendments made to the Clean Air Act in 1990. One of the reformulated gasoline requisites is to contain oxygenates to provide a content of oxygen of at least 2% by mass, which is equivalent to 11% of MTBE, after being formulated. These amendments were made specifically for the states that did not comply with air quality standards for ozone. Fortunately, Puerto Rico was not included in that list, since it complied and complies with the established air quality standards.

The increased use of reformulated gasoline in the United States appears as a means to comply with legal requisites on minimum oxygen content and reduce the emissions of the exhaust lines of vehicles, mainly carbon monoxide in cars without catalytic converters. EPA assessed and promoted the use of MTBE to reduce these emissions.

Oficina Principal
PO BOX 366807
SAN JUAN, PR 00936-6807

Registered in England No. 174568
Registered office Shell Centre,
London SE 1 7NA

Tel: (787) 721-0150
Fax: (787) 729-1755
BAC: (787) 729-1700

Honorable Antonio Silva Delgado
Socioeconomic Development and Planning Commission
Chamber Resolution 7008
August 15, 2000
Page 2

MTBE, "methyl-tertiary butyl ether," is a common chemical widely used as gasoline additive. It is an oxygenate, which means that it increases the oxygen content in gasoline. It is manufactured combining methanol (produced from natural gas methane) and isobutylene (from various refineries, chemical plants and liquefied natural gas). Using MTBE in gasoline creates a product with cleaner burning.

MTBE is manufactured within the legal limits established by the laws of both the United States and Europe, at concentrations of up to 11% by volume (depending on the density of the fuel). MTBE was originally developed and used as a substitute for lead to enhance octane rating.

Recent information suggests that MTBE is not more toxic than the other components of gasoline. MTBE has been extensively studied in conventional toxicological tests and there is no concrete evidence to suggest that the use of MTBE in gasoline represents a risk to human health.

The studies on the possible effects of MTBE on health include results from three long-term carcinogenic studies in animals. The results of these studies are available to the public at large, and were examined in 1998 by the "International Agency for Research on Cancer" (IARC), which is part of the World Health Organization, with the mission of understanding and minimizing the causes of cancer in humans. After the revision of the available data for MTBE, said agency concluded that, even though there is limited evidence of carcinogenesis in some animal studies, in general MTBE "is not classifiable as carcinogenic for humans" (see http://www.IARC.fr.). In other words, there is no compelling reason to sustain that MTBE causes cancer in humans.

The reason why this controversy has arisen in the United States is because of the increase in the use of MTBE in fuels and the extensive use of relatively shallow underground water bodies as drinking water sources. Even though MTBE has low toxicity, it has a very low threshold for odor and taste, which causes even low levels (20 to 40 ppm) to cause water to be unacceptable.

PR-LEG-0000050

Honorable Antonio Silva Delgado
Socioeconomic Development and Planning Commission
Chamber Resolution 7008
August 15, 2000
Page 3

On the Island, the situation of MTBE should be studied and analyzed much more deeply, since the sources of drinking water originating from underground water bodies are mainly deep wells. Since this is an island, the water must be in continuous movement and is not stored underground. We must also consider that the threshold limits established, both by EPA and by JCA [Environmental Quality Board] and AAA [Water & Sewer Authority], do not allow supplying low quality drinking water.

Being aware of the potential dangers that a spill may cause, The Shell Company (Puerto Rico) Limited has an aggressive program for improvement of underground storage tanks, including an aggressive monitoring of all inventory systems and controls. In the short-term, our priority is to promote and support the dialogue between the oil industry and the parties involved, such as the government, the health and water authority and vehicle manufacturers, so as to proceed and provide an effective manner to take care of the concern expressed by this Honorable Commission in Chamber Resolution 7008. We respectfully sustain that the term of six months provided in Chamber Resolution 7008 is too short in this case to carry out the necessary studies to responsibly take care of this situation and support dialogue.

I am at your disposal for the questions you may have.

Sincerely,

[signature]
Juan I. Vásquez
Country Chairman

PR-LEG-0000051

**CERTIFICATION OF DOCUMENTS FOUND IN THE FILE:**

In the capacity of custodian of the files of the Legislative Assembly of Puerto Rico, I certify that we have diligently reviewed the file of the Chamber Resolution 7008, (hereinafter Chamber Resolution 7008) found in our archives and we delivered a true and exact copy of all documents that are part of the file to Atty. Jorge A. Sagardía, including:

1) Copy of the Text of Final Approval of Chamber Resolution 7008 dated June 30, 2000. (2 pages)
2) Report on Chamber Resolution 7008 by the Internal Affairs Commission of the Chamber dated June 29, 2000, signed by Augusto Sánchez Fuentes (Interim President — Internal Affairs Commission). (2 pages)
3) Report on Chamber Resolution 7008 by the Socioeconomic Development, Planning and Natural Resources Commission of the Chamber dated November 29, 2000, signed by Antonio Silva Delgado (President —Socioeconomic Development and Planning Commission) and Jorge Acevedo Méndez (President — Natural Resources Commission). (4 pages)
4) Presentation of The Shell Company (Puerto Rico) Limited dated August 15, 2000, signed by Juan I. Vásquez (Country Chairman). (3 pages)
5) Presentation of Caribbean Petroleum Limited Partnership dated August 15, 2000, signed by Eric Guzmán (Marketing Manager). (3 pages)
6) Presentation of the Gasoline Retailers Association of Puerto Rico, Inc. dated August 17, 2000. (5 pages)
7) Presentation of the Department of Health dated September 11, 2000, signed by Carmen Feliciano de Melecio, M.D. (Secretary of Health). (2 pages)
8) Presentation of the Department of Consumer Affairs dated September 14, 2000, signed by Jose M. Cintrón (Undersecretary). (2 pages)
9) Presentation of Esso Standard Oil Co. (Puerto Rico) dated September 20, 2000, signed by Jorge Concha (President). (3 pages)
10) Presentation of Texaco Puerto Rico Inc. dated September 20, 2000, signed by Cándido Rivera (Marketing Manager). (3 pages)
11) Presentation of the Environmental Quality Board signed by Atty. Héctor Russe Martínez (President). (4 pages)

The file consists of various documents – with a combined total number of 33 pages.

ISSUED today, October __, 2010, in San Juan, Puerto Rico.

[stamp:]
OCT. 13, 2010 9:15 AM
[stamp:]
OFFICE OF LEGISLATIVE SERVICES
ARCHIVE [illegible]

[signature]

PR-LEG-0000082

 **Caribbean Petroleum Limited Partnership**

August 15, 2000

Honorable Antonio Silva
President
Socioeconomic Development and Planning Commission
Chamber of Representatives of Puerto Rico
San Juan, Puerto Rico 00901

Re:     Call to Public Hearings
        Chamber Resolution 7008

> *"To order the Socioeconomic Development, Planning and Natural Resources Commission and Environmental Quality of the Chamber of Representatives of Puerto Rico to carry out a study to find out the presence of "Methyl Tertiary Butyl Ether" (MTBE), in the preparation of gasoline in Puerto Rico, as well as that imported; to know its risks and proper handling; and study alternatives to replace said chemical."*

Honorable Antonio Silva:

My name is Eric Guzmán Janer, "Marketing Manager" of Caribbean Petroleum Corporation, in which capacity I appear in this public hearing to present our comments concerning Chamber Resolution 7008.

I am accompanied by Atty. Norma Cotti, legal advisor of Caribbean Petroleum Corporation and Mr. Norberto Sepulveda, Manager of Planning and Economy of CPC.

### Caribbean Petroleum Corporation and the Market of Puerto Rico

Caribbean Petroleum Corporation (CPC) has been doing business in Puerto Rico since September 1987, when it purchased the service stations and the Refinery located on Highway # 28 Km. 2.0 in Bayamón from Chevron Gulf. Caribbean Petroleum Corporation has been for many years one of the main suppliers of oil products for the consumers through our chain of 250 service stations and also through other wholesale companies, independent companies, direct sales to the government and other Private Companies.

 P.O. Box 361988, San Juan P.R. 00936-1988 • Carr.#28, Km.2, Urb. Industrial Luchetti, Bayamón, P.R. 00961
Tels. (787) 785-0520/787-0101 • Fax:(787) 740-7880

PR-LEG-0000053

Hon. Antonio Silva
Page 2
August 15, 2000

Chamber Resolution 7008

The gasoline used in Puerto Rico does not require the use of MTBE. In the events where it is used, it is used only in order to increase the octane rating of the mix of components used in the production of gasoline. The maximum level permitted in the manufacture of gasoline is 15% by volume and its presence is more typical in high octane rating gasoline (Premium).

Concerning the Industry in general, the use of MTBE has increased since 1998, as it was used to control vehicle emissions. CPC does not produce MTBE, but has imported it to use it together with the other components produced in our refinery to manufacture finished gasoline for the Puerto Rican market.

The following table shows the average content of MTBE in percentage (%) by volume of gasoline produced in our refinery:

| YEAR | MTBE CONTENT (% Vol.) |
|------|------------------------|
| 1990 | 4.89 |
| 1991 | 5.30 |
| 1992 | 2.10 |
| 1993 | 0.00 |
| 1994 | 0.00 |
| 1995 | 0.00 |
| 1996 | 0.00 |
| 1997 | 0.00 |
| 1998 | 0.00 |
| 1999 | 0.00 |
| 2000 | 0.43 [*1] |

[*1] Represents the value in June 2000

PR-LEG-0000054

Hon. Antonio Silva
Page 3
August 15, 2000

CPC imports gasoline from all the parts of the World, which may contain MTBE with a maximum concentration of 15% by volume. The reality is that, during 1998 and 1999, the average concentration of MTBE in the gasoline imported by CPC was 1.02% by volume.
Please refer to the following table:

| YEAR | MTBE CONTENT (% Vol.) |
|------|------------------------|
| 1998 | 1.02 |
| 1999 | 0.61 |

Currently, there is no clear and precise scientific evidence demonstrating that MTBE causes cancer in humans, even though there are statistics that indicate that MTBE may cause cancer in animals, only when administered daily in high doses during the life of the animal.

Consequently, we understand that this Honorable Commission must continue to follow-up on the various studies carried out in the United States and elsewhere in the World, before making a decision concerning the use of MTBE.

In the specific case of CPC, we understand that after eliminating the use of lead in the production of gasoline, MTBE is the most suitable component to complement the production of gasoline in our Refinery at a time when there is no option to import high octane rating gasoline. In addition, if we eliminated the use of MTBE, the present viable alternatives would be to increase the content of aromatic compounds (BTX) in the gasoline pool. However, everybody knows that aromatic compounds are highly dangerous since, contrary to MTBE, it is known that these components cause cancer in humans.

Sincerely,
[signature]
Eric Guzmán
Marketing Manager

cbr

PR-LEG-0000055

**CERTIFICATION OF DOCUMENTS FOUND IN THE FILE:**

In the capacity of custodian of the files of the Legislative Assembly of Puerto Rico, I certify that we have diligently reviewed the file of the Chamber Resolution 7008, (hereinafter Chamber Resolution 7008) found in our archives and we delivered a true and exact copy of all documents that are part of the file to Atty. Jorge A. Sagardía, including:

1) Copy of the Text of Final Approval of Chamber Resolution 7008 dated June 30, 2000. (2 pages)
2) Report on Chamber Resolution 7008 by the Internal Affairs Commission of the Chamber dated June 29, 2000, signed by Augusto Sánchez Fuentes (Interim President — Internal Affairs Commission). (2 pages)
3) Report on Chamber Resolution 7008 by the Socioeconomic Development, Planning and Natural Resources Commission of the Chamber dated November 29, 2000, signed by Antonio Silva Delgado (President —Socioeconomic Development and Planning Commission) and Jorge Acevedo Méndez (President — Natural Resources Commission). (4 pages)
4) Presentation of The Shell Company (Puerto Rico) Limited dated August 15, 2000, signed by Juan I. Vásquez (Country Chairman). (3 pages)
5) Presentation of Caribbean Petroleum Limited Partnership dated August 15, 2000, signed by Eric Guzmán (Marketing Manager). (3 pages)
6) Presentation of the Gasoline Retailers Association of Puerto Rico, Inc. dated August 17, 2000. (5 pages)
7) Presentation of the Department of Health dated September 11, 2000, signed by Carmen Feliciano de Melecio, M.D. (Secretary of Health). (2 pages)
8) Presentation of the Department of Consumer Affairs dated September 14, 2000, signed by Jose M. Cintrón (Undersecretary). (2 pages)
9) Presentation of Esso Standard Oil Co. (Puerto Rico) dated September 20, 2000, signed by Jorge Concha (President). (3 pages)
10) Presentation of Texaco Puerto Rico Inc. dated September 20, 2000, signed by Cándido Rivera (Marketing Manager). (3 pages)
11) Presentation of the Environmental Quality Board signed by Atty. Héctor Russe Martínez (President). (4 pages)

The file consists of various documents – with a combined total number of 33 pages.

ISSUED today, October _, 2010, in San Juan, Puerto Rico.

[stamp:]
OCT. 13, 2010 9:15 AM
[stamp:]
OFFICE OF LEGISLATIVE SERVICES
ARCHIVE [illegible]

[signature]

certifiedtranslate



**CERTIFIED TRANSLATION**

A member of the American
Translators Association
ATA Member Number: 248719

*Documents Translated For:*

| Name: | John Dema, Esq. | Street Address: | 1236 Strand Street |
|---|---|---|---|
| Firm: | Law Offices of John K. Dema | City/State/Zip: | Christiansted / Virgin Islands / 00820 |

*Description of Document(s):*

| LETTER TRANSLATION (SEPTEMBER 20, 2000) |
|---|
| |
| XOM-PR-FILES-SUPP-473224 through XOM-PR-FILES-SUPP-473226 |
| |

| Source Language: | **SPANISH** | Target Language: | **ENGLISH** |
|---|---|---|---|

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at Language Fish LLC (doing business as www.certifiedtranslate.com), a professional document translation company, attest that the language translation completed by Language Fish's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, Language Fish LLC has caused the Certificate to be signed by its duly authorized officer(s).

