**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | **Master File No. 1:00-1989** **MDL 1358 (SAS)** |
| This Document Relates To: | The Honorable Shira A. Scheindlin |
| *Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.,* Case No. 07 Civ. 1-470 (SAS) | |

**DECLARATION OF BRYAN BARNHART IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE SHELL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1

I, Bryan Barnhart, hereby declare:

1.      I am an attorney duly admitted to practice law in the State of California and an associate with the firm of Miller & Axline, counsel of record for Plaintiff Commonwealth of Puerto Rico and the Commonwealth of Puerto Rico through the Environmental Quality Board ("EQB") in this matter.  I declare the following facts of my own personal knowledge – obtained through my service as Plaintiff's counsel – and I could and would testify competently to the matters declared herein.

2.      Attached as **Exhibit 1** are true and correct copies of excerpts of the following deposition transcripts: (a) **Angel Juan Olivera-Alemar** (August 12, 2013); **Ian Charman**[1] (November 21, 2013); and (c) **Jonathan D. Watson, Vol. 2** (November 14, 2013).

3.      Attached as **Exhibit 2** are true and correct copies of excerpts of the following deposition transcripts: (a) **Patrick M. Bloomer,** 30(b)(6) Representative for Shell Oil Company and Shell Trading (US) Company (November 14, 2013); (b) Deposition transcript of **Curtis Stanley** (May 6, 1999), and (c) **George Dominguez** (September 12, 2000) ; and (d) **Luis Pagan-Rodriguez,** Special Aide to the Secretary of the Department of Consumer Affairs (November 14, 2013).

4.      Attached as **Exhibit 3** are true and correct copies of excerpts of the following deposition transcripts: (a) **Ivan Cintron-Vasquez** (September 27, 2013); (b) **David Lewis** (November 22, 2013); and (c) **Brenda Torano** (September 26, 2013).

---

[1]The following exhibits are being filed under seal:

Ex. 1 (b) November 21, 2013 Deposition Trans. of Ian Charman.
Ex. 2 (a) November 13, 2013 Deposition Trans. of Patrick Bloomer.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 7th day of November, 2014, at Sacramento, California.

Bryan Barnhart

# Exhibit 1

**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL   *      Master File
ETHER ("MTBE") PRODUCTS               No. 1:00-1898
LIABILITY LITIGATION             *
-------------------------------       MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,   *      M21-88
et al.,
                                 *
          Plaintiffs,            *

              vs.                *

          Defendants.            *

Case No. 07-CIV-10470 (SAS)
-------------------------------

The videotape deposition of:
     ANGEL JUAN OLIVERA-ALEMAR,
Distribution Supevisor for Sol Puerto Rico Limited, and
a Non-Party Witness herein, was held at the DEPARTMENT
OF JUSTICE FOR THE COMMONWEALTH OF PUERTO RICO, Ninth
Floor, Olimpo Street, San Juan, Puerto Rico  00907, on
Tuesday, August 12, 2013, at 9:12 a.m.

**2**

APPEARANCES
COUNSEL FOR THE PLAINTIFFS
MILLER, AXLINE & SAWYER
1050 Fulton Avenue, Suite 100
Sacramento, California  95825
BY:  TRACEY L. O'REILLY, ESQ.
     916.488.6688
     toreilly@toxictorts.org

     - and -

ORLANDO H. MARTINEZ-ECHEVARRIA, ESQ;
Centro de Seguros Building, Suite 413
701 Ponce de Leon Avenue
San Juan, Puerto Rico  00907
(Also acting as Notary Public)
     787.722.2378
     omartinez@martinezlaw.org

     - and -

JACKSON, GILMOUR & DOBBS, PC.
3900 Essex Lane, Suite 700
Houston, Texas  77027
BY:  VICTOR L. CARDENAS, JR., ESQ.
     713.355.5007
     vcardenas@jgdpc.com
     - and -
LAW OFFICES OF JOHN K. DEMA
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands  00820
BY:  MICHAEL SHORT, ESQ.
     340.773.6142
     jdema@lojkd.com

**3**

APPEARANCES (Continued)
COUNSEL FOR CODEFENDANT SOL PUERTO RICO LIMITED
McCONNELL VALDES, LLC
270 Munoz Rivera Avenue
San Juan, Puerto Rico  00918
BY:  JUAN A. MARQUES-DIAZ, ESQ.,
     ALEJANDRO J. CEPEDA-DIAZ, ESQ.,
     JORGE J. GARCIA-DIAZ, ESQ. and
     GERMAN A. NOVOA-RODRIGUEZ, ESQ.
     787.759.9292
     jam@mcvpr.com
     ajc@mcvpr.com
     jjg@mcvpr.com
     gnr@mcvpr.com

COUNSEL FOR SHELL CODEFENDANTS

SEDGWICK, LLP
2900 K Street NW
Harbourside, Suite 500
Washington, DC  20007
BY:  PETER C. CONDRON, ESQ.
     202.204.3707
     peter.condron@sedgwicklaw.com

COUNSEL FOR CODEFENDANT CHEVRON
PHILLIPS PUERTO RICO CHEMICAL CORE
and CONOCOPHILLIPS COMPANY

PIETRANTONI, MENDEZ & ALVAREZ, LLC
Banco Popular Center, 19th Floor
208 Ponce de Leon Avenue
San Juan, Puerto Rico  00918
BY:  ISABEL C. FRAU-NICOLE, ESQ.
     787.773.6000
     ifrau@pmalaw.com

COUNSEL FOR CODEFENDANT TOTAL
PETROLEUM PUERTO RICO CORP.
SEPULVADO & MALDONADO, PSC
Citibank Tower, 19th Floor
252 Ponce de Leon Avenue
San Juan, Puerto Rico  00918
BY:  DELIRIS ORTIZ-TORRES, ESQ.
     787.765.5656
     dortiz@smlawpr.com

**4**

APPEARANCES (Continued)
COUNSEL FOR CITGO CODEFENDANTS
EIMER STAHL, LLP
224 S. Michigan Avenue, Suite 1100
Chicago, Illinois  60604
BY:  LISA M. CIPRIANO, ESQ.
     (Appearing telephonically)
     312.660.7619
     lcipriano@eimerstahl.com
COUNSEL FOR CODEFENDANT ESSO STANDARD
OIL PUERTO RICO and EXXON MOBIL CORPORATION

ARCHER & GREINER, PC
One Centennial Square
Haddonfield, New Jersey  08033
BY:  MATTHEW CONLEY, ESQ.
     (Appearing telephonically)
     856.795.2121
     mconley@archerlaw.com

COUNSEL FOR CODEFENDANT PC PUERTO RICO, LLC

KING & SPALDING
1100 Louisiana, Suite 4000
Houston, Texas  77002
BY:  JAMES J. MAHER, ESQ.
     713.276.7403
     jmaher@kslaw.com
COUNSEL FOR CODEFENDANT LYONDELL CHEMICAL COMPANY
BLANK ROME, LLP
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania  19103-6998
BY:  ANGELA M. GUARINO, ESQ.
     (Appearing telephonically)
     215.569.5638
     Guarino-A@BlankRome.com

1  (Pages 1 to 4)

29

1  not necessarily are service stations.
2      Q.  So industrial customers that may have
3  their own tanks at there facility.
4      A.  Yes.
5      Q.  Okay.
6      With respect to service stations, was it always
7  branded Shell gasoline distributed at the rack?
8      A.  Yes, we always delivered to Shell service
9  stations.
10     Q.  Did--
11     A.  In the time I worked.
12     Q.  In the time you worked at Catano.
13     A.  At Catano terminal.
14     Q.  Okay.
15     At the time you worked at Catano, did Shell
16  distribute unbranded gasoline through the rack?
17     A.  No, no.  Only branded.
18     Q.  I guess I should ask this.
19     How long did you work at the Catano terminal?
20     A.  For seven years.
21     Q.  So up to '85?
22     A.  From '85, mid summer '85, to mid summer
23  '92.
24     Q.  So when you started in the-- so in the
25  accounting department, where were you based when you

30

1  worked in the accounting department in '78?
2      A.  In the accounting department?  I was in
3  the central office.
4      Q.  Okay.
5      And how long did you remain in the accounting
6  department?
7      A.  For seven years, until--
8      Q.  Until you went to the Catano--
9      A.  The Catano terminal.  Yes.
10     Q.  Okay.
11     So you said for a while in the accounting
12  department you worked on gasoline purchases.
13     Did your responsibilities in the accounting
14  department expand at any time, or did you always work
15  on gasoline purchases?
16     A.  No, I worked for about six months in the
17  accounts payable department and then I moved on to
18  the-- to work as an internal auditor for the next six
19  and a half years.
20     Q.  And what did you do as an internal
21  auditor?
22     A.  Oh, we reviewed the processes, the
23  procedures, to be sure that they are complied.
24     Q.  Review--I'm sorry--the processes?
25     A.  Yeah.  How you pay, how you purchase, how

31

1  you spend the money.
2      Q.  As an auditor, were you auditing only
3  purchase and sale of gasoline, or did you audit all
4  money that was spent by Shell Puerto Rico?
5      A.  Any type of expenditures and expenses.
6      Q.  Did you oversee expenditure and expenses
7  for remediation, environmental cleanups?
8      A.  No.
9      Q.  Okay.
10     I was asking you earlier about distributions at
11  the rack at Catano.
12     Is it "Cantano" or "Catano"?
13     A.  "Catano."
14     Q.  "Catano."
15     You said you had consumers.  Did that include
16  any public agencies?  Did you have public agency
17  customers at Catano?
18     A.  I think we have a few government agencies,
19  but usually they're really small.
20     Q.  Okay.
21     Do you remember which agencies?
22     A.  Some municipalities, but due to the
23  difficulty of collecting from them, usually they are
24  really small amount of that type of customers.
25     Q.  Okay.

