UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.,* No. 07 Civ. 10470 (SAS) | Master File No. 1:00-1898<br>MDL 1358 (SAS)<br>M21-88 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF THE SHELL DEFENDANTS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.   THE SHELL DEFENDANTS HAVE BEEN A SUBSTANTIAL FACTOR IN
     CAUSING INJURY TO THE GROUNDWATERS OF PUERTO RICO . . . . . . . . . 2

     A.   The Shell Defendants Have Been Major Suppliers of MTBE Gasoline to Shell-
          Branded Service Stations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.   Shell Int'l (1988-1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          2.   Shell Western (1997-2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          3.   Shell Oil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          4.   Motiva . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          5.   Shell Yabucoa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     B.   Shell Int'l Has Experienced Substantial Control Over Environmental Matters at
          Shell-Branded Service Stations Throughout the Commonwealth . . . . . . . . . 11

II.  THERE IS NO DE MINIMIS EXCEPTION TO THE SHELL DEFENDANTS'
     LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A.   The Ban on MTBE Protects Public Health and the Environment . . . . . . . . . 18

     B.   There is No License to Pollute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. THE SHELL DEFENDANTS ARE LIABLE UNDER COUNT V (EPPA) . . . . . . . 21

IV.  SHELL OIL COMPANY IS LIABLE UNDER COUNT VII (TOXIC SUBSTANCES
     CONTROL ACT ("TSCA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE**

*Adinolfe v. United Tech. Corp.*
    768 F.3d 1161 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Caronia v. Philip Morris USA, Inc.*
    715 F.3d 417, 427 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21

*City of New York*
    725 F.3d 65 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 6, 19, 20, 22

*Guilbert v. Gardner*
    480 F.3d 140 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re MTBE*
    458 F.Supp.2d 149 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re MTBE*
    510 F.Supp.2d 299 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*In re MTBE*
    739 F. Supp.2d 576 *(S.D.N.Y. 2010)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re N-500L Cases*
    691 F.2d 15 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

*Martinez de Jesus v. Puerto Rico Electric Power Auth.*
    256 F.Supp.2d 122, 125 (D.P.R. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Paoli Mendez v. Hernandez*
    138 D.P.R. 449 (P.R. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Perez-Trujillo*
    137 F.3d 50 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Prado Alvarez v. R. J. Reynolds Tobacco Co.*
    313 F.Supp.2d 61 (D.P.R. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

*Suffolk County Water Auth. v. Dow Chem. Co.*
    35 Misc.3d 307,  N.Y.S.2d 765(N.Y. S.Ct. 2012). . . . . . . . . . . . . . . . . . . . . . 19

*Vaqueria Garrochales, Inc. v. A.P.P.R.*
    106 D.P.R. 799 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Widow of Andino v. A.F.F.*
    93 D.P.R. 170 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATUTES

10 L.P.R.A. §4175 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20

12 L.P.R.A. §8001    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

12 L.P.R.A. §8002c(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

12 L.P.R.A. §8002j(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

12 L.P.R.A. §8002j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

12 L.P.R.A. §8004a  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

15 U.S.C. §2602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. §2607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

15 U.S.C. §2619 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## OTHER AUTHORITIES

Regulation No. 7837 at § 1303.1(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Regulation No. 7837 at § 1303.2(F)(2)(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TSCA §3  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TSCA §8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TREATISE

*Prosser and Keeton on the Law of Torts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The Shell Defendants[1] argue there is no evidence they "supplied gasoline with MTBE which was subsequently discharged" anywhere in Puerto Rico – including at Shell stations for which no discovery has been conducted.   Motion at 1.   To the contrary, there is extensive evidence, from Shell and other defendants, that Shell supplied MTBE gasoline to Shell stations throughout Puerto Rico, over a significant period of time, including at the Shell Trial Site.   At least 72 of the gas stations in Puerto Rico where MTBE was released, including the Shell Trial Site,  are Shell branded stations with which the Shell defendants had extensive gasoline supply and control agreements.

In fact, in arguing for a *de minimis* exception to liability, Shell establishes that it cumulatively supplied enormous volumes of MTBE gasoline.   Shell's motion, therefore, itself refutes the assertion that there is "no evidence" Shell supplied MTBE gasoline to Puerto Rico.   In reality, Shell hopes that the Court will accepting Shell's argument that the amounts of MTBE it admittedly supplied were sufficiently de minimis that the Court should simply grant Shell summary judgment.

There is extensive evidence in this case that the Shell defendants were a substantial factor in causing injury to the Commonwealth by contaminating the Commonwealth's water with MTBE – including at the Shell Trial Site.   And the Shell defendants' argument that there is a "de minimis" exception to regulatory and tort

---

[1] The Shell Defendants are Shell Oil Company ("Shell Oil"), Motiva Enterprises LLC ("Motiva"), Equilon Enterprises LLC (d/b/a Shell Oil Products US) ("Equilon"), Shell Trading (US) Company ("Shell Trading"), TMR Company (f/k/a Texaco Refining and Marketing)("TMR"), Shell Chemical Yabucoa, Inc. ("Shell Yabucoa"), Shell International Petroleum Company Limited ("Shell Int'l"), and Shell Western Supply and Trading Limited ("Shell Western").   For purposes of this Opposition, plaintiff refers to the Memorandum of Points and Authorities in Support of the Motion for Summary Judgment of the Shell Defendants as the "Motion."

requirements in Puerto Rico is simply wrong.

Shell's motion should be denied, both with respect to the Shell Trial Site and with respect to the Commonwealth's broader claims for contamination at other locations in Puerto Rico.

## I.    THE SHELL DEFENDANTS HAVE BEEN A SUBSTANTIAL FACTOR IN CAUSING INJURIES TO THE GROUNDWATERS OF PUERTO RICO.

Notwithstanding the Shell Defendants' central argument that they did *not* supply MTBE gasoline to Puerto Rico, the Shell Defendants concede they did, in fact, supply MTBE gasoline.  As the Shell defendants themselves put it:  "Even accepting that the Shell Defendants supplied some shipments of gasoline with *de minimis* levels of MTBE to Puerto Rico, Plaintiffs still lack the requisite proof needed to support their claims asserted against the Shell Defendants because *de minimis* levels of MTBE should not be actionable."  Mot. at 14.

