UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | Master File No. 1:00-1898 (SAS) MDL 1358 |
| **This document relates to:** Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al., Case No. 07-cv-10470 | |

**PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS REGARDING THE MOTION FOR SUMMARY JUDGMENT OF THE SHELL DEFENDANTS**

# PLAINTIFF'S RULE 56.1 STATEMENT OF UNDIPSUTED FACTS REGARDING THE MOTION FOR SUMMARY JUDGMENT OF THE SHELL DEFENDANTS

Pursuant to Rule 56.1 of this Court's Civil Rules, Plaintiff the Commonwealth of Puerto Rico ("Commonwealth") respectfully submits the following separate statement of undisputed facts regarding Defendants Shell Oil Company ("Shell Oil"), Motiva Enterprises LLC ("Motiva"), Equilon Enterprises LLC ("Equilon"), Shell Trading (US) Company ("Shell Trading"), TMR Company ("TMR"), Shell Chemical Yabucoa, Inc. ("Shell Yabucoa"), Shell International Petroleum Company Limited ("Shell Int'l"), and Shell Western Supply and Trading Limited ("Shell Western") (collectively, the "Shell Defendants") motion for summary judgment.

## Plaintiff's Separate Rule 56.1 Statement

### Shell International Was Involved in Shell PR Retail Stations

1. On January 1, 1999, Shell Retail International, a <u>division of</u> Shell Int'l, entered into a Shell Retail International Franchise Agreement, with Shell PR ("the Franchisee") to provide "franchise specialist advice and services . . . for Shell Operating Companies throughout the world that have a Retail Business (the "Franchisees")." (O'Reilly Decl., Ex. 9, at 1.) The agreement states that Shell PR had previous "agreement for a range of services to be provided by" Shell Int'l, but Shell has failed to produce this document. (*Ibid.*) According to the agreement, Shell Retail Int'l and Shell PR agreed to comply with certain core elements as "central to the achievement of common standards throughout the [Shell global network of retail businesses]….These…[included]:…(ii) [*Health, Safety and Environment] core standards*; and (iii) adherence to…*performance specifications for equipment and systems*…." (*Ibid.*) Shell Retail Int'l was required to "[p]ublish guidelines on…[Health, Safety and Environment core standards] together with details on how to acquire the relevant specification and standards documents…and Shell PR agree[d] to comply with the guidelines." (*Ibid.*) The agreement also

1

required Shell Retail Int'l to provide "comprehensive advice and business support for products and services" regarding "[e]ngineering design" and "[s]ite operations and training," among other things. (*Ibid.*) The Shell Retail Int'l website was "the central information point for [Shell PR] and the method by which [Shell Retail Int'l] provide[d] information and documents, and reports…." (*Ibid.*)

      2.    A current document on Shell's website says the following describing its pre-2009 Health, Safety, Security and Environment ("HSSE") Standards:

> Previously our HSSE standards contained *detailed requirements*….A set of *mandatory manuals includes more detailed requirements* to help our staff put our standards into practice. The manuals contain all of the HSSE and [Social Performance] *requirements* we have *followed in the past*….[1]

The standards include "Global environmental standards," which included "Soil and groundwater monitoring/remediation," Volatile organic compounds," "Waste," and "Water in the environment." *See* "Previous Shell Health, Safety, Security and Environment Standards" (emphasis added), available at http://s08.static-shell.com/content/dam/shell/static/environment-society/downloads/previous-hsse-standards.pdf.

      3.    David Lewis, was the Caribbean and Central America ("CCA"), Health Safety, Security, and Environmental ("HSSE") manager, from April 1999 to January 2002. (Barnhart Decl., Ex. 3, Lewis Depo. at 12:1-2.) CCA was "an informal cluster of the [Shell] operating companies [in the] Caribbean and Central America." (Barnhart Decl., Ex. 1, Charman Depo. at 125:20-22.) Mr. Lewis confirmed that as HSSE manager he was responsible for advising all of the businesses in the cluster on retail stations. (Barnhart Decl., Ex. 3, Lewis Depo. at 14:3-11.)