**By:**    Sean Kirschenstein, Director        **Date:**    December 3, 2013

A copy of the translated version(s) is attached to this statement of certification.

State of California
County of Los Angeles

On __Dec 3, 2013__ before me, _____Karina Drosenos_____, Notary Public, appeared ____Sean Kirschenstein____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity; and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct

WITNESS my hand and official seal

Signature _____

KARINA D DROSENOS
Commission # 2033323
Notary Public - California
Los Angeles County
My Comm. Expires Jul 13, 2017

EXHIBIT NO.: 6
WITNESS: CONCHA
DATE: 12-4-13
Dorothy Linda Minor, RPR



Esso Standard Oil Co. (Puerto Rico)
PO Box 364269
San Juan PR 00936-4269
(787) 792-2920 Telephone
(787) 793-6555 Fax



September 20, 2000

Honorable Antonio Silva Delgado
President
Socioeconomic Development and Planning Commission
Puerto Rico House of Representatives
San Juan, Puerto Rico 00901

Re:    House Resolution 7008

Honorable Mr. President and Members of the Commission:

Esso Standard Oil Co. (Puerto Rico) thanks the Honorable Commission for the opportunity to be able to offer our comments on House Resolution 7008, regarding the presence of MTBE in gasoline and the existing alternatives. ESSO respectfully submits the following comments:

ESSO supplies gasoline to retail customers in Puerto Rico through the service stations that operate under the Esso brand. The gasoline we sell is not manufactured by ESSO, but rather is imported under a contract with a refiner in the region, or is obtained through exchange with a local producer. ESSO then adds its exclusive additive to the product, resulting in the gasoline that is sold at ESSO stations.

According to our records, the gasoline that is supplied to us contains low levels of Methyl Tertiary Butyl Ether, or MTBE. During the first seven months of this year (2000), the levels of this product have varied between 0 and 0.5 percent of MTBE by volume.

XOM-PR-FILES-SUPP-473224



Hon. Antonio Silva Delgado                    -2-                    September 20, 2000

It bears mentioning that the Federal Environmental Protection Agency (EPA) approves the use of MTBE in gasoline. This approval is based on a wide range of scientific and health studies.

In fact, in 1999 the EPA's Blue Ribbon Panel on Oxygenates in Gasoline did not recommend that this product (MTBE) be eliminated completely from gasoline. The panel observed that, as MTBE is being used in gasoline, it does not pose a danger or risk to the public. In areas of the United States where reformulated gasoline (RFG) is required, the panel recommended that the federal requirement on oxygenates be eliminated, which in regard to MTBE represents concentrations no less than 11 percent by volume.

In areas of the United States where use of reformulated gasoline is required, concerns have arisen regarding MTBE in underground water. The United States Congress and the Federal Environmental Protection Agency (EPA) are currently working on this matter. It is worth noting that the use of reformulated gasoline, or RFG, is not required in Puerto Rico. As was already mentioned, the levels of MTBE in the gasoline that is supplied to us tend to be substantially lower than the levels in reformulated gasoline.

ESSO is aware of the interest that this Honorable Commission has in MTBE. In addition, we are aware of the concern voiced in some states of the United States in regard to this subject. We want this Honorable Commission to know that we are seriously concerned about the handling of our products. Toward that end, we are working to minimize any leaks from the underground storage tank systems at our stations. ESSO's policy is to comply fully with the environmental laws and local regulations that apply to these tank systems. ESSO supports the strict observation of these regulations, and it is our policy not to deliver gasoline in underground tanks that we know do not comply with these regulations. Furthermore, companies affiliated with ESSO actively follow up and participate in scientific studies on pollution prevention and cleaning methods that are being conducted by various government and industry organizations.

XOM-PR-FILES-SUPP-473225



Hon. Antonio Silva Delgado                    -3-                        September 20, 2000

Once again, on behalf of Esso Standard Oil Co. (Puerto Rico), I thank you for the opportunity to address you today. I will be glad to answer any questions you may have.

Sincerely,

[Signature]
Jorge Concha
President

XOM-PR-FILES-SUPP-473226

**Esso Standard Oil Co. (Puerto Rico)**
PO Box 364269
San Juan PR 00936-4269
(787) 792-2920 Telephone
(787) 793-6555 Fax



20 de Septiembre de 2000

Honorable Antonio Silva Delgado
Presidente
Comisión de Desarrollo Socioeconómico y Planificación
Cámara de Representantes de Puerto Rico
San Juan, Puerto Rico 00901

Re:   R. de la C. 7008

Honorable Sr. Presidente  y miembros de la Comisión:

Esso Standard Oil Co. (Puerto Rico) agradece a la Honorable Comisión la oportunidad de poder presentar nuestros comentarios a la R. de la C. 7008, en relación con la presencia de MTBE en la gasolina y las alternativas que hay.  ESSO respetuosamente somete  los siguientes comentarios:

ESSO suple gasolina a clientes al detal en Puerto Rico a través de la red de estaciones de servicio que operan bajo la marca Esso.  La gasolina que vendemos no es fabricada por ESSO, más bien se importa bajo contrato con algún refinador en la región, o se obtiene mediante intercambio con algún productor local.  ESSO entonces añade su aditivo exclusivo al producto resultando en la gasolina que se vende en estaciones ESSO.

De acuerdo a nuestros registros, la gasolina que se nos suple contiene niveles bajos de Methyl Tertiary Butyl Ether, o MTBE.  Durante los primeros siete meses de este año 2000, los niveles de este producto han variado entre  0  y 0.5 por ciento de MTBE por volumen.

An ExxonMobil Subsidiary



Hon. Antonio Silva Delgado          -2-                    20 de Septiembre de 2000

Cabe señalar que la Agencia Federal de Protección Ambiental  (EPA, por sus siglas
en ingles) aprueba el uso de MTBE en la gasolina.  Esta aprobación se basa en una
amplia gama de estudios científicos y de salud.

De hecho, en 1999 el Panel Cinta Azul de  EPA sobre Oxigenados en la Gasolina
("Blue Ribbon Panel") no recomendó que se eliminara por completo este producto
(MTBE) de la gasolina.  El panel observó que tal como se usa MTBE  en la gasolina
no ofrece  peligro o riesgo para el público.  En áreas de los Estados Unidos en que
se requiere gasolina reformulada (RFG, por sus siglas en ingles), el panel
recomendó se eliminara el requisito federal de oxigenados, que en cuanto a MTBE
representa concentraciones no menores de 11 por ciento por volumen.

 En áreas de los Estados Unidos donde se requiere el uso de gasolina reformulada
han  surgido  preocupaciones  en  relación  a  MTBE  en  aguas  subterráneas.
Actualmente  el  Congreso  de  los  Estados  Unidos   y  la  Agencia  Federal   de
Protección Ambiental (EPA) están trabajando en este asunto.  Cabe señalar que el
uso  de  la gasolina reformulada, o  RFG, no es requerida en Puerto Rico.   Según ya
mencionado los niveles de MTBE en la gasolina que se nos suple tienden a ser
sustancialmente más bajos que los niveles en gasolina reformulada.

ESSO está consciente del  interés  que esta Honorable Comisión tiene en MTBE.
Ademas estamos conscientes de la preocupación expresada en algunos estados de
los Estados Unidos con relación a este tema.  Queremos que esta Honorable
Comisión  sepa  que  nos  preocupamos  seriamente  por  el  manejo  de  nuestros
productos.    A esos efectos, trabajamos para minimizar cualquier escape de los
sistemas de tanques soterrados en nuestras estaciones.  La política de ESSO es
cumplir a cabalidad con las leyes ambientales y las reglamentaciones locales que
aplican a dichos sistemas de tanques.   ESSO apoya la observación estricta de
estos reglamentos y es nuestra política no entregar gasolina en tanques soterrados
que sabemos no cumplen con estas regulaciones.  Además,  compañías afiliadas a
ESSO dan seguimiento activo y participan en estudios científicos de prevención de
contaminación y métodos de limpieza que están siendo conducidos por distintas
organizaciones de gobierno e industria.

XOM-PR-FILES-SUPP-473225

Hon. Antonio Silva Delgado          -3-                    20 de Septiembre de 2000

Nuevamente, en nombre de Esso Standard Oil Co. (Puerto Rico) les agradezco la
oportunidad de dirigirme a ustedes el día de hoy.  Estoy en la mejor disposición de
contestar cualquier pregunta que puedan tener.

Atentamente,

Jorge Concha
Presidente

XOM-PR-FILES-SUPP-473226

**Exhibit 9**

1           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               IN AND FOR THE COUNTY OF SAN FRANCISCO

3                            --o0o--

4   SOUTH TAHOE PUBLIC UTILITY       )
    DISTRICT,                        )
5                                    )
                   Plaintiff,        )
6                                    )
                   vs               )   No.  999128
7                                    )   THIS TRANSCRIPT CONTAINS
    ATLANTIC RICHFIELD COMPANY       )   CONFIDENTIAL MATERIALS
8   ("ARCO"); ARCO CHEMICAL COMPANY; )
    SHELL OIL COMPANY; CHEVRON       )
9   U.S.A., INC.; EXXON CORPORATION; )
    B.P. AMERICA, INC.; TOSCO        )
10  CORPORATION; ULTRAMAR, INC.;     )
    BEACON OIL CO.; USA GASOLINE     )
11  CORPORATION; SHELL OIL PRODUCTS  )
    CO.; TERRIBLE HERBST, INC.;      )
12  ROTTEN ROBBIE; J.E. TVETEN       )
    CORP.; TAHOE TOM'S GAS STATION;  )
13  THE SOUTHLAND CORP.; PARADISE    )
    CHEVRON; and DOES 1 through 600, )
14  inclusive,                       )
                                     )
15                 Defendants.       )
    _____)

16

17                          --o0o--
                    THURSDAY, JANUARY 13, 2000
18                       10:07 A.M.
                           --o0o--
19                      DEPOSITION OF
                       BARBARA MICKELSON
20                          --o0o--

21

22

23

24  CATHLEEN SLOCUM, CSR
    License No. 2822

25

1 responsibility for maintaining the tank systems.

2 Q   Okay.  Did you make that statement based on discussions

3 with other people employed by Exxon at the time, that is,

4 that if MTBE were added to Exxon gas there was going to be a

5 detailed risk assessment to determine where additional

6 monitoring in the form of monitoring wells should occur?

7 A   I would, I would think that I had discussions with

8 Mr. Decker and Mr. Eaton.

9 Q   Okay.  You wouldn't make a statement like that on your

10 own?

11 A   Well, I think that it would be something that I would

12 review with my supervisor, the department.  It's something

13 that I don't think that I would sign off and copy them

14 without making sure that they knew I was going to say that.

15 Q   Okay.  So at least as you understood it, it was your

16 group's decision that if Exxon went ahead with the use of

17 MTBE, you would be recommending a detailed risk assessment

18 with monitoring?

19 A   That's how I read this memo.

20 Q   Okay.  And the monitoring would be to install

21 monitoring wells that could check the condition of

22 groundwater right near the service station and thereby let

23 you know if you were having a problem quickly?

24 A   That was one of the techniques in these monitoring

25 programs.  Other things that were done were the inventory

1 control and tank testing.

2 Q   So you'd be doing more for gasoline that contained MTBE

3 than you were doing before you had gasoline that contained

4 MTBE?

5 A   I think that all those things were done routinely for

6 the gasoline.  I don't want to suggest that there wasn't a

7 concern about gasoline not containing MTBE, but my

8 recommendation was to be more aggressive or to look at the

9 need for monitoring more, more directly or more thoroughly

10 because MTBE increased some risks that I had identified

11 previously.

12 Q   Okay.  Now, this detailed risk assessment that you

13 referred to would have been used to try to identify sites

14 that might be more sensitive than others to contamination

15 problems so that you could invest your money in the

16 monitoring where the greatest risk was, was that the idea?

17 A   Well, I think it, the idea was to look at things like

18 the soil conditions, the tank age, other things to determine

19 which ones would, you know, may need to be addressed sooner

20 than others.  So it's a combination of the soil, equipment

21 and where you were located, things like that.

22 Q   Okay.  So the older the tank, would that tend to

23 indicate the greater the need assuming the soil conditions

24 were the same?

25 A   I think that if everything were the same, age would

1 drive you to deal with the older tank first.

2 Q   Because corrosion or other factors associated with age

3 might cause that one to leak with a greater frequency?

4 A   Again, if there were no other factors involved, I would

5 say that then you only would make your decision based on

6 age.  I would look at the older tanks.

7 Q   Okay.  And this letter was sent to Mr. Mixter.  Was he

8 head of the marketing department at the time?

9 A   I don't know what his title was at the time.

10 Q   It was sent to Mr. Eaton who was your boss?

11 A   At that time I worked directly for Art Decker who

12 worked for Mr. Eaton.

13 Q   I see.  Mr. Eaton had been promoted?

14 A   No.  I think that Mr. Decker was brought in to --

15 Mr. Eaton was in the same job, but Mr. Decker was brought in

16 to coordinate the environmental activities.