32

1      How long-- in mid 1992, was Catano still one of
2  the main distribution points for Shell for gasoline?
3      A.  In 1992, we-- more than 70 percent of the
4  distribution in 1992 was still from Catano.
5      Q.  Did Catano receive gasoline via marine at
6  any time when you were working there?
7      A.  Yes.  By the time I went to Catano in '85,
8  CORCO was not supplying any type of product, so almost
9  all the product came from the sea, from dock.
10     Q.  And that was by barge?
11     A.  A few of them.  Most of them on tankers.
12     Q.  What was the tankage at Catano that Shell
13  had?
14     A.  "What was"?
15     Q.  What was the tankage.
16     A.  What do you mean by "the tankage"?
17     Q.  Volume.
18     A.  We have a lot of volume there, but I don't
19  remember exact.  I can't make some type of calculation,
20  but the biggest tank we got was for regular gasoline.
21  It has a capacity of four million gallons.  That's 100
22  barrels.
23     Q.  Wow.
24     THE REPROTER:  "That's a hundred"?
25     THE DEPONENT:  Thousand barrels.

joannedethomas@yahoo.com  -  787.501.3007

41

1    Q.   Okay.
2    So we know it was before 2006, right?
3    A.   Yes.
4    Q.   Okay.
5    And what was your responsibility as a marketing
6    analyst?
7    A.   We need to recollect all the statistic
8    information in order to help the management make
9    decisions.  Marketing decisions, of course.
10   Q.   And when you say statistical information,
11   is that about sales at the service stations?
12   A.   Sales of service stations, projections,
13   expenses.
14   Q.   Did you have any involvement with the-- or
15   oversee any tank improvements at service stations?
16   A.   Tank storage improvement at service
17   stations?
18   Q.   Yes.
19   A.   No.
20   Q.   Were you aware of improvements in
21   underground storage tanks at service stations, any
22   project that Shell had for that?
23   A.   As a program, not.
24   Q.   So you weren't aware of any program
25   implemented by Shell Puerto Rico to upgrade or change

42

1    the underground storage tanks at service stations.
2    Is that correct?
3    MR. CONDRON:  Objection to form.
4    THE DEPONENT:  Yes, I know that-- I know
5    that due to federal regulations Shell has to
6    comply with them and have a program established
7    for compliance.
8    BY MS. O'REILLY:
9    Q.   Do you recall that program had to be
10   completed in or around 1998?
11   A.   No.
12   Q.   Did you have any involvement in
13   implementing the federal regulations at any of the
14   Shell service stations?
15   A.   No.
16   Q.   Do you remember who in Shell was
17   responsible for that program?
18   A.   The maintenance engineer and project
19   engineer has the same-- do the same things, and the
20   health and safety environmental advisor.
21   Q.   And at that time, do you remember who that
22   person was?
23   A.   The engineer was Jose Marrero.
24   Q.   I'm sorry.  Could you spell the last name.
25   A.   "Marrero."  It's M-A-R-R-E-R-O.

43

1    Q.   And what about the health and safety
2    advisor?  Do you recall?
3    A.   It's more difficult, because we have about
4    three or four.  I don't know exactly which one was at
5    which time.
6    Q.   Do you remember Yamina Rivera?
7    A.   "Yamira"?
8    Q.   Yamira Rivera.
9    A.   Rivera.  She's working with us now in Sol,
10   but she was not with us when we were Shell.
11   Q.   Okay.
12   So it wouldn't have been her who was the health
13   and safety and environmental advisor?
14   A.   No.  No.
15   Q.   Okay.
16   But you can't remember the name of the person.
17   A.   No.
18   Q.   If you do remember later today, just let
19   me know and we'll have you put that on the record,
20   okay?
21   A.   Okay.
22   Q.   Did you work with Mr. Marrero on the
23   expenses for the upgrade program at the stations?
24   A.   No, because those are usually capital
25   projects and you need approval outside Puerto Rico in

44

1    order to have the expenditures, and those are worked
2    through the marketing and operations department.
3    Q.   Now, when you were-- you said you were
4    collecting statistical information as a marketing
5    analyst.
6    Were you in the marketing and operations
7    department, or were you in a different department?
8    A.   No, I was in the marketing department.
9    Q.   But you weren't directly involved in
10   operations.
11   A.   No.
12   Q.   Okay.
13   Who-- where outside of Puerto Rico, to your
14   understanding, did they have to get permission to
15   implement capital projects?
16   A.   When I started in Shell we need to-- all
17   the Caribbean companies report to Venezuela, but then
18   it was moved to Santo Domingo, then it was moved to
19   Brazil, and that depends on the year.
20   Q.   And do you remember which Shell entity you
21   reported to, the name of it?
22   MR. MARQUES:  Objection to form.
23   MR. CONDRON:  Object to form.
24   THE DEPONENT:  As-- in Puerto Rico, to
25   Shell Puerto Rico.

11  (Pages 41 to 44)

# FILED UNDER SEAL

Jonathan D. Watson

Page 286

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X
In re:  Methyl Tertiary Butyl Ether
("MTBE") Products Liability Litigation
———————————————————————— X

Master File No. 1:00-1898
MDL No. 1358 (SAS)
M21-88
———————————————————————— X

Commonwealth of Puerto Rico, et al.
v.
Shell Oil Co., et al.
Case No. 07-CIV-10470 (SAS)
———————————————————————— X


— — —

Thursday, November 14th, 2013

Volume 2

Pages 286-448


— — —

          Videotaped Oral deposition of JONATHAN
D. WATSON AS 30(b)(6) REPRESENTATIVE FOR1,
CITGO INTERNATIONAL P.R.; CITGO PETROLEUM
CORPORATION; AND CITGO REFINING COMPANY, LP
held in the offices of Jackson, Gilmour &
Dobbs, 300 Essex Street, Suite 700, Houston,
Texas, commencing at 9:01 a.m., on the above
date, before Daniel J. Skur, Notary Public in
and for the State of Texas.


— — —

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Jonathan D. Watson

Page 307

1   part of the conversation.
2       Q.   Okay. But you haven't had any
3   conversations with Julio Bucci or Mr. Arbeloa
4   to confirm that.
5       A.   I have not.
6       Q.   Do you have any reason to
7   believe that, in fact, MTBE was not present
8   in the gasoline being supplied to CITGO
9   Puerto Rico by PDVSA in the early 2000s?
10      A.   I do not.
11      Q.   The next says, bullet says,
12  discussed CILA perhaps using our lab
13  facilities for testing.
14           Do you see that?
15      A.   Yes.
16      Q.   Do you know if CILA, in fact,
17  utilized the Core lab to test product coming
18  into the facility?
19      A.   I don't know that CILA did. It
20  appears that agents of CILA may have.
21      Q.   What do you mean by "agents"?
22      A.   An inspector that, when the
23  vessels were off loaded, it appears the
24  facility may have been used in some cases.

Page 308

1       Q.   Okay. Did you ever meet,
2   yourself, with people from Core?
3       A.   I think I met them more as just
4   a courtesy call. I don't recall any lengthy
5   business interaction with them.
6       Q.   No substantive meetings?
7       A.   Not that I recall.
8       Q.   Okay.
9           (Whereupon, Watson Deposition
10          Exhibit 26, November 21, 2001 Bucci
11          Fax Regarding Terms and Conditions,
12          Bates No. CITGO-PR 60429 through
13          06431, was marked for identification.)
14  BY MS. O'REILLY:
15      Q.   For the record, I've marked as
16  Exhibit 26 a three-page document, appears to
17  be a fax or a telex to Chevron Texaco
18  Houston, appears to be from CITGO
19  International Puerto Rico. Excuse me, other
20  way around, Chevron Texaco Global Trading,
21  division of Chevron U.S.A., to CITGO
22  International Puerto Rico, Bates stamped
23  CITGO PR 060429 through 060431, and it's
24  dated November 21st, 2001. Let me know when

Page 309

1   you're ready.
2           (Witness reviews document.)
3       A.   Okay.
4   BY MS. O'REILLY:
5       Q.   Okay. Can you tell me what
6   this document is?
7       A.   Appears to be a buy/sell
8   agreement between Texaco Aviation and CITGO
9   International Puerto Rico for 200,000 barrels
10  of 87 grade gasoline, regular unleaded
11  gasoline.
12      Q.   And where was it delivered to?
13      A.   According to the document,
14  delivered Ex-Ship Guayama, Puerto Rico.
15      Q.   Okay. Would this be --
16           MR. ANDERSON: Objection,
17  foundation.
18  BY MS. O'REILLY:
19      Q.   Would this be a spot sale?
20           MR. ANDERSON: Objection,
21  foundation.
22      A.   I can -- I can't tell from the
23  document, but it's -- it appears to be a
24  one-time purchase, which I would describe as

Page 310

1   a spot purchase on -- by CITGO International
2   Puerto Rico.
3   BY MS. O'REILLY:
4       Q.   Do you have any reason to
5   believe that CITGO International did not take
6   delivery of the 200,000 barrels of unleaded
7   regular gasoline?
8           MS. HANEBUTT: Objection --
9           MR. ANDERSON: Objection,
10  foundation.
11      A.   I have no way of knowing
12  whether this transaction was consummated or
13  not.
14  BY MS. O'REILLY:
15      Q.   Do you have any information to
16  believe that this sale did not occur?
17           MS. HANEBUTT: Same objection,
18  lack of foundation.
19      A.   I don't know.
20  BY MS. O'REILLY:
21      Q.   Was this one of the documents
22  you reviewed in preparation for your
23  deposition?
24      A.   I don't recall having seen this

7 (Pages 307 to 310)

Jonathan D. Watson

Page 411

1    I don't think.
2        Q.   Let me make sure I understand
3    your answer.  Did you ask any of the
4    witnesses on your interview list if gasoline
5    provided to CITGO, either from off-island or
6    on-island sources, contained MTBE?
7        A.   Yes.
8        Q.   Who did you ask?
9        A.   Steve Fuller.
10       Q.   Anyone other than Steve Fuller?
11       A.   No.
12       Q.   And what did Mr. Fuller tell
13   you about the presence of MTBE in gasoline
14   supplied to CITGO either from on-island or
15   off-island sources?
16       A.   He confirmed that we could
17   identify shipments into Puerto Rico that did
18   contain MTBE.
19       Q.   Beyond identifying individual
20   shipments, did Mr. Fuller indicate to you if
21   he knew whether or not gasoline supplied to
22   Puerto Rico, for example, in the 1991 to 1994
23   time period, whether those -- that gasoline
24   contained MTBE?

Page 412

1        MS. HANEBUTT:  Objection to
2    form.
3        A.   I did not discuss 1990-'94 with
4    Mr. Fuller, per my recollection.
5    BY MS. O'REILLY:
6        Q.   In your conversation with
7    Mr. Fuller, did he know beyond specific
8    documents identifying the presence of MTBE,
9    did he know whether or not MTBE was regularly
10   present in gasoline that CITGO received from
11   either Hovensa, PDV or Shell Yabucoa?
12       MS. HANEBUTT:  Objection to the
13   form and the compound form of the
14   question.
15       A.   Yes.  He indicated that it was
16   common for MTBE to be in the gasoline from
17   PDVSA.
18   BY MS. O'REILLY:
19       Q.   And what about Hovensa?
20       A.   His indication was that it was
21   not typically in product from Hovensa.
22       Q.   And what about Shell Yabucoa?
23       A.   I don't recall him having any
24   knowledge of the product specifications for

Page 413

1    product out of Yabucoa.
2        Q.   At any time during the time
3    period that CITGO was selling gasoline in
4    Puerto Rico, did CITGO have a policy
5    concerning the presence of MTBE in its
6    gasoline?
7        MS. HANEBUTT:  Ask and answered
8    yesterday.  Go ahead.
9        A.   Okay.  We did not.
10   BY MS. O'REILLY:
11       Q.   With respect to the 1991-1994
12   time period, did you ask Mr. Clingan if he
13   had any knowledge concerning the presence of
14   MTBE in gasoline provided to CITGO by its
15   suppliers?
16       A.   I did not ask the question of
17   Bob Clingan.
18       Q.   Did you ask anyone whether or
19   not MTBE was present in gasoline supplied to
20   CITGO in the 1991 to 1994 time period?
21       A.   I inquired if anyone might have
22   knowledge of that, and no one did.
23       Q.   Inquired of whom?
24       A.   Just -- I was -- inquired of

Page 414

1    Steve Fuller if there might be someone still
2    present in the organization who might have
3    knowledge, and he indicated he did not think
4    so.
5        Q.   Did you look for any documents
6    which indicated to you whether or not MTBE
7    was present in 1991, 1994 time period?
8        A.   No.
9        Q.   And designated issue number 20,
10   any product codes and/or product descriptions
11   which identify gasoline products containing
12   MTBE, TBA ethanol, and/or any other
13   oxygenates delivered to and/or marketed to or
14   within the Commonwealth of Puerto Rico.
15       What did you do to prepare?
16       A.   Again, I reviewed the documents
17   that were provided by our sources.
18       Q.   Did you identify any product
19   codes that indicated the presence of MTBE or
20   any other oxygenates?
21       A.   We identified product codes,
22   but I don't think the product codes
23   themselves would indicate that they would
24   necessarily not have oxygenates in them.