The Shell Defendants did not just supply *"de minimis"* amounts of MTBE gasoline to Puerto Rico, however.  Shell Defendants *admit* they supplied over 150 tanker "shipments" of MTBE gasoline.  Mot. at 5.  And there is substantial evidence independent of the evidence that Shell concedes that establishes Shell supplied substantially more MTBE gasoline than 150 tanker shipments.  This MTBE gasoline was shipped into a country with a high percentage of leaking, out of date underground storage tanks and gasoline dispensing systems.

The Shell Defendants ask the Court to grant summary judgment as to the almost 350 release sites in the case, including the Shell trial site.   No discovery has taken place, however, with respect to over 300 of the sites at issue; no subpoenas have been issued to collect documents or take testimony.  Accordingly, the Shell Defendants' request for

summary judgment as to all sites is inappropriate, particularly because the Commonwealth has reserved its right to rely on market share and other alternative theories of liability following trial of the initial Trial Sites.

In Puerto Rico, "it is not necessary that [a defendant's] conduct be the sole proximate cause of the injury as long as it is a proximate cause." *In re N-500L Cases* 691 F.2d 15, 28 (1st Cir. 1982), citing *Widow of Andino v. A.F.F.,* 93 D.P.R. 170, 178 (1966). The Commonwealth need only "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a *substantial factor* in bringing about the result." *Prado Alvarez v. R. J. Reynolds Tobacco Co.*, 313 F.Supp.2d 61, 76 (D.P.R. 2004) (emphasis added). To meet its burden, the Commonwealth can rely upon circumstantial evidence to prove causation. *Perez-Trujillo*, 137 F.3d 50 (1st Cir. 1998); *see In re MTBE*, 739 F. Supp.2d 576, 596 (S.D.N.Y. 2010), *affirmed*, 725 F.3d 65 (2d Cir. 2013) ("*City of New York*") (finding the jury reasonably relied on market share data as circumstantial evidence to identity of manufacturer). In *City of New York,* the plaintiff introduced three pieces of evidence to prove that a particular supplier's MTBE gasoline was a "substantial factor" in bringing about its injuries:

1. Expert testimony that, due to comingling, the defendant's product would have been in nearly every UST within the capture zone;

2. Expert testimony that the defendant supplied about 25% of gasoline within the State of New York (as a proxy for evidence that the defendant supplied about 25% of gasoline within Queens County); and

3. Testimony from Marcel Moreau that, over time, all USTs leak.

*Id.* at 606-607 & nn. 191-192. Although no "direct tracing" evidence was presented, the jury returned a verdict in favor of the plaintiff. *Id.* at 584, 606. The Court found

"nothing unreasonable about the jury relying on that data to find [the defendant] liable." *Id.* at 607. The jury verdict, and the Court's decision, were affirmed on appeal.

**A.    The Shell Defendants Have Been Major Suppliers of MTBE Gasoline to Shell-Branded Service Stations.**

Of the 340-release sites where MTBE has been detected in water or soil in Puerto Rico, 72 of these are Shell-branded stations.  Short Decl. ¶¶ 3, 4.  Prior to June 13, 2006, Shell PR, which was part of the international web of Shell owned and controlled companies, owned all Shell-branded service stations, including the underground storage tanks ("USTs") and dispensing equipment, in Puerto Rico.  Local Rule 56.1 Statement of Material Facts in Support of Motion for Summary Judgment of the Shell Defendants ("Doc. 469") ¶ 2.  In 2006, Shell PR was acquired by Sol Investments Limited ("Sol"), an entity unrelated to the Shell Group.   Doc. 469 ¶ 4.

Shell PR leased bulk gasoline storage tanks at the Cataño Terminal, located just outside of San Juan, from approximately 1947 to April 2006, and last received gasoline at this facility around July-August 2004.  Rule 56.1 ¶ 3.  By 1985, all gasoline delivered to Shell at the Cataño Terminal came by barge or tanker.  *Id.*  All gasoline distributed by Shell PR from the Cataño Terminal was Shell branded gasoline and delivered to Shell-branded service stations.  *Id.* From 1979 until 2004, most, if not all, of the gasoline supplied to the Shell-branded sites and the Shell Trial Site service station came from the Cataño Terminal.  *Id.*

According to Juan Vasquez of Shell PR, the use of MTBE started in 1988 as a substitute for lead.  Rule 56.1 ¶ 3.  In an internal discussion, personnel from Shell PR admitted that MTBE gasoline had been imported into Puerto Rico until the "mid-90's.

Rule 56.1 ¶ 3. Shell PR was supplied MTBE gasoline by a number of inter-related Shell

entities, including Shell Int'l, Shell Western, Shell Oil, Motiva, and Shell Yabucoa.

Below is a summary of the key evidence demonstrating that certain Shell

Defendants supplied substantial volumes of MTBE gasoline to Shell PR. Detailed, and

additional evidence, is contained in the Rule 56.1 statement.

> ### 1.  *Shell Int'l (1988-1998).*

On February 1, 1988, Shell Int'l's trading division entered into an evergreen

contract to supply 3,000 barrels per day of premium and 5,000 barrels per day of regular

gasoline to Shell PR for delivery to San Juan. Rule 56.1 ¶ 3. The premium specifications

in the contract specifically state "MTBE % vol max 10." Rule 56.1 ¶ 3. The Shell

Defendants admit that Shell Int'l supplied Shell PR until at least 1995. Mot. at 8. Shell

Int'l supplied gasoline to Shell PR from both the Hess Oil Virgin Islands Corporation

("HOVIC"), St. Croix, U.S. Virgin Islands and Maravan (later Petroleos de Venezuela

("PDVSA")), Curacao refineries. Rule 56.1 ¶ 3; Mot. at 9.