---

[1] *See* "Previous Shell Health, Safety, Security and Environment Standards" (emphasis added), available at http://s08.static-shell.com/content/dam/shell/static/environment-society/downloads/previous-hsse-standards.pdf.

2

4.      Brendo Torano, Health, Safety, and Environmental manager for Shell PR after 2000, identified herself as a "Retail/Comm. Environmental Adviser" with the Shell CCA, when reporting information regarding USTs in Puerto Rico. (Barnhart Decl., Ex. 3, Torano Depo. at 89:19-90:15; *see also* O'Reilly Decl., Ex. 9, Nov. 19, 2001, Email from B. Torano to J. Vasquez.) Mr. Lewis confirmed that Ms. Torano was an employee when she served as an Environmental Advisor for CCA. (Barnhart Decl., Ex. 3, Lewis Depo. at 15:4-22.)

5.      Mr. Lewis confirmed that in their roles as CCA Environmental Advisors, Ms. Torano and her predecessor, Vanessa Rodriguez, were responsible for working with the "retail business advising them" on how to conduct environmental investigations for retail stations. (Barnhart Decl., Ex. 3, Lewis Depo. at 18:17-19:21.) Ms. Torano and Ms. Rodriguez were considered "the local environmental expert" to provide advice to Shell PR. (*Id.* at 18:17-19:21.]. Ms. Torano specifically prepared a "Shell CCA Project Proposal, 5 Yr. Puerto Rico Site Remediation Plan" that had to be submitted to obtain budget approval to do the work. (*Id.* at 143:22-144:3, 144:8-144:17.)

6.      Ms. Torano testified that, while Shell PR was a part of Shell Int'l, Shell PR had access to "Yellow Guides" concerning environmental guidelines that were available to Shell PR in both hard copy and via the internet. (Barnhart Decl., Ex. 3, Torano Depo. at 89:19-90:15.) Ms. Torano also testified that she communicated with Shell personnel in the Caribbean, Central America, and England, which she referred to as "our base." (*Id.* at 17:24-18:1, 19:19-23, and 26:12-18.) She referred to England as Shell PR's "base . . . because Shell Puerto Rico operated – reported to England as part of their operating unit." (*Id.* at 26:19-21.)

7.      In April 2000, David Holden, Retail Network Manager for Shell CCA, advised Shell PR that the Retail Capital Proposal for Shell PR's "Tank Replacement Program" "has been

3

approved." (O'Reilly Decl., Ex. 9, April 3, 2000, Email from D. Holden (CCA) to B. Verbrug (Shell PR.) Notably, Mr. Holden only approved a portion of the tank replacements proposed by Shell PR. (*Id.* at UST Replacement Program 2000, Puerto Rico.)

8.      Again, in 2001, Martin Miksits, Retail Network Manager for Shell CCA sent an email to Jose Melendez, Shell PR, regarding a proposal to upgrade underground storage tanks at Shell stations in Puerto Rico, including the Trial Site, which states that "the following capital sanction has been approved." (O'Reilly Decl., Ex. 9.)

9.      Angel Olivera confirmed that for any "capital projects . . . you need approval *outside* Puerto Rico in order to have the expenditures. . ." (Barnhart Decl., Ex. 1, Olivera Depo. at 43:22-44:2.) (emphasis added).

**Shell Int'l Had a Long History of Substantial Involvement Shell PR's Business**

10.     In 1984 and 1985, Shell Int'l approved Shell PR expenditures for "major improvements to the Catano" dock, and also approved Shell PR's "proposal to increase expenditure" on this project. (O'Reilly Decl., Ex. 9.)

11.     In 2003, when Shell Chemical Yabucoa, Inc. ("Shell Yabucoa") entered into a Marketing and Distribution Services Agreement with Shell PR, the Agreement explicitly stated that Shell PR's "duty of care" must comply with "standard business practices . . . established by the Royal Dutch Shell Group." (O'Reilly Decl., Ex. 7, at 2.3.) The Governance Guide ("GG") which accompanied the Agreement further provided:

> This document is intended to define the relationship between Shell Chemicals Yabucoa Inc. (SCYl) and The Shell Company (Puerto Rico) Limited (SCPRL) in the conduct of the business in the Commonwealth of Puerto Rico. It follows the principles defined in the Royal Dutch Shell Group Governance Guide (RDSGG).