17 Q   Okay.  If we could turn to Exhibit 8, we now have a

18 third memo again signed by yourself, again addressed to Mr.

19 Mixter.  Dated just what, about two months later than the

20 memo we just went over, namely, April 19, 1985; is that

21 correct?

22 A   That's correct.

23 Q   So this would be your third memo on MTBE and its

24 potential for causing groundwater contamination problems in

25 less than a year?

1 A   That would be correct.

2 Q   Were you writing these memos because you were being

3 asked more and more questions or because you had new

4 information?  Why did you keep writing?  Could you explain

5 that?

6 A   I think the first memo was a general question, you

7 know, what if we put MTBE in our gas.  The second one was

8 more focused, what if we put MTBE in the particular Texas

9 pipeline situation.  And this third one, again, it's the

10 Texas transmission, but it looks like they've added some

11 other locations.  They've added Florida, South Carolina and

12 North Carolina.  So I think each time they wanted to get

13 another check on, okay, if we do this, what do you say?

14 Okay, what if we just do a smaller thing, what do you say?

15 Okay.  Now, we've got a slight change.  So they just keep

16 coming back and making sure that they get our input on each

17 choice that they're evaluating.

18 Q   Okay.  It certainly wasn't because they didn't

19 understand what your concerns were that they kept coming

20 back to you?

21 A   No, I think they understood what my concerns were.

22 Q   And it wasn't because they disagreed with what you were

23 saying?

24 A   I had not heard that they disagreed with what I was

25 saying.

1 Q   It was because they wanted to look at a different
2 scenario?
3 A   That's -- my thought is there's a system of getting
4 input and if they went to management and said here's our
5 proposal, management would say, what did marketing
6 environmental say about that?  They said, well, we didn't
7 ask them.  That wouldn't work within Exxon.  So they had to
8 come back and get the input.
9 Q   I see.  So this third one, Exhibit 8, is an attempt to
10 look at the use of MTBE in the Texas Eastern Transmission
11 area that would include sending gasoline to Jacksonville,
12 Florida, Charleston, South Carolina, and Wilmington, North
13 Carolina areas which I assume includes some outlying
14 communities.  Was that your understanding?
15 A   As I'm looking at it today I'm not sure whether the
16 Texas Eastern Transmission serviced those additional areas
17 or if they were going to get -- I'm not sure if those are
18 four different locales with different service or if the
19 Texas Eastern encompasses that.
20 Q   Okay.
21 A   I'm not sure.
22 Q   But what you do recall is this memo was designed to
23 discuss the potential impact of having MTBE in gas not just
24 in the Texas pipeline but also in Florida, South Carolina
25 and North Carolina?

1 A   That's, my read of it today as I'm looking at it is we
2 had the question about the Texas Eastern and this is
3 additional areas.
4       MR. MILLER:  Okay.  We're going to have to go off
5 the video record for just a minute.
6       THE VIDEOGRAPHER:  Going off record at 11:55.
7       (Thereupon a brief recess was taken.)
8       THE VIDEOGRAPHER:  Back on record 11:56.
9       MR. MILLER:  Q   I'd like to review your April 19,
10 1985 memo briefly.  First thing you do in the memo is you
11 give four reasons why there is an environmental risk of
12 using MTBE.  You do them as bullet points; is that correct?
13 A   That's correct.
14 Q   And like your prior memos you point out that MTBE has
15 higher solubility, correct?
16 A   That's correct.
17 Q   It has special taste and odor, correct?
18 A   That's correct.
19 Q   It has a higher differential transportation rate which
20 is language you use to say it's more mobile than some of the
21 other components of gasoline?
22 A   I use because it, again, when you look at how it
23 functions and where it goes, it travels differently and
24 isn't adsorbed by the soils.  So it goes with the water in a
25 different way than others do.

1 Q   Okay.  So it's not because you don't want to refer to
2 that other oil company, Mobil, it's because --
3 A   To me it just, it doesn't, it isn't as accurate.
4 Q   Okay.
5 A   I wouldn't -- I'm sure I've used that in conversation,
6 but it can't move faster than water.  It moves with the
7 water.  It moves through the environment just like the other
8 constituents, but it doesn't get adsorbed.  It has this
9 chromatographic effect that we were seeing.  So it could
10 move out beyond the benzene, for instance, and get further
11 away from the source.
12 Q   Basically MTBE goes where the water goes, it doesn't
13 stick to the soil?
14 A   Basically that's what happens.  It doesn't like soil as
15 much as some of the other constituents do.
16 Q   Okay.  And then the fourth bullet point is MTBE cannot
17 be removed below detectable levels by carbon adsorption and,
18 therefore, must be treated by more complicated and expensive
19 air stripping columns, correct?
20 A   What I think I said earlier, it can be removed by
21 carbon adsorption and different, you know, carbon has
22 developed a lot since the time I wrote this memo in terms of
23 things.  So I wouldn't have written it the same way today,
24 but at that time with my experience on carbon that's what I
25 thought.

1 Q   It's your understanding we've got some new and improved
2 carbon these days; is that correct?
3 A   I believe we have some new and improved carbon.
4 Q   All right.  They actually make carbon different ways
5 depending upon what chemical you're trying to filter out.
6 Is that your understanding?
7 A   There are some, there are some, you know, polymer
8 enhanced carbons that go in one direction and a whole
9 variety of carbons.  So you can get special carbons for
10 different chemicals in a way that we didn't have as much
11 information about in 19 -- you know, they just -- it wasn't
12 as big an industry in 1985.  So I just -- I would not say
13 today that you can't remove it from solution to below
14 detectable levels.
15 Q   Okay.
16 A   That, I just wanted to clarify that that was what my
17 position was based on my understanding and experience in
18 1985.
19 Q   Okay.  Now, apparently because of the trend in coming
20 back to you for requests, even though you were responding
21 for a two-way request for information on Texas, Florida and
22 the Carolinas, you even, you went further and mentioned the
23 US as a whole?  If you look at --
24 A   Well, I believe I read this a little, while we were
25 taking a break I looked at the letter again.  And I see that

Page 72

1 we talk about the Texas Pipeline System and the Texas
2 Eastern Transmission System are not the same thing. They're
3 different things.
4 Q   Okay.
5 A   In our earlier conversation I was looking at Texas
6 Eastern and thinking it was the pipeline, but they're two
7 different things. So this is a, this isn't the same request
8 with a different, like some add-on, this is a completely new
9 request.
10 Q   Okay. I guess my point is if you look at your four
11 bullets and the paragraph immediately below, after going
12 over those four points you state, "As a result we recommend
13 that from an environmental risk point of view MTBE not be
14 considered as an additive to Exxon gasolines on a blanket
15 basis throughout the United States."
16 A   That was the conclusion.
17 Q   And you use the term "we" not in the royal sense but to
18 discuss what you and your colleagues agreed upon; is that
19 correct?
20 A   I think that we were talking about real estate and
21 engineering. I think at this, I'm looking at the cc list,
22 and now we've added W.E. Gattis who was Mr. Eaton's
23 supervisor. So, again, I'm making a recommendation based on
24 review, but the recommendation is really being submitted by
25 real estate and engineering services, the group that did the

Page 73

1 environmental work for marketing.
2 Q   So this is a report by a group of people employed by
3 Exxon who have expertise in environmental contamination
4 incidents to somebody whose three levels above where you are
5 in the chain of command in Exxon?
6 A   I don't know exactly where Mr. Mixter fits. He may
7 have been at Mr. Gattis' level. He may have been at
8 Mr. Eaton's level.
9 Q   Okay.
10 A   He may have been at Mr. Decker's level. I just don't
11 know.
12 Q   But certainly it was going to people higher up in the
13 company?
14 A   Yes.
15 Q   The purpose of this was to give information to
16 management so that a good decision could be made?
17 A   I believe that's correct.
18 Q   Okay. You go on to state after your group made the
19 recommendation that it not be used on a blanket basis
20 throughout the United States, that, quote, "... on an
21 area-by-area basis the risks to the environment differ."
22 A   Right.
23 Q   And that was your opinion at the time; is that
24 correct?
25 A   That's correct.

Page 74

1 Q   So certainly this memo couldn't be read as a
2 recommendation to use MTBE in gasoline in California?
3 A   No. It wasn't addressing California.
4 Q   California is a little different than Texas now that
5 you've been out here, not just the climate, not just the
6 humidity, not just the number of folks in the oil business,
7 but for some other reasons relating to your field,
8 hydrogeology?
9 A   I would say that's true.
10 Q   Okay. There are quite a few public drinking water
11 systems here in California that rely on groundwater. Is
12 that your understanding?
13 A   Yes.
14 Q   And there have been some contamination problems in some
15 of those wells associated with activities by us folks
16 walking around on the surface, substances
17 A   I'm not sure I understand that question that way.
18 Q   Substances introduced at the surface are finding their
19 way to California wells, public drinking water wells. Is
20 that your understanding?
21 A   I believe that's true.
22 Q   Okay. You again reference the Texas Pipeline System
23 and the factors that lead you to conclude that it would be
24 okay. What you state is, after discussing the Texas
25 Pipeline System, you state, "Therefore, we saw no overriding

Page 75

1 reason to and did not recommend against the addition of MTBE
2 in the Texas Pipeline System," correct?
3 A   That's correct.
4 Q   Is that different than saying I recommend that you use
5 it?
6 A   I don't think it -- it wasn't my position to recommend
7 that they use it. There would be other reasons to use it.
8 But here I didn't, as a result of the risks that we saw in
9 that particular distribution area, we didn't recommend
10 against it.
11 Q   Okay. You then state in the next paragraph, "The
12 mitigating factors which reduce the risks associated with
13 the addition of MTBE in the Texas Pipeline System do not
14 exist in other areas of the country where we market,"
15 correct?
16 A   That was my understanding of where we market and what
17 the characteristics were.
18 Q   Okay. You go on to state, "From an environmental risk
19 point of view we recommend against introducing MTBE into the
20 Texas Eastern Transmission System and the Southeast Atlantic
21 Coast"?
22 A   That's correct.
23 Q   Now, that would have included the state of North
24 Carolina?
25 A   Well, at least the Wilmington area.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN FRANCISCO

SOUTH TAHOE PUBLIC UTILITY
DISTRICT,

      Plaintiff

VS.

                               NO. 999128

ATLANTIC RICHFIELD COMPANY ("ARCO");
ARCO CHEMICAL COMPANY; SHELL OIL
COMPANY; CHEVRON U.S.A., INC.;
EXXON CORPORATION; B.P. AMERICA,
INC.; TOSCO CORPORATION; ULTRAMAR,
INC.; BEACON OIL CO.; USA
GASOLINE CORPORATION; et al.,

      Defendants

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN FRANCISCO

COMMUNITIES FOR A BETTER
ENVIRONMENT, a California
Non-Profit Corporation, on behalf
of the general public,

      Plaintiff

VS.                  CIVIL NO. 997013

UNOCAL CORPORATION,
a Delaware Corporation, et al

      Defendants

* * * * * * * * * * * * * * * * * * *

* * * * * * * * * * * * * *

ORAL DEPOSITION OF
DALE YOUNG
April 26, 2000

* * * * * * * * * * * * * * * * * * * * * * * *

1      ORAL DEPOSITION OF DALE YOUNG, produced as a witness
2  at the instance of the plaintiff, was taken in the above
3  styled and numbered cause on April 26, 2000, from 10:23
4  a.m. to 4:24 p.m., before Kay Howell, Certified Shorthand
5  Reporter in and for the State of Texas, reported by
6  machine shorthand, at the Doubletree Hotel, 400 Dallas
7  Street, Houston, Texas, 77002.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                        2

59

1    Q.   Then there is a commercial MTBE product.  Is that
2  correct?
3    A.   I've not heard it referred to as commercial MTBE.
4    Q.   What term is used for the type of product that is
5  sold to your customers who are refineries?
6    A.   MTBE.
7    Q.   And is that product neat MTBE, or does it have a
8  lesser concentration of MTBE in the product?
9    A.   That would be product that is as we produced,
10  which, again, I would apply personally the term neat to
11  that, meaning it's unblended at that point.
12    Q.   Is it your understanding that a chemical is
13  present in the product that you sell as MTBE which is
14  called TBA?
15    A.   The acronym is TBA.  Yes, I am aware of that.
16    Q.   Is it possible to produce an MTBE product in the
17  real world that doesn't contain TBA?
18    A.   Practically speaking, I would say yes.
19    Q.   Okay.  Now is that TBA included as an
20  ingredient in the MTBE products that you sell to
21  refineries?
22    A.   The process for which we make MTBE starts with a
23  product -- with the TBA or tertiary butyl alcohol.  You
24  process that downstream ultimately to MTBE.  As you go
25  through the processing steps, you will typically get some

60

1  material that remain unreacted.  And therefore you'll
2  have some level of that product in the final product, in
3  this case TBA in MTBE.
4    Q.   So basically you're starting with a group of
5  chemicals in the process of manufacturing MTBE that
6  includes TBA in terms of the way Arco does it, is that
7  correct?
8    A.   Generally speaking, yes.
9    Q.   And then for various reasons some portion of that
10  TBA isn't chemically changed during the process so it
11  ends up in the final product?
12    A.   That is correct.
13    Q.   Now, is that true to your understanding during
14  the time Arco Chemical Company was making MTBE?
15    A.   Yes.
16    Q.   And is that still true today?
17    A.   Yes.
18    Q.   Can you tell me approximately what portion of the
19  product contains TBA?
20    A.   I personally cannot tell you in that that's a
21  detail that I wouldn't be directly involved in.
22    Q.   Can you identify the person you would ask to get
23  the answer to that question?
24    A.   I would ask my marketing manager for that
25  information.