33 (Pages 411 to 414)

# Exhibit 2

**FILED UNDER SEAL**

Page 1

```
 1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2            IN AND FOR THE COUNTY OF SAN FRANCISCO
 3                       --oOo--
 4   SOUTH TAHOE PUBLIC UTILITY    )
     DISTRICT,                     )
 5                                 )
          Plaintiff,               )
 6                                 )
          vs             )   No. 999128
 7                        )   VOLUME I
     ATLANTIC RICHFIELD COMPANY    )
 8   ("ARCO"); ARCO CHEMICAL COMPANY;)
     SHELL OIL COMPANY; CHEVRON    )
 9   U.S.A., INC.; EXXON CORPORATION;)
     B.P. AMERICA, INC.; TOSCO     )
10   CORPORATION; ULTRAMAR, INC.;  )
     BEACON OIL CO.; USA GASOLINE  )
11   CORPORATION; SHELL OIL PRODUCTS )
     CO.; TERRIBLE HERBST, INC.;   )
12   ROTTEN ROBBIE; J.E. TVETEN    )
     CORP.; TAHOE TOM'S GAS STATION; )
13   THE SOUTHLAND CORP.; PARADISE  )
     CHEVRON; and DOES 1 through 600,)
14   inclusive,                    )
                                   )
15        Defendants.              )
     _____)
16
17                      --oOo--
            THURSDAY, MAY 6, 1999
18             10:03 A.M.
                    --oOo--
19          DEPOSITION OF
            CURTIS STANLEY
20                  --oOo--
21
22
23
24   CATHLEEN SLOCUM, CSR
     License No. 2822
25
```

Page 14

```
 1   Q    And did you determine during that investigation that
 2   there were complaints about the taste and odor of water from
 3   that well that was operated by the municipality involved?
 4   A    Yes.
 5   Q    Who were the taste, who was making the taste and odor
 6   complaints?
 7   A    I was told that some people which were served by that
 8   utility had made those complaints.
 9   Q    And did you determine what concentration of MTBE was
10   present in their drinking water in some way?
11   A    I, I believe we did.  I don't recall specifically what
12   those concentrations were in their drinking water.
13   Q    Are we talking about parts per billion?
14   A    Yes.
15   Q    So is it fair to say that by 1981 Shell Oil Company
16   knew that MTBE and its gasoline could contaminate public
17   drinking water supplies?
18   A    Yes.
19   Q    And is it also fair to say that they knew by that time
20   that it created taste and odor problems in public drinking
21   water supplies?
22   A    Yes.
23   Q    And did you report those facts to Shell management?
24   A    Yes.
25   Q    How did you do that?
```

Page 1

```
 1  SUPERIOR COURT OF THE STATE OF CALIFORNIA
       IN AND FOR THE COUNTY OF SAN FRANCISCO
 2
       SOUTH TAHOE PUBLIC UTILITY  :  NO. 999128
 3  DISTRICT;                      :
           Plaintiff,              :
 4                                 :
       vs.                         :
 5                                 :
       ATLANTIC RICHFIELD COMPANY  :
 6  ("ARCO"); ARCO CHEMICAL        :
       COMPANY; SHELL OIL COMPANY; :
 7  et al.,                        :
           Defendants.             :
 8  --------------------
       COMMUNITIES FOR A BETTER    :  NO. 997013
 9  ENVIRONMENT, a California       :
       Non-Profit Corporation, on  :
10  behalf of the General Public;   :
           Plaintiff,              :
11                                 :
       vs.                         :
12                                 :
       UNOCAL CORPORATION, a       :
13  Delaware corporation, et al.,:  :
           Defendant.              :
14
               - - -
15
          September 12, 2000
16
17
            Videotape deposition of
18  GEORGE DOMINGUEZ, held at the Centennial
       Inn, 5 Spring Lane, Farmington,
19  Connecticut 06032 commencing at 9:33
       a.m., on the above date, before Margaret
20  Peoples, a Federally Approved Certified
       Professional Reporter and Notary Public
21  of the Commonwealth of Pennsylvania.
               - - -
22
          ESQUIRE DEPOSITION SERVICES
23              15th Floor
          1880 John F. Kennedy Boulevard
24        Philadelphia, Pennsylvania 19103
               (215) 988-9191
```

Page 140

```
 1   that the members of the MTBE Committee
 2   had the opportunity to review this
 3   document and make any changes they saw
 4   fit prior to it being sent to the EPA?
 5        A.   That is my recollection.
 6        Q.   Did you draft any portions
 7   of the comments?
 8        A.   I certainly drafted, as I
 9   recall, the cover letter, but I don't
10   recall drafting the comments per se.  No.
11        Q.   Now, if you look at the
12   comments, I believe, Section II is
13   entitled Occupational and Environmental
14   Exposure.
15             MR. THALER:  Which page are
16        you looking at, Scott?
17             MR. SUMMY:  I was looking at
18        page 1 of the document, of the
19        comments.
20             MR. THALER:  The
21        introduction page?
22             MR. SUMMY:  Yes.  The
23        introduction page under the
24        Organization of The Statement.
```

Page 139

```
 1        by the committee, that is the MTBE
 2        testing task force
 3        representatives.  And then, I
 4        believe, it was finalized by
 5        counsel
 6   BY MR. SUMMY:
 7        Q.   By legal counsel?
 8        A.   Yes.
 9        Q.   Now, when you say it was
10   prepared by the MTBE Committee, how would
11   that have occurred?
12        A.   They would have had a
13   meeting and reviewed the various
14   documents referred to in the appendices
15   and drafted a summary conclusion
16   predicated on that review.
17        Q.   Now, this particular
18   document was intended to answer the -- or
19   respond to the concerns that were brought
20   out by the EPA in the December 16th focus
21   meeting related to MTBE ground water
22   contamination; correct?
23        A.   In part.  Yes.
24        Q.   And is it your recollection
```

Page 148

```
 1   group that you represented?
 2        A.   I'm not sure I understand
 3   that question.
 4             Consistent with the thinking
 5   of the group?
 6        Q.   Was it -- when you presented
 7   these documents to the EPA, you indicated
 8   that the committee jointly drafted some
 9   of these documents; is that correct?
10        A.   Yes.
11        Q.   Was it a consensus process
12   in developing these documents, is that
13   your understanding?
14        A.   Yes.  Except that the
15   supporting documents were appended and
16   submitted.
17        Q.   Do you recall any occasions
18   where any member of the committee
19   objected to the content of a document
20   being submitted to the EPA concerning
21   MTBE?
22        A.   No, I do not.
23        Q.   So, as best you can recall,
24   the industry was of one mind, at least
```

Page 154

```
 1      A.   Yes.
 2      Q.   And certainly several of
 3 them did attend and participate?
 4      A.   Yes.
 5      Q.   And did you circulate the
 6 documents sent to the EPA among committee
 7 members?
 8           Was that the practice?
 9           MR. THALER: At what time?
10 Circulated at what time?
11           You mean prior to submission
12 or after submission to EPA, Duane?
13           MR. MILLER: We'll take it
14 one step at a time.
15 BY MR. MILLER:
16      Q.   Was it your practice to
17 circulate a copy of the document that was
18 being considered for submission to the
19 EPA before it was submitted to that group
20 to get any comments, corrections, or
21 additions from committee members that
22 were interested in participating?
23      A.   Yes.
24      Q.   Was it also your practice to
```

Page 155

```
 1 circulate the final document that was
 2 sent to the EPA in to each of those
 3 members?
 4      A.   Yes.
 5      Q.   And do you recall any
 6 occasions where someone who failed to
 7 attend a meeting received a final version
 8 of a document and said we need to submit
 9 a correction?
10      A.   No.  I have no recollection
11 of that occurring.
12      Q.   All right.  And at the time
13 these documents were prepared, is it fair
14 to say Exxon was the committee, sir?
15      A.   Yes.
16      Q.   ARCO?
17      A.   Yes.
18      Q.   Texaco?
19      A.   Yes.
20      Q.   Shell?
21      A.   Yes.
22      Q.   And do you recall any of
23 them objecting to the reports that were
24 submitted to the EPA, any of the four
```

Page 156

```
 1 companies I just mentioned?
 2      A.   No.
 3      Q.   Now, if we return to an
 4 exhibit that we marked before.
 5           MR. THALER: Which number?
 6           MR. MILLER: I'm about to
 7 provide it to the witness.
 8           We'll go off the video
 9 record for just a moment.
10           VIDEOGRAPHER: 1:34, off the
11 record.
12           - - -
13           (Whereupon, a recess was
14 taken.)
15           - - -
16           VIDEOGRAPHER: 1:34, on the
17 record.
18 BY MR. MILLER:
19      Q.   Do you have Exhibit 12
20 before you?
21      A.   Yes.
22      Q.   And just so the record is
23 clear, this is a submission to the EPA
24 with a cover letter signed by
```

Luis Pagan-Rodriguez

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE: METHYL TERTIARY BUTYL  : MASTER FILE NO.
ETHER ("MTBE") PRODUCTS        : 1:00-1898
LIABILITY LITIGATION           : MDL 1358 (SAS):
                               : No. M21-88

This Document Relates to:      :
                               :
Commonwealth of Puerto         :
Rico, et al.                   : Case No.
              v.               : 07-CIV-10470(SAS)
Shell Oil Co., et al.          :

- - -

The Videotaped 30(b)(6) deposition of:

LUIS PAGÁN-RODRÍGUEZ,

special aide to the Secretary of the Department of

Consumer Affairs of Puerto Rico was held at

O'Neill & Borges, 250 Muñoz Rivera Avenue, Suite

800, San Juan, Puerto Rico, on Thursday, November

14, 2013, at 9:14 a.m.

Reported By:  Derek L. Hoagland

              California CSR No. 13445

Luis Pagan-Rodriguez

Page 58

1 the information supplied by companies that import
2 gasoline to Puerto Rico. Can we talk about that a
3 little more?
4    A    Yes.
5    Q    What information does DACO collect
6 regarding the gasoline that is imported to Puerto
7 Rico?
8    A    There is a really long list in one of
9 the orders, and we have practically spoken about
10 all of them here, which includes the quarterly,
11 the half-yearly reports, the audited financial
12 statements, and when they receive the fuel, the
13 bill of lading. And well, what we spoke about.
14    Q    When a supplier of gasoline brings
15 petroleum products to Puerto Rico, do they have to
16 supply information to DACO?
17    A    Yes.
18    Q    What do they have to give to DACO?
19    A    They have to give us the bill of
20 lading. And together with the bill of lading,
21 they do some lab tests, which they supply us also.
22    Q    And what does DACO do with the bill of
23 lading information?
24    A    It corroborates the gasoline supplies

Page 59

1 that exist in the island and when it was that it
2 arrived.
3    Q    What does DACO do with the gasoline
4 supply information on the island?
5    A    Well, it's tabulated, and in the case
6 that there is a national emergency, then it can be
7 provided to the Department of Energy.
8    Q    Okay. And what does DACO do with the
9 certificates of analysis?
10    A    Well, the certificates of analysis --
11 well, we have to -- very few people working with
12 us. I already told you that it's only two of us.
13 So what we verify is that the certificates of
14 analysis are updated.
15    Q    Okay. Do either you or the other
16 person who review the certificates of analysis go
17 through all of the parameters that are tested for?
18    A    Not necessarily.
19    Q    Okay. Can you tell me what you do
20 look at and why you only look at those? I
21 apologize. It is not a clear question.
22       I think you testified that you don't
23 necessarily look at every parameter that's tested
24 for in the certificates of analysis; is that true?