Based solely on the testimony of one employee who only worked at the Curacao

refinery up to 1985 (*i.e.,* prior to the relevant period during which the refinery was

supplying Shell PR), Shell asserts "the Curacao refinery generally did not add MTBE to

gasoline" during the 1985 to 1995 period. Mot. at 9. This is untrue. Certificates of

Quality produced by other defendant for gasoline refined by the Curacao refinery in the

early 1990s, indicate that MTBE was present at concentrations from 8.8% to 14.1% in

gasoline shipped to Puerto Rico, including gasoline shipped to Shell PR.[2] Rule 56.1 ¶ 3.

---

[2] A 1987 Product Supply Contract between Shell PR and Shell Western Services (another
affiliate of Shell Int'l) providing for a supply of gasoline from "Maraven" specifically
stated "MTBE PCT Volume Max. 10." Rule 56.1 ¶ 3.

MTBE was generally known to be present in gasoline associated with Maraven (known as PDVSA). Rule 56.1 ¶ 3. Shell Int'l's aassertion that it is unlikely MTBE was present in shipments from Curacao must be rejected, or at the very least, there is a genuine dispute of material facts.

Shell Int'l also obtained gasoline for Shell PR from the HOVIC refinery in St. Croix – a shipment of gasoline from St. Croix to Shell PR at the Cataño terminal contained 8.9% MTBE in the premium grade and 2.51% in the mid-grade gasoline delivered. Rule 56.1 ¶ 3. Voluminous shipment records produced by the Hess/Hovensa/Hovic defendants in this matter show that after 1994, St. Croix supplied substantial volumes of MTBE gasoline to Shell PR pursuant to the agreements with Shell Int'l. Short Decl., Ex. 1.

Shell Int'l's reliance on its lack of data is negated by the substantial evidence (primarily from parties other than Shell Int'l) that gasoline supplied by Shell In'l did, in fact, contain substantial volumes of MTBE. This evidence combined with the fact that all of Shell PR's imported gasoline was delivered to Cataño and then to Shell-branded stations is sufficient for a jury to conclude that it is "more likely than not that [Shell Int'l's MTBE] gasoline played a substantial role in bringing about the [plaintiff's] injury" at Shell-branded stations. *City of New York*, 725 F.3d at 115-116 (2nd Cir.). Viewed in a light most favorable to the non-moving plaintiff, a genuine issue exists and summary judgment should be denied. *Guilber v. Gardner*, 480 F.3d 140, 145 (2nd Cir. 2007).

## 2. *Shell Western (1997-2010).*

Shell Western also was a major player in the supply of MTBE gasoline in Puerto Rico. Approximately 25% of Shell Western's shipments that were analyzed for MTBE

had detections of MTBE in the gasoline.  Mot. at 5, Table (161/638=25.235%).  Shell Western admits it was responsible for ten shipments of gasoline containing MTBE above the so-called *de minimis* level of 0.5% MTBE.  Mot. at 10-11.  Six of these shipments contained concentrations above 1%, meaning that there was at least 10 million ppb of MTBE present in <u>each</u> these shipments.  Mot. at 11.  Shell acknowledges that the average concentration of the Shell Western shipments was 0.08%, but Shell fails to inform the Court that this is approximately ***800,000 ppb***, which is several orders of magnitude greater than the water ***cleanup standard of 12 ppb***.  Plaintiff's Rule 56.1 Statement of Undisputed Facts ¶¶ 14 ("Planitiff's 56.1").  Moreover, MTBE was found in every one out of three of the hundreds of shipments supplied by Shell Western.  Mot. at 5, 10-11.  Shell Western's contracts permitted the use of oxygenates such as MTBE.  Rule 56.1 ¶ 3.  Evidence also shows that Shell knew MTBE was being added to Puerto Rican gasoline for octane purposes.  Rule 56.1 ¶45. While Shell argues that the presence of MTBE was an "accident," the finder of fact could reasonably conclude that the presence of such MTBE was quite purposeful and consistent with Shell's practice of using MTBE pursuant to its contracts and business practices.

       **3.**    ***Shell Oil.***

Shell Oil admits that multiple shipments of gasoline manufactured by Shell's United States Deer Park and Norco refineries were supplied to Shell PR.  Mot. at 5-7.  Shell blended MTBE into gasoline at the Deer Park and Norco refineries at various times, beginning by 1979, and Shell started manufacturing neat MTBE at Deer Park and Norco in 1992.  Rule 56.1 ¶3.  Shell Oil admits that 22 shipments of gasoline were sent from Deer Park to Puerto Rico between 2002 and 2008.  Mot. at 7.  Two of these shipments contained 0.02% MTBE, or ***200,000 ppb***.  *Id.*

Shell Oil admits that Norco may have supplied up to 6 shipments of "conventional" gasoline to Shell PR between 1995 and 1998. Mot. at 6; Rule 56.1 ¶ 3. According to Shell, conventional gasoline manufactured by Norco can, and did, contain substantial amounts of MTBE. Doc. 469 ¶ 44; Rule 56.1 ¶ 3. Shell's assertion that Norco had no reason to ship MTBE gasoline to Puerto Rico is contradicted by Shell's documents and Shell's own admissions in other motions filed concurrently with this one that MTBE was the only octane enhancer available for conventional gasoline. Rule 56.1 ¶ 3. Defendants assert in the lack of causation motion that, with respect to refineries in the United States, when lead was phased out in 1995, "MTBE became the preferred choice of most refiners and blenders" and that *__MTBE was typically used as an octane enhancer in conventional gasoline__ in a concentration in the range of 1-7 Vol. %."* Rule 56.1 ¶ 45. Shell Oil is talking out of both sides of its mouth and asking the Court to reach contrary inconsistent factual conclusions in two different motions for summary judgment. Shell Oil's own judicial admission directly contradicts its purportedly "undisputed" fact that there was no reason Shell would have shipped MTBE gasoline.