(*Id.* GG at.) The GG also states that Shell Oil Products Latin America has "accountability" for "the return on investment and compliance with Group standards and policies" for Shell PR.

4

(*Ibid.*) Shell Yabucoa and Shell PR were, in fact, owned by the same Shell holding company which is traceable back to Shell Petroleum. (*Ibid*). The GG also states that the Shell holding companies will provide "support for Capital Investment Proposals," and further states that "financing . . . will not be limited to existing corporate structures." (*Ibid.*) Finally, the GG expressly requires both Shell Yabucoa and Shell PR to adopt "The Group HSE Commitment and Policy," thus dictating health, safety, and environmental policy for both companies. (*Ibid.*) Similarly, both companies are required to comply with "Group's Risk and Internal Control Policy." (*Ibid.*) It is clear that the operations of both of these entities was controlled and tied up with the global Shell business, and were certainly not independent third party operators as portrayed by Shell in its motion.

12. In 2004, when Shell PR had meetings with "the government" regarding of Shell PR's usage of MTBE, Shell PR was directed to "contact David Harrington . . . manager of external affairs in the U.S." so that "[h]e can best ensure that advocacy work in Puerto Rico is aligned with that in the US." (Barnhart Decl., Ex. 2, Bloomer Depo. at 89:9-91:4; and O'Reilly Decl., Ex. 9.) Mr. Knight's email address, in fact, is SOPUS, i.e. Shell Oil Products US.

13. When Shell PR was sold to Sol, there were numerous changes in business operations. Ms. Torano testified, for example, that the "Yellow Guides" provided by Shell London "were not the property of Sol," so Shell "took [them] with them . . . or destroyed" them. (Barnhart Decl., Ex. 3, Torano Depo. at 90:16-91:17.)

14. Consistent with Ms. Torano's testimony, at the time of the sale to Sol, an email was circulated throughout Shell PR making it clear that the Shell global entities previously involvement in the Shell PR business was ending:

> "In preparation for the transition to SOL, it is required to formally protect Shell from unauthorized disclosure or misuse of information" classified as restricted or

5

confidential . . . [e]ach individual is responsible for deleting classified information and communications . . . On **August 31st ALL** data stored in assigned computers will be wiped out . . . [t]he following services will not be available after cutover date . . "SWW Shell Wide Web Mobil Office . . . "access to Shell Group Reporting FASTER . ."

(O'Reilly Decl., Ex. 9,) (emphasis in original).

### De Minimis MTBE is Harmful

15. The Commonwealth's expert and other evidence demonstrates that 0.5% MTBE in millions of barrels of gasoline translates into millions of gallons of pure MTBE. Thus, a release of gasoline with 0.5% MTBE to groundwater contains over 416,000 times the limit set in Puerto Rico's cleanup standard.

16. A 2006 draft review prepared by Shell Int'l personnel states that "oxygenates [were] used in [the] Americas . . . [because] countries like . . . Puerto Rico were the same as the U.S., namely the big cities within these countries have high pollution levels and MtBE was added to reduce exhaust emission." (O'Reilly Decl., Ex. 8 at 6.)

17. DACO witnesses confirmed it is not the department responsible for environmental protection programs. Indeed the witness states that "we are not experts in environmental issues, so simply what we do, that if the order says there can't be MTBE, we check that there is none." (Barnhart Decl., Ex. 2, Pagan Depo. (Nov. 14, 2014) at 60:11-14 (DACO Rule 30(b)(6).)

18. Some 10% of the population can detect the presence of MTBE in water at levels of 1-2 ppb and 25% of the population can detect it at 3 ppb. (O'Reilly Decl., Ex. 10, Dec. 2, 2013, Expert Report of Harry T. Lawless at 4; Feb. 27, 2014, Rebuttal Report of Harry T. Lawless at 9.)