**Page 1**

```
 1      1    SUPERIOR COURT OF THE STATE OF CALIFORNIA
                   FOR THE COUNTY OF SAN FRANCISCO
 2      2  COMMUNITIES FOR A BETTER  :
              ENVIRONMENT, a California :
 3      3  Non-Profit Corporation,    :
              On Behalf of the General :
 4      4  Public,                    :
                     Plaintiff   : CIVIL ACTION NO.
 5      5     vs.                : 997013
           UNOCAL CORPORATION, a   :
 6      6  Delaware corporation,    :
           et al.,                  :
 7      7       Defendants   :
                   -------------------
 8      8    SUPERIOR COURT OF THE STATE OF CALIFORNIA
                   FOR THE COUNTY OF SAN FRANCISCO
 9      9  SOUTH TAHOE PUBLIC       :
           UTILITY DISTRICT         :
10     10      Plaintiff    : CASE NO.
              vs.           : 999128
11     11  ATLANTIC RICHFIELD COMPANY :
           ("ARCO"); ARCO CHEMICAL   :
12     12  COMPANY; SHELL OIL        :
           COMPANY; CHEVRON U.S.A.,  :
13     13  INC.; EXXON CORPORATION;  :
           B.P. AMERICA, INC.; TOSCO :
14     14  CORPORATION; ULTRAMAR,    :
           INC.; BEACON OIL CO.; USA :
15     15  GASOLINE CORPORATION;     :
           SHELL OIL PRODUCTS CO.;   :
16     16  TERRIBLE HERBST, INC.;    :
17     17    ROTTEN ROBBIE; J.E. TVETEN:
18     17  CORP.; TAHOE TOM'S GAS    :
19         STATION; THE SOUTHLAND    :
20     18  CORP.; PARADISE CHEVRON;  :
21         and DOES 1 through 600,   :
22     19  Inclusive,                :
23              Defendants   :
24     20       -------------------
25     21
```

**Page 2**

```
 1      1      The videotaped deposition of DAVID J.
 2      2  BOTT, taken on Monday, June 5, 2000 at 10:05
 3  a.m., at the Law Offices of Blank Rome Comisky &
 4  McCauley, LLP, One Logan Square, 18th and Cherry
 3      5  Street, Philadelphia, Pennsylvania before Deborah
 6  C. D. Shumaker, Notary Public.
 4      7       --------------------
 5      8
 6      9  Reported by:
 7     10  Deborah C. D. Shumaker
 8     11
 9     12  APPEARANCES:
10     13       SCOTT SUMMY, ESQUIRE
11           Cooper & Scully
12     14       900 Jackson Street
13           Suite 100
14     15       Dallas, Texas  75202
15           (214) 712-9506
16     16       On behalf of the Plaintiff
17           Communities For A Better
18     17       Environment
19     18  DUANE C. MILLER, ESQUIRE
20           Miller, Sher & Sawyer
21     19       University Park Offices
22           100 Howe Avenue
23     20       Suite S120
24           Sacramento, California  95825-8218
25     21       (916) 924-8600
```

**Page 3**

```
 1      1       Tahoe Public Utility District
 2    JONATHAN JENKINS, ESQUIRE
 2      3  Latham & Watkins
           633 West Fifth Street
 3    Suite 4000
 4    Los Angeles, California 90071-2007
           (213) 485-1234
 4      5       On behalf of the Defendant
 5           Tosco Corporation
 6
 6    KENNETH L. WAGGONER, ESQUIRE
 7    Brobeck Phleger & Harrison LLP
           550 South Hope Street
 7      8  Los Angeles, California 90071-2604
           (213) 489-4060
 8      9       On behalf of the Defendants
 9           B.P. America, Unocal Corporation
10     10  and Union Oil Company of
           California
11
11    JEFFREY S. BROMME, ESQUIRE
12     12  MARK W. STOUTENBURG, ESQUIRE
           Arnold & Porter
13     13  555 Twelfth Street, N.W.
           Washington, D.C. 20004-1206
14     14  (202) 942-5999
           On behalf of the Defendant
15     15       Atlantic Richfield Company
16    ELIZABETH M. WEAVER, ESQUIRE
16           Howrey Simon Arnold & White
17     17  550 South Hope Street
18    Suite 1400
19     18  Los Angeles, California 90071-2627
20           (213) 892-1800
21     19       On behalf of the Defendant
22           Mobil Oil Corporation
23     20
24    MARYLIN JENKINS MILNER, ESQUIRE
25     21  Manatt, Phelps & Phillips, LLP
```

**Page 4**

```
 1      1       Suite 700 Washington, D.C.  20005
           (202) 955-0625
 2      2       On behalf of the Defendants
           Ultramar, Inc. and USA Petroleum
 3      3
 4    COLLEEN P. DOYLE, ESQUIRE
 4      4  McCutchen, Doyle, Brown & Enersen LLP
           355 South Grand Avenue
 5      5  Suite 4400
           Los Angeles, California  90071
 6      6  (213) 680-6446
           On behalf of the Defendants
 7      7  Chevron U.S.A., Inc., Texaco
           Refining & Marketing, Inc., Shell
 8      8  Oil Company and Exxon Corporation
 9    ALAN J. HOFFMAN, ESQUIRE
 9    Blank Rome Comisky & McCauley, LLP
10     10  One Logan Square
11           18th and Cherry Street
12     11  Philadelphia, Pennsylvania  19103-6998
13           (215) 568-5505
14     12       On behalf of Lyondell Chemical
15           Company and the Deponent
16     13
17     14  Also present:  Joseph Speelman
18           Ken Nuzzi, Video Operator
19     15
20     16
21     17
22     18
23     19
24     20
25     21
```

1    1    A.  This was before my time with the
2    2  company.
3    3    Q.  Certainly the document that is marked
4    4  Deposition Exhibit Number 6 is a document that is
5    5  dated June 4th, 1987.
6    6    Would it appear to you that Arco
7    7  Chemical was using TBA at least beginning in
8    8  1987?
9    9    A.  It appears to be so, yeah.
10   10    Q.  Was Arco Chemical using TBA to make
11   11  isobutylene during the time in which you were in
12   12  the division that dealt with MTBE?
13   13    A.  Yes.
14   14    Q.  Do you know whether or not your
15   15  customers, the refiners, when they manufacture
16   16  MTBE, whether or not they use TBA as part of the
17   17  isobutylene process?
18   18    A.  They typically do not.
19   19    Q.  Was this something that was particular
20   20  to a chemical company such as Arco Chemical?
21   21    A.  Yes.
22
23
24
25

1    1    Q.  Certainly to the extent that the
2    2  refiners purchased pure MTBE from Arco Chemical,
3    3  the isobutylene would contain TBA, correct?
4    4    A.  I didn't understand the question.
5    5    Q.  To the extent that your customers
6    6  purchased pure MTBE from Arco Chemical, that MTBE
7    7  would contain TBA as part of the isobutylene,
8    8  correct?
9    9    MR. JENKINS:  I just object.  The
10   10  question makes no sense.
11   11    MR. HOFFMAN:  I didn't understand the
12   12  question either.
13   13    Q.  Okay.  Let's try it again.
14   14    Does commercial grade MTBE contain
15   15  TBA?
16   16    A.  Typically, yes, a small amount.
17   17    Q.  What written literature, warnings,
18   18  instructions were given to your customers related
19   19  to the characteristics of TBA in groundwater?
20   20    A.  I am not aware of any.
21   21    Q.  Are you aware of any Arco Chemical
22
23
24
25

1    1  literature that was given to your customers
2    2  related to TBA and the storage and handling of
3    3  TBA?
4    4    A.  I'm sure there was information at some
5    5  point.
6    6    Q.  Are you aware of any warnings or
7    7  instructions given by Arco Chemical to your
8    8  customers related to TBA?
9    9    A.  As far as I know, again, it was before
10   10  my time, but Arco Chemical sold TBA as a
11   11  gasoline-blending component, and my assumption
12   12  would be that there was information at that
13   13  point.
14   14    Q.  Are you aware of any literature,
15   15  warnings or instructions that Arco Chemical would
16   16  have given to its customers relating to TBA when
17   17  it sold these customers MTBE?
18   18    A.  No.
19   19    Q.  Are you aware of any literature,
20   20  warnings or instructions given by Arco Chemical
21   21  to owners and operators of gasoline service
22
23
24
25

1    1  stations related to TBA?
2    2    A.  No.
3    3    (Whereupon, Bott Deposition
4    4  Exhibit No. 7, Document Bates Stamped ARC 067913
5    5  and ARC 067914, marked.)
6    6    BY MR. SUMMY:
7    7    Q.  I show you what has been marked as
8    8  Deposition Exhibit Number 7.
9    9    Have you seen this document before?
10   10    A.  Not the cover, but the memo, yes.
11   11    Q.  The cover has some handwriting on it.
12   12    Do you know whose handwriting that is?
13   13    A.  No.
14   14    Q.  Do you know who the initials are at the
15   15  bottom of the handwritten note?
16   16    A.  I can't read it.
17   17    Q.  On the first page there are some
18   18  stamped names.  One of them is your name, David
19   19  Bott, and the other one is William Piel.
20   20    Do you see that?
21   21    A.  Yes.
22
23
24
25

1  number over again.  016192.  There's actually two
2  documents here.  One appears to be a material
3  safety data sheet for MTBE dated August 31, and
4  the date may be '85, and the second is dated May
5  9th, 1997.  I will show you these two material
6  safety data sheets we have marked as Exhibit 18.
7        I'm going to ask you to identify them
8  after you've had a chance to look at them and to
9  flip to the components page.
10       MR. MILLER:  We will go off the video
11  record.
12       THE VIDEO OPERATOR:  4:39 p.m., off
13  record.
14       (Discussion off the record.)
15       THE VIDEO OPERATOR:  Now 4:41, on
16  record.
17       BY MR. MILLER:
18  Q.  Have you examined the material safety
19  data sheets, sir?
20  A.  I looked through them, yes.
21  Q.  Can you tell me the apparent date of

1  the first one from Arco Chemical Company?
2  A.  Do you mean these top, the top sheet?
3  Q.  There is a date at the top apparently
4  of each page.  On some pages the legibility is
5  better than others.  I apologize, but it was
6  faxed here, so I am giving you the best copy
7  available to me at the moment.
8  A.  This looks like page 6, 7 and 8 of an
9  MSDS dated August 31st, either '85 or '95.  Maybe
10 '95 if you look at the second page.
11 Q.  And could you turn to the component
12 section of that particular MTBE product, please.
13 A.  Could you give me the page.
14 Q.  You have the only copy, sir.  I'd be
15 happy to if I --
16       (Document tendered.)
17 Q.  If you look at page, the second page,
18 16193, there's a section that says component
19 name, MTBE.
20       Do you see that portion?  It's about
21 midway in the document.

1  A.  Yes.
2  Q.  Now, do you know how to interpret that
3  from your years as a technical manager?
4  A.  I believe this is the label section of
5  the MSDS which would be typical of the label that
6  you would put on a container if you stored it
7  that way.
8  Q.  And what does it list as the amount of
9  MTBE present?
10 A.  It says AP, which would be
11 approximately, 97 percent.
12 Q.  Does it disclose what the other 3
13 percent of the product is?
14 A.  It does not.
15 Q.  Is it your understanding from your
16 years as an Arco Chemical employee that that
17 product would contain some TBA?
18 A.  It would typically contain some TBA,
19 yes.
20 Q.  Could you turn to the material safety
21 data sheet for 1997 for MTBE.

1  A.  I will give you that.
2  Q.  Yes.  Let me see if I can help you.  It
3  begins on page 16154.  It has an apparent date of
4  May 9th, 1997 at the top, and under component
5  name it indicates MTBE and lists a percentage.
6  A.  Right.
7  Q.  And what is listed there as far as the
8  contents of the product that Arco was selling?
9        MR. HOFFMAN:  I think -- objection,
10 because this MSDS is for something called
11 Arcopure, high purity MTBE, whereas the other
12 MSDS was for MTBE.
13       MR. MILLER:  Okay.  That's fine.
14 Q.  Is that the case, sir?
15 A.  Yes.
16 Q.  Now, for this particular MTBE product,
17 what is the composition of the product, according
18 to your material safety data sheet?
19 A.  This particular product is a solvent,
20 high purity solvent grade MTBE used in things
21 like pharmaceutical manufacture, and the purity

Page 209

1 here is GT, which is greater than 99.9 percent.

2    Q.   So it is possible to make MTBE without
3 TBA; is that correct?

4    A.   Anything is possible, yes.

5    Well, Arco Chemical Company
6 manufactures an MTBE product without TBA; is that
7 correct?

8    MR. JENKINS:   Objection.  It assumes
9 facts not in evidence.  It's greater than 99.9
10 percent pure, but the number 100 is not pure.

11    A.   It can be manufactured, but it would be
12 too expensive to sell this for gasoline use.

13    Q.   At least given the way Arco Chemical
14 Company makes the product; is that correct?

15    A.   Given the way anybody makes the
16 product.

17    Q.   So you would expect that all MTBE would
18 contain some TBA?

19    A.   I would expect all MTBE would not be
20 99.9 percent.  It could contain some small
21 amounts of TBA.

Page 210

1    Q.   Why is that?  As a chemical engineer,
2 could you explain that.

3    A.   Yes, I could.

4    Q.   Please.

5    A.   Methanol is reactive with isobutylene
6 to create MTBE, manufacture MTBE.  Methanol often
7 contains a small amount of water as an impurity,
8 and the water in the methanol can react with the
9 isobutylene as well as the methanol, and when
10 water reacts with isobutylene, it creates TBA.