Page 60

1    A    That is true.
2    Q    Can you explain that answer?
3    A    Well, what we do regarding this
4 analysis, as I stated before, is we check that
5 they arrive within the stipulated time period that
6 is specified in the order. And -- well,
7 specifically we observe the order that the -- that
8 it should not include any MTBE, so then,
9 specifically, we do check that the results are
10 negative for MTBE.
11       But I have to clarify that we are not
12 experts in environmental issues, so simply what we
13 do, that if the order says there can't be MTBE, we
14 check that there is none.
15    Q    And, specifically, you're checking
16 whether there is MTBE above the permitted amount,
17 right?
18    A    Yes.
19    Q    And I just want to clarify, is it your
20 understanding that MTBE is permitted to be in
21 gasoline in Puerto Rico at levels less
22 than 0.5 percent per volume?
23    A    Yes, that is what the order you have
24 in your hands establishes.

Page 61

1    Q    Right, I want to make sure I got it
2 correct. Anything above 0.5 percent per volume
3 would not be in compliance; is that correct?
4    A    That is correct.
5    Q    What would DACO do if they discovered
6 gasoline that, according to the certificates of
7 analysis, contained MTBE above 0.5 percent by
8 volume?
9    A    We have to notify the EQB and, well,
10 obviously, they would be fined.
11    Q    Okay. In the time that you have been
12 with DACO in your position, in your current
13 position, have you ever discovered gasoline coming
14 into Puerto Rico above 0.5 percent per volume?
15    A    No.
16    Q    Okay. In the time that you have been
17 doing this job, have you seen MTBE present in
18 gasoline coming into Puerto Rico, but below
19 0.5 percent volume?
20    A    The ones I have seen have zero.
21    Q    Okay. And when certificates of
22 analysis are submitted to DACO by the suppliers of
23 gasoline, are -- is every certificate of analysis
24 checked by either you or Ms. García?

16  (Pages 58 to 61)

**Exhibit 3**

**3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL     *     Master File
ETHER ("MTBE") PRODUCTS                No. 1:00-1898
LIABILITY LITIGATION
-------------------------------------     MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,     *     M21-88
et al.,
                                             *
        Plaintiffs,
                                             *
        vs.
                                             *
        Defendants.
                                             *

Case No. 07-CIV-10470 (SAS)
-------------------------------------

The videotaped deposition of:
        IVAN CINTRON-VAZQUEZ,
former Shell Puerto Rico Limited (Sol Puerto Rico
Limited) employee, and a non-party witness herein, was
held at Haciendas de Belverde, 29 Colirubia Street,
Cabo Rojo, Puerto Rico  00623, on Friday, September 27,
2013, at 9:24 a.m.

---

APPEARANCES (Continued)
COUNSEL FOR SHELL DEFENDANTS
SEDGWICK, LLP
2900 K Street NW
Harbourside, Suite 500
Washington, DC  20007
BY:  RUBEN F. REYNA, ESQ.
(Appearing telephonically)
        202.204.1000
        ruben.reyna@sedgwicklaw.com

COUNSEL FOR CODEFENDANT IDEMITSU APOLLO CORPORATION

BOWMAN and BROOKE, LLP
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota  55402
BY:  DUSTIN D. FOSSEY, ESQ.
(Appearing telephonically)
        612.656.4021
        dustin.fossey@bowmanandbrooke.com

VIDEOGRAPHER

MR. NELSON D'FREITAS

ALSO PRESENT

MRS. CARMEN RIVERA
Deponent's spouse

---

**2**

APPEARANCES
COUNSEL FOR PLAINTIFFS
MILLER, AXLINE & SAWYER
1050 Fulton Avenue, Suite 100
Sacramento, California  95825
BY:  TRACEY L. O'REILLY, ESQ.
        916.488.6688
        toreilly@toxictorts.org

COUNSEL FOR CODEFENDANT SOL PUERTO RICO LIMITED

McCONNELL VALDES, LLC
270 Munoz Rivera Avenue
San Juan, Puerto Rico  00918
BY:  JUAN A. MARQUES-DIAZ, ESQ.
(Also acting as Notary Public)
        787.759.9292
        jam@mcvpr.com

COUNSEL FOR CODEFENDANT CHEVRON PHILLIPS PUERTO RICO
CHEMICAL CORE and CONOCOPHILLIPS COMPANY
PIETRANTONI, MENDEZ & ALVAREZ, LLC
Banco Popular Center, 19th Floor
208 Ponce de Leon Avenue
San Juan, Puerto Rico  00918
BY:  MARIA DOLORES TRELLES-HERNANDEZ, ESQ.
(Appearing telephonically)
        787.773.6000
        mtrelles@pmalaw.com

COUNSEL FOR CODEFENDANT TOTAL PETROLEUM
PUERTO RICO CORP.
SEPULVADO & MALDONADO, PSC
Citibank Tower, 19th Floor
252 Ponce de Leon Avenue
San Juan, Puerto Rico  00918
BY:  DELIRIS ORTIZ-TORRES, ESQ.
(Appearing telephonically)
        787.765.5656
        dortiz@smlawpr.com

---

**4**

INDEX
EXAMINATION
                                                        PAGE

IVAN CINTRON-VAZQUEZ
        By Ms. O'Reilly                      10
        By Ms. Trelles                         61

EXHIBITS
                                     REFERENCED/
NO.        DESCRIPTION        MARKED

1     Notice of Deposition,
        six pages                              25
2     "Supply & Demand Map," one page          26
3     Letter to The Shell Oil Company
        (Puerto Rico Limited),
        Attn.: Messrs. Ruben Vazquez and
        Ivan Cintron, from Alberto M. Sola,
        of 11/30/87, four pages                27
4     Letter to The Shell Company (PR) LTD.,
        Attn.: Mr. Ivan Cintron, from Alberto
        M. Sola, of 9/16/92, and "Fax Memo" to
        Pedro J. Corujo, from Ivan Cintron, of
        9/29/92, a total of two pages          31
5     "Ocean Bill of Lading" to The Shell
        Oil Company from Phillips Puerto Rico
        Core, Inc., of 12/3/87, one page       31
6     Letter to Victor Reyes from
        Ivan Cintron of 1/26/94, two pages     32
7     "Petroleum Products Purchase Contract"
        of 8/1/88, 11 pages                    33
8     Letter to Luis R. Martin from
        Ivan Cintron of 3/3/88, Bates
        stamped SOL 48620, one page            35
9     Letter to Luis R. Martin from
        Ivan Cintron of 3/3/88, Bates,
        stamped SOL 48619, one page            35

---

1 (Pages 1 to 4)

53

1   (Whereupon, the document is marked for
2   purposes of identification as Deposition
3   Exhibit No. 30.)
4   THE DEPONENT:  Yeah, this is a spot
5   purchase from HESS Oil.
6   BY MS. O'REILLY:
7   Q.   By Shell Puerto Rico?
8   A.   By Shell Puerto Rico.
9   Q.   And you received the product, yes?
10  A.   Yes.
11  Q.   Okay.
12  THE REPORTER:  This would be 31.
13  (Whereupon, the document is marked for
14  purposes of identification as Deposition
15  Exhibit No. 31.)
16  BY MS. O'REILLY:
17  Q.   Just a couple of more.
18  A.   Yes, this is another spot purchase from
19  HESS Oil.
20  Q.   To Shell?
21  A.   To Shell Puerto Rico.
22  Q.   And they received delivery of the
23  gasoline?
24  A.   Yes.
25  THE REPORTER:  This would be 32.

54

1   (Whereupon, the document is marked for
2   purposes of identification as Deposition
3   Exhibit No. 32.)
4   THE DEPONENT:  Yes, this is another
5   purchase from Shell to HESS Oil and Shell
6   received the product.
7   BY MS. O'REILLY:
8   Q.   HESS sold to Shell?
9   A.   HESS sold to Shell.
10  Q.   And Shell received the product?
11  A.   Yes.
12  Q.   Okay.  The last one.
13  THE REPORTER:  This would be 33.
14  (Whereupon, the document is marked for
15  purposes of identification as Deposition
16  Exhibit No. 33.)
17  MR. MARQUES:  Counsel, do you know where
18  you got this document?  It's not Bates stamped.
19  MS. O'REILLY:  Yes, it is.
20  MR. MARQUES:  Oh, it is?  Oh, it's this
21  way.  Okay.
22  THE DEPONENT:  Yes, this is the same.
23  BY MS. O'REILLY:
24  Q.   Is this a delivery of a tanker of-- tank
25  gasoline from Hovensa to Shell?

55

1   A.   Yes.
2   Q.   And Shell received this gasoline?
3   A.   Yes.
4   This is very funny.
5   Q.   Why?
6   A.   I tried to purchase gasoline from HESS Oil
7   for many years and they don't want to sell us to Shell
8   Puerto Rico.  And suddenly in one day they give me a
9   call on the phone if I want gasoline.  I got on the
10  phone and called the people in Houston and I told them
11  and they said, "No kidding?"  I said, "They want to
12  sell us."  And they also give us the transportation.
13  And I called HESS and I say, "Yes, we are
14  interested in buying from you."  And they were so
15  interested in buying-- selling the gasoline to us, and
16  they sent the manager, the marine manager, in a plane,
17  in one of the company planes, to meet me in San Juan
18  the same day.
19  Q.   Wow.
20  A.   After that we did some purchases.  But
21  that was incredible.  Everybody was-- when I told them,
22  "No, it can't be done."
23  Q.   And they suddenly wanted to sell to you.
24  Who did you call in Houston?
25  A.   I don't remember the name now.  I don't

56

1   remember the name.
2   Q.   And why did you call Houston?  Did you
3   need approval to buy from HESS?
4   A.   No, because I have instructions that if
5   anything out of the area, to notify them immediately.
6   Q.   Okay.
7   A.   Because they have to inspect the tankers,
8   if the tanker is a suitable transport carrier they will
9   leave.  The reason is why you're here.
10  THE REPORTER:  (To the deponent) "The
11  reason is" what?
12  MS. O'REILLY:  (To the reporter) Why I'm
13  here.
14  BY MS. O'REILLY:
15  Q.   Lawyers. "Abogados."
16  A.   After that we have about a year buying
17  from them gasoline every week and they had the tankers
18  also so you have no problem.
19  Q.   So you could get big quantities from
20  gasoline-- from HESS instead of just lots of little
21  purchases, yes? "Yes"?
22  A.   Yes.
23  Q.   How often did you communicate with Houston
24  about supply issues in Puerto Rico?
25  A.   Almost every week.