The very witness upon whom Shell relies, Mr. Bloomer, for its assertion that Norco didn't ship MTBE gasoline, conceded at his deposition that some or all of the gasoline containing MTBE produced at Norco was potentially shipped to Puerto Rico. Rule 56.1 ¶ 3. Mr. Bloomer admitted, moreover, that he cannot deny that such shipments did occur between 1995 and 1998. Rule 56.1 ¶ 3. Shell PR personnel specifically stated that MTBE was present in gasoline imported to Puerto Rico in the "mid-1990s." Rule 56.1 ¶ 3. The Shell PR supply contracts in place during the 1995 to 1998 period

specifically permitted shipment of gasoline containing MTBE up to at least 10%, and there was no prohibition on importation of MTBE gasoline. Rule 56.1 ¶ 3.

A division of Shell Oil, known as Shell Atlantic Services Co. ("Shell Atlantic"), which was based in Houston, negotiated and arranged for the supply of gasoline from the HOVIC refinery in St. Croix for Shell PR. Rule 56.1 ¶ 3. Ivan Cintron, responsible for Shell PR spot purchases testified that when Amerada Hess ("Hess") approached him about supplying gasoline to Shell PR, he "got on the phone and called people in Houston . . ." to essentially obtain approval. Rule 56.1 ¶ 3. He testified that if he wanted to purchase gasoline from any entity off-island then he had to "notify [Houston] immediately." Rule 56.1 ¶ 3. Mr. Citron testified that he communicated with Houston "about supply issues in Puerto Rico...almost every week." Rule 56.1 ¶ 3. The evidence below shows that Mr. Cintron was likely communicating with Shell Atlantic.

On December 9, 1994, Ray Thomas of Shell Atlantic, sent a request to Hess to supply gasoline to Shell PR, and the contract for the sale was sent from Hess to Shell Atlantic. Rule 56.1 ¶ 3. Shell Atlantic, moreover, conducted all contract negotiations with Hess, and received all final contracts. Rule 56.1 ¶ 3. The parties entered into a supply contract for the period of February 1, 1995 through July 31, 1995. Rule 56.¶ 3.

Again, in January 1996, Shell Atlantic contacted Hess regarding "Term Gasoline Sale to Shell Puerto Rico." Rule 56.1 ¶ 3. Shell Atlantic again negotiated the terms and received the final contracts. Rule 56.1 ¶ 3. Shell Atlantic, moreover, continued to negotiate with Hess on Shell PR's behalf regarding "Proposed Revisions to the Term Gasoline Agreement with Shell Puerto Rico." Rule 56.1 ¶ 3. The 1996 contract was renewed through July 31, 1997, by Shell Atlantic. Rule 56.1 ¶ 3.

Shipment records produced by the Hess/HOVIC/HOVENSA defendants in this matter show that between 1995 to 1997, St. Croix supplied substantial volumes of MTBE gasoline to Shell PR during this time period.  Short Decl., Ex. 1.   During 1995, HOVIC supplied Shell PR six MTBE gasoline loads with concentrations ranging from 0.17% to 2.39% MTBE by volume.  Short Decl., Ex. 1.   During 1996 to 1997, HOVIC supplied 17 loads of MTBE gasoline with MTBE concentrations ranging from 0.17% to 8.9%.  *Id.* This evidence shows that Shell Oil and its division Shell Atlantic was within the chain of supply for gasoline delivered to Shell PR, and that this gasoline contained substantial quantities of MTBE.

### 4.    *Motiva.*

Motiva admits that it has supplied at least two shipments of gasoline to Shell Yabucoa with concentrations of 0.04% to 0.11%, or 400,000 to 1.1 million ppb.  Mot. at 7.

### 5.    *Shell Yabucoa.*

Shell Yabucoa imported shipments of gasoline containing sub-0.5% concentrations of MTBE.  Doc. 469 ¶ 14.  According to the Shell Defendants, at least 8 shipments of gasoline containing MTBE were imported into the Yabucoa facility.  *Id.* ¶ 29.  The concentrations of MTBE ranged from 0.02% to .17%, or approximately 200,000 ppb to 1.7 million ppb.  *Id.*  In addition, Shell Yabucoa imported two additional shipments of MTBE gasoline into Cataño Terminal in 2004.  *Id.* ¶ 36.  These shipments had 0.11% and 0.21% MTBE, or approximately 1.1 million to 2.1 million ppb MTBE. As discussed above, these concentrations matter.  *Id.*  The Shell Yabucoa gasoline was

ultimately supplied to service stations within the Commonwealth; its gasoline was not shipped out of the Commonwealth. Rule 56.1 ¶ 3.

**B.**  **Shell Int'l Has Exercised Substantial Control Over Environmental Matters at Shell-Branded Service Stations Throughout the Commonwealth.**

The evidence shows that Shell Int'l, and its various wholly owned subsidiaries, had direct involvement with numerous aspects of station operations in Puerto Rico. Shell Int'l went well beyond supplying MTBE gasoline to Shell PR; it was substantively involved in Shell PR's daily operations, including site operations, training, equipment, and environmental compliance.

On January 1, 1999, Shell Retail International ("Shell Retail Int'l"), a division of Shell International Petroleum Company Limited, entered into a Shell Retail International Franchise Agreement with Shell PR. Plaintiff's Rule 56.1 ¶¶ 1-13. According to the agreement, Shell Retail Int'l and Shell PR agreed to comply with certain core elements as "central to the achievement of common standards throughout the [Shell global network of retail businesses]….These…[included]:…(ii) [*Health, Safety and Environment] core standards*; and (iii) adherence to…*performance specifications for equipment and systems*…." Plaintiff's Rule 56.1 ¶¶ 1-13. (emphasis added) Shell Retail Int'l was required to "[p]ublish guidelines on…[Health, Safety and Environment core standards] together with details on how to acquire the relevant specification and standards documents…and Shell PR agree[d] to comply with the guidelines." *Id.* The agreement also required Shell Retail Int'l to provide "comprehensive advice and business support for products and services" regarding "[e]ngineering design" and "[s]ite operations and training," among other things. Plaintiff's Rule 56.1 ¶¶ 1-13. The Shell Retail Int'l