**TSCA Evidence**

19. Over a decade ago, Exxon Research & Engineering Company's own environmental personnel explained that "[s]mall leaks of gasoline (1 teaspoon) can translate into MTBE ground water concentrations above the taste and odor detectable threshold levels." (O'Reilly Decl., Ex. 10, March 30, 1999, MTBE Release Source Identification at Marketing Sites at 2).

20. In the same time frame, defendant Shell Oil's environmental personnel concluded that "[v]ery small releases of MTBE . . . have the potential to adversely impact groundwater." (O'Reilly Decl., Ex. 10. Nov.3, 1998, Email from C. Stanley to J. Pedley at ¶ 1.)

21. Any exposure can result in an increased long-term risk of cancer for humans." (O'Reilly Decl., Ex. 10, Dec. 6, 2013, Expert Report of Kenneth Rudo at 2.)

22. In addition, according to plaintiff's natural resource economics expert, Kevin J. Boyle, Ph.D., "it is very likely that the Puerto Rican public holds economic values for uncontaminated groundwater even if there is no use of the water. (O'Reilly Decl., Ex. 10, Feb. 28, 2014, Rebuttal Report to: "Non Site-Specific Expert Report of Dr. William H. Desvousges," Kevin J. Boyle, Ph.D. at 7.)

23. In October, 1980, MTBE released from a Shell gas station contaminated public drinking water supplies in Rockaway, New Jersey. As Curt Stanley, a hydrogeologist employed by Shell Oil Company testified:

> Q: So is it fair to say by 1981 Shell Oil Company knew that MTBE in its gasoline could contaminate public drinking water supplies?
> A: Yes.
> Q: And is it also fair to say that they knew by that time that it created taste and odor problems in public drinking water supplies?
> A: Yes.
> Q: And did you report those facts to Shell management?
> A: Yes.

(Barnhart Decl., Ex.2, Stanley Depo. (May 6, 1999) at 8:15-24.)

24. In 1983, Shell responded to a survey regarding hydrocarbon pollution of groundwater conducted by the American Petroleum Institute (API) by emphasizing that:

> In our spill situation, the MTBE was detectable (by drinking) in 7 to 15 parts per billion so even if it were not a factor to health, it still had to be removed to below the detectable amount in order to use the water.

(O'Reilly Decl., Ex. 10.)

25. Despite this knowledge, Shell was a participant in the MTBE Committee, which was affiliated with the Oxygenated Fuels Association and submitted comments to EPA in response to an EPA notice announcing its intention to designate MTBE for priority testing consideration under TSCA. (Barnhart Decl., Ex. 2, Dominguez Depo. (Sept. 12, 2000) at 155:12-156:2.)

26. Remarkably, Shell permitted these comments to be submitted with the following conclusion: "We believe that the information provided supports the conclusion that MTBE does not represent a drinking water hazard." (O'Reilly Decl., Ex. 10, Feb. 27, 1987, Comments of the MTBE Committee on the Interagency Testing Committee's Recommendations Concerning Methyl Tertiary Butyl Ether at 2.) The Committee also relied upon data from Shell Oil to argue that MTBE has a higher detectability threshold of about 700 ppb in water. (*Id.* at 11.) Shell Oil had an opportunity to review the document and make any changes it saw fit prior to it being sent to the EPA. (Barnhart Decl., Ex. 2, Dominguez Depo. at 139:24-140:5; 148:17-22; 154:16-23; 155:12-156:2.)

Dated: November 7, 2014

Respectfully submitted,

_____
Tracey O'Reilly
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, California 95825

**PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE**

*Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*, United States District Court, Southern District of New York Case No. No. 07 Civ. 10470 (SAS)

  I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action. My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA 95825-4225.

  On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

**PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS REGARDING THE MOTION FOR SUMMARY JUDGMENT OF THE SHELL DEFENDANTS**

  I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

  Executed on November 7, 2014, at Sacramento, California.

_____
TONYA L. ZIMMERMAN