11    Q.   I see.

12    So basically if there's some water in
13 the methane, you are going to end up with some
14 TBA in the MTBE product made from methane and
15 isobutylene?

16    A.   Methanol.  Yes.

17    Q.   Right.

18    Does any of the material safety data
19 sheets that I have marked as Exhibit 18 mention
20 that TBA is present in product?

21    A.   It doesn't appear to be listed here in

Page 211

1 this 1997 one.

2    Q.   That would be the last in the series
3 that you would have been responsible for more or
4 less, that is, the 1997 editions?

5    A.   Actually, the 1997 is the Arcopure
6 which I didn't have anything to do with.  The
7 latest one here appears to be 1995.

8    Q.   For MTBE?

9    A.   Fuel grade for regular MTBE.

10    Q.   And does that one mention TBA as a
11 component of the product that your employer
12 made?

13    A.   I don't believe so.

14    Q.   All right.

15    Now, as a chemical engineer and former
16 technical manager for Arco Chemical, you know
17 some of the chemistry involved in MTBE; is that
18 correct?

19    A.   It depends what you mean by chemistry.

20    Q.   MTBE is a name for a molecule; is that
21 correct?

Page 212

1    A.   Yes.

2    Q.   And is it your understanding that
3 MTBE's principal use was for blending with
4 gasoline?

5    A.   Yes.

6    Q.   At least those are the customers that
7 your firm had, principally refineries for that
8 product, correct?

9    A.   Yes.

10    Q.   And did you understand that once MTBE
11 is blended with gasoline, that molecule, MTBE,
12 would remain intact in the gasoline?

13    A.   Yes.

14    Q.   So it would be part of the gasoline
15 product ultimately put in underground storage
16 tanks.  Was that your understanding?

17    A.   It would be a component of the finished
18 gasoline.

19    Q.   And was that the reason, to your
20 understanding, that you were getting some phone
21 calls about MTBE in groundwater; that is, that it

Legal Retention at MSXSOC

EXHIBIT
tables'  51
999/28

From:       Marshall GR (Glen)  at MSXSOPC
Sent:       Friday, May 29, 1998 5:36 PM
To:         Stanley CC (Curtis)  at MSXWHWTC
Cc:         Chistolini C. Wayne [STAR]
Subject:    RE:

(We, Shell) are also moving on said focus.  "Achilles Heel" of systems has always been the "Bubba-factor".........the best intentions of hardware manufacturers and designers being ultimately defeated by poor installation and maintenance practices.  Have been working last 2 years with Oy U-Cont (Varkaus, Finland) and Trusco Tanks (Fresno, CA) on a modular UST system manufactured in a factory (controlled environment) by properly trained personnel under constant supervision and inspection.  Initial evaluations indicate a significantly more reliable system installed with roughly 20%+ savings in total project time and costs (related to UST portion of project).  LA City Fire loved concept.  Have two projects in for permits in LA Basin now.  Coupled with our "Compliance Management Concept" (Veeder-Root Simplicity), overall concept could provide significant movement towards what UST system operation should have been all along.  Advise if further concept details desired.

Glen R. Marshall, P.E.
Staff Engineer
Marketing Engineering
Shell Oil Products Company
WSP-1138
Office:  (713) 241-1452
Fax:     (713) 241-7166
Beeper:  (800) 342-4033
Shell ELS:  EM10138 @ MSXSOPC
Internet:   grmarshall@shellus.com

----Original Message----
From:       Stanley CC (Curtis)  at MSXWHWTC
Sent:       Friday, May 29, 1998 9:03 AM
To:         Marshall GR (Glen)  at MSXSOPC
Subject:    FW:

Glen,

I told API that they had better have a project on slate to evaluate existing systems and new system design, installation, and operations.  I already have a good idea what Santa Clara is going to find and if the industry isn't ready with an adequate response/solution, we are all going to look bad.  I foresee many agencies requiring extensive groundwater monitoring systems to evaluate whether or not MTBE is being released into the environment, especially in environmentally sensitive areas (near wells, fractured bedrock, etc.).

*Curtis C. Stanley*

Environmental Technology Directorate - Soil and Groundwater
Westhollow Technology Center
(phone-©2) 281-544-7675  (fax-®) ) 281-544-8727
e-mail: ccstanley@shellus.com
(This communication per applicable agreements between our respective companies.)

----Original Message----
From:       **Judy Shaw [SMTP:shaw@api.org] <mailto:[SMTP:shaw@api.org]>**
Sent:       Friday, May 29, 1998 8:57 AM
To:         Al Jessel; Brian Harney; C. Fairbrother; Carol Fairbrother; Curt Stanley; Dave Peirce; David Smith; Don Gilson; Eric Vogt; Gene Mancini; Georgia Callahan; Gerry Raabe; Gweneyette Broussard; James Rocco; Jeff Sickenger; Jim Stevenson; John Taunton; Lee Hoffman; Mark Saperstein; Mary Kate Kell; Mike Lobue; Mike Wang; Ned Seppi; Ron Benton; Tim Buscheck; William Doyle
Cc:         Alexis Steen; Bill Bush; Bill Frick; Bob Greco; bruce bauman; Carol Henry; Chuck Krambuhl; David Deal; David Lax; Debi Tulou; Dee Gavora; Eldon Rucker; Howard Feldman; Jim Williams (MDM); Karen Inman; Kim Ashton; Larry Magni; Marc Meteyer; Martha Jordan; Molly Sinclair; Rick Brown; Robert Barter; Ron Chittim; Theresa Pugh; Tom Lareau; Valerie Ughetta
Subject:

You need to look at the following; it relates to the source identification /protection discussion we had the other day.

49

50

SH 032897

**Legal Retention at MSXSOC**

| | |
|---|---|
| **From:** | Marshall Glen R [Newcos] |
| **Sent:** | Friday, March 12, 1999 2:47 AM |
| **To:** | Stanley CC (Curtis)  at MSXWHWTC |
| **Subject:** | RE: Draft Agenda; Roster; Info Items |

Already discussed details with Mike Barsa twice. '98 upgrade work will have no affect on MTBE issues.  Any system that was going to have problems is still going to have problems.  Upgrades addressed inadvertent spills and releases, not root causes of tank or line leaks.  Also, all R&D work I'm familiar with indicates that MTBE will have no affect on same.

# Glen R. Marshall, P.E.
Staff Coordinator
Technical Services - Engineering
## Equiva Services, L.L.C.
Shell + Texaco + Saudi Aramco

| 9/80 Schedule "A" | | Address: Equiva Services, L.L.C |
|---|---|---|
| Office: | (281) 874-4857 | 12700 Northborough Drive |
| Fax: | (281) 874-7979 | Suite 300C12 |
| Beeper: | (800) 342-4033 | Houston, TX 77067 |
| Alliance ELS: | Marshall GR (Glen) | |
| Internet: | GRMarshall @ Equiva.com | |

-----Original Message-----
From:     Stanley CC (Curtis)  at MSXWHWTC [SMTP:CS193653@MSXWHWTC.SHELL.COM]
Sent:     Thursday, March 11, 1999 3:35 AM
To:       Marshall Glen R [Newcos]
Subject:  RE: Draft Agenda; Roster; Info Items

Glen,

This is just an fyi.  The new MTBE counsel (outside attorney) is interested in hearing your opinion on tank upgrades in relation to MTBE release prevention.  They will contact you in the near future.

Curt

-----Original Message-----
From:     Marshall Glen R [Newcos]
Sent:     March 10, 1999 9:32 PM
To:       Stanley CC (Curtis)  at MSXWHWTC
Subject:  RE: Draft Agenda; Roster; Info Items

Any specific support needs from me or my department?  I'm not officially on any of the attached committees to my knowledge, have out-of-state vendor coming in on 3-31, and will only be in office 3-29 thru 4-1.  Due to current travel commitments, will not be back in office on regular basis until roughly 4-8.

# Glen R. Marshall, P.E.
Staff Coordinator
Technical Services - Engineering
## Equiva Services, L.L.C.
Shell + Texaco + Saudi Aramco

| 9/80 Schedule "A" | | Address: Equiva Services, L.L.C. |
|---|---|---|
| Office: | (281) 874-4857 | 12700 Northborough Drive |
| Fax: | (281) 874-7979 | Suite 300C12 |
| Beeper: | (800) 342-4033 | Houston, TX 77067 |
| Alliance ELS: | Marshall GR (Glen) | |
| Internet: | GRMarshall@Equiva.com | |

-----Original Message-----
From:     Stanley CC (Curtis)  at MSXWHWTC [SMTP:CS193653@MSXWHWTC.SHELL.COM]
Sent:     Wednesday, March 10, 1999 12:48 PM
To:       Allen Register; Arlene Warden; Brad Boschetto; Bruce Krewinghaus; Chen Chiang; Chris Neaville; Christine Whitr; Chuck Lieder; Cindy Delaney; Daniel Farrier; Ed Hsu; Edward Dinkfeld; Erik Hansen; F Benton; Felicia Federico; George Dealey; George Devault; Gerard Spinner; Glen Marshall; Gweneyette Broussard; Ileana Rhodes; James Michalak; Jerry Ivie; Joe Salanitro; Jonathan Miller; Kathleen Gilimore; Ken Darmer; Ken Springer; Marjorie Hong; Michael Gallagher; Otto Meyers; Paul Sun; Pete Parker; Phil Daly; Phil Dorn; Richard Lewis; Rick Wolfe; Robert Dedoes; Robert Ettinger
Subject:  FW: Draft Agenda; Roster; Info Items

FYI

Curt

**EXHIBIT**
877
999/98

SH 022667

# Exhibit 10

ORIGINAL

**F I L E D**
San Francisco County Superior Court

APR 1 5 2002

GORDON PARK-LI/ Clerk
BY: _____
Deputy Clerk

1
2
3
4
5
6
7
8

9    SUPERIOR COURT OF THE STATE OF CALIFORNIA

10    COUNTY OF SAN FRANCISCO, UNLIMITED JURISDICTION

11    DEPARTMENT NO. 514

12
13  SOUTH TAHOE PUBLIC UTILITY         )    CASE NO. 999128
    DISTRICT,                          )
14                                     )
              Plaintiff,               )
15                                     )    **SPECIAL VERDICT [PHASE I]**
         vs.                           )
16                                     )    (3/4/02)
    ATLANTIC RICHFIELD COMPANY,        )
    et al.,                            )
17                                     )
              Defendants.              )
18                                     )
19  _____)

20  We, the jury in the above-entitled action, find as follows on the questions submitted to us:

21
22
23
24
25
26
27
28

**Question No. 1**: Was gasoline containing MTBE manufactured, sold, or supplied by any of the following defendants defective in design because the risk of harm inherent in its design outweighed the benefits of that design?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective in design?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| Shell Oil Company | ✓ | ____ | Fall/Winter 1990 to 12·31·77 |
| Equilon Enterprises LLC | ✓ | ____ | 1·1·78 to Present |
| Texaco, Inc. | ✓ | ____ | 1988 to 12·31·1997 |
| Tosco Corporation | ✓ | ____ | April 1992 to March 1996 |

If you answer "no" as to each defendant, then go to question No. 3. If you answer "yes" as to one or more defendants, then answer the next question only as to such defendants.

**Question No. 2**: As to each defendant for which you answered "yes" in Question No. 1, did the defect exist when the gasoline containing MTBE left the possession of such defendant?

Answer "yes" or "no" for each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective in design?

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| Shell Oil Company | ✓ | ____ | Fall/Winter 1990 to 12·31·1997 |
| Equilon Enterprises LLC | ✓ | ____ | 1·1·1998 to Present |
| Texaco, Inc. | ✓ | ____ | 1988 to 12·31·1997 |
| Tosco Corporation | ✓ | ____ | April 1992 to March 1996 |

**Question No. 3**: Was gasoline containing MTBE manufactured, sold or supplied by any of the following defendants defective because of a failure to warn?

Answer "yes" or "no" after the name of each such defendant.  If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective due to a failure to warn?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| 12.0 Shell Oil Company | ✓ | ___ | Fall/Winter 1970 to 12·31·1997 |
| ✓ Equilon Enterprises LLC | ✓ | ___ | 1·1·1998 to Present |
| ✓ Texaco, Inc. | ✓ | ___ | 1992 to 12·31·1997 |
| 10·2 Tosco Corporation | ✓ | ___ | April 1996 to Present |

**Question No. 4**: As to each defendant for whom you answered "yes" in Question No. 3, did the defect exist, because of a failure to warn, when the gasoline containing MTBE left the possession of such defendant?

Answer "yes" or "no" after the name of each such defendant.  If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective due to a failure to warn?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| 12.0 Shell Oil Company | ✓ | ___ | Fall/Winter 1970 to 12·31·1997 |
| ✓ Equilon Enterprises LLC | ✓ | ___ | 1·1·1998 to Present |
| ✓ Texaco, Inc. | ✓ | ___ | 1992 to 12·31·1997 |
| 12·2 Tosco Corporation | ✓ | ___ | April 1996 to Present |

\\\
\\\
\\\

1

2     **Question No. 5**: Were the risks involved in the transportation, storage and handling of

3 MTBE recognized by all of Lyondell Chemical Company's (ARCO Chemical Company's)

4 California refiner and distributor customers, who transported, stored and handled MTBE in bulk?

5 If not, during what time period were the risks not recognized?

6     Answer "yes" or "no." If you answer is "no," state the time period.

| | Yes | No | If no, time period |
|---|---|---|---|
7
| Answer: | 12·0 _____ | ✓ | *1992 to 1996* |
8

9

10     If you answered "no" to Question No. 5, then answer Question No. 6. If you answered "yes"

11 to Question No. 5, then answer Question No. 9.