14  (Pages 53 to 56)

57

1    Q.   And did you report your inventory to them?
2    A.   No.
3    Q.   Did you just communicate to them who you
4    were buying from? "Yes"?
5    A.   Yes.
6    Q.   Did they ever suggest to you someone that
7    you should buy from?
8    A.   No.
9    Q.   Did you ever receive gasoline from Houston
10   in Puerto Rico?
11   A.   Yes.
12   Q.   How often?
13   A.   About every other month.
14   Q.   Every other month it came from the
15   refinery in Houston?
16   A.   Yeah. Not Houston. Down south.
17   Q.   Louisiana?
18   A.   Louisiana.
19   Q.   Did it have MTBE in it?
20   A.   I don't remember.
21   Q.   Okay.
22   So every other month. For how long?
23   A.   For about a year.
24   Q.   For a year? It was tankers?
25   A.   They were barges. The tanker converted

58

1    into barge.
2    Q.   How does that work?
3    A.   The tanker, they strip off the equipment
4    and they instead of having a barge pulling the barge,
5    it was a barge pushing the barge.
6    Q.   Oh. Okay.
7    Did you ever go to Louisiana to see the
8    refinery?
9    A.   Yes, but not on the-- in the oil. Other
10   business.
11   Q.   Oh. Okay. Okay.
12   So do you remember about what year you received
13   shipments from Louisiana?
14   A.   Shipments were around '98.
15   Q.   And was this-- I think it's called NOLA or
16   something like that, the Louisiana refinery?
17   A.   I don't remember.
18   Q.   Okay.
19   Were there any other people that you bought
20   gasoline from that we haven't covered this morning?
21   A.   Not that I know now. We have CAPECO, Sun
22   Oil, Shell, Phillips. Mainly we buy from Shell
23   companies and they were suggested by Shell Chemical.
24   Q.   And Shell Chemical was based in Houston,
25   correct?

59

1    A.   Yes.
2    Q.   And they would suggest companies for you
3    to buy from?
4    A.   Yeah, because that was the company policy,
5    to buy from company sources. That's why we purchased
6    everything through Traders in Curacao for many, many
7    years.
8    Q.   Okay.
9    Any other Shell refinery besides the one in
10   Louisiana that you got gasoline from?
11   A.   No.
12   Q.   No? You don't remember?
13   A.   No, because the other business that we do
14   was with the lubricants. That's another story.
15   Q.   Totally different. Yeah.
16   Did you ever get gasoline from California?
17   A.   No. It's too far away.
18   Q.   Was there anything else-- you remember
19   anything-- looking at these documents remind you of
20   anything else about your suppliers that I haven't asked
21   you today?
22   A.   No, not that I remember.
23   Q.   Okay.
24   Well, I don't have anymore questions for you. I
25   don't know if your counsel has any questions.

60

1    MR. MARQUES: I don't have any questions.
2    I just want to mark as an exhibit the medical
3    certificate--
4    MS. O'REILLY: Sure.
5    MR. MARQUES: --for Mr. Cintron.
6    You have copies of that.
7    MS. O'REILLY: I don't have it with me.
8    THE REPORTER: This would be 34.
9    (Whereupon, the document is marked for
10   purposes of identification as Deposition
11   Exhibit No. 34.)
12   MS. O'REILLY: Counsel on the phone, we're
13   done here. Does any counsel on the phone have
14   questions?
15   MS. TRELLES: Hi. I have questions. This
16   is Maria Trelles from-- representing Chevron
17   Phillips Chemical Puerto Rico Core.
18   If I could just have someone to place the
19   phone near the deponent so I catch his answers
20   clearly.
21   MS. O'REILLY: Okay. We'll move it
22   closer.
23   MR. TRELLES: Okay. Thank you.
24
25

15  (Pages 57 to 60)