11

website was "the central information point for [Shell PR] and the method by which [Shell Retail Int'l] provide[d] information and documents, and reports...."  Plaintiff's Rule 56.1 ¶¶ 1-13.  A current document on Shell's website says the following describing its pre-2009 Health, Safety, Security and Environment ("HSSE") Standards:

> Previously our HSSE standards contained *detailed requirements*....A set of *mandatory manuals includes more detailed requirements* to help our staff put our standards into practice.  The manuals contain all of the HSSE and [Social Performance] *requirements* we have *followed in the past*....[3]

The standards include "Global environmental standards," which included "Soil and groundwater monitoring/remediation," Volatile organic compounds," "Waste," and "Water in the environment."[4]

Brenda Torano, the Health, Safety, and Environmental manager for Shell PR after 2000, testified that prior to Shell PR's sale and name change in 2006, Shell PR had access to environmental standards published by the Shell group, known as the "Yellow Guides." They were available to Shell PR in both hard copy and via the internet. Plaintiff's Rule 56.1 ¶ 5.  However, upon the sale in 2006, Shell Int'l took or destroyed the Yellow Guides.  Rule 56.1 ¶ 12.

According to Ms. Torano and David Lewis, a HSSE manager, Ms. Torano worked for Shell Caribbean and Central America ("CCA") and Shell PR at the same time. Plaintiff's Rule 56.1 ¶ 3.  According to Ian Charman, a manager who has been employed by various Shell-affiliated companies for 40 years and has offered a declaration in

---

[3] *See* "Previous Shell Health, Safety, Security and Environment Standards" (emphasis added), available at http://s08.static-shell.com/content/dam/shell/static/environment-society/downloads/previous-hsse-standards.pdf.

[4] *See id.*

support of the Shell Defendants' Motion, CCA was "an informal cluster of the [Shell] operating companies" in the Caribbean and Central America.[5]  Declaration of Ian Charman in Support of the Shell Defendants' Motion for Summary Judgment (Doc. 470), ¶1; Plaintiff's Rule 56.1 ¶ 2.  David Lewis, the CCA HSSE manager, was responsible for advising all of the businesses in the cluster with respect to their retail stations. Plaintiff's Rule 56.1 ¶ 2.  Ms. Torano and her predecessor, Vanessa Rodriguez, were responsible for working with the "retail business advising them" on how to conduct environmental investigations for retail stations. Plaintiff's Rule 56.1 ¶ 4.  Ms. Torano and Ms. Rodriguez were considered "the local environmental expert[s]" to provide advice to Shell PR. Plaintiff's Rule 56.1 ¶ 4.  Ms. Torano also kept the CCA group apprised of proposed underground storage tank regulations in Puerto Rico.  Plaintiff's Rule 56.1 ¶ 3.

The environmental managers in CCA were responsible for ensuring that Shell Int'l's policies were being followed by organizations within the cluster, including Shell PR.  In her role within CCA and Shell PR, Ms. Torano regularly communicated with Shell personnel in the Caribbean, Central America, and England, referring to England (*i.e.,* Shell Int'l) as "our base."  Plaintiff's Rule 56.1 ¶ 5.  Ms. Torano referred to England as the "base" "because Shell Puerto Rico operated - reported to England as part of their operating unit."  Rule 56.1 ¶ 5.

The control and procedures dictated by Shell Int'l required that Shell PR even had

---

[5] To the extent the Shell Defendants argue that CCA was a separate company from Shell Int'l and Shell's other subsidiaries, Shell's own managers operated as if CCA was an informal cluster of managers from various Shell entities working together to comply with Shell Int'l's Shell-wide policies regarding various issues, including environmental policies.  There is a disputed fact based upon various Shell employees' testimony as to how CCA functioned and its relationship to Shell PR and Shell Int'l.

to seek approval to spend funds on engineering and environmental projects, like "major improvements to the Cataño" dock. Shell Int'l granted its approval. Plaintiff's Rule 56.1 ¶ 9. More importantly, records available to the Commonwealth show that at least in 2000 and 2001, Shell PR had to seek and obtained approval from CCA to upgrade underground storage tanks at Shell stations, including the Shell Trial Site. Planitiff's Rule 56.1 ¶¶ 6-7. "[C]apital projects…need[ed] approval *outside Puerto Rico* in order to have the expenditures…." Plaintiff's Rule 56.1 ¶ 8.

Contrary to Shell's assertions that Sol PR was the "same" company as Shell PR, there is evidence that Shell Group information was destroyed and deleted from all computers left behind in order to protect Shell Group's proprietary internal information and communications to make sure they were not provided to the purchaser of Shell PR. Plaintiff's Rule 56.1 ¶ 12-13. With respect to the operation of service stations and environmental issues, the Shell entities, including Shell PR and Shell Int'l acted as one coherent confidential business organization with ultimate decision-making authority and control with Shell Int'l in London.

Based upon the substantial volumes of MTBE gasoline supplied by various Shell Defendants to Shell PR, the exclusive distributor of Shell-branded gasoline, there is no doubt that Shell Int'l, Shell Western, Shell Oil, Motiva, and Shell Yabucoa (collectively referred to as the "Shell Supplier Defendants") supplied sufficient quantities of MTBE to cause substantial harm to the waters of the Commonwealth. As discussed above, very minute percentages of MTBE in gasoline can cause very high concentrations of MTBE that are harmful. *See supra* Part I. The MTBE gasoline of these Shell Supplier Defendants was distributed by Shell PR to the Shell-branded sites throughout the

Commonwealth, of which 72 sites have had leaks into the environment and are at issue in this case. Even if such sites received Shell-branded gas supplied by other defendants in this case, there is more than sufficient evidence for a jury to conclude that the Shell Supplier Defendants' MTBE gasoline was a substantial factor in causing the harm at the Shell-branded service stations, including the Shell Trial Site.[6] The Commonwealth need not show that the Shell Supplier Defendants' gasoline was the sole cause of injury, but need only show that it was a cause. *See In re N-500L Cases* 691 F.2d at 28. Circumstantial evidence may be used to prove such causation. *See e.g., Vaqueria Garrochales, Inc. v. A.P.P.R.*, 106 D.P.R. 799, 801(1978); *City of New York*, 725 F. Supp.2d at 597. Because the court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant," summary judgment is not appropriate with respect to the Shell Supplier Defendants. *See Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (quotations omitted).