12

13     **Question No. 6**: Was MTBE manufactured, sold or supplied by defendant Lyondell

14 Chemical Company (ARCO Chemical Company) defective because of a failure to warn?

15     Answer "yes" or "no." If you answer "yes", during what time period was the MTBE

16 manufactured, sold or supplied by the defendant defective due to a failure to warn?

| | Yes | No | If yes, time period |
|---|---|---|---|
17
| Answer: | 11-1 ✓ | _____ | *1992 to 1996* |
18

19     If you answered Question No. 6 "yes", answer Question No. 7. If you answered Question

20 No. 6 "no", answer question No. 9.

21

22     **Question No. 7**: Did the defect exist, because of a failure to warn, when the MTBE left the

23 possession of defendant Lyondell Chemical Company (ARCO Chemical Company)?

24     Answer "yes" or "no." If you answer "yes", during what time period was the MTBE

25 manufactured, sold or supplied by the defendant defective due to a failure to warn?

| | Yes | No | If yes, time period |
|---|---|---|---|
26
| Answer: | 11-1 ✓ | _____ | *1992 to 1996* |
27

28

    If you answered Question No. 7 "yes", answer Question No. 8. If you answered Question

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF MERCED

FILED 2/9/12
MERCED SUPERIOR COURT
By: _Judith Gallager_
Deputy

| | |
|---|---|
| CITY OF MERCED, | Case No. 148451 |
| Plaintiff, | |
| v. | *Assigned to the Honorable Carol K. Ash* |
| CHEVRON U.S.A., INC., *et al.*, | |
| Defendants. | |

## SPECIAL VERDICT FORM

**DIRECTIONS:** *Answer all questions unless directed to skip them. Answer all questions for each defendant listed (some defendants are omitted from certain questions intentionally, and you need not answer questions for any defendant that is not listed). For each question that calls for a "Yes" or "No" answer, fill in the blanks with the number of jurors voting "Yes" and the number of jurors voting "No."*

*The following table lists the stations in this case and the pages of this form where questions regarding each station begin.*

| | | |
|---|---|---|
| 1. | Beacon 3-505 at 3006 G Street | Page 2 |
| 2. | Buggy Bath at 2210 G Street | Page 5 |
| 3. | Former Exxon at 1415 R Street | Page 8 |
| 4. | Former Texaco at 1415 R Street | Page 11 |
| 5. | Gas n Save at 963 West 16th Street | Page 14 |
| 6. | Pacific Pride Cardlock at 1455 R Street | Page 17 |
| 7. | Century Chevron at 1970 East Childs Avenue | Page 20 |

We, the jury, answer the questions submitted to us as follows:

1

## SECTION A:  Beacon 3-505 service station at 3006 G Street

1.   Has the City proven that gasoline containing MTBE refined, distributed or sold by
     Shell/Equilon was delivered to the Beacon 3-505 station at 3006 G Street?

                                             12  Yes        0   No

     *If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors
     answered "No," skip the other questions in this Section and move on to the next Section
     about the next station.*

2.   Has the City proven that the gasoline containing MTBE identified in answering the prior
     question was spilled or leaked from that station?

                                             12  Yes        0   No

     *If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors
     answered "No," skip the other questions in this Section and move on to the next Section
     about the next station.*

3.   Has the City proven that the release or releases found in the answer to the prior question
     caused harm to the City's drinking water supply system?

                                             12  Yes        0   No

     *If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors
     answered "No," skip the other questions in this Section and move on to the next Section
     about the next station.*

4.   Did gasoline containing MTBE have potential risks that were known, or knowable
     through the use of scientific knowledge available at the time of manufacture, distribution
     or sale?

                                             12  Yes        0   No

     *If 9 or more jurors answered "Yes," proceed to the next question.  If 9 or more jurors
     answered "No," skip the other questions in this Section and move on to the next Section
     about the next station.*

5.   Has the City proven that Shell/Equilon failed to adequately warn or instruct the owner/operators of the Beacon 3-505 station concerning the safe handling of the product?

_12_ Yes   _0_ No

*If 9 or more jurors answered "Yes," proceed to the next question. If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

6.   Has the City proven that Shell/Equilon knew or should reasonably have known that gasoline containing MTBE was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner?

_12_ Yes   _0_ No

7.   Because of their particular position, training, experience, knowledge, or skill, did the owner/operators of the Beacon 3-505 station know, or should they have known, of the risk, harm, or danger from gasoline containing MTBE?

_0_ Yes   _12_ No

*If 9 or more jurors answered "No," proceed to the next question. If 9 or more jurors answered "Yes," skip the other questions in this Section and move on to the next Section about the next station.*

8.   Was the lack of sufficient instructions or warnings a substantial factor in causing harm to the City of Merced?

_9_ Yes   _3_ No

*If 9 or more jurors answered "Yes," proceed to the next question. If 9 or more jurors answered "No," skip the other questions in this Section and move on to the next Section about the next station.*

9.   Would the City's same harm have occurred even if Shell/Equilon had provided specific warnings or instructions about MTBE?

_0_ Yes   _12_ No

*If 9 or more jurors answered "No," proceed to the next question. If 9 or more jurors answered "Yes," skip the other questions in this Section and move on to the next Section about the next station.*

3

**STATE OF NEW HAMPSHIRE
SUPERIOR COURT**

MERRIMACK, SS.                                                                    03-C-0550

STATE OF NEW HAMPSHIRE
v.
HESS CORPORATION,
et al.

<u>**SPECIAL VERDICT FORM – part 1**</u>

PETER H. FAUVER, Presiding Justice

**INJURY**

1.    Has the State proven, by a preponderance of the evidence, that New Hampshire
       groundwater has been or will be harmed by MTBE gasoline in the future?

       YES ___X___                    NO _____

       *If you answered no, **stop here**, proceed to page 5, and have your foreperson
       sign and date the form.
       If you answered yes, proceed to next Question.*

**NEGLIGENCE CLAIM**

2a.   Has the State proven, by a preponderance of the evidence, that ExxonMobil was
       negligent in its manufacturing or supply of MTBE gasoline to the State of New
       Hampshire?

       Yes ___X___                    No _____

       *If you answered no, proceed to Question 3a.
       If you answered yes, proceed to next Question.*

2b.   Has the State proven, by a preponderance of the evidence, that MTBE gasoline
       was a substantial factor in bringing about the State's harm and that the State's
       harm would not have occurred but for MTBE gasoline?

       Yes ___X___                    No _____

       *Proceed to next Question.*

## DESIGN DEFECT CLAIM

3a.   Has the State proven, by a preponderance of the evidence, that MTBE in gasoline created a defective condition that was unreasonably dangerous.

YES   X_____        NO   _____

*If you answered no, proceed to Question 4a.*
*If you answered yes, proceed to next Question.*

3b.   Has the State proven, by a preponderance of the evidence, that the ways in which MTBE gasoline would be used were reasonably foreseeable to ExxonMobil?

YES   X_____        NO   _____

*If you answered no, proceed to Question 4a.*
*If you answered yes, proceed to next Question.*

3c.   Has the State proven, by a preponderance of the evidence, that MTBE gasoline was a substantial factor in bringing about the State's harm and that but for MTBE being in gasoline the State would not be harmed.

Yes   X_____        No   _____

*If you answered no, proceed to Question 4a.*
*If you answered yes, proceed to next Question.*

## DEFENSES TO DESIGN DEFECT CLAIM

3d.   Has ExxonMobil proven, by a preponderance of the evidence, that in designing its MTBE gasoline, it complied with the state of the art?

YES   _____        NO   X_____

*Proceed to next Question.*

2

**FAILURE TO WARN CLAIM**

4a.   Has the State proven, by a preponderance of the evidence, that ExxonMobil failed to adequately warn the State about the hazards of MTBE gasoline?

YES   __X__          NO   _____

*If you answered no, proceed to Question 5a.*
*If you answered yes, proceed to next Question.*

4b.   Has the State proven, by a preponderance of the evidence, that it would not have used MTBE gasoline or would have used it differently if ExxonMobil had provided an adequate warning.

YES   __X__          NO   _____

*If you answered no, proceed to Question 5a.*
*If you answered yes, proceed to next Question.*

4c.   Has the State proven, by a preponderance of the evidence, that failure to warn was a substantial factor in bringing about the State's harm and that but for the failure to warn the State would not be harmed.

YES   __X__          NO   _____

*If you answered no, proceed to Question 5a.*
*If you answered yes, proceed to next Question.*

**DEFENSES TO FAILURE TO WARN CLAIM**

4d.   Has ExxonMobil proven, by a preponderance of the evidence, that the hazards posed by the use of MTBE in gasoline were obvious, or were known and recognized by the State?

YES   _____          NO   __X__

*If you answered no, proceed to next Question.*
*If you answered yes, proceed to Question 5a.*

4e.   Has ExxonMobil proven, by a preponderance of the evidence, that it provided distributors with adequate warnings of the hazards of MTBE gasoline?

Yes _____        No _____X_____

*If you answered no, proceed to Question 5a.*
*If you answered yes, proceed to next Question.*

4f.   Has ExxonMobil proven, by a preponderance of the evidence, that ExxonMobil had reasonable assurances from distributors that they would pass along the adequate warnings from ExxonMobil to end users and consumers?

Yes _____        No _____

*Proceed to next Question.*

## MARKET SHARE LIABILITY

5a.   Has the State proven, by a preponderance of the evidence, that MTBE gasoline is fungible?

Yes _____X_____        No _____

*If you answered no, **stop here**, proceed to the end, and have your foreperson sign and date this form.*
*If you answered yes, proceed to next Question.*

5b.   Has the State proven, by a preponderance of the evidence, that it cannot trace MTBE gasoline found in groundwater and in drinking water back to the company that manufactured or supplied that MTBE gasoline?

Yes _____X_____        No _____

*If you answered no, **stop here**, proceed to the end, and have your foreperson sign and date this form.*
*If you answered yes, proceed to next Question.*

5c.   Has the State proven, by a preponderance of the evidence, that it has identified a substantial segment of the relevant market for gasoline containing MTBE?

Yes _____X_____        No _____

*If you answered no, **stop here**, proceed to the end, and have your foreperson sign and date this form.*
*If you answered yes, proceed to next Question.*

4

GOVERNMENT
EXHIBIT
421

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

CITY OF NEW YORK, *et al.*,

           **Plaintiff,**

    - against -

EXXON MOBIL CORPORATION,

           **Defendant.**

------------------------------------------------------------X

           **INTERROGATORY SHEET**
                **PHASE III**

             04 Civ. 3417 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**Injury**

    1.     Has the City proven, by a fair preponderance of the credible evidence, that it is, or will be, injured by the MTBE that will be in the combined outflow of the Station 6 wells, given your earlier findings that: (a) the City intends, in good faith, to use the water from the Station 6 wells within the next fifteen to twenty years to serve as a back-up source of drinking water; and (b) MTBE will peak at a level of 10 parts per billion in the combined outflow of the Station 6 wells in 2033?

           Yes ___✓___    No_____

        **If you answered "Yes" to this question, proceed to Question 2. If you answered "No" to this question, proceed to Question 7 (Trespass) and do not answer any other questions.**

**Direct Spiller** *Causation*

    2.     Has the City proven, by a fair preponderance of the credible evidence, that ExxonMobil was a cause of the City's injury as a direct spiller?

Yes __✓__ No _____

**Proceed to the next question.**

### Manufacturer, Refiner, Supplier or Seller *Causation*

3.  Has the City proven, by a fair preponderance of the credible evidence, that ExxonMobil was a *cause* of the City's injury in its capacity as a manufacturer, refiner, supplier or seller?

    Yes __✓__ No _____

    **If you answered "Yes" to either Question 2 or 3, proceed to Question 5.  If you answer "No" to both Questions 2 and 3, proceed to Question 4.**

### Manufacturer or Refiner *Contribution*

4.  Has the City proven, by a fair preponderance of the credible evidence, that ExxonMobil *contributed* to the City's injury in its capacity as a manufacturer or refiner?

    Yes _____ No _____

    **If you answered "Yes" to this question, proceed to the next question.  If you answered "No" to this question and to Questions 2 and 3, proceed to Question 7 (Trespass) and do not answer any further questions after Question 7.**

### Products Liability Claims

#### Design Defect Claim

5a.  Has the City proven, by a fair preponderance of the credible evidence, that ExxonMobil's gasoline containing MTBE was not reasonably safe for its intended or reasonably foreseeable purpose or in light of the reasonably foreseeable harms caused by its use?

Yes ___✓___  No _____

**Proceed to the next question.**

5b.  Has the City proven, by a fair preponderance of the credible evidence, that there was a safer, feasible alternative design at the time ExxonMobil's gasoline containing MTBE was marketed?