David Lewis

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------§
IN RE:  METHYL TERTIARY BUTYL   §
ETHER ("MTBE") PRODUCTS         §
LIABILITY LITIGATION,           §  Master File No.
                                §  1:00-1898
                                §  MDL 1358(SAS)
                                §  No. M21-88
                                §
This document relates to:       §
                                §
COMMONWEALTH OF PUERTO RICO,     §
et al.,                         §  Case No.
                                §  07-civ-10470 (SAS)
        Plaintiff,              §
vs.                             §
                                §
SHELL OIL COMPANY, et al.,      §
                                §
        Defendants.             §
-------------------------------§
                            - - -
```

NOVEMBER 22, 2013

- - -

Videotaped deposition of DAVID LEWIS, held at
Sedgwick, LLC, Fitzwilliam House, 10 St. Mary Axe,
London, EC3A 8BF, England, commencing at
9:20 a.m. on the above date, before Joan L. Pitt,
Registered Merit Reporter, Certified Realtime
Reporter, and Florida Professional Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

David Lewis

## Page 10

1  doesn't give us a clear record.  So will you try to give
2  a verbal answer?
3      A.  I will.
4      Q.  Okay.  If at any time today you need a break,
5  let me know and we'll take a break.  We usually try to
6  take a break about right around every hour or so to give
7  everybody a chance to stretch their legs, but if you
8  need a break in between that, just let me know and we
9  can take one.  Okay?
10     A.  Okay.
11     Q.  I know we're going to be going back over some
12  events that occurred quite some time ago.  If at the
13  time I ask you a question you can't remember something,
14  but you remember it later in the day, maybe a document I
15  show you refreshes your recollection, please let me know
16  and I will give you an opportunity to add your testimony
17  to the record.  Okay?
18     A.  Okay.  Thank you.
19     Q.  All right.  Did you do anything to prepare for
20  your deposition today?
21     A.  Yes.  I reviewed documents relating to the case
22  and I had various discussions with my counsel.
23     Q.  Okay.  Did you talk to anyone other than your
24  counsel?

## Page 11

1      A.  I spoke to a few colleagues, both present and
2  retired, who worked with me during the period I was in
3  the Caribbean.
4      Q.  Who did you speak to?
5      A.  I spoke to Ted Tomes, who was the distribution
6  manager during that period.  I spoke with John Bullock,
7  who was my line manager at that period.  I spoke with
8  George Varny, who succeeded me as the HSSE manager for
9  the CCA cluster.  And obviously I've kept my line
10 management and functional management advised of the fact
11 that I've been deposed.
12     Q.  Okay.  Your current line manager?
13     A.  My current line management, yeah.
14     Q.  What's your current position?
15     A.  I'm currently the manager of the HSSE
16 functional services team, and we call it an FDG, a
17 functional delivery group, for the downstream
18 businesses.
19     Q.  And "downstream," downstream of refineries?
20     A.  That includes everything in the supply chain,
21 from the refineries right the way through the supply
22 chain to the end user.  So it would include the retail
23 sites, various commercial businesses, and distribution
24 activity, and so on.

## Page 12

1      Q.  In what region are you manager of?
2      A.  It's a global team, so I have global
3  responsibilities.
4      Q.  Okay.  And just for the record, can you tell us
5  what HSSE stands for?
6      A.  Health, safety, security, and environment.
7      Q.  Okay.  And do you recall -- you mentioned the
8  CCA, and just for the record, can you state what that
9  stands for?
10     A.  Caribbean and Central America.
11     Q.  And was it always called CCA when you were in
12 that group?
13     A.  Yes.  I think the official title was Shell CCA
14 Limited, I think, but we tended to refer to it as the
15 CCA cluster.  It was a cluster organization.
16     Q.  Okay.  And how long were you involved with the
17 CCA cluster in HSSE?
18     A.  I moved to Santo Domingo and took up my role as
19 the CCA HSSE manager in April 1999.  I returned to
20 London at the end of January 2002, so that was the
21 period when I was the HSSE manager for CCA, but when I
22 returned to London, I then was appointed to be the HSSE
23 manager for the south zone.  The cluster was part of the
24 south zone organization, so as the zonal HSSE manager, I

## Page 13

1  continued to be involved with CCA and the rest of the
2  zone for the next just over two years.
3      Q.  So approximately until 2004?
4      A.  Yes.  I moved, changed jobs, I think it was
5  April 2004.  The south zone covered Latin America,
6  Central America, and all of Africa.
7      Q.  And when you arrived at -- Santo Domingo in
8  April of 1999, what was your prior position?  What was
9  your position just prior to that?
10     A.  I was the HSSE manager for the marketing
11 operations in Shell UK.
12     Q.  Did that involve gasoline?
13     A.  Yes.
14     Q.  Was that retail stations?
15     A.  I didn't have responsibility for the retail
16 business from an HSSE point of view.
17     Q.  I'm sorry.  You didn't?
18     A.  I didn't.
19     Q.  Okay.  So marketing would be terminals?
20 Distribution?
21     A.  It included the terminals, distribution.  It
22 included the commercial businesses, which included
23 distributors.  It included businesses such as LPG,
24 aviation, bitumen, those businesses.  Excluded was the

4  (Pages 10 to 13)

David Lewis

## Page 14

1  refinery activity and the retail activity. That wasn't
2  part of my remit.
3  Q. Okay. When you were HSSE in the CCA, did you
4  have responsibility for retail stations? Was that part
5  of your remit?
6  A. Yes, in the sense that I was the HSSE manager
7  for the cluster, and as such I was responsible for
8  advising all of the businesses in the cluster in
9  relation to HSSE matters, which would have included
10 retail. I wasn't directly responsible for the retail
11 business.
12 Q. Okay. Do you recall who was the HSSE
13 individual in Puerto Rico who reported to you?
14 A. We had an environmental advisor called
15 Vanessa Rodriguez based in Puerto Rico. During my time
16 as the HSSE manager for CCA, her employment was
17 terminated and she was replaced by Brenda Torano, my
18 predecessor, and it wasn't an exact like-for-like
19 replacement, it was a gentleman named, if I recall
20 correctly, Raphael Jiminez, and he was based in Puerto
21 Rico, and he retired shortly after I was appointed.
22     There were various other people in Puerto Rico
23 who would have had some involvement in HSSE matters.
24 For example, in the retail business there was a retail

## Page 15

1  engineer, who, if I recall correctly, became more
2  involved in HSSE. Carlos Rodriguez, I believe, his name
3  was.
4  Q. Did -- was Ms. Torano working for Shell Puerto
5  Rico when -- before she replaced Ms. Rodriguez?
6  MR. WALLACE: Object to the form. You can
7  answer.
8  Q. If you recall.
9  A. As far as I recollect, she was appointed during
10 my tenure in the role, and she was initially working in
11 support of Vanessa Rodriguez, but she was employed by
12 Shell Puerto Rico.
13 Q. So when she became environmental advisor, who
14 was she employed by?
15 A. Shell Puerto Rico.
16 Q. Oh, still Shell Puerto Rico. Okay.
17 A. She was always employed by Shell Puerto Rico.
18 Q. Okay. And Ms. Rodriguez was also employed by
19 Shell Puerto Rico?
20 A. Correct.
21 Q. Okay.
22 A. That's my understanding.
23 Q. In the Caribbean area, which -- was Puerto Rico
24 fairly large in terms of the number of retail sites that

## Page 16

1  Shell was involved with?
2  MR. WALLACE: Object to the form. Vague and
3  ambiguous.
4  Q. He's objecting to put an objection on the
5  record so later, if we have a disagreement about whether
6  your testimony comes into evidence, he has his
7  objection, but you can answer unless he instructs you
8  not to.
9  A. From my recollection, it was one of the larger
10 markets that we operated in across the -- across the
11 cluster in terms of the size of the business, the number
12 of sites.
13 Q. Were you -- you indicated you left in January
14 2002. Were you involved at all in the process by which
15 Shell purchased the Yabucoa facility?
16 A. No.
17 Q. Were you -- when you were working for CCA, were
18 you aware that Shell was in the process of purchasing
19 the Yabucoa facility?
20 A. Yes.
21 Q. Was someone else from an HSSE perspective
22 involved in that process?
23 A. I don't know.
24 Q. Did you ever visit the Yabucoa facility before

## Page 17

1  you left?
2  A. No. No.
3  Q. Was Yabucoa the only refinery, to your
4  understanding, that Shell owned and operated or -- at
5  that time period in the Caribbean area?
6  A. No.
7  Q. What other refinery did Shell operate, to your
8  understanding?
9  A. In the Caribbean area, they operated the
10 Refidomsa refinery in Dominican Republic, which was a
11 joint venture between Shell and the Dominican
12 government.
13 Q. And what was the name of the refinery? I
14 apologize.
15 A. Refidomsa.
16 Q. Okay.
17 A. Which was basically just outside Santo Domingo
18 in the Dominican Republic.
19 Q. Okay.
20 A. That was the only other refinery which we
21 operated in CCA.
22 Q. Okay. Did you ever visit the Catano terminal?
23 A. Yes.
24 Q. Did you have responsibility for HSSE matters at

5  (Pages 14 to 17)

David Lewis

## Page 18

1  the Catano terminal?
2      MR. WALLACE: Object to the form. You can
3  answer.
4      A. I was responsible for -- I was the line manager
5  for the HSSE team in -- across CCA, so we had a team of
6  HSSE advisors who ultimately reported to me. So in the
7  sense that a member of my team or members of the team
8  would have been responsible for providing HSSE advice
9  and support to Catano, as well as every other aspect of
10  the operations and activities in Puerto Rico, I had,
11  ultimately, responsibility, but it wasn't a direct
12  responsibility in the sense of, you know, me personally.
13  It was through my line.
14      Q. Did you ever visit the facilities, the Peerless
15  facilities?
16      A. No.
17      Q. Did Ms. Rodriguez have responsibility both for
18  the distribution at the Catano terminal and the retail
19  stations in Puerto Rico?
20      MR. WALLACE: I'll object insofar as the
21  question calls for speculation, but you can answer
22  if you know.
23      A. I do know in the sense that I think the use of
24  the word responsibility is incorrect.

## Page 19

1      Q. Okay.
2      A. She didn't have responsibility as such, but as
3  the environmental advisor employed within the CCA
4  cluster based in Puerto Rico, she would have been
5  responsible for providing advice to all aspects of our
6  operations.
7      Q. Was she the one responsible, for example, if an
8  environmental investigation needed to be undertaken at a
9  retail station?
10      MR. WALLACE: Object to the form.
11      Q. Was she the individual responsible for setting
12  that up and undertaking that?
13      A. She would have been the person that would have
14  worked with the retail business advising them on how to
15  approach such an activity. She was the local
16  environmental expert, so she would have given --
17  provided advice to the business, worked with the
18  business in terms of how that was done, which
19  contractors to use, what methodologies to use, and so
20  on. She wouldn't have actually done it herself, but she
21  would have provided that advice.
22      Q. Okay. Do you recall, was Ms. Rodriguez there
23  during the entire -- was she there when you arrived in
24  CCA?

## Page 20

1      A. Yes.
2      Q. And you recall she was replaced with
3  Ms. Torano. Do you recall approximately when that
4  occurred?
5      A. Approximately 2001. During 2001.
6      Q. Okay. When you arrived in the CCA in Santo
7  Domingo in April 1999, were you aware of MTBE?
8      MR. WALLACE: Object to the form. Vague and
9  ambiguous. Go ahead and answer to the extent you
10  can understand the question.
11      A. In April '99 when I arrived in my role in CCA,
12  at that point, as far as I recall, I had not had any
13  involvement in MTBE or any issues associated with MTBE.
14      Q. After you arrived, at any point did you learn
15  that MTBE was an issue in the CCA?
16      MR. WALLACE: Object to the form.
17      A. After I arrived, during the latter part of '99
18  I was made aware of the MTBE issue from a global
19  perspective and thereafter started the process to
20  determine whether or not it was an issue in the very
21  many markets that the CCA cluster covered, of which
22  Puerto Rico was just one.
23      Q. And when -- what were you made aware of in
24  terms of MTBE being a global perspective?

## Page 21

1      A. I was made aware of the fact that particularly
2  in the US that it had become a significant issue, I
3  think particularly on the west coast, in California,
4  that there had been a number of legal actions initiated
5  against the oil industry and that there were a number of
6  issues associated with the use of MTBE and the potential
7  impact that it -- it may have in certain environments.
8      Q. And did you -- once you became aware of the
9  MTBE issue, did you go to any workshops or training
10  sessions that were held to understand further MTBE?
11      MR. WALLACE: Object to the form of the
12  question.
13      A. Not specifically to discuss just the MTBE issue
14  or to be trained on MTBE. It's possible that I would
15  have attended leadership team meetings. I frequently
16  came back to London for leadership team meetings, and
17  it's possible that MTBE may have been an issue on those
18  agendas, but it would have been just in the sense of
19  keeping us updated on the latest developments in terms
20  of managing MTBE as an issue.
21      Q. Were you aware at any time that there were
22  committees or leadership teams that -- in the
23  environmental section of Shell that were discussing MTBE
24  specifically?

6  (Pages 18 to 21)

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: METHYL TERTIARY BUTYL   *      Master File
ETHER ("MTBE") PRODUCTS         *      No. 1:00-1898
LIABILITY LITIGATION            *
---------------------------           MDL 1358 (SAS)
COMMONWEALTH OF PUERTO RICO,     *      M21-88
et al.,

                *

    Plaintiffs,                 *

    vs.                          *

    Defendants.                  *

Case No. 07-CIV-10470 (SAS)
---------------------------

The videotaped deposition of:
    BRENDA TORANO,
former Shell Puerto Rico Limited (Sol Puerto Rico
Limited) employee, current Puma Energy employee, and a
non-party witness herein, was held at the law offices
of O'NEILL & BORGES, LLC, American International Plaza,
Suite 800, 250 Munoz Rivera Avenue, San Juan, Puerto
Rico  00918, on Thursday, September 26, 2013,
at 9:04 a.m.

APPEARANCES (Continued)
COUNSEL FOR SHELL CODEFENDANTS
SEDGWICK, LLP
2900 K Street NW
Harbourside, Suite 500
Washington, DC  20007
BY:  RUBEN F. REYNA, ESQ.
    202.204.1000
    ruben.reyna@sedgwicklaw.com
COUNSEL FOR CODEFENDANT IDEMITSU APOLLO CORPORATION
BOWMAN and BROOKE, LLP
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota  55402
BY:  DUSTIN D. FOSSEY, ESQ.
(Appearing telephonically)
    612.656.4021
    dustin.fossey@bowmanandbrooke.com
NOTARY PUBLIC
MARTA S. RAMIREZ-ISERN, ESQ.
O'Neill & Borges, LLC

VIDEOGRAPHER

MR. NELSON D'FREITAS

INTERPRETER

MS. SANDRA MELENDEZ-LEBRON

---

2

APPEARANCES
COUNSEL FOR PLAINTIFFS
MILLER, AXLINE & SAWYER
1050 Fulton Avenue, Suite 100
Sacramento, California  95825
BY:  TRACEY L. O'REILLY, ESQ.
    916.488.6688
    toreilly@toxictorts.org

COUNSEL FOR CODEFENDANT SOL PUERTO RICO LIMITED

McCONNELL VALDES, LLC
270 Munoz Rivera Avenue
San Juan, Puerto Rico  00918
BY:  JUAN A. MARQUES-DIAZ, ESQ., and
    JORGE J. GARCIA-DIAZ, ESQ.
    787.759.9292
    jam@mcvpr.com
    jjg@mcvpr.com
COUNSEL FOR PUMA ENERGY CARIBE and THE DEPONENT
GREENBERG TRAURIG, LLP
2101 L Street, NW
Suite 1000
Washington, DC  20037
BY:  BRENT ALLEN, ESQ.
    202.33.3157
    allenbr@gtlaw.com
COUNSEL FOR CODEFENDANT TOTAL PETROLEUM
PUERTO RICO CORP.

SEPULVADO & MALDONADO, PSC
Citibank Tower, 19th Floor
252 Ponce de Leon Avenue
San Juan, Puerto Rico  00918
BY:  ALBENIZ COURET-FUENTES, ESQ.
    787.765.5656
    acouret@smlawpr.com

---

4

I N D E X
EXAMINATION
                 PAGE
BRENDA TORANO
  By Ms. O'Reilly                 10
EXHIBITS
              REFERENCED/
NO.    DESCRIPTION          MARKED
1    Notice of Deposition,
    six pages                 12

2    E-mail chain, last of which is to
    David Lewis, among others, from
    Arturo Ponciano, of 1/17/02,
    three pages                38

3    E-mail chain, last of which is to
    Huberto Diaz, among others, from
    Brenda Torano, of 2/4/02,
    four pages                 52

4    E-mail chain, last of which is to
    Luis Fernandez from Brenda Torano, of
    5/22/02, and a certified translation
    of portions of above exchange,
    a total of 12 pages        70

5    "The Shell Company (Puerto Rico)
    Limited Health, Safety, Security and
    Environment Management System (HSSE - MS),"
    48 pages                   87

6    E-mail chain, last of which is to
    Brenda Torano from Luis Fernandez, of
    7/8/05, and a certified translation
    of portions of above exchange,
    a total of six pages       94

7    E-mail to Claudio Alzerreca from
    Michael Armstrong of 9/12/05,
    two pages                 100

joannedethomas@yahoo.com   -   787.501.3007

**17**

1  the work unit.
2  Q.  Okay.
3  And how many service stations were you
4  responsible for when you were with EQB working on USTs?
5  A.  We didn't have any-- as long as they were
6  underground tanks, we didn't have any-- a number of
7  stations assigned to each technical person or each
8  engineer.
9  Q.  Were you assigned an area, like a
10  geographical area, for service stations?
11  A.  No.
12  Q.  Were there other people doing your same
13  job in the UST section of EQB?
14  A.  Yes.
15  Q.  How many people?
16  A.  If I remember correctly, because it was a
17  long time ago, there could have been five or six people
18  assigned to that area.
19  Q.  Okay.
20  And you stayed in USTs for two and a half years
21  at EQB, and then where did you go?
22  A.  After I was at EQB for that time, then I
23  got an offer from Shell.
24  Q.  Do you recall what year it was that you
25  started with Shell?

**18**

1  A.  At the end of 2000.
2  Q.  When you went to work for Shell, were you
3  aware of MTBE in gasoline?
4  A.  I had contact or some information that it
5  was one of the components that gasoline could contain.
6  Q.  Do you recall where you got that
7  information?
8  A.  Well, specifically not, but it could have
9  been a document or it could have been information that
10  I got in training, or just finding more information
11  because I wanted to learn more about my job.
12  Q.  And when you started with Shell, did you