Moreover, Shell Int'l has played a substantial role in controlling site-specific activities and policies related to underground storage tanks, environmental compliance, and budgeting for environmental and engineering projects in Puerto Rico. Shell Int'l set the Health, Safety, Security and Environment policies for the Shell entities doing business in Puerto Rico. Shell PR was obligated under its contract with Shell Retail Int'l (a division of Shell Int'l) to follow Shell Int'l's core standards, including those concerning Health, Safety and Environment and performance specifications for

---

[6] It is uncontested that MTBE has been detected in groundwater at or near the Trial Sites. *See* Letter from Peter Sacripanti to the Honorable Shira A. Scheindlin, dated June 26, 2014, at 1, 4.

equipment and systems. Shell Int'l was responsible for providing assistance to Shell PR regarding "[e]ngineering design" and "[s]ite operations and training." Shell Int'l had to approve Shell PR's capital expenditures. With all of this involvement and control by Shell Int'l, Shell environmental staff working on issues in Puerto Rico referred to Shell Int'l's office in England as their "base." The simple truth is that Shell's underground storage tanks at its retail facilities in Puerto Rico failed. They leaked MTBE into the waters and soils of Puerto Rico at 72 sites at issue in this case. Shell PR was not managing these tanks and facilities alone. Shell Int'l was involved at "every step of the way." These facts, when considered together, establish that Shell Int'l's actions were a substantial factor in causing MTBE contamination throughout the Commonwealth, including at the Shell Trial Site. *See Prado Alvarez*, 313 F.Supp.2d at 76 (emphasis added).

Accordingly, summary judgment should be denied as to Counts I (Products Liability) and IV (Negligence) with respect to Shell Western, Shell Oil, Motiva, and Shell Yabucoa. Summary judgment should be denied as to Counts I (Products Liability), II (Nuisance), III (Trespass), and IV (Negligence) with respect to Shell Int'l.[7]

## II.    THERE IS NO DE MINIMIS EXCEPTION TO THE SHELL DEFENDANTS' LIABILITY.

Even if the Shell Defendants had supplied only *"de minimis"* amounts of MTBE gasoline to the Commonwealth, the Commonwealth has banned MTBE. Puerto Rico law provides that "[n]o natural or legal person shall import, sell, dispense or offer for sale

---

[7] Plaintiff will work with the Shell Defendants to voluntarily dismiss: Equilon Enterprises LLC, Shell Trading (US) Company, and TMR Company; Shell Western, Shell Oil, Motiva, and Shell Yabucoa with respect to Count II (Nuisance) and Count III (Trespass); and Count VIII with respect to all of the Shell Defendants.

gasoline containing *methyl tertiary butyl ether*." Decl. of Ruben F. Reyna, Ex. 9 (Law No. 16-2012, Article 3) (hereinafter "Reyna Ex. _"). The legislative history describes the ban as "completely prohibiting MTBE in gasoline used in Puerto Rico." *Id.*

The Motion asserts: "Although [Puerto Rico] banned the use of MTBE in gasoline, Puerto Rico expressly permits *de minimis* levels of MTBE, up to 0.5% by volume." Mot. at 15. This statement is incorrect. The law banning MTBE in gasoline does not "expressly permit *de minimis* levels of MTBE, up to 0.5% by volume." The law bans MTBE – period. The Shell Defendants' Motion confuses the law banning MTBE with a Department of Consumer Affairs ("DACO") regulation implementing the law.

Pursuant to Law No. 16-2012, DACO was tasked with promulgating a regulation to implement the ban. Law No. 16-2012 (codified at 10 L.P.R.A. § 4175). DACO acknowledged in the preamble to the regulation that the purpose of Law 16-2012 is to implement an "exhaustive[ ]" prohibition on the import, sale, distribution, and offer of gasoline that contains MTBE in Puerto Rico. DACO Regulation 8198, dated May 11, 2012. The law "does not set a 0.5% permitted level." "[T]here is no acceptable level." Decl. of Luis Pagán Rodríguez, ¶ 3 ("Pagán Decl. _"). DACO did not purport to change the ban or "permit" *de minimis* levels of MTBE. Administrative agencies cannot amend laws. They can, however, exercise prosecutorial discretion in carrying out laws and determining when and whether to enforce and impose fines and penalties.

That is all DACO has done. DACO recognized that residual levels of MTBE might be present in concentrations less than 0.5% due to the commingling of product in barges. Pagán Decl. ¶ 6. Therefore, in its exercise of enforcement discretion relative to the imposition of fines for *per se* violations of the regulation, DACO has adopted a policy

of not enforcing the ban at concentrations less than 0.5% by volume although such volumes technically violate the statute.[8] *Id.* This does not "permit" anything. The ban on MTBE under Law 16-2012 remains, and the Commonwealth can enforce it.

### A. The Ban on MTBE Protects Public Health and the Environment.

The Commonwealth had good reason to ban MTBE. Puerto Rico's Water Quality Standards provide that the taste and odor of groundwater shall not be altered except by natural causes. Regulation No. 7837 at § 1303.2(F)(2)(g). Some 10% of the population can detect the presence of MTBE in water at levels of 1-2 parts per billion ("ppb") and 25% of the population can detect it at 3 ppb. Plaintiff's Rule 56.1 ¶ 17. This has been confirmed by the defendants and their own scientists. Over a decade ago, Exxon Research & Engineering's environmental personnel found that "[s]mall leaks of gasoline (1 teaspoon) can translate into MTBE ground water concentrations above the taste and odor detectable threshold levels." Plaintiff's Rule 56.1 ¶ 18. In the same time frame, defendant Shell Oil's environmental personnel found that "[v]ery small releases of MTBE . . . have the potential to adversely impact groundwater." Plaintiff's Rule 56.1 ¶ 19.