Yes ____  No _✓___

**If you answered "Yes" to Questions 5a and 5b, then proceed to the next question.  If you answered "No" to either Question 5a or Question 5b, then proceed to Question 6a and do not answer Questions 5c or 5d.**

5c.  **If you answered "Yes" to Questions 2 and/or 3**: Has the City proven, by a fair preponderance of the credible evidence, that the defective design in ExxonMobil's gasoline containing MTBE was a substantial factor in causing the City's injury? **If you answered "No" to Questions 2 and 3, do not answer this question and proceed to the next question.**

Yes _____  No _____

**If you answered "Yes" to this question, Proceed to Question 6a.  If you answered "No" to this question, proceed to the next question.**

5d.  **If you answered "Yes" to Question 4**: Has the City proven, by a fair preponderance of the credible evidence, that the design defect in the commingled gasoline containing MTBE was a substantial factor in causing the City's injury? **If you answered "No" to Question 4, do not answer this question. If you have not answered Question 4, please do so now, then return to this question.**

Yes _____  No _____

**Proceed to the next question.**

3

**Insufficient Warning Claim**

6a.   Has the City proven, by a fair preponderance of the credible evidence, that ExxonMobil's product was defective because ExxonMobil gave no warnings or insufficient warnings?

Yes ___✓___   No _____

**If you answered "No" to this question, proceed to Question 7. If you answered "Yes" to this question, proceed to the next question.**

6b.   **If you answered "Yes" to Questions 2 and/or 3:** Has the City proven, by a fair preponderance of the credible evidence, that ExxonMobil's failure to warn or insufficient warning was a substantial factor in causing the City's injury? **If you answered "No" to both Questions 2 and 3, do not answer this question and proceed to Question 6c.**

Yes ___✓___   No _____

**If you answered "Yes" to this question, proceed to Question 7. If you answered "No" to this question, proceed to the next question.**

6c.   **If you answered yes to Question 4**: Has the City proven, by a fair preponderance of the credible evidence, that ExxonMobil's failure to warn or insufficient warning was a substantial factor in contributing to the City's injury? **If you answered "No" to Question 4 do not answer this question. If you have not answered Question 4, please do so now, then return to this question.**

Yes _____   No _____

**Proceed to the next question.**

**Trespass Claim**

7.   Has the City proven, by a fair preponderance of the credible evidence, that ExxonMobil trespassed onto the City's property?

4

# Exhibit 11

1

E7fWmtbC
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
3    ETHER ("MTBE") PRODUCTS                Master File
4    LIABILITY LITIGATION                   No. 1:00-1898(SAS)
5    ------------------------------x        M21-88
6    This document relates to:
6    Commonwealth of Puerto Rico, et al.
7             v.
7    Shell Oil Co., et al,
8    Case  No. 07 Civ. 10470 (SAS)
8
9    ------------------------------x
10                                          New York, N.Y.
10                                          July 15, 2014
11                                          2:30 p.m.
11
12   Before:
12
13                   HON. SHIRA A. SCHEINDLIN,
13
14                                          District Judge
14
15                        APPEARANCES
15
16
16   MILLER & AXLINE LLP
17        Attorneys for Plaintiffs
17   BY:  DUANE C. MILLER
18        ROBIN L. GREENWALD
18        -and-
19   JOHN K. DEMA
19   SCOTT E. KAUFF
20   NATHAN SHORT
20
21   McDERMOTT, WILL & EMERY LLP
21        Attorneys for Defendants Exxon Mobil Corp.
22        and defendants' liaison counsel
22   BY:  JAMES A. PARDO
23        STEPHEN J. RICCARDULLI
23        -and-
24   ARCHER & GREINER, PC
24   BY:  WILLIAM J. STACK
25        CARLOS M. BOLLAR
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

41

E7fWmtbC

```
 1  190.  Again, five million versus 190, so with all due respect,
 2  we disagree with the defendants that it is irrelevant or
 3  shouldn't be considered simply because it meets that ban
 4  requirement.  It still can cause harm to the environment.
 5           THE COURT:  In other words, the commonwealth passed
 6  legislation that allows people to sell material that will harm
 7  the island?
 8           MR. KAUFF:  It's not supposed to get out of their
 9  tanks.
10           THE COURT:  That's true.
11           MR. KAUFF:  It's when it's out of the tanks that it
12  harms the environment.  If it stays in their tanks and it's
13  handled property, it wouldn't harm the environment.
14           THE COURT:  That's going to be the response to your
15  motion, that legislation or not, that's not the end of the
16  matter.
17           MR. WALLACE:  Understood.  I respect the argument.  I
18  could refute it now, but all I'm asking is that you permit me
19  to bring on a motion.
20           THE COURT:  Not necessarily because it's Shell
21  specific or everybody.
22           MR. WALLACE:  Indeed.
23           THE COURT:  Sounds like the defense wants to make that
24  motion, whoever has the motion, if you want to take the lead,
25  that's fine, but it can be made, of course.  What would you say
```

E7fWmtbC

 1   station owner been more fully aware of the harm caused by MTBE,
 2   it would have made a different decision with respect to taking
 3   the risk of not locating or remediating a leaking tank.
 4           MR. RICCARDULLI:  Your Honor, that decision may have,
 5   again, I don't know.  Respectfully, I probably disagree with
 6   that decision, but I understand what it was, but that was based
 7   on whatever evidence was in the record in the City of New York
 8   case.  We think there's different evidence here, and a lack
 9   thereof, of evidence that would allow Mr. Moreau to opine on
10   whether or not any warning from any defendant would have made a
11   difference at one of these stations.  For example, I don't
12   think it's enough for him to say, again, for one of the
13   stations he says that company put in monitoring wells at the
14   service station.  They were fully compliant with the regs, so I
15   guess he's asking the jury to assume that had somebody said we
16   know they're fully compliant with local and state laws, you
17   should upgrade them, the dealer would have done it at unlimited
18   cost and would have done it, and even then would be only
19   willing to say that the risk would have been reduced.  The harm
20   wouldn't have been prevented because he's not willing to go
21   that far, and when you say how much would the risk have been
22   reduced, he'd say I can't quantify, and we don't think that's
23   enough to get over their burden to prove causation.  And again
24   it's specific on the causation piece on especially the product
25   strict liability claim.  Again, they plead it both ways, but we

E7fWmtbC

```
 1    think that's where it falls apart, general statements about the
 2    industry and what we should have done.
 3              THE COURT:  I probably would have been more receptive
 4    to your argument before the City of New York case and the
 5    Second Circuit's view on it, but they seem to accept it as
 6    rather general theory that Moreau came up with and I think
 7    plaintiffs are relying on that.
 8              Is it anything more than Moreau, or is that really
 9    what you're relying on, Mr. Miller?
10              MR. MILLER:  Certainly in terms of expert testimony,
11    Moreau has been determined to be sufficient, but we also have
12    testimony from their own employees again.
13              THE COURT:  Their own employees.
14              MR. MILLER:  Here, we have Exxon's counsel arguing, we
15    depose Mr. DelaRosa, who is in charge of their tank program for
16    over 30 years.  He knew nothing about MTBE.  In the deposition,
17    we asked him did you know about this, did you know about this,
18    and then the ultimate question, would it have made a difference
19    to you, and he said quite possibly yes.  Their own people and
20    their own documents, defendants' own documents talk about the
21    need to tell people about MTBE.  So I view this as a question
22    of fact, not a good motion.
23              THE COURT:  How about the owner defendant argument
24    that some defendants make, that they themselves are responsible
25    for the tanks so there's nobody to warn?  You're taking on that
```

1
2
3
4        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
5            IN AND FOR THE COUNTY OF MERCED
6

| 7 | CITY OF MERCED, | ) | Case No: 148451 |
| 8 | Plaintiff, | ) | RULING ON DEFENDANTS' MOTIONS |
| 9 | vs. | ) | FOR NONSUIT |
| 10 | CHEVRON, et al | ) | |
| 11 | Defendants | ) | |
| 12 | | | |

13       In deciding a Motion for Nonsuit, the court must consider every legitimate inference that

14 can reasonably be drawn in plaintiff's favor from the evidence or facts.  A "reasonable

15 inference" by the court is one on which there is "some substance to plaintiff's evidence upon

16 which reasonable minds could differ."  *Carson v. Facilities Develop.Co.* (1984) 36 Cal. 3d 830,

17 839.  This means the judge in a jury trial may not weigh the evidence or determine the credibility

18 of witnesses.  Plaintiff's evidence is entitled to its full probative strength, as long as that evidence

19 is relevant to the issues.  *Estate of Callahan* (1967) 67 C.2d 609.

20     1.   Statute of Limitations as to 1415 R Street, 1455 R Street, Gas n Save and Century

21         Chevron.

22       Normally, it is a jury question as to when and whether a Plaintiff suffered appreciable harm

23 for purposes of starting the running of the statute of limitations.  *Lee v. Los Angeles County*

24 *Metropolitan Transportation Authority* (2003) 107 Cal. App. 4th 848, 859: "The determination

25

b.   Century Chevron.

Plaintiff is only proceeding on a negligent operator theory and nonsuit is denied.  There is sufficient evidence in the record for the jury to draw a reasonable inference releases at Century Chevron were caused by Chevron, since they were responsible for the USTs, pipelines and other equipment at the station.  Thus their failure to install spill containment at fill manholes, maintaining of a faulty spill bucket and failure to upgrade equipment based upon releases discovered in 1996 would provide evidence of liability for negligent operation.

3.   Causation—Failure to Warn—as to all stations.

Nonsuit is denied.  Mr. Moreau's testimony provides sufficient evidence of what types of precautions needed to be taken to prevent or reduce spills and releases, to allow this question to go the jury.  Further the types of precautions he recommended would have prevented many of the types of releases that are alleged in this case.  As Plaintiff pointed out, the adequacy of a warning is a question of fact for the jury.  And as I pointed out originally in the ruling on Defendant's MIL No.10 to exclude certain portions of Mr. Moreau's testimony, expert testimony is not always required and a layperson can evaluate if the warnings were adequate or not.  (MIL No. 10; Transcript dated 10/4/11a.m. at pages 10 and 11).

4.   Speculative Damages.

a.   Past Damages claimed as costs of testing, remediation, staff time and postage.

Nonsuit is granted as to past damages as they are too speculative and unable to be tied to any particular station or claim.  It would be impossible for a reasonable jury to appropriately determine the amount each defendant would owe for past damages if they were found liable.

b.   Future Damages for assessment and remediation at the sites in the future.

Nonsuit is denied.  A reasonable jury could determine appropriate future work at each site based upon the testimony of Mr. Norman and Mr. Angulo.  There is sufficient evidence that it should at least be presented to the jury for their determination of whether or not it is too

```
 1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2            IN AND FOR THE COUNTY OF MERCED

 3           Before the Honorable CAROL ASH, Judge

 4                        -oOo-

 5   CITY OF MERCED,            )

 6                Plaintiff(s), )

 7   vs.                        )  Case No. CU148451

 8   CHEVRON U.S.A., INC.,      )
     et al,                     )
 9                              )

10                Defendant(s). )
     _____  )

11

12

13              REPORTER'S TRANSCRIPT

14               MOTIONS IN LIMINE

15             TUESDAY, OCTOBER 4, 2011

16

17

18

19

20

21

22

23   Reported by:       RENEE L. TERRY, CSR #7321, RPR
                         Official Reporter
24

25

26
```

1

---

 1        This is Motion in Limine No. 10 to exclude certain

 2   opinions and testimony of Marcel Moreau.  And defendant is

 3   seeking to exclude any testimony regarding whether or not the

 4   warnings were sufficient, alleging Mr. Moreau does not have

 5   the qualifications, like a degree in psychologist or

 6   something like that, as to whether the warnings would affect

 7   a person reading the warnings.

 8        Excuse my voice.  I took some more DayQuil, but it's

 9   really drying out my throat.

10        MR. PARKER:  Your Honor, I have a bottle of water

11   unopened.

12        THE COURT:  I do have some hot tea here.  Thank you.

13        The second portion they're seeking to exclude are the

14   site histories.  They're saying that's a complication of

15   other documents and that they would not really assist the

16   jury.  And then, number three, they're seeking to exclude

17   documents from oil companies that were not involved in this

18   case.

19        My initial reaction to the motion regarding the

20   warnings is I don't think you necessarily need expert

21   training in psychology, et cetera, especially when you have

22   someone like Mr. Moreau who is very familiar with MTBE and

23   its possible dangers.  I think he could testify as to what

24   certain mitigation measures could have been taken or what

25   could have been warned of.  And then it would be up to the

26   jury to decide if those warnings are adequate or not.  I

11

---

 1   think in the cases even that the defendants rely on that

 2   point is brought forward, that you don't necessarily need

 3   expert testimony for every type of opinion, and sometimes it

 4   is just a matter of common sense on the part of the jury.

 5        And there have been cases that have found that the

 6   adequacy of warnings were proper for an expert to give his

 7   knowledge of what he would advise to be dangerous in the

 8   product and how that might be handled.  And then the jury can

 9   decide considering those criteria if the warnings were

10   adequate in this case.  So that would be my tentative ruling

11   regarding the warnings.

12        Regarding the site histories, I just think this would

13   be helpful for the jury to have that.  I mean, it is just him

14   listing of the histories of each site.  And unless there is

15   some showing that it's inaccurate or not correct, I think it

16   would be helpful to the jury and also as far as him

17   expressing his opinion.  So I would tend not to grant that

18   motion.

19        As far as the third issue regarding documents from

20   oil companies not involved in the case, I would tend to grant

21   that motion unless at some point it did become an issue as to

22   what was knowable by the defendants.  If they denied on

23   something, then obviously you could bring in what would be

24   knowable in the industry.