13  get any training?
14  A.  Yes.
15  Q.  What kind of training?
16  A.  My first year with the company I was not
17  in the environmental section because I started as a
18  health and safety inspector first and not as an
19  environmental engineer.
20  Q.  And what was your responsibility as a--
21  health and safety coordinator?  Is that right?
22  A.  "Sí."
23  Q.  What was your responsibility?
24  A.  It was to secure OSHA compliance in the
25  programs that the company had to make sure that their

**19**

1  security measures were met by the employees.
2  Q.  And when you were safety coordinator, did
3  you have any contact with or interaction with service
4  station operators?
5  A.  No.
6  Q.  So would it be fair to say that while you
7  were safety coordinator you didn't have any involvement
8  in the operation of the service stations?
9  A.  Not in the environmental part during that
10  first year.
11  Q.  What about in the safety part?  Did you
12  give any safety classes to station operators?
13  A.  Not to operators, but to the sales
14  representatives or to the company engineers.
15  Q.  What is a "company engineer"?
16  A.  A maintenance or construction engineer.
17  Q.  How long were you safety coordinator for?
18  A.  Approximately for one year.
19  Q.  And after that, then what was your next
20  position with Shell?
21  A.  I was HSE, and that included the
22  environmental part.  It was health, safety and
23  environmental.
24  Q.  And was that-- were there somebody
25  responsible for the environmental portion of your job

**20**

1  prior to you taking it over?
2  A.  Yes.
3  Q.  And who was that?
4  A.  If I remember correctly, it was Vanessa
5  Rodriguez.
6  Q.  Did she leave the company, or did she move
7  to a different position?
8  A.  If I remember correctly, she left the
9  company.
10  Q.  Now, when you worked for Shell, did you
11  work for Shell Puerto Rico?
12  A.  Correct.  Shell Company Puerto Rico
13  Limited.
14  Q.  Okay.
15  Did you ever work for any other Shell entity
16  during your time with Shell?
17  A.  No.
18  Q.  And as I understand it, you remained
19  health and-- health-- HSE--we'll just call it
20  "HSE"--from 2002 to about 2012.
21  A.  (In English) 2011.
22  Q.  November 2011?
23  A.  No.  (In English) March of 2011.
24  Q.  Okay.
25  And that's when you left Shell to work for-- or

5  (Pages 17 to 20)

**25**

1 monitor leaks, was monitoring the wells on a monthly
2 basis.
3    Q.  You're talking about the tank field wells?
4    A.  Correct.
5    Q.  Was it your understanding that those tank
6 field wells were oftentimes dry?
7    A.  Yes.
8    Q.  So they monitor them only through vapor
9 measurements, correct?
10    A.  They would monitor them for both. It
11 depended on the case, whether it was— how the well was
12 or the station.
13    Q.  Monitor for both groundwater and vapor?
14    A.  Yes. If I remember correctly.
15    Q.  And did they also monitor for free
16 product?
17    A.  Correct. That's the purpose also.
18    Q.  Did you ever recommend at any time when
19 you were in HSE that they install an additional
20 tank-monitoring system that did what the Veeder-Root
21 did in monitoring interstitial space and other types of
22 leak detection?
23    A.  No, I don't remember having recommended
24 additional systems as part of the implementation.
25    Q.  Was the decision to utilize USTMAN instead

**26**

1 of Veeder-Root made before you joined Shell, do you
2 recall?
3    A.  Yes. When I arrived at Shell the system
4 was either already running or starting to run.
5    Q.  Did you ever talk to anyone about the
6 USTMAN system and why they went with USTMAN instead of
7 Veeder-Root?
8    A.  No, I don't recall.
9    Q.  Do you know who made the decision to do
10 the USTMAN system?
11    A.  No.
12    Q.  Did you communicate with people on a
13 regular basis in other Shell entities other than Shell
14 Puerto Rico as part of your job?
15    A.  At the beginning I did not, but then and
16 the people that were in our area, in the Caribbean area
17 or Central America, and also in England, which was our
18 base.
19    Q.  And why do say England was your base?
20    A.  Because Shell Puerto Rico operated--
21 reported to England as part of their operating unit.
22    Q.  Do you remember to whom you reported in
23 England?
24    A.  I didn't report directly over there. I
25 reported directly to the sales manager here in the

**27**

1 country, or the general manager here in the country,
2 and they reported directly then to England.
3    Q.  Who was your general manager while you
4 were at Shell, or who were your general managers while
5 you were at Shell, if you remember?
6    A.  Yeah. If I recall, it was Johnny Vazquez,
7 and then, if I remember, it was Juan Carlos, and it was
8 a transition process, but I don't remember his last
9 name. And afterward with Sol it was Candido Rivera.
10    Q.  "Claudio"?
11    THE INTERPRETER: "Candido."
12    MS. O'REILLY: "Candido."
13 BY MS. O'REILLY:
14    Q.  And did you ever go to England for
15 training?
16    A.  No.
17    Q.  Did you ever have training outside of
18 Puerto Rico with Shell?
19    A.  Yes, meetings or seminars that were given
20 within the same organization.
21    Q.  And what to you is "the same
22 organization"? What do you mean by that?
23    A.  We had meetings to inform about a work or
24 implement programs with the engineers, the people who
25 were in the cluster group, and it would have been a

**28**

1 work group from this area, the Caribbean or Central
2 America.
3    Q.  Did you ever meet with or interact with
4 people from Shell Oil Company in USA?
5    A.  No, we couldn't have communication with
6 Shell USA.
7    Q.  Did Shell, any Shell entity, provide you
8 with information about remediation at gasoline
9 stations? Did they come and give you technical advice
10 about how to proceed with remediations at stations?
11 Did you get technical advice from anyone?
12    MR. MARQUES: Objection. Compound.
13 BY MS. O'REILLY:
14    Q.  You can answer, if you can.
15    A.  There wasn't a center group within the
16 cluster that was dedicated to remediation, other than
17 sharing information or maybe what consultants were
18 doing in a certain area.
19    Q.  Did you work or did you ever see the
20 consultants who were implementing the investigations
21 and remediation at the Shell stations in Puerto Rico?
22    A.  Yes. The consultant would've worked with
23 us, under me, to investigate the remediation or the
24 removal of product.
25    Q.  And what consultants do you recall that

7 (Pages 25 to 28)

49

1    Q.   And when you say "process," what do you
2  mean?
3    A.   I had to make sure that each product had
4  its own MSDS and that it was in the binder and that it
5  was communicated to the retail sales people so that
6  they would have them.
7    Q.   And when you say "binder," is that a
8  binder at the service station that the operator would
9  keep with his manual and other documents for operating
10  the station?
11    A.   Correct.
12    Q.   Did you have any input into what-- how the
13  binders were put together, what went into them?
14    A.   It was a binder that was already put
15  together in terms of what document and what information
16  was included in it.
17    Q.   Did you have any input or drafting in the
18  manuals about how to clean up a spill?  Was that
19  something that you drafted, or did that-- was that
20  already in place when you came into Shell?
21    A.   It was already established and it was just
22  a matter of reviewing it to see if anything had to be
23  modified or changed.
24    Q.   Do you recall if you ever modified or
25  changed the manuals that were provided to the service

50

1  station operators for instructions on how to handle
2  spills during the time that you were with Shell?
3    A.   Specifically in which areas they were
4  changed, I don't remember.
5    Q.   Okay.
6       Who, to your understanding, had the primary
7  responsibility for putting together the manuals and
8  making sure that they got to the operators?
9    A.   It was the environmental area and the
10  sales area together, because those were the people that
11  had the daily contact with the retailer.
12    Q.   Okay.
13       Going back to some of the names up here, do you
14  recognize Alejandro Espinosa?
15    A.   I remember having heard the name, but no.
16    Q.   Okay.
17       Is there anyone else on this, in the list of
18  people here, that were sent the e-mail whose name you
19  also recognize?
20    A.   (In English) Yeah.  Yes.
21    Q.   Who's that?
22    A.   Well, basically, I recognize some of the
23  people that used to work with Caribbean in different
24  areas.
25    Q.   And can you point out a name for me.

51

1    A.   Neville.
2    Q.   Okay.
3       Anyone else's name that you recognize?
4    A.   Carl Farley.  Felino, he used to work in
5  the Caribbean also.  Carlos Rodriguez.  Julian Rojas
6    Q.   All right.
7       Did you have-- when you were HSE, did you have
8  any responsibility for the distribution outlets, like
9  terminals, like Catano, or anything like that?  Did you
10  have responsibility for those facilities?
11    A.   No, not directly.
12    Q.   Was there someone else who had
13  environmental responsibility for those facilities?
14    A.   The terminal managers themselves, and
15  sometimes if they need just to consultation, just to
16  get something, they ask.
17    Q.   Okay.
18       What about Yabucoa?  Did you have any
19  interaction with people at Yabucoa?
20    A.   (Through the interpreter) No, that was a
21  different entity.
22    Q.   What entity, to your understanding, was
23  responsible for Yabucoa?
24    A.   Shell Chemical Yabucoa.
25       THE REPORTER:  This would be Exhibit 3.

52

1       (Whereupon, the document is marked for
2       purposes of identification as Deposition
3       Exhibit No. 3.)
4  BY MS. O'REILLY:
5    Q.   No, go ahead and take your time and review
6  it.
7       MS. O'REILLY:  For the record, I've marked
8       as Exhibit 3 a series of e-mails in and around
9       February two-- February and January, 2002.
10       They're Bates stamped SOL ESI 2-00009623 through
11       626.
12  BY MS. O'REILLY:
13    Q.   All right.  I want to start-- let's start
14  at the back, at the first e-mail, which I believe was
15  sent by you, and it's dated November 19, 2001.
16       Do you see that?
17    A.   Yes.
18    Q.   Now, this has got your name, Brenda
19  Torano, Retail--
20    A.   (In English) Commercial.
21    Q.   --Commercial Environment Advisor, Shell
22  Caribbean and Central America.
23       Was that your cluster group, or is that the
24  company you were with?
25    A.   It's the cluster group.

53

1      Q.   Okay.
2      But you were employed by Shell Company Puerto
3  Rico Limited, correct?
4      A.   (Through the interpreter) Correct.
5      Q.   Okay.
6      And then this says "Don Johnny." Is that Juan
7  Vazquez?
8      A.   Correct.
9      Q.   Okay.
10     And he was your general manager at the time?
11     A.   Correct.
12     Q.   And the e-mail that you wrote to him says,
13 "During the past week personnel from the Environmental
14 Quality Board inform me (not an official communication)
15 several amendments to the UST regulation are going to
16 be proposed for the regulated community during
17 November 28th, 2001, for comments at a public hearing
18 30 days after around December 28th, 2001.  Other
19 amendments proposed are for the UIC plan underground
20 injection control program that regulates the septic
21 tanks in our S/S."
22     Does "S/S" stand for "service station"?
23     A.   Correct.
24     Q.   Okay.
25     Do you recall your conversation with the

54

1  Environmental Quality Board about the proposed changes?
2      A.   No.
3      Q.   All right.
4      It says, "The information I gather is that some
5  of the amendments includes additional parameter to be
6  sampled during tank closures and replacement like lead,
7  MTBE and other."
8      Do you see that?
9      A.   Yes.
10     Q.   Does this refresh your recollection that
11 there was some interest in sampling for MTBE in or
12 around 2002?
13         MR. MARQUES:  Objection.  Vague.
14         THE DEPONENT:  What I remember for that
15     time is that the requirements for underground
16     tanks were from 1992, and what I remember is
17     that the Environmental Quality Board was
18     supposed to propose amendments to make changes
19     to that, and as part of those amendments they
20     were going to include criteria on MTBE and lead.
21 BY MS. O'REILLY:
22     Q.   And did they update the regulations in or
23 around 2001, 2002, to include MTBE, to your
24 recollection?
25     A.   No.  The regulation has still not been

55

1  amended.
2      Q.   Okay.
3      Was Sol-- prior to your e-mail, do you remember
4  if Sol was, or Shell was, testing for MTBE at their
5  stations at this time?
6      A.   At this date, no.
7      Q.   Okay.
8      Do you know why they weren't sampling for MTBE?
9      A.   As I indicated previously, it wasn't part
10 of the parameters that the agency asked us to sample.
11     Q.   Okay.
12     And the next sentence says, "They are
13 implementing several measures taken during this past
14 year with the Esso's case in Barranquitas to be more
15 strict on the regulated community."
16     Do you see that?
17     A.   Yes.
18     Q.   What were you referring to with
19 Barranquitas?
20     A.   The description was a case in a service
21 station where the agency fined Esso 78 or 79 million
22 dollars.  They were in a case and it was in progress.
23     Q.   Okay.
24     And it says, "This is something to worry because
25 this is going to make our cost to increase, in addition

56

1  to new parameters to remediate in the future."
2      Do you see that?
3      A.   Yes.
4      Q.   Why do you think that it was going to
5  increase the cost?
6      A.   Well, if there are more parameters that we
7  have to deal with in terms of cleaning, then it
8  increases the cost of remediation.
9      Q.   Did you have any understanding as of this
10 time whether MTBE was more expensive to remediate than
11 the BTEX compounds?
12     A.   Not from experience, but in terms of
13 reading documentation, documents in terms of the EPA,
14 in cases where it explained that this had happened.
15     Q.   And was it your understanding, or did you
16 learn at or around this time, that one of the reasons
17 MTBE needed to be cleaned up was because it imparted a
18 bad taste or odor to water?
19     A.   If I recall correctly, it was because it
20 was part of the information that I had received.  They
21 didn't know yet whether it was a carcinogen or not, but
22 I understood that from reading materials.  Not by
23 experience.
24     Q.   Well, do you understand anything about its
25 smell or its taste when it was in water, that it didn't

14  (Pages 53 to 56)

89

1 that time during that model is what is the risk and the
2 actions that need to follow in order just to put either
3 a remedial action plan or a plan just to implement it.
4 But it's-- not only refer just to environmental or--
5 issues. It's just to ranking in terms of the risk or
6 if an incident happened what was the consequences in
7 order just to place this one area. And that incident
8 report or the development of that risk asks you to do
9 something else regarding that.
10     So it's just a figure that it was--I don't
11 know--prepared based on the details of--I don't
12 know--millions of recorders during the process of
13 development in order to identify what is the risk and
14 the conditions and what you need to do in order to, but
15 it's just a figure.
16     Q.  Okay.
17     And that was something-- who provided you that
18 figure? Do you remember?
19     A.  It's part of documents, of guidelines, of
20 yellow guides, or guides from Shell, that it was part
21 of the process, so...
22     Q.  Okay.
23     You say "yellow guides"?
24     A.  That's what they call it in Shell before.
25 It's just guidelines. It's yellow guides.

90

1     Q.  Okay.
2     A.  That's what we call it because everything
3 was yellow.
4     Q.  I wonder why.
5     And so the yellow guides was specific for you to
6 utilize when doing your work for risk assessment.
7     A.  Yellow guides is a library. It's a
8 library of documents that Shell have and if you have
9 anything to do, you go into there. It's just look now
10 going into the internet.
11     Q.  Oh. Okay.
12     And the library, was that on electronic, like
13 you could access it through your computer?
14     A.  (Through the interpreter) It was in paper
15 format and electronic.
16     Q.  Where was the paper-- when you were at
17 Shell Puerto Rico, where was the paper copy kept? Did
18 you have a copy in your office?
19     A.  There were some guidelines and files
20 there, yes, while we were at Shell. When we changed to
21 Sol, many of the documents that marked with Shell's
22 name, Shell took with them.
23     Q.  Okay.
24     Now, the yellow guidelines, do you remember--
25 did that come from the cluster, or did it come from the

91

1 Shell London? Do you remember where those came from?
2     A.  (In English) Not precisely, but I'm
3 assuming it's from Shell London.
4     Q.  Okay.
5     Did anyone from Shell London ever come and meet
6 with you when you were working for Shell?
7     A.  Not that I recall.
8     Q.  Okay.
9     Do you know why Shell-- you said many of the
10 documents that had the Shell name on them Shell took
11 with them.
12     What do you mean by that?
13     A.  That if they have the branded or the logo,
14 as part of I'm assuming the process of sales and
15 transferring to Sol, they took those documents or
16 destroyed documents. In terms of saying that it was
17 guides, it was not the property of Sol.
18     Q.  Okay.
19     And did you hand those over to somebody? Did
20 someone come collect them, or did you send them
21 somewhere?
22     A.  We identified it and just put it together.
23     Q.  Okay.
24     And then did you hand it to somebody who then
25 took care of it? I mean, physically, did you take

92

1 your-- all your Shell things with the Shell logo on
2 them and give them to somebody within the company, or
3 did you send them somewhere?
4     MR. MARQUES: Objection to the form.
5     THE DEPONENT: No, we just organized them
6     and left them in boxes.
7 BY MS. O'REILLY:
8     Q.  Okay. And what happened to those boxes?
9     A.  I don't know.
10     Q.  Did someone come pick up the boxes at some
11 point?
12     A.  No, I don't know.
13     Q.  Was there somebody at Shell Puerto Rico
14 during the time of the transition who's responsible for
15 those boxes?
16     A.  I have no knowledge of that.
17     Q.  Were all the boxes in one room?
18     A.  I really don't remember where they were.
19     Q.  Okay.
20     Did you also, when you changed from Shell Puerto
21 Rico to Sol, did your computer, materials that were
22 stored on your computer, were those changed as well?
23     MR. MARQUES: Objection. Vague.
24     THE DEPONENT: (In English) Can you repeat
25     the question.

23  (Pages 89 to 92)