The Water Quality Standards also prohibit any substance that is toxic or produces undesirable physiological responses in humans, fish or other flora or fauna. Regulation No. 7837 § 1303.1(I). MTBE is a genotoxic carcinogen with "*no safe level of human exposure*, especially in drinking water. Any exposure can result in an increased long-term risk of cancer for humans." Plaintiff's Rule 56.1 ¶ 20. MTBE "causes lymphomas

---

[8] DACO is not the department responsible for environmental protection. Deposition of DACO, at 60:11-14. Such programs are implemented primarily by the Environmental Quality Board and Department of Natural and Environmental Resources.

and leukemias in animal studies." *Id.*  The Water Quality Standards prohibit MTBE in

the waters of the Commonwealth and do not "permit" MTBE at *any* level.  Law 16-2012.

In addition, according to plaintiff's natural resource economics expert Kevin J.

Boyle, "it is very likely that the Puerto Rican public holds economic values for

uncontaminated groundwater even if there is no use of the water."  Plaintiff's Rule 56.1 ¶

21.  In other words, the mere presence of MTBE in groundwater is an economic injury.

This conclusion "provides economic evidence that supports undertaking primary

restoration[9] of groundwater [(*i.e.,* removing detectable levels of MTBE)]." *Id.*

### B.  There is No License to Pollute

Even if the law "permit[ted]" MTBE in gasoline, which it does not, this Court has

held: "[W]hether a plaintiff has suffered injury from contamination at levels below an

applicable regulatory threshold is a question of fact for the jury." *City of New York,* 725

F.3d at 106, 108 (2nd Cir.); *see also Suffolk County Water Auth. v. Dow Chem. Co.*, 35

Misc.3d 307, 316, 942 N.Y.S.2d 765, 771 (N.Y. S.Ct. 2012).

The Puerto Rico courts have reached a similar conclusion.  In the relatively recent

case of *Martinez de Jesus v. Puerto Rico Electric Power Auth.*, the court concluded that:

> Even assuming that [the defendant] complied with the allegedly applicable
> regulation, this is not enough for the Court to conclude, as a matter of law,
> that [the defendant] is not liable.  In fact, whether [the defendant] …
> complied or not with the applicable regulations does not necessarily mean
> that it acted as a prudent person would have under Article 1802.

256 F.Supp.2d 122, 125 (D.P.R. 2003).  According to the court, "[c]ompliance with a

legislative enactment or an administrative regulation does not prevent a finding of

---

[9] Primary restoration is the restoration of groundwater to its pre-contaminated condition.
Because MTBE is not a naturally occurring substance, MTBE would not exist in the
natural environment but for defendants' decisions to use and release it.

negligence where a reasonable man would take additional precautions." *Id.* at 126.

"[W]hile one's compliance with a statute or an ordinance may amount to evidence of reasonableness, such compliance is not tantamount to reasonableness as a matter of law." *Adinolfe v. United Tech. Corp.*, 768 F.3d 1161, 1174 (11th Cir. 2014). Compliance with a standard is no more than a minimum. *Id.* (citing *Prosser and Keeton on the Law of Torts*). As this Court has recognized previously, a regulatory standard designed to protect public health does not govern "'conduct in manufacturing and selling a defective product.'" *In re MTBE*, 458 F.Supp.2d 149, 157 (S.D.N.Y. 2006). The issue is whether MTBE contamination injures a protected interest. *Id.* at 158 n.47.

The Court should deny defendants' request to hold that a regulatory standard "convey[s] a license to pollute up to that threshold," just as the Court did in the *City of New York* case. *City of New York*, 725 F.3d at 109 (2nd Cir.). This is especially true here, where the Commonwealth adopted an absolute prohibition on MTBE. Law 16-2012.

Equally unavailing is the Shell Defendants' argument that they should not be liable because MTBE is inevitably in the petroleum distribution system (Mot. at 15) The Shell Defendants fail to acknowledge that they are not innocent bystanders whose product was besmirched by the noxious chemical of others, but that they have been a substantial factor in introducing MTBE into the distribution system. *Supra*, Pt. I; *see also* 56.1 Opp. to Defendants' MSJ re Sophisticated User, ¶¶ 99-107 (discussing problems resulting from Shell's decision to place MTBE in gasoline).

Under the Shell Defendants' argument, if all MTBE in Puerto Rican waters originated from commingled product, no defendant could be held accountable. That outcome would undermine the purposes of Puerto Rico's Environmental Public Policy

Act and Constitution, which recognize that the Commonwealth has a duty to protect the environment and rights of its people to an environment free from degradation. *Paoli Mendez v. Hernandez*, 138 D.P.R. 449, 460 (P.R. 1995); 12 L.P.R.A. §§ 8001 and 8001a.

Additionally, the MTBE present in gasoline distributed by the Shell Defendants was not all due to commingling, much of it was intentional. Most of the Shell Defendants have supplied MTBE gasoline to the Commonwealth, sometimes with high concentrations of MTBE, and supply contracts between Shell Int'l and Shell PR indicate Shell Int'l promised to supply gasoline to Puerto Rico with MTBE concentrations up to 10% by volume. Rule 56.1 ¶ 3.

The testimony a former employee that "to the best of [his] knowledge, the [supplying] refinery generally did not add MTBE to gasoline [during the supply contract period]," particularly when the witness did not work at the refinery during the relevant time period is insufficient to overcome the substantial evidence of actual contracts and shipments submitted by the Commonwealth. Rule 56. 1 ¶ 3. Based on this evidence, a jury could draw reasonable inferences that the Shell Defendants shipped substantial amounts of MTBE gasoline to Puerto Rico. Since the court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant," those inferences control. *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).

## III.    THE SHELL DEFENDANTS ARE LIABLE UNDER COUNT V (EPPA).

Summary judgment on the EPPA count should be denied as to Shell Int'l, Shell Western, Shell Oil, Motiva, and Shell Yabucoa. The EPPA empowers the Environmental Quality Board ("EQB") to institute "civil actions for damages" against "all persons

responsible for polluting [the Commonwealth's] soils, waters, and atmosphere." 12 L.P.R.A. §§ 8002c(a)(11), 8002j(b), 8002j(a); 8001(b).

The Act's broad definition of "person responsible" includes any person that "exercises dominion or ownership, or holds, or exercises partial or total control over establishments, . . . facilities or services that generate, store, transport, distribute or otherwise handle" any "hazardous substance" that has been discharged into the environment. 12 L.P.R.A. §§ 8004a(4), 8004a(2), 8004a(1). "[H]azardous substance" also is defined broadly, and includes "any element, substance, compound or mixture that may harm living organisms or the environment." 12 L.P.R.A. § 8004a(2).

MTBE is "a highly dangerous compound, like tar or nicotine, poses a threat to human health if ingested." *In Re MTBE*, 488 F.3d 112, 131 (2nd Cir. 2007). A reasonable jury could find that MTBE is a "hazardous substance." 12 L.P.R.A. § 8004a(2); *see also City of New York*, 725 F.3d 65, 78 (2nd Cir. 2013) ("MTBE causes water to assume a foul smell and taste, and has been identified as an animal carcinogen and a possible human carcinogen.").

A reasonable jury also could find that the above-listed defendants are "person[s] responsible" for discharging MTBE into Puerto Rico's soil and groundwater. 12 L.P.R.A. §§ 8004a(4), 8004a(2), 8004a(1). Importantly, the Act does not require proof that defendants owned a UST to be "responsible" for an MTBE discharge. All that is required is partial control over any facility in the distribution chain that brought MTBE gasoline into Puerto Rico -- "person responsible" includes those that *supervise or exercise partial control over* establishments *or that provide services that distribute* hazardous substances.

Here, all of the above-listed defendants concede that they were part of Puerto Rico's MTBE-gasoline-distribution chain. *See* Motion at 5-6 (Shell Yacucoa), 7 (Shell Oil and Motiva), 8-9 (Shell Int'l), and 10-11 (Shell Western). In addition, Shell Int'l has played a substantial role in controlling site-specific activities related to underground storage tanks, environmental compliance, and budgeting for environmental and engineering projects at Shell-branded service stations prior to the sale of Shell PR to Sol in 2006. Shell Int'l's policies and activities have caused, in part, the discharge of MTBE into the waters of the Commonwealth in violation of Water Quality Standards at dozens of Shell-branded service stations in the Commonwealth -- summary judgment as to the EPPA claim against Shell Int'l should be denied on this ground as well. *See supra* Part I for description of Water Quality Standards.

## IV.   SHELL OIL COMPANY IS LIABLE UNDER COUNT VII (TOXIC SUBSTANCES CONTROL ACT ("TSCA")).

TSCA requires any "person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment [to] immediately inform the [EPA] Administrator." 15 U.S.C. § 2607(e) and (f). Section 20 of the Act authorizes any person – including the Commonwealth – to "commence a civil action" against violators. 15 U.S.C. § 2619(a); *see also In Re MTBE*, 510 F.Supp.2d 299, 316 (public-agency "Plaintiffs plainly have standing to bring the TSCA claim"].

Shell Oil has been in violation of TSCA for decades. The Shell Defendants admit that Shell Oil blended MTBE gasoline at the Deer Park and

23

Norco Refineries beginning as early as 1979 and 1980, respectively. They also concede that Shell Oil began manufacturing MTBE at these same refineries in 1992. Rule 56.1 ¶ 3. Shell Oil admits that at least two shipments of MTBE gasoline were delivered to Puerto Rico. *See* Mot.at 4, 5, and 7. MTBE and MTBE gasoline are chemical substances and mixtures as defined by TSCA § 3(2) and 3(8). *See* 15 U.S.C. §§ 2602(2) and (8).

Since at least 1980, Shell has had "information which reasonably supports the conclusion that" MTBE and MTBE gasoline "present[] a substantial risk of injury to health or the environment." 15 U.S.C. § 2607(e) and (f). In October of that year, MTBE released from a Shell gas station contaminated public drinking water supplies in Rockaway, New Jersey. As Curt Stanley, a Shell Oil Company hydrogeologist, testified at deposition that "by 1981 Shell Oil Company knew that MTBE in its gasoline could contaminate [and] create taste and odor problems in public drinking water supplies public drinking water supplies." Plaintiff's Rule 56.1 ¶ 23. In 1983, Shell disclosed to the American Petroleum Institute ("API") that, in its "spill situation, the MTBE was detectable (by drinking) in 7 to 15 parts per billion so even if it were not a factor to health, it still had to be removed to below the detectable amount in order to use the water. Plaintiff's Rule 56.1 ¶ 24.

TSCA required Shell to disclose this information about MTBE's hazards to the EPA. Shell violated this requirement. In fact, Shell joined its MTBE Committee colleagues in opposing the EPA's notice of intent to designate MTBE for priority testing under the TSCA. The Committee's comments misrepresented that: "We believe that the information provided supports the conclusion that MTBE does not represent a drinking

24

water hazard." Plaintiff's Rule 56.1 ¶ 25-26. The Committee also relied upon data from Shell Oil to argue that MTBE has a higher detectability threshold of about 700 ppb in water. Plaintiff's Rule 56.1 ¶ 26. Shell Oil had an opportunity to review the document and make any changes it saw fit prior to it being sent to the EPA. Plaintiff's Rule 56.1 ¶ 26. This evidence is more than sufficient to support a reasonable jury finding that Shell Oil Company violated its EPA-disclosure requirements under TSCA.


Dated: November 7, 2014

Respectfully submitted,


Tracey O'Reilly
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, California  95825

**PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE**

*Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*, United States District Court, Southern District of New York Case No. No. 07 Civ. 10470 (SAS)

I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action.  My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF THE SHELL DEFENDANTS**

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on November 7, 2014, at Sacramento, California.

_____
TONYA L. ZIMMERMAN