25        Mr. Stack, are you arguing that motion?

26        MR. STACK:  Yes, Your Honor.

12

# Exhibit 12

1

```
1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
3    _____ X
4    In re:  Methyl Tertiary Butyl Ether
5    ("MTBE") Products Liability Litigation
6    _____ X
7    Master File No. 1:00-1898
8    MDL No. 1358 (SAS)
9    M21-88
10   _____ X
11
12   30(b)(6) VIDEOTAPED ORAL DEPOSITION OF HERITAGE
13   CONOCO and CONOCOPHILLIPS COMPANY
14   by and through WAYNE WILSON,
15   In Re: Warnings
16   December 7, 2006
17   •_____•
18
19
20
21          GOLKOW TECHNOLOGIES, INC.
22   1880 John F. Kennedy Boulevard, Suite 760
23       Philadelphia, Pennsylvania  19103
24              1.888.465.5698
```

Wilson, Wayne- ConocoPhillips- Warnings (12/07/2006)

12

```
1    A.   Yes, we have.
2    Q.   Just so that the record's clear,
3    though, if you need to take a break at any
4    time, please let me know.  My only caveat is if
5    there's a question pending, I'd like for you to
6    answer it before the break.  Is that
7    understood?
8    A.   Yes, it is.
9    Q.   And you -- you understand that
10   you've sworn to tell the truth today, and
11   that's the same oath as if you were in front of
12   a judge or a jury in a courtroom; you
13   understand that, right?
14   A.   Yes, I do.
15   Q.   I've handed you what's been marked
16   Deposition Exhibit 1.  This is the notice for
17   your deposition.  Have you seen this document
18   before?
19   A.   Yes, I have.
20   Q.   And you understand that you've been
21   designated as a corporate representative today
22   to talk about those issues in the notice for
23   both ConocoPhillips and the Heritage Conoco
24   entity; do you understand that?
```

Wilson, Wayne- ConocoPhillips- Warnings (12/07/2006)

13

```
1    A.   Yes, I do.
2    Q.   And the subject for this deposition
3    today is essentially warnings provided
4    regarding MTBE.  Is that your understanding?
5    A.   That is my understanding.
6    Q.   And as a corporate representative,
7    you understand that your job here today is to
8    testify not just from your own experience and
9    own opinions, but to testify on behalf of the
10   corporation; you understand that?
11   A.   Yes, I do.
12   Q.   Please tell us how you prepared for
13   this deposition.
14   A.   I reviewed documents and interviewed
15   people.
16   Q.   Tell me who you interviewed, please.
17   A.   I interviewed Lorraine Lewis, Sheila
18   Ryan, Bill Broddle, Gene Harlacker, Marla
19   Benyshek, Mitch Oliver, Karen Shorten, Jack
20   Cearley, Mike Beevers, Jeff Meyers, Mike
21   Hanson.  Those are the ones I can recall.
22   Q.   And as in prior depositions, if you
23   think of anybody else that you interviewed, let
24   me know and we'll add it to the list, okay?
```

Wilson, Wayne- ConocoPhillips- Warnings (12/07/2006)

48

```
1    Q.   (BY MS. EVANGELISTI)  One of the
2    issues in the notice, it's on page 5.  It's
3    number 4(i), asks that you be prepared to
4    testify about whether, when, where, and under
5    what circumstances you -- meaning Conoco and
6    ConocoPhillips -- notified service station
7    owners, downstream handlers and/or any other
8    customers in writing or otherwise that gasoline
9    containing MTBE should be handled differently
10   than gasoline without MTBE.
11        In conjunction with these seminars
12   that were provided to those that ran
13   company-owned stations, did Conoco or
14   ConocoPhillips ever make an effort to provide
15   this type of information, specifically whether
16   gasoline containing MTBE should be handled
17   differently than conventional gasoline?  I
18   understand that you're telling me they provided
19   information that gasoline may contaminate
20   groundwater and information about how to handle
21   conventional gasoline or gasoline in
22   particular.
23        My question is focused on whether
24   any effort was made to provide information
```

Wilson, Wayne- ConocoPhillips- Warnings (12/07/2006)

49

1  about MTBE gasoline as compared to gasoline in

2  general.

3          MS. JOHNSON:  Objection, assumes

4      facts in dispute, misstates testimony.

5      A.   A couple of things that I would say.

6  First of all, I've said that I was not able to

7  learn everything that was covered in the

8  seminars.  That's one thing that I've said.

9          The other thing that I can say is

10  that based on my investigation, the general

11  view of the people that I talked with was that

12  gasoline with MTBE or gasoline -- conventional

13  gasoline without MTBE should be handled the

14  same, in that they both should be securely

15  stored, tightly contained, spills should be

16  taken care of quickly, those kinds of things.

17      Q.   (BY MS. EVANGELISTI)  And in

18  accordance with that position that you just

19  mentioned, Conoco and ConocoPhillips never

20  distinguished between gasoline in general and

21  gasoline containing MTBE in particular.  As far

22  as providing information, it was Conoco and

23  later ConocoPhillips' position that they

24  shouldn't be handled any differently?

Wilson, Wayne- ConocoPhillips- Warnings (12/07/2006)

50

1          MS. JOHNSON:  Objection, assumes

2      facts, outside the scope.

3      A.   Based on my investigation, the

4  approach was that both types of gasoline, as

5  I've explained, should be handled the same in

6  the way that I've described it, securely

7  contained, spills taken care of quickly, that

8  kind of thing.

9      Q.   (BY MS. EVANGELISTI)  And was that

10  same -- did that same position hold true with

11  respect to non-company-owned stations?  Was

12  Conoco and then ConocoPhillips' position that

13  gasoline containing MTBE should be treated no

14  differently than gasoline in general?

15          MS. JOHNSON:  Objection, vague,

16      outside the scope.

17      A.   I didn't learn that in my -- I

18  didn't learn anything in my investigation that

19  would say that anything was done differently

20  for the non-company-owned stations than for the

21  company-owned stations.

22          And in general, what I'm saying is

23  that based on my investigation, I believe the

24  seminars that I've talked about were primarily

Wilson, Wayne- ConocoPhillips- Warnings (12/07/2006)

1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3                      --oOo--

 4    ------------------------------X
      IN RE:                        )
 5    Methyl Tertiary               ) MDL No. 1358 (SAS)
      Butyl Ether                   )
 6    ("MTBE")                      )
      Products Liability            )
 7    Litigation                    )
      _____X

 8

 9

10                    VOLUME I

11            VIDEOTAPED DEPOSITION OF

12            KENNETH WARREN ANDERSON

13             Wednesday, June 20, 2007

14              San Francisco, California

15          _____

16

17

18

19

20

21

22

23    REPORTED BY:  KENNETH T. BRILL, RPR, CRR, CSR #12797

24

25
```

Anderson, Kenneth Warren - Chevron - Warnings (06/20/2007)

8

```
 1    representing Washoe Fuel, Inc.  Sorry, counsel.

 2    BY MR. KRASS:

 3        Q.   Please state your full name and address

 4    for the record.

 5             MR. MORTHOLE:  Karl Morthole, K-A-R-L,

 6    Morthole is M-O-R-T-H-O-L-E.  I'm at 57 O Street,

 7    San Francisco.

 8             MR. CORRELL:  Thank you.

 9    BY MR. KRASS:

10        Q.   Would you please state your full name and

11    address for the record.

12        A.   It's Kenneth Warren Anderson.  I'm -- my

13    address is 5049 St. Dunstan Court, Concord,

14    California 94521.

15        Q.   Who is your current employer?

16        A.   Chevron Products Company.

17        Q.   Have you ever been deposed before?

18        A.   I have.

19        Q.   And approximately how many times?

20        A.   Three that I recall.

21        Q.   And when was the last time that you were

22    deposed?

23        A.   I was deposed, I think, about a year ago.

24        Q.   And what did that case involve generally?

25        A.   The -- the similar topic, MTBE, gasoline.
```

Anderson, Kenneth Warren - Chevron - Warnings (06/20/2007)

39

```
 1    provide to its dealers and jobbers with respect to

 2    proper handling and storage of gasoline containing

 3    MTBE?

 4        A.   Well, again, the instruction that we

 5    provided to our jobbers and dealers was about

 6    gasoline, not gasoline with MTBE, because it really

 7    doesn't matter to us.  If they're good gasoline

 8    product stewards, it really doesn't matter what's in

 9    the project -- or product.

10             But again, we reminded them that gasoline

11    was a dangerous product that needed to be handled

12    carefully, they needed to keep accurate inventory

13    records, they needed to inspect their equipment,

14    look for problems, check for leaks, they need to

15    check for water.  They need to follow all the local

16    government laws and regulations.  If they spill it,

17    they need to clean it up quickly and notify all the

18    appropriate parties.

19             And we told them that once they notified

20    all the appropriate parties, then the appropriate

21    expertise in the area of regulation and

22    investigation would -- would get involved.

23        Q.   Your listing of points here under

24    instruction, are these all of the necessary action

25    required to practice good gasoline product
```

Anderson, Kenneth Warren - Chevron - Warnings (06/20/2007)

1

```
 1           UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF NEW YORK
 3    - - - - - - - - - - - - - - - -X
 4    In Re:                    :  Master File No.
 5    Methyl Tertiary Butyl Ether  :  1:00 - 1898
 6    ("MTBE") Products Liability  :  MDL No. 1358(SAS)
 7    Litigation                :  M21-88
 8    - - - - - - - - - - - - - - - -X
 9
10       Videotaped Deposition of MICHAEL ROMAN
11                Washington, D.C.
12              Wednesday, March 28, 2007
13                   9:25 a.m.
14
15
16
17
18    Job No.:  1-100226
19    Pages 1 through 177
20    Reported by:  Cynthia R. Simmons Ott, RMR, CRR
21
22
23
24
```

10

```
 1    transcript.)
 2    BY MS. SANCHEZ:
 3       Q.  This is the deposition notice for what
 4    you're about to provide testimony on in Warnings
 5    on behalf of Heritage Mobil and ExxonMobil
 6    Corporation.  Have you seen this document before?
 7       A.  Yes, I have.
 8       Q.  And are you prepared to -- and you
 9    understand that you're being designated as a
10    corporate representative?
11       A.  Yes, I did.  Yes, I understand that.
12       Q.  Just to make the record clearer and for
13    purposes of convenience, I'll just -- when I refer
14    to Mobil it will be Heritage Mobil, and then we'll
15    just, ExxonMobil, will just shorten it from
16    ExxonMobil Corporation for post merger.  Is that
17    okay with you?
18       A.  Sounds fine, thank you.
19       Q.  Okay.  If there's any time that you have a
20    question about it, just let me know, and we'll
21    make it clear.  And for the record, were you a
22    Heritage Mobil employee, is that where you started
23    your career with ExxonMobil?
24       A.  Yes.
```

162

```
 1    would require immediate remediation.
 2    BY MS. SANCHEZ:
 3       Q.  Did Mobil ever warn or notify stations,
 4    service stations or customers, that gasoline
 5    containing MTBE should be handled differently than
 6    gas without MTBE?
 7       A.  No, we did not.
 8       Q.  Did Mobil have a position as to whether
 9    gasoline containing MTBE should be handled
10    differently than gasoline without MTBE?
11       A.  In the review of all the documents that I
12    went through and the individuals that I spoke to,
13    I can say that we viewed gasoline as being the
14    primary product that we sold and no difference in
15    the way we would handle gasoline with or without
16    MTBE.
17       Q.  I'm going to ask you some of the same
18    questions, but on behalf of ExxonMobil.
19       A.  Sure.
20       Q.  I just wanted to have them separated for
21    the record.
22       A.  Okay.
23       Q.  Did ExxonMobil ever notify its service
24    station owners or customers that they should test
```

164

```
 1    or other customers that MTBE is relatively
 2    difficult and expensive to clean up or remediate?
 3           MR. BONGIORNO:  Objection.
 4           THE WITNESS:  What does "relatively" mean?
 5    BY MS. SANCHEZ:
 6       Q.  More difficult than cleaning up VTech's
 7    constituents?
 8       A.  I'm not sure I can answer that question.
 9    It's not, it's not a warning issue that I -- as
10    far as I can see, and I'm not sure I can
11    understand or properly respond to a question about
12    relative cost, since that may be defined
13    differently by different people.
14       Q.  Did ExxonMobil ever notify in writing to
15    its station, to station owners, or to ExxonMobil
16    customers, that MTBE is more difficult and more
17    expensive to clean up or remediate than
18    conventional gasoline?
19           MR. BONGIORNO:  Objection.  You can
20    answer.
21           THE WITNESS:  To the best of my knowledge,
22    no.  Again, gasoline is the issue for us.
23    BY MS. SANCHEZ:
24       Q.  Did ExxonMobil notify in writing to
```

165

1   service stations or to its customers that gasoline

2   containing MTBE should be handled differently than

3   gasoline without MTBE?

4        A.   No, we did not.

5        Q.   We reviewed several MSDS sheets for MTBE

6   and MTBE containing gasoline for Mobil and for

7   ExxonMobil.  In review and in preparation for your

8   deposition, did Mobil, in its MSDSes, advise its

9   customers who purchased MTBE gasoline that they

10  should test for the presence of MTBE when gasoline

11  contamination is discovered at a site?

12       A.   We did not.

13       Q.   And the same question for ExxonMobil.

14       A.   Same thing for ExxonMobil, they don't test

15  for components, and quite frankly, they don't

16  test, they look, to let us know that there's a

17  leak, and if there's a leak, we will provide the

18  resources necessary to determine whether a leak

19  has occurred and begin the remediation where we

20  own tanks and pumps.

21       Q.   For customers of Mobil that were

22  responsible for their own remediation, did Mobil

23  advise them to test for the presence of MTBE when

24  gasoline is discovered at a site?

Roman, Michael- ExxonMobil- Warnings (03/28/2007)