```
                                              141
1    leakage rate that those tests cannot detect?
2            MR. MARQUES: Objection. Calls for an
3    opinion, speculative.
4            THE DEPONENT: Based on my recollection,
5    it's part even of the requirements, and in order
6    to the agency to approve a certain method,
7    usually present a leakage rate in order just to
8    identify if it works or not.
9    BY MS. O'REILLY:
10       Q.  Okay. Okay. So there's a threshold.
11   Above that threshold, they can detect a leak. Below
12   that threshold, they can't, they won't detect the leak.
13           MR. MARQUES: Same objection.
14           THE DEPONENT: Yes. Based on the
15   results.
16   BY MS. O'REILLY:
17       Q.  Okay. All right. We need to change
18   tapes, so why don't we take a break.
19           THE VIDEOGRAPHER: We're going off the
20   record. The time is 2:25. Off the record.
21           (Recess.)
22           THE VIDEOGRAPHER: We're back on the
23   record. The time is 2:34. Tape No. 5. On the
24   record.
25
```

```
                                              142
1    BY MS. O'REILLY:
2        Q.  Okay. I want to go-- we're still on
3    Exhibit 14 and on the last page it says "Remediation of
4    contaminated sites." And it says, "Evaluate,
5    coordinate, contract and supervise remediation actions
6    and projects at several Retail sites in a cost
7    effective way."
8            And then it says, "Prepare, revise and submit
9    remediation programs and reports for the facilities to
10   comply with the cleanup levels required by the
11   environmental agencies in order to obtain a release of
12   responsibility for the company."
13           Do you see that?
14       A.  Yes.
15       Q.  Did you prepare any remediation programs
16   for any of the Shell gasoline stations while you were
17   with Shell or Sol?
18       A.  I requested and supervised consultants to
19   prepare the remediation plans in order to submit it,
20   including the plans.
21       Q.  Did any of the consultants that you worked
22   with prepare remediation plans for gasoline station?
23       A.  I'm assuming yes, during the period.
24           THE REPORTER: (To the deponent) I'm
25   sorry. Could I get that answer again.
```

```
                                              143
1            THE DEPONENT: I think yes, during the
2    period.
3    BY MS. O'REILLY:
4        Q.  Do you recall which consultants prepared
5    those reports?
6        A.  As I mentioned before, we had several
7    consultants, so it would be difficult for me to
8    identify one of all sites.
9        Q.  Did you have a standard-- I know your
10   consultants prepared them for individual sites. Did
11   you have a generic or standard remediation plan that
12   you provided to those consultants of elements that you
13   wanted included in a remediation plan?
14       A.  No. That I remember, no.
15       Q.  Okay.
16           THE REPORTER: This would be 15.
17           (Whereupon, the document is marked for
18           purposes of identification as Deposition
19           Exhibit No. 15.)
20           MS. O'REILLY: Okay. (To the reporter)
21   Ready?
22           For the record, I've marked as Exhibit
23   15-- it's two parts. First is a document
24   entitled "Shell CCA Project Proposal, 5 Year
25   Puerto Rico Site Remediation Plan," Bates
```

```
                                              144
1    stamped Sol ESI 2-00009555 through 557, and then
2    a-- some summary pages Bates stamped SOL ESI
3    2-00009576 through 9590.
4    BY MS. O'REILLY:
5        Q.  When you're ready, let me know.
6    Are you ready? Okay.
7        A.  Yes.
8        Q.  Do you recognize these documents?
9        A.  Yes.
10       Q.  And could you tell me what they are?
11       A.  It's like a plan or a proposal to present
12   to management in order just to attack the sites that we
13   identified that have any concerns or were in the LUST
14   list sites at the EOB.
15       Q.  Okay.
16   Did you prepare this remediation plan?
17       A.  I prepared the program. Yes.
18       Q.  Okay.
19   Was the program-- was the program in place when
20   you arrived at Shell?
21       A.  No. It was part of the process of me
22   evaluating the sites and identify what sites weren't
23   leaking in order just to try to get to a no further
24   action.
25       Q.  Okay.
```

joannedethomas@yahoo.com  -  787.501.3007

1

**PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE**

2

*Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*, United States District Court, Southern District of New York Case No. No. 07 Civ. 10470 (SAS)

3

4

    I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action.  My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

5

6

    On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

7

**DECLARATION OF BRYAN BARNHART IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE SHELL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

8

9

10

    I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

11

12

    Executed on November 7, 2014, at Sacramento, California.

13

14

KATHY HERRON

15

16

17

18

19

20

21

22

23

24

25

26

